### f.  *ResCap's Near Term Refinancing Needs Trigger Ratings Downgrade*

On April 23, 2008, Moody's downgraded its ratings for both AFI and ResCap. The rating agency lowered AFI's senior rating to B2 from B1, and ResCap to Caa1 from B2. Moody's stated that the ratings would remain on review for a further downgrade. Moody's further reported: "The [AFI] downgrade is based upon Moody's opinion that further operating weakness at ResCap poses risks to [AFI]'s capital position and liquidity that exceed previous estimates." Moody's stated that the ResCap downgrade resulted from the mortgage unit facing significant near-term refinancing needs.[616]

### (1)  *In May 2008/June 2008 ResCap Engaged In A Private Debt Offering, Note Exchange, And Dutch Auction*

On May 5, 2008, ResCap announced that it had commenced accepting offers to exchange certain securities with a total value of $12.8 billion in return for one of two series of ResCap's newly issued notes.[617] Specifically, ResCap offered Senior Secured Notes and Junior Secured Notes in exchange for (1) the Unsecured Notes; and (2) the subordinated notes issued under an indenture dated as of April 17, 2006 (together with the Unsecured Notes, the "Old Notes").

The Senior Secured Notes and Junior Secured Notes issued in connection with the exchange offer were guaranteed by ResCap's subsidiaries and "secured by a security interest in substantially all of ResCap's existing and after-acquired unencumbered assets."[618] Noteholders participating in the exchange offer also had the option of exchanging their Old Notes for cash instead of the Senior Secured Notes or Junior Secured Notes through a modified Dutch Auction.[619]

When ResCap closed the private debt tender and exchange offers on June 6, 2008,[620] ResCap had issued $1.7 billion initial aggregate principal amount of Senior Secured Notes, and $4 billion initial aggregate principal amount of Junior Secured Notes due 2014 in exchange for $2.6 billion of Senior Unsecured Notes due to mature in 2008–2009, and $6 billion of Senior Unsecured Notes that were scheduled to mature in 2010–2015. An additional $1.6 billion of notes scheduled to mature in 2008–2009, and $2.6 billion of notes scheduled to mature in 2010 through 2015, were exchanged for cash. The auction price was $920 per $1,000 principal amount of Senior Secured Notes, and $650 per $1,000 principal

---

[616] Wallace Witkowski, *Moody's Downgrades GMAC, ResCap Ratings*, WALL ST. J. MARKETWATCH, Apr. 23, 2008, http://articles.marketwatch.com/2008-04-23/news/30946308_1_rescap-downgrade-gmac-llc.

[617] *See* ResCap Press Release, *ResCap Commences Private Exchange Offers and Cash Tender Offers for U.S. Dollar Equivalent $14.0 Billion Outstanding Principal Amount of Its Outstanding Debt Securities* (May 5 2008), http://media.ally.com/index.php?s=43&item=232 (quoting *Offering Memorandum and Consent Solicitation Statement*, dated May 5, 2008).

[618] *See id*.

[619] *See id*.

[620] *See* Residential Capital LLC, Current Report (Form 8-K), June 12, 2008, Item 1.01.

amount of Junior Secured Notes.[621] Significantly, amendments effected pursuant to the exchange offer released the subsidiary guarantees of ResCap's obligations under the Old Notes and eliminated certain restrictive covenants and events of default in the indentures governing the Old Notes.[622]

### (2) Additional Related Party Transactions Undertaken To Provide Liquidity And To Prevent Breach Of Tangible Net Worth Covenant

In June 2008, AFI provided a $3.5 billion secured line of credit to ResCap. ResCap utilized $1.75 billion to repay its outstanding unsecured term loan and subsequently utilized the remaining capacity for other operational purposes.[623] In addition, AFI arranged for GMAC CF to provide a servicing advance receivables factoring facility of $600 million.[624]

### (3) Transactions Lead to Further AFI Rating Downgrades

On June 16, 2008, citing ResCap's lack of sufficient committed contingent liquidity, Moody's downgraded AFI to B3 from B2 with a negative outlook due to its exposure to ResCap. Moody's noted that the $3.5 billion credit facility provided by AFI replaced ResCap's committed, undrawn revolving bank credit facilities of $1.75 billion and was likely utilized to pay $900 million of bonds maturing on June 9, 2008, to fund the $1.2 billion modified Dutch auction that was offered as part of the bond exchange, and transfer to AFI/prepay a $1.75 billion bank term loan due in July 2008.[625]

### g. ResCap's Monetization Of Assets Over Time To AFI/Cerberus; Lack Of Marketability For Such Assets Due To Severe Market Dislocation And Disruption During Relevant Time Period

### (1) GMAC CF's Purchases Resort Financing Business

As noted above, in April 2008 there was a failed attempt to sell the Resort Finance business in the open market. On July 2, 2008, ResCap, agreed to sell ResCap's Resort Finance business to GMAC CF.[626]

---

[621] *See id.*

[622] *See id.*, Item 3.03.

[623] *See* Section V.E.3.

[624] *See* Section V.E.4 (discussing the factoring facility).

[625] Sue Chang, *Moody's Cuts GMAC to 'B3'; Outlook Negative*, WALL ST. J. MARKETWATCH, June 16, 2008, http://articles.marketwatch.com/2008-06-16/news/30862108_1_gmac-residential-capital-llc-rescap; *see also Moody's downgrades GMAC on ResCap exposure*, CREDITFLUX, http://www.creditflux.com/Trading/2008-06-16/Moodys-downgrades-GMAC-on-ResCap-exposure/.

[626] *See* Section V.F.4.c (discussing Resort Finance Sale).

The sale was finalized on July 30, 2008 for a purchase price of $96.1 million, and the difference between the deposit amount and the purchase price (or $153.9 million) was returned to AFI. ResCap booked an impairment of $153.9 million for the portion of the deposit returned. [627]

### (2) In June 2008, Cerberus Purchased Certain ResCap Assets[628]

In June 2008, Cerberus arranged to purchase certain assets, including certain model home assets, for approximately $230 million.[629] Ron Kravit, Managing Principal of Cerberus Real Estate, appeared to represent Cerberus interests in the transaction while concurrently serving as a director on the ResCap Board.[630]

In connection with the refinancing, and to reflect the revised business of ResCap, the TNW covenant was reduced from $5.4 billion to $250 million.

---

[627] *See* Section V.F.4.c for a discussion of the Resort Finance Sale.

[628] *See* Section V.F.

[629] *See id.* (discussing the sale to Cerberus). The model home assets on ResCap's balance sheet had been purchased from homebuilders at a discount to appraisal value and then leased back for use as sales models from ResCap. The homebuilder would generally agree to lease the model home for eighteen to twenty four months. ResCap then generally contracted with homebuilders to sell the model homes for which they would pay the homebuilder a commission. This enabled the homebuilder to get cash for the models while still using them to showcase a development.

[630] *See* Letter from Cerberus to ResCap signed on behalf of Cerberus Capital Management by R. Kravit (Sept. 25, 2008) [CERB000009].

## H. FINANCIAL MARKET DISLOCATION AND IMPACT ON RESCAP'S OPERATIONS (AUGUST 2008 THROUGH JANUARY 2009)

### 1. The Period Of August 2008 Through January 2009 Was One Of Momentous Financial Dislocation

The period of August 2008 through January 2009 was a tumultuous one for financial markets in the United States and the rest of the world. Following the seizure by regulators of mortgage bank IndyMac in July 2008,[631] and other events described in Section III.F, the global financial crisis expanded during this period. By September 2008, market concerns in the U.S. over credit quality led hedge funds, pension funds, and institutional investors to begin pulling cash out of investment banks and money market funds; individual investors followed.[632]

As September progressed, consumer and investor confidence were further challenged by a series of high-profile events and increasingly disturbing economic trends.[633] These included the federal takeover of Fannie Mae and Freddie Mac on September 7, 2008,[634] followed the next week by two near simultaneous and momentous announcements: the collapse and

---

[631] *See* FDIC, Press Release, *FDIC Establishes IndyMac Federal Bank, FSB as Successor to IndyMac Bank, F.S.B.* (July 11, 2008), http://www.fdic.gov/news/news/press/2008/pr08056.html.

[632] Joe Nocera, *36 Hours of Alarm and Action as Crisis Spiraled,* N.Y. Times, Oct. 2, 2008, http://www.nytimes.com/2008/10/02/business/worldbusiness/02iht-crisis.1.16638063.html?pagewanted=all&_r=0 ("Since that Monday, big institutional investors—like pension funds and college endowments—had been pulling money out of money funds. On Tuesday, individual investors joined the stampede.").

[633] *See generally* Congressional Oversight Panel, March Oversight Report: Final Report of the Congressional Oversight Panel (Mar. 16, 2011), http://cybercemetery.unt.edu/archive/cop/20110401232213/http://cop.senate.gov/documents/cop-031611-report.pdf.

[634] In July 2008, following sharp declines in the share prices of Fannie Mae and Freddie Mac, U.S. Treasury announced its intention to seek approval from Congress to increase the lines of credit available to the GSEs and, if necessary, to purchase stock of the GSEs. *See* U.S. Treasury, Press Release, *Paulson Announces GSE Initiatives* (July 13, 2008), http://www.treasury.gov/press-center/press-releases/Pages/hp1079.aspx. Also in July, as the GSE share prices plummeted and fears of a liquidity crunch in the mortgage sector increased, the FRB voted to give Freddie Mac and Fannie Mae access to its discount window. *See* FRB, Press Release, *Board Grants Federal Reserve Bank of New York Authority to Lend to Fannie Mae and Freddie Mac* (July 13, 2008), http://www.federalreserve.gov/newsevents/press/other/20080713a.htm. On September 7, 2008, the newly created FHFA placed both Freddie Mac and Fannie Mae into conservatorship. *See* U.S. Treasury, Press Release, *Statement of FHFA Director James B. Lockhart* (Sept. 7, 2008), http://www.treasury.gov/press-center/press-releases/Documents/fhfa_statement_090708hp1128.pdf. At the same time, the U.S. Treasury announced that it had entered into preferred stock purchase agreements with the GSEs in order to avoid triggering mandatory receiverships, and that it had established a new secured lending facility to serve as the "ultimate liquidity backstop" for the GSEs. *See* U.S. Treasury, Press Release, *Statement by Secretary Henry M. Paulson, Jr. on Treasury and Federal Housing Finance Agency Action to Protect Financial Markets and Taxpayers* (Sept. 7, 2008), http://www.treasury.gov/press-center/press-releases/Pages/hp1129.aspx. Such explicit government backing of the GSEs was unprecedented. *See generally* U.S. Treasury, *Fact Sheet: Treasury Senior Preferred Stock Purchase Agreement* (Sept. 7, 2008), http://www.fhfa.gov/webfiles/23896/pspa_factsheet_090708%20.pdf (noting that prior to this initiative ambiguities in the Congressional charters of the GSEs "created a perception of government backing").

III-119

bankruptcy of Lehman Brothers on September 15, 2008,[635] and the government "bailout" of AIG on September 16, 2008.[636] On the same day that Lehman sought protection under the Bankruptcy Code, Merrill Lynch avoided a similar fate only by agreeing to be purchased by Bank of America,[637] and the next day several money market funds announced that they had "broken the buck."[638] Following those developments, the week of October 6, 2008 was the worst for U.S. stock markets in decades.[639]

Meanwhile, by October 2008 housing prices were down approximately 20 percent from their peak in 2006,[640] and U.S. unemployment rates were rising sharply—from 6.1 percent in August 2008 to 7.8 percent in January 2009.[641]

---

[635] *See* Joe Nocera, *36 Hours of Alarm and Action as Crisis Spiraled*, N.Y. TIMES, Oct. 2, 2008, http://www.nytimes.com/2008/10/02/business/worldbusiness/02iht-crisis.1.16638063.html?pagewanted=all&_r =0. The Lehman bankruptcy has deservedly been called "one of the signal events of the financial crisis." *The Orderly Liquidation of Lehman Brothers Holdings Inc, under the Dodd Frank Act*, FDIC QUARTERLY, Vol. 5, No. 2, 2011, at 1, https://www.fdic.gov/bank/analytical/quarterly/2011_vol5_2/lehman.pdf.

[636] *See, e.g.*, FRB, Press Release, *Federal Reserve Board, With Full Support of the Treasury Department, Authorizes the Federal Reserve Bank of New York to Lend Up to $85 billion to the American International Group* (Sept. 16, 2008), http://www.federalreserve.gov/newsevents/press/other/20080916a.htm. Ultimately, federal support of AIG would include lending it an additional $37.8 billion, as well as government support under TARP. *See* CONGRESSIONAL OVERSIGHT PANEL, JUNE OVERSIGHT REPORT: THE AIG RESCUE, ITS IMPACT ON MARKETS, AND THE GOVERNMENT'S EXIT STRATEGY (June 10, 2010), at 65, 68, 228, http://cybercemetery.unt.edu/archive/cop/20110402010341/ http://cop.senate.gov/documents/cop-061010-report.pdf.

[637] *See* Bank of America, Press Release, *Bank of America Buys Merrill Lynch Creating Unique Financial Services Firm* (Sept. 15, 2008), http://newsroom.bankofamerica.com/press-release/corporate-and-financial-news/bank-america-buys-merrill-lynch-creating-unique-financial. With the encouragement of the FRB, that transaction closed in 2009. *See* FRB, Press Release, *Testimony of Chairman Ben S. Bernanke Before the Committee on Oversight and Government Reform, U.S. House of Representatives* (June 25, 2009), http://www.federalreserve.gov/newsevents/testimony/bernanke20090625a.htm.

[638] Joe Nocera, *36 Hours of Alarm and Action as Crisis Spiraled*, N.Y. TIMES, Oct. 2, 2008, http://www.nytimes.com/2008/10/02/business/worldbusiness/02iht-crisis.1.16638063.html?pagewanted=all&_r=0. In addition, on September 18, 2008, there was a run on the Putnam Prime Money Fund that caused Putnam to shutter it. *See id.* The FRB opened the discount window to money market funds for borrowings, and Britain's Financial Services Authority banned short selling of 29 financial stocks for thirty days, with the SEC placing similar restrictions on 799 financial stocks. *See id.*

[639] *See* Vikas Bajaj, *Whiplash Ends a Roller Coaster Week*, N.Y. TIMES, Oct. 11, 2008, http://www.nytimes.com/2008/10/11/business/11markets.html?_r=1&pagewanted=print&.

[640] STANDARD & POOR'S, S&P/CASE SHILLER HOME PRICE INDICES 2008, A YEAR IN REVIEW (Jan. 13, 2009), at 13, http://www.standardandpoors.com/servlet/BlobServer?blobheadername3=MDT-Type&blobcol=urldata &blobtable=MungoBlobs&blobheadervalue2=inline%3B+filename%3DCase-Shiller_Housing_Whitepaper_ YearinReview%2C0.pdf&blobheadername2=Content-Disposition&blobheadervalue1=application% 2Fpdf&blobkey =id&blobheadername1=content-type&blobwhere=1243618038238&blobheadervalue3=UTF-8.

[641] U.S. DEPARTMENT OF LABOR, BUREAU OF LABOR STATISTICS, LABOR FORCE STATISTICS FROM THE CURRENT POPULATION SURVEY, http://data.bls.gov/timeseries/LNS14000000 (unemployment rate from 2003–2013).

Seeking to stem the worsening economic disaster, U.S. Treasury Secretary Paulson and FRB Chairman Bernanke proposed the rapid adoption and implementation of a program of government support, stating on September 18, 2008: "If we don't do this, we may not have an economy on Monday."[642] While initially hesitant,[643] following the President's urging,[644] the U.S. Congress passed the $700 billion TARP on October 3, 2008, and the President signed the bill that day.[645] As summarized in a report prepared (with the benefit of hindsight) by the Congressional Oversight Panel established pursuant to the same act that created TARP:

> In September, the housing bubble, the liquidity crunch, and the financial crisis culminated in a string of unprecedented events and government interventions that took place over a 19-day stretch. During this period, Fannie Mae and Freddie Mac were placed into conservatorship, Lehman Brothers filed for bankruptcy, the Federal Reserve initiated an $85 billion government rescue of American International Group (AIG), Treasury announced a temporary guarantee of the $3.7 trillion money market funds (MMFs), and the FDIC steered Washington Mutual through the largest bank failure in U.S. history. By the beginning of October 2008, the value of the stock market had declined by nearly 20 percent from its level in January of that year, losing 10 percent in September alone.[646]
>
> *       *       *
>
> In response to rapidly deteriorating financial market conditions, Congress passed and the President signed into law the Emergency Economic Stabilization Act of 2008 (EESA) on

---

[642] *See* Joe Nocera, *36 Hours of Alarm and Action as Crisis Spiraled*, N.Y. Times, Oct. 2, 2008, http://www.nytimes.com/2008/10/02/business/worldbusiness/02iht-crisis.1.16638063.html?pagewanted=all&_r=0.

[643] Initially, Congress rejected the TARP proposal, complaining that members did not have sufficient time to fully review it. *See id.; see also* U.S. Treasury, Press Release, *Statement by Secretary Henry M. Paulson, Jr. on Emergency Economic Stabilization Act Vote* (Sept. 29, 2008), http://www.treasury.gov/press-center/press-releases/Pages/hp1168.aspx.

[644] Executive Office of the President, Statement of Administration Policy on H.R. 1424, Oct. 3, 2008, http://www.whitehouse.gov/sites/default/files/omb/assets/omb/legislative/sap/110-2/saphr1424-h2.pdf.

[645] TARP was created pursuant to the Emergency Economic Stabilization Act of 2008, Pub. L. No. 110-343, 122 Stat. 3765 (2008); *see also* U.S. Treasury, Press Release, *Paulson Statement on Emergency Economic Stabilization Act* (Oct. 3, 2008), http://www.treasury.gov/press-center/press-releases/Pages/hp1175.aspx.

[646] Congressional Oversight Panel, March Oversight Report: The Final Report of the Congressional Oversight Panel (Mar. 16, 2011), at 21, http://cybercemetery.unt.edu/archive/cop/20110401232213/http://cop.senate.gov/documents/cop-031611-report.pdf (citations and references omitted).

October 3, 2008, creating the Troubled Asset Relief Program
(TARP). The Act was intended to "immediately provide
authority and facilities that the Secretary of the Treasury can use
to restore liquidity and stability to the financial system of the
United States" and "to ensure that such authority and such
facilities are used in a manner that protects home values, college
funds, retirement accounts, and life savings; preserves
homeownership and promotes jobs and economic growth;
maximizes overall returns to the taxpayers of the United States;
and provides public accountability for the exercise of such
authority."[647]

\*        \*        \*

The law–EESA–authorized the Treasury Secretary to purchase
not only mortgage-related securities under the TARP, but also
"any other financial instrument" the purchase of which the
Secretary determined to be "necessary to promote financial
market stability."[648]

The Congressional Oversight Panel observed that "[a]lthough the federal government has
intervened to rescue financial institutions and prevent bank runs on several previous occasions
in U.S. history, the scale and breadth of the financial rescue authorized in EESA was
unprecedented."[649] And, indeed, less than two weeks after passage of TARP, the U.S.
Treasury announced that "to restore confidence and stability to our financial markets and get
credit flowing again," it would "purchase equity stakes in a wide array of banks and thrifts."[650]
Initially, Secretary Paulson noted that the U.S. Treasury would make some $250 billion
available to such institutions in the form of preferred stock purchases.[651]

---

[647] *Id.* at 13.

[648] *Id*. at 22.

[649] *Id*.

[650] U.S. Treasury, Press Release, *Statement by Secretary Paulson on Actions to Protect the U.S. Economy*
(Oct. 14, 2008), http://www.treasury.gov/press-center/press-releases/Pages/hp1205.aspx; *see also* U.S.
Treasury, Press Release, *Joint Statement by Treasury, Federal Reserve and FDIC* (Oct. 14, 2008), http://
www.treasury.gov/press-center/press-releases/Pages/hp1206.aspx.

[651] U.S. Treasury, Press Release, *Statement by Secretary Paulson on Actions to Protect the U.S. Economy*
(Oct. 14, 2008), http://www.treasury.gov/press-center/press-releases/Pages/hp1205.aspx.

Those institutions, which ultimately would include AFI, initially consisted of: (1) four commercial banks—JP Morgan, Bank of America, Citibank, and Wells Fargo; (2) three investment banks—Goldman Sachs, Morgan Stanley, and Merrill Lynch; and (3) two custodian banks—State Street and BNY Mellon.[652] On October 28, 2008, these institutions received an aggregate infusion of $125 billion in TARP funds in exchange for preferred stock.[653]

Less than a week after passage of TARP, central banks worldwide announced a coordinated rate cut.[654] Two days later, and following a meeting of the G7 central bankers and finance ministers, Secretary Paulson released a statement concerning further coordinated efforts to address domestic and worldwide financial dislocations, pointing specifically to the role of the housing and mortgage markets:

> Global financial market conditions are severely strained. In the United States, our economy has been facing a prolonged period of uncertainty and our financial markets are experiencing unprecedented and extraordinary challenges. A root cause of this situation is the housing correction and a lack of confidence in mortgage assets, as well as a lack of confidence in many of the financial institutions that hold these assets.[655]

Secretary Paulson's description and the foregoing summary of events only scratch the surface of the extent of the emerging financial market dislocations (and government/regulatory efforts to address them) in the Fall and Winter of 2008. Indeed, the history is still being written.[656] The Examiner relies here on reports of the Congressional Oversight Panel not

---

[652] *See* CONGRESSIONAL OVERSIGHT PANEL, MARCH OVERSIGHT REPORT: THE FINAL REPORT OF THE CONGRESSIONAL OVERSIGHT PANEL (Mar. 16, 2011), at note 41 and accompanying text, http://cybercemetery.unt.edu/archive/cop/20110401232213/http://cop.senate.gov/documents/cop-031611-report.pdf. Applications by Morgan Stanley and Goldman Sachs to become bank holding companies had been approved by the FRB on September 21, 2008. *See* FRB, Press Release, *Order Approving Formation of Bank Holding Companies* (Sept. 21, 2008), http://federalreserve.gov/newsevents/press/orders/orders20080922a1.pdf; FRB, Press Release, *Order Approving Formation of Bank Holding Companies and Notice to Engage in Certain Nonbanking Activities* (Sept. 21, 2008), http://federalreserve.gov/newsevents/press/orders/orders20080922a2.pdf.

[653] CONGRESSIONAL OVERSIGHT PANEL, MARCH OVERSIGHT REPORT: THE FINAL REPORT OF THE CONGRESSIONAL OVERSIGHT PANEL (Mar. 16, 2011), at 23, http://cybercemetery.unt.edu/archive/cop/20110401232213/http://cop.senate.gov/documents/cop-031611-report.pdf (citations omitted).

[654] *See Fed, European Banks Coordinate Interest Rate Cut*, PBS NEWSHOUR, Oct. 8, 2008, http://www.pbs.org/newshour/updates/business/july-dec08/ratecut_10-08.html.

[655] U.S. Treasury, Press Release, *Statement by Secretary Henry M. Paulson, Jr. Following Meeting of the G7 Finance Ministers and Central Bank Governors* (Oct. 10, 2008), http://www.treasury.gov/press-center/press-releases/Pages/hp1194.aspx.

[656] *See, e.g.*, ALAN S. BLINDER, AFTER THE MUSIC STOPPED: THE FINANCIAL CRISIS, THE RESPONSE, AND THE WORK AHEAD (Penguin Press 2013).

to express agreement or disagreement with the conclusions of that body, but rather as a convenient compendium of certain relevant facts and observations constituting the backdrop for the AFI-ResCap narrative in this timeframe.

Other notable developments forming that backdrop in the period of August 2008 through January 2009 include the following:

- The FRB's announcement on October 7, 2008 of its new Commercial Paper Funding Facility, to provide a liquidity "backstop" to non-financial sector companies.[657] It was reported that as much as $1.3 trillion of commercial paper would be eligible for financing under this facility.[658] Ultimately this facility's purchases aggregated to approximately $738 billion.[659]

- The acquisition by Wells Fargo of Wachovia Bank on October 12, 2008.[660]

- By the third quarter of 2008, commercial real estate market lending and securitizations had all but dried up.[661]

- The U.S. Treasury's announcement in November and December 2008 that in addition to the TARP investments noted above, it would make additional investments in Citigroup and Bank of America preferred shares, and the joint announcement by the U.S. Treasury, the FRB, and the FDIC in November 2008 of a $301 billion guarantee of Citibank assets.[662]

---

[657] *See* FRB, Press Release, *Board Announces Creation of the Commercial Paper Funding Facility (CPFF)* (Oct. 7, 2008), http://federalreserve.gov/newsevents/press/monetary/20081007c.htm.

[658] *See, e.g.,* Mark Felsenthal & Glenn Somerville, *Fed Creates Facility to Buy Commercial Paper*, REUTERS, Oct. 7, 2008, http://www.reuters.com/article/2008/10/07/us-financial-fed-paper-idUSTRE4964S420081007.

[659] *See* FRB, Press Release, *Commercial Paper Funding Facility* (Dec. 13, 2012), http://www.federalreserve.gov/newsevents/reform_cpff.htm (follow embedded links to data). AFI sold approximately $10.5 billion dollars of commercial paper to the CPFF, beginning on or about October 28, 2008, and concluding on January 29, 2009. *See id.*; *see also* Greg Bensinger & Ari Levy, *GMAC Says Fed Grants Access to Commercial-Paper Plan,* BLOOMBERG, Oct. 28, 2008, http://www.bloomberg.com/apps/news?pid=newsarchive&sid=ahh__3XylWUE (quoting de Molina as having said "the company has 'limited if any access to funding' for its mortgage and auto-lending units").

[660] *See* FRB, Press Release, *Approval of Proposal by Wells Fargo & Company to Acquire Wachovia Corporation* (Oct. 12, 2008), http://federalreserve.gov/newsevents/press/orders/20081012a.htm.

[661] *See* PRUDENTIAL REAL ESTATE INVESTORS, U.S. QUARTERLY MARKET PERSPECTIVE (Oct. 2008), at 2, http://www2.prudential.com/o&s/prei.nsf/14ef712a6b099d9d852566ef005111d0/1b5ef60e780618d1852574f100679b91/$FILE/Pru_US_3Q08.pdf ("The commercial MBS market is for all intents and purposes closed. Only $12.1 billion of CMBS has been issued in the United States so far this year, none in the third quarter.").

[662] *See* CONGRESSIONAL OVERSIGHT PANEL, MARCH OVERSIGHT REPORT: THE FINAL REPORT OF THE CONGRESSIONAL OVERSIGHT PANEL (Mar. 16, 2011), at notes 37, 38 and accompanying text, http://cybercemetery.unt.edu/archive/cop/20110401232213/http://cop.senate.gov/documents/cop-031611-report.pdf.

- The distribution of $33.6 billion of TARP funds to 21 smaller and regional banks.[663]

- In December 2008, the National Bureau of Economic Research declared that the U.S. had entered recession in December 2007.[664]

- For the full year ended December 2008, there were over 3 million real property foreclosures in the U.S., an 81% increase over the previous year.[665]

- The announcement by the U.S. Treasury on December 19, 2008, of loans to GM and Chrysler in the amounts of $13.4 billion and $4 billion, respectively.[666]

   *2. ResCap Board Membership Was Stable During This Period*

   In contrast to the period addressed in Section III.G (during which ResCap Board member Paul Bossidy resigned, Independent Directors Thomas Melzer and Thomas Jacob resigned, Edward Smith and Karen Hirtler-Garvey were appointed separately as new Independent Directors, and Thomas Marano and Joshua Weintraub were installed as directors), during the period of August 2008 through January 2009 there were no changes to the membership of ResCap's Board, although Jim Jones' resignation as President and CEO, and the appointment to those roles of Marano, occurred just prior, at the end of July 2008. During August 2008 through January 2009 the ResCap Board consisted of the following members:

- Marano: ResCap Chairman, President, and CEO. Until April 2009, Marano remained a Cerberus employee. He maintained an office at Cerberus, and his salary was paid by Cerberus while he was on secondment to ResCap.[667] Thereafter, from May 2009 to May 2012, he was also the Chief Capital Markets Officer and Chief Mortgage Officer of AFI.

---

[663] *See* Greg Robb, *Treasury Gives $33.6 Billion to 21 Banks*, WALL ST. J. MARKET WATCH, Nov. 17, 2008, http://articles.marketwatch.com/2008-11-17/news/30801650_1_suntrust-banks-bb-t-corp-publicly-traded-banks. As of January 30, 2009, all of but approximately $70 billion of the $301 billion TARP program to date had been distributed to just thirteen recipients. These were: Citigroup, Bank of America, JP Morgan, Wells Fargo, Goldman Sachs, Merrill Lynch, Morgan Stanley, Bank of New York, State Street, GM, Chrysler, Chrysler Financial, and AFI. *See* CONGRESSIONAL OVERSIGHT PANEL, MARCH OVERSIGHT REPORT: THE FINAL REPORT OF THE CONGRESSIONAL OVERSIGHT PANEL (Mar. 16, 2011), at note 41 and accompanying text, http://cybercemetery.unt.edu/archive/cop/20110401232213/http://cop.senate.gov/documents/cop-031611-report.pdf.

[664] NATIONAL BUREAU OF ECONOMIC RESEARCH, DETERMINATION OF THE DECEMBER 2007 PEAK IN ECONOMIC ACTIVITY (Dec. 11, 2008), http://www.nber.org/dec2008.pdf.

[665] RealtyTrac Staff, *Foreclosure Activity Increases 81 Percent In 2008*, REALTYTRAC, Jan. 15, 2009, http://www.realtytrac.com/content/press-releases/foreclosure-activity-increases-81-percent-in-2008-4551.

[666] *See* U.S. Treasury, Press Release, *Secretary Paulson Statement on Stabilizing the Automotive Industry* (Dec. 11, 2008), http://www.treasury.gov/press-center/press-releases/Pages/hp1332.aspx; *see also Indicative Summary of the Terms for the Secured Loan Facility*, (Dec. 19, 2008) (GM term sheet), http://www.treasury.gov/press-center/press-releases/Documents/gm%20final%20term%20_%20appendix.pdf; *Indicative Summary of the Terms for the Secured Loan Facility*, (Dec. 19, 2008) (Chrysler Holding LLC term sheet), http://www.treasury.gov/press-center/press-releases/Documents/chrysler%20final%20term%20_%20appendix.pdf.

[667] Int. of T. Marano, Nov. 26, 2012, at 9:11–23, 194:24–195:6.

- James Young: ResCap CFO.

- David DeBrunner: AFI Chief Accounting Officer and Controller.

- Karin Hirtler-Garvey: ResCap Independent Director. Hirtler-Garvey became an employee of Ally Bank in May of 2009, and later joined AFI.

- Ronald Kravit: Cerberus partner.

- Alvaro de Molina: AFI CEO. De Molina resigned from the ResCap Board in March 2009.[668]

- Edward Smith, III: ResCap Independent Director.

- David Walker: AFI Treasurer.

- Joshua Weintraub: ResCap Vice Chairman, Cerberus partner.

- Catherine Dondzila: ResCap Chief Accounting Officer and Controller.

### 3. ResCap's Liquidity And TNW Covenants Concerns Continue

The broad market dislocations presented growing challenges to the businesses of AFI and ResCap in this period. In the second quarter 2008 earnings conference call on July 31, 2008, AFI's CFO observed that the worsening economy and its effect on the auto industry and the mortgage industry were "the perfect storm for our business and we see no meaningful sign of it blowing over."[669] Indeed, AFI finished the second quarter of 2008 with a consolidated loss of $2.5 billion[670]—$1.9 billion of which came from ResCap (as compared to a loss of $254 million for the same quarter a year earlier).[671] At the end of the third quarter of 2008, the loss figures were flat: $2.5 billion loss for AFI[672] and $1.9 billion loss for ResCap.[673] While AFI

---

[668] Although de Molina recalled that he resigned from the ResCap Board when he became CEO of AFI (in April 2008), Int. of A. de Molina, Nov. 20, 2012, at 112:5–113:7, that recollection seems incorrect, as minutes reflect that he was a member of ResCap's Board through March 23, 2009, at which meeting Anthony Renzi became a member of ResCap's Board. *See* Minutes of a Special Meeting of the Board of Residential Capital, LLC, Mar. 23, 2009, at RC40006091–92 [RC40005949]. ResCap Board meeting minutes from this period reflect that de Molina was often not in attendance, but that was not always the case. *See, e.g.*, Minutes of a Special Meeting of the Board of Residential Capital, LLC, Oct. 28, 2008, at RC40005894–96 [RC40005652] (recording that de Molina briefed the ResCap Board regarding "pending strategic initiatives that are being pursued by [AFI]," including its application under the Bank Holding Company Act, and efforts to access TARP).

[669] Transcript of GMAC Q2 2008 Earnings Call (July 31, 2008), at 2 (available from Bloomberg Transcript).

[670] *See id.*

[671] *See* Residential Capital, LLC, Quarterly Report (Form 10-Q) (Aug. 8, 2008), at 4.

[672] *See* Transcript of GMAC Q3 2008 Earnings Call (Nov. 5, 2008), at 2 (available from Bloomberg Transcript).

[673] *See* Residential Capital, LLC, Quarterly Report (Form 10-Q) (Nov. 10, 2008), at 4.

reported a profit of $7.5 billion for the fourth quarter of 2008 (largely arising from a debt exchange and cash tender and the benefit of an infusion of TARP funds),[674] ResCap reported a loss of $981 million.[675] For the entire 2008 year, AFI reported a profit of $1.9 billion (compared to $2.3 billion loss in 2007),[676] and ResCap finished 2008 with a loss of $5.6 billion (compared to a loss of $4.3 billion in 2007).[677]

As of September 1, 2008, AFI had a Moody's credit rating of B3 (negative outlook) and ResCap's was Ca (under review). On October 30, 2008, AFI was downgraded by Moody's to Caa1 (under review). Then, on November 20, 2008, Moody's further downgraded AFI's unsecured debt to C, and downgraded ResCap to C as well.[678]

For ResCap, the period of August 2008 through January 2009 was one of continuing concerns about liquidity and the ability to satisfy TNW covenants. ResCap and its parent company engaged in multiple "fire drills,"[679] and ResCap was reliant on AFI for liquidity and capital support, as projections repeatedly pointed to imminent TNW covenant violations.[680] Marano is reported as having said in a meeting with the company's financial and legal advisors that ResCap was "simply not able to take advantage of market opportunities due to lack of capital."[681] He stated, however, that ResCap was always capitalized sufficiently to avoid covenant violations.[682]

---

[674] *See* Transcript of GMAC Q4 2008 Earnings Call (Feb. 3, 2009), at 2 (available from Bloomberg Transcript); *see also* GMAC LLC, Annual Report (Form 10-K) (Feb. 27, 2009), at 29 ("The 2008 results were primarily driven by a fourth quarter private debt exchange and cash tender offers that resulted in a $11.5 billion pretax gain on extinguishment of debt. The majority of the gain was offset by losses experienced by ResCap and our Global Automotive Finance operations as adverse market conditions continued to persist, both domestically and internationally.").

[675] *See* Residential Capital, LLC, Current Report (Form 8-K) (Feb. 3, 2009), Ex. 99.1.

[676] *See* GMAC LLC, Annual Report (Form 10-K) (Feb. 27, 2009), at 107.

[677] *See* Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2009), at 119.

[678] ResCap's credit rating would never recover to a level above Ca. Moody's historical data for AFI and ResCap are available to registered users at http://www.moodys.com.

[679] Int. of L. Hall, Nov. 29, 2012, at 41:21–25 ("I would have loved to say there was a lot of planning for the future going on, but I think a lot of it was we were trying to address fire drills all throughout 2008 and the capital needs.").

[680] As addressed in Section VI, the Examiner concludes that the evidence supports the proposition that ResCap was balance sheet insolvent as of December 31, 2007, and remained so through the Petition Date. In addition, the Examiner concludes that the evidence supports the proposition that ResCap was left with unreasonably small capital not later than August 15, 2007, and that this remained the case through the Petition Date.

[681] Minutes of an Executive Session of the Board of Residential Capital, LLC, Sept. 23, 2008, at RC40006865 [RC40006865].

[682] Int. of T. Marano, Nov. 26, 2012, at 114:17–20 ("I always wanted more capital so we could grow the business. But we had enough capital according to our debt covenants, so we were okay.").

As further addressed below in this Section, the ResCap Board was advised during this period that ResCap was operating in the "zone of insolvency."[683] Both ResCap and AFI focused explicitly and repeatedly on the questions of whether and when ResCap should file for bankruptcy, particularly at and after the end of the third quarter. As officials from AFI candidly acknowledged, in November 2008 the survival of both companies was in serious question.[684] And various officials from both companies recognized that ResCap became during this period (if not sooner) dependent upon AFI[685]—its "lender of last resort"[686]—for its own survival. However, December 2008 culminated in AFI's successful conversion to a bank holding company and, concomitant with that, the injection by the U.S. Government of $5 billion in capital into AFI pursuant to the EESA. AFI's own survival made it possible for AFI to continue to provide a degree of financial support for ResCap.

Finally, effective January 30, 2009, AFI exercised the option to convert its ResCap Preferred Interests to IB Finance Preferred Interests, and AFI purchased from ResCap all of its remaining IB Finance Class M Shares. As a result, AFI (through IB Finance) became the sole owner of Ally Bank, and embarked upon a plan to grow its deposits.[687]

During this period, there were multiple inter-company assets sales, multiple instances of inter-company debt forgiveness and other capital contributions, and the establishment of a new inter-company financing facility. AFI's Lara Hall explained that while "cash contributions" could supply liquidity as well as address TNW issues, AFI recognized that "we'd never be able to get it back out," so "we chose to put a financing facility in place [if] . . . it was a liquidity need, not a tangible net worth need."[688] Significant transactions during this period are highlighted in the following discussion.

---

[683] *See* Minutes of an Executive Session of the Board of Directors of Residential Capital, LLC, Sept. 23, 2008, at RC40006865 [RC40006865].

[684] *See* Int. of R. Hull, Feb. 7, 2013, at 142:24–25 ("[I]n November of '08 . . . we didn't know that we'd survive at [AFI] . . . .").

[685] *See, e.g.*, *id*. at 140:18–141:12; Int. of T. Marano, Nov. 26, 2012, at 59:5–16.

[686] *See, e.g.*, Int. of J. Lombardo, Sept. 17, 2012, at 145:15–17; Int. of D. Walker, Nov. 28, 2012, at 274:6–8; Int. of C. Pinkston, Nov. 8, 2012, at 93:1–4; Int. of L. Gray, Mar. 7, 2013, at 52:19–24; Int. of R. Hull, Feb. 7, 2013, at 73:20–74:19, 141:23–142:10; Int. of T. Marano, Feb. 27, 2013, at 189:5–12; *see also* Int. of S. Preston, Jr. (Goldin Associates), Feb. 15, 2013, at 41:14–22.

[687] *See* Section V.A.1.c (examining the 2009 Bank Transactions in detail).

[688] Int. of L. Hall, Nov. 29, 2012, at 110:21–111:1.

### 4. *ResCap Streamlines Its Business, Experiences Liquidity And Capital Challenges, And Engages In Multiple Inter-Company Transactions With AFI*

Marano's plans for restructuring ResCap, which had been in development since on or about July 25, 2008,[689] were approved by the ResCap Board on August 27, 2008.[690] At that meeting, the ResCap Board reviewed materials summarizing Marano's intention to focus ResCap's business on originating and servicing conforming mortgages, while shedding much of the company's business lending and international operations.

The restructuring was publicly announced on September 3, 2008.[691] The salient features of this "remediation plan"[692] were: closure of all 200 GMAC Mortgage retail offices; ceasing originations through the Homecomings Financial wholesale broker channel; and further curtailing business lending and international business activities.[693] ResCap also announced that it was "evaluating strategic alternatives for the GMAC Home Services business and the non-core servicing business."[694] Implementation of these decisions was said to implicate the elimination of approximately 5,000 employee jobs—3,000 immediately, and 2,000 more by the end of the year.[695]

---

[689] *See* Presentation to ResCap Board, dated Aug. 21, 2008, at RC40008455 [RC40008442] (schedule for restructuring).

[690] *See* Minutes of a Meeting of the Board of Residential Capital, LLC, Aug. 27, 2008, at RC40005846–47 [RC40005652].

[691] Residential Capital, LLC, Current Report (Form 8-K) (Sept. 3, 2008), Ex. 99.1 ("GMAC Financial Services and ResCap Announce Further Streamlining of Mortgage Operations").

[692] Int. of T. Marano, Nov. 26, 2012, at 42:3–44:18.

[693] *See* Residential Capital, LLC, Current Report (Form 8-K) (Sept. 3, 2008), Ex. 99.1.

[694] *See id.* At the August 27, 2008 ResCap Board meeting, approval was obtained by management to sell "AFI Home Services" (consisting of AFI Home Services, LLC and GHS Global Relocation U.K. Limited), real-estate brokerage, and relocation subsidiaries of Debtors' Residential Finance Group, to a third party. The minutes reflect Marano's advice to the ResCap Board that the business was unprofitable, and that it was more cost-effective to sell it than to incur shutdown costs. Houlihan Lokey assisted in finding the buyer. This deal was not consummated, however, until November 14, 2008, as noted below. *See* Minutes of a Meeting of the Board of Residential Capital, LLC, Aug. 27, 2008, at RC40005844–46 [RC40005652].

[695] *See* Residential Capital, LLC, Current Report (Form 8-K) (Sept. 3, 2008), Ex. 99.1. In 2009, Debtors reported that the actual reduction in force pursuant to this initiative was 3,300 employees (37%), with an additional 500 notified of terminations effective in the first quarter of 2009. A further 1,000 employees were transferred in connection with Debtors' sale of AFI Home Services to a third party in November 2008. ResCap estimated annual cost reductions of $625 million from the workforce reduction. *See* Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2009), at 55.

At the same time, ResCap affirmed its intention to continue originating conforming products through its direct lending centers and Ally Bank correspondents, and to maintain its servicing business:

> ResCap will continue to originate loans in the U.S. and internationally where there is a secondary market to sell the loans. The company will originate products through its correspondent and direct lending channels. ResCap's commitment to servicing loans is unchanged by the actions announced today, and the company will continue to expand and enhance its industry-leading servicing platform, including further development of high-touch special servicing operations to help preserve homeownership and support investors that own distressed and special situation loan portfolios.[696]

Origination and servicing of mortgage loans was described to the Examiner's Professionals as the remaining "core" business of ResCap,[697] and the conforming agency products as "the core of the core."[698]

The ResCap Board met frequently during this period, as liquidity and TNW continued to be topics of concern. At the September 12, 2008 meeting of ResCap's Audit Committee, the members (consisting of the two Independent Directors, Smith and Hirtler-Garvey, together with DeBrunner, who was AFI's Chief Accounting Officer) delegated to the entire ResCap Board future discussion of ResCap's liquidity.[699] In a presentation to the ResCap Board distributed in advance of its September 23, 2008 meeting, bankruptcy specialists from Lazard and Skadden observed that "ResCap faces a challenging operating and liquidity situation," with liquidity expected to be depleted by mid-November.[700]

The ultimate transfer of ResCap's interest in Ally Bank, as mentioned, occurred at the end of January 2009. But consideration of such a transaction (in various forms) began at the ResCap Board level as early as September 2008, in the course of addressing ResCap's TNW

---

[696] *See* Residential Capital, LLC, Current Report (Form 8-K) (Sept. 3, 2008), Ex. 99.1. Debtors also continued on a limited basis to provide warehouse lending to other mortgage originators through Ally Bank. *See* Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2009), at 53.

[697] *See, e.g.*, Int. of J. Young, Sept. 28, 2012, at 30:20–24 ("This is the core mortgage business, which is you originate loans with the intent to sell. And you sell the loans primarily in securitizations and you retain the servicing because your primary business is you have the servicing platform.").

[698] *Id.* at 120:11.

[699] *See* Minutes of Residential Capital, LLC, Audit Committee Meeting, Sept. 12, 2008, at RC40005407, RC40005410 [RC40005375].

[700] Draft Skadden and Lazard Project Scout Presentation, dated Sept. 2008, at RC40008640 [RC40008601]. It appears that this presentation was distributed to the following AFI personnel, all of whom also attended the September 23, 2008, ResCap Board meeting by telephone: DeBrunner (AFI Controller; also ResCap Director); de Molina (AFI CEO; also ResCap Director); Walker (AFI Treasurer; also ResCap Director); Hull (AFI CFO); Solomon (AFI General Counsel); and Ramsey (AFI Chief Risk Officer). *See id.* at RC40008601 (distribution list); *see also* Agenda, Residential Capital, LLC, Sept. 23, 2008, at RC40006954–55 [RC40006934] (annotated); Minutes of a Special Meeting of the Board of Residential Capital, LLC, Sept. 23, 2008, at RC40005872 [RC40005652] (attendance list).

covenant as of September 30, 2008.[701] The notion of ResCap selling its stake in Ally Bank to AFI was first brought to the attention of the ResCap Board by Young on September 12, 2008, as one of a variety of "strategic alternatives / liquidity initiatives."[702] Presentation papers advised that ResCap, AFI, and Ally Bank had "formed a cross-functional team to review the potential sale."[703] The presentation identified "several benefits for ResCap" of such a sale, namely:

- A sale would generate cash that could be redeployed into other operations.

- The sale would have a significant positive impact on ResCap's minimum net worth covenant, as ResCap's investment in the bank is subtracted from total ResCap net worth under the covenant.[704]

This initial brief presentation also identified factors "[o]ffsetting these positives," namely, that "a sale of the bank would reduce ResCap's long-term earnings and cash generation power."[705] The ResCap Board minutes noted that a more complete update of any such transaction would be provided at a future meeting.[706] Although no minutes were kept, the potential transaction was also addressed in an executive session on September 12, 2008, after which Young wrote: "Board did decide to go for two fairness opinions on the transaction and no valuation of the bank."[707]

At its September 19, 2008 meeting, the ResCap Board heard a presentation from Young on "the timing of the potential sale of ResCap's stake in [Ally] Bank."[708] At this stage, the minutes reflect that at least three potential structures for the transaction were under

_____

[701] The September 23, 2008 Skadden and Lazard presentation stated: "A proposed resolution to the CTNW covenant issue entails selling ResCap's equity position in [Ally] Bank to [AFI]; this transaction is expected to defer liquidity and equity covenant issues by several months but does not resolve the Company's long-term challenges." Draft Skadden and Lazard Project Scout Presentation, dated Sept. 2008, at RC40008640 [RC40008601].

[702] Minutes of a Special Meeting of the Board of Residential Capital, LLC, Sept. 12, 2008, at RC40005865 [RC40005652]. The AFI Board had been advised not later than August 21, 2008, that management was "[r]eviewing options to purchase ResCap's remaining equity interest in [Ally] Bank." GMAC—Phase II Update, dated Aug. 21, 2008, at ALLY_PEO_0003605 [ALLY_PEO_0003591]. Distribution for those materials included de Molina and Marano, both of whom were ResCap Board members at that time. *Id.* at ALLY_PEO_0003591.

[703] ResCap Board of Directors Update, dated Sept. 12, 2008, at RC40008581 [RC40008541].

[704] *Id.*

[705] *Id.*

[706] Minutes of a Special Meeting of the Board of Residential Capital, LLC, Sept. 12, 2008, at RC40005865 [RC40005652].

[707] E-mail from J. Young to J. Kilman (Sept. 15, 2008) [MS-RESCAP_003756].

[708] Minutes of a Special Meeting of the Board of Residential Capital, LLC, Sept. 19, 2008, at RC40005870 [RC40005652].

consideration: (1) cash purchase by AFI of 100% of ResCap's interest on September 30, 2008; (2) partial purchase by AFI on September 30, 2008 in exchange for debt forgiveness; and (3) debt forgiveness by AFI on September 30, 2008 and a future transfer of ResCap's interest in Ally Bank.[709]

The potential acquisition by AFI of ResCap's entire interest in IB Finance was again addressed at the September 23, 2008 ResCap Board meeting. Advisors and lawyers at this meeting also addressed "preliminary considerations on structuring a potential chapter 11 case, in the event that ResCap pursues such a strategy."[710] The "hypothetical" bankruptcy was evaluated based upon a filing date of October 17, 2008, "[i]n the event that ResCap believes that the asset sales referenced are unlikely to be realized or to deliver the estimated proceeds."[711]

Not later than July 2008, the ResCap Board had constituted the ResCap Independent Directors as a "Special Committee" to which the board delegated "full authority . . . to review and approve (or to recommend for approval . . . ) any Affiliate Transaction involving aggregate consideration of $10 million or more."[712] Procedures for the Special Committee's operations[713] were discussed at a ResCap Board meeting on August 21, 2008.[714] The single-page document sets out what it describes as mandatory procedures to be followed "in considering approval of, or recommending to the full Board approval of, any proposed transaction with [AFI], Cerberus or any of their respective affiliates." Most saliently, these procedures stated that:

> The Special Committee shall not approve or recommend approval of any proposed transaction unless either ResCap management and/or outside advisors advise that they believe the proposed transaction is on terms and conditions consistent with those that parties at arms-length would agree to for fair value.[715]

_____

[709] *See id.*

[710] *See* Minutes of a Special Meeting of the Board of Residential Capital, LLC, Sept. 23, 2008, at RC40005874 [RC40005652]; *see also* Draft Skadden and Lazard Project Scout Presentation, dated Sept. 2008, at RC40008640 [RC40008601].

[711] Draft Skadden and Lazard Project Scout Presentation, dated Sept. 2008, at RC40008649, RC40008652 [RC40008601].

[712] Unanimous Written Consent of the Board of Directors of Residential Capital, LLC, dated July 14, 2008, at RC40005807 [RC40005652].

[713] *See* ResCap Special Committee Procedures, dated Aug. 8, 2008, at RC40008488 [RC40008442].

[714] *See* Minutes of a Special Meeting of the Board of Residential Capital, LLC, Aug. 21, 2008, at RC40005843 [RC40005652].

[715] *See* ResCap Special Committee Procedures, dated Aug. 8, 2008, at RC40008488 [RC40008442].

Independent Director Smith had only a general recollection of this Special Committee procedures document, although he did recall the arm's-length guidance and said that the Independent Directors received advice both from company and outside counsel on complying with it.[716] Independent Director Hirtler-Garvey did not specifically recall the document either, nor did she recollect "the circumstances under which [the Independent Directors] could approve an affiliate transaction in the absence of a fairness opinion."[717]

Consideration of the potential sale to AFI of ResCap's interest in Ally Bank had progressed sufficiently in September 2008 that the two Independent Directors, as the "Independent Committee of the Board of Directors," discussed the potential transaction on September 22, 2008, and arranged to retain Goldin Associates as their financial advisor with respect to the potential transaction.[718] At a September 25, 2008 meeting, ResCap's Independent Directors reviewed a draft term sheet for the bank acquisition by [AFI], but "concluded that [AFI's] offer and the proposed counter offer . . . would not provide the Company with sufficient liquidity for a significant period of time."[719] Additional discussion and negotiations between ResCap and AFI occurred in September 2008, but at the October 16, 2008 ResCap Board meeting, it was announced that AFI was no longer considering this transaction.[720] Nevertheless, in December 2008 that transaction again moved to the forefront, and closed in January 2009.

As noted, prior to closing the third quarter of 2008, ResCap received advice on, and engaged in planning for, a potential bankruptcy filing. At an executive session of the ResCap Board on September 23, 2008, those present received advice from David Kurtz, of Lazard, that "ResCap's balance sheet and current liquidity situation place it within the zone of insolvency and that the best course of action for the Directors is to act as if the company were insolvent and consider the best interest of all its creditors."[721]

The same ResCap Board minutes also record Marano's observation that "the most realistic view from the materials [presented by Lazard] would mean ResCap's unsecured

---

[716] Int. of E. Smith, Nov. 30, 2012, at 108:15–20, 111:19–113:8.

[717] Int. of K. Hirtler-Garvey, Dec. 20, 2012, at 219:14–25, 226:20–24.

[718] Minutes of a Meeting of the Independent Committee of the Board of Directors of Residential Capital, LLC, Sept. 22, 2008, at RC40006642–43 [RC40006611].

[719] Minutes of a Telephonic Meeting of the Independent Committee of the Board of Directors of Residential Capital, LLC, Sept. 25, 2008, at RC40006678 [RC40006611].

[720] Minutes of a Special Meeting of the Board of Residential Capital, LLC, Oct. 16, 2008, at RC40005882 [RC40005652].

[721] Minutes of an Executive Session of the Board of Directors of Residential Capital, LLC, Sept. 23, 2008, at RC40006865 [RC40006865]. Timothy Pohl, a Skadden restructuring attorney who was present at that meeting and who continued to advise ResCap when he moved to Lazard, said in an interview with the Examiner's Professionals that Lazard actually never concluded that ResCap was in the zone of insolvency, but rather had advised that it would be "prudent" for ResCap's directors to proceed as if it were in the zone. Int. of T. Pohl, Feb. 26, 2013, at 29:5–30:9.

creditors would be unlikely to receive anything if the business were liquidated at this time."[722] Kurtz is also reported to have advised "that Lazard has not made a determination as to whether or not it is advisable for ResCap to file for bankruptcy protection," and that the subject should be revisited in mid-October.[723]

In the final week of September 2008, both the ResCap Board and the AFI Board continued to consider the proposed bank transaction, and more generally were occupied with considering forms of support for ResCap that could be concluded in sufficient time to address ResCap's need for liquidity and its looming default of TNW covenants on September 30, 2008. ResCap and AFI also continued to receive advice on planning for a possible bankruptcy of ResCap, and AFI was faced as well with liquidity concerns regarding its auto finance business.

At its meeting on September 29, 2008, the AFI Board was introduced to attorneys from Kirkland & Ellis and Mayer Brown. The minutes reflect that these "Special Counsel" were in attendance in order to "discuss[ ] the fiduciary duties owed by directors of a company that is or becomes financially distressed," including "duties owed by the directors to shareholders and creditors when a company reaches the zone of insolvency or becomes insolvent."[724] This advice was in regard to the financial situation then faced by AFI,[725] and at this meeting it is clear that the AFI Board was concerned with both the liquidity and the capital adequacy of AFI. One AFI Board member recalled as follows: "[T]here was no liquidity in the capital markets for any organization, and [AFI] didn't have access to the [FRB] window. So, I can't speak to whether or not I was concerned about [AFI] being in the zone of insolvency. What I can tell you—we were concerned about the ability to continue to make [auto] loans."[726]

---

[722] Minutes of an Executive Session of the Board of Directors of Residential Capital, LLC, Sept. 23, 2008, at RC40006865 [RC40006865].

[723] *Id.* at RC40006866; *see also* Int. of T. Pohl, Feb. 26, 2013, at 65:5–17 (confirming that at that juncture it was Lazard's view that those unsecured creditors who by virtue of the June 2008 bond exchange had become subordinate to holders of ResCap secured debt, would be unlikely to recover anything in bankruptcy).

[724] The advice was with respect to acting "in the best interests of the Company," which is defined in the minutes to mean AFI. Minutes of a Special Meeting of the Board of Directors of GMAC LLC, Sept. 29, 2008, at ALLY_PEO_0001281 [ALLY_PEO_0001009].

[725] *See id.*

[726] Int. of L. Tessler, Feb. 28, 2013, at 69:10–17. Neporent said there was no concern at this point regarding AFI's solvency: "[T]his is just a prophylactic measurement. Good corporate governance. Reminding everybody about their responsibilities." Int. of M. Neporent, Feb. 6, 2013, at 151:10–17.

Mark Neporent[727] had the following comments regarding the economic condition of ResCap at this point and about the approach AFI was taking to its support of ResCap as of September 29, 2008:

> There was always a debate at the time. "What should be done with ResCap? Should we continue to fund it? Should we continue to support its liquidity?" And I think, obviously, our consistent answer was, "Yes. We think it's a valuable platform. We think they have adequate capital. We think that if we can just get to the other side of the crisis, whenever that is, we'll have an even more valuable platform. Because by now more and more of our competitors have just simply gone away."[728]

More generally, Lenard Tessler said the following regarding access to capital, liquidity challenges, and fiduciary duties:

> [T]hroughout this period, we were consistently evaluating how to manage the business given the lack of access to the capital markets and the lack of available liquidity. That was not just being done at the ResCap level; that was also being done at the [AFI] level. I mean, during this period of time, and probably in—I believe it was in August of 2008 as an example that we were having the . . . conversations about whether or not to continue to provide origination and financing to GM and the auto dealers. So, I mean, liquidity was a precious commodity, and access to the capital markets was a precious commodity that was neither available to [AFI] or ResCap at this time. So, this was a consistent theme, in discharge of our fiduciary duties, on how we thought about what was the right course of action for every one of the business units of [AFI]. So, this was not unusual to ResCap.[729]

With respect to the potential purchase by AFI of ResCap's interest in Ally Bank, the Kirkland & Ellis lawyers are noted as having "responded to questions pertaining to the

_____

[727] Neporent was the COO and General Counsel of Cerberus and, until March 2009, a member of AFI's Board. *See* Int. of M. Neporent, Feb. 6, 2013, at 8:7–9, 11:14–21.

[728] *Id.* at 152:1–11. Neporent elaborated: "There was never, ever an obligation of [AFI] to provide any support to ResCap. Only . . . what we as [AFI] directors decided was in our best interests. And I think we had an identity of interest with ResCap, because ResCap was a valuable asset that we were preserving for ourselves and for the ResCap platform." *Id.* at 152:21–153:3.

[729] Int. of L. Tessler, Feb. 28, 2013, at 36:11–37:6.

consummation of such a transaction outside of or within a ResCap Chapter 11 filing."[730] Further discussion by the AFI Board at the September 29 meeting "focused on valuation of the non-voting interest held by ResCap; feasibility of completing the [Ally] Bank transaction in the event of a bankruptcy filing by ResCap and implications of such a filing on [AFI]."[731] At an AFI Board meeting the next day, "[m]anagement addressed the difficulty in establishing proper valuation of [Ally] Bank given its ownership structure."[732] It is likely that the referenced information was provided by AFI Chief Risk Officer Sam Ramsey, but it is unclear whether this discussion focused on the value of ResCap's interest in IB Finance, on the combined valuation of IB Finance Class M Shares and IB Finance Class A Shares, or on something else.[733]

With regard to ResCap's immediate need for capital to avoid defaulting on minimum TNW covenants as of the end of the third quarter, the AFI Board was advised (and ultimately agreed) that "[t]he exact amount of debt forgiven, if any, would be determined as part of ResCap's accounting close for the quarter."[734] That is, the amount of equity injected into ResCap by AFI was based upon the TNW shortfall that would otherwise exist when ResCap closed its quarter.[735] The AFI Board was advised by CFO Robert Hull that in the event ResCap fell short of its TNW covenants, "management believes that it is highly likely that

_____

[730] Minutes of a Special Meeting of the Board of GMAC LLC, Sept. 29, 2008, at ALLY_PEO_0001282 [ALLY_PEO_0001009]. In this regard, Kirkland & Ellis evidently recommended "that the Board require ResCap to commission independent fairness opinions to analyze a possible purchase from ResCap and its stakeholders' perspective." *Id.* The ResCap Independent Directors did engage advisors, specifically Goldin Associates, to provide a fairness opinion when the 2009 Bank Transaction ultimately occurred.

[731] *Id.* at ALLY_PEO_0001283.

[732] Minutes of Special Meeting of the Board of GMAC LLC, Sept. 30, 2008, at ALLY_PEO_0001287 [ALLY_PEO_0001009].

[733] *See* Int. of S. Ramsey, Dec. 10, 2012, at 153:16–154:11 (does not recall what the "difficulties" were); Int. of T. Rowe, Dec. 7, 2012, at 149:8–19, 155:1–7 (demonstrating that Ramsey was presenter, and the discussion reflected that: "[A]bsent a transaction that provides ResCap additional headroom . . . ResCap will file for bankruptcy. In that bankruptcy the bank has no value"); Int. of R. Hull, Feb. 7, 2013, at 168:4–21 ("[I]t's hard to value any stock in a falling, you know, stock environment like that, let alone a bank stock, and one that was unique—as unique as this one.").

[734] Minutes of a Special Meeting of the Board of GMAC LLC, Sept. 29, 2008, at ALLY_PEO_0001283 [ALLY_PEO_0001009].

[735] Int. of R. Hull, Feb. 7, 2013, at 170:19–171:10.

ResCap will file for Chapter 11 bankruptcy protection."[736] The AFI Board adopted resolutions authorizing contributions of up to $400 million, which were implemented through debt forgiveness.[737] It was in its self-interest to do so, as Neporent explained:

> [W]e had extensions of credit to ResCap as well. So there was an economic component from the [AFI] perspective also. It obviously wasn't helpful for [AFI's] debt investment or credit relationship with ResCap to have them go into an uncontrolled bankruptcy.[738]

No agreement was reached on the 2009 Bank Transaction in time to have any bearing on ResCap's third quarter financials. The September 30, 2008 AFI Board minutes suggest that "matters associated with preference and fraudulent transfers" were addressed in the context of considering "the disposition of [Ally] Bank."[739] Neporent disputes that such concerns played a role in consideration of this transaction.[740]

As of September 30, 2008, AFI made a capital contribution to Debtors by forgiving $101.5 million of indebtedness under the Secured MSR Facility.[741] Also, on the same day, AFI contributed ResCap notes to ResCap that AFI had obtained in the June 2008 bond exchange, with a face value of $92.8 million and an approximate fair value of $51 million. ResCap recorded a capital contribution in that amount, and recognized a gain of $42.2 million on extinguishment of debt. In addition, AFI forgave $2.5 million of accrued interest on the notes, increasing the total capital contribution to $53.5 million.[742]

On September 30, 2008, as well, ResCap completed the September 2008 Model Home Sale to an affiliate of Cerberus known as MHPool Holdings LLC, for a net purchase price of approximately $59 million, after adjustments.[743] This was one of three transactions pursuant to

---

[736] Minutes of a Special Meeting of the Board of GMAC LLC, Sept. 30, 2008, at ALLY_PEO_0001286 [ALLY_PEO_0001009].

[737] *Id.* at ALLY_PEO_0001288–90. The AFI Board also requested that an independent financial advisor be engaged immediately "to undertake a review of ResCap and the decisions that will need to be made by AFI on or before October 18, 2008." *Id.* at ALLY_PEO_0001288. At the next AFI board meeting, Hull announced that Goldman Sachs had been retained "as financial advisor to [AFI]." Minutes of a Special Meeting of the Board of GMAC LLC, Oct. 3, 2008, at ALLY_PEO_0001291 [ALLY_PEO_0001009].

[738] Int. of M. Neporent, Feb. 6, 2013, at 157:9–14.

[739] Minutes of a Special Meeting of the Board of GMAC LLC, Sept. 30, 2008, at ALLY_PEO_0001287–88 [ALLY_PEO_0001009].

[740] Int. of M. Neporent, Feb. 6, 2013, at 158:1–16.

[741] *See* Residential Capital, LLC, Current Report (Form 8-K) (Oct. 23, 2008); *see also* Section V.E.2 (addressing the Secured MSR Facility).

[742] *See* Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2009), at 89.

[743] *See* Residential Capital, LLC, Current Report (Form 8-K) (Oct. 6, 2008). The sale was conducted as an auction, in which there were five bidders in addition to Cerberus. *Id.*

an agreement in the second quarter of 2008 between ResCap and Cerberus entities, whereby the latter committed to purchase assets (to be identified later) for net cash proceeds of $300 million.[744]

GMAC CF continued purchases pursuant to the June 17, 2008 Servicing Advance Factoring Agreement in the third quarter of 2008.[745] During 2008, total purchases pursuant to the Servicing Advance Factoring Agreement were $949.1 million, the total cash proceeds were $806.7 million, and the cumulative net loss recorded by ResCap was $142.4 million.[746]

ResCap's third quarter results (preliminarily announced on November 5, 2008) showed a net loss for the quarter of $1.9 billion (compared to $2.3 billion a year earlier), which ResCap advised was "primarily attributable to continued adverse market conditions, which drove high credit-related provisions and weak revenue."[747] ResCap also disclosed that "absent economic support from [AFI], substantial doubt exists regarding ResCap's ability to continue as a going concern."[748]

5.   *ResCap Continues To Experience Liquidity And Capital Challenges, Engages In Additional Inter-Company Transactions With AFI, And Announces That It Is "Dependent" On AFI*

Having avoided TNW covenant breaches at the close of the third quarter, ResCap immediately faced the same concerns in the fourth quarter. At the October 1, 2008 ResCap Board meeting, Young observed that even with the contributions just received, which enabled ResCap to comply with its TNW covenants, his forecast indicated that ResCap's TNW would drop below the required level in December.[749]

---

[744] *See* Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2009), at 90. The other transactions related to that commitment (i.e., the Excess Servicing Rights Sales and the June 2008 Model Home Sale) had closed on July 30, 2008. *See* Section V.F (describing asset sales).

[745] The total of such purchases in the third and fourth quarters of 2008 was reported to be $362.7 million. *See* Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2009), at 90; *see also* Section V.E.4 (addressing the Servicing Advance Factoring Facility).

[746] *See* Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2009), at 90–91.

[747] *See* Residential Capital, LLC, Current Report (Form 8-K) (Nov. 5, 2008), Ex. 99.1.

[748] *See id.*

[749] Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Oct. 1, 2008, at RC40005875 [RC40005652].

Also on October 1, 2008, the ResCap Board, in executive session,[750] was advised by Pohl (counsel from Skadden) that in light of cash projections, "ResCap would not need to make a decision as to a bankruptcy filing prior to the end of October."[751] Pohl responded to various questions about bankruptcy and strategy. For example, in response to a query from de Molina (ResCap director and AFI officer) as to whether stalking horse bids from affiliates would be acceptable, Pohl advised in the affirmative, "as the auction process that would occur in the bankruptcy would ensure the best price and terms for ResCap."[752] He noted that "one way to quietly arrange stalking horse bids would be to work with [AFI] and Cerberus if they were interested in any of the assets or businesses."[753]

ResCap Board minutes also reflect AFI's continued interest in obtaining full economic ownership of IB Finance: "A discussion followed as to the amount of indebtedness that [AFI] has already forgiven and the fact that it would be interested in buying ResCap's shares of the holding company of [Ally] Bank."[754] And, de Molina "noted that the best way to proceed may be to have [AFI] purchase those shares inside a bankruptcy proceeding," with Pohl advising that "the primary concern is about the process and making sure the Directors did what was in the best interest of its creditors."[755]

A possible bankruptcy filing continued to be an agenda item for the ResCap Board throughout October 2008, which heard from advisors and lawyers on that topic, inter alia, in executive session on October 1, 2008,[756] and at regular or special meetings on

---

[750] This meeting occurred prior to the end-of-quarter SEC filings. During the meeting, Marano "asked whether there could be discussion about possibly raising capital from third parties," and Young "responded that something like that could be included if we have a reasonable belief it might materialize." Minutes of an Executive Session of the Board of Residential Capital, LLC, Oct. 1, 2008, at RC40006867 [RC40006865].

[751] *Id.*

[752] *Id*. at RC40006868.

[753] *Id*.

[754] *Id*.

[755] *Id.*

[756] *Id*. at RC40006867.

October 8,[757] October 10,[758] October 17,[759] October 20,[760] and October 23, 2008.[761] As already described, by October 8, 2008, TARP had been enacted.[762] Kurtz is recorded at the October 8, 2008 ResCap Board meeting as having "stated that absent an infusion of third party capital or government assistance or support, the decision of whether to file for bankruptcy and the timing of a filing would depend on the availability of, and consideration received in, a[n] [Ally] Bank transaction."[763]

At its October 10, 2008 meeting, the AFI Board focused on AFI's own liquidity concerns, with AFI President William Muir noting plans to reduce consumer auto loan originations.[764] Hull explained that Goldman Sachs would perform an AFI liquidity analysis, including an assessment of "material, investment and credit initiatives concerning ResCap and their impact on [AFI] liquidity."[765] Marano, ResCap's President and CEO, presented "an analysis of the impact of a hypothetical ResCap bankruptcy filing (and the timing of filing) on ResCap's cash flows."[766] Marano's presentation assumed a sale of ResCap's interest in Ally Bank, with ResCap's resultant "cash runway" extending somewhere between "December and February/March," depending upon whether the assumed consideration of approximately $1.2 billion included $400 million cash or $700 million cash.[767] As became the norm, the meeting was also attended by attorneys from Kirkland & Ellis and Mayer Brown.

---

[757] Minutes of a Special Meeting of the Board of Residential Capital, LLC, Oct. 8, 2008, at RC40005877 [RC40005652].

[758] Minutes of a Special Meeting of the Board of Residential Capital, LLC, Oct. 10, 2008, at RC40005880 [RC40005652].

[759] Minutes of a Special Meeting of the Board of Residential Capital, LLC, Oct. 17, 2008, at RC40005884 [RC40005652].

[760] Minutes of a Special Meeting of the Board of Residential Capital, LLC, Oct. 20, 2008, at RC40005887 [RC40005652].

[761] Minutes of a Special Meeting of the Board of Residential Capital, LLC, Oct. 23, 2008, at RC40005890 [RC40005652]. "Mr. Young noted that the Company's expected loss for October is approximately $650 million and as equity at September 30 was $350 million, a large capital injection will be needed in order to maintain compliance with tangible net worth covenants." *Id*.

[762] As had the FRB's Commercial Paper Funding Facility, of which (as already mentioned) AFI availed itself beginning on or about October 29, 2008.

[763] Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Oct. 8, 2008, at RC40005878 [RC40005652].

[764] Minutes of a Special Meeting of the Board of GMAC LLC, Oct. 10, 2008, at ALLY_PEO_0001296 [ALLY_PEO_0001009].

[765] *Id*. at ALLY_PEO_0001297.

[766] *Id*. at ALLY_PEO_0001297–98.

[767] *Id*. at ALLY_PEO_0001297. The projections were developed by Lazard, and had been presented to the ResCap Board on October 8, 2008. *See* Skadden and Lazard Project Scout Presentation, dated Oct. 8, 2008, at RC40008687 [RC40008678]. Pohl explained that the two dates were selected in order to demonstrate the effect on creditors over time. *See* Int. of T. Pohl, Feb. 26, 2013, at 73:1–5.

Later that day, the ResCap Board held its own meeting, at which a wide range of liquidity options were discussed. Marano reported on the AFI Board meeting held earlier in the day, noting that the potential purchase by AFI of ResCap's interest in Ally Bank had been discussed, and that AFI was considering alternative liquidity options for ResCap as well.[768]

Marano also raised the subject of whether TARP might "present an opportunity for ResCap to access additional liquidity and/or sell assets at potentially attractive prices relative to those which could be achieved in today's market place."[769] He expressed the view that ResCap should "accelerate contingency planning efforts," while such options were under consideration.[770]

At one point in October, Marano was personally in contact with one or more U.S. Treasury officials and had broached the subject of a $5 billion injection under TARP, unaware that AFI was making similar overtures.[771] When he became aware that AFI and Cerberus did not view it advisable for ResCap and AFI both to pursue TARP, Marano stood down his own efforts in favor of a coordinated approach lead by AFI[772] and Cerberus.[773]

Marano recalled that despite bankruptcy preparations in 2008, he did not then believe that ResCap would ultimately seek such relief, since he believed that TARP funds would be

---

[768] Minutes of a Special Meeting of the Board of Residential Capital, LLC, Oct. 10, 2008, at RC40005880 [RC40005652].

[769] *Id.* at RC40005881.

[770] Marano "said that it would be prudent to accelerate contingency planning efforts with a staged approach while other options such as the TARP, a[n] [Ally]Bank transaction with [AFI], possible servicing sale transaction with Fannie Mae, and other actions to bolster the Company's liquidity are considered." *Id.* Marano had sought advice regarding access to TARP within days of its enactment. *See* E-mail from T. Marano to J. Kilman (Oct. 7, 2008) [MS-RESCAP_005319].

[771] *See, e.g.*, E-mail from T. Marano to N. Kashkari (Oct. 22, 2008) [CCM00012371] ("As we discussed, I believe it will take an equity investment of approximately $5 billion dollars [sic] to recapitalize ResCap and provide stability for the next 24 months. . . . [A]n investment of $3 billion would provide needed capital through 2009 as we work to find additional partners to preserve our platform."). According to Marano, however, he intentionally inflated the $5 billion estimate by as much as $3 billion, to account for anticipated "horse-trading." Int. of T. Marano, Nov. 26, 2012, at 206:3–23.

[772] *See* Int. of T. Marano, Nov. 26, 2012, at 22:2–14 ("And so at one point [in the Fall of 2008], unbeknownst to me, [AFI], the parent, was asking for assistance from TARP. I was asking for assistance from TARP. . . . And then actually, I found out Cerberus was looking for assistance as well for the combined outfit. That was a very memorable moment when I found out all three of us were seeking assistance from some of the same people."); *id.* at 24:9–15 ("[I]t was logical that the parent would be the one that would be seeking support. And so I made sure the parent knew everything that I was aware of that we needed and what the challenges were so that the parent could seek the support."); *see also* Minutes of a Special Meeting of the Board of Residential Capital, LLC, Oct. 17, 2008, at RC40005885 [RC40005652] ("Mr. Marano mentioned that he is working with Cerberus and with Morrison & Foerster on a term sheet to use in communicating a request to the Treasury Department for participation in the TARP program.").

[773] Former U.S. Treasury Secretary John Snow was at the time Vice Chairman of Cerberus and was "our conduit to the Treasury." Int. of L. Tessler, Feb. 28, 2013, at 104:6–16.

obtained either independently or through AFI,[774] and he suggested that he did not believe that a bankruptcy filing would be in the best interest of ResCap's creditors.[775] Moreover, Marano recalled that on several occasions, AFI officials advised against bankruptcy, and reassured him that ResCap would get the support it needed from AFI.[776] In this respect, Marano also observed that the more aggressive ResCap was in contingency planning, the harder AFI worked to provide capital support for ResCap.[777] Pohl explained that while there could neither be certainty of support for ResCap from AFI, nor certainty of a TARP infusion to AFI,[778] Lazard never recommended that ResCap pull the trigger on a chapter 11 filing.[779]

Independent Director Hirtler-Garvey said that it was her understanding that the question of whether and when ResCap would file for bankruptcy called for "a vote of the Independent Directors," and that while she and Smith viewed bankruptcy as "one of many paths to be considered," there was never a time when they thought that ResCap would have to file for bankruptcy.[780] Hirtler-Garvey never thought that ResCap was insolvent during her tenure on the ResCap Board.[781]

On October 16, 2008, Marano told the ResCap Board that AFI was "no longer considering a purchase of the ResCap interest in [Ally] Bank."[782] The next day, during his "ResCap Update" to the AFI Board, Marano said that the deal was off the table "for strategic business reasons."[783] The "tabled"[784] transfer was renewed in December 2008, and it ultimately closed in January 2009.

---

[774] Int. of T. Marano, Nov. 26, 2012, at 163:18–20.

[775] *Id*. at 218:1–7 ("[Q:] Did you believe in this timeframe that keeping ResCap alive and trying to save the company would improve value for creditors and stakeholders? [A:] I definitely believed at this point in time not filing was in the interest of the creditors, yes.").

[776] *See id*. at 158:3–8.

[777] *See id*. at 160:14–22 ("And there were times that, by—in my opinion, by working relatively hard on contingency planning, we made them work harder on capital support for us.").

[778] Pohl said there was a "strong belief" that if AFI received a TARP investment it would facilitate "ongoing funding" for ResCap. Int. of T. Pohl, Feb. 26, 2013, at 42:8–16.

[779] *Id*. at 54:20–23.

[780] Int. of K. Hirtler-Garvey, Dec. 20, 2012, at 247:20–248:1, 256:3–6.

[781] *Id*. at 140:24–141:2. It may or may not be significant that neither Hirtler-Garvey nor Smith were familiar during their interviews with the Examiner's Professionals with the term "zone of insolvency." *See id*. at 139:20–140:2; Int. of E. Smith, Nov. 30, 2012, at 75:22–25.

[782] Minutes of a Special Meeting of the Board of Residential Capital, LLC, Oct. 16, 2008, at RC40005882 [RC40005652]. Marano said he did not recall why this was the case. *See* Int. of T. Marano, Feb. 27, 2013, at 185:9–14.

[783] Minutes of a Special Meeting of the Board of GMAC LLC, Oct. 17, 2008, at ALLY_PEO_0001301 [ALLY_PEO_0001009].

[784] Int. of R. Hull, Feb. 7, 2013, at 165:1–7. "It is a complex transaction, so I'm not surprised that on the . . . first or second blush we still wanted more time to digest it." *Id*. at 164:4–7.

The October 17, 2008 ResCap Board minutes also reflect that ResCap agreed to repay a borrowing base shortfall of $168 million under the Secured MSR Facility in exchange for AFI's agreement to extend until May 2009 the maturity date of that facility, which was due to expire that day; ResCap also accepted a reduction in capacity of the Secured MSR Facility from $1.2 billion to $900 million,[785] and, as discussed in Section V.E.2, thereafter the capacity of the Secured MSR Facility declined dollar for dollar with any debt forgiveness thereunder.

At its October 28, 2008 meeting, the ResCap Board heard presentations regarding the possible sale of ResCap's Canadian mortgage banking subsidiary (ResMor) to AFI,[786] as well as regarding the possible sale of ResCap's domestic and international broker-dealer subsidiaries to AFI.[787] Both transactions were subsequently considered by the Independent Directors, were the subject of fairness opinions, and ultimately closed—ResMor on January 1, 2009 for $67 million, and the broker-dealers in March 2009 for $110.4 million.[788]

The AFI Board met on October 31, 2008,[789] and agreed to make a capital contribution to ResCap by forgiving a further $238.9 million indebtedness under the Secured MSR Facility.[790] At this meeting, the AFI Board also heard from management regarding a bond exchange proposal intended to raise capital in contemplation of qualifying AFI as a bank holding company, as well as regarding the purchase from ResCap of ResMor and the two broker-dealers, intended to "allow ResCap to meet near-term cash needs and remain in compliance with tangible net worth covenants."[791] The AFI Board "expressed support" for the asset purchases.[792]

_____

[785] *See* Minutes of a Special Meeting of the Board of Residential Capital, LLC, Oct. 17, 2008, at RC40005885–86 [RC40005652]; *see also* Minutes of a Special Meeting of the Board of GMAC LLC, Oct. 17, 2008, at ALLY_PEO_0001301–02 [ALLY_PEO_0001009] ("It was noted that if [AFI] chose not to extend the maturity of the facility, ResCap would have been unable to pay down the facility when due.").

[786] *See* Minutes of a Special Meeting of the Board of Residential Capital, LLC, Oct. 28, 2008, at RC40005895 [RC40005652]; ResMor Trust Valuation Analysis, dated Oct. 28, 2008, at RC40008766–77 [RC40008754].

[787] *See* Minutes of a Special Meeting of the Board of Residential Capital, LLC, Oct. 28, 2008, at RC40005896 [RC40005652]; Proposed Transfer of Ownership of Residential Funding Securities (RFS) LLC to GMAC LLC, dated Oct. 27, 2008, at RC40008778–86 [RC40008754].

[788] These transactions are discussed in Section V.F.4.f and Section V.F.4.g of this Report, respectively.

[789] Minutes of a Special Meeting of the Board of GMAC LLC, Oct. 31, 2008, at ALLY_PEO_0001310–11 [ALLY_PEO_0001009].

[790] *See* Residential Capital, LLC, Current Report (Form 8-K) (Nov. 20, 2008), Ex. 99.1. The Secured MSR Facility had matured on October 17, 2008, but was renewed to May 1, 2009. *See id.*; *see also* Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2009), at 90.

[791] Minutes of a Special Meeting of the Board of GMAC LLC, Oct. 31, 2008, at ALLY_PEO_0001309 [ALLY_PEO_0001009].

[792] *Id*. at ALLY_PEO_0001310.

On November 5, 2008, Hull conducted an earnings conference call for the third quarter of 2008. Hull focused his remarks on what he called "important transformative initiatives," including but not limited to AFI's application for bank holding company status to improve AFI's capital position. Specifically, he noted AFI's belief that as a bank holding company it "would have a greater chance of participating in the various government liquidity programs."[793]

It was Hull's practice to conduct earnings calls which addressed both AFI and its subsidiary, ResCap, and the latter did not otherwise hold such calls (although ResCap commonly had a representative present).[794] With respect to ResCap, Hull noted continued efforts to "reduce the balance sheet . . . and lower operating expenses," but observed that "market conditions have overwhelmed these efforts somewhat."[795] Furthermore, he stated the following regarding the financial relationship between ResCap and its parent and sole member: "In addition, market conditions have made it difficult for ResCap to maintain capital and liquidity. As a result, ResCap has become dependent on [AFI] for support."[796] Asked about this observation, Hull confirmed that the statement reflected his view at the time and further explained that he meant:

> Just exactly what it says, I think they really needed the help of these injections. And I think we'd have had a hard time finding someone on the outside to come up with them, although that's just conjecture.[797]

\*          \*          \*

---

[793] Transcript of GMAC Q3 2008 Earnings Call (Nov. 5, 2008), at 7 (available from Bloomberg Transcript).

[794] Int. of R. Hull, Feb. 7, 2013, at 24:3–8.

[795] Transcript of GMAC Q3 2008 Earnings Call (Nov. 5, 2008), at 4 (available from Bloomberg Transcript).

[796] *Id.*

[797] Int. of R. Hull, Feb. 7, 2013, at 141:8–12. The "conjecture" comment can be discounted. *Id.* at 141:13–17 ("[Q:] [I]s that just conjecture? I mean, third quarter '08, did ResCap have the ability to borrow from third parties? [A:] I don't believe so.").

> And I can't tell you if there wasn't an investor or a banker in the
> country that would or wouldn't have stepped in, but none whom
> I knew of at the time.[798]

AFI's CEO at the time (and a member of the ResCap Board), de Molina, acknowledged that, in hindsight, he agreed with Hull's observation that ResCap was "dependent" on AFI, but said he would move that "dependent" status earlier in the time line, perhaps back to 2007.[799]

On November 8, 2008, the ResCap Board heard a presentation from Corey Pinkston addressing the proposed bond exchange and AFI's contemplated application to become a bank holding company, which he said would facilitate access to government financial support.[800] While AFI had considered becoming a bank holding company as early as March 2008, to obtain access to more consumer deposits and to the FRB discount window,[801] the November initiative was directed particularly at TARP eligibility.[802] Pinkston (an AFI official) advised the ResCap Board that:

> From a ResCap perspective . . . the bond exchange transaction
> plays a key part of a potential interim solution to provide
> required near term support and taking on material ResCap debt
> at discounted levels would provide [AFI] with better flexibility
> to potentially review and consider alternatives for additional
> support and/or liability restructuring.[803]

At this stage, AFI had developed two alternative structures for the bond exchange, and in each instance, Pinkston explained that "the transaction would result in substantial equity generation on a combined basis as part of the required bank holding company capital raise and a material reduction in total debt of the consolidated company."[804]

_____

[798] *Id*. at 142:7–10.

[799] *See* Int. of A. de Molina, Nov. 20, 2012, at 80:1–7 ("[Q:] Okay. At what point in time do you think ResCap became dependent on [AFI] for support? [A:] Well, ex-post, I'd say it was sometime in '07. Did I realize it then? No. I didn't realize it until, you know, much, much later."); *see also* Int. of S. Preston, Jr., Feb. 15, 2013, at 41:14–22 (AFI was ResCap's lender of last resort in the last quarter of 2008); *id.* at 70:25–71:8 (ResCap and AFI were in "survivor mode" as of fourth quarter 2008).

[800] *See* Minutes of a Special Meeting of the Board of Residential Capital, LLC, Nov. 8, 2008, at RC40005902–03 [RC40005652]; Draft GMAC Bond Exchange Presentation, dated Nov. 7, 2008, at RC40008804–19 [RC40008802].

[801] *See, e.g.*, Int. of L. Tessler, Nov. 16, 2012, at 176:25–178:9.

[802] *See, e.g.*, Int. of L. Tessler, Feb. 28, 2013, at 54:14–20 (explaining that after Lehman went bankrupt "and liquidity is gone for everybody . . . we then accelerate our efforts to become a bank holding company to get access to TARP and to get access to the [FRB] window").

[803] Minutes of a Special Meeting of the Board of Residential Capital, LLC, Nov. 8, 2008, at RC40005903 [RC40005652].

[804] *Id*. at RC40005902–03.

The AFI Board minutes for November 2008 demonstrate that: (1) AFI considered achieving bank holding company approval (and, thereby, eligibility for TARP funds) as critical to its own survival; (2) AFI management believed that such approval was unlikely should ResCap file for bankruptcy;[805] and (3) accordingly, it was necessary for AFI to continue to support ResCap. For example, materials presented to the AFI Board in support of its November 28, 2008 meeting include a decision tree analysis that highlighted the contrast among multiple "potential scenarios for [AFI]."[806] While to be sure, none indicated any guarantee of AFI's (or ResCap's) future, lack of support by AFI for ResCap was shown as the shortest path to AFI failure. Accordingly, management advised the AFI Board as follows:

> Under the scenarios where BHC status is not achieved, [AFI] faces almost immeasurable near-term and long-term liquidity risks that threaten the company's business model[.]

> Although there are challenges, management believes that BHC status is achievable, but has been advised that support for ResCap is a prerequisite[.]

> Despite the many permutations of the bond exchange, OEM health and government support, based on the information available today, Management requests ongoing support for ResCap[.][807]

De Molina explained that in 2008 his view was that obtaining bank holding company approval for AFI was its only lifeline and, concomitantly, ResCap's only lifeline.[808] Further, he believed that ResCap's liquidity problems could be solved by developing an expanded Ally Bank depositor base.[809] And, he said, he never seriously considered supporting a ResCap bankruptcy filing in 2008 because he "was so petrified that that would derail the entire bank holding company strategy."[810]

---

[805] AFI had evidently received advice to that effect from its consultants: "[AFI's] advisors continue to believe that a ResCap bankruptcy would make it politically impossible for [AFI] to achieve BHC status." ResCap Decisions and Support Action, AFI Board Meeting, dated Nov. 24, 2008, at EXAM10277375 [EXAM10277369]. Among others, such advice may have been provided by Goldman Sachs. "[W]e definitely felt that the ResCap filing would create a lot of uncertainty for the BHC application." Int. of R. Hutchinson, Mar. 27, 2013, at 34:14–16.

[806] ResCap Decisions and Support Action, AFI Board Meeting, dated Nov. 24, 2008, at EXAM10277374–78 [EXAM10277369].

[807] *Id*. at EXAM10277378; *see also* Government Support Presentation, dated Nov. 11, 2008, at ALLY_0259602 [ALLY_0259598] (noting under "Status" of "Resolve ResCap" initiative: "Necessary part of bond exchange in order to achieve required capital").

[808] Int. of A. de Molina, Nov. 20, 2012, at 100:14–101:5.

[809] *Id*. at 63:12–64:11 ("So in my mind, that was the long-term solution to all the businesses, to ResCap, to [AFI], to everybody.").

[810] *Id*. at 101:25–102:2.

While AFI's achievement of bank holding company status and its completion of the acquisition of ResCap's interest in Ally Bank were distinct and not necessarily related steps,[811] records reflect similar concerns on the part of AFI regarding how a ResCap bankruptcy would bear on completion of the latter transaction. On September 30, 2008, the AFI Board had been presented with a management report addressing the risks to AFI of a ResCap bankruptcy including, inter alia, "the fate of [Ally] Bank," which stated:

> Though the FDIC is likely to approve a transfer of the ResCap interest in the Bank to [AFI], a bankruptcy filing by ResCap could complicate, if not delay, this action. In addition, the ResCap bankruptcy would necessitate an auction of its interests in the Bank, thereby putting at risk [AFI's] ability to acquire it. It is unclear whether the FDIC would seize the bank in the event of a bankruptcy. The bank is critical to [AFI's] future liquidity. This uncertainty poses a significant risk.[812]

Hull stated that the fates of AFI and ResCap were intertwined at this point, because the ability to obtain support from the U.S. Treasury turned in part on the viability of Ally Bank, which was partially owned by ResCap:

> I can tell you then, as the fate of both companies was really in the balance now, right? So, for the first time [AFI's] liquidity was clearly—the parent was clearly in question, right, and hence, the request for TARP that all came through and so forth. . . . So, we had had multiple meetings with the [FRB] and the FDIC, telephonic and otherwise, and I think through one communiqué or another, it became clear that a filing of ResCap at all in the context of this BHC [request], it would complicate matters immensely, let alone whether the bank, you know, was the pivotal component to that. It was one of many, and I think

---

[811] *See* Int. of S. Ramsey, Dec. 10, 2012, at 142:19–22 ("I don't recall, at the moment, that there were any strings involved in the [conversion] of [AFI] to a bank holding company related to the shares of the bank.").

[812] ResCap Capital Action, AFI Board Meeting, dated Sept. 30, 2008, at ALLY_0361451 [ALLY_0361444]; *see also* Int. of S. Ramsey, Dec. 10, 2012, at 129:19–22 ("De Molina and I knew that strategically long-term, you know, the only true solution to the liquidity of the overall company was a bank charter.").

> we started to realize that, I mean, you know, we probably needed not to have a BK, whether we'd been of the view to prevent that anyways, now it was getting harder because we didn't have the cash to sustain them with a passage of time. And, the bank looked like a more important component, I'm sure. And I'm sure the regulators made that clear to us.[813]

This assessment may not have been unanimous. Neporent disputes the notion that a ResCap bankruptcy would have been fatal to the ability of AFI to obtain bank holding company status and, therefore, to its ability to access TARP support.[814] The AFI Board minutes and presentations, however, do not reflect that Neporent or anyone else expressed this view at the time. In his interview with the Examiner's Professionals, Neporent acknowledged that AFI's bank regulatory lawyers had advised that a ResCap bankruptcy would have complicated AFI's ability to become a bank holding company.[815]

On November 20, 2008, AFI formally submitted its application to the FRB to become a bank holding company. Concurrently, it applied to the U.S. Treasury to participate in the Capital Purchase Program ("CPP") created under EESA, i.e., TARP, conditional upon becoming a bank holding company.[816] In its public statement, AFI referenced "mortgage financing" as part of its "core mission," though it did not specifically mention ResCap:

> As a bank holding company, [AFI] would obtain increased flexibility and stability to fulfill its core mission of providing automotive and mortgage financing to consumers and businesses. [AFI] also expects to have expanded opportunities for funding and for access to capital as a bank holding company.[817]

---

[813] Int. of R. Hull, Feb. 7, 2013, at 176:22–177:20; *see also* Int. of A. de Molina, Nov. 20, 2012, at 100:14–21 ("I didn't think that filing a major subsidiary when you had—that was in the middle of the mortgage servicing business during the middle of the biggest mortgage crisis in history was a way to [endear] yourself to the Federal Reserve Board as they considered your application as a good citizen to become a bank holding company.").

[814] Int. of M. Neporent, Feb. 6, 2013, at 189:11–190:3, 191:19–23 ("We had our own pipeline and our own counsel. . . . It was all speculation. I just didn't accept that as QED. If ResCap filed, we were dead."). By contrast, de Molina had reported to the AFI Board that "a ResCap bankruptcy filing would be severely detrimental, and likely fatal, to [AFI's] bank holding company application." Minutes of a Special Meeting of the Board of GMAC LLC, Oct. 31, 2008, at ALLY_PEO_0001308 [ALLY_PEO_0001009].

[815] *See* Int. of M. Neporent, Feb. 6, 2013, at 189:21–24 (referring to the view expressed by Edward Herlihy of Wachtell, Lipton, Rosen & Katz); *id*. at 191:15–19 ("We were told that [AFI's] bank reg counsel reached that conclusion. . . . based on his discussions with the regulators.").

[816] *See* AFI, Press Release, *GMAC Files Application with Federal Reserve to Become Bank Holding Company* (Nov. 20, 2008), http://media.ally.com/index.php?s=43&item=288.

[817] *See id*. at 1.

Meanwhile, several more inter-company transactions between ResCap and AFI—asset sales and a financing facility—were finalized, and a new bond exchange was commenced.

On November 3, 2008, ResCap posted two cash-collateralized supersedeas bonds totaling $127.5 million, in connection with the Mitchell Trial Order.[818] Concerned about the liquidity impact of the cash collateral, ResCap obtained support from AFI, which agreed to replace ResCap as the surety provider on November 11, 2008 for $100 million of the $127.5 million bonds.[819]

On November 20, 2008, ResCap and AFI announced the commencement of separate private exchange offers and cash tender offers pursuant to which AFI would purchase and/or exchange certain outstanding notes of AFI (and non-Debtor subsidiaries), as well as certain notes of ResCap, for cash, newly issued notes of AFI and, with regard to the repurchase of AFI's notes, preferred stock of an AFI Subsidiary.[820]

In addition, on November 20, 2008, ResCap announced an agreement with AFI whereby AFI would provide up to $500 million to ResCap through various transactions "intended to improve ResCap's liquidity and support its capital structure."[821] Such transactions would include, but not necessarily be limited to: (1) the purchase by AFI of ResMor, the Canadian mortgage bank indirectly wholly owned by ResCap; (2) a bridge loan in an amount equal to the sale price for ResMor; and (3) a new senior revolving loan facility.[822]

AFI entered into an agreement with a Canadian subsidiary of ResCap to purchase the parent company of ResMor Trust, on November 20, 2008. Following consideration at several ResCap Board meetings and a meeting of the Independent Directors,[823] the transaction had been approved by the AFI Board on November 11, 2008, and by the ResCap Board on November 20, 2008.[824] Funds in the amount of approximately $67 million were advanced

---

[818] *See* ResCap Legal Matters Update, dated Dec. 11, 2009, at RC40018301 [RC40018295].

[819] *See* Minutes of a Special Meeting of the Board of GMAC LLC, Nov. 11, 2008 at ALLY_PEO_0001316 [ALLY_PEO_0001009]. As de Molina recalled, the $27.5 million ResCap share reflected ResCap's assessment of its "maximum exposure" in the case. Int. of A. de Molina, Nov. 20, 2012, at 175:19–177:17. Accordingly, it was the companies' intention that AFI would support ResCap's liquidity by bearing the credit risk, while ResCap retained the litigation risk. *Id.* at 177:12–15. As further discussed in Section V.G.1.c of this Report, the Missouri Court of Appeals reversed the punitive damages award in November 23, 2010, and remanded for a new trial. Most of the bond collateral was thereafter ultimately released.

[820] *See* Residential Capital, LLC, Current Report (Form 8-K) (Nov. 20, 2008), Item 8.01.

[821] *Id.* Ex. 99.1.

[822] *See id.*

[823] *See* Minutes of a Telephonic Meeting of the Independent Committee of the Board of Directors of Residential Capital, LLC, Nov. 3, 2008, at RC40006691 [RC40006611].

[824] *See* Minutes of a Special Meeting of the Board of GMAC LLC, Nov. 11, 2008, at ALLY_PEO_0001316 [ALLY_PEO_0001009]; Action by Written Consent of the Board of Directors of Residential Capital, LLC, dated Nov. 20, 2008, at RC40005913–24 [RC40005652]; *see also* Residential Capital, LLC, Current Report (Form 8-K) (Nov. 26, 2008), Item 1.01.

by AFI to GMAC Residential Funding of Canada on November 20, 2008, and the sale was completed on January 1, 2009 for the same amount, i.e., payment was made by forgiveness of the debt (as more particularly described in Section V.E.6).[825] In connection with this sale, ResCap obtained a fairness opinion from Goldin Associates.[826]

Also on November 20, 2008, AFI entered into the $430 million Initial Line of Credit Agreement with PATI and RAHI, two ResCap subsidiaries.[827] The Initial Line of Credit Facility included guarantees by RFC, GMAC Mortgage, and ResCap. The purpose of the Initial Line of Credit Facility was to provide contingency liquidity on a daily basis. Draws were only permitted if ResCap's liquidity dropped below a certain level (as further described in Section V.E.5). The Initial Line of Credit Facility was immediately drawn upon for $115 million.[828]

As of December 31, 2008, the Initial Line of Credit Facility did not have any indebtedness outstanding, and its maturity date was extended to January 31, 2009, and thereafter further extended to March 31, 2009.[829] Some records suggest that this two-month extension of maturity was contemplated as part of the consideration for the 2009 Bank Transaction.[830] However, the Membership Interest Purchase Agreement associated with that

---

[825] Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2009), at 91.

[826] *See* Opinion Letter from Goldin Associates to the Committee of the Independent Members of the Board of Directors of ResCap (Dec. 3, 2008) [RC00027945]; *see also* Goldin Associates Presentation to The Committee of Independent Members of the Board of Directors of Residential Capital, LLC Regarding The Purchase of ResMor Trust Company by GMAC, LLC, dated Dec. 2, 2008 [GOLDIN00127218]. Although Goldin Associates had earlier been retained to provide a fairness opinion in connection with ResCap's transfer of its interest in IB Finance to AFI, the ResMor Sale closed first, and thus was the first such opinion Goldin Associates provided to ResCap's Independent Directors. *See* Int. of S. Preston, Jr., Feb. 15, 2013, at 73:2–13. It was also the first formal fairness opinion Goldin Associates had ever rendered. *See id.* at 31:21–23. The ResMor Loan Agreement and ResMor Sale are addressed in Sections V.E.6 and V.F.4.f, respectively.

[827] *See* Residential Capital, LLC, Current Report (Form 8-K) (Nov. 26, 2008), Item 1.01; *see also* Section V.E.5.

[828] *See* Residential Capital, LLC, Current Report (Form 8-K) (Nov. 26, 2008), Item 1.01.

[829] *See* Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2009), at 89. In December 2008, the parties took steps to increase the limits of the Initial Line of Credit Facility. *See* Opinion Letter from Goldin Associates to the Committee of the Independent Members of the Board of Directors of ResCap (Dec. 22, 2008) [GOLDIN00126301]. That contemplated transaction was not concluded, and in June 2009 a complementary facility, the Second Line of Credit Facility, was established (addressed in Section V.E.7). As addressed in Section V.E.8, both facilities were amended and restated in December 2009. Under the resulting $1.1 billion A&R Line of Credit Facility, the borrowers were RFC and GMAC Mortgage. Approximately $380 million remained unpaid under the A&R Line of Credit Facility as of the Petition Date. *See* First Day Affidavit, ¶ 61.

[830] *See, e.g.*, Draft GMAC Bank Transaction Term Sheet, dated Jan. 13, 2009 [GOLDIN00126222].

transaction (dated January 30, 2009) does not show this to be the case,[831] nor does the final draft of the term sheet so indicate;[832] and the fairness opinion associated with the 2009 Bank Transaction mentions but ascribes no value to the maturity extension.[833]

Finally, as described below, as of November 30, 2008 (and finalized in early December), AFI made a capital contribution to ResCap by forgiving a further $451.5 million of indebtedness under the Secured MSR Facility, in order to keep ResCap in compliance with its $250 million TNW covenant.[834] ResCap reported that total debt forgiveness under the Secured MSR Facility during the third and fourth quarters of 2008 was $791.9 million.[835]

By the end of November 2008, ResCap and Ally Bank had entered into a Broker Agreement,[836] whereby GMAC Mortgage (and its subsidiary, ditech, LLC) could channel production to Ally Bank, on whose books mortgage loans would be originated:

> Under the terms of a broker agreement (the "broker agreement"), the Company acts in a broker capacity and provides loan processing services to [Ally] Bank to support its origination and purchase of loans as well as loan closing services. The broker agreement has no mandatory expiration date and can be terminated by either party on 30 days notice. Under the terms of the broker agreement, loans meeting the underwriting standards of [Ally] Bank are originated by [Ally] Bank while loans not meeting those standards may be originated by the Company and sold directly into the secondary market. The Company also provides certain representations and warranties and indemnifications to [Ally] Bank with respect to

---

[831] *See* Residential Capital, LLC, Current Report (Form 8-K) (Feb. 3, 2009), Ex. 10.1.

[832] *See* Draft GMAC Bank Transaction Term Sheet, dated Jan. 23, 2009 at RC40011107–08 [RC40011078] (describing the sixty-day extension as a "simultaneous transaction" to be executed on the closing date of the 2009 Bank Transaction).

[833] *See* Goldin Associates Presentation to The Committee of Independent Members of the Board of Directors of Residential Capital, LLC Regarding The GMAC Bank Transaction with GMAC, LLC, dated Jan. 22, 2009, at 34 [GOLDIN00128045]. ("Goldin does not quantify any value associated with the $430 million secured credit facility from [AFI] to ResCap subsidiaries."). Goldin Associates also did not consider whether in sixty days ResCap would have had the wherewithal to repay this facility, but "assumed that these credit facilities as they matured would be extended." Int. of S. Preston, Jr., Feb. 15, 2013, at 145:23–146:10.

[834] *See* Residential Capital, LLC, Current Report (Form 8-K) (Dec. 2, 2008) (announcement); Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2009), Ex. 10.14 (amount).

[835] *See* Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2009), at 90. The Secured MSR Facility was entirely repaid through debt forgiveness and was terminated as of December 30, 2009. *See* Letter from GMAC to ResCap, et al. (Dec. 30, 2009) [ALLY_0353025].

[836] *See* Broker Agreement [RC00030534].

> brokered loans. The Company recorded broker fee income of
> $11.0 million for these services for the three months ended
> March 31, 2009.[837]

This arrangement took advantage of Ally's Bank's relatively strong liquidity position and its relatively low costs of funds (via the FHLB and consumer deposits).[838] Thereafter, GMAC Mortgage essentially ceased loan origination, instead channeling production in most instances through Ally Bank.[839] In addition, because brokered loans were originated by Ally Bank in its own name, and therefore were not subject to the limits of the 250.250 exception for affiliate transactions that applied to loans purchased by Ally Bank from GMAC Mortgage, the Broker Agreement facilitated an increased volume of MSRs on Ally Bank's balance sheet.[840]

It was the intention of the parties to the Broker Agreement, however, that the economics as between Ally Bank and GMAC Mortgage would remain under the Broker Agreement as they were under the 250.250 sales arrangement, i.e., that GMAC Mortgage would retain the profit and loss (P&L) impact of origination fees and expenses for loans brokered to Ally Bank.[841] The manner in which the parties attempted to accomplish this, and additional details regarding the Broker Agreement and its relationship to the relevant derivative transactions, are addressed in detail in Section V.B.6.

### 6. AFI Becomes A Bank Holding Company; The Federal Government Supports AFI With First TARP Investment; And ResCap Sells Its Interest In Ally Bank To AFI

On December 2, 2008, ResCap reported that AFI had approved additional forgiveness of ResCap's indebtedness under the Secured MSR Facility in an amount "equal to the amount required for ResCap to maintain a consolidated tangible net worth of $300 million"—i.e., $50 million above its $250 million covenant under its Bilateral Facilities—as of November 30, 2008, but not to exceed $683 million.[842] ResCap's announcement also reported two caveats: (1) if the foregoing amount was not sufficient to allow TNW compliance, AFI "does not currently intend that any forgiveness will take place," since "additional forgiveness subsequent to November 30, 2008 would not remedy ResCap's non compliance as of such

---

[837] Residential Capital, LLC, Quarterly Report (Form 10-Q) (May 11, 2009), at 58.

[838] Int. of A. Celini, Feb. 18, 2013, at 120:11–17, 220:11–15.

[839] *See* E-mail from L. Kelly (July 23, 2009) [EXAM10115666].

[840] *See* Int. of A. Celini, Feb. 18, 2013, at 208:13–17. At its meeting on October 21, 2008, the Bank Board had approved an exception to Ally Bank's "Counterparty Credit Policy" in recognition that its affiliate-counterparty on the MSR and Pipeline Swaps, GMAC Mortgage, had a credit rating lower than otherwise called for by the credit policy. *See* Minutes of a Regular Meeting of the Board of Directors of GMAC Bank, Oct. 21, 2008, ALLY_PEO_0001593–94 [ALLY_PEO_0001488]. This action was taken in response to findings of a regulatory examination. *Id.*; *see also* Summary of Approval of Exception to Counterparty Credit Policy and Proposed Resolution of the Board of Directors, dated Oct. 21, 2008, at ALLY_PEO_0007393–95 [ALLY_PEO_0007331] (addressing rationale for exception).

[841] *See* Int. of A. Celini, Feb. 18, 2013, at 225–26.

[842] Residential Capital, LLC, Current Report (Form 8-K) (Dec. 2, 2008), Item 8.01.

date"; and (2) AFI did not "currently intend to take further actions in support of ResCap if the [AFI] offers [i.e., AFI's repurchase of its own debt] are not completed, although it reserves the right to do so."[843] As noted, AFI ultimately forgave $451 million under the Secured MSR Facility effective November 30, 2008.

By December 19, 2008, the purchase by AFI of ResCap's interest in Ally Bank was back on the table. AFI Board minutes reflect that in the context of addressing support for ResCap's liquidity and net worth potentially needed by year end, AFI's Tazewell Rowe "reviewed possible forms of support that [AFI] might provide to ResCap including contribution of exchanged bonds, debt forgiveness on the mortgage servicing rights facility, and acquisition by [AFI] of the non-voting interest ResCap holds in IB Finance Holdings, LLC, the parent company of [Ally] Bank."[844] Neporent pointed out that the purchase of Ally Bank shares differed from a bond exchange or debt forgiveness, because AFI would "actually get something in return other than just an effective capital contribution."[845]

On December 19, 2008, ResCap publicly announced the contemplated 2009 Bank Transaction.[846] ResCap's filing advised that AFI and ResCap were "in negotiations to undertake a transaction or series of transactions pursuant to which, concurrently with or shortly following completion of the [AFI] offers and ResCap offers [i.e., the tender and exchange offers] . . . [AFI] would transfer ResCap old notes acquired by [AFI] in the ResCap debt-for-debt exchange offers . . . in exchange for all or a majority of the non-voting common equity of IB Finance Holding Company, LLC . . . held by ResCap."[847]

Of course, AFI already had the ability, as of January 1, 2009, to exercise its conversion rights under the ResCap Preferred Interests it owned, and thereby obtain ownership of 806,344 IB Finance Preferred Interests. In this regard, ResCap requested that AFI postpone its exercise of such rights until not earlier than February 28, 2009, a request that AFI management supported (although ultimately the 2009 Bank Transaction closed earlier than that date).[848] This request reflected concern on the part of the ResCap Board about concluding the transfer to its parent company of Ally Bank assets in the face of substantial uncertainty as to whether ResCap would soon face bankruptcy:

> The Board also engaged in discussion with respect to the extension of the date on which ResCap's preferred units could be exchanged for IB Finance Class M preferred units from

---

[843] *Id.*

[844] Minutes of a Special Meeting of the Board of GMAC LLC, Dec. 19, 2008, at ALLY_PEO_0001371 [ALLY_PEO_0001009].

[845] Int. of M. Neporent, Feb. 6, 2013, at 214:5–7.

[846] Residential Capital, LLC, Current Report (Form 8-K) (Dec. 19, 2008).

[847] *Id.*

[848] *See* Minutes of a Special Meeting of the Board of GMAC LLC, Dec. 19, 2008, at ALLY_PEO_0001371–72 [ALLY_PEO_0001009].

> January 1, 2009 to February 23, 2009 in light of continued
> deterioration and concerns regarding a potential bankruptcy
> filing by ResCap or any of its significant subsidiaries. It was the
> consensus of the Board that the date should be extended.[849]

Neporent's recollection is that in November and December, while a TARP infusion to AFI was not yet a certainty, AFI's approach in terms of supporting ResCap was "to provide as little as possible [while] . . . not inadvertently blowing it up."[850] In other words, to preserve the option of saving ResCap at the least cost if the effort proved futile:

> As we were getting to the end with the application and
> expecting to get the TARP funds, we, you know, not knowing
> which way it was going to go, we would have been irresponsible
> just to throw good money after bad. But we wanted to preserve
> the option value because we, again, thought the platform was
> very valuable. But if we weren't going to get the money, it was
> going to be taken away from us. There was no reason to
> downstream the cash.[851]

The FRB approved AFI's application to become a bank holding company on December 24, 2008.[852] AFI and ResCap actors recalled that bank holding company approval was viewed contemporaneously with a sense of optimism and relief.[853] In its order, the FRB noted that it had acted expeditiously on the application:

> In light of the unusual and exigent circumstances affecting the
> financial markets, and all other facts and circumstances, the
> Board has determined that emergency conditions exist that

---

[849] Minutes of a Special Meeting of the Board of Residential Capital, LLC, Dec. 29, 2008, at RC40005948 [RC40005652].

[850] Int. of M. Neporent, Feb. 6, 2013, at 204:16–20. Hull evinced certitude about the bank holding company application as early as late November. *See* E-mail from R. Hull to J. Young (Nov. 27, 2008) [EXAM10172908] ("I am still very confident a GM loan, a bondex and a BHC will come together—mostly [because] it is abundantly logical and unavoidable given the alternatives.").

[851] Int. of M. Neporent, Feb. 6, 2013, at 205:18–206:3.

[852] *See* FRB, Press Release, *Order Approving Formation of Bank Holding Companies and Notice to Engage in Certain Nonbanking Activities* (Dec. 24, 2008), http://www.federalreserve.gov/newsevents/press/orders/orders 20081224a1.pdf. More specifically, the FRB approved the application of both AFI and of IB Finance (the direct parent of Ally Bank) under section 3 of the Bank Holding Company Act, 12 U.S.C. § 1842. *See id.* at 13; *see also* GMAC LLC, Current Report (Form 8-K) (Dec. 24, 2008).

[853] *See, e.g.*, Int. of T. Marano, Nov. 26, 2012, at 157:1–21 (noting regulators had never let a subsidiary of a bank holding company file for bankruptcy); Int. of T. Rowe, Dec. 7, 2012, at 37:15–17 ("I was one of the receivers of the call and I recall running out of my office to celebrate . . . ."); Int. of S. Ramsey, Dec. 10, 2012, at 143:7–18 ("I remember where I was when I got the call."); Int. of J. Lombardo, Sept. 17, 2012, at 107:4–6 ("We'd gotten bank holding company status. This was a big win. This was going to put us on solid footing.").

> justify expeditious action on this proposal in accordance with
> the provisions of the BHC Act and the Board's regulations.[854]

In connection with the conversion of Ally Bank from an industrial bank to a commercial bank, and the approval of AFI's bank holding company status, it became necessary to revise the ownership structure of AFI, since under the Bank Holding Company Act and the FRB order, GM and the Cerberus investors were permitted to have no more than between 7.5% to 10% of voting and total equity interest. The FRB order outlined the elements of this requirement, and the commitments by GM and Cerberus to comply therewith.[855] The FRB order included additional elements of a "passivity commitment" whereby, inter alia, "Cerberus employees and consultants would cease providing services to, or otherwise functioning as dual employees of, [AFI], and neither Cerberus nor any affiliated entity will have any advisory relationships with [AFI] or any investor regarding the vote or sale of shares or the management or policies of [AFI] or [Ally] Bank."[856] Cerberus agreed that it would not directly or indirectly "[e]xercise or attempt to exercise a controlling influence over the management or policies of [AFI] or any of its subsidiaries."[857] Cerberus employees resigned from the ResCap Board,[858] and Cerberus reduced its AFI Board membership to one director (initially, Steve Feinberg); Cerberus was also permitted to designate Tessler as an AFI "board observer" on behalf of Cerberus investors.[859]

Shortly after the approval under the Bank Holding Company Act, the U.S. Treasury announced its initial $5 billion TARP investment in AFI.[860] AFI received this first tranche (as it turned out) of TARP funding from the U.S. Treasury on or about December 30, 2008, in

---

[854] FRB, Press Release, *Order Approving Formation of Bank Holding Companies and Notice to Engage in Certain Nonbanking Activities* (Dec. 24, 2008), at 2 (citations omitted), http://www.federalreserve.gov/newsevents/press/orders/orders20081224a1.pdf.

[855] *Id.* at 5–7.

[856] *Id*. at 7; *see also* FRB, 2009 Fed. Res. Interp. Ltr. LEXIS 19, at App. (Mar. 24, 2009).

[857] FRB, 2009 Fed. Res. Interp. Ltr. LEXIS 19, at App. (Mar. 24, 2009).

[858] Marano's secondment to ResCap was terminated, and he became a direct employee of AFI, continuing to serve as ResCap's CEO and Chairman of the ResCap Board. *See* Separation and General Release Agreement, dated Apr. 30, 2009 [CCM00552554].

[859] *See* FRB, 2009 Fed. Res. Interp. Ltr. LEXIS 19, at App. (Mar. 24, 2009).

[860] U.S. Treasury, Press Release, *Treasury Announces TARP Investment in GMAC* (Dec. 29, 2008), http://www.treasury.gov/press-center/press-releases/Pages/hp1335.aspx. The Term Sheet, Securities Purchase Agreement, and related documents are available on the U.S. Treasury's website at http://www.treasury.gov/initiatives/financial-stability/TARP-Programs/automotive-programs/Documents/GMAC%20Agreement%20Dated%2029%20December%202008.pdf.

exchange for preferred membership interests and equity warrants.[861] Ultimately, additional TARP funds would be provided to AFI in May and December 2009, for a total government investment of roughly $18 billion.[862]

There was nothing explicit in either the approval of bank holding company status, or in the documentation associated with the TARP investment, that called upon or prohibited AFI from using TARP funds to support ResCap. Jerry Lombardo said: "[I]t wasn't like the money came into [AFI] and [AFI] cut a check to ResCap. ResCap didn't get any money."[863] Rather, he observed, AFI would "be in better financial shape to potentially provide" support to ResCap.[864] Ramsey pointed out that, inasmuch as money is fungible, no dollar can be traced directly from TARP to ResCap.[865] But, he said, "we had $5 billion in additional cash and capital . . . [s]o clearly, that had a long term impact on ResCap in that it increased the flexibility of the holding company to support ResCap."[866] Similarly, Independent Director Smith expressed no view as to whether TARP enabled AFI to support ResCap,[867] but observed that AFI "got billions of dollars in TARP support and [AFI] supported us with billions."[868] And Marano believed that in seeking TARP funds, AFI took into account ResCap's needs, and that when the funds were received "[t]hey gave us what was needed as it was deemed necessary."[869]

---

[861] *See* E-mail from R. Hull (Dec. 30, 2008) [EXAM10807243]; *see also* GMAC LLC, Current Report (Form 8-K) (Jan. 2, 2009), at 2–3; GMAC LLC, Annual Report (Form 10-K) (Feb. 27, 2009), Item 5.

[862] The figure is inclusive of a loan of $884 million to GM on Dec. 29, 2008, for participation in AFI's December 2008 bond exchange. *See* Congressional Oversight Panel, January Oversight Report: An Update on TARP Support for the Domestic Automotive Industry (Jan. 13, 2011), at 74–76, http://cybercemetery.unt.edu/archive/cop/20110402010325/http://cop.senate.gov/documents/cop-011311-report.pdf.

[863] Int. of J. Lombardo, Sept. 17, 2012, at 291:13–16.

[864] *Id.* at 291:10–11. Lombardo also observed that it was the "[AFI] family . . . receiving money." *Id.* at 106:25–107:1.

[865] Int. of S. Ramsey, Dec. 10, 2012, at 104:20–105:11 ("[T]o the extent some of that cash 'found its way' into ResCap . . . [i]t was not because you followed a line. It was because at some point in the future of [AFI], it determined that there was an amount of support it wanted to provide ResCap."); *id.* at 110:24–111:1 ("[F]unds within a company of that nature are fungible.").

[866] *Id.* at 103:7–12.

[867] Smith said that "I honestly don't know if [AFI] would have supported us or not without that money" nor did he know whether it would have had the ability to do so. Int. of E. Smith, Nov. 30, 2012, at 36:22–37:2.

[868] *Id.* at 34:23–35:14.

[869] Int. of T. Marano, Nov. 26, 2012, at 205:20–206:2. A 2009 UBS and Lazard strategy presentation mentions "TARP capital allocated to the mortgage business." UBS and Lazard Project Scout II Presentation, dated July 2009, at RC40010740 [RC40010645]. In respect of this reference, Marano thought "it would be interesting to know if TARP funds were allocated specifically." Int. of T. Marano, Nov. 26, 2012, at 252:8–11; *see also* Congressional Oversight Panel, March Oversight Report: The Unique Treatment of GMAC Under the TARP (Mar. 10, 2010), at 41, http://cybercemetery.unt.edu/archive/cop/20110402024235/http://cop.senate.gov/documents/cop-031110-report.pdf ("[AFI]'s contributions to ResCap would not have been possible . . . had [AFI] not received TARP assistance.").

In February 2010—by which time there had been two additional TARP investments in AFI and a recapitalization by AFI of ResCap at the end of 2009 (addressed in Section III.I)—both AFI CEO Michael Carpenter and CFO Hull testified before the Congressional Oversight Panel.[870] In his written submission to the Panel, Hull stated that the TARP infusions had "allowed our subsidiary . . . ResCap . . . to continue servicing approximately three million residential mortgage loans and assisted approximately 500,000 borrowers [to] avoid risk of imminent default or foreclosure."[871]

The Congressional Oversight Panel expressed skepticism over reasoning offered by U.S. Treasury officials in support of the initial and subsequent decisions to support AFI.[872] Notably, it is unclear that supporting or saving ResCap, per se, was among those reasons: "Treasury has stated that . . . it regarded ResCap as 'marginal, at best' as a factor in the decision to support [AFI]."[873] In an e-mail, however, Tessler opined that "Rescap [sic] was one of the significant reasons the [FRB] and FDIC decided to support [AFI] in becoming a BHC."[874]

Little more than a week after the initial receipt of TARP funds, AFI issued a public statement of support for ResCap, announcing as follows in a disclosure on January 8, 2009:

> In response to various questions that have come to [AFI's] . . . attention, [AFI] reiterated in an announcement that Residential Capital, LLC ("ResCap") is an important subsidiary of [AFI], and [AFI] has made significant progress in reshaping ResCap to better align it with current market conditions. [AFI] stated that it believes that the support it has provided to ResCap to date was in the best interests of [AFI] stakeholders. It further stated that if ResCap were to need additional support, [AFI] would provide that support so long as it was in the best interests of [AFI]

---

[870] *See* E-mail from M. Lieber (Mar. 8, 2010) [ALLY_0227856] (including attached February 25, 2010 draft transcripts).

[871] WRITTEN STATEMENT OF ROBERT S. HULL, GMAC CHIEF FINANCIAL OFFICER, GMAC FINANCIAL SERVICES, BEFORE THE CONGRESSIONAL OVERSIGHT PANEL, Feb. 25, 2010, at 1–2, http:// cybercemetery.unt.edu/archive/cop/20110402012141/http://cop.senate.gov/documents/testimony-022510-hull.pdf. In the same statement, Hull described AFI's actions in the fourth quarter of 2009 as "minimizing further adverse effects on [AFI] related to ResCap." *Id.* at 6.

[872] *See* CONGRESSIONAL OVERSIGHT PANEL, MARCH OVERSIGHT REPORT: THE UNIQUE TREATMENT OF GMAC UNDER THE TARP (Mar. 10, 2010), at 78–79, http://cybercemetery.unt.edu/archive/cop/20110402042135/ http://cop.senate.gov/documents/cop-031110-report.pdf; *see also* CONGRESSIONAL OVERSIGHT PANEL, JANUARY OVERSIGHT REPORT: AN UPDATE ON TARP SUPPORT FOR THE DOMESTIC AUTOMOTIVE INDUSTRY (Jan. 13, 2011), at 71–103, http://cybercemetery.unt.edu/archive/cop/20110402010325/http://cop.senate.gov/ documents/cop-011311-report.pdf.

[873] CONGRESSIONAL OVERSIGHT PANEL, MARCH OVERSIGHT REPORT: THE UNIQUE TREATMENT OF GMAC UNDER THE TARP (Mar. 10, 2010), at 79, http://cybercemetery.unt.edu/archive/cop/20110402042135/http:// cop.senate.gov/documents/cop-031110-report.pdf.

[874] E-mail from L. Tessler to M. Carpenter (Dec. 3, 2009), at CCM00065542 [CCM00065540].

> stakeholders. While there can be no assurances, [AFI's] recently
> approved status as a regulated bank holding company has
> increased the importance of its support for ResCap.[875]

Hull recalled that this announcement was made because ResCap was receiving multiple inquiries to the effect of "what happens to me now, to ResCap,"[876] and Hull also observed that this announcement had "the benefit of being the truth."[877] He recalled, further:

> The thing I can remember the most is that we didn't want . . . it
> would not be a good fact pattern for the government to grant us
> a bank holding company [and] for us to have the very first event
> be a bankruptcy filing of one of our active businesses. . . . So,
> we hadn't intended to bankrupt it all along. We certainly
> evaluated, but our actions showed that we were committed to
> supporting it. . . . I think that support just got stronger here.[878]

The same qualified statement of support appears in AFI's 2008 Annual Report, although AFI also disclosed therein that since "there are currently no commitments or assurances for future funding and/or capital support . . . there remains substantial doubt about ResCap's ability to continue as a going concern."[879]

Other significant end-of-the-year developments in connection with recapitalizing Debtors and AFI were announced as well. As part of the required capital raise in connection with obtaining bank holding company approval,[880] on December 29, 2008, AFI announced that GM and Cerberus contributed to AFI their $750 million subordinated participation in the Secured Revolver Facility in exchange for new common equity of AFI.[881] The Secured Revolver Facility

---

[875] Residential Capital, LLC, Current Report (Form 8-K) (Jan. 8, 2009).

[876] Int. of R. Hull, Feb. 7, 2013, at 185:11–23.

[877] *Id.* at 185:23–24; *see also* Minutes of a Special Meeting of the Board of Residential Capital, LLC, Dec. 29, 2008, at RC40005947 [RC40005652] ("Mr. Marano remarked that [AFI] views ResCap as an important component of its bank holding company platform and that the Company offers diversification to [AFI's] business model.").

[878] Int. of R. Hull, Feb. 7, 2013, at 187:6–24.

[879] *See* GMAC LLC, Annual Report (Form 10-K) (Feb. 27, 2009), at 113.

[880] *See* Capital Raising Actions Presentation, dated Dec. 28, 2008, at ALLY_PEO_0002703 [ALLY_PEO_0002659] ("Contribution will be to [AFI] without any current plan to downstream the loan to ResCap").

[881] GMAC LLC, Current Report (Form 8-K) (Jan. 2, 2009), Item 1.01.

commitment was reduced to $3 billion as of December 31, 2008.[882] Cerberus and GM also made an equity investment of $1.25 billion in AFI as of December 29, 2008.[883]

And, on December 31, 2008, AFI announced the completion of its private exchange offer and cash tender offer, inter alia, to purchase and/or exchange certain outstanding ResCap notes.[884] Specifically, approximately $3.7 billion in aggregate principal amount of the outstanding ResCap notes were validly tendered and accepted. On December 31, 2008, AFI tendered $937.4 million par value ResCap bonds to ResCap for retirement, resulting in: (1) gain on debt extinguishment of $756.6 million; (2) common equity increase of $219.9 million; and (3) write down of bond carrying value of $976.5 million.[885] The AFI private debt exchange and cash tender offers generated pretax gains of $11.5 billion for AFI (inclusive of the ResCap gain), representing the difference between carrying cost of the tendered notes and fair value of the new notes.[886]

On January 21, 2009, Young provided a presentation for Hull, addressing ResCap's financial condition as of the end of fourth quarter 2008.[887] The "Executive Overview" included the following data and observations:

> Execution of strategic initiatives are continuing to reduce the balance sheet and lower operating costs; however, significant losses continue, driven by high credit-related costs associated with legacy assets and low/negative net interest margins while revenue opportunities are limited to sales of conforming mortgage product and the performance of the servicing asset.[888]

*     *     *

---

[882] *Id.* at 8; *see also* Section V.E.3 (addressing the Secured Revolver Facility).

[883] *See* Opinion Letter from Morgan Stanley to the AFI Board (Jan. 16, 2009) [MS-RESCAP_024297]. Morgan Stanley had assisted AFI in efforts to obtain $2 billion of "fresh" equity from unrelated parties, without success. *See, e.g.*, Morgan Stanley Presentation for AFI Board, dated Dec. 8, 2008, at MS-RESCAP_024636–47 [MS-RESCAP_024630].

[884] GMAC LLC, Current Report (Form 8-K) (Jan. 2, 2009), at 8.

[885] Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2009), at 87.

[886] GMAC LLC, Annual Report (Form 10-K) (Feb. 27, 2009), at 29.

[887] *See* ResCap CFO Presentation, dated Jan. 21, 2009 [EXAM10750436] (attached to E-mail from M. Wright (Jan. 20, 2009) [EXAM10750435]).

[888] *Id.* at EXAM10750437.

> Fourth quarter equity infusions of $1.67 billion ($690 million of
> MSR debt; $977 [million] of bonds received in exchange offer)
> required to maintain capital covenants resulted in a recorded
> gain of $756.5 million in the quarter.[889]

In the "Capital, Liquidity and Related Disclosure" section, Young noted that "ResCap capital and cash needs [are] expected to continue to be significant in 2009," and that "Management is developing 'self-help' plans to address cash and capital needs for 2009."[890] The report observed, however: "it is unlikely that ResCap will be able to demonstrate sufficiently firm 'self-help' actions for the next twelve months to avoid 'substantial doubt' disclosures without a firm commitment of financial support from [AFI]."[891]

Finally, on January 30, 2009, the 2009 Bank Transaction was concluded.[892] AFI exercised its option to convert its 806,344 ResCap Preferred Interests into the same number of IB Finance Preferred Interests. [893] In addition, AFI purchased all of ResCap's remaining IB Finance Class M Shares.[894] According to the Membership Interest Purchase Agreement filed by ResCap, consideration for the transaction was the contribution to ResCap of its 8.5% Senior Secured Notes acquired by AFI in its recent bond exchange, notes having a face amount of approximately $830.5 million and accrued interest, and fair value of approximately $608.5 million.[895] Although not reflected in the Membership Interest Purchase Agreement,[896]

---

[889] *Id.*

[890] *Id.* at EXAM10750440.

[891] *Id.; see also* GMAC LLC, Annual Report (Form 10-K) (Feb. 27, 2009), at 34 ("As a result of the difficult market conditions and resulting impact on ResCap's business, ResCap is likely to continue to rely on [AFI] for support in the near-term.").

[892] *See* Section V.A.2.c (examining the 2009 Bank Transaction).

[893] Residential Capital, LLC, Current Report (Form 8-K) (Feb. 3, 2009), Item 1.01. As noted in Section III.G, AFI had obtained the convertible preferred shares in March and June 2008, in exchange for its contribution to Debtors of certain bonds issued by Debtors which AFI has purchased on the open market.

[894] *Id.; see also* Action by Written Consent of the Board of Directors of Residential Capital, LLC, dated Jan. 30, 2009, at RC40005965 [RC40005949] (reflecting consent of the ResCap Board and of its Independent Directors, having taken note of the fairness opinion by Goldin Associates); January 26 Goldin Letter [RC00027940].

[895] Residential Capital, LLC, Current Report (Form 8-K) (Feb. 3, 2009), Ex. 10.1, at 8 (Membership Interest Purchase Agreement, § 2.2); *see also* Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2009), at Note 25; ResCap Support and IB Finance Transaction Presentation, dated Jan. 30, 2009, at ALLY_PEO_0002114-17 [ALLY_PEO_0002000].

[896] Residential Capital, LLC, Current Report (Form 8-K) (Feb. 3, 2009), Ex. 10.1.

certain documents referred to other consideration, i.e., previous debt forgiveness[897] and the sixty-day extension of the maturity of the Initial Line of Credit Facility.[898] ResCap recognized a gain on extinguishment of $510.9 million and additional consideration of $383.4 million,[899] i.e., Debtors' TNW[900] increased by approximately $894 million (the carrying value of the extinguished debt).[901]

Upon completion of the sale, ResCap no longer had any ownership interest in Ally Bank, since it was (and is) wholly owned by IB Finance. IB Finance, including its subsidiary Ally Bank, was therefore deconsolidated by ResCap.[902] Marano recalled that in light of ResCap's economic circumstances, he was pleased to sell Ally Bank, and more than satisfied with the transaction:

> You know, when we sold the bank, that did come into my mind. Was it to our advantage or not to retain our interest in the bank? And then I started looking at the losses coming out of the bank portfolio and I was skeptical that we could ever make enough money to cover the bank losses. So when I was afforded the opportunity to sell—to get economic benefit from a money

---

[897] *See* Letter from R. Hull to T. Marano (Sept. 30, 2008) [ALLY_0141114]; Letter from R. Hull to T. Marano (Dec. 31, 2008) [ALLY_0141115]. Although not reflected in the January 30, 2009 Membership Interest Purchase Agreement, these documents characterize as additional consideration the debt forgiveness granted by AFI to ResCap as of September 30, 2008, and as of December 31, 2008.  In the course of the Investigation, Hull was not able to clarify the matter of debt forgiveness in the context of the transfer of ResCap's interest in IB Finance: "So I don't have any clarity for you. I just do remember doing this and I remember thinking, 'This'll go toward that purchase.' It's part of it. Whether it was formally memorialized, I can't say. I suspect it wasn't." Int. of R. Hull, Feb. 7, 2013, at 174:4–9. Rowe said that Hull's letters were, if nothing more, good optics: "[I]t's a construct meant to keep people happy. . . . But optically to certain members of the [AFI] board they felt this was valuable and it gave them more comfort in supporting the transaction." Int. of T. Rowe, Dec. 7, 2012, at 186:10–21; *see also* ResCap Support and IB Finance Transaction Presentation, dated Jan. 30, 2009, at ALLY_PEO_0002115 [ALLY_PEO_0002000] ("This consideration is in addition to the capital contributions made to ResCap on 12/31/08 and 9/30/08 which represented a fair market value of approximately $423 million.").

[898] The contemporaneous granting by AFI of an extension (to March 31, 2009) of the Initial Line of Credit Agreement appears to have been contingent on completion of the 2009 Bank Transaction. *See, e.g.*, Draft GMAC Bank Transaction Term Sheet, dated Jan. 23, 2009, at RC40011108 [RC40011078] (describing the sixty-day extension as a "simultaneous transaction" to be executed on the closing date of the 2009 Bank Transaction). Although not reflected in the January 30, 2009 Membership Interest Purchase Agreement as consideration, the extension is referenced in the declarations thereof. *See* Residential Capital, LLC, Current Report (Form 8-K) (Feb. 3, 2009), Ex. 10.1, at 1.

[899] *See* Residential Capital, LLC, Quarterly Report (Form 10-Q) (May 11, 2009), at 56.

[900] For this purpose, TNW was defined as ResCap's consolidated equity, excluding any tangible assets and excluding any equity in Ally Bank to the extent such equity was included in ResCap's consolidated balance sheet. *See id.* at 8.

[901] *See id.* at 12.

[902] *See id.*

> losing portfolio I was like done. You know, and then we had
> warehouse financing provided by the bank for our warehouse
> customers. So, to me it was a good trade.[903]

The Independent Directors obtained a fairness opinion from Goldin Associates in advance of closing the transaction,[904] and it was supplemented on the day of closing.[905] The Membership Interest Purchase Agreement incorporated a sixty-day post-closing marketing period,[906] during which time ResCap had the opportunity to seek a third-party buyer on better

---

[903] Int. of T. Marano, Nov. 26, 2012, at 111:5–21. Although the sequence of events suggests otherwise, Marano also said that AFI needed full ownership of Ally Bank in order to facilitate the bank holding company application. *See* Int. of T. Marano, Feb. 27, 2013, at 185:19–21. Another view, which seems plausible but incomplete, was that expressed by Ramsey: "an outright acquisition . . . would have been in [AFI's] interest to simplify the ownership structure of the bank . . . with regard to regulators." Int. of S. Ramsey, Dec. 10, 2012, at 141:7–13 (i.e., even though the "tracking shares" did not have "a great deal of economic value").

[904] *See* January 26 Goldin Letter [RC00027940]; *see also* Goldin Associates Presentation to The Committee of Independent Members of the Board of Directors of Residential Capital, LLC Regarding The GMAC Bank Transaction with GMAC, LLC, dated Jan. 22, 2009 [GOLDIN00128045].

[905] *See* January 30 Goldin Letter [RC00027949] (noting that the market price of the 8.5% second lien notes constituting the "principal[ ]" consideration at closing may differ from that as of the date of the earlier opinion letter).

[906] The minutes reflect that ResCap's Board had directed in December 2008 that management seek other buyers. *See* Minutes of a Special Meeting of the Board of Residential Capital, LLC, Dec. 29, 2008, at RC40005948 [RC40005652]. Marano said he had "worn out a lot of shoe leather" doing so. Int. of T. Marano, Nov. 26, 2012, at 39:7–11. UBS was engaged in such efforts, as directed by Marano, as early as October 2008. *See, e.g.*, Minutes of a Special Meeting of the Board of Residential Capital, LLC, Oct. 30, 2008, at RC40005897 [RC40005652] ("Mr. Benett reported on preliminary discussions with certain banks and private equity firms regarding potential opportunities to enter into a strategic alliance or arrangement with ResCap."). UBS viewed that assignment as "a fishing expedition," and had found "[n]o interest." Int. of H. Benett, Mar. 7, 2013, at 38:9, 39:24–25; *see also* Int. of L. Hall, Nov. 29, 2012, at 240:20–22 ("Corey [Pinkston] and I were pretty big proponents of the after-marketing period that ResCap would have available to it."); *id.* at 265:15–19 ("We wanted to ensure ResCap got the best value for their assets, and if we needed to pay more for the IB Financing, so be it. I think it was just an extra check-the-box to make sure that it was a fair transaction."); Int. of D. DeBrunner, Sept. 13, 2012, at 207:17–20 ("So that . . . was to protect ResCap's interests. So as a Board member those were important considerations for me to make sure that it was a fair, arm's length transaction.").

terms; AFI had a right of first refusal should ResCap have found a willing buyer.[907] UBS was engaged to conduct the marketing effort.[908]

UBS reported that it found no interest in purchasing the IB Finance Class M Shares among the banks, private equity firms and other private investors, insurance companies, and special purpose acquisition companies with which it engaged.[909] Marano was not surprised at this result; he described it as an effort to sell "a 51% interest with non-voting shares in a loan portfolio that . . . was several billion dollars of loans and it was hemorrhaging hundreds of millions of dollars a year."[910] Ramsey's view was similar: "I can tell you what my opinion of what their success was going to be. And it was next to nil because there was not going to be any market associated value with those shares."[911] Both Marano and Ramsey

---

[907] Residential Capital, LLC, Current Report (Form 8-K) (Feb. 3, 2009), at 1.

[908] *See* Minutes of a Special Meeting of the Board of Residential Capital, LLC, Jan. 23, 2009, at RC40005963–64 [RC40005949]; Draft GMAC Bank Transaction Term Sheet, dated Jan. 23, 2009, RC40011107–08 [RC40011078] (the term sheet states it is a draft, but the context of the January 23, 2009 meeting reflects the terms as final); *see also* UBS Presentation on GMAC Bank Tracking Stock Overview, dated Jan. 2009, at RC40011109–14 [RC40011078]. As noted, UBS had evidently been engaged in such marketing already, but it apparently viewed this assignment as a renewed effort. *See, e.g.*, Memorandum, UBS Call re GMAC Bank, dated Jan. 7, 2009 [GOLDIN00090358] (Goldin Associates to file: VanDerKnapp of UBS "was just getting started and had been on the job for less than 24 hours"). According to Benett of UBS, the presentation materials reflect only "discussion points" for its marketing efforts. Int. of H. Benett, Mar. 7, 2013, at 86:25–87:4. Documents suggest that UBS proposed to solicit investments in AFI as part of the same process, but Hull told Marano to decline the suggestion. *See* E-mail from R. Hull (Jan. 20, 2009) [CCM00503395].

[909] *See* Minutes of a Special Meeting of the Board of Residential Capital, LLC, Mar. 2009, at RC40006091–92 [RC40005949]; *see also* Letter from H. Benett to T. Marano [CCM00257945] ("[T]hese prospective investor[s] have been unwilling to pursue a transaction further."). The letter is undated but what appears to be an earlier draft is dated April 2, 2009. *See* E-mails between J. Nance and H. Benett (Apr. 2, 2009) [UBS-RESCAP-0052371]. The UBS letter is directed to Marano's attention but is addressed to "GMAC." Benett could not say why. Int. of H. Benett, Mar. 7, 2013, at 94:20–23. In any event, Benett said that such "go shop" efforts are rarely successful, because "interest typically goes way down after a deal's already been struck." *Id.* at 90:3–4.

[910] Int. of T. Marano, Nov. 26, 2012, at 38:11–15. Marano said that the "general consensus was, 'You'd have to pay us to take this thing because it has no voting rights and it keeps losing money.'" *Id.* at 38:17–20.

[911] Int. of S. Ramsey, Dec. 10, 2012, at 145:20–23. Ramsey believed that the non-voting nature of ResCap's interest in IB Finance was no more than "a footnote" to the valuation of ResCap's interest. *Id.* at 156:2–7. Hull, AFI's CFO, said: "I'm sure the voting status . . . informs value at some level. It can't not." Int. of R. Hull, Feb. 7, 2013, at 169:6–8. UBS (which was engaged in marketing, not valuation) had highlighted this factor in the discussion materials it presented to the ResCap Board on January 23, 2009. See UBS Presentation on GMAC Bank Tracking Stock Overview, dated Jan. 2009, at RC40011109–14 [RC40011078]. Benett said that "we would have given them advice that non-voting stock is going to be harder to sell." Int. of H. Benett, Mar. 7, 2013, at 78:21–24. Although the discussion points prepared by UBS for the ResCap Board intimate that "add[ing] voting rights" or "restructur[ing] the profit rights" would enhance marketability of the interests, Benett had no specific recollection of such considerations in the context of UBS marketing efforts or in discussions with ResCap's Board in general or with its Independent Directors. *Id.* at 86:15–88:14.

(among others) were on the distribution list for an October 31, 2008 presentation by Goldman Sachs which had opined: "Despite limited rights and other issues, third party interest in Class M Common Units still possible."[912]

In this regard, Seymour Preston, one of the professionals from Goldin Associates who provided the fairness opinion, said that Goldin Associates did not give any thought at the time to what a third party might have paid for ResCap's interest in the Ally Bank holding company,[913] but surmised that it would have been "well below" the consideration obtained from AFI, in part because the shares were "non-voting, had no controlling capabilities, and were highly illiquid."[914]

Notwithstanding that limited recollection, it is evident that in evaluating the fairness of the transaction, Goldin Associates took into account the fact that the IB Finance Class M Shares owned by ResCap conferred only limited rights. Goldin Associates' presentation noted that "[t]he potential fair value of the Class M Common Interests is in large measure a function of the rights conferred upon holders of those interests,"[915] and went on to observe: "In fact, the rights associated with the Class M Common Interests are significantly limited; such limitations pose significant risks to any third party buyer of the Class M Common Interests."[916]

Accordingly, Goldin Associates reported that it applied less weight to certain comparable transactions considered in connection with the valuation process associated with preparation of the fairness opinion:

> Goldin determined to underweight the Comparable Company analysis . . . . Shareholders of the public companies have greater protections, including the right to vote . . . . Goldin determined to underweight the Precedent Transactions analysis because the transactions analyzed include control / strategic premiums that are not relevant to the limited rights of the Class M Interests.[917]

[912] Goldman Sachs Discussion Materials on AFI, Oct. 31, 2008, at ALLY_0259085 [ALLY_0259003]. The thought process of Goldman Sachs at the time was that a potential buyer may have thought market expectations of losses were overstated. *See* Int. of R. Hutchinson, Mar. 27, 2013, at 35:19–36:7.

[913] Int. of S. Preston, Jr., Feb. 15, 2013, at 113:19–25.

[914] *Id.* at 113:3–8; *see also* Goldin Associates Presentation to The Committee of Independent Members of the Board of Directors of Residential Capital, LLC Regarding The GMAC Bank Transaction with GMAC, LLC, dated Jan. 22, 2009, at 9 [GOLDIN00128045] ("tracking interests . . . are not readily marketable"); Int. of S. Preston, Jr., Feb. 15, 2013, at 135:9–13 (stating that one reason the shares were not readily marketable is that they were non-voting).

[915] Goldin Associates Presentation to The Committee of Independent Members of the Board of Directors of Residential Capital, LLC Regarding The GMAC Bank Transaction with GMAC, LLC, dated Jan. 22, 2009, at 35 [GOLDIN00128045].

[916] *Id.*

[917] *Id.* at 36; *see also* E-mail from S. Preston, Jr. (Dec. 30, 2008) [GOLDIN00126262] (stating "Discounts for lack of control range from 20% to 65%, or even higher").

On November 14, 2008, prior to approval of bank holding company status and the subsequent sale of ResCap's interest in Ally Bank, the AFI Board had adopted a resolution delegating to the Bank Board the authority to change the name of the bank (then known as GMAC Bank) should the Bank Board determine it was necessary to do so "to preserve or enhance the reputation of GMAC Bank and better enable GMAC Bank to maintain liquidity and continue operations."[918] On November 19, 2008, the Bank Board delegated to the bank's President the authority to change the name of the bank.[919] Following completion of the consolidation of AFI's bank ownership, the Bank Board ratified a change of the name of the corporation to "Ally Bank."[920] The moniker "Ally Bank" was rolled out to the public on May 15, 2009, with the assertion that the rebranded institution would "take banking in a new direction."[921]

As 2008 drew to a close, ResCap "was still very dependent on its parent for capital support and liquidity support."[922] ResCap's Preliminary Fourth Quarter and Full-Year Financial Results, released on February 3, 2009, announced a fourth quarter net loss of $981 million (approximately $60 million more than the same period in 2008) and a net loss for the year of $5.6 billion—exceeding its 2007 loss by $1.3 billion.[923] The report noted AFI's fourth quarter $1.67 billion "contribution" to ResCap, including $690 million of debt forgiveness under the Secured MSR Facility, and $976 million of ResCap bonds. It advised that "[a]s a result of these actions, ResCap remained in compliance with its tangible net worth covenants at Dec. 31, 2008."[924]

With respect to future support, and echoing AFI's January 8, 2009 statement of support for ResCap, ResCap's February 3, 2009 filing advised:

> As previously disclosed, if ResCap were to need additional support, [AFI] would provide that support so long as it was in the best interest of [AFI] stakeholders. While there can be no assurances, [AFI's] recently approved status as a regulated bank holding company has increased the importance of its support for ResCap.[925]

---

[918] Minutes of a Special Meeting of the Board of GMAC LLC, Nov. 14, 2008, at ALLY_PEO_0001326 [ALLY_PEO_0001009].

[919] *See* Minutes of a Regular Meeting of the Board of GMAC Bank, Nov. 19, 2008, at ALLY_PEO_0001635–36 [ALLY_PEO_0001488].

[920] *See* Minutes of a Regular Meeting of the Board of GMAC Bank, Apr. 21, 2009, at ALLY_PEO_0018213–14 [ALLY_PEO_0018165]; *see also* Rebranding GMAC Bank Presentation, dated Jan. 30, 2009, at ALLY_PEO_0002060–90 [ALLY_PEO_0002000].

[921] *See* AFI, Press Release, *Ally Bank Challenges Banking Industry with "Straight Talk" for Customers* (May 15, 2009), http://media.ally.com/index.php?s=43&item=328.

[922] Int. of C. Dondzila, Sept. 27, 2012, at 149:9–12.

[923] *See* Residential Capital, LLC, Current Report (Form 8-K) (Feb. 3, 2009), Ex. 99.1.

[924] *Id.*

[925] *Id.*

On February 3, 2009, Hull (together with Young, Muir, and others) conducted the fourth quarter 2008 earnings conference call to "go over [AFI] and ResCap's fourth quarter 2008 results."[926] In his remarks, Hull described as "critical," the federal bank holding company approval and $5 billion TARP investment received at the end of December 2008.[927]

In his opening narrative, Hull said that the funds permitted AFI to immediately "expand[ ] our consumer auto lending," and that while the TARP investment was as yet "not fully used or applied," the funds had to date been put "toward consumer auto lending and toward cash required in our bond exchange."[928] Asked by one participant in the conference call to address "what actions [you are] taking with the BHC status to improve [ResCap's] profitability," Hull stated that "there are open discussions going on and we think we have as good a position as anybody to help that business out," but he declined to give a more specific response.[929]

_____

[926] Transcript of GMAC Q4 2008 Earnings Call (Feb. 3, 2009), at 1 (available from Bloomberg Transcript). Hull specifically indicated in his statement that he would be addressing ResCap's results as well. It was not the practice of ResCap's management to hold a separate investor call. *See* Int. of R. Hull, Feb. 7, 2013, at 24:3–8.

[927] Transcript of GMAC Q4 2008 Earnings Call (Feb. 3, 2009), at 2 (available from Bloomberg Transcript).

[928] *Id.*

[929] *Id.* at 9.

## I.   THE POST-TARP PERIOD (2009–2010)

### 1.   *ResCap's Financial Picture In 2009*

In January 2009, ResCap was coming out of a year in which it had suffered a net loss of $5.6 billion, as compared to a $4.3 billion net loss in 2007, and a fourth quarter in which it had suffered a net loss of $981 million, as compared to the fourth quarter of 2007 when its net loss had been $921 million.[930]

ResCap blamed its revenue decline in 2008 on the domestic and European housing markets, funding costs, and adverse mortgage conditions in general, all of which continued to have an effect on ResCap's performance in 2009.[931] In addition, lower mortgage production during the fourth quarter of 2008—because of tight underwriting as well as "the closing of certain retail and wholesale lending channels, and lower net servicing fees"[932]—affected ResCap's domestic residential finance business. ResCap's declining asset values and its increasing losses and liabilities in the fourth quarter of 2008 led AFI to contribute $1.67 billion of equity to ResCap.[933] That figure included $690 million of debt forgiveness and $976 million (face value and accrued interest) of ResCap bonds that AFI contributed to ResCap in fourth quarter 2008, and which ResCap thereafter retired.[934] As a result of AFI's contributions, ResCap was in compliance with its consolidated TNW covenants as of December 31, 2008.

As 2009 dawned, experts made different negative economic forecasts for the coming year. The International Monetary Fund, for example, projected world economic growth in 2009 to be the slowest growth rate since World War II.[935] Other experts projected "by far the worst year for the global economy since the Great Depression."[936]

Across the economic landscape, pressures mounted in 2009, and efforts to stimulate the economy escalated. On February 17, 2009, President Obama signed a $787 billion stimulus

[930] *See* Residential Capital, LLC, Current Report (Form 8-K) (Feb. 3, 2009), Ex. 99.1 (providing preliminary financial results for fourth quarter 2008 and full year 2008).

[931] *See id.*

[932] *Id.*

[933] *See id.*

[934] *See id.*

[935] IMF, *WORLD ECONOMIC OUTLOOK UPDATE* (Jan. 28, 2009), http://www.imf.org/exter nal/pubs/ft/weo/2009/update/01/index.htm.

[936] SIMON JOHNSON, TESTIMONY TO THE SENATE BUDGET COMMITTEE HEARING ON THE GLOBAL ECONOMY: OUTLOOK, RISKS, AND THE IMPLICATIONS FOR POLICY, PETERSON INSTITUTE FOR INTERNATIONAL ECONOMICS, Jan. 29, 2009, http://www.iie.com/publications/testimony/print.cfm?ResearchId=1111&doc=pub (predicting "a severe slump" of the global economy "with declining output in the near term and no clear turnaround in sight").

package.[937] On March 18, 2009, the FRB announced a decision to buy $1.2 trillion of government bonds and mortgage-related securities, including $200 billion of Fannie Mae and Freddie Mac debt.[938] The FRB's earlier, similar effort to stimulate the economy pushed 30-year fixed-rate mortgages down by one percentage point, and economic analysts anticipated that the FRB's additional investment would push interest rates down another one-half of one percent.[939]

On April 30, 2009, Chrysler filed for chapter 11 bankruptcy protection.[940] On June 1, 2009, GM also sought chapter 11 protection with $172 billion in debt and $82 billion in assets.[941]

### a. Rising Unemployment And Increasing Mortgage Delinquencies And Foreclosures Continued To Pressure The Mortgage And Capital Markets In 2009

By the end of the first quarter of 2009, the prognosticators were proven right about just how bad the economy had become. The U.S. saw the fifth consecutive month of job losses totaling 600,000 or more. Unemployment, which had been at a discouraging 7.6% in January 2009, climbed to 8.5% in March 2009.[942] By October 2009, unemployment peaked at 10.2%, the highest unemployment rate since 1983, and an increase from 5.3% in December 2007.[943] Rising unemployment affected other parts of the economy, particularly the housing market.

In the U.S., high unemployment led to record numbers of homeowners being pushed into delinquency or foreclosure during the first quarter of 2009. The Mortgage Bankers

---

[937] *See* Laura Meckler, *Obama Signs Stimulus Into Law,* WALL ST. J., Feb. 18, 2009, http://online.wsj.com/article/SB123487951033799545.html.

[938] *See* Neil Irwin, *Fed To Pump $1.2 Trillion Into Markets*, WASH. POST, Mar. 19, 2009, http://www.washingtonpost.com/wp-dyn/content/article/2009/03/18/AR2009031802283.html.

[939] *See id.*

[940] Jim Ruttenberg & Bill Vlasic, *Chrysler Files to Seek Bankruptcy Protection*, N.Y. TIMES, Apr. 30, 2009, http://www.nytimes.com/2009/05/01/business/01auto.html?pagewanted=all.

[941] Neil King & Sharon Terlep, *GM Collapses Into Government's Arms,* WALL ST. J., June 2, 2009, http://online.wsj.com/article/SB124385428627671889.html.

[942] CNN MONEY, *Job Loss: Worst in 34 Years*, Feb. 6, 2009, http://money.cnn.com/2009/02/06/news/economy/jobs_january/(comparing January job losses and unemployment statistics with other post-World War II periods); *see also* Donald L. Kohn, Vice-Chairman, FRB, *The Economic Outlook* (Apr. 20, 2009), http://www.federalreserve.gov/newsevents/speech/ kohn20090420a.htm (noting that the labor market and production data continued to deteriorate in first quarter 2009, but finding a little light in the darkness with respect to the housing market where "declines in sales and construction of single-family homes" seemed to have abated in the preceding two months "in part, perhaps, because of the low levels of mortgage interest rates and the greater affordability of housing").

[943] U.S. DEP'T OF LABOR, BUREAU OF LABOR AND STATISTICS, UNEMPLOYMENT IN OCTOBER 2009 (Nov. 10, 2009), http://www.bls.gov/opub/ted/2009/ted_ 20091110.htm.

Association estimated that 12.7% of mortgage loans were delinquent, an increase from 8% for the same quarter in 2008.[944] Foreclosures also increased year-to-year. For the full year ended December 2009, RealtyTrac reported 3,957,643 foreclosure filings, up 21% from 2008,[945] while the U.S. Census Bureau reported that subprime mortgage delinquencies during the same period increased from 19.9% to 25.5% and prime loan delinquencies increased from 4.3% to 5.4%.[946]

Consumer Confidence Index, after bottoming out at 26.9 during the first quarter of 2009, climbed to 53.6 by year-end.[947] In addition, the S&P/Case-Shiller home price appreciation index, which had declined more than 50 points from its 2006 peak, leveled off and stabilized during the second half of 2009.[948] The rate of new housing starts in 2009, at a seasonally adjusted annualized rate of 456,000,[949] was less than half of the 1.2 million housing starts in 2006. This had the combined effect of limiting both the number of homes on the market and the number of months any individual house was available for sale.[950] Mortgage lenders,

---

[944] *See* Renae Merle, *Mortgage Delinquency Reaches Record High*, Wash. Post, May 29, 2009, http://articles.washingtonpost.com/2009-05-29/business/36897739_1_foreclosure-crisis-foreclosure-prevention-foreclosure-rates.

[945] Daren Blomquist, *A Record 2.8 Million Properties Receive Foreclosure Notices in 2009,* undated, http://www.realtytrac.com/landing/2009-year-end-foreclosure-report.html (noting that "2.21 percent of all U.S. housing units (one in 45) received at least one foreclosure filing during the year, up from 1.84 percent in 2008, 1.03 percent in 2007, and 0.58 percent in 2006").

[946] U.S. Census Bureau, Statistical Abstract Of The United States: 2012, Table 1194, Mortgage Originations And Delinquency And Foreclosure Rates: 1990 to 2010, Banking, Finance, and Insurance 743, http://www.census.gov/compendia/statab/2012/tables/12s1194.pdf. The abstract is based on the National Delinquency Survey, which covers 45 million loans on one-to-four-unit properties, representing 80 to 85% of all 'first-lien' residential mortgage loans outstanding. The loans surveyed were reported by approximately 120 lenders, including mortgage bankers, commercial banks, and thrifts.

[947] *See* The Consumer Confidence Index, Jan. 2009 to Dec. 2009. *Id.* The Conference Board, http://www.conference-board.org. Consumer Confidence in the United States is reported by The Conference Board. Historically, from 1967 until 2013, U.S. Consumer Confidence averaged 92.86 reaching an all-time high of 144.70 in January 2000 and a record low of 25.30 in February 2009. The Consumer Confidence Index is a barometer of the health of the U.S. economy from the perspective of the consumer. The Index is based on approximately 3,000 completed questionnaires reflecting consumers' perceptions of current business and employment conditions, as well as their expectations for the next six months regarding business conditions, employment, and income. The Consumer Confidence Index and its related series are among the earliest sets of economic indicators available each month and are closely watched as leading indicators for the U.S. economy. *See id.*

[948] S&P/Case-Shiller Home Price Indices 2009, A Year in Review, at Chart 3, http://www.cm egroup.com/trading/real-estate/files/SP-CSI-2009-Year-in-Review.pdf. The S&P/Case-Shiller index declined slightly during 2010 and 2011 before returning to 2009 levels in 2012. *Id.*; *see also* Section III.F.1.a (reviewing charts relevant to home price indices for the ten-year period ending 2012).

[949] S&P Dow Jones Indices: Residential Real Estate Indicators—January 2010, http://us.spindices.com/indices/real-estate/sp-case-shiller-us-national-home-price-index.

[950] *Id.*

however, began to face new troubles in 2009 as the monoline insurers and government agencies suffered significant losses caused by the growing number of delinquencies and foreclosures and began to seek recourse against the lenders.[951]

### (1) Rising Mortgage Delinquencies Negatively Affected ResCap's MSR Assets And Servicing Platform, Making ResCap Increasingly Dependent On AFI

In early 2009, ResCap's liquidity portfolio—"cash readily available to cover operating demands from across [their] business operations and maturing obligations"—totaled only $0.5 billion.[952] ResCap was continuing to implement the restructuring plan that it had adopted in September 2008. That plan called for the reduction of ResCap's workforce by 60% (equaling approximately 5,000 employees) to achieve "estimated annual cost reductions of $410 million in compensation and benefits and a further $25 million of reduced rent and asset depreciation."[953] As 2008 came to a close, ResCap employed a total of 6,100 workers, which included 1,000 GMAC Home Services employees who were retained on ResCap's payroll through year-end 2008 as part of the GMAC Home Services sale transition agreement.[954] An additional 500 employees were given termination notices in 2008 and removed from ResCap's rolls in early 2009.[955] ResCap hired a limited number of additional personnel in the origination area during the second quarter of 2009 as a result of increased consumer demand for mortgages resulting from lower interest rates,[956] but by early 2010, it appears that ResCap had continued to reduce the size of their workforce overall.[957]

### (2) The Makeup Of The ResCap Board Changed During 2009

When 2009 began, the ResCap Board included AFI's David DeBrunner, Alvaro de Molina, and David Walker; Cerberus executives Joshua Weintraub, and Ronald Kravit; Independent Directors Karin Hirtler-Garvey and Ted Smith; and ResCap's CFO James Young, and Chairman and CEO, Thomas Marano. Kravit's and Weintraub's resignations were announced at the March 23, 2009 ResCap Board meeting. They said they had to resign from the ResCap Board because of rules and conditions associated with AFI obtaining bank holding

---

[951] *See, e.g.* Lorraine Woellert & Clea Benson, *Banks Resisting Fannie, Freddie Demands to Buy Back Mortgages*, BLOOMBERG, Nov. 30, 2010, http://www.bloomberg.com/news/2010-11-30/banks-in-u-s-resisting-calls-to-repurchase-fannie-mae-freddie-mac-loans.html.

[952] *See* Residential Capital, LLC, Annual Report (Form 10-K/A) (Aug. 25, 2009), at 62–63.

[953] Residential Capital, LLC, Quarterly Report (Form 10-Q) (Nov. 10, 2008), at 49.

[954] *See* Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 26, 2009), at 30.

[955] *See id.*

[956] Jeff Blumenthal, *ResCap hiring at least 100 in Fort Washington*, PHILA BUS. J., Apr. 15, 2009, http://www.bizjournals.com/philadelphia/stories/2009/04/13/daily18.html.

[957] Goldman Sachs Presentation to AFI, dated Mar. 17, 2010, at 12 [ALLY_0355162] (listing the total number of employees at 3,998).

company status.[958] During that meeting, Marano nominated ResCap EVP and CFO, Anthony Renzi, to the ResCap Board,[959] and on March 26, 2009, Renzi and Young joined Marano on the Executive Committee.[960]

AFI's de Molina also left the ResCap Board in March 2009, at approximately the same time he joined the AFI Board and became AFI CEO.[961] Although de Molina described his attendance at ResCap Board meetings as "spotty," he said he was "involved in all the conversations around liquidity and so forth during the whole period."[962]

On April 30, 2009, Marano informed the ResCap Board that Independent Director Karin Hirtler-Garvey was joining AFI as Chief Risk Executive, but that she would continue on the ResCap Board until her replacement was appointed.[963] At the end of May 2009, Pam West began serving as an Independent Director with Ted Smith, and Hirtler-Garvey apparently remained on the ResCap Board as an inside director.

A month later, Marano informed the ResCap Board that (1) Hirtler-Garvey had tendered her resignation from the Board and from the Audit Committee, which she had chaired in her capacity as an Independent Director; and (2) he did not anticipate the vacated Board seat being filled at that time.[964] Marano could not recall if Hirtler-Garvey ever advised the ResCap Board that she was interviewing with AFI for a potential position while sitting as an Independent Director on the ResCap Board, but he knew that there was a point where she informed the ResCap Board, and it was "determined that she needed to get off the Board, she was no longer an independent."[965] Hirtler-Garvey stated that she recommended West, who

[958] Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Mar. 23, 2009, at RC40006091 [RC40005949].

[959] *Id.* at RC40006092.

[960] Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Mar. 26, 2009, at RC40006109 [RC40005949].

[961] *Id.*

[962] Int. of A. de Molina, Nov. 20, 2012, at 13:13–15:3.

[963] Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Apr. 30, 2009, at RC40006152 [RC40005949]. At this time, as an Independent Director, Hirtler-Garvey was also chair of the ResCap Audit Committee and had chaired a meeting the previous day and chaired another meeting of the ResCap Audit Committee on May 7, 2009. *See* Minutes of the Meeting of the Residential Capital Audit Committee, Apr. 29, 2009, at RC40020707 [RC40020694]; Minutes of the Meeting of the Residential Capital Audit Committee, May 7, 2009, at RC40020712 [RC40020694]. Hirtler-Garvey's online resume indicates that she was AFI's Chief Risk Officer from May 2009 to November 2011.

[964] *See* Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, June 23, 2009, at RC40006224 [RC40005949]. West stated that it was her understanding that Hirtler-Garvey ceased being an Independent Director and became an Inside Director when West joined the ResCap Board. Int. of P. West, Dec. 18, 2012, 177:15–178:23.

[965] Int. of T. Marano, Nov. 26, 2012, at 98:13–99:7.

came out of Bank of America, to be the incoming Independent Director. Hirtler-Garvey advised that she remained on the ResCap Board for a month after joining AFI so that West would have the benefit of the overlap.[966]

On July 15, 2009, Young informed the ResCap Board that David Walker had resigned from the Board on that date, effective immediately.[967] The following day, on July 16, 2009, DeBrunner resigned from the ResCap Board, effective July 17, 2009.[968] DeBrunner acknowledged that he resigned from the ResCap Board because, as an AFI officer, he began to believe he was conflicted.[969]

On September 8, 2009, the ResCap Board was informed that Renzi had tendered his resignation from the Board and all related committees.[970] The ResCap Board was reduced to four people: Marano and Young, and Independent Directors West and Smith.

### (3) The ResCap Board Met Regularly To Review Liquidity In 2009

Liquidity concerns and the strategic direction of the company were two key agenda items for the ResCap Board by the summer of 2009. Although ResCap complied with its consolidated TNW covenants in the first six months of 2009, ResCap acknowledged that there was a risk that it would "not be able to meet its debt service obligations, and would default on its financial debt covenants due to insufficient capital and/or be in a negative liquidity position

---

[966] Int. of K. Hirtler-Garvey, Dec. 20, 2012, at 296:20–297:15.

[967] Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, July 15, 2009, at RC40006249 [RC40005949]. Walker resigned from AFI a month later. Int. of D. Walker, Nov. 28, 2012, at 6:19–21.

[968] *See* Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, July 16, 2009, at RC40006251 [RC40005949].

[969] Int. of D. DeBrunner, Sept. 13, 2012. The following colloquy is enlightening with respect to what DeBrunner was thinking at the time of his resignation:

[Q:] I understood what you said. Your duty was to provide knowledge and wisdom, if you will, on accounting related issues. I guess I had a different question in mind, which is sitting on the ResCap [B]oard did you consider you had a duty to ResCap? Did you consider you had a duty to GMAC?

[A:] I considered I had a duty to ResCap.

[Q:] All right. And how did you reconcile in your mind your role as GMAC officer with interest presumably as a fiduciary to GMAC as an officer with your role as a fiduciary to ResCap?

[A:] Well, and maybe this gets to where the question is going, but that was part and parcel the reason why when I did resign from the board. It was because at the time there started to be discussions about should we consider a bankruptcy. And at that point, given my role at GMAC, as an officer of GMAC, I felt that that was a conflict and that it was hard for me to separate the two. So I resigned from the [B]oard because I didn't want to be in that position.

*Id.* at 73:8–74:7. DeBrunner added that had he previously felt conflicted, he would have recused himself. *Id*. at 74:8–14.

[970] *See* Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Sept. 8, 2009, at RC40006291 [RC40005949].

in 2009 or future periods."[971] From June 2009 through approximately November 2009, the ResCap Board scheduled a standing daily 6:00 p.m. meeting to discuss liquidity.[972] Marano explained:

> [Liquidity] was something that we were worried about, because we had facilities that were up, and we did have projections that showed we could potentially run into a liquidity problem. And those would largely be caused by movements in the MSR valuation. A lot of times, the MSR came back in value and we were able to borrow against it no problem from Citi or [AFI]. There . . . were times where it definitely got tight. But . . . it wasn't a problem, because [AFI was] more than willing to provide the liquidity to us. It was capital that [AFI] got more worked up about, providing capital support.[973]

> ### b. AFI Voiced Concerns About ResCap's Ability To Remain A Going Concern Early In 2009 And Made No Assurance That AFI Would Continue To Provide Support In The Form Of Liquidity Or Capital

As 2009 progressed, the mortgage and capital markets remained under a period of severe stress in the United States, the United Kingdom, and the European continent.[974] ResCap, which required substantial capital to support its operations, was now "heavily dependent" on AFI and its affiliates for "funding and capital support," and faced the reality that there was no longer any assurance that AFI could continue to support ResCap's capital and liquidity needs.[975] On January 8, 2009, ResCap filed the following Regulation FD (Fair Disclosure) statement with the SEC:

> In response to various questions that have come to [AFI's] attention, [AFI] reiterated in an announcement that Residential Capital, LLC ("ResCap") is an important subsidiary of [AFI], and [AFI] has made significant progress in reshaping ResCap to better align it with current market conditions. [AFI] stated that it believes that the support it has provided to ResCap to date was

---

[971] Residential Capital, LLC, Quarterly Report (Form 10-Q) (Aug. 7, 2009), at 8.

[972] *See* Int. of T. Marano, Nov. 26, 2012, at 133:16–134:18; *see also* Minutes of a Special Meeting of the Residential Capital Board of Directors, June 5, 2009, at RC40006172 [RC40005949]. Scheduling a standing meeting at 6:00 p.m. daily to discuss liquidity was done at the behest of Marano. *Id.* at RC40006173. The meetings were often telephonic and on many occasions were held for the sole purpose of discussing liquidity.

[973] Int. of T. Marano, Nov. 26, 2012, at 134:4–18.

[974] *See, e.g.*, EUROPEAN COMMISSION, DIRECTORATE-GENERAL FOR ECONOMIC AND FINANCIAL AFFAIRS, ECONOMIC CRISIS IN EUROPE: CAUSES, CONSEQUENCES AND RESPONSES (July 2009), http://ec.europa.eu/economy_finance/publications/publication15887_en.pdf (describing the European economy as being "in the midst of the deepest recession since the 1930s, with real GDP projected to shrink by some 4% in 2009").

[975] GMAC LLC, Annual Report (Form 10-K) (Feb. 26, 2009), at 14 (emphasis added).

> in the best interests of [AFI] stakeholders. It further stated that if
> ResCap were to need additional support, [AFI] would provide
> that support *so long as it was in the best interests of [AFI]
> stakeholders*. While there can be no assurances, [AFI's] recently
> approved status as a regulated bank holding company has
> increased the importance of its support for ResCap.[976]

The above statement makes clear that AFI was giving no assurance that its support for ResCap would continue. ResCap knew that losing AFI's financial support would have a material adverse effect on ResCap's businesses and financial position, particularly given the likelihood that ResCap (and other ResCap subsidiaries with similar debt obligations) could not remain in compliance with TNW and debt covenants without AFI's support.[977]

As 2009 proceeded, the subject of ResCap's reliance on AFI to meet its capital and liquidity needs—and what would happen if the AFI spigot were turned off—became an on-going theme, not just at ResCap, but also within AFI.

AFI's lack of unconditional support for ResCap was expressed again in AFI's 2008 Annual Report, which was filed with the SEC on February 26, 2009:

> ResCap remains heavily dependent on [AFI] for funding and
> capital support, and there can be no assurance that [AFI] will
> provide such support. In light of ResCap's liquidity and capital
> needs, combined with volatile conditions in the marketplace,
> *there is substantial doubt about ResCap's ability to continue as
> a going concern*. If [AFI] determines to no longer support
> ResCap's capital or liquidity needs, or ResCap is unable to

---

[976] Residential Capital, LLC, Current Report (Form 8-K) (Jan. 8, 2009), Item 7.01 (emphasis added). At AFI's first quarter 2009 earnings call, AFI CFO Robert Hull reiterated AFI's position in response to a question:

> We evaluate our support of ResCap just like all of our businesses, frankly; although ResCap, because it's walled off, requires special care. We, both from a capital and liquidity basis, we evaluate it constantly; monthly, if not more regularly. It continues to get our support. . . . *And as long as it's in the interest of the core [AFI] stakeholder base, we will continue to support it*.

GMAC Earnings Call, dated May 5, 2009, http://www.ally.com/about/investor/events-presentations/ (emphasis added). Thus ResCap's future was in the hands of AFI and its "core . . . stakeholder[s]." *Id*.

[977] *See* Residential Capital, LLC, Annual Report (Form 10-K/A) (Aug. 25, 2009), at 61.

successfully execute its other initiatives, it could have a material adverse effect on ResCap's business, results of operations, and financial position.[978]

ResCap has significant near-term liquidity issues. There is a significant risk that ResCap will not be able to meet its debt service obligations and other funding obligations in the near-term. . . . We have extensive financing and hedging arrangements with ResCap, which could be at risk of nonpayment if ResCap were to file for bankruptcy.[979]

In its May 2009 10-Q filing reporting on the first of quarter of 2009, AFI provided a similar, but slightly more nuanced version of its position, while at the same time underscoring that it had concerns about the implications of a ResCap bankruptcy:

ResCap remains heavily dependent on [AFI] and its affiliates for funding and capital support, and there can be no assurance that [AFI] or its affiliates will continue such actions. We have previously disclosed that ResCap is an important subsidiary and that we believed the support we have provided to ResCap was in the best interests of our stakeholders. We have further disclosed that if ResCap were to need additional support, we would provide that support so long as it was in the best interests of our stakeholders. While there can be no assurances, our recently approved status as a regulated bank holding company has increased the importance of our support for ResCap as its core origination and servicing business provides diversification benefits for us.

Although our continued actions through various funding and capital initiatives demonstrate support for ResCap and our status as a bank holding company and completion of our private debt exchange and cash tender offers better position us to be capable of supporting ResCap, *there are currently no commitments or assurances for future funding and/or capital support. Consequently, there remains substantial doubt about ResCap's ability to continue as a going concern.* Should we no longer continue to support the capital or liquidity needs of ResCap or

_____

[978] GMAC LLC, Annual Report (Form 10-K) (Feb. 26, 2009), at 14. AFI's recognition of the Debtors' possible bankruptcy continued throughout 2009. *See, e.g.*, Minutes of a Special Meeting of the Board of Directors of GMAC LLC, Oct. 28, 2009, at ALLY_0115266 [ALLY_0114717] (noting that Sam Ramsey had updated the AFI Board on ResCap's cash position and the status of management's analysis of different strategic alternatives to which the AFI Board responded with questions regarding capital considerations related to a ResCap bankruptcy or implications of a potential chapter 11 filing).

[979] GMAC LLC, Annual Report (Form 10-K) (Feb. 26, 2009), at 15.

> should ResCap be unable to successfully execute other
> initiatives, it would have a material adverse effect on ResCap's
> business, results of operations, and financial position.[980]

At this time, AFI also participated in "Project Windmill," which analyzed AFI's exposure in the event ResCap filed for bankruptcy in 2009.[981]

### c. AFI Was Not A Lone Voice; ResCap Questioned Its Own Ability To Continue As A "Going Concern"

The concerns AFI voiced in the first quarter of 2009 were echoed by ResCap:

> The occurrence of recent adverse developments in the mortgage
> finance and credit markets has adversely affected our business,
> our liquidity and our capital position and has raised substantial
> doubt about our ability to continue as a going concern. . . . [982]

After discussing: (1) the negative effect on ResCap of the conditions in the mortgage industry; (2) the deteriorating fair market valuations of mortgage loans held for sale, mortgage servicing rights, and securitized interests attributable to weakening housing prices and increasing mortgage loan delinquency rates; and (3) recent rating agency downgrades of asset-backed and mortgage-backed securities, which significantly reduced the levels of liquidity available to ResCap to finance its operations; ResCap added:

> We are highly leveraged relative to our cash flow and continue
> to recognize substantial losses resulting in a significant
> deterioration in capital. There continues to be a risk that we will
> not be able to meet our debt service obligations, [that we will]
> default on our financial debt covenants due to insufficient
> capital and/or [that we will] be in a negative liquidity position in
> 2009. We remain heavily dependent on our parent and affiliates
> for funding and capital support, and there can be no assurance
> that our parent or affiliates will continue such actions. . . .
>
> In light of our liquidity and capital needs, combined with
> volatile conditions in the marketplace, *there is substantial doubt*
> *about our ability to continue as a going concern. If our parent*
> *no longer continues to support our capital or liquidity needs, or*

---

[980] GMAC LLC, Quarterly Report (Form 10-Q) (May 11, 2009), at 8 (emphasis added).

[981] *See* Draft GMAC Presentation on Project Windmill, Exposure Review and Key Points, dated Mar. 6, 2009 [ALLY_0199540] (estimating that if ResCap filed for bankruptcy that day, AFI's exposure would be between $3.1 and $4.9 billion).

[982] Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 26, 2009), at 31–32 (emphasis added).

> *we are unable to successfully execute our other initiatives, it*
> *would have a material adverse effect on our business, results of*
> *operations and financial position.*[983]

### d. The ResCap Board Also Looked Into The Ramifications Of A Bankruptcy Filing In 2009

On several occasions in 2009, the ResCap Board considered the implications of a bankruptcy filing or other scenarios, including merging ResCap into AFI. In May 2008, ResCap had retained Lazard as its "investment banker and financial advisor with respect to an on-going contingency planning process," which later became known as Project Scout I.[984] Project Scout I involved developing "a strategy for a potential chapter 11 process,"[985] which included, at various times, projected ResCap chapter 11 filing dates of June 9, 2008[986] and October 31, 2008.[987] Project Scout I, and Lazard's services in relation to Project Scout I, were terminated when "TARP relief was granted" to AFI in December 2008.[988]

In 2009, ResCap retained Lazard to oversee Project Scout II. The project was described as being a "different project in a sense" than Project Scout I because "things had changed" as a result of AFI's receipt of TARP funding.[989]

---

[983] *See* Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 26, 2009), at 31–32. As noted above, the debtors' liquidity portfolio ("cash readily available to cover operating demands from across [its] business operations and maturing obligations") totaled \$.05 billion at the end of 2008. *Id*. at 31. ResCap anticipated liquidity pressures to continue through 2009. *Id.* In the same report, ResCap acknowledged the risk that AFI could require ResCap to act against ResCap's own interests:

> [AFI] controls all fundamental matters affecting us, and its interests may differ from ours. [AFI] indirectly owns all of our outstanding membership interests and has the power to elect and remove all of our directors, including the two Independent Directors who are required under an operating agreement to which we and [AFI] are a party. The operating agreement may be amended by the parties thereto, except for amendments that materially and adversely affect the rights of the holders of our outstanding notes, which require the approval of a majority of the Independent Directors. The operating agreement may be terminated by the parties thereto provided a majority of the Independent Directors approve the termination. The operating agreement also terminates if we cease to be a direct or indirect subsidiary of [AFI]. [AFI's] interests may differ from ours and, subject to the applicable provisions of the operating agreement; AFI may cause us to take actions that are materially adverse to us.

*Id*. at 32.

[984] Int. of T. Pohl, Feb. 26, 2013, at 8:5–9. In total, there appear to have been three iterations of Project Scout over as many years.

[985] Lazard/Skadden Draft Presentation, Project Scout, dated May 2008, at 1 [LAZ-RSCP-XMR00010457].

[986] *Id*.

[987] Lazard/Skadden Presentation for GMAC, dated Oct. 2008, at EXAM20020827 [EXAM20020824].

[988] Int. of T. Pohl, Feb. 26, 2013, at 35:20–36:6.

[989] *Id.* at 36:7–16.

Project Scout II focused on the ramifications of a "sudden" ResCap chapter 11 filing.[990] On June 10, 2009, Lazard presented to the ResCap Board materials on a "free-fall" chapter 11 filing by ResCap and the potential ramifications for Ally Bank and AFI. With respect to Ally Bank, the Project Scout II team examined:

- The effect of an immediate cessation of all lending and servicing operations;

- The risk of rising (and potentially doubling) default rates and the impact on investors and the government;

- The reputational harm that could adversely impact Ally Bank's (and AFI's) "ability to participate in the mortgage, depository and auto finance markets";

- The termination of hedges, which would leave Ally Bank with pipeline and MSR exposure; and

- The significant risk of litigation, brought by "customers, investors, clients, [and] vendors."[991]

The Project Scout II team also examined the potential collateral harm to AFI, which included placing at risk: (1) $5 billion of AFI debt and equity; (2) AFI's state and federal licenses; (3) AFI's reputation; (4) $300 million of ResCap cash, which was on deposit at Fannie Mae; and (5) AFI, with respect to an increased risk of litigation.[992] The Project Scout II presentation to the ResCap Board reviewed the strategic importance of mortgage operations, and noted the critical importance of ResCap to AFI's mortgage operations.[993] Although the Project Scout II materials were shared with the AFI Board as well as the ResCap Board on June 10, 2009, only the AFI Board minutes reflect a related discussion.[994] At the AFI Board meeting, "it was agreed that a free fall chapter 11 filing would be detrimental to ResCap and its enterprise value. It was also agreed that the AFI Board would need additional analysis with respect to strategic options available for ResCap."[995]

On June 16, 2009, the ResCap Board met telephonically in a reconvened session to hear from ResCap counsel, Morrison & Foerster, "with respect to information and guidance

---

[990] See Lazard, Project Scout II Presentation, prepared for a Special Meeting of the Board of Directors of Residential Capital, LLC, dated June 10, 2009, at RC40011255–59 [RC40011250] (discussing a "free fall" chapter 11 filing).

[991] See Project Scout II Presentation, prepared for a Special Meeting of the Board of Directors of Residential Capital, LLC, dated June 10, 2009, at RC40011256 [RC40011250].

[992] See id.

[993] See id. The June 10, 2009 ResCap Board minutes reflect no related discussion. See Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, June 10, 2009, at RC40006224 [RC40005949].

[994] See Minutes of a Special Meeting of the Board of GMAC LLC, June 10, 2009, at ALLY_0114989 [ALLY_0114717].

[995] See id. at ALLY_0114989–90.

relating to the possibility of a ResCap bankruptcy filing."[996] This included "a detailed presentation [by counsel] on a chapter 11 bankruptcy filing" and a discussion of "asset sale alternatives in a chapter 11 filing."[997]

### e. Project Origin Analyzed The Risk Of A ResCap Chapter 11 Filing On Various Constituents

On July 7, 2009, the ResCap Board considered a presentation prepared by Lazard under a new project name, "Project Origin." The project considered the risks to various constituents if ResCap instituted a chapter 11 case.[998] Marano informed the ResCap Board that ResCap management had reviewed the Project Origin presentation earlier the same day with U.S. Treasury officials.[999] Project Origin made certain assumptions with regard to a bankruptcy filing, including that: (1) ResCap would "reorganize as a going concern"; (2) the "contingency planning" would include "reaching out to certain constituencies prior to filing"; and (3) ResCap would engage in an out-of-court restructuring with contingency planning involving a smaller subset of the constituent list discussed below.[1000] In other words, unlike Project Scout II, Project Origin's focus was not on a free fall bankruptcy.

For each constituent on a list carrying the heading, "Constituent Risk Assessment," the Project Origin presentation identified the risk/issue, the exposure, the next steps to be

---

[996] Minutes of the Reconvened Meeting of the Board of Directors of Residential Capital, LLC, June 16, 2009, at RC40006184 [RC40005949]. The ResCap Board's meeting earlier the same day ended at 6:25 p.m., in time for the reconvened meeting to begin at 6:30 p.m. Minutes for the earlier meeting were distributed separately. *See* Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, June 16, 2009, at RC40006183 [RC40005949].

[997] Minutes of a Reconvened Meeting of the Board of Directors of Residential Capital, LLC, June 16, 2009, at RC40006184 [RC40005949]. The presentation materials provided to the ResCap Board for this meeting do not appear to have been produced in this proceeding. The minutes of the Board meeting are not marked privileged, but within the context of the minutes is a reference to the Board engaging in a privileged discussion with counsel. *Id.*

[998] Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, July 7, 2009, at RC40006240 [RC40005949]; *see also* Project Origin Presentation to the Board of Directors of Residential Capital, LLC, dated July 2009, at RC40011389 [RC40011378].

[999] Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, July 7, 2009, at RC40006240 [RC40005949].

[1000] Project Origin Presentation to the Board of Directors of Residential Capital, LLC, dated July 2009, at RC40011389 [RC40011378].

taken, and the priority of each constituent. The following chart contains examples of the Constituent Risk Assessment from the presentation:

EXHIBIT III.I.1.e
**Constituent Risk Assessment Examples**

| Constituent | Risk / Issue | Exposure | Next Steps | Priority Level |
|---|---|---|---|---|
| AFI shareholders | Need buy-in for strategy on ResCap Reputational risk Capital/value risk | N/A | On-going discussions | High |
| Federal Reserve | Regulatory authority over AFI BHC status Reputational risk | N/A | [AFI] to meet with Federal Reserve on July 14 | High |
| FDIC | Regulatory authority over Ally Bank Reputational risk | N/A | Determine timing of meeting based on discussion with Fed prior to July 14 | High |
| Federal Housing Financing Agency | Oversees GSEs | TBD | Make contact once decision is made and plan mapped out | High |
| HUD | Key mortgage policy maker/regulator | TBD | Make contact once decision is made and plan mapped out | High |
| FNMA | Potential to transfer servicing and discontinue purchasing of loans | ResCap: $1.1 billion in MSRs Ally: $505 million in MSRs | Make contact once decision is made and plan mapped out | High |
| FHLMC | Potential to transfer servicing and discontinue purchasing of loans | ResCap: $4.4 million in MSRs Ally: $210 million in MSRs | Make contact once decision is made and plan mapped out | High |
| Federal Home Loan Bank | Potential to cease lending to Ally Bank | $8.7 billion outstanding amount | Make contact once decision is made and plan mapped out | High |
| GNMA | Potential to transfer servicing and discontinue purchasing of loans | ResCap: $376 million in MSRS | Make contact once decision is made and plan mapped out | High |

*Source: Project Origin Presentation to the Board of Directors of Residential Capital, LLC, July 7, 2009 at RC40011391-92 [RC40011378].*

Twenty-two additional constituents, either by name or by type (with some types representing multiple entities) were identified on the draft chart including banks, vendors, derivative counterparties, monoline bond insurers, PMI insurers, noteholders, and foreign regulators.[1001]

---

[1001] Project Origin Presentation to the Board of Directors of Residential Capital, LLC, July 7, 2009, at RC40011391–92 [RC40011378].

The possibility of a ResCap bankruptcy went beyond internal discussions. At its August 5, 2009 meeting, the ResCap Board considered the implications of a Bloomberg News article, which had been forwarded to Marano by a senior executive from AFI's Capital Markets Division. The article began: "[AFI] the auto lender that took $13.5 billion of U.S. bailout funds, may cut losses and the need for capital by sending its home mortgage unit, Residential Capital LLC, into bankruptcy."[1002] Quoting CreditSights, the article stated that by doing so, AFI "could keep ResCap's 'remaining good assets' and leave behind $11.4 billion of debt"; Bloomberg News noted that CreditSights had queried whether it was "'time to put ResCap out of its misery.'"[1003] The ResCap Board considered the effect the article might have on employees and the possible effect on renewing lines of credit.[1004]

### f. In August 2009, AFI Made An Opening Offer To Purchase Certain MSRs From ResCap, Which Appears To Have Been An Off-Shoot Of Project Origin

On August 4, 2009, AFI Executive Vice President Samuel Ramsey sent a letter to Marano, attaching a draft, non-binding proposal by which one or more AFI[1005] Subsidiaries would acquire ResCap's MSRs and its origination platform.[1006] Ramsey's letter was captioned "Project Origin," but this potential transaction transformed into "Project Timex" shortly thereafter.[1007] The assets that AFI offered to purchase included:

- MSRs related to certain mortgage loan portfolios (including the obligation to make servicer advances);

- All contracts with Fannie Mae, Freddie Mac, and Ginnie Mae (the "GSE contracts");

---

[1002] E-mail from K. Skover (Aug. 5, 2009) [RC40011015] (forwarding to the ResCap Board an e-mail from AFI's Seth Silverstein attaching the Bloomberg article).

[1003] Id.

[1004] See Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Aug. 5, 2009, at RC40006272 [RC40005949].

[1005] GMAC LLC converted from a Delaware limited liability company to a Delaware corporation, renamed GMAC Inc., effective June 30, 2009. See GMAC Inc., Quarterly Report (Form 10-Q) (Aug. 7, 2009), at 5.

[1006] See Draft Proposal for the Acquisition of the Origination/Servicing Assets of Residential Capital, LLC and Cover Letter from AFI to ResCap, dated Aug. 4, 2009, at RC40011007 [RC40011000]. Ramsey's August 4, 2009 letter and proposal were included among the materials sent to the ResCap Board the same day. See ResCap Board Materials Prepared for a Special Meeting of the ResCap Board, dated Aug. 4, 2009, at RC40007038 [RC40007006].

[1007] Project Timex Presentation Prepared for a Special Meeting of the Board of Directors of GMAC Inc., dated Sept. 10, 2009, at 2 [ALLY_PEO_0025671]. Project Timex was intended to be an "out of court" purchase of ResCap's origination and servicing business, including Agency and private label MSRs, conforming mortgage loans held for sale, derivatives related to the MSRs, etc. for a purchase price of $3.8 billion, offset by representation and warranty liabilities, and other credits. The deal was intended to include a $600 million capital contribution from AFI to ResCap. Id. De Molina referred to Project Timex as "Sam Ramsey's baby," and said Ramsey "was trying to find solutions." He added that Ramsey found Project Timex to be an attractive solution, although de Molina said he did not know if Ramsey felt that way in the end. Int. of A. de Molina, Nov. 20, 2012, at 208:2–13. Ramsey, when interviewed, could not recall the specifics of Project Timex. Int. of S. Ramsey, Dec. 10, 2012, at 135:25–136:5.

- All accounts receivable that were servicer advances made by ResCap in connection with Fannie Mae, Freddie Mac, and Ginnie Mae transactions;

- Certain prime conforming loans that were held for sale and eligible for delivery to Fannie Mae, Freddie Mac, and Ginnie Mae;

- All related sub-servicing contracts and agreements; and

- Other ancillary assets, property, equipment employees, records, etc. required to conduct the business.[1008]

The ResCap Board was introduced to AFI's proposal at an August 4, 2009 meeting,[1009] and they considered the matter again in a special session on August 9, 2009, in order to allow the Independent Directors an opportunity to discuss the draft term sheet.[1010] Among the topics discussed by the ResCap Board were "the assets available for sale, rep and warranty considerations, and timing of a potential transaction."[1011] Between meetings, Marano, on behalf of ResCap, and Ramsey, on behalf of AFI, exchanged letter proposals and counter-proposals.[1012] The discussion continued at August 10, 2009 and August 12, 2009 ResCap Board meetings.[1013] On August 13, 2009, Ramsey provided ResCap with a revised term sheet and counter-offer that included the following AFI commitments:

- AFI would make a further equity investment in ResCap of $500 million in connection with the completion of the proposed transactions so long as there was a "simultaneous transfer by [AFI] of 100% of ResCap's common equity interests to [AFI's] current shareholders";

- AFI would work with ResCap "to develop a solution to provide" ResCap with $300 million in additional liquidity that ResCap anticipated needing through September 30, 2009; and

---

[1008] *See* Draft Proposal for the Acquisition of the Origination/Servicing Assets of Residential Capital, LLC and Cover Letter from AFI to ResCap, dated Aug. 4, 2009, at RC40011007 [RC40011000].

[1009] *See* Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Aug. 4, 2009, at RC40006287 [RC40005949].

[1010] Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Aug. 9, 2009, at RC40006276 [RC40005949]. A marked-up draft of the Servicing Proposal was provided to the ResCap Board in advance of this meeting. *See* Comments by ResCap and its Advisors, Acquisition of the Origination/Servicing Assets of Residential Capital, LLC, dated Aug. 7, 2009, at RC40009422–43 [RC40009421].

[1011] Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Aug. 9, 2009, at RC40006276 [RC40005949].

[1012] *See* Board Materials Prepared for a Special Meeting of the Board of Directors of Residential Capital, LLC, dated Aug. 12, 2009, at RC40009510 [RC40009497].

[1013] *See* Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Aug. 10, 2009, at RC40006277 [RC40005949]; *see also* Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Aug. 12, 2009, at RC40006278 [RC40005949].

- ResCap would continue to be a viable asset management company following the completion of the transfer.[1014]

The ResCap Board reviewed liquidity issues, confidentiality concerns, servicing and origination platforms, and lines of credit related to AFI's revised proposal at its August 13, 2009 meeting,[1015] and the "potential structure of a transaction, legal issues, and funding and timing considerations" at its August 17, 2009 meeting.[1016] On August 17, 2009, the ResCap Board reviewed a list of "non-negotiable items," including (1) the business remaining within ResCap Asset Management Company be viable; (2) AFI providing financial support to keep ResCap within its covenants through the closing; (3) "[AFI providing] provide post-closing funding through the extension or revision of the Secured Revolver Facility or other funding mechanism"; and (4) ResCap obtaining a fairness opinion with respect to AFI's proposal.[1017]

The Project Timex proposal required AFI to complete an out-of-court purchase of ResCap's origination and servicing business prior to September 30, 2009. The ResCap Board continued the discussion at its September 17, 2009 meeting. At that meeting, it reviewed a pro forma balance sheet setting forth the securitized and non-securitized assets included in AFI's proposal, an updated term sheet, details of the transaction, timing, regulatory reporting and required disclosures.[1018] The ResCap Board also discussed the "risk and benefits of entering into the proposed transaction."[1019] Ultimately, ResCap did not enter into the transaction. According to AFI's Head of Corporate Debt and Equity, Corey Pinkston, the reason the sale did not proceed is because the arrangements represented "pretty complicated thinking," and it was ultimately decided that Project Timex "was too complicated to work."[1020]

### 2. In March 2009, The ResCap Board Approved ResCap's 2009 Business Plan

In March 2009, a ResCap team consisting of CEO Marano; COO Renzi; CFO Young; a junior associate from Cerberus, Edward Buttacavoli (who shortly thereafter became a senior analyst at AFI); and others from the GMAC ResCap Financial Planning and Analysis[1021] department; prepared a 2009 business plan, which was presented to the ResCap Board on

---

[1014] Letter from S. Ramsey to T. Marano (Aug. 13, 2009), at RC40009538 [RC40009525] (distributed to the ResCap Board in advance of its August 13, 2009 meeting).

[1015] Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Aug. 13, 2009, at RC40006280 [RC40005949].

[1016] Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Aug. 17, 2009, at 1 RC40006281 [RC40005949].

[1017] See Non-Negotiable Items Draft Discussion Document Prepared for a Special Meeting of the Board of Directors of Residential Capital, LLC, dated Aug. 17, 2009 at RC40007032 [RC40007006].

[1018] Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Sept. 8, 2009, at RC40006290 [RC40005949].

[1019] Id.

[1020] Int. of C. Pinkston, Nov. 8, 2012, at 63:10–65:9.

[1021] See E-mail from M. Wright (Mar. 24, 2009) [CCM00028868]; see also Attachment to E-mail from M. Wright (Mar. 24, 2009) [CCM00028869] (draft business plan).

March 26, 2009.[1022] The purpose of the 2009 business plan was to "focus on leveraging ResCap's capital markets expertise and winding down ResCap's non-core businesses."[1023] Reflecting a loss of $1.072 billion and ending assets of $20.8 billion, the 2009 business plan distinguished ResCap, the "Legal Entity," from what was called "GMAC ResCap Managerial." The latter, the business plan reported, "represent[ed] all business activities managed by Tom Marano," including "[a]ll RFG, BCG, IBG, PIA and Corporate activities and financial statements."[1024] "GMAC ResCap Managerial" related to planning as well as to measuring outcomes and performance. "ResCap LLC (Legal Entity)," on the other hand, represented the "consolidation of all entities owned by ResCap."[1025]

The 2009 business plan set forth four strategic initiatives for ResCap:

- "Rationalize Business and Asset Portfolio," which the business plan described as streamlining and managing "businesses and assets considered to be viable and aligned with [AFI's] long term strategy," and otherwise liquidating or selling non-core businesses;

- Capitalize on Deposit Funding to Drive Profitability," which meant leveraging Ally Bank in the U.S. and ResMor in Canada, and exploring the "sale of RFG core businesses to Ally Bank to access cheaper funding";

- "Grow Revenue and Market Share in Core Businesses," which focused on continuing to originate primarily conforming mortgages in the U.S. that would be eligible for sale to GSEs, among other items; and

- "Reposition Risk Profile and Maximize Efficiencies," which the business plan described as capitalizing on "servicing expertise," maximizing "the value of serviced assets," and implementing "aggressive loan-loss modification strategies to reduce foreclosures, credit losses and funding advances."[1026]

Put more plainly, a significant focus of ResCap's 2009 business plan was on growing revenue and market share in ResCap's core businesses, including mortgage origination and servicing, by:

- Continuing to produce with an originate-to-sell strategy;

- In the U.S., originating primarily conforming mortgages that are eligible for sale to GSEs;

---

[1022] Seven directors sat on the ResCap Board as of March 26, 2009, including the two Independent Directors, Hirtler-Garvey and Smith. The other five directors were Marano, DeBrunner, Walker, Young, and Renzi, the newest director, appointed March 13, 2009 and attending his first official meeting as a director when the business plan was discussed.

[1023] ResCap 2009 Business Plan Review (Legal Entity), Mar. 26, 2009, at RC40011150–72 [RC40011135].

[1024] *Id.*

[1025] *Id.*

[1026] *Id.*

- Implementing pricing strategy and marketing initiatives;

- Driving revenue growth through fee-based servicing and loan modifications; and

- Striving for improved work-flow quality by leveraging existing innovative on-line systems.[1027]

The 2009 business plan also focused on process improvement and expense reductions. Base expenses for the year were projected to be lower, down from $3 billion in 2008 to $1.2 billion in 2009, but the plan assumed continued AFI support to maintain ResCap's TNW covenant of $350 million, and debt forgiveness of $631 million.[1028]

ResCap's 2009 business plan provided that ResCap would continue to be an originator of consumer loans for Ally Bank and a servicer of Ally Bank's HFI portfolio and MSR assets, as well as a provider of certain administrative support to Ally Bank. ResCap also would continue to provide "executive oversight, finance and accounting support, IT, treasury and legal services to" ResMor.[1029] ResMor, in turn, would provide the same litany of services to ResCap's remaining Canadian entity, Residential Funding of Canada, and Ally Bank would provide funding to ResCap through its purchases of ResCap's consumer loan originations.[1030] ResCap's 2009 business plan projected a loss of $1.072 billion and assets of $20.8 billion,[1031] but a need for $631 million in AFI capital contributions in order to comply with ResCap's TNW covenant of $350 million.

### 3. ResCap Entered Into Several Related-Party Transactions In 2009

Throughout 2009, ResCap continued its efforts to reduce its balance sheet through asset sales and other strategic transactions. ResCap began the year with two significant transactions bookending the month of January: the sale of ResMor to AFI, which closed on January 1, 2009,[1032] and the 2009 Bank Transaction, pursuant to which ResCap sold its remaining interest in IB Finance (the direct parent of Ally Bank) to AFI, which closed on January 30, 2009.[1033]

---

[1027] *See id.*

[1028] *Id.*

[1029] *Id.*

[1030] *Id.*

[1031] *Id.*

[1032] As of January 1, 2009, ResCap's subsidiary, Residential Funding of Canada, completed the sale of ResMor to AFI for $67 million, pursuant to the agreement entered into on November 2008. ResCap had suspended mortgage loan production in its other foreign markets for most of 2008 and the sale of ResMor effectively ended loan production within IBG. *See* Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 26, 2009), at 30, 38; *see also* Section V.F.4.f (detailing the ResMor transaction).

[1033] *See* Section V.A.1.c (discussing the 2009 Bank Transaction).

Later in the spring of 2009, ResCap engaged in a transaction to sell its US/UK Broker-Dealer business unit to AFI.[1034] Out of concern for keeping ResCap in compliance with its TNW covenant and debt covenants, AFI made multiple capital contributions to the Debtors throughout the year in the form of cash and forgiveness of debt.[1035]

### a. In May 2009, ResCap Capitalized Sold Its Interest In The US/UK Broker Dealers To AFI

The US/UK Broker-Dealer Sale, which began in 2008, closed in May 2009. The details of this transaction are discussed in Section V.F.4.g.

### b. AFI Helped ResCap To Temporarily Overcome Liquidity Constraints Through Secured Credit Facilities

ResCap's covenants in the second half of 2009 required ResCap to have $250 million in liquid cash and $750 million in total cash, including cash located in operating accounts.[1036] During spring 2009, mortgage interest rates rose, which benefitted ResCap's MSRs (and led to fewer borrowers seeking to refinance), but "generated losses on associated hedge positions," with a resulting need for ResCap to post collateral. To meet ResCap's liquidity concern, AFI provided incremental funding to ResCap in late spring/early summer 2009.[1037]

Before approving the incremental $370 million credit line, the ResCap Board agreed to appoint a financial advisor and to wait until the Independent Directors met to consider matters related to the approval of the $370 million credit facility.[1038] Thereafter, on June 1, 2009, PATI and RAHI entered into a credit agreement for a short-term $370 million revolving credit facility guaranteed by RFC, GMAC Mortgage, and ResCap.[1039]

In June 2009, the ResCap Board met to discuss having AFI provide additional support to meet ResCap's short-term cash and liquidity requirements.[1040] The outstanding amount on the Secured MSR Facility was $240 million against $926 million of MSR collateral (a 26%

---

[1034] See Section V.F.4.g (discussing the US/UK Broker-Dealer Sale).

[1035] *See* Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 26, 2009), at 31 (describing ResCap as heavily reliant on its parent and affiliates); GMAC LLC, Quarterly Report (Form 10-Q) (May 11, 2009), at 8.

[1036] *See* Presentation prepared for GMAC LLC Strategy Group, dated June 10, 2009, at RC40011260 [RC40011250] (distributed to the ResCap Board in advance of its June 10, 2009 Board meeting).

[1037] *See* Presentation prepared for GMAC LLC Strategy Group, dated June 10, 2009, at RC40011260 [RC40011250] (distributed to the ResCap Board in advance of its June 10, 2009 Board meeting); *see also* Section V.E.7 (discussing the Second Line of Credit Facility).

[1038] Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, May 28, 2009, at RC40006154 [RC40005949].

[1039] *See* Section V.E.7.

[1040] *See, e.*g., Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, June 5, 2009, at RC40006172–6173 [RC40005949]; *see also* Minutes of a Special Meeting of the Residential Capital Board of Directors, June 8, 2009, at 1 RC40006174 [RC40005949] (the Board "discussed possible modifications to expand funding capacity under existing loan facilities in place with AFI," and agreed to "meet with [AFI] management to discuss available options").

advance rate). In order to address its liquidity concerns, ResCap requested an increase in the advance rate and the facility limit of the Secured MSR Facility. AFI proposed increasing the advance rate to 40% of ResCap's marked MSR collateral and the Secured MSR Facility limit to $400 million.[1041]

On June 12, 2009, ResCap reported that the Secured MSR Facility was amended to "increase [AFI's] maximum lending commitment to up to $400 million, such availability being based on advance rates against the amount of eligible collateral."[1042] AFI extended the loan repayment dates for the Initial Line of Credit Facility, the Second Line of Credit Facility, and the Secured MSR Facility, on July 31, 2009; the Secured MSR Facility, Initial Line of Credit Facility, and Second Line of Credit Facility.[1043] For a further discussion of the Secured MSR Facility and the Line of Credit Facilities, see Sections V.E.2, V.E.5, and V.E.7, respectively.

### c. AFI's Contributions In The Form Of Debt Forgiveness And ResCap Bond Retirements Assisted ResCap In Meeting Its TNW Requirements In 2009

On March 31, 2009, AFI contributed to ResCap Junior Secured Notes, and Senior Unsecured Notes. The Junior Secured Notes had a face amount of a $478 million plus accrued interest. The Senior Unsecured Notes had a face amount of a $40.3 million plus accrued interest.[1044] The forgiveness and extinguishment of the debt resulted in a gain on extinguishment of $389.5 million and capital contribution of $263.3 million.[1045]

ResCap's consolidated TNW was $1.05 billion as of June 30, 2009, which allowed ResCap to remain in compliance with its TNW and debt covenants.[1046] This was achieved in

---

[1041] Presentation prepared for the GMAC LLC Strategy Group, dated June 10, 2009, at RC40011260 [RC40011250] (made a part of the Board presentation prepared for the June 10, 2009 ResCap Board meeting). The AFI Board recognized that there was "some risk that any loan would be re-characterized as equity in a bankruptcy given [AFI's] status as a lender of last resort under the doctrine of Debt Re-characterization" and acknowledged the "potential for further funding to create lender liability risk for [AFI] under the doctrines of Deepening Insolvency and Equitable Subordination." *Id.* at 4.

[1042] Residential Capital, LLC, Current Report (Form 8-K) (June 18, 2009), Item 1.01.

[1043] Residential Capital, LLC, Current Report (Form 8-K) (Aug. 4, 2009), at 2; *see also* Residential Capital, LLC, Quarterly Report (Form 10-Q/A) (Aug. 25, 2009), at 66.

[1044] Residential Capital, LLC, Quarterly Report (Form 10-Q) (May 8, 2009), at 81.

[1045] *Id.*

[1046] Residential Capital, LLC, Current Report (Form 8-K) (Aug. 4, 2009), at Ex. 99.1.

part through AFI's forgiveness of $1.4 billion (face value) of ResCap bonds, which resulted in a pre-tax gain to ResCap in the form of debt extinguishment of $817 million.[1047] The capital contributions made by AFI in 2009 included:

| | |
|---|---|
| March 2009: | $263.3 million (bonds) |
| April 2009: | $ 34.7 million (bonds) |
| May 2009: | $112.6 million (bonds) |
| June 2009: | $750.8 million (bonds) |
| November 2009: | $ 23.6 million (bonds) |
| November 2009: | $ 52.4 million (MSR debt forgiveness) |
| December 2009: | $262.7 million (MSR debt forgiveness) |
| December 2009: | $1.436 billion (loans held for sale) |
| December 2009: | $600 million (cash) |
| December 2009: | $316.2 million (receivables) |
| December 2009: | $195 million (intercompany payable)[1048] |

Although ResCap was consistently plagued by liquidity concerns throughout the year, ResCap met its TNW and debt covenants at the end of the third quarter of 2009, with TNW of $409 million, and ended 2009 in compliance with its covenants as well.

### 4. The ResCap Board Reviewed Various "What If" Scenarios At Its June And July 2009 Board Meetings

On multiple occasions in June and July 2009, the ResCap Board was presented with and discussed two scenarios that were under consideration.[1049] Noting that ResCap continued to rely on monthly support from AFI in the form of capital and cash in order to meet its minimum TNW and cash requirements, the ResCap Board considered (1) the effect of having its core business absorbed into AFI against (2) the effect of having both its core and non-core businesses absorbed into AFI.[1050] Under the partial absorption scenario, ResCap would file for bankruptcy and AFI would buy ResCap's core business for fair value. In order to determine the effect on ResCap and AFI, the ResCap Board was shown forecasted balance sheets and cash flow analyses for 2010 to 2011 and forecasted income statements for the core

---

[1047] *See* Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, June 30, 2009, at RC40006236 [RC40005949]. ("Mr. Marano reported that during its meeting held earlier this day the [AFI] Board had approved additional capital support of ResCap. He said that the capital contribution [would] be made through the forgiveness of ResCap bonds acquired by [AFI] in the December 2008 bond exchange transaction.").

[1048] Residential Capital, LLC, Consolidated Financial Statements For The Years Ended December 31 2010 and 2009 (Feb. 28, 2011) [EXAM00123052].

[1049] *See* Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, June 15, 2009 at RC40006181 [RC40005949].

[1050] ResCap's core business was identified as the consumer lending business and the capital markets business, servicing platform, and assets. ResCap's non-core business was identified as the "Business Lending Group, the International Business Group, and domestic non-core mortgage." Partial Absorption into GMAC (Core) Presentation to the Board of Directors of Residential Capital LLC, dated June 15, 2009, at RC40011293 [RC40011291].

servicing business, segregated into (1) GMAC Mortgage prime and conforming MSR; (2) GMAC Mortgage non-conforming MSR; (3) HFN MSR; and (4) fee-based servicing.[1051]

Under the full absorption scenario, ResCap could avoid bankruptcy by having its cash and capital needs met by AFI, its core businesses grown, and its non-core businesses run off or sold. The analysis included balance sheets, income statement and cash flows for 2009 to 2011 and the same segregated income statement for the core servicing business.[1052] Young led the ResCap Board discussion at its June 15, 2009 meeting.[1053]

The ResCap Board renewed its discussion of the 2010–2011 pro forma analysis at its June 23, 2009 meeting, when Young led a discussion concerning both the partial and full absorption scenarios.[1054] These discussions, with modified versions of the pro forma analyses, also took place at the ResCap Board meeting held on (1) June 25, 2009,[1055] where Young focused on the full-absorption scenario; (2) June 30, 2009, where Young focused on adjustments made to the International Business Group and BCG activities, MSRs, and accounts receivable;[1056] and (3) July 9, 2009, where the ResCap Board also considered the run-off of the ResCap business.[1057] Under the run-off of ResCap's non-core assets scenario, the following assumptions were made:

- AFI would acquire the core business assets and liabilities of ResCap LLC as of June 30, 2009 for market value (i.e., book value);

---

[1051] *Id.*

[1052] *Id.*

[1053] *See* Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, June 15, 2009, at RC40006181 [RC40005949].

[1054] *See* Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, June 23, 2009, at RC40006224–25 [RC40005949]. The ResCap Board also discussed at this meeting whether to continue the daily liquidity calls and agreed that it would be best to continue holding them for the time being and to revisit the meeting schedule in late July. *Id.* at RC40006225; *see also* Material for Discussion, dated June 23, 2009, at RC40011335 [RC40011334].

[1055] *See* Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, June 25, 2009, at RC40006228 [RC40005949]; *see also* Material for Discussion, dated June 25, 2009, at R40010474 [RC40010472].

[1056] *See* Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, June 30, 2009, at RC40003536 [RC40005949]; Material for Discussion, dated June 30, 2009 RC40010577 [RC40010575].

[1057] *See* Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, July 9, 2009, at RC40006242 [RC40005949]. At the July 17, 2009 ResCap Board meeting, Young advised the ResCap Board that the pro forma analyses would be extended to 2012. *See* Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, July 17, 2009, at RC40006252 [RC40005949]; *see also* 2009–2011 Pro Forma ResCap, LLC Modified Non Core Run-off, dated July 16, 2009, at RC40011463 [RC40011453]. The pro forma analyses were modified to include non-agency servicing advances and other receivables. *Id.* at RC40011468. Also provided to the Board in advance of the July 17, 2009 Board meeting was a letter from de Molina to Marano stating: "I am in receipt of your July 10, 2009 note requesting confirmation from the [AFI] Board of Directors concerning its intentions for providing additional liquidity to ResCap should the need arise. This request has been delivered to the [AFI] Board which will be considering it in the days ahead." Materials for Discussion, dated July 17, 2009, at RC40011502 [RC40011453].

- ResCap would continue "under a mission to run-off remaining non-core business assets leveraging existing cash, the proceeds from the sale of the core business";

- The AFI line of credit would be paid off and the AFI revolver extended; and

- No additional support in the form of cash, capital or borrowings would be assumed from AFI.[1058]

At the July 20, 2009 meeting, Young presented to the ResCap Board a revised pro forma analysis, extended to 2012.[1059] Although the ResCap Board continued meeting almost daily through the month of August 2009, the meetings do not reflect that further attention was paid to the pro forma analyses during this period. Rather, the ResCap Board focused on the sale of certain MSRs and other assets to AFI.[1060] The ResCap Board does not appear to have revised the pro forma analyses until September 2009, at which time the ResCap Board linked AFI's proposed asset purchase that had been before it for a month to the "Non-Core Run-off" scenario.[1061]

### 5. In 2009, The SEC Approved ResCap's Request To Deregister ResCap's Securities

In August 2008, Young proposed to Marano as well as to Robert Hull and Sam Ramsey at AFI that they consider "having ResCap deregister as a separate filer with the SEC," as it would "reduce audit costs, printing costs, some people, etc."[1062] At its June 24, 2009 meeting,

---

[1058] *See* 2009–2011 Pro Forma ResCap, LLC Modified Non Core Run-off Presentation for Special Meeting of the Board of Directors of Residential Capital, LLC, dated July 8, 2009 [RC40010645]. A Lazard opinion included in the July 9, 2009 ResCap Board materials suggests that these scenarios were prepared at the request of AFI. Lazard noted "[AFI] has requested that ResCap provide it with various integration strategies for the ResCap franchise. ResCap, its Board and its advisors believe that it is in the best interests of ResCap and its stakeholders (including [AFI]) that there be a full integration of ResCap into [AFI]." Lazard Project Scout II Presentation, dated July 7, 2009, at RC40010737 [RC40010645] (noting that full absorption would "result in substantial benefits to [AFI]." The ResCap Board discussed Project Scout II, and the possible sale of ResCap assets to AFI, at its July 22, 2009 and July 27, 2009 Board meetings. *See* Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, July 22, 2009, at RC40006256 [RC40005949]; *see also* Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, July 27, 2009, at RC40006259 [RC40005949].

[1059] *See* Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, July 20, 2009, at RC40006253 [RC40005949]; *see also* Materials for Discussion, dated July 20, 2009 at RC40010791 [RC40010781].

[1060] *See generally* Section III.I.1.f.

[1061] *See* 2009–2012 Pro Forma ResCap, LLC Project Newton Non-Core Runoff Presentation, dated Aug. 27, 2009, at RC40009730 [RC40009729].

[1062] E-mail from J. Young to R. Hull, S. Ramsey, and T. Marano (Aug. 11, 2008) [EXAM10174901].

the ResCap Board discussed the rationale supporting de-registration of ResCap from the SEC reporting requirements. Young reviewed the material laying out the rationale for deregistration that was provided in advance of the call:[1063]

- It was allowed because ResCap's exchanged instruments were deemed "freely tradable under the indentures as of June [6], 2008, subject to confirming that less than 300 investors currently held the bonds";

- Financial information (more limited than what would be included in SEC filings) would be provided to debt investors;

- Full audited financial statements would continue to be required of ResCap;

- Deregistration would reduce regulatory risk, facilitate further finance consolidation and drive incremental cost savings; and

- The current restructuring alternatives being considered by ResCap were not expected to preclude deregistration.[1064]

---

[1063] Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, June 24, 2009, at RC40006226 [RC40005949].

[1064] ResCap's De-registration from SEC Filing Requirements Presentation, dated June 24, 2009, at RC40010462 [RC40010460]. Young also apprised the ResCap Board of the status of ResCap's request to de-register as an SEC registrant at the July 29, 2009 Board meeting. *See* Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, July 29, 2009, at RC40006262 [RC40005949]. Young updated the ResCap Audit Committee on August 3, 2009. *See* Minutes of a Meeting of the Audit Committee of Residential Capital, LLC, Aug. 3, 2009, at RC40005459 [RC40005434] (informing the Audit Committee that "in response to comments from the SEC, ResCap [would] file amendments to the Company's Quarterly Report for September 30, 2008, Annual Report for December 31, 2008, and Quarterly Report for March 31, 2009"). The disclosures in the amended filings were described as "not material." *Id.*

Young again updated the ResCap Board on de-registration at the August 19, 2009 Board meeting. *See* Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Aug. 19, 2009, at RC40006283 [RC40005949]. Although ResCap initially anticipated the de-registration to be accomplished by June 20, 2009, according to what Young told the ResCap Board at its June 24, 2009 meeting, the SEC did not approve the de-registration until November 3, 2009, shortly before ResCap's 10-Q report for third quarter 2009 was scheduled to be filed. A draft of ResCap's third quarter 2009 report was prepared, but never filed. *See* Certification Draft of ResCap Quarterly Report (Form 10-Q), at RC40018129 [RC40018123] (as provided to the ResCap Audit Committee on November 5, 2009). From the outset, the ResCap Board had been advised that the de-registration would "reduce regulatory risk, facilitate further finance consolidation, and drive incremental cost saves." ResCap's De-registration from SEC Filing Requirements Presentation, dated June 24, 2009, at RC40010462 [RC40010460]. No material produced in this proceeding appears to indicate de-registration led to any significant cost-savings.

On November 3, 2009, the SEC approved ResCap's request to stop filing reports, including the quarterly report for the quarter ending September 30, 2009.[1065] Thereafter, ResCap ceased making any independent filings to the SEC.

### 6. AFI Ratings Improved Slightly In 2009

While Fitch's ratings of AFI remained static, the other three Rating Agencies saw some positive growth in AFI's outlook in the second quarter of 2009:

- On June 10, 2009, Moody's upgraded AFI's senior debt rating to CA from C, affirmed the commercial paper rating of Not-Prime, and changed the outlook to Review-Positive;

- On May 26, 2009, S&P affirmed AFI's senior debt rating of CCC, affirmed the commercial paper rating of C, and changed the outlook to Developing; and

- On May 26, 2009, DBRS affirmed AFI's senior debt rating of CCC, affirmed the commercial paper rating of R-5, and changed the outlook to "Review-Developing."[1066]

In addition, on June 22, 2009, Marano informed the ResCap Board that "Fitch had upgraded ResCap's servicer ranking and had provided positive comments on the operation."[1067]

---

[1065] *See* SEC No Action Letter (Nov. 3, 2009) (responding to Letter from Mayer Brown, Sent on Behalf of Residential Capital, LLC (Nov. 3, 2009)).

[1066] *See* GMAC LLC, Quarterly Report (Form 10-Q) (Aug. 7, 2009), at 104.

[1067] Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, June 22, 2009, at RC40006223 [RC40005949]. Fitch's support for the ResCap's servicer operation continued into 2010, when Fitch stated that in the intervening year, ResCap had "continued to make incremental improvements to its servicing platform to address changing market conditions and to enhance loss mitigation and default management processes"; had "implemented functionality for customers to complete Home Affordable Modification Program (HAMP) financial forms via its website, with automated feeds to the servicing system" and that ResCap continued to "maintain a solid servicing platform with the appropriate staff, default procedures and controls in place to manage its servicing portfolio." Fitch warned that it would continue to monitor ResCap's ability "to maintain servicing performance in a high delinquency environment." Fitch Ratings, *Fitch Affirms ResCap's Residential Servicer Ratings*, Dec. 3, 2010, http://www.bus inesswire.com/news/home/20101203005963/en/Fitch-Affirms-ResCap's-Residential-Servicer Ratings.

### 7. AFI's Efforts To Recapitalize ResCap In December 2009 Was Part Of An AFI Strategic Review Of How Best To "Maximize Value"

AFI experienced a significant change at its helm in November 2009, when Michael A. Carpenter replaced de Molina as AFI CEO.[1068] Carpenter began his tenure as AFI CEO—a role he continues to play—with media interviews in which he laid out AFI's priorities going forward, making clear that they were different under his leadership than they had been under de Molina's.[1069] Carpenter described his first priority as making AFI "the premier auto-finance company."[1070] He asserted that AFI needed "a very strong strategic direction," and a "turnaround orientation."[1071] Carpenter described the mortgage business as "a drag on the economy" that required a solution.[1072]

Tessler, who was no longer a member of the AFI Board, attended the December 14, 2009 AFI Board meeting as a "non-voting observing designee."[1073] At that meeting, a decision was made to recapitalize ResCap. In an early December 2009 e-mail to Carpenter, Tessler gave the following piece of advice to Carpenter: "Recap and sell ResCap, merge it with [AFI] and keep it or file it, but my advice whatever you decide is to put uncertainty about ResCap behind you before the end of '09."[1074] Carpenter responded that "clear, decisive action" was needed in

---

[1068] *See* Minutes of Special Meeting of the Board of Directors of GMAC Inc., Nov. 16, 2009, at ALLY_0115270–72 [ALLY_0114717]. Forbes subsequently described de Molina's departure as one of the top 12 CEO departures of 2009: "In November the board of automobile lender [AFI] ousted its chief executive, Alvaro de Molina, after 19 months on the job. Between December 2008 and the time of de Molina's departure, [AFI] had received $12.5 billion in taxpayer money, which gave the U.S. government a 35.4% stake in the Detroit company." *Top 12 CEO Departures*, Forbes, http://www.forbes.com/ 2009/12/15/ceo-departures-employment-leadership-ceo network-fired_slide_4.html.

Carpenter joined the AFI Board as an independent director on May 21, 2009, along with Franklin W. Hobbs (who later became AFI Board chair) and Mayree C. Clark. They were a part of a "newly reconstituted" AFI Board, which also included de Molina, Cerberus appointee Stephen Feinberg and two appointees of the U.S. Treasury, Robert T. Blakely and Kim S. Fennebresque. GMAC LLC, Current Report (Form 8-K) (May 29, 2009), Ex. 99.1.

[1069] *See, e.g.*, Dakin Campbell, *GMAC's New CEO Focuses on Autos, 'Solution' at ResCap*, Bloomberg News, Nov. 17, 2009, http://www.bloomberg.com/apps/news?pid=newsarchive&sid= aNNg1tH1YKq4.

[1070] *Id.*; *see also* GMAC Press Release, *GMAC Names Michael A. Carpenter Chief Executive Officer; Will Lead Next Phase Of Renewal*, Nov. 16, 2009, http://www.prnewswire.com/news-releases/gmac-names-michael-a-carpenter-chief-executive-officer—will-lead-next-phase-of-renewal-70219362.html ("'A renewed [AFI] is crucial to business and public sector efforts to bolster the U.S. auto industry, and we have a special obligation to the public to do everything we can to ensure [AFI] succeeds,' Carpenter said. His mission, he noted, includes operating [AFI] the rigorous standards required of a bank holding company, resolving the difficult issues we face with the mortgage business, and repaying in full the funds the U.S. government has invested in [AFI].'").

[1071] Dakin Campbell, *GMAC's New CEO Focuses on Autos, 'Solution' at ResCap*, Bloomberg News, Nov. 17, 2009, http://www.bloomberg.com/apps/news?pid=newsarchive&sid= aNNg1tH1YKq4.

[1072] *Id.*

[1073] Minutes of Special Meeting of the Board of Directors of GMAC Inc., Dec. 14, 2009, at ALLY_0115287 [ALLY_0114717].

[1074] E-mails between M. Carpenter and L. Tessler (Dec. 3–4, 2009) [CCM00065644].

2009. He opined that his problem had been "lack of clarity" on ResCap's numbers and proposed solutions that "often resulted in increased commitment[,] not isolating the cancer."[1075] It thus appears that Carpenter's inclination in December 2009 was finality, in whatever form it arrived.

At the time Carpenter became AFI CEO, the U.S. Treasury appeared poised to make an additional $5.6 billion TARP investment in AFI before the end of the 2009 fiscal year, when TARP funding was set to expire. The media at the time reported that Carpenter had tabled that injection of funds until he could assess AFI's needs,[1076] including evaluating ResCap. Carpenter clarified that it was actually the U.S. Treasury that slowed the funds down until AFI produced a "game plan" with respect to AFI's business, including ResCap.[1077]

AFI began an ongoing strategic review of how to best deploy AFI's current and future capital and liquidity, which included a decision to "pursue strategic alternatives for" ResCap.[1078] In its Quarterly Report for the quarter ended September 30, 2009, AFI acknowledged that ResCap expected to have "significant near-term liquidity issues," and that there was a "significant risk that ResCap [would] not be able to meet its debt service obligations and other funding obligations in the near term."[1079] AFI noted:

> ResCap expects continued liquidity pressures for the remainder of 2009 and into 2010. ResCap is highly leveraged relative to its cash flow…. ResCap also must find alternate funding sources for assets that must periodically be withdrawn from some of its financing facilities as maximum funding periods for those assets expire. In addition, in connection with the recent restructuring of ResCap's credit facilities, ResCap became subject to requirements to maintain minimum consolidated tangible net worth and consolidated liquidity balances in order to continue its access to those facilities. ResCap will attempt to meet these and other liquidity and capital demands through a combination of operating cash and additional asset sales. The sufficiency of these sources of additional liquidity cannot be assured, and any asset sales, even if they raise sufficient cash to meet ResCap's liquidity needs, may result in losses that negatively affect our overall profitability and financial condition. Moreover, even if ResCap is successful in implementing all of the actions described above, its ability to satisfy its liquidity needs and comply with any covenants included in its debt agreements requiring maintenance of minimum cash balances may be affected by additional factors and events (such as interest rate fluctuations and margin calls) that increase ResCap's cash needs making ResCap unable to independently satisfy its near-term liquidity requirements.[1080]

---

[1075] *Id.*

[1076] Dakin Campbell, *GMAC's New CEO Focuses on Autos, 'Solution' at ResCap*, BLOOMBERG NEWS, Nov. 17, 2009, http://www.bloomberg.com/apps/news?pid=newsarchive&sid= aNNg1tH1YKq4.

[1077] Int. of M. Carpenter, Mar. 4, 2013, 86:16–90:17.

[1078] GMAC Inc., Current Report (Form 8-K) (Dec. 30, 2009), Ex. 99.1.

[1079] GMAC Inc., Quarterly Report (Form 10-Q) (Nov. 10, 2009), at 109.

[1080] *Id.*

On December 11, 2009, AFI made a presentation to the U.S. Treasury, requesting an infusion of funds under the SCAP program.[1081] During the meeting, AFI noted that its corporate objectives included taking the following actions:

- Build a world class auto finance franchise;

- Repay the U.S. Government investment as soon as possible; and

- Resolve ResCap drag.[1082]

AFI described its "Auto Finance franchise" to the U.S. Treasury as "strong with substantial room for improvement," and with a "[s]trong management team."[1083] Noting that ResCap had "reduced its assets to approximately $20 billion," from its "peak of over $135 billion,"[1084] AFI took a different tone with respect to the mortgage business. It declared the challenge with regard to ResCap to be "neutralizing/exiting at lowest cost," and proposed that in order for AFI to repay the U.S. Treasury in full by the end of 2012, three things needed to happen:

(1) ResCap had to be "neutralized";

(2) AFI had to "return to profitability in 2009; and

(3) an appropriate capital structure had to be implemented in 2009.[1085]

AFI discussed what it called the "ResCap Containment Strategy," which called for AFI to exit the mortgage business over time rather than to pursue an "in court solution."[1086] AFI

---

[1081] *See* GMAC Presentation to the U.S. Department of the Treasury Regarding Request for SCAP Funding, dated Dec. 11, 2009, at ALLY_0271776 [ALLY_0271648] (discussed in AFI Board materials for December 14, 2009 [ALLY_0271648]). SCAP—the Supervisory Capital Assessment Program—was a program established under the Capital Assistance Program (a component of TARP) "to assess whether the 19 largest U.S. bank holding companies had enough capital to withstand a severe economic downturn." GOVERNMENT ACCOUNTING OFFICE, TROUBLED ASSET RELIEF PROGRAM BANK STRESS TEST OFFERS LESSONS AS REGULATORS TAKE FURTHER ACTIONS TO STRENGTHEN SUPERVISORY OVERSIGHT (Sept. 27, 2010), http://www.gao.gov/products/GAO-10-861. Through the SCAP program, federal bank regulators would conduct a stress test to determine if the bank holding company needed to raise additional capital.

[1082] *See* GMAC Presentation to the U.S. Department of the Treasury Regarding Request for SCAP Funding, dated Dec. 11, 2009, at ALLY_0271779 [ALLY_0271648] (discussed in AFI Board materials for December 14, 2009 [ALLY_0271648]).

[1083] *Id.* at ALLY_0271780.

[1084] *Id.* at ALLY_0271782.

[1085] *Id.* at ALLY_0271783.

[1086] *Id.* at ALLY_0271784–86.

posited that such an outcome would be "counterproductive" to AFI's objectives because asset values (particularly MSRs) would be impaired, AFI would have to provide financing to ResCap, and the risk of multi-billion dollar litigation would further "delay any improvement in AFI's debt ratings, restrict demand in AFI's unsecured bonds, and delay the timing of AFI's IPO.[1087]

AFI advised the U.S. Treasury that it would be making the following recommendations to the AFI Board:

- Recognize embedded losses on remaining distressed mortgage assets (estimated at $3.3 billion, including $1.3 billion at Ally Bank);

- Recapitalize ResCap in the most efficient way possible, using a combination of inter-company debt forgiveness, asset contributions and cash;

- Restructure the intercompany facilities to improve the repayment of the facilities over time;

- Explore all options to distribute assets or businesses and monetize bond discounts where possible; and

- Recognize up to an addition $295 million of Reps and Warranties expense.[1088]

AFI offered a series of recommended "capital structure transactions" to be executed prior to year-end, which it asserted would position AFI for "future success."[1089]

At a December 14, 2009 meeting, Carpenter, along with Hirtler-Garvey and Ramsey, made a presentation to the AFI Board on alternative scenarios for ResCap, and Marano discussed ResCap's proposed sale of "selected international assets" to Fortress. After Marano left the meeting, Carpenter turned to a discussion of ResCap's strategic alternatives.[1090] A draft of the December 14 AFI Board deck suggests that AFI sought to:

- Insulate AFI from ResCap "earning surprises";

- Distance ResCap from AFI to allow AFI "better access to public markets";

---

[1087] *Id.* at ALLY_0271785.

[1088] *Id.* at ALLY_0271786.

[1089] *Id.* at ALLY_0271799.

[1090] *See* Minutes of Special Meeting of the Board of Directors of GMAC Inc., Dec. 14, 2009, at ALLY_0115293–94 [ALLY_0114717] (noting that capital infusions of more than $50 million required the approval of the AFI Board). At this meeting, the AFI Board agreed to permit a capital contribution in the amount of $77.325 million "in the form of forgiveness of inter-company debt held by GMAC-RFC Holding Company" from ResCap to its wholly owned indirect subsidiary, RFC, so that RFC could meet its own minimum net worth targets. *Id.* at ALLY_0115291.

- Minimize AFI's "capital infusion to facilitate ResCap wind-down";

- "Maximize exit value over time"; and

- Enable AFI to repay the government quickly.[1091]

The strategic alternatives discussed included having ResCap (1) running off or selling assets in a chapter 11 or chapter 7 bankruptcy case, possibly with AFI bidding on ResCap's origination and servicing business in a sale under section 363 of the Bankruptcy Code; (2) maintaining the status quo; (3) merging ResCap into AFI; (4) spinning off ResCap; (5) restructuring ResCap and selling ResCap's mortgage operations; or (6) restructuring ResCap and AFI buying ResCap's agency origination and servicing business.[1092] The presentation underscored that AFI investors would view a ResCap merger into AFI as "extremely unattractive."[1093] The AFI Board was advised that a recommended next step would be to recapitalize ResCap.[1094] AFI did just that. The AFI Board reviewed the alternatives and "unanimously concluded" that the proposed actions were in the best interest of AFI and its stakeholders.[1095]

On December 30, 2009, AFI announced a series of what it described as "key capital and strategic actions" designed to strengthen AFI's capital base, position AFI for "improved financial performance, minimize further adverse effects" on AFI related to ResCap, and "improve access to the capital markets over time."[1096] The capital actions included a capital infusion of $3.79 billion from the U.S. Treasury, which was less than the originally anticipated

---

[1091] Draft Presentation to the Board of Directors of GMAC Inc. Regarding Proposed ResCap Actions, dated Dec. 14, 2009, at ALLY_0385303 [ALLY_0385276].

[1092] *Id.* at ALLY_0385307.

[1093] *Id.* at ALLY_0385305.

[1094] *Id.* at ALLY_0385309.

[1095] *See* GMAC Inc., Current Report (Form 8-K) (Dec. 30, 2009), Ex. 99.1.

[1096] *See id.* During his interview, Carpenter explained that he personally went to U.S. Treasury on December 22, 2009 and advised the U.S. Treasury that AFI had a strategy going forward with regard to ResCap. He said he requested a smaller sum than the $5.6 billion that was earmarked for the third TARP payment. Carpenter stated that during this period AFI also marked the mortgages in Ally Bank to market and used the marked-down mortgages as a capital contribution to ResCap, which, in combination with debt forgiveness "created about $2.8 billion of capital for ResCap." As Carpenter expressed it, they "did a complete reset with the government's money in December of 2009." Int. of M. Carpenter, Mar. 4, 2013, at 95:7–15.

$5.6 billion. AFI described the need for fewer dollars as being "due in large part to lower-than-expected losses related to the General Motors bankruptcy filing."[1097]

With respect to ResCap, AFI reclassified certain mortgage assets from "HFI" to "HFS," which resulted in an estimated pre-tax charge of $1.3 billion for international mortgage assets and businesses and $700 million for domestic mortgage assets.[1098] AFI also repurchased reserve expense of $500 million associated with the mortgage servicing business. The actions taken by AFI called for a capital contribution to ResCap of $2.7 billion in the form of mortgage loans that AFI acquired from Ally Bank, debt forgiveness, and cash. The infusion of capital permitted ResCap's net worth to exceed its TNW and debt covenants.[1099]

AFI stated that, following the transactions that took place in December 2009, it did not expect to incur any further significant losses from ResCap. Rather, AFI expected that ResCap going forward would be in a position to explore strategic alternatives.[1100]

### 8. The Year 2010 Was Economically Brighter For ResCap And AFI

In contrast to 2009, the year 2010 began on a stronger economic note. Mortgage interest rates had fallen to historic lows in 2009, which benefited homeowners and homebuyers, if not

---

[1097] See GMAC Inc., Current Report (Form 8-K) (Jan. 5, 2010), Item 9.01, Ex. 99.1. Under the plan, the U.S. Treasury also would transfer $3 billion of Mandatorily Convertible Preferred (MCP) into common equity increasing its common equity ownership of AFI to approximately 56.3%. AFI's remaining common equity holdings following the conversion are as follows: Cerberus and its affiliates hold approximately 14.9%, third party investors hold approximately 12.2%, a trust managed by an independent trustee for the benefit of General Motors holds approximately 9.9%, and an affiliate of General Motors LLC holds approximately 6.7%.

[1098] ResCap Chief Account Officer and Controller, Cathy Dondzila, explained that this constituted a large transfer of assets from "held for investment" to "held for sale," and that not many loans have transferred the opposite way since the 2009 transaction. Int. of C. Dondzila, Sept, 27, 2012, at 28:1–4. Loans that are "held for sale" typically are held for a short time and put into the market; "held for sale" accounting requirements called for the assets to be held "at the lower of cost or market" but different accounting rules applied for "held for investment," which was "more of a cost basis less an allowance for expected losses." Id. at 27:22–24.

[1099] See GMAC Inc., Current Report (Form 8-K) (Jan. 5, 2010), Item 9.01, Ex. 99.1

[1100] See id. In its 2009 Annual Report, AFI made the following year-end statement with regard to ResCap:

On December 31, 2009, we announced that due to our ongoing strategic review of how to best deploy GMAC's current and future liquidity, we decided to pursue strategic alternatives with respect to ResCap and committed to a plan involving a series of specific actions related to management's intent to sell certain ResCap related assets and businesses. These actions resulted in the reclassification of certain international and domestic mortgage-related assets and businesses of ResCap from held-for-investment to held-for-sale, which included ResCap's United Kingdom operations, continental Europe operations, and certain domestic assets. In order to maximize value, we will consider a variety of options including one or more sales, spin-offs, or other potential transactions. The timing and form of execution of any such transaction will depend on market conditions. We believe these transactions should minimize the impact of any significant future losses related to ResCap's legacy mortgage business and position us to explore strategic alternatives for ResCap.

GMAC Inc., Annual Report (Form 10-Q) (Mar. 1, 2010), at 4.

necessarily the business of mortgage servicing. In December 2010, the unemployment rate was 9.4%.[1101] Mortgage delinquencies also leveled off in 2010, and new housing starts held steady at 417,000.[1102] The FRB cut its target funds rate to near zero, actually reaching 0.01% in December 2009.[1103] The yield curve, which had inverted in 2006 and 2007 when short-term interest rates exceeded long term rates, had now normalized as the FRB held short-term rates low.[1104]

Under Carpenter's leadership, AFI, which became Ally Financial Inc. as of May 10, 2010, had a profitable year in 2010. AFI earned core pretax income of $2.5 billion in 2010 and was profitable in all four quarters in 2010.[1105] For ResCap, too, 2010 showed promise. Marano stated that he believed the mortgage and capital markets business to be "a very good opportunity in 2010.[1106] He added: "And, you know, we did make money in 2010."[1107]

As part of its future business plans, ResCap considered various scenarios, including Project Gemini, which provided for recapitalizing the core operations of ResCap into a new entity, as modeled by Bank of America. As Marano succinctly put it: "We were marketing ResCap in 2010."[1108] As part of the 2010 "sale process," AFI was "considering a sale, a spin-off or retaining" ResCap.[1109]

---

[1101] *See* U.S. DEP'T OF LABOR, BUREAU OF LABOR AND STATISTICS, THE EMPLOYMENT SITUATION–DECEMBER 2010 (Jan. 7, 2011), at http://www.bls.gov/news.release/archives/empsit_01072011.pdf.

[1102] S&P DOW JONES INDICES: RESIDENTIAL REAL ESTATE INDICATORS—JANUARY 2011, http://us.spindices.com/ indices/real-estate/sp-case-shiller-us-national-home-price-index.

[1103] FRB, Press Release (Dec. 16, 2009), http://www.federalreserve.gov/newsevents/press/ monetary/ 20091216a.htm. The press release reads in part: "The Committee will maintain the target range for the federal funds rate at 0 to 1/4 percent and continues to anticipate that economic conditions, including low rates of resource utilization, subdued inflation trends, and stable inflation expectations, are likely to warrant exceptionally low levels of the federal funds rate for an extended period. To provide support to mortgage lending and housing markets and to improve overall conditions in private credit markets, the Federal Reserve is in the process of purchasing $1.25 trillion of agency mortgage-backed securities and about $175 billion of agency debt. In order to promote a smooth transition in markets, the Committee is gradually slowing the pace of these purchases, and it anticipates that these transactions will be executed by the end of the first quarter of 2010. The Committee will continue to evaluate the timing and overall amounts of its purchases of securities in light of the evolving economic outlook and conditions in financial markets."

[1104] Larry Kudlow, *The Yield Curve Is Signaling Bigger Growth,* 1260 WRC, Dec. 22, 2009, http://www.1260wrc.com/column.aspx?id=5c932231-63c0-4d2f-895a-90474faf4212.

[1105] Ally Financial Inc., Annual Report (Form 10-K) (Feb. 25, 2011), at 261.

[1106] Int. of T. Marano, Nov. 26, 2012, at 71:24–72:18; 76:7–15.

[1107] *Id.*

[1108] Int. of T. Marano, Feb. 27, 2013, at 111:4–8.

[1109] *Id.* at 132:16–19.

### a. Steven Abreu Was Named ResCap President In January

The new year also brought a change to the executive ranks of ResCap when Steven Abreu joined as president on January 29, 2010. A special meeting of the ResCap Board was called to introduce Abreu as a candidate for ResCap president. In response to a director's question, Marano advised that if Abreu were appointed president, Abreu would be responsible for the day-to-day operations of ResCap. Following a question/answer period and discussion among the directors, the ResCap Board voted unanimously to appoint Abreu effectively immediately.[1110] Abreu was elected to the ResCap Board on March 29, 2010.[1111]

### b. 2010 Also Saw A Bump In Ratings For AFI And A Small Boost From S&P For ResCap

With AFI having received substantial support in the form of TARP funds from the U.S. Treasury, both AFI and ResCap bonds traded higher.[1112] The beginning of 2010 brought a boost to AFI's ratings:

(1) On January 19, 2010, DBRS upgraded AFI's senior debt rating to BB-Low from CCC, upgraded the commercial paper rating to R-4 from R-5, and changed the outlook to Stable (from Review-Developing);

(2) On January 21, 2010, Fitch upgraded AFI's debt to B from CC, upgraded the commercial paper rating to B from C, and changed the outlook to Positive;

(3) On January 27, 2010, S&P upgraded AFI's senior debt rating to B from CCC, affirmed the commercial paper rating of C, and changed the outlook to Stable (from Developing); and

(4) On February 5, 2010, Moody's upgraded AFI's senior debt rating to B3 from Ca, affirmed the commercial paper rating of Not-Prime, and changed the outlook to Stable (from Review-Positive).[1113]

ResCap's ratings otherwise remained static.

---

[1110] *See* Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Jan. 29, 2010, at RC40018731 [RC40018729].

[1111] Unanimous Written Consent of the Residential Capital, LLC Board of Directors, dated Mar. 29, 2010, at RC40018746 [RC40018729].

[1112] Matt Townsend, *GMAC, ResCap Bonds Rally on Bailout, Rejection of Bankruptcy*, BLOOMBERG, Jan. 6, 2010, http://www.bloomberg.com/apps/news?pid=newsarchive&sid=aM794waDGk94&pos=4.

[1113] *See* GMAC, Inc., Annual Report (Form 10-K) (Feb. 25, 2011), at 104.

*9. ResCap Sold Its International Mortgage Business To Fortress, And AFI Entertained Two Offers For ResCap Itself*

ResCap spent much of 2010 negotiating a sale of its European mortgage assets and operations to Fortress. Although Carpenter described 2010 as "quite benign," the sale of ResCap's European mortgage assets involved a difficult negotiation, and it was not clear until the end "whether there would be a deal or not."[1114] At the time of closing, Carpenter made the following public statement:

> The completion of these sales is another milestone toward our objective of reducing exposure in the legacy mortgage operation . . . . In addition to these transactions, we continue to sell other legacy assets and remain focused on defining the best long-term strategy for our origination and servicing business. The sales include a combination of approximately US $11 billion of securitized loans, other loan assets (including non-performing loans) and servicing rights, and the shares of the related operating entities in the United Kingdom, Germany and The Netherlands. With the completion of these transactions, [AFI] has effectively exited the European mortgage market.[1115]

During this period, AFI considered selling ResCap. Fortress and Centerview each submitted bids to buy ResCap outright.[1116] During his interview, Carpenter explained that the sale did not happen because the bidders were taking advantage of the market, and wanted AFI to continue holding the historical exposures. For Carpenter, this made no sense because it meant AFI would have all of the exposure and no business in which to manage any problems. He explained that because of this, AFI dropped the idea "pretty quickly. [1117]"

*10. The ResCap Board Considered And Approved The First 2009 Tax Allocation Agreement In August 2010 And Later Considered And Approved The Second 2009 Tax Allocation Agreement In December 2010*

From ResCap's inception in 2005, ResCap had in place tax allocation agreements with AFI that created contractual rights to cash flows between ResCap and AFI that were tied to the income taxation of the operations of ResCap and AFI.[1118] Tax allocation agreements relating

---

[1114] Int. of M. Carpenter, Mar. 4, 2013, at 141:16–145:6.

[1115] AFI, *Ally Financial Completes Sales of European Mortgage Assets and Operations*, Oct. 1, 2010, http://media.ally.com/index.php?s=43&item=419.

[1116] Int. of M. Carpenter, Mar. 4, 2013, at 147:7–148:14.

[1117] *Id.* at 141:16–148:14.

[1118] Implemented 2005 Tax Allocation Agreement, at ALLY_0178780–86 [ALLY_0178779]; Other 2005 Tax Allocation Agreement [MELZER.009035]; 2006 Tax Allocation Agreement, at ALLY_0178787–93 [ALLY_0178779]; First 2009 Tax Allocation Agreement, at RC40016379–84 [RC40016362]; Second 2009 Tax Allocation Agreement [RC00028796].

to federal income tax liabilities and refunds were in effect only during the periods when ResCap was included on either a GM or AFI consolidated federal income tax return. In early August 2010, ResCap management presented to the ResCap Board the First 2009 Tax Allocation Agreement.[1119] It had been drafted by AFI and negotiated with ResCap's counsel,[1120] and it provided for federal income tax liabilities and refunds to be covered by a tax allocation agreement effective as of November 1, 2009,[1121] which was when ResCap joined the AFI consolidated federal income tax return.[1122] The ResCap Board approved the First 2009 Tax Allocation Agreement,[1123] but no ResCap officer ever signed the agreement.[1124] AFI drafted and presented the Second 2009 Tax Allocation Agreement to ResCap management in October 2009 after AFI had calculated that it would be required to make large payments to ResCap before the end of the 2010 under the First 2009 Tax Allocation Agreement.[1125] In drafting the Second 2009 Tax Allocation Agreement, AFI started with the First 2009 Tax Allocation Agreement and removed the provision that created ResCap's contractual right to receive payments from AFI.[1126] The ResCap Board later approved the Second 2009 Tax Allocation Agreement in December 2010.[1127] The Second 2009 Tax Allocation Agreement was fully executed by all parties in January 2011.[1128]

### 11. The Debtors Settled Certain Fannie Mae And Freddie Mac Claims In 2010

The year 2010 saw lawsuits and repurchase demands beginning to mount against mortgage originators and servicers by a number of state attorneys general, federal agencies,

---

[1119] *See* Minutes of a Regular Meeting of the Board of Directors of Residential Capital, LLC, Aug. 6, 2010, at RC40018820–22 [RC40018729].

[1120] *See* Memorandum, Revised Tax Allocation Agreement Draft, dated July 11, 2010 [EXAM20269709]; E-mail from W. Marx (Dec. 6, 2009) [EXAM12308200].

[1121] First 2009 Tax Allocation Agreement, at RC40016379 [RC40016362].

[1122] *See* Tax Classification and Allocation History, prepared by AFI, at ALLY_0178779 [ALLY_0178779].

[1123] *See* Minutes of a Regular Meeting of the Board of Directors of Residential Capital, LLC, Aug. 6, 2010, at RC40018820–22 [RC40018729].

[1124] *See* E-mail from W. Marx (Oct. 13, 2010), at ALLY_0245484 [ALLY_0245484] ("Under proposed and partially executed tax allocation agreements (Jim Young has not yet executed on behalf of ResCap), [AFI] would be required to pay ResCap for losses used by other members of the group.").

[1125] *See* E-mail from W. Marx (Oct. 18, 2010) [ALLY_0424659] ("In light of the potentially large capital contributions that could result under [the First 2009 Tax Allocation Agreement], I have requested review and approval by [AFI's] current senior leadership."); E-mail from W. Marx (Oct. 15, 2010), at 2 [ALLY_0434931] ("Calculations were started immediately upon filing the first consolidated return on September 15. . . . [W]e realized that we might be locking up cash inside ResCap and raised the alarm.").

[1126] *See* Draft of Second 2009 Tax Allocation Agreement, dated Nov. 2, 2009 [ALLY_0424672].

[1127] *See* Minutes of Special Meeting of Board of Directors of Residential Capital, LLC, Dec. 22, 2010, at RC40018862 [RC40018729].

[1128] Second 2009 Tax Allocation Agreement, at RC00028801 [RC00028796]; *see also* Section V.D.2 (discussing the tax allocation agreements in greater detail).

and investors based on allegations of non-compliance with underwriting standards.[1129] As of December 31, 2009, Freddie Mac had outstanding repurchase requests to its sellers and servicers of $3.8 billion.[1130] This figure grew to $4.8 billion by March 31, 2010.[1131] The first quarter of 2010 repurchase requests of $1.3 billion represented a 65% increase over $789 million in repurchase requests in the first quarter of 2009.

In March 2010,[1132] ResCap reached an agreement with Freddie Mac to settle purported repurchase obligations (for loans written that did not meet Freddie Mac's standards) for the period prior to 2009 for a one-time payment of $325 million.[1133] The Freddie Mac settlement did not settle any alleged violations of servicing obligations or any purported failure to comply with property foreclosure laws.[1134]

### 12. The FHFA Raised New Concerns With ResCap On Behalf Of Fannie Mae And Freddie Mac

On July 12, 2010, the FHFA, conservator to Fannie Mae and Freddie Mac, issued 64 subpoenas to some of the major lenders seeking loan files and transaction documents related to private label mortgage-backed securities in which Fannie Mae and Freddie Mac had

---

[1129] *See, e.g.*, *Countrywide Agrees to Pay $600 Million to Settle Mortgage Lawsuits*, N.Y. TIMES, Aug. 3, 2010, http://www.nytimes.com/2010/08/03/business/03countrywide.html?_r=0; *see also Loan Servicers Prepare for Borrower Backlash, Lawsuits Mounting*, MORTGAGE NEWS DAILY, Oct. 1, 2010, http://www.mortgagenews daily.com/10012010_servicer_lawsuits.asp; *We'd Like to Return These Bad Loans, Please*, CNN Oct. 22, 2010, http://money.cnn.com/2010/10/22/real_estate/repurchase_banks/ index.htm.

[1130] Federal Home Loan Mortgage Corporation (Freddie Mac), Quarterly Report (Form 10-Q) (May 5, 2010), Item 2 at 65.

[1131] *Id*.

[1132] The GMAC Board reviewed the proposed legal settlement with Freddie Mac at its regular Board meeting on January 29, 2010. *See* Proposed Legal Settlement—Freddie Mac/ResCap, presented at a Regular Meeting of the Board of Directors of GMAC Inc., Jan. 29, 2010 [ALLY_0267940].

[1133] Monique Lewis & Tibita Kaneene, *Ally Financial starts talks on ResCap, CEO says*, THE FINANCIAL TIMES, May 21, 2010, http://www.ft.com/intl/cms/s/2/1e73a0e2-6ced-11df-91c8-00144feab49a.html#axzz2Kcg80dPx. GMAC Mortgage, RFC, and Freddie Mac were the parties to the Freddie Mac settlement. A draft term sheet, endorsed by Marano and Carpenter, was presented to the ResCap Board Executive Committee on March 15, 2010. The term sheet stated that AFI was not a party to the agreement, but was required by Freddie Mac to enter into a guaranty or "keep well agreement" related to the settlement. *See* GMAC Mortgage Repurchase Settlement Term Sheet, attached to e-mail from C. Quenneville, Mar. 15, 2010 [RC40015746]; *see also* Ally Financial Inc., Annual Report (Form 10-K) (Feb. 25, 2011) (noting that settlement agreements had been reached with Freddie Mac and Fannie Mae during the fiscal year, which had significantly limited AFI's and the Debtors' repurchase obligations, and noting that AFI's mortgage operations held reserves of $830 million as of December 31, 2010 for potential breaches of representations and warranties).

[1134] Ally Financial Inc., Annual Report (Form 10-K) (Feb. 25, 2011), at 247. At least one media outlet tried to make the case that the timing of the spring 2010 Freddie Mac settlement was influenced by the U.S. Treasury's desire to see ResCap sold. *See* Josh Kosman, *Freddie Lets GMAC Loan Go Free For Fee*, N.Y. POST, May 11, 2010, http://www.nypost.com/p/news/business/recycling_bad_ paper_ yxUqiKN54z7ZZ85wRrFXKJ.

invested only to suffer substantial losses.[1135] The agency and its clients wanted to learn whether in securitizing and selling the loans, the lenders had made material misrepresentations or omissions such that the lenders would be obligated to repurchase the loans. Private label securities were "among the poorest performing mortgages," representing 27% of all mortgages that were ninety days or more past due.[1136] Fannie Mae and Freddie Mac were large investors in the securities.[1137] Certain of the subpoenas were directed at ResCap entities.[1138]

In an agreement dated December 23, 2010, between Fannie Mae and GMAC Mortgage, ResCap, RFS, RAMP, RFC, RALI, and Homecomings, ResCap settled Fannie Mae's claims. In exchange for making a cash payment of $461.5 million (involving approximately $292 billion unpaid principal balance ($84 billion of current unpaid principal balance)),[1139] Fannie Mae agreed to release ResCap and its affiliates, officers, directors, and shareholders (other than Ally Bank) "from certain potential mortgage liabilities," related to mortgage repurchase obligations triggered by representation and warranty breaches.[1140] The settlement agreement covered "loans serviced by GMAC Mortgage on behalf of Fannie Mae prior to June 30, 2010 and all mortgaged-backed securities that Fannie Mae purchased at various times prior to the settlement, including private label securities."[1141] The settlement did not (1) release ResCap of its obligations to indemnify Fannie Mae or (2) protect ResCap from any potential liability for any failure to comply with any state or federal law applicable to foreclosing on property serving as mortgage collateral.[1142] ResCap and AFI described the settlement as "modestly in excess of" the amount that the ResCap had previously reserved.[1143]

---

[1135] Nick Timaros, *U.S. Queries 64 Issuers of Mortgage Securities, Others*, WALL ST. J., July 13, 2010, http://online.wsj.com/article/SB10001424052748704288204575362882033038278.html; *see also* Suzanne Kapner, *Fannie, Freddie Regulator Issues Subpoenas*, THE FIN. TIMES, http://www.ft.co m/intl/cms/s/ 0/75d669c0-8e01-11df-b06f-00144feab49a.html#axzz2Kcg 80dPx.

[1136] Nick Timaros, *U.S. Queries 64 Issuers of Mortgage Securities, Others*, WALL ST. J., July 13, 2010, http://online.wsj.com/article/SB10001424052748704288204575362882033038278.html.

[1137] *Id*.

[1138] Ally Financial Inc., Current Report (Form 8-K) (Dec. 23, 2010).

[1139] Ally Financial Inc., Press Release, *Ally Financial's Mortgage Subsidiaries Reach Agreement with Fannie Mae on Repurchase Exposure* (Dec. 27, 2010), http://media.ally.com/index.php?s=43&item=437.

[1140] Ally Financial Inc., Current Report (Form 8-K) (Dec. 23, 2010).

[1141] Ally Financial Inc., Press Release, *Ally Financial's Mortgage Subsidiaries Reach Agreement with Fannie Mae on Repurchase Exposure* (Dec. 27, 2010), http://media.ally.com/index.php?s=43&item=437.

[1142] Ally Financial Inc., Current Report (Form 8-K) (Dec. 23, 2010); *see also* Ally Financial Inc., Annual Report (Form 10-K) (Feb. 25, 2011), Ex. 10.9.

[1143] Ally Financial Inc., Press Release, *Ally Financial's Mortgage Subsidiaries Reach Agreement with Fannie Mae on Repurchase Exposure* (Dec. 27, 2010), http://media.ally.com/index.php?s=43&item=437.

When fiscal year 2010 drew to a close, ResCap was still responding to the Freddie Mac subpoenas for documents connected to Freddie Mac's investments in private label mortgaged backed securities. In its 2010 Annual Report, AFI stated that it was not possible to determine what the potential losses might be related to these claims.[1144]

### 13. Fall 2010 Brought Investigations And Allegations By Various State And Federal Government Offices And Agencies Related To Mortgage Foreclosure Activities

In fall 2010, U.S. state and federal government offices and agencies, including the attorneys general of all fifty states, the DOJ, U.S. Treasury, HUD,[1145] the FRB, the FDIC, the SEC and other agencies, regulators, government offices, and Congressional committees opened investigations into the procedures followed by mortgage servicing companies and banks, including ResCap, "in connection with mortgage foreclosure home sales and evictions."[1146] AFI and its subsidiaries cooperated with the investigations and anticipated that AFI or its subsidiaries would be subject to penalties and sanctions related, in part, to foreclosures begun through an automated "robo-signing" system where the person signing the foreclosure affidavit had no knowledge of what it contained.

On September 17, 2010, GMAC Mortgage "temporarily suspended mortgage foreclosure home sales and evictions and postponed hearings on motions for judgment in certain states"[1147] when in some states, questions arose as to whether the persons signing the affidavits (1) verified the information contained in the affidavits and (2) actually signed the affidavits in the physical presence of a notary.[1148] AFI also reported that GMAC Mortgage had implemented additional procedures to be used in all foreclosure cases going forward that would ensure that all affidavits were "properly verified and executed."[1149] Following the suspension of activity, GMAC Mortgage would only proceed with the foreclosure following an individualized review of each file.[1150] Two weeks later, ResCap executives, including Marano, Abreu, and Hamzehpour were advised by AFI's Chief Public Policy Officer to start

---

[1144] Ally Financial Inc., Annual Report (Form 10-K) (Feb. 25, 2011), at 247.

[1145] *See, e.g.*, Zachary Goldfarb, *Task force probing whether banks broke federal laws during home seizures*, WASH POST, Oct. 20, 2010, http://www.washingtonpost.com/wp-dyn/content/article/2010/10/19/AR201010 1904845.html.

[1146] Ally Financial Inc., Annual Report (Form 10-K) (Feb. 25, 2011), at 246.

[1147] *Id*.

[1148] *Id*.

[1149] *Id*.

[1150] *Id*; *see also* TESTIMONY OF T. MARANO, BEFORE THE SUBCOMMITTEE ON HOUSING AND COMMUNITY OPPORTUNITY, COMMITTEE ON FINANCIAL SERVICES, U.S. HOUSE OF REPRESENTATIVES, Nov. 18, 2010, at 6, http://financialservices.house.gov/media/file/hearings/111/marano111810.pdf.

identifying all of the stakeholders and to determine what information would be shared with them, and to start identifying the relevant documents, in anticipation of possible public scrutiny.[1151]

Congress got involved in October 2010. Senators Jeanne Shaheen (D-N.H.), Al Franken (D-Minn.), Sheldon Whitehouse (D-R.I.) and Carl Levin (D-Mich.) sent a letter to Carpenter requesting that AFI immediately extend suspension of foreclosure activities in all 50 states, rather than in the 23 states that required judicial involvement.[1152] On November 10, 2010, Marano, in his capacity as CEO of Mortgage Operations for AFI, was invited by the U.S. House of Representatives' Subcommittee on Housing and Community Opportunity to testify at a hearing eight days later taking up the foreclosure issue.[1153] Marano testified to Congress that it was GMAC Mortgage's position that foreclosure is a last resort as "[p]reserving home ownership is in the best interest of all parties," including GMAC Mortgage, which is able to recover its advances following a loan modification, but must continue paying advances on a foreclosure until the foreclosure is finalized, without any hope of having the advances repaid.[1154]

---

[1151] E-mail from M. Leiber to T. Marano, W. Solomon, S. Abreu, J. Pensabnee, T. Hamzehpour, and P. Hobbib, copied to M. Carpenter, B. Yastine, and G. Proia (Sept. 30, 2010) [EXAM11135342].

[1152] Letter from Sen. J. Shaheen, et. al to M. Carpenter (Oct. 8, 2010) [EXAM10425702]. A similar letter was sent to JP Morgan Chase, and the date of the letter coincides with the date that Bank of America agreed to halt foreclosures in all fifty states.

A judicial foreclosure involves a court proceeding, where the lender files a complaint, records a notice among the land records, and properly serves the borrower. The complaint asks the court to allow the lender to foreclose the lien and take possession of the property for nonpayment of the debt. The borrower is given an opportunity to dispute the facts asserted in the complaint, show that the lien has been paid, make any relevant counterclaims, and to appear in any court proceeding. (In most cases, foreclosure actions are undisputed because the borrower has defaulted on the repayment of a valid debt.) If the court determines that foreclosure is appropriate, it will issue a judgment for the lender or servicer for the total amount owed plus the costs of the foreclosure proceeding. Once a judgment has issued, the court will authorize a sheriff's sale of the property, although generally the lender or servicer will be the highest bidder and will take possession of the property.

Non-judicial foreclosures do not involve courts, but rather are controlled by state statute. Typically, in non-judicial proceedings, the borrower is sent a notice of default, which may or may not be recorded among the land records, depending on the individual state law. If the borrower does not cure the default within a set period, the borrower will be sent a Notice of Sale, which generally must be published, and then the property is sold at public auction. A borrower in non-judicial states still may seek the help of a court to enjoin the foreclosure activity. *See* Mortgage Bankers Ass'n, *Judicial Versus Non-Judicial Foreclosure*, http://www.mbaa.org/files/ResourceCenter/ForeclosureProcess/JudicialVersusNon-JudicialForeclosure.pdf.

[1153] Letter from Rep. M. Waters to T. Marano (Nov. 10, 2010) [EXAM10425695].

[1154] TESTIMONY OF T. MARANO, BEFORE THE SUBCOMMITTEE ON HOUSING AND COMMUNITY OPPORTUNITY, COMMITTEE ON FINANCIAL SERVICES, U.S. HOUSE OF REPRESENTATIVES, Nov. 18, 2010, at 3, http://financialservices.house.gov/media/file/hearings/111/marano111810.pdf.

In its 2010 Annual Report, AFI "recorded a liability of approximately $13 million related to potential fines and penalties [it] determined were probable and estimable."[1155] AFI also expressed concerns about other risks that could lead to unforeseen costs, including litigation, delays in the foreclosure process, state interference with foreclosures even after the submission of corrected affidavits, claims from investors holding securities that were impacted by continued delays in the foreclosure process, regulatory fines and sanctions, and reputational harm.[1156]

### 14. 2010 Ended With ResCap "Reasonably Well-Positioned"

As Marano noted, 2010 was a profitable year. It was a year in which ResCap did not repeatedly need to look to AFI for liquidity funding and capital contributions, at least in part, because of the recapitalization in December 2009.[1157] Carpenter described 2010 as "a year of tremendous accomplishment."[1158] He added, "[i]n 2009, [ResCap's problems] were critical and urgent. In 2010, ResCap's problems were time-consuming, but were part of a well-thought out plan"; the year 2010 was one in which Carpenter says the ResCap team accomplished what it set out to do, leaving ResCap smaller and not as important to AFI, but "reasonably well positioned."[1159]

---

[1155] Ally Financial Inc., Annual Report (Form 10-K) (Feb. 25, 2011), at 246. At December 31, 2010, we recorded liability of approximately $13 million related to potential fines and penalties we determined were probable and estimable.

[1156] *Id.*

[1157] That being said, at the end of 2010, ResCap and AFI added an unsecured $500 million "Swingline tranche" to the A&R Line of Credit Agreement. *See* Minutes of a Special Meeting of the Board of Residential Capital, LLC, Dec. 22, 2010, at RC40018857 [RC40018729]; *see also* Fourth Amendment to the Amended and Restated Loan Agreement (Line of Credit Agreement), dated Dec. 23, 2010 [RC00025467]. A "Swingline" loan provides an entity immediate access to large amounts of cash in order to cover possible shortfalls from other debt commitments.

[1158] Int. of M. Carpenter, Mar. 4, 2013, at 143:16–145:6.

[1159] *Id.* at 145:2–6.

## J. EVENTS LEADING TO THE CHAPTER 11 CASES AND PROPOSED POSTPETITION TRANSACTIONS AND AGREEMENTS

By summer 2011, notwithstanding the efforts to stabilize ResCap's business, ResCap "continued to lack liquidity and capital and the market began to perceive that AFI's support for [ResCap] was weakening."[1160] Following the June 2011 Countrywide Settlement, ResCap's and AFI's views evolved as to the substantial magnitude of the potential representation and warranty liabilities.[1161] Indeed, according to AFI's financial advisor, the Countrywide Settlement was a major event culminating in AFI's determination that the potential downside of the mortgage business ultimately outweighed ResCap's value as an asset.[1162]

### 1. ResCap's Consideration Of Strategic Restructuring Scenarios

#### a. ResCap's Initial Contingency Planning

As it became more apparent that AFI would not support ResCap indefinitely, ResCap's management began efforts to "create leverage" over AFI—and thereby persuade AFI to continue to support ResCap for an additional time—by, among other things, threatening that ResCap could "either file for bankruptcy or look for alternative outcomes that were not controlled by or most desired by AFI."[1163] ResCap's goal was to obtain the ability to "self-determine."[1164] In other words, according to ResCap's counsel, if at some point AFI decided to end its support for ResCap, ResCap wanted to be in a position to implement an "elegant-like exit through spin, sale, or ultimately bankruptcy."[1165]

One example of ResCap's efforts to create leverage in connection with preparations for the 2012 bankruptcy filing was the August 12, 2011 letter from Thomas Marano, CEO of ResCap, to Michael Carpenter, CEO of AFI, sent pursuant to a resolution of the ResCap Board.[1166] In his letter, Marano described ResCap's precarious financial condition,

---

[1160] First Day Affidavit, ¶ 86.

[1161] Meeting with Evercore, Financial Advisors to AFI, in N.Y., N.Y. (Sept. 6, 2012); *see also* E-mail from J. Mackey (Aug. 19, 2011) [ALLY_0169890] (noting that representation and warranty claims are "coming" and "[i]t will be an avalanche").

[1162] Meeting with Evercore, Financial Advisors to AFI, in N.Y., N.Y. (Sept. 6, 2012).

[1163] Int. of G. Lee, Feb. 20, 2013, at 38:10–39:21.

[1164] *Id*. at 38:14–21.

[1165] *Id*. at 38:10–40:19. ResCap's Board preferred an out-of-court restructuring to an in-court restructuring. *See id*. at 75:23–77:1. Accordingly, it began to consider a possible transaction with Cerberus in late July 2011. *See* Section III.J.1.b(1).

[1166] Minutes of a Special Meeting of the Board of Residential Capital, LLC, Aug. 12, 2011, at RC40018649–50 [RC40018411]. At the August 12, 2011 meeting, the ResCap Board agreed to "re-engage Morrison & Foerster to refresh bankruptcy planning" and FTI and Lazard as ResCap's "financial advisors and investment bankers, respectively." *Id*. at RC40018650.

acknowledged that AFI had engaged Kirkland & Ellis for bankruptcy planning advice, and informed Carpenter that ResCap would be engaging Morrison & Foerster and Lazard to assist the ResCap Board in preparing for a possible ResCap bankruptcy filing.[1167] Marano noted that if ResCap violated its net worth covenants, it would be forced to file a free fall bankruptcy and warned, "[w]ithout sufficient time to prepare, a filing would be extremely disorganized and would damage the board's efforts to preserve asset value."[1168] Marano asked AFI to provide ResCap with "assurance of sufficient equity to ResCap so it does not violate its net worth covenants" or, in the alternative, "a sufficient equity injection to allow sufficient time for ResCap, if necessary, to file for bankruptcy in a planned and orderly manner."[1169]

AFI was reluctant to provide any support to ResCap unless it believed such support would benefit AFI's own stakeholders. On August 10, 2011, two days prior to sending the above-referenced letter, Marano e-mailed Carpenter to preview ResCap's concerns regarding its ability to meet tangible net worth (TNW) covenants and warned that ResCap may "request an equity injection" from AFI.[1170] Carpenter forwarded Marano's e-mail to Jeff Brown, AFI's Senior Executive Vice President of Finance and Corporate Planning, and noted that "an equity infusion [to ResCap] is the LAST thing I want to do."[1171] On August 16, 2011, Carpenter responded to Marano with a letter noting that "[AFI] has provided substantial support to ResCap in the past and would consider doing so again if it were determined to be in its shareholders' best interest although that does not appear to be necessary at the present time."[1172] Carpenter further noted:

> [AFI] certainly has no interest in seeing the ResCap Board of Directors pursue a free fall bankruptcy and assumes that there would be considerable dialogue with AFI before such an action were contemplated. AFI and ResCap should, therefore, each monitor developments over the coming weeks and months and consider the impact of alternative scenarios on future plans.[1173]

---

[1167] Letter from T. Marano to M. Carpenter (Aug. 12, 2011) [ALLY_0150092]. The ResCap Board eventually ascertained that Lazard had been retained by the U.S. Treasury and instead hired Centerview, a financial advisory firm that had not been "previously engaged by ResCap or any of its affiliated entities." *See* Minutes of a Special Meeting of the Board of Residential Capital, LLC, Oct. 4, 2011, at RC40018690–91 [RC40018411].

[1168] Letter from T. Marano to M. Carpenter (Aug. 12, 2011), at 1 [ALLY_0150092].

[1169] *Id*. at 1–2.

[1170] E-mail from T. Marano to M. Carpenter (Aug. 10, 2011) [ALLY_0170697].

[1171] E-mail from M. Carpenter to J. Brown (Aug. 11, 2011) [ALLY_0170697].

[1172] Letter from M. Carpenter to T. Marano (Aug. 18, 2011) [EXAM11101715] (attached to E-mail from M. Carpenter to T. Marano (Aug. 16, 2011) [EXAM11101714]) (the letter is dated August 18, 2011 but was sent by e-mail on August 16, 2011).

[1173] *Id*.

Carpenter's response to Marano's letter was acknowledged by the ResCap Board as "constructive but non-committal."[1174]

Two days later, on August 18, 2011, the ResCap Board met with attorneys from Morrison & Foerster and Morrison Cohen and discussed "a variety of strategic matters including, but not limited to, various contingencies including a potential bankruptcy and matters associated therewith."[1175] Over the following two weeks, the ResCap Board met on four separate occasions (August 19, 23, 25, and 31) to discuss preparations for a bankruptcy or restructuring.[1176]

With bankruptcy planning underway, ResCap still needed to continue satisfying its TNW covenants in order to have enough time to consummate an out-of-court restructuring or prepare an orderly bankruptcy filing.[1177] To that end, the ResCap Board authorized Marano on August 25, 2011 to deliver a letter to AFI requesting that AFI forgive sufficient ResCap indebtedness so that ResCap could end August 2011 with a TNW level of $500 million.[1178] In the letter, Marano noted that ResCap's estimate of TNW as of August 25, 2011 was $309.7 million, "barely $59 million over our $250 million funding facility covenant levels."[1179] Although Marano conceded in the letter that ResCap's request for sufficient capital to achieve a net worth of $500 million was more than what would "be necessary to avoid breaching the covenants from a technical perspective," he explained that the ResCap Board expected further liquidity drain to occur at the end of August 2011.[1180]

Carpenter forwarded Marano's letter to Brown stating, "This is nuts!"[1181] AFI remained reluctant to provide ResCap with financial support and, rather than accede to ResCap's request for sufficient capital to maintain $500 million of TNW, the AFI Board resolved to provide ResCap with only enough capital for it to exceed its $250 million minimum TNW

---

[1174] Minutes of a Special Meeting of the Board of Residential Capital, LLC, Aug. 16, 2011, at RC40018652 [RC40018411].

[1175] Minutes of a Special Meeting of the Board of Residential Capital, LLC, Aug. 18, 2011, at RC40018653–54 [RC40018411].

[1176] *See* Minutes of a Special Meeting of the Board of Residential Capital, LLC, Aug. 19, 2011, at RC40018655–56 [RC40018411]; Minutes of a Special Meeting of the Board of Residential Capital, LLC, Aug. 23, 2011, at RC40018657–58 [RC40018411]; Minutes of a Special Meeting of the Board of Residential Capital, LLC, Aug. 25, 2011, at RC40018659–60 [RC40018411]; Minutes of a Special Meeting of the Board of Residential Capital, LLC, Aug. 31, 2011, at RC40018661–62 [RC40018411].

[1177] *See* Letter from T. Marano to M. Carpenter (Aug. 12, 2011) [ALLY_0150092].

[1178] Minutes of a Special Meeting of the Board of Residential Capital, LLC, Aug. 25, 2011, at RC40018660 [RC40018411]. Marano delivered the letter requesting AFI's debt forgiveness to Carpenter on August 26, 2011. *See* Letter from T. Marano to M. Carpenter (Aug. 26, 2011) [ALLY_0380110].

[1179] Letter from T. Marano to M. Carpenter (Aug. 26, 2011) [ALLY_0380110].

[1180] *Id.*

[1181] E-mail from M. Carpenter to J. Brown (Aug. 26, 2011) [ALLY_0380109].

covenants by $50 million.[1182] Carpenter explained that Marano's request was "nuts" because ResCap was "$50 million above their minimum and they wanted $500 million. They didn't need $500 million."[1183] In his letter to Marano dated August 30, 2011, Carpenter expressed a hope that AFI's support for ResCap would "allow the ResCap board to focus on permanent solutions rather than devoting resources to near term catastrophe scenarios."[1184]

Notwithstanding AFI's reluctance to provide support to ResCap, it recognized that a breach by ResCap of its TNW covenants would likely result in an "immediate liquidity event" that would need to be disclosed by AFI and would also "put[] ResCap and its independent directors in a much more tenuous position regarding [bankruptcy] preparations . . . ."[1185] Accordingly, the AFI Board resolved again in September, October, November, and December 2011 to ensure that ResCap maintained sufficient capital for it to exceed its TNW covenants by $50 million.[1186]

With its immediate equity concerns temporarily alleviated, but having received the message that AFI's support for ResCap would not necessarily continue indefinitely, the ResCap Board continued to evaluate "various different strategic scenarios" and "contingency planning" options during September and October 2011.[1187] To assist it in its restructuring efforts, ResCap retained Centerview as its investment banker on October 18, 2011.[1188] Centerview's role was focused on "assisting ResCap in restructuring its balance sheet or

--------------------------------------------------------

[1182] *See* Unanimous Consent to Action, dated Aug. 29, 2011, at ALLY_0115739–48 [ALLY_0115565].

[1183] Int. of M. Carpenter, Mar. 4, 2013, at 223:8–224:23.

[1184] Letter from M. Carpenter to T. Marano (Aug. 30, 2011), at RC40019728 [RC40019727].

[1185] *See* E-mail from L. Hall to M. Carpenter (Sept. 26, 2011) [ALLY_0359385].

[1186] *See* Unanimous Consent to Action, dated Sept. 27, 2011, at ALLY_0115751–60 [ALLY_0115565]; Unanimous Consent to Action, dated Oct. 25, 2011, at ALLY_0115768–77 [ALLY_0115565]; Unanimous Consent to Action, dated Nov. 30, 2011, at ALLY_0115789–98 [ALLY_0115565] (apparently supplanting a November 29, 2011 AFI Board action to provide ResCap with enough capital for it to exceed its TNW covenants by just $25 million, *see* Unanimous Consent to Action, dated Nov. 29, 2011, at ALLY_0115779–88 [ALLY_0115565]); Unanimous Consent to Action, dated Dec. 29, 2011, at ALLY_0115843–52 [ALLY_0115565]. AFI forgave $109.4 million of ResCap's debt on December 30, 2011. In addition, AFI forgave $196.5 million of ResCap's debt on January 30, 2012 in connection with the FRB/FDIC Settlement and the DOJ/AG Settlement. *See* Residential Capital, LLC Consolidated Financial Statements for the Years Ended December 31, 2011 and 2010, at 11, 39 [EXAM00122651]. As discussed in Section V.C.1, through those settlements AFI, Ally Bank, ResCap, and GMAC Mortgage addressed certain allegations related to purportedly improper oversight and servicing of residential mortgage loans.

[1187] *See* Minutes of a Regular Meeting of the Board of Residential Capital, LLC, Sept. 15, 2011, at RC40018675 [RC40018411]; Minutes of a Special Meeting of the Board of Residential Capital, LLC, Sept. 27, 2011, at RC40018677 [RC40018411]; Minutes of a Special Meeting of the Board of Residential Capital, LLC, Oct. 4, 2011, at RC40018691 [RC40018411]; Minutes of a Regular Meeting of the Board of Residential Capital, LLC, Oct. 7, 2011, at RC40018695 [RC40018411]; Minutes of a Special Meeting of the Board of Residential Capital, LLC, Oct. 10, 2011, at RC40018696 [RC40018411].

[1188] *See* Centerview Engagement Letter and Indemnification Agreement, dated Oct. 18, 2011, at 1 [EXAM20178226]; Dep. of M. Puntus, Nov. 5, 2012, at 11:7–13.

disposing of assets, and/or financing the Chapter 11 cases."[1189] FTI, which had been working with ResCap intermittently since 2008,[1190] was more focused on the day-to-day financial analyses ResCap required to support those efforts.[1191] The ResCap Board referred to its evaluation of strategic alternatives for ResCap as "Project Bounce."[1192]

Recognizing the company's precarious financial position, the ResCap Board requested that Morrison & Foerster answer the question: "who do we owe our [fiduciary] duties to . . . on any particular day."[1193] On October 28, 2011, Morrison & Foerster gave "a detailed presentation . . . with respect to fiduciary duties of directors."[1194]

As the market became increasingly aware that ResCap was preparing for a potential restructuring, ResCap began to experience difficulty obtaining financing. Following the November 2, 2011 AFI earnings conference call, Randall Newman, Assistant Treasurer of ResCap, e-mailed Jerry Lombardo, Treasury Executive of ResCap, and noted that "renewing the GSAP [F]acility is going to be 50-100bps more exciting."[1195] In response, Lombardo wrote "I knew that was going to happen. . . . [W]hile they are looking to save the [AFI] ship, they are dumping buckets of water into the ResCap vessel."[1196]

On November 8, 2011, the ResCap Board held a special meeting for the purpose of hearing a presentation from Morrison & Foerster, Centerview, and FTI regarding "guidance relating to ResCap contingency planning."[1197] Attorneys from Morrison & Foerster gave a "detailed presentation on matters relating to bankruptcy planning and a sale of assets under Section 363 of the Bankruptcy Code," and the ResCap Board discussed "potential asset sale structures, sale process considerations, and debtor in possession financing and use of cash collateral."[1198] Marano presented, reviewed, and discussed "a series of charts that further described potential strategic alternatives for ResCap, including details of a potential sale transaction.[1199] In addition, Morrison & Foerster attorneys discussed with the ResCap Board

---

[1189] *See* Dep. of M. Puntus, Nov. 5, 2012, at 13:19–24.

[1190] *See* Dep. of M. Renzi, Nov. 7, 2012, at 17:25–19:8.

[1191] *See* Dep. of M. Puntus, Nov. 5, 2012, at 14:12–21.

[1192] *See, e.g.*, Centerview Project Bounce Materials for Discussion, dated Oct. 31, 2011 [EXAM11219455].

[1193] Int. of G. Lee, Feb. 20, 2013, at 146:24–147:20.

[1194] Minutes of a Regular Meeting of the Board of Residential Capital, LLC, Oct. 28, 2011, at RC40018698 [RC40018411].

[1195] E-mail from R. Newman to J. Lombardo (Nov. 3, 2011), at EXAM10460161 [EXAM10460160].

[1196] E-mail from J. Lombardo to R. Newman (Nov. 3, 2011), at EXAM10460160 [EXAM10460160].

[1197] Minutes of a Special Meeting of the Board of Residential Capital, LLC, Nov. 8, 2011, at RC40018701 [RC40018411].

[1198] *Id*.

[1199] *Id*.

"potential legal claims against [AFI] under different strategic scenarios for the mortgage operations."[1200]

On November 25, 2011, the ResCap Board held another special meeting and invited Carpenter to attend. At the meeting, Carpenter discussed, among other things, "the recent historical relationship between [AFI] and ResCap and the impact of external factors, such as capital markets volatility, challenges in the residential mortgage market, and changes in the economy, on mortgage operations and on the business of [AFI] and ResCap."[1201] Carpenter also discussed "the recent reevaluation of potential strategic alternatives and contingency plans for the business."[1202]

### b. ResCap's Consideration Of Restructuring Alternatives And Asset Sales

As noted above, ResCap retained Centerview as its investment banker on October 18, 2011. Centerview was retained to advise ResCap in connection with "any Restructuring, Sale Transaction and/or Financing."[1203] Part of Centerview's mandate was to consider the possible disposition of ResCap's assets.[1204] Centerview was to begin working immediately on "the evaluation and execution of various strategic alternatives including a potential sale of the Company."[1205] Although Centerview analyzed potential out-of-court asset sales and asset sales that would be effectuated in a chapter 11 proceeding, it recognized that an out-of-court transaction would only be successful if AFI could "sever its relationship with ResCap" in a structure that would "eliminate/mitigate current and future financial and legal liabilities."[1206]

---

[1200] *Id.*

[1201] Minutes of a Special Meeting of the Board of Residential Capital, LLC, Nov. 25, 2011, at RC40018712 [RC40018411].

[1202] *Id.* At the same meeting, advisors from Centerview verbally provided a "detailed report" to the ResCap Board regarding bankruptcy planning and "matters related to a potential asset sale," among other topics. *Id.* at RC40018713. Centerview provided an update report on similar matters to the ResCap Board on December 9, 2011. *See* Minutes of a Special Meeting of the Board of Residential Capital, LLC, Dec. 9, 2011, at RC40018725 [RC40018411].

[1203] Centerview Engagement Letter and Indemnification Agreement, dated Oct. 18, 2011, § 1 [EXAM20178226].

[1204] From 2010 through 2012, AFI and ResCap had evaluated a number of strategic alternatives for their mortgage operations, "including 'status quo,' a sale of [AFI's] equity interest in ResCap as well as a spin-off of ResCap to [AFI's] equity holders." *See* Discussion Materials—Joint Presentation by Ally and ResCap, dated Jan. 23, 2012, at 5 [RC00096076]. A sale process conducted in 2010 had failed because, among other things, the bids were "not compelling," bidders were "unwilling to assume contingent liabilities," and "most required [AFI] indemnity." *See id.* Similarly, the "status quo" alternative was not viable because of the "[c]ontinued increase in contingent litigation liabilities," the need for "significant cash infusion by [AFI]," and the potential delay of AFI's initial public offering or sale. *See id.*

[1205] Joint Project Bounce Presentation by Centerview, FTI, and Morrison & Foerster, dated Dec. 15, 2011, at 2 [RC00096142].

[1206] *Id.* at 2–3.

III-213

Centerview prepared a preliminary assessment of ResCap's "asset sale alternatives . . . [a]ssuming a chapter 11 sale process is required"[1207] and, on November 16, 2011, Sam Greene from Centerview reported to the ResCap Board regarding "a potential asset sale transaction."[1208] In the presentation, Centerview analyzed ResCap's options with respect to potential asset sales, including whether the business should be marketed "as a whole" or as "separate assets," and evaluated how ResCap's alternatives would be influenced by external factors, including, among other things, AFI's "willingness to contribute assets to and/or sell assets alongside ResCap . . . [and] to provide DIP financing."[1209]

### (1) Evaluation Of Out-of-Court Restructuring Options With Cerberus

Beginning in July 2011, Cerberus, ResCap, and AFI began the process of conducting due diligence for a potential out-of-court transaction by which Cerberus might have purchased the ResCap platform.[1210] As Lenard Tessler of Cerberus summarized:

> [W]e went through an analysis in the third and fourth quarters [of 2011]. Was there a check that [AFI] could write where they could be confident that they would shed themselves of ResCap and we would be confident that we would be able to continue to operate ResCap and fight the litigation in a way that would provide both parties certainty that we would continue to operate and prosper and be able to meet all of our obligations as they come due and that [AFI] would not have to worry about these liabilities coming back at them?[1211]

AFI viewed a ResCap spin-off or sale as "likely not viable paths . . . without more capital and liquidity support."[1212] AFI was also concerned that it might "lose control of managing the liabilities" if ResCap were sold.[1213]

Notwithstanding that the parties believed an out-of-court transaction would be difficult to achieve, ResCap and AFI worked with Cerberus on a potential transaction.[1214] As of

---

[1207] Centerview Project Bounce Materials for Discussion, dated Nov. 14, 2011, at 1–2 [RC00096119].

[1208] Minutes of a Special Meeting of the Board of Residential Capital, LLC, Nov. 16, 2011, at RC40018710 [RC40018411].

[1209] Centerview Project Bounce Materials for Discussion, dated Nov. 14, 2011, at 1 [RC00096119].

[1210] *See* Int. of M. Neporent, Feb. 6, 2013, at 235:15–236:17; E-mail from T. Marano (July 20, 2011) [EXAM11107725]; E-mail from A. Saperstein (July 28, 2011) [EXAM11091053]; ResCap Preliminary Diligence List, dated July 19, 2011 [EXAM11091055]; Project Bounce: Information Provided to Cerberus, dated July 28, 2011 [EXAM11091059].

[1211] Int. of L. Tessler, Feb. 28, 2013, at 176:14–178:4.

[1212] E-mail from J. Brown (Sept. 21, 2011) [ALLY_0237702]; *see also* E-mail from J. Brown to M. Carpenter (Jan. 31, 2012) [ALLY_0141903] (noting that a spin or sale transaction would cost AFI more than $3 billion).

[1213] E-mail from J. Brown (Sept. 21, 2011) [ALLY_0237702].

[1214] Indeed, Centerview complained about the amount of time it spent working on a "highly speculative" Cerberus transaction. *See* E-mail from D. Ying to M. Carpenter (Dec. 12, 2011) [ALLY_0380152]. AFI's advisors believed it was AFI's decision "as to how much time going forward that ResCap should continue to devote to Cerberus." *Id.*

November 14, 2011, Centerview considered Cerberus to be the "top potential buyer" for ResCap assets.[1215] In November and December 2011, ResCap and its advisors spent "significant time working with [AFI] and Cerberus to determine which assets . . . Cerberus would be interested in purchasing."[1216] Discussions between the parties included negotiations regarding the possibility of "Cerberus purchasing ResCap equity, assuming [ResCap]'s contingent legal liabilities and [AFI] providing a significant monetary contribution to capitalize the business."[1217] After "additional due diligence," Cerberus decided to pursue "an asset sale transaction . . . with no legacy financial or legal liabilities."[1218]

As of December 5, 2011, the key terms of the "understanding of the proposed out-of-court transaction" between ResCap, Cerberus, and AFI were as follows: (1) Cerberus would have created a new entity "NewCo" (to be owned 51% by Cerberus and 49% by AFI) and would have invested capital to fund the purchase of ResCap's mortgage loan origination and servicing platform and to adequately capitalize NewCo; (2) AFI would have invested approximately $3.1 billion of cash into ResCap, structured as secured debt, which would have been used to repay the Junior Secured Notes and the Unsecured Notes at a discount in order to "eliminate [the] 'all or substantially all' limitation"; and (3) AFI would have retained 100% ownership of ResCap, which would continue to hold liabilities for potential litigation claims.[1219]

---

[1215] Centerview Project Bounce Materials for Discussion, dated Nov. 14, 2011, at 7 [RC00096119].

[1216] Materials for Discussion, dated Dec. 12, 2011, at 4 [RC00000114].

[1217] Joint Project Bounce Presentation by Centerview, FTI, and Morrison & Foerster, dated Dec. 15, 2011, at 4 [RC00096142].

[1218] *Id.*

[1219] Project Bounce Illustrative Out-of-Court Transaction Structure, dated Dec. 5, 2011, at 1–3 [RC00000068].

EXHIBIT III.J.1.b(1)—1
**Proposed Out-of-Court Transaction Structure**
As of December 5, 2011



Note: Exhibit is verbatim excerpt from source.
Source: *Project Bounce Illustrative Out-of-Court Transaction Structure, dated Dec. 5, 2011, at 1 [RC00000068].*

By December 15, 2011, the key terms of the proposed out-of-court Cerberus transaction structure had changed such that: (1) ResCap would have "spun-out" from AFI and would have ceased to be a subsidiary of AFI; and (2) ResCap would have owned between 19% and 49% of NewCo, with Cerberus owning the remainder.[1220]

---

[1220] Joint Project Bounce Presentation by Centerview, FTI, and Morrison & Foerster, dated Dec. 15, 2011, at RC00096147 [RC00096142].

EXHIBIT III.J.1.b(1)—2
**Proposed Out-of-Court Transaction Structure**
As of December 15, 2011

——— Equity Ownership   - - -> Cash Payment   ·····> Transfer of Assets   – – – Fee-Based Subservicing Agreements



Note: Exhibit is verbatim excerpt from source.
[1] Current potential Cerberus transaction grants partial sweep of NewCo excess cash flow to Legacy Co for specified time period. Equity
ownership percentages dependent on percentage and tenor of cash flow sweep.
Source: Joint Project Bounce Presentation by Centerview, FTI, and Morrison & Foerster, dated Dec. 15, 2011, at 5 [RC00096142].

Regardless of the transaction structure, there were a number of concerns regarding the
attractiveness and viability of a proposed out-of-court transaction, including whether AFI could
achieve its "desire to separate itself from potential ResCap [litigation] liabilities and successfully
launch an initial public offering."[1221] Centerview also acknowledged a risk that AFI's capital
contribution could "subsequently [be] recharacterized as an equity investment."[1222] In a
December 12, 2011 presentation prepared "at the suggestion of" AFI, the ResCap management
team and its advisors identified similar issues and noted that execution of a potential out-of-court
transaction with Cerberus would be "challenging."[1223]

---

[1221] Project Bounce Illustrative Out-of-Court Transaction Structure, dated Dec. 5, 2011, at RC00000071
[RC00000068]; *see also* Discussion Materials—Joint Presentation by Ally and ResCap, dated Jan. 23, 2012, at 5
[RC00096076].

[1222] *Id.*

[1223] Materials for Discussion, dated Dec. 12, 2011, at RC00000115,–18 [RC00000114].

Likewise, Cerberus identified a number of concerns regarding the proposed transactions. Most significantly, with respect to exposure to potential RMBS-related representation and warranty liabilities, Cerberus "did not agree with ResCap . . . that they had appropriately reserved and that they had appropriately projected out the losses and the liabilities."[1224] Ultimately, ResCap, AFI, and Cerberus viewed an asset sale effectuated through a chapter 11 bankruptcy filing as the "most advantageous strategy."[1225] As Tessler explained:

> We could never develop enough certainty around that process, so we abandoned that effort sometime[] in the third quarter of 2011. . . . [W]e are concerned about the success of [AFI] as we are about the success of the acquisition we'd otherwise be making . . . . It was a series of projections, so therefore, you know, [AFI has] to get comfortable that we would be able to operate the business, generate appropriate cash flows, meet our obligations as they came due . . . so that the liabilities wouldn't necessarily . . . boomerang back at [AFI] because they were not getting third party releases. . . . [T]hey were passing the baton over to somebody who was going to indemnify them, but . . . the indemnification would come from ResCap, it wasn't going to come from us as acquirers, and therefore . . . [i]t made [doing the transaction outside of bankruptcy] less certain, and it was the lack of certainty that made it something that they were unwilling to engage in.[1226]

### c. ResCap's Preparations For Chapter 11 Bankruptcy

In late 2011, according to ResCap's counsel, ResCap had not yet reached the point of no return in connection with a chapter 11 filing and purportedly still held out hope that an out-of-court restructuring was a possibility.[1227] Nonetheless, ResCap's primary efforts shifted towards preparations for a chapter 11 proceeding that would include an asset sale and provide a forum for resolution of financial and litigation claims.[1228]

---

[1224] *See* Int. of M. Neporent, Feb. 6, 2013, at 236:25–237:16.

[1225] *See* Houlihan Lokey Residential Capital LLC Restricted Presentation to the Ad Hoc Noteholder Group, dated May 2012, at CCM00447534 [CCM00447520] (attached to E-mail from J. Strelcova (May 5, 2012) [CCM00447519] ("ResCap has signed off on this document to be distributed.")); *see also* Discussion Materials—Joint Presentation by Ally and ResCap, dated Jan. 23, 2012, at 5 [RC00096076].

[1226] Int. of L. Tessler, Feb. 28, 2013, at 178:5–180:14.

[1227] Int. of G. Lee, Feb. 20, 2013, at 78:22–80:24 ("I still, until Michael Carpenter said they weren't going to fund the business any longer, was of the view that another alternative might come up . . . .").

[1228] Discussion Materials—Joint Presentation by Ally and ResCap, dated Jan. 23, 2012, at 5–6 [RC00096076].

With the hope of making any bankruptcy filing as "elegant" as possible, the ResCap management team and the ResCap Board determined that its priorities were first to obtain a DIP financing commitment to "get the liquidity [ResCap] need[ed] to live," and second to get "a stalking horse bid so that [ResCap] could have some certainty" as to a potential purchaser.[1229] ResCap's third priority, according to Marano, was the negotiation of a settlement with AFI—a task which he stated was "outsourced" to the Special Review Committee.[1230]

On November 28, 2011, ResCap made certain formal "asks" for support from AFI, including a commitment from AFI to: (1) provide ResCap with DIP financing on reasonable commercial terms; and (2) act as "a back-up § 363 purchaser of ResCap's assets."[1231]

### (1) Securing DIP Financing

#### (a) Initial AFI DIP Financing Proposal

On December 2, 2011, the ResCap Board discussed the need for "continued capital support for ResCap and potential DIP financing from AFI in the event ResCap were to file for bankruptcy."[1232] At that meeting, the ResCap Board directed Marano to negotiate a letter agreement with AFI which would "provide for liquidity support for [ResCap], and provide assurance, subject to acceptable conditions, regarding [AFI's] present intention to provide DIP financing (as detailed in the letter agreement) to [ResCap]."[1233]

On December 4, 2011, AFI's counsel memorialized AFI's intention to provide ResCap with DIP financing in the event of a ResCap bankruptcy in an amount "consistent with ResCap's anticipated needs," estimated to be "as high as $1 to $2 billion."[1234] AFI's counsel stressed that the agreement was "not an enforceable commitment to make a DIP Loan."[1235]

AFI understood that the main risk in providing DIP financing was that the recoverability of the DIP financing largely depended upon the value of the section 363 asset sale bids.[1236] However, AFI also understood that it could extract significant benefits by providing DIP

---

[1229] Dep. of T. Marano, Nov. 12, 2012, at 81:20–84:5; *see also* E-mail from T. Marano to J. Mackey (Feb. 19, 2012) [ALLY_0150256]. For a discussion of ResCap's efforts to secure DIP financing, *see* Section III.J.1.c(1). For a discussion of ResCap's efforts to solicit bids on certain assets, *see* Section III.J.1.c(2).

[1230] Dep. of T. Marano, Nov. 12, 2012, at 83:20–25.

[1231] *See* E-mail from T. Marano to M. Carpenter et al. (Nov. 28, 2011) [ALLY_0237877].

[1232] Minutes of a Special Meeting of the Board of Residential Capital, LLC, Dec. 2, 2011, at RC40018716 [RC40018411].

[1233] *Id.*

[1234] E-mail from R. Schrock (Dec. 4, 2011) [ALLY_PEO_0030848]. Specifically, ResCap's estimate of the DIP financing need was $1.7 billion, which included refinancing prepetition indebtedness of $1.2 billion and additional liquidity needs of $0.5 billion. Evercore, Kirkland & Ellis, and Mayer Brown Project Rodeo Discussion Materials, dated Dec. 13, 2011, at 30 [CCM00336243].

[1235] E-mail from R. Schrock (Dec. 4, 2011) [ALLY_PEO_0030848].

[1236] Evercore, Kirkland & Ellis, and Mayer Brown Project Rodeo Discussion Materials, dated Dec. 13, 2011, at 30 [CCM00336243].

financing, such as protecting the value of the platform servicing Ally Bank's assets, obtaining leverage in the negotiations of the AFI Settlement and Plan Sponsor Agreement, and securing a potential lien on any unencumbered cash.[1237]

In January 2012, ResCap and its financial advisors engaged in meetings with AFI and Evercore in which they discussed DIP financing scenarios.[1238] ResCap asked AFI to provide two DIP financing proposals, one that included unencumbered assets in the collateral package and one that excluded unencumbered assets.[1239]

On January 20, 2012, AFI provided a draft DIP financing term sheet to ResCap.[1240] The proposed DIP lenders were AFI and BMMZ (solely with respect to the BMMZ Master Repo Agreement), with a provision for potentially one or more additional financial institutions selected by AFI.[1241] The proposed financing consisted of a senior secured credit facility in the amount of up to $721 million with three sub-facilities.[1242] The proposed AFI DIP financing was to be guaranteed by substantially all of the direct and indirect subsidiaries of ResCap LLC, other than GMAC Mortgage, RFC, and certain bankruptcy remote entities, and secured by all of the related Debtors' interests in the assets sold under the BMMZ Master Repo Agreement, certain GSAP Facility collateral, and the Debtors' mortgage servicing rights related to mortgage loans owned by Fannie Mae and Freddie Mac (subject to obtaining the necessary consent of the applicable GSEs).[1243] No maturity date, interest, or fees were

---

[1237] *Id*.

[1238] E-mail from K. Chopra (Jan. 11, 2012) [EXAM00011218] (certain scenarios allowed repayment from asset sale proceeds, while other scenarios required DIP to "remain in place during a portion of the asset run-off").

[1239] *See* E-mail from K. Chopra (Jan. 13, 2012) [EXAM00077639].

[1240] *See* Draft Summary of Terms and Conditions for Debtor-in-Possession Financing to Residential Capital, LLC and certain of its subsidiaries, dated Jan. 20, 2012 [EXAM00077225] (attached to E-mail from T. Goren to T. Marano (Jan. 27, 2012) [EXAM00077205]).

[1241] *See id*. at 1. Subject to the satisfaction of the closing conditions for the DIP facility, BMMZ proposed to amend and restate the BMMZ Master Repo Agreement to provide that BMMZ would continue to honor transactions executed prepetition under the BMMZ Master Repo Agreement and would commit to execute new transactions on the same terms postpetition. *See id*. at 2.

[1242] *Id*. The draft DIP financing term sheet appeared to assume that AFI would provide only a portion of ResCap's total DIP financing need. *See id*.

[1243] *See id.* at 1, 6.

determined as of the date of the AFI proposed DIP financing term sheet. AFI's proposed DIP financing assumed the following sources and uses of proceeds:

EXHIBIT III.J.1.c(1)(a)
**AFI DIP Financing Proposal — Sources and Uses**
*($ in Millions)*

| Sources | | Uses | |
|---|---|---|---|
| Repo sub-facility initial commitment | $ 250 | Repo sub-facility — repo transactions | |
| GSAP incremental funding sub-facility | 76 | GSAP sub-facility — sale of receivables | |
| Revolving credit sub-facility | 395 | Repayment of Fannie Mae EAF facility | |
| | | Fees and expenses, including DIP facility | |
| | | Working capital, capex, Ginnie Buybacks, other | |
| | $ 721 | | $ 721 |

*Source: Draft Summary of Terms and Conditions for Debtor-In-Possession Financing to Residential Capital, LLC and certain of its subsidiaries, dated Jan. 20, 2012, at 2—4 [EXAM00077225].*

AFI was also cognizant of the potential settlement value of providing DIP financing. On January 17, 2012, Carpenter e-mailed the AFI Board and noted that the issue of whether ResCap should negotiate with "[a]lternative DIP providers and [p]otential third party stalking horses" was an "important one" because, "without Rescap seeking third party expressions of interest, AFI will not get full value in its negotiations with Rescap for whatever DIP financing it provides or any seller financing."[1244]

### (b) Third-Party DIP Financing

Centerview initiated a third-party DIP financing marketing process in January 2012, viewing a facility from AFI as a contingency plan in the event that a third-party DIP financing lender could not be identified.[1245] The process initially undertaken by Centerview was to identify major financial institutions that could support a large, complex DIP financing.[1246] Centerview and ResCap focused primarily on lenders that had the best knowledge of the assets and identified JPMorgan, Barclays, Citibank, Deutsche Bank, and Goldman Sachs as potential DIP financing sources.[1247] Deutsche Bank was the only lender that did not have a prior lending relationship with ResCap.[1248]

During the week of January 30, 2012, ResCap provided Barclays and Citibank with due diligence and allowed them two to three weeks to submit non-binding DIP financing proposals.[1249] On February 17, 2012, Barclays provided ResCap with a DIP financing proposal that provided

[1244] E-mail from M. Carpenter (Jan. 17, 2011) [ALLY_0182854].

[1245] Meeting with Centerview, Investment Banker to the Debtors, in N.Y., N.Y. (Jan. 18, 2013).

[1246] *Id.*

[1247] *Id.*

[1248] *Id.*

[1249] Materials for Discussion, dated Feb. 24, 2012, at EXAM20194425 [EXAM20194424].

for a $1.8 billion facility consisting of a $200 million revolving credit facility, a $1 billion term loan ("A-1 TL"), and a $600 million term loan ("A-2 TL").[1250] On February 21, 2012, Citibank provided ResCap with a DIP financing proposal that provided for DIP financing of up to $1.8 billion, structured with a term loan tranche and a revolving loan tranche in unspecified amounts.[1251]

After receiving the DIP financing proposals from Citibank and Barclays, Centerview advised the ResCap Board that the "proposals were for considerably larger amounts" than the AFI DIP proposal.[1252] Negotiations with both Barclays and Citibank continued through March 2012.[1253] The primary adjustment made in the March DIP financing proposals by Barclays and Citibank was the amount of the DIP facility, which was driven primarily by the decision on whether to refinance certain prepetition facilities.[1254] For a detailed evolution of the different Barclays and Citibank DIP financing proposals, refer to Appendix III.J.1.c(1)(b)—1 and Appendix III.J.1.c(1)(b)—2.

On March 8, 2012, the ResCap Board also considered "the need to reach out to potential additional lenders [other than Barclays and Citibank] because of the expected size of the DIP financing."[1255] Accordingly, ResCap and its advisors engaged in discussions with JPMorgan, Goldman Sachs, and Deutsche Bank regarding additional DIP financing opportunities.[1256] ResCap management believed that soliciting additional third parties would also create more

---

[1250] *Id.* at EXAM20194432.

[1251] Citibank DIP Financing Considerations Presentation, dated Feb. 21, 2012, at RC40020349–50 [RC40020290]. For additional terms included in the February 17, 2012 Barclays DIP financing proposal and the February 21, 2012 Citibank DIP financing proposal, refer to Appendix III.J.1.c(1)(b)—1 and Appendix III.J.1.c(1)(b)—2.

[1252] Draft Minutes of a Special Meeting of the Board of Residential Capital, LLC, Feb. 24, 2012, at 3–4 [EXAM11088866].

[1253] During that month, Barclays submitted revised term sheets on March 8, 19, and 21. *See* Materials for Discussion, dated Mar. 8, 2012, at 2 [RC00000286]; Confidential Presentation of Financing Discussion Materials, dated Mar. 19, 2012, at 1–2 [EXAM00073480]; Centerview Materials for Discussion, Mar. 23, 2012, at 1 [RC00000304]. Citibank submitted a revised DIP financing proposal on March 6. *See* Citibank DIP Financing Considerations Presentation, dated Mar. 6, 2012 [EXAM00074757]; Materials for Discussion, dated Mar. 8, 2012, at 2 [RC00000286].

[1254] *See* Materials for Discussion, dated Mar. 8, 2012, at 2 [RC00000286]; Citibank DIP Financing Considerations Presentation, dated Mar. 6, 2012, at 1 [EXAM00074757].

[1255] Draft Minutes of a Special Meeting of the Board of Residential Capital, LLC, Mar. 8, 2012, at 1 [EXAM11088874].

[1256] Meeting with Centerview, Investment Banker to the Debtors, in N.Y., N.Y. (Jan. 18, 2013); *see also* E-mail from M. Puntus (Mar. 6, 2012) [EXAM00074767] (informing Marano of discussion with Goldman Sachs with respect to participation in the DIP facility); Centerview Materials for Discussion, dated Mar. 23, 2012, at RC00000305 [RC00000304] (noting continuing discussions with Citibank, Deutsche Bank, and Goldman Sachs to "select co-arranger(s)"). This effort was undertaken in part because Citibank expressed discomfort with financing servicing advances. *See* E-mail from M. Puntus (Mar. 6, 2012) [EXAM00074767].

competition.[1257] Goldman was not able to participate in the financing process because of a conflict of interest.[1258] JPMorgan and Deutsche Bank undertook due diligence but ultimately chose not to make a DIP financing proposal.[1259]

On March 23, 2012, Centerview indicated to the ResCap Board that the Barclays DIP financing proposal was more favorable than the Citibank proposal "based on both economic (all-in-yield) and non-economic (collateral, borrowing base) terms," as shown in the exhibit below.[1260]

---

[1257] *See* E-mail from T. Marano to M. Puntus (Mar. 11, 2012) [EXAM00005017]; Meeting with Centerview, Investment Banker to the Debtors, in N.Y., N.Y. (Jan. 18, 2013).

[1258] Meeting with Centerview, Investment Banker to the Debtors, in N.Y., N.Y. (Jan. 18, 2013).

[1259] *Id*.

[1260] Centerview Materials for Discussion, dated Mar. 23, 2012, at 1 [RC00000304].

EXHIBIT III.J.1.c(1)(b)—1
**Barclays Versus Citibank DIP Financing Proposals**
March 2012

| Term | Barclays March 21st DIP Financing Terms[1] | Citibank March 6th DIP Financing Terms[2] |
|---|---|---|
| Borrowers | GMAC Mortgage and new SPV subsidiary that would own certain first lien collateral | ResCap |
| Facility Summary | $1.5 billion facility comprised of:<br>$200 million revolver<br>$1.1 billion term loan (A-1 TL)<br>$200 million term loan (A-2 TL) | $1.35 billion facility comprised of:<br>$800 million Advance Facility (Barclays)<br>$550 million Liquidity Facility (Citibank) |
| Prepetition Facilities Refinanced | GSAP Facility<br>BMMZ Repo Facility<br>FNMA EAF facility | GSAP Facility (Advance Facility)<br>BMMZ Repo Facility (Liquidity Facility) |
| Pricing | Revolver: L + 400 bps<br>A-1 TL: L + 400 bps (LIBOR floor of 1.25%)<br>A-2 TL: L + 600 bps (LIBOR floor of 1.25%) | Approximately 7.00% |
| Maturity | 18 months from closing | 12 months from closing |
| Upfront Fees/OID | Revolver: 150 bps<br>A-1 TL: 99 OID<br>A-2 TL: 98 OID | Liquidity Facility: 98 OID |
| Underwriting Fee | Underwriting fee: 200 bps<br>Structuring fee: 50 bps | 250 bps |
| Collateral | - First lien on collateral of prepetition facilities<br>- Second lien on A&R Line of Credit Facility collateral<br>- No priming liens or liens on unencumbered assets | - First lien, and as applicable, priming lien on:<br>- All BMMZ Repo Facility collateral<br>- All A&R Line of Credit Facility collateral<br>- A percentage of asset sale proceeds<br>- All existing unencumbered cash available for use by ResCap |

[1] *Barclays also submitted a March 19, 2012 DIP proposal.*
[2] *Terms are related only to the Citibank Liquidity Facility and do not include the Barclays Advance Facility.*
*Source: Confidential Presentation of Financing Discussion Materials, dated Mar. 19, 2012, at 1 [EXAM00073480]; Citibank DIP Financing Considerations Presentation, dated Mar. 6, 2012, at 1—3 [EXAM00074757]; Materials for Discussion, dated Mar. 8, 2012, at 3 [RC00000286]; Centerview Materials for Discussion, dated Mar. 23, 2012, at 2—4 [RC00000304]; Materials for Discussion, dated Feb. 24, 2012, at 8—10 [EXAM20194424].*

The Barclays DIP Financing Agreement triggered certain approval requirements under AFI's bylaws because Barclays was a common stockholder of AFI.[1261] On April 4, 2012, the AFI Board approved a waiver of the section of AFI bylaws governing affiliate transactions.[1262] ResCap executed a committed DIP facility term sheet with Barclays on April 9, 2012.[1263]

On May 14, 2012 (the Petition Date), ResCap filed a motion requesting approval of the Barclays DIP Financing Agreement.[1264] The Barclays DIP financing of $1.45 billion included $1.25 billion outstanding as of the Petition Date and up to $200 million in new revolver draws.[1265] The Barclays DIP Financing Agreement included the following modifications in comparison to the Barclays proposal of March 21, 2012. First, the Barclays DIP Financing Agreement removed the refinancing of the FNMA EAF Agreement.[1266] Consequently, the Barclays DIP Financing Agreement amended the collateral to change the first lien on the assets securing the FNMA EAF Loan Agreement to a junior lien.[1267] Second, the Barclays DIP Financing Agreement increased the unused line fee to 75 bps on the undrawn portion of the revolver,[1268] compared to 50 bps in the proposal of March 21, 2012.[1269] Approximately $52 million in total fees, net of credits ($18.75 million was paid prior to the Petition Date), were provided for under the Barclays DIP Financing Agreement.[1270]

The Creditors' Committee filed an objection on June 11, 2012 in which it objected to, among other things, the $52 million in fees under the Barclays DIP Financing Agreement. The

---

[1261] *See* E-mail from A. Bhama to T. Hamzehpour and T. Marano (Mar. 28, 2012), at EXAM00064966 [EXAM00064965].

[1262] *See* Minutes of a Regular Meeting of the Board of Directors of Ally Financial Inc., Apr. 4, 2012, at ALLY_PEO_0020549 [ALLY_PEO_0020479].

[1263] *See* Barclays DIP Financing Agreement, Summary of Indicative Terms and Conditions, dated Apr. 9, 2012 [EXAM20122499].

[1264] *See* Debtors' Motion For Interim And Final Orders Pursuant To 11 U.S.C. §§ 105, 362, 363(b)(1), 363(f), 363(m), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) And 364(e) And Bankruptcy Rules 4001 And 6004 (I) Authorizing The Debtors To (A) Enter Into And Perform Under Receivables Purchase Agreements And Mortgage Loan Purchase And Contribution Agreements Relating To Initial Receivables And Mortgage Loans And Receivables Pooling Agreements Relating To Additional Receivables, And (B) Obtaining Postpetition Financing On A Secured, Superpriority Basis, (II) Scheduling A Final Hearing Pursuant To Bankruptcy Rules 4001(b) and 4001(c), And (III) Granting Related Relief [Docket No. 13] [hereinafter Barclays DIP Motion].

[1265] *Id.* at 5.

[1266] *Id.* at 16.

[1267] *Id*. at 12–13.

[1268] *Id*. at 11.

[1269] *See* Centerview Materials for Discussion, dated Mar. 23, 2012, at 4 [RC00000304].

[1270] Barclays DIP Motion, at 11. For further comparison of the Barclays DIP Financing Agreement to the prior Barclays DIP financing proposals, refer to Appendix III.J.1.c(1)(b)—1.

Creditors' Committee argued that the fees were excessive considering that almost half of the Barclays DIP facility was used to roll up a prepetition facility in which Barclays was the sole lender.[1271]

On June 15, 2012, an amendment to the Barclays DIP financing fee letter was filed.[1272] Barclays agreed to: (1) reduce the applicable margin with respect to A-1 TL by 0.25%; (2) reduce the applicable margin with respect to A-2 TL by 0.50%; and (3) limit the ability to decrease the revolving facility by no more than an aggregate principal amount of $10 million.[1273] In turn, the Debtors agreed to pay Barclays an additional upfront fee equal to 0.50% of up to $56 million aggregate principal amount of the revolving commitments of each revolving lender, minus a credit for a portion of the upfront fees on the revolving commitments previously paid to Barclays equal to 0.50% of $10 million of the aggregate principal amount of the revolving commitments.[1274]

On June 25, 2012, a final order was entered authorizing GMACM Borrower and RFC Borrower to enter into a postpetition secured superpriority financing in aggregate principal amount up to $1.45 billion provided by Barclays acting as administrative agent, comprised of: (1) up to $190 million under the revolver; (2) up to $1.06 billion under the A-1 TL; and (3) up to $200 million under the A-2 TL.[1275]

The following exhibit provides an overview of the anticipated total sources and uses relating to the Barclays DIP Financing Agreement as of May 16, 2012:

EXHIBIT III.J.1.c(1)(b)—2
**Barclays DIP Financing — Sources and Uses**
*($ in Millions)*

| Sources | | | Uses | | |
|---|---|---|---|---|---|
| New revolver draw | $ | - | Refinance GSAP Facility | $ | 652.7 |
| New DIP A-1 term loan | | 1,050.0 | Refinance BMMZ Repo Facility | | 251.5 |
| New DIP A-2 term loan | | 200.0 | Unrestricted cash | | 100.0 |
| | | | DIP fees and expenses | | 35.1 |
| | | | DIP restricted cash | | 210.8 |
| | $ | 1,250.0 | | $ | 1,250.0 |

*Source: DIP Lender's Presentation, dated May 16, 2012, at 20 [EXAM00092938].*

---

[1271] Omnibus Objection Of The Official Committee Of Unsecured Creditors To The Debtors' Motions Seeking (I) Entry Into The Barclays DIP Facility, (II) Entry Into The Ally DIP Facility And The Use Of Certain Cash Collateral, And (III) The Use Of The Citibank Cash Collateral [Docket No. 301] ¶¶ 43–44.

[1272] Notice of Filing Of Amendment To Financing Fee Letters [Docket No. 417].

[1273] Amendment Agreement to Facility Fee Letter [Docket No. 417-1] at 1.

[1274] *Id*.

[1275] Barclays DIP Order, at 4.

The exhibit below compares the prepetition liabilities to the postpetition liabilities anticipated as of May 16, 2012 as a result of the Barclays DIP Financing Agreement:

EXHIBIT III.J.1.c(1)(b)—3
**ResCap (Consolidated) Estimated Prepetition and Postpetition Debt**
*($ in Millions)*

| Facility | Estimated Balance Prepetition | | Adjustments | | Estimated Balance Postpetition | |
|---|---|---|---|---|---|---|
| DIP restricted cash | $ | - | $ | 210.8 | $ | 210.8 |
| Unrestricted cash | | 666.9 | | 100.0 | | 766.9 |
| Total cash and equivalents | | 666.9 | | 310.8 | | 977.7 |
| New DIP revolver | | - | | - | | - |
| New DIP A-1 term loan | | - | | 1,050.0 | | 1,050.0 |
| New DIP A-2 term loan | | - | | 200.0 | | 200.0 |
| GSAP Facility | | 652.7 | | (652.7) | | - |
| A&R Line of Credit Facility | | 600.0 | | - | | 600.0 |
| Citibank MSR Loan | | 160.0 | | - | | 160.0 |
| A&R Secured Revolver Loan | | 745.5 | | - | | 745.5 |
| BMMZ Repo Facility | | 251.5 | | (251.5) | | - |
| Home equity funding facility | | 135.8 | | - | | 135.8 |
| FNMA EAF facility | | 50.2 | | - | | 50.2 |
| Total loans and securitized borrowings | | 2,595.7 | | 345.9 | | 2,941.5 |
| Junior Secured Notes | | 2,120.0 | | - | | 2,120.0 |
| Total secured debt | | 4,715.7 | | 345.9 | | 5,061.5 |
| US Dollar senior Unsecured Notes | | 675.1 | | - | | 675.1 |
| UK Sterling senior Unsecured Notes | | 164.2 | | - | | 164.2 |
| Euro senior Unsecured Notes | | 128.6 | | - | | 128.6 |
| Interest rate swaps | | 244.8 | | - | | 244.8 |
| Other debt | | 784.8 | | - | | 784.8 |
| Total debt | $ | 6,713.2 | $ | 345.9 | $ | 7,059.0 |

*Source: DIP Lender's Presentation, dated May 16, 2012, at 20 [EXAM00092938].*

ResCap indicated that it needed to refinance the GSAP Facility and the BMMZ Repo Facility to release collateral for the Barclays DIP Financing Agreement.[1276] The GSAP Facility, for which Barclays was the counterparty, was the primary facility used to finance and fund servicing advances and was structured as an offshore special purpose entity that would go into a "rapid amortization" as a result of a chapter 11 filing.[1277] ResCap justified refinancing the

---

[1276] Declaration Of Marc D. Puntus In Support Of The Debtors' Motions For Interim And Final Orders Authorizing The Debtors To Enter Into The Barclays DIP Facility And The AFI DIP Facility [Docket No. 20] ¶¶ 26–27 (the "Puntus Declaration").

[1277] *Id*. ¶ 15.

GSAP Facility by noting that the facility was: (1) structured to require "rapid amortization" repayments; and (2) over-secured by approximately $208 million.[1278] ResCap also highlighted that it negotiated advantageous terms under the Barclays DIP Financing Agreement (marginal advance rates on servicing advance receivables of 70% under the GSAP Facility as compared to 90% to 95% under the Barclays DIP Financing Agreement).[1279]

The BMMZ Repo Facility was a repo/factoring facility with BMMZ, an indirect wholly owned subsidiary of AFI.[1280] Prior to entering into the BMMZ Master Repo Agreement, ResCap was also party to repurchase agreements with Citibank and Goldman Sachs.[2181] These agreements offered short-term liquidity through financing secured by a collateral pool of jumbo, Alt-A, second lien, and subprime mortgage loans.[1282] On December 20, 2011, the Citibank and Goldman Sachs repurchase agreements terminated.[1283] Although Citibank offered to renew its repurchase facility and take on Goldman Sachs's position, BMMZ proposed to provide a facility on slightly more favorable terms.[1284] ResCap entered into the BMMZ Master Repo Agreement on December 21, 2011.[1285]

BMMZ had the right to terminate the BMMZ Repo Facility in the event of a chapter 11 filing and sell the underlying mortgage loans to third parties, potentially eliminating ResCap's interests.[1286] ResCap justified refinancing the BMMZ Master Repo Agreement to maintain control of the subject assets, to access approximately $223 million in excess collateral value, and to obtain more advantageous terms under the Barclays DIP Financing Agreement (60% advance rate under the BMMZ Master Repo Agreement as compared to 75% under the Barclays DIP Financing Agreement).[1287]

---

[1278] *Id*. ¶¶ 27–28.

[1279] *Id*. ¶ 28.

[1280] *See id*. ¶ 15; Meeting with Centerview, Investment Banker to the Debtors, in N.Y., N.Y. (Jan. 18, 2013).

[2181] ResCap Certificate of Assistant Secretary, dated Dec. 19, 2011 [GOLDIN00119483].

[1282] *See* Goldin Associates Presentation to The Committee of Independent Members of the Board of Directors of Residential Capital, LLC Regarding Proposed Master Repurchase Facility Between GMAC Mortgage, LLC and Residential Funding Company, LLC and BMMZ Holdings LLC, dated Dec. 20, 2011, at 4 [GOLDIN00131711].

[1283] *See id.* at 4.

[1284] *See id.* at 10–11. BMMZ terms were better than those offered by Citibank with respect to: (1) the MSR facility step-down; (2) pricing and advance rates; and (3) a commitment fee of $1.875 million to Citibank versus no fee to BMMZ. *See id.*

[1285] BMMZ Master Repo Agreement [EXAM20068893].

[1286] Puntus Declaration, ¶ 29.

[1287] *Id*.

### (c) AFI DIP Financing Agreement

Before the Petition Date, the Debtors determined that the negotiated Barclays DIP Financing Agreement would be insufficient to cover the Debtors' second largest expense of repurchases of whole loans that were sold into securitization trusts guaranteed by Ginnie Mae ("Ginnie Buybacks").[1288] In April 2012, ResCap began negotiations with AFI regarding funding the Ginnie Buybacks prior to and during the Chapter 11 Cases.[1289] Previously, the repurchases had been funded by draws under the A&R Line of Credit Facility.[1290] When Centerview negotiated the Barclays DIP Financing Agreement, Centerview had not included the Ginnie Buybacks in the DIP budget because it assumed ResCap would draw down the A&R Line of Credit Facility prepetition to fund the Ginnie Buybacks postpetition.[1291] However, AFI never consented to the use of its line of credit for postpetition needs and instead indicated a preference to provide supplemental DIP financing.[1292]

ResCap negotiated the additional postpetition financing from AFI in the form of postpetition draws on the A&R Line of Credit Facility.[1293] AFI agreed to provide the additional DIP financing in an amount up to $150 million, which was subsequently increased to $220 million.[1294] Under the terms of the AFI DIP Financing Agreement, ResCap agreed that AFI would be permitted to prime itself in its capacity as lender under the A&R Line of Credit Facility.[1295] The agreement specified that ResCap could use the financing proceeds for the following purposes:

- To repurchase whole loans from Ginnie Mae pools in order to avoid GMAC Mortgage being in violation of delinquency triggers applicable under chapter 18 of the Ginnie Mae guide;[1296]

- To effect foreclosures, conveyance, or other normal course loss mitigation activities of the related properties in connection with the submission of HUD claims;[1297] and

- To allow for trial modification under programs implemented by the Debtors for which the related loan and borrowers were qualified.[1298]

---

[1288] *Id*. ¶ 18.

[1289] *Id*. ¶ 20.

[1290] *Id*. ¶ 18.

[1291] Meeting with Centerview, Investment Banker to the Debtors, in N.Y., N.Y. (Jan. 18, 2013).

[1292] Meeting with Centerview, Investment Banker to the Debtors, in N.Y., N.Y. (Sept. 11, 2012).

[1293] Puntus Declaration, ¶ 18.

[1294] AFI DIP Order, at 5; Meeting with Centerview, Investment Banker to the Debtors, in N.Y., N.Y. (Jan. 18, 2013).

[1295] Puntus Declaration, ¶ 24.

[1296] AFI DIP Order, at 20–21.

[1297] *Id*.

[1298] *Id*.

The AFI DIP Financing Agreement specified the termination date as the effective date of a Plan for any of the Debtors or upon written notice of AFI,[1299] an interest rate of LIBOR + 4.00% with a LIBOR floor of 1.25%,[1300] and carve-out fees not to exceed $25 million.[1301] There were no additional fees included in the AFI DIP Financing Agreement.[1302] As adequate protection, AFI received a perfected first priority lien on collateral securing the A&R Line of Credit Facility and the Secured Revolver Facility, and payments consisting of accrued and unpaid prepetition and postpetition interest on both facilities.[1303] The AFI DIP Financing Agreement also included additional adequate protection covenants.[1304]

### (2) Solicitation Of Bids For ResCap Assets

Centerview indicated that, as of December 15, 2011, excluding Cerberus, no third parties had been contacted regarding their interest in purchasing ResCap.[1305] At that time, Centerview was preparing an information memorandum and was ready to approach third parties "when given permission to do so."[1306]

By January 2012, Centerview was preparing for a pre-filing marketing process for ResCap's assets. On January 10, 2012, Centerview provided the ResCap Board with a detailed presentation regarding, among other things, "several potential asset sale structures for the Board's consideration including, but not limited to, a hypothetical in-court process utilizing Chapter 11."[1307]

After negotiating non-disclosure agreements with Centerbridge, Cerberus, Fortress (through its home mortgage subsidiary, Nationstar), Ocwen, and Private National Mortgage Acceptance Company, LLC (PennyMac), these potential "stalking horse" bidders received substantial due diligence during the week of January 30, 2012 and were given over two weeks to submit preliminary non-binding letters of intent ("LOIs").[1308] ResCap solicited interest in a "NewCo" business structure in which the "Investor," or bidder, would have 100% equity ownership in NewCo, which had servicing (MSR-based and fee-based) and origination (retail/ call center) platforms.[1309] However, bidders were encouraged to submit proposals for other

---

[1299] *Id*. at 36.

[1300] AFI DIP Financing Agreement, § 2.1(e).

[1301] AFI DIP Order, at 31–32.

[1302] Meeting with Centerview, Investment Banker to the Debtors, in N.Y., N.Y. (Jan. 18, 2013).

[1303] AFI DIP Order, at 26.

[1304] *Id*. at 33.

[1305] *See* Joint Project Bounce Presentation by Centerview, FTI, and Morrison & Foerster, dated Dec. 15, 2011, at 3 [RC00000121].

[1306] *Id*.

[1307] Minutes of a Special Meeting of the Board of Residential Capital, LLC, Jan. 10, 2012, at RC40019183 [RC40019179].

[1308] Materials for Discussion, dated Feb. 24, 2012, at 1 [EXAM20194424].

[1309] *Id*. at 2.