structures and asset combinations that they believed maximized their return and provided value to ResCap.[1310] The exhibit below presents an example of the proposed structure.



EXHIBIT III.J.1.c(2)—1
**Proposed Stalking Horse Bid Structure** [(1)]
February 2012

Note: Exhibit is verbatim excerpt from source.
Source: Materials for Discussion, dated Feb. 24, 2012, at 2 [EXAM20194424].

On February 17, 2012, Centerview received preliminary LOIs from Centerbridge and Fortress.[1311]

Centerbridge's February 17, 2012 LOI included a bid of $1.5 billion, which was approximately 76% of the $2 billion book value (as of December 31, 2011) of the following assets: FNMA/FHLMC MSRs and advances, GNMA MSRs and advances, PLS MSRs, first lien performing whole loans (less than 60 days delinquent), the servicing platform, and the consumer origination platform.[1312] The Centerbridge bid excluded assets with a book value of $4.4 billion,

---

[1310] *Id.*

[1311] *See* Letter from L. West to K. Chopra (Feb. 17, 2012) [CCM00483106]; Letter from W. Edens to K. Chopra (Feb. 17, 2012) [ALLY_0367789]; *see also* Materials for Discussion, dated Feb. 24, 2012, at 1 [EXAM20194424]. Cerberus and PennyMac elected not to submit bids at this time. Materials for Discussion, dated Feb. 24, 2012, at 1 [EXAM20194424]. Ocwen also submitted a preliminary LOI on February 20, 2012. *See* Letter from R. Faris to K. Chopra (Feb. 20, 2012) [RC00000585]. Centerview advised ResCap that it should primarily consider the bids from Fortress and Centerbridge because Ocwen bid only on the PLS portfolio. Meeting with Centerview, Investment Banker to the Debtors, in N.Y., N.Y. (Jan. 18, 2013), at 1. Ocwen's LOI also required debt financing to support the transaction. Materials for Discussion, dated Feb. 24, 2012, at 6 [EXAM00015700].

[1312] Materials for Discussion, dated Feb. 24, 2012, at 4–5 [EXAM20194424].

or 69% of the assets of ResCap, including GNMA AR and GNMA loans included in the whole loan portfolio, certain legacy assets, other MSRs and advances, existing fee based advances, and certain other assets.[1313] While Centerbridge did not have licenses required to originate and service loans, it was willing to explore alternate solutions such as acquiring BMMZ, which held the necessary licenses.[1314] The exhibit below shows the assets included in the Centerbridge stalking horse bid.



EXHIBIT III.J.1.c(2)—2
**Assets Included in the Centerbridge Stalking Horse Bid**
February 17, 2012

*Source: Materials for Discussion, dated Feb. 24, 2012, at 2–4 [EXAM20194424].*

Centerbridge's bid included equity of $700 million and debt financing of $900 million.[1315] Wells Fargo proposed $825 million of structured asset-based financing contingent on agreement with GSEs limiting set-off rights.[1316] Barclays also proposed a $700 million term loan facility.[1317]

Fortress's February 17, 2012 LOI included a bid of $2.6 billion, which was approximately 94% of the $2.8 billion book value (as of December 31, 2011) of the following assets: FNMA/ FHLMC MSRs, GNMA MSRs, PLS MSRs, first lien performing whole loans (less than 60 days delinquent), first lien non-performing whole loans, second lien whole loans, home equity and other whole loans, trading securities, the servicing platform, and the consumer origination platform.[1318] The Fortress bid excluded assets with a book value of $3.6 billion, or 56% of assets of ResCap, including PLS and other advances, Master Servicing MSRs, GNMA AR and GNMA loans included in the whole loan portfolio, existing fee-based advances, MSR advances, legacy asset advances, and certain other assets.[1319] Unlike Centerbridge, Fortress had the necessary

---

[1313] *Id.*

[1314] Materials for Discussion, dated Feb. 24, 2012, at 6 [EXAM00015700].

[1315] *Id.*

[1316] *Id.*

[1317] *Id.*

[1318] Materials for Discussion, dated Feb. 24, 2012, at 4 [EXAM20194424].

[1319] *Id.*

licenses to originate and service loans through its Nationstar and Newcastle portfolio companies.[1320] The exhibit below shows the assets included in the Fortress stalking horse bid.



EXHIBIT III.J.1.c(2)—3
**Assets Included in the Fortress Stalking Horse Bid**
February 17, 2012

*Source: Materials for Discussion, dated Feb. 24, 2012, at 2–4 [EXAM20194424].*

On February 22, 2012, ResCap distributed letters to Centerbridge and Fortress requesting additional information and detail with respect to potential bid adjustments.[1321]

In response, on February 28, 2012, Centerbridge revised its LOI to incorporate a broader range of assets, including PLS advances, non-performing first lien loans, and second lien loans in the ResCap legacy portfolio.[1322] Additional terms of Centerbridge's revised LOI are summarized below:

- Removed the financing contingency related to GSE stipulations but increased required financing support from ResCap/AFI;[1323]

- Included a request of AFI to purchase GNMA Department of Veterans Affairs (VA) MSR and subservice them back to NewCo or indemnify NewCo against costs arising from VA servicing obligations;[1324] and

---

[1320] Materials for Discussion, dated Feb. 24, 2012, at 6 [EXAM00015700]

[1321] Materials for Discussion, dated Feb. 24, 2012, at 1 [EXAM20194424].

[1322] *See* Letter from L. West to M. Puntus and S. Greene (Feb. 28, 2012) [RC00000560]; Materials for Discussion, dated Feb. 29, 2012, at 1 [RC40020394].

[1323] Materials for Discussion, dated Feb. 29, 2012, at 1 [RC40020394].

[1324] *Id.*

- Reduced the purchase price on assets included in the initial bid to $1.4 billion from $1.5 billion[1325] but increased the total bid to $3.2 billion.[1326]



EXHIBIT III.J.1.c(2)—4
**Comparison of Assets Included in the Centerbridge Stalking Horse Bids**
February 17, 2012 and February 28, 2012

*Source: Materials for Discussion, dated Feb. 24, 2012, at 2–4 [EXAM20194424]; Materials for Discussion, dated Feb. 29, 2012, at 1–2 [RC40020394].*

Fortress also responded to ResCap's request and, on February 28, 2012, revised its LOI to increase the purchase price on assets included in the initial bid by $100 million and expanded the assets purchased to include Agency and PLS advances, which increased the total bid to $4.2 billion.[1327] The exhibit below shows the assets included in and excluded from the Fortress February 17, 2012 and February 28, 2012 stalking horse bids.

---

[1325] *Id.*

[1326] *Id.* at 2.

[1327] *See* Letter from W. Edens to S. Greene (Feb. 28, 2012) [ALLY_0001709]; Materials for Discussion, dated Feb. 29, 2012, at 1 [RC40020394].

EXHIBIT III.J.1.c(2)—5
**Comparison of Assets Included in the Fortress Stalking Horse Bids**
February 17, 2012 and February 28, 2012



*Source: Materials for Discussion, dated Feb. 24, 2012, at 2—4 [EXAM20194424]; Materials for Discussion, dated Feb. 29, 2012, at 1—2 [RC40020394].*

The Fortress LOI included equity of $1.3 billion ($1 billion for the servicing/origination platform assets and $320 million for the HFS Portfolio), which would be sourced from Nationstar and Newcastle.[1328] There were no financing contingencies for the purchase of the platform assets; Fortress, however, requested seller financing to purchase the HFS Portfolio.

The below exhibit compares the February 28, 2012 revised bids of Centerbridge and Fortress.

EXHIBIT III.J.1.c(2)—6
**Comparison of Centerbridge and Fortress Stalking Horse Bids**
February 28, 2012
*($ in Millions)*

| | Centerbridge February 28, 2012 Bid | | | | Fortress February 28, 2012 Bid | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Assets Purchased | | Assets Remaining | | Assets Purchased | | Assets Remaining | |
| | Bid Amount | Bid as % of Book Value | | Book Value | Bid Amount | Bid as % of Book Value | | Book Value |
| Servicing/origination platform | $ 648 | 54% | $ | 30 | $ 1,100 | 89% | $ | - |
| Servicing advances | 1,550 | 98% | | 531 | 1,505 | 95% | | 531 |
| HFS Portfolio/other | 1,028 | 80% | | 1,752 | 1,601 | 102% | | 1,461 |
| Total bid | $ 3,225 | 79% | $ | 2,313 | $ 4,206 | 96% | $ | 1,992 |
| Common assets bid | $ 3,225 | 79% | | | $ 3,894 | 96% | | |

*Source: Materials for Discussion, dated Feb. 29, 2012, at 2 [RC40020394].*

---

[1328] Materials for Discussion, dated Feb. 24, 2012, at 6 [EXAM00015700]

On February 29, 2012, Centerview presented the bid summaries to the ResCap Board.[1329] Fortress was selected as the "exclusive bidder" by ResCap with the goal of working expeditiously towards a binding asset purchase agreement in advance of a chapter 11 filing.[1330]

The Fortress proposed transaction overview is presented in the exhibit below. Fortress anticipated that its Nationstar portfolio company would acquire and operate ResCap as a standalone platform.[1331] As the primary operating owner and GSE interface, Nationstar would contribute a significant portion of the purchase price with the balance from other Fortress affiliates.[1332]



EXHIBIT III.J.1.c(2)—7
**Fortress Transaction Overview**
March 19, 2012

*(1) Transaction would be funded by Nationstar and other Fortress affiliates.*
*(2) At acquisition the ResCap platform would run parallel to the existing Nationstar operations.*
*Source: Transaction Discussion, dated Mar. 19, 2012, at 7 [EXAM00015730].*

---

[1329] *Id.* at 1.

[1330] Transaction Discussion, dated Mar. 19, 2012, at 3 [EXAM00015730].

[1331] *Id.* at 7.

[1332] *Id.* at 7.

Fortress and its advisors conducted extensive legal and business due diligence after becoming the exclusive bidder on February 29, 2012.[1333] In addition to ongoing due diligence and the drafting of an asset purchase agreement, Fortress and ResCap worked together to develop short-term and long-term integration plans.[1334]

Fortress submitted a revised bid on April 12, 2012 for ResCap's assets.[1335] The "headline" bid amount did not materially change from the prior bid,[1336] but the bid was revised to include the following AFI support conditions:

- AFI was to provide financing for the purchase of the HFS Portfolio at an 80% advance rate of LIBOR+250. Without financing, the HFS Portfolio purchase price would have decreased by $200 million;[1337]

- AFI was to provide financing for the purchase of $223 million of subservicing advances and finance new advances (with a book value of $248 million) at an 80% advance rate of LIBOR+250;[1338] and

- Without financing, the MSR purchase price would have been reduced by $30 million, and the old advances would have been left in the Estate.[1339]

Additionally, Fortress assigned a value of $150 million to the long-term subservicing contract for the Ally Bank MSR portfolio with full refinancing and solicitation rights.[1340] Without the sub-servicing agreement with Ally Bank, the MSR purchase price would have been reduced by $180 million ($150 million value of long-term subservicing contract plus $30 million reduction to the MSR purchase price).[1341] Below is a summary of the February 28, 2012 bid versus the revised April 12, 2012 bid with and without AFI support.

[1333] *Id.* at 3.

[1334] *Id*. While Fortress conducted additional due diligence, various other parties expressed interest in other strategic alternatives that were outside of the section 363 marketing process. Elliott Associates LP ("Elliott") sent two letters to AFI suggesting that an in-court restructuring was not the best option for AFI. Elliot indicated that an in-court restructuring would accelerate putbacks, trigger a torrent of lawsuits, and cause the U.S. Treasury, GM, AFI shareholders, and AFI creditors to suffer. Elliott indicated that the liabilities stemming from representation and warranty claims would be a large risk to AFI in bankruptcy. Additionally, Elliott noted that AFI should minimize the perceived risk for putback liabilities by improving the capitalization of AFI. *See* Letter from D. Cederholm (Mar. 22, 2012) [ALLY_PEO_0035610]; E-mail from D. Cederholm (Feb. 15, 2012), at ALLY_0380883–85 [ALLY_0380883] (detailing Elliot's views on a ResCap bankruptcy).

[1335] Evercore, Kirkland & Ellis, and Mayer Brown Project Rodeo Discussion Materials, dated Apr. 23, 2012, at 2 [CCM00335615].

[1336] *Id*.

[1337] *Id*.

[1338] *Id*.

[1339] *Id*.

[1340] *Id*.

[1341] *Id*.

EXHIBIT III.J.1.c(2)—8
**Comparison of Fortress Stalking Horse Bids**
February 28, 2012 and April 12, 2012
*($ in Millions)*

|  | February 28, 2012 Bid [(1)] | April 12, 2012 Bid – Without AFI Support | April 12, 2012 Bid – With AFI Support | Variance Between April Bids |
|---|---|---|---|---|
| Servicing/origination platform | $        1,100 | $         920 | $       1,100 | $        180 |
| Servicing advances | 1,505 | 1,505 | 1,728 | 223 |
| HFS Portfolio | 1,601 | 1,400 | 1,600 | 200 |
| Total bid | $        4,206 | $       3,825 | $       4,428 | $        603 |

[(1)] *Fortress submitted an initial bid on February 17, 2012 for $2.6 billion.*
*Source: Evercore, Kirkland & Ellis, and Mayer Brown Project Rodeo Discussion Materials, dated Apr. 23, 2012, at 2 [CCM00335615];*
*Centerview Materials for Discussion, dated May 4, 2012, at RC40020573 [RC40020568]; Materials for Discussion, dated Feb. 24,*
*2012, at 2–4 [EXAM20194424].*

After Fortress revised its bid on the HFS Portfolio to be $1.6 billion with financing from AFI or $1.4 billion without,[1342] AFI indicated it would not provide financing but offered to purchase the HFS Portfolio for $1.6 billion if sold pursuant to a plan of reorganization that included a Third-Party Release or $1.4 billion pursuant to a section 363 sale.[1343] AFI sought to have its $200 million incremental bid considered "firm settlement credit" even if it was overbid in the auction.[1344] ResCap, concerned that it could lose AFI's bid altogether, agreed to confirm the settlement credit.[1345]

---

[1342] *Id.*

[1343] Centerview Materials for Discussion, dated May 4, 2012, at RC40020573 [RC40020568]; Evercore, Kirkland & Ellis, and Mayer Brown Project Rodeo Discussion Materials, dated Apr. 23, 2012, at 3–4 [CCM00335615]. Centerview stated that the AFI settlement credit relating to the stalking horse bid on the HFS Portfolio was heavily negotiated between AFI and ResCap. At one point, AFI's bid was $1.2 billion pursuant to a section 363 sale and $1.6 billion pursuant to a plan, which would have resulted in a $400 million AFI settlement credit. Meeting with Centerview, Investment Banker to the Debtors, in N.Y., N.Y. (Jan. 18, 2013).

[1344] E-mail from L. Tessler (Apr. 28, 2012) [EXAM11114982].

[1345] E-mails between J. Ilany and T. Marano (Apr. 28–29, 2012) [EXAM11114982].

On May 2, 2012, Fortress revised its bid again to reduce its bid value for the Platform Sale by $380 million, of which $170 million stemmed from AFI's decision not to offer subservicing on the Ally Bank MSR and HFI/HFS portfolios.[1346] Below is a comparison of the Fortress bids from February 2012 and May 2012.

EXHIBIT III.J.1.c(2)—9
**Comparison of Fortress Stalking Horse Bids**
February 2012 versus May 2012
*($ in Millions)*

|  | February 28, 2012 Bid | May 2, 2012 Bid |
|---|---|---|
| **Servicing/ Origination Platform** | | |
| FNMA/FHLMC MSR |  | $    380 |
| GNMA MSR | $    870 | 100 |
| PLS MSR | | 200 |
| Master servicing MSR | | 10 |
| Third-party subservicing | 60 | 30 |
| Ally Bank MSR subservicing | 150 | - |
| Ally Bank HFI/HFS subservicing | 20 | - |
| Total servicing/origination | 1,100 | 720 |
| **Servicing Advances** | | |
| FNMA/FHLMC advances | 218 | 218 |
| GNMA advances | 106 | 106 |
| PLS advances | 1,181 | 1,181 |
| Third-party subservicing | - | 223 |
| Total servicing advances | 1,505 | 1,728 |
| **HFS Portfolio** | | |
| HFS - first lien performing | 797 | |
| HFS - second lien | 512 | 1,400  –  1,600 |
| HFS - HELOC/other | 245 | |
| Trading securities | 46 | |
| Total HFS Portfolio | 1,601 | 1,400  –  1,600 |
| Total bid | $    4,206 | $ 3,848  –  $ 4,048 |

*Source: Centerview Materials for Discussion, dated May 4, 2012, at RC40020573 [RC40020568].*

Centerview determined that, even though the AFI and Fortress stalking horse bids on the HFS Portfolio were of similar amounts, AFI's bid was better.[1347] Centerview indicated that Fortress had not done due diligence on the HFS Portfolio and, thus, its final bid amount could be reduced downward after additional due diligence.[1348] Additionally, AFI was not requesting a break-up fee.[1349] Centerview believed that AFI's stalking horse bid was a good backup plan since lack of a break-up fee would not discourage bidders from participating in the auction.[1350]

[1346] Centerview Materials for Discussion, dated May 4, 2012, at RC40020573 [RC40020568].

[1347] Meeting with Centerview, Investment Banker to the Debtors, in N.Y., N.Y. (Jan. 18, 2013).

[1348] *Id.*

[1349] *Id.*

[1350] *Id.*

On the Petition Date, ResCap filed two stalking horse bids with the Bankruptcy Court. Fortress (through Nationstar) was the proposed stalking horse bidder for the Platform Sale,[1351] and AFI was the proposed stalking horse bidder for the Legacy Sale of the HFS Portfolio.[1352] The Fortress bid was $2.3 billion for the Platform Sale, of which approximately $200 million was related to the GNMA MSR.[1353] If Fortress was not the successful bidder, it would have been entitled to a $72 million break-up fee plus reimbursement of actual, reasonable, out-of-pocket expenses incurred, not to exceed $10 million.[1354]

As noted above, AFI's bid was $1.6 billion if the sale was consummated pursuant to a chapter 11 plan or $1.4 billion if pursuant to section 363.[1355] Subject to a higher bid, the AFI purchased assets could be sold separately or together with the Fortress assets.[1356] There were no break-up fees required in the AFI stalking horse bid.[1357]

On June 11, 2012, Berkshire Hathaway filed an objection to the Debtors' Postpetition Asset Sales.[1358] In its objection, Berkshire Hathaway argued that the structure of the Legacy Sale provided AFI with an unfair advantage at the auction and would discourage third-party

---

[1351] *See* Debtors' Motion Pursuant to 11 U.S.C. §§ 105, 363(b), (f), and (m), 365 and 1123, and Fed. R. Bankr. P. 2002, 6004, 6006, and 9014 For Order: (A)(I) Authorizing and Approving Sale Procedures, Including Break-Up Fee and Expense Reimbursement; (II) Scheduling Bid Deadline and Sale Hearing; (III) Approving Form and Manner of Notice Thereof; and (IV) Granting Related Relief and (B)(I) Authorizing the Sale of Certain Assets Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (II) Authorizing and Approving Asset Purchase Agreements Thereto; (III) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto; and (IV) Granting Related Relief [Docket No. 61] at 2, ¶ 7 [hereinafter Sale Procedures Motion]; *see also* Nationstar Asset Purchase Agreement [Docket No. 61-2].

