Although Devine suggested the use of $750 million in the presentation, ResCap was represented by sophisticated bankruptcy advisors throughout the relevant period and ultimately controlled which numbers were used. The $750 million figure included in the presentation to the Steering Committee Group accurately reflected AFI's highest offer as of April 25, 2012 in connection with the AFI-ResCap settlement negotiations.[1704]

After ResCap and AFI had settled on the amount and form of AFI's settlement contribution, Patrick made a demand that AFI increase its cash contribution by $150 million "above the 750 + 200 + 100 previously agreed."[1705] As Patrick explained, she "tried very hard to get partly at [Lee's] urging, another $100 or $150 million in cash out of AFI. And it almost broke everything."[1706] Lee stated that he believed it was his "obligation to take one final crack at AFI to get more money . . . . And I went back to Tim Devine, and I think I told [Patrick] to go back to Tim Devine and see if she could help me get more money."[1707] According to Patrick, Devine conveyed the demand to Carpenter and then reported to her that he "had almost been fired. . . . He looked white as a sheet."[1708] According to Devine, "[AFI] wasn't interested in negotiating with [Patrick] the dollar amount that was contained in the [AFI] and ResCap settlement."[1709]

On May 9, 2012, Devine e-mailed Lee and stated that "[t]here is no new [AFI] money. Hard stop at 750 + 200 + 100."[1710] Based on that e-mail, it appears AFI had decided that, regardless of the ultimate terms of the Plan Support Agreements, AFI would not agree to contribute any additional funds into the Estates before the bankruptcy filing.[1711]

### e. ResCap And AFI Board Approvals For AFI Settlement And Plan Sponsor Agreement And Bankruptcy Filing

On May 4, 2012, all of the independent directors of AFI, in addition to Carpenter, consented to the declaration of a bankruptcy by ResCap.[1712] On May 9, 2012, the AFI Board consented to waive its rights to approve certain actions by ResCap, including, among other

---

[1704] *See* Summary Discussion of Ally Financial Inc. Support For a ResCap Chapter 11 Plan of Reorganization, dated Apr. 19, 2012, at 1 [RCES00002362] (attached to E-mail from A. Grossi to L. Nashelsky, J. Tanenbaum, and G. Lee (Apr. 19, 2012) [RCES00002361]).

[1705] E-mail from T. Devine to M. Carpenter (May 8, 2012), at CCM00565465 [CCM00565463].

[1706] Int. of K. Patrick, Mar. 18, 2013, at 91:23–92:7.

[1707] Int. of G. Lee, Feb. 20, 2013, at 327:4–18.

[1708] Int. of K. Patrick, Mar. 18, 2013, at 175:1–177:4.

[1709] Int. of T. Devine, Mar. 19, 2013, at 130:2–133:1.

[1710] E-mail from T. Devine to G. Lee (May 9, 2012) [EXAM00180215]; Dep. of T. Devine, Nov. 19, 2012, at 229:24–230:6.

[1711] *See* Dep. of T. Devine, Nov. 19, 2012, at 233:20–234:4.

[1712] Ally Financial Inc. Consent to Action, dated May 4, 2012, at ALLY_PEO_0020551–59 [ALLY_PEO_0020479].

things, ResCap's ability to enter into any legal settlement greater than $25 million and ResCap's ability to divest a major line of business or exit major business activities.[1713]

On May 13, 2012, the ResCap Board formally authorized Ilany and Mack to execute the AFI Settlement and Plan Sponsor Agreement.[1714] Marano testified that the ResCap Board concluded that the settlement with AFI was "fair" based on the recommendation of the "independent directors who . . . told us this was the best deal they could get."[1715]

Marano noted that, although the ResCap Board "got the best deal we could get from [AFI] at the time we filed," the ResCap Board "knew there would be an opportunity to challenge that settlement and to have another bite at the apple."[1716] James Tanenbaum of Morrison & Foerster agreed with Marano. Tanenbaum asserted that the settlement was "within the range of a fair offer because it permitted so much more to be done that protected and enhanced the value of the estate."[1717] However, he went on to note that he did not think at that time that the AFI settlement contribution would be sufficient "to get the creditors to bite off and be satisfied."[1718] He further explained:

> [T]here was a high likelihood that [AFI's settlement contribution] would not remain as is and would have to be increased by [AFI] pretty substantially in order to get a settlement. So it was one of those very good opportunities for a company to be able to obtain financing and obtain the wherewithal to effect an orderly filing and maintain an enterprise preserving great value in bankruptcy while at the same time having an opportunity to recut the settlement number in the future which I thought was an exceptional opportunity. To bring it to very granular level, look at the asset sales. They were

---

[1713] Ally Financial Inc. Consent to Action, dated May 9, 2012, at ALLY_PEO_0020560–69 [ALLY_PEO_0020479].

[1714] Minutes of a Special Meeting of the Board of Residential Capital, LLC, May 13, 2012, at 9 [EXAM00184467].

[1715] Dep. of T. Marano, Nov. 12, 2012, at 194:8–18.

[1716] Id. at 191:9–195:12.

[1717] Int. of J. Tanenbaum, Mar. 29, 2013, at 227:7–230:18.

[1718] Id.

terrific. That wouldn't have been a possibility in the absence of reaching a settlement number with [AFI].[1719]

### f. AFI Settlement And Plan Sponsor Agreement As Filed

On the Petition Date, the Debtors and AFI entered into the AFI Settlement and Plan Sponsor Agreement, which set forth the terms of the global settlement between the Debtors and AFI and its direct and indirect subsidiaries and affiliates other than the Debtors. These terms were to be implemented in a chapter 11 plan consistent with the Plan Term Sheet.

### (1) AFI Settlement And Plan Sponsor Agreement Termination

The AFI Settlement and Plan Sponsor Agreement was terminated by the Debtors as of February 28, 2013.[1720] As a result, AFI is not obligated to make the $750 million cash contribution nor is AFI entitled to receive any releases from the Debtors or any Third-Party Claimants.[1721] However, AFI has not withdrawn its offer to provide a $750 million cash contribution to the Debtors' estates "if an acceptable settlement can be reached."[1722]

Prior to the expiration of the AFI Settlement and Plan Sponsor Agreement, AFI fulfilled the following obligations: (1) served as the stalking horse bidder for the Legacy

---

[1719] *Id*. According to Lee:

> We meaningfully negotiated the plan support agreement so that we, ResCap on behalf of our creditors, would get all of the benefits of origination and bankruptcy and support and the ability to sell a clean platform. And AFI left itself with the risk that at the end of that process, we would have sold a clean servicing platform and gotten all the money in, and there would be no settlement with it. I mean, that's been their risk throughout this process. . . . And the reality is, ResCap was focused on getting a clean sale because the view of the board and the management was that a clean sale and a robust auction would generate the most value in this case. And everybody who signed the plan support agreement had taken a risk that that value will come in and they'll be left with, you know, a litigated claim, in [Patrick's] case depending on what happens with the settlement. In AFI's case creditor reaction to a $750 million settlement.

Int. of G. Lee, Feb. 20, 2013, at 291:1–292:7.

[1720] Ally Financial Inc., Annual Report (Form 10-K) (Mar. 1, 2013), at 17.

[1721] *Id*. at 17–18. The Debtors were permitted to terminate their obligations under the AFI Settlement and Plan Sponsor Agreement, including the obligation to seek approval of a plan that provides a Third-Party Release, if they made a good faith determination that an alternative restructuring was "reasonably likely to be more favorable to the Debtors' estates, their creditors, and other parties to whom the Debtors owe fiduciary duties" than the restructuring contemplated by the Plan Term Sheet. *See* AFI Settlement and Plan Sponsor Agreement, § 3.2(c). Following such determination to pursue an alternative restructuring, AFI's only remaining obligations under the AFI Settlement and Plan Sponsor Agreement are to continue (a) performing under the Shared Services Agreement, and (b) providing ResCap with the use of cash collateral pursuant to the terms of the Cash Collateral Order. *See id*. § 7.6.

[1722] Ally Financial Inc., Quarterly Report (Form 10-Q) (May 1, 2013), at 11.

Sale with no break-up fees or other bid protections (until replaced by Berkshire Hathaway pursuant to Bankruptcy Court order on June 28, 2012) ;[1723] (2) provided consumer lending origination support through and until the closing of the Platform Sale;[1724] (3) provided up to $220 million of DIP financing and provided ResCap with the use of cash collateral;[1725] (4) performed under the Shared Services Agreement;[1726] and (5) negotiated and entered into a transition services agreement with the purchaser in connection with the Platform Sale.[1727]

The AFI Settlement and Plan Sponsor Agreement would have obligated AFI to make the following additional contributions to the Debtors in exchange for the Debtor Release and Third-Party Release: (1) provide a cash contribution to the Debtors in the amount of $750 million, to be used to fund the settlement of pending and future claims and to secure the Debtor Release and Third-Party Release;[1728] and (2) release the Debtors and all related persons from any and all causes of action arising from or related in any way to the Debtors.[1729]

---

[1723] AFI Settlement and Plan Sponsor Agreement, § 2.1(b). AFI submitted an original stalking horse bid of $1.6 billion if the assets were sold pursuant to a plan that provided a Third-Party Release but only $1.4 billion if the assets were sold in a section 363 sale. *See id*. Although the Debtors selected Berkshire Hathaway as the stalking horse, the Debtors assert that AFI complied with its obligations under the AFI Settlement and Plan Sponsor Agreement to act as the stalking horse for the Legacy Sale and that AFI's stalking horse bid was valuable to the estate because it set a floor on bidding. *See* Transcript of Hearing at 8:4–11, In re Residential Capital, LLC, No. 12-12020 (Bankr. S.D.N.Y. June 6, 2012).

[1724] AFI Settlement and Plan Sponsor Agreement, § 2.1(h).

[1725] *Id*. §§ 2.1(d), (f).

[1726] *Id*. § 2.1(c).

[1727] *Id*. § 2.1(e).

[1728] *Id*. § 2.1(a).

[1729] *Id*. at § 2.3. Specifically, AFI agreed that on the Effective Date of the Plan it and its direct and indirect subsidiaries and affiliates other than the Debtors would release the Debtors and each of their respective members, officers, directors, agents, financial advisors, attorneys, employees, partners, affiliates, and representatives and their respective properties from any and all Causes of Action, whether known or unknown, whether for tort, fraud, contract, violations of federal or state securities laws, or otherwise, arising from or related in any way to the Debtors, including those that AFI or any of its direct or indirect subsidiaries or affiliates (other than the Debtors) would have been legally entitled to assert against any of the parties above in their own right (whether individually or collectively). However, the following claims held by AFI against the Debtors were specifically carved out of this release: (1) claims under the A&R Secured Revolver Loan Agreement, (2) claims under the A&R Line of Credit Agreement, and (3) claims arising after the Petition Date in the ordinary course of business or otherwise agreed to by the Debtors and AFI. *Id*.

### (2) Debtor Release And Third-Party Release

The Debtors' settlement with AFI was built around releases that each party purported to grant to the other and, significantly, the proposed Third-Party Release. The scope of the Claims that would have been released was extremely broad. First, the Debtors agreed to provide the Debtor Release, as follows: [1730]

> On and as of the Effective Date, for the good and valuable consideration provided by each of the [AFI] Released Parties, including: (a) the discharge of debt and all other good and valuable consideration provided pursuant to the Plan; (b) pursuant to the terms of [the AFI Settlement and Plan Sponsor Agreement]; and (c) the services of the Debtors' present officers and directors in facilitating the expeditious implementation of the restructuring contemplated by the Plan, each of the Debtors shall provide a full discharge and release to the [AFI] Released Parties (and each such [AFI Released Party] so released shall be deemed released and discharged by the Debtors)) and their respective properties from any and all Causes of Action, whether known or unknown, whether for tort, fraud, contract, violations of federal or state securities laws, or otherwise, including those Causes of Action based on avoidance liability under federal or state laws, veil piercing or alter-ego theories of liability, a theory of debt recharacterization, or equitable subordination liability, arising from or related in any way to the Debtors, including those that any of the Debtors or Reorganized Debtors would have been legally entitled to assert against a[n AFI] Released Party in their own right (whether individually or collectively) or that any holder of a Claim or Interest or other entity, would have been legally entitled to assert on behalf of any of the Debtors or any of their Estates, including those in any way related to the [Chapter 11] Cases or the Plan to the fullest extent of the law; provided that [AFI] shall reaffirm its obligations under Section 2.2 [of the AFI Settlement and Plan Sponsor Agreement] in conjunction with the Plan; provided, further, that the Debtors' rights to any insurance shall not be adversely affected.[1731]

---

[1730] Capitalized terms used in the quoted text but not otherwise defined herein shall have the meanings ascribed to such terms in Article I of the AFI Settlement and Plan Sponsor Agreement.

[1731] *Id.* § 3.1(d)(i).

The proposed Third-Party Releases were just as broad, providing:

> On and as of the Effective Date, the holders of Claims and
> Interests shall be deemed to provide a full discharge and release
> to the [AFI] Released Parties and their respective property from
> any and all Causes of Action, whether known or unknown,
> whether for tort, fraud, contract, violations of federal or state
> securities laws, veil piercing or alter-ego theories of liability, or
> otherwise, arising from or related in any way to the Debtors,
> including those in any way related to residential mortgage
> backed securities issued and/or sold by Debtors and/or the
> Chapter 11 Cases or the Plan; provided that claims of the
> Debtors' directors and officers against [AFI] pursuant to [AFI]'s
> indemnification obligations and Section 2.2 [of the AFI
> Settlement and Plan Sponsor Agreement] (as well as any
> applicable insurance related thereto) shall not be released.[1732]

The importance of the releases, particularly to AFI and its affiliates, was underscored by the parties' identification in the AFI Settlement and Plan Sponsor Agreement of the numerous Causes of Action the Debtors and AFI believe to exist between the parties. The Debtors asserted that the Debtors' Estates have claims against AFI relating to the corporate relationship between the Debtors and AFI, including equitable subordination, debt recharacterization, fraudulent conveyance, avoidance liability under federal or state laws, and other claims under theories of veil piercing and alter ego liability.[1733] AFI maintained it has substantial claims against the Debtors (although these claims—outside of funded debt—were not identified in the AFI Settlement and Plan Sponsor Agreement or in any other document produced by AFI).[1734] Finally, the parties noted in the AFI Settlement and Plan Sponsor Agreement that AFI and certain of its affiliates, including GMAC Mortgage Group LLC, Ally Securities LLC, and Ally Bank, have been named as defendants in lawsuits brought by third parties in connection with, or arising from, the Debtors' business activities, including with respect to residential mortgage backed securities issued and/or sold by the Debtors.[1735] All of these claims were also purposed to be released, which made the Third-Party Release a valuable component of the AFI Settlement and Plan Sponsor Agreement for AFI.

---

[1732] *Id*. § 3.1(d)(ii). On August 23, 2012, the Debtors filed a motion which attached a draft Plan that modified the release language for the proposed Debtor Release and Third-Party Release. *See* Debtors' Motion for the Entry of an Order Extending Their Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof [Docket No. 1248] at Ex. 1. As of the date of the Examiner's Report, the Debtors have not filed a Plan that includes either the Debtor Release or Third-Party Releases.

[1733] AFI Settlement and Plan Sponsor Agreement, at 1.

[1734] *Id*.

[1735] *Id*. at 2.

### (3) Debtors' Obligations Under AFI Settlement And Plan Sponsor Agreement

Pursuant to the terms of the AFI Settlement and Plan Sponsor Agreement, the Debtors were obligated to (1) use commercially reasonable efforts to obtain approval of the Debtors' obligations under the AFI Settlement and Plan Sponsor Agreement;[1736] (2) use good faith efforts to file and prosecute the Plan as set forth in the Plan Term Sheet;[1737] (3) perform all of the obligations required under the Consent Materials and fund any and all costs related to such performance through and until the closing of the Platform Sale;[1738] and (4) obtain entry of a Confirmation Order that allows the following claims held by AFI against the Debtors in full: (a) claims under the A&R Secured Revolver Loan Agreement; (b) claims under the A&R Line of Credit Agreement; and (c) claims arising after the Petition Date in the ordinary course of business or otherwise agreed to by the Debtors and AFI.[1739]

### g. Examiner's Conclusions Regarding Process Resulting In AFI Settlement and Plan Sponsor Agreement

Pursuant to the Examiner Scope Approval Order, the Examiner reviewed the process that resulted in the AFI Settlement and Plan Sponsor Agreement, including the activities of the ResCap Board in connection with that agreement. Although the AFI Settlement and Plan Sponsor Agreement has been terminated, a review of the settlement process remains relevant. AFI has not withdrawn its offer to provide a $750 million cash contribution to the Debtors' Estates "if an acceptable settlement can be reached."[1740] As described below, the Investigation identified a number of issues that raise significant doubts as to whether ResCap's process reaching the AFI Settlement and Plan Sponsor Agreement was adequate. While a close question, the Examiner concludes it is more likely than not that a court would have found that the now-terminated AFI Settlement and Plan Sponsor Agreement was the product of a defective or deficient process.

### (1) Morrison & Foerster's Investigation Of Legal Claims

In November 2011, ResCap appointed two new independent directors, Jonathan Ilany and John Mack, to act as the Special Review Committee of the ResCap Board and "implement[] a process and procedure for the review and assessment" of Affiliate Transactions, the historical course of dealing between ResCap and AFI, and potential claims arising therefrom.[1741] Despite

---

[1736] *Id*. § 3.1(a).

[1737] *Id*. § 3.1(b).

[1738] *Id*. § 3.1(c). After the Platform Sale, unless the purchaser assumes such obligations on terms reasonably acceptable to AFI, the Debtors were required to escrow proceeds from the asset sales to fund any remaining obligations. *See id*.

[1739] *Id*. § 3.1(e).

[1740] Ally Financial Inc., Quarterly Report (Form 10-Q) (May 1, 2013), at 11.

[1741] *See* Residential Capital, LLC Resolutions for Adoption by the Board of Directors, dated Dec. 5, 2011, at RC40020104 [RC40020073]; Minutes of a Special Meeting of the Board of Residential Capital, LLC, Dec. 5, 2011, at RC40018719–20 [RC40018411].

authorization to engage independent counsel at the expense of ResCap, Ilany and Mack relied on Morrison & Foerster to perform that review.

Morrison & Foerster's decision that it could "independently" assess the "financial and operational course of dealing between [AFI] and ResCap"[1742] is questionable in light of the firm's significant involvement in that very course of dealing during the preceding years. From September 2008 through November 2011, Morrison & Foerster attended over 100 ResCap Board meetings, including meetings at which discussions occurred regarding Affiliate Transactions subject to the Special Review Committee's scrutiny. Morrison & Foerster acknowledged that it had advised the ResCap Board on a variety of issues relating to the Affiliate Transactions and corporate governance,[1743] but did not believe it had a conflict of interest in investigating its prior work.[1744]

In light of Morrison & Foerster's history advising the ResCap Board, Ilany and Mack should have questioned whether Morrison & Foerster was the appropriate firm to perform the investigation and, at a minimum, Ilany and Mack should have discussed the potential conflict with Morrison & Foerster. But Morrison & Foerster's potential conflict did not cause Ilany or Mack any concern. Ilany explained that "the lawyers that have conflicts tell you that they have conflicts. I'm not a lawyer."[1745]

Notwithstanding the possible conflicts of interest, Morrison & Foerster conducted the investigation and presented "the initial results of their independent review of historical transactions" to the ResCap Board on January 25, 2012. The investigation was conducted within a relatively compressed period. As such, in the course of its investigation, Morrison & Foerster did not review any contemporaneous e-mails and did not have access to any AFI files other than certain AFI Board materials.[1746] The scope of Morrison & Foerster's written materials to the ResCap Board was limited: those materials did not review direct Third-Party Claims against AFI; nor did they analyze breach of fiduciary duty claims against ResCap's directors and officers that could have given rise to claims against AFI for aiding and abetting breach of fiduciary duty.[1747]

---

[1742] Morrison & Foerster Report on the Independent Review Claims Analysis, dated Jan. 25, 2012, at RC00023718 [RC00023710].

[1743] Int. of J. Tanenbaum, Mar. 29, 2013, at 217:6–22.

