## IV. BOARD OF DIRECTOR AND MANAGEMENT ISSUES

## A. THE PROTOCOL AND FUNCTIONING OF RESCAP'S BOARD OF DIRECTORS

The ResCap Board was subject to formal governance protocols and requirements, met frequently in response to a variety of challenging circumstances, and had access to numerous sophisticated legal and financial advisors. The statistical data indicate that the ResCap Board was extremely active. Yet, despite the general volume and intensity of the ResCap Board's activities, several factors diminished the Board's overall effectiveness.

Those factors included a grueling rate of activity, substantial turnover of inside directors, dual affiliations of many Board members, underlying conflicts, and information flow management issues. All of this contributed to a level of dysfunction in Board processes, which compromised the Board's capacity to respond optimally to deteriorating conditions. The presence of the Independent Directors was supposed to safeguard ResCap's interests, but their performance was, to a degree, handicapped by problematic structural issues that beset the Board.

### 1. The ResCap Board Was Increasingly Industrious Yet Beleaguered

In 2005, when ResCap was thriving financially and viewed as having bright prospects going forward, the ResCap Board attended to its duties with fairly conventional diligence. Events occurring during that year demanded no extraordinary attention from the ResCap Board. The ResCap Board was quite stable and methodical in 2005 as compared to later periods.

Worsening market conditions and financial performance starting in the third quarter of 2006 prompted the ResCap Board, by necessity, to become more active. Indeed, from 2005 through 2008, the activity of the ResCap Board eventually reached nearly frenzied levels of meetings and proposals, which in part led to the resignations of the two original Independent Directors of the Board.

Statistics reflect the escalating activity of the ResCap Board during the relevant period. In 2005, a year of significant financial achievements for ResCap, Tom Jacob and Tom Melzer became the Board's first Independent Directors pursuant to dictates of the 2005 Operating Agreement.[1] The ResCap Board (after the appointments of Jacob and Melzer) was then comprised of eight directors and met a total of four times. In 2006, the ResCap Board held six regular and four special meetings, along with fifteen Audit Committee and eleven Executive Committee meetings.

The greater frequency of ResCap Board meetings in 2006 was tied to certain substantial transactions implicating ResCap, namely the November 2006 closing of the Cerberus acquisition of a majority stake in AFI and the 2006 Bank Restructuring. Yet by late 2006, the pace of ResCap Board activity began to accelerate as rapidly changing market circumstances produced dramatic shifts in the mortgage industry. On December 12, 2006, a new business

---

[1] Section 2(g)(i) of the 2005 Operating Agreement required that "[AFI] shall vote for, and ResCap shall at all times have, at least two Independent Directors." 2005 Operating Agreement, § 2(g)(i) [ALLY_0140795]. Jacob and Melzer joined the ResCap Board concurrently on April 20, 2005, in connection with the subsequent execution of the 2005 Operating Agreement.

plan was presented to the ResCap Board, which included projections for 2007 and a three-year 2007–2009 operating plan.[2] The business plan and projections presented to the ResCap Board contemplated a long-term deterioration in the market. But, as it turned out, ResCap's actual results for year-end 2006 were in fact materially worse than the related estimates presented to the Board less than three weeks earlier.[3] These were early signs that ResCap's forecasting capabilities were deficient in the face of a rapidly declining mortgage industry.

After the first quarter of 2007, the ResCap Board met to grapple with recurring liquidity and net worth covenant crises for the company. The need to respond to the magnitude and velocity of declining conditions in the mortgage industry led to an upsurge in activity of the ResCap Board. The Board considered and approved multiple business plans during the course of 2007, reflecting periodic resets of ResCap's operating strategies crafted to secure ResCap's survival.[4] Among other attempted cures to its growing financial woes, ResCap inaugurated a series of asset sales to its parent company in mid-2007 designed to address severe liquidity deficiencies. Several of these sales occurred within compressed timeframes, affording the ResCap Board (and particularly its Independent Directors) a narrow window within which to consider each transaction between negotiation and closing.[5]

On September 7, 2007, the law firm of Mayer Brown made a presentation to the ResCap Board regarding duties owed to various constituencies by directors of a company in the "zone of insolvency," including advice about the risks of engaging in potential fraudulent transfers at a time of financial distress.[6] While Mayer Brown did not opine that ResCap was in the zone of

---

[2] Minutes of a Regular Meeting of the Board of Directors of Residential Capital, LLC, dated Dec. 12, 2006, at RC40006856–57 [RC40006748]; Residential Capital, LLC, ResCap Board of Directors Meeting, 2007–2009 Operating Plan Review, dated Dec. 2006 [EXAM10468633].

[3] Residential Capital, LLC, Annual Report (Form 10-K) (Mar. 13, 2007), at 101.

[4] Each of the three separate and superseding 2007–2009 business plans presented to the ResCap Board from December 2006 through September 2007—three business plans presented to a board in less than a year itself an extraordinary occurrence—underestimated the severity of worsening mortgage market conditions and overestimated ResCap's financial performance in the face of those conditions. Minutes of a Regular Meeting of the Board of Directors of Residential Capital, LLC, dated Dec. 12, 2006, at RC40006856–57 [RC40006748]; Residential Capital, LLC, ResCap Board of Directors Meeting, 2007–2009 Operating Plan Review, dated Dec. 2006 [EXAM10468633]; Minutes of a Regular Meeting of the Board of Directors of Residential Capital, LLC, May 11, 2007, at RC40005588–89 [RC40005558]; Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Sept. 26, 2007, at RC40005624–26 [RC40005558].

[5] *See* Sections III.G, VII.E.

[6] Minutes of a Regular Meeting of the Board of Directors of Residential Capital, LLC, Sept. 7, 2007, at RC40005620–21 [RC40005558]; Mayer Brown Presentation on Fiduciary Duties of Directors and Related Legal Issues, dated Sept. 7, 2007, at RC40012721–23 [RC40012695]. Mayer Brown gave a similar presentation regarding directors' fiduciary duties in distressed financial circumstances to the AFI Board in May 2008. Minutes of a Special Meeting of the Board of Directors of GMAC LLC, May 30, 2008, at ALLY_PEO_0001080–81 [ALLY_PEO_0001009]. Independent Director Jacob stated that he believed ResCap was in the "zone of insolvency" in August 2007, shortly before Mayer Brown gave its fiduciary duty presentation to the ResCap Board. Int. of T. Jacob, Nov. 7, 2012, at 63:23–64:1 ("Tom Melzer and I said hey listen, we are in the zone of insolvency. We want to understand the duties and responsibilities of the board members of a company which is in a zone of insolvency."), 197:1–6 ("I think [the first time I thought the company was in the zone of insolvency] it was in—toward the third quarter, August of 2007 when they had this credit crunch.").

insolvency, it did advise the ResCap Board that "if insolvency (or potentially a zone of insolvency) is present, the Company's directors should carefully consider the disinterestedness and independence of directors . . . in the context of any proposed transaction among the Company . . . or any of [its] respective affiliates."[7] At the same meeting, Sanjiv Khattri, ResCap's CFO, delivered a ResCap consolidated review presentation to the Board; materials from that meeting detailed strategic considerations and major initiatives being implemented or contemplated to address the various financial and liquidity issues. Those initiatives included planned or potential asset sales, monetization of loan portfolios, expanded use of Ally Bank, a business restructuring, funding considerations, and a potential equity injection by AFI.[8] In light of ResCap's precipitously deteriorating financial performance and the Mayer Brown fiduciary duty presentation, the members of the ResCap Board were on notice of the precarious nature of ResCap's financial condition heading into 2008.

As 2007 progressed, the ResCap Board (and primarily its two Independent Directors) was being updated with greater frequency on numerous actions initiated by managers to deal with various financial and operational issues. The severe volatility and dislocation in market conditions caused ResCap to cease its origination and securitization business for non-conforming loans by September 2007 and to suspend its program of purchasing distressed mortgage loans at about the same time.[9] ResCap suffered downgrades to its credit ratings, thereby increasing its cost of funds. Thus, over the course of 2007, the ResCap Board confronted an array of acute challenges and grave consequences.[10]

Not surprisingly, in light of the escalating urgency of ResCap's business hurdles, the ResCap Board met more often in 2007 than it had in the prior year. The ResCap Board met a total of twelve times in 2007, which included six "special" (i.e., not regularly scheduled) meetings. Further, the ResCap Board experienced substantial turnover in 2007, during which six new "inside" directors were appointed to the Board. Five of the new directors were affiliated with Cerberus (Bossidy, Jones, Kravit, de Molina, and Rossi), the first Cerberus-affiliated appointments to the ResCap Board following consummation of Cerberus's purchase

---

[7] Mayer Brown Presentation on Fiduciary Duties of Directors and Related Legal Issues, dated Sept. 7, 2007, at RC40012726 [RC40012695].

[8] Minutes of a Regular Meeting of the Board of Directors of Residential Capital, LLC, Sept. 7, 2007, at RC40005621–22 [RC40005558]; ResCap Consolidated Review, dated Sept. 7, 2007, at RC40012737–40 [RC40012695].

[9] Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2008), at 6, 18, 48, 63.

[10] *See* Sections III.F–G.

of its stake in AFI in late 2006.[11] Three directors resigned from the ResCap Board in 2007 (Applegate, Giertz, and Paradis),[12] occasioned by the recent transition in ownership control of AFI.[13]

The rate of ResCap Board activity escalated dramatically in 2008 and 2009 as ResCap's financial problems deepened. The ResCap Board met fifty times in 2008 and eighty-seven times in 2009. The quality of ResCap Board conduct, however, could not keep pace with the frequency of meetings. The frenetic rate of ResCap Board activity hampered the Independent Directors' ability to fulfill the role they were appointed to play as guardians of ResCap's separateness and independence.

As ResCap's financial problems mounted, the Board's original Independent Directors Jacob and Melzer began to feel the burden of rapid-fire activity as the frequency of Board meetings and management turnover spiked beyond their expectations.[14] In 2008, ResCap consummated the greatest number of Affiliate Transactions (e.g., asset sales and financing transactions), with respect to which the Independent Directors paid particular scrutiny. Jacob and Melzer eventually both concluded that the hectic circumstances of ResCap's fight for survival, as well as ResCap's increasing dependence on its parent company, compelled their resignations from the ResCap Board. They resigned on April 20, 2008, three years to the day after they had joined.[15] The following morning, Bossidy tendered his own Board resignation.[16]

The immediate impetus behind the resignations of Independent Directors Jacob and Melzer appears to be twofold: (1) dissatisfaction with the proposed Affiliate Transaction through which ResCap's $3.5 billion credit facility would be restructured, with the result that AFI would displace unsecured lenders and obtain a priority over certain of ResCap's other

---

[11] *See* Minutes of a Regular Meeting of the Board of Directors of Residential Capital, LLC, Mar. 23, 2007, at RC40005567–68 [RC40005558]; Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Aug. 21, 2007, at RC40005615 [RC40005558]; Minutes of a Regular Meeting of the Board of Directors of Residential Capital, LLC, Sept. 7, 2007, at RC40005619 [RC40005558]; *see also* Appendix IV.A.1—1; Appendix IV.A.1—2.

[12] Craig Chapman also became a member of the ResCap Board on April 20, 2007, but he resigned soon after, on July 17, 2007, apparently having attended only a single Board meeting on May 11, 2007. *See* Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Apr. 20, 2007, at RC40005578 [RC40005558]; Minutes of a Regular Meeting of the Board of Directors of Residential Capital, LLC, May 11, 2007, at RC40005587 [RC40005558]; Minutes of a Regular Meeting of the Board of Directors of Residential Capital, LLC, July 17, 2007, at RC40005602 [RC40005558].

[13] *See* Minutes of a Regular Meeting of the Board of Directors of Residential Capital, LLC, Mar. 23, 2007, at RC40005567 [RC40005558] (resignation of Applegate); Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Apr. 20, 2007, at RC40005577–78 [RC40005558] (resignation of Giertz); Minutes of a Regular Meeting of the Board of Directors of Residential Capital, LLC, May 11, 2007, at RC40005587 [RC40005558] (resignation of Paradis).

[14] *See* Int. of T. Jacob, Nov. 7, 2012, 216:25–219:20; Int. of T. Melzer, Oct. 10, 2012, 161:2–20, 170:15–171:1; *see also* Appendix IV.A.1—3.

[15] *See* E-mail from A. de Molina (Apr. 20, 2008) [EXAM12336204]; *see also* E-mails between J. Jones and A. de Molina (Apr. 13–14, 2008) [EXAM12381623].

[16] *See* E-mail from P. Bossidy (Apr. 21, 2008) [EXAM12336092].

creditors; and (2) weariness resulting from the increasingly onerous ResCap Board duties with which they were saddled.[17] Jacob and Melzer resigned from the Board without having approved the $3.5 billion facility restructuring that they had resisted because they believed AFI was overreaching.[18]

The concerns of Jacob and Melzer about their roles as ResCap's Independent Directors, however, dated from an earlier period, when management turnover at ResCap began to proliferate. After the Cerberus acquisition in late 2006, both Jacob and Melzer felt a shift in dynamics on the ResCap Board. By the end of the first quarter of 2007, there was a substantial change in senior ResCap and AFI management, which directly affected the composition of the ResCap Board. After amendment of the 2005 Operating Agreement (through the 2006 Amended Operating Agreement) deleted a provision that had previously required that "ResCap shall at all times . . . conduct or cause to be conducted the business operations of itself and its Subsidiaries by its or their own employees and officers, who will not also be employees or officers of any [AFI] affiliates,"[19] Cerberus began to insert its own personnel into the ResCap and AFI organizational structures, including the entities' boards of directors. The deletion of this separateness provision eventually served to dilute ResCap's independence.

Within four months of the Cerberus acquisition, ResCap CFO James Giertz resigned, citing "the random management style of Cerberus" and "the drive to dismantle the ResCap structure and replace it with a more substantial infrastructure within the parent company [AFI]."[20] In November 2007, Michael Rossi, ResCap's Board Chairman, asked Jerry Lombardo, then a Cerberus-affiliated ResCap advisor, to lead a team in "develop[ing] a plan to reconstruct [ResCap's] governance and organization structure."[21] In response, Lombardo prepared a presentation entitled "ResCap Governance Project Approach Proposal," which recognized the presence of ResCap "[c]ulture clashes," observed that both AFI and Cerberus were "*perceived* to be trying to drive the bus," and acknowledged operational issues such as

---

[17] Int. of T. Jacob, Nov. 7, 2012, at 212:21–218:4; Int. of T. Melzer, Oct. 10, 2012, at 159:6–161:11.

[18] Jacob and Melzer, through their counsel at Bryan Cave, went out of their way to propose revisions to certain April 2008 ResCap Board meeting minutes, which were never adopted. *See* Minutes of Prior Meetings April 14, April 18, and April 20, 2008: Review Comments Received From Counsel to Former Independent Directors After Meeting Minutes Were Approved, at RC40008502–13 [RC40008489]; Int. of T. Jacob, Nov. 7, 2012, at 237:13–240:1; Int. of T. Melzer, Oct. 10, 2012, at 279:5–285:9, 287:12–289:15. No one from ResCap contacted Jacob and Melzer after their resignations, and the subsequent Independent Directors (and, indeed, most ResCap and AFI officers and directors)—particularly the two "super" Independent Directors appointed in 2011 to evaluate prior Affiliate Transactions, several of which were approved by Jacob and Melzer—exhibited a surprising lack of curiosity as to the reason(s) for the simultaneous resignations of the Board's original Independent Directors. Int. of T. Jacob, Nov. 7, 2012, at 221:12–223:14; Int. of T. Melzer, Oct. 10, 2012, at 171:2–172:7; Int. of E. Smith, Nov. 30, 2012, at 44:16–45:4, 48:24–49:15; Int. of K. Hirtler-Garvey, Dec. 20, 2012, at 70:14–72:6; Int. of P. West, Dec. 18, 2012, at 54:5–23; Int. of J. Ilany, Nov. 28, 2012, at 65:9–66:12; Int. of J. Mack, Dec. 5, 2012, at 81:9–82:12.

[19] *Compare* 2005 Operating Agreement, § 2(f)(vii) [ALLY_0140795], *with* 2006 Amended Operating Agreement, § 2(f).

[20] E-mail from J. Giertz (Mar. 26, 2007) [EXAM10166630].

[21] E-mail from J. Lombardo (Dec. 5, 2007) [CCM00498698].

"unclear roles & responsibilities [and] overlapping, inefficient and ineffective oversight processes . . . ."[22] Cerberus instituted numerous managerial changes to remedy the perceived administrative inefficiency.[23]

Jacob described this management turnover as a "revolving door" and felt the frequent management changes were "extremely disruptive" to the operations of ResCap and Board.[24] Similarly, Melzer recalled a "parade of people" entering and exiting management in 2007, with the rapid ResCap and AFI management turnover akin to a "merry-go-round," leading to a situation in which he was largely unfamiliar with "the executives that were driving the train."[25] Jacob felt that Cerberus was bringing in new people to "[put] out fires" but was neglecting the impact that Cerberus-directed management changes had on the rest of the organization.[26] The initial Independent Directors were never consulted in advance with respect to the substantial managerial changes that affected their ResCap Board service.[27] Eventually, they lost familiarity with and confidence in the senior ResCap management with whom they interacted.[28]

Moreover, the rapid pace of proposed Affiliate Transactions late in the tenure of Jacob and Melzer convinced them that ResCap's leverage in ongoing negotiations with AFI was waning, and that their opportunity for measured consideration of significant issues was a thing of the past. Jacob felt pressured to approve Affiliate Transactions that for him were problematic:

> [W]e were feeling rushed the entire [first] quarter [of 2008] . . . .
> I never met all these guys who were making the presentations
> [to the ResCap Board] . . . . [T]hat was really extremely
> uncomfortable with the new management that was rushing us
> into making the decisions . . . . And here we are in 2008, a
> distressed company, you know, kind of scrambling to find
> liquidity and rushing the [I]ndependent [D]irectors to approve

---

[22] ResCap Governance Project Approach Proposal, dated Nov. 29, 2007, at 2 [CCM00498699] (emphasis in the original).

[23] Int. of L. Tessler, Nov. 16, 2012, at 86:4–19, 89:7–19, 115:22–116:10; Int. of E. Feldstein, Dec. 14, 2012, at 188:19–189:20, 200:7–201:4; Int. of P. Bossidy, Dec. 14, 2012, at 120:13–121:6.

[24] Int. of T. Jacob, Nov. 7, 2012, at 60:2–63:19.

[25] Int. of T. Melzer, Oct. 10, 2012, at 63:13–64:5, 161:12–162:24, 223:3–225:17.

[26] Int. of T. Jacob, Nov. 7, 2012, at 61:6–8, 62:21–63:3.

[27] *Id.* at 218:24–220:10. Tellingly, Jacob and Melzer learned of the Cerberus acquisition at about the same time it was publicly announced. *See id.* at 120:12–25. To the extent that the ResCap Board was not consulted or informed with respect to termination of ResCap officers, the relevant sections of the 2006 ResCap LLC Agreement and 2008 ResCap Amended LLC Agreement, addressing the appointment and removal of ResCap officers, may have been violated.

[28] Int. of T. Jacob, Nov. 7, 2012, at 61:6–8, 62:23–63:2; Int. of T. Melzer, Oct. 10, 2012, at 225:24–227:6. An aggregate total of fourteen inside directors populated the ResCap Board during the co-terminous tenures of Jacob and Melzer. *See* Appendix IV.A.1—1.

> related party transactions [to] which we knew that we could not
> in good conscience agree. And so, we were in a totally different
> company [from the one we originally joined] . . . . [T]he whole
> thing was crazy.[29]

In early 2008, when Jacob and Melzer felt harried by a flurry of proposed Affiliate Transactions, the rest of the ResCap Board (consisting of several AFI-affiliated directors) unanimously approved an increase in Independent Director annual fees. After initially expressing gratitude, Jacob and Melzer renounced such award in March 2008 because they were concerned about the appearance of impropriety created by a compensation increase they felt was designed to entice them regarding consideration of Affiliate Transactions.[30] Soon after, the Independent Directors decided they had endured enough on the ResCap Board and resigned in tandem.

Overall, there was significant turnover and instability on the ResCap Board in 2008. Seven new directors were appointed (two of whom (Marano and Weintraub) were affiliated with Cerberus), and nine directors resigned (two of whom (Jones and Rossi) were Cerberus-affiliated).

Following the resignations of Jacob and Melzer in April 2008, the ResCap Board appointed and then withdrew the appointments of two new directors (David DeBrunner and Clifford Skelton).[31] AFI spearheaded the attempt to identify, recruit, and appoint two new Independent Directors to the ResCap Board,[32] as required by the 2006 Amended Operating Agreement. AFI appointed James Chapman to serve as an Independent Director as of May 15, 2008, but AFI swiftly rescinded his appointment after he attended a single Board meeting by

---

[29] Int. of T. Jacob, Nov. 7, 2012, at 217:3–218:13.

[30] *See id.* at 213:9–214:9; Int. of T. Melzer, Oct. 10, 2012, at 239:8–21; Int. of T. Jacob, Apr. 16, 2013, at 44:23–45:3; *see also* Section IV.B.1.d(4).

[31] At its meeting on April 21, 2008, the ResCap Board elected three new "directors to fill the vacancies on the Board": David DeBrunner (AFI VP, Corporate Controller, and Chief Accounting Officer), Clifford Skelton (AFI Chief Information Officer), and James Young (ResCap CFO). Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Apr. 21, 2008, at RC40005731 32 [RC40005652]. DeBrunner was not only absent from the meeting, but had not even been contacted prior to his appointment. *See* Int. of D. Debrunner, Sept. 13, 2012, at 52:12–53:3. On April 23, 2008, another ResCap Board meeting was convened at the request of ResCap's shareholder GMAC Mortgage Group LLC, "to reassess and revise the composition of the ResCap Board of Directors." *See* Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Apr. 23, 2008, at RC40005741 [RC40005652]. By resolution of the ResCap Board, the appointments of Skelton and Young were "rescinded and nullified, *ab initio*, as though [they] never occurred." *See id.* A slate of eight directors was then elected, including new appointees Marano, Weintraub, and Linda Zukauckas. *See id*. The Investigation uncovered insufficient evidence to determine whether any of the April 21, 2008 appointees were intended to serve as Independent Directors.

[32] *See* E-mails between R. Hull and W. Solomon (May 15, 2008) [EXAM12337817]; E-mail between J. Jones, A. De Molina, and W. Solomon (May 20, 2008) [EXAM11305628]; Int. of D. DeBrunner, Sept. 13, 2012, at 53:11–19, 65:3–66:1; Int. of T. Hamzehpour, Oct. 5, 2012, at 232:20–233:9; Int. of K. Hirtler-Garvey, Dec. 20, 2012, at 67:20–68:5, 69:25–70:22.

telephone.[33] AFI also appointed Smith as an Independent Director at the same time as Chapman (Smith continues to serve as of the current time, making him the longest-tenured Independent Director).[34] AFI then appointed Hirtler-Garvey as the second Independent Director of the ResCap Board on June 12, 2008.[35] For approximately four weeks only one Independent Director served on the ResCap Board.

The newly minted Independent Directors (Smith and then Hirtler-Garvey) were promptly confronted by worsening market conditions, financial distress contingency planning, and a series of Affiliate Transactions that demanded their close scrutiny. As it turned out, the four-week period during which only one Independent Director (Smith) was seated on the ResCap Board encompassed Board approval of several Affiliate Transactions. On June 1, 2008, less than two weeks after he had joined the ResCap Board, Smith participated in a meeting that addressed a series of complex and sizeable Affiliate Transactions, which implicated contract-governed relationships between ResCap and two affiliated entities: (1) a proposed $3.5 billion senior secured facility with AFI (the terms of which in part had precipitated the resignations of Jacob and Melzer); (2) three commitment letters from Cerberus for the purchase of assets totaling $1.175 billion; (3) the sale of the Resort Finance business to AFI; (4) an amendment to the Secured MSR facility; and (5) the proposed Servicing Advance Factoring Facility from AFI. Despite a blunt admonition from AFI CEO and ResCap Director de Molina regarding the need for ResCap Board members with affiliations to AFI and Cerberus to take account of conflicts of interests that could cloud their judgment (discussed further below), the full ResCap Board approved these various Affiliate Transactions without abstention and with Smith voting as a solo Independent Director.[36]

Similarly, at Hirtler-Garvey's first ResCap Board meeting shortly thereafter on June 13, 2008, the Board approved a waiver of a section of the 2006 Amended Operating Agreement (in respect of the model home transaction) that prohibited a ResCap investment in an affiliate entity.[37] Hirtler-Garvey's task at her very first Board meeting to review effectively and understand intricacies of both the 2006 Amended Operating Agreement and the proposed Affiliate Transaction was a challenging one.

---

[33] *See* Letter from R. Hull to J. Chapman (May 15, 2008) [EXAM10146754]; E-mail from W. Solomon (May 28, 2008) [EXAM11234241]; Participant List for a Meeting of the Board of Directors, Residential Capital, LLC, May 22, 2008, at RC40006981 [RC40006934] (identifying Chapman as a participant by telephone). The Investigation has revealed little about the mysterious circumstances surrounding Chapman's short-lived appointment to, and speedy disappearance from, the ResCap Board. The e-mail withdrawing Chapman's appointment suggests that his lack of "independence" was one of a number of factors on which AFI's decision was based, and Chapman's reply similarly acknowledges an "existing conflict." E-mails between W. Solomon and J. Chapman (May 27–28, 2008) [EXAM11234241].

