## V. AFFILIATE TRANSACTIONS

## A.  THE ALLY BANK TRANSACTIONS

### 1.  Factual Narrative

Between November 2006 and January 2009, AFI and ResCap entered into three transactions that ultimately consolidated their mortgage and automotive banking operations under a single entity, Ally Bank, and transferred full ownership of Ally Bank to AFI. Despite this cumulative effect, the Examiner has considered each of the three transactions separately because the Investigation did not reveal evidence suggesting that the Ally Bank Transactions were part of an integrated whole or presupposed the occurrence of each other. Additionally, regardless of the Examiner's ultimate conclusions with respect to any causes of action implicated by the Ally Bank Transactions, each of the transactions appears to have been motivated independently by separate business considerations.

Before the Ally Bank Transactions, AFI's automotive banking operations rested with GMAC Automotive Bank, a Utah industrial bank and a direct wholly owned subsidiary of AFI,[1] and ResCap's mortgage banking operations were performed by Old GMAC Bank, a federal savings bank and an indirect wholly owned subsidiary of ResCap.

---

[1]   The formation of GMAC Automotive Bank was previously approved by the DFI on April 8, 2004. *See* Minutes of the Annual Meeting of the Board of Directors of General Motors Acceptance Corporation, May 10, 2004, at ALLY_PEO_0028505 [ALLY_PEO_0028475]. *See generally* Order Approving Application for Federal Deposit Insurance, FDIC (June 25, 2004) [GOLDIN00092209].

EXHIBIT V.A.1
**Bank Subsidiaries**
Pre-November 2006



*Source: See Walker Report, at Ex. A-1 [RC40008925].*

In 2006, Old GMAC Bank's operations represented a relatively small but important piece of ResCap's business.[2] Despite a small deposit base, Old GMAC Bank remained important as it provided various value-added components, including the ability to provide low-cost secured and unsecured funding, preemption benefits (simplified licensing and regulatory environment), bank funding to hedge against potential problems with existing structured transaction facilities, exclusive banking activities (trust and custodial businesses), and a

---

[2] As of September 30, 2006, Old GMAC Bank had approximately $14.1 billion of total assets and $1.1 billion of equity while ResCap had approximately $132.6 billion of total assets and $8.4 billion of equity. *See* GMAC Bank FDIC Thrift Financial Report (Call Report) (Sept. 30, 2006); Residential Capital, LLC, Quarterly Report (Form 10-Q) (Nov. 7, 2006), at 3; *see also* Int. of J. Young, Sept. 28, 2012, at 87:16–88:2 ("[T]he bank was a facilitator of a very small piece and facilitating what was going on with respect to ResCap."); Int. of L. Tessler, Nov. 16, 2012, at 150:20–23 ("Being a deposit-funded institution for any wholesale-funded enterprise on a global basis became increasingly important as we moved through 2007 and into 2008.").

diversified income stream.[3] As David Walker, then Chief Financial Officer of GMAC Mortgage Group, explained, these advantages were most pronounced in times of economic stress.[4] In addition, ResCap planned for Old GMAC Bank to become a larger source of mortgage production through a restructuring of certain origination channels and to significantly increase its acquisition of MSRs in an effort to grow its HFI portfolio.[5] In fact, just a year earlier, Walker had argued that "growing GMAC Bank is the single most important non-revenue focused project within ResCap, and it's likely to remain so through the end of 2007."[6]

### a. The 2006 Bank Restructuring

#### (1) Purpose Of The 2006 Bank Restructuring

During the first quarter of 2005, AFI experienced a series of negative credit rating actions as a result of its exposure to GM.[7] These downgrades had negative implications for AFI's business model, namely, impairing AFI's ability to maintain automotive origination levels.[8] Despite being "ring-fenced" from AFI, the downgrades also had negative implications for ResCap because its credit rating remained linked to AFI's and could only be a limited number of "notches" above AFI's rating.[9] Thus, a further downgrade in AFI's ratings likely would have resulted in ResCap being downgraded to below investment grade.[10] A downgrade in

---

3   *See* ResCap GMAC Bank Strategies Presentation, dated Jan. 31, 2006, at 131–32 [RC40012974] (indicating a bank funding advantage of 13 basis points over various other internal and external funding sources); *see also* Int. of S. Khattri, Oct. 25, 2012, at 8:2–16 ("[A] good financial services company has several sources of capital, all the way from equity to unsecured, to secured, different types of conduits. At that time and probably always, the cheapest form of financing is bank deposits because they are guaranteed and they are normally very low interest. So, typically, to the extent that the mix of assets allow it and regulators allow it, that is always the cheapest source of financing. And because a lot of the conforming mortgage business, which is what [GMAC Mortgage] did, they were competing with the banks and they were competing with Fannie, they were competing with Freddie, this was important to have.").

4   *See* Int. of D. Walker, Nov. 28, 2012, at 53:19–23, 55:9–10 ("When times are very, very good, typically in a market, the benefit and cost of the bank is minimal relative to the non-bank. It's in times of great stress when the bank probably has better value than a non-bank. . . . And from 2000 to 2006, times were pretty good.").

5   *See* ResCap GMAC Bank Strategies Presentation, dated Jan. 31, 2006, at 133–35 [RC40012974]; s*ee also* Int. of S. Khattri, Oct. 25, 2012, at 33:8–12; E-Mail from D. Walker to S. Khattri (Apr. 1, 2006) [EXAM11315506] ("[Old GMAC Bank] has more than \$11 billion in assets and is growing rapidly."); Residential Capital Corp., Annual Report (Form 10-K) (Mar. 28, 2006), at 72 ("We plan to further diversify our funding sources by, among other things, further expanding our use of [Old] GMAC Bank . . . .").

6   Memorandum, RFC/ResCap Financial Staff Issues, dated July 18, 2005, at 3 [EXAM11826950].

7   *See* GMAC Board of Directors Meeting Presentation, dated July 25, 2005, at 8, 10 [ALLY_0258663].

8   *Id*. at 10.

9   *See* Walker Report, at 9 [RC40008925] ("Given that [AFI]'s and ResCap's credit ratings are linked, we expect that if [AFI] is downgraded, ResCap will be downgraded to non-investment grade."); Int. of D. Walker, Nov. 28, 2012, at 127:24–129:1 ("The [rating agencies] would say in looking at the linkage. . . 'We're giving [ResCap] these ratings because there's de-linkage from [AFI] because of the operating agreement . . . .' They may have had language that said, 'We're notching it two because we'll go no more than two on any kind of entity that's wholly owned by the parent.").

10  Walker Report, at 9 [RC40008925].

ResCap's credit ratings would have triggered step-up provisions on its unsecured debt and bank facilities.[11]

GM, at the urging of AFI management and after initial resistance, evaluated strategic alternatives for AFI, including the sale of a controlling interest in AFI.[12] AFI management believed that such a transaction would restore its investment grade credit rating and access to low-cost funding, allowing it to continue to provide GM with cost-effective auto financing.[13] While GM had alternative plans in the event it was unable to sell a controlling interest in AFI, the Ratings Agencies made clear that a successful closing was imperative to de-linking AFI's credit ratings from those of GM.[14]

In early 2006, approximately five months after GM began actively marketing a majority (51%) interest in AFI, GM, AFI, and Cerberus entered into the Cerberus PSA.[15] Pursuant to the Cerberus PSA, FIM Holdings LLC, an investment vehicle formed by Cerberus, acquired a 51% stake in AFI for a purchase price of approximately $7.4 billion.[16] As part of that sale, Cerberus required that ResCap divest Old GMAC Bank so that Cerberus could avoid thrift holding company status and the restrictions on non-banking activities that would have been triggered by ownership of a federal savings bank.[17]

In order to comply with this requirement, AFI and ResCap undertook a fundamental restructuring of their automotive and mortgage banking operations. Substantially all of the assets and liabilities of Old GMAC Bank were transferred to GMAC Automotive Bank while the Old GMAC Bank entity and its remaining assets and liabilities were transferred to GM.[18]

---

[11]   The impact of these potential changes is addressed in Section V.A.2.b(6).

[12]   *See* Section III.E (providing background on the AFI-Cerberus transaction).

[13]   *See* GMAC Board of Directors Meeting Presentation, dated Nov. 7, 2005, at 17 [ALLY_0258741].

[14]   *See* GMAC Board of Directors Meeting Presentation, dated Mar. 23, 2006, at 17–18 [ALLY_PEO_0002478];

   Walker Report, at 9 [RC40008925]. The Walker Report quoted the following ratings agency statements:

   S&P—"If the transaction is not completed and GM does not take other steps to justify rating it differently from [AFI], [AFI]'s ratings would be equalized with those of GM."

   Moody's—"If the sale does not close, Moody's would re-link [AFI]'s credit rating with GM's rating."

   DBRS—"[A] lack of progress could lead to rating actions including potentially lowering [AFI]'s rating several notches to bring it more in line with the rating of GM in accordance with DBRS's captive finance policy."

   Walker Report, at 9 [RC40008925].

[15]   Walker Report, at 2 [RC40008925].

[16]   General Motors Acceptance Corp., LLC, Annual Report (Form 10-K) (Mar. 13, 2007), at 17.

[17]   *See* Walker Report, at 2 [RC40008925]; Cerberus PSA, § 4.1(e)(i) [CERB000521]; Cerberus PSA, Ex. H, at 1 [CERB039811].

[18]   Certificate of Share Transfer, Nov. 21, 2006 [CERB001732]; Transfer of Shares Agreement, dated Nov. 22, 2006 [CERB001787].

Full ownership of GMAC Automotive Bank was then transferred to IB Finance, a newly created wholly owned direct subsidiary of AFI.[19] By conveying Old GMAC Bank's assets and operations to GMAC Automotive Bank and transferring the Old GMAC Bank entity to GM, ResCap maintained the benefits of bank funding while simultaneously eliminating the possibility that Cerberus would become subject to federal regulations related to ownership of a federal savings bank.[20] Following the consolidation, the mortgage assets contributed by Old GMAC Bank comprised approximately 76% of GMAC Automotive Bank's assets.[21]

The Cerberus deal provided substantial benefits to ResCap.[22] The sale of AFI allowed the further de-linking of the credit ratings of ResCap, AFI, and GM,[23] thereby helping to protect against credit downgrades at GM resulting in corresponding downgrades at AFI and ResCap.[24] Accordingly, restructuring Old GMAC Bank and helping to close the Cerberus deal created value for ResCap in that it avoided a potential ResCap credit rating downgrade and, in fact,

---

[19]  Share Contribution Agreement [CERB001521].

[20]  As a result of a "loophole" in the Bank Holding Company Act, ownership of an industrial bank did not trigger consolidated federal regulation of certain commercial activities. Debate over this "loophole" prompted the FDIC, on July 28, 2006, to issue a six-month moratorium on deposit insurance and change of control approvals for industrial loan banks. Despite the moratorium, Cerberus received FDIC approval in November, 2006 for its acquisition of 51% of AFI by agreeing that Ally Bank would be subject to any changes that the FDIC might make to the regulation and supervision of industrial loan banks once the moratorium was lifted (agreeing, if necessary, to sell its interest in the bank, to convert the bank to a thrift, or to obtain a waiver from the FDIC). *See, e.g.*, FDIC, Press Release, *FDIC Places Six-Month Moratorium on Industrial Loan Company Applications and Notices* (July 28, 2006), http://www.fdic.gov/news/news/press/ 2006/pr06073.html; FDIC, Press Release, *FDIC Board Approves Change in Control Notice for GMAC Automotive Bank, Midvale, Utah* (Nov. 15, 2006) [EXAM10241413]. Cerberus appears to have received a further ten-year waiver of these requirements on July 15, 2008. *See* FDIC, Order, *In re GMAC Bank, Midvale, Salt Lake County, Utah, Request for Waiver of Certain Conditions*, dated July 15, 2008 [ALLY_0000032]; *see also* Int. of L. Tessler, Feb. 28, 2013, at 110:15–19 ("We only had a two-year license to operate the bank . . . when we closed the transaction in 2006. We didn't get an extension on that two-year license until . . . 2008.").

[21]  As of December 31, 2006, the mortgage division had approximately $15.4 billion of assets compared to the bank's consolidated total assets of approximately $20.2 billion. *See* GMAC Bank 2007 Business Plan Review, dated Jan. 25, 2007, at ALLY_PEO_0006858, –65 [ALLY_PEO_0006664].

[22]  *See* Int. of T. Jacob, Nov. 7, 2012, at 136:25–137:5 ("[T]he decision that faced Tom Melzer and I was . . . the risk of not letting this restructuring take place because that risked the closing of the . . . Cerberus deal with General Motors and that was very important for ResCap."); Memorandum, Proposed Restructuring of GMAC U.S. Banking Entities, dated May 5, 2006, at 2 [EXAM10258913] (explaining that the sale "should result in [AFI] and ResCap ratings being de-linked from GM's rating"); Int. of T. Melzer, Mar. 22, 2013, at 80:6–12 ("I didn't look at the bank transaction as a separate transaction. I looked at the totality of bringing in an investor like Cerberus to buy a majority interest in [AFI], getting [AFI] and ResCap out from under GM's credit rating and the benefit that would have overall for ResCap and its creditors.").

[23]  Int. of D. Walker, Nov. 28, 2012, at 120:2–13, 132:8–12; Int. of T. Melzer, Oct. 10, 2012, at 180:12–14 ("[M]y perception was that [the] acquisition was really important to get [AFI]. . . less attached to GM . . . .").

[24]  Int. of D. Walker, Nov. 28, 2012, at 132:8–12.

paved the way for a future ResCap credit rating upgrade.[25] That said, however, issues remain concerning the form of the 2006 Bank Restructuring and whether, taking account of the credit ratings benefit, ResCap received reasonably equivalent value in the transaction.

### (2) Lead-Up To The 2006 Bank Restructuring

The Cerberus PSA, which is dated April 2, 2006,[26] required Old GMAC Bank to be removed from the Cerberus ownership chain and required its assets and liabilities to be transferred to GMAC Automotive Bank.[27] However, the Cerberus PSA did not specify a particular structure for GMAC Automotive Bank's future ownership, except that it had to be "directly or indirectly wholly owned" by AFI.[28] In fact, the Cerberus PSA provided that either "[AFI] or ResCap will wholly own the Industrial Bank, or it will be co-owned by [AFI] and ResCap,"[29] and Cerberus officers confirmed in their interviews that Cerberus did not dictate a specific form of ownership for the restructured bank.[30]

AFI and ResCap management clearly were concerned with the reaction that ResCap bondholders might have to the 2006 Bank Restructuring.[31] David Applegate, then Chief Operating Officer of ResCap, thought it best to "keep the Bank below the radar scope" until a sensible restructuring strategy could be developed and approved.[32] As of April 4, 2006, ResCap management was exploring the advantages and disadvantages of three potential

---

[25] *See* Int. of D. Walker, Nov. 28, 2012, at 159:8–16 ("Moody's went from a negative outlook at Baa3 to a stable at Baa3. S&P went from a triple B-minus to a triple B-flat. Fitch went from a triple B-minus to a triple B-flat with a positive outlook. And DBRS went from developing under review to stable. So, we actually, as a result of this deal, got increased ratings or increased outlooks from all four rating agencies as a result of the positive transaction."); *see also* E-mail from R. Hall to D. Applegate (Mar. 2, 2006) [EXAM11740350] ("I view this as a material negative to ResCap, but acknowledge that at a[n] [AFI] level it is a negative that should potentially be absorbed if ResCap and [AFI] get improved ratings outlooks, etc.").

[26] Cerberus PSA, at 1 [CERB000521].

[27] Cerberus PSA, Ex. H, at 1 [CERB039811].

[28] Cerberus PSA, § 4.1(e)(i) [CERB000521]; *see also* Cerberus PSA, Ex. H, at 1 [CERB039811].

[29] Cerberus PSA, Ex. H, at 2 [CERB039811].

[30] *See* Int. of M. Neporent, Feb. 6, 2013, at 24:20–25:8; Int. of L. Tessler, Nov. 16, 2012, at 27:11–23 ("The bank restructuring was a prerequisite for us to be able to succeed to a 51 percent control interest in [AFI]. . . . The specifics of how that ultimately got structured was more likely left in the hands of [AFI] and ResCap . . . .").

[31] *See* E-mail from D. Olson (Apr. 1, 2006) [EXAM11265206] ("I believe the ResCap bond investors may be concerned not only with funding but also control of the ILC . . . ."); E-mail from D. Applegate to S. Khattri and D. Walker (Apr. 2, 2006) [EXAM11265206] ("We need to have a concise picture (document) in place that shows why the overall transaction and the final outcome for the Bank support the best interest of ResCap bondholders—a group we have made multiple statements to regarding the importance of the Bank to ResCap's growth and liquidity plans—and an investor base that is critical to our long term success.").

[32] E-mail from D. Applegate to S. Khattri and D. Walker (Apr. 2, 2006) [EXAM11265206] ("[W]e are trying to keep the Bank below the radar scope. If we do say something about the Bank the statement would focus on Cerberus's lack of ability to retain the Bank (Thrift), GM's desire to keep the Thrift and ResCap and [AFI's] confidence that via [GMAC Automotive Bank] we can create a similar operating environment for our banking entities post the transaction . . . .").

ownership structures for the reorganized bank: (1) 100% AFI ownership of voting control of IB Finance with proportional earnings distribution to ResCap; (2) proportional voting control and earnings distribution; and (3) ResCap formation of its own industrial bank.[33]

However, it appears that through formal and informal discussions among officers of AFI and ResCap,[34] some of whom held positions with both companies,[35] AFI management quickly settled on the first of the proposed ownership structures—AFI ownership of 100% of voting control, with proportional earnings distribution to ResCap.[36]

---

[33] *See* Draft Memorandum, IB Alternatives, dated Apr. 4 2006, at 1 [EXAM11237439] (attached to E-mail from D. Applegate to B. Paradis (Apr. 4, 2006) [EXAM11237438]). Despite being drafted by ResCap and Old GMAC Bank employees, the memorandum analyzing these structures regards "[AFI] Control" as a "Pro" and "[AFI] shared control" as a "Con." *See* Draft Memorandum, IB Alternatives, dated Apr. 4 2006, at 1 [EXAM11237439]; *see also* E-mail from R. Hall to D. Applegate, Mar. 2, 2006 [EXAM11740350] ("I view this as a material negative to ResCap, but acknowledge that at a[n] [AFI] level it is a negative that should potentially be absorbed if ResCap and [AFI] get improved ratings outlooks, etc.").

[34] *See* Int. of S. Khattri, Oct. 25, 2012, at 72:1–73:9.

[35] *See* Director and Officer Appendix, dated June 25, 2012 [ALLY_0004637] (indicating dual roles held by Khattri and Walker, among others).

[36] *See* Memorandum, GMAC Bank Restructuring, dated Apr. 20, 2006, at 1 [EXAM11248642].

David Marple, then General Counsel of ResCap, prepared a memorandum dated April 20, 2006 regarding the transaction. The memorandum explains that the structure was proposed because "[AFI] maintains that it must control the Industrial Bank in order for its automotive businesses to be covered under the 'call option' provided [to GM] by the [Cerberus PSA]."[37] As a result of some ambiguity regarding the interaction between the Cerberus PSA and ResCap's financial reporting,[38] it appears that the non-voting structure was developed by AFI as a means to ensure that, if GM exercised its call option, the GMAC Automotive Bank entity could be transferred to GM without hindrance or delay from

---

[37]   *Id*. at 2. William Muir, AFI's President, offered a different explanation in his interview with the Examiner's Professionals. Muir suggested that AFI control of the restructured bank was favorable from a regulatory perspective. *See* Int. of W. Muir, Mar. 1, 2013, at 34:25–36:13 ("[A]t the time, having a bank inside of a company like ours was a somewhat politically contentious issue. And so, you had to run a very clean operation . . . . [I]n order to manage that reputational and regulatory risk, it was very important to us that there be one voice, not two, but one voice that clearly had that mandate and could run the bank for the benefit of the bank . . . . So, there are two different things. One is actually running a regulated enterprise and establishing the right kind of regulation reputation and conduct with the regulator, and the other is getting the economic benefits of being able to fund assets in the bank. . . . [W]e didn't think you could have more than one voice up here, but that we could still give everybody who was a part of our enterprise the economic benefit of funding assets in the bank."). The Investigation revealed no documentary evidence suggesting that this regulatory concern, rather than the GM call option, was AFI's reason for the proposed structure, and this justification does not appear to have been raised with either of the Independent Directors. Further, Muir's comment seems inconsistent with the reality that, at a higher level, the bank would already have multiple owners (GM and Cerberus), and that even if ResCap was given partial voting control of the industrial bank, AFI's parental control over ResCap would have likely ensured "one voice" with respect to regulators.

[38]   The call option provided GM, through its wholly-owned subsidiary GM Finance Co Holdings Inc., with a 10-year option to repurchase certain assets from AFI related to the North American and international automotive finance operations, if certain conditions were met (including that GM have an investment grade rating). Specifically, the assets covered by the call option were equity interests of (1) the "NAO Subsidiary" (defined in the Cerberus PSA as a wholly owned subsidiary to be created by AFI pursuant to which all (with one exception) of AFI's *consolidated* subsidiaries that conduct the North American auto finance business would be contributed); and (2) the IO Subsidiaries (defined in the Cerberus PSA as certain direct and indirect consolidated subsidiaries of AFI engaged in the international auto finance business). Because GMAC Automotive Bank was consolidated with ResCap for financial reporting purposes, it would not have been one of the subsidiaries contributed to the NAO Subsidiary. However, the Cerberus PSA required that the "Auto Business," defined to specifically include GMAC Automotive Bank, be owned by the NAO Subsidiary and the IO Subsidiaries as of the closing of any exercise of the call option. Accordingly, AFI's full control of GMAC Automotive Bank ensured that it could transfer the entity to the NAO Subsidiary, if necessary. *See* Cerberus PSA, Art. X [CERB000521]; Cerberus PSA, Disclosure Schedules, Sched. 10.1(3) [CERB000731]; Memorandum, Bank Restructuring Accounting Implications, dated July 20, 2007, at 12 [EXAM10198423].

ResCap.[39] This justification is called into question, however, by Walker's later observation that GM's exercise of the call option was a "remote" risk given its unlikely ability to maintain an investment grade credit rating in late 2006.[40]

Marple's April 20, 2006 memorandum also explained that certain aspects of the 2006 Bank Restructuring raised potential conflicts under the 2005 Operating Agreement.[41] Specifically, Marple identified and analyzed three provisions of the 2005 Operating Agreement that were implicated by the 2006 Bank Restructuring:[42]

- First, Marple opined that there would be a conflict with section 2(b) of the 2005 Operating Agreement, which prohibited ResCap from entering into any agreements with AFI Affiliates unless the transactions were "on terms and conditions that are consistent with those that parties at arm's-length would agree to and for fair value."[43] Marple noted that because "ResCap will not be given any voting control with regard to . . . material business activities or the entity itself," it is "not reasonable to believe that ResCap's leadership would agree to transfer a material business to a third-party under a similar agreement."[44]

- Second, Marple concluded that "ResCap's proposed investment in [the] Industrial Bank would be a violation of [s]ection 2(a)(ii) of the [2005] Operating Agreement,"[45] which prohibited ResCap and its affiliates from making any investment in any AFI Affiliates.[46]

- Third, Marple recognized that the proposed restructuring "blurs the lines" between ResCap's and AFI's businesses[47] and thus would potentially violate section 2(f) of the 2005 Operating Agreement, which required ResCap to run its business separately from AFI and to "maintain, or cause to be maintained, its assets and the assets of its Subsidiaries in such a manner that it would not be costly or difficult to segregate . . . such assets from those of any and all [AFI] Affiliates."[48]

---

[39]   *See* Memorandum, GMAC Bank Restructuring, dated Apr. 20, 2006, at 2 [EXAM11248642]; Int. of D. Marple, Jan. 22, 2013, at 122:14–18.

[40]   *See* Walker Report, at 6–7 [RC40008925]; *see also* Int. of S. Khattri, Oct. 25, 2012, at 68:5–13 ("Candidly the option agreement was put in place because certain members of the GM management were of the strong belief that the GM recovery was around the corner . . . . I personally did not rate the chances of their option ever being exercised seriously.").

[41]   *See* Memorandum, GMAC Bank Restructuring, dated Apr. 20, 2006, at 1 [EXAM11248642] (attached to E-mail from K. Sabatowski to W. Muir, S. Khattri, D. Walker, J. Vanorman, B. Paradis, D. Applegate, R. Hall and D. Marple (Apr. 26, 2006) [EXAM11248640]).

[42]   Memorandum, GMAC Bank Restructuring, dated Apr. 20, 2006, at 3–5 [EXAM11248642].

[43]   2005 Operating Agreement, § 2(b) [ALLY_0140795].

[44]   Memorandum, GMAC Bank Restructuring, dated Apr. 20, 2006, at 4 [EXAM11248642].

[45]   *Id*.

[46]   2005 Operating Agreement, § 2(a)(ii) [ALLY_0140795].

[47]   Memorandum, GMAC Bank Restructuring, dated Apr. 20, 2006, at 5 [EXAM11248642].

[48]   2005 Operating Agreement, § 2(f) [ALLY_0140795].

The transaction's potential conflicts could be waived by ResCap's Independent Directors,[49] but Marple noted that "if either of the independent directors believes that the amendment is a 'close call' under the [2005] Operating Agreement—they will likely veto the amendment."[50] As Marple further noted, the 2005 Operating Agreement required that, in considering whether to grant such a waiver, the Independent Directors were to "consider *only* the interest of ResCap, including its creditors."[51]

After reviewing Marple's memorandum, Applegate prepared a one-page memorandum of his own to AFI's president, William Muir, proposing an alternate ownership structure whereby ResCap would manage and control at least 51% of the restructured bank.[52] Applegate observed that "ResCap and [AFI] have made multiple statements about the ground breaking nature of the ResCap structure and our mutual commitment to ResCap's firewalls."[53] Consequently, Applegate was "fearful our long-term credibility in the markets will be impaired, if we pursue a course of action which leaves ResCap without controlling interest in a bank."[54] Applegate thought that ResCap control of at least 51% of the reorganized bank would "seem to address the conflicts in the [2005] Operating Agreement" and "[AFI] would still retain 100% ownership of [Ally Bank] through its sole ownership of ResCap."[55] Applegate's proposal seems to have been rejected,[56] however, because less than two weeks later, AFI and ResCap personnel had apparently settled on a structure whereby AFI would have full voting control of the restructured bank.[57]

The first written communication from ResCap or AFI management to the Independent Directors regarding the details of the 2006 Bank Restructuring appears to be a memorandum

---

[49]  2005 Operating Agreement, § 8 [ALLY_0140795] ("The provisions of this Agreement may not be amended or waived except by an instrument in writing signed by the parties hereto; *provided* that no amendment or waiver that materially and adversely affects the rights of any Class of Rated Indebtedness shall become effective unless such amendment or waiver has been approved by a majority of the members of ResCap's Board of Directors, including a majority of the Independent Directors.") (emphasis in original).

[50]  Memorandum, GMAC Bank Restructuring, dated Apr. 20, 2006, at 6 [EXAM11248642].

[51]  *Id.*; 2005 Operating Agreement, § 8 [ALLY_0140795] (emphasis added). It is perhaps notable that, unlike ResCap's later indentures, the 2005 Indenture did not restrict ResCap transactions with AFI affiliates. *Compare* 2005 Indenture, Art. 4 [EXAM40024737], *with* Junior Secured Notes Indenture, § 4.11 [ALLY_0122066], *and* Senior Secured Notes Indenture, § 4.11 [GOLDIN00000019].

[52]  Memorandum, ILC Ownership and Control, dated Apr. 24, 2006 [EXAM11248641].

[53]  *Id.*

[54]  *Id.*

[55]  *Id.*

[56]  Muir suggested to the Examiner's Professionals that Applegate's proposal of shared control of the restructured bank was never seriously considered by AFI. *See* Int. of W. Muir, Mar. 1, 2013, at 25:20–26:7 ("[Q:] And, to the extent that ResCap did ask to take control of the ILC once the transaction was done, who made the decision that ResCap should not have control? . . . [A:] Well, I would say my recollection is that it wasn't . . . a seriously considered proposition. It was not something that, I don't think, Dave himself ever really thought was reasonable and was going to fly. But it didn't hurt to ask.").

[57]  *See* Memorandum, Proposed Restructuring of GMAC U.S. Banking Entities, dated May 5, 2006, at 1 [EXAM10258913] (attached to E-mail from K. Sabatowski to T. Melzer and T. Jacob (May 4, 2006) [EXAM10258912]).

from Eric Feldstein, then President of AFI and Chairman of the ResCap Board, dated May 5, 2006 (but apparently sent on May 4, 2006).[58] Feldstein's memorandum specified that "voting ownership of [the restructured bank] (i.e., shareholder votes) would remain 100% with [AFI]."[59] Feldstein further stated that the 2006 Bank Restructuring would require "waivers of certain provisions of the [2005] Operating Agreement" to allow ResCap to invest in an AFI affiliate and to enable Applegate and others to be officers of an AFI Affiliate, but made no mention of Marple's prior concern that the restructuring was not at arm's length or for fair-value.[60] The memorandum also suggested that ResCap could later regain control over its mortgage operations by applying for a second industrial bank charter, which entity would then reacquire ResCap's banking assets from the restructured bank.[61] Given that the 2006 Bank Restructuring would preserve ResCap's economic rights and "result in [AFI] and ResCap ratings being de-linked from GM's ratings," Feldstein concluded that the 2006 Bank Restructuring was "prudent and sound for ResCap."[62] Despite Marple's and Applegate's prior memoranda, there was no indication in Feldstein's memorandum or the accompanying e-mail that alternate ownership structures had been contemplated, were possible under the terms of the Cerberus PSA, or had been rejected to accommodate GM at ResCap's expense.[63]

---

[58]  Memorandum, Proposed Restructuring of GMAC U.S. Banking Entities, dated May 5, 2006, at 1 [EXAM10258913] (attached to E-mail from K. Sabatowski to T. Melzer and T. Jacob (May 4, 2006) [EXAM10258912]). Jacob and Melzer learned of the Cerberus acquisition just shortly before it was made public on April 3, 2006. *See* Int. of T. Jacob, Nov. 7, 2012, at 120:12–25; GMAC, LLC, Current Report (Form 8-K) (Apr. 2, 2006), Item 1.01. It is unclear when Jacob and Melzer first learned that the bank restructuring was a necessary component of the Cerberus deal. *See* Int. of T. Melzer, Oct. 10, 2012, at 178:23–179:3 ("[Q:] Can you tell us what you recall about the board's consideration of the . . . GMAC Bank deal, that first phase of it in 2006? [A:] Well, and that had been going on for some time, I think maybe going back initially to March of that year.").

[59]  Memorandum, Proposed Restructuring of GMAC U.S. Banking Entities, dated May 5, 2006, at 1 [EXAM10258913].

[60]  *Id*. at 2.

[61]  *Id*. at 2. This concept was developed further in the Walker Report. *See* Walker Report, at 6–7 [RC40008925].

[62]  Memorandum, Proposed Restructuring of GMAC U.S. Banking Entities, dated May 5, 2006, at 2 [EXAM10258913]; *see also* Int. of D. Marple, Jan. 22, 2013, at 127:21–128:8 ("[Q:] When you received a copy of Mr. Feldstein's memorandum, do you recall if you . . . agreed or disagreed with his assessment? . . . [A:] The short answer is, no, I didn't. But . . . my understanding at the time as to why I was personally comfortable with this under the agreement was we were getting the economic benefits . . . . Two, we . . . had a commitment to get another charter. Three, we were going to dot I's and cross T's under the operating agreement and get the independent directors comfortable.").

[63]  Memorandum, Proposed Restructuring of GMAC U.S. Banking Entities, dated May 5, 2006, at 1 [EXAM10258913] (attached to E-mail from K. Sabatowski to T. Melzer and T. Jacob (May 4, 2006) [EXAM10258912]); *see also* Int. of E. Schenk, Apr. 24, 2013, at 35:23–36:5 ("By the time [Bryan Cave, counsel to the Independent Directors,] received information about the transaction . . . [it was] presented as this is the . . . proposed transaction; here is what we have determined, and then we obviously worked through questions, comments, et cetera. But there was no presentation of alternatives . . . .").

Interviewed AFI officers said that briefings to Jacob and Melzer were detailed,[64] but none of them recalled any communication to Jacob and Melzer suggesting that alternative ownership structures were possible, and Jacob and Melzer recalled no such communication.[65] Instead, several AFI officers, including recipients of the Marple and Applegate memoranda, portrayed the lost voting interest as a non-issue.[66] In addition, Sanjiv Khattri, then Chief Financial Officer of AFI, suggested that full AFI control of IB Finance was simply "cleaner."[67]

---

[64]   Int. of S. Khattri, Oct. 25, 2012, at 80:22–81:5 ("We spent a lot of time with [Melzer and Jacob] educating them on why the [AFI] sale made sense. It was very important for us that not only are they made aware of it, but they are enthusiastically supporting it and as part of that exercise there was a regular briefing that I was holding with them to update them on what was going on. As part of that things like the bank and a lot of other stuff would come up."); Int. of E. Feldstein, Dec. 14, 2012, at 119:3–12 ("[W]e were fairly forthcoming to the independent directors irrespective of whether [a given transaction] legally needed their action or waiver or approval. But [the bank restructuring], we reviewed with them in painstaking detail with painstaking care . . . and discussed with them to ensure that they were very comfortable, with what we were doing.").

[65]   *See* Int. of S. Khattri, Oct. 25, 2012, at 73:10–17 ("[Q:] Was there any presentation to the independent directors that suggested it was an option that ResCap receive something other than a non-voting interest? [A:] To the best of my knowledge no."); Int. of E. Feldstein, Dec. 14, 2012, at 112:25–113:10 ("[Q:] Do you ever remember . . . any discussions you had with the independent board members as to why they were non-voting shares . . . ? [A:] . . . I don't recall discussing the issue of voting shares versus non-voting shares."); Int. of T. Melzer, Mar. 22, 2013, at 62:14–63:12, 74:6–9, 85:12–19, 89:22–25 ("[W]hen the transaction was presented to us . . . my recollection is it was always presented to the ResCap board from the perspective of this bank would end up in [AFI], not in ResCap."); Int. of T. Jacob, Apr. 17, 2013, at 70:7–22 ("[Q:] [H]ere Mr. Applegate is saying it makes sense for ResCap in fact to have the majority voting control of the bank. First of all did you ever have any discussion with Mr. Applegate about that option? [A:] Never. . . . [Q:] Did you ever have any conversations with anyone at ResCap about what they were obviously considering? . . . About having voting ownership in the bank. [A:] No.").

[66]   *See* Int. of S Khattri, Oct. 25, 2012, at 97:18–98:15 ("I think the focus was this was considered a successful way where we were enabling the transaction and also protecting everybody's funding sources. . . . This is going to allow automotive finance to continue to diversify away from GM and this is going to continue to allow the mortgage business to get capital. That was the big theme."); Int. of J. Young, Sept. 28, 2012, at 89:19–91:25 ("I guess all I'm trying to say is I believe there wasn't a lot of debate just because it really wasn't that critical to [] what was going on in the core business and . . . ResCap ended up in the same position they would've had before."); Int. of E. Feldstein, Dec. 14, 2012, at 110:17–111:1 ("I don't recall that being an issue. . . . [A]n accommodation was being made for ResCap to use this bank that was owned by [AFI] and to get all the economic benefits associated with the low-cost funding, economic benefits directly proportional with the assets . . . that were being housed in the bank, economic benefits very, very much, if not precisely along the lines of the same benefits they had in their own bank."); Int. of M. Neporent, Feb. 6, 2013, at 25:19–26:4 ("What mattered was that ResCap had access to the bank. . . . And the voting or non-voting interest sort of seemed irrelevant at the time, at least from my perspective. ResCap wound up with an economic interest that was the same before and after."); Int. of W. Muir, Mar. 1, 2013, at 31:13–32:5 ("[Q:] Do you recall discussing with anyone this concern that the bank transaction was not going to be perceived as an arm's-length agreement for purposes of the operating agreement that was in place? . . . [A:] I remember the issue being brought up by Dave [Applegate] that . . . there were some concerns that one might have about that. Now, I will also tell you that I didn't agree, people generally didn't agree, with the level of concern that was being raised, and that this type of analysis—I just think the discussions that we had with Dave were more—it was like a 'Nice try.' You know, you wanted to make an attempt to come up with a justification as to . . . why things had to be the way you wanted them to be. That's really what it was.").

[67]   *See* Int. of S. Khattri, Oct. 25, 2012, at 66:9–15 ("[T]he thinking was that you wanted to keep the control of [Ally Bank] clean, but do it in such a way that ResCap continues to enjoy the benefits of having a bank fund a certain amount of its qualifying assets.").

In an e-mail dated May 10, 2006, Bryan Cave, on behalf of Jacob and Melzer, posed a series of questions to Marple regarding the details of the transaction, including, for example, with respect to GMAC Automotive Bank's cost of funds and licensing requirements.[68] Most notably, the Bryan Cave e-mail stated that "[a]lthough not a direct request for information, the independent directors have noted and are considering the impact of the difference between the economic stake of ResCap and the voting rights in [IB Finance] . . . ."[69] Despite the fact that Marple had determined that the proposed structure could not reasonably be considered "arm's-length,"[70] his May 12, 2006 response to the Independent Directors' note that they were considering the impact of the non-voting structure was simply, "let me know if you would like

_____

[68]   E-mail from E. Schenk to D. Marple (May 10, 2006) [JACOB.000010]; Int. of T. Jacob, Nov. 7, 2012, at 136:16–137:15.

[69]   E-mail from E. Schenk to D. Marple (May 10, 2006) [JACOB.000010].

[70]   Memorandum, GMAC Bank Restructuring, dated Apr. 20, 2006, at 4 [EXAM11248642].

any further information in connection with your consideration of this matter."[71] Although Jacob and Melzer engaged in ongoing discussions with Bryan Cave and various AFI and ResCap executives regarding the 2006 Bank Restructuring,[72] the Investigation revealed no documentation showing that the Independent Directors were ever informed of the possibility of alternate ownership structures, such as the one proposed by Applegate in his April 24 memorandum, or that the proposed structure was not mandated by the Cerberus PSA.[73]

Instead, it appears that this information was withheld from the Independent Directors, as was the fact that such structures had been rejected by AFI personnel to accommodate GM's call option. This restricted flow of information takes on additional significance when considered in light of the fact that many of the individuals with whom the Independent Directors communicated concerning this transaction (including Walker, Khattri, and Feldstein) held dual affiliations with ResCap and AFI.[74]

---

[71] Memorandum, GMAC Bank Restructuring, dated May 12, 2006, at Question 4 [ALLY_0401600]; *see also* Int. of E. Schenk, Apr. 24, 2013, at 53:9–54:1, 89:3–18 ("[Q:] Going back to the Marple memo . . . . This is within his discussion of the arm's length and fair value requirements of the operating agreement. . . . [I]t says, 'However, ResCap will not be given any voted control with regard to either of these material business activities or the entity itself. It is not reasonable to believe that ResCap's leadership would agree to transfer a material business to a third party under a similar arrangement. Hence, the restructuring of GMAC Bank as currently proposed cannot reasonably be deemed a transaction to which parties at arm's length would agree.' Did Mr. Marple ever convey that view to you? [A:] No.").

[72] *See* Int. of T. Jacob, Nov. 7, 2012, at 136:16–137:22 ("[W]e had extensive discussions back and forth . . . regarding [the bank restructuring], Tom Melzer and I, talking to David Marple, Bryan Cave . . . ."); Int. of S. Khattri, Oct. 25, 2012, at 80:13–15, 80:21–81:4 ("I believe that there were sort of discussions held with [Melzer and Jacob] before the formal board meeting, yes. . . . I think explaining the whole transaction. We spent a lot of time with [Melzer and Jacob] educating them on why the [AFI] sale made sense. It was very important for us that not only are they [made] aware of it, but they are enthusiastically supporting it and as part of that exercise there was a regular briefing that I was holding with them to update them on what was going on."); Int. of T. Melzer, Oct. 10, 2012, at 252:23–253:21 ("I know this concept was around for quite a while and we worked on it for quite a while in terms of getting our mind around it.").

[73] *See* Memorandum, ILC Ownership and Control, dated Apr. 24, 2006 [EXAM11248641]; *see also* E-mail from D. Applegate to J. Barr and R. Hall (Mar. 21, 2006) [EXAM11740324] (deciding that talking points regarding the restructuring would not go to the ResCap Board and that "[t]he goal is to solidify our leadership of the process and end ownership."); Int. of S. Khattri, Oct. 25, 2012, at 73:10–17 ("[Q:] Was there any presentation to the independent directors that suggested it was an option that ResCap receive something other than a non-voting interest? [A:] To the best of my knowledge no.").

[74] The protocol and functioning of the ResCap Board is explored in more depth in Section IV.A.

The regulatory application for the 2006 Bank Restructuring was submitted by GMAC Automotive Bank to the FDIC and DFI on May 19, 2006.[75] The application's cover letter stated that "[AFI] will hold 100% of voting interests in [IB Finance], and ResCap will hold non-voting interests . . . ."[76] The proposed structure of the reorganized bank, including ResCap's non-voting interest, remained unchanged throughout future ResCap Board discussions.[77]

On November 15, 2006, the FDIC and the DFI approved the application for the change in control of GMAC Automotive Bank from GM to Cerberus.[78] A condition of the DFI's approval of the 2006 Bank Restructuring was that the restructured bank "hold capital of no less than 10% of total assets until August 2007 and no less than 9.25% of total assets until November 2008."[79] GMAC Automotive Bank (i.e., the automotive division) already met this requirement, but Old GMAC Bank (the mortgage division) did not.[80] ResCap was thus required to contribute (through IB Finance) an additional $360 million to the mortgage division of GMAC Automotive Bank in connection with the 2006 Bank Restructuring.[81]

To assist the ResCap Board with its evaluation of the 2006 Bank Restructuring, Walker authored a report which explained the transaction.[82] The final version of the Walker Report was presented to the ResCap Board on November 20, 2006, the same day the matter was to be

[75]   *See* Letter from J. Feinberg to FDIC and DFI (May 19, 2006), at 2 [ALLY_0397537]; Walker Report, at 5 [RC40008925]; Memorandum, Bank Restructuring Accounting Implications, dated July 20, 2007, at 2 [EXAM10198423]. The Independent Directors were aware of the application, but did not formally approve it. *See* Bank Restructuring Project Plan, dated July 25, 2006, at Task E.19 [EXAM10256021] ("5/18 - Dave Marple and Karen [Sabatowski] had a call with Bryan Cave, the ResCap independent directors' outside counsel. . . . We all agreed that there is no need for formal ResCap Board approval at this time . . . .").

[76]   Letter from J. Feinberg to FDIC and DFI (May 19, 2006), at 2 [ALLY_0397537].

[77]   *See* ResCap Performance and Market Update, dated June 22, 2006, at 12 [RC40011836] ("ResCap will purchase non-voting interests in GMAC Automotive Bank from [AFI] at which time GMAC Automotive Bank will create a mortgage operation."). *Compare* Draft Report to the Board of Directors of ResCap, dated Oct. 16, 2006, at 3 [RC00016501], *with* Walker Report, at 3 [RC40008925].

[78]   DFI, Findings, Conclusions, and Order Conditionally Approving Application, dated Nov. 15, 2006 [CERB003827]; FDIC Approval Letter from S. L. Thompson (Nov. 15, 2006) [GOLDIN00093066]; Walker Report, at 3 [RC40008925].

[79]   Walker Report, at 5 [RC40008925]; Capital Maintenance Agreement, dated Nov. 15, 2006 [GOLDIN00093168]; 12 C.F.R. § 325.103(b) (2000).

[80]   Walker Report, at 5 [RC40008925].

[81]   Walker Report, at 5 [RC40008925]; Capital Contribution Agreement, dated Nov. 22, 2006 [ALLY_PEO_0021232].

[82]   The ResCap Board received a draft of the Walker Report at their October 19, 2006 meeting and a final version at their November 20, 2006 meeting. *Compare* Draft Report to the Board of Directors of ResCap, dated Oct. 16, 2006 [RC00016501], *with* Walker Report [RC40008925]. The Walker Report was presented by Karen Sabatowski and was jointly prepared by David Walker and Sanjiv Khattri, among others. *See* Int. of S. Khattri, Oct. 25, 2012, at 85:15–86:6 (demonstrating Khattri's involvement); Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Nov. 20, 2006, at 3 [RC00016852] (demonstrating. Sabatowski's involvement); Walker Report, at 10 [RC40008925] (demonstrating Walker's involvement).

voted on, including by the Independent Directors.[83] The Walker Report offered no explanation of why ResCap's interest in IB Finance would be non-voting. Similarly, the Walker Report provided no valuation of the voting interest that ResCap was giving up or of the non-voting interest that ResCap would receive.[84] In later years, AFI would acknowledge difficulty in valuing ResCap's non-voting interest in IB Finance.[85]

With the exceptions noted above, the Walker Report explained the details of the proposed restructuring and acknowledged that "waivers of the relevant provisions of the [2005] Operating Agreement would need to be made and approved by the ResCap Board as a condition to the proposed [IB Finance] structure."[86] As discussed above, Marple had identified in his April 20, 2006 memorandum a conflict with the 2005 Operating Agreement's requirement that ResCap not make investments in AFI Affiliates as well as two potential conflicts with its requirements that affiliate transactions be arms-length and for fair value and that ResCap maintain separateness from AFI.[87] However, the Walker Report only disclosed two of these conflicts: ResCap's preclusion from making investments in AFI Affiliates and the requirement that ResCap maintain separateness from AFI.[88] The Walker Report made no mention of section 2(b)'s requirement that any agreements between ResCap and AFI be "on terms and conditions that are . . . arm's-length . . . and for fair value,"[89] or of Marple's prior conclusion that the proposed restructuring "cannot reasonably be deemed a transaction to which parties at arm's-length would agree."[90]

---

83   Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Nov. 20, 2006, at 3 [RC00016852] ("Ms. Sabatowski presented Report No. DCW-3 that recommended approval of certain actions necessary to effect the restructuring of the two U.S. banking entities currently owned directly and indirectly, by [AFI].").

84   In his interview, Melzer acknowledged that a voting interest would have been better for ResCap. *See* Int. of T. Melzer, Oct. 10, 2012, at 206:18–25, 208:24–209:7 ("[Q:] Was it your understanding that nonvoting shares were less valuable than voting shares? And would it have been better for ResCap to have voting shares, if that could be arranged? [A:] Yeah, I think . . . voting would be better."); *see also* Int. of T. Hamzehpour, Oct. 5, 2012, at 157:14–19 ("[Q:] Do you recall any discussions about whether [the 2006 Bank Restructuring] was a good or bad deal for ResCap? [A:] Other than a feeling personally that we should have at least had a voting interest versus a non-voting interest.").

85   *See* Agenda and Supporting Materials, GMAC Board of Directors Meeting, Sept. 30, 2008, at ALLY_PEO_0003724 [ALLY_PEO_0003715] ("Because of a number of factors, including . . . the non-voting nature of ResCap's ownership, valuation of the bank is somewhat subjective and exposes [AFI] to purchase price litigation."). *But see* Int. of T. Rowe, Dec. 7, 2012, at 159:11–160:19 ("I don't know that it was a significant issue or we didn't think it was a significant issue. . . . No one was going to make a financially driven investment in this type of structure because they don't serve the kinds of purposes or there is too much difficulty. Not having voting rights might be one more component of that, but it's much broader in just the overall structure.").

86   Walker Report, at 3–6 [RC40008925].

87   *See* Memorandum, GMAC Bank Restructuring, dated Apr. 20, 2006 [EXAM11248642].

88   Walker Report, at 5 [RC40008925].

89   2005 Operating Agreement, § 2(b) [ALLY_0140795].

90   Memorandum, GMAC Bank Restructuring, dated Apr. 20, 2006, at 4 [EXAM11248642].

The Walker Report also stated that "ResCap's control over the bank would also be unchanged relative to its current position" because while AFI would own 100% of the voting shares of the restructured bank, "[AFI] currently wholly owns ResCap and controls the ResCap board . . . ."[91] It is unclear to what extent the Independent Directors considered and/or agreed with this proposition at the time, but both Melzer and Jacob appear to disagree with this statement in hindsight.[92]

In addition to the transfer of assets from Old GMAC Bank to GMAC Automotive Bank, the Walker Report contemplated a "Phase II" of the 2006 Bank Restructuring, whereby ResCap would acquire its own industrial bank charter to later re-acquire the mortgage division assets.[93] This would have resulted in ResCap and AFI each holding their own industrial bank to carry on their respective mortgage and automotive businesses. While the proposal to acquire a second industrial bank appears to have been sincere,[94] as the Walker Report acknowledged, by November 2006 there were significant obstacles to acquiring a second industrial bank charter, including the FDIC's moratorium on new industrial banks.[95] Nonetheless, in approving the 2006 Bank Restructuring, both Independent Directors

---

[91] Walker Report, at 9 [RC40008925]; *see also* Int. of D. Walker, Nov. 28, 2012, at 141:6–9 ("[Q:] The ResCap entity has less control at the end of the day than it started with. Am I missing something there? [A:] Well, again, I would argue that I don't think control, as I described it here is really any different. Control is sort of the power to elect the board. And then, the board members themselves are the ones that operate the business day to day.").

[92] *See* Int. of T. Melzer, Oct. 10, 2012, at 207:1–18 ("[Q:] If you look at [RC40008939], the last two lines, 'ResCap's control over the bank would also be unchanged relative to its current position. Under the proposed restructuring, [AFI] would own 100 percent of the voting shares of the bank. But, since [AFI] currently wholly owns ResCap and controls the ResCap board, there would be no effective change in control' . . . . [A:] You know, frankly, I didn't pay any attention to that. . . . [Q:] Do you agree with that statement? [A:] No. No, not if you're sitting there looking after the interests of ResCap's creditors."); Int. of T. Jacob, Nov. 7, 2012, at 177:4–5, 177:15–17 ("[T]hat looks like an unfortunate choice of words from DCW. . . . [I]t's always better to have voting shares, but I do not know why we could not achieve that . . . ."). *But see* Int. of L. Zukauckas, Oct. 19, 2012, at 156:8–14, 157:4–6 ("But the fact that in substance there was no meaningful change . . . it influenced me being supportive of the transaction. . . . [ResCap] still enjoyed the benefits of the bank and so the substance in my opinion was still there."); Int. of T. Melzer, Mar. 22, 2013, at 88:17–89:5 ("[I]f you think about it in substance there wasn't really a change. . . . It's in a different form, but the reality is that [AFI] controlled that bank both before and after, if you will, what was the ResCap piece that became part of the Industrial Bank.").

[93] Walker Report, at 6–7 [RC40008925].

[94] *See, e.g.*, E-mail from S. Khattri (Oct. 26, 2006) [EXAM10165848] ("[G]oal is in to have separate banks however, not clear when and how . . . mortgage 'branch' will be very separate from day [zero] so even though charter is shared it is implicitly two banks."); Int. of E. Feldstein, Dec. 14, 2012, at 104:23–105:2 ("I do recall certainly inquiring about it and exploring its viability. I also recall a fairly negative response . . . about that viability.").

[95] Walker Report, at 7–8 [RC40008925].

appear to have relied, at least in part, on the possibility of a second bank.[96] Ultimately, Phase II did not occur.[97]

Another risk disclosed in the Walker Report was GM's call option on the AFI automotive business, as described earlier.[98] If GM exercised the call option and acquired GMAC Automotive Bank before ResCap obtained its own industrial bank, ResCap might be left without access to bank funding.[99] The Walker Report characterized this risk as "remote," because GM needed to have an investment grade rating in order to exercise this option and, at the time, GM's credit ratings were declining.[100] Other risks the Walker Report noted were that "[s]ome senior employees of the FSB could resign as a result of the restructuring" and that "ResCap's growth strategy for the FSB could be slowed significantly during the pendency of the restructuring."[101] In the end, the Walker Report concluded that "[t]he proposed bank restructuring will not have a material adverse impact on ResCap" and that "ResCap's earnings from its bank activities would be essentially unchanged."[102]

On November 20, 2006, the ResCap Board unanimously approved the 2006 Bank Restructuring in all respects.[103] To address conflicts with the 2005 Operating Agreement,

---

96   *See* Int. of T. Jacob, Nov. 7, 2012, at 180:21–181:1 ("The big issue for me was economic interest in the assets that were transferred over according to ResCap. And also, an ability to get those assets back to domicile it in our own bank once the FDIC gave us their charter."); Int. of T. Melzer, Mar. 22, 2013, at 92:4–20; *see also* Bank Restructuring Project Plan, dated July 25, 2006, at Task E.19 [EXAM10256021] ("Independent directors would like more definitive information and documentation regarding the re-transfer of mortgage assets to a new ILC . . . before providing formal approval.").

97   Int. of E. Feldstein, Dec. 14, 2012, at 104:23–105:9 ("I do recall certainly inquiring about [obtaining a second charter] and exploring its viability. I also recall a fairly negative response from Michelle Lieber about that viability. . . . Michelle Lieber was either a GM employee or a[n] [AFI] employee who was based in Washington and worked closely with expert lobbyists in this arena and offered us advice on ILCs and the like.").

98   Walker Report, at 7 [RC40008925].

99   Walker Report, at 7 [RC40008925]. This concern was also raised by the Independent Directors. *See* E-mail from E. Schenk (May 10, 2006) [JACOB.000010]; Memorandum, GMAC Bank Restructuring, dated May 12, 2006 [ALLY_0401600]. On behalf of the Independent Directors, Bryan Cave questioned whether the GM call option could be waived, "at least so far as it relates to ResCap's assets that will be moved into [GMAC Automotive Bank]." Marple responded that "the parties can always agree to waive or amend the provisions in the agreement" and that AFI did in fact intend "to seek a waiver/amendment that codifies the repurchase of mortgage assets in the event of a call by GM." Memorandum, GMAC Bank Restructuring, dated May 12, 2006 [ALLY_0401600].

100  Int. of D. Walker, Nov. 28, 2012, at 119:19–24; Int. of S. Khattri, Oct. 25, 2012, at 68:5–22 ("I personally did not rate the chances of their option ever being exercised seriously.").

101  Walker Report, at 8 [RC40008925]. The risk of slowing the bank's growth strategy appears to be attributable to the fact that ResCap's mortgage business would cease being regulated by OTS and instead be monitored by the FDIC and DFI. *See* Int. of D. Walker, Nov. 28, 2012, at 123:25–124:8 ("[P]ragmatically the OTS is going to be the regulator for the thrift, now that business unit is moving to the DFI and the FDIC, and certainly they're familiar with mortgage companies generically. But, our particular team, they're going to have to get to know. So, this is the outcome of having to make the move in the first place.").

102  Walker Report, at 9 [RC40008925].

103  Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Nov. 20, 2006, at 3 [RC00016852].

the ResCap Board granted a "waiver of the Operating Agreement, *including [s]ection 2(a) and [s]ection 2(f) thereof*, in connection with the restructuring of the two U.S. banking entities as described in all material respects in [the Walker Report]."[104] While the relevant board resolution explicitly waives sections 2(a) (investments in AFI affiliates) and 2(f) (AFI/ResCap separateness) of the 2005 Operating Agreement, it does not mention section 2(b) (transactions must be at arm's length and for fair value).[105] Despite the requirement in the Cerberus PSA that the "purchase price for [Old GMAC Bank's] assets and liabilities will be established by an independent third-party valuation,"[106] the parties to the transaction do not appear to have solicited any formal fairness opinions or valuations in connection with the 2006 Bank Restructuring.[107] Additionally, ResCap was not represented by outside counsel in connection with negotiating or finalizing the transaction.[108]

### (3) The 2006 Bank Restructuring

Effective November 22, 2006, Old GMAC Bank transferred substantially all of its assets (approximately $11.7 billion at book value) and liabilities (approximately $10.7 billion at book value) to GMAC Automotive Bank for the purchase price of $1.161 billion, the net book value of Old GMAC Bank's assets and liabilities.[109] The $1.161 billion purchase price was then sent as a dividend from Old GMAC Bank, through a series of holding companies, to ResCap.[110] ResCap's equity in Old GMAC Bank (along with its remaining assets and

---

[104]  Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Nov. 20, 2006, at 3 [RC00016852] (emphasis added); *see also* Int. of T. Jacob, Nov. 7, 2012, at 172:8–173:24; Int. of T. Melzer, Oct. 10, 2012, at 213:5–17 ("So as to not leave the . . . bank discussion open, there were aspects of that transaction that concern me. But, on balance, all things considered, I felt it was in the best interests of all stakeholders . . . . [W]e did not have independent valuations of the interests in this particular case. But I think it was probably a book value transaction, which is not uncommon, and I wasn't uncomfortable with that approach. But . . . I had some discomfort with it.").

[105]  Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Nov. 20, 2006, at 3 [RC00016852].

[106]  Cerberus PSA, Ex. H, at 1 [CERB039811].

[107]  *See* Int. of T. Melzer, Oct. 10, 2012, 213:5–17 ("So as to not leave the . . . bank discussion open, there were aspects of that transaction that concern me. But, on balance, all things considered, I felt it was in the best interests of all stakeholders . . . we did not have independent valuations of the interests in this particular case. But I think it was probably a book value transaction, which is not uncommon, and I wasn't uncomfortable with that approach.").

[108]  The Independent Directors themselves consulted with Bryan Cave in an informal review of the 2006 Bank Restructuring. *See* Int. of T. Melzer, Oct. 10, 2012, at 184:9–186:7; *see also* Memorandum, Bank Restructuring Project Plan, dated July 25, 2006, at Tasks E.19, E.20 [EXAM10256021].

[109]  Purchase and Assumption Agreement [CERB001654]; Bill of Sale, Assignment and Assumption Agreement, dated Nov. 22, 2006 [ALLY_0018322]. The FDIC approved this transfer on November 15, 2006. Order and Basis for Corporation Approval, Division of Supervision and Consumer Protection, FDIC (Nov. 15, 2006) [GOLDIN00093168].

[110]  Unanimous Written Consent of Executive Committee of GMAC Bank, dated Nov. 20, 2006 [CERB001608] (declaring dividend of to GMAC Residential Holding Company, LLC); GMAC Residential Holding Company, LLC Certification, dated Nov. 20, 2006 [CERB001610] (declaring dividend of approximately $1.1 billion to ResCap).

liabilities)[111] was then transferred to GM through a series of dividends, thus removing Old GMAC Bank from the Cerberus ownership chain.[112] Old GMAC Bank subsequently changed its name from "GMAC Bank" to "National Motors Bank FSB,"[113] and was eventually voluntarily dissolved in February 2009.[114] The result of this transaction was that AFI's automotive banking operations and ResCap's mortgage banking operations were consolidated within GMAC Automotive Bank.

EXHIBIT V.A.1.a(3)—1
**Consolidation of Bank Assets and Divestiture of Old GMAC Bank**



*Source: See AFI Certain Key Factual Background Presentation, Sept. 23, 2011, at [ALLY_0157478].*

Contemporaneously with the consolidation of these operations, AFI contributed 100% of its interests in GMAC Automotive Bank to a newly-created limited liability holding company, IB Finance.[115] This transfer eliminated AFI's direct ownership of GMAC Automotive Bank, and placed IB Finance in a holding position between AFI and GMAC Automotive Bank. AFI

---

[111] Following Old GMAC Bank's transfer of assets and liabilities to GMAC Automotive Bank, Old GMAC Bank retained approximately $105 million in assets, $93 million in liabilities, and $13 million in equity. *See* Residential Capital, LLC, Annual Report (Form 10-K) (Mar. 13, 2007), at 11–12.

[112] Certificate of Share Transfer, Nov. 21, 2006 [CERB001732]; Transfer of Shares Agreement, dated Nov. 22, 2006 [CERB001787].

[113] Residential Capital, LLC, Current Report (Form 8-K) (Nov. 27, 2006), Item 2.01, at 2.

[114] FDIC, *Institution Directory—National Motors Bank FSB*, http://www2.fdic.gov/idasp/confirmation_outside.asp?inCert1=35054 (last updated Dec. 20, 2012) (providing that National Motors Bank FSB was "involved in a Voluntary Liquidation and Closing").

[115] Share Contribution Agreement, Art. 1 [CERB001521].

retained two million voting IB Finance Class A Shares, which entitled AFI to earnings and distributions from the automotive division of GMAC Automotive Bank, and were the only voting interests in IB Finance.

Immediately following the transfer of GMAC Automotive Bank to IB Finance, ResCap purchased two million non-voting IB Finance Class M Shares for the price of $1.161 billion (the same amount that Old GMAC Bank had received for its assets and sent by dividend to ResCap).[116] While the IB Finance Class M Shares entitled ResCap to the earnings and distributions of GMAC Automotive Bank's mortgage division,[117] their non-voting nature effectively stripped ResCap of formal legal control over its mortgage banking operations. In terms of day-to-day operations, the change in control may have been less pronounced than the transaction suggests, because the personnel from Old GMAC Bank were simply moved to GMAC Automotive Bank.[118] However, all of the business and affairs of IB Finance were to be managed solely by AFI.[119] Following these equity transfers, GMAC Automotive Bank changed its name to "GMAC Bank,"[120] and later to "Ally Bank," which is the term used herein.

---

[116] Equity Purchase Agreement, dated Nov. 20, 2006 [ALLY_0018330].

[117] Memorandum, Bank Restructuring Accounting Implications, dated July 20, 2007, at 4 [EXAM10198423]. At the time, the mortgage division appears to have represented approximately 82% of the bank's asset base and approximately 78% of the income. Memorandum, Bank Restructuring Accounting Implications, dated July 20, 2007, at 7 [EXAM10198423].

[118] *See, e.g.*, Walker Report, at 5 [RC40008925]; Int. of D. Walker, Nov. 28, 2012, at 141:6–9 ("[Q:] The ResCap entity has less control at the end of the day than it started with. Am I missing something there? [A:] Well, again, I would argue that I don't think control, as I described it here is really any different."); Int. of E. Feldstein, Dec. 14, 2012, at 121:9–11 ("I guess if [AFI] owns ResCap and ResCap owns the bank, then [AFI] really owns the bank. So it doesn't really matter."); Int. of D. Marple, Jan. 22, 2013, at 138:14–17 ("As a practical matter, yeah, [AFI was the] 100% shareholder—they could wipe out the board if they wanted including the independent directors.").

[119] IB Finance 2006 LLC Agreement, § 3.1(a) [ALLY_0401862].

[120] Articles of Amendment to Articles of Incorporation of GMAC Automotive Bank, dated Nov. 22, 2006 [ALLY_0104546].

EXHIBIT V.A.1.a(3)—2
**Creation of IB Finance**
November 20 and 22, 2006



*Source: See AFI Certain Key Factual Background Presentation, Sept. 23, 2011, at 14 [ALLY_0157478].*

The 2006 Bank Restructuring imposed certain capital maintenance requirements on AFI and ResCap.[121] Under the IB Finance 2006 LLC Agreement, ResCap was required to make additional capital contributions "as necessary to support and grow the assets and businesses" of the mortgage division, while AFI was obligated to support the automotive division.[122] Both AFI and ResCap were required to maintain sufficient capital in each of their respective divisions "at a level of capitalization that qualifies as 'well-capitalized' under applicable federal banking laws or such higher level of capitalization as may be required by the [FDIC] or the [DFI]."[123]

### (4) Post-Closing Events

As required by the DFI, ResCap contributed approximately $360 million in additional capital to the mortgage division of GMAC Automotive Bank on November 22, 2006.[124] This capital contribution consisted of $302 million in cash and approximately $58 million in low-

---

[121] IB Finance 2006 LLC Agreement, § 2.1(b) [ALLY_0401862].

[122] *Id.*

[123] *Id.* ResCap contributed additional capital to the mortgage division of Ally Bank on five subsequent occasions between April 2007 and July 2007, totaling $200 million. *See* Capital Contributions—ResCap to Ally Bank [EXAM00221558].

[124] *See* Walker Report, at 5 [RC40008925]; Capital Contribution Agreement, dated Nov. 22, 2006 [ALLY_PEO_0021232].

quality mortgage assets.[125] A week later, on November 30, 2006, Cerberus and GM finalized the sale of 51% of AFI for a purchase price of $7.35 billion.[126]

### (5) Value Of Exchange[127]

In order to assess reasonably equivalent value for the 2006 Bank Restructuring, the Examiner's Financial Advisors estimated the value transferred from ResCap as well as the consideration received by ResCap. The value transferred from ResCap consisted of: (1) a controlling interest in 100% of the equity of Old GMAC Bank; and (2) $360 million in cash and mortgage assets contributed by ResCap to IB Finance. The consideration received by ResCap consisted of: (1) two million IB Finance Class M Shares; and (2) the indirect benefit of avoiding a credit downgrade by facilitating the sale of a 51% interest in AFI to Cerberus.

To value the interest in Old GMAC Bank, the Examiner's Financial Advisors considered three traditional and commonly used approaches to estimating FMV: (1) the Market Approach, using public stock prices and transaction prices for comparable thrift institutions; (2) Income Approach; and (3) the Asset-Based Approach. These approaches yield a value of the controlling interest in Old GMAC Bank of approximately $1.62–1.90 billion.

To value the IB Finance Class M Shares, the Examiner's Financial Advisors used the same approach and assumptions as for valuing the interest in Old GMAC Bank, with adjustments to reflect the different form of ownership (such as lack of marketability, lack of control, and lack of voting rights). The Examiner's Financial Advisors also considered the IB Finance Class M Shares' "tracking stock" structure, a form of investment that was generally viewed as unfavorable by investors. The estimated value of ResCap's two million IB Finance Class M Shares, after discounting for these factors, is approximately $1.44–1.65 billion.

To quantify the indirect benefit to ResCap of avoiding the likely credit downgrades that would have occurred had the sale to Cerberus not closed, the Examiner's Financial Advisors considered: (1) the costs that would have been incurred by ResCap as a result of a credit ratings downgrade; and (2) the time horizon over which such cost savings could reasonably be attributed to the successful closing of the Cerberus sale. The Examiner's Financial Advisors quantified this benefit as the present value of after-tax cost savings over a one-year period. This calculation yields an indirect benefit to ResCap of approximately $143 million.[128]

In sum, the Examiner concludes that a fair estimate of the value transferred from ResCap in connection with the 2006 Bank Restructuring, including the $360 million capital contribution, is approximately $1.98–2.26 billion, while a fair estimate of the value received by ResCap is approximately $1.58–1.79 billion. Accordingly, the Examiner concludes that the

---

[125]  *See* Capital Contribution Agreement, dated Nov. 22, 2006 [ALLY_PEO_0021232].

[126]  *See* Cerberus PSA [CERB000521]; General Motors Acceptance Corp., LLC, Annual Report (Form 10-K) (Mar. 13, 2007), at 17.

[127]  This Section provides a summary of the more detailed analysis in Section V.A.2.b.

[128]  For a discussion of the law regarding intangible benefits and their effect on reasonably equivalent value, *see* Section VII.F.5.d.

consideration received by ResCap in the 2006 Bank Restructuring was less than the value that was transferred from ResCap in that transaction. A more detailed analysis of these valuations is contained in Section V.A.2.b. Additionally, a summary of these findings is presented in Appendix V.A.2.b.

### (6) Causes Of Action Implicated By The 2006 Bank Restructuring

The causes of action potentially implicated by the 2006 Bank Restructuring include (1) actual and constructive fraudulent transfer pursuant to section 544 of the Bankruptcy Code; (2) breach of fiduciary duty and aiding and abetting breach of fiduciary duty; (3) breach of the 2005 Operating Agreement and tortious interference with the 2005 Operating Agreement; (4) common law fraud; and (5) equitable subordination with respect to some or all of AFI's claims against the Debtors. The Examiner also considered the 2006 Bank Restructuring in connection with the alter ego claims alleged against AFI. An analysis of these claims is provided in Section VII.

### b.   The 2008 Bank Transaction

### (1) Background

The Investigation revealed no evidence that the 2008 Bank Transaction was contemplated at the time of the 2006 Bank Restructuring. In fact, as discussed below, the 2008 Bank Transaction seems not to have been considered before March 2008. Throughout 2007 and the first quarter of 2008, ResCap faced ongoing challenges with respect to its liquidity and TNW.[129] In December 2007, it was clear that addressing ResCap's TNW covenants was a "primary" objective for the first quarter of 2008.[130] By early March 2008, it became clear to AFI and ResCap senior officers that the TNW shortfall for the first quarter would be greater than anticipated and that AFI would potentially need to make a substantial equity infusion into ResCap ("in the $1.75–2.25 billion zone") before the end of the quarter.[131] ResCap's interest in IB Finance does not appear to have been part of the discussion surrounding the potential equity infusion,[132] but it was considered as collateral for a potential secured loan from AFI.[133] Throughout March 2008, the ResCap Board considered several options to address both

---

[129]   *See, e.g.,* Minutes of a Regular Meeting of the Board of Directors of Residential Capital, LLC, Feb. 22, 2008, at 2 [RC00017129]; Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Mar. 17, 2008, at 5 [RC00017144]. ResCap's principal credit facilities contained TNW covenants requiring ResCap to maintain $5.4 billion in TNW. *See* Minutes of the Meeting of the Special Committee of the Independent Directors of the Board of Residential Capital, LLC, Mar. 26, 2008, at 2 [MELZER.008984]. As part of a June 2008 refinancing of certain credit facilities, these TNW covenants were reduced from $5.4 billion to $250 million.

[130]   *See* Minutes of a Regular Meeting of the Board of GMAC LLC, Dec. 13, 2007, at ALLY_PEO_0001001 [ALLY_PEO_0000860].

[131]   *See* E-mail from E. Feldstein (Mar. 6, 2008) [EXAM11306297].

[132]   *See id.* (discussing a potential equity infusion, but making no mention of IB Finance or Ally Bank).

[133]   *See* E-mail from J. Young (Mar. 5, 2008) [EXAM10209694].

liquidity and TNW concerns, including a bond exchange and a restructuring of ResCap's debt facilities,[134] but management ultimately determined that these solutions could not be implemented in time to meet ResCap's TNW covenants as of March 31, 2008.[135]

On March 24, 2008, one week before ResCap was expected to breach its TNW covenants, Corey Pinkston, then head of Capital Markets at GMAC Financial Services, presented the Independent Directors with a proposal developed jointly by him and PwC only days earlier.[136] Pursuant to the proposal, AFI would contribute to ResCap up to $1.5 billion in ResCap bonds that AFI had purchased on the open market during the first quarter of 2008 in exchange for ResCap Preferred Interests, convertible at AFI's option into IB Finance Preferred Interests.[137] If exercised, AFI's conversion of the ResCap Preferred Interests into IB Finance Preferred Interests would reduce ResCap's IB Finance Class M Shares on a unit-for-unit basis.[138] The ResCap Preferred Interests and the IB Finance Preferred Interests would have fixed interest rates of 13% and 10%, respectively.[139] It is unclear whether the Independent Directors were informed of this proposal before the March 24, 2008 meeting, but if they were, it appears that such notice would have come only days earlier.[140] It is likewise unclear why, given that ResCap and AFI were aware since December 2007 that ResCap likely would have difficulty meeting its TNW covenant, this proposal was not developed until

---

[134] *See, e.g.*, Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Mar. 17, 2008, at 5 [RC00017144].

[135] Int. of S. Khattri, Oct. 25, 2012, at 247:7–248:13 ("Most of the other transactions involved third parties. And, with the environment like it was, [] the timeframe would have taken too long. And many of them turned out to be dead ends anyway. . . . So, this one was something you controlled and could make it happen much faster, because it was [between] two sort of affiliated parties."); Int. of T. Jacob, Nov. 7, 2012, at 237:2–12 ("I would say there was a sense of urgency here to provide some liquidity sources. Unrelated parties were not willing to provide any liquidity and their only choice was related parties.").

[136] *See* E-mail from C. Pinkston (Mar. 20, 2008) [EXAM11308640] ("[M]ultiple calls and structures discussed internally and with [accountants] today. . . . [H]ave to also consider timing for the rescap board ([including] the independents). Timing is just very tight on all of this."); Minutes of a Meeting of the Special Committee of the Independent Directors of the Board of Residential Capital, LLC, Mar. 24, 2008, at 2 [MELZER.008984]; Int. of C. Pinkston, Nov. 8, 2012, at 164:14–18 ("I'm pretty sure that . . . everybody except the independents should have been pretty apprised on this at that point in time."); s*ee also* E-mail from J. Jones to T. Melzer and T. Jacob (Mar. 22, 2008) [MELZER.008822] (giving a "heads-up on the form of capital infusion [AFI] is proposing" and setting up call for March 24, 2008 to get the Independent Directors "current as soon as possible").

[137] Minutes of a Meeting of the Special Committee of the Independent Directors of the Board of Residential Capital, LLC, Mar. 24, 2008, at 2 [MELZER.008984].

[138] *Id.*

[139] Morgan Stanley Project Duvall Presentation, dated Mar. 28, 2008, at 5–6 [RC40007480].

[140] *See* Int. of S. Khattri, Oct. 25, 2012, at 245:15–18 ("[Q:] Had [the preferred stock bank transaction] been discussed with the independent directors before [March 24, 2008]? [A:] I think it had."); E-mail from T. Hamzehpour to T. Melzer and T. Jacob (Mar. 20, 2008) [MELZER.008815] (attaching Morgan Stanley Engagement Letter from D. Ammann to J. Jones (Feb. 13, 2008) [MELZER.008816]).

one week before a potential breach.[141] Pinkston advised the Independent Directors at the March 24, 2008 special meeting that this was a "good transaction" for ResCap and a "fair way for [AFI] to contribute additional capital [to ResCap]."[142]

Pinkston's opinion of the transaction appears to have been based first on the fact that the bonds to be contributed likely would be worth less upon the date of contribution than when AFI had purchased them, and second, on ResCap's retention of a future call option on the interest in IB Finance.[143] In response, Melzer noted that "it might appear that [AFI] is converting the ResCap bonds that it currently holds into something worth more than they are now," that is, a preferred interest in IB Finance and indirectly, Ally Bank.[144] At the urging of Jacob and Melzer,[145] ResCap proposed that the bond contribution from AFI be in exchange for simple common equity, but this proposal was reportedly rejected by AFI.[146] AFI reportedly insisted on this type of exchange instead of a straight capital infusion because the prevailing

───────────────────────────

[141] *See* Int. of S. Ramsey, Dec. 10, 2012, at 128:1–129:1 ("[W]e were making decisions continuously and in real time . . . . But it is not particularly unlikely that the reason the timeframe was as short as it was is because the [AFI Board] said you need to do something better. And, so, we'd come up with an idea of what something better is in the context of what the [AFI] Board thought. And that was it."); Int. of A. de Molina, Nov. 20, 2012, at 139:24–140:10 (explaining that the parties waited until the end of the quarter to see how much of a shortfall would exist before deciding how to address that shortfall).

[142] Minutes of a Meeting of the Special Committee of the Independent Directors of the Board of Residential Capital, LLC, Mar. 24, 2008, at 3 [MELZER.008984].

[143] *Id.*

[144] *Id.*; *see also* E-mail from J. Jones (Mar. 25, 2008) [EXAM11307284] ("[The Independent Directors] are completely focused on ResCap, and there to both the shareholder and to the bondholders. They are trying to enforce our Operating Agreement and ensure that bondholders are not inappropriately disadvantaged. . . . They do not want this seen as a preferential exchange for ResCap bonds."). At a subsequent meeting, Melzer reiterated this concern, observing that "if the ResCap Preferred is exchanged, the IB Finance Holding Company Preferred would represent a claim on ResCap's economic interest in the mortgage division of [Ally Bank] that is structurally senior to the claim on that economic interest held by the ResCap unsecured creditors." Minutes of a Meeting of the Special Committee of the Independent Directors of the Board of Residential Capital, LLC, Mar. 25, 2008, at RC40006621 [RC40006611].

[145] Meeting of the Special Committee of the Independent Directors of Residential Capital, LLC, Mar. 24, 2008, at 2 [MELZER.008984].

[146] *See* Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Mar. 28, 2008, at 4 [RC00017152].

view among AFI's shareholders and bondholders was that if ResCap needed additional assistance, AFI should receive something of value in return.[147]

At a meeting the next day, Jacob expressed concern about whether the transaction would provide ResCap with liquidity beyond the first quarter of 2008.[148] Jacob was told that the proposed transaction was meant to satisfy short-term TNW covenants, not to provide additional liquidity.[149] Skadden, as special legal counsel to ResCap, advised that the likely result of a breach of ResCap's TNW covenants would be bankruptcy and "in the absence of prior reorganization planning, it would create a terrible outcome for all constituencies, including the Company, its shareholder and the public bondholders."[150] Conversely, approving the exchange would "buy the Company time to negotiate successfully the restructuring of the bank facilities and to complete planned asset sales which themselves are paramount to ensuring that ResCap has sufficient liquidity required to continue its restructuring efforts . . . ."[151] Skadden informed Jacob and Melzer, who were being advised independently by Bryan Cave, that the terms of the proposed transaction were still under active negotiation and that it believed the opportunity existed to improve the terms of the transaction for ResCap.[152] One such concession that was asked for, and received, by the Independent

---

[147] *See* Minutes of a Meeting of the Special Committee of the Independent Directors of the Board of Residential Capital, LLC, Mar. 25, 2008, at RC40006621 [RC40006611] ("Mr. [James G.] Jones advised that he understands that [AFI] is under significant pressure from its shareholders and bondholders to receive more value and security in respect of future capital infusions into ResCap."); *see also* Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Mar. 28, 2008, at 4 [RC00017152]; Int. of L. Hall, Nov. 29, 2012, at 157:24–158:24 ("[T]here was a view . . . in [AFI] management, that we should try to get some type of value back for these contributions. And a lot of this . . . drives all back to this operating agreement because whatever capital you put in, unlike a regular parent subsidiary relationship, that capital is never going to be able to come back to the parent . . . because of the stipulations in the operating agreement. . . . I don't know specifically who started to come up with the idea of getting back value. To me, it was a natural progression based on the number of capital contributions . . . .").

[148] Minutes of a Meeting of the Special Committee of the Independent Directors of the Board of Residential Capital, LLC, Mar. 25, 2008, at RC40006621 [RC40006611]; E-mail from J. Jones (Mar. 25, 2008) [EXAM11307284] ("The independent directors are quite concerned about the preferred exchange for the bond contribution by [AFI]. Their concerns largely fall into two categories: how much time do we buy and how much does it cost."); E-mail from J. Young (Mar. 25, 2008), at EXAM11307404 [EXAM11307403] ("Long story, but the independent directors of ResCap are unlikely to approve a preferred structure in time to close the quarter.").

[149] Minutes of a Meeting of the Special Committee of the Independent Directors of the Board of Residential Capital, LLC, Mar. 25, 2008, at RC40006621 [RC40006611].

[150] *Id.*

[151] *Id.*

[152] *Id.*

Directors was that the ResCap Preferred Interests not be convertible into IB Finance Preferred Interests if ResCap filed for bankruptcy before January 1, 2009.[153]

At ResCap's request, Morgan Stanley undertook a valuation of the bonds to be contributed by AFI.[154] Morgan Stanley apparently was chosen because it was already advising ResCap as to other potential strategic transactions,[155] and management reportedly thought that it would be difficult for another financial advisor to come up to speed in time to meet the March 31 deadline.[156] At the time, a Morgan Stanley officer named Robert Scully was also a member of the AFI Board.[157] This potential conflict was disclosed to the Independent Directors on March 20, 2008,[158] and the ResCap Board was later informed that an "ethical wall" had been established between Scully and the Morgan Stanley team working on the engagement.[159] It is unclear when this ethical wall was established, and more to the point, whether a prohibition on communications could cure the fact that the Morgan Stanley

---

[153] *Id.*; Minutes of the Meeting of the Special Committee of the Independent Directors of the Board of Residential Capital, LLC, Mar. 26, 2008, at 1 [MELZER.008984].

[154] Minutes of a Meeting of the Special Committee of the Independent Directors of the Board of Residential Capital, LLC, Mar. 24, 2008, at 3 [MELZER.008984]. It appears that Morgan Stanley was not asked to prepare a valuation of the bonds until the March 24, 2008 board meeting. *Id.* ResCap had previously engaged Morgan Stanley for other purposes. As a practical matter, there may have been few other parties with sufficient understanding of ResCap and its affiliates to provide a valuation on such short notice. *See, e.g.*, Int. of S. Khattri, Oct. 25, 2012, at 265:1–267:17.

[155] *See* Morgan Stanley Engagement Letter from D. Ammann to J. Jones (Feb. 13, 2008) [MELZER.008816].

[156] *See* Int. of S. Khattri, Oct. 25, 2012, at 265:21–25 ("[Morgan Stanley] knew [AFI] really well, because they represented GM on the sale of [AFI] to Cerberus. So, they really knew the asset well. So, the thinking was that they could come up to speed quickly and provide value.").

[157] *See* Morgan Stanley Engagement Letter from D. Ammann to J. Jones (Feb. 13, 2008), at 4 [MELZER.008816] ("Additionally, as you know, an executive office of Morgan Stanley is a member of the Board of Directors of [AFI]."); Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Mar. 28, 2008, at 3 [RC00017152].

[158] *See* Morgan Stanley Engagement Letter from D. Ammann to J. Jones (Feb. 13, 2008), at 3–4 [MELZER.008816] (attached to E-mail from T. Hamzehpour to T. Jacob and T. Melzer (Mar. 20, 2008) [MELZER.008815]).

[159] Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Mar. 28, 2008, at 3 [RC00017152] ("In response to a question by Mr. Melzer, Mr. Ammann advised that an appropriate Chinese Wall had been established in respect of Mr. Scully, and that absolutely no discussions had been had between anyone on Mr. Ammann's team and Mr. Scully on the subject of this engagement.").

personnel performing the valuation knew that one of their senior officers was on the board of the other party to the transaction.[160]

While Morgan Stanley did not prepare a formal valuation or written fairness opinion,[161] its presentation concluded that "the terms and conditions of the proposed transaction are consistent with those to which parties at arm's length would agree, and is for fair value."[162] Additionally, Morgan Stanley informed the ResCap Board that the final proposal was "materially more favorable to ResCap than the initial proposal made by [AFI] within the last several days" and "better than market terms."[163] Skadden reiterated at the March 28, 2008 meeting that failing to meet ResCap's TNW covenants would be "very detrimental" to

---

[160] *Cf. Concat LP v. Unilever, PLC*, 350 F. Supp. 2d 796, 822 (N.D. Cal. 2004) (explaining that "[s]creening measures . . . do nothing to mitigate conflict[s] arising from concurrent adverse client relationships, since the purpose of the prohibition against such relationships is to preserve the attorney's duty of loyalty, not confidentiality," but also suggesting that an "informed waiver" is sufficient to cure such a conflict); *In re Trust Am. Serv. Corp.*, 175 B.R. 413, 421 (Bankr. M.D. Fla. 1994) ("A 'chinese wall' typically protects a client from the past activities and information of representation of an adverse client. The 'chinese wall' is generally not an acceptable means of conflict avoidance where the same professional organization actively represents two adverse interests."). Additionally, while Morgan Stanley advised ResCap on several subsequent affiliate transactions with AFI, the Investigation revealed no evidence that subsequent Independent Directors were informed of this conflict.

[161] *See* E-mail from T. Pohl (Mar. 27, 2008) [EXAM11234652] (explaining that Jacob and Melzer understood "the kind of presentation and recommendation [Morgan Stanley], management and [Skadden] are planning to make . . . that this type of [transaction] is not 'opinionable' in normal sense (and that there simply is not going to be one), and . . . 'will be ok with this'"). The only written product memorializing Morgan Stanley's conclusions is a presentation deck given to the ResCap Board on March 28, 2008. *See* Morgan Stanley Project Duvall Presentation, dated Mar. 28, 2008, at 5–6 [RC40007480]. Morgan Stanley's valuation methodology appears to have rested on: (1) the observed market value of the ResCap bonds to be contributed; (2) a comparison of the ResCap Preferred Interests dividend rate to existing ResCap short-term debt; and (3) a comparison of the IB Finance Preferred Interests dividend rate to other regional bank preferred interests. *See id.* at 7–10.

[162] Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Mar. 28, 2008, at 4 [RC00017152]; *see also* Morgan Stanley Project Duvall Presentation, dated Mar. 28, 2008, at 7–10 [RC40007480]; Int. of S. Ramsey, Dec. 10, 2012, at 204:9–20 ("[Q:] What is your opinion . . . on whether that price of one times book value was a fair price to ResCap at that time? [A:] It could only be characterized as more than fair. . . . Because as I said, the underlying assets in terms of their market value would have to be severely discounted and questioned as to whether or not there was any true achievable economic value in the marketplace.").

[163] Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Mar. 28, 2008, at 3–4 [RC00017152].

ResCap and, given ResCap's lack of bankruptcy planning,[164] could lead to a "free fall" bankruptcy.[165] Skadden and Morgan Stanley both advised that the only downside of the proposed transaction was AFI's potential preferred claim on ResCap's economic interest in the mortgage division of Ally Bank.[166] Despite this potential preferred claim, ResCap's management, financial advisors and counsel were all in agreement that the proposed transaction was fair to ResCap, its creditors and its shareholder.[167] The proposal was

_____

[164] It is unclear why ResCap performed so little in the way of bankruptcy planning prior to this point, but it potentially reflected ResCap management's optimism that the business could be saved. *See* Int. of S. Khattri, Oct. 25, 2012, at 259:11–261:5 ("I think the feeling was . . . that we had a decent handle on stuff and there were enough options available that that would be unnecessary. I think the other feeling was, because everybody was already working round the clock on the current steps of what we were taking, not only would the effort on bankruptcy be a distraction, but it would . . . create issues, because people would say, 'Oh my god, these guys are planning that.' Instead, the focus was that we were planning on fixing the company. And there was a genuine belief, which, in hindsight, turned out to be misplaced, that there was a way out."); Int. of J. Jones, Nov. 30, 2012, at 126:9–127:9 ("I don't think that there was ever even a cavalier conversation about bankruptcy until maybe the end of 2007. And at that point in time, I think there tended to be more speculative conversations about, well, gee, how bad does this get or how long does it remain bad or what other things could take place or those kinds of things that there was ever even any, as I say, speculative conversation among ResCap management. . . . [T]here began to be, perhaps with the Board, a question . . . of how far can we go with this, how much can we rely on [AFI]. What I would call a[n] extended vision in terms of how we managed through this downturn. But there was [never] . . . a conversation in terms of we should file and/or we ought to get ready to file or anything else . . . . [When] I did begin to make some contingency preparations in the second quarter of '08, I did that largely on my own authority. And I did not take it to the Board.").

[165] Minutes of the Meeting of the Special Committee of the Independent Directors of the Board of Residential Capital, LLC, Mar. 26, 2008, at 3 [MELZER.008984]; Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Mar. 28, 2008, at 4 [RC00017152].

[166] Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Mar. 28, 2008, at 5 [RC00017152].

[167] *Id.* at 5–6.

unanimously approved by the ResCap Board on March 28, 2008,[168] and then modified on March 31, 2008 to permit the exchange to occur in tranches.[169]

### (2) Bond Exchange

The transaction was consummated on March 31, 2008, the same day that ResCap was required to meet its TNW covenants. AFI contributed ResCap bonds with a face value of approximately $1.2 billion and an FMV of $607.192 million to ResCap.[170] In return for the bonds, ResCap provided to AFI 607,192 ResCap Preferred Interests.[171] The stated purpose of this transaction was to "increase ResCap's Consolidated [TNW] . . . which will allow ResCap to meet certain covenants in its various credit facilities"[172] and to avoid "an immediate liquidity crisis and probable bankruptcy."[173] The ResCap Preferred Interests were exchangeable, at AFI's option, on a unit-for-unit basis for IB Finance Preferred Interests at any time on or after January 1, 2009,[174] as long as neither ResCap nor any of its significant

---

[168] *Id.* (reciting that Independent Directors Jacob and Melzer "believed that they had been afforded sufficient time to review all materials provided in respect of the proposed transaction, sufficient time to consult with their legal counsel on this matter, and were informed to the extent necessary to reach a decision on the proposal").

[169] *See* Unanimous Written Consent of the Board of Directors of Residential Capital, LLC, dated Mar. 31, 2008, at 1–2 [RC00017159]; *see also* Exchange Agreement, dated Mar. 31, 2008 (attached to Residential Capital, LLC, Current Report (Form 8-K) (Apr. 4, 2008), Ex. 10.1); Int. of L. Hall, Nov. 29, 2012, at 204:16–24, ("[T]he structure was created in March. And the operating agreement at that point in time created . . . 806,000 units . . . . When we did the initial part or the first part of that trade, . . . ResCap only needed a certain amount of capital contribution, . . . so we did 600 and something units initially."); E-mail from T. Hamzehpour (Mar. 30, 2008) [EXAM11233449] ("Corey Pinkston let us know that [AFI] Board would indeed want to receive additional preferred interests of ResCap for any [supplemental] contributions. We've modified the amended and restated LLC agreements for ResCap and IB Finance Holding to contemplate that such additional contributions may be made, up to the full $1.5 billion of bonds [AFI] holds, with $1.2 billion being contributed March 31, and any remaining contributions to be made prior to May 31."); Memorandum, Written Consent of Directors, dated Mar. 31, 2008 [JACOB.000057] (explaining revisions to ResCap and IB Finance LLC agreements and attaching revised resolutions in the form of a written consent).

[170] Unanimous Written Consent of the Board of Directors of Residential Capital, LLC, dated Mar. 31, 2008, at 1 [RC00017159]. This FMV is supported by the Examiner's findings. *See* Section V.A.2.c(3).

[171] The ResCap Preferred Interests were created pursuant to a March 31, 2008 amendment and restatement of the ResCap Limited Liability Company Agreement. *See* 2008 ResCap Amended LLC Agreement [ALLY_0255882].

[172] Morgan Stanley Project Duvall Presentation, dated Mar. 28, 2008, at 4 [RC40007480].

[173] Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Mar. 28, 2008, at 5 [RC00017152].

[174] It was necessary to delay this exchange until January 1, 2009 because of a new GAAP principle that went into effect on that date. Prior to January 1, 2009, the exchange would have been viewed as a "minority interest," while after January 1, 2009, the exchange would be classified as "shareholder equity." It appears that shareholder equity provided ResCap with certain capital impact benefits that a minority interest would not have. *See* Minutes of a Meeting of the Special Committee of the Independent Directors of the Board of Residential Capital, LLC, Mar. 24, 2008, at 2–3 [MELZER.008984]; Int. of D. DeBrunner, Sept. 13, 2012, at 95:15–98:12; Int. of C. Pinkston, Nov. 8, 2012, at 184:16–185:9.

subsidiaries was the subject of a bankruptcy proceeding on or before that date.[175] In the event that it was financially able to do so, ResCap retained a right to redeem the ResCap Preferred Interests and/or the IB Finance Preferred Interests at par, thereby regaining its full economic interest in Ally Bank.[176]

On May 30, 2008, the AFI Board approved an additional contribution of ResCap bonds to ResCap in the approximate face amount of $249 million and an FMV of $199.152 million.[177] Such contribution was made on June 3, 2008.[178] In exchange for the bonds, AFI received an additional 199,152 ResCap Preferred Interests, bringing AFI's total ownership of ResCap Preferred Interests to 806,344 units.[179] The value of the additional contributed bonds seems to have been set at the time of the March phase of the 2008 Bank Transaction[180] and the ResCap Board does not appear to have requested, or received, an updated valuation of the bonds.[181]

### (3) Value Of Exchange[182]

In order to assess reasonably equivalent value for the 2008 Bank Transaction, the Examiner's Financial Advisors estimated the value transferred from ResCap and the consideration received by ResCap. The value transferred from ResCap consisted of (1) the issuance of the ResCap Preferred Interests; and (2) the exchange option granted to AFI whereby it could convert the ResCap Preferred Interests into IB Finance Preferred Interests after January 1, 2009. The consideration received by ResCap in connection with the 2008 Bank Transaction consisted of (1) certain bonds contributed by AFI to ResCap; and (2) the retention of the right to redeem the IB Finance Preferred Interests at par in the event that AFI exercised its exchange option.

---

[175] Exchange Agreement, dated Mar. 31, 2008, § 1 (attached to Residential Capital, LLC, Current Report (Form 8-K) (Apr. 4, 2008), Ex. 10.1).

[176] 2008 ResCap Amended LLC Agreement, §§ 11(b)(iii), 13(a) [ALLY_0255882] (providing ResCap "may redeem the [ResCap Preferred Interests] then outstanding, in whole or in part, on any Distribution Payment Date . . . or on the date of the Preferred Exchange"); IB Finance 2008 LLC Agreement, § 2.1(b)(iii) [GOLDIN00007614]; Minutes of a Meeting of the Special Committee of the Independent Directors of the Board of Residential Capital, LLC, Mar. 24, 2008, at 3 [MELZER.008984]; Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Mar. 28, 2008, at 3 [RC00017152]. This option was never exercised by ResCap, presumably because it did not thereafter have the financial ability to do so.

[177] Minutes of a Special Meeting of the Board of GMAC LLC, May 30, 2008, at ALLY_PEO_0001082 [ALLY_PEO_0001009]; *accord* Residential Capital, LLC, Current Report (Form 8-K) (June 9, 2008), Item 3.02. The Examiner concludes that this contribution may have actually been worth as much as $249 million, as discussed in Section V.A.2.c(3).

[178] Residential Capital, LLC, Current Report (Form 8-K) (June 9, 2008), Item 3.02.

[179] *Id*.

[180] *See* 2008 ResCap Amended LLC Agreement, § 10, Sched. B [ALLY_0255882] (providing that for purposes of determining the value of additional capital contributions, the existing indebtedness shall have the value set forth on Schedule B).

[181] *See* Minutes of a Meeting of the Board of Residential Capital, LLC, June 1, 2008, at RC40005749–50 [RC40005652]; Residential Capital, LLC, Current Report (Form 8-K) (June 9, 2008), Item 3.02 (disclosing FMV of the bonds as of March 31, 2008).

[182] This Section provides a summary of the more detailed analysis contained in Section V.A.2.c.

In light of the Examiner's conclusion that ResCap was insolvent at the time of the 2008 Bank Transaction, the Examiner concludes that the ResCap Preferred Interests had no value at such time. The real value transferred to AFI in connection with these transactions was the right to exchange the ResCap Preferred Interests for IB Finance Preferred Interests. The Examiner's Financial Advisors estimated the value of the IB Finance Preferred Interests using a capitalization of annual dividends approach, with capitalization rates determined by benchmark preferred yields. The Examiner's Financial Advisors determined the value of the IB Finance Preferred Interests as of the date of their expected conversion, January 1, 2009, and then discounted this value to the time of each phase of the 2008 Bank Transaction, March and June 2008. This discount reflects the time value of money and the probability that ResCap would file for bankruptcy before January 2009, thus nullifying AFI's exchange rights. The Examiner's Financial Advisors used the yield-to-maturity on ResCap's short-term notes to quantify this last adjustment. Based upon the above approach, the Examiner's Financial Advisors estimate the value of the right to exchange the ResCap Preferred Interests into IB Finance Preferred Interests to be between approximately $403–504 million for the March phase of the 2008 Bank Transaction and between $168–210 million for the June phase of the 2008 Bank Transaction (see Appendix V.A.2.c).

The Examiner's Financial Advisors estimated the value of the bonds contributed by AFI to ResCap by referencing available price quotations proximate to the time of the transactions, plus accrued interest. The estimate of the value of these contributions is approximately $595 million for the March phase of the 2008 Bank Transaction and $246 million for the June phase of the 2008 Bank Transaction.

Thus, the Examiner concludes that the consideration received by ResCap was greater than the value transferred from ResCap in connection with the 2008 Bank Transaction. A more detailed analysis of these valuations is contained in Section V.A.2.c. Additionally, a summary of these findings is presented in Appendix V.A.2.c.

### (4)  Causes Of Action Implicated By The 2008 Bank Transaction

The Examiner believes that the only causes of action potentially implicated by the 2008 Bank Transaction would be avoidance actions. An analysis of these claims is provided in Section VII.F.

### c.  The 2009 Bank Transaction

The final stage of the Ally Bank Transactions occurred in January 2009. At this time, the capital structure of IB Finance was as follows:

- ResCap owned two million IB Finance Class M Shares, representing a non-voting interest in IB Finance and an economic interest in the mortgage division of Ally Bank; and

- AFI owned (1) two million IB Finance Class A Shares, representing all of the voting interest in IB Finance and an economic interest in the automotive division of Ally Bank; and (2) 806,344 units of ResCap Preferred Interests, which were exchangeable at AFI's option into IB Finance Preferred Interests.[183]

While ResCap's remaining interest in IB Finance was considered as a possible source of liquidity only a few months after the 2008 Bank Transaction, the Investigation revealed no evidence to suggest that the 2009 Bank Transaction was contemplated at the time of the 2008 Bank Transaction.

### (1) Early Consideration Of An IB Finance/Ally Bank Sale

As discussed in Section III.H.4, the period of August 2008 through January 2009 was a tumultuous one for financial markets in the United States and the rest of the world. Broad market dislocations presented growing challenges to both AFI and ResCap, though both companies managed to weather the storm, in part, because of AFI's decision to seek bank holding company status and its successful application for TARP funds.[184] Before receiving access to TARP funds, however, AFI and ResCap explored several potential transactions whereby AFI would acquire certain "core" and "non-core" assets of ResCap.[185] All the while, AFI and Cerberus management remained aware of the challenges that such transactions would present for ResCap's creditors.[186] Additionally, it had become clear to Cerberus and AFI management just how interdependent AFI and ResCap had become.[187] There was a growing concern that "[a]ny actions taken to divorce ResCap from [AFI] during this period would have resulted in [AFI's] bank lines either being pulled or not renewed and the probable [loss] of the Bank to the FDIC."[188] Further, some thought "ResCap was one of the significant reasons that the Fed and FDIC [ultimately] decided to support [AFI] in becoming a [bank holding company]."[189]

In September 2008, the ResCap Board began considering several initiatives that would further ease ResCap's ongoing liquidity and TNW difficulties, including a potential sale of

---

[183] If exchanged, the IB Finance Preferred Interests would reduce ResCap's IB Finance Class M Shares on a unit-for-unit basis.

[184] *See* Section III.H.6.

[185] *See, e.g.,* ResCap Capital Requirement Analysis: Core Business, prepared by UBS, dated Nov. 2008 [EXAM10159892]; ResCap Capital Requirement Analysis: Core Business and Bank Managerial, prepared by UBS, dated Nov. 2008 [EXAM10159894]; UBS Good Bank/Bank Bank Considerations, dated Dec. 2008 [UBS-RESCAP-0000001].

[186] *See, e.g.*, E-mail from L. Tessler to A. De Molina (Aug. 9, 2008) [CCM00121378] ("We can't hollow out all of ResCap or we are going to have a problem with Bonds but I am sure we can figure out something that works.").

[187] *See, e.g.*, Strategy Discussion, GMAC Board of Directors Meeting, May 15, 2008, at ALLY_0259428 [ALLY_0259388] (explaining that "ResCap's non-voting interest in [Ally] Bank would be part of the bankruptcy estate").

[188] E-mail from L. Tessler to M. Carpenter (Dec. 3, 2009) [CCM00065540].

[189] *Id.*

ResCap's remaining interest in IB Finance.[190] AFI and ResCap management initially considered three transaction structures, all with a scheduled close of September 30, 2008: (1) a cash purchase by AFI of 100% of ResCap's interest in IB Finance; (2) a partial purchase by AFI of ResCap's interest in IB Finance in exchange for debt forgiveness; and (3) debt forgiveness by AFI, which would be earmarked toward AFI's future purchase of ResCap's interest in IB Finance.[191] The Independent Directors at the time, Edward Smith and Karin Hirtler-Garvey, retained Goldin Associates to act as their financial advisor with respect to the potential transactions.[192]

On September 23, 2008, Lazard, acting as ResCap's financial advisor, advised the ResCap Board that "ResCap's balance sheet and current liquidity situation place it within the zone of insolvency and . . . the best course of action for the Directors is to act as if the company were insolvent and consider the best interest of all its creditors."[193] A joint presentation prepared by Skadden and Lazard further advised that the sale of ResCap's remaining interest in IB Finance would not, in and of itself, be sufficient to resolve ResCap's liquidity issues, and therefore the ResCap Board should contemplate additional initiatives.[194] The presentation also advised that "[i]n the event that ResCap believes that the asset sales referenced are unlikely to be realized or to deliver the estimated proceeds, [ResCap] should consider whether a bankruptcy filing would afford an opportunity both to preserve value and to maximize liquidity."[195] During this presentation, ResCap management expressed its hope that a sale of ResCap's interest in IB Finance would provide a "runway" to prevent further deterioration of ResCap's net worth.[196]

On September 25, 2008, the Independent Directors considered a purchase offer by AFI for 100% of ResCap's interest in IB Finance, as well as a counter offer proposed by ResCap's

---

[190] Minutes of a Regular Meeting of the Board of Residential Capital, LLC, Sept. 12, 2008, at RC40005864–65 [RC40005652]; Minutes of a Special Meeting of the Board of Residential Capital, LLC, Sept. 17, 2008, at RC40005868–69 [RC40005652]; *see also* AFI Board Structural Initiatives and Strategic Discussion, dated Aug. 21, 2008, at ALLY_PEO_0003605 [ALLY_PEO_0003591] ("Bank Strategy: Reviewing option to purchase ResCap's remaining equity interest in [Ally] Bank and Broker-Dealer").

[191] Minutes of a Special Meeting of the Board of Residential Capital, LLC, Sept. 19, 2008, at RC40005870 [RC40005652]. While all of these structures contemplated a closing date of September 30, 2008, it was acknowledged in the board minutes that it would be a challenge to obtain the required third-party fairness opinion and valuation in such a short timeframe. *See id.* at RC40005870–71.

[192] Minutes of Meeting of the Independent Directors of the Board of Directors of Residential Capital, LLC, Sept. 22, 2008, at RC40006643 [RC40006611]; *see also* Engagement Letter from Goldin Associates to the Special Committee of the Board of Directors of ResCap (Sept. 23, 2008) [GOLDIN00072892].

[193] Minutes of an Executive Session of a ResCap Board Meeting, Sept. 23, 2008, at 1 [RC40006865].

[194] Skadden and Lazard Project Scout Presentation, dated Sept. 2008, at 8–9 [RC00018721].

[195] *Id.* at 8. The Skadden and Lazard presentation also contained several pages of "Preliminary Observations on Bankruptcy Strategy." *See id.* at 11–23.

[196] Minutes of an Executive Session of a ResCap Board Meeting, Sept. 23, 2008, at 1 [RC40006865].

management.[197] Following a discussion of the various term sheets, the Independent Directors "concluded that [AFI's] offer and the proposed counter offer as outlined . . . would not provide [ResCap] with sufficient liquidity for a significant period of time."[198] ResCap's management offered to revise the counter offer and present the revisions to the Independent Directors at a later date.[199] The Independent Directors subsequently requested that the counter offer seek to eliminate AFI's option to convert the ResCap Preferred Interests into IB Finance Preferred Interests.[200]

The AFI Board was determined to support ResCap at this time, in part, because of its concern that a ResCap bankruptcy could derail AFI's then pending application for bank holding company status.[201] Such a result would have undermined AFI's effort to obtain access to the FRB window and receive TARP funds, which were critical to AFI's own survival.[202]

---

[197] Minutes of a Telephonic Meeting of the Independent Committee of the Board of Directors of Residential Capital, LLC, Sept. 25, 2008, at RC40006678–83 [RC40006611] (providing that the proposed consideration would consist of mostly debt forgiveness plus $400 million cash). ResCap's counter offer proposed that, for an additional $100 million in cash and approximately $820 million in debt forgiveness, ResCap would also transfer to AFI the GMAC Mortgage servicing platform, the ditech and direct origination channels and its Charlotte FHA call center. *See id.* at RC40006682–83 [RC40006611]; Acquisition Term Sheet, Draft [EXAM10090723] (attached to E-mail from J. Young (Sept. 24, 2008) [EXAM10090721]).

[198] Minutes of a Telephonic Meeting of the Independent Committee of the Board of Directors of Residential Capital, LLC, Sept. 25, 2008, at RC40006678 [RC40006611].

[199] *Id.*

[200] Minutes of a Meeting of the Special Committee of the Board of Residential Capital, LLC, Sept. 27, 2008, at RC40006685 [RC40006611].

[201] Minutes of a Special Meeting of the Board of GMAC LLC, Sept. 29, 2008, at ALLY_PEO_0001283 [ALLY_PEO_0001009] ("Mr. Ramsey discussed the potential consequences of failure to approve the [equity injection into ResCap], and the risks to [AFI] of a bankruptcy filing by ResCap."); Int. of M. Neporent, Feb. 6, 2013, at 154:5–155:6 ("[W]e were talking about what the risks were to [AFI] if we were not to support ResCap, or if ResCap couldn't support itself. We were in the process of the bank holding company license. . . . [A]gain, the capital markets were a mess. I think by this time, Fannie and Freddie had been nationalized. And we were concerned that if ResCap went down, that could, from the [AFI] perspective, have an adverse effect on our application to become a bank holding company, because we'd be effectively putting four million homeowners—four million mortgages—out into the market, where there wasn't enough servicing capacity in the market to take them up. . . . We thought we'd have been looked at very cross-eyed by the regulators if we were to have allowed that to happen."); Int. of L. Tessler, Feb. 28, 2013, at 94:5–14 ("[H]istorically, there had never been a circumstance where a bank holding company had its subsidiary file for bankruptcy. And there was expressed concern provided to the [AFI] board as part of its application process from its legal advisors . . . that if we had a subsidiary file for bank holding . . . the likelihood of us getting our license was very low.").

[202] Int. of M. Neporent, Feb. 6, 2013, at 145:10–146:1 ("Well, it's pretty simple. Now we're in the fall of 2008. The financial crisis is in full swing. Capital markets are in total disarray. There are hundreds and hundreds of . . . non-depository institutions . . . that were falling off the cliff because they couldn't get access to the securitization markets. To the extent that you're originating an asset and then you have no place to offload it, you're going to run out of gas pretty quickly. And by having the bank holding company license, we'd have access to the Fed window for TARP . . . . And you'd have the support of a deposit-based funding source, as opposed to a wholesale-funded funding source.").

Additionally, AFI Board materials from this time indicate that the AFI Board was concerned that a ResCap bankruptcy filing would interfere with AFI's future ownership of Ally Bank by allowing another purchaser to acquire ResCap's shares of IB Finance in a bankruptcy auction, or by giving the FDIC cause to seize Ally Bank.[203]

ResCap and AFI were unable to agree on and finalize a satisfactory transaction involving IB Finance by September 30, 2008. Accordingly, on that day, the AFI Board passed a resolution providing ResCap with up to $400 million in debt forgiveness to satisfy ResCap's TNW covenants.[204] The AFI Board materials describing this transaction conclude that "[b]ecause the capital contribution is structured as debt forgiveness, and because ResCap is not currently in a position to repay these obligations, there is no near-term impact on cash at the [AFI] level."[205] Additionally, it was noted that "in the event there is a subsequent transaction whereby [AFI] purchases ResCap's stake in [Ally] Bank, it is intended that the amount of the contribution would be deemed to be part of the consideration for such a purchase."[206]

Despite the $400 million debt forgiveness by AFI, ResCap's liquidity remained a concern and the ResCap Board continued to consider a sale of ResCap's interest in IB Finance as a way to "extend the Company's cash runway" through December 2008 or February/March 2009.[207] However, on October 16, 2008, Thomas Marano informed the ResCap Board that AFI was no longer considering a purchase of ResCap's interest in IB Finance, and was instead exploring other initiatives, such as a potential securitization transaction in Europe or a

───────────────────────

[203] *See* Minutes of a Special Meeting of the Board of GMAC LLC, Sept. 29, 2008, at ALLY_PEO_0001283 [ALLY_PEO_0001009] ("Discussion by the [AFI] Board focused on valuation of the non-voting interest held by ResCap; feasibility of completing the [Ally] Bank transaction in the event of a bankruptcy filing by ResCap and implications of such a filing on [AFI]."); Agenda and Supporting Materials, GMAC Board of Directors Meeting, Sept. 30, 2008, at ALLY_PEO_0003722 [ALLY_PEO_0003715]; *see also* Int. of S. Ramsey, Dec. 10, 2012, at 157:24–158:4 ("The joint ownership of the bank could've been very disruptive with the regulators. If there was a single ownership of the bank by [AFI] when a [ResCap bankruptcy] occurred, if it was to occur, it would be less risk. It was that simple."); Int. of L. Tessler, Feb. 28, 2013, at 93:19–94:4 ("[Q:] Why was there specific focus on the bank and the need to try to preserve your ownership interest in the bank in the event of a ResCap bankruptcy? [A:] Well, I mean, again, I don't have specific recollection of this particular board meeting. What I do know is as part of a critical element of the application to become a bank holding company was we had to have our deposit-taking institution there in order to achieve such status.").

[204] Minutes of a Special Meeting of the Board of GMAC LLC, Sept. 30, 2008, at ALLY_PEO_0001288–90 [ALLY_PEO_0001009]; Minutes of a Special Meeting of the Board of Residential Capital, LLC, Oct. 1, 2008, at 1–2 [RC00017309].

[205] Agenda and Supporting Materials, GMAC Board of Directors Meeting, Sept. 30, 2008, at ALLY_PEO_0003720 [ALLY_PEO_0003715].

[206] *Id*. at ALLY_PEO_0003721; *see also* Letter from R. Hull to T. Marano (Sep. 30, 2008) [ALLY_0141114].

[207] Minutes of a Special Meeting of the Board of Residential Capital, LLC, Oct. 8, 2008, at 2 [RC00017311].

forgiveness of bond or MSR debt.[208] AFI's decision to walk away from the potential purchase of IB Finance at this time appears to have been driven, at least in part, by its own economic difficulties[209] as well as concerns over fraudulent transfer liability in the event of a ResCap bankruptcy filing.[210]

### *(2) Subsequent Consideration Of An IB Finance/Ally Bank Sale*

In December 2008, the ResCap Board once again began considering a sale of ResCap's interest in IB Finance, this time in connection with AFI's conversion to a bank holding company and subsequent access to TARP funds.[211] In preparation for a potential sale, the ResCap Board asked that an independent third-party commence a valuation of IB Finance.[212] Additionally, the Independent Directors requested that AFI delay the effectiveness of its option to convert the ResCap Preferred Interests into IB Finance Preferred Interests until February 28, 2009.[213] AFI's management supported this request and the AFI Board seemingly consented as well.[214]

On December 24, 2008, the FRB approved AFI's application to become a bank holding company.[215] Four days later, the AFI Board approved another capital contribution to ResCap

---

[208]  Minutes of a Special Meeting of the Board of Residential Capital, LLC, Oct. 16, 2008, at 1 [RC00017316].

[209]  *See, e.g.*, E-mail from T. Marano (Oct. 30, 2008) [CCM00199669] ("I have been offered limited shorter term support from our parent [AFI]. I have yet to receive longer term support as they themselves are challenged.").

[210]  *See* Minutes of a Special Meeting of the Board of GMAC LLC, Sept. 30, 2008, at ALLY_PEO_0001287–88 [ALLY_PEO_0001009] ("Mr. Ramsey presented materials that . . . provided an overview of the risks to [AFI] in the event of a ResCap bankruptcy filing. . . . Management and the advisors in attendance at the meeting responded to questions raised regarding the disposition of [Ally] Bank; the impact on [AFI's] 11:1 leverage ratio covenant; and matters associated with preference and fraudulent transfers."); Agenda and Supporting Materials, GMAC Board of Directors Meeting, Sept. 30, 2008, at ALLY_PEO_0003722–24 [ALLY_PEO_0003715]; *see also* Int. of M. Neporent, Feb. 6, 2013, at 173:24–174:10.

[211]  Minutes of a Special Meeting of the Board of Residential Capital, LLC, Dec. 21, 2008, at 2 [RC00017375].

[212]  *Id*.

[213]  Minutes of a Special Meeting of the Board of GMAC LLC, Dec. 19, 2008, at ALLY_PEO_0001371 [ALLY_PEO_0001009] (indicating that the ResCap Board was "concerned that the potential transfer of value out of ResCap associated with the exercise will raise concerns with ResCap bondholders"); *see also* Letter from R. Hull to ResCap and IB Finance (Dec. 30, 2008) [EXAM12047807] (agreeing that the effective date of the Exchange Agreement shall not occur prior to February 28, 2009).

[214]  Minutes of a Special Meeting of the Board of GMAC LLC, Dec. 19, 2008, at ALLY_PEO_0001372 [ALLY_PEO_0001009] (after discussion of this topic, AFI's general counsel, Bill Solomon, "affirmed that formal approval of the extension of the exercise date is not required by the [AFI] Board"). AFI's consent to this delayed conversion was later revoked on January 23, 2009. *See* Exchange Notice, dated Jan. 23, 2009, at ALLY_0031220 [ALLY_0031012].

[215]  Order Approving Formation of Bank Holding Companies and Notice to Engage in Certain Nonbanking Activities, Federal Reserve Board of Governors (Dec. 24, 2008) [EXAM10278872]; *see also* Section III.H.6 (for a discussion of AFI's application for bank holding company status).

in the form of debt forgiveness.[216] In a "non-binding" letter, dated December 31, 2008, AFI stated that if it subsequently purchased ResCap's interest in IB Finance, AFI intended to treat the December 2008 debt forgiveness as a portion of the consideration paid for ResCap's interest in IB Finance.[217] It appears that ResCap management agreed to this proposal, in part, because of the fact that it did not obligate ResCap to sell the tracking stock to AFI.[218] Despite this letter, it appears that no such pre-sale contributions were ultimately treated as consideration for the sale of the remaining IB Finance Class M Shares.[219]

––––––––––––––––––––––––––––––––––––––––

[216] Minutes of a Special Meeting of the Board of GMAC LLC, Dec. 28, 2008, at ALLY_PEO_0001378–79 [ALLY_PEO_0001009]; Minutes of a Special Meeting of the Board of Residential Capital, LLC, Dec. 29, 2008, at 1–2 [RC00017379]; *see also* E-mail from A. Rutter (Nov. 15, 2008) [GSResCap0000198483] ("[AFI] will continue to support ResCap because management has received indications from the government that BHC and TARP are no-go if ResCap files for bankruptcy.").

[217] Letter from R. Hull to T. Marano (Dec. 31, 2008) [ALLY_0141115]; *see also* Minutes of a Special Meeting of the Board of Residential Capital, LLC, Dec. 29, 2008, at 1–2 [RC00017379]. A similar letter had been sent by AFI on September 30, 2008, with respect to a previous capital contribution. *See* Letter from R. Hull to T. Marano (Sept. 30, 2008) [ALLY_0141114].

[218] *See* E-mail from T. Marano (Dec. 30, 2008) [EXAM10289305].

[219] *See* Goldin Associates Presentation to the Committee of Independent Members of the Board of Directors of Residential Capital, LLC Regarding the GMAC Bank Transaction with GMAC, LLC, dated Jan. 22, 2009, at 8 [GOLDIN00129860] (listing as consideration only the $830.5 million in second lien notes and the extension of maturity on a $430 million secured credit facility); Memorandum, GMAC Bank Sale & Deconsolidation, dated Feb. 3, 2009, at 3 [EXAM00220301] (same); Memorandum, Accounting Impact, dated Jan. 13, 2009, at 5 [EXAM12047802] (providing that consideration for the bank sale would be "principally in the form of debt contribution from [AFI] to ResCap in January, rather than consideration in the form of past capital contributions"); Int. of T. Rowe, Dec. 7, 2012, at 185:9–186:21 ("To bridge the gap between ResCap's need to survive and [those who] felt like there should be consideration for the support that was being given . . . we created this type of language and I believe there was a letter signed by Tom Marano that said we hereby agree you're giving us a capital contribution and it needs to be a capital contribution because capital is what's required to be in our covenant and therefore it can't be contingent or recoverable or anything else so that it gets the right accounting treatment and we survive. However we'll give you credit for it in the future when we get around to doing the [IB Finance] trade. . . . Honestly it's a construct meant to keep people happy. Tom gets the capital that he needs. It's real capital. It's not contingent upon anything else. He signs a commitment saying we promise to give you credit . . . optically to certain members of the [AFI] board they felt this was valuable and it gave them more comfort in supporting the transaction."). *But see* ResCap Support and IB Finance Transaction Presentation, prepared by GMAC, dated Jan. 30, 2009, at ALLY_PEO_0002114–15 [ALLY_PEO_0002000] (describing the consideration for this transaction as: (1) previous debt forgiveness from September 30, 3008 and December 31, 2008 in the amount of approximately $423 million; and (2) current debt forgiveness of approximately $570 million); E-mail from T. Hamzehpour (Dec. 30, 2008) [EXAM10281879] ("[T]he debt forgiveness granted in September has now been added as a credit toward the purchase price, in addition to the forgiveness [AFI] will provide on December 31."). While there is some conflicting communications about whether the September 2008 and December 2008 debt forgiveness was credited toward the sale of IB Finance, the issue is ultimately irrelevant because, as discussed in Section V.A.2.d, the Examiner concludes that ResCap received well in excess of reasonably equivalent value for the transfer of its remaining interest in IB Finance.

On January 23, 2009, the ResCap Board received presentations on the potential IB Finance sale from both UBS and ResCap management.[220] UBS discussed a strategy to market ResCap's IB Finance Class M Shares for a sixty-day period following the closing, on the same or better terms as contained in the proposed agreement with AFI.[221] This sixty-day marketing period, which was eventually incorporated into the sale agreement, provided AFI with a right to match any third-party buyer offering more than what AFI had paid.[222] In the event that a third party offered a higher purchase price, the sale agreement provided that the third party would acquire the assets from AFI and AFI would remit the excess purchase price to ResCap.[223] In connection with this effort, UBS "remarked on possible challenges in successfully marketing the non-voting interest in IB Finance to a third party."[224] It is not clear whether AFI's right to match any third party offers presented an additional challenge to the marketing efforts.[225] It should be noted that had ResCap been successful in selling its IB Finance Class M Shares to a third party before entering into the sale agreement with AFI,

---

[220] Minutes of a Special Meeting of the Board of Residential Capital, LLC, Jan. 23, 2009, at 1–2 [RC00021108]. It appears that UBS was asked to undertake this evaluation approximately three weeks earlier. *See* Memorandum, UBS Call re GMAC Bank, dated Jan. 7, 2009 [GOLDIN00090358] ("UBS . . . was just getting started and had been on the job for less than 24 hours."); *see also* E-mail from T. Marano (Jan. 5, 2009) [UBS-RESCAP-0036534] ("In order to fulfill [Marano's] fiduciary responsibility and that of my [Independent Directors], we would like [UBS] to work on selling [the bank stock].").

[221] GMAC Bank Transaction Term Sheet, Draft, dated Jan. 23, 2009 [RC40011078]; Minutes of a Special Meeting of the Board of Residential Capital, LLC, Jan. 23, 2009, at 1–2 [RC00021108] ("Mr. Benett joined the discussion and discussed plans to solicit a series of potential third party investors who had been previously contacted to determine possible interest in acquiring the Class M shares. Mr. Marano noted that he had discussed the solicitation of potential third party investors with [AFI] management. . . . Mr. Van Der Knaap said Berkshire Hathaway will be among the parties contacted."). In his interview, Benett of UBS suggested that there was no practical difference between the pre-closing and post-closing marketing efforts. *See* Int. of H. Benett, Mar. 7, 2013, at 89:13–20.

[222] *See* Membership Interest Purchase Agreement, dated Jan. 30, 2009, § 5.4 [ALLY_0031012] (providing that a third party had to offer more than the purchase price of $608.5 million, either in cash, FMV of ResCap notes, or some combination of the two); Int. of L. Hall, Nov. 29, 2012, at 240:20–241:13, 265:15–19 ("I think Corey [Pinkston] and I were pretty big proponents of the after-marketing period that ResCap would have available to it. . . . It was just an added layer of ensuring fair value and third-party-type transaction and just making sure it was compliant with indentures. . . . We wanted to ensure ResCap got the best value for their assets, and if we needed to pay more for [IB Finance], so be it. I think it was just an extra check-the-box to make sure that it was a fair transaction.").

[223] *See* Membership Interest Purchase Agreement, dated Jan. 30, 2009, § 5.4 [ALLY_0031012].

[224] Minutes of a Special Meeting of the Board of Residential Capital, LLC, Jan. 23, 2009, at 1 [RC00021108]. This statement echoed earlier concerns of AFI itself, as expressed at the September 30, 2008 AFI Board Meeting. *See* Agenda and Supporting Materials, GMAC Board of Directors Meeting, Sept. 30, 2008, at ALLY_PEO_0003724 [ALLY_PEO_0003715] ("Because of a number of factors, including . . . the non-voting nature of ResCap's ownership, valuation of the bank is somewhat subjective and exposes [AFI] to purchase price litigation.").

[225] As a general matter, Benett of UBS suggested in his interview that the post-closing marketing period likely would present additional challenges. *See* Int. of H. Benett, Mar. 7, 2013, at 90:2–8 ("[P]eople's interest[ ] typically goes way down after a deal's already been struck. So, the likelihood of . . . breaking up a deal that's already been set up and agreed to is very low. Not specific to this case, just general market knowledge.").

AFI would not have had any consent or approval right over the third-party buyer under the IB Finance 2008 LLC Agreement.[226] Also on January 23, 2009, ResCap received an "Exchange Notice" from AFI revoking its offer not to exchange the ResCap Preferred Interests before February 28, 2009 and informing ResCap that AFI intended to convert such interests as of January 30, 2009.[227]

On January 26, 2009, the Independent Directors received a limited fairness opinion on the proposed transaction from Goldin Associates.[228] The fairness opinion was limited in that it did not provide an explicit valuation of ResCap's interest in IB Finance and expressed no opinion with respect to "the consideration that could actually be received by [ResCap] in an open market sale of the Interests," or "whether any alternative transaction might produce [greater] consideration for [ResCap] . . . ."[229] A supplemental fairness letter was delivered by Goldin Associates on January 30, 2009, confirming its opinion as to the fairness of the consideration as of that date (subject to the same limited terms).[230] Given the express limitations of the opinion, it seems to provide little real comfort as to the fairness of the transaction.

Nonetheless, a majority of the ResCap Board approved the 2009 Bank Transaction on January 30, 2009, though it does not appear that a formal board meeting was held.[231] The ResCap Board resolutions from that day recite that the Independent Directors "reviewed and considered the fairness opinion of Goldin Associates" and that the transaction is fair from a financial point of view and "not materially less favorable to [ResCap] than those that could reasonably have been obtained in a comparable arm's length transaction . . . ," despite Goldin Associates' express refusal to opine on what consideration could be obtained in an open market transaction.[232]

### (3) Conversion And Sale

On January 30, 2009, AFI exercised its option to exchange its ResCap Preferred Interests into the same number of IB Finance Preferred Interests. Upon conversion of ResCap Preferred Interests into IB Finance Preferred Interests, the IB Finance Class M Shares held by ResCap were reduced on a unit-for-unit basis with the ResCap Preferred Interests exchanged.[233]

---

[226]   IB Finance 2008 LLC Agreement, §§ 2.3, 8.5 [GOLDIN00007614].

[227]   *See* Exchange Notice, dated Jan. 23, 2009, ALLY_0031220 [ALLY_0031012].

[228]   *See* January 26 Goldin Letter, at 1 [RC00027940].

[229]   *Id*. at 3–4. *But see* Int. of E. Smith, Nov. 30, 2012, at 182:20–24 ("I thought that, by [Goldin] saying that the transaction was fair to ResCap and its creditors, that they were saying that it was at least in the range of what anybody else would pay.").

[230]   *See* January 30 Goldin Letter [RC00027949].

[231]   Action by Written Consent of the Board of Directors of Residential Capital, LLC, dated Jan. 30, 2009, at RC00021956–63 [RC00021956] (Resolutions of the Board of Directors of Residential Capital, LLC).

[232]   *Id*. at RC00021963–64 (Resolutions of the Board of Directors of Residential Capital, LLC).

[233]   IB Finance 2008 LLC Agreement, § 2.6 [GOLDIN00007614].

Accordingly, the exchange of 806,344 ResCap Preferred Interests for IB Finance Preferred Interests reduced ResCap's two million IB Finance Class M Shares by 806,344, leaving ResCap with 1,193,656 IB Finance Class M Shares.

Immediately following the exchange of ResCap Preferred Interests, ResCap sold its remaining 1,193,656 IB Finance Class M Shares to AFI.[234] As consideration for the IB Finance Class M Shares, AFI contributed to ResCap Senior Secured Notes of ResCap's that AFI had previously acquired in a December 2008 exchange offer.[235] ResCap's and AFI's professionals determined at the time that these notes had a face amount of approximately $830.5 million and a market value of approximately $608,522,330.63.[236] Following this transfer, AFI directly owned all of the equity interest in IB Finance and thus, indirectly, all of the equity interest in Ally Bank.[237] Simultaneously with the 2009 Bank Transaction described above, AFI provided a sixty-day extension of the maturity date of the Initial Line of Credit Facility, a short-term $430 million revolving credit facility with AFI as lender to two of ResCap's indirect subsidiaries.[238]

On March 23, 2009, UBS reported to the ResCap Board that "no serious interest to acquire the tracking stock was expressed from the hedge funds and private equity firms that were solicited."[239] Although UBS suggested in its solicitations to third parties that the

---

[234] Membership Interest Purchase Agreement, dated Jan. 30, 2009, at 1–2 [ALLY_0031012].

[235] Residential Capital, LLC, Current Report (Form 8-K) (Feb. 3, 2009), Item 1.01, at 1; *see also* Certificate of Forgiveness of Indebtedness of Residential Capital, LLC, dated Jan. 30, 2009 [ALLY_0031012].

[236] The market value of this transaction was determined based on the average of two price quotations obtained by ResCap and AFI from independent broker-dealers. *See* E-mail from E. Graber (Jan. 29, 2009) [GOLDIN00133022] (providing that prior to Goldin Associates releasing its opinion, Goldin Associates "would like to know the price for the bonds that results from . . . UBS and Goldman Sachs [obtaining] midpoints for the bid/ask quotes for the bonds"); Valuation Methods for Debt Forgiveness [UBS-RESCAP-0063993] (attached to E-mail from M. Monson (Jan. 28, 2009) [UBS-RESCAP-0063992]); E-mail from Goldman Sachs (Jan. 30, 2009) [GSResCap0000241578]; E-mail from B. Conway (Jan. 29, 2009) [CCM00651618] (providing information as to valuation). ResCap later extinguished the $830.5 million face amount of the Second Lien Notes.

[237] AFI's ownership was as follows 2,000,000 IB Finance Class A Shares, 806,344 IB Finance Class M Preferred Shares, and 1,193,656 IB Finance Class M Shares.

[238] *See* Membership Interest Purchase Agreement, dated Jan. 30, 2009, at 1 [ALLY_0031012]. An early term sheet listed this extension as part of the consideration that ResCap would receive for its IB Finance Class M Shares, but the extension was referred to merely as a "Simultaneous Transaction" in subsequent term sheets and excluded as consideration from the final purchase agreement. *See* Draft GMAC Bank Transaction Term Sheet, dated Jan. 13, 2009, at 1 [GOLDIN00126222]; Draft GMAC Bank Transaction Term Sheet, dated Jan. 23, 2009, at RC40011107 [RC40011078]; Membership Interest Purchase Agreement, dated Jan. 30, 2009, § 2.2 [ALLY_0031012]. For additional information on the Initial Line of Credit Facility, *see* Section V.E.5.

[239] Minutes of a Special Meeting of the Board of Residential Capital, LLC, Mar. 23, 2009, at RC40006091–92 [RC40005949]; *see also* E-mail from H. Benett (Jan. 27, 2009) [UBS-RESCAP-0064068] (indicating that UBS contacted several hedge funds and investment firms including CVC, Blackstone, and Warburg Pincus, among others); Letter from UBS to T. Marano [EXAM00220064]; Int. of H. Benett, Mar. 7, 2013, at 23:10–22 ("We made a series of phone calls. Interest came back as zero.").

structure of the security could be altered to add voting rights,[240] it seems that the non-voting aspect of ResCap's interest represented a substantial barrier to marketability.[241]

### (4) Value Of Exchange[242]

In order to assess reasonably equivalent value for the 2009 Bank Transaction, the Examiner's Financial Advisors estimated the value transferred from ResCap as well as the consideration received by ResCap. The value transferred from ResCap consisted of (1) ResCap's remaining IB Finance Class M Shares; and (2) the right to redeem the IB Finance Preferred Interests at redemption value. The consideration received by ResCap consisted of certain bonds contributed by AFI.

To value the remaining IB Finance Class M Shares, the Examiner's Financial Advisors valued the total equity of the Mortgage Bank (before deducting the value of the IB Finance Preferred Interests) giving consideration to three traditional and commonly used approaches to estimating FMV: (1) the Market Approach, using public stock prices for comparable institutions; (2) the Income Approach; and (3) the Asset-Based Approach. From the total equity value of the Mortgage Bank, the Examiner's Financial Advisors then subtracted their estimate of the value of the IB Finance Preferred Interests, calculated based on a capitalization of annual dividends approach, with capitalization rates determined by benchmark preferred yields. The Examiner's Financial Advisors made further adjustments to value to reflect the tracking stock nature of the interests as well as the form of ownership (including lack of marketability, lack of control, and lack of voting rights). The Examiner concludes that in January 2009, the value of ResCap's remaining IB Finance Class M Shares was approximately between $107–218 million. The Examiner attributed no material value to the right to redeem

---

[240] Draft UBS GMAC Bank Tracking Stock Overview Presentation, dated Jan. 2009, at 3 [UBS-RESCAP-0064039] ("This security may not have the precise terms to make it an attractive investment, however there may be flexibility to amend the terms if this entity is attractive to an investor: add voting rights; restructure profit rights (e.g., share in profits of entire bank)."); Int. of H. Benett, Mar. 7, 2013, at 86:15–87:20 ("[Q:] Do you recall conversations about changing the interest? [A:] No . . . these would've simply been discussion points, particularly for members of the company. . . . when you have a nonvoting stock, the easiest option to consider would be putting voting rights on a nonvoting stock.").

[241] Int. of T. Marano, Nov. 26, 2012, at 38:9–39:11 ("The challenge with this transaction was that you were actually not buying into a whole bank. You were selling a 51% interest with non-voting shares in a loan portfolio that . . . was hemorrhaging hundreds of millions of dollars a year. So after marketing it to several institutions, I recall the general consensus was, 'You'd have to pay us to take this thing because it has no voting rights and it keeps losing money. And by the way, we're not used to buying companies where we can't . . . control . . . our interests in the bank.' . . . And by the end of a couple weeks, I'm kind of saying, 'Well, I've now worn out a lot of shoe leather up and down Park Avenue and 6th Avenue. And I sort of understand why people don't really want to buy this thing.'"); Int. of H. Benett, Mar. 7, 2013, at 78:20–79:1 ("I don't recall any specific conversations, but I'm sure we would have given them advice that non-voting stock is going to be harder to sell as of than this type of voting, as well as selling a minority interest would be difficult versus selling a controlling interest . . . ."). Additionally, while certain UBS marketing materials incorrectly stated that "[a]ll of the voting shares of [Ally] Bank are owned by General Motors," there is no evidence to suggest that this mistake had a material impact on UBS's attempts to solicit third party purchasers. *See* UBS GMAC Bank Tracking Stock Overview Presentation, dated Jan. 2009, at 2 [UBS-RESCAP-0064024]; E-mail from M. Monson (Jan. 27, 2009) [UBS-RESCAP-0064068].

[242] This Section provides a summary of the more detailed analysis contained in Section V.A.2.d.

the IB Finance Preferred Interests at the redemption value, given that the estimated value of the units as of January 2009 was significantly lower than the redemption value.

The Examiner's Financial Advisors estimated the value of the bonds contributed by AFI by referencing available price quotations proximate to the date of the transaction, plus accrued interest. The Examiner's Financial Advisors estimated that the value of the bonds contributed was approximately $600 million.

Thus, the Examiner concludes that the consideration received by ResCap was greater than the value transferred from ResCap in connection with the 2009 Bank Transaction. A more detailed analysis of these valuations is contained in Section V.A.2.d. Additionally, a summary of these findings is presented in Appendix V.A.2.d.

### (5) Causes Of Action Implicated By The 2009 Bank Transaction

The Examiner believes that the only causes of action implicated by the 2009 Bank Transaction would be avoidance actions. An analysis of these claims is provided in Section VII.F.

## 2. Ally Bank Transactions: Reasonably Equivalent Value

### a. Ally Bank Transactions – Overview Of Issues

The Examiner evaluated whether ResCap received less than reasonably equivalent value in connection with the Ally Bank Transactions, which consist of three separate transactions: (1) the 2006 Bank Restructuring; (2) the 2008 Bank Transaction; and (3) the 2009 Bank Transaction. Each of the Ally Bank Transactions is described in detail in Section V.A.1 of the Report. The Examiner addressed three fundamental questions regarding reasonably equivalent value as it relates to the Ally Bank Transactions:

> (1) What was the form and value of the property transferred by ResCap?
>
> (2) Did ResCap receive value in exchange for the property transferred, and, if so, in what form and amount?
>
> (3) Was the value received by ResCap reasonably equivalent in exchange for the property transferred?

Reasonably equivalent value compares the property transferred from a debtor with the value actually received by the debtor. Reasonably equivalent value is not susceptible to simple formulation; rather, an analysis of reasonably equivalent value begins with a range of values. Moreover, an assessment of reasonably equivalent value is guided by its purpose—to protect against the unjust diminution of the bankruptcy estate. Reasonably equivalent value may not be synonymous with Fair Market Value, although the latter may be an important factor in determining whether a debtor received reasonably equivalent value. Ultimately, an assessment

of reasonably equivalent value requires a consideration of the totality of the circumstances in addition to a value comparison, including earmarks of an arm's-length transaction, good faith, and the degree of difference between the market value of property transferred and the value actually received by the debtor.

For each of the Ally Bank Transactions, the Examiner's Financial Advisors employed traditional and commonly used valuation methods to assess the value ResCap transferred and received. Appendix V.A.2.a provides a summary of the value determinations for each of the Ally Bank Transactions.[243]

The Examiner's Financial Advisors assessed the value of Old GMAC Bank and the IB Finance Class M Shares using a Fair Market Value standard. For the case at hand, a going concern premise of value reflects the highest and best use of the assets in place. A going concern premise reflects the value of a business expected to continue to operate into the future. The liquidation premise of value was considered and rejected as not applicable. There was no evidence that liquidation of Old GMAC Bank or Ally Bank would have been considered imminent at the time of any of the Ally Bank Transactions or would have resulted in the highest and best use of the assets.[244]

In Section V.A.2, Old GMAC Bank (prior to the 2006 Bank Restructuring) and the mortgage division of Ally Bank (after the 2006 Bank Restructuring) will, at times, be referred to as the "Mortgage Bank" when discussing the methodology and assumptions that apply to the valuation of Old GMAC Bank and the IB Finance Class M Shares, respectively. For the 2006 Bank Restructuring, a valuation of the Mortgage Bank is used in determining the value of what was transferred from ResCap—Old GMAC Bank—and what ResCap received—IB Finance Class M Shares.

The Examiner concludes that the evidence supports the proposition that ResCap did not receive reasonably equivalent value in the 2006 Bank Restructuring. The Examiner concludes that the evidence supports the proposition that ResCap received reasonably equivalent value in the 2008 Bank Transaction and the 2009 Bank Transaction.

Appendix V.A.2.a presents summary financial information for the Mortgage Bank over the period from 2003 through 2008.[245] Appendix V.A.2.a shows loan performance and delinquency trends of the Mortgage Bank.[246]

_____

[243] Appendix V.A.2.a, at 1.

[244] For further discussion of the standard and premise of value, including definitions, see Section VI.B.2.a and Section VI.B.2.b, respectively.

[245] Appendix V.A.2.a, at 2–3.

[246] Appendix V.A.2.a, at 4.

### b. 2006 Bank Restructuring Overview

When the assets of Old GMAC Bank were transferred to Ally Bank, ResCap received IB Finance Class M Shares. The transferred assets became the mortgage division of Ally Bank[247] with a "tracking stock" structure.[248] Under that structure, ResCap's IB Finance Class M Shares gave ResCap an interest in the financial performance of Ally Bank's mortgage division, but the assets of the mortgage division were wholly owned by IB Finance and its subsidiary, Ally Bank.[249]

For the 2006 Bank Restructuring, the Examiner's Financial Advisors estimated the value of the following:

*Value Transferred from ResCap*

- Controlling interest in 100% of the equity of Old GMAC Bank;

- $360 million in cash and debt contributed by ResCap to IB Finance;

*Value Received by ResCap*

- IB Finance Class M Shares; and

- Value of a de-linked credit rating (an indirect benefit of the 2006 Bank Restructuring).

Appendix V.A.2.b presents a summary of value determinations for the 2006 Bank Restructuring.[250]

Because the IB Finance Class M Shares provided ResCap with the economic benefits of substantially all of the assets of Old GMAC Bank through a tracking stock structure, the analysis in this Report used the same approach and assumptions in valuing both assets—Old

---

[247] Residential Capital, LLC, Current Report (Form 8-K) (Nov. 27, 2006).

[248] *See* B. Espen Eckbo & Karin S. Thorburn, *Corporate Restructuring: Breakups and LBOs* 29 (Tuck Sch. of Bus. Working Paper No. 2008-49, 2008), http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1133153. ("Tracking stock—also called targeted stock or letter stock—is a separate class of parent company common stock whose dividends track the performance of a given division. That is, the holders of the tracking stock are entitled to the cash flow generated by this division, hence determining the value of the stock."); Matthew T. Billet & Anand M.Vijh, *The Wealth Effects of Tracking Stock Restructurings*, 27 J. Fin. Research 559, 559–83 (2004) ("Tracking stocks are newly issued stocks created by distributing a nontaxable stock dividend to existing shareholders . . . [a] tracking stock is an equity claim intended to reflect the performance of a certain division of a multidivisional firm . . . .").

[249] Equity Purchase Agreement, dated Nov. 20, 2006, § 1.A [CERB001530].

[250] Appendix V.A.2.b, at 1.

GMAC Bank and the IB Finance Class M Shares—making appropriate adjustments to reflect differences in the value arising from the different form of ownership, including marketability and control.[251]

The Examiner's Financial Advisors considered traditional and commonly used approaches to estimating the Fair Market Value of the interests:

- The Market Approach using guideline financial institutions and considering both the Guideline Publicly Traded Company Method and the Guideline M&A Method;

- The Income Approach using the DCF Method; and

- The Asset-Based Approach using the Adjusted Book Value Method.

### (1) Market Approach – Guideline Publicly Traded Company Method

The Guideline Publicly Traded Company Method provides an indication of the Fair Market Value of a business by developing valuation multiples based on prices at which securities of similar companies trade in a public market.[252] These market-based multiples are then applied to the operating results of the subject business, resulting in an estimate of the Fair Market Value of the invested capital or equity (depending on the nature of the multiple applied) on a marketable, minority basis. A premium for control, if applicable, is then applied to the equity to indicate the Fair Market Value of the equity of the subject business on a marketable, controlling basis.[253] The Fair Market Value of debt is then added to derive the Market Value of Invested Capital.

### (a) Selection Of Guideline Companies

The first step in the application of this methodology is the selection of guideline publicly traded companies. The Examiner's Financial Advisors selected a group of companies with similar characteristics that provide a meaningful basis for comparison to the Mortgage Bank. Appendix V.A.2.b presents a brief description of each guideline company.[254] Appendix V.A.2.b presents various financial ratios for the guideline companies compared to the Mortgage Bank.[255]

––––––––––––––––––––––––––––––––––––––––

[251] In addition to the assets transferred to Ally Bank, approximately $13 million in net assets remained with Old GMAC Bank, which was transferred via dividend to GM along with Old GMAC Bank's Federal Savings Bank charter. The Examiner's Financial Advisors treated this amount as immaterial to its analysis and made no adjustment for it in its calculations.

[252] SHANNON P. PRATT WITH ALINA V. NICULITA, VALUING A BUSINESS: THE ANALYSIS AND APPRAISAL OF CLOSELY HELD COMPANIES 265 (5th ed. 2008).

[253] *Id.* at 265–69.

[254] Appendix V.A.2.b, at 5–7.

[255] Appendix V.A.2.b, at 3–4.

### (i) Guideline Companies Selection Criteria

The selected set of guideline companies consisted of large financial institutions whose principal subsidiary operated as either a federal savings bank or a state-chartered thrift institution. The Examiner's Financial Advisors identified the selected set of guideline companies by querying the Capital IQ database for companies with the following characteristics:

- Operating primarily in Standard Industrial Classifications 6035 (Savings Institutions, Federally Chartered) or 6036 (Savings Institutions, Not Federally Chartered);

- Total assets greater than $5 billion; and

- Residential mortgage loans greater than 50% of total loans.

This process identified thirteen guideline companies for consideration.

### (ii) Comparison With Guideline Companies

The Mortgage Bank was exposed to greater risk in its operations than many of the publicly traded guideline companies considered in this analysis. Areas of greater risk included:

- *Lending Standards*: Most of the guideline companies held relatively high quality loan portfolios. The majority of the Mortgage Bank's HFI Portfolio was comprised of interest-only loans.[256] The Mortgage Bank also engaged in Alt-A lending, including interest-only Alt-A.[257] The HFI Portfolio also included loans originally issued with limited documentation, high DTI levels, high LTV ratios, and/or low credit scores, particularly in the home equity products.[258] These loans gave the Mortgage Bank significant exposure in the event of a downturn in the economy or a decline in home values.

- *Age and Location*: As a result of rapid growth in lending activities, the Mortgage Bank's portfolio was heavily weighted by loans originated after 2004.[259] This gave the Mortgage Bank significant exposure to loans made near the peak of the real estate market (circa mid-to-late 2006). The Mortgage Bank's geographic concentrations included states that experienced rapid increases in housing prices during the real

---

[256] For example, as of April 30, 2007 approximately 81% of the HFI first mortgage portfolio was comprised of interest-only loans. *See* GMAC Bank Mortgage Operation Credit Review, dated Apr. 30, 2007, at EXAM11415745 [EXAM11415741].

[257] *See id.* For example, as of April 30, 2007, approximately 20% of the HFI first mortgage portfolio was comprised of Alt-A loans, most of which were interest only. *See id.*

[258] *See* GMAC Bank Mortgage Division Credit Review Monthly Executive Summary, dated Dec. 31, 2008, at 4–5 [EXAM11629614].

[259] *See id.* at 6.

estate boom. Approximately 23% of the Mortgage Bank's residential mortgage portfolio was concentrated in California as of the end of 2006,[260] with significant exposure in other high-appreciation states including Virginia, Florida, and Arizona.[261] Approximately 7% of its portfolio was in Michigan,[262] which was expected to experience high subprime default rates.[263] By December 2006, housing prices were expected to decline in most metropolitan areas in which the Mortgage Bank had substantial exposure.[264] The guideline companies generally had longer histories with less exposure to loans issued during the recent run-up in real estate prices, and included a number of regional banks operating in more stable markets such as New England and Kansas.

• *Funding Base*: The Mortgage Bank operated without a branch banking network and relied on funding primarily through advances from the FHLB; brokered deposits also contributed a large share of funding.[265] The guideline companies generally had networks of branch banking offices, providing them with a more stable base of retail deposits characterized by long-term customer relationships and lower interest rates, though maintaining a branch network adds to operating costs.[266]

### (b) Calculation Of Market Multiples

The Guideline Publicly Traded Company Method entails the calculation of valuation multiples based on those of publicly traded guideline companies that are then applied to a subject company's relevant metrics. The Examiner's Financial Advisors calculated ratios of MVE to several historical and projected metrics. The Examiner's Financial Advisors relied on three commonly used valuation multiples in its analysis:

• Ratio of MVE to tangible book value of equity (the P/TBVE multiple);

• Ratio of MVE to last twelve months' earnings (the LTM P/E multiple); and

• Ratio of MVE to projected earnings for the current or upcoming year (the Forward P/E multiple).

---

[260] *See* GMAC Bank Consolidated Financial Statements as of December 31, 2006 and Independent Auditors' Report, dated Mar. 27, 2007, at 20 [RC00035095].

[261] *See* GMAC Bank Mortgage Operation Credit Review, dated Apr. 30, 2007, at EXAM11415747 [EXAM11415741].

[262] *See id.*

[263] *See, e.g.*, Ron Nixon, *Study Predicts Foreclosure for 1 in 5 Subprime Loans*, N.Y. TIMES (Dec. 20, 2006), http://www.nytimes.com/2006/12/20/business/20home.html?_r=0.

[264] *See* GMAC Bank Mortgage Operation Credit Review, dated Apr. 30, 2007, at EXAM11415748 [EXAM11415741] (citing December 2006 forecasts by Economy.com).

[265] *See* Board of Director Meeting: 2007 Business Plan Review, dated Jan. 25, 2007, at ALLY_PEO_0006858 [ALLY_PEO_0006664].

[266] *See* Appendix V.A.2.b, at 5–7 (providing descriptions of the guideline companies).

These ratios measure the value of equity (common stock outstanding multiplied by the price per share) as a multiple of either book value or net income. TBVE was used rather than NBV to place the guideline companies—several of which had goodwill on their balance sheets—on a similar basis to the Mortgage Bank, which had no goodwill on its balance sheet.

### (c) Selecting Appropriate Multiples

As discussed above, the Mortgage Bank had a riskier business model, resulting in a poorer financial condition than many of the guideline companies. Analysis of the guideline companies showed that companies with riskier business models generally had lower multiples in 2006 than companies with less risky business models.[267] Accordingly, the Examiner's Financial Advisors selected market multiples below the average of the guideline companies to adjust for differences in relative risk profiles of the Mortgage Bank and the guideline companies taken as a whole.

### (d) Control Premium

A control premium is an amount by which the pro rata value of a controlling interest exceeds the pro rata value of a non-controlling interest in a business enterprise. This premium or upward adjustment in value reflects the right and power of control, a property interest.[268] The Guideline Publicly Traded Company Method derives value indications from trading prices of minority equity interests in a liquid market and indicates value on a marketable, minority basis. A control premium is then applied, when warranted, to estimate the value of equity on a controlling basis.[269]

The Examiner's Financial Advisors gave consideration to premiums paid for controlling interests for similar companies during 2006 in determining an appropriate control premium for a 100% equity interest in the Mortgage Bank. The Examiner's Financial Advisors compiled data on premiums paid in control transactions involving targets primarily operating as savings institutions (Standard Industrial Classifications 6035 and 6036) as reported in the *Mergerstat Control Premium Study*.[270] The median premium for these companies was 29.6% in 2006.[271] The Examiner's Financial Advisors noted that for a broader group (financial services), Mergerstat reported a median premium of 19.6% during 2006,[272] while across all industries the median premium was 20.6%.[273] Premiums paid for the five companies considered in the

---

[267] *See* Appendix V.A.2.b, at 3–4 (providing ratio analyses of the guideline companies); Appendix V.A.2.b, at 5–7 (providing additional descriptions of the guideline companies). Guideline companies with heavy concentrations in subprime, Alt-A, or non-traditional mortgage products such as option ARMs include BankUnited Financial Corp., Downey Financial Corp., and FirstFed Financial Corp.

[268] SHANNON P. PRATT, BUSINESS VALUATION: DISCOUNTS AND PREMIUMS 16, 32 (2d ed. 2009).

[269] *Id.* at 5.

[270] *See* MERGERSTAT, CONTROL PREMIUM STUDY: 4TH QUARTER 2006, at 17–19.

[271] *See id.* at 18.

[272] *See id.* at 17.

[273] *See id.* at 5.

Guideline M&A Method discussed below ranged from 10% to 33%. Observed premiums include payment for synergies and tend to overstate the value of control per se. Accordingly, the Examiner's Financial Advisors applied a 10% control premium in this analysis. Appendix V.A.2.b provides a summary of data on control premiums.[274]

### *(e) Guideline Publicly Traded Company Method: Conclusion*

Based on the application of the Guideline Publicly Traded Company Method, the indicated range of total equity value of Old GMAC Bank on a marketable, controlling basis before adjustments is estimated to be approximately $1.69 billion to $2.13 billion as of November 22, 2006. Appendix V.A.2.b provides a summary of the Guideline Publicly Traded Company Method conclusion.[275]

### *(2) Market Approach – Guideline M&A Method*

The Guideline M&A Method estimates the Fair Market Value of a business based on exchange prices in actual transactions for controlling interests in similar companies.[276] This process involves comparison and correlation of the subject business with similar companies acquired within a reasonable time of the valuation date. Considerations such as location, time of sale, operating characteristics, and conditions of sale are analyzed for the guideline companies. This variation of the Market Approach results in an indicated Fair Market Value of the subject business on a marketable, controlling basis.[277]

### *(a) Selection Of Guideline Merged And Acquired Companies*

The first step in the application of this methodology is the selection of guideline transactions involving similar companies. Selected guideline merged and acquired companies were identified by querying the Capital IQ database for acquisitions involving target companies whose primary operating subsidiaries included federal savings banks or state-chartered thrift institutions with assets greater than $5 billion.

### *(b) Calculation Of Multiples*

The Guideline M&A Method involves the calculation of valuation multiples based on those of the guideline merged and acquired companies that are then applied to the Mortgage Bank's operating results in a similar manner as the previously described Guideline Publicly Traded Company Method. The primary difference is that a control premium is generally not applied in the Guideline M&A Method because the observed transactions are typically for controlling interests. The analysis in this Report relied on the P/TBVE multiple and the LTM P/E multiple.

---

[274] Appendix V.A.2.b, at 9.

[275] Appendix V.A.2.b, at 2.

[276] *See* JAMES R. HITCHNER, FINANCIAL VALUATION: APPLICATIONS AND MODELS 259 (3d ed. 2011).

[277] *See id.*

### (c) Selecting Appropriate Multiples

The Examiner's Financial Advisors generally focused on multiples at the lower end of the indicated range, because of the relatively higher risk associated with the operations of the Mortgage Bank as compared to the guideline companies.

### (d) Guideline M&A Method: Conclusion

Based on the application of the Guideline M&A Method, the indicated range of total equity value of Old GMAC Bank on a marketable, controlling basis before adjustments is estimated to be approximately $2.69 billion to $2.85 billion as of November 22, 2006. Appendix V.A.2.b presents detail of the Guideline M&A Method conclusion.[278]

### (3) Income Approach – DCF Method

The Income Approach indicates the Fair Market Value of a business based on the value of the cash flows the business can be expected to generate in the future.[279] This analysis is commonly performed using the DCF Method, which discounts a projection of a company's future cash flows to present value at an appropriate discount rate.[280] Typically, the DCF Method has three basic components: (1) an estimation of projected net cash flows the firm will generate over a relevant and discrete period; (2) a terminal or residual value equal to the future value, as of the end of the projection period, of the firm's net cash flows beyond the projection period; and (3) a cost of capital with which to discount to a present value both the projected net cash flows and an estimated terminal or residual value.[281]

As applied to financial institutions, this method is commonly formulated as the value of future cash flows to equity holders and that approach is adopted here.[282] Since the projections here do not contemplate distributions during the forecast horizon, this approach becomes a quantification of dividend paying capacity in the residual period, net of the present value of any projected or required capital contributions.

---

[278] Appendix V.A.2.b, at 11–12.

[279] SHANNON P. PRATT WITH ALINA V. NICULITA, VALUING A BUSINESS: THE ANALYSIS AND APPRAISAL OF CLOSELY HELD COMPANIES 175–76 (5th ed. 2008).

[280] *See, e.g., MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Servs. Co*., 910 F. Supp. 913, 925 (S.D.N.Y. 1995); *see also* SHANNON P. PRATT WITH ALINA V. NICULITA, VALUING A BUSINESS: THE ANALYSIS AND APPRAISAL OF CLOSELY HELD COMPANIES 174–76 (5th ed. 2008).

[281] *See id.*

[282] *See generally* TIM KOLLER ET AL., VALUATION: MEASURING AND MANAGING THE VALUE OF COMPANIES 745 (5th ed. 2010); ASWATH DAMODARAN, INVESTMENT VALUATION: TOOLS AND TECHNIQUES FOR DETERMINING THE VALUE OF ANY ASSET 579 (2d ed. 2002).

*(a) Estimation Of Discount Rate*

When applying the Income Approach, the cash flows a business expects to generate are discounted to their present value equivalent using a rate of return that reflects the relative risk of the investment and the time value of money.[283] The Examiner's Financial Advisors used the MCAPM to determine the required return on equity. The CAPM estimates the rate of return on common equity as the current risk-free rate of return on U.S. Treasury bonds, plus a market risk premium expected over the risk-free rate of return, multiplied by the "beta" for the stock.[284] Beta is a risk measure that reflects the sensitivity of a company's stock return to the changes in returns for the stock market as a whole.[285] The MCAPM adjusts the CAPM with a "Size Premium" to correct for a historical tendency of the CAPM to underestimate rates of return for small and mid-cap companies, and a "Company-Specific Adjustment" to account for risk factors not accounted for elsewhere in the analysis.[286] The assumptions used in this calculation are:

- *Risk-Free Rate*: The risk-free rate is based on the yield on 20-Year U.S. Treasury bonds as of November 22, 2006.

- *Beta*: This analysis used predicted betas for the guideline publicly traded companies published by MSCI Barra.[287] The Examiner's Financial Advisors also considered historical betas, but determined that the predicted betas better reflected changes in the industry during the relevant time period not adequately captured by the historical betas. The Examiner's Financial Advisors considered the risk and financial condition of the Mortgage Bank relative to the guideline companies. As discussed in the section on the Market Approach, the Examiner's Financial Advisors determined that the Mortgage Bank exhibited above-average risk, and accordingly selected betas from approximately the 75th percentile of the guideline company betas. Appendix V.A.2.b presents betas for the guideline companies.[288]

---

[283] *See* SHANNON P. PRATT & ROGER J. GRABOWSKI, COST OF CAPITAL: APPLICATIONS AND EXAMPLES 6 (4th ed. 2010).

[284] *Id.* at 106.

[285] *See id.* at 107.

[286] *Id.* at 110.

[287] *See* Section V.A.2.b(1)(a) (providing a more detailed discussion of the selection of guideline companies).

[288] Appendix V.A.2.b, at 4.

- *Market Risk Premium*: The Examiner's Financial Advisors considered a variety of historical and forward-looking sources for the market risk premium in their analyses of the Ally Bank Transactions.[289] The Examiner's Financial Advisors used a market risk premium judged as representative of the consensus of alternative sources as of the relevant dates (5.0% for the 2006 Bank Restructuring and 6.5% for the 2009 Bank Transaction).[290]

- *Size Premium*: Historical evidence indicates that rates of return vary with the size of a company in a manner not fully captured by the CAPM.[291] The MCAPM rate of return is adjusted by a premium that reflects the increased risk (or premium over CAPM) for an investment in a company that is of a size similar to that of the Mortgage Bank.[292] This premium is derived from historical differences in returns between small companies and large companies using data published by Ibbotson Associates.[293] The Examiner's Financial Advisors determined a premium consistent with the size of the Mortgage Bank.[294]

- *Company-Specific Adjustment*: This adjustment may be upward or downward, depending on how the risks of the subject company compare to the risks of the guideline companies used in the analysis, as well as the risks of the companies that comprise the general market indices used in the analysis of the discount rate.[295] The

---

[289] *See, e.g.,* IBBOTSON ASSOCIATES, SBBI: VALUATION EDITION 2006 YEARBOOK (2006); MORNINGSTAR, INC., SBBI: VALUATION EDITION 2007 YEARBOOK (2007); MORNINGSTAR, INC., IBBOTSON SBBI: 2008 VALUATION YEARBOOK (2008); MORNINGSTAR, INC., IBBOTSON SBBI: 2009 VALUATION YEARBOOK (2009); BLOOMBERG L.P., COUNTRY RISK PREMIUM FOR UNITED STATES, Sept. 30, 2006–Mar. 31, 2009; BRADFORD CORNELL, THE EQUITY RISK PREMIUM: THE LONG-RUN FUTURE OF THE STOCK MARKET 201– 02 (1999); SHANNON P. PRATT & ROGER J. GRABOWSKI, COST OF CAPITAL: APPLICATIONS AND EXAMPLES 89–113 (3d ed. 2008); SHANNON P. PRATT & ROGER J. GRABOWSKI, COST OF CAPITAL: APPLICATIONS AND EXAMPLES 117–45 (4th ed. 2010); TIM KOLLER ET AL., VALUATION: MEASURING AND MANAGING THE VALUE OF COMPANIES 297–306 (4th ed. 2005); TIM KOLLER ET AL., VALUATION: MEASURING AND MANAGING THE VALUE OF COMPANIES 238–45 (5th ed. 2010); PABLO FERNANDEZ, MARKET RISK PREMIUM USED IN 2008 BY PROFESSORS: A SURVEY WITH 1,400 ANSWERS (Apr. 16, 2009), http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1344209; DUFF & PHELPS LLC, RISK PREMIUM REPORT (2012), http://www.duffandphelps.com/SiteCollectionDocuments/Reports/2012%20Risk%20Premium%20 Report% 20EXCERPT%20(DP).pdf.

[290] The calculation of a Market Risk Premium was not applicable for the 2008 Bank Transaction.

[291] IBBOTSON ASSOCIATES, SBBI: VALUATION EDITION 2006 YEARBOOK 136 (2006).

[292] SHANNON P. PRATT & ROGER J. GRABOWSKI, COST OF CAPITAL: APPLICATIONS AND EXAMPLES 110 (4th ed. 2010).

[293] IBBOTSON ASSOCIATES, SBBI: VALUATION EDITION 2006 YEARBOOK 137 (2006).

[294] The Examiner's Financial Advisors also considered small stock premium data published by Duff & Phelps, but elected not to use this data because it excludes financial institutions in its derivation. *See* DUFF & PHELPS LLC, RISK PREMIUM REPORT (2012), http://www.duffandphelps.com/SiteCollectionDocuments/Reports/ 2012%20Risk%20 Premium%20Report%20EXCERPT%20(DP).pdf.

[295] SHANNON P. PRATT & ROGER J. GRABOWSKI, COST OF CAPITAL: APPLICATIONS AND EXAMPLES 110 (4th ed. 2010).

Examiner's Financial Advisors concluded no adjustment for company-specific risk
was necessary given the other adjustments made in this analysis.

Appendix V.A.2.b presents details of the calculation of the discount rate for the 2006 Bank
Restructuring.[296]

### (b) Present Value Of Future Cash Flows

The Examiner's Financial Advisors estimated the Fair Market Value of the equity of the
Mortgage Bank using the DCF Method. The Examiner's Financial Advisors used projections
prepared by Ally Bank management for the Mortgage Bank around the time of the
transaction[297] as the basis for calculating projected cash flows to equity holders.[298]

The DCF Method was based on a one-year business plan presented to the board of
directors of Ally Bank on January 25, 2007.[299] The business plan contained projections for the
Mortgage Bank, including a projected balance sheet and income statement. These projections
were provided by management approximately two months after the 2006 Bank Restructuring.
The projections were based on financial information reasonably available at the time of the
2006 Bank Restructuring and provided evidence of reasonably foreseeable financial
performance at that date.

### (c) Calculation Of Residual Value

The present value of the residual represents the amount an investor would pay today for
the expected cash flows of the business for years subsequent to the discrete projection period.
In calculating the residual value, the Examiner's Financial Advisors estimated a normalized
cash flow to equity holders for the residual period. Changes in assets and liabilities were
normalized to match the assumed long-term growth rate. Normalized cash flows were then
capitalized using a rate calculated by subtracting the residual growth rate from the overall
required return on equity estimated previously. The present value factor from the last year of
the forecast horizon was then applied to estimate the present value of the residual cash flows.
The present value of the residual and the sum of the present value of available cash flows for
the discrete projection period were then summed to arrive at the indicated value of equity on a
marketable, controlling basis.

---

[296]  Appendix V.A.2.b, at 14.

[297]  Board of Director Meeting: 2007 Business Plan Review, dated Jan. 25, 2007, at ALLY_PEO_0006858–59
[ALLY_PEO_0006664].

[298]  The Examiner's Financial Advisors estimated cash flows to equity holders using the following formula:
Projected Net Income – Projected Increase in Stockholders' Equity = Estimated Cash Flows to Equity
Holders.

[299]  Board of Director Meeting: 2007 Business Plan Review, dated Jan. 25, 2007, at ALLY_PEO_0006858–59
[ALLY_PEO_0006664].

### (d) Adjustment For Capital Excess Or Deficiency

The Examiner's Financial Advisors' analysis included an adjustment to account for the value of projected shortfalls or surpluses in equity capitalization, in recognition of the requirement to maintain adequate capital. The adjustment was based on an assumption that departures from the normal industry equity-to-asset ratio would be addressed by future capital contributions (in the case of a shortfall, as in the 2009 Bank Transaction analysis) or a distribution (as in the case of an equity surplus for the 2006 Bank Restructuring analysis). For the 2006 Bank Restructuring, the capital distribution was partially offset by the present value of future interest expense associated with the borrowings required to enable the distribution of the equity surplus.[300] The analysis assumes that equity can revert to a normal industry capitalization after the expiration of binding agreements on capital requirements with bank regulators.[301] These agreements required capital in excess of the industry norm.

To analyze levels of equity capital maintained by the guideline depository institutions, the Examiner's Financial Advisors identified the principal depository subsidiary of each of the guideline publicly traded banking organizations selected in the Guideline Publicly Traded Company Method. Data was gathered for the regulated depository subsidiary (rather than the consolidated organization) because the bank subsidiaries are most directly affected by regulatory capital requirements. IB Finance had no subsidiary other than Ally Bank.

For each of these depository institutions, the Examiner's Financial Advisors obtained call reports from the FDIC and determined the "Tier 1 Leverage Ratio" as defined by, and reported to, the FDIC.[302] The Mortgage Bank's Tier 1 Leverage Ratio was similar to its ratio of equity to total assets.[303] Appendix V.A.2.b presents data on guideline Tier 1 Leverage Ratios as of the most recent quarter-end prior to the transaction date.[304] The average guideline bank Tier 1 Leverage Ratio was approximately 9% before the 2006 Bank Restructuring. The Examiner's Financial Advisors assumed that a normal Tier 1 Leverage Ratio in the industry was 9% for purposes of this analysis.

The Examiner's Financial Advisors also determined the present value of future cash flows before adjustment for excess capital. This alternative estimate assumes that the "excess"

---

[300] The applied present value of future interest expense was calculated using the Mortgage Bank's projected interest rate on borrowed funds on an after-tax basis.

[301] Ally Bank had commitments to the DFI (as of the 2006 Bank Restructuring) and to the FDIC (as of the 2009 Bank Transaction) to maintain capital ratios at prescribed levels for a period of time.

[302] 12 C.F.R. § 325.2, FDIC Minimum Capital Requirements—Definitions, http://www.fdic.gov/regulations/laws/rules/2000-4400.html#fdic2000part325.2.

[303] The Tier 1 Leverage Ratio includes a number of adjustments from a simple equity-to-assets ratio, including adjustments for goodwill, preferred stock, unrealized gains, and various other items. In the case of the Mortgage Bank, these adjustments were not material.

[304] Appendix V.A.2.b, at 8. The Examiner's Financial Advisors reviewed FDIC call reports for the primary depository subsidiaries of the guideline companies available as of September 30, 2006, March 31, 2008, and December 31, 2008.

capital is actually necessary to achieve the projected level of earnings over the longer term, and therefore could not be distributed to shareholders. The level of projected earnings for the Mortgage Bank in 2007 (and the residual period) was higher than 2006 even though, at the time, the industry outlook was softening. These projected earnings could be difficult to obtain over the long term without a larger banking operation, which would require more capital. This calculation establishes the lower value in the DCF Method.

### (e) Income Approach–DCF Method: Conclusion

Based on the application of the DCF Method, the indicated value of Old GMAC Bank on a marketable, controlling basis before adjustments is estimated to be approximately $1.67 billion to $1.97 billion as of November 22, 2006. Appendix V.A.2.b presents detail of the DCF Method conclusion.[305]

### (4) Asset-Based Approach

The Asset-Based Approach indicates the Fair Market Value of a business by adjusting the assets and liabilities of the subject company to their market value equivalents. The Asset-Based Approach is based on the summation of the individual values of the underlying assets, properties, and/or business units of a company. This approach can be performed using the "Adjusted Book Value Method,"[306] which involves examining the book value of a company's assets and liabilities and making adjustments to reflect market value. The book value is generally the accounting value of a company's assets and liabilities as determined under GAAP, which is then subjected to adjustments to reflect market value.[307] One should also consider any off-balance sheet assets or liabilities when applying the Adjusted Book Value Method to estimate the Fair Market Value of a business. Courts caution that accounting values may not be reflective of Fair Market Value, and, in particular, certain assets and liabilities may not be listed on the balance sheet because GAAP limits inclusion on the balance sheet to known and quantifiable assets and liabilities.[308] The Examiner's Financial Advisors estimated the Fair Market Value of the equity of the Mortgage Bank by adjusting the balance sheet to reflect the Fair Market Value of the individual assets and liabilities.

### (a) Fair Value Estimates

The Examiner's Financial Advisors used Ally Bank management's estimates of fair value for certain assets and liabilities as reported in the notes to audited financial statements as of

---

[305]  Appendix V.A.2.b, at 13.

[306]  SHANNON P. PRATT WITH ALINA V. NICULITA, VALUING A BUSINESS: THE ANALYSIS AND APPRAISAL OF CLOSELY HELD COMPANIES 352 (5th ed. 2008).

[307]  *See Lids Corp. v. Marathon Inv. Partners, L.P.* (*In re Lids Corp.*), 281 B.R. 535, 542–43 (Bankr. D. Del. 2002).

[308]  *See Trans World Airlines, Inc. v. Travellers Int'l AG.* (*In re Trans World Airlines, Inc.*), 180 B.R. 389, 405 (Bankr. D. Del. 1994) (noting that "the balance sheet is merely the starting point for the analysis"), *aff'd in part, rev'd in part*, 203 B.R. 890 (D. Del. 1996), *rev'd*, 134 F.3d 188 (3d Cir. 1998).

December 31, 2006.[309] For several major items on the balance sheet, the notes to audited financial statements report Ally Bank management's estimated fair values, including HFS loans, HFI loans, deposits, advances from the FHLB, and other items. Except as otherwise indicated (see discussion of the loan loss reserve below), the Examiner's Financial Advisors accepted Ally Bank management's audited estimate of fair value (where available) and (where not available) assumed that the book value was indicative of fair value

### (b) Loan Loss Reserves

The loan loss reserve was reflected in the fair value of loan estimates.[310] Accordingly, the reserve of approximately $23.8 million as of December 31, 2006 was reduced to zero.

### (c) Goodwill

The Asset-Based Approach applied here adjusts for items carried on the Mortgage Bank's balance sheet. The Asset-Based Approach does not adjust for items such as goodwill or other intangibles not reported on the Mortgage Bank's balance sheet.

### (d) Asset-Based Approach: Conclusion

Based on the application of the Asset-Based Approach, the indicated value of Old GMAC Bank on a marketable, controlling basis before adjustments is estimated to be approximately $1.19 billion. Appendix V.A.2.b provides detail of the Asset-Based Approach conclusion.[311]

### (5) Adjustments To Value

The methods employed provide preliminary value indications prior to certain necessary adjustments. All valuation methods are developed based on a specific set of facts, circumstances, and assumptions that result in a particular valuation basis or level (e.g., all of the indications of value described above are presented on a marketable, controlling interest basis). Therefore, adjustments are often required, and are typically accomplished through applying discounts and/or premiums to account for differences in certain ownership characteristics of the subject interest such as the degree of ownership control and marketability.

The Examiner's Financial Advisors considered adjustments to the value of the Mortgage Bank attributable to certain affiliate transactions between ResCap and the Mortgage Bank that may have had terms inconsistent with arm's-length transactions. However, during the time period of the Ally Bank Transactions, certain transactions benefitted the Mortgage Bank—

---

[309] *See* GMAC Bank Consolidated Financial Statements as of December 31, 2006 and Independent Auditors' Report, dated Mar. 27, 2007, at 35 [RC00035095].

[310] Int. of J. Cortese, Mar. 7, 2013, at 170:25–172:18.

[311] Appendix V.A.2.b, at 15.

such as general and administrative services and interest-free deposits provided by ResCap—while others benefited ResCap. Accordingly, the Examiner's Financial Advisors made no adjustment for affiliate transactions.

### (a) Old GMAC Bank: Private Company Discount

Old GMAC Bank was a wholly owned subsidiary of ResCap, did not have publicly traded common stock, and was not an SEC registrant. A controlling interest in a private company may sell at a discount to a controlling interest in a publicly traded company for various reasons. A private company generally has limited access to financial markets, may have less financial transparency, and may incur additional costs to function on a stand-alone basis once separate from its current owner. There may also be less knowledge about the business among potential investors, including a more limited number of potential buyers and an inherently less competitive "bidding" process.[312]

Empirical evidence indicates that controlling interests in stand-alone private companies (and divisions of larger public companies) tend to sell at a discount to the values observed in control transactions involving similar publicly traded companies.[313] Estimated private company discounts range from 0% to 30%. Evidence suggests that such discounts are related to size and other characteristics, with smaller and lower growth privately held companies selling for higher discounts.[314] Other evidence suggests that the observed discounts may be exaggerated to the extent that they include depressed prices for businesses sold by financially troubled parent companies.[315] The Examiner's Financial Advisors considered the facts and circumstances, including that Old GMAC Bank was a profitable institution with assets in excess of $10 billion, with audited financial statements, and a history of publicly available financial reporting to regulators, and determined that a relatively low discount was appropriate. The Examiner's Financial Advisors applied a 5% private company discount to the controlling interest in Old GMAC Bank based upon these factors.

---

[312] Kathleen Fuller et al., *What Do Returns To Acquiring Firms Tell Us? Evidence From Firms That Make Many Acquisitions*, 57 J. Fin. 1763, 1784 (2002); *see also* Shannon P. Pratt with Alina V. Niculita, Valuing a Business: The Analysis and Appraisal of Closely Held Companies 443–45 (5th ed. 2008).

[313] *See generally* John Koeplin et al., *The Private Company Discount*, J. Applied Corp. Fin., 94, 94–101 (Winter 2000); Micah S. Officer, *The Price of Corporate Liquidity: Acquisition Discounts for Unlisted Targets*, 83 J. Fin. Econ. 571, 571–98 (2007); Jean-Francois L'Her et al., *A New Examination of the Private Company Discount: The Acquisition Approach*, J. Private Equity, 48, 48–55 (Summer 2003).

[314] *See* Jean-Francois L'Her et al., *A New Examination of the Private Company Discount: The Acquisition Approach*, J. Private Equity, 48, 53–54 (Summer 2003).

[315] *See* Micah S. Officer, *The Price of Corporate Liquidity: Acquisition Discounts for Unlisted Targets*, 83 J. Fin. Econ. 571, 596–97 (2007).

### (b) IB Finance Class M Shares: Discount For Attributes Of Shares

The IB Finance Class M Shares have a number of attributes that require a lower valuation than indicated for otherwise similar interests. These include:

- Lack of control;

- Lack of voting rights;

- Lack of marketability; and

- Tracking stock structure.

### (i)  Lack Of Control

The valuation methods used in this analysis provide an estimate of the value of the Mortgage Bank on a controlling interest basis. Valuation theory and practice holds that a non-controlling interest will generally be valued at less than an otherwise similar controlling interest.[316] The IB Finance 2006 LLC Agreement[317] gave AFI complete control over IB Finance. ResCap's interest in IB Finance was disadvantaged in a number of ways:

- AFI had complete power to appoint directors, managers, and determine strategic direction;[318]

- AFI had sole power to determine financial policy, including payment of dividends;[319] and

- AFI had sole power to make decisions regarding such matters as acquisitions or sales of the business or assets of the business, including the Mortgage Bank.[320]

A commonly used method of quantifying a discount for lack of control is based on the inverse of the control premium used in arriving at the controlling interest value.[321] Application of this method would give an approximately 9% lack of control discount using the 10% control premium from the Examiner's Financial Advisors' Guideline Publicly Traded Company Method analysis.

---

[316] Shannon P. Pratt with Alina V. Niculita, Valuing a Business: The Analysis and Appraisal of Closely Held Companies 65–66 (5th ed. 2008).

[317] *See, e.g.,* IB Finance 2006 LLC Agreement, §§ 3.1–3.10 [ALLY_0401862].

[318] *See id.* § 3.1.

[319] *See id.* §§ 2.5, 3.1(a)–(b).

[320] *See id.* § 3.10.

[321] Discount for Lack of Control = 1− (1 ÷ (1 + Control Premium) ). *See* James R. Hitchner, Financial Valuation: Applications and Models 377 (3d ed. 2011).

### (ii) Lack Of Voting Rights

Voting shares are more valuable than non-voting shares because of the value associated with control for the reasons previously described. There is extensive empirical evidence supporting a premium for voting rights (or a discount for lack of voting rights) based on studies of companies with dual share structures (wherein one class of shares either lacks voting power or has limited voting power).[322] This body of research studied the market value attributed to voting rights by comparing the difference in prices paid for voting and non-voting minority shares of dual class firms. Average discounts reported for the lack of voting rights for minority interests in these studies ranged from approximately 3% to 10%.

### (iii) Lack Of Marketability

The IB Finance Class M Shares require a discount for lack of marketability.[323] Investors prefer equity investments with access to a liquid secondary market and that may be readily converted into cash. Equity investments without such marketability and liquidity characteristics normally sell at a discount to provide an investor with compensation for this lack of liquidity. Shares not readily marketable sell at a discount because of higher transaction costs, longer time requirements associated with selling the shares, and the interim risks associated with selling the shares. In general, the diminution in value associated with this factor is referred to as a discount for lack of marketability.[324]

Numerous studies have attempted to measure the diminution of value associated with an investment which lacks a ready market or involves various stock restrictions.[325] A common approach is the study of discounts on restricted stock. In general, restricted stock is the term used to describe shares of publicly traded companies subject to limitations or restrictions on transfer or trading. The limitations generally relate to legal restrictions on resale placed on shares by Rule 144 under the Securities Act of 1933.[326] A company's restricted stock is identical in every aspect to similar, publicly traded shares except for the applicable restrictions. Average discounts in these studies typically ranged from 20% to 40%.[327]

---

[322] *See, e.g.,* STEVEN R. COX & DIANNE M. RODEN, THE SOURCE OF VALUE OF VOTING RIGHTS AND RELATED DIVIDEND PROMISES, 8 J. CORP. FIN. 337 (2002), https://scholarworks.iu.edu/dspace/bitstream/ handle/ 2022/6919/Voting_Rights_and_Dividends.pdf?sequence=1 (summarizing academic research); SHANNON P. PRATT, BUSINESS VALUATION: DISCOUNTS AND PREMIUMS 246–51 (2d ed. 2009) (summarizing a number of studies by practitioners).

[323] The Examiner's Financial Advisors distinguish the discount for lack of marketability from the "private company discount" discussed above for the controlling interest in Old GMAC Bank. Controlling interests are generally considered to be easier to liquidate than minority interests.

[324] *See* SHANNON P. PRATT WITH ALINA V. NICULITA, VALUING A BUSINESS: THE ANALYSIS AND APPRAISAL OF CLOSELY HELD COMPANIES 416 (5th ed. 2008).

[325] *See Id.* at 415–57 (summarizing a number of studies).

[326] 17 C.F.R. § 230.144.

[327] *See* SHANNON P. PRATT WITH ALINA V. NICULITA, VALUING A BUSINESS: THE ANALYSIS AND APPRAISAL OF CLOSELY HELD COMPANIES 431 (5th ed. 2008).

Several studies of restricted stocks and other private placements suggest that observed discounts are related to the characteristics of the issuing company.[328] Studies have found relationships between the observed discounts and such characteristics as the size of the company, size of the offered block, financial condition, and volatility of stock price or earnings. Generally, the studies suggest that discounts are larger if:

- The issuing company is small or the value of the deal is small;[329]

- The deal involves a large percent of outstanding stock;[330]

- The issued shares lack registration rights;[331]

- The issuing company is unprofitable or has uncertain prospects; [332] and/or

- The volatility of stock price is high.[333]

The Examiner's Financial Advisors obtained information on restricted stock discounts for twenty-eight transactions involving restricted stock issued by publicly traded banking organizations. Appendix V.A.2.b presents data for these transactions.[334] The mean discount

---

[328]  *See, e.g.,* William L. Silber, *Discounts on Restricted Stock: The Impact of Illiquidity on Stock Prices*, FIN. ANALYSTS J., 60, 60–64 July–Aug. 1991; Michael Hertzel & Richard L. Smith, *Market Discounts and Shareholder Gains for Placing Equity Privately*, 48 J. FIN. 459, 459–85 (1993); Bruce A. Johnson, *Quantitative Support for Discounts for Lack of Marketability*, BUS. VALUATION REV., 152, 152–55 (Dec. 1999); Mukesh Bajaj et al., *Firm Value and Marketability Discounts*, J. CORP. L., 89, 89–115 (Fall 2001).

[329]  *See generally* William L. Silber, *Discounts on Restricted Stock: The Impact of Illiquidity on Stock Prices*, FIN. ANALYSTS J., 60, 60–64 (July–Aug. 1991); Michael Hertzel & Richard L. Smith, *Market Discounts and Shareholder Gains for Placing Equity Privately*, 48 J. FIN. 459, 459–85 (1993); Bruce A. Johnson, *Quantitative Support for Discounts for Lack of Marketability*, BUS. VALUATION REV., 152, 152–55 (Dec. 1999).

[330]  *See generally* William L. Silber, *Discounts on Restricted Stock: The Impact of Illiquidity on Stock Prices*, FIN. ANALYSTS J., 60, 60–64 (July–Aug. 1991); Michael Hertzel & Richard L. Smith, *Market Discounts and Shareholder Gains for Placing Equity Privately*, 48 J. FIN. 459, 459–85 (1993); Bruce A. Johnson, *Quantitative Support for Discounts for Lack of Marketability*, BUS. VALUATION REV., 152, 152–55 (Dec. 1999); Mukesh Bajaj et al., *Firm Value and Marketability Discounts*, J. CORP. L., 89, 89–115 (Fall 2001).

[331]  *See generally* Michael Hertzel & Richard L. Smith, *Market Discounts and Shareholder Gains for Placing Equity Privately*, 48 J. FIN. 459, 459–85 (1993); Bruce A. Johnson, *Quantitative Support for Discounts for Lack of Marketability*, BUS. VALUATION REV., 152, 152–55 (Dec. 1999); Mukesh Bajaj et al., *Firm Value and Marketability Discounts*, J. CORP. L., 89, 89–115 (Fall 2001).

[332]  *See generally* William L. Silber, *Discounts on Restricted Stock: The Impact of Illiquidity on Stock Prices*, FIN. ANALYSTS J., 60, 60–64 (July–Aug. 1991); Michael Hertzel & Richard L. Smith, *Market Discounts and Shareholder Gains for Placing Equity Privately*, 48 J. FIN. 459, 459–85 (1993); Mukesh Bajaj et al., *Firm Value and Marketability Discounts*, J. CORP. L., 89, 89–115 (Fall 2001).

[333]  *See generally* Mukesh Bajaj et al., *Firm Value and Marketability Discounts*, J. CORP. L., 89, 89–115 (Fall 2001).

[334]  Appendix V.A.2.b, at 10.

was approximately 14.2% and the median was 9.1%, while the inter-quartile range (25th to 75th percentile) was approximately 5.3% to 16.0%, for these transactions. This range is relatively low compared with the typical average reported in published studies of restricted stock as summarized above.

Legal or contractual restrictions on transfer may also impact marketability.[335] The marketability of the IB Finance Class M Shares was impaired by the requirement for approval by AFI for any sale to a third party.[336]

### (iv) Tracking Stock Structure

The IB Finance Class M Shares were structured as a tracking stock of the Mortgage Bank. A tracking stock is an equity stake in a parent company that gives investors an economic interest in only one division or subsidiary of the parent.[337] Such stocks do not share in the consolidated performance of the company pro rata with other equity holders.

There was an interest in the U.S. public markets in tracking stocks and a number of companies issued tracking stocks for a time in the 1980s and 1990s. However, this form of ownership became unpopular after 2000, leading companies to retire these shares.[338] By 2009, there was only one company (Liberty Media) in the U.S. with a tracking stock structure.[339] Shareholders of a tracking stock do not have a separate board of directors with a fiduciary responsibility to look solely after their interests, and there is no assurance that conflicts of interest between divisions will be resolved favorably.[340] Moreover, the possibility of weak legal protection against intercompany transfers that disadvantage investors is an undesirable aspect of a tracking stock.[341]

---

[335] *See* SHANNON P. PRATT WITH ALINA V. NICULITA, VALUING A BUSINESS: THE ANALYSIS AND APPRAISAL OF CLOSELY HELD COMPANIES 66 (5th ed. 2008).

[336] *See* IB Finance 2006 LLC Agreement, § 2.3 [ALLY_0401862] ("No additional members will be admitted to the Company without the consent of the Members.").

[337] *See* B. Espen Eckbo & Karin S. Thorburn, *Corporate Restructuring: Breakups and LBOs* 29 (Tuck Sch. of Bus. Working Paper No. 2008-49, 2008), http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1133153.

[338] Palash R. Ghosh, *Tracking Stocks Are Now Relics*, WALL ST. J., Jan. 9, 2008, http://online.wsj.com/article/SB119985406966877497.html.

[339] Stephani A. Mason & Meera Rani Behera, *Were We Better Off Without the Invention of Tracking Stocks?: The Wealth Effects of the Elimination of Tracking Stock Structures* 5 (Jan. 6, 2012), http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1986132.

[340] *See* TIM KOLLER ET AL., VALUATION: MEASURING AND MANAGING THE VALUE OF COMPANIES 472 (5th ed. 2010).

[341] *See* B. Espen Eckbo & Karin S. Thorburn, *Corporate Restructuring: Breakups and LBOs* 31–32 (Tuck Sch. of Bus. Working Paper No. 2008-49, 2008), http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1133153.

Studies of retirements of publicly traded tracking stocks have found that, on average, the announcement of retirement was associated with abnormal positive returns to shareholders in excess of 10%.[342] These studies suggest the magnitude of discount that may result from this form of ownership.

### (v) Discount For IB Finance Class M Shares: Conclusion

The various discounts described above (for lack of control, lack of voting rights, lack of marketability, and tracking stock structure) considered together indicate a substantial discount from a marketable, controlling interest value. The Examiner's Financial Advisors recognized that there is overlap between these discounts (e.g., lack of control in this instance largely results from lack of voting rights), and did not treat these discounts as additive. The Examiner's Financial Advisors applied a discount of 30% to the marketable, controlling value of the IB Finance Class M Shares to reflect the value on a non-marketable, non-controlling basis as of November 22, 2006.[343]

The Examiner's Professionals considered arguments that the IB Finance Class M Shares could not be materially less valuable than the equity of Old GMAC Bank because the IB Finance ownership structure gave ResCap an interest in the financial performance of essentially the same Old GMAC Bank assets it previously owned, and ResCap's management had control of the day-to-day operations of the Mortgage Bank. However, the Examiner's Professionals determined that those arguments failed to account for the material diminution in value resulting from: (1) the loss of legal *rights* to control the business; (2) the loss of voting rights; (3) the increased lack of marketability; and (4) the undesirability of the tracking stock structure from an investor's point of view.

### (6) Assessment Of The Value Of Obtaining A De-Linked Credit Rating

ResCap had exposure to a credit downgrade if the Cerberus PSA failed to close and AFI's rating remained linked to that of GM. Failure to maintain an investment-grade rating would have increased ResCap's funding costs by an amount that ResCap management estimated would be $250 million per year before taxes.[344]

---

[342] *See* Stephani A. Mason & Meera Rani Behera, *Were We Better Off Without the Invention of Tracking Stocks?: The Wealth Effects of the Elimination of Tracking Stock Structures* 3 (Jan. 6, 2012), http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1986132. *See generally* Matthew T. Billet & Anand M. Vijh, *The Wealth Effects of Tracking Stock Restructurings*, 27 J. FIN. RESEARCH 559, 559–83 (2004).

[343] A combined discount in a range of approximately 29% to 38% was obtained by sequentially applying four distinct discounts: (1) a discount for lack of control of approximately 8% to 10%; (2) a discount for lack of marketability of approximately 15% to 20%; (3) a non-voting discount of approximately 5%; and (4) a discount for the tracking stock structure of approximately 5% to 10%.

[344] Walker Report, at RC40008939 [RC40008925] ("Additionally, the downgrade would trigger step-up provisions on ResCap's outstanding unsecured debt and bank credit facilities, which would increase ResCap's cost of funds and reduce earnings by approximately $250 million per year (pre-tax).").

The Examiner's Financial Advisors accepted management's estimate of $250 million per year in cost savings before taxes. The Examiner's Financial Advisors then recognized that cost savings benefit for a one-year period, resulting in a $150 million cost savings after applying a tax rate of 40% for purposes of assessing REV. Although the ResCap Board contemplated that ResCap would be a disregarded entity for federal income tax purposes as of November 22, 2006, the ResCap Board was clearly aware that any future income would be subject to the economic equivalent of a federal income tax. Further, the ResCap Board had knowledge of the terms and conditions of the 2005 Operating Agreement, which required that "ResCap and GMAC shall maintain in effect an income tax allocation agreement that shall provide for two-way sharing payments based on the separately calculated tax liability or benefit of ResCap."[345] Therefore, the Examiner's Financial Advisors conclude that tax affecting the cost savings benefit is entirely appropriate in these circumstances.

The Examiner's Financial Advisors viewed the credit rating as transitory because ResCap's profitability in late 2006 was suffering from pricing pressure, deteriorating asset quality, unfavorable interest rates, and other factors attributable to the mortgage industry downturn.[346] This trend was expected to continue, if not deteriorate further, in the near term. ResCap's credit rating would also continue to be linked to that of AFI, which had a below-investment grade rating, putting ResCap at risk of a downgrade if AFI was downgraded.[347] The Examiner's Financial Advisors viewed the cost savings associated with de-linking AFI's credit rating from GM as a short-term benefit for these reasons.

S&P upgraded ResCap from BBB- to BBB on November 27, 2006 contemporaneously with the closing of the Cerberus transaction, but gave this new rating a "negative" outlook citing a challenging industry environment and a link to AFI's rating (which remained below investment grade).[348] Moody's gave ResCap a stable outlook but kept its rating at Baa3 on November 15, 2006.[349] Fitch upgraded ResCap from BBB- to BBB on November 30, 2006 and gave a "positive" outlook (citing developments at AFI rather than ResCap).[350]

A future downgrade over the near term was reasonably foreseeable as of November 22, 2006 because of the deteriorating conditions in ResCap's business, the mortgage industry, and financial condition of its parent, AFI (with which it remained linked). The Examiner's Financial Advisors selected a one-year time horizon to value the cost savings benefit, and

---

[345] 2005 Operating Agreement, § 2(b)(iii) [ALLY_0140795].

[346] *See* Section VI.C.4.b(3) (providing additional discussion regarding the financial condition and outlook for ResCap during late 2006 period).

[347] These factors were confirmed by S&P when it upgraded ResCap to BBB (negative outlook) on November 27, 2006. *See* S&P, Research Update, *Residential Capital LLC Rating Raised to 'BBB', Removed From CreditWatch; Outlook Negative* (Nov. 27, 2006).

[348] *See id.*

[349] *See* Moody's, Announcement, *Moody's Expects to Confirm ResCap's Debt at Baa3 Stable* (Nov. 15, 2006), http://www.moodys.com/research/Moodys-expects-to-confirm-ResCaps-debt-at-Baa3-stable--PR_122397.

[350] Fitch, Press Release, *Fitch Upgrades GMAC LLC to 'BB+' & ResCap to 'BBB'; Outlook Positive* (Nov. 30, 2006), http://www.fitchratings.com/creditdesk/press_releases/detail.cfm?print=1&pr_id=326772.

concluded that the present value of the $150 million cost savings to ResCap from de-linking AFI's credit rating from GM's was approximately $143 million.[351]

### (7) 2006 Bank Restructuring Valuation Conclusion

#### (a) Value Of Transfers From ResCap

Based on the analysis described above, the Examiner's Financial Advisors considered the results of each valuation approach to determine a range of the Fair Market Value of the equity of Old GMAC Bank on a marketable, controlling basis to be $1.70 billion to $2 billion.[352]

The Examiner's Financial Advisors relied on an average of the Guideline Publicly Traded Company Method and the DCF Method in determining their conclusion of value. The other methods were considered but given no explicit weight. There were relatively few timely precedent transactions under the Guideline M&A Method at a time when the market outlook was changing. The Asset-Based Approach applied here adjusts for items carried on the Mortgage Bank's balance sheet. The Asset-Based Approach does not adjust for items such as goodwill or other intangibles not reported on the Mortgage Bank's balance sheet.

---

[351] The Examiner's Financial Advisors conclude that the gross value (before taxes) of the indirect benefit reasonably related to the credit rating de-linkage is $250 million per year, based on the estimate made by Walker in his memorandum to the ResCap Board. Walker Report, at RC40008939 [RC40008925]. The Examiner's Financial Advisors' conclusion that the cost savings associated with a credit rating de-linkage constitutes a benefit for purposes of assessing reasonably equivalent value generates a question as to how long that benefit should be counted for purposes of assessing reasonably equivalent value. The Examiner's Financial Advisors conclude that the transitory nature of the cost savings associated with a credit rating de-linkage justifies a time horizon of no greater than one year in these circumstances. A credit rating is influenced by a host of factors; it is the result of a dynamic process that will likely be influenced by post-transfer data that having nothing to do with the de-linkage event. Thus, beyond a short-term realization of cost savings, any continued favorable or unfavorable credit rating simply becomes too tenuous to suggest a reasonable nexus between it and the de-linkage event.

In contrast, during the Investigation, Walker projected that additional cost savings (beyond the $250 million per year before taxes previously identified above) could be "a little more than a billion dollars" *over a three-year time period*. Int. of D. Walker, Nov. 28, 2012, at 137:1–12. Walker provided no basis for this statement. The Examiner's Financial Advisors have found none. The Examiner's Financial Advisors reviewed the minutes of the ResCap Board meetings during the relevant time period, including a thorough consideration of the detailed memorandum prepared by Walker for the ResCap Board. The Examiner's Financial Advisors found that Walker never shared with the ResCap Board any additional cost savings estimates beyond the $250 million per year already identified in his memorandum. The Examiner's Financial Advisors conclude that incorporating the cost savings associated with a credit rating de-linkage over a one-year time horizon is reasonable because the assessment should recognize the ephemeral and transitory nature of any benefits actually received by the debtor.

[352] All values reflected in this Section V.A.2 are approximate.

EXHIBIT V.A.2.b(7)(a)—1
**2006 Bank Restructuring – Old GMAC Bank Equity Value (Marketable, Controlling)**
November 22, 2006
*($ in Millions)*

| Valuation Method | Fair Market Value | | | Weighting |
| | Low | | High | |
|---|---|---|---|---|
| Guideline Publicly Traded Company Method | $ | 1,691.7 | $ 2,125.5 | 50.0% |
| Guideline M&A Method | | 2,689.9 | 2,848.8 | 0.0% |
| DCF Method | | 1,667.8 | 1,965.3 | 50.0% |
| Adjusted Book Value Method | | 1,192.2 | 1,192.2 | 0.0% |
| Equity value of Old GMAC Bank (marketable, controlling) | $ | 1,679.7 | $ 2,045.4 | |
| Equity value of Old GMAC Bank (marketable, controlling), rounded | $ | 1,700.0 | $ 2,000.0 | |

*Source: Appendix V.A.2.b, at 1.*

The Examiner's Financial Advisors applied a 5% private company discount to reflect the equity value of Old GMAC Bank on a non-marketable, controlling basis. The Examiner's Financial Advisors included the $360 million capital contribution to estimate the range of value transferred from ResCap on November 22, 2006 at approximately $1.98 billion to $2.26 billion.

EXHIBIT V.A.2.b(7)(a)—2
**2006 Bank Restructuring – Value of Transfers from ResCap**
November 22, 2006
*($ in Millions)*

| | Fair Market Value | | | |
| | Low | | High | |
|---|---|---|---|---|
| Equity value of Old GMAC Bank (marketable, controlling) | $ | 1,700.0 | $ | 2,000.0 |
| Private company discount of 5% | | (85.0) | | (100.0) |
| Equity value of Old GMAC Bank (non-marketable, controlling) | | 1,615.0 | | 1,900.0 |
| Capital contribution to IB Finance | | 360.0 | | 360.0 |
| Total property transferred | $ | 1,975.0 | $ | 2,260.0 |

*Source: Appendix V.A.2.b, at 1.*

### (b) Value Received By ResCap

The Examiner's Financial Advisors applied a 30% discount for lack of control and marketability in determining the value of the IB Finance Class M Shares received by ResCap, which is estimated to be approximately $1.44 billion to $1.65 billion. The Examiner's Financial Advisors included approximately $143 million reflecting the value of de-linking AFI's credit rating from GM's to estimate the range of value received by ResCap at $1.58 billion to $1.79 billion.[353]

---

[353]  *See* Section V.A.2.b(6).

EXHIBIT V.A.2.b(7)(b)
**2006 Bank Restructuring – Value Received by ResCap**
November 22, 2006
*($ in Millions)*

|  | Fair Market Value | | | |
| --- | --- | --- | --- | --- |
|  | Low | | High | |
| Equity value of Old GMAC Bank |  |  |  |  |
| before capital contribution (marketable, controlling) | $ | 1,700.0 | $ | 2,000.0 |
| Capital contribution to IB Finance |  | 360.0 |  | 360.0 |
| Value of IB Finance Class M Shares (marketable, controlling) |  | 2,060.0 |  | 2,360.0 |
| Discount for attributes of shares of 30% |  | (618.0) |  | (708.0) |
| Value of IB Finance Class M Shares |  |  |  |  |
| (non-marketable, non-controlling) |  | 1,442.0 |  | 1,652.0 |
| Cost savings to ResCap as a result of de-linking AFI's credit rating from GM |  | 142.7 |  | 142.7 |
| Total property received | $ | 1,584.7 | $ | 1,794.7 |

*Source: Appendix V.A.2.b, at 1.*

## (8) 2006 Bank Restructuring Reasonably Equivalent Value Conclusion

Based upon the above discussion and analysis of the 2006 Bank Restructuring, the Examiner concludes that the evidence supports the proposition that ResCap did not receive reasonably equivalent value in the 2006 Bank Restructuring. Appendix V.A.2.b details the Examiner's conclusions.[354]

EXHIBIT V.A.2.b(8)
**2006 Bank Restructuring – Values Transferred from and Received by ResCap**
November 22, 2006
*($ in Millions)*

| Value Transferred from ResCap | | | Value Received by ResCap | | |
| --- | --- | --- | --- | --- | --- |
| Component | Low | High | Component | Low | High |
| Equity value of Old GMAC Bank | $ 1,615.0 | $ 1,900.0 | IB Finance Class M Shares | $ 1,442.0 | $ 1,652.0 |
| Capital contribution to IB Finance | 360.0 | 360.0 | Cost savings to ResCap as a result of de-linking AFI's credit rating from GM | 142.7 | 142.7 |
| Total property transferred | $ 1,975.0 | $ 2,260.0 | Total property received | $ 1,584.7 | $ 1,794.7 |

Value received by ResCap less value transferred from ResCap, rounded [(1)]    $ (390.3) to $ (465.3)

[(1)] *The low end of the range of value for property transferred is paired with the low end of the range of value for property received (with a similar pairing of the respective high ends) in order to maintain consistency between the economic assumptions associated with the respective ranges.*
*Source: Appendix V.A.2.b, at 1.*

---

[354] Appendix V.A.2.b, at 1.

Whether reasonably equivalent value was received is normally a question of fact,[355] and valuation factors will "turn on the case-specific circumstances surrounding the debtor's decision to enter into the challenged transaction."[356] Courts look to, among other things: (1) whether the value of what was transferred is equal to the value of what was received; (2) the market value of what was transferred and received; (3) whether the transaction took place at arm's length; and (4) the good faith of the transferee.[357] The inquiry of whether reasonably equivalent value was received "is fundamentally one of common sense, measured against market reality . . . ."[358]

Reasonable, not exact, equivalence is all that is required.[359] In *Calvillo*, the bankruptcy court noted "[t]here is no set minimum percentage or monetary amount necessary" for a court to find that the debtor received reasonably equivalent value.[360]

The Examiner concludes that the evidence supports the proposition that ResCap did not receive reasonably equivalent value for the property transferred as part of the 2006 Bank Restructuring by considering the totality of the circumstances. First, the disparity in values of the properties is significant. ResCap suffered a diminution in value of approximately 20% resulting from the differential between the value of property transferred and the value of the property received (including the cost savings resulting from the maintenance of a transitory credit rating). Part of the outbound value from ResCap included $360 million of cash and debt, or approximately 18% to 16% of the property transferred; ResCap received no cash or cash equivalent in return.

---

[355] *See, e.g., Klein v. Tabatchnick*, 610 F.2d 1043, 1047 (2d Cir. 1979) ("Fairness of consideration is generally a question of fact."); *Texas Truck Ins. Agency, Inc. v. Cure* (*Matter of Dunham*), 110 F.3d 286, 288–89 (5th Cir. 1997); *Jacoway v. Anderson* (*In re Ozark Rest. Equip. Co., Inc.*), 850 F.2d 342, 344 (8th Cir. 1988); *Daley v. Chang (In re Joy Recovery Tech. Corp.)*, 286 B.R. 54, 75 (Bankr. N.D. Ill. 2002); *Leonard v. Mylex Corp.* (*In re Northgate Computer Sys., Inc.*), 240 B.R. 328, 365 (Bankr. D. Minn. 1999); *Alberts v. HCA Inc.* (*In re Greater Se. Cmty. Hosp. Corp. I*), No. 11-5279-BK, 2008 WL 2037592, at *8 (Bankr. D. Dist. Col. May 19, 2008). *But see Liquidation Trust v. Daimler AG* (*In re Old Carco LLC*), 2013 WL 335993, at *1 (2d Cir. Jan. 30, 2013) (concluding as a matter of law that the plaintiff in a fraudulent transfer suit failed to plausibly allege that the debtor received less than reasonably equivalent value).

[356] *Lowe v. B.R.B. Enters., Ltd.* (*In re Calvillo*), 263 B.R. 214, 220 (W.D. Tex 2000) (citation omitted).

[357] *See Barber v. Golden Seed Co., Inc.*, 129 F.3d 382, 387 (7th Cir. 1997); *Mellon Bank, N.A, v. Official Comm. of Unsecured Creditors of R.M.L. Inc.* (*In re R.M.L. Inc.*), 92 F.3d 139, 149 (3d Cir. 1996).

[358] *In re Northgate Computer Sys.,* 240 B.R. at 365 (citation omitted).

[359] *Murphy v. Meritor Sav. Bank* (*In re O'Day Corp.*), 126 B.R. 370, 393 (Bankr. D. Mass. 1991); *MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Servs. Co.*, 910 F. Supp. 913, 937 (S.D.N.Y. 1995); *see also Rubin v. Mfrs. Hanover Trust Co.*, 661 F.2d 979, 994 (2d Cir. 1981); *Butler Aviation Int'l, Inc. v. Whyte* (*Matter of Fairchild Aircraft Corp.*), 6 F.3d 1119, 1125–26 (5th Cir. 1993); *Waste Mgmt., Inc. v. Danis Indus. Corp.*, No. 3:00CV256, 2009 WL 347773, at *21 (S.D. Ohio Feb. 10, 2009); *In re Calvillo*, 263 B.R. at 220; *Coan v. Fleet Credit Card Servs., Inc.* (*In re Guerrera*), 225 B.R. 32, 36 (Bankr. D. Conn. 1998) ("It is not necessary that there be 'mathematical precision' or a 'penny-for-penny' exchange.").

[360] *In re Calvillo*, 263 B.R. at 220.

Second, the nature, attributes, and characteristics of the properties exchanged were significantly different. The 2006 Bank Restructuring left ResCap with a stake in the financial performance of substantially the same assets as it held through its position in Old GMAC Bank. However, the form of ownership—IB Finance Class M Shares—was significantly different. ResCap held a controlling interest in 100% of the equity of Old GMAC Bank before the transfer, whereas the 2006 Bank Restructuring left ResCap with a non-controlling and non-voting interest in a tracking stock. These new shares were significantly less valuable than the interests transferred. The evidence discussed in this Report shows that market participants place less value on equity interests that lack control, lack voting rights, lack marketability, and are structured as tracking stocks, as compared to equity interests that do not have these undesirable attributes.

Third, the properties were not exchanged through an arm's-length transaction. The Investigation revealed that the specific characteristics of the properties exchanged and the disparity of value clearly fall outside the range of characteristics and values one would expect reasonable parties to reach based on the information available to each at the time of the transfer with both parties acting at arm's length.[361] Therefore, in the absence of other consideration, the 2006 Bank Restructuring was for less than reasonably equivalent value even when the indirect benefits received by ResCap—maintenance of its credit rating—are included.

### c. 2008 Bank Transaction – Analysis And Examiner's Conclusions

The ResCap Preferred Interests issued to AFI in the 2008 Bank Transaction were exchangeable into IB Finance Preferred Interests after January 1, 2009.[362] For the 2008 Bank Transaction, the Examiner's Financial Advisors estimated the value of the following:

*Value Transferred from ResCap*

- ResCap Preferred Interests issued to AFI;

- AFI's right to exchange the ResCap Preferred Interests for IB Finance Preferred Interests;

*Value Received by ResCap*

- ResCap bonds contributed by AFI to ResCap; and

- Right to redeem IB Finance Preferred Interests for $1,000 per unit.

Appendix V.A.2.c presents a summary of the reasonably equivalent value determinations for the 2008 Bank Transaction.[363]

---

[361] *See* Section V.A.1 (providing a detailed description of the 2006 Bank Restructuring).

[362] *See* Residential Capital, LLC, Current Report (Form 8-K) (Apr. 4, 2008), at Item 5.03.

[363] Appendix V.A.2.c, at 1.

### (1) Value Of The ResCap Preferred Interests

The Examiner concludes that the ResCap Preferred Interests had little to no value, given the conclusions discussed in Section VI of this Report that ResCap was insolvent, inadequately capitalized, and could not have reasonably believed it was able to pay its debts as they became due, both immediately before and after the 2008 Bank Transaction.

### (2) Value Of Right To Exchange ResCap Preferred Interests For IB Finance Preferred Interests

Because the ResCap Preferred Interests issued to AFI had little to no value in and of themselves, the Examiner's Professionals concluded that the value transferred from ResCap was AFI's right to exchange the ResCap Preferred Interests into IB Finance Preferred Interests. AFI, in effect, received an option on the IB Finance Preferred Interests with a zero exercise price. While ResCap did not own the IB Finance Preferred Interests (the units would be newly issued at the time of a future exchange), the units still represented value transferred from ResCap because any future issuance of these units to AFI would diminish the value of ResCap's remaining IB Finance Class M Shares.

The Examiner's Financial Advisors estimated the expected future value of the IB Finance Preferred Interests as of January 1, 2009—the earliest date at which AFI could exercise its exchange rights—by capitalizing the annual dividends on those interests.[364] Under this method of the Income Approach, value is calculated as the annual dividend divided by the discount rate, representing the present value of the annual dividend received in perpetuity.

The annual dividend on the IB Finance Preferred Interests equals the 10% dividend rate times the redemption value of approximately $806 million (approximately $607 million and $199 million, respectively, for the March 2008 and June 2008 contributions).[365] The Examiner's Financial Advisors' estimate of the discount rate was derived from a study of yields on preferred stock and debt for various benchmarks as of March and June 2008.[366] The benchmarks considered in this analysis included:

- Dividend yields on the preferred stock issues identified in Morgan Stanley's presentation to the ResCap Board. The Examiner's Financial Advisors obtained yields on these instruments as of March 31, 2008, and June 3, 2008, using data available from Bloomberg.

---

[364] *See* SHANNON P. PRATT WITH ALINA V. NICULITA, VALUING A BUSINESS: THE ANALYSIS AND APPRAISAL OF CLOSELY HELD COMPANIES 580 (5th ed. 2008).

[365] *See* Appendix V.A.2.c, at 2.

[366] The Examiner's Financial Advisors did not identify publicly available pricing on preferred stock issued by any of the guideline companies selected in this analysis.

- Yields on publicly traded preferred stock issued by a selection of major financial companies, including Bank of America, Citigroup, J.P. Morgan Chase, Merrill Lynch, Wachovia, and Wells Fargo.

- Yields to maturity for various indices of high-yield debt published by Merrill Lynch, including an index of high-yield banks and thrift institutions.

Appendix V.A.2.c presents these various benchmarks.[367]

The Examiner's Financial Advisors concluded that yields of 8% to 10% were appropriate for the 2008 Bank Transaction after reviewing the benchmark yield data described previously. The present value of dividends provides a future value of the exchange rights for the IB Finance Preferred Interests as of January 1, 2009 (the assumed date of exchange); however, it is necessary to discount this future value to determine the present value as of the 2008 Bank Transaction (for the March 31, 2008 and June 3, 2008 contributions). A high discount rate was determined to be necessary because the exchange rights were only exercisable if ResCap did not file for bankruptcy before January 2009. Market pricing of ResCap bonds at the time of these transactions shows that market participants were steeply discounting ResCap's bonds with short-term maturities, a reflection of perceived bankruptcy risk. The Examiner's Financial Advisors therefore used a discount rate of approximately 71.9% for the March 31, 2008 transaction, and 33.7% for the June 3, 2008 transaction, based on yields of ResCap's short-term debt. The different discount rates reflect changes in the price of ResCap's notes between the two dates.

Based on this approach, the estimated value of the right to exchange the ResCap Preferred Interests into IB Finance Preferred Interests was approximately $403 million to $504 million as of the March 31, 2008 contribution, and approximately $168 million to $210 million as of the June 3, 2008 contribution. These values were discounted to reflect the risk of a ResCap bankruptcy before January 1, 2009, as discussed previously.[368]

### (3) Fair Market Value Of Bonds Contributed By AFI To ResCap

AFI contributed bonds on both March 31, 2008 and June 3, 2008 with a reported Fair Market Value of approximately $806 million (consisting of approximately $607 million for the March contribution and $199 million for the June contribution). Price quotes were available for each of the bond issues included in these contributions. The Examiner's

---

[367] Appendix V.A.2.c, at 4.

[368] The discount rates' reflection of bankruptcy risk has a material impact on the valuation of the IB Finance Preferred Interest exchange rights. If the dividend yields of 8% to 10% were used as discount rates in the high and low scenarios, the resulting present values would be $565 million to $716 million as of March 31, 2008 and $188 million to $238 million as of June 3, 2008. This alternative calculation ignores the actual risk of a near-term ResCap bankruptcy and is presented only for informational purposes.

Financial Advisors determined that the Observable Market Value Method[369] or quoted trading prices provided a suitable basis for determining the value of these securities contributed to ResCap.

The Examiner's Professionals considered arguments that the contribution of bonds may have had no value to ResCap, or that market prices may not have provided a meaningful measure of value at the time of the Ally Bank Transactions. The Examiner's Professionals reasoned that: (1) the bonds represent obligations by ResCap; (2) prices paid for these bonds reflect the expectations of market participants about the present value of expected future payments by ResCap (possibly including restructured payments or recoveries in reorganization); and (3) eliminating ResCap's obligations on these future payments represents value to ResCap and its creditors, even if ResCap remained insolvent after the contribution.

The Examiner's Financial Advisors gathered pricing data as of the transaction date for each of the bonds contributed in the 2008 Bank Transaction.[370] This analysis indicates the following approximate value of these contributions:[371]

---

[369] *See* Section VI.B.2.c(1)(c) (providing further discussion of the Observable Market Value Method).

[370] Pricing per Interactive Data Corporation, a provider of securities pricing data.

[371] Section 548 of the Bankruptcy Code, as well as comparable state statutes, define satisfaction of an antecedent debt as value for fraudulent transfer purposes. *See* 11 U.S.C.A. § 548. Possible avoidance issues raised by Minnesota's insider preference statute (Minn. Stat. Ann. section 513.45(b)) with respect to contributions of ResCap bonds are analyzed in Section VII.F.

EXHIBIT V.A.2.c(3)
**2008 Bank Transaction – Value of ResCap Bonds Contributed by AFI**
March 31, 2008 and June 3, 2008
*($ in Millions, except bond prices, rounded)*

| Coupon | Debt Rank | Maturity | [A]<br>Price | [B]<br>Face Amount Contributed | [C] =<br>[A] × [B]<br>Observed Market Value | [D]<br>Accrued Interest | [E] =<br>[C] + [D]<br>Observed Market Value Plus Accrued Interest | |
|---|---|---|---|---|---|---|---|---|
| *March 31, 2008:* | | | | | | | | |
| Floating | Sr unsecured | 11/21/08 | 68.0 | $    71.0 | $    48.3 | $    0.5 | $    48.8 | |
| Floating | Sr unsecured | 04/17/09 | 57.0 | 36.0 | 20.5 | 0.5 | 21.0 | |
| Floating | Sr unsecured | 05/22/09 | 57.0 | 51.0 | 29.1 | 0.3 | 29.4 | |
| 6.375% | Sr unsecured | 06/30/10 | 50.3 | 206.9 | 104.0 | 4.2 | 108.2 | |
| Floating | Sr unsecured | 09/27/10 | 45.0 | 31.2 | 14.0 | - | 14.0 | |
| 6.000% | Sr unsecured | 02/22/11 | 49.0 | 60.0 | 29.4 | 0.5 | 29.9 | |
| 5.125% | Sr unsecured | 05/17/12 | 45.5 | 163.7 | 74.5 | 8.7 | 83.2 | |
| 6.500% | Sr unsecured | 06/01/12 | 49.0 | 135.0 | 66.2 | 3.7 | 69.9 | |
| 6.500% | Sr unsecured | 04/17/13 | 48.5 | 63.0 | 30.6 | 2.3 | 32.9 | |
| 6.375% | Sr unsecured | 05/17/13 | 44.5 | 20.0 | 8.9 | 1.3 | 10.2 | |
| 7.875% | Sr unsecured | 07/01/14 | 44.5 | 44.0 | 19.6 | 1.0 | 20.6 | |
| 6.875% | Sr unsecured | 06/30/15 | 48.5 | 113.0 | 54.8 | 2.4 | 57.2 | |
| Floating | Sr subordinated | 04/17/09 | 37.0 | 181.4 | 67.1 | 2.8 | 69.9 | |
| Total | | | | $    1,176.2 | $    566.9 | $    28.2 | $    595.1 | [F] |
| *June 3, 2008:* | | | | | | | | |
| Floating | Sr unsecured | 06/09/08 | 98.0 | $    249.1 | $    244.1 | $    2.1 | $    246.3 | [G] |
| Contribution of Bonds | | | | | | | $    841.3 | [F] + [G] |

*Source: Appendix V.A.2.c, at 3.*

The estimate of the June 2008 bond contribution is approximately $50 million higher than the Fair Market Value estimate in ResCap's public disclosures. The Examiner's Financial Advisors determined that this variance appears to be a result of AFI pricing the Fair Market Value of the bonds contributed in June at the Fair Market Value of the bonds as of March 31, 2008. Appendix V.A.2.c presents details of this analysis.[372]

---

[372]  Appendix V.A.2.c, at 3.

*(4) Third Party Valuations*

ResCap did not obtain a written fairness opinion for this transaction.[373] ResCap did obtain advice from its financial advisor, Morgan Stanley, concerning the value of bonds to be contributed to ResCap in March 2008. Morgan Stanley also made an assessment of market dividend rates for the ResCap Preferred Interests and the IB Finance Preferred Interests that would potentially be created by the 2008 Bank Transaction.[374]

For each bond issue included in the contribution by AFI to ResCap, Morgan Stanley adjusted the face value to Fair Market Value using a recent market price quotation, and added accrued interest thereto. Morgan Stanley's estimate of the Fair Market Value of the March 31, 2008 contribution was approximately $607 million.[375]

Morgan Stanley did not explicitly value the portion of the IB Finance Class M Shares that ResCap would exchange as part of the transaction. Instead, its presentation included an analysis of yields on securities that Morgan Stanley deemed comparable to the ResCap Preferred Interests and IB Finance Preferred Interests. Morgan Stanley made the presumption that the ResCap Preferred Interests should be analyzed as two pieces: (1) an interest in ResCap until January 2009; and (2) a preferred interest in IB Finance after January 2009. Thus, their analysis implicitly presumes that these interests would be exchanged.

Morgan Stanley analyzed the yield on short-term ResCap bonds as a benchmark for the ResCap Preferred Interests and noted yields in excess of 100% for ResCap bonds, but suggested that a 13% coupon rate was reasonable. As a benchmark for the IB Finance Preferred Interests, Morgan Stanley compiled data on yields for preferred stocks issued by banks in recent transactions and concluded that 10% was a reasonable dividend rate for the IB Finance Preferred Interests.

*(5) 2008 Bank Transaction Valuation Conclusion*

*(a) Value Transferred From ResCap*

Based on the analysis described above, the Examiner's Financial Advisors estimated the value of the right to exchange the ResCap Preferred Interests into IB Finance Preferred Interests on March 31, 2008 and June 3, 2008 transferred from ResCap to be approximately $571 million to $714 million in the aggregate.

---

[373]  Morgan Stanley's transaction work was described as not "opinionable." E-mail from T. Pohl (Mar. 26, 2008) [EXAM11234652]. However, Morgan Stanley delivered the following oral opinions to the ResCap Board regarding the 2008 Bank Transaction on March 28, 2008: (1) the terms and conditions of the transaction were consistent with those to which parties at arm's length would agree and was for fair value; (2) the transaction was fair to ResCap, its shareholder, and its creditors; and (3) the transaction was "absolutely" in the best interests of ResCap, its shareholder, and its creditors. *See* Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Mar. 28, 2008, at 4–5 [RC00017152].

[374]  Morgan Stanley Project Duvall Discussion Materials, dated Mar. 28, 2008, at RC40007500 [RC40007480].

[375]  Draft Morgan Stanley Project Duvall Discussion Materials, dated Mar. 31, 2008, at 3 [EXAM12112699]. Note that this analysis did not address the bonds contributed on June 3, 2008.

ResCap retained a right to retire the IB Finance Preferred Interests at redemption value of approximately $806 million.[376] This right gave ResCap the potential to recover any value of the IB Finance Preferred Interests to the extent that: (1) the value of the IB Finance Preferred Interests exceeded the redemption price; and (2) ResCap had the resources to exercise the option. The Examiner's Financial Advisors did not attribute value to this right, regarding it as speculative given ResCap's likely inability to obtain funds to make redemption payments.

### (b) Value Received By ResCap

The Examiner's Financial Advisors estimated the value received by ResCap for the contribution of ResCap bonds made by AFI on March 31, 2008 and June 3, 2008, in the aggregate, to be approximately $841 million.

### (6) 2008 Bank Transaction Reasonably Equivalent Value Conclusion

Based on the above discussion and analysis of the 2008 Bank Transaction, the Examiner concludes that the evidence supports the proposition that ResCap received reasonably equivalent value for the 2008 Bank Transaction. Appendix V.A.2.c presents a summary of the analysis detailing these conclusions.[377]

EXHIBIT V.A.2.c(6)
**2008 Bank Transaction – Value Transferred from and Received by ResCap**
March 31, 2008 and June 3, 2008
*($ in Millions)*

| Value Transferred from ResCap | | | Value Received by ResCap | | |
|---|---|---|---|---|---|
| **Component** | **Low** | **High** | **Component** | **Low** | **High** |
| ResCap Preferred Interests | $ - | $ - | Contribution of bonds | $ 841.3 | $ 841.3 |
| Right to exchange ResCap Preferred Interests for IB Finance Preferred Interests | 571.4 | 714.2 | Right to redeem IB Finance Preferred Interests | - | - |
| Total property transferred | $ 571.4 | $ 714.2 | Total property received | $ 841.3 | $ 841.3 |
| Value received by ResCap less value transferred from ResCap, rounded | | | | $ 269.9 to | $ 127.1 |

*Source: Appendix V.A.2.c, at 1.*

### d. 2009 Bank Transaction – Analysis And Examiner's Conclusions

AFI exercised the exchange rights it received in the 2008 Bank Transaction and converted its ResCap Preferred Interests into IB Finance Preferred Interests on January 30, 2009.

---

[376] *See* IB Finance 2008 LLC Agreement, §§ 2.1(b)(iii), 2.1(d) [EXAM10801679] (providing that, in the option of ResCap's Independent Directors, ResCap could make a special capital contribution to IB Finance and the proceeds would be used to redeem the IB Finance Preferred Interests at redemption value); Presentation to the Committee of Independent Members of the Board of Directors of Residential Capital, LLC Regarding the GMAC Bank Transaction with GMAC, LLC, dated Jan. 22, 2009, at 11 [GOLDIN00129860].

[377] Appendix V.A.2.c, at 1.

AFI also purchased the remaining IB Finance Class M Shares owned by ResCap in exchange for AFI's contribution of additional ResCap bonds on the same day. The Examiner's Financial Advisors estimated the value of the following in connection with the 2009 Bank Transaction:

*Value Transferred from ResCap*

- IB Finance Class M Shares remaining after AFI received the IB Finance Preferred Interests;

- Loss of the right to redeem IB Finance Preferred Interests for $1,000 per unit; and

*Value Received by ResCap*

- ResCap bonds contributed by AFI to ResCap.

Appendix V.A.2.d presents a summary of reasonably equivalent value determinations for the 2009 Bank Transaction.[378]

### *(1) IB Finance Preferred Interests*

A valuation of the IB Finance Preferred Interests as of January 30, 2009 is a required step in estimating the value of the remaining IB Finance Class M Shares held by ResCap after the exchange. The Examiner's Financial Advisors estimated the value of the IB Finance Preferred Interests using a capitalization of annual dividends, with a discount rate derived from a study of yields on preferred stock and debt for guideline banks (and general market benchmarks) as of January 30, 2009.

The annual dividend was the 10% dividend rate on the IB Finance Preferred Interests times the redemption value of $806 million.[379] The estimate of the discount rate was derived from the study of yields on preferred stock and debt for various benchmarks as described above for the 2008 Bank Transaction, updated to reflect pricing in January 2009. This data is detailed in Appendix V.A.2.c.[380]

---

[378] Appendix V.A.2.d, at 1.

[379] *See* IB Finance 2008 LLC Agreement, § 2.5(a) [EXAM10801679].

[380] Appendix V.A.2.c, at 4.

The Examiner's Financial Advisors concluded that a range of capitalization rates from 15% to 25% was appropriate as of January 30, 2009,[381] and, correspondingly, valued the IB Finance Preferred Interests at approximately $323 million to $538 million. Appendix V.A.2.d presents details of this analysis.[382]

The Examiner's Financial Advisors also reviewed analyses prepared by third parties, such as Goldin Associates, who assumed that the value of the IB Finance Preferred Interests was a fixed proportion of the value of total equity (in proportion to the ratio of redemption value to total book value of equity).[383] However, the economic attributes of these interests do not support such an assumption because the IB Finance Preferred Interests had a fixed dividend,[384] a dividend preference,[385] a liquidation preference,[386] and no obligation to contribute capital.[387]

### (2) Remaining 1.2 Million IB Finance Class M Shares

The Examiner's Financial Advisors estimated the value of ResCap's remaining 1,193,656 IB Finance Class M Shares. This value was determined using the following steps:

- Step 1: Determine the value of 100% of the equity of the Mortgage Bank on a marketable, controlling interest basis;

- Step 2: Subtract the value of IB Finance Preferred Interests to determine the value of the remaining IB Finance Class M Shares on a marketable, controlling interest basis; and

- Step 3: Adjust the value for lack of control, lack of voting rights, lack of marketability, and tracking stock structure to determine the value of the remaining IB Finance Class M Shares on a non-marketable, non-controlling basis.

---

[381] The valuation model is developed using a capitalization of the stated dividends rather than forecasted dividends. Management projections did not contemplate dividends for at least three years. An alternative approach could determine the present value of annual dividends in perpetuity commencing in 2012, discounted at a required rate of return on the preferred interest. In this alternative approach, a value at the lower end of the value range corresponds to a discount rate of approximately 16% (which is the same discount rate used in the discounted cash flow analysis of the equity of the Mortgage Bank), while the upper range of value would correspond to an approximately 11% discount rate. Because the IB Finance Preferred Interests are senior to common equity and should have a lower discount rate, this alternative framework confirms the reasonableness of the results of the capitalization approach.

[382] Appendix V.A.2.d, at 8.

[383] *See* Presentation to the Committee of Independent Members of the Board of Directors of Residential Capital, LLC Regarding the GMAC Bank Transaction with GMAC, LLC, dated Jan. 22, 2009, at 11, 37 [GOLDIN00129860].

[384] *See* IB Finance 2008 LLC Agreement, § 2.5(a) [EXAM10801679].

[385] *See id.* § 2.5(b).

[386] *See id.* § 7.1.

[387] *See id.* § 2.1(d).

The Examiner's Financial Advisors considered traditional and commonly used approaches to estimate the Fair Market Value of 100% of the equity of the Mortgage Bank on a marketable, controlling interest basis as of January 30, 2009:

- The Market Approach using guideline financial institutions. The Examiner's Financial Advisors considered the Guideline Publicly Traded Company Method of the Market Approach. The Examiner's Financial Advisors did not employ the Guideline M&A Company Method because of a lack of relevant transactions;

- The Income Approach using the DCF Method; and

- The Asset-Based Approach using the Adjusted Book Value Method.

### (a) Guideline Publicly Traded Company Method

The Examiner's Financial Advisors considered the results of the Guideline Publicly Traded Company Method, as previously described, for the 2009 Bank Transaction.

### (i) Selection Of Guideline Companies

The Examiner's Financial Advisors selected a group of companies that provide a meaningful basis for comparison to the Mortgage Bank. Appendix V.A.2.b presents a brief description of each guideline company.[388]

### (A) Guideline Companies Selection Criteria

The Examiner's Financial Advisors employed the same criteria as previously discussed for the 2006 Bank Restructuring, resulting in a set of ten guideline banking institutions for the 2009 Bank Transaction valuation.[389]

### (B) Comparison With Guideline Companies

The Examiner's Financial Advisors observed that the Mortgage Bank was exposed to greater risk in its operations than many of the publicly traded guideline companies considered in this analysis, as described above for the 2006 Bank Restructuring. By the time of the 2009 Bank Transaction, the Mortgage Bank was losing money and suffering from the results of deteriorating asset quality, as evidenced by large loan losses recognized in 2008, and escalating levels of delinquencies and non-performing assets. As a result, the Mortgage Bank's financial performance compared unfavorably to the majority of guideline companies.

---

[388] Appendix V.A.2.b, at 5–7.

[389] The guideline company set for the 2009 Bank Transaction differed from the set used for the 2006 Bank Restructuring as follows: (1) Downey Financial Corp. and Franklin Bank Corp. were removed because they filed for bankruptcy relief in 2008; (2) MAF Bancorp. was removed because it was acquired in 2007; (3) Northwest Bancshares, Inc. was removed because it did not meet the criterion requiring residential mortgage loans to be greater than 50% of total loans in 2009; and (4) TFS Financial Corp was added (it was not a publicly traded company before 2007).

Appendix V.A.2.d presents key financial ratios comparing the Mortgage Bank with the guideline companies.[390] Appendix V.A.2.a shows a graph of the loan performance history or delinquency trends of the Mortgage Bank.[391]

### (ii) Calculation Of Market Multiples

The Examiner's Financial Advisors considered three commonly used valuation multiples: the P/TBVE multiple, the LTM P/E multiple, and the Forward P/E multiple. In this analysis, the Examiner's Financial Advisors relied solely on a multiple of tangible book value of equity. The Examiner's Financial Advisors did not use a price-to-earnings multiple because the Mortgage Bank's earnings were negative (both on an LTM basis and projected 2009 earnings).

In determining appropriate multiples, the Examiner's Financial Advisors observed that three guideline companies displayed notably worse financial performance than the Mortgage Bank.[392] As shown in Appendix V.A.2.d,[393] relative to the Mortgage Bank, those companies had suffered larger losses (e.g., worse ROE ratio), and had lower asset quality (e.g., higher non-performing assets-to-equity ratio). Those three companies had P/TBVE ratios in a 0.0x to 0.1x range. All of the other guideline companies (whose lowest P/TBVE ratio was 0.8x) were in better financial condition than the Mortgage Bank because they had superior measures of asset quality, were expected to be profitable in 2009, and all but one was profitable in the most recent prior year. The Examiner's Financial Advisors determined that an appropriate multiple for the Mortgage Bank should fall between the respective ranges of these two groups of companies. Further, in evaluating an appropriate P/TBVE multiple, the Examiner's Financial Advisors noted the low quality of the Mortgage Bank's book value of equity. This is revealed by a comparison of the reserve for loan losses as of December 31, 2008, with Ally Bank management's projection of future charge-offs and provisions over the 2009 to 2011 period.[394] These future losses exceeded the year-end 2008 reserve by over $820 million, as detailed in Appendix V.A.2.d.[395] This amount is over 40% of the NBV for the Mortgage Bank as of December 31, 2008, and over 80% of the book value of the remaining IB Finance Class M Shares after giving effect to the exchange of IB Finance Preferred Interests.

---

[390]  Appendix V.A.2.d, at 3–4.

[391]  Appendix V.A.2.a, at 4.

[392]  These guideline companies include Bank United Financial Corporation, FirstFed Financial Corp., and Flagstar Bancorp.

[393]  Appendix V.A.2.d, at 3–4.

[394]  Ally Bank's projections for future charge-offs and provisions were prepared in March 2009. *See* GMAC Bank Board of Director Meeting: 2009–2011 Business Plan Review, dated Mar. 17, 2009, at 12–15, 23–25, 31–33 [ALLY_0199599].

[395]  Appendix V.A.2.d, at 7.

The Examiner's Financial Advisors also noted that the Mortgage Bank was undercapitalized relative to the FDIC's 11% Tier 1 capital requirement for Ally Bank.[396] The amount of undercapitalization was nearly one-third of NBV.

Because of the Mortgage Bank's poor earnings performance, low quality of NBV, and shortfall in capitalization, the Examiner's Financial Advisors determined that an appropriate P/TBVE multiple should be within a range of 0.3x to 0.5x.

### (iii) Control Premium

The Examiner's Financial Advisors gave consideration to premiums paid for controlling interests for similar companies during 2008 in determining an appropriate control premium for a 100% equity interest in the Mortgage Bank. The Examiner's Financial Advisors compiled data on premiums paid in control transactions involving targets primarily operating as savings institutions (Standard Industrial Classifications 6035 and 6036) as reported in the *Mergerstat Control Premium Study*. The median premium for these companies was 8.3% in 2008.[397] The Examiner's Financial Advisors noted that for a broader group (financial services), Mergerstat reported a median premium of 29.3%[398] during 2008, while across all industries the median premium was 31.4%.[399] The observed premiums included value paid for synergies in addition to value of control per se. Appendix V.A.2.b provides a summary of data on control premiums.[400] The Examiner's Financial Advisors applied a 10% control premium in this analysis.

### (iv) Guideline Publicly Traded Company Method: Conclusion

Based on the application of the Guideline Publicly Traded Company Method, the indicated range of value of the remaining 1,193,656 IB Finance Class M Shares on a marketable, controlling basis, before adjustments, is estimated to be approximately $602 million to $1 billion. Appendix V.A.2.d presents detail of the Guideline Publicly Traded Company Method conclusion.[401]

### (b) Income Approach–DCF Method

The Examiner's Financial Advisors considered the results of the DCF Method, as previously described, for the 2009 Bank Transaction.

---

[396] ResCap was obligated to provide capital to the Mortgage Bank by terms of the IB Finance LLC Agreements. *See* Section V.A.2.d(2)(b)(iii) (providing a more detailed discussion of ResCap's capital support obligations under the IB Finance LLC Agreements).

[397] MERGERSTAT, CONTROL PREMIUM STUDY: 4TH QUARTER 2008, at 20.

[398] *Id.* at 19.

[399] *Id.* at 3.

[400] Appendix V.A.2.b, at 9.

[401] Appendix V.A.2.d, at 2.

### (i)  Estimation Of Discount Rate

The Examiner's Financial Advisors used the MCAPM to determine the required return on equity. The assumptions used in this calculation are consistent with the assumptions described for the 2006 Bank Restructuring, updated to reflect market conditions in January 2009. Appendix V.A.2.b presents details of the calculation of the discount rate.[402]

### (ii) Present Value Of Future Cash Flows And Calculation Of Residual Value

The Examiner's Financial Advisors used Ally Bank management's projections as the basis for calculating projected cash flows to equity holders. The Examiner's Financial Advisors used projections prepared by Ally Bank management for the Mortgage Bank around the time of the transaction[403] and employed a methodology substantially similar to that described for the 2006 Bank Restructuring.

The DCF Method was based on a three-year business plan presented to the board of directors of Ally Bank on March 17, 2009.[404] The business plan contained projections for the Mortgage Bank, including projected balance sheets and income statements. These projections were provided by management approximately seven weeks after the 2009 Bank Transaction. The projections are based on financial information reasonably available at the time of the 2009 Bank Transaction and provide evidence of reasonably foreseeable financial performance at that date.

### (iii) Adjustment For Capital Deficiency

The DCF Method considers potential obligations for shareholders to provide adequate capital. The Ally Bank management projections that the Examiner's Financial Advisors relied on were prepared in March 2009,[405] after Ally Bank became wholly owned by AFI. The projections include substantial growth in the automotive division of Ally Bank but not the Mortgage Bank. The projections also assume significant capital contributions to the automotive division of Ally Bank but none to the Mortgage Bank.

In the IB Finance 2006 LLC Agreement, ResCap and AFI committed to make capital contributions sufficient to: (1) support and grow their respective divisions; and (2) maintain a level of capitalization in their respective divisions that qualified as "well capitalized" under federal rules or such higher level of capitalization as may be required by the FDIC or DFI. [406]

---

[402]  Appendix V.A.2.b, at 14.

[403]  *See* GMAC Bank Board of Director Meeting: 2009–2011 Business Plan Review, dated Mar. 17, 2009, at 12–15, 23–25, 31–33 [ALLY_0199599].

[404]  *See* GMAC Bank Board of Director Meeting: 2009–2011 Business Plan Review, dated Mar. 17, 2009 [ALLY_0199599].

[405]  *See id.*

[406]  IB Finance 2006 LLC Agreement, § 2.1(b) [ALLY_0401862].

The FDIC's definition of "well capitalized" (including a 5% Tier 1 Leverage Ratio) was lower than the requirements imposed on Ally Bank by the FDIC and the DFI during the relevant period. The IB Finance 2006 LLC Agreement effectively committed ResCap to maintain capital at the level specified in the agreements with the FDIC and DFI.

The IB Finance 2008 LLC Agreement retained ResCap's obligation to provide capital.[407] The IB Finance 2008 LLC Agreement made possible a future issuance of IB Finance Preferred Interests to AFI and clarified that "[t]he holder of any Class M Preferred Units shall not be required to make any additional capital requirements."[408] Therefore, ResCap would retain its obligation to provide 100% of any capital required by the Mortgage Bank, even in the event that AFI became a part-owner of the division as a holder of preferred units.

The FDIC, Ally Bank, IB Finance, AFI, and Cerberus entered into a "Capital and Liquidity Maintenance Agreement" on July 21, 2008,[409] whereby the parties agreed to maintain the Tier 1 Capital Ratio of Ally Bank at a minimum of 11% for the following three years.[410]

The Mortgage Bank had deficient capital relative to ResCap's obligations under the IB Finance 2008 LLC Agreement at the time of the 2009 Bank Transaction. Ally Bank reported a consolidated Tier 1 leverage ratio of 11.1% as of December 31, 2008,[411] thus satisfying (on a consolidated basis) the bank's agreement with the FDIC. However, this ratio was achieved via surplus capital in the automotive division of Ally Bank (with a 17.5% ratio)[412] and a deficiency in the Mortgage Bank (with an 8.3% ratio).[413] The deficiency in the Mortgage Bank was expected to deepen after projected losses—Ally Bank management expected the Tier 1 leverage ratio to fall to approximately 5.9% by the end of 2009.[414]

### (iv) Adjustment For Capital Deficiency: Conclusion

Regulators imposed certain capital support requirements with regard to Ally Bank. There is no evidence that AFI or IB Finance made a capital call to ResCap during 2008 or 2009 arising from these requirements. Nevertheless, the Examiner's Professionals viewed ResCap's

---

[407]   *See* IB Finance 2008 LLC Agreement, § 2.1(d) [EXAM10801679].

[408]   *See id.*

[409]   *See* Capital and Liquidity Maintenance Agreement, dated July 21, 2008, at ALLY_0000042–50 [ALLY_0000032].

[410]   *See id.* at ALLY_0000043–44.

[411]   *See* GMAC Bank Consolidated Financial Statements as of December 31, 2008 and December 31, 2007 and Independent Auditors' Report, dated Mar. 17, 2009, at 43 [RC00034535].

[412]   *See* GMAC Bank Board of Director Meeting: 2009–2011 Business Plan Review, dated Mar. 17, 2009, at 17 [ALLY_0199599].

[413]   *See id.* at 13.

[414]   *See id.*

contingent capital support obligation as binding. The FDIC restriction was scheduled to end during 2011. The analysis presented here assumes that equity could revert to a normal industry capitalization after the expiration of the FDIC restriction.

ResCap would have had a substantial obligation to contribute additional capital under this premise. The capital shortfall was treated as a future out-of-pocket obligation for an investor in the IB Finance Class M Shares. The Examiner's Financial Advisors limited the obligation to providing sufficient capital to bring equity to a normal industry equity-to-assets ratio of 9%, rather than to the 11% required (temporarily) by the FDIC.[415]

The Examiner's Financial Advisors also considered the present value of future cash flows before considering the obligation to provide additional capital. This implicitly assumes that the future capital requirement is no higher than the level of capital actually projected (approximately 6% equity-to-total asset ratio). Under this premise, ResCap would have no obligation to contribute additional capital, and the Tier 1 leverage ratio would remain above the FDIC's minimum threshold of 5% for a "well capitalized" institution (the IB Finance LLC Agreements required contributions to maintain a "well capitalized" rating in the absence of more stringent requirements from the FDIC). This premise results in a materially higher value compared to the alternative premise in which additional capital is required to bring equity to a normal industry level.

### (v)  Income Approach–DCF Method: Conclusion

Based on the application of the DCF Method, the indicated value of the remaining 1,193,656 IB Finance Class M Shares on a marketable, controlling basis before adjustments is estimated to be approximately $412 million to $875 million. Appendix V.A.2.d presents the details of the DCF Method for the 2009 Bank Transaction.[416]

### (c)  Asset-Based Approach

The Examiner's Financial Advisors estimated the Fair Market Value of the equity of the Mortgage Bank by adjusting the balance sheet to reflect the Fair Market Value of the individual assets and liabilities. The Examiner's Financial Advisors used Ally Bank management's estimates of fair value for certain assets and liabilities[417] as reported in the notes to audited financial statements as of December 31, 2008.

---

[415]  *See* Appendix V.A.2.b, at 8.

[416]  Appendix V.A.2.d, at 5.

[417]  The notes to the audited financial statements included fair value disclosures for HFS and HFI mortgage loans, MSRs, deposits, FHLB borrowings, and other balance sheet items.

### (i) Fair Value Estimates

The Examiner's Financial Advisors accepted Ally Bank management's estimate of fair value (where available) and (where not available) assumed that the carrying value was indicative of fair value, except as otherwise indicated (see discussion of the loan loss reserve below).

### (ii) Loan Loss Reserves

The Examiner's Financial Advisors made an adjustment to the value of assets to reflect projected losses and provisions foreseen in Ally Bank management's three-year business plan, but not provided for by the current level of reserves. The derivation of this adjustment is presented in Appendix V.A.2.d.[418]

### (iii) Goodwill

The Asset-Based Approach applied here adjusts for items carried on the Mortgage Bank's balance sheet. The Asset-Based Approach does not adjust for items such as goodwill or other intangibles not reported on the Mortgage Bank's balance sheet.

### (iv) Asset-Based Approach: Conclusion

The Asset-Based Approach, as presented here, provides a measure of the value of the assets and liabilities on the Mortgage Bank's balance sheet before consideration of certain intangible assets. Appendix V.A.2.d presents a summary of the analysis showing the results of the Asset-Based Approach.[419]

### (d) Adjustments To Value

The Examiner's Financial Advisors relied on an average of the Guideline Publicly Traded Method and the DCF Method to determine the range of the value of the equity of the Mortgage Bank on a marketable, controlling basis to be $500 million to $900 million as of January 30, 2009. These indications of value, as previously described, are determinations prior to certain necessary valuation adjustments. The Examiner's Financial Advisors made the adjustments described below.

### (i) IB Finance Preferred Interests

The Examiner's Financial Advisors deducted the value of the IB Finance Preferred Interests, as previously described, from the indicated range of value of the total equity of the Mortgage Bank. This results in an estimated value of the remaining IB Finance Class M Shares on a marketable, controlling basis.

---

[418]  Appendix V.A.2.d, at 7.

[419]  Appendix V.A.2.d, at 6.

### (ii) IB Finance Class M Shares: Discount For Attributes Of Shares

The remaining IB Finance Class M Shares have a number of attributes that require a lower valuation than indicated for otherwise similar interests. As discussed previously in connection with the 2006 Bank Restructuring, these include:

- Lack of control;

- Lack of voting rights;

- Lack of marketability; and

- Tracking stock structure.

For the 2009 Bank Transaction, the Examiner's Financial Advisors used a discount of 40%.[420] This is higher than the discount used for the 2006 Bank Restructuring because of the deteriorating financial condition of Ally Bank and distressed industry conditions in 2009.

### (3) Bonds Contributed By AFI

The Examiner's Financial Advisors estimated the value of the bonds contributed by AFI in the 2009 Bank Transaction by using the Observable Market Value Method and by referencing available price quotes proximate to the time of the 2009 Bank Transaction. This estimate of the Fair Market Value of those bonds, or $600 million, is lower than the value of $608.5 million that ResCap's management ascribed to them.[421] Appendix V.A.2.d summarizes this analysis.[422]

### (4) 2009 Bank Transaction Valuation Conclusion

### (a) Value Transferred From ResCap

Based on the analysis described above, the Examiner's Financial Advisors estimated the range of value for the transfer from ResCap on January 30, 2009 (the value of the remaining 1,193,656 IB Finance Class M Shares) to be approximately $107 million to $218 million.

### (b) Value Received By ResCap

The Examiner's Financial Advisors estimated the value received by ResCap from AFI's contribution of ResCap bonds on January 30, 2009 to be approximately $600 million.

---

[420] A combined discount in a range of approximately 38% to 46% is obtained by sequentially applying four distinct discounts: (1) a discount for lack of control of approximately 8% to 10%; (2) a discount for lack of marketability of approximately 25% to 30%; (3) a non-voting discount of approximately 5%; and (4) a discount for tracking stock structure of approximately 5% to 10%.

[421] *See* Residential Capital, LLC, Current Report (Form 8-K) (Feb. 3, 2009), at Item 1.01.

[422] Appendix V.A.2.d, at 9.

### (5) 2009 Bank Transaction Reasonably Equivalent Value Conclusion

Based upon the above discussion and analysis of the 2009 Bank Transaction, the Examiner concludes that the evidence supports the proposition that ResCap received reasonably equivalent value for the 2009 Bank Transaction. Appendix V.A.2.d presents a summary of this analysis and details the conclusions.[423]

---

EXHIBIT V.A.2.d(5)
**2009 Bank Transaction – Value Transferred from and Received by ResCap**
January 30, 2009
*($ in Millions)*

| Value Transferred from ResCap | | | Value Received by ResCap | | |
|---|---|---|---|---|---|
| Component | Low | High | Component | Low | High |
| Remaining 1.2 million IB Finance Class M Shares | $ 106.5 | $ 217.5 | Contribution of bonds | $ 600.2 | $ 600.2 |
| Forfeited right to redeem IB Finance Preferred Interests | - | - | | | |
| Total property transferred | $ 106.5 | $ 217.5 | Total property received | $ 600.2 | $ 600.2 |
| Value received by ResCap less value transferred from ResCap, rounded | | | | $ 493.7 to | $ 382.7 |

*Source: Appendix V.A.2.d, at 1.*

---

### (6) Third Party Valuations

Goldin Associates prepared a fairness opinion regarding the 2009 Bank Transaction for the Committee of the Independent Members of the ResCap Board. Their supporting analysis was detailed in a presentation dated January 22, 2009.[424]

---

[423]  Appendix V.A.2.d, at 1.

[424]  *See* Presentation to the Committee of Independent Members of the Board of Directors of Residential Capital, LLC Regarding the GMAC Bank Transaction with GMAC, LLC, dated Jan. 22, 2009 [GOLDIN00129860].

Goldin Associates employed four valuation methodologies: (1) the Asset-Based Approach; (2) the DCF Method; (3) the Guideline Publicly Traded Company Method; and (4) the Guideline M&A Method, the results of which are summarized in the following table.[425]

EXHIBIT V.A.2.d(6)
**2009 Bank Transaction – Third Party Valuations**
**Goldin Associates Fairness Opinion Summary**
January 22, 2009
*($ in Millions)*

| Valuation Method | Weight | Range of value of remaining IB Finance Class M Shares | | |
|---|---|---|---|---|
| Adjusted Book Value Method | 40.0% | $ 240.7 | – | $ 645.5 |
| DCF Method | 40.0% | 343.4 | – | 462.8 |
| Guideline Publicly Traded Company Method | 7.5% | 1,072.4 | – | 1,206.9 |
| Guideline M&A Method: | | | | |
| Guideline M&A Method: Historical | 5.0% | 1,618.9 | – | 1,888.4 |
| Guideline M&A Method: Recently announced | 7.5% | 726.0 | – | 941.3 |
| Concluded range of value | 100.0% | $ 449.5 | – | $ 698.9 |

*Source: Presentation to the Committee of Independent Members of the Board of Directors of Residential Capital, LLC Regarding the GMAC Bank Transaction with GMAC, LLC, dated Jan. 22, 2009, at 37 [GOLDIN00129860].*

Goldin Associates' analysis differed from the analysis of the Examiner's Financial Advisors in various ways, and the observed differences in assumptions, methodologies, and conclusions led to a range of value that was higher than the Examiner's Financial Advisors' estimate of the value transferred from ResCap as a result of the 2009 Bank Transaction. While the Examiner's Financial Advisors have a different determination on the value transferred from ResCap, this third-party valuation provides an additional data point that supports the reasonably equivalent valuation determination regarding the 2009 Bank Transaction as outlined previously.

### e. Subsequent Value Considerations

The Mortgage Bank reported loan loss provisions of approximately $2.7 billion in 2009, which contributed to a net loss of over $2 billion in that year.[426] A loss of that magnitude would have eliminated all of the legacy ResCap equity in the Mortgage Bank (even if ResCap had retained ownership of the remaining IB Finance Class M Shares), which was approximately $1.8 billion as of December 31, 2008.[427] The Examiner's Financial Advisors concluded that there was no equity value remaining in the Mortgage Bank after December 31, 2009 that could have been attributed to ResCap's legacy equity interest in IB Finance.

---

[425] *See id.* at 37.

[426] *See* Ally Bank Summary Financials [ALLY_PEO_0089617] (showing pre-tax income).

[427] *See* GMAC Bank Board of Director Meeting: 2009–2011 Business Plan Review, dated Mar. 17, 2009, at 14 [ALLY_0199599].

A roll-forward of ResCap's IB Finance Class M interest would result in a negative capital balance as of April 30, 2013. Key assumptions for this conclusion are: (1) elimination of capital contributions made by AFI after January 2009; and (2) adjustment for the net earnings impact that Ally Bank would have recognized had the parties' agreed-upon allocation of revenues and expenses on loans brokered by GMAC Mortgage been respected from August 1, 2009 to April 30, 2012.[428]

## B. GMAC MORTGAGE CONTRACTS WITH ALLY BANK GOVERNING LOAN SALE, BROKERAGE, SERVICING, AND RELATED DERIVATIVE TRANSACTIONS

ResCap's GMAC Mortgage subsidiary historically focused on purchasing and originating conforming loans with the intent ultimately to sell them to GSEs while retaining the associated MSRs (though it also engaged in some business involving non-conforming products such as home-equity loans and jumbo prime loans).[429] A portion of GMAC Mortgage's production had involved use of Old GMAC Bank since the Bank's founding in 2001. Old GMAC Bank had been formed in August 2001 to engage in mortgage lending and investment activities traditionally associated with federal savings banks. The Bank was able to provide a lower-cost source of funds by virtue of its access to FDIC-insured deposits and borrowings from the Federal Home Loan Bank Board.[430] Conversely, Old GMAC Bank (and later, Ally Bank) did not have the infrastructure in place to conduct appropriate hedging, to securitize loans (with GSEs or private-label investors), or to perform servicing for loans and MSRs, and it looked to GMAC Mortgage to perform these functions (or to arrange for their performance through ResCap affiliates).

---

[428]  *See* Section V.B.6.

[429]  Int. of J. Young, Sept. 28, 2012, at 30:20–31:8, 118:8–16, 120:9–15, 127:10–129:25, 167:7–170:6, 195:1–196:21. ResCap essentially ceased purchasing and originating non-conforming loans in 2007, and the conforming business remained as the core of ResCap's ongoing operations.

[430]  *Id.* at 196:17–197:24 (noting "[t]his is all about funding"); Int. of David Applegate, Dec. 7, 2012, at 38:5–13 ("[W]e structured the bank so that certain origination activity would occur through it, so that, while the loans were funded, they were utilizing, during that funding period, GMAC Bank's lower cost access. And then the loans would generally be sold back to Mortgage and then securitized and put into the, you know, secondary market. And then GMAC Mortgage would retain the servicing."), 93:1–2 ("[T]he goal around the bank was to optimize it as a funding source."); Int. of S. Khattri, Oct. 25, 2012, at 28:19–30:15; Int. of A. Celini, Feb. 18, 2013, at 22:11–22 ("The bank's primary business during that time was really to serve as a funding conduit. We had access to the federal home loan bank, consumer deposits . . . . We'd provide liquidity. That was our goal at that time."). This advantage was relatively small in "bull" market periods, when ResCap's (and other enterprises') cost of borrowing from other sources was relatively inexpensive, and more pronounced in "down" markets, when ResCap's cost of borrowing from other sources increased. *See* Int. of D. Walker, Nov. 28, 2012, at 53:18–55:15; 2006 ResCap Plan Presentation, dated Jan. 31, 2006, at 133 [RC40012974] (describing Old GMAC Bank's then-current funding advantage as 13 basis points).

Of course, GMAC Mortgage's use of the Bank as a conduit or source of loans that GMAC Mortgage could securitize or service was limited by the size of the Bank's balance sheet, the volume of deposits, and regulatory restrictions, including restrictions on transactions with affiliates.[431] Nonetheless, from and after 2007, Ally Bank came to account for an increasing proportion of GMAC Mortgage's loan production. By January 1, 2009, almost all of the production was being channeled through the Bank, which by then was also retaining title to MSRs on Fannie Mae and Freddie Mac loans (but not Ginnie Mae loans).

GMAC Mortgage and the Bank were parties to six principal agreements related to this business in effect at various times from 2001 forward:

(1) The Correspondent Agreement, which governed GMAC Mortgage's sale of loans to the Bank;

(2) The Master Mortgage Loan Purchase and Sale Agreement or MMLPSA, which governed GMAC Mortgage's purchase of loans from the Bank;

(3) The Pipeline Swap, a derivative transaction under which GMAC Mortgage assumed certain risks and rewards related to changes in the market value of certain loans;

(4) The Broker Agreement, entered into effective January 1, 2009, when GMAC Mortgage ceased originating loans (in all but a few states), and instead began brokering loans to Ally Bank;

(5) The Original Servicing Agreement pursuant to which GMAC Mortgage serviced mortgage loans for the Bank;[432] and

(6) The MSR Swap, another derivative transaction, under which GMAC Mortgage assumed certain risks and rewards related to the fluctuation in the value of the Bank's MSR portfolio.

These agreements, particularly the MMLPSA, Pipeline Swap, Correspondent Agreement, and Broker Agreement, were interconnected. Corey Pinkston, Head of Corporate Debt and Equity of GMAC's Treasury, aptly described understanding them as "detangl[ing] the spaghetti."[433]

---

[431] *See* Section V.B.1.b (discussing regulatory restrictions); Int. of R. Groody, Dec. 17, 2012, at 246:6–16.

[432] GMAC Mortgage and Ally Bank are also parties to the A&R Servicing Agreement, as discussed in Section V.C.

[433] Int. of C. Pinkston, Nov. 8, 2012, at 127:4–128:18 ("It's spaghetti in the term that you have a series of transactions that at the end of the day provided the ability for ResCap to continue to do the business that it was in but use the bank as effectively a funding vehicle . . . . [I]f you're thinking about certain strategic transactions you've got to deal with all of these various touch points and coordination to make sure that it all works. So that's where the spaghetti term was probably used a fair amount. Detangle the spaghetti."); *see also* Int. of J. Young, Oct. 10, 2012, at 6:3–18 (noting that components of the MMLPSA, Pipeline Swap, and MSR Swap work together).

This enterprise is further complicated by several additional factors: First, the various agreements underwent numerous amendments over time. Second, over the course of the period in question, a number of the employees most knowledgeable about the agreements left or were discharged, including, in particular, Bank officials Albert Celini and Robert Groody. The personnel who replaced them in later years, reliant on the vagaries of imperfect institutional memory, frequently demonstrated an understanding of the agreements that was less than accurate or complete.[434] Third, there have been a number of anomalies in the implementation of these agreements. These anomalies include the parties' application of certain of the agreements in ways that cannot be squared with their language (but which application some witnesses nonetheless maintain reflected the parties' "intent"),[435] and, in one significant instance, a substantial shift away from the negotiated and agreed-upon economics of a set of transactions, apparently as the unwitting result of a shift in Ally Bank's accounting methodology.

Certain of these arrangements, particularly the MSR Swap and the Pipeline Swap, have attracted particular suspicion and concern that they were key cogs in a scheme to impose losses on GMAC Mortgage/ResCap while insulating the Bank. The evidence concerning the purpose and history of these transactions, however, does not support this theory. Moreover, review and analysis of the pertinent accounting and financial records does not bear out the notion that GMAC Mortgage incurred significant net losses as a result of these transactions.[436] As discussed in greater detail in Sections V.B.12.a and V.B.12.b, GMAC Mortgage was near break-even on the Pipeline Swap and "in the money" on the MSR Swap. Indeed, as discussed in Section V.B.9.b(5), provisions of the MSR Swap governing the disposition of assets on termination arguably were unduly favorable to GMAC Mortgage. Of course, that is not the end of the analysis; the parties understood that ResCap/GMAC Mortgage would hedge these risks in the market. However, while there are substantial obstacles to allocating the results of ResCap's market hedges specifically to the loans subject to the Pipeline Swap and the Ally Bank-owned MSRs, the available evidence suggests that ResCap/GMAC Mortgage were also "in the money" on these market hedges as well. In sum, the evidence indicates that GMAC Mortgage received a net benefit from the Pipeline Swap, the MSR Swap and the market hedges relating thereto, assessing the entirety of the economics of these transactions as they were implemented by the parties.

[434] For example, as discussed in Sections V.B.4 and V.B.5, from 2004 to July 2008, the Pipeline Swap applied only to the Bank's HFI portfolio; the Pipeline Swap did not apply to the Bank's HFS portfolio until July 1, 2008. Yet, in interviews and meetings with the Examiner's Financial Advisors, current Ally Bank and ResCap personnel repeatedly asserted that the Pipeline Swap had always applied to HFS loans; *see, e.g.,* Int. of J. Whitlinger, Nov. 30, 2012, at 134:19–137:20; Int. of C. Dondzila, Sept. 27, 2012, at 252:14–253:2.

[435] *See* Sections V.B.3.a(4), V.B.5.a.

[436] Concerns about the MSR Swap, in particular, seem to stem from statements made by Marano, who described the MSR Swap as an "absurd transaction" in a 2010 e-mail responding to FDIC objections that the interest rate used to calculate payments to the Bank under the Swap was too low. E-mail from T. Marano (Apr. 14, 2010) [ALLY_PEO_0065507] ("In essence we all know the bank owns the MSR. Yet they have shifted the risk to Rescap—that borders on an absurd transaction."). When interviewed, Marano explained that initially he had not understood the transaction, and that he subsequently learned that the rate economics were roughly equivalent to the Citibank MSR credit facility. Int. of T. Marano, Nov. 26, 2012, at 239:16–240:14. In any event, as discussed in text and in Section V.B.12.b, the claims made by or attributed to Marano about the MSR Swap's economics are contradicted by analysis of the actual results under the Swap.

There nonetheless remain several issues concerning the implementation of these agreements that give rise to potential claims on behalf of the Estate, detailed below and in Section VII.L.2.

### 1. Restrictions On Affiliate Transactions Applicable To GMAC Mortgage And The Bank

These contractual relationships between GMAC Mortgage and Ally Bank implicated restrictions on affiliate transactions imposed by ResCap's Operating Agreement and by federal banking regulations.

#### a. The ResCap Operating Agreements

As discussed in Sections III.E and VII.L.2.a(1)(a)(ii)(B), the 2005 Operating Agreement and 2006 Amended Operating Agreement imposed restrictions on ResCap's transactions with GMAC Affiliates, requiring, inter alia, that they be "*consistent with* those that parties at *arm's-length* would agree to and *for fair value,*"[437] and any departure from these strictures had to be approved by ResCap's Independent Directors.[438] As discussed below, the contemporaneous documentation confirms that, with the exception of the Correspondent Agreement, *none* of these agreements is consistent with the terms into which parties at arm's length would have entered.[439] The relationship between GMAC Mortgage and Ally Bank was sui generis, and all of the agreements have terms that were not available in the market.

Nonetheless, with three exceptions in 2010 and 2011 (all occurring in the context of increased involvement by outside counsel),[440] these agreements and amendments thereto were not brought to the ResCap Board[441] for approval, and, a fortiori, were not approved by ResCap's Independent Directors.

Whether this gives rise to a viable cause of action is discussed in Section VII.L.2.a(1)(a)(ii)(B).

---

[437] *See* 2005 Operating Agreement, § 2(b) [ALLY_0140795] (emphasis added); 2006 Amended Operating Agreement, § 2(b) (Residential Capital, LLC, Current Report (Form 8-K) (Nov. 30, 2006), Ex. 10.1) (emphasis added).

[438] 2005 Operating Agreement, § 8 [ALLY_0140795]; 2006 Amended Operating Agreement, § 8 (Residential Capital, LLC, Current Report (Form 8-K) (Nov. 30, 2006), Ex. 10.1).

[439] *See* Sections V.B.10.c, V.B.6.f; *see also* KPMG Report, at RC40022079 [RC40022044] (noting that the agreements include provisions "not typically seen in 'arm's length' transactions").

[440] The three occasions on which agreements or amendments thereto were presented to the ResCap Board are expressly noted in Sections V.B.9.d, V.B.10.b, and V.B.10.d. In the discussion below, unless presentation to the ResCap Board is specifically noted, the Examiner has found no evidence that the matter was submitted to the ResCap Board.

[441] Nor were the agreements approved by the GMAC Mortgage board of directors, which was composed entirely of insiders.

### b.  Bank Regulatory Restrictions

Ally Bank was subject to federal regulatory restrictions on its transactions with affiliates. In particular, under Federal Reserve Act sections 23A and 23B,[442] the terms of the Bank's agreements with its affiliates are required, inter alia, to be no less favorable to the Bank than an arm's-length, market transaction.[443] Further, Ally Bank was only permitted to purchase up to 50% of GMAC Mortgage's loan production under 12 C.F.R. § 250.250 (an exemption from broader restrictions on an "extension of credit" by a bank to an affiliate).[444] The general aim of these regulations, and of the FDIC in enforcing them, is to protect depositors and the Deposit Insurance Fund from depredations by a bank's affiliates.

Ally Bank generally attempted to document that these agreements complied with regulatory requirements through Affiliate Transaction Memos explaining that the particular agreement's terms were at market or better than market from Ally Bank's perspective. The Bank periodically re-reviewed the transactions, documenting continued compliance in a

---

[442]  12 U.S.C. §§ 371c, 371c-1.

[443]  Sections 23A and 23B of the Federal Reserve Act are intended to limit the risks that may arise when a bank that is a member of the Federal Reserve system engages in transactions with one of its affiliates.

Section 23A has four primary components. First, the statute limits a member bank's "covered transactions" with its affiliates, including, among other things, asset purchases from, extensions of credit to, investments in securities issued by and guarantees for the benefit of such affiliates. *See* 12 C.F.R. § 223.3(h). Covered transactions with any single affiliate may not exceed 10% of the member bank's capital and surplus, while aggregate covered transactions with all affiliates may not exceed 20% of that amount. *See* 12 C.F.R. §§ 223.11, 223.12. Second, subject to certain exceptions, a member bank may not purchase "low quality assets" from an affiliate. *See* 12 C.F.R. § 223.15. Third, covered transactions between member banks and their affiliates must be "consistent with safe and sound banking practices." 12 C.F.R. § 223.13. Finally, a bank's loans to, or guarantees for the benefit of, its affiliates must be secured by an amount of collateral fixed by statute. *See* 12 C.F.R. § 223.14.

Additionally, section 23B requires that certain transactions between a bank and its affiliates occur on an arm's-length, market-rate basis. In particular, bank transactions that must be arm's-length include: (1) "covered transactions"; (2) asset sales to the affiliate; (3) payment of money or provision of services to an affiliate; (4) any transaction in which an affiliate acts as an agent or broker or receives a fee for its services to the bank or to any other person; and (5) any transaction or series of transactions with a third party if an affiliate has a financial interest in the third party or if an affiliate is a participant in such transaction or series of transactions. *See* 12 C.F.R. §§ 223.51–223.56.

[444]  Regulation W implements and clarifies the scope of sections 23A and 23B of the Federal Reserve Act. *See* 12 C.F.R. § 223.1. In particular, Regulation W contains what is generally referred to as the "250.250 exemption." Under the 250.250 exemption, a member bank may purchase a loan receivable from an affiliate, without regard to the quantitative or asset quality limits of sections 23A and 23B, if: (1) the loan was originated by the affiliate; (2) the bank independently evaluates the borrower's credit before the affiliate commits to make the loan; (3) the bank commits to purchase the loan before the affiliate commits to make the loan; (4) the bank does not make a blanket advance commitment to purchase loans from the affiliate; and (5) the amount of the loan, aggregated with the amount of all other loans purchased from the affiliate during the preceding 12 calendar months by the bank and its depository affiliates, is no more than 50% of the affiliate's loan originations during that period. *See* 12 C.F.R. § 223.42(k).

further Affiliate Transaction Memo.[445] In addition, the various agreements and amendments were presented to the Bank's Board for approval, accompanied by representations from management that the arrangements were compliant with Rules 23A and 23B.[446]

As discussed below, from at least 2007 forward, the agreements discussed here became the subject of increasing FDIC scrutiny, concern that the transactions were not properly documented, and demands that Ally Bank better justify that the transactions were compliant or alter their terms.

### 2. The Correspondent Agreement

Shortly after Old GMAC Bank was chartered, it entered into an August 21, 2001 Correspondent Agreement with GMAC Mortgage, which provided for GMAC Mortgage sales of loans it had originated or purchased to the Bank.[447] The Correspondent Agreement was a standard form used by the Bank with other correspondent lenders[448] from whom it purchased loans.[449] The Agreement provided for purchase at "product market pricing existing on the day of sale" as evidenced by the Bank's "wholesale pricing grid" used to purchase loans from other correspondents.[450] The Agreement specifically noted that GMAC Mortgage would be entitled to charge and retain origination fees and any collected discounts in excess of the purchase price.[451] Further, GMAC Mortgage provided to the Bank the standard loan-level representations and warranties that were required of all correspondent lenders.[452]

---

[445]  *See, e.g.,* GMAC Bank Affiliate Transaction Memorandum, Master Mortgage Loan Purchase and Sale Agreement, dated Dec. 14, 2001 [ALLY_0018320]; GMAC Bank Affiliate Transaction Memorandum, Master Mortgage Loan Purchase and Sale Agreement Amended and Restated 6/1/07, dated June 6, 2007 (Revised Oct. 31, 2007) [ALLY_0017869].

[446]  *See, e.g.,* Minutes of a Regular Meeting of the Board of Directors of GMAC Bank, Nov. 30, 2006, at 2 [ALLY_PEO_0020880].

[447]  Correspondent Agreement, at 1 [ALLY_0017350].

[448]  A "correspondent" mortgage lender is a lender that originates and funds loans in its own name, but sells the loans to larger mortgage lenders or on the secondary market. *See* Comptroller of the Currency, Administrator of National Banks, Mortgage Banking Comptroller's Handbook (Procedures dated Mar. 1998), at 9 (Wholesale) and 31 (definition of Correspondent), http://www.occ.gov/publications/publications-by-type/comptrollers-handbook/mortgage.pdf.

[449]  *See* Int. of A. Celini, Feb. 18, 2013, at 33:24–34:14 (as a general rule, the affiliate correspondent agreements were based on market agreements at the start but over time they may have been modified to reflect changes in the business practices).

[450]  *See* Correspondent Agreement, § 3(f) [ALLY_0017350]; Int. of A. Celini, Feb. 18, 2013, at 37:5–24.

[451]  *See* Correspondent Agreement, § 5 [ALLY_0017350].

[452]  *See id.* § 7.

The Correspondent Agreement was assumed by Ally Bank in the 2006 Bank Restructuring.[453] While there were subsequent revisions of the form of agreement governing GMAC Mortgage sales to the Bank, the market pricing terms and allocation of revenues effected by the Agreement were unchanged through the adoption of the Broker Agreement in late 2008,[454] discussed in Section V.B.6.

As noted above, the Bank's purchase of loans from GMAC Mortgage was permissible under the "250.250 exception," but was limited to 50% of GMAC Mortgage's twelve-month rolling production.[455] These loans essentially were "warehouse[d]"[456] with the Bank (taking advantage of its lower cost of funds) until GMAC Mortgage was ready to pool them with other loans for sale to a GSE[457] or to another investor.[458] The Bank then sold the loans back to GMAC Mortgage pursuant to the Master Mortgage Loan Purchase and Sale Agreement,[459] discussed below. Loans that first had been sold by GMAC Mortgage to Ally Bank under the 250.250 exception were 6.5% of the total volume of loans sold to GMAC Mortgage under the MMLPSA in 2003; this figure grew to a peak of 46.1% in 2007, before dropping to approximately 14.3% in 2008 as GMAC Mortgage's loan production decreased.[460]

---

[453]  *See* Purchase and Assumption Agreement, at Sched. A [ALLY_PEO_0021066]; Review of GMAC Bank Affiliate Agreements Assigned from GMAC Bank FSB to GMAC Bank ILB, dated Nov. 30, 2006, at ALLY_0260095–96 [ALLY_0260087].

[454]  *See* Int. of A. Celini, Feb. 18, 2013, at 38:11–14, 35:16–23; Correspondent Agreement, at Recitals [ALLY_0017350] (incorporating terms and conditions in the GMAC Bank Credit Policy Manual and Correspondent Manual); Client Contract, dated Mar. 1, 2008 [ALLY_0248292] (incorporating terms and conditions in the GMAC Bank Correspondent Manual).

[455]  12 C.F.R. §§ 250.250, 223.42(k); *see also* E-mail from S. Whilden to S. McCumber (Feb. 18, 2008) [EXAM30329671]; GMAC Bank Charter–Strategic Analysis, Draft Discussion Document, dated Nov. 1, 2007, at 19 [EXAM10152682].

[456]  Memorandum, GMAC Mortgage to GMAC Bank Loan Transfer SAB99 Review, dated Jan. 6, 2009, at 2 [EXAM12042904].

[457]  GMAC Mortgage: (1) resold Fannie Mae-eligible and Freddie Mac-eligible loans to those entities, who in turn deposited them into securitization trusts; and (2) deposited Ginnie Mae-guaranteed loans into securitization trusts itself and sponsored the issuance of mortgage-backed securities or certificates by such trust in whole-loan sales and securitizations. First Day Affidavit, ¶ 22; *see also* Int. of R. Groody, Dec. 17, 2012, at 73:12–74:8.

[458]  Int. of R. Groody, Dec. 17, 2012, at 73:12–74:8, 85:10–86:9; *see also* Int. of A. Celini, Feb. 18, 2013, at 29:3–15 ("The bank never funded or purchased any loans that . . . didn't have a take-out investor."). "Held for sale" loans were held on Ally Bank's balance sheet for an average of twenty-seven days until the loans were sold. Letter from Arnold & Porter LLP to Board of Directors of Ally Bank (May 24, 2011), at 2 [EXAM00000137].

[459]  Int. of R. Groody, Dec. 17, 2012, at 73:12–74:8, 18:9–12.

[460]  GMAC Mortgage Corporation Consolidated Financial Statements as of and for the years ended December 31, 2004 and 2003 (Restated), at 46 [EXAM00231260]; GMAC Mortgage Corporation Consolidated Financial Statements As of and for the years ended December 31, 2005 and 2004 (Restated), at 51 [EXAM00231553]; ResCap Financial Statements-Related Party Footnotes—2006–2011 [EXAM00229659].

3. *The Master Mortgage Loan Purchase And Sale Agreement (Pre-July 2008)*

a. *The 2001 MMLPSA*

The original Master Mortgage Loan Purchase and Sale Agreement (the 2001 MMLPSA) was entered into between GMAC Mortgage and Old GMAC Bank on December 15, 2001, to govern GMAC Mortgage's purchases of loans (including both First Lien Loans[461] and Second Lien Loans[462] such as home equity loans) from the Bank.[463] Subject to certain amendments,[464] the 2001 MMLPSA remained in place until the 2006 Bank Restructuring discussed in Section V.A.[465]

Most loans sold by Old GMAC Bank to GMAC Mortgage were loans originated by third-party correspondent lenders.[466] As noted above, the Bank also sold a small volume of loans purchased from GMAC Mortgage pursuant to the Correspondent Agreement. In addition the Bank sold a small volume of loans that were brokered by third parties and originated by the Bank itself.[467]

---

[461] As used in this Section, "First Lien Loan" shall mean (1) an individual mortgage loan (other than a HELOC) secured by a mortgage that creates a first priority lien upon the pledged collateral; and/or (2) in the context of an MMLPSA, a "First Lien Mortgage Loan" as defined in the applicable MMLPSA.

[462] As used in this Section, "Second Lien Loan" shall mean (1) an individual mortgage loan secured by a mortgage that creates a second priority lien upon the pledged collateral; (2) a HELOC; and/or (3) in the context of an MMLPSA, a "Second Lien Mortgage Loan" as defined in the applicable MMLPSA.

[463] 2001 MMLPSA [ALLY_0018253].

[464] Amendments to the 2001 MMLPSA include the Addendum to 2001 MMLPSA, dated Jan. 22, 2002 [ALLY_0201226]; Second Addendum to 2001 MMLPSA, dated June 4, 2002 [ALLY_0018245]; Third Addendum to 2001 MMLPSA, dated Jan. 1, 2003 [ALLY_0018247]; Fourth Addendum to 2001 MMLPSA, dated Sept. 1, 2004 [ALLY_0018249].

[465] GMAC Mortgage entered into a new MMLPSA with new GMAC Bank dated October 6, 2006. *See* Section V.B.3.b.

[466] In January 2002, Old GMAC Bank acquired GMAC Mortgage's correspondent lending business, pursuant to which Old GMAC Bank purchased closed mortgage loans from correspondents. *See* Int. of A. Celini, Feb 18, 2013, at 53:9–15. By 2007, most purchases from correspondent lenders were conducted through GMAC Bank. *See* Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2008), at 5; *see also* Int. of R. Groody, Dec. 17, 2012, at 16:17–22.

[467] Int. of R. Groody, Dec. 17, 2012, at 18:1–2; Int. of A. Celini, Feb. 18, 2013, at 40:17, 41:19–23.

Significant terms of the 2001 MMLPSA included the following:

### *(1) Loan Purchase Requirements*

The 2001 MMLPSA initially did not mandate that GMAC Mortgage purchase, or that Old GMAC Bank sell, any particular loans, but instead simply provided a framework for sales otherwise agreed upon through separate offers by the Bank and acceptances (as to some or all of the offered loans) by GMAC Mortgage.[468]

A June 2002 amendment mandated that GMAC Mortgage purchase and Old GMAC Bank sell all "First Lien Mortgage Loans to be originated or acquired by" Old GMAC Bank[469] (but did not include Second Lien/home equity loans in this obligation).[470] Then, in a September 2004 amendment, the purchase/sale obligation was limited to "any and all First Lien Mortgage Loans to be originated by [the Bank] that are classified on the balance sheet of the [Bank] as 'held for sale.'"[471]

To facilitate purchases and their coordination with GMAC Mortgage's sales and securitizations of packages of loans,[472] Old GMAC Bank was required to provide GMAC Mortgage with loan-level information.[473] Identification of the specific loans to be included in a particular purchase was then left to GMAC Mortgage, which was required to notify Old GMAC Bank of its intent to purchase and submit a list of the loans to be purchased.[474] While

---

[468]  2001 MMLPSA, Art. II [ALLY_0018253].

[469]  Second Addendum to 2001 MMLPSA, dated June 4, 2002, ¶ 3 [ALLY_0018245].

[470]  According to Celini, there was no hedging done for home equity loans as most were floating rate loans. As there was minimal interest rate and market risk, "the mandatory nature of the sale isn't as explicit here . . . . But there was no change in the intent that . . . the affiliate would take us out." Int. of A. Celini, Feb. 18, 2013, at 105:1–8.

[471]  Fourth Addendum to 2001 MMLPSA, dated Sept. 1, 2004, ¶ 2 [ALLY_0018249]. This change was made when the Bank decided to begin maintaining an HFI portfolio. Int. of A. Celini, Feb. 18, 2013, at 101:4–18.

[472]  According to Dondzila:

> [W]hat would, practically speaking, be happening is that the group within ResCap that pools loans would be looking at, collectively, its portfolio, meaning ResCap's portfolio of saleable loans and Ally Bank's portfolio of saleable loans, and would be looking to pool those loans for sale.

> And so, they don't just say, 'Oh, give me all the production,' . . . [b]ut, . . . the onus was on the purchaser to say, "Here are the loans that I'm intending to purchase," and then providing presumably some of this notification, and then those loans would subsequently be sold, and then ResCap would have already probably sold those loans to one of the agencies or into a Ginnie [Mae] securitization.

Int. of C. Dondzila, Sept. 27, 2012, at 201:6–24; *see also* Int. of R. Groody, Dec. 17, 2012, at 85:16–86:9.

[473]  Second Addendum to 2001 MMLPSA, dated June 4, 2002, § 2.2(a) [ALLY_0018245].

[474]  *Id.* § 2.2(b), (c).

mandating the purchase and sale of all of the Bank's HFS loans, the 2001 MMLPSA, as amended, did not specify a mechanism for assuring that all subject loans were purchased, or deadlines for such purchases.[475]

### *(2) Servicing Rights*

The 2001 MMLPSA, as amended, provided that Old GMAC Bank would not retain MSRs for loans sold under the agreement, but would instead sell the loans "as whole loans and on a servicing-released basis."[476]

### *(3) Purchase Price*

The 2001 MMLPSA initially provided that the Purchase Price for loans would be the "unpaid principal balance" of the loan ("UPB"), plus "any accrued and unpaid interest," plus a "Purchase Price Premium" to be specified in Exhibits to the Agreement.[477] Exhibit C to the 2001 MMLPSA specified that the Premium for (second-lien) Home Equity Loans was to be 450 basis points.[478] However, the version of the first-lien loan pricing exhibit attached to the 2001 MMLPSA as Exhibit B says it is "TO BE SUPPLIED."[479] The parties' productions did not contain a version of Exhibit B specifying the original Purchase Price Premium for First Lien Loans. A contemporaneous Old GMAC Bank Affiliate Transaction Memo prepared by Celini, the Bank official primarily responsible for affiliate transactions,[480] stated that the Purchase Price Premium for loans was 250 basis points (without distinguishing between first-lien and second-lien loans).[481] In his interview, Celini explained that the first-lien loan pricing

---

[475] *Id*. § 2.2; Fourth Addendum to 2001 MMLPSA, dated Sept. 1, 2004 [ALLY_0018249].

[476] 2001 MMLPSA, § 2.1 [ALLY_0018253]; Second Addendum to 2001 MMLPSA, dated June 4, 2002, § 2.1 [ALLY_0018245]; Fourth Addendum to 2001 MMLPSA, dated Sept. 1, 2004, § 2.1 [ALLY_0018249].

[477] 2001 MMLPSA, §§ 1.21, 1.22, 2.4(c), 2.4(d) [ALLY_0018253]. As discussed in Section V.B.3.a(4), the development of these pricing provisions relates to issues regarding representations and warranties provided under the 2001 MMLPSA; accordingly, it is discussed in some detail here.

[478] *Id.* Ex. C. The Premium for Home Equity Loans was later reduced to 175 basis points. Third Addendum to 2001 MMLPSA, ¶ 2 [ALLY_0018247].

[479] 2001 MMLPSA, Ex. B [ALLY_0018253].

[480] Celini, hired in 2000 to become the CFO of Old GMAC Bank, worked on the initial chartering process for the Bank, and then also served as chief credit and risk officer from 2003–2006. His primary responsibility was to expand the lending capacity of the Bank through the 250.250 exemption. Int. of A. Celini, Feb. 18, 2013, at 6:15–17, 7:22–8:3, 9:3–10:13, 11:1–8. He became CFO of Ally Bank in November 2006. Celini's responsibilities also included the Bank's affiliate agreements. Int. of A. Celini, Feb. 18, 2013, at 8:14–18. He signed a number of the subsequent agreements and amendments addressed in this Section on behalf of the Bank, and authored several of the related Bank Affiliate Transaction Memoranda. He left the Bank in October 2009. Int. of A. Celini, Feb. 18, 2013, at 15:11–15.

[481] GMAC Bank Affiliate Transaction Memorandum, Master Mortgage Loan Purchase and Sale Agreement, dated Dec. 14, 2001, at 2 [ALLY_0018320].

had not been settled at this point, since the Bank started off by selling home equity loans rather than first-lien loans, and first-lien loan pricing was not resolved until just over a month later, when the parties adopted an Addendum to the 2001 MMLPSA.[482]

The January 22, 2002 Addendum replaced the Purchase Price Premium Exhibit for First Lien Loans with a new Exhibit B specifying that "Pricing for first mortgage loans sold from GMAC Bank to [GMAC Mortgage] will be at the Bank's *cost basis* in the loan (UPB + Premium/Discount + SRP) as of the date of sale."[483] As noted above, "UPB" references the unpaid principal balance on the loan. "Premium/Discount" references an adjustment made to the carrying value of a loan where, e.g.*,* the interest rate varies from the market rate because the buyer pays points up front for a lower rate or accepts a higher rate but pays no points.[484] "SRP" references the "servicing-released premium," a payment by the purchaser of a mortgage to the seller for the release of the servicing rights on the underlying loan.

Celini and Groody[485] explained that the effect of these provisions was that GMAC Mortgage acquired First Lien Loans at Old GMAC Bank's cost (rather than paying market value for the loans), so that GMAC Mortgage recognized the gain (or loss) on sale for any mortgage, including the benefit (or loss) resulting from any change in the market value of the

---

[482] Int. of A. Celini, Feb. 18, 2013, at 51:11–21, 52:3–13, 53:22–24. This account is in some tension with Celini's contemporaneous Bank Affiliate Transaction Memorandum's recitation of a premium of "250 basis points" for "loans" generically. This does not appear to have been a reference to the premium for Home Equity Loans (as defined in the 2001 MMLPSA) and Lines of Credit (as defined in the 2001 MMLPSA), which were subject to the 450 basis point premium specified in Exhibit C. The "250 basis points" reference in the Affiliate Transaction Memorandum consequently might most readily be understood as a statement of the premium applicable to first-lien loans. *But see* Int. of A. Celini, Feb. 18, 2013, at 50:6–51:10.

[483] Addendum to 2001 MMLPSA, dated Jan. 22, 2002, ¶ 2, Ex. B [ALLY_0201226] (emphasis added). The revision of Exhibit B is not entirely harmonious with the text of sections 1.21 and 1.22, which indicate that the Exhibit is simply supposed to set forth the "Purchase Price Premium." 2001 MMLPSA, §§ 1.21, 1.22 [ALLY_0018253]. The revised Exhibit B in the Addendum to the 2001 MMLPSA speaks not merely to the Purchase Price Premium, but sets forth the complete "Pricing for first mortgage loans." Addendum to 2001 MMLPSA, dated Jan. 22, 2002, Ex. B [ALLY_0201226].

[484] Int. of A. Celini, Feb. 18, 2013, at 56:6–24.

[485] Groody joined Old GMAC Bank as its CFO in May 2005, became Chief Mortgage Accountant of Ally Bank in the 2006 Bank Restructuring, and became Ally Bank's EVP and COO in December 2007. Int. of R. Groody, Dec. 17, 2012, at 8:5–9:3, 9:19–25, 10:12–11:13, 60:15–20, 67:1–5, 280:24–281:8. He was a signatory to every version and amendment of the MMLPSA adopted after he joined Old GMAC Bank in May 2005, beginning with the 2006 MMLPSA; he also executed a number of Pipeline Swap and MSR Swap schedules and amendments. He left the Bank in May 2009. *Id*. at 11:24–12:1.

loan before its sale under the MMLPSA.[486] Thus, the 2001 MMLPSA was a forward sale commitment that essentially served as a hedge for Old GMAC Bank against loan market-value fluctuations.[487] Old GMAC Bank's revenue from the loans consisted of the net interest carry for the period that the loan was on Old GMAC Bank's books.[488] According to Celini, the pricing structure was the same for each of Old GMAC Bank's loan channels—loans were purchased at Old GMAC Bank's cost basis.[489]

These terms were not "market" terms, from either party's perspective. In a sale to a third party, Old GMAC Bank ordinarily would have retained the gain on sale, not merely the net interest carry. However, Old GMAC Bank would have been un-hedged, could not have purchased a similarly complete hedge in the market, and would have incurred significant expense in constructing a (less complete) hedge through third-party arrangements.[490]

### (4) Loan-Level Representations And Warranties

In Article IV, Old GMAC Bank provided a lengthy series of "loan-level" representations and warranties to GMAC Mortgage for "each Mortgage Loan sold" under the 2001 MMLPSA, including representations and warranties that the loan had been originated and serviced in accordance with applicable law, was enforceable, etc.[491]

Celini and Groody both asserted that, despite the presence of these representations and warranties in the text of the 2001 MMLPSA, the parties' "intent" was that Old GMAC Bank not be held responsible for representations and warranties.[492] While their recollection or

---

[486] Int. of A. Celini, Feb. 18, 2013, at 55:1–18 ("So our goal for pricing would be for us to be taken out at our cost basis. In other words, whatever the basis of the asset that the bank had acquired the loan at, that it would be removed at that cost basis, so that this would be a risk-free transfer from the bank's perspective."); Int. of R. Groody, Dec. 17, 2012, at 88:17–89:6 (discussing cost basis under 2001 MMLPSA), 90:22–91:25, 92:21–93:6.

[487] Int. of R. Groody, Dec. 17, 2012, at 96:20–97:18; *see also* GMAC Bank Affiliate Transaction Memorandum, Master Mortgage Loan Purchase and Sale Agreement Amended and Restated 6/1/07, dated Oct. 31, 2007, ¶ 2 [ALLY_0017869] (explaining that the June 2007 MMLPSA functioned as a hedge for the Bank).

[488] Int. of A. Celini, Feb. 18, 2013, at 232:8–233:14 (Bank revenues on first lien HFS loans were limited to net carry, and, in later years, revenues associated with retained MSRs under the MSR Swap); Int. of R. Groody, Dec. 17, 2012, at 96:20–97:15.

[489] Int. of A. Celini, Feb. 18, 2013, at 59:5–13.

[490] GMAC Bank Affiliate Transaction Memorandum, Master Mortgage Loan Purchase and Sale Agreement Amended and Restated 6/1/07, dated Oct. 31, 2007, ¶ 2 [ALLY_0017869].

[491] 2001 MMLPSA, §§ 4.1–4.26 [ALLY_0018253].

[492] *See* Int. of R. Groody, Dec. 17, 2012, at 121:21–122:3; Int. of A. Celini, Feb. 18, 2013, at 159:6–8.

knowledge of negotiations or discussions leading to the arrangement was limited, ResCap personnel also uniformly understood that Old GMAC Bank was not to have any exposure for representation and warranty liability.[493]

Celini explained that the 2001 MMLPSA, including the representation and warranty provisions, had been copied from a third-party arrangement.[494] As noted above, Celini believed that the pricing for First Lien Loans was not resolved at the time the parties first entered into the 2001 MMLPSA. When they agreed upon cost-basis pricing in the Addendum adopted in January 2002, Old GMAC Bank's revenue on loans was limited to "net carry," while any gain on sale consequently would be recognized by GMAC Mortgage, rather than Old GMAC Bank.[495] Old GMAC Bank was acting simply as a funding vehicle for GMAC Mortgage, and the "net carry" margin was too thin, Celini asserted, to support assumption of representation and warranty liability.[496] This was true even though the risk assumed—given that the vast majority of loans had not been originated by Old GMAC Bank, but had been purchased from correspondents (or GMAC Mortgage) who had themselves given representations and warranties—was largely limited to credit risk.[497] Celini advised that he had discussed the matter with ResCap/GMAC Mortgage personnel in advance of the adoption of the Addendum, and it was agreed that Old GMAC Bank would not have representation and

---

[493]  *See, e.g.,* Int. of D. Bricker, Mar. 15, 2013, at 95:19–99:14; Int. of B. Bier, Feb. 22, 2013, at 22:15–24:9; Int. of S. Blitzer, Mar. 5, 2013, at 26:18–28:15.

[494]  Int. of A. Celini, Feb. 18, 2013, at 64:11–18 ("[W]e started most of our affiliate agreements with market terms. And these look like market terms as it applied to representations and warranties.").

[495]  *Id.* at 58:14–18, 66:1–3. This was Bier's understanding as well. *See* Int. of B. Bier, Feb. 22, 2013, at 27:4–28:1 (". . . [G]enerally speaking, the bank was financing the loans. So, the bank was entitled to a financing spread, and to cover whatever its costs were related to the transactions. But, all the risk and reward from a capital markets perspective were retained by the mortgage company. So, essentially, that's not . . . inconsistent with other financing type of arrangements . . . .").

[496]  Int. of A. Celini, Feb. 18, 2013, at 88:25–89:12. Celini also noted that it would not have passed the scrutiny of the regulators or auditors. *Id.* at 89:13–18; *see also* Int. of B. Bier, Feb. 22, 2013, at 23:7–13, 45:12–46:15 (agreeing, and noting that the Bank was set up as a financing vehicle and in financing, financier is entitled to its cost plus a spread).

[497]  Int. of A. Celini, Feb. 18, 2013, at 90:13–91:5.

warranty obligations to GMAC Mortgage.[498] Asked, why, if this had been discussed, the 2001 MMLPSA had not been revised accordingly in the January 2002 Addendum when the pricing provision was revised, Celini said "we should have addressed the complete agreement at the time," and that "it was an error for us not to go back and make that change at the time."[499]

Groody, who joined the Bank in 2005, reached the same substantive result by a somewhat different route. While asserting that the representation and warranty provisions in the 2001 MMLPSA were intended to be in the agreement,[500] Groody seems to have understood the provisions to function essentially as pass-throughs or assignments of the representations and warranties Old GMAC Bank had itself received from third-party correspondents from whom it had purchased the loans,[501] though that is not what the

---

[498] *Id.* at 66:16–72:13. Celini also stated,

> when you look at the true cash flows and the financial activities [and] the intention of the parties at the time, we were funding loans and our specific intention was not to take market risk, not to take credit risk or any risk for the activity because we were providing interim funding. So we earned coupon interest and coupon interest only. We got no gain on sale. And because of that treatment, it was not the expectation of the parties that the depositary would take any reps and warrants on the loans that it originated . . . . And while the agreement indicates reps and warrants, that would not be a matching of the rewards and the benefits—the expenses and the revenues associated with the traditional mortgage banking practice.

*Id.* at 65:20–66:15. Bricker and Blitzer, two GMAC Mortgage personnel that Celini recalled speaking with about representations and warranties, did not recall any such discussions but did not dispute that they spoke with Celini about the issue, and agreed that the Bank was not supposed to be retaining representation and warranty risk. Int. of D. Bricker, Mar. 15, 2013, at 107:25–108:6; Int. of S. Blitzer, Mar. 5, 2013, at 26:16–22, 86:16–87:20.

[499] Int. of A. Celini, Feb. 18, 2013, at 74:14–16, 74:24–75:1. Celini also observed that "[a]t a point in the future, I do recall that we went back and did a cleanup of the agreement," apparently referencing MMLPSA revisions in 2006 and 2007, discussed in Sections V.B.3.b and V.B.3.c. *Id.* at 74:17–19.

[500] Indeed, Groody went so far as to suggest that later versions of the MMLPSA, which appear first to limit the effect of the representations and warranties to second-lien loans, and then to eliminate them altogether, were themselves errors. *See* Sections V.B.3.b(3), V.B.3.c(2); Int. of R. Groody, Dec. 17, 2012, at 86:19–87:23, 120:16–122:11.

[501] Int. of R. Groody, Dec. 17, 2012, at 122:4–11.

provisions state.[502] Normally, the representation and warranty claim would be pursued "up the chain" and come to rest with the third party that originated the loan. Asked what would occur if a third-party loan originator was insolvent and unable to satisfy the representation and warranty claim, Groody concluded that "[w]e would have figured out a mechanism to put that loss, if any, back to GMAC Mortgage," because the "intent" and "understanding" of the program was always that Old GMAC Bank would not actually bear this risk.[503] In a number of subsequent documents and in his interview, Groody expressed the maxim that, as between the Bank and GMAC Mortgage, "the party [that] retains the Gain on sale of the mortgage loans retains the rep and warrant risk."[504]

Barry Bier, who had held senior positions in capital markets and lending for GMAC Mortgage since 1997,[505] echoed this view, agreeing that GMAC Mortgage would bear the loss if no recovery was possible from the third-party correspondent because the Bank was "really a financing vehicle for the inventory" and GMAC Mortgage took all the risk and reward with respect to the loans.[506]

_____

[502] *Id.* at 122:4–11. One might expect that, absent GMAC Mortgage's receipt of representations and warranties from the Bank, or the Bank's assignment in some form of the representations and warranties it had received from third-party correspondents, GMAC Mortgage would be unable to pursue representation and warranty claims against third parties. However, the terms of the parties' agreements with the correspondents from whom the Bank purchased loans permitted GMAC Mortgage to pursue representation and warranty claims in these circumstances. Int. of A. Celini, Feb. 18, 2013, at 80:1–84:7; Int. of B. Bier, Feb. 22, 2013, at 36:8–37:17. Old GMAC Bank's correspondent agreements provided indemnification and repurchase rights that explicitly extended to Old GMAC Bank's affiliates. *See* Correspondent Agreement, dated Apr. 4, 2006, § 9 [RCUW00140906]; Correspondent Agreement, dated Oct. 17, 2005, § 9 [RCUW00145416]; Correspondent Agreement, dated Sept. 24, 2004, § 9 [RCUW00141132]; *see also* Response to UBS Questions as of May 14, 2010, dated Feb. 10, 2010, at EXAM11011434 [EXAM11011422] ("To the extent these loans were originated by third-parties and sold to [GMAC Mortgage] under the MMLPSA, [GMAC Mortgage] pursues recovery of losses from third-parties under breach of customary representation[s] and warranties.").

[503] Int. of R. Groody, Dec. 17, 2012, at 127:12–128:4. Groody's belief that the Bank would be able to put any losses for unsatisfied representation and warranty claims on GMAC Mortgage was not tested during his tenure at Old GMAC Bank or at Ally Bank. The parties did not encounter any situations where insolvent third-party originators were unable to satisfy representation and warranty claims before he left in May 2009. *Id.* at 126:18–127:10.

[504] E-mail from R. Groody to C. Dondzila, J. Peterson, and J. Whitlinger (Mar. 13, 2009) [ALLY_0329052]; Int. of R. Groody, Dec. 17, 2012, at 252:13–254:2; *see also* Int. of J. Whitlinger, Nov. 30, 2012, at 68:1–3 ("[M]y understanding at the time was that whoever got gain on sale got the rep and warranty:"); Int. of A. Celini, Feb. 18, 2013, at 58:14–19 ("We earned coupon interest during the period of holding and the asset was removed from our balance sheet at basis. We received no gain or loss on the transaction and it was not our intent to take any risk during that time.").

[505] Bier held various positions during his tenure with the companies, including Senior VP for Capital Markets of GMAC Mortgage when he joined the company in 1997, EVP of Capital Markets and Lending; COO of GMAC Mortgage, and EVP Asset Manager of ResCap. Int. of B. Bier, Feb. 22, 2013, at 5:18–6:4, 7:9–15.

[506] *Id.* at 39:16–40:13.

Thus, Celini stated, it was normal practice for GMAC Mortgage to accept put-back requests from Fannie Mae and Freddie Mac.[507] GMAC Mortgage's own Quality Control unit was "charged with the responsibility of reviewing repurchase requests from all Investors on GMAC Mortgage *and GMAC Bank originated loans.*"[508] But such repurchase requests were never tendered back to Old GMAC Bank.[509] These loans included both loans originated by Old GMAC Bank and loans originated by third-party correspondents.[510]

Consequently, Celini noted, while GMAC Mortgage carried representation and warranty reserves,[511] Old GMAC Bank never carried a reserve for representation and warranty exposure.[512]

### *(5) Termination*

Either party could terminate the 2001 MMLPSA without cause on 30 days' notice.[513]

### *(6) Disposition Of The 2001 MMLPSA In The 2006 Bank Restructuring*

Neither the 2001 MMLPSA nor any contingent liabilities of Old GMAC Bank thereunder were assumed by Ally Bank in the 2006 Bank Restructuring.[514]

The OTS approved the transfer of assets under the 2006 Bank Restructuring subject to certain conditions, including the provision of a "holding company guarantee confirming

---

507  Int. of A. Celini, Feb. 18, 2013, at 78:19–79:3, 79:23–25.

508  Executive Summary, Repurchases—December, 2004, at 1 [EXAM20056326] (emphasis added).

509  Int. of A. Celini, Feb. 18, 2013, at 78:19–79:3, 79:23–25.

510  *Id.* at 79:13–18, 83:6–9.

511  *See* ResCap Rep and Warranty Reserves as of November 30, 2006, dated Dec. 14, 2006, at 9 [EXAM10183443]; Memorandum, Contingent Liability for Reps and Warranties related to Repurchase, dated Nov. 28, 2006, at EXAM10183454 [EXAM10183443].

512  Int. of A. Celini, Feb. 18, 2013, at 86:8–87:9 (discussing period from 2001 to January 2005); *see also* Memorandum, Ally Bank Representation & Warrant Position on Affiliate Mortgage Loan Sales, dated Mar. 3, 2011, at 2 [EXAM20276496] ("As there is no exposure to [GMAC Mortgage], the Bank does not record an R&W reserve related to the sale with [GMAC Mortgage]."); *see also id.*, at 3 ("Therefore, even though the Bank maybe the servicer of record for the loan and has an obligation under the agency seller and servicer guides, as seller [GMAC Mortgage] holds the initial obligation as between the Bank and [GMAC Mortgage], and as such records 100% of the R&W reserve for the loans it sells to the agencies.").

513  2001 MMLPSA, § 7.1 [ALLY_0018253].

514  The 2001 MMLPSA was not listed as an "Acquired Asset" in the Purchase and Assumption Agreement nor was it listed in the Old GMAC Bank board minutes approving the assignment of certain affiliate agreements. Purchase and Assumption Agreement [ALLY_PEO_0021066]; Minutes of a Regular Meeting of the Board of Directors of GMAC Bank, Nov. 30, 2006, at 2 [ALLY_PEO_0020880]; Review of GMAC Bank Affiliate Agreements Assigned from GMAC Bank FSB to GMAC Bank ILB, dated Nov. 30, 2006, at ALLY_0260095–97 [ALLY_0260087].

responsibility for any of [Old GMAC Bank's] contingent liabilities following the consummation of the transaction" and the receipt of written non-objection thereto from the OTS.[515] In a November 10, 2006 response, AFI agreed only to "indemnify, defend and hold harmless [Old GMAC Bank] with respect to any post-closing claims or liabilities relating to the assets sold to [GMAC Bank]" as described in the applications to the OTS.[516] The OTS issued a non-objection letter with respect to the indemnity AFI provided.[517]

### b. The 2006 MMLPSA

In late 2006, GMAC Mortgage entered into a new MMLPSA with Ally Bank (the 2006 MMLPSA).[518] The 2006 MMLPSA is dated October 31, 2006,[519] shortly before the 2006 Bank Restructuring occurred in connection with the Cerberus acquisition of a majority interest in AFI.[520] The loans sold to GMAC Mortgage under the 2006 MMLPSA consisted of loans purchased from third-party correspondents and from GMAC Mortgage itself, as well as brokered loans originated in Ally Bank's name.[521]

---

[515]   Letter from OTS to J. Feinberg (Aug.16, 2006) [EXAM10221739].

[516]   Letter from S. Khattri to R. Albanese (Nov. 10, 2006) [ALLY_0402156]. In consideration of AFI's agreement to provide the holding company guarantee requested by the OTS, ResCap agreed to counter-indemnify AFI with respect to the same post-closing claims or liabilities. Letter from S. Khattri to B. Paradis (Nov. 10, 2006) [ALLY_0018335]. This indemnity was approved by the ResCap Board. Certificate of C. Quenneville (Nov. 22, 2006) [CERB001616].

[517]   Letter from R. Albanese to J. Feinberg (Nov. 20, 2006) [ALLY_0401904].

[518]   2006 MMLPSA [ALLY_0018291].

[519]   Groody, who executed the agreement on behalf of the industrial bank, did not become an officer of the industrial bank until the restructuring occurred on November 20, 2006, and consequently was at something of a loss to explain why the agreement was dated October 31, 2006. Int. of R. Groody, Dec. 17, 2012, at 64:21–68:13. He believed that the agreement was not actually executed until Old GMAC Bank and GMAC Automotive Bank consummated the Purchase and Assumption Agreement under which Old GMAC Bank transferred the bulk of its assets to GMAC Automotive Bank on November 22, 2006. Id. at 68:18–22; see also Section V.A (discussing the Purchase and Assumption Agreement).

[520]   See Section V.A.

[521]   Groody suggested that the Bank ceased producing brokered loans in 2006. Id. at 72:21–73:4. Compare GMAC Mortgage Corporation Consolidated Financial Statements as of Dec. 31, 2005 and 2004, at 6 [EXAM00231553] (noting Bank loan production through "network of brokers and correspondents") and GMAC Bank Audited Financial Statements as of Dec. 31, 2005 and 2004, at 5 [GOLDIN00091763], with GMAC Bank Consolidated Financial Statements as of Dec. 31, 2006, at 9, 23 [EXAM00231722] (referencing correspondents, not brokers), and GMAC Bank Consolidated Financial Statements as of Dec. 31, 2007 and 2006, at 9 [EXAM00125246] (same). However, it appears that the Bank continued to have brokered loans through the life of the agreement. See E-mails among C. Dondzila, J. Cortese, S. Ruby, et al. (Feb. 10–11, 2010), at EXAM11891922 [EXAM11891921] (discussing continued production of brokered loans since 2006). There apparently was some confusion caused by the fact that the Bank in Q2 2006 placed its Broker Fulfillment group under the aegis of its Correspondent Lending operation. Id. It continued to close brokered loans "in the name of the Bank," though the volume appears to have been relatively small. Id. Then, with the advent of the Broker Agreement at the end of 2008, loans brokered to Ally Bank by GMAC Mortgage were sold to GMAC Mortgage under the MMLPSA. See Section V.B.6.

The 2006 MMLPSA was modeled on the 2001 MMLPSA, but materially changed some of the significant terms described above:

### (1) Loan Purchase Requirements

While the 2006 MMLPSA did not change the scope of the loans GMAC Mortgage was obligated to purchase (First Lien HFS loans), or the procedures for selection of loans for purchase, it did add a provision barring GMAC Mortgage from using "adverse selection procedures" in choosing loans for purchase.[522]

### (2) Servicing Rights

While the 2001 MMLPSA only provided for the sale of loans on a "servicing-released" basis, the 2006 MMLPSA permitted the Bank to sell loans on either "a servicing-retained or servicing-released basis."[523] From at least as early as 2005, ResCap and Old GMAC Bank had contemplated moving MSRs to the Bank, and ResCap and Bank personnel had embarked on a project with this aim by the fall of 2006.[524] This change from the 2001 MMLPSA was made to align the agreement with this plan.[525]

### (3) Loan-Level Representations And Warranties

Potentially the most noteworthy language change effected by the 2006 MMLPSA was the revision of Article IV's loan-level representation and warranty provisions to eliminate their application to First Lien Loans. As revised, the preamble to Article IV provided that Ally Bank made such representations and warranties only "with respect to each Second Lien Mortgage Loan sold and transferred to Purchaser."[526] GMAC Mortgage, of course, was still required to make such representations and warranties on First Lien Loans to GSEs or other third parties when it sold or securitized these loans.[527]

---

[522] 2006 MMLPSA, § 2.2(e) [ALLY_0018291].

[523] *Id.* § 2.1.

[524] *See* Section V.B.9.a.

[525] Int. of R. Groody, Dec. 17, 2012, at 81:23–82:15.

[526] 2006 MMLPSA, Art. IV [ALLY_0018291]. The title of Article IV was also changed from "Representations and Warranties of Seller Relating to Mortgage Loans" to "Representations and Warranties of Seller Relating to *Second Lien* Mortgage Loans." *Id.* (emphasis added). *Compare* 2001 MMLPSA, Art. IV [ALLY_0018253] *with* 2006 MMLPSA, Art. IV [ALLY_0018291].

[527] There are two additional loan purchase agreements dated October 31, 2006, one between ResCap and Old GMAC Bank [ALLY_PEO_0021142], and the other between ResCap and GMACB Asset Management Corp. (a subsidiary of Old GMAC Bank) [CERB001537]. These agreements each govern the sale of discrete packages of existing loans to ResCap; notably, under Article IV of each agreement, all of the loans sold (not just second lien loans) are subject to substantially the same representations and warranties that were applicable under the 2001 MMLPSA.

Celini viewed the elimination of representations and warranties for First Lien Loans as a "clean up" of the agreement to make it consistent with the parties' understanding that the Bank would not have representation and warranty liability.[528] But he was at a loss to explain why the 2006 MMLPSA explicitly retained representations and warranties for Second Lien Loans, since he maintained that the Bank's margins on those loans were also too thin to support accepting representation and warranty liability and that it had been agreed in 2002 that the Bank would have no such liability for *any* loans under the MMLPSA.[529]

Groody, in contrast, asserted that, despite the revision to Article IV's preamble, the "understanding" remained that the representations and warranties applied to *all* loans sold under the 2006 MMLPSA, including First Lien Loans.[530] However, Groody was unable to satisfactorily explain why, if this was the case, the preamble language had been changed.[531] It is difficult to read the preamble revisions as anything other than a statement that

---

[528]  Int. of A. Celini, Feb. 18, 2013, at 149:21–150:6.

[529]  *Id.* at 151:5–21, 156:1–157:23.

[530]  Int. of R. Groody, Dec. 17, 2012, at 86:19–87:8.

[531]  Groody noted that his "focus" had been on the individual representations and warranties, which continued to include provisions germane only to First Lien Loans. *Id.* at 87:9–23. For example, section 4.21 of the 2006 MMLPSA provides a representation and warranty that loan proceeds "have been fully disbursed," but expressly carves out "home equity lines of credit"—Second Lien Loans—from its application. 2006 MMLPSA, § 4.21 [ALLY_0018291].

Groody further observed that the term "Mortgage Loan" used throughout the individual representations and warranties (*see, e.g.,* §§ 4.1, 4.2, 4.3) is elsewhere defined broadly, so that it would include First Lien Loans and home equity loans and lines of credit. Int. of R. Groody, Dec. 17, 2012, at 87:4–8; 2006 MMLPSA, § 1.17 [ALLY_0018291] (defining "Mortgage Loan"). However, the individual sections in Article IV were copied wholesale from the 2001 MMLPSA; the references to Mortgage Loan did not need to be revised or narrowed to give effect to the intent apparent from the revision of the preamble to limit the application of the representations and warranties to Second Lien Loans, which were a species of "Mortgage Loans."

AFI counsel noted that perhaps the reference to Second Lien Loans in the preamble was an error somehow produced because Second Lien Loans had not been encompassed in the 2001 MMLPSA. However, in fact, the 2001 MMLPSA, though it did not set forth either "First Lien Mortgage Loan" or "Second Lien Mortgage Loan" as separate defined terms, clearly encompassed both sorts of loans. *See* 2001 MMLPSA, § 1.15 [ALLY_0018253] (definition of Mortgage Loan includes home equity loans and lines of credit), Ex. B, C (separate exhibits for "First Mortgage Pricing" and "Home Equity Loan/Line Pricing").

AFI counsel also suggested that the preamble should be ignored, citing section 8.11 of the agreement, which contains a commonplace provision stating that "Paragraph captions" are "for ease of reference only and shall be given no substantive or restrictive meaning or significance." The difficulty with this argument is that section 8.11 applies to "captions," not to preambles, and the various preambles in the agreement (including the preambles in Articles I, III, IV, and V) seem clearly to have been intended to have operative effect. Indeed, only the preambles to Articles III, IV, and V specify that the statements in the various sections of those articles are representations and warranties of the pertinent party; absent the preamble to Article V, for example, there would be nothing in the text of the various sections of that Article that explains that they are representations and warranties of the Purchaser, as opposed to mutual statements of understanding made by both parties.

representations and warranties are not to apply to First Lien Loans.[532] In any case, Groody maintained his view was that, even though the Bank continued to provide representations and warranties to GMAC Mortgage for First Lien Loans, the parties' "intent" had always (even under the 2001 MMLPSA) been that the Bank would not ultimately be held responsible for any breach.[533]

In any case, neither Celini nor Groody could provide an explanation for the 2006 MMLPSA representation and warranty provisions for Second Lien Loans that could be reconciled with their respective explanations concerning the parties' "intent" that there would be no Bank representation and warranty liability for *any* loans.[534] Moreover, as discussed in Section V.B.3.a(3), while First Lien Loans were priced at the Bank's cost,[535] the purchase price for Second Lien Loans under the 2006 MMLPSA included a purchase price premium with a basis points component.[536]

Individuals who only became involved in these matters in later years, including ResCap officials involved in addressing the substantial "rep & warranty" issues and settlements with Fannie Mae and Freddie Mac, were unaware or had no recollection that the Bank had ever provided loan-level representations and warranties.[537] As James Whitlinger noted, even if the third-party originator was not solvent and no longer paying claims, "[w]e didn't go back to Ally Bank."[538]

---

[532] Kenneth Blackburn, the GMAC Mortgage employee who executed the 2006 MMLPSA on behalf of GMAC Mortgage, was unable to recall executing the agreement or any involvement in negotiating its terms; he speculated that he may have been called upon to execute the agreement because his office was near Groody's. Int. of K. Blackburn, Mar. 26, 2013, at 13:17–14:8.

[533] Int. of R. Groody, Dec. 17, 2012, at 121:21–122:18, 127:12–128:4.

[534] Blackburn had no recollection of the agreement or its terms and therefore was unable to provide any insight on the representation and warranty provisions for Second Lien Loans. Int. of K. Blackburn, Mar. 26, 2013, at 11:1–13:23. Blackburn "at a high level" was aware that the Bank sold loans to GMAC Mortgage, but was not involved in any of the transaction's details and had no recollection of whether the Bank provided representations and warranties to GMAC Mortgage under the MMLPSA. *Id*.

[535] 2006 MMLPSA, § 1.24, Ex. B [ALLY_0018291].

[536] *Id*. § 1.24, Ex. C [ALLY_0018291].

[537] Int. of C. Dondzila, Sept. 27, 2012, at 213:20–219:13; Int. of J. Young, Sept. 28, 2012, at 262:22–263:23; Int. of J. Whitlinger, Nov. 30, 2012, at 51:2–14.

[538] Int. of J. Whitlinger, Nov. 30, 2012, at 68:13–69:4.

*(4) Pricing And Termination Provisions*

The 2006 MMLPSA left unchanged the provisions of the 2001 MMLPSA (as amended) concerning the purchase price of First Lien Loans[539] and termination.[540] The pricing of Second Lien Loans still included a purchase price premium, with a basis-point component of 175 bps. [541]

### c.   The 2007 MMLPSA

Effective June 1, 2007, GMAC Mortgage and Ally Bank entered into an "Amended and Restated" MMLPSA (the "2007 MMLPSA").[542] This version of the MMLPSA, adopted as ResCap was confronting worsening market conditions (though the market for conforming loans, the loans principally at issue under the MMLPSA, was comparatively strong), made several key revisions:

*(1) Loan Purchase*

The 2007 MMLPSA imposed several new requirements concerning GMAC Mortgage's loan purchase obligations:

(1) First, GMAC Mortgage was now required to purchase not only First Lien Loans HFS, but also "any and all Mortgage Loans to be originated or acquired by Seller" classified on Ally Bank's balance sheet as HFS (i.e., including Second Lien Loans HFS not previously subject to this mandate).[543]

(2) Second, for all mortgage loans now subject to GMAC Mortgage's expanded purchase obligation, Ally Bank was given the right once a year (on or about June 15th) to identify any loans that were aged 180 days or more and require that GMAC Mortgage "promptly" purchase such loans.[544]

---

[539]   *See* 2006 MMLPSA, §§ 1.23 (Purchase Price), 1.24 (Purchase Price Premium), Ex. B [ALLY_0018291]. These provisions replicate the MMLPSA as amended by the Addendum to 2001 MMLPSA, dated Jan. 22, 2002 [ALLY_0201226], including the inharmonious aspects of those provisions discussed in Section V.B.3.a(3). *See also* Int. of R. Groody, Dec. 17, 2012, at 88:11–89:16.

[540]   *See* 2006 MMLPSA, § 7.1 [ALLY_0018291] (Termination without Cause).

[541]   *See id.* §§ 1.23 (Purchase Price), 1.24 (Purchase Price Premium), Ex. C [ALLY_0018291].

[542]   2007 MMLPSA [ALLY_0018275].

[543]   *Id.* § 2.1. Groody, while he could not recall the precise impetus for this change, explained that the general "intent" was that the Bank would not keep any HFS loans, but would instead sell them all to GMAC Mortgage. Int. of R. Groody, Dec. 17, 2012, at 104:1–105:16, 107:3–7.

[544]   2007 MMLPSA, § 2.2(c) [ALLY_0018275].

(3) Third, for First Lien Loans, the Bank was entitled "from time to time" to identify loans that had been "delinquent for a period of sixty (60) days or more" and require that GMAC Mortgage "promptly" purchase the loans.[545]

Given that, for First Lien Loans HFS, GMAC Mortgage had been required to purchase all such loans since adoption of the June 4, 2002 Second Addendum to the 2001 MMLPSA, the latter two provisions essentially operated to provide deadlines for the purchase of loans that GMAC Mortgage had not pooled for sale/securitization.[546]

### (2) Loan-Level Representations And Warranties

The 2007 MMLPSA eliminated all loan-level representations and warranties, including those for Second Lien Loans that had been retained by the 2006 MMLPSA.[547] Groody did not recall why this change was made,[548] but asserted that the "business understanding" remained unchanged from prior versions of the agreement—that the Bank would pass on the representations and warranties received from third parties to GMAC Mortgage, but would not itself ultimately be responsible for remedying any breach.[549] Celini, of course, believed that this was simply a further clean-up of the Agreement to reflect the parties' long-standing intent.[550]

---

545   *Id.* § 2.2(f) [ALLY_0018275].

546   Celini noted that the clean-up of aging loans had been taking place in practice on an ad hoc basis and the parties amended the agreement to reflect their business practice. Int. of A. Celini, Feb. 18, 2013, at 76:12–77:18; *see also* Int. of R. Groody, Dec. 17, 2012, at 108:10–109:11; Int. of C. Dondzila, Sept. 27, 2012, at 241:15–244:9. In the Letter Agreement Re: Performance Indemnification - GMAC Bank HFS to HFI Transfers, dated April 16, 2008 [ALLY_0017906], GMAC Bank agreed to forbear from exercising its rights under these provisions to require GMAC Mortgage to purchase certain loans with an unpaid principal balance of $166 million (and a carrying value of $118 million). (The Letter Agreement references MMLPSA "Section 2.2(d)" instead of section 2.2(c) or (f), but this appears to be in error.) In exchange, GMAC Mortgage agreed that if, over the next four years, any of the loans became so delinquent that GMAC Bank had to charge it off, GMAC Mortgage would indemnify GMAC Bank for any realized losses in an amount not to exceed the net carrying value of the loan as of April 1, 2008 (the principal balance reduced by any charge-offs or reserves). Groody explained that the Bank made this accommodation because of the "cash flow sensitivity of GMAC Mortgage" at the time that would have been exacerbated had GMAC Mortgage been required to purchase the loans in question. Int. of R. Groody, Dec. 17, 2012, at 288:7–17.

547   2007 MMLPSA, Art. IV [ALLY_0018275] (prior content of the section replaced with "[RESERVED]").

548   Int. of R. Groody, Dec. 17, 2012, at 120:10–23, 125:14–18.

549   *Id.* at 121:5–7, 121:21–122:11.

550   Int. of A. Celini, Feb. 18, 2013, at 74:5–22.

### (3) Pricing Provisions

The 2007 MMLPSA substantially revised the Purchase Price provisions, stating that the price for a portfolio of Mortgage Loans:

> shall be calculated as (a) the difference between [i] the Market Value and [ii] the Cost Basis of such Mortgage Loans, calculated as of [the last Business Day of the month preceding the Closing Date], plus (b) the Cost Basis of the Mortgage Loans calculated as of the Closing Date.[551]

The same pricing now applied to all "Mortgage Loans," which included both First Lien Loans and Second Lien Loans.[552] The pricing for Second Lien Loans was revised and no longer included the 175 basis points purchase price premium.[553] The Market Value was defined as "the market value of such Mortgage Loan, as determined by the Seller with reference to independent pricing sources."[554] The "Cost Basis" of a loan was defined as "the sum of the unpaid principal balance . . . plus premium and the Servicing released premium, plus accrued interest minus any discount."[555] The language of these provisions appears to provide for sale at a market price, adjusted by any changes in the Cost Basis from the end of the month preceding the sale to the date of the sale. Groody recommended approval of the 2007 MMLPSA to the Bank's Board, explaining that it would "provide for the sale of the loans by the Bank at market value as determined by independent pricing sources."[556]

According to an Affiliate Transaction Memorandum prepared by Celini in June 2007, the pricing under the 2007 MMLPSA was stated to be at market value determined by GMAC Bank using independent pricing sources.[557] Celini prepared a revised version of this Affiliate Transaction Memorandum in October 2007 which states that the sales to GMAC Mortgage

---

[551] 2007 MMLPSA, §§ 1.24 (Purchase Price), 1.10 (Cutoff Date) [ALLY_0018275].

[552] *Id.* §§ 1.18 (Mortgage Loan), 1.24 (Purchase Price), 2.1 [ALLY_0018275].

[553] As noted above, the 2007 MMLPSA also eliminated the loan-level representations and warranties for Second Lien Loans. ResCap's representation and warranty reserve on loan sales for the quarter ended March 31, 2007 was 170 basis points. GMAC–Residential Capital, LLC, Review Status–Quarter Ended September 30, 2007, dated Nov. 1, 2007, at 12 [PWC00663]. Notably, when the MMLPSA was amended on May 1, 2012, the Bank agreed to accept responsibility for customary loan-level representations and warranties and increased the purchase price by the estimated cost plus a margin to compensate for this risk. 2012 MMLPSA, §§ 1.31, 2.5 [RC00027892].

[554] *Id.* § 1.13 (Market Value) [ALLY_0018275].

[555] *Id.* § 1.9 (Cost Basis) [ALLY_0018275].

[556] Minutes of a Regular Meeting of the Board of Directors of GMAC Bank, June 19, 2007, at ALLY_PEO_0001435 [ALLY_PEO_0001400].

[557] GMAC Bank Affiliate Transaction Memorandum, dated June 6, 2007 [ALLY_0017783].

will occur at the actual market value price paid by Ally Bank to acquire such loan.[558] When asked about the discrepancy, Celini explained that the regulators had wanted to see a market-based transaction.[559] Originally the parties thought they would mark the loans to market but the process turned out to be impractical.[560] Despite the language of the 2007 MMLPSA, the parties did not change their practice of selling loans at the Bank's cost, described as the market value paid by the Bank to acquire the loan from the third-party or affiliate correspondent.[561]

Groody similarly explained that, while these changes were made to the language of the MMLPSA to make it "more in conformance with the affiliate transaction policy the Bank had, which specified market terms,"[562] the changes were essentially cosmetic. In fact, "the intent never changed" and the Bank continued to sell loans on a cost basis, rather than on a basis consistent with marking the loans to market after purchase.[563] The "market price" utilized was the price the Bank had paid for First Lien Loans, so that, for the Bank "there was never a gain or a loss associated with the transactions."[564]

_____

558  GMAC Bank Affiliate Transaction Memorandum, dated Oct. 31, 2007 [ALLY_0017869] (stated: "[Rule] 23b compliant pricing source for 1st Lien loan sales is arrived at through the following constructs: 1. Loan sales to Affiliate occur at *the actual market value price paid by [Ally Bank] to acquire such loan* from affiliated or third-party correspondents (+/- accrued interest, discount and premium)") (emphasis added). The original, June 6, 2007 version of the Affiliate Transaction Memorandum notably does not include this language. It instead references the use of "independent pricing sources," and "GAAP pricing source for loan sales . . . derived from various market inputs—(including but not limited to Wall Street Analytics, Yield Book, observed market price sales, current/forward yield curves) and are identical to values utilized within primary accounting systems utilized to drive mark to market valuations for [Ally Bank] GAAP financial statements." GMAC Bank Affiliate Transaction Memorandum, Master Mortgage Loan Purchase and Sale Agreement Amended and Restated 6/1/07, dated June 6, 2007, at 1, 2 [ALLY_0017783]. On October 31, 2007, the date of the revised Affiliate Transaction Memorandum, Jonathan Andrews issued a Memorandum to the Bank Board certifying that, based on his review of the Agreement and the revised Memorandum, and assuming their content to be accurate, the Agreement complied with Federal Reserve Act sections 23A and 23B, and with Regulation W. GMAC Bank Affiliate Transaction Memorandum, Master Mortgage Loan Purchase and Sale Agreement Amended and Restated 6/1/07, dated Oct. 31, 2007 [ALLY_0017867].

559  Int. of A. Celini, Feb. 18, 2013, at 170:22–25; *see also* ResCap Controls Follow-Up Materials, dated May 15, 2007, at 17 [EXAM10241180] ("In view of the new regulator (FDIC) mngmnt will be changing their process of selling loans to affiliates, which will provide a monthly mark-to-market that will provide the Bank with a market price for all assets sold to [GMAC Mortgage].").

560  Int. of A. Celini, Feb. 18, 2013, at 177:6–13 (noting that they would have to also mark-to-market the forward commitment (the MMLPSA)).

561  *Id.* at 174:5–7 ("[I]t basically restates what we always had been doing, except the fact that we tried to articulate to the regulator that this is market."); *see also* Minutes of a Regular Meeting of the Board of Directors of GMAC Bank, Jan. 22, 2008 [ALLY_PEO_0001488] (discussing proposed changes to MMLPSA, apparently never adopted, to conform pricing language to the October 2007 version of the GMAC Bank Affiliate Transaction Memorandum).

562  Int. of R. Groody, Dec. 17, 2012, at 112:24–113:3, 111:12–21.

563  *Id.* at 110:11–111:10.

564  *Id.* at 113:21–114:2.

David Bricker executed the 2007 MMLPSA on behalf of GMAC Mortgage. While his recollection was limited, he concurred that loans historically had been purchased at cost[565] and believed that the 2007 MMLPSA had not changed to market-basis pricing.[566]

Based on a review of loan accounting examples,[567] this appears to be what in fact happened. The purchase price paid by GMAC Mortgage under the 2007 MMLPSA was consistent with the historical pricing under prior agreements, and defined there as the Bank's "cost" basis: the unpaid principal balance (UPB) plus or minus the premium or discount. The individual loans were carried at this "cost" basis in the accounting records throughout this process and were not adjusted to market value at any point in time. Until the Bank began selling Fannie Mae and Freddie Mac loans on a servicing-released basis in August 2007 (and continuing for Ginnie Mae loans thereafter), the purchase price also included the servicing-released premium (the amount paid to acquire the MSRs). For loans where interest had accrued, the interest was a component of both the purchase price paid by GMAC Mortgage to the Bank and the purchase price received by GMAC Mortgage upon sale of the loan to third-party investors.[568] The Bank recorded the net interest earned during the period it held the loan as income. GMAC Mortgage recorded the difference between the purchase price paid to the Bank (the Bank's cost) and the purchase price received from the third-party investors as a gain on sale. For loans GMAC Mortgage sold to the Bank, it retained the origination income, including points paid by borrowers and processing or underwriting fees net of origination expenses.[569] Celini testified that the Bank likewise retained only net interest carry on brokered loans, with the effect of origination fees, premium pricing, etc., passing to GMAC Mortgage under the MMLPSA.[570]

Consequently, the 2007 MMLPSA continued to act as a hedge for the Bank, so that it was "exposed to no negative pricing risk during its holding period."[571] Further, in the Affiliate

---

[565] Int. of D. Bricker, Mar. 15, 2013, at 94:17–23.

[566] *Id.* at 109:20–110:4. Bricker did not recall negotiating with Groody any revisions to the pricing provision of the 2007 MMLPSA and did not seem to understand the changes to this provision during his interview. *Id.* at 105:11–109:17.

[567] The parties produced accounting entries and supporting detail for sample loans with varying characteristics for the period September 2005 to November 2012. Loan Summary [EXAM00229653]; Loan Summary [EXAM00233017]; Examiner Loan Selections 03 11 13 [EXAM00339939]; Examiner Loan Selections 04 15 13 [EXAM00345279].

[568] Note that GMAC Mortgage's purchase of loans from the Bank occurred shortly before their sale to third-party investors, as further described in Section V.B.12.a.

[569] *See* Loan Summaries, at Example Nos. 2, 3, 5 [EXAM00229653]. These loan examples are loans funded by GMAC Mortgage, and reflect that it retained the origination income.

[570] Int. of A. Celini, Feb. 18, 2013, at 59:5–19.

[571] GMAC Bank Affiliate Transaction Memorandum, Master Mortgage Loan Purchase and Sale Agreement Amended and Restated 6/1/07, dated Oct. 31, 2007, at 2 [ALLY_0017869].

Transaction Memo prepared to document compliance with federal regulatory restrictions on affiliate transactions, Bank officials stated that because such a complete hedge—which protected the Bank from "all interest rate, credit and fallout risk"—was not commercially available in the marketplace, and because the Bank was able to avoid the cost of purchasing "stand alone derivatives to hedge its risks," the 2007 MMLPSA provided terms "*better* than those prevailing at the time for comparable transactions with unaffiliated parties in the marketplace."[572] The memo, seeking to portray the pricing to the Bank as better than "market pricing," notably does not explicitly acknowledge that the gain on sale is being passed on to GMAC Mortgage, the buyer (even though in arm's-length market transactions it typically would be retained by the seller).

### (4) Termination Provision

While earlier versions of the MMLPSA permitted either party to terminate without cause upon appropriate notice, the 2007 MMLPSA provided only Ally Bank with this right.[573] The 2007 MMLPSA had no expiration date, so GMAC Mortgage could terminate only for cause.

### 4. The Pipeline Swap (Pre-July 2008)

The original Pipeline Swap was entered into between GMAC Mortgage and Old GMAC Bank as of October 1, 2004. It was documented under an International Swaps and Derivatives Association ("ISDA") Master Agreement—Multicurrency-Cross Border (1992 form) and related Schedule.[574] As discussed below, until 2008, the Pipeline Swap covered only the Bank's HFI portfolio.[575] The swap was designed to insulate the Bank from changes in the market value of loans (generally due to market interest rate changes) between "rate lock" (when the funding price to the borrower or purchase price to a third party was fixed) and "funding" (the date on which the loan was funded to the Borrower or purchased from a correspondent by the Bank). This allowed Old GMAC Bank to avoid recognizing a loss (or gain) on the date they were funded for the loans that it intended to hold as an investment.[576]

---

[572] *Id.*

[573] 2007 MMLPSA, § 7.1 [ALLY_0018275].

[574] 2004 Pipeline Swap [ALLY_0041583]; 2004 Pipeline Swap Schedule [ALLY_0041808]. Derivative contracts are typically documented with an ISDA Master Agreement, one or more schedules, and one or more confirmations. Until later years (when the Bank and GMAC Mortgage changed the forms of their derivative contract documentation in response to FDIC criticism), the Pipeline Swap (and the MSR Swap, discussed in Section V.B.9), were documented only on a Master Agreement and schedules, without use of confirmations.

[575] HFS loans were sold to GMAC Mortgage under the MMLPSA and already hedged under that agreement. *See* Section V.B.3.a(3).

[576] Int. of R. Groody, Dec. 17, 2012, at 134:18–135:21; Int. of J. Whitlinger, Nov. 30, 2012, at 122:12–123:4; Int. of A. Celini, Feb. 18, 2013, at 108:9–18.

So long as the Pipeline Swap remained limited to HFI loans, there was no real benefit to GMAC Mortgage if the arrangement is considered independently of the parties' other arrangements.[577] It was understood that GMAC Mortgage, rather than retaining the hedged risk, would in turn hedge the risk in the market.[578] Assuming its hedges were effective, GMAC Mortgage would realize neither profit nor loss from the HFI Pipeline Swap.[579] However, GMAC Mortgage presumably incurred some incremental hedging expense, which, under the terms of the Swap, the Bank was not required to reimburse. Bier noted that, at this time, Old GMAC Bank and GMAC Mortgage were owned by the same holding company, with the trading desk in GMAC Mortgage. He posited that, given the objective to be "business efficient," it was appropriate that GMAC Mortgage do the hedging for the Bank's loans.[580]

### a. The 2004 Pipeline Swap For HFI Loans

The 2004 Pipeline Swap identified as "Subject Transactions" covered by the swap legally binding commitments by Old GMAC Bank:

> (A) to *originate* a loan or *purchase* a loan that has *not* been originated by [GMAC Mortgage], that is . . . secured by a mortgage on [U.S.] residential real estate . . . and that [Old GMAC Bank] intends to originate or purchase *for its "Held For Investment" (HFI) portfolio*;[581]

---

[577] Int. of A. Celini, Feb. 18, 2013, at 175:22–176:10.

[578] *Id.* at 116:18–21; Int. of S. Blitzer, Mar. 5, 2013, at 47:3–9.

[579] Int. of A. Celini, Feb. 18, 2013, at 282:21–283:8; *see also* Int. of S. Blitzer, Mar. 5, 2013, at 38:23–39:8 ("My general understanding of how the swap worked was that it was intended to keep economics neutral between the mortgage company and the bank. . . . [I]f the loans increased or decreased in value, no one side should have seen a large gain or loss based on that change in value because in relation to it, there were hedges that should have been acting in an opposite but highly correlated manner.").

[580] Int. of B. Bier, Feb. 22, 2013, at 50:17–52:7 (noting also that the holding company "had a business intent that was around utilizing the resources that were available within the holding company, organization structure to basically manage risk prior to the loans going on the bank's balance sheet.").

[581] Dondzila and Whitlinger were surprised in their interviews to see that the language of the earlier versions of the Pipeline Swap limited its coverage to the HFI portfolio, asserting that their understanding was that the Pipeline Swap had always covered HFS loans. *See* Int. of C. Dondzila, Nov. 9, 2012, at 13:6–10; Int. of J. Whitlinger, Nov. 30, 2012, at 126:19–21. Other personnel, including Joe Cortese and Nikki Rock, asserted likewise in meetings with the Examiner's Professionals. This appears to be a misconception arising from their understanding that the HFS portfolio was hedged and an assumption that the hedging was accomplished through the Pipeline Swap; in fact, as discussed above, before 2008, the MMLPSA, through its cost-based pricing, is the instrument that functioned as a hedge on the Bank's HFS portfolio. *See* Int. of J. Whitlinger, Feb. 27, 2013, at 14:10–17:12 (acknowledging that this may be correct). Blitzer believed GMAC Mortgage was hedging HFS loans for the Bank before the July 2008 amendment to the Pipeline Swap, but he but did not recall whether the HFS hedging at that time (before 2008) was governed by the Pipeline Swap or not. Int. of S. Blitzer, Mar. 5, 2013, at 60:13–61:20.

(B) that has been entered into by [Old GMAC Bank] with a borrower or a mortgage correspondent that is not an Affiliate of [Old GMAC Bank or GMAC Mortgage];

(C) in respect of which the funding price to the borrower or the purchase price from the mortgage correspondent has been fixed; and

(D) in respect to certain loan products listed in [an attached schedule (such as six-month LIBOR loans and jumbo fixed-rate loans)].[582]

For loans that had been funded ("Funded Loans"), the 2004 Pipeline Swap tracked changes in the loan's fair market value ("FMV Changes") from the price at which the loan had been locked ("Lock FMV") to the value on the funding date ("Funding FMV").[583] On each "Payment Date" (the fifth day of each month), positive FMV Changes in the preceding month required the Bank to make payments to GMAC Mortgage, and negative changes required GMAC Mortgage to make payments to the Bank.[584] The Swap similarly covered changes in the fair market value of loans that had not yet been funded ("Pipeline Loans"), measured from the Lock FMV to the fair market value as of the last day of the preceding month (such changes were referred to as the "Pipeline FMV").[585]

The 2004 Pipeline Swap had a one-year term, but was subject to automatic one-year extensions absent prior notice by either party that the termination date would not be extended.[586]

### b. The March 2005 Amended Schedule Eliminated Bank-"Originated" Loans From The Pipeline Swap

The Pipeline Swap's Schedule was amended as of March 30, 2005.[587] The amended Schedule revised the definition of Subject Transaction to eliminate references to loans "originated" by the Bank, limiting its scope to loans "purchased" by the Bank.[588] Thus, loans

---

[582] 2004 Pipeline Swap Schedule, part 6(a)(xiii) [ALLY_0041808] (emphasis added).

[583] *Id.* parts 6(a)(iv), (vi), (viii), (ix).

[584] *Id.* parts 6(a)(x), (d).

[585] *Id.* parts 6(a)(iv)(B), (xi), (xii).

[586] *Id.* part 6(a)(xiv).

[587] 2005 Pipeline Swap Schedule [ALLY_0041601].

[588] *Id.* part 6(a)(xiii)(A).

brokered to the Bank and originated by it (that is, funded in Old GMAC Bank's name), apparently were eliminated from the scope of the Swap's coverage.[589]

In addition, the 2005 Pipeline Swap Schedule revised the term provisions, eliminating the automatic extension provisions and setting a fixed Termination Date of March 31, 2006.[590]

### c. *It Appears That The Pipeline Swap Was Not In Effect From April 1, 2006 To April 30, 2007*

The parties produced no Pipeline Swap agreements or schedules effective after March 2006 and before May 2007. There is some evidence suggesting that the Swap was nonetheless in place during this period. In particular, documentation of contracts being assumed in the 2006 Bank Restructuring suggest that an agreement hedging HFI pipeline risk is being assumed.[591] However, documentation from approval of the next Schedule for which the Examiner's Professionals found copies of agreements, the 2007 Pipeline Swap Schedule discussed in Section V.B.4.d, indicates that it was modeled on an Old GMAC Bank agreement in place from 2005 through 2006, suggesting that the Swap had not been in place in the interim.[592] Celini believed that the Pipeline Swap should have continued and did so during this period even if there was not an agreement in place.[593] Groody and Sandy Blitzer, who was responsible for hedging the loans in the market on behalf of GMAC Mortgage, were unable to recall whether the Pipeline Swap had lapsed during this period.[594] While it was difficult for ResCap personnel to find accounting documentation reflecting the results of the Pipeline Swap

---

[589] Groody was not certain of the reason for this change, but noted his belief that the Bank ceased originating brokered loans at some point, and thought this might reflect that shift. Int. of R. Groody, Dec. 17, 2012, at 18:1–8, 73:1–4, 73:9–11. Blitzer also could not recall why reference to originated loans was deleted, surmising that the deletion could have been because the Bank was no longer originating loans. Int. of S. Blitzer, Mar. 5, 2013, at 48:20–49:18. However, it appears that the Bank continued to have brokered loans until at least the fall of 2008 (and that it thereafter originated loans brokered by GMAC Mortgage under the Broker Agreement). E-mails among C. Dondzila, J. Cortese, S. Ruby, et al. (Feb. 10–11, 2010) [EXAM11891921]. There apparently was some confusion caused by the fact that the Bank in Q2 2006 placed its Broker Fulfillment group under the aegis of the Correspondent Lending operation. *Id.* It continued to close brokered loans "in the name of the Bank," though the volume appears to have been relatively small. *Id*. These loans would not have been "purchased" and therefore would not have been subject to the Pipeline Swap.

[590] 2005 Pipeline Swap Schedule, part 6(a)(xiv) [ALLY_0041601].

[591] *See* Review of GMAC Bank Affiliate Agreements Assigned from GMAC Bank FSB to GMAC Bank ILB, dated Nov. 30, 2006, at ALLY_0260095 [ALLY_0260087].

[592] *See* Approval of GMAC Bank Affiliate Agreements, dated May 17, 2007, at ALLY_PEO_0005523 [ALLY_PEO_0005512].

[593] Int. of A. Celini, Feb. 18, 2013, at 114:12–22.

[594] Int. of R. Groody, Dec. 17, 2012, at 138:5–18; Int. of S. Blitzer, Mar. 5, 2013, at 71:3–17, 73:2–11 ("I have zero recollection as to when or when it was not in place."). Blitzer did not recall any change in his market hedging activity with respect to loans held by the Bank during this time. *Id.* at 73:12–20.

for HFI loans, they eventually located such records. The documents located notably include records from the inception of the Pipeline Swap through March 2006, and from and after May 1, 2007; thus, there is a gap in the accounting records that corresponds to the gap in the periods covered by the written agreements that have been produced.[595] Accordingly, while there is some evidence to the contrary, it appears that the Pipeline Swap was not in effect from April 1, 2006 through April 30, 2007.

### d. The May 2007 Pipeline Swap Remained Limited To Purchased HFI Loans And Limited GMAC Mortgage's Ability To Block Automatic Renewal

GMAC Mortgage and Ally Bank entered into a new Pipeline Swap schedule effective May 1, 2007.[596] The substantive provisions of the 2005 Pipeline Swap Schedule were unchanged, including the limitation of the Swap's application to "purchased," as opposed to "originated" loans.[597] The term provision was revised, setting a May 1, 2008 termination date, subject to automatic one-year extensions absent (1) a default by the Bank continuing on the day before termination, or (2) notice by the Bank of non-renewal.[598] Unlike the automatic-extension provisions of earlier versions of the Pipeline Swap that allowed either party to prevent renewal upon notice to the other, GMAC Mortgage had no right to block the extension of the Swap, absent a breach by the Bank. This revision notably paralleled the June 2007 amendments to the MMLPSA's termination provisions, which eliminated GMAC Mortgage's right to terminate the MMLPSA without cause.

### e. The March 2008 Pipeline Swap Schedule Prevented Application Of The Swap To HFI Loans The Bank Purchased From Certain Correspondent Lenders Not Acceptable To GMAC Mortgage

The parties entered into a new Schedule to the Pipeline Swap dated March 14, 2008.[599] The "Subject Transaction" definition continued to be limited to loans the Bank intended to "*purchase* for its 'Held for Investment' (HFI) portfolio," but added a further restriction, limiting the loans covered to those "whose 'pipeline risk' is managed by the ResCap Capital

---

[595] Bank HFI Swap [EXAM00344897]; Bank Flow HFI Portfolio (May 2007–Mar. 2008) [EXAM00344891–902].

[596] 2007 Pipeline Swap Schedule [ALLY_0041789].

[597] *See id.* 7–8.

[598] *Id.* part 6(a)(xiv).

[599] March 2008 Pipeline Swap Schedule [ALLY_0018074]. There are several anomalies in this Schedule, including: (1) a definition of "Commencement Date" as "May 1, 2007" (unchanged from the 2007 Pipeline Swap Schedule); and (2) even though the Schedule is fully executed, a header on each page after the first page reading "DRAFT DATED 5/7/07." *Id.* part 6(a)(ii), 2–9. These appear to be clerical errors in completion of the document arising from use of the prior version as a template; Groody's best understanding was that this Schedule became effective March 14, 2008. Int. of R. Groody, Dec. 17, 2012, at 150:11–151:20.

Markets Group [sic] a legally binding commitment."[600] Groody explained that this provision was added because Ally Bank had begun to purchase HFI loans from new correspondents who had not previously been GMAC Mortgage correspondent lenders, and that GMAC Mortgage did not want to assume the risk for such loans.[601] The reference to risks managed by the ResCap Capital Markets Group served to exclude such loans from the Pipeline Swap.

### 5. The July 2008 Amendments To The MMLPSA And The Pipeline Swap

Effective July 1, 2008, GMAC Mortgage and Ally Bank agreed to amended versions of the MMLPSA and the Pipeline Swap.[602] Groody explained that these amendments were interrelated and were prompted, at least in part, by the FDIC's urging that Ally Bank document its hedges with a standard ISDA Master Agreement and appropriate supplemental documentation.[603] The MMLPSA, as noted above, had functioned as a hedge for Old GMAC Bank and Ally Bank by virtue of its cost-based pricing, but was not in the form of an ISDA derivative contract. According to Groody, to address the FDIC's criticism, the parties decided to add Ally Bank's HFS loans to the Pipeline Swap, while amending the MMLPSA's pricing provisions.[604] While the documentation was changed, however, the goal was to preserve the existing economics, so that the Bank would earn the net interest carry for the period the loan was on its books, and would be hedged against market, interest, and fallout risk, while GMAC Mortgage would earn the gain on sale, and would accept all market, interest, and fallout risk.[605] As described below, the loan accounting examples reviewed confirm that there were, in fact, no changes in the underlying loan accounting following implementation of the July 2008 agreements.

### a. The Principal July 2008 Pipeline Swap Revisions

The July 2008 Pipeline Swap Schedule redefined the "Subject Transaction[s]" to which the swap applied to include both HFS and HFI loans; the revised definition is "a legally binding commitment by [the Bank] to *purchase, either for its 'Held for Sale' (HFS) portfolio*

---

[600] March 2008 Pipeline Swap Schedule, part 6(a)(xiii) [ALLY_0018074].

[601] Int. of R. Groody, Dec. 17, 2012, at 147:2–150:2.

[602] 2008 MMLPSA [ALLY_0201210]; July 2008 Pipeline Swap Schedule [ALLY_0018237].

[603] Int. of R. Groody, Dec. 17, 2012, at 156:2–8, 159:2–161:13. The impetus is described somewhat differently in the Minutes of a Regular Meeting of the Board of Directors of GMAC Bank, July 22, 2008, at ALLY_PEO_0001551 [ALLY_PEO_0001488] (reporting that GMAC Bank General Counsel J. Andrews, presenting the revisions for approval, said that "the proposed amendments respond to comments made by the Federal Deposit Insurance Corporation ('FDIC') recommending clarification of certain provisions pertaining to *pricing*.") (emphasis added).

[604] Int. of R. Groody, Dec. 17, 2012, at 160:14–161:3, 164:22–165:10, 167:2–20.

[605] *Id.* at 167:6–174:11. GMAC Mortgage, in turn, would hedge these risks in the market as part of its broader hedging program.

or its 'Held for Investment' (HFI) portfolio" loans from certain loan products or programs "for which 'Pipeline Risk' is managed by the ResCap Capital Markets Group."[606]

While the July 2008 Pipeline Swap Schedule added HFS loans to the Pipeline Swap, it continued to limit the scope of the Pipeline Swap to loans "purchased" by the Bank, and did not revise the language to include loans "originated" by the Bank.

Further, the July 2008 Pipeline Swap Schedule did not change the Swap's terms governing the period over which valuation changes were measured. The agreement's language continued to state that it applied to changes from rate lock to *funding* (as discussed at Section VII.L.2.c).[607] For HFI loans (which the Bank intended to keep as an investment), the language made sense because the Bank sought to avoid recognizing losses (or gains) on the loans between rate lock and funding when it recorded the loans on its books.[608] After initially booking HFI loans, Ally Bank generally would continue to carry them at its original basis less a reserve, without having to mark them to market. For HFS loans, however, the language failed.

For HFS loans to be fully hedged by the Pipeline Swap, the Swap needed to cover not just the period from rate lock to funding, but from rate lock to *sale*. By its written terms, the July 2008 Pipeline Swap Schedule left Ally Bank un-hedged (and exposed to shifts in market value) for the period from loan funding until sale of the loan to GMAC Mortgage.[609] The Bank's contemporaneous June 2008 Affiliate Transaction Memo expressly stated that the swap covered only the period "from the rate lock date to *the time of funding for HFI and HFS*."[610]

Despite the terms of the Pipeline Swap, several witnesses asserted that their understanding was that loans were hedged from rate lock all the way to sale.[611] An April 2010 Ally Bank Affiliate Transaction Memo, revisiting the July 2008 Pipeline Swap Schedule, asserts that it

---

[606] July 2008 Pipeline Swap Schedule, part 6(a)(xvi) [ALLY_0018237] (emphasis added).

[607] *Id.* part 6(a)(iv)(A), (viii).

[608] *See* Section V.B.4; Int. of J. Whitlinger, Nov. 30, 2012, at 122:12–123:4; Int. of R. Groody, Dec. 17, 2012, at 131:25–132:11, 134:14–135:21.

[609] *See* Int. of C. Dondzila, Nov. 9, 2012, at 10:13–21; Int. of R. Groody, Dec. 17, 2012, at 162:6–163:17.

[610] GMAC Bank Affiliate Transaction Memorandum, July 1, 2008 Schedule to ISDA Master Agreement, dated June 30, 2008, ¶ 2 [ALLY_0017919] (emphasis added).

[611] Int. of J. Young, Sept. 28, 2012, at 202:13–205:14; Int. of J. Young, Oct. 10, 2012, at 9:17–10:12; Int. of C. Dondzila, Sept. 27, 2012, at 252:14–253:2; Int. of C. Dondzila, Nov. 9, 2012, at 13:1–10; Int. of J. Whitlinger, Nov. 30, 2012, at 134:19–135:5, 137:10–20, 147:25–148:11.

covers "from the lock date to the time of funding (for HFI) and from funding to final sale (for HFS)."[612] Blitzer recalled hedging loans acquired from the Bank all the way to sale.[613]

### b. The 2008 MMLPSA's Revised Pricing Provisions

The 2008 MMLPSA defined the "Purchase Price" for First Lien Mortgage Loans as "the Cost Basis plus reserves associated" with the loan.[614] "Cost Basis," in turn, was defined to mean:

> with respect to a Mortgage Loan, its net carrying value, as defined by accounting principles generally accepted in the United States of America (as amended) *to include* without limitation the unpaid principal balance of such Mortgage Loan, plus or minus any premium or discount paid, *net deferral fees or costs,* accrued interest and basis adjustments from derivative loan commitments, *hedge accounting* or *lower of cost or market adjustments*.[615]

Witnesses explained that, based on the understanding that the Pipeline Swap applied from rate lock to sale, the loans were accounted for on a hedge-accounting basis, and this meant that they were "marked to market" and sold to GMAC Mortgage at *market value* (rather than Ally Bank's cost, notwithstanding the use of the term "Cost Basis" in the agreement).[616] In theory, through application of the Pipeline Swap, GMAC Mortgage would then recover (or pay) the difference between the market price it had paid under the MMLPSA and the Bank's cost basis (as defined in prior MMLPSAs) in the loan. Thus, the combined application of the revised 2008 MMLPSA and the Pipeline Swap would be to preserve the same economics that had prevailed under prior versions of the MMLPSA.[617]

---

[612] Ally Bank Affiliate Transaction Memorandum, July 1, 2008 Schedule to ISDA Master Agreement, dated April 30, 2010, ¶ 2 [ALLY_0018059]; *see also* Ally Bank Pipeline Swap with GMAC Mortgage, LLC [EXAM10880562] (attached to E-mail from N. Rock (Nov. 15, 2010) [EXAM10880561]) ("The principal purpose of the Pipeline Swap is to insulate the Bank from the volatility in the valuation change of HFS assets from the time of interest rate commitment through the time of loan sale.").

[613] Int. of S. Blitzer, Mar. 5, 2013, at 105:21–107:24. Blitzer's recollection of the terms of the Pipeline Swap, of which he signed several iterations, was minimal.

[614] 2008 MMLPSA, § 1.24 [ALLY_0201210].

[615] *Id.* § 1.9 [ALLY_0201210] (emphasis added).

[616] *See* Int. of C. Dondzila, Sept. 27, 2012, at 228:14–229:11; Int. of C. Dondzila, Nov. 9, 2012, at 142:22–143:10; Int. of J. Whitlinger, Nov. 30, 2012, at 105:24–108:11.

[617] Whitlinger observed that, consistent with this view of the Pipeline Swap and MMLPSA, GMAC Mortgage/ResCap entered into hedging transactions with third parties predicated on the view that GMAC Mortgage bore the risk from rate lock to sale, not just lock to funding. Int. of J. Whitlinger, Nov. 30, 2012, at 134:19–137:20.

However, if the July 2008 Pipeline Swap Schedule were applied as written and covered only the period from rate lock to funding, rather than sale, then (1) application of hedge accounting would be improper under GAAP,[618] so that the MMLPSA pricing would not be a marked-to-market price, and (2) the changes in the fair market value of the loans between funding and sale would not flow to GMAC Mortgage under the Pipeline Swap, and this risk would instead reside with the Bank. Further, the Pipeline Swap would be inapplicable to brokered loans originated by the Bank (rather than purchased).

### c.   Implementation Of The HFS Swap/Pricing Revisions

Based on a review of accounting records for sample loans and interviews with accounting personnel,[619] the combined effect of the accounting for MMLPSA sales and the Pipeline Swap was to preserve the same economics that had prevailed under prior versions of the MMLPSA, as though the Pipeline Swap applied from rate lock to sale (and as though it applied to brokered/bank-originated loans, and not merely to purchased loans). But the accounting process through which this was accomplished was not what one would expect, with fair market value pricing under the MMLPSA (due to application of hedge accounting), and the change in value between rate lock and sale exchanged under the Pipeline Swap.

Instead, for purposes of the MMLPSA, loans were not marked to market by Ally Bank and sold to GMAC Mortgage at a market price. The accounting records for sales under the MMLPSA reflect that the purchase price paid by GMAC Mortgage continued to be the Bank's cost basis as historically defined (UPB plus or minus premium or discount plus servicing released premium where the Bank did not retain servicing rights).[620] Thus, the MMLPSA pricing was unchanged despite implementation of the July 2008 agreements.

---

[618] *See* Int. of C. Dondzila, Nov. 9, 2012, at 73:18–74:9. Dondzila explained that the Bank had designated the Pipeline Swap as a hedge of its HFS portfolio under FAS 133, and that "the held for sale portfolio would have been marked to fair value consistent with the mark on its derivative, in this case the hedge, which was the held for sale swap." *Id.* at 74:4–9. In accordance with FAS 133, if changes in the fair value of the loans were highly correlated to changes in the fair value of the Pipeline Swap, the loans would properly be carried at an estimated fair value with unrealized gains and losses recorded in the statement of operations. *Id.* However, if the Pipeline Swap did not cover the period from funding to sale, then changes in the value of the Swap would *not* be highly correlated to changes in the loan value for that period. If FAS 133 were not applicable, the GAAP carrying value would change to the lower of the cost of the loan or its market value. The net effect would be to subject the Bank to reductions in the value of the loans during the holding period between funding and sale.

FAS 133, "Accounting for Derivative Instruments and Hedging Activities (as amended), was superseded by the FASB Accounting Standards Codification ("ASC") 815, "Derivatives and Hedging" on September 15, 2009.

[619] Meeting with C. Dondzila and N. Rock in Fort Washington, P.A. (Jan. 16, 2013).

[620] Loan Summary [EXAM00229653]; Loan Summary [EXAM00233017]; Examiner Loan Selections 03 11 13 [EXAM00339939]; Examiner Loan Selections 04 15 13 [EXAM00345279]; *see* E-mail from C. Dondzila to M. Sitlinger and N. Rock (Nov. 22, 2011) [EXAM11892942] ("When the loans are actually 'delivered' to [GMAC Mortgage] under the MMLPSA the transfer is recorded at Bank[']s cost.").

In separate accounting records maintained for the Pipeline Swap, changes in loan value were assessed for the Bank's whole HFS portfolio on a daily basis, and the net gain or loss was settled daily through the Pipeline Swap.[621] Upon sale of the loan to GMAC Mortgage, however, the Pipeline Swap entries were simply reversed, resulting in repayment under the Pipeline Swap of any amounts that had been previously paid by either party with respect to that loan under the Pipeline Swap.[622]

Thus, upon sale of a loan, the net payments made after lock under the Pipeline Swap for that individual loan totaled $0, and the loan was sold at the Bank's "cost" basis (as historically defined under the MMLPSA).[623] Although this accounting does not actually align with the terms of the agreements, the net effect was to obtain the same economic result (if the Pipeline Swap is understood to include the period from funding to sale, and originated loans).

### 6. The Broker Agreement, Fair Value Election, And The Allocation Of Net Revenues Between Ally Bank And GMAC Mortgage

On November 20, 2008, GMAC Mortgage and Ally Bank entered into a "Broker Agreement" pursuant to which GMAC Mortgage brokered loans to the Bank.[624] GMAC Mortgage then essentially ceased originating loans and instead channeled its production through Ally Bank (except in four states (later two) where Ally Bank could not originate loans).[625] As discussed below, there are substantial issues about how revenues related to the loans brokered under this arrangement were allocated between GMAC Mortgage and the Bank.

---

[621] ResCap—Pipeline Swap Template [EXAM00231094]. Beginning in October 2008, the parties settled two days in arrears; beginning in May 2009, they switched to settle daily one day in arrears with a monthly "catch up"; and in January 2011, they switched to a weekly "catch up." Meeting with C. Dondzila, J. Whitlinger, et al. in Fort Washington, P.A. (Dec. 11, 2012).

[622] E-mails among J. Cortese, T. Kushman, et al. (Mar. 13, 2012) [ALLY_0381701]; E-mail from J. Cortese to C. Dondzila (Nov. 22, 2011) [EXAM11892955] (example of loan accounting entries showing "Loan Sold" at "Loan Origination Cost," rather than marked to market "Adjusted Fair Value," with offsetting positive and negative "MTM Swap" entries reflecting the "MTM while in HFS").

[623] *See* E-mail from K. Walsh to C. Dondzila and J. Kothe (July 31, 2009) [EXAM12056469] ("[H]ow the swap works is that the Bank is made whole at cost by the time we get to sale.").

[624] Broker Agreement [RC00030534]. GMAC Mortgage subsidiary ditech, LLC is also a party to the Broker Agreement, and, together with GMAC Mortgage, is identified as the "Broker" in the agreement. Broker Agreement, Preamble [RC00030534].

[625] Detailed Analysis of Ally Bank's Affiliate Agreements, dated June 12, 2012, at 29 [SOP0000380]; E-mail from L. Kelly (July 23, 2009) [EXAM10115666] (loans originated by GMAC Mortgage in four states represent less than 5% of the Bank's HFS portfolio).

### a. Genesis Of The Brokering Consumer Loans To Bank Project

In or around March 2008, as ResCap faced severe liquidity issues,[626] ResCap and Ally Bank personnel began work on the "Brokering Consumer Loans to Bank" (or "Broker to Bank") project.[627] The Bank, in contrast to ResCap, had excess liquidity, and was looking for ways to grow consistent with its regulator-approved business plan.[628] As noted above, the Bank's ability to purchase loans originated by GMAC Mortgage was limited under the 250.250 exception to 50% of GMAC Mortgage's production over the preceding twelve months.[629] The 250.250 program sales to the Bank were reaching this limit in the summer and fall of 2008 (and, in at least one instance, the limit was exceeded).[630] However, loans brokered to the Bank by GMAC Mortgage and then originated by the Bank in its own name would not be subject to this limit.[631] Further, switching to a broker model not only offered the prospect of increasing the number of loans which could be funded through the Bank (with a projected savings to GMAC Mortgage of 10 to 21 basis points over loans originated by GMAC Mortgage),[632] but would increase the volume of MSRs that could be retained by the Bank.[633] As Celini, the "Sponsor" of the Broker to Bank Project for the Bank,[634] noted, "there was very widespread knowledge that the affiliate had high cost liquidity or no liquidity and that if we didn't do this, if we didn't find a way to do this that there would be a bad outcome on the other side."[635] The project "was made a priority,"[636] and the assembled project team, under the direction of Bank Project Leader (and Celini's subordinate) Debra Scott,[637] was "basically working this during the day and had to do [their] other jobs at night."[638]

_____

[626]  *See* Section III.G.

[627]  Int. of A. Celini, Feb. 18, 2013, at 207:23–209:18; Brokering Consumer Loans to GMAC - Project Overview, dated Mar. 11, 2008, ¶¶ 1–2 [EXAM10087770] (noting that project will expand use of Bank's lower cost funding, deepen liquidity, avoid 250.250 limitations, and allow the bank to build its MSR position faster).

[628]  Int. of A. Celini, Feb. 18, 2013, at 208:7–17.

[629]  *See* Section V.B.1.b.

[630]  Int. of A. Celini, Feb. 18, 2013, at 41:2–10; Minutes of Mortgage Credit Policy Committee Meeting, June 25, 2008, at 3 [EXAM11445640].

[631]  Int. of A. Celini, Feb. 18, 2013, at 208:13–17.

[632]  Brokering Consumer Loans to Bank Project Charter, dated Nov. 10, 2008, at 6 [EXAM12253233].

[633]  Int. of A. Celini, Feb. 18, 2013, at 209:9–18.

[634]  Brokering Consumer Loans to Bank Project Charter, dated Nov. 10, 2008, at 4 [EXAM12253233].

[635]  Int. of A. Celini, Feb. 18, 2013, at 220:11–15.

[636]  *Id.* at 208:25.

[637]  Brokering Consumer Loans to Bank Project Charter, dated Nov. 10, 2008, at cover page, 5 [EXAM12253233].

[638]  Int. of A. Celini, Feb. 18, 2013, at 220:3–5.

It should also be noted that a significant accounting issue had arisen as to whether the 250.250 program sales were actually "true sales" or were instead required to be accounted for as a financing, given that the MMLPSA required that loans be sold back to GMAC Mortgage.[639] This posed a significant problem, given that an extension of credit by the Bank to GMAC Mortgage would have required collateral, and for non-cash collateral (such as the loans), the collateral posted would have to equal 110% or 120% of principal.[640] While it is not clear whether this problem was one of the initial reasons for the brokering project, Bank personnel recognized that "the 250.250 issue will be greatly reduced" by implementation of the Broker-to-Bank arrangement.[641]

### b. The Parties' Agreement To Maintain The Existing Economics, Under Which The Bank Received Only Net Interest Carry For The Period Loans Were On Its Books

As discussed above, for loans GMAC Mortgage sold under the Correspondent Agreement pursuant to the 250.250 exception,[642] the Bank recognized as revenue only the "net interest carry" for the period the loan was on the Bank's books. GMAC Mortgage realized the benefit of any points or other origination fees charged. One of the key issues addressed by the Brokering Consumer Loans to Bank team was how revenues and expenses would be allocated under a brokering arrangement. Matthew Whitehead, a ResCap representative, was tasked with mapping out and getting agreement on these issues.[643]

As detailed in a Tuesday, September 2, 2008, e-mail exchange between Celini and Whitehead, as Celini confirmed in his interview with the Examiner's Professionals, and as

---

[639] Memorandum, GMAC Mortgage to GMAC Bank Loan Transfer Accounting Review, dated Nov. 24, 2008, at 1, 2–3 [EXAM00233961] (noting that the Bank Controller's "Q4 2007 Senior Financial Officer Controls Certification" had noted that the Bank was reviewing the 250.250 purchases for sales treatment, and that in Q2 2008, the qualification was revised to note that "as reported in prior quarter, and *concluded this quarter*, Bank purchases from [GMAC Mortgage] under 250.250 *do not qualify for sale treatment*") (emphasis added); E-mail from K. Walsh to C. Dondzila, et al. (Dec. 23, 2008), at EXAM12378491 [EXAM12378490] ("The 250.250 program . . . never qualified for transfer accounting by [GMAC Mortgage] under FAS 140 (and therefore purchase accounting by Bank) as a true-sale opinion is unattainable (confirmed with outside counsel earlier this year").

[640] E-mail from K. Walsh to C. Dondzila, et al. (Dec. 23, 2008), at EXAM12378491–92 [EXAM12378490]; *see* Section V.B.1.b (regulatory discussion).

[641] E-mail from K. Walsh to C. Dondzila, et al. (Dec. 23, 2008), at EXAM12378492 [EXAM12378490] (noting that the issue would remain problematic for states where the broker arrangement could not be put into effect, and where loans would continue to be sold to the Bank under the 250.250 program).

[642] *See* Section V.B.2.

[643] Int. of A. Celini, Feb. 18, 2013, at 221:21–22:8; Brokering Loans to Bank Project Issue Log, dated July 3, 2008, at 4 [EXAM20052676]; *see also* E-mail from D. Scott (July 3, 2008) [EXAM20052672] (circulating log).

Scott stated when interviewed by KPMG in early 2012, the agreement ultimately reached was to maintain the same economics that had been in place for loans sold under the 250.250 program.[644] In the e-mail exchange, Whitehead recapitulated the conclusions reached in a call the preceding Friday, and asked that Celini confirm his understanding; Celini responded by interlineating the word "Correct" at several junctures in response to Whitehead's statements.[645] As interlineated, the e-mail reads as follows in pertinent part:

> Based on our conversation on Friday, I wanted to confirm that *{the} only revenue the Bank is going to recognize is the Net Carry (i.e. Interest Income/Expense). All of the other income/ fees (i.e. Origination Fee, Loan Discount Fee income (points)*, Rate Lock Fee, Overage/Shortage/Subsidies, Underwriting Fee, other ancillary fees) *will be payable to the Bank (lender) from the borrower, and will be capitalized within the cost basis of the loan and essentially sold to Mortgage at that cost basis as the purchase price*. CORRECT. *All the traditional rev{enue}/ exp{ense} reimbursement items that normally {would} be recognized by the originator {will} be born by GMACB{ank} and capitalized into the loan basis {in} accordance with GAAP. These items will not reside on the Bank P&L [deferred onto B{alance}/S{heet}] and will be recognized on the Mortgage P&L once the loan is sold to GSEs*. Likewise, *the Broker Fee will be paid to Mortgage from the Bank and will also be capitalized within the basis of the loan* and sold to Mortgage at which time it would be recognized as a{n} expense and offset [eliminated in consolidation] any Broker Fee income on the Mortgage entity. *This would effectively make the Bank P&L neutral to the way it currently conducts business* and would act essentially as a funder of loans and not impacted by any market or interest rate movement. [correct].[646]

---

[644] Int. of A. Celini, Feb. 18, 2013, at 242:22–24 ("We essentially replicated the economics of the 250.250 transaction in a broker form."); E-mails between M. Whitehead and A. Celini (Sept. 2, 2008) [EXAM00003975]; Ally Global Security Investigation Report, dated Mar. 14, 2012, at RC40022063–64 [RC40022044] (summary of KPMG interview of Debra Scott) ("In her opinion the bank was suppose[d] to receive the same income as it received from the prior 250/250 agreement and the bank was to 'remain income neutral' . . . any points or premium pricing income would be discounted from the price [when] GMAC Mortgage purchased the loan from Ally Bank"); *see also* E-mail from D. Scott to M. Whitehead, et al. (Aug. 28, 2008) [EXAM10286218].

[645] E-mails between M. Whitehead and A. Celini (Sept. 2, 2008) [EXAM00003975]; Int. of A. Celini, Feb. 18, 2013, at 225:1–226:19 (confirming the "correct" interlineations were Celini's, and his continued agreement with Whitehead's statements).

[646] E-mails between M. Whitehead and A. Celini (Sept. 2, 2008) [EXAM00003975] (alterations in original) (emphasis added) (material with "{   }" added).

In the e-mail forwarding the interlineation, Celini further noted his understanding that the arrangement "would have Bank Legal entity recognize the typical[ ] revenues of an originator, bear the cost of U/W, pay the broker a Respa/23B fee for taking the application and bringing the loan to [the Bank] and processing it to close," but then,

> [T]he appropriate items would be capitalized into the loan basis such that when the loan is sold under the MMLPSA (fwd sale agreement) there would be *no gain or loss on sale* for the [Bank] Legal entity. I would believe this to be "market risk neutral[.]"[647]

A few days earlier, Scott had exchanged e-mails with Whitehead and others that similarly described the arrangement as:

> (1) [GMAC Mortgage] will broker loan to bank at the channel price sheet;
>
> (2) If loan is underwritten and approved by [the Bank], loan is funded by [the Bank];
>
> (3) All traditional non-pass through fees (application, origination, copying, courier, etc) and points are paid to [the Bank];
>
> (4) [The Bank] pays [GMAC Mortgage] broker fee for services rendered;
>
> (5) [GMAC Mortgage] records broker fee as income (will get eliminated in consolidation);
>
> (6) [The Bank] capitalizes the broker and origination fee in accordance with GAAP. Any portion of the broker fee not capitalized should be off-set by fees collected from borrower;
>
> (7) *[The Bank] records loan origination at cost (includes origination fee income[648] and broker and admin services expense);*

---

[647] E-mails between M. Whitehead and A. Celini (Sept. 2, 2008) [EXAM00003975] (emphasis added).

[648] It has been suggested by AFI counsel that Scott's e-mail does not address the capitalization of "points" income. However, as discussed below, under FAS 91, "origination fee income" includes "points"; thus, Scott's reference to the inclusion of "origination fee income" in the cost-basis pricing of the loan reflects an understanding that the loan's cost would be reduced where points had been paid. *See* Section V.B.6.d; FIN. ACCOUNTING STANDARDS BD., STATEMENT OF FINANCIAL ACCOUNTING STANDARDS NO. 91, Accounting for Nonrefundable Fees and Costs Associated with Originating and Acquiring Loans and Initial Direct Costs of Leases, ¶ 80 (Dec. 1986). FAS 91, "Accounting for Nonrefundable Fees and Costs Associated with Originating or Acquiring Loans and Initial Direct Costs of Leases (as amended)," was superseded by the FASB Accounting Standards Codification ("ASC") 310–20, "Nonrefundable Fees and Other Costs" on September 15, 2009.

(8) *[The Bank] sells loan to [GMAC Mortgage] at cost (no gain or loss to [the Bank])* which means that loan is net of expense incurred not covered by borrower or capitalized. [The Bank] retains float income during . . . the hold period;

(9) [GMAC Mortgage] hedges loan in accordance to the existing [Bank/GMAC Mortgage] swap agreement;

(10) [*GMAC Mortgage*] sells loan to GSE - (eliminates broker and admin fee) and *realizes gain or loss*; and

(11) [*The Bank*] *should not have gains or losses* due to this transaction.[649]

Thus, the agreement reached was that GMAC Mortgage would continue to retain the profit and loss impact of origination fees and expenses for loans brokered to the Bank, just as it had when it sold loans to the Bank under the 250.250 program, while the Bank would have no "gains or losses," earning only net interest carry—the "float income during the hold period."

There are two significant alternative scenarios to bear in mind in connection with understanding the impact of this arrangement—"discount points" and "premium pricing"[650]— illustrated in Exhibit V.B.6.b:

EXHIBIT V.B.6.b
**Generic Loan Scenario Examples Comparing Discount Points vs. Premium Pricing**

| *Loan Scenario 1 - "Discount Points"* | | | *Loan Scenario 2 - "Premium Pricing"* | | |
|---|---|---|---|---|---|
| Loan type | | 30-Year Fixed | Loan type | | 30-Year Fixed |
| Loan amount (UPB) | $ | 200,000 | Loan amount (UPB) | $ | 200,000 |
| Par rate | | 5.00% | Par rate | | 5.00% |
| Note rate | | 4.50% | Note rate | | 5.50% |
| Closing costs paid by lender | | N/A | Closing costs paid by lender | $ | 2,000 |
| Broker fee paid by lender | $ | 1,500 | Broker fee paid by lender | $ | 1,500 |
| Discount points (per 0.25%) | $ | 2,000 | Discount points | | N/A |
| Total points collected from borrower (0.25% × 2) | $ | 4,000 | Total points collected from borrower | | N/A |
| Bank's cost basis | $ | 197,500 | Bank's cost basis | $ | 203,500 |

As illustrated in Loan Scenario 1, a borrower may pay "discount points" in connection with a loan to reduce the rate from 5.00% to 4.50%. The total mortgage discount points paid to obtain the desired mortgage note rate are $4,000 ($2,000 x 2) and the bank's cost basis is $197,500 ($200,000 UPB - $4,000 points collected + $1,500 broker fee). The reduced note rate will negatively affect the gain on sale recognized when the loan is sold to an investor due to the note rate being below par.

---

[649]  E-mail from D. Scott to M. Whitehead, et al. (Aug. 28, 2008) [EXAM10286218] (emphasis added).

[650]  These two examples illustrate two common scenarios that help illuminate the issues addressed; there are, of course, many other alternative scenarios not described here.

Conversely, as illustrated in Loan Scenario 2, a borrower may instead accept a higher mortgage interest rate ("premium pricing") while paying "no discount points." In this scenario, the borrower qualifies for a mortgage par rate of 5.00%, but the bank offers a rate of 5.50% using a "lender credit" to cover the borrower's closing costs. This is known as a "no-closing cost loan" and is considered "premium pricing." In this scenario, the bank's cost basis is $203,500 ($200,000 UPB + $2,000 bank-paid closing costs + $1,500 broker fee). The increased, above-par note rate will positively affect the gain on sale recognized when the loan is sold to an investor. Furthermore, a portion of this gain on sale, referred to as the "day one gain on sale" relates to the difference between the Bank's cost and the value of the loan on the day the loan is recorded on the Bank's books (the Capital Markets Required Price or "CMRP"); as discussed below, this "day one gain on sale" was treated as a form of origination income.

The accounting treatment for nonrefundable fees and costs associated with lending, committing to lend, or purchasing a group of loans was governed by Statement of Financial Accounting Standards No. 91 ("FAS 91").[651] Under FAS 91, nonrefundable fees include origination fees (points and placement fees), commitment fees (application fees, management fees, and restructuring fees), and syndication fees.[652] Origination fees are fees charged to the borrower in connection with the process of originating, refinancing, or restructuring a loan and include (but are not limited to) points, management fees, arrangement fees, placement fees, application fees, and underwriting fees.[653] FAS 91 specifies that loan origination fees and related direct loan origination costs for a given loan shall be offset, and only the net amount shall be deferred and recognized as an adjustment to the cost basis of the loan.[654] For example, if a lender pays a broker fee of $2,000 and collects points of $1,500, the net deferred amount is an expense of $500 ($2,000 broker expense less $1,500 fee income). For loans classified as held for sale, the deferred amount is not amortized before the sale, but is recognized through the income statement as a component of gain on sale when the loan is sold.[655]

Thus, Scott's e-mail and Celini's exchange with Whitehead reflect that origination fees (e.g., discount points) would be paid by the borrower to the Bank in the first instance, and the Bank would then defer and "capitalize" the income under FAS 91, *reducing* the cost basis of the loan. This, in turn, would serve to *reduce* the price charged to GMAC Mortgage when it purchased the loan from the Bank, due to the combined effect of the MMLPSA and the Pipeline Swap (which, as discussed above, were designed to operate together to result in the transfer of loans to GMAC Mortgage at the Bank's cost).[656]

---

[651] FIN. ACCOUNTING STANDARDS BD., STATEMENT OF FINANCIAL ACCOUNTING STANDARDS NO. 91, Accounting for Nonrefundable Fees and Costs Associated with Originating and Acquiring Loans and Initial Direct Costs of Leases (Dec. 1986).

[652] *Id.* ¶ 2.

[653] *Id.* Appx. C.

[654] *Id.* ¶ 5.

[655] *Id.* ¶ 27c; Ally Accounting Policy 2740, Loan Premiums, Discounts, and Deferred Fees or Costs, dated Jan. 1, 2012, at 10 [RC40000936].

[656] *See* Section V.B.5.

In contrast, in the "premium pricing" scenario, the Bank would defer and capitalize the amounts related to uncompensated origination expenses (such as underwriting expense and other closing costs). The market value of the loan (and day one gain on sale) would be higher (because of the above-market note rate), but the Bank would, under FAS 91, capitalize a corresponding expense item for its uncompensated origination expense. The deferral of these expenses would increase the price of the loan to GMAC Mortgage under the combined cost-basis pricing effect of the MMLPSA and Pipeline Swap.

The Celini/Whitehead and Scott e-mails discussed above reflect an intent to maintain cost-based pricing for loans brokered to the Bank, so that the Bank would recognize neither gains nor losses on sale of the loans.[657] While the parties also contemplated that GMAC Mortgage would charge the Bank a broker fee, this expense would likewise be capitalized and deferred under FAS 91, so that it would serve to *increase* the price of the loan under the MMLPSA/Pipeline Swap. Thus, the Bank would recoup the cost of the broker fee from GMAC Mortgage when GMAC Mortgage purchased the loan.[658]

The parties' agreement about the allocation of revenue on brokered loans is further reflected in a slide presentation dated November 19, 2008 (the day before the Broker Agreement was executed), entitled "Brokering Consumer Loans 2 Bank Project (BCL2B), Legal Entity Revenue, Expense, and Broker Fee Proposal" (the "BCL2B Presentation").[659] The BCL2B Presentation describes the "Base Assumptions" for the Broker to Bank Project, including:

- "[GMAC Bank], acting as the lender[,] will remain *P&L neutral from the brokered transaction with the exception of net interest carry"*;

- "FAS91 will be booked on [GMAC Bank] at loan level to include deferrable fees and expenses" and "will include Broker Fee expense"; and

---

[657] E-mails between M. Whitehead and A. Celini (Sept. 2, 2008) [EXAM00003975]; E-mail from D. Scott to M. Whitehead, et al. (Aug. 28, 2008) [EXAM10286218]. Celini also stated that this also replicated the economics of other brokered loans originated by the Bank. Int. of A. Celini, Feb. 18, 2013, at 229:20–230:7 (explaining that for other bank-originated loans before the advent of the Broker Agreement with GMAC Mortgage, "the affiliate" (GMAC Mortgage) received the P&L impact of origination income and expenses, noting "we were not recognizing gains and losses on these activities").

[658] E-mails between M. Whitehead and A. Celini (Sept. 2, 2008) [EXAM00003975]; E-mail from D. Scott to M. Whitehead, et al. (Aug. 28, 2008) [EXAM10286218].

[659] Materials for Audit Committee Meeting of Residential Capital, LLC, Mar. 20, 2012, at RC40022103–24 [RC40022044].

- "GMAC[ Bank] will receive payment for that loan upon sale to Mortgage that is equal to the originated cost basis of the loan rather than a purchase price equal to the capital markets required price," and "[t]he Cost basis of the loan would include any origination and loan processing fee income and any broker fee expenses."[660]

Elsewhere the BCL2B Presentation similarly states that the Bank will "recognize":

- (G) Income related to:

  - Fees paid by the borrower for loan origination services performed by [GMAC Mortgage] (broker) on behalf of GMAC Bank (lender)

  - Origination fee and ditech/GMAC fee (may be renamed)

  - Fee/income for loan discount/rate buydowns

  - Fees for services provided with locking the rate on the loan being originated

  - Fees for underwriting services performed by the bank underwriters

  - Other miscellaneous ancillary fees or "Lender Loan Services Fee: (i.e. document prep, processing, etc.)

- (H) Receive overage/shortage or pricing subsidies

- (I) Net Carry while loan is in pipeline at the bank

- (J) Will pay "Broker fee" to GMACM (broker for loan origination expenses through a broker agreement (inter-company transaction) and offset by (A) on GMACM. Eliminated in ELIM17 for management reporting purposes

- (K) Expense for headcount and related expense associated with the underwriting and credit decisioning

---

[660] BCL2B Presentation, at 5 [EXAM00075395] (emphasis added). Counsel for AFI notes that, on the same page, the Presentation, after stating that "[c]ompensation in the form of a 'Broker Fee' must be paid to [GMAC Mortgage] (Broker) and disclosed to borrower in order to remain RESPA compliant," then states that "No yield spread premium or admin services fee will be paid to [GMAC Mortgage]." AFI and Young suggest that the reference to "yield spread premium" is a reference to premium pricing, indicating that GMAC Mortgage was not to get the benefit of premium pricing. Int. of J. Young, Mar. 15, 2013, at 202:1–5. However, "yield spread premium" is a typical component of many broker fee arrangements. *See* DEP'T OF HOUS. AND URBAN DEV. REAL ESTATE PROCEDURES ACT (RESPA) STATEMENT OF POLICY 1999-1 REGARDING LENDER PAYMENTS TO MORTGAGE BROKERS, FINAL RULE (1999), at 3, http://www.hud.gov/offices/hsg/ramh/res/fr-4450.pdf. The BCL2B Presentation thus makes clear that the Broker Fee to be paid to GMAC Mortgage is not to include such a component. It then goes on in the next entries, quoted in text, to state that the Bank "will remain P&L neutral . . . with the exception of net interest carry," that FAS 91 deferrals to be booked by the Bank "will include Broker Fee expense," and that the loans will be transferred at "the originated cost basis of the loan rather than . . . the capital markets required price," with "any origination and loan processing fee income and any broker fee expenses" included in the cost basis. BCL2B Presentation, at 5 [EXAM00075395].

- (L) Receive and fund the capitalized servicing asset [MSR] on the balance sheet

- (M) *Fees and expenses will be deferred through FAS91 and capitalized in cost basis of loan on balance sheet (related to items G, H, J, and K).*[661]

Thus, while the Bank would "recognize" origination income, overage/shortage or pricing subsidies, broker fees, and underwriting expense (items G, H, J and K), these items would be deferred and capitalized, and their resulting economic effects would be transferred to GMAC Mortgage through the MMLPSA and Pipeline Swap upon sale of the loan. The Bank would retain Net Carry (item I), and would retain the MSR (item L) upon sale of the loan.

Further, the BCL2B Presentation explained that the Broker Fee would be set at GMAC Mortgage's cost. The Presentation identified the fees (in terms of basis points) to be charged for conventional/conforming loans and for government loans,[662] demonstrating that the fees had been calculated on a cost basis and "[d]id NOT include a premium on top of the actual expenses."[663] This pricing reflected the fact that the Broker Fee would ultimately be a "wash," since it would be paid to GMAC Mortgage by the Bank and then recouped through including this amount as a FAS 91 deferral, increasing the MMLPSA/Pipeline Swap cost-based purchase price of the loan.[664]

Finally, the BCL2B Presentation provided loan-level accounting examples and a 2009 consumer lending operating plan profit and loss statement (comparing GMAC Mortgage and the Bank), illustrating the allocation of revenues and expenses just described. The sample loan-level accounting journal entries associated with an HFS loan brokered from GMAC Mortgage to the Bank included origination fee income, loan discount income and broker fee

---

[661] BCL2B Presentation, at 7 [EXAM00075395] (emphasis added).

[662] *Id.* at 4; *see also* GMAC Bank Affiliate Transaction Memorandum Re Broker Agreement - GMAC Mortgage LLC & GMAC Bank, dated Nov. 30, 2008, at 1 [ALLY_0017944] (reciting same fees reflected in the BCL2B Presentation); Int. of A. Celini, Feb. 18, 2013, at 240:21–243:3.

[663] BCL2B Presentation, at 11 [EXAM00075395]. The February 2012 Sandler O'Neill presentation to the Bank Board (discussed in Section V.B.10.c) noted that the broker fee was not on market terms. At the time of that presentation—February 2012—the Bank was paying GMAC Mortgage a broker fee of 65 basis points to cover a number of GMAC Mortgage's costs, including loan officer compensation, overhead, infrastructure and marketing costs. Sandler O'Neill noted that this fee was below market, observing that the market was paying 50–75 basis points for loan officer compensation alone. Based on that observation, Sandler O'Neill stated that it "would expect the total origination fee paid by knowledgeable market participants to be greater than 50–75 basis points because originators would need to cover additional costs (e.g., overhead, infrastructure and marketing costs) over and above loan officer compensation." Sandler O'Neill Report to the Board of Directors of Ally Bank Re: Analysis of Financial Terms of Certain Affiliate Agreements between Ally Bank and GMAC Mortgage LLC, dated Feb. 28, 2012, at 59 [ALLY_PEO_0084709].

[664] Int. of A. Celini, Feb. 18, 2013, at 236:22–237:13.

expense as components of the FAS 91 deferral.[665] The 2009 operating plan identified the projected income statement impact upon implementation of the Broker to Bank Project. The loan-level accounting samples and the profit and loss statements illustrated the elimination of the broker fee and the recognition of the economics of the FAS 91 deferrals by GMAC Mortgage.[666]

In connection with implementation of the Broker to Bank Project, approximately 65 ResCap/GMAC Mortgage underwriters were transferred to Ally Bank.[667] ResCap received no compensation in exchange for the transfer of this unit.[668] This absence of consideration can be justified by the structure of the contemplated arrangement through which the underwriters were not to function as a profit center for the Bank but instead as a cost center whose expense was to be capitalized, deferred, and passed on to GMAC Mortgage when it purchased the loans. Had it been intended that the Bank would realize additional profits by virtue of assuming the underwriting and origination functions, one would expect that GMAC Mortgage would have been compensated for the transfer of this unit.

The only new written agreement into which the parties entered in connection with the BCL2B was the November 20, 2008 Broker Agreement. The Broker Agreement notably does not specify the fee that is to be paid to GMAC Mortgage for acting as a broker.[669] A November 30, 2008 GMAC Bank Affiliate Transaction Memo (authored by Celini) addressing the Broker Agreement discusses the broker fees to be charged, reciting the same figures as the BCL2B Presentation and the services to be provided by GMAC Mortgage.[670] Subsequent documentation (including the report of a review performed by KPMG in 2012, discussed

---

[665] BCL2B Presentation, at 20 [EXAM00075395]. The journal entries include an origination fee credit of ($1,179.00), a discount for net loan discount income debit of $640.92 and broker fee expense debit of $1,568.00. The combination of these line items ($1,568.00 + $640.92—$1,179.00) equals the FAS 91 Deferral of $1,029.92.

[666] BCL2B Presentation, at 8 [EXAM00075395].

[667] E-mail from S. McCumber to L. Gess (July 7, 2008) [EXAM20052672]; Brokering Contact List [EXAM20052675]; *see also* Int. of A. Celini, Feb. 18, 2013, at 217:12–218:8.

[668] Int. of A. Celini, Feb. 18, 2013, at 217:6–19.

[669] *See* Broker Agreement, § 4 [RC00030534] ("Broker Compensation" provision specifies circumstances in which fee is to be paid, requires appropriate consumer disclosures, and provides that the Bank can limit the fee where it exceeds the normal market price, but does not specify the fee).

[670] GMAC Bank Affiliate Transaction Memorandum Re Broker Agreement- GMAC Mortgage LLC & GMAC Bank, dated Nov. 30, 2008, at 1–3 [ALLY_0017944]. The Memorandum notably does *not* address the revenue allocation that will apply to the brokered loans by operation of the MMLPSA and the Pipeline Swap.

below) and witness interviews confirm that the broker fee GMAC Mortgage charged over the ensuing years was based on its cost, rather than a market-based fee, and that the parties periodically reevaluated the fee to assure that it equated to actual cost.[671]

It does not appear that the parties thought any further agreements or modifications to existing agreements were necessary to effectuate their agreed-upon allocation of revenues and expenses.[672] Celini explained that the contemplated allocation of revenues and expenses generally was the same as that under the existing contractual arrangements;[673] in particular, for pre-Broker Agreement third-party brokered loans, the economic impact of "points" and the day one gain on sale were being passed on to GMAC Mortgage and were not retained by Ally Bank.[674] AFI counsel confirmed that pre-Broker Agreement loan accounting shows that this was the case,[675] and sample brokered loans from this period[676] show that the Bank, as Celini indicated, was not "recognizing gains or losses on these activities."[677] The cost-based pricing

---

[671] *See, e.g.,* Int. of C. Dondzila, Nov. 9, 2012, at 50:24–52:10; ResCap Audit Committee Presentation, dated Mar. 20, 2012, at RC40022051 [RC40022044] (noting GMAC Mortgage will "realize a net loss" on each transaction unless the broker fee is "increased significantly"); KPMG Report, at RC40022079 [RC40022044] ("[T]he broker fee would likely not cover GMAC [Mortgage's] costs to perform services to broker loans to the Bank."); *see also* Ally Bank Affiliate Transaction Memorandum Re Broker Agreement- GMAC Mortgage LLC & GMAC Bank, dated Sept. 7, 2011, at 1 [ALLY_0018206] (reflecting updated broker fees).

[672] Int. of A. Celini, Feb. 18, 2013, at 244:2-19; Int. of R. Groody, Dec. 17, 2012, at 176:21–177:25.

[673] Int. of A. Celini, Feb. 18, 2013, at 229:20–230:7 (for pre-Broker Agreement bank-originated loans "the affiliate" (GMAC Mortgage) received the P&L impact of origination income and expenses; "we were not recognizing gains and losses on these activities").

[674] It appears that there were two categories of items whose impact accrued to the Bank for earlier brokered loans that were to be deferred under the new arrangement: First, it appears that there were several ancillary fees sometimes charged by the Bank that were being retained by the Bank, including tax service fees and loan processing fees. Second, even though FAS 91, paragraph 65 specifically contemplates that broker fees are to be deferred, historically the Bank had not done so. As part of the new process, the parties agreed that the broker fee should be treated as part of the Bank's cost to originate the loan, and that it therefore, was to be included in the FAS 91 deferral. *See* E-mail from L. Corrigan to S. Bode, S. Ruby, et al. (Oct. 28, 2009) [EXAM12008765]; Section V.B.6.c. Of course, had this expense not been deferred, it would have been paid by the Bank to GMAC Mortgage and would not then have been recouped through application of the MMLPSA and Pipeline Swap on sale of the loan to GMAC Mortgage; in other words, revising the parties' prior practice and deferring the broker expense benefited the Bank.

[675] Meeting with Kirkland & Ellis, AFI Counsel, in N.Y., N.Y. (Apr. 11, 2013).

[676] Broker Loans Before 2009 [ALLY_0434976]. As discussed above, the sample loans show that the Bank was receiving, in addition to net interest carry, certain miscellaneous fees such as tax service fees, but was not recognizing other gains or losses, which instead were recognized by GMAC Mortgage.

[677] Int. of A. Celini, Feb. 18, 2013, at 229:20–230:7

for loans purchased (effectuated under the 2008 MMLPSA and July 2008 Pipeline Swap as implemented) would have captured the effect of the FAS 91 deferrals.[678]

Further, Celini stated that to effectuate any change in these economics (or any change in the accounting that resulted in such a change) would have required "a change in affiliate agreements" then in place.[679]

### c. Ally Bank Initially Realized Only Net Interest Carry On GMAC Mortgage Brokered Loans

When Ally Bank and GMAC Mortgage initially implemented the broker arrangement, the revenue and expense allocation was implemented as they had agreed. From January 1, 2009 to July 31, 2009 (when the Bank elected an accounting change discussed below), the Bank realized only the net interest carry on the loans, while also retaining the MSRs on the increased volume of loans passing through the Bank by virtue of avoiding the 250.250 limits. GMAC Mortgage, through the impact of FAS 91 deferrals (inclusive of discounts/premiums/day one gains on sale), continued to reap the profit and loss ("P&L") benefit of points and other origination-related revenues, as well as the impact of capitalized expenses. In a review performed several years later, Joe Cortese[680] summarized the accounting for brokered loans during this initial period from January 1, 2009, to July 31, 2009, as follows:

> Upon origination, the carrying value of the loan on the Bank consisted of the UPB, plus or minus discount/premium (collected from borrower and CMRP);[681] and net deferred fees (FAS91). Net deferred fees consisted of premium/discount collected/paid at closing; the capital markets required price (CMRP); broker fee expense; and a per unit deferral for internal costs. Upon sale of the loan, the UPB was derecognized; the net deferred fee was reversed into earnings; the discount/premium on the loan was derecognized; and interest income representing

---

[678] Indeed, the 2008 MMLPSA pricing provisions specifically stated that, for MMLPSA pricing purposes, the loan's "net carrying value" determined in accordance with GAAP, was

*to include* without limitation the unpaid principal balance of such Mortgage Loan, plus or minus any premium or discount paid, *net deferral fees or costs,* accrued interest and basis adjustments from derivative loan commitments, hedge accounting or lower of cost or market adjustments.

2008 MMLPSA, § 1.9 [ALLY_0201210] (emphasis added).

[679] Int. of A. Celini, Feb. 18, 2013, at 246:4–248:18; *see also* Int. of R. Groody, Dec. 17, 2012, at 259:25–260:11 (agreeing change from cost-basis pricing would have required amendment of agreements).

[680] Cortese joined Old GMAC Commercial Mortgage as an accounting director in June 2000 before leaving in October 2004. In July 2008, Cortese joined ResCap as an accounting director. He became Chief Accounting Officer for Ally Bank in August 2009, and became Ally Bank Mortgage Controller in August/September 2012. Int. of J. Cortese, Mar. 7, 2013, at 7:19–25, 9:15–25, 10:20–12:3.

[681] "CMRP," or "Capital Markets Required Price," is a market valuation of the loan; as Cortese explained, the discount/premium consisted of loan discount income, which was "inclusive of what they're referring to as the capital markets required price, which again, is the day one estimate of the gain on sale." Int. of J. Cortese, Mar. 7, 2013, at 68:15–69:3.

the carry of the loan was recognized. These items were offset to intercompany with [GMAC Mortgage]. An entry was then recorded to transfer the net deferred fee to [GMAC Mortgage] (DR to revenue) with offset to intercompany with [GMAC Mortgage]. The net intercompany balance would be settled with a cash transfer. *Net revenue to the Bank consisted of interest carry only.[682]*

The accounting for sample loans from this period produced by the Debtors confirms the above-described treatment.[683] Further, this accounting also matched the sample loan-level accounting provided by the BCL2B Presentation.[684]

The net P&L benefit to GMAC Mortgage from adjusting the purchase price of the brokered loans by the FAS 91 deferrals—not only for points, fee revenues and the day one gain on sale (which benefited GMAC Mortgage by making loans less expensive) but also for lender-paid closing costs and broker fee expense (which adversely affected GMAC Mortgage by making loans more expensive)[685]—was $47.18 million for the period January 1, 2009 through July 31, 2009.[686]

---

[682] Broker to Bank Contract Accounting Review, at 2 [EXAM12253506] (attached to e-mail from J. Cortese to C. Dondzila, J. Young, J. Whitlinger, and J. Andrews (Feb. 27, 2012) [EXAM12253505]) (emphasis added).

[683] *See* Loan Summary [EXAM00229653]; Loan Summary [EXAM00233017]; Examiner Loan Selections 03 11 13 [EXAM00339939]; Examiner Loan Selections 04 15 13 [EXAM00345279].

[684] The overall net effect of the accounting resulted in the Bank receiving interest income and GMAC Mortgage receiving the risks and rewards associated with the loan, including points paid, gain on sale and origination fees.

[685] To effectuate the appropriate accounting upon implementation of the broker to bank process in January 2009, manual adjustment to the general ledger was required relating to the appropriate FAS 91 deferral. The entry had no net income effect and represented a reclassification of the appropriate income statement line item. The FAS 91 fee entry was net of loan revenue (origination fees, loan processing income, etc.) and broker fee expense. E-mail from L. Corrigan to S. Bode, S. Ruby, C. Cowley, and C. Dondzila (Oct. 28, 2009) [EXAM12008765]. As part of the month-end process whereby the FAS 91 deferral was reallocated from "gain on sale" line item to the appropriate income statement line items, the broker fee expense was excluded in error. *Id.* In October 2009, a correcting entry was made to reclassify $39.8 million (for the period January 1, 2009 through September 30, 2009) and $7.1 million (for the quarter ending September 30, 2009). *Id.* The correcting entry was a debit to "gain on sale" and a credit to "other expenses" and had no impact on the economics of the transaction. *Id.*

[686] E-mail from S. Ruby to J. Cortese, C. Dondzila, et al. (Dec. 16, 2011) [EXAM12253153], attaching Ally Bank Consumer-Broker to Bank, HFS Loans Income Statement [EXAM12253154]; Memorandum to ALLY Bank 2011 Financial Statement Files, SAB 99 & 108 Analysis – Broker to Bank Error (Mar. 13, 2012) [ALLY_0401565].

### d. *Ally Bank (Unwittingly, And Without GMAC Mortgage's Agreement) Altered The Net Revenue Allocation Through Its August 1, 2009 Fair Value Accounting Election*

Effective August 1, 2009, Ally Bank elected to implement the fair value option to account for HFS loans[687] in accordance with Statement of Financial Accounting Standards ("FAS") No. 159, The Fair Value Option for Financial Assets and Financial Liabilities.[688] The Bank reportedly made this election because the mechanics of implementing fair value accounting were simpler than those for hedge accounting.[689] Under the fair value election, loans were required to be marked to market.[690] The Bank ostensibly was doing this already as a function of applying hedge accounting for HFS loans based on the applicability of the MMLPSA and the Pipeline Swap (though, as discussed above, this in fact is not quite how the Bank performed the loan-level accounting for these transactions).[691] Consequently, witnesses suggested, the fair value election really should not have made a difference in loan pricing.[692] This view, however, ignores that the combined effect of the 2008 MMLPSA and the Pipeline Swap was to transfer loans to GMAC Mortgage not at market value (or even at the Bank's "carrying value"), but at Ally Bank's cost (UPB + discount/premium + SRP).[693] Most significantly, this view also disregards the fact that when it elected fair value accounting, Ally Bank no longer recorded FAS 91 deferrals.[694]

---

[687] Audit Committee Meeting Presentation, Significant Judgments and Estimates and Other Accounting Matters, dated Oct. 29, 2009, at RC40017984 [RC40017954]; KPMG Report, at RC40022072 [RC40022044].

[688] FAS 159, "The Fair Value Option for Financial Assets and Financial Liabilities (as amended), was superseded by the FASB Accounting Standards Codification ("ASC") 825, "Financial Instruments" on September 15, 2009.

[689] Int. of C. Dondzila, Nov. 9, 2012, at 130:17–31:19; Audit Committee Meeting Presentation, Significant Judgments and Estimates and Other Accounting Matters, dated Oct. 29, 2009, at RC40017984 [RC40017954].

[690] FINANCIAL ACCOUNTING STANDARDS BOARD, STATEMENT OF FINANCIAL ACCOUNTING STANDARDS No. 159, The Fair Value Option for Financial Assets and Financial Liabilities (Feb. 2007); GMAC Fair Value Measurements, DRAFT Accounting Policy #1060, Sept. 1, 2009, at 2 [EXAM12299919]; Int. of C. Dondzila, Nov. 9, 2012, at 132:3–15.

[691] As discussed in Section V.B.5.c, the Bank was not transferring the loans at market price under the MMLPSA, and recovering the difference between its cost and the market price under the Pipeline Swap hedge, as specified by the agreements. Instead, the Bank was transferring the loans at cost (UPB+discount/premium+SRP (where the Bank released the servicing rights)) and, after accounting for market value shifts under the Pipeline Swap at various junctures before sale, "zeroing out" the payments under the Pipeline Swap at sale, so that the net cumulative payments under the Pipeline Swap on any given loan were always $0 when sold under the MMLPSA.

[692] Int. of C. Dondzila, Nov. 9, 2012, at 89:23–90:7.

[693] *See* Section V.B.5.c.

[694] FINANCIAL ACCOUNTING STANDARDS BOARD, STATEMENT OF FINANCIAL ACCOUNTING STANDARDS No. 159, The Fair Value Option for Financial Assets and Financial Liabilities (Feb. 2007). According to paragraph 3, "Upfront costs and fees related to items for which the fair value option is elected shall be recognized in earnings as incurred and not deferred."

Thus, the Bank ceased capitalizing and deferring points and other origination income, and ceased capitalizing and deferring premium pricing-related expense and broker fees. Consequently, as Cortese later summarized the change:

> Post-Fair Value Election—Upon origination, the carrying value of the loan on the bank consists of the UPB; plus or minus discount/premium (collected from borrower and CMRP). Upon sale, the UPB would be derecognized; discount/premium would be reversed; and interest income representing the carry of the loan is recognized. These items are offset to intercompany with [GMAC Mortgage]. The net intercompany balance is then settled with a cash transfer. *Net revenue to the Bank consists of discount/premium; broker fee paid; and interest carry.*[695]

Cortese further explained in his interview that the discount/premium consisted of loan discount income, which he defined as "any points that the Bank has received from the borrower, net of any expenses that the Bank paid on origination directly to the borrower for the net premium pricing . . . inclusive of what they're referring to as the capital markets required price, which again, is the day one estimate of the gain on sale."[696] GMAC Mortgage no longer received the net FAS 91 deferred income and expenses, and the Bank began keeping, inter alia, a portion of the "gain on sale."

As a result, beginning August 1, 2009, rather than realizing the P&L benefit of points and the gain on sale as the parties had agreed (and as it had received under the 250.250 program and for third-party brokered loans), GMAC Mortgage instead received the cost-based, below-market broker fee (which, since it was no longer capitalized, GMAC Mortgage did not have to repay to Ally Bank when it purchased the loan). Of course, GMAC Mortgage had agreed to such a fee with the understanding that, whatever the fee charged, the fee would be a "wash" because of the FAS 91 deferrals, and with the expectation that it would continue to receive the P&L benefit of the FAS 91 deferrals.

---

[695] Broker to Bank Contract Accounting Review, at 2 [EXAM12253506] (attached to e-mail from J. Cortese to C. Dondzila, J. Young, J. Whitlinger, and J. Andrews (Feb. 27, 2012) [EXAM12253505]) (emphasis added).

[696] Int. of J. Cortese, Mar. 7, 2013, at 68:18–69:3.

Thus, with this shift, the Bank got to "have its cake and eat it too," keeping a significant portion of the gain on sale, but still assuming no representation and warranty exposure or hedge exposure, and paying a below-market broker fee in the bargain. The changed allocation of revenues is illustrated in Exhibit V.B.6.d below:



EXHIBIT V.B.6.d
**Accounting for Loans Brokered by GMAC Mortgage to the Bank**
**Pre and Post Fair Value Election**

GMAC Mortgage    Ally Bank

|  | Pre-Fair Value Election | Post-Fair Value Election |
|---|---|---|
| Points collected | GMACM | BANK |
| Lender paid closing costs | GMACM | BANK |
| "Day one" gain | GMACM | BANK |
| Net interest carry | BANK | BANK |
| Gain on sale to third party | GMACM | GMACM |
| Broker fee (at cost) | N/A | GMACM |

*Source: Broker to Bank Contract Accounting Review, at 2 [EXAM12253506] (attached to e-mail from J. Cortese to C. Dondzila, J. Young, J. Whitlinger, and J. Andrews (Feb. 27, 2012) [EXAM12253505].*

As noted above, Celini stated that any change from the revenue allocation agreed upon in the Brokering Consumer Loans to Bank Project, particularly any change resulting from the adoption of fair-value accounting, would have required a change in the parties' agreements.[697] There appears to be no evidence that this change in the underlying economics was understood and agreed to by GMAC Mortgage. Indeed, there appears to be no evidence that the parties even recognized at the time that the fair-value election would have the effect described above. Celini, for example, did not believe there were "any changes to intention" when the fair-value election was made.[698] In fact, it appears that the impact of the change was not discovered until two years later, in late 2011.

---

[697] Int. of A. Celini, Feb. 18, 2013, at 246:4–248:18.

[698] *Id.* at 246:4–21.

### e. *Glassner's Discovery Of The Net Revenue-Allocation Issue*

The matter appears to have come to light in December 2011, when an issue was raised by Ally Bank Senior Managing Director Adam Glassner (who also served the functional role of Executive VP and Managing Director for Ally Capital Markets)[699] with Young (who had become the Bank's Chief Financial Executive in 2011), and Whitlinger (then ResCap's CFO, Mortgage Operations).[700]

In his Ally Bank capacity, Glassner was responsible for warehouse and correspondent lending, and also became "the point of contact for Ally Bank's mortgage business with both the FDIC and the Utah Department of Financial Institutions."[701] In his Capital Markets function, Glassner's responsibilities included, inter alia, pricing for each of the Bank and ResCap loan channels.[702] When he raised the issue, Glassner was on the verge of leaving the Bank to take a position with Fannie Mae; he resigned January 3, 2012, but was asked to stay until January 26, 2012.[703]

According to Glassner, the issue arose when he was reviewing a report or presentation concerning profitability by origination channel and by legal entity, and "the revenue recognition by legal entity was more in the bank and less in ResCap" than he believed it should be, based on his "high level" understanding of the economics.[704] Glassner's understanding—echoing the views expressed by Celini, Groody and others in their interviews—was that under the parties' agreements, GMAC Mortgage was supposed to receive the "gain on sale,"[705] and it appeared that the Bank was retaining a portion of this revenue.[706]

---

[699] Glassner had joined Ally Bank as Senior Vice President in May 2009, and was one of a number of former Bank of America executives who joined AFI or its affiliates during this timeframe, including Al de Molina. Int. of A. Glassner, Mar. 20, 2013, at 8:11–9:12; Section V. Glassner took on the responsibilities of Executive Vice President and Managing Director of Capital Markets in July 2009, though he believes he was never formally given this title. Int. of A. Glassner, Mar. 20, 2013, at 14:12–22.

[700] Ally Global Security Investigation Report, dated Mar. 14, 2012, at RC40022053 [RC40022044].

[701] Int. of A. Glassner, Mar. 20, 2013, at 26:7–10, 16:6–9. *See also* Section V.B.9.d(1) (discussing Glassner's 2010 involvement in responding to FDIC criticisms of the interest rate applicable to the MSR Swap Funding Fee).

[702] *Id.* at 16:6–17:13.

[703] *Id.* at 98:5–8; 133:22–134:19.

[704] *Id.* at 135:10–136:23.

[705] *Id.* at 148:15–19, 150:7–18 (noting that his opinion "around the gain on sale" was formed in conversations several years earlier with Bank officials Mark Hales, Groody, and Celini "in an attempt to understand the business").

[706] *Id.* at 136:15–137:9.

Glassner asked Whitlinger and Young "to investigate the split of the revenue between the legal entities by channel to make sure that they were appropriately being accounted for and transacted for under the swap agreements—and given, again, at a high level that that split was incongruous with my generic understanding of [the proper revenue allocation]."[707] Glassner further raised the concern with Young and Whitlinger that, if he was correct, the Bank "would have overstated [its] earnings and, thus, capital at the bank."[708]

In a December 14, 2011 e-mail, Young, noting that he (Young) had "spoken with Adam," requested that Cortese meet with Dondzila and Rock the following day to discuss "consumer loan/HFS swap accounting."[709] The next day, Cortese e-mailed back that the meeting had occurred and reported:

> The consensus is that a piece of [Gain on Sale] is being recorded in the Bank as loan discount. *We believe that the intent of the Broker to Bank initiative was not to have any piece of sale execution revenue at the Bank.* This treatment appears to have begun in the beginning of 2009 when the program started. We are working to quantify the amount, however for 2011 thru [sic] November it was $136MM.
>
> This issue does impact the amount of broker fee that Bank pays Mortgage, as *the intent is for Bank to be neutral for originating consumer loans.* . . . [W]e are continuing to work on quantification and determination of intent.[710]

---

[707] Int. of A. Glassner, Mar. 20, 2013, at 138:11–18. Whitlinger later suggested that Glassner initially inquired of Whitlinger as to whether ResCap would earn more if loan pricing were structured to result in more premium pricing arrangements, rather than the payment of points, an objective Whitlinger suggested would raise regulatory concerns. *See* Ally Global Security Investigation Report, dated Mar. 14, 2012, at RC40022057 [RC40022044]; *see also* Int. of J. Whitlinger, Nov. 30, 2012, at 187:24–88:13. In his interview, Glassner vehemently denied making such an inquiry. Int. of A. Glassner, Mar. 20, 2013, at 138:3–139:23 ("[a]bsolutely 100 percent false"). Glassner also explained that it would not really be possible, given the market environment, to achieve such a result through structuring pricing to encourage one form of loan instead of another. *Id.* at 141:6–143:18. This issue is discussed further in Section V.B.6.f.

[708] Int. of A. Glassner, Mar. 20, 2013, at 169:1–6. Glassner initially suggested that he "raised the concern that it would present regulatory problems to the bank because if the accounting for the issue was wrong, we would have had different income, thus different capital." *Id.* at 162:17–21; 163:1–8. Later, he indicated that he did not specifically recall going beyond the statements about potential overstatement of the Bank's income and capital to say that this would pose regulatory problems for the Bank. *Id.* at 170:1–171:7.

[709] E-mails among J. Young, J. Cortese, J. Mackey, et al. (Dec. 14–15, 2011), at 1–2 [ALLY_0387143].

[710] *Id.* at 1 (emphasis added).

In an e-mail exchange with Cortese the following day, Ally Bank Accounting Director Sylvia Ruby documented the $47.18 million in FAS 91 deferrals (net of expense, including broker fees) that had flowed to GMAC Mortgage from January 1, 2009 to July 31, 2009.[711] Ruby's analysis also reflected the value for the period from August 1, 2009 to November 2011 of the points and day one gain-on-sale revenues that had accrued to the Bank instead of GMAC Mortgage; these items alone (excluding other FAS 91 deferrals) totaled $253.5 million (loan discount income of $444.4 million net of $190.9 million in broker fees paid but not deferred/recouped by the Bank for this period).[712] For the later years, these numbers were substantially a function of the day one gain on sale on "no points," premium pricing loans, which had become an increasingly popular option for refinancing as interest rates declined.

Glassner himself conducted limited additional inquiry before resigning on January 3, 2012.[713] Another employee who was cleaning up files belonging to an employee who had left the company provided a mortgage-related file to Glassner to determine whether its contents were worth keeping, and he found among them a copy of the BCL2B Presentation, which he in turn provided to Young and Whitlinger.[714] Glassner reviewed the Swap agreements and prior presentations to the FDIC and the DFI, confirming that they were consistent with his views that the Bank was not to receive gain on sale revenues.[715] He did not review other documents related to the Broker to Bank Project,[716] and does not recall speaking with any of the personnel involved in the project.[717] With respect to the BCL2B Presentation, Glassner concluded that the document as a whole was consistent with his general conclusion, though there were parts of it that he did not understand, and, in particular, he did not fully understand FAS 91 or the impact of the Presentation's statements concerning FAS 91.[718] Glassner maintained that the Bank was not supposed to receive any gain on sale income; however, reflecting his lack of understanding concerning the impact of deferring origination point and

---

[711] E-mail from S. Ruby (Dec. 16, 2011) [EXAM12253153]; Ally Bank Consumer—Broker to Bank, HFS Loans Income Statement [EXAM12253154].

[712] E-mail from S. Ruby (Dec. 16, 2011) [EXAM12253153]; Ally Bank Consumer—Broker to Bank, HFS Loans Income Statement [EXAM12253154].

[713] Int. of A. Glassner, Mar. 20, 2013, at 159:14–23.

[714] *Id.* at 144:20–146:11. Whitlinger later stated that he provided the BCL2B presentation to Glassner. Ally Global Security Investigation Report, dated Mar. 14, 2012, at RC40022058 [RC40022044].

[715] Int. of A. Glassner, Mar. 20, 2013, at 146:18–147:1–4, 148:24–149:6.

[716] *Id.* at 162:1–9.

[717] *Id.* at 147:5–148:9. Glassner thought that he might have spoken with Jill Horner, but does not specifically recall doing so. *Id.*

[718] *Id.* at 153:12–15 ("At the most high level, I understand what FAS 91 is. . . . But I could not make a FAS 91 adjustment if my life depended on it"); *id.* at 153:25–154:6 ("I understood that certain expenses were amortized under rules within FAS 91 over the asset and included in the amortized cost of the asset. Outside of that, the extent of my knowledge around FAS 91 or really any accounting issues is zero").

fee income under FAS 91, Glassner believed that these revenues were intended to flow to the Bank.[719] In late January 2012, just as he was about to leave the company, Glassner voiced his concerns about the propriety of the revenue recognition that had occurred to AFI's General Auditor, Ann Cummings.[720] He then refused to sign a Sarbanes Oxley certification [721] upon his departure. [722]

> f.   The January 1, 2009 To July 31, 2009 Allocation Of Net Revenues Is Labeled An "Accounting Error" And ResCap Is Required To Pay Ally Bank The $47.4 Million Received For That Period, Plus Interest

The response to Glassner's concerns was threefold. First, in an effort that appears to have been coordinated by Young, Cortese (for Ally Bank), and Dondzila (for ResCap) prepared virtually identical memoranda addressing the issue dated, respectively, March 13 and March 10, 2012.[723] Second, AFI General Counsel William Solomon retained the accounting firm KPMG to investigate the matter on AFI's behalf, and KPMG formally delivered its report on March 16, 2012.[724] Third, Ally Global Security conducted an internal investigation, delivering a report dated March 14, 2012 (but which quotes extensively from the KPMG Report delivered two days later, and, with one exception, appears to rely on the same materials as the KPMG Report).[725]

---

[719] *Id.* at 168:7–9 (points and fees to be recognized by the Bank); 172:23–173:3 (same); 153:16–25 (acknowledging lack of understanding of impact of FAS 91 deferral of income and expenses described in BCL2B Presentation).

[720] Ally Global Security Investigation Report, dated Mar. 14, 2012, at RC40022053 [RC40022044].

[721] The Sarbanes-Oxley Act of 2002, § 302, requires the principal executive officer or officers and the principal financial officer or officers, or persons performing similar functions, of publicly traded companies to certify the appropriateness of their financial statements and disclosures and to certify that they fairly present, in all material respects, the operations and financial condition of the company. The Sarbanes-Oxley Act of 2002, Pub. L. 107-204, 116 Stat. 745 (2002).

[722] Int. of J. Whitlinger, Nov. 30, 2012, at 109:1–110:13; Int. of C. Dondzila, Nov. 9, 2012, at 43:4–44:2; KPMG Report, at RC40022071 [RC40022044]; Ally Global Security Investigation Report, dated Mar. 14, 2012, at RC40022053 [RC40022044].

[723] Memorandum, SAB 99 & 108 Analysis—Broker to Bank Error, dated Mar. 13, 2012 [ALLY_0401565]; Memorandum Re SAB 99 & 108 Analysis - Broker to Bank Error, dated Mar. 10, 2012 [EXAM12219169].

[724] KPMG Report, at 2 [RC40022044].

[725] Ally Global Security Investigation Report, dated Mar. 14, 2012, at RC40022052 [RC40022044].

### (1) The Internal Accounting Memos

The Cortese and Dondzila memos announce a conclusion that the revenue recognition for January 1, 2009 to July 31, 2009, "was done in error."[726] They then analyze whether the error requires an out-of-period accounting adjustment (involving a restatement of the relevant party's prior-period financials), concluding that the $47 million error is too small to require such an adjustment.[727] As Cortese acknowledged in his interview, had the conclusion instead been that the post-July 31, 2009 revenue allocation was an error, given the increased magnitude of the error, there is a "very strong likelihood" that restatement of the Bank's prior-period financials would have been required.[728]

With respect to the "error," the memos state that there were "conflicting corporate evidential documents, which in certain cases clearly describe an intention that Ally Bank would not recognize gains or losses with respect to loans originated under the Broker Agreement other than net carry," and in others "contradict this intention and suggest that Ally Bank, as originator was entitled to all fees, including points, and would merely pay GMAC Mortgage a market rate broker fee for the services it provided."[729] The conflict, Cortese explained in his interview, was between statements that the Bank would "recognize" certain revenues (such as points) and statements that the P&L impact of those items would nonetheless accrue to GMAC Mortgage, which he thought suggested that "those items don't get recognized by the Bank ever"; he characterized this as a "technical accounting" inconsistency.[730]

In fact, however, for the loan examples from the January 1, 2009 through July 31, 2009 reviewed as part of this Investigation, and for the loan accounting examples in the BCL2B Presentation Exhibit D (which Cortese had not reviewed),[731] the deferred revenues and costs *were* recognized in the Bank's income statement; they were then derecognized upon sale of the loan to GMAC Mortgage through the FAS 91 accounting entries. From a technical accounting perspective, the Bank did in fact "recognize" the net deferred fees during this period. Moreover, in the view of the Examiner's Financial Advisors, the accounting

---

[726] Memorandum, SAB 99 & 108 Analysis—Broker to Bank Error, dated Mar. 13, 2012, at 2 [ALLY_0401565]; C. Dondzila, Memorandum Re SAB 99 & 108 Analysis—Broker to Bank Error, dated Mar. 10, 2012, at 2 [EXAM12219169].

[727] Memorandum, SAB 99 & 108 Analysis—Broker to Bank Error, dated Mar. 13, 2012, at 2, 10 [ALLY_0401565]; C. Dondzila Memorandum Re SAB 99 & 108 Analysis—Broker to Bank Error, dated Mar. 10, 2012, at 2, 12 [EXAM12219169].

[728] Int. of J. Cortese, Mar. 7, 2013, at 172:20–173:20.

[729] Memorandum, SAB 99 & 108 Analysis—Broker to Bank Error, dated Mar. 13, 2012, at 2 [ALLY_0401565]; C. Dondzila, Memorandum Re SAB 99 & 108 Analysis—Broker to Bank Error, dated Mar. 10, 2012, at 2 [EXAM12219169].

[730] Int. of J. Cortese, Mar. 7, 2013, at 122:15–123:21; 124:19–125:16.

[731] *Id.* at 119:14–20:19.

methodology of capitalizing and deferring origination related fees and costs, as reflected in these loan examples, was in accordance with GAAP as required by FAS 91. Notably, neither the Cortese nor the Dondzila memo concluded that pre-August 2009 accounting was not in accordance with GAAP.[732] Of course, even if it were not, the ultimate issue to be addressed in determining whether the parties' agreement was complied with is not whether the accounting they agreed upon to determine the revenue allocation for purposes of the broker arrangement was GAAP-compliant, but whether the allocation of revenues was as they had agreed.

### (2) The KPMG And Ally Global Security Reports

AFI tasked KPMG with (1) "[a]ssess[ing] whether or not the accounting for the transaction was consistent with the agreements," and (2) "[a]ssessing whether or not the Company's accounting policies for the transaction have been consistently applied."[733] With respect to the second assessment AFI sought—as to whether the company's accounting policies had been applied consistently—KPMG concluded only that the policies had been applied consistently "after the fair value election,"[734] while elsewhere acknowledging that a different accounting treatment had been applied before the fair-value election.[735]

With respect to the first portion of the assignment, KPMG provided an assessment only as to whether the post-fair value election accounting could be reconciled with the parties' agreements. The KPMG Report curiously notes that it "will not cover the accounting for the transaction *prior to the fair value election,"* adding, in an apparent reference to the Cortese and Dondzila memos, that Ally had *already* concluded that the accounting implemented from January 1, 2009 to July 31, 2009 was the result of an error.[736] The documents produced do not disclose KPMG's view of the accounting for this pre-fair value period (and whether or not it, too, complied with GAAP or the parties' agreements in KPMG's view), or whether KPMG was directed not to opine on this period by AFI.[737]

---

[732] Memorandum, SAB 99 & 108 Analysis—Broker to Bank Error, Mar. 13, 2012, at 2 [ALLY_0401565]; C. Dondzila, Memorandum Re SAB 99 & 108 Analysis—Broker to Bank Error, Mar. 10, 2012, at 2 [EXAM12219169]. The Cortese and Dondzila memos were provided to Deloitte, AFI's and ResCap's auditors, to support the position that no out-of-period adjustment was required. Deloitte accepted the conclusion that no such adjustment was required; while Deloitte echoed the Cortese/Dondzila conclusion that the pre-August 2009 accounting had been an "error" in application of the parties' agreements, it notably did not conclude that the pre-August 2009 accounting was not in accordance with GAAP. Memorandum, Broker to Bank Retrospective Adjustment Overview, at 3 [DT032536]. Deloitte representatives indicated that they accepted ResCap's conclusion that the issue stemmed from a misinterpretation of contractual terms leading to accounting that did not reflect the intent of the parties, rather than a misapplication of GAAP. However, Deloitte representatives were unable to explain what aspect of the parties' agreements precipitated the pre-August 2009 accounting "error." Meeting with Deloitte, AFI's and ResCap's Auditors (Apr. 18, 2013) (telephonic).

[733] KPMG Report, at RC40022079 [RC40022044].

[734] *Id*. at RC40022072.

[735] *Id.*

[736] *Id.*

[737] Solomon could not recall details concerning this issue. Int. of W. Solomon, Mar. 19, 2013, at 157:10–18.

KPMG was provided with copies of certain (but not all) versions of the MMLPSA, Pipeline Swap and MSR Swap, the Broker Agreement, the BCL2B Presentation, and the Bank's November 30, 2008 Affiliate Transaction Memo.[738] KPMG was provided two loan-level accounting examples, one for the period from January 1, 2009 to July 31, 2009, and one from the period after the Bank's fair-value election. Neither KPMG, nor, for that matter, any of the other persons or entities who investigated this issue in early 2012 reviewed pre-2009 loan-level accounting examples.[739] Further, KPMG apparently was not provided a copy of the September 2008 e-mail exchange between Celini and Whitehead described above,[740] even though Scott had located it and, noting that it supported her view of "the broker project being economically neutral to the Bank," circulated it in early March 2012 to Young and Cortese, who forwarded it on to Whitlinger, Dondzila and Cummings.[741] Nor does it appear that KPMG received a copy of the August 28, 2008, Scott/Whitehead e-mail exchange.

KPMG interviewed Glassner, six current Ally and Ally Bank officials (including Young and Cortese), and three current ResCap officials, including Whitlinger.[742] Only one of the KPMG interviewees, Scott, was involved in the Broker to Bank Project revenue-allocation discussions.[743]

Glassner explained that his view was that from 2009 through 2011, "gain on sale income and fee income from mortgage loan origination and sale was incorrectly credited to GMAC Bank," that "today's interpretation [of the agreements] is a stretch as the agreements do not talk about the impact from fair value option accounting," and "the Bank does not have 'hedge risk, eligibility risk or default risk,' and therefore should not obtain gain on sale or premium pricing income."[744]

---

[738]   *See* KPMG Report, Appx. I [RC40022044].

[739]   *Id.* at RC40022076; Int. of J. Cortese, Mar. 7, 2013, at 119:5–21:7; Int. of C. Dondzila, Nov. 9, 2012, at 104:20–05:14; Int. of J. Whitlinger, Nov. 30, 2012, at 109:11–110:13; Int. of J. Young, Mar. 15, 2013, at 198:6–199:25.

[740]   KPMG Report, at Appx. I [RC40022044].

[741]   E-mail from D. Scott to J. Young and J. Cortese (Mar. 1, 2012) [EXAM00003975].

[742]   KPMG Report, Appx. II [RC40022044]. The Report mis-identifies Nikki Rock as an Ally Bank Senior Accounting Director. *Id.*; *compare* Ally Global Security Investigation Report, dated Mar. 14, 2012, at RC40022061 [RC40022044] (identifying Rock's affiliation as ResCap Capital Markets Accounting).

[743]   The only ResCap-side officials interviewed, Dondzila and Whitlinger, were not involved in the Broker to Bank Project. Dondzila and Whitlinger were relied upon primarily to provide an overview of the MMLPSA, Pipeline Swap, and Broker Agreement, though they were not involved in the development of the MMLPSA or Pipeline Swap, and, in the interviews conducted by the Examiner's Professionals, they professed limited familiarity with the terms of those agreements (though they had some familiarity with how loans subject to those agreements had been accounted for). *See* Int. of C. Dondzila, Sept. 27, 2012, at 41:11–17, 180:17–181:8, 271:6–13, 286:21–287:20; Int. of J. Whitlinger, Nov. 30, 2012, at 41:1–15, 44:25–45, 111:11–15, 126:7–16, 239:5–23.

[744]   Ally Global Security Investigation Report, dated Mar. 14, 2012, at RC40022062 [RC40022044].

Scott asserted that "the bank was suppose[d] to receive the same income as it received from the prior 250/250 agreement and the bank was to 'remain income neutral.'"[745] She is further reported to have "felt that any points or premium pricing income would be discounted from the price [for which] GMAC Mortgage purchased the loan from Ally Bank."[746] The summary for KPMG's interview dismisses Scott's summary of how revenues were to be allocated as "mechanical," observing that she was unable to "describe how this transaction was accounted for" or "how the accounting practices impacted the economics."[747]

KPMG did not interview Celini. Ally Global Security interviewed Celini (then at Freddie Mac) telephonically[748] without KPMG involvement; this interview is omitted from the KPMG Report's list of interviews conducted and is not referenced in KPMG's report.[749] No documents were provided to Celini for review beforehand or during the interview.[750] The Ally Global Security account of his interview attributes statements to Celini to the effect that the Bank would receive income from points and premium pricing,[751] statements at odds with those in his interview with the Examiner's Professionals discussed in Section V.B.6.e and in his September 2008 e-mail exchange with Whitehead. Celini, however, specifically denied that his statements in the telephonic interview concerning the Broker to Bank arrangement and the agreed allocation of revenues were in any way different from those made when he was interviewed by the Examiner's Professionals (that the Bank was to receive only net interest carry, while GMAC Mortgage received the gain on sale and other economics), which notably were made in conjunction with a review of the contemporaneous documentation.[752]

KPMG did interview Ally Bank General Counsel Jonathan Andrews, who was involved in the Broker to Bank Project, but does not appear to have been involved in the discussion of revenue allocation.[753] Andrews opined that he "believe[d] that it was the intention of the parties that the Bank, in its capacity as an originator of brokered loan applications, receive income traditionally received by a mortgage lender, consistent with market terms (including pricing)," and that to deviate from market pricing would "result[   ] in excessive income" to

---

[745] *Id.* at RC40022064.

[746] *Id.*

[747] *Id.*

[748] *Id.*

[749] KPMG Report, Appx. II [RC40022044].

[750] Int. of A. Celini, Feb. 18, 2013, at 288:2–14.

[751] Ally Global Security Investigation Report, dated Mar. 14, 2012, at RC40022064 [RC40022044].

[752] Int. of A. Celini, Feb. 18, 2013, at 288:2–20.

[753] E-mails between M. Whitehead and A. Celini (Sept. 2, 2008) [RC40057139]; E-mail from S. McCumber to L. Gess (July 7, 2008) [EXAM20052672]; Brokering Contact List [EXAM20052675]; Brokering Consumer Loans to Bank Project Charter, dated Nov. 10, 2008 [EXAM12253233]; Project Issues Log [EXAM20052676].

GMAC Mortgage, potentially violating Rule 23A.[754] However, Andrews responded to a KPMG request that he "provide a formal opinion" that the shift in economics would constitute a regulatory violation not by providing such an opinion but by indicating that an analysis of the economics in comparison with the economics of market transactions would be required.[755] Absent from the summary of KPMG's Andrews interview is any suggestion that Andrews was shown the BCL2B Presentation, that he explained the pre-Broker Agreement economics under the agreements, or that he acknowledged the demonstrably non-market terms of the MMLPSA and Pipeline Swap, including the fact that the Bank avoided representation and warranty risk while giving up the gain on sale.[756]

Young, both in his interview with KPMG and in his interview with the Examiner's Professionals, echoed the view that the revenue to the Bank would be inadequate if it were to give up the revenue items it kept after July 31, 2009.[757] In his interview with the Examiner's Professionals, Cortese asserted a similar position[758] (despite his initial, unvarnished reaction in December 2011 that the "the intent of the Broker to Bank initiative was not to have any piece of sale execution revenue at the Bank").[759] Young and Cortese both suggested that the Bank, as the originator who funded the brokered loans, would have expenses not covered by this arrangement.[760] But, as discussed above, the Bank's origination expenses, including, specifically, its underwriting expenses, were capitalized and recovered by the Bank from GMAC Mortgage. While Cortese asserted that some component of expense was not recouped by the Bank through deferrals,[761] he acknowledged that he did not know how much or what was not included, or whether the quantum of expense not captured was more than a very small

---

[754] Ally Global Security Investigation Report, dated Mar. 14, 2012, at RC40022060 [RC40022044].

[755] *Id.*

[756] *Id.* The other KPMG interviewees addressed the mechanics of how the loans had been accounted from January 1, 2009, to July 31, 2009, and under the fair-value election, but do not appear to have provided evidence of the parties' intent (nor do they appear to have been competent to do so). *See id.* at RC40022059–64 (summaries of the remaining interviews).

[757] *Id.* at RC40022061; Int. of J. Young, Mar. 15, 2013, at 204:3–207:24.

[758] Int. of J. Cortese, Mar. 7, 2013, at 59:12–62:18.

[759] E-mails among J. Young, J. Cortese, J. Mackey, et al. (Dec. 15, 2011), at 1 [ALLY_0387143].

[760] Ally Global Security Investigation Report, dated Mar. 14, 2012, at RC40022061 [RC40022044]; Int. of J. Young, Mar. 15, 2013, at 196:17–24; Int. of J. Cortese Mar. 7, 2013, at 137:4–138:10.

[761] Int. of J. Cortese, Mar. 7, 2013, at 74:10–24.

fraction (or a large multiple) of the amounts that were deferred.[762] (Of course, the contemporaneous BCL2B materials appear to contemplate that the Bank would defer all related expenses.)[763]

To this, Young and Whitlinger added an additional concern that transferring the loan economics other than net interest carry to GMAC Mortgage would pose a Regulation W issue by empowering the Capital Markets group to skew the pricing on points and no-points loans to favor GMAC Mortgage at the Bank's expense.[764] Whitlinger suggested that Glassner's original inquiry concerned the possibility of manipulating pricing in this fashion;[765] Glassner vehemently denied this assertion as "[a]bsolutely 100 percent false."[766] It is not clear why Glassner, the Bank EVP with principal responsibility for dealing with the Bank's regulators would have had such an agenda (particularly given that he was then about to accept other employment). More to the point, as Glassner further explained, in light of the market context, it seems apparent that such an effort would be doomed to failure:

> Clearly, ResCap, GMAC Mortgage and Ally is not bigger than the residential mortgage loan market, so while its tactics and strategies may be relevant, at the end of the day, the market is the key driver of that activity. I have views on that from an opinion perspective. At this point in time, the market is heavily refinanced—a refinanced transaction, and my view is that in a heavily refinanced transaction very rarely do consumers pay points or any money out of pocket. So, you can implement a strategy to want to collect points and fees upfront and you are most likely to not get any loans because that's not the market and the loan that the consumers want.

. . .

---

[762]   *Id.* at 75:15–77:4 ("I couldn't venture to guess right now.").

[763]   AFI's counsel suggested that, if the Bank did not keep the "day one gain on sale," the revenues to the Bank would be inadequate to cover the broker fee paid to GMAC Mortgage. But, of course, this presupposes that the broker fee would not be recaptured by the Bank through its inclusion in the cost-basis price charged for the loan under the MMLPSA/Pipeline Swap, as the parties did from January 1, 2009 to July 31, 2009 (and as the contemporaneous documents from negotiation of the broker arrangement show they agreed to do).

[764]   Ally Global Security Investigation Report, dated Mar. 14, 2012, at RC40022059, RC40022061 [RC40022044]; Int. of J. Whitlinger, Nov. 30, 2012, at 186:16–187:14; Int. of J. Young, Mar. 15, 2013, at 196:17–197:1.

[765]   Ally Global Security Investigation Report, dated Mar. 14, 2012, at RC40022059 [RC40022044]; Int. of James Whitlinger, Nov. 30, 2012, at 187:24–188:19.

[766]   Int. of A. Glassner, Mar. 20, 2013, at 139:19–20.

> And so you can attempt to dictate things to the market—
> generally speaking, the market is highly efficient and will not
> react to whatever you dictate no matter your size or scope.[767]

The KPMG Report ultimately concluded that the post-fair value election accounting was consistent with the parties' agreements.[768] First, it concluded that the agreements and the BCL2B Presentation are not clear, though it does not explain why it comes to this conclusion.[769] The KPMG Report's description of the BCL2B Presentation inexplicably omits any acknowledgement of the Presentation's explicit references to FAS 91 deferrals of fees and expenses,[770] and instead simply notes that "this document is unclear,"[771] without specifying what is unclear.[772] Consequently, the KPMG Report does not explain how KPMG understands the BCL2B Presentation's seemingly unambiguous comments about the allocation of revenues accomplished through FAS 91 deferrals, or reconcile the Bank's retention of the day one gain on sale with the repeated statements that the Bank is not to realize any gain or loss on these transactions. The KPMG Report likewise does not address the sample accounting provided with the BCL2B Presentation, or the fact that it aligns with the accounting treatment implemented from January 1, 2009 to July 1, 2009 by those who had just negotiated the broker arrangement, but not with the accounting treatment implemented after the Bank's fair-value election.

Rather than relying on the agreements or the BCL2B Presentation (or the September 2, 2008 Whitehead/Celini e-mail exchange, or the August 28, 2008 Scott/Whitehead e-mail exchange), to divine the parties' intent, the KPMG Report ultimately rests instead on the conclusion that "had the economics not been shared between the two parties as was done [post-fair value election], the two entities would have been in violation of Regulation W."[773]

---

767  *Id.* at 141:6–20, 142:6–10; *see also id.* at 142:24–143:18.

768  KPMG Report, at RC40022080–81 [RC40022044].

769  *Id.* at RC40022071 (asserting that the agreements "do not provide sufficiently specific details on the revenue sharing arrangement"); *id.* at RC4002280–81.

770  KPMG Report, at RC40022073 [RC40022044]; *see* Section V.B.6.b; BCL2B Presentation, at 5, 7 [RC40037557].

771  KPMG Report, at RC40022080–81 [RC40022044].

772  The Ally Global Security Investigation Report notes that the BCL2B Presentation refers principally to [the deferral of] origination fees, and does not explicitly address premium pricing expense deferrals. Ally Global Security Investigation Report, dated Mar. 14, 2012, at RC40022062 [RC40022044]. But, ironically, this only shows that the BCL2B Presentation is particularly clear about the deferrals that would benefit GMAC Mortgage by reducing loan prices (origination fee deferrals), as opposed to deferrals that would increase loan prices (for premium pricing-related expense).

773  KPMG Report, at RC40022080 [RC40022044]. While the KPMG Report suggests that Celini's November 30, 2008 Affiliate Transaction Memorandum supports this conclusion, that Memorandum simply addresses the broker fee, which it asserts meets regulatory requirements, without discussing the overall allocation of revenues. GMAC Bank Affiliate Transaction Memorandum Re Broker Agreement—GMAC Mortgage LLC & GMAC Bank, dated Nov. 30, 2008, at 1–3 [ALLY_0017944].

This is not a conclusion about what the parties actually agreed to when they negotiated the broker arrangement in 2008, but an attempt to divine their intent from statements about potential regulatory considerations first made years later. Indeed, in his interview, Young tellingly suggested that, from his review of the BCL2B Presentation in 2012, he was left "wondering if this team even thought about regulatory," and saw "nothing in [the Presentation] about regulatory considerations."[774]

The evidence, moreover, is that the terms of the pertinent agreements were *never* on market terms. While there is extensive evidence that there was close regulatory scrutiny of these agreements from well before the inception of the Broker Agreement, there is no evidence that any regulator ever made the claim that regulatory requirements would be violated by a revenue allocation in which the Bank did not retain the gain on sale. This is true not only for the period from January 1, 2009 to July 31, 2009, but for earlier periods; the same economics—in which the Bank received only "net interest carry"—had been in place for years. Given that GMAC Mortgage would be absorbing the Bank's expenses, and would be accepting the representation and warranty risk, hedge risk, and eligibility risk or default risk, it is difficult to see how this allocation of revenues is any more objectionable than that for the remainder of the loans sold under the MMLPSA.

Indeed, the revised allocation of revenues effected by the Bank's fair-value election is plainly at odds with the fundamental tenet of the arrangement described by Groody and Celini from the advent of the MMLPSA, in which the Bank receives net interest carry, while the remainder of the economics pass to GMAC Mortgage in exchange for its acceptance of representation and warranty liability, hedging risk, and other risk; "the party [that] retains the Gain on sale of the mortgage loans retains the rep and warrant risk."[775]

The Ally Global Security Investigation Report, citing the KPMG Report and the same evidence as that Report (plus a summary of Celini's interview), concludes that "[t]he investigation revealed that $47.2 million of income was inappropriately credited to GMAC Mortgage prior to the election of fair value accounting (January 1, 2009 to July 31, 2009)."[776]

---

[774] Int. of J. Young, Mar. 15, 2013, at 194:24–195:1. Young notably was forwarded a copy of the BCL2B Presentation on November 20, 2008, for a meeting on November 21, 2008. E-mail from J. Young (Nov. 20, 2008) [EXAM10608856]. Young does not recall reviewing the BCL2B Presentation at the time. Int. of J. Young, Mar. 15, 2013, at 185:15–186:18; 194:5–22. The documents produced do not include any suggestion that, when analyzing the broker arrangement in 2008, Young, or, for that matter, anyone else, raised a claim that the contemplated revenue allocation would violate regulatory requirements.

[775] E-mail from R. Groody to C. Dondzila, J. Peterson, and J. Whitlinger (Mar. 13, 2009) [ALLY_0329052]; Int. of R. Groody, Dec. 17, 2012, at 252:13–254:2; *see also* Int. of J. Whitlinger, Nov. 30, 2012, at 68:1–3 ("[M]y understanding at the time was that whoever got gain on sale got the rep and warranty"); Int. of A. Celini, Feb. 18, 2013, at 58:14–19 ("We earned coupon interest during the period of holding and the asset was removed from our balance sheet at basis. We received no gain or loss on the transaction and it was not our intent to take any risk during that time").

[776] Ally Global Security Investigation Report, dated Mar. 14, 2012, at RC40022052 [RC40022044].

As previously noted, the KPMG Report explicitly stated that it was not assessing whether the pre-fair value accounting was consistent with the parties' agreements.[777] The Ally Global Security Investigation Report suggests, without further analysis, that the evidence shows the accounting for this period was "the result of a potential miscommunication regarding the economics associated with the loan sale agreements that led to FAS 91 fees being inappropriately reversed back to GMAC Mortgage."[778]

Following issuance of these reports, they were presented by AFI's General Auditor, Ann Cummings, at a March 20, 2012 meeting of ResCap's Audit Committee.[779] The Audit Committee reviewed management's conclusion that no out of period adjustment was necessary. There notably is no record of any approval of a settlement of these matters by the ResCap Independent Directors or the ResCap Board.

ResCap personnel then acquiesced to demands that ResCap reimburse Ally Bank for the $47.2 million received for the January 1, 2009 to July 31, 2009 time period, plus interest. On March 27, 2012, GMAC Mortgage remitted $51,419,494 to Ally Bank.[780] At the same time, contingent on GMAC Mortgage's payment to Ally Bank, AFI forgave an equivalent amount of debt.[781]

---

[777] KPMG Report, at RC40022072 [RC40022044].

[778] Ally Global Security Investigation Report, dated Mar. 14, 2012, at RC40022052 [RC40022044].

[779] Materials for Audit Committee Meeting of Residential Capital, LLC, dated Mar. 20, 2012 [RC40022044]; Minutes of a Meeting of Audit Committee Meeting of Residential Capital, LLC, dated Mar. 20, 2012 [RC40019158]. The Audit Committee tabled approval of the financial statements pending further advice.

[780] AFI Letter re: Forgiveness of Certain Indebtedness under LOC Loan Agreement, dated Mar. 27, 2012 [EXAM40066674]; Transaction Detail Archive, dated Mar. 28, 2013 [EXAM00339992].

[781] *See* E-mails between J. Whitlinger and J. Mackey (Mar. 22, 2012) [EXAM00072999]; E-mail from J. Ruhlin (Mar. 23, 2012) [EXAM11004221]; AFI Letter re: Forgiveness of Certain Indebtedness under LOC Loan Agreement, dated Mar. 27, 2012 [EXAM40066674]; GMAC ResCap Report, dated May 9, 2012 (cell D6 comment showing subtraction of $51,419,494) [EXAM00339993].

### g. The Financial Impact On GMAC Mortgage

Exhibit V.B.6.g below reflects the revenues that the Bank retained from the August 1, 2009, fair value election through April 2012 that would have been allocated to GMAC Mortgage under the revenue allocation implemented from January 1, 2009 through July 31, 2009. As it illustrates, in addition to the $51.4 million ($47.18 million plus interest) GMAC Mortgage paid in March 2012, from August 2009 to April 2012, Ally Bank retained a further $469.1 million that would have been paid to GMAC Mortgage had the revenue allocation originally agreed to remained in place:

EXHIBIT V.B.6.g
**Amounts Retained by Ally Bank But Owed to GMAC Mortgage Under the Revenue Allocation Implemented Between January 1, 2009, and July 31, 2009**
August 2009 – April 2012
*($ in Thousands)*

|  | 2009 | 2010 | 2011 | YTD April 2012 | Total |
|---|---|---|---|---|---|
| Loan discount (net, borrower and lender paid) | $   144,503 | $   40,461 | $   10,540 | $   513 | $   196,017 |
| Loan discount (Capital Markets Required Price) | 209 | 113,920 | 158,852 | 137,775 | 410,756 |
| Non-broker activity | 853 | 178 | 635 | - | 1,667 |
| Loan discount income | 145,566 | 154,559 | 170,028 | 138,288 | 608,440 |
| Loan processing fee income | 44,268 | 47,419 | 46,709 | 12,267 | 150,663 |
| Pricing adjustments | (7,551) | (9,064) | (9,831) | (3,816) | (30,262) |
| Overage/shortage | 17 | - | - | - | 17 |
| Origination fee | 16,801 | (666) | (13) | (17) | 16,104 |
| Broker fee expense | (78,089) | (64,543) | (55,622) | (30,416) | (228,670) |
| Total FAS 91 deferral at origination for the period January 1, 2009 to YTD April 2012 | $   121,010 | $   127,704 | $   151,270 | $   116,306 | $   516,291 |
| FAS 91 deferral at origination for the period January 1, 2009 to July 31, 2009 | (47,180) | - | - | - | (47,180) |
| Total amount retained by Ally Bank but owed to GMAC Mortgage under the revenue allocation implemented from Jan. 1, 2009 – July 31, 2009 [1] | $   73,830 | $   127,704 | $   151,270 | $   116,306 | $   469,111 |

*[1] Under this allocation, Ally Bank receives interest carry only and GMAC Mortgage receives the effect of income and expense items that would have been deferred under FAS 91 before the fair value election consistent with the original accounting allocation for the period January 1, 2009 through July 31, 2009.*

*Source:   Exam Requested Loan Origination Revenue [ALLY_0402447]; Broker to Bank Contract Accounting Review, at 2 [EXAM12253506] (attached to e-mail from J. Cortese to C. Dondzila, J. Young, J. Whitlinger, and J. Andrews (Feb. 27, 2012) [EXAM12253505].*

As discussed above, given its expectations about the application of FAS 91 deferrals, GMAC Mortgage agreed to a below-market, cost-based broker fee. As the KPMG Report acknowledged, the fees actually charged "would likely not cover GMAC Mortgage's costs to perform services to broker loans to the Bank."[782] In December 2011, Whitlinger undertook an analysis of the difference between the cost-based broker fees GMAC Mortgage charged and

---

[782]   KPMG Report, at RC40022079 [RC40022044].

the fees it would have received had it charged a "Broker's Fee at Arm's Length" for the years 2009 through 2011.[783] His analysis produced a range of estimates, with a difference of $162.1 million at the low end, a mid-range estimate of $236.9 million, and an upper-end estimate of $343.9 million.[784]

### 7. The April 2009 Pipeline Swap First Amendment

Effective April 6, 2009, the parties entered into a First Amendment to the ISDA Master Agreement.[785] The sole revision wrought by this First Amendment was the elimination of HFI loans from the Pipeline Swap by re-defining "Subject Transaction" to include only loans purchased for Ally Bank's "'Held for Sale' (HFS) portfolio."[786] Thus, the Pipeline Swap, which had covered only HFI loans until July 2008, now covered only HFS loans. Groody explained that this likely reflected the fact that the Bank was no longer purchasing HFI loans, so that there was no longer a need for the HFI lock-to-funding hedge.[787]

### 8. The Original Servicing Agreement

GMAC Mortgage and Old GMAC Bank entered into the Original Servicing Agreement in 2001 at the time Old GMAC Bank received its charter to operate as a federal savings bank. As noted above, Old GMAC Bank had just commenced the mortgage loan business and did not have the infrastructure to service the loans it owned so it engaged GMAC Mortgage to do so. The Original Servicing Agreement was a largely bare-bones agreement designed to cover home equity loans although it also covered other loans before their sale by the Bank.[788] GMAC Mortgage was required under the Original Servicing Agreement to service loans in accordance with all laws and regulations, the Original Servicing Agreement, and the terms of the GMAC Bank Servicing Guides (as incorporated into the Original Servicing Agreement by reference).[789] Servicing activities included all operational servicing functions with respect to these loans.[790]

---

[783] Int. of J. Whitlinger, Nov. 30, 2012, at 212:3–220:11; Consumer-Broker to Bank HFS Loans [RC40056678].

[784] Consumer-Broker to Bank HFS Loans, at 1 [EXAM00003654]; *see also* Memorandum, Affiliate Transaction, dated Apr. 9, 2010 [SOP0016050] (comparing fees to those that would be paid to third-party brokers).

[785] First Amendment to ISDA Master Agreement, dated Apr. 6, 2009 [ALLY_0017963].

[786] *Id.* ¶ 1.

[787] Int. of R. Groody, Dec. 17, 2012, at 175:12–176:10.

[788] Original Servicing Agreement [ALLYKE000000741].

[789] *Id.* § 2.2(b).

[790] *Id.* This would include collecting the monthly mortgage payments from the borrowers, remitting principal and interest due to the investor in the loan, paying property tax and insurance bills from the escrow funds collected from the borrowers, and performing collection activity with respect to delinquent borrowers.

Important terms of the Original Servicing Agreement included the following:

### a. Compensation

GMAC Mortgage earned the greater of (1) a $15,000 per month minimum servicing fee and (2) the aggregate of the base fees which was $8.25 per serviced loan for home equity loans and a fee based on principal amount for agency loans.[791] All collections on the loans were for the account of Old GMAC Bank.[792] The agreement provided that if either party believed that the compensation was less favorable than what it could obtain from an independent third party the parties would enter into good faith negotiations to adjust the compensation.[793]

### b. Indemnity Provisions

GMAC Mortgage and Old GMAC Bank each agreed to indemnify the other for all losses arising from an event of default by the other party.[794] Most significantly, GMAC Mortgage's maximum liability under the Original Servicing Agreement was limited to the total compensation paid by Old GMAC Bank to GMAC Mortgage under the Agreement within the twelve-month period before a demand for payment pursuant to these provisions.[795] The obligation was contingent on the receipt of timely notice of the claim, an opportunity to defend the claim, and cooperation of the non-defaulting party.[796] The Original Servicing Agreement provided that the indemnity provisions would survive termination.[797] In addition, the agreement expressly relieved GMAC Mortgage of liability related to the purchase or origination of any loan or for any prior servicing of a loan.[798]

---

[791]  *Id.* Ex. A.

[792]  *Id.* § 2.1. The agreement provided a separate pricing schedule for GSE First Lien Mortgage Loans which provided for fees of between 0.25% and 0.50% of the principal amount. All ancillary income and principal and interest and escrow float related to such loans was for the account of GMAC Mortgage. In addition, GMAC Mortgage earned certain additional fees for matters such as delinquent loan handling and credit line increases. *See id.* § 3.3, Ex. A. Old GMAC Bank was required to reimburse GMAC Mortgage for certain out-of-pocket expenses and other expenses it expressly agreed to pay. *Id.* § 3.5. GMAC Mortgage was required to advance money to fund draws on the loans and Old GMAC Bank was required to reimburse GMAC Mortgage for the advances. These payments were made on a net basis by deducting such amounts from principal and interest payments received by GMAC Mortgage on account of the loans. *Id.* Art. 4.

[793]  *Id.* § 10.2.

[794]  *Id.* § 7.3.

[795]  *Id.* § 8.2 ("Anything to the contrary not-withstanding, [GMAC Mortgage's] maximum liability under this Agreement shall in no event exceed the Servicing Compensation paid by the Bank to [GMAC Mortgage] within the twelve-month period prior to a demand for payment made by the Bank to [GMAC Mortgage], resulting from [GMAC Mortgage's] liability under this Agreement.").

[796]  *Id.* § 7.3.

[797]  *Id.* § 7.3.

[798]  *Id.* § 7.1.

The Original Servicing Agreement did not contain a specific provision governing indemnification in the event that loans were modified. As noted above, the agreement did require GMAC Mortgage to service the loans in accordance with all applicable laws and regulations and the terms of the GMAC Bank Servicing Guide stated to be attached as an exhibit to the Original Servicing Agreement (as amended from time to time) and failure to do so would constitute an event of default.[799] Furthermore, the Fourth Addendum to Original Servicing Agreement permitted certain modifications without Ally Bank consent.[800]

### c. Events Of Default

Events of default included: (1) failure to make any payment required to be made under the terms of the Original Servicing Agreement; (2) breach of any representation and warranty;[801] and (3) bankruptcy.[802]

### d. Term

The term of the Original Servicing Agreement was from August 21, 2001 through August 21, 2004 (unless previously terminated pursuant to the agreement). The agreement would automatically extend for additional one-year terms unless either party gave the other party 120 days' prior notice of its intent not to extend.[803]

### e. Addenda

Although, as noted above, the Original Servicing Agreement provided for re-negotiation of the pricing provisions, no amendments were executed until July 2004 when GMAC Mortgage and Old GMAC Bank entered into an Addendum to the Original Servicing

---

[799] Material failure to perform any obligations under the Original Servicing Agreement within 60 days following receipt of a written notice constitutes an event of default. *Id.* §§ 2.2(b), 8.1.

[800] The Approval Matrix attached to the Fourth Addendum to the Original Servicing Agreement provided the parameters for when the approval of Ally Bank would be required for particular actions with respect to the loans. Specifically, with respect to loan modifications, any loan modifications (i) which did not reduce the interest more than 2% or extend the maturity beyond 480 months or (ii) where capitalization of delinquent interest, escrow and/or servicing advances did not exceed $20,000 over the original principal balance did not require Ally Bank approval. Fourth Addendum to Original Servicing Agreement, dated Sept. 1, 2007 [ALLYKE000000741].

[801] Under the Original Servicing Agreement, in addition to the normal corporate representations and warranties, GMAC Mortgage represented that the terms of the Original Servicing Agreement were no less favorable to Old GMAC Bank than those that would be offered by GMAC Mortgage to a third party. Original Servicing Agreement, § 7.8 [ALLYKE000000741]. Old GMAC Bank also represented that all loans to be serviced pursuant to the Original Servicing Agreement were originated in compliance with all applicable state and federal laws and regulations except to the extent that the failure to so comply would not have a material effect on the servicing of any such loan. *Id.* § 7.9.

[802] *Id.* §§ 8.1 (Default by GMAC Mortgage), 8.3 (Default by Ally Bank).

[803] *Id.* § 9.1.

Agreement.[804] The Addendum allocated certain ancillary income between GMAC Mortgage and Old GMAC Bank. Line fees and late charges as well as principal and interest float were for the account of Old GMAC Bank while tax and insurance float was for the account of GMAC Mortgage.[805] The agreement further provided that the principal and interest payments were passed on to Old GMAC Bank as received rather than being held by the servicer until the payments were due to the investor in the loan.[806] Thus, GMAC Mortgage did not earn the "float" on the principal and interest payments. The fee schedule was again amended in April 2005.[807]

The Original Servicing Agreement, as amended, was assumed by GMAC Bank in November 2006.[808]

### 9. The MSR Swap

#### a. Genesis Of The MSR Swap

When ResCap was formed, its subsidiaries GMAC Mortgage and RFC owned substantial portfolios of mortgage servicing rights (MSRs), which are contractual rights to service loans and receive the related fees and certain ancillary income. As an accounting memorandum discussing the MSR Swap explained:

> MSRs represent the capitalized value of the right to receive future cash flows from the servicing of mortgage loans for others. Because residential mortgage loans typically contain a prepayment option, borrowers often elect to prepay their

_____

[804] Addendum to Original Servicing Agreement, dated July 1, 2004 [ALLYKE000000741]. For pre-July 2004 first mortgage loans classified as HFI and all first mortgages classified as HFS there was "no change from the practice of passing through net interest [to the investor] after deducting the applicable servicing fee (25 or 37.5 bps depending on the loan type)" on the outstanding unpaid principal balance. For first lien loans funded after June 30, 2004 and classified as HFI, the fee was 1.62 basis points per annum. For home equity loans, the fee was 16.18 basis points per annum and for HELOCs the fee was 23.43 basis points per annum. *Id.* Ex. A.

[805] *Id.* Ex. A.

[806] *Id.*

[807] Second Addendum to Original Servicing Agreement, dated Apr. 1, 2005 [ALLYKE000000741]. The Second Addendum distinguished between "prime" and "ALT-A" first lien loans and amended the fee schedule to provide for a 2.0 basis points per annum fee on ALT-A loans.

[808] The Original Servicing Agreement was not listed as an "Acquired Asset" in the Purchase and Assumption Agreement but the materials for the board of directors meeting approving the assumption of affiliate agreements lists the Servicing Agreement; *see* Purchase and Assumption Agreement, at Schedule A [ALLY_PEO_0021066]; Minutes of a Regular Meeting of the Board of Directors of GMAC Bank, Nov. 30, 2006, at 2 [ALLY_PEO_0020880]; Agenda and Supporting Materials, GMAC Bank Board of Directors Meeting, dated Nov. 30, 2006, at 9–12 [ALLY_0260087]. The parties also entered into a Third Addendum to Original Servicing Agreement, dated June 1, 2007 [ALLYKE000000741].

> mortgage loan by refinancing at lower rates during declining
> interest rate environments. When this occurs, the stream of cash
> flows generated from servicing the original mortgage loan is
> terminated. As such, the market value of mortgage servicing
> rights has historically been very sensitive to changes in interest
> rates and tends to decline as market interest rates decline and
> increase as interest rates rise.[809]

Further, one of the obligations attendant to being the servicer of record who holds an MSR is
an obligation to make servicer advances where the borrower does not make timely payments,
advancing the delinquent amounts to the owner of the loan (with rights to recoup the payment
from later collections).[810]

These assets were notoriously difficult to value; while there was some limited market
trading activity for conforming loan MSRs, there was little or no observable market trading
activity in non-conforming MSRs.[811] RFC and GMAC Mortgage initially had different
discounted cash flow models (proprietary to RFC/GMAC Mortgage) used to value their MSR
portfolios; each used a different third-party vendor's "platform," and each engaged in different
third-party "benchmarking" as a check on its proprietary valuation.[812] In the first quarter of
2007, the GMAC Mortgage valuation model was adopted for the whole portfolio.[813] Further,
MSR values were volatile due to their sensitivity to interest rate and prepayment risk, and
consequently were particularly difficult to finance through third-party lenders, who would
lend only with relatively low "advance" rates. For example, the Citibank MSR credit facility

---

[809] Memorandum, Ally Bank/GMAC Mortgage Affiliate Total Return Swap Accounting Analysis Revised for
April 2011 Agreement, dated (Jul. 25, 2011), at 6 [ALLY_0171117].

[810] COMPTROLLER OF THE CURRENCY, ADMINISTRATOR OF NATIONAL BANKS, MORTGAGE BANKING
COMPTROLLER'S HANDBOOK (1998), at 2–3, http://www.occ.gov/publications/publications-by-type/
comptrollers-handbook/mortgage.pdf.

[811] Int. of R. Flees, Jan. 18, 2013, at 198:1–13, 194:5–9 ("[E]ven at the best days of the mortgage environment,
very few firms sold servicing rights. So you did not have an active market in which you could see trades.");
Memorandum, Ally Bank/GMAC Mortgage Affiliate Total Return Swap Accounting Analysis Revised for
April 2011 Agreement, dated July 25, 2011, at 6 [ALLY_0171117] ("[O]bservable market prices are not
available.").

[812] Int. of R. Flees, Jan. 18, 2013, at 201:1–204:12. MSR Value was benchmarked against peer survey data,
broker quotes, bulk trades and the IO market. E-mail from N. Rock (Dec. 10, 2010), at EXAM10872298
[EXAM10872295].

[813] Int. of R. Flees, Jan. 18, 2013, at 195:22–197:15; E-mail between R. Flees, J. Lundgren, et al. (May 16–18,
2006) [EXAM11604538]; Memorandum, Change in Estimate Conclusion regarding MSR replatform in Q1
2007, dated Apr. 27, 2007 [EXAM10131487]; Draft Memorandum, Conclusion regarding Q1 2007 change in
value of Master Mortgage Servicing Rights (MMSRs), dated Apr. 30, 2007 [EXAM10130221].

that GMAC Mortgage had in place from September 10, 2007 through 2012 had an advance rate of only 60%, meaning that Citibank would lend only 60% of the value of the MSRs used to collateralize the loan.[814]

While the MSR Swap did not become effective until August 2007, plans to enter into such an arrangement had been on the "drawing board" since 2005 or earlier, before the Cerberus acquisition, the 2006 Bank Restructuring, and the advent of ResCap's financial troubles.[815] Old GMAC Bank and ResCap had undertaken a review of the GMAC and ResCap businesses in the summer and fall of 2005 to analyze how the Bank could better serve its primary purpose of serving as a funding vehicle for GMAC Mortgage and ResCap.[816] One of the conclusions reached was that the Bank should be used to hold MSRs.[817] The difficulty with financing MSRs through regular lending channels (with low advance rates) made use of the Bank (financing the asset through deposits) particularly desirable.[818] Moving the MSRs to the Bank was projected to result in savings of approximately 206 basis points.[819] Further, from early on, the personnel involved contemplated that the movement of the MSRs to the Bank would be accompanied by a "total return swap," transferring the MSRs' economics (positive and negative) back to ResCap in exchange for providing the Bank a fixed rate of return.[820] ResCap would continue to service the MSRs under the Original Servicing Agreement.[821]

---

[814] Loan and Security Agreement, dated Sept. 10, 2007 [GOLDIN00044759]; *see also* Sandler O'Neill Report to the Board of Directors of Ally Bank Re: Analysis of Financial Terms of Certain Affiliate Agreements between Ally Bank and GMAC Mortgage LLC, dated Feb. 28, 2012, at 38 [ALLY_PEO_0084709]; Morgan Stanley Project Duvall Presentation, MSR Facility—Discussion Materials, dated Apr. 14, 2008, at 4 [EXAM10279337] ("Advance rates on agency MSR assets are ranging between 50% and 60%.").

[815] According to Celini, the retention of MSRs was contained in the business plan for Old GMAC Bank in 2001, but the OTS rejected the idea. Int. of A. Celini, Feb.18, 2013, at 127:6–16.

[816] *See* Int. of R. Groody, Dec. 17, 2012, at 19:5–20; Build out GMAC Bank, dated Aug. 29, 2005 [EXAM10181192].

[817] Int. of R. Groody, Dec. 17, 2012, at 26:22–27:17.

[818] *Id.* at 197:23–198:20, 53:6–60:9 (explaining that the proposal did not stem from the Cerberus acquisition or related Bank restructuring); Int. of J. Whitlinger, Nov. 30, 2012, at 228:1–229:4; Int. of B. Bier, Feb. 22, 2013, at 81:18–24; Build out GMAC Bank, dated Aug. 29, 2005 [EXAM10181192] ("Strategies and Actions" include "[b]uild investment philosophy to include . . . [m]ortgage servicing rights"); GMAC Bank Presentation on Retention of MSRs by the Bank, dated Mar. 27, 2006 [EXAM10607865].

[819] GMAC Bank Inter-office Memorandum, from R. Groody and K. Lunde to J. Peterson, dated Oct. 16, 2007 [EXAM10092812] (noting that, under the swap arrangement, half of the savings would remain in the Bank).

[820] Preliminary Analysis of Bank Opportunity [EXAM11248134] (referring to total return swap) (attached to e-mail from B. Bier (Dec. 14, 2006) [EXAM11232773]).

[821] *See* Section V.B.8.e (Original Servicing Agreement, Addendum 4).

By the fall of 2006, ResCap/GMAC Mortgage personnel and Bank personnel were actively engaged in a project aimed at moving MSRs to the Bank.[822] The project involved substantial work within ResCap and the Bank on a number of complex systems and process issues, GSE approval of the Bank as a master servicer, and regulatory approval of (1) a Bank business plan involving the retention of MSRs and (2) the Bank's acquisition of existing MSRs from ResCap. The project, at least initially, seems to have been slowed by the 2006 Bank Restructuring (which resulted in the mortgage banking business being moved to a different entity with a different regulator, and involved substantial efforts by the parties' personnel).[823] By March 2007, the project was again a focal point of the parties' efforts.[824] According to Celini, at the time Ally Bank had excess capital and management felt that building an MSR portfolio would enhance the Bank's balance sheet and portfolio.[825] At the same time ResCap's liquidity position was weak and Ally Bank viewed this as a "win-win" situation for the parties.[826]

While the FDIC eventually approved Ally Bank's retention of MSRs on loans sold by the Bank to GMAC Mortgage, it refused to approve the Bank's acquisition of existing MSRs from ResCap entities; indeed, it repeatedly refused such applications to have the Bank acquire an existing ResCap-affiliate MSR portfolio.[827] Further, while the Bank gained approval to act as a master servicer on Fannie Mae and Freddie Mac loans, the parties ran into an insuperable obstacle on Ginnie Mae loans. Ginnie Mae's governing statute and regulations prohibited designation of more than one affiliated entity as a master servicer; because GMAC Mortgage retained possession of a portfolio of MSRs it could not transfer to the Bank, it continued as the designated Ginnie Mae master servicer, and the Bank continued to sell Ginnie Mae loans to GMAC Mortgage on a servicing-released basis.[828]

The regulators were opposed to Ally Bank's retention of the MSRs without the protection of the MSR Swap, as discussed below, which finally went into effect on August 31, 2007. This came just as ResCap had experienced significant liquidity problems and the disruption in

---

[822] E-mail from B. Bier (Dec. 14, 2006) [EXAM11232773]; Preliminary Analysis of Bank Opportunity [EXAM11248134].

[823] Int. of R. Groody, Dec. 17, 2012, at 53:18–54:24 (discussing delay in getting business plan approval due to restructuring).

[824] Grow the Bank Balance Sheet Strategy, dated Mar. 23, 2007 [EXAM10060869]; E-mail from T. Grzeskiewicz (Mar. 27, 2007) [EXAM10060574]; GMAC Bank Presentation on Retention of MSRs by the Bank, dated Mar. 27, 2006 [EXAM10607865].

[825] Int. of A. Celini, Feb. 18, 2013, at 133:1–134:21.

[826] *Id.* at 134:6.

[827] Int. of R. Groody, Dec. 17, 2012, at 278:3–17; E-mail from J. Peterson (Sept. 24, 2008) [EXAM10839861].

[828] Int. of R. Groody, Dec. 17, 2012, at 298:2–300:15; E-mails between K. Walsh, A. Celini, R. Groody et al. (Sept. 19–22, 2008) [EXAM10286196].

credit markets that occurred in mid-August 2007.[829] Nonetheless, Groody stated that the timing of the MSR Swap was not driven by these factors, but by the fact that the parties had finally gotten all of the necessary approvals and completed all the groundwork necessary to put the swap into effect.[830] Given that the regulators did not approve the Bank's acquisition of ResCap's existing MSR portfolio, the initial economic impact of the transaction was small: the Bank's MSR portfolio, which grew organically as the Bank sold (non-Ginnie Mae) loans to GMAC Mortgage, was only $120 million at the end of 2007,[831] grew to $420 million by the end of 2008,[832] and then, as more of GMAC Mortgage's loan production was routed through the Bank under the Broker Agreement, grew to $1 billion in 2009, and $1.7 billion by year-end 2010.[833]

### b.   2007 MSR Swap

The original MSR Swap is documented on an ISDA Master Agreement[834] and two Schedules—the FMV Schedule and the Net Funding Schedule, each dated August 31, 2007.[835]

#### (1) The FMV Schedule

The FMV Schedule applied to the "dollar amount of mortgage servicing rights owned by [Ally Bank] as reported on the accounting general ledger of [the Bank]."[836] The FMV Schedule required payments for the "FMV Change," defined as the "FAS 156 mark to market for the Valuation Period as recorded by [the Bank] against the mortgage servicing right asset."[837] The FMV Change was to be measured each business day; if the change was positive

---

[829]   *See* Sections III.F (financial history), V.F (healthcare asset sale).

[830]   Int. of R. Groody, Dec. 17, 2012, at 197:20–199:2; *see also* Int. of A. Celini, Feb. 18, 2013, at 134:22–140:17 (Celini noted that MSR retention had been in the Bank's business plan for a long time and part of its ongoing strategic planning process, but did not recall what drove the particular timing of the MSR Swap).

[831]   GMAC Bank Consolidated Financial Statements as of Dec. 31, 2008 and 2007, at 2 [RC00034535].

[832]   *Id.* at 2.

[833]   December 2009 Business Review—Core Mortgage Business & Operations, dated Jan. 25, 2010 at 37 [ALLY_0222595]; Ally Financial Inc. 4Q and Full Year 2010 Earnings Review, dated Feb. 1, 2011, at 38 [ALLY_PEO_0069372]; *see* Section V.B.12.b (analyzing economic impact of the MSR Swap).

[834]   ISDA Master Agreement, dated June 12, 2007 [ALLY_0041610].

[835]   2007 FMV Schedule [RC00027822]; 2007 Net Funding Schedule [RC00027852].

[836]   2007 FMV Schedule, part 6(a)(v) [RC00027822].

[837]   *Id.* part 6(a)(iii). FAS 156, "Accounting for Servicing of Financial Assets (as amended)," was superseded by the FASB Accounting Standards Codification ("ASC") 860, "Transfers and Servicing" on September 15, 2009.

(i.e., if the combined value of the MSRs[838] on the Bank's books had increased), then the Bank owed GMAC Mortgage the amount of the increase, and if the change was negative (the value of the Bank's MSR portfolio had decreased), then GMAC Mortgage owed the Bank the amount of the decrease.[839]

Thus, the FMV Schedule applied not to shifts in the value of individual MSRs, but to changes in the value of the Bank's MSR portfolio as a whole. Such FMV changes could be the result of changes in the market valuations of MSRs, triggered, e.g., by shifts in interest rates or in borrower delinquency rates (which affect the cost to service the loan) and severity (affecting the financial impact of the master servicer's obligation to make servicing advances). As discussed in Section V.B.10.b(2), there is a substantial issue concerning the applicability of the FMV Schedule where the value of the Bank's MSR portfolio increases through the capitalization or purchase of new MSRs.

---

[838] The "mortgage servicing rights asset" on the Bank's general ledger included not just MSRs, but "excess servicing rights" as well. Excess servicing rights arise where the borrower note rate exceeds the interest provided to investors when a loan is sold or securitized and the mortgage servicing fees payable under the MSR. The remaining amount of interest is considered an "excess servicing fee" and is often retained by the holder of the MSR. Excess servicing rights are a form of cash flow associated with future "Interest Only" ("I/O") income; they do not include ancillary income such as float or late fees. *See* Ally Bank Excess Servicing Transaction Presentation, at 2 [ALLY_PEO_0065951]. The excess servicing right asset represents the interest collected and retained by the servicer that is not considered payment for the actual services being performed. This asset is also referred to as an interest-only strip, and ResCap reported it as part of the MSR assets on its balance sheet. FINANCIAL ACCOUNTING STANDARDS BOARD, STATEMENT OF FINANCIAL ACCOUNTING STANDARDS NO. 156, Accounting for Servicing of Financial Assets, an amendment of FASB Statement No. 140, at ¶¶ 14, 63, 65. For purposes of the MSR Swap, excess servicing rights were generally treated in the same way as MSRs (with one exception discussed in Sections V.B.9.b(4) and V.B.12.b(1)). Bank MSR TRS Daily Settlement, May 2011 [EXAM00234419]; ResCap—MSR Cash Summary [EXAM00231039]; MSR ARB Interest Expense Allocation, dated Mar. 31, 2012 [EXAM00233968]. For the sake of convenience, the term MSR is used generically in Section V.B to refer to both MSRs and excess servicing rights, except where the distinction is significant. (*See, eg.,* Sections V.B.9.b(4), V.B.12.b(1)).

[839] 2007 FMV Schedule, parts 6(a)(vii), 6(d) [RC00027822].

*(2) The Net Funding Schedule*

The Net Funding Schedule provided for two payments.

*(a) The Net Servicing Fee Paid To GMAC Mortgage*

The Schedule obligated the Bank to pay GMAC Mortgage a "Net Servicing Fee," defined as:

> the sum of the amounts posted to the general ledger of [the Bank] for amounts collected or earned by [the Bank] (i.e.[,] *normal servicing fees and ancillary income*) less any associated servicing expenses paid or incurred, as is customary for normal servicing of residential mortgage loans.[840]

Thus, the Bank was required to pay GMAC Mortgage all the servicing income it received on its portfolio of MSRs, net of expenses incurred.

The expenses to be deducted included the fees paid to GMAC Mortgage under the Original Servicing Agreement for Bank-owned MSRs.[841] In connection with the MSR Swap, the parties entered into a Fourth Addendum to Servicing Agreement amending the fee schedule pertaining to loans for which Ally Bank held the MSR.[842] The servicing fee for such loans was changed to a flat $46.00 per annum from a fee based on a percentage of principal, subject to quarterly adjustment based on GMAC Mortgage's actual cost to service the loans. On the other hand, while the Addendum specifies that all float on principal and interest payments and on tax and insurance escrows, as well as other ancillary income, will be for the account of GMAC Bank,[843] this income was part of the normal "ancillary" servicing income required to be paid to GMAC Mortgage under the MSR Swap.[844]

---

[840] 2007 Net Funding Schedule, parts 6(a)(v), 6(d) [RC00027852] (emphasis added).

[841] Int. of C. Dondzila, Sept. 27, 2012, at 294:1–15; Int. of J. Young, Sept. 28, 2012, at 210:24–211:13; Int. of R. Groody, Dec. 17, 2012, at 232:16–233:16. Consequently, whether the fees paid to GMAC Mortgage for servicing the Bank's MSR portfolio were at market or at cost seems to be immaterial, given that the cost would have been passed back to GMAC Mortgage through the Net Servicing Fee. "So if you charged a gazillion dollars per loan for the subservicing . . . then a gazillion dollars would come back through the swap." Int. of J. Whitlinger, Feb. 27, 2013, at 93:25–94:4. (Of course, this is not true for the fees charged to service the bank's HFI portfolio.)

[842] Fourth Addendum to Original Servicing Agreement, dated Sept. 1, 2007 [ALLYKE000000741].

[843] *Id.*

[844] 2007 Net Funding Schedule, part 6 [RC00027852].

### (b) The Funding Fee Paid To Ally Bank

The Net Funding Schedule also required GMAC Mortgage to pay the Bank a "Funding Fee," which was defined as the product of an interest rate (set at LIBOR plus 1%) and the "dollar amount of Mortgage Servicing Rights owned by [the Bank] as reported on [the Bank's] accounting general ledger . . . and the dollar amount of Servicing Advances owned by [the Bank] as reported on [the Bank's] accounting general ledger."[845]

### (3) Termination Provisions

Both the FMV Schedule and the Net Funding Schedule had a one-year term subject to automatic renewal for successive one-year periods absent 120 days' notice by Ally Bank.[846] Termination of either Schedule would trigger termination of the other.[847] The Schedules' provisions notably did not contemplate any sort of unwinding of the Swap on termination,[848] a fact whose significance is discussed below.

### (4) Application Of The MSR Swap To The Recognition Of New MSRs

As discussed above, the FMV Schedule required payment of the FMV Change, the "FAS 156 mark to market for the Valuation Period as recorded by [the Bank] against the mortgage servicing right asset" on the Bank's general accounting ledger.[849]

When Ally Bank sold loans to GMAC Mortgage and retained the related servicing rights, it capitalized the newly recognized MSRs (including excess servicing rights),[850] adding their value to the mortgage servicing right asset on the Bank's general accounting ledger.[851] The Bank also periodically purchased MSRs (as opposed to whole loans) from third parties, adding the value of these MSRs to the mortgage servicing right asset on the Bank's general accounting ledger as well. Consequently, when GMAC Mortgage paid the LIBOR-based

---

[845]  2007 Net Funding Schedule, parts 6(a)(iii), (iv), (vi) [RC00027852]; Serv Fee JE & Query, dated Dec. 31, 2008 [EXAM00233021].

[846]  2007 FMV Schedule, part 6(a)(vi) [RC00027822]; 2007 Net Funding Schedule, part 6(a)(vii) [RC00027852].

[847]  2007 FMV Schedule, part 1(h) [RC00027822]; 2007 Net Funding Schedule, part 1(h) [RC00027852].

[848]  2007 FMV Schedule, parts 1(f), 5e [RC00027822]; 2007 Net Funding Schedule, parts 1(f), 5e [RC00027852]; Int. of R. Groody, Dec. 17, 2012, at 220:9–224:6 (FMV payments remain with GMAC Mortgage upon termination).

[849]  2007 FMV Schedule, part 6(a)(iii) [RC00027822]; see also E-mails between R. Groody, S. Griffith, N. Rock et al. (Apr. 5–6, 2007) [EXAM 10287667].

[850]  Excess servicing rights are discussed in Section V.B.9.b(1) and the accompanying footnotes.

[851]  Int. of J. Cortese, Mar. 7, 2013, at 19:12–20.

Funding Fee, the value of the newly recognized MSRs was included in the "dollar amount of Mortgage Servicing Rights . . . reported on the [Bank's] accounting general ledger"[852] used to calculate the Funding Fee.[853]

However, while the Bank paid to GMAC Mortgage the capitalized value of new MSRs and excess servicing rights related to Bank-originated loans that were added to the value of the Bank's MSR asset, it did not do this for MSRs arising from correspondent loans the Bank had purchased or for MSRs purchased separately.[854] For correspondent loans, the Bank paid the capitalized value of excess servicing rights to GMAC Mortgage, but not the capitalized value of the MSRs themselves.[855] The Bank's records likewise reflect that the value of purchased MSRs was not paid to GMAC Mortgage. From the August 2007 inception of the MSR Swap, the capitalization and purchase of new MSRs was always handled in this fashion.[856] This appears to be a significant anomaly in the application of the FMV Schedule. The Schedule appears to require that all increases in the value of the Bank's mortgage servicing right asset flow to GMAC Mortgage, without distinguishing among MSRs arising from Bank-originated loans, purchased MSRs, and MSRs arising from purchased loans.

In their interviews, Bank and ResCap personnel involved in putting the MSR Swap in place generally had little recollection or understanding of how the Swap applied to the value of new MSRs.[857] Groody presented the MSR Swap to the Ally Bank Board for approval in August 2007; the written materials he provided to the Board state:

> [t]he Total Return Swap will be transacted monthly with GMACM where the Bank will pay cash to GMACM in the event the market value of the asset increases and will receive

---

[852] 2007 Net Funding Schedule, part 6(a)(vi) [RC00027852].

[853] Int. of J. Cortese, Mar. 7, 2013, at 38:14–39:14; MSR ARB Interest Expense Allocation, dated Mar. 31, 2012 [EXAM00233968]; MSR ARB Interest Expense Allocation, dated Apr. 30, 2012 [EXAM00233969].

[854] Int. of J. Cortese, Mar. 7, 2013, at 19:3–11; Ally Bank Overview Accounting for Mortgage Servicing Rights [ALLY_PEO_0042124] (reflecting payment to GMAC Mortgage for MSRs related to Bank-originated loans, but not for MSRs related to purchased loans); Detailed Analysis of Ally Bank's Affiliate Agreements, dated June 12, 2012, at 18 [SOP0000380]; Bank MSR TRS Daily Settlement, dated Apr. 30, 2012 [ALLY_PEO_0070279].

[855] Int. of J. Cortese, Mar. 7, 2013, at 19:3–11; Ally Bank Overview Accounting for Mortgage Servicing Rights [ALLY_PEO_0042124] (reflecting payment to GMAC Mortgage for MSRs related to Bank-originated loans, but not for MSRs related to purchased loans); Detailed Analysis of Ally Bank's Affiliate Agreements, dated June 12, 2012, at 18 [SOP0000380]; Bank MSR TRS Daily Settlement, dated May 2011 [EXAM00234419].

[856] Int. of J. Cortese, Mar. 7, 2013, at 36:3–37:15; Int. of J. Young, Mar. 15, 2013, at 85:19–21; MSR Swap Review (May 2012) [ALLY_0368244].

[857] *See* Int. of R. Groody, Dec. 17, 2012, at 215:21–216:5; Int. of B. Bier, Feb. 22, 2013, at 154:23–158:5 (Bier had no independent recollection on how the MSR Swap was to apply to capitalization of MSRs and, based solely on his review of the MSR Swap's language during his interview, assumed that the Bank would pay the market value of MSRs for both originated and correspondent loans to GMAC Mortgage and would recoup the SRP for the correspondent loans under the MMLPSA).

cash in the event the market value of the MSR decreases. *The swap will use the recorded amounts in the Bank's income statement as the basis for the cash settlement of the swap to ensure all income statement volatility is removed from the Bank each month.* The Bank will also receive a fee equal to a spread above the LIBOR one-month rate under the terms of the swap agreement.[858]

While this statement does not focus specifically on the capitalization or purchase of MSRs, or on the mechanics of either the FMV Schedule or the Net Funding Schedule, it is notable that the statement describes the Swap as focusing on the Bank's income statement (rather than its balance sheet), and asserts that the Swap will eliminate income-statement volatility.

Cortese, who was not involved in the original negotiations of the 2007 MSR Swap but had substantial experience with the MSR Swap after he became CAO of Ally Bank in August 2009,[859] explained the different treatment of MSRs from Bank-originated loans and those from purchased loans as follows: For Bank-originated loans, the Bank recognized a gain corresponding to the value of the MSR when it was capitalized. In contrast, for purchased correspondent loans, since the Bank had paid a purchase price that included an SRP for the loan servicing rights, the Bank did not recognize a gain when it capitalized the corresponding MSR.[860] Similarly, the Bank did not recognize a gain when it added the value of purchased MSRs to its balance sheet (since it had paid to purchase the MSRs). The Bank did, however, recognize a gain when it capitalized the value of any excess servicing rights associated with either a correspondent or Bank-originated loan.[861]

In Cortese's view, "the whole intent that ResCap and the [B]ank manager had in drafting this was that the [B]ank was not to have any economics related to holding the MSR asset"; he added that, "the swap is more of a revenue, of a P&L view, than, say, the balance sheet," and "[t]he intent of the swap was to have all those economics, net cash flows, go back to GMAC Mortgage," since "[t]he Bank was holding the MSR for, I think, purely financing purposes."[862] Asked what in the language of the MSR Swap supported this view, Cortese responded, "I would say that the language at that point in time was pretty vague," and "I don't think it's specifically identified."[863] However, as discussed in greater detail below, Cortese referred to

---

[858] Materials for GMAC Bank Board of Directors Meeting, dated Aug. 16, 2007, at ALLY_PEO_0005805 [ALLY_PEO_0005782] (emphasis added).

[859] Int. of J. Cortese, Mar. 7, 2013, at 14:12–16. Cortese joined ResCap in July 2008 as an accounting director, and became Chief Accounting Officer of Ally Bank in August 2009. *Id*. at 9:15–10:3.

[860] *Id.* at 28:19–29:9.

[861] MSR Rollforward Q1 2011 and Q4 2010 [ALLY_PEO_0069504] (attached to e-mail from L. Gerner to B. Yastine and J. Young (Apr. 27, 2011) [ALLY_PEO_0069503]).

[862] Int. of J. Cortese, Mar. 7, 2013, at 28:19–29:9.

[863] *Id*. at 30:2–16.

revisions to the FMV portion of the MSR Swap in April 2011 amendments as reflecting his understanding that newly capitalized MSRs were to flow to GMAC Mortgage when they involved a "gain or loss," rather than a "change[] in the balance sheet."[864]

Young[865] offered a different explanation for the treatment of MSR capitalization under the MSR Swap. Young pointed out that the FMV Schedule's provisions defining FMV Changes cover "the FAS 156 mark to market for the valuation period," and asserted that "[t]he creation of an MSR is not a marked-to-market adjustment."[866] Consequently, he explained that the Bank's payments related to the recognition of MSRs related to the Bank-originated loans were not made under the FMV Schedule, but as part of the Net Servicing Fee under the Net Funding Schedule.[867] The Net Servicing Fee, as noted above, required payment of "amounts posted to the general ledger of [the Bank] for amounts collected or earned by [the Bank] (i.e.[,] *normal servicing fees and ancillary income*) less any associated servicing expenses paid or incurred, as is customary for normal servicing of residential mortgage loans."[868] According to Young, the Bank's gain on sale for MSRs arising from Bank-originated loans was an amount "earned" by the Bank; conversely, there was no gain on sale and consequently "no earning" on correspondent loan MSRs.[869] It should be noted that the Net Servicing Fee provision references "amounts collected or earned by [Ally Bank] (i.e.[,] *normal servicing fees and ancillary income*)." Young agreed that the gain related to capitalization of Bank-originated loan MSRs was neither a "normal servicing fee" nor "ancillary income."[870] He suggested that these items were meant to be examples of MSR-related earnings, rather than an exhaustive list,[871] saying, in effect that the provision should be read as though it says "(*e.g.,* normal servicing fees and ancillary income)," rather than "(*i.e.,* normal servicing fees and ancillary income)."

---

[864] Int. of J. Cortese, Mar. 7, 2013, at 33:19–34:14, 37:23–38:13 (discussing April 2011 MSR Swap Confirmation, § 2, definitions of FMV Change, FMV Value, and MSR Amount [ALLY_0041799]). *See* Section V.B.10.b.

[865] Young signed the 2007 MSR Swap for ResCap, but in his interview acknowledged that he had not been involved in the development or negotiation of the arrangement, first became aware of it when it was adopted, and did not recall having executed the document; consequently, his knowledge, like Cortese's, was predicated on his subsequent involvement. Int. of J. Young, Oct. 10, 2012, at 90:12–18; Int. of J. Young, Mar. 15, 2013, at 72:6–75:4.

[866] Int. of J. Young, Mar. 15, 2013, at 82:19–23.

[867] *Id*. at 83:7–21.

[868] 2007 Net Funding Schedule, part 6(a)(v) [RC00027852] (emphasis added).

[869] Int. of J. Young, Mar. 15, 2013, at 82:24–83:6, 83:21–24.

[870] *Id.* "Ancillary income" in the loan servicing context typically refers to revenues such as the "float" on loan payments collected by the servicer. *See* Fourth Addendum to Original Servicing Agreement, dated Sept. 1, 2007 [ALLYKE000000741].

[871] Int. of J. Young, Mar. 15, 2013, at 84:6–21.

However, the few documents that explicitly discuss how capitalizations of MSRs flowed under the MSR Swap do not support Young's explanation. Instead, they reflect that the parties understood that the FMV Schedule "fair value changes to the MSR asset" included "the [G]ain recognized . . . on newly capitalized MSR[s]."[872] The Investigation has revealed no documents saying that the Net Funding Fee was the applicable portion of the Swap.

Further, a review of FAS 156 indicates that it applies not only to the adjustment of asset values already on an entity's books, but to the initial recognition of assets.[873] FAS 156, Accounting for Servicing of Financial Assets, speaks in terms of the "fair value" of assets, rather than using the phrase "mark to market."[874] Recording an asset at fair value is a concept used interchangeably in accounting literature with "mark to market."[875] FAS 156 specifically requires "all separately recognized servicing assets and servicing liabilities to be initially measured at fair value."[876] Indeed, paragraph 65 of FAS 156 provides an example of an MSR asset being recorded at fair value upon the transfer of the loan and the retention of servicing.[877] Moreover, Ally Bank's own audited financial statements, as well as the governing Ally Accounting Policy, state that mortgage servicing assets and liabilities are initially measured at fair value.[878] Of course, FAS 156 also contemplates the subsequent measurement of servicing assets and liabilities at "fair value," with changes in "fair value" reported in earnings in the period in which the changes occur (though, again, it does not use the phrase "mark to market").[879] Nothing in FAS 156 suggests that the initial measurement of an asset at fair value is not a "mark to market."

---

[872] Memorandum, Ally Bank/GMAC Mortgage Affiliate Total Return Swap Accounting Analysis, dated Feb. 25, 2011, at 2, n.2 [ALLY_0202271]; MSR Swap Between GMACM and Ally Bank Presentation, dated Feb. 2011, at 5 [EXAM11190199] ("Capitalization of New Servicing" identified as flowing under the "FMV Swap"). The Investigation has uncovered no documentary evidence which indicates the MSR capitalization flowed to GMAC Mortgage under the Net Funding Fee, as Young asserted.

[873] FINANCIAL ACCOUNTING STANDARDS BOARD, STATEMENT OF FINANCIAL ACCOUNTING STANDARDS No. 156, Accounting for Servicing of Financial Assets, an amendment of FASB Statement No. 140, Summary ¶ 2.

[874] *Id.*

[875] *See, e.g.,* FINANCIAL ACCOUNTING STANDARDS BOARD, STATEMENT OF FINANCIAL ACCOUNTING STANDARDS No. 107, Disclosures about Fair Value of Financial Instruments, ¶ 9; Report and Recommendations Pursuant to Section 133 of the Emergency Economic Stabilization Act of 2008: Study on Mark-To-Market Accounting, Office of the Chief Accountant, Division of Corporate Finance, United States Securities and Exchange Commission, at 1.

[876] FINANCIAL ACCOUNTING STANDARDS BOARD, STATEMENT OF FINANCIAL ACCOUNTING STANDARDS No. 156, Accounting for Servicing of Financial Assets, an amendment of FASB Statement No. 140, Summary ¶ 2.

[877] *Id*. ¶ 65.

[878] GMAC Bank, Consolidated Financial Statements as of December 31, 2008 and 2007 and Independent Auditor's Report, at RC00034550–51 [RC00034535]; Accounting Policy 2451, Mortgage Servicing Rights, Sept. 1, 2011, at RC40000806 [RC40000802].

[879] Financial Accounting Standards No. 156, Accounting for Servicing of Financial Assets, an amendment of FASB Statement No. 140, Summary ¶ 3.

This issue is addressed further in connection with the revisions to the MSR Swap adopted in April 2011, discussed in Section V.B.10.

### (5) The Combined Economic Effect: "Synthetic Lending"?

Ally Bank officials, in Affiliate Transaction Memos prepared at the time of the MSR Swap and in an April 2010 reassessment, characterized the FMV portion of the MSR Swap as a straightforward hedge of the fair market value of the MSRs.[880] They noted that MSR assets are volatile, that providing a 100% hedge of MSRs in the marketplace was not possible (citing communications with a third-party swap provider, Lehman Brothers, to the effect that such a swap was not available in the marketplace), and that there were no administrative costs or fees paid to GMAC Mortgage (and hence no hedge ineffectiveness).[881] The Net Funding portion of the exchange was described as an exchange of "net servicing fees, a variable cash flow for a fixed payment that provides the Bank with a 100 bp over libor risk free return on its MSR asset," a return that was "commensurate with other low/no risk investments in the marketplace (fed funds and short term treasury notes in the current market)."[882]

While the analogy is imperfect, Ally Bank's role has been described as that of a "synthetic lender"[883] and the MSR Swap is similar in many respects to a loan: GMAC Mortgage received (almost) all of the economic benefit (and detriment) from owning the MSR portfolio without actually having to purchase the assets or pay a servicing-released premium. It received the value of each Bank-originated loan MSR and excess servicing rights upon recognition on the Bank's balance sheet. GMAC Mortgage paid the amortization of the value of the entire MSR asset to the Bank each month, receiving in exchange the corresponding servicing fees (net of expense) for that month. GMAC Mortgage paid the Bank, in effect, interest on the capital the Bank had tied up in the assets, including the amounts paid by the

---

[880] GMAC Bank Affiliate Transaction Memorandum, Swap Agreement for Mortgage Servicing Rights with GMAC Mortgage Corp., dated Sept. 1, 2007, at 2 [ALLY_0017878]; GMAC Bank Affiliate Transaction Memorandum, Assessment of Swap Agreement for Mortgage Servicing Rights with GMAC Mortgage LLC, dated Apr. 30, 2010, at 1 [ALLY_0018063].

[881] GMAC Bank Affiliate Transaction Memorandum, Swap Agreement for Mortgage Servicing Rights with GMAC Mortgage Corp., dated Sept. 1, 2007, at 2 [ALLY_0017878]; GMAC Bank Affiliate Transaction Memorandum, Assessment of Swap Agreement for Mortgage Servicing Rights with GMAC Mortgage LLC, dated Apr. 30, 2010, at 1 [ALLY_0018063]; E-mail from T. O'Hara, Lehman Brothers, to R. Groody (Sept. 20, 2007) [ALLY_0017960] (Lehman is unable to structure "all-encompassing" hedge for MSRs).

[882] GMAC Bank Affiliate Transaction Memorandum, Assessment of Swap Agreement for Mortgage Servicing Rights with GMAC Mortgage LLC, dated Apr. 30, 2010, at 1 [ALLY_0018063]; GMAC Bank Affiliate Transaction Memorandum, Swap Agreement for Mortgage Servicing Rights with GMAC Mortgage Corp., dated Sept. 1, 2007, at 2 [ALLY_0017878]; *see also* Minutes of a Regular Meeting of the Board of Directors of GMAC Bank, Aug. 22, 2007 [ALLY_PEO_0001400]; Proposal to Invest in Mortgage Servicing Rights, dated Aug. 22, 2007, at ALLY_PEO_0005803 [ALLY_PEO_0005782] (stating 100 basis point return spread is "significantly greater than alternative risk-free investments," and "[r]eturns on equity will be in excess of 8.5% annually"); Int. of R. Groody, Dec. 17, 2012, at 194:19–196:24.

[883] Int. of J. Young, Oct. 10, 2012, at 22:4–5.

Bank as servicing advances. In a sense, the MSR Swap functioned as though GMAC Mortgage had borrowed the funds necessary to purchase the MSRs and the funds needed to make related servicing advances.[884]

Of course, there are key differences between the MSR Swap and a scenario in which GMAC Mortgage had borrowed money from Ally Bank to purchase the asset itself. These include the following: First, the Bank had actual title to the MSR assets, instead of a security interest in the assets.

Second, as noted above, there was no provision for unwinding any of the prior payments on termination of the Swap. Thus on termination, GMAC Mortgage would get to keep an element of the "principal"—the amounts that had been advanced to it under the Swap resulting from the initial capitalization of MSRs from Bank-originated loans—rather than repaying it to the Bank (as it would have done through paying for the decline in value attributable to economic amortization of the asset through the swap, had it not been terminated). Ally Bank would keep the MSRs themselves on termination, but of course had owned the MSRs from their inception, and GMAC Mortgage had not paid to purchase them.[885] The termination of the MSR Swap is not discussed in the Bank's Affiliate Transaction Memos.[886]

---

[884] According to Young, the MSR Swap essentially was a low-cost, convenient funding source for GMAC Mortgage to continue its core servicing business:

> [T]he whole theory is that you want to swap all the economics of that MSR to where they belong, if you will, in the core business that has the rest of the core. It has the hedging expertise, the capital markets expertise, the servicing expertise.

> They want the risk and—ResCap wants the risk and rewards of that MSR, but putting it in the bank provides a way of funding it, putting it on their balance sheet. But the economics of flowing back—so, in exchange for a LIBOR-based payment, all of the other economics of the MSR are coming back under the swap.

> So, servicing fees, any benefit of servicing from float, the cost of subservicing, which is really all embedded in ResCap, all those components of that core process are going back to ResCap in exchange for a LIBOR-based payment. So, it puts ResCap in the exact same position that they would be if they—as if they owned the asset.

Int. of J. Young, Sept. 28, 2012, at 210:18–211:13; *see also* Int. of B. Bier, Feb. 22, 2013, at 157:15–18 ("[T]he intent of the swap was that GMAC Bank would finance the fair value of the MSRs.").

[885] Before the adoption of the MSR Swap and retention of the MSR by Ally Bank, GMAC Mortgage would have paid the Bank an SRP (servicing-released premium) to purchase the MSR. Under the Swap, GMAC Mortgage did not pay for the MSR, but, for MSRs arising from Bank-originated loans, was paid the value of the MSR and was not obligated to return it (or the unamortized portion of the MSR) on termination.

It should be noted that excess servicing rights (discussed in Section V.B.9.b(1) and the accompanying footnotes) do not implicate the same considerations, since GMAC Mortgage would have been entitled to the benefit of this income without payment of an SRP or the equivalent as a perquisite of purchasing the loan itself (and controlled whether or to what extent excess servicing rights were created because it controlled the securitization process).

[886] *See* Section V.B.11.a (discussing economic results under the MSR Swap following 2012 termination).

### c. 2009 Revisions To Termination Provisions And The Issuance And Rescission Of Termination Notices

In response to FDIC expressions of dissatisfaction with Ally Bank's exposure to GMAC Mortgage,[887] as well as a threat by Ginnie Mae to cease permitting loan purchases from GMAC Mortgage given its precarious finances, Ally Bank considered terminating the MSR Swap.[888] On May 1, 2009, the parties agreed to reduce the advance notice the Bank was required to give to prevent renewal of the FMV and Net Funding Schedules to 90 days.[889] Ally Bank then issued notices of non-renewal on June 1, 2009, which would have resulted in termination effective September 1, 2009.[890] On August 31, 2009, Ally Bank confirmed that these notices had been withdrawn by mutual agreement,[891] and the following day the parties agreed to make both Schedules unilaterally terminable by Ally Bank on 30 days' notice (at any time, not merely at renewal).[892] Ally Bank sent 30-day notices of termination in September and October 2009, but they were subsequently rescinded.[893]

### d. 2010 MSR Swap Revisions

In or after November 2010, but with effect retroactive to July 1, 2010, the parties entered into an "Amended and Restated" Net Funding Schedule (the "2010 Net Funding Schedule").[894] The

---

[887] Int. of R. Groody, Dec. 17, 2012, at 156:2–8, 157:9–158:2. ResCap acknowledged that GMAC Mortgage was no longer "an acceptable counterparty to others." ResCap Presentation on Affiliate Agreements, at 4 [EXAM10787403].

[888] Review of GNMA Mortgage Hedging and MSR Hedging, dated June 30, 2009, at 9 [EXAM11621591].

[889] Letter Agreement Re Amendment of ISDA Schedules, dated May 1, 2009 [ALLY_0017962].

[890] Letter from A. Celini to J. Young (June 1, 2009) [ALLY_0212903].

[891] Letter from A. Celini to J. Young (Aug. 31, 2009), at 3 [RC00027847].

[892] Letter from A. Celini to J. Young (Sept. 1, 2009), at 1 [RC00027847].

[893] Letter from A. Celini to J. Young (Sept. 1, 2009) [RC00027847] (termination effective Oct.1, 2009); Letter from A. Celini to J. Young (Sept. 21, 2009) [EXAM00237972] (termination effective Nov. 1, 2009; rescinds prior termination notice); Letter from M. Hales to J. Young (Oct. 21, 2009) [ALLY_0212907] (termination effective Nov. 30, 2009; rescinds prior termination notice); Letter from M. Hales to J. Young (Nov. 18, 2009) [ALLY_0017995] (rescinding October 2009 termination notice). Apparently the parties tried to "operationalize the elimination of" the MSR Swap and Pipeline Swap but ultimately they were not terminated. E-mail from J. Whitlinger to J. Young et al. (Dec. 15, 2009) [EXAM10161997]. ResCap viewed the retention of the "total return swap" (referring to combined effect of MMLPSA and MSR Swap) as in its best interest and noted "without the total return swap relationship, ResCap would lose any future capability of delivering securities to the [GSEs]." Affiliate Agreements: GMAC Bank and ResCap, at 8–9 [EXAM10787403].

[894] 2010 Net Funding Schedule [ALLY_0018118].

amended agreement was approved by the ResCap Board[895] (although the parties applied the new pricing terms even before the amended agreement was executed or approved).[896] This appears to be the first instance after adoption of the 2005 Operating Agreement in which ResCap Board approval of any of the agreements discussed in this Section occurred. No fairness opinion was obtained.[897] The Amended and Restated Schedule contained two key revisions, both made in response to concerns or objections raised by FDIC officials:

### (1) Increase In The Funding Fee Interest Rate To 3.25%

First, the 2010 Net Funding Schedule increased the interest rate applicable to the Funding Fee to LIBOR plus 3.25%.[898]

FDIC officials had questioned, inter alia, whether LIBOR +1% was an adequate interest rate, comparing it to a facility that ResCap had in place with Citibank secured by MSRs (under which ResCap paid Citibank LIBOR +6%) and characterizing the LIBOR +1% rate as an "apparent violation" of section 23B.[899] Ally Bank management, particularly Glassner, disagreed with the comparison to the Citibank interest rate, noting that there were key structural differences that support a reduced pricing structure.[900] The differences cited included the "avoidance of hedge costs," the Bank's "ability to unilaterally terminate the swaps at any time," and the "[m]onetary benefit to the Bank resulting from availability of no-cost mortgage servicing escrow funds controlled by [GMAC Mortgage]."[901] Ally Bank argued to the FDIC that

---

[895] Minutes of a Special Meeting of the Board of Residential Capital, LLC, Nov. 5, 2010, at RC40018847-48 [RC40018729]; *see also* Minutes of a Special Meeting of the Board of Residential Capital, LLC, Oct. 3, 2010, at RC40018840 [RC40018729] (discussing revisions); Minutes of a Special Meeting of the Board of Residential Capital, LLC, Oct. 5, 2010, at RC40018842–43 [RC40018729] (same).

[896] E-mail from A. Glassner to J. Andrews and J. Young (Aug. 26, 2010) [EXAM10436075].

[897] Minutes of a Special Meeting of the Board of Residential Capital, LLC, Nov. 5, 2010, at RC40018844-45 [RC40018729]. *See also* Minutes of a Special Meeting of the Board of Residential Capital, LLC, Oct. 3, 2010, at RC40018840 [RC40018729] (discussing revisions); Minutes of a Special Meeting of the Board of Residential Capital, LLC, Oct. 5, 2010, at RC40018842–43 [RC40018729] (same). It was suggested that the Independent Directors discuss whether a fairness opinion should be obtained. E-mail from C. Quenneville to P. West and J. Young (Nov. 3, 2010) [EXAM10436173].

[898] 2010 Net Funding Schedule, part 6(a)(iv) [ALLY_0018118].

[899] Ally Bank Board Meeting Presentation, dated June 18, 2010, at 15 [EXAM11119117]. Int. of L. Gerner, Nov. 13, 2012, at 144:4–154:5, 175:8–176:19; E-mails among M. Hales, A. Glassner, D. Scott, et al. (Apr. 8–21, 2010) [ALLY_PEO_0065507].

[900] *See* Ally Bank Board Meeting Presentation, dated June 18, 2010, at 15 [EXAM11119117]; E-mail from A. Glassner to D. Scott (Apr. 14, 2010) [ALLY_PEO_0065507] (comparison of the Swap to the Citibank facility being fundamentally flawed).

[901] Detailed Analysis of Ally Bank's Affiliate Agreements, dated June 12, 2012, at 7, 15, 23 [SOP0000380]; *see also* Ally Bank Board Meeting Presentation, dated June 18, 2010, at 15 [EXAM11119117]. GMAC Mortgage maintained at Ally Bank non-interest bearing escrow accounts that it held on behalf of Borrowers for tax and insurance payments as well as other escrow accounts.

the differences justified a spread 2.75% less than the LIBOR +6% Citibank facility, i.e.*,* of
LIBOR +3.25%.[902] In his interview, Glassner acknowledged that this calculation did not include
an adjustment based on other factors that could have supported a further downward adjustment,
particularly the fact that the Bank, unlike a lender, held title to the MSRs.[903]

It seems clear from the record that the revised interest rate was developed essentially to
palliate the regulators, rather than based on agreement that the adjustment was necessary. But
as discussed below, the regulators remained dissatisfied with the increased rate.

### (2) Deducting Loan Repurchase Expense From The Net Servicing Fee

The parties amended the Net Servicing Fee definition, providing that Ally Bank could
deduct from the servicing fees it was remitting to GMAC Mortgage not merely "any
associated servicing expenses paid or incurred, as is customary for normal servicing of
residential mortgage loans" (as the original schedule had provided),[904] but also:

> [t]he losses, liabilities, costs and expenses (collectively, "Losses")
> incurred by [Ally Bank] as owner of mortgage servicing rights or
> servicer of record under applicable Seller/Servicer Agreements or
> Master Agreements (including the respective Seller or Servicer
> Guides) between [Ally Bank] and either the Federal National
> Mortgage Association or the Federal Home Loan Mortgage
> Corporation (each, an "Agency") including without limitation
> Losses related to any Agency loan repurchase request,
> indemnification or make-whole agreement, to the extent such
> Losses remain unreimbursed by [GMAC Mortgage].[905]

This revision was portrayed at the time as merely a "clarification" of the agreement.[906]

The 2007 Net Servicing Fee provisions did not explicitly address whether Bank loan
repurchase expenses are among the expenses to be deducted from the Net Servicing Fee.
According to Groody, who presented the 2007 MSR Swap to the Bank Board for approval,[907]
there was no discussion at the time of whether any representation and warranty or loan

---

[902]  Ally Bank Board Meeting Presentation, dated June 18, 2010, at 15 [EXAM11119117].

[903]  Int. of A. Glassner, Mar. 20, 2013, at 67:17–68:5, 72:15–73:22.

[904]  2007 Net Funding Schedule, part 6(a)(v) [RC00027852].

[905]  2010 Net Funding Schedule, part 6(a)(v) [ALLY_0018118].

[906]  *See, e.g.,* Memorandum to Residential Capital, LLC Board of Directors, dated Oct. 3, 2010, at RC40016545
[RC40016545].

[907]  Minutes of a Regular Meeting of the Board of Directors of GMAC Bank, Aug. 22, 2007, at
ALLY_PEO_0001451 [ALLY_PEO_0001400].

repurchase expenses Ally Bank might incur in connection with its MSR ownership would be deductible from the Net Servicing Fee.[908] This is not surprising, given that the GSEs did not then make repurchase demands to master servicers, a practice they did not adopt until after 2007.[909] The witnesses interviewed agreed that Ally Bank had not, in the years between inception of the MSR Swap and these amendments, actually paid representation and warranty claims and then deducted them from the Net Servicing Fee.[910] Consequently, there was no "course of dealing" to confirm that these changes were merely a "clarification" of agreed intent. Moreover, in September 2008, in connection with a discussion about a new effort to permit Ally Bank to hold Ginnie Mae MSRs, Groody advised the Bank Board that the matter would be complicated by the fact that Ginnie Mae looks to servicers to fulfill repurchase obligations, and it would be necessary to "modify the scope of the total return [MSR] swap with [GMAC Mortgage] to ensure that it covers losses on repurchased loans."[911] This exchange reflects that it was at least unclear to the GMAC Bank architect of the MSR Swap in 2008 that repurchase obligations would be covered by GMAC Mortgage under the existing agreement.

Nonetheless, concerns about this modification to the terms of the MSR Swap appear to be moot because Ally Bank never actually paid any repurchase claims (or, consequently, deducted any such payments from the Net Servicing Fee).[912] Instead, representation and warranty liabilities were assumed by ResCap/GMAC Mortgage as a seller of the loans; it did not pursue recovery from Ally Bank on loans purchased under the MMLPSA, though it did pursue recovery from third-party correspondents who had sold the loans to the Bank.[913]

### e. 2010 AFI Guarantee And Indemnification Side Letter

In October 2010, various state and federal agencies commenced an investigation following revelations of the widespread practice of "robo-signing" affidavits in foreclosure proceedings across the country. Responding to FDIC and investor pressure, Ally Bank asked GMAC Mortgage to enter into an indemnification letter to "clarify" GMAC Mortgage's indemnification obligations under the Original Servicing Agreement in the event that any liabilities were incurred in connection with this activity;[914] in truth, the request was to expand GMAC Mortgage's indemnification obligations by eliminating the existing limitation on the obligations to one year's

---

[908]   Int. of R. Groody, Dec. 17, 2012, at 236:18–237:5.

[909]   Int. of J. Young, Oct. 10, 2012, at 165:10–166:6.

[910]   Int. of R. Groody, Dec. 17, 2012, at 236:10–237:15; Int. of J. Young, Sept. 28, 2012, at 247:11–15; Int. of C. Dondzila, Sept. 27, 2012, at 227:16–22; Int. of J. Whitlinger, Nov. 30, 2012, at 67:13–68:12.

[911]   Minutes of a Regular Meeting of the Board of Directors of GMAC Bank, Sept. 24, 2008, at ALLY_PEO_0001583 [ALLY_PEO_0001488].

[912]   Int. of R. Groody, Dec. 17, 2012, at 236:10–237:15; Int. of J. Young, Sept. 28, 2012, at 247:11–15; Int. of C. Dondzila, Sept. 27, 2012, at 227:16–22; Int. of J. Whitlinger, Nov. 30, 2012, at 67:13–68:12.

[913]   *See* Section V.B.3.a(4).

[914]   Memorandum to Residential Capital, LLC Board of Directors, dated Oct. 3, 2010, at RC40016547 [RC40016545].

servicing fees. In October 2010, Barbara Yastine, Chief Administrative Officer of Ally Bank, wrote "[m]y fear here is if we don't get clear, unlimited indemnification in place for the bank, the FDIC will force us to cease providing financing to ResCap/[GMAC Mortgage]. I think that would shut the business down."[915] Yastine also noted that the indemnification had not yet been approved by the ResCap Board and that:

> [i]t seems this is not a slam dunk with the board. After all, they have gotten the bank to hold and fund the MSR, being the required face to Fannie and Freddie, and the bank has previously accepted an indemnification limited to one year's worth of servicing fees, which isn't much. Nice deal if you can get away with it, and ResCap has. But we have an answer due the FDIC on Tuesday, so Hu Benton has offered up a direct guarantee from Ally Financial to bank. Our alternative is to talk about our intentions, but that's not that strong, of course.[916]

The ResCap Board discussed this issue at a number of meetings including the October 3, 2010,[917] and October 5, 2010, meetings, but did not approve the proposed revision.[918] Considerable discussion was given to the exclusion of a liability cap, which would have resulted in unlimited indemnification liability for GMAC Mortgage.[919]

Instead, in a letter dated October 5, 2010, AFI provided a guarantee to Ally Bank of all of GMAC Mortgage's obligations under certain agreements, which include the Original Servicing Agreement and the MSR Swap.[920] In addition, AFI agreed to compensate Ally Bank for any losses arising out of violations by GMAC Mortgage of the Original Servicing Agreement, as amended, applicable law, or the Ally Bank Servicing Guides.[921] AFI reaffirmed this guarantee in a subsequent letter dated April 1, 2011.[922]

By a side letter dated October 5, 2010, GMAC Mortgage acknowledged it was responsible for "any aspect of the foreclosure affidavit process" to the extent it caused a violation of the covenant to service loans in accordance with all applicable laws and

---

[915] E-mail from B. Yastine (Oct. 4, 2010) [ALLY_0334586].

[916] E-mail from B. Yastine (Oct. 3, 2010) [ALLY_0334586].

[917] Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Oct. 3, 2010, at RC40018840–41 [RC40018729].

[918] *Id.* at RC40018842–43.

[919] *Id.* at RC40018843.

[920] Letter from AFI to Ally Bank (Oct. 5, 2010) [ALLY_0018084].

[921] *Id.*

[922] Letter from AFI to Ally Bank (Apr. 1, 2011) [ALLY_0018204].