regulations.[923] GMAC Mortgage also agreed to indemnify Ally Bank in accordance with the terms of the Original Servicing Agreement for any breach thereof (and thus subject to the cap on liability set forth therein).[924] Apparently the letter was not presented to the ResCap Board for approval because it was viewed as not expanding the liability of GMAC Mortgage beyond what it had under the Original Servicing Agreement.[925] Ally Bank decided not to mention the side letter in its response to the FDIC but to disclose only the AFI guarantee.[926]

### f.   The 2010 Servicing Agreement Negotiations

A revised servicing agreement was prepared and negotiated in 2009 but not executed;[927] there were extensive additional negotiations in 2010, but the parties were ultimately unable to agree on a revision, so the Original Servicing Agreement remained in effect.

The materials presented to the ResCap Board in April 2010 included a summary of the differences between the Original Servicing Agreement and the draft revised servicing agreement, which noted that the indemnification in the draft was more favorable to GMAC Mortgage and similar to what GMAC Mortgage would receive from non-affiliated customers, due to the coverage for liability due to origination and prior servicing.[928] According to this summary, the Original Servicing Agreement no longer fit GMAC Mortgage's business practices at the time[929] because the Original Servicing Agreement was drafted primarily as a HELOC agreement and the draft revised servicing agreement covered primarily loans owned by one of the [GSEs].[930] In addition, the summary noted that the pricing under the Original Servicing Agreement was below-market but that the pricing in the draft revised servicing agreement was similar to what GMAC Mortgage would earn under a third-party agreement.[931] The difference was quantified at $18.8 million per year under the Original Servicing

---

[923]   Letter from GMAC Mortgage to Ally Bank (Oct. 5, 2010) [ALLY_0099749].

[924]   *Id.*

[925]   E-mail from T. Hamzehpour (Oct. 5, 2010) [EXAM30020126].

[926]   E-mail from J. Andrews (Oct. 5, 2010) [ALLY_0362953].

[927]   *See* Minutes of a Regular Meeting of the Board of Directors of Ally Bank, Oct. 19, 2010, at ALLY_PEO_0018501 [ALLY_PEO_0018332].

[928]   Materials for Presentation on Proposed Subservicing Agreement between GMAC Mortgage, LLC and Ally Bank by T. Hamzehpour, dated Apr. 29, 2010, at RC40016107–08 [RC40016061].

[929]   *Id.* at RC40016107–08.

[930]   *Id.* at RC40016107–08.

[931]   *Id.* at RC40016107–08; *see also* Affiliate Transaction Memorandum, Apr. 30, 2010 [ALLY_0018036] (attaching term sheets for comparable servicing functions provided to third parties to demonstrate that the pricing under the Original Servicing Agreement was favorable to Ally Bank).

Agreement (based on amounts received in 2009) and $49.7 million per year under the draft revised servicing agreement (assuming the new pricing was effective at the start of 2010).[932] Surprisingly, the cap on GMAC Mortgage indemnification liability was not mentioned.[933]

The ResCap Board continued to discuss revision of the servicing agreement at numerous board meetings in 2010,[934] and the indemnification provisions were a focus of the discussions.[935] The materials presented to the ResCap Board in October 2010 stated that none of the four most recent sub-servicing agreements GMAC Mortgage entered into with third parties contained caps on liability and that GMAC Mortgage has generally not sought or received caps in other third-party servicing agreements.[936] The presentation also noted that servicing agreements that the Bank entered into with third-party servicers did not contain caps.[937] The Bank's indemnification of the servicer was also narrower under the Original Servicing Agreement as it was limited to breach of the agreement.[938] Under the draft revised servicing agreement, GMAC Mortgage as the servicer would be indemnified for origination errors and for acting at Ally Bank's direction. Further, the presentation noted that if the servicer obtained a cap on liability GMAC Bank would likely seek a reciprocal cap.[939] Despite the materials presented it appears the ResCap Board did not agree to remove the indemnity cap.[940] On December 7, 2010, the ResCap Board discussed revisions to the draft servicing agreement which incorporated a cap on GMAC Mortgage's liability in an amount equal to

---

[932] Materials for Presentation on Proposed Subservicing Agreement between GMAC Mortgage, LLC and Ally Bank by T. Hamzehpour, dated Apr. 29, 2010, at RC40016107–08 [RC40016061].

[933] *Id.* at RC40016107–08.

[934] Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Apr. 29, 2010, at RC40018774 [RC40018729] (discussing whether a fairness opinion was needed and deciding to defer decision until the Independent Directors could discuss the draft revised servicing agreement with counsel). Although the proposed draft servicing agreement was approved via a Unanimous Written Consent of the Board of Directors of Residential Capital, LLC, dated Apr. 30, 2010 [RC40018729], the agreement was not entered into at the time due to operational and compliance issues. *See* Memorandum to Residential Capital, LLC Board of Directors, dated Oct. 3, 2010, at RC40018776 [RC40016545]; *see also* Minutes of Special Meetings of the Board of Residential Capital, LLC, Nov. 5, 2010, at RC40018848 [RC40018729].

[935] *See* Minutes of a Regular Meeting of the Board of Directors of Ally Bank, Oct. 19, 2010, at ALLY_PEO_0018501 [ALLY_PEO_0018332].

[936] Materials for Presentation on Ally Bank Servicing Agreement by T. Hamzehpour, dated Oct. 5, 2010, at RC40016594–95 [RC40016584].

[937] *Id.* at RC40016594–95.

[938] *Id.*

[939] *Id.*

[940] Apparently "to resolve the impasse over caps on [GMAC Mortgage's] indemnification obligations under the Servicing Agreement" the ResCap Board proposed that [GMAC Mortgage's] indemnity would be uncapped in all respects except for affidavit and related foreclosure issues, which would be capped at an amount equal to aggregate servicing fees payable over one year under the [Original Servicing] Agreement." E-mail from J. Andrews (Nov. 23, 2010) [EXAM10434855].

twelve months' servicing compensation—consistent with the Original Servicing Agreement—and an exclusion for liability for indirect or incidental damages.[941] GMAC Mortgage presented a revised draft containing the terms to Ally Bank.[942] Ultimately, the draft revised servicing agreement[943] was approved by the ResCap Board on December 22, 2010.[944] Marano attended the ResCap Board meeting in his capacity as a director. During the telephonic meeting, he e-mailed Barbara Yastine, stating "it seems as if the [ResCap Board] has to accept what may be 'non-market' ie [sic] uncapped liability, which I will get them to do."[945] Despite Marano's assertion, a revised servicing agreement was not entered into until May 11, 2012 and the indemnification cap remained in place.[946]

### 10. 2011 Revisions To The Swaps/The Pipeline Letter Agreement

#### a. Continued FDIC Objections To The Swaps

FDIC Examiners continued to express concern about the MMLPSA and the Swaps, suggesting that the combination of agreements "could be viewed as one extensive 'cradle-to-grave' transaction for purposes of analysis under section 23A," and that the "'overall process' . . . might be found to be 'abusive' to the Bank."[947] They further advised GMAC Bank management that "the Bank's efforts to cure the Apparent Violation with respect to the 'total return swap' for mortgage servicing rights between the Bank and GMAC [Mortgage] were not considered successful."[948] The FDIC Examiners "had the impression that if not for the various transactions between the Bank and ResCap, including the HFS portfolio and MSR swap, ResCap would have failed."[949] They advised Ally Bank management that "due to the repeat apparent violations of 23A and 23B they were considering imposition of civil money penalties on the Bank Officers and Board members."[950] The FDIC recommended that the Bank retain outside counsel "to obtain legal opinions on all affiliate transactions with respect

---

[941] *See* Minutes of a Regular Meeting of the Board of Residential Capital, LLC, Dec. 7, 2010, at RC40018850–51 [RC40018729].

[942] Privileged and Confidential Discussion Document as of December 7, 2010: Subservicing Agreement by and between GMACM and Ally, dated Dec. 7, 2010 [EXAM20131693].

[943] Servicing Agreement, dated Dec. 31, 2010, ALLY_0018127 [ALLY_0018160] (executed by only GMAC Mortgage, not Ally Bank).

[944] Minutes of a Special Meeting of the Board of Residential Capital, LLC, Dec. 22, 2010, at RC40018862 [RC40018729].

[945] E-mail from T. Marano (Dec. 22, 2010) [ALLY_0386265].

[946] *See* Section V.B.11.c.

[947] Minutes of a Special Joint Meeting of the Board of Directors and the Compliance Committee of Ally Bank, Nov. 11, 2010, at ALLY_PEO_0018507 [ALLY_PEO_0018332].

[948] *Id.*

[949] *Id.*

[950] *Id.*

to market terms[,] obtain legal opinions on corrective actions taken to cure the Apparent Violation, and obtain legal review of the Total Return Swap to ensure that the Bank was adequately protected from repurchase demands from the GSEs."[951]

In response, Ally Bank retained Arnold & Porter LLP to conduct a legal review of the transactions and, later, retained Sandler O'Neill to conduct an economic analysis.

As part of its engagement, Arnold & Porter LLP reviewed the MMLPSA, the MSR Swap and the Pipeline Swap, as well as the Bank's affiliate transaction policies with the goal of confirming that the policies, the agreements and the related transactions complied with sections 23A and 23B of the Federal Reserve Act, implemented by Regulation W.[952]

### b. April 2011 Swap Revisions

In connection with Arnold & Porter LLP's review,[953] the parties entered into new documentation of the Pipeline Swap and the MSR Swap dated as of April 1, 2011.[954] The parties entered into a single 2002 ISDA Master Agreement covering both Swaps,[955] along with a Schedule[956] and a Credit Support Annex,[957] each likewise applicable to both Swaps, and separate confirmations for the Pipeline Swap[958] and the MSR Swap.[959] In addition, AFI at the same time reaffirmed its October 5, 2010 Guarantee, extending the scope of the Guarantee to include the Pipeline Swap and the 2008 MMLPSA.[960] According to Arnold & Porter LLP, the revised documentation contained "market terms, including terms related to events of default, termination events, credit support, payments and collateral requirements, that are at least as

---

[951] *Id.* at ALLY_PEO_0018508.

[952] GMAC Mortgage, as a wholly owned subsidiary of AFI, qualified as an affiliate of Ally Bank for purposes of this statute, and Arnold & Porter LLP's review was focused on the transactions between the Bank and GMAC Mortgage. *See* Letter from Arnold & Porter LLP to Board of Directors of Ally Bank (May 24, 2011), at EXAM00000137 [EXAM00000137].

[953] Letter from Arnold & Porter LLP to Board of Directors of Ally Bank (May 24, 2011), at 4–5 [EXAM00000137].

[954] April 2011 Pipeline Swap Confirmation [ALLY_0041695]; April 2011 MSR Swap Confirmation [ALLY_0041799]

[955] ISDA 2002 Master Agreement, dated Apr. 1, 2011 [RC00027962].

