(as hereafter defined), dated April 26, 2012, whereby AFI agreed to be secondarily liable for ResCap's obligations under the FRB/FDIC Consent Order in the event that ResCap commenced bankruptcy proceedings.

The agreements that relate to the DOJ/AG Settlement include: (1) the DOJ/AG Consent Judgment, agreed to in principle on February 9, 2012, and filed on April 4, 2012, whereby AFI, ResCap, and GMAC Mortgage agreed to comply with certain servicing standards and provide monetary and non-monetary restitution; and (2) the DOJ/AG Earmark and Indemnification Agreement (as hereafter defined), dated March 9, 2012, whereby AFI agreed to indemnify the U.S. and certain state AGs in the event that they are required to make payments as a result of an avoidance action under chapter 5 of the Bankruptcy Code.

Additionally, the AFI corporate group entered into several affiliate agreements concerning the government settlements. The first is the January 30 Letter Agreement, which set forth the terms of support to be provided to ResCap and GMAC Mortgage related to the not-yet-finalized DOJ/AG Settlement. Subsequently, GMAC Mortgage and Ally Bank negotiated and entered into the A&R Servicing Agreement. Finally, AFI and ResCap entered into the Earmark Agreement, dated March 14, 2012, which dictated the terms of ResCap's use of liquidity provided by AFI pursuant to the January 30 Letter Agreement solely to fund the payments required under the DOJ/AG Consent Judgment.

Below is an overview of the timing of these settlements and related agreements:

EXHIBIT V.C.1.a
**Government Settlements & Subservicing Timeline**
2001 – 2013



*Source: ALLY_0251284; ALLY_0251201; Residential Capital, LLC, Annual Report (Form 10-K/A) (Aug. 25, 2009); Ally Financial Inc.,
Annual Report (Form 10-K) (Feb. 25, 2011); First Day Affidavit; SOP0000176; ALLY_0318475; ALLY_0364373; [RC40018411] at
RC40018445-47; RC00067937; Ally Financial Inc., Current Report (Form 8-K) (Apr. 13, 2011); ALLY_0194817; EXAM11092238;
[RC40019179] at RC40019205-08; FRB, Press Release (Feb. 9, 2012),
http://www.federalreserve.gov/newsevents/press/enforcement/20120209a.htm; ALLY_0001961; ALLY_0001865; ALLY_0000001;
EXAM11004487; RC00027463; ALLY_0182267; EXAM20203413; ALLY_0114469; Voluntary Petition for Residential Capital, LLC
[Docket No. 1]; Office of Mortgage Settlement Oversight, Press Release, National Mortgage Settlement Monitor: Ally Has Met its
Consumer Relief Obligations (Feb. 14, 2013), https://www.mortgageoversight.com/wp-content/uploads/2012/03/Ally-Report.pdf.*

As explained in greater detail below, the government settlements and related agreements resulted in ResCap incurring significant liabilities. However, the Examiner was not charged with second-guessing these settlements, but rather with examining "the propriety of the allocation of obligations as among the Debtors and AFI" under these settlements.[1067] To accomplish this task, the Examiner's Professionals analyzed the final settlements and related agreements, the negotiations leading up to the settlements, and, finally, the allocation of monetary and non-monetary costs of the settlements.

### b.    Public Events Leading To Government Settlements

As early as August 25, 2009, ResCap notified the public of developments related to predatory lending practices that could affect its mortgage lending or servicing business.[1068] Specifically, ResCap stated that it could be subject to fines or other penalties based on the conduct of independent mortgage brokers through which ResCap originated mortgage loans and lenders from which ResCap acquired mortgage loans.[1069]

In October 2010, various state and federal agencies commenced an investigation following revelations of the widespread practice of "robo-signing" affidavits in foreclosure proceedings across the country. In the course of the investigation, other mortgage servicer-related problems were identified, including deceptive loan modification practices that resulted in unnecessary foreclosure proceedings. Ultimately, this investigation led to: (1) the FRB commencing fourteen corrective actions against large mortgage servicers or their parent-holding companies for unsafe and unsound processes and practices in residential mortgage loan servicing and foreclosure processing; and (2) negotiations between five leading bank mortgage servicers (including AFI) and a coalition of state AGs, state banking regulators, the Federal Trade Commission, the Consumer Financial Protection Bureau, and the Departments of Justice, Treasury, and Housing and Urban Development.

On September 17, 2010, GMAC Mortgage suspended mortgage foreclosure home sales and evictions, and postponed hearings on motions for judgment in certain states based on concerns of "robo-signing."[1070] As of December 31, 2010, AFI recorded a liability of approximately $13 million for possible fines and penalties with respect to the newly discovered issues related to foreclosure proceedings.[1071] On February 25, 2011, AFI notified

---

[1067] Examiner Scope Approval Order, at 4 n.2.

[1068] Residential Capital, LLC, Annual Report (Form 10-K/A) (Aug. 25, 2009), at 44–45. *See also* E-mail from Michele Lieber (Sept. 30, 2010) [EXAM11135342] (detailing a discussion Lieber had with Jeff Eller, a "crisis political advisor," regarding the best steps to take to deal with the robo-signing issue). Lieber was the Vice President of Government Relations for AFI during this period.

[1069] Residential Capital, LLC, Annual Report (Form 10-K/A) (Aug. 25, 2009), at 48.

[1070] Ally Financial Inc., Annual Report (Form 10-K) (Feb. 25, 2011), at 246.

[1071] *Id.*

the public[1072] that representatives of federal and state governments had announced investigations into procedures followed by AFI's subsidiaries in connection with mortgage foreclosure home sales and evictions and that, while the results of these investigations were uncertain, it was expected that "Ally or its subsidiaries will become subject to fines, penalties, sanctions or other adverse actions."[1073]

Ultimately, the investigation by the FRB led to a settlement agreed to on February 9, 2012, between the FRB and the FDIC and five major bank mortgage servicers, including AFI.[1074] Similarly, the negotiations with a coalition of state AGs, state banking regulators, the Federal Trade Commission, the Consumer Financial Protection Bureau, and the Departments of Justice, Treasury, and Housing and Urban Development led to a settlement with the five leading bank mortgage servicers.[1075] Except for the 1998 Master Tobacco Settlement, this settlement represents the largest financial recovery obtained by the AGs in history, resulting in an estimated $25 billion in monetary sanctions and relief.[1076]

### c. Terms Of The FRB/FDIC Settlement

AFI is subject to the supervision and examination of the FRB because it is a bank holding company. As a federally-insured depository institution, Ally Bank is subject to the regulation and examination of the FDIC.[1077]

### (1) FRB/FDIC Consent Order

On April 13, 2011,[1078] AFI, Ally Bank, ResCap, and GMAC Mortgage entered into the FRB/FDIC Consent Order to address allegations that the AFI corporate group, including GMAC Mortgage and its subsidiaries, engaged in a variety of harmful acts in connection with

---

[1072] It was believed by some members of ResCap's management that the investigations regarding these robo-signing issues had a negative impact on the possibility of an AFI IPO in 2011. *See* Int. of T. Marano, Nov. 26, 2012, at 188:3–7. Marano was the CEO of ResCap during this period.

[1073] Ally Financial Inc., Annual Report (Form 10-K) (Feb. 25, 2011), at 13.

[1074] In addition to AFI, the four other major banking organizations that reached agreement with the FRB on Feb. 9, 2012 were: Bank of America Corporation, Citigroup Inc., JPMorgan Chase & Co., and Wells Fargo & Company. *See* FRB, Press Release (Feb. 13, 2012), http://www.federalreserve.gov/newsevents/press/enforcement/20120213a.htm.

[1075] The four other bank mortgage servicers that settled with the DOJ and the state AGs are: Bank of America Corp., Citigroup, Inc., J.P. Morgan Chase & Co., and Wells Fargo & Co. *See* Philip A. Lehman, EXECUTIVE SUMMARY OF MULTISTATE/FEDERAL SETTLEMENT OF FORECLOSURE MISCONDUCT CLAIMS, ABOUT THE SETTLEMENT, http://nationalmortgagesettlement.com/about.

[1076] *See* Philip A. Lehman, EXECUTIVE SUMMARY OF MULTISTATE/FEDERAL SETTLEMENT OF FORECLOSURE MISCONDUCT CLAIMS, ABOUT THE SETTLEMENT, http://nationalmortgagesettlement.com/about.

[1077] *See, e.g.*, GMAC Inc., Annual Report (Form 10-K) (Mar. 1, 2010), at 5, 9–11.

[1078] Ally Financial Inc., Current Report (Form 8-K) (Apr. 13, 2011).

foreclosure activities involving the servicing of residential mortgage loans.[1079] These alleged harmful acts included: (1) filing (or causing to be filed) false affidavits of employees of GMAC Mortgage, its subsidiaries or third-party providers; (2) litigating foreclosure and bankruptcy proceedings without confirming accurate documentation of ownership; (3) failing to increase financial, staffing and managerial resources in a manner sufficient to respond to increased foreclosure levels; (4) failing to ensure timely, effective and efficient communications with borrowers with respect to loss mitigation activities and foreclosures; and (5) failing to have adequate internal controls, policies and procedures and oversight of the foreclosure process, including over outside counsel and other third-party providers.[1080]

Pursuant to the FRB/FDIC Consent Order, AFI, Ally Bank, ResCap, and GMAC Mortgage agreed to cease and desist any actions related to these allegations and to take affirmative actions, both individually and as a group, to address these allegations.[1081]

With respect to AFI, the FRB/FDIC Consent Order requires:

> (1) that AFI utilize its resources to serve as a "source of strength" to Ally Bank as defined in Regulation Y of the FRB (12 C.F.R. § 25.4(a)) including, but not limited to, taking steps to ensure that Ally Bank complies with the applicable provisions of the FRB/FDIC Consent Order as issued by the FDIC;[1082]

> (2) that the AFI Board, together with the ResCap Board, submit an acceptable written plan to strengthen the boards' oversight of GMAC Mortgage and its subsidiaries, including provisions that provide for proper risk management of independent contractors and adequate funding of personnel, systems and resources;[1083]

> (3) that AFI, together with ResCap, for itself and on behalf of GMAC Mortgage and its subsidiaries, retain an independent consultant acceptable to the FRB to conduct an assessment of GMAC Mortgage and its subsidiaries' risks, particularly in the area of residential mortgage loan servicing, loss mitigation and foreclosures;[1084]

---

[1079] *See* FRB/FDIC Consent Order [ALLY_0203290].

[1080] *See id.* at 3–4.

[1081] *See id.* at 6.

[1082] *See id.* at 7.

[1083] *See id.* at 7–10.

[1084] *See id.* at 27–28.

(4) that AFI submit acceptable plans to: (a) enhance its compliance program to ensure that the operations of GMAC Mortgage and its subsidiaries comply with legal requirements and that internal policies are conducted in a safe and sound manner; and (b) enhance the internal audit program with respect to residential mortgage loan servicing, loss mitigation, and foreclosure activities and operations;[1085] and

(5) that AFI and ResCap jointly submit: (a) an acceptable comprehensive risk management program for GMAC Mortgage and its subsidiaries; and (b) an acceptable enhanced written internal audit program to periodically review compliance with applicable legal requirements and supervisory guidance of the FRB.[1086]

With respect to GMAC Mortgage, the FRB/FDIC Consent Order requires:

(1) that GMAC Mortgage retain an independent consultant to conduct an independent review of foreclosure actions and sales from January 1, 2009 through December 31, 2010 (the "Foreclosure Review"). Following the Foreclosure Review, the independent consultant shall prepare a written report of its review and, within 45 days of receipt of such review, GMAC Mortgage shall submit an acceptable plan to, among other things, (a) remediate any errors or deficiencies in any foreclosure filing, and (b) reimburse or remediate any borrower for any fees or other financial injury;[1087]

(2) that GMAC Mortgage submit a plan and timeline for strengthening communications between GMAC Mortgage and its subsidiaries and borrowers, including the establishment of a "single point of contact" that will be available for borrowers to obtain information through the loss mitigation and foreclosure processes;[1088]

(3) that GMAC Mortgage submit acceptable policies and procedures for outsourcing any residential mortgage loan servicing, loss mitigation activities, or foreclosure functions to any independent contractor, consulting firm, law firm, property manager, or any other third party, including appropriate oversight and due diligence of such outside parties;[1089] and

---

[1085] *See id*. at 20–24.

[1086] *See id.* at 28–32.

[1087] *Id*. at 11–15.

[1088] *Id*. at 15–17.

[1089] *Id*. at 18–20.

(4) that GMAC Mortgage submit acceptable plans: (a) to ensure appropriate controls and oversight over GMAC Mortgage and its subsidiaries' activities with respect to the Mortgage Electronic Registration System; (b) to review and remediate, if necessary, GMAC Mortgage and its subsidiaries' management information systems to ensure timely delivery of complete and accurate information; and (c) to ensure improved training of all officers and staff.[1090]

With respect to Ally Bank, the FRB/FDIC Consent Order required that Ally Bank implement a mortgage servicing management and oversight program that, at a minimum and among other things, maintains a reserve sufficient to cover identified servicing risks.[1091]

The FRB/FDIC Consent Order required that each of AFI, Ally Bank, ResCap, and GMAC Mortgage submit written programs for approval to the FRB (or, in the case of Ally Bank, the FDIC), which are intended to address how each entity will implement the actions set forth above.[1092] The AFI entities were then required to implement these programs and submit written progress reports to the FRB or, the FDIC, as applicable.[1093] AFI, ResCap, and GMAC Mortgage were also required to submit a validation report prepared by an independent third-party consultant with respect to compliance with the FRB/FDIC Consent Order during the first year after the FRB/FDIC Consent Order became effective.[1094]

### (2) CMP Order, Dated February 10, 2012

The FRB/FDIC Consent Order did not impose any monetary penalties on the AFI corporate group. Instead, the parties negotiated the amount of a civil money penalty over the course of several months, which culminated in the CMP Order. Notably, Ally Bank was not a party to the CMP Order. Instead, AFI, ResCap, and GMAC Mortgage executed the order.

The CMP Order entered by the FRB provides that AFI, ResCap, and GMAC Mortgage and its subsidiaries are jointly and severally assessed the CMP in the amount of $207 million.[1095]

---

[1090] *Id*. at 24–27.

[1091] *See id.* at 32–34.

[1092] *See id.* at 34.

[1093] *See id.* at 34–36.

[1094] *See id.* at 36.

[1095] *See* CMP Order, at 7 [ALLY_0001961].

### (3) FRB Supplemental Agreement, Dated April 26, 2012

Concurrently with discussions regarding the CMP and DOJ/AG Settlement, the FRB became concerned about the possibility of ResCap filing for bankruptcy and not being able to comply with the terms of the various government settlements.[1096] As a result, on April 26, 2012, AFI and the FRB entered into a supplemental agreement concerning the obligations of ResCap and GMAC Mortgage and its subsidiaries under the FRB/FDIC Settlement (the "FRB Supplemental Agreement").[1097] Pursuant to the terms of the FRB Supplemental Agreement, AFI agreed that if ResCap or its subsidiaries commence bankruptcy cases or are otherwise subject to protection under the Bankruptcy Code, AFI would be secondarily liable for the obligations to timely pay any portion of: (1) the fee owed to PricewaterhouseCoopers or any successor consultant to complete the Foreclosure Review; and (2) the monetary reimbursement or remediation payments under the FRB/FDIC Consent Order (together, the "ResCap FRB/FDIC Obligations").[1098] The FRB Supplemental Agreement explicitly provided that the FRB in no way released, reduced, or alleviated GMAC Mortgage of its obligations under the FRB/FDIC Consent Order and confirmed that GMAC Mortgage would be primarily liable for such obligations.[1099] Furthermore, the FRB Supplemental Agreement provided that nothing in the agreement or any payments that AFI made with respect to the ResCap FRB/FDIC Obligations would prejudice AFI's right to seek reimbursement of the ResCap FRB/FDIC Obligations as administrative or priority payments under the Bankruptcy Code.[1100] According to the terms of the FRB Supplemental Agreement, AFI's secondary liability became effective only when, ResCap became subject to protection under the Bankruptcy Code.[1101]

### (4) Economics Related To The FRB/FDIC Settlement

Appendix V.C.1.c(4) identifies the various costs incurred as of December 31, 2012 by ResCap and AFI related to the FRB/FDIC Settlement as well as the most recent estimates made available of future costs to be incurred. These costs are summarized in Exhibit V.C.1.c(4) below. As of the date of this Report, none of the costs associated with the FRB/FDIC Settlement have been paid by AFI.

---

[1096] *See, e.g.*, Int. of J. Pensabene, Jan. 9, 2013, at 189:20–190:2 (noting that the government "insisted on [AFI being party to the settlement] . . . because of concerns about ResCap's ability to pay the fine."). Pensabene was the Chief Servicing Officer and Senior Vice President of GMAC Mortgage during this period.

[1097] *See* FRB Supplemental Agreement, dated Apr. 26, 2012 [ALLY_0193256].

[1098] *Id*. at 2–3.

[1099] *Id*. at 2.

[1100] *Id*. at 3.

[1101] *Id*.

EXHIBIT V.C.1.c(4)
**FRB/FDIC Settlement Costs Incurred to Date and Estimated Future Costs**
*($ in Millions)*

| Item | ResCap Costs |
|------|-------------:|
| FRB/FDIC Consent Order costs | $ 517.0 |
| CMP Order costs | N/A |
| Total FRB/FDIC Settlement costs incurred to date and estimated future costs | $ 517.0 |

*Source: Ally Financial Inc., Annual Report (Form 10-K) (Feb. 28, 2012), at 12; Declaration of Thomas Marano, Chief Executive Officer of Residential Capital, LLC, in Support of Debtors' Motion Pursuant to Bankruptcy Rule 3013 and Bankruptcy Code Section 362(a) for a Determination that (I) GMAC Mortgage's FRB Foreclosure Review Obligation is a General Unsecured Claim and (II) the Automatic Stay Prevents Enforcement of the FRB Foreclosure Review Obligation [Docket No. 3055-3] at 4-5; FRB Unsecured Claim Motion [Docket No. 3055] at 7 (as defined below).*

### (5) FRB/FDIC Consent Order Costs - $517 Million

As shown in Exhibit V.C.1.c(5) below, ResCap currently expects to incur a total of $517 million in costs as a result of the FRB/FDIC Consent Order. The components of the $517 million estimate include incremental compliance costs and costs resulting from the Foreclosure Review and remediation.

EXHIBIT V.C.1.c(5)
**FRB/FDIC Consent Order Costs**
*($ in Millions)*

| Item | ResCap Costs |
|------|-------------:|
| FRB/FDIC Consent Order costs | |
| Incremental compliance costs | $ 80.0 |
| Foreclosure Review and remediation costs | 437.0 |
| Total FRB/FDIC Consent Order costs | $ 517.0 |

*Source: Ally Financial Inc., Annual Report (Form 10-K) (Feb. 28, 2012), at 12; Declaration of Thomas Marano, Chief Executive Officer of Residential Capital, LLC, in Support of Debtors' Motion Pursuant to Bankruptcy Rule 3013 and Bankruptcy Code Section 362(a) for a Determination that (I) GMAC Mortgage's FRB Foreclosure Review Obligation is a General Unsecured Claim and (II) the Automatic Stay Prevents Enforcement of the FRB Foreclosure Review Obligation [Docket No. 3055-3] at 4-5; FRB Unsecured Claim Motion [Docket No. 3055] at 7.*

### (a) Incremental Compliance Costs - $80 Million

AFI, Ally Bank, ResCap, and GMAC Mortgage made certain operational improvements to various aspects of their residential mortgage loan servicing business as a result of the FRB/FDIC Consent Order including, but not limited to, the following: compliance programs, internal audit, communications with borrowers, vendor management, management information systems,

employee training, and oversight by the AFI and ResCap Boards.[1102] As of February 28, 2012, AFI estimated that the incremental costs to ResCap and GMAC Mortgage would be approximately $40 million annually during 2012 and 2013, and would then decline over time.[1103]

### (b) Foreclosure Review And Remediation—$437 Million

As stated above, the FRB/FDIC Consent Order required GMAC Mortgage to hire an independent consultant to perform a Foreclosure Review. AFI and GMAC Mortgage retained PwC on February 1, 2012 to perform this review.[1104]

Following the completion of the Foreclosure Review, the FRB/FDIC Consent Order requires GMAC Mortgage to reimburse or remediate any borrower for any fees or other financial injury discovered during the Foreclosure Review.[1105] Because the review is still ongoing, remediation costs have not yet been incurred.[1106]

As of February 27, 2013, the Debtors estimated that the costs of the Foreclosure Review and remediation could be as high as $415 million to $459 million.[1107] For the purpose of this

---

[1102] Ally Financial Inc., Annual Report (Form 10-K) (Feb. 28, 2012), at 12. These improvements required ResCap and GMAC Mortgage to hire additional servicing personnel, enhance information systems, increase audit and compliance costs, etc.

[1103] Ally Financial Inc., Annual Report (Form 10-K) (Feb. 28, 2012), at 12. ResCap did not provide the total incremental compliance costs incurred through December 31, 2012, nor did ResCap provide a more current estimate of the incremental compliance costs to be incurred going forward.

[1104] PwC Foreclosure Review Engagement Letter, dated Feb. 1, 2012 [EXAM11092238] (the "PwC Engagement Letter").

[1105] FRB/FDIC Consent Order, at 13–14 [ALLY_0203290].

[1106] *See* Sections V.C.3, V.C.4 (discussing the status of, and issues surrounding, the PwC Compensation Motion (defined below) and the FRB Unsecured Claim Motion (defined below), respectively).

[1107] *See* Debtors' Motion Pursuant to Bankruptcy Rule 3013 and Bankruptcy Code Section 362(a) for a Determination that (I) GMAC Mortgage's FRB Foreclosure Review Obligation is a General Unsecured Claim and (II) the Automatic Stay Prevents Enforcement of the FRB Foreclosure Review Obligation [Docket No. 3055] at 7 (the "FRB Unsecured Claim Motion"). This estimate was a dramatic increase from the amounts previously estimated. *See* Declaration of Joseph A. Pensabene in Support of Debtors' Motion for Entry of an Order Under Bankruptcy Code Section 363 and Bankruptcy Rule 6004 (I) Authorizing the Debtors to Compensate PricewaterhouseCoopers, LLP for Foreclosure Review Services in Furtherance of the Debtors' Compliance Obligations Under Federal Reserve Board Consent Order and (II) Reaffirming Relief Granted in the GA Servicing Order [Docket No. 1357-5] at 5 (the Debtors estimated that the total costs of the Foreclosure Review could be as high as $180 million as of the Petition Date); *id*. (stating that the estimate of total Foreclosure Review costs had been revised upward to a total of $250 million as of September 5, 2012 and also explaining that this estimate included law firms and other third-party advisors who were retained to assist with the Foreclosure Review, in addition to PwC); *id*. (as of September 5, 2012, Pensabene estimated the Foreclosure Review remediation costs to be between $35 million and $60 million).

analysis, the Examiner's Financial Advisors assumed the costs to be $437 million, representing the midpoint of the most current range estimated by the Debtors. Included in this estimate are total fees paid to PwC through December 31, 2012, of $73 million.[1108]

According to Thomas Marano, the estimated total costs associated with the Foreclosure Review and remediation have grown significantly due to the continued extension of the time period during which borrowers were allowed to request that their loan be reviewed and due to a lack of clarity surrounding the exact review parameters.[1109]

### (6) CMP Order Costs

Per the CMP Order, AFI, ResCap, and GMAC Mortgage consented to the assessment of a CMP in the amount of $207 million. However, the terms of the CMP Order provide that the FRB will remit up to $207 million of the CMP by amounts equivalent to: (1) the aggregate dollar value of borrower assistance and payments pursuant to the DOJ/AG Consent Judgment; and (2) the aggregate amount expended on funding for nonprofit housing counseling organizations, approved by the HUD.[1110] As discussed below, to date, ResCap has provided over $250 million in borrower relief (also known as "soft costs") and paid a $110 million fine (referred to as "hard costs") as a result of the DOJ/AG Settlement and DOJ/AG Consent Judgment. Therefore, AFI and ResCap will not incur additional costs associated with the CMP Order.

### (7) Accounting For FRB/FDIC Settlement Costs

ResCap did not accrue a liability for the costs associated with the FRB/FDIC Consent Order. Rather, ResCap expensed the costs associated with the FRB/FDIC Consent Order as incurred.[1111]

In contrast, AFI and ResCap did accrue a liability for the combined effect of the CMP Order and the DOJ/AG Settlement. On January 30, 2012, AFI and ResCap estimated that they could incur an expense as great as $268 million relating to the CMP Order in conjunction with the DOJ/AG Settlement.[1112] Therefore, AFI and ResCap originally recognized a combined

---

[1108] Declaration of Thomas Marano, Chief Executive Officer of Residential Capital, LLC, in Support of Debtors' Motion Pursuant to Bankruptcy Rule 3013 and Bankruptcy Code Section 362(a) for a Determination that (I) GMAC Mortgage's FRB Foreclosure Review Obligation is a General Unsecured Claim and (II) the Automatic Stay Prevents Enforcement of the FRB Foreclosure Review Obligation [Docket No. 3055-3] at 5.

[1109] *Id*.

[1110] *See* CMP Order, at 7–9 [ALLY_0001961].

[1111] Meeting with ResCap and FTI, Financial Advisor to the Debtors, in Ft. Washington, PA (Dec. 11, 2012).

[1112] *See* Memorandum, Accrual for DOJ Settlement at December 31, 2011, dated Feb. 28, 2012, at 3 [EXAM00220938]; *see also* Memorandum, Significant Transaction Memo: General Information and Transaction Description Re Mortgage Fine, Waivers and Debt Forgiveness, dated Feb. 2012, at EXAM00220149 [EXAM00220147].

liability of $268 million in their December 31, 2011 financial records.[1113] Of this $268 million liability, $196.5 million was recorded by ResCap and the remaining $71.5 was recorded by AFI.[1114] ResCap and AFI calculated these reserves using a 73% (ResCap) and 27% (AFI) division of the total estimated liability.[1115] The basis for these allocation percentages will be discussed in Section V.C.1.f below.

AFI and ResCap reduced their estimate of this liability to $230 million in AFI's December 31, 2011 consolidated financial statements after the announcement of the CMP Order and the DOJ/AG Settlement on February 9, 2012.[1116] The basis for the $230 million liability will be discussed in detail in Section V.C.1.d(4)(b)(v). AFI and ResCap also modified the percentage of the total estimated liability allocated to ResCap and AFI to 92% and 8%, respectively. Therefore, although AFI and ResCap reduced the amount of the total liability accrued by $38 million, the total amount of the liability allocated to ResCap increased from $196.5 million to $211.5 million and the total amount allocated to AFI decreased from $71.5 million to $18.5 million.[1117]

### (8) Allocation Of The FRB/FDIC Settlement Costs

The amounts above assumed that all of the $207 million CMP would be offset by the borrower relief associated with the DOJ/AG Settlement, resulting in an effective cost for the CMP Order of $0 to both AFI and ResCap.[1118] All of the above-described costs resulting from the FRB/FDIC Consent Order have been and will be borne by ResCap. To date, none of these costs have been allocated to AFI.

### d.  Terms Of The DOJ/AG Settlement

### (1) DOJ/AG Consent Judgment, Dated April 4, 2012

The DOJ/AG Settlement was agreed to by the parties on February 9, 2012, prior to the filing of a formal complaint by the United States, acting through the DOJ and the AGs of various states

---

[1113] *See id.*

[1114] Memorandum, Significant Transaction Memo: General Information and Transaction Description Re Mortgage Fine, Waivers and Debt Forgiveness, dated Feb. 2012, at EXAM00220149 [EXAM00220147].

[1115] Accounting Presentation by C. Dondzila to the ResCap Board, dated Jan. 10, 2012, at RC40020152 [RC40020121].

[1116] Memorandum, Accrual for DOJ Settlement at December 31, 2011, dated Feb. 28, 2012, at 3 [EXAM00220938].

[1117] *See* Memorandum, Significant Transaction Memo: General Information and Transaction Description Re Mortgage Fine, Waivers and Debt Forgiveness, dated Feb. 2012, at EXAM00220149 [EXAM00220147]; Residential Capital, LLC Consolidated Financial Statements for the Years Ended December 31, 2011 and 2010 (Mar. 28, 2012), at 70 [EXAM00122651].

[1118] *See* Residential Capital, LLC Consolidated Financial Statements for the Years Ended December 31, 2011 and 2010 (Mar. 28, 2012), at 70 [EXAM00122651].

(the "DOJ/AG Plaintiffs").[1119] After negotiating the terms of the consent judgment based on allegations of improper conduct relating to mortgage servicing activities, as a formality, the DOJ/AG Plaintiffs filed a formal complaint against defendants AFI, ResCap, and GMAC Mortgage on March 12, 2012. The complaint alleged certain civil claims for conduct related to the servicing of mortgage loans, the servicing of loans of borrowers in bankruptcy,[1120] and the origination of mortgage loans.[1121] The DOJ/AG Consent Judgment memorializing the terms of the settlement agreed to on February 9 was filed on April 4, 2012.

The DOJ/AG Consent Judgment and its related exhibits identified various actions that AFI, ResCap, and GMAC Mortgage agreed to take in settlement of claims alleged. These actions included:

> (1) The adoption of new servicing standards by AFI, ResCap, and GMAC Mortgage related to loans secured by owner-occupied properties that serve as the primary residence of the borrower, including: (a) standards relating to foreclosure and bankruptcy information, documentation of the borrower's account information, and chain of ownership; (b) oversight and management of third party providers of foreclosure, bankruptcy, or mortgage servicing activities; and (c) restrictions on servicing fees;[1122]

> (2) Payment by AFI, ResCap, and GMAC Mortgage (collectively defined as "Defendant" under the DOJ/AG Consent Judgment)[1123] of hard costs in the amount of $109,628,425;[1124] and

---

[1119] The states that are party to the DOJ/AG Settlement include: Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas, Louisiana, Maine, Maryland, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Ohio, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Washington, West Virginia, Wisconsin, Wyoming, the Commonwealths of Kentucky, Massachusetts, Pennsylvania and Virginia, and the District of Columbia. *See* DOJ/AG Consent Judgment, at 1 [RC00027463]. A separate consent judgment was entered into with the State of Oklahoma and the Oklahoma State Banking Department. Pursuant to this settlement, AFI, ResCap, and GMAC Mortgage agreed to pay $935,208 to the state of Oklahoma.

[1120] *See* DOJ/AG Consent Judgment, Ex. F-9, § E [RC00027463].

[1121] *See id.* Ex. F-6, § D.

[1122] *See id.* Ex. A.

[1123] *See id.* at 1.

[1124] *See id.* at 3. This amount was paid into an escrow fund along with other institutions resolving claims asserted by the DOJ and AGs, which aggregate amount was then to be distributed in the manner and for the purposes set forth in Ex. B1 and Ex. B2. Ex. B1 and Ex. B2 include an allocation of the settlement amount among the various states. *See id.* Ex. B1, B2.

(3) Providing a total of $200 million in consumer relief and refinancing to consumers meeting certain eligibility criteria.[1125] AFI, ResCap, and GMAC Mortgage could receive credit towards these obligations by performing certain types of loan modifications, deficiency waivers and forbearances ("soft credits").[1126] The details of this "borrower relief program" are set forth in detail below. Further, as noted below, the amount of soft credits permitted was subject to significant negotiations.[1127] Failure to earn sufficient soft credits to cover the $200 million consumer relief obligation would result in an additional payment of hard costs equal to, depending on the circumstances of the failure, either 125% or 140% of the unmet commitment amount.[1128]

In addition to imposing payment obligations on AFI, ResCap, and GMAC Mortgage, the DOJ/AG Consent Judgment also established a "monitor" to oversee compliance[1129] and provided for enforcement mechanisms.

In exchange for the payment of the settlement amounts, the DOJ/AG Consent Judgment provided for a federal[1130] and state[1131] release of claims[1132] against AFI and its affiliates[1133] based on conduct connected with the servicing of mortgage loans, the origination of mortgage loans, and the servicing of loans of borrowers in bankruptcy. The release did not cover certain other specified claims and remedies.[1134] Notably, the broad language contained in the release provisions arguably released Ally Bank, despite the fact that Ally Bank was not a party to the DOJ/AG Consent Judgment.[1135]

---

[1125] *See* DOJ/AG Consent Judgment, at 4 [RC00027463].

[1126] *See id.* Ex. D-1–12.

[1127] *See* Section V.C.1.e (discussion on negotiations leading up to the DOJ/AG Settlement).

[1128] *See* DOJ/AG Consent Judgment, Ex. D-11 [RC00027463].

[1129] *See id*. at 4, Ex. E-1.

[1130] *See id.* Ex. F-1–43.

[1131] *See id.* Ex. G-1–12.

[1132] There is also a section of the settlement that provides for the release of claims under the Servicemembers Civil Relief Act ("SCRA"), in exchange for certain obligations. *See id.* Ex. H-1–13.

[1133] Ex. F of the DOJ/AG Settlement, governing the federal releases, uses the term "Company," defined as AFI. Throughout, the releases include a release of "Company and any current or former affiliated entity (to the extent the Company retains liabilities associated with such former affiliated entity), and any of their respective successors or assigns, as well as any current or former director, current or former officer, and current or former employee of any of the foregoing, individually and collectively . . . ." *Id.* Ex. F-12, § F(2)(a). Similarly, Ex. G of the DOJ/AG Settlement, governing the state releases, provides a release for the "Bank", which is defined for the purposes of that section as AFI and "its current and former parent corporations or other forms of legal entities, direct and indirect subsidiaries, brother or sister corporations or other forms of legal entities divisions or affiliates." *Id.* Ex. G-1, § I.

[1134] *See id.* Ex. F-29–38.

[1135] *See id*. Ex. F, G.

### (a) Exhibit I Of The DOJ/AG Consent Judgment And The Allocation Of Responsibilities

Exhibit I of the DOJ/AG Consent Judgment was the subject of much negotiation among the governmental entities and the AFI corporate family. It provides additional terms and clarifications of the judgment and exhibits. Exhibit I specifically notes that ResCap, GMAC Mortgage, RFC (collectively, the "DOJ/AG ResCap Parties"), and AFI have agreed to certain conditions in recognition of ResCap's "financial situation."[1136]

### (i) Provisions Governing Payment Of And Credit Towards Hard And Soft Costs

Exhibit I specifically provides that the DOJ/AG ResCap Parties shall make the hard costs payment of $109.6 million and that AFI has agreed to enter into the DOJ/AG Earmark and Indemnification Agreement in furtherance of such payment.[1137] Exhibit I also states that the DOJ/AG ResCap Parties (and to the extent the DOJ/AG ResCap Parties do not perform such obligations, AFI) shall be responsible for the $200 million in soft costs. Notably, Exhibit I also provides that any successor or purchaser of all or a substantial portion of the assets of the DOJ/AG ResCap Parties shall not be obligated to pay any of the amounts owed by the DOJ/AG ResCap Parties or AFI under the DOJ/AG Consent Judgment.[1138]

### (ii) Provisions Governing Loan Modification Programs

Exhibit I of the DOJ/AG Consent Judgment also requires that the DOJ/AG ResCap Parties and AFI conduct nationwide loan modification programs to be offered to borrowers suffering economic hardship with respect to both first-lien and second-lien loans.[1139] Pursuant to the terms of the DOJ/AG Consent Judgment, the DOJ/AG ResCap Parties are required to offer relief to all borrowers who meet the eligibility criteria in the owned-loan portfolios of the DOJ/AG ResCap Parties, AFI, and its affiliates, with the exception of certain Ally Bank-owned loans.[1140] Failure on behalf of the DOJ/AG ResCap Parties to satisfy the $200 million commitment would result in an additional assessment.[1141] Furthermore, even if more than $200 million in consumer relief were completed, the DOJ/AG ResCap Parties were required to continue to make offers to eligible borrowers during the solicitation period (which ultimately resulted in the parties providing relief in excess of the $200 million commitment).[1142]

------

[1136] *See id.* Ex. I-1.

[1137] *See id.*

[1138] *See id.*

[1139] *See id.* Ex. I-2.

[1140] *See id.*

[1141] *See id.* Ex. I-10–11.

[1142] *See id.* Ex. I-6.

*(iii) Representations And Warranties*

Finally, Exhibit I contained provisions that governed the responsibilities of the DOJ/AG ResCap Parties in the event of a bankruptcy or other "transformative transaction," including, without limitation, a change of control transaction, a sale of all or substantially all of their assets (or assets that together are material to the performance of the obligations of the DOJ/AG ResCap Parties), or a reorganization or similar transaction. The DOJ/AG ResCap Parties agreed that in the event of such a transformative transaction, they would ensure the continued performance of their obligations under the DOJ/AG Consent Judgment, including requiring any successor or purchaser of substantially all the assets of a DOJ/AG ResCap Party to honor and perform the obligations under the DOJ/AG Consent Judgment.[1143]

Furthermore, the DOJ/AG ResCap Parties and AFI agreed that they would not enter into a transformative transaction without the consent of AFI; and AFI agreed that it would not consent to any such transformative transaction (or provide financial support in connection with any such transaction) unless the DOJ/AG ResCap Parties (including any successor to or purchaser of the assets from a ResCap Party) agreed to ensure the continued performance of the obligations under the DOJ/AG Consent Judgment.[1144] However, any successor or purchaser of all or a substantial portion of the assets of the DOJ/AG ResCap Parties would not be obligated to pay any of the amounts owed by the DOJ/AG ResCap Parties or AFI under the DOJ/AG Consent Judgment or the exhibits thereto.[1145]

*(2) DOJ/AG Earmark And Indemnification Agreement, Dated March 9, 2012*

AFI, the U.S. government, and certain states entered into the DOJ/AG Earmark and Indemnification Agreement in contemplation of the fact that ResCap's payment of the hard costs might may be at risk of avoidance in any subsequent ResCap bankruptcy case.[1146] The terms of this agreement required that prior to payment of the $109.6 million, AFI and ResCap would execute Earmark Agreement (summarized below).[1147] Additionally, AFI agreed to indemnify the U.S. and certain states for any payments they are required to make as a result of an avoidance action pursuant to chapter 5 of the Bankruptcy Code, including all reasonable costs and expense in defending against such action.[1148]

---

[1143] *See id.* Ex. I-12–13.

[1144] *See id.*

[1145] See *id.* Ex. I-12.

[1146] *See* DOJ/AG Earmark and Indemnification Agreement, dated Mar. 9, 2012 [ALLY_0001865].

[1147] *See id.* at 1–2.

[1148] *See id.* ¶ 2.

### *(3) Earmark Agreement, Dated March 14, 2012*

AFI and ResCap entered into the Earmark Agreement, dated March 14, 2012.[1149] Pursuant to the terms of the Earmark Agreement, ResCap agreed that, inter alia:

(1) The debt forgiveness set forth in the January 30 Letter Agreement was to allow ResCap to fund the hard costs under the DOJ/AG Consent Judgment;

(2) Without the capital support provided by AFI, ResCap could not have funded the hard costs;

(3) The $109.6 million of liquidity provided by AFI will be used solely to fund the hard costs; and

(4) AFI's capital support, and ResCap's use of that support does not result in any additional debt obligations of ResCap.[1150]

### *(4) Economics Related To The DOJ/AG Settlement*

To ascertain the cost to ResCap of obtaining $200 million in soft credits, ResCap first determined which loans were eligible for borrower relief. Next, ResCap reviewed each individual loan to determine whether it was qualified for one of the forms of relief available from the "menu" or "waterfall" set forth in the DOJ/AG Consent Judgment.[1151] ResCap then utilized a model to estimate the expected accounting loss on these qualifying loans.[1152] The $200 million in borrower relief credits required under the DOJ/AG Settlement did not correspond dollar-for-dollar to the actual accounting loss incurred by ResCap due to previous accounting adjustments relating to the market value of the subject loans. For example, if ResCap held a loan in its HFS portfolio with an unpaid principal balance of $200,000 that it wrote down to a market value of $100,000 prior to the DOJ/AG Settlement, an offer by ResCap to the borrower of a $20,000 principal reduction, under the borrower relief program, would not decrease the market value of the loan by a corresponding $20,000 because the entire amount of the principal reduction was encompassed in the previous write-down of the loan.

The projected accounting loss associated with each loan often depended on the portfolio from which the loan came. For example, if a loan was in ResCap's HFS portfolio and the borrower was offered principal forgiveness, that form of relief on that type of loan could cost the company nothing because the loan had already been marked down to zero.[1153] On the other

---

[1149] *See* Earmark Agreement [ALLY_0000001].

[1150] *Id.* at 2.

[1151] DOJ/AG Consent Judgment, Ex. D [RC00027463].

[1152] Int. of C. Dondzila, Nov. 9, 2012, at 228:1–21.

[1153] *See id.* at 228:22–229:2.

hand, if a loan was in Ally Bank's portfolio, because it was considered HFI and had an allowance, then the accounting loss could be higher because in addition to reducing the unpaid principal balance of the loan, there would also only be a partial recovery of the allowance.[1154] The final step in the process was to determine whether Ally Bank should be reimbursed for any of the relief taken, based on a separate reimbursement schedule/matrix which was to be negotiated in accordance with the Servicing Agreement Modification Terms.[1155]

Appendix V.C.1.c(4) identifies the various costs incurred by ResCap and AFI related to the DOJ/AG Consent Judgment as well as the most recent estimates made available of future costs to be incurred. The costs incurred by ResCap and AFI and estimated future costs stemming from the DOJ/AG Settlement are summarized in Exhibit V.C.1.d(4) below.[1156]

EXHIBIT V.C.1.d(4)
**Summary of Total DOJ/AG Consent Judgment Costs**
*($ in Millions)*

| Item | | Total |
|------|---|------:|
| Penalty/fine | $ | 109.6 |
| Ally Bank reimbursement - borrower relief | | 134.5 |
| Accounting impact of ResCap loan modifications - borrower relief | | 15.7 |
| Subtotal borrower relief costs | | 150.2 |
| Other costs associated with DOJ/AG Consent Judgment | | 4.0 |
| Total DOJ/AG Consent Judgment costs | $ | 263.8 |

*Source: EXAM00220897; EXAM11004487; ALLY_0196290; EXAM2020343; ALLY_0402171; ALLY_0402172; ALLY_0402173; EXAM00221497; EXAM00221498; ALLY_0402174; EXAM00237710; ALLY_0402175; ALLY_0402176; ALLY_0402177.*

*(a) Penalty / Fine – $109.6 Million*

ResCap, through GMAC Mortgage, remitted the full fine of $109.6 million to an escrow account created pursuant to the DOJ/AG Consent Judgment on March 14, 2012.[1157]

---

[1154] *See id.* at 229:3–14.

[1155] *See id.* at 231:4–11; *see also* A&R Servicing Agreement, §§ 10.01(e)–(f), Ex. 4-B [ALLY_0114469].

[1156] Exhibit V.C.1.d(4) provides actual costs incurred through January 31, 2013 and estimates of future costs to be incurred as of November 1, 2012. As described below, adjustments have been made to eliminate double counting due to overlap of the estimation period and the period for which actual costs incurred were available (November 2012–January 2013).

[1157] *See* E-mail from C. Dondzila (Mar. 15, 2013) [EXAM11004487]; ResCap Liquidity Update: A Presentation for the ResCap Board of Directors, dated Mar. 23, 2012, at RC40020491 [RC40020488]; Special Examiner Presentation: DOJ/AG Settlement, dated Dec. 11, 2012, at EXAM00220908 [EXAM00220897]; ResCap Consolidating Financial Statements – 2012, dated Oct. 29, 2012 [ALLY_0244598] (showing payment of the funds was recorded under GMAC Mortgage).

*(b) Borrower Relief Program – $150.2 Million*

*(i) Description Of Borrower Relief Program*

As stated in Section V.C.1.d(1) above, AFI, ResCap, and GMAC Mortgage are required to offer relief to borrowers meeting certain criteria as outlined in Exhibit D of the DOJ/AG Consent Judgment.[1158] All borrowers meeting these criteria must be offered the relief, and ResCap must honor the relief regardless of the amount of time it takes the borrower to accept the offer. However, ResCap no longer has to honor the solicitations if the borrower does not respond within 180 days of the initial solicitation once ResCap exceeds its borrower relief obligation by $50 million (i.e. $250 million in borrower relief credits have been provided).[1159]

According to scenario analyses performed by ResCap in January 2012, ResCap did not have a large enough portfolio to earn the $200 million in borrower relief credits without modifying loans held in Ally Bank's portfolio.[1160] As shown in Exhibit V.C.1.d(4)(b)(i)—1 below, full access to the Ally Bank loan portfolio was necessary for ResCap to exceed the $200 million threshold in borrower relief credits and to avoid the resulting potential hard dollar penalty.[1161] ResCap estimated that it would incur an additional $56.0 million to $114.3 million under the DOJ/AG Consent Judgment if it were not able to modify Ally Bank loans or were allowed to do so only on a limited basis.[1162]

EXHIBIT V.C.1.d(4)(b)(i)—1
**Summary of Settlement Scenario Analyses**
*($ in Millions)*

| Settlement Scenario | Total Earned Soft Credits | | Soft Menu Shortfall (vs $200 million) | | Potential Soft Menu Penalty (at 25%) | | Additional Hard Dollar Impact | |
|---|---|---|---|---|---|---|---|---|
| Bank portfolio excluded entirely | $ | 108.6 | $ | 91.4 | $ | 22.9 | $ | 114.3 |
| Limit bank participation to contractual cap | $ | 155.2 | $ | 44.8 | $ | 11.2 | $ | 56.0 |
| Uncapped bank participation | $ | 203.4 | $ | - | $ | - | $ | - |

*Source:  Settlement Credit Model, prepared by ResCap [EXAM20276481] (attached to E-mail from C. Dondzila (Jan. 23, 3012) [EXAM20276480]).*

---

[1158] *See* DOJ/AG Consent Judgment, Ex. D [RC00027463].

[1159] *See id.* Ex. I-6 [RC00027463]; Residential Capital, LLC Condensed Consolidated Financial Statements for the Periods Ended March 31, 2012 and 2011 (Unaudited), at 44 [EXAM00070376].

[1160] *See* Settlement Credit Model, prepared by ResCap [EXAM20276481] (attached to E-mail from C. Dondzila (Jan. 23, 2012) [EXAM20276480]).

[1161] *See id.*

[1162] Settlement Credit Model, prepared by ResCap [EXAM20276481] (attached to E-mail from C. Dondzila (Jan. 23, 2012) [EXAM20276480]). This estimate assumes a 25% penalty. *See id.* As described in Section V.C.1.d(1), failure to earn sufficient soft credits to cover the $200 million consumer relief obligation would result in an additional payment of hard costs equal to, depending on the circumstances of the failure, either 125% or 140% of the unmet commitment amount. *See* DOJ/AG Consent Judgment, Ex. D-11 [RC00027463].

ResCap reviewed the loans contained in the ResCap and Ally Bank portfolios and determined that as of March 1, 2012,[1163] a total of 14,071 loans, with an unpaid principal balance of approximately $2.2 billion, were eligible for the borrower relief program.[1164] As shown in Exhibit V.C.1.d(4)(b)(i)—2 below, according to a ResCap report created on March 22, 2013, prior to the implementation of the borrower relief program, 6,033 of these loans, with an unpaid principal balance of $1.3 billion, were in the Ally Bank portfolio, and 8,038 of these loans, with an unpaid principal balance of $910 million, were in the ResCap portfolio.[1165]

EXHIBIT V.C.1.d(4)(b)(i)—2
**Summary of Loans Subject to Borrower Relief**
*($ in Millions)*

| | Number of Loans | | UPB | % of Total (Count) | % of Total (UPB) |
|---|---|---|---|---|---|
| Ally Bank loans | 6,033 | $ | 1,253 | 43% | 58% |
| ResCap loans | 8,038 | | 910 | 57% | 42% |
| Total loans to be solicited | 14,071 | $ | 2,163 | 100% | 100% |

*Source: Analysis of AG Consumer Relief: Eligibility and Solicitation Progress, dated March 22, 2013 [EXAM00339991].*

### (ii) Current Status Of Borrower Relief Program

Exhibit V.C.1.d(4)(b)(ii) provides a summary of the current solicitation status of the borrower relief program. As of March 22, 2013, ResCap and GMAC Mortgage had either solicited or borrowers had fully paid off the principal balances of all eligible loans under the borrower relief program.

EXHIBIT V.C.1.d(4)(b)(ii)
**Summary of Borrower Relief Solicitation Status**
As of March 22, 2013
*($ in Millions)*

| | Number of Loans | | UPB | % of Total (Count) | % of Total (UPB) |
|---|---|---|---|---|---|
| Ally Bank loans solicited | 5,704 | $ | 1,252 | 41% | 58% |
| Ally Bank loans paid off | 329 | | 1 | 2% | 0% |
| ResCap loans solicited | 7,532 | | 906 | 54% | 42% |
| ResCap loans paid off | 506 | | 3 | 4% | 0% |
| Total loans to be solicited | 14,071 | $ | 2,163 | 100% | 100% |

*Source: Analysis of AG Consumer Relief: Eligibility and Solicitation Progress, dated March 22, 2013 [EXAM00339991].*

---

[1163] *See* Special Examiner Presentation: DOJ/AG Settlement, dated Dec. 11, 2012, at EXAM00220903 [EXAM00220897].

[1164] *See* Analysis of AG Consumer Relief: Eligibility and Solicitation Progress, dated Mar. 22, 2013 [EXAM00339991] (providing an updated status of solicitation progress as of March 22, 2013).

[1165] *See id.*

In February 2013, the court-appointed monitor of the borrower relief program certified that AFI, ResCap, and GMAC Mortgage had satisfied the terms of the DOJ/AG Consent Judgment.[1166]

### (iii) Economic Impact Of Modifications

### (A) Modifications Of Ally Bank Loans – $134.5 Million

As described in Section V.C.2 below, GMAC Mortgage reimbursed Ally Bank for modifications made to Ally Bank loans in accordance with the January 30 Letter Agreement, in addition to the A&R Servicing Agreement between GMAC Mortgage and Ally Bank and the related AG Menu Matrix.

As shown in Exhibit V.C.1.d(4)(b)(iii)(A) below, ResCap, through GMAC Mortgage, remitted reimbursement payments totaling $96.8 million to Ally Bank from April 2012 through January 31, 2013.[1167] Two of these payments occurred in the days leading up to ResCap's bankruptcy filing—$45.0 million on May 10, 2012 and $3.4 million on May 11, 2012.[1168]

---

[1166] Office of Mortgage Settlement Oversight, Press Release, *National Mortgage Settlement Monitor: Ally Has Met its Consumer Relief Obligations* (Feb. 14, 2013), https://www.mortgageoversight.com/wp-content/uploads/2012/03/Ally-Report.pdf.

[1167] Ally Bank sent reimbursement invoices to ResCap dated May 9, 2012, May 10, 2012, June 4, 2012, June 28, 2012, July 3, 2012, August 3, 2012, September 7, 2012, October 2, 2012, November 2, 2012, December 6, 2012, January 3, 2013, and February 4, 2013. *See* Invoice from Ally Bank to ResCap (May 9, 2012) [ALLY_0196290]; Invoice from Ally Bank to ResCap (May 10, 2012) [EXAM20203413]; Invoice from Ally Bank to ResCap (June 4, 2012) [ALLY_0402171]; Invoice from Ally Bank to ResCap (June 28, 2012) [ALLY_0402172]; Invoice from Ally Bank to ResCap (July 3, 2012) [ALLY_0402173]; Invoice from Ally Bank to ResCap (Aug. 3, 2012) [EXAM00221497]; Invoice from Ally Bank to ResCap (Sept. 7, 2012) [EXAM00221498]; Invoice from Ally Bank to ResCap (Oct. 2, 2012) [ALLY_0402174]; Invoice from Ally Bank to ResCap (Nov. 2, 2012) [EXAM00237710]; Invoice from Ally Bank to ResCap (Dec. 6, 2012) [ALLY_0402175]; Invoice from Ally Bank to ResCap (Jan. 3, 2013) [ALLY_0402176]; Invoice from Ally Bank to ResCap (Feb. 4, 2013) [ALLY_0402177]. *See also* Special Examiner Presentation: DOJ/AG Settlement, dated Dec. 11, 2012, at EXAM00220908 [EXAM00220897]; ResCap Consolidating Financial Statements – 2012, dated Oct. 29, 2012 [ALLY_0244598]. Payments made after the Petition Date relating to postpetition modifications were expressly authorized by an interim order entered on May 16, 2012, and by a final stipulation and order entered on September 12, 2012. *See* Interim Order Pursuant to Sections 105(a) and 363 of the Bankruptcy Code Authorizing the Debtors to Continue to Perform Under the Ally Bank Servicing Agreement in the Ordinary Course of Business [Docket No. 90]; Stipulation and Order Reserving Rights with Respect to Debtors' Motion for Interim and Final Orders Under Bankruptcy Code Sections 105(a) and 363 Authorizing the Debtors to Continue to Perform Under the Ally Bank Servicing Agreement in the Ordinary Course of Business [Docket No. 1420].

[1168] *See* E-mail from M. Rosen (May 10, 2012), at ALLY_0182324 [ALLY_0182323]; Invoice from Ally Bank to ResCap (May 9, 2012) [ALLY_0196290]. Rosen was a member of the Capital Markets Team at AFI during this period. *See also* Invoice from Ally Bank to ResCap (May 10, 2012) [EXAM20203413]; Agreement for AG Settlement Loan Modifications for April 2012, dated May 11, 2012 [ALLY_PEO_0087335] (letter agreement between Ally Bank, ResCap, and GMAC Mortgage clarifying the modification and reimbursement agreement between GMAC Mortgage and Ally Bank as provided under the January 30 Letter Agreement).

EXHIBIT V.C.1.d(4)(b)(ii)(A)
**Summary of Ally Bank Reimbursement Payments**
*($ in Millions)*

| Date of Invoice | Covered Monthly Period Ending | Invoice Amount |
|---|---|---|
| May 9, 2012 | April 30, 2012 | $ 45.0 |
| May 10, 2012 | April 30, 2012 | 3.4 |
| June 4, 2012 | May 31, 2012 + prior true-up amounts | 19.9 |
| June 28, 2012 | May 31, 2012 + prior true-up amounts | 1.1 |
| July 3, 2012 | June 30, 2012 + prior true-up amounts | 3.6 |
| August 3, 2012 | July 31, 2012 + prior true-up amounts | 2.9 |
| September 7, 2012 | August 31, 2012 + prior true-up amounts | 5.3 |
| October 2, 2012 | September 30, 2012 + prior true-up amounts | 1.7 |
| November 2, 2012 | October 31, 2012 | 3.5 |
| December 6, 2012 | November 30, 2012 | 1.3 |
| January 3, 2013 | December 31, 2012 | 0.3 |
| February 4, 2013 | January 31, 2013 | 8.8 |
| Total Ally Bank reimbursements | | $ 96.8 |

*Source: ALLY_0196290; EXAM2020343; ALLY_0402171; ALLY_0402172; ALLY_0402173; EXAM00221497; EXAM00221498; ALLY_0402174; EXAM00237710; ALLY_0402175; ALLY_0402176; ALLY_0402177.*

As of November 1, 2012, ResCap estimated that GMAC Mortgages' future reimbursement payments to Ally Bank would total $48.1 million.[1169] Given that actual reimbursement payments for the period beginning November 1, 2012 through January 31, 2013 were $10.4 million, the Examiner's Financial Advisors assumed that estimated reimbursement payments from February 1, 2013 through the end of the borrower relief program would be $37.7 million ($48.1 million – $10.4 million = $37.7 million).[1170] As a result, the total reimbursement payments to Ally Bank are estimated to be $134.5 million ($96.8 million + $37.7 million = $134.5 million).

### (B) Modifications Of ResCap Loans – $15.7 Million

As of October 31, 2012, ResCap, had incurred $12.2 million in costs associated with the modification of loans held in the ResCap portfolio.[1171] As of the same date, ResCap estimated that it would incur an additional $3.5 million in costs associated with future modifications of loans held in the ResCap portfolio, for a total of $15.7 million.[1172]

---

[1169] Special Examiner Presentation: DOJ/AG Settlement, dated Dec. 11, 2012, at EXAM00220908 [EXAM00220897].

[1170] ResCap did not provide a more current estimate of post-January 2013 reimbursement payments to Ally Bank.

[1171] Special Examiner Presentation: DOJ/AG Settlement, dated Dec. 11, 2012, at EXAM00220907 [EXAM00220897].

[1172] ResCap did not provide updated information regarding the total costs incurred to date or future costs to be incurred by ResCap due to modification of loans held in the ResCap portfolio.

As shown in Exhibit V.C.1.d(4)(b)(iii)(B) below, the vast majority of costs related to borrower relief result from GMAC Mortgage's reimbursement payments to Ally Bank.[1173]

EXHIBIT V.C.1.d(4)(b)(iii)(B)
**Comparison of ResCap Borrower Relief Costs to Loans Solicited to Date**
*($ in Millions)*

| ResCap Borrower Relief Costs | ResCap Subtotal | % of Total | Loan Portfolio | Loans Solicited (Units) | % of Total | UPB | % of Total |
|---|---|---|---|---|---|---|---|
| Ally Bank reimbursement | $ 134.5 | 89.5% | Ally Bank | 5,704 | 43.1% | $ 1,251.8 | 58.0% |
| Accounting impact of ResCap loan modifications | 15.7 | 10.5% | ResCap | 7,532 | 56.9% | 906.4 | 42.0% |
| Total | $ 150.2 | | Total | 13,236 | | $ 2,158.2 | |

*Source: Appendix V.C.1.c(4); Analysis of AG Consumer Relief: Eligibility and Solicitation Progress, dated March 22, 2013 [EXAM00339991].*

Nearly 60% of the solicitations as of October 31, 2012 were for ResCap loans. However, over 89% ResCap's costs related to borrower relief resulted from reimbursement payments to Ally Bank. This discrepancy is due in part to different accounting methodologies for HFS and HFI loans, as well as the fact the reimbursement payments to Ally Bank did not account for the reserves Ally Bank recorded on its HFI portfolio.

The ResCap loans subject to borrower relief were held in ResCap's HFS portfolio. The Ally Bank loans subject to borrower relief were held in Ally Bank's HFI portfolio.[1174] AFI's accounting policy[1175] requires that ResCap record the carrying value its HFS portfolio based on the lower of cost or market (fair value), commonly referred to as "LOCOM," if it does not elect the option to record the loans at fair value.[1176] The carrying value of the loans held in ResCap's HFS portfolio closely approximated the fair value of those loans as of December 31, 2011.[1177]

AFI's accounting policy requires that Ally Bank record the carrying value of its HFI portfolio on an adjusted cost basis.[1178] AFI's accounting policy for HFI loans states that carrying

---

[1173] Special Examiner Presentation: DOJ/AG Settlement, dated Dec. 11, 2012, at EXAM00220904, 08 [EXAM00220897].

[1174] Meeting with ResCap and FTI, Financial Advisor to the Debtors, in Ft. Washington, PA (Dec. 11, 2012).

[1175] AFI's accounting policies for HFS and HFI applied to both ResCap and Ally Bank.

[1176] Accounting Policy: Loans—Held for Sale or Held for Investment, dated June 1, 2010, at RC40000591 [RC40000585].

[1177] The fair value of the HFS loans held by GMAC Mortgage was $3.13 billion, or less than 1%, greater than the carrying value for these loans of $3.11 billion. GMAC Mortgage, LLC Consolidated Financial Statements for the Years Ended December 31, 2011 and 2010 (Mar. 28, 2012), at 48 [RC00032177].

[1178] *See* Accounting Policy: Loans—Held for Sale or Held for Investment, dated June 1, 2010, at RC40000593–94 [RC40000585].

value for purchased HFI loans is based on the loan's unpaid principal balance, the purchase premium or discount, and the change in value of the loan commitment derivative.[1179] The initial carrying value of originated HFI loans is calculated in the same manner as the purchased HFI loans with the inclusion of any charge-offs or allowances for estimated uncollectible amounts and impairments in value.[1180] AFI's accounting policy also states that HFI loans must be evaluated for possible credit impairment. If it is probable that AFI has incurred a loss and the amount is reasonably estimable, the loss should be recognized in the period in which the loss occurred.[1181] This credit impairment is recorded in the form of a reserve on the balance sheet.

In general, the accounting methodology employed for the HFS portfolio resulted in greater reductions to the carrying value of the HFS loans compared to the accounting methodology employed for the HFI loans.[1182] This premise is corroborated by an analysis of the write-offs and reserves related to HFS and HFI loans. GMAC Mortgage wrote-down the unpaid principal balance of its HFS portfolio of residential mortgage loans by $318.2 million (9.2% of carrying value) and $427.7 million (11.2% of carrying value) in 2011 and 2010, respectively.[1183] On the other hand, AFI's reserves related to the consumer mortgage HFI loans for the origination and servicing operations were $16 million (0.6% of carrying value) and $13 million (0.6% of carrying value) in 2011 and 2010, respectively.[1184]

Furthermore, Ally Bank's reserves on its HFI portfolio were not accounted for in the calculation of the reimbursement payments due from GMAC Mortgage to Ally Bank. Therefore, the reimbursement payment is based on the impact of the borrower relief on Ally Bank's gross carrying value of its HFI loans as opposed to the carrying value net of reserves. The exclusion of Ally Bank's reserves from the reimbursement calculations will be discussed in greater detail in Section V.C.2.c(4) below.

---

[1179] *Id*.

[1180] *See id*. at RC40000594.

[1181] *See id*. at RC40000595.

[1182] Meeting with ResCap and FTI, Financial Advisor to the Debtors, in Ft. Washington, PA (Dec. 11, 2012).

[1183] *See* GMAC Mortgage, LLC Consolidated Financial Statements for the Years Ended December 31, 2011 and 2010 (Mar. 28, 2012), at 20 [RC00032177].

[1184] Ally Financial Inc., Annual Report (Form 10-K) (Feb. 28, 2012), at 61.

### (iv) Other Costs Associated With DOJ/AG Consent Judgment–$4 Million

ResCap, through GMAC Mortgage, had incurred approximately $4 million in "other" costs relating to the borrower relief program as of November 1, 2012.[1185] These costs included attorneys' fees, other fines and penalties, and costs associated with the Hope for Homeowners Program.[1186]

### (v) Accounting For DOJ/AG Settlement

As noted in Section V.C.1.c(7), on January 30, 2012, AFI and its subsidiaries estimated their liability associated with the CMP Order and DOJ/AG Settlement to be $268 million and accrued a liability in the December 31, 2011 financial records.[1187] After the announcement of the CMP Order and the DOJ/AG Settlement on February 9, 2012, AFI and its subsidiaries reduced their estimate of this liability to $230 million in their December 31, 2011 financial statements.[1188] Exhibit V.C.1.d(4)(b)(v) outlines the elements comprising this $230 million liability.

EXHIBIT V.C.1.d(4)(b)(v)
**DOJ/AG Settlement: Summary of $230 Million Accrued Liability**
December 31, 2011
*($ in Millions)*

|  |  |  |
|---|---|---|
| Hard dollar penalties | $ | 112.5 |
| Soft dollar penalties |  | 99.0 |
| Other [(1)] |  | 18.5 |
| Total | $ | 230.0 |

*[(1)] Includes $9 million Service Member Civil Relief Act, $7.5 million servicer advance reserve, and $2.0 million rounding.*
*Source: Memorandum, Accrual for DOJ Settlement at December 31, 2011, dated Feb. 28, 2012, at 3 [EXAM00220938].*

As will be discussed in Section V.C.1.f, ResCap and AFI considered various allocation scenarios when estimating the total cost of the DOJ/AG Settlement. Ultimately, ResCap and AFI decided to match the allocation methodology set forth in the February 9, 2012 FRB press release announcing the CMP Order,[1189] and agreed to allocate the estimated $230 million liability for the DOJ/AG Settlement and the CMP Order 8% to AFI and 92% to ResCap.[1190] Therefore, AFI

---

[1185] Special Examiner Presentation: DOJ/AG Settlement, dated Dec. 11, 2012, at EXAM00220908 [EXAM00220897].

[1186] *See id.*

[1187] Memorandum, Accrual for DOJ Settlement at December 31, 2011, dated Feb. 28, 2012, at 3 [EXAM00220938].

[1188] *Id.*

[1189] FRB, Press Release (Feb. 9, 2012), http://www.federalreserve.gov/newsevents/press/enforcement/ 20120209a.htm.

[1190] *See* Section V.C.1.f(4) (discussing AFI's and ResCap's decision to use the FRB press release as the proper allocation method of penalties imposed under the government settlements).

recorded $18.5 million of the total liability, and ResCap (through GMAC Mortgage) recorded the remaining $211.5 million liability.[1191]

### e. *Negotiations Leading To The Government Settlements*

The government's investigation in the latter half of 2009 was followed by intense negotiations between the governmental entities and the AFI corporate group.[1192] While the settlement negotiations with the DOJ and AGs were lengthy, the road to settlement with the FRB and FDIC was relatively short and was accomplished in two stages, with the agreement regarding the FRB/FDIC Consent Order coming first, and the agreements regarding the CMP Order and the DOJ/AG Consent Judgment coming last. During these negotiations there was a general view that the interests of AFI and ResCap were aligned regarding getting the lowest possible penalty amount.[1193] However, there was tension between the two companies[1194] and their subsidiaries regarding the ultimate allocation of costs between them.[1195]

#### (1) *Involvement Of The AFI Board And The ResCap Board In The Negotiations Concerning The Government Settlements*

According to Pamela West, the ResCap Board, including the Independent Directors, had "robust discussions about the consent order"[1196] and was kept abreast of developments regarding the

---

[1191] *See* Residential Capital, LLC Consolidated Financial Statements for the Years Ended December 31, 2011 and 2010 (Mar. 28, 2012), at 70 [EXAM00122651].

[1192] Marano noted that there was "minimal discussion" regarding the FRB/FDIC Settlement, due to its nature as a "natural order from the regulator" and that the FRB/FDIC Settlement "largely copied what we negotiated with the [DOJ and AG]. Int. of T. Marano, Feb. 27, 2013, at 5:10–19, 6:9–10. However, the discussions regarding the DOJ/AG Settlement involved a lot of back and forth and entailed several meetings a week over the course of a year. *See id.* at 6:15–7:8.

[1193] *See id.* at 16:18–17:8 ("While the negotiations were going on, the general view was that some portion of this would have to get picked up by ResCap, and the enforcement activity was largely tar—initially targeted at the servicer. So, the approach I took was, get the lowest fine possible for the servicer, and that should, you know, be fine for everybody."); Int. of M. Carpenter, Mar. 4, 2013, at 217:11–220:12 ("[T]he interest of ResCap and of the parent were completely aligned in terms of getting the lowest possible cost and settlement that we could."). Carpenter was the CEO of AFI during this period.

[1194] *See* Int. of T. Marano, Nov. 26, 2012, at 280:3–25 (noting that Solomon was "consistently trying to shift the responsibility from Ally to ResCap" while the FRB was simultaneously and "consistently trying to make sure that if anything happened to ResCap, that Ally would be ultimately responsible.").

[1195] *Compare* Int. of T. Marano, Feb. 27, 2013, at 18:25–19:14 ("There was definitely pushback from the bank to have as much fall on ResCap as possible. And, ResCap was actually doing the servicing. . . . I obviously was pushing for the lowest possible fees, and to minimize the impact to ResCap."), *with* Int. of M. Carpenter, Mar. 4, 2013, at 219:10–220:12 ("Now, in terms of how it gets allocated, it is 100 clear to everybody that everything that happened for which we paid a fine was because of ResCap's operations. There was nothing in there having to do with anything the parent company did with one minor exception. And so by any logic, 100 percent of whatever it costs should go to ResCap.").

[1196] Int. of P. West, Jan. 11, 2013, at 55:3–4. At this point, West was the Chairperson of the ResCap Audit Committee.

settlements and compliance efforts, despite the fact that they did not take part in the negotiations themselves.[1197] The discussions appear to have been focused on understanding the settlement itself, rather than on the allocation of settlement responsibilities between AFI and ResCap.[1198]

On January 27, 2011, the ResCap Board was informed of information requests and inquiries from the SEC, the DOJ, and the state AGs, and was presented with "the findings of the interagency mortgage foreclosure examination of Ally Financial, its nonbank mortgage subsidiaries and Ally Bank conducted by the Federal Reserve."[1199] In February 2011, Marano briefed the ResCap Board on "the results of the mortgage foreclosure target examination conducted by the Federal Reserve."[1200] By letter dated February 18, 2011, the FRB provided the AFI corporate group with a draft of the FRB/FDIC Consent Order.[1201]

As early as February 25, 2011, the ResCap Board discussed the proposed FRB/FDIC Settlement, led by Diane Citron (who was assigned to head the task force devoted to addressing the issues the FRB had identified).[1202] Communications between ResCap and AFI revealed that the FRB indicated in discussions regarding the FRB/FDIC Consent Order that it expected AFI to be "on notice that it is fully accountable for its businesses and must take a

---

[1197] *Id.* at 61:17–22 ("We were certainly updated on a very regular basis as the negotiations and discussions were going along, yes. Did we take an active participatory part in them, no. But the independent directors were certainly kept up to date on the status of the negotiations."); Int. of J. Mack, Jan. 15, 2013, at 96:17–97:7. Mack was a Director of the ResCap Board during this period.

[1198] *See* Int. of P. West, Jan. 11, 2013, at 54:17–56:16; *see also* Int. of J. Pensabene, Jan. 9, 2013, at 190:9–192:22 (noting that there were no discussions with the government during negotiations of the DOJ/AG Settlement regarding what entities were responsible for the conduct underlying the settlement or which entities were liable under the statutes being violated).

[1199] Minutes of a Special Meeting of the Board of Residential Capital, LLC, Jan. 27, 2011, at RC00023406 [RC00023397] (noting that Marano presented a series of charts summarizing the FRB investigation, paying particular attention to issues raised in "the review of foreclosure and delinquent loan files, the Document Custodian activity and Risk Management[,]" and also the next steps in responding to the investigation's findings). *See also* Federal Reserve Bank of Chicago AFI Supervisory Team Presentation, Interagency Mortgage Foreclosure Examination of Ally Financial, Inc., its Nonbank Mortgage Subsidiaries, and Ally Bank, dated Jan. 27, 2011, at RC40019274–84 [RC40019219].

[1200] Minutes of a Regular Meeting of the Board of Residential Capital, LLC, Feb. 11, 2011, at RC00023418 [RC00023397].

[1201] *See* Minutes of a Special Meeting of the Board of Residential Capital, LLC, Feb. 25, 2011, at RC00023419 [RC00023397]; Letter from the Federal Reserve Bank of Chicago to T. Marano, W. Solomon, and Mark Weintraub (Feb. 18, 2011) [ALLY_0359123]. During this period, Weintraub was the Executive Vice President of Mortgage Servicing Remediation Oversight at AFI, and was designated the "Engagement Manager" on behalf of AFI for the implementation of the PwC Engagement Letter.

[1202] *See* FRB Program Charter, Presentation to the ResCap Board, dated Mar. 7, 2011, at RC40019421 [RC40019366] ("A Task Force led by Ms. Citron was established."); Minutes of a Special Meeting of the Board of Residential Capital, LLC, Feb. 25, 2011, at RC00023419 [RC00023397].

more active role in setting risk tolerances and assuring adherence."[1203] The draft FRB/FDIC Consent Order listed AFI, Ally Bank, ResCap, and GMAC Mortgage as responsible parties from the beginning,[1204] but the ResCap Board apparently discussed only the applicability of items in the draft to ResCap or GMAC Mortgage, not to AFI or Ally Bank.[1205] The ResCap Board was informed, during its regular meeting in March 2011, that the proposed FRB/FDIC Consent Order was directed at each of AFI, Ally Bank, ResCap, and GMAC Mortgage.[1206]

ResCap's management determined that it had concluded negotiations with respect to the FRB/FDIC Consent Order on April 1, 2011. At that time, the ResCap Board was provided with a near-final draft order.[1207] Cathy Quenneville, the Corporate Secretary of ResCap and AFI, informed the ResCap Board that ResCap should enter into the order quickly, lest it be the only target of the investigations subject to a separate announcement by the FRB.[1208] That same day, following a discussion on the version of the FRB/FDIC Consent Order circulated to the ResCap Board earlier in the morning,[1209] the ResCap Board authorized Marano to enter into the FRB/FDIC Consent Order.[1210]

---

[1203] E-mail from B. Yastine to D. Citron, T. Marano, and S. Abreu (Feb. 22, 2011) [EXAM11084270]. Abreu was the President of both GMAC Mortgage and ResCap during this period. He was also a member of the ResCap Board and the ResCap Executive Committee.

[1204] Minutes of a Special Meeting of the Board of Residential Capital, LLC, Feb. 25, 2011, at RC00023419 [RC00023397].

[1205] *Id.* ("Discussion was given to, among other things, applicability of the items to ResCap or to GMAC Mortgage, LLC; regulatory recommendations and actions required; and topics or areas identified in the draft Consent Order for which actions have been implemented or initiated by management prior to receipt of the draft Consent Order.").

[1206] Minutes of a Regular Meeting of the Board of Residential Capital, LLC, Mar. 9, 2011, at RC00023423 [RC00023397]. ("[Citron] informed the Board that the draft Consent Order is directed at Ally, Ally Bank, ResCap, GMAC Mortgage, LLC and Residential Funding, LLC and that the primary focus is on controls around the risks attendant to mortgage servicing.").

[1207] E-mail from C. Quenneville (Apr. 1, 2011), at RC40019516 [RC40019428].

[1208] *Id.*

    It is in ResCap's interest to execute the Consent Order relatively quickly. While the [FRB] and OCC have agreed to a joint announcement, the [FRB] confirmed today that the OCC and its banks are well ahead of us on the execution process, and the OCC may proceed on its own with a public announcement. If we have already executed our Consent Order, we would likely be included in any such announcement. If we have not executed, we might find our self being the sole subject of a subsequent announcement.

[1209] Draft FRB/FDIC Consent Order, dated Apr. 1, 2011, at RC40019518–57 [RC40019428] (attached to E-mail from C. Quenneville (Apr. 1, 2011), at RC40019516 [RC40019428]).

[1210] Minutes of a Special Meeting of the Board of Residential Capital, LLC, Apr. 1, 2011, at RC00023432–33 [RC00023397].

### *(2) Compliance With The FRB/FDIC Consent Order*

Following the formal settlement, on May 6, 2011, the ResCap Board discussed the formation of a ResCap Consent Order Compliance Committee to oversee compliance with the FRB/FDIC Consent Order and update the ResCap Board on compliance with the order,[1211] which was authorized in late-May.[1212] The ResCap Board further suggested the possibility of holding joint meetings of the ResCap and AFI sub-committees "established for the same purpose to ensure consistency in the communication of required information and follow-through plans."[1213] These joint meetings were held by a "Combined" Consent Order Compliance Committee, which included representatives from AFI and ResCap.[1214]

—————————————————————

[1211] Minutes of a Regular Meeting of the Board of Residential Capital, LLC, May 6, 2011, at RC00023444–45 [RC00023397]. On April 28, 2012, the AFI Board similarly discussed the formation of a special committee to "oversee compliance and to review and monitor management's action plan to comply with the Consent Order." Minutes of a Regular Meeting of the Board of Directors of Ally Financial Inc., Apr. 28, 2011, at ALLY_0115679–80 [ALLY_0115565].

[1212] Action by Written Consent of the Board of Directors of Residential Capital, LLC, dated May 26, 2011, at RC00023453–54 [RC00023397]. Prior to his appointment to the ResCap Consent Order Compliance Committee, Edward Smith was a member of the ResCap Audit Committee.

[1213] Minutes of a Regular Meeting of the Board of Residential Capital, LLC, May 6, 2011, at RC00023444–45 [RC00023397].

[1214] *See, e.g.,* Minutes of the Ally Financial Inc./Residential Capital, LLC Combined Consent Order Compliance Committee Meeting, June 7, 2011 [RC40019071]; Minutes of the Ally Financial Inc./Residential Capital, LLC Combined Consent Order Compliance Committee Meeting, July 12, 2011, at RC40019075 [RC40019071]; Minutes of the Ally Financial Inc./Residential Capital, LLC Combined Consent Order Compliance Committee Meeting, July 27, 2011, at RC40019088 [RC40019071]; Minutes of the Ally Financial Inc./Residential Capital, LLC Combined Consent Order Compliance Committee Meeting, Aug. 22, 2011, at RC40019091–93 [RC40019071] (noting that "a report on the costs associated with the foreclosure review and overall Consent Order compliance program will be presented at an upcoming meeting of the COCCs."); Minutes of the Ally Financial Inc./Residential Capital, LLC Combined Consent Order Compliance Committee Meeting, Sept. 27, 2011, at RC40019095 [RC40019071]; Minutes of the Ally Financial Inc./Residential Capital, LLC Combined Consent Order Compliance Committee Meeting, Oct. 28, 2011, at RC40019137 [RC40019109]; Minutes of the Residential Capital, LLC Consent Order Compliance Committee Meeting, Dec. 16, 2011, at RC40019143–44 [RC40019109] ("Mr. Weintraub noted that certain process improvements implemented to comply with Consent Order requirements are benefiting other areas of the business, and that there is evidence of the effectiveness of the policies, practices, and procedures that have been put into operation, specifically reference enhancements to oversight of legal suppliers and SPOC."); Minutes of the Ally Financial Inc./Residential Capital, LLC Combined Consent Order Compliance Committee Meeting, Jan. 25, 2012, at RC40019148 [RC40019109]; Minutes of the Ally Financial Inc./Residential Capital, LLC Combined Consent Order Compliance Committee Meeting, Mar. 8, 2012, at RC40019152 [RC40019109]. The Examiner was able to uncover evidence of only one meeting individually held by the ResCap Consent Order Compliance Committee, and even in that circumstance, a representative of the AFI Consent Order Compliance Committee, John Durrett, was present. *See* Minutes of the Residential Capital, LLC Consent Order Compliance Committee Meeting, Dec. 16, 2011, at RC40019143 [RC40019109].

The ResCap Consent Order Compliance Committee updated the ResCap Board regarding the progress of compliance with the FRB/FDIC Consent Order.[1215] The ResCap Board was further informed by Citron that while "the focus of the Consent Order is on the mortgage servicing activity," compliance was "a company-wide effort with multiple requirements for Ally and Ally Bank as well."[1216]

The ResCap Board approved an oversight plan prepared for the FRB and FDIC[1217] addressing, among other things, funding of the items set forth in the FRB/FDIC Consent Order (the "Board Oversight Plan"). The Board Oversight Plan identified the AFI Board and the ResCap Board as the appropriate parties to ensure adequate funding of mortgage servicing operations,[1218] but additionally identified two AFI Board committees as being responsible, together with ResCap, for adequate funding of risk management, audit and compliance programs.[1219] The Board Oversight Plan reflected comments by the FRB and was to be reviewed by the Combined Consent Order Compliance Committee.[1220] In addition, draft action plans related to compliance with the FRB/FDIC Consent Order were submitted to the FRB to incorporate feedback received prior to the submission of the final action plans by the July 13, 2011 due date.[1221]

The members of the ResCap Consent Order Compliance Committee gave oral updates to the ResCap Board covering costs associated with such compliance.[1222] As the compliance

---

[1215] *See, e.g.,* Minutes of a Regular Meeting of the Board of Residential Capital, LLC, May 6, 2011, at RC00023444 [RC00023397]; Draft Minutes of a Regular Meeting of the Board of Residential Capital, LLC, Mar. 23, 2013, at EXAM11088883 [EXAM11088882].

[1216] Minutes of a Regular Meeting of the Board of Residential Capital, LLC, May 6, 2011, at RC00023444 [RC00023397].

[1217] Action by Written Consent of the Board of Directors of Residential Capital, LLC, dated June 9, 2011, at RC00023465–69 [RC00023397].

[1218] The Boards of Directors of Ally Financial and Residential Capital, LLC; Board Oversight Plan, dated June 13, 2011, at RC00023481 [RC00023397] (attached to Action by Written Consent of the Board of Directors of Residential Capital, LLC, dated June 9, 2011, Ex. A, [RC00023397]).

[1219] *See id.* at RC00023492.

[1220] Minutes of a Regular Meeting of the Board of Residential Capital, LLC, July 1, 2011, at RC40018631 [RC40018411].

[1221] Minutes of a Regular Meeting of the Board of Directors of Residential Capital, LLC, July 1, 2011, at RC40018631 [RC40018411]; Consent Order Compliance Program Update, Presentation to the Board of Residential Capital, LLC, dated July 1, 2011, at RC40019649–53 [RC40019597].

[1222] *See, e.g.,* Minutes of a Regular Meeting of the Board of Residential Capital, LLC, Oct. 7, 2011, at RC40018694–95 [RC40018411] (noting that West "informed the Board that she will present to the Board on a regular basis a verbal report regarding the activities of the combined Ally Financial Inc., and ResCap Consent Order Compliance Committees" and that West reported on "program costs through 2013, and costs associated with the foreclosure review."); Materials of a Special Residential Capital, LLC Board of Directors Meeting, Oct. 7, 2011, at RC00023278 [RC00023248] (inserted document stating that a "verbal" update to the Board was made by the Consent Order Compliance Committee).

program progressed, it became clear that the original cost estimate for an independent consultant to conduct an assessment of GMAC Mortgage's and its subsidiaries' risk would be insufficient.[1223] The Combined Consent Order Compliance Committee likewise included a review of costs in its normal reporting and efforts to ensure compliance with the FRB/FDIC Consent Order.[1224] Discussions regarding the settlement with the state AGs and the DOJ

---

[1223] Minutes of a Regular Meeting of the Board of Residential Capital, LLC, July 1, 2011, at RC40018631 [RC40018411].

> Ms. Citron next commented on the status of the Consent Order requirement that an independent consultant be engaged to conduct a comprehensive assessment of the mortgage servicing companies' risk, and she explained that the review is to include testing as well as the assessment of risk controls. She added that the testing component significantly increases the scope and cost of the engagement.

[1224] Minutes of the Ally Financial Inc./Residential Capital, LLC Combined Consent Order Compliance Committee Meeting, Sept. 27, 2011, at RC40019096 [RC40019071].

> Mr. Weintraub briefed the COCCs and Mr. Geer on program finances, which he said would be reviewed in more detail later in the meeting. Responding to a question asked by Mr. Geer, Mr. Weintraub said that Ally Bank expenses are included in reported Consent Order program costs. During the discussion that ensued, Ms. [Barbara] Yastine commented on quarterly and monthly reporting requirements imposed on Ally Bank under the Consent Order.

*Id.* at RC40019097.

> Mr. Weintraub presented a series of charts that provided a detailed review of Consent Order program finances. Mr. Weintraub reviewed and discussed one time spend amounts, recurring expenses and approved spend amounts compared with forecasted amounts . . . Mr. Weintraub explained the distribution of Rust Consulting costs among the mortgage services subject to Consent Orders and said that [AFI's] reimbursement to Rust Consulting is reflected in foreclosure review costs.

Rust Consulting was a third party administrator retained by GMAC Mortgage to "send[] notices to eligible borrowers" under the FRB/FDIC Consent Order as part of the mortgage "complaint review process" in conjunction with the Foreclosure Review. *Id.*, at RC40019096. *See also* Minutes of the Residential Capital, LLC Consent Order Compliance Committee Meeting, Dec. 16, 2011, at RC40019145 [RC40019109].

> Mr. Weintraub presented dashboard charts that illustrated year-to-date actual financial data as of Nov. 30, 2011. . . . Responding to questions asked, Mr. Weintraub said that the projected recurring spend of $99.9 million represents cumulative recurring costs from 2011 through 2013. He pointed out that the financial projections for the foreclosure review do not include associated remediation costs.

became more active in September 2011,[1225] and continued through December 2011,[1226] as efforts to comply with the FRB/FDIC Consent Order and its provisions continued.[1227]

### (3) Major ResCap Board Actions Leading To CMP Order And DOJ/AG Consent Judgment

Despite the formal settlement with the FRB and FDIC, the total cost of the settlement and the outcome of the DOJ's and state AGs' investigation remained uncertain. Additionally, the parties had not settled on the total amount of the CMP associated with the FRB/FDIC Consent Order.

In a special meeting on January 10, 2012, the ResCap Board focused on the reporting of potential losses related to the federal and state investigations, including "considerable discussions regarding, among other topics, the timing and implications of the anticipated issuance to mortgage loan servicers of possible fines and penalties in connection with the mortgage foreclosure matter,"[1228] and also the possibility that fines relating to these government investigations could have a "material adverse impact on ResCap's financial position."[1229] In connection with an accounting analysis focused on loss contingencies, Cathy Dondzila informed the ResCap Board that the following amounts related to the potential settlement with the DOJ and the state AGs were "potentially achievable":

> (1) $75 million hard dollar amount, comprised of $25 million AFI "upfront," $25 million ResCap "upfront," and a $25 million installment by ResCap over a two-year period;

---

[1225] *See* Minutes of a Special Meeting of the Board of Residential Capital, LLC, Sept. 27, 2011, at RC40018677 [RC40018411].

> The Board and members of management and legal advisors in attendance at the meeting engaged in full discussion of various matters relating to the residential mortgage foreclosure issues and potential settlements with the Federal Housing Finance Agency and the Department of Justice; ResCap's near-term projected equity position vis-à-vis tangible net worth financial covenant requirements; shareholder support; and contingency planning.

[1226] *See* ResCap Board—Business Review Presentation, dated Dec. 15, 2011, at ALLY_0309734 [ALLY_0309689] (noting that there were still major issues outstanding with respect to the "AG Settlement," including the finalization of the monetary component).

[1227] *See* Minutes of a Special Meeting of the Board of Residential Capital, LLC, Nov. 16, 2011, at RC40018710 [RC40018411] ("Mr. Marano commented on the Consent Order and matters pertaining to the Single Point of Contact and foreclosure review requirements. Hamzehpour informed the Board that the terms of the engagement letter with PricewaterhouseCoopers LLP for their work on the foreclosure review were being finalized.").

[1228] Minutes of a Special Meeting of the Board of Residential Capital, LLC, Jan. 10, 2012, at RC40019181 [RC40019179].

[1229] *Id.* at RC40019183.

(2) $40 million contingent hard dollar amount (comprised of $10 million per year, contingent upon ResCap annual revenues in excess of $1.1 billion); and

(3) $200 million soft dollar amount (estimated at a $100 million accounting loss and including $17 million in indemnification payment obligations to Ally Bank).[1230]

Simultaneously, Dondzila informed the ResCap Board that ResCap's then-current ability to pay was $50 million.[1231] Ultimately, the ResCap Board determined that $150 million was an appropriate amount to reserve against the potential assessment of a civil money penalty from the FRB.[1232] However, this decision was retracted the next day because AFI had not yet closed its books for the year ending December 2011, and Marano planned on having additional conversations with the FRB to clarify the potential amount of the penalty.[1233]

On January 25, 2012, following a discussion led by Marano, Steven Abreu, and James Whitlinger[1234] regarding the status of the proposed DOJ/AG Settlement, the ResCap Board granted Marano the authority "to enter into a Consent Assessment Order by and among Ally Financial, Inc., Residential Capital, LLC, GMAC Mortgage, LLC and the Board of Governors of the Federal Reserve System."[1235]

### (4) Discussions Regarding Ally Bank's Responsibilities Under The Government Settlements

The FDIC and the Utah Department of Financial Institutions required Ally Bank to explain the DOJ/AG Consent Order's impact on its various hedging and swap agreements.[1236] Internally, Ally Bank performed analyses regarding a proposed modification strategy on HFI loans related to the potential DOJ/AG settlement and the eligible population for such

---

[1230] Accounting Presentation by C. Dondzila to the ResCap Board, dated Jan. 10, 2012, at RC40020151 [RC40020121]. The estimated $17 million in indemnification payment obligations appears to represent only a portion of the estimated indemnification payments to Ally Bank.

[1231] *See id.*

[1232] Minutes of a Special Meeting of the Board of Residential Capital, LLC, Jan. 10, 2012, at RC40019183 [RC40019179].

[1233] *Id.* at RC40019185.

[1234] Whitlinger was the CFO of ResCap during this period.

[1235] Minutes of a Special Meeting of the Board of Residential Capital, LLC, Jan. 25, 2012, at RC40019195 [RC40019179].

[1236] Int. of L. Gerner, Nov. 13, 2012, at 203:21–207:2 (stating that John Andrews, Adam Glassner and James Young were the primary Ally Bank representatives who worked with the FDIC and Utah Department of Financial Institutions on these matters). Gerner was the CFO of Ally Bank from 2004 until October 2011. Glassner was also the Executive Vice President of Capital Markets at GMAC Mortgage during this period. Young was the Chief Financial Executive of Ally Bank during this period.

modifications.[1237] However, it is unclear whether there were any discussions about Ally Bank contributing financially to the DOJ/AG Settlement, even though the broad release ultimately agreed upon in the DOJ/AG Consent Judgment appears to have covered Ally Bank.[1238] Internal AFI documents from this period also indicate that Ally Bank was aware that it would be reimbursed for damages it suffered as a result of the settlement.[1239] As an apparent result of this benefit, Ally Bank elected to participate in loan modifications imposed under the DOJ/AG Settlement.[1240] However, law firm Bradley Arant Boult Cummings LLP ("Bradley Arant") was eventually able to negotiate a removal of Ally Bank from the DOJ/AG Settlement documents. Ultimately, Ally Bank was not a party to the DOJ/AG Consent Judgment (though it arguably is included in its broad releases).[1241]

### (5) Representation Of ResCap And AFI In The DOJ/AG Settlement Negotiations

Bradley Arant represented both AFI and ResCap and was instrumental in negotiating the DOJ/AG Settlement.[1242] AFI also retained its own separate counsel, hiring the law firm of Sullivan & Cromwell LLP to represent its interests in these negotiations.[1243] ResCap, by contrast, did not retain separate counsel and made no particular effort to segregate ResCap's interests from AFI's during settlement negotiations.[1244] Marano and Joseph Pensabene, together with Robert

---

[1237] E-mail from X. Portillo (July 25, 2011) [EXAM11088091]; AG Settlement Items and Delegation Authority Exceptions: Discussion Materials, dated July 25, 2011 [EXAM11088092] (attached to E-mail from X. Portillo (July 25, 2011) [EXAM11088091]) (presentation covering, among other things, an estimated total $25.4 million loss related to the economic effect of a proposed first lien modification process on Ally Bank's HFI loans).

[1238] Int. of L. Gerner, Nov. 13, 2012, at 207:21–208:11.

[1239] Ally Bank Affordability Preservation Program: Program Summary Presentation, dated Sept. 21, 2011, at 2–3 [ALLY_0033594] (noting that GMAC Mortgage's proposed program related to the DOJ/AG Settlement would "reimburse the Bank for the gross principal forgiveness" and that a benefit to Ally Bank of the DOJ/AG Settlement would therefore be a "free option to improve portfolio" because "[GMAC Mortgage] reimburses Bank for all principal forgiveness activities").

[1240] See E-mail from M. Rosen to T. Marano et al. (Sept. 21, 2011) [ALLY_0206899].

[1241] See Int. of T. Marano, Feb. 27, 2013, at 57:19–58:10.

[1242] See Int. of T. Hamzehpour, Oct. 5, 2012, at 98:8–100:18 ("[Bradley Arant Boult Cummings] were keeping everybody informed of the direction things were going and as with the consent order work it was I think a group conversation about the direction things were taking, where we should be trying to push back and not, etcetera."); Second Supplemental Declaration of Robert R. Maddox in Support of Debtors' Application for Authorization (I) to Employ and Retain Bradley Arant Boult Cummings LLP as Special Litigation and Compliance Counsel to the Debtors, Nunc Pro Tunc to May 14, 2012, and (II) to Approve Alternative Billing Arrangement [Docket No. 1008] at 3–4. Hamzehpour was General Counsel and Assistant Secretary of ResCap during this period.

[1243] See Int. of T. Hamzehpour, Oct. 5, 2012, at 99:13–100:2.

[1244] See id. at 99:13–17; Int. of T. Marano, Nov. 26, 2012, at 279:13–24 (noting that Marano represented both AFI and ResCap's interests in the negotiations and that AFI was a "tagalong" beneficiary of the settlement because the federal entities "consistently looked at Ally as . . . having some exposure as well because they were the parent.").

Maddox of Bradley Arant, were the primary negotiators on behalf of ResCap with respect to the DOJ/AG Settlement.[1245] Marano believed that despite representing both AFI and ResCap, Bradley Arant fought "very, very hard" for ResCap and was able to help ResCap (and AFI) achieve a comparably low fine.[1246]

### (6) Cerberus Influence Over AFI During Final Negotiations And Implementation Of Government Settlements

In February 2012, AFI hired Lenard Tessler to help with AFI's turnaround efforts, particularly in connection with the restructuring of ResCap, so that an AFI IPO could move forward.[1247] In this role, Tessler had access to confidential information regarding acquisition and financing proposals for ResCap.[1248] While advising AFI, Tessler maintained his position as managing director and co-head of private equity at Cerberus, and Cerberus continued to consider bidding on ResCap assets.[1249] Tessler also served on AFI's behalf as a negotiator of the AFI Settlement and Plan Sponsor Agreement.[1250]

Tessler obtained permission from the FRB to serve in an advisory capacity to AFI, notwithstanding the requirement that "any existing business relationships and transactions between AFI and Cerberus . . . be limited to their existing scope and terms, and no new business relationships, including any advisory agreements, with [AFI] . . . be permitted."[1251]

---

[1245] *See* Int. of J. Pensabene, Jan. 9, 2013, at 183:14–19.

[1246] Int. of T. Marano, Feb. 27, 2013, at 56:11–57:12.

[1247] *See* E-mail from G. Kosinski to L. Tessler (Feb. 24, 2012) [CCM00121169] (e-mailing Bloomberg article regarding Tessler's hiring). In addition to his advisory role at AFI, Tessler was, and continues to be, a Senior Managing Director and Co-Head of Global Private Equity at Cerberus.

[1248] *See* E-mail from L. Tessler (Feb. 26, 2012) [EXAM00075603].

[1249] *See* E-mail from L. Tessler to J. Ilany (Apr. 28, 2012) [ALLY_0158581]. Ilany was an independent director of the ResCap Board and a member of the ResCap Audit Committee during this period.

[1250] *See* Int. of L. Tessler, Feb. 28, 2013, at 195:3–16.

[1251] *Id.* at 189:7–18.

### f.   Allocation Methods Discussed

As previously noted, the FRB/FDIC Consent Order, CMP Order, and DOJ/AG Consent Judgment did not allocate the costs of such settlements among the AFI and ResCap entities.[1252] This left AFI and ResCap to determine the appropriate allocation of these costs themselves, with the understanding that many of the costs of the settlements were interrelated.[1253] The process of determining this allocation occurred over the course of several months[1254] and required constant revision as the settlement discussions with the government progressed and the details of the ultimate costs associated with the settlements were finalized.[1255] Three primary methods for allocating the joint and several costs of the government settlements among the members of the AFI corporate group appear to have been discussed by ResCap and AFI.

### (1) 0% Allocation To AFI Based On Nature Of Penalty

Several members of AFI's and ResCap's Boards believed that AFI should not be responsible for any amount of the costs associated with the government settlements.[1256] However, outside of a few emails among various AFI and ResCap employees, there is scarce

---

[1252] Int. of D. DeBrunner, Apr. 18, 2013, at 35:18–36:5 (noting that the FRB/FDIC Consent Order and the CMP Order did not contain allocations and in fact dictated joint and several liability among AFI, ResCap, and GMAC Mortgage and certain of its subsidiaries); Int. of P. West, Jan. 11, 2013, at 56:12–16 ("[Q:] Was there discussion of the fairness to ResCap of the allocation within the consent order? [A:] I do not recall that discussion."); id. at 59:20–25 ("[Q:] So to your knowledge, was there any negotiation between ResCap and Ally as to the allocation of the financial impact or burden of those government settlements? [A:] Not to my knowledge."); Int. of J. Pensabene, Jan. 9, 2013, at 189:13–19 (noting that, with respect to the DOJ/AG Settlement, there was never any discussion by the government about allocation among the Ally or ResCap entities but that the "discussion with the government about the amount was just whether or not Ally would be a party to the settlement."). Arguably, the DOJ/AG Consent Judgment did impose an allocation method by expressly requiring ResCap, GMAC Mortgage, and RFC to make all hard payments and incur all of the soft costs. DOJ/AG Consent Judgment, Ex. I [RC00027463].

[1253] See Int. of D. DeBrunner, Apr. 18, 2013, at 9:24–10:14.

[1254] See id. at 38:3–16.

[1255] See id. at 38:8–39:12.

[1256] See, e.g., Int. of P. West, Jan. 11, 2013, at 55:21–56:5 ("Well, first of all, you don't evaluate the fairness of what your regulator is telling you have to do. I mean, that's just kind of the way the banking business works. And it was a mortgage issue. And so we looked at it as a ResCap obligation, but it was a mortgage obligation."); id. at 62:21–63:8 (noting that the FRB/FDIC Consent Order involved a "servicing issue," that "Rescap's taken responsibility" for such issue and that West never came to think that AFI should bear some of the burden of the government settlements); Int. of M. Carpenter, Mar. 4, 2013, at 219:10–220:12.

documentary evidence of formal presentations outlining this option.[1257] Further, there appears to have been a general view among both AFI and ResCap employees that AFI would ultimately bear the burden for some portion of the costs,[1258] and so this possible allocation was apparently not extensively considered.

### (2) 27% Allocation To AFI Based On 15 Possible Actionable Issues

At some point, the DOJ indicated that the fines to be levied against the various mortgage servicers and bank holding companies would be based on a market share fine, which would then be adjusted based on the performance of each company as a servicer.[1259] AFI internally debated whether, and to what extent, AFI should share responsibility for the fines levied under any settlement with ResCap or Ally Bank and what impact ResCap's lack of financial stability would have on that decision, while acknowledging that there was "some logic/benefit in splitting the fine."[1260] Michael Carpenter took the position that ResCap was the responsible

---

[1257] *See, e.g.*, DOJ/AG Settlement—Allocation Scenarios, dated Feb. 13, 2012 [EXAM10999353] (attached to E-mail from Heather McKay (Feb. 13, 2012) [EXAM10999352]). McKay was the Senior Director of Finance at AFI during this period.

[1258] *See*, *e.g*., Int. of S. Abreu, Jan. 22, 2013, at 366:2–3; E-mail from J. Whitlinger to T. Marano and T. Hamzehpour (Jan. 2, 2012) [ALLY_0171726] (noting that "D&T has expressed a view that the DOJ/[FRB] Fines should be borne by the servicer entirely (i.e. ResCap)[]," but that "[w]e have previously discussed that some portion of the $268 M would be expensed at [AFI]."); E-mail from J. Brown (Jan. 25, 2012) [ALLY_0171733] (showing an early belief that AFI would bear a portion of the financial burden, as evidenced by Brown stating "plan to book an entry over next 24/48 hrs. Basis will be [FRB] CMP or $268m. 11/15 goes to RC or abt $196m. Rest to ally."); Memorandum, Accrual for DOJ Settlement at December 31, 2011, dated Feb. 28, 2012, at 8 [EXAM00220938] ("[W]e [AFI] believe that a portion of the DOJ/AG Settlement liability should be allocated to AFI."). Brown was the Senior Executive Vice President of Finance and Corporate Planning of AFI during this period.

[1259] *See* Int. of T. Marano, Nov. 26, 2012, at 275:11–19.

[1260] *See* E-mail from M. Carpenter (Nov. 3, 2011) [ALLY_0228577].

> If we settled with DoJ at 300 or so and the plan was to modify some mortgages at the bank for credit and others at Rescap. And we know that Rescap net worth will go below minimums and require a capital infusion. And do we know if Rescap has the liquidity without drawing the [AFI] line. What I am getting at is there some logic/benefit in splitting the fine between Recap and AFI of Ally Bank and, correspondingly, where we get credit for mods etc.

party for the settlement, or at least for the "servicer fine," and expressed concern regarding undermining that or other legal arguments if AFI were to "[take] part of the settlement."[1261]

Eventually, oral discussions with the FRB and FDIC revealed that the federal government's method for computing the penalty apparently was based on three factors: (1) severity of the issues; (2) number of actionable issues—15; and (3) period of time during which such issues occurred—two years. Based on these variables, the ResCap Board estimated that the total penalty could be $268 million.[1262] Of this amount, Dondzila estimated that $196.5 million (based on 11 of the 15 issues) should be allocated to ResCap; the remaining $71.5 million (based on the remaining four of the 15 issues) should be allocated to AFI.[1263] Based on these allocations, ResCap would be responsible for approximately 73% of the monetary fine and AFI would be responsible for the remaining 27%.[1264]

During this stage of the negotiations in early January 2012, there continued to be tension between the apparent acceptance that AFI would be held jointly and severally responsible for the settlement (and possibly assume some of the burden of the settlement) on the one hand,

---

[1261] E-mail from M. Carpenter (Nov. 4, 2011) [ALLY_0228577] ("[I]f we take part of it at [AFI] do we undermine the argument that Rescap is the responsible party or even weaken our legal case—what should AFI receive from Rescap in exchange for taking part of the settlement?"); E-mail from M. Carpenter (Dec. 16, 2011) [ALLY_PEO_0080176] ("Seems to me servicer fine should go to Rescap and rest to BHC for supervision lapses."); E-mails between M. Carpenter and L. Tessler (Dec. 27, 2011) [ALLY_0142356].

> Tessler: Is Ally accepting financial responsibility for all of these settlements and if so how does that integrate in to the BK discussions? . . .

> Carpenter: No but DOJ making noise about [AFI] guaranteeing the cash portion for obvious reasons!

> Tessler: . . . I am concerned about timing sequence in getting this right given the push for resolution with [AFI] before the Rescap Board is prepared to negotiate other matters. I think we need to start thinking about this because I believe it is a high probability that the UST is going to insist that [AFI] honor all governmental obligations.

> Carpenter: Timing is not going to be perfect. We will have to decide on DOJ and figure out how it gets split between the three entities including soft dollars. Any settlement may be a preference item anyway. Not much we can do until we know what the deal is.

[1262] *See* Accounting Presentation by C. Dondzila to the ResCap Board, dated Jan. 10, 2012, at RC40020151 [RC40020121].

[1263] *See id.* at RC40020152.

[1264] E-mail from R. Zachary to M. Carpenter (Jan. 25, 2012) [EXAM00077270] (stating that "[i]t is expected that [AFI] and ResCap will share the $268 million [FRB] CMP 4/15 ($71.5 million) and 11/15ths ($196.5 million) respectively," and noting that it was discussed that each of AFI and ResCap would contribute 50% to the full "hard dollars" fine). Zachary was a member of the AFI Capital Markets Team during this period.

and AFI's efforts to exclude itself from the settlement on the other.[1265] As negotiations progressed, beginning in late January 2012, it was expressly contemplated by members of AFI's and ResCap's management that AFI would be responsible for a hard dollar payment of at least $50 million.[1266] When Carpenter questioned this allocation of hard dollar payments to AFI and indicated it was unacceptable,[1267] he was informed that Deloitte (which was then the auditor for both AFI and ResCap[1268]) "remained very firm in their position on the economic splits between [ResCap] and [AFI]."[1269]

---

[1265] *Compare* E-mail from J. Whitlinger to T. Marano and T. Hamzehpour (Jan. 2, 2012) [ALLY_0171726] (noting that "D&T has expressed a view that the DOJ/[FRB] Fines should be borne by the servicer entirely [(i.e. ResCap)]," but that "[w]e have previously discussed that some portion of the $268 M would be expensed at [AFI]."), *with* E-mail from M. Carpenter (Jan. 13, 2012) [RC40053347] (responding in the affirmative to the question posed by Solomon of whether the companies should "try to exclude [AFI] from the Order (and leave only the mortgage entities as parties)," responding in the negative to the question posed by Solomon of whether, "[i]f [AFI] remains a part of the Order, should it be *jointly* and severally liable with ResCap for the full amount of the fine" (emphasis added), and responding in the affirmative to the question posed by Solomon of whether Ally Bank should be removed entirely from the draft settlement order).

[1266] *See* E-mail from C. Dondzila to D. DeBrunner (Jan. 23, 2012), at ALLY_0359579 [ALLY_0359578].

[1267] *See* E-mails between M. Carpenter and James Mackey (Jan. 23–24, 2012) [ALLY_0359578]. Mackey was the CFO of AFI during this period.

[1268] *See* Int. of D. DeBrunner, Apr. 18, 2013, at 92:7–9.

[1269] E-mail from J. Mackey to M. Carpenter (Jan. 24, 2012) [ALLY_0359578]. In early January 2012, Deloitte expressed the view that the costs of the settlements should primarily be allocated to ResCap. Meeting with Deloitte and Touche, LLP, Independent Financial Statement Auditor of the Debtors, via conference call (Apr. 18, 2012). No documentation has been identified either confirming or refuting that this is the position to which Mackey was referring.

### (3) 8% Allocation To AFI Based On FRB Press Release

On February 9, 2012, the FRB issued a press release announcing that it had reached an agreement in principal with Bank of America Corporation, Citigroup Inc., JPMorgan Chase & Co., Wells Fargo & Company and AFI.[1270] In the press release, the FRB identified each institution, the total penalty assessed against each, and the allocation of the total penalty amount between penalties attributable to servicers and penalties attributable to bank holding companies, as follows:[1271]

EXHIBIT V.C.1.f(3)
**Penalties Attributable to Servicers and Bank Holding Companies**
*($ in Millions)*

| Institution | BHC Penalty | Servicer Penalty | Total |
|---|---|---|---|
| Bank of America | $ 175.5 | $ - | $ 175.5 |
| Wells Fargo | $ 87.0 | $ - | $ 87.0 |
| JPMorgan Chase | $ 106.5 | $ 168.5 | $ 275.0 |
| Citigroup | $ 22.0 | $ - | $ 22.0 |
| Ally Financial | $ 17.0 | $ 190.0 | $ 207.0 |

*Source: FRB, Press Release, (Feb. 9, 2012), http://www.federalreserve.gov/newsevents/press/enforcement/20120209a.htm*

This announcement came as a surprise to the persons within ResCap familiar with the negotiations to date.[1272] As an initial matter, ResCap was pleased with the amount of the fine, given that it internally believed the fine could have been as high as $2 billion.[1273] The FRB press release also introduced a new possible allocation methodology by attributing 92% of the FRB settlement amount (or $190 million of the total $207 million penalty) to a "servicer penalty," and only 8% (or $17 million of the total $207 million penalty) to a "bank holding company penalty." There appears to have been a general acceptance that the "servicer penalty" was tied to GMAC

---

[1270] *See* FRB, Press Release (Feb. 9, 2012), http://www.federalreserve.gov/newsevents/press/enforcement/20120209a.htm.

[1271] *Id.* Notably, unlike JPMorgan Chase and others, AFI and ResCap were not subject to a fine from the OCC. *See* E-mail from J. Mackey (Feb. 9, 2012) [EXAM00076554] ("Don't we also have to point out that others got OCC and Fed fines. Ours was just Fed."); Final Regulatory Settlement Numbers—2/9/2012, dated Feb. 9, 2012 [ALLY_PEO_0034437] (attached to E-mail from T. Marano to C. Carpenter (Feb. 9, 2012) [ALLY_PEO_0034436] (containing the subject line "cleaner number we never want to leak")) (showing the breakdown of the final penalty figures (hard and soft costs) imposed by the DOJ/AG, FRB, and OCC on the five bank mortgage servicers).

[1272] *See* Int. of J. Pensabene, Jan. 9, 2013, at 209:17–212:20; Int. of S. Abreu, Jan. 22, 2013, at 368:4–368:8.

[1273] *See* Int. of T. Marano, Nov. 26, 2012, at 273:21–24 ("I got the best deal of anybody here and we should've had about a $2 billion fine and we got a fine of about $300 million."); *id.* at 273:25–274:13 (noting that (a) the fine could have been as high as $2 billion because it was based on market share as a servicer and the actions and conduct of the companies as servicers and (b) that ResCap and AFI were able to reduce their possible fine by modifying their loan portfolio); Int. of W. Solomon, Mar. 19, 2013, at 175:11–177:1 (noting that AFI and ResCap did "far better than the other four financial institutions" largely based on their efforts to address problems with their mortgage servicing prior to the government becoming involved in investigation such activities).

Mortgage, that the "BHC penalty" was tied to AFI,[1274] and that this press release represented the FRB's guidance regarding the allocation of the settlement.[1275]

Following the publication of the press release, AFI and ResCap perceived that there were now three possible structures for determining how to allocate settlement costs.[1276] First, ResCap could bear the entirety of the costs because "the penalties were very much geared toward the presumptive behavior and misdoings, to the extent those were ultimately confirmed, of the servicer."[1277] Second, the costs could be allocated based on the initial communications from the FRB that identified 15 possible wrongful categories of acts (i.e., the 73%/27% allocation). Finally, ResCap and AFI could use the allocation set forth in the press release, based on the assumption that ResCap would be responsible for the entirety of the servicer penalty (i.e., the 92%/8% allocation).[1278]

In addition to these general allocations, as late as February 15, 2012, AFI also considered whether the allocation should take into account the fair value of the release provided to AFI under the terms of the DOJ/AG Consent Judgment.[1279] The fair value assigned to this release in internal AFI communications was $25 million, though it is unclear how that figure was determined.[1280] However, AFI ultimately decided that there was no "good mechanism" to come up with an appropriate fair value of the release, which played a role in the ultimate decision to apply the allocation contained in the February 9, 2012 press release.[1281]

_____

[1274] See, e.g., Int. of D. DeBrunner, Apr. 18, 2013, at 29:20–31:6; Int. of C. Dondzila, Nov. 9, 2012, at 195:25–197:3.

[1275] See, e.g., Int. of D. DeBrunner, Apr. 18, 2013, at 40:3–6 (noting that the final agreement did not reference any of the earlier allocations and that the press release was "the final record" with respect to the proper allocation); id. at 57:17–24 (noting that the press release "was the best evidence that we had," that Deloitte agreed with that conclusion and that AFI believed that it was relying on the FRB's assessment of the liability when it determined that the 8% allocation was appropriate); Int. of C. Dondzila, Nov. 9, 2012, at 198:1–8.

[1276] Int. of C. Dondzila, Nov. 9, 2012, at 198:1–8 ("So, those were sort of the three that we triangulated around: everything to ResCap; a split that was based on the original civil monetary penalty letter, which had a reference to—I think it was 15, maybe, findings; or this press release. And, because the press release was final and was public, the conclusion was to go with that.").

[1277] Id. at 197:11–197:16.

[1278] See E-mail from H. McKay (Feb. 9, 2012), at EXAM12400363 [EXAM12400360] ("To us, these revised facts really point to the fact that there continue to be multiple paths that may be taken from an allocation perspective (100% to [GMAC Mortgage] as servicer, allocation of $17 mm to AFI, etc.).").

[1279] DOJ/AG Settlement—Allocation Scenarios, dated Feb. 13, 2012 [EXAM10999353] (attached to E-mail from H. McKay (Feb. 13, 2012) [EXAM10999352]).

[1280] Id. (describing "Allocation Scenario #3" as "$25 million to [AFI] (based on FV of DOJ/AG Release); E-mail from M. Anspach (Jan. 8, 2012), at ALLY_PEO_0082426 [ALLY_PEO_0082426] ("Secondly, we told Deloitte we felt that the $25 million is a reasonable approximation of the fair value of what AFI will be receiving by being released under the DOJ/AG settlement."); Int. of D. DeBrunner, Apr. 18, 2013, at 77:17–24, 81:20–82:8.

[1281] Int. of D. DeBrunner, Apr. 18, 2013, at 77:17–24, 81:20–82:8.

*(4) Decision To Apply 8% Allocation To AFI*

Following the filing of the CMP Order and the initial agreement with respect to the DOJ/ AG Consent Judgment (which was ultimately filed on April 4, 2012), a small group of AFI and ResCap accounting employees appeared to assume responsibility for determining how the settlement costs should be allocated,[1282] in consultation with Deloitte.[1283] The Investigation has not uncovered any evidence that either the AFI Board or the ResCap Board themselves were involved in determining how the settlement costs should be allocated.[1284] Witness testimony does indicate that AFI senior management reviewed the final allocation conclusions and that the AFI Board approved the allocation as part of the larger approval process associated with AFI's public filings.[1285] There are some contemporary emails that indicate that Whitlinger, ResCap's CFO at the time, was kept informed regarding the allocation discussions.[1286] However, it is not clear whether ResCap's Board was aware of the ultimate 8% allocation. Further, the Investigation has uncovered some confusion among ResCap personnel regarding: (1) whether the CMP Order or DOJ/AG Consent Judgment dictated an

---

[1282] *See* Int. of T. Marano, Feb. 27, 2013, at 21:4–21:17 (noting that the decision on what allocation would apply "may have been determined by the accounting people."); *id*. at 49:11–23 (stating that whether or not the costs should be allocated to "one or the other, I think was the decision of the accountants.").

[1283] *See* E-mail from T. Robinson (Feb. 10, 2012), at EXAM12400362 [EXAM12400360] ("The original 11/15-4/15 [FRB] allocation provided a starting point for allocating the amounts. The updated [FRB] Fine/ Announcement seems to refine that starting point."). Robinson, a representative from Deloitte, worked on behalf of ResCap and AFI during these discussions. *See also* Int. of J. Whitlinger, Feb. 27, 2013, at 154:15–163:25 (noting, among other things, that he (Whitlinger) believed there was a difference between the legal allocation of responsibility and treatment for accounting purposes and that Deloitte was involved in discussing the accounting treatment).

[1284] Int. of T. Marano, Feb. 27, 2013, at 51:17–23 ("I am not aware that [the ResCap Board] specifically approved the allocation."). Marano expressed the view that by authorizing ResCap's entry into the CMP Order and the DOJ/AG Consent Order the ResCap Board had implicitly approved any allocation contained in those documents. *See* Int. of T. Marano, Feb. 27, 2013, at 51:17–23.

[1285] Int. of D. DeBrunner, Apr. 18, 2013, at 33:7–33:24 ("[W]e reviewed the conclusions with the senior management of [AFI] . . . . And it also got reviewed up through at the board level as part of our quarterly financial filings, where we discussed accounting conclusions and disclosures."); *see id*. at 94:7–96:1.

[1286] *See*, *e.g*., E-mail from C. Dondzila to J. Whitlinger (Feb. 17, 2012) [EXAM10345198] (noting that AFI was recommending an 8% allocation consistent with the FRB press release); E-mail from M. Anspach to J. Whitlinger (Feb. 17, 2012), at EXAM10345151 [EXAM10345150] (requesting a call to discuss the DOJ/AG Settlement expense allocation); E-mail from M. Anspach to J. Whitlinger (Feb. 15, 2012) [EXAM10999352] (forwarding the slide titled DOJ/AG Settlement—Allocation Scenarios, dated Feb. 13, 2012 [EXAM10999353], originally attached to E-mail from H. McKay (Feb. 13, 2012) [EXAM10999352])).

allocation;[1287] (2) who, exactly, was involved in determining how the settlement costs should be allocated;[1288] and (3) how the settlement was ultimately allocated.[1289]

Despite the fact that the CMP Order did not contain an allocation, did not specify which legal entity should be allocated what percentage of the penalty,[1290] and was apparently not accompanied by any explanation as to the division of the fine,[1291] there appears to have been a

---

[1287] According to Marano, the allocation between AFI and ResCap was an "[FRB] concept," whereby "the [FRB] said that Ally bore . . . about 25 percent of the responsibility for failure to supervise and provide adequate resources. And ResCap bore 75 percent of the fine because they were . . . the operator of the servicing business." Int. of T. Marano, Nov. 26, 2012, at 275:22–276:4. The Chairperson of the ResCap Consent Order Compliance Committee also appeared to be under the impression that the FRB/FDIC Consent Order imposed a determination regarding which entity should be responsible for the costs of the settlement and imposed such determination on AFI and ResCap. *See* Int. of P. West, Jan. 11, 2013, at 55:9–11 ("I recollect that the bank was required to sign [the FRB/FDIC Consent Order]"); *id*. at 55:21–56:5 ("And I believe it was the regulator that asked Ally to sign it as well.").

[1288] According to Tammy Hamzehpour, the General Counsel and Assistance Secretary of ResCap during this time, discussions regarding allocating the settlement burden among the various AFI entities were largely between Dondzila, Marano, and Carpenter, though Whitlinger and the financing department were also involved. *See* Int. of T. Hamzehpour, Oct. 5, 2012, at 254:9–256:17. Abreu, ResCap's President at the time, also believed that Marano and Whitlinger were involved, but also thought Pensabene had a role in these discussions. *See* Int. of S. Abreu, Jan. 22, 2013, at 364:22–365:13. In contrast, Pensabene, ResCap's Chief Servicing Officer at the time, was under the impression that these discussions occurred between Marano, Solomon, Hamzehpour, and Carpenter. *See* Int. of J. Pensabene, Jan. 9, 2013, at 180:20–181:13. However, Marano disclaimed involvement in determining the appropriate allocations, noting that it was more of "an accounting concept" and that Whitlinger or Dondzila would have been involved in those determinations. Int. of T. Marano, Feb. 27, 2013, at 44:21–45:3.

[1289] *See* Int. of M. Carpenter, Mar. 4, 2013, at 219:10–220:12 (noting that the FRB "imputed a percentage" for AFI's failure to supervise, which Carpenter believed was 15%, and that "whatever that allocation was what we used as the basis to do the accounting"); Int. of T. Marano, Feb. 27, 2013, at 19:16–21:2 (noting that he (Marano) was fairly certain that the allocation was imposed by the FRB and that the allocation was a 75/25 split); Int. of J. Whitlinger, Feb. 27, 2013, at 150:18–22 (noting that he (Whitlinger) was not aware of an allocation embedded in the actual settlement agreements).

[1290] An e-mail dated February 9, 2012 from McKay of AFI to Robinson at Deloitte states that there was a separate press release "by the [FRB]" that included "an allocation of $190 mm to [GMAC Mortgage] and $17 million to [AFI]." E-mail from H. McKay (Feb. 9, 2012), at EXAM12400363 [EXAM12400360]. However, despite diligent efforts on behalf of the Examiner's Professionals, this second press release with an allocation divided according to legal entity has not been located nor produced.

[1291] *See* E-mail from H. McKay (Feb. 9, 2012), at EXAM12400363 [EXAM12400360] (noting that Weintraub indicated that "there is no science behind this number (e.g. no specific # of issues cited for [GMAC Mortgage]/AFI]."). DeBrunner noted that the fact that the press release did not tie specific actionable issues to the dollar amounts would not necessarily be relevant for purposes of performing the accounting allocation. *See* Int. of D. DeBrunner, Apr. 18, 2013, at 63:6–67:11.

general assumption of the idea, by both AFI and ResCap, that the federal government, through the press release, had dictated the allocation methodology to be applied.[1292]

Ultimately, after consultation with AFI and Deloitte, it appears that sometime in mid-February, AFI's and ResCap's accounting departments[1293] made the determination that the 92%/8% allocation contained in the February 9 press release should govern.[1294] Contemporaneous e-mails indicate that this logic was not something that ResCap wanted to highlight. In fact, Dondzila advised the AFI employees preparing ResCap's public filings that David DeBrunner, AFI's Chief Accounting Officer and Corporate Controller, should be consulted to "ensure any public statements about how this was allocated are consistent" and that the "answer, not for public disclosure" on how the allocation was determined was "that we allocated 8% to [AFI] and 92% to ResCap consistent with the public allocation of the [FRB] fine ($17 million—8%—to [AFI] and $190 million—92%—to ResCap)."[1295] As previously noted, it is not clear if ResCap's Board was presented with explicit information regarding this allocation.[1296]

### (5) Application Of 8% Allocation To DOJ/AG Settlement

Despite the fact that the FRB press release was issued only in relation to the CMP, and that the FRB/FDIC Settlement and the DOJ/AG Settlement were perceived, at least by

---

[1292] *See* Int. of S. Abreu, Jan. 22, 2013, at 368:22–369:11 (noting that once the February 9 press release was filed it was generally accepted that the FRB had made a ruling and that "you abide by it and you kind of step in line and do what they ask."); Int. of M. Carpenter, Mar. 4, 2013, at 219:10–220:12; Int. of D. DeBrunner, Apr. 18, 2013, at 26:22–27:6 (noting that AFI and ResCap both agreed that 8% should be allocated to AFI and that this allocation was approved by Deloitte and that "when you look at the [press release] that came out from the [FRB], it was pretty clear."); *id.* at 70:9–12 (noting that when the press release was issued it made the other allocation methods previously discussed no longer appropriate considerations).

[1293] *See* Int. of T. Marano, Feb. 27, 2013, at 44:21–45:15 (noting that "the allocations . . . were more an accounting concept" and that such allocations were "largely . . . a topic of discussion with Deloitte and the accounting and finance people"); Int. of D. DeBrunner, Apr. 18, 2013, at 91:17–23 (noting that the decision to use the 8% allocation was made "sometime in that middle of February [2012]").

[1294] Int. of C. Dondzila, Nov. 9, 2012, at 196:15–197:3, 198:1–8 ("[B]ecause the press release was final and public, the conclusion was to go with that."); Int. of D. DeBrunner, Apr. 18, 2013, at 32:9–33:16.

[1295] E-mail from C. Dondzila (Feb. 27, 2012) [EXAM11893483].

[1296] DeBrunner indicated in his interview that though he was not aware of whether Dondzila presented this information to the ResCap Board but that he would assume that she did. *See* Int. of D. DeBrunner, Apr. 18, 2013, at 25:5–10. On March 21, 2012, the ResCap Audit Committee approved ResCap's consolidated financial statements for the year ended December 31, 2011, which included adjustments for the portion of the fine that ResCap was allocated as determined by the ResCap and AFI accounting teams. *See* Minutes of a Meeting of the Residential Capital, LLC Audit Committee, Mar. 21, 2012, at RC40019172–73 [RC40019158]. However, there is no evidence that the 92%/8% split was expressly discussed or focused upon during this or prior meetings of the ResCap Audit Committee. Further, Ilany and Mack, the independent members of the ResCap Audit Committee, abstained from this vote. *See id.*

Marano, as involving separate criteria,[1297] ResCap and AFI decided that the same allocation percentages should also be used to allocate the costs of the DOJ/AG Settlement between them.[1298] Arguably, Exhibit I of the DOJ/AG Consent Judgment could have dictated a different result, given that it expressly provided that ResCap, GMAC Mortgage, and RFC were responsible for: (1) making the $109.6 million hard dollar payment; and (2) the $200 million soft costs.[1299] In short, AFI and ResCap allowed the FRB press release to dictate how *all* costs associated with the government settlements were allocated between them,[1300] apparently without considering or making any effort to allocate costs based the allegations being settled in the DOJ/AG Settlement, or considering whether to assign some responsibility to Ally Bank,[1301] or considering any other basis of allocation.[1302]

---

[1297] Int. of T. Marano, Feb. 27, 2013, at 23:1–24:12 (noting that the FRB used different criteria than the DOJ in evaluating the settlements and that the FRB criteria involved a separate examination resulting in the identification of 15 statutory violations, 11 of which were attributable to ResCap and 4 of which were attributable to AFI).

[1298] Int. of C. Dondzila, Nov. 9, 2012, at 196:15–197:3 ([A]fter consultation with our parent and with our auditors, the decision was made that that was the only—that that was the appropriate way to allocate the obligation, because, again, under both of these—under the [FRB] civil money penalty and under the DOJ settlement, both ResCap, GMAC Mortgage and Ally Financial were parties to those agreements. And so the decision was to use the only publicly communicated attribution of responsibility, which was the [FRB] press release, and to split what we ultimately recorded consistent with those percentages that they had disclosed.); Int. of D. DeBrunner, Apr. 18, 2013, at 32:9–33:6 (explaining that the decision to allocate the DOJ/AG Settlement based on the numbers provided in the February 9, 2012 press release issued by the FRB was made "because . . . the [FRB/FDIC Settlement] was satisfied by the [DOJ/AG Settlement] . . . such that if you met the requirements of the [DOJ/AG Settlement], then that satisfied the [FRB/FDIC Settlement]. So, we went through and we researched that from an accounting perspective, we had significant discussion with Deloitte, including consultation with their national professional standards office, and concluded that that was the right way to allocate."); *id*. at 23:2–23:12 (noting that AFI and ResCap made their conclusions regarding the proper accounting and that Deloitte also agreed).

[1299] *See* DOJ/AG Consent Judgment, Ex. I [RC00027463].

[1300] *See* Int. of C. Dondzila, Nov. 9, 2012, at 195:25–198:8.

[1301] *See id.* at 202:16–203:4 (noting that Dondzila was not aware of any discussions regarding whether Ally Bank should be a party to any of the settlement agreements and that as a result Ally Bank was not allocated any of the liabilities of the settlement agreements).

[1302] *See id.* at 199:18–24.

An internal AFI memorandum dated February 28, 2012, discussed the decision to employ the 92%/8% allocation and the resulting accounting treatment. This memorandum notably states:

*Legal Entity Allocation*

AFI and ResCap are both liable under the DOJ/AG Settlement and the CMP Order. . . . Both the CMP Order and the DOJ/AG Settlement indicate that AFI and ResCap are jointly and severally liable for the settlements. The settlement stems from perceived wrong-doing by the servicer as it relates to foreclosure process. As primary servicer among the named parties, ResCap (through its subsidiary [GMAC Mortgage]) has the primary obligation for servicing. However, as the parent company of ResCap, AFI is partially liable given they are responsible for providing oversight to ResCap. Therefore, we believe a portion of the DOJ/AG Settlement liability should be allocated to AFI. While [GMAC Mortgage] (as Servicer) contributed to "reckless unsafe or unsound practices" pursuant to servicing activities it was also acknowledged that AFI failed to provide sufficient oversight over such practices.

While neither the DOJ/AG Settlement nor the CMP Order specifically allocate a portion of the fine to AFI, such an allocation was inferred in a press release issued by the [FRB] dated February 9, 2012 which allocates $190 million (of the total $207 million fine) to [GMAC Mortgage] as Servicer, and $17 million to AFI, as the associated Bank Holding Company. . . . Using these allocation amounts, this would indicate that an allocation of 8% of the expense to AFI and 92% of the expense to ResCap would be appropriate. Therefore, the following allocation will be recorded for each legal entity (rounded, in millions):

| | |
|---|---|
| AFI | $ 18.5 million |
| ResCap | 211.5 million |
| Consolidated | $230.0 million |

On January 30, 2012, ResCap and AFI entered into [the January 30 Letter Agreement] which, among other things, obligated ResCap to agree to pay to the applicable governmental authorities any and all cash payments with respect to Hard Dollar Penalties owed to such governmental authorities under the DOJ/AG Settlement. Therefore, ResCap will be required to make cash payments for amounts which have otherwise been recorded at AFI. Any amounts paid by ResCap (yet incurred by

> AFI) could be considered a deemed dividend from ResCap to
> AFI, to the extent that AFI does not otherwise reimburse
> ResCap for such amounts paid, as it would represent an amount
> paid by a subsidiary on behalf of a parent company.[1303]

Notably, there appears to have been some confusion between AFI and ResCap regarding the extent of this agreed-upon 8% allocation. There was an apparent belief on ResCap's part that AFI had agreed to pay 8% of the total costs of the settlement, including any costs that were incurred beyond the $230 million estimated amount.[1304] However, AFI apparently believed that this agreement was related to the "amount that was accrued" and not to any additional costs, such as the higher amount of soft costs that ResCap ultimately incurred in complying with the DOJ/AG Settlement.[1305] The fact that the apparent agreement from late-February 2012 between AFI and ResCap to allocate 8% to AFI was not memorialized in writing[1306] may have contributed to the confusion regarding AFI's ultimate responsibilities under the government settlements. Ultimately, AFI determined that it would not accept an 8% responsibility for the additional amounts associated with the soft costs.[1307]

The parties' intentions were also unclear as to the mechanism under which AFI would discharge any of its allocated liability. Dondzila stated in a January 27, 2012 e-mail to Whitlinger that AFI could make direct payments to the settlement counterparties or make payments to ResCap as ResCap incurred the settlement related costs.[1308] Dondzila further stated that another option was for AFI to deem the unpaid liability a dividend from ResCap to AFI once ResCap relieved its portion of the liability.[1309] As noted above, a February 28, 2012 AFI accounting memo regarding the accrual for the DOJ/AG Settlement referred to both the option that AFI would reimburse ResCap for their allocated share, and the option that any

---

[1303] Memorandum, Accrual for DOJ Settlement at December 31, 2011, dated Feb. 28, 2012, at 8–9 [EXAM00220938].

[1304] *See* E-mail from D. DeBrunner to J. Mackey (May 17, 2012) [ALLY_0385806]) ("[Dondzila] said that there was an agreement for AFI to cover 8% of any additional liability in line with how the original settlement was allocated between ResCap and AFI.").

[1305] *See id.* ("I am not aware of any formal agreement for us to cover 8% of an additional liability."); Int. of D. DeBrunner, Apr. 18, 2013, at 99:17–100:7 ("We had agreed on the amount that was accrued, on the calculated amount, that 8 percent related to [AFI], 92 percent to [ResCap].").

[1306] Int. of D. DeBrunner, Apr. 18, 2013, at 99:7–11 ("I don't recall any written formal agreement between [AFI and ResCap] but we each had to conclude on our accounting treatment at that point in time.").

[1307] *See* E-mail from C. Dondzila (May 22, 2012) [EXAM10418886] ("I understand . . . that 100% of this additional liability [associated with the soft dollar costs under the DOJ/AG Consent Judgment] would be recorded by ResCap as AFI does not believe there is any AFI obligation with respect to this matter.").

[1308] E-mail from C. Dondzila (Jan. 27, 2012) [EXAM10995269].

[1309] *Id.*

payment by ResCap would be considered a deemed dividend to AFI and thus not repaid.[1310] As recently as April 18, 2013, DeBrunner appeared to believe that AFI would repay ResCap for AFI's $18.5 million portion, and he confirmed in his interview the understanding that AFI had recorded a payable to ResCap in this amount.[1311] However, any such claim by ResCap or obligation by AFI does not appear to have been formally documented.

### g. *Ultimate Payments of Penalties Under The Government Settlements*

In due course, ResCap and AFI earned sufficient credits to remit the $207 million fine set forth in the CMP Order. The hard costs set forth in the DOJ/AG Consent Judgment were ultimately paid when GMAC Mortgage remitted the full fine of $109.6 million on March 14, 2012.[1312]

Notably, the determination of how to allocate the government settlements appears to have been limited in effect to AFI and ResCap's accounting, since this allocation ultimately did not tie to the actual costs associated with the government settlements that were paid by AFI. As noted in Exhibit V.C.5 below, even though AFI was only "allocated" 8% of the costs of the government settlements, it will ultimately end up "paying" for 25% of the total costs of the government settlements (in large part due to the $196.5 million debt forgiveness made pursuant to the January 30 Letter Agreement).

### 2. *Agreements Between AFI And ResCap In Response To The Government Settlements*

AFI negotiated and entered into several affiliate agreements to provide ResCap and GMAC Mortgage with the financial support to comply with their obligations under the various government settlements.

### a. *AFI, ResCap, And GMAC Mortgage Enter Into The January 30 Letter Agreement*

On January 30, 2012, ResCap, GMAC Mortgage, and AFI entered into the January 30 Letter Agreement regarding "Terms of Support Relating to Possible DOJ/State Attorneys' General Settlement."[1313] Ally Bank is not a party to the January 30 Letter Agreement, but is identified as a third party beneficiary.[1314] The January 30 Letter Agreement details the support

---

[1310] Memorandum, Accrual for DOJ Settlement at December 31, 2011, dated Feb. 28, 2012, at 9 [EXAM00220938].

[1311] Int. of D. DeBrunner, Apr. 18, 2013, at 86:12–18 ("we still have the payable and I would assume ResCap has the receivable. But that was not settled because prior to that being settled, there was a bankruptcy filing. So we're waiting for a direction from counsel as everything goes through. But we still have the payable.").

[1312] *See* E-mail from C. Dondzila (Mar. 15, 2013) [EXAM11004487]; ResCap Liquidity Update: A Presentation for the ResCap Board of Directors, dated Mar. 23, 2012, at RC40020491 [RC40020488].

[1313] January 30 Letter Agreement [ALLY_0194817].

[1314] *See id.* ¶ 9.

to be provided to ResCap and GMAC Mortgage by AFI so that ResCap and GMAC Mortgage could satisfy the terms of a possible CMP Order or DOJ/AG Settlement.[1315]

Pursuant to the material terms of the January 30 Letter Agreement:

(1) AFI agreed to provide capital support to ResCap and GMAC Mortgage by forgiving indebtedness of $196.5 million under the A&R Line of Credit Agreement;[1316]

(2) AFI agreed, and agreed to cause BMMZ to waive any default under the consolidated TNW covenants in those credit facilities listed in Exhibit B to the January 30 Letter Agreement, where such default resulted from any amounts recorded in the financial statements of ResCap and its subsidiaries with respect to the FRB/FDIC Settlement or DOJ/AG Settlement;[1317]

(3) ResCap and its relevant subsidiaries, including GMAC Mortgage: (a) agreed that they would not enter into the FRB/FDIC Consent Order or DOJ/AG Settlement without AFI's prior written consent; and (b) acknowledged that AFI would not consent to any DOJ/AG Settlement that did not contain, at a minimum, a release of AFI and its affiliates;[1318]

(4) ResCap and GMAC Mortgage agreed to pay the hard costs (defined in the January 30 Letter Agreement as "hard dollar payments"—estimated at the time to be $100 million) owed pursuant to a FRB/FDIC Consent Order or DOJ/AG Settlement within two business days of the date on which such amounts are agreed in principle in writing;[1319]

(5) ResCap and GMAC Mortgage agreed to promptly perform all of their obligations under any FRB/FDIC Consent Order or DOJ/AG Settlement;[1320]

(6) ResCap and GMAC Mortgage each agreed to fully reimburse AFI and Ally Bank for: (a) any amounts AFI or Ally Bank expended in connection with their performance under the FRB/FDIC Consent Order or DOJ/AG Settlement; and (b) any fines levied against AFI or Ally Bank, in each case, as a result of the failure of ResCap, GMAC Mortgage or their subsidiaries to perform their obligations under the FRB/FDIC Consent Order or DOJ/

---

[1315] *See id.*

[1316] *Id.*

[1317] *Id.*

[1318] *Id.*

[1319] *Id.*

[1320] *Id.*

AG Settlement (the January 30 Letter Agreement defined the amounts which may be reimbursed pursuant to this provision as "Settlement Costs");[1321]

(7) ResCap and GMAC Mortgage would not have any further reimbursement obligation for Settlement Costs from and after the time ResCap and GMAC Mortgage paid the hard costs and earned $200 million of funds paid or credited as a result of mitigation, remediation or other financial accommodation to mortgage loan borrowers or other third parties pursuant to the DOJ/AG Settlement (defined by the January 30 Letter Agreement as "soft dollar credits");[1322]

(8) GMAC Mortgage agreed to negotiate an amendment to the Original Servicing Agreement which would permit GMAC Mortgage to implement modifications and perform other loss mitigation activities to loans owned by Ally Bank that GMAC Mortgage was servicing to earn soft dollar credits in accordance with the requirements of the DOJ/AG Settlement. The amendment was required to contain the Servicing Agreement Modification Terms as set forth in Exhibit C to the January 30 Letter Agreement;[1323]

(9) ResCap and GMAC Mortgage agreed to terminate the Amended and Restated ISDA Master Agreement, dated April 1, 2011, between GMAC Mortgage and Ally Bank, as well as the related credit support annex and confirmations, and to enter into new derivative documentation on the same economic terms with Ally Investment Management;[1324] and

(10) AFI, subject to the authorization of the AFI Board, committed to provide capital to ResCap in an amount necessary for ResCap to exceed its TNW covenants for January 2012 by $25 million, provided that such contribution was required as a result of operating losses in the ordinary course of business and did not exceed $100 million.[1325]

The January 30 Letter Agreement did not expressly provide that GMAC Mortgage may "implement modifications and other loss mitigation activities and earn soft dollar credits in accordance with the requirements" of the DOJ/AG Settlement "in respect of mortgage loans owned by Ally Bank that [GMAC Mortgage] is servicing for Ally Bank."[1326] Instead, it only provided that GMAC Mortgage, in good faith, would negotiate an amendment to the Original

---

[1321] *Id.*

[1322] *Id.*

[1323] *Id.* ¶ 7.

[1324] *Id.* ¶ 8.

[1325] *Id.* ¶ 10.

[1326] *Id.* ¶ 7.

Servicing Agreement, consistent with the Servicing Agreement Modification Terms, permitting GMAC Mortgage to implement such modifications.[1327] It also did not provide terms relating to any indemnification for losses due to such modification activities as set forth in the Servicing Agreement Modification Terms. The terms of any potential indemnification (as well as the methodology for calculating what was owed) were only considered over the course of negotiating the A&R Servicing Agreement.[1328]

### (1) Modification Terms

Paragraph 7 of the January 30 Letter Agreement required GMAC Mortgage to negotiate, in good faith, an amendment to the Original Servicing Agreement,[1329] which amendment was to contain the Servicing Agreement Modification Terms.[1330] Thus, it was contemplated that an amended servicing agreement would (1) permit GMAC Mortgage to perform loan modifications on certain loans in Ally Bank's portfolio; and (2) provide an indemnification in favor of Ally Bank for losses incurred in connection with any such loan modifications.[1331] Specifically, the Servicing Agreement Modification Terms provide that:

> (1) Any modification of the Original Servicing Agreement would provide GMAC Mortgage with the right, but not the obligation, to offer modifications to borrowers holding subject loans (loans owned and held for investment by Ally Bank that GMAC Mortgage was servicing and that qualify for soft dollar credit pursuant to the DOJ/AG Settlement);[1332]

> (2) Ally Bank would allow GMAC Mortgage to continue to implement modifications permitted under the Original Servicing Agreement. Ally Bank and GMAC Mortgage agreed to develop new matrices and processes related to the implementation of modifications and loss mitigation activities under the DOJ/AG Settlement;[1333]

> (3) GMAC Mortgage agreed to indemnify Ally Bank for any loss suffered by Ally Bank with respect to any subject loan as a result of any modification

---

[1327] *Id.*

[1328] *See*, *e.g.*, E-mail from C. Dondzila to J. Whitlinger (Feb. 22, 2012) [EXAM11893427] ("FYI regarding where Bank is landing in terms of requiring indemnification payments. I think we are back to where we started, that we will be making payments to them on virtually all of the modification activity, and in amounts in excess of their actual incurred accounting losses."); E-mail from R. Fowlie to C. Dondzila and J. Whitlinger (Mar. 16, 2012) [EXAM10994711] ("As the negotiations between us and the Bank continue on the sub servicing agreement one process that should be in there is around the AG settlement and how we should reimburse the Bank for losses on their portfolio.").

[1329] January 30 Letter Agreement, ¶ 7 [ALLY_0194817].

[1330] *Id.*

[1331] *See id*. Ex. C.

[1332] *Id*. Ex. C-1.

[1333] *Id.*

or loss mitigation, provided that GMAC Mortgage would not be required to indemnify Ally Bank for any losses in connection with any modification or loss mitigation activities permitted under the terms of the Original Servicing Agreement. GMAC Mortgage would be required to make such indemnification payments no later than two business days after the last day of each calendar month for all modifications or loss mitigation activities undertaken in such calendar month;[1334]

(4) If a modification or other loss mitigation alternative was extended to a customer of Ally Bank, GMAC Mortgage, as servicer, would be required to complete such modification or other loss mitigation activity if such customer provided the necessary data;[1335] and

(5) GMAC Mortgage would not be permitted to perform modifications or other loss mitigation activities once indemnification payments to Ally Bank pursuant to an amended servicing agreement exceeded $75 million in the aggregate. If GMAC Mortgage desired to perform modifications or other loss mitigation activities resulting in indemnification payments to Ally Bank pursuant to an amended servicing agreement in excess of the aggregate amount of $75 million, then Ally Bank and GMAC Mortgage agreed to discuss the terms on which such additional loss mitigation activities could proceed.[1336]

### (2) Subsequent E-Mail Correspondence

The parties quickly realized that the January 30 Letter Agreement did not expressly provide for the use of Ally Bank's portfolio for loan modifications, and that such activity was only to be explicitly permitted under an amended and restated servicing agreement as set forth in the Servicing Agreement Modification Terms. The parties attempted to remedy this issue by e-mail in early February, 2012. Ross Zachary sent an e-mail to Jim Young and Hu Benton, General Counsel of Ally Bank, copying Tammy Hamzehpour and Pensabene, which stated

---

[1334] *Id*. Ex. C-1.

[1335] *Id.* Ex. C-1–2.

[1336] *Id.* Ex. C-2.

"[r]ealizing that the actual agreement under which ResCap will use the Bank assets is not complete, can you confirm that the Ally Bank board of directors did, in fact, agree in that second meeting to allow the assets to be used?"[1337] Young provided a response the same day, stating:

> Yes, under the agreement of full reimbursement for all losses related to loan preservation activities that would be adopted outside of the pre-existing delegation of authority matrix for modifications; as documented under Exhibit C of the recently completed capital support agreement along it [sic] the other terms documented in that Exhibit.[1338]

The use of Ally Bank's portfolio for modifications was critical to ResCap and GMAC Mortgage. Without "having access to those loans, [ResCap and GMAC Mortgage would] not . . . meet [the required] $200 million credit."[1339] The ability to perform enough modifications to meet the requirements of the DOJ/AG Settlement was a constant concern of parties on both sides of the transactions.[1340]

### (3) The January 30 Letter Agreement Was The Product Of Extensive Negotiations

In late 2011, ResCap was again having difficulty meeting its covenants under various funding agreements that required it to have a TNW of greater than or equal to $250 million.[1341] This required ResCap to repeatedly request support from AFI or, as Carpenter

---

[1337] E-mail from R. Zachary (Feb. 9, 2012), at EXAM20169860 [EXAM20169858].

[1338] E-mail from J. Young to R. Zachary, H. Benton, T. Hamzehpour, J. Pensabene, C. Evans, and J. Whitlinger (Feb. 9, 2012), at EXAM20169859–60 [EXAM20169858]. The parties generally recognized this informal agreement. *See* Int. of J. Whitlinger, Feb. 27, 2013, at 237:7–238:2.

[1339] Int. of J. Whitlinger, Feb. 27, 2013, at 186:8–11. Whitlinger went on to say that "our view was that . . . if we didn't have access to modify bank loans at the bank portfolio, we were going to have a soft menu shortfall and potentially incur a penalty for not being able to meet it. And it would be more costly to the estate." *Id.* at 192:12–17.

[1340] *See, e.g.*, E-mails between M. Detwiler, C. Schares, and M. Rosen (Apr. 12–13, 2012), at EXAM00001279–80 [EXAM00001279] (Rosen asked whether reimbursements were capped at $75 million. In response, Schares stated "[u]nfortunately, yes. But we could still argue for our interpretation and we can also ask to increase the cap." Rosen replied, "[o]k, well, this makes it pretty clear that we need to get the servicing agreement done."). Detwiler was the Senior Vice President of Servicing Solutions at GMAC Mortgage during this period. Schares was the Vice President of Fee Based Operations at ResCap during this period.

[1341] *See, e.g.*, Unanimous Consent to Action of Ally Financial Inc. Board of Directors, dated Aug. 29, 2011, at RC40019729 [RC40019727]; Draft Discussion Materials—Joint Presentation by Ally and ResCap, dated Jan. 23, 2012, at 2 [EXAM00010740] ("ResCap's net worth has fallen from approximately $850mm at the beginning of 2011 to $250mm by year end"). *See also* Section VI.

phrased it, to "devot[e] resources to near term catastrophe scenarios."[1342] AFI's support came often in the form of debt forgiveness.[1343] For example, on August 29, 2011, the AFI Board approved liquidity support and a capital contribution to ResCap in the form of debt forgiveness under the A&R Line of Credit Agreement and the A&R Secured Revolver Loan Agreement.[1344]

TNW concerns came into focus again near the end of 2011. In late November 2011, decision-makers at ResCap and AFI began discussing the provision of "near and medium term support" to ResCap.[1345] Specifically, ResCap requested that AFI provide capital support to ResCap through June 30, 2012, including a "commitment to fund any and all potential DOJ/AG settlement and foreclosure file review costs."[1346] AFI responded to this request with a December 5, 2011 support agreement in which AFI committed to contribute capital to ResCap "in an amount necessary for ResCap to exceed its TNW covenants . . . by $50 million . . . provided that such capital contribution shall not exceed $200 million, to the extent necessary for ResCap to exceed its TNW Covenants by $50 million for the month of November 2011."[1347] Additionally, AFI represented that it would "seek approval from the AFI board for the month of December to provide similar tangible net worth support for the month of December 2011 (including with a buffer of $50 million over the TNW Covenant)," and that "AFI management currently intends to seek the same required board approval for the month of January 2012."[1348] AFI also stated its intention to provide debtor-in-possession financing for ResCap and its subsidiaries should ResCap determine to commence chapter 11 cases.[1349]

On December 30, 2011, consistent with the terms of the December 5, 2011 letter agreement, the AFI Board approved a net worth support agreement which capped support at

---

[1342] Letter from M. Carpenter to T. Marano (Aug. 30, 2011), at RC40019728 [RC40019727] (attached to E-mail from C. Quenneville (Sept. 8, 2011) [RC40019727]). Carpenter preferred that ResCap focus on long-term solutions rather than month-by-month survival.

[1343] *See, e.g.*, Unanimous Consent to Action of Ally Financial Inc. Board of Directors, dated Aug. 29, 2011, at RC40019729–30 [RC40019727].

[1344] Unanimous Consent to Action of Ally Financial Inc. Board of Directors, dated Aug. 29, 2011, at RC40019729–30 [RC40019727].

[1345] *See* E-mail from T. Marano (Nov. 28, 2011) [ALLY_0366218].

[1346] *Id.*

[1347] Letter Agreement Re: Preservation of Sales of Mortgage Loans to ResCap and Other Matters, dated Dec. 5, 2011, § D [EXAM00000127].

[1348] *Id.*

[1349] *Id.*

$200 million.[1350] ResCap was informed of AFI's support on the same day.[1351] AFI conditioned this support commitment, however, by an e-mail dated January 1, 2012 (sent by Anita Bhama on behalf of Carpenter),[1352] which stated:

> The amount of any contribution will not exceed $200 million, and in determining the amount of any debt to be forgiven, any amounts for a DOJ settlement or for any fines issued by the Federal Reserve Board will not be taken into account in determining whether ResCap has met the CTNW Covenants or exceeded the CTNW Covenants by $50 million, or how much of a debt forgiveness would be required for ResCap to do the same.[1353]

Discussion within AFI about imposing this additional condition reveals some internal discord, as Jeffrey Brown, James Mackey, Carpenter, and Bhama exchanged e-mails from December 29 through December 31 regarding whether such a condition was appropriate.[1354] Specifically, Bhama suggested that the condition could be included, while Brown and Mackey suggested that Deloitte would not accept any conditionality on the support commitment.[1355]

Carpenter saw the condition as an opportunity to gain leverage in future negotiations with ResCap, because AFI would not have a pre-existing obligation to provide ResCap with capital support in the event of a DOJ/AG Settlement.[1356] Specifically, Carpenter stated that:

> My thought here is, in the event of a unique event (eg DoJ) that, before automatically topping up [ResCap's] net worth (which is real value) that it becomes part of a broader negotiation with ResCap (eg 9019). Particularly in the (likely) event that the DoJ number comes in higher than our current expectation. I think we are nuts to forgive 200mm of debt and get nothing for it![1357]

---

[1350] *See* E-mail from M. Carpenter (Dec. 30, 2011), at ALLY_0171727 [ALLY_0171726].

[1351] *See* E-mail from M. Carpenter to T. Marano (Dec. 30, 2011), at EXAM11006579 [EXAM11006578] ("Tom,[   ]I am pleased to inform you that the Ally Financial Board has approved the ResCap net worth support agreement for December. Regards,[   ]Mike").

[1352] Bhama was Legal Counsel for AFI during this period.

[1353] E-mail from A. Bhama to T. Marano (Jan. 1, 2012) [ALLY_0192373].

[1354] *See* E-mails between M. Carpenter, J. Brown, J. Mackey, and A. Bhama (Dec. 29–31, 2011), at ALLY_0142373–76 [ALLY_0142373].

[1355] *See* E-mail from M. Carpenter to A. Bhama and J. Mackey (Dec. 30, 2011), at ALLY_0142374 [ALLY_0142373] ("Anita,[   ]Jim [Mackey's] strong view is that Deloitte will not accept any conditionality on the commitment. I will send an e mail to Tom Marano notifying him.").

[1356] *See* E-mail from M. Carpenter to J. Brown (Dec. 31, 2011) [ALLY_0142373].

[1357] *Id.*

Ultimately, despite advice to the contrary from Brown,[1358] Carpenter decided to include the proposed condition.[1359] This new condition did not sit well with ResCap, which saw it as a "retrade" of the "support of the TNW from the [December 5, 2011] Letter Agreement up and through the e-mail of December 30, 2011."[1360]

Around this time, all parties started to consider options relating to the potential DOJ/AG Settlement. On December 29, 2011, Young circulated an e-mail discussing "Bank Indemnifications."[1361] Specifically, Young reached out to Joe Cortese[1362] and Dondzila "to lay out the work we need to do between now and Jan 5th related to the settlement."[1363] Young states that he would like to discuss a few topics, including "[s]oft credit[s]" as well as "potential indemnification payments."[1364] With respect to indemnification payments, Young stated that the parties should consider payments in light of the "cap in the servicer agreement (one-year of servicing fees, which . . . is roughly \$35 million). Hu and Bank management are still contemplating the application of the existing agreement to the situation . . . ."[1365]

---

[1358] *See, e.g.,* E-mail from J. Brown to M. Carpenter (Dec. 31, 2012) [ALLY_0142373] ("On the Anita [Bhama] logic, I have about 25 other emails . . . saying she is . . . wrong . . . . I do understand the logic . . . but . . . [i]f this was truly the case, then we should have put conditions in place all along.").

[1359] *See* E-mail from A. Bhama to T. Marano (Jan. 1, 2012) [ALLY_0192373] (informing Marano of Carpenter's decision to include the proposed condition).

[1360] Letter from L. Nashelsky to C. Hoyt (Jan. 20, 2012), at 2 [RC00068545]. Hoyt, of Mayer Brown, negotiated on behalf of AFI with respect to the January 30 Letter Agreement.

[1361] E-mail from J. Young (Dec. 29, 2011) [EXAM11892941].

[1362] Cortese was the Chief Accounting Officer of Ally Bank during this period.

[1363] E-mail from J. Young (Dec. 29, 2011) [EXAM11892941].

[1364] *Id.*

[1365] *Id.* Even at this early point in considering how to deal with the DOJ/AG Settlement, the parties understood that it would be problematic to operate under the Original Servicing Agreement, which contained a cap on indemnification obligations. *See* E-mail from H. McKay (Dec. 30, 2011) [EXAM11893283].

> There is a cap on indemnification payments required to be made to the Bank under the servicing agreement, of \$35 million. While this is still being evaluated by the Bank, it is expected that the Bank will still make their portfolio available for soft dollar credits even after this cap is reached . . . . Even though this changes the fact pattern slightly in that the Bank losses on mods may not be fully covered in excess of this cap . . . .

This was also considered by Ally Bank later in negotiations. *See* E-mail from B. Yastine (Jan. 25, 2012) [ALLY_0342613] ("Appears we still don't have agreement on whether is only going to mod 35 under cap or all. Not comfortable going back to the Board until we have clarification."). *See also* GMAC Mortgage, LLC Consolidated Financial Statements for the Years Ended December 31, 2011 and 2010 (Mar. 28, 2012), at 66 [RC00032177] (stating that GMAC Mortgage earned \$34.8 million in servicing fees from Ally Bank in 2011). As stated in Section V.C.1.d(4)(b)(iii)(A) above, total indemnification payments to Ally Bank are estimated to be \$134.5 million.

Immediately after receiving the conditioned support commitment on January 1, 2012, ResCap was also forced to turn its attention to funding a potential DOJ/AG Settlement.[1366] At this time, it was unclear which AFI or ResCap entities would be responsible for paying a potential settlement.[1367] Regardless of who was to bear this burden, ResCap was not certain of AFI and Ally Bank support in the event it incurred government fines.[1368]

This was a major concern for ResCap, because ResCap realized that it continued to face "difficult tangible net worth issues."[1369] AFI was not eager to support ResCap as evidenced by Carpenter's statement that AFI had a "limited appetite" for supporting ResCap.[1370] Despite this reluctance, Carpenter informed Marano on January 17, 2012, that "we reviewed a second draft of a term sheet yesterday which you should get today. Assuming the terms are agreeable, we should be able to turn it into a letter quickly." On the same day, Mayer Brown, counsel to AFI, sent a draft term sheet to Morrison & Foerster providing terms of potential support relating to a possible DOJ/AG Settlement.[1371]

This initial draft term sheet laid out the framework of the ultimate support agreement, including: (1) AFI's provision of capital support to ResCap such that ResCap could meet its TNW covenants as of December 31, 2011; and (2) ResCap's agreement to pay to the applicable governmental authorities any and all amounts owed when determined as part of the FRB/FDIC Consent Order and the DOJ/AG Settlement.[1372] Additionally, the term sheet provided the first iteration of a proposed indemnity with respect to losses incurred by Ally Bank due to GMAC Mortgage modification activity, as well as a proposed amendment to the A&R Line of Credit Agreement that would secure certain loans relating to that credit facility.[1373]

---

[1366] *See* E-mail from J. Whitlinger (Jan. 2, 2012) [EXAM11006608] ("I received this morning [AFI's] commitment for December support. They will support up to $200M….the DOJ/Fed Fines may put us right up to this limit; if not over….stay tuned.").

[1367] *See* Section V.C.1.f regarding settlement allocation issues.

[1368] *See* E-mail from J. Whitlinger (Jan. 2, 2012) [ALLY_0171726].

[1369] ResCap was also considering other potential options to solve its net worth problem. *See* E-mail from J. Whitlinger (Jan. 11, 2012), at EXAM10419200–01 [EXAM10419200]. ("Given the difficult tangible net worth issues that ResCap is facing, would the FRB entertain a penalty amount in a much smaller amount, such that booking that penalty would not cause ResCap to default under its credit facilities by reducing tangible net worth below its $250mm covenant level (i.e. a penalty of no more than $50mm all-in)?").

[1370] E-mail from M. Carpenter to J. Brown, J. Mackey, and B. Yastine (Jan. 17, 2012) [ALLY_0182854] ("AG's are struggling with what they perceive as [AFI's] small contribution—Tom continues to educate DoJ on ResCap's overall situation . . . . [AFI] believes [the State Attorneys General] have no case and has limited appetite for supporting ResCap.").

[1371] MB Draft Terms of Potential Support relating to a Possible DOJ/State Attorneys' General Settlement, dated Jan. 17, 2012 [ALLY_0394178] (attached to E-mail from C. Hoyt (Jan. 17, 2012) [ALLY_0394176]).

[1372] *Id.* ¶¶ 1–4.

[1373] *Id.* ¶ 6.

Morrison & Foerster, on behalf of ResCap and GMAC Mortgage, responded to the January 17 term sheet in a letter dated January 20, 2012.[1374] This letter highlighted ResCap's previously described issues with what it deemed the "retrad[ing]" of the December 5, 2011 letter agreement by AFI.[1375] The letter nevertheless addressed each enumerated paragraph of the January 17 term sheet "in an effort to obtain the support previously agreed to by AFI."[1376]

ResCap pushed back on a number of proposed provisions. Specifically, ResCap refused to "accept full responsibility 'for actions or inactions that are the basis of the DOJ/AG Settlement[,]'" as AFI requested, and also stated that "[GMAC Mortgage] will not indemnify Ally Bank for any los[s]es resulting from [loan] modifications [as potentially could be required under a DOJ/AG Settlement], other than as currently agreed to by the parties."[1377] Further, ResCap rejected AFI's proposal of securing certain loans under the A&R Line of Credit Agreement. In sum, as the letter expressly stated, ResCap's response was based on the belief that:

> AFI should rethink the Proposed Terms and limit them solely to the mechanics of ResCap's payment of any settlement amounts to DOJ/State AGs following AFI's capital contribution of amounts necessary to permit ResCap to make such payment and continue to be in compliance with its TNW at December 31, 2011.[1378]

Kirkland & Ellis responded in a January 25, 2012 letter from Richard Cieri to Larren Nashelsky of Morrison & Foerster,[1379] and also provided a draft agreement based on the January 17 term sheet, which incorporated some of ResCap's comments.[1380] Kirkland's letter cited the December 5, 2011 letter agreement as the "foundation for AFI's potential support for ResCap in this context" and disputed Morrison & Foerster's assertions "that AFI is seeking to renegotiate, or otherwise declining to satisfy, the terms of the December 5 Letter Agreement . . . ."[1381] Kirkland asserted that "AFI's sole obligation was to 'seek' board approval, and it fulfilled this

---

[1374] Letter from L. Nashelsky to C. Hoyt (Jan. 20, 2012) [RC00068545].

[1375] *Id*. at 2. This "retrade" essentially related to the revision of the AFI provision of support on December 30–31, 2011.

[1376] *Id*. at 3.

[1377] *Id.* at 3–4.

[1378] *Id.* at 4.

[1379] Letter from R. Cieri to L. Nashelsky (Jan. 25, 2012) [EXAM20276355].

[1380] AFI Draft Terms of Support Relating to Possible DOJ/State Attorneys' General Settlement, dated Jan. 25, 2012 [EXAM20276340] (attached to E-mail from N. Ornstein to L. Nashelsky (Jan. 25, 2012) [EXAM20276338]).

[1381] Letter from R. Cieri to L. Nashelsky (Jan. 25, 2012), at 1–2 [EXAM20276355].

obligation. The December 5 Letter Agreement does not require a December capital contribution. As such, your statement that AFI 'undid that which it agreed to and had confirmed' is wholly without merit."[1382] Kirkland & Ellis concluded by stating that:

> Last and most importantly, AFI has been engaging, and remains committed to continuing to engage, ResCap in consensual and constructive discussions on all aspects of ResCap's restructuring efforts—including the proposed terms on which AFI would support ResCap's obligations under the Potential DOJ/State AG Settlement.[1383]

AFI's proposed terms were communicated to ResCap in the draft agreement the same day.

AFI's January 25 draft agreement accepted essentially just one comment from Morrison & Foerster's January 20 letter, deleting the provision which had allocated to ResCap responsibility for activity which formed the basis of the DOJ/AG Settlement.[1384] Most other provisions included in the January 17 term sheet remained, including the provision of support to ResCap, ResCap's payment of the applicable governmental authorities, and the proposed amendment to the A&R Line of Credit Agreement.[1385] Notably, a new paragraph of the draft agreement provided for a right of reimbursement:

> [F]or any and all amounts expended by AFI or Ally Bank in connection with their performance or satisfaction of obligations under any DOJ/State AG Settlement or FRB Order and for any fines, penalties or other amounts levied against AFI or Ally Bank as a result of the failure of ResCap, [GMAC Mortgage] or their subsidiaries to perform their obligations under any DOJ/State AG Settlement or FRB Order . . . .[1386]

In addition to this proposed obligation, paragraph 5 of the draft agreement provided that GMAC Mortgage would implement the modifications and loss mitigation activities designated on Exhibit A to the draft agreement, and that "[GMAC Mortgage] shall reimburse Ally Bank for any loss suffered by Ally Bank with respect to any mortgage loan as a result of any modification or loss mitigation in accordance with the Modification Plan, as calculated

---

[1382] *Id*. at 2.

[1383] *Id.*

[1384] AFI Draft Terms of Support Relating to Possible DOJ/State Attorneys' General Settlement, dated Jan. 25, 2012, at 1–4 [EXAM20276340].

[1385] *Id.*

[1386] *Id.* ¶ 4.

pursuant to Exhibit A hereto . . . ."[1387] The draft thus contemplated two distinct rights of reimbursement, one relating to "amounts expended by AFI or Ally Bank" in connection with their performance under any settlement or for any related penalties, and the other relating to "any loss suffered by Ally Bank . . . as a result of [loan] modification or loss mitigation."

After "robust" discussions among the members of ResCap's Board at their meeting on January 26,[1388] ResCap responded with a marked-up draft of the proposed agreement on the same day.[1389] This version incorporated a cap on the reimbursement for "amounts expended by AFI or Ally Bank" in connection with the DOJ/AG Settlement "from and after the time ResCap and [GMAC Mortgage] have effected the hard dollar payments . . . and $200 million of soft dollar credits pursuant to the DOJ/State AG Settlement."[1390] ResCap additionally deleted most of what was paragraph 5 of the January 25 draft agreement regarding the reimbursement of "Ally Bank for any loss suffered by Ally Bank with respect to any mortgage loan as a result of any modification or loss mitigation" while providing that GMAC Mortgage would negotiate in good faith an amendment to the Original Servicing Agreement "to implement modifications and other lost mitigation activities" in connection with the DOJ/AG Settlement.[1391] ResCap once again refused to include a provision amending the A&R Line of Credit Agreement.[1392]

ResCap received a revised draft agreement from AFI on January 30, which was substantially similar to the January 30 Letter Agreement.[1393] This version added a waiver of defaults relating to TNW covenants by AFI and BMMZ and a commitment from AFI to "contribute capital to ResCap in an amount necessary for ResCap to exceed its TNW Covenants . . . by $25 million for the month of January, 2012."[1394] It also included an

---

[1387] *Id*. ¶ 5.

[1388] Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Jan. 26, 2012, at RC40019196 [RC40019179].

> At Mr. Marano's request, Ms. Nashelsky described the terms of the capital support letter draft prepared by the advisers for Ally Financial Inc. received earlier that day and distributed to the members of the Board, including changes therein since the first indicative terms were sent on January 18, 2012. After a robust discussion among the members of the Board and its advisers about the appropriate responses to the terms of the capital support letter, the Board directed Mr. Marano and Morrison & Foerster to negotiate changes to the proposed support letter.

[1389] Draft Terms of Support Relating to Possible DOJ/State Attorneys' General Settlement - ResCap Comments, dated Jan. 26, 2012 [RC00067767].

[1390] *Id*. ¶ 4.

[1391] *Id*. ¶ 6.

[1392] *Id*. at 4.

[1393] *See* AFI Draft Terms of Support Relating to Possible DOJ/State Attorneys' General Settlement, dated Jan. 30, 2012 [ALLY_0018546].

[1394] *Id*. at 2, 4.

Exhibit C which set forth terms to be included in any amendment to the Original Servicing Agreement, which GMAC Mortgage, per the terms of the draft agreement, had agreed to negotiate.[1395] These Servicing Agreement Modification Terms included a reimbursement provision similar to that included in the January 25 draft (and which was struck in ResCap's January 26 response), wherein "[GMAC Mortgage] shall indemnify Ally Bank for any loss suffered by Ally Bank with respect to any Subject Loan as a result of any modification or loss mitigation . . . ."[1396]

### (4) The ResCap Board Approves The January 30 Letter Agreement

At a ResCap Board meeting held January 30, Marano "described the nearly final terms of the capital support letter from Ally Financial Inc. . . . received shortly before the meeting and distributed to the members of the Board."[1397] The ResCap Board and its advisers then discussed the remaining open items and ultimately gave Marano "full authority . . . to enter into a final capital support letter . . . in substantially the form and on the terms set forth in the draft thereof previously delivered to the Board members, with such changes therein as he deems necessary or appropriate."[1398] When asked about their rationale for supporting ResCap's entry into the January 30 Letter Agreement, certain ResCap Board members could not recall any details, but only that the January 30 Letter Agreement "allowed ResCap to continue to operate."[1399] The approval of the January 30 Letter Agreement was not voted on by a committee of Independent Directors,[1400] was not subject to an independent valuation,[1401]

---

[1395] *Id*. ¶ 7, Ex. C.

[1396] *Id*. Ex. C.

[1397] Minutes of a Special Meeting of the Board of Residential Capital, LLC, Jan. 30, 2012, at RC40019197 [RC40019179].

[1398] *Id*. Ilany did not attend this meeting.

[1399] Int. of S. Abreu, Jan. 22, 2013, at 370:4–22; Dep. of J. Whitlinger, Aug. 3, 2012, at 52:14–53:17 (stating that if "ResCap didn't have the funds available" from AFI pursuant to the January 30 Letter Agreement, ResCap and GMAC Mortgage couldn't have entered into the DOJ/AG Settlement as they did not have the requisite net worth or liquidity).

[1400] *See* Dep. of J. Whitlinger, Aug. 3, 2012, at 68:5–70:10, 73:5–14. Whitlinger stated that he did not believe that having the special committee of independent directors review and approve the January 30 Letter Agreement was necessary because the "agreement for AFI provide[d] that forgiveness to allow [ResCap and GMAC Mortgage] to settle . . . and be able to make our payments, and, in my opinion, was straightforward." *Id*. at 70:9–18. Regardless, Whitlinger believed that "the independent directors were fully a part of this decision." *Id*. at 72:11–19.

[1401] *See id.* at 73:15–74:15.

and was not considered or approved at a separate meeting of the GMAC Mortgage Board of Directors.[1402] Ultimately, members of the ResCap Board expressed pleasure with the result of the negotiations,[1403] which they considered contentious.[1404]

### (5) Economics Of The January 30 Letter Agreement

In the January 30 Letter Agreement, AFI agreed to forgive $196.5 million of ResCap debt under the A&R Line of Credit Agreement.[1405] The amount of the debt forgiveness appears to have been based upon the estimates of ResCap's portion of the potential settlements under one of the approaches previously described in Section V.C.1.f(2) ($11/15 \times \$268$ million = $196.5 million).[1406]

GMAC Mortgage and RFC were the borrowers under the A&R Line of Credit Agreement.[1407] When accounting for AFI's forgiveness of $196.5 million under the A&R Line

---

[1402] See id. at 91:10–92:14. Whitlinger stated that he did not believe that there was a "separate board meeting" of the GMAC Mortgage Board to consider and vote on whether GMAC Mortgage should enter into the January 30 Letter Agreement, however, he felt that they had "concurrence of the board." Id. Whitlinger further stated that "Steve Abreu and myself are both GMAC Mortgage board members. Joe Pensabene was intimately involved with all of the discussions. I believe that we had concurrence of the board." Id.

[1403] See E-mails between P. West and J. Whitlinger (Jan. 31, 2012) [EXAM10345463] (after Whitlinger stated that the January 30 Letter Agreement provided that "ResCap would not indemnify bank for soft menu credits on normal course of business as it is processed today" and that "no minimum usage of bank portfolio is necessary," West commented that this was "[g]reat. Looks like we got most of what we wanted. Good work."); Int. of T. Marano, Feb. 27, 2013, at 69:7–17 (when discussing the agreement regarding the amount of debt forgiveness to be provided by AFI, Marano stated "[b]ecause I felt that's about the number I would need not to have a negative impact to my net worth . . . related to this settlement. So I think I won this one."); Int. of J. Whitlinger, Feb. 27, 2013, at 202:19–203:15, 223:5–12 ("I got them to pay the whole $196.").

[1404] See Int. of T. Marano, Feb. 27, 2013, at 70:17–20 ("[T]his is like every agreement was [sic] extremely contentious between us and [AFI] . . . .").

[1405] January 30 Letter Agreement, ¶ 1 [ALLY_0194817].

[1406] See Section V.C.1.f regarding allocation. It has also been suggested that the amount of debt forgiveness was intended to act as a cap on amounts to be paid by ResCap under the January 30 Letter Agreement. See Int. of J. Whitlinger, Feb. 27, 2013, at 206:25–207:8 ("[O]ur view was—and I was very clear when we were negotiating some of this—that 'You're giving us debt forgiveness of $196.5 million. And once we hit above that amount, we don't have to pay anymore. Because you only gave us debt forgiveness up to that amount. . . .'").

[1407] See A&R Line of Credit Agreement [ALLY_0240633].

of Credit Agreement, ResCap allocated $124.2 million of debt forgiveness to GMAC Mortgage and the remaining $72.3 million to RFC.[1408]

The A&R Line of Credit Facility provided ResCap with a maximum capacity of $1.6 billion ($1.1 billion secured and $500 million unsecured).[1409] Draws on the unsecured portion of the line of credit were available only after the secured portion had been fully utilized.[1410] As of December 31, 2011, ResCap's total borrowings under the A&R Line of Credit Facility were $185.0 million.[1411] GMAC Mortgage's portion was $111.5 million,[1412] while RFC's portion was $73.5 million.[1413] After giving effect to the debt forgiveness required under Exhibit A of the January 30 Letter Agreement, the amount of outstanding debt under the A&R Line of Credit Agreement was $311.5 million.[1414] Therefore, the $196.5 million in debt that was forgiven under the January 30 Letter Agreement had been drawn on the secured portion of the A&R Line of Credit Agreement.

---

[1408] *See* GMAC Mortgage, LLC Consolidated Financial Statements for the Years Ended December 31, 2011 and 2010 (Mar. 28, 2012), at 11, 69 [RC00032177] (stating that on January 30, 2012 GMAC Mortgage "recognized a capital contribution . . . of $124.4 million, and a corresponding reduction in borrowings under the [A&R Line of Credit Agreement]"); Residential Funding Company, LLC Consolidated Financial Statements for the Years Ended December 31, 2011 and 2010 (Mar. 28, 2012), at 11, 61 [RC00032246] (stating that on January 30, 2012, RFC "recognized a capital contribution . . . of $72.3 million, and a corresponding reduction in our borrowings under the [A&R Line of Credit Agreement]"); Memorandum, Significant Transaction Memo: General Information and Transaction Description Re Mortgage Fine, Waivers and Debt Forgiveness, dated Feb. 2012, at EXAM00220160 [EXAM00220147].

[1409] *See* Residential Capital, LLC Consolidated Financial Statements for the Years Ended December 31, 2011 and 2010 (Mar. 28, 2012), at 38 [EXAM00122651].

[1410] *See id.* at 39.

[1411] *Id.* at 76.

[1412] *See* GMAC Mortgage, LLC Consolidated Financial Statements for the Years Ended December 31, 2011 and 2010 (Mar. 28, 2012), at 65 [RC00032177].

[1413] *See* Residential Funding Company, LLC Consolidated Financial Statements for the Years Ended December 31, 2011 and 2010 (Mar. 28, 2012), at 60 [RC00032246].

[1414] *See* January 30 Letter Agreement, Ex. A [ALLY_0194817]; E-mail from E. Kahan (Jan. 31, 2012), at ALLY_PEO_0034525–26 [ALLY_PEO_0034500] (providing the description of the daily outstanding balance on the A&R Line of Credit Facility. According to ResCap's January 31, 2012 unaudited "Trial Balance," GMAC Mortgage's outstanding balance on the A&R Line of Credit Facility was $156.7 million, and RFC's outstanding balance was $103.4 million, for a total balance of $260.1 million. *See* Residential Capital, LLC Unaudited Trial Balance for Month ended 2012-01-31, dated January 31, 2012 [EXAM00228752]; *see also* Ally Financial Inc. Summary of Intercompany Balances with ResCap, dated May 28, 2012, at ALLY_0182819 [ALLY_0182793] (also stating that the outstanding balance on the A&R Line of Credit Facility was $261 million including interest as of January 31, 2012). This difference of $51.4 million (between the $311.5 million and the $260.1 million) is due to an additional $51.4 million of debt forgiveness (in connection with the payment by GMAC Mortgage to Ally Bank due to the "accounting error" under the Broker Agreement, as described in Section V.B.6) recorded on March 1, 2012 that was retroactively applied to the December 31, 2011 financial records. Conference call with ResCap and FTI, Financial Advisor to the Debtors (Apr. 29, 2012).

### b. GMAC Mortgage Begins Performing Modifications To Ally Bank's Loan Portfolio

ResCap and GMAC Mortgage had to determine which population of loans could be modified, what type of modification could be made, and the costs associated with such modifications to receive credits against the soft costs of the CMP. The ResCap and GMAC Mortgage capital markets and servicing teams applied a "waterfall" to determine what types of loans were subject to the modification provisions in the DOJ/AG Settlement and what type of model should apply to those loans.[1415] The ResCap and GMAC Mortgage risk analysis team then ran the models on the loans to compare the pre-modification financials with the post-modification financials,[1416] or, in other words "present what happens economically as a result of the modifications."[1417] This information was then provided to the ResCap and GMAC Mortgage accounting, servicing management and capital markets groups.[1418]

Solicitations to borrowers from the Ally Bank portfolio began at the end of March 2012, and modifications began to occur in April.[1419] Both of these activities commenced prior to the negotiation of the AG Menu Matrix, as discussed below, which governed the reimbursement

---

[1415] Int. of C. Senick, Nov. 16, 2012, at 66:23–67:2, 239:20–240:14. Senick was the Risk Officer of GMAC Mortgage during this period.

[1416] *Id.* at 66:23–67:2, 239:20–240:14.

[1417] *Id.* at 240:11–13.

[1418] *See id.* at 240:13–14.

[1419] *See* Dep. of J. Whitlinger, Aug. 3, 2012, at 94:19–24; Residential Capital, LLC Condensed Consolidated Financial Statements for the Periods Ended March 31, 2012 and 2011 (Unaudited), at 44 [EXAM00070376].

by ResCap and GMAC Mortgage to Ally Bank of costs associated with the loans modified pursuant to the government settlements.[1420] Each type of modification had a specific associated reimbursement calculation.[1421]

### c. *GMAC Mortgage And Ally Bank Enter Into The A&R Servicing Agreement*

GMAC Mortgage and Ally Bank entered into the A&R Servicing Agreement, which is dated May 11, 2012.[1422] The A&R Servicing Agreement incorporates the Servicing Agreement Modification Terms and includes the AG Menu Matrix.[1423]

#### *(1) Indemnity Provisions*

The A&R Servicing Agreement incorporated the indemnity provision required by the Servicing Agreement Modification Terms. Specifically, the A&R Servicing Agreement provided that:

> [GMAC Mortgage] shall indemnify [Ally Bank] for losses
> suffered by [Ally Bank] as a result of any action taken in
> accordance with the AG Menu Items attached hereto as Exhibit
> 4-B; provided, that [GMAC Mortgage] shall not be required to

---

[1420] Int. of C. Senick, Nov. 16, 2012, at 242:9–245:19 (noting that the parties that negotiated this matrix likely were (a) for ResCap and GMAC Mortgage: Mark Schaeffer, Peter Muriungi and Feyera Milkessa, and (b) for Ally Bank: Joe Cortese and Young).

[1421] Int. of C. Senick, Nov. 16, 2012, at 243:2–244:14 (referring to the AG Menu Matrix as the "reimbursement matrix").

> What we were talking about there is what are the economics, what are you being made whole for— you being the bank. Our recommendation was to try to keep the reimbursement consistent with the economics coming out of the model. So in terms of a principal forgiveness if you're forgiving $10,000 of principal that's a $10,000 charge off to the bank with a few nuances that I'm not familiar with. For the most part you get reimbursed $10,000. That one is fairly easy and was managed outside of our process. For loans where the modification resulted in a refinance, a new loan there you don't have an amount of principal that was forgiven. So the question is how much has the bank lost or gained from that modification. One argument is well if you're reducing interest, the note rate on the loan, that's less interest over time. So one suggestion on the bank side was let's calculate that lifetime interest change. My response to that was yes, but you should receive more payments over time. So there are pros and there are cons. Why don't we apply the net present value of those cash flows to determine fair value which is consistent with the bank's fair value disclosure on its quarterly statements on the portfolio on which it has a reserve? They need to disclose what the fair value of those loans would be under an HFS or a fair value methodology. So I said if we have this methodology that we're all comfortable with in what is the fair value of a loan let's run the fair value of the loan before, the fair value after and if you get more principal back than interest or vice versa that will show up in that NPV calculation. That ultimately made its way into the reimbursement.

[1422] Additional discussion related to the A&R Servicing Agreement can be found in Section V.B.9.

[1423] *See* A&R Servicing Agreement, §§ 10.01(e)–(f), Ex. 4-B [ALLY_0114469]. The AG Menu Matrix is described in detail in Section V.C.2.d.

> indemnify [Ally Bank] for any losses in connection with any
> such action that also would have been permitted under the terms
> of the Standard Matrix.[1424]

Exhibit 4-B provides the framework for "ResCap AG Consumer Relief," or the implementation of the consumer relief required by the DOJ/AG Settlement.[1425]

The A&R Servicing Agreement also included the limitation on modifications as set forth in the Servicing Agreement Modification Terms, which states that "[i]n no case shall [GMAC Mortgage] evaluate additional Portfolio Loans for actions pursuant to the AG Menu Items in the month following the month in which indemnification payments to [Ally Bank] . . . exceed $75,000,000 in the aggregate."[1426] This $75 million cap was generally viewed as a protection for Ally Bank.[1427]

The A&R Servicing Agreement omitted, however, any cap on this indemnity like the cap included in paragraph 5 of the January 30 Letter Agreement, which limits ResCap's and GMAC Mortgage's reimbursement liabilities once the hard dollar payments have been made under the DOJ/AG Settlement, and ResCap and GMAC Mortgage have earned $200 million of soft dollar credits.[1428]

---

[1424] A&R Servicing Agreement, § 10.01(e) [ALLY_0114469].

[1425] *See id*. Ex. 4-B.

[1426] *Id*. § 10.01(f). The parties generally referred to this as a "speed bump." E-mail from J. Young (May 31, 2012) [ALLY_0197143] ("The key question we will need to address and recommend is whether we should approve them moving beyond our $75 million speed bump given our view of collection of reimbursement."); *see also* Int. of J. Whitlinger, Feb. 27, 2013, at 209:18–210:2 ("Our view on the $75 million speed bump was that we're going to do modification activities. . . . When we've done those activities and we've made payments of $75 million, we'd get back together and talk about, should we have to pay anything more to them, and who should take it?").

[1427] *See* Int. of J. Whitlinger, Feb. 27, 2013, at 211:5–16 (responding to the question of whether the $75 million was a "cap on the level of their consent to modifications" Whitlinger stated "[t]hat's Jim Young's view. . . . And he'd probably tell you that that $75 million was for that, because we needed to tell the regulators and show the regulators that we have control and how much of our portfolio is getting modified.").

[1428] January 30 Letter Agreement, ¶ 5 [ALLY_0194817].

### *(2) Negotiation Of The A&R Servicing Agreement*

Negotiations regarding the various provisions of the A&R Servicing Agreement took place over an extended period of time,[1429] from at least from February 1, 2012[1430] through May 11, 2012.[1431] Throughout the negotiation process, GMAC Mortgage was eager to finalize the A&R Servicing Agreement,[1432] which it viewed as critical to the future sale of its platform.[1433] GMAC Mortgage, however, perceived that Ally Bank was dragging its feet.[1434]

_____

[1429] *See, e.g.,* Letter from T. Marano to B. Yastine (May 9, 2012) [EXAM00069159] ("[GMAC Mortgage] offered Ally Bank an amendment in March to the 2001 Servicing Agreement in accordance with the terms of the Support Letter. While that amendment was not pursued, both parties have been working towards finalizing the [Subservicing Agreement] for quite some time.").

[1430] *See, e.g*., E-mails between B. Yastine and T. Marano (Feb. 1, 2012) [ALLY_0194846] (Yastine stated to Marano that "[w]e all want to move fast on the servicing agreement, but to date it has not been reviewed through a BK lens. . . . That will not happen in 1–2 days." Marano responded that "[w]e banged 2 of the issues out this am. Can u stop by at 10:30am tomw . . . so we can wrap u[sic] the r3d [sic] issue . . . .").

[1431] While the A&R Servicing Agreement is dated May 11, 2012, it appears as though signature pages were held in escrow until GMAC Mortgage and Ally Bank had come to an agreement on a letter detailing the terms of an indemnity payment from GMAC Mortgage to Ally Bank based on April loan modifications, as discussed in Section V.C.2.e. *See* E-mail from T. Hamzehpour (May 13, 2012) [EXAM11151314] ("Also, signature pages are standing by on the Servicing Agreement for both [GMAC Mortgage] and [Ally] Bank, so as soon as we sign off on this letter those should be able to be released.").

[1432] *See, e.g*., E-mail from M. Detwiler (Feb. 13, 2012) [EXAM00001482] ("Joe/Gary, wanted to give you an update that I anticipate that we will execute the new subservicing agreement with Ally Bank sometime this month . . . ). *See also* Letter from T. Marano to B. Yastine (May 9, 2012) [EXAM00069159].

[1433] *See* Int. of J. Pensabene, Jan. 9, 2013, at 245:4–12 ("If we lost rights to service one-third of our overall portfolio and . . . even more as it relates to just the value of the portfolio then the auction of the business would not have been nearly as successful as it turned out to be. The value of the platform would have been diminished dramatically.").

[1434] *See, e.g.,* E-mail from M. Carpenter (Feb. 24, 2012) [ALLY_0195356]. In an e-mail to Yastine, Carpenter, when discussing the negotiations surrounding the servicing agreement, suggested that Marano "says you don't return phone calls, answer e mails promptly or talk to the right people!! My only point is if you and he talked once a day we would avoid a lot of bs." *Id.* In response to being asked why it took so long to get a new servicing agreement in place, Marano responded "the folks at Ally Bank were extremely slow and had a tendency to nitpick every detail. And so, I think they just—I would put responsibility on them. They were very slow." Int. of T. Marano, Feb. 27, 2013, at 87:25–88:7. At various points early in the negotiations, the parties would state that they had drafts that were "nearly complete." *See, e.g.*, E-mail from M. Detwiler (Feb. 13, 2012) [EXAM00001482] ("Joe/Gary, wanted to give you an update that I anticipate that we will execute the new subservicing agreement with Ally Bank sometime this month . . .); E-mail from K. Kohler to C. Hoyt (Mar. 14, 2012), at EXAM00073758 [EXAM00073757] ("I just heard from Mary Fahy Woehr, the ResCap in-house lawyer working on the subservicing agreement . . . . [S]he has a draft that is nearly complete and that she could try to turn tonight if you and she were able to address several of the key points."). However, as previously stated, the A&R Servicing Agreement was not finalized until at least May 11, 2012.

There was voluminous regular correspondence between the parties during this time period discussing terms of the A&R Servicing Agreement.[1435] The negotiations covered numerous issues,[1436] and involved internal as well as outside counsel.[1437] The parties do not appear to dispute the inclusion of the indemnity provision relating to loan modifications.[1438] The issue discussed most frequently was the structure of the AG Menu Matrix,[1439] which was

---

[1435] *See, e.g.*, E-mail from M. Rosen to J. Young (Apr. 20, 2012) [ALLY_0208224] (in providing an update regarding reimbursement issues, Rosen told Young that "I believe that both parties are still working on other items ties to the servicing agreement, so I don't think [the reimbursement issue] is the only thing holding up ratification.").

[1436] *See, e.g.*, E-mail from M. Fahy Woehr (Mar. 14, 2012) [EXAM00073757] (discussing thoughts regarding a number of issues including representations and warranties, consent rights to assignments and events of default, as well as a potential reimbursement matrix "under the AG Menu"). Fahy Woehr was in-house counsel for ResCap during this period and negotiated the A&R Servicing Agreement on ResCap's behalf. *See* E-mail from K. Kohler to C. Hoyt (Mar. 14, 2012), at EXAM00073758 [EXAM00073757].

[1437] Morrison & Foerster represented ResCap and GMAC Mortgage in these negotiations, while Mayer Brown and Kirkland & Ellis represented Ally Bank. *See, e.g.*, E-mails between C. Hoyt and K. Kohler (Mar. 14, 2012), at EXAM00073758 [EXAM00073757]; E-mail from K. Kohler (Apr. 16, 2012), at ALLY_0019252–53 [ALLY_0019252].

[1438] The parties viewed the inclusion of such an indemnification provision as a standard term. *See* Int. of J. Whitlinger, Feb. 27, 2013, at 189:9–17.

> But absolutely we ended up having to pay them. And I've said this very clearly in my other deposition, that as a third party, if I went to Fannie and Freddie and said, 'Hey, I have this DOJ settlement. I got to go solicit all these borrowers and I got to earn $200 million; can I use your loans, guys?' They would absolutely say, 'Sure. Pay me for the loss mods.'

*See also* Int. of T. Marano, Feb. 27, 2013, at 91:4–10 ("I was told that caps were not common, that for servicers to make an error, that usually the servicer was 100 percent liable. And I was also told in the current environment of the [DOJ/AG], many agreements were being renegotiated to increase the liability of the servicers.").

[1439] *See, e.g.*, E-mail from C. Dondzila to J. Whitlinger (Feb. 22, 2012) [EXAM11893427] ("FYI regarding where Bank is landing in terms of requiring indemnification payments. I think we are back to where we started, that we will be making payments to them on virtually all of the modification activity, and in amounts in excess of their actual incurred accounting losses."); E-mail from R. Fowlie to C. Dondzila and J. Whitlinger (Mar. 16, 2012) [EXAM10994711] ("As the negotiations between us and the Bank continue on the sub servicing agreement one process that should be in there is around the AG settlement and how we should reimburse the Bank for losses on their portfolio."); E-mail from M. Rosen (Apr. 13, 2012), at ALLY_0368406–07 [ALLY_0368405] ("Let us know if you have any questions or when you've finished your review and are ready to discuss next steps in finalizing the reimbursement matrix."); E-mail from M. Rosen to J. Young (Apr. 20, 2012) [ALLY_0208224] ("I've had a chance to follow up with [Pensabene]. He's reviewed the issue with [Marano] and his position remains that he does not agree to reimburse on the refinance program in a scenario where they would also be paying dollar-for-dollar on principal reduction."); E-mail from J. Pensabene (Apr. 24, 2012) [EXAM00066809] ("FYI – follow up to where we ended with the Bank on remediation. Tom and I met with Barbara and Jim yesterday. We essentially agreed that on the principal forgiveness mods we would reimburse $ for $. On the rate refi we would pay them for negative FMV and they would pay us for positive FMV. Tom felt like this was a compromise we could live with."); E-mail from C. Senick (Apr. 25, 2012) [ALLY_0208255].

not resolved until just prior to the Petition Date.[1440] Evidence suggests that all parties considered the negotiations to be contentious.[1441] ResCap seems to have been satisfied with the results of the negotiations. Marano observed that "what we negotiated was a much better deal for ResCap than what [ResCap] had before."[1442]

### (3) It Is Unclear If The GMAC Mortgage Board Approved Entry Into The A&R Servicing Agreement

The Investigation did not uncover any GMAC Mortgage Board minutes or written consents evidencing the approval of the A&R Servicing Agreement.[1443] Pensabene signed the A&R Servicing Agreement on behalf of GMAC Mortgage.[1444]

### (4) Economics Of The A&R Servicing Agreement

As of June 25, 2012, ResCap estimated that GMAC Mortgage would earn $41.6 million in subservicing revenue and $24.7 million in net income from June 2012 through December 2012 as a result of the A&R Servicing Agreement.[1445]

From May 2012 through February 2013, GMAC Mortgage paid Ally Bank a total of $96.8 million in connection with loan modifications under the indemnification provision of the January 30 Letter Agreement and the A&R Servicing Agreement.[1446]

---

[1440] *See, e.g.,* Letter from T. Marano to B. Yastine (May 9, 2012) [EXAM00069159] ("The AG Menu Matrix attachment to [the A&R Servicing Agreement] that sets forth the methodology for use of the soft dollar credits under the DOJ/AG settlement was only agreed to on Monday of this week, and agreement as to all other provisions of the new servicing agreement was reached yesterday."); E-mail from M. Fahy Woehr (May 7, 2012) [EXAM20139177] ("Attached is a final execution copy of the [A&R Servicing Agreement]. However, this afternoon, more comments came into the pricing exhibit from the Bank.").

[1441] *See, e.g.,* E-mail from B. Yastine (Apr. 25, 2012) [ALLY_0196078] (in response to an e-mail from Young which describes a potential compromise regarding the indemnification of Ally Bank which Benton and Young feel they can defend, Yastine states that negotiations were a "[h]ard fight, but best outcome."). *See also* E-mail from B. Yastine to T. Marano and M. Carpenter (Apr. 26, 2012) [ALLY_0196081].

> As you know, the teams had a call last night and have another scheduled for 10 am this morning. The only remaining issue is that [GMAC Mortgage] will not agree that it is a servicer event of default if it fails to comply with the Consent Order. We don't have much of an explanation for why, other than this wasn't in the "Support Letter." . . . We will see if the teams can make any progress at 10 am, but you and I will likely need to lead a summit again to come to terms on this one.

[1442] Int. of T. Marano, Nov. 26, 2012, at 243:24–244:5.

[1443] The GMAC Mortgage Board was comprised of Whitlinger, Abreu, and Pensabene. Dep. of J. Whitlinger, Aug. 3, 2012, at 36:24–37:5.

[1444] A&R Servicing Agreement, at ALLY_0114541 [ALLY_0114469].

[1445] Joint Servicing—Ally Subservicing Agreement Presentation by Centerview, Morrison & Foerster, and FTI, dated July 17, 2012, at RC00075962 [RC00075960].

[1446] Loan Level Reimbursements Through January 2013, prepared by ResCap [EXAM00345233].

Reimbursement payments made by ResCap to Ally Bank were based upon the parameters set forth within the AG Menu Matrix, which allows GMAC Mortgage to perform loan modifications to Ally Bank loans beyond the previously set modification parameters attached to the September 2007 Fourth Addendum to the Original Servicing Agreement.[1447]

As stated, the amount of the reimbursement to Ally Bank is calculated based on the collateral position of a particular loan as well as the type and amount of the modification performed for that loan. The majority of the reimbursement payments through the period ending January 2013 to Ally Bank resulted from principal reductions on mortgage loans where Ally Bank held a first lien position.[1448] For non-Home Affordable Modification Program-eligible first lien principal reduction modifications, the AG Menu Matrix allows for a dollar-for-dollar reimbursement payment from ResCap to Ally Bank if the unpaid principal balance was not previously charged off by Ally Bank. Home Affordable Modification Program-eligible first lien principal reduction modifications yield less than a dollar-for-dollar reimbursement payment if the post-modification loan retains a loan-to-value percentage of greater than 105%.[1449]

---

[1447] A&R Servicing Agreement, Ex. 4-B [ALLY_0114469]; *see also* Fourth Addendum to Servicing Agreement, dated Sept. 12, 2007, Ex. A-1 [ALLY_0251201]. Notably, GMAC Mortgage would not be required to reimburse Ally Bank for any losses incurred in connection with any modification or loss mitigation activities that were permitted under the terms of the Original Servicing Agreement, as amended. During negotiations, members of the ResCap Board viewed this as an important aspect of the agreement. *See* E-Mails between P. West and J. Whitlinger (Jan. 31, 2012) [EXAM10345463] (after Whitlinger stated that the January 30 Letter Agreement provided that "ResCap would not indemnify bank for soft menu credits on normal course of business as it is processed today," West commented that the terms were "[g]reat. Looks like we got most of what we wanted."). Despite this view, evidence demonstrates that ResCap and GMAC Mortgage did not keep track of whether any modifications conducted may have been previously permitted, and thus not subject to reimbursement. Pensabene stated that GMAC Mortgage did not look to see whether loans modified would have been eligible for modification under existing authority, as "it would be very difficult . . . to try and figure out what the loss to the bank would have been under a program we're already authorized to do versus what it is—you're basically asking operationally for us to underwrite the loan for two different programs." Int. of J. Pensabene, Jan. 9, 2013, at 229:22–230:3. Such an oversight could have led to GMAC Mortgage paying more than it was required to by the terms of the January 30 Letter Agreement and the A&R Servicing Agreement. However, the Examiner was unable to conclude, based on the information available, whether any overpayment was made.

[1448] Loan Level Reimbursements Through January 2013, prepared by ResCap [EXAM00345233] (providing detailed information on all reimbursements invoiced by Ally Bank to ResCap and analysis broken down by loan reimbursement amount, pre-modification unpaid principal balance, charge-off amount, and post-modification unpaid principal balance).

[1449] A&R Servicing Agreement, Ex. 4-B [ALLY_0114469].

The remainder of the Ally Bank reimbursement payments that ResCap made through the period ending January 2013 resulted from modifications performed on loans where Ally Bank held the second-lien position. For second-lien principal reduction loan modifications, reimbursements to Ally Bank are based on reductions in excess of 20% of the debtor's pre-modification unpaid principal balance multiplied by the U.S. Treasury Department's Second-Lien Modification Investor Incentive Schedule (set range of 20% to 42% based on current loan-to-value).[1450] For second-lien loan extinguishments, where the loan is deemed paid off, the lien is released, and all outstanding balances are forgiven, and reimbursement to Ally Bank are calculated based on the total amount of the extinguished loan unpaid principal balance multiplied by the net charge-off recovery rate (2.2%).[1451]

The AG Menu Matrix notably specifies that ResCap's reimbursement payments to Ally Bank for principal reductions will be reduced by the amount of charge-offs associated with the loans being modified.[1452] However, the AG Menu Matrix does not specify that the reimbursement payments will be further reduced by the amount of reserves recorded on these loans by Ally Bank.[1453] In his interview, Young stated:

> [L]osses are reserved for under Generally Accepted Accounting Principles when the loss is considered probable and can be estimated. That usually happens long—and it generally occurs at the time when there's some evidence of a potential loss; so delinquency, something of that nature. A charge-off would occur after a period of time where a loan has gone through 30, 60, 90 days, it's into foreclosure and it now has become very clear that there is a loss and that loss can be, of course, dollar amount can be known, and the loss is known. At that point in time it's charged off against that reserve. So, a reserve is an estimate of an event that occurred based on the information that you have, but it's not a final determination by any stretch of the imagination.[1454]

---

[1450] *Id.*

[1451] *Id.*

[1452] *Id.*

[1453] GMAC Mortgage previously entered into an agreement with Ally Bank (then GMAC Bank) whereby, in exchange for Ally Bank's forbearance from exercising its rights to require GMAC Mortgage to purchase certain loans, GMAC Mortgage would indemnify Ally Bank for any realized losses on any such loans that Ally Bank had to charge off in an amount not to exceed the net carrying value of the loan as of a certain date (the principal balance reduced by any charge-offs or reserves). GMAC Bank Indemnification Agreement, dated April 16, 2008 [ALLY_0017906]. This treatment differs from the AG Menu Matrix in that it considers reserves in calculating the indemnified losses of Ally Bank.

[1454] Int. of J. Young, Mar. 15, 2013, at 222:19–223:16.

As shown in Exhibit V.C.2.c(4) below, the total amount reserved on the modified loans held in the Ally Bank portfolio prior to the borrower relief modifications was approximately $50.6 million. Approximately $34.7 million of these reserves related to loans for which Ally Bank received reimbursement payments from ResCap. On certain loans, Ally Bank's reserves exceeded the amount of the reimbursement from ResCap. The total amount of the reserve was approximately $7.8 million greater than the reimbursement payment to Ally Bank for these loans. Based on the foregoing, ResCap reimbursed Ally Bank for $26.9 million ($34.7 million—$7.8 million) related to loan modifications for which Ally Bank had recorded reserves equal to or less than the reimbursement amount.

EXHIBIT V.C.2.c(4)
**Comparison of Reimbursement Payments to Pre-Modification Reserves**
*($ in Millions)*

| Item | Count | Reimbursement Payments | Pre-Modification Reserve Amount |
|---|---|---|---|
| Loans modified from April 2012 – January 2013 | 2,610 | $      96.9 | $      50.6 |
| Less: Modified loans with no reimbursements | 873 | - | 15.9 |
| Modified loans with reimbursements | 1,737 | $      96.9 | 34.7 |
| Modified loans with reserve amounts in excess of reimbursements | | | |
| Reimbursement payments | | | 10.1 |
| Less: Pre-modification reserve amount | | | 17.9 |
| Amount of reserves in excess of reimbursement | | | (7.8) |
| Net reimbursement payments for loan modifications with pre-modification reserves | | | $      26.9 |

*Source: Loan Level Reimbursements Through January 2013, prepared by ResCap [EXAM00345233].*

### d.  Prepetition Indemnity Payment To Ally Bank

On May 10 and May 11, 2012, just prior to the Petition Date, the Debtors made indemnity payments to Ally Bank totaling $48.4 million. Ally Bank's invoices for these payments stated that the payments related to "loan modification activities performed by GMAC Mortgage, LLC as sub-servicer, prior to April 30, 2012 and in connection with the DOJ/State AG Settlement."[1455]

---

[1455] This amount was paid in two installments. According to the invoices, $45 million was to be paid on May 10, 2012, with the remaining $3,432,719 to be paid on May 11, 2012. *See* Invoice from Ally Bank to ResCap (May 9, 2012) [ALLY_0196290]; Invoice from Ally Bank to ResCap (May 10, 2012) [EXAM20203413]; *see also* E-mail from J. Pensabene (May 9, 2012) [ALLY_0196286] ("The money will be transferred first thing tomorrow.").

This installment payment structure was employed because GMAC Mortgage had yet to determine the actual amount of reimbursement allegedly due to Ally Bank at the time of the payments.[1456]

The prepetition payments were the subject of significant dispute and confusion between Ally Bank, ResCap and GMAC Mortgage. Initially, ResCap had questions regarding the existence of any obligation to make an indemnity payment (as well as the right to perform the loan modifications giving rise to the alleged obligation).[1457] On May 8, 2012, this concern was addressed by Hamzehpour, who forwarded to Benton a February 9, 2012 e-mail from Young confirming that GMAC Mortgage could perform modifications to the Ally Bank loan portfolio "under the agreement of full reimbursement for all losses related to loan preservation activities . . . ."[1458] Hamzehpour suggested that the e-mail "seems to confirm an approval to move forward, conditioned on the full indemnification – which is where we should end up on this, as we just discussed."[1459]

The same day, Ally Bank was exerting pressure on ResCap and GMAC Mortgage to make the payments. In an e-mail to Marano, Yastine stated:

> Under the terms of the [January 30 Letter Agreement], ResCap committed to reimbursing the Bank for DOJ mods as a condition to doing such mods (appears in Exhibit C to the Agreement, which is attached). There was no connection to the new servicing agreement other than in 7(c), which states that similar provisions will be included in any new servicing agreement.
>
> ResCap tying reimbursement to the new servicing agreement puts ResCap in breach of the January 30 [Letter] Agreement. I don't think ResCap wants to go there, and it will blow things up if FDIC learns of this.
>
> Please consult with Tammy [Hamzehpour] asap, and have the funds released to the Bank.[1460]

---

[1456] *See, e.g.*, Letter from T. Marano to B. Yastine (May 9, 2012) [EXAM00069159]; E-mail from J. Pensabene (May 8, 2012) [EXAM00069549] ("FYI – the support letter does not outline how the reimbursement will be calculated. The new contract provides a matrix for the calculation."). Loan-level reconciliation information was also circulated between GMAC Mortgage and Ally Bank. *See* E-mails between M. Rosen, J. Cortese, J. Young, and J. Pensabene (May 10–11, 2012), at ALLY_0182323–24 [ALLY_0182323].

[1457] *See, e.g.*, E-mail from T. Marano (May 8, 2012) [EXAM20139177] ("I need the exhibits — esp Exhibit C as we have a dispute over the obligation to wire the $50mm payment related to mods, and further whether or not we had the right to even do the mods we did.").

[1458] E-mail from J. Young to T. Hamzehpour, J. Pensabene, H. Benton, C. Evans, and J. Whitlinger (Feb. 9, 2012), at EXAM20169859–60 [EXAM20169858]. This e-mail correspondence is referenced in Section V.C.2.a(2).

[1459] E-mail from T. Hamzehpour (May 8, 2012), at EXAM20169859 [EXAM20169858].

[1460] E-mail from B. Yastine to T. Marano (May 8, 2012) [EXAM00063493].

Marano responded that "we are in process of getting [Ally Bank] numbers to reconcile . . . have spoken with Tammy and would like to repeat my prior position, please finish the subservicing agreement."[1461] He later told Pensabene that "I will not be bullied. We will honor our specific contractual obligations and advise them professionally of what they need to do to protect their and our interests."[1462] Evidence indicates that Ally Bank remained intent on getting the payments as soon as possible,[1463] despite Ally Bank's consideration with both inside and outside counsel that these payments might be avoidable as preferential transfers.[1464]

On May 9, 2012, Marano sent a letter to Yastine in which he detailed ResCap's willingness to make the payments.[1465] The letter stated that:

> While working to achieve a mutually satisfactory amendment or agreement, management of the Bank authorized the use of its portfolio for modifications that would qualify for soft dollar credits . . . . This was done, of course, on the consistent that the Bank would be reimbursed for its losses consisted with the language in the Support Letter and with the methodology that ultimately was agreed in the [AG Menu Matrix].

The letter went on to state that "[b]ased on the above and your assurances that Ally Bank has submitted the new subservicing agreement to the FDIC for approval and will execute that agreement immediately upon receipt of that approval . . . ResCap is prepared to wire Ally Bank $45 million on May 9, 2012."[1466]

--------------------------------------------------

[1461] E-mail from T. Marano to B. Yastine, M. Rosen, and J. Pensabene (May 8, 2012), at ALLY_0368459 [ALLY_0368458].

[1462] E-mail from T. Marano to J. Pensabene (May 8, 2012) [EXAM00069549].

[1463] *See* E-mail from H. Benton (May 9, 2012), at ALLY_0021095 [ALLY_0021094] ("Just received their counter. Doesn't have any of the language we discussed this morning, but I think at this point the Bank should take the money. The references to the AG matrix and the negotiation process provide some nexus to the bundle we'll seek to have blessed in the continuation order."); E-mail from J. Young to B. Yastine, C. Evans, H. Benton, and T. Houghton (May 10, 2012) [ALLY_0196309] ("We are going to send another invoice for $3,432,719 tonight . . . . There are some very minor recon items to complete . . . but we can wrap into next month. Best to get the bigger number now."); Int. of T. Marano, Feb. 27, 2013, at 87:2–10 ("The bank was very restless because we had signed an agreement saying that we were going to reimburse them for the modifications. They had regulators looking over their shoulder to make sure they were getting paid. We did not want to be in default to Ally Bank on the subservicing contract, which we thought was valuable to the estate.").

[1464] *See* E-mail from H. Benton (May 7, 2012), at EXAM20272697 [EXAM20272696] (acknowledging that "[i]f ResCap pays [Ally Bank] now, there is some risk that the payment will be challenged as a voidable preference (preferential payment for a pre-petition debt)," yet continuing to advise Ally Bank that it is "[b]etter to have the money and fight over a preference than have an unsecured claim."); Dep. of J. Whitlinger, Aug. 3, 2012, at 99:19–105:16.

[1465] *See* Letter from T. Marano to B. Yastine (May 9, 2012) [EXAM00069159].

[1466] *Id.* at 2.

Following receipt of the May 9 letter, the parties began to draft an agreement setting forth their understanding regarding the modifications and any indemnification payments. On May 11, 2012, in reference to this agreement, Yastine told Marano "[p]er our discussion. Need to sign before signing servicing agreement."[1467] Similarly, over the weekend of May 11 to May 13, 2012, while discussing the terms of an agreement setting forth the details of the indemnity payment relating to April loan modifications, Hamzehpour mentioned that "signature pages are standing by on the [A&R] Servicing Agreement for both [GMAC Mortgage] and [Ally] Bank, so as soon as we sign off on this letter those should be able to be released."[1468] The agreement was ultimately finalized on May 13, 2012,[1469] and signature pages for the A&R Servicing Agreement were released.[1470]

This agreement stated that:

> [ResCap, GMAC Mortgage] and Ally Bank desire to clarify any misperceptions that may result from the letter dated May 9, 2012 . . . . [GMAC Mortgage] and Ally Bank have been negotiating (i) the reimbursement calculation methodology for modifications to loans in Ally Bank's mortgage portfolio, as contemplated under [the January 30 Letter Agreement], and (ii) the terms of the [A&R Servicing Agreement] . . . . The parties acknowledge that such modifications . . . are conditioned on full reimbursement to Ally Bank of all losses in accordance with the [January 30 Letter Agreement], as well as the matrix and reimbursement calculation methodology . . . that the parties have subsequently negotiated as part of the [A&R Servicing Agreement].[1471]

---

[1467] E-mail from B. Yastine to T. Marano (May 11, 2012) [EXAM20138580].

[1468] E-mail from T. Hamzehpour (May 13, 2012) [EXAM11151314].

[1469] *See* E-mail from T. Hamzehpour (May 13, 2012) [ALLY_PEO_0087330].

[1470] E-mail from H. Benton (May 13, 2012) [EXAM10346545] ("I have Barbara's signature page, and I will get the sig page to the servicing agreement so I can send both simultaneously. Assuming you're OK with the final language, can you send signature pages for both ResCap and [GMAC Mortgage] (and also for the servicing agreement) tonight?").

[1471] Agreement for AG Settlement Loan Modifications For April 2012, dated May 11, 2012 [ALLY_PEO_0087335].

The agreement further provided that:

> The parties acknowledge that the respective managements of
> Ally Bank and ResCap appear to have differing viewpoints
> concerning the outcome of discussions and negotiations with
> respect to the timing and commencement of the modification
> activity contemplated by the [January 30 Letter Agreement].
> Nevertheless, based on both (i) the acknowledgements and the
> agreements of Ally Bank, ResCap and [GMAC Mortgage]
> above and (ii) the payments to Ally Bank, both made and to be
> made in accordance with, and subject to, numbered paragraph 4
> above, the parties agree that ResCap and [GMAC Mortgage]
> will have provided the requisite reimbursement to Ally Bank for
> losses in connection with the April Modifications.[1472]

This agreement was intended to clarify the understanding between the parties that
modifications were permitted to commence prior to the execution of the A&R Servicing
Agreement.[1473] There is no evidence to indicate that the ResCap or GMAC Mortgage Board
formally approved this agreement or the payments.[1474]

### e. The Debtors And AFI Dispute Existence Of Cap On Indemnity Obligations

#### (1) Revised Estimation Of Indemnification Obligations

Immediately prior to the Petition Date, ResCap and GMAC Mortgage realized that their
estimate of Ally Bank's losses related to loan modifications, and thus ResCap and GMAC

---

[1472] *Id.* at ALLY_PEO_0087337.

[1473] *See* Int. of T. Marano, Feb. 27, 2013, at 93:5–14.

> I believe that the problem that [Yastine] was trying to address is that we had begun the
> modifications before the new subservicing agreement had been negotiated — or had been
> signed . . . . However, there were verbal understandings that we were going to be servicing under
> that agreement. And we were interested in doing the modifications as quickly as possible in order to
> facilitate as much credit as possible from the DOJ/AG monitor.

[1474] Whitlinger stated that he and Marano discussed the payments, particularly in light of discussions of whether
this payment might have been considered a preferential transfer. *See* Dep. of J. Whitlinger, Aug. 3, 2012, at
106:13–109:19. However, no evidence demonstrates explicit Board approval by either ResCap or GMAC
Mortgage.

Mortgage's indemnification obligations, was going to be inadequate.[1475] In an e-mail to Carpenter, Brown, and Whitlinger, Marano states that "the take up rate on mod offers is more than 2X what we modeled. . . . ResCap may need to make additional payments of between $70 and $120mm to [Ally Bank] if our revised projections pan out."[1476] There were a number of different revised estimates discussed at the time.[1477]

The updated estimates raised several issues. One of the most important considerations was "whether [Ally Bank] should approve [ResCap and GMAC Mortgage] moving beyond [Ally Bank's] $75 million speed bump given our view of reimbursement."[1478] This refers to the "speed bump" limitation set forth in section 10.01(f) of the A&R Servicing Agreement.[1479] At the time, Ally Bank was considering a proposal to raise that limitation.[1480] ResCap and GMAC Mortgage were concerned about their ability to indemnify Ally Bank because of liquidity concerns.[1481]

---

[1475] In response to a question of why ResCap's and GMAC Mortgage's projections regarding the indemnity obligation were "much lower" in January 2012 than they were in early May 2012, Whitlinger explained that when ResCap and GMAC Mortgage entered into the January 30 Letter Agreement, they had no experience in this area and could only make rough estimates as to what the indemnity obligation might be. *See* Dep. of J. Whitlinger, Aug. 3, 2012, at 117:4–19 ("In January we hadn't even rolled out a solicitation program, so there has [sic] been no experience in the industry on what this DOJ settlement, and the modification program, could be. So in January we had estimates on what the [pull] through rates of borrowers being in the program could be.").

[1476] E-mail from T. Marano (May 12, 2012) [EXAM11027183].

[1477] *See* E-mail from C. Dondzila (May 22, 2012) [EXAM10418886] (estimating "an additional accrual of $90 million"); E-mail from J. Ruhlin (May 25, 2012), at EXAM10345055 [EXAM10345054] (estimating "$65M to fund those bank payments").

[1478] E-mail from J. Young (May 31, 2012) [ALLY_0197143].

[1479] *See* A&R Servicing Agreement, § 10.01(f) [ALLY_0114469] ("In no case shall the Servicer evaluate additional Portfolio Loans for actions pursuant to the AG Menu Items in the month following the month in which indemnification payments to the Owner pursuant to subsection (e) above exceed $75,000,000 in the aggregate. . . . If the Servicer desires to perform modifications or other loss mitigation activities resulting in indemnification payments to the Owner in excess of . . . $75,000,000, then the Owner and the Servicer will agree to discuss the terms on which such additional loss mitigation activities could proceed.").

[1480] *See* E-mail from B. Yastine (May 31, 2012) [ALLY_0197143] ("As for $75 million, I think we should propose we raise limit to $150mm, based on revised requirements in final DOJ settlement and Rescap's new estimate.").

[1481] *See* Int. of J. Whitlinger, Feb. 27, 2013, at 213:6–14 ("And then the pull-through started getting so much higher and more people were converting on the bank's portfolio is when we said, 'Whoa, whoa. Wait a minute. Time-out. We don't have the liquidity to pay for that.' And once we earned 200, we didn't have to pay for it. And that's when the disagreements happened . . . .").

*(2) ResCap And GMAC Mortgage Notify Ally Bank That Cumulative Indemnification Payments Are Nearing $75 Million*

On June 20, 2012, Marano wrote a letter to Carpenter notifying Ally Bank that "we are approaching cumulative indemnification payments of $75 million . . . . Additionally, at this point we have earned in excess of $200 million of credits as a result of mitigation, remediation or other financial accommodation to mortgage loan borrowers."[1482] The letter went on to state that:

> Pursuant to the terms of both the [January 30 Letter Agreement] and the [A&R Servicing Agreement], we do not intend to perform any further solicitations for programs under the Consumer Relief provisions of the Settlement on eligible loans in the Ally Bank portfolio until the terms on which such additional loss mitigation activities could proceed have been agreed.[1483]

On the same day, Pensabene wrote a similar letter to Craig Evans, with some subtle differences.[1484] First, the letter stated that "[ResCap and GMAC Mortgage] fully expect to make further indemnification payments to Ally Bank related to any currently outstanding solicitations on Ally Bank owned assets."[1485] Second, this letter did not mention having earned soft credits in excess of $200 million. This second distinction was immediately noted by Ally Bank.[1486]

---

[1482] Letter from T. Marano to M. Carpenter (June 20, 2012) [EXAM10421722].

[1483] *Id.*

[1484] Letter from J. Pensabene to C. Evans (June 20, 2012) [ALLY_0197307]. The Pensabene letter generally stated ResCap had reimbursed Ally Bank roughly $70 million, and that GMAC Mortgage and ResCap would like to discuss the terms on which such additional loss mitigation activities could proceed.

[1485] *Id.*

[1486] E-mail from J. Young to B. Yastine (June 20, 2012) [ALLY_0197305] (while comparing the two letters, Young stated: "[s]o, appears [ResCap and GMAC Mortgage] have stopped solicitations, but will honor outstanding solicitations. Also, appropriately, no mention in this letter of the $200 million.").

### *(3) The Parties Frame Their Indemnity Dispute*

In early July, Ray Schrock of Kirkland & Ellis wrote a letter to Larren Nashelsky of Morrison & Foerster setting forth AFI's and Ally Bank's combined position with respect to the January 30 Letter Agreement, the A&R Servicing Agreement, and the indemnity payments thereunder.[1487] Schrock stated that during a telephone conversation on June 27, 2012, ResCap and GMAC Mortgage took the position that GMAC Mortgage would "no longer issue any further reimbursements to Ally Bank under the [A&R Servicing Agreement] for loan modifications . . . based upon the [January 30 Letter Agreement] . . . and ResCap's and [GMAC Mortgage's] assertion that they have earned more than $200 million in 'soft dollar credits' under the DOJ/AG Settlement."[1488]

Schrock argued that such position was wholly inconsistent with the terms of the A&R Servicing Agreement and the parties' business discussions.[1489] The letter goes on to restate the indemnity provisions of the A&R Servicing Agreement, asserting that "[t]he [A&R Servicing Agreement] does not contain any limitation on [GMAC Mortgage's] indemnity obligation relating to 'soft dollar credits' earned under the DOJ/AG Settlement and is the 'entire agreement' between the parties as set forth in Section 12.03 of the [A&R Servicing Agreement]."[1490]

In a footnote, Schrock noted that even though the terms of the A&R Servicing Agreement are clear, the reimbursement obligation of the A&R Servicing Agreement is consistent with the January 30 Letter Agreement. He stated that the limitation of reimbursements to AFI and Ally Bank contained in paragraph 5 of the January 30 Letter Agreement once ResCap and GMAC Mortgage have affected the required hard dollar payments and have earned $200 million in "soft dollar credits" applies only to the obligation in paragraph 5. Instead, GMAC Mortgage's obligations to reimburse Ally Bank for its use of Ally Bank's loans to obtain the "soft dollar credits" was contemplated in paragraph 7 of the January 30 Letter Agreement, which contains no dollar limit.[1491]

Finally, Schrock acknowledged that the A&R Servicing Agreement provides that GMAC Mortgage shall cease soliciting Ally Bank loans for modification in the month after it has paid $75 million in reimbursements until GMAC Mortgage and Ally Bank can agree on terms on which additional loss mitigation activities can proceed, and that ResCap and GMAC Mortgage provided notification that this threshold may be crossed in the month of June in their June 20 letters.[1492]

---

[1487] Letter from R. Schrock to L. Nashelsky (July 2, 2012) [ALLY_0226606].

[1488] *Id.* at 1.

[1489] *Id.*

[1490] *Id*. at 1–2.

[1491] *Id*. at 2.

[1492] *Id*. at 2–3.

Nashelsky responded a week later.[1493] In his letter, Nashelsky stated that GMAC Mortgage disagrees with AFI's and Ally Bank's statements that ResCap and GMAC Mortgage were obligated to make further indemnity payments under the A&R Servicing Agreement.[1494] Nashelsky argued that "[t]he [January 30 Letter Agreement] capped the Debtors' reimbursement obligations to AFI <u>and</u> Ally Bank once the Debtors had made the $110 million cash payment and earned $200 million in Soft Dollar Credits . . . ."[1495] Nashelsky further asserted that:

> [C]ontrary to your suggestion that referring to the [January 30 Letter Agreement] constitutes improper reliance on extrinsic evidence, the [January 30 Letter Agreement] and the [A&R Servicing Agreement cannot be interpreted independently of each other. Importantly, nothing in the Servicing Agreement between the Debtors and Ally Bank modifies or eliminates the Reimbursement Cap contemplated under the [January 30 Letter Agreement] . . . and the course of dealing between the Debtors on the one hand, and AFI and Ally Bank on the other . . . .[1496]

Nashelsky went on to assert that "it is clear that the reference to the Reimbursement Cap in paragraph 5 of the [January 30 Letter Agreement] was intended to apply not just to direct settlement costs but also to the Indemnification Obligations."[1497] Based on this interpretation, and AFI's responsibility to indemnify Ally Bank pursuant to other agreements, Nashelsky argued that further indemnification payments are AFI's responsibility.[1498]

---

[1493] Letter from L. Nashelsky to R. Schrock (July 9, 2012) (attached to Declaration of Thomas Marano, Chief Executive Officer of Residential Capital, LLC, in Further Support of Debtors' Ally Servicing Motion [Docket No. 793-1] at Ex. 7).

[1494] *See id.*

[1495] *Id.* at 2 (emphasis in original).

[1496] *Id.*

[1497] *Id.* at 7.

[1498] *Id.* at 4, 7.

Although not necessarily germane to the indemnity cap dispute, Nashelsky highlighted another issue: that "the Debtors may have improperly paid Ally Bank approximately $12.9 million on account of a pre-petition general unsecured claim without Bankruptcy Court authorization."[1499]

### 3.  Motion Practice With Regard To PwC Fee Issue

#### a.  The Debtors File The PwC Compensation Motion

The requirements and obligations imposed under the FRB/FDIC Consent Order did not cease upon the Debtors' bankruptcy. Accordingly, on September 9, 2012, the Debtors sought to invoke the authority granted to them by the Court in the GA Servicing Order [Docket No. 401][1500] and continue their compliance with the FRB/FDIC Consent Order postpetition, including compensating PwC, by filing the Debtors' Motion for Entry of an Order Under Bankruptcy Code Section 363 and Bankruptcy Rule 6004 (I) Authorizing the Debtors to Compensate PricewaterhouseCoopers, LLP for Foreclosure Review Services in Furtherance of

---

[1499] *Id.* at 3. This issue has been highlighted by the parties at several junctures. The Committee noted that "Judge Peck's interim approval order was relied on as purported authority to make a $19.9 million postpetition indemnification payment to Ally Bank (including $13 million relating to *prepetition* loan modifications) . . . ." Statement of the Official Committee of Unsecured Creditors Regarding the Debtors' Motion for an Order Authorizing the Debtors to Continue to Perform Under the Ally Bank Servicing Agreement in the Ordinary Course [Docket No. 1280] at 6 (emphasis in original). In the stipulation reserving the parties' rights with respect to the indemnity dispute, the parties stated that "[t]his Stipulation's authorization for the Debtors to make the payments under the Indemnification Obligation shall not constitute a determination that . . . the Debtors' $19.9 million postpetition payment to Ally Bank was or was not authorized by the Interim Order, . . ." Notice of Presentment of Stipulation and Proposed Order Reserving Rights with Respect to Debtors' Motion for Interim and Final Orders Under Bankruptcy Code Sections 105(a) and 363 Authorizing the Debtors to Continue to Perform Under the Ally Bank Servicing Agreement in the Ordinary Course of Business [Docket No. 1275] at 14. The Interim Order was silent on whether the Debtors were authorized to make such payment, providing only that "[t]he Debtors are authorized and directed to continue to perform under the terms of the [A&R] Servicing Agreement . . . ." Interim Order Pursuant to Sections 105(A) and 363 of the Bankruptcy Code Authorizing the Debtors to Continue to Perform Under the Ally Bank Servicing Agreement in the Ordinary Course of Business [Docket No. 90] at 2. Notably, however, the related motion expressly stated that the Debtors "are not seeking to pay any prepetition claims through or pursuant to the [A&R] Servicing Agreement." Debtors' Motion for Interim and Final Orders Under Bankruptcy Code Sections 105(A) and 363Authorizing the Debtors to Continue to Perform Under the Ally Bank Servicing Agreement in the Ordinary Course of Business [Docket No. 47] at 15.

[1500] On June 15, 2012, the Court entered an order granting the Debtors' GA Servicing Motion, which authorized the Debtors to continue their compliance with the terms of the FRB/FDIC Consent Order, including using estate assets to compensate PwC. *See* Order (I) Authorizing the Debtors to continue in the Ordinary Course of Business (A) Servicing Governmental Association Loans and (B) Foreclosure Activities Related to Certain Real Estate Owned by Fannie Mae, Freddie Mac, and Ginnie Mae; (II) authorizing the Debtors to Pay Certain Prepetition Amounts Due to Critical Servicing Vendors and Foreclosure Professionals; (III) Granting Limited Stay Relief to Enable Borrowers to Assert Direct Claims and Related Counter-Claims in Foreclosure and Eviction Proceedings; (IV) Authorizing the Debtors to Use Cash Collateral Under the Fannie Mae EAF Facility; and (V) Granting related Relief [Docket No. 401] (the "GA Servicing Order").

the Debtors' Compliance Obligations Under Federal Reserve Board Consent Order and (II) Reaffirming Relief Granting in the GA Servicing Order [Docket No. 1357] (the "PwC Compensation Motion").

The PwC Compensation Motion asked the Court to enter an order: (1) allowing the Debtors to compensate PwC for all obligations under the PwC Engagement Letter for services rendered in connection with the Foreclosure Review; (2) authorizing the Debtors to comply with the terms of the PWC Engagement Letter; and (3) reaffirming the relief granted in the GA Servicing Order with respect to compliance with the FRB Consent Order, the DOJ/AG Settlement and the CMP Order.[1501]

The Debtors asserted that continuing to pay PwC was necessary and appropriate to ensure compliance with the terms of the FRB/FDIC Consent Order, and was appropriate under Bankruptcy Code section 363, given PwC's role and the fact that its retention occurred prior to and not in connection with the commencement of the Chapter 11 proceedings.[1502] Further, the Debtors argued that failure to comply could lead to additional delays in foreclosures, possible monetary fines imposed by the FRB, and violations of the Debtors' DIP Facility with AFI.[1503]

### b. The Creditors' Committee And Wilmington Trust File Objections To The Motion

The Creditors' Committee filed an objection to the PwC Compensation Motion on September 19, 2012, stating that continuing to pay PwC for the Foreclosure Review was not in the best interest of the Debtors' estate because the Debtors did not provide a valid business justification. The Creditors' Committee cited: (1) the added scrutiny warranted by the magnitude of the foreclosure obligations;[1504] (2) the severe impact the amounts expended would have on distributions to other creditors;[1505] and (3) the fact that the amounts to be spent on the review greatly outweighed the possible remediation liabilities to be uncovered or the potential penalties that might be assessed by government regulators.[1506] Further, to the extent the Court required the Debtors to continue complying with the terms of the FRB/FDIC

---

[1501] *See* PwC Compensation Motion [Docket No. 1357] at 7. The Debtors further proposed to continue to preserve any and all claims or causes of action the Debtors or any other party in interest may have against AFI for past or future costs of compliance with the FRB/FDIC Consent Order. *Id.*

[1502] *Id*. at 9–10, 18–21.

[1503] *Id*. at 10, 18.

[1504] *See* Omnibus Objection of the Official Committee of Unsecured Creditors to (A) The Debtors' Motion for Entry of an Order Under Bankruptcy Code Section 363 and Bankruptcy Rule 6004 (I) Authorizing the Debtors to Compensate PricewaterhouseCoopers, LLP for Foreclosure Review Services in Furtherance of the Debtors' Compliance Obligations Under Federal Reserve Board Consent Order and (II) Reaffirming Relief Granted in the GA Servicing Order [Docket No. 1493] at 3–4, 10.

[1505] *See id*. at 3–4.

[1506] *See id*. at 4, 11–12.

Consent Order, the Creditors' Committee argued that the costs of the Foreclosure Review should be allocated not to the Debtors, but to AFI, a solvent co-obligor, jointly and severally liable under the FRB/FDIC Consent Order.[1507]

Wilmington Trust also filed an objection to the PwC Compensation Motion. Wilmington Trust asserted that: (1) AFI—a solvent entity—should bear the responsibility for compensating PwC under a contractual obligation for which it was jointly and severally liable;[1508] (2) AFI improperly exerted its influence over the Debtors to impose on ResCap the added responsibilities of managing the Foreclosure Review and compensating PwC; and (3) legal responsibility for the costs lay not upon ResCap but rather only upon GMAC Mortgage and AFI.[1509]

### c. Court Proceedings

Following the initial hearing on the PwC Compensation Motion, the Debtors and Creditors' Committee engaged in negotiations to resolve the concerns the Creditors' Committee expressed in its omnibus objection and at the initial hearing.[1510] Both parties ultimately agreed upon a proposal for a 90-day interim order granting the PwC Compensation Motion on an interim basis, which would allow the Debtors to continue to use estate funds to compensate PwC in accordance with the terms of the PwC Engagement Letter and the FRB/FDIC Consent Order and comply in all respects with the FRB/FDIC Consent Order up until a

---

[1507] *See id.* at 1–2, 4, 14–18.

[1508] *See* Limited Objection of Wilmington Trust, National Association to Debtors' Motion for Entry of an Order (I) Authorizing Debtors to Compensate PricewaterhouseCoopers, LLP for Foreclosure Review Services and (II) Reaffirming Relief Granted in the GA Servicing Order [Docket No. 1465] at 1–2, 5–6.

[1509] *See id.* at 3, 6–7.

[1510] *See, e.g.*, Debtors' Statement in Further Support of (A) Debtors' Motion for an Order (I) To Compensate PricewaterhouseCoopers, LLP for Foreclosure Review Services and (II) Reaffirming Relief Granting in the GA Servicing Order (B) Debtors' Application to Employ and Retain Hudson Cook, LLP as Special Counsel, and (C) Debtors' Application to Employ and Retain Pepper Hamilton LLP as Special Foreclosure Review Counsel for Bankruptcy Issues [Docket No. 1749] at 2–3; Supplemental Objection of the Official Committee of Unsecured Creditors to (A) the Debtors' Motion for Entry of an Order Under Bankruptcy Code Section 363 and Bankruptcy Rule 6004 (I) Authorizing the Debtors to Compensate PricewaterhouseCoopers, LLP for Foreclosure Review Services in Furtherance of the Debtors' Compliance Obligations Under Federal Reserve Board Consent Order and (II) Reaffirming Relief Granted in the GA Servicing Order, (B) Pepper Hamilton Retention Application, and (C) Hudson Cook Retention Application [Docket No. 1725] at 3–4.

final order decided the matter.[1511] On October 11, 2012, Judge Glenn entered an order approving the PwC Compensation Motion on an interim basis through and including January 14, 2013,[1512] which was extended through the final hearing date on this issue (currently May 14, 2013).[1513]

_____

[1511] *See* Debtors' Statement in Further Support of (A) Debtors' Motion for an Order (I) To Compensate PricewaterhouseCoopers, LLP for Foreclosure Review Services and (II) Reaffirming Relief Granting in the GA Servicing Order (B) Debtors' Application to Employ and Retain Hudson Cook, LLP as Special Counsel, and (C) Debtors' Application to Employ and Retain Pepper Hamilton LLP as Special Foreclosure Review Counsel for Bankruptcy Issues [Docket No. 1749] at 2–3; Supplemental Objection of the Official Committee of Unsecured Creditors to (A) the Debtors' Motion for Entry of an Order Under Bankruptcy Code Section 363 and Bankruptcy Rule 6004 (I) Authorizing the Debtors to Compensate PricewaterhouseCoopers, LLP for Foreclosure Review Services in Furtherance of the Debtors' Compliance Obligations Under Federal Reserve Board Consent Order and (II) Reaffirming Relief Granted in the GA Servicing Order, (B) Pepper Hamilton Retention Application, and (C) Hudson Cook Retention Application [Docket No. 1725] at 2.

[1512] *See* Interim Order signed on 10/11/2012 Under Bankruptcy Code Section 363 and Bankruptcy Rule 6004 (I) Authorizing the Debtors to Compensate PricewaterhouseCoopers, LLP for Foreclosure Review Services in Furtherance of the Debtors' Compliance Obligations Under Federal Reserve Board Consent Order and (II) Reaffirming Relief Granting in the GA Servicing Order [Docket No. 1799] at 3, 7.

[1513] On January 13, 2013, the Court entered a second order approving the Motion on a further interim basis through and including February 28, 2013. *See* second Interim Order Under Bankruptcy Code Section 363 and Bankruptcy Rule 6004 (I) Authorizing the Debtors to Compensate PricewaterhouseCoopers, LLP for Foreclosure Review Services in Furtherance of the Debtors' Compliance Obligations Under Federal Reserve Board Consent Order and (II) Reaffirming Relief Granting in the GA Servicing Order [Docket No. 2622] at 3, 7. On February 28, 2013, the Court entered a third order approving the Motion on a further interim basis through and including March 21, 2013. *See* Third Interim Order Signed on 2/28/2013 (I) Authorizing the Debtors to Compensate PricewaterhouseCoopers, LLP for Foreclosure Review Services in Furtherance of the Debtors' Compliance Obligations Under Federal Reserve Board Consent Order and (II) Reaffirming Relief Granting in the GA Servicing Order [Docket No. 3062] at 3, 7. On March 21, 2013, the Court entered a fourth order approving the Motion on an interim basis through and including April 11, 2013. *See* Fourth Interim Order Signed on 3/21/2013 (I) Authorizing the Debtors to Compensate PricewaterhouseCoopers, LLP for Foreclosure Review Services in Furtherance of the Debtors' Compliance Obligations Under Federal Reserve Board Consent Order and (II) Reaffirming Relief Granting in the GA Servicing Order [Docket No. 3290] at 3, 7. On April 11, 2013, the Court entered a fourth order approving the Motion on an interim basis through and including April 30, 2013. *See* Fifth Interim Order Signed on 4/12/2013 (I) Authorizing the Debtors to Compensate PricewaterhouseCoopers, LLP for Foreclosure Review Services in Furtherance of the Debtors' Compliance Obligations Under Federal Reserve Board Consent Order and (II) Reaffirming Relief Granting in the GA Servicing Order [Docket No. 3425] at 3, 7. On April 29, 2013, the Court entered a sixth order approving the Motion on an interim basis through and including May 14, 2013. *See* Sixth Interim Order Signed on 4/29/2013 (I) Authorizing the Debtors to Compensate PricewaterhouseCoopers, LLP for Foreclosure Review Services in Furtherance of the Debtors' Compliance Obligations Under Federal Reserve Board Consent Order and (II) Reaffirming Relief Granting in the GA Servicing Order [Docket No. 3543] at 3, 7.

### 4.  Motion Practice With Regards To Foreclosure Review

#### a.  The Debtors File The FRB Unsecured Claim Motion

On January 7, 2013, the FRB announced a resolution of foreclosure review requirements contained in consent orders with ten major mortgage servicers that now requires banks to pay lump sums into a settlement fund instead of continuing the expensive foreclosure review process.[1514] Ally Bank and ResCap were not part of these resolutions. However, in light of this settlement, on February 27, 2013, the Debtors filed a motion seeking entry of an order, pursuant to Bankruptcy Code section 362(a) and Bankruptcy Rule 3013, determining that: (1) GMAC Mortgage's obligation to conduct the Foreclosure Review constitutes a general unsecured claim for purposes of any chapter 11 plan proposed in the Debtors' chapter 11 cases; and (2) the automatic stay applies to prevent the FRB, FDIC, and other Government Entities from taking any action to enforce GMAC Mortgage's obligation to continue conducting the Foreclosure Review (the "FRB Unsecured Claim Motion").[1515]

The Debtors noted in the motion that GMAC Mortgage's Foreclosure Review obligation "can easily be quantified, can be satisfied by an alternative 'right to payment,' and represents a general unsecured claim against the Debtors."[1516] Further, the Debtors argued because the Foreclosure Review obligation is an unsecured claim, the FRB and FDIC (the holders of the claim) may not seek to enforce that claim outside of the bankruptcy process.[1517]

#### b.  AFI And The FRB File Objections To The FRB Unsecured Claim Motion

AFI and the FRB filed objections to the FRB Unsecured Claim Motion. The objections argued similar points, namely that: (1) the Debtors' obligation to conduct the Foreclosure Review is not a claim under section 101(5) of the Bankruptcy Code;[1518] and (2) any action by the FRB to enforce the Debtors' obligation fits within the police or regulatory powers

---

[1514] FRB/OCC, Joint Press Release, *Independent Foreclosure Review to Provide $3.3 Billion in Payments, $5.2 Billion in Mortgage Assistance* (Jan. 7, 2013), http://www.federalreserve.gov/newsevents/press/bcreg/20130107a.htm; *see also* FRB Unsecured Claim Motion [Docket No. 3055] at 9–10.

[1515] *See* FRB Unsecured Claim Motion [Docket No. 3055] at 10 (though not explicitly stated, arguably the implications of the requested relief would be for ResCap and GMAC Mortgage to cease all payments to PwC with respect to the PwC Engagement Letter).

[1516] *See id*. at 1–2.

[1517] *See id*. at 3.

[1518] *See* Objection to Motion of Debtors Pursuant to Bankruptcy Rule 3013 and Bankruptcy Code Section 362(a) for a Determination That (I) GMAC Mortgage's FRB Foreclosure Review Obligation Is a General Unsecured Claim and (II) The Automatic Stay Prevents Enforcement of the FRB Foreclosure Review Obligation [Docket No. 3149] at 1–2, 6–7; *See* Ally Financial Inc.'s Objection to Debtors' Motion for a Determination that (I) GMAC Mortgage's FRB Foreclosure Review Obligation is a General Unsecured Claim and (II) the Automatic Stay Prevents Enforcement of the FRB Foreclosure Review Obligations [Docket No. 3150] at 14–15, 17–18.

exception from the automatic stay.[1519] Additionally, AFI argued that: (1) the Debtors are equitably estopped from avoiding compliance with, or enforcement of, their obligations under the FRB/FDIC Consent Order;[1520] (2) all costs of compliance with the FRB/FDIC Consent Order, including the Foreclosure Review, are entitled to administrative expense priority;[1521] and (3) the motion is procedurally improper and requires an adversary proceeding.[1522]

### c. Wilmington Trust Files A Statement In Support Of And Limited Objection To The Motion

Wilmington Trust filed a statement in support, and limited objection to, the FRB Unsecured Claim Motion. Unlike AFI and the FRB, Wilmington Trust supported a determination that the Foreclosure Review obligation and any subsequent remediation be treated as an unsecured prepetition claim against GMAC Mortgage, as such obligations do not qualify as an administrative expense under section 503(b) of the Bankruptcy Code and are not otherwise entitled to priority under section 507 of the Bankruptcy Code.[1523] However, Wilmington Trust argued that the Debtors' proposed order is unclear in that its language imposes the obligation at issue under the Motion against the Debtors, while only GMAC Mortgage, not ResCap is responsible for the obligations arising under the FRB/FDIC Consent Order.[1524] Wilmington Trust accordingly requested that any relief granted under the motion make clear that no claim is being allowed against ResCap absent substantive consolidation.[1525]

### d. The Debtors And Creditors' Committee File Replies In Support Of The FRB Unsecured Claim Motion

On March 19, 2013, the Debtors filed an omnibus reply in further support of the FRB Unsecured Claim Motion. The Debtors asserted that they are not requesting the Bankruptcy Court to convert, or otherwise modify or alter, the Foreclosure Review or FRB/FDIC Consent Order, but rather reclassify it.[1526] As such, the Debtors argue primarily that the Foreclosure

---

[1519] *See id.* at 11–12.

[1520] *See* Ally Financial Inc.'s Objection to Debtors' Motion for a Determination that (I) GMAC Mortgage's FRB Foreclosure Review Obligation is a General Unsecured Claim and (II) the Automatic Stay Prevents Enforcement of the FRB Foreclosure Review Obligations [Docket No. 3150] at 19–20.

[1521] *See id.* at 22–24.

[1522] *See id.* at 24–25.

[1523] *See* Statement in Support of and Limited Objection to Debtors' Motion Pursuant to Bankruptcy Rule 3013 and Bankruptcy Code Section 362(a) for a Determination that (I) GMAC Mortgage's FRB Foreclosure Review Obligation Is a General Unsecured Claim and (II) the Automatic Stay Prevents Enforcement of the FRB Foreclosure Review Obligation [Docket No. 3139] at 2–3.

[1524] *See id.* at 3–4.

[1525] *See id.* at 4.

[1526] *See* Debtors' Omnibus Reply in Further Support of Motion Pursuant to Bankruptcy Rule 3013 and Bankruptcy Code Section 362(a) for a Determination that (I) GMAC Mortgages FRB Foreclosure Review Obligations is a General Unsecured Claim and (II) The Automatic Stay Prevents Enforcement of the FRB Foreclosure Review Obligation [Docket No. 3242] at 5–6.

Review obligation is retrospective and represents a general unsecured claim for the following reasons: (1) the review is a bankruptcy claim, not an administrative expense, by operation of law because it was aimed solely at remedying allegedly wrongful past conduct and the FRB has an alternative right to payment which it can (and has) asserted under 12 U.S.C. § 1818; [1527] (2) the Ocwen Platform Asset Purchase Agreement and Ocwen Sale Order [Docket No. 2246][1528] do not alter the nature of the claim;[1529] and (iii) the ongoing expenses associated with the review do not represent "actual, necessary costs or expenses of preserving the estate" and are thus not entitled to administrative expense priority.[1530]

Further, the Debtors argued that: (1) 12 U.S.C. § 1818(i) does not deprive the Bankruptcy Court of jurisdiction to determine the classification of a claim;[1531] (2) the police and regulatory exception to the automatic stay does not apply to any efforts by the FRB or other Government Entities to enforce the general unsecured Foreclosure Review obligation;[1532] and (3) the FRB Unsecured Claim Motion is procedurally proper in that the Bankruptcy Court is permitted under Bankruptcy Code Rule 3013 to make a determination regarding the appropriate classification of a claim under the Bankruptcy Code, and is otherwise authorized to enforce the automatic stay.[1533]

The Debtors also submitted a Supplemental Declaration of Thomas Marano as Exhibit 1 to the omnibus reply. The Declaration summarized the ongoing negotiations between the Debtors and the FRB regarding the Foreclosure Review, and stated that the Debtors were offered a lump-sum settlement similar in form to the settlements entered between the FRB and ten major non-debtor mortgage servicers on January 7, 2013.[1534]

--------------------------------------------------

[1527] *See id*. at 6–9.

[1528] Order Under 11 U.S.C. §§ 105, 363, and 365 and Fed. Bankr. P. 2002, 6004, 6006, and 9014 (I) Approving (A) Sale of Debtors' Assets Pursuant to Asset Purchase Agreement With Ocwen Loan Servicing, LLC; (B) Sale of Purchased Assets Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (C) Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Thereto; (D) Related Agreements; and (II) Granting Related Relief Platform Sale [Docket No. 2246] (the "Ocwen Sale Order").

[1529] *See* Debtors' Omnibus Reply in Further Support of Motion Pursuant to Bankruptcy Rule 3013 and Bankruptcy Code Section 362(a) for a Determination that (I) GMAC Mortgages FRB Foreclosure Review Obligations is a General Unsecured Claim and (II) The Automatic Stay Prevents Enforcement of the FRB Foreclosure Review Obligation [Docket No. 3242] at 9–10, 12.

[1530] *Id*. at 12.

[1531] *Id*. at 14–17.

[1532] *Id*. at 17.

[1533] *Id*. at 19–20.

[1534] *See* Supplemental Declaration of Thomas Marano, Chief Executive Officer of Residential Capital, LLC, in Support of Debtors' Motion Pursuant to Bankruptcy Rule 3013 and Bankruptcy Code Section 362(a) for a Determination that (I) GMAC Mortgages FRB Foreclosure Review Obligations is a General Unsecured Claim and (II) The Automatic Stay Prevents Enforcement of the FRB Foreclosure Review Obligation [Docket No. 3242-1] at 6.

In addition, on March 19, 2013, the Creditors' Committee filed a reply in support of the FRB Unsecured Claim Motion and asked the Court to authorize GMAC Mortgage to stop paying PwC for the Foreclosure Review that the government has admitted is an unnecessary and costly mistake.[1535] Further, the Creditors' Committee asserted that any claims arising from the FRB/FDIC Consent Order should be classified as general unsecured claims because all such claims relate to the investigation and remediation of prepetition conduct and any restitution to borrowers for such conduct "as pure example of payment on account of prepetition claims as exists."[1536] The two types of potential claims the Creditors' Committee explicitly addressed include: (1) restitution claims under either the existing FRB/FDIC Consent Order or an amended FRB/FDIC Consent Order; and (2) claims by AFI to recoup costs it may incur if GMAC Mortgage ceases to pay PwC for compliance with the existing FRB/FDIC Consent Order.[1537] Finally, the Creditors' Committee argued that AFI's equitable estoppel argument is meritless because there is no unfairness to AFI in the Debtors' attempting to cease paying AFI.[1538] They asserted that the Debtors properly exercised their fiduciary duties by making the FRB Unsecured Claim Motion to request relief that is in the best interest of all unsecured creditors and the Estate by avoiding the substantial waste of estate assets.[1539]

### e.  Court Proceedings

On March 21, 2013, the parties presented their arguments before Judge Glenn. At the conclusion of the hearing, Judge Glenn asked for supplemental briefs on the issues of whether: (1) restitution payments under the FRB/FDIC Consent Order are general unsecured claims; and (2) AFI would be liable for the shortfall if ResCap only paid this claim on a pro-rata basis. Judge Glenn encouraged the parties to reach an agreement on these issues, indicating that he would extend the briefing deadline if the parties made progress prior to April 5, 2013. The Debtors, Creditors' Committee, and FRB submitted supplemental briefs on April 5. The FRB Unsecured Claim Motion is still pending.

---

[1535] Reply of the Official Committee of Unsecured Creditors to the Debtors' Motion for a Determination that (I) GMAC Mortgage's FRB Foreclosure Review is a General Unsecured Claim and (II) the Automatic Stay Prevents Enforcement of the FRB Foreclosure Review Obligation [Docket No. 3245] at 4–5.

[1536] *Id.* at 3–4, 13–14.

[1537] *Id.* at 10.

[1538] *Id.* at 4, 14.

[1539] *See id.* at 17.

### 5. *Estimate Of Total Economic Impact Of Government Settlements*

As shown in Exhibit V.C.5 below, AFI and ResCap expect to incur a total of $780.8 million as a result of the government settlements. Based on current estimates ResCap is expected to incur 75% of these costs and AFI is expected to incur 25% of the total costs, as detailed below:[1540]

EXHIBIT V.C.5
**Summary of Current Allocation of Total Costs Associated with Government Settlements**
*($ in Millions)*

| Item | AFI | ResCap | Total |
|------|-----|--------|-------|
| FRB/FDIC Consent Order costs | $ - | $ 517.0 | $ 517.0 |
| CMP Order costs | N/A | N/A | N/A |
| DOJ/AG Consent Judgment costs | - | 263.8 | 263.8 |
| January 30 Letter Agreement | 196.5 | (196.5) | - |
| Total costs incurred to date and estimated future costs | $ 196.5 | $ 584.3 | $ 780.8 |
| *Percent of total* | *25%* | *75%* | *100%* |

*Source: Ally Financial Inc., Annual Report (Form 10-K) (Feb. 28, 2012), at 12; Declaration of Thomas Marano, Chief Executive Officer of Residential Capital, LLC, in Support of Debtors' Motion Pursuant to Bankruptcy Rule 3013 and Bankruptcy Code Section 362(a) for a Determination that (I) GMAC Mortgage's FRB Foreclosure Review Obligation is a General Unsecured Claim and (II) the Automatic Stay Prevents Enforcement of the FRB Foreclosure Review Obligation [Docket No. 3055-3] at 4-5; FRB Unsecured Claim Motion [Docket No. 3055] at 7; EXAM00002678; EXAM00002677; EXAM00220897; EXAM11004487; ALLY_0196290; EXAM20203413; ALLY_0402171; ALLY_0402172; ALLY_0402173; EXAM00221497; EXAM00221498; ALLY_0402174; EXAM00237710; ALLY_0402175; ALLY_0402176; ALLY_0402177; RC40020121.*

### 6. *Conclusion*

The Examiner has determined that while there may have been some problematic aspects in the allocation of these settlements between the Debtors and AFI, AFI did ultimately pay for a portion of the settlements through debt forgiveness to ResCap. In addition, ResCap received ancillary benefits from the A&R Servicing Agreement, including the opportunity to earn an estimated $24.7 million in servicing income[1541] and an arguably enhanced ability to sell the servicing platform as a going concern.[1542] Furthermore, it is beyond dispute that ResCap and its

---

[1540] As discussed in Section V.C.1.f(5), AFI recorded a reserve for 8% of the estimated DOJ/AG Settlement cost ($230 million) in late February 2012. However, no record of an actual obligation from AFI to GMAC Mortgage has been identified in the accounting records or otherwise.

[1541] *See* Joint Servicing—Ally Subservicing Agreement Presentation by Centerview, Morrison Foerster, and FTI, dated July 17, 2012, at 2–3 [RC00075960].

[1542] *See id.* at 2 ("Additionally, the loss of Ally [Bank] loans limits [ResCap's] access to potential brokerage fees from refinancings. . . . The discontinuation of the subservicing agreement would result in collateral damage to [ResCap's] servicing platform overall, which would influence potential buyers when submitting their bids for the business. . . . Rejection of the agreement would also result in distractions in transferring approximately 700K loans to Ally Bank's designated servicer.").

subsidiaries, as the mortgage servicers, were responsible for a significant portion of the actionable issues that were the subject of the FRB/FDIC Settlement and the DOJ/AG Settlement. For a full discussion of the implications of AFI's conduct in connection with the government settlements and potential claims and defenses that could be asserted in connection with that conduct, please see Sections VII.F, VII.G, and VII.H.

## D.   TAX SHARING ARRANGEMENTS AND TAX ACCOUNTING AND CLASSIFICATION ISSUES

ResCap has made and received numerous payments in respect of the income tax attributes that it generated and the tax-related accounts on ResCap's balance sheet. Most of these payments were made pursuant to tax allocation agreements for periods when ResCap was part of a consolidated federal income tax return. One payment was the LLC Conversion Dividend distributed by ResCap in the amount of the equity impact of the elimination of ResCap's tax-related accounts upon a change in ResCap's federal tax classification. To provide a basis for understanding the role of the tax allocation agreements to which ResCap was a party, this Section first provides background on how consolidated federal income tax reporting works, why tax allocation agreements are used, and what are examples of typical provisions in tax allocation agreements. Second, this Section chronologically describes the changes in ResCap's and AFI's federal tax classification and the tax allocation agreements in place between them. Third, this Section describes the drafting and approval process for each tax allocation agreement. This Section then summarizes the amounts paid under each tax allocation agreement and whether additional amounts should have been paid or will soon become due under the terms of each agreement. Finally, this Section describes the approval process for and the payment of the LLC Conversion Dividend by ResCap.

### 1.   Consolidated Tax Reporting And The Role Of Tax Allocation Agreements

Since ResCap's formation in March 2005, there have been various tax allocation agreements in place between ResCap and AFI.[1543] These tax allocation agreements created contractual rights to cash flows between ResCap and AFI regarding U.S. federal and state income taxation of the operations of ResCap and AFI. ResCap has paid significant sums to AFI pursuant to these tax allocation agreements. The tax allocation agreements relating to U.S. federal income tax liabilities and refunds were in effect for all the time periods in which ResCap was included on GM's consolidated federal income tax returns (i.e., January 1, 2005 to November 30, 2006) and AFI's consolidated federal income tax returns (i.e., November 2, 2009 to present). In addition, a tax allocation agreement relating to state income tax liabilities and refunds was in effect for the time period in which AFI was a partnership between Cerberus and GM under U.S. federal income tax law.

---

[1543] Implemented 2005 Tax Allocation Agreement, at ALLY_0178780–86 [ALLY_0178779]; Other 2005 Tax Allocation Agreement [MELZER.009035]; 2006 Tax Allocation Agreement, at ALLY_0178787–93 [ALLY_0178779]; First 2009 Tax Allocation Agreement, at RC40016379–84 [RC40016362]; Second 2009 Tax Allocation Agreement [RC00028796].