### a. Consolidated Tax Reporting

The Internal Revenue Code allows affiliated corporations meeting certain requirements to elect to file federal tax returns on a consolidated basis.[1544] A principal policy objective of this allowance is the mitigation of the distorting impact that the separate existence of affiliated corporations has on their aggregate tax liability.[1545] When the first consolidated tax return statutes were enacted by Congress in 1918, the application of the statutes was mandatory to applicable corporations, with the rationale being that "the principle of taxing as a business unit what in reality is a business unit is sound and equitable . . . ."[1546] Notwithstanding this couching of the objective in terms of equity, Congress acknowledged that "its general and permanent effect is to prevent evasion which cannot be successfully blocked in any other way."[1547]

The consolidated return rules are designed to enable affiliated groups of corporations to file substantively as if they were a single entity. This treatment, however, can provide opportunities for related parties to engage in transactions that attempt to manipulate the realization of gains and losses.[1548] The current regulations generally handle this possibility by requiring the deferral of gains and losses from intercompany transactions to prevent these transactions from "creating, accelerating, avoiding, or deferring consolidated taxable income (or consolidated tax liability)."[1549] The intent is to produce tax results that would match the results of comparable transactions between divisions of a single corporation.[1550]

The filing of consolidated returns is now elective. Notwithstanding the government's use of the consolidated return rules to prevent certain forms of tax avoidance, taxpayers can obtain valuable benefits by electing to file consolidated tax returns. The most important benefit is the ability to use the losses of one member of the consolidated group against the income of another member.[1551] This offset ability can provide entities with the flexibility to join together

---

[1544] *See* I.R.C. § 1501.

[1545] *See* ANDREW J. DUBROFF ET AL., FEDERAL INCOME TAXATION OF CORPORATIONS FILING CONSOLIDATED RETURNS § 1.01, 1–2 (2d ed. 2012).

[1546] S. REP. NO. 617, at 8–9 (1918); *see also* S. REP. NO. 960, at 13–15 (1928) ("The mere fact that by legal fiction several corporations owned by the same stockholders are separate entities should not obscure the fact that they are in reality one and the same business owned by the same individuals and operated as a unit.").

[1547] S. REP. NO. 617, at 8–9 (1918).

[1548] *See* ANDREW J. DUBROFF ET AL., FEDERAL INCOME TAXATION OF CORPORATIONS FILING CONSOLIDATED RETURNS §§ 1.01, 31.01[1], 1–2, 31–4 to 31–5 (2d ed. 2012).

[1549] Treas. Reg. § 1.1502–13(a)(1).

[1550] *See* ANDREW J. DUBROFF ET AL., FEDERAL INCOME TAXATION OF CORPORATIONS FILING CONSOLIDATED RETURNS § 31.01[1], 31–7 (2d ed. 2012).

[1551] *See id.* § 1.01, 1–2.

risky businesses and mature businesses with the expectation that tax losses may be available for current use while keeping each enterprise's exposure to liability separate by insulating the business activities under separate corporate entities.[1552]

Only "affiliated groups" can elect to file consolidated tax returns.[1553] An affiliated group is a chain of "includible corporations" that has a common parent that owns at least 80% of the stock of at least one other member in the chain and in which at least 80% of each member other than the common parent is owned directly by one or more of the other members in the chain.[1554] An affiliated group that elects to file consolidated tax returns is called a "consolidated group."[1555] The initial election to file consolidated tax returns requires all includible corporations in the affiliated group to consent to the election on Internal Revenue Service Form 1122.[1556]

The consolidated return regulations require the consolidated group to be treated as a single entity in some ways and as separate entities in other ways. The single entity approach applies in numerous respects. First, all members of the consolidated group must use the same taxable year.[1557] Second, gains and losses of all members are aggregated in determining consolidated taxable income or loss.[1558] Third, realization of gains and losses on intercompany transactions is deferred until the gain or loss can be matched with the offsetting item of the other member party to the intercompany transaction or a member, or the asset in the transaction, leaves the consolidated group.[1559] The character and source of tax items are determined on a separate group basis.[1560] The separate entity approach also applies when determining the amount and applicable accounting method of each member's tax items relating to intercompany transactions.[1561]

---

[1552] *See id.* § 1.01, 1–3.

[1553] I.R.C. § 1501.

[1554] *Id.* § 1504(a)(1).

[1555] Treas. Reg. § 1.1502–1(h).

[1556] I.R.C. § 1501; Treas. Reg. § 1.1502–75(a)(1), (b)(1); ANDREW J. DUBROFF ET AL., FEDERAL INCOME TAXATION OF CORPORATIONS FILING CONSOLIDATED RETURNS § 13.02[1][a][i], at 13–4 (2d ed. 2012).

[1557] Treas. Reg. § 1.1502–76(a).

[1558] *Id.* § 1.1501–21.

[1559] *See id.* § 1.1502–13.

[1560] *Id.* § 1.1502–13(a)(2); *see also* ANDREW J. DUBROFF ET AL., FEDERAL INCOME TAXATION OF CORPORATIONS FILING CONSOLIDATED RETURNS § 31.03[1][b], 31–26, 27 (2d ed. 2012).

[1561] *See* Treas. Reg. § 1.1502–17; ANDREW J. DUBROFF ET AL., FEDERAL INCOME TAXATION OF CORPORATIONS FILING CONSOLIDATED RETURNS § 31.03[1][b], 31-26, 27 (2d ed. 2012).

To prepare the consolidated tax return, the separate taxable income is first computed for each member of the consolidated group on a stand-alone basis with some modifications.[1562] The amount of consolidated taxable income or consolidated NOL is then determined by aggregating the separate taxable incomes and losses of all members, and then adding certain tax items that are required to be computed on a consolidated basis.[1563] Subject to certain limitations, the consolidated group is allowed to use a carryover or carryback of its members' separate NOLs from taxable years when they were not part of the consolidated group towards its available consolidated NOL deduction.[1564]

If a member leaves the consolidated group, the portion of the consolidated NOL that is attributable to the member, determined for each year by the proportion of the member's separate NOL for such year on a stand-alone basis to the consolidated NOL for such year, can be carried over for use by the departing member in a future year.[1565]

Regulations require certain methods of allocation of the consolidated tax liability among the members for tax accounting purposes. These rules are necessary to enable each member to keep track of adjustments to basis[1566] and adjustments to earnings and profits.[1567] In contrast, the consolidated return regulations do not impose any requirements on how the members of the consolidated group allocate the financial responsibility for tax liabilities and rights to tax refunds. These cash flow concerns are usually handled through tax allocation agreements.

### b. Tax Allocation Agreements

Parents and subsidiaries in consolidated groups frequently enter into tax allocation agreements to allocate the responsibilities for payments of tax liabilities and the right to receive tax refunds.[1568] The common parent of the consolidated group generally serves as a common agent for all the members of the group in making the tax payments to the IRS and receiving tax refunds.[1569] These rules, however, do not limit how the members of the group can divide the tax liabilities and refunds among themselves. A parent often will want to enter into a tax allocation agreement with a subsidiary member of the group to obtain a right as a

---

[1562] Treas. Reg. § 1.1502–12.

[1563] *Id.* §§ 1.1502–11(a), 21(e).

[1564] *Id.* § 1.1502–21(a).

[1565] *Id.* § 1.1502–21(b).

[1566] *Id.* § 1.1502–32(b).

[1567] I.R.C. § 1552; Treas. Reg. §§ 1.1502–33(d).

[1568] *See* Andrew J. Dubroff et al., Federal Income Taxation of Corporations Filing Consolidated Returns § 41.01, 41–5 (2d ed. 2012).

[1569] Treas. Reg. § 1.1502–77(a).

creditor to reimbursement for the subsidiary's share of tax liabilities because the subsidiary may have liabilities held by third-party creditors that take priority over the parent's equity position.[1570]

There are no statutory or regulatory limitations on the division of rights and responsibilities for taxes among members of consolidated groups. The consolidated return regulations mandate allocations of tax liability for purposes of determining adjustments to earnings and profits and tax basis but are irrelevant in determining cash flow rights.[1571]

The terms of tax allocation agreements vary widely. Often, a subsidiary will be required to pay a parent for the amount of the subsidiary's stand-alone positive tax liability. As for the subsidiary's right to receive a payment, a typical arrangement would have the parent pay to the subsidiary an amount equal to the tax savings attributable to a tax benefit generated by the subsidiary that the parent was able to use.[1572] A variation on this theme could also take into account whether the subsidiary would be able to use the tax benefit on a stand-alone basis; the amount of the payment could be reduced if it appears unlikely that the subsidiary will be able to use the tax benefit on a stand-alone basis in the future.[1573] Similarly, the agreement could provide that the parent's payment to the subsidiary for a tax benefit currently used by the parent would be postponed until a year when the subsidiary would have been able to use the tax benefit on a stand-alone basis.[1574] Another fairly common arrangement is to treat the subsidiary as a stand-alone taxpayer for all purposes. Thus, if the subsidiary would be entitled to a tax refund on a stand-alone basis, the parent would pay an amount equal to such tax refund to the subsidiary even if the parent cannot use the subsidiary's tax benefits in the current year.

Generally, business entities are classified as either corporations or pass-through entities under federal income tax law.[1575] A pass-through entity with a single owner is called a disregarded entity because it is treated as a branch or division of its owner rather than as a separate taxable entity from its owner.[1576] Nevertheless, a disregarded entity is a separate legal entity for non-tax purposes. A pass-through entity with multiple owners is treated as a partnership for tax purposes.[1577] Business entities that are not required to be classified as corporations for federal income tax purposes, which include limited liability companies, can

---

[1570] *See* ANDREW J. DUBROFF ET AL., FEDERAL INCOME TAXATION OF CORPORATIONS FILING CONSOLIDATED RETURNS § 71.02[4], 71–195 (2d ed. 2012).

[1571] *See id.* § 71.02[4][a], 71–195.

[1572] *See id.* § 41.01, 41–5 n.9.

[1573] *Id.*

[1574] *Id.*

[1575] *See* Treas. Reg. § 301.7701–2(a).

[1576] *Id.*

[1577] *Id.*

elect to be treated as either corporations or pass-through entities.[1578] The default classification for such business entities that are organized in the U.S. is to be treated as pass-through entities.[1579] Thus, a single-member limited liability company is treated as a disregarded entity unless it elects to be taxed as a corporation. As noted above, the parent may want to be reimbursed for taxes it pays on the disregarded entity's income. Further, there may be different lending groups at the parent and disregarded entity levels who want the parent and disregarded entity to agree to a specific tax arrangement. There is no reason why a disregarded entity for federal income tax purposes cannot enter into a tax allocation agreement with its owner. In lieu of a tax allocation agreement, distributions by the disregarded entity to its owner of its stand-alone tax liability are not unusual.

## 2.  ResCap Tax Sharing Arrangements

### a.  Chronology Of ResCap's Tax Classification And Tax Allocation Agreements

ResCap was first incorporated as a Delaware corporation on August 20, 2004,[1580] but it did not begin conducting operations until subsidiaries were transferred to it in March 2005.[1581] From March 2005 through November 30, 2006, ResCap was included in the GM consolidated federal income tax return.[1582] The Implemented 2005 Tax Allocation Agreement between AFI and ResCap was in effect for this period.[1583] Entry into the tax allocation agreement was required under the 2005 Operating Agreement, dated June 24, 2005,[1584] and the Implemented 2005 Tax Allocation Agreement was executed on that same date.[1585] Despite ResCap having no operations until March 2005, the Implemented 2005 Tax Allocation Agreement was made effective as of January 1, 2005, because GM's tax department believed splitting up the 2005

---

[1578] *Id.* § 301.7701–3(a).

[1579] *Id.* § 301.7701–3(b)(1).

[1580] *See* Certificate of Conversion to Limited Liability Company of Residential Capital Corporation to Residential Capital, LLC, dated Oct. 24, 2006, at ALLY_0003762 [ALLY_0003761].

[1581] Residential Capital Corporation, Annual Report (Form 10-K) (Mar. 28, 2006), at 2.

[1582] *See* Memorandum, Final Tax Liabilities Allocated from GM, dated Jan. 25, 2008, at ALLY_0208456 [ALLY_0208456]; *see also* Tax Classification and Allocation History, prepared by AFI, at ALLY_0178779 [ALLY_0178779]; Implemented 2005 Tax Allocation Agreement, at ALLY_0178780 [ALLY_0178779].

[1583] Implemented 2005 Tax Allocation Agreement, § 6.08 [ALLY_0178779]. Section 6.08 of the agreement states that the agreement generally "shall continue in effect until the ResCap Group is no longer included in the consolidated Federal income tax return of the [AFI] Group . . . ." Since GM, not AFI, was the common parent of the affiliated group that filed consolidated federal income tax returns, the Examiner assumes that the parties to the agreement intended for it to remain in effect until the ResCap Group, as defined in the agreement, was no longer included in either the GM consolidated federal income tax return or the "GMAC Group," as defined in the agreement.

[1584] *See* 2005 Operating Agreement, § 2(b)(iii) [MELZER.004869] ("ResCap and [AFI] shall maintain in effect an income tax allocation agreement that shall provide for two-way sharing payments based on the separately calculated tax liability or benefit of ResCap.").

[1585] Implemented 2005 Tax Allocation Agreement, at ALLY_0178786 [ALLY_0178779].

tax year between allocations under the Implemented 2005 Tax Allocation Agreement and allocations under the tax allocation agreements previously in place with ResCap's subsidiaries before they were transferred to ResCap would be unduly burdensome.[1586]

As required by the Cerberus PSA, under which 51% of AFI was to be sold to Cerberus,[1587] ResCap converted to a limited liability company on October 24, 2006.[1588] Upon conversion, ResCap initially elected to be taxable as a corporation for U.S. federal income tax purposes.[1589] Shortly thereafter, but before the Cerberus transaction closed, ResCap elected to change its federal tax classification to an entity disregarded as separate from GM (AFI had also elected to become an entity disregarded as separate from GM) effective as of November 21, 2006.[1590] The change in classification required consent from AFI.[1591] The election of disregarded entity status was treated as a tax-free liquidation of ResCap into GM,[1592] and all of ResCap's tax attributes were transferred to GM in the deemed liquidation. The sale of 51% of AFI to Cerberus closed on November 30, 2006.[1593] From ResCap's perspective, the Cerberus transaction was treated for federal income tax purposes as Cerberus purchasing 51% of ResCap's assets followed by Cerberus and GM making tax-free contributions of ResCap assets to the new AFI tax partnership, with ResCap becoming a disregarded entity treated as a branch or division of the AFI partnership.[1594] As a result of the Cerberus transaction, ResCap and AFI were no longer part of the GM consolidated group,[1595] which had the effect of terminating the Implemented 2005 Tax Allocation Agreement.[1596]

---

[1586] *See* E-mail from B. Belfore (Apr. 28, 2005) [EXAM11839057] ("GM Tax Department would like to make the agreement effective Jan.1.2005. Although the 2 operating companies weren't transferred to ResCap until Mar.30.2005, I am told it is extremely difficult to split up the year and try to allocate it 2 different ways.").

[1587] Cerberus PSA, § 2.3(a) [CERB000521].

[1588] Certificate of Conversion of Limited Liability Company of Residential Capital Corporation to Residential Capital, LLC, dated Oct. 24, 2006 [ALLY_0003761].

[1589] *See* Memorandum, Final Tax Liabilities Allocated from GM, dated Jan. 25, 2008, at ALLY_0208456 [ALLY_0208456].

[1590] *Id.*

[1591] Treas. Reg. § 301.7701–3(c)(2).

[1592] I.R.C. § 337(a) (no recognition of gain or loss by liquidating corporation on distributions to 80% distributee); Treas. Reg. § 301.7701–3(g)(iii) (election to change classification from association taxable as a corporation to disregarded entity treated as liquidation of corporation).

[1593] *See* Memorandum, Final Tax Liabilities Allocated from GM, dated Jan. 25, 2008, at ALLY_0208457 [ALLY_0208456].

[1594] I.R.C. § 721(a) (no recognition of gain or loss on contribution of property to partnership); Treas. Reg. § 301.7701–3(b)(1)(i), (f)(2) (addition of member to disregarded entity turns entity into partnership); Rev. Rul. 99–5, 1991–1 C.B. 434 (When an owner of a disregarded entity sells part of its interest in the disregarded entity to a buyer, the buyer and seller are treated as contributing their shares of the disregarded entity's assets to a new partnership in exchange for interests in the partnership.).

[1595] I.R.C. § 1504(a)(1).

[1596] Implemented 2005 Tax Allocation Agreement, § 6.08 [ALLY_0178779].

From December 1, 2006 through June 30, 2009, ResCap remained a disregarded entity treated as a division of AFI.[1597] AFI was a partnership owned by GM and Cerberus for tax purposes throughout this period.[1598] The 2006 Tax Allocation Agreement between AFI and ResCap was in place for this period for state and local jurisdictions that did not follow the disregarded entity classification rules under federal tax law.[1599] A tax allocation agreement was required to be in effect for this period by the 2006 Amended Operating Agreement.[1600] The 2006 Tax Allocation Agreement, however, was not fully executed until December 9, 2008. The parties did not act upon the requirement in the 2006 Amended Operating Agreement until they noted that the requirement was referenced in a May 5, 2008 offering memorandum for an exchange of outstanding ResCap notes for newly issued notes.[1601] Since AFI was a partnership for tax purposes, all of ResCap's income, loss, and other tax attributes during this period passed up to AFI's partners—Cerberus and GM—pursuant to the GMAC LLC Agreement.

ResCap became a partnership for federal income tax purposes on July 1, 2009.[1602] This change in federal tax classification was not the result of any tax election made by ResCap. Rather, the change was because ResCap gained an additional member. ResCap's direct owner, GMAC Mortgage Group LLC, contributed a one percent interest in ResCap to GMAC Mortgage Group LLC's newly-incorporated wholly-owned subsidiary, ResCap Investments Inc., on June 29, 2009.[1603] ResCap's ownership structure as a partnership resulting from these steps is provided in Exhibit V.D.2.a, below.

---

[1597] *See* Tax Classification and Allocation History, prepared by AFI, at ALLY_0178779 [ALLY_0178779].

[1598] *See id.*

[1599] *See* 2006 Tax Allocation Agreement, at ALLY_0178791 [ALLY_0178779]. Although the 2006 Tax Allocation Agreement makes some passing references to a few federal tax concepts, such as the Internal Revenue Service and the Internal Revenue Code, the agreement apparently did not apply with respect to federal income taxes. It was intended to apply with respect to income taxes in only those state and local jurisdictions that did not treat ResCap as a disregarded entity. *See* Letter from W. Marx to J. Young (Nov. 13, 2008), at ALLY_0178792 [ALLY_0178779] ("[T]his agreement is effective only with respect to those very few jurisdictions that treat ResCap as a taxable entity and only where ResCap would file a combined or unitary return with [AFI].").

[1600] *See* 2006 Amended Operating Agreement, § 2(b)(iii) [ALLY_0041818] ("ResCap and [AFI] shall maintain in effect an income tax allocation agreement that shall provide for two-way sharing payments based on the separately calculated tax liability or benefit of ResCap.").

[1601] *See* Letter from W. Marx to J. Young (Nov. 13, 2008), at ALLY_0178792 [ALLY_0178779] ("[W]e saw little need for a new tax allocation agreement between [AFI] and ResCap. Until now. Page 110 of the Offering Memorandum for the recent ResCap bond swap describes the ResCap Operating Agreement . . . . To comply with the terms of the Operating Agreement, we have drafted the attached new tax allocation agreement . . . ."); *see also* Residential Capital, LLC, Offering Memorandum (May 5, 2008), at 110 [ALLY_0103305] (describing the 2006 Amended Operating Agreement, including its requirement to have a tax allocation agreement providing for two-way sharing payments in effect between ResCap and AFI).

[1602] *See* Tax Classification and Allocation History, prepared by AFI, at ALLY_0178779 [ALLY_0178779].

[1603] *See* Memorandum, Year-End Transaction Regarding Mortgage Assets and Mortgage Companies, dated Jan. 27, 2010, at EXAM00220204 [EXAM00220202].

EXHIBIT V.D.2.a
**ResCap as a Partnership for Federal Income Tax Purposes**
July 1, 2009 – November 1, 2009



Thus, ResCap went from having a single tax-regarded member, AFI, to having two tax-regarded members, AFI and ResCap Investments Inc. This change in the number of members automatically converted ResCap from a disregarded entity to a partnership for federal income tax purposes.[1604] But ResCap was still a pass-through entity not responsible for the payment of federal income taxes under federal tax law. ResCap filed a federal partnership tax return for a tax

---

[1604] Treas. Reg. § 301.7701–3(b)(1)(i), (f)(2).

year beginning on July 1, 2009 and ending on November 1, 2009,[1605] and the 2006 Tax Allocation Agreement for state and local income tax purposes was treated by AFI and ResCap as remaining in effect for this period.[1606] The additional member was added to make ResCap a partnership prior to AFI's conversion to a Delaware corporation on June 30, 2009.[1607] AFI was concerned that had ResCap remained a disregarded entity when AFI was incorporated, ResCap would have been required to record on its book balance sheet a net current tax expense, a net deferred tax liability, and an offsetting decrease in net equity.[1608] By making ResCap a partnership prior to AFI's incorporation, the tax liabilities and reduction in net equity were recorded on AFI's book balance sheet instead of ResCap's.[1609]

ResCap became disregarded as separate from AFI once again on November 2, 2009 because of an election by ResCap's 1% owner to become disregarded as separate from AFI for

---

[1605] Residential Capital, LLC, U.S. Return of Partnership Income (I.R.S. Form 1065) [ALLY_0337795]. The Examiner notes that ResCap probably became a partnership on June 30, 2009, the day after the June 29, 2009 contribution of 1% of ResCap to ResCap Investments Inc. The Examiner assumes that ResCap's income for the day of June 30, 2006 was reported directly on AFI's federal partnership tax return for its tax year ending June 30, 2006 for administrative convenience, instead of having ResCap file a one-day federal partnership tax return for June 30, 2006 in addition to its federal partnership tax return for its short tax year beginning on July 1, 2006 and ending on November 1, 2006.

[1606] *See* Residential Capital, LLC U.S. Federal, State, and Local Tax Allocations Analysis, prepared by AFI [ALLY_PEO_0079527]; *see also* Residential Capital, LLC Tax Allocation Payment Detail Analysis, prepared by AFI [ALLY_PEO_0079528].

[1607] *See* Memorandum, Year-End Transaction Regarding Mortgage Assets and Mortgage Companies, dated Jan. 27, 2010, at EXAM00220204 [EXAM00220202].

[1608] *See* E-mail from S. Cohen (June 24, 2009), at EXAM12059274 [EXAM12059274] ("Upon conversion of [AFI] from LLC to C Corp on June 30, paragraph 28 of FAS 109 (and SAB Topic 1B) will require ResCap to record a tax a [sic] expense of $1.0 billion and a deferred tax liability of $1.0 billion (temporary tax difference)."); *see also* Memorandum, Agreements for Allocation of Taxes, dated Aug. 6, 2010, at 2 [RC40016362] ("If ResCap had remained a tax-disregarded LLC, it was estimated that it would have been required to book deferred tax assets and liabilities up to the corporate tax rate at the ResCap level of approximately $150 million, reducing its reported net equity."); E-mail from J. Aretakis (July 14, 2009), at EXAM12429610 [EXAM12429609] ("[H]ad ResCap remained an LLC subsidiary of a corporate [AFI], deferred taxes would have been required. The net DTL at ResCap would have triggered a P&L hit at ResCap.").

[1609] *See* E-mail from J. Aretakis (July 14, 2009), at EXAM12429610 [EXAM12429609] ("As a partnership, ResCap need not book any deferred taxes on various items on its balance sheet, most notably MSRs. . . . [The] hit was instead taken at the [AFI] level."); *see also* E-mail from T. Baker (June 29, 2009), at EXAM12421559 [EXAM12421559] ("We understand that PWC has concluded that if ResCap is converted to a tax partnership prior to incorporating [AFI] . . . . [AFI's] book/tax basis difference in its investment in the newly created ResCap partnership would give rise to a net deferred tax asset or liability at the [AFI] level . . . ."); Memorandum, Agreements for Allocation of Taxes, dated Aug. 6, 2010, at 2 [RC40016362] ("As a partnership, ResCap was not required to record deferred taxes[;] rather, its parent company was.").

federal income tax purposes.[1610] ResCap Investments Inc. had converted into a Delaware limited liability company on September 11, 2009[1611] and initially had elected to be treated as a corporation for federal income tax purposes.[1612] On December 30, 2009, ResCap Investments LLC changed its federal tax classification to disregarded entity status with a retroactive effective date of November 2, 2009.[1613] This change resulted in ResCap again having only one member, AFI, for federal income tax purposes.[1614] Accordingly, ResCap automatically became a disregarded entity under federal income tax law as of November 2, 2009.[1615]

AFI decided to return ResCap to disregarded entity status effective as of November 2, 2009 to preserve substantial tax losses that would be generated by Ally Bank and GMACB Asset Management Corporation, a wholly-owned subsidiary of Ally Bank. These tax losses arose from AFI's intercompany purchase of certain loans from Ally Bank and GMACB Asset Management Corporation and subsequent contribution of those loans to ResCap.[1616] AFI wanted to transfer those loans out of Ally Bank to "strengthen the asset quality profile of Ally Bank."[1617] If ResCap had remained a partnership at the time of the sale and contribution of the loans, then deductions for Ally Bank's and GMACB Asset Management Corporation's losses from the sale, estimated as of November 13, 2009 to be approximately $650 million,[1618] would have been permanently disallowed under federal income tax law because ResCap would have been a related party transferee but would not have been part of the same "controlled group" of

---

[1610] *See* Memorandum, Year-End Transaction Regarding Mortgage Assets and Mortgage Companies, dated Jan. 27, 2010, at EXAM00220204 [EXAM00220202].

[1611] Certificate of Conversion to Limited Liability Company of ResCap Investments Inc. to ResCap Investments LLC, dated Sept. 11, 2009 [RC40006869].

[1612] *See* Memorandum, Year-End Transaction Regarding Mortgage Assets and Mortgage Companies, dated Jan. 27, 2010, at EXAM00220204 [EXAM00220202].

[1613] *See id.*

[1614] *See id.*

[1615] Treas. Reg. § 301.7701–3(b)(1)(i), (f)(2).

[1616] *See* Memorandum, Agreements for Allocation of Taxes, dated Aug. 6, 2010, at 2 [RC40016362]; *see also* Memorandum, Year-End Transaction Regarding Mortgage Assets and Mortgage Companies, dated Jan. 27, 2010, at EXAM00220204–05 [EXAM00220202].

[1617] Memorandum, Year-End Transaction Regarding Mortgage Assets and Mortgage Companies, dated Jan. 27, 2010, at EXAM00220203 [EXAM00220202].

[1618] *See* E-mail from J. Aretakis (Nov. 13, 2009), at ALLY_0381586 [ALLY_0381585] ("Purchase of Bank loans by [AFI] and contribution to ResCap will generate a deferred tax loss . . . . Consolidated [AFI] will record a DTA (est. $650 million) for the deferred tax benefit.").

corporations as Ally Bank and GMACB Asset Management Corporation.[1619] By making
ResCap a disregarded entity prior to the sale and contribution of the loans, the final transferee
was considered to be AFI for federal income tax purposes, and the deductions for Ally Bank's
and GMACB Asset Management Corporation's losses were merely deferred, instead of
permanently disallowed, until ResCap disposed of the loans to a person outside the AFI
consolidated group.[1620]

Since November 2, 2009, ResCap has been a disregarded entity owned by AFI through
other disregarded entities, GMAC Mortgage Group LLC and ResCap Investments LLC.[1621]
AFI has been a corporation since July 1, 2009.[1622] The Second 2009 Tax Allocation
Agreement among GMAC Mortgage Group LLC, ResCap Investments LLC, and ResCap,
effective as of November 1, 2009, was fully executed on January 26, 2011.[1623] This agreement
is still putatively in effect.[1624]

### b.   Drafting And Approval Processes For The Tax Allocation Agreements

#### (1)   Implemented 2005 Tax Allocation Agreement And Other 2005 Tax Allocation Agreement

It is unclear when the process of drafting the Implemented 2005 Tax Allocation
Agreement between ResCap and AFI was initiated and which party created the first draft. On

---

[1619] *See* Treas. Reg. § 1.267(f)–1(c)(1)(iii), (j) Ex. 6; *see also* Memorandum, Year-End Transaction Regarding
Mortgage Assets and Mortgage Companies, dated Jan. 27, 2010, at EXAM00220204 [EXAM00220202];
E-mail from J. Aretakis (Nov. 13, 2009), at ALLY_0381586 [ALLY_0381586] ("The tax loss would be
permanently disallowed if we leave ResCap in partnership form."); E-mail from J. Aretakis (July 14, 2009),
at EXAM12429610 [EXAM12429609] ("Going forward, in general, tax gains on [AFI]/ResCap
intercompany sales will be fully taxable, but tax losses will be disallowed. Tax losses subject to the
disallowance rule are usually permanently disallowed, not merely deferred.").

[1620] *See* I.R.C. § 267(f)(2); *see also* Treas. Reg. § 1.1502–13(c); Memorandum, Year-End Transaction Regarding
Mortgage Assets and Mortgage Companies, dated Jan. 27, 2010, at EXAM00220204–05 [EXAM00220202].

[1621] *See* Tax Classification and Allocation History, prepared by AFI, at ALLY_0178779 [ALLY_0178779]; *see
also* Second 2009 Tax Allocation Agreement, at 1 [RC00028796]. ResCap Investments LLC merged into
GMAC Mortgage Group LLC with GMAC Mortgage Group LLC surviving on July 31, 2011. *See* Debtor's
Motion for Interim and Final Orders Under Bankruptcy Code Sections 105(a), 363, 506(a), 507(a)(8), 541,
and 1129 and Bankruptcy Rule 6003 Authorizing Payment of Taxes and Regulatory Fees [Docket No. 37] at
8; *see also* Consent to Action of the Sole Director of ResCap Investments LLC, dated July 25, 2011, at
RC40006896 [RC40006869].

[1622] *See* Ally Financial Inc. & Subs., U.S. Corporation Income Tax Return (I.R.S. Form 1120), at
ALLY_0388747 [ALLY_0388745]; *see also* Tax Classification and Allocation History, prepared by AFI, at
ALLY_0178779 [ALLY_0178779].

[1623] Second 2009 Tax Allocation Agreement [RC00028796].

[1624] *See* Debtor's Motion for Interim and Final Orders Under Bankruptcy Code Sections 105(a), 363, 506(a),
507(a)(8), 541, and 1129 and Bankruptcy Rule 6003 Authorizing Payment of Taxes and Regulatory Fees
[Docket No. 37] at 8–9; *see also* Tax Classification and Allocation History, prepared by AFI, at
ALLY_0178779 [ALLY_0178779].

April 28, 2005, GM sent to ResCap and AFI a revised draft of the Implemented 2005 Tax Allocation Agreement.[1625] GM notified ResCap that the revisions were designed to "deny ResCap a tax benefit for [three] specific tax attributes (foreign tax credits, capital losses, or net operating losses) until both GM and [AFI] could also enjoy the benefit."[1626] The revisions were proposed by GM because it wanted to "[p]revent cash from being 'trapped' in ResCap ([i.e.,] prevent GM from paying ResCap for tax losses that GM cannot use)."[1627] GM also noted that ResCap does not have to be able to use the tax benefits on a stand-alone basis to receive payment from GM as long as both GM and AFI can use the tax benefits.[1628]

In late May 2005, PwC, the auditor of ResCap's financial reports for 2005, gave comments to ResCap on the draft of the Implemented 2005 Tax Allocation Agreement suggesting that ResCap push back on the requirement that both GM and AFI have to use tax benefits for ResCap to receive payment.[1629] ResCap's Chief Financial Officer at the time, Davee Olson, expressed concerns about being able to push back because the terms of the 2005 Operating Agreement were still being negotiated by GM and AFI.[1630] ResCap continued to negotiate with GM and AFI over the terms of the Implemented 2005 Tax Allocation Agreement in late May and early June 2005.[1631] James Young, Chief Accounting Officer of ResCap at that time, made comments that focused on internal consistency in the agreement regarding the requirement that both GM and AFI had to use ResCap's losses for ResCap to be entitled to compensation and stated that he wanted the provisions to be "consistent (even if not in ResCap's best interest)."[1632] It appears that all or most of the parties signed off on the provisions of the Implemented 2005 Tax Allocation Agreement by June 3, 2005.[1633]

The ResCap Board delegated the negotiation and final approval of the terms of the Implemented 2005 Tax Allocation Agreement to certain officers. In a unanimous written consent dated June 15, 2005, the ResCap Board authorized certain officers to "negotiate,

---

[1625] *See* E-mail from B. Belfore (Apr. 28, 2005) [EXAM11839057], attaching draft of Implemented 2005 Tax Allocation Agreement [EXAM11839059].

[1626] E-mail from B. Belfore (Apr. 28, 2005), at EXAM11839057 [EXAM11839057].

[1627] *Id.*

[1628] *See* E-mail from J. Aretakis (Apr. 29, 2005), at EXAM10183493 [EXAM10183493].

[1629] *See* E-mail from S. Mooradian (May 21, 2005), at EXAM11738506 [EXAM11738506] ("I would push back and at least get a cash benefit if [AFI] is in a taxable position even if GM is not.").

[1630] *See* E-mail from D. Olson (May 23, 2005), at EXAM11864785 [EXAM11864785] (Pushing back to get a cash benefit even if only AFI can use the tax benefit is "a problem getting in place until GM and [AFI] get real about their operating agreement.").

[1631] *See* E-mail from J. Young (June 1, 2005) [EXAM10182754]; E-mail from J. Young (May 31, 2005) [EXAM10220414].

[1632] E-mail from J. Young (May 31, 2005) [EXAM10220414].

[1633] *See* Task List regarding ResCap Open Items as of June 24, 2005, at EXAM12180173 [EXAM12180165] ("Received signoffs from majority of reviewers, including Kevin Nowlan (GM). The 6/1/05 draft should be considered final. Need to obtain signatures.").

execute and deliver in the name of and on behalf of ResCap . . . the Tax Allocation Agreement
. . . substantially in the form described to the Board and in such form as the Authorized
Persons executing the same may approve, such approval to be conclusively evidenced by the
execution thereof."[1634] The Implemented 2005 Tax Allocation Agreement was later executed
on June 24, 2005.[1635]

In addition to the Implemented 2005 Tax Allocation Agreement, there was another tax
allocation agreement purportedly executed on June 24, 2005, the Other 2005 Tax Allocation
Agreement.[1636] The Other 2005 Tax Allocation Agreement requires only AFI to use ResCap
tax benefits for ResCap to receive payment from AFI.[1637] It is unclear why two different tax
allocation agreements between AFI and ResCap were executed for the 2005 tax year and
whether each agreement was actually signed on the same date, but the Other 2005 Tax
Allocation Agreement is far more favorable to ResCap than the Implemented 2005 Tax
Allocation Agreement. The Other 2005 Tax Allocation Agreement was an exhibit in the first
amendment to ResCap's registration statement for a $4 billion notes exchange offer filed with
the SEC on September 2, 2005.[1638] ResCap later filed a second amendment to that registration
statement on September 20, 2005 in which the Implemented 2005 Tax Allocation Agreement
was included as an exhibit.[1639] The parties' use of the Implemented 2005 Tax Allocation
Agreement resulted in ResCap not being compensated for some of its 2006 losses because GM
had sufficient losses from its other subsidiaries to shield its income through 2006 on a
consolidated basis.[1640]

### (2) 2006 Tax Allocation Agreement

Under the 2006 Amended Operating Agreement, a tax allocation agreement between AFI
and ResCap was required to be in effect even after Cerberus's acquisition of 51% of AFI on
November 30, 2006.[1641] Accordingly, AFI and ResCap had in place the 2006 Tax Allocation
Agreement from December 1, 2006 through November 1, 2009 for state and local jurisdictions

---

[1634] Unanimous Consent to Action of the Board of Directors of Residential Capital Corporation, June 15, 2006, at
2 [RC40005468].

[1635] Implemented 2005 Tax Allocation Agreement, at ALLY_0178786 [ALLY_0178779].

[1636] Other 2005 Tax Allocation Agreement [MELZER.009035].

[1637] *See id.* § 1.03E.

[1638] Residential Capital Corporation, Amendment No. 1 to Registration Statement (Form S-4/A) (Sept. 2, 2005),
Ex. 10.3.

[1639] Residential Capital Corporation, Amendment No. 2 to Registration Statement (Form S-4/A) (Sept. 20, 2005),
Ex. 10.3.

[1640] *See* Section V.D.2.c(1).

[1641] *See* 2006 Amended Operating Agreement, § 2(b)(iii) [ALLY_0041818] ("ResCap and [AFI] shall maintain
in effect an income tax allocation agreement that shall provide for two-way sharing payments based on the
separately calculated tax liability or benefit of ResCap.").

that did not follow the disregarded entity classification rules under federal tax law.[1642] The 2006 Amended Operating Agreement is unclear as to whether the agreement had to apply to federal income taxes, or state and local income taxes, or both. The 2006 Tax Allocation Agreement, however, was not executed until late 2008. Neither AFI nor ResCap acted upon the requirement in the 2006 Amended Operating Agreement until William Marx, AFI's Director of Tax Operations and Analysis, noticed that the requirement was referenced in a May 5, 2008 offering memorandum for an exchange of outstanding ResCap notes for newly issued notes. He then wrote to David DeBrunner, AFI's Chief Accounting Officer, on September 30, 2008 about the need to get a tax allocation agreement in place to comply with the 2006 Amended Operating Agreement.[1643] On November 3, 2008, DeBrunner signed the 2006 Tax Allocation Agreement that AFI had prepared and that Marx had attached to his September 30, 2008 letter. Marx then sent the partially executed 2006 Tax Allocation Agreement to Young, ResCap's Chief Financial Officer at that time, for his review and signature on November 13, 2008.[1644] Young signed the 2006 Tax Allocation Agreement on December 9, 2008.

The Investigation has not uncovered any record in the minutes of the ResCap Board or Executive Committee or written consent of the ResCap Board that authorized Young to execute the 2006 Tax Allocation Agreement. Further, the Investigation has not uncovered any evidence that the ResCap Board was ever informed of the existence of the 2006 Tax Allocation Agreement prior to Young signing it. The only evidence of any kind of review of the provisions of the 2006 Tax Allocation Agreement comes from Marx's letters to DeBrunner and Young, in which Marx states that the "agreement has been reviewed and accepted by Dina Shapiro, relevant ResCap Legal Staff and Bond Counsel (see attached e-mail)."[1645]

---

[1642] *See* 2006 Tax Allocation Agreement, at ALLY_0178791 [ALLY_0178779]. Although the 2006 Tax Allocation Agreement makes some passing references to a few federal tax concepts, such as the IRS and the Internal Revenue Code, the agreement apparently did not apply with respect to federal income taxes. It was intended to apply with respect to income taxes in only those state and local jurisdictions that did not treat ResCap as a disregarded entity. *See* Letter from W. Marx to J. Young (Nov. 13, 2008), at ALLY_0178792 [ALLY_0178779] ("[T]his agreement is effective only with respect to those very few jurisdictions that treat ResCap as a taxable entity and only where ResCap would file a combined or unitary return with [AFI].").

[1643] *See* Letter from W. Marx to D. DeBrunner (Sept. 30, 2008), at ALLY_0178793 [ALLY_0178779] ("[W]e saw little need for a new tax allocation agreement between [AFI] and ResCap. Until now. Page 110 of the Offering Memorandum for the recent ResCap bond swap describes the ResCap Operating Agreement . . . . To comply with the terms of the Operating Agreement, we have drafted the attached new tax allocation agreement . . . ."); *see also* Residential Capital, LLC, Offering Memorandum (May 5, 2008), at 110 [ALLY_0103305] (describing the 2006 Amended Operating Agreement, including its requirement to have a tax allocation agreement providing for two-way sharing payments in effect between ResCap and AFI).

[1644] *See* Letter from W. Marx to J. Young (Nov. 13, 2008), at ALLY_0178792 [ALLY_0178779] (almost an exact copy of the letter from W. Marx to D. DeBrunner dated September 30, 2008).

[1645] *Id.*; Letter from W. Marx to D. DeBrunner (Sept. 30, 2008), at ALLY_0178793 [ALLY_0178779].

*(3) First 2009 Tax Allocation Agreement And Second 2009 Tax Allocation Agreement*

In connection with the discussions in December 2009 about making ResCap a disregarded entity for federal tax purposes effective around November 1, 2009, AFI drafted the First 2009 Tax Allocation Agreement between ResCap and AFI (and GMAC Mortgage Group LLC) to be effective as of November 1, 2009.[1646] AFI stated that since ResCap will become a member of the AFI consolidated tax return as a result of converting to a disregarded entity, "tax allocation agreements are required to be in place to document the method of tax allocation."[1647] AFI drafted the First 2009 Tax Allocation Agreement to treat ResCap generally as if ResCap were a stand-alone taxpayer. The agreement, however, was more favorable to ResCap than a pure stand-alone agreement or being left as a disregarded entity without a federal income tax allocation agreement in place because it entitled ResCap to be paid for its tax benefits that AFI could currently use even if ResCap could not yet use the tax benefits on a stand-alone basis.[1648] AFI intentionally drafted the First 2009 Tax Allocation Agreement to provide this benefit to ResCap. As described in an e-mail from Marx to ResCap management and AFI management, on which DeBrunner and Young were copied, attaching a draft of the agreement:

> If ResCap or any of its relevant sub-groups or subsidiaries generates foreign tax credits, net operating losses, or capital losses that it would not be able to use on a stand-alone basis in the current period, but the [AFI] group can utilize the benefits on the consolidated [AFI] return, then the ResCap entity will be paid currently for those benefits. This deviation from strict stand-alone accounting will in all cases be either neutral or more beneficial to ResCap than strict stand-alone. [AFI] drafted the agreements in this manner to be consistent with other allocation agreements in the Group (Bank and Insurance have similar agreements already in place).[1649]

This provision was present not only in tax allocation agreements that AFI had in effect with Ally Bank and AFI's insurance subsidiaries, but also in the Implemented 2005 Tax Allocation Agreement and in the tax allocation agreement that was in effect between GM and

---

[1646] *See* Dec. 6, 2009 Draft of First 2009 Tax Allocation Agreement [EXAM12308207]; *see also* Int. of W. Marx, Apr. 18, 2013, at 36:24–37:16 (stating that Marx was the "primary drafter" of the First 2009 Tax Allocation Agreement among a group of people at AFI). As of the December 6, 2009 draft, only GMAC Mortgage Group LLC and ResCap were included as parties to the agreement. AFI and ResCap Investments LLC were added as parties in later versions of the agreement.

[1647] *See* E-mail from W. Marx (Dec. 6, 2009) [EXAM12308200].

[1648] *See id.*

[1649] *Id.*

AFI from November 1, 2000 to November 30, 2006.[1650] Another reason for the inclusion of the provision was to see if creating this contractual right for ResCap would allow ResCap to report an "equity bump" for its net deferred tax assets that were otherwise subject to a valuation allowance that resulted in no "equity bump."[1651] AFI had explored the possibility of taking this position with its external auditors.[1652]

The First 2009 Tax Allocation Agreement went through a series of revisions that resulted in substantial changes to its operative provisions. First, Morrison & Foerster, counsel to ResCap, and Morrison Cohen, counsel to the Independent Directors, reviewed a December 14, 2009 draft and submitted their collective comments on December 23, 2009.[1653] Their comments appear to have been rejected by AFI.[1654] Second, AFI made a set of changes and on July 19, 2010 sent a revised draft dated July 8, 2010[1655] to ResCap that incorporated some changes previously discussed between AFI and ResCap.[1656] Consideration of the agreement appears to have been a low priority for ResCap and AFI in early 2009, resulting in the six-month span that passed from the lawyers' submission of their collective comments to AFI on December 23, 2009 to AFI's revision of the draft agreement on July 8, 2010.[1657] The changes made in the July 8, 2010 draft of the First 2009 Tax Allocation Agreement were largely formatting changes and corrections of factual errors in the recitals as opposed to substantive changes to operative provisions. A few substantive changes, however, were made providing that ResCap would be compensated based on AFI's use of ResCap's tax benefits, not hypothetical use by GMAC Mortgage Group LLC, a disregarded entity, and that AFI would reimburse GMAC Mortgage Group LLC to the extent that GMAC Mortgage Group LLC would have to compensate ResCap for AFI's use of ResCap's tax benefits.[1658]

ResCap asked Morrison & Foerster to review and comment on the July 8, 2010 draft, and Morrison & Foerster provided comments in a memorandum dated July 11, 2010.[1659] The comments included that "[GMAC Mortgage Group LLC/AFI] only compensates ResCap for

---

[1650] *See* Implemented 2005 Tax Allocation Agreement, §§ 1.03F, 3.03 [ALLY_0178779]; Agreement for the Allocation of United States Federal Income Taxes, made effective as of December 8, 1994, by and between GM and AFI, as amended and in effect from November 1, 2000 to November 30, 2006 [ALLY_0434993].

[1651] *See* Int. of W. Marx, Apr. 18, 2013, at 29:12–31:10.

[1652] *See id.*

[1653] *See* Memorandum, Revised Tax Allocation Agreement Draft, dated July 11, 2010, at 1 [EXAM20269709].

[1654] *See id*.

[1655] July 8, 2010 Draft of First 2009 Tax Allocation Agreement [EXAM20132706].

[1656] *See* E-mail from W. Marx (July 19, 2010) [EXAM20132705].

[1657] *See* Int. of W. Marx, Apr. 18, 2013, at 44:12–46:5.

[1658] *Compare* July 8, 2010 Draft of First 2009 Tax Allocation Agreement, § 1.03D [EXAM20132706], *with* Dec. 6, 2009 Draft of First 2009 Tax Allocation Agreement, § 1.03C [EXAM12308207].

[1659] Memorandum, Revised Tax Allocation Agreement Draft, dated July 11, 2010 [EXAM20269709].

ResCap tax losses and credits that [GMAC Mortgage Group LLC/AFI] can actually use during the same taxable year" and reiterated that Morrison & Foerster and Morrison Cohen's previous "suggestion that ResCap be compensated to the extent such items create carrybacks and carryovers was not adopted."[1660] AFI had viewed such comment as an unnecessary change to the agreement because it believed the terms of the agreement already clearly provided for compensation based on tax attributes that ResCap could carry back or carry forward.[1661]

At an August 6, 2010 meeting, the ResCap Board "authorized and empowered" ResCap's officers to execute the First 2009 Tax Allocation Agreement.[1662] The version approved included some minor edits from the July 8, 2010 draft but no changes regarding Morrison & Foerster's suggestion to add clarifying language that ResCap would receive compensation for its carrybacks and carryovers. The First 2009 Tax Allocation Agreement was distributed to the ResCap Board the day before its August 6, 2010 meeting, in a package containing the meeting agenda and supporting materials,[1663] as an exhibit to the Joint ResCap-AFI Tax Memorandum to ResCap Board.[1664] The Joint ResCap-AFI Tax Memorandum, which was co-authored by Marx, Young, and Hamzehpour, summarized the history of ResCap's federal tax classification and provided a detailed analysis of the terms of the First 2009 Tax Allocation Agreement, ResCap's deferred tax position, and governance requirements relevant to the decision to approve the agreement.[1665] The benefit that AFI included in the first draft it sent to Young on December 6, 2009, that provided for ResCap to receive payments to the extent that AFI would use ResCap's tax benefits, remained in the version of the First 2009 Tax Allocation Agreement presented to the ResCap Board on August 6, 2010. The Joint ResCap-AFI Tax Memorandum explained and highlighted this benefit to the ResCap Board:

> The [First 2009 Tax Allocation Agreement] generally provide[s] that ResCap will be allocated income taxes under a hypothetical calculation that assumes ResCap to be a stand-alone taxpayer, filing its own tax returns, with full rights to make all accounting method choices and tax elections available under the law. *However*, in cases where the consolidated return regulations allow the [AFI] group of companies to benefit from net operating losses, capital losses or foreign tax credits before

---

[1660] *Id.* at 2.

[1661] *See* Int. of W. Marx, Apr. 18, 2013, at 40:17–43:8.

[1662] *See* Minutes of a Regular Meeting of the Board of Directors of Residential Capital, LLC, Aug. 6, 2010, at RC40018820–22 [RC40018729].

[1663] *See* Agenda and Supporting Materials for the Regular Meeting of the Board of Directors of Residential Capital, LLC, Aug. 6, 2010 [RC40016362].

[1664] Joint ResCap–AFI Tax Memorandum to ResCap Board, at RC40016374–84 [RC40016362].

[1665] *See* Joint ResCap–AFI Tax Memorandum to ResCap Board, at RC40016375–78 [RC40016362]. Marx prepared the language in the memorandum that explained the tax issues; Hamzehpour and Young prepared the language regarding ResCap governance requirements and ResCap management's recommendation to the ResCap Board. *See* Int. of W. Marx, Apr. 18, 2013, at 46:8–47:16, 50:19–54:12.

> ResCap could benefit from them on a stand-alone basis, the
> Agreement requires [AFI] to pay [GMAC Mortgage Group
> LLC] and [GMAC Mortgage Group LLC] to currently pay
> ResCap for those tax attributes. This is the only provision that
> differs from stand-alone treatment for ResCap, and in all cases
> can only be beneficial to ResCap, i.e. it may allow the
> monetization of tax benefits either earlier, or in some cases
> where the benefits would have expired and been permanently
> lost by ResCap, if it had filed as a stand-alone taxpayer.[1666]

In the Joint ResCap-AFI Tax Memorandum to the ResCap Board, it was noted that ResCap's legal staff believed that the First 2009 Tax Allocation Agreement was "on terms consistent with those that parties at arms' length would agree to and for fair value."[1667] ResCap's legal staff also suggested that the ResCap Board "exclude [the First 2009 Tax Allocation Agreement] from its prior delegation of affiliate agreements to the Special Committee of independent directors . . . ."[1668] The ResCap Board accepted this analysis, excluded the agreement from the requirement that affiliate agreements get recommended by the Special Committee before the ResCap Board considers them, and found that the First 2009 Tax Allocation Agreement was "on terms not more disadvantageous in any material respect to the holders of [ResCap's] notes than those existing tax allocation agreement(s) [it is] intended to replace[.]"[1669]

When the ResCap Board approved the First 2009 Tax Allocation Agreement on August 6, 2010 and authorized officers to execute it, the Board "assumed that [the officers] would execute and deliver the agreement."[1670] However, as of October 13, 2010, notwithstanding the ResCap Board's approval of the First 2009 Tax Allocation Agreement and its very favorable nature to ResCap, all parties except for ResCap had signed the agreement.[1671] The ResCap Board resolution did not specifically designate Young as ResCap's signatory on the First 2009 Tax Allocation Agreement, but there does not appear to be a question that Young would be the ResCap officer signing. Young testified that "it would make perfect sense that I was the one signing a tax allocation agreement being that I'm the chief financial officer of the company."[1672] Young's name appeared on the signature block for

---

[1666] Joint ResCap-AFI Tax Memorandum to ResCap Board, at RC40016377 [RC40016362].

[1667] *Id.* at RC40016378.

[1668] *Id.*

[1669] Minutes of a Regular Meeting of the Board of Directors of Residential Capital, LLC, Aug. 6, 2010, at RC40018822 [RC40018729].

[1670] Int. of P. West, Apr. 16, 2013, at 58:1–19.

[1671] *See* E-mail from W. Marx (Oct. 13, 2010), at ALLY_0245484 [ALLY_0245484] ("Under proposed and partially executed tax allocation agreements (Jim Young has not yet executed on behalf of ResCap), [AFI] would be required to pay ResCap for losses used by other members of the group.").

[1672] Int. of J. Young, Apr. 22, 2013, at 200:12–201:9.

ResCap in the version of the agreement that was presented to the ResCap Board at the August 6, 2010 board meeting, and he was the signatory on prior tax allocation agreements, as well as the signatory on the Second 2009 Tax Allocation Agreement.[1673]

The chain of events after the ResCap Board's approval of the First 2009 Tax Allocation Agreement on August 6, 2010 appears to have been as follows. On September 9, 2010, about a month after the ResCap Board approved the agreement, Marx prepared a memorandum to DeBrunner, Young, Dondzila, and Quenneville setting out instructions for signing the First 2009 Tax Allocation Agreement and similar tax allocation agreements between AFI and GMAC Mortgage Group LLC and between ResCap's subsidiaries.[1674] Marx also had binders created containing the First 2009 Tax Allocation Agreement and the other tax allocation agreements for signature. In the memorandum, Marx stated that the First 2009 Tax Allocation Agreement "has been reviewed by outside legal counsel representing the ResCap Board and by Tammy Hamzehpour of the ResCap Legal Staff, and has been approved by the ResCap Board," that "no additional governance is required at the [AFI] level" and that the agreement had been "previously circulated to [AFI] Accounting Policy, David DeBrunner, Cathy Dondzila, Jim Young and others."[1675] The Investigation has not uncovered a copy of the partially executed First 2009 Tax Allocation Agreement, but Marx and DeBrunner have confirmed that the memorandum and the binder of tax allocation agreements were hand-delivered to DeBrunner and that DeBrunner signed the First 2009 Tax Allocation Agreement on behalf of AFI around September 13, 2010.[1676] Marx was responsible for obtaining signatures for the First 2009 Tax Allocation Agreement and believed that the terms of agreement were final at the time he delivered the agreement to DeBrunner for signature.[1677] Marx did not expect any changes to its terms to be presented by either AFI or ResCap.[1678]

---

[1673] *See* First 2009 Tax Allocation Agreement, at RC40016384 [RC40016362]; *see also* 2006 Tax Allocation Agreement, at ALLY_0178791 [ALLY_0178779]; Second 2009 Tax Allocation Agreement, at 6 [RC00028796].

[1674] Memorandum, Action Required – ResCap Tax Allocation Agreements for Execution, dated Sept. 9, 2010 [ALLY_0435003].

[1675] *Id.*

[1676] *See* Int. of D. DeBrunner, Apr. 18, 2013, at 110:14–111:19, 115:11–116:22 ("Bill Marx told me that I would be getting a binder of tax allocation agreements that needed to be executed by an officer of [AFI] . . . . So, I signed those agreements, I gave the binder back or sent the binder back to Bill."); Int. of W. Marx, Apr. 18, 2013, at 57:20–58:9 ("So Monday the 13th, I believe I walked he binder down to David's office . . . . I don't recall exactly how long it was before I got it back. It might have been a day or two, or he might have gotten it back to me the same day.").

[1677] *See* Int. of W. Marx, Apr. 18, 2013, at 54:13–55:20 ("The expectation was that once these were executed that that would be the agreement.").

[1678] *See id*. at 55:12–55:24 ("We weren't expecting any additional edits at that point.").

AFI, however, apparently failed to deliver a copy of the memorandum and the binder containing the tax allocation agreements to Young for signature on behalf of ResCap in September 2010.[1679] AFI eventually mailed the binder to Young around (but most likely shortly before) October 15, 2010.[1680]

On September 15, 2010, AFI filed its consolidated federal income tax return for the tax year ending on December 31, 2009.[1681] Then, as required by the First 2009 Tax Allocation Agreement,[1682] AFI immediately started to calculate the amount it would have to pay to ResCap by October 31, 2010 under the agreement for ResCap's tax year beginning on November 2, 2009 and ending on December 31, 2009.[1683] In doing the calculation, AFI realized that the required payments to ResCap for 2009 and 2010 tax results would be substantial, perhaps as high as $250 million for 2009 and $400 million for 2010.[1684]

From October 13, 2010 to October 15, 2010, Marx communicated with AFI's Chief Financial Officer, Mackey, about the monetary impact to AFI of the First 2009 Tax Allocation Agreement. Marx discussed the possibility of proposing a less favorable tax allocation agreement to ResCap in an e-mail chain under the subject line "High Priority-Tax Allocation-

---

[1679] *See id*. at 57:1–59:18, 63:10–65:19, 90:22–92:7.

[1680] *See* Int. of J. Young, Apr. 22, 2013, at 101:4–104:23 ("I do not remember when I got the binder. . . . I would suspect that it was a relatively short period of time between the time I got the binder and the time that I was informed that [AFI] . . . had not gone through their appropriate governance with respect to the transaction."); *see also* Int. of W. Marx, Apr. 18, 2013, at 57:1–59:18, 63:10–65:19, 90:22–92:7.

[1681] *See* E-mail from W. Marx (Oct. 15, 2010), at ALLY_0424661 [ALLY_0424660].

[1682] *See* First 2009 Tax Allocation Agreement, § 3.02 [RC40016362]. Section 3.02 of the agreement provides as follows:

> Within forty-five (45) days following the filing of the [AFI] Group consolidated Federal income tax return . . . [GMAC Mortgage Group LLC] shall notify ResCap of the amount of the Separate ResCap Group Tax Liability. Within fifteen (15) days after such notification, Rescap shall pay to [GMAC Mortgage Group LLC] or [GMAC Mortgage Group LLC] will pay to ResCap as the circumstances warrant, the difference between the Separate ResCap Group Tax Liability and the estimated tax payments previously made by ResCap.

[1683] *See* E-mail from W. Marx (Oct. 15, 2010), at ALLY_0424661 [ALLY_0424660] ("Calculations were started immediately upon filing the first consolidated return on September 15."); *see also* E-mail from W. Marx (Oct. 13, 2010), at ALLY_0245484 [ALLY_0245484] ("[P]ayment may be on the order of $200 to $250m, due 10/31.").

[1684] *See* E-mail from W. Marx (Oct. 13, 2010), at ALLY_0245484 [ALLY_0245484] ("Calculations are still in process, but the payment may be on the order of $200 to $250m, due 10/31 (Additional $300 to $400m would likely be due for the 2010 tax year, payable at this time next year).").

Large Payment Possibly due October 30."[1685] AFI, however, was aware that the ResCap Board had already approved the First 2009 Tax Allocation Agreement,[1686] and Marx believed that "[p]eople at ResCap think the method of allocation has been resolved and we are just finalizing docs and the allocation will follow"[1687] and that Young "has been in the loop on the development of [the First 2009 Tax Allocation Agreement and other tax allocation agreements] and thinks they are done."[1688] Marx testified that, at the time, he suggested a new method of allocation because he was concerned that AFI may want to retain discretion in deciding when to inject more capital into ResCap rather than be subject to contractual obligations that mandate payments by AFI to ResCap.[1689] AFI had already made a total of about $2.9 billion in cash capital contributions to ResCap from 2007 to 2009 to keep ResCap afloat.[1690] Marx testified that ResCap's consideration of a new and less favorable tax allocation agreement "would likely require a fairness opinion of outside counsel" and "will likely be unpopular as the Board has already been presented and approved a more beneficial agreement."[1691] Marx suggested that they let Young and DeBrunner know that AFI senior financial management is reconsidering the tax allocation approach and will get back to them in November 2010 with its modification plan.[1692] Mackey agreed that he did not want to make

---

[1685] *See* E-mail from W. Marx (Oct. 15, 2010), at ALLY_0424661 [ALLY_0424660]; E-mail from J. Mackey (Oct. 15, 2010), at ALLY_0424661 [ALLY_0424660]; E-mail from W. Marx (Oct. 15, 2010), at ALLY_0424661 [ALLY_0424660]; E-mail from J. Mackey (Oct. 15, 2010), at ALLY_0424661–62 [ALLY_0424660]; E-mail from W. Marx (Oct. 15, 2010), at ALLY_0424662 [ALLY_0424660]; E-mail from J. Mackey (Oct. 15, 2010), at ALLY_0424662–63 [ALLY_0424660]; E-mail from W. Marx (Oct. 15, 2010), at ALLY_0424663 [ALLY_0424660]; E-mail from J. Mackey (Oct. 15, 2010), at ALLY_0424663 [ALLY_0424660]; E-mail from W. Marx (Oct. 13, 2010), at ALLY_0424663–64 [ALLY_0424660].

[1686] *See* E-mail from W. Marx (Oct. 13, 2010), at ALLY_0245484 [ALLY_0245484] ("The [First 2009 Tax Allocation Agreement] was reviewed and approved by the ResCap Board. There is sensitivity here regarding arms-length dealings with affiliates.").

[1687] E-mail from W. Marx (Oct. 15, 2010), at ALLY_0424663 [ALLY_0424660].

[1688] *Id.* at ALLY_0424662.

[1689] *See* E-mail from W. Marx (Oct. 13, 2010), at ALLY_0245484 [ALLY_0245484] ("Today, it is not clear to me that [AFI] would desire to inject capital into ResCap or, once in, whether we could get it back out."); *see also* E-mail from W. Marx (Nov. 3, 2010), at EXAM10432503 [EXAM10432501] ("Current management does not want to put in place an allocation agreement that could compel capital contributions. Rather, capitalization of ResCap should be left to the discretion of the [AFI] Board."); E-mail from J. Mackey (Oct. 15, 2010), at ALLY_0424663 [ALLY_0424660] ("What happens if we just ignore this for now[?] Not sure I can get focus from decision makers by the end of the month. I don't really want to put in more capital . . . .").

[1690] *See* Capital Contributions to ResCap Legal Entity as of Jan. 31, 2012, [ALLY_PEO_0075634]; *see also* Residential Capital Company, LLC, Quarterly Report (Form 10-Q) (Nov. 8, 2007), at 50 ("[As of September 30, 2007], we have received $2.0 billion in capital contributions from GMAC, excluding the contribution to the auto division of GMAC Bank[.]").

[1691] E-mail from W. Marx (Oct. 13, 2010), at ALLY_0245484 [ALLY_0245484].

[1692] E-mail from W. Marx (Oct. 15, 2010), at ALLY_0424663 [ALLY_0424660].

payments to ResCap,[1693] and he asked Marx, "Do we have to go back to them [ResCap,] or can we just ignore it[?] Jim Y and team are very focused on other things[,] so they may not even think about it."[1694] Marx replied, "At some point, we will need formal agreements in place to document the timing of payments in both directions. Without such agreements, we may not be able to compel ResCap to pay its taxes up to [AFI]. In fact, under a strict stand-alone approach, they [ResCap] would owe [AFI] $6m this year."[1695] Marx later explained to Mackey the timeline of how Marx became aware of the potentially large payments that AFI would owe to ResCap under the First 2009 Tax Allocation Agreement: "Calculations were started immediately upon filing the first consolidated return on September 15. . . . During our deep dive review, [Mackey] commented on the need to tie into the cash forecasting team, raising our sensitivity. . . . [W]e realized that we might be locking up cash inside ResCap and raised the alarm."[1696] Mackey then stated, "We should consider how everything would look if we never execute the agreement. There will be resistance."[1697] Then Marx replied that:

> Things today would look just like they are currently booked. ResCap has a payable to [AFI] for about $6m related to excess inclusion income, which is a quirky type of REMIC income that results in current tax even though the company is in a deep overall loss. . . . Bottom line: [AFI] has a small receivable that ResCap may resist paying. [AFI] would avoid booking a large Q4 capital contribution.[1698]

When DeBrunner signed the First 2009 Tax Allocation Agreement, he believed he was acting under "delegated authority."[1699] AFI had an accounting policy in place since December 23, 2009 providing that "[a]ll tax sharing agreements must be approved by the respective boards of directors or appropriate management designee."[1700]

---

[1693] E-mail from J. Mackey (Oct. 15, 2010), at ALLY_0424663 [ALLY_0424660].

[1694] E-mail from J. Mackey (Oct. 15, 2010), at ALLY_0424662–63 [ALLY_0424660].

[1695] E-mail from W. Marx (Oct. 15, 2010), at ALLY_0424662 [ALLY_0424660].

[1696] E-mail from W. Marx (Oct. 15, 2010), at ALLY_0424661 [ALLY_0424660].

[1697] E-mail from J. Mackey (Oct. 15, 2010), at ALLY_0424661 [ALLY_0424660].

[1698] E-mail from W. Marx (Oct. 15, 2010), at ALLY_0424661 [ALLY_0424660].

[1699] *See* Int. of D. DeBrunner, Apr. 18, 2013, at 125:9–126:9 ("As an officer of the company, they asked me to be the signer on it. My recollection is it had been reviewed with multiple parties around the company and I was asked to sign on that. . . . So, again, you know, there was a delegated authority.").

[1700] AFI Accounting Policy 3330: Accounting for Income Taxes, effective Oct. 1, 2010, at EXAM12354094, – 101 [EXAM12354093].

Marx, on his own initiative, decided to hold up the process of completing execution of the First 2009 Tax Allocation Agreement after DeBrunner had signed the agreement:

> Some time in that early October timeframe, there was a first pass made at tax calculations. And it was at that point that we realized that . . . this is going to result in a very large payment down to ResCap that would be characterized [   ] it would be a capital contribution. And knowing all the focus that had been on the capital structure of ResCap over the prior year, I thought, gee, you know, this is not something that we've really vetted with our senior management on this side. And my senses went off and said I'm not sure we should be doing this. . . .
>
> . . .
>
> It was kind of a late realization that, of you know what? We're putting something in place here that probably is beyond our authority to make decisions. And that's when we raised the issue with Jim Mackey. As you can see through the tone of the e-mails, this was news to him. . . . So, there was, in my view, certainly a kind of overstepping on our part in tax of moving this thing along on the [AFI] side. You know, we saw the governance going on on the ResCap side. We weren't doing the same thing on the [AFI] side.[1701]

Although Marx believed that the First 2009 Tax Allocation Agreement was not binding because it had not been fully executed, he never sought legal advice on the issue.[1702] Marx testified that, based on this belief that the agreement was not binding, the copies that had been partially executed were discarded.[1703]

On October 18, 2010, Marx sent Young and Hamzehpour an e-mail, with Mackey copied, explaining AFI's current thinking that it may propose "changes to the tax allocation agreement recently approved by the ResCap Board (but not yet executed)."[1704] Marx testified that he probably called Young regarding holding off on signing the First 2009 Tax Allocation

---

[1701] Int. of W. Marx, Apr. 18, 2013, at 60:5–61:14, 126:2–126:25; *see also id.* at 75:1–75:12 ("I simply didn't consider the ramifications of putting an agreement in place that could compel very large capital contributions when that's something the board was very focused on.").

[1702] *See id.* at 144:1–144:13.

[1703] *See id.* at 141:8–141:20 ("My recollection is once they were retrieved from their trip to Minneapolis, they were discarded. We didn't believe them to be effective because they weren't executed. They weren't going to be the final agreement. They were not retained.").

[1704] E-mail from W. Marx (Oct. 18, 2010) [ALLY_0424659].

Agreement shortly before sending the October 18, 2010 e-mail.[1705] In the e-mail, Marx explained the reason for the potential modification as follows: "The proposed agreement was initially drafted and proposed under a previous [AFI] senior financial management team. In light of the potentially large capital contributions that could result under such an agreement, I have requested review and approval by [AFI's] current senior leadership."[1706] It appears that Marx was referring to Mackey becoming AFI's Interim Chief Financial Officer effective on April 2, 2010.[1707] Mackey then sent an e-mail to Young on the same day (October 18, 2010) stating "Jim, we should discuss. None of this has been discussed at the [AFI] level[,] so I think there needs to be a ton of socialization."[1708] Young replied on the same day:

> Agreed, if not discussed at [AFI], should get clear at that level. Since all tax benefits will ultimately belong to [AFI], this is more about how to managerially show the tax impacts on the legal entity of ResCap LLC. ResCap board would only be concerned if cash was being extracted from LLC in an "unfair" way via the tax allocation agreement . . . but I don't see that happening.[1709]

During interviews with the Examiner's Professionals, Young was asked about the events surrounding his receipt of the execution copy of the First 2009 Tax Allocation Agreement and any communications he had with AFI or with ResCap directors, officers, and counsel regarding AFI's desire to modify the terms of the agreement.[1710] His recollection of these events was limited.[1711] Young did not have any recollection of the timeline with respect to when he received the execution copy of the First 2009 Tax Allocation Agreement as compared to when he was contacted by AFI officers and told not to execute the agreement.[1712] In fact, Young initially could not even recall whether he ever signed the First 2009 Tax Allocation Agreement.[1713] Thereafter, at a follow-up interview on April 22, 2013, he believed that he never signed the First 2009 Tax Allocation Agreement.[1714]

---

[1705] *See* Int. of W. Marx, Apr. 18, 2013, at 94:10–95:17 ("And there probably had been a phone call saying, 'Hold on. We've got some issues at our end.' And then I imagine this was a follow-up email . . . .").

[1706] E-mail from W. Marx (Oct. 18, 2010) [ALLY_0424659].

[1707] *See* Minutes of a Regular Meeting of the Board of Directors of GMAC Inc., Apr. 30, 2010, at ALLY_PEO_0017627 [ALLY_PEO_0017568] (appointing Mackey as Interim Chief Financial Officer, effective as of April 2, 2010); Int. of W. Marx, Apr. 18, 2013, at 98:8–23.

[1708] E-mail from J. Mackey (Oct. 18, 2010), at EXAM20317195 [EXAM20317195].

[1709] E-mail from J. Young (Oct. 18, 2010), at EXAM20317195 [EXAM20317195].

[1710] *See* Int. of J. Young, Apr. 22, 2013, at 101:4-104:23; *see also* Int. of J. Young, Mar. 15, 2013, at 37:8-22.

[1711] *See* Int. of J. Young, Apr. 22, 2013, at 101:4-104:23; *see also* Int. of J. Young, Mar. 15, 2013, at 37:8-22.

[1712] *See* Int. of J. Young, Apr. 22, 2013, at 101:4-104:23.

[1713] *See* Int. of J. Young, Mar. 15, 2013, at 37:8-22.

[1714] *See* Int. of J. Young, Apr. 22, 2013, at 146:19–147:4.

Young testified that he believed that the August 6, 2010 ResCap Board resolution
provided him with discretion not to sign the First Tax Allocation Agreement if in reviewing
the final document "there was something amiss."[1715] Young's decision not to sign the
agreement was largely influenced by a high-ranking AFI officer, perhaps Mackey, informing
Young that the agreement had not been properly vetted or approved within AFI.[1716] Young
apparently never considered signing the agreement after being told this:

> I found out that [AFI] had not gone through the proper level of
> governance from their perspective. . . . [A]lthough I don't know
> their governance process . . . I was informed that whoever
> signed the documents didn't have the authority to do so. And, as
> you know, of course I'm not going to enter into a transaction
> where it's not going to stand up.[1717]

He testified that he "had no reason to believe that what [he] was being told was not
true,"[1718] and that he "took [AFI's] word that they understood their governance and that they
were being honest and truthful of which [he] never had a reason to doubt."[1719]

Furthermore, Young testified that he was concerned that compelling AFI to follow
through on the terms of the First 2009 Tax Allocation Agreement would have harmed
ResCap's relationship with AFI, which he viewed as important because of ResCap's reliance
on AFI for its capital needs:

> [S]omewhere along the line before these agreements were
> executed, we learned that our counterparty hadn't vetted it. And
> this counterparty by the way is very important to us. They were
> providing capital and liquidity to separate transactions for a
> long period of time where we couldn't go to third parties. Very
> important for us. And the fact that they hadn't gone through
> their process, certainly as a businessperson at that time, given
> the importance of this counterparty, *we weren't going to talk
> about a short-term forcing them into a transaction that could
> ultimately turn off our ability to do further transactions with
> them*.[1720]

---

[1715] Int. of J. Young, Apr. 22, 2013, at 92:6-20.

[1716] *See id.* at 10:14-11:10, 97:11-21, 160:14-162:13.

[1717] *Id.* at 97:13-21.

[1718] *Id.* at 98:5-15.

[1719] *Id.* at 162:9-13.

[1720] *Id.* at 160:18-161:10 (emphasis added).

Young, however, testified that AFI never told him that if ResCap were to pursue a course of trying to hold AFI to the terms of the First 2009 Tax Allocation Agreement, there would be negative consequences for ResCap in its ongoing relationship with AFI.[1721]

In addition, Young testified that he did not intend for the First 2009 Tax Allocation Agreement to be binding until he signed the agreement and that he did not believe that anyone on the ResCap side intended for ResCap to be bound by the agreement until it was signed by a ResCap officer.[1722] Although he could not recall any specific discussions he had as to whether the agreement would have been enforceable had he signed it, he believes that he may have discussed this issue with Tammy Hamzehpour, ResCap's General Counsel at the time.[1723]

After AFI informed Young and Hamzehpour that it may propose a new tax allocation agreement in place of the First 2009 Tax Allocation Agreement, Marx called Young on November 1, 2010 and explained in more detail why AFI was proposing changes to the tax allocation agreement and what the monetary impact would be to ResCap:

> I shared with him the reason why we stopped the execution of the draft agreements, i.e., they would have compelled large capital contributions to ResCap on the order of hundreds of millions for 2009 and 2010 tax years, versus a cash payment to [AFI] of $6m if we removed the beneficial language with respect to NOL's, capital losses and foreign tax credits. He understood the reason and did not think changing the draft agreements was disadvantageous to ResCap. Jim's view was that we need to move ahead and present a revised, stand-alone agreement to the ResCap Board for approval and than an executed agreement would be required to allow remittance of funds. I plan to eliminate the clauses in question and start the Board review process.[1724]

The Investigation has uncovered no evidence that Young vetted the issue of the proposed changes in the tax allocation arrangement and the monetary impact to ResCap with anyone else on the ResCap Board or in ResCap senior management prior to telling Mackey and Marx that he did not see anything unfair with the changes AFI was proposing and suggesting that

---

[1721] *See id.* at 173:16–22. ("[Q:] Did anyone at [AFI] ever suggest in words or substance to you that if ResCap sought to enforce the [First 2009 Tax Allocation Agreement], that there would be consequences to doing so? [A:] No discussion like that ever occurred.").

[1722] *See id.* at 209:20–210:10.

[1723] *See id.* at 98:5–20.

[1724] E-mail from W. Marx (Nov. 2, 2010), at ALLY_0424660 [ALLY_0424660]. Despite Marx's characterization of the payments that AFI would owe to ResCap under the First 2009 Tax Allocation Agreement as "capital contributions," payments under tax allocation agreements should not be considered capital contributions and dividends. *See* Int. of J. Young, Apr. 22, 2013, at 137:25–139:11.

AFI move forward with preparing a new agreement to present to the ResCap Board. Young immediately accepted AFI's explanation of the proposed changes as reasonable.[1725]

At a November 5, 2010 ResCap Board meeting, Young presented and discussed AFI's proposed draft of the Second 2009 Tax Allocation Agreement, which removed ResCap's right under the First 2009 Tax Allocation Agreement to receive compensation from AFI for AFI's use of ResCap tax benefits.[1726] Marx had discussed AFI's proposal with Young on November 1, 2010 and had sent a copy of the draft agreement to Tammy Hamzehpour, ResCap's General Counsel, on November 3, 2010.[1727] The ResCap Board discussed the Second 2009 Tax Allocation Agreement again on December 9, 2010, and the Independent Directors later discussed it with their counsel, Morrison Cohen.[1728]

Young testified that he has no specific recollection of speaking to anyone on the ResCap Board about why he did not sign the agreement or what was said if, in fact, he did discuss the agreement with the Board.[1729] Furthermore, he could not recall ever quantifying for the ResCap Board the amount that ResCap might have been owed under the First 2009 Tax Allocation Agreement.[1730] Similarly, West testified that the ResCap Board's discussions regarding the Second 2009 Tax Allocation Agreement were in the context of abstract concepts of reasonableness, with no specific discussions on the estimated monetary impact to ResCap of accepting the new agreement.[1731] West also could not recall the ResCap Board ever asking whether the First 2009 Tax Allocation Agreement had been signed by a ResCap officer and, if not, why it had not been signed.[1732]

---

[1725] *See* Int. of W. Marx, Apr. 18, 2013, at 100:10–101:7 ("[T]his was not—this back and forth was never really adversarial. As soon as it came up, Jim was—Jim Young . . . was like, 'Oh yeah, we're not trying to do something here that we didn't intend to do, so if we need to put the breaks [sic] on and, you know, and he's a very reasonable person . . . .'"); *see also id.* at 130:23–131:12 ("[A]s soon as we brought up our issue with the first agreement, Jim [Young] was like, 'Oh yeah, I see that. You know, that's okay. If we need to have some further discussion, let's do it.' You know he got it. . . . And you know, there was no coaching, cajoling, convincing.").

[1726] *See* Draft Second 2009 Tax Allocation Agreement, at RC40016933 [RC40016871] (deleting part of Section 1.03D from the First 2009 Tax Allocation Agreement); *see also* Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Nov. 5, 2010, at RC40018848 [RC40018729]; E-mail from T. Hamzehpour (Nov. 10, 2010), at EXAM10432502–03 [EXAM10432501] ("We discussed [the draft Second 2009 Tax Allocation Agreement] with ResCap's independent directors on Nov 5.")

[1727] *See* E-mail from W. Marx (Nov. 3, 2010), at EXAM10432503–04 [EXAM10432501].

[1728] *See* E-mail from T. Hamzehpour (Dec. 16, 2010), at EXAM10432502 [EXAM10432501].

[1729] *See* Int. of J. Young, Apr. 22, 2013, at 146:20–147:16.

[1730] *See id.* at 148:2–149:18.

[1731] *See* Int. of P. West, Apr. 16, 2013, at 23:2–12, 80:8–81:23.

[1732] *See id.* at 18:24–19:3.

Morrison Cohen sent comments on the Second 2009 Tax Allocation Agreement to ResCap on December 16, 2010:

> First, seems very unfair. If Rescap earns profit but [GMAC Mortgage Group LLC/AFI] has losses and no tax is ultimately due, then Rescap still must pay [GMAC Mortgage Group LLC/ AFI] the hypothetical tax on Rescap's profit. However, if [GMAC Mortgage Group LLC/AFI] earns profit but Rescap has losses and no tax is ultimately due, then [GMAC Mortgage Group LLC/AFI] need not pay Rescap the hypothetical tax on [GMAC Mortgage Group LLC/AFI's] profit. . . . Second, [Marx's] cover email suggests that as a consolation prize the losses used up by [AFI] can reduce future income of Rescap. Nice thought but I really don't see that spelled out in the agreement. If anything, the key definition in section 1.03(D) seems to be an annual calculation due to the phrase "for any taxable year[,]" and it has no reference to past losses.[1733]

Hamzehpour forwarded Morrison Cohen's comments to AFI on December 16, 2010,[1734] and then ResCap, AFI, and Morrison Cohen discussed the proposed Second 2009 Tax Allocation Agreement on a December 21, 2010 conference call.[1735] Marx summarized the discussion as follows:

> First, regarding fairness, they pressed [AFI] fairly hard about [AFI] not being consistent with all companies in the group . . . . My response was that there is no obligation for [AFI] to pay its subsidiaries in advance of stand-alone use of the attributes . . . and that [AFI] senior management was unlikely to agree to a tax allocation regime that could compel random capital contributions. I also made the point that where we do pay currently for attributes that would otherwise not be utilized by the subsidiary on a stand-alone basis, we do so because of regulatory requirements, and ResCap has no such regulatory requirement. However, even absent regulatory requirements, it is the parent company's prerogative to decide whether or not to sprinkle benefits on one subsidiary and not another. Finally, we (Jim Young was very supportive) drove home the point that keeping ResCap in the same position it would have been in on a

---

[1733] E-mail from M. Connolly (Dec. 16, 2010), at EXAM10432518 [EXAM10432517].

[1734] *See* E-mail from T. Hamzehpour (Dec. 16, 2010), at EXAM10432501–02 [EXAM10432501].

[1735] *See* Conference call invitation from T. Hamzehpour [EXAM10902438]; *see also* E-mail from W. Marx (Dec. 20, 2010), at EXAM10432501 [EXAM10432501].

stand-alone basis is as fair as anyone could demand, and this agreement does that. . . . They took several runs at the fairness point. I was thinking they were going to escalate the issue. Then Michael Connelly [sic] basically threw in the towel, saying there was enough support for our proposal and that it was not an unreasonable business position to go straight stand-alone. It was a pretty abrupt ending, but with the right result. They are going to propose language on the loss attributes, but otherwise will tell the Board that the agreement is reasonable.[1736]

Young was supportive of AFI's position on the conference call in that he agreed that a strict stand-alone agreement was fair between the parties.[1737]

The Independent Directors believed that language Morrison Cohen drafted addressed the fairness concerns that Morrison Cohen previously raised and relied on its outside counsel in considering the approval of the Second 2009 Tax Allocation Agreement.[1738] In fact, as stated in Marx's summary of the December 21, 2010 conference call, Morrison Cohen's comment that was eventually incorporated into the Second 2009 Tax Allocation Agreement merely clarified ResCap's ability to use carryovers of tax benefits as an offset in calculating its stand-alone tax liability in future years. The clarifying language did not address the fairness point as the parties on the conference call agreed to leave the tax allocation provisions as drafted by AFI.[1739] In addition, the tax attorney at Morrison Cohen who reviewed the Second 2009 Tax Allocation Agreement, Isaac Grossman, knew that ResCap had been generating substantial tax losses but was not aware that ResCap was also generating excess inclusion income, which cannot be offset by tax losses.[1740] One of the Independent Directors, Pamela West, does not recall the issue of excess inclusion income or that ResCap would owe cash payments to AFI under the Second 2009 Tax Allocation Agreement being presented to the ResCap Board at meetings or to her at any time.[1741] In fact, West was not aware that ResCap has been making payments to AFI on account of taxes on excess inclusion income under the Second 2009 Tax Allocation Agreement.[1742] Yet on November 1, 2010, Marx had told Young that ResCap would owe $6 million to AFI for the 2009 tax year under the Second 2009 Tax Allocation Agreement.[1743]

---

[1736] E-mail from W. Marx (Dec. 22, 2010), at 1 [ALLY_0424667].

[1737] *See* Int. of W. Marx, Apr. 18, 2013, at 130:7–22.

[1738] *See* Int. of P. West, Apr. 16, 2013, at 66:6–19, 81:11–84:23, 87:20–91:24, 100:20–103:1.

[1739] *See* E-mail from W. Marx (Dec. 22, 2010), at 1 [ALLY_0424667].

[1740] *See* Int. of I. Grossman, Apr. 16, 2013, at 6:18–9:12, 25:6–28:9.

[1741] *See* Int. of P. West, Apr. 16, 2013, at 25:7–25:14, 66:20–67:4, 95:9–98:8.

[1742] *See id.* at 95:9–98:8 ("[Q:] Are you aware that ResCap has had to make any payments under the [Second 2009 Tax Allocation Agreement]? [A:] Not that I'm aware. [Q:] You laughed there and is that because of the financial condition that ResCap was in at the time? [A:] Yes.").

[1743] *See* E-mail from W. Marx (Nov. 2, 2010), at ALLY_0424660 [ALLY_0424660].

The Second 2009 Tax Allocation Agreement was approved by the ResCap Board on December 22, 2010, subject to inclusion of the language to be provided by Morrison Cohen.[1744] On January 24, 2011, Morrison Cohen provided such language to clarify that ResCap would be entitled to factor in its ability to use carryover NOLs, capital losses, and foreign tax credits when ResCap's stand-alone tax liability was determined for each tax year under the agreement, but no edits were provided to address Morrison Cohen's previous comments as to why the agreement seemed "very unfair."[1745] The Second 2009 Tax Allocation Agreement was fully executed on January 26, 2011.[1746]

The Investigation has not uncovered any documents indicating that ResCap requested or received a fairness opinion on the Second 2009 Tax Allocation Agreement or considered the requirements in the 2006 Amended Operating Agreement that the tax allocation agreement had to "provide for two-way sharing payments."[1747]

On multiple occasions during his interview, Young stated his belief that a tax allocation agreement has only two purposes—(1) to be used as an accounting tool to assist readers of financial statements so they can understand financial results and (2) to be used to ensure that a subsidiary that is not a taxpayer pays cash to its parent that is responsible for paying taxes on income related to the subsidiary's operations—but is not intended to "transfer value" or be a vehicle through which a subsidiary compels capital contributions from its parent.[1748] Based on Young's understanding of the purpose of a tax allocation agreement, Young viewed the favorable payment provision to ResCap in the First 2009 Tax Allocation Agreement as a "windfall," because it was better than stand-alone treatment.[1749] Young testified that, although he could not remember his specific discussions with the ResCap Board at meetings regarding the Second 2009 Tax Allocation Agreement, he believed that he presented to the Board his understanding of the general purposes of a tax allocation agreement along the lines stated above.[1750]

### c. *Provisions Of The Tax Allocation Agreements And Their Impact On ResCap*

#### (1) *Implemented 2005 Tax Allocation Agreement And Other 2005 Tax Allocation Agreement*

The Implemented 2005 Tax Allocation Agreement was favorable to ResCap in some respects but unfavorable to ResCap in other respects because of certain terms rarely seen in

---

[1744] *See* Minutes of Special Meeting of Board of Directors of Residential Capital, LLC, Dec. 22, 2010, at RC40018862 [RC40018729].

[1745] *See* E-mail from M. Connolly (Jan. 24, 2011), at 1 [ALLY_0424649]; *see also* E-mail from I. Grossman (Dec. 21, 2010), at 2 [ALLY_0424649].

[1746] Second 2009 Tax Allocation Agreement, at 6 [RC00028796].

[1747] 2006 Amended Operating Agreement, § 2(b)(iii) [ALLY_0041818].

[1748] *See* Int. of J. Young, Apr. 22, 2013, at 62:15–64:18, 77:5–78:2, 82:2–83:23, 139:18–140:16, 172:22–173:15.

[1749] *See id*. at 76:10–16.

[1750] *See id*. at 149:19–150:11, 203:5–204:15.

tax allocation agreements. As to the favorable aspects, the Implemented 2005 Tax Allocation Agreement provided for two-way sharing payments. That provision provides for the possibility that ResCap would make payments to AFI or AFI would make payments to ResCap in a particular tax year, depending, in part, on ResCap's tax position for the year.[1751] Two-way sharing was required by the 2005 Operating Agreement.[1752] Furthermore, when determining the amount of compensation to which ResCap was entitled when GM and AFI used ResCap's NOLs, the parties followed the allocation rules under section 1.1502-21 of the Treasury Regulations (and followed similar rules in the Treasury Regulations with respect to other tax benefits), instead of a "but for" concept typically found in tax allocation agreements.[1753] Simply put, in a typical tax allocation agreement, a parent corporation is not considered to have begun using a subsidiary's NOLs in a tax year unless all the NOLs the parent receives from its other subsidiaries were insufficient to shield the parent from having net income in that tax year. In contrast, section 1.1502-21 of the Treasury Regulations generally allocates use of the consolidated NOL of a consolidated group for any tax year among all of the members of the consolidated group that had NOLs for such tax year in the proportion that each member's separate NOL bears to the sum of all member's NOLs for such year.[1754] Thus, the Implemented 2005 Tax Allocation Agreement was more favorable to ResCap than a typical tax allocation agreement because ResCap would be entitled to some compensation, for instance, even if GM had to carry forward a larger amount of consolidated NOL than the amount of the separate NOL that ResCap and its subsidiaries generated in the tax year.

The Implemented 2005 Tax Allocation Agreement was unfavorable to ResCap in that it required both GM and AFI to be able to use ResCap tax benefits before ResCap would be entitled to compensation for use of its tax benefits.[1755] ResCap was required under the Implemented 2005 Tax Allocation Agreement to pay to AFI the amount of ResCap's stand-alone tax liability that

---

[1751] *See* Implemented 2005 Tax Allocation Agreement, §§ 1.03F, 3.03 [ALLY_0178779].

[1752] *See* 2005 Operating Agreement, § 2(b)(iii) [MELZER.004869].

[1753] *See* E-mail from J. Aretakis (Jan. 4, 2006), at EXAM10170854 [EXAM10170853] (GM's use of ResCap's NOLs under the Implemented 2005 Tax Allocation Agreement is "governed by Treasury Regulations that mandate the allocation of a consolidated net operating loss carryforward to individual members [of a consolidated group] upon deconsolidation."); *see also* Memorandum, AFI-ResCap Tax Sharing, dated Mar. 20, 2013, at 2 ("The initial allocations limited ResCap's benefit for 2005 losses to the amount of those losses treated as absorbed by taxable income of non-ResCap entities on the 2005 GM consolidated return. ResCap was left with loss carryforwards to the extent it was allocated consolidated net operating loss under Treas. Reg. §1.1502-21."); Memorandum, AFI-ResCap Tax Sharing, dated Mar. 12, 2013, at 5 ("The initial tax allocation calculations interpreted the [Implemented 2005 Tax Allocation Agreement] in accordance with the principles of Section 1.1502-21 of the Treasury regulations . . . ."); Description of 2005 and 2006 Tax Allocation to ResCap, prepared by W. Marx, dated Nov. 27, 2012, at ALLY_0338094 [ALLY_0338094] ("add back to taxable income . . . for the consolidated net operating loss carry forward [sic] allocable to ResCap under Treasury Regulations").

[1754] *See* Treas. Reg. § 1.1502–21(b)(2)(iv)(B).

[1755] *See* Implemented 2005 Tax Allocation Agreement, § 1.03F [ALLY_0178779].

ResCap generated in a tax year.[1756] In determining the amount of compensation ResCap would receive when ResCap generated net tax benefits for a tax year, the Implemented 2005 Tax Allocation Agreement would ignore ResCap's net tax refund position on a stand-alone basis and instead look to use by ResCap's owners.[1757] Tax sharing arrangements in which a subsidiary is compensated by a parent based on the parent's use, not the subsidiary's stand-alone tax position, are common. It is unusual, however, for a tax allocation agreement to require use by both a direct parent and indirect parent before the subsidiary can receive compensation. In contrast, the operative provision in the Other 2005 Tax Allocation Agreement required only that AFI use ResCap's tax benefits for ResCap to receive compensation—a more standard construction.[1758]

The Implemented 2005 Tax Allocation Agreement was in effect from March 2005 through November 30, 2006, the period when ResCap was a corporation within the GM consolidated group. In 2005, ResCap generated $779.7 million in taxable income on a stand-alone basis as a separate ResCap sub-group within the GM consolidated group.[1759] Using a 35% federal income tax rate and applying $0.1 million in tax credits also generated by ResCap, this equated to a $272.8 million stand-alone tax liability.[1760] GM, however, had to carry forward consolidated NOLs and consolidated charitable contribution deductions, and $204.8 million of the consolidated NOL carryover and $8.5 million of the consolidated charitable contribution deduction carryover were allocable to individual members of the ResCap sub-group under section 1.1502-21 of the Treasury Regulations.[1761] This translates to $74.7 million in potential tax savings (applying a 35% federal income tax rate) generated by ResCap in 2005 that GM could not use on a current basis.[1762] Pursuant to the terms of the Implemented 2005 Tax Allocation Agreement, this $74.7 million in potential tax savings that GM could not currently use was added to ResCap's $272.8 million stand-alone tax liability to determine the total of $347.5 million that ResCap owed to AFI.[1763] Accordingly, AFI billed ResCap $347.5 million in respect of obligations under the Implemented 2005 Tax Allocation Agreement for 2005.[1764]

---

[1756] *See id.* §§ 1.03F, 3.03.

[1757] *See id.* § 1.03F.

[1758] *See* Other 2005 Tax Allocation Agreement, § 1.03E [MELZER.009035].

[1759] Allocation of 2005 Tax Liability Analysis, prepared by AFI, at cell H-11 [ALLY_0338098].

[1760] *Id.* at cells H-27, H-29, H-30, H-36 [ALLY_0338098].

[1761] *See* Description of 2005 and 2006 Tax Allocation to ResCap, prepared by W. Marx, dated Nov. 27, 2012, at ALLY_0338094 [ALLY_0338094] ("$8,488,654 for the consolidated limitation on charitable contributions calculated by GM under Treasury Regulations" and "$204,838,050 for the consolidated net operating loss carry forward [sic] allocable to ResCap under Treasury Regulations").

[1762] Allocation of 2005 Tax Liability Analysis, prepared by AFI, at cells G-12, G-20, G-25, G-36 [ALLY_0338098].

[1763] *Id.* at cells E-36, F-36, G-36, H-36.

[1764] *Id.* at cells E-37, F-37, E-38, F-38, G-38.

ResCap paid to AFI $210.5 million of the bill by March 31, 2006.[1765] But before ResCap paid the remainder of the bill, ResCap contested the $74.7 million portion of the bill regarding amounts of ResCap tax benefits that GM was not able to use currently.[1766]

Around April 2006, Thomas Melzer, one of the Independent Directors, questioned the provision in the Implemented 2005 Tax Allocation Agreement requiring both GM and AFI to use ResCap's tax benefits for ResCap to receive compensation.[1767] Melzer had noticed that ResCap had an income tax receivable on its books that had built up to more than $300 million. This receivable related to tax benefits generated by ResCap and its subsidiaries from 2001 through 2005 that had not yet been used by GM and AFI under the Implemented 2005 Tax Allocation Agreement (and previous tax allocation agreements between AFI and the entities that were transferred to ResCap in March 2005), and, thus, for which ResCap had not yet received compensation.[1768] Melzer thought the requirement that GM and AFI had to be able to use the tax benefits before ResCap would be entitled to compensation was "very peculiar" and that it was "inconsistent with the spirit of what had been disclosed in [registration statements filed with the SEC] with respect to how the tax sharing agreement was described."[1769] The income tax receivable was in the amount of $346.4 million as of December 31, 2005.[1770] GM agreed to convert the receivable to cash and paid $346.4 million to ResCap in June 2006, in part because of the pending sale of 51% of AFI to Cerberus.[1771] This settlement resulted in ResCap paying to AFI its stand-alone tax liability of $272.8 million for its 2005 tax year, instead of the $347.5 that was

---

[1765] *Id.* at cells E-37, G-37.

[1766] *Id.* at cells E-39, F-39.

[1767] *See* Int. of T. Melzer, Oct. 10, 2012, at 147:7–152:22.

[1768] *See id.* at 149:2–150:14; *see also* Residential Capital, LLC, Annual Report (Form 10-K) (Mar. 13, 2007), at 133–134 [ALLY_0338091] (describing the tax receivable as a result of ResCap's 2004 and 2005 NOLs, charitable contribution deductions, and foreign tax credits that had not been used by GM but instead were carried forward by GM).

[1769] *See* Int. of T. Melzer, Oct. 10, 2012, at 149:21–150:25.

[1770] The $346.4 million income tax receivable was comprised of potential tax savings that ResCap and its subsidiaries generated from 2001 through 2005 but that GM could not yet use. *See* ResCap's GM Intercompany Receivable as of 6/30/06 [ALLY_0434980].

[1771] *See* Residential Capital, LLC, Annual Report (Form 10-K) (Mar. 13, 2007), at 133–134 [ALLY_0338091]; *see also* Memorandum, AFI-ResCap Tax Sharing, dated Mar. 12, 2013, at 5 ("Because of the pending sale of [AFI] at that time, the parties all felt it was appropriate to make a payment to ResCap to settle the intercompany receivable in respect of the tax losses generated by the ResCap business.").

originally billed by AFI and required under the Implemented 2005 Tax Allocation Agreement.[1772] ResCap's 2005 federal income tax position and related payments to AFI are summarized in Exhibit V.D.2.c(1)—1, below.

EXHIBIT V.D.2.c(1)—1
**ResCap's Federal Income Tax Position**
2005 Tax Year

| | ResCap Taxable Income | ResCap Tax Credits | ResCap Stand-Alone Tax Liability | GM Consolidated NOL Carryover Allocable to ResCap | GM Charitable Contribution Deduction Carryover Allocable to ResCap | Amount Originally Billed by AFI to ResCap | Final Net Payment by ResCap to AFI |
|---|---|---|---|---|---|---|---|
| Income/Loss | $ 779,719,198 | N/A | N/A | $ 204,838,050 | $ 8,488,654 | N/A | N/A |
| Tax-effective (at 35%) | $ 272,901,720 | $ (124,822) | $ 272,776,898 | $ 71,693,317 | $ 2,971,029 | $ 347,441,244 | $ 272,776,898 |

*Source: Allocation of 2005 Tax Liability Analysis, prepared by AFI, at cells E-36, F-36, H-11, H-27, H-29, H-30, H-36, [ALLY_0338098]; Description of 2005 and 2006 Tax Allocation to ResCap, prepared by W. Marx, dated Nov. 27, 2012, at ALLY_0338094 [ALLY_0338094].*

ResCap generated $515 million in losses in its short tax year ended November 30, 2006.[1773] It also had $231.2 million in excess inclusion income,[1774] which is a type of income that cannot be offset by losses.[1775] These losses and excess inclusion income netted to a $283.8 million net loss that ResCap could use on a stand-alone basis by carrying the losses back to 2005 to offset its income from that year. Applying the 35% federal income tax rate, this $283.8 million net loss translated to $99.3 million in potential tax savings for the GM consolidated group. In addition, ResCap generated another tax benefit for GM—$1.7 million in foreign tax credits, which reduce tax liability dollar-for-dollar. Accordingly, ResCap generated a total of $101 million in potential tax savings to GM in 2006.[1776]

AFI, however, paid ResCap $85.9 million for ResCap's tax benefits generated in the tax year ending November 30, 2006.[1777] The payment was based on estimates of ResCap's tax attributes and GM's and AFI's use of the tax attributes as of the completion of the final closing balance sheet of AFI in connection with the Cerberus transaction.[1778] The parties to the

---

[1772] *Cf.* Description of 2005 and 2006 Tax Allocation to ResCap, prepared by W. Marx, dated Nov. 27, 2012, at ALLY_0338094 [ALLY_0338094] ("Thus, ResCap received full benefit for its 2005 NOL's and charitable contributions despite language in the tax allocation agreement that would have limited the current benefit.").

[1773] Reconciliation of Taxable Income through November 30, 2006 Analysis, prepared by AFI, at cell J-11 [ALLY_0338099].

[1774] ResCap Consolidated 2006 Tax True-up and Carryback Refund Analysis, prepared by AFI [ALLY_0424686].

[1775] *See* I.R.C. § 860E(a); *see also* Treas. Reg. § 1.860E–1(a)(1).

[1776] GMAC Mortgage Group, Inc. and Subsidiaries' Liability for 2006 U.S. Federal Income Tax Year Ended November 30, 2006, prepared by AFI, at tab MTG GROUP, cell O-36 [ALLY_0208453].

[1777] Reconciliation of Taxable Income through November 30, 2006 Analysis, prepared by AFI, at cell L-15 [ALLY_0338099]; *see also* Description of 2005 and 2006 Tax Allocation to ResCap, prepared by W. Marx, dated Nov. 27, 2012, at ALLY_0338095–96 [ALLY_0338094].

[1778] *See* Description of 2005 and 2006 Tax Allocation to ResCap, prepared by W. Marx, dated Nov. 27, 2012, at ALLY_0338094–96 [ALLY_0338094].

Implemented 2005 Tax Allocation Agreement later updated the calculation of the tax benefit generated by ResCap when the 2006 GM consolidated federal income tax return was prepared in mid-2007, but AFI made no additional payments to ResCap on account of an increased tax benefit reflected in the updated calculation.[1779]

In addition, when AFI and ResCap first estimated the amount of tax attributes that ResCap had generated, the parties believed that GM would have to carry forward consolidated NOLs and consolidated capital losses from 2006 and that ResCap's allocable share of these loss carryovers was estimated to be $78.6 million.[1780] Applying the 35% federal income tax rate, this $78.6 million portion of GM's loss carryover represented $27.5 million of the total $101 million potential tax savings generated by ResCap that the parties originally believed that GM could not use in 2006. During the Investigation, the Examiner's Professionals spoke with GM's tax staff, who stated that GM has used all of its 2006 losses, including any losses it inherited from ResCap in 2006 upon ResCap's conversion to a disregarded entity.[1781] Consequently, GM and AFI have used all of the $101 million in tax savings generated by ResCap.

The Implemented 2005 Tax Allocation Agreement provided that it would terminate when ResCap Group left the GM consolidated group but would "continue to apply to all years and that part of a year ending prior to the date of termination."[1782] Upon ResCap's conversion to a disregarded entity, ResCap was severed from the GM consolidated group, the Implemented 2005 Tax Allocation Agreement terminated, and ResCap's unused 2006 losses were inherited by GM via ResCap's deemed liquidation under federal tax law. Nevertheless, the termination clause of the Implemented 2005 Tax Allocation Agreement provided that ResCap would still be entitled to compensation under the agreement for tax benefits generated by ResCap and used by GM at any time, even after the agreement terminated (presumably as long as AFI could also use the tax benefits before it left the GM consolidated group, which is not at issue). NOLs can be carried forward for twenty years; whereas, capital losses can be carried forward for five years.[1783] Now that GM tax staff has confirmed that GM has used all of the 2006 ResCap tax benefits, ResCap should be entitled to $15.1 million in additional compensation from AFI under the Implemented 2005 Tax Allocation Agreement. In addition, the Examiner notes that ResCap also would have been entitled to the additional $15.1 million under the Other 2005 Tax Allocation Agreement, where use by GM was not a prerequisite to ResCap receiving compensation.

---

[1779] *See id.* at ALLY_0338095–96.

[1780] Reconciliation of Taxable Income through November 30, 2006 Analysis, prepared by AFI, at cell J-14 [ALLY_0338099]; *see also* Description of 2005 and 2006 Tax Allocation to ResCap, prepared by W. Marx, dated Nov. 27, 2012, at ALLY_0338095 [ALLY_0338094] ("This was an estimate based on how much of ResCap's losses would not generate a current year benefit to the GM Group and thus not be paid to ResCap under the allocation agreement."). Moreover, AFI's ability to use all of ResCap's tax benefits does not appear to have been in doubt under the documents calculating the amount owed to ResCap for its tax year ending November 30, 2006 under the Implemented 2005 Tax Allocation Agreement.

[1781] Conference call with GM's tax staff and internal counsel (Apr. 17, 2013).

[1782] Implemented 2005 Tax Allocation Agreement, § 6.08 [ALLY_0178779].

[1783] I.R.C. §§ 172(b)(1)(A)(ii), 1212(a)(1)(B).

ResCap's federal income tax position for the tax year ending November 30, 2006 and related payments under the Implemented 2005 Tax Allocation Agreement are summarized in Exhibit V.D.2.c(1)—2 below.

EXHIBIT V.D.2.c(1)—2
**ResCap's Federal Income Tax Position**
Tax Year Beginning January 1, 2006, Ending November 30, 2006

|  | ResCap Taxable Loss | ResCap Excess Inclusion Income | ResCap Tax Credits | ResCap Stand-Alone Tax Liability (Refund) | GM Consolidated Loss Carryover Allocable to ResCap | Final Net Payment by AFI to ResCap |
|---|---|---|---|---|---|---|
| Income/Loss | $ (514,967,148) | $ 231,238,744 | N/A | N/A | $ 78,568,397 | N/A |
| Tax-effective (at 35%) | $ (180,238,502) | $ 80,933,560 | $ (1,650,000) | $ (100,954,942) | $ 27,498,939 | $ 85,899,495 |

*Source: Reconciliation of Taxable Income through November 30, 2006 Analysis, prepared by AFI, at cells J-11, J-14, L-11, L-14, L-15 [ALLY_0338099]; ResCap Consolidated 2006 Tax True-up and Carryback Refund Analysis, prepared by AFI [ALLY_0424686]; GMAC Mortgage Group, Inc. and Subsidiaries' Liability for 2006 U.S. Federal Income Tax Year Ended November 30, 2006, prepared by AFI, at tab MTG GROUP, cell O-36 [ALLY_0208453]; see also Description of 2005 and 2006 Tax Allocation to ResCap, prepared by W. Marx, dated Nov. 27, 2012, at ALLY_0338095–96 [ALLY_0338094].*

### (2) 2006 Tax Allocation Agreement

The 2006 Tax Allocation Agreement applied to income taxes imposed only by state and local jurisdictions that did not treat ResCap as a disregarded entity and that taxed ResCap and AFI on a combined or unitary basis.[1784] This tax allocation agreement was the only one in effect from December 1, 2006 through June 30, 2009. ResCap paid a total of $1.2 million to AFI under the 2006 Tax Allocation Agreement.[1785]

It is not clear whether the tax allocation agreement required to be in place under section 2(b)(iii) of the 2006 Amended Operating Agreement must apply to federal income taxes or state and local income taxes, or both.

ResCap did not have to make payments in respect of federal income taxes on any income it generated from December 1, 2006 through June 30, 2009 because it was not a taxpayer under federal tax law and it was not subject to a tax allocation agreement covering federal income taxes. ResCap likewise had no right to receive compensation for any tax benefits that it generated during this period. As it turned out, ResCap generated substantial tax benefits that

---

[1784] *See* 2006 Tax Allocation Agreement, at ALLY_0178791 [ALLY_0178779]. Although the 2006 Tax Allocation Agreement makes some passing references to a few federal tax concepts, such as the IRS and the Internal Revenue Code, the agreement apparently did not apply with respect to federal income taxes. It was intended to apply with respect to income taxes in only those state and local jurisdictions that did not treat ResCap as a disregarded entity. *See* Letter from W. Marx to J. Young (Nov. 13, 2008), at ALLY_0178792 [ALLY_0178779] ("[T]his agreement is effective only with respect to those very few jurisdictions that treat ResCap as a taxable entity and only where ResCap would file a combined or unitary return with [AFI].").

[1785] Residential Capital, LLC Tax Payment Detail Analysis, prepared by AFI, at tab Tax Payment Support, cells F-8, F-9, F-10, F-11[ALLY_PEO_0079528] ($0.1 million for AFI's tax year ending December 31, 2006, $0.9 million for AFI's 2007 tax year, $0.1 million for AFI's 2008 tax year, and less than $0.1 million for AFI's tax year ending June 30, 2009); *see also* Residential Capital, LLC U.S. Federal, State, and Local Tax Allocations Analysis, prepared by AFI, at cells N-10, N-12, N-14, N-16 [ALLY_PEO_0079527].

passed through to GM and Cerberus during this period, which amounts are summarized in Exhibit V.D.2.c(2), below. ResCap also generated $28.6 million in excess inclusion income in 2008 that GM and Cerberus had to recognize.[1786]

---

EXHIBIT V.D.2.c(2)
**ResCap's Federal Income Tax Attributes**
December 1, 2006 – June 30, 2009

| | ResCap Ordinary Income/(Loss) | | ResCap Capital Gain/(Loss) | | ResCap Foreign Tax Credits | |
|---|---|---|---|---|---|---|
| December 1, 2006 – December 31, 2006 | $ | (204,028,712) | $ | 3,323,011 | $ | (1,418,270) |
| January 1, 2007 – December 31, 2007 | | (5,659,030,998) | | (489,363,299) | | (783,372) |
| January 1, 2008 – December 31, 2008 | | 3,133,426,930 | | (49,951,683) | | (411,244) |
| January 1, 2009 – June 30, 2009 | | (1,904,184,692) | | (453,496,439) | | (72,633) |
| Total | $ | (4,633,817,472) | $ | (989,488,410) | $ | (2,685,519) |
| Tax-effective [(1)] | $ | (1,621,836,115) | $ | (346,320,944) | $ | (2,685,519) |

*[(1)] Calculated at 35% for ordinary income/loss and capital gain/loss. The foreign tax credits are already tax-effective amounts because tax credits reduce tax liability on a dollar-for-dollar basis.*
*Source: GMAC LLC, U.S. Return of Partnership Income (I.R.S. Form 1065) for Tax Year Ending Dec. 31, 2006, at ALLY_0176462 [ALLY_0176426]; GMAC LLC, U.S. Return of Partnership Income (I.R.S. Form 1065) for Calendar Year 2007, at ALLY_0172570 [ALLY_0172540]; GMAC LLC, U.S. Return of Partnership Income (I.R.S. Form 1065) for Calendar Year 2008, at ALLY_0391272– 86 [ALLY_0390037]; GMAC LLC, U.S. Return of Partnership Income (I.R.S. Form 1065) for Tax Year Ending June 30, 2009, at ALLY_0175879–89 [ALLY_0175031].*

---

### (3) First 2009 Tax Allocation Agreement And Second 2009 Tax Allocation Agreement

At first glance, the Second 2009 Tax Allocation Agreement, which has ostensibly been in effect since November 1, 2009, appears to be a pure stand-alone agreement in that ResCap is obligated to pay to AFI its hypothetical separate tax liability each year.[1787] A closer look, however, reveals that the agreement is significantly worse for ResCap than a pure stand-alone agreement because there is nothing in the agreement that would require AFI to make a payment to ResCap of a refund that ResCap might be entitled to on a stand-alone basis.[1788] In fact, there is no provision in the Second 2009 Tax Allocation Agreement that permits any possibility of

---

[1786] *See* GMAC LLC, U.S. Return of Partnership Income (I.R.S. Form 1065) for Calendar Year 2008, at ALLY_03900052, –083, –114[ALLY_0390037].

[1787] Second 2009 Tax Allocation Agreement, §§ 1.03D, 2.03 [RC40016871].

[1788] *See id.*

payments being made to ResCap.[1789] ResCap could only take into account the tax benefits it generates as carryovers in calculating its positive tax liability on a stand-alone basis for a future year.[1790]

The Second 2009 Tax Allocation Agreement does not meet the requirement of the 2006 Amended Operating Agreement that it "shall provide for two-way sharing payments based on the separately calculated tax liability or benefit of ResCap."[1791] Nor does the Second 2009 Tax Allocation Agreement meet the standard set by the ResCap Board when it approved the First 2009 Tax Allocation Agreement—that the agreement be "on terms not more disadvantageous in any material respect to the holders of [ResCap's] notes than those existing tax allocation agreement(s) [it is] intended to replace[.]"[1792] First, the 2006 Tax Allocation Agreement, which was a pure stand-alone agreement, explicitly provided that ResCap would be paid by AFI if ResCap generated a net tax benefit for a tax year.[1793] Second, the more appropriate comparison is between the Second 2009 Tax Allocation Agreement and having no tax allocation agreement in place for federal income tax purposes because there had been no such tax allocation agreement in place since the Implemented 2005 Tax Allocation Agreement terminated on November 30, 2006. Viewed from this perspective, the Second 2009 Tax Allocation Agreement was certain to be more disadvantageous to ResCap than leaving ResCap alone as a disregarded entity that had no obligation to make any payments on account of federal income taxes.

---

[1789] *See id.* Marx and Young each testified that he believed the agreement provided for the possibility that ResCap could receive a payment from AFI if ResCap were in a position of having NOLs that it could carry back to a previous tax year in which it had income. *See* Int. of W. Marx, Apr. 18, 2013, at 134:3–136:7; Int. of J. Young, Apr. 22, 2013, at 205:5–206:11. The agreement, however, does not provide for this treatment. ResCap can use NOLs only as carryovers in reducing the amount of its positive stand-alone tax liability in future years. *See* Second 2009 Tax Allocation Agreement, § 1.03D [RC40016871] ("For the avoidance of doubt, any [tax benefits] that are generated by the ResCap Group in any taxable period (to the extent not previously utilized pursuant to this sentence in prior periods) shall be taken into account and treated as available and unutilized in determining the Separate ResCap Group Tax Liability for any subsequent periods . . . ."). Furthermore, the reference to a carryback in section 5.02 of the agreement does not appear to allow ResCap to receive compensation for NOLs that it could carry back to a previous year under federal tax law if it were a taxpayer because section 5.02 applies to only a "change or adjustment to any item relating to the computation of payments" under the agreement, and NOL carrybacks would not generally be considered "changes" or "adjustments." *Id.* § 5.02.

[1790] *See* Second 2009 Tax Allocation Agreement, § 1.03D [RC40016871] ("For the avoidance of doubt, any [tax benefits] that are generated by the ResCap Group in any taxable period (to the extent not previously utilized pursuant to this sentence in prior periods) shall be taken into account and treated as available and unutilized in determining the Separate ResCap Group Tax Liability for any subsequent periods . . . .").

[1791] 2006 Amended Operating Agreement, § 2(b)(iii) [ALLY_0041818].

[1792] Minutes of a Regular Meeting of the Board of Directors of Residential Capital, LLC, Aug. 6, 2010, at RC40018822 [RC40018729].

[1793] 2006 Tax Allocation Agreement, § 3.03 [ALLY_0178779] ("In the event the Separate ResCap Group Tax Liability is a refund, [AFI] shall pay ResCap, or such other payee as may be required under the law.").

ResCap generated $1.44 billion in ordinary losses and $1.63 billion in capital losses between November 1, 2009 and through December 31, 2012 (including projections for the 2012 calendar year as of September 30, 2012).[1794] These ResCap losses are summarized in more detail in Exhibit V.D.2.c(3)—1, below.[1795]

EXHIBIT V.D.2.c(3)—1
**ResCap's Federal Income Tax Attributes**
November 2, 2009 – December 31, 2012

|  | ResCap Ordinary Income/(Loss) | | ResCap Capital Gain/(Loss) | |
|---|---|---|---|---|
| November 2, 2009 – December 31, 2009 | $ | (627,775,696) | $ | (6,712,990) |
| January 1, 2010 – December 31, 2010 | | 78,057,191 | | (1,360,661,391) |
| January 1, 2011 – December 31, 2011 | | (334,734,368) | | (9,068,589) |
| January 1, 2012 – December 31, 2012 [(1)] | | (559,600,000) | | (253,000,000) |
| Total | $ | (1,444,052,873) | $ | (1,629,442,970) |
| Tax-effective total (at 35%) | $ | (505,418,506) | $ | (570,305,040) |

*[(1)] Projected as of September 30, 2012.*
*Source: Ordinary & Capital Losses Generated by ResCap Companies Analysis, prepared by AFI [ALLY_0424653]; cf. ResCap Consolidation, Pro Forma U.S. Corporation Income Tax Return (I.R.S. Form 1120) for Tax Year Ending Dec. 31, 2009, at ALLY_0337325 [ALLY_0337325]; 2009 ResCap Reconciliation of Book Income to Tax Return Analysis, prepared by AFI, at tab Summary, cells I-19, J-19 [ALLY_0337324]; ResCap Consolidation, Pro Forma U.S. Corporation Income Tax Return (I.R.S. Form 1120) for Calendar Year 2010, at ALLY_0337040 [ALLY_0337039]; 2010 ResCap Reconciliation of Book Income to Tax Return Analysis, prepared by AFI, at tab Summary, cells I-18, J-18 [ALLY_0337158]; ResCap Consolidation, Pro Forma U.S. Corporation Income Tax Return (I.R.S. Form 1120) for Calendar Year 2011, at ALLY_0336318 [ALLY_0336317]; 2011 ResCap Reconciliation of Book Income to Tax Return Analysis, prepared by AFI, at tab Summary, cells I-19, J-19 [ALLY_0337157].*

These ordinary losses and capital losses flowed up to AFI for use within its consolidated group under federal tax law. Nevertheless, under the Second 2009 Tax Allocation Agreement, ResCap was not entitled to compensation for AFI's use of those substantial tax benefits.

---

[1794] *See* Ordinary & Capital Losses Generated by ResCap Companies Analysis, prepared by AFI [ALLY_0424653].

[1795] *See id.*; *cf.* ResCap Consolidation, Pro Forma U.S. Corporation Income Tax Return (I.R.S. Form 1120) for Tax Year Ending Dec. 31, 2009, at ALLY_0337325 [ALLY_0337325]; 2009 ResCap Reconciliation of Book Income to Tax Return Analysis, prepared by AFI, at tab Summary, cells I-19, J-19 [ALLY_0337324] (showing $(604.3 million) ordinary loss (after netting out excess inclusion income) and $(6.7 million) capital loss); ResCap Consolidation, Pro Forma U.S. Corporation Income Tax Return (I.R.S. Form 1120) for Calendar Year 2010, at ALLY_0337040 [ALLY_0337039]; 2010 ResCap Reconciliation of Book Income to Tax Return Analysis, prepared by AFI, at tab Summary, cells I-18, J-18 [ALLY_0337158] (showing $125.2 million ordinary income (after netting out excess inclusion income) and $(1.4 billion) capital loss); ResCap Consolidation, Pro Forma U.S. Corporation Income Tax Return (I.R.S. Form 1120) for Calendar Year 2011, at ALLY_0336318 [ALLY_0336317]; 2011 ResCap Reconciliation of Book Income to Tax Return Analysis, prepared by AFI, at tab Summary, cells I-19, J-19 [ALLY_0337157] (showing $(293.6 million) ordinary loss (after netting out excess inclusion income) and $(9.07 million) capital loss).

ResCap also generated $83 million in excess inclusion income from November 2, 2009 to December 31, 2011,[1796] on which ResCap paid $29 million to AFI (after applying a 35% federal income tax rate).[1797] Furthermore, AFI billed ResCap an additional $3 million in tax on excess inclusion income that was generated from July 1, 2009 to November 1, 2009, which was before the Second 2009 Tax Allocation Agreement's effective date.[1798] ResCap was also projected to generate $50.6 million of excess inclusion income for the 2012 year as of September 30, 2012,[1799] which would obligate it to pay $17.7 million to AFI under the Second 2009 Tax Allocation Agreement (at a 35% federal income tax rate). In contrast, ResCap would not have had to make any payments on account of excess inclusion income had it not entered into the Second 2009 Tax Allocation Agreement. If ResCap was left without a tax allocation agreement regarding federal income taxes, ResCap would not have been responsible for any tax liability as a disregarded entity. The excess inclusion income generated by and payments made by ResCap under the Second 2009 Tax Allocation Agreement are summarized in Exhibit V.D.2.c(3)—2, below.[1800]

---

[1796] *See* Ordinary & Capital Losses Generated by ResCap Companies Analysis, prepared by AFI [ALLY_0424653]; *see also* Residential Capital, LLC Tax Payment Detail Analysis, prepared by AFI, at tab Federal Breakout, cells E-21, F-31, F-45 [ALLY_PEO_0079528].

[1797] *See* Residential Capital, LLC Tax Payment Detail Analysis, prepared by AFI, at tab Tax Payment Support, cells D-12, D-13, D-14, D-16 [ALLY_PEO_0079528].

[1798] *See id.* at cell D-12 & tab Federal Breakout, cell F-21 [ALLY_PEO_0079528] (showing that ResCap was billed $6.144 million based on $17.6 million excess inclusion income from July 1, 2009 to December 1, 2009, instead of $2.8 million, which would apply the 35% federal income tax rate to $7.9 million of ResCap excess inclusion income from November 2, 2009 to December 31, 2009); *see also* Ordinary & Capital Losses Generated by ResCap Companies Analysis, prepared by AFI [ALLY_0424653] (showing that $9.6 million of ResCap excess inclusion income related to July 1, 2009 to November 1, 2009 and that $7.9 million of ResCap excess inclusion income related to November 2, 2009 to December 31, 2009).

[1799] *See* Ordinary & Capital Losses Generated by ResCap Companies Analysis, prepared by AFI [ALLY_0424653].

[1800] *See id.*; *see also* Residential Capital, LLC Tax Payment Detail Analysis, prepared by AFI, at tab Tax Payment Support, cells D-12, D-13, D-14, D-16[ALLY_PEO_0079528]; *cf.* ResCap Consolidation, Pro Forma U.S. Corporation Income Tax Return (I.R.S. Form 1120) for Tax Year Ending Dec. 31, 2009, at ALLY_0337325 [ALLY_0337325]; 2009 ResCap Reconciliation of Book Income to Tax Return Analysis, prepared by AFI, at tab Summary, cells I-19, J-19 [ALLY_0337324] (showing $(604.3 million) ordinary loss (after netting out excess inclusion income) and $(6.7 million) capital loss); ResCap Consolidation, Pro Forma U.S. Corporation Income Tax Return (I.R.S. Form 1120) for Calendar Year 2010, at ALLY_0337040 [ALLY_0337039]; 2010 ResCap Reconciliation of Book Income to Tax Return Analysis, prepared by AFI, at tab Summary, cells I-18, J-18 [ALLY_0337158] (showing $125.2 million ordinary income (after netting out excess inclusion income) and $(1.4 billion) capital loss); ResCap Consolidation, Pro Forma U.S. Corporation Income Tax Return (I.R.S. Form 1120) for Calendar Year 2011, at ALLY_0336318 [ALLY_0336317]; 2011 ResCap Reconciliation of Book Income to Tax Return Analysis, prepared by AFI, at tab Summary, cells I-19, J-19 [ALLY_0337157] (showing $(293.6 million) ordinary loss (after netting out excess inclusion income) and $(9.06 million) capital loss).

EXHIBIT V.D.2.c(3)—2
**ResCap's Payments to AFI Under Second 2009 Tax Allocation Agreement in Respect of Federal Income Tax Liabilities**
July 1, 2009 – December 31, 2012

|  | ResCap Excess Inclusion Income | | ResCap Payments to AFI [(1)] | |
|---|---|---|---|---|
| July 1, 2009 – November 1, 2009 | $ | 9,673,867 | $ | 3,364,353 |
| November 2, 2009 – December 31, 2009 | | 7,942,752 | | 2,779,963 |
| January 1, 2010 – December 31, 2010 | | 33,523,248 | | 11,733,137 |
| January 1, 2011 – December 31, 2011 | | 41,102,833 | | 14,385,992 |
| January 1, 2012 – December 31, 2012 [(2)] | | 50,600,000 | | 17,710,000 |
| Total | $ | 142,842,700 | $ | 49,973,445 |

*[(1)] Applying 35% tax rate on excess inclusion income. There is an insignificant difference between the amount paid by ResCap and the amount of tax calculated at a 35% tax rate on the excess inclusion income for the July 1, 2009 – November 1, 2009 period.*
*[(2)] Projected as of September 30, 2012.*
*Source: Ordinary & Capital Losses Generated by ResCap Companies Analysis, prepared by AFI [ALLY_0424653], see also Residential Capital, LLC Tax Payment Detail Analysis, prepared by AFI, at tab Tax Payment Support, cells D-12, D-13, D-14, [ALLY_PEO_0079528]; cf. ResCap Consolidation, Pro Forma U.S. Corporation Income Tax Return (I.R.S. Form 1120) for Tax Year Ending Dec. 31, 2009, at ALLY_0337325 [ALLY_0337325]; 2009 ResCap Reconciliation of Book Income to Tax Return Analysis, prepared by AFI, at tab Summary, cells I-19, J-19 [ALLY_0337324]; ResCap Consolidation, Pro Forma U.S. Corporation Income Tax Return (I.R.S. Form 1120) for Calendar Year 2010, at ALLY_0337040 [ALLY_0337039]; 2010 ResCap Reconciliation of Book Income to Tax Return Analysis, prepared by AFI, at tab Summary, cells I-18, J-18 [ALLY_0337158]; ResCap Consolidation, Pro Forma U.S. Corporation Income Tax Return (I.R.S. Form 1120) for Calendar Year 2011, at ALLY_0336318 [ALLY_0336317]; 2011 ResCap Reconciliation of Book Income to Tax Return Analysis, prepared by AFI, at tab Summary, cells I-19, J-19 [ALLY_0337157].*

If ResCap and AFI had followed the First 2009 Tax Allocation Agreement, which the ResCap Board approved on August 6, 2010, AFI would have to pay ResCap for use of its tax benefits, regardless of whether ResCap could use its tax benefits on a stand-alone basis.[1801] This provision in the First 2009 Tax Allocation Agreement differs from stand-alone treatment for ResCap. This provision can only be beneficial to ResCap; that is, it may allow ResCap to monetize its tax benefits either earlier than if it had filed as a stand-alone taxpayer or, in some cases where the tax benefits would have expired and been permanently lost, where it would not have been able to monetize the tax benefits at all if it had filed as a stand-alone taxpayer.[1802]

It does not appear that AFI used any of ResCap's tax benefits generated since November 1, 2009 on a "but for" basis through the 2012 tax year.[1803] ResCap and AFI, however, had interpreted use to be based on the allocation principles provided in section 1.1502-21 of the

---

[1801] *See* First 2009 Tax Allocation Agreement, § 1.03D [RC40016362].

[1802] *See* Joint ResCap-AFI Tax Memorandum to ResCap Board, at RC40016377 [RC40016362].

[1803] *See* Ally Federal Tax Benefit from ResCap Losses, July 1, 2009 through December 31, 2012, prepared by AFI, at ALLY_0424652 [ALLY_0424651]. For an explanation of how use of tax benefits is determined on a "but for" basis, see Section V.D.2.c(1).

Treasury Regulations under the Implemented 2005 Tax Allocation Agreement,[1804] so it would make sense that the parties would apply the same interpretation under the First 2009 Tax Allocation Agreement, if it were in effect. The Investigation has not uncovered any information on the amount of ResCap's tax benefits that were used by AFI under the principles of section 1.1502-21 of the Treasury Regulations because ResCap and AFI have been following the Second 2009 Tax Allocation Agreement instead of the First 2009 Tax Allocation Agreement.

Nevertheless, AFI's current projections indicate that AFI considers it likely that it will start using ResCap's tax benefits in 2013, even on a "but for" basis.[1805] First, AFI expects to have used almost all of its NOLs and capital losses from subsidiaries other than ResCap and its subsidiaries by the end of 2012.[1806] Based on this expectation, any use of tax benefits by AFI in 2013 is likely to be attributable to ResCap's tax benefits. Second, AFI recently recorded $1.33 billion in income on its books for the fiscal year ended December 31, 2012 to

---

[1804] *See* E-mail from J. Aretakis (Jan. 4, 2006), at EXAM10170854 [EXAM10170853] (GM's use of ResCap's NOLs under the Implemented 2005 Tax Allocation Agreement is "governed by Treasury Regulations that mandate the allocation of a consolidated net operating loss carryforward to individual members [of a consolidated group] upon deconsolidation."); *see also* Memorandum, AFI-ResCap Tax Sharing, dated Mar. 20, 2013, at 2 ("The initial allocations limited ResCap's benefit for 2005 losses to the amount of those losses treated as absorbed by taxable income of non-ResCap entities on the 2005 GM consolidated return. ResCap was left with loss carryforwards to the extent it was allocated consolidated net operating loss under Treas. Reg. §1.1502-21."); Memorandum, AFI-ResCap Tax Sharing, dated Mar. 12, 2013, at 5 ("The initial tax allocation calculations interpreted the [Implemented 2005 Tax Allocation Agreement] in accordance with the principles of Section 1.1502-21 of the Treasury regulations . . . ."); Description of 2005 and 2006 Tax Allocation to ResCap, prepared by W. Marx, dated Nov. 27, 2012, at ALLY_0338094 [ALLY_0338094] ("add back to taxable income . . . for the consolidated net operating loss carry forward [sic] allocable to ResCap under Treasury Regulations").

[1805] For an explanation of how use of tax benefits is determined on a "but for" basis, see Section V.D.2.c(1).

[1806] *See* Ally Federal Tax Benefit from ResCap Losses, July 1, 2009 through December 31, 2012, prepared by AFI, at ALLY_0424652 [ALLY_0424651].

reflect a release of its deferred tax asset valuation allowance.[1807] Consistent with the conservatism principle of GAAP with regard to asset realization, accounting rules generally require a thorough analysis of the likelihood of the realization of tax assets.[1808] A company must reduce its deferred tax assets "by a valuation allowance if, based on the weight of available evidence, it is more likely than not (a likelihood of more than 50 percent) that some portion or all of the deferred tax assets will not be realized."[1809] The determination requires the company to assess "the weight of all available evidence, both positive and negative, with greater weight placed on information that is objectively verifiable,"[1810] and "there is a basic requirement to reduce the measurement of deferred tax assets not expected to be realized."[1811] Deferred tax assets typically consist of tax benefits that are required to be recognized later under income tax law than under GAAP for financial reporting purposes, which include items such as NOL carryovers and capital loss carryovers. Since AFI has already used almost all of its NOLs and capital losses from subsidiaries other than ResCap, most, if not almost all, of the deferred tax asset valuation allowance that AFI released probably relates to ResCap NOL carryovers and capital loss carryovers. Accordingly, the release suggests that AFI considers it more likely than not that it will realize about $1.33 billion in tax savings generated by ResCap in the near future.

---

[1807] *See* ALLY FINANCIAL INC., 4Q EARNINGS REVIEW (Feb. 5, 2013), at 10, http://phx.corporate-ir.net/ External.File?item=UGFyZW50SUQ9MTcwNDI4fENoaWxkSUQ9LTF8VHlwZT0z&t=1; *see also* AFI, Press Release, *Ally Financial Reports Preliminary Fourth Quarter and Full Year 2012 Financial Results* (Feb. 5, 2013), http://media.ally.com/2013-02-05-Ally-Financial-Reports-Preliminary-Fourth-Quarter-and-Full-Year-2012-Financial-Results.

[1808] "The accounting for income taxes under ASC 740 is sometimes very specific and can be complex. An entity's primary objective in accounting for income taxes under ASC 740 is to reflect its after-tax financial position in its balance sheet. To accomplish this objective, an entity employs the balance sheet model for recording current and deferred taxes." DELOITTE & TOUCHE LLP, A ROADMAP TO ACCOUNTING FOR INCOME TAXES § 1.01 (2011).

[1809] ACCOUNTING STANDARDS CODIFICATION § 740-10-30-5(e) (Fin. Accounting Standards Bd. 2013).

[1810] DELOITTE & TOUCHE LLP, A ROADMAP TO ACCOUNTING FOR INCOME TAXES § 4.120 (2011).

[1811] ACCOUNTING STANDARDS CODIFICATION § 740-10-30-16 (Fin. Accounting Standards Bd. 2013).

Moreover, it appears that AFI will have a total of $5.056 billion in ResCap losses available for use as of the end of the tax year in which the Chapter 11 Cases conclude, which translates to $1.77 billion in potential tax savings (applying a 35% federal income tax rate), based on information in the tax basis balance sheet for ResCap as of December 31, 2012 and the expected total amount of asset recoveries for the creditors as laid out in a waterfall analysis prepared by FTI.[1812] AFI's counsel reported to the Examiner's Professionals that AFI expects to use "by the end of 2014 a substantial portion of the losses generated by ResCap's operations that will not have been offset by [cancellation of debt income]."[1813] Consequently, it appears that AFI may eventually use all of the $1.77 billion in tax savings generated by ResCap. AFI's use of the $1.77 billion in tax savings would trigger an AFI obligation to pay to ResCap that amount for such use if the First 2009 Tax Allocation Agreement were in effect.

---

[1812] ResCap has total tax liabilities in the amount of $10.154 billion and a total tax basis in its assets of $11.387 billion as of December 31, 2012. *See* Residential Capital, LLC Tax Basis Balance Sheet as of December 31, 2012 [ALLY_PEO_0094436]. In addition, according to the mid-range of FTI's waterfall analysis, the total recovery for the creditors is expected to be $6.233 billion. *See* Draft Hypothetical Waterfall Analysis, prepared by FTI, dated Aug. 16, 2012, at EXAM00176584 [EXAM00176577]. Furthermore, ResCap generated $1.444 billion in NOLs and $1.629 billion in capital losses from November 2, 2009 to December 31, 2012. *See* Ordinary & Capital Losses Generated by ResCap Companies Analysis, prepared by AFI [ALLY_0424653]. Based on these numbers, the $1.77 billion in ResCap benefits available for AFI's use is calculated as follows:

Expected amount of cancellation of debt income (in millions)

| | |
|---|---:|
| ResCap tax liabilities | $ 10,154 |
| Less creditors' expected recovery* | – 6,233 |
| | $ 3,921* |

Amount of built-in losses expected to be realized by ResCap during the Chapter 11 Cases (in millions)

| | |
|---|---:|
| Creditors' expected recovery | $ 6,233 |
| Less assumed contribution by AFI to creditors' recovery | – 750 |
| Less tax basis in ResCap assets | – 11,387 |
| | $ -5,904 |

Amount of ResCap tax benefits available for AFI's use (in millions)

| | |
|---|---:|
| ResCap NOLs generated (11/2/2009 – 12/31/2012) | $ 1,444 |
| ResCap capital losses generated (11/2/2009 – 12/31/2012) | + 1,629 |
| ResCap losses to be realized during Chapter 11 cases | + 5,904 |
| Less expected amount of cancellation of debt income | – 3,921 |
| | $ 5,056 |
| Federal income tax rate | × 35% |
| | $ 1,770 |

* The $6.233 million estimate of the creditors' expected recovery in the above calculation assumes that AFI contributes $750 million towards the creditors' recovery. Any additional amount that AFI contributes towards the recovery would reduce cancellation of debt income on a dollar-for-dollar basis.

[1813] Memorandum, AFI-ResCap Tax Sharing, dated Mar. 12, 2013, at 2.

3. *ResCap's Conversion To A Disregarded Limited Liability Company And Payment Of LLC Conversion Dividend*

  a. *ResCap's Conversion To A Limited Liability Company And Change In Tax Classification To A Disregarded Entity*

As discussed in Section V.D.2.a, ResCap converted from a corporation to a limited liability company effective October 24, 2006,[1814] and elected to be treated as a disregarded entity for federal income tax purposes effective November 21, 2006.[1815] The change in classification of ResCap to a disregarded entity was required by Cerberus as a condition to its acquisition of AFI.[1816] Moreover, becoming a disregarded entity provided ResCap with the potential for relief from future federal income tax liabilities to the extent that ResCap were to generate income.

In connection with ResCap's conversion from a corporation to a disregarded entity on November 21, 2006, ResCap paid a $575 million installment of the LLC Conversion Dividend to AFI on November 28, 2006, which amount was tied to the estimated increase in equity ResCap received by eliminating all tax assets accounts and tax liabilities accounts from its balance sheet.[1817]

  b. *LLC Conversion Dividend*

The declaration of the LLC Conversion Dividend appears to have been driven by a desire of GM to receive a dividend from ResCap prior to GM completing its sale of 51% of AFI to Cerberus, at which time there was insufficient dividend capacity at ResCap for a standard dividend based on restrictions in the 2005 Operating Agreement. During the middle of 2006, numerous attempts were made by ResCap's staff and officers to track ResCap's dividend capacity under the restrictions in the 2005 Operating Agreement.[1818] ResCap first had considered during June and July 2006 a request by GM that it declare a $250 million dividend

---

[1814] Certificate of Conversion to Limited Liability Company of Residential Capital Corporation to Residential Capital, LLC, dated Oct. 24, 2006 [ALLY_0003761].

[1815] *See* Memorandum, Final Tax Liabilities Allocated from GM, dated Jan. 25, 2008, at ALLY_0208456 [ALLY_0208456].

[1816] *But see* Residential Capital, LLC Rating Agency Review Presentation, dated Nov. 2006, at 4 [EXAM10124762] (stating that Cerberus provided numerous benefits to ResCap in connection with Cerberus's purchase of 51% of AFI).

[1817] Residential Capital, LLC, Annual Report (Form 10-K) (Mar. 13, 2007), at 80.

[1818] *See, e.g.*, ResCap Presentation on Dividend Restrictions [EXAM10129727] (attached to E-mail from D. Olson (July 21, 2006) [EXAM10129726]); Dividend Capacity Analysis, prepared by ResCap, dated June 14, 2006 [EXAM11332217] (attached to E-mail from T. Rowe (June 14, 2006) [EXAM11332216]); E-mail from D. Olson (June 13, 2006) [EXAM11241506]; E-mail from T. Rowe (June 14, 2006) [EXAM11241506]; GMAC Dividend and Sub Debt Balance Analysis, prepared by ResCap, dated June 12, 2006 [EXAM11335577] (attached to E-mail from J. Malloy (June 12, 2006) [EXAM11335576]).

"in conjunction with the second quarter gain on the sale of ResCap's interest in WL Homes."[1819] This proposed dividend was not related to the conversion, and the ResCap Board decided to delegate to its executive committee the authority to declare the dividend.[1820] There is no evidence, however, that such a dividend was ever authorized or made.

By August 30, 2006, ResCap began to consider a dividend based on the amount of net deferred tax liabilities that were expected to be released upon its conversion to a disregarded entity.[1821] ResCap officers worked on creating a report to the ResCap Board regarding the LLC Conversion Dividend from around September 25, 2006 to October 19, 2006,[1822] when James Giertz, ResCap's Chief Financial Officer at the time, presented the report at a Special Meeting of the ResCap Board.[1823] At that October 19, 2006 meeting, the ResCap Board discussed a "dividend equal to the estimated amount of net deferred tax liability released in connection with the conversion of [ResCap] to a limited liability company . . . ."[1824] The ResCap Board and ResCap officers also discussed at the meeting the need to amend the 2005 Operating Agreement to permit the LLC Conversion Dividend and to establish a comprehensive ResCap dividend strategy.[1825] Giertz recommended that the ResCap Board delegate the decision to declare the LLC Conversion Dividend to the ResCap Board's Executive Committee;[1826] the ResCap Board deferred its decision to a future meeting.[1827]

ResCap prepared a Rating Agency Review presentation in November 2006 in which it was stated that the LLC Conversion Dividend, which was estimated as of September 30, 2006 would be

---

[1819] Minutes of a Regular Meeting of the Board of Directors of Residential Capital Corporation, June 22, 2006, at RC40006797 [RC40006748]; *see also* E-mail from C. Quenneville (July 21, 2006), at EXAM11340616 [EXAM11340616] (providing comments on the draft report to the ResCap Board in support of declaring a $250 million dividend).

[1820] *See* Minutes of a Special Meeting of the Board of Directors of Residential Capital Corporation, July 24, 2006, at RC40006800 [RC40006748].

[1821] *See* E-mail from D. Schaeffer (Aug. 30, 2006), at EXAM10163555 [EXAM10163554] (asking whether ResCap's dividend plans should continue to exclude an "incremental assumed dividend" relating to an estimated $450 million in net deferred tax liabilities that would become income upon conversion).

[1822] *See* Minutes of a Special Meeting of the Board of Directors of Residential Capital Corporation, Oct. 19, 2006, at RC40006814–15 [RC40006748]; E-mail from D. Marple (Oct. 3, 2006) [EXAM10259033] (describing the LLC Conversion Dividend as "a waiver of essentially 'found money' in ResCap's pocket" and attaching a draft report to the ResCap Board on the LLC Conversion Dividend for review and comment); E-mail from D. Marple (Sept. 25, 2006) [EXAM10250748] (attaching the initial draft of the report to the ResCap Board on the LLC Conversion Dividend for review and comment).

[1823] *See* Minutes of a Special Meeting of the Board of Directors of Residential Capital Corporation, Oct. 19, 2006, at RC40006814 [RC40006748].

[1824] *Id.*

[1825] *See id.* at RC40006814–15.

[1826] *See id.* at RC40006814.

[1827] *See id.* at RC40006815.

in the amount of $570 million, would have "[n]o impact to ResCap's capital position—net effect to ResCap of making this dividend is primarily timing of the cash outflow."[1828] The Examiner assumes that this was intended to mean that the LLC Conversion Dividend was viewed as an acceleration of the payment of future tax obligations that ResCap would have had to pay as a corporate taxpayer had it not converted to a disregarded entity. Moreover, the Examiner notes that ResCap's conversion to a disregarded entity did not have to result in ResCap's net equity increasing. AFI and ResCap were free to agree to enter into a new tax allocation agreement covering federal income taxes or to provide in ResCap's operating agreement that ResCap would have stand-alone federal income tax liability responsibilities. This arrangement is not unusual between pass-through entities. Had AFI and ResCap taken this course, ResCap's net tax liabilities would have stayed on its books, its net equity would not have increased, and GM would have lost its ability to justify the LLC Conversion Dividend as having no impact on ResCap's equity when combined with the effects of the conversion.

At the November 20, 2006 Special Meeting of the ResCap Board, Giertz presented another report, in which he recommended that the ResCap Board amend the 2005 Operating Agreement to exclude the LLC Conversion Dividend from the formula restrictions for calculating ordinary dividend capacity and delegate the decision to declare the LLC Conversion Dividend to the Board's Executive Committee.[1829] Although it appears that ResCap had the requisite liquidity to declare the LLC Conversion Dividend, the 2005 Operating Agreement contained a restriction that limited authority to declare dividends based on the amount of ResCap's "Cumulative Net Income" as reported in its last quarterly financial statements.[1830] The proposal to amend the 2005 Operating Agreement to provide special treatment for the LLC Conversion Dividend suggests that the LLC Conversion Dividend could not comply with the usual standards for ResCap dividends.[1831] Nevertheless, the ResCap Board unanimously agreed to "permit the LLC Tax Dividend and not subject it to the dividend restrictions contained in the Operating Agreement . . . ."[1832] The ResCap Board delegated the authority to declare the LLC Conversion Dividend to its executive committee.[1833] The Independent Directors were not members of the

---

[1828] Residential Capital, LLC Rating Agency Review Presentation, dated Nov. 2006, at 9 [EXAM10124762].

[1829] *See* Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Nov. 20, 2006, at RC40006837 [RC40006748].

[1830] *See* Residential Capital, LLC Presentation to the Board of Directors Regarding Capital Budgeting Considerations, dated Oct. 9, 2006, at MELZER.002825, –27, –32 [MELZER.002821] (showing sufficient liquidity to pay a $450 million LLC Conversion Dividend but stating that a waiver of dividend restrictions in the 2005 Operating Agreement would be required to declare the LLC Conversion Dividend); *see also* 2005 Operating Agreement [MELZER.004869] (defining "Cumulative Net Income" as the "net income of ResCap . . . for the period beginning with the first date of the first fiscal quarter beginning after the date of this Agreement and ending on the last day of the fiscal quarter ending immediately preceding the date as of which a determination of Cumulative Net Income is required").

[1831] *Compare* 2006 Amended Operating Agreement, § 2(d)(ii) [ALLY_0041818], *with* 2005 Operating Agreement, § 2(d)(ii) [MELZER.004869].

[1832] Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Nov. 20, 2006, at RC40006837 [RC40006748].

[1833] *See id.*

executive committee.[1834] In addition, the ResCap Board authorized its executive committee to declare the LLC Conversion Dividend in an amount "equal to the estimated net increase in equity resulting from the release of all tax-related accounts" of ResCap, as opposed to basing the size of the LLC Conversion Dividend on the increase in equity attributable to the release of only the net deferred tax liabilities that was previously proposed and discussed at the October 19, 2006 ResCap Board meeting.[1835] This change in the breadth of accounts to be released and taken into account in sizing the LLC Conversion Dividend decreased the authorized amount of the LLC Conversion Dividend because ResCap had net current tax assets, not net current tax liabilities, upon its conversion to a disregarded entity.

On November 27, 2006, Giertz presented a report at a Special Meeting of the Executive Committee, which stated that "[m]anagement's most recent estimate of the Released Amount is $570 million as of September 30, 2006."[1836] The Executive Committee unanimously declared the LLC Conversion Dividend and allowed it to be paid in one or more installments.[1837]

ResCap paid the first installment of the LLC Conversion Dividend in the amount of $575 million on November 28, 2006.[1838] In January 2007, ResCap began to calculate more precisely the amount of the increase in net equity that resulted from the release of all tax-related accounts upon its conversion to a disregarded entity.[1839] It became apparent that the $575 million first installment was larger than the actual net equity increase amount and, accordingly, AFI would have to make a capital contribution to ResCap to true-up the LLC Conversion Dividend.[1840] Young, ResCap's Chief Accounting Officer at the time, recommended that ResCap "hold off on any action until we are completely settled with the audit and Cerberus."[1841] Sanjiv Khattri, AFI's Chief Financial Officer at the time, agreed that ResCap should "hold of [sic] until numbers settle down."[1842]

---

[1834] *See* Minutes of a Special Meeting of the Executive Committee of the Board of Directors of Residential Capital, LLC, Nov. 27, 2006, at RC40006418 [RC40006402] (no Independent Directors present).

[1835] *Compare* Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Nov. 20, 2006, at RC40006837 [RC40006748], *with* Minutes of a Special Meeting of the Board of Directors of Residential Capital Corporation, Oct. 19, 2006, at RC40006814 [RC40006748].

[1836] Report to the Executive Committee of the Board of Directors, Residential Capital, LLC, prepared by J. Giertz, dated Nov. 27, 2006 [RC40013153].

[1837] *See* Minutes of a Special Meeting of the Executive Committee of the Board of Directors of Residential Capital, LLC, Nov. 27, 2006, at RC40006418 [RC40006402].

[1838] *See* E-mail from J. Malloy (Nov. 28, 2006) [EXAM10167986].

[1839] *See* E-mail from J. Young (Jan. 22, 2007), at EXAM11474370 [EXAM11474370]; *see also* E-mail from S. Khattri (Jan. 22, 2007), at EXAM11474371 [EXAM11474370].

[1840] *See* E-mail from S. Khattri (Jan. 22, 2007), at EXAM11474370 [EXAM11474370]; E-mail from J. Young (Jan. 22, 2007), at EXAM11474370 [EXAM11474370].

[1841] E-mail from J. Young (Jan. 22, 2007), at EXAM11474370 [EXAM11474370].

[1842] E-mail from S. Khattri (Jan. 22, 2007), at EXAM11474370 [EXAM11474370].

ResCap eventually determined that the increase in equity resulting from the release of all tax-related accounts was $420.1 million.[1843] Consequently, ResCap stated in its annual report for 2006 that it expected to receive a capital contribution of $154.9 million for reimbursement of the overpayment.[1844] It is unclear, however, whether AFI ever made a capital contribution to ResCap to correct ResCap's overpayment. While ResCap received $2 billion in cash capital contributions in 2007, there is no evidence that any of those capital contributions related to truing down the LLC Conversion Dividend.[1845]

Around the same time that the ResCap Board considered and approved the LLC Conversion Dividend, ResCap also received pressure from GM to declare a $600 million dividend.[1846] Thomas Melzer, one of the Independent Directors, raised concerns about the combined effect that the LLC Conversion Dividend and the $600 million dividend would have on ResCap's liquidity.[1847] Despite his concerns, Melzer initially was doubtful that the Independent Directors could block the $600 million dividend from being approved by the ResCap Board, which apparently was not a decision over which the Independent Directors had a veto.[1848] In an e-mail from Melzer to Thomas Jacob, the other Independent Director, on the morning of a day on which the ResCap Board was meeting to consider, among other things, both the LLC Conversion Dividend and the $600 million dividend, Melzer expressed his concerns: "I explained [to David Walker at AFI] that circumstances, not their intent, put us in a situation where we had no leverage when approval is sought for the $600 million dividend in December. I also reiterated our concern about liquidity. . . . [Walker] also said they did not

---

[1843] *See* Residential Capital, LLC, Annual Report (Form 10-K) (Mar. 13, 2007), at 80, 116.

[1844] *See id.* at 80. ResCap also reported a $433.4 million non-cash deemed dividend in connection with its conversion to a disregarded entity. *See* Residential Capital, LLC, Annual Report (Form 10-K) (Mar. 13, 2007), at 62, 134. The non-cash deemed dividend appears to relate to contingent tax assets and liabilities being treated as assumed by GM upon the conversion, in similar fashion to intercompany accounts being forgiven, and written off as deemed dividends and capital contributions by ResCap on its books. The Examiner's Professionals have noted that while the disclosures to the ResCap Board of the accounting treatment of the conversion and the actual reporting in the 10-K were not entirely accurate, there is no indication that they were intentionally false or misleading. Moreover, there is no economic harm to ResCap or its creditors resulting from this accounting treatment.

[1845] *See* Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2008), at 49.

[1846] *See* Minutes of a Special Meeting of the Board of Directors of Residential Capital Corporation (Oct. 19, 2006), at RC40006816 [RC40006748] (stating that David Walker presented to the ResCap Board a proposal for a $600 million dividend based on projections that ResCap would have $8.6 billion in equity at year end and management's belief that $8 billion in equity would suffice); Residential Capital, LLC Presentation to the Board of Directors Regarding Capital Budgeting Considerations, dated Oct. 9, 2006, at MELZER.002832 [MELZER.002821] (presenting plans for paying both a $450 million LLC Conversion Dividend and a $600 million dividend in late 2006).

[1847] *See* Int. of T. Melzer, Mar. 22, 2013, at 123:10–127:19; *cf.* Residential Capital, LLC Presentation to the Board of Directors Regarding Capital Budgeting Considerations, dated Oct. 9, 2006, at MELZER.002832 [MELZER.002821] (showing projections of insufficient liquidity to pay both a $450 million LLC Conversion Dividend and a $600 million dividend in late 2006).

[1848] *See* Int. of T. Melzer, Mar. 22, 2013, at 125:2–126:7.

want a 7–2 vote on this action, with the two of us dissenting."[1849] At the meeting later that day, the ResCap Board decided to defer consideration of the $600 million dividend.[1850] And in December 2006, the ResCap Board again deferred a decision on the $600 million dividend.[1851] The Investigation has not uncovered any evidence that the ResCap Board ever reconsidered the $600 million dividend, and it does not appear that the $600 million dividend was ever declared or paid.[1852]

## E. FINANCINGS

### 1. Resort Finance Facility

The fourth quarter of 2007 ended not only with (1) a reduction in ResCap's workforce by 25%;[1853] (2) ResCap's debt rating falling to below investment grade;[1854] and (3) contributions by AFI to ResCap of ResCap bonds in excess of $700 million for the quarter,[1855] but also with a pressing need to address liquidity shortages and pending debt maturities.[1856] One of the first steps taken was to have RFC enter into the Resort Finance Facility with AFI on February 21, 2008. The Resort Finance Facility was intended to be a bridge financing while ResCap searched for a third party to purchase its Resort Finance business.[1857] According to Sanjiv Khattri, CFO of ResCap, when the Resort Finance Facility was entered into, there were already discussions of a sale of the Resort Finance business to a third party.[1858] The Resort

---

[1849] Email from T. Melzer (Oct. 19, 2006) [MELZER.004954].

[1850] *See* Minutes of a Special Meeting of the Board of Directors of Residential Capital Corporation, Oct. 19, 2006, at RC40006816 [RC40006748].

[1851] *See* Minutes of a Regular Meeting of Board of Directors of Residential Capital, LLC, Dec. 12, 2006, at RC40006860 [RC40006748].

[1852] *See* Int. of T. Melzer, Mar. 22, 2013, at 120:22–123:9, 125:8–127:13.

[1853] Residential Capital, LLC, Current Report (Form 8-K) (Oct. 17, 2007), at 6.

[1854] *E.g.* Moody's Investors Service, Rating Action, Moody's Downgrades ResCap to Ba1, From Baa3; Ratings Remain on Review Down (Aug. 16, 2007), S&P, Research Update: Residential Capital LLC Ratings Off Watch Neg, Lowered to 'BB+/B' From 'BBB-/A-3'; Outlook Neg (Nov. 1, 2007); Fitch Ratings, Amend: Fitch Lowers Countrywide IDR to 'BBB+' & ResCap to 'BB+'; Indymac on Watch Negative (Aug. 16, 2007).

[1855] Memorandum, ResCap: Significant Capital Contributions and Related-Party Transactions, dated June 9, 2009, at 1 [ALLY_0240180].

[1856] *See* Minutes of a Regular Meeting of the Board of Directors of Residential Capital, LLC, Dec. 7, 2007, at RC40005645 [RC40005558] (S. Khattri discussed actual October 2007 $524 million loss driven by collapse of the real estate market, including tight credit and falling home prices and a potential $800 million downside risk in the fourth quarter); *see also* Minutes of a Regular Meeting of the Board of Directors of Residential Capital, LLC, Dec. 20, 2007, at RC40005649 [RC40005558] (S. Khattri discussed ResCap's liquidity position and said that primary 2008 first quarter objectives included, among other things, assessing the $5.4 billion TNW financial covenant and restructuring funding facilities and revolving lines of credit to meet ResCap's prospective needs).

[1857] E-mail from S. Khattri (Feb. 12, 2008) [EXAM11309438].

[1858] Int. of S. Khattri, Oct. 25, 2012, at 250:11–14.

Finance Facility was a $750 million non-recourse borrowing base facility with repayment to be made solely from collections on the collateral, which consisted of certain loans made by RFC to developers in connection with resort financing transactions. These loans included (1) certain eligible developer loans (subject to an advance rate of 90%); (2) certain construction loans (subject to an advance rate of 75%); and (3) certain loans extended to finance the sale of time shares (subject to an advance rate of 50%).[1859] ResCap provided a limited guarantee in connection with the Resort Finance Facility.[1860]

The Resort Finance Facility was approved by the ResCap Board at a meeting held on February 15, 2008[1861] and by RFC's board on February 19, 2008.[1862]

Bear Stearns issued a fairness opinion to ResCap with respect to the Resort Finance Facility, concluding that "the financial terms and conditions of the Resort Finance Facility, taken as a whole, are no less favorable to RFC, from a capital markets point of view, than the financial terms and conditions that would be expected to be obtained in a comparable financing with an unaffiliated third party on an arm's-length basis."[1863]

The Resort Finance Facility contained representations and warranties,[1864] closing conditions,[1865] covenants,[1866] events of default,[1867] and indemnification provisions[1868] that were standard for facilities of comparable size and nature (and would have been typical for a syndicated credit facility with unaffiliated lenders). Certain of the provisions, however, exemplified an affiliate transaction and were more favorable to the Resort Facility Borrower (RFC) — namely, (1) the negative covenants did not contain limitations on debt incurrence, dividend payments or affiliate transactions;[1869] (2) there were no financial covenants; and (3) there was no upfront fee payable to AFI. Moreover, it would have been highly unusual for a single lender to provide a lending commitment of this size.

---

[1859] Resort Finance Agreement, § 1.1 [ALLY_0116311] (definition of "Borrowing Base").

[1860] Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2008), Ex.10.13, at 275.

[1861] ResCap Secretary's Certificate dated Feb. 19, 2008, at ALLY_0116488, Exhibit C [ALLY_0116462].

[1862] Action by Written Consent of the Board of Directors of Residential Funding Company, LLC, dated Feb. 19, 2008, at ALLY_0116456–59 [ALLY_0116429].

[1863] Opinion Letter from Bear Stearns to the Board of Directors of ResCap (Feb. 20, 2008) [ALLY_0116519].

[1864] Resort Finance Agreement, § 3 [ALLY_0116311].

[1865] *Id.* § 4.

[1866] *Id.* §§ 5–6.

[1867] *Id.* § 7.

[1868] *Id.* §§ 2.16, 9.5.

[1869] *See id.* § 6.

Upon the consummation of the Resort Finance Sale, the obligations of RFC under the Resort Finance Facility were transferred to, and assumed by, GMAC CF.[1870] In its 10-Q for the period ending March 31, 2009, ResCap reported that the Resort Finance Facility had been paid in full.[1871]

See Appendix V.E.1 for more details on the terms of the Resort Finance Facility.

### 2. Secured MSR Facility

Shortly after closing the Resort Finance Facility, the Secured MSR Facility Borrowers (RFC and GMAC Mortgage), entered into the Secured MSR Facility with AFI, as lender, on April 18, 2008, which provided additional liquidity.[1872] The Secured MSR Facility was initially a $750 million borrowing base facility[1873] (increased to $1.2 billion on June 2, 2008),[1874] and was guaranteed on a full recourse basis by ResCap.[1875] The Secured MSR Facility Collateral served as the borrowing base and included: (1) certain MSRs and the related Servicing Contracts; (2) certain pledged Fannie Mae, Freddie Mac and Ginnie Mae securities; and (3) certain pledged U.S. treasury securities.[1876]

On April 1, 2008, prior to entering into the Secured MSR Facility, ResCap received a draft term sheet from Barclays that contemplated providing RFC with a facility to be secured by non-GSE MSRs.[1877] When sending the term sheet, Joseph O'Doherty of Barclays noted that the bank was eager to play a role in ResCap's restructuring efforts and wanted to work with ResCap and its advisors to get the best outcome possible.[1878] However, ResCap's liquidity needs were imminent and several months of negotiations could have been required to complete and syndicate a facility with Barclays,[1879] leading to the proposal that AFI provide

---

[1870] Asset Purchase Agreement between Residential Funding Company, LLC, GMAC Residential Funding of Canada Limited, and GMAC Commercial Finance LLC, dated July 2, 2008, § 2.2(b) [RC00024026].

[1871] Residential Capital, LLC, Quarterly Report (Form 10-Q) (May 11, 2009), at 56.

[1872] Secured MSR Loan Agreement [RC00024114].

[1873] Id. §§ 2.01–2.04, Sched. I (definition of Commitment Amount).

[1874] Amendment No. 3 to the Secured MSR Facility, dated June 2, 2008, § 1(b) [RC00037692].

[1875] Guarantee by Residential Capital, LLC, in favor of GMAC LLC as lender pursuant to the Secured MSR Facility, dated Apr. 18, 2008, § 3 [RC00037568].

[1876] Secured MSR Loan Agreement, § 4.01 [RC00024114].

[1877] Draft MSR Facility Summary of Indicative Terms and Conditions, dated Apr. 1, 2008 [EXAM10809952].

[1878] E-mail from J. O'Doherty to J. Peterson (Apr. 1, 2008) [EXAM10809950].

[1879] Minutes of a Meeting of the Special Committee of the Independent Directors of the Board of Residential Capital, LLC, Apr. 9, 2008, at RC40006626–27 [RC40006611].

the Secured MSR Facility as a bridge to the Barclays facility.[1880] In support of this timing issue, Morgan Stanley, in its April 14, 2008 discussion materials regarding the proposed facility, noted that several months could have been required to close, because a syndication of the loan and the obtaining of consents would have been necessary.[1881] Time was of the essence, as Jim Young (ResCap CFO) reported to the ResCap Board on April 14, 2008 that the Secured MSR Facility was needed to support Servicing Advances to be funded on April 17, 2008.[1882]

In considering the proposal for the Secured MSR Facility, the Independent Directors (then Thomas Jacob and Thomas Melzer) expressed concern over pricing terms, namely the proposed LIBOR + 300 bps interest rate, the 20 bps non-use fee and the 50% advance rate.[1883] Ultimately, most of these concerns were addressed to the satisfaction of the ResCap Board, including the Independent Directors (the pricing was reduced to LIBOR + 200 bps and the non-use fee was eliminated), who approved the Secured MSR Facility (including the ResCap guarantee) on April 14, 2008.[1884] The boards of RFC[1885] and GMAC Mortgage[1886] approved the Secured MSR Facility on April 15, 2008.

However, the advance rates remained at 50% when the Secured MSR Facility closed (which addressed the concern that a higher advance rate could impede the contemplated Barclays refinancing, because ResCap did not want to be "in excess of where [Barclays] would refinance the facility").[1887]

---

[1880] *Id.* at RC40006627 (statement from William Casey (ResCap Treasurer) that "the proposed funding facility from GMAC would provide ResCap with bridge financing while the Barclays facility is being finalized") [RC40006611]. *See also* Draft Indicative Terms and Conditions of the Debt Facility, dated Apr. 7, 2008 [EXAM10277333]; Draft Indicative Summary of Terms and Conditions of the Debt Facility, dated Apr. 9, 2008 [EXAM10807536].

[1881] Morgan Stanley Project Duvall Presentation, dated Apr. 14, 2008, at 3 [EXAM10279337].

[1882] Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Apr. 14, 2008, at RC40005713–15 [RC40005652].

[1883] E-mail from J. Jones (Apr. 13, 2008) [EXAM10399601].

[1884] Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Apr. 14, 2008, at RC40005714 [RC40005652].

[1885] Action by Written Consent of the Board of Directors of Residential Funding Company, LLC, dated Apr. 15, 2008, at ALLY_0131194–96 [ALLY_0131157].

[1886] Action by Written Consent of the Board of Directors of GMAC Mortgage, LLC, dated Apr. 15, 2008, at ALLY_0131229–31 [ALLY_0131201].

[1887] E-mail from J. Jones (Apr. 13, 2008) [EXAM10399601].

Morgan Stanley viewed the terms of the Secured MSR Facility favorably, concluding that: (1) the Secured MSR Facility provided materially better economic terms than the proposed Barclays facility and existing facilities; (2) as a result of negotiations between AFI and ResCap, the Secured MSR Facility was materially more favorable to ResCap than the initial AFI proposal; and (3) based on market observations and informal discussion, the Secured MSR Facility was more attractive in all material respects than facilities that were available in the then current marketplace.[1888] The economic terms were generally in line with those then in place between ResCap and Citibank and Natixis, which provided facilities secured by GSE MSRs. However, unlike the Citibank and Natixis facilities, the Secured MSR Facility did not require the Secured MSR Facility Borrowers to pay either a use fee or a non-use fee.[1889]

The Secured MSR Facility contained representations and warranties,[1890] covenants,[1891] events of default[1892] and indemnification provisions[1893] that were standard for facilities of comparable size and nature (and would have been typical for a syndicated credit facility with unaffiliated lenders). However, certain of the provisions exemplified an affiliate transaction and were more favorable to the Secured MSR Facility Borrowers — namely (1) lien searches were a post-closing requirement (typically they are required to be delivered as a condition to closing);[1894] (2) the negative covenants did not contain limitations on debt incurrence, dividend payments, affiliate transactions, or mergers/asset sales;[1895] and (3) as noted by Morgan Stanley, no fees were stated to be payable by the Secured MSR Facility Borrowers. Moreover, it would have been highly unusual for a single lender to provide a lending commitment of this size.

On June 2, 2008 (within three weeks from the closing of the Secured MSR Facility), the Secured MSR Facility was amended to increase the facility size from $750 million to $1.2 billion and the advance rate was increased from 50% to 85% giving ResCap access to more liquidity.[1896]

---

[1888] Morgan Stanley Project Duvall Presentation, dated Apr. 14, 2008, at 3–4 [EXAM10279337]. At the time ResCap engaged Morgan Stanley to provide advice in connection with certain potential strategic transactions, it was revealed that a Morgan Stanley officer was also a member of the AFI Board. Morgan Stanley Engagement Letter from D. Ammann to J. Jones (Feb. 13, 2008), at 3–4 [MELZER.008816] (attached to E-mail from T. Hamzehpour to T. Jacob and T. Melzer (Mar. 20, 2008) [MELZER.008815]). Section V.A.1.b(1) provides more information regarding this potential conflict.

[1889] Id. at 5.

[1890] Secured MSR Loan Agreement, § 6.01 [RC00024114].

[1891] Id. Art. VII.

[1892] Id. § 8.01.

[1893] Id. Art. X.

[1894] Id. § 7.01(r).

[1895] See id. § 7.02.

[1896] Amendment No. 3 to the Secured MSR Facility, dated June 2, 2008, at RC40006474 [RC40006437].

In its April 14, 2008 presentation, Morgan Stanley noted that lending against MSRs had generally been viewed by lenders as a "loss leader," was undertaken to secure future securitizations and other business, and that diminished prospects for such business had reduced the appetite to lend against MSRs.[1897] As a result, the advance rates on MSR facilities were trending lower and the costs were rising.[1898]

Ultimately, the search for a lender to refinance the Secured MSR Facility proved futile. Morgan Stanley pointed out that JPMorgan, Citibank and Bank of America were not interested in lending against non-GSE assets at acceptable rates.[1899] Arranging a takeout facility for the Secured MSR Facility proved even more difficult after the advance rate under the Secured MSR Facility was raised to 85%. Barclays indicated that it would be comfortable with only up to a 60% advance rate.[1900] In addition, Barclays appeared to be growing concerned with its overall exposure to both ResCap and AFI. Jerry Lombardo, a GMAC CF employee at the time (hired to perform diagnostic work at ResCap relating to liquidity forecasting), commented that he thought Barclays's lending commitment to AFI would have to be reduced one for one in order to convince Barclays to participate in an MSR facility with ResCap.[1901] John Peterson, then ResCap's Assistant Treasurer, commented that ResCap continued to be challenged to find new outside financing alternatives for MSRs and he hypothesized that it might be due to AFI's risk profile.[1902] Despite this challenge, Peterson noted that ResCap was pursuing sources for outside financing (Barclays and other banks as well as banks through Cerberus, but also commented that Royal Bank of Canada and Calyon Securities (USA), Inc. (n/k/a Credit Agricole Securities (USA), Inc.) would "certainly not be interested").[1903] After June 2008, there was no evidence of a renewed search for a third party to refinance the Secured MSR Facility.

Since the Secured MSR Facility was designed to be a bridge to the Barclays facility, it had a short term maturity. The initial maturity date was the earlier of October 17, 2008 (six months after the April 18, 2008 closing) and the receipt by the Secured MSR Facility Borrowers of a commitment from a third party lender for a replacement facility.[1904] The

---

[1897] Morgan Stanley Project Duvall Presentation, dated Apr. 14, 2008, at 3 [EXAM10279337].

[1898] *Id.* at 4.

[1899] *Id.* at 3.

[1900] E-mail from J. Peterson (June 12, 2008) [EXAM10172519].

[1901] E-mail from J. Lombardo (May 3, 2008) [EXAM10844051].

[1902] E-mail from J. Peterson (June 12, 2008) [EXAM10172519].

[1903] *Id.*

[1904] Secured MSR Facility, Sched. I [RC00024114] (definition of "Loan Repayment Date").

maturity date of the Secured MSR Facility was ultimately extended repeatedly for short periods: from October 17, 2008 to May 1, 2009;[1905] from May 1, 2009 to June 30, 2009;[1906] from June 30, 2009 to July 31, 2009;[1907] from July 31, 2009 to September 30, 2009;[1908] from September 30, 2009 to November 30, 2009;[1909] and from November 30, 2009 to December 31, 2009.[1910]

As summarized in the table below, AFI forgave indebtedness under the Secured MSR Facility in an aggregate amount of over $1.1 billion from inception until the facility was terminated on December 30, 2009, when all remaining outstanding indebtedness thereunder (including accrued and unpaid interest) was forgiven.[1911] These debt forgiveness steps were generally taken to enable ResCap to remain in compliance with its TNW covenants.[1912]

---

[1905] Amendment No. 6 to the Secured MSR Facility, dated Oct. 17, 2008, § 2(d) [ALLY_0238920].

[1906] Amendment No. 8 to the Secured MSR Facility, dated Mar. 18, 2009, § 1(d) [GOLDIN00003753].

[1907] Amendment No. 11 to the Secured MSR Facility, dated June 30, 2009, § 2(a) [RC00033704].

[1908] Amendment No. 12 to the Secured MSR Facility, dated July 31, 2009, § 2(c) [ALLY_0130416].

[1909] Amendment No. 13 to the Secured MSR Facility, dated Sept. 22, 2009, § 2(a) [ALLY_0130424].

[1910] Amendment No. 14 to the Secured MSR Facility, dated Nov. 30, 2009, § 2(a) [GOLDIN00097683].

[1911] Letter from GMAC Inc. Re: Forgiveness of Certain Indebtedness and Termination of MSR Facility (Dec. 30, 2009), at 1–3 [ALLY_0353025].

[1912] *See* Minutes of a Special Meeting of the Board of Residential Capital, LLC, Oct. 1, 2008, at RC40005875 (statement from J. Young that "on September 30, 2008, ResCap received a $400 million contribution from GMAC in the form of debt forgiveness, which satisfied the TNW covenant requirement and immediate cash needs" and that as currently forecasted, "ResCap will drop below the required TNW level in December 2008") [RC40005652]; *see also* Minutes of a Special Meeting of the Board of Residential Capital, LLC, Oct. 23, 2008, at RC40005890 (statement from J. Young that ResCap's expected loss for October is "approximately $650 million and as equity at September 30 was $350 million, a large capital injection will be needed in order to maintain compliance with [TNW] covenants") [RC40005652].

EXHIBIT V.E.2
**Secured MSR Facility – Debt Forgiveness**
*($ in Millions)*

| Date | Amount | |
|------|:------:|---|
| September 2008 | $ | 101.5 |
| October 2008 | | 238.9 |
| November 2008 | | 451.5 |
| November 2009 | | 52.4 |
| December 2009 | | 262.7 |
| Total: | $ | 1,107.0 |

*Source: Capital Contributions to ResCap Legal Entity as of Jan. 31, 2012 [ALLY_PEO_0075634].*

See Appendix V.E.2 for more details on the terms of the Secured MSR Facility.

### 3.  Secured Revolver Facility

Neither the Resort Finance Facility nor the Secured MSR Facility fully addressed ResCap's liquidity needs. With looming credit maturities (as more particularly described below) and stress on ResCap's capital needs, on April 21, 2008, the ResCap Board approved the bond exchange[1913] pursuant to which the Senior Secured Notes and Junior Secured Notes were issued. Then, on June 1, 2008, the ResCap Board approved a new credit facility with the Secured Revolver Facility Borrowers (RFC and GMAC Mortgage), ResCap and various ResCap Subsidiaries, as guarantors, and AFI, as lender, to be evidenced by the Secured Revolver Loan Agreement.[1914] A separate approval of the Secured Revolver Facility was provided by the Executive Committee of the ResCap Board on June 2, 2008.[1915] When the ResCap Board approved the Secured Revolver Facility, Edward Smith was the only Independent Director on the ResCap Board despite the 2006 Amended Operating Agreement requiring ResCap to have two Independent Directors at all times.[1916] The Secured Revolver Facility was approved by the boards of RFC[1917] and GMAC Mortgage[1918] on June 3, 2008.

---

[1913] Minutes of Meeting of the Board of Directors of Residential Capital, LLC, Apr. 21, 2008 at RC40005727–32 [RC40005652].

[1914] Minutes of Meeting of the Board of Directors of Residential Capital, LLC, June 1, 2008 at RC40005754–60 [RC40005652].

[1915] Unanimous Written Consent of the Executive Committee of the Board of Directors of Residential Capital, LLC, June 2, 2008, at RC40006443–49 [RC40006437].

[1916] The fact that only one Independent Director approved the Secured Revolver Facility does not have a bearing on whether the Secured Revolver Facility was duly authorized by ResCap. The 2006 Amended Operating Agreement barred material affiliate transactions not on arm's-length terms or for fair value; since the Secured Revolver Facility generally contained terms typical for a credit facility with unaffiliated lenders (as further described in this Section), it would not have required Independent Director approval. *See* 2006 Amended Operating Agreement, § 2(f)(i) [ALLY_0041818].

[1917] Action by Written Consent of the Board of Directors of Residential Funding Company, LLC, dated June 3, 2008 [ALLY_0045029].

[1918] Action by Written Consent of the Board of Directors of GMAC Mortgage, LLC, dated June 3, 2008 [ALLY_0045069].

On the horizon was the maturity of certain ResCap bonds, with more than $3 billion coming due between 2008 and 2009.[1919] In addition, certain credit facilities to which ResCap, RFC, and other ResCap Subsidiaries were party were maturing and needed to be renewed or refinanced.[1920] Two such facilities were: (1) the JPMorgan 364-Day Facility, an unsecured facility in the amount of $875 million,[1921] which had a scheduled maturity date of June 9, 2008;[1922] and (2) the JPMorgan 2005 Term Loan Facility in the amount of $1.75 billion,[1923] which had a scheduled maturity date of July 28, 2008.[1924]

During an April 18, 2008 ResCap Board meeting, Samuel Ramsey, AFI Chief Risk Officer at the time, in addressing the looming credit facility maturities, provided an overview of ResCap's overall debt restructuring aimed at injecting $3.5 billion of new liquidity, which plan included the structural precursor to the Secured Revolver Facility.[1925] The original structure, as described in the minutes of this board meeting, contemplated a $1.75 billion two-year facility, secured on a first lien basis, to be provided by certain of ResCap's existing bank lenders, led by JPMorgan and Citibank.[1926] This facility was intended to replace $1.75 billion of liquidity[1927] represented, collectively, by the JPMorgan 364-Day Facility and a JPMorgan unsecured $875 million Three-Year Competitive Advance and Revolving Credit Facility[1928] with a scheduled termination date of June 9, 2010.[1929] In addition, it was contemplated that AFI would provide a new $1.75 billion term loan to be secured on a second lien basis (junior to the two-year bank facility) and ranking *pari passu* with the liens securing the proposed Senior Secured Notes;[1930] thus, the new $1.75 billion second lien term loan to be provided by AFI would effectively replace the JPMorgan 2005 Term Loan Facility.[1931]

---

[1919] Confidential Offering Memorandum and Consent Solicitation Statement, dated May 5, 2008 [ALLY_0103305].

[1920] *See* Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Apr. 20, 2008, at RC40005723 [RC40005652].

[1921] JPMorgan 364-Day Facility, Sched. I [EXAM00344999].

[1922] *Id.* § 1.1 (definition of "Termination Date").

[1923] JP Morgan 2005 Term Loan Facility, Sched. I [EXAM00345163].

[1924] *Id.* § 1.1 (definition of "Maturity Date").

[1925] Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Apr. 18, 2008, at RC40005719-20 [RC40005652].

[1926] *Id.* at RC40005719.

[1927] *See id.* at RC40005719.

[1928] Three Year Competitive Advance and Revolving Credit Facility among Residential Capital, LLC, the several lenders from time to time parties thereto, the documentation agents named therein, Citibank, N.A., and JPMorgan Chase Bank, N.A., dated June 11, 2007, Sched. I [EXAM00345072].

[1929] *Id.* § 1.1 (definition of "Termination Date").

[1930] Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Apr. 18, 2008, at RC40005720 [RC40005652].

[1931] *Id.* at RC40005719–22.

During the same April 18, 2008 ResCap Board meeting, Ramsey also stated that AFI's management was considering a structural change whereby AFI would replace the bank syndicate on the proposed $1.75 billion two-year facility and provide a $3.5 billion facility on its own, with all of AFI's exposure secured by a first priority lien position ahead of the proposed Senior Secured Notes and the Junior Secured Notes.[1932] Such a structure would be "less complex and would allow ResCap to liquidate assets and repay the loan in a more attractive manner."[1933] At a subsequent meeting of the ResCap Board held on April 20, 2008, it was reported that the new $3.5 billion credit facility would in fact be provided solely by AFI.[1934] In addition, Ramsey stated that as part of the transaction, AFI would obtain from ResCap's existing third party lenders a $1 billion fixed-rate, two-year unsecured term loan.[1935] The banks had agreed to swap ResCap credit risk for AFI credit risk.

On the closing date of the Secured Revolver Facility, (1) AFI converted approximately $1.3 billion of term loans outstanding under the JPMorgan 2005 Term Loan Facility that it had obtained via assignment into an equivalent amount of Secured Revolver Facility Term Loans;[1936] and (2) the Secured Revolver Facility Borrowers borrowed (a) approximately $450 million of Secured Revolver Facility Revolver Loans to repay the remaining principal amount of term loans under the JPMorgan 2005 Term Loan Facility;[1937] and (b) $1.75 billion of Secured Revolver Facility Revolver Loans to pay the cash portion of the ResCap tender and bond exchange.[1938]

It was this proposed shift in AFI's status from second lien lender to sole first lien lender that factored into the decision of Jacob and Melzer to resign as Independent Directors, effective as of April 20, 2008. As Jacob noted, "asking us to approve a related party transaction of this magnitude, which allowed them to leapfrog over other unsecured creditors, was something that we felt that if we approved, it would be a serious violation of the ResCap operating agreement."[1939] Melzer similarly commented that "I just wasn't willing to be in a position where all of a sudden GMAC would be putting itself in a senior position to all the unsecured creditors at ResCap."[1940] For further detail regarding the resignations of Jacob and Melzer see Section IV.A.1.

─────────────────────────────

[1932] *Id.* at RC40005721.

[1933] *Id.* at RC40005721. *See also* Int. of L. Hall, Nov. 29, 2012, 130:3-5 ("it made a lot more sense for GMAC to do the entire facility, which gave more flexibility to ResCap, better pricing, better terms . . .").

[1934] Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Apr. 20, 2008, at RC40005723–25 [RC40005652].

[1935] *Id.* at RC40005723.

[1936] Secured Revolver Loan Agreement, § 2.01(c) [RC00024234].

[1937] Residential Capital, LLC, Current Report (Form 8-K) (June 9, 2008), at Item 1.01.

[1938] E-mail from J. Brooke (June 6, 2008) [CCM00145708].

[1939] Examiner's Interview of T. Jacob, Nov. 7, 2012, at 216:19–216:24.

[1940] Examiner's Interview of T. Melzer, Oct. 10, 2012, at 160:17–160:21.

Though Independent Directors Jacobs and Melzer had expressed concern with the $3.5 billion facility being proposed by AFI,[1941] Daniel Ammann and Jon Pruzan, representatives from Morgan Stanley,[1942] noted at the ResCap Board meeting on June 1, 2008, that it was the most viable option for ResCap at that time.[1943] Comparing the facility being proposed by AFI to that being proposed by the banks, they stated that "the fees and advance rates between the two were similar; that [AFI] was willing to provide a full $3.5 billion, whereas the bank syndicate had offered only $1.75 billion; that the [AFI] covenant structure was more favorable to [ResCap] than that proposed by the bank syndicate."[1944] In addition, Ammann and Pruzan concluded that ResCap would not have been able at that time to obtain a comparable secured facility in the market absent AFI's willingness to provide it.[1945]

Proceeds from Secured Revolver Facility Loans were to be used to repay existing indebtedness of ResCap and for working capital purposes.[1946] In connection with the closing of the Secured Revolver Facility and as part of ResCap's debt restructuring, on or about June 5, 2008, AFI acquired, via assignment,[1947] $1.293 billion of ResCap's outstanding term loans under the JPMorgan 2005 Term Loan Facility; the remainder of the amounts outstanding under the JPMorgan 2005 Term Loan Facility (approximately $450 million) was repaid with proceeds of a Secured Revolver Facility Revolver Loan.[1948] The $1.293 billion loan owed by ResCap under the JPMorgan 2005 Term Loan Facility and acquired by AFI was, pursuant to the terms of the Secured Revolver Loan Agreement, converted into a Secured Revolver Facility Term Loan (due July 28, 2008) and, as such, became a direct secured obligation of the Secured Revolver Facility Borrowers.[1949] Indeed, ResCap was absolved of all direct liability under the assigned and converted term loan under the JPMorgan 2005 Term Loan Facility.[1950]

--------------------------------------------------

[1941] Jacob and Melzer, through their counsel, Bryan Cave, proposed revisions to certain April 2008 ResCap Board meeting minutes (which were never adopted). *See, e.g.*, Draft Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Apr. 18, 2008, at RC40008507–10 [RC40008489] (indicating concern with Secured Revolver Facility).

[1942] Although the Secured Revolver Facility was ultimately approved by independent director Smith, there is nothing in the record that shows Smith was informed about the Morgan Stanley conflict discussed in Section V.A.1.

[1943] *See* Minutes of a Meeting of the Board of Residential Capital, LLC, June 1, 2008, at RC40005753 [RC40005652].

[1944] Minutes of a Meeting of the Board of Residential Capital, LLC, June 1, 2008, at RC40005753 [RC40005652].

[1945] *Id.*

[1946] GMAC LLC, Current Report (Form 8-K) (June 9, 2008), Item 8.01.

[1947] Master Assignment and Assumption among Residential Capital LLC, JPMorgan, and Citibank, dated June 5, 2008 [ALLY_0043831].

[1948] GMAC LLC, Current Report (Form 8-K) (June 9, 2008), Item 8.01.

[1949] Secured Revolver Loan Agreement, § 2.01(c) [RC00024234].

[1950] *Id.* § 2.01(d).

Simultaneously with the closing of the Secured Revolver Facility, ResCap consummated a tender and bond exchange, pursuant to which approximately $8.6 billion in unsecured ResCap notes maturing between 2008 and 2015 were exchanged for approximately $5.6 billion of Senior Secured Notes and Junior Secured Notes.[1951] On or about June 6, 2008, a borrowing of a Secured Revolver Facility Revolver Loan in the amount of $1.75 billion was made to fund the cash portion of this ResCap tender and bond exchange.[1952] As a result, the Secured Revolver Facility was fully drawn in the amount of $3.5 billion as of June 6, 2008, with the proceeds having been used to exchange direct unsecured ResCap obligations owed to unaffiliated third parties (represented by the JPMorgan 2005 Term Loan Facility that was assigned and repaid and by the ResCap bonds tendered and/or exchanged) for direct secured obligations of the Secured Revolver Facility Borrowers owed to AFI. According to ResCap's Form 10-Q for the period ending September 30, 2008, the $1.293 billion Secured Revolver Facility Term Loan that came due on July 28, 2008 was repaid through a Secured Revolver Facility Revolver Loan.[1953] Repayment in this manner was likely not possible, as there was insufficient availability under the Secured Revolver Facility to fund a draw of that size (the facility was capped at $3.5 billion)—it is more likely that the outstanding Secured Revolver Facility Term Loan was simply converted into a Secured Revolver Facility Revolver Loan.

The total commitment under the Secured Revolver Facility was eventually reduced to $3.1 billion in December 2008.[1954] Notably, it appears that AFI, rather than ResCap, requested the permanent reduction of the commitment under the Secured Revolver Facility. In a November 26, 2008 e-mail from Jerry Lombardo to Terry Farley and Melissa White, Lombardo noted that "today [AFI] requested and ResCap (Tom Marano and I) agreed to permanently reduce the Revolver by $500M as of today."[1955] A commitment reduction request procedure such as this would not have been typical for a credit facility among unaffiliated parties. It is normally the borrower, not the lender, that has the right to seek commitment reductions. In fact, the above-referenced e-mail from Lombardo referenced Section 2.10(b) of the Secured Revolver Loan Agreement,[1956] the provision pursuant to which the Secured Revolver Facility Borrowers could voluntarily reduce the lending commitment.

The collateral securing the Secured Revolver Facility included all the then unencumbered assets of the Secured Revolver Facility Borrowers and Secured Revolver Facility Guarantors, including, among other assets, accounts, chattel paper, commercial tort claims, certain deposit and securities accounts, intellectual property, investment property, specific pledged shares and

---

[1951] Memorandum, GMAC ResCap Significant Transaction #1028, at EXAM00220282 [EXAM00220281].

[1952] E-mail from J. Brooke (June 6, 2008) [CCM00145708].

[1953] *See* Residential Capital, LLC, Quarterly Report (Form 10-Q) (Nov. 10, 2008), at 78.

[1954] Amendment No. 4 to the Secured Revolver Loan Agreement, dated Dec. 12, 2008, § 2.01(k) [ALLY_0051551].

[1955] Email from J. Lombardo (Nov. 26, 2008) [EXAM10845441].

[1956] *Id.*

equity interests and specific pledged promissory notes.[1957] The Secured Revolver Facility, the Senior Secured Notes and the Junior Secured Notes shared liens on the same collateral, with the Secured Revolver Facility having a first lien priority position ahead of both the Senior Secured Notes and the Junior Secured Notes.[1958] The lien priority arrangements and other intercreditor rights governing the Secured Revolver Facility, the Senior Secured Notes and the Junior Secured Notes were governed by the Intercreditor Agreement.

The Secured Revolver Facility contained representations and warranties,[1959] covenants,[1960] events of default[1961] and indemnification provisions[1962] that were standard for facilities of comparable size and nature (and would have been typical for a syndicated credit facility with unaffiliated lenders). However, certain of the provisions exemplified an affiliate transaction and were more favorable to the Secured Revolver Facility Borrowers — namely (1) the negative covenant on debt incurrence not only provided the Secured Revolver Facility Borrowers with a sizable basket of $500 million, but also provided a very broad exception for "debt incurred in the ordinary course of business through financing, securitization and hedging activities";[1963] (2) the negative covenant regarding lien incurrence only applied to liens on the First Priority Collateral (as opposed to other assets of the Secured Revolver Facility Borrowers and Secured Revolver Facility Guarantors);[1964] (3) a non-traditional and broader set of exceptions to the covenant limiting affiliate transactions (e.g., any transaction between ResCap and any of its Subsidiaries was permitted);[1965] and (4) no ongoing commitment or facility fees were stated to be payable by the Secured Revolver Facility Borrowers (whereas a typical third party credit facility would likely have required payment of either a commitment or facility fee). Moreover, it would have been extremely unusual for a single lender to provide a lending commitment of this size.

In addition, while the Secured Revolver Facility Borrowers were required to make mandatory prepayments in connection with net cash proceeds from certain collateral dispositions,[1966] mandatory prepayment was only required to prepay the Secured Revolver Facility Loans to the extent the amount of such net cash proceeds exceeded retained proceeds (an agreed upon threshold of up to $450 million) or were not otherwise used to acquire

---

[1957] First Priority Security Agreement, § 2 [RC00038119]; *see also* Appendix V.E.3.g.

[1958] Intercreditor Agreement, § 2.1(a) [ALLY_0066819].

[1959] Secured Revolver Loan Agreement, § 6.01 [RC00024234].

[1960] *Id.* Art. VII.

[1961] *Id.* § 8.01.

[1962] *Id.* Art. X.

[1963] *Id.* § 7.02(f).

[1964] *Id.* § 7.02(h).

[1965] *Id.* § 7.02(l).

[1966] *Id.* § 2.08(c).

additional First Priority Collateral.[1967] Further, such mandatory prepayments, to the extent they were applied to Secured Revolver Facility Revolver Loans, did not automatically reduce AFI's commitment to make Secured Revolver Facility Revolver Loans. Although the inclusion of a mandatory prepayment provision was typical for secured syndicated credit facilities, the described exceptions were more favorable to the Secured Revolver Facility Borrowers than would be expected in connection with a loan provided by an unaffiliated lender.

On June 4, 2008, AFI sold to GM and Cerberus a $750 million first loss participation interest in the Secured Revolver Facility which was subsequently contributed by them to AFI on December 29, 2008, in exchange for equity in AFI.[1968]

The Secured Revolver Loan Agreement was amended and restated by the A&R Secured Revolver Loan Agreement.[1969]

See Appendix V.E.3 for more details on the terms of the Secured Revolver Facility.

### 4. Servicing Advance Factoring Facility

ResCap sought additional financing options shortly after the closing of the Secured Revolver Facility and looked to monetize certain non-GSE related Servicing Advances. Unlike other credit facilities entered into with AFI, the Servicing Advance Factoring Facility (which was entered into with GMAC CF) was structured as a "true sale" of receivables and not as a financing, which was required by AFI.[1970] In the event ResCap filed for bankruptcy and a bankruptcy court held that the transfer of the Servicing Advances to GMAC CF under the Servicing Advance Factoring Agreement was a "true sale" and not a secured financing, the purchased Servicing Advances would be deemed assets of GMAC CF and not part of ResCap's bankruptcy estate, unless clawed back as a fraudulent transfer, nor would the purchased Servicing Advances be subject to preference claims.[1971] Thus, GMAC CF would have been in a better position, as a purchaser of assets, than a secured creditor. Nonetheless,

---

[1967] *See id.*

[1968] Memorandum, ResCap: Significant Capital Contributions and Related-Party Transactions, dated June 9, 2009, at ALLY_0240183 [ALLY_0240180]; Participation Agreement between GMAC LLC, General Motors Corporation and Cerberus ResCap Financing LLC, dated as of June 4, 2008 [ALLY_0043807].

[1969] A&R Secured Revolver Loan Agreement [ALLY_0066146].

[1970] Minutes of Meeting of the Board of Directors of Residential Capital, LLC, June 1, 2008 at RC40005752 (De Molina stated that AFI could commit to the "GMAC Factoring Facility so long as it could be structured as a 'true sale' rather than as a financing") [RC40005652].

[1971] *See* 6 Peter J. Lahny iv, Debtor-Creditor Law § 41.01 (2013) (explaining that the "transaction must be structured as a 'true sale' because if a court should find that the transaction was a disguised secured loan, the assets will be drawn back into the originator's bankruptcy estate").

GMAC CF was reluctant[1972] to enter into the Servicing Advance Factoring Agreement; after tense negotiations (as further described below), the deal was sized at $600 million with an advance rate of 85%.[1973] The sale of the Servicing Advances at a 15% discount rate provided the Servicing Advance Factoring Sellers (RFC and GMAC Mortgage) with greater liquidity than they would have had if they borrowed against the same assets under the Secured Revolver Facility.[1974]

On June 17, 2008, concurrently with the execution of the Servicing Advance Factoring Agreement, AFI, as lender agent under the Secured Revolver Loan Agreement and the First Priority Collateral Agent, entered into a release agreement with respect to the subject Servicing Advances[1975] with GMAC CF and the Servicing Advance Factoring Sellers, which provided that upon the purchase by GMAC CF of any Servicing Advances, AFI and the First Priority Collateral Agent agreed to an automatic release of all liens and security interests on the purchased Servicing Advances, which served as collateral securing the Secured Revolver Facility, the Senior Secured Notes and the Junior Secured Notes. The sale of Servicing Advances to AFI and/or one of its Affiliates (other than ResCap, ResCap Subsidiaries and Old GMAC Bank) was explicitly permitted under the Secured Revolver Facility[1976] and under the terms of the Intercreditor Agreement—if the lien on any collateral securing the Secured Revolver Facility was released by the First Priority Collateral Agent in connection with a transaction permitted under the Secured Revolver Loan Agreement, then the lien on such collateral securing the Senior Secured Notes and the Junior Secured Notes was automatically released.[1977]

The initial determination of the discount rate under the Servicing Advance Facility Agreement was an issue of contention. In an e-mail exchange, dated June 13, 2008, from Ken Fick (FTI)[1978] to Lombardo and Peterson,[1979] Fick informed Lombardo and

---

[1972] According to Linda Voss (GMAC CF Chief Operating Officer and CFO), GMAC CF would not have ever entered into this transaction with a third party. Int. of L. Voss, Dec. 13, 2012, at 102:15–16.

[1973] Servicing Advance Factoring Agreement, § 2(a)(3) [ALLY_0041874] (providing for an 85% advance rate for each type of Servicing Advance that, subject to agreement among the parties, could be adjusted to reflect the FMV).

[1974] Under the Secured Revolver Facility, the discount rate used to determine collateral value with respect to Servicing Advances varied from 70–80%. *See* Table V.E.3.b.

[1975] Release Agreement with respect to the Servicer Advance receivables, dated June 17, 2008 (ALLY_0118954).

[1976] Secured Revolver Loan Agreement, §§ 7.02(l)(iii), 7.02(r) [RC00024234].

[1977] Intercreditor Agreement, § 5.1(a) [ALLY_0066819].

[1978] FTI had been retained by ResCap since April 2008 to perform certain limited financial consulting procedures in connection with liquidity reporting. *See* ResCap Liquidity & Financial Forecast Report to Lenders by FTI Consulting, Inc., at 3 [ALLY_0319759]; *see also* E-mail from J. Lombardo to K. Fick (June 5, 2008) [EXAM10839158] (requesting Fick to assist with diligence and to provide business metrics to GMAC CF in connection with the Servicing Advance Factoring Facility).

[1979] E-mails between K. Fick and J. Peterson/J. Lombardo (June 13, 2008), at 1–2 [EXAM10306497].

Peterson that GMAC CF wanted to increase the discount rate from 5% (as provided in the Term Sheet)[1980] to approximately 20%. Fick pointed out that "to get $600M we need to sell $750M in Servicing Advances." Fick advised that Tony Renzi (ResCap Director) was following up with Marano (ResCap CEO) to "get guidance [regarding] the very steep price [a 20% discount rate] would cost."[1981] Lombardo thought the 20% discount rate was "nuts" and wanted to know whether Marano and Young were aware of the 20% discount.[1982]

Bill Hall, GMAC CF President and CEO at the time, added some color on the struggles GMAC CF had with the Servicing Advances. He referred to them as an "unattractive asset"[1983] to finance because Servicing Advances did not accrue or pay interest or have a maturity date.[1984] It was clear from contemporaneous e-mails and documents that GMAC CF had difficulty getting comfortable with the risk profile for the Servicing Advances and was not getting a complete, accurate picture of the assets. At one point ResCap told GMAC CF that the Servicing Advances to be sold were triple-A securities with a two-month average life.[1985] That was not the case, however, as approximately 50% of the Servicing Advances related to loans in foreclosure.[1986] Due to the short time available to close the transaction and the inability of ResCap to provide sufficient and complete information, GMAC CF had to rely on whatever information was provided, including a delinquent roll rate analysis, limited and "spotty" aging information, and information from Barclays relating to GSE Servicing Advances (as opposed to the non-GSE Servicing Advances at issue under the Servicing Advance Factoring Facility) that were part of a Barclays facility covering 2005-2007.[1987] The cost of funds and the time value of money associated with funding purchases of Servicing Advances under the Servicing Advance Factoring Facility were other factors driving the discount rate, along with the expected loss rate and repayment period for purchased Servicing Advances.[1988] As part of its analysis, GMAC CF started with the information provided by ResCap and prepared a model that included what GMAC CF thought the repayment history on the Servicing Advances would be and modeled in a loss rate of 2%, and from that information GMAC CF came up with a 20% discount rate.[1989]

---

[1980] Special Board Meeting, Receivables Factoring Facility Terms and Conditions, May 31, 2008, at RC40008283–84 [RC40008218].

[1981] E-mail from K. Fick (June 13, 2008), at 1–2 [EXAM10306497].

[1982] E-mails between K. Fick and J. Peterson/J. Lombardo (June 13, 2008), at 1–2 [EXAM10306497].

[1983] Int. of B. Hall, Dec. 13, 2012, at 132:16–132:17.

[1984] *Id.* at 132:18–132:20.

[1985] *Id.* at 133:17–20.

[1986] *Id.* at 136:12–16.

[1987] *See* Int. of L. Voss, Dec. 13, 2012, at 94:9–102:12.

[1988] Examiner's Interview of Bill Hall, Dec. 13, 2012, at 137:13–17, 140:4–6, 141:3–11.

[1989] *Id.* at 141:20–142:4.

In an e-mail exchange dated July 15, 2008, between Lombardo and Renzi, Lombardo discussed the next Servicing Advance sale to GMAC CF under the Servicing Advance Factoring Agreement.[1990] Lombardo referenced a meeting with Young and Marano and stated that he and Rory Bluhm (AFI Treasury Department, Director of Structured Funding and Operations) were putting together "an analysis of the turn times because this facility is very expensive to ResCap."[1991] Renzi agreed that the facility was very expensive and recalled negotiating the discount rate down from GMAC CF's original 21% to 15%.[1992] As Renzi noted, the Servicing Advance Factoring Agreement permitted discount adjustments based on the facts of the underlying receivable turn rates.[1993]

On July 18, 2008, a month after the Servicing Advance Factoring Agreement had closed, Morgan Stanley delivered a fairness opinion with respect to the Servicing Advance Factoring Facility,[1994] as was required for affiliate transactions in an amount greater than $500 million.[1995] Delivery of the opinion was delayed because GMAC CF was not able to explain to Morgan Stanley's satisfaction the duration calculations ResCap had provided to GMAC CF during negotiation of the facility and which GMAC CF had accepted. After the facility closed, ResCap was able to locate additional data relating to the calculations, which Renzi and Young agreed would be shared with GMAC CF and Morgan Stanley.[1996] The Morgan Stanley opinion concluded that the purchase price for the initial purchase of receivables, consummated on July 17, 2008,[1997] and the subsequent purchase of receivables contemplated to occur on July 18, 2008[1998] (the date the opinion was issued) were fair to RFC from a financial point of view.[1999]

---

[1990] E-mails between T. Renzi and J. Lombardo (July 15, 2008) [EXAM10842763].

[1991] E-mail from J. Lombardo (July 15, 2008) [EXAM10842763].

[1992] E-mail from T. Renzi (July 15, 2008) [EXAM10842763].

[1993] *Id.; see also* Servicing Advance Factoring Agreement, § 2(a)(3) [ALLY_0041874] (providing that the purchase price for the Servicing Advances could be adjusted to reflect factors, if any, agreed to by GMAC CF and the Servicing Advance Factoring Sellers that would result in a price that reflected the FMV of the Servicing Advances to be purchased); see *also* Servicing Advance Factoring Agreement, § 2(a)(4) [ALLY_0041874] (providing that any such adjustments applied by the Servicing Advance Factoring Sellers had to be verified by the Purchaser).

[1994] Opinion Letter from Morgan Stanley to the Board of Directors of ResCap (July 18, 2008) [EXAM00126523].

[1995] Senior Secured Notes Indenture, § 4.11(a)(3) [RC00024456]; Junior Secured Notes Indenture, § 4.11(a)(3) [RC00024572]; Secured Revolver Loan Agreement, § 7.02(l)(iii) [RC00024234] (requiring delivery of an opinion by a nationally recognized investment banking, accounting or appraisal firm stating the transaction is fair from a financial point of view with respect to affiliate transactions involving aggregate consideration greater than $500 million).

[1996] E-mail between J. Young and T. Renzi (June 27, 2008) [EXAM10172133].

[1997] *See* GMAC Commercial Factoring Schedule, prepared by ResCap, dated June 24, 2008 [EXAM00237715] (Column B at second tab, for description of projected sale of receivables).

[1998] *See id.* (Column AB at second tab) (describing projected sale of receivables).

[1999] Opinion Letter from Morgan Stanley to the Board of Directors of ResCap (July 18, 2008), at EXAM00126528 [EXAM00126523].

Due to lingering unanswered questions about the Servicing Advances, the Secura Group, a financial advisory consulting firm, was engaged by GMAC CF[2000] after the closing of the Servicing Advance Factoring Facility to conduct an independent review of the Servicing Advances.[2001] The Secura Group delivered a written report to AFI dated December 2008. According to AFI, the Secura Group had a difficult time gathering information from ResCap and had to use assorted pieces of data to construct its analysis.[2002] AFI concluded that the Secura Group analysis fell short of "providing a clear answer as to the true estimated recovery period and loss rate for [GMAC CF's] servicing advances."[2003]

Despite the reluctance of GMAC CF to enter into the Servicing Advance Factoring Facility, GMAC CF received in the first year about 72% of the amounts it spent to purchase the Servicing Advances hereunder[2004] and ultimately made a profit of $25 million on the transaction.[2005]

The Servicing Advance Factoring Facility contained provisions commonly found in receivables factoring transactions, including (1) the obligation of the Servicing Advance Factoring Sellers to repurchase receivables upon a breach of a representation pertaining to a purchased receivable;[2006] and (2) suspension of GMAC CF's obligation to purchase additional receivables until such breach was cured or the related receivables were repurchased.[2007]

The Servicing Advance Factoring Facility contained other representations and warranties,[2008] covenants,[2009] termination events[2010] and indemnification provisions[2011] standard for receivable factoring transactions between unaffiliated parties. GMAC CF and the Servicing Advance Factoring Sellers intended the sale of the receivables to constitute an

---

[2000] Although the Secura Group was engaged by AFI, it was chosen by ResCap. Int. of B. Hall, Dec. 13, 2012, at 170:11–15.

[2001] Memorandum, Response to September 2008 Servicing Advance Review Conducted by the Secura Group [CCM00172188].

[2002] *Id.*

[2003] *Id.* at CCM00172190.

[2004] Examiner's Interview of Bill Hall, Dec. 13, 2012, at 142:14–15.

[2005] *Id.* at 158:11–12.

[2006] Servicing Advance Factoring Agreement, § 6(a) [ALLY_0041874].

[2007] *Id.* § 6(c).

[2008] *Id.* § 5.

[2009] *Id.* § 7.

[2010] *Id.* § 8.

[2011] *Id.* § 2(k).

absolute sale and not a loan.[2012] Orrick, Herrington & Sutcliffe LLP, counsel to the Servicing Advance Factoring Sellers, delivered customary "true sale" opinion letters for each Servicing Advance Factoring Seller,[2013] limited by standard qualifications relating to uncertain outcomes in cases of bankruptcy and insolvency.[2014]

The Servicing Advance Factoring Facility was discussed at the ResCap Board meeting held on June 1, 2008,[2015] and approved by (1) the Unanimous Written Consent of the Executive Committee of the ResCap Board on June 2, 2008;[2016] (2) the boards of RFC[2017] and GMAC Mortgage[2018] on June 3, 2008; and (3) the Unanimous Written Consent of the ResCap Board on June 17, 2008.[2019]

The Servicing Advance Factoring Facility was terminated on June 16, 2009.[2020]

See Appendix V.E.4 for more details on the terms of the Servicing Advance Factoring Facility.

*5. Initial Line Of Credit Facility*

Despite having recently closed the bond exchange and the Secured Revolver Facility and having received the benefit of certain debt forgiveness by AFI,[2021] during the last quarter of

───────────────────────

[2012] *Id.* § 9.

[2013] Opinion Letter from Orrick, Herrington & Sutcliffe LLP to RFC, GMAC Mortgage and GMAC CF for RFC (June 17, 2008), at ALLY_0078815 [ALLY_0078491]; Opinion Letter from Orrick, Herrington & Sutcliffe LLP to RFC, GMAC Mortgage and GMAC CF for GMAC Mortgage (June 17, 2008), at ALLY_0078840 [ALLY_0078491].

[2014] Opinion Letter from Orrick, Herrington & Sutcliffe LLP to RFC, GMAC Mortgage and GMAC CF for RFC (June 17, 2008), at ALLY_0078816–20 [ALLY_0078491]; Opinion Letter from Orrick, Herrington & Sutcliffe LLP to RFC, GMAC Mortgage and GMAC CF for GMAC Mortgage (June 17, 2008), at ALLY_0078841–45 [ALLY_0078491].

[2015] Minutes of Meeting of the Board of Directors of ResCap, June 1, 2008, at RC40005749–60 [RC40005652].

[2016] Unanimous Written Consent of the Executive Committee of the Board of Directors of Residential Capital, LLC, June 2, 2008, at RC40006443, 50–51, 79–85 [RC40006437].

[2017] Action by Written Consent of the Board of Directors of Residential Funding Company, LLC, June 3, 2008, at ALLY_0042590–92 [ALLY_0042553].

[2018] Action by Written Consent of the Board of Directors of GMAC Mortgage, LLC, June 3, 2008, at ALLY_0042514–16 [ALLY_0042484].

[2019] Unanimous Written Consent of the Board of Directors of Residential Capital, LLC, June 17, 2008, at RC40005787–97 [RC40005652].

[2020] Residential Capital, LLC, Consolidated Financial Statements for the Years Ended December 31, 2009 and 2008 (Feb. 26, 2010), at 99 [EXAM00124455].

[2021] *See* Exhibit V.E.2.

2008, ResCap's liquidity needs continued to exceed its available cash.[2022] Normally having in place a first lien secured credit facility and second and third lien secured bonds, each with a blanket lien security package, would be an impediment to putting in place a new significant secured credit facility. However, because of the favorable permitted lien and collateral release provisions set forth in the Secured Revolver Loan Agreement, the Senior Secured Notes Indenture, the Junior Secured Notes Indenture and the Intercreditor Agreement, the Initial Line of Credit Borrowers (PATI and RAHI) were able to enter into the Initial Line of Credit Facility on November 20, 2008, with AFI, as lender, in the amount of $430 million, which facility was guaranteed on a full recourse basis by ResCap. Draws under the Initial Line of Credit Facility were only available if ResCap's liquidity fell below a certain level.[2023] Although the Secured MSR Facility Borrowers[2024] and Secured Revolver Facility Borrowers[2025] were required to make a solvency representation, the Initial Line of Credit Borrowers were never required to do so under the terms of the Initial Line of Credit Agreement.

As a result of failed efforts to find unaffiliated lenders (as described below), it became evident that AFI was the lender of last resort for the Initial Line of Credit Facility. In an e-mail from Erik Graber of Goldin Associates to Lombardo and Melissa White (Assistant Treasurer of various ResCap Affiliates) dated December 16, 2008,[2026] Graber asked (presumably, in connection with the preparation of a fairness opinion in anticipation of an increase to the

---

[2022] Minutes of a Special Meeting of the Board of Residential Capital, LLC, Nov. 12, 2008, at RC40005906 [RC40005652]. Young and Lombardo discussed the availability of funds under the Secured Revolver Facility. Young said that ResCap would not draw against the revolving facility as there was insufficient collateral available to support further advances and Marano said the bond exchange transaction had not generated cash for ResCap. Lombardo said that based on forecast projections, on December 17, 2008, ResCap would be required to borrow under the Initial Line of Credit Facility that the AFI Board had recently approved as part of a ResCap support package. *Id.*

[2023] Initial Line of Credit Agreement, § 2.03(a) [ALLY_0023145]. The Initial Line of Credit Borrowers could request loans only if, on the proposed funding date and after giving effect to such loans, either or both of the following liquidity tests were met: (1) unrestricted ResCap liquidity was less than $250 million and/or (2) ResCap consolidated liquidity was less than $750 million. *Id.*; *see also* Appendix V.E.5.c.

[2024] Secured MSR Loan Agreement, § 6.01(h) [RC00024114] (providing that other than as explicitly set forth in the Seventh Amendment to the Secured MSR Loan Agreement, dated December 10, 2008, the Secured MSR Facility Borrowers were always required to make a solvency representation). *See* Appendix V.E.2.e.(7) (detailing the solvency representation).

[2025] Secured Revolver Loan Agreement, § 6.01(h) [RC00024234] (explaining that other than as explicitly set forth in the Fourth and Fifth Amendments to the Secured Revolver Loan Agreement, dated December 12, 2008 and December 31, 2008, respectively, the Secured Revolver Facility Borrowers were always required to make a solvency representation). See Appendices V.E.3.i.(5) and V.E.3.i.(6) for more detail regarding the solvency representation.

[2026] E-mails between E. Graber and J. Lombardo (Dec. 16, 2008) [EXAM10178557].

Initial Line of Credit Facility)[2027] about ResCap's efforts to seek alternative lenders for the Initial Line of Credit Facility.[2028] In response, Lombardo stated that there were no external third party lenders with the liquidity or desire to finance the assets pledged to secure the Initial Line of Credit Facility given the "current extraordinary tightness in the financial markets coupled with [ResCap's] corporate rating, the level of [ResCap's] [TNW] (below $500M) and the classification of assets."[2029] Lombardo also stated that ResCap had no other alternative, and that since the second quarter of 2008, ResCap had been in discussions with no fewer than fifteen banks around the world.[2030]

Since a blanket lien on all assets was provided to secure the Secured Revolver Facility, the Senior Secured Notes, and the Junior Secured Notes, certain collateral had to be released in order to have such collateral available to secure the Initial Line of Credit Facility. To do so, on November 20, 2008, (1) the Secured Revolver Facility Borrowers executed a Request for Collateral Release;[2031] (2) AFI, as the lender agent, executed a Consent and Direction to Release Collateral;[2032] and (3) the First Priority Collateral Agent, the Second Priority Collateral Agent and the Third Priority Collateral Agent executed a Partial Release of Collateral.[2033] The relatively liberal collateral release provisions set forth in the Secured Revolver Loan Agreement,[2034] the Senior Secured Notes Indenture,[2035] the Junior Secured

---

[2027] Opinion Letter from Goldin Associates to the Committee of the Independent Members of the Board of Directors of ResCap (Dec. 22, 2008) [GOLDIN00125814]. The anticipated increase to the Initial Line of Credit Facility would have resulted in a lending facility with a total commitment amount in excess of $5 million, thus triggering the provisions under the Senior Secured Notes Indenture and the Junior Secured Notes Indenture requiring delivery of a fairness opinion. *See* Senior Secured Notes Indenture, § 4.11(a)(3) [RC00024456]; Junior Secured Notes Indenture, § 4.11(a)(3) [RC00024572]; Secured Revolver Loan Agreement, § 7.02(i)(iii) [RC00024234] (requiring delivery of an opinion by a nationally recognized investment banking, accounting or appraisal firm stating the transaction is fair from a financial point of view with respect to affiliate transactions involving aggregate consideration greater than $500 million).

[2028] E-mails between E. Graber and J. Lombardo (Dec. 16, 2008) [EXAM10178557].

[2029] *Id.*

[2030] *Id.*

[2031] Request for Collateral Release, dated Nov. 20, 2008 [ALLY_0054102]. The collateral released (which became the initial collateral under the Initial Line of Credit Facility) included certain pledged shares and equity interests, certain pledged promissory notes, certain deposit and securities accounts and all accounts, chattel paper, general intangibles and other assets relating to the foregoing pledged assets.

[2032] Consent and Direction to Release Collateral, dated Nov. 20, 2008 [ALLY_0054408].

[2033] Partial Release of Collateral, dated Nov. 20, 2008 [ALLY_0054713].

[2034] Secured Revolver Loan Agreement, § 12.11 [RC00024234].

[2035] Senior Secured Notes Indenture, § 8.04(a) [RC00024456].

V-370

Notes Indenture[2036] and the Intercreditor Agreement[2037] made the movement of this collateral securing the Secured Revolver Facility, the Senior Secured Notes and the Junior Secured Notes possible.[2038]

Under the terms of the Secured Revolver Loan Agreement, there were restrictions imposed on the disposition and transfer of certain collateral designated as "Primary Collateral."[2039] "Primary Collateral" included only a portion of the collateral covered by the blanket lien granted under the related security documents. As a result, the disposition of non-Primary Collateral did not trigger the collateral disposition restrictions set forth in the Secured Revolver Loan Agreement, the Senior Secured Notes Indenture, and the Junior Secured Notes Indenture, allowing the Secured Revolver Facility Borrowers and the Secured Revolver Facility Guarantors to freely elect to have the lien on the non-Primary Collateral[2040] released and re-encumbered under other permitted credit facilities, such as the Line of Credit Facilities, without the consent of the holders of either the Senior Secured Notes or the Junior Secured Notes.

Pursuant to the Intercreditor Agreement, if the lien on collateral securing the Secured Revolver Facility was released by the First Priority Collateral Agent in connection with a transaction permitted under the Secured Revolver Loan Agreement, then the lien on such collateral securing the Senior Secured Notes and the Junior Secured Notes would be automatically released.[2041]

---

[2036] Junior Secured Notes Indenture, § 8.04(a) [RC00037197].

[2037] Intercreditor Agreement, § 5.1(a) [ALLY_0066819].

[2038] The definition of "Collateral Disposition" set forth in the Secured Revolver Loan Agreement was limited to the disposition or transfer of only "Primary Collateral" and the lien covenant in the Secured Revolver Loan Agreement permitted liens on financing assets securing "Permitted Funding Indebtedness". The term "Permitted Funding Indebtedness" was very broad and included, among other things, indebtedness incurred in the ordinary course through financings, including customary lines of credit, and included other indebtedness on terms at least as favorable to ResCap or its applicable Subsidiary that would be available on an arm's-length basis. Secured Revolver Loan Agreement, Sched. 1.01 [RC00024234].

[2039] *Id.* (definition of "Primary Collateral").

[2040] Int. of L. Hall, Nov. 29, 2012, 114:25 (discussing the Secured Revolver Facility and making a distinction between "Primary Collateral" and non-Primary Collateral by stating that "the blanket lien had no restrictions").

[2041] Intercreditor Agreement, § 5.1(a) [ALLY_0066819].

In fact, in an October 24, 2008 e-mail from Dave Miller of Elliott Management Corporation to Lenard Tessler (Managing Director of Cerberus), Miller refers to the security interest held by the holders of the Senior Secured Notes as "almost completely illusory,"[2042] and stated that ResCap had the ability to free up collateral to re-encumbered to generate liquidity to "denude the 2nd lien bondholders of their security interests."[2043] Collateral was released from the liens securing the Secured Revolver Facility, the Senior Secured Notes and the Junior Secured Notes and re-encumbered as collateral securing the Line of Credit Facilities on at least six different occasions.[2044]

The Initial Line of Credit Facility contained representations and warranties,[2045] covenants,[2046] events of default,[2047] and indemnification provisions[2048] that were standard for facilities of comparable size and nature (and would have been typical for a syndicated credit facility with unaffiliated lenders). However, the Initial Line of Credit Borrowers were not required at closing to, nor did they ever, make a solvency representation. The provisions of the Initial Line of Credit Facility that exemplified an affiliate transaction more favorable to the Initial Line of Credit Borrowers than would have been obtained in a syndicated credit facility with unaffiliated lenders were the same as those provided to the Secured Revolver Facility Borrowers under the Secured Revolver Facility;[2049] in addition, the Initial Line of Credit Borrowers were never required to pay an upfront fee when the facility closed (whereas an upfront fee was payable at the closing of the Secured Revolver Facility). Moreover, it would have been extremely unlikely for a single lender to provide a facility of this size.

---

[2042] E-mail from D. Miller (Oct. 24, 2008) [CCM00393464].

[2043] *Id.*

[2044] Partial Release of Collateral, dated Nov. 20, 2008 [ALLY_0054713]; Partial Release of Collateral, dated May 19, 2009 [ALLY_0057631]; Partial Release of Collateral, dated June 5, 2009 [ALLY_0057873]; Partial Release of Collateral, dated Nov. 9, 2009 [ALLY_0065802]; Partial Release of Collateral, dated Dec. 16, 2009 [ALLY_0066099]; Partial Release of Collateral, dated May 14, 2010 [ALLY_0070276]. In connection with a later collateral release from the Secured Revolver Facility on May 14, 2010, ResCap obtained a fairness opinion from Goldin Associates, dated May 13, 2010, stating that the "terms upon which [ResCap] will add the Additional Collateral to the Collateral as security under the [A&R Line of Credit Agreement], are fair to [ResCap] and to its creditors (other than [AFI]), from a financial point of view." Opinion Letter from Goldin Associates to the Committee of the Independent Members of the Board of Directors of ResCap (May 13, 2010), at GOLDIN00125805 [GOLDIN00125802].

[2045] Initial Line of Credit Agreement, § 6.01 [ALLY_0023145].

[2046] *Id.* Art. VII.

[2047] *Id.* § 8.01.

[2048] *Id.* Art. X.

[2049] *See* Section V.E.3.

On November 20, 2008, the Initial Line of Credit Facility was approved by the ResCap Board[2050] and the boards of PATI[2051] and RAHI.[2052] The Initial Line of Credit Facility was amended and restated in December 2009 by the A&R Line of Credit Facility.

See Appendix V.E.5 for more details on the terms of the Initial Line of Credit Agreement.

### 6. ResMor Loan Facility

On November 20, 2008, the closing date of the Initial Line of Credit Facility, the ResMor Facility Borrower (GMAC Canada) entered into the ResMor Loan Facility with AFI in the principal amount of CDN $82 million. Also, on the same day, GMAC Canada, as seller, and AFI, as purchaser, entered into a purchase agreement pursuant to which AFI agreed, subject to the satisfaction of conditions precedent, to purchase from GMAC Canada the stock of 1020491 Alberta Ltd. and ResMor.[2053]

The principal amount of the ResMor Loan was intended to be repaid upon the closing of the ResMor Sale by setting off the purchase price against such principal amount[2054] and in fact, on January 1, 2009, the ResMor Sale closed and the ResMor Loan was repaid in the manner so contemplated.[2055] The ResMor Loan Facility provided that the loan proceeds were to be used to repay existing debt due to ResCap or any of its Subsidiaries.[2056] Ultimately, the loan proceeds were used to repay (1) intercompany debt owed by GMAC Canada to its direct parent, GMAC RFC International Holdings Cooperatief U.A.;[2057] and (2) immediately

---

[2050] Action by Written Consent of the Board of Directors of Residential Capital, LLC, dated Nov. 20, 2008, at RC40005928–38 [RC40005652].

[2051] Action by Written Consent of the Board of Directors of Passive Asset Transactions, LLC, dated Nov. 20, 2008 [ALLY_0051116].

[2052] Action by Written Consent of the Board of Directors of RFC Asset Holdings II, LLC, dated Nov. 20, 2008 [ALLY_0051015].

[2053] Share Purchase Agreement, between GMAC Residential Funding of Canada, Limited and GMAC LLC, dated Nov. 20, 2008 [RC00025358].

[2054] ResMor Loan Agreement, § 2.2 [RC00025269].

[2055] Residential Capital, LLC, Quarterly Report (Form 10-Q) (May 11, 2009), at 56 (reporting outstanding advance under the ResMor Loan Facility was settled as consideration given for the completed ResMor Sale); *see also* Payout and Release Letter from GMAC LLC to GMAC Residential Funding of Canada, Limited, dated Jan. 1, 2009 [ALLY_0127021] (evidencing termination of the facility).

[2056] ResMor Loan Agreement, § 6.1.2 [RC00025269].

[2057] Memorandum, GMAC ResCap Significant Transaction Memo, General Information and Transaction Description (Part I) #1144, at EXAM0020432–34 [EXAM00220430]; E-mail from S. Bashmakov (Nov. 20, 2008) [EXAM10843968].

thereafter, intercompany debt owed by GMAC RFC International Holdings Cooperatief U.A. to ResCap.[2058] AFI's recourse against GMAC Canada to recover the principal amount of the ResMor Loan was limited solely to AFI's right to foreclose on the shares pledged to secure the ResMor Loan Facility.[2059]

On November 20, 2008, the ResMor Sale and the ResMor Loan Facility were approved by the (1) ResCap Board;[2060] and (2) the ResMor board.[2061] On December 2, 2008, Goldin Associates delivered a presentation to the Independent Directors regarding the ResMor Sale,[2062] and on December 3, 2008, Goldin Associates rendered a fairness opinion with respect thereto, stating that the ResMor Sale was fair, from a financial point of view, to ResCap and its creditors (other than AFI).[2063]

The ResMor Facility contained very basic representations and warranties[2064] and covenants (but no financial covenants, which was not atypical given the short term nature and purpose of the ResMor Facility).[2065] The events of default[2066] were standard for facilities of comparable size and nature (and would have been typical for a syndicated credit facility with unaffiliated lenders).

The ResMor Loan Facility had a maturity date of the earlier of the closing of the ResMor Sale and December 22, 2008, or such earlier date as AFI and GMAC Canada agreed.[2067] The ResCap Board, as part of the written consent dated November 20, 2008, contemplated a process to repay the ResMor Loan Facility (and prevent the collateral from being foreclosed upon) if a default occurred and the ResMor Sale had not yet closed.[2068] Although

---

[2058] E-mail from S. Bashmakov (Nov. 20, 2008) [EXAM10843968].

[2059] ResMor Loan Agreement, § 5.1 [RC00025269].

[2060] Action by Written Consent of the Board of Directors of Residential Capital, LLC, dated Nov. 20, 2008, at RC40005913–27 [RC40005652].

[2061] Resolutions of the Directors of GMAC Residential Funding of Canada, Limited, dated Nov. 20, 2008, at ALLY_0126674–76 [ALLY_0126650].

[2062] Presentation to the Committee of Independent Members of the Board of Directors of Residential Capital, LLC, Regarding The Purchase of ResMor Trust Company by GMAC, LLC (Dec. 2, 2008) [GOLDIN00129056].

[2063] Opinion Letter from Goldin Associates to the Committee of the Independent Members of the Board of Directors of ResCap (Dec. 3, 2008) [RC00027945].

[2064] ResMor Loan Agreement, § 4.2 [RC00025269].

[2065] Id. § 6.

[2066] Id. § 8.1.

[2067] Id. § 1.1 (definition of "Maturity Date").

[2068] Action by Written Consent of the Board of Directors of Residential Capital, LLC, dated Nov. 20, 2008, at RC40005914 [RC40005652].

December 22, 2008 passed without consummation of the ResMor Sale (which technically constituted an event of default under the ResMor Loan Facility), by January 1, 2009 (a matter of 10 days) the ResMor Sale had occurred and the ResMor Loan was repaid.

See Appendix V.E.6 for more details on the terms of the ResMor Loan Facility and Section V.F.4.f for more details on the ResMor Sale.

### 7.  Second Line Of Credit Facility

In an effort to raise additional cash, asset sales were consummated (e.g., the ResMor Sale, which closed in January 2009) and the US/UK Broker-Dealer Sale.[2069] In addition, AFI continued to contribute RescAp bonds to RescAp to ensure RescAp's compliance with its TNW covenants.[2070] Approximately fifteen days after the Initial Line of Credit Facility closed, Lombardo advised the RescAp Board that RescAp wished to extend and increase the Initial Line of Credit Facility.[2071] A draft term sheet, dated December 5, 2008, contemplated a $400 million increase to the Initial Line of Credit Facility.[2072] Goldin Associates delivered a fairness opinion, dated December 22, 2008, in anticipation of the increase to the commitment amount under the Initial Line of Credit Facility.[2073] Although the Initial Line of Credit Facility was amended on numerous occasions to add collateral and to extend the maturity date, the Initial Line of Credit commitment amount was never increased. Instead, on June 1, 2009, AFI provided the Second Line of Credit Borrowers (PATI and RAHI), with the Second Line of Credit Facility, a new, separate,[2074] secured credit facility in the initial amount of $370 million on substantially similar terms to the Initial Line of Credit Facility (including, among other things, the Second Line of Credit Borrowers were not required to make a solvency representation or pay an upfront fee or ongoing commitment or facility fees).

-------------------------------------------------

[2069] See Section V.F.4.f for discussion of the ResMor Sale and Section V.F.4.g for discussion of the US/UK Broker-Dealer Sale.

[2070] Materials of a Meeting of the GMAC Board of Directors, May 28, 2009, at ALLY_0239887 [ALLY_0239885].

[2071] Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Dec. 5, 2008, at RC40005941 [RC40005652] (Lombardo discussed RescAp's liquidity drain for the period December 2, 2008 through December 31, 2008).

[2072] Draft Terms and Conditions for the Initial Line of Credit Agreement, dated Dec. 5, 2008 [ALLY_0239167].

[2073] Opinion Letter from Goldin Associates to the Committee of the Independent Members of the Board of Directors of RescAp (Dec. 22, 2008) [GOLDIN00125814].

[2074] Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, May 28, 2009, at RC40006154 [RC40005949] (engaging in discussion with members of AFI management and advisors from Morrison Cohen with respect to the optimal structure and terms of the proposed increase in funding capacity).

Although the Line of Credit Facilities remained separate until December 30, 2009 (when they were combined into the A&R Line of Credit Facility), they served as parallel liquidity sources. The Line of Credit Facilities were secured by the same collateral[2075] and had the same advance rates. Borrowing requests and availability under both Line of Credit Facilities were permitted only when ResCap's liquidity fell below the same threshold levels.[2076] Second Line of Credit Loans were available to the Second Line of Credit Borrowers only after the Initial Line of Credit Facility was fully drawn.[2077] On June 12, 2009, the Second Line of Credit Facility was increased from $370 million to $470 million[2078] giving the Second Line of Credit Borrowers the ability to borrow up to a total of $900 million under the combined Line of Credit Facilities.

In connection with the Second Line of Credit Facility, on June 25, 2009, a fairness opinion was delivered by Goldin Associates concluding that the terms of the transaction documents "are fair to [ResCap] and its creditors (other than [AFI]), from a financial point of view."[2079] Goldin Associates also provided a favorable fairness opinion, dated September 17, 2009, with respect to an amendment to the Second Line of Credit Agreement relating to increasing the size of the Second Line of Credit Facility.[2080]

The Second Line of Credit Facility mirrored the Initial Line of Credit Facility, containing representations and warranties,[2081] covenants,[2082] events of default[2083] and indemnification provisions[2084] that were standard for facilities of comparable size and nature (and would have been typical for a syndicated credit facility with unaffiliated lenders). The provisions of the Second Line of Credit Facility that exemplified an affiliate transaction more favorable to the Second Line of Credit Borrowers than would have been obtained in a third party financing were the same as those provided to the Initial Line of Credit Borrowers under the Initial Line of Credit Facility.[2085]

---

[2075] The collateral also secured the obligations under the Secured MSR Facility, the Master Netting Agreement and other derivative transactions with GMAC IM as a counterparty.

[2076] Initial Line of Credit Agreement, § 2.03(a) [ALLY_0023145]; Second Line of Credit Agreement, § 2.03(a) [ALLY_0023953].

[2077] Second Line of Credit Agreement, Art. V [ALLY_0023953].

[2078] Amendment No.1 to the Second Line of Credit Agreement, dated June 12, 2009, § 2.2(a) [ALLY_0026615].

[2079] Opinion Letter from Goldin Associates to the Committee of the Independent Members of the Board of Directors of ResCap (June 25, 2009), at GOLDIN00125801 [GOLDIN00125798].

[2080] Opinion Letter from Goldin Associates to the Committee of the Independent Members of the Board of Directors of ResCap (Sept. 17, 2009) [GOLDIN00125793].

[2081] Second Line of Credit Agreement, § 6.01 [ALLY_0023953].

[2082] *Id.* Art. VII.

[2083] *Id.* § 8.01.

[2084] *Id.* § 10.01.

[2085] *See* Section V.E.5.

In order to meet ResCap's continuing liquidity needs, AFI and ResCap intended to increase the amount that could be drawn under both Line of Credit Facilities and eventually planned to combine them.[2086] Goldin Associates delivered a favorable fairness opinion, dated November 19, 2009, in connection with proposed amendments to the Line of Credit Facilities, which would increase the cumulative commitment amount available to ResCap under those facilities up to an additional $500 million.[2087] On December 21, 2009, just before the consolidation of the Line of Credit Facilities on December 30, 2009, the size of the Second Line of Credit Facility was increased from $470 million to $670 million.[2088]

The Second Line of Credit Facility was approved by the boards of PATI[2089] and RAHI[2090] on May 30, 2009, and by the ResCap Board on May 31, 2009.[2091]

See Appendix V.E.7 for more details on the terms of the Second Line of Credit Facility.

### 8.  Amended And Restated Credit Facilities

On December 30, 2009, the Line of Credit Facilities were combined into one agreement[2092] and the Secured Revolver Loan Agreement was amended and restated.[2093] The Secured Revolver Loan Agreement was modified to convert $1.55 billion of Secured Revolver Facility Revolver Loans into Secured Revolver Facility Term Loans, eliminating the ability of the Secured Revolver Facility Borrowers to draw any new loans under the Secured Revolver Facility.

Under the A&R Line of Credit Agreement, RAHI and PATI assigned their obligations as "Borrowers" under the Line of Credit Facilities to RFC and GMAC Mortgage (previously, RFC and GMAC Mortgage were "Guarantors" under the Line of Credit Facilities). At closing and upon any draws under the A&R Line of Credit Facility, the A&R Line of Credit Borrowers (new borrowers, GMAC Mortgage and RFC) were required to make a solvency

---

[2086] Presentation to The Committee of Independent Members of the Board of Directors of ResCap regarding the June 1, 2009 Secured Line of Credit with GMAC (June 24, 2009), at 4 [GOLDIN00128957].

[2087] Opinion Letter from Goldin Associates to the Committee of the Independent Members of the Board of Directors of ResCap (Nov. 19, 2009) [GOLDIN00125789]

[2088] Amendment No.10 to the Second Line of Credit Agreement, dated Dec. 21, 2009, § 2.1(a) [ALLY_0077250].

[2089] Action by Written Consent of the Board of Directors of Passive Asset Transactions, LLC, dated May 30, 2009 [ALLY_0056164].

[2090] Action by Written Consent of the Board of Directors of RFC Asset Holdings II, LLC, dated May 30, 2009 [ALLY_0056122].

[2091] Action by Written Consent of the Board of Directors of Residential Capital, LLC, dated May 31, 2009, at RC40006156–69 [RC40005949].

[2092] A&R Line of Credit Agreement [ALLY_0240633].

[2093] A&R Secured Revolver Loan Agreement [ALLY_0066146].

representation,[2094] something which had never been required previously under the Line of Credit Facilities. The solvency representation made under the A&R Line of Credit Agreement[2095] was in substance identical to the solvency representation made under the A&R Secured Revolver Loan Agreement;[2096] however, the term "Solvent," as used in the solvency representation set forth in the A&R Line of Credit Agreement, was never defined.[2097]

Under the A&R Line of Credit Facility, (1) a new negative covenant requiring maintenance of Consolidated Liquidity (cash and cash equivalents of ResCap on a consolidated basis, excluding cash and cash equivalents of Ally Bank) thresholds[2098] was added that mirrored the liquidity maintenance covenant under the Secured Revolver Facility;[2099] and (2) the interest rate margin under the A&R Line of Credit Agreement was decreased to 2.75%[2100] (interest had accrued at 3.50% under the Line of Credit Facilities).[2101] When the A&R Line of Credit Facility was first entered into, the discount factors used to determine the collateral "value" (for borrowing base purposes) were not changed from discount factors set forth in the Line of Credit Facilities.[2102] However, the amendment and restatement provided AFI the ability to modify the discount factors in its reasonable discretion taking into account estimated collections, market value, legal risks, cost of recovery and other matters customarily considered by commercial lenders when determining advance rates.[2103]

The A&R Line of Credit Agreement contained representations and warranties,[2104] covenants,[2105] events of default[2106] and indemnification provisions[2107] that were standard for

---

[2094] A&R Line of Credit Agreement, § 6.01(h) [ALLY_0240633].

[2095] *Id*.

[2096] A&R Secured Revolver Loan Agreement, § 6.01(h) [ALLY_0066146].

[2097] *See* A&R Line of Credit Agreement, Sched. 1.01 [ALLY_0240633].

[2098] A&R Line of Credit Agreement, § 7.02(i) [ALLY_0240633].

[2099] Secured Revolver Loan Agreement, § 7.02(i) [RC00024234]; A&R Secured Revolver Loan Agreement, § 7.02(i) [ALLY_0066146].

[2100] A&R Line of Credit Agreement, Sched. 1.01 [ALLY_0240633] (definition of "Applicable Margin").

[2101] Initial Line of Credit Agreement, Sched. 1.01 [ALLY_0023207] (definition of "Applicable Margin"); Second Line of Credit Agreement, Sched. 1.01 [ALLY_0023953] (definition of "Applicable Margin").

[2102] *Compare* A&R Line of Credit Agreement, Sched. 2.04 [ALLY_0240633], *with* Second Line of Credit Agreement, Sched. 2.04 [ALLY_0023953], *and* Initial Line of Credit Agreement, Sched. 2.04 [ALLY_0023241].

[2103] A&R Line of Credit Agreement, Sched. 2.04, § 4 [ALLY_0240633].

[2104] *Id.* § 6.01.

[2105] *Id.* Art. VII.

[2106] *Id.* § 8.01.

[2107] *Id.* § 10.01.

facilities of comparable size and nature (and would have been typical for a syndicated credit facility with unaffiliated lenders). Provisions exemplifying an affiliate transaction that were more favorable to the A&R Line of Credit Borrowers, were the same as those provided under the Line of Credit Facilities.[2108]

The A&R Line of Credit Agreement was amended on December 23, 2010, to, among other things, add a $500 million unsecured swingline facility.[2109] In an e-mail from Joe Ruhlin (ResCap treasury executive and AFI treasury managing director), dated December 18, 2010, Ruhlin expressed concern with the TNW of RFC and stated "if [swingline] were really unsecured, it would be easy to allocate the debt to [GMAC Mortgage] or [ResCap], but with it being secured, we have the same [RFC] TNW problem."[2110] Ultimately, the swingline facility was made available solely to GMAC Mortgage.[2111] ResCap received favorable fairness opinions from Goldin Associates, one dated December 21, 2010[2112] and another dated January 4, 2011,[2113] in connection with the addition of the swingline facility. Ultimately, the unsecured swingline facility became secured under the A&R Line of Credit Agreement.[2114] The swingline was never drawn[2115] and pursuant to an amendment thereto dated, April 10, 2012, the swingline facility was terminated.[2116]

---

[2108] *See* Sections V.E.5, V.E.7.

[2109] Amend. No.4 to the A&R Line of Credit Agreement, dated Dec. 23, 2010 [RC00025467].

[2110] E-mail from J. Ruhlin (Dec. 18, 2010) [EXAM10307775].

[2111] Amend. No.4 to the A&R Line of Credit Agreement, dated Dec. 23, 2010, § 2.2 [RC00025467].

[2112] Opinion Letter from Goldin Associates to the Committee of the Independent Members of the Board of Directors of ResCap (Dec. 21, 2010) [GOLDIN00125810].

[2113] Opinion Letter from Goldin Associates to the Committee of the Independent Members of the Board of Directors of ResCap (Jan. 4, 2011) [GOLDIN00125824].

[2114] *See* Amend. No.7 to the A&R Line of Credit Agreement, dated Sept. 29, 2011 [RC00025831].

[2115] First Day Affidavit, at 26.

[2116] *See* Amend. No. 7 to the A&R Line of Credit Agreement, dated Apr. 10, 2012 [RC00026655].

The A&R Secured Revolver Loan Agreement[2117] and the A&R Line of Credit Facility[2118] were approved by the ResCap Board on December 29, 2009, and by the GMAC Mortgage[2119] and RFC[2120] boards on December 30, 2009.

On the Petition Date, an aggregate amount of $747 million under the A&R Secured Revolver Loan Agreement[2121] and $380 million under the A&R Line of Credit Facility[2122] remained outstanding.

See Appendix V.E.3 for more details on the terms of the A&R Secured Revolver Loan Agreement and Appendix V.E.8 for more details on the terms of the A&R Line of Credit Agreement.

9. *BMMZ Repo Facility*

On May 14, 2010, GMAC Mortgage and RFC each entered into separate financing agreements with Citibank[2123] and Goldman Sachs[2124] that took the form of mortgage loan repurchase facilities with an initial aggregate commitment of $300 million.[2125] ResCap

---

[2117] Action by Written Consent of the Board of Directors of Residential Capital, LLC, dated Dec. 29, 2009 [ALLY_0067456].

[2118] Action by Written Consent of the Board of Directors of Residential Capital, LLC, dated Dec. 29, 2009 [ALLY_0072506].

[2119] Action by Written Consent of the Board of Directors of GMAC Mortgage, LLC, dated Dec. 30, 2009, at ALLY_72337–48 [ALLY_0072327] (with respect to the A&R Line of Credit Facility); Action by Written Consent of the Board of Directors of GMAC Mortgage, LLC, dated Dec. 30, 2009, at ALLY_0067179–90 [ALLY_0067164] (with respect to the A&R Secured Revolver Loan Agreement).

[2120] Action by Written Consent of the Board of Directors of Residential Funding Company, LLC, dated Dec. 30, 2009, at ALLY_0067256–66 [ALLY_0067164] (with respect to the A&R Secured Revolver Loan Agreement); Action by Written Consent of the Board of Directors of Residential Funding Company, LLC, dated Dec. 30, 2009, at ALLY_0072387–97 [ALLY_0072327] (with respect to the A&R Line of Credit Facility).

[2121] First Day Affidavit, at 26.

[2122] *Id.*

[2123] Master Repurchase Agreement by and among Citibank, N.A., and GMAC Mortgage, LLC, Residential Funding Company, LLC, and Residential Capital, LLC, dated May 14, 2010 [GOLDIN00026092].

[2124] Master Repurchase Agreement by and among Goldman Sachs Mortgage Company, and GMAC Mortgage, LLC, Residential Funding Company, LLC, and Residential Capital, LLC, dated May 14, 2010 [RC00068945].

[2125] Goldin Associates Presentation to the Committee of Independent Members of the Board of Directors of ResCap Regarding Proposed Master Repurchase Facility between GMAC Mortgage, LLC and Residential Funding Company, LLC and BMMZ Holdings LLC, dated Dec. 20, 2011, at GOLDIN00129245 [GOLDIN00129238].

guaranteed the obligations of GMAC Mortgage and RFC under those repo facilities.[2126] Each of these two facilities had an initial expiration date of December 20, 2011[2127] (which were subsequently extended to January 19, 2011)[2128] and ResCap needed to either extend or refinance such facilities before they expired. Citibank expressed an interest in amending and extending its expiring repo facility in an amount large enough to also cover the then existing commitment of Goldman Sachs under its expiring facility.[2129] In connection with Citibank's repo facility proposal, Citibank required that (1) an existing MSR facility provided by Citibank not be extended beyond its March 2012 termination date; (2) there be a reduction in the size of such MSR facility from $500 million to $200 million; and (3) such MSR facility be repaid in full in four consecutive monthly payments of $50 million.[2130] The terms of the proposed Citibank repo facility were substantially similar to the terms of the expiring Citibank facility, but with proposed advance rates of 50%[2131] and a commitment fee of 75 bps ($1.875 million).[2132]

AFI proposed to ResCap a new mortgage loan repo facility to be provided by one of its Subsidiaries, BMMZ, on substantially the same terms as proposed by Citibank, but with some advantages, including (1) no commitment fee; (2) more favorable advance rates; and (3) no aggressive amortization schedule.[2133]

Goldin Associates was engaged to provide an analysis of the terms of the Citibank proposal and the terms of the BMMZ Repo Facility, and to provide a fairness opinion. Goldin Associates concluded that the BMMZ Repo Facility contained terms that were at least as favorable to ResCap and its creditors (other than AFI) as those that could reasonably be obtained by ResCap from an unaffiliated third party lender.[2134]

––––––––––––––––––––––––––––––––––––––––

[2126] Master Guarantee of Residential Capital, LLC, in favor of Citigroup Global Markets Realty Corp., dated May 14, 2010, § 1 [GOLDIN00116743]; Master Guarantee of Residential Capital, LLC, in favor of Goldman Sachs Mortgage Company, dated May 14, 2010, § 1 [GOLDIN00035792].

[2127] Master Repurchase Agreement by and among Goldman Sachs Mortgage Company, and GMAC Mortgage, LLC, Residential Funding Company, LLC, and Residential Capital, LLC, dated May 14, 2010, § 34 [RC00068945]; Master Repurchase Agreement by and among Citibank, N.A., and GMAC Mortgage, LLC, Residential Funding Company, LLC, and Residential Capital, LLC, dated May 14, 2010, § 34 [GOLDIN00026092].

[2128] Goldin Associates Presentation to the Committee of Independent Members of the Board of Directors of ResCap Regarding Proposed Master Repurchase Facility between GMAC Mortgage, LLC and Residential Funding Company, LLC and BMMZ Holdings LLC, dated Dec. 20, 2011, at GOLDIN00129245 [GOLDIN00129238].

[2129] *Id.* at GOLDIN00129247.

[2130] *Id.*

[2131] *Id.* (the reference to the 50% advance rate was bracketed in the presentation materials and most likely indicated the advance rate was to be discussed).

[2132] *Id.*

[2133] *See id.* at GOLDIN00129249.

[2134] *Id.* at GOLDIN00129255.

The BMMZ Repo Facility was approved by the GMAC Mortgage and RFC boards, on December 20, 2011,[2135] and the ResCap Board on December 15, 2011.[2136] The BMMZ Repo Facility closed on December 21, 2011 and the initial funding thereunder was in the aggregate amount of $250 million (the entire facility commitment amount) against mortgage loans sold by GMAC Mortgage and RFC to BMMZ with an aggregate unpaid balance of approximately $932.5 million and an aggregate market value of approximately $498.7 million.[2137] Shortly after the closing of the BMMZ Repo Facility, BMMZ executed a default waiver on January 30, 2012,[2138] pursuant to which it waived the event of default under the BMMZ Repo Facility for the failure of ResCap to be in compliance with the TNW covenant for the period ending December 31, 2011.

The BMMZ Repo Facility contained closing conditions,[2139] representations and warranties,[2140] events of default[2141] and indemnification provisions[2142] that are generally customary for a repo facility. Events of default included failure to make payments,[2143] failure to remit payments under the purchased mortgage loans to the collection accounts,[2144] breaches of representations and warranties,[2145] bankruptcy,[2146] and cross-defaults to the A&R Line of Credit Agreement.[2147] Upon the occurrence of an event of default, the BMMZ Repo Sellers (RFC and GMAC Mortgage) were obligated to repurchase the purchased mortgage loans.[2148] The parties intended that the sale by the BMMZ Repo Sellers of the mortgage loans to BMMZ constitute sales and purchases and not loans, but the BMMZ Master Repo Agreement contained customary re-characterization provisions pursuant to which the BMMZ Repo

---

[2135] Action by Written Consent of the Board of Directors of GMAC Mortgage, LLC, dated Dec. 20, 2011, at ALLY_0139938–44 [ALLY_0139910]; Action by Written Consent of the Board of Directors of Residential Funding Company, LLC, dated Dec. 20, 2011, at ALLY _0139991–97 [ALLY _0139949].

[2136] Certificate of Assistant Secretary of Residential Capital, LLC, dated Dec. 19, 2011, attaching an excerpt from a Special Meeting of the Board of Directors of Residential Capital, LLC, held on Dec. 15, 2011, at ALLY_0140033–36 [ALLY_0140002].

[2137] Request/Confirmation from RFC to BMMZ, dated Dec. 22, 2011 [ALLY_0006232]; Request/Confirmation from GMAC Mortgage to BMMZ, dated Dec. 22, 2011 [ALLY_0006228].

[2138] Waiver of Default under BMMZ Master Repo Agreement, dated Jan. 30, 2012 [ALLY_0140092].

[2139] BMMZ Master Repo Agreement, § 3 [ALLY_0005646].

[2140] *Id.* § 10.

[2141] *Id.* § 11.

[2142] *Id.* § 30.

[2143] *Id.* § 11(A)(1).

[2144] *Id.* § 11(A)(2).

[2145] *Id.* § 11(D).

[2146] *Id.* § 11(I).

[2147] *Id.* § 11(M).

[2148] *Id.* § 11(R)(iii).

Sellers granted liens on the purchased mortgage loans to BMMZ in case the transactions were deemed to be loans.[2149] Dorsey & Whitney LLC, as counsel to the BMMZ Repo Sellers and to ResCap, delivered a customary opinion relating to the treatment of the transactions as a "repurchase agreement" under the Bankruptcy Code, with standard qualifications.[2150]

The BMMZ Repo Facility terminated on May 16, 2012,[2151] in connection with the transactions consummated under the Barclays DIP Financing Agreement.

See Appendix V.E.9 for more details on the terms of the BMMZ Repo Facility.

*10. Conclusion*

Based upon the above facts, the Examiner believes certain of the foregoing Related Party Transactions implicate potential claims, as discussed in more detail in Section VIII.

## F. PREPETITION ASSET SALES

*1. Overview*

This section addresses the following sales of assets to affiliates of ResCap:[2152]

- Health Capital Sale by RFC to GMAC CF in August 2007;

- June 2008 Model Home Sale by GMAC MHF to Cerberus;

- Resort Finance Sale by RFC and GMAC Canada to GMAC CF in July 2008;

- Excess Servicing Rights Sales by GMAC Mortgage to Cerberus in July 2008;

- September 2008 Model Home Sale by DOA Holding Properties, LLC to Cerberus;

- ResMor Sale by GMAC Canada to AFI in January 2009; and

- US/UK Broker-Dealer Sale by RFC to AFI in May 2009.

---

[2149] *Id.* § 6.

[2150] Opinion Letter from Dorsey & Whitney LLC to BMMZ (Dec. 21, 2011) [ALLY_0140078].

[2151] Payoff Letter from BMMZ Holdings LLC to Residential Funding Company, LLC, GMAC Mortgage, LLC and Barclays Bank PLC (May 16, 2012) [ALLY_0140096].

[2152] The Examiner's Professionals reviewed relevant information regarding the April 2010 sale by ResCap of its European mortgage asset and businesses to affiliates of Fortress and the sale of the data center to AFI in May 2012, because these two sales were identified by the Committee. However, these transactions are not addressed in this Report because the Fortress sale was not to an affiliate, and the data center sale was for an immaterial amount (approximately $6 million).

### 2. *Liquidity Concerns*

RFC, GMAC Canada, and GMAC Mortgage, each wholly owned subsidiaries of ResCap, and their affiliate sellers entered into the Prepetition Asset Sales with various affiliates in large part to address the liquidity issues ResCap faced as a result of difficulties in the mortgage industry and capital markets. Because the Prepetition Asset Sales occurred while ResCap was financially distressed within the meaning of applicable fraudulent transfer laws, the Examiner evaluated whether RFC, GMAC Canada, GMAC Mortgage, and their affiliate sellers received reasonably equivalent value in these transactions.

### 3. *Reasonably Equivalent Value*

The Examiner addressed three fundamental questions regarding REV as it relates to the Prepetition Asset Sales:

> 1.  What was the form and value of the property transferred by Debtor(s)?
>
> 2.  Did the Debtor(s) receive value in exchange for the property transferred, and, if so, in what form and amount?
>
> 3.  Was the value received by Debtor(s) reasonably equivalent in exchange for the property transferred?

REV suggests a comparison of the property transferred from a debtor with the value actually received by a debtor. REV is not susceptible to simple formulation; rather, an analysis of REV begins with a range of values. Moreover, an assessment of REV is guided by its purpose—to protect against the unjust diminution of the bankruptcy estate.

REV may not be synonymous with Fair Market Value, although the latter may be an important factor in determining whether a debtor received REV. Ultimately, an assessment of REV requires a consideration of the totality of the circumstances in addition to a value comparison, including earmarks of an arm's-length transaction, good faith, and the degree of difference between the market value of property transferred and the value received by the debtor.

As set forth in the discussion and analysis below, the Examiner concludes that the evidence supports the proposition that RFC, GMAC Canada, GMAC Mortgage and their affiliate sellers received reasonably equivalent value in each of the Prepetition Asset Sales with the possible exception of the June 2008 Model Home Sale to a Cerberus subsidiary. With respect to the June 2008 Model Home Sale, the Examiner's Financial Advisors conclude that RFC received at least $30 million less than Fair Market Value. However, while a close question, the Examiner concludes it is more likely than not that a constructive fraudulent transfer claim against Cerberus would not succeed under prevailing law, because it is more likely than not that a court would find the value received by RFC as the equity owner of GMAC MHF, and GMAC MHF, in the June 2008 Model Home Sale to constitute reasonable equivalent value based on the totality of the circumstances.

4. *Summaries Of The Prepetition Asset Sales*

    a. *Health Capital Sale By RFC To GMAC CF In August 2007*

Pursuant to an Asset Purchase Agreement dated August 27, 2007,[2153] RFC and Equity Investments II, LLC, each wholly owned subsidiaries of ResCap, sold substantially all of the assets and operations comprising Health Capital to GMAC CF for $900.5 million.

Because of ResCap's liquidity needs, the transaction was executed within a relatively short time frame. On August 17, 2007, ten days before any binding agreement had been reached[2154] and four days prior to the ResCap Board's approval of the transaction,[2155] RFC received an initial deposit of $775 million toward the final purchase price.[2156] After executing an Asset Purchase Agreement and closing the transaction on August 27, 2007,[2157] the purchase price was increased by $125.5 million to a total of $900.5 million based on an independent valuation performed by Houlihan Lokey.[2158] Based on Health Capital's net book value of $876.8 million as of closing, ResCap recognized a capital contribution from AFI of $23.7 million as a result of the sale.[2159]

As set forth in the discussion and analysis below and based on the totality of the circumstances, the Examiner concludes that the evidence supports the proposition that RFC received reasonably equivalent value in the Health Capital Sale.

    (1) *Overview Of Health Capital*

Health Capital, headquartered in Dallas, Texas, was formed in 2001 as a division of RFC and provided capital solutions to the middle-market healthcare industry, primarily through asset-based, cash flow, or real estate loans.[2160] Health Capital customers included hospitals, home health agencies, nursing homes, dental practices, physician associations, durable medical

---

[2153] Asset Purchase Agreement between RFC, Equity Investments II, LLC and GMAC CF, dated Aug. 27, 2007 [ALLY_0021813].

[2154] *Id.*

[2155] Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Aug. 21, 2007, at RC40005615–18 [RC40005558].

[2156] Letter from D. Walker to G. Schultz and W. Casey (Aug. 17, 2007) [ALLY_0022003].

[2157] Asset Purchase Agreement between RFC, Equity Investments II, LLC and GMAC CF, dated Aug. 27, 2007 [ALLY_0021813].

[2158] Health Capital Valuation Analysis, prepared by Houlihan Lokey, dated Sept. 28, 2007, at ALLY_0031286 [ALLY_0031246].

[2159] Residential Capital, LLC, Quarterly Report (Form 10-Q) (Nov. 8, 2007), at 21.

[2160] Health Capital Valuation Analysis, prepared by Houlihan Lokey, dated Sept. 28, 2007, at ALLY_0031257–262 [ALLY_0031246]; Health Capital Business Overview, dated Aug. 17, 2007, at 2 [ALLY_PEO_0028626].

equipment manufacturers, and rehabilitation centers. Health Capital was one of five business units consolidated within the BCG division of RFC and accounted for approximately 11% of BCG's loan portfolio in August 2007.[2161]

Health Capital's earning assets grew from $335.6 million to $768.6 million from 2003 to 2006 and, as of the closing date of the Health Capital Sale, Health Capital had a net book value of $876.8 million.[2162] Health Capital's pre-tax net income grew from $1.2 million in 2002 to $23.6 million in 2006, and was forecasted to reach $26.5 million in 2007.[2163] Health Capital had a total of twenty-one employees, thirty-six customers, and fifty-eight loans outstanding with an average balance of $15.1 million (876.8 million net book value / 58 loans = $15.1 million) as of August 2007.[2164]

Despite its significant growth, Health Capital anticipated "significant pressure on margins due to increased competition in the industry and due to increasing ResCap funding costs."[2165] Following the downgrade of ResCap's debt to below investment grade on August 16, 2007, Health Capital's concerns regarding its access to affordable capital heightened.[2166]

When interviewed, Khattri noted that the sale of Health Capital had been discussed for some time prior to the transaction because it was considered a non-core asset for ResCap and there was a desire to "beef up" ResCap's liquidity.[2167] Bill Hall, CEO of GMAC CF, noted that he met with the Health Capital executive leadership team in spring 2007 to discuss "whether it made sense to do any type of business combination, marshal resources, pool resources."[2168] Hall continued, however, that:

> [A]t that meeting, it was collectively decided that we did not think that made sense for a whole number of reasons . . . . We thought that was the end of it, but in the early summer of '07, my recollection is I got a call from [Khattri] . . . and he was

---

[2161] Health Capital Business Overview, dated Aug. 17, 2007, at 2 [ALLY_PEO_0028626].

[2162] Appendix V.F.4.a(1); Residential Capital, LLC, Quarterly Report (Form 10-Q) (Nov. 8, 2007), at 20–21.

[2163] Notice of a Special Telephonic Meeting of the Board of Directors of Residential Capital, LLC, dated Aug. 20, 2007, at RC00016863 [RC00016856].

[2164] Draft Proposed Acquisition by GMAC CF of ResCap's Health Capital Business [ALLY_PEO_0028625]; Residential Capital, LLC, Quarterly Report (Form 10-Q) (Nov. 8, 2007), at 20–21. *See* Appendix V.F.4.a(1) (summarizing Health Capital's historical financial statements).

[2165] Notice of a Special Telephonic Meeting of the Board of Directors of Residential Capital, LLC, dated Aug. 20, 2007, at RC00016860 [RC00016856].

[2166] *Id.*; Notice of a Special Telephonic Meeting of the Board of Directors of GMAC, LLC, dated Aug. 20, 2007, at ALLY_PEO_0004039 [ALLY_PEO_0004035].

[2167] Int. of S. Khattri, Oct. 25, 2012, at 213:12–213:15.

[2168] Int. of B. Hall, Dec. 13, 2012, at 22:19–23:1.

very clear, as was Eric Feldstein in his instructions, "For a variety
of reasons, we'd like you to purchase the Healthcare business, and
we need you to do it extraordinarily quickly. We're trying to assist
ResCap with a . . . liquidity issue and we think this is a good way
to do it. So, we need you to [do] something, even if it's staged, but
do something very quickly. And your instructions are, do a deal
that's commercially supportable, but favors ResCap in each and
every way possible." It was not to be structured as a deal that I
would love to do. It was structured as a deal that I could—if I had
to support—to Ally bondholders. So that's exactly what we tried to
do.[2169]

### (2) Summary Of Transaction And Process

The following diagram summarizes the value exchanged between RFC and GMAC CF in
the Health Capital Sale.



EXHIBIT V.F.4.a(2)
**Health Capital Sale Transaction Diagram**

*Source: Asset Purchase Agreement between RFC, Equity Investments II, LLC and GMAC CF, dated Aug. 27, 2007 [ALLY_0021813]; Letter
from D. Walker to G. Schultz and W. Casey (Aug. 17, 2007) [ALLY_0022003]; Health Capital Valuation Analysis, prepared by
Houlihan Lokey, dated Sept. 28, 2007 [ALLY_0031246]; Residential Capital, LLC, Quarterly Report (Form 10-Q) (Nov. 8, 2007), at
21; Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Aug. 21, 2007, at RC40005616
[RC40005558].*

---

[2169] Int. of B. Hall, Dec. 13, 2012, at 23:21–24:21.

AFI paid RFC a deposit of $775 million on August 17, 2007, before any binding obligation to buy the assets had been made.[2170] David Walker noted that the purpose of the advance payment was to get cash to ResCap as quickly as possible.[2171]

The ResCap Board adopted a resolution on August 21, 2007, six days prior to closing, stating that the ResCap Board saw no objection to the sale of Health Capital to "[AFI], [GMAC CF], or other affiliate" on "terms and conditions that are no less favorable to ResCap than terms and conditions prevailing for comparable transactions with non-affiliates."[2172] The ResCap August 21, 2007 board minutes also recite Khattri's statements that the transaction was being structured to be in compliance with the 2006 Amended Operating Agreement and that the mechanics ensured a fair purchase price to ResCap.[2173]

The materials sent to the ResCap Board on August 20, 2007, one day before the board meeting, provided some rationale for the sale, including that: (1) Health Capital's products and services were "more closely aligned with GMAC CF's lending business than ResCap's core consumer mortgage business"; (2) potential funding efficiencies could result from pooling the assets; and (3) there would be better access to capital for Health Capital than if it remained within ResCap.[2174] The materials also noted that the transaction was "structured to provide protection and benefit to ResCap bondholders," reciting that: (1) "ResCap bondholders benefit from the incremental liquidity generated by the sale at a time when ResCap's liquidity is under significant strain" and (2) "[t]ransaction mechanics . . . ensure a fair purchase price."[2175] The materials further note that "[d]espite the significant growth and favorable loss history at [Health Capital], the company anticipates significant pressure on margins due to increased competition in the industry and due to increasing ResCap funding costs."[2176] Additionally, the materials noted that: (1) "[c]oncern has heightened about the long-term value of the franchise following the recent ResCap downgrade to non-investment grade"; (2) "[i]mpaired access to funding will hinder future growth prospects"; (3) the "[h]igher cost

---

[2170] Letter from D. Walker to G. Schultz and W. Casey (Aug. 17, 2007) [ALLY_0022003].

[2171] Int. of D. Walker, Nov. 28, 2012, at 199:14–205:06.

[2172] Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Aug. 21, 2007, at RC40005616 [RC40005558]. In addition to approving the Health Capital Sale, Alvaro de Molina was appointed to the ResCap board at this meeting and attended the meeting.

[2173] Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Aug. 21, 2007, at RC40005616 [RC40005558].

[2174] Notice of a Special Telephonic Meeting of the Board of Directors of Residential Capital, LLC, dated Aug. 20, 2007, at RC00016858 [RC00016856]; *see* Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Aug. 21, 2007, at RC40005616 [RC40005558].

[2175] Notice of a Special Telephonic Meeting of the Board of Directors of Residential Capital, LLC, dated Aug. 20, 2007, at RC00016858 [RC00016856].

[2176] *Id.* at RC00016860.

of funds will erode profit margins"; and (4) "there is a need to preserve ResCap's scarce capital and liquidity to support the core real estate finance franchise, which is under distress in the current industry environment."[2177]

Substantially the same materials were sent to the AFI Board on August 22, 2007 for its August 22 meeting.[2178] These materials had been circulated for comment on August 17, 2007, prior to ResCap's and AFI's board meetings, to persons at AFI, GMAC CF, and ResCap. In response, George Triebenbacher replied to Linda Voss, Bill Hall, and Kevin Boland, all associated with GMAC CF, that:

> I've read this … not sure where we can add value other than beefing up the "rationale for sale" section. Do you want to have a call to discuss it? 61% of portfolio are cf loans, avg libor margin around 4.50%, huge growth in NI … scarey [sic].[2179]

When asked about this e-mail, Voss stated:

> Well I think whenever you see a significant growth in net income and growth in a portfolio there is just not a lot of experience there. You wonder well how is it that they were able to grow so quickly. Where did the assets come from? The 61 percent cash flow loans are the riskier side of loans. Average LIBOR margin about 450 so, you know, not great compared to the risk of the assets. So I think, because I said earlier, we all looked at the portfolio and it didn't look like the types of assets that we originated. They were still commercial loans, but they weren't structured the way we would structure them, priced the way we would price them for the risk and size was in particular on those three larger exposures was larger than we would have felt comfortable holding. So thinking that this was coming in and we'd have to start to manage it we all had concerns about how it was going to perform.[2180]

Voss also noted that GMAC CF did not do extensive due diligence prior to closing, nor were they asked to.[2181] GMAC CF was not "thrilled" to be getting the assets, but GMAC CF was asked to execute the transaction and accepted that the assets were going to come onto its balance sheet.[2182]

---

[2177] *Id.*

[2178] Notice of a Special Telephonic Meeting of Board of Directors of GMAC, LLC, dated Aug. 20, 2007, at ALLY_0033522–28 [ALLY_0033520].

[2179] E-mail from G. Triebenbacher (Aug. 18, 2007) [ALLY_0110156].

[2180] Int. of L. Voss, Dec. 13, 2012, at 26:5–26:24.

[2181] *Id.* at 14:6–14:9.

[2182] *Id.* at 17:14–17:22.

The AFI Board adopted on August 22, 2007, a resolution similar to the resolution adopted by the ResCap Board, stating that the Board had no objection to the acquisition of Health Capital by AFI, GMAC CF, or an affiliate "on terms and conditions that are no less favorable to the acquiring entity than terms and conditions prevailing for comparable transactions with non-affiliates."[2183] The board of directors of each of RFC,[2184] Equity Investments II, LLC,[2185] and GMAC CF[2186] approved the transaction by August 22, 2007 by written consent.

ResCap engaged Houlihan Lokey on August 24, 2007 to perform an independent valuation of Health Capital post-closing, in accordance with the terms of the Asset Purchase Agreement, which would determine the final purchase.[2187]

The Asset Purchase Agreement was executed and the transaction closed on August 27, 2007.[2188] ResCap was represented by Mayer Brown, but it does not appear that GMAC CF was represented by outside counsel. In subsequent transactions involving ResCap entities, however, Mayer Brown acted for AFI and its non-ResCap affiliates. The initial drafts of the Asset Purchase Agreement contemplated that the $775 million deposit was subject to both upward and downward adjustment; the executed agreement contained only an upward adjustment feature.[2189]

Houlihan Lokey submitted its valuation report on September 28, 2007, resulting in a $125.5 million increase from the pre-closing deposit of $775 million for a total purchase price of $900.5 million.[2190] There does not appear to have been any independent financial advisors to any of the parties nor was any fairness opinion delivered in connection with the transaction.

_____

[2183] Minutes of a Special Meeting of the Board of Directors of GMAC, LLC, Aug. 22, 2007, at ALLY_PEO_0000947 [ALLY_PEO_0000860].

[2184] Unanimous Written Consent of the Board of Directors of Residential Funding Company, LLC, dated Aug. 22, 2007, at ALLY_0021951–54 [ALLY_0021922].

[2185] Unanimous Written Consent of the Board of Directors of Equity Investments II, LLC, dated Aug. 21, 2007, at ALLY_0021972–74 [ALLY_0021955].

[2186] Unanimous Consent to Action of the Board of Directors of GMAC Commercial Finance LLC, dated Aug. 22, 2007, at ALLY_PEO_0001793–99 [ALLY_PEO_0001781].

[2187] Letter Agreement between Houlihan Lokey and ResCap, dated Aug. 24, 2007 [ALLY_0021806].

[2188] Asset Purchase Agreement between RFC, Equity Investments II, LLC and GMAC CF, dated Aug. 27, 2007 [ALLY_0021813].

[2189] *See* Draft Asset Purchase Agreement between RFC, Equity Investments II, LLC, and GMAC CF, dated Aug. 20, 2007, at ALLY_0096829 [ALLY_0096810]. In the Resort Finance deal the deposit was subject to adjustment both ways and in fact the final valuation resulted in ResCap returning a substantial portion of the deposit.

[2190] Health Capital Valuation Analysis, prepared by Houlihan Lokey, dated Sept. 28, 2007, at ALLY_0031286 [ALLY_0031246].

The parties had fifteen days upon receipt of the valuation by Houlihan Lokey to give notice of any objections, which period would have expired after September 30, 2007.[2191] In an e-mail dated September 26, 2007, Khattri proposed accepting the $900.5 million valuation without objection and stated that GMAC CF would like to pay the $125.5 million post-closing adjustment to ResCap so that all outstanding issues could be finalized before quarter end, and requested that management at GMAC CF support this recommendation.[2192]

However, because GMAC CF management believed they were doing this transaction at the request of AFI, Hall replied:

> My understanding is that our team is not being asked to opine on the HL valuation process or outcome, so I'm not sure why this was directed my way. We are of course happy to deal with any administrative details as they arise in the closing of the transaction.[2193]

In a subsequent e-mail Hall stated:

> My instructions from Eric [Feldstein] have been quite clear in that I (nor members of our management team) am not being asked to opine on the valuation for a number of reasons. If the Board wishes to direct me, in my capacity as President of CFG, to accept or dispute the valuation, I would of course comply.[2194]

When Voss was asked about the Houlihan Lokey valuation report, she noted that she was not involved in the review of the report but that the report did not go into the level of detail that GMAC CF would normally have done if it were making a purchase. She noted that she would have been more involved with the transaction had it been with a third party and that "[i]f we would have looked into it the purchase price would have definitely been lower and so it would have been detrimental to ResCap which effectively would decrease the amount of cash that they were able to get from the transaction."[2195] Likewise, Hall felt the Houlihan Lokey valuation was flawed. He noted that the valuation did not look at the underlying credit quality of each individual loan, which was something that he felt was an "obvious" thing to do.[2196]

---

[2191] *See* Asset Purchase Agreement between RFC, Equity Investments II, LLC and GMAC CF, dated Aug. 27, 2007, § 2.6(b)(iii) [ALLY_0021813].

[2192] E-mail from S. Khattri (Sept. 26, 2007) [ALLY_0110345].

[2193] E-mail from B. Hall (Sept. 27, 2007) at ALLY_0110540 [ALLY_0110539].

[2194] *Id.* at ALLY_0110539.

[2195] Int. of L. Voss, Dec. 13, 2012, at 39:14–42:21.

[2196] Int. of B. Hall, Dec. 13, 2012, at 44:19–25.

Ultimately, no objections were submitted by either party and the $125.5 million true-up payment was made prior to quarter end.[2197] The transaction was reported in ResCap's SEC filings for the quarter ended September 30, 2007 as follows:

> On August 27, 2007, Residential Funding Company, LLC ("RFC") and Equity Investments II, LLC, each wholly owned subsidiaries of the Company, sold substantially all of the assets and operations comprising their healthcare finance business to GMAC Commercial Finance LLC, a wholly owned subsidiary of [AFI], pursuant to an asset purchase agreement. The Company received $900.5 million, which represents the fair value of the business as valued by an independent third-party valuation. Net book value totaling $876.8 million was transferred as part of the sale resulting in a capital contribution from [AFI] of $23.7 million.[2198]

In the same filing, ResCap described its sources of liquidity, noting:

> In the quarter, we received a capital contribution from [AFI] of $1.0 billion. In addition, our wholly owned subsidiaries, Residential Funding Company, LLC ("RFC") and Equity Investments II, LLC, sold substantially all of the assets and operations comprising their healthcare finance business to GMAC Commercial Finance LLC, a wholly owned subsidiary of [AFI], for which we received $900.5 million.[2199]

### (3) Third-Party Conclusion Of Value

The ResCap Board minutes dated August 21, 2007 reflect two possible candidates to act as the valuation agent for the transaction and note that neither had any conflict of interest.[2200] The two Independent Directors, Thomas Jacob and Thomas Melzer, agreed to give their recommendation regarding the valuation agent by the next day.[2201] Though no evidence of their recommendation was located, ResCap appointed Houlihan Lokey as the valuation agent by an engagement letter dated August 24, 2007.[2202]

---

[2197] Request for Wire Transfer, dated Sept. 28, 2007, at ALLY_0030372 [ALLY_0030363].

[2198] Residential Capital, LLC, Quarterly Report (Form 10-Q) (Nov. 8, 2007), at 20–21.

[2199] *Id.* at 33.

[2200] *See* Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Aug. 21, 2007, at RC40005616 [RC40005558].

[2201] *See id.*

[2202] Letter Agreement between Houlihan Lokey and ResCap, dated Aug. 24, 2007 [ALLY_0021806].

On September 28, 2007, Houlihan Lokey submitted its valuation report that concluded a FMV purchase price of $900.5 million.[2203] Appendix V.F.4(a)(3) contains an overview of Houlihan Lokey's conclusion of value and key assumptions.

In summary, Houlihan Lokey developed a range of equity values based on three valuation methods: (1) the Guideline Publicly Traded Company Method; (2) the Guideline M&A Method under the Market Approach; and (3) the DCF Method. Houlihan Lokey then weighted each method equally in calculating that the market value of equity, which, after adding cash and cash equivalents, ranged from $128.7 million to $153.7 million.

Houlihan Lokey added $759.3 million in imputed debt to their equity conclusion to calculate a range of MVIC of between $888 million and $913 million. Houlihan Lokey selected the midpoint, or $900.5 million, as its conclusion of the market value of Health Capital's invested capital, implying a multiple of enterprise value to adjusted total assets of 1.03.[2204] Health Capital's net book value totaled $876.8 million as of the transaction closing, resulting in a capital contribution from AFI of $23.7 million to achieve the $900.5 million purchase price.[2205]

The Examiner's Financial Advisors reviewed and analyzed Houlihan Lokey's valuation to assess whether FMV was reasonably determined.

### (4) Analysis Of Third-Party Conclusion Of Fair Market Value

Houlihan Lokey employed three commonly used valuation methodologies for valuing the equity of Health Capital: (1) the Guideline Publicly Traded Company Method under the Market Approach; (2) the Guideline M&A Method under the Market Approach; and (3) the DCF Method under the Income Approach.

Health Capital was not a separate legal or accounting entity and, as such, did not have a reliable stand-alone balance sheet or income statement. Houlihan Lokey's approach required adjustment to certain equity-related measures such as book value of equity and net income. Houlihan Lokey used management's calculation of economic capital as a proxy for book value of equity (approximately 14% of average assets for the LTM), and estimated debt by subtracting this amount from total assets. Houlihan Lokey estimated net income by making assumptions about interest rates on debt. The Examiner's Financial Advisors consider Houlihan Lokey's approach to be reasonable given the goal of valuing assets rather than equity.

---

[2203] Health Capital Valuation Analysis, prepared by Houlihan Lokey, dated Sept. 28, 2007 [ALLY_0031246].

[2204] *Id.* at ALLY_0031286.

[2205] Residential Capital, LLC, Quarterly Report (Form 10-Q) (Nov. 8, 2007), at 20–21.

### (a) Guideline Publicly Traded Company Method

The Guideline Publicly Traded Company Method used by Houlihan Lokey considered three multiples: LTM P/E, Forward P/E, and P/TBVE. These multiples are commonly considered when completing a valuation of a financial services company such as Health Capital.

Houlihan Lokey selected six guideline companies for consideration in applying the Guideline Publicly Traded Company Method. Matt St. Charles, an AFI manager involved in the review and coordination of Houlihan Lokey's valuation analysis, expressed his opinion in internal correspondence that one of Houlihan Lokey's selected comparable companies, Financial Federal Corporation, was not a relevant comparable for valuation purposes.[2206] Financial Federal Corporation had higher multiples than the other five comparable companies selected by Houlihan Lokey.[2207]

Houlihan Lokey's selected multiple ranges for LTM P/E and P/TBVE were approximately 80% to 90% of the median of the guideline company multiples, while their range for the Forward P/E was approximately 100% to 110% of the median.[2208]

### (b) Guideline M&A Method

The Guideline M&A Method employed by Houlihan Lokey considered thirteen transactions with the earliest announced transaction dating back to April 19, 1999, approximately eight years prior to the valuation date. Six of the transactions occurred more than five years prior to the valuation date and eight occurred more than three years prior.

St. Charles expressed his opinion in internal correspondence that transactions prior to 2004 may not be relevant for valuation purposes.[2209] The Guideline M&A Method is often cited in valuation literature generally to be more relevant when there are observable transactions that occur close to the valuation date. In Houlihan Lokey's guideline transaction study, the older transactions generally had higher multiples than the more recent transactions considered. Houlihan Lokey selected a multiple range of 1.10x to 1.25x book value of equity, which was less than the mean of 1.41x or the median of 1.35x.

---

[2206] E-mail from M. St. Charles to S. Khattri (Sept. 21, 2007), at ALLY_0030393 [ALLY_0030363].

[2207] *See* Health Capital Valuation Analysis, prepared by Houlihan Lokey, dated Sept. 28, 2007, at ALLY_0031290, 307 [ALLY_0031246]. The GMAC manager further noted that Financial Federal Corp. specialized in lending to small/medium businesses in road and infrastructure construction, road transportation, and waste disposal industries and that these industries had experienced strong growth over the prior 12 months, which may explain their higher multiples. E-mail from M. St. Charles to S. Khattri (Sept. 21, 2007), at ALLY_0030393 [ALLY_0030363].

[2208] *See* Health Capital Valuation Analysis, prepared by Houlihan Lokey, dated Sept. 28, 2007, at ALLY_0031292 [ALLY_0031246].

[2209] E-mail from M. St. Charles to S. Khattri (Sept. 21, 2007), at ALLY_0030393 [ALLY_0030363].

Houlihan Lokey's selected range was more in line with the recent transactions than the older transactions. It appears Houlihan Lokey placed more reliance on the recent transactions, but did not describe this conclusion in its report. Houlihan Lokey also determined that the LTM P/E multiple calculated was not meaningful and, therefore, did not select a range of relevant multiples for this metric. Valuation multiples of earnings are often considered not meaningful when the earnings metric is negative for an acquired or public company.

Houlihan Lokey did not provide an explanation for its determination that the LTM P/E multiple was not meaningful. The low end of the range was 13.2x earnings, which would imply a value of $186.5 million when applied to Houlihan Lokey's representative level of LTM net income of $14.129 million. Therefore, any selected LTM P/E multiple within the observed range would have led to a higher indicated equity value than any of Houlihan Lokey's other indications.[2210]

### (c) DCF Method

Houlihan Lokey's final valuation was from the DCF Method under the Income Approach. Houlihan Lokey used management's projections through the fiscal year ending December 31, 2010, making adjustments for items such as loan loss provisions, cost of funding, and expense allocations to calculate cash flow to equity holders in each year. The loan loss provision, in particular, was historically above 2%; however, Houlihan Lokey adjusted the provision to equal 2%, which had the effect of increasing the valuation. St. Charles suggested in internal correspondence that had the provision been lowered even further to 1.5%, in line with some of the selected guideline companies, Houlihan Lokey's analysis would have resulted in a higher valuation.[2211]

In her interview, Voss stated that the funding costs assumed in the projected net income were low (e.g., at LIBOR plus 150 bps, instead of LIBOR plus 200 bps or higher), and that if Houlihan Lokey had used higher funding costs, then the net income would have been lower and the price could have reduced from $900.5 million to $820 million. She explained, however, that GMAC CF did not believe it was appropriate to raise that issue because any resulting change would have benefited GMAC CF to the detriment of ResCap or perhaps even AFI. Other than making certain that no one could say that GMAC CF paid too little, Voss explained that GMAC CF really did not spend a lot time trying to quantify the transaction.[2212]

---

[2210] *See generally* Health Capital Valuation Analysis, prepared by Houlihan Lokey, dated Sept. 28, 2007 [ALLY_0031246].

[2211] E-mail from M. St. Charles to S. Khattri (Sept. 21, 2007), at ALLY_0030393 [ALLY_0030363].

[2212] *See* Int. of L. Voss, Dec.13, 2012, at 46:3–48:8.

The NPV of Houlihan Lokey's projected cash flows from the valuation date through 2010 was less than one million dollars. Therefore, almost all of Health Capital's value in Houlihan Lokey's DCF was derived from its assumptions about the residual value, or the value generated by the business into perpetuity after the discrete four-year projection period. Houlihan Lokey chose to apply a residual multiple in its residual value calculation, as opposed to the capitalization of cash flow methodology (this method is discussed below). Houlihan Lokey's selection of 9.0x net income in 2010 resulted in a residual value of approximately $197 million, which when discounted to its present value equivalent was approximately $127 million.[2213] Houlihan Lokey did not identify the rationale for the selection of this multiple.[2214]

Houlihan Lokey's method for calculating residual value may have resulted in a higher value than would have been obtained using a capitalization of cash flows, an alternative and theoretically preferable method according to many valuation authorities. The capitalization of cash flows formula calculates present value as:

$$\text{Value} = (CF \times (1+g)) / (k\text{-}g)^{2215}$$

Assuming zero long-term growth in this formula would produce a residual value of approximately C$156 million (i.e., projected 2010 net income as adjusted by Houlihan Lokey of approximately C$22 million, divided by Houlihan Lokey's 14% discount rate). This methodology therefore would result in a lower value than Houlihan Lokey's residual value calculation of approximately $197 million. The Examiner's Financial Advisors determined that a higher long-term growth assumption would add little to the value calculated by the capitalization formula after considering that cash flow would be reduced for funding of asset growth.

### (d) Discount Rate

The discount rate selected by Houlihan Lokey of 14% was based on the MCAPM using guideline company observations such as a levered beta.

Houlihan Lokey selected a levered beta of 1.03, meaning that Houlihan Lokey assessed Health Capital to be slightly more risky than the overall market (a beta of 1.0 represents the risk of the market). The observed betas calculated by Houlihan Lokey for the six guideline companies ranged from 0.72 to 1.61.

---

[2213] *See generally* Health Capital Valuation Analysis, prepared by Houlihan Lokey, dated Sept. 28, 2007 [ALLY_0031246].

[2214] *Id.*

[2215] In the formula, "CF" stands for normalized cash flow in the base year, "g" stands for the long-term growth rate, and "k" stands for the discount rate.

The size premium, which is an additional risk premium used to account for the fact that investments in smaller companies are considered to require a greater return on investment, was based on a commonly cited study by Ibbotson Associates in the Stocks Bonds Bills and Inflation 2007 yearbook. The premium selected by Houlihan Lokey was 2.7%, which is the premium suggested by Ibbotson Associates for companies with a market capitalization between $315 million and $627 million. Houlihan Lokey's range of equity value from their DCF, however, was $120 million to $160 million.[2216] Generally, companies with higher market capitalizations have lower size premiums. Had a higher premium been selected by Houlihan Lokey, the resulting range of equity value would have been lower.

### (e)  Premiums And Discounts

Customary valuation procedures make use of premiums and discounts related to the ownership characteristics of an equity interest for such matters as control (or lack of control) and lack of marketability. Houlihan Lokey did not apply any discounts or premiums in their analysis, although their analysis presumes that their conclusions of value were on a controlling interest basis.[2217] Of the three methods used by Houlihan Lokey, only one (i.e., the Guideline Publicly Traded Company Method) would ordinarily call for a control premium.

Control premiums are often quantified by reference to premiums paid in control transactions involving comparable publicly traded companies. Data published by Factset indicated that the median control premium paid in transactions during this time period involving financial services companies was approximately 20%.[2218] While such an adjustment would be a material percentage of the value of equity, the adjustment would be much smaller as a percentage of assets, as equity in the commercial finance industry represents a relatively small share of assets. Also, this adjustment would apply to only one of the methods used by Houlihan Lokey to which they gave 33.3% weight.

On the other hand, a discount for lack of marketability, which Houlihan Lokey also did not use, would apply to all three methods. Privately held entities, including divisions of public companies, generally sell at a discount relative to similar publicly traded entities.

---

[2216] *See* Health Capital Valuation Analysis, prepared by Houlihan Lokey, dated Sept. 28, 2007 [ALLY_0031246].

[2217] *See id.*

[2218] Factset Mergerstat, Control Premium Study (Q4 2007), at 20.

### (f)  Overall Assessment Of Third-Party Conclusion Of Value

Based upon the foregoing, several aspects of Houlihan Lokey's valuation analysis could merit adjustment. However, on balance these adjustments would have a downward effect on value, rather than indicating that the purchase price paid by GMAC CF to RFC was insufficient. Houlihan Lokey concluded that the value of Health Capital's assets approximated book value, which conclusion can also be corroborated by other valuation indicators.

The Examiner's Financial Advisors' review of market pricing of commercial finance companies at the time of the transaction corroborates Houlihan Lokey's analysis that equity shares generally traded at an average of approximately 120% of the book value of tangible equity. Multiples at this level indicate only a small premium over the book value of the assets (the ratio indicates a premium over equity, which comprises a relatively small portion of the capital structure of commercial finance companies that are funded largely with debt). The Examiner's Financial Advisors found that the average market-to-book ratio had little sensitivity to the choice of guideline companies; a broader set of publicly-traded finance companies than selected by Houlihan Lokey produced a similar ratio.

The Examiner's Financial Advisors' review of the financial disclosures of the guideline companies showed that the estimated fair value of financial assets, which were primarily loans as is the case with Health Capital, was similar to their carrying value at the end of 2007.[2219] This pattern would support an expectation of a valuation close to book value for the case at hand in the absence of evidence that the loan portfolio of Health Capital was of unusually poor quality. Statistics cited by Houlihan Lokey indicated that the loan portfolio had not experienced a loss since 2001, that the weighted-average credit score for Health Capital's portfolio was between 2 and 3 (based on management's credit scoring system for which 1 represented the highest quality credit on a scale of 1 to 5), and that only approximately 3% of the portfolio was rated 4 or higher.[2220]

### (5)  Conclusion Regarding Reasonably Equivalent Value

Based upon the above discussion and analysis of the Health Capital Sale and the totality of the circumstances, including but not limited to Houlihan Lokey's valuation and other market indicators, the Examiner concludes that the evidence supports the proposition that RFC received reasonably equivalent value in the Health Capital Sale.

---

[2219] *See generally* Financial Federal Corporation, Annual Report (Form 10-K) (Sept. 24, 2007); CapitalSource Inc., Annual Report (Form 10-K) (Feb. 28, 2008); CIT Group Inc., Annual Report (Form 10-K) (Feb. 29, 2008); Marlin Business Services Corp., Annual Report (Form 10-K) (Mar. 5, 2008); NewStar Financial, Inc., Annual Report (Form 10-K) (Mar. 10, 2008); Resource Capital Corp., Annual Report (Form 10-K) (Mar. 17, 2008).

[2220] *See generally* Health Capital Valuation Analysis, prepared by Houlihan Lokey, dated Sept. 28, 2007 [ALLY_0031246].

### b. *June 2008 Model Home Sale By GMAC MHF To Cerberus*

Pursuant to a Purchase Agreement dated June 6, 2008 (the "June 2008 Model Home Purchase Agreement"),[2221] on June 9, 2008, GMAC MHF, a direct wholly owned subsidiary of RFC and indirect wholly owned subsidiary of ResCap, sold 1,614 model homes and 127 lots to CMH, an affiliate of Cerberus, for $230 million plus Class B Junior Preferred Shares in CMH with a beginning basis of $227.8 million (i.e., $457.8 million net carrying value before valuation reserves less $230 million in cash consideration received).[2222] The Class B Junior Preferred Shares were entitled to a 20% preferred return; however, redemption was contingent upon the full redemption of the Class A Senior Preferred Shares, which provided Cerberus with the greater of a 20% preferred return on its capital investment or $46 million.[2223]

As set forth in the discussion and analysis below, with respect to the June 2008 Model Home Sale, the Examiner's Financial Advisors conclude that RFC received at least $30 million less than Fair Market Value. While a close question, the Examiner concludes it is more likely than not that a constructive fraudulent transfer claim against Cerberus would not succeed under prevailing law, because it is more likely than not that a court would find the value received by RFC, as the equity owner of GMAC MHF, and GMAC MHF in the June 2008 Model Home Sale to constitute reasonably equivalent value based on the totality of the circumstances. Relevant factors, including the degree of the deficiency relative to the total transaction value of $406.9 million ($457.8 million net carrying value less valuation reserves of $50.9 million), the prevailing market conditions for sales and financings of assets of this nature, and the intangible benefits derived by RFC and ResCap from the immediate liquidity infusion as a result of the sale.

### (1) *Overview Of GMAC Model Home Finance*

GMAC MHF provided homebuilders with model home finance through one of two types of programs: either the model home program or the net lease lot program. Under the model home program, GMAC MHF acquired model homes and categorized them into discrete portfolios under a lease to a single builder, each of which was governed by a master servicing and rental agreement ("MSRA"). GMAC MHF purchased the completed model homes from the builder at 85% to 95% of the agreed upon value (i.e., the cash at closing ("CAC")) and

---

[2221] Purchase Agreement among ResCap, GMAC Model Home Finance I, LLC and CMH, dated June 6, 2008 [RC00025149].

[2222] Draft Cerberus Real Estate Capital Management, LLC Presentation, dated June 2008, at CERB03308788 [CERB033086]; Memorandum, Divestiture of Model Home Assets to Cerberus, dated June 10, 2009, at ALLY_0237920 [ALLY_0237920]; *see* Residential Capital, LLC, Current Report (Form 8-K) (June 9, 2008), Item 1.01.

[2223] Draft Cerberus Real Estate Capital Management, LLC Presentation, dated June 2008, at CERB033087 [CERB033086]. As discussed further below, ResCap had accrued an impairment of approximately $50.9 million against the book value of these model homes.

then leased the home back to the homebuilder for a period of 12 to 48 months.[2224] The homebuilder had the option to market and sell the model homes at any time during the lease period, although GMAC MHF retained the right to block any sale that would result in net proceeds below its basis. GMAC MHF's cash flows under this program were generated from monthly lease payments from the homebuilders, who also covered all carrying costs (e.g., real estate taxes and insurance), as well as from proceeds upon final disposition of the home.[2225]

GMAC MHF purchased finished lots instead of the finished model homes from homebuilders under the net lease lot program. GMAC MHF purchased the lot at 85% of the appraised value, or otherwise agreed upon value once the construction of the model home was completed.[2226] In the event subsequent construction costs to complete the model home plus GMAC MHF's accrued basis were greater than 85% of the agreed upon value, the homebuilder had the right to require GMAC MHF to reimburse them for the full amount of the cost.[2227] However, if the homebuilder exercised this right, it would typically result in the increase in the monthly rent payment for all homes within that MSRA. Also, if the homebuilder did not complete the model home within the "12-month period following [GMAC MHF's] purchase of the lot, [GMAC MHF] had the right to 'put' the lot back to the homebuilder at the price [GMAC MHF] paid for the lot, plus any accrued interest from the date of purchase to the date of the 'put.'"[2228]

### (2) Summary Of Transaction And Process

Pursuant to the June 2008 Model Home Purchase Agreement, on June 9, 2008, GMAC MHF, a direct wholly owned subsidiary of RFC and indirect wholly owned subsidiary of ResCap, sold certain model home assets to CMH, an affiliate of Cerberus.[2229]

The subject assets consisted of 1,614 model homes located in 72 metropolitan statistical areas throughout the United States and 127 lots located in Phoenix, Arizona, and had a book value at the transaction date of approximately $479.2 million and a related liability of $21.4 million, for a net book value before valuation reserves of approximately $457.8 million.[2230] RFC received consideration consisting of $230 million cash and Class B Junior Preferred

---

[2224] Draft Cerberus Investment Overview, CMH, dated June 6, 2008, at CERB032934 [CERB032933]. *See* Letter from Houlihan Lokey to Peter Rumbold (Aug. 28, 2008), at CERB013935 [CERB013934].

[2225] Draft Cerberus Investment Overview, CMH, dated June 6, 2008, at CERB032934 [CERB032933].

[2226] *Id.*

[2227] *Id*.

[2228] *Id.*

[2229] Purchase Agreement among ResCap, GMAC Model Home Finance I, LLC and CMH, dated June 6, 2008 [RC00025149].

[2230] Draft Cerberus Real Estate Capital Management, LLC Presentation, dated June 2008 [CERB033086]; Memorandum, Divestiture of Model Home Assets to Cerberus, dated June 10, 2009, at ALLY_0237920 [ALLY_0237920].

Shares in CMH with a beginning basis of $227.8 million (i.e., $457.8 million net carrying value prior to valuation reserves less $230 million in cash consideration received) in exchange for transferring these assets to CMH.[2231] The Class B Junior Preferred Shares were entitled to a 20% preferred return, but redemption was contingent upon the full redemption of the Class A Senior Preferred Shares.[2232]

The Class A Senior Preferred Shares were held by a Cerberus affiliate (Cerberus ResCap Asset Investors, LLC, or "CRAI") , had a beginning basis of $230 million and were entitled to the greater of either (1) a minimum 20% return on the $230 million (i.e., $46 million) or (2) a 20% preferred return per annum on its capital account.[2233] Another Cerberus affiliate (Cerberus ResCap Financing, LLC, or "CRF") entered into a term loan with CMH in a principal amount equal to the $230 million for the purpose of funding CMH's payment of the cash consideration and a revolving loan facility with CMH of up to $10 million in aggregate principal amount for the purpose of providing funding for the ongoing operations of CHM (together, the "CMH Loans"). The CMH Loans bore interest at a rate of 15% per annum and compounded quarterly to the extent not paid in cash. The CMH Loans had a maturity date of June 30, 2013 and were secured by a pledge on all of the assets of CMH.

The 15% interest on the $230 million term loan was subsumed within the 20% minimum return guaranteed to Cerberus as holder of the Class A Senior Preferred Shares. As specified in the amended and restated limited liability company agreement of CMH between GMAC MHF and Cerberus (the "CMH LLC Agreement"):[2234]

> "Class A Senior Unreturned Preferred Capital" means, with respect to the outstanding Class A Senior Preferred Units, an aggregate amount initially equal to the sum of (i) 10,000 and (ii) all amounts contributed to [CMH] by the Class A Senior Preferred Members on or after the Closing to fund expenses associated with the Transferred Assets and their operation, maintenance, development or disposition, and increased by a preferred return equal to the difference between (A) the greater of (I) 20% of the Cash Amount [i.e., $230 million * 20% = $46 million] and (II) a 20% per annum return (calculated on a daily basis) on the aggregate amount of the Cash Amount and the

_____

[2231] Draft Cerberus Real Estate Capital Management, LLC Presentation, dated June 2008, at CERB033087–88 [CERB033086]; Memorandum, Divestiture of Model Home Assets to Cerberus, dated June 10, 2009, at ALLY_0237920 [ALLY_0237920].

[2232] Draft Cerberus Real Estate Capital Management, LLC Presentation, dated June 2008, at CERB033087 [CERB033086]. As discussed further below, ResCap had accrued a valuation reserve of approximately $50.9 million against the book value of these model homes.

[2233] Amended and Restated Limited Liability Company Agreement of CMH, dated June 6, 2008 [CERB000423].

[2234] *Id.*

amounts specified in the foregoing clauses (i) and (ii) (provided, that, solely for the purposes of this clause (II), the Cash Amount shall be adjusted, subject to Section 6.02(b)(iii), from time to time, such that any repayment of principal of any [CMH] Loan shall be deemed to reduce the Cash Amount effective as of the date of such repayment and any additional borrowings under the Loan Agreement shall be deemed to increase the Cash Amount effective as of the date of such borrowing), compounded annually, and (B) the aggregate amount of interest paid by [CMH] to the Lender in respect of the [CMH] Loans (it being understood that any amounts distributed pursuant to Section 5.02(a)(i) with respect to such Class A Senior Preferred Units decreases the amount of Class A Senior Unreturned Preferred Capital by a corresponding amount).[2235]

The CMH LLC Agreement identified CRAI, a wholly owned subsidiary of Cerberus, as the Class A Senior Preferred Member,[2236] GMAC MHF as the Class B Junior Preferred Member,[2237] and Cerberus as the manager. CRAI was also identified as the sole holder of Common Unit Shares in CMH.

The purpose of CMH, according to the CMH LLC Agreement, was to acquire the model home assets pursuant to the June 2008 Model Home Purchase Agreement, dispose of them, and distribute and reinvest distributable cash in accordance with the CMH LLC Agreement.[2238] In furtherance of this purpose, the CMH LLC Agreement states:

[CMH] shall use commercially reasonable efforts to conduct an orderly sale of the Transferred Assets in arm's-length transactions through nationally recognized brokers to be retained by [CMH]. The sale of the Transferred Assets shall be conducted through an auction process or such other process as shall be recommended by such nationally recognized brokers. . . . Notwithstanding anything to the contrary in this Agreement, the terms and conditions of any sales of the Transferred Assets shall be subject to the prior approval of the Manager, which approval shall not be unreasonably withheld.[2239]

---

[2235] *Id.* at § 1.01.

[2236] *Id.*

[2237] *Id.*

[2238] *Id.* at § 2.05(a).

[2239] *Id.* at § 2.05(b).

After repayment of the CMH Loans to Cerberus, distributions of distributable cash were to be made as follows:

> [F]irst, 100% to the Class A Senior Preferred Members, pro rata to each Class A Senior Preferred Member in accordance with the percentage of Class A Senior Preferred Units held by each Class A Senior Preferred Member, until the Class A Senior Unreturned Preferred Capital of each such Class A Senior Preferred Member is zero;
>
> [S]econd, 100% to the Class B Junior Preferred Members, pro rata to each Class B Junior Preferred Member in accordance with the percentage of Class B Junior Preferred Units held by each Class B Junior Preferred Member, until the Class B Junior Unreturned Preferred Capital of each such Class B Junior Preferred Member is zero;
>
> [T]hird, subject to Section 5.02(e), 100% to the Class B Junior Preferred Members, pro rata to each Class B Junior Preferred Member in accordance with the percentage of Class B Junior Preferred Units held by each such Class B Junior Preferred Member, until the Class B Junior Preferred Member Reimbursable Costs is zero; and
>
> [F]ourth, 100% to the Common Unit Members, pro rata to each Common Unit Member in accordance with the percentage of Common Units held by each such Common Unit Member.[2240]

---

[2240] *Id.* at § 5.02(a).

The following diagram summarizes the value exchanged between RFC and GMAC CF in the June 2008 Model Home Sale.

EXHIBIT V.F.4.b(2)
**June 2008 Model Home Sale Transaction Diagram**

☐ Parties to the June 2008 Model Home Purchase Agreement

**Background**:
Concurrent with the June 2008 Model Home Purchase Agreement, GMAC MHF, Cerberus, and CRAI entered into the CMH LLC Agreement, with Cerberus as manager

Residential Capital, LLC ("ResCap")

100% (indirectly)

Residential Funding Company, LLC ("RFC")

Seller: 100%

GMAC Model Home Finance I, LLC ("GMAC MHF")

100%

Subsidiary Assets Sold:

GMAC Model Home Finance, LLC

LENOne, LLC

GMCMTH, LLC

KBOne, LLC

Cerberus Capital Management, L.P. ("Cerberus")

100%    100%

Cerberus ResCap Financing LLC ("CRF")

Cerberus ResCap Assets Investors LLC ("CRAI")

① $230 million term loan at 15% compounded quarterly and $10 million revolving credit facility

① 100% Class A Senior Preferred Units and Common Units (100% of voting rights)

② $230 million cash at closing ("Cash Amount") plus Class B Units

⑤ **See below.

① 100% Class B Junior Preferred Units ($227.8 million)[(1)]

Purchaser:

① $10,000 capital contribution

CMH Holdings LLC ("CMH")

② $457.8 million NBV in model homes, option lots, lending receivables, and other real estate

④ First priority distribution of Class A Senior Preferred Unreturned Capital equal to the sum of (i) $10,000 capital contribution and (ii) any additional amounts contributed to CMH after the Closing, and increased by a preferred return equal to the difference between (A) the greater of (I) 20% of the Cash Amount and (II) a 20% per annum return (calculated on a daily basis) on the aggregate amount of the Cash Amount and (B) the aggregate amount of interest paid by CMH to CRF in respect of the Loans. Distributions to Class A Senior Preferred Units are made only after repayment of the Loans, and until the Class A capital account is zero

⑤ **Second priority distribution of Class B Junior Preferred Unreturned Capital equal to $227.8 million and increased by a preferred return equal to 20% per annum (calculated on a daily basis) compounded annually. Distributions to Class B Junior Preferred Units are made only after the Class A Senior Preferred capital account is zeroed out, and until the Class B capital account is zero

⑥ Third priority distribution to Common Units after repayment of the Loans and Class A Senior Preferred and Class B Junior Preferred capital accounts are zero

[(1)] $227.8 million capital account = $457.8 million NBV in assets sold less $230.0 million cash at closing.
Source: Purchase Agreement among ResCap, GMAC MHF, and CMH, dated June 6, 2008 [RC00025149]; Amended and Restated Limited Liability Company Agreement of CMH, dated June 6, 2008 [CERB000423]; Memorandum, Divestiture of Model Home Assets to Cerberus, dated June 10, 2009 [ALLY_0237920].

Cerberus viewed the transaction as offering an attractive risk/reward profile, with downside risk mitigated because Cerberus's basis of $230 million represented a substantial discount to its assessment of the underwritten, fair market, and book value of the assets.[2241] Cerberus analyzed over a thousand recent closings, pending contracts, offers, and third-party listings related to the model home portfolio to verify market pricing. Cerberus had also been monitoring and valuing AFI's entire model home portfolio on a monthly basis as part of its normal asset management practices.[2242] The model home assets were to be sold on an orderly basis in arm's-length transactions through an auction process following the sale to CMH.[2243]

The transaction was approved by the ResCap Board on June 1, 2008,[2244] subject to the receipt, review, and approval of, ResCap's executive committee of final versions of the underlying commitment letter and term sheet that were presented to the ResCap Board. On June 9, 2008,[2245] the ResCap Board subsequently resolved that the transaction was completed on terms not materially less favorable to ResCap and its relevant subsidiaries (i.e., RFC and GMAC MHF) than those that could reasonably have been obtained in a comparable arm's-length transaction by ResCap or such subsidiaries with an unaffiliated party.

Pursuant to the 2006 Amended Operating Agreement, ResCap was required to have at least two Independent Directors at all times and AFI was obligated to fill any vacancy as promptly as practical.[2246] At the time that ResCap approved the transaction there was only one Independent Director on the ResCap Board.[2247]

The transaction appears to have moved quickly with only four business days elapsing between the execution of Cerberus's underlying commitment letter on June 2, 2008[2248] and the consummation of the transaction on June 9, 2008. The commitment letter stated that Cerberus had not completed its diligence on the proposed assets as of June 2, 2008.[2249]

---

[2241] *See* Draft Cerberus Investment Overview, CMH, dated June 6, 2008 [CERB032933].

[2242] Draft Cerberus Real Estate Capital Management, LLC Presentation, dated June 2008 [CERB033086].

[2243] Residential Capital, LLC, Current Report (Form 8-K) (June 3, 2008), at 4.

[2244] Minutes of a Meeting of the Board of Directors of Residential Capital, LLC, June 1, 2008, at RC40005749–60 [RC40005652].

[2245] Unanimous Written Consent of the Board of Directors of Residential Capital, LLC, dated June 9, 2008, at RC40005772–80 [RC40005652].

[2246] *See* 2006 Amended Operating Agreement, § 2(f).

[2247] The only Independent Director at the time of approval was Edward Smith, who had been appointed earlier in May. Karin Hirtler-Garvey was added as an additional Independent Director on June 13, 2008. *See* Section IV.A.

[2248] Letter from Cerberus to ResCap (June 2, 2008), at EXAM31326394–98 [EXAM31326384].

[2249] *Id.*

The ResCap Board authorized and approved the issuance of a waiver on June 13, 2008, retroactively to have effect on and as of June 9, 2008, of the "Investment in Affiliates Covenants" contained in the 2006 Amended Operating Agreement in respect of ResCap's investment in CMH as a material component of the transaction.[2250] The covenant prohibited ResCap from making an investment in any AFI affiliate.[2251] Separate Independent Director approval was not needed to waive this covenant.[2252]

ResCap accounted for the transaction as a financing and consolidated CMH into ResCap with a minority interest recognized on the balance sheet, although the transaction was structured as a sale in form.[2253]

In connection with the transaction, ResCap entered into a servicing agreement with CMH pursuant to which ResCap agreed to provide, at CMH's request, all services provided by ResCap and its subsidiaries with respect to the subject assets prior to CMH's acquisition of such assets (including ownership, operation, maintenance and disposition-related services).

### (3) Lack Of Third-Party Conclusion Of Value Or Fairness Opinion

Neither of the parties appears to have engaged independent financial advisors to perform valuations or opine on the fairness of the transaction.

### (4) Reasonably Equivalent Value Analysis

The primary issue for REV purposes is the Fair Market Value of the Class B Junior Preferred Shares, which is directly affected by the 20% minimum preferred return guaranteed to Cerberus as holder of the Class A Senior Preferred Shares.

The Class A Senior Unreturned Preferred Capital, as defined in the CMH LLC Agreement, included a 20% per annum preferred return on its $230 million basis plus any subsequent capital contributions, with a minimum guaranteed payment of $46 million.[2254] The Class B Junior Unreturned Preferred Capital, as defined in the CMH LLC Agreement,[2255] also included a

---

[2250] Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, June 13, 2008, at RC40005781–86 [RC40005652].

[2251] *See* 2006 Amended Operating Agreement, § 2(a).

[2252] *See id.* at § 2.

[2253] Minutes of a Meeting of the Audit Committee of Residential Capital, LLC, July 28, 2008, at RC40015179–210 [RC40015158].

[2254] Amended and Restated Limited Liability Company Agreement of CMH, dated June 6, 2008, § 1.01 [CERB000423].

[2255] *Id.*

20% per annum preferred return on its $227.8 million basis. However, based upon the priority of distributions, the value of the Class B Junior Unreturned Preferred Capital was contingent upon the proceeds from the sales of model home assets by CMH first satisfying the CMH Loans from Cerberus and the 20% preferred return on the Class A Senior Preferred Units, as defined in the CMH LLC Agreement,[2256] also held by Cerberus.[2257]

Assuming a one-year time frame to dispose of the model homes (for demonstrative purposes), the Class B Junior Preferred Members[2258] would not receive a distribution until Cerberus had been repaid the $230 million term loan and any amount outstanding on the $10 million facility and, as the Class A Senior Preferred Member,[2259] had been paid the greater of its 20% preferred return, or $46 million (i.e., $230 million * 20%). The one-year time-frame to dispose of the model homes implies a monthly run rate of approximately $33.9 million in sales based on estimated proceeds of $406.9 million.[2260] This assumption is corroborated by the actual sales of model homes reported by CMH over the five-month period following the transaction, in which $38.5 million in sales proceeds were generated on average each month, plus an additional $1.5 million on average in monthly proceeds from lease payments.[2261] Further, by December 31, 2008, CMH had sold 1,022 model homes generating aggregate proceeds of $234 million and had another 158 homes under contract to be sold.[2262] By March 31, 2009, CMH had sold a total of 1,228 model homes (or 76% of the total), an additional 53 were under contract to be sold, and Cerberus had received a full return of its capital plus interest and its preferred return totaling approximately $276 million (i.e., $230 million loan plus $46 million interest and preferred return).[2263] CMH repaid the $230 million principal by February 2, 2009,[2264] which, together with the $46 million preferred return, equates to an annualized return of 32% on Cerberus's investment of $230 million.[2265]

---

[2256] *Id.*

[2257] Memorandum, Divestiture of Model Home Assets to Cerberus, dated June 10, 2009, at ALLY_0237920 [ALLY_0237920].

[2258] Amended and Restated Limited Liability Company Agreement of CMH, dated June 6, 2008, § 1.01 [CERB000423].

[2259] *Id.*

[2260] *See* Ex. V.F.4(b)(4)–1.

[2261] *See* GMAC Model Home I Funding and Proceeds from Sale, dated Nov. 17, 2008 [CERB024371].

[2262] Draft Investor Letter from Cerberus Institutional Real Estate Partners, L.P. (Feb. 2009), at CCM00214549 [CCM00214545].

[2263] Investor Letter from Cerberus Institutional Real Estate Partners, L.P. (Mar. 31, 2009), at CCM00215547 [CCM00215539]; CMH Consolidating GAAP Balance Sheet as of March 31, 2009 [CERB041100] (showing that the balance remaining on the $230 million loan and $46 million interest due to Cerberus is zero).

[2264] CMH Loan Repayment Schedule [EXAM00345879].

[2265] Draft Cerberus Investment Overview, CMH, dated June 6, 2008, at CERB032935 [CERB032933] (projecting an IRR of 25.6% on Cerberus's investment in CMH).

By June 2008, the housing and capital markets were experiencing the impact of the subprime mortgage crisis, which resulted in a general and prolonged depreciation of home values across the country. As discussed in further detail below, at the time of this transaction with Cerberus, RFC had already accrued a $50.9 million valuation reserve associated with the $457.8 million model home net assets (approximately $22 million of which related to the model homes comprising the $227.8 million basis of Class B Junior Preferred Shares). Although RFC released the valuation reserve as a result of the transaction, it reflects RFC's belief that the full $457.8 million was unlikely to be recovered. An internal forecast prepared by RFC as of June 19, 2008[2266] projected declining home prices through the remainder of 2008 and 2009, with only modest recovery beginning in 2010,[2267] the period over which CMH planned to dispose of the model home assets. Similarly, a contemporaneous analysis prepared by Cerberus as of June 11, 2008 projected weighted-average annual home declines for the portfolio of model home assets acquired by CMH of 17.5%, 9.8%, and 3.8% in 2008, 2009, and 2010, respectively.[2268]

For demonstrative purposes, assuming RFC's net carrying value of model home assets less valuation reserves (i.e., $406.9 million) was a reasonable estimate of the Fair Market Value of the assets at the closing date, the proceeds to the Class B Junior Preferred Members after a one-year disposal period would be limited to approximately $130.9 million, as summarized in the table below.

EXHIBIT V.F.4.b(4)—1
**Proceeds to Class B Junior Preferred Members After One Year (Demonstrative)**
*($ in Millions)*

| | | |
|---|---|---:|
| Net asset value (book) of model homes | $ | 457.8 |
| *Less:* ResCap valuation reserve | | 50.9 |
| Estimated proceeds from sale of model homes | | 406.9 |
| *Less:* Repayment of term loan to Cerberus | | 230.0 |
| *Less:* 20% preferred return to Cerberus | | 46.0 |
| Residual proceeds available to Class B Junior Preferred Members | $ | 130.9 |

*Source: Purchase Agreement among ResCap, GMAC MHF, and CMH, dated June 6, 2008 [RC00025149]; Amended and Restated Limited Liability Company Agreement of CMH, dated June 6, 2008 [CERB000423]; Memorandum, Divestiture of Model Home Assets to Cerberus, dated June 10, 2009 [ALLY_0237920].*

---

[2266] *See* E-mail from J. Morris (June 21, 2008) [CERB026886].

[2267] *See* Model Home Portfolio Financial Model, dated May 31, 2008 [CERB026887].

[2268] Draft Cerberus Investment Overview, CMH, dated June 6, 2008, at CERB032935 [CERB032933].

Over the same period, the Class B Junior Unreturned Preferred Capital account would have appreciated by 20% from $227.8 million to $273.4 million; however, the proceeds from the asset disposals would fall short of satisfying this full amount by approximately $142.5 million, as summarized in the table below.

EXHIBIT V.F.4.b(4)—2
**Class B Junior Unreturned Capital Account Appreciation (Demonstrative)**
*($ in Millions)*

| | | |
|---|---:|---:|
| Beginning basis of Class B Junior Preferred Shares | $ | 227.8 |
| *Plus:* 20% preferred return | | 45.6 |
| Ending basis (after one year) | | 273.4 |
| *Less:* Residual proceeds (from above) | | 130.9 |
| Remaining Class B Junior Unreturned Preferred Capital | $ | 142.5 |

*Source: Purchase Agreement among ResCap, GMAC MHF, and CMH, dated June 6, 2008 [RC00025149]; Amended and Restated Limited Liability Company Agreement of CMH, dated June 6, 2008 [CERB000423]; Memorandum, Divestiture of Model Home Assets to Cerberus, dated June 10, 2009 [ALLY_0237920].*

Under the above scenario, the Class B Junior Preferred Members would receive proceeds of $130.9 million, which is nearly $100 million less than the beginning basis in CMH of $227.8 million. This result is attributable in roughly equal parts to the assumed reduction in market values versus the original transaction value (i.e., $50.9 million) and the 20% preferred return to Cerberus (i.e., $46 million). This demonstrative analysis is corroborated by the cash flow forecast prepared by Cerberus as of June 11, 2008, in which Cerberus estimated that nominal proceeds from the sale of model homes and lot options, net of transaction costs, plus rental income, would be $436.7 million.[2269] After repayment of the $230.0 million loan and $46.0 million preferred return to the Class A Senior Preferred Units, Cerberus estimated residual proceeds available to the Class B Junior Preferred Units would be $160.7 million (i.e., $436.7 million less $276.0 million total return to Cerberus) before discounting to present value.

Hindsight further corroborates the above scenario. CMH's remaining assets as of March 31, 2009, the point by which Cerberus had received its $276 million, totaled $131.3 million, comprised of $120 million in CMH's portfolio of model homes and $10.8 million in cash.[2270] RFC would receive nearly $100 million less than its beginning basis in CMH assuming a 100% recovery of these remaining assets, which was unlikely given forecasted market conditions.

The relevant comparison, however, is the value of the proceeds RFC would have received had it disposed of the model home assets itself compared to the value of the $230 million cash at closing and interest in Class B Junior Preferred Shares of CMH. With the assumption that

---

[2269] *Id.*

[2270] CMH Consolidating GAAP Balance Sheet as of March 31, 2009, at CERB041100–104 [CERB041100].

GMAC MHF and CMH could dispose of the assets equally[2271] and that RFC and ResCap did not need an immediate cash infusion, the primary valuation issue under these disposal scenarios is the 20% preferred return to Cerberus in exchange for $230 million in cash at closing. Holding all else equal in the above disposal scenario, had GMAC MHF liquidated the assets itself, the proceeds to RFC would have been approximately $46 million higher on an undiscounted basis—or the amount of the preferred return to the Class A Senior Preferred Members.

This $46 million difference alone is insufficient in analyzing whether RFC received REV. An immediate cash need was, in fact, a key driver of this transaction given ResCap's liquidity position in mid-2008, as described in Section VI. Inasmuch as this sale was accounted for by RFC as a financing transaction, rather than a true sale, the primary issue becomes whether the 20% minimum preferred return to Cerberus was comparable to the cost of financing ResCap may have otherwise been able to obtain on a $230 million loan as of June 2008.

The CMH Loans bore interest at 15% per annum compounded quarterly. Holding all else equal in the above scenario in which all model home assets are sold ratably over one year, CMH would have repaid the $230 million term loan to CRF in approximately seven months and paid a total of approximately $11.9 million in interest. However, CMH would still owe CRAI an additional $34.1 million to satisfy the 20%, or $46 million, minimum preferred return to the Class A Senior Preferred Members. In other words, CMH's financing costs would have been $34.1 million less, and its proceeds from the disposition of model home assets $34.1 million greater, had CMH only been obligated to pay the 15% interest per the terms of the $230 million term loan from CRF.

During the June 1, 2008 ResCap Board meeting, Marano commented that the 20% return was comparable to DIP financing rates.[2272] No basis or analysis was discussed during the meeting or provided in Marano's interview, however, to substantiate this position. While a comparison to DIP financing rates is of questionable relevance, in a presentation to the Independent Directors dated December 19, 2008 (related to a separate transaction), Goldin Associates reported that "[DIP] loans originated since June 2008 had mean pricing of LIBOR

---

[2271] One could argue either that Cerberus and its affiliates, as over-secured lenders and underwater common equity holders of CMH, could have had the incentive to liquidate these properties quickly at discounted prices, or that the additional liquidity provided by the $230 million CMH Loans and the involvement of Cerberus as an investor could have allowed a more orderly and thorough marketing process to maximize the value of the model home assets. Regardless, no direct evidence of either has been identified in the Investigation, and ResCap continued to provide ownership, operation, maintenance and disposition-related services. Thus, an assumption that there would have been no difference in disposition results is appropriate.

[2272] Minutes of a Meeting of Board of Directors of Residential Capital, LLC, June 1, 2008, at RC40005752 [RC40005652].

plus 498 bps and additional fees."[2273] The 22 DIP loans reflected in Goldin Associates' analysis ranged in amount from $30 million to $1.185 billion (with an average of $260 million), with spreads over LIBOR ranging from 150 bps to 750 bps, and fees ranging from 25 bps to 275 bps. The Examiner's Financial Advisors' review of market DIP rates during this time corroborates Goldin Associates' analysis.

During 2008, the 12-month LIBOR ranged from approximately 2.0% to 4.2% with an average of approximately 3.1%.[2274] Utilizing the 2008 average 12-month LIBOR and the ranges reflected in Goldin Associates' DIP analysis implies a range of DIP financing rates (including fees) of 4.85%[2275] to 13.35%[2276] with an average of 9.58%.[2277] By comparison, ResCap's short-term and long-term borrowings from AFI for the year ended December 31, 2008 each bore interest at 4.2%.[2278]

Assuming, arguendo, that comparison to DIP financing is relevant and that CMH could have obtained financing at a rate of 10% (comparable to the average DIP rate over the relevant period), CMH would have repaid the $230 million within approximately seven months and paid approximately $7.7 million in financing costs, or $38.3 million less than the 20%, or $46.0 million guaranteed minimum return to Cerberus and its affiliates (assuming a one-year disposal period and holding all else equal in the above scenario). In other words, had CMH obtained a DIP financing-based interest rate on the $230 million loan, the undiscounted consideration CMH received could have been approximately $38.3 million greater.

Had CMH been able to obtain $230 million in financing at 4.2% (i.e., ResCap's rate for AFI borrowings over this period), CMH would have paid only $3.2 million in financing costs in the above scenario, or $42.8 million less than the $46.0 million.

Actual subsequent financial results indicate that CMH paid Cerberus and its affiliates approximately $11.2 million in interest on the $230 million term loan, or $34.8 million less than it otherwise would have had to pay, but for the $46 million, 20% preferred return guaranteed to Cerberus.[2279] Had CMH even paid 20% interest per annum compounded quarterly on the $230 million term loan, rather than the 20% minimum preferred return of $46 million, CMH's financing costs would have been $30 million less.

---

[2273] Draft Goldin Associates Presentation to the Committee of Independent Members of the Board of Directors of Residential Capital Regarding Proposed Amendment to the Secured Line of Credit with GMAC, LLC, dated Dec. 19, 2008, at 17 [GOLDIN00127127].

[2274] US DOLLAR LIBOR RATES 2008, http://www.global-rates.com/interest-rates/libor/american-dollar/2008.aspx.

[2275] 3.1% LIBOR plus 150 bps spread and 25 bps fees.

[2276] 3.1% LIBOR plus 750 bps spread and 150 bps fees.

[2277] 3.1% LIBOR plus 498 bps spread and 275 bps fees.

[2278] Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2009), at 154.

[2279] CMH Loan Repayment Schedule [EXAM00345879].

This transaction was in form a sale and in substance a financing. However, Cerberus expected to earn not only a financing rate of return but a significant preferred return despite investing only $10,000 in equity above the $230 million CMH Loans. In an investment summary prepared as of June 11, 2008, immediately following the closing of the transaction, Cerberus projected an IRR on its investment in CMH of 25.6%.[2280] However, according to Cerberus's analysis:

> Cerberus'[s] expected IRR is greater than 20% due to assumed sales pace in the Cerberus projection, which is much slower than the historical sales pace. Therefore, Cerberus'[s] IRR may actually be much higher if the sales pace exceeds the forecasted sales pace in the Cerberus'[s] analysis.[2281]

The September 2008 Model Home Sale process could be considered an indicator of required returns from investors on model home assets. On July 10, 2008 (approximately one month after the June 2008 Model Home Sale), Young asked Brian Murray, managing director at ResCap, for his view of the IRR implied by Cerberus's bid, to which Murray responded, "I do not believe we would be able to get bids with an IRR much lower than 20%."[2282] Murray's assessment apparently was premised on "two large bids in process in which Lennar will be buying back their models (in the CMH) at an IRR in 20% range, and Jack Buck . . . looking to buy us out (ResCap) in the same 20% IRR range."[2283] Young responded, "[t]his would leave me to believe that their bid is in the fair value range for a bulk sale. Then our decision is do we take the cash now or run it out over two years, or some combination of both, if possible."[2284] Young forwarded Murray's analysis to Marano and Weintraub on the same day, commenting:

> Bottom line, this analysis indicates it would take us around 2 years to sell off the model homes at a cash npv of approx. 15% higher than [Cerberus's] bid. However, the NPV is discounted at 10% which is low to me. I've asked the team to run at a yield to [Cerberus]—it looks like will be around 20% which doesn't seem out of line.[2285]

---

[2280] Draft Cerberus Investment Overview, CMH, dated June 6, 2008, at CERB032941 [CERB032933].

[2281] *Id*. at CERB032936.

[2282] E-mail from B. Murray to J. Young (July 10, 2008) [EXAM10399483].

[2283] *Id.*

[2284] E-mail from J. Young to B. Murray (July 10, 2008) [EXAM10399483].

[2285] E-mail from J. Young to T. Marano and J. Weintraub (July 10, 2008) [EXAM12115217].

However, these transactions required potential investors to commit funds to purchasing the model homes at their Fair Market Value and assume the full risk of subsequent changes in value. By comparison, Cerberus advanced only 50% of the net book value of the model home assets (before valuation reserves) in the form of $230 million in secured CMH Loans, on which it was guaranteed a minimum 20% return. As such, the 20% IRR described in Young's e-mails is not consistent with the economics of the transaction structure in the June 2008 Model Home Sale.

An inquiry into REV should also consider other intangible or nonfinancial consideration received by the transferor in evaluating the import of any potential deficiency in Fair Market Value identified. As discussed in Section V.E, RFC's parent, ResCap, was experiencing reduced availability in third-party financing at the time of the June 2008 Model Home Sale. Further, ResCap's worsening liquidity, as described in Section VI, was a key driver of this transaction.

### (5) Conclusion Regarding Reasonably Equivalent Value

With respect to the June 2008 Model Home Sales, the Examiner's Financial Advisors conclude that RFC received at least $30.0 million less than Fair Market Value, considering the differential between the cost of financing CMH may have been able to obtain under different financing scenarios (i.e., between 4.2% and 20% per annum) and the $46 million return guaranteed to Cerberus.

However, based on the above discussion and analysis and the totality of the circumstances, while a close question, the Examiner concludes it is more likely than not that a court would find the value received by RFC, constitute reasonably equivalent value. Relevant considerations include but are not limited to the degree of the deficiency relative to the total transaction value of $406.9 million (net of valuation reserves), the prevailing market conditions for sales and financings of assets of this nature, and the intangible benefits derived by RFC and ResCap from the immediate liquidity infusion as a result of the sale.

### c.   Resort Finance Sale By RFC And GMAC Canada To GMAC CF In July 2008

Pursuant to an Asset Purchase Agreement dated July 2, 2008[2286] (the "RF Asset Purchase Agreement") on July 31, 2008, RFC and GMAC Canada, each an indirect wholly owned subsidiary of ResCap, sold substantially all of Resort Finance, including the equity of RFC Resort Funding, LLC, to GMAC CF for cash consideration of $96.1 million plus the assumption of $1.125 billion of debt. GMAC FS paid RFC a deposit of $250 million on June 3, 2008 before GMAC CF had entered into any binding obligation to buy the Resort Finance assets[2287] RFC returned $153.9 million of the deposit to GMAC FS upon closing.[2288]

---

[2286] Asset Purchase Agreement between RFC, LLC, GMAC Canada, and GMAC CF, dated July 2, 2008 [RC00024026].

[2287] Letter from R. Hull to T. Marshall (June 3, 2008) [ALLY_0100979].

[2288] GMAC Canada's audited financial statements disclose that GMAC Canada sold construction finance loans in the Resort Finance Sale for $24.6 million and recorded no gain or loss on the sale. *See* GMAC Residential Funding of Canada, Limited Non-Consolidated Financial Statements, dated Dec. 31, 2008, at EXAM00233417 [EXAM00233396]; *see also* First Amendment to APA [ALLY_0130062].

Houlihan Lokey was engaged to value Resort Finance and, on July 24, 2008, submitted its valuation conclusion of $74.6 million, the mid-point of its concluded range of value between $50.7 million and $98.6 million.[2289] The RF Asset Purchase Agreement was amended by the First Amendment dated as of July 26, 2008 (the "First Amendment"), which set the purchase price at $96.1 million, near the high end of the Houlihan Lokey range.[2290] The First Amendment further provided that, in the event that Resort Finance was resold within three years of the closing, the sellers would receive a portion of any profit on the sale.[2291] ResCap unsuccessfully marketed Resort Finance to potential buyers during the fourth quarter of 2007 and the first two quarters of 2008. Immediately following the Resort Finance Sale, GMAC CF continued the effort to market and sell Resort Finance to a third party,[2292] which it was finally able to do during the third quarter of 2010, albeit at a loss.[2293]

As set forth in the discussion and analysis below and based on the totality of the circumstances, the Examiner concludes that the evidence supports the proposition that RFC and GMAC Canada received reasonably equivalent value in the Resort Finance Sale. The Resort Finance Sale purchase price was later increased by $15 million from $96.1 million to $111.1 million, according to ResCap's Form 10-K for 2008.

### (1) Overview Of Resort Finance

Resort Finance was one of five business units consolidated within RFC's BCG division and provided real estate finance solutions to middle-market resort developers to, inter alia, finance acquisitions, develop timeshare properties, and meet working capital needs to grow their business. "The company's capital solutions ranged from acquisition, development, and construction loans ('AD&C Loans') to working capital lines of credit secured by timeshare receivables ('Receivables Loans')."[2294]

---

[2289] *See* Houlihan Lokey Valuation Analysis of Resort Finance as of June 30, 2008, dated July 24, 2008, at 3 [ALLY_0102229].

[2290] *See id*.

[2291] First Amendment to APA [ALLY_0130062].

[2292] *See, e.g.*, E-mail from B. Hall to S. Ramsey (June 24, 2008) [ALLY_0113803]; E-mail from D. Baker (July 20, 2008) [ALLY_0114077]; E-mail from L. Voss to B. Hall (June 6, 2008) [ALLY_0112625]; Int. of L. Voss, Dec. 13, 2012, at 76:7–20.

[2293] Int. of L. Voss, Dec. 13, 2012 at 77:5–78:17.

[2294] Houlihan Lokey Valuation Analysis of Resort Finance as of June 30, 2008, dated July 24, 2008, at 8 [ALLY_0102229].

Appendix V.F.4.c(1) provides Resort Finance's historical financial statements. Resort Finance experienced strong organic growth in commitments and loans outstanding since its inception in 2002, as summarized in the following table.[2295]

EXHIBIT V.F.4.c(1)
**Resort Finance Organic Growth in Commitments and Loans Outstanding**
*($ in Millions)*

|  | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 YTD | CAGR |
|---|---|---|---|---|---|---|---|
| Commitments | $ 340.0 | $ 758.5 | $ 1,249.2 | $ 1,453.5 | $ 1,798.4 | $ 2,182.6 | 52% |
| Loans outstanding | 36.7 | 364.3 | 683.4 | 692.0 | 1,142.8 | 1,385.4 | 136% |

*Source: Memorandum, GMAC Resort Finance, prepared by Bear Stearns, dated Dec. 2007 [HL2929].*

Resort Finance grew its pre-tax income from $0.3 million to $36.6 million, and its pre-tax return on average earning assets grew from 0.2% to 3.9%, from 2003 (its first full year of operations) through September 2007.

### (2) Summary Of Transaction And Process

ResCap began marketing Resort Finance to potential third-party buyers beginning in the fourth quarter of 2007 and engaged Bear Stearns to handle the process.[2296] Bear Stearns reported to ResCap in a January 13, 2008 presentation that marketing efforts began in mid-November 2007, forty-four teaser letters were sent out, eleven confidentiality agreements were executed and confidential information memoranda disseminated, and six initial proposal letters were received, all from strategic buyers.[2297] The initial proposals ranged from 87.00% to 99.75% of the outstanding unpaid balance ("UPB") of Resort Finance's portfolio of loans.[2298] On February 21, 2008, RFC entered into the $750 million Resort Finance Facility with AFI to obtain bridge financing while ResCap searched for a third party to purchase Resort Finance, as discussed in Section V.E.1. ResCap Board minutes from early 2008 indicate that ResCap was still expecting to close a sale in the second quarter of 2008,[2299] although no agreement with any third party was ever reached.

Thereafter, the concept of selling Resort Finance to an affiliate seemed to move quickly. Young noted in an e-mail to Marano and Jones on May 23, 2008 that, "with the fading asset sales and other situations" there is a need for ResCap to raise $650 million to $1 billion in short

---

[2295] *Id.* at HL2937. Memorandum, GMAC Resort Finance, prepared by Bear Stearns, dated Dec. 2007, at HL2935 [HL2929].

[2296] Engagement Letter from Bear Stearns to ResCap (Jan. 22, 2008) [ALLY_0113551].

[2297] Bear Stearns Presentation Regarding Project Time Off Preliminary Indications of Interest, dated Jan. 13, 2008, at 1 [ALLY_0030327].

[2298] *Id.* at 2.

[2299] *See* Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Mar. 17, 2008, at RC40005667 [RC40005652].

term cash to be comfortable with its cash situation and have the option to hold certain assets to increase value realization over time.[2300] Young noted that ResCap and AFI needed to decide quickly on actions.[2301] One of the items proposed was to sell Resort Finance to a related party for $250 million before a "haircut."[2302]

GMAC FS paid RFC a deposit of $250 million on June 3, 2008, before GMAC CF had entered any binding obligation to purchase Resort Finance.[2303] The RF Asset Purchase Agreement established that the purchase price was to be based on the Fair Market Value of the assets as of June 30, 2008, as determined by an independent valuation.[2304]

The ResCap Board approved, on June 1, 2008, the company or its subsidiaries entering into a sale transaction with affiliates, subject to subsequent executive committee approval or ratification.[2305] The executive committee approved and ratified, on June 2, 2008, the resolutions adopted by the ResCap Board on June 1.[2306] The Board of Directors of RFC, one of the sellers,[2307] authorized the transaction, along with other affiliate transactions, in a general resolution on June 3, 2008.[2308]

Pursuant to the 2006 Amended Operating Agreement, ResCap was required to have at least two Independent Directors at all times and AFI was obligated to fill any vacancy as promptly as practical.[2309] At the time that ResCap approved the transaction there was only one

---

[2300] E-mail from J. Young (May 23, 2008) [EXAM10175040].

[2301] *Id*.

[2302] *Id*.

[2303] Letter from R. Hull to T. Marshall (June 3, 2008) [ALLY_0100979].

[2304] *See* Asset Purchase Agreement between RFC, GMAC Canada, and GMAC CF, dated July 2, 2008, § 2.6(b)(i) [RC00024026].

[2305] Minutes of a Meeting of Board of Directors of Residential Capital, LLC, June 1, 2008, at RC40005755 [RC40005652].

[2306] Unanimous Written Consent of the Executive Committee of the Board of Directors of Residential Capital, LLC, dated June 2, 2008, at RC40006443–87 [RC40006437]. The Examiner's Counsel notes that the version of this written consent review was signed by two of the three members of the executive committee, however, under the ResCap LLC Agreement in effect at the time, written consents of the ResCap Board were not required to be signed by all directors.

[2307] Minutes, if they exist, approving the execution of the agreement by GMAC Canada, one of the two sellers, have not been produced for review.

[2308] Action by Written Consent of the Board of Directors of Residential Funding Company, LLC, dated June 3, 2008, at ALLY_01187968–34 [ALLY_0118759].

[2309] *See* 2006 Amended Operating Agreement, § 2(f).

Independent Director on the ResCap Board.[2310] Independent Director approval of a transaction like this sale was not required under the 2006 Amended Operating Agreement. However, under the 2006 Amended Operating Agreement, any material affiliate transaction was required to be "on terms and conditions that are consistent with those that parties at arm's-length would agree to and for fair value,"[2311] absent a waiver by the Independent Directors.[2312] Based on a review of the RF Asset Purchase Agreement and the negotiations that took place, the terms generally appear to be at arm's-length; value is discussed below.

The transaction was approved prior to the execution of the Junior Secured Notes Indenture and the Senior Secured Notes Indenture, but the agreement was signed after execution of those indentures. Thus, the affiliate transactions covenant in the June 2008 Indentures (section 4.11 thereof) was applicable to the sale. However, because the final purchase price was under $500 million, no fairness opinion was required to be delivered to the trustee for these indentures and, because the final purchase price was under $250 million, no certification from an officer of ResCap was required to be delivered to the trustee pursuant to this covenant. However, because the consideration was in excess of $10 million, the transaction was still required to be on terms not materially less favorable than those that could reasonably be obtained in a comparable arm's-length transaction with an unaffiliated party.[2313] The Morgan Stanley fairness opinion permitted a copy of the fairness opinion to be delivered to the trustee under these Indentures.[2314] The Quarterly Report on Form 10-Q for the quarterly period ended June 30, 2008 filed by ResCap, noted "[t]he Resort Finance assets were not part of the primary collateral securing the senior secured credit facility or the notes issued in the Company's private exchange offers."[2315]

The June 2, 2008 Current Report on Form 8-K filed by ResCap noted:

> ResCap believes that each of the transactions described above complies with the proposed indentures governing the new notes being offered in ResCap's private exchange offers as if such indentures were in effect and governing such transactions. The consummation of each of the transactions described above is

---

[2310] Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, June 13, 2008, at RC40005781–86 [RC40005652]. The only Independent Director at the time of approval was Edward Smith who had been appointed earlier in May. Karin Hirtler-Garvey was added as an additional Independent Director on June 13, 2008. *See* Section IV.A.

[2311] 2006 Amended Operating Agreement, § 2(b).

[2312] *Id*. § 8.

[2313] June 2008 Indentures, §4.11 [GOLDIN00000019; ALLY_0122066].

[2314] Opinion Letter from Morgan Stanley to the Board of Directors of ResCap (July 30, 2008), at RC00028117 [RC00028114].

[2315] Residential Capital, LLC, Quarterly Report (Form 10-Q) (Aug. 8, 2008), at 39.

> subject to a number of conditions; accordingly, there is no
> assurance that all of the transactions will be consummated or
> that they will be consummated within the timeframes described
> above.[2316]

The Board of Directors of GMAC CF, subsequently approved the transaction on June 23, 2008.[2317] The GMAC CF board minutes refer to a May 31, 2008 meeting of the AFI Board, and recite that "[AFI] has decided that [Resort Finance] should be acquired by [GMAC CF] and has directed [GMAC CF] to enter into an asset purchase agreement with RFC for the purchase of the Business."[2318]

The parties executed the RF Asset Purchase Agreement on July 2, 2008 and closed the sale on July 31, 2008.[2319]

The transaction appears to have been negotiated by both sides.[2320] There were multiple drafts of the RF Asset Purchase Agreement exchanged between counsel. The first draft distributed by AFI did not contain a downward adjustment of the deposit, which would have been consistent with the structure of the Health Capital Sale between the same parties executed in August 2007.[2321] The two-way adjustment was added later. Skadden, acting for the sellers, tried to eliminate the downward adjustment on the deposit and to obtain better terms for RFC on the post-closing indemnities.[2322]

In response to a series of e-mails on the status of negotiations,[2323] Richard Kent, in-house counsel at AFI, wrote to persons at AFI, GMAC CF, and Mayer Brown (purchaser's counsel):

> I apologize if I seem to be picking on [Voss]. I'm not picking on
> [Voss], she is only doing her job. Likewise the [sic] ResCap and

---

[2316] Residential Capital, LLC, Current Report (Form 8-K) (June 3, 2008), at 5 (referencing the Resort Finance Sale).

[2317] Minutes of a Special Meeting of Board of Directors of GMAC Commercial Finance LLC, June 23, 2008, at ALLY_PEO_0001822 [ALLY_PEO_0001813].

[2318] The minutes for this meeting, if it did take place, have not been produced for review.

[2319] Asset Purchase Agreement between RFC, GMAC Canada, and GMAC CF, dated July 2, 2008 [RC00024026]; *see also* Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2009), at 90.

[2320] *See, e.g.*, E-mail from E. Raymond (June 1, 2008) [ALLY_0111575]; E-mail from L. Voss (June 16, 2008) [ALLY_0113450]; E-mail from R. Kent (June 16, 2008) [ALLY_0113453]; E-mail from A. Land (July 30, 2008) [ALLY_0114354].

[2321] *See* Draft Asset Purchase Agreement between RFC, GMAC Canada, and GMAC CF, dated June 9, 2008, at ALLY_0108962 [ALLY_0108960].

[2322] *See* Draft Asset Purchase Agreement between RFC, GMAC Canada, and GMAC CF, dated June 9, 2008 [ALLY_0108960].

[2323] E-mail from R. Kent (June 16, 2008) [ALLY_0113453].

their lawyers are only doing their jobs. Maybe my e-mail should have been addressed to Melissa. I suggested that a list be developed and Melissa and I would arbitrate. In any event [AFI] needs to address these business issues. What I'm disappointed with is ResCap renegotiating [sic] issues they have agreed too [sic] and wasting money on lawyers negotiating a deal that was suppose [sic] to be market driven. My response was to say that their demands are not market. I instructed Mayer Brown to draft a middle of the road agreement. We have already done this once with Health Capital. It was done in record time with not all of this difficulty. Sorry for the frustration."

In response to Kent's e-mail, Robert Hull, the CFO of AFI noted "[t]he ResCap group is not making this easy."[2324]

Even before the RF Asset Purchase Agreement was signed, GMAC CF was preparing to resell the Resort Finance as soon as possible[2325] and was evaluating financial advisors to assist in the process.[2326] In an e-mail dated June 6, 2008, Voss expressed the desire to retain Bear Stearns (then under JP Morgan ownership) to continue marketing Resort Finance to third parties on AFI's behalf. She further commented that, "[a]t this point, the sale of [Resort Finance] will continue to be pursued, but [AFI] doesn't think it is likely that this will occur in the next 6 to 12 months."[2327] ResCap's STM noted, "[a]s of the date of the transaction, the ultimate intention at the corporate level is to sell the Resort Finance to a third party and, essentially, monetize the business as quickly as possible. This directive was made at the AFI corporate level."[2328] Voss confirmed in her interview that the intent of GMAC CF upon acquiring Resort Finance was immediately to begin the process of selling it to a third party.[2329] She explained that the only reason GMAC CF purchased Resort Finance to immediately turn it around, rather than let ResCap market and sell the business, was because ResCap needed cash.[2330] Voss stated that Resort Finance was completely different from GMAC CF's business and that GMAC CF did even less due diligence on Resort Finance than it did on Health Capital.[2331]

---

[2324] E-mail from R. Hull (July 17, 2008) [ALLY_0113453].

[2325] E-mail from B. Hall to S. Ramsey (June 24, 2008) [ALLY_0113803].

[2326] E-mail from D. Baker (July 20, 2008) [ALLY_0114077].

[2327] E-mail from L. Voss to B. Hall (June 6, 2008) [ALLY_0112625].

[2328] ResCap STM, Resort Finance Sale to GMAC CF, at EXAM00220238 [EXAM00220235].

[2329] Int. of L. Voss, Dec.13, 2012, at 76:7–20.

[2330] *Id.* at 76:21–77:4.

[2331] *Id.* at 60:8–19.

As noted above the RF Asset Purchase Agreement established the purchase price was to be based on the Fair Market Value of the assets as of June 30, 2008 as determined by an independent valuation.[2332] The parties agreed to engage Houlihan Lokey as the valuation expert on July 2, 2008.[2333] On July 24, 2008, Houlihan Lokey submitted its valuation conclusion of $74.6 million, the mid-point of its concluded range of value between $50.7 million, and $98.6 million.[2334] However, rather than base the purchase price on Houlihan Lokey's conclusion, the parties executed the First Amendment, which set the purchase price at $96.1 million, near the high end of the Houlihan Lokey range.[2335] The First Amendment further provided that in the event that Resort Finance was resold within three years of the closing, the sellers would receive a portion of any profit on the sale.[2336] This upside sharing arrangement appears to have arisen as a compromise, with the parties agreeing not to use the Houlihan Lokey valuation directly to establish the price and instead agreeing to a purchase price of $96.1 million and the sharing arrangement.[2337]

Hall stated in his interview that he was asked to support taking the higher end of the range of the Houlihan Lokey valuation, which he did agree to do in the spirit of GMAC CF trying to "do the right thing as much as we could for our sister company."[2338] Hall also noted that they included the upside sharing arrangement but that they "laughed about it, because we knew there wasn't any chance of that manifesting itself."[2339]

Voss, CFO and COO of GMAC CF, stated in her interview that "[w]e spent several days negotiating that [profit-sharing clause] into our agreement because the [ResCap] folks felt that it was worth more than what it sold for."[2340] Voss continued:

> And we're—we said fine, "If you think it's worth more, we're happy to put this in the agreement." You know, I wasn't real thrilled spending the days negotiating that profit-sharing

---

[2332] *See* Asset Purchase Agreement between RFC, GMAC Canada, and GMAC CF, dated July 2, 2008, § 2.6(b)(i) [RC00024026].

[2333] *See* Agreement with respect to Valuation Expert, dated July 2, 2008 [ALLY_0113933].

[2334] *See* Houlihan Lokey Valuation Analysis of Resort Finance as of June 30, 2008, dated July 24, 2008, at 3 [ALLY_0102229].

[2335] *See id.*

[2336] First Amendment to APA [ALLY_0130062].

[2337] *See* E-mail from L. Voss (July 25, 2008) [ALLY_0114323] (discussing ResCap having objections to the valuation and then discussing the terms of the upside sharing arrangement, which terms were reflected in the terms of the First Amendment).

[2338] Int. of B. Hall, Dec. 13, 2012, at 89:4–8.

[2339] *Id*. at 89:15–17.

[2340] Int. of L. Voss, Dec.13, 2012, at 77:15–18.