agreement because they're hard to structure. But, you know, we did it because that's what they wanted. And, so, if there would have been any upside, [ResCap] would have gotten it. And because it needed to be a true sale, we [i.e., GMAC CF] couldn't build any—in any downside protection for us. So, it was extremely one sided to—so, there's no way that deal could have been a bad deal for ResCap.[2341]

Although the First Amendment including the profit-sharing clause was adopted, Voss expressed her doubts that any deferred purchase price would be payable to ResCap:

We felt that it was extremely overvalued when we bought it. The purchase document did include a mechanism, whereby, if we sold it for—if we sold it externally for more than we bought it from Resort, that ResCap would get, you know, some portion of the upside . . . So, we bought it at 82 percent and we sold it at around 65 percent. So, during the period of time [GMAC CF] owned it, we lost about $340 million.[2342]

The First Amendment calculated the $96.1 million purchase price by employing an Asset-Based Approach approach, as depicted in the following table:[2343]

EXHIBIT V.F.4.c(2)—1
**Purchase Price Calculation per the First Amendment**
*($ in Millions)*

| | | |
|---|---|---:|
| Total assets | $ | 1,488.9 |
| *Less:* Cash & cash equivalents | | 1.4 |
| Assets excluding cash & cash equivalents | | 1,487.5 |
| | | |
| 82% mark of assets excluding cash & cash equivalents | | 1,219.8 |
| *Plus:* Cash & cash equivalents | | 1.4 |
| *Less:* GMAC Facility | | 750.0 |
| *Less:* Deutsche Bank Facility | | 375.0 |
| Purchase price at closing, rounded | $ | 96.1 |

*Source: First Amendment to APA [ALLY_0130062].*

---

[2341] *Id*. at 77:18–78:6.

[2342] *Id*. at 77:9–15, 78:14–17.

[2343] First Amendment to APA, at Ex. A [ALLY_0130062].

As a result of the purchase price established by the First Amendment, RFC returned $153.9 million of the $250 million deposit, netting $96.1 million. However, ResCap later announced in its public filings a total transaction value of $111.1 million, stating, "[t]his purchase price represents the net asset value of the business, appraised by a third-party."[2344] The revised number reported in ResCap's public filings modified the $96.1 million cash purchase price for an unspecified $15 million error in the Houlihan Lokey report after it was reviewed by ResCap and AFI management.[2345] ResCap's auditors noted in their workpapers that the $15 million adjustment was made for "liabilities mistakenly left out of third party valuation."[2346]

The First Amendment does not explicitly attribute the calculation of the $96.1 million based on the 82% mark to Houlihan Lokey, though the public filings continued to refer to a third-party valuation. If the calculation was indeed intended to be derived based on Houlihan Lokey's Asset-Based Approach, which is where the 82% mark appears to originate,[2347] then there appear to be two errors—not just one—in the purchase price calculation used in the First Amendment. Taking both errors into consideration would have resulted in a modified purchase price of $108.3 million, rather than $111.1 million (see discussion below for further detail).

Morgan Stanley delivered a fairness opinion dated July 30, 2008 to the ResCap Board that the transaction at $96.1 million was fair from a financial point of view to the sellers. The fairness opinion disclosed that Robert Scully, a member of the Office of the Chairman and a Managing Director of Morgan Stanley, was serving as a member of the AFI Board, bringing into question Morgan Stanley's independence relative to this transaction.[2348] There do not appear to have been any independent financial advisors to any of the parties.

---

[2344] Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2009), at 16.

[2345] *See* ResCap STM, Resort Finance True-Up SOPA, at EXAM00220464 [EXAM00220463].

[2346] Resort Finance Net Assets, dated June 30, 2008 [PWC09192]. Had the $15 million in liabilities been included in the calculation per the First Amendment, the purchase price would have been $15 million lower (i.e., $96.1 million less $15 million). However, the purchase price was set at $96.1 million, and that is what ResCap received. Afterward, it appears that ResCap discovered it still had the $15 million in liabilities on its books and that AFI either assumed the debt or paid ResCap an addition $15 million, thus creating the $15 million gain that increased total consideration from $96.1 million to $111.1 million per ResCap's SEC filings. Documentation confirming that RFC received the additional $15 million in consideration was not produced for review in the Investigation.

[2347] *See* Houlihan Lokey Valuation Analysis of Resort Finance as of June 30, 2008, dated July 24, 2008, at 34 [ALLY_0102229].

[2348] Opinion Letter from Morgan Stanley to the Board of Directors of ResCap (July 30, 2008) [RC00028114].

The following diagram summarizes the value exchanged between RFC and GMAC CF in the Resort Finance Sale.



EXHIBIT V.F.4.c(2)—2
**Resort Finance Sale Transaction Diagram**

Source: Asset Purchase Agreement between RFC, LLC, GMAC Canada, and GMAC CF, dated July 2, 2008 [RC00024026]; First Amendment to APA [ALLY_0130062]; Houlihan Lokey Valuation Analysis of Resort Finance as of June 30, 2008, dated July 24, 2008 [ALLY_0102229]; Minutes of a Meeting of the Board of Directors of Residential Capital, LLC, June 1, 2008 [RC40005652]; Letter from R. Hull to T. Marshall (June 3, 2008) [ALLY_0100979].

### (3) Third-Party Conclusion Of Value

Although Houlihan Lokey's conclusion of value was not ultimately adopted, it appears from ResCap's SEC filings and the calculation of the purchase price under the First Amendment that Houlihan Lokey's Asset-Based Approach was considered in establishing the 82% mark used in the calculation of the $96.1 million purchase price.

Appendix V.F.4.c(3) provides a summary of Houlihan Lokey's conclusion of value and key assumptions. In summary, Houlihan Lokey developed a range of Fair Market Value for the net transferred assets (assets less assumed obligations) based on two approaches: the Guideline Publicly Traded Company Method under the Market Approach and the Adjusted Book Value Method under the Asset-Based Approach.

Houlihan Lokey calculated a range of enterprise values for each approach employed and then averaged the low and high values from each approach to determine a range of $1.174 billion to $1.222 billion. After adding cash of $1.4 million, and subtracting obligations of $375.0 million related to a Deutsche Bank facility and $750.0 million related to an AFI facility, the resulting range of value for the net transferred assets was $50.7 million to $98.6 million. Houlihan Lokey selected the midpoint, or $74.6 million, as its conclusion of the Fair Market Value of the net transferred assets of the Resort Finance business.[2349] Resort Finance's net book value totaled $349.2 million as of the valuation date, implying a 0.21x book value multiple to Houlihan Lokey's concluded Fair Market Value.

### (4) Analysis Of Third-Party Conclusion Of Fair Market Value

As discussed in greater detail below, the Examiner's Financial Advisors consider Houlihan Lokey's Adjusted Book Value Method, upon which the 82% mark appears to have been based, to be a reliable indicator of the Fair Market Value of Resort Finance. The Examiner's Financial Advisors do not consider Houlihan Lokey's Guideline Publicly Traded Company Method to be a reliable indicator of Fair Market Value.

### (a) Guideline Publicly Traded Company Method

The Guideline Publicly Traded Company Method used by Houlihan Lokey considered three multiples: Annualized P/E,[2350] P/NBV, and EV/TA. Although the Annualized P/E and P/NBV multiples are commonly considered when valuing a financial services company such as Resort Finance, the use of an EV multiple, such as EV/TA, is questionable. When valuing

---

[2349] *See* Houlihan Lokey Valuation Analysis of Resort Finance as of June 30, 2008, dated July 24, 2008, at 3 [ALLY_0102229].

[2350] Or "Net Income." Houlihan Lokey annualized the net income for the six months year-to-date for the period ending June 30, 2008. *See* Houlihan Lokey Valuation Analysis of Resort Finance as of June 30, 2008, dated July 24, 2008, at 30 [ALLY_0102229].

the equity of financial firms, analysts generally employ methods that directly measure equity value, such as through the P/E and P/NBV multiples, rather than trying to define and quantify EV, such as through the EV/TA multiple. Debt funding is an integral part of the business operations of such companies, which is a key justification for preferring equity multiples over EV multiples.

Houlihan Lokey selected four guideline companies in applying the Guideline Publicly Traded Company Method and selected multiples near and in some cases below the lowest data point of the indicated range.[2351] Houlihan Lokey did perform a "risk ranking" analysis whereby it compared Resort Finance to the guideline companies based on different financial measures, including: interest income; net interest margin to total assets; selling, general, and administrative ("SGA") costs to interest margin; SGA to interest income; SGA to total assets; net income to return on assets; net income to return on equity; loan loss percentage; and net income to net income margin. Resort Finance ranked at, or second to, the worst in eight of the nine categories.[2352]

Houlihan Lokey selected a range of Annualized P/E multiples of 7.0x to 8.0x, which was lower than the observed range of the LTM P/E multiples of the guideline companies.[2353] Additionally, Houlihan Lokey used an annualized[2354] net income of $12.3 million for the period ended June 30, 2008 despite higher LTM net income near of $19.2 million for the same period ended. Houlihan Lokey did not explain why it used the lower annualized income, which is also inconsistent with the measure utilized for the guideline companies. Houlihan Lokey and Morgan Stanley both noted in their respective reports that cash flow projections (against which annualized and LTM earnings could have been compared) were not available for the Resort Finance business.[2355]

Houlihan Lokey also selected a range of P/NBV of 0.2x to 0.3x. In correspondence with AFI, representatives of Houlihan Lokey were reluctant to support a valuation conclusion at the upper end of the overall concluded range because of where they "[thought] the assets would sell" and the previous "long and failed effort to sell this asset [i.e., by Bear Stearns]."[2356] Houlihan

---

[2351] Houlihan Lokey Valuation Analysis of Resort Finance as of June 30, 2008, dated July 24, 2008, at 28 [ALLY_0102229].

[2352] *See id.* at 32

[2353] *Id.* at 28 [ALLY_0102229]. The lowest observed LTM P/E multiple was 10.6x for NewStar Financial, Inc. The range of LTM multiples was 10.6x to 12.3x. *Id.* at 31

[2354] Houlihan Lokey Valuation Analysis of Resort Finance as of June 30, 2008, dated July 24, 2008, at 28 [ALLY_0102229] ("assuming the same level of earnings for the remaining six months of 2008").

[2355] *See* Houlihan Lokey Valuation Analysis of Resort Finance as of June 30, 2008, dated July 24, 2008, at 5 [ALLY_0102229]; Opinion Letter from Morgan Stanley to the Board of Directors of ResCap, dated July 30, 2008, at RC00028115 [RC00028114].

[2356] E-mail from R. Hull (July 25, 2008) [EXAM10171978].

Lokey selected low and high multiples of P/NBV that were both below the lowest observed multiple among the set of guideline companies—approximately 51% and 77% of the lowest observed multiples.[2357] Similarly, Houlihan Lokey selected a range of Annualized P/E multiples that was below the lowest estimate of the guideline group of companies. Houlihan Lokey concluded upon a range of Annualized P/E multiples of 7.0x to 8.0x, or 66% and 75% of the lowest meaningful LTM P/E multiple estimates.[2358]

In the Examiner's Financial Advisors' experience, when the subject company's financial position or performance appears to justify selected multiples below the observed range, as is the case in Houlihan Lokey's analysis of Resort Finance, the reliability of the Guideline Publicly Traded Company Method as an indicator of Fair Market Value must be assessed. In such situations, the question arises as to how much lower than the observed range would be appropriate as a reliable measure of value. In support of its selection of multiples relative to the observed range, Houlihan Lokey noted, "[w]e generally selected capitalization multiples near the bottom of the range due to, among other things, lower margins, higher customer and industry concentration, smaller size, and uncertain future prospects."[2359]

These factors, when taken together with the other weakness in Houlihan Lokey's market multiple analyses noted above, indicate that the Guideline Publicly Traded Company Method (to which Houlihan Lokey applied a 50% weight) is not a reliable indicator of the Fair Market Value of Resort Finance. The Examiner's Financial Advisors instead considered Houlihan Lokey's Asset-Based Approach (discussed immediately below) to be a reliable indicator of Fair Market Value.

### (b) Asset-Based Approach

Houlihan Lokey used the Adjusted Book Value Method under the Asset-Based Approach to value Resort Finance's assets. The Adjusted Book Value Method is a commonly applied method when valuing financial companies.

---

[2357] CIT's LTM P/NBV was 0.39x and had the lowest P/NBV of the selected comparable set of companies. Houlihan Lokey Valuation Analysis of Resort Finance as of June 30, 2008, dated July 24, 2008, at 32 [ALLY_0102229].

[2358] NewStar's LTM P/E was 10.6x and had the lowest P/E of the selected comparable set of companies. Houlihan Lokey did not compute CIT's P/E estimate and it was determined as not meaningful. Houlihan Lokey Valuation Analysis of Resort Finance as of June 30, 2008, dated July 24, 2008, at 32 [ALLY_0102229].

[2359] Houlihan Lokey Valuation Analysis of Resort Finance as of June 30, 2008, dated July 24, 2008, at 28 [ALLY_0102229].

To value Resort Finance's portfolio of loans, Houlihan Lokey considered the "nature and terms of each loan, the borrowers' credit profiles, and the level of collateral as compared to the principal amount and lack of marketability of the investment" in order to determine the Fair Market Value of the loans.[2360]

Houlihan Lokey sampled 88.4% of Resort Finance's AD&C Loans and Receivables Loans and concluded on an aggregate mark to Fair Market Value of between 81.2% and 83.2% of the UPB.[2361] In analyzing the Fair Market Value of the loans, Houlihan Lokey also considered the following: a DCF analysis of the loans using appropriate risk adjusted returns; market spreads, yields, and credit statistics for comparable debt instruments; and the prepayment expectations for the loans.

Contemporaneous to Houlihan Lokey's determination of the value-to-par multiples range of 81.2% to 83.2% (with a mid-point of 82.2%) for the loans, on May 16, 2008 Morgan Stanley presented an analysis to the ResCap Board of the estimated recovery of ResCap's portfolio of assets under two premises: an orderly liquidation and a rapid liquidation.[2362] Morgan Stanley estimated the recovery of the Resort Finance assets to range between 70.0% and 80.0% of the gross carrying value on an orderly liquidation basis and 50.0% to 70.0% of the gross carrying value on a rapid liquidation basis.[2363] Morgan Stanley's analysis under the orderly liquidation premise of value corroborates Houlihan Lokey's conclusion of an estimated recovery of the Resort Finance business assets of between 81.2% and 83.2% based on its Adjusted Book Value Method.

Using the Adjusted Book Value Method, Houlihan Lokey determined a range of enterprise value between $1.225 billion and $1.226 billion higher than its range using the Guideline Publicly Traded Company Method of $1.123 billion to $1.188 billion.

### (c) Premiums And Discounts

Customary valuation procedures use premiums and discounts related to the ownership characteristics of an equity interest for such matters as control (or lack of control) and lack of marketability. Houlihan Lokey did not apply any discounts or premiums in their analysis, though their analysis presumes that their conclusions of value were on a controlling interest basis. Houlihan Lokey used only one valuation method (i.e., the Guideline Publicly Traded Company Method, to which 50% weight was applied) that would ordinarily call for a control premium.

---

[2360] *Id.* at 33.

[2361] *See id.* at 34–35.

[2362] Morgan Stanley Project Duvall Board of Directors Presentation, dated May 16, 2008 [CCM00012048].

[2363] Morgan Stanley Project Duvall Board of Directors Presentation, dated May 16, 2008, at 15–16 [CCM00012048].

Based on the determination that the Guideline Publicly Traded Company Method is not a reliable indicator of the Fair Market Value of Resort Finance, the issue of premiums and discounts does not have an impact on the Fair Market Value assessments herein.

### (d) Overall Assessment Of Third-Party Conclusion Of Value

As discussed above, Houlihan Lokey's Adjusted Book Value Method concluded on a range of enterprise values between $1.225 billion and $1.225 billion. The Examiner's Financial Advisors considered the impact on Houlihan Lokey's conclusion of applying 100% weight to this approach, which resulted in a range of equity value of $101.7 million to $132.2 million, with a mid-point of $116.9 million, as summarized in the table below:

EXHIBIT V.F.4.c(4)(d)—1
**Modified Conclusion of Value Based on Houlihan Lokey's Asset-Based Approach**
*($ in Millions)*

|  | Low | | High | |
|---|---|---|---|---|
| Concluded EV from operations | $ | 1,225.3 | $ | 1,255.8 |
| *Plus:* Cash & cash equivalents | | 1.4 | | 1.4 |
| *Less:* GMAC Facility | | 750.0 | | 750.0 |
| *Less:* Deutsche Bank Facility | | 375.0 | | 375.0 |
| Indicated range of value | | 101.7 | | 132.2 |
|  |  |  |  |  |
| Concluded value (mid-point) | $ | 116.9 | | |

*Source: Houlihan Lokey Valuation Analysis of Resort Finance as of June 30, 2008, dated July 24, 2008 [ALLY_0102229].*

Houlihan Lokey's range of concluded enterprise value from operations of $1.225 billion to $1.256 billion reflected in the table above was calculated based on Houlihan Lokey's determination of a range of low to high value-to-par multiples, stated as a percentage. Although Houlihan Lokey analyzed each component of the Resort Finance portfolio separately, in the aggregate, the mark to Fair Market Value ranged from 81.2% to 83.2% across the entire portfolio,[2364] with a mid-point of 82.2%. In Houlihan Lokey's analysis, this range was applied to the gross carrying amount of the Resort Finance portfolio prior to the deduction of valuation reserves. In the purchase price calculation for the First Amendment however, the 82% mark, which apparently corresponds to the mid-point of Houlihan Lokey's Adjusted Book Value Method (i.e., 82.2%), was applied to the net carrying value of the portfolio (i.e., net of valuation reserves). Correcting this apparent error would result in would be an increase to the purchase price calculated in the First Amendment. This increase would partially be offset, however, by the deduction of the approximately $15 million in liabilities excluded in error, as described previously. The net result of these two adjustments to the calculation contained within the First Amendment is a purchase price of $108.3 million (as summarized in the table below), which is not materially different from the actual $111.1 million adjusted purchase price (or the $116.9 million calculated in the table above).

---

[2364] Houlihan Lokey Valuation Analysis of Resort Finance as of June 30, 2008, dated July 24, 2008, at 34 [ALLY_0102229].

EXHIBIT V.F.4.c(4)(d)—2
**Correction of Purchase Price Calculation per the First Amendment**
*($ in Millions)*

|  | Carrying Value | Mark | Adj. Value |
|---|---|---|---|
| Loan portfolio | $ 1,490.7 | 82% | $ 1,222.4 |
| Interest receivable | 13.0 | 82% | 10.7 |
| Other receivables | 13.0 | 82% | 10.7 |
| Other assets | 3.6 | 82% | 3.0 |
| Other liabilities | (14.7) | 100% | (14.7) |
| Concluded Enterprise Value from operations | | | 1,232.0 |
| *Plus:* Cash & cash equivalents | | | 1.4 |
| *Less:* GMAC Facility | | | 750.0 |
| *Less:* Deutsche Bank Facility | | | 375.0 |
| Concluded value | | | $ 108.3 |

*Source: Resort Finance Net Assets, dated June 30, 2008 [PWC09192].*

### (5) Conclusion Regarding Reasonably Equivalent Value

Based on the above discussion and analysis and the totality of the circumstances including but not limited to Houlihan Lokey's valuation and potential adjustments thereto, the First Amendment, Morgan Stanley's fairness opinion, Bear Stearns' failed sale attempt, Morgan Stanley's orderly liquidation analysis, the $15 million post-closing correction of the purchase price, and other potential adjustments to the calculation of the purchase price reflected in the First Amendment the Examiner concludes that the evidence supports the proposition that RFC and GMAC Canada received reasonably equivalent value in the Resort Finance Sale.

### d. Excess Servicing Rights Sales By GMAC Mortgage To Cerberus In July 2008

Following two auctions, on July 14 and 15, 2008, GMAC Mortgage, a wholly owned subsidiary of ResCap, agreed to sell Cerberus (the highest bidder in each auction) certain excess servicing rights on two populations of loans consisting of $13.8 billion in unpaid principal balance of Freddie Mac loans and $24.8 billion in unpaid principal balance of Fannie Mae loans, capturing $591.2 and $981.9 million of notional interest-only securities, respectively. The sales closed on July 30, 2008 and GMAC Mortgage received net cash proceeds of $175.1 million.[2365]

---

[2365] Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2009), at 90. ResCap received approximately $282 million in cash receipts from the sales. *See* Residential Capital, LLC, Current Report (Form 8-K) (Aug. 5, 2008) (referencing the $105.3 million and $176.7 million in proceeds from the two sales). The difference between the $282 million in cash receipts and $175.1 million in net proceeds relates ResCap's repayment of a Citibank MSR facility, for which ResCap's excess servicing rights were collateral. *See* ResCap Daily Liquidity Rollforward (July 31, 2008) [CERB007342] (referencing the pay down of the Citi MSR facility); Memorandum, Pentalpha Capital, LLC Loan Sale Review, dated July 16, 2008, at RC40006641 [RC40006611] (referencing estimated proceeds of $166 million).

Pentalpha was engaged to provide oversight of the auction process, and to review bid levels and the overall economics of the transaction.[2366] Pentalpha opined that "the ResCap sales team used commercially reasonable efforts to solicit the interest of the most likely buyers for this particular asset type" and that "the auction of the two excess interest strip securities was conducted in a fair and equitable fashion and in line with the stated objective of achieving the highest and best price for the assets, taking into consideration the market conditions under which the auction was held."[2367]

As set forth in the discussion and analysis below, and based on the totality of the circumstances, the Examiner concludes that the evidence supports the proposition that GMAC Mortgage received reasonably equivalent value in the Excess Servicing Rights Sales.

### (1) Overview Of Excess Servicing Fees And GMAC Mortgage

#### (a) Excess Servicing Rights

Mortgage servicing rights arise from a contractual agreement to service a mortgage, which commonly entails collecting monthly mortgage payments, setting aside taxes and insurance premiums in escrow, and forwarding interest and principal to the mortgage lender. The servicer receives a fee normally calculated as a per annum percentage of the outstanding balance payable monthly in return for providing these administrative services.[2368]

After deducting the required mortgage servicing fee from the borrower note rate, additional interest in excess of the pass-through rate required by the investor may remain. This additional amount of interest is considered an "excess servicing fee" (or "excess servicing rights") and is often retained by the holder of the base MSR. Excess servicing rights are a form of cash flow associated with future interest only ("I/O") income (i.e., it does not include ancillary income, such as float and late fees).[2369]

The market has different avenues for securitizing this excess I/O, including Fannie Mae strips and Freddie Mac strips. Nearly every large mortgage servicer has issued excess I/O strips in the past, including Citibank, Wells Fargo, Bank of America, Chase, and PHH Mortgage; however, such securitizations are less frequent because of the need to accumulate sufficient amounts to make the transaction costs viable.[2370]

---

[2366] Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, July 11, 2008, at RC40005805–6 [RC40005652].

[2367] Memorandum, Pentalpha Capital, LLC Loan Sale Review, dated July 16, 2008, at RC40006640 [RC40006611].

[2368] STM, Excess Servicing Right Sale to Cerberus, at EXAM00220388 [EXAM00220386].

[2369] Ally Bank Excess Servicing Transaction Presentation, at 2 [ALLY_PEO_0065951].

[2370] *Id.*

### (b) GMAC Mortgage Excess Servicing Rights

GMAC Mortgage transferred portfolios of mortgage loans in its normal course of business to Fannie Mae and Freddie Mac in standard securitization structures.[2371] "[GMAC Mortgage] acted as a servicer of the mortgage loans" under the terms of these transfers and:

> was entitled to retain a portion of the collections on each mortgage loan as its servicing fee. The servicing fee had two components: a minimum servicing fee, which equaled [25 bps] per annum on the outstanding balance of the mortgage loan; and the balance of the servicing fee, which constituted an "excess servicing fee.[2372]

"[GMAC Mortgage]'s rights to receive servicing fees were contractual rights to receive specified amounts from collections on the mortgage loans. By agreeing to reduce its servicing fees (in the amount of the excess servicing fee)," and retain only its minimum servicing fee, "GMAC Mortgage reduced its contractual claim relating to" the cash flows from excess servicing fees, which made "it possible for the corresponding portion of those cash flows to instead be used for [distribution] on the [excess I/O] strips."[2373]

### (2) Summary Of Transaction And Process

ResCap entered into a Master Agreement with Pentalpha on June 24, 2008, in which Pentalpha agreed to assist ResCap with addressing its liquidity needs through auctions of certain assets.[2374] ResCap later engaged Pentalpha on July 14, 2008 specifically to provide oversight of the auction for the Fannie Mae and Freddie Mac stripped I/O certificates held by GMAC Mortgage, and to review bid levels and the overall economics of the transaction.[2375]

---

[2371] STM, Excess Service Right Sale to Cerberus, at EXAM00220388 [EXAM00220386].

[2372] *Id.*

[2373] *Id*.

[2374] *See* E-mail from T. Dwyer (July 13, 2008) [CERB014452]; Draft Incorporation of Master Agreement between ResCap and Pentalpha Capital, LLC [CERB014453].

[2375] Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, July 11, 2008, at RC40005805–6 [RC40005652]. At the board meeting Weintraub noted that the transaction was part of ResCap's $650 million "as is/where is" auction. *Id.* at RC40005805. This may have been a misstatement as the transaction is subsequently reported in ResCap's SEC filings as forming part of a standalone $300 million commitment by Cerberus to purchase certain mortgage-related assets from ResCap. Residential Capital, LLC, Current Report (Form 8-K) (Aug. 5, 2008), at Item 1.01.

ResCap considered the securities to be "relatively unique in nature," and determined that it would not likely benefit from a broad marketing effort of the I/O certificates.[2376] ResCap's trading personnel elected to solicit bids from five potential investors: Freddie Mac, Fannie Mae, Lehman, Goldman Sachs, and Cerberus, because these institutions were considered to be the most likely buyers of this particular asset type. Pentalpha was of the opinion that despite the relatively small number of institutions, the inclusion of the Wall Street broker-dealers (Lehman and Goldman Sachs) effectively enhanced the distribution leverage. Further, Pentalpha offered the view that in addition to bidding for their own investment portfolio, these investment banking firms would also likely be motivated to bid for these assets if they believed their clients, of which ResCap might not be aware, would subsequently show interest.[2377]

ResCap provided collateral tapes containing detailed loan-level information to the prospective bidders on Wednesday, July 9, 2008, along with instructions to submit bids by the market close on Friday, July 11, 2008. Pentalpha reviewed the collateral tapes and deemed them to contain sufficient detail for the purpose of collateral analysis by sophisticated investors. Pentalpha also considered the due diligence period of three days to be an adequate timeframe for the formulation of bids.[2378]

ResCap received four initial bids on Friday, July 11, 2008 for the Fannie Mae assets. However, each bid was below the levels anticipated by ResCap trading personnel, and the auction accordingly was cancelled on Monday, July 14, 2008. Cerberus and Goldman Sachs submitted refreshed bids on July 15, 2008, and ResCap reopened the auction and executed the trade with the highest bidder, Cerberus. Pentalpha noted that while the process disadvantaged Cerberus, which also submitted the highest initial bid, the bids from the second round were more than $3 million closer to the pre-bid expectations (albeit revised downward).[2379]

In the case of the Freddie Mac assets, ResCap received four initial bids on Monday, July 14, 2008. Cerberus and Goldman Sachs were again the two highest bidders and were both invited to submit a second, final bid. Both bidders increased their bids from the first round, but Cerberus's final bid was the highest and was deemed acceptable because of its close proximity to pre-bid expectations.[2380]

---

[2376] Memorandum, Pentalpha Capital, LLC Loan Sale Review, dated July 16, 2008, at RC40006638 [RC40006611].

[2377] Id.

[2378] Id. at RC40006638, 40.

[2379] Id. at RC40006638–39.

[2380] Id. at RC40006639.

The ResCap Board created the Special Committee of Independent Directors on July 14, 2008, the same day as the auctions, to make certain decisions regarding transactions with affiliates of ResCap.[2381] On the day it was created, the Special Committee of Independent Directors recommended approval of the auctions, even though the Fannie Mae auction had not yet concluded, and a reserve position was later approved by the ResCap Board by written consent.[2382] Considerable discussion reportedly transpired regarding the establishment of a reserve position and monitoring of the auction process to ensure the transaction was reasonably priced and consistent with market terms based on similar transactions. The ResCap Board's written consent resolved that: (1) if the reserve position was met; (2) if Cerberus's bid was the highest received in the auction; and (3) if at least one other bona fide bid was received from a non-affiliated party, then the sale of the excess servicing rights by GMAC Mortgage to Cerberus (as the highest bidder) would be deemed authorized and approved. The ResCap Board further resolved that, after review and discussion of the recommendation of the Special Committee of Independent Directors, any sale to Cerberus pursuant to the auction process, and in accordance with the foregoing stipulations, would be deemed to have been completed on terms not materially less favorable to ResCap and its relevant subsidiaries than those that could reasonably have been obtained in a comparable arm's-length transaction by ResCap or such subsidiary with an unaffiliated party.[2383]

The Special Committee of Independent Directors later reviewed the results of the auctions including the memorandum containing Pentalpha's opinions and ratified its previous recommendation that the ResCap Board approve the sale to Cerberus in these circumstances.[2384] The ResCap Board subsequently resolved on July 30, 2008, that, based upon such ratification and further recommendation by the Special Committee of Independent Directors, the sale of assets to Cerberus be authorized and approved.[2385]

GMAC Mortgage, Ally Securities (acting as an intermediary on the Fannie Mae Sale),[2386] and Cerberus executed Purchase Agreements on the same day, July 30, 2008,[2387] for the

---

[2381] Unanimous Written Consent of the Board of Directors of Residential Capital, LLC, dated July 14, 2008, at RC00017276 [RC00017276].

[2382] *Id.* at RC00017279.

[2383] *Id.*

[2384] Unanimous Written Consent of the Special Committee of Independent Directors of Residential Capital, LLC, dated July 25, 2008, at RC40006633–41 [RC40006611].

[2385] Written Consent of the Board of Directors of Residential Capital, LLC, dated July 30, 2008 [RC00017286].

[2386] Purchase Agreement between GMAC Mortgage and RFS, dated July 30, 2008 [EXAM31874759]; *see also* Letter from Mayer Brown to GMAC Mortgage (July 30, 2008) [PWC11075]; Letter from Fannie Mae to GMAC Mortgage (July 24, 2008) [PWC11032].

[2387] Residential Capital, LLC, Quarterly Report (Form 10-Q) (Nov. 10, 2008), at Ex. 10.2, Ex. 10.3.

excess servicing rights on the two populations of loans consisting of $13.8 billion in unpaid principal balance of Freddie Mac loans and $24.8 billion in unpaid principal balance of Fannie Mae loans, capturing $591.2 million and $981.9 million of notional interest-only securities, respectively. The sales closed on July 30, 2008 and GMAC Mortgage received net cash proceeds of $175.1 million after paying an associated obligation to Citibank.[2388]

Cerberus previously had executed a commitment letter on June 2, 2008 to purchase certain assets identified by ResCap for consideration consisting of $300 million in net cash proceeds.[2389] The Excess Servicing Rights Sales, together with Cerberus's firm bid in the September 2008 Model Home Sale, satisfied Cerberus's obligations under its $300 million commitment letter.[2390]

### (3) Summary Of FMV Indicia

As discussed in Section III, at the time of this auction, Wall Street firms were already experiencing the economic turmoil that would eventually lead to Fannie Mae and Freddie Mac being placed into conservatorship, Lehman filing bankruptcy, and Goldman Sachs receiving a $5 billion cash infusion from Berkshire Hathaway, in September 2008. Given this context, many Wall Street firms likely would have had little, if any, appetite to bid for the excess servicing right I/O strips without having identified a buyer.

After the failure of the first auction of the Fannie Mae I/O strips on July 14, 2008, when the reserve level was not achieved, the subsequent auction successfully increased the transaction price relative to pre-bid expectations (albeit revised downward). The second round of bidding on the Freddie Mac I/O strips resulted in an absolute price increase over the first round of bidding. Finally, there were multiple independent bidders and Cerberus competed with Goldman Sachs in the final pricing of both auctions.

### (4) Conclusion Regarding Reasonably Equivalent Value

Based on the above discussion and analysis and based on the totality of the circumstances, including the nature of the auctions, Pentalpha's memorandum, and market conditions at the time of the auctions, the Examiner concludes that the evidence supports the proposition that GMAC Mortgage received reasonably equivalent value in the Excess Servicing Rights Sales.

---

[2388] Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2009), at 90.

[2389] Letter from Cerberus to ResCap (June 2, 2008), at EXAM31326401 [EXAM31326384].

[2390] Letter from Cerberus to ResCap (Aug. 1, 2008) [EXAM10283374].

     *e.   September 2008 Model Home Sale By DOA Holding Properties, LLC To Cerberus*

     *(1) Overview Of September 2008 Model Home Sale*

Following an auction, on September 30, 2008, DOA Holding Properties, LLC, a direct wholly owned subsidiary of RFC ("DOA Holding"), sold two pools of model home assets to MHPool Holdings LLC, an affiliate of Cerberus,[2391] for net cash proceeds of $59.2 million.[2392] Mark Neporent, COO and General Counsel of Cerberus, explained that these model homes were not included in the June 2008 Model Home Sale because ResCap had not yet identified them at the time of that transaction.[2393] The September 2008 Model Home Sale, together with the Excess Servicing Rights Sales entered into between GMAC Mortgage and Cerberus, satisfied a commitment by Cerberus to purchase assets from ResCap or its subsidiaries for net cash proceeds of $300 million.[2394]

As set forth in the discussion and analysis below and based on the totality of the circumstances, the Examiner concludes that the evidence supports the proposition that RFC as the equity owner of DOA Holding, and DOA Holding, received reasonably equivalent value in the September 2008 Model Home Sale.

     *(2) Summary Of Transaction And Process*

Cerberus executed a commitment letter on June 2, 2008, to purchase certain assets from ResCap for "consideration consisting of $300 million in net cash proceeds."[2395] In partial fulfillment of this commitment, on July 25, 2008, Cerberus submitted a firm bid to purchase four pools of model home assets, comprising 487 model homes and first mortgage loans secured by another 208 model homes, for $125 million, subject to an auction process.[2396] The stated purpose of Cerberus's July 25, 2008 letter was to "(i) identify the assets that are to be the subject of the Firm Bids, (ii) confirm the terms, conditions and procedures for the Auction, and (iii) set forth the terms and conditions of the Firm Bids."[2397] The auction was to be commenced and completed as soon as reasonably practicable and conducted in an arm's-

---

[2391] Purchase Agreement among ResCap, DOA Holding Properties, LLC, DOA Properties IIIB (KB Models), LLC and MHPool Holdings LLC, dated Sept. 30, 2008 [CERB000010].

[2392] Seller's Certificate, dated Sept. 30, 2008 [CERB000184].

[2393] Int. of M. Neporent, Feb. 6, 2013, at 118:3–120:19.

[2394] Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2009), at 90; Draft Letter from Cerberus to ResCap (Aug. 1, 2008) [EXAM10144390].

[2395] Letter from Cerberus to ResCap (June 2, 2008), at EXAM31326401–04 [EXAM31326384].

[2396] Letter from Cerberus to ResCap (July 25, 2008) [CERB000001]; Letter from Cerberus to Investors (undated), at CERB033227 [CERB033224].

[2397] Letter from Cerberus to ResCap (July 25, 2008), at CERB000001 [CERB000001].

length transaction through the retention of Houlihan Lokey or another nationally recognized broker. Cerberus also retained the right to withdraw its firm bid on any of the pools in the event that more than 25% of the pool had been sold prior to the conclusion of the auction.[2398]

Cerberus and ResCap amended the $300 million commitment letter on August 1, 2008, agreeing that Cerberus's obligations therein had been satisfied fully through: (1) Cerberus's participation in the Excess Servicing Rights Sales that closed the day before on July 30, 2008; and (2) Cerberus's $125 million firm bid to purchase the four pools of model homes assets.[2399]

As of August 6, 2008, Houlihan Lokey, acting as financial advisor to RFC, had begun to contact other potential investors regarding the auction of the four pools of model home assets.[2400] By August 15, 2008, Houlihan Lokey had contacted fifty-four potential investors, fifteen of whom (including Cerberus) had executed confidentiality agreements and been provided data room access to analyze the four pools of model home assets.[2401] Houlihan Lokey expected to receive preliminary bid proposals by August 28, 2008, complete the auction by September 30, 2008, and close the transaction by October 15, 2008.[2402]

The Special Committee of Independent Directors convened a telephonic meeting on September 23, 2008, to discuss and compare the bids from Cerberus and the only other bidder in the auction whose overall preliminary bid exceeded Cerberus's—Dubose Model Homes USA ("Dubose").[2403] The Independent Directors were provided a bid comparison sheet indicating that Dubose's bid exceeded Cerberus's bid by approximately $5.4 million.[2404] Young and Hamzehpour noted, however, that Cerberus's bid expired on September 30, 2008, that Cerberus was unlikely to extend the deadline, and that Dubose had indicated its final bid could not be submitted until October 6, 2008.[2405] Young emphasized the importance of closing the sale by no later than October 15, 2008, which Cerberus had committed to do, and stated his concern that the time frame required by Dubose instead would result in a closing at the end of October.[2406]

---

[2398] Letter from Cerberus to ResCap (July 25, 2008) [CERB000001].

[2399] Letter from Cerberus to ResCap (Aug. 1, 2008) [EXAM10283374].

[2400] Houlihan Lokey Presentation Regarding RFC Model Home Sale Process Update, dated Aug. 15, 2008, at 4 [CERB022285].

[2401] *Id.* at 1–3.

[2402] *Id.* at 4.

[2403] Minutes of a Meeting of the Special Committee of the Independent Directors of the Board of Residential Capital, LLC, Sept. 23, 2008, at RC40006676–77 [RC40006611].

[2404] RFC Model Home Portfolio Bid Summary, dated Sept. 23, 2008 [CCM00519193].

[2405] Minutes of a Meeting of the Special Committee of the Independent Directors of the Board of Residential Capital, LLC, Sept. 23, 2008, at RC40006676 [RC40006611].

[2406] *Id.*

After this discussion, the Special Committee of Independent Directors requested that RFC approach Dubose to determine if it would submit a firm bid without a financing contingency by September 29, 2008, and be prepared to close by October 15, 2008, if its bid was accepted. This would allow time to accept Cerberus's bid prior to its September 30, 2008 expiration if the Special Committee of Independent Directors deemed Dubose's bid to be inadequate.[2407]

The Special Committee of Independent Directors convened another telephonic meeting two days later on September 25, 2008 to obtain an update on Hamzehpour's discussion with Dubose. Hamzehpour reported that Dubose would be unable to submit a firm bid prior to September 30, 2008. The Special Committee of Independent Directors then authorized Hamzehpour to pursue the sale of model homes (i.e., all four pools of model home assets) to Cerberus in accordance with the terms previously presented.[2408]

In a letter dated September 25, 2008, Cerberus acknowledged its understanding that it was the winning bidder on all four pools and that, with respect to pools 1 and 2, it intended to work with ResCap in good faith to close the transaction by September 30, 2008.[2409] Cerberus also noted, however, that more than 25% of the assets in pools 3 and 4 had been the subject of a sale and, in accordance with its July 25, 2008 firm bid, executed its right to withdraw its bids on pools 3 and 4.[2410]

On September 30, 2008, DOA Holding and DOA Properties IIIB (KB Models), LLC, each a wholly owned subsidiary of RFC, and ResCap executed a purchase agreement with MHPool Holdings LLC, an affiliate of Cerberus,[2411] for the sale of approximately 487 model homes in exchange for cash consideration consisting of approximately $80 million (corresponding to Cerberus's July 25, 2008 firm bid on pools 1 and 2). The purchase price was subject to certain adjustments, primarily relating to the sales of homes in the ordinary course after June 30, 2008, resulting in a net purchase price of $59.2 million.[2412] The diagram below provides a summary of the assets and value exchanged in the September 2008 Model Home Sale.

---

[2407] *Id.*

[2408] Minutes of a Telephonic Meeting of the Independent Committee of the Board of Directors of Residential Capital, LLC, Sept. 25, 2008, at RC40006678–83 [RC40006611].

[2409] Letter from Cerberus to ResCap (Sept. 25, 2008) [CERB000009].

[2410] *Id.*

[2411] Purchase Agreement among ResCap, DOA Holdings Properties, LLC, DOA Properties IIIB (KB Models), LLC and MHPool Holdings LLC, dated Sept. 30, 2008 [CERB000010].

[2412] Seller's Certificate, dated Sept. 30, 2008 [CERB000184]; Letter from Cerberus to ResCap (July 25, 2008) [CERB000001].

EXHIBIT V.F.4.e(2)
**September 2008 Model Home Sale Transaction**



**Source:** *Purchase Agreement among ResCap, DOA Holdings Properties, LLC, DOA Properties IIIB (KB Models), LLC, and MHPool Holdings LLC, dated Sept. 30, 2008 [CERB000010]; Seller's Certificate, dated Sept. 30, 2008 [CERB000184]; Letter from Houlihan Lokey to Peter Rumbold (Aug. 28, 2008) [CERB013934].*

### (3) Summary Of FMV Indicia

As noted previously, on July 10, 2008 Young asked Brian Murray, managing director at ResCap, for his view of the IRR implied by Cerberus's bid, to which Murray responded, "I do not believe we would be able to get bids with an IRR much lower than 20%."[2413] Murray's assessment apparently was premised on "two large bids in process in which Lennar will be buying back their models (in the CMH) at an IRR in 20% range, and Jack Buck . . . looking to buy us out (ResCap) in the same 20% IRR range."[2414] Young responded, "[t]his would leave me to believe that their bid is in the fair value range for a bulk sale. Then our decision is do we take the cash now or run it out over two years, or some combination of both, if possible."[2415] Young forwarded Murray's analysis to Marano and Weintraub on the same day, commenting:

> Bottom line, this analysis indicates it would take us around 2 years to sell off the model homes at a cash [NPV] of approx. 15% higher than [Cerberus's] bid. However, the NPV is discounted at 10% which is low to me. I've asked the team to run at a yield to [Cerberus] – it looks like will be around 20% which doesn't seem out of line.[2416]

Young's observation is corroborated by the fact that through the arm's-length auction process conducted by Houlihan Lokey, which included non-affiliate bidders, only one preliminary bid and no firm bids exceeded Cerberus's firm bid.

### (4) Conclusion Regarding Reasonably Equivalent Value

Based on the above discussion and analysis and the totality of the circumstances, including but not limited to an auction process that included non-affiliate bidders and was conducted by a nationally recognized broker in an arm's-length manner, the degree of differential between the bids received, and the temporal and contingent factors surrounding such bids, the Examiner concludes that the evidence supports the proposition that RFC as the equity owner of DOA Holding, DOA Holding, received reasonably equivalent value in the September 2008 Model Home Sale.

### f.   ResMor Sale By GMAC Canada To AFI In January 2009

On January 1, 2009, AFI acquired from GMAC Canada, a wholly owned subsidiary of RFC, all of the outstanding shares in ResMor for C\$82 million (approximately \$67 million as of

---

[2413] E-mail from B. Murray to J. Young (July 10, 2008) [EXAM10399483].

[2414] *Id.*

[2415] E-mail from J. Young to B. Murray (July 10, 2008) [EXAM10399483].

[2416] E-mail from J. Young to T. Marano and J. Weintraub (July 10, 2008) [EXAM12115217].

December 31, 2008). ResMor had been acquired by GMAC Canada from a third party only one year earlier in November 2007 for C$53.8 million.[2417] GMAC Canada invested another C$25 million in the company in December 2007, bringing its total investment in ResMor to C$78.5 million through the end of 2007.[2418]

Prior to closing, Goldin Associates delivered a fairness opinion dated December 3, 2008, to the Special Committee of Independent Directors indicating that the consideration to be received in the transaction was fair from a financial point of view to ResCap and its creditors (other than AFI).[2419] On December 4, 2008, Sandler O'Neill delivered a fairness opinion to the AFI Board that the consideration to be paid in the transaction was fair to AFI from a financial point of view.[2420]

As set forth in the discussion and analysis below and based on the totality of the circumstances, the Examiner concludes that the evidence supports the proposition that RFC as the equity owner of GMAC Canada, and GMAC Canada, received reasonably equivalent value in the ResMor Sale.

### (1) Overview Of ResMor

ResMor's principal business involved the origination, sale, and administration of mortgage loans through a federally chartered Canadian trust company whose operations were regulated by Canada's Office of the Superintendent of Financial Institutions. The mortgage loans were sold to investor-clients either directly or through securitization programs. ResMor also serviced the majority of mortgage loans sold to investor clients.[2421]

ResMor was also an approved lender for credit insurance by the Canada Mortgage and Housing Corporation and Genworth Financial Mortgage Insurance Company Canada, and an approved issuer of National Housing Act mortgage-backed securities. ResMor was headquartered in Calgary with an office in Toronto, and operated in all of the Canadian

---

[2417] Draft Goldin Associates Presentation to the Committee of Independent Members of the Board of Directors of Residential Capital, LLC Regarding the Purchase of ResMor Trust Company by GMAC, LLC, dated Dec. 2, 2008, at 10 [GOLDIN00127218].

[2418] *See id.*

[2419] Opinion Letter from Goldin Associates to the Committee of Independent Members of the Board of Directors of ResCap (Dec. 3, 2008) [RC00027945].

[2420] Opinion Letter from Sandler O'Neill & Partners, L.P. to the Board of Directors of GMAC, LLC (Dec. 4, 2008) [SOP0000653].

[2421] ResCap STM, ResMor Sale to AFI, at EXAM00220432 [EXAM00220430].

provinces except Quebec.[2422] Although ResMor had approximately 260 employees (i.e., 100 in loan servicing, sixty-five in underwriting, fifty administrative, thirty in information technology, and fifteen in marketing/production), it relied upon ResCap for staffing assistance.[2423]

ResMor held approximately C$425 million in HFI and HFS loans and serviced approximately C$5.9 billion in mortgage loans at the time of its sale to AFI.[2424] ResMor's revenue consisted of origination gains on the sale of residential mortgage loans, interest and other income from loans held until maturity, and servicing revenue from loans under administration.[2425] The table below provides a summary of ResMor's historical income statement leading up to the sale.[2426]

EXHIBIT V.F.4.f(1)
**ResMor Historical Income Statement**
*(C$ in Millions)*

|  | 12/31/2006 | 12/31/2007 | YTD 10/31/2008 |
|---|---|---|---|
| Originations | $ 1,394.4 | $ 2,228.2 | $ 1,799.2 |
| Mortgage loans sold | 1,508.5 | 2,075.2 | 1,886.9 |
| | | | |
| Net interest income | $     4.2 | $     5.1 | $     2.4 |
| Mortgage banking revenue | 16.8 | 27.0 | 43.9 |
| Other revenue | 1.3 | 2.0 | 2.1 |
| Total revenue | $   22.3 | $   34.1 | $   48.4 |
| | | | |
| Total expenses | 19.5 | 26.8 | 25.1 |
| Income before taxes | $     2.9 | $     7.3 | $   23.3 |

*Source: Draft Goldin Associates Presentation to the Committee of Independent Members of the Board of Directors of Residential Capital, LLC Regarding the Purchase of ResMor Trust Company by GMAC, LLC, dated Dec. 2, 2008 [GOLDIN00127218].*

ResMor had no branch network. It relied on brokered customer deposits that were insured by the Canada Deposit Insurance Corporation, to fund its business. Its growth was both fueled and limited by its access to equity capital. ResMor's equity grew from C$25 million on December 31, 2006, to C$71 million on October 31, 2008, because of growth in earnings and a C$25 million investment from ResCap in December 2007.[2427]

---

[2422] Draft Presentation to the Committee of Independent Members of the Board of Directors of Residential Capital, LLC Regarding the Purchase of ResMor Trust Company by GMAC, LLC, dated Dec. 2, 2008, at 9 [GOLDIN00127218].

[2423] *Id.*

[2424] *Id.*

[2425] *Id.*

[2426] *Id.* at 13.

[2427] *Id.* at 9.

Before the sale to AFI, credit concerns about ResCap and AFI led counterparties to terminate ResMor's repurchase and swap lines of credit, thereby limiting ResMor's ability to hedge pipeline and inventory exposure. In response, as of October 31, 2008, ResMor had built a relatively large excess cash balance of C$282.5 million (or, cash on hand less C$75 million).[2428] Because ResMor's growth was limited by its capital ratio constraints, equity capital that could have been used to support growth in mortgage loan assets was instead being used to support excess cash balances.[2429] The resulting negative spread on excess cash balances was becoming a drag on ResMor's earnings.[2430]

### (2) Summary Of Transaction And Process

The idea of selling ResMor to AFI was suggested as early as August 2008 by Jerry Lombardo.[2431] The transaction was discussed by the ResCap Board at various board or committee meetings as early as October 10, 2008.[2432] Following the ResCap Board meeting on October 10, 2008, the Independent Directors held a telephonic meeting with their counsel, Morrison Cohen, to discuss the proposed sale of ResMor to an affiliate.[2433] The Independent Directors held another telephonic meeting on November 3, 2008, to discuss the proposed sale and agreed that Morrison Cohen would continue its discussions with various parties regarding a fairness opinion.[2434]

Materials prepared for the October 28, 2008 ResCap Board meeting stated that "book value is solid, therefore would not sell for anything less than book value," went on to state that "our valuation work supports a range of 1.2x to 1.7x tangible book or C$80 to C$120 million" and also noted that AFI has offered C$82 million in cash.[2435] Materials prepared for the AFI Board dated October 31, 2008 indicated that C$82 million was 1.15x book value as of September 30, 2008 and that certain publicly traded guideline companies traded in a range of 1.0x to 1.1x tangible book value.[2436]

---

[2428] *Id.* at 10.

[2429] *Id.* at 10, 14.

[2430] *Id.* at 10.

[2431] *See* E-mail from J. Lombardo to S. Ramsey (Aug. 11, 2008) [EXAM10176312] (discussing possible sale of ResMor to AFI).

[2432] *See* Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Oct. 10, 2008, at RC40005881 [RC40005652].

[2433] Minutes of a Telephonic Meeting of the Independent Committee of the Board of Directors of Residential Capital, LLC, Oct. 10, 2008, at RC40006686 [RC40006611].

[2434] Minutes of a Telephonic Meeting of the Independent Committee of the Board of Directors of Residential Capital, LLC, Nov. 3, 2008, at RC40006691 [RC40006611].

[2435] ResCap ResMor Trust Valuation Analysis Presentation, dated Oct. 28, 2008, at RC00018978 [RC00018958].

[2436] *See* Board Meeting, ResCap Support Actions, dated Oct. 31, 2008, at 2 [ALLY_0230517].

Sandler O'Neill was retained on October 20, 2008 by AFI to prepare a fairness opinion.[2437] Once a decision was made to proceed with the sale to AFI, the transaction moved quickly. Minutes for the November 12, 2008, ResCap Board meeting reflect that AFI was willing to close as quickly as November 14, 2008,[2438] and a draft term sheet was prepared by November 13, 2008.[2439]

At least two other potential buyers were contacted about acquiring ResMor. Before approving the transaction, inquiry was made to find out whether they were still interested in acquiring ResMor. One potential buyer was not responsive, while the other needed to raise funding for the transaction and could not close in a timely manner.[2440]

Although no third-party valuation was performed for this transaction, as was the case in certain other sales to AFI Affiliates, the Special Committee of Independent Directors did retain Goldin Associates on November 17, 2008 to prepare a fairness opinion on the proposed sale of ResMor to AFI.[2441]

The transaction was approved by the ResCap Board on November 20, 2008, by written consent, which noted that the Special Committee of Independent Directors (established on July 14, 2008, to review and approve affiliate transactions over $10 million) had approved the transaction.[2442] No separate minutes for the Special Committee of Independent Directors approving this transaction were located in the Investigation.

On the same day as the ResCap Board's approval, GMAC Canada, a wholly owned subsidiary of RFC, entered into an agreement to sell all of the outstanding shares of 1020491 Alberta Ltd ("Alberta Ltd") and all of its shares of ResMor to AFI for C$82 million (approximately US$67 million as of December 31, 2008).[2443] Alberta Ltd owned the other outstanding shares of ResMor, so the purchaser acquired 100% of ResMor and 100% of

---

[2437] Letter from Sandler O'Neill & Partners, L.P. to AFI Board (Oct. 20, 2008) [SOP0000579].

[2438] Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Nov. 12, 2008, at 2 [RC00017340].

[2439] Non-Binding Offer to Acquire ResMor Trust Company, Indicative Summary of Terms, dated Nov. 13, 2008 [CCM00015169].

[2440] Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Nov. 15, 2008, at RC40005911 [RC40005652].

[2441] Engagement Letter from Goldin Associates to the Committee of the Independent Members of the Board of Directors of ResCap (Nov. 17, 2008) [EXAM00233501].

[2442] Action by Written Consent of the Board of Directors of Residential Capital, LLC, dated Nov. 20, 2008, at RC40005913–27 [RC40005652].

[2443] Share Purchase Agreement between GMAC Canada and GMAC, LLC, dated Nov. 20, 2008 [RC00025358].

ResMor Trust Company, a wholly owned subsidiary of ResMor.[2444] Concurrent with the execution of the Share Purchase Agreement, GMAC Canada and AFI also entered into the ResMor Loan Agreement, whereby GMAC Canada received proceeds of C$82 million.[2445]

On December 2, 2008, Goldin Associates presented its valuation analysis to the Special Committee of Independent Directors[2446] and, on December 3, 2008, it issued its fairness opinion indicating that the consideration to be received in the transaction was fair from a financial point of view to ResCap and its creditors (other than AFI).[2447] On December 4, 2008, Sandler O'Neill delivered a fairness opinion to the AFI Board indicating that the consideration to be paid in the transaction was fair to AFI from a financial point of view.[2448]

The transaction closed on January 1, 2009. The purchase price of C$82 million was paid via forgiveness of debt under the ResMor Loan Agreement. The purchase price was not adjusted post-closing, though early drafts of the share purchase agreement provided for such an adjustment feature.[2449]

---

[2444] Share Purchase Agreement between GMAC Canada and GMAC, LLC, dated Nov. 20, 2008, at RC00025364 [RC00025358].

[2445] Loan Agreement between GMAC Canada and GMAC, LLC, dated Nov. 20, 2008 [ALLY_0149086].

[2446] *See* Draft Goldin Associates Presentation to the Committee of Independent Members of the Board of Directors of Residential Capital, LLC Regarding the Purchase of ResMor Trust Company by GMAC, LLC, dated Dec. 2, 2008 [GOLDIN00127218].

[2447] Opinion Letter from Goldin Associates to the Committee of Independent Members of the Board of Directors of ResCap (Dec. 3, 2008) [RC00027945].

[2448] Opinion Letter from Sandler O'Neill & Partners, L.P. to the Board of Directors of GMAC, LLC (Dec. 4, 2008) [SOP0000653].

[2449] *See* Draft Share Purchase Agreement between GMAC Canada and GMAC, LLC, dated Nov. 13, 2008 [GOLDIN00093530].

The diagram below provides a summary of the value exchanged between GMAC Canada and AFI in the ResMor Sale.



EXHIBIT V.F.4.f(2)
**ResMor Sale Transaction Diagram**

Source:  Share Purchase Agreement between GMAC Canada and GMAC, LLC, dated Nov. 20, 2008 [RC00025358]; Draft Goldin Associates Presentation to the Committee of Independent Members of the Board of Directors of Residential Capital, LLC Regarding the Purchase of ResMor Trust Company by GMAC, LLC, dated Dec. 2, 2008 [GOLDIN00127218]; .

Under the June 2008 Indentures, the transaction was required to be on an arm's-length basis. The November 20, 2008 ResCap Board Written Consent included a resolution that the transaction was on terms that are not materially less favorable to the company and its relevant subsidiaries than those that could reasonably have been obtained in an arm's-length transaction by the company or such subsidiaries with an unaffiliated third party (which is the standard in the June 2008 Indentures).[2450]

[2450] Written Consent of the Board of Directors of Residential Capital, LLC, dated Nov. 20, 2008, at RC40005913–27 [RC40005652].

*(3) Internal ResCap Valuation Analysis*

The internal analysis presented to the ResCap Board dated October 28, 2008, contained an Income Approach (using the DCF Method) and a Market Approach (using the Guideline Publicly Traded Company Method) in deriving a range of equity values.[2451] The analysis in the presentation was high-level in nature and did not present significant detail. ResCap's DCF Method under the Income Approach used projections from 2009 through 2013 and applied a discount rate of between 15% and 20%. The presentation did not disclose the residual period or discount rate calculation. The range of equity value was estimated at C$84.8 million to C$126.0 million.

There are two key differences between this internal analysis and the valuation analysis prepared by Goldin Associates (which will be discussed in detail below); namely, (1) ResCap's internal analysis did not assume cash flows over the discrete projection period would be reinvested in the business to fund more loans, as Goldin Associates assumed; and (2) ResCap applied a higher discount rate than Goldin Associates. These two inputs account for much of the difference between ResCap's preliminary analysis of a valuation range between C$84.8 million and C$126.0 million, and Goldin Associates' opinion of a valuation range between C$74.8 million and C$89.1 million.

ResCap's Guideline Publicly Traded Company Method under the Market Approach was based on five companies: Home Capital Group, Equitable Group, Xceed Mortgage Corporation, Bank of Nova Scotia, and Royal Bank of Canada. The analysis equally weighted four multiples: P/NBV, P/TBVE, 2008 Forward P/E, and 2009 Forward P/E. Based on the low and high end of the range of these multiples, the analysis resulted in a wide range of value of between C$38.1 million and C$157.8 million.

The Examiner's Financial Advisors do not view the inclusion of Bank of Nova Scotia and Royal Bank of Canada in the guideline group as appropriate given the relatively smaller size and narrower scope of ResMor. Excluding Bank of Nova Scotia and Royal Bank of Canada results in lower mean and median multiples for the guideline group. In addition, the wide range of value indications somewhat limits the usefulness of the Guideline Publicly Traded Company Method in assessing the question of whether RFC as the equity owner of GMAC Canada, and GMAC Canada obtained REV in the ResMor Sale.

*(4) Summary Of Third-Party Indicia Of Value*

The Examiner's Financial Advisors reviewed and analyzed the valuations underlying the fairness opinions by Goldin Associates and Sandler O'Neill to gauge their utility as indicia of Fair Market Value.

---

[2451] Notice of a Special Meeting of the Board of Directors of Residential Capital, LLC, dated Oct. 28, 2008, at RC40008766–77 [RC40008754].

### (a) Third-Party Conclusion Of Value

In preparing its fairness opinion, Goldin Associates conducted various valuation analyses. It did not, however, arrive at an independent conclusion of value. Appendix V.F.4.f(4)(a) provides a summary of the ResMor valuation analysis performed by Goldin Associates in developing its fairness opinion. In summary, Goldin Associates ultimately relied upon three valuation methodologies: (1) DCF Method under the Income Approach; (2) Guideline Publicly Traded Company Method (placing weight on two different multiples under this methodology) under the Market Approach; and (3) Guideline M&A Method under the Market Approach, the results of which are summarized in the following table.[2452] Goldin Associates also performed an analysis under the Asset-Based Approach, on which it ultimately did not rely, as discussed further below.

EXHIBIT V.F.4.f(4)(a)
**Goldin Associates Valuation Methodologies**
*(C$ in Millions)*

|  | Weight | Low | | High | |
|---|---|---|---|---|---|
| Income Approach: | | | | | |
| DCF Method | 40% | $ | 75.7 | $ | 85.8 |
| | | | | | |
| Guideline Publicly Traded Company Method: | | | | | |
| P/TBVE Multiple | 20% | | 69.1 | | 85.3 |
| LTM P/E Multiple | 20% | | 81.8 | | 98.0 |
| | | | | | |
| Guideline M&A Method | 20% | | 71.6 | | 90.7 |
| | | | | | |
| Value range | | $ | 74.8 | $ | 89.1 |

*Source: Draft Goldin Associates Presentation to the Committee of Independent Members of the Board of Directors of Residential Capital, LLC Regarding the Purchase of ResMor Trust Company by GMAC, LLC, dated Dec. 2, 2008 [GOLDIN00127218].*

Goldin Associates concluded that the C$82 million proposed purchase price for ResMor was within the range of value implied by the various valuation methodologies and, therefore, fair to ResCap and its creditors (other than AFI).

### (b) DCF Method

Goldin Associates used management's financial projections to develop a DCF analysis. Goldin Associates described making various adjustments to management's financial projections for 2008 through 2013, as follows:

> 1. Business lines
> Only the mortgage business projections were used. Automotive and
> commercial lines of business were omitted because they do not presently exist

---

[2452] *See* Draft Presentation to the Committee of Independent Members of the Board of Directors of Residential Capital, LLC Regarding the Purchase of ResMor Trust Company by GMAC, LLC, dated Dec. 2, 2008, at 26 [GOLDIN00127218].

> 2. Funding channels
> Removed direct to consumer funding source because the company does not presently utilize such a source and because of required capital expenditures to effectuate
> 3. Mortgage origination growth
> Gradually lowered the growth rate to approach historical industry averages . . .
> 4. [GMAC Canada] conduit activity
> Added C$2 million to revenue in 2009 and 2010 to reflect [GMAC Canada] payments to ResMor for servicing of ongoing conduit activities.[2453]

From 2009 through 2013, the projected annual free cash flow to equity was assumed to be zero because 100% of the net income was assumed to be reinvested in regulatory capital. In the residual period, the assumed reinvestment rate was 33.6%. This rate was derived by taking the assumed long term growth rate in net income of 4.9% and dividing that by the ROE of 14.4% as projected in 2013. The 2013 ROE was calculated by dividing the 2013 projected net income of C$16.5 million by the projected 2013 book value of equity of C$114.5 million. This ratio of 33.6% (4.9% / 14.4%) represented the reinvestment rate, and 66.4% (100.0% - 33.6%) was the estimated payout ratio.

Using these DCF assumptions, 100% of the value conclusion was derived from the indicated value in the residual period. The residual period value was calculated using three different approaches: (1) a capitalization of cash flow using a perpetual growth rate of 4.9%;[2454] (2) a P/E exit multiple of 8.4x; and (3) a P/NBV exit multiple of 1.2x. The total equity values derived from the DCF Method using these three residual period calculations ranged from C$75.7 million to C$85.8 million.[2455]

The source for the 4.9% perpetual growth rate used in the residual value calculation was the "IMF World Economic Outlook Oct 2008." The perpetual growth rates implied by the P/E and P/NBV exit multiples were 4.0% and 3.9%, respectively. The Examiner's Financial Advisors view these perpetual growth rates in the residual period to be within the range that an appraiser would apply in the valuation of a business of this type that is a going concern.

---

[2453] *Id.* at 16.

[2454] The general model for capitalization of cash flows is $(CF \times (1+g))/k\text{-}g$ where CF is the base year cash flow, g is the long-term growth rate, and k is the discount rate.

[2455] Draft Presentation to the Committee of Independent Members of the Board of Directors of Residential Capital, LLC Regarding the Purchase of ResMor Trust Company by GMAC, LLC, dated Dec. 2, 2008, at 18 [GOLDIN00127218].

The selected P/E exit multiple of 8.4x was similar to the mean LTM P/E multiple of 8.5x estimated in the Guideline Publicly Traded Company Method. The selected P/NBV exit multiple of 1.2x was equal to the mean P/NBV multiple estimated in the Guideline Publicly Traded Company Method. This approach assumes that market multiples will not change over the discrete projection period.

*(c) Discount Rate*

The discount rate of 12.2% selected by Goldin Associates was a cost of equity based on a MCAPM using guideline company observations, such as a levered beta. Goldin Associates selected a levered beta of 0.67, which means that they assessed the volatility of ResMor's stock to be positively correlated with, but lower than, the overall market (which has as a beta of 1.0). The observed betas for the six guideline companies ranged from 0.40 to 1.04. The size premium, which was an additional risk premium used to account for the fact that investments in smaller companies are considered to require a greater return on investment, was based on a commonly cited study by Ibbotson Associates in the Stocks Bonds Bills and Inflation 2007 yearbook. The size premium selected by Goldin Associates was 3.0% and described in the report as the "Micro-Cap Size Premium." Goldin Associates' range of equity value from their DCF Method was C$75.7 million to C$85.8 million.[2456]

In reviewing the Ibbotson 2007 publication cited by Goldin Associates, it appears that the size premium for the "micro-cap" companies was 3.88% (rather than 3.0% used by Goldin Associates). However, Ibbotson's 2008 edition was available when Goldin Associates did its analysis and indicated a 3.65% micro-cap premium. If the 3.88% size premium were used, the discount rate would have been 13.12% (rather than 12.2% as calculated). Using this higher discount rate, the range of equity value from the DCF Method would decrease to a range of C$72.6 million to C$73.6 million. Given the equity value of ResMor, however, some appraisers might apply the size premium equating to the 10th decile, which would be 6.27%, or even the 10b decile, which would be 9.68%. If the analysis were to use these higher size premiums, the discount rate would be higher and, thus, the equity value would be lower still.

---

[2456] Draft Goldin Associates Presentation to the Committee of Independent Members of the Board of Directors of Residential Capital, LLC Regarding the Purchase of ResMor Trust Company by GMAC, LLC, dated Dec. 2, 2008, at 17–18 [GOLDIN00127218].

On the other hand, the unsourced 8.56% premium over the 10-year Canadian government bonds used by Goldin Associates is higher than the benchmark's commonly cited for U.S. equity risk premiums. For instance, the 2008 Ibbotson publication recommended a U.S. equity risk premium in a range of 6.2% to 7.1% over 20-year Treasuries.[2457] The Examiner's Financial Advisors do not believe that a Canadian equity risk premium would be materially different from a U.S. premium. The use of an equity risk premium of 6.5% and the 2008 micro-cap companies size premium (3.65%) would have a combined effect of reducing the discount rate and increasing value. However, the Examiner's Financial Advisors further note that Goldin Associates' selection of a beta (0.67) is unusually low for levered equity of financial services companies. A higher beta would result in a higher discount rate and lower value. Even assuming these possible adjustments to the size premium, equity risk premium, and beta were made, Goldin Associates' 12.2% discount rate likely falls within a reasonable range.

### (d) Guideline Publicly Traded Company Method

The Guideline Publicly Traded Company Method used by Goldin Associates considered four multiples: P/NBV, P/TBVE, LTM P/E, and Forward P/E. These multiples are commonly considered when valuing a financial services company such as ResMor. Goldin Associates calculated the four multiples using both (1) the stock prices as of November 19, 2008; and (2) the average stock price over a 30-day period.

Goldin Associates selected six guideline companies for consideration in applying the Guideline Publicly Traded Company Method. Based on the mean of the four multiples and the six guideline companies, Goldin Associates derived the following value ranges: P/NBV multiples were C$71.1 million to C$85.3 million; P/TBVE multiples were C$69.1 million to C$82.9 million; LTM P/E multiples were C$81.8 million to C$98.0 million; and Forward P/E multiples were considered to be not meaningful because of the depressed level of earnings projected in 2009.[2458]

---

[2457] The Examiner's Financial Advisors also considered the following sources, among others, of equity risk premium: BRADFORD CORNELL, THE EQUITY RISK PREMIUM (1999), SHANNON P. PRATT & ROGER J. GRABOWSKI, COST OF CAPITAL: APPLICATIONS AND EXAMPLES 89113 (3rd ed. 2008); SHANNON P. PRATT & ROGER J. GRABOWSKI, COST OF CAPITAL: APPLICATIONS AND EXAMPLES 117145 (4th ed. 2010); TIM KOLLER ET AL., VALUATION: MEASURING AND MANAGING THE VALUE OF COMPANIES 297306 (3rd ed. 2005); TOM COPELAND ET AL., VALUATION: MEASURING AND MANAGING THE VALUE OF COMPANIES 238245 (4th ed. 2010); and Pablo Fernandez, *The Market Risk Premium Used in 2008 by Professors: A Survey With 1,400 Answers* (IESE Bus. Sch., Working Paper, 2009), *available at* http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1344209.

[2458] Draft Goldin Associates Presentation to the Committee of Independent Members of the Board of Directors of Residential Capital, LLC Regarding the Purchase of ResMor Trust Company by GMAC, LLC, dated Dec. 2, 2008, at 21 [GOLDIN00127218].

The Examiner's Financial Advisors view the guideline companies selected by Goldin Associates as a reasonable group of companies to use as the basis for analysis. The Examiner's Financial Advisors performed a search for guideline companies and identified a group that included some of the same companies used by Goldin Associates as well as certain additional companies. In general, the mean and median multiples observed by Goldin Associates were similar to the mean and median multiples from the Examiner's Financial Advisors' group of guideline companies.

For each of the six guideline companies used by Goldin Associates, the 30-day average stock price was higher than the stock price as of November 19, 2008. This would imply that the share prices, and therefore the trading multiples, for each of these guideline companies had been generally declining over this timeframe. This trend would suggest that the estimated values for ResMor using the 30-day average stock prices, which resulted in higher indications of equity values, were less current than the value indications that were derived from the stock prices as of November 19, 2008. The Examiner's Financial Advisors adjusted the Goldin Associates analysis by substituting the market prices as of January 1, 2009 (i.e., the actual closing date), and the results were slightly lower than the value indications from the fairness opinion. The P/NBV multiples decline from a range of 1.0x to 1.2x to a range of 0.9x to 1.0x, while the LTM P/E multiples decline from a range of 7.1x to 8.5x to a range of 6.3x to 6.7x. These lower multiples translate to declines in the range of equity value from C$71.4 million to C$98.0 million to a range of C$64.6 million to C$77.6 million.

It may be difficult, however, to make a meaningful comparison of the P/NBV multiples between ResMor and the guideline companies because the book value of ResMor was adjusted upwards to reflect the purchase price at the time of its acquisition in 2007 by GMAC Canada, while certain assets of the guideline companies may be stated at historical cost less reserves. As such, the guideline company multiples could be higher than ones appropriately applicable to ResMor.

In addition, when GMAC Canada acquired ResMor on November 1, 2007, the purchase price of C$53.8 million was 1.94x NBV.[2459] On that date, these guideline companies traded at an average of 2.4x book value. Therefore, the transaction multiple for ResMor was 19% lower than the average of the guideline group of companies. Applying this 19% discount to the average guideline company P/NBV multiple of 1.0x as of the valuation date would result in a multiple of 0.81x book value and an indicated value of C$57.6 million.

### (e) Guideline M&A Method

The Guideline M&A Method employed by Goldin Associates considered eight transactions. The dates of the transactions ranged from June 27, 2002 to February 22, 2008. Goldin Associates relied on the P/NBV multiples in deriving a range of indicated equity

---

[2459] Notice of a Special Meeting of the Board of Directors of Residential Capital, LLC, dated Oct. 28, 2008, at RC40008767 [RC40008754].

values in the Guideline M&A Method. The Examiner's Financial Advisors have not identified an explanation for Goldin Associates' failure to consider earnings multiples because Goldin Associates used them for the guideline public companies. If the mean or median LTM P/E multiples were used, the resulting value from the Guideline M&A Method would be higher than the indication from using mean or median P/NBV multiples. Based on the eight transactions, the mean and median P/NBV multiples were 1.3x and 1.0x, respectively. The indicated range of equity values derived from the Guideline M&A Method was C$71.6 million to C$90.7 million.[2460]

Two common issues that generally arise when applying the Guideline M&A Method are the availability of a sufficient number of transactions contemporaneous to the valuation date and the comparability of the subject companies from the available transactions to the target company. Only one potentially comparable transaction in Goldin Associates' search results closed after November 2007, when GMAC Canada originally acquired ResMor. The acquisition of ResMor was completed at 1.9x NBV. Given the NBV of C$71.1 million as of October 31, 2008, the value of ResMor would be approximately C$135.1 million if the 1.9x book value were applied. Given the pace of change in the financial services industry in 2008, however, especially in the months leading up to the valuation date, the Guideline M&A Method most likely would provide a less reliable indication of value for ResMor compared to other methods.

### (f)  Asset-Based Approach

Goldin Associates also utilized the Adjusted Book Value Method under the Asset-Based Approach but did not ultimately rely on it. The Adjusted Book Value Method employed by Goldin Associates adjusted the book values of ResMor's assets and liabilities as of October 31, 2008 based on a range of low and high recovery estimates. In the Goldin Associates analysis, the following asset line items had a range of recovery estimates other than 100%: (1) HFS mortgage loans had a low recovery estimate of 97.7% and a high recovery estimate of 102.4%; (2) HFI mortgage loans had a low recovery estimate of 97.7% and a high recovery estimate of 102.4%; (3) retained interests had a low recovery estimate of 98.4% and a high recovery estimate of 101.6%; and (4) "[o]ther assets" had a low recovery estimate of 85.0% and a high recovery estimate of 95.0%.[2461] Goldin Associates noted that "estimates of recovery value are made by utilizing varying assumptions regarding discount rates, prepayment rates and other assumptions used by ResMor management."[2462]

---

[2460] Draft Goldin Associates Presentation to the Committee of Independent Members of the Board of Directors of Residential Capital, LLC Regarding the Purchase of ResMor Trust Company by GMAC, LLC, dated Dec. 2, 2008, at 23 [GOLDIN00127218].

[2461] *Id.* at 24.

[2462] *Id.*

In addition, Goldin Associates included unallocated 2008 net operating expenses that reduced the adjusted book values by C$4.5 million. In a footnote, Goldin Associates explained that this amount represented the after-tax expenses that GMAC Canada incurred in supporting ResMor business activities. There was no assumption of wind-down expenses because the business was assumed to be a going concern. Goldin Associates does not appear to have considered any goodwill or other intangible value not reflected on the balance sheet. Based on this analysis, the range of adjusted book values was between C$51.6 million and C$76.9 million.

Goldin Associates did not apply any weight to the Adjusted Book Value Method in deriving its concluded range of equity values.

### (g) Premiums And Discounts

GMAC Canada's interest in ResMor was a 100% controlling, closely-held interest. Consideration of the perceived value of these attributes can be quantified by an appraiser through certain premiums and discounts. For example, the Guideline Publicly Traded Company Method is often considered to provide an indication of value on a marketable, minority basis in that the market price is based on small blocks of stock traded in liquid markets. Therefore, a premium for control and a discount for lack of marketability may be warranted when applying public company valuation multiples to a 100% controlling, closely-held interest. Discounts for lack of marketability may similarly be applicable in a DCF Method or a Guideline M&A Method. Goldin Associates did not apply any discounts or premiums in their analysis. If Goldin Associates had applied a marketability discount for the closely held interest, the indicated value would have been lower.

### (h) Sandler O'Neill Fairness Opinion

AFI retained Sandler O'Neill to render a fairness opinion in connection with the ResMor Sale. As with Goldin Associates, Sandler O'Neill performed various valuation analyses to arrive at its fairness opinion from AFI's perspective. It did not arrive at an independent conclusion of value.[2463]

Sandler O'Neill employed a different approach than Goldin Associates to the valuation of ResMor because their objective was to determine whether the transaction was fair to AFI. Based on its analysis, Sandler O'Neill indicated that the ResMor Sale would create a significant benefit to the cost of funds of AFI's Canadian auto financing business.[2464] The valuation model projected the cost of funds benefit annually from 2009 through 2014.[2465]

---

[2463] *See* Sandler O'Neill Fairness Opinion Materials Prepared for Project Cub, dated Dec. 4, 2008 [SOP0000652].

[2464] *Id*. at 11.

[2465] *Id.*

After deducting expenses and taxes, Sandler O'Neill calculated the annual net savings and incremental free cash flows resulting from the impact of owning ResMor on AFI's automotive financing business.[2466]

Sandler O'Neill assumed a range of value for the existing business between C$65.0 million to C$75.0 million but presented no supporting analysis.[2467] In concluding on the range of value for ResMor from the perspective of AFI, Sandler O'Neill added the value of the existing ResMor business to the value of the incremental savings in the cost of funds.

Based on the Sandler O'Neill analysis, the total value of ResMor to AFI was a broad range of C$69.1 million and C$308.4 million.[2468] This valuation was predicated on a significant amount of financial synergies, namely savings from cost of funds. Even if this incremental value could be realized through acquiring ResMor, it is questionable that a buyer such as AFI would pay the shareholders of ResMor the value of such synergies.

When evaluating the transaction for the benefit of AFI shareholders, the premise of value employed by Sandler O'Neill most resembled an investment value from the perspective of a specific buyer. Sandler O'Neill concluded on an extremely broad range of equity values for alternative assumptions about the magnitude of low cost funding that AFI could realize through ResMor. However, albeit unsupported, their valuation for ResMor's existing business as of the transaction date was lower than the valuation by Goldin Associates.

---

[2466] *Id.* at 11, 16.

[2467] *Id.* at 17.

[2468] *Id.*

### (i)  Overall Assessment Of Fair Market Value Indicia

GMAC Canada acquired ResMor in November 2007 for C$53.8 million[2469] and subsequently invested C$25.0 million in the company in December 2007,[2470] bringing the total investment to C$78.8 million through the end of 2007. ResMor was expected to record earnings in 2008 of C$16.5 million and incur operating expenses of C$10 million that were excluded from the ResMor financials but recognized at GMAC Canada.[2471] As a result, GMAC Canada's net investment in ResMor as of the closing of the ResMor Sale was approximately C$85.3 million, as summarized in the table below.

EXHIBIT V.F.4.f(4)(i)
**Summary of GMAC Canada Investment in ResMor**
*(C$ in Millions)*

| | | |
|---|---|---|
| Value paid in November 2007 | $ | 53.8 |
| Capital contribution in December 2007 | | 25.0 |
| 2008 earnings (forecast) | | 16.5 |
| 2008 GMAC Canada operating expense (forecast) | | (10.0) |
| Projected GMAC Canada investment through 2008 | $ | 85.3 |

*Source: Draft Goldin Associates Presentation to the Committee of Independent Members of the Board of Directors of Residential Capital, LLC Regarding the Purchase of ResMor Trust Company by GMAC, LLC, dated Dec. 2, 2008 [GOLDIN00127218]; Notice of a Special Meeting of the Board of Directors of Residential Capital, LLC, dated Oct. 28, 2008 [RC40008754].*

The Examiner's Financial Advisors considered the change in stock price for the guideline public companies as identified by Goldin Associates and Sandler O'Neill between November 1, 2007, when GMAC Canada acquired ResMor, and December 31, 2008, immediately prior to the closing of the ResMor Sale. Over that timeframe, shares of most of the companies declined by more than 50%. If this level of decline were applied to GMAC Canada's total investment in ResMor, the resulting value would be less than half of the C$85.3 million noted above.

Additionally, the Examiner's Financial Advisors analyzed the change in stock prices and trading multiples between the transaction close date of January 1, 2009, and the date that the market information was obtained in the Goldin Associates fairness opinion (i.e., November 19, 2008). Overall, the trading multiples were lower as of January 1, 2009, and would result in equity values that were approximately 10% to 20% lower than the indicated value range concluded by Goldin Associates.

---

[2469] Draft Goldin Associates Presentation to the Committee of Independent Members of the Board of Directors of Residential Capital, LLC Regarding the Purchase of ResMor Trust Company by GMAC, LLC, dated Dec. 2, 2008, at 10 [GOLDIN00127218].

[2470] *Id.*

[2471] Notice of a Special Meeting of the Board of Directors of Residential Capital, LLC, dated Oct. 28, 2008, at RC40008771 [RC40008754].

### (5) Conclusion Regarding Reasonably Equivalent Value

Based upon the above discussion and analysis and the totality of the circumstances, including but not limited to the fairness opinions by Goldin Associates and Sandler O'Neill, the GMAC Canada investment in ResMor in the year before this transaction with AFI, and other market indicators, the Examiner concludes that the evidence supports the proposition that RFC, as the equity owner of GMAC Canada, and GMAC Canada received reasonably equivalent value in the ResMor Sale.

### g.  US/UK Broker-Dealer Sale By RFC To AFI In May 2009

Pursuant to a Membership Interest and Share Purchase Agreement dated March 31, 2009, on May 1, 2009,[2472] RFC sold its interests in Ally Securities and RFCIL to AFI for $42.3 million and $18.1 million, respectively (i.e., $60.4 million total).[2473] RFCIL owned all of the outstanding share capital of RFSCIL, a broker-dealer registered with the Financial Services Authority in the United Kingdom, so AFI acquired 100% of ResCap's U.K. broker-dealer business in addition to ResCap's U.S. broker-dealer business, Ally Securities.[2474] With respect to the Ally Securities interests, on April 30, 2009, AFI also paid to RFC an amount equal to the entire outstanding principal due and payable under the existing $50 million subordinated loan between RFC and Ally Securities.[2475]

Prior to closing, Goldin Associates delivered a fairness opinion dated March 20, 2009, to the Special Committee of Independent Directors indicating that the consideration to be received by ResCap in connection with the transaction was fair from a financial point of view to ResCap and its creditors (other than AFI).[2476]

As set forth in the discussion and analysis below and based on the totality of the circumstances, the Examiner concludes that the evidence supports the proposition that RFC received reasonably equivalent value in the US/UK Broker-Dealer Sale.

---

[2472] Membership Interest and Share Purchase Agreement between RFC and GMAC, LLC, dated Mar. 31, 2009 [RC00026472]; Residential Capital, LLC, Quarterly Report (Form 10-Q) (Aug. 7, 2009), at 64.

[2473] Residential Capital, LLC, Quarterly Report (Form 10-Q) (Aug. 7, 2009), at 64.

[2474] Membership Interest and Share Purchase Agreement between RFC and GMAC, LLC, dated Mar. 31, 2009 [RC00026472].

[2475] Residential Capital, LLC, Quarterly Report (Form 10-Q) (Aug. 7, 2009), at 64.

[2476] Opinion Letter from Goldin Associates to the Committee of the Independent Members of the Board of Directors of ResCap (Mar. 20, 2009) [RC00027931].

### (1) Overview Of Ally Securities And RFCIL

#### (a) Ally Securities

Founded in 1990, Ally Securities was a registered broker-dealer under the Exchange Act, headquartered in Bethesda, Maryland. Ally Securities underwrote, distributed, and provided capital market liquidity for MBS and RMBS sold by its affiliate entities to institutional investors and financial institutions. It also traded MBS, RMBS, and other fixed income securities with brokers, dealers, and institutional investors for its proprietary account.[2477]

Ally Securities "[u]nderwrote a significant portion of ResCap's securitization activity (over $100 billion, and $65 billion since 2005)," and "also loaned funds to ResCap on a short-term basis."[2478] "[Ally Securities] competed with larger Wall Street broker-dealers that engaged in capital markets activity and market making of residential [MBS] and whole loans."[2479]

At the time of the transaction, Ally Securities was largely inactive because of various factors, including economic and financial conditions, ResCap's financial and operational circumstances, and its clearing capabilities as a broker-dealer being inhibited by State Street's credit concerns. Its assets consisted primarily of liquid agency RMBS and cash, and its activities were concentrated on acting as an agent or broker on sales of ResCap's Principal Investment Activity ("PIA") inventory and opportunistically evaluating bids on its own inventory.[2480] Ally Securities' headcount had declined from approximately sixty in 2007 to only fourteen as of March 2009, including three in senior management, two traders, three sales professionals, and two restructuring professionals, among others. ResCap provided Ally Securities with additional administrative and trading personnel, as well as with various administrative services, including equipment rental, data processing, maintenance, and other corporate services.[2481]

---

[2477] Draft Goldin Associates Presentation to the Committee of Independent Members of the Board of Directors of Residential Capital Regarding the Purchase of Residential Funding Securities, LLC and RFC Investments Limited by GMAC, LLC, dated Mar. 18, 2009, at 11 [GOLDIN00132386].

[2478] *Id.*

[2479] *Id.* at 16.

[2480] *Id.* at 11.

[2481] *Id.* at 12.

Appendix V.F.4.g(1)(a) provides the historical financial statements of Ally Securities. From December 31, 2005 to February 28, 2009, Ally Securities' total assets and total equity declined 83% and 51%, respectively, as depicted in the following table.[2482]

EXHIBIT V.F.4.g(1)(a)—1
**Ally Securities Total Assets and Total Equity**
*($ in Millions)*

|  | 12/31/2005 | 12/31/2006 | 12/31/2007 | 12/31/2008 | 2/28/2009 | Decline |
|---|---|---|---|---|---|---|
| Total assets | $     550.9 | $     1,441.9 | $     285.9 | $     96.8 | $     95.8 | (83%) |
| Total equity | 89.8 | 96.1 | 68.4 | 46.0 | 44.2 | (51%) |

*Source: Draft Goldin Associates Presentation to the Committee of Independent Members of the Board of Directors of Residential Capital Regarding the Purchase of Residential Funding Securities, LLC and RFC Investments Limited by GMAC, LLC, dated Mar. 18, 2009 [GOLDIN00132386].*

Similarly, over the same period, Ally Securities' operating results show a dramatic decline in underwriting activity, net interest income, and net income (loss), as depicted in the following table.[2483]

EXHIBIT V.F.4.g(1)(a)—2
**Ally Securities Operating Results**
*($ in Millions)*

|  | 12/31/2005 | 12/31/2006 | 12/31/2007 | 12/31/2008 | 2/28/2009 | Decline |
|---|---|---|---|---|---|---|
| Underwriting activity[1] | $     14,300.0 | $     13,500.0 | $     10,300.0 | $     - | $     - | (100%) |
| Net interest income | 11.9 | 3.3 | 4.0 | 5.7 | 1.1 | (91%) |
| Net income (loss) | 4.1 | 6.5 | (30.3) | (23.4) | (1.8) | (144%) |

[1] *For ResCap and affiliates.*
*Source: Draft Goldin Associates Presentation to the Committee of Independent Members of the Board of Directors of Residential Capital Regarding the Purchase of Residential Funding Securities, LLC and RFC Investments Limited by GMAC, LLC, dated Mar. 18, 2009 [GOLDIN00132386].*

### (b) RFCIL And RFSCIL

RFCIL supported ResCap's business activities, including those of Ally Securities, through RFSCIL, its wholly owned UK-broker-dealer subsidiary. Founded in London in 1997, RFSCIL supported Ally Securities' activities in Europe and comprised 100% of the assets and liabilities of RFCIL. RFSCIL had five employees, including two in senior management and three investment advisors. [2484]

Historically, RFSCIL placed securities sold by ResCap to institutional investors and financial institutions in Europe and did not trade securities for its proprietary account or provide advisory services. With the help of its affiliates, RFSCIL served as a "one-stop shop" for

---

[2482] *See id.* at 13.

[2483] *See id.* at 14.

[2484] *Id.* at 25.

European investors and, at the peak of its activity in 2006, placed an annual volume of securities totaling $10 billion. RFSCIL competed with larger European broker-dealers that engaged in capital markets activity and market making of residential MBS and whole loans.[2485]

At the time of the transaction, RFSCIL was largely inactive because of various factors, including economic and financial conditions and ResCap's financial and operational circumstances. Its assets consisted primarily of cash and other short-term investments, and its activities were concentrated on acting as the international agent or broker on sales of ResCap's PIA inventory.[2486]

Appendix V.F.4.g(1)(b) provides the historical financial statements of RFSCIL. From December 31, 2005 to February 28, 2009, RFSCIL's total assets and total equity increased 39% and 34%, respectively, as depicted in the following table.[2487]

EXHIBIT V.F.4.g(1)(b)—1
**RFSCIL Total Assets and Total Equity**
*($ in Millions)*

|  | 12/31/2005 | 12/31/2006 | 12/31/2007 | 12/31/2008 | 2/28/2009 | Increase |
|---|---|---|---|---|---|---|
| Total assets | $    15.0 | $    24.9 | $    29.4 | $    21.3 | $    20.8 | 39% |
| Total equity | 12.7 | 19.7 | 23.9 | 17.5 | 17.0 | 34% |

*Source: Draft Goldin Associates Presentation to the Committee of Independent Members of the Board of Directors of Residential Capital Regarding the Purchase of Residential Funding Securities, LLC and RFC Investments Limited by GMAC, LLC, dated Mar. 18, 2009 [GOLDIN00132386].*

However, over the same period, RFSCIL's operating results show a dramatic decline in net interest income and net income (loss), as depicted in the following table.[2488]

EXHIBIT V.F.4.g(1)(b)—2
**RFSCIL Operating Results**
*($ in Millions)*

|  | 12/31/2005 | 12/31/2006 | 12/31/2007 | 12/31/2008 | 2/28/2009 | Increase |
|---|---|---|---|---|---|---|
| Net interest income | $    5.5 | $    11.0 | $    7.8 | $    2.3 | $    0.1 | (99%) |
| Net income (loss) | 1.7 | 4.9 | 3.8 | 0.1 | (0.2) | (112%) |

*Source: Draft Goldin Associates Presentation to the Committee of Independent Members of the Board of Directors of Residential Capital Regarding the Purchase of Residential Funding Securities, LLC and RFC Investments Limited by GMAC, LLC, dated Mar. 18, 2009 [GOLDIN00132386].*

### (2) Summary Of Transaction And Process

As previously noted, ResCap's US/UK broker-dealers had been largely inactive in the year before the sale to AFI. Jones, CEO of ResCap from June 2007 to July 2008, recalled having considered closing ResCap's broker-dealer operations because any value was "primarily the

---

[2485] *Id.* at 25, 28.

[2486] *Id.* at 25.

[2487] *Id.* at 26.

[2488] *See id.* at 27.

employee capabilities" and "it wasn't at all clear that we were going to be able to deliver the employees to whoever the purchaser was."[2489] Jones further recalled that "as Marano came on with some amount of expertise in that area" there was an ongoing dialogue about whether the broker-dealers should be moved to AFI and how else they could be used.[2490]

On October 10, 2008, the ResCap Board discussed the possibility of selling its US/UK broker-dealers to AFI, including the need to obtain a fairness opinion should the negotiations with AFI proceed.[2491] On October 28, 2008, Robert Cole presented the ResCap Board with an overview of the proposed sale and estimated total proceeds of $118 million.[2492] Marano reported to the ResCap Board on November 3, 2008, that management was proceeding with the transaction negotiations with AFI.[2493] On November 12, 2008, Goldin Associates was engaged by the Special Committee of Independent Directors to render an opinion on the fairness to ResCap and its creditors of the proposed sale of the Ally Securities interests.[2494] The engagement letter was silent regarding a fairness opinion on the proposed sale of the RFCIL interests although Goldin Associates ultimately prepared a fairness opinion for the sale of those interests as well. From November 12, 2008 until March 1, 2009, however, the ResCap Board postponed further discussions on the potential sale.

On March 1, 2009,[2495] the ResCap Board resumed its deliberations regarding the US/UK Broker-Dealer Sale and heard a report from Robert Conway on the terms proposed by AFI. AFI offered to purchase Ally Securities for 1.0x book value as of February 28, 2009, less $500,000, plus payment of the $50 million loan due to RFC, and offered to purchase RFCIL for 1.0x book value as of February 28, 2009.[2496] Immediately following the meeting, the Independent Directors convened with their counsel, Morrison Cohen, to discuss the proposal.[2497] Goldin Associates presented its valuation analysis to the Special Committee of

---

[2489] Int. of J. Jones, Nov. 30, 2012, at 111:10–112:1.

[2490] *Id.* at 112:12–114:4.

[2491] Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Oct. 10, 2008, at RC40005881 [RC40005652].

[2492] Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Oct. 28, 2008, at RC40005896 [RC40005652].

[2493] Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Nov. 3, 2008, at RC40005900 [RC40005652].

[2494] Letter from Goldin Associates to the Committee of the Independent Members of the Board of Directors of ResCap (Nov. 12, 2008) [EXAM00233465].

[2495] Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Mar. 1, 2009, at RC40006068–70 [RC40005949].

[2496] Notice of a Special Meeting of the Board of Directors of Residential Capital, LLC, dated Mar. 1, 2009 at RC40011117–19 [RC40011115].

[2497] Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Mar. 1, 2009, at RC40006070 [RC40005949].

Independent Directors on March 18, 2009,[2498] and issued its opinion on March 20, 2009, that the consideration to be received in connection with the US/UK Broker Dealer Sale was fair from a financial point of view to ResCap and its creditors (other than AFI).[2499]

On March 23, 2009, Marano informed the ResCap Board that the Special Committee of Independent Directors had completed its review and approved the US/UK Broker-Dealer Sale.[2500] On March 25, 2009, the ResCap Board acted on the recommendation of the Special Committee of Independent Directors and signed a written consent and authorization for ResCap executives to carry out the transaction.[2501] The term sheets attached as Exhibit A and B to the authorization signed by the ResCap Board, however, were outdated and did not include the $500,000 reduction to the net book value of Ally Securities as of February 28, 2009 in the determination of the purchase price.[2502] This omission may have been a clerical error, as the presentation by Goldin Associates to the Special Committee of Independent Directors, which led to their recommendation to the ResCap Board to pursue the sale, included the updated terms—including the $500,000 reduction to Ally Securities' net book value.

The ResCap Board resolved that, based upon its review and consideration of the Special Committee of Independent Directors, the aggregate consideration was fair from a financial point of view to ResCap, and that the terms of the transaction were not materially less favorable to ResCap than those that could reasonably have been obtained in a comparable arm's-length transaction between ResCap and an unaffiliated party.[2503]

Once a decision was made to proceed with the US/UK Broker-Dealer Sale to AFI, the transaction moved quickly. RFC and AFI executed a Membership Interest and Share Purchase Agreement on March 31, 2009, and closed the sale approximately one month later on May 1, 2009.[2504]

---

[2498] Draft Goldin Associates Presentation to the Committee of Independent Members of the Board of Directors of Residential Capital Regarding the Purchase of Residential Funding Securities, LLC and RFC Investments Limited by GMAC, LLC, dated Mar. 18, 2009 [GOLDIN00132386].

[2499] Opinion Letter from Goldin Associates to the Committee of the Independent Members of the Board of Directors of ResCap (Mar. 20, 2009) [RC00027931].

[2500] Minutes of Special Meeting of Board of Residential Capital, LLC, Mar. 23, 2009, at RC40006091–93 [RC40005949].

[2501] Written Consent of the Board of Directors of Residential Capital, LLC, dated Mar. 25, 2009, at RC40006094–108 [RC40005949].

[2502] Ex. A and B to the Written Consent of the Board of Directors of Residential Capital, LLC, dated Mar. 25, 2009, at RC40006103–04 [RC40005949].

[2503] Written Consent of the Board of Directors of Residential Capital, LLC, dated Mar. 25, 2009, at RC00021244 [RC00021236].

[2504] Membership Interest and Share Purchase Agreement between RFC and GMAC, LLC, dated Mar. 31, 2009 [RC00026472]; Residential Capital, LLC, Quarterly Report (Form 10-Q) (Aug. 7, 2009), at 63.

RFC received cash consideration of $42.3 million and $18.1 million for the interests in Ally Securities and RFCIL, respectively. In addition, with respect to the Ally Securities interests, AFI paid to RFC an amount equal to the entire outstanding principal due and payable under the existing $50 million subordinated loan between RFC and Ally Securities.[2505]

The following diagram summarizes the value exchanged between RFC and AFI in the US/UK Broker-Dealer Sale.



EXHIBIT V.F.4.g(2)
**US/UK Broker-Dealer Sale Transaction Diagram**

*Source: Membership Interest and Share Purchase Agreement between RFC and GMAC, LLC, dated Mar. 31, 2009 [RC00026472]; Residential Capital, LLC, Quarterly Report (Form 10-Q) (Aug. 7, 2009), at 64.*

### (3) Third-Party Conclusion Of Value

As previously noted, on March 20, 2009, Goldin Associates opined that the proposed transaction terms set forth in the March 13, 2009 draft of the purchase agreement were fair from a financial point of view to ResCap and its creditors.[2506] Appendices V.F.4.g(4)(a) and V.F.4.g(4)(b) provide a summary of the Ally Securities and RFCIL/RFSCIL valuation analyses performed by Goldin Associates.

---

[2505] Residential Capital, LLC, Quarterly Report (Form 10-Q) (Aug. 7, 2009), at 64.

[2506] Opinion Letter from Goldin Associates to the Committee of the Independent Members of the Board of Directors of ResCap (Mar. 20, 2009) [RC00027931].

Based on Goldin Associates' assessment that both Ally Securities and RFCIL had limited ability to continue as independent going concerns, the Adjusted Book Value Method under the Asset-Based Approach was determined to be the most appropriate indicator for determining the transaction's fairness.[2507] Goldin Associates noted in its March 18, 2009 presentation to the Special Committee of Independent Directors that the "net asset value represent[ed] a floor on a range of values," and that it did not take into account the future value of Ally Securities or RFCIL to AFI.[2508]

### (4) Analysis Of Third-Party Fairness Opinion

Goldin Associates expressed no opinion on what value could actually be received by RFC in an open market sale of its interests. Rather, its opinion was limited to the fairness of the proposed transaction, from a financial point of view, to ResCap and its creditors (other than AFI).[2509]

According to the Goldin Associates presentation to the Special Committee of Independent Directors on March 18, 2008, Ally Securities and RFCIL each had limited ability to continue as an independent going concern in the then-current market, and was best valued at its liquidation or net asset value of 0.97x book value.[2510] Goldin Associates specifically concluded with regard to Ally Securities that ResCap's interest in Ally Securities was illiquid and marketable to only a very limited group of investors, and that the range of implied valuation multiples of 0.74x to 1.07x, arguably, should be reduced because of the illiquidity and lack of marketability of the Ally Securities interests.[2511]

---

[2507] Draft Goldin Associates Presentation to the Committee of Independent Members of the Board of Directors of Residential Capital Regarding the Purchase of Residential Funding Securities, LLC and RFC Investments Limited by GMAC, LLC, dated Mar. 18, 2009, at 21, 33 [GOLDIN00132386].

[2508] *Id.*

[2509] *See* Opinion Letter from Goldin Associates to the Committee of the Independent Members of the Board of Directors of ResCap (Mar. 20, 2009) [RC00027931].

[2510] *See* Draft Goldin Associates Presentation to the Committee of Independent Members of the Board of Directors of Residential Capital Regarding the Purchase of Residential Funding Securities, LLC and RFC Investments Limited by GMAC, LLC, dated Mar. 18, 2009, at 21, 33 [GOLDIN00132386].

[2511] *Id. at 22.*

### (a) Goldin Associates Valuation Analysis Of Ally Securities

Appendix V.F.4.g(4)(a) provides a summary of the Ally Securities valuation analysis performed by Goldin Associates. In summary, Goldin Associates employed three valuation methodologies in forming its fairness opinion: (1) the Guideline Publicly Traded Company Method under the Market Approach; (2) the Guideline M&A Method under the Market Approach; and (3) the Adjusted Book Value Method under the Asset-Based Approach, the results of which are summarized in the following table.[2512]

EXHIBIT V.F.4.g(4)(a)
**Goldin Associates Valuation Analysis of Ally Securities**
*($ in Millions)*

| | Weight | Low | | High | |
|---|---|---|---|---|---|
| Guideline Publicly Traded Company Method | 25% | $ | 32.7 | $ | 48.5 |
| Guideline M&A Method | 5% | | 70.7 | | 79.5 |
| Adjusted Book Value Method | 70% | | 42.6 | | 42.6 |
| | | | | | |
| Range of indicated value | | $ | 41.5 | $ | 45.9 |

*Source: Draft Goldin Associates Presentation to the Committee of Independent Members of the Board of Directors of Residential Capital Regarding the Purchase of Residential Funding Securities, LLC and RFC Investments Limited by GMAC, LLC, dated Mar. 18, 2009 [GOLDIN00132386].*

### (i) Guideline Publicly Traded Company Method

The Guideline Publicly Traded Company Method used by Goldin Associates considered two multiples: P/NBV and P/TBVE. These multiples are commonly considered when completing a valuation of a financial services company such as Ally Securities. However, given the lack of any significant operational activity at the time of the valuation analysis, the Examiner's Financial Advisors view the relevance of this method for a valuation of Ally Securities as questionable. The Guideline Publicly Traded Company Method is generally not meaningful in determining the value of an entity with minimal operating activities.

Goldin Associates selected ten guideline companies for consideration in applying the Guideline Publicly Traded Company Method. Based on these ten guideline companies, Goldin Associates calculated the mean P/NBV multiple to be 0.90x and the median P/NBV multiple to be 0.74x. The mean P/TBVE multiple was 1.10x, and the median P/TBVE multiple was 0.80x. Given these indications, the range of multiples was between 0.74x and 1.10x, with a resulting range in equity value of between $32.7 million and $48.6 million.[2513]

---

[2512] *Id.* at 21.

[2513] *Id.* at 13, 16–17.

### (ii) Guideline M&A Method

The Guideline M&A Method employed by Goldin Associates considered eight transactions. The dates of the transactions ranged from June 2, 2003 (earliest) to July 1, 2008 (most recent). Goldin Associates relied on the P/NBV multiples in deriving a range of indicated values. Based on the eight transactions, the mean P/NBV multiple was 1.80x, and the median P/NBV multiple was 1.60x. Using this range of multiples, the indicated range of equity values derived from the Guideline M&A Method was between $70.7 million and $79.5 million.[2514]

As with the Guideline Publicly Traded Company Method, given the lack of any significant operational activity at the time of the valuation analysis, the Examiner's Financial Advisors view the relevance of the Guideline M&A Method for a valuation of Ally Securities as questionable. The Guideline M&A Method is generally not meaningful in determining the value of entity with minimal operating activities.

### (iii) Adjusted Book Value Method

The Adjusted Book Value Method employed by Goldin Associates under the Asset-Based Approach adjusted the book values of Ally Securities' assets and liabilities as of February 28, 2009 based on recovery estimates. In the Goldin Associates analysis, cash and cash equivalents and trading securities comprised the preponderance of the assets (i.e., $85.1 million out of $95.8 million in total assets) and were valued at 100% of book value. "Securities owned, not readily marketable – non-agency" comprised approximately $10.7 million of the $95.8 million in total assets and were valued at 90% of book value. Goldin Associates noted that, "estimates of recovery are made by utilizing varying assumptions regarding default rates, loss severities and other assumptions." In addition, Goldin Associates deducted total wind-down expenses, professional fees, and occupancy costs of $0.5 million from the adjusted asset value. Based on this analysis, the net proceeds from liquidation of assets were estimated to be $42.6 million. Comparing this to the book value of $44.2 million indicates that the expected proceeds would be $1.5 million lower than book value of equity and implies a P/NBV multiple of 0.97x.[2515]

In the case of Ally Securities, where there was no significant operational activity, the Examiner's Financial Advisors view the Adjusted Book Value Method as the most appropriate valuation method.

---

[2514] *Id.* at 13, 18–19.

[2515] *Id.* at 20.

### (b) Goldin Associates Valuation Of RFCIL/RFSCIL

Appendix V.F.4.g(4)(b) provides a summary of the RFCIL/RFSCIL valuation analysis performed by Goldin Associates. In summary, Goldin Associates employed three valuation methodologies in forming its fairness opinion: (1) the Guideline Publicly Traded Company Method under the Market Approach; (2) the Guideline M&A Method under the Market Approach; and (3) the Adjusted Book Value Method under the Asset-Based Approach, the results of which are summarized in the following table:[2516]

EXHIBIT V.F.4.g(4)(b)
**Goldin Associates Valuation of RFCIL/RFSCIL**
*($ in Millions)*

|  | Weight | Low | | High | |
|---|---|---|---|---|---|
| Guideline Publicly Traded Company Method | 25% | $ | 13.0 | $ | 19.1 |
| Guideline M&A Method | 5% | | 39.7 | | 40.6 |
| Adjusted Book Value Method | 70% | | 16.5 | | 16.5 |
| Range of indicated value | | $ | 16.8 | $ | 18.4 |

*Source: Draft Goldin Associates Presentation to the Committee of Independent Members of the Board of Directors of Residential Capital Regarding the Purchase of Residential Funding Securities, LLC and RFC Investments Limited by GMAC, LLC, dated Mar. 18, 2009 [GOLDIN00132386].*

### (i) Guideline Publicly Traded Company Method

The Guideline Publicly Traded Company Method used by Goldin Associates considered two multiples: P/NBV and P/TBVE. These multiples are commonly considered when completing a valuation of a financial services company such as RFCIL. However, given the lack of any significant operational activity at the time of the valuation analysis, the Examiner's Financial Advisors view the relevance of this method for a valuation of RFCIL as questionable; the Guideline Publicly Traded Company Method is generally not meaningful in determining the value of an entity with minimal operating activities.

Goldin Associates selected eleven guideline companies for consideration in applying the Guideline Publicly Traded Company Method. Based on these eleven guideline companies, Goldin Associates calculated the mean P/NBV multiple to be 0.77x and the median P/NBV multiple to be 0.92x. The mean P/TBVE multiple was 1.03x, and the median P/TBVE multiple was 1.12x. Given these indications, the range of multiples was between 0.77x and 1.12x, and the resulting range in value was $13.1 million to $19.0 million.[2517]

### (ii) Guideline M&A Method

The Guideline M&A Method employed by Goldin Associates considered three transactions. The dates of the transactions range from April 13, 2005 (earliest) to May 23, 2008 (most recent).

---

[2516] *Id.* at 33.

[2517] *Id.* at 26, 29.

Goldin Associates relied on the P/NBV multiples in deriving a range of indicated values. Based on the three transactions, the mean P/NBV multiple was 2.34x and the median P/NBV multiple was 2.39x. Using this range of multiples, the indicated range of equity values derived from the Guideline M&A Method was between $39.7 million and $40.6 million.[2518]

As with the Guideline Publicly Traded Company Method, given the lack of any significant operational activity at the time of the valuation analysis, the Examiner's Financial Advisors view the relevance of the Guideline M&A Method for a valuation of RFCIL as questionable. The Guideline M&A Method is generally not meaningful in determining the value of an entity with minimal operating activities.

### (iii) Adjusted Book Value Method

The Adjusted Book Value Method employed by Goldin Associates under the Asset-Based Approach adjusted the book value of RFCIL's assets and liabilities as of February 28, 2009 based on recovery estimates. In the Goldin Associates analysis, cash and short-term deposits comprised the preponderance of the assets and were valued at 100% of book value. Prepaid expenses, accounts receivable and fixed assets were insignificant in amount and were valued at 0% to 50% of book value due to liquidation costs. In addition, Goldin Associates deducted total wind-down expenses of $0.5 million. Based on this analysis, the net proceeds from liquidation of assets were estimated to be $16.5 million. Comparing this to the book value of approximately $17.0 million indicates that the expected proceeds would be $0.5 million lower than the book value of equity and implies a P/NBV of 0.97x.[2519]

### (iv) Premiums And Discounts

RFC's interests in Ally Securities and RFCIL were 100% controlling, closely-held interests. Consideration of the perceived value of these attributes relative to guideline indications can be quantified by an appraiser through certain premiums (i.e. control) and discounts (i.e. lack of marketability for a closely held interest). Goldin Associates did not apply any discounts or premiums in their analysis.

The lack of any significant operational activity at the time of the transaction would most likely decrease the valuation multiple that would be paid by a market participant interested in acquiring the US/UK broker-dealers. Therefore, for both Ally Securities and RFCIL, a buyer would likely apply a discount to any trading multiples observed in the Guideline Publicly Traded Company Method and Guideline M&A Method. If such a discount were applied, the equity value resulting from such analysis would be lower.

---

[2518] *Id.* at 33.

[2519] *Id.* at 32.

### (c) Overall Assessment Of Fair Market Value Indicia

In summary, the Examiner's Financial Advisors consider the Adjusted Book Value Method to be a reliable indicator of the Fair Market Value of Ally Securities and RFCIL, while the Guideline Publicly Traded Company Method and the Guideline M&A Method have limited relevance for companies with minimal operating activity. The assets of these entities were principally carried on the balance sheets at fair value. Under the circumstances, the Examiner's Financial Advisors consider the valuation of the assets of the US/UK broker-dealers at approximately book value to be appropriate, if not somewhat optimistic. Given the state of the financial services industry and capital markets in early 2009, and the resulting limitations on the operations of Ally Securities and RFCIL, their recent trend of operating losses was not likely to abate. Further, a discount for lack of marketability could be appropriate in light of market conditions at the time when valuing a portfolio of mortgage-backed securities and asset-backed securities.

As described in Section VIII, Third-Party Claimants assert that Ally Securities is directly liable for false statements in the RMBS Offering Documents. These parties allege that Ally Securities enabled the Debtors' fraudulent conduct by providing critical underwriting services in connection with the securitizations, including by reviewing, marketing and distributing false and misleading RMBS Offering Documents. Plaintiffs have asserted several causes of action against Ally Securities, including claims based on (1) federal and state securities law; (2) common-law fraud, fraudulent inducement, and aiding and abetting fraud; and (3) negligent misrepresentation. The consideration received by RFC in the US/UK Broker-Dealer Sale was not adjusted to account for any contingent liability related to potential third-party claims.

### (5) Conclusion Regarding Reasonably Equivalent Value

Based upon the above discussion and analysis and the totality of the circumstances, including but not limited to the Goldin Associates valuation analyses and fairness opinion and prevailing market conditions, the Examiner concludes that the evidence supports the proposition that RFC received reasonably equivalent value in the US/UK Broker-Dealer Sale.

## G.  MITCHELL BOND TRANSACTION

### 1.  Posting Of Bond In Mitchell Litigation

As part of the Investigation, the Examiner reviewed ResCap's posting of two litigation bonds in connection with the Mitchell case. The Mitchell bond posting was identified as a "Specified Transaction" in the Committee Rule 2004 Motion,[2520] and the scope of the Investigation was guided in part by the Bankruptcy Court's observation that the Committee Rule 2004 Motion "sets the appropriate scope parameter."[2521] Accordingly, the Examiner presents the following review and analysis of the Mitchell bond posting.

### a.  Procedural Background And Trial

The Mitchell Plaintiffs filed a putative class action lawsuit on July 29, 2003 in state court in Kansas City, Missouri against the Mitchell Defendants—including Debtors RFC and Homecomings Financial (a subsidiary of RFC)[2522]—alleging violations of the MSMLA, which places limits on the amount of closing costs and fees that second mortgage lenders may charge loan consumers in Missouri.[2523] The Debtors' potential liability arises from 248 second mortgage loans originated by Mortgage Capital Resource Corporation and assigned to RFC. The Mitchell Plaintiffs asserted that the Mitchell Defendants were strictly liable as assignee mortgagees pursuant to the assignee provisions of HOEPA.[2524] The trial court certified a class consisting of all individuals who obtained a second mortgage loan on Missouri real property from Mortgage Capital Resource Corporation on or after July 29, 1997.[2525]

---

[2520] Committee Rule 2004 Motion, Ex. B, at 6.

[2521] Examiner Memorandum Opinion, at 6 n.4.

[2522] No other ResCap entities are Mitchell Defendants. The other Mitchell Defendants are Household Finance Corp. III and Wachovia Equity Servicing.

[2523] MO. REV. STAT. §§ 408.231–241. The Mitchell Plaintiffs' claims of direct liability were brought under Missouri's Second Mortgage Loan Act, a consumer protection law enacted in 1979 that was "designed to regulate the business of making high interest second mortgage loans on residential real estate." Mitchell Appeal Decision, at 486 (quoting *Avila v. Cmty. Bank of Va.*, 143 S.W.3d 1, 4 (Mo. Ct. App. 2003)).

[2524] 15 U.S.C. § 1641. The Mitchell Plaintiffs' claims of assignee liability are based HOEPA, a federal law enacted in 1994 that "provides that assignees of HOEPA (high interest) loans 'are derivatively liable' for the conduct of the assignor . . . ." Mitchell Appeal Decision, at 487 (quoting *Schwartz v. Bann–Cor Mortg.*, 197 S.W.3d 168, 179 (Mo. Ct. App. 2006)). In enacting HOEPA, Congress "intended to place the increased burden of inquiring into the legitimacy of the lending practices engaged in by the original lender upon the assignees of HOEPA loans." *Id.* at 487 (quoting *Bryant v. Mortg. Capital Res. Corp.*, 197 F. Supp. 2d 1357, 1365 (N.D. Ga. 2002)).

[2525] Mitchell Appeal Decision.

The case was tried in circuit court in Kansas City, Missouri from December 3, 2007 through January 4, 2008.[2526] At the close of the Mitchell Plaintiffs' case, the court directed a partial verdict for the Mitchell Plaintiffs, holding: (1) Mortgage Capital Resource Corporation violated the MSMLA by charging illegal closing fees; and (2) the Mitchell Defendants, as assignee mortgagees, were strictly liable for such violations.[2527] The jury assessed damages, including compensatory and punitive damages, of $99,651,115 against RFC and $706,042 against Homecomings Financial.[2528]

On October 14, 2008, RFC filed a Notice of Appeal to the Missouri Court of Appeals.[2529] On October 24, 2008, the circuit court issued an order requiring each of the Mitchell Defendants to post supersedeas bonds—including post-judgment interest at nine percent per annum over a three year anticipated appeal period—by November 3, 2008 to stay execution of the judgment.[2530] RFC was required to post a bond in the amount of $126,556,917,[2531] and Homecomings Financial was required to post a bond in the amount of $896,674.[2532]

---

[2526] Mitchell Trial Order.

[2527] Mitchell Appeal Decision, at 486.

[2528] *See* Amended Order, dated Oct. 24, 2008 [EXAM10537447]. Approximately one month after the damages verdict, on February 14, 2008, William Solomon, General Counsel of AFI, presented a legal report to the AFI Board which described the damages assessed against ResCap entities in the Mitchell litigation and noted, among other things, that "ResCap is submitting a claim for possible reimbursement under an old Integrated Risk insurance policy acquired for the 2000–2003 time period (subject to a $5 million deductible)." *See* Legal Report to the Board of Directors of GMAC LLC, dated Feb. 14, 2008, at ALLY_PEO_0004558 [ALLY_PEO_0004442]. As explained in a June 24, 2010 presentation to the AFI Board, AFI has numerous insurance programs, the largest of which is the "Management Liability Blend." *See* Ally Financial Corporate Insurance Update, dated June 24, 2010, at ALLY_0262858 [ALLY_0262724]. The Management Liability Blend includes an "Errors & Omissions" policy that provides coverage with a $100 million limit and a $25 million deductible in the "event that third parties allege negligence for services rendered or failed to be rendered by Ally." *See id.* at ALLY_0262858. The presentation also notes that "[o]ne of Ally's most significant claims is from 2003 (Mitchell) involving ResCap and is currently on appeal and bonded for $127M." *See id.* at ALLY_0262862 [ALLY_0262724]. In light of the Examiner's conclusions regarding the Mitchell bond posting, the Examiner determined it was not an effective use of Estate resources to investigate the results of ResCap's insurance claim.

[2529] Residential Capital, LLC, Quarterly Report (Form 10-Q/A) (Aug. 25, 2009), at 104.

[2530] Amended Order, dated Oct. 24, 2008 [EXAM10537447].

[2531] Order Approving the Amount of Supersedeas Bond, dated Nov. 3, 2008, at EXAM10278908 [EXAM10278905].

[2532] Order Approving the Amount of Supersedeas Bond, dated Nov. 3, 2008, at EXAM10278916 [EXAM10278913].

### b. *ResCap/AFI Bond Posting Procedure And Approval*

On October 10, 2008, Thomas Marano, CEO of ResCap, gave a presentation to the AFI Board explaining that, absent a cash infusion, "ResCap is forecast to deplete its liquidity on November 17, 2008."[2533] In connection with that presentation, William Solomon, General Counsel of AFI, addressed questions from board members regarding the bond posting in the Mitchell litigation.[2534]

At special meetings held on October 16 and 17, 2008, ResCap's General Counsel Tammy Hamzehpour updated the ResCap Board on matters relating to the Mitchell litigation, including the supersedeas bond. The ResCap Board discussed the "consequences of not posting the bond," including the possibility that non-payment would "result ultimately in a default under numerous credit facilities."[2535] The minutes reflect that Marano and Timothy Pohl of Skadden participated in the discussion on October 16, 2008.[2536] On October 17, 2008, at a special meeting of the AFI Board, Marano noted that the bond posting in the Mitchell litigation would result in a "significant outflow of cash in October 2008" for ResCap.[2537]

On October 28, 2008, the ResCap Board met and "discussed key components of the [ResCap] liquidity drain . . . such as the collateral posting in the Mitchell litigation . . . ."[2538] In connection with that discussion, ResCap Treasurer Jerry Lombardo stated that "important events are in process that will provide significant upside and runway to meet the Company's near-term cash and capital needs."[2539] The ResCap Board held another meeting to review ResCap's liquidity balance on October 30, 2008. At that meeting, the ResCap Board discussed "various transactions and options that would provide sufficient liquidity," including "the possibility of [AFI] posting the bond required in the Mitchell litigation on ResCap's behalf."[2540]

---

[2533] *See* Project Scout Discussion Materials to GMAC Board, dated Oct. 10, 2008, at ALLY_PEO_0003777 [ALLY_PEO_0003752]; Minutes of a Special Meeting of the Board of GMAC LLC, Oct. 10, 2008, at ALLY_PEO_0001297 [ALLY_PEO_0001009].

[2534] Minutes of a Special Meeting of the Board of GMAC LLC, Oct. 10, 2008, at ALLY_PEO_0001297 [ALLY_PEO_0001009].

[2535] Minutes of a Special Meeting of the Board of Residential Capital, LLC, Oct. 16, 2008, at RC40005882 [RC40005652]; Minutes of a Special Meeting of the Board of Residential Capital, LLC, Oct. 17, 2008, at RC40005884 [RC40005652].

[2536] Minutes of a Special Meeting of the Board of Residential Capital, LLC, Oct. 16, 2008, at RC40005882 [RC40005652].

[2537] Minutes of a Special Meeting of the Board of GMAC LLC, Oct. 17, 2008, at ALLY_PEO_0001299 [ALLY_PEO_0001009].

[2538] Minutes of a Special Meeting of the Board of Residential Capital, LLC, Oct. 28, 2008, at RC40005894 [RC40005652].

[2539] *Id.*

[2540] Minutes of a Special Meeting of the Board of Residential Capital, LLC, Oct. 30, 2008, at RC40005897 [RC40005652].

On October 31, 2008, Marano gave a presentation to the AFI Board regarding the expected liquidity drain at ResCap for November 2008, including the bond posting in the Mitchell litigation.[2541] The presentation noted that ResCap's liquidity balance as of October 31, 2008 was approximately $534 million, and projected a negative liquidity balance by mid-November 2011.[2542] During the presentation, the AFI Board and Marano discussed "the level of support that would provide sufficient cash runway and avoid a bankruptcy filing by ResCap."[2543] Although the minutes reflect consideration by the AFI Board of various transactions meant to allow ResCap to remain in compliance with certain TNW covenants, the AFI Board did not specifically authorize posting the Mitchell supersedeas bond on ResCap's behalf. The AFI Board resolved to provide "capital contributions to ResCap in an amount necessary to . . . exceed the [TNW] covenants by $100 million . . . up to, and not to exceed under any circumstances, $931 million."[2544]

On November 3, 2008, ResCap posted collateral to secure two supersedeas bonds in the Mitchell litigation in the aggregate amount of $127,453,591—one bond for RFC in the amount of $126,556,917 and one bond for Homecomings Financial in the amount of $896,674.[2545] The bonds were fully collateralized by cash on deposit in a bank account.[2546]

On November 11, 2008, the AFI Board again met to discuss ResCap's liquidity concerns. At that meeting, AFI VP of Finance Tazewell Rowe reported that ResCap was "projecting negative cash balances" beginning November 17, 2008, and needed cash support to meet operating needs and equity support to maintain compliance with certain consolidated TNW financial covenants.[2547] Marano informed the AFI Board that additional support from AFI, including in the form of AFI providing collateral for the Mitchell litigation bond, "would provide ResCap with sufficient runway until the bond exchange [was] successfully closed and the matters associated with the bank holding company initiative completed."[2548]

---

[2541] Minutes of a Special Meeting of the Board of GMAC LLC, Oct. 31, 2008, at ALLY_PEO_0001307 [ALLY_PEO_0001009].

[2542] Key Components of Liquidity Drain, dated Oct. 30, 2008, at ALLY_0259009 [ALLY_0259003].

[2543] Minutes of a Special Meeting of the Board of GMAC LLC, Oct. 31, 2008, at ALLY_PEO_0001307 [ALLY_PEO_0001009].

[2544] *Id.*

[2545] *See* Order Approving the Amount of Supersedeas Bond, dated Nov. 3, 2008, at EXAM10278908 [EXAM10278905]; Order Approving the Amount of Supersedeas Bond, dated Nov. 3, 2008, at EXAM10278916 [EXAM10278913]; s*ee also* Legal Matters Update to the Residential Capital, LLC Audit Committee, dated Dec. 11, 2009, at RC40018301 [RC40018295]; E-mail from M. Riskey (Nov. 18, 2008) [EXAM10278903].

[2546] Legal Matters Update to the Residential Capital, LLC Audit Committee, dated Dec. 11, 2009, at RC40018301 [RC40018295].

[2547] Minutes of a Special Meeting of the Board of GMAC LLC, Nov. 11, 2008, at ALLY_PEO_0001313 [ALLY_PEO_0001009].

[2548] *Id.*

Following deliberations, the AFI Board unanimously resolved to restructure the bond posting in the Mitchell litigation "with [AFI] replacing ResCap's $100 million with the surety provider."[2549] ResCap would retain first loss position of approximately $27 million, but would obtain cash inflow of $100 million.[2550] On the next day, November 12, 2008, the ResCap Board approved the support offer, including the support in connection with the Mitchell litigation bond.[2551]

### c. Appeal Decision

On November 23, 2010, the Missouri Court of Appeals reversed the $99 million punitive damages award and remanded the case for a new trial as to punitive damages.[2552] At the initial trial, the jury had been instructed to award punitive damages if either of the following conditions were met: (1) the Mitchell Defendants were liable as assignees for the actions of the mortgage loan originator (which liability the Mitchell Appeal Decision explains could only be assigned pursuant to HOEPA); or (2) the Mitchell Defendants "were liable for their own culpability in their own acts violating the MSMLA."[2553] As explained in the Mitchell Appeal Decision, "to the extent Defendants' liability depends on [the first condition] HOEPA assignee liability, it is subject to the cap within 15 U.S.C. § 1641(d)(2) . . . . Consequently, the

---

[2549] *Id.*

[2550] Minutes of a Special Meeting of the Board of GMAC LLC, Nov. 11, 2008, at ALLY_PEO_0001313 [ALLY_PEO_0001009]. Alvaro de Molina, AFI's CEO at the time, explained that ResCap expected to win the appeal and that the $27 million first loss position represented the legal team's expectation of ResCap's approximate "maximum exposure." *See* Int. of A. de Molina, Nov. 20, 2012, at 175:19–177:17. Therefore, the $27 million exposure risk remained with ResCap and AFI took the "ResCap credit risk and put up the liquidity for the collateral." *See id.* at 175:19–177:17.

[2551] Minutes of a Special Meeting of the Board of Residential Capital, LLC, Nov. 12, 2008, at RC40005906 [RC40005652]. The ResCap Board directed delivery of, among other things, a "Letter Agreement regarding litigation bonds related to the Mitchell case" in connection with its November 20, 2008 consent to the Initial Line of Credit Security Agreement. *See* Unanimous Written Consent of the Board of Directors of Residential Capital, LLC, dated Nov. 20, 2008, at RC40005928 [RC40005652]. The Letter Agreement memorialized the terms of AFI's support offer with respect to the Mitchell litigation bonds, including the requirement that any payments to be made would come from ResCap's "first loss" collateral prior to any payment from AFI's "second loss" collateral. *See* Letter Agreement Re: Litigation Bonds Relating to the Mitchell Case (Mayer Brown Draft), dated Nov. 16, 2008 [EXAM12079400]. Examiner's Professionals requested production of an executed copy of the Letter Agreement from the Debtors and AFI. Neither party was able to recover an executed copy of the Letter Agreement.

[2552] Mitchell Appeal Decision, at 484.

[2553] *Id.* at 513.

jury could not properly be instructed to award punitive damages based on assignee liability."[2554] Because it was "impossible to ascertain" the basis upon which the jury awarded punitive damages, the punitive damages award was reversed and remanded for retrial.[2555]

### d.  Disposition Of Bond And Settlement Of Mitchell Litigation

Upon remand of the Mitchell litigation to the trial court, ResCap "paid $12.8 million in compensatory damages (including interest and attorneys' fees)."[2556]

On November 7, 2011, the Mitchell Plaintiffs, RFC and Homecomings Financial entered into a "Stipulation to Release of RFC Defendants' Supersedeas Bonds and Approval of Substitute Bond," which permitted the discharge and release of the supersedeas bonds that had previously been posted in the aggregate amount of $127,453,591 and the substitution of a new bond in the amount of $2 million.[2557]

On November 14, 2011, approximately $112 million in "funds previously required to be held as bond for the Mitchell case" were released to ResCap.[2558]

In advance of receiving the funds, on November 3, 2011, Todd Stitt, a Director in Global Funding and Liquidity at AFI, noted that the funds would be "unencumbered cash coming back to Rescap and is simply a return of cash paid/expense that was recognized from 2008."[2559] Lombardo responded and explained, "the cash . . . will not be unencumbered because a) it is covered under the blanket lien, and b) we will use that cash to repay the like amount on the LOC with [AFI], unless less than this amount is O/S."[2560] In other words, to the extent there was an outstanding balance on the A&R Line of Credit Facility, according to Lombardo, ResCap would use the $112 million in Mitchell bond funds to pay down the outstanding balance. In a November 16, 2011 presentation to the ResCap Board, the $112 million in Mitchell bond funds was shown as decreasing ResCap's projected liquidity "need" for June 2012, suggesting that ResCap retained the funds for its own purposes.[2561]

---

[2554] *Id.* at 514. Although HOEPA creates assignee liability for purchasers of second mortgage loans, the consumer's damages against the assignee are capped at the sum of: (1) the amount still owed by the consumer; and (2) the amount paid by the consumer "in connection with the transaction." *Id.* at 513 (quoting 15 U.S.C. § 1641(d)(2)).

[2555] *Id.* at 514.

[2556] Residential Capital, LLC Consolidated Financial Statements for the Years Ended December 31, 2011 and 2010, at RC40034930 [RC40034857].

[2557] Stipulation to Release of RFC Defendants' Supersedeas Bonds and Approval of Substitute Bond, dated Nov. 7, 2011, at EXAM00229991 [EXAM00229991].

[2558] *See* ResCap Liquidity Update, dated Nov. 16, 2011, at RC40019986 [RC40019983]; E-mail from T. Stitt (Nov. 15, 2011) [EXAM10916320].

[2559] E-mail from T. Stitt (Nov. 3, 2011) [EXAM10922744].

[2560] E-mail from J. Lombardo (Nov. 3, 2011) [EXAM10922744].

[2561] ResCap Liquidity Update, dated Nov. 16, 2011, at RC40019986 [RC40019983]. The Mitchell bond funds were also omitted from the list of projected cash outflows for the remainder of 2011. *See id.*

The Examiner's Financial Advisors reviewed the books and records of ResCap for November and December 2011 to determine whether any of the Mitchell bond funds were returned to AFI. On November 14, 2011, the day ResCap received the $112 million in Mitchell bond funds, ResCap borrowed approximately $217 million under the A&R Line of Credit Facility, increasing its borrowings under that facility from approximately $452 million to approximately $669 million.[2562] From November 15, 2011 through November 21, 2011, ResCap made incremental draws of approximately $184 million under the A&R Line of Credit Facility.[2563] The first paydown by ResCap on the A&R Line of Credit Facility subsequent to the inflow of the Mitchell bond funds occurred on November 22, 2011 in the amount of $143 million.[2564] The Examiner concludes that the evidence supports the proposition that ResCap did not directly transfer any of the returned Mitchell bond funds to AFI.[2565]

In February 2012, "RFC entered into an agreement in principle . . . to settle all of plaintiffs' remaining claims, including plaintiffs' already-awarded attorneys' fees on appeal, for a total of $17.3 million."[2566] The settlement agreement was preliminarily approved on April 16, 2012.[2567] The hearing on final approval of the proposed settlement was scheduled for May 18, 2012.[2568] However, on May 14, 2012, the Petition Date occurred and the automatic stay of litigation against the Debtors went into effect. Accordingly, the hearing for final approval of the Mitchell settlement was continued indefinitely.[2569]

### e. Conclusion

Based on the foregoing, the Examiner concludes that the only Causes of Action implicated by the Mitchell bond transactions would be potential avoidance actions arising from payments made by ResCap under the A&R Line of Credit Facility. An analysis of these claims is provided in Section VII.F.

---

[2562] *See* ResCap Liquid Cash Rollforward, dated Dec. 1, 2011 [EXAM00114709]; Ally Affiliate Debt Journals, dated 2008 through 2012 [EXAM00338635]. According to James Whitlinger, CFO of ResCap, ResCap intended to draw approximately $330 million from the A&R Line of Credit Facility on November 14, 2011 but, after receiving the funds from the release of the Mitchell bond, only needed to borrow approximately $217 million. Teleconference with J. Whitlinger, CFO of ResCap (April 18, 2013).

[2563] Ally Affiliate Debt Journals, dated 2008 through 2012 [EXAM00338635].

[2564] *See id.*

[2565] The Debtors maintained an outstanding balance on the A&R Line of Credit Facility on all dates through February 14, 2012, on which date the Debtors had no amounts outstanding. *See* ResCap Liquid Cash Rollforward, dated Apr. 2, 2012 [EXAM00114713].

[2566] Residential Capital, LLC Consolidated Financial Statements for the Years Ended December 31, 2011 and 2010, at RC40034930 [RC40034857].

[2567] Ally Financial Inc., Quarterly Report (Form 10-Q) (Apr. 27, 2012), at 72.

[2568] *Id.*

[2569] *See Mitchell Case*, WALTERS, BENDER, STROHBEHN & VAUGHAN, P.C., http://www.wbsvlaw.com/wbsv-cases/mitchell-case.

## H.  SHARED SERVICES

### 1.  Background

ResCap, AFI, and Old GMAC Bank/Ally Bank provided various financial, operational, and administrative services ("Shared Services")[2570] to each other to varying degrees after ResCap's formation in 2005.[2571] The Examiner evaluated the processes used by ResCap, AFI, and Old GMAC Bank/Ally Bank for the provision of Shared Services and the allocation of related costs, and the extent to which ResCap received adequate consideration for Shared Services by and among ResCap, AFI, and Old GMAC Bank/Ally Bank. The Examiner analyzed Shared Services over two prepetition time periods: (1) ResCap's formation in April 2005 through December 2008; and (2) January 2009 through the Petition Date. The Examiner also considered postpetition activities with regard to Shared Services.

### 2.  April 2005 Through December 2008

The ResCap corporate group generally functioned independently within a decentralized AFI corporate structure during the earlier portion of this time period.[2572] However, in 2007,[2573] and again in 2008,[2574] there were concentrated efforts to increase efficiency by centralizing functions. Shared Services by and among ResCap, AFI, and Old GMAC Bank/Ally Bank were not evidenced by written agreements during this period, with the exception of services provided by Ally Bank to its affiliates.[2575] Rather, Shared Services were provided on an informal, undocumented basis.[2576]

---

[2570] The scope and nature of Shared Services changed over time, as described in this section.

[2571] First Day Affidavit, at 82. *See also,* Int. of C. Dondzila, Sept. 27, 2012, at 42:16–43:10 ("a majority of the accounting activities related to bank business activities were actually performed by ResCap employees."); E-mail from B. Yastine (Dec. 1, 2011) [ALLY_0304495] (noting the "operational entanglement" of ResCap and Ally Bank).

[2572] *See* Memorandum, GMAC Global Functions, Mar. 15, 2007 [EXAM10063058].

[2573] *See id.* (announcing that "staff functions . . . [would] be realigned into strong global functions" in areas including finance, information technology, communications, human resources, and legal).

[2574] *See* Int. of T. Hamzehpour, Oct. 5, 2012, at 67:16-24 (discussing 2008 effort led by de Molina to further eliminate duplication and centralize "global functions").

[2575] Ally Bank executed Administrative Service Agreements with affiliates to comply with regulatory requirements regarding the provision of services to affiliates for fair value. *See e.g.,* Administrative Services Agreement by and between Residential Funding Company, LLC and GMAC Bank, dated Oct. 31, 2006 [ALLY_0017710]; Administrative Services and Facilities Agreement by and between GMAC Mortgage, LLC and GMAC Bank, et al., dated Nov. 22, 2006 [RC00028357].

[2576] Declaration of James Whitlinger, Chief Financial Officer of Residential Capital, LLC, in Further Support of Entry of Final Orders for Specific "First Day" Motions [Docket No. 257] at 3. *See also* Declaration of Philip Marc Scheipe in Support of AFI's Submission Regarding the Shares Services Agreement [Docket No. 1299] (where Scheipe asserts that some of the shared services historically were provided on a formally documented basis while others were provided on an informal, undocumented basis).

ResCap reported in its Annual Report (Form 10-K) for 2008 that it paid management fees to AFI for finance, information technology, communications, corporate marketing, procurement, and services related to facilities, and that ResCap received fees from AFI for "risk management" services provided by ResCap in the amounts summarized in the table below.[2577] The amounts paid and received by ResCap encompassed its subsidiaries, which during this period included Old GMAC Bank/Ally Bank.

EXHIBIT V.H.2
**Shared Services Activity**
2006 – 2008
*($ in Millions)*

|  | 2006 | 2007 | 2008 |
|---|---|---|---|
| Management fees paid by ResCap to AFI | $ 27.5 | $ 42.5 | $ 66.9 |
| Less: Risk management fees paid by AFI to ResCap | 6.4 | 19.4 | - |
| Net Shared Services fees paid by ResCap to AFI | $ 21.1 | $ 23.1 | $ 66.9 |

*Source: Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2009), at 206.*

These disclosures do not indicate how ResCap and AFI allocated these costs. Documents produced during the Investigation are likewise uninformative. The Debtors and AFI advised the Examiner's Professionals that only limited information exists regarding the processes and allocation methodology used for Shared Services during this period for various reasons, including personnel turnover and a lack of institutional knowledge from those years.[2578] Accordingly, the available evidence does not support a finding with regard to the consideration exchanged for Shared Services during this period.

### 3. January 2009 Through May 14, 2012

In January 2009, AFI completed the 2009 Bank Transaction and the acquisition of ResMor.[2579] The scope of Shared Services between ResCap and AFI expanded during 2009 as functional service areas and departments were consolidated and centralized at AFI.[2580] Shared Services tracking and reporting improved because of this consolidation. ResCap, AFI, and Ally Bank agreed to classify two basic categories of costs for Shared Services: (1) costs arising from services "directly benefitting another domestic or foreign [business] unit,"[2581] including rent,

---

[2577] Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2009), at 206.

[2578] Meeting with Debtors and FTI, Financial Advisor to the Debtors, in Fort Washington, PA (Mar. 25, 2013).

[2579] *See* Sections V.A. and V.F.

[2580] Int. of C. Dondzila, Sept. 27, 2012, at 51:7–53:25, 64:23–65:22; Int. of T. Hamzehpour, Oct. 5, 2012, at 64:7–65:9.

[2581] An activity was generally considered to provide a benefit if the beneficiary of the service would be willing to pay a third party to perform the same or similar activity, or if the beneficiary would have performed the same or similar activity for itself. Meeting with AFI and Ally Bank, and Kirkland & Ellis, in Detroit, MI (Oct. 23, 2012); *see also* Ally Financial, Inc., ResCap Intercompany Activity with AFI (Sept. 24, 2012), at ALLY_0182794 [ALLY_0182793].

marketing, certain information technology, and certain legal costs[2582] ("Direct Benefit Costs"); and (2) costs expended "to protect the shareholders' investment or to facilitate compliance with reporting or regulatory requirements for the benefit of the shareholder" ("Stewardship Costs").[2583] Shared Services cost allocations were often settled through intercompany accounts, with certain Direct Benefit Costs settled on a cash basis, such as rent and some legal costs.[2584]

### a. Cost Of Shared Services Provided By AFI To ResCap

Because of AFI's acquisition of Ally Bank and ResMor in January 2009, AFI no longer charged ResCap for Direct Benefit Costs related to those entities. Also, AFI decided in 2009 that it would not charge ResCap for Stewardship Costs allocable to the mortgage segment.[2585] This decision was not made until December 2009, at which time AFI forgave the outstanding payable from ResCap in the amount of $195 million related to those allocable Stewardship Costs.[2586] AFI determined that it would allocate Stewardship Costs to ResCap thereafter for internal managerial reporting purposes only.[2587] In communicating these changes to AFI personnel, Paul Grande, senior director of financial planning and analysis at ResCap, explained:

> During this year[']s plan process it was decided that the [AFI] Global Function charges would no longer be charged 100% to the ResCap legal entity. Instead, the Direct Benefit charges would be calculated as if [AFI] would separately charge ResCap, Ally Bank and ResMor Bank. Then only the ResCap LLC amount will be charged and settled with ResCap LLC. [. . .] Stewardship charges in total will be charged on a managerial basis only.[2588]

---

[2582] Meeting with Debtors and FTI, Financial Advisor to the Debtors, in Fort Washington, PA (Mar. 25, 2013).

[2583] Meeting with AFI and Ally Bank, in Detroit, MI (Oct. 24, 2012). *See also* Ally Financial, Inc., ResCap Intercompany Activity with AFI (Sept. 24, 2012), at ALLY_0182794 [ALLY_0182793].

[2584] Meeting with Debtors and FTI, Financial Advisor to the Debtors, in Fort Washington, PA (Mar. 25, 2013).

[2585] E-mail from P. Grande (Dec. 2, 2009), at ALLY_0182846 [ALLY_0182793].

[2586] Residential Capital, LLC Consolidated Financial Statements for the Years Ended December 31, 2009 and 2008 (Feb. 26, 2010), at EXAM00124502 [EXAM00124455]. *See also* Ally Financial, Inc., ResCap Intercompany Activity with AFI (Sept. 24, 2012), at ALLY_0182794 [ALLY_0182793] and E-mail from P. Grande (Dec. 2, 2009), at ALLY_0182846 [ALLY_0182793].

[2587] E-mail from P. Grande (Dec. 11, 2009), at ALLY_0182847 [ALLY_0182793].

[2588] *Id.*

The management fees charged to ResCap by AFI for Shared Services increased in 2009 and 2010 as reflected in the table below. Much of the increase resulted from the further centralization of corporate services and functions, as reflected in the table below. The net amount of Shared Services fees paid by ResCap to AFI represented the Direct Benefit Costs allocated by AFI to ResCap.[2589] This increase in management fees was offset, however, by the decrease in ResCap's total compensation and benefits expense because of the transfer of departments and employees to AFI.

EXHIBIT V.H.3—1
**Shared Services Activity**
2008 – 2011
*($ in Millions)*

|  | 2008 | 2009 | 2010 | 2011 |
|---|---|---|---|---|
| Management fees paid by ResCap to AFI | $  66.9 [(1)] | $  284.6 | $  93.3 | $  67.7 |
| Less: Forgiveness of Stewardship Costs allocation | - | 195.0 | - | - |
| Risk management fees paid by AFI to ResCap | - | - | - | - |
| Net Shared Services fees paid by ResCap to AFI | $  66.9 | $  89.6 | $  93.3 | $  67.7 |
| ResCap compensation and benefits expense | $  791.3 | $  344.0 | $  261.8 | $  319.6 |

[(1)] *2008 Management Fees Paid by ResCap to AFI of $66.9 million include the cost of Shared Services rendered by AFI to ResCap for the benefit of Ally Bank and ResMor, both of which were acquired by AFI in January 2009.*
*Source: Residential Capital, LLC Consolidated Financial Statements for the Years Ended December 31, 2009 and 2008 (Feb. 26, 2010) [EXAM00124455]; Residential Capital, LLC Consolidated Financial Statements for the Years Ended December 31, 2011 and 2010 (Mar. 28, 2012) [EXAM00122651].*

---

[2589] *See* Project Bounce, Shared Services UCC Requests [EXAM00219984].

In preparing for ResCap's chapter 11 filing (as further described below), ResCap and AFI analyzed both the Direct Benefit Costs and Stewardship Costs allocated for managerial reporting purposes on a monthly basis, breaking down the allocation by functional area in 2011 through April 2012 (the "Prepetition Shared Services Analysis"). The Examiner's Financial Advisors analyzed the Debtors' records of Stewardship Costs charged to the mortgage segment for the benefit of ResCap and Ally Bank, and the Direct Benefit Costs allocated to ResCap for cash settlement.[2590] The table below summarizes the percentage of total Shared Services Costs allocated by AFI to the mortgage segment for the benefit of ResCap and Ally Bank that were charged to ResCap under the Prepetition Shared Services Analysis.

EXHIBIT V.H.3–2
**Portion of Mortgage Segment Shared Services Costs Allocated to ResCap**
*($ in Millions)*

|  | 2010 | 2011 | Apr. 2012 |
|---|---|---|---|
| Total Shared Services costs allocated by AFI to mortgage segment | $   322.8 | $   283.9 | $   97.8 |
| Portion of total Shared Services costs allocated to ResCap | 92.0 [(1)] | 67.7 | 38.3 |
| Percentage of total Shared Services costs allocated to ResCap | 28.5% | 23.8% | 39.2% |

[(1)] *The $92.0 million of total Shared Services costs allocated to ResCap in 2010 per this source is $1.3 million less than the $93.3 million reported in ResCap's audited financial statements. See Residential Capital, LLC Consolidated Financial Statements for the Years Ended December 31, 2011 and 2010 (Mar. 28, 2012) [EXAM00122651].*
*Source: Project Bounce, Shared Services UCC Requests [EXAM00219984].*

The balance of the total Shared Services Costs allocated by AFI to the mortgage segment primarily represented Stewardship Costs and costs associated with ResMor and Ally Bank. These balances total approximately $230.8 million for 2010 and $216.2 million for 2011.

### b. Cost Of Shared Services Provided By ResCap To Ally Bank

Regulations applicable to Ally Bank required that transactions with affiliates be on terms at least as favorable to Ally Bank as those applicable to nonaffiliated companies.[2591] Because ResCap determined that the process of documenting the terms of comparable transactions with nonaffiliated companies was difficult, it historically rendered services to Ally Bank at no

---

[2590] *Id.*

[2591] Federal Reserve Act, section 23B, "Restrictions on Transactions with Affiliates," as implemented by Regulation W, requires that "A member bank and its subsidiaries may engage in [transactions involving the payment of money or the furnishing of services to an affiliate under contract, lease, or otherwise] only – (A) on terms and under circumstances, including credit standards, that are substantially the same, or at least as favorable to such bank or its subsidiary, as those prevailing at the time for comparable transactions with or involving other nonaffiliated companies, or (B) in the absence of comparable transactions, on terms and under circumstances, including credit standards, that in good faith would be offered to, or would apply to, nonaffiliated companies." 12 U.S.C. 371c – 1(a)(1).

cost.[2592] Prior to the 2009 Bank Transaction, this arrangement did not affect ResCap's overall financial results because AFI's entire mortgage segment was consolidated within ResCap. ResCap's financial statements during the period 2009 through 2011 noted the following:

> [ResCap] provides office facilities and a wide range of administrative services, including legal, risk, capital markets, finance and accounting, and information technology support to Ally Bank under an administrative services agreement.[2593] No fees were collected during the year . . . for these facilities and services. . . . [ResCap] contracts with Ally Bank to provide document custody services including, certifications, releases, reinstatements and file maintenance.[2594]

The Examiner's Financial Advisors analyzed various data prepared in connection with the Prepetition Shared Services Analysis, as described below. While not comprehensive, the review supports the Debtors' contention that the value of uncompensated Shared Services rendered by ResCap to Ally Bank was significantly less than the unallocated Stewardship Costs not charged by AFI to ResCap from 2009 to 2011.[2595]

### c. Statements Of Work And Negotiations Of Shared Services In Preparation For ResCap's Filing

ResCap and AFI commenced a joint effort in 2011—the Prepetition Shared Services Analysis—to document the services each company provided to the other or its Affiliates in preparation for ResCap's bankruptcy filing.[2596] ResCap appointed groups of employees who were knowledgeable regarding each functional service area.[2597] These designated ResCap employees engaged in frequent conversations and met on several occasions with their

---

[2592] *See, e.g.,* Memorandum, Administrative Services Agreement Between GMAC Mortgage and GMAC Bank (Aug. 1, 2007) [ALLY_0017837] (referencing statement that "[a]ll services provided under this agreement are at no charge to the Bank.").

[2593] *See, e.g.,* Administrative Services Agreement by and between Residential Funding Company, LLC and GMAC Bank, dated Oct. 31, 2006 [ALLY_0017710]; and Administrative Services Agreement by and between GMAC Mortgage, LLC and GMAC Bank, dated Nov. 22, 2006; ResCap, LLC Quarterly Report (Form 10-Q) (May 11, 2009), at 558.

[2594] Residential Capital, LLC Consolidated Financial Statements for the Years Ended December 31, 2009 and 2008, at EXAM00124556 [EXAM00124455].

[2595] Meeting with FTI, Financial Advisor to the Debtors, in Fort Washington, PA (Mar. 25, 2013). Whitlinger explained that the uncompensated Shared Services provided by AFI and Ally Bank to ResCap were in excess of those provided by ResCap to Ally Bank.

[2596] Declaration of James Whitlinger, Chief Financial Officer of Residential Capital, LLC, in Further Support of Entry of Final Orders for Specific "First Day" Motions [Docket No. 257] at 3; Meeting with FTI, Financial Advisor to the Debtors, in Fort Washington, PA (Mar. 25, 2013).

[2597] Declaration of James Whitlinger, Chief Financial Officer of Residential Capital, LLC, in Further Support of Entry of Final Orders for Specific "First Day" Motions [Docket No. 257] at 3.

counterparts at AFI and with ResCap's counsel, Morrison & Foerster, resulting in the production of over fifty detailed descriptions, or "Statements of Work" ("SOW"),[2598] regarding the identified Shared Services.[2599]

ResCap analyzed the SOW during the bankruptcy planning process to determine which services were essential for continued operations during its bankruptcy and sale process. ResCap engaged in negotiations with AFI over the course of several months to eliminate services deemed unnecessary.[2600] This process ultimately resulted in a significant reduction in the services the two companies provided to each other.[2601] Whitlinger explained:

> [W]hen negotiations began between the companies, AFI was seeking compensation for shared services in an amount of approximately $300 million annually, which reflected the

---

[2598] *See, e.g.,* Affiliate Statement of Work for Accounting to Master Services Agreement Dated August 1, 2011 [ALLY_PEO_0030748]; Affiliate Statement of Work for Capital Markets to Master Services Agreement Between Ally Bank and Residential Capital, LLC, dated August 1, 2011 [ALLY_PEO_0030703].

[2599] Declaration of James Whitlinger, Chief Financial Officer of Residential Capital, LLC, in Further Support of Entry of Final Orders for Specific "First Day" Motions [Docket No. 257] at 3; Meeting with FTI, Financial Advisor to the Debtors, in Fort Washington, PA (Mar. 25, 2013). *See also* Int. of C. Dondzila, Nov. 9, 2012, at 214:18–215:6. To determine the cost of each of the Shared Services, the designated groups of employees conducted personnel surveys in each functional area to determine the percentage of time each employee typically spent performing work on certain tasks for the benefit of ResCap, AFI, or their various affiliates, including Ally Bank. These percentages were applied to the functional costs (e.g., salaries plus overhead) to determine the pricing basis for the tasks identified within each SOW. *See* Declaration of James Whitlinger, Chief Financial Officer of Residential Capital, LLC, in Further Support of Entry of Final Orders for Specific "First Day" Motions [Docket No. 257] at 4; Meeting with FTI, Financial Advisor to the Debtors, in Fort Washington, PA (Mar. 25, 2013).

[2600] AFI provided a number of cost allocation templates for various shared services that ResCap and AFI identified and negotiated, which illustrate the results of the efforts described above. For example, the cost allocation template for human resources included, among other data, the following: (1) identification of the various functional areas (e.g., benefits administration, compensation, employee relations, staffing administration); (2) description of the service provided; (3) identification of the entity providing the service (i.e., either ResCap or AFI); (4) identification of the entity receiving the service (i.e., either ResCap, AFI, or Ally Bank); (5) identification of any SOW, existing contract, or formal agreement, whether intercompany or with third parties; (6) the allocation methodology employed (e.g., time studies); and (7) the total expense allocation on a monthly or per annum basis for each service. *See, e.g.,* Shared Services Analysis Cost Allocation Template, Human Resources [ALLY_0021129]; Shared Services Analysis Cost Allocation Template, ITG [ALLY_0021111]; and Shared Services Analysis Cost Allocation Template, Legal [ALLY_0021136].

[2601] Meeting with FTI, Financial Advisor to the Debtors, in Fort Washington, PA (Mar. 25, 2013); Declaration of James Whitlinger, Chief Financial Officer of Residential Capital, LLC, in Further Support of Entry of Final Orders for Specific "First Day" Motions [Docket No. 257] at 2–4 (Whitlinger further indicates that negotiations resulted in a total of 31 SOWs for which AFI provided services to ResCap, and a total of 20 SOWs for which ResCap provided services to AFI). *See also* Project Bounce, Shared Services UCC Requests [EXAM00219984] (indicating that services negotiated out included those related to Bank Holding Company status, information technology projects related to the general ledger and Basel compliance, and general accounting services).

> approximate annual cost of "shared services" for the total
> mortgage operations over the last several years prior to the filing.
> As a result of the intensive and thorough negotiations that
> occurred between the two companies, the final cost to ResCap for
> services provided by AFI [. . .] was reduced to $123 million – a
> significant reduction reflecting the provision of services that are
> absolutely necessary to the functioning of ResCap and its
> subsidiaries as debtors in possession.[2602]

The approximately $300 million in Shared Services to which Whitlinger referred above
includes Stewardship Costs and Direct Benefit Costs for the mortgage segment—ResCap,
Ally Bank and ResMor. The "final cost" of $123 million represented an increase of
approximately $55.3 million (or approximately 82%) from the 2011 Direct Benefit Costs
($67.7 million) paid by ResCap to AFI. This differential reflects postpetition several structural
and philosophical changes, including: (1) ResCap discontinued receiving certain Shared
Services; (2) AFI absorbed the costs for services previously provided by ResCap to Ally Bank
under the Administrative Services Agreement; (3) AFI transferred certain shared employees
and functions to ResCap to enhance corporate separateness; (4) and AFI began charging
ResCap for certain previously unallocated Stewardship Costs. The 82% increase in the cost of
Shared Services to ResCap when negotiated on a stand-alone basis supports the notion that
ResCap was receiving a prepetition net benefit relative to AFI and Ally Bank.

The Examiner's Financial Advisors analyzed the cost allocation templates prepared
through the Prepetition Shared Services Analysis that documented the nature and cost of
services related to six functional areas: information technology, human resources, treasury,
compliance, supply chain, and legal.[2603] The Examiner's Financial Advisors noted that, for
each functional area, the scope and cost of Shared Services provided by AFI for the benefit of
ResCap exceeded the scope and cost of Shared Services provided by ResCap for the Benefit
of AFI and Ally Bank.

---

[2602] Declaration of James Whitlinger, Chief Financial Officer of Residential Capital, LLC, in Further Support of
Entry of Final Orders for Specific "First Day" Motions [Docket No. 257] at 5.

[2603] *See* Shared Services Analysis Cost Allocation Template, ITG [ALLY_0021111]; Shared Services Analysis
Cost Allocation Template, Human Resources [ALLY_0021129]; Shared Services Analysis Cost Allocation
Template, Treasury [ALLY_0004788]; Shared Services Analysis Cost Allocation Template, Compliance
[ALLY_0004799]; Shared Services Analysis Cost Allocation Template, Supply Chain [ALLY_0004800];
and Shared Services Analysis Cost Allocation Template, Legal [ALLY_0021136]).

### 4. *Postpetition*

ResCap's and AFI's Shared Services analyses and negotiations culminated in the drafting of the Shared Services Agreement, which the Bankruptcy Court approved, authorized, and directed ResCap to execute on June 15, 2012, retroactive to the Petition Date.[2604]

The Shared Services Agreement included various schedules detailing the functional areas and services to be provided by either ResCap or AFI under the various SOW and the estimated monthly variable or fixed cost for each service.[2605] The services identified included, among other things:

> (i) information technology services; (ii) employee benefits administration and other human resources functions; (iii) accounting, tax and internal audit services; (iv) treasury and collateral management; (v) risk management functions; (vi) supply chain management, including procurement of goods and services from third parties; (vii) government and regulatory relations and compliance services; (viii) facilities management services; (ix) marketing services; and (x) capital markets services relating to managing the value of certain of the Debtors' loan servicing rights.[2606]

The total monthly cost to ResCap for postpetition services provided by AFI was estimated to be $10.2 million, while the total monthly cost to AFI for services provided by ResCap postpetition was estimated to be $4.4 million. The resulting estimated monthly net cash settlement of $5.8 million would be payable by ResCap to AFI.[2607] The monthly cost of postpetition Shared Services that ResCap agreed to provide to Ally Bank was $3 million[2608] or approximately $36 million per year.

---

[2604] *See* Final Order Under Bankruptcy Code Sections 105(a) and 363(b) Authorizing Residential Capital, LLC to Enter Into a Shared Services Agreement with Ally Financial Inc. *Nunc Pro Tunc* to the Petition Date for the Continued Receipt and Provision of Shared Services Necessary for the Operation of the Debtors' Businesses [Docket No. 387].

[2605] *Id.* Ex. A.

[2606] First Day Affidavit, at 84. The description of Shared Services evolved over time.

[2607] Final Order Under Bankruptcy Code Sections 105(a) and 363(b) Authorizing Residential Capital, LLC to Enter Into a Shared Services Agreement with Ally Financial Inc. *Nunc Pro Tunc* to the Petition Date for the Continued Receipt and Provision of Shared Services Necessary for the Operation of the Debtors' Businesses, at Exhibit A [Docket No. 387].

[2608] *Id.* Schedule C-2 to the Shared Services Agreement estimated the monthly cost for information technology, capital markets, human resources, risk management, legal, accounting, finance, and consumer lending services rendered by ResCap to Ally Bank to be approximately $3 million.

*5.  AFI Proof Of Claim*

AFI filed a proof of claim related to "shared services" in ResCap's Chapter 11 Cases, asserting that "[b]efore the Petition Date, the Debtors did not satisfy certain amounts owed to [AFI] or third-party vendors for various shared services provided by [AFI] for or on behalf of the Debtors."[2609] AFI enumerated sixteen claims for "unreimbursed costs, expenses, or losses that it has incurred in relation to prepetition shared services" totaling approximately $169.1 million, plus one additional claim for an unliquidated amount.[2610] The four largest claims accounted for $168.2 million of the total and included the following:

- Up to $98 million on account of pension underfunding for the Employees' Retirement Plan for GMAC Mortgage Group, LLC, which represents the amount of underfunding allocable to ResCap.

- Approximately $49 million on account of cash payments made or to be made by AFI to certain of the Debtors' employees for delayed compensation pursuant to the Troubled Asset Relief Program under the Emergency Economic Stabilization Act of 2008 earned by Debtors' employees before the Petition Date.

- $15.8 million on account of ResCap's portion of shared insurance coverage premiums, which were paid by AFI before the Petition Date.

- $5.4 million on account of ResCap's allocable share of prepetition expenditures by AFI in relation to the construction of a mortgage information warehouse . . . in order to comply with the Basel Accords.[2611]

Despite the characterization of this proof of claim as being related to "shared services," it appears that the vast majority of the amount relates to discrete compensation and benefit claims rather than the allocable service charges that were the subject of the Examiner's inquiry. The Examiner's Professionals have not investigated the status of any amounts paid or objections filed by ResCap in regard to AFI's proof of claim.

*6.  Conclusion*

For the period of April 2005 through December 2008, the available evidence does not permit a conclusion to be formed with regard to the consideration exchanged for Shared Services.

For the period of January 2009 through the Petition Date, when considering the excess of unallocated Stewardship Costs over the likely amounts that remained uncompensated to ResCap under the Administrative Services Agreement with Ally Bank, the Examiner concludes that the evidence supports the proposition that ResCap received adequate consideration for Shared Services by and among ResCap, AFI, and Ally Bank.

---

[2609] Addendum to Proof of Claim of Ally (Nov. 6, 2012), at 16 [Claim No. 3974].

[2610] *Id.* at 16–19.

[2611] *Id.* at 16.