[1352] *See* Sale Procedures Motion [Docket No. 61] at 3, ¶ 6; *see also* AFI Asset Purchase Agreement [Docket No. 61-3].

[1353] Sale Procedures Motion [Docket No. 61] ¶ 7. Subject to a higher bid, the GNMA MSRs could be sold separately from the other Platform Assets. *Id.* ¶ 50.

[1354] *Id.* ¶ 58(i).

[1355] *Id.* ¶¶ 6–7.

[1356] *Id.*

[1357] *Id.* ¶ 58(i); Meeting with Centerview, Investment Banker to the Debtors, in N.Y., N.Y. (Jan. 18, 2013).

[1358] Objection of Berkshire Hathaway Inc. to Debtors' Motion Pursuant to 11 U.S.C. §§ 105, 363(b), (f), and (m), 365 and 1123, and Fed. R. Bankr. P. 2002, 6004, 6006, and 9014 For Orders: (A)(I) Authorizing and Approving Sale Procedures, Including Break-Up Fee and Expense Reimbursement; (II) Scheduling Bid Deadline and Sale Hearing; (III) Approving Form and Manner of Notice Thereof; and (IV) Granting Related Relief and (B)(I) Authorizing the Sale of Certain Assets Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (II) Authorizing and Approving Asset Purchase Agreements Thereto; (III) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto; and (IV) Granting Related Relief [Docket No. 284].

bidding because of the conditional increase in purchase price from $1.4 billion to $1.6 billion.[1359] In addition, Berkshire Hathaway offered to serve as the designated stalking horse bidder for either or both the Platform Sale and the Legacy Sale.[1360] Berkshire Hathaway's bid with respect to the Platform Sale proposed the same purchase price with substantially the same terms as Fortress, but reduced the break-up fees and related expenses to $24 million.[1361] The Berkshire Hathaway bid for the Legacy Sale was for $50 million more than AFI's bid, but included a 3% break-up fee.[1362]

Centerview believed that, if Berkshire Hathaway had served as stalking horse bidder for the Platform Sale, other parties might not have participated in the auction as they may not have wanted to bid against Berkshire Hathaway because of its size and reputation.[1363]

On June 28, 2012, the Bankruptcy Court entered an order ruling that Berkshire Hathaway would replace AFI as the stalking horse bidder for the Legacy Sale with a $10 million break-up fee, and that Fortress (through Nationstar) would serve as the stalking horse bidder for the Platform Sale with a $24 million break-up fee.[1364]

On October 23, 2012, the Debtors conducted the auction for the Platform Sale in which Fortress had the opening bid of $2.4 billion.[1365] Ultimately, Walter Investment Management Corp. ("Walter") and Ocwen offered the highest and best bid of $3 billion.[1366] The sale of the

---

[1359] *Id*. ¶ 5.

[1360] *Id*. ¶ 2.

[1361] *Id*. ¶ 3.

[1362] *Id*. ¶ 4.

[1363] Meeting with Centerview, Investment Banker to the Debtors, in N.Y., N.Y. (Jan. 18, 2013).

[1364] Order Under 11 U.S.C. §§ 105, 363(b) And 365 (I) Authorizing And Approving Sale Procedures, Including Payment Of Break-Up Fees; (II) Scheduling Bid Deadline, Auction (If Necessary) And Sale Hearing; (III) Establishing Assumption And Assignment Procedures, Including Procedures For Fixing Cure Amounts; And (IV) Establishing Notice Procedures And Approving Forms Of Notice [Docket No. 538] at 1–2 [hereinafter Order Approving Sale Procedures].

[1365] On June 28, 2012, Fortress amended its Asset Purchase Agreement to, among other things, increase the aggregate purchase price for the Platform Sale by $125 million (or, if the MSR related to the loans guaranteed by Ginnie Mae and the related servicing advances were sold to another bidder, by $85 million). This increased the Fortress stalking horse bid from $2.3 billion, as filed on the Petition Date, to $2.4 billion. Sales Procedure Motion, ¶ 6; Nationstar Mortgage LLC, Current Report (Form 8-K) (July 5, 2012), Item 1.01.

[1366] Notice of Successful Bidders at the Auctions and Sales of (A) the Platform Assets to Ocwen Loan Servicing, LLC and (B) the Whole Loan Assets to Berkshire Hathaway Inc. [Docket No. 1960] at 3; Third Stipulation and Order Amending the AFI DIP and Cash Collateral Order [Docket No. 3230] at 2–3 [hereinafter Third AFI DIP Order].

origination and capital markets platform assets to Walter closed on January 31, 2013.[1367] The sale of the servicing platform assets to Ocwen closed on February 15, 2013.[1368]

On October 25, 2012, the Debtors conducted the auction for the Legacy Sale in which Berkshire Hathaway had the opening bid of $1.45 billion.[1369] Berkshire Hathaway ultimately prevailed after raising its bid to $1.5 billion because of competition from a number of bidders, including Bayview Acquisitions LLC, DLJ Mortgage Capital Inc., Roosevelt Depositor LLC, Roosevelt Mortgage Acquisition Co., and Selene Finance LP.[1370] The sale to Berkshire Hathaway closed on February 5, 2013.[1371]

### (3) Bankruptcy Filing Timing Considerations

In January 2012, AFI and its advisors suggested that ResCap be prepared to file the Chapter 11 Cases by March 30, 2012, which was the maturity date of the Citibank MSR Loan Agreement.[1372] Although AFI recognized that "Centerview [was] setting the pace," as the sale process moved forward, AFI became concerned that the overall bankruptcy project was progressing too slowly.[1373] On January 20, 2012, Carpenter informed Marano that "we need any third party stalking horse[] bid[s] nailed down by [February] 28 to meet the necessary timeline."[1374]

Meanwhile, AFI understood that several other involved parties—including ResCap and its advisors, the GSEs, ratings agencies, and the U.S. Treasury—viewed AFI's proposed timeline as "too aggressive."[1375] As Jeff Brown, AFI's Senior Executive Vice President of Finance and Corporate Planning, explained in an e-mail to Carpenter, "[m]ore time allows smoother process, but also comes at the expense of more support in the interim. Centerview

---

[1367] Residential Capital, LLC, Press Release, *ResCap Completes Sale of Origination and Capital Markets Platform Assets to Walter Investment Management Corp.* (Jan. 31, 2013), http://www.kccllc.net/documents/ 1212020/1212020130131000000000013.pdf; Third AFI DIP Order, at 2–3.

[1368] Residential Capital, LLC, Press Release, *ResCap Completes Sale of Servicing Platform Assets to Ocwen Loan Servicing, LLC* (Feb. 15, 2013), http://www.kccllc.net/documents/1212020/1212020130215000000000010.pdf; Third AFI DIP Order, at 2–3.

[1369] Sales Procedure Motion,¶ 6: Order Approving Sale Procedures, at 4.

[1370] Notice of Successful Bidders at the Auctions and Sales of (A) the Platform Assets to Ocwen Loan Servicing, LLC and (B) the Whole Loan Assets to Berkshire Hathaway Inc. [Docket No. 1960] at 3.

[1371] Residential Capital, LLC, Press Release, *ResCap Completes Sale of Whole Loan Portfolio to Berkshire Hathaway* (Feb. 5, 2013), http://www.kccllc.net/documents/1212020/1212020130205000000000002.pdf; Third AFI DIP Order, at 2–3.

[1372] *See* Materials for Discussion, dated Jan. 10, 2012, at 30 [RC00000200].

[1373] E-mail from M. Carpenter (Jan. 17, 2012) [ALLY_0187331]

[1374] E-mail from M. Carpenter to T. Marano (Jan. 20, 2012) [EXAM00010758].

[1375] E-mail from J. Brown to M. Carpenter (Jan. 31, 2012) [ALLY_0141903].

thinks end May or June realistic, but that may mean several hundred million more in support to ResCap."[1376] In response, Carpenter e-mailed Brown stating, "[n]o way we can do this through May/June."[1377]

On February 2, 2012, William Solomon, General Counsel of AFI, reportedly committed to being "done" with Project Bounce by "the 10th."[1378] In response to concerns from ResCap's in-house counsel regarding that deadline, Solomon reportedly stated, "[Hamzehpour] reports to me and I'm commiting [sic] to getting it done by the 10th. . . . [C]rank up MoFo if you have to because it needs to get done."[1379] By April 11, 2012, Pam West, an Independent Director on the ResCap Board, understood AFI to be "pushing for [an] April 30 filing."[1380]

Notwithstanding the timing pressure from AFI, ResCap's counsel asserted that ResCap "took whatever time [it] thought was necessary and appropriate" and did not think the timing pressure had any impact on the pre-bankruptcy marketing of ResCap's assets.[1381] John Mack, an Independent Director of the ResCap Board, explained that AFI's timing suggestions were "never an issue" because it was ResCap's "position that we couldn't logistically get there."[1382]

On April 12, 2012, the ResCap Board resolved not to make the scheduled April 17, 2012 interest payment due under the Unsecured Notes, but instead to use "the 30-day grace period allowed under the related indenture."[1383] At that point, a bankruptcy filing the week of May 14, 2012 was all but settled.[1384] When the ResCap Board made that decision, ResCap had

---

[1376] Id.

[1377] E-mail from M. Carpenter to J. Brown (Feb. 1, 2012) [ALLY_0141903].

[1378] E-mail from M. Fahy Woehr to T. Hamzehpour (Feb. 2, 2012) [EXAM20180037]. It is unclear which month is being referred to in the e-mail. Solomon agreed that the quote attributed to him in the e-mail "sounds like me." Int. of W. Solomon, Mar. 19, 2013, at 98:19–99:8. Solomon stated that he believes the e-mail and the deadline referred to therein related only to the Shared Services Agreement, *see id.* at 97:12–98:18, and that appears to be true. *See* E-mail from J. Mackey (Feb. 18, 2012) [EXAM20283454] ("We all had agreed [the Shared Services Agreement] would be finalized and ready to go on feb 10th. Obviously we have missed that deadline.").

[1379] E-mail from M. Fahy Woehr to T. Hamzehpour (Feb. 2, 2012) [EXAM20180037]. Solomon characterized the statement that Hamzehpour reported to him as a "non-sequitur" and explained that the statement was "really more about whatever we need to do to get this done we need to get it done by the 10th." Int. of W. Solomon, Mar. 19, 2013, at 99:22–101:20.

[1380] Notes of P. West (Apr. 11, 2012), at EXAM00128221 [EXAM00128214]; *see also* E-mail from C. Dondzila to J. Whitlinger (Apr. 20, 2012) [EXAM11114890] ("[N]ow we are pushing to be able to file on the 30th, which may or may not be the real date.").

[1381] Int. of G. Lee, Feb. 20, 2013, at 203:11–204:23.

[1382] Int. of J. Mack, Jan. 15, 2013, at 193:3–15.

[1383] Minutes of a Special Meeting of the Board of Residential Capital, LLC, Apr. 12, 2012, at 1 [EXAM00094875].

[1384] ResCap had additional obligations maturing on May 14, 2012, including payments due to AFI under the A&R Secured Revolver Loan Agreement and A&R Line of Credit Agreement. *See* GMAC ResCap Executive Liquidity Report, dated Apr. 16, 2012 [ALLY_0194266].

already executed a committed DIP facility term sheet with Barclays,[1385] and had made significant progress towards negotiating a stalking horse bid for the sale of its business.[1386]

Although AFI may have indirectly affected ResCap's timing considerations through its willingness or unwillingness to provide additional capital support, the evidence does not support the proposition that AFI controlled the timing of the bankruptcy filing. Indeed, ResCap did not file the Chapter 11 Cases until May 14, 2012, which was after it had conducted a marketing process, obtained stalking horse bids on its assets, secured DIP financing, and reached settlements with certain creditor constituencies.

### (4) ResCap Considers Potential Legal Claims Against AFI

As discussions of a possible bankruptcy filing became more frequent in late 2011, the ResCap Board determined that it would need to conduct a retrospective review of ResCap's relationships with certain affiliates and investigate potential legal claims in connection with any "grant of releases of potential liability to the counterparties under" various related-party transactions.[1387]

Sometime around November 2011, Marano and his team began brainstorming on a "range of possible claims" that ResCap may have against AFI.[1388] According to Marano, the senior management team—including Jim Whitlinger, Steve Abreu, Adam Glassner, and Cathy Dondzila—spoke with Morrison & Foerster and was told that there was "an opportunity to settle claims between ResCap and [AFI] and that [management] needed to come up with areas for [counsel] to look into that could be a possible area where [AFI] might have done something wrong."[1389]

With that directive, Marano stated that management, individually and occasionally together, tried to come up with ideas of "what exactly we could get [AFI] for."[1390] As a result of that process, management considered several areas worth further consideration, including claims against AFI or Ally Bank related to loans originated or underwritten by Ally Bank, the factoring agreement, representation and warranty risk, and the bank's underwriting

––––––––––––––––––––––––––––––––––––––

[1385] *See* Barclays DIP Financing Agreement, Summary of Indicative Terms and Conditions, dated Apr. 9, 2012 [EXAM20122499].

[1386] Transaction Discussion, dated Mar. 19, 2012, at 3 [EXAM00015730].

[1387] Residential Capital, LLC Resolutions for Adoption by the Board of Directors, dated Dec. 5, 2011, at RC40020104 [RC40020073]; Minutes of a Special Meeting of the Board of Residential Capital, LLC, Dec. 5, 2011, at RC40018719–21 [RC40018411].

[1388] Int. of T. Marano, Nov. 26, 2012, at 168:24–169:14.

[1389] *Id*. at 170:5–11; *see also* Int. of J. Whitlinger, Nov. 30, 2012, at 62:24–63:10 (noting he "had helped do a brainstorming session on potential claims to try and negotiate a settlement").

[1390] Int. of T. Marano, Nov. 26, 2012, at 170:12–15.

practices.[1391] When asked whether management came to believe any of these areas were good grounds for seeking relief against AFI, Marano noted:

> The problem with that is that we gave a bunch of possible areas for Morrison & Foerster to look into. Then we formed an independent committee of directors to take on responsibility for that. They did the work.[1392]

### (5) ResCap Appoints Additional Independent Directors And Establishes Special Review Committee

The ResCap Board recognized that, as it was constituted at the time, it could not settle ResCap's potential claims against AFI and other affiliates because the directors had participated in many of the transactions that would be investigated.[1393] Accordingly, ResCap sought "to increase the size of the board to have a majority of independent directors" by adding two additional independent directors.[1394]

In November 2011, after an interview process,[1395] Marano recommended the appointment of Jonathan Ilany and John Mack.[1396] The ResCap Board appointed Ilany and Mack members of the ResCap Board effective November 16, 2011.[1397] By hiring the new independent directors, ResCap's management could focus on securing DIP financing and stalking horse bids—two matters which it deemed to be of higher priority than the negotiation of a settlement with AFI[1398]—and "outsource[] or kind of create[] a separate committee to deal with the

---

[1391] *Id.* at 170:20–171:4; *see also* Dep. of J. Whitlinger, Nov. 15, 2012, at 129:3–132:10.

[1392] Int. of T. Marano, Nov. 26, 2012, at 171:12–20.

[1393] *See* Int. of J. Ilany, Nov. 28, 2012, at 64:10–65:8; *see also* Int. of J. Tanenbaum, Mar. 29, 2013, at 171:1–21 ("[F]rom a good corporate governance standpoint, one would not want any of the directors who participated in approving those interested transactions to approve the settlement, because they'd be approving their own work, in effect.").

[1394] Dep. of J. Mack, Nov. 14, 2012, at 30:8–15.

[1395] Int. of J. Tanenbaum, Mar. 29, 2013, at 177:8–178:3; Minutes of a Special Meeting of the Board of Residential Capital, LLC, Nov. 4, 2011, at RC40018700 [RC40018411].

[1396] Minutes of a Special Meeting of the Board of Residential Capital, LLC, Nov. 16, 2011, at RC40018710 [RC40018411]. Ilany was first contacted about the ResCap board position by James Tanenbaum of Morrison & Foerster. Int. of J. Ilany, Nov. 11, 2012, at 47:23–48:7. Ilany had met Tanenbaum when Ilany worked at Bear Stearns and Tanenbaum's firm at the time was advisor to Bear Stearns. *See id.* at 49:14–51:15; *see also* Int. of J. Tanenbaum, Mar. 29, 2013, at 171:24–172:21. While at Bear Stearns, Ilany also worked with Marano, and for a period of time Marano reported directly to Ilany. Int. of J. Ilany, Nov. 11, 2012, at 57:14–58:19. Tanenbaum met Mack when Mack worked at what is now Bank of America and also viewed Mack as extremely qualified to serve as an independent director. Int. of J. Tanenbaum, Mar. 29, 2013, at 178:16–179:18.

[1397] Minutes of a Special Meeting of the Board of Residential Capital, LLC, Nov. 16, 2011, at RC40018710 [RC40018411].

[1398] *See* E-mail from T. Marano to Mackey (Feb. 19, 2012) [ALLY_0150256].

9019" and the investigation of potential claims against AFI.[1399] Even though it was not the focus of ResCap's management, the "[p]otential settlement of ResCap claims against [AFI] under Rule 9019" was considered by ResCap to be a major element of the chapter 11 filing process.[1400]

Ilany understood that he was joining the ResCap Board as a "super independent" because ResCap needed "a fresh set of eyes that was not involved with anything that happened" to perform the retrospective review of ResCap transactions.[1401] Likewise, Mack understood that he and Ilany were "truly independent" in a way that the other independent directors—Edward Smith and Pam West—were not, and that the Special Review Committee needed to be "independent of the past" to properly investigate the Affiliate Transactions.[1402]

Effective December 5, 2011, the ResCap Board established the Special Review Committee, consisting of Ilany and Mack, for the purpose of:

> [I]mplementing a process and procedure for the review and assessment of (i) all material transactions entered into between [ResCap] and any affiliate (other than [ResCap's] subsidiaries) of [ResCap], including [Cerberus, AFI] and any of their respective affiliates (each, an "Affiliate Transaction") that occurred since the formation of [ResCap] in 2004 . . . , (ii) the historic course of dealing and interrelationships between [ResCap] and [AFI] and their respective subsidiaries and affiliates over the same time period and (iii) potential claims arising in relation to these transactions and interrelationships . . . .[1403]

In addition to delegating full authority to the Special Review Committee to conduct its review of Affiliate Transactions, interrelationships and potential legal claims, the ResCap Board authorized the Special Review Committee to approve or recommend for approval "any potential release of liability of any counterparty to any Affiliate Transactions that may be considered by [ResCap]."[1404]

Ilany understood that it was his and Mack's mandate to review Affiliate Transactions and "everything that was done" between ResCap and AFI and Cerberus to see if it was "done in a

---

[1399] Dep. of T. Marano, Nov. 12, 2012, at 81:20–84:5.

[1400] Joint Project Bounce Presentation by Centerview, FTI, and Morrison & Foerster, dated Dec. 15, 2011, at 10 [RC00000121].

[1401] Int. of J. Ilany, Nov. 28, 2012, at 18:1–13, 64:10–65:8.

[1402] Int. of J. Mack, Dec. 5, 2012, at 77:13–20, 78:13–24, 138:21–140:14.

[1403] Residential Capital, LLC Resolutions for Adoption by the Board of Directors, dated Dec. 5, 2011, at RC40020104 [RC40020073]; Minutes of a Special Meeting of the Board of Residential Capital, LLC, Dec. 5, 2011, at RC40018719–20 [RC40018411].

[1404] Id.

commercial arm's length transaction at market."[1405] If Affiliate Transactions were not done "in market or in arm's length transactions," Ilany understood that it was his and Mack's mandate to negotiate with AFI a resolution of any claims arising out of those transactions.[1406] According to Marano, as part of their review of the Affiliate Transactions, Ilany and Mack did not seek out the thoughts or views of senior management to any great extent,[1407] apparently choosing to rely mainly on Morrison & Foerster's analysis to understand the prior transactions and any related claims.

To perform its responsibilities, the Special Review Committee was authorized to engage "financial and other experts and consultants, including legal counsel . . . at the expense of [ResCap]."[1408] Despite that authorization, Ilany and Mack continued to use Morrison & Foerster and Morrison Cohen. Ilany understood that he could hire professionals to help him understand the transactions,[1410] but he never considered hiring separate counsel, stating "our belief was that these professionals were representing us versus another entity and they were our lawyers and [Morrison Cohen] represent[s] the independent people of the board which is including us and [Morrison & Foerster] represents the company and the board. We have not seen any need to hire anybody else."[1411]

### (6) Morrison & Foerster Investigates Legal Claims On Behalf Of ResCap And Special Review Committee

The primary investigation into ResCap's potential legal claims against AFI was conducted by ResCap's restructuring counsel Morrison & Foerster,[1412] which was "asked by ResCap to conduct a review of the related party transactions as well as the financial and operational course of dealing between [AFI] and ResCap."[1413] Thus, the Special Review Committee did not itself investigate potential legal claims against AFI, but rather was formed "to consider [Morrison & Foerster's] report on potential claims . . . [and] then determine next steps."[1414] Indeed, Morrison & Foerster's claims investigation was already underway when the

---

[1405] Int. of J. Ilany, Nov. 28, 2012, at 106:14–108:7.

[1406] *Id*. at 109:7–19 ("[I]f transactions were not done in market or in arm's length transactions that there might be claims and my advisors will help me figure them out. This is what we were hired to do and if there are claims to negotiation with the parent.")

[1407] *See* Int. of T. Marano, Nov. 26, 2012, at 172:4–22.

[1408] Minutes of a Special Meeting of the Board of Residential Capital, LLC, Dec. 5, 2011, at RC40018722 [RC40018411].

[1409] *See* Int. of J. Ilany, Nov. 28, 2012, at 116:7–16.

[1410] *See id*. at 116:7–11.

[1411] *Id*. at 118:19–119:7.

[1412] Materials for Discussion, dated Dec. 12, 2011, at 6 [RC00000114].

[1413] Morrison & Foerster Report on the Independent Review Claims Analysis, dated Jan. 25, 2012, at 4 [RC00023710].

[1414] Materials for Discussion, dated Dec. 12, 2011, at 6 [RC00000114].

two new independent directors were retained.[1415] Morrison & Foerster "was the driving force in the analysis of legal claims that were settled in the [AFI] settlement."[1416]

Morrison & Foerster's decision that it could perform an "independent" review on the "financial and operational course of dealing between [AFI] and ResCap"[1417] is questionable in light of the firm's significant involvement in that very course of dealing during the preceding years. From September 2008 through November 2011, Morrison & Foerster attended over 100 ResCap Board meetings, including meetings at which discussions occurred regarding Affiliate Transactions subject to the Special Review Committee's scrutiny, including the 2009 Bank Transaction;[1418] the First 2009 Tax Allocation Agreement;[1419] the Initial Line of Credit Facility;[1420] and the ResMor Sale,[1421] among others.[1422] James Tanenbaum of Morrison & Foerster explained that his firm frequently advised the ResCap Board on a variety of issues relating to the Affiliate Transactions and corporate governance.[1423]

Tanenbaum stated that he did not believe there was any conflict that should have precluded Morrison & Foerster from conducting the investigation. In fact, he noted that Morrison & Foerster was "exactly the right [firm] to do it. Because at that point, we had some background with the company."[1424] Tanenbaum asserted that Mack's and Ilany's appointment as Independent Directors to review the Affiliate Transactions was necessary because the other ResCap Board members had *voted* on those transactions.[1425] Tanenbaum acknowledged that

---

[1415] *See* Int. of T. Hamzehpour, Oct. 5, 2012, at 233:10–20; Int. of J. Tanenbaum, Mar. 29, 2013, at 189:13–190:9.

[1416] Dep. of M. Puntus, Nov. 5, 2012, at 28:3–6.

[1417] Morrison & Foerster Report on the Independent Review Claims Analysis, dated Jan. 25, 2012, at 4 [RC00023710].

[1418] *See, e.g.*, Minutes of a Special Meeting of the Board of Residential Capital, LLC, Sept. 19, 2008, at RC40005870–71 [RC40005652] (discussing potential transaction structures for 2009 Bank Transaction).

[1419] *See* Minutes of a Regular Meeting of the Board of Directors of Residential Capital, LLC, Aug. 6, 2010, at RC40018820–22 [RC40018729].

[1420] *See* Minutes of a Special Meeting of the Board of Residential Capital, LLC, Nov. 12, 2008, at 2 [RC00017340] (during the meeting at which the ResCap Board approved an AFI support offer, including the Initial Line of Credit Facility, Tanenbaum of Morrison & Foerster "noted the importance of disclosing the deferral of [a ResCap bond interest payment due November 17, 2008] in the context of the overall support plan" and "discussed the potential impact that the delayed interest payment might have on the bond exchange").

[1421] *See id.*

[1422] *See* Morrison & Foerster Report on the Independent Review Claims Analysis, dated Jan. 25, 2012, at 8 [RC00023710].

[1423] Int. of J. Tanenbaum, Mar. 29, 2013, at 217:6–22 ([Q:] "[D]id you have an understanding of whether MoFo had given any legal advice with respect to any of the transactions that were the subject of the special review committee's work?" [A:] "I would've hoped that we would've given advice on process, board process and consideration of the issues. I think, during the course of our relationship, I would be very surprised if we did not give an advice on governance and process relating to these and other issues.").

[1424] *Id.* at 215:6–216:1.

[1425] *Id.* at 218:6–25.

Morrison & Foerster advised the ResCap Board on the Affiliate Transactions,[1426] but did not view that as creating the same conflict that voting on those transactions arguably created.[1427]

The ability of Morrison & Foerster to review transactions on which it had previously advised the ResCap Board should have been considered by Ilany and Mack, and, at a minimum, also discussed with Morrison & Foerster. But Morrison & Foerster's potential conflicts did not cause Ilany or Mack any concern. Ilany explained that "the lawyers that have conflicts tell you that they have conflicts. I'm not a lawyer."[1428] Mack also did not feel the need to retain counsel that had not been involved in the Affiliate Transactions to be scrutinized by the Special Review Committee.[1429]

Notwithstanding the possible conflicts of interest, Morrison & Foerster conducted the investigation. The stated objective of Morrison & Foerster's investigation was "to identify and analyze claims that may be made by ResCap against [AFI] in the context of an insolvency proceeding."[1430] Gary Lee of Morrison & Foerster explained that Morrison & Foerster's goal was to create "the existential threat, the threat that would persuade somebody to write a very

---

[1426] *Id*. at 217:6-22.

[1427] *Id*. at 217:6–219:21. When asked why the logic that required the retention of Mack and Ilany did not apply to Morrison & Foerster, Tanenbaum replied:

> You've mixed up two things. They were tasked with this responsibility because they had not been involved in voting on those transactions. Voting. . . . In respect of the interested transactions, they didn't sit on the board and had never exercised a vote. . . . Our view was that the best governance would entail having [Mack and Ilany] negotiate and ultimately, if possible, resolve those claims. However, I can't—could not then and cannot now, think of anything associated with the work that MoFo had done up to that point which would not put them in the position of being able to conduct effectively—in fact, perhaps, most effectively—an analysis of claim and other issues that could be relevant to the settlement process.

*Id.*

[1428] Int. of J. Ilany, Nov. 28, 2012, at 120:19–21. Ilany understood that both Morrison & Foerster and Morrison Cohen had been advising ResCap and its independent directors, respectively, for several years, and that each had been involved in transactions to be reviewed by the Morrison & Foerster. *See id*. at 117:2–118:11, 120:5–120:16 (explaining that he was not concerned by the use of potentially conflicted lawyers because "they are professionals. They are bound by duty to me and they are my advisors. They are going to do what is right for the company going forward and for the committee that I represent going forward. There is no limit to how many more you can hire.").

[1429] *See* Int. of J. Mack, Dec. 5, 2012, at 155:8–21 (Mack understood Morrison & Foerster, Morrison Cohen, FTI, and Centerview to be the advisors for the Special Review Committee, noting "I felt very good about the advisors we had, the advice we got, the professionalism. I didn't feel a need to have more advisors. I thought we were well advised, completely advised, thoroughly advised, appropriately advised.").

[1430] Morrison & Foerster Report on the Independent Review Claims Analysis, dated Jan. 25, 2012, at 4 [RC00023710]. Morrison & Foerster did not investigate potential claims against Cerberus despite the Special Review Committee's authorization to do so. Tanenbaum explained that an investigation of claims against Cerberus was not necessary because Cerberus would not be a released party under any Plan. *See* Int. of J. Tanenbaum, Mar. 29, 2013, at 190:14–191:3, 209:8–214:10 ("To the extent that ResCap had then claims against Cerberus, it would have those claims now. . . . Cerberus was not going to be a party to the [settlement] . . . . Everybody knew that. There would've been no basis for them to become a party.").

big check."[1431] To that end, Morrison & Foerster sought to develop three basic types of claims ResCap could assert against AFI: (1) single entity type claims, including substantive consolidation, pooling of the assets of the entities, alter ego, and veil piercing claims;[1432] (2) bankruptcy claims, including equitable subordination, recharacterization of debt as equity, and constructive or actual fraudulent conveyance;[1433] and (3) contribution claims arising as a result of ResCap's liability to third parties.[1434]

As part of its investigation, Morrison & Foerster reviewed ResCap Board meeting minutes and other materials dating from mid-2007, the ResCap LLC Agreement and the ResCap 2006 Amended Operating Agreement, certain AFI Board meeting minutes and other materials, relevant agreements and materials relating to certain Affiliate Transactions, fairness opinions and legal opinions addressed to ResCap, and SEC filings for ResCap and AFI.[1435] In addition, Morrison & Foerster conducted interviews of several current or former ResCap and AFI employees, including, among others: (1) Tom Marano;[1436] (2) Lisa Gess;[1437] (3) Tammy Hamzehpour;[1438] (4) Joe Pensabene;[1439] (5) Cathy Dondzila;[1440] and (6) Steve Abreu.[1441]

In the course of its investigation, Morrison & Foerster did not review any contemporaneous e-mails and did not have access to any AFI files other than certain AFI Board materials.[1442] When asked if there was anything on his "wish list of what [Morrison &

---

[1431] Int. of G. Lee, Feb. 20, 2013, at 125:7–20.

[1432] *See* Morrison & Foerster Report on the Independent Review Claims Analysis, dated Jan. 25, 2012, at RC00023725–27 [RC00023710].

[1433] *Id.* at RC00023725, –28–32.

[1434] *Id.* at RC00023725, –33.

[1435] *Id.* at RC00023720–21.

[1436] Int. of T. Marano, Nov. 26, 2012, at 168:24–169:8, 172:13–173:3; *see also* Int. of S. Abreu, Jan. 22, 2013, at 55:2–20.

[1437] Int. of L. Gess, Nov. 30, 2012, at 13:16–14:1.

[1438] Int. of T. Hamzehpour, Oct. 5, 2012, at 113:5–7.

[1439] Int. of J. Pensabene, Jan. 9, 2013, at 121:17.

[1440] Int. of C. Dondzila, Sept. 27, 2012, at 176:11–24.

[1441] Int. of S. Abreu, Jan. 22, 2013, at 55:2–20.

[1442] Meeting with Morrison & Foerster, Counsel to the Debtors, in N.Y., N.Y. (July 20, 2012); *see also* Morrison & Foerster Report on the Independent Review Claims Analysis, dated Jan. 25, 2012, at RC00023720–21 [RC00023710].

Foerster] might have had access to," Mack stated, "I would've loved to have had access to [AFI] e-mails. I would love to be able to interview anybody at [AFI].... [B]ut, we didn't have the power."[1443] Mack added that he never specifically asked Morrison & Foerster whether they should have asked AFI for access to additional information.[1444]

As noted above, Morrison & Foerster began meeting with ResCap officers to investigate possible claims before the Special Review Committee was formed.[1445] Morrison & Foerster initially "anticipate[d] completing its review" of potential claims "and discussing its conclusions with the Special Review Committee before the end of December 2011."[1446] Ultimately, the results of the investigation were presented to the ResCap Board on January 25, 2012.[1447]

### (a) Morrison & Foerster Presentation Of Claims Analysis To ResCap Board

On January 25, 2012, at a special meeting of the ResCap Board, Morrison & Foerster presented "the initial results of their independent review of historical transactions between ResCap and [AFI], its predecessors and affiliates, including Cerberus entities" and "their initial analysis of potential claims that could be made against [AFI] in a potential Rule 9019 settlement discussion with [AFI] . . . ."[1448]

Mack stated that his overall conclusion from Morrison & Foerster's report was that there were no "smoking guns, but that an aggregate taken as a holistic view, we thought we had a case, but not any specific transaction or specific legal claim here could be or would be successful."[1449] Mack explained that the presentation was "designed to be . . . one-sided in a way" that was "favorable to ResCap, not favorable to [AFI]," but that the ResCap Board and its advisors engaged in "full and thorough discussion" on the claims analysis.[1450] According to Smith, Morrison & Foerster noted that potential claims against AFI "could be as much as $12 billion."[1451]

---

[1443] Int. of J. Mack, Jan. 15, 2013, at 109:17–24; *see also* Int. of J. Tanenbaum, Mar. 29, 2013, at 196:4–17 ("The one external factor that shaped timing is that ResCap didn't have subpoena power as [the Examiner has]. So there are many things that we probably would've liked to have looked at that we really didn't have occasion to do.").

[1444] Int. of J. Mack, Jan. 15, 2013, at 109:25–110:6.

[1445] *See id.* at 108:13–16 ("I understand that MoFo had begun the investigation prior to our joining the board. And so, that must've come from somebody, but I don't know who.").

[1446] Materials for Discussion, dated Dec. 12, 2011, at 6 [RC00000114].

[1447] Minutes of a Special Meeting of the Board of Residential Capital, LLC, Jan. 25, 2012, at RC40019194 [RC40019179].

[1448] *Id.* The minutes suggest that Morrison & Foerster presented the "initial results" of its investigation, but no subsequent presentation on the results of Morrison & Foerster's claims investigation was ever provided to the Special Review Committee. *See* Int. of J. Mack, Jan. 15, 2013, at 85:17–87:1, 144:15–145:2.

[1449] Int. of J. Mack, Jan. 15, 2013, at 105:1–23.

[1450] *Id.* at 152:1–8.

[1451] Int. of E. Smith, Nov. 30, 2012, at 199:8–203:1.

Specifically, the Morrison & Foerster presentation observes, among other things, that "a strong argument can be made that the course of conduct [between AFI and ResCap] changed following the restructuring events in 2008."[1452] The presentation explains that, in connection with the review of the relationship between AFI and ResCap, it is "highly relevant . . . whether and when ResCap was undercapitalized and/or in the 'zone of insolvency'"[1453] and "ResCap may have been in the 'zone of insolvency' from 2008 onward."[1454] When asked about those points, Mack stated unequivocally that ResCap was "never insolvent" but that he had not reached a conclusion as to whether ResCap was ever in the "zone of insolvency" because "that's kind of a vague concept."[1455] Notwithstanding Morrison & Foerster's advice that solvency was "highly relevant,"[1456] when asked for his "understanding of how the zone of insolvency analysis figured into [his] review of the potential claims,"[1457] Mack stated, "I don't know that it affects my view of the individual claims. It affects the way you run the company, but it doesn't affect my view of the individual claims."[1458]

In addition, the Morrison & Foerster presentation noted that it is arguable that ResCap and AFI acted "as a single, integrated operation in certain respects" during "the post-TARP period."[1459] When Mack was asked what the relevance was to the claims analysis of "whether ResCap and [AFI] had acted as a single, integrated operation," he stated "[j]ust trying to make sure we understood the way the company was run. . . . I don't recall anything about whether it had any impact on my assessment of the claims."[1460]

Morrison & Foerster's presentation did not review claims relating to AFI's potential liability directly to third parties, nor did it analyze breach of fiduciary duty claims against ResCap's directors and officers that could have given rise to claims against AFI for aiding and abetting breach of fiduciary duty.[1461]

---

[1452] Morrison & Foerster Report on the Independent Review Claims Analysis, dated Jan. 25, 2012, at RC00023773 [RC00023710].

[1453] *Id*. at RC00023774.

[1454] *Id*. at RC00023756.

[1455] *See* Int. of J. Mack, Jan. 15, 2013, at 135:23–136:25, 148:5–150:16; *see also* Dep. of T. Hamzehpour, Nov. 13, 2012, at 103:10–104:6 (asserting she did not consider ResCap to be insolvent until the bankruptcy filing).

[1456] Morrison & Foerster Report on the Independent Review Claims Analysis, dated Jan. 25, 2012, at RC00023774 [RC00023710].

[1457] Int. of J. Mack, Jan. 15, 2013, at 137:17–20.

[1458] *Id*. at 137:21–138:24.

[1459] Morrison & Foerster Report on the Independent Review Claims Analysis, dated Jan. 25, 2012, at RC00023774 [RC00023710].

[1460] Int. of J. Mack, Jan. 15, 2013, at 140:17–141:15.

[1461] Morrison & Foerster Report on the Independent Review Claims Analysis, dated Jan. 25, 2012 [RC00023710]. Gary Lee of Morrison & Foerster asserted that the firm considered Third-Party Claims in its investigation, *see* Int. of G. Lee, Feb. 20, 2013, at 59:12–60:21, 222:14–223:1, but Lee could not recall whether Morrison & Foerster had investigated breach of fiduciary duty claims. *See id*. at 219:1–9.

### (b) Morrison & Foerster Presentation Of Claims Analysis To Kirkland & Ellis

After the January 25, 2012 presentation, either the ResCap Board or the Special Review Committee directed Morrison & Foerster to meet with AFI's counsel Kirkland & Ellis to present the results of Morrison & Foerster's claims investigation.[1462] That meeting took place on February 14, 2012.[1463] It appears that the presentation Morrison & Foerster gave to Kirkland & Ellis was not shared with the members of the ResCap Board.[1464]

There are certain differences between the two Morrison & Foerster presentations. Notably, the February 14 presentation to Kirkland & Ellis noted that "FTI analyzed whether ResCap was insolvent at various times and concluded that ResCap may have been insolvent as early as 2006" and, under certain measures, "ResCap has been insolvent during the entire period [from 2006 through 2011.]"[1465] In contrast, Morrison & Foerster's strongest statement on ResCap's solvency in the January 25 presentation was that "ResCap may have been in the 'zone of insolvency' from 2008 onward."[1466] In addition, whereas the January 25 presentation did not address potential damages, the February 14 presentation asserted that AFI's control over ResCap had resulted in a $7.6 billion diminution of ResCap's estimated enterprise value and that the market value of ResCap's equity had declined by $12 billion.[1467]

### 2. AFI's Consideration Of Strategic Restructuring Scenarios

### a. AFI's Strategic Cost-Benefit Analysis Regarding Mortgage Business

While ResCap was considering its options, AFI was undertaking similar analyses to evaluate strategic scenarios for ResCap and to understand its own contingent liability exposure. By June 2011, Jeff Brown, AFI's Senior Executive Vice President of Finance and Corporate Planning, viewed the mortgage business as "a weight" and doubted whether a scenario existed in which AFI could be released from all contingent liabilities.[1468] By August 19, 2011, James Mackey, CFO of AFI, believed that representation and warranty claims against ResCap and/or AFI were inevitable and would be an "avalanche."[1469]

---

[1462] Int. of J. Mack, Jan. 15, 2013, at 86:1–14.

[1463] *Id.* at 156:1–5.

[1464] *Id.* at 155:19–21, 159:13–22.

[1465] Morrison & Foerster ResCap Claims Presentation, dated Feb. 14, 2012, at RC00028281–83 [RC00028255]. The Examiner's Financial Advisors reviewed the calculations underlying FTI's February 14, 2012 solvency analysis and concluded that FTI's conclusions were not credible. For the Examiner's full analysis of ResCap's financial condition, *see* Section VI.

[1466] Morrison & Foerster Report on the Independent Review Claims Analysis, dated Jan. 25, 2012, at RC00023756 [RC00023710].

[1467] Morrison & Foerster ResCap Claims Presentation, dated Feb. 14, 2012, at 48–51 [RC00028255].

[1468] *See* E-mail from J. Brown to M. Carpenter (June 29, 2011) [ALLY_0225116].

[1469] *See* E-mail from J. Mackey (Aug. 19, 2011) [ALLY_0169890].

On September 16, 2011, Brown e-mailed Carpenter and recommended that AFI and ResCap "[s]top origination immediately" and "[a]nnounce we are exiting future mortgage business."[1470] Although Brown noted that bankruptcy would give AFI the "best protection," he viewed it as "unrealistic and unpalatable by [the U.S. Treasury]."[1471] He proposed instead to stop the business and stockpile cash to provide "a much longer runway of life" that could "support contingent liability claims."[1472] In response, Carpenter noted that, "as we know from [2010], the business has some value aside from contingent liabilities."[1473] He asked, "[s]hould we forego that?"[1474]

On September 23, 2011, the AFI Board held a special meeting for the purpose of "review[ing] strategic alternatives for [ResCap] and the impact on [AFI], in light of private label securitization and related litigation pending against ResCap and [AFI] and other entities in the organization to inform the Board's on-going deliberations pertaining to the mortgage operations."[1475] In connection with preparing the presentation for that AFI Board meeting, Brown queried whether they should "add some drama," and noted that "[m]ortgage has in many ways become a cancer for [AFI]" and "[a]ction is needed to take some of the cloud away from [AFI]."[1476]

The materials that were presented to the AFI Board on September 23, 2011 did not contain such dramatic statements. Instead, the presentation analyzed ResCap's obligations, ResCap's existing and potential litigation exposure, and AFI's potential exposure to ResCap-related liabilities.[1477] The analyses regarding AFI's exposure were then applied to the following "potential business scenarios": (1) status quo; (2) bankruptcy; (3) spin; and (4) sale.[1478]

On October 6, 2011, the AFI Board met and discussed the "merits and potential consequences of remaining in or exiting all or a portion of the mortgage business."[1479] At the meeting, members of the AFI Board "reviewed and discussed at length a presentation prepared by management that provided a detailed assessment of the potential strategic alternatives and contingencies for [AFI]'s mortgage operations . . . ."[1480] The presentation included, among

---

[1470] E-mail from J. Brown to M. Carpenter (Sept. 16, 2011) [ALLY_0170751].

[1471] *Id*.

[1472] *Id*.

[1473] E-mail from M. Carpenter to J. Brown (Sept. 16, 2011) [ALLY_0170751].

[1474] *Id*.

[1475] Minutes of a Special Meeting of the Board of Directors of Ally Financial Inc., Sept. 23, 2011, at ALLY_0115749–50 [ALLY_0115565]. Marano and Mackey participated in the AFI Board discussion regarding mortgage strategic alternatives and responded to various questions from AFI Board members.

[1476] E-mail from J. Brown (Sept. 21, 2011) [ALLY_0237702].

[1477] AFI Board Presentation, dated Sept. 23, 2011 [ALLY_0157602].

[1478] *Id*. at 20.

[1479] Minutes of a Regular Meeting of the Board of Directors of Ally Financial Inc., Oct. 6, 2011, at ALLY_0115762 [ALLY_0115565].

[1480] *Id*. at ALLY_0115761.

III-254

other things, detailed analyses regarding "each of the strategic alternatives evaluated, and management's observations as to these matters."[1481] AFI's priorities at the time included maximizing the consolidated equity value of AFI and insulating AFI from escalating mortgage issues.[1482]

AFI engaged Evercore on October 15, 2011 to analyze strategic alternatives in connection with AFI's mortgage business, including developing a ResCap bankruptcy plan and analyzing potential sale scenarios.[1483] The AFI Board referred to its evaluation of strategic alternatives for ResCap as "Project Rodeo."[1484]

In December 2011, AFI and its advisors began to focus on preparations for a ResCap bankruptcy case, including the "two important objectives" of obtaining "court approval of claims settlement under 9019" and "completion of a 363 sale of the servicing platform."[1485] As of December 16, 2011, Evercore assigned "low probability" to either a sale or spin-off transaction outcome for ResCap.[1486] Corey Pinkston, Head of Corporate Debt and Equity at AFI, was working with Evercore in considering strategic alternatives,[1487] and noted that AFI did not see any other viable options for ResCap to avoid bankruptcy, stating:

> [I]t was not like there was another silver bullet out there with respect of, okay, what potentially—the problem is, at that point in time, is you're dealing with this litigation that you don't have a definition around what is it? How do you box it, right? . . . [I]f you're looking at the portfolio of assets or your balance sheet, you're trying to figure out how many losses can you take in something? You think recovery of prices, et cetera, you know, this is a litigation issue out there. Nobody could really frame up what does it really mean, how legitimate is it . . . . [Y]ou're not solving for an ability to say, "Well, let me model up specifically what the number's going to be," when you've got this building.

---

[1481] *Id.*; *see also* Mortgage/ResCap Strategic Alternatives Discussion: Critical Issues, dated Oct. 6, 2011 [ALLY_0400275].

[1482] *See* Mortgage / ResCap Strategic Alternatives Discussion: Critical Issues, dated Oct. 6, 2011, at 2 [ALLY_0400275]. At the October 6, 2011 meeting, the AFI Board also discussed "hypothetical scenarios illustrative of potential legal claims against [AFI] and [ResCap]," and engaged in discussion with Solomon regarding "the legal risk analysis of mortgage servicing matters." Minutes of a Regular Meeting of the Board of Directors of Ally Financial Inc., Oct. 6, 2011, at ALLY_0115762–63 [ALLY_0115565].

[1483] *See* Evercore Engagement Letter, dated Oct. 15, 2011, at 1 [ALLY_0142108]; E-mail from D. Ying (Dec. 12, 2011) [ALLY_0380152].

[1484] *See, e.g.*, E-mail from D. Schaeffer (Sept. 20, 2011) [EXAM20192690].

[1485] E-mail from E. Mestre to M. Carpenter (Dec. 16, 2011) [ALLY_0142418].

[1486] *Id.*

[1487] Int. of C. Pinkston, Nov. 8, 2012, at 81:8–16.

> So, at a certain point in time, I think the folks realized that the
> whole idea of a spinoff or whatever those issues are, I mean, you
> just don't—you don't have a number that you can confidently
> say I think kind of solves this issue. Or, you can call somebody
> up and settle it or something like that, or if you're willing to
> try.[1488]

AFI recognized that there were significant challenges inherent in divorcing itself from the mortgage business, especially with respect to the "operational entanglement of [Ally] Bank and ResCap."[1489] As of December 13, 2011, AFI's business and financial goals in connection with a ResCap chapter 11 filing included, among other things, minimizing "guarantees, obligations, or unsecured exposures that would be injurious to [AFI] upon a ResCap filing," and maximizing the value of AFI's claims.[1490] AFI's legal goals included continuing AFI's "separation from current and potential litigation of ResCap claimants," implementing a settlement of any alleged claims against AFI held by the ResCap estate, and using the chapter 11 process "as a possible consolidated forum to address certain 3rd party litigation claims against [AFI]."[1491] On December 26, 2011, Carpenter informed the AFI Board that "[g]ood progress [was] being made on unscrambling the complex relationships between AFI, Ally Bank and Rescap/GMAC Mortgage. . . . This is consistent with Rescap's 363 plan also."[1492]

Over the following months, the AFI Board discussed strategic options for ResCap and the mortgage business or preparations for a ResCap bankruptcy on many occasions.[1493] Ultimately, AFI made an official determination to cease its support for ResCap and allow ResCap to file for bankruptcy. Brown's view that AFI was better off exiting the mortgage business remained consistent when he discussed the decision retrospectively. He wrote, "ResCap was maintained separately . . . [which] has afforded [AFI] options to deal with the pig. . . . [M]assive financing

---

[1488] *Id.* at 81:17–82:21.

[1489] *See* E-mail from B. Yastine to M. Carpenter (Dec. 1, 2011) [ALLY_0304495]; *see also* Int. of M. Carpenter, Mar. 4, 2013, at 240:2–241:25 (discussing the "challenges of separating ResCap from Ally Bank").

[1490] Evercore, Kirkland & Ellis, and Mayer Brown Project Rodeo Discussion Materials, dated Dec. 13, 2011, at 4 [CCM00336243].

[1491] *Id.*

[1492] E-mail from M. Carpenter (Dec. 26, 2011) [ALLY_0142356].

[1493] *See, e.g.*, Minutes of a Regular Meeting of the Board of Directors of Ally Financial Inc., Dec. 20, 2011, at ALLY_0115830 [ALLY_0115565]; Minutes of a Regular Meeting of the Board of Directors of Ally Financial Inc., Feb. 1, 2012, at ALLY_PEO_0020498 [ALLY_PEO_0020479] (discussion of ResCap strategic alternatives lasted approximately three and a half hours); Minutes of a Special Meeting of the Board of Directors of Ally Financial Inc., Mar. 14, 2012, at ALLY_PEO_0020540–41 [ALLY_PEO_0020479]; Minutes of a Regular Meeting of the Board of Directors of Ally Financial Inc., Apr. 4, 2012, at ALLY_PEO_0020548 [ALLY_PEO_0020479].

needs over coming years, regulatory mess, contingent clouds . . . all these things mean you must dump it."[1494] Carpenter outlined AFI's ResCap strategy as follows:

> 1. Rescap is a wholely [sic] owned sub of [AFI] but has always operated as a separate company (own BoD, own 10k etc). Therefore, and because of its separateness [AFI] can make decisions about [its] investment in the subsidiary.

> 2. Rescap and the mortgage business have struggled for years and [AFI] has supported the company through its difficulties.

> 3. However, three reasons for [AFI] not wishing to continue to invest are

> —the mortgage servicing business has become marginally profitable as a result of industry changes including substantial additional costs driven by new government rules and regulations (without the ability to recover through pricing)

> —approx 3 billion of Rescap bonds become due in the next several years and these cannot be refinanced in the capital markets

> —large contingent liabilities from governmental and unjustified suits and potential suits create an additional drain on the company.

> 4. For [AFI] to continue to support Rescap is hugely detrimental to our key objective of repaying the American taxpayer. Continuing to support Rescap will require billions of taxpayer capital [to] be invested in this unattractive business. In addition, it will raise [AFI]'s cost of funding in support of its principal objective, supporting the US auto industry. Further, it will preclude an IPO and other options for repaying the US taxpayer.

> 5. Several alternatives were examined to separate Rescap from [AFI], including sale, but bankruptcy was by far the best alternative.[1495]

---

[1494] *See* E-mail from J. Brown to J. Mackey and M. Carpenter (Apr. 13, 2012) [ALLY_0334715].

[1495] *See* E-mail from M. Carpenter (Apr. 15, 2012) [ALLY_0381153]; *see also* E-mail from M. Carpenter (Jan. 20, 2012) [EXAM00010735] (outlining similar "themes" with respect to AFI's decision to cease its support for ResCap).

### b.   Investigation Of Legal Claims By Kirkland & Ellis On Behalf Of AFI

Whereas ResCap's counsel began its investigation of legal claims in late 2011, AFI's counsel, Kirkland & Ellis, began investigating AFI's potential exposure to ResCap-related liabilities in 2008.[1496] Kirkland & Ellis interviewed AFI executives in fall 2008 and September 2011, reviewed SEC filings and certain transaction documents, and analyzed relevant law.[1497] However, Kirkland & Ellis counsel did not speak with ResCap employees, former AFI employees, or third parties, and did not review e-mails.[1498]

In a presentation given to the AFI Board on September 23, 2011, during which both Carpenter and Tessler were present,[1499] Kirkland & Ellis analyzed, among other things, (1) whether AFI could be held *directly* liable for litigation-related liabilities associated with the activities of ResCap;[1500] and (2) whether AFI could be *indirectly* liable for ResCap's obligations (under theories such as indemnity or veil piercing).[1501] Kirkland & Ellis also provided the AFI Board with analysis of AFI's potential litigation exposure to claims that could be brought by ResCap against AFI relating to intercompany transactions between AFI and ResCap, including capital contributions, loans, and asset or equity purchases.[1502]

### c.   Berkshire Hathaway Alternative Restructuring Proposal

On April 16, 2012, Carpenter met with Warren Buffett and Ted Weschler of Berkshire Hathaway.[1503] Following the meeting, Carpenter e-mailed Marano and informed him that Berkshire Hathaway was "unconcerned" regarding its position in the Junior Secured Notes, but "concerned" regarding its position in the Unsecured Notes.[1504] Carpenter explained that Berkshire Hathaway's representatives "[s]eemed surprised at likely donut [for Unsecured Noteholders] and status versus PLS," which led to a discussion of "numerous alternatives including no [bankruptcy]."[1505]

---

[1496] *See* AFI Board Presentation Appendix, dated Sept. 23, 2011, at 50 [ALLY_0157478] (noting "work done" by Kirkland & Ellis began in Fall 2008); Int. of G. Lee, Feb. 20, 2013, at 29:9–24 (noting Morrison & Foerster did not analyze ResCap's potential claims against AFI in connection with bankruptcy planning in 2009).

[1497] AFI Board Presentation Appendix, dated Sept. 23, 2011, at 50 [ALLY_0157478].

[1498] *Id.*

[1499] *See* Minutes of a Special Meeting of the Board of Directors of Ally Financial Inc., Sept. 23, 2011, at ALLY_0115749 [ALLY_0115565]

[1500] AFI Board Presentation Appendix, dated Sept. 23, 2011, at 17 [ALLY_0157602].

[1501] *Id.* at 19; *see also* AFI Board Presentation Appendix, dated Sept. 23, 2011, at 100–105 [ALLY_0157478].

[1502] AFI Board Presentation Appendix, dated Sept. 23, 2011, at 73–99 [ALLY_0157478].

[1503] *See* E-mail from M. Carpenter (Apr. 16, 2012) [ALLY_PEO_0028897]; E-mail from D. Schaeffer (Apr. 19, 2012) [RC40052879] ("AFI CEO met with Berkshire Hathaway CEO Monday 4/16").

[1504] E-mail from M. Carpenter to T. Marano (Apr. 16, 2012) [EXAM00010583].

[1505] *Id.*

That same day, Weschler sent Carpenter an e-mail stating that the "one big takeaway" that he and Buffett had from the meeting was that "we weren't convinced that a bankruptcy of ResCap actually betters [AFI]'s situation . . . conceptually we have a hard time seeing how [AFI] is any cleaner with an ongoing bankruptcy of a major sub vs the status quo or selling the entity for minimal consideration to a third party that would essentially operate the business in run off . . . ."[1506] Carpenter forwarded Weschler's e-mail to Tessler, who remarked, "[i]n the absence of a 9019 or 3rd party releases he is right regarding 'better off'. However, the other question he should be asking given the volume of already pending litigation . . . how is [AFI] worse off by trying?"[1507]

On April 18, 2012, Carpenter and Marano discussed Buffett's "thoughts about avoiding a [bankruptcy]."[1508] On April 19, 2012, Marano sent an e-mail noting that Buffett may not "get the most informed analysis from Evercore," and suggested that the ResCap Board consider providing Berkshire Hathaway "access to the data room and our advisors since they are more up to speed [than Evercore]."[1509]

On April 23, 2012, Carpenter e-mailed to Weschler a presentation prepared by Evercore responding to Berkshire Hathaway's request for AFI's "analysis of certain non-chapter 11 options to restructure ResCap."[1510] The presentation included two scenarios: (1) Platform Sale scenario to an investor; and (2) a ResCap standalone scenario.[1511] The Platform Sale was assumed to be contemporaneous with the sale of ResCap's platform assets and certain other assets to Fortress.[1512] Under the ResCap standalone scenario, upon a sale of ResCap to an investor, ResCap was assumed to operate in the ordinary course without support from AFI.[1513] Under both scenarios, AFI provided a forecast with no cash contribution to ResCap and another forecast with a $1 billion cash contribution.[1514] Additional common assumptions included: releases of AFI by ResCap creditors; ResCap litigation addressed in the ordinary course; a "creditworthy indemnity" to AFI from the investor; ResCap solvency on cash flow, adequate capital, and balance sheet basis; and consummation of the transaction outside of bankruptcy court.[1515]

---

[1506] E-mail from T. Weschler (Apr. 16, 2012) [ALLY_PEO_0028897].

[1507] E-mail from L. Tessler (Apr. 16, 2012) [ALLY_PEO_0028897].

[1508] E-mail from T. Marano (Apr. 19, 2012) [EXAM00004077].

[1509] *Id.*

[1510] *See* Evercore, Kirkland & Ellis, and Mayer Brown Project Rodeo Discussion Materials, dated Apr. 23, 2012, at 2 [CCM00200924]; E-mail from M. Carpenter to T. Weschler (Apr. 23, 2012) [ALLY_0142583].

[1511] Evercore, Kirkland & Ellis, and Mayer Brown Project Rodeo Discussion Materials, dated Apr. 23, 2012, at 2 [CCM00200924].

[1512] *Id.*

[1513] *Id.*

[1514] *Id.*

[1515] *Id.*

Under the Platform Sale scenario, the proceeds received from the Platform Sale and Legacy Sale to Fortress (assuming a $3.976 billion purchase price)[1516] would be used to pay down first lien debt and any excess proceeds would be left on the balance sheet.[1517] The remaining assets and liabilities would be run off at ResCap with the debt being repaid as it would come due.[1518] The Platform Sale scenario resulted in cash as of December 2015 of $439 million with AFI support, and negative $561 million without AFI support, as shown in Exhibit III.J.2.c—1 below.[1519]

EXHIBIT III.J.2.c—1
**Platform Sale Scenario**
*($ in Millions)*

|  | **April 23, 2013** | | | |
|  | **Platform Sale Scenario** | | | |
|  | No AFI Contribution | | $1 Billion AFI Contribution | |
| 2012 beginning cash balance[(1)] | $ | 2,493 | $ | 3,493 |
| Cumulative 2012-2015 cash flows | | (3,055) | | (3,055) |
| 2015 ending cash balance | $ | (561) | $ | 439 |

*[(1)] 2012 beginning cash balance includes sale proceeds of approximately $4.0 billion net of secured debt repayments of $2.3 billion.*
*Source: Evercore, Kirkland & Ellis, and Mayer Brown Project Rodeo Discussion Materials, dated Apr. 23, 2012, at 7—11 [CCM00200924].*

Transaction considerations and potential obstacles under the Platform Sale scenario were noted to include, among other things:

- Fortress, the AFI Board, and AFI would require an opinion that the remaining ResCap was solvent;[1520]

- Bondholders would potentially have to waive the "all or substantially all" covenant (50% vote) for the sale of assets to Fortress; and[1521]

- AFI would face substantial risk that the transaction itself would serve as a catalyst for further litigation against AFI.[1522]

---

[1516] *Id.* at 7.

[1517] *Id.* at 6.

[1518] *Id.*

[1519] *Id.* at 8, 11.

[1520] *Id.* at 13.

[1521] *Id.*

[1522] *Id.*

The ResCap standalone scenario anticipated that ResCap would continue retail origination operations and execute a subservicing agreement with Ally Bank on a fee-for-service basis.[1523] ResCap would extend certain facilities against the HFS Portfolio and Servicing Advances at current effective advance rates, and debt would be repaid as it came due.[1524] The ResCap standalone scenario resulted in an ending cash balance at December 2015 of $1.021 billion with a $1 billion cash contribution from AFI, and $21 million without the AFI contribution, as shown in Exhibit III.J.2.c—2 below.[1525]

EXHIBIT III.J.2.c—2
**Standalone Scenario**
*($ in Millions)*

|  | April 23, 2013 ResCap Standalone Scenario | | | |
|---|---|---|---|---|
|  | No AFI Contribution | | $1 Billion AFI Contribution | |
| 2012 beginning cash balance | $ | 823 | $ | 1,823 |
| Cumulative 2012-2015 cash flows |  | (802) |  | (802) |
| 2015 ending cash balance | $ | 21 | $ | 1,021 |

*Source: Evercore, Kirkland & Ellis, and Mayer Brown Project Rodeo Discussion Materials, dated Apr. 23, 2012, at 17—20 [CCM00200924].*

Transaction considerations and potential obstacles under the ResCap standalone scenario were noted to include, among other things:

- ResCap and the AFI Board would likely require a solvency opinion;[1526]

- ResCap would likely not be able to replicate the funding that was being provided by AFI;[1527] and

- ResCap would need to demonstrate its ability to meet the GSE net worth covenant.[1528]

---

[1523] *Id.* at 16.

[1524] *Id.*

[1525] *Id.* at 17–19.

[1526] *Id.* at 21.

[1527] *Id.*

[1528] *Id.*

Exhibit III.J.2.c—3 below compares the Platform Sale scenario and ResCap standalone scenario presented to Berkshire Hathaway on April 23, 2012.

EXHIBIT III.J.2.c—3
**Platform Sale Versus ResCap Standalone Scenario Comparison**
*($ in Millions)*

|  | April 23, 2013 Platform Sale | | | | April 23, 2013 ResCap Standalone | | | |
|  | No AFI Contribution | | $1 Billion AFI Contribution | | No AFI Contribution | | $1 Billion AFI Contribution | |
|---|---|---|---|---|---|---|---|---|
| 2012 beginning cash balance | $ | 2,493 | $ | 3,493 | $ | 823 | $ | 1,823 |
| Cumulative 2012-2015 cash flows | | (3,055) | | (3,055) | | (802) | | (802) |
| 2015 ending cash balance | $ | (561) | $ | 439 | $ | 21 | $ | 1,021 |

*Source: Evercore, Kirkland & Ellis, and Mayer Brown Project Rodeo Discussion Materials, dated Apr. 23, 2012, at 8—11 and 17—20 [CCM00200924].*

Although AFI and Berkshire Hathaway were engaged in discussions regarding a potential out-of-court restructuring, AFI and ResCap also sought Berkshire Hathaway's support for the Chapter 11 Cases.[1529] On April 29, 2012, Carpenter sent an e-mail to Weschler explaining that the proposed mechanics of AFI's settlement contributions strengthened the position of the Junior Secured Noteholders and provided benefit to Unsecured Noteholders.[1530] According to Carpenter, as shown in Exhibit III.J.2.c—4 below, over 50% of the amount of AFI's settlement contribution that was allocated to ResCap LLC was estimated to go to Berkshire Hathaway.[1531]

---

[1529] Evercore, Kirkland & Ellis, and Mayer Brown Project Rodeo Discussion Materials, dated Apr. 23, 2012, at 9–10 [CCM00335615].

[1530] E-mail from M. Carpenter to T. Weschler (Apr. 29, 2012) [ALLY_0142587].

[1531] *Id*; Evercore, Kirkland & Ellis, and Mayer Brown Project Rodeo Potential Ally Settlement Allocation Mechanics, dated Apr. 29, 2012, at 1 [ALLY_0142588].

EXHIBIT III.J.2.c—4
**Berkshire Hathaway Recovery from AFI Settlement Allocated to ResCap LLC (Illustrative)**
*($ in Millions)*

| | | | | | Berkshire Hathaway | |
| Unsecured Claims[1] | Total Amount Outstanding | % of Claims at ResCap LLC | Allocated $1 Settlement[2] | | % Owned | Allocated Settlement[3] |
|---|---|---|---|---|---|---|
| Junior Secured Notes | $    2,128 | 68% | $    0.68 | | 45% | $    0.31 |
| Unsecured Notes | 969 | 31% | 0.31 | | 76% | 0.23 |
| Other general unsecured claims | 50 | 2% | 0.02 | | 0% | - |
| Total | $    3,147 | 100% | $    1.00 | | N/A | $    0.54 |

*[1] Excludes medium-term unsecured notes guarantee claim.*
*[2] Reflects illustrative amount of $1 in AFI support allocated to ResCap LLC (holding company).*
*[3] Berkshire Hathaway would recover $0.54 for every $1 of the AFI Settlement allocated to ResCap LLC.*
*Source: E-mail from M. Carpenter to T. Weschler (Apr. 29, 2012) [ALLY_0142587]; Evercore, Kirkland & Ellis, and Mayer Brown Project Rodeo Discussion Materials, dated Apr. 29, 2012, at 1 [ALLY_0142588].*

Berkshire Hathaway continued to view a potential non-bankruptcy solution as superior to a ResCap bankruptcy filing.[1532] On April 30, 2012, in response to Berkshire Hathaway's request, Evercore prepared a presentation that analyzed a potential sale of ResCap to Berkshire Hathaway for a nominal amount.[1533] The scenario had two key assumptions: (1) Berkshire Hathaway would purchase ResCap stock for $1; and (2) AFI would not make any contribution to ResCap.[1534] In that scenario, ResCap would operate in the ordinary course based on Centerview's projections and the following assumptions:

- ResCap would continue retention and retail originations, with the ability to retain the related MSR without compensation to Ally Bank;[1535]

- ResCap would implement a subservicing agreement in connection with Ally Bank's MSRs and its HFS Portfolio on a fee-for-service basis;[1536]

- ResCap would refinance senior debt secured by the HFS Portfolio and Servicing Advances and obtain a warehouse line at current effective advance rates (LIBOR+300);[1537] and

---

[1532] E-mail from T. Weschler and M. Carpenter (Apr. 30, 2012) [CCM00652529] ("As I waded through the documents this weekend, and compared notes with Warren [Buffett], we continue to be of a view that filing of ResCap will create much more harm than good to many key stakeholders of both ResCap and [AFI].").

[1533] Evercore, Kirkland & Ellis, and Mayer Brown Project Rodeo Discussion Materials, dated Apr. 30, 2012, at 1 [CCM00048209].

[1534] *Id.*

[1535] *Id.*

[1536] *Id.*

[1537] *Id.*

- ResCap would repay the Junior Secured Notes and Unsecured Notes as they came due.[1538]

The forecast for the Berkshire Hathaway potential sale scenario showed a negative equity position from 2012 through 2015, ranging from approximately $3.5 billion in 2012 to $2.9 billion in 2015.[1539] The GSE minimum net worth covenant was $250 million.[1540] AFI's advisors indicated that a sizeable cash contribution would likely have been required in order for ResCap to be considered a solvent and adequately capitalized standalone entity without Berkshire Hathaway providing a make-well guarantee of ResCap.[1541] Evercore, using Centerview's assumptions, prepared an analysis indicating that a $6.5 billion contribution would have been needed on day one assuming a 20% ratio of equity to assets.[1542]

Carpenter sent Evercore's analysis to Weschler on May 1, 2012 and noted that "the magnitude of the longer term commitment required of Berkshire is very large."[1543] Carpenter also suggested that Weschler consider reviewing Cerberus's analysis, noting that "Cerberus went very far down the road exploring a similar alternative and concluded that it was not workable . . . ."[1544] The Exhibit III.J.2(c)—5 below summarizes the scenarios evaluated with Berkshire Hathaway.

EXHIBIT III.J.2.c(2)—5
**Platform Sale Versus ResCap Standalone Versus Sale Scenario Comparison**
*($ in Millions)*

| | April 23, 2013 Platform Sale | | April 23, 2013 ResCap Standalone | | April 30, 2013 Sale of ResCap |
|---|---|---|---|---|---|
| | No AFI Contribution | $1 Billion AFI Contribution | No AFI Contribution | $1 Billion AFI Contribution | No AFI Contribution |
| 2012 beginning cash balance | $ 2,493 | $ 3,493 | $ 823 | $ 1,823 | $ 823 |
| Cumulative 2012-2015 cash flows | (3,055) | (3,055) | (802) | (802) | (3,223) |
| 2015 ending cash balance | $ (561) | $ 439 | $ 21 | $ 1,021 | $ (2,400) |

Source: Evercore, Kirkland & Ellis, and Mayer Brown Project Rodeo Discussion Materials, dated Apr. 23, 2012, at 8—11 and 17—20 [CCM00200924]; Evercore, Kirkland & Ellis, and Mayer Brown Project Rodeo Discussion Materials, dated Apr. 30, 2012, at 3 [CCM00048209].

---

[1538] *Id*.

[1539] *Id*. at 2.

[1540] *Id*.

[1541] *Id*. at 4.

[1542] *Id*.

[1543] E-mail from M. Carpenter to T. Weschler (May 1, 2012) [ALLY_PEO_0079127].

[1544] *Id*.

On May 3, 2012, Berkshire Hathaway sent an offer letter to AFI, stating that it did not believe that a bankruptcy was in the best interests of AFI, the U.S. Treasury, Berkshire Hathaway, or any of the significant stakeholders.[1545] Berkshire Hathaway noted that a bankruptcy filing would likely trigger an extended and costly proceeding in which many of the past transactions between AFI and ResCap would be challenged by ResCap creditors, while plaintiffs pursuing representation and warranty claims would be encouraged to file claims as part of the bankruptcy process.[1546]

Berkshire Hathaway's proposed alternative scenario included the following terms:

- A Berkshire Hathaway subsidiary would purchase 100% of the equity interest in ResCap for $1.00;[1547]

- AFI would contribute $850 million of cash to ResCap (based on the range of the recently disclosed expected loss to be incurred by AFI pursuant to a potential bankruptcy filing by ResCap);[1548] and

- The sale of ResCap to a Berkshire Hathaway affiliate within 30 days would fully refinance what was, as of March 31, 2012, a $1.4 billion intercompany loan from AFI to ResCap.[1549]

Berkshire Hathaway believed that this structure would allow ResCap to continue to operate for the long-term as a viable, self-contained entity.[1550] It was Berkshire Hathaway's intent that ResCap would continue operating as a going concern and would pay its debts as they came due, while diligently reviewing and challenging any and all litigation claims to which ResCap might be subjected.[1551] Berkshire Hathaway proposed selling insurance to AFI to mitigate AFI's risk associated with past activities.[1552]

On May 4, 2012, Carpenter responded to Berkshire Hathaway with a counterproposal.[1553] The proposal included the following terms:

- Berkshire Hathaway would acquire AFI's 100% equity interest in ResCap for $1.00, on or prior to May 10, 2012;[1554]

---

[1545] *See id*. at 1; Letter from T. Weschler to M. Carpenter (May 3, 2012) [ALLY_0225404].

[1546] *See id*.

[1547] *Id*.

[1548] *Id*.

[1549] *Id*.

[1550] *Id*. at 2.

[1551] *Id*.

[1552] *Id*.

[1553] Letter from M. Carpenter to T. Weschler (May 4, 2012) [EXAM00010554].

[1554] *Id*. at 2.

- AFI would pay $850 million to Berkshire Hathaway or contribute $850 million to ResCap in exchange for a full indemnity or other satisfactory insurance from Berkshire Hathaway for any liability associated with the proposed transaction as well as for any liability associated with ResCap that would otherwise be discharged in a ResCap chapter 11 case;[1555] and

- Berkshire Hathaway would provide for the repayment of all of the AFI credit facilities and the repayment or refinancing of all third-party credit facilities as of the sale date.[1556]

On May 4, 2012, Berkshire Hathaway responded with a binding and unconditional commitment, which expired on May 6, 2012.[1557] The proposal included the following terms:

- Berkshire Hathaway would acquire AFI's 100% equity interest in ResCap for $1;[1558]

- The contemplated sale of ResCap's Platform Sale to Fortress would not be consummated;[1559]

- AFI would contribute $850 million to ResCap;[1560] and

- Berkshire Hathaway would share evenly with AFI in any liabilities in excess of $1 billion associated with ResCap that would otherwise be discharged in a ResCap chapter 11 case, subject to a cap of $3 billion, in exchange for a payment by AFI to Berkshire Hathaway of $500 million.[1561]

---

[1555] *Id.*

[1556] *Id.*

[1557] Letter from T. Weschler to M. Carpenter (May 4, 2012) [EXAM00010547].

[1558] *Id.*

[1559] *Id.*

[1560] *Id.*

[1561] *Id.*

On May 5, 2012, Carpenter forwarded Berkshire Hathaway's May 4, 2012 proposal to the AFI Board and informed them that, after consulting with Kirkland & Ellis, Davis Polk, and Evercore, he intended to reject Berkshire Hathaway's offer for the following reasons:

> Any proposal which leaves [AFI] with exposure in a worst case scenario is unattractive versus the [bankruptcy] alternative. In this case the [$]3 billion cap would leave [AFI] vulnerable in possible scenarios. . . . The cost of the insurance is very high. We would essentially be paying [$]1.35 billion for [$]1 billion dollars of insurance after we have absorbed the first [$]1 billion loss.[1562]

In response, Mayree Clark, an AFI Board member, suggested that AFI continue to explore options with Berkshire Hathaway because "[t]here is a number where I, for one, could get comfortable doing something . . . ."[1563] Carpenter e-mailed Clark and explained, "this is a game. This proposal is more costly than any of the sale/spin off scenarios we discussed. Can do a lot of settling for [$]3 billion!"[1564] But Clark continued to believe a deal was possible, and recommended that AFI insist that Berkshire Hathaway "buy equity in [AFI] as part of any transaction."[1565] Carpenter responded, "[W]e will consider any deal that separates [AFI] completely from Rescap including contingent liabilities. Any deal that does not accomplish that objective is a non starter. Berkshire is not willing to do such a deal. QED."[1566]

On May 5, 2012, Carpenter sent a response letter to Berkshire Hathaway stating that its May 4, 2012 proposal terms were "unworkable as written."[1567] According to Carpenter, AFI required "full and complete protection against liability associated with a Berkshire transaction for ResCap as well as liability associated with ResCap that would otherwise be discharged in a ResCap chapter 11 case."[1568] In response, Weschler wrote:

> [Y]ou have stressed to us that you believe such liabilities we suggest to insure are expected to be zero in the event of a ResCap bankruptcy. . . . [I]t is not clear to us that a ResCap bankruptcy would cleanse [AFI] of exposure to past intercompany transactions between [AFI] and ResCap. . . . Our offer set forth [May 4, 2012] remains open—with or without the insurance provision.[1569]

---

[1562] E-mail from M. Carpenter to the AFI Board (May 5, 2012) [ALLY_0381237].

[1563] E-mail from M. Clark to the AFI Board (May 5, 2012) [ALLY_0381237].

[1564] E-mail from M. Carpenter (May 5, 2012) [ALLY_0381237].

[1565] E-mail from M. Clark (May 6, 2012) [ALLY_PEO_0079157].

[1566] E-mail from M. Carpenter (May 6, 2012) [ALLY_PEO_0079157].

[1567] Letter from M. Carpenter to T. Weschler (May 5, 2012) [EXAM00063836].

[1568] *Id*.

[1569] E-mail from T. Weschler to M. Carpenter (May 5, 2012) [EXAM00069914].

On May 7, 2012, Carpenter wrote a brief letter to Weschler explaining that none of Berkshire Hathaway's proposals was acceptable to AFI's "baseline requirements" for a ResCap equity sale.[1570] Mark Neporent of Cerberus expressed the view that Berkshire Hathaway's offer to purchase the ResCap equity for $1 was "amateurish and ridiculous" and did not "address a fraction of the issues that would have to be addressed under the circumstances. Nobody was going to let them steal that platform for a dollar."[1571]

Marano, who was not a party to the negotiations, stated that he "wish[ed] [AFI] had made an effort to sell [ResCap] to Warren Buffett," as opposed to letting ResCap file bankruptcy, and "that probably would have been the better path."[1572]

On May 10, 2012, Berkshire Hathaway stated that it could step into Fortress's shoes with short notice if Fortress faded as a stalking horse bidder. Carpenter indicated that this made more sense than any of Berkshire Hathaway's other proposals.[1573]

As previously discussed, Berkshire Hathaway was later selected by the Bankruptcy Court to be the stalking horse bidder for the Legacy Sale and ultimately prevailed at the auction with a bid of $1.5 billion.[1574]

### 3.  Negotiation And Entry Into AFI Settlement And Plan Sponsor Agreement

In connection with discussions regarding a possible settlement of Estate and Third-Party Claims, ResCap and AFI identified a range of possible chapter 11 restructuring scenarios. The least desirable option for all parties was a "free fall" restructuring,[1575] which contemplated "[a]sset sale(s) under section 363 . . . followed by a wind-down of the estate," with no ResCap-AFI settlement.[1576] The most preferable option—particularly from AFI's perspective—was referred to as the "elegant" restructuring,[1577] which contemplated support from AFI (including a settlement contribution in exchange for the Debtor Release and the Third-Party Release) and the sale of ResCap's assets pursuant to a plan of reorganization that would have been "pre-arranged with key stakeholders prior to filing."[1578] An intermediate option contemplated that the ResCap

[1570] Letter from M. Carpenter to T. Weschler (May 5, 2012) [EXAM00010538].

[1571] Int. of M. Neporent, Feb. 6, 2013, at 260:2–10.

[1572] Int. of T. Marano, Feb. 27, 2013, at 158:16–20.

[1573] E-mail from M. Carpenter (May 10, 2012) [CCM00120369] (discussing Berkshire Hathaway's interest in being stalking horse bidder).

[1574] Notice of Successful Bidders at the Auctions and Sales of (A) the Platform Assets to Ocwen Loan Servicing, LLC and (B) the Whole Loan Assets to Berkshire Hathaway Inc. [Docket No. 1960] at 3.

[1575] Dep. of J. Mack, Nov. 14, 2012, at 96:7–9, 101:3–6.

[1576] Discussion Materials—Joint Presentation by Ally and ResCap, dated Jan. 23, 2012, at RC00096080 [RC00096076].

[1577] See Dep. of J. Mack, Nov. 14, 2012, at 84:5–14, 96:5–15, 99:5–17; Int. of P. West, Jan. 11, 2013, at 190:3–16.

[1578] Discussion Materials—Joint Presentation by Ally and ResCap, dated Jan. 23, 2012, at RC00096080 [RC00096076].

asset sales could be consummated pursuant to section 363 rather than in a plan of reorganization, but still included support from AFI (including a settlement contribution in exchange for the Debtor Release).[1579] At a minimum, both AFI and ResCap wanted to ensure a "soft landing" for ResCap's mortgage business to "preserve[] the value and functionality of the operating platform."[1580]

### a. ResCap's Views Regarding Negotiations With AFI

ResCap and its advisors viewed a settlement with AFI as necessary to achieve the goal of an "elegant" chapter 11 filing. When asked to explain why this was the case, Puntus of Centerview said:

> [AFI] . . . is the debtor's parent. We originate loans through [AFI]. . . . [T]hey had secured facilities aggregating over a billion dollars outstanding to [AFI]. We had various contractual relationships with them. They provided us a DIP facility. They were potentially going to be a stalking horse not only for the whole loan portfolio but potentially for the platform. They were the stalking horse for the whole loan portfolio. So, from our perspective, Centerview's perspective, and the company's perspective as well, having them supportive of the case and supportive of ResCap continuing to do business in the ordinary course was crucial. In fact, had they not been supportive, and had we not been able to continue to do business in the ordinary course, then we wouldn't have had a stalking horse, and we wouldn't have had a successful auction like we did [in October 2012]. They were preconditions to ultimately selling these assets.[1581]

The ResCap management team and its advisors viewed "any consideration to be paid by [AFI] to ResCap" in connection with a settlement of claims as "separate from funding that may be required for the DIP loan, as a bidder for ResCap assets or as capital for any new entity owning former ResCap assets going forward."[1582] Centerview understood that AFI viewed negotiations differently, with AFI's willingness to provide any support to ResCap influenced by whether it would be able to settle its exposure to ResCap-related claims.[1583] According to Puntus,

---

[1579] *See* E-mails between L. Nashelsky and R. Schrock (May 13, 2012) [CCM00566819].

[1580] Int. of M. Carpenter, Mar. 4, 2013, at 234:1–18; *see also* Materials for Discussion, dated Feb. 24, 2012, at RC40020316 [RC40020290]; Discussion Materials—Joint Presentation by Ally and ResCap, dated Jan. 23, 2012, at RC00096081 [RC00096076].

[1581] *See* Dep. of M. Puntus, Nov. 5, 2012, at 30:20–31:25.

[1582] Materials for Discussion, dated Dec. 12, 2011, at RC00000120 [RC00000114].

[1583] *See* Dep. of M. Puntus, Nov. 5, 2012, at 32:2–12.

"[AFI] was using every lever it could to negotiate the best possible settlement."[1584] As Marano noted, the "mixture of currency from [AFI] changed at least two or three times a week."[1585]

AFI was seeking a global settlement, including a release of Third-Party Claims.[1586] However, it is not clear whether ResCap's independent directors ever understood the distinction between "claims of third parties that could flow through ResCap to [AFI]"[1587]— referred to in the January 25, 2012 Morrison & Foerster presentation as "[c]ontribution claims arising as a result of ResCap's liability to third parties"[1588]—and claims that third-party creditors could potentially assert directly against AFI, and therefore did not ascribe appropriate value to the requested Third-Party Release.[1589] Essentially, Mack and Ilany were prepared to negotiate primarily with respect to a potential release of the Debtors' claims against AFI, but were negotiating with highly-experienced AFI and Cerberus principals who were prepared to negotiate a release of both the Debtors' potential claims against AFI and Third-Party Claims.[1590]

---

[1584] *Id*. at 45:5–11. Puntus further suggested that AFI's provision of the DIP was influenced by the possible settlement of estate claims against it, noting that AFI used its willingness to continue originating loans for ResCap in bankruptcy "in the context of negotiating the settlement of the estate's claims against them." *Id*. at 45:12–18.

[1585] *See* Dep. of T. Marano, Nov. 12, 2012, at 255:8–10.

[1586] *See* Int. of J. Mack, Jan. 15, 2013, at 207:7–208:16; Dep. of T. Hamzehpour, Nov. 13, 2012, at 50:3–51:4 ("That Third-Party Releases would be required, in order to achieve a substantial contribution from AFI . . . was clear to everyone internally, in the context of the discussions that were beginning to take shape [in April 2012]."); Notes of P. West (Apr. 2, 2012), at EXAM00128216 [EXAM00128214] (AFI "wants 3rd party releases from creditors & litigants").

[1587] Int. of J. Mack, Jan. 15, 2013, at 206:3–208:3.

[1588] *See* Morrison & Foerster Report on the Independent Review Claims Analysis, dated Jan. 25, 2012, at RC00023725 [RC00023710].

[1589] *See* Int. of J. Mack, Jan. 15, 2013, at 206:3–209:16 (Mack assigned "no specific value" to a Third-Party Release); Int. of J. Ilany, Nov. 28, 2012, at 157:6–15 (Ilany did not remember that the AFI Settlement and Plan Sponsor Agreement included a proposed Third-Party Release for AFI and did not remember considering the value of Third-Party Claims for purposes of agreeing to a Third-Party Release). While Morrison & Foerster considered third-party claims, *see* Int. of G. Lee, Feb. 20, 2013, at 59:12–60:21, 222:14–223:1, Morrison & Foerster's January 25, 2012 report to the ResCap Board did not review claims relating to AFI's potential liability directly to third parties. *See* Morrison & Foerster Report on the Independent Review Claims Analysis, dated Jan. 25, 2012 [RC00023710].

[1590] *See* Section III.J.2.b (discussing investigation of legal claims by Kirkland & Ellis on behalf of AFI).

In addition, the ResCap principals approached the settlement as a business deal rather than a settlement reflecting the merits of legal claims. Mack testified that his settlement negotiations with Carpenter "really had nothing to do with the legal arguments" identified in the Morrison & Foerster claims analysis.[1591] As Mack testified:

> Mike Carpenter and I never discussed legal issues, legal matters . . . the legal basis for any of this. We would discuss the fact that we were able to—we were trying to settle lawsuits, that we were trying to settle I guess what you would broadly call legal claims. But we were not talking the specific legalities of the law. We rely on our advisors to do that.[1592]

Although Mack ostensibly recognized that the underpinning of any settlement between ResCap and AFI was a release of legal liabilities for AFI in exchange for consideration,[1593] Mack did not believe that he was "settling legal claims."[1594]

While Mack and Ilany negotiated directly with AFI principals, other ResCap Board members were kept apprised of the process and expressed views regarding the appropriate settlement amount. Marano testified that he was "fairly vocal" in expressing his view to Carpenter and other members of the ResCap Board that "it probably would take something close to $2 billion to settle this. . . . [N]o one was going to do a deal for 750 [million]."[1595] Marano later clarified that his $2 billion estimate was not "necessarily based on the merits of the claims,"[1596] but represented the amount he believed would be necessary "to get all of the investors or vulture funds in the deal to go away . . . to buy peace."[1597]

### b. AFI's Views Regarding Negotiations With ResCap

According to Tim Devine, AFI's Chief Counsel of Litigation, "[AFI] was looking to achieve an appropriately expedited, clean, clear, fair, comprehensive and quick resolution in connection with the ResCap filing. And that's what motivated [AFI]'s participation in the

---

[1591] Dep. of J. Mack, Nov. 14, 2012, at 92:6–93:4. Indeed, Mack testified that he left the Morrison & Foerster presentation in the board room when he left the meeting on January 25, 2012, and that he did not need to review the materials at all during the course of the negotiations. *Id*.

[1592] *Id*. at 163:22–164:18.

[1593] *Id*. at 84:19–85:5.

[1594] *Id*. at 131:13–24.

[1595] Dep. of T. Marano, Nov. 12, 2012, at 92:11–94:23. Mack characterized Marano's view of the appropriate settlement amount as suggesting that $2 billion was "desirable." Mack did not disagree with Marano's assessment, but stated that he believed the final settlement amount was nevertheless "fair." *See* Dep. of J. Mack, Nov. 14, 2012, at 115:21–116:22.

[1596] Dep. of T. Marano, Nov. 12, 2012, at 232:11–18.

[1597] *Id*. at 193:12–19.

[AFI]/ResCap settlement agreement and to—motivated the participation and the discussions with Kathy Patrick."[1598]

As noted above, ResCap viewed any settlement contribution to be paid by AFI as separate and distinct from AFI support for ResCap during a bankruptcy proceeding.[1599] AFI, on the other hand, actively sought to characterize any support it provided to ResCap, directly or indirectly, in or out of bankruptcy, as settlement value.[1600] As Carpenter described in a December 26, 2011 e-mail, AFI viewed support for ResCap "in terms of business transfers, ongoing relationships [and] DIP financing" as evidence of "substantial value AFI/[Ally Bank] can provide to the estate to justify a 9019 settlement."[1601] Carpenter further observed that "the difference between the 'bare minimum' support necessary from AFI to protect its own interests and the support required for ResCap to implement its desired post [bankruptcy] strategy to maximize value is quite substantial . . . ."[1602]

Indeed, AFI was frustrated that ResCap did not give them the settlement credit AFI believes to be appropriate. As Carpenter noted in December 2011, "topping up" ResCap's TNW was "real value" and should have been "part of a broader negotiation with Rescap (eg 9019). . . . I think we are nuts to forgive 200mm of debt and get nothing for it!"[1603] At an interview in March 2013, Carpenter stated that he could "confidently demonstrate a billion dollars of value created" by AFI—separate and apart from the proposed $750 million cash contribution—and was frustrated that AFI was told that that value "doesn't count."[1604] Tessler expressed similar frustration, noting that "ResCap and its creditors have profound amnesia with regard to anything that ever happened historically that is in any way not supportive of their desire to make outrageous claims."[1605]

### c. Direct Negotiations Between ResCap And AFI

On January 25, 2012, the same day Morrison & Foerster first presented the results of its investigation to the ResCap Board, the ResCap Board members met with Carpenter for approximately half an hour with no advisors present.[1606] Marano testified that, at that meeting,

---

[1598] Dep. of T. Devine, Nov. 19, 2012, at 148:23–149:6.

[1599] Materials for Discussion, dated Dec. 12, 2011, at 6 [RC00000114].

[1600] *See, e.g.*, E-mails between M. Carpenter and J. Mackey (Mar. 28, 2012) [ALLY_0381024] ("Question is how do we get credit for [capital injection of $150 million]" relating to the "unavoidable" transfer of certain reserves from ResCap's books to AFI's books).

[1601] E-mail from M. Carpenter (Dec. 26, 2011), at ALLY_0142357 [ALLY_0142356].

[1602] *Id*. at ALLY_0142356–57. In response, Tessler remarked that AFI's financial obligations with respect to various government settlements should also be "part of the consideration of the 9019 action." E-mail from L. Tessler (Dec. 26, 2011) [ALLY_0142356].

[1603] E-mail from M. Carpenter to J. Brown (Dec. 31, 2011) [ALLY_0142373].

[1604] Int. of M. Carpenter, Mar. 4, 2013, at 272:14–274:3.

[1605] Int. of L. Tessler, Feb. 28, 2013, at 192:16–193:8.

[1606] Minutes of a Special Meeting of the Board of Residential Capital, LLC, Jan. 25, 2012, at RC40019194 [RC40019179].

"there was a desire expressed by Mr. Carpenter for [AFI] to try to come to a settlement with ResCap, if the number was fair and reasonable. And there were platitudes . . . from the ResCap board members saying they, too, would like to get to an agreement."[1607] Mack stated that his "sense" of the ResCap Board's meeting with Carpenter was that "it was a meeting to try to be sure we were on the same wave length, the same page, and that we can work together."[1608] When asked to explain the meaning of "to be on the same page with [AFI]," Mack explained, "we have a company that's in financial distress and they're the parent. We need their help."[1609]

Several weeks later, on February 14, 2012, Morrison & Foerster met with Kirkland & Ellis to present the results of the ResCap investigation of potential claims against AFI.[1610] As part of that presentation, Morrison & Foerster asserted that AFI's control over ResCap had resulted in a $7.6 billion diminution of ResCap's estimated enterprise value and that the market value of ResCap's equity had declined by $12 billion.[1611]

Both AFI and ResCap representatives have characterized the Morrison & Foerster damages analysis as ResCap's "initial ask" in the settlement negotiations. Jeff Brown explained to the FRB that "originally ResCap presented a $8 or $9B claim against [AFI]."[1612] Mack stated that he never personally presented such a claim,[1613] which is consistent with the fact that the damages claim was presented by ResCap's attorneys directly to AFI's attorneys. Marano testified that he could not precisely recall the amount of ResCap's "initial ask" but that it "was a really big number. It was much bigger than $2 billion. . . . [AFI]'s reaction was NFW, we'd rather litigate."[1614] Carpenter described the Morrison & Foerster damages analysis as "laughable and fatally flawed."[1615]

---

[1607] Dep. of T. Marano, Nov. 12, 2012, at 74:2–75:4.

[1608] *See* Int. of J. Mack, Jan. 15, 2013, at 93:9–16.

[1609] *Id*. at 93:18–25.

[1610] *Id*. at 86:1–14, 156:1–5.

[1611] Morrison & Foerster ResCap Claims Presentation, dated Feb. 14, 2012, at 48–51 [RC00028255].

[1612] E-mail from J. Brown (May 8, 2012) [ALLY_0141967] (Brown noted that the original $8–$9 billion claim was "totally gone" as of May 8, 2012).

[1613] Dep. of J. Mack, Nov. 14, 2012, at 130:10–131:24. Mack speculated that an $8 billion or $9 billion claim may have been presented "in an early meeting between [Morrison & Foerster] and [Kirkland & Ellis]," but noted that he never presented such an "ask" because "[t]hese are legal matters. I'm not going to discuss legal matters with principals." *Id.*

[1614] Dep. of T. Marano, Nov. 12, 2012, at 233:4–16.

[1615] Int. of M. Carpenter, Mar. 4, 2013, at 232:14–233:14.

It appears that the principals did not begin negotiating in earnest until March 2012.[1616] In the intervening period, attorneys from Morrison & Foerster and Kirkland & Ellis exchanged their differing views on the legal merits of ResCap's claims against AFI.[1617]

The principal negotiators of the economic terms of the AFI Settlement and Plan Sponsor Agreement were Mack and Ilany—the Special Review Committee—on behalf of ResCap, and Carpenter and Tessler on behalf of AFI.[1618] When asked about the process followed by the Special Review Committee, Ilany said:

> I do not remember the process. We went through a process which advisors told us we need to go as far as the process. We asked our advisors to tell us, to go over all the transactions and, for lack of a better word, I'll say translate it into English to us from legalese which they did and they produced a very, very large stack presentation which we went through excruciating detail, where they gave us their conclusions which we decided to accept. I don't remember if we voted on it or not. Then after the conclusions we were asked to go and talk with [AFI].[1619]

Mack explained that he primarily negotiated with Carpenter and Ilany negotiated with Tessler.[1620] Ilany asserted that, between him and Mack, he played the lead negotiating role on behalf of the Special Review Committee.[1621]

---

[1616] *See* Dep. of J. Mack, Nov. 14, 2012, at 94:14–22.

[1617] *See, e.g.*, Draft Minutes of a Special Meeting of the Board of Residential Capital, LLC, Feb. 22, 2012, at 2 [EXAM11088864]; Draft Minutes of a Special Meeting of the Board of Residential Capital, LLC, Feb. 24, 2012, at 4 [EXAM11088866].

[1618] Dep. of J. Mack, Nov. 14, 2012, at 81:18–82:19; *see also* Dep. of T. Marano, Nov. 12, 2012, at 76:14–77:2, 91:2–10. Marano testified that, even though he was not directly involved in settlement negotiations, whenever he spoke with Carpenter, he "always asked for more, including as it relates to [the settlement of claims]." Dep. of T. Marano, Nov. 12, 2012, at 92:11–21.

[1619] Int. of J. Ilany, Nov. 28, 2012, at 126:9–127:2.

[1620] Dep. of J. Mack, Nov. 14, 2012, at 101:25–102:13.

[1621] Int. of J. Ilany, Nov. 28, 2012, at 145:15–18, 153:20–154:21 ("[T]he majority of the negotiations were done between Lenard Tessler and me on the telephone . . . . Sometimes twice a day.").

The exhibit below presents a comprehensive list of the dates of Mack's and Ilany's negotiations with Carpenter and Tessler that occurred between March and May 2012.[1622]

**EXHIBIT III.J.3.c—1**
**Independent Director Negotiation Meetings with Carpenter and/or Tessler**

| Meeting/Call Date | Ilany | Mack |
| --- | --- | --- |
| March 8, 2012 | Did not attend | Attended |
| March 23, 2012 (in person) | Attended | Attended |
| March 28, 2012 (2 calls with Lenard) | Attended | Did not attend |
| March 29, 2012 (2 calls with Carpenter) | Attended | Did not attend |
| April 4, 2012 (in person) | Attended | Attended |
| April 6, 2012 (2 calls with Carpenter) | Did not attend | Attended |
| April 9, 2012 (call with Lenard) | Attended | Did not attend |
| April 12, 2012 (call with Lenard) | Attended | Did not attend |
| April 18, 2012 (call with Lenard) | Attended | Did not attend |
| April 19, 2012 (2 calls with Lenard) | Attended | Did not attend |
| April 20, 2012 (4 calls with Lenard) | Attended | Did not attend |
| April 20, 2012 (call with Carpenter) | Attended | Did not attend |
| April 24, 2012 (2 calls with Lenard) | Attended | Did not attend |
| April 25, 2012 (call with Lenard) | Attended | Did not attend |
| April 26, 2012 (call with Lenard) | Attended | Did not attend |
| April 26, 2012 (Settlement meeting with K&E) | Attended | Did not attend |
| April 30, 2012 (call with Lenard/Carpenter) | Attended | Did not attend |
| May 4, 2012 (call with Carpenter) | Did not attend | Attended |
| May 5, 2012 (call with Carpenter) | Did not attend | Attended |
| Date Unknown (call with Carpenter) | Did not attend | Attended |
| Date Unknown (call with Carpenter) | Did not attend | Attended |
| | | |
| Total Meetings Attended | 15 | 8 |
| Total Compensation ($1,500 per meeting) | $22,500 | $12,000 |

*Source: Independent Director Compensation, dated May 10, 2012, EXAM20124551 [EXAM20124550].*

According to the Debtors' records, Ilany engaged in at least fifteen negotiation sessions with either Carpenter or Tessler, while Mack engaged in at least eight sessions (including two calls with Carpenter on unknown dates). Ilany's final recorded involvement in direct settlement negotiations apparently occurred on April 30, 2012.

---

[1622] On May 4, 2012, Marano, Abreu, and Whitlinger, comprising the management members of the ResCap Board, approved an amended compensation plan for the ResCap independent directors. *See* Residential Capital, LLC Action by Written Consent of the Management Members of the Board of Directors, dated May 4, 2012, at RC40019214–16 [RC40019179]. The amended compensation plan added additional background information noting that Mack and Ilany had "taken on additional responsibilities and [we]re devoting a substantial amount of additional time related to certain strategic negotiations with executives of [AFI] and [Cerberus] in respect of the potential sale or restructuring of [ResCap]." *Id.* at RC40019217. Accordingly, the amended compensation plan provided that Mack and Ilany would each receive a fee of $1,500 per session of "strategic restructuring negotiations" attended, retroactive to the date of their engagement. *Id.* at RC40019218. Exhibit III.J.3.c—1 reflects the Debtors' records for purposes of compensating Mack and Ilany.

On March 19, 2012, Carpenter e-mailed Marano to request a meeting with the Special Review Committee.[1623]

The meeting took place on or about March 23, 2012 with Mack, Ilany, Carpenter, and Tessler present.[1624] Carpenter outlined various restructuring alternatives for ResCap—all of which involved a ResCap bankruptcy filing[1625]—and proposed a $750 million settlement comprised of (1) $350 million in cash; (2) contribution of all of the equity of Ally Securities, valued by AFI at $250 million; and (3) the value of the Ally Bank subservicing agreement, valued by AFI at $150 million.[1626] According to Mack, the non-cash aspects of that settlement offer were "ancillary items which in our view ultimately didn't really have value."[1627] As Gary Lee of Morrison & Foerster explained, "the perception was that in and of itself this represented an offer of $350 million full stop."[1628]

The next meeting of the four principal settlement negotiators occurred on or about April 4, 2012.[1629] In preparation for the April 4 meeting, Ilany, Mack, and ResCap's advisors developed the view that $1 billion dollars would be "good compensation" for claims against AFI.[1630] However, ResCap's "counterproposal" at the April 4 meeting did not include a specific number in terms of the AFI cash contribution, but instead "pointed out why [ResCap] . . . didn't assign value to certain parts of [AFI's] proposal" and stressed the need for "a reasonable headline number in terms of achieving credibility" for "the more elegant process, involving a plan."[1631] As Ilany explained, "everybody had the same [goal]—it was to keep the enterprise operating. . . . [S]o if you are to maximize the value for the company and for the creditors, which I was working for, I had to make sure that I kept the company and the

---

[1623] E-mail from M. Carpenter to T. Marano (Mar. 19, 2012) [EXAM00100919].

[1624] *See* E-mails between T. Marano and C. Ortiz-Zorn (Mar. 22, 2012) [ALLY_0142489]; Int. of J. Mack, Jan. 15, 2013, at 86:6–14.

[1625] Dep. of J. Mack, Nov. 14, 2012, 95:24–96:15.

[1626] Evercore, Kirkland & Ellis, and Mayer Brown Project Rodeo Discussion Materials, dated Apr. 4, 2012, at CCM00444815 [CCM00444794]. As described by Mack, the alternatives presented by Carpenter ranged from a "free fall 363 bankruptcy" to a "plan settlement" under which "there would be a greater contribution by [AFI]." Dep. of J. Mack, Nov. 14, 2012, at 96:5–15.

[1627] Dep. of J. Mack, Nov. 14, 2012, at 97:4–8.

[1628] Int. of G. Lee, Feb. 20, 2013, at 264:6–266:9. Lee further explained that "it was ResCap's view that the value of Ally Securities was functionally zero and maybe even a negative number." *Id*.

[1629] E-mail from C. Ortiz-Zorn (Apr. 3, 2012) [ALLY_0142547]. Wes Edens of Fortress also attended the meeting. *See* Int. of M. Carpenter, Mar. 4, 2013, at 245:8–246:20.

[1630] Int. of J. Ilany, Nov. 28, 2012, at 140:15–143:2 ("[Mack] and I, were advised that if we were to go to court, we—they [Morrison & Foerster, Centerview, and FTI] felt, okay, I can't give you percentages, I don't remember, that we could get somewhere around a billion dollars in value out of the other side.").

[1631] Dep. of J. Mack, Nov. 14, 2012, at 98:23–100:21; *see also* Notes of P. West (Mar. 30, 2012), at EXAM00128214 [EXAM00128214] ("Come back with counter proposal $$—give after [April 4 meeting]").

value of the company intact, if I could."[1632] Mack stated that, at the conclusion of the April 4 meeting, the principals encouraged their advisors to immediately begin working on "an agreement that mirrored" the proposed "elegant" resolution.[1633]

Following the April 4 meeting, Ilany and Mack, together with ResCap's advisors, determined that ResCap's counteroffer should be approximately $1.9 billion. As Ilany explained, "in order to get to a billion dollars you have to start somewhere and starting right under double sounded kind of right."[1634] In an April 5, 2012 presentation, ResCap proposed a settlement contribution from AFI of at least $1.9 billion, which included the following components: (1) $1 billion cash payment; (2) $500 million of value provided by AFI via the transition services agreement, sub-servicing, and parent-financing; (3) $400 million of value related to the assumption of regulatory costs; and (4) purchase by AFI through credit bid of the assets secured by the A&R Secured Revolver Loan Agreement.[1635] According to Lee, the components of the $1.9 billion counteroffer were not particularly meaningful, but rather were "simply a way to get to [$]1.9 [billion]."[1636]

By April 5, 2012, AFI had revised its $750 million settlement offer by increasing the proposed cash contribution to $600 million.[1637] As of April 11, 2012, according to West's handwritten notes, ResCap was considering a settlement proposal of $1.55 billion, although it is not clear what portion of that proposal was comprised of a cash contribution from AFI. West observed, "[we] need to get somewhere in [the] middle."[1638]

_____

[1632] Int. of J. Ilany, Nov. 28, 2012, at 141:12–25.

[1633] Dep. of J. Mack, Nov. 14, 2012, at 100:3–7, 100:22–101:9.

[1634] Int. of J. Ilany, Nov. 28, 2012, at 140:15–143:2 ("[Mack] and I, were advised that if we were to go to court . . . we could get somewhere around a billion dollars in value out of the other side."). In contrast to Ilany's statements, Mack testified that he and Ilany did not have an "ask" but rather argued for "a headline number" that they believed "needed to be" about $1 billion "to be credible." Dep. of J. Mack, Nov. 14, 2012, at 83:3–23. But Gary Lee of Morrison & Foerster characterized the $1.9 billion as an "all-in ask," Int. of G. Lee, Feb. 20, 2013, at 272:19–273:14, and Carpenter understood ResCap to have made a "counterproposal." Int. of M. Carpenter, Mar. 4, 2013, at 250:19–251:4, 256:5–22.

[1635] Draft FTI Presentation to the Board of Residential Capital, LLC, dated Apr. 5, 2012, at 5 [EXAM00176483]. As of April 5, 2012, waterfall analyses prepared by FTI of the recoveries implied by the proposal did not provide an assumption related to allocation of the settlement between the Debtor entities. *Id.* at 3–4. West's notes dated April 5, 2012 appear to show that ResCap was considering a settlement proposal of $1.55 billion, comprised of $1.4 billion in cash and $150 million in subservicing. *See* Notes of P. West (Apr. 5, 2012), at EXAM00128218 [EXAM00128214]. It is not clear if or when that offer was conveyed to AFI.

[1636] Int. of G. Lee, Feb. 20, 2013, at 276:10–277:17 (noting that the goal was to get Ally Bank to be willing to allow ResCap to continue originating mortgages, creating value of what was perceived to be $100 million, to get DIP financing, and to get cash, and "there was a view that with those pieces of support together we'd be able to continue to underwrite and originate in bankruptcy and sell a platform as opposed to financial assets. And that that was going to be a big part of what would enhance the value of the return to creditors.").

[1637] *See* Notes of P. West (Apr. 5, 2012), at EXAM00128218 [EXAM00128214]; E-mail from M. Carpenter to L. Tessler (Apr. 19, 2012) [CCM00652320] ("Our last offer was 750 with 600 cash.").

[1638] Notes of P. West (Apr. 11, 2012), at EXAM00128221 [EXAM00128214].

On April 12, 2012, Carpenter sent an e-mail to Caribel Ortiz-Zorn, his administrative assistant, with the subject line "To Lenard, Rick, Ray, David, Yelena, JB."[1639] In the e-mail, Carpenter wrote that he had spoken with Mack and "took the opportunity to explain to him," among other things, "that our proposal was not an opening low ball but was responsive to the facts as we know them and that the waterfall analysis comparison did not indicate that we were off base," whereas "the [Morrison & Foerster] ask did not seem to have any basis in logic."[1640] Carpenter noted that Mack "got it, restated our mutuality of interest and his optimism that we could reach a deal."[1641]

On April 19, 2012, AFI proposed that it could contribute the Ally Bank MSR portfolio to ResCap—thereby allowing ResCap to sell the MSR portfolio to Fortress as part of the Chapter 11 Cases—as an alternative to cash as the principal form of settlement consideration.[1642] According to Carpenter, MSR and cash were "fungible."[1643] Carpenter initially recommended a settlement proposal that included the contribution of $800 million of Ally Bank's MSR portfolio and support for continued retail channel origination, which he valued at $200 million.[1644] Carpenter noted that such an offer would have been a "big jump, a big headline number, above 750 in 'cash equivalent' and leaves room for another round."[1645]

Ultimately, AFI proposed to contribute Ally Bank's entire MSR portfolio to ResCap. ResCap could sell the portfolio to a purchaser in the Chapter 11 Cases, but ResCap's share of

---

[1639] E-mail from M. Carpenter to C. Ortiz-Zorn (Apr. 12, 2012) [ALLY_0142576]. Carpenter may have intended for Ortiz-Zorn to forward the e-mail to Tessler, Rick Cieri and Ray Schrock of Kirkland & Ellis, David Ying and Jelena Strelcova of Evercore, and Jeff Brown.

[1640] *Id.* According to Lee, the "ask" that purportedly had no "basis in logic" was not the April 5, 2012 counteroffer, but rather Morrison & Foerster's February 14, 2012 damages assertion that AFI's control over ResCap had resulted in a $7.6 billion diminution of ResCap's estimated enterprise value. *See* Int. of G. Lee, Feb. 20, 2013, at 272:11–19.

[1641] E-mail from M. Carpenter to C. Ortiz-Zorn (Apr. 12, 2012) [ALLY_0142576]. In the same E-mail, Carpenter also noted that he explained to Mack "how out of line I thought Tom's behavior was yesterday." *Id.* At his deposition, Marano stated that there is "no doubt" Carpenter was referring to him in that e-mail, and explained that "Carpenter frequently thought my behavior was out of line as I advocated for ResCap." Dep. of T. Marano, Nov. 12, 2012, at 88:14–17.

[1642] Summary Discussion of Ally Financial Inc. Support For a ResCap Chapter 11 Plan of Reorganization, dated Apr. 19, 2012, at 1–2 [RCES00002362] (attached to E-mail from A. Grossi to L. Nashelsky, J. Tanenbaum, and G. Lee (Apr. 19, 2012) [RCES00002361]).

[1643] E-mail from M. Carpenter to L. Tessler (Apr. 19, 2012) [CCM00652320]; *see also* Dep. of T. Marano, Nov. 12, 2012, at 132:5–134:12 ("I thought it was an interesting idea because it added more value to the estate not only from the cash value but it maintained a servicing asset that could have been sold away from the estate."); Int. of M. Carpenter, Mar. 4, 2013, at 251:12–20, 257:5–9 ("The idea of using the MSR from Ally Bank was part of the conversation, which actually was very appealing to ResCap because it took the whole issue of the subservicing agreement stuff off the table, and gave them an asset that had, you know, a significant value."). Divestiture of Ally Bank's MSR portfolio was also beneficial to AFI for several reasons, and Tessler did not think AFI would retain it "under any circumstance." E-mail from L. Tessler to C. Pinkston (Mar. 20, 2012) [CCM00565103].

[1644] E-mail from M. Carpenter to L. Tessler (Apr. 19, 2012) [CCM00652320].

[1645] *Id.*

the sale proceeds would be capped.[1646] Kirkland & Ellis sent Morrison & Foerster a "settlement discussion document" that set forth the terms of an AFI settlement contribution in exchange for a Debtor Release and a Third-Party Release as follows: (1) AFI would contribute Ally Bank's MSR portfolio to ResCap, with sale proceeds received by ResCap on account of the Ally Bank MSR to be capped at $750 million; (2) AFI would purchase ResCap's HFS Portfolio at Fortress's proposed bid price; and (3) Ally Bank would support the continuation of origination of MSR through the ResCap chapter 11 case.[1647] The terms of AFI's settlement proposal were conveyed to the ResCap Board at a special meeting on April 20, 2012.[1648]

The April 19, 2012 settlement proposal included essentially the same three components of AFI support that were memorialized in the AFI Settlement and Plan Sponsor Agreement and presented to the Bankruptcy Court on the Petition Date (assuming cash and MSR to be fungible). However, ResCap and AFI had not finished negotiating at that point. As described below, although AFI's offers to bid on the HFS Portfolio and to support retail origination remained constant, the cash/MSR portion of the settlement contribution was an open item. Indeed, on April 23, 2012, pursuant to a conversation between Ilany and Carpenter,[1649] Morrison & Foerster sent a revised settlement proposal to AFI's Project Rodeo team that removed the $750 million cap on AFI's contribution and replaced it with brackets signifying the amount of AFI's contribution remained subject to further negotiation.[1650]

Ilany explained that, in late April, he and Tessler reached a "handshake" agreement on an AFI settlement contribution of $1.1 billion, comprised of cash and "things that I thought are extremely important for the business."[1651] However, according to Ilany, Tessler informed him shortly thereafter that "the trade is off" because "Carpenter will not let me do—I cannot do that."[1652] Ilany stated that he "went ballistic" and called Carpenter:

> I'm not paraphrasing—[Carpenter] basically said that he has an FDIC to deal with, that he knows that he's going to have to maybe pay some more money a little bit later, that at a certain

---

[1646] Summary Discussion of Ally Financial Inc. Support For a ResCap Chapter 11 Plan of Reorganization, dated Apr. 19, 2012, at 1 [RCES00002362] (attached to E-mail from A. Grossi to L. Nashelsky, J. Tanenbaum, and G. Lee (Apr. 19, 2012) [RCES00002361]).

[1647] *Id.* AFI valued the settlement contributions at $750 million for the Ally Bank MSR, $200 million for the purchase of the HFS Portfolio, and $200 million for the support of originations. *See* Evercore, Kirkland & Ellis, and Mayer Brown Project Rodeo Discussion Materials, dated Apr. 23, 2012, at 3 [CCM00335615].

[1648] Draft Minutes of a Special Meeting of the Board of Residential Capital, LLC, Apr. 20, 2012, at 1 [EXAM11088893].

[1649] *See* E-mail from T. Goren (Apr. 23, 2012) [CCM00534282].

[1650] Blackline Summary Discussion of Ally Financial Inc. Support For a ResCap Chapter 11 Plan of Reorganization, dated Apr. 23, 2012, at 1 [CCM00534287] (comparing AFI's April 19, 2012 proposal to ResCap's April 23, 2012 proposal) (attached to E-mail from T. Goren (Apr. 23, 2012) [CCM00534282]).

[1651] Int. of J. Ilany, Nov. 28, 2012, at 145:15–148:11.

[1652] *Id.*

> point whatever he pays—we didn't talk about—but we were at a
> billion-one, that he was pealing me off—he said, the FDIC is
> going to step in. . . . So, he said, "I cannot do that." And we
> ended up at a billion-50.[1653]

Mack, like Ilany, also suggested that his intervention was needed in late April 2012 to keep the settlement on track for ResCap. According to Mack, ResCap and AFI purportedly reached agreement in principle on the $1.05 billion "headline number" during "the last weekend of April 2012."[1654] Mack testified that the parties negotiated over the weekend of April 28 and 29, 2012 "to bridge a difference of economics of about $150 million."[1655] At that time, Mack testified, "the bid and the ask" on the settlement was between $750 million and $1.1 billion, but the parties "were still working on some of the fine points."[1656] According to Mack, to bridge the gap, certain advisors proposed that AFI, ResCap, and Fortress each contribute approximately $50 million in value, but "not cash necessarily."[1657] Mack testified that the advisors' proposal was "not consistent with the understanding" he had reached with Carpenter and, after Carpenter contacted Mack, Mack contacted "the lawyers" and Marano and "put people back on track."[1658]

On April 30, 2012, after ResCap and AFI had purportedly reached an agreement in principle, the ResCap Board was presented with a draft settlement agreement which contemplated that "[AFI] will make a Cash contribution to the Debtors in the amount of $850 million."[1659] A blackline comparison that was also presented to the ResCap Board reflected that the amount of the AFI cash contribution had changed from "[$750] million" on April 29, 2012 to "$850 million" on April 30, 2012.[1660]

---

[1653] *Id*. When asked to explain the statement that Carpenter reportedly said that AFI would "maybe pay some more money a little bit later," Ilany stated that Carpenter meant that he "might have other liabilities." *Id.* at 147:5–148:11.

[1654] Dep. of J. Mack, Nov. 14, 2012, at 102:14–105:5.

[1655] *Id*. at 102:20–103:15; *see also* E-mail from T. Marano to J. Ilany (Apr. 29, 2012) [EXAM11114982] ("[W]e all doing docs at mofo now.").

[1656] Dep. of J. Mack, Nov. 14, 2012, at 104:6–16.

[1657] *Id*. at 103:8–24.

[1658] *Id*.

[1659] Draft Settlement Agreement, dated Apr. 30, 2012, at RC40020541 [RC40020521]. The draft settlement agreement also contemplated that AFI would serve as the stalking horse bidder for the HFS Portfolio and would provide consumer lending origination support to the Debtors. *Id*.

[1660] Blackline Draft Settlement Agreement, dated Apr. 30, 2012, at RC40020556 [RC40020521] (comparing April 30, 2012 draft to April 29, 2012 draft).

Ilany, who asserted he was the lead negotiator for ResCap,[1661] was "away" beginning on April 30, 2012 and did not have any recorded involvement in settlement negotiations after that date.[1662] Mack apparently took over in Ilany's absence.[1663]

Mack testified that AFI had never agreed to a cash contribution of $850 million and explained that the $850 million number in the April 30, 2012 draft settlement agreement was merely an "effort" by ResCap "to get a greater contribution from [AFI]" that AFI "never agreed to."[1664] However, that statement is not consistent with the documents. Drafts of the settlement agreement exchanged between ResCap and AFI suggest that, by May 4, 2012, AFI had indeed agreed to a contribution of $850 million in cash or MSR.

On May 2, 2012, Kirkland & Ellis sent a "draft settlement agreement incorporating AFI's comments" to Morrison & Foerster and principals at AFI and Cerberus.[1665] In that draft, Kirkland & Ellis revised AFI's cash contribution from "$850 million" to "$850,000,000; provided that a purchaser acceptable to [AFI] purchases the [Ally Bank] MSR . . . ."[1666] In other words, AFI's May 2, 2012 draft tied AFI's cash contribution to a successful sale of the Ally Bank MSR portfolio.

On May 3, 2012, after a discussion with Ray Schrock of Kirkland & Ellis,[1667] Morrison & Foerster sent a draft settlement agreement to AFI's Project Rodeo team that provided that AFI would make a contribution of $850 million to the Debtors, whether in the form of cash or by contributing the Ally Bank MSR portfolio. Specifically, ResCap's May 3, 2012 draft agreement read as follows:

> [AFI] will make a Cash contribution to the Debtors in the amount of $850,000,000. Without limiting the forgoing, to the extent that the Purchaser agrees to purchase the Ally MSR for a

---

[1661] Int. of J. Ilany, Nov. 28, 2012, at 145:15–18, 153:20–154:21.

[1662] *See* E-mail from T. Marano (Apr. 30, 2012) [EXAM11114989] ("Ilany is away [so] I [am] fairly certain he will not be able to dial in."); E-mail from J. Ilany to T. Marano (Apr. 29, 2012) [EXAM11114982] ("Remember that I am leaving tommorow [sic] . . . ."); Independent Director Compensation, dated May 10, 2012, at EXAM20124551 [EXAM20124550].

[1663] *See* Independent Director Compensation, dated May 10, 2012, at EXAM20124551 [EXAM20124550]; Dep. of J. Mack, Nov. 14, 2012, at 125:4–16 ("The 850 [million] was a number that perhaps [Ilany] had, but I'll take the credit for it or blame for it.").

[1664] Dep. of J. Mack, Nov. 14, 2012, at 124:7–125:16; *see also* Int. of J. Mack, Jan. 15, 2013, at 185:19–186:14 (stating that AFI's proposed settlement contribution "never got above $750 [million] in conversations between [Carpenter] and myself. . . . [T]here was at one time an attempt to get it to be greater than that. And that appeared in a document, but that was never something that [Carpenter] had ever agreed to").

[1665] E-mail from N. Ornstein to L. Nashelsky and G. Lee (May 2, 2012) [CCM00449220].

[1666] Blackline Draft Settlement Agreement, dated May 2, 2012, at 6 [CCM00449236] (attached to E-mail from N. Ornstein to L. Nashelsky and G. Lee (May 2, 2012) [CCM00449220]).

[1667] *See* E-mail from T. Goren (May 3, 2012) [RCES00001556].

> purchase price of at least $1,150,000,000 and assume representation and warranty liability associated with the Ally MSR (the "MSR Sale Conditions"), [AFI] shall make such contribution by contributing the Ally MSR to the Debtors on or before the Effective Date; provided that [AFI] shall be entitled to receive direct payment of any Ally MSR sale proceeds received by the Debtors between $850,000,000 and $1,150,000,000 and [AFI] and the Debtors shall share all proceeds in excess of $1,150,000,000, [   ]% to the Debtors and [   ]% to [AFI]. [To be discussed].[1668]

On May 4, 2012, ResCap and AFI apparently reached agreement on a guaranteed $850 million contribution in the form of either cash or MSR sale proceeds. First, at approximately noon, Lee e-mailed Devine and wrote:

> There needs to be a back stop to the Ally Bank MSR proceeds. As drafted, we get nothing under the plan if you decide not to sell the Ally Bank MSR to Fortress or a higher bidder. If you choose not to sell the Ally Bank MSR for any reason, AFI must fund the settlement amount with cash ($850 million).[1669]

Then, in an e-mail to Carpenter at approximately 2:30 p.m., Marano identified "the withdrawal of Cash in event of no MSR sale as a re-trade" that was a "major road block[] to moving forward."[1670] Marano did not mention the amount of the proposed settlement in his e-mail and appears to have been focused on the form of the contribution.[1671] At approximately 11:40 p.m. that night, Kirkland & Ellis sent a "draft settlement agreement incorporating AFI's comments" that accepted the pertinent language from ResCap's May 3, 2012 draft, such that AFI's May 4, 2012 draft agreement read as follows:

> [AFI] will make a Cash contribution to the Debtors in the amount of $850,000,000. Without limiting the forgoing, to the extent that the Purchaser agrees to purchase the Ally MSR for a purchase price of at least $1,100,000,000 and assume representation and warranty liability associated with the Ally MSR (the "MSR Sale Conditions"), [AFI] shall make such contribution by contributing the Ally MSR to the Debtors on or before the Effective Date; provided that [AFI] shall be entitled

---

[1668] Draft Settlement Agreement, dated May 3, 2012, at 6–7 [RCES00001557] (attached to E-mail from T. Goren (May 3, 2012) [RCES00001556]).

[1669] E-mail from G. Lee to T. Devine (May 4, 2012) [ALLY_0334556]. Devine forwarded Lee's email to Solomon, who forwarded Lee's e-mail to Carpenter, Tessler, and Kirkland & Ellis. E-mail from W. Solomon (May 4, 2012) [ALLY_0334556].

[1670] E-mail from T. Marano to M. Carpenter (May 4, 2012) [EXAM00003199].

[1671] *Id.*

> to receive direct payment of any Ally MSR sale proceeds
> between \$850,000,000 and \$1,100,000,000 and [AFI] and the
> Debtors shall share all proceeds in excess of \$1,100,000,000,
> 50% to the Debtors and 50% to [AFI].[1672]

Again, there were no brackets around the \$850 million to suggest the amount remained subject to further negotiation and, moreover, Kirkland & Ellis deleted the phrase "[To be discussed]" from the "Cash Contribution" section of the agreement.[1673]

Notwithstanding the apparent agreement on the terms of an \$850 million contribution from AFI, Kirkland & Ellis sent a revised draft settlement agreement to Morrison & Foerster on May 5, 2012 at approximately 12:30 p.m., which changed AFI's contribution to either \$750 million in cash or \$850 million upon the successful sale of the Ally Bank MSR.[1674] Almost contemporaneously with the transmittal of AFI's revised draft settlement agreement, Larren Nashelsky of Morrison & Foerster e-mailed Schrock and requested, on behalf of Marano, "an email from [Kirkland & Ellis] (not the settlement agreement) with 3-4 bullets of the settlement terms around the cash/Ally MSR payment to ResCap and any straight cash backstop. He wants no misunderstanding."[1675] It is unclear why Marano, rather than either Ilany or Mack, was requesting information from AFI on the terms of the settlement. Marano explained that he was seeking "clarification" regarding "additional support that could come to ResCap" in connection with the valuation of the Ally Bank MSR portfolio, and he "wanted to see if it was in the agreement."[1676] In response, Schrock wrote:

> Here it is. Straight from the agmt—with plain english to assist.
> Hope helpful.
>
> Upon satisfaction of the conditions set forth in the settlement
> Agmt:
>
> [AFI] will make a Cash contribution to the Debtors in the
> amount of \$750,000,000;
>
> provided that if the Purchaser agrees to purchase the Ally MSR
> for a purchase price of at least \$1,100,000,000 and assume
> representation and warranty liability associated with the Ally

---

[1672] Draft Settlement Agreement, dated May 4, 2012, at 6 [RCES00001523] (attached to E-mail from M. Meltzer to L. Nashelsky and G. Lee (May 4, 2012) [RCES00001506]).

[1673] Blackline Draft Settlement Agreement, dated May 4, 2012, at 6–7 [RCES00001507] (comparing ResCap's May 3, 2012 draft to AFI's May 4, 2012 draft) (attached to E-mail from M. Meltzer to L. Nashelsky and G. Lee (May 4, 2012) [RCES00001506]).

[1674] Blackline Draft Settlement Agreement, dated May 4, 2012, at 6 [RCES00001459] (attached to E-mail from V. Cole to L. Nashelsky and G. Lee (May 5, 2012) [RCES00001443]).

[1675] E-mail from L. Nashelsky to R. Schrock (May 5, 2012) [ALLY_0021383].

[1676] Dep. of T. Marano, Nov. 12, 2012, at 132:5–133:2.

> MSR (the "MSR Sale Conditions"), [AFI] shall make a contribution of the Ally MSR to the Debtors immediately before the effective date of the plan of reorg with
>
> The debtors receiving the first $850,000,000 of Ally MSR sale proceeds,
>
> [AFI] receiving direct payment of any Ally MSR sale proceeds between $850,000,000 and $1,100,000,000
>
> [AFI] and the Debtors shall share all proceeds in excess of $1,100,000,000, 50% to the Debtors and 50% to Ally.[1677]

It appears that Marano was unaware that AFI had sent ResCap a draft settlement agreement the previous evening proposing a cash contribution of $850 million. Marano testified that his recollection as to the amount AFI was offering in the settlement negotiations at the time was as follows:

> [T]here had been talk of a 750 [million] settlement. Then there was an effort to try and get additional proceeds above the 750 [million]. Keep in mind Mr. Mack and Ilany did most of this negotiation or all this negotiation. At one point in order to get more money from [AFI], something above 750 [million], there apparently was a discussion of [AFI] selling their MSR and contributing some portion of the MSR to ResCap."[1678]

Marano stated that AFI estimated its MSR to have a value of approximately $1.1 billion and, if certain sale conditions were met, AFI would have agreed to contribute the first $850 million of sale proceeds to ResCap.[1679] Marano testified that he believes the concept "became too complex to incorporate into the document" and that ultimately, "Ilany and Mack decided . . . to take the 750 or Carpenter decided to take [the MSR Sale] off the table."[1680]

Carpenter, at his interview, initially explained that he remembered ResCap's representatives asking for an $850 million cash contribution from AFI, but that AFI "declined to pay it."[1681] Upon further review of the iterations of the draft settlement agreements, Carpenter

---

[1677] E-mail from R. Schrock to L. Nashelsky (May 5, 2012) [ALLY_0021383].

[1678] Dep. of T. Marano, Nov. 12, 2012, at 129:14–136:4.

[1679] *Id*. at 134:13–135:3 (explaining his understanding of the settlement proposal, based on review of Schrock's May 5, 2012 e-mail, at ALLY_0021383).

[1680] *Id*. at 135:15–136:4. Carpenter stated that, ultimately, "the MSR piece came off the table, not because we wanted to—I think we just couldn't figure out how to make it work." Int. of M. Carpenter, Mar. 4, 2013, at 257:20–265:23. Carpenter could not recall why the MSR idea did not work and did not explain AFI's apparent agreement to contribute $850 million in cash separate from the proposed MSR sale. *Id*.

[1681] Int. of M. Carpenter, Mar. 4, 2013, at 257:20–258:20.

stated, "I said to you a minute ago that I knew that we turned the 850 [million] down. Now that I'm looking at this, I withdraw that."[1682] Carpenter could not explain why the amount of AFI's proposed cash contribution changed from $850 million to $750 million,[1683] but noted:

> [T]his was a multi-faceted negotiation. It was heavily contested. . . . It was aggressively pursued by the other side. And, it was very tough. And the terms of it changed numerous times because each side was not only trying to get some economic value, but they were trying to get it in the form that was beneficial to them in one way or another.[1684]

---

[1682] *Id*. at 258:21–265:23.

[1683] *Id*. at 261:23–262:5 ("I don't remember what exactly—because obviously it morphed from then to here.").

[1684] *Id*. at 261:23–265:23. Lee stated that he did not know whether AFI had ever agreed to contribute $850 million in cash to the Debtors because he was not involved in "the turns of the documents." Int. of G. Lee, Feb. 20, 2013, at 333:7–335:11. Lee also stated he did not remember ever having discussions in which $850 million was discussed as the AFI cash contribution. *Id.* at 333:7–335:11.

On May 6, 2012, Marano e-mailed Carpenter and informed him, "[o]n settlement we s/b fine w your offer."[1685] It is not clear why Marano conveyed ResCap's acceptance of AFI's offer to Carpenter. Carpenter asserted that Marano "was nowhere to be seen" in the AFI-ResCap settlement negotiations.[1686]

Exhibit III.J.3.c—2 below reflects the evolution of negotiations related to AFI's cash contribution to the AFI Settlement.



EXHIBIT III.J.3.c—2
**Cash or MSR Component of the AFI Settlement**
**ResCap Versus AFI Positions**
*($ in Millions)*

*Source: EXAM00176483; EXAM00128214; RC40020521; RCES00001556; RCES00001573; ALLY_0334556; EXAM00002973; CCM00444794; CCM00449220; CCM00449236; RCES00001506; RCES00001523; ALLY_0021383; RCES00002361; RCES00002362.*

---

[1685] E-mail from T. Marano to M. Carpenter (May 6, 2012) [EXAM00002973]; *see also* E-mail from R. Schrock (May 6, 2012) [EXAM00069808] (noting that the "[s]ettlement agreement is agreed upon (today we all hope)").

[1686] Int. of M. Carpenter, Mar. 4, 2013, at 271:17–272:2.

Ultimately, ResCap and AFI presented the settlement as one by which AFI provided $1.05 billion to ResCap, in addition to other non-financial contributions, in exchange for a Debtor Release and a Third-Party Release.[1687] Mack stated at his deposition that the settlement was comprised of "750 of cash and then there were a couple of other components, some financing, some loan sales. So in total it was around a billion dollars."[1688] Mack asserted that the final settlement amount achieved "the headline number [he was] looking for."[1689] Ilany was also very satisfied with the final settlement amount:

> [W]hen my advisors and my—when my lawyer tells me "I can take you to court and you'll win a billion dollars" and I can settle 850 million without paying his fee and going to court, I call that a good workday. When I get to billion-50, it's even a better workday.[1690]

In reality, it is questionable whether the AFI Settlement and Plan Sponsor Agreement actually provided the $1 billion in settlement value that Mack and Ilany believed was achieved.[1691] Indeed, Ilany thought the settlement amount he and Mack had been able to negotiate with Carpenter and Tessler was *more* than his advisors had told him ResCap would be able to recover through litigation.[1692] His belief that AFI was willing to settle for more than it would have supposedly been liable if the claims were litigated apparently did not give Ilany any pause as to whether his advisors' advice was sound. More noteworthy, however, was that Ilany could not remember if the settlement with AFI was to release only ResCap's claims against AFI or to also include a release of claims held by third parties against AFI.[1693] Ilany also did not remember giving any consideration to the value of those Third-Party Claims in connection with the release given to AFI.[1694]

--------------------------------------------------

[1687] *See* Section III.J.3.f (discussing terms of AFI Settlement and Plan Sponsor Agreement as filed).

[1688] Dep. of J. Mack, Nov. 14, 2012, at 104:22–25.

[1689] *Id.* at 105:2–5.

[1690] *See* Int. of J. Ilany, Nov. 28, 2012, at 151:21–152:6. Ilany also noted "[W]e ended up with 850 million of what I believe right then and there of good value . . . . And I believe it was more than that because it was the 750 in cash and $100 million that we ascribed to the ability to keep and originate mortgages, which means . . . that allows us to keep our doors open, our originators open, paying our originators, keeping the machine going, and that is valued at much more than $100 million . . . ." *Id.* at 147:22–148:11.

[1691] For the Examiner's full analysis of proposed consideration for releases, see Section IX.

[1692] Int. of J. Ilany, Nov. 28, 2012, at 156:23–157:5.

[1693] *Id.* at 157:6–15 ("[Q:] Right, but [AFI was] getting a release from parties other than ResCap. Did you understand that? [A:] I don't remember.").

[1694] *Id.* at 157:16–20 ("[Q:] Do you recall any consideration of the value of those third party claims for purposes of that release in the settlement? [A:] I don't remember.").

#### d.  *Third Party Involvement In Negotiations Of AFI Settlement Contribution*

In April 2012, certain of ResCap's advisors—including Lee and Jamie Levitt of Morrison & Foerster and Mark Renzi of FTI—prepared a presentation of hypothetical waterfall scenarios to be given to the Steering Committee Group (represented by Kathy Patrick of Gibbs & Bruns LLP), and considered including scenarios in which AFI would contribute greater than $750 million in cash.[1695] On April 23, 2012, Devine, who maintained that he was not directly involved in the AFI-ResCap settlement negotiations,[1696] recommended to Hamzehpour that the hypothetical waterfall analysis include a maximum contribution from AFI of "$750 million rather than one billion" because "it would be better to leave some room for negotiation," presumably with Patrick.[1697] Hamzehpour responded by saying she was unable to comment on the proposed settlement with AFI, "as MoFo [wa]s much closer to that."[1698] ResCap ultimately decided not to incorporate such scenarios into their April 25, 2012 presentation to the Steering Committee Group.[1699]

Devine explained that he preferred using $750 million rather than $1 billion because he "didn't want a number that had no basis, to [his] knowledge, involved in presentations that people would rely on and later be surprised and disappointed in."[1700] When asked at his deposition why he recommended leaving "some room for negotiation," Devine stated that he "was mistaken" and he "overspoke with regard to the status of the communications at that point."[1701] He added that "[t]he 750 was not being negotiated with Kathy Patrick" and "Patrick wasn't demanding a certain amount of money from AFI into the estate."[1702] Furthermore, according to Devine:

> Patrick understood that the negotiation of a dollar number between AFI and ResCap was going on separately from the discussions over the RMBS settlement . . . [and] that she had no direct role or—or standing to bargain for a number there . . . since that agreement was between the estate and [AFI]. She did care about the number and she told me that she cared about the number for the obvious reason that she wanted to maximize that figure from [AFI].[1703]

---

[1695] *See* Dep. of M. Renzi, Nov. 7, 2012, 72:7–73:7.

[1696] *See, e.g.*, Dep. of T. Devine, Nov. 19, 2012, at 227:4–12.

[1697] E-mail from T. Devine to T. Hamzehpour (Apr. 23, 2012) [EXAM00345835]. Devine further indicated that to "use a billion we will need clearance from AFI and I haven't spoken to [Carpenter]." *Id.*

[1698] *See id.*; Dep. of T. Hamzehpour, Nov. 13, 2012, at 57:13–60:9.

[1699] *See* Centerview and FTI Discussion Materials Presentation, dated Apr. 25, 2012, at 7–11 [EXAM00176409]; Dep. of M. Renzi, Nov. 7, 2012, 72:7–73:7.

[1700] Int. of T. Devine, Mar. 19, 2013, at 70:5–72:25.

[1701] Dep. of T. Devine, Nov. 19, 2012, at 91:4–93:18.

[1702] *Id*. at 95:22–25, 142:18–20.

[1703] *Id*. at 142:21–143:22.