[1744] *Id*. at 215:6–219:21.

[1745] Int. of J. Ilany, Nov. 28, 2012, at 117:2–120:21 (stating he was not concerned by the use of potentially conflicted lawyers because "they are professionals . . . bound by duty to me and they are my advisors").

[1746] Meeting with Morrison & Foerster, Counsel to the Debtors, in N.Y., N.Y. (July 20, 2012); *see also* Morrison & Foerster Report on the Independent Review Claims Analysis, dated Jan. 25, 2012, at RC00023720–21 [RC00023710].

[1747] Morrison & Foerster Report on the Independent Review Claims Analysis, dated Jan. 25, 2012 [RC00023710]. Gary Lee of Morrison & Foerster asserted that the firm considered Third-Party Claims in its investigation, *see* Int. of G. Lee, Feb. 20, 2013, at 59:12–60:21, 222:14–223:1, but Lee could not recall whether Morrison & Foerster had investigated breach of fiduciary duty claims, *see id.* at 219:1–9.

Perhaps because of the compressed period in which it conducted its investigation, Morrison & Foerster failed to inform the ResCap Board of significant Estate Causes of Action. For example, as discussed in Sections V.B.6 and VII.L.2.d, ResCap may have a claim in excess of $500 million relating to misallocation of net revenues under the Broker Agreement. Morrison & Foerster's failure to explore the potential ramifications of this issue with the ResCap Board as part of its investigation is surprising in light of the fact that, in January 2012, Morrison & Foerster apparently advised ResCap in connection with its investigation of the "whistleblower" allegations regarding this very claim.[1748] In addition, despite Morrison & Foerster's involvement in the ResCap Board's analysis and approval of the First 2009 Tax Allocation Agreement, Morrison & Foerster did not investigate claims arising from the tax allocation agreements or advise the ResCap Board that ResCap may have a claim in excess of $1 billion relating to those agreements.[1749] Although the Examiner does not necessarily fault Morrison & Foerster for failing to report on all potential Estate Causes of Action, there is little doubt that a more thorough investigation would have put the ResCap Board in a better position to assess the claims against AFI.

After receiving Morrison & Foerster's presentation on ResCap's potential claims against AFI, Ilany and Mack approached the settlement negotiations with AFI as a business deal, using these potential claims as a means to create "the existential threat, the threat that would persuade somebody to write a very big check."[1750] But Ilany and Mack did not have an adequate understanding of all of the legal claims involved. In particular, they had a very limited understanding of Third-Party Claims, and it did not appear that Ilany and Mack understood that these claims were proposed to be released as part of the settlement they were negotiating. As discussed in Section IX, the threshold for obtaining third-party releases in the Second Circuit is extremely high and, absent the consent of all or substantially all creditors, a third-party release is very difficult to obtain. A nondebtor can provide consideration to a debtor's estate in attempt to obtain such a third-party release, but the consideration must be substantial. There is no evidence that Morrison & Foerster explained to Ilany and Mack the relevance of that high standard in connection with AFI's request for a Third-Party Release. And Ilany and Mack did not seem to have ascribed any value to the requested Third-Party Release.[1751] Instead, Mack and Ilany simply sought to achieve a "headline number" of approximately $1 billion and, to get to that number, likely ascribed too much value to the non-cash contributions from AFI.[1752]

---

[1748] *See* Ally Global Security Investigation Report, dated Mar. 14, 2012, at RC40022054 [RC40022044] (noting that Morrison & Foerster reviewed "whether the definition of cost basis in the [MMLPSA] was consistent with the accounting agreement."). For the Examiner's full analysis of issues relating to GMAC Mortgage's contracts with Ally Bank, see Sections V.B and VII.L.

[1749] For the Examiner's full analysis of tax sharing and allocation issues, see Sections V.D and VII.K.

[1750] Int. of G. Lee, Feb. 20, 2013, at 125:7–20.

[1751] *See* Int. of J. Mack, Jan. 15, 2013, at 206:3–209:16 (Mack assigned "no specific value" to a Third-Party Release); Int. of J. Ilany, Nov. 28, 2012, at 157:6–15 (failing to remember that the AFI Settlement and Plan Sponsor Agreement included a proposed Third-Party Release for AFI and did not remember considering the value of Third-Party Claims for purposes of agreeing to a Third-Party Release).

[1752] For the Examiner's full analysis of proposed consideration for releases, see Section IX.

*(2) Apparent Agreement On $850 Million Cash Contribution From AFI*

Ilany was the primary negotiator for ResCap with respect to the AFI Settlement and Plan Sponsor Agreement, although Mack was also involved in portions of the negotiations. ResCap and AFI purportedly reached an agreement in principle in late April 2012. On April 30, 2012, the date of Ilany's final recorded involvement in the settlement negotiations, the ResCap Board was presented with a draft settlement agreement which contemplated that "[AFI] will make a Cash contribution to the Debtors in the amount of $850 million."[1753] Mack, who had been involved in the settlement negotiations in a more limited capacity before then, at that point apparently took over for Ilany. Mack testified that AFI never agreed to a cash contribution of $850 million and explained that the April 30, 2012 draft settlement agreement was merely an "effort" by ResCap "to get a greater contribution from [AFI]."[1754] The documentary evidence does not support that recollection.

ResCap and AFI exchanged draft settlement agreements on May 2, 3, and 4. On May 2, AFI's counsel, Kirkland & Ellis, sent a draft settlement agreement to Morrison & Foerster that provided that AFI would make a cash contribution of $850 million, but tied such contribution to a successful sale of the Ally Bank MSR portfolio.[1755] Given the inherent uncertainty in such a transaction, ResCap and its representatives insisted on a "back stop" under which AFI would be required to fund the settlement amount with $850 million in cash, whether or not it was successful in selling the Ally Bank MSR portfolio.[1756] On May 3, Morrison & Foerster responded to AFI with a draft settlement agreement that provided that AFI would make a cash contribution of $850 million, not conditioned on any outcome with respect to the proposed MSR sale. On May 4, at approximately 11:40 p.m., Kirkland & Ellis sent a "draft settlement agreement incorporating AFI's comments" providing:

> [AFI] will make a Cash contribution to the Debtors in the amount of $850,000,000. Without limiting the forgoing, to the extent that the Purchaser agrees to purchase the Ally MSR . . . [AFI] shall make such contribution by contributing the Ally MSR to the Debtors . . . .[1757]

---

[1753] Draft Settlement Agreement, dated Apr. 30, 2012, at RC40020541 [RC40020521].

[1754] Dep. of J. Mack, Nov. 14, 2012, at 124:7–125:16; *see also* Int. of J. Mack, Jan. 15, 2013, at 185:19–186:14 (stating that AFI's proposed settlement contribution "never got above $750 [million] in conversations between [Carpenter] and myself. . . . [T]here was at one time an attempt to get it to be greater than that. And that appeared in a document, but that was never something that [Carpenter] had ever agreed to").

[1755] Blackline Draft Settlement Agreement, dated May 2, 2012, at 6 [CCM00449236] (attached to E-mail from N. Ornstein to L. Nashelsky and G. Lee (May 2, 2012) [CCM00449220]).

[1756] *See* E-mail from G. Lee to T. Devine (May 4, 2012) [ALLY_0334556]; *see also* E-mail from T. Marano to M. Carpenter (May 4, 2012) [RC40027673]; Draft Settlement Agreement, dated May 3, 2012, at 6–7 [RCES00001557] (attached to E-mail from T. Goren (May 3, 2012) [RCES00001556]).

[1757] Draft Settlement Agreement, dated May 4, 2012, at 6 [RCES00001523] (attached to E-mail from M. Meltzer to L. Nashelsky and G. Lee (May 4, 2012) [RCES00001506]).

There were no brackets around the $850 million (as there had been in drafts prior to April 30, 2012) to suggest the amount remained subject to further negotiation and, moreover, Kirkland & Ellis deleted the phrase "[To be discussed]" from the "Cash Contribution" section of the draft settlement agreement.[1758]

Approximately twelve hours later, seemingly without explanation, Kirkland & Ellis sent a revised draft settlement agreement to Morrison & Foerster that revised AFI's settlement contribution to either $750 million in cash or $850 million upon the successful sale of the Ally Bank MSR.[1759] AFI's revised offer was accepted by Marano on behalf of ResCap.[1760] Marano had not been involved in any of the prior negotiations regarding the amount of AFI's cash contribution. It is therefore not clear why Marano, rather than either Ilany or Mack, conveyed ResCap's acceptance to Carpenter.

The *form* of AFI's settlement contribution—whether cash or MSR—should not have had any impact on the proposed *amount* of the contribution. The MSR contribution was essentially equivalent to a cash contribution because it was dependent upon a third party purchasing the portfolio and providing cash to ResCap. Indeed, Carpenter recognized that MSR and cash were "fungible."[1761] Any alert negotiator should have recognized that there was an additional $100 million of settlement value available for ResCap's taking.

The sudden reduction of AFI's settlement amount by $100 million, with no record of any real protest from Ilany (who was not present) or Mack, raises serious questions as to ResCap's settlement process. It would appear that, whether by miscommunication or lack of aggressive negotiation, ResCap left that value on the table.

### (3) ResCap's "Second Bite At The Apple"

The deficiencies in the process leading to the AFI Settlement and Plan Sponsor Agreement are perhaps mitigated by ResCap's understanding that AFI's cash contribution was not the most important aspect of the "elegant" bankruptcy ResCap was seeking. Tanenbaum explained that ResCap viewed the settlement with AFI primarily as an opportunity "to effect an orderly [bankruptcy] filing and maintain an enterprise preserving great value in bankruptcy."[1762] Marano testified that ResCap knew it would have "another bite at the apple" with respect to the amount of AFI's cash contribution.[1763] Tanenbaum candidly explained that

---

[1758] Blackline Draft Settlement Agreement, dated May 4, 2012, at 6–7 [RCES00001507] (comparing ResCap's May 3, 2012 draft to AFI's May 4, 2012 draft) (attached to E-mail from M. Meltzer to L. Nashelsky and G. Lee (May 4, 2012) [RCES00001506]).

[1759] Blackline Draft Settlement Agreement, dated May 4, 2012, at 6 [RCES00001459] (attached to E-mail from V. Cole to L. Nashelsky and G. Lee (May 5, 2012) [RCES00001443]).

[1760] E-mail from T. Marano to M. Carpenter (May 6, 2012) [EXAM00002973].

[1761] E-mail from M. Carpenter to L. Tessler (Apr. 19, 2012) [CCM00652320].

[1762] Int. of J. Tanenbaum, Mar. 29, 2013, at 227:7–230:18.

[1763] Dep. of T. Marano, Nov. 12, 2012, at 191:9–195:12.

he expected the settlement would be "revised," stating that the proposed $750 million "would have to be increased by [AFI] pretty substantially in order to get a settlement" and that ResCap was going to have an "opportunity to recut the settlement number in the future."[1764]

Viewed in that light, with the benefit of hindsight, and considering the termination of the settlement by the Debtors and the ongoing settlement negotiations in the Chapter 11 Cases, the pre-negotiated amount of AFI's cash contribution may be of less importance. While AFI, for its part, professed to be "very disappointed" and "very upset" that ResCap "turned their back" on the settlement agreement,[1765] Tanenbaum asserted his belief that AFI also expected that its cash contribution would ultimately be "revised upward in connection with a resolution of creditor issues."[1766]

### 4. Negotiation And Entry Into RMBS Trust Settlement Agreements And RMBS Plan Support Agreements

#### a. Relevant Background Concerning Private Label RMBS And Potential Representation And Warranty Liability

ResCap and its affiliates underwrote and sold 392 separate securitizations of private label RMBS between 2004 and 2007, with original principal balances totaling $221 billion.[1767] In a typical private label securitization, ResCap entities pooled together non-conforming mortgage loans in their own names ("private label") and conveyed the pool of loans to a newly formed private label securitization trust (or SPE).[1768] The PLS trust raised cash to purchase the mortgage loans from ResCap and its affiliates by issuing RMBS to investors.[1769] The securities entitled their holders to receive the principal (including prepayments) and interest collected on the mortgage loans in the PLS trust.[1770]

In connection with securitization and loan sales, investors were provided various representations and warranties related to the loans sold.[1771] Such representations and warranties were made on a deal-by-deal basis and pertained to, among other things, ownership of the loan, the validity of the lien securing the loan, the loan's compliance with the criteria for inclusion in the transaction, the ability to deliver required documentation, and compliance

---

[1764] Int. of J. Tanenbaum, Mar. 29, 2013, at 227:7–230:18.

[1765] Int. of M. Carpenter, Mar. 4, 2013, at 272:14–274:3.

[1766] Int. of J. Tanenbaum, Mar. 29, 2013, at 227:7–230:18.

[1767] *See* Debtors' Reply Brief Re Iridium Factors In Support Of Motion For Approval Of RMBS Settlement Agreements [Docket No. 2803] at 9. As explained in the First Day Affidavit, after the collapse of the mortgage loan industry in 2007, the Debtors ceased to be an active sponsor of PLS. *See* First Day Affidavit, ¶ 23 n.15.

[1768] *See* First Day Affidavit, ¶ 23 n.15.

[1769] *Id*.

[1770] *Id*.

[1771] Mortgage Contingencies Review with Disclosure Benchmarking, dated July 27, 2011, at 4 [RC40021333].

with applicable laws.[1772] As discussed below, certain RMBS Institutional Investors have asserted claims against various ResCap entities for alleged breaches of such representations and warranties included in the documentation governing the securitization trusts. The alleged breaches relate to the quality of loans contributed by ResCap or its affiliates to the trusts.[1773]

ResCap sought support from certain key creditor constituencies, including the RMBS Institutional Investors, in connection with preparing for its chapter 11 bankruptcy filing.[1774] At the same time, AFI sought support from the RMBS Institutional Investors for a plan of reorganization that would include a Third-Party Release in favor of AFI.[1775]

Prior to filing bankruptcy, the Debtors and AFI negotiated two substantially similar RMBS Trust Settlement Agreements and two substantially similar RMBS Plan Support Agreements with the Steering Committee Group and the Talcott Franklin Group.[1776] The RMBS Trust Settlement Agreements seek to resolve, in exchange for an allowed general unsecured claim of up to $8.7 billion, any alleged and potential representation and warranty claims held by up to 392 securitization trusts in connection with approximately 1.6 million mortgage loans and approximately $221 billion in original issue balance of associated RMBS, comprising all such securities issued by the Debtors' affiliates from 2004 to 2007 (the "Trust R&W Claims").[1777] Pursuant to the RMBS Plan Support Agreements, the RMBS Institutional Investors agreed, among other things, to support a plan that included a Third-Party Release in favor of AFI.[1778] In exchange, AFI agreed to support consummation of the RMBS Trust Settlement Agreements and to make a significant contribution of value to the Debtors pursuant to the AFI Settlement and Plan Sponsor Agreement.[1779]

### b.   Scope Of The Investigation Of RMBS Trust Settlement Agreements And RMBS Plan Support Agreements

Consistent with the scope of the Investigation, the Examiner reviewed the process that resulted in the RMBS Trust Settlement Agreements and RMBS Plan Support Agreements, including the activities of the ResCap Board in connection with such agreements, and whether such agreements were negotiated at arm's length. As set forth in the Examiner Scope

---

[1772] *Id.*

[1773] RMBS Trust Settlement Agreements, at 1.

[1774] *See* RMBS Plan Support Agreements, at 2–3; RMBS Trust Settlement Agreements, at 1–2.

[1775] *See* RMBS Plan Support Agreements, at 2–3; RMBS Trust Settlement Agreements, at 2.

[1776] *See* RMBS Plan Support Agreements; RMBS Trust Settlement Agreements.

[1777] *See* Debtors' Supplemental Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the RMBS Trust Settlement Agreements [Docket No. 1176] at 1–2; Objection of the Official Committee of Unsecured Creditors to the Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the RMBS Trust Settlement Agreements [Docket No. 2825]. at 1, 41.

[1778] RMBS Plan Support Agreements, § 3.1(i).

[1779] *See id.* § 4.

Approval Order, the Examiner is not opining on whether the $8.7 billion unsecured claim proposed to be allowed by the RMBS Trust Settlement Agreements falls within the range of reasonableness. In connection with the pending contested motion before the Bankruptcy Court to approve the RMBS Trust Settlement Agreements under Bankruptcy Rule 9019, the parties engaged numerous experts to perform loan re-underwriting analyses and to estimate potential cumulative lifetime loss ranges, among other things, to evaluate the proposed allowed claim amount. The Examiner did not seek to duplicate the work of the parties' experts. Those analyses are, in any event, not within the scope of the Investigation, and it is within the province of the Bankruptcy Court to determine the reasonableness of the settlement amount.

### c. Initiation Of Discussions With The Steering Committee Group

On October 17, 2011, Kathy Patrick of the firm Gibbs & Bruns LLP—the lead counsel to the Steering Committee Group and the institutional investors in the Countrywide Settlement— sent a letter to William Solomon, General Counsel of AFI, advising him that her firm represented a number of investment advisers and holders of RMBS issued and/or underwritten by AFI and/or its affiliates, which collectively held 25% or more of the voting rights in 242 RMBS trusts issued or underwritten by AFI or one of its affiliates (with an aggregate outstanding balance of more than $51 billion).[1780] According to Patrick's letter, "large numbers of the mortgages securing the certificates held by [the Steering Committee Group] were sold or deposited into the RMBS pools based on false and/or fraudulent representations and warranties by the mortgage originators, sellers and/or depositors,"[1781] and, as a result, AFI and/or its affiliates have "substantial repurchase liability for such loans."[1782]

Patrick alleged that the evidence supporting such Trust R&W Claims included, among other things, (1) excess early default and foreclosure rates in the relevant mortgage pools; (2) an FHFA loan-level analysis, which purportedly showed that up to 49% of the mortgage loans in AFI or ResCap RMBS breached certain representations and warranties; (3) MBIA's loan-level analysis (as reported in MBIA's lawsuits against AFI), which purportedly showed that high numbers of mortgages in the RMBS pools were ineligible at origination;

---

[1780] *See* Letter from K. Patrick to W. Solomon (Oct. 17, 2011) [ALLY_0212896]. Patrick's letter also indicated that the Steering Committee Group collectively held 50% or more of the voting rights in 173 RMBS trusts issued or underwritten by AFI or one of its affiliates (with an aggregate outstanding balance of more than $36 billion). *See id.* at 1. As of February 1, 2013, the Steering Committee Group investors owned at least 25% of the voting rights in 300 of the securitizations issued by the Debtors. *See* Debtors' Reply Brief Re Iridium Factors In Support Of Motion For Approval Of RMBS Settlement Agreements [Docket No. 2803] at 10.

[1781] *See* Letter from K. Patrick to W. Solomon (Oct. 17, 2011), at 1 [ALLY_0212896].

[1782] *Id.* at 3. Patrick explained that her letter was an "advocacy document" that was "basically making the point to Ally: this is your tar baby. And I will find a way to make it your tar baby no matter how much you try to pull it off." Int. of K. Patrick, Mar. 18, 2013, at 41:22–42:5.

(4) downgrades in the credit ratings of the certificates issued by the RMBS trusts; and (5) AFI's reserve in the amount of $829 million for repurchase liabilities as of June 30, 2011.[1783]

The letter concluded with Patrick's Steering Committee Group requesting a meeting "to begin a constructive dialogue regarding these issues" with "appropriately senior legal and business personnel."[1784]

On October 19, 2011, Solomon forwarded Patrick's letter to, among others, Michael Carpenter, CEO of AFI, Barbara Yastine, CEO and President of Ally Bank, Thomas Marano, CEO of ResCap, and Tammy Hamzehpour, General Counsel of ResCap, and noted that "Patrick represented the claimants in the $8.5 billion settlement with [Bank of America]."[1785] Solomon added that he would meet with the litigation team and Tim Devine, Chief Counsel of Litigation for the consolidated AFI/ResCap legal department,[1786] "to develop a recommend[ed] approach for dealing with this."[1787] In response to Solomon's e-mail, Carpenter suggested that "we should meet" with Patrick "but that it should be with Rescap personnel with no one from [AFI] present."[1788]

After meeting with Devine,[1789] Solomon sent a reply letter to Patrick on October 21, 2011 in which he indicated that "it would be inappropriate [for AFI] to engage [Patrick] on the

---

[1783] *See* Letter from K. Patrick to W. Solomon (Oct. 17, 2011), at 1–2 [ALLY_0212896]. Patrick further alleged that AFI and/or ResCap, "as servicer and/or master servicer of mortgage loans securing the certificates held by [her firm's] clients, has failed to observe and perform the covenants and agreements imposed on it by the governing agreements, and has failed to meet its duty to prudently service those mortgage loans . . . ." *Id.* at 2.

[1784] *Id.* at 4.

[1785] E-mail from W. Solomon (Oct. 19, 2011) [ALLY_0209221].

[1786] Beginning in January 2011 and continuing until early 2012, Devine was the "main lawyer" advising the ResCap Board with respect to RMBS-related legal issues. *See* Int. of T. Devine, Mar. 19, 2013, at 12:3–18:17 (noting that Hamzehpour "was frequently updated and in the loop."); *see also* Minutes of a Special Meeting of the Board of Residential Capital, LLC, Sept. 7, 2011, at RC40018664 [RC40018411] (Devine updated the ResCap Board regarding a lawsuit filed by FHFA relating to the sale of private-label mortgage-backed securities to Freddie Mac); Minutes of a Regular Meeting of the Board of Residential Capital, LLC, July 1, 2011, at RC40018628 [RC40018411] (Devine gave a "detailed presentation" to the ResCap Board regarding PLS investor litigation, representation and warranty litigation, and government subpoenas); Minutes of a Regular Meeting of the Board of Residential Capital, LLC, May 6, 2011, at RC40018459–60 [RC40018411] (showing that Devine gave the ResCap Board an overview of the "mortgage business litigation docket," and noted that the legal staff "meets regularly with senior management to identify and communicate legal risk identified in litigation."). Devine's role in advising the ResCap Board with respect to RMBS-related legal issues appeared to significantly diminish after Morrison & Foerster was re-engaged as ResCap's counsel in August 2011. Indeed, John Mack, who became a ResCap Independent Director in November 2011, testified that he does not know Devine. *See* Dep. of J. Mack, Nov. 14, 2012, at 43:19–21, 126:5–7.

[1787] *See* E-mail from W. Solomon (Oct. 19, 2011) [ALLY_0209221].

[1788] *See* E-mail from M. Carpenter (Oct. 19, 2011) [ALLY_0209221].

[1789] *See* Dep. of T. Devine, Nov. 19, 2012, at 16:5–17:17.

issues" because "[n]one of the transactions [Patrick] described in [her] letter involved [AFI]."[1790] Solomon provided Patrick with contact information for Hamzehpour.[1791]

On October 25, 2011, Patrick responded by letter and indicated that she would forward her October 17, 2011 letter to Hamzehpour, but insisted that AFI, as the ultimate parent and indirect owner of the "parties to the pooling and serving agreements at issue, . . . ultimately bear[s] the liability associated with the repurchase and servicing claims described in [the] October 17 letter."[1792] Solomon forwarded Patrick's October 25, 2012 letter to Carpenter, Yastine, Marano, Devine, and Hamzehpour, among others, and wrote "[t]he issues are beginning to crystallize. I do not intend answering."[1793]

On October 26, 2011, Hamzehpour sent a letter to Patrick and offered dates on which the litigation team could meet with Patrick in ResCap's Minneapolis offices, with no business personnel present (despite Patrick's request for business personnel to attend).[1794] The letter was transmitted on GMAC Mortgage letterhead and signed by Hamzehpour on behalf of GMAC Mortgage in her capacity as general counsel.[1795]

Prior to meeting with Patrick, certain members of the AFI and ResCap consolidated legal team, including Devine, David Hagens, and John Ruckdaschel, discussed possible defenses to the types of claims raised by the Steering Committee Group. In addition to the obvious defense—arguing that certain of the representations and warranties had not been breached— the group considered a "loss causation" defense, but did not attempt to quantify the potential claims or defenses.[1796] The group apparently did not consider a potential statute of limitations defense.[1797]

On November 21, 2011, Hamzehpour, Devine, Ruckdaschel,[1798] and Hagens met with Patrick and certain of her team members at ResCap's offices in Minneapolis to discuss the potential claims held by the Steering Committee Group.[1799] According to Devine, "[t]he

---

[1790] *See* Letter from W. Solomon to K. Patrick (Oct. 21, 2011) [EXAM00185054].

[1791] *See id.*

[1792] *See* Letter from K. Patrick to W. Solomon (Oct. 25, 2011) [EXAM40000700].

[1793] E-mail from W. Solomon (Oct. 26, 2011) [ALLY_PEO_0042786].

[1794] *See* Letter from T. Hamzehpour to K. Patrick (Oct. 26, 2011) [EXAM40000705].

[1795] *See id.* It is not clear why Hamzehpour drafted the letter on behalf of GMAC Mortgage rather than ResCap. *See* Int. of W. Solomon, Mar. 19, 2013, at 92:22–93:9.

[1796] *See* Dep. of J. Ruckdaschel, Nov. 8, 2012, at 34:5–39:4.

[1797] *See id.* at 39:18–20.

[1798] Patrick understood Ruckdaschel's role to be that of the "data person" who understood ResCap's securitization structures. Int. of K. Patrick, Mar. 18, 2013, at 21:9–22:9.

[1799] *See id.* at 17:7–19:8; Int. of T. Devine, Mar. 19, 2013, at 21:21–22:11; Dep. of T. Hamzehpour, Nov. 13, 2012, at 26:17–27:4, 27:8–28:22.

conversation was, from our point of view, a ResCap conversation . . . ."[1800] Devine stated that he told Patrick "from the beginning" that "the contract claims which she purported to have . . . would have been against other contracting counterparties, which were . . . in fact, subsidiaries of the ResCap business."[1801]

When asked if there had been any discussion of the Steering Committee Group's potential claims against AFI, Devine stated that "[t]he meeting was expressly a ResCap meeting. To the extent [that issue] came up, and it may have, I would have said . . . there's no claim. There's no exposure to [AFI]."[1802] Patrick recalled that Devine asked whether the Steering Committee Group could agree to a resolution with ResCap independent of a resolution with AFI and her answer was "of course, but then [AFI] will not get a release as a part of any such deal."[1803]

At the meeting, Patrick rejected the argument that "loss causation" was a viable defense to her clients' claims and noted that the parties could spend "years and years litigating that point."[1804] Hamzehpour understood that Patrick was seeking a settlement negotiation, and recalled that Devine asked Patrick what she would view as a successful outcome.[1805] According to Hamzehpour, Patrick stated that "she would like to arrive at an agreed settlement" and asked for data access "to help refine [the Steering Committee Group's] exposure analysis."[1806] The meeting concluded with a discussion of the specific types of data sought by Patrick and next steps,[1807] which would include entering into confidentiality and tolling agreements with respect to the Steering Committee Group's potential claims.[1808]

_____

[1800] Int. of T. Devine, Mar. 19, 2013, at 23:6–12. There is some confusion with respect to who Devine was representing at the November 21, 2011 meeting. Devine testified that he "was there in [his] capacity as chief counsel for litigation for ResCap . . . ." Dep. of T. Devine, Nov. 19, 2012, at 360:15–361:3. Patrick stated that she believed Devine had dual roles at ResCap and AFI, but that Devine "appeared to be . . . acting for ResCap because he talked about . . . ResCap wanting to get a resolution; they may not be able to get one, depending on what [AFI] did or didn't do." Int. of K. Patrick, Mar. 18, 2013, at 17:16–19, 23:9–22. Ruckdaschel testified that, prior to 2012, Devine was the head of litigation for the entire enterprise and it was not clear whether anyone at the meeting with Patrick was representing AFI because "[a]t that time we were still the integrated global legal department." Dep. of J. Ruckdaschel, Nov. 8, 2012, at 31:19–24, 44:10–45:21. Hamzehpour testified that "Devine from [AFI]" attended the meeting. Dep. of T. Hamzehpour, Nov. 13, 2012, at 26:21–27:4.

[1801] Int. of T. Devine, Mar. 19, 2013, at 23:6–25:22.

[1802] *Id*. at 32:6–23.

[1803] Int. of K. Patrick, Mar. 18, 2013, at 23:19–22, 25:23–26:3.

[1804] *See* Dep. of J. Ruckdaschel, Nov. 8, 2012, at 43:16–44:9.

[1805] *See* Dep. of T. Hamzehpour, Nov. 13, 2012, at 29:3–29:21.

[1806] *See id*. at 29:22–30:5.

[1807] *See id*. at 30:6–15.

[1808] *See id*. at 34:17–35:7.

On December 7, 2011, David Sheeren of Gibbs & Bruns LLP sent an e-mail to Hamzehpour attaching a draft confidentiality agreement and a draft tolling agreement.[1809] The AFI/ResCap legal team decided that Devine would act as the primary "interface with Patrick" on behalf of ResCap.[1810] Pursuant to the AFI/ResCap plan for interacting with Patrick,[1811] on December 19, 2011, Devine sent a letter to Patrick seeking confirmation of the identity of her clients.[1812] Later that day, Patrick responded by e-mailing a letter containing a list of the twenty entities that comprised the Steering Committee Group, and requested that AFI promptly execute the proposed confidentiality agreement so that substantive discussions could begin.[1813]

In January 2012, Devine and Gibbs & Bruns LLP negotiated a confidentiality agreement and a tolling agreement.[1814] On January 20, 2012, Devine informed Solomon, Hamzehpour, Hagens, and Ruckdaschel that negotiations regarding the terms of the tolling and forbearance agreements were effectively concluded and "[w]e . . . got everything we needed."[1815] Devine explained that he had demonstrated a "willingness to hear [Patrick] out, but skepticism over their claims and over the vehicle she is proposing for resolution."[1816]

On March 9, 2012, Devine asked Jeff Cancelliere, a ResCap officer, and Todd Kushman of AFI to perform certain calculations regarding "exposure to claims represented by Patrick and Franklin."[1817] In his e-mail, Devine stated that, although Kushman and Cancelliere would be responsible for the quantitative analyses, Devine would remain responsible for "vocaliz[ing] or add[ing] legal limitations and caveats . . . ."[1818] On March 22, 2012, the Steering Committee Group provided a "template" spreadsheet relating to ResCap's RMBS deals and requested that ResCap populate the spreadsheet with GSE demand rates and repurchase rates.[1819]

On April 5, 2012, Devine and Patrick exchanged a short series of e-mails in which Devine stated that progress was being made with respect to the information Patrick had

[1809] *See* E-mail from D. Sheeren to T. Hamzehpour (Dec. 7, 2011) [ALLY_0158609].

[1810] *See* Dep. of T. Devine, Nov. 19, 2012, at 43:14–18.

[1811] *See* E-mail from T. Devine (Dec. 15, 2011) [ALLY_PEO_0042503].

[1812] *See* Letter from T. Devine to K. Patrick (Dec. 19, 2011) [ALLY_0158616].

[1813] *See* Letter from K. Patrick to T. Devine (Dec. 19, 2011) [ALLY_0158641].

[1814] *See* E-mails between T. Devine, K. Patrick and D. Sheeren (Jan. 13, 2012) [ALLY_0158753]; E-mails between T. Devine, K. Patrick, S. Humphries, and D. Sheeren (Jan. 20, 2012) [ALLY_0158769]; Dep. of T. Hamzehpour, Nov. 13, 2012, at 37:20–38:11.

[1815] E-mail from T. Devine (Jan. 20, 2012) [EXAM00230900].

[1816] *Id.*

[1817] E-mail from T. Devine (Mar. 9, 2012), at ALLY_0210958–59 [ALLY_0210958].

[1818] *Id.*

[1819] *See* E-mail from D. Sheeren to T. Devine (Mar. 22, 2012) [ALLY_0159888]; Dep. of T. Hamzehpour, Nov. 13, 2012, at 46:15–47:5; Int. of K. Patrick, Mar. 18, 2013, at 26:21–28:12, 49:23–50:19.

requested.[1820] That same day, Patrick requested information concerning AFI and ResCap so that her clients could perform an assessment of capital structure, substantive consolidation, and successor liability issues, and build such "litigation risk" into their discount analysis.[1821] Patrick explained that her clients sought that information for the purpose of analyzing past transactions between AFI and ResCap "to understand whether there were any holes in the fence, so to speak."[1822]

On April 16, 2012, Ruckdaschel returned the template spreadsheet to Patrick "populated with aggregated data."[1823] According to Patrick, the April 16, 2012 spreadsheet did not contain the GSE repurchase data she was looking for.[1824] On April 30, 2012, ResCap provided Patrick with an updated spreadsheet that included the requested GSE repurchase data.[1825]

### d. Initiation Of Discussions With The Talcott Franklin Group

On November 18, 2011, Talcott Franklin of the firm Talcott Franklin, P.C. sent a letter to Hamzehpour, advising her that his firm represented a number of holders of ownership interests in securitization trusts backed by loans sold or serviced by RFC and/or its affiliates.[1826] Franklin's letter explained that his clients had "serious concerns regarding the manner in which these Trusts have been serviced, including the negative impact certain RFC servicing practices may have had on the borrowers whose loans back our investments."[1827]

---

[1820] *See* E-mail from T. Devine to K. Patrick (Apr. 5, 2012) [ALLY_0143539].

[1821] *See* E-mail from K. Patrick to T. Devine (Apr. 5, 2012) [ALLY_0143539]. On April 16, 2012, at the request of Morrison & Foerster, Devine sent Patrick a draft confidentiality agreement which he explained was in addition to the existing confidentiality agreement and "was drafted to permit the sort of information exchange" Patrick had requested. *See* E-mail from T. Devine to K. Patrick (Apr. 16, 2012) [ALLY_0159943]. The additional confidentiality agreement was executed by Patrick on April 25, 2012. *See* Letter from T. Hamzehpour to K. Patrick (Apr. 25, 2012), at 1, 5 [ALLY_0159971].

[1822] Int. of K. Patrick, Mar. 18, 2013, at 47:20–48:8.

[1823] *See* E-mail from J. Ruckdaschel to K. Patrick (Apr. 16, 2012) [EXAM00191015]. FTI provided additional financial analytical support in connection with the analysis of ResCap's potential RMBS repurchase exposure, analyzing information provided by ResCap and publicly available information. *See* Dep. of M. Renzi, Nov. 7, 2012, 19:9–26:7.

[1824] Int. of K. Patrick, Mar. 18, 2013, at 49:23–50:19.

[1825] *See id*. at 50:21–51:9, 68:15–70:2; E-mail from J. Ruckdaschel (Apr. 30, 2012) [ALLY_0159984]; GSE Repurchase Requests 04-08 Vintage, prepared by ResCap, dated Apr. 30, 2012 [ALLY_0159987] (attached to E-mail from J. Ruckdaschel (Apr. 30, 2012) [ALLY_0159984]).

[1826] *See* Letter from T. Franklin to T. Hamzehpour (Nov. 18, 2011) [EXAM00215992]. According to the Debtors' court filings, as of February 1, 2013, the Talcott Franklin Group investors owned at least 25% of the voting rights in 31 of the securitizations issued by the Debtors. *See* Debtors' Reply Brief Re Iridium Factors In Support Of Motion For Approval Of RMBS Settlement Agreements [Docket No. 2803] at 10; *see also* Letter from T. Franklin to T. Hamzehpour (Nov. 18, 2011) [EXAM00215992].

[1827] *See* Letter from T. Franklin to T. Hamzehpour (Nov. 18, 2011) [EXAM00215992].

After negotiating the terms of a tolling agreement with respect to the claims of Franklin's clients in December 2011,[1828] Devine proposed to hold an in-person meeting to discuss those claims.[1829] The parties ultimately agreed to meet at ResCap's Minneapolis offices in early February 2012.[1830] The meeting was subsequently rescheduled for February 28, 2012.[1831]

Internally at ResCap and AFI, Devine took a leading role in addressing the claims of the Talcott Franklin Group,[1832] and indeed proposed the strategy for the February 28, 2012 meeting.[1833] Specifically, Devine suggested that ResCap and AFI "use" the meeting to "smoke them out regarding the extent to which [Franklin's firm would be] prepared to act across their various representations."[1834]

On February 28, 2012, Hamzehpour, Hagens, and Ruckdaschel met with Franklin at ResCap's offices in Minneapolis.[1835] At that meeting, Franklin discussed who his clients were, what he believed their claims to be, and then proposed a general strategy for resolving those claims.[1836] The settlement structure proposed by Franklin—which bore no resemblance to the structure ultimately adopted in the RMBS Trust Settlement Agreements—would have involved ResCap (or affiliated entities) repurchasing bonds from the Talcott Franklin Group, packaging those bonds with additional collateral and then re-securitizing those bonds back to the Talcott Franklin Group.[1837] The meeting was concluded in much the same manner as the initial meeting held between ResCap/AFI and Patrick, with promises that, among other things, Franklin would provide additional information and evidence as to his clients' holdings.[1838]

---

[1828] *See* E-mails between T. Devine and T. Franklin (Dec. 23, 2011) [ALLY_0142715].

[1829] E-mail from T. Devine to T. Franklin (Jan. 6, 2012) [ALLY_0142715].

[1830] *See* E-mails between L. Rosten and T. Franklin (Jan. 9–12, 2012) [ALLY_0142721]; Dep. of T. Devine, Nov. 19, 2012, at 54:23–57:2.

[1831] *See* E-mail from J. Phelps to T. Devine (Feb. 23, 2012), at ALLY_0209507 [ALLY_0209505]; E-mail from T. Devine (Feb. 23, 2012), at ALLY_0209506 [ALLY_0209505] (noting "we pushed them off at last minute on Feb 2 meeting").

[1832] *See* Dep. of T. Hamzehpour, Nov. 13, 2012, at 38:12–15; Dep. of T. Devine, Nov. 19, 2012, at 53:25–54:9.

[1833] *See* E-mail from T. Devine (Feb. 23, 2012), at ALLY_0209506 [ALLY_0209505].

[1834] *See id*. Additionally, Devine suggested that they "pre-set" Franklin's expectations, such that ResCap and AFI would not be expected to respond or react during the meeting. Devine believed that the meeting would be an opportunity for ResCap and AFI to develop information about Franklin's clients without having to provide information in return. Devine did, however, expect to face demands for information regarding insurance coverage and other facets of ResCap or AFI's business. *See id*.

[1835] *See* Dep. of T. Hamzehpour, Nov. 13, 2012, at 42:9–43:16. According to Hamzehpour, Devine did not attend the meeting with Franklin in Minneapolis. *Id*. at 43:17–43:19.

[1836] *See id*. at 43:20–44:13.

[1837] *See id*. at 44:2–13. Hamzehpour stated that she asked some questions about how Franklin's proposed settlement could be implemented. *See id*. at 44:19–45:2. The Examiner has uncovered no evidence to show that Franklin's structure was ever seriously considered by ResCap or AFI.

[1838] *See id*. at 45:3–12.

### e. *Negotiations Resulting In The RMBS Trust Settlement Agreements And RMBS Plan Support Agreements*

Although ResCap had initial discussions with both the Steering Committee Group and the Talcott Franklin Group, ResCap primarily negotiated the terms of the RMBS Trust Settlement Agreements (and the allowed amount of the Trust R&W Claims) with the Steering Committee Group. As Gary Lee of Morrison & Foerster explained:

> [P]ractically, they have very different footprints across the trusts. . . . Patrick had a far greater concentration within the trusts. So, if you're talking about why one would negotiate with her as opposed to him, I mean, she fundamentally, in a bankruptcy, would have significant control over . . . your ability to sell a business. . . . [H]er group, because they control the trust to a sufficient extent, could kill a sale, full stop. . . . And that wasn't true for Talcott Franklin . . . .[1839]

Before the substantive negotiations on the RMBS Trust Settlement Agreements began, ResCap and AFI conducted analyses attempting to estimate the total potential Trust R&W Claims. In an April 5, 2012 presentation to the ResCap Board, FTI estimated the Trust R&W Claims to be approximately $6.1 billion.[1840] According to Mark Renzi of FTI, the April 5, 2012 estimate may have been a "placeholder" while further analysis was ongoing.[1841] As of April 19, 2012, based on an analysis of estimated total losses and a range of defect rates from 10% to 20%, FTI estimated the potential Trust R&W Claims to range from $4.4 billion to $8.8 billion, with a midpoint of $6.6 billion.[1842]

While there may have been confusion regarding Devine's role at the November 21, 2011 meeting (as discussed above), by mid-April 2012, Devine was representing AFI only in connection with RMBS settlement negotiations. In Devine's words, the negotiations with the Steering Committee Group were "about a potential bankruptcy deal, and people knew I wasn't representing ResCap in connection with the bankruptcy."[1843] Ruckdaschel, at his deposition, testified repeatedly that he understood Devine to be representing AFI in the RMBS settlement discussions in April and May 2012.[1844] According to Patrick, by April 25, 2012, Devine "was always talking for [AFI] and [Lee] was always talking for ResCap. And [Devine] was not

---

[1839] Int. of G. Lee, Feb. 20, 2013, at 151:23–153:3.

[1840] *See* Draft FTI Presentation to the Board of Residential Capital, LLC, dated Apr. 5, 2012, at 3–5 [EXAM00176483].

[1841] Dep. of M. Renzi, Nov. 7, 2012, at 31:3–19.

[1842] Draft FTI Litigation Claims Presentation, dated Apr. 19, 2012, at 4–5 [EXAM00176361].

[1843] Int. of T. Devine, Mar. 19, 2013, at 47:6–19; *see also* Dep. of T. Devine, Nov. 19, 2012, at 126:16–24 ("But clearly by that point I would have been participating in attorney-client discussions with the [AFI] client with regard to the Kathy Patrick discussions.").

[1844] Dep. of J. Ruckdaschel, Nov. 8, 2012, at 66:21–67:4, 110:10–20, 142:5–11.

talking for ResCap. And [Lee] made clear to me at various points that ResCap was willing to do things that [AFI] did not want them to do."[1845] Regardless, Devine remained a central figure in the negotiations. At his deposition, Devine explained his role as "driving a deal to conclusion" between ResCap, the RMBS Institutional Investors, and AFI.[1846]

On April 17, 2012, Devine e-mailed Lee and Hamzehpour and described for Hamzehpour a "very constructive" conversation he had the previous day with Lee.[1847] In the e-mail, Devine recommended that the next step in negotiations with Patrick should focus on "the structure of the proposed outcomes, the potential for a substantial contribution from AFI, fragility of the goal but clarity of purpose for comprehensive third-party releases, etc."[1848] Hamzehpour understood Devine's statement to mean that a Third-Party Release in favor of AFI would "be required in order to achieve a substantial contribution from AFI."[1849] Devine explained that "fragility of the process" was a reference to the fragility of selling the ResCap business as a going concern, which required support from AFI.[1850] According to Lee, notwithstanding Devine's e-mail, there was no "clarity of purpose" for a comprehensive Third-Party Release.[1851] Instead, as Lee explained, ResCap "care[s] about the releases only insofar as it's a vehicle to get what we think is the best deal we can from AFI."[1852]

On April 19, 2012, Devine arranged a meeting with the Steering Committee Group for April 25, 2012 and contacted Lee and Hamzehpour to confirm their availability.[1853] In preparation for the meeting, FTI was directed by Morrison & Foerster to prepare a hypothetical waterfall analysis presentation.[1854]

On April 23, 2012, Devine sent Hamzehpour an e-mail setting out his proposed strategy for the upcoming meeting with Patrick. Devine suggested that the presentation to Patrick include assumptions of $3 billion, $4 billion, and $6 billion (rather than $4 billion, $5 billion, and $6 billion) as the potential low, medium, and high amounts at which the Trust R&W

---

[1845] Int. of K. Patrick, Mar. 18, 2013, at 140:14–141:20.

[1846] Dep. of T. Devine, Nov. 19, 2012, at 248:4–249:4.

[1847] E-mail from T. Devine to G. Lee and T. Hamzehpour (Apr. 17, 2012) [EXAM00345280].

[1848] *Id*.

[1849] Dep. of T. Hamzehpour, Nov. 13, 2012, at 50:3–17.

[1850] *See* Int. of T. Devine, Mar. 19, 2013, at 82:23–83:24 ("[Patrick] was taking advantage of the fact that . . . [AFI] would put money in on the front end and would provide the indispensable support that only [AFI] could provide to sell the assets as a going concern. . . . And that's what . . . the fragility of the process to my mind was . . . is this going to sell as something rather historic a going concern of this fifth largest mortgage servicer in the country or not?").

[1851] Int. of G. Lee, Feb. 20, 2013, at 288:22–25.

[1852] *Id*. at 288:26–289:18.

[1853] E-mail from T. Devine to T. Hamzehpour and G. Lee (Apr. 19, 2012) [EXAM00180025].

[1854] *See* Dep. of M. Renzi, Nov. 7, 2012, at 36:13–37:7, 69:3–22.

Claims might be allowed in a ResCap bankruptcy.[1855] According to Devine, the goal was not to convince Patrick that such a range was correct (indeed, he noted that Patrick would likely dispute the range as "unrealistically low"), but rather to make Patrick aware that "ratcheting up those ranges leads automatically to lower percentage recoveries, by simple math in light of [the] fact that there will only be X or Y real dollars available."[1856] Such a message, Devine believed, would clearly tell Patrick to "get on board."[1857] Hamzehpour responded by indicating that it would be acceptable not to raise Patrick's expectation, so long as the projections provided to Patrick had a sound basis in the analytics.[1858] In any event, Devine's proposed changes were probably irrelevant, as Patrick focused only on the "high" scenario assumptions.[1859]

As planned, various ResCap and AFI representatives met with Patrick and her team on April 25, 2012 at Morrison & Foerster's New York office.[1860] According to Patrick, the principal purpose of the meeting was *not* to negotiate "the price of the repurchase settlement," but rather to discuss the structure of the proposed sale of the ResCap servicing platform.[1861]

---

[1855] *See* E-mail from T. Devine to T. Hamzehpour (Apr. 23, 2012) [EXAM00345835]; Dep. of T. Devine, Nov. 19, 2012, at 85:19–87:20. When asked why he proposed lowering the claim assumptions if he was not representing ResCap at the time, Devine explained, "I wasn't representing ResCap in connection with the development of these plans. I was still representing ResCap with regard to the defense of the litigation. And so to me, as sort of a subject matter expert with regard to ResCap's actual litigation exposure, I was saying those numbers don't look right to me." Int. of T. Devine, Mar. 19, 2013, at 42:4–16.

[1856] *See* E-mail from T. Devine to T. Hamzehpour (Apr. 23, 2012) [EXAM00345835].

[1857] *See id.*

[1858] *See* E-mail from T. Hamzehpour to T. Devine (Apr. 23, 2012) [EXAM00345835]. Indeed, the "high" claim scenario presented to the Steering Committee Group was near the midpoint of FTI's analysis. *See* Draft FTI Litigation Claims Presentation, dated Apr. 19, 2012, at 4–5 [EXAM00176361]. The range of potential claim amounts included in the April 25, 2012 presentation, while being deemed "reasonable for the purposes of negotiating," were not necessarily reflective of ResCap's opinion of the potential liability. *See* Dep. of M. Renzi, Nov. 7, 2012, at 74:16–75:2. At a minimum, ResCap "recognized that the [potential RMBS liability] was likely going to be higher than what was on the books and records of the company." *See id.* at 62:20–23.

[1859] Int. of K. Patrick, Mar. 18, 2013, at 101:17–102:8.

[1860] *See* Dep. of T. Hamzehpour, Nov. 13, 2012, at 57:25–59:15; Int. of K. Patrick, Mar. 18, 2013, at 75:14–22. ResCap's representatives included, among others, Hamzehpour, Renzi, Ruckdaschel, Lee, and Puntus. AFI's representatives included Devine and two attorneys from Kirkland & Ellis, Rick Cieri and Ray Schrock. *See* Dep. of T. Hamzehpour, Nov. 13, 2012, at 57:25–59:15; Int. of K. Patrick, Mar. 18, 2013, at 75:14–22.

[1861] Int. of K. Patrick, Mar. 18, 2013, at 78:25–80:25. Patrick explained that her clients had a "high degree of concern about the potential buyers for the servicing. And they wanted to be sure that the servicing would not be dumped out for dollars in derogation of servicing performance. . . . [P]eople treat this 9019 settlement as a repurchase settlement, but it was balled up . . . in a significant way with our willingness to consent to the sale of the servicing platform unobstructed." *Id.* According to Patrick, Puntus, Nashelsky and Hamzehpour participated in the conversation regarding the servicing sale. *See id.* at 80:9–25. Puntus explained that Centerview's role was to describe what ResCap was seeking to accomplish through an elegant bankruptcy filing and how it proposed to implement the process. *See* Dep. of M. Puntus, Nov. 5, 2012, at 54:8–18. Hamzehpour testified that she led a brief discussion regarding servicing standards. *See* Dep. of T. Hamzehpour, Nov. 13, 2012, at 59:22–60:9.

When ResCap presented its position on the exposure to Trust R&W Claims, Lee walked through the waterfall and "how they had approached sizing the potential claims."[1862] As Devine had suggested, the final presentation used at the meeting reflected $3 billion (low), $4 billion (middle), and $6 billion (high) valuations for the allowed amount of the Trust R&W Claims.[1863] Patrick recalled stating at the meeting that $6 billion "was not enough . . . to settle the case."[1864] She added, "I think I said I was closer to 11 or 11 and a half or 12 [billion]."[1865]

The April 25, 2012 waterfall presentation also reflected Devine's suggestion of $750 million, rather than $1 billion, as the highest settlement contribution from AFI.[1866] Devine participated in the portion of the meeting related to "the waterfall and the ranges of recoveries, losses, et cetera, that were the topic of the discussion around the settlement,"[1867] and took that opportunity to inform Patrick that AFI would support a settlement on an allowed claim but AFI would seek support from the Steering Committee Group for the Third-Party Release.[1868] Patrick recalled that Rick Cieri of Kirkland & Ellis stated that AFI viewed the settlement process as "extortion."[1869] According to Patrick, she responded as follows:

> I said, "Well, I have a different view." . . . "My view is, it's just a question of how much you want your IPO because you don't have to settle with me. I'll settle with ResCap. We'll . . . get this done in the bankruptcy and you and I can go in down the road. So I don't view these as related, so don't feel like you have to if you don't like the price."[1870]

---

[1862] Int. of K. Patrick, Mar. 18, 2013, at 78:6–141:14.

[1863] *See* Centerview and FTI Discussion Materials Presentation, dated Apr. 25, 2012, at 7–11 [EXAM00176409]; Dep. of T. Hamzehpour, Nov. 13, 2012, at 58:7–11. Renzi, who was responsible for portions of the presentation, agreed that Devine was involved in determining "what range to present for these negotiations," but rejected the assertion that he simply did as instructed by Devine. *See* Dep. of M. Renzi, Nov. 7, 2012, at 96:7–25, 99:6–101:4.

[1864] Int. of K. Patrick, Mar. 18, 2013, at 94:9–95:19.

[1865] *Id*. Patrick noted that the Apr. 25, 2012 meeting was not a negotiation session on the amount of the Trust R&W Claims, but that she nevertheless provided her "reactions" to the proposed allowed claim amount. *See id*.

[1866] *See* Centerview and FTI Discussion Materials Presentation, dated Apr. 25, 2012, at 7–11 [EXAM00176409]. For a discussion of the implications of Devine's e-mail in connection with the negotiations of the AFI Settlement and Plan Sponsor Agreement, see Section III.J.3.d.

[1867] Dep. of T. Hamzehpour, Nov. 13, 2012, at 60:14–25.

[1868] *See* Dep. of T. Devine, Nov. 19, 2012, at 98:5–99:2.

[1869] Int. of K. Patrick, Mar. 18, 2013, at 81:2–12.

[1870] *Id*. at 81:13–24. Patrick noted that she ultimately concluded that the AFI contribution was "quite satisfactory given what we understood the liabilities and how we assessed them." *Id*. at 81:25–82:10.

Hamzehpour understood that AFI was "negotiating [the settlement] to the extent that if they were making a contribution to ResCap in a settlement separately, they wanted Third-Party Releases from [Patrick]. So the two things were related to each other somewhat."[1871]

Exhibit III.J.4.e—1 below reflects the estimated recovery to holders of Trust R&W Claims—assuming a $6 billion claim amount, a $750 million cash contribution from AFI, and an 85% allocation of AFI's cash contribution to creditors of GMAC Mortgage and RFC—as presented to the Steering Committee Group on April 25, 2012.[1872]

EXHIBIT III.J.4.e—1
**Projected RMBS Claim Recovery**
April 25, 2012
*($ in Millions)*

| | | | April 25, 2012 Presentation $750M AFI Settlement | | |
|---|---|---|---|---|---|
| | | | | $ | % |
| **RMBS Claims** | | Total Claim | | Recovery | Recovery |
| R&W claims | $ | 1,080 | $ | 424 | 39% |
| PLS claims | | 4,920 | | 568 | 12% |
| Total RMBS Claims | $ | 6,000 | $ | 992 | 17% |

**Allocation of AFI settlement to RFC and GMAC Mortgage general unsecured claims**

| | | |
|---|---|---|
| Distributable value from AFI settlement | $ | 750 |
| Recovery to RFC/GMACM from AFI settlement | | 639 |
| % of settlement distributable value | | 85% |

*Source: Centerview and FTI Discussion Materials Presentation, dated Apr. 25, 2012, at 10 [EXAM00176409].*

On April 27, 2012, Devine spoke with Patrick to discuss "next steps."[1873] Devine then sent an e-mail to Solomon, Hamzehpour, Lee, Ruckdaschel, and AFI's outside counsel at Kirkland & Ellis providing an update on the conversation with Patrick.[1874] According to Devine, Patrick had presented the "'input' dollars as [ResCap and AFI] had presented" to the Steering Committee Group, and the Steering Committee Group investors had authorized Patrick to continue working

---

[1871] Dep. of T. Hamzehpour, Nov. 13, 2012, at 67:24–68:7. Devine reiterated the necessity of Third-Party Releases to Patrick in an e-mail on May 12, 2012, noting that Patrick's support for Third-Party Releases was a "drop dead"—meaning non-negotiable—issue that AFI would insist on. *See* E-mail from T. Devine (May 12, 2012) [EXAM00345296]; Dep. of T. Devine, Nov. 19, 2012, at 281:12–282:8.

[1872] *See* Centerview and FTI Discussion Materials Presentation, dated Apr. 25, 2012, at 7–11 [EXAM00176409].

[1873] *See* E-mail from T. Devine to K. Patrick (Apr. 27, 2012) [EXAM00345814]. When asked why Patrick was communicating "next steps" directly with him (after he had made clear he was representing AFI only), Devine stated, "I think it was just force of habit that we had an easy, professional, clear working relationship and [Patrick] was relaying questions to me . . . ." Int. of T. Devine, Mar. 19, 2013, at 56:9–58:13. Devine explained that he distributed Patrick's inquiries and messages to the appropriate parties at ResCap, Morrison & Foerster, AFI, or Kirkland & Ellis, or some combination thereof. *See id.*

[1874] *See* E-mail from T. Devine (Apr. 27, 2012) [EXAM00345814].

with ResCap and AFI towards resolving their claims.[1875] He continued by noting that Patrick intended to send follow up questions from her clients and that he would "forward them to all on this e-mail so we can have both teams collaborate in drafting responses, ensuring alignment at every step."[1876] Devine concluded by noting that "[t]his has been an exemplary team effort, with expert support from both 'sides.'"[1877]

On May 1, 2012, Devine e-mailed the rest of the AFI/ResCap team, informing them that Patrick was ready for them to present directly to the steering committee of her group of investors via a web meeting.[1878] He then followed up with the team, stating that the meeting was set for May 3, 2012, and the "[o]nly presentation material will be the waterfall deck."[1879] According to Patrick, the May 3, 2012 meeting was "not a negotiation session, it was just a presentation to my steering committee, so they had the same universe of information . . . about the proposed structure . . . ."[1880] The waterfall presentation given to the Steering Committee Group on May 3, 2012 included the same scenarios as the waterfall presentation given to Patrick and her colleagues on April 25, 2012.[1881]

On May 4, 2012, Lee sent an e-mail to Devine and Hamzehpour regarding a series of meetings and calls with Patrick. According to Lee, Patrick proposed the following:

> 1. ResCap and the [Steering Committee Group] will settle all claims (including servicing and contract claims) other than securities claims (which she does not control).
>
> 2. The settlement will be effectuated through a motion under Rule 9019 . . . .
>
> 3. In exchange, ResCap will give the [Steering Committee Group] an allowed claim that will be characterised as a cure payment (ie to cure loan repurchase and service defects).
>
> 4. The [Steering Committee Group] will enter into a plan support agreement which would support the DIP, sale, sale process, servicing, shared services and plan releases provided that [AFI] contributes no less than $x in cash.

---

[1875] *Id.*

[1876] *Id.*

[1877] *Id.*

[1878] *See* E-mail from T. Devine (May 1, 2012) [EXAM00345816].

[1879] *Id.* Devine was responsible for coordinating this web meeting with Patrick. *See* Dep. of T. Hamzehpour, Nov. 13, 2012, at 67:9–13.

[1880] Int. of K. Patrick, Mar. 18, 2013, at 129:16–132:1.

[1881] *Compare* Centerview and FTI Discussion Materials Presentation, dated Apr. 25, 2012 [EXAM00176409], *with* Centerview and FTI Discussion Materials Presentation, dated May 3, 2012 [EXAM00178949].

> 5. [Patrick] also intimated a willingness to do a back-stop deal
> with [AFI] in the event the plan fails (ie only a sale occurs and
> the releases fail). In other words she is willing to agree [to] a
> deal with [AFI] even if the third party releases-settlement
> through a plan fail.[1882]

Devine responded by e-mail stating, "[o]ur notes match. This is very good new[s]."[1883]

According to Devine, at this juncture, Patrick was not demanding a certain amount of contribution from AFI to enter into the proposed settlement.[1884] Rather, Patrick "understood that the negotiation of a dollar number between AFI and ResCap was going on separately from the discussions over the RMBS settlement."[1885] Patrick explained that the "X dollars" represented her desire to "get more" money from AFI.[1886] Devine also noted that, by early May 2012, Lee was "having a variety of conversations with Kathy Patrick . . . some of which [Devine] would have been included on and some of which [he was not] included on."[1887]

On May 6, 2012, Devine e-mailed Renzi and expressed an urgent need for him to revise FTI's waterfall analysis.[1888] Devine then spoke with Patrick and sent a follow-up e-mail to Renzi explaining, "[i]t is ver[y] important for [Patrick] to have the waterfall . . . reflect the attribution over to GMACM we have discussed. . . . She will be in much better position to deliver for us if I can give the revised waterfalls, below, to her by bedtime tonight."[1889]

On the morning of May 7, 2012, Devine sent an e-mail to Patrick stating that, based on "preliminary runs" of the waterfall analysis using all of the assumptions and caveats that the two had discussed, holders of Trust R&W Claims "across the entire run of all the trusts would

---

[1882] *See* E-mail from G. Lee to T. Devine and T. Hamzehpour (May 4, 2012) [EXAM00191506].

[1883] *See* E-mail from T. Devine to G. Lee and T. Hamzehpour (May 4, 2012) [EXAM00191506].

[1884] *See* Dep. of T. Devine, Nov. 19, 2012, at 142:18–20.

[1885] *Id*. at 143:10–14.

[1886] Int. of K. Patrick, Mar. 18, 2013, at 138:15–139:2 ("I tried up until the last to get more. I couldn't get any more.").

[1887] *See* Dep. of T. Devine, Nov. 19, 2012, at 138:10–16.

[1888] *See* E-mail from T. Devine M. to Renzi and J. Cancelliere (May 6, 2012) [EXAM00345833]. Devine did not recall who asked him to have these waterfalls prepared. *See* Dep. of T. Devine, Nov. 19, 2012, at 167:7–169:10.

[1889] *See* E-mail from T. Devine to M. Renzi and J. Cancelliere (May 6, 2012) [EXAM00345833]. The "attribution over to GMACM" appears to refer to an allocation of some recovery to PLS claims asserted against GMAC Mortgage. In waterfall analyses prior to May 7, 2012, no such claims were assumed to be asserted against GMAC Mortgage. *Compare* Centerview and FTI Discussion Materials Presentation, dated Apr. 25, 2012, at 8–10 [EXAM00176409], *with* Centerview and FTI Discussion Materials Presentation, dated May 7, 2012, at 8 [EXAM00176519]. Patrick explained, "we had to have the right number and the number had to be allocated to all of the trusts, not just to some of the trusts because all of the trusts were being asked to give a release. . . . [E]very trust that's going to give a release gets value." Int. of K. Patrick, Mar. 18, 2013, at 162:17–164:3.

*take at above the threshold you had mentioned to me of a billion*."[1890] As Patrick explained, "we wanted at least a billion dollars to flow to these trusts if we were going to support this deal."[1891]

During the evening of May 7, 2012, Lee and Patrick had "several calls" discussing the possible allowed claim amount.[1892] Shortly before 9:00 p.m., Patrick e-mailed Lee and wrote:

> [T]he number you suggested is a problem. At a defect rate of 22[%], the stated claim is 10.0 billion. That insulates the settlement substantially from objectors because it is certainly within the realm of reason. I can deliver a deal at 10 [billion]. Please get your last and best.[1893]

About ten minutes after receiving Patrick's e-mail, Lee e-mailed Devine, Hamzehpour, Renzi, and Cancelliere, among others, and reported Patrick's counter.[1894] Lee explained, "[Patrick's] view is that she can get her clients there, its within industry benchmark etc. . . . She thinks this number allows her to dis-arm other rmbs holders as this ties to other rmbs defect rates."[1895] Lee asked Renzi to run a waterfall analysis incorporating new assumptions, including a $10 billion total claim, "in addition to the other model you are doing for [Patrick]."[1896]

In response, Devine tried to convince his colleagues at ResCap and AFI (and their advisors) that they could potentially "pick away" at the $10 billion by "pursuad[ing] [Patrick's] team that they are using the wrong severities etc. . . ."[1897] Devine also raised concerns that stipulating to a $10 billion allowed claim would create "securities/SEC/ disclosure risk"[1898] because AFI had publicly disclosed on April 27, 2012 that "ResCap's

---

[1890] *See* E-mail from T. Devine to K. Patrick (May 7, 2012) [ALLY_PEO_0028927] (emphasis added).

[1891] Int. of K. Patrick, Mar. 18, 2013, at 162:3–163:8.

[1892] *See* E-mail from G. Lee (May 7, 2012) [EXAM00345282]. Patrick also spoke with Devine on the evening of May 7, 2012. *See* E-mails between K. Patrick and T. Devine (May 7, 2012), at EXAM00180194 [EXAM00180193].

[1893] E-mail from K. Patrick to G. Lee (May 7, 2012) [EXAM00180187].

[1894] *See* E-mail from G. Lee (May 7, 2012) [EXAM00345282].

[1895] *Id.*

[1896] *Id.*

[1897] *See* E-mail from T. Devine (May 7, 2012) [EXAM00345282].

[1898] *Id.*

reasonably possible losses over time related to the litigation matters and potential repurchase obligations . . . could be between $0 and $4 billion over existing accruals."[1899] Devine noted:

> If we want to prove we're correct at something less than 4 billion let's just skip the filing and try the cases. If [Patrick] can't make a deal with us at a stipulated valuation at 10 [billion], she will file proofs of claim which would equate to valuation at 40 billion.[1900]

At around 11:00 p.m., after additional discussions with Patrick, Lee e-mailed Devine and Hamzehpour and noted he was "getting a signal [Patrick] may go a little lower [than $10 billion] but not much."[1901]

Shortly after midnight on May 8, 2012, Renzi distributed two revised waterfall presentations to Lee and Devine, among others.[1902] The first presentation was meant for distribution to Patrick and showed scenarios with $3.5 billion (low), $4.7 billion (middle), and $7.1 billion (high) for the allowed amount of the Trust R&W Claims.[1903] The second presentation, meant for "internal" use only, contained alternate recovery scenarios assuming $4 billion (low), $6 billion (middle), and $10 billion (high).[1904] In addition, the revised waterfall analyses assumed that approximately 90% of AFI's settlement contribution would be allocated to creditors of GMAC Mortgage and RFC, with the remaining 10% allocated to creditors of ResCap LLC (a change from the 85%/15% allocation assumption in the April 25, 2012 and May 3, 2012 waterfalls).[1905]

The most significant driver of funds to holders of Trust R&W Claims was AFI's cash contribution. In the scenarios distributed to Patrick, the estimated total recovery to holders of Trust R&W Claims ranged from $494 million to $624 million if AFI did not contribute any cash

---

[1899] *See* Ally Financial Inc., Quarterly Report (Form 10-Q) (Apr. 27, 2012), at 73. Notwithstanding Devine's insistence in the e-mail that he "need[ed] an answer" regarding "SEC/disclosure risk . . . in comparison to the risk that we'll blow the chance to get third party releases," *see* E-mail from T. Devine (May 7, 2012) [EXAM00345282], Devine testified that the question was purely rhetorical and that he "knew that the answer was no risk." *See* Dep. of T. Devine, Nov. 19, 2012, at 201:24–25.

[1900] E-mail from T. Devine (May 7, 2012) [EXAM00345282].

[1901] E-mail from G. Lee (May 7, 2012) [EXAM00345241].

[1902] *See* E-mails from M. Renzi to G. Lee and T. Devine (May 8, 2012) [EXAM00176430].

[1903] *See* Centerview and FTI Discussion Materials Presentation, dated May 7, 2012, at 7–9 [EXAM00176421] (attached to E-mail from M. Renzi to G. Lee and T. Devine (May 8, 2012) [EXAM00176420]). The "high" allowed claim amount of approximately $7.1 billion appears to reflect ResCap's negotiating position at the time. *See* Dep. of M. Renzi, Nov. 7, 2012, at 139:4–143:5; Int. of K. Patrick, Mar. 18, 2013, at 164:7–165:2.

[1904] *See* Centerview and FTI Discussion Materials Presentation, dated May 7, 2012, at 10–12 [EXAM00176431] (attached to E-mail from M. Renzi to G. Lee and T. Devine (May 8, 2012) [EXAM00176430]).

[1905] *Compare* Centerview and FTI Discussion Materials Presentation, dated May 7, 2012, at 8 [EXAM00176519], *with* Centerview and FTI Discussion Materials Presentation, dated Apr. 25, 2012, at 10 [EXAM00176409].

to the Estates (depending on the allowed claim amount), compared to a range of $961 million to $1.19 billion if AFI contributed $750 million.[1906] Assuming the "high" allowed claim amount of approximately $7.1 billion and a $750 million AFI cash contribution allocated 90% to creditors of GMAC Mortgage and RFC, the total recovery to holders of Trust R&W Claims was calculated to be approximately $1.19 billion.[1907]

EXHIBIT III.J.4.e—2
**Projected RMBS Claim Recovery**
May 7, 2012
*($ in Millions)*

| | | May 7, 2012 Presentation $750M AFI Settlement | | |
| --- | --- | --- | --- | --- |
| **RMBS Claims** | | Total Claim | $ Recovery | % Recovery |
| R&W claims | $ | 2,160 | $ 611 | 28% |
| PLS claims | | 4,920 | 579 | 12% |
| Total RMBS Claims | $ | 7,080 | $ 1,190 | 17% |

**Allocation of AFI settlement to RFC and GMAC Mortgage general unsecured claims**

| | | |
| --- | --- | --- |
| Distributable value from AFI settlement | $ | 750 |
| Recovery to RFC/GMACM from AFI settlement | | 671 |
| % of settlement distributable value | | 90% |

*Source: Centerview and FTI Discussion Materials Presentation, dated May 7, 2012, at 8 [EXAM00176519].*

That same evening, Devine e-mailed Patrick after midnight and wrote:

> I'm getting lots of pressure on valuation now. [Bank of America's settlement of $]8.5 billion represents 14[%] defect rate, correct? Everything we know about our product—from origination through pooling through reps and diligence through[] servicing—makes our folks believe we are better (lower) than Countrywide by a large margin. I am being asked to explain how we could agree to a defect rate 150[%] of Countrywide's.[1908]

Devine explained that the "pressure on valuation" meant pressure from AFI to reduce the implied defect rate of the claim settlement.[1909] Patrick responded by indicating that while Bank of America *argued* that their defect rate was 14%, the parties ultimately settled using a 36% defect rate, which was then discounted for risk concerning Bank of America's liability for

---

[1906] *See* Centerview and FTI Discussion Materials Presentation, dated May 7, 2012, at 9 [EXAM00176519].

[1907] *See id.*

[1908] E-mail from T. Devine to K. Patrick (May 8, 2012), at EXAM00180194 [EXAM00180193].

[1909] Int. of T. Devine, Mar. 19, 2013, at 120:8–122:9.

Countrywide's actions.[1910] Patrick explained that in the Bank of America settlement, "the CLAIM size was $32 billion against them, and we settled for $8.5 billion."[1911] In the ResCap settlement, Patrick analogized, the claim size would be $10 billion (subsequently negotiated to $8.7 billion) and the "[s]ettlement" would be "whatever is distributed" in the ResCap bankruptcy case.[1912] Devine forwarded that analysis, with a brief explanation of his own, to Lee and Cieri, among others.[1913]

On the morning of May 8, 2012, Lee e-mailed Patrick and asked her to send him Countrywide Settlement-related documents "to show apples to apples on this deal."[1914] Patrick agreed to send a spreadsheet to Lee, who requested that Patrick speak with Cancelliere to explain the data.[1915] The spreadsheet showed, among other things, a "BOA" scenario with 36% breach rate and 40% success rate—a combined rate of 14.4%—applied to estimated losses of $107.8 billion, which resulted in a claim of approximately $15.5 billion.[1916]

Later that morning, e-mails between Lee and Devine suggest that Lee would have been willing to settle the allowed amount of the Trust R&W Claims at or near Patrick's demand of $10 billion, whereas Devine continued to press for a "lower" dollar number, suggesting $8 billion as a possible stipulated allowed claim.[1917] Lee responded to Devine and wrote that Patrick's proposal (then at $10 billion) was "lower than we thought we would end up with. [Patrick] is taking the discount already because its [bankruptcy] dollars not [Bank of America] dollars."[1918] But Devine continued to pressure his colleagues and suggested a further

---

[1910] *See* E-mail from K. Patrick to T. Devine (May 8, 2012), at EXAM00180193–94 [EXAM00180193].

[1911] *Id.* at EXAM00180193. Indeed, the Countrywide Settlement provided for a cash payment of $8.5 billion to certain trusts in connection with $424 billion in original principal balance of associated RMBS. *See* Bank of America Corp., Annual Report (Form 10-K) (Feb. 28, 2013), at 213–14.

[1912] *See* E-mail from K. Patrick to T. Devine (May 8, 2012), at EXAM00180193–94 [EXAM00180193]. As noted above, as of May 7, 2012, the waterfall scenarios estimated a range of $494 million to $1.19 billion for total recovery to holders of Trust R&W Claims. *See* Centerview and FTI Discussion Materials Presentation, dated May 7, 2012, at 9 [EXAM00176519].

[1913] *See* E-mail from T. Devine to G. Lee and R. Cieri (May 8, 2012) [EXAM00180193].

[1914] *See* E-mail from G. Lee to K. Patrick (May 8, 2012) [EXAM00180201]. Lee asked Patrick to "[p]lease just reply back to me for now—have to guide our board." *Id.* Lee forwarded Patrick's spreadsheet to Devine and others almost immediately after he received it. *See* E-mail from G. Lee (May 8, 2012) [EXAM00191369].

[1915] *See* E-mails between G. Lee and K. Patrick (May 8, 2012) [EXAM00188953]. Cancelliere apparently spoke with Patrick at around 10:30 a.m. on May 8, 2012. *See* E-mail from J. Cancelliere (May 8, 2012) [EXAM00193761].

[1916] *See* BOA Loss Estimation [EXAM00180200] (attached to E-mail from D. Sheeren to G. Lee (May 8, 2012) [EXAM00180199]). As noted above, the Countrywide Settlement provided cash payment of approximately $8.5 billion on that claim. *See* Bank of America Corp., Annual Report (Form 10-K) (Feb. 28, 2013), at 213–14

[1917] *See* E-mail from T. Devine (May 8, 2012) [EXAM00191095] ("Isn't the obvious answer that [Patrick] states her 22%—[$]11 billion or whatever—and then takes an appropriate haircut (analogous to the 36% to 14% haircut she took in [Bank of America]) to get to a lower $ number ($8B?) as stipulated allowed claim?").

[1918] *See* E-mail from G. Lee (May 8, 2012) [EXAM00191095].

conversation with Patrick. He wrote, "[i]f we can articulate the proper haircut, [Patrick] can get her defect rate and we can get a reasonable dollar number."[1919]

On the evening of May 8, 2012, according to Patrick, there were two "parallel negotiations": (1) Patrick was "trying to agree [to] the size of the claim number with [Lee] and [Hamzehpour]"; and (2) Patrick was separately negotiating with Devine about "whether [AFI] would put in more cash."[1920] At some point during negotiations that evening, Patrick spoke with Lee and offered to settle with ResCap for an allowed claim of $9 billion.[1921] According to Patrick, Lee responded that $9 billion was more than AFI wanted him to pay, but he would do his best to get "close to that."[1922] Later that night, according to Patrick, Lee came back and offered to settle for $8.7 billion, but requested that Patrick speak with Devine and demand that AFI agree to contribute additional cash to the Estates.[1923]

As requested by Lee, Patrick conveyed the demand to Devine.[1924] That night, at around 11:45 p.m., Devine reported to Carpenter and others at AFI and Kirkland & Ellis that Patrick had demanded an "allowed claim at $8.7 billion" and "$150 million increase in [AFI] cash contribution above the 750 + 200 + 100 previously agreed."[1925] According to Patrick, after Devine conveyed the demand to Carpenter, he came back "white as a sheet" and reported that he "had almost been fired."[1926] Patrick then spoke with Lee in a separate room and, according to Patrick, Lee stated that they may have "tried to build a bridge too far. I don't care whether you sign a plan support agreement with [AFI] or not. I will settle with you for [$8.7 billion]. This is the best I can do. Will you take it?"[1927] And Patrick accepted the deal.[1928]

The next morning, on May 9, 2012 at approximately 6:00 a.m., Devine sent an e-mail to Cancelliere asking him to determine what defect rate would be implied by an $8.7 billion allowed claim.[1929] Cancelliere calculated that an $8.7 billion claim implied a defect rate of 19.7% using the ResCap/AFI assumption of $44.1 billion in aggregate losses, or 17.9% using the Steering Committee Group's assumption of $48.7 billion in aggregate losses.[1930] At

---

[1919] *See* E-mail from T. Devine (May 8, 2012) [EXAM00191095].

[1920] *See* Int. of K. Patrick, Mar. 18, 2013, at 175:1–10.

[1921] *See id.* at 172:8–177:4.

[1922] *See id.*

[1923] *See id.*

[1924] *See id.*

[1925] E-mail from T. Devine to M. Carpenter (May 8, 2012) [CCM00565463].

[1926] *See* Int. of K. Patrick, Mar. 18, 2013, at 172:8–177:4.

[1927] *See id.*

[1928] *See id.*

[1929] *See* E-mails between T. Devine and J. Cancelliere (May 9, 2012) [EXAM00345832].

[1930] *See id.*

9:00 a.m., Devine e-mailed Lee and informed him that AFI would "support the $8.7 billion allowed claim" but that there was "no new [AFI] money."[1931]

Exhibit III.J.4.e—3 below reflects the evolution of negotiations related to the allowed claim amount for holders of Trust R&W Claims.



EXHIBIT III.J.4.e—3
**RMBS Claim Settlement**
**ResCap Versus Steering Committee Group Positions**
*($ in Billions)*

Source: EXAM00176409; EXAM00176337; EXAM00178949; CCM00565463; EXAM00176421; EXAM00176548; EXAM00180187; Int. of K. Patrick, Mar. 18, 2013, at 94:9—95:19, 172:8—177:4.

---

[1931] *See* E-mail from T. Devine to G. Lee (May 9, 2012) [EXAM00180215]; Dep. of T. Devine, Nov. 19, 2012, at 229:24–230:6. Although ResCap agreed upon an allowed claim of $8.7 billion on or about May 9, 2012, as of that date, neither ResCap nor AFI had performed a loan sampling in an effort to calculate ResCap's actual liability. *See* Dep. of J. Ruckdaschel, Nov. 8, 2012, at 39:21–40:25; Dep. of M. Renzi, Nov. 7, 2012, at 81:9–82:12, 91:11–92:17. Such approach was not necessarily unreasonable, as calculating actual liability would have required loan by loan analysis of "literally . . . millions of loan files." *See* Dep. of J. Ruckdaschel, Nov. 8, 2012, at 129:2–19.

The Steering Committee Group also agreed to support a Plan that provided a Third-Party Release in favor of AFI. The Steering Committee Group performed an independent analysis of the sufficiency of the proposed AFI settlement contribution, and concluded that it was acceptable.[1932] Patrick explained:

> [AFI] had infused far more capital into these entities than it ever was required to do to keep them afloat. . . . And while we think and maintain that we have direct alter ego claims that we will pursue, . . . from our perspective in the total context of what was being offered here, substantial value from [AFI] for claims that were aggressively postured, let's put it that way. Tenuous, it would be another adjective you could use. To get that value, stabilize the servicing platform and get a number that the trustees could defend on the size of the repurchase claim to us seemed obvious.[1933]

Exhibit III.J.4.e—4 below reflects the evolution of estimated recoveries for holders of Trust R&W Claims, as presented to the Steering Committee Group during the course of negotiations.

EXHIBIT III.J.4.e—4
**Evolution of Projected RMBS Claim Recoveries**
*($ in Millions)*

| RMBS Claims | April 25, 2012 Presentation $750M AFI Settlement | | | May 7, 2012 Presentation $750M AFI Settlement | | | May 9, 2012 Presentation $1,050M AFI Settlement[1] | | |
|---|---|---|---|---|---|---|---|---|---|
| | Total Claim | $ Recovery | % Recovery | Total Claim | $ Recovery | % Recovery | Total Claim | $ Recovery | % Recovery |
| R&W claims | $ 1,080 | $ 424 | 39% | $ 2,160 | $ 611 | 28% | $ 3,132 | $ 738 | 24% |
| PLS claims | 4,920 | 568 | 12% | 4,920 | 579 | 12% | 5,568 | 556 | 10% |
| Total RMBS Claims | $ 6,000 | $ 992 | 17% | $ 7,080 | $ 1,190 | 17% | $ 8,700 | $ 1,294 | 15% |

**Allocation of AFI settlement to RFC and GMAC Mortgage general unsecured claims**

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Distributable value from AFI settlement | | | $ 750 | | | $ 750 | | | $ 865 |
| Recovery to RFC/GMACM from AFI settlement | | | 639 | | | 671 | | | 779 |
| % of settlement distributable value | | | 85% | | | 90% | | | 90% |

[1] *$1,050 million AFI settlement included $750 million cash, $200 million incremental Legacy Sale bid, and $100 million origination support. Only $115 million of the additional $300 million was assumed to be distributable to general unsecured creditors.*
*Source: Centerview and FTI Discussion Materials Presentation, dated Apr. 25, 2012, at 10 [EXAM00176409]; Centerview and FTI Discussion Materials Presentation, dated May 7, 2012, at 8 [EXAM00176519]; Centerview and FTI Discussion Materials Presentation, dated May 9, 2012, at 4 [EXAM00176544].*

---

[1932] Int. of K. Patrick, Mar. 18, 2013, at 124:20–125:13 ("[W]e made our own judgment about the fairness of the deal from our perspective. . . . One of my partners is very deep in the weeds on those kinds of issues for all of these banks, and so we did our own analysis of it.").

[1933] *Id.* at 121:22–124:3.

On May 10, 2012, Carpenter e-mailed the AFI Board and informed them of the agreement with the Steering Committee Group:

> [W]e have a deal with Kathy Patrick and 50/60 percent of pls/ r and w claimants. Our [$]750 [million] contribution does not change but the waterfall will deliver over [$]1 billion to her class; trustees seem to be very relieved that servicer disruption in a free fall will be avoided. The big negotiating point was the amount of claims we would agree to (because this sets up for the next negotiation with eg Wells); the ask was [$]12 [billion] (about double the [Bank of America] settlement[)] and we ended up at [$]8.7 billion. There are some risks with this approach if, in the end, the plan falls apart bu[t] risks worth taking to have pls supporting the deal.[1934]

### (1) ResCap Board Approval Of RMBS Trust Settlement Agreements and RMBS Plan Support Agreements

On May 9, 2012, the ResCap Board met to consider the RMBS Trust Settlement Agreements.[1935] An e-mail was circulated to the ResCap Board at 2:08 p.m. scheduling a meeting to approve the settlement for 3:00 p.m.[1936] According to the agenda, a total of thirty minutes was allotted to consideration of the RMBS Trust Settlement Agreements.[1937] Lee provided the ResCap Board with discussion materials regarding the proposed settlement at 2:38 p.m.—leaving the board only twenty-two minutes (at most) to review and develop an understanding of those materials before the start of the meeting.[1938] Although the ResCap Board had been updated on the status of settlement negotiations on May 4, 2012,[1939] the May 9, 2012 meeting was the first occasion on which most of the ResCap Board members were informed of the $8.7 billion settlement amount, given that the agreement had been reached earlier that day.[1940]

---

[1934] E-mail from M. Carpenter (May 10, 2012) [CCM00120369].

[1935] *See* Minutes of a Special Meeting of the Board of Residential Capital, LLC, May 9, 2012, at 1–2 [EXAM00126544].

[1936] *See* E-mail from A. Ellenburg (May 9, 2012) [EXAM00230295].

[1937] *See* Agenda, Special Meeting of the Residential Capital, LLC Board of Directors, dated May 9, 2012, at RC40020576 [RC40020575].

[1938] *See* E-mail from G. Lee (May 9, 2012) [EXAM00230295]; Dep. of J. Whitlinger, Nov. 15, 2012, at 31:6–11.

[1939] *See* Draft Minutes of a Regular Meeting of the Board of Residential Capital, LLC, May 4, 2012, at 2 [EXAM11088898] ("Lee discussed the status of a proposed settlement of certain representation and warranty and private label securitization litigation claims.").

[1940] *See* Dep. of J. Whitlinger, Nov. 15, 2012, at 47:13–48:7.

At the May 9, 2012 meeting, the ResCap Board discussed the terms of the RMBS Trust Settlement Agreements and reviewed the presentation materials.[1941] Cancelliere advised the ResCap Board on, among other things, settlement defect rates and the allocation of liability among the Debtors.[1942] Renzi reviewed some of the key assumptions regarding the settlement and the preliminary agreements reached.[1943]

The board materials showed, among other things, that the proposed $8.7 billion allowed claim implied a 19.72% defect rate.[1944] In the presentation, the $8.7 billion allowed claim was juxtaposed against what the allowed amount of Trust R&W Claims would have been if alternative defect rates had been used.[1945] Notably, the presentation showed that the allowed claim would have been approximately $15.9 billion if the "BofA Baseline—36% Defect" rate had been applied.[1946] A footnote on the page explained that "BofA proposed settlement defect rate set at 36% prior to litigation adjustments."[1947] These figures were presented to the ResCap Board as "comparative data point[s] to the ResCap settlement"[1948] and were treated by at least certain members of the ResCap Board in exactly that manner.[1949] Their inclusion in the board presentation was ordered by Lee.[1950]

The inclusion of the Bank of America comparative defect rate in the board materials could have caused confusion among the ResCap Board members because the 36% "baseline" Bank of America defect rate was not "apples to apples" with the 19.72% ResCap "settlement" defect rate. The 19.72% ResCap defect rate reflected the total allowed claim of $8.7 billion divided by the estimated aggregate losses of $44.1 billion. If a similar calculation were applied to the Bank of America materials Patrick had sent Lee—a $15.5 billion claim divided by

---

[1941] *See* Minutes of a Special Meeting of the Board of Residential Capital, LLC, May 9, 2012, at 1 [EXAM00126544].

[1942] *See id.*

[1943] *See id.* On May 9, 2012, the AFI Board consented to waive its rights to approve certain actions by ResCap, including, among other things, ResCap's ability to enter into any legal settlement greater than $25 million. *See* Ally Financial Inc. Consent to Action, dated May 9, 2012, at ALLY_PEO_0020560–69 [ALLY_PEO_0020479].

[1944] *See* ResCap Private Label Securities Rep & Warrant Settlement Discussion Supporting Information, dated May 9, 2012, at RC40020578 [RC40020575].

[1945] *See id.*

[1946] *See id.* The "BofA Baseline" defect rate was not derived by ResCap or its professionals, but was provided by Patrick. *See* Dep. of J. Cancelliere, Nov. 14, 2012, at 184:9–20.

[1947] *See* ResCap Private Label Securities Rep & Warrant Settlement Discussion Supporting Information, dated May 9, 2012, at RC40020578 [RC40020575].

[1948] *See* Dep. of J. Cancelliere, Nov. 14, 2012, at 182:11–18.

[1949] *See* Dep. of J. Whitlinger, Nov. 15, 2012, at 38:10–40:16, 45:15–46:13; Dep. of J. Mack, Nov. 14, 2012, at 68:8–71:7.

[1950] *See* Dep. of J. Cancelliere, Nov. 14, 2012, at 183:4–10.

estimated aggregate losses of $107.8 billion—the "defect rate" would have been approximately 14.4%, not 36%.[1951]

During the meeting, Marano "requested that a report with separate line items identifying the different settlement amounts be prepared to provide the ResCap Board with additional details on the settlements."[1952] It is unclear if such materials were ever prepared and provided to the ResCap Board.[1953]

Compounding the confusion, at least some members of the ResCap Board erroneously believed that the $8.7 billion dollar claim amount accounted for the Debtors' potential litigation defenses to putback claims.[1954] The proposed claim amount, however, was not reduced for such litigation defenses.[1955] Other ResCap Board members understood the settlement to include a release of claims based on securities law violations,[1956] which also was not the case.

_____

[1951] *See* BOA Loss Estimation [EXAM00180200] (attached to E-mail from D. Sheeren to G. Lee (May 8, 2012) [EXAM00180199]).

[1952] *See* Minutes of a Special Meeting of the Board of Residential Capital, LLC, May 9, 2012, at 1 [EXAM00126544].

[1953] *See* Dep. of J. Cancelliere, Nov. 14, 2012, at 204:2–205:8.

[1954] *See* Dep. of J. Whitlinger, Nov. 15, 2012, at 115:24–117:8. Steven Abreu, a ResCap Board member, stated that he understood that the allowed claim amount did not include any reductions for potential litigation defenses. *See* Int. of S. Abreu, Jan. 22, 2013, at 350:22–351:2.

[1955] *See* Dep. of J. Cancelliere, Nov. 14, 2012, at 189:24–190:2; Dep. of J. Mack, Nov 14, 2012 52:25–53:7.

[1956] *See* Dep. of J. Mack, Nov. 14, 2012, 108:25–109:11. Abreu stated that he knew securities claims were not part of the settlement with Patrick because securities claims were not part of Lee's presentation to the board on May 9, 2012. *See* Int. of S. Abreu, Jan. 22, 2013, at 323:1–24.

There is evidence showing that the ResCap Board had a substantive familiarity with representation and warranty claims prior to receiving the settlement materials because of, among other things, prior discussions with its advisors, accounting policy teams, and in-house counsel.[1957] According to Lee:

> I actually recall having had several discussions with the board about the comparison with Lehman and Bank of America. I think the board was actually very familiar with the Bank of America settlement, either through presentations we made or independently. . . . [T]he board was perfectly comfortable with the range that we settled in. Because I think the view that we had been articulating was if the collective action lawsuits were brought, we'd be facing potentially a $44 billion claim. So, seemed to be perfectly rational. . . . There had been several discussions prior to that board meeting about people's perception of what ranges were appropriate. Because there had been several different waterfalls of analysis that were done and allocations of claims between GMAC and ResCap arising out of the PLS. My recollection was that Tom Marano and Jonathan Ilany, really the two people who traded these types of securities, both were of the view that they wouldn't be surprised if the ultimate number was well in excess of eight and probably closer to $20 billion. So I didn't get the impression that the board was remotely concerned with a number less than 10 [billion]. Given, I think, that their ultimate expectation was that the number could well be 20 [billion].[1958]

The ResCap Board voted to approve the settlement in approximately thirty minutes, subject to "such changes as [ResCap LLC] management, upon the advice of legal counsel, shall make with the understanding that if such changes are material they will be reviewed with

---

[1957] *See* Dep. of J. Whitlinger, Nov. 15, 2012, 30:23–31:5 ("[W]hen we talk about rep and warrant topics, the board has had plenty of experience around this discussion with our advisors, with our accounting policy teams and in-house counsel."); s*ee also* Minutes of a Regular Meeting of the Board of Residential Capital, LLC, July 1, 2011, at RC40018628 [RC40018411] (noting that Devine gave a "detailed presentation" to the ResCap Board regarding, among other things, PLS investor litigation and representation and warranty litigation). According to Devine:

> The business was deeply familiar for many years with . . . what representations were made in connection with and what potential exposures existed in connection with the various kinds of loan sales, whether they were GSE, whole loan, direct, or RMBS. . . . And when I presented to the Board . . . the discussions were lively and many-sided. It was not a one-way presentation. The questions were smart and well-informed.

Int. of T. Devine, Mar. 19, 2013, at 20:9–21:12.

[1958] Int. of G. Lee, Feb. 20, 2013, at 301:18–307:19; *see also* Dep. of J. Whitlinger, Nov. 15, 2012, 97:10–98:3 (noting that he understood the Countrywide Settlement amount was $8.5 billion).

the Board."[1959] On May 13, 2012, the ResCap Board formally resolved to enter into the RMBS Trust Settlement Agreements and the RMBS Plan Support Agreements.[1960]

### (2) Apparent Confusion During Attempts To Finalize Settlement Language After ResCap Board Approval

After approval of the economics of the settlement by the ResCap Board, counsel for the settling parties continued working towards memorializing the agreement. On May 9, 2012, after the ResCap Board had approved the settlement, Lee sent an e-mail to Patrick stating that "[t]here seems to be a disagreement . . . on one fundamental point" concerning the settlement.[1961] Lee noted that he understood "that the $8.7bn [proposed allowed claim] settles all claims arising from the sale and servicing of the RMBS."[1962] He noted, however, that Ross Martin of Ropes & Gray, which had been retained to act as the Steering Committee Group's bankruptcy counsel, understood the $8.7 billion dollar settlement would not involve a release of individual investors' securities law claims.[1963] Lee went on to state that such an arrangement was unacceptable and contrary to the understanding of the deal as approved by the ResCap Board, "because [it would] render[] a deal at $8.7bn illusory."[1964]

Lee's e-mail prompted Patrick to ask Devine to intercede and correct Lee's misunderstanding or risk the deal falling apart. She wrote:

> [Lee] is claiming he was "told" that [the Steering Committee Group] would release securities claims in the plan. We never told him that and we have never offered or agreed to release securities claims. We've been very clear about that from the very beginning. It's the basis on which I got my clients to approve it, it's what I've told the Trustees this morning. [I]t's also what I assured Freddie Mac. As you and I discussed: a release of securities claims is not part of this putback settlement. [Lee's] misunderstanding—*or his effort to extract something that we never offered and don't have to give*—is impeding getting the deal documented. Would you please intercede with him and tell him to move on? Insisting on this will destroy any

---

[1959] *See* Minutes of a Special Meeting of the Board of Residential Capital, LLC, May 9, 2012, at 1–2 [EXAM00126544]; Dep. of J. Whitlinger, Nov. 15, 2012, at 26:24–27:4 (confirming that thirty minutes was allotted for discussion of the proposed legal settlement).

[1960] Minutes of a Special Meeting of the Board of Residential Capital, LLC, May 13, 2012, at 9–10 [EXAM00184467].

[1961] E-mail from G. Lee to K. Patrick (May 9, 2012) [EXAM00345817].

[1962] *Id.*

[1963] *Id.*

[1964] *Id.*

> chance of the deal happening. I understand his determination to
> try again, but we need to move on. I'm sorry to bother you, but
> we need you to intercede here.[1965]

Devine indicated that he would "try to straighten everything out."[1966] Patrick thanked Devine and noted that she had just received a further call from Lee in which she informed him that a deal would never be reached if he insisted on attempting to roll securities claims into the settlement.[1967]

Following his e-mails with Patrick, Devine sent an e-mail to Lee, among others, explaining that:

> The [RMBS Trust Settlement Agreement] is for *everything*
> except securities claims. . . . The circle is squared at the
> Plan. . . . though [Patrick's] clients don't release securities
> claims, they sign Plan Support Agreements, and the Plan
> includes very simple comprehensive releases, which of course
> include third party release of all claims, which of course
> includes securities claims. . . . This is the beauty of it."[1968]

Devine's explanation of how the RMBS Trust Settlement Agreement fit into the larger plan architecture apparently had the desired effect—Jamie Levitt of Morrison & Foerster replied that ResCap would agree to exclude securities law claims from the RMBS Trust Settlement Agreement.[1969] Lee, Devine, and others then went on to discuss the importance of including a clear statement in the RMBS Plan Support Agreements that the Steering Committee Group would "support[] all releases including securities and fraud releases."[1970] Devine underscored that point, stating "It must say so. That's the deal."[1971]

---

[1965] E-mail from K. Patrick to T. Devine (May 9, 2012), at ALLY_0143982–83 [ALLY_0143982] (emphasis added).

[1966] E-mail from T. Devine to K. Patrick (May 9, 2012) [ALLY_0143982].

[1967] E-mail from K. Patrick to T. Devine (May 10, 2012) [ALLY_0143982].

[1968] E-mail from T. Devine (May 10, 2012) [EXAM00345817]. This and other communications suggest that Devine had a sophisticated understanding of the RMBS Trust Settlement Agreements and how that settlement fit in with the broader reorganization. In light of Devine's demonstrably sophisticated understanding of the deal, it is difficult to give significant credence to his statements at his deposition that he "may very well not have understood what [he] was talking about" with respect to the bankruptcy. Dep. of T. Devine, Nov. 19, 2012, at 246:7–13.

[1969] *See* E-mail from J. Levitt (May 10, 2012) [EXAM00345817]. On May 12, 2012, Levitt e-mailed Gibbs & Bruns and Ropes & Gray and stated "we do not have authority at this time to accept your removal of [the securities claims provisions] from the release and related provisions." E-mail from J. Levitt (May 12, 2012) [EXAM00179203]. But those provisions were eventually removed from the agreement.

[1970] *See* E-mail from G. Lee (May 10, 2012) [EXAM00345823].

[1971] E-mail from T. Devine (May 10, 2012) [EXAM00345823].

Lee's apparent confusion was curious because, less than a week earlier, he seemingly understood that "ResCap and the [Steering Committee Group] will settle all claims . . . *other than securities claims (which [Patrick] does not control)*."[1972] Despite Patrick's initial concerns, she apparently figured out that Lee was perhaps making an "effort to extract something."[1973] And, indeed, Lee admitted as much, explaining:

> There are a couple of things that happened right at the end. One is, you know, we settled on a deal with AFI at that point, and we're still in the final throes of negotiation with [Patrick]. You know, and I believe that it's my obligation to take one final crack at AFI to get more money and one final crack at [Patrick] to get something else. . . . And I was prepared, as I did, to negotiate right up until the time that we basically hit the button. . . . And I went back to [Patrick] and I told her that we'd like you to get the securities claims in. And, you know, we had a good fight about it, but, at the end of the day, the reason we backed down was she was correct. That's what the deal was and that's what she told us.[1974]

### (3) Negotiations With The Talcott Franklin Group

As noted above, ResCap primarily negotiated the terms of the RMBS Trust Settlement Agreements with the Steering Committee Group because, unlike the Talcott Franklin Group, the Steering Committee Group "could kill a sale, full stop."[1975]

On March 22, 2012, Franklin sent a letter to Devine expressing his frustration at AFI's failure to move forward in negotiating a resolution of his client's claims.[1976] In his letter, Franklin stated that his clients were "concerned that [AFI] may be holding out on [them] so it can place RFC in bankruptcy and force an untenable resolution" on them.[1977] Franklin suggested that there would be adverse consequences for AFI if it pursued such a strategy, reiterated his desire to resolve his clients' claims, and requested a response no later than March 26, 2012.[1978]

On April 19, 2012, Franklin, apparently having become frustrated by the slow pace at which settlement negotiations were advancing, informed Devine that he intended to

---

[1972] E-mail from G. Lee to T. Devine and T. Hamzehpour (May 4, 2012) [EXAM00191506] (emphasis added).

[1973] E-mail from K. Patrick to T. Devine (May 9, 2012) [ALLY_0143982].

[1974] Int. of G. Lee, Feb. 20, 2013, at 321:15–328:12.

[1975] *Id.* at 151:23–153:3.

[1976] *See* Letter from T. Franklin to T. Devine (Mar. 22, 2012) [ALLY_0143503].

[1977] *Id.*

[1978] *See id.*

independently reach out to Fortress to discuss his clients' interests following a ResCap bankruptcy filing.[1979] On April 19, 2012, Devine e-mailed Hamzehpour and Solomon to update them on this development with the Talcott Franklin Group.[1980] In that e-mail, Devine indicated that he had attempted to dissuade Franklin from directly engaging with Fortress, and recommended "giving Talcott a 'KP-Lite' meeting."[1981]

On May 9, 2012, Devine reported receiving a call from Franklin in which Franklin indicated that he was "very favorably inclined to support and participate in" the plan support and settlement agreements that were then in the progress of being developed.[1982] Lee responded by stating that he would send Franklin a revised settlement agreement and plan support agreement after receiving a revised draft from Patrick.[1983]

On May 11, 2012, Levitt emailed Devine, copying Lee and Noah Ornstein of Kirkland & Ellis, stating that she had:

> spent a considerable amount of time today talking first with Talcott Franklin and then on two occasions with his gaggle of lawyers. It is pretty clear they are coming to understand the economics and advantages of the proposal and want in. . . . With all this in mind, we would like to pick your brain tomorrow on how you best see fit to maneuver the Kathy/Talcott discussions and intrigue.[1984]

On May 12, 2012, Devine sent an e-mail to Levitt, Lee, Ornstein, and Ruckdaschel asking if "Talcott Franklin [had] signed on without reservation to support the Plan, including broad third party release of all claims against [AFI] etc including security claims?"[1985] Lee responded that it was "complicated—they are trying to preserve lots of other claims . . . . [W]e sent Talcott the agreement the way we wanted it and told him he couldn't really negotiate it— but if [Patrick] doesnt sign I dont know if he will."[1986]

On May 13, 2012, Devine e-mailed Franklin and informed him that he could not "expose [AFI] to any claims however remote."[1987] By this statement, Devine intended to convey that

---

[1979] *See* E-mail from T. Devine to W. Solomon and T. Hamzehpour (Apr. 19, 2012) [EXAM00191427].

[1980] *See id.*

[1981] *Id.*

[1982] E-mail from T. Devine (May 9, 2012) [EXAM00180216]; Dep. of T. Devine, Nov. 19, 2012, at 239:12– 240:25.

[1983] E-mail from G. Lee (May 9, 2012) [EXAM00180216]; Dep. of T. Devine, Nov. 19, 2012, at 242:10–18.

[1984] E-mail from J. Levitt (May 11, 2012) [EXAM00345831].

[1985] E-mail from T. Devine (May 12, 2012) [EXAM00345296].

[1986] E-mail from G. Lee (May 12, 2012) [EXAM00345296].

[1987] E-mails between T. Devine and T. Franklin (May 13, 2012) [ALLY_0144252].

AFI's support for the plan was contingent on Franklin's clients agreeing to support a "third-party nonconsensual release" for AFI.[1988] Later that day, Devine again e-mailed Franklin stating that they "need[ed] to close now . . . this is my last chance [to] get you in the deal pre-filing . . . ."[1989] Franklin thanked Devine and asked for a call to "tell [him] what we're able to do so there's no confusion."[1990] Ultimately, the Talcott Franklin Group agreed to the RMBS Trust Settlement Agreements and RMBS Plan Support Agreements.[1991]

### f.   Terms Of The RMBS Trust Settlement Agreements

#### (1) Allowed Claim

The RMBS Trust Settlement Agreements seek to resolve all the Trust R&W Claims in exchange for an allowed general unsecured claim of up to $8.7 billion.[1992] The proposed settlement extends to all securitizations issued by the Debtors, not just those in which the Steering Committee Group or the Talcott Franklin Group have significant holdings.[1993] The final amount of the allowed claim will be reduced from $8.7 billion based upon the total dollar amount of original principal balance for the trusts participating in the settlement.[1994] Each of the RMBS trusts that accepts the settlement will receive an allocated portion of the allowed claim pursuant to the determination of a "qualified financial advisor" after application of certain allocation formulas.[1995]

#### (2) Amendments To RMBS Trust Settlement Agreements

On August 15, 2012, the Debtors filed amended and restated RMBS Trust Settlement Agreements.[1996] The most significant amendment permitted each settling trust to reallocate up to 20% of its share of the $8.7 billion allowed claim as a general unsecured claim against

---

[1988] *See* Dep. of T. Devine, Nov. 19, 2012, at 286:15–287:20.

[1989] E-mail from T. Devine to T. Franklin (May 13, 2012) [ALLY_0144252].

[1990] E-mail from T. Franklin to T. Devine (May 13, 2012) [ALLY_0144252].

[1991] *See* Talcott Franklin Group RMBS Trust Settlement Agreement, dated May 13, 2012 [RC00031542]; Talcott Franklin Group Plan Support Agreement, dated May 13, 2012 [RC00031742].

[1992] *See* Debtors' Supplemental Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the RMBS Trust Settlement Agreements [Docket No. 1176]; Objection of the Official Committee of Unsecured Creditors to the Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the RMBS Trust Settlement Agreements [Docket No. 2825].

[1993] RMBS Trust Settlement Agreements, § 5.01.

[1994] *Id.*

[1995] *See id.* Ex. B. The Examiner did not investigate the proposed allocation methodology.

[1996] *See* Amended and Restated RMBS Trust Settlement Agreement with the Steering Committee Group [Docket No. 1176-2]; Amended and Restated RMBS Trust Settlement Agreement with the Talcott Franklin Group [Docket No. 1176-3] (together, the "First Amended RMBS Trust Settlement Agreements").

ResCap LLC (the "HoldCo Election").[1997] For each settling trust that could have made the HoldCo Election, the amount of the allowed claim to be asserted against the other Debtors would have been reduced on a dollar-for-dollar basis.[1998] The Debtors asserted that the HoldCo Election was meant to resolve "direct purported alter ego claims against [ResCap LLC] that the [RMBS] Institutional Investors argue they could have directed the Trustees to assert."[1999]

As originally proposed, the RMBS Trust Settlement Agreement provided that the allowed $8.7 billion claim would be against RFC and GMAC Mortgage.[2000] As amended, the RMBS Trust Settlement Agreements provide that the Depositor Entities would be jointly liable with RFC and GMAC Mortgage for the allowed claim.[2001]

On October 19, 2012, the Debtors again filed amended and restated RMBS Trust Settlement Agreements.[2002] The Third Amended and Restated RMBS Trust Settlement Agreements formally removed the Holdco Election but, unlike the original RMBS Trust Settlement Agreement, allowed for possible recoveries against ResCap LLC.[2003] The total potential liability of ResCap LLC is limited to $8.7 billion and any recovery by an accepting trust on any allowed claim against ResCap LLC will be reduced by any amounts paid to such accepting trust by RFC, GMAC Mortgage, or any of the Depository Entities on account of the Trust R&W Claims.[2004]

---

[1997] *See id.* § 6.02.

[1998] *Id.*

[1999] *See* Debtors' Supplemental Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the RMBS Trust Settlement Agreements [Docket No. 1176] at 12.

[2000] *See* Declaration of William J. Nolan in Support of Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the RMBS Trust Settlement Agreements [Docket No. 320-7] ¶ 9.

[2001] *See* First Amended RMBS Trust Settlement Agreements, §§ 1.03, 5.01.

[2002] *See* Third Amended and Restated RMBS Trust Settlement Agreement with the Steering Committee Group [Docket No. 1887-2]; Third Amended and Restated RMBS Trust Settlement Agreement with the Talcott Franklin Group [Docket No. 1887-3] (together, the "Third Amended RMBS Trust Settlement Agreements"). The parties also entered into Second Amended and Restated RMBS Trust Settlement Agreements, but such agreements were never filed with the Bankruptcy Court.

[2003] *See id.* §§ 6.02, 8.01. Under the Third Amended RMBS Trust Settlement Agreements, accepting trusts are permitted to file proofs of claim against ResCap LLC. Such proofs of claim will remain subject to objections in all respects. *See id.* §8.01.

[2004] *See id.*

### (3) Released Claims

Under the RMBS Trust Settlement Agreement, in exchange for the allowed $8.7 billion claim, the RMBS Institutional Investors, each of the accepting trusts, and the trustees in respect of such trusts will release the Debtors (excluding ResCap LLC) and their current and former officers, directors, and employees (excluding AFI and its officers or directors) from all Trust R&W Claims that arose prior to the Petition Date.[2005] The claims allowance and releases are effective on the date on which the Bankruptcy Court enters an order approving the RMBS Trust Settlement Agreement.[2006] The RMBS Trust Settlement Agreement does not release individual direct claims for securities fraud or other disclosure-related claims arising from the purchase or sale of RMBS.[2007]

### g. Terms Of The RMBS Plan Support Agreements

The Steering Committee Group and the Talcott Franklin Group entered into substantially similar RMBS Plan Support Agreements with the Debtors and AFI that obligated the RMBS Institutional Investors to direct the securitization trustees to support the terms of the proposed Plan Term Sheet and the AFI Settlement and Plan Sponsor Agreement, including the Third-Party Release for AFI.[2008]

### (1) Distributions To RMBS Institutional Investors

The RMBS Plan Support Agreements require that the Plan "be materially consistent with the methodology of allocation of sale proceeds, settlement proceeds, and all other matters that determine distributions to creditors as set forth in the May 9, 2012 and May 12, 2012 Executive Summaries . . . given by Debtors' counsel to the steering committee appointed by

---

[2005] *See id.* § 7.01. Specifically, the RMBS Institutional Investors, each of the accepting trusts, and the trustees in respect of such trusts will release claims arising out of and/or relating to the following: (1) the origination and sale of mortgage loans to the accepting trusts; (2) documentation of the underlying mortgage loans held by the accepting trusts; (3) the servicing of the mortgage loans held by the accepting trusts, but only to the extent assumed pursuant to the sales of the Debtors' assets; (4) any duty of a debtor as master servicer, servicer, or sub-servicer to notice and enforce remedies in respect of alleged breaches of representations and warranties; (5) setoff or recoupment under the accepting trusts' governing agreements; and (6) any mortgage loan seller that either sold loans to ResCap or AFI that were sold and transferred to an accepting trust or sold loans directly to an accepting trust. *Id.*

[2006] *See id.* § 2.01.

[2007] *See id.* § 7.01.

[2008] RMBS Plan Support Agreements, at 2.

the Consenting Claimants."[2009] Accordingly, the RMBS Institutional Investors apparently have a preset ratable share of creditor recoveries, including recoveries from any contribution by AFI.[2010] As Patrick explained:

> You don't know what's going to happen on the size of [AFI]'s contribution, which is why the plan support agreement we negotiated negotiates for a waterfall treatment, not an absolute size because we wanted to be sure that if there was more money that came in, the trust would be treated . . . the same. That is, not the same in dollars, but the same rateable take of the number.[2011]

### (2) Termination Rights Regarding RMBS Plan Support Agreements

The RMBS Institutional Investors are permitted to terminate the RMBS Plan Support Agreements with three days' advance written notice upon the occurrence of a variety of events or conditions, including the Debtors' failure to comply with the deadlines and conditions set forth in the milestones.[2012] Although a number of termination events have been triggered, the Steering Committee Group has not terminated its agreement, and therefore the Steering Committee Group RMBS Plan Support Agreement remains binding on the parties.[2013]

The RMBS Plan Support Agreements automatically terminate upon a breach by the RMBS Institutional Investors of any material provision of either the RMBS Plan Support Agreements or the RMBS Trust Settlement Agreements, unless such breach is waived in writing by the Debtors or AFI.[2014] In addition, if the Debtors make a good faith determination that an alternative restructuring proposal is "reasonably likely to be more favorable" than the restructuring contemplated by the Plan "to the Debtors' estates, their creditors, and other parties to whom the Debtors owe fiduciary duties," then the Debtors are permitted to immediately terminate their obligations under the RMBS Plan Support Agreement, including the obligation to seek approval of a plan that provides a Third-Party Release.[2015] However, if the Debtors determine to pursue such an alternative restructuring, it must be "no less favorable to the [RMBS] Consenting Claimants than the [r]estructuring contemplated by the Plan."[2016]

---

[2009] *Id*. § 1(c).

[2010] *See* Int. of K. Patrick, Mar. 18, 2013, at 118:8–120:15, 154:25–155:8, 213:7–215:15.

[2011] *Id*. at 119:23–120:8.

[2012] RMBS Plan Support Agreements, §§ 6.1, 6.4.

[2013] *See* Ally Financial Inc., Quarterly Report (Form 10-Q) (May 1, 2013), at 10. The Steering Committee Group RMBS Plan Support Agreement remains in effect notwithstanding the termination of the AFI Settlement and Plan Sponsor Agreement. Patrick explained that if AFI ultimately contributes an amount greater than $750 million, the RMBS Institutional Investors are "going to do better." Int. of K. Patrick, Mar. 18, 2013, at 214:14–216:11. However, if AFI's cash contribution is lower, according to Patrick, "[w]e'll all be very unhappy that we screwed with [AFI] . . . which is what I told people at the time." *Id*. On April 18, 2013, the Talcott Franklin Group sent the Debtors and AFI a notice of termination of its RMBS Plan Support Agreement. *See* Ally Financial Inc., Quarterly Report (Form 10-Q) (May 1, 2013), at 10.

[2014] RMBS Plan Support Agreements, §§ 6.2, 6.4.

[2015] *Id*. at § 2.4.

[2016] *Id*.

### (3) Debtors' Obligations Under RMBS Plan Support Agreements

Under the RMBS Plan Support Agreements, the Debtors agreed to the following obligations: (1) file a motion within fourteen days of the petition date seeking approval of the RMBS Trust Settlement Agreements and obtain an order approving the motion by the earlier of (a) sixty days after the petition date, and (b) the date on which the disclosure statement is approved;[2017] (2) for sixty days following the petition date, offer to all other RMBS holders a settlement of their claims on the same economic terms;[2018] and (3) file a motion within twenty-one days of the petition date seeking authority to perform under the RMBS Plan Support Agreements.[2019]

### (4) RMBS Institutional Investors' Obligations Under RMBS Plan Support Agreements

Under the RMBS Plan Support Agreements, the RMBS Institutional Investors agreed to direct the trustees to undertake the following obligations: (1) use commercially reasonable efforts to obtain agreement to the RMBS Plan Support Agreements and the RMBS Trust Settlement Agreements from holders of mortgage-backed securities held by the securitization trusts other than the RMBS Institutional Investors;[2020] (2) support the Debtors' restructuring, the prosecution of the first and second day pleadings, and prosecution of the chapter 11 cases;[2021] (3) support entry of an injunction staying litigation against AFI and current and former directors and officers of AFI and ResCap during the pendency of the chapter 11 cases;[2022] (4) vote to accept the plan;[2023] and (5) support confirmation of the plan and approval of any settlement with AFI, including approval of the Third-Party Release, on terms no less favorable than the AFI Settlement and Plan Sponsor Agreement and take no action otherwise adverse to AFI during the chapter 11 cases.[2024] The RMBS Institutional Investors also agreed to maintain holdings aggregating 25% of the voting rights in one or more classes of securities of not less than 235 of the securitizations issued by the Debtors.[2025] The RMBS Institutional Investors did not waive their right to file an objection to a motion of the Junior Secured Noteholders requesting payment of any interest on account of their claims.[2026]

---

[2017] *Id*. at § 2.1(a).

[2018] *Id*. at § 2.1(b).

[2019] *Id*. at § 2.2(b).

[2020] *Id*. at § 3.1(b).

[2021] *Id*. at §§ 3.1(a), (c)–(d).

[2022] *Id*. at § 3.1(e).

[2023] *Id*. at § 3.1(h).

[2024] *Id*. at § 3.1(i).

[2025] *Id*. at § 3.3.

[2026] *Id*. at § 2.2.

### (5) AFI's Obligations Under RMBS Plan Support Agreements

AFI consented to approval of the RMBS Trust Settlement Agreement or any allowance of the claims of the trusts in any amount at or less than the aggregate amount of $8.7 billion, or to any allocation of such claims among the trusts reasonably proposed by the RMBS Institutional Investors.[2027]

### h. Examiner's Conclusions Regarding Process Resulting In RMBS Trust Settlement Agreements And RMBS Plan Support Agreements

### (1) Role Of AFI And Tim Devine In Negotiations

The objectors to the RMBS Trust Settlement Agreements argue that the Bankruptcy Court should decline to approve the settlement because it was not the product of arm's length bargaining.[2028] The principal theory underlying the objections is that AFI "dominated and controlled" the negotiations to obtain a Third-Party Release, essentially "trading" an "excessive" $8.7 billion allowed claim against ResCap for an "inadequate" $750 million plan contribution by AFI.[2029]

The objectors focus on the involvement of Tim Devine, AFI's Chief Counsel of Litigation, arguing that he "dominated" the settlement negotiations.[2030] Devine has suggested that his role was minimal and that many of his communications with Patrick were then distributed to the appropriate parties at ResCap, Morrison & Foerster, AFI, or Kirkland & Ellis, or some combination thereof.[2031] Such assertions understate Devine's role in the negotiations. The RMBS objectors rightly point out that Devine played one of the central roles in the settlement negotiation process. Indeed, Devine testified that he viewed his role as "driving a deal to conclusion" between ResCap, the RMBS Institutional Investors, and AFI.[2032]

---

[2027] *Id*. at § 4(a).

[2028] *See* Objection of the Official Committee of Unsecured Creditors to the Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the RMBS Trust Settlement Agreements [Docket No. 2825] at 1–3; Objection of Financial Guaranty Insurance Company to the Debtors' Second Supplemental Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of RMBS Trust Settlement Agreements [Docket No. 2819] ¶¶ 2–4; Objection of MBIA Insurance Corporation to Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the RMBS Trust Settlement Agreements [Docket No. 2810] at 1–3.

[2029] *See* Objection of the Official Committee of Unsecured Creditors to the Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the RMBS Trust Settlement Agreements [Docket No. 2825] at 1, 20–21.

[2030] *See, e.g.*, Objection of Financial Guaranty Insurance Company to the Debtors' Second Supplemental Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of RMBS Trust Settlement Agreements [Docket No. 2819] ¶¶ 7–9.

[2031] *See* Int. of T. Devine, Mar. 19, 2013, at 56:9–58:13.

[2032] Dep. of T. Devine, Nov. 19, 2012, at 248:4–249:4.

However, the totality of the evidence suggests that Devine advocated consistently in negotiations for as low an allowed claim amount as was achievable.[2033] Notably, as the negotiations were drawing close to a resolution, Devine was the principal advocate among the representatives of ResCap and AFI for continuing to "pick away" at Patrick's demands.[2034] Correspondence between Lee and Devine on May 8, 2012 suggests that Lee would have been willing to settle the allowed amount of the Trust R&W Claims at or near Patrick's demand of $10 billion, whereas Devine continued to press for a "lower" dollar number, suggesting $8 billion as a possible stipulated allowed claim.[2035]

The Creditors' Committee argues that AFI's "primary—or sole—motivation" in reaching the RMBS settlement was to obtain a Third-Party Release.[2036] The evidence does not support that assertion. AFI had good reasons to negotiate for as low an allowed claim amount as was achievable, including: (1) AFI would potentially be liable for all of the Debtors' debts if an Estate representative successfully pierced the corporate veil between AFI and the ResCap entities;[2037] (2) AFI had publicly disclosed on April 27, 2012 that "ResCap's reasonably possible losses over time related to the litigation matters and potential repurchase obligations . . . could be between $0 and $4 billion over existing accruals [of $811 million],"[2038] and was concerned that agreeing to an allowed claim well in excess of that amount could create "securities/SEC/disclosure risk";[2039] and (3) AFI was under pressure from federal regulators to settle at a defect rate that would not put stress on other banks.[2040]

The Examiner concludes that AFI was motivated to and did advocate consistently throughout the negotiations for a lower claim amount and, ultimately, AFI's involvement in the negotiations helped drive down the proposed allowed claim amount. The Examiner

---

[2033] *See, e.g.*, Int. of G. Lee, Feb. 20, 2013, at 103:10–23 (Lee: "My personal experience with [Devine] was, irrespective of whether he was considered a badged [AFI] employee, that he was acting in—throughout the period of time I engaged with him, in a way that was consistent with the best interests of ResCap.").

[2034] *See* E-mail from T. Devine (May 7, 2012) [EXAM00345282]; *see also* Dep. of T. Marano, Nov. 12, 2012, at 249:4–20 ("I think [Devine] was negotiating his position, trying to get Ms. Patrick down from a number that was in the vicinity of 30 percent. . . . Clearly in this context he was assisting . . . in negotiating this defect rate.").

[2035] *See* E-mails between T. Devine and G. Lee (May 8, 2012) [EXAM00191095].

[2036] *See* Objection of the Official Committee of Unsecured Creditors to the Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the RMBS Trust Settlement Agreements [Docket No. 2825] at 17–18.

[2037] *See, e.g.*, Motion of the Official Committee of Unsecured Creditors for Entry of an Order Authorizing the Committee to Prosecute and Settle Certain Claims on Behalf of the Debtors' Estates [Docket No. 3412] at 1 (seeking authority to pursue claims that "may render AFI liable for the entire $20-25 billion of the estates' unsecured liabilities").

[2038] *See* Ally Financial Inc., Quarterly Report (Form 10-Q) (Apr. 27, 2012), at 69, 73.

[2039] *See* E-mail from T. Devine (May 7, 2012) [EXAM00345282].

[2040] *See* E-mail from T. Devine to K. Patrick (May 8, 2012), at EXAM00180194 [EXAM00180193] ("I'm getting lots of pressure on valuation now."); E-mail from M. Carpenter (May 10, 2012) [CCM00120369] ("The big negotiating point was the amount of claims we would agree to (because this sets up for the next negotiation with eg Wells)."); s*ee also* Int. of K. Patrick, Mar. 18, 2013, at 191:10–194:9.

concludes that the evidence supports the proposition that the process underlying the RMBS Trust Settlement Agreements and RMBS Plan Support Agreements was sufficiently robust to satisfy the "arm's length bargaining" factor under Rule 9019.

### (2) ResCap Board Approval Process

The objectors to the RMBS Trust Settlement Agreements argue that the ResCap Board "rubber-stamped" the RMBS Trust Settlement Agreements on May 9, 2012 after reviewing a "cursory" and "flawed" presentation.[2041]

The presentation provided to the ResCap Board on May 9, 2012 showed that the proposed $8.7 billion allowed claim amount implied a 19.72% defect rate, and presented a comparison to what the proposed claim amount would have been if supposedly comparable alternative defect rates had been used.[2042] Specifically, the presentation showed that if the "BofA Baseline—36%" defect rate had been applied to the approximately $44.1 billion estimated lifetime losses for ResCap's RMBS issuance, the allowed claim amount would have been approximately $15.9 billion.[2043] As discussed above in Section III.J.4.e(1), ResCap's advisors knew or should have known that the 36% "baseline" Bank of America defect rate was not "apples to apples" with the 19.72% ResCap "settlement" defect rate.[2044] An "apples to apples" calculation based on the Bank of America materials provided to ResCap's advisors by the Steering Committee Group would have yielded a defect rate of approximately 14.4%, not 36%.[2045] If a 14.4% rate had been applied to ResCap's $44.1 billion estimated lifetime losses, the comparative allowed claim amount would have been approximately $6.35 billion. At least

_____

[2041] *See* Objection of the Official Committee of Unsecured Creditors to the Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the RMBS Trust Settlement Agreements [Docket No. 2825] at 18; *see also* Objection of Financial Guaranty Insurance Company to the Debtors' Second Supplemental Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of RMBS Trust Settlement Agreements [Docket No. 2819] ¶ 4, 26–32; Objection of Wilmington Trust, National Association to the Debtors' Second Supplemental Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of RMBS Trust Settlement Agreements [Docket No. 2814] at 2. The RMBS objectors also assert that the Debtors and the ResCap Board breached their fiduciary duties to creditors by approving the RMBS Trust Settlement Agreements. *See* Objection of Financial Guaranty Insurance Company to the Debtors' Second Supplemental Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of RMBS Trust Settlement Agreements [Docket No. 2819] ¶ 41–43. For the Examiner's analysis of potential breach of fiduciary duty claims in connection with the ResCap Board's approval of the RMBS Trust Settlement Agreements, see Section VII.E.

[2042] *See* ResCap Private Label Securities Rep & Warrant Settlement Discussion Supporting Information, dated May 9, 2012, at RC40020578 [RC40020575].

[2043] *See id.*

[2044] As discussed in Section III.J.4.e(1), the 19.72% "settlement" defect rate reflected a calculation of the $8.7 billion total allowed claim divided by the $44.1 billion estimated aggregate losses.

[2045] *See* BOA Loss Estimation [EXAM00180200] (attached to E-mail from D. Sheeren to G. Lee (May 8, 2012) [EXAM00180199]).

one ResCap Board member, John Mack, apparently relied on the flawed comparative figures in evaluating the reasonableness of the $8.7 billion allowed claim amount.[2046]

The presence of flawed comparative data points in the May 9, 2012 presentation does not, by itself, render the ResCap Board approval process inadequate. The May 9, 2012 presentation set forth in detail other information that the ResCap Board needed to understand to make an informed decision to approve the RMBS Trust Settlement Agreements and the RMBS Plan Support Agreements.[2047] According to Jim Whitlinger, the comparative data points were not the primary focus of the presentation to the ResCap Board:

> We had, you know, conversations regarding the types of claims that could be brought forth. Our lawyers and our advisors and our numbers people had talked about what types of risk could come from litigation and our advisors told us that this settlement was a good settlement based on all those risks. It wasn't pointed to just saying this Lehman claim amount defect rate or this BofA baseline defect rate is the most important thing on this page. It's a data point.[2048]

In addition, the ResCap Board had significant experience and familiarity with the issues underlying the settlements.[2049] Because of that familiarity with the underlying issues, the brief time allotted for consideration of the proposed settlement (approximately thirty minutes) does not necessarily mean the consideration was inadequate. Certain ResCap Board members explained that they independently believed the $8.7 billion allowed claim settlement was appropriate based on their understanding of the claims at issue and past review of internal

---

[2046] *See* Dep. of J. Mack, Nov. 14, 2012, at 68:8–71:7 ("[W]e thought the number was—well, it was, by evidence, lower than two other settlements, one of which Ms. Patrick had been engaged with. That was the Bank of America. And it was within the range of defects that we his—we, ResCap, historically had. It was kind of the midpoint of that range. So in a market sense, it seemed to be a reasonable number. . . . The BofA defect rate was higher. That's what I was looking at.").

[2047] *See* ResCap Private Label Securities Rep & Warrant Settlement Discussion Supporting Information, dated May 9, 2012, at RC40020579 [RC40020575].

[2048] Dep. of J. Whitlinger, Nov. 15, 2012, 45:6–46:13

[2049] *See id*. at 30:23–31:5 ("[W]hen we talk about rep and warrant topics, the board has had plenty of experience around this discussion with our advisors, with our accounting policy teams and in-house counsel."); *see also* Draft Minutes of a Regular Meeting of the Board of Residential Capital, LLC, May 4, 2012, at 2 [EXAM11088898] ("Lee discussed the status of a proposed settlement of certain representation and warranty and private label securitization litigation claims."); Minutes of a Regular Meeting of the Board of Residential Capital, LLC, July 1, 2011, at RC40018628 [RC40018411] (Devine gave a "detailed presentation" to the ResCap Board regarding, among other things, PLS investor litigation and representation and warranty litigation); Int. of T. Devine, Mar. 19, 2013, at 20:9–21:12 (ResCap management was "deeply familiar" with representation and warranty claims).

ResCap analyses.[2050] The Examiner concludes that, while it is a close question, it is more likely than not that a court would find that the ResCap Board had a sufficient understanding of the underlying Trust R&W Claims to vote on an informed basis with respect to the RMBS Trust Settlement Agreements.

Importantly, when the ResCap Board voted to approve the RMBS Trust Settlement Agreements, it understood that a settlement with the RMBS Institutional Investors on the allowed amount of Trust R&W Claims was critical to achieving a successful sale of ResCap's mortgage loan origination and servicing platform.[2051] Accordingly, the Examiner concludes that the evidence supports the proposition that the ResCap Board had a rational business purpose in mind when it approved the RMBS Trust Settlement Agreements.

While the May 9, 2012 presentation to the ResCap Board was flawed, the Examiner does not believe that such flaws undermine the conclusion that the settlement negotiations between ResCap, AFI, and the Steering Committee Group were conducted at arm's length.

### (3) Disclosure Of Reasonably Possible Losses On Trust R&W Claims

As noted above, just a few weeks before the $8.7 billion claim amount was agreed upon in connection with the RMBS Trust Settlement Agreements, AFI publicly disclosed that "ResCap's reasonably possible losses over time related to the litigation matters and potential repurchase obligations . . . could be between $0 and $4 billion over existing accruals."[2052] In that same SEC filing, AFI disclosed it had established a reserve of $811 million for such liabilities.[2053]

---

[2050] *See* Int. of J. Ilany, Nov. 28, 2012, at 169:9–173:24 ("[W]e looked at numbers that were in the 40-plus, $50 billion type of numbers, and that we settled it in 20 cents on the dollars, and that given the recovery expectation . . . that ResCap had, because everybody in the industry has different ones, the number we thought could be as high as—closer to [$]20 billion."); *see also* Int. of P. West, Jan. 11, 2013, at 188:17–189:4 ("[A]s we looked at where we had settled claims in the past which was somewhere between 10 and 30 percent, we looked at some market data and said, you know, if we can settle the 45 billion for 20 percent, that that would be a good thing to do.").

[2051] *See* Dep. of T. Marano, Nov. 12, 2012, at 171:8–176:12 ("[R]esolution of the PLS claims was critical to enhancing the value of the platform for a sale. . . . [B]y settling those claims, we put the assets in a position where . . . [w]e could sell them at a higher price."); Int. of E. Smith, Nov. 30, 2012, at 193:14–195:6 ("[W]e were trying to maximize the pie for creditors. Part of doing that was selling the platform and the legacy bonds. And, without that [RMBS Trust] settlement, I don't think we could have sold the mortgage platform for anything close to what we sold it for, $3 billion. I think that it would be at least $1 billion less."); Int. of J. Ilany, Nov. 28, 2012, at 169:9–173:24 ("[W]ithout getting a release from the trustees, this transaction is not closing. . . . It's not closing because nobody's buying. You need to inoculate this platform and this platform, somebody bid $3 billion for it, a big number for the creditors . . . ."); Int. of P. West, Jan. 11, 2013, at 190:9–16 ("[Y]ou've got to have, you know, we wanted to have a settlement of RMBS claims. So, we had a window to sell a very clean platform."); Int. of J. Mack, Jan. 15, 2013, at 211:19–212:4 ("[T]he RMBS Trust Settlement, to me, . . . allows us to sell a clean platform, the value of which [inures] to all of the creditors. So that's a huge benefit to the creditors, being able to sell a clean platform.").

[2052] *See* Ally Financial Inc., Quarterly Report (Form 10-Q) (Apr. 27, 2012), at 73.

[2053] *See id.* at 69.

The Creditors' Committee has suggested that a comparison between the claim amount ultimately agreed with the Steering Committee Group and the exposure disclosed in AFI's SEC filing is evidence of a flawed negotiation process.[2054] To explain the apparent discrepancy between the settlement amount and AFI's disclosures to the SEC, the Debtors assert that the $0 to $4 billion range estimates the liability that the Debtors "would have faced had they continued as [a] going concern outside of bankruptcy."[2055] The Debtors note that the disclosed range was based on non-litigation loan repurchase history, for the "obvious" reason that not one trust had brought a lawsuit against the Debtors before that point in time. The Debtors then contrast these facts with the proposed $8.7 billion allowed claim amount under the RMBS Trust Settlement Agreements. The Debtors assert the $8.7 billion reflected the assumption that all of the 392 trusts would assert all claims against the Debtors through the proof of claim process in the Chapter 11 Cases.[2056]

The Debtors assert that AFI was required to disclose and estimate, if possible, its "reasonably possible" future losses.[2057] In a presentation to the AFI Audit Committee dated July 27, 2011, AFI noted several factors that contributed to AFI's inability to estimate a reasonably possible range of loss in excess of its then current reserve levels with respect to representation and warranty claims, including: (1) there were limited data points for comparative purposes; (2) loss calculation required a loan-by-loan review; and (3) there were significant hurdles for plaintiffs, including the requirement that investors comprise 25% of a class of securities issued by a trust before the trust can pursue representation and warranty claims.[2058]

In the first quarter of 2012, AFI determined that estimation of losses was possible. In an internal accounting memo, AFI referred to several factors in support of its decision that it was now possible for AFI to report a range of possible losses, including: (1) increased activity by trustees relating to PLS representation and warranty claims on behalf of investors; (2) increased activity by investors in their own right relating to PLS representation and warranty claims, "including additional clarity regarding extent of investor power to compel trustees to make PLS R&W claims"; and (3) developments in AFI's PLS representation and warranty cases.[2059] AFI's internal accounting memo specifically referred to the "substantial engagement with Gibbs & Bruns" and "substantial engagement with Talcott Franklin."[2060]

---

[2054] *See* Objection of the Official Committee of Unsecured Creditors to the Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the RMBS Trust Settlement Agreements [Docket No. 2825] at 14–15, 18.

[2055] Debtors' Reply Brief re *Iridium* Factors in Support of Motion for Approval of RMBS Settlement Agreements, dated Jan. 15, 2012, at 54.

[2056] *Id*.

[2057] *Id*. at 53.

[2058] *See* AFI Audit Committee Mortgage Contingencies Review with Disclosure Benchmarking Presentation, dated July 27, 2011, at 8–9 [RC40021333].

[2059] Memorandum, Legal/Rep and Warrant—Range of Reasonably Possible Loss Disclosure Considerations—Q1 2012, dated Apr. 27, 2012, at 1–2 [ALLY_PEO_0074712].

[2060] *Id*.

As of April 27, 2012, the same date of AFI's accounting memo in which AFI estimated its range of reasonably possible losses at $0 to $4 billion above its accrual of $811 million, ResCap, with AFI's knowledge, was presenting scenarios in which the allowed amount of Trust R&W Claims ranged from $3 to $6 billion, and AFI knew that this range was likely too low.[2061] There is a disconnect between AFI's disclosures in its SEC filings and the settlement discussions with Patrick. As discussed above, Devine was concerned that this disconnect could give rise to "securities/SEC/disclosure" risk for AFI.[2062] On balance, the Examiner believes that AFI's SEC disclosures for the first quarter of 2012 offer relatively light guidance in the Investigation as to whether the negotiations between AFI, ResCap, and the Steering Committee Group were at arm's length. The evidence demonstrates that AFI was considering claims in excess of its SEC disclosure before its 10-Q was filed—it is not the case that AFI believed on April 27 that $4.8 billion was the maximum claim that could be asserted in bankruptcy and later influenced ResCap to agree to settle at a number twice that amount. Instead, from the start, AFI seemingly understood that representation and warranty litigation exposure could well exceed the $4.8 billion disclosed, which disclosure appeared to rely on different assumptions and circumstances than ultimately came to fruition through the RMBS Trust Settlement Agreements.[2063]

### 5. The Now-Terminated Junior Secured Noteholders' Plan Support Agreement

On May 13, 2012, the Debtors, AFI, and the Consenting Junior Secured Noteholders[2064] entered into the Junior Secured Noteholders' Plan Support Agreement. The Junior Secured Noteholders' Plan Support Agreement provided for an intercreditor settlement between AFI and the Consenting Junior Secured Noteholders as to the division of collateral in which both parties purportedly hold security interests.[2065]

---

[2061] *See* E-mail from T. Devine to T. Hamzehpour (Apr. 23, 2012) [EXAM00345835].

[2062] *See* E-mail from T. Devine (May 7, 2012) [EXAM00345282]; Dep. of T. Devine, Nov. 19, 2012, at 201:11–25.

[2063] To be clear, by noting that SEC disclosure requirements and settlement considerations differ, the Examiner is not opining on AFI's disclosure obligations pursuant to GAAP requirements or relevant accounting regulations. AFI's reporting requirements and the considerations in the RMBS Trust Settlement Agreements may not have been the same. *See* E-mails between J. Mackey, D. DeBrunner, and C. Dondzila (Apr. 27, 2012) [ALLY_0226233] (noting that range of $0-$4 billion had been revised from earlier draft of $3-$7 billion and that "finalized proposed range" was based on, among other things, a "variety of discussions with the auditors").

[2064] As of June 11, 2012, the ad hoc group of Consenting Junior Secured Noteholders consisted of the following entities: Alliance Bernstein LP; Appaloosa Management LP; Davidson Kempner Capital Management LLC; DO S1 Limited; Loomis, Sayles & Company, L.P.; Marathon Asset Management, L.P.; P. Schoenfeld Asset Management LP; Pentwater Capital Management LP; Silver Point Finance, LLC; Taconic Capital Advisors LP; Venor Capital Management LP; York Capital Management. *See* Notice Of Filing Of Corrected Exhibit A To Verified Statement Of White & Case LLP Pursuant To Federal Rule Of Bankruptcy Procedure 2019 [Docket No. 488].

[2065] Junior Secured Noteholders' Plan Support Agreement, at 2. The Debtors attested that, "[b]esides for obtaining the support of a key creditor constituency, the settlement with the junior secured noteholders also has the benefit of reducing the estate's interest obligations by $350 million." First Day Affidavit, ¶ 108.

The Junior Secured Noteholders' Plan Support Agreement was terminated by the Consenting Junior Secured Noteholders on or about September 28, 2012.[2066] Because the Junior Secured Noteholders' Plan Support Agreement was primarily an intercreditor settlement and because it was terminated approximately two months after the entry of the Examiner Scope Approval Order, the Examiner did not investigate the process underlying the negotiation and entry into that settlement. Presented below are certain terms of the Junior Secured Noteholders' Plan Support Agreement, as it existed on the Petition Date.

### a. AFI Intercreditor Settlement With Consenting Junior Secured Noteholders

Pursuant to the Junior Secured Noteholders' Plan Support Agreement, distribution of proceeds from Joint Collateral would have occurred in the following sequence:[2067]

- AFI would receive first payment of proceeds from Joint Collateral in the amount of $400 million plus postpetition interest accrued on account of $400 million;

- Holders of Junior Secured Notes Claims would receive the next $1 billion;

- Holders of Junior Secured Notes Claims would receive 81% of the next proceeds from Joint Collateral (and AFI would receive 19%) until the Junior Secured Notes Claims have been paid in full;

- AFI would receive all remaining proceeds from Joint Collateral up to the full amount of the AFI Secured Revolver Facility Claims plus all postpetition interest accrued on account of the AFI Secured Revolver Facility Claims to the extent such interest has not been paid.

If the proceeds from Joint Collateral were insufficient to pay the AFI Secured Revolver Facility Claims and the Junior Secured Notes Claims in full, distributions under the Plan on account of the related deficiency claims would have occurred as follows:

- Holders of Junior Secured Notes Claims would receive 81% of deficiency distributions (and AFI would receive 19%) until Junior Secured Notes Claims have been paid in full;

- AFI would receive all remaining deficiency distributions.

[2066] *See* E-mail from G. Proia (Sept. 26, 2012) [ALLY_0209104]; E-mail from G. Proia (Sept. 28, 2012) [ALLY_0209106]. According to a statement from AFI, the termination enabled the Consenting Junior Secured Noteholders to transfer rights in and sell claims arising under the Junior Secured Notes "without waiving the right to accrued and unpaid interest" during the Chapter 11 Cases, and "also free[d] [AFI] from subordinating its recovery by $350 million." *Id.*

[2067] Junior Secured Noteholders' Plan Support Agreement, §§ 5.1, 5.2. In the event of a section 363 sale, the Debtors were to seek authority to pay the holders of Junior Secured Notes Claims in advance of confirmation of a plan of reorganization. *See id.* § 5.5.

### b.  Conditional Waiver Of Interest On Joint Collateral

The Consenting Junior Secured Noteholders agreed to waive all rights to any interest on account of the Junior Secured Notes Claims that may be due and owing after the Petition Date through and including December 31, 2012.[2068] That proposed interest waiver was contingent upon the Debtors' compliance with certain deadlines and conditions regarding the Effective Date of the Plan, among other things. Because such deadlines were not met, the terms of the proposed interest waiver would need to be renegotiated by the parties in connection with any new plan support agreement or intercreditor settlement with the Junior Secured Noteholders.

### c.  AFI's Obligations Under Junior Secured Noteholders' Plan Support Agreement

Under the Junior Secured Noteholders' Plan Support Agreement, in addition to its general obligations to support the Debtors' restructuring efforts consistent with the AFI Settlement and Plan Sponsor Agreement, AFI agreed to support the prompt payment of proceeds of the Platform Sale and any other assets and cash on hand that represent Joint Collateral or proceeds thereof to the Consenting Junior Secured Noteholders.[2069]

### d.  Consenting Junior Secured Noteholders' Obligations Under Junior Secured Noteholders' Plan Support Agreement

Under the Junior Secured Noteholders' Plan Support Agreement, the Consenting Junior Secured Noteholders agreed to the following obligations: (1) support the Debtors' efforts to pursue the restructuring contemplated by the Plan Term Sheet;[2070] (2) support approval of the Cash Collateral Order, Disclosure Statement, DIP facilities, and the relief requested in all first day pleadings;[2071] (3) not contest the validity and enforceability of the Intercreditor Agreement;[2072] and (4) vote to accept the plan, and support confirmation of the plan, including the Debtor Release and Third-Party Release.[2073] In addition, the Consenting Junior Secured Noteholders agreed to restrict themselves from transfer of claims unless the transferee agreed to be bound by the terms of the Junior Secured Noteholders' Plan Support Agreement.[2074]

---

[2068] *Id.* § 5.4(a). After Dec. 31, 2012, the Consenting Junior Secured Noteholders may seek a determination from the Bankruptcy Court that the holders of Junior Secured Notes Claims are entitled to receive postpetition interest accruing from and after January 1, 2013. *See id.*

[2069] *Id.* § 3.1(h).

[2070] *Id.* § 4.1(a).

[2071] *Id.* §§ 4.1(b), (d).

[2072] *Id.* § 4.1(c).

[2073] *Id.* §§ 4.1(f), (g).

[2074] *Id.* § 4.2.

e. *Debtors' Obligations Under Junior Secured Noteholders' Plan Support Agreement*

Under the Junior Secured Noteholders' Plan Support Agreement, the Debtors agreed to the following obligations: (1) use good faith obligations to consummate the restructuring as set forth in the Plan Term Sheet and seek bankruptcy court approval of the Junior Secured Noteholders' Plan Support Agreement;[2075] (2) in the Cash Collateral Order, stipulate to the validity of the liens securing the Junior Secured Notes Claims and grant adequate protection for the Junior Secured Notes Claims;[2076] (3) reimburse or pay the out-of-pocket costs and expenses reasonably incurred by the Ad Hoc Group as allowed administrative expenses pursuant to Bankruptcy Code sections 503(b)(1) and 507(a)(2).[2077]

---

[2075] *Id*. §§ 2.1(a), (d).

[2076] *Id*. §§ 2.1(b), (c).

[2077] *Id*. §§ 2.3(b), 11.1(a)(3).