[34] *See* Letter from R. Hull to E. Smith (May 15, 2008) at EXAM10146755 [EXAM10146754].

[35] *See* Letter from C. Quenneville to K. Hirtler-Garvey (Jun. 12, 2008) [CCM00388535].

[36] Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, June 1, 2008, at RC40005749, RC40005755–56 [RC40005652]. The transactions addressed at the June 1, 2008 ResCap Board meeting appear to be the only Affiliate Transactions presented for approval to any Independent Directors that were subject to the vote of only a single Independent Director.

[37] Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, June 13, 2008, at RC40005783–84 [RC40005652].

The new Independent Directors also soon addressed the imminent prospects of a ResCap bankruptcy. By September 2008 and over the coming months, Lazard made several presentations and frequent appearances as ResCap's financial advisor at ResCap Board meetings as part of potential pre-bankruptcy and restructuring planning.[38] On September 15, 2008, the ResCap Board agreed to meet as frequently as needed to address market and business updates.[39] Numerous subsequent Board meetings through early November 2008 (including four meetings in a single week in October), led primarily by Lazard and Skadden, focused on bankruptcy planning and solvency issues.[40] On September 23, 2008, Lazard made explicit to the ResCap Board what the Mayer Brown fiduciary duty presentation of a year earlier had implied: "ResCap's balance sheet and current liquidity situation place it within the zone of insolvency and . . . the best course of action for the Directors is to act as if the company were insolvent and consider the best interest of all its creditors."[41]

From at least that time forward, the ResCap Board was largely focused on ResCap's survival, rather than its mere stabilization. ResCap managed to secure its survival primarily through continuing financial support from AFI following AFI's receipt of TARP funds, until a

---

[38] *See, e.g.,* Minutes of a Reguler [sic] Meeting of the Board of Residential Capital, LLC, Sept. 12, 2008, at RC40005863–65 [RC40005652]; Minutes of a Special Meeting of the Board of Residential Capital, LLC, Sept. 15, 2008, at RC40005866–67 [RC40005652]; Minutes of a Special Meeting of the Board of Residential Capital, LLC, Sept. 17, 2008, at RC40005868–69 [RC40005652]; Minutes of a Special Meeting of the Board of Residential Capital, LLC, Sept. 23, 2008, at RC40005872–74 [RC40005652]; Minutes of a Special Meeting of the Board of Residential Capital, LLC, Oct. 1, 2008, at RC40005875–76 [RC40005652]; Minutes of a Special Meeting of the Board of Residential Capital, LLC, Oct. 8, 2008, at RC40005877–79 [RC40005652]; Minutes of a Special Meeting of the Board of Residential Capital, LLC, Oct. 10, 2008, at RC40005880–81 [RC40005652]; Minutes of a Special Meeting of the Board of Residential Capital, LLC, Oct. 16, 2008, at RC40005882–83 [RC40005652]; Minutes of a Special Meeting of the Board of Residential Capital, LLC, Oct. 17, 2008, at RC40005884–86 [RC40005652]; Minutes of a Meeting of the Board of Residential Capital, LLC, Oct. 20, 2008, at RC40005887–89 [RC40005652]; Minutes of a Special Meeting of the Board of Residential Capital, LLC, Oct. 23, 2008, at RC40005890–93 [RC40005652]; Minutes of a Special Meeting of the Board of Residential Capital, LLC, Oct. 28, 2008, at RC40005894–96 [RC40005652].

[39] Minutes of a Special Meeting of the Board of Residential Capital, LLC, Sept. 15, 2008, at RC40005867 [RC40005652].

[40] *See* Minutes of a Special Meeting of the Board of Residential Capital, LLC, Sept. 23, 2008, at RC40005874 [RC40005652]; Minutes of a Special Meeting of the Board of Residential Capital, LLC, Oct. 8, 2008, at RC40005875–76 [RC40005652]; Minutes of a Special Meeting of the Board of Residential Capital, LLC, Oct. 16, 2008, at RC40005882–83 [RC40005652]; Minutes of a Special Meeting of the Board of Residential Capital, LLC, Oct. 17, 2008, at RC40005884–85 [RC40005652]; Minutes of a Meeting of the Board of Residential Capital, LLC, Oct. 20, 2008, at RC40005887–88 [RC40005652]; Minutes of a Special Meeting of the Board of Residential Capital, LLC, Oct. 23, 2008, at RC40005891–93 [RC40005652]; Minutes of a Special Meeting of the Board of Residential Capital, LLC, Oct. 30, 2008, at RC40005897–98 [RC40005652]; Minutes of a Special Meeting of the Board of Residential Capital, LLC, Nov. 8, 2008, at RC40005905 [RC40005652].

[41] Minutes of a Meeting of an Executive Session of the Board of Residential Capital, LLC, Sept. 23, 2008, at RC40006865 [RC40006865].

bankruptcy filing—which had seemed imminent in 2008[42] and was likely deferred for years due to considerations relating to AFI's circumstances—was finally deemed to be in the interests of both ResCap and its parent.[43]

The ResCap Board continued to be extremely active (although not necessarily proactive) during this entire challenging period. After peaking at eighty-seven meetings in 2009 (as ResCap's fragile existence persisted), the ResCap Board met twenty-six times in 2010 (after AFI received TARP funds), thirty-one times in 2011, and nineteen times in 2012 up until the Petition Date.

EXHIBIT IV.A.1
**ResCap Board of Director Meetings**
2005 – 2012 (until Petition Date)



*Source: Minutes of Meetings of the ResCap Board Produced to Examiner; Independent Director Compensation, April 1, 2012 – Present, Meeting Attendance Fees, Board and Committees, dated May 16, 2012 [EXAM00294338].*

Starting in 2008, the ResCap Board was advised by a coterie of legal and financial advisors, including the law firms Bryan Cave (counsel to Jacob and Melzer); Morrison & Foerster (counsel to Cerberus secondee Marano and then to the full ResCap Board); Morrison Cohen (counsel to the Independent Directors who succeeded Jacob and Melzer); Skadden (counsel to the ResCap Board); and Mayer Brown (counsel to both the ResCap and AFI Boards);[44] as well as financial advisors and/or fairness opinion providers Morgan Stanley,

---

[42] For example, at a ResCap Board meeting on October 17, 2008, Skadden presented contingency and bankruptcy planning updates to the Board, and indicated that it had begun drafting chapter 11 bankruptcy pleadings. Minutes of a Special Meeting of the Board of Residential Capital, LLC, Oct. 17, 2008, at RC40005884–85 [RC40005652].

[43] *See generally* Sections III.I and III.J.

[44] ResCap General Counsel Tammy Hamzehpour was not a particularly influential figure with respect to the functioning of the ResCap Board, especially regarding Independent Directors. *See* Int. of T. Jacob, Nov. 7, 2012, at 83:23–84:1 84:4–7; Int. of T. Melzer, Oct. 10, 2012, at 237:17–24; Int. of E. Smith, Nov. 30, 2012, at 51:7–22; Int. of P. West, Dec. 18, 2012, at 76:4–13, 234:13–22; Int. of J. Ilany, Nov. 28, 2012, at 89:19–90:22, 104:8–14; Int. of J. Mack, Dec. 5, 2012, at 98:22–99:6.

Lazard, FTI, Goldin Associates, Houlihan Lokey, UBS, and PwC. Yet, despite the substantial professional resources at the ResCap Board's disposal, the functioning of the Board suffered from flaws that eroded its performance.

### 2. *Governing Protocols Of The ResCap Board Were Not Consistently Applied*

The composition and conduct of the ResCap Board were subject to various requirements intended to facilitate ResCap's independence and separateness from AFI (initially bolstering ResCap's credit rating), primarily through appointment of at least two Independent Directors at any given time.[45] The key documentary sources of ResCap Board protocol were the 2005 Operating Agreement and the 2006 Amended Operating Agreement (collectively, the "Operating Agreements") and relevant provisions in ResCap's bond indentures.[46] Certain Board resolutions (seemingly lifted from Cerberus Secondment Agreements) and an unidentified memorandum also reflected ResCap Board protocol.[47]

Although the Operating Agreements did not expressly require Independent Director approval of all Affiliate Transactions,[48] the Independent Directors nevertheless believed that they were obligated under governing Board protocol sources (e.g., the Operating Agreements and indenture provisions) to scrutinize all proposed Affiliate Transactions carefully. As a threshold matter, Independent Directors generally believed that the Operating Agreements governed their duties on the ResCap Board.[49] The Independent Directors also generally believed (despite the technical intricacies of the Operating Agreements) that they owed

---

[45] In compliance with the dictates of the Operating Agreements, the ResCap Board continuously encompassed at least two Independent Directors, with the notable exception described above following the simultaneous resignations of Jacob and Melzer, when Smith was for a period of time the lone Independent Director on the Board in the wake of mishaps in efforts to fill the two vacancies.

[46] *See* Section IV.A.2.

[47] *See* Unanimous Written Consent of the Residential Capital, LLC, Board of Directors, dated July 14, 2008, at 1–2 [EXAM20213485]; Draft ResCap Special Committee Procedures, dated Aug. 8, 2008, at RC40008488 [RC40008442]; Resolutions for Adoption by the Residential Capital, LLC, Board of Directors, dated Dec. 5, 2011, at RC40020104–07 [RC40020073]; Minutes of a Special Meeting of the Board of Residential Capital, LLC, Dec. 5, 2011, at RC40018719–22 [RC40018411]. Notably, the AFI Board also adopted independent director governance requirements for proposed Affiliate Transactions with Cerberus above a certain monetary threshold, but did so shortly after the closing of the Cerberus acquisition and long before the ResCap Board adopted similar requirements. *See* GMAC LLC Board of Directors Meeting Appendix III—Report on Affiliated Transactions, dated Feb. 8, 2007, at 95 [ALLY_0259170] ("[A]ll new [Affiliate Transactions] are subject to review by . . . Independent Directors if transactions larger than $5 million."); *see also* E-mail from J. Giertz (Feb. 13, 2007) [EXAM11371431] (referencing "a new governance requirement for any significant transactions with a [C]erberus affiliated company" that requires review by AFI independent directors of all such transactions for $5 million or more).

[48] *See generally* Section III.B.

[49] *See* Int. of T. Jacob, Nov. 7, 2012, at 127:22–23, 128:14–129:2; Int. of T. Melzer, Oct. 10, 2012, at 82:21–83:4; Int. of K. Hirtler-Garvey, Dec. 20, 2012, at 109:6–12, 184:5–16. For example, Hirtler-Garvey stated that the 2006 Amended Operating Agreement governed the responsibilities of the Special Committee, which was comprised of Hirtler-Garvey and Smith and, later, of West and Smith. *See* Int. of K. Hirtler-Garvey, Dec. 20, 2012, at 109:6–12, 184:5–16; Int. of P. West, Dec. 18, 2012, at 118:17–22.

fiduciary duties to, and were appointed to protect the interests of, ResCap's creditors.[50] For example, Melzer and Smith were consistently concerned with voting in the best interests of only ResCap and its creditors when making decisions about proposed Affiliate Transactions because they believed that they were obligated to do so under the Operating Agreements.[51]

West and Hirtler-Garvey specifically noted that, pursuant to their understanding of the dictates of the 2006 Amended Operating Agreement, the fiduciary duties of the Independent Directors included "determin[ing] when it was appropriate to look at Affiliate Transactions," which occurred whenever the proposed transactions satisfied certain criteria.[52] West and Smith believed that the Independent Directors were required to review and obtain fairness opinions for every proposed Affiliate Transaction that exceeded certain monetary thresholds.[53]

The initial Independent Directors began the special scrutiny of proposed Affiliate Transactions. Jacob believed that "it was an established governance process" that he and Melzer would review all proposed Affiliate Transactions, and he stated that they in fact convened to review every such proposed transaction.[54] Jacob and Melzer believed that, as the only disinterested parties on the ResCap Board, they were bound to determine whether each proposed Affiliate Transaction was at arm's length and for fair value.[55] West also thought that, if a proposed transaction satisfied the criteria of an Affiliate Transaction, there were no circumstances under which Independent Director approval of that proposed Affiliate Transaction was not necessary or could be excused.[56] West never recalled receiving advice to the effect that "the Board could decide that it did not need the Independent Directors to approve Affiliate Transactions under certain circumstances."[57]

Notably, Jacob and Melzer believed that either of them could have singlehandedly vetoed any proposed Affiliate Transaction, as long as he felt that such veto was "in the best interests of all the stakeholders," particularly ResCap's creditors.[58] Smith also emphasized that the prerogative of the Independent Directors to approve or veto any proposed Affiliate

---

[50] *See* Int. of T. Melzer, Oct. 10, 2012, at 54:4–55:5; Int. of K. Hirtler-Garvey, Dec. 20, 2012, at 141:16–18, 141:25–142:4; Int. of P. West, Dec. 18, 2012, at 69:10–14, 69:21; Int. of J. Ilany, Nov. 28, 2012, 79:22–80:4; Int. of J. Mack, Dec. 5, 2012, 69:15–20, 69:25–70:3.

[51] *See* Int. of T. Melzer, Oct. 10, 2012, at 55:21–56:8, 104:1–16; Int. of E. Smith, Nov. 30, 2012, at 139:12–140:1, 141:12–20.

[52] *See* Int. of P. West, Dec. 18, 2012, at 96:22–24; Int. of K. Hirtler-Garvey, Dec. 20, 2012, at 161:4–14, 173:18–174:2.

[53] *See*e Int. of E. Smith, Nov. 30, 2012, at 91:25–92:20; Int. of P. West, Dec. 18, 2012, at 70:13–18, 71:24–72:4, 131:11–16; Int. of P. West, Jan. 11, 2013, at 139:17–140:8, 144:3–12. West stated that the Special Committee always had to review any proposed Affiliate Transaction with a value exceeding $10 million and obtain fairness opinions for transactions over $500 million. Int. of P. West, Jan. 11, 2013, at 139:17–140:7, 144:3–12.

[54] Int. of T. Jacob, Nov. 7, 2012, at 134:17–22, 134:25–135:4.

[55] *Id.* at 130:18–131:7; Int. of T. Melzer, Oct. 10, 2012, at 96:17–98:6.

[56] Int. of P. West, Dec. 18, 2012, at 143:9–18.

[57] *Id.* at 141:19–142:1.

[58] Int. of T. Jacob, Nov. 7, 2012, at 145:6–10; Int. of T. Melzer, Oct. 10, 2012, at 163:13–164:4; 199:21–200:03.

Transaction "was an extremely important part of [their] function" in order to ensure that the transaction was "fair" to ResCap's stakeholders, specifically its creditors.[59] However, although certain Independent Directors expressly believed that they each had effective pocket veto power with respect to Affiliate Transactions, they *never* exercised that solo veto power and *always* voted the same way.[60]

Despite the fairly uniform understanding over time by the various Independent Directors of their fiduciary duties under governing Board protocol documents, those governance provisions were often applied imprecisely or loosely, perhaps because the Board protocol requirements in the various documentary sources were not fully consistent.[61] Indeed, certain transactions that appeared to qualify as Affiliate Transactions, and arguably should have been subject to focused Independent Director assessment, were authorized by ResCap management outside the purview of related-party transaction protocol under the Operating Agreements and indenture provisions.[62]

Counsel for Jacob and Melzer (Bryan Cave) specifically questioned the failure of ResCap management to bring to the attention of the Independent Directors a related-party transaction with Cerberus in November 2007.[63] Hamzehpour, ResCap's General Counsel, responded to the Bryan Cave attorney (James Nouss) that ResCap management had internally decided that such transaction was not "material" ("given the small [$3.2 million value] involved"), but that in any event it satisfied the "arm's length" and "fair value" requirements of the 2006 Amended Operating Agreement, thereby mooting the need to bring it to the Independent Directors to make their own separate assessment of those terms.[64]

Other examples exist of inconsistent or relaxed application of ResCap Board protocol governing approval of proposed Affiliate Transactions. The issue of government settlement allocations as between ResCap and AFI appears never to have been perceived or considered by the ResCap Board as subject to special Independent Director scrutiny as Affiliate Transactions.[65] Similarly, various derivative transaction agreements and amendments were never reviewed by the ResCap Board and thus were not scrutinized as Affiliate Transactions by the Independent

---

[59] Int. of E. Smith, Nov. 30, 2012, at 95:21–96:10.

[60] *See* Int. of T. Jacob, Nov. 7, 2012, at 144:11–145:10; Int. of T. Melzer, Oct. 10, 2012, at 153:12–14, 157:23–159:5, 163:7–164:4; Int. of E. Smith, Nov. 30, 2012, at 96:11–21, 97:13–19.

[61] *See* Section IV.A.2.

[62] Even when the protocol requirements of the Operating Agreements were technically honored, they were eventually eroded through recurring waivers secured in connection with various Affiliate Transactions, including with respect to the 2006 Bank Restructuring. Indeed, by late 2010, ResCap CEO Marano wrote in an email to AFI colleagues: "We are doing dumb stuff to maintain a charade of a fig leaf," presumably referring to the debilitated "firewall" created through the 2006 Amended Operating Agreement. E-mail from T. Marano (Nov. 22, 2010) [ALLY_0359049].

[63] E-mail from J. Nouss to T. Hamzehpour (Dec. 11, 2007), at MELZER.006947 [MELZER.006946].

[64] E-mails from T. Hamzehpour to J. Nouss (Dec. 11, 19, 2007), at MELZER.006946–47 [MELZER.006946].

[65] *See* Int. of K. Hirtler-Garvey, Dec. 20, 2012, at 317:20–318:5; Int. of P. West, Dec. 18, 2012, at 105:6–16; Int. of P. West, Jan. 11, 2013, at 53:19–56:16, 57:3–12, 58:8–59:25, 61:13–63:8; Int. of J. Mack, Jan. 15, 2013, at 96:15–97:7, 97:18–98:14, 99:13–16, 99:24–100:16.

Directors.[66] Further, an approximately $433 million in-kind dividend paid out by ResCap to GM in 2006 seems never to have been specifically approved by the Board, let alone by the Independent Directors.[67] Some evidence, therefore, creates the impression that certain Affiliate Transactions with AFI and Cerberus entities, through either design or carelessness by ResCap's management, circumvented the scrutiny of ResCap's Independent Directors.[68]

### 3. Board Dynamics Created Obstacles To Optimal Functioning

The composition and conduct of the ResCap Board inhibited its optimal functioning. The ResCap Board was consistently populated by directors with dual affiliations. Over its history, 43% of non-independent ResCap Board members had affiliations with either AFI, Cerberus, or both; until 2009, the majority of its seats were filled by dual-affiliated directors.[69] The dynamics of the ResCap Board were thus complex, as potential conflicts loomed perpetually.

AFI executive David Walker—who was involved in the decision to form ResCap, helped craft the 2005 Operating Agreement, was a founding member of the ResCap Board, and helped recruit original Independent Directors Jacob and Melzer—described the ResCap Board as having had "three heads in the room," namely AFI, ResCap, and the set of two Independent Directors.[70] The Board's effectiveness in managing the intricate affiliate-entity relationships hinged on the diligence and skill of the Independent Directors, who contended with the three "heads in the room."[71]

---

[66] Int. of T. Melzer, Oct. 10, 2012, at 245:11–22; Int. of P. West, Dec. 18, 2012, at 242:17–244:21; Int. of P. West, Jan. 11, 2013, at 50:21–51:3, 52:16–24.

[67] Minutes of a Special Meeting of the Board of Residential Capital, LLC, Dec. 12, 2006, at RC40006860 [RC40006748]; Residential Capital, LLC, Annual Report (Form 10-K) (Mar. 13, 2007), at 104–05.

[68] The issue of management control of information vis-à-vis the Independent Directors is discussed further below, including the most egregious example of possible insider manipulation of the Independent Director review process in connection with the 2006 Bank Restructuring. *See* Section V.A.1.a (providing more detail regarding the respective roles of inside managers and Independent Directors in the 2006 Bank Restructuring).

[69] *See* Appendices IV.A—2,—3.

[70] Int. of D. Walker, Nov. 28, 2012, at 46:13–15.

[71] Each of the Independent Directors possesses impressive experience and skills. But none of them previously faced the challenges that ResCap came to pose for them, some seemed to lack familiarity with certain key concepts at the core of those challenges, and collectively they had somewhat differing understandings of facets of their fiduciary duties, all of which may bear on the judgment they employed in their capacity as Independent Directors. Int. of T. Jacob, Nov. 7, 2012, at 11:7–17, 11:22–12:20, 64:4–7, 229:21–231:6; Int. of T. Melzer, Oct. 10, 2012, at 29:2–4, 199:13–200:8, 202:10–19; Int. of E. Smith, Nov. 30, 2012, at 16:7–16, 32:12–22, 67:5–17, 71:17–22, 73:14–75:25; Int. of K. Hirtler-Garvey, Dec. 20, 2012, at 93:13–95:19, 117:20–118:9, 139:20–140:23, 142:5–9; Int. of P. West, Dec. 18, 2012, at 58:6–59:14, 62:13–64:5, 65:19–66:9, 68:23–70:18, 71:14–72:5, 93:11–18, 96:17–97:9, 156:14–22, 157:12–23, 158:16–159:21; Int. of P. West, Jan. 11, 2013, at 179:5–180:5; Int. of J. Ilany, Nov. 28, 2012, at 95:1–17, 103:8–21, 203:3–6; Int. of J. Mack, Dec. 5, 2012, at 111:15–114:6, 116:4–117:21, 118:15–25, 123:13–17; Int. of J. Mack, Jan. 15, 2013, at 137:17–24, 138:14–24, 158:9–159:11. Further, the Independent Directors' personal views on ResCap's solvency at any particular time have no bearing on the Examiner's Financial Advisors' objective analysis of whether ResCap was or was not insolvent at any such time.

The specter of conflicts of interest within the ResCap Board, which routinely was either unrecognized or disregarded, percolated to the surface of a Board discussion at least one time. At a June 1, 2008 ResCap Board meeting, de Molina expressly articulated the actual conflicts of interest that ResCap directors had to evaluate and subdue before voting on proposed Affiliate Transactions involving AFI and Cerberus:

> Mr. de Molina noted to the Board, before it took any action on the proposed transactions, that there does exist for the [AFI] and Cerberus members of the Board a conflict of interest, including for himself as the CEO of [AFI]. He stated that if these transactions do not go forward it could have a substantial negative impact on [AFI] (and several Directors agreed), but that, without regard to that concern, the Directors must vote in the best interest only of ResCap and its creditors.[72]

The frank articulation by de Molina of the challenges generated by conflicts of interest that all dual-affiliated ResCap directors faced when considering Affiliate Transactions seems unique in the annals of ResCap. There does not appear to be any other such acknowledgment in ResCap Board materials. Nor was any response to de Molina's cautionary statement recorded in the June 21, 2008 minutes. However, one ResCap director (DeBrunner) did state that he resigned from the ResCap Board (on July 16, 2009) because he felt increasingly conflicted as a result of his dual affiliations.[73]

The potential conflicts of interest that permeated the conduct of the ResCap Board were embodied in 2008 in the arrival of new ResCap CEO Tom Marano. In the wake of the Cerberus acquisition of its AFI ownership stake, numerous Cerberus employees, including Marano, were seconded to ResCap in an effort by Cerberus to cure the ailments of its portfolio company and subsidiaries. For the first year of his tenure as ResCap CEO and Board Chairman, Marano was employed pursuant to a Cerberus Secondment Agreement.[74] Marano was personally represented on the ResCap Board by Morrison & Foerster attorney James Tanenbaum, who subsequently emerged as primary outside counsel to the ResCap Board, including its Independent Directors.[75] Further, AFI and Cerberus representatives, including

---

[72] Minutes of a Meeting of the Board of Directors of Residential Capital, LLC, June 1, 2008, at RC40005754 [RC40005652].

[73] Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, July 16, 2009, at RC40006251; Int. of D. DeBrunner, Sept. 13, 2012, at 73:8–74:7.

[74] Minutes of a Special Meeting of the Board of Residential Capital, LLC, July 21, 2008, at RC40005828–30 [RC40005652]; Minutes of a Special Meeting of the Board of Residential Capital, LLC, Dec. 29, 2008, at RC40005948 [RC40005652]; Int. of T. Marano, Nov. 26, 2012, at 9:11–23, 193:20–194:8; Int. of K. Hirtler-Garvey, Dec. 20, 2012, at 74:19–22, 194:19–195:16, 198:2–13.

[75] Int. of J. Tanenbaum, Mar. 29, 2013, at 45:17–47:25.

inside counsel of those entities, often attended ResCap meetings, not always with apparent specific purpose and sometimes in connection with ResCap Board discussion of proposed Affiliate Transactions.[76]

The independence of certain Independent Directors may also have been somewhat compromised because of prior ties to AFI employees as well as to Tanenbaum, the Morrison & Foerster attorney who arrived on the ResCap scene with Marano. Hirtler-Garvey and West worked together previously at Bank of America; Hirtler-Garvey helped recruit West to the ResCap Board; and, before joining the Board, Hirtler-Garvey and West knew various AFI personnel from their prior work together at Bank of America, including de Molina, who (in his capacity as a dual-affiliated ResCap director) recruited and appointed Hirtler-Garvey and West to the ResCap Board.[77] Hirtler-Garvey was on the ResCap Board for approximately a year; she went from being a ResCap Independent Director to a full-time AFI employee, but she did not immediately resign from the Board upon her move to AFI (much less upon consideration of that employment change).[78] The most recently appointed Independent Directors, Special Review Committee members Ilany and Mack, each had long professional associations with Tanenbaum, who recruited them to the ResCap Board in late 2011;[79] Ilany and Mack then were responsible for the claims investigation that Tanenbaum's law firm conducted.

### 4. The Information Flow To Independent Directors Was Managed By Insiders

The flow of significant information within the ResCap Board, and particularly the circulation of information to the Independent Directors of the Board, was occasionally deficient. By their own description, the Independent Directors did not proactively formulate or revise ResCap's strategic plans but, rather, reacted to initiatives already developed and then brought to them by the inside directors.[80] Inside directors (many with dual affiliations)

---

[76] *See* Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, June 13, 2008, at RC40005781–86 [RC40005652]; Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, July 3, 2008, at RC40005801–04 [RC40005652]; Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Nov. 12, 2008, at RC40005906–08 [RC40005652]; Minutes of a Special Meeting of the Board of Residential Capital, LLC, May 28, 2009, at RC40006154–55 [RC40005949]; Int. of T. Jacob, Nov. 7, 2012, at 80:12–17; Int. of K. Hirtler-Garvey, Dec. 20, 2012, at 146:25–147:17, 156:12–156:22, 184:17–185:10, 263:15–264:7; Int. of P. West, Dec. 18, 2012, at 125:22–126:16.

[77] *See* Int. of K. Hirtler-Garvey, Dec. 20, 2012, at 67:20–24, 68:6–69:10, 70:8–10, 75:2–5, 82:12–25, 300:16–301:20; Int. of P. West, Dec. 18, 2012, at 41:5–42:24, 45:25–46:3, 47:15–48:13, 95:2–7.

[78] *See* Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Jun. 13, 2008, at RC40005781 [RC40005652] (appointment of Hirtler-Garvey); Minutes of a Special Meeting of the Board of Residential Capital, LLC, June 23, 2009, at RC40006224 [RC40005949] (notice of Hirtler-Garvey resignation); Int. of K. Hirtler-Garvey, Dec. 20, 2012, at 296:19–297:15.

[79] Int. of J. Ilany, Nov. 28, 2012, at 48:1–4, 49:14–53:22; Int. of J. Mack, Dec. 5, 2012, at 72:1–3, 72:11–77:4; Int. of J. Tanenbaum, Mar. 13, 2013, at 170:19–24, 172:1–173:15, 178:13–179:9.

[80] *See* Int. of T. Jacob, Nov. 7, 2012, at 101:14–104:19; Int. of T. Melzer, Oct. 10, 2012, at 291:8–16; Int. of P. West, Dec. 18, 2012, at 194:12–195:7; Int. of J. Ilany, Nov. 28, 2012, at 16:7–17:8; Int. of J. Mack, Dec. 5, 2012, at 18:23–19:10.

generally vetted strategic initiatives and potential transactions within their management group before bringing such plans to the attention of the Independent Directors of the ResCap Board, which influenced the dynamics of Board meetings by presenting the Independent Directors with seemingly pre-packaged plans, which often lacked optionality.[81]

Further, the overall pattern of interaction between ResCap and AFI seems to have been that potential Affiliate Transactions were generally conceptualized by the AFI Board and subsequently discussed with inside manager directors of the ResCap Board, who then proposed them to the Independent Directors of the ResCap Board when they deemed it appropriate. On some occasions, certain pertinent information regarding proposed Affiliate Transactions appears to have reached Independent Directors in either untimely fashion or not at all, which jeopardized the Independent Directors' ability to assess transactions in a fully informed and measured manner.[82] Such circumstances imperiled compliance with Board protocol requirements.

An example of a pre-packaged management presentation of core and highly developed business strategies to the ResCap Board's Independent Directors was the rollout of the 2007 Restructuring Plan, discussed at a September 26, 2007 ResCap Board meeting.[83] The 2007 Restructuring Plan—which included substantial cost and headcount reductions, rationalization of several ResCap businesses, identification for the first time of the company's non-core assets, and contingencies that included a liquidation option—was not devised or developed by the ResCap Board; rather, it was presented to the full ResCap Board for support.[84] The Board at that meeting expressed support for the 2007 Restructuring Plan—including Jacob and Melzer, who likely heard about the plans for the first time on that day, in contrast to the inside directors—although it essentially (and perhaps unrealistically) forecast a $3 billion improvement in net income for 2008, based on a projection (later seen to be erroneous) of final losses for 2007.[85]

---

[81] Int. of T. Jacob, Nov. 7, 2012, at 55:6–10, 56:2–9.

[82] *See id.* at 216:25–218:4; Int. of T. Melzer, Oct. 10, 2012, at 266:18–23, 272:8–20, 273:1–24, 276:15–23.

[83] ResCap announced the 2007 Restructuring Plan to the public via a Form 8-K filing on October 17, 2007. Residential Capital, LLC, Current Report (Form 8-K) (Oct. 17, 2007), Ex. 99.1, at 1–2.

[84] Rossi, who had been appointed to the ResCap Board only weeks earlier, presented the 2007 Restructuring Plan to the ResCap Board. Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Sept. 26, 2007, at RC40005624–26 [RC40005558].

[85] *Id.* at RC40005625–26. On February 1, 2008, the ResCap Board was presented with materials detailing the final 2007 actual net loss of $4.3 billion, approximately one-quarter greater than the prior forecasted loss for the year ($3.4 billion) when the full ResCap Board expressed its support for the 2007 Restructuring Plan on September 26, 2007. *Compare* Business and Liquidity Update, ResCap Board of Directors, dated Feb. 1, 2008, at EXAM12125418 [EXAM12125414] *and* ResCap Review, ResCap Board of Directors Meeting, dated Sept. 26, 2007, at RC40012919 [RC40012907]. ResCap's 2008 business plan was also overly optimistic in its forecasts, predicting that ResCap would break even for the year despite having incurred massive losses in 2007 and witnessing increasing degradation in the market. The ResCap Board, including its Independent Directors, never expressed substantial concerns about management's ability to forecast properly or respond effectively to severe conditions.

An example of AFI effectively dictating plans to ResCap's management, which in turn shaped what was subsequently discussed (or not) by the ResCap Board, was in respect of ResCap's potential application for TARP funds. When apprised of ResCap management's consideration of submitting a TARP funds application on behalf of ResCap, AFI management rebuffed that option and asserted that AFI would alone submit a TARP application.[86] The ResCap Board never seriously entertained the possibility of a ResCap TARP application.

The AFI Board also expressly discussed the potential implications of a ResCap bankruptcy filing in 2008 during the pendency of (and following) AFI's bank holding company application to the FRB. The AFI Board was informed by its advisors that a ResCap bankruptcy filing would be detrimental, and potentially fatal, to AFI's bank holding company application, among other potentially injurious factors affecting AFI.[87] AFI managers informed ResCap inside directors of their concerns regarding the timing of a ResCap bankruptcy, which in turn shaped the ResCap Board's deliberations and decisions.[88]

By 2009, the ResCap Board was grappling with successive years of: (1) multi-billion dollar losses; (2) a balance sheet reflecting asset values of approximately 40% of their peak values of just a few years earlier; (3) recurring liquidity crises and potential tangible net-worth covenant breaches; and (4) financial dependence on AFI for survival. Yet, despite the dire circumstances and numerous liquidity-related meetings, the ResCap Board relegated itself to reactive, rather than proactive, strategic planning. Its Independent Directors did not aggressively confront ResCap's situation. Throughout the period after the resignations of Jacob and Melzer, AFI and its advisors provided informational updates to the ResCap Board, which relied on both AFI's largesse and guidance.

Meanwhile, the AFI Board had reached its own stark conclusions about ResCap's future, viewing ResCap as a corporate burden that had to be alleviated. In a presentation to the U.S. Treasury on December 11, 2009, AFI described ResCap as a "millstone around the neck, . . . [with] no businesses that are strategic for the future," and AFI's challenge as "[r]esolv[ing] [the] ResCap [d]rag" by "neutralizing/exiting at the lowest cost."[89] In a section of the presentation entitled "ResCap Containment Strategy," AFI concluded that "an in-court solution is counterproductive to [AFI's] objectives," and that "[m]ultibillion litigation risk is material in any in-court solution and would likely . . . delay the timing of an initial public

---

[86] Int. of T. Marano, Nov. 26, 2012, at 22:2–23:11, 24:9–11, 204:4–14, 205:1–3, 207:21–208:7.

[87] Minutes of a Special Meeting of the Board of Directors of GMAC, LLC, Oct. 31, 2008, at ALLY_PEO_0001307–08 [ALLY_PEO_0001009].

[88] AFI obtained bank holding company status on December 24, 2008. FEDERAL RESERVE RELEASE, FEDERAL RESERVE BOARD OF GOVERNORS (week ending Dec. 27, 2008), http://www.federalreserve.gov/releases/h2/20081227/h2.pdf. On December 29, 2008, Marano noted to the ResCap Board that AFI "view[ed] ResCap as an important component of its bank holding company platform and that [ResCap] offer[ed] diversification to [AFI's] business model." Minutes of a Special Meeting of the Board of Residential Capital, LLC, Dec. 29, 2008, at RC40005947 [RC40005652].

[89] Presentation to the U.S. Department of the Treasury: GMAC Request for SCAP Funding, dated Dec. 11, 2009, at 4–5 [ALLY_0231352].

offering."[90] Accordingly, AFI maintained its financial support of ResCap because it continued to believe that a ResCap bankruptcy filing would undermine AFI's own interests.[91]

In 2010 and 2011, AFI's advisors and officers made periodic presentations to the ResCap Board reflecting AFI's deliberations about ResCap's future.[92] On November 5, 2010, Michael Constantino of AFI's Capital Markets Group reported on the results of a bidding process orchestrated by AFI for the sale of ResCap's assets.[93] Notably, the materials presented by Constantino to the ResCap Board indicated that all three potential bids implied a transaction loss and negative cash at closing of a sale, suggesting a market view that ResCap was then insolvent.[94] There is no indication that ResCap employees or advisors were involved in the (unconsummated) bidding process for ResCap's assets, nor is there any reference in ResCap Board minutes as to why AFI discontinued the ResCap sale process. During this period, the ResCap Board seems to have taken no concrete actions in response to the various presentations to it by AFI's advisors; rather, it appears to have been a fairly passive audience for AFI's strategic planning. It was not until late 2011 that the ResCap Board proactively initiated its own independent consideration of strategic alternatives through advisors that it—rather than AFI—had retained.

The Independent Directors who succeeded Jacob and Melzer were nominally presented by ResCap management with strategic alternatives for ResCap's future, but often were given inadequate information about the various options.[95] For example, West, appointed as an Independent Director in 2009, did not seem to fully understand certain ResCap strategic alternatives, nor certain key affiliate agreements with certain AFI entities (regarding mortgage servicing rights and hedging) as to which she nevertheless approved amendments.[96]

Perhaps the most prominent example of management control of information that likely influenced decision-making of ResCap Independent Directors related to the 2006 Bank Restructuring, which required the scrutiny of Independent Directors Jacob and Melzer.[97] The

---

[90] *Id.* at 10.

[91] *See generally* Section III.I.

[92] *See, e.g.,* Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Apr. 29, 2010, at RC40018773–74 [RC40018729] (discussing joint presentation by Oliver Wyman, Citi, and Goldman Sachs entitled "Strategic Evaluation of AFI's Mortgage Business," dated Apr. 30, 2010 [EXAM10424634]).

[93] Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Nov. 5, 2010, at RC40018846 [RC40018729].

[94] Mortgage Strategic Alternatives Presentation to the ResCap Board of Directors, dated Oct. 29, 2010, at RC40016894, RC40016897–98 [RC40016871].

[95] Int. of P. West, Jan. 11, 2013, at 7:20–11:10.

[96] Int. of P. West, Dec. 18, 2012, at 242:9–243:16, 243:20–244:4, 244:13–21; Int. of P. West, Jan. 11, 2013, at 50:21–52:5, 52:16–24.

[97] The 2006 Bank Restructuring contemplated an investment by ResCap in an AFI affiliate, which was prohibited under the 2005 Operating Agreement. That proposed affiliate investment required a waiver of the 2005 Operating Agreement that could only be obtained by affirmative vote of a majority of the Board's two Independent Directors. *See* Section V.A.1.a.

Cerberus PSA required that Old GMAC Bank be removed from Cerberus ownership but did not mandate any particular future ownership structure for the Bank.[98] AFI and ResCap officers eventually agreed that AFI would own 100% of the Bank's voting interests, yet Jacob and Melzer were never informed that the option of ResCap retaining voting shares in the Bank was viable and, therefore, never considered whether to press for that position in negotiations with AFI. The Examiner is aware of no evidence suggesting that Jacob and Melzer, or their counsel at Bryan Cave LLP, were ever informed that ownership structures different from the one to which they agreed were in fact available to ResCap, despite ResCap CEO David Applegate having previously memorialized an alternative structure in a memorandum to AFI President Bill Muir, which promoted the viability and efficiency of ResCap retaining voting rights in the restructured bank.[99] If information had freely flowed from inside managers to the Independent Directors regarding the option of ResCap retaining voting interests in Ally Bank, the transaction may have been structured very differently.[100]

### 5. The Mandate Of The "Super Independent" Directors Was Not Completely Fulfilled

The relevant performance of the ResCap Board has been reflected most recently in connection with the process through which the (now-abandoned) bankruptcy-related settlement with AFI was investigated and negotiated in 2011–2012. That process again exhibits a ResCap Board that fell short of peak performance.

As set out more fully in Section III.J, Special Review Committee members (and most recently appointed Independent Directors) Ilany and Mack were asked to assess potential claims against both AFI and Cerberus and then potentially approve (or recommend to the ResCap Board that it approve) a settlement of such claims. The mandate of the Special Review Committee was detailed and challenging, yet it was not fulfilled according to its express terms. The Special Review Committee's investigation of potential claims and subsequent negotiation of a proposed settlement with AFI was flawed.

As a threshold matter, the pertinent resolutions of the ResCap Board authorized the Special Review Committee to investigate potential claims and to approve (or recommend for approval) a possible settlement of any such claims, but was silent as to its authority to negotiate the possible settlement of claims.[101] Arguably, the resolution was designed precisely to establish a committee of new Independent Directors who would leave to others the negotiation of a settlement that the Special Review Committee would then evaluate for adequacy in light of the claims investigation it had supervised. That is *not* what occurred; Ilany and Mack investigated claims, and subsequently voted to approve the settlement that they themselves had negotiated.

---

[98] *See* Cerberus PSA, Exhibit H [CERB039811].

[99] Memorandum from D. Applegate to B. Muir (Apr. 24, 2006) [EXAM11248641]; s*ee generally* Section V.A.1.a.

[100] ResCap CEO Marano, whose tenure at ResCap post-dated the 2006 Ally Bank transaction, stated that he found it "odd" that ResCap maintained non-voting shares in Ally Bank, that he had "never heard" of such an arrangement, and that he had received no response to his inquiry about why the 2006 Bank Restructuring had been structured to provide ResCap with non-voting interests. Int. of T. Marano, Nov. 26, 2012, at 35:21–36:23.

[101] Minutes of a Special Meeting of the Board of Residential Capital, LLC, Dec. 5, 2011, at RC40018720–22 [RC40018411].

Further, Ilany and Mack—self-described as "super" Independent Directors—were appointed for the specific task of assessing potential claims against AFI and Cerberus entities. That mandate was spelled out in no uncertain terms in the ResCap Board resolutions.[102] Ilany and Mack, however, appear not to have considered any potential claims against Cerberus, as such potential claims were not encompassed within Morrison & Foerster's investigation.[103]

Ilany and Mack also seemed oblivious to potential conflicts relating to issues within their bailiwick. For example, Mack was unconcerned with potential conflict arising from Marano's membership on ResCap's Compensation Committee, which addressed (among other things) ResCap executives' (including Marano's) compensation in the form of AFI equity.[104]

Similarly, Ilany and Mack were expressly authorized by ResCap Board resolutions to retain their own separate legal and financial advisors to fulfill their duties on the Special Review Committee, but they never seriously considered the option.[105] As a result, Ilany and Mack relied (with little or no consideration of alternatives) on the counsel of Morrison Cohen and Morrison & Foerster, both of whom by late 2011 had longstanding associations with the ResCap Board, including with respect to strategic planning and Affiliate Transactions that were to be the subject of the Special Review Committee's investigation.[106] Ilany believed that he did not need to be concerned about potential conflicts of his advisors because they would have apprised him of any conflicts if they existed. He therefore believed that no conflicts existed because his advisors (including Morrison & Foerster) did not apprise him of any.[107] Perhaps this apparently naïve belief was attributable to the fact that both Ilany and Mack were recruited to the ResCap Board by Tanenbaum, a Morrison & Foerster attorney who had a multi-decade professional and social relationship with both men leading up to their appointments to the Board.[108]

The failure of "super" Independent Directors Ilany and Mack to give serious consideration to the option of retaining separate legal counsel to conduct the seminal investigation on their behalf of potential claims relating to several years' worth of prior Affiliate Transactions is troubling. By the time that it commenced its investigation of potential

---

[102] *Id.* at RC40018721 [RC40018411].

[103] Morrison & Foerster's Report on Independent Review Claims Analysis to the Residential Capital, LLC, Board of Directors, dated Jan. 25, 2012, at RC00023718 [RC00023710]; Int. of J. Ilany, Nov. 28, 2012, at 142:1–5; Int. of J. Mack, Dec. 5, 2012, at 164:16–165:7, 172:5–12, 176:10–14; Int. of J. Mack, Jan. 15, 2013, at 87:15–88:14.

[104] Int. of J. Mack, Dec. 5, 2012, at 63:10–67:15.

[105] Minutes of a Special Meeting of the Board of Residential Capital, LLC, Dec. 5, 2011, at RC40018722 [RC40018411]; Int. of J. Ilany, Nov. 28, 2012, at 118:19–119:21; Int. of J. Mack, Dec. 5, 2012, 183:8–18, 190:14–25. Moreover, the Special Review Committee had no retention letters with any of its advisors. *See* Int. of J. Mack, Dec. 5, 2012, at 186:22–187:3.

[106] *See* Minutes of a Special Meeting of the Board of Residential Capital, LLC, Sept. 15, 2008, at RC40005866–67 [RC40005652]; Minutes of a Special Meeting of the Board of Residential Capital, LLC, Sept. 19, 2008, at RC40005870–71 [RC40005652].

[107] Int. of J. Ilany, Nov. 28, 2012, at 120:5–20.

[108] *Id.* at 48:1–4, 49:14–53:22; Int. of J. Mack, Dec. 5, 2012, at 72:1–3, 72:11–77:4.

claims in late 2011, Morrison & Foerster had previously advised the ResCap Board with respect to several proposed Affiliate Transactions.

Morrison & Foerster had been involved with ResCap Board activities since Tanenbaum attended a special meeting of the Board on September 19, 2008.[109] In November 2008, Tanenbaum appears to have advised the ResCap Board about an AFI support offer, which the Board ultimately approved, as well as a bond exchange.[110] The AFI support offer included the ResMor Sale to AFI, the Mitchell litigation bond, and the $320 million extension of secured credit by AFI.[111] At the November 12, 2008 ResCap Board meeting, Tanenbaum discussed "the probability of deferring a ResCap bond interest payment due November 17, 2008" in the context of the AFI support offer.[112] Tanenbaum subsequently advised the ResCap Board about the term sheet for a potential transaction with AFI in August 2009.[113] That term sheet, which ResCap and its "advisors" marked up, involved AFI's acquisition of ResCap's origination and servicing assets and AFI's forgiveness of ResCap's debt upon closing.[114] Clearly, by the time Morrison & Foerster launched its investigation of potential claims in late 2011, it had been advising the ResCap Board for several years, including with respect to Affiliate Transactions that were the subject of its own investigation. Yet, despite the long entanglement of Morrison & Foerster (and Morrison Cohen) with the ResCap Board, Ilany and Mack never pursued the option of retaining new legal counsel, although they were specifically authorized to do so.

Gary Lee, current chair of Morrison & Foerster's Business Restructuring and Insolvency Group and a senior member of the team that advised the ResCap Board, stated that Morrison & Foerster presented to the Board about the best practices for conducting an internal investigation and recommended the creation of the Special Review Committee (later comprised of Ilany and Mack) to assess the historical Affiliate Transactions that had previously been approved by current Board members.[115] Yet the practice guide (authored by a Morrison & Foerster attorney) on which Lee relied in giving that advice to the ResCap Board

---

[109] Minutes of a Special Meeting of the Board of Residential Capital, LLC, Sept. 19, 2008, at RC40005870 [RC40005652]. Tanenbaum attended the September 19, 2008 meeting, likely in his capacity as counsel to ResCap CEO Marano, at which the Board, "its advisors," and management discussed the potential sale of ResCap's stake in Ally Bank to AFI. The minutes do not specify which advisors (including Tanenbaum) participated in this discussion; other advisors at this meeting included Timothy Pohl of Skadden, and Michael Connolly, Jack Levy, and Joseph Moldovan of Morrison Cohen.

[110] Minutes of a Special Meeting of the Board of Residential Capital, LLC, Nov. 12, 2008, at RC40005907–8 [RC40005652].

[111] *Id.* at RC40005907.

[112] *Id.*

[113] Minutes of a Special Meeting of the Board of Residential Capital, LLC, Aug. 10, 2009, at RC40006277 [RC40005949].

[114] Comments by ResCap and Its Advisors, dated Aug. 7, 2009 [RC40009421].

[115] CARL H. LOEWENSON, ETHICS OF INTERNAL INVESTIGATIONS, MORRISON & FOERSTER LLP, http://www.mofo.com/files/Publication/055a0d6e-c9b7-4230-b2a2-d9dad9daae94/Presentation/PublicationAttachment/34bd7647-30d8-4d3f-8e8c-db99dfee280e/Loewenson_Ethics_of_Internal_Investigation.pdf; Int. of G. Lee, Feb. 20, 2013, at 145:15–146:4, 156:7–22, 168:3–9.

itself advises that "the firm that was involved in the underlying conduct [under investigation] is *not* the appropriate firm to do an internal investigation."[116] Notably, Lee did not recall any discussions about whether it was appropriate for Ilany and Mack to retain new legal counsel to conduct their claims investigation in light of Morrison & Foerster's protracted involvement with the ResCap Board.[117] Similarly, Tanenbaum stated that the Special Review Committee never raised with Morrison & Foerster the issue of retaining special counsel to conduct the claims investigation, and did not believe that Morrison & Foerster had ever discussed the issue.[118]

In any event, the Special Review Committee's assessment of potential claims was done through an investigation that was necessarily limited by time and access to information.[119] Ilany and Mack believed, however, that Morrison & Foerster's investigation on their behalf was fully comprehensive and exhaustive.[120] In their effort to fulfill their Special Review Committee obligations, Ilany and Mack do not appear to have given any interim investigation status updates to the ResCap Board leading up to Morrison & Foerster's January 25, 2012 claims presentation.[121] Further, despite their mandate to investigate potential claims relating to historical Affiliate Transactions, Ilany and Mack did not seem particularly interested in the history of either of those related-party transactions or of ResCap's prior consideration of a bankruptcy filing, nor in the legal merits of claims that emerged through the investigation.[122] Overall, conflicts and deficiencies associated with the Special Review Committee's investigation diminished its utility in assessing the value of potential Estate and Third-Party Claims against the AFI entities.

---

[116] CARL H. LOEWENSON, ETHICS OF INTERNAL INVESTIGATIONS, MORRISON & FOERSTER LLP, at 10 (emphasis in the original), http://www.mofo.com/files/Publication/055a0d6e-c9b7-4230-b2a2-d9dad9daae94/Presentation/PublicationAttachment/34bd7647-30d8-4d3f-8e8c-db99dfee280e/Loewenson_Ethics_of_Internal_Investigation.pdf.

[117] Int. of G. Lee, Feb. 20, 2013, at 196:17–197:11.

[118] Int. of J. Tanenbaum, Mar. 29, 2013, at 214:11–217:5.

[119] *See* Section III.J.3.

[120] Int. of J. Ilany, Nov. 28, 2012, at 190:16–19, 192:13–22; Int. of J. Mack, Jan. 15, 2013, at 34:1–9, 36:1–5, 111:3–14.

[121] *See* Minutes of a Special Meeting of the Board of Residential Capital, LLC, Dec. 9, 2011, at RC40018724–26 [RC40018411]; Minutes of a Special Meeting of the Board of Residential Capital, LLC, Jan. 10, 2012, at RC40019179-84 [RC40019179], Minutes of a Special Meeting of the Board of Residential Capital, LLC, Jan. 11, 2012, at RC40019185-86 [RC40019179].

[122] The lack of interest by Ilany and Mack in ResCap's history is striking. *See* Int. of J. Ilany, Nov. 28, 2012, at 67:1–23, 73:1–74:3, 83:21–84:4, 100:13–101:6; Int. of J. Mack, Dec. 5, 2012, at 80:8–25, 110:20–111:5, 124:4–10, 158:23–161:2; Int. of J. Mack, Jan. 15, 2013, at 116:10–20. For example, Ilany and Mack had never heard of original Independent Directors Jacob and Melzer despite their crucial role in ResCap's formative history. Int. of J. Ilany, Nov. 28, 2012, at 65:15–66:12; Int. of J. Mack, Dec. 5, 2012, at 81:9–82:6. Similarly, their lack of interest in the legal merits of the potential claims they investigated and subsequently sought to settle is notable. *See* Int. of J. Ilany, Nov. 28, 2012, at 157:16–20; Int. of J. Mack, Jan. 15, 2013, at 166:24–172:3.

## B. INDEPENDENT DIRECTOR COMPENSATION, INDEMNIFICATION, AND INSURANCE (YEARS 2005–2012)

### 1. *Independent Director Compensation, Indemnification, And Insurance*

#### a. *Requirement To Have Independent Directors*

Since June 24, 2005, ResCap has been required to have at all times at least two Independent Directors. Specifically, section 2(g)(i) of the 2005 Operating Agreement states:

> [AFI] shall vote for, and ResCap shall at all times have, at least two Independent Directors. In the event of a vacancy in the position of an Independent Director, whether as a result of resignation, removal, or otherwise, [AFI] shall, as promptly as practicable, elect a successor Independent Director. No appointment of an Independent Director or successor Independent Director, shall be effective until such Independent Director or successor shall have (y) accepted his or her appointment as an Independent Director by a written instrument, which may be a counterpart signature page to this Agreement, and (z) executed a counterpart to this Agreement.[123]

Section 2(g)(ii) requires that the chairperson of the Audit Committee of the ResCap Board shall be an Independent Director.[124]

The 2005 Operating Agreement defines "Independent Director" generally to include an individual who is not and has not been an officer, director, or employee of an AFI affiliate

_____

[123] 2005 Operating Agreement, § 2(g)(i) [ALLY_0140795]. Each Independent Director has executed a counterpart signature page. Independent Directors Thomas Jacob and Thomas Melzer together executed a counterpart signature page to the 2005 Operating Agreement. *Id.* at 13. Independent Directors Edward Smith, Karin Hirtler-Garvey, Pamela West, Jonathan Ilany, and John Mack each executed counterpart signature pages to the 2006 Amended Operating Agreement. *See* Edward F. Smith, III Signature Page for 2006 Amended Operating Agreement [MC-Examiner-000022]; Karin Hirtler-Garvey Signature Page for 2006 Amended Operating Agreement, dated June 12, 2008 [MC-Examiner-000021]; Pamela E. West Signature Page for 2006 Amended Operating Agreement [MC-Examiner-000023]; John Mack Signature Page for 2006 Amended Operating Agreement, dated Nov. 16, 2011 [MC-Examiner-000024]; Jonathan Ilany Signature Page for 2006 Amended Operating Agreement, dated Nov. 16, 2011 [MC-Examiner-000025]. The 2006 Amended Operating Agreement did not substantively change the provisions related to the Independent Directors.

[124] 2005 Operating Agreement, § 2(g)(ii) [ALLY_0140795].

within the three-year period immediately prior to such individual's appointment, subject to certain additional limitations.[125]

Sections III.B.3 and IV.A.2 provide a more detailed summary and analysis of the 2005 Operating Agreement and the 2006 Amended Operating Agreement with respect to requirements applicable to Independent Directors.

### b. Independent Director Service Dates

The following chart sets forth the service dates of the Independent Directors:

EXHIBIT IV.B.1.b
**Independent Director Service Dates**

| Independent Director | Date Appointed To ResCap Board | Date Resigned From ResCap Board |
|---|---|---|
| Thomas Jacob | April 20, 2005 | April 20, 2008 |
| Thomas Melzer | April 20, 2005 | April 20, 2008 |
| Edward Smith | May 15, 2008 | Presently Serving |
| Karin Hirtler-Garvey | June 12, 2008 | June 23, 2009 |
| Pamela West | May 8, 2009 | Presently Serving |
| Jonathan Ilany | November 16, 2011 | Presently Serving |
| John Mack | November 16, 2011 | Presently Serving |

*Source: See Residential Capital, LLC Company Profile, dated Jan. 31, 2012, at 2–3 [EXAM00121209]; Officer Listing, dated June 20, 2012 [ALLY_0020862]. See also Appendix IV.A.1—1.*

A chart setting forth all directors who served on the ResCap Board from 2004–2012, their dates of service, and their affiliations can be found at Appendix IV.A—1.

---

[125] *See id.* § 1. The 2005 Operating Agreement defines "Independent Director" as an individual who:

(A) is not and has not been an officer, director or employee, and has no immediate family member that is or has been an officer, of any [AFI] Affiliate within the three years immediately prior to such individual's appointment as an Independent Director; (B) has not received, and has no immediate family member who has received, during any twelve-month period in the three years immediately prior to such individual's appointment as an Independent Director, more than $100,000 in direct compensation from any [AFI] Affiliate, other than director fees and pension and other forms of deferred compensation for prior service that is not contingent in any way on continued service; (C) is not employed by, and has no immediate family member that is an officer of, any Person that has made payments to, or received payments from, any [AFI] Affiliate for property or services in an amount which, in any of the last three fiscal years, exceeds the greater of $1 million or 2% of ResCap's consolidated gross revenues; and (D) is reasonably believed by the then current directors of ResCap to be financially sophisticated and otherwise qualified to fulfill the obligations of an Independent Director as set forth in this Agreement. For purposes of this definition, 'immediate family member' means an individual's spouse, parents and parents-in-law, siblings and siblings-in-law, children and children-in-law and anyone (other than domestic employees) who shares such individual's home. Notwithstanding anything contained in clauses (A) through (D) above, any Independent Director may serve or have served as an Independent Director of one or more limited purpose entities organized for the purpose of acquiring, financing or otherwise investing, directly or indirectly, in assets or receivables originated, owned or serviced by any [AFI] Affiliate or ResCap Subsidiary or holding equity beneficial interest in trusts formed by any [AFI] Affiliate or ResCap Subsidiary.

### c. Independent Director Recruitment

#### (1) Thomas Melzer And Thomas Jacob

Thomas Jacob and Thomas Melzer served as Independent Directors from April 20, 2005 through April 20, 2008.[126] Melzer stated that he was initially contacted regarding the position by a search firm, Crist and Company, and did not know anyone at AFI or ResCap. He met with ResCap Director and AFI VP Jerome Van Orman, AFI Board Chairman Eric Feldstein, and ResCap Co-CEOs David Applegate and Bruce Paradis.[127] Jacob was initially contacted regarding the position by "a headhunting firm in Chicago," and was previously familiar with Paradis and Applegate. He subsequently met with Van Orman, Feldstein, and Applegate.[128] ResCap VP David Walker also recalled personal involvement in recruiting the initial Independent Directors.[129]

Jacob and Melzer were present at the April 20, 2005 meeting of the ResCap Board at which they were elected to serve as Independent Directors.[130] Their appointments were announced in an AFI press release dated May 4, 2005.[131] As to whether Jacob and Melzer were recruited by and serving as Independent Directors at the request of AFI (which, as discussed further in Section IV.B.2, is a prerequisite to AFI's indemnification of such Independent Directors), William Solomon, General Counsel of AFI, stated in an e-mail dated April 14, 2008 to Jacob and Melzer:

> Gentlemen: In response to a recent inquiry, I researched how it came to be that you have become associated with ResCap as independent directors of that company. I am writing on behalf of [AFI] to confirm that you were originally recruited, and continue to serve, as independent directors of Residential Capital, LLC at the request of [AFI], the sole shareholder of that

---

[126] See Residential Capital, LLC Company Profile, dated Jan. 31, 2012, at 3 [EXAM00121209]; Officer Listing, dated Jun. 20, 2012 [ALLY_0020862]; see also Appendix IV.A.1—1.

[127] See Int. of T. Melzer, Oct. 10, 2012, 32:21–34:17; see Int. of T. Melzer, Mar. 22, 2013, 32:23–33:15.

[128] See Int. of T. Jacob, Nov. 7, 2012, at 25:6–33:11.

[129] See Int. of D. Walker, Nov. 28, 2012, at 24:16–25:16.

[130] See Minutes of a Special Meeting of the Board of Directors of Residential Capital Corporation, Apr. 20, 2005, at RC40005473 [RC40005468].

[131] General Motors Acceptance Corporation, Press Release, *GMAC Capitalizes New Residential Mortgage Subsidiary; Elects Jacob and Melzer to Board of Directors* (May 3, 2005), http://media.ally.com/index.php?s=43&item=133.

company. I trust that this e-mail communication will suffice for the present but I will send each of you an original version of this note, in the form of a letter, by first class mail.[132]

The resignation of Jacob and Melzer after the April 20, 2008 ResCap Board meeting was announced at the April 21, 2008 ResCap Board meeting.[133] The reasons for their resignations are described in Section IV.A.1.

### *(2) Edward Smith*

Edward Smith has served as an Independent Director since May 15, 2008.[134] AFI appointed Smith to the ResCap Board.[135] Smith stated that Hull had been a casual, long-time acquaintance.[136] ResCap CEO Thomas Marano spoke with Smith over the subsequent weekend (May 17–18, 2008) and confirmed Smith's qualifications.[137] Unlike the process used to recruit Jacob and Melzer, it does not appear that AFI used an executive search firm to recruit Smith.[138] Smith's appointment to serve as an Independent Director was announced in a press release dated May 22, 2008.[139]

---

[132] E-mail from W. Solomon to T. Melzer and T. Jacob (Apr. 14, 2008) [MELZER.004778]. AFI not only recruited each independent director candidate, but, starting with Smith, vetted each candidate using a "Questionnaire for Director Independence" which requested that the candidate candidly complete and return a signed copy to AFI. *See*, *e.g*., Questionnaire of Edward Farrelly Smith, III [EXAM20181465]. Such Questionnaire was "modeled after the one used at the [AFI] Board level" and adapted to the Independent Director requirements of the 2006 Amended Operating Agreement. *See* E-mail from W. Solomon (May 8, 2008) [CCM00549322]. AFI's appointment of certain Independent Directors is further evidenced by the letters sent "on behalf of [AFI]," confirming each director's appointment and thanking him or her "[o]n behalf of [AFI] . . . for serving as an Independent Director of ResCap." *See*, e.g., Letter from R. Hull to E. Smith (May 15, 2008) at EXAM10146755 [EXAM10146754]; Letter from C. Quenneville to K. Hirter-Garvey (Jun. 12, 2008) [CCM00388535].

[133] *See* Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Apr. 21, 2008, at RC40005731 [RC40005652]; *see also* E-mail from A. de Molina (Apr. 20, 2008) [EXAM12336204].

[134] *See* Residential Capital, LLC Company Profile, dated Jan. 31, 2012, at 2 [EXAM00121209]; Officer Listing, dated Jun. 20, 2012 [ALLY_0020862]; *see also* Appendix IV.A.1—3.

[135] *See* Letter from R. Hull to E. Smith (May 15, 2008) at EXAM10146755 [EXAM10146754].

[136] *See* Int. of E. Smith, Nov. 30, 2012, at 20:14–21:18; *see also* E-mail from R. Hull (May 15, 2008) [EXAM12337817] ("I approached Ted Smith, a friend of mine with capital markets and portfolio management background from Goldman and Bank of America. He is willing to take the other Indy spot . . . .").

[137] E-mail from C. Quenneville (May 19, 2008) [EXAM10146753].

[138] *See* E-mail from R. Hull (May 15, 2008) [EXAM12337817].

[139] Residential Capital, LLC, Press Release, *Independent Director Appointed to the ResCap Board* (May 22, 2008), http://media.ally.com/index.php?s=43&item=238. Such press release makes no mention of James Chapman, who AFI appointed as an Independent Director the same day as it did Smith, but whose appointment was subsequently rescinded. *See* Section IV.A.1. The supporting materials for the May 22, 2008 ResCap Board meeting list Smith and Chapman as participants and the first agenda item was "Welcome New Independent Directors" by Marano. Hand-marked agenda and participant list for a meeting of the Board of Directors, Residential Capital, LLC, May 22, 2008, at RC40006980–81 [RC40006934]. Because the minutes for this meeting have not been produced to Examiner's Counsel, the Examiner cannot determine if Smith's appointment was subject to ratification by the ResCap Board.

### *(3) Karin Hirtler-Garvey*

Karin Hirtler-Garvey served as an Independent Director from June 12, 2008 through June 23, 2009.[140] Hirtler-Garvey was recruited by AFI CEO Alvaro de Molina and interviewed by Marano.[141] AFI appointed Hirtler-Garvey to the ResCap Board.[142]

Marano introduced Hirtler-Garvey as "the newly appointed Independent Director" in the ResCap Board meeting held on June 13, 2008.[143] The ResCap Board then elected Hirtler-Garvey as a Member and Chair of the ResCap Audit Committee.[144] Hirtler-Garvey's appointment as an Independent Director and Chair of the ResCap Audit Committee was announced in a June 13, 2008 press release.[145]

At the Board meeting held on June 23, 2009, Marano informed the ResCap Board that Hirtler-Garvey had tendered her resignation as a member of the ResCap Board and Audit Committee, and that at this time, "the vacated Board seat is not expected to be filled."[146]

### *(4) Pamela West*

Pamela West has served as an Independent Director since May 8, 2009.[147] West stated that she was recruited by Hirtler-Garvey, with whom she had previously worked at Bank of America and with whom she was friends.[148] AFI appointed West to the ResCap Board.[149]

Various documents list West's date of appointment as an Independent Director as May 8, 2009.[150] The minutes of the May 28, 2009 ResCap Board meeting list West as "present," but make no reference to any ResCap Board changes.[151]

---

[140] *See* Residential Capital, LLC Company Profile, dated Jan. 31, 2012, at 3 [EXAM00121209]; Officer Listing, dated Jun. 20, 2012 [ALLY_0020862]; *see also* Appendix IV.A.1–3.

[141] Int. of K. Hirtler-Garvey, Dec. 20, 2012, at 67:20–84:15.

[142] Letter from C. Quenneville to K. Hirtler-Garvey (Jun. 12, 2008) [CCM00388535].

[143] *See* Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Jun. 13, 2008, at RC40005781 [RC40005652].

[144] *Id*.

[145] Residential Capital, LLC, Press Release, *Independent Director Appointed to the ResCap Board* (Jun. 13, 2008), http://media.ally.com/index.php?s=43&item=245.

[146] Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Jun. 23, 2009, at RC40006224 [RC40005949].

[147] *See* Residential Capital, LLC Company Profile, dated Jan. 31, 2012, at 2 [EXAM00121209]; *see also* Officer Listing, dated Jun. 20, 2012 [ALLY_0020862].

[148] *See* Int. of P. West, Dec. 18, 2012, at 41:5–42:24.

[149] *Id*. at 45:25–46:3. West stated that she received a letter of appointment from de Molina, who she had known from Bank of America, "inviting [her] to join the [ResCap] board as an independent director." *Id*. Examiner's Counsel requested but did not receive a copy of this letter of appointment.

[150] *See* Residential Capital, LLC Company Profile, dated Jan. 31, 2012, at 2 [EXAM00121209]. *See* Officer Listing, dated Jun. 20, 2012 [ALLY_0020862].

[151] Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, May 28, 2009, at RC40006154–55 [RC40005949].

*(5) Jonathan Ilany And John Mack*

As the ResCap Board began preparing for a possible bankruptcy filing, it was expanded to provide for two additional Independent Directors who could assess potential legal claims against AFI and Cerberus entities and potentially approve (or recommend for approval) a settlement of any such claims.[152] Jonathan Ilany and John Mack have served as Independent Directors since November 16, 2011.[153]

Ilany stated that James Tanenbaum of Morrison & Foerster, with whom he was acquainted from prior professional dealings, first contacted him regarding service as an Independent Director.[154] Subsequently, Ilany met with West and Smith, and with Marano, who had worked for Ilany at Bear Stearns earlier in their careers.[155]

Mack recalled that Tanenbaum, with whom he was also acquainted from extensive prior professional dealings, first contacted him regarding service as an Independent Director.[156] Subsequently, Mack met West, with whom he was acquainted from prior dealings, and Smith.[157] Although Mack and Ilany were interviewed on the same day, they were interviewed separately.[158]

On November 12, 2011, AFI Legal Counsel Anita Bhama forwarded to AFI CEO Michael Carpenter and Ally Bank Chair Barbara Yastine an e-mail from ResCap General Counsel Tammy Hamzehpour regarding the pending appointment of two individuals (presumably Ilany and Mack) that the ResCap Board had interviewed and was recommending for appointment as Independent Directors.[159] Bhama responded with an analysis of how AFI's

---

[152] *See* Sections III.J.1.c and IV.A.5; Dep. of John E. Mack, Nov. 14, 2012, at 30:8–15; Int. of T. Marano, Nov. 26, 2012, at 170:14–17; Int. of J. Ilany, Nov. 28, 2012, at 64:10–65:8. The new Independent Directors' mandate was set forth in ResCap Board resolutions setting up the Special Review Committee. Minutes of a Special Meeting of the Board of Residential Capital, LLC, Dec. 5, 2011, at RC40018721 [RC40018411].

[153] *See* Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Nov. 16, 2011, at RC40018710 [RC40018411]; *see also* Appendix IV.A.1—3.

[154] *See* Int. of J. Ilany, Nov. 28, 2012, at 47:25–53:23.

[155] *See id*. at 54:14–55:9; 57:22–58:19.

[156] *See* Int. of J. Mack, Dec. 5, 2012, at 72:1–77:4.

[157] *See id*. at 82:13–19, 83:15–85:20.

[158] *See id*. at 85:22–86:2. At the ResCap Board meeting on November 4, 2011, "Mr. Marano referred to discussions previously held regarding the appointment of two additional directors to the ResCap Board. He commented on the scheduling of interviews with potential candidates." *See* Minutes of a Special Meeting of the Board of Residential Capital, LLC, Nov. 4, 2011, at RC40018700 [RC40018411]. Marano's reference to "discussions previously held" does not appear to correspond to any recorded prior discussion at any meeting of the ResCap or AFI Boards.

[159] *See* E-mail from A. Bhama (Nov. 12, 2011) [ALLY_0207114]. Note that while a forwarded message is referenced both by Bhama's message ("per Tammy's Hamzehpour's note below") and by her subject line ("FW: As requested by the Board…."), the document produced to Examiner's Counsel was redacted starting immediately after Bhama's sign off ("Thanks."), and continuing for almost two pages thereafter.

appointment of Independent Directors would trigger AFI's indemnification liability and recommended that the Independent Directors be appointed by the ResCap Board.[160] Carpenter's reply to both Bhama and Yastine instructs them to "[p]roceed as you think appropriate."[161] Independent Director appointment as it relates to indemnification by AFI is discussed further in Sections IV.B.1.e(6) and IV.B.2.a.

The ResCap Board appointed Ilany and Mack as Independent Directors at a November 16, 2011 meeting of the ResCap Board.[162]

---

[160] *See id.*

[161] E-mail from M. Carpenter (Nov. 12, 2011) [ALLY_0207114].

[162] *See* Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Nov. 16, 2011, at RC40018709 [RC40018411].

### d. Independent Director Compensation

The following chart sets forth a brief summary of the compensation for Independent Directors:

EXHIBIT IV.B.1.d
**Independent Director Compensation**
2005 – 2012

| Year | RCID | Annual Base Retainer | Annual Committee Fees | Special Payment | Other Amounts |
|------|------|------|------|------|------|
| 2005 | Jacob | Not disclosed | Not disclosed | N/A | Not disclosed |
| | Melzer | Not disclosed | Not disclosed | | |
| 2006 | Jacob | $100K | Audit: 30K (chair) | N/A | Pre-paid 2-year GM auto lease; Expense reimbursement |
| | Melzer | $100K | Audit: 10K (member) | | |
| 2007 | Jacob | $110K | Audit: 30K (chair) | N/A | Pre-paid 2-year GM auto lease; Expense reimbursement |
| | Melzer | $110K | Audit: 10K (member) | | |
| 2008 | Jacob | $110K | Audit: 30K (chair) | $8,333 monthly [1] | Expense reimbursement |
| | Melzer | $110K | Audit: 10K (member) | | |
| | Hirtler-Garvey | $110K | Audit: 30K (chair) | $100K annual single sum | |
| | Smith | $110K | Audit: 10K (member) | | |
| 2009 | Hirtler-Garvey | $110K | Audit: 30K (chair) | $100K annual single sum | Expense reimbursement |
| | West | $110K | Audit: 30K (chair) | | |
| | Smith | $110K | Audit:10K (member) | | |
| 2010 | West | $110K | Audit: 30K (chair) | $100K annual single sum | Expense reimbursement |
| | Smith | $110K | Audit: 10K (member) | | |
| 2011 | West | $120K | Audit: 30K (chair) | N/A | $1500 per meeting (after first 4 meetings, total capped at $25k); Expense reimbursement |
| | Smith | $120K | Audit: 10K (member) | | |
| | Ilany | $120K | N/A | | |
| | Mack | $120K | N/A | | |
| 2012 | West | $180K | Audit: 30K (chair) Compensation [2]: 10K (member) | Payment for retroactive increase to 2011 base retainer and meeting fees | $1500 per meeting Expense reimbursment |
| | Smith | $180K | Audit: 10K (member) | | |
| | Illany | $180K | Audit: 10k (member) | | $1500 per meeting; $1500 per negotiation; Expense reimbursement |
| | Mack | $180K | Audit: 10k (member) Compensation [2]: 20K (chair) | | |

[1] Whether payment was made is disputed.  See Section IV.B.1.d(4).
[2] Pro-rata payment of annual fees in 2012 following March, 2012 establishment of Compensation Committee.
Source: See E-mail from W. Hasson (Jan. 8, 2007) at EXAM10164167 [EXAM10164165]; E-mail from D. Marple (Jan. 9, 2007) [EXAM10165583]; Minutes of a Special Meeting of the Board of Directors of Residential Capital Corporation, Oct. 19, 2006, at RC40006816 [RC40006748]; Proposed 2008 Compensation Plan for ResCap Independent Directors, dated Jan. 31, 2008, at RC40007277 [RC40007261]; Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Feb. 1, 2008, at RC40005653–54 [RC40005652]; Minutes of a Meeting of the Special Committee of the Independent Directors of the Board of Residential Capital, LLC, Mar. 25, 2008, at RC40006622 [RC40006611]; See E-mail from T. Hamzehpour to R. Hull (Apr. 30, 2008) [EXAM20248306]; E-mail from C. Quenneville (May 23, 2008) [EXAM11234420]; Spreadsheet, PAYMENT INFO BY VEND Number, Edward F. Smith, III [EXAM00294352]; Spreadsheet, PAYMENT INFO BY VEND Number, Karin Hirtler-Garvey, [EXAM00294334]; Spreadsheet reflecting payments to Pamela E. West [EXAM00294341]; Spreadsheet, PAYMENT INFO BY VEND Number, Jonathan Ilany [EXAM00294335]; Spreadsheet, PAYMENT INFO BY VEND Number, John E. Mack [EXAM00294337].

Appendices IV.B.1.d—1, IV.B.1.d—2, and IV.B.1.d—3, and Section IV.B.1.d(8) and Appendices cited therein set forth additional information regarding Independent Director compensation.[163]

The following provides a more detailed narrative chronology of the compensation arrangements for Independent Directors based upon documentation and information received.[164]

### (1) 2005 Independent Director Compensation Documentation Is Limited

Examiner's Counsel has requested but not received any documentation that specifies the compensation paid to Independent Directors for 2005.

### (2) 2006 Independent Director Compensation Was Relatively Modest

Jacob and Melzer were paid an annual base retainer of $100,000 and an annual $10,000 fee for audit committee membership for 2006. Jacob also was paid an annual fee of $20,000 for his service as audit committee chair.[165]

### (3) 2007 Independent Director Compensation Included A Modest Increase In Annual Base Retainer

Jacob and Melzer were paid an annual base retainer of $110,000 and an annual $10,000 fee for Audit Committee membership for 2007. Jacob also was paid an annual fee of $20,000 for his service as Audit Committee Chair. Jacob and Melzer also were entitled to a pre-paid two-year auto lease with GM and reimbursement of expenses.[166]

---

[163] *See* Spreadsheet, Payment Info By Vend Number, Edward F. Smith, III [EXAM00294352]; Spreadsheet, Payment Info By Vend Number, Karin Hirtler-Garvey, [EXAM00294334]; Spreadsheet reflecting payments to Pamela E. West [EXAM00294341]; Spreadsheet, Payment Info By Vend Number, Jonathan Ilany [EXAM00294335]; Spreadsheet, Payment Info By Vend Number, John E. Mack [EXAM00294337]. Similar charts were not provided with respect to Jacob and Melzer.

[164] Examiner's Counsel received incomplete documentation in response to an omnibus request for production of all information regarding compensation for the Independent Directors, including detailed information on the time, form and source of payment of such compensation for each Independent Director.

[165] *See* E-mail from W. Hasson (Jan. 8, 2007) at EXAM10164167 [EXAM10164165] (requesting an updated spreadsheet for 2007 director compensation and providing that current monthly payments for Jacob and Melzer were $9,166.67 and $10,833.34, respectively); E-mail from D. Marple (Jan. 9, 2007) [EXAM10165583].

[166] Specifically, at a special meeting held on October 19, 2006, the ResCap Board discussed and approved Independent Director compensation for 2007. Independent Directors Jacob and Melzer were recused from the discussion and approval of such Independent Director compensation. The ResCap Board approved an increase of $10,000 in the base retainer and re-affirmed the extension of a pre-paid two-year lease on a GM vehicle and full reimbursement of expenses related to performing duties as an Independent Director and committee member. Jacob and Melzer re-joined the meeting and were apprised of the 2007 compensation plan approved by the ResCap Board. Minutes of a Special Meeting of the Board of Directors of Residential Capital Corporation, Oct. 19, 2006, at RC40006816 [RC40006748]. Such minutes do not reflect the specific amounts of the base retainer, committee membership fees, pre-paid auto lease or expense reimbursement limits, *but see* E-mail from D. Marple (Jan. 9, 2007) [EXAM10165583].

An e-mail from ResCap's General Counsel Marple dated January 9, 2007 notes that "[r]egarding contracts with the independent directors—there are none that relate to their term or compensation. As with all directors, they simply serve at the discretion of ResCap's shareholder."[167]

> ### (4) 2008 Independent Director Compensation Included An Award Of A Special Payment That Was Renounced As Improper By Certain Independent Directors But Continued To Be Paid

The Independent Directors were paid an annual base retainer of $110,000 and an annual $10,000 fee for audit committee membership for 2008. The audit committee chair was paid an annual $20,000 fee.[168] The 2008 Compensation Plan for Independent Directors (the "Compensation Plan") makes no reference to an extension of their pre-paid two-year GM auto leases, and subsequent compensation plans are silent on whether such leases were provided.[169]

In addition, in February 2008, the ResCap Board approved a special supplemental payment to each Independent Director of $100,000 per year for a three-year period, with annual installments to be paid on each April 1st of 2008, 2009, and 2010 (the "2008 Supplemental Award").[170]

---

[167] E-mail from D. Marple (Jan. 9, 2007) [EXAM10165583].

[168] The 2007 base retainer and committee fee compensation levels were extended into 2008 by the ResCap Board resolution approving the Proposed 2008 Compensation Plan for ResCap Independent Directors, dated Jan. 31, 2008, at RC40007277 [RC40007261]. *See* Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Feb. 1, 2008, at RC40005653–54 [RC40005652]. *See also* Karin Hirtler-Garvey— Independent Board Member payment schedule [EXAM00294336] (reflecting 2008 monthly payments equal to an annual base retainer of $110,000, an annual $10,000 fee for audit committee membership, and an annual $20,000 fee for the audit committee chair).

[169] Note, however, that a week after Smith was appointed as Independent Director, Hamzehpour wrote an e-mail which states "Rob Hull asked me yesterday to set up Ted Smith with the appropriate compensation, car, etc." E-mail from Hamzehpour (May 23, 2008) [EXAM11234420].

[170] *See* Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Feb. 1, 2008, at RC40005653–54 [RC40005652] (approving the Proposed 2008 Compensation Plan for ResCap Independent Directors, dated Jan. 31, 2008, at RC40007277 [RC40007261]).

Specifically, at a special meeting held on February 1, 2008, the ResCap Board discussed and approved Compensation Plan for Independent Directors.[171] Jacob and Melzer were recused from the discussion and approval of the Compensation Plan.[172] The Compensation Plan is summarized in a proposal distributed to the ResCap Board (presumably excluding Jacob and Melzer) prior to the special meeting.[173] The proposal states that:

> Management of [AFI] and ResCap recognize the incremental burdens and obligations recently placed on the independent directors, particularly in the third and fourth quarters of 2007, in respect of a higher than usual number of board and committee meetings, the oversight of the extensive restructuring of ResCap and the substantial increase in the number of material transactions that require review by the directors. It is management's expectation that the [sic] ResCap's business and financial circumstances will continue to place these incremental requirements on the independent directors in the near term and desire to provide an additional component of compensation to them as part of their compensation plan . . . .[174]

The amount of the annual payment under the 2008 Supplemental Award was almost double the $110,000 annual base retainer then being paid to Independent Directors. The 2008 Supplemental Award was payable without regard to whether the 2006 Amended Operating Agreement remained in effect through 2010 and was subject to acceleration and payment in full in the event of a change in control of ResCap or the termination of the 2006 Amended Operating Agreement.[175]

When Jacob and Melzer rejoined the meeting and were apprised of the details of the compensation plan that the ResCap Board had just approved, "each expressed appreciation for the recognition of the increased responsibility and commitment required in connection with the appointment as Independent Directors of ResCap."[176]

During a subsequent telephonic meeting of the Special Committee of the Independent Directors of the ResCap Board held on March 25, 2008, Melzer raised a concern about the increase in Independent Director annual fees.[177] The minutes state that "[i]n order to avoid

---

[171] *See* Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Feb. 1, 2008, at RC40005653–54 [RC40005652].

[172] *See id.*

[173] *See* Proposed 2008 Compensation Plan for ResCap Independent Directors, dated Jan. 31, 2008, at RC40007277 [RC40007261].

[174] *Id.*

[175] *See id.*

[176] Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Feb. 1, 2008, at RC40005654 [RC40005652].

[177] *See* Minutes of a Meeting of the Special Committee of the Independent Directors of the Board of Residential Capital, LLC, Mar. 25, 2008, at RC40006622 [RC40006611].

even an appearance of impropriety or influence, both Jacob and Melzer advised management that they would not accept such amount scheduled to be paid on April 1, 2008" and that ResCap President and CEO "Jim Jones said he would advise the Board of their decision."[178]

When interviewed, Melzer questioned the timing of the 2008 Supplemental Award, stating:

> [T]hey came up with a proposal to increase our compensation significantly . . . when we were right in the middle of one of these related party transactions . . . . And I said—we both did, said "No way. There's no way we're taking that compensation. This is going to look like somehow our independence and judgment was influenced by a large payment of that magnitude." I frankly couldn't have believed—I couldn't believe they proposed it.[179]

Jacob stated that accepting the 2008 Supplemental Award would have created "an appearance of impropriety" because of the many related party transactions that he and Melzer were then being asked to approve.[180] Jacob also felt uneasy about the timing: "we were working very hard. It is not that we were not worth it, but in the context of all the related party transactions that we were asked to approve, I was uncertain about the motives for this, the timing . . . ."[181] Asked if he thought the ResCap Board had been "trying to entice [him and Melzer] to approve the transactions by that hike in compensation," Jacob stated: "Yeah, you're exactly right. There was an attempt to influence us in a sense, okay. And so, we told them that we would not accept [the annual single sum payments of $100,000 starting that April 1] . . . ."[182]

Notwithstanding such concerns, and only one day after Jacob and Melzer advised that they would not accept their upcoming lump sum payment, on March 26, 2008, counsel for Jacob and Melzer, James Nouss, wrote to Hamzehpour and proposed restructuring the supplemental award in the form of monthly payments equal to the same $100,000 annual increase, and retroactive to January 1, 2008.[183] Nouss suggested the following:

> [Jacob and Melzer] would like to propose alternatively that the Board consider restructuring their approved compensation adjustment to be included in 12 monthly payments in the amount of $8,333.33 per month. (So, for example, Tom Melzer would now receive $18,333.33 per month for his services.) This

---

[178] *See id.*

[179] Int. of T. Melzer, Oct. 10, 2012, 239:8–239:21.

[180] Int. of T. Jacob, Nov. 7, 2012, at 213:14–24.

[181] *Id.* at 213:20–24.

[182] *Id*. at 213:25–214:6.

[183] *See* E-mail from J. Nouss (Mar. 26, 2008) [MELZER.008841].

> change would be retroactive to January 1, 2008. Could this item
> be added to the agenda of this week's Board meeting in order to
> avoid even the appearance that Tom and Tom somehow would
> be receiving a lump-sum payment in exchange for their
> favorable vote on matters considered at the upcoming Board
> meeting? They would, of course, recuse themselves from
> deliberation on this matter.[184]

On March 28, 2008, the ResCap Board approved by unanimous written consent a resolution to restructure the 2008 Supplemental Award in accordance with Nouss's proposal.[185]

Although Jacob and Melzer previously had renounced the 2008 Supplemental Award, Hamzehpour reports that they were paid a pro rata share of the 2008 Supplemental Award for 2008.[186] However, Jacob stated that he does not believe he received any part of the 2008 Supplemental Award.[187]

The form of payment of the 2008 Supplemental Award was subsequently converted back to annual single sum payments[188] and paid to certain Independent Directors. Smith received 2008 Supplemental Award payments of $100,000 for each of 2008, 2009 and 2010.[189] Hirtler-Garvey received 2008 Supplemental Award payments of $100,000 for each of 2008 and 2009.[190] West received a 2008 Supplemental Award payment of $100,000 for 2010.[191]

---

[184] *Id.*

[185] Unanimous Written Consent of the Board of Directors of Residential Capital, LLC, dated Mar. 28, 2008, at RC40005692–99 [RC40005652].

[186] *See* E-mail from T. Hamzehpour to R. Hull (Apr. 30, 2008) [EXAM20248306]. Hamzehpour states:

> Also, I think you're aware, but just in case—although the supplemental compensation plan for 2008 contemplated lump sum payments of $100K to each independent on April 1, the independent directors requested late in March that the supplemental comp be paid out on a monthly basis instead. Therefore, they both received those additional monthly installments for January–April, as well as their regular monthly payments. They will now receive no further payments, except for any expense reimbursements that they may submit related to dates prior to their resignation.

[187] Int. of T. Jacob, Apr. 17, 2013, at 46:25–47:13; *see also* Int. of T. Jacob, Apr. 17, 2013, at 48:18–49:7.

[188] E-mails between J. Jones and T. Hamzehpour (May 23–27, 2008) [EXAM11234420].

[189] E-mails between T. Hamzehpour and M. Brunette (May 27–30, 2008) [EXAM11306589].

[190] Karin Hirtler-Garvey—Independent Board Member payment schedule [EXAM00294336]; *see also* Spreadsheet, Payment Info By Vend Number, Karin Hirtler-Garvey [EXAM00294334].

[191] Spreadsheet reflecting payments to Pamela E. West [EXAM00294341]. Also, in an e-mail to Hamzehpour, West notes that Smith "has received his $100m [sic.] april bonus payment but mine must be lost in the mail." E-mail from P. West to T. Hamzehpour (April 08, 2009), at EXAM10434898–99 [EXAM10434896]. Upon learning from Kollenberg that West's $100,000 2008 Special Award payment for 2010 had been omitted from her pre-approved payment schedule, Hamzehpour requests Kollenberg's assistance correcting West's payment schedule and processing the missing payment. E-mails between T. Hamzehpour and C. Kollenberg (April 12–13, 2010) [EXAM10434896].

An e-mail dated May 23, 2008 from Jones sheds light on a purpose of the 2008 Supplemental Award:

> Part of the idea of the supplemental payments in the first place is that they automatically receive an accelerated payment if we ever vote to take down the firewall. Otherwise they would be voting to disband the board and cease their compensation. We could arrange separate comp for them in that event, but it may look like a payment for their votes. The way the supplemental was originally structured they get that pay if there is a board or not, and there should be no voting conflicts, real or perceived. It was the Toms that felt the first annual payment coincided with the Q1 bond contribution to preferred, and they did not like the optics of that. So we went to monthly payments.
>
> I would like to go back to annual payments each April for the next two years or upon dissolution of the board, whichever is first.[192]

### (5) 2009 Independent Director Compensation Remained Relatively Stable

The Independent Directors were paid an annual base retainer of $110,000 and an annual $10,000 fee for audit committee membership for 2009. The audit committee chair was paid an annual $20,000 fee.[193]

Specifically, Hirtler-Garvey was paid a total of $146,666.68 in Independent Director compensation in 2009, with the last payment on April 24, 2009.[194] Smith was paid a total of $320,000 in Independent Director compensation in 2009.[195] West, who joined the ResCap Board on May 8, 2009, was paid a total of $86,666.64 in Independent Director compensation for 2009.[196]

---

[192] E-mail from J. Jones (May 23, 2008) [EXAM11234420].

[193] *See, e.g.*, Spreadsheet, Payment Info By Vend Number, Edward F. Smith, III [EXAM00294352]; Spreadsheet reflecting payments to Pamela E. West [EXAM00294341].

[194] Hirtler-Garvey continued to receive $11,666.67 per month through April 2009, and as noted in Section IV.B.1.d(4), also received an additional $100,000 in March 2009. Spreadsheet, Payment Info By Vend Number, Karin Hirtler-Garvey, dated Jan. 29, 2013 [EXAM00294334]. An e-mail sent January 10, 2011 from Kollenberg to Hamzehpour states that "[a]ccording to the payment history and old schedule for Karin Hirtler-Garvey, her monthly payment was $11,666.67 (aside from the additional comps received)." E-mail from C. Kollenberg to T. Hamzehpour (Jan. 10, 2011) [EXAM20136494].

[195] Spreadsheet, Payment Info By Vend Number, Edward F. Smith, III, dated Jan. 29, 2013 [EXAM00294352].

[196] Vendor Payment Activity Spreadsheet With Respect to Pamela E. West, dated Jan. 14, 2013 [EXAM00294341].

### (6) 2010 Independent Director Compensation Remained Relatively Stable

For 2010, the Independent Directors were paid an annual base retainer of $110,000 and an annual $10,000 fee for audit committee membership. The audit committee chair was paid an annual $20,000 fee.[197]

Specifically, for 2010, West was paid $219,166.63 in Independent Director compensation and Smith was paid $210,000 in Independent Director compensation.[198]

### (7) 2011 Independent Director Compensation Included An Increase In Base And New Excess Meeting Fees

For 2011, the Independent Directors initially were paid an annual base retainer of $120,000 and an annual $10,000 fee for audit committee membership. The audit committee chair was paid an annual $20,000 fee. The Independent Directors were paid additional compensation for each ResCap Board meeting of $1,500 per meeting, though subject to limitations described immediately below.[199]

At a special telephonic meeting held on January 27, 2011, the ResCap Board discussed and approved Independent Director compensation for 2011.[200] Smith and West were recused from the discussion and approval of such Independent Director compensation.[201] The ResCap Board unanimously approved the following non-employee director compensation effective January 1, 2011: (1) an annual base retainer of $120,000; (2) an annual audit committee chair fee of $20,000; (3) an annual audit committee membership fee of $10,000; (4) additional compensation for ResCap Board meetings in excess of four per year of $1,500 per excess meeting (capped at $25,000); and (5) full reimbursement of expenses incurred in carrying out

---

[197] *See, e.g.*, Spreadsheet, Payment Info By Vend Number, Edward F. Smith, III [EXAM00294352]; Spreadsheet reflecting payments to Pamela E. West [EXAM00294341].

[198] *See Id.* In e-mails exchanged on December 3, 2010, Kollenberg and Hamzehpour discuss the continuation of director payments for Smith and West in 2011. Hamzehpour responds that: (1) both Smith and West are still directors; (2) payments should continue through 2011; and (3) "[i]n fact, there may be an adjustment to the compensation and, if so, that would be effective in January." E-mail from T. Hamzehpour to C. Kollenberg (Dec. 3, 2010) [EXAM10357376]. In a follow-up e-mail to Hamzehpour, dated January 10, 2011, Kollenberg notes that West received twenty payments of $10,833.33 per month for the period from June 2009 through November 2010, and that West had not been paid her monthly $833.33 Audit Committee Member fee and is due a make-up payment of $16,666.60 for her twenty missing Audit Committee Member fees. E-mail from C. Kollenberg to T. Hamzehpour (Jan. 10, 2011) [EXAM20136494].

[199] Minutes of a Special Meeting of the Board of Residential Capital, LLC, Jan. 27, 2011, at RC40018421–22 [RC40018411]. Note, however, that the annual base retainers were increased to $180,000 and all limitations on per meeting fees were lifted in December 2011, with payment retroactive to January 2011. *See* Section IV.B.1.d(7); s*ee also* Unanimous Written Consent of the Management Members of the Board of Directors of Residential Capital, LLC, dated Dec. 9, 2011, at RC40018727–28 [RC40018411].

[200] Minutes of a Special Meeting of the Board of Residential Capital, LLC, Jan. 27, 2011, at RC40018421–22 [RC40018411].

[201] *Id*. at RC40018421.

responsibilities as directors and committee members.[202] The retroactive payment of Independent Director compensation for 2011 is discussed further in Section IV.B.1.d(8).

In an e-mail dated January 3, 2012 from Jennifer Shank of AFI Legal Staff to Hamzehpour, Shank asks Hamzehpour how she should determine the meetings for which West and Smith previously received compensation.[203] Shank notes:

> Per Kitty's e-mail from last week, there were 51 ResCap Board and Committee meetings held in 2011, not including the 12/15/2011 Business Review/Executive Session, which was not a regular meeting and for which minutes were not taken (see below)

|  | BOARD | AUDIT | COCC |
|---|---|---|---|
| Q1 | 5 | 3 | — |
| Q2 | 2 | 2 | 1 |
| Q3 | 13 | 5 | 4 |
| Q4 | 11 | 3 | 2 |
| Total | 31 | 13 | 7 |

> According to the resolution adopted by ResCap Management on 12/9/2011, Pam and Ed both need to receive $60K for the retainer increase that was made retroactive to 1/1/2011 and should receive meeting fees past the $25K for 2011 meetings. For the two new independent directors, they need the base retainer of $180K as well as payment for any meetings they attended since their appointment on 11/15/2011.[204]

### (8) 2012 Independent Director Compensation Was Significantly Higher Than Any Previous Year

For 2012, the Independent Directors were paid an annual base retainer of $180,000 and an annual $10,000 fee for audit committee membership. The audit committee chair also was paid an annual $20,000 fee for his services as audit committee chair. The Independent Directors also were paid additional compensation for each ResCap Board meeting of $1,500 per meeting.[205]

_____

[202] _Id._ at RC40018421–22.

[203] E-mail from J. Shank to T. Hamzehpour (Jan. 3, 2012) [EXAM20136494].

[204] _Id._

[205] Unanimous Written Consent of the Management Members of the Board of Directors of Residential Capital, LLC, dated Dec. 9, 2011, at RC40018728 [RC40018411].

On December 9, 2011, the management members of the ResCap Board approved by unanimous written consent the proposed 2012 compensation plan for the Independent Directors.[206] The proposal states that ResCap management:

> [R]ecognizes the incremental burdens and obligations placed on the independent directors during 2011, and anticipated during 2012, in respect of a higher than usual number of board and committee meetings, ResCap's unrelenting capital and liquidity challenges and continuing need to evaluate material transactions (including affiliate transactions) that require review by the directors.[207]

The proposal calls for: (1) increases in the base retainer amount from $120,000 to $180,000 per year; (2) the continuance of the audit committee membership fee of $10,000 and audit committee chair fee of $20,000 per year; (3) the continuance of the fee of $1,500 per meeting (but without the "in excess of four" and $25,000 cap restrictions that were in place in 2011); and (4) the continuance of full reimbursement of expenses in carrying out responsibilities as directors and committee members.[208] In addition, the proposal provides that: (1) the increased base retainer will be retroactive to January 1, 2011 for Smith and West and retroactive to the date of engagement for Mack and Ilany; (2) to the extent that any Independent Directors reach the $25,000 cap on meeting fees during 2011, the company will nevertheless pay any excess meeting fees; and (3) the company will pay to each Independent Director the meeting fees for the first four meetings each attended during 2011.[209]

On May 4, 2012, the management members of the ResCap Board approved by unanimous written consent proposed amendments to the 2012 director compensation plan.[210] The amendments provide for additional compensation to Independent Directors who serve on the ResCap Board compensation committee that was established in March 2012: (1) an annual compensation committee membership fee of $10,000; (2) an annual compensation committee chair fee of $10,000; (3) a fee of $1,500 per meeting attended; and (4) full reimbursement of expenses incurred in carrying out the responsibilities as committee members.[211] The amendments also approve additional compensation to Independent Directors, "in particular Messrs. Mack and Ilany, who have taken on additional responsibilities and are devoting a substantial amount of additional time related to certain strategic negotiations with executives

---

[206] *Id.* at RC40018727–28.

[207] *Id.* at RC40018728.

[208] *Id.*

[209] *Id.* In addition, in an e-mail dated December 30, 2011 from Hamzehpour to Kollenberg, Hamzehpour notes the need for retroactive adjustments in 2011 director compensation so that they will effectively have been paid the $180,000 base for all of 2011. E-mail from T. Hamzehpour to C. Kollenberg (Dec. 30, 2011) [EXAM20119671].

[210] Unanimous Written Consent of the Management Members of the Board of Directors of Residential Capital, LLC, May 4, 2012, at RC40019214–18 [RC40019179].

[211] *Id*. at RC40019217–18.

of [AFI] and Cerberus Capital Partners in respect of the potential sale or restructuring of [ResCap]."[212] The additional fees for such strategic negotiations were set at $1,500 per negotiating session (regardless of whether held in person or telephonically).[213] The Independent Directors were required to notify ResCap's Secretary or Assistant Secretary of all such meetings so that the related payments could be included in the regular quarterly payments of meeting fees.[214]

The special fees for meetings held in 2012 were substantial. For example, in the period from March 1, 2012 through May 16, 2012, there were a total of eight ResCap Board meetings, three Audit Committee meetings, one Consent Order Compliance Committee Meeting, four Compensation Committee meetings (one not included in 1Q compensation) and twenty-nine "Negotiation Meetings/Calls with Carpenter and Lenard."[215] Independent Directors received a total of $112,500 in special meeting fees for such meetings.

Studies of board of director practices and compensation indicate a trend among publicly traded companies to eliminate per meeting fees to simplify compensation structures. The *Spencer Stuart Board Index* reported that the number of companies paying per meetings fees in addition to annual retainers decreased from 70% in 2002 to approximately 33% in 2012.[216] According to a study of 240 publicly traded companies conducted by Frederick W. Cook & Co., Inc., in 2012 only 51% of mid-cap companies surveyed paid per meeting fees to directors.[217] Fifty-two-percent of financial services companies surveyed paid per meeting fees.[218] A 2011 survey by The Conference Board, Inc. of 334 publicly traded companies reported that meeting fees comprised approximately 13% of directors' total compensation for financial services companies, and approximately 21% of total compensation for directors of publicly traded companies with $1 billion to $9.9 billion of assets.[219] By comparison, per meetings fees

---

[212] *Id*. at RC40019217.

[213] *Id*. at RC40019218. Based on the compensation records produced for Ilany and Mack, it appears that this $1,500 payment was paid on a per day rather than per event basis. *See* Residential Capital, LLC Independent Director Compensation, Apr. 1, 2012–Present, dated May 16, 2012, at EXAM00294339 [EXAM00294338].

[214] Unanimous Written Consent of the Management Members of the Board of Directors of Residential Capital, LLC, May 4, 2012, at RC40019218 [RC40019179].

[215] Residential Capital, LLC, Independent Director Compensation: Meeting Attendance Fees, Board and Committees, Apr. 1, 2012–Present, dated May 16, 2012 [EXAM00294338]. Note that it appears Ilany and Mack were compensated for each day and not by meeting or call.

[216] SPENCER STUART, 2012 SPENCER STUART BOARD INDEX (Nov. 6, 2012), 39, http://www.spencerstuart.com/research/articles/1621/.

[217] *See* FREDERIC W. COOK & CO., 2012 DIRECTOR COMPENSATIONREPORT: NON-EMPLOYEE DIRECTOR COMPENSATION ACROSS INDUSTRIES AND SIZE (Oct. 2012), at 10, http://www.fwcook.com/alert_letters/2012_Directors_Compensation_Report_Non-Employee_Director_Compensation_Across_Industries_and_Size.pdf.

[218] *Id.*

[219] Tonello, Matteo, & Judit Torok, THE 2011 U.S. DIRECTOR COMPENSATION AND BOARD PRACTICES REPORT (November 2, 2011), at 24–25, http://ssrn.com/abstract=2032229. THE CONFERENCE BD., THE 2011 U.S. DIRECTOR COMPENSATION AND BOARD PRACTICES REPORT (Nov. 2011), at 24–25, http://www.conference-board.org/publications/publicationdetail.cfm?publicationid=2040.

accounted for approximately 41% of the total compensation paid to the ResCap Independent Directors for 2012.[220] Exhibit IV.B.1.d(8) shows the composition of total compensation for the Independent Directors in 2012.



EXHIBIT IV.B.1.d(8)
**ResCap Independent Director Compensation**
Paid in 2012

Source: *PAYMENT INFO BY VEND Number, John E. Mack [EXAM00294337]; Spreadsheet, PAYMENT INFO BY VEND Number, Jonathan Ilany [EXAM00294335]; Spreadsheet, PAYMENT INFO BY VEND Number, Edward F. Smith, III [EXAM00294352]; Spreadsheet reflecting payments to Pamela E. West [EXAM00294341].*

It is noteworthy that other financially distressed financial services companies did not remove caps or minimum meeting requirements from compensation plans prior to a bankruptcy filing. Lehman reported in its 2008 Proxy Statement that the final quarterly installment of a director's annual retainer would be withheld if the director failed to attend at least 75% of the total number meetings.[221] Lehman Brothers only paid per meeting fees for committee meetings, not board meetings.[222] Similarly, IndyMac compensated directors for per meeting attendance of special board functions and committee meetings over a minimum of four meetings; its directors did not receive per meeting fees for board meetings.[223]

---

[220] This calculation does not include the retroactive meeting fees paid to the Independent Directors in 2012 for 2011.

[221] Lehman Brothers, Proxy Statement (Schedule 14A) (Mar. 5, 2008), at 14–15.

[222] *Id.*

[223] Indymac Bancorp, Inc., Proxy Statement (Schedule 14A) (Mar. 24, 2008), at 21.

Based on calculations by Examiner's Financial Advisors, compensation paid to Independent Directors in 2012 was $409,000 to Mack, $373,000 to Ilany, $464,500 to West and $409,500 to Smith. The $414,000 average amount paid to Independent Directors in 2012 is higher than the $165,000 average amount of Independent Director compensation in 2011 and approximately twice the average amount of Independent Director compensation paid for the preceding four years.[224]

Examiner's Professionals obtained peer group information and compared the amount of compensation paid to Independent Directors with compensation paid to independent directors of peer group companies for the period from 2005 to the present, which is summarized in the charts in Appendix IV.B.1.d(8)—1 and —2. The peer group includes financially distressed financial services companies that either filed for bankruptcy or were sold on the brink of bankruptcy between 2008 and 2012. Notably, the Independent Directors' $414,000 average total compensation ranks as the second highest among the peer group. Only non-employee directors of Countrywide received more average total compensation, $472,800, than the Independent Directors in the year preceding Countrywide's sale to Bank of America. Lehman's directors received $365,000 in average total compensation in the year prior to Lehman's bankruptcy filing. There was no clear pattern of increasing board compensation in the year prior to a bankruptcy filing among financially distressed peers.

Moreover, annual compensation paid to Independent Directors was significantly higher than compensation paid to independent directors of AFI. For example, average annual total cash compensation for the Independent Directors was $414,000 for 2012, whereas average annual total cash compensation for AFI's independent directors was approximately $314,000. For more detail, see Appendix IV.B.1.d(8)—3, Appendix IV.B.1.d(8)—4, and Appendix IV.B.1.d(8)—5.

Indeed, the Independent Directors' average annual compensation is greater than the average compensation received by directors at some of the U.S.'s largest publicly traded financial institutions. For 2012, the directors of Morgan Stanley were paid an average of $351,080, while directors of Wells Fargo received approximately $299,429.[225] Also for 2012, the directors of Citigroup, Bank of America, and JPMorgan received an average of $315,000, $275,000, and $278,194, respectively.[226] By comparison, the Independent Directors received average annual compensation of approximately $414,000 for 2012.[227]

---

[224] Compensation paid in 2012 was significantly increased by the lump sum payment in January 2012 of compensation, made retroactive to 2011. The effect was a significant increase in compensation paid to the Independent Directors in 2012. If the retroactive fees were considered on an accrual versus on a cash basis, the 2012 average would be $342,125, which would still exceed the average compensation paid to AFI and peer group independent directors in 2012.

[225] Susanne Craig, *At Banks, Board Pay Soars Amid Cutbacks*, N.Y. TIMES, Mar. 31, 2013, http://dealbook. nytimes.com/2013/03/31/pay-for-boards-at-banks-soars-amid-cutbacks/.

[226] *Id.*

[227] Compensation paid in 2012 was significantly increased by the lump sum payment in January 2012 of compensation, made retroactive to 2011. The effect was a significant increase in compensation paid to the Independent Directors in 2012. If the retroactive fees were considered on an accrual versus on a cash basis, the 2012 average would be $342,125, which would still exceed the average compensation paid to AFI and peer group independent directors in 2012.

### *(9) Other Independent Director Compensation*

With the exception of the Independent Director compensation described above (most notably the 2008 Supplemental Award), no documentation or information was produced that reflects any special payments made by ResCap, AFI, or any of their respective affiliates to the Independent Directors.[228] Moreover, the form of payment for Independent Directors appears to be limited to cash payments and prepaid auto leases and does not appear to include any equity-based compensation of ResCap or any of its related entities.

### *(10) Source Of Independent Director Compensation*

Examiner's Professionals have been unable to verify from the documents produced the source of Independent Director compensation, including both the original source of payment and any intercompany or affiliate accounting adjustments or charge-backs. Such information is important to determining whether there may be a basis to assert a claim that the Independent Directors breached their fiduciary duties and may have been improperly influenced by payments made from AFI or other affiliates of ResCap.

Examiner's Professionals note that AFI shared services processed ResCap Independent Director compensation under the direction of Hamzehpour, who sent periodic e-mails updating AFI shared services on the compensation due to each Independent Director.[229]

Counsel for Independent Directors, Morrison Cohen, told Examiner's Counsel that the Independent Directors were ultimately paid by AFI shared services from ResCap funds, identifying a general ledger account number from which AFI shared services' debited Independent Directors payments as an account for professional fees relating to RFC, and a cost center referenced on certain director invoices as a ResCap-related cost center.

### *(11) Independent Director Compensation Development*

Examiner's Counsel did not receive sufficient documentation or information to determine which entity created or proposed Independent Director compensation plans each year, or whether outside compensation consultants or peer group information was received or considered in developing such compensation arrangements.

### *(12) Non-Independent Director Compensation*

As noted in Appendix IV.A.1—1, certain directors and officers of ResCap were also employed by one or more AFI affiliates. This is not uncommon, as many wholly owned subsidiaries often share officers, directors, and employees with their parents.

---

[228] For example, in his Rule 9019 deposition of November 14, 2012, Mack confirmed that he did not have any additional director incentive compensation. *See* Dep. of J. Mack, Nov. 14, 2012, at 24:15–25:2.

[229] *See, e.g.*, E-mails between T. Hamzehpour and C. Kollenberg (Apr. 12–13, 2008) [EXAM10434896]; E-mail from T. Hamzehpour to M. Brunette (May 27, 2008) [EXAM11306589]; E-mail from T. Hamzehpour to C. Kollenberg (Dec. 3, 2010) [EXAM10357376].

As is not uncommon for employees of a wholly owned subsidiary or dual service directors, certain senior ResCap executives earned deferred incentive compensation based on parent AFI's value and performance and were paid AFI equity-based compensation, including restricted stock units. Appendix IV.B.1.d(12) sets forth a summary of compensation paid to ResCap directors and officers that were not Independent Directors, including directors and officers who served in a dual capacity with both ResCap and AFI.

It is important to note that at least one ResCap director, Marano, was considered among the top twenty-five most highly paid individuals of AFI and its subsidiaries. In recent testimony before the U.S. House of Representatives oversight panel, Rep. Jim Jordan (R. Ohio) "took aim at special paymaster Patricia Geoghegan who approved $8 million in compensation for ResCap Chief Executive Tom Marano just weeks before the company filed for Chapter 11."[230] In response, Special Paymaster Patricia Geoghegan noted that "[t]he salary was at the request of [the] ResCap board of directors."[331] AFI spokeswoman Gina Proia told the Wall Street Journal that "Tom Marano's compensation for periods following ResCap filing for bankruptcy is the responsibility of ResCap, not [AFI]."[332] Proia added that Marano, a former Bear Stearns executive, is seeking compensation for 2013 of $2 million.[333]

Debtors sought and obtained approval from the U.S. Treasury's Office of the Special Master to have any deferred compensation elements arising after the Petition Date to be issued in the form of deferred cash rather than AFI stock units, so that postpetition compensation to ResCap employees is not tied to the value of AFI stock.[334]

### e.  Indemnification Of ResCap Directors And Officers

This Section summarizes the entity indemnification as between ResCap and AFI and the indemnification provisions applicable to ResCap directors and officers, including Independent Directors.

### (1)  2005 And 2006 Operating Agreements—Entity Indemnification

Pursuant to the 2005 Operating Agreement and the 2006 Amended Operating Agreement, AFI agrees to indemnify and hold harmless ResCap and its subsidiaries against certain losses, including liabilities related to or arising "from and against any Losses related to [AFI]

---

[230] Patrick Fitzgerald, *Lawmakers Grill Treasury on ResCap Executive Pay*, WALL ST. J., Feb. 27, 2010, http://blogs.wsj.com/bankruptcy/2013/02/27/lawmakers-grill-treasury-on-rescap-executive-pay/.

[331] *Id*.

[332] *Id*.

[333] *Id*.

[334] *See* Debtors' Submission Paper, April 11, 2013, at 17–18.

Indemnifiable Liabilities."[335] Specifically excluded are liabilities related to or arising from and against any Losses related to GM Indemnifiable Liabilities, for which GM is responsible.[336] ResCap, in turn, agrees to indemnify and hold harmless GM, AFI, and their affiliates from and against any Losses related to ResCap Indemnifiable Liabilities.[337]

### (2) ResCap By-Laws

Pursuant to section 6.1 of the ResCap By-Laws, ResCap was required to indemnify and advance expenses to every director and officer in the manner and to the full extent permitted by applicable law.[338] In particular, such section provides that:

> Subject to the other provisions of this article, the corporation shall indemnify and advance expenses to every director and officer (and to such person's heirs, executors, administrators or other legal representatives) in the manner and to the full extent permitted by applicable law as it presently exists, or may hereafter be amended, against any and all amounts (including judgments, fines, payments in settlement, attorneys' fees and other expenses) reasonably incurred by or on behalf of such person in connection with any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative ("a proceeding"), in which such director or officer was or is made or is threatened to be made a party or is otherwise involved by reason of the fact that such person is or was a director or officer of the corporation, or is or was serving at the request of the corporation as a director, officer, employee, fiduciary or member of any other corporation, partnership, joint venture, trust, organization or

---

[335] 2005 Operating Agreement, § 3(b) [ALLY_0140795]; 2006 Amended Operating Agreement, § 3(b) [ALLY_0041818]. AFI Indemnifiable Liabilities are defined as "all Liabilities of any [AFI] Affiliate to the extent such Liabilities (a) relate to, (b) arise out of or (c) result principally from any of the following items: (i) the failure of any [AFI] Affiliate to pay, perform or otherwise promptly discharge any Liabilities of such [AFI] Affiliate in accordance with their terms; or (ii) the [AFI] Affiliate Business." *Id.*

[336] *See* 2005 Operating Agreement, § 3(a) [ALLY_0140795]; 2006 Amended Operating Agreement, § 3(a) [ALLY_0041818]. GM Indemnifiable Liabilities are defined as "all Liabilities of any GM Affiliate to the extent such Liabilities (a) relate to, (b) arise out of or (c) result principally from any of the following items: (i) the failure of any GM Affiliate to pay, perform or otherwise promptly discharge any Liabilities of such GM Affiliate in accordance with their terms; or (ii) the GM Affiliate Business." *Id.*

[337] *See* 2005 Operating Agreement, § 3(c) [ALLY_0140795]; 2006 Amended Operating Agreement, § 3(c) [ALLY_0041818]. ResCap Indemnifiable Liabilities are defined as "all Liabilities of ResCap or any of its Subsidiaries to the extent such Liabilities (a) relate to, (b) arise out of or (c) result principally from any of the following items: (i) the failure of ResCap or any of its Subsidiaries to pay, perform or otherwise promptly discharge any Liabilities of ResCap or such Subsidiary, as the case may be, in accordance with their terms; or (ii) the ResCap Business." *Id.*

[338] ResCap By-Laws, § 6.1 [EXAM12325305].

> other enterprise. The corporation shall not be required to
> indemnify a person in connection with a proceeding initiated by
> such person if the proceeding was not authorized by the board of
> directors of the corporation.[339]

The ResCap By-Laws also include detailed provisions with respect to the advancement of expenses of directors and officers, claims by officers and directors, non-exclusivity of rights, offsets for other indemnification, indemnification insurance and other related terms. Such provisions of the ResCap By-Laws are relevant with respect to claims for indemnification from ResCap that relate to periods prior to conversion of ResCap from a corporation to a limited liability company.

### (3) 2006 ResCap LLC Agreement

The 2006 ResCap LLC Agreement provides for exculpation and indemnification of ResCap directors and officers.[340]

Specifically, section 17 of the 2006 ResCap LLC Agreement sets forth an exculpation provision which provides, in pertinent part, that no director, officer or employee of ResCap or any subsidiary of ResCap (each a "Covered Person") will be liable to ResCap or any person bound by such agreement for any loss, damage, or claim incurred by reason of any act or omission performed or omitted by such Covered Person in good faith on behalf of ResCap and in a manner reasonably believed to be within the scope of the Covered Person's authority, except for any loss, damage or claims incurred by reason of such covered person's willful misconduct or bad faith.[341] As a result, claims that relate to acts or omissions performed or omitted by ResCap directors and officers in good faith and in a manner reasonably believed to be within the scope of such director or officer's authority have been exculpated by ResCap.[342]

Section 18 of the 2006 ResCap LLC Agreement provides, subject to limitations set forth therein and "to the fullest extent permitted by applicable law," for indemnification of Covered Persons for acts or omissions of the Covered Person performed in good faith on behalf of ResCap and in a manner reasonably believed to be within the scope of authority conferred on such Covered Person by such agreement.[343]

The 2006 ResCap LLC Agreement indemnification provisions do not provide indemnification in respect of: (1) the Covered Person's willful misconduct or bad faith with respect to such acts or omissions; (2) claims, issues, or matters to which the Covered Person is

---

[339] *Id.*

[340] 2006 ResCap LLC Agreement, §§ 17, 18 [KL000000474].

[341] *Id.* § 17 ("Any repeal or modification of this Section 17 shall not adversely affect any right or protection of a Covered Person existing hereunder with respect to any act or omission occurring prior to such repeal or modification.").

[342] *See* Section VII.E.1.g(3).

[343] 2006 ResCap LLC Agreement, §18(a) [KL000000474].

determined to be liable to ResCap, unless a court determines that the Covered Person is entitled to such indemnification; (3) claims initiated by the Covered Person (other than claims for indemnification and claims authorized or consented to by the ResCap Board); (4) settlements entered into without the prior written consent of ResCap, which consent shall not be unreasonably withheld; and (5) certain other matters.[344] Importantly, the 2006 ResCap LLC Agreement makes clear that the indemnification provided pursuant to section 18 thereof "shall be provided out of and to the extent of Company assets only, and the Member shall not have personal liability on account thereof."[345] The 2006 ResCap LLC Agreement contains detailed indemnification provisions, including provisions on successful defense, partial indemnification, advancement of payment of expenses, notification and defense of claims, and procedures for indemnification.[346]

### (4) 2008 ResCap Amended LLC Agreement

The 2006 ResCap LLC Agreement was amended and restated, effective as of March 31, 2008, to reflect the addition of AFI as a preferred member and the issuance of Preferred Units (as defined therein) to AFI.[347] The exculpation and indemnification provisions generally do not appear to be substantively changed in the 2008 ResCap Amended LLC Agreement.[348]

### (5) ResCap Indemnification Agreements With Independent Directors

ResCap entered into an Indemnification Agreement with Melzer dated as of June 21, 2005,[349] and into Amended and Restated Indemnification Agreements with Jacob and

---

[344] *See id*. § 18(a)(i), (a)(iii), (h), (i).

[345] *Id*. § 18(a)(i).

[346] *See Id*. § 18.

[347] 2008 ResCap Amended LLC Agreement [KL000000433].

[348] However, the indemnification provision in the 2006 ResCap LLC Agreement, § 18(a)(i) [KL000000474], which states that "the Member shall not have personal liability on account thereof," was amended to read as follows in the 2008 ResCap Amended LLC Agreement, § 18(a)(i) [KL000000433]: "no Member shall have personal liability on account thereof."

[349] Indemnification Agreement between Residential Capital, Corporation and Thomas Melzer, dated June 21, 2005 [MELZER.000886]. Examiner's Counsel believes that ResCap entered into a similar Indemnification Agreement with Jacob dated on or about June 21, 2005. *See* Minutes of the Annual Meeting of the Board of Directors, Residential Capital Corporation, Jun. 21, 2005, at RC40005518–19 [RC40005468] (showing that the ResCap Board authorized certain executive officers of ResCap to enter into and execute indemnification agreements with Jacob and Melzer, of same scope as afforded to directors in the ResCap By-Laws); Minutes of a Special Meeting of the Board of Directors, Residential Capital Corporation, Oct. 19, 2006, at RC40006812 [RC40006748] (recapping that ResCap Director David Walker "referred to previously approved indemnification agreements with each of the Independent Directors"); Amended and Restated Indemnification Agreement between Residential Capital, LLC and Thomas Jacob, dated Oct. 24, 2006 [EXAM00296828] (amending, presumably, ResCap's original Indemnification Agreement with Jacob). However, the original Indemnification Agreement for Jacob was requested and not produced.

Melzer dated as of October 24, 2006[350] (collectively, the "Individual Indemnification Agreements"). ResCap does not appear to have entered into any individual indemnification agreements with any other Independent Director.

The indemnification provisions set forth in the Individual Indemnification Agreements provide that ResCap will indemnify the Indemnitees (Jacob and Melzer):

> [I]f Indemnitee is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative, by reason of the fact that Indemnitee is or was or has agreed to serve at the request of [ResCap] as a director of [ResCap], or while serving as a director of [ResCap] or by reason of any action alleged to have been taken or omitted in such capacity.[351]

Indemnification is provided only if "Indemnitee acted in good faith and in a manner Indemnitee reasonably believed to be in or not opposed to the best interests of [ResCap], and with respect to any criminal action, suit or proceeding, had no reasonable cause to believe Indemnitee's conduct was unlawful."[352] The Individual Indemnification Agreements contain a number of other exclusions, including exclusions for claims, issues or matters as to which Indemnitee shall have been adjudged to be liable to ResCap, unless a court determines that the Indemnitee is entitled to such indemnification.[353] The Amended and Restated Indemnification Agreements contain other exclusions that are consistent with the 2006 ResCap LLC

---

[350] Amended and Restated Indemnification Agreement between Residential Capital, LLC and Thomas Jacob, dated Oct. 24, 2006 [EXAM00296828]; Amended and Restated Indemnification Agreement between Residential Capital, LLC and Thomas Melzer, dated Oct. 24, 2006 [EXAM00296838]. In a special meeting of the ResCap Board held on October 19, 2006, ResCap Director David Walker "recommended approval of updated indemnification agreements [with each of the Independent Directors] to reflect changes related to the conversion of ResCap to a limited liability company." Minutes of a Special Meeting of the Board of Directors, Residential Capital Corporation, Oct. 19, 2006, at RC40006812 [RC40006748]. At this meeting, the ResCap Board approved the form and execution of amended indemnification agreements with each of the Independent Directors in substantially the form presented at such meeting. Minutes of a Special Meeting of the Board of Directors, Residential Capital Corporation, Oct. 19, 2006, at RC40006813 [RC40006748].

[351] Indemnification Agreement between Residential Capital, Corporation and Thomas Melzer, dated June 21, 2005, § 1(a) [MELZER.000886]; Amended and Restated Indemnification Agreement between Residential Capital, LLC and Thomas Jacob, dated Oct. 24, 2006 [EXAM00296828], § 1(a); Amended and Restated Indemnification Agreement between Residential Capital, LLC and Thomas Melzer, dated Oct. 24, 2006 [EXAM00296838], § 1(a).

[352] Indemnification Agreement between Residential Capital, Corporation and Thomas Melzer, dated June 21, 2005 [MELZER.000886]; Amended and Restated Indemnification Agreement between Residential Capital, LLC and Thomas Jacob, dated Oct. 24, 2006 [EXAM00296828]; Amended and Restated Indemnification Agreement between Residential Capital, LLC and Thomas Melzer, dated Oct. 24, 2006 [EXAM00296838].

[353] Indemnification Agreement between Residential Capital, Corporation and Thomas Melzer, dated June 21, 2005 [MELZER.000886]; Amended and Restated Indemnification Agreement between Residential Capital, LLC and Thomas Jacob, dated Oct. 24, 2006 [EXAM00296828]; Amended and Restated Indemnification Agreement between Residential Capital, LLC and Thomas Melzer, dated Oct. 24, 2006 [EXAM00296838].

Agreement,[354] plus an exclusion for claims related to certain violations of section 16(b) of the Exchange Act, as amended.[355] The Individual Indemnification Agreements set forth detailed provisions for partial indemnification, indemnification determinations, advance of payment of expenses, notification and defense of claims, and procedures for indemnification, insurance, and subrogation.[356]

### (6) AFI Indemnification Provisions

Pursuant to the 2011 AFI Amended Certificate, AFI agrees to indemnify and hold harmless ResCap's directors and officers who are serving at the request of AFI against claims incurred if the directors or officer acted in good faith and in a manner reasonably believed to be in or not opposed to the best interests of AFI, "other than claims arising from: (1) bad faith acts; (2) claims for which the individual is liable to [AFI], unless an applicable court finds the individual is entitled to indemnity; and (3) derivative actions not approved by the [AFI Board]."[357]

Specifically, the 2011 AFI Amended Certificate states:

> [AFI] shall indemnify and hold harmless each person who was or is made a party or is threatened to be made a party to or is involved in or participates as a witness with respect to any action, suit or proceeding, whether civil, criminal, administrative or investigative (each a "Proceeding"), by reason of the fact that he or she, or a person of whom he or she is the legal representative, is or was a director or an officer, or is or was serving at the request of [AFI] as a manager, director, officer, employee, fiduciary or agent of another entity (collectively, the "Indemnified Persons") from and against any and all loss, cost, damage, fine, expense (including reasonable fees and expenses of attorneys and other advisors and any court costs incurred by any Indemnified Person) or liability actually and reasonably incurred

---

[354] *See* Section VI.B.1.e(3).

[355] Amended and Restated Indemnification Agreement between Residential Capital, LLC and Thomas Jacob, dated Oct. 24, 2006 [EXAM00296828]; Amended and Restated Indemnification Agreement between Residential Capital, LLC and Thomas Melzer, dated Oct. 24, 2006 [EXAM00296838].

[356] Indemnification Agreement between Residential Capital, Corporation and Thomas Melzer, dated June 21, 2005 [MELZER.000886]; Amended and Restated Indemnification Agreement between Residential Capital, LLC and Thomas Jacob, dated Oct. 24, 2006 [EXAM00296828]; Amended and Restated Indemnification Agreement between Residential Capital, LLC and Thomas Melzer, dated Oct. 24, 2006 [EXAM00296838].

[357] Ally Board Presentation Appendix, dated Sept. 23, 2011, at 24 [ALLY_0157478]. *But see* 2011 AFI Amended Certificate, at Art. VII, § F [GSResCap0000065785] (Ally Financial Inc., Current Report (Form 8-K) (Mar. 25, 2011), Ex. 3.1) ("The Corporation shall not be required to indemnify a Person in connection with a Proceeding initiated by such Person against the Corporation or any of its subsidiaries if the Proceeding was not authorized by the Board of Directors. The ultimate determination of entitlement to indemnification of any Indemnified Person shall be made by the Board of Directors in such manner as the Board of Directors may determine.").

> by the person in connection with the Proceeding, if the person acted in good faith and in a manner the person reasonably believed to be in or not opposed to the best interests of [AFI] and except that no indemnification shall be made in respect of any claim, issue, or matter as to which such person has been adjudged to be liable to [AFI], unless, and only to the extent that, the Court of Chancery of the State of Delaware or the court in which such action or suit was brought shall determine upon application that, despite the adjudication of liability but in view of all the circumstances of the case, such person is fairly and reasonably entitled to indemnity for such expenses which the Court of Chancery or such other court shall deem proper. The termination of any Proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that the person did not act in good faith or in a manner such person reasonably believed to be in or not opposed to the best interests of [AFI].[358]

An e-mail from Bhama to Carpenter and Yastine regarding AFI's indemnification of Independent Directors, previously discussed in Section IV.B.1.c(6), notes two issues with respect to the pending appointments of two additional Independent Directors: (1) increasing the number of director seats on the ResCap Board; and (2) who should appoint the directors.[359] Bhama notes that, as to the second issue, under the 2008 ResCap Amended LLC Agreement, the new Independent Directors can be appointed by either GMAC Mortgage Group, LLC, as ResCap's immediate shareholder, or by the ResCap Board itself (subject to GMAC Mortgage Group, LLC's right to unilaterally remove any director from the ResCap Board with or without cause).[360] Bhama states that she recommends the latter approach for two reasons:

> (1) It will further reinforce the separation and independence of each individual from [AFI] as the ultimate shareholder since each appointment will be an act of the ResCap board itself without [AFI] involvement. This should mitigate perceptions of [AFI] "taint."

---

[358] 2011 AFI Amended Certificate, at Art. VII, § D [GSResCap0000065785].

[359] E-mail from A. Bhama (Nov. 12, 2011) [ALLY_0207114].

[360] Examiner's Counsel notes that Bhama's advice about GMAC Mortgage Group LLC's ability to appoint Independent Directors appears to be incorrect. *See* 2008 ResCap Amended LLC Agreement, § 14(e) [KL000000433] ("Notwithstanding anything to the contrary in this Agreement, the provisions of the Operating Agreement shall govern the qualifications, duties, powers, appointment, removal and other corporate governance matters of the Independent Directors."); 2006 Amended Operating Agreement, § 2(f)(i) ("[AFI] shall vote for, and ResCap shall at all times have, at least two Independent Directors. In the event of a vacancy in the position of an Independent Director, whether as a result of resignation, removal, or otherwise, [AFI] shall, as promptly as practicable, elect a successor Independent Director.").

(2) It will help insulate [AFI] from liability for indemnifying these individuals, if they are ever sued in connection with their services as directors on the ResCap board. Under [AFI's] corporate charter, [AFI] essentially must indemnify, and advance litigation defense expenses to, any person who serves as an officer or director of another entity "at the request of [AFI]", if that person is (or is threatened to be) named in a lawsuit related to their officer/director service. If the person does not serve "at the request of AFI", then these financial obligations do not arise. This means that if the ResCap board appoints these individuals as directors of ResCap, then they will not be serving "at the request of [AFI]", but rather at the request of the ResCap board. Therefore, [AFI's] indemnification and expense advance obligation would not be triggered in future lawsuit brought against these individuals. This may become important in light of the various ResCap strategic alternatives under consideration. (In this regard, [AFI] is facing this issue today as to former ResCap directors who have been sued as part of the PLS, etc. cases, though I am exploring our defenses along the lines noted above.)[361]

Note, however, that even if the ResCap Board appointed these individuals, as discussed in Section IV.B.2.a(1), it is more likely than not that a court would find that they were still serving "at the request of" AFI. The indemnification of ResCap directors by AFI is discussed further in Section IV.B.2.

## f.   ResCap Director And Officer Insurance

This Section summarizes certain aspects of the director and officer ("D&O") insurance arrangements for ResCap directors and officers. These insurance arrangements are sponsored by AFI and cover both AFI and ResCap directors and officers. Such arrangements are multiple-layer "claims-made" policies. A full coverage analysis is beyond the scope of the Examiner's Investigation, and would depend in large part upon facts particular to whatever claims, if any, are ultimately pursued against ResCap directors or officers. Accordingly, this summary and overview of the D&O insurance arrangements are included to illustrate a potential additional source to pay successful claims against directors, albeit subject to important caveats. Such arrangements likely also impact the ultimate financial exposure of AFI to such claims. This is because, to the extent indemnification is payable by AFI to the directors for such claims, the D&O insurance arrangements are potential sources of recovery for AFI, subject to the terms of those policies. Even for covered claims, AFI would be required to absorb one or more deductibles of $10 million each.

---

[361] E-mail from A. Bhama (Nov. 12, 2011) [ALLY_0207114]. Examiner's Counsel notes that Bhama's advice appears to be incorrect. *See* Section IV.B.2.a(1); *VonFeldt v. Stifel Fin. Corp.*, 714 A.2d 79, 85 (Del. 1998).

*(1) ResCap Charter Documents Authorize ResCap To Purchase And Maintain D&O Insurance, And Such Insurance Was Obtained Through AFI*

Each of the ResCap charter documents sets forth provisions which authorize ResCap to purchase and maintain at ResCap's expense insurance to indemnify directors, officers, and employees, which seem to contemplate ResCap purchasing and maintaining D&O insurance for directors either itself or through its affiliates.[362] It appears that, in fact, such insurance was obtained through AFI. All of the D&O insurance documents produced by ResCap and AFI to Examiner's Counsel are in respect of coverage obtained through and shared with AFI. In this regard, a presentation to the ResCap Board dated April 19, 2012 states "D&O coverage is shared with [AFI]," and "ResCap does not have separate coverage."[363]

*(2) Types of D&O Insurance Coverage Obtained Beginning December 15, 2005*

The D&O insurance documents produced to Examiner's Counsel relate to policy periods beginning December 15, 2005 and running through December 15, 2013. The terms of those policies vary somewhat from year to year but, as a general matter, the policies include four types of coverage:

- "Side A" coverage, which applies to losses for which directors and officers are not and cannot be indemnified by the company;

- "Side B" coverage, which reimburses the company for costs incurred in indemnifying a director or officer;

- "Side C" coverage, which pays for losses the company sustains from litigation involving securities violations; and

---

[362] Specifically, section 6.8 of the ResCap By-Laws permits the ResCap Board, to the fullest extent permitted by applicable law, to authorize officers to purchase and maintain at ResCap's expense insurance to: (1) indemnify ResCap for any obligation it incurs as a result of the indemnification of directors, officers and employees under the indemnification provisions of the ResCap By-Laws; and (2) indemnify or insure directors, officers, and employees against liability in instances in which they may not otherwise be indemnified by ResCap under the indemnification provisions of the ResCap By-Laws. *See* ResCap By-Laws, § 6.8 [EXAM12325305]. Section 18(f) of the 2006 ResCap LLC Agreement provides that ResCap may purchase and maintain (itself or through its affiliates) insurance on behalf of any Covered Person (which, as noted in Section IV.B.1.e(3), includes any ResCap director) who has agreed to serve at the request of ResCap as a director, officer, or employee of ResCap against any liability asserted against, and incurred by, the Covered Person or on the Covered Person's behalf, or arising out of the Covered Person's status as a director, officer, or employee, whether or not ResCap would have the power to indemnify the Covered Person against such liability under the provisions of section 18 of the 2006 ResCap LLC Agreement. *See* 2006 ResCap LLC Agreement, § 18(f)(i) [KL000000474]. The 2008 ResCap Amended LLC Agreement contains an insurance provision that is substantively identical to the provisions set forth in the 2006 ResCap LLC Agreement. *Compare* 2006 ResCap LLC Agreement, § 18 [KL000000474], *with* 2008 ResCap Amended LLC Agreement, § 18 [KL000000433].

[363] Morrison & Foerster presentation to the Board of Residential Capital, LLC, dated Apr. 19, 2012, at 9 [EXAM11131326].

- "Side D" coverage, which pays for losses arising out of breach of fiduciary duty obligations for establishing and administering AFI-sponsored employment benefit and retirement plans.

"Side A" and "Side B" are the coverages relevant to whether the D&O insurance represents a potential additional source by which successful claims against the directors and officers, if any, may be paid. The policy periods, limits, and deductibles (except for "Side A" coverage, which is not subject to a deductible) for the period from December 15, 2005 through December 15, 2013 are summarized in the following table:

EXHIBIT IV.B.1.f(2)
**Key Elements Of AFI D&O Insurance Policies**
December 15, 2005 – December 15, 2013

| Policy Period | Side A (Non-Indemnifiable Claims) | Side B (Indemnifiable Claims) | Side C (Entity Claims) | Side D (Fiduciary Claims) |
|---|---|---|---|---|
| 12/15/05– 12/15/06 [1] | $490M with no deductible ($250M shared with Side D) | $130M ($16M co-insurance) with $25M deductible, shared with Side C | $130M ($16M co-insurance) with $25M deductible, shared with Side B | $250M shared with D&O coverage |
| 11/30/06– 11/30/07 | $300M with no deductible ($100M for Side A only and $200M shared with Sides B, C, and D) | $200M with $10M deductible. Limit shared with Sides A, C, and D | $200M with $10M deductible. Limit shared with Sides A, B, and D | $200M with $1M deductible. Limit shared with Sides A, B, and C |
| 11/30/07– 11/30/08 [2] | $300M with no deductible (Likely $200M shared with Sides B, C, and D) | Likely $200M with $10M deductible. Limit shared with Sides A, C, and D | Likely $200M with $10M deductible. Limit shared with Sides A, B, and D | Likely $200M with $10M deductible. Limit shared with Sides A, B, and C |
| 12/15/08– 12/15/09 | $220M with no deductible ($70M for Side A only, $50M shared with Sides B, C, and D, $100M shared with errors and omissions ("E&O") and employment practices liability ("EPL") | $150M with $10M deductible. Limit shared with Sides A, C, D, E&O and EPL | $150M with $10M deductible. Limit shared with Sides A, B, D, E&O and EPL | $150M with $1M deductible. Limit shared with Sides A, B, C, E&O and EPL |
| 12/15/09– 12/15/10 | $275M with no deductible ($125 Side A only, $150M shared with other coverage) | $150M with $10M deductible. Limit shared with Sides A, C, D, E&O and EPL | $150M with $10M deductible. Limit shared with Sides A, B, D, E&O and EPL | $150M with $1M deductible. Limit shared with Sides A, B, C, E&O and EPL |
| 12/15/10– 12/15/11 | $275M with no deductible ($125 Side A only, $150M shared with fiduciary coverage) | $150M with $10M deductible. Limit shared with Sides A, C, and D | $150M with $10M deductible. Limit shared with Sides A, B, and D | $150M with $1M deductible. Limit shared with Sides A, B, and C |
| 12/15/11– 12/15/13 | $275M with no deductible ($125 Side A only, $150M shared with fiduciary coverage) | $150M with $10M deductible. Limit shared with Sides A, C, and D | $150M with $10M deductible. Limit shared with Sides A, B, and D | $150M with $1M deductible. Limit shared with Sides A, B, and C |

[1] This is a GM policy that pre-dates GM's sale of a majority interest in AFI. The inception of the AFI D&O insurance program on November 30, 2006 coincides with that sale.

[2] Certain documentation concerning this and other policy years was produced late in the Examiner's Investigation and may be incomplete. However, the fact that the insurers treated coverage as having been continuous supports the conclusion that this policy was extended to December 15, 2008, which was confirmed by counsel to AFI in an April 18, 2013 e-mail to Examiner's Counsel.

Source: Draft General Motors' New Directors and Officers and ERISA-Fiduciary Liability Insurance Coverages for 2004–2006 Summary, dated Dec. 21, 2005 [EXAM11405951]; GMAC's 2006–2007 Director's Officers, and Fiduciary Liability Insurance Coverages [EXAM10281860]; GMAC's 2008–2009 Blended Liability Insurance Coverages [CCM00327263]; GMAC's 2009–2010 Blended Liability Insurance Coverages, dated Apr. 8, 2010 [EXAM20109362]; Ally's 2010–2011 Blended Liability Insurance Coverages, dated Feb. 22, 2011 [EXAM20119524]; Ally's 2011–2012 Management Liability Insurance Coverages, dated Feb. 24, 2012, at ALLY_0267089–92 [ALLY_0266553]; Policy Term Extension Endorsement to Dec. 15, 2013, Allied World Side 'A' Directors & Officers Excess and Lead Difference-in-Conditions ("DIC") Insurance Policy number C012138/004 for Dec. 15, 2011 to Dec. 15, 2012, at ALLY_PEO_0093982 [ALLY_PEO_0093898].

In addition to the (generally) annual-period policies summarized in Exhibit IV.B.1.f(2), in 2009 AFI purchased a multi-year "run-off" Side-A-only policy, which provided a total of $105 million for limits on an excess basis,[364] as discussed further in Section IV.B.1.f(2).

As issued, the last policy would have expired December 15, 2012. However, coverage was extended by endorsement (rather than by renewal of the policy).[365] It therefore appears that, to date, the D&O insurance has been extended for just one year. In that regard, in an April 10, 2013 e-mail, AFI's counsel has advised Examiner's Counsel that, based on their inquiries, AFI has not purchased a six-year run-off policy covering the ResCap directors. This is of interest in light of a letter dated May 4, 2012 from Mack to Franklin Hobbs, AFI Board Chairman, and Carpenter, in which Mack expressed concern on behalf of all directors and officers of ResCap regarding the insurance coverage available under AFI's current blended D&O and fiduciary insurance programs:

> We are concerned because claims may arise later against ResCap's directors and officers that relate to activities prior to the closing of a significant transaction and it is (at least theoretically) possible that after the closing of the transaction, but before the claims arise, the Current Program could be amended to exclude coverage for such claims. If that happened, ResCap's directors and officers could be exposed to ResCap-related liability.[366]

Mack suggests that the best way to address this concern and protect ResCap's directors and officers is to put the current program, which insures both AFI and ResCap, into run-off for a period of six years following a significant transaction involving ResCap. The run-off period would be prepaid. Similarly, the AFI Settlement and Plan Sponsor Agreement between the Debtors and AFI had, as executed, obligated AFI to use commercially reasonable efforts to continue to renew its current D&O insurance program for a run-off period of six years, on substantially the same terms and conditions as under existing D&O insurance programs.[367] The AFI Settlement and Plan Sponsor Agreement was subject to Bankruptcy Court approval, and has since expired.

### (3) The D&O Coverage Is On A "Claims-Made Basis," Which Determines Which Policies Are Potentially Applicable

As is typical for D&O insurance, each of the annual-period polices set forth in Exhibit IV.B.1.f.(2) provide coverage on a "claims-made basis." This, together with

---

[364] *See* GMAC's 2009–2010 Blended Liability Insurance Coverages, dated Apr. 8, 2010 [EXAM20109362].

[365] *See* Policy Term Extension Endorsement to Dec. 15, 2013, Allied World Side 'A' Directors & Officers Excess and Lead Difference-in-Conditions ("DIC") Insurance Policy number C012138/004 for Dec. 15, 2011 to Dec. 15, 2012, at ALLY_PEO_0093982 [ALLY_PEO_0093898].

[366] Letter from J. Mack to F. Hobbs and M. Carpenter (May 4, 2012) [EXAM00092188].

[367] *See* Settlement and Plan Sponsor Agreement, § 2.2(b).

provisions linking claims that arise from the same or interrelated wrongful acts and requiring relatively prompt notice, will typically substantially narrow the number of potentially-applicable policies, as follows.

- *Claim "First Made" Requirement.* Such policies limit coverage only to loss on account of any "Claim" (as defined) "first made" against an insured during the policy period. As stated in the policy incepting December 15, 2011, in respect of "Side A" and "Side B" coverage, the insurers' obligation to pay otherwise-covered loss only applies where the loss is "on account of any Claim first made against such Insured Person, individually or otherwise, during the Policy Period . . . ."[368]

- *Same and Interrelated Wrongful Acts.* Such policies also link claims that arise from the same wrongful act, or interrelated wrongful acts, thereby limiting coverage of such linked claims to the first policy period in which any of them was first made. As stated in the policy incepting December 15, 2011: "All Loss arising out of the same Wrongful Act and all Interrelated Wrongful Acts of any Insured Persons shall be deemed one Loss, and such Loss shall be deemed to have originated in the earliest Policy Period in which a Claim is first made against any Insured Person alleging any such Wrongful Act or Interrelated Wrongful Acts."[369]

- *Notice to the Insurer.* In addition to requiring that the claim have been "first made" against an insured within the policy period, such policies also require relatively prompt notice to the insurer, including a requirement that such notice be given within a specified period after the end of the policy period. As stated in the policy incepting December 15, 2011: "The Insured shall, as a condition precedent to exercising any right of coverage under this Policy, give to the [insurer] written notice of any Claim as soon as practicable, but in no event later than . . . sixty (60) days after the effective date of expiration or termination" of the policy.[370]

As a result of these provisions in the D&O insurance policies, an analysis of any potential claim against a director to determine whether D&O insurance is potentially available must begin with an analysis of whether that claim: (1) has already been made against an insured under the D&O insurance policies; or (2) will be deemed to have already been made because it is linked to an earlier claim that arises from the same "Wrongful Act" or "Interrelated Wrongful Acts." In either case, coverage would typically be limited to the earliest policy period in which such claim or linked claim was first made. However, for most of the annual-period policies described in Exhibit IV.B.1.f(2) the period in which timely notice could be given to the insurer has already passed, such that the carrier would likely deny coverage unless notice has already been given.[371]

---

[368] DFI Primary Professional Liability Policy number 8207-6455 for Dec. 15, 2011 to Dec. 15, 2012, at RCES00000138 [RCES00000130] (defined terms bolded in original).

[369] *Id.* at RCES00000140 (defined terms bolded in original).

[370] *Id.* at RCES00000138, RCES00000167 (defined terms bolded in original).

[371] A presentation to the ResCap Board dated April 19, 2012 states that "there are no claims against the D&O coverage." Morrison & Foerster Residential Capital, LLC Board Presentation, dated Apr. 19, 2012, at 9 [EXAM11131326].

For claims that have not yet been "first made," two avenues remain to potential D&O coverage.

First, although the original policy period for the last policy as described in Exhibit IV.B.1.f(2) was to have expired December 15, 2012, that policy period was later extended by endorsement to December 15, 2013.[372] As a result, a "Policy Period" remains in effect, during which the requirement of a "Claim first made" can be satisfied.

Second, as noted in Section IV.B.1.f(2), in 2009 AFI purchased a multi-year "run-off" Side-A-only policy.[373] Because this policy was effective May 22, 2009, and had a six-year term (i.e., through May 21, 2015), it is also potentially available for not-yet-made claims. To the extent other coverage is available, the "run-off" policy applies only excess of that other coverage. A more important limitation on the potential applicability of the "run-off" policy is that it only applies to loss arising from "wrongful acts" that took place during the period from November 30, 2006 through May 22, 2009.[374] In contrast, at least some portion of the limits for the other annual period policies described in Exhibit IV.B.1.f(2) including the last policy, are not subject to any similar restriction. Since that policy ran through at least December 15, 2012—after the Petition Date—there is at least some potential coverage for "Wrongful Acts" taking place during the entire time period being investigated by the Examiner, subject to satisfaction of the "first made," notice, and other requirements of the policy.

### (4) Other Circumstances That Will Impact The Existence, And Amount, Of Coverage Available

Once a policy is identified as being potentially applicable to a particular claim, a full analysis of the specific facts of that particular claim, in relation to the specific wording of the particular policy, would be required to determine the existence and amount of coverage potentially available. Certain key, but certainly non-exclusive, considerations are identified below. Because the annual policy beginning December 15, 2011 (as extended) is the policy most likely to be relevant to any not-yet-made claims (the "run-off" policy would apply only excess of that policy), those considerations are analyzed below in terms of the language of that policy.[375]

---

[372] *See* Policy Term Extension Endorsement to Dec. 15, 2013, Allied World Side 'A' Directors & Officers Excess and Lead Difference-in-Conditions ("DIC") Insurance Policy number C012138/004 for Dec. 15, 2011 to Dec. 15, 2012, at ALLY_PEO_0093982 [ALLY_PEO_0093898].

[373] *See* GMAC's 2009–2010 Blended Liability Insurance Coverages, dated Apr. 8, 2010 [EXAM20109362].

[374] *See Id.*

[375] Specifically, the discussion is based on the terms of the policy issued by Federal Insurance. DFI Primary Professional Liability Policy number 8207-6455 for Dec. 15, 2011 to Dec. 15, 2012 [RCES00000130]. The coverage described in Exhibit IV.B.1.f.(2) for each policy period actually consists of several layers of coverage, each provided by various insurers and thus subject to certain variations that would need to be taken into account in a full insurance coverage analysis. For purposes of this discussion, the wording of just one policy, the policy issued by Federal Insurance, is highlighted.

### (a) Definition Of "Wrongful Act"

As an initial matter, the scope of coverage under the D&O insurance policies is determined by the definition of "Wrongful Act." The December 15, 2011 policy defines "Wrongful Act" to mean:

> [A]ny error, misstatement, misleading statement, act, omission, neglect, or breach of duty committed, attempted, or otherwise allegedly committed or attempted, by an Insured Person, individually or otherwise, in his Insured Capacity, or any matter claimed against him solely by reason of his serving in such Insured Capacity. [376]

In addition to determining whether coverage is available under the policy, where this definition is broader than the director's rights to indemnification from either ResCap or AFI, such a difference in scope creates the possibility of a payment being made under "Side A," rather than "Side B."

### (b) "Side A" Versus "Side B"

"Side A" coverage applies to "Loss for which the Insured Person is not indemnified by the Organization . . . ."[377] In contrast, "Side B" coverage applies to "Loss for which the Organization grants indemnification to each Insured Person . . . ."[378]

Here, the definition of "Organization" ("the Parent Organization and/or any Subsidiary")[379] would encompass both AFI and ResCap, thus making indemnification by either of them relevant as an initial matter. However, in light of ResCap's bankruptcy, the focus would be on whether the claim is indemnifiable by AFI, and not on whether ResCap fails to indemnify owing to its bankruptcy:

> If the Organization:
>
> (a) fails or refuses, other than for reason of Financial Impairment, to indemnify the Insured Person for Loss; and
>
> (b) is permitted or required to indemnify the Insured Person for such Loss pursuant to the fullest extent permitted by law;
>
> then, notwithstanding any other conditions, provisions or terms of this Policy to the contrary, any payment by the [insurer] of such Loss shall be subject to [Side-B coverage] . . . .[380]

[376] *Id*. at RCES00000147 (defined terms bolded in original).

[377] *Id*. at RCES00000138 (defined terms bolded in original).

[378] *Id.* at RCES00000138 (defined terms bolded in original).

[379] *Id*. at RCES00000147 (defined terms bolded in original).

[380] *Id.* at RCES00000141 (defined terms bolded in original).

Thus, to the extent that the claim is indemnifiable by AFI, the insurer would assert that it is a "Side B" claim, under which the proceeds could not be directly accessed by directors, but are instead payable only by way of the insurer indemnifying AFI, after AFI has absorbed the "Side B" deductible, which is $10 million in this case. That deductible applies separately to each "Loss" (as defined), so AFI could potentially be required to absorb multiple deductibles.

In contrast, to the extent the claim is otherwise covered under the policy, but is a claim for which AFI is neither permitted nor required to indemnify the director, then "Side A" would apply. Under "Side A" coverage, the insurer's payment obligation is directly to the director and there is no deductible.

### (c) "Insured Versus Insured" And Other Exclusions

D&O insurance policies typically include a so-called "insured vs. insured" exclusion, for claims brought against, or with the involvement of, another insured. Under the policy beginning December 15, 2011, this excludes coverage "for Loss on account of any Claim made against any Insured Person . . . brought by an Organization against (i) any other Organization; or (ii) an Insured Person of such Organization. . . ."[381] This exclusion is subject to certain exceptions, including one of particular relevance to this proceeding, stating that the exclusion does not apply to "any Claim brought . . . (B) in the event of Financial Impairment of the Organization."[382] In any event, any claim brought on behalf of ResCap, or by AFI or another D&O insured, would require further analysis.

There are also a number of other exclusions that vary from policy to policy, that would require analysis in light of the particular claim. For example, the policies will generally include exclusions relating to the conduct of the insured. For example, the December 15, 2011 policy contains "Side A" exclusions for claims against an Insured Person that are:

> (a) [B]ased upon, arising from, or in consequence of any deliberately fraudulent act or omission or any willful violation of any statute or regulation by such Insured Person, if a final, non-appealable adjudication in any underlying proceeding or action establishes such a deliberately fraudulent act or omission or willful violation; or
>
> (b) [B]ased upon, arising from, or in consequence of such Insured Person having gained any personal profit, remuneration or other advantage to which such Insured Person was not legally entitled, if a final, non-appealable adjudication in any underlying proceeding or action establishes the gaining of such a personal profit, remuneration or advantage.[383]

---

[381] *Id.* at RCES00000139, RCES00000201 (defined terms bolded in original).

[382] *Id*. at RCES00000201 (defined terms bolded in original).

[383] *Id.* at RCES00000194 (defined terms bolded in original).

### (d) Erosion Of Limits

The D&O insurance available to any particular claim will be subject to insurer liability limitations that apply on a per-"Loss" basis, as well as to overall aggregate limits. As a result, other claims have the potential to exhaust or erode the available aggregate limits, or (if the claims are part of the same "Loss") the available per-"Loss" limits, thereby leaving the claim with no or reduced limits available. In addition, as set forth in Exhibit IV.B.1.f(2), certain of the "Side A" and "Side B" limits are shared with other coverages under the policies, which increase the potential for exhaustion or erosion of limits.[384] On the other hand, some of the limits are subject to provisions that provide for certain priorities in payments designed to protect the availability of coverage for the directors. These provisions changed over time, including in respect of the relative priority of AFI directors and ResCap directors.[385]

### 2. Legal Analysis Regarding AFI's Indemnification Of ResCap Directors

Examiner's Counsel has been asked to review the circumstances in which directors on the ResCap Board could be indemnified by AFI for claims related to their service on the ResCap Board. Delaware corporate law permits a parent company like AFI to indemnify directors of its subsidiaries, such as ResCap, in certain circumstances. AFI elected to do so via the 2011 AFI Amended Certificate, the 2009 AFI Certificate and the 2009 AFI Amended Certificate, as well as when AFI was a limited liability company via the 2006 AFI Amended LLC Operating Agreement (collectively, the "Indemnification Provisions").[386]

Examiner's Counsel notes that AFI, in the 2006 AFI LLC Agreement, did not provide indemnification rights to ResCap directors unless such directors were also members of

---

[384] The increased risk of erosion of limits because various coverages share limits was previously identified as a concern. In May 2008, Chapman, as a prospective independent director, provided copies of certain of the D&O policies to his counsel, Thorn Rosenthal. After reviewing those policies, Rosenthal identified several provisions and ambiguities in the policies that could result in the erosion of limits as a result of other claims and other coverages. *See* E-mail from T. Rosenthal (May 5, 2008) [CCM00557210]. Other concerns identified by Rosenthal included that the policies might not cover defense costs before a claim had formally been asserted; that injunctive relief might not be covered; and that the notice provisions included significant particularity requirements, and were subject to strict deadlines. *Id.*

[385] Minutes of a Regular Meeting of the Board, GMAC LLC, Mar. 10, 2009, at ALLY_0114747 [ALLY_0114717]. The Independent Directors requested, at a meeting of the AFI Board on March 10, 2009, that they be ranked the same as the AFI independent directors in the order of payment provisions; following such discussion, the AFI Board approved a change in the order of payments endorsement in the AFI D&O policy to rank the Independent Directors pari passu with the independent directors of AFI. *See also* Minutes of a Special Meeting of the Board, GMAC LLC, Jan. 30, 2009, at ALLY_0114729 [ALLY_0114717].

[386] *See* 2011 AFI Amended Certificate, at Art. VIII, § D [GSResCap0000065785] ("To the fullest extent permitted by the DGCL or applicable Law . . . the Corporation will indemnify and hold harmless each person by reason of the fact that he or she . . . is or was a director or an officer, or is or was serving at the request of the Corporation as a manager, director . . . or agent of another entity . . . ."); *see also* 2009 AFI Amended Certificate, at Art. VIII, § D [GSResCap0000064387]; 2009 AFI Certificate, at Art. VIII, § D [KL000000204]; 2006 AFI Amended LLC Operating Agreement, at Art. XI, § 11.1 [CERB001063].

the AFI Board or officers of AFI.[387] However, the Indemnification Provisions conferred upon ResCap directors certain broadly-drafted indemnification rights, which rights apply to a director who "is or was serving at the request of [AFI]."[388] Such rights are not limited to claims made during any particular time period, nor are they limited to directors serving at the time that the Indemnification Provisions were adopted.[389] The Indemnification Provisions should be treated as an enforceable contract between AFI and the covered directors.[390] Examiner's Counsel was unable to locate any information as to what the intention was at the time of adopting the Indemnification Provisions. Thus, while a close question, based on a plain language reading of the Indemnification Provisions, the Examiner concludes it is more likely than not that a court would determine that even ResCap directors who served on the ResCap Board only prior to November 30, 2006 and who were not also members of the AFI Board or officers of AFI would have rights under the Indemnification Provisions, including rights with respect to claims arising from acts that occurred prior to November 30, 2006.

In addition, AFI, ResCap, and/or the directors of the ResCap Board may be entitled to indemnification under AFI's director and officer insurance policies.[391]

### a. Right To Indemnification And DGCL Sections 145(a) And (b)

Delaware General Corporation Law sections 145(a) and (b) ("DGCL sections 145(a) and (b)") are enabling provisions that give Delaware corporations the statutory authority to indemnify directors that serve "at the request of the corporation," provided that the director "acted in good faith and in a manner the [director] reasonably believed to be in or not opposed to the best interests of the corporation . . . ."[392] The Indemnification Provisions apply "to the fullest extent permitted by the DGCL or applicable Law" and contain the same requirements that the director have acted "at the request of" AFI (and/or a predecessor entity, if applicable) (AFI and/or any applicable predecessor entity are referred to herein as a "Parent Entity"), "in good faith," and "in a manner reasonably believed to be in or not opposed to the best interests

---

[387] *See* 2006 AFI LLC Agreement, at Art. VI, § 6.1 [GSResCap0000078836]. Note, however, that the Independent Directors may be entitled to mandatory indemnification by ResCap. *See* Section IV.B.1.e.

[388] 2011 AFI Amended Certificate, at Art. VIII, § D [GSResCap0000065785]; 2009 AFI Amended Certificate, at Art. VIII, § D [GSResCap0000064387]; 2009 AFI Certificate, at Art. VIII, § D [KL000000204]; 2006 AFI Amended LLC Operating Agreement, at Art. XI, § 11.1 [CERB001063].

[389] *See* 2011 AFI Amended Certificate, at Art. VIII, § D [GSResCap0000065785]; 2009 AFI Amended Certificate, at Art. VIII, § D [GSResCap0000064387]; 2009 AFI Certificate, at Art. VIII, § D [KL000000204]; 2006 AFI Amended LLC Operating Agreement, at Art. XI, § 11.1 [CERB001063].

[390] *See Beneficial Indus. Loan Corp. v. Cohen,* 170 F.2d 44, 50 (3d Cir. 1948) (applying Delaware law) ("Generally, corporate documents such as bylaws have the force of a contract between the corporation and the directors."); Bishop, *Law of Corporate Officers and Directors*, Ch. 7.05 (1991); 8 WILLIAM MEADE ET AL. FLETCHER CYCLOPEDIA OF THE LAW OF PRIVATE CORPORATIONS § 4177 (West 2012).

[391] *See* Section IV.B.1.f. While the Investigation has revealed that Jacob and Melzer had indemnification agreements with ResCap, the Investigation has uncovered no evidence of any Independent Directors having such agreements with AFI.

[392] DEL. CODE ANN. tit. 8, § 145(a)–(b).

of the Corporation."[393] Thus, to determine whether an Independent Director may be indemnified under DGCL sections 145(a) or (b) and the Indemnification Provisions, it is necessary to determine whether the director acted "at the request" of a Parent Entity, whether the director acted in "good faith" in the performance of his duties, and whether the director acted in a manner "reasonably believed to be in or not opposed to the best interests of the corporation."[394]

It should be noted that where the operative indemnification provisions specify that an entity "shall indemnify" an individual, as is the case here, at least one Delaware court has stated that the burden shifts to the entity to demonstrate that the individual is not entitled to indemnification (as opposed to the burden being on the individual to demonstrate that he is entitled to indemnification).[395]

### (1) Serving "At The Request Of" The Corporation

DGCL sections 145(a) and (b) provide that a corporation has the power to indemnify any person who "is or was serving at the request of the corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise . . . ."[396] The Indemnification Provisions contain similar language. To determine whether a director may be indemnified under DGCL sections 145(a) or (b), and therefore under the Indemnification Provisions, it must be determined whether he was serving "at the request of" the corporation from which the indemnity is sought.

---

[393] 2011 AFI Amended Certificate, at Art. VIII, § D [GSResCap0000065785]; 2009 AFI Amended Certificate, at Art. VIII, § D [GSResCap0000064387]; 2009 AFI Certificate, at Art. VIII, § D [KL000000204]; 2006 AFI Amended LLC Operating Agreement, at Art. XI, § 11.1 [CERB001063] (stating "the best interests of *the Company*") (emphasis added).

[394] It should be noted that the 2011 AFI Amended Certificate, the 2009 AFI Amended Certificate, and the 2009 AFI Certificate provide that reasonable expenses incurred by a Independent Director in connection with a covered proceeding are to be advanced or reimbursed to the director prior to a final determination of whether the director is entitled to be indemnified, provided that the director agrees to repay those amounts to the Parent Entity if it is finally judicially determined by a court of competent jurisdiction that the director is not entitled to indemnification. *See* 2011 AFI Amended Certificate, at Art. VIII, § E [GSResCap0000065785]; 2009 AFI Amended Certificate, at Art. VIII, § E [GSResCap0000064387]; 2009 AFI Certificate, at Art. VIII, § E [KL000000204] (collectively, the "Reasonable Expense Indemnification Provisions").

[395] *VonFeldt v. Stifel Fin. Corp.*, No. 15688, 1999 Del. Ch. LEXIS 131, at 10 (Del. Ch. June 11, 1999) ("By using the phrase 'shall indemnify,' the bylaw not only mandates indemnification; it also effectively places the burden on [the parent entity] to demonstrate that the indemnification mandated is not required.").

[396] DEL. CODE ANN. tit. 8, § 145(a)–(b).

In the context of a parent corporation that owns 100% of the stock of a subsidiary—as in the case of AFI and ResCap—the Supreme Court of Delaware has noted that the parent corporation owning the 100% interest in the subsidiary is the only entity with the right to vote in board elections and thus is solely responsible for electing all of the subsidiary's directors.[397] On those facts, the Delaware Supreme Court held as follows:

> [W]here a 100% stockholder elects a director to the board of a subsidiary, that director thereafter serves the subsidiary "at the request of" the stockholder, within the meaning of 8 Del. C. § 145(a). By virtue of the fact that [the parent company] elected [the director] to the board of its wholly-owned subsidiary, [the director] is deemed to be serving the subsidiary at the request of the parent. He therefore has standing to invoke the protections offered by Section 145 and [the parent company's] Indemnification bylaw.[398]

The Delaware Supreme Court has held that, in these circumstances, a director is not required to prove any additional facts, such as pointing to a specific "request" made by the parent corporation, to demonstrate that he served "at the request of" the parent corporation.[399]

One Delaware court has applied the reasoning of this holding even where there was no formal election or vote for the director serving on the subsidiary's board.[400] In *Zaman v. Amedeo Holdings*, two individuals served as directors of the New York Palace Hotel. The New York Palace Hotel had a complex multi-layered chain of ownership, at the top of which was a trust of which one individual was the sole beneficiary.[401] The directors of the New York Palace Hotel were not elected, but rather were appointed directly by this sole beneficiary. Because it appeared that corporate formalities had been ignored, the court found that the directors of the New York Palace Hotel "were serving at the requests of the subsidiaries above them in the chain of ownership flowing down from [the sole beneficial owner],"[402] and held that the directors were entitled to seek indemnification from the defendant parent company for any claims for breaches of their duties as directors of the New York Palace Hotel.[403]

To the extent that it can be shown that an Independent Director was elected to the ResCap Board by a Parent Entity, such director should be deemed to be serving "at the request of" the Parent Entity as a matter of law, without having to prove any additional facts.

---

[397] *See VonFeldt v. Stifel Fin. Corp.*, 714 A.2d 79 (Del. 1998).

[398] *Id.* at 85*; see also Cochran v. Stifel Fin. Corp.*, No. 17350, 2000 Del. Ch. LEXIS 58, 55 (Del. Ch. Mar. 8, 2000).

[399] *See, e.g.*, *VonFeldt*, 714 A.2d at 85.

[400] *See Zaman v. Amedeo Holdings, Inc.*, No. 3115–VCS, 2008 Del. Ch. LEXIS 60 (Del. Ch. May 23, 2008).

[401] *Id.* at *11–12.

[402] *Id.* at *60–61.

[403] *Id.* at *63.

Similarly, to the extent that it can be shown that an Independent Director was appointed to the ResCap Board by a Parent Entity, it is likely that the director would also be deemed to be serving "at the request of" the Parent Entity as a matter of law. Note that, pursuant to the 2005 Operating Agreement and 2006 Amended Operating Agreement, only AFI could vote for and fill vacancies with respect to the Independent Directors.[404]

To the extent that it cannot be established that an Independent Director was elected or appointed to the ResCap Board by a Parent Entity, it is not clear what factors a court would consider to determine whether the director was serving "at the request of" the Parent Entity, as Examiner's Counsel has not found case law addressing that circumstance. However, some factors that a court may consider in making this determination include evidence that the Parent Entity controlled and/or dominated ResCap, such as by setting ResCap's corporate policy, controlling ResCap's operations, selecting ResCap's key personnel, determining compensation for ResCap's key personnel, considering and approving employment and termination fee contracts with ResCap's key personnel, and/or terminating ResCap's key personnel.[405] Other relevant factors may include to what extent the Parent Entity recruited and/or compensated the director.[406] Based on the fact that the 2005 Operating Agreement and the 2006 Amended Operating Agreement provide that only AFI could vote for and fill vacancies with respect to the Independent Directors, in addition to the level of control AFI exerted over ResCap (and, with respect to certain Independent Directors, the involvement of AFI in their recruitment), the Examiner concludes that it is likely that a court would find that the Independent Directors served "at the request of" AFI.

---

[404] *See* 2006 Amended Operating Agreement, § 2(f)(i); [ALLY_0041818] ("[AFI] shall vote for, and ResCap shall at all times have, at least two Independent Directors. In the event of a vacancy in the position of an Independent Director, whether as a result of resignation, removal, or otherwise, [AFI] shall, as promptly as practicable, elect a successor Independent Director."); 2005 Operating Agreement, § 2(g)(i) [ALLY_0140795] (same). Examiner's Counsel notes that Bhama's advice about GMAC Mortgage LLC's ability to appoint Independent Directors appears to be incorrect. *See* 2008 ResCap Amended LLC Agreement, § 14(e) [KL000000433] ("Notwithstanding anything to the contrary in this Agreement, the provisions of the Operating Agreement shall govern the qualifications, duties, powers, appointment, removal and other corporate governance matters of the Independent Directors.").

[405] *See VonFeldt v. Stifel Fin. Corp.*, 714 A.2d 79, 81, 83 (Del. 1998).

[406] It should be noted that there is an e-mail from AFI's General Counsel to Jacob and Melzer confirming, on behalf of AFI, that Jacob and Melzer served on the ResCap Board as independent directors "at the request of" AFI, so it is unlikely that anything further would be required to demonstrate that these two independent directors were serving "at the request of" AFI. *See* E-mail from W. Solomon to T. Melzer and [T. Jacob] (April 14, 2008) [MELZER.004778]; Section IV.B.1.c(1). Also, an e-mail from ResCap's General Counsel indicates that in his estimation, all ResCap directors serve at the discretion of AFI. E-mail from D. Marple (Jan. 9, 2007) [EXAM10165583] ("As with all directors, [Independent Directors] simply serve at the discretion of ResCap's shareholder."). Moreover, AFI's appointment of certain Independent Directors is reflected in the letters sent "on behalf of [AFI]" confirming each director's appointment and thanking him or her"[o]n behalf of [AFI] . . . for serving as an Independent Director of ResCap." *See, e.g.,* Letter from R. Hull to E. Smith (May 15, 2008) at EXAM10146755 [EXAM10146754]; Letter from C. Quenneville to K. Hirler-Garvey (Jun. 12, 2008) [CCM00388535].

IV-64

### (2) Acting "In Good Faith"

To be indemnified under DGCL sections 145(a) and (b) and under the Indemnification Provisions, a director must have acted "in good faith." As one Delaware court has stated, "as a matter of public policy it simply would not make sense for a corporation to have the power to indemnify agents who do not act in its best interests."[407] In fact, if a Delaware corporation adopts a provision (e.g., in its charter or bylaws) that "expands the permissive nature of indemnification to mandatory indemnification, the good faith requirement survives."[408] The law in Delaware is that "Delaware corporations lack the power to indemnify a party who did not act in good faith or in the best interests of the corporation."[409] Accordingly, a director who breaches a fiduciary duty can only be entitled to indemnification if such breach of a fiduciary duty was in "good faith."[410]

Under Delaware law, a director is subject to the fiduciary duties of (1) due care and (2) loyalty.[411] To determine whether a fiduciary has breached a duty in "good faith," the Delaware Supreme Court has articulated a "spectrum" of the shades of "good faith" and "bad faith" acts by fiduciaries.[412] At one end of the spectrum are acts involving "fiduciary conduct motivated by an actual intent to do harm," which are acts in bad faith.[413] In the middle of the spectrum are acts such as the "intentional dereliction of duty or a conscious disregard of one's responsibilities," which the Delaware Supreme Court has found to be a "non-Indemnifiable violation of the fiduciary duty to act in good faith."[414] At the farthest end of the spectrum are fiduciary acts taken "solely by reason of gross negligence and without any malevolent intent," which are indemnifiable because "grossly negligent conduct, without more, does not and cannot constitute a breach of the fiduciary duty to act in good faith."[415] Conduct at this farthest end of the spectrum has important consequences because "director conduct amounting *only* to a violation of the duty of care, but otherwise taken in good faith, is . . . indemnifiable under 8 Del. C. § 145."[416] Thus, circumstances may arise in which a director can be found to have breached the duty of care, but still may be indemnified under DGCL sections 145(a) and (b).

---

[407] *VonFeldt v. Stifel Fin. Corp.*, 1999 Del. Ch. LEXIS 131, at *5–6 (Del. Ch. June 11, 1999).

[408] *Id.*

[409] *Id.* at *8.

[410] Note that when indemnification is claimed under state law for amounts paid in connection with federal securities law violations, federal law generally preempts state law and disallows claims for indemnification because such claims run counter to the policies underlying the federal securities acts by reducing their deterrent effect. *See, e.g.*, *Eichenholtz v. Brennan*, 52 F.3d 478, 484 (3d Cir. 1995). However, there is some precedent for state law indemnification when there has been no judicial finding of federal securities law violations by the potential indemnitee, and indemnification is available for amounts paid in settlement and for defense of such claims. *See, e.g.*, *CFTC v. Richards*, No. 96 C 334, 1996 U.S. Dist. LEXIS 5359 (N.D. Ill. Apr. 19, 1996); *Raychem Corp. v. Fed. Ins. Co.*, 853 F. Supp. 1170, 1177 (N.D. Cal. 1994).

[411] *See* Section VII.E.1.

[412] *See Ryan v. Lyondell Chem. Co.*, C.A. No. 3176–VCN, 2008 Del. Ch. LEXIS 125, at *22–23 (Del. Ch. Aug. 29, 2008).

[413] *See Brehm v. Eisner* (*In re Walt Disney Co. Derivative Litig.*), 906 A.2d 27, 64 (Del. 2006).

[414] *See Ryan*, 2008 Del. Ch. LEXIS 125, at *23.

[415] *See In re Walt Disney Co. Derivative Litig.*, 906 A.2d at 64–65.

[416] *See Ryan*, 2008 Del. Ch. LEXIS 125, at *22–23 (emphasis in original).

While a fiduciary may violate the duty of care and still act in good faith, "the requirement to act in good faith is a subsidiary element, i.e., a condition, of the fundamental duty of loyalty."[417] A director "cannot act loyally towards the corporation unless she acts in the good faith belief that her actions are in the corporation's best interest."[418] Because "good faith" is a "subsidiary element" of the duty of loyalty, a director who has breached the duty of loyalty has not done so in good faith, and thus cannot be indemnified under DGCL sections 145(a) and (b).

Simply put, under Delaware law, a director "can be indemnified for liability (and litigation expenses) incurred by reason of a violation of the duty of care, but not for a violation of the duty to act in good faith."[419] If an Independent Director is found to have breached his or her duty of loyalty, then that finding should preclude the director from being indemnified under the Indemnification Provisions. If, however, an Independent Director is found to have breached only his duty of care, then such breach could be found to have been in "good faith" and is potentially indemnifiable under the Indemnification Provisions.[420]

### (3) "Best Interests Of The Corporation"

To be indemnified under DGCL sections 145(a) and (b), a director must have acted "in a manner the person reasonably believed to be in or not opposed to the best interests of the corporation."[421] The Indemnification Provisions require that the ResCap director have acted "in a manner the person reasonably believed to be in or not opposed to the best interests of" the Parent Entity (i.e., AFI).[422] This language in the Indemnification Provisions generally tracks the language of DGCL sections 145(a) and (b), except that it specifically defines the term "corporation" as referring to the Parent Entity (i.e., AFI). A Delaware court would likely agree with the interpretation that the term "corporation" within the clause "best interests of the corporation" in DGCL sections 145(a) and (b) refers to the parent corporation from which the indemnification is sought.[423]

---

[417] *See Stone v. Ritter*, 911 A.2d 362, 270 (Del. 2006) (citations omitted).

[418] *Id*. (citing *Guttman v. Huang*, 823 A.2d 492 (Del. Ch. 2003)).

[419] *In re Walt Disney Co. Derivative Litig*., 906 A.2d at 64-66.

[420] Note that, in the 2012 case of *Hermelin v. K-V Pharm. Co.*, the Court of Chancery noted that "no Delaware case has squarely addressed what evidence is relevant to an inquiry into whether an indemnitee acted in good faith for the purposes of permissive indemnification under DGCL §§ 145(a) and (b)" and that ". . . there is a dearth of case law addressing the scope of relevant evidence with respect to good faith under Section 145(a)." *Hermelin v. K-V Pharm. Co.*, 54 A.3d 1093, 1112 (Del. Ch. 2012).

[421] DEL. CODE ANN. tit. 8, § 145(a)–(b).

[422] 2011 AFI Amended Certificate, at Art. VIII, § D [GSResCap0000065785]; 2009 AFI Amended Certificate, at Art. VIII, § D [GSResCap0000064387]; 2009 AFI Certificate, at Art. VIII, § D [KL000000204]; 2006 AFI Amended LLC Operating Agreement, at Art. XI, § 11.1 [CERB001063].

[423] *See Cochran v. Stifel Fin. Corp.*, No. 17350, 2000 Del. Ch. LEXIS 58, 45 (Del. Ch. Mar. 8, 2000) ("And under § 145(a), the parent corporation could indemnify the subsidiary directors for an adverse judgment against them so long as the directors 'acted in good faith and in a manner [they] reasonably believed to be in or not opposed to the best interests of the [parent] corporation.'") (brackets in original); *see also* Section VII.E.1.f (discussing whether the directors owe a fiduciary duty to the subsidiary and/or the parent company).

Thus, to be indemnified under DGCL sections 145(a) or (b) and the Indemnification Provisions, an Independent Director will likely need to show that, in the performance of his duties on the ResCap Board, he was acting in a manner that he reasonably believed to be in or not opposed to the best interests of the Parent Entity, and not just ResCap.

### b. DGCL Section 145(c)

While DGCL sections 145(a) and (b) provide permissive authority pursuant to which corporations may provide indemnification to their directors, Delaware General Corporations Law section 145(c) ("DGCL section 145(c)") is a mandatory indemnification statute that requires:

> To the extent that a present or former director or officer of a corporation has been successful on the merits or otherwise in defense of any action, suit or proceeding referred to in subsections (a) and (b) of this section, or in defense of any claim, issue or matter therein, such person shall be indemnified against expenses (including attorneys' fees) actually and reasonably incurred by such person in connection therewith.[424]

DGCL section 145(c) requires a corporation to indemnify a director who is successful, on the merits or otherwise, in an action that would otherwise fall within DGCL sections 145(a) and (b), even if the director may not have acted in good faith—for example, if the director prevailed based "on a technicality in a proceeding within the scope of section 145(a)," or "if an action for breach of fiduciary duty brought against the [director] were dismissed on non-merits grounds."[425]

DGCL section 145(c) mandates this indemnification for "a present or former director or officer of a corporation," so it is clear that a director of ResCap who was successful on the merits or otherwise in defending any action that falls within the scope of DGCL sections 145(a) or (b) would be entitled to mandatory indemnification under DGCL section 145(c). However, DGCL section 145(c) does not appear to mandate indemnification for a director of a subsidiary of a corporation. As such, a director of ResCap would probably not be entitled to mandatory indemnification by a Parent Entity under DGCL section 145(c). While Delaware case law does not squarely address this question, *Cochran v. Stifel Financial Corp.* indicates that indemnification by a parent company under DGCL section 145(c) does not extend to directors of a subsidiary corporation.[426]

### c. D&O Insurance

Even if an Independent Director is not entitled to indemnification under the Indemnification Provisions and/or the Reasonable Expense Indemnification Provisions, the director may still be covered and insured under a Parent Entity's D&O insurance policy, subject to applicable deductibles and coverage limits.[427]

---

[424] DEL. CODE ANN. tit. 8, § 145(c).

[425] *See Cochran v. Stifel Fin. Corp.*, No. 17350, 2000 Del. Ch. LEXIS 179, 32 (Del. Ch. Dec. 13, 2000).

[426] *Id*. at *34–37.

[427] *See* Section IV.B.1.f.

   *d. Breaches Of Fiduciary Duty And Exculpation, Indemnification, And D&O Insurance*

The following chart summarizes how each type of breach of a director's fiduciary duty would coordinate with exculpation by ResCap, indemnification by AFI, and coverage under AFI's "Side A" D&O insurance:

EXHIBIT IV.B.2.d
**Breaches Of Fiduciary Duty And Exculpation, Indemnification, And D&O Insurance**

| Director's Breach of Fiduciary Duty | Exculpation of Director by ResCap | Indemnification of Director by AFI | Coverage of Director Under AFI "Side A" D&O Policy |
|---|---|---|---|
| Breach of Duty of Care But Acted in Good Faith (grossly negligent, but without malevolent intent) | ResCap exculpates director if acted in good faith on behalf of ResCap in scope of authority as director | AFI indemnifies director of ResCap serving at its request, if director acted in good faith and in a manner reasonably believed to be in best interests of AFI | If claim is indemnifiable by AFI, it is not covered under "Side A" D&O policy (but AFI may be entitled to recover costs of indemnification under "Side B" D&O policy, subject to terms of policy) |
| Breach of Duty of Care Acted in Bad Faith (motivated by actual intent to do harm) | ResCap does not exculpate director for willful misconduct or bad faith | AFI Charter and Delaware public policy do not permit indemnification if director did not act in good faith | "Side A" D&O policies cover wrongful acts that are not indemnifiable by AFI, such as non-indemnifiable breaches of duty; coverage would be subject to policy terms, including deductibles and coverage limitations; claims would have to be made during applicable period specified under applicable policy; and must not be excluded owing to dishonesty exclusion in policy for deliberately criminal or fraudulent acts, etc. |
| Breach of Duty of Loyalty Acted in Bad Faith (motivated by actual intent to do harm) | ResCap does not exculpate director for willful misconduct or bad faith | AFI Charter and Delaware public policy do not permit indemnification if director did not act in good faith | "Side A" D&O policies cover wrongful acts that are not indemnifiable by AFI, such as non-indemnifiable breaches of duty; coverage would be subject to policy terms, including deductibles and coverage limitations; claims would have to be made during applicable period specified under applicable policy; and must not be excluded owing to dishonesty exclusion in policy for deliberately criminal or fraudulent acts, etc. |

*Source: See Section IV.B.2.*

The Examiner notes that a variation unique to the parent-subsidiary context, in which a fiduciary affiliated with both the parent and subsidiary entities could at the direction of the parent entity breach his duty of loyalty in bad faith to the subsidiary but act in good faith with respect to the parent, might apply to potential claims encompassed by the Investigation.[428] The parent may indemnify such a director because such a breach would be in good faith with respect to the parent entity under Delaware General Corporate Law section 145(d).[429] However, the Examiner is aware of no existing case law that would support the argument of a director bringing suit against the parent entity to compel such indemnification. The outcome of such a hypothetical argument in the absence of case law on point is uncertain.[430]

---

[428] See Section VII.E.1.f(1) for a discussion of the duties owed by directors of a wholly owned subsidiary and Section VII.E.2.a for a discussion of such a potential claim.

[429] DEL. CODE ANN. tit. 8, § 145(d) (allowing permissive indemnification if approved by majority vote of the directors who are not parties to such action, by a committee designated by a majority vote of such directors, by independent legal counsel in a written opinion if elected by such directors, or by the stockholders).

[430] Equitable considerations might dictate that the parent entity that benefited from and arguably directed the breach of fiduciary duty vis-à-vis the subsidiary should be compelled to indemnify its director even though not obligated to do so under conventional indemnification principles.