[956] Amended and Restated Schedule to the 2002 ISDA Master Agreement, dated Apr. 1, 2011 [RC00027879].

[957] ISDA Credit Support Annex to the Schedule to the Master Agreement, dated Apr. 1, 2011 [RC00027990].

[958] April 2011 Pipeline Swap Confirmation [ALLY_0041695].

[959] April 2011 MSR Swap Confirmation [ALLY_0041799].

[960] Letter from J. Mackey to Ally Bank (Apr. 1, 2011) [RC00067937] (amending the agreements covered by the guarantee to included, inter alia, "the Confirmation of the Swap Relating to Loans in the Held For Sale Portfolio, dated April 1, 2011").

favorable to Ally Bank as those prevailing for comparable transactions with unaffiliated market participants,"[961] and was compliant with sections 23A and 23B of the Federal Reserve Act and Regulation W.[962]

The ResCap Board referred the revision of the Swaps to the Independent Directors for separate consideration and for the purpose of obtaining a fairness opinion.[963] Instead of a fairness opinion, the Independent Directors arranged to have Goldin Associates provide a summary of its "understanding of the changes" effected by the agreement revisions; Goldin Associates was to "render no opinion, oral or written, regarding the [MSR Swap and the Pipeline Swap arrangements], or any aspect thereof."[964] On June 14, 2011, the ResCap Board (including the Independent Directors) gave unanimous written consent to the transaction.[965]

### (1) The Pipeline Swap Confirmation

As discussed in Section V.B.5, when the Pipeline Swap was amended to cover HFS loans, the period covered for funded HFS loans was not revised to cover the period from funding to sale. The April 2011 Pipeline Swap Confirmation cured this problem by providing for valuations on each Business Day the loan remained on the Bank's books (a "Valuation Date"), and requiring payments in respect of the change in the loan's value from the preceding Valuation Date. [966]

However, the April 2011 Pipeline Swap Confirmation did not address the omission of loans Ally Bank "originates" from the scope of the Swap. Instead, the "Loan Portfolio" subject to the Swap continued to be limited to "Loans that [the Bank] has *purchased or committed to purchase* . . . for [the Bank's] Held for Sale portfolio."[967]

---

[961] Letter from Arnold & Porter LLP to Board of Directors of Ally Bank (May 24, 2011), at 16 [EXAM00000137].

[962] *Id.* at 16.

[963] Minutes of Special Meeting of Board of Directors of Residential Capital, LLC, Apr. 1, 2011, at RC40018446 [RC40018411] (referring the matter to a Special Committee of the Independent Directors).

[964] Goldin Associates Presentation to The Committee of Independent Members of the Board of Directors of Residential Capital, LLC Regarding Proposed Amendments to the ISDAs and Other Documentation Related to Swap Transactions Between GMAC Mortgage, LLC and Ally Bank, dated Apr. 19, 2011, at 5 [GOLDIN00130788].

[965] Action by Written Consent of the Board of Directors [of] Residential Capital, LLC, dated June 14, 2011, at RC40018529–627 [RC40018411].

[966] April 1, 2011 Pipeline Swap Confirmation, at 2–4 [ALLY_0041695] (definitions of Valuation Date, Funded Loan FMV Change, and Funded Loan FMV Change Amount). The Pipeline Swap previously had been settled on a monthly basis. July 2008 Pipeline Swap Schedule, part 6(a)(xii) [ALLY_0018237] ("Payment Date" is the fifth business day of each calendar month), (d) (requiring payments on the Payment Date).

[967] April 1, 2011 Pipeline Swap Confirmation, at 2 [ALLY_0041695] (emphasis added).

### (2) The MSR Swap Confirmation

The April 2011 MSR Swap Confirmation covered both the FMV Swap and the Net Funding Swap, which previously were documented on separate Schedules.[968] On the Net Funding Swap, the Confirmation left the Interest Rate applicable to the Funding Fee unchanged at LIBOR + 3.25%,[969] which Ally Bank continued to justify based on the analysis previously provided in a June 22, 2010 letter to the FDIC.[970] For the Net Servicing Fee, the language added in the 2010 Schedule regarding deductions for GSE repurchases[971] was retained in a slightly modified form.[972] For both the Funding Fee and the Net Servicing Fee, the Confirmation provided a mechanism for estimated payments on a daily basis, with a monthly "true-up."[973] There remained no provision for payment to Ally Bank at termination based on any calculation of run-off or the unamortized balance of amounts advanced to GMAC Mortgage upon capitalization of MSRs.

However, the most notable revisions in the April 2011 MSR Swap Confirmation are changes to both the FMV Swap and the Net Servicing Fee provisions that bear on the issue of the treatment of newly recognized MSRs.

Under the FMV Swap, "FMV Change" (the measurement of the payment due under the Swap) was redefined to mean:

> For any Valuation Date, the sum of (i) the amount of the change, if any, in the FMV Value from the immediately preceding Valuation Date, and (ii) the MSR Amount for such Valuation Date.[974]

---

[968] April 2011 MSR Swap Confirmation, §2 [ALLY_0041799] (definitions of Funded Loan FMV Change Payer, Funded Loan FMV Change Amount, Funded Loan FMV Change and Valuation Date).

[969] *Id*. § 2.

[970] *See* Memorandum, April 1, 2011 ISDA 2002 Master Agreement, Amended and Restated Schedule to the Master Agreement, Transaction Reference #1, Transaction Reference #2, and ISDA Credit Support Annex to the Schedule to Master Agreement, dated Oct. 27, 2011, ¶ 6 [ALLY_0018216].

Arnold & Porter LLP and Sandler O'Neill also defended the fee. *See* Letter from Arnold & Porter LLP to Board of Directors of Ally Bank (May 24, 2011), at 14–16 [EXAM00000137]; Sander O'Neill Report to the Board of Directors of Ally Bank Re: Analysis of Financial Terms of Certain Affiliate Agreements between Ally Bank and [GMAC Mortgage], dated Sept. 30, 2011, at 11, 14 [ALLY_0207866].

[971] *See* Section V.B.9.d(2) (quoting 2010 provision).

[972] April 2011 MSR Swap Confirmation, § 2 [ALLY_0041799] (definition of Actual Net Servicing Fee, clause (ii)).

[973] *Id*. § 2.

[974] *Id*. § 2 (definition of FMV Change).

"FMV Value" in turn, was defined as:

> For any Valuation Date, the most recent estimated valuation of
> the mortgage servicing rights then owned by [the Bank],
> inclusive of any MSR Amount. Such valuation shall be based
> upon, among other things, techniques consistent with [GMAC
> Mortgage's] internal financial and risk management processes
> for financial statement and regulatory filing purposes.[975]

Finally, "MSR Amount," a new concept introduced in the April 2011 MSR Swap
Confirmation, was defined as:

> For any Valuation Date, as applicable, (i) the *net loss* recorded
> by [the Bank] in respect of the *sale of mortgage servicing rights*
> then on [the Bank's] general ledger, *taking into account any*
> ***gain*** *on new origination and capitalization of mortgage*
> *servicing rights,* or gain or loss on the disposition thereof or in
> respect of the prepayment of any related mortgage loans, or
> (ii) the *net gain* recorded by [the Bank] in respect of the *sale of*
> *mortgage servicing rights* then on [the Bank's] general ledger,
> taking into account *any gain on new origination and*
> *capitalization of mortgage servicing rights,* or gain or loss on
> the disposition thereof or in respect of the prepayment of any
> related mortgage loans.[976]

Notably, eliminated from these definitions is any reference to the "FAS 156 mark to market";
the FMV Change applies simply to changes in the value of the Bank's mortgage servicing
rights, regardless of whether the change reflects a "FAS 156 mark to market." On the other
hand, the "MSR Amount" provisions, which were introduced because Ally Bank had sold
MSR assets and the parties wanted to address the application of the FMV Swap in that
circumstance,[977] do introduce the concept of "gain" on MSR capitalization.

The Net Servicing Fee provisions were also revised. As revised, the key term in defining how
servicing-fee payments to GMAC Mortgage will be calculated is "Actual Net Servicing Fee,"
which is defined as follows:

> For any Calculation Period, (x) the sum of the *amounts posted to*
> *all servicing and mortgage servicing rights related income*
> *statements accounts* in the general ledger of [the Bank] to

---

975  *Id.* § 2 [ALLY_0041799] (definition of FMV Value).

976  *Id.* § 2 [ALLY_0041799] (definition of MSR Amount) (emphasis added).

977  Int. of J. Young, Mar. 15, 2013, at 87:4–24.

include (i) any associated servicing expenses paid or incurred, as is customary for normal servicing of residential mortgage loans and (ii) the losses, liabilities, costs and expenses (collectively, "Losses") incurred by [the Bank] as owner of mortgage servicing rights, including without limitation Losses related to any agency loan repurchase request, indemnification or make-whole agreement, to the extent such Losses remain unreimbursed by [GMAC Mortgage].[978]

Thus, the definition of Actual Net Servicing Fee revised the Net Servicing Fee language, which had referenced "amounts collected or earned by [the Bank] (*i.e.,* normal servicing fees and ancillary income)," abandoning the reference to "normal servicing fees and ancillary income."

Cortese and Young offered differing accounts of these changes. Cortese, as noted in Section V.B.9.b(4), believed that the payments of the capitalized value of Bank-originated loan MSRs were being exchanged under the FMV Swap. He explained that the April 2011 Confirmation FMV Change/MSR Amount reference to "any *gain* on new origination and capitalization of MSRs" was the result of the accountants telling the Capital Markets teams involved in drafting the revised swap that it should be "specific to the gain or loss rather than what changed in the balance sheet."[979] The accountants told the "authors how they were doing it" and the authors "put together language that coincided with how [the accountants] were doing it."[980]

Young, however, maintained that the revisions in the Actual Net Servicing Fee definition, focusing on "amounts posted to all servicing and mortgage servicing rights related income statements accounts," make clear that it is the vehicle for the exchange of the gain (income) on capitalization of Bank-owned MSRs.[981] Young correctly noted that the "gain" reference in the FMV Swap occurs only in connection with provisions governing the sale of MSRs;[982] he explained that the addition to the FMV Swap language applies only where the Bank has sold MSRs, requiring adjustment of the FMV Change based on the gain or loss realized in such sales.[983] Young asserted the language was added as "belt and suspenders" and the gain remained covered by the Actual Net Servicing Fee as well.[984] This explanation

---

[978] April 2011 MSR Swap Confirmation, § 2, at 7 [ALLY_0041799] (definition of Actual Net Servicing Fee) (emphasis added).

[979] Int. of J. Cortese, Mar. 7, 2013, at 37:24–38:13 (emphasis added).

[980] *See id.*

[981] Int. of J. Young, Mar. 15, 2013, at 93:2–94:18.

[982] *Id.* at 79:8–80:2.

[983] *Id.* at 87:4-87:24.

[984] *Id.* at 93:8–93:19.

suggests that the gain would be included in the calculations of *both* the FMV Change and the Actual Net Servicing Fee, though Young denied that there was any intent to double-count the gain in this fashion.[985]

Indeed, if the April 2011 Swap Confirmation's Actual Net Servicing Fee definition—"amounts posted to all servicing and mortgage servicing rights related income statements accounts"—is read as Young argues, then it poses an even larger "double counting" problem: If the definition extends beyond "normal servicing fees and ancillary income" to embrace any and all amounts posted to the Bank's servicing rights related income statement accounts, then it includes even the items Young agrees are captured by the FMV Change provisions, the mark-to-market adjustments for MSRs that already have been capitalized on the Bank's books. These adjustments to the value of previously recognized MSRs are themselves recorded in the Bank's mortgage servicing rights related income statement accounts, and would consequently trigger payment under both the Actual Net Servicing Fee definition (as Young reads it) and the FMV Change definition.[986]

Exhibit V.B.10.b(2) below summarizes the total additions to the value of Ally Bank's MSR asset attributable to correspondent loans and purchased MSRs, which were not paid to GMAC Mortgage under the MSR Swap:

EXHIBIT V.B.10.b(2)
**Additions to the Value of Ally Bank's MSR Asset Attributable to Correspondent Loan MSRs and Purchased MSRs**
*($ in Thousands)*

|  | Sep. 2007 - Dec. 2008[1] | Jan.2009 - Mar. 2011 | Apr. 2011 - Mar. 2012 | Total |
|---|---|---|---|---|
| New capitalizations - purchased MSRs | $   421,860 | $   256,239 | $     28,986 | $   707,085 |
| New capitalizations - originated and correspondent loan MSRs | 19,035 | 923,463 | 404,805 | 1,347,303 |
| Sub-total new capitalization | 440,895 | 1,179,702 | 433,790 | 2,054,387 |
| New capitalizations - excess servicing (originated and correspondent) | 271,602 | 325,647 | 62,153 | 659,402 |
| Gain paid to GMAC Mortgage on new capitalizations | (310,934) | (578,364) | (99,152) | (988,450) |
| Additions attributable to correspondent loan MSRs and purchased MSRs | $   401,563 | $   926,985 | $   396,791 | $1,725,340 |

[1] *Period before the 2009 Bank Transaction; monthly data not available for January 2009.*
*Source:  MSR Swap Review, dated May 2012 [ALLY_0368244]; MSR Rollforward YTD 2009, dated Dec. 31, 2009 [EXAM00232590]; MSR Rollforward YTD 2010, dated Dec. 31, 2010 [EXAM00232591]; MSR Rollforward YTD 2011, dated Dec. 31, 2011 [EXAM00232592].*

Of the $1.7 billion total additions, $402 million related to 2007 and 2008, before the 2009 Bank Transaction, while $397 million related to the period after the April 2011 MSR Swap Confirmation.

---

[985]  *Id*. at 93:20–94:23.

[986]  Accounting Policy 2451, Mortgage Servicing Rights, Sept. 1, 2011, at RC40000816 [RC40000802]; Mortgage Segment Legacy YTD Consolidating Trial Balance (Dec. 31, 2011) [EXAM00228758].

### *(3) The Credit Support Annex*

The Credit Support Annex addressed concerns about Ally Bank's credit exposure to GMAC Mortgage by requiring that collateral be posted. Though obligations under the Swap could result in payments being due by either party, the collateral requirements imposed granted greater security to Ally Bank. Specifically, for purposes of calculating the collateral amount required to be posted, the amount was to be calculated by projecting the amount that would be payable if the transaction were terminated at the time and by whom (the Bank or GMAC Mortgage), and then adjusting that amount in favor of the Bank based on an "independent amount" calculated using certain metrics in the underlying transaction (the MSR Swap FMV Amount, Pipeline Swap Funded Loan Amount and Pipeline FMV Change Amounts).[987] Further, Ally Bank had the power, in its "reasonable discretion," to change the "independent amount" in the event of a material change in the financial condition of GMAC Mortgage or AFI.[988] Ally Bank invoked this right in February 2012, obtaining $40 million in additional collateral posted by AFI.[989]

### *c.   Sandler O'Neill's Review*

Later that year, the Bank Board also retained Sandler O'Neill to review the terms of the MMLPSA, the MSR Swap, the Pipeline Swap, and the Broker Agreement. In February 2012, Sandler O'Neill's retention was amended to include an analysis of the Bank's exposure to counterparty credit risk with respect these agreements. On February 28, 2012, Sandler O'Neill presented its report to the Bank Board.[990]

Starting with the swaps, like Arnold & Porter LLP, Sandler O'Neill reviewed the revised April 1, 2011 documentation for the MSR Swap and the Pipeline Swap. Based on that review, Sandler O'Neill observed that GMAC Mortgage through the swap protected the Bank against changes in market value, changes in interest rates, credit losses, prepayments and illiquidity of the MSRs as well as the underlying loan portfolio. GMAC Mortgage also absorbed servicing costs and losses incurred by the Bank in connection with its servicing activities. Sandler O'Neill noted that these protections were customized for the Bank, not typically seen in arm's-length transactions and, if available in the market, would only be available at considerable expense.[991]

---

[987] Credit Support Annex, dated Apr. 1, 2011, ¶ 13(b)(iv)(A) [RC00027990]; April 2011 Pipeline Swap Confirmation, §5 [ALLY_0041695]; April 2011 MSR Swap Confirmation, §5 [ALLY_0041799].

[988] Credit Support Annex, dated Apr. 1, 2011, ¶ 13(b)(iv)(A) [RC00027990]; April 2011 Pipeline Swap Confirmation, §5 [ALLY_0041695]; April 2011 MSR Swap Confirmation, §5 [ALLY_0041799].

[989] E-mail from J. Young to T. Marano, S. Abreu, J. Whitlinger, and T. Hamzehpour (Feb. 20, 2012) [EXAM00076116].

[990] Sandler O'Neill Report to the Board of Directors of Ally Bank Re: Analysis of Financial Terms of Certain Affiliate Agreements between Ally Bank and GMAC Mortgage LLC, dated Feb. 28, 2012 [ALLY_PEO_0084709].

[991] *Id.* at 19.

As to the Bank's counterparty risk to GMAC Mortgage, Sandler O'Neill stated that the Bank's risk was significantly mitigated by several features of the April 1, 2011 documentation, including: (1) the Bank's ability to select the assets covered by the swap; (2) the daily mark to market of swap exposures as well as the daily settlement requirement; (3) the Bank's ability to terminate the swaps, without cause, on 30 days' notice; and (4) the Bank's ability to require additional collateral as the result of a credit deterioration of GMAC Mortgage or AFI.[992]

In evaluating the terms of the MSR Swap and the Pipeline Swap, Sandler O'Neill compared their provisions to those found in the Citibank MSR Loan Agreement, under which Citibank received a financing fee of LIBOR + 6% and maintained a security interest in the servicing rights.[993] Sandler O'Neill opined that, while the fee paid to the Bank under the MSR Swap was lower, Ally Bank's ownership of the MSRs under the MSR Swap protected the Bank "against any declines in market value, changes in interest rates, credit losses, prepayments and illiquidity with respect to the MSR assets."[994] Sandler O'Neill concluded that, had the MSR Swap been structured more like the Citibank MSR Loan Agreement, the Bank would be able to obtain these protections only through a series of hedges "at considerable cost" to the Bank.[995] After highlighting several advantages to the Bank under the MSR Swap compared to the Citibank MSR Loan Agreement, Sandler O'Neill noted that it considered other transactions with similar residential mortgage risk, but "[c]omparable transactions are not readily available due to the unique terms of the MMLPSA and related swaps."[996]

### d.   The December 2011 Pipeline Letter Agreement

The MMLPSA had always required GMAC Mortgage to pay the purchase price for loans upon closing.[997] In 2011, a review determined that there sometimes was a delay of more than a day between the time loans were transferred to GMAC Mortgage and receipt of payment by Ally Bank.[998] ResCap personnel explained that this was not a recent development, or a reflection of ResCap's financial difficulties, but a product of normal delays in the

---

[992] *Id.* at 31.

[993] *Id.* at 33.

[994] *Id.* at 34.

[995] *Id.*

[996] *Id.* at 45.

[997] *See* 2001 MMLPSA, § 2.4(c) [ALLY_0018253]; 2006 MMLPSA, § 2.4(c) [ALLY_0018291]; 2007 MMLPSA, § 2.4(c) [ALLY_0018275]; 2008 MMLPSA, § 2.1 [ALLY_0201210].

[998] Letter from Arnold & Porter LLP to Board of Directors of Ally Bank (May 24, 2011), at 2 [EXAM00000137].

securitization process and receipt by ResCap of payment for the loans.[999] Nevertheless, such a delay was considered to constitute an extension of credit by the Bank to GMAC Mortgage; bank regulatory requirements required cash collateral for such obligations.[1000]

To address this issue, AFI, GMAC Mortgage Group, LLC, ResCap and GMAC Mortgage entered into a December 5, 2011, letter agreement (the Pipeline Letter Agreement).[1001] ResCap itself lacked the cash to provide the requisite collateral.[1002] GMAC Mortgage Group LLC (ResCap's immediate parent) had begun posting cash to collateralize GMAC Mortgage's obligations, using funds borrowed from AFI.[1003] In the Pipeline Letter Agreement, GMAC Mortgage Group and AFI agreed to continue to post up to $4 billion in cash collateral to satisfy bank regulatory requirements, and to "use commercially reasonable efforts to cause Ally Bank to continue to sell mortgage loans" under the MMLPSA for "not less than thirty (30) days."[1004] ResCap and GMAC Mortgage agreed, inter alia, that GMAC Mortgage (1) would take steps to expedite the pooling of loans into Mortgage-Backed Securities (MBSs), such as delivering loan schedules and other information necessary to facilitate pooling to the pertinent GSE contemporaneously with transfer of the loans under the MMLPSA; (2) arrange for the GSEs to wire MBSs directly to an agreed-upon account; and (3) grant Ally Bank and GMAC Mortgage Group, LLC a security interest in the loans and any proceeds.[1005]

---

[999] Int. of C. Dondzila, Sept. 27, 2012, at 257:5–262:15.

[1000] Letter from Arnold & Porter LLP to Board of Directors of Ally Bank (May 24, 2011), at 2 [EXAM00000137].

[1001] Pipeline Letter Agreement [ALLYKE000000579]. While the Pipeline Letter Agreement recites that it has been the subject of extensive negotiations involving Ally Bank, and that it memorializes the basis on which the Ally Bank is prepared to continue loan sales under the MMLPSA, *id.* at 1, Ally Bank is not a party to the Pipeline Letter Agreement.

[1002] *See* Section III.J (discussing ResCap's financial posture at this juncture).

[1003] Letter from Arnold & Porter LLP to Board of Directors of Ally Bank (May 24, 2011), at 2 [EXAM00000137]; Pipeline Letter Agreement, ¶ A [ALLYKE000000579].

[1004] Pipeline Letter Agreement, ¶ A(3), 4 ¶ B [ALLYKE000000579].

[1005] *Id.* at ¶¶ A(1), (2), (4), (5).

Following consideration by a Special Committee of the Independent Directors, the Pipeline Letter Agreement was approved at the December 5, 2011 meeting of the ResCap Board,[1006] subject to receipt of a fairness opinion from Goldin Associates[1007] and an opinion of counsel from Morrison & Foerster required to be delivered to AFI and GMAC Mortgage Group.[1008]

### 11. 2012 Terminations/Revisions

Just before ResCap filed its bankruptcy petition, the parties entered into an agreement terminating the MSR Swap and the Pipeline Swap, and entered into an Amended and Restated MMLPSA. These matters were apparently discussed with the ResCap Board in an April 30, 2012 ResCap Board meeting, but in-house counsel (with the concurrence of separate counsel for the Independent Directors) advised that no fairness opinion was required, at least for the terminations, and it does not appear that the agreements were voted on or otherwise approved by the Independent Directors or the ResCap Board.[1009]

#### a.   The Termination Agreement

GMAC Mortgage and Ally Bank entered into a Termination Agreement dated April 30, 2012, terminating both the Pipeline Swap and the MSR Swap.[1010] The Termination Agreement provided that amounts due for prior periods and for the period ending on the April 30, 2012 termination date would not be discharged by termination,[1011] and agreed to the return of all posted collateral.[1012] The parties further agreed to negotiate a "termination payment" within seven days.[1013] The parties thereafter agreed that the Bank owed GMAC Mortgage a termination payment of $51.048 million, comprising true-up payments under the MSR Swap

---

[1006] Minutes of a Special Meeting of the Board of Residential Capital, LLC, Dec. 5, 2011, at RC40018718–19, RC40018722–23 [RC40018411]; *see also* Minutes of a Special Meeting of the Board of Residential Capital, LLC, Dec. 2, 2011, at RC40018716–17 [RC40018411].

[1007] Opinion Letter from Goldin Associates to the Board of Directors of Residential Capital, LLC (Dec. 5, 2011) [GOLDIN00000683].

[1008] Letter from Morrison & Foerster, LLP to AFI, GMAC Mortgage Group, and Ally Bank (Dec. 5, 2011) [ALLYKE000000589]. The letter opines as to the good standing of ResCap and GMAC Mortgage, the due authorization of the Pipeline Letter Agreement, the lack of any need for additional authorizations or consents, and similar matters.

[1009] Draft Minutes of a Special Meeting of the Board of Residential Capital, LLC, Apr. 30, 2012, at 2–3 [EXAM11088895].

[1010] Termination Agreement, dated Apr. 30, 2012, Preamble, ¶ 2 [ALLY_0224353].

[1011] *Id.* ¶ 2(a).

[1012] *Id.* ¶ 2(b).

[1013] *Id.* ¶ 2(c).

and the Pipeline Swap through the date of termination totaling $18.2 million and the return of $32.8 million in collateral previously posted by GMAC Mortgage.[1014] Ally Bank paid this amount to GMAC Mortgage on May 4, 2012.[1015]

### b. *The May 2012 Amended And Restated MMLPSA*

Shortly before ResCap's bankruptcy filing, GMAC Mortgage and Ally Bank entered into an "Amended and Restated" MMLPSA dated May 1, 2012 (the "2012 MMLPSA").[1016] The MMLPSA amendments were presented to the ResCap Board at an April 30, 2012 meeting.[1017] In the months preceding the bankruptcy filing, Ally Bank obtained the necessary approvals and made the other arrangements necessary to become a direct seller of loans to Fannie Mae and Freddie Mac.[1018] Accordingly, the 2012 MMLPSA provides for the purchase and sale of loans eligible for securitization by Ginnie Mae, and not of Fannie Mae or Freddie Mac loans.[1019]

Under the 2012 MMLPSA, the Purchase Price for Mortgage Loans is:

> the Adjusted Carrying value of such Mortgage Loan as of the date such Mortgage Loan is funded, *plus* interest accrued on such Mortgage Loan from the date of funding through Closing Date, broker fees and Underwriting Fees and *minus* prepaid interest on such Mortgage Loan payable to Purchaser.[1020]

Adjusted Carrying Value is defined to mean

> with respect to any Mortgage Loan and any date of determination, the adjusted carrying value of such Mortgage Loan on Seller's books on such date calculated by Seller to be the unpaid principal balance of such Mortgage Loan on such date, *plus* any premium at origination and any servicing released premium, *minus* any discount at origination, and without consideration of any fair value adjustment, to the extent the

---

[1014] Affiliate Swap Termination Payment, dated May 4, 2012 [EXAM00233016].

[1015] Account Statement Detail Archive, dated Apr. 15, 2013 [EXAM00345836].

[1016] 2012 MMLPSA [RC00027892].

[1017] Draft Minutes of a Special Meeting of the Board of Residential Capital, LLC, Apr. 30, 2012, at 2–3 [EXAM11088895]. The Examiner has found no evidence that the matter was approved by the ResCap Board.

[1018] Detailed Analysis of Ally Bank's Affiliate Agreements, dated June 12, 2012, at 9 [SOP0000380].

[1019] 2012 MMLPSA, § 2.1 [RC00027892]. In addition, the MMLPSA provides for the sale of loans produced by USAA Federal Savings Bank, a Texas-based bank affiliated with United Services Automobile Association. *Id.* § 2.1.

[1020] *Id.* § 1.31.

> Mortgage Loan is subject to a fair value election, or LOCOM [lower of cost or market] adjustment to the extent the Mortgage Loan is not subject to a fair value election.[1021]

Thus, with the termination of the Pipeline Swap, the 2012 MMLPSA reverted to cost-based pricing, specifically excluding fair-value and LOCOM adjustments from calculation of the purchase price.

Under the 2012 MMLPSA, Ally Bank makes a loan-level representation and warranty that:

> each Mortgage Loan sold to Purchaser pursuant to this Agreement is eligible and insurable by the FHA, the VA or the USDA, and will remain eligible and insurable by the FHA, the USDA or the VA for purposes of Ginnie Mae pool certification until the issuance of a valid and binding mortgage insurance certificate or guaranty.[1022]

Ally Bank further agreed to repurchase any ineligible or uninsurable loan (subject to a right to promptly cure any curable issue).[1023]

Finally, the 2012 MMLPSA may be terminated by either party without cause on 30 days' notice.

### c. 2012 Amendment And Restatement Of Servicing Agreement

Ally Bank provided notice to GMAC Mortgage that it would not renew the Original Servicing Agreement on April 19, 2012. As a result, the Original Servicing Agreement would have expired pursuant to its terms on August 21, 2012.[1024] However, pursuant to negotiations described in Section V.B.9, the Original Servicing Agreement was replaced with the A&R Servicing Agreement dated May 11, 2012 as discussed at Section V.C.

### 12. Analysis Of The Financial Results Under The Derivative Agreements

The Examiner's Financial Advisors have analyzed the economic impact of the Pipeline Swap and the MSR Swap, as described in further detail below. First, on the Pipeline Swap, Ally Bank paid GMAC Mortgage a net total of $120.4 million during the period that the

---

[1021] *Id.* § 1.1.

[1022] *Id.* § 2.5(b).

[1023] *Id.* § 2.5(c).

[1024] *See* July 26, 2012, Hearing Transcript [Docket No. 942] at 20–21. The expiration date was extended at the request of the Bankruptcy Court to August 24, 2012.

Pipeline Swap was settled in cash from October 2008 through termination in April 2012.[1025] However, these payments are not reflective of the economics of the Pipeline Swap because the daily Pipeline Swap entries were simply reversed upon sale of the related loan to GMAC Mortgage, resulting in repayment under the Pipeline Swap of any amounts that had been previously paid by either party with respect to that loan. The best evidence of the actual impact of the Pipeline Swap is GMAC Mortgage's financial statements, which evidence net losses of $32.7 million on the Pipeline Swap from its inception in 2004 through 2011.[1026]

Second, as to the MSR Swap, Ally Bank paid GMAC Mortgage a net total of $699.7 million over the duration of the MSR Swap from September 2007 through termination in April 2012.[1027] GMAC Mortgage reported income related to the MSR Swap of approximately this same amount in its financial statements from 2007 through 2011.[1028]

GMAC Mortgage also hedged its pipeline and MSR risk, including risk associated with both loans and MSRs held by the Bank and those held by GMAC Mortgage itself. The Debtors' accounting and financial records do not allow the reliable allocation of the hedge results between those assets covered by the Pipeline Swap and the MSR Swap and those not subject to the Swaps. However, the overall hedge results and other analyses produced by the Debtors indicate that GMAC Mortgage did not incur hedging losses that would materially affect the overall economic impact of the swaps, and likely earned gains on these hedges.[1029]

Accordingly, the Examiner concludes that the evidence supports the proposition that GMAC Mortgage received a net benefit on the Pipeline Swap, the MSR Swap and the market hedges relating thereto when assessing the entirety of the economics as implemented by the parties.

---

[1025] ResCap—Pipeline Swap Template [EXAM00231094].

[1026] GMAC Mortgage, LLC Consolidated Financial Statements, as of and for the years ended December 31, 2005 and 2004, at 52 [EXAM00231553]; GMAC Mortgage, LLC Consolidated Financial Statements, as of and for the years ended December 31, 2007 and 2006, at 51 [EXAM00232043]; GMAC Mortgage, LLC Consolidated Financial Statements, as of and for the years ended December 31, 2009 and 2008, at 88 [EXAM00234189]; GMAC Mortgage, LLC Consolidated Financial Statements, as of and for the Years Ended December 31, 2011 and 2010, at 66 [EXAM00234281].

[1027] ResCap—MSR Cash Summary [EXAM00231039].

[1028] GMAC Mortgage, LLC Consolidated Financial Statements, as of and for the years ended December 31, 2008 and 2007, at 72 [EXAM00234112]; GMAC Mortgage, LLC Consolidated Financial Statements, as of and for the years ended December 31, 2010 and 2009, at 61 [EXAM00234350]; GMAC Mortgage, LLC Consolidated Financial Statements, as of and for the years ended December 31, 2011 and 2010, at 66 [EXAM00234281].

[1029] Meeting with J. Whitlinger in Ft. Washington, P.A. (Mar. 29, 2013).

### a. The Pipeline Swap

#### (1) Financial Results Under The Pipeline Swap

Ally Bank and GMAC Mortgage records reflecting the financial results of the Pipeline Swap show that the net result over the life of the Pipeline Swap was generally neutral from a financial standpoint, before consideration of related hedges. As mentioned above, the Pipeline Swap applied only to the Bank's HFI portfolio before July 1, 2008. ResCap produced financial records related to the Pipeline Swap from its inception in October 2004 through termination in April 2012, with certain exceptions. The Pipeline Swap was settled through intercompany accounts, rather than through the exchange of cash, before October 2008.[1030] The Debtors' internal records initially extend from October 2004 to March 2006, and then resume from May 2007 to March 2008, with the intervening time period corresponding to the gap in the periods covered by the written agreements that have been produced.[1031] These financial records showed activity under the HFI Pipeline Swap peaking in March through May 2005 and declining significantly hereafter, with a net benefit to GMAC Mortgage from the Pipeline Swap of approximately $2.4 million,[1032] as shown in Exhibit V.B.12.a(1)—1 below.

---

[1030] Accrual v. Cash Settlement [EXAM00339946].

[1031] *See* Section V.B.4 (discussing gap in documentation of Pipeline Swap).

[1032] Bank HFI Swap Analysis [EXAM00344897]; Bank Flow HFI Portfolio (May 2007–Mar. 2008) [EXAM00344891; EXAM00344892; EXAM00344893; EXAM00344894; EXAM00344895; EXAM00344896; EXAM00344897; EXAM00344898; EXAM00344899; EXAM00344900; EXAM00344901; EXAM00344902].

EXHIBIT V.B.12.a(1)—1
**Pipeline Swap (HFI) – Total Amount Swapped to GMAC Mortgage and Settled on an Intercompany Basis**
October 2004 – March 2006, May 2007 – March 2008

| Date | Loan Count | Loan UPB | Pipeline (HFI) Swap Total |
|---|---|---|---|
| October-04 | 169 | $  56,738,541 | $  449,347 |
| November-04 | 347 | 120,083,931 | 110,229 |
| December-04 | 430 | 157,715,377 | 318,588 |
| January-05 | 404 | 153,509,632 | 567,352 |
| February-05 | 452 | 160,416,552 | 485,984 |
| March-05 | 1,162 | 403,533,551 | (2,300,621) |
| April-05 | 1,069 | 347,575,939 | 618,671 |
| May-05 | 923 | 300,971,305 | 1,317,929 |
| June-05 | 623 | 178,070,670 | 662,065 |
| July-05 | 459 | 119,907,448 | (62,552) |
| August-05 | 544 | 140,812,565 | 45,635 |
| September-05 | 533 | 137,051,983 | 587,292 |
| October-05 | 89 | 32,670,082 | (95,949) |
| November-05 | 85 | 31,318,506 | (14,642) |
| December-05 | 52 | 18,449,152 | 66,608 |
| January-06 | 19 | 6,252,116 | 29,706 |
| February-06 | 15 | 4,756,337 | (8,881) |
| March-06 | 8 | 1,457,616 | 6,717 |
| Subtotal - October '04 - March '06 [1] | 410 | 131,738,406 | 2,783,478 |
| Subtotal - May '07 - March '08 [1] | 17 | 9,628,856 | (400,763) |
| Total | | | $  2,382,715 |

[1] *The loan count and loan UPB reflected represent the monthly average for the period.*
*Source: Bank HFI Swap [EXAM00344897]; Bank Flow HFI Portfolio (May 2007-Mar. 2008) [EXAM00344891; EXAM00344892; EXAM00344893; EXAM00344894; EXAM00344895; EXAM00344896; EXAM00344898; EXAM00344899; EXAM00344900; EXAM00344901; EXAM00344902].*

The Examiner's Financial Advisors undertook certain efforts to validate the amounts provided by the Debtors. First, reference to GMAC Mortgage's financial statements indicated gains of $3.7 million related to the Pipeline Swap for 2004 through 2006,[1033] as compared to $2.8 million reflected in Exhibit V.B.12.a(1)—1 above. Intercompany accounting and period-end true-ups may account for this 32% discrepancy, but it appears no such documentation is available.[1034]

More generally, ResCap provided accounting data for August and September 2008 to demonstrate the method utilized for settlement of the Pipeline Swap through intercompany accounts.[1035] GMAC Mortgage recorded the total mark-to-market amount for pipeline and inventory loans as an accrual at month-end. GMAC Mortgage made another entry that same day to reclassify the portion of the mark-to-market adjustment related to the Bank through an intercompany entry, which reflected the settlement of the Pipeline Swap. For example, the total mark-to-market adjustment in August 2008 for pipeline and inventory loans before hedge results was $57.3 million, inclusive of $40.8 million attributable to Bank loans subject to the Pipeline Swap. Therefore, GMAC Mortgage recorded an intercompany receivable from the Bank for $40.8 million to reflect amounts due related to the increase in the value of the Bank's loans to reflect settlement of the Pipeline Swap through intercompany accounts.[1036] The Pipeline Swap was settled in cash from October 2008 through termination in April 2012.[1037] ResCap's records reflecting cash payments related to the Pipeline Swap for this period showed a net benefit to GMAC Mortgage from the Pipeline Swap of approximately $120.4 million,[1038] as shown in Exhibit V.B.12.a(1)—2 below.[1039]

---

[1033] GMAC Mortgage, LLC Consolidated Financial Statements, as of and for the years ended December 31, 2005 and 2004, at 52 [EXAM00231553]; GMAC Mortgage, LLC Consolidated Financial Statements, as of and for the years ended December 31, 2007 and 2006, at 51 [EXAM00232043].

[1034] According to Whitlinger, Debtors are unable to provide the information necessary to reconcile the amounts included in Exhibit V.B.12.a(1)—1 above to the general ledger. Meeting with J. Whitlinger in Ft. Washington, P.A. (Mar. 29, 2013).

[1035] Accrual v. Cash Settlement [EXAM00339946].

[1036] *Id.*

[1037] ResCap—Pipeline Swap Template [EXAM00231094].

[1038] *Id.*

[1039] Ally Bank also provided records reflecting approximately $106.6 million in cumulative net cash payments related to the Pipeline Swap made by the Bank to GMAC Mortgage for the period October 2008 to April 2012 but could not provide sufficient information to permit reconciliation with the ResCap data. Mortgage Division, Affiliate Transaction Summary [ALLY_0171134].

EXHIBIT V.B.12.a(1)—2
**Pipeline Swap Annual Payments (Net)**
October 2008 – April 2012
*($ in Millions)*



*Source: ResCap - Pipeline Swap Template [EXAM00231094].*

The cash payments are not truly reflective of the economics of the Pipeline Swap, however, because, as discussed in Section V.B.5.c, the parties' post-July 1, 2008 accounting for the MMLPSA and for the Pipeline Swap did not correspond to the terms of the agreements (though in combination they reached the same economic effect). While changes in loan value were tracked under the Pipeline Swap, upon the sale of the loan to GMAC Mortgage the daily Pipeline Swap entries were simply reversed, resulting in repayment under the Pipeline Swap of any amounts that had been previously paid by either party with respect to that loan.[1040] The loan was then purchased at the Bank's "cost basis" as historically defined, effectively shifting the impact of any subsequent changes in market value to GMAC Mortgage. The records provided by the Debtors were insufficient to isolate the "fair value exchange at sale" entry reversing the daily Pipeline Swap entries that would reflect the economics from lock to sale.[1041]

---

[1040] Loan Summary [EXAM00229653]; Loan Summary [EXAM00233017]; Examiner Loan Selections 03 11 13 [EXAM00339939]; Examiner Loan Selections 04 15 13 [EXAM00345279].

[1041] ResCap provided detailed information on 867,084 loans that were subject to the Pipeline Swap for the period from 2009 through 2012. Journal Entry Level Detail of Transactions [EXAM00338648; EXAM00338649; EXAM00338650; EXAM00338651; EXAM00338652; EXAM00338653; EXAM00338654; EXAM00338655; EXAM00338656; EXAM00338657; EXAM00338658; EXAM00338659; EXAM00338660; EXAM00338661; EXAM00338662]. Upon review and analysis, the information lacked certain components and key inputs, such as lock pull-through rate amounts, rendering the data inconclusive.

Consequently, the most reliable information regarding the overall economic impact of the Pipeline Swap appears to be the related party footnotes to GMAC Mortgage's financial statements. This information reflects losses of $32.7 million on the Pipeline Swap from its inception in 2004 through 2011, including losses of $1.5 million during the period from 2009 through 2011 when ResCap no longer owned an interest in IB Finance.[1042] This amount was reported as part of the *Gain on Sale of Mortgage Loans, Net* line item in the income statement of GMAC Mortgage.[1043] Exhibit V.B.12.a(1)—3 indicates that the annual gain or loss recognized by GMAC Mortgage on the Pipeline Swap averaged 7.6% and ranged from -23.5% to 116.3% of the amounts reflected on the GMAC Mortgage income statement for this line item. The Exhibit also demonstrates the shift of gain/loss related to HFS loans from the Correspondent Agreement in earlier periods to the Pipeline Swap in later periods.

EXHIBIT V.B.12.a(1)—3
**GMAC Mortgage Selected Financial Information – Overall Economic Impact of the Pipeline Swap**
Years Ended 2004 – 2011
*($ in Millions)*

| | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | Total | Average |
|---|---|---|---|---|---|---|---|---|---|---|
| Correspondent Agreement - Gain (loss) [1] | $ 29.6 | $ 54.5 | $ 94.1 | $ 50.8 | $ 3.1 | $ - | $ - | $ - | $ 232.0 | |
| Pipeline Swap - Gain (loss) [2] | $ 1.5 | $ 2.2 | $ 0.0 | $ 2.5 | $ (37.4) | $ (121.3) | $ (70.1) | $ 189.9 | $ (32.7) | |
| GMAC Mortgage, LLC - "Gain on mortgage loans, net" | $438.1 | $ 313.7 | $ 246.5 | $ 38.6 | $ 231.4 | $ 517.3 | $ 298.7 | $ 163.3 | $ 2,247.7 | |
| Pipeline Swap as a % of GMAC Mortgage, LLC - "Gain on mortgage loans, net" | 0.3% | 0.7% | 0.0% | 6.4% | -16.2% | -23.4% | -23.5% | 116.3% | -1.5% | 7.6% |

[1] *Related to the gain (loss) recognized upon the sale of mortgage loans sold to the Bank under the Correspondent Agreement between GMAC Mortgage and the Bank.*
[2] *Financial results from the Pipeline Swap are reported as a component of "Gain on mortgage loans, net." The financial statement impact of the Pipeline Swap is disclosed in the related party transaction footnotes contained in GMAC Mortgage's audited financial statements.*
*Source: GMAC Mortgage Corporation Consolidated Financial Statements as of and for the years ended December. 31, 2005 and 2004 (Restated), at 2, 52 [EXAM00232043]; GMAC Mortgage, LLC Consolidated Financial Statements, as of and for the years ended December 31, 2009 and 2008, at 5, 88 [EXAM00234189]; GMAC Mortgage, LLC Consolidated Financial Statements, as of and for the years ended December 31, 2011 and 2010, at 5, 66 [EXAM00234281].*

---

[1042] GMAC Mortgage, LLC Consolidated Financial Statements, as of and for the years ended December 31, 2005 and 2004, at 52 [EXAM00231553]; GMAC Mortgage, LLC Consolidated Financial Statements, as of and for the years ended December 31, 2007 and 2006, at 51 [EXAM00232043]; GMAC Mortgage, LLC Consolidated Financial Statements, as of and for the years ended December 31, 2009 and 2008, at 88 [EXAM00234189]; GMAC Mortgage, LLC Consolidated Financial Statements, as of and for the Years Ended December 31, 2011 and 2010, at 66 [EXAM00234281].

[1043] GMAC Mortgage, LLC Consolidated Financial Statements, as of and for the years ended December 31, 2009 and 2008, at 88 [EXAM00234189].

The *Gain on Mortgage Loans, Net* line item reflects mortgage loan purchase and sale activity between GMAC Mortgage and the Bank of $517 million in 2009, $299 million in 2010, and $163 million in 2011.[1044] The majority of this gain resulted from GMAC Mortgage's purchase of loans from the Bank and sale of those loans to third-party investors pursuant to the terms of the Pipeline Swap in conjunction with the MMLPSA.[1045] GMAC Mortgage activity that was independent of the Bank had accounted for a majority of the gain on sale of mortgage loans before implementation of the Broker to Bank initiative in 2009, as shown in Exhibit V.B.12.a(1)—4 below:

EXHIBIT V.B.12.a(1)—4
**Loans Sold by GMAC Mortgage to the Bank as a Percentage of Loans Purchased Under the MMLPSA (Includes Old GMAC Bank and Ally Bank)**
Years Ended 2004 – 2008
*($ in Millions)*



*Source: GMAC Mortgage Corporation Consolidated Financial Statements As of and for the years ended December 31, 2005 and 2004 (Restated), at 51 [EXAM00231553]; GMAC Mortgage, LLC Consolidated Financial Statements, as of and for the years ended December 31, 2007 and 2006, at 51 [EXAM00232043]; GMAC Mortgage, LLC Consolidated Financial Statements, as of and for the years ended December 31, 2009 and 2008, at 86 [EXAM00234189].*

[1044] GMAC Mortgage, LLC Consolidated Financial Statements, as of and for the years ended December 31, 2009 and 2008, at 5 [EXAM00234189]; GMAC Mortgage, LLC Consolidated Financial Statements, as of and for the Years Ended December 31, 2011 and 2010, at 5 [EXAM00234281].

[1045] GMAC Mortgage, LLC, Notes to Consolidated Financial Statements for the years ended December 31, 2010 and 2009, at EXAM00234358 [EXAM00234350].

## (2) Financial Results Of GMAC Mortgage's Market Pipeline Risk Hedging

GMAC Mortgage also hedged its pipeline risk in the market, including the risk absorbed through the Pipeline Swap.[1046] GMAC Mortgage hedged at the portfolio level, which included all of GMAC Mortgage's pipeline risk, and did not allocate hedges to specific Bank loans covered under the Pipeline Swap. The results of GMAC Mortgage's hedging activity, the purpose of which was to neutralize market risk, are an important consideration in assessing the economics of the Pipeline Swap.

GMAC Mortgage reported the results of its pipeline and inventory trading activity, including hedging, through the Trading P&L, which ties to GMAC Mortgage's general ledger.[1047] As illustrated in Exhibit V.B.12.a(2) below, the total trading P&L impact for January 2006 through April 2012 was a $1.5 billion gain,[1048] after adjustment.

EXHIBIT V.B.12.a(2)
**Cumulative Pipeline Trading Profit and Loss Change According to GMAC Mortgage Pipeline Hedged Reports**
January 2006 – April 2012
*($ in Millions)*

|  | 2006 | | 2007 | | 2008 | | 2009 | | 2010 | | 2011 | | YTD April | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total pipeline trading P&L change | $ | (5) | $ | (59) | $ | (34) | $ | 628 | $ | 600 | $ | 399 | $ | 159 | $ | 1,688 |
| - Net interest income [1] | | - | | - | | - | | - | | (106) | | (89) | | (16) | | (210) |
| - Interest carry [1] | | - | | - | | - | | - | | (3) | | 3 | | 7 | | 7 |
| Total pipeline trading P&L change after adjustment for interest [2] | $ | (5) | $ | (59) | $ | (34) | $ | 628 | $ | 491 | $ | 314 | $ | 150 | $ | 1,485 |

[1] *According to Debtor's management, net interest income and interest carry were removed from the total profit and loss change because they are unrelated to analyzing hedge results.*

[2] *According to Debtor's management, total profit and loss change contains certain manual adjustments, including HFS to HFI transfer adjustments which cannot be hedged. Therefore, Pipeline Hedged Reports do not fully reflect true hedge performance, and should be adjusted further. Debtors' management nonetheless advises that the adjustments would not significantly alter overall results, and this appears to the Examiner's Professionals to be reasonable.*

*Source: Pipeline Hedged Reports [EXAM00338641]; [EXAM00338642]; [EXAM00338643]; [EXAM00338644]; [EXAM00338645]; [EXAM00338646]; [EXAM00338647]; Meeting with J. Whitlinger in Ft. Washington, PA (Mar. 29, 2013).*

---

[1046] Int. of A. Celini, Feb. 18, 2013, at 116:18–21.

[1047] The Trading P&L was a component of the Pipeline Hedged Report, a daily summary of pipeline and inventory trading results and related financial information. Pipeline Hedged Report Detail, dated Apr. 24, 2012 [EXAM00000916].

[1048] 2006 Monthly Sum of Sum [EXAM00338641]; 2007 Monthly Sum of Sum [EXAM00338642]; 2008 Monthly Sum of Sum [EXAM00338643]; 2009 Monthly Sum of Sum [EXAM00338644]; 2010 Monthly Sum of Sum [EXAM00338645]; 2011 Monthly Sum of Sum [EXAM00338646]; 2012 Monthly Sum of Sum [EXAM00338647].

The Debtors' accounting and financial records do not allow the reliable allocation of the hedge results to loans subject to the Pipeline Swap. The overall hedging gains are likely indicative of hedging gains related to the Pipeline Swap, according to the Debtors' management.[1049] Based on the available evidence, it appears that GMAC Mortgage did not incur hedging losses that would materially affect the overall economic impact of the Pipeline Swap, and likely earned offsetting gains on these hedges.[1050]

### b.  The MSR Swap

#### (1) Financial Results Under The MSR Swap

Ally Bank and GMAC Mortgage records reflecting the financial results of the MSR Swap show that the net result over the life of the MSR Swap was substantially in GMAC Mortgage's favor, before consideration of related hedges.[1051] As described above, GMAC Mortgage and Ally Bank entered into a number of revisions and amendments to the MSR Swap and the related documentation between its inception in August 2007 and its termination in April 2012. While certain terminology changed over time, the substance of the components comprising the calculation of payments between the parties generally did not change and included the following:

> (1) The gain or loss on servicing rights—GMAC Mortgage received payments from Ally Bank for the gain related to the creation of MSRs and other servicing related assets. The Bank recognized this gain, which was recorded on the income statement as a component of the line item *Gain on Sale of Mortgage Loans to Affiliate,* when it capitalized the assets at the time of sale of the underlying loans to GMAC Mortgage. As discussed above, loans sold by Ally Bank created two separate types of gains that were transferred to GMAC Mortgage—gain on originated MSRs (referred to as "OMSRs") and gain on excess servicing rights. While Bank-originated loans resulted in gains from both MSRs and excess servicing rights, correspondent loans resulted in gains only from excess servicing rights because the purchase price the Bank paid to the correspondent included an SRP corresponding to the MSR value.

---

[1049] Meeting with J. Whitlinger in Ft. Washington, P.A. (Mar. 29, 2013).

[1050] *Id. See* 2006 Monthly Sum of Sum [EXAM00338641]; 2007 Monthly Sum of Sum [EXAM00338642]; 2008 Monthly Sum of Sum [EXAM00338643]; 2009 Monthly Sum of Sum [EXAM00338644]; 2010 Monthly Sum of Sum [EXAM00338645]; 2011 Monthly Sum of Sum [EXAM00338646]; 2012 Monthly Sum of Sum [EXAM00338647].

[1051] Ally Bank provided records reflecting approximately $585.2 million in cumulative net cash payments related to the MSR Swap made by the Bank to GMAC Mortgage for the period January 2008 to April 2012 but did not provide sufficient information for reconciliation with the ResCap data. Mortgage Division, Affiliate Transaction Summary [ALLY_0171134]. The data provided by the Bank included monthly information presented to the Ally Bank Board for the period November 2007 to April 2012; *see also* ResCap—MSR Cash Summary [EXAM00231039]. ResCap provided a detailed schedule for the period September 2007 to April 30, 2012.

(2) The change in value of MSR assets after origination—GMAC Mortgage received or made payments to Ally Bank based on changes in the fair market value of the MSR assets on the Bank's balance sheet. These fair market value changes were generally due either to changes in interest rate assumptions, which could result in either gains or losses, or to the amortization expense recognized each month as a result of servicing fees being earned.

(3) The net fees earned on servicing—GMAC Mortgage received payments from Ally Bank for the net fees earned by Ally Bank on servicing for its MSR assets. This amount generally included servicing revenue less servicing expenses or losses.[1052] Servicing expenses included the servicing fees paid to GMAC Mortgage. As a result, GMAC Mortgage received all of the income from servicing through receiving both the contractual servicing fee and the profit (or loss) remaining after payment of that fee.

(4) The funding fee on the MSR and related servicing assets—GMAC Mortgage paid to Ally Bank a funding fee that was calculated by applying an agreed-upon interest rate to the total of all MSRs, servicing advances and related payables reflected on the Bank's balance sheet. The parties increased the margin over LIBOR from the 1.0% rate established in 2007 to 3.25% in July 2010.[1053]

---

[1052] As discussed above, while the amended and restated Schedule from July 2010 added references to certain losses related to representations and warranties, Ally Bank never actually paid any repurchase claims and thus did not deduct any such payments from the Net Servicing Fee. 2010 Net Funding Schedule, part 6(a)(v) [ALLY_0018118].

[1053] 2007 Net Funding Schedule, parts 6(a)(iii), (iv), (vi) [RC00027852], 2010 Net Funding Schedule, part 6(a)(iv) [ALLY_0018118].

The exchange proved to be a financially beneficial one to GMAC Mortgage. ResCap's records indicate that Ally Bank paid GMAC Mortgage a total of $699.7 million[1054] over the duration of the MSR Swap from September 2007 through termination in April 2012, as shown in Exhibit V.B.12.b(1)—1 below.[1055]



EXHIBIT V.B.12.b(1)—1
**MSR Swap Annual Payments (Net)**
September 2007 – April 2012
*($ in Millions)*

Source: ResCap - MSR Cash Summary [EXAM00231039].

GMAC Mortgage recorded gains in its financial statements from 2007 through 2011 of approximately the same amount as the cash payments shown above.[1056] The income or loss on the MSR Swap was reported as part of the *Servicing Valuation and Hedge Activities, Net* line item that is part of *Net Servicing Fees* in the income statement of GMAC Mortgage.[1057]

---

[1054] Ally Bank also provided records reflecting approximately $585.2 million in cumulative net cash payments related to the MSR Swap made by the Bank to GMAC Mortgage for the period January 2008 to April 2012 but did not provide sufficient information for reconciliation with the ResCap data. Mortgage Division, Affiliate Transaction Summary [ALLY_0171134].

[1055] ResCap—MSR Cash Summary [EXAM00231039].

[1056] GMAC Mortgage, LLC Consolidated Financial Statements, as of and for the years ended December 31, 2008 and 2007, at 72 [EXAM00234112]; GMAC Mortgage, LLC Consolidated Financial Statements, as of and for the years ended December 31, 2010 and 2009, at 61 [EXAM00234350]; GMAC Mortgage, LLC Consolidated Financial Statements, as of and for the years ended December 31, 2011 and 2010, at 66 [EXAM00234281] (showing total impact of the MSR Swap as $699 million from 2007 through 2011, though differences from cash payments were noted in 2007 and 2008).

[1057] GMAC Mortgage, LLC Consolidated Financial Statements, as of and for the years ended December 31, 2008 and 2007, at 72 [EXAM00234112]; GMAC Mortgage, LLC Consolidated Financial Statements, as of and for the years ended December 31, 2010 and 2009, at 61 [EXAM00234350]; GMAC Mortgage, LLC Consolidated Financial Statements, as of and for the years ended December 31, 2011 and 2010, at 66 [EXAM00234281].

Exhibit V.B.12.b(1)—2 indicates that the annual gain or loss recognized by GMAC Mortgage on the MSR Swap averaged 21.6% and ranged from -82.2% to 141.9% of the amounts reflected on the GMAC Mortgage income statement for this line item.

EXHIBIT V.B.12.b(1)—2
**GMAC Mortgage Selected Financial Information – Overall Economic Impact of the MSR Swap**
Years Ended 2007 – 2011
*($ in Millions)*

| | 2007 | 2008 | 2009 | 2010 | 2011 | Total | Average |
|---|---|---|---|---|---|---|---|
| GMAC Mortgage "Servicing assets valuation and hedge activities, net — derivative instruments with Ally Bank" [1] | $    3.9 | $    103.2 | $ 481.6 | $    469.9 | $(359.5) | $    699.1 | |
| GMAC Mortgage, LLC - "Net servicing fees" | $ 817.0 | $1,234.4 | $ 339.4 | $1,189.0 | $ 437.5 | $4,017.3 | |
| MSR Swap as a % of GMAC Mortgage, LLC - "Net servicing fees" | 0.5% | 8.4% | 141.9% | 39.5% | -82.2% | 17.4% | 21.6% |

[1] *A review of the line item, "Servicing Assets valuation and hedge activities, net – derivative instruments with Ally Bank" and the related footnotes included in the corresponding financial statements indicate this line item reflects the financial results of the MSR Swap.*
*Source:  GMAC Mortgage, LLC Consolidated Financial Statements, as of and for the years ended December 31, 2007 and 2006, at 2, 51 [EXAM00232043]; GMAC Mortgage, LLC Consolidated Financial Statements, as of and for the years ended December 31, 2009 and 2008, at 5, 87 [EXAM00234189]; GMAC Mortgage, LLC Consolidated Financial Statements, as of and for the years ended December 31, 2011 and 2010, at 5, 66 [EXAM00234281].*

ResCap also provided accounting records quantifying each of the above-described elements of the MSR Swap. Exhibit V.B.12.b(1)—3 below summarizes the cumulative changes related to each element of the MSR Swap for the period September 2007 to April 2012. The inflows from net servicing fees generally offset the outflows from market value changes, while the gain on servicing assets far outweighed the funding fees.[1058]

---

[1058] GMAC Mortgage did not calculate economic amortization separately from changes in interest rate assumptions in 2007 and 2008. The impact of the increase in the interest rate used to calculate the funding fee (from LIBOR plus 1% to LIBOR plus 3.25%) was immaterial relative to the total amount of funds exchanged under the MSR Swap.



EXHIBIT V.B.12.b(1)—3
**MSR Swap Cumulative Activity by Element**
September 2007 – April 2012
*($ in Millions)*

*Source: ResCap - MSR Cash Summary [EXAM00231039]; OMSR Values [EXAM00339036].*

Ally Bank paid GMAC Mortgage a total of $608.3 million during the period from January 2009 through April 2012 (after ResCap sold its interest in IB Finance), as shown in Exhibit V.B.12.b(1)-4 below.[1059] The relationship between the various elements remained generally consistent. Available information segregating market value changes indicated that virtually the entire net adjustment in this category related to economic amortization rather than changes in interest rate assumptions.

_____

[1059] ResCap - MSR Cash Summary [EXAM00231039].



EXHIBIT V.B.12.b(1)—4
**MSR Swap Cumulative Activity by Element**
January 2009 – April 2012
*($ in Millions)*

*Source: ResCap - MSR Cash Summary [EXAM00231039]; OMSR Values [EXAM00339036].*

Considerable volatility due to interest rate changes is evident when looking at the MSR Swap data on an annual rather than aggregated basis, as shown in Exhibit V.B.12.b(1)-5 below:

EXHIBIT V.B.12.b(1)—5
**MSR Swap – Key Financial Elements**
September 2007 – April 2012
*($ in Millions)*

|  | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | Total |
|---|---|---|---|---|---|---|---|
| FMV change - interest rate [1] | $ (0.0) | $ (296.4) | $ 257.8 | $ 171.7 | $ (430.0) | $ (0.2) | $ (297.3) |
| FMV change - amortization [1] | - | - | (117.9) | (318.2) | (364.1) | (127.2) | (927.4) |
| Funding fees (LIBOR +) | (0.4) | (14.0) | (9.1) | (23.5) | (59.6) | (16.1) | (122.6) |
| Gain on new cap - MSR | 8.6 | 53.4 | 77.6 | 136.1 | 61.6 | 27.0 | 364.2 |
| Gain on new cap - excess servicing | 14.6 | 219.5 | 95.9 | 209.9 | 69.4 | 10.9 | 620.2 |
| Net servicing fees | 3.9 | 102.2 | 177.3 | 294.0 | 362.8 | 122.2 | 1,062.5 |
| Total cash settlement paid to GMAC Mortgage | $ 26.6 | $ 64.7 | $ 481.6 | $ 469.9 | $ (360.0) | $ 16.7 | $ 699.7 |

*[1] For 2007 to 2008, economic amortization was not calculated separately from changes to interest rate assumptions.*
*Source: ResCap - MSR Cash Summary [EXAM00231039]; OMSR Values [EXAM00339036].*

The payments under the MSR Swap due to periodic interest rate-driven changes in market value were particularly pronounced in 2011, giving rise to $430 million of payments for that element from GMAC Mortgage to Ally Bank. Exhibit V.B.12.b(1)-6 below, which shows monthly MSR Swap payments from inception through April 2012, indicates that the most significant changes occurred in the third quarter of 2011.



EXHIBIT V.B.12.b(1)—6
**MSR Swap Monthly Payments**
September 2007 – April 2012
*($ in Millions)*

Source: ResCap - MSR Cash Summary [EXAM00231039].

ResCap, Ally Bank, and other mortgage servicers revised assumptions in their MSR valuation models during 2011 to reflect changes in the macroeconomic environment, including increases in prepayments rates and discounts rates and the impact of government initiatives and settlements on both servicing costs and borrower behavior, all of which negatively affected the value of MSRs.[1060] Exhibits V.B.12.b(1)-7 and V.B.12.b(1)-8 below compare a measure of MSR value for AFI and Ally Bank to a subset of other large financial institutions with significant MSR portfolios. The AFI and Ally Bank MSR portfolios dropped in book value from 1.0% to 0.7% of servicing unpaid principal balance between the second and third quarters of 2011, which was in line with other industry participants. This market change in turn was the driver for many of the payments under the MSR Swap related to changes in market value.

---

[1060] MSR Performance Presentation, dated Aug. 2011 [ALLY_PEO_0031247].

EXHIBIT V.B.12.b(1)—7
**Industry MSR Valuation – Quarterly MSR Book Value Comparisons**
March 31, 2011 – March 31, 2012
*($ in Billions)*

| Company | MSR Book Value | | | | |
|---|---|---|---|---|---|
| | 3/31/11 | 6/30/11 | 9/30/11 | 12/31/11 | 3/31/12 |
| Ally Financial Inc. | $   3.8 | $   3.7 | $   2.7 | $   2.5 | $   2.6 |
| Bank of America | 15.3 | 12.4 | 7.9 | 7.4 | 7.6 |
| JPMorgan Chase | 13.1 | 12.2 | 7.8 | 7.2 | 8.0 |
| Citigroup | 4.7 | 4.2 | 2.9 | 2.6 | 2.7 |
| Wells Fargo | 15.6 | 14.7 | 12.4 | 12.6 | 13.6 |
| U.S. Bancorp | 2.1 | 2.0 | 1.5 | 1.5 | 1.7 |
| PNC | 1.1 | 1.0 | 0.7 | 0.6 | 0.7 |
| SunTrust | 1.5 | 1.4 | 1.0 | 0.9 | 1.1 |
| High | $  15.6 | $  14.7 | $  12.4 | $  12.6 | $  13.6 |
| Median | 4.3 | 4.0 | 2.8 | 2.5 | 2.7 |
| Mean | 7.2 | 6.5 | 4.6 | 4.4 | 4.8 |
| Low | 1.1 | 1.0 | 0.7 | 0.6 | 0.7 |
| Ally Bank | $   1.7 | $   1.8 | $   1.3 | $   1.3 | $   1.3 |

Source: *Individual Company SEC filings; MSR Rollforward (2010-2011) [EXAM00232591]; [EXAM00232592]; MSR Swap Review [ALLY_0368244]; See Appendix X.*

EXHIBIT V.B.12.b(1)—8
**Industry MSR Valuation – Quarterly MSR Book Value/UPB Ratio Comparisons**
March 31, 2011 – March 31, 2012

| Company | MSR Book Value / UPB | | | | |
|---|---|---|---|---|---|
| | 3/31/11 | 6/30/11 | 9/30/11 | 12/31/11 | 3/31/12 |
| Ally Financial Inc. | 1.1% | 1.0% | 0.7% | 0.7% | 0.8% |
| Bank of America | 0.8% | 0.6% | 0.4% | 0.4% | 0.5% |
| JPMorgan Chase | 1.4% | 1.3% | 0.8% | 0.8% | 0.9% |
| Citigroup | 1.1% | 1.0% | 0.7% | 0.6% | 0.7% |
| Wells Fargo | 0.8% | 0.8% | 0.7% | 0.7% | 0.7% |
| U.S. Bancorp | 1.1% | 1.1% | 0.8% | 0.8% | 0.9% |
| PNC | 0.9% | 0.8% | 0.6% | 0.5% | 0.6% |
| SunTrust | 0.9% | 0.9% | 0.6% | 0.6% | 0.7% |
| High | 1.4% | 1.3% | 0.8% | 0.8% | 0.9% |
| Median | 1.0% | 0.9% | 0.7% | 0.7% | 0.7% |
| Mean | 1.0% | 0.9% | 0.7% | 0.6% | 0.7% |
| Low | 0.8% | 0.6% | 0.4% | 0.4% | 0.5% |
| Ally Bank | 1.1% | 1.0% | 0.7% | 0.7% | 0.8% |

[1] *The Servicing Unpaid Principal Balance ("UPB") for Ally Bank was calculated by using the percentage of MSR Book Value to Servicing UPB for Ally Financial Inc. multiplied by the MSR Book Value for Ally Bank.*
Source: *Individual Company SEC filings; MSR Rollforward (2010-2011) [EXAM00232591]; [EXAM00232592]; MSR Swap Review [ALLY_0368244]; See Appendix X.*

## (2) Financial Results Of GMAC Mortgage's Market MSR Risk Hedging

GMAC Mortgage hedged all of its MSR risk, including the risk absorbed through the MSR Swap, in the market[1061] but did not allocate hedges between the Bank and GMAC Mortgage.[1062] The results of GMAC Mortgage's hedging activity are an important consideration in assessing the economics of the MSR Swap.

For the period January 2008 to March 2012, the MSR hedges for AFI on a consolidated basis generated gains of $2.3 billion, though $2.0 billion of that amount was related to 2008. These results were reported in the income statement as a component of the line item, *Servicing Valuation and Hedge Activities, Net*.[1063] The decrease in the fair value of AFI's MSR assets during this period was $4.8 billion. The hedges, which generally correlate to interest rate risk as opposed to other value inputs such as cost to service, therefore offset only a portion of the volatility in the value of the MSR asset, as shown in Exhibit V.B.12.b(2)-1 below.

EXHIBIT V.B.12.b(2)—1
**AFI – Total Aggregate MSR Results, Net of Hedging**
Years Ended 2008 – 2011, Quarter Ended March 31, 2012
*($ in Millions)*

|  | 2008 | 2009 | 2010 | 2011 | YTD March 2012 | Total |
|---|---|---|---|---|---|---|
| Change in fair value of mortgage servicing rights | $ (2,250) | $ (106) | $ (872) | $ (1,606) | $ 1 | $ (4,833) |
| Change in fair value of derivative financial instruments | 2,000 | (998) | 478 | 817 | 8 | 2,305 |
| Servicing valuation and hedge activates, net | $ (250) | $ (1,104) | $ (394) | $ (789) | $ 9 | $ (2,528) |

*Note:  Reflects the entire AFI MSR portfolio, inclusive of ResCap and Ally Bank for the period January 1, 2009 to March 31, 2012.*
*Source:   Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2008), at 10; Ally Financial Inc., Annual Report (Form 10-K) (Feb. 28, 2012), at 169; Ally Financial Inc., Quarterly Report (Form 10-Q) (Apr. 27, 2012), at 43.*

---

[1061] Int. of A. Celini, Feb. 18, 2013, at 116:18–21.

[1062] The Debtors attempted to estimate the allocation of hedge results between the Bank and GMAC Mortgage using certain assumptions as to risks hedged and relative changes in market inputs. The results of the analyses did not provide a reliable basis upon which to allocate the results to Bank-owned MSRs given the number of factors that can influence hedge movement and changes in asset values. However, each of the allocation scenarios analyzed indicated significant gains on GMAC Mortgage's hedges of the risk associated with the Bank's MSR assets. MSR Hedge Allocation [EXAM00339989].

[1063] This line item also included the net impact of the MSR Swap, as previously noted.

The above consolidated hedge results include GMAC Mortgage, RFC and Ally Bank. The exhibit below demonstrates the relative MSR balances for each of these entities from 2003 through 2011. The Bank held no MSRs on its balance sheet before August 2007, but its portfolio grew to $1.3 billion and approximately 51.1% of the GMAC Mortgage/RFC/Ally Bank combined MSR balance as of December 2011.[1064] This data provides a general framework for considering the allocation of hedge results, though the portfolio age and composition are among the factors that affect the level of interest rate sensitivity for any given portfolio.



EXHIBIT V.B.12.b(2)—2
**MSR Asset – Year End Balances by Entity**
Years Ended 2003 – 2011
*($ in Millions)*

*Source: GMAC Mortgage LLC Consolidated Financial Statements [EXAM00231553]; [EXAM00232043]; [EXAM00234189]; [EXAM00234281]; GMAC Bank Audited Financial Statements [RC00034535]; Residential Funding Company, LLC Consolidated Financial Statements [EXAM00231149]; [EXAM00231642]; [EXAM00124988]; MSR Rollforward YTD 2011, dated Dec. 31, 2011 [EXAM00232592].*

[1064] MSR Rollforward YTD 2011, dated Dec. 31, 2011 [EXAM00232592].

The Debtors' accounting and financial records do not allow the reliable allocation of the hedge results to assets subject to the MSR Swap. However, the overall hedging gains, as well as other allocation scenarios analyzed, are likely indicative of hedging gains related to the MSR Swap, according to the Debtors' management.[1065] Consequently, it appears that GMAC Mortgage did not incur hedging losses that would materially affect the overall economic impact of the MSR Swap, and likely earned gains on these hedges.

### c. Summary Of Analysis Of The Financial Results Under The Derivative Agreements

Review and analysis of the pertinent accounting and financial records and inquiry of the Debtors' and Ally Bank's employees and management regarding the same indicate that the Pipeline Swap and the MSR Swap provided value to the Debtors. The information demonstrates that the Pipeline Swap was near break-even from 2004 through 2011, while value transferred from Ally Bank to GMAC Mortgage under the MSR Swap approximated $700 million over its existence from 2007 through April 2012. The overall hedge results and other analyses produced by the Debtors indicate that GMAC Mortgage did not incur hedging losses that would materially affect the overall economic impact of the swaps, and likely earned gains on these hedges. Accordingly, the Examiner concludes that the evidence supports the proposition that GMAC Mortgage received a net benefit from the Pipeline Swap, the MSR Swap and the market hedges relating thereto, assessing the entirety of the economics as implemented by the parties.

### 13. Potential Claims Regarding The MMLPSA, Pipeline Swap, MSR Swap, And Loans Brokered To Ally Bank

Based on the analysis of the transactions described above in this Section, the transactions implicate the following issues, which raise potential contractual claims and other causes of action:

(1) representation and warranty liability under the MMLPSA;

(2) failure to comply with the 2005 and 2006 Operating Agreements;

(3) application of the Pipeline Swap to the funding to sale period and to Ally Bank-originated loans;

(4) misallocation of net revenues on loans brokered to Ally Bank by GMAC Mortgage under the Broker Agreement; and

(5) failure to pay the value of correspondent-loan MSRs and purchased MSRs to GMAC Mortgage under the MSR Swap.

The basis for these claims and the Examiner's determination regarding each are further addressed in Section VII.L.2.

---

[1065] Meeting with J. Whitlinger in Ft. Washington, P.A. (Mar. 29, 2013).

## C.  GOVERNMENT SETTLEMENTS & SUBSERVICING

The Examiner Scope Approval Order specifically identifies two settlements among AFI and ResCap, on the one hand, and various governmental entities, on the other, as worthy of investigation. The objective is to determine whether such settlements properly allocated the costs, both direct and indirect, between AFI entities and ResCap entities. The first is the settlement with the Board of Governors of the Federal Reserve System and the Federal Deposit Insurance Corporation, as memorialized by the FRB/FDIC Consent Order and related CMP, among the FRB and the FDIC on the one hand and AFI, Ally Bank, ResCap, and GMAC Mortgage on the other (though Ally Bank was not a party to the CMP) (the "FRB/FDIC Settlement"). The second is the settlement with the U.S. Department of Justice and the state Attorneys General, as memorialized by the DOJ/AG Consent Judgment, among the DOJ and various state AGs on the one hand and AFI, ResCap, and GMAC Mortgage on the other (the "DOJ/AG Settlement"). These settlements deal with a variety of allegations concerning improper oversight of and execution of mortgage servicing, including allegations of "robo-signing"—the practice of individuals signing foreclosure affidavits without reviewing the validity or accuracy of the sworn statements.[1066]

While these settlements are technically separate, they concern the same alleged misconduct and were negotiated during the same time period with an understanding of the aggregate penalties that would be imposed as a result of the settlements as a whole. Furthermore, these settlements spurred agreements between AFI and ResCap and tangential agreements with third parties. The aggregate effect of these various agreements was that a majority of the costs of the settlements were allocated to ResCap entities, while AFI provided certain support so that the ResCap entities could comply with these obligations. As explained below and in Section VII of this Report, these related agreements implicate several potential claims assertable on behalf of the Estate, which, in turn may be offset by potential defenses assertable on behalf of AFI.

1. *Government Assesses Penalties Regarding Alleged Improper Mortgage Servicing Activities And Oversight*

   a. *Overview Of Settlements And The Agreements Related Thereto*

The agreements relating to the FRB/FDIC Settlement include: (1) the FRB/FDIC Consent Order, filed on April 13, 2011, which required a foreclosure review by independent consultants and imposed non-monetary restitution and changes to mortgage servicing and mortgage servicing oversight that the AFI corporate group agreed to enact; (2) the CMP, agreed to on February 9, 2012, and executed on February 10, 2012, which set forth the monetary fine imposed on the AFI corporate group; and (3) the FRB Supplemental Agreement

---

[1066] *See* Philip A. Lehman, EXECUTIVE SUMMARY OF MULTISTATE/FEDERAL SETTLEMENT OF FORECLOSURE MISCONDUCT CLAIMS, http://nationalmortgagesettlement.com/about.