## VI. EXAMINER'S ASSESSMENT OF RESCAP'S FINANCIAL CONDITION

Several of the causes of action analyzed in this Report require the Examiner to assess whether ResCap (or, in some instances, RFC and GMAC Mortgage) was insolvent or in financial distress as prescribed by the applicable Bankruptcy Code provisions and analogous state-law statutes at various relevant times preceding the commencement of the Debtors' bankruptcy cases. This Section contains the Examiner's analysis and conclusions on these issues.

## A. GENERAL INTRODUCTION TO ANALYSIS OF A DEBTOR'S FINANCIAL CONDITION

Section VII includes a comprehensive analysis and evaluation of the principal claims that could be asserted on behalf of the Debtors' bankruptcy estates against AFI, Cerberus, and their respective affiliates. In addition to being a necessary element of certain claims (such as constructive fraudulent transfer, preference, or breach of fiduciary duties while insolvent), ResCap's financial condition over time is relevant to the Examiner's assessment of other significant issues, claims, and potential remedies.

For a constructive fraudulent transfer claim to succeed, a plaintiff must show—in addition to establishing the absence of reasonably equivalent value—that the relevant debtor was financially impaired (as defined in any of three separate statutory tests), or became so, at the time of the challenged transfer. The three disjunctive tests of financial distress focus respectively on: (1) whether the sum of the debtor's debts (including its contingent and/or unliquidated liabilities) is greater than all of the debtor's assets, at a fair valuation (the Balance Sheet Test); (2) whether the debtor was left with "unreasonably small capital [or assets]" to carry on its business (the "inadequate capital" test); or (3) whether the debtor intended or believed that it was or would become unable to pay its debts as they became due (the "inability to pay" test).[1]

Claims to avoid preferences under section 547 of the Bankruptcy Code and claims to avoid "insider preferences" under section 5(b) of the UFTA (as enacted in various relevant states) require a demonstration of insolvency pursuant to the Balance Sheet Test. Claims based on breaches of fiduciary duty while insolvent look to state law to determine the relevant measure of financial distress.

This Section examines the financial condition of ResCap (and, as appropriate, RFC and GMAC Mortgage) at various relevant times by reference to the applicable legal tests for financial distress under the Balance Sheet Test, inadequate capital test, and inability to pay test. Section VII discusses the applicable tests for financial impairment as to each type of claim analyzed.

---

[1] *MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Servs. Co.*, 910 F. Supp. 913, 936, 943 (S.D.N.Y. 1995).

## B. BALANCE SHEET TEST

### 1. Introduction

The first of the three disjunctive tests of financial distress for a constructive fraudulent transfer analysis seeks to determine the insolvency of the debtor through what is commonly known as the Balance Sheet Test.[2] The Balance Sheet Test is the exclusive manner of assessing a debtor's financial condition in avoidable preference litigation.[3]

In the Bankruptcy Code, "insolvent" is defined as a "financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation . . . ."[4] Section 2 of the UFCA states that "[a] person is insolvent when the present fair salable value of his assets is less than the amount that will be required to pay his probable liability on his existing debts as they become absolute and matured."[5] The UFTA states that "[a] debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets, at a fair valuation."[6] The UFCA, in effect in New York, predates the Bankruptcy Code's and the UFTA's definition of insolvency. The UFTA's definition of insolvency is generally patterned on the definition in the Bankruptcy Code. Although authorities have acknowledged that the Balance Sheet Tests for financial distress under the UFCA, the Bankruptcy Code, and the UFTA differ slightly,[7] there is general agreement that the similarities between the three statutes justify a substantially similar analysis.[8]

---

[2]   11 U.S.C. § 548(a)(1)(B)(ii).

[3]   *Id.* § 547(b)(3).

[4]   *Id.* § 101(32)(A).

[5]   UFCA § 2(1); N.Y. DEBT. & CRED. LAW § 271.

[6]   UFTA § (2)(a).

[7]   *See, e.g.*, *Bay Plastics, Inc.* v. *BT Commercial Corp.* (*In re Bay Plastics, Inc.*), 187 B.R. 315, 328 n.22 (Bankr. C.D. Cal. 1995) (noting slightly different definitions of insolvency under the Bankruptcy Code, the UFCA, and the UFTA).

[8]   *See, e.g.*, *Sharp Int'l Corp. v. State St. Bank & Trust Co.* (*In re Sharp Int'l Corp.*), 403 F.3d 43, 55 (2d Cir. 2005) (noting "New York's policy in favor of national uniformity in UFCA law") (citing *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 634 n.8 (2d Cir.1995) ("In order to promote a uniform national interpretation of the UFCA, both this Circuit and the courts of New York have encouraged recourse to the case law of other jurisdictions.") (citation omitted)); *Nisselson v. Empyrean Inv. Fund, L.P.* (*In re MarketXT Holdings Corp.*), 376 B.R. 390, 420 n.42 (Bankr. S.D.N.Y. 2007) ("[T]here is no dispute that Federal and State law are virtually identical as to their requirements for proving a constructive fraudulent conveyance."); *Moody v. Sec. Pac. Bus. Credit, Inc.*, 971 F.2d 1056, 1068 (3d Cir. 1992) ("The fraudulent conveyance provisions of the Bankruptcy Code are modeled on the UFCA, and uniform interpretation of the two statutes is essential to promote commerce nationally. . . . [A]lthough the UFCA's 'present fair salable value' language differs from the Bankruptcy Code's 'fair valuation' requirement . . . we find the bankruptcy cases instructive on the proper valuation standard here." (citation omitted)); *Kaler v. Red River Commodities, Inc.* (*In re Sun Valley Prods., Inc.*), 328 B.R. 147, 155 (Bankr. D.N.D. 2005) ("The language of UFTA and section 548 are nearly identical . . . . Considering the similarities in purpose and language, many courts have concluded that the UFTA and section 548 are *in pari materia*, and that the same analysis applies under both laws. The Court finds the reasoning behind these cases persuasive and will analyze the transfer at issue only under the purview of section 548." (citation omitted)).

*2.  Methodology*

The basic methodology for assessing whether a debtor is insolvent is generally well established in the law and the relevant valuation literature. The following steps are performed to ensure both the relevance and reliability of the valuation analysis: (1) define the legal interest to be valued; (2) identify ownership interest characteristics (such as controlling, marketable, etc.); (3) select a relevant date (usually the transfer date); (4) determine the purpose of the valuation (avoidance action, breach of duty, etc.); (5) identify the applicable standard of value; (6) identify the applicable premise of value; (7) select the applicable valuation approaches (for example, the Market Approach, Asset-Based Approach, and/or Income Approach, etc.); (8) reach a conclusion on value, making appropriate adjustments for control or lack of control, marketability, etc.; and (9) cross-validate valuation results.[9] The determination of the appropriate standard of value, premise of value, and valuation approaches are discussed in greater detail in the following Sections.

*a.  Standard Of Value*

The Bankruptcy Code provides that an insolvency determination should compare the debts of the debtor with its property at a "fair valuation." The UFCA and UFTA are substantially similar in this regard. The Bankruptcy Code does not define a "fair valuation." Although the standard of Fair Market Value is specifically mentioned in section 522(a)(2) of the Bankruptcy Code, it is not specifically used in the definition of insolvency under section 101(32). The conventional use of Fair Market Value in an insolvency determination has been developed by courts, which have maintained the flexibility to vary from that standard of value in appropriate circumstances. There is a strong practice among courts and valuation experts to embrace a Fair Market Value standard when assessing "fair valuation" under the Bankruptcy Code or the UFTA. Although the UFCA uses the term "fair salable value" as opposed to "fair valuation," courts have stated that "fair salable value" means "that value which can be obtained if the assets are liquidated with reasonable promptness in an arm's-length transaction in an existing and not theoretical market."[10] Thus, authorities generally conclude that a "fair valuation" and "fair salable value" both mean Fair Market Value, absent circumstances to justify any deviation. Fair Market Value is defined as:

> [T]he price, expressed in terms of cash equivalents, at which property would change hands between a hypothetical willing and able buyer and a hypothetical willing and able seller, acting

---

[9]   Assoc. of Insolvency & Restructuring Advisors, Certification in Distressed Business Valuation Study Course Part 2: Advanced Business Valuation 3–9 (Sept. 22, 2010); *see also* Shannon P. Pratt with Alina V. Niculita, Valuing A Business: The Analysis and Appraisal of Closely Held Companies 30–31 (5th ed. 2008).

[10]   *United States v. Gleneagles Inv. Co.*, 565 F. Supp. 556, 578 (M.D. Pa. 1983), *aff'd sub nom. United States v. Tabor Court Realty Corp.,* 803 F.2d 1288 (3d Cir. 1986).

at arm's length in an open and unrestricted market, when neither is under compulsion to buy or sell and when both have reasonable knowledge of the relevant facts.[11]

### b. Premise Of Value

Valuation theory includes two operational premises of value that are regularly recognized by bankruptcy courts: going concern value and liquidation value. These premises are defined as follows:

- ***Going concern value*** is defined as "the value of a business enterprise that is expected to continue to operate into the future. The intangible elements of [g]oing [c]oncern [v]alue result from factors such as having a trained work force, an operational plant, and the necessary licenses, systems, and procedures in place."[12]

- ***Liquidation value*** is defined as "the net amount that would be realized if the business is terminated and the assets are sold piecemeal. Liquidation can be either 'orderly' or 'forced.'"[13]

Where liquidation is not clearly imminent on the date of the challenged transfer, it is generally accepted that assets should be valued under a going concern basis or "determined by the fair market price of the debtor's assets that could be obtained if sold in a prudent manner within a reasonable period of time to pay the debtor's debts."[14]

---

[11] INTERNATIONAL GLOSSARY OF BUSINESS VALUATION TERMS, Statement on Standards for Valuation Services No. 1 app. B, at 44 (Am. Inst. of Certified Pub. Accountants 2007), http://www.aicpa.org/InterestAreas/ ForensicAndValuation/DownloadableDocuments/SSVS_Full_Version.pdf.

[12] *Id.* at 45.

[13] *Id.* at 46.

[14] *Lawson v. Ford Motor Co.* (*In re Roblin Indus., Inc.*), 78 F.3d 30, 35 (2d Cir. 1996).

### c.  *Valuation Approaches*

Three valuation approaches are commonly used in assessing insolvency: the Market Approach, the Asset-Based Approach, and the Income Approach.[15] Numerous valuation methods can be applied under each of these three approaches.[16] The appropriate use of any of these valuation methods depends on the circumstances of the valuation and the reasoned judgment of the valuation expert.[17] Once the valuation is performed, the resulting Fair Market Value of invested capital[18] (or assets) is compared to a company's debts (or liabilities) with the result indicating whether a debtor is insolvent under the Balance Sheet Test as of the valuation date.[19]

### *(1) Market Approach*

The Market Approach indicates the Fair Market Value of a company based on its market capitalization (if publicly traded) or a comparison of the subject company to similar publicly traded companies and transactions in its industry.[20] The Market Approach can be applied through a number of different methods including the Guideline Publicly Traded Company Method, the Guideline M&A Method, and the Observable Market Value Method.

### *(a) Guideline Publicly Traded Company Method*

The Guideline Publicly Traded Company Method provides an indication of the Fair Market Value of a business by developing valuation multiples based on prices at which securities of similar companies are trading in a public market.[21] These market-based multiples are then applied to the operating results of the subject business, resulting in an estimate of the Fair Market Value of invested capital or equity (depending on the nature of the multiple

---

[15] SHANNON P. PRATT WITH ALINA V. NICULITA, VALUING A BUSINESS: THE ANALYSIS AND APPRAISAL OF CLOSELY HELD COMPANIES 62 (5th ed. 2008).

[16] For example, the DCF Method is a method under the Income Approach, the Guideline Publicly Traded Company Method is a method under the Market Approach, and the Adjusted Book Value Method is a method under the Asset-Based Approach.

[17] *Statutory Comm. of Unsecured Creditors ex rel. Iridium Operating LLC v. Motorola, Inc.* (*In re Iridium Operating LLC*), 373 B.R. 283, 351 (Bankr. S.D.N.Y. 2007) (noting that certain valuation methods may be preferred in certain circumstances).

[18] Invested capital is defined as the sum of equity and interest-bearing debt in a business. INTERNATIONAL GLOSSARY OF BUSINESS VALUATION TERMS, Statement on Standards for Valuation Services No. 1 app. B, at 45 (Am. Inst. of Certified Pub. Accountants 2007), http://www.aicpa.org/InterestAreas/ ForensicAndValuation/DownloadableDocuments/SSVS_Full_Version.pdf.

[19] Section VI.B.5 discusses the treatment of contingent or unliquidated liabilities for purposes of the Balance Sheet Test.

[20] SHANNON P. PRATT WITH ALINA V. NICULITA, VALUING A BUSINESS: THE ANALYSIS AND APPRAISAL OF CLOSELY HELD COMPANIES 265, 310 (5th ed. 2008).

[21] *Id.* at 265.

applied) on a marketable, minority basis. A premium for control, if applicable, is then applied to the equity to indicate the Fair Market Value of equity of the subject business on a marketable, controlling basis.[22] The Fair Market Value of debt is added to derive the Fair Market Value of invested capital.

The Guideline Publicly Traded Company Method is also known as the "Comparable Company" approach for its direct reliance on a set of comparable companies to estimate the market value of the subject company, or as the "Market Multiple" approach for its direct reliance on the selection of an appropriate range of risk-adjusted multiples based upon revenues, earnings, or some other appropriate measure under the circumstances to determine the value of a business.[23]

### (b) Guideline M&A Method

The Guideline M&A Method estimates the Fair Market Value of a business based on exchange prices in actual transactions for controlling interests in similar companies.[24] This process involves comparison and correlation of the subject business with similar companies acquired within a reasonable time of the valuation date. Considerations such as location, time of sale, operating characteristics, and conditions of sale are analyzed for the guideline companies. This variation of the Market Approach results in an indicated Fair Market Value of the subject business on a marketable, controlling basis.[25]

### (c) Observable Market Value Method

The Observable Market Value Method relies on the use of the quoted market prices of the equity and/or debt securities of the subject company trading in active, well-informed, and efficient markets. For purposes of the Balance Sheet Test, this method assumes that the combined market value of the company's debt and equity is a proxy for the Fair Market Value of the company's assets, net of non-debt current liabilities.[26]

For equity, the quoted market price per share is multiplied by the number of equity shares outstanding to yield the Fair Market Value of the equity of a business on a marketable, minority basis. A premium for control, if applicable, is then applied to indicate the Fair Market Value of the equity of a business on a marketable, controlling basis.[27] For debt, the

[22] *Id.* at 265–269.

[23] *Lids Corp. v. Marathon Inv. Partners, L.P.* (*In re Lids Corp.*), 281 B.R. 535, 540, 542–543 (Bankr. D. Del. 2002).

[24] SHANNON P. PRATT WITH ALINA V. NICULITA, VALUING A BUSINESS: THE ANALYSIS AND APPRAISAL OF CLOSELY HELD COMPANIES 310 (5th ed. 2008).

[25] *Id.* at 311.

[26] The sum of the interest-bearing debt and equity of a company (i.e., invested capital) is equivalent to the total assets of a company, net of non-debt current liabilities.

[27] This represents the value of the equity component of a company's overall capital structure and is not necessarily indicative of solvency.

quoted market price is multiplied by the face value of debt to yield the Fair Market Value of debt. The equity and debt values are combined to arrive at the indicated Fair Market Value of invested capital of the business on a marketable, controlling basis.

The Observable Market Value Method, also known as the "Market Capitalization Method" or the "Stock and Debt" method, [28] focuses on a "company's stock price [as] an 'ideal datapoint' for determining value."[29] This method can be advantageous because it is "untainted by hindsight or post-hoc litigation interests."[30] Moreover, recognizing that individual equity prices represent a minority equity interest in the company, a control premium adjustment may be necessary.[31] The application of a control premium, when warranted, results in the Fair Market Value of an entity on a controlling basis exceeding the Fair Market Value of an entity on a non-controlling or minority basis. The Observable Market Value Method may not be appropriate in circumstances where markets are illiquid, inefficient, or where events drive market prices away from the economic fundamentals of the business.[32]

### (2) Asset-Based Approach

The Asset-Based Approach indicates the Fair Market Value of a business by adjusting the assets and liabilities of the subject company to their market value equivalents.[33] The Asset-Based Approach is based on the summation of the individual values of the underlying assets, properties, and/or business units of a company. This approach can be performed using the "Adjusted Book Value Method,"[34] which involves examining the book value of a company's

---

[28] BRADFORD CORNELL, CORPORATE VALUATION 34 (1993).

[29] *Statutory Comm. of Unsecured Creditors ex rel. Iridium Operating LLC v. Motorola, Inc.* (*In re Iridium Operating LLC*), 373 B.R. 283, 291 (Bankr. S.D.N.Y. 2007) ("[P]ublic markets constitute a better guide to fair value than the opinions of hired litigation experts whose valuation work is performed after the fact and from an advocate's point of view." (citing *VFB LLC v. Campbell Soup Co.*, 482 F.3d 624 (3d Cir. 2007))).

[30] *In re Iridium,* 373 B.R. at 346 (citing *VFB LLC v. Campbell Soup Co.*, Civ.A.02-137 KAJ, 2005 WL 2234606, at *22 (D. Del. Sept. 13, 2005), *aff'd*, 482 F.3d 624 (3d Cir. 2007)).

[31] ACCOUNTING STANDARDS CODIFICATION 350-20-35-23 (FASB 2013).

[32] *In re Emerging Comm'cns, Inc. Shareholders Litig.*, No. Civ.A 16415, 2004 WL 1305745, at *23 (Del. Ch. June. 4, 2004) (noting that under Delaware law, "the market price of shares is not always indicative of value," and rejecting defendant's argument that the market price of its stock corroborated the fair value of defendant, in part because defendant's expert testified that "markets occasionally make errors, . . . it is possible for a stock that trades even in an efficient market to be mispriced, especially in the short run, . . . [and] the market may be inefficient if material information is withheld from it" (internal citations omitted)).

[33] For purposes of the Balance Sheet Test, it is only necessary to estimate the Fair Market Value of the total assets when applying the Asset-Based Approach. The Fair Market Value of the total assets is then compared to the face value of the total liabilities to assess insolvency. Total liabilities include interest-bearing liabilities, non-interest bearing liabilities (i.e., payables, accrued expenses, and other current and non-current liabilities, etc.), and contingent and/or unliquidated liabilities.

[34] SHANNON P. PRATT WITH ALINA V. NICULITA, VALUING A BUSINESS: ANALYSIS AND APPRAISAL OF CLOSELY HELD COMPANIES 352 (5th ed. 2008).

assets and liabilities and making adjustments to reflect market value. The book value is generally the accounting value of a company's assets and liabilities as determined under GAAP, which is then subjected to adjustments to reflect market value.[35] One should also consider any off-balance sheet assets or liabilities when applying the Adjusted Book Value Method to estimate the Fair Market Value of a business, as discussed in Section VI.B.5. Courts caution that accounting values may not be reflective of Fair Market Value, and, in particular, certain assets and liabilities may not be listed on the balance sheet because GAAP limits inclusion on the balance sheet to known and quantifiable assets and liabilities.[36]

### (3) Income Approach

The Income Approach indicates the Fair Market Value of a business based on the value of the cash flows the business can be expected to generate in the future.[37] This analysis is commonly performed using the DCF Method, which discounts a projection of a company's future cash flows to present value at an appropriate discount rate.[38] Typically, the DCF Method has three basic components: (1) an estimation of projected net cash flows that the firm will generate over a relevant and discrete period; (2) a terminal or residual value equal to the future value, as of the end of the projection period, of the firm's net cash flows beyond the projection period; and (3) a cost of capital with which to discount to a present value both the projected net cash flows and the estimated terminal or residual value.[39]

Contemporaneous projections should be considered for their reasonableness and whether they were prudently prepared when applying the Income Approach.[40] The Examiner's Financial Advisors reviewed various sets of ResCap's projections prepared from 2006 through 2010 and did not find these projections to be reliable for purposes of assessing insolvency for several reasons, including: (1) ResCap's historical inability to meet its annual budgets and financial projections; (2) ResCap management's commentary regarding the difficulty of forecasting the performance of key assets of its business;[41] and (3) the significant uncertainty

---

[35] *Lids Corp. v. Marathon Inv. Partners, L.P.* (*In re Lids Corp.*), 281 B.R. 535, 540, 542–43 (Bankr. D. Del. 2002).

[36] *Trans World Airlines, Inc. v. Travellers Int'l AG.* (*In re Trans World Airlines, Inc.*), 180 B.R. 389, 405 n.22 (Bankr. D. Del. 1994) (noting that "the balance sheet is merely a starting point for the analysis"), *aff'd*, 134 F.3d 188 (3d Cir. 1998).

[37] Shannon P. Pratt with Alina V. Niculita, Valuing a Business: Analysis and Appraisal of Closely Held Companies 175–76 (5th ed. 2008).

[38] *MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Servs. Co.*, 910 F. Supp. 913, 925 (S.D.N.Y. 1995).

[39] *Id.*; *see also* Shannon P. Pratt with Alina V. Niculita, Valuing a Business: Analysis and Appraisal of Closely Held Companies 174–76 (5th ed. 2008).

[40] *Statutory Comm. of Unsecured Creditors ex rel. Iridium Operating LLC v. Motorola, Inc.* (*In re Iridium Operating LLC*), 373 B.R. 283, 345 (Bankr. S.D.N.Y. 2007) (citation omitted).

[41] *See, e.g.*, E-mails between D. Applegate, E. Feldstein, and S. Khattri (Jan. 27–28, 2007) [EXAM10163216]; Residential Capital, LLC, Quarterly Report (Form 10-Q) (May 7, 2008), at 85; Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2009), at 39; Residential Capital, LLC, Quarterly Report (Form 10-Q) (May 11, 2009), at 28–29.

and volatility in the mortgage industry during the relevant time period.[42] The Examiner's Financial Advisors did not consider the Income Approach to be reliable for purposes of evaluating ResCap's insolvency for these reasons.

### d. Retrojection And Projection

Recognizing that evidence of insolvency at the time of a transfer or obligation may be sparse,[43] some courts have accepted evidence of insolvency from dates *before* or *after* the stated transfer as indicative of insolvency as of a separate date.[44] A plaintiff must prove a debtor's insolvency at the beginning or end of a specified time period. Employing retrojection or projection, a court may find that the debtor was insolvent during the time period between

---

[42]  *See* Section VI.C.4.a.

[43]  *Killips v. Schropp* (*In re Prime Realty, Inc.*), 380 B.R. 529, 535 (B.A.P. 8th Cir. 2007) ("[A] plaintiff may establish that the debtor was insolvent when it made the transfers in question if the plaintiff can establish both that the debtor was insolvent shortly after making the transfers and that the debtor's financial condition did not substantially change in the interim."); *Weaver v. Kellogg*, 216 B.R. 563, 576 (Bankr. S.D. Tex. 1997) (citing David G. EPSTEIN ET AL., BANKRUPTCY § 6–49 (1992)); *N.Y. Credit Men's Adjustment Bureau, Inc. v. Adler*, 2 B.R. 752, 756 n.5 (Bankr. S.D.N.Y. 1980) ("[Retrojection] has been often employed and often approved. Indeed, it provides the only reliable means of determining solvency when the basic data normally available, such as books and inventory, are incomplete or missing."); *Dahar v. Jackson* (*In re Jackson*), 318 B.R. 5, 16 (Bankr. D.N.H. 2004) ("Insolvency is not always susceptible to direct proof and frequently must be determined by proof of other facts or factors from which the ultimate fact of insolvency on the transfer dates must be inferred or presumed." (quoting *Hassan v. Middlesex Cnty. Nat'l Bank* (*In re Mystic Pipe & Supply Corp.*), 333 F.2d 838, 840 (1st Cir. 1964) (citation omitted))); *see Daneman v. Stanley* (*In re Stanley*), 384 B.R. 788, 807 (Bankr. S.D. Ohio 2008) ("A retrojection analysis begins with a debtor's financial condition at a certain point in time (typically the petition date) and extrapolates back in time in an attempt to show that the debtor must have been insolvent at some earlier relevant time (e.g., the date of an alleged fraudulent transfer)."); *Wash. Bancorporation v. Hodges* (*In re Wash. Bancorporation*), 180 B.R. 330, 334 (Bankr. D.D.C. 1995).

[44]  *Bruno Mach. Corp. v. Troy Die Cutting Co.* (*In re Bruno Mach. Corp.*), 435 B.R. 819, 838 (Bankr. N.D.N.Y. 2010) ("Because of the 'difficulty in valuing the assets and liabilities of a debtor on the exact date of a preferential transfer,' courts use 'the well-established bankruptcy principles of retrojection and projection, which provide for the use of evidence of insolvency on a date before and after the preference date as competent evidence of the debtor's insolvency on the preference date.'" (quoting *Coated Sales, Inc. v. Glantz* (*In re Coated Sales, Inc.*), 144 B.R. 663, 666 (Bankr. S.D.N.Y. 1992))); *Daneman v. Stanley* (*In re Stanley*), 384 B.R. 788, 807 (Bankr. S.D. Ohio 2008) ("As its name suggests, retrojection is the inverse of projection.").

two valuation dates, or within a reasonable time period prior or subsequent to a valuation date,[45] providing there are no intervening events that could have led to the insolvency.[46]

### 3. Summary Of Examiner's Conclusions

The Examiner concludes that the evidence supports the proposition that ResCap was balance sheet solvent on May 4, 2005, the date that AFI announced the capitalization of ResCap,[47] and was balance sheet insolvent from December 31, 2007 through the Petition Date.[48] The Examiner's conclusions are based on the results of the Balance Sheet Test prepared by the Examiner's Financial Advisors and consideration of the contemporaneous facts and circumstances underlying the changes in ResCap's financial condition from 2005 through the Petition Date, as described herein.

The Examiner's Financial Advisors estimated the Fair Market Value of ResCap using a Market Approach and an Asset-Based Approach under a going concern premise of value.[49] The Examiner's Financial Advisors employed the Market Approach using the Guideline Publicly Traded Company Method to value ResCap's equity and the Observable Market Value

---

[45] *In re Stanley,* 384 B.R. at 807 (noting that "[r]etrojection can be used to go back days, weeks or even several months in time," but holding that the use of "retrojection to go back nearly two years in time stretches retrojection analysis past its breaking point"); *Silagy v. Gagnon (In re Gabor),* 280 B.R. 149, 160 (Bankr. N.D. Ohio 2002) (concluding that debtor was insolvent based upon amounts set forth in bankruptcy petition that was filed six months after the transfer and there had been "little change in debtor's income and life for several years"); Weaver, 216 B.R. at 576 ("Plaintiff may be able to prove insolvency at earlier periods through the process of 'retrojection,' i.e. 'showing that the debtor was insolvent a reasonable time . . . after the transfer and that the debtor's financial condition did not materially change during the intervening period.'" (internal citations omitted)); Mancuso v. T. Ishida USA, Inc. (In re Sullivan), 161 B.R. 776, 783–84 (Bankr. N.D. Tex. 1993) ("The Court finds itself . . . with credible evidence that [debtor] was hugely insolvent both six months before and six months after the transaction in question. 'Where there is clear proof of insolvency on a given date and no subsequent financial change, the courts are prone to find that the Debtor was also insolvent on the earlier date at issue. Furthermore, the usual presumption is that a known condition will continue to exist under similar circumstances for a reasonable time.") (quoting *Kleinfeld v. Nacol* (*In re Nacol*), 36 B.R. 566, 568 (Bankr. M.D. Fla. 1983))). *But see War Eagle Floats, Inc. v. Travis* (*In re War Eagle Floats*), 104 B.R. 398, 400 ("Six months is simply too long a period considering the strict requirements of § 548(a)(2) specifically necessitating evidence of insolvency on the date of the transfer at issue.").

[46] *Pryor v. Tiffen* (*In re TC Liquidations LLC*), 463 B.R. 257, 274–75 (Bankr. E.D.N.Y. 2011); *McColley v. Navaro Gem Ltd.* (*In re Candor Diamond Corp.*), 68 B.R. 588, 594 n.5 (Bankr. S.D.N.Y. 1986) (discussing the use of "retrojection by which a later finding of insolvency is read into an earlier period if there is evidence that there was no change in financial condition") (citing *Braunstein v. Mass. Bank & Trust Co.*, 443 F.2d 1281, 1284 (1st Cir. 1971)).

[47] General Motors Acceptance Corporation, Current Report (Form 8-K) (May 4, 2005), Ex. 99.1.

[48] The Examiner's conclusion that ResCap was balance sheet solvent on May 4, 2005 also pertains to RFC and GMAC Mortgage.

[49] The Income Approach was considered but not applied for reasons discussed herein.

Method to value ResCap's interest-bearing debt.[50] These values were then combined to yield the Fair Market Value of ResCap's invested capital under the Market Approach. The Examiner's Financial Advisors also employed the Asset-Based Approach using the Adjusted Book Value Method to estimate the Fair Market Value of ResCap's assets. The Examiner's Financial Advisors performed the valuation analyses on a quarterly basis from December 31, 2005 through December 31, 2011.[51]

Under the Market Approach, ResCap's total interest-bearing debt was subtracted from the Fair Market Value of ResCap's invested capital to determine the Fair Market Value surplus/(deficit).[52] Under the Asset-Based Approach, ResCap's total liabilities were subtracted from the Fair Market Value of ResCap's total assets to determine the Fair Market Value surplus/(deficit).[53]

The valuation analysis shows a Fair Market Value deficit indicating insolvency under the Balance Sheet Test as of December 31, 2007, and remaining as of each quarterly measurement date through the end of 2011.[54] The following exhibits summarize the results of the Balance Sheet Test for ResCap.

---

[50] The Guideline M&A Method was also considered but not applied because of the lack of a sufficient number of timely transactions as of the quarterly measurement dates, most notably from 2007 through 2009. It is common to consider transactions occurring within the prior one to three years when applying the Guideline M&A Method. However, given the volatility in the mortgage industry from 2007 through 2009, the use of more timely transactions in the Guideline M&A Method was deemed necessary to arrive at reliable indications of value as of each measurement date. Because there were few such transactions, the Examiner's Financial Advisors deemed the Guideline M&A Method to be less reliable than the other methods utilized herein.

[51] The Examiner's Financial Advisors selected quarterly measurement dates due in part to the availability of necessary financial information.

[52] The Examiner's Financial Advisors' application of the Market Approach estimates the Fair Market Value of ResCap's invested capital, which equals the Fair Market Value of assets net of non-interest-bearing liabilities. Therefore, to assess ResCap's insolvency under the Market Approach, only interest-bearing debt is subtracted from the Fair Market Value of invested capital.

[53] The Examiner's Financial Advisors' application of the Asset-Based Approach estimates ResCap's total asset value. Therefore, to assess ResCap's insolvency under the Asset-Based Approach, total liabilities are subtracted. Total liabilities include interest-bearing liabilities, non-interest bearing liabilities (i.e., payables, accrued expenses, and other current and non-current liabilities, etc.), and contingent and/or unliquidated liabilities.

[54] ResCap was a "disregarded entity" for federal income tax purposes subsequent to November 2006. Under a Fair Market Value standard, the Examiner's Financial Advisors assumed that tax obligations, if any, would be paid at either the ResCap level or at the acquirer level. Accordingly, the Examiner's Financial Advisors did not assign any incremental value to the tax status of ResCap for purposes of assessing financial distress in these circumstances.



EXHIBIT VI.B.3—1
**Concluded Fair Market Value Surplus / (Deficit) of ResCap [1]**
2005 – 2011
*($ in Millions)*



[1] *The Examiner's Financial Advisors placed full weight on the Market Approach from Dec. 31, 2005 through Jun. 30, 2007. The Market Approach and Asset-Based Approach were weighted equally from Sep. 30, 2007 through Dec. 31, 2009. The Examiner's Financial Advisors placed full weight on the Asset-Based Approach for all quarterly measurement dates subsequent to Dec. 31, 2009. These weightings were applied for the reasons described herein.*

Source: Appendix VI.B.3.

EXHIBIT VI.B.3—2
**Concluded Fair Market Value Surplus / (Deficit) of ResCap**
2005 – 2011
*($ in Millions)*

| | Market Approach | | Asset-Based Approach | | Concluded Fair Market Value Surplus / (Deficit) | Balance Sheet Test Conclusion |
|---|---|---|---|---|---|---|
| | Fair Market Value Surplus / (Deficit) | Weight | Fair Market Value Surplus / (Deficit) | Weight | | |
| 12/31/05 | $ 12,602.0 | 100% | $ 7,464.0 | 0% | $ 12,602.0 | Solvent |
| 03/31/06 | 13,126.1 | 100% | 7,763.5 | 0% | 13,126.1 | Solvent |
| 06/30/06 | 14,590.6 | 100% | 8,404.3 | 0% | 14,590.6 | Solvent |
| 09/30/06 | 13,199.7 | 100% | 8,375.9 | 0% | 13,199.7 | Solvent |
| 12/31/06 | 13,235.3 | 100% | 7,622.1 | 0% | 13,235.3 | Solvent |
| 03/31/07 | 9,706.6 | 100% | 7,173.9 | 0% | 9,706.6 | Solvent |
| 06/30/07 | 10,145.3 | 100% | 7,507.4 | 0% | 10,145.3 | Solvent |
| 09/30/07 | 2,429.6 | 50% | 1,273.8 | 50% | 1,851.7 | Solvent |
| 12/31/07 | (3,760.5) | 50% | 111.8 | 50% | (1,824.4) | Insolvent |
| 03/31/08 | (5,921.7) | 50% | (1,994.9) | 50% | (3,958.3) | Insolvent |
| 06/30/08 | (5,752.0) | 50% | (3,742.1) | 50% | (4,747.1) | Insolvent |
| 09/30/08 | (10,066.3) | 50% | (4,828.8) | 50% | (7,447.6) | Insolvent |
| 12/31/08 | (7,499.4) | 50% | (4,397.3) | 50% | (5,948.4) | Insolvent |
| 03/31/09 | (4,575.5) | 50% | (1,102.5) | 50% | (2,839.0) | Insolvent |
| 06/30/09 | (2,056.8) | 50% | (1,164.7) | 50% | (1,610.7) | Insolvent |
| 09/30/09 | (1,715.4) | 50% | (1,563.6) | 50% | (1,639.5) | Insolvent |
| 12/31/09 | (1,250.5) | 50% | (687.7) | 50% | (969.1) | Insolvent |
| 03/31/10 | (34.8) | 0% | (1,628.0) | 100% | (1,628.0) | Insolvent |
| 06/30/10 | 230.7 | 0% | (1,617.5) | 100% | (1,617.5) | Insolvent |
| 09/30/10 | 447.2 | 0% | (2,544.3) | 100% | (2,544.3) | Insolvent |
| 12/31/10 | 599.6 | 0% | (2,457.7) | 100% | (2,457.7) | Insolvent |
| 03/31/11 | 633.3 | 0% | (2,260.4) | 100% | (2,260.4) | Insolvent |
| 06/30/11 | 460.1 | 0% | (3,587.5) | 100% | (3,587.5) | Insolvent |
| 09/30/11 | (791.8) | 0% | (4,572.3) | 100% | (4,572.3) | Insolvent |
| 12/31/11 | (1,465.1) | 0% | (4,498.1) | 100% | (4,498.1) | Insolvent |

*Source: Appendix VI.B.3.*

The Examiner's Financial Advisors used their professional judgment to select appropriate weightings for each valuation approach in assessing ResCap's insolvency. Authoritative valuation literature states "there are no scientific formulas or specific rules to use with regard to the weighting of the results of two or more valuation methods" and the final value conclusion should be "derived from the analyst's reasoning and judgment of all the factors considered and from the impartial weighting of all of the market-derived valuation evidence."[55]

The Examiner's Financial Advisors determined that the Asset-Based Approach was not a reliable indicator of the value of ResCap for the period from December 31, 2005 through June 30, 2007, because ResCap was deemed to have intangible value associated with its business model not reflected on the balance sheet. This intangible value was not captured in the

---

[55] SHANNON P. PRATT WITH ALINA V. NICULITA, VALUING A BUSINESS: THE ANALYSIS AND APPRAISAL OF CLOSELY HELD COMPANIES 477–78 (5th ed. 2008).

Examiner's Financial Advisors' application of the Asset-Based Approach. For this reason, the Examiner's Financial Advisors placed full weight on the results of the Market Approach, and no weight was given to the results of the Asset-Based Approach from December 31, 2005 through June 30, 2007.

The Examiner's Financial Advisors equally weighted the results of the Market Approach and the Asset-Based Approach to assess ResCap's insolvency for the period from September 30, 2007 through December 31, 2009. As described in Section III, there was a severe dislocation in the capital markets in August 2007 which had a dramatic effect on the mortgage industry. Many mortgage companies did not survive this market dislocation and consequently filed for bankruptcy relief.[56] In August 2007, credit analysts noted the distressed trading levels of ResCap's securities and indicated that ResCap's business model was no longer viable.[57] Indeed, ResCap wrote off the entirety of its acquired intangible assets during the third quarter of 2007.[58] Additionally, ResCap was dependent on financial support (capital contributions and debt forgiveness) from AFI during this period.

The Examiner's Financial Advisors did not consider the Market Approach to be a reliable indicator of the value of ResCap after December 31, 2009, because of the impact of TARP funds received by AFI on the market prices of ResCap's public debt. As discussed in Section VI.B.4.a(3), the receipt of TARP funding by AFI had a significant upward impact on the pricing of ResCap's debt securities, particularly in early 2010. As shown in Exhibit VI.B.4.a(3)—2, immediately following each round of TARP funding to AFI, the pricing of ResCap's debt securities increased dramatically. After receiving the third round of TARP funding in the amount of $3.8 billion on December 30, 2009, Carpenter stated, "[t]hese decisive balance sheet actions and resulting capital infusions are intended to minimize the impact on [AFI] and Ally Bank of any significant future losses related to ResCap's legacy mortgage business."[59] Following Carpenter's statement, analysts commented that the U.S. Treasury "pumped in another $3.8 billion into [AFI] largely so that [AFI] could support ResCap, which is ring-fenced off from [AFI] and lacks a compelling ongoing business model" and added that "[w]e are at a loss for words over the complete lack of logic behind using tax dollars to support ResCap."[60] The Examiner's Financial Advisors deemed the market prices of ResCap's debt securities to be an unreliable proxy for determining the value of ResCap after December 31, 2009, because of the cumulative influence of AFI's receipt of TARP funds on

---

[56] *See* Section VI.B.4.a(1)(a)(iv) (discussing the bankruptcies of certain mortgage companies).

[57] Kabir Caprihan & Monica Parekh, JPMorgan, Countrywide and Residential Capital Corp Recovery, Liquidity, Balance Sheet Burn, etc. 1, 10 (Aug. 21, 2007).

[58] The intangible asset value on ResCap's balance sheet reflected acquired intangible assets and did not reflect the value of non-acquired intangible assets, if any. A write-off of all acquired intangible value may suggest that the value of any non-acquired intangible assets of ResCap (or the specific ResCap reporting unit) was similarly impaired.

[59] *GMAC to Receive $3.8 Bln. in Third Bailout by U.S. Treasury*, RTT News, (Dec. 30, 2009), http://www.rttnews.com/1168552/gmac-to-receive-3-8-bln-in-third-bailout-by-u-s-treasury.aspx.

[60] *See* Karen Brettell, *US CREDIT–ResCap Rallies on Capital Support, Risks Remain*, Reuters, (Jan. 4, 2010), (quoting CreditSight analysts Adam Steer and David Hendler), http://www.reuters.com/article/2010/01/04/markets-credit-idUSN0457155120100104.

the market prices of ResCap public debt. Accordingly, the Examiner's Financial Advisors placed full weight on the results of the Asset-Based Approach from March 31, 2010 through the Petition Date.

### 4.  Application Of The Balance Sheet Test

The Examiner's Financial Advisors performed a Balance Sheet Test of ResCap's insolvency at the end of each quarter from December 31, 2005 through December 31, 2011. The standard of value applied in the application of the Balance Sheet Test was Fair Market Value, which was estimated on a non-marketable, controlling basis. Appropriate discounts or premiums were considered and applied, as appropriate, for each valuation approach. The Fair Market Value of ResCap was estimated under a going concern premise of value. The Examiner's Financial Advisors used two generally accepted valuation approaches to assess ResCap's insolvency: (1) the Market Approach; and (2) the Asset-Based Approach.

#### a.  Market Approach

The Examiner's Financial Advisors used two market-based valuation methodologies to estimate the Fair Market Value of ResCap's invested capital. The Guideline Publicly Traded Company Method was used to estimate the Fair Market Value of ResCap's equity because ResCap's equity was not publicly traded. A significant portion of ResCap's interest-bearing debt, however, was traded in the secondary market where transaction prices could be observed. This allowed for the application of the Observable Market Value Method to value ResCap's interest-bearing debt. The estimated Fair Market Value of ResCap's equity and interest-bearing debt were summed to arrive at the Fair Market Value of ResCap's invested capital.

##### (1) Valuation Of The Equity Of ResCap

The Guideline Publicly Traded Company Method was used to estimate the Fair Market Value of ResCap's equity based on a comparison of ResCap to guideline publicly traded companies with similar characteristics. Once the guideline companies were identified, valuation multiples of the publicly traded companies were then determined. These valuation multiples were then applied to ResCap's financial metrics to indicate the value of ResCap's equity on a marketable, minority basis. A private company discount and a control premium were applied, to the extent warranted, to arrive at the Fair Market Value of ResCap's equity on a non-marketable, controlling basis.

###### (a) Selection Of Guideline Companies

The first step in the application of the Guideline Publicly Traded Company Method is the selection of guideline publicly traded companies. The Examiner's Financial Advisors identified and considered publicly traded companies whose businesses were comprised principally of residential mortgage operations and assets. The following provides the framework for the selection process and descriptions of the guideline companies.

The Examiner's Financial Advisors reviewed analyst and industry reports, and used the Capital IQ database, to gather information about companies operating in the mortgage industry during the period from 2005 through 2011. The Examiner's Financial Advisors reviewed ResCap analyst reports from HSBC,[61] Bear Stearns,[62] and JPMorgan,[63] which identified companies with similarities to ResCap during that time frame. The Examiner's Financial Advisors also reviewed mortgage finance industry reports from Bear Stearns,[64] Fox-Pitt,[65] Credit Suisse,[66] and Sterne Agee,[67] which also identified numerous companies

---

[61] VAN HESSER & DAPHNE FENG, HSBC, RESIDENTIAL CAPITAL, LLC LOOKING FOR SOMEONE TO TAKE THE OTHER SIDE OF THE TRADE (Nov. 20, 2007); VAN HESSER & DAPHNE FENG, HSBC, RESIDENTIAL CAPITAL CORP. DOWNGRADE RISK HAS RISEN TO MORE LIKELY THAN NOT (July 19, 2007); VAN HESSER & DAPHNE FENG, HSBC, RESIDENTIAL CAPITAL CORP: SCRUBBED, BUT HOW CLEAN? (Mar. 14, 2007); VAN HESSER & DAPHNE FENG, HSBC, RESIDENTIAL CAPITAL CORP. RELIEF RALLY AHEAD? (Feb. 23, 2007); VAN HESSER & DAPHNE FENG, HSBC, RESIDENTIAL CAPITAL CORP RESCAP GETS THE GREEN LIGHT (Nov. 17, 2006); VAN HESSER & DAPHNE FENG, HSBC, RESIDENTIAL CAPITAL CORPORATION PROFITABLE, BUT DISAPPOINTING Q3 HIGHLIGHTS HEADWINDS (Oct. 25, 2006); VAN HESSER & DAPHNE FENG, HSBC, COUNTRYWIDE FINANCIAL AND RESIDENTIAL CAPITAL CORP MORTGAGE NAMES LANDING SOFTLY IN A MANAGEABLE ENVIRONMENT (Aug. 2, 2006); VAN HESSER & DAPHNE FENG, HSBC, RESIDENTIAL CAPITAL CORP. BOUNCEBACK (Apr. 20, 2006).

[62] IAN JAFFE & MICHAEL SCHALLER, BEAR STEARNS, RESIDENTIAL CAPITAL, LLC 2Q07 PRELIMINARY EARNINGS REVIEW (Aug. 1, 2007); IAN JAFFE & MICHAEL SCHALLER, BEAR STEARNS, RESIDENTIAL CAPITAL, LLC 2Q07 PREVIEW AND INTERMEDIATE-TERM OUTLOOK (July 30, 2007); IAN JAFFE & MICHAEL SCHALLER, BEAR STEARNS, RESIDENTIAL CAPITAL, LLC 1Q07 PRELIMINARY EARNINGS REVIEW (May 3, 2007); IAN JAFFE & MICHAEL SCHALLER, BEAR STEARNS, RESIDENTIAL CAPITAL, LLC FIGHTING THE SUBPRIME CREDIT TSUNAMI . . . TIME HORIZON IS KEY (Mar. 6, 2007).

[63] KABIR CAPRIHAN & MONICA PAREKH, JPMORGAN, COUNTRYWIDE AND RESIDENTIAL CAPITAL CORP RECOVERY, LIQUIDITY, BALANCE SHEET BURN, ETC. (Aug. 21, 2007).

[64] SCOTT COREN ET AL., BEAR STEARNS, MORTGAGE FINANCE SUB-PRIME ABS SPREAD MONITOR FOURTH QUARTER 2006 (Jan. 1, 2007); SCOTT COREN ET AL., BEAR STEARNS, MORTGAGE FINANCE SUB-PRIME ABS SPREAD MONITOR FOURTH QUARTER 2005 (Mar. 22, 2006).

[65] EDWIN GROSHANS & MATTHEW HOWLETT, FOX-PITT, US MORTGAGE FINANCE THE YEAR OF THE CLEANSING HEADWINDS (Dec. 21, 2006).

[66] MOSHE ORENBUCH & RAJAT BHU, CREDIT SUISSE, MORTGAGE FINANCE WEAK JOB MARKET COMPOUNDS HOUSING PROBLEMS (Jan. 9, 2009); MOSHE ORENBUCH & RAJAT BHU, CREDIT SUISSE, MORTGAGE FINANCE HOME PRICES; INVENTORY AND CREDIT CRUNCH DRIVE SECTOR SLOWDOWN (Sept. 10, 2008); MOSHE ORENBUCH & RAJAT BHU, CREDIT SUISSE, MORTGAGE FINANCE GSE TRAVAILS; HOME PRICES WEIGH ON OUTLOOK (July 16, 2008); MOSHE ORENBUCH, CREDIT SUISSE, MORTGAGE FINANCE INVENTORY OVERHANG PUSHES DOWN PRICES (June 5, 2008); MOSHE ORENBUCH, CREDIT SUISSE, MORTGAGE FINANCE: HOUSING STRUGGLES TO GAIN TRACTION (Apr. 11, 2008).

[67] JAMES ACKOR, STERNE AGEE, MORTGAGE FINANCE: EXPECTING DECENT 4Q08 RESULTS DESPITE A SOMEWHAT CHALLENGING OPERATING ENVIRONMENT—SEQUENTIAL EPS AND DPS GROWTH EXPECTED TO RESUME IN 1Q09 (Jan. 7, 2009); JAMES ACKOR, STERNE AGEE, MORTGAGE FINANCE: DEBT MARKET FEARS DRIVING HISTORIC DISCONNECT BETWEEN AGENCY MORTGAGE REIT PROFITABILITY AND STOCK VALUATIONS—POTENTIAL RETURNS COMPELLING (Nov. 25, 2008); JAMES ACKOR, STERNE AGEE, MORTGAGE FINANCE: AGENCY MORTGAGE REITS—CHOPPY EARNINGS SEASON EXPECTED—SLIGHT BIAS TOWARD DOWNSIDE SURPRISES—EXPECTED RETURNS AND VALUATIONS REMAIN ATTRACTIVE (Oct. 20, 2008).

operating in the mortgage industry. Finally, the Examiner's Financial Advisors performed numerous queries against the Capital IQ database to identify guideline companies that operated in the same or similar lines of business as ResCap.

Based on this screening process, the Examiner's Financial Advisors selected Countrywide, IndyMac, and WaMu as ResCap Guideline Companies. The Examiner's Financial Advisors chose these companies because of the similarities to ResCap in their business operations, relative size, and exposure to prevailing industry conditions. The following is a brief description of each of the ResCap Guideline Companies.

### (i) Countrywide

Countrywide was a holding company engaged in mortgage lending and other finance-related businesses, including mortgage banking, retail banking and mortgage warehouse lending, securities dealing, insurance underwriting, and international mortgage loan processing and subservicing through its subsidiaries.[68] Countrywide managed its business through five segments: (1) mortgage banking; (2) banking; (3) capital markets; (4) insurance; and (5) global operations.[69] The mortgage banking segment, the core of Countrywide's business, originated, purchased, securitized, and serviced mortgage loans.[70] Countrywide originated and purchased prime mortgage loans, prime home equity loans, non-prime mortgage loans, and commercial real estate loans.[71] The majority of loan production consisted of prime mortgage loans, which were prime credit quality first-lien mortgage loans secured by single-family residences.[72] The banking segment operated a federally-chartered bank that invested in mortgage loans and home equity lines of credit primarily sourced through the company's mortgage banking operation.[73] The banking segment also provided short-term secured financing to mortgage lenders through a non-depository lending company.[74] The capital markets segment operated an institutional broker-dealer that specialized in trading and underwriting mortgage-backed securities.[75] During 2004, this segment began originating HFS loans secured by commercial real estate.[76] This segment also managed acquisition and disposition of mortgage loans on behalf of Countrywide Home Loans, Countrywide's primary mortgage banking subsidiary.[77] The insurance segment offered property, casualty, life, and

---

[68]   Countrywide Financial Corporation, Annual Report (Form 10-K) (Mar. 1, 2006), at 1.

[69]   *Id.*

[70]   *Id.*

[71]   *Id.* at 2.

[72]   This includes loans secured by one-to-four dwelling unit residential real estate. *Id.*

[73]   *Id.* at 1.

[74]   *Id.*

[75]   *Id.*

[76]   *Id.*

[77]   *Id.*

credit insurance as an underwriter and as an independent agent, and also provided reinsurance coverage to primary mortgage insurers.[78] Countrywide became a subsidiary of Bank of America on July 1, 2008, and continues to operate as such.[79]

Countrywide was selected as a guideline company because of its similar operations, significant percentage of mortgage related assets, and reliance on the sale of mortgage-backed securities. Countrywide was used as a guideline company from December 31, 2005 through March 31, 2008.

### (ii) IndyMac

IndyMac was the holding company for IndyMac Bank, F.S.B., a hybrid thrift/mortgage bank.[80] IndyMac provided financing for the acquisition, development, and improvement of single-family homes.[81] IndyMac also provided financing secured by single-family homes and other banking products.[82] IndyMac's banking business model was based on two segments: mortgage banking and thrift.[83] Mortgage banking involved the origination and trading of mortgage loans and related assets, and the servicing of those loans.[84] The product lines included ARMs, hybrid ARMs, option ARMs offering borrowers multiple payment options, fixed-rate mortgages, both conforming and non-conforming, construction-to-permanent loans, subprime mortgages, and reverse mortgages.[85] The thrift segment principally invested in single-family residential mortgage loans (predominantly prime ARMs, including hybrid ARMs), construction financing for single-family residences or lots provided directly to individual consumers, builder construction financing facilities for larger residential subdivision loans, home equity lines of credit, and mortgage-backed securities.[86] IndyMac also had a warehouse lending business that provided short-term revolving warehouse lending facilities to small-to-medium sized mortgage bankers and brokers to finance mortgage loans.[87] IndyMac filed for relief under chapter 7 of the Bankruptcy Code on July 31, 2008.[88]

---

[78]  *Id.*

[79]  Bank of America Corporation, Annual Report (Form 10-K) (Feb. 27, 2009), at 17.

[80]  IndyMac Bancorp, Inc., Annual Report (Form 10-K) (Mar. 1, 2006), at 4.

[81]  *Id.*

[82]  *Id.*

[83]  *Id.* at 5.

[84]  *Id.*

[85]  *Id.* at 6.

[86]  *Id.* at 9.

[87]  *Id.*

[88]  IndyMac Bancorp, Inc., Current Report (Form 8-K) (July 31, 2008), at 2.

IndyMac was selected as a guideline company because of its similar operations, significant percentage of mortgage-related assets, and the high percentage of its loans sold into securitizations. IndyMac was used as a guideline company from December 31, 2005 through March 31, 2008.

### (iii) WaMu

WaMu was a retailer of financial services to consumers and small businesses.[89] WaMu's earnings were primarily driven by lending to consumers, deposit-taking activities that generated net interest income, and activities that generated non-interest income, including the sale and servicing of loans and providing fee-based services to its customers.[90]

WaMu had four operating segments: (1) the retail banking and financial services group; (2) home loans group; (3) card services group; and (4) the commercial group.[91] The retail banking and financial services group offered a comprehensive line of deposit and other retail banking products and services to consumers and small businesses, originated, managed and serviced home equity loans and lines of credit, and provided investment advisory and brokerage services.[92] The home loans group originated and serviced home loans, bought and sold home loans in the secondary market, and sold insurance.[93] The card services group originated and serviced credit card loans and provided other cardholder services.[94] The commercial group provided financing to developers and investors for the acquisition or construction of multi-family dwellings and other commercial properties, originated and serviced multi-family and other commercial real estate loans, provided financing and other banking services to mortgage bankers for the origination of residential mortgage loans, and originated and serviced home loans made to subprime borrowers.[95]

WaMu sold substantially all assets of its principal operating subsidiary, Washington Mutual Bank, to JPMorgan Chase on September 25, 2008.[96] WaMu filed for relief under chapter 11 of the Bankruptcy Code on September 26, 2008.

---

[89]  Washington Mutual, Inc., Annual Report (Form 10-K) (Mar. 15, 2006), at 1.

[90]  *Id.*

[91]  *Id.* at 38.

[92]  *Id.*

[93]  *Id.* at 39.

[94]  *Id.* at 40.

[95]  *Id.*

[96]  Decl. of Stewart M. Landefeld in Supp. of the Debtors' Chapter 11 Pets. and First Day Mots., *In re Wash. Mut., Inc.,* Case No. 08-12229, Docket No. 13, at 12.

WaMu was selected as a guideline company because of its similar operations,[97] significant percentage of mortgage-related assets, and reliance on securitizing loans. WaMu was used as a guideline company from December 31, 2005 through June 30, 2008.

### (iv) Bankruptcies Of Other Mortgage Companies

The Examiner's Financial Advisors examined companies within the mortgage industry subject to the same adverse market conditions affecting ResCap in 2007, including a volatile interest rate environment, competitive mortgage pricing, declining housing appreciation, and tightening liquidity. Many of these companies did not survive the collapse of the mortgage industry and consequently filed for bankruptcy relief. The reasons for failure cited in the bankruptcy filings of New Century, American Home, Aegis, First Magnus, and Delta Financial provide additional context for ResCap's decline in equity value during the second half of 2007, as discussed herein.

New Century announced that it would be restating its financials in February 2007 and stopped accepting loan applications on March 8, 2007.[98] New Century filed for relief under chapter 11 of the Bankruptcy Code on April 2, 2007, after a spike in margin calls. Aegis ceased all mortgage origination activity as of August 3, 2007.[99] American Home filed for bankruptcy relief on August 6, 2007[100] and First Magnus ceased operations on August 16, 2007.[101] They were each unable to meet margin calls and lost access to essential lines of credit. American Home's CEO, Michael Strauss, stated that "the markets for these assets (mortgage-backed securities and mortgage loan holdings) have been disrupted to the point of dysfunction."[102]

Delta Financial received a small loan that helped it meet margin calls in the third quarter of 2007. However, after a failed attempt to securitize $900 million in loans, it too could not secure additional funding to support its business. Delta Financial filed for relief under chapter 11 of the Bankruptcy Code on December 17, 2007.[103]

---

[97]  While WaMu did offer services such as retail banking and card services, the vast majority of its balance sheet was comprised of mortgage-related assets. *See* Washington Mutual, Inc., Annual Report (Form 10-K) (Mar. 15, 2006), at 168–172.

[98]  Decl. of Monika L. McCarthy in Supp. of Chapter 11 Pets. and First Day Relief, *In re New Century TRS Holdings, Inc.,* Case No. 07-10416, Docket No. 2, at 10–14.

[99]  Decl. of Edward S. Robertson, Executive VP and CFO of the Debtors, in Supp. of First Day Mots. *In re Aegis Mortg. Corp.,* Case No. 07-11119, Docket No. 3, at 3.

[100]  *See* Decl. of Michael Strauss in Supp. of the Debtors' Chapter 11 Pets. and First Day Relief, *In re Am. Home Mortg. Holdings, Inc.,* Case No. 07-11047, Docket No. 2, at 2.

[101]  Decl. of Gurpreet S. Jaggi in Supp. of Debtor's Chapter 11 Pet. and First Day Motions, *In re First Magnus Fin. Corp.,* Case No. 07-01578, Docket No. 6, at 9.

[102]  Decl. of Michael Strauss in Supp. of the Debtors' Chapter 11 Pet. and First Day Relief, *In re Am. Home Mortg. Holdings, Inc.,* Case No. 07-11047, Docket No. 2, at 10.

[103]  Aff. of Hugh Miller in Supp. of Chapter 11 Pets. and First Day Relief, *In re Delta Fin. Corp.,* Case No. 07-11880, Docket No. 3, at 2.

*(b) Calculation Of Market Multiples*

The Guideline Publicly Traded Company Method entails the calculation of valuation multiples based on publicly traded guideline companies that are then applied to a subject company's relevant metrics. The Examiner's Financial Advisors calculated the ratio of MVE to reported net book value of equity (commonly referred to as price-to-book or P/NBV).[104] The book value of equity and, correspondingly, book value multiples, are useful measures for determining the Fair Market Value of equity for companies comprised of financial assets.[105] The book value of equity for financial institutions is "much more likely to track the market value of equity invested in existing assets" and leads to stronger relationships between price-to-book ratios and returns on equity.[106] Book value multiples are useful and widely used measures for valuing financial concerns.[107]

Commonly used invested capital multiples such as "invested capital to EBITDA" and "invested capital to revenue" are generally not applicable to the valuation of financial companies, because "[w]ith a financial service firm, debt takes a different connotation. Rather than view debt as a source of capital, most financial firms view it as a raw material."[108] Further, the Examiner's Financial Advisors considered a price-to-earnings multiple but did not apply it because of ResCap's negative earnings for the majority of the quarterly measurement dates.[109]

After calculating the P/NBV multiples for the ResCap Guideline Companies, appropriate multiples were selected by evaluating factors such as the size, growth, and profitability of ResCap relative to the ResCap Guideline Companies. Based on an evaluation of these factors, the average P/NBV multiple of the ResCap Guideline Companies at each quarter was selected and applied in the valuation of ResCap's equity from December 31, 2005 through June 30, 2008. The following table details the selected P/NBV multiples for the ResCap Guideline Companies applied in the valuation of ResCap's equity under the Guideline Publicly Traded Company Method from December 31, 2005 through June 30, 2008.

---

[104] The Examiner's Financial Advisors also considered the use of a P/TBVE multiple for valuing ResCap's equity. Ultimately, the P/NBV multiple was selected because of the availability of industry P/NBV multiples from Ibbotson Associates which served as a basis for valuing ResCap's equity subsequent to June 2008 (Ibbotson Associates does not provide industry P/TBVE multiples in its quarterly publications). The use of a P/TBVE multiple would not, however, change the Examiner's conclusions with respect to the Balance Sheet Test for ResCap.

[105] ASWATH DAMODARAN, INVESTMENT VALUATION: TOOLS AND TECHNIQUES FOR DETERMINING THE VALUE OF ANY ASSET 579 (2d ed. 2002).

[106] *Id.* at 599.

[107] *Id.* at 596.

[108] *Id.* at 576.

[109] Applying a market multiple to a negative income stream generally does not produce a meaningful value. Market multiples inherently contain a perpetuity assumption (i.e., going concern value). Applying a market multiple to a negative income stream implicitly assumes that the business will continue to produce negative income into perpetuity. Investors would liquidate the business before incurring losses into perpetuity.

EXHIBIT VI.B.4.a(1)(b)
**ResCap Guideline Companies**
**Calculation of P/NBV Multiples**
December 31, 2005 – June 30, 2008
*($ in Millions)*

| | Countrywide [1] | | | IndyMac [2] | | | WaMu [3] | | | Average |
| | MVE | Book Equity | P/NBV | MVE | Book Equity | P/NBV | MVE | Book Equity | P/NBV | P/NBV |
|---|---|---|---|---|---|---|---|---|---|---|
| 12/31/05 | $ 20,515 | $ 12,816 | 1.60x | $ 2,507 | $ 1,526 | 1.64x | $ 42,974 | $ 27,616 | 1.56x | 1.60x |
| 03/31/06 | 22,196 | 13,506 | 1.64x | 2,691 | 1,644 | 1.64x | 40,609 | 26,156 | 1.55x | 1.61x |
| 06/30/06 | 23,257 | 14,297 | 1.63x | 3,146 | 1,804 | 1.74x | 43,615 | 26,131 | 1.67x | 1.68x |
| 09/30/06 | 21,611 | 15,099 | 1.43x | 2,917 | 1,938 | 1.51x | 40,823 | 26,458 | 1.54x | 1.49x |
| 12/31/06 | 24,841 | 14,318 | 1.73x | 3,297 | 2,028 | 1.63x | 42,691 | 26,969 | 1.58x | 1.65x |
| 03/31/07 | 19,888 | 14,818 | 1.34x | 2,358 | 2,055 | 1.15x | 35,620 | 24,578 | 1.45x | 1.31x |
| 06/30/07 | 20,873 | 14,386 | 1.45x | 2,149 | 2,050 | 1.05x | 37,085 | 24,210 | 1.53x | 1.34x |
| 09/30/07 | 10,957 | 15,252 | 0.72x | 1,817 | 1,871 | 0.97x | 30,466 | 23,941 | 1.27x | 0.99x |
| 12/31/07 | 5,171 | 14,656 | 0.35x | 481 | 1,344 | 0.36x | 11,746 | 24,584 | 0.48x | 0.40x |
| 03/31/08 | 3,193 | 13,155 | 0.24x | 436 | 959 | 0.45x | 9,029 | 22,449 | 0.40x | 0.37x |
| 06/30/08 | N/A | N/A | N/A | N/A | N/A | N/A | 8,378 | 26,086 | 0.32x | 0.32x |

[1] *Purchased by Bank of America on Jul. 1, 2008. See Bank of America Corporation, Annual Report (Form 10-K) (Feb. 27, 2009), at 17.*
[2] *Filed for chapter 7 on Jul. 31, 2008. See IndyMac Bancorp, Inc. Current Report (Form 8-K) (Jul. 31, 2008), at 2.*
[3] *Filed for chapter 11 on Sep. 26, 2008. See Declaration of Stewart M. Landerfeld in Support of the Debtors' Chapter 11 Petitions and First Day Motions, In re Wash. Mutual, Inc., [Case No. 08-12229; Docket No. 13] at 12.*
Source: Appendix VI.B.4.a(4).

   The Examiner's Financial Advisors considered the median P/NBV multiples for the overall financial services industry within Standard Industrial Classification ("SIC") Code 6,[110] as published by Ibbotson Associates[111] for periods subsequent to June 30, 2008. This information was analyzed because the ResCap Guideline Companies had either filed for bankruptcy relief or been acquired by September 30, 2008, making the continued use of the ResCap Guideline Companies from September 30, 2008 through the Petition Date impossible. The Examiner's Financial Advisors compared the average P/NBV multiple for the ResCap Guideline Companies to the overall financial services industry multiple as of each quarterly date from December 31, 2005 through June 30, 2008. Based on this analysis, it was estimated that the average P/NBV multiples of the ResCap Guideline Companies were approximately 70% of the P/NBV multiples

---

[110] This includes companies operating primarily in the fields of finance, insurance, and real estate. Finance includes depository institutions, nondepository credit institutions, and broker dealers. Insurance covers carriers, agents, and brokers. Real estate includes owners, lessors, agents, and developers. IBBOTSON ASSOCS., STATISTICS FOR STANDARD INDUSTRIAL CLASSIFICATION SYS. CODE 6, FINANCE, INSURANCE, AND REAL ESTATE 1 (DEC. 2005). SIC Code 6 was deemed appropriate because it encompassed the ResCap Guideline Companies (prior to their acquisition/bankruptcy filings) and was comprised of hundreds of companies, thus serving as a benchmark for the prevailing economic conditions in the financial services industry.

[111] "The *Ibbotson Cost of Capital Yearbook* is a comprehensive source of industry-level financial data. The yearbook presents statistics critical in applying the income and market approaches to business valuation. Cost of equity, cost of capital, capital structure ratios, growth rates, industry multiples, and other useful financial data are presented for more than 300 industries . . . . This book is an excellent resource for industry analysis and is a useful tool for obtaining comparable market data applicable to privately held company valuation." SHANNON P. PRATT & ROGER J. GRABOWSKI, COST OF CAPITAL: APPLICATIONS AND EXAMPLES 440 (4th ed. 2010).

of the overall industry during this period. Therefore, the Examiner's Financial Advisors applied that percentage to the overall industry P/NBV multiples from March 31, 2009 through December 31, 2011,[112] to estimate an appropriate P/NBV multiple for ResCap's equity.[113] This approach is supported by authoritative valuation literature, which discusses the use of a peer group average multiple, as adjusted for differences, when a lack of financial information (in this case the absence of guideline companies after June 30, 2008) prevents using guideline company multiples in a relative valuation (i.e. Market Approach).[114]

The Examiner's Financial Advisors also considered three bids to purchase ResCap's assets or stock presented in October 2010 in assessing the reasonableness of the selected valuation multiples for 2010 and 2011. AFI's financial advisors believed that acceptance of any of the bids would result in equity losses to ResCap ranging from approximately $23 million to $650 million.[115] Additionally, none of the buyers were willing to assume ResCap's contingent or unliquidated liabilities for representation and warranty claims, absent a cap or indemnification from AFI.[116] The Examiner's Financial Advisors considered these bids to be informative with respect to the proposed purchase prices relative to book value and the significant risks perceived by market participants regarding ResCap's contingent and/or unliquidated liabilities for representation and warranty-related claims.[117]

### (c)  Control Premium

A control premium is an amount by which the pro rata value of a controlling interest exceeds the pro rata value of a non-controlling interest in a business enterprise. This premium or upward adjustment reflects the right and power of control, a property interest.[118] The Guideline Publicly Traded Company Method derives value indications from trading prices of minority equity interests in a liquid market and indicates value on a marketable, minority

---

[112] The Examiner's Financial Advisors applied the relative multiple percentage of 31.8% as of June 30, 2008 for the September 30, 2008 and December 31, 2008 measurement dates to reflect continuing deterioration in the mortgage industry during the second half of 2008.

[113] The Examiner's Financial Advisors recognize the limitations of this estimation method. However, the application and results were deemed reasonable for purposes of evaluating ResCap's insolvency.

[114] ASWATH DAMODARAN, DAMODARAN ON VALUATION: SECURITY ANALYSIS FOR INVESTMENT AND CORPORATE FINANCE 17 (2d ed. 2006).

[115] Mortgage Strategic Alternatives Presentation, dated Oct. 29, 2010, at ALLY_0263412 [ALLY_0263337].

[116] Contemporaneous documents indicate that Ocwen and Centerbridge were unwilling to assume any exposure for contingent or unliquidated liabilities related to representation and warranty claims. Fortress was apparently willing to discuss assuming some exposure for such claims, subject to a cap. *Id.* at ALLY_0263416.

[117] According to internal documents, Fortress bid $500 million for a 51% equity interest with a corresponding book value of $740 million, which implied a P/NBV multiple of 0.68. *Id.* at ALLY_0263412. This implied bid multiple served to cross-validate the selected P/NBV multiples for the late 2010 and early 2011 measurement dates.

[118] SHANNON P. PRATT, BUSINESS VALUATION: DISCOUNTS AND PREMIUMS 16, 32 (2d ed. 2009).

basis. A control premium is then applied, when warranted, to estimate the value of equity on a controlling basis. For purposes of assessing ResCap's insolvency, a 100% controlling basis was assumed.

The Examiner's Financial Advisors reviewed observed equity transaction control premiums paid in the "Banking & Finance" and the "Brokerage, Investment & Management Consulting" industries for the years 2006 through 2011 as published by Mergerstat.[119] This information provided a wide range of annual average transaction premiums, generally ranging from 18% to 67%.[120] The Examiner's Financial Advisors also considered the volatility in the mortgage industry and the market's concerns about the viability of ResCap's business model.[121] These are relevant facts that a buyer would consider in deciding whether a premium for a controlling equity interest in ResCap was warranted. In addition, the acquisition of one of ResCap's Guideline Companies, Countrywide, by Bank of America in July of 2008 implied a negative control premium because of the distressed nature of Countrywide and the mortgage industry in 2008.[122] The Examiner's Financial Advisors selected and applied an equity control premium of 10% in the valuation of the equity of ResCap at each quarterly measurement date from December 31, 2005 through June 30, 2007. The Examiner's Financial Advisors concluded that a control premium would not be warranted for ResCap from September 30, 2007 through the Petition Date because of prevailing conditions in the mortgage industry.

### (d) Private Company Discount

As a private company, ResCap did not have publicly traded stock. A controlling interest in a private company may sell at a discount to a controlling interest in a publicly traded company for various reasons. A private company generally has limited access to financial markets, may have less financial transparency, and may incur additional costs to function on a stand-alone basis once separate from its current owner. There may also be less knowledge about the business among potential investors, including a more limited number of potential buyers and an inherently less competitive "bidding" process.[123]

---

[119] It is well recognized that the equity control premiums published by Mergerstat likely include a "synergistic" component in addition to a "financial control" component, as the transactions include both strategic and financial buyers. Therefore, the transaction premiums published in Mergerstat are generally considered to overstate the value of "financial control." *Id.* at 64.

[120] FACTSET MERGERSTAT, 2012 MERGERSTAT REVIEW 81 (Bus. Valuation Res. LLC ed., 2012); FACTSET MERGERSTAT, 2011 MERGERSTAT REVIEW 81 (Bus. Valuation LLC Res. ed., 2011).

[121] KABIR CAPRIHAN & MONICA PAREKH, JPMORGAN, COUNTRYWIDE AND RESIDENTIAL CAPITAL CORP RECOVERY, LIQUIDITY, BALANCE SHEET BURN, ETC. 1 (Aug. 21, 2007).

[122] Based on transaction details provided by Capital IQ, the control premium paid by Bank of America was negative 7.4% one day prior to announcement, negative 14.8% one week prior to announcement and negative 31.9% one month prior to announcement.

[123] Kathleen Fuller et al., *What Do Returns to Acquiring Firms Tell Us? Evidence From Firms that Make Many Acquisitions,* 57 J. FIN. 1763, 1784 (Aug. 2002); SHANNON P. PRATT, VALUING A BUSINESS: THE ANALYSIS AND APPRAISAL OF CLOSELY HELD COMPANIES 443–45 (5th ed. 2008).

Empirical evidence indicates that controlling interests in stand-alone private companies (and divisions of larger public companies) tend to sell at a discount to the values observed in control transactions involving similar publicly traded companies.[124] Estimated average discounts tend to range from 0% to 30%. Evidence suggests that discounts are related to size and other characteristics, with smaller and lower growth privately held companies selling for higher discounts.[125] Other evidence suggests that the observed discounts may be exaggerated to the extent that they include depressed prices for businesses sold by financially troubled parent companies.[126] The Examiner's Financial Advisors considered the facts and circumstances, including that ResCap was an SEC registrant with publicly available audited financial statements through the second quarter of 2009,[127] and determined that a relatively low discount was appropriate. The Examiner's Financial Advisors applied a 5% private company discount to the controlling equity interest in ResCap at each quarterly measurement date.

### (e) Indicated Value Of The Equity Of ResCap

The Examiner's Financial Advisors selected the appropriate P/NBV multiples and applied them to ResCap's reported book value to arrive at the indicated value of ResCap's equity on a marketable, minority basis. The Examiner's Financial Advisors then applied a control premium and private company discount, as applicable, to arrive at the indicated value of ResCap's equity on a non-marketable, controlling basis. The following table summarizes the estimated Fair Market Value of ResCap's equity on a quarterly basis from December 31, 2005 through December 31, 2011.

---

[124] *See, e.g.*, John Koeplin et al., *The Private Company Discount*, J. OF APPLIED CORP. FIN. (Winter 2000); Micah S. Officer, *The Price of Corporate Liquidity: Acquisition Discounts for Unlisted Targets*, 83 J. OF FIN. ECON. 571 (2007); Jean-Francois L'Her et al., *A New Examination of the Private Company Discount: The Acquisition Approach*, J. PRIVATE EQUITY (Summer 2003).

[125] Jean-Francois L'Her et al., *A New Examination of the Private Company Discount: The Acquisition Approach,* J. PRIVATE EQUITY (Summer 2003), at 54.

[126] Micah S. Officer, *The Price of Corporate Liquidity: Acquisition Discounts for Unlisted Targets,* 83 J. FIN. ECON. 571, 596–97 (2007).

[127] ResCap filed financial statements with the SEC through the second quarter of 2009. Subsequently, audited financials were available to holders of notes, prospective investors, and securities analysts at https://www.rescapholdings.com.

EXHIBIT VI.B.4.a(1)(e)
**ResCap Fair Market Value of Equity** [(1)]
December 31, 2005 – December 31, 2011
*($ in Millions)*

| | [A] | [B] | [C] = [A] × [B] | [D] [(2)] | [E] = [C] + [D] | [F] = [E] × -5% | [G] = [E] + [F] |
|---|---|---|---|---|---|---|---|
| | ResCap Book Equity | Selected P/NBV Multiple | Fair Market Value of ResCap Equity (Marketable, Minority Basis) | Control Premium | Fair Market Value of ResCap Equity (Marketable, Controlling Basis) | Private Company Discount of 5% | Fair Market Value of ResCap Equity (Non-Marketable, Controlling Basis) [(1)] |
| 12/31/05 | $ 7,464.0 | 1.60x | $ 11,941.3 | $ 1,194.1 | $ 13,135.4 | ($656.8) | $ 12,478.7 |
| 03/31/06 | 7,763.5 | 1.61x | 12,507.7 | 1,250.8 | 13,758.5 | (687.9) | 13,070.6 |
| 06/30/06 | 8,404.3 | 1.68x | 14,118.2 | 1,411.8 | 15,530.0 | (776.5) | 14,753.5 |
| 09/30/06 | 8,375.9 | 1.49x | 12,505.8 | 1,250.6 | 13,756.4 | (687.8) | 13,068.6 |
| 12/31/06 | 7,622.1 | 1.65x | 12,560.5 | 1,256.0 | 13,816.5 | (690.8) | 13,125.7 |
| 03/31/07 | 7,173.9 | 1.31x | 9,419.4 | 941.9 | 10,361.3 | (518.1) | 9,843.3 |
| 06/30/07 | 7,507.4 | 1.34x | 10,086.7 | 1,008.7 | 11,095.4 | (554.8) | 10,540.6 |
| 09/30/07 | 6,171.6 | 0.99x | 6,093.6 | 0.0 | 6,093.6 | (304.7) | 5,788.9 |
| 12/31/07 | 6,030.1 | 0.40x | 2,389.5 | 0.0 | 2,389.5 | (119.5) | 2,270.0 |
| 03/31/08 | 5,732.9 | 0.37x | 2,100.5 | 0.0 | 2,100.5 | (105.0) | 1,995.5 |
| 06/30/08 | 4,067.5 | 0.32x | 1,306.3 | 0.0 | 1,306.3 | (65.3) | 1,241.0 |
| 09/30/08 | 2,315.4 | 0.32x | 751.0 | 0.0 | 751.0 | (37.5) | 713.4 |
| 12/31/08 | 2,187.4 | 0.40x | 869.4 | 0.0 | 869.4 | (43.5) | 825.9 |
| 03/31/09 | 1,050.0 | 0.62x | 646.8 | 0.0 | 646.8 | (32.3) | 614.5 |
| 06/30/09 | 1,050.0 | 0.53x | 558.6 | 0.0 | 558.6 | (27.9) | 530.7 |
| 09/30/09 | 408.8 | 0.57x | 231.8 | 0.0 | 231.8 | (11.6) | 220.2 |
| 12/31/09 | 275.0 | 0.60x | 165.6 | 0.0 | 165.6 | (8.3) | 157.3 |
| 03/31/10 | 425.7 | 0.67x | 286.0 | 0.0 | 286.0 | (14.3) | 271.7 |
| 06/30/10 | 793.5 | 0.64x | 505.4 | 0.0 | 505.4 | (25.3) | 480.2 |
| 09/30/10 | 858.5 | 0.62x | 534.8 | 0.0 | 534.8 | (26.7) | 508.1 |
| 12/31/10 | 846.2 | 0.71x | 604.2 | 0.0 | 604.2 | (30.2) | 574.0 |
| 03/31/11 | 884.2 | 0.70x | 619.0 | 0.0 | 619.0 | (30.9) | 588.0 |
| 06/30/11 | 772.1 | 0.68x | 524.2 | 0.0 | 524.2 | (26.2) | 498.0 |
| 09/30/11 | 331.1 | 0.59x | 194.7 | 0.0 | 194.7 | (9.7) | 184.9 |
| 12/31/11 | 92.4 | 0.64x | 58.8 | 0.0 | 58.8 | (2.9) | 55.9 |

[(1)] *This section details the value of the equity component of ResCap's overall capital structure and is not indicative of solvency, as described herein.*
[(2)] *A control premium of 10% was applied in the valuation of ResCap's equity at each quarterly measurement date from Dec. 31, 2005 through Jun. 30, 2007. A control premium was not warranted for ResCap from Sep. 30, 2007 through the Petition Date for reasons described herein.*
*Source: Appendix VI.B.4.a(4).*

The results of the Guideline Publicly Traded Company Method using the P/NBV multiple imply a positive market value of equity for ResCap. It is not appropriate to consider this positive value of equity as an indication of solvency. Under the Balance Sheet Test, the Fair Market Value of equity is combined with the Fair Market Value of debt to determine the Fair Market Value of invested capital. The face value of debt is then deducted from the Fair Market Value of invested capital, with a surplus indicating solvency and a deficit indicating insolvency as of the measurement date.[128]

---

[128] A determination that ResCap was insolvent implies that ResCap's equity had little to no value as of the specific measurement date. Equity for insolvent companies transacts at positive values for numerous reasons, including the option value inherent in the security, speculation, and/or lack of market transparency.

Further, despite the condition of the mortgage markets, ResCap's book value of equity remained positive throughout the credit crisis. This was largely because of ongoing capital support from AFI. The Examiner's Financial Advisors found that ResCap's book value of equity was not necessarily reflective of either the Fair Market Value of ResCap's equity or its solvency over the relevant time period.

### (2) Valuation Of The Interest-Bearing Debt Of ResCap

The Examiner's Financial Advisors used the Observable Market Value Method to value ResCap's interest-bearing debt. This method is applicable when the securities of a company are actively traded in an efficient market and relies on the premise that the market prices of the subject securities incorporate the future expectations of market participants with regard to the underlying value of the subject company.[129]

The Examiner's Financial Advisors analyzed and priced ResCap's interest-bearing debt based on the following five categories:[130]

(1) *Parent/Affiliate Borrowings*: Priced at estimated fair value per ResCap's annual Statement of Financial Accounting Standards ("SFAS") 107 disclosure. In each of ResCap's disclosures from 2005 through 2011, ResCap estimated that the fair value of this debt was equal to its face value.

(2) *Senior and Junior Secured Notes*: Priced using observable market data from financial data providers.[131]

(3) *Other Secured Borrowings*: ResCap completed an exchange of certain unsecured notes for senior and junior secured notes in June 2008. Other secured borrowings were assumed to be priced at par prior to June 2008. Other secured borrowings were valued using the same pricing as ResCap's senior secured notes after June 2008.

(4) *Unsecured Notes and Term Loan*: Priced using observable market data from financial data providers.[132]

---

[129] SHANNON P. PRATT WITH ALINA V. NICULITA, VALUING A BUSINESS: THE ANALYSIS AND APPRAISAL OF CLOSELY HELD COMPANIES 551 (5th ed. 2008).

[130] Beginning in November 2007, AFI implemented a program of open market purchases which may have affected the pricing of ResCap's debt securities. Such purchases would not necessarily indicate an increase in ResCap's value based on its underlying fundamentals, but could cause an upward bias in the valuation of ResCap's interest-bearing debt. No adjustment to the pricing of ResCap's interest-bearing debt was applied to account for this potential bias.

[131] Market pricing on bonds was observed from Interactive Data Corporation and Advantage Data Inc., providers of securities pricing data.

[132] Market pricing on bonds and loans was observed from Interactive Data Corporation, Advantage Data Inc., and Thomson Reuters LPC's Secondary Market Intelligence, providers of securities pricing data.

(5) *Other Unsecured Borrowings*: Other unsecured borrowings were valued using the weighted average of the unsecured notes' pricing.

ResCap's collateralized borrowings in securitization trusts were excluded from the insolvency analysis because they were secured by specific securitized mortgage assets not controlled by ResCap. The FHLB advances on ResCap's consolidated balance sheet were also excluded from the insolvency analysis because the FHLB advances were obligations with recourse to Ally Bank. The exclusion of these items did not have a material impact on the assessment of ResCap's insolvency because the market value of these liabilities approximated par at all relevant measurement dates.[133] The following table summarizes the analysis of the Fair Market Value of ResCap's interest-bearing debt.

EXHIBIT VI.B.4.a(2)
**ResCap Fair Market Value of Debt**
December 31, 2005 – December 31, 2011
*($ in Millions)*

| | [A] Face Value of ResCap Debt | [B] Fair Market Value of ResCap Debt | [C] = [B] - [A] Fair Market Value Surplus / (Deficit) | [D] = [B] / [A] Fair Market Value/ Face Value |
|---|---|---|---|---|
| 12/31/05 | $ 43,050.0 | $ 43,173.3 | $ 123.3 | 100.3% |
| 03/31/06 | 41,617.3 | 41,672.8 | 55.5 | 100.1% |
| 06/30/06 | 43,317.4 | 43,154.5 | (162.9) | 99.6% |
| 09/30/06 | 49,271.0 | 49,402.0 | 131.0 | 100.3% |
| 12/31/06 | 52,601.4 | 52,711.0 | 109.6 | 100.2% |
| 03/31/07 | 47,009.5 | 46,872.9 | (136.6) | 99.7% |
| 06/30/07 | 43,573.3 | 43,178.0 | (395.3) | 99.1% |
| 09/30/07 | 39,644.1 | 36,284.8 | (3,359.3) | 91.5% |
| 12/31/07 | 34,835.2 | 28,804.7 | (6,030.5) | 82.7% |
| 03/31/08 | 31,619.1 | 23,702.0 | (7,917.1) | 75.0% |
| 06/30/08 | 26,127.6 | 19,134.6 | (6,993.0) | 73.2% |
| 09/30/08 | 21,772.4 | 10,992.6 | (10,779.8) | 50.5% |
| 12/31/08 | 15,993.9 | 7,668.5 | (8,325.4) | 47.9% |
| 03/31/09 | 13,781.3 | 8,591.3 | (5,190.0) | 62.3% |
| 06/30/09 | 11,978.7 | 9,391.2 | (2,587.5) | 78.4% |
| 09/30/09 | 10,502.2 | 8,566.6 | (1,935.6) | 81.6% |
| 12/31/09 | 9,909.4 | 8,501.6 | (1,407.8) | 85.8% |
| 03/31/10 | 9,170.0 | 8,863.5 | (306.5) | 96.7% |
| 06/30/10 | 7,766.8 | 7,517.3 | (249.5) | 96.8% |
| 09/30/10 | 7,013.5 | 6,952.5 | (61.0) | 99.1% |
| 12/31/10 | 6,991.2 | 7,016.9 | 25.6 | 100.4% |
| 03/31/11 | 6,618.6 | 6,663.9 | 45.3 | 100.7% |
| 06/30/11 | 6,397.3 | 6,359.3 | (38.0) | 99.4% |
| 09/30/11 | 6,088.7 | 5,111.9 | (976.7) | 84.0% |
| 12/31/11 | 5,894.8 | 4,373.8 | (1,521.0) | 74.2% |

*Source: Appendix VI.B.4.a(4).*

---

[133] Accordingly, the net impact of excluding these items on the assessment of insolvency would be negligible because both the Fair Market Value of the debt and the face value of the debt would decrease by approximately the same amount.

### (3) Impact Of TARP Funding

ResCap's distressed financial condition was well recognized by the market. This is evident in ResCap's CDS spreads, which tracked the market's perception of ResCap's likelihood of default. During the second half of 2007, the market was pricing in a 72% chance that ResCap would default on its debt within one year.[134] An analyst noted, "[w]hat has driven ResCap's credit spreads to current levels has to do with something more practical and human. Simply put, there is little interest in taking the other side (*i.e.*, going long risk) of the trade."[135] ResCap's CDS spreads fluctuated significantly in the first half of 2008 amid market concerns that ResCap would default on its debt without a capital infusion from AFI. According to a market analyst, "ResCap's credit default swaps have been trading at levels that indicate investors have been expecting bankruptcy since the fall of 2007."[136]

EXHIBIT VI.B.4.a(3)—1
**ResCap Credit Default Swap Spreads** [(1)]
August 1, 2005 – December 31, 2011



*(1) Five year CDS spreads depicted; one year CDS spreads not depicted. Default probabilities per contemporaneous analyst commentary.*
*(2)Karen Brettell, US Credit –ResCap Debt Risk as Swaps Imply Distress, REUTERS, Aug. 21, 2007,*
  *http://uk.reuters.com/article/2007/08/21/markets-credit-idUKN2157256720070821.*
*(3)Karen Brettell, US Credit –ResCap Swaps Imply 72 Percent Default Risk, REUTERS, Nov. 20, 2007,*
  *http://www.reuters.com/article/2007/11/20/markets-credit-idUKN2053644620071120.*
*(4)Ari Levy & Caroline Salas, GMAC's $60 Billion Deal Loses Traction as Cash Burns (Update1), BLOOMBERG, Jun. 24, 2008,*
  *http://www.bloomberg.com/apps/news?pid=newsarchive&refer=home&sid=aFREd.COhlF4.*
Source: Advantage Data Inc.

---

[134] Karen Brettell, *US CREDIT–ResCap Swaps Imply 72 Percent Default Risk,* REUTERS, Nov. 20, 2007, www.reuters.com/assets/print?aid=UKN2053644620071120.

[135] VAN HESSER & DAPHNE FENG, HSBC, RESIDENTIAL CAPITAL, LLC LOOKING FOR SOMEONE TO TAKE THE OTHER SIDE OF THE TRADE 3 (Nov. 20, 2007).

[136] Cynthia Koons, *ResCap Bonds Command Pricey Insurance*, WALL ST. J., Aug. 2, 2008, http://online.wsj.com/article/SB121759683223604485.html.

A financial reporter noted in August 2008 that ResCap's "value in the credit markets is like that of a company on the verge of taking its last breath."[137] ResCap's CDS spreads spiked in November 2008, mirroring the decline in ResCap's bond prices and signaling the market's expectation of an imminent bankruptcy.[138] Moody's downgraded ResCap from Ca to C on November 20, 2008, and made the following comments with regard to ResCap's financial condition:

> ResCap cannot produce the required cash flow to service and ultimately repay its obligations . . . ResCap requires significant external support to continue as a going concern . . . [i]t is our opinion that ResCap would not be a going concern without support from [AFI] . . . each month requires additional support from [AFI] to prevent ResCap from violating its debt covenants and defaulting on its debt service.[139]

AFI received approval for $5 billion in TARP funds on December 24, 2008.[140] ResCap engaged in contingency planning for a bankruptcy filing in the weeks leading up to AFI's approval for TARP funding. Absent AFI receiving TARP funds, a ResCap bankruptcy filing in December 2008 appeared imminent.[141]

AFI received another $7.5 billion of TARP funding on May 21, 2009, and a third and final round of TARP funding of $3.8 billion on December 30, 2009.[142] After receipt of the third round of TARP funding, the Congressional Oversight Panel noted that ResCap's "ongoing existence and viability have remained highly doubtful without continued contributions from its parent. [AFI's] contributions to ResCap would not have been possible; however, had [AFI] not received TARP assistance. . . ."[143] Further, Carpenter testified before the Congressional Oversight Panel

---

[137] *Id.*

[138] A Fitch Financial Institutions "Special Report" noted:

An important caveat in using annualized spreads to imply annual probabilities of default is that if the market considers an entity's default to be imminent, the resulting implied probability of default could exceed 100%. For example, a protection buyer might be willing to pay 1,000 bps (or 10% of the notional CDS amount) for effectively a month's horizon of protection, which if annualized would translate to a spread of 12,000 bps and imply an annual probability of default of 200% (assuming a 60% loss severity).

ROBERT J. GROSSMAN & MARTIN HANSEN, FITCH, FINANCIAL INSTITUTIONS: CDS SPREADS AND DEFAULT RISK INTERPRETING THE SIGNALS 2 (Oct. 12, 2010).

[139] ROBERT YOUNG & CRAIG A. EMRICK, MOODY'S, RATING ACTION: MOODY'S DOWNGRADES RESCAP TO C (Nov. 20, 2008), http://www.moodys.com/research/Moodys-downgrades-ResCap-to-C--PR_167799.

[140] Cong. Oversight Panel, March Oversight Report: The Unique Treatment of GMAC Under the Tarp (Mar. 10, 2010), at 20, http://cybercemetery.unt.edu/archive/cop/20110402042135/http://cop.senate.gov/documents/cop-031110-report.pdf.

[141] Int. of T. Pohl, Feb. 26, 2013, at 41:10–44:16, 66:6–69:19.

[142] CONG. OVERSIGHT PANEL, MARCH OVERSIGHT REPORT: THE UNIQUE TREATMENT OF GMAC UNDER THE TARP (Mar. 10, 2010), at 3, http://cybercemetery.unt.edu/archive/cop/20110402042135/http://cop.senate.gov/documents/cop-031110-report.pdf.

[143] *Id.* at 41.

on February 25, 2010, that "[f]or [AFI], over the last several years, [ResCap] has been what I have described publicly as a millstone around the company's neck. It has been the single-greatest barrier to the company's access to capital markets, it has been the greatest barrier on our profitability as an enterprise."[144]

As shown on the following chart, the receipt of TARP funds by AFI corresponded with significant increases in the pricing of ResCap's debt[145] following each of the three TARP funding dates.



EXHIBIT VI.B.4.a(3)—2

**Effect of AFI TARP Funding on ResCap Bond Pricing**

2008 – 2010

Source: Pricing per Interactive Data Corporation, a provider of securities pricing data.

As indicated above, AFI's receipt of TARP funds had a significant upward impact on the market prices of ResCap's publicly traded securities.

[144] *GMAC Financial Services and the Troubled Asset Relief Program: Hearing Before the Cong. Oversight Panel*, 111th Cong. 54 (2010), http://cybercemetery.unt.edu/archive/cop/20110402012152/http://cop.senate.gov/documents/transcript-022510-gmac.pdf.

[145] An analysis was performed of the historical pricing trends of ResCap's 6.5% bond maturing on April 17, 2013. This bond was selected because of the trading frequency and availability of data from 2006–2012. This bond is senior unsecured and is identified by CUSIP 76113BAR0.

### (4) Market Approach Conclusion Of Value

The Examiner's Financial Advisors estimated ResCap's Fair Market Value of invested capital by adding the Fair Market Value of ResCap's equity to the Fair Market Value of ResCap's interest-bearing debt. The face value of ResCap's interest-bearing debt was then subtracted from the Fair Market Value of invested capital to determine the Fair Market Value surplus or deficit. The following table summarizes the results of the Balance Sheet Test using the Market Approach.

EXHIBIT VI.B.4.a(4)
**Market Approach: Concluded Fair Market Value Surplus / (Deficit) of ResCap** [1]
December 31, 2005 – December 31, 2011
*($ in Millions)*

| | [A] [2] Fair Market Value of ResCap Equity (Non-Marketable, Controlling Basis) | [B] Fair Market Value of ResCap Debt | [C] = [A] + [B] Fair Market Value of Invested Capital | [D] Face Value of ResCap Debt | [E] = [C] - [D] Fair Market Value Surplus / (Deficit) |
|---|---|---|---|---|---|
| 12/31/05 | $ 12,478.7 | $ 43,173.3 | $ 55,652.0 | $ 43,050.0 | $ 12,602.0 |
| 03/31/06 | 13,070.6 | 41,672.8 | 54,743.4 | 41,617.3 | 13,126.1 |
| 06/30/06 | 14,753.5 | 43,154.5 | 57,908.0 | 43,317.4 | 14,590.6 |
| 09/30/06 | 13,068.6 | 49,402.0 | 62,470.7 | 49,271.0 | 13,199.7 |
| 12/31/06 | 13,125.7 | 52,711.0 | 65,836.7 | 52,601.4 | 13,235.3 |
| 03/31/07 | 9,843.3 | 46,872.9 | 56,716.1 | 47,009.5 | 9,706.6 |
| 06/30/07 | 10,540.6 | 43,178.0 | 53,718.6 | 43,573.3 | 10,145.3 |
| 09/30/07 | 5,788.9 | 36,284.8 | 42,073.7 | 39,644.1 | 2,429.6 |
| 12/31/07 | 2,270.0 | 28,804.7 | 31,074.7 | 34,835.2 | (3,760.5) |
| 03/31/08 | 1,995.5 | 23,702.0 | 25,697.4 | 31,619.1 | (5,921.7) |
| 06/30/08 | 1,241.0 | 19,134.6 | 20,375.6 | 26,127.6 | (5,752.0) |
| 09/30/08 | 713.4 | 10,992.6 | 11,706.1 | 21,772.4 | (10,066.3) |
| 12/31/08 | 825.9 | 7,668.5 | 8,494.4 | 15,993.9 | (7,499.4) |
| 03/31/09 | 614.5 | 8,591.3 | 9,205.8 | 13,781.3 | (4,575.5) |
| 06/30/09 | 530.7 | 9,391.2 | 9,921.9 | 11,978.7 | (2,056.8) |
| 09/30/09 | 220.2 | 8,566.6 | 8,786.8 | 10,502.2 | (1,715.4) |
| 12/31/09 | 157.3 | 8,501.6 | 8,658.9 | 9,909.4 | (1,250.5) |
| 03/31/10 | 271.7 | 8,863.5 | 9,135.2 | 9,170.0 | (34.8) |
| 06/30/10 | 480.2 | 7,517.3 | 7,997.5 | 7,766.8 | 230.7 |
| 09/30/10 | 508.1 | 6,952.5 | 7,460.7 | 7,013.5 | 447.2 |
| 12/31/10 | 574.0 | 7,016.9 | 7,590.8 | 6,991.2 | 599.6 |
| 03/31/11 | 588.0 | 6,663.9 | 7,251.9 | 6,618.6 | 633.3 |
| 06/30/11 | 498.0 | 6,359.3 | 6,857.4 | 6,397.3 | 460.1 |
| 09/30/11 | 184.9 | 5,111.9 | 5,296.9 | 6,088.7 | (791.8) |
| 12/31/11 | 55.9 | 4,373.8 | 4,429.6 | 5,894.8 | (1,465.1) |

[1] *This section details the Fair Market Value surplus/(deficit) of ResCap under the Market Approach and is not necessarily indicative of the solvency of ResCap. As discussed in Section VI.B.3, the Examiner's Financial Advisors placed full weight on the Market Approach from Dec. 31, 2005 through Jun. 30, 2007. The Market Approach and Asset-Based Approach were weighted equally from Sep. 30, 2007 through Dec. 31, 2009. The Examiner's Financial Advisors placed full weight on the Asset-Based Approach for all quarterly measurement dates subsequent to Dec. 31, 2009.*
[2] *Reflects the value of the equity component of ResCap's overall capital structure and is not indicative of solvency, as described herein.*
*Source: Appendix VI.B.4(a)(4).*

### b. *Asset-Based Approach*

The Examiner's Financial Advisors also applied the Asset-Based Approach using the Adjusted Book Value Method to estimate the Fair Market Value of ResCap's total assets. Application of the Adjusted Book Value Method involved adjusting the book value of ResCap's assets to estimated market values. The Asset-Based Approach can be applied using either a going concern premise of value or a liquidation premise of value.[146] The Examiner's Financial Advisors concluded that the valuation for purposes of assessing ResCap's insolvency should be performed under a going concern premise of value.[147]

The Adjusted Book Value Method was deemed appropriate for valuing ResCap as this method "is useful for valuing a business that has had very erratic earnings, or has had successive years of losses, [because] both situations could render the income approach inapplicable. It is also used when market comparables are unavailable."[148] This method is particularly appropriate for companies such as ResCap where operating earnings are insignificant relative to the value of the underlying assets. Valuation literature indicates that "asset-intensive businesses with low profitability relative to their invested capital may be more appropriately valued using the asset approach under a going concern assumption."[149]

The Examiner's Financial Advisors applied the Adjusted Book Value Method considering contemporaneous asset-based valuation analyses prepared by various advisors and other third-party analysts from 2007 through 2009. Information considered by the Examiner's Financial

---

[146] Shannon P. Pratt with Alina V. Niculita, Valuing a Business: The Analysis and Appraisal of Closely Held Companies 64 (5th ed. 2008).

[147] Collier on Bankruptcy explains:

One of the most vexing problems in the valuation of the assets of a business enterprise as of a specified date is the question whether, and under what conditions, it should be treated as a going concern requiring appraisal of its property as an active unit rather than on an item-by-item basis. Fair value, in the case of a going concern, is determined by "the fair market price of the debtor's assets that could be obtained if sold in a prudent manner within a reasonable period of time." There is overwhelming authority to the effect that normally such valuation must be made from the vantage of a going concern and that subsequent dismemberment or impossibility to dispose of plant, equipment, inventory, etc., as an entirety should not enter into the picture. Indeed, it has been held that the court should use fair market going concern price "unless a business is on its deathbed," in which case a liquidating value should be used . . . . Where the going concern value is the appropriate standard, the appraisal must take into account the additional value element which flows from the combination of the various assets to an economic unit.

Collier on Bankruptcy ¶ 101.32 (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2011) (citations omitted).

[148] Zabihollah Rezaee, Financial Institutions, Valuations, Mergers, & Acquisitions: The Fair Value Approach 206 (2d ed. 2001).

[149] Ian Ratner et al., Business Valuation And Bankruptcy 25 (2009).

Advisors included asset recovery assumptions reported by credit analysts from JPMorgan[150] and Citibank[151] during the second half of 2007, and also by Lazard during the fourth quarter of 2008[152] and second quarter of 2009.[153] These analyses each contained high, medium, and low asset recovery scenarios. The Examiner's Financial Advisors noted that these asset recovery rates were used to estimate the value of ResCap's assets in the event of liquidation. Therefore, the Examiner's Financial Advisors adjusted the recovery rates upward, as deemed appropriate, to reflect the going concern value of the business.[154] The Examiner's Financial Advisors assumed that ResCap's assets would be sold in a prudent manner within a reasonable period of time in order to achieve a going concern value, recognizing associated execution risk because of deteriorating market conditions.

The Examiner's Financial Advisors also considered the ABX index to be an indicator of the state of mortgage industry. The ABX index, created by the Markit Group, Ltd. ("Markit"), is a synthetic tradable index that allows investors to take positions on subprime mortgage-backed securities via CDS contracts.[155] The ABX index became a benchmark for the performance of subprime RMBS and served as a widely followed barometer of the United States subprime mortgage market.[156] During 2007 and 2008, the ABX BBB and A indices suffered declines of approximately 90% in value, while the AAA index suffered a decline of approximately 40%. The condition of the mortgage industry, as reflected by the ABX index, supports the trend in the asset value adjustments applied by the Examiner's Financial Advisors in the Adjusted Book Value Method for ResCap. The following graph demonstrates the precipitous decline across various credit-rated ABX sub-indices.

---

[150] KABIR CAPRIHAN & CHLOE THOMPSON, JPMORGAN, RESIDENTIAL CAPITAL CORP RECOVERY, LIQUIDITY, CASH FLOW BURN (Nov. 26, 2007); KABIR CAPRIHAN & MONICA PAREKH, JPMORGAN, COUNTRYWIDE AND RESIDENTIAL CAPITAL CORP RECOVERY, LIQUIDITY, BALANCE SHEET BURN, ETC. (Aug. 21, 2007).

[151] RYAN O'CONNELL & JERRY DOROST, CITIBANK, RESIDENTIAL CAPITAL LLC LOWERING THE ESTIMATED RECOVERY VALUES (Mar. 3, 2008) [CCM00049053].

[152] *See* Skadden & Lazard Project Scout Presentation, dated Oct. 8, 2008 [RC40008678].

[153] *See* Skadden & Lazard Project Scout II Presentation, dated Jun. 2009 [UBS-RESCAP-0015151]; Skadden & Lazard Project Scout II Presentation, dated Jul. 2009 [RC40010890].

[154] The Adjusted Book Value Method also requires the inclusion of the Fair Market Value of any off-balance sheet assets including intangible assets. The Examiner's Financial Advisors assumed the value of ResCap's off-balance sheet intangible assets to be negligible after June 2007 given ResCap's negative earnings, distressed financial condition, and unsustainable business model. Furthermore, ResCap wrote off all of its acquired intangible assets (including goodwill) in the third quarter of 2007.

[155] *See generally* Products and Services: Markit ABX.HE, MARKIT GROUP LTD., http://www.markit.com/en/products/data/indices/structured-finance-indices/abx/abx.page.

[156] Ingo Fender & Martin Scheicher, *The ABX: How Do the Markets Price Subprime Mortgage Risk?*, BANK FOR INT'L SETTLEMENTS Q. REV., (Sept. 2008), at 67.



EXHIBIT VI.B.4.b—1
**ABX.HE Indices** [1]
December 30, 2005 – December 31, 2011

[1] *The ABX.HE is a series of five indices that track credit default swaps based on tranches of subprime mortgage-backed securities. The tranches differ by their ratings, from AAA to BBB-.*

*Source: Bloomberg; Declaration of Stewart M. Landefeld in Support of the Debtors' Chapter 11 Petitions and First Day Motions, In re Wash. Mutual, Inc., [Case No. 08-12229; Docket No. 13] at 12; IndyMac Bancorp, Inc. Current Report (Form 8-K) (Jul. 31, 2008), at 2; Bank of America Corporation, Annual Report (Form 10-K) (Feb. 27, 2009), at 17.*

The Examiner's Financial Advisors considered contemporaneous third-party asset recovery assumptions, the state of the mortgage industry, and the financial condition of ResCap[157] in estimating the asset value adjustments for ResCap's assets as of each quarterly measurement date.[158] The following chart summarizes the resulting overall value adjustment percentages for ResCap's assets across the quarterly measurement dates for each scenario.

---

[157] The Examiner's Financial Advisors reviewed the annual fair value estimates provided in ResCap's SEC Form 10-K disclosures, but did not rely heavily on these estimates because of the volatility in the mortgage industry and ResCap's acknowledgement of its inability to price certain assets accurately. *See* E-mails between D. Applegate, E. Feldstein, and S. Khattri (Jan. 27–28, 2007) [EXAM10163216].

[158] The application of the Adjusted Book Value Method considered appropriate market adjustments for the assets of Ally Bank, which included both the mortgage and automotive divisions. The Examiner's Financial Advisors noted that Ally Bank's assets were generally of higher quality than ResCap's (the delinquency rates of ResCap's mortgage loans were much higher than the delinquency rates of Ally Bank's mortgage loans). Total liabilities for Ally Bank and minority interests were then subtracted from the resulting value to derive an estimated value of ResCap's equity interest in the mortgage division of Ally Bank. The application of the Adjusted Book Value Method for ResCap on a consolidated basis is consistent with the analyses performed by JPMorgan. *See* KABIR CAPRIHAN & CHLOE THOMPSON, JPMORGAN, RESIDENTIAL CAPITAL CORP RECOVERY, LIQUIDITY, CASH FLOW BURN (Nov. 26, 2007); KABIR CAPRIHAN & MONICA PAREKH, JPMORGAN, COUNTRYWIDE AND RESIDENTIAL CAPITAL CORP RECOVERY, LIQUIDITY, BALANCE SHEET BURN, etc. (Aug. 21, 2007).

EXHIBIT VI.B.4.b—2
**ResCap Asset-Based Approach**
**Adjusted Book Value Method: Total Asset Value Adjustment**
December 31, 2005 – December 31, 2011



*Source: Appendix VI.B.4.b.*

The Examiner's Financial Advisors estimated the Fair Market Value of ResCap's total assets by applying the asset value adjustments to the book value of ResCap's assets at each quarterly measurement date. The face value of ResCap's total liabilities[159] was then subtracted from the Fair Market Value of ResCap's total assets to determine ResCap's Fair Market Value surplus or deficit. The following table summarizes the results of the Balance Sheet Test using the Asset-Based Approach.

---

[159] Total liabilities include interest-bearing liabilities, non-interest bearing liabilities (i.e., payables, accrued expenses, and other current and non-current liabilities, etc.), and contingent and/or unliquidated liabilities.

EXHIBIT VI.B.4.b—3
**Asset-Based Approach: Concluded Fair Market Value Surplus / (Deficit) of ResCap** [(1)]
December 31, 2005 – December 31, 2011
*($ in Millions)*

| | Fair Market Value Surplus / (Deficit) | | |
|---|---|---|---|
| | **High** | **Low** | **Concluded Value** |
| 12/31/05 | $ 7,464.0 | $ 7,464.0 | $ 7,464.0 |
| 03/31/06 | 7,763.5 | 7,763.5 | 7,763.5 |
| 06/30/06 | 8,404.3 | 8,404.3 | 8,404.3 |
| 09/30/06 | 8,375.9 | 8,375.9 | 8,375.9 |
| 12/31/06 | 7,622.1 | 7,622.1 | 7,622.1 |
| 03/31/07 | 7,173.9 | 7,173.9 | 7,173.9 |
| 06/30/07 | 7,507.4 | 7,507.4 | 7,507.4 |
| 09/30/07 | 3,932.6 | (1,385.0) | 1,273.8 |
| 12/31/07 | 2,854.6 | (2,631.1) | 111.8 |
| 03/31/08 | 793.4 | (4,783.1) | (1,994.9) |
| 06/30/08 | (1,180.6) | (6,303.6) | (3,742.1) |
| 09/30/08 | (2,371.7) | (7,286.0) | (4,828.8) |
| 12/31/08 | (2,110.3) | (6,684.2) | (4,397.3) |
| 03/31/09 | (226.9) | (1,978.2) | (1,102.5) |
| 06/30/09 | (350.2) | (1,979.2) | (1,164.7) |
| 09/30/09 | (866.8) | (2,260.5) | (1,563.6) |
| 12/31/09 | (183.9) | (1,191.5) | (687.7) |
| 03/31/10 | (592.2) | (2,663.9) | (1,628.0) |
| 06/30/10 | (498.2) | (2,736.8) | (1,617.5) |
| 09/30/10 | (1,403.6) | (3,685.1) | (2,544.3) |
| 12/31/10 | (1,385.5) | (3,529.9) | (2,457.7) |
| 03/31/11 | (1,243.6) | (3,277.2) | (2,260.4) |
| 06/30/11 | (2,539.0) | (4,635.9) | (3,587.5) |
| 09/30/11 | (3,361.3) | (5,783.2) | (4,572.3) |
| 12/31/11 | (3,386.0) | (5,610.3) | (4,498.1) |

[(1)] *The Fair Market Value surplus/(deficit) shown above is calculated as the Fair Market Value of the total assets of ResCap less the face value of the total liabilities of ResCap as of each measurement date.*
*Source: Appendix VI.B.4.b.*

### 5.  Contingent / Unliquidated Liabilities

#### a.  Legal Analysis

An assessment of ResCap's insolvency requires consideration of certain contingent and/or unliquidated liabilities (or unliquidated damages) that might not have been contemporaneously or adequately recorded when it issued its financial statements. The most prominent of these liabilities included potential representation and warranty-related claims. ResCap sold loans through whole-loan sales and securitizations, and was required to make customary representations and warranties regarding those loans. ResCap bore the risk of loss associated with those loans if they were intentionally or negligently misrepresented.[160]

In evaluating a debtor's insolvency, both present and contingent assets and liabilities are to be considered, so long as the contingency is capable of reasonable estimation and provided

---

[160] Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2008), at 34–36.

that such contingent assets or liabilities are properly discounted.[161] "It makes no difference whether the firm has a contingent asset or a contingent liability; the asset or liability must be reduced to its present, or expected, value before a determination can be made whether the firm's assets exceed its liabilities."[162] If contingencies are not properly discounted, the "absurd" result would be "that every individual firm that had contingent liabilities greater than his or its net assets" would be insolvent.[163]

Furthermore, when examining a debtor's insolvency as of the date of an allegedly fraudulent transfer, courts should not engage in an improper hindsight analysis.[164] As noted by the Third Circuit:

> Far from "hindsight" or "*post-hoc*" analysis, a court looks at the circumstances as they appeared to the debtor and determines whether the debtor's belief that a future event would occur was reasonable. The less reasonable a debtor's belief, the more a court is justified in reducing the assets (or raising the liabilities) to reflect the debtor's true financial condition at the time of the alleged transfers.[165]

The *Lippe v. Bairnco Corp.*[166] case provides an example of courts' valuation of a debtor's assets and liabilities as of the date of an allegedly fraudulent transfer. In *Lippe*, creditors of Keene Corporation ("Keene") sought to avoid a series of transfers made by the company as actually fraudulent under NY DCL section 276 and/or constructively fraudulent under NY DCL section 273. Keene filed for bankruptcy in 1993 after being overwhelmed by asbestos personal injury liabilities. The transfers challenged by the creditors were executed in 1983 through 1989.

---

[161] *Mellon Bank, N.A. v. Official Comm. of Unsecured Creditors of R.M.L., Inc.* (*In re R.M.L., Inc.*), 92 F.3d 139, 156 (3d Cir. 1996) ("If a debtor's treatment of an item as an 'asset' depends for its propriety on the occurrence of a contingent event, a court must take into consideration the likelihood of that event occurring from an objective standpoint.") (citations omitted); *In re Xonics Photochemical, Inc.*, 841 F.2d 198, 200 (7th Cir. 1988) ("By definition, a contingent liability is not certain—and often is highly unlikely—ever to become an actual liability. To value the contingent liability it is necessary to discount it by the probability that the contingency will occur and the liability will become real.").

[162] *In re Xonics Photochemical, Inc.*, 841 F.2d at 200.

[163] *Id.* at 199.

[164] *Lippe v. Bairnco Corp.*, 249 F. Supp. 2d 357, 380 (S.D.N.Y. 2003) (explaining that in consideration of a claim pursuant to the UFCA, "solvency must be gauged at the time of the transfer and not with the benefit of hindsight") (citations omitted), *aff'd*, 99 F. App'x 274 (2d Cir. 2004); *see also Paloian v. LaSalle Bank, N.A.*, 619 F.3d 688, 693 (7th Cir. 2010) (noting that "[h]indsight bias is to be fought rather than embraced" when determining whether debtor was insolvent under Illinois UFTA) (citing *Boyer v. Crown Stock Distrib., Inc.*, 587 F.3d 787, 794-95 (7th Cir. 2009); *In re R.M.L., Inc.*, 92 F.3d at 155 ("The use of hindsight to evaluate a debtor's financial condition for purposes of the [Bankruptcy] Code's 'insolvency' element has been criticized by courts and commentators alike.") (citation omitted); *Wolkowitz v. Am. Research Corp.* (*In re DAK Indus., Inc.*), 195 B.R. 117, 125 (Bankr. C.D. Cal. 1996) (cautioning against using hindsight to determine if business was on its "deathbed"), *aff'd*, 170 F.3d 1197 (9th Cir. 1999).

[165] *In re R.M.L., Inc.*, 92 F.3d at 156 (emphasis in original).

[166] *Lippe*, 249 F. Supp. 2d 357.

The defendants filed motions for summary judgment, seeking to dismiss, among other claims, the creditors' constructive fraudulent transfer claims. The district court's summary judgment decision turned, in part, on whether Keene was solvent at the time of the transfers under NY DCL section 271. That section provides that a person is insolvent if "the present fair salable value of his assets is less than the amount that will be required to pay his probable liability on his existing debts as they become absolute and matured."[167] Focusing on the phrase "probable," the district court calculated the debtor's liabilities as of the relevant transfer dates, considering only that information known to the company at the time of the transfers, and not including the company's ultimate asbestos liability.[168]

Emphasizing that "solvency must be gauged at the time of the transfer and not with the benefit of hindsight,"[169] the district court determined that the company "had, or believed it had, more than sufficient assets to cover its probable liabilities at the time of the transactions . . . and during the years it paid dividends."[170] Evidence gathered during discovery revealed that "Keene's managers and lawyers . . . never believed that Keene was insolvent or would be rendered insolvent by virtue of the asbestos cases"[171] based on the company's monitoring and calculations of its asbestos liability. Ultimately, the district court determined that "no reasonable jury could find that Keene actually believed its probable liabilities would exceed the amount of [its assets]" but that "of course, no one could predict the future"[172] when this remote likelihood ultimately occurred. With this finding, the district court refused to use hindsight to add retroactively Keene's ultimate asbestos liability to its balance sheet at the time of the transfers, and granted the summary judgment motion on the basis that the plaintiffs could not demonstrate that the debtor was insolvent at the time of the allegedly constructive fraudulent transfer claims.

In contrast, in a decision in the *In re W.R. Grace & Co.* bankruptcy cases, the Bankruptcy Court for the District of Delaware held that, in assessing whether W.R. Grace & Co. was insolvent at the time of an allegedly fraudulent transfer, it was appropriate for the court to consider future asbestos claims that had not yet been asserted against Grace, but were otherwise fully established.[173]

---

[167] N.Y. DEB. & CRED. LAW § 271.

[168] The District Court noted that "Keene could not predict the future, and it had no reason to know, at the time of the transfers, that years later it would be rendered insolvent by a flood of asbestos filings." *Lippe,* 249 F. Supp. 2d at 360.

[169] *Id.* at 380 (citations omitted).

[170] *Id.* at 378. The court noted that at the time of the transfers, Keene was contesting many of the asbestos claims and believed that many had no merit and that the amounts sought were exaggerated, and that "from 1984 through 1990, [Keene] won 97% of the cases that went to verdict, and lost only a total of $192,143 in the cases in which there were adverse verdicts." *Id*. at 380.

[171] *Id.* at 366.

[172] *Id.* at 379.

[173] *Official Comm. of Asbestos Pers. Injury Claimants of W.R. Grace & Co. v. Sealed Air Corp.* (*In re W.R. Grace & Co.*), 281 B.R. 852, 865 (Bankr. D. Del. 2002). The *Grace* decision was issued by the Honorable Alfred M. Wolin, United States District Judge for the District of New Jersey (sitting by designation in the Bankruptcy Court for the District of Delaware).

In that case, the creditors' committee sought to avoid Grace's prepetition transfer of one of its divisions as constructively fraudulent under the UFTA. The issue for the court was whether the liabilities the court should consider in determining Grace's insolvency as of the date of the allegedly fraudulent transfer were: (1) "those that were known on that date or those that the debtor reasonably should have known about at that time"; or (2) "the actual liabilities of the debtor" on that date, irrespective of "what the debtor may have known about those liabilities on the transfer date, reasonably or otherwise."[174] This issue was critical because Grace knew at the time of the transfer that it had asbestos liabilities, but it did not anticipate at that time that the liabilities would be as large as they ultimately were. If the entirety of the claims ultimately asserted against Grace could be retroactively considered in the analysis of Grace's insolvency, then Grace would be considered insolvent for purposes of fraudulent transfer law.

Turning to the UFTA, the court noted that two sections could be considered "constructive fraudulent transfer" provisions: (1) section 4(a)(2), which focused on what the debtor "reasonably should have believed" with respect to incurring debts beyond its ability to pay; and (2) section 5(a), which focused on the objective reality of whether "the debtor was insolvent at that time" and not by reference to what the debtor may have reasonably estimated its liabilities to be.[175] The *Grace* court described the insolvency test under section 5 as a "strict balance sheet test," with the debtor insolvent if its debts exceeded its assets.[176] Notably, the court did not discuss the actual statutory language of section 5, which provides that a debtor is insolvent "if the sum of the debtor's debts is greater than all of the debtor's assets, *at a fair valuation.*"[177]

Because the parties had focused on the section 5 definition of insolvency, the court limited its analysis to this "strict balance sheet test."[178] In calculating assets and debts pursuant to section 5, the defendants asserted that the value of the asbestos injury claims against Grace should be subject to the "probability discount rule" because those claims were contingent liabilities on the date of the allegedly fraudulent transfer and should be valued accordingly.[179]

The court disagreed, finding that the post-transfer date asbestos claims were not contingent at the time of the transfer, but simply "unknown" in amount. The court noted that

---

[174] *Id.* at 856.

[175] *Id.* at 855–856.

[176] *Id.* at 856.

[177] UFTA § 2(a) (emphasis added). The New Jersey UFTA, which was applicable in *Grace,* is identical to section 2(a) of the model UFTA: "A debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets, at a fair valuation." *Compare* N.J. STAT. ANN. § 25:2-23(a), *with* UFTA § 2(a). The legislative history of the model UFTA states that this definition contemplates "a fair valuation of the debts as well as the assets of the debtor." UFTA § 2(a) cmt. 1. It is notable that the bankruptcy court did include the relevant statutory language of UFTA section 4(a)(2) when describing that provision. *In re W.R. Grace & Co.,* 281 B.R. at 856.

[178] *In re W.R. Grace & Co.,* 281 B.R. at 856.

[179] *Id.* at 857–58.

the UFTA defined a debt as a "liability on a claim" and, applying the then-controlling Third Circuit case for what may be considered a claim,[180] the court determined that the asbestos claimants who had been exposed to asbestos and had physical manifestations of their exposure, even if the claimants did not know it at the time, had "a right to payment and thus a claim for purposes of the solvency analysis of the UFTA on the transfer date"[181] because "every element of liability was already present."[182]

The court emphasized that at the time of the challenged transfer, the debtors were well aware that they had liabilities relating to asbestos claims. In the three years leading up to the transfer date, the debtors averaged about 31,500 asbestos claims per year.[183] In distinguishing these asbestos claims from "contingent liabilities" that may be subject to the probability discount rule, the court noted that as of the transfer date, the debtor's asbestos products:

> [H]ad *already* proven dangerous on the transfer date affecting tens of thousands, not hundreds. The post-1998 increase in the claiming rate was not an airplane falling out of the sky nor a melt down in a reactor. Every element of liability was already present and had been for many years.[184]

In other words, at the time of the transfer, the debtor "knew it had an existing liability, it just did not know how big that liability was."[185] This unknown amount of liability did not make the claims contingent and therefore subject to reduced valuation.[186] "The law is the same–contingent liabilities are to be reduced by the reasonably probability of the contingency, but mere errors in the debtor's calculation of its solvency are to be corrected to reflect the

---

[180] *Avellino & Bienes v. M. Frenville Co.* (*In re M. Frenville Co.*), 744 F.2d 332 (3d Cir. 1984) (interpreting the meaning of the term "claim" under the Bankruptcy Code and holding that a "claim" does not "arise" until a cause of action has accrued under applicable nonbankruptcy, or state, law). The Third Circuit revisited its "accrual test" in 2010 and overturned the *Frenville* decision, holding instead that "a 'claim' arises when an individual is exposed prepetition to a product or other conduct giving rise to an injury, which underlies a 'right to payment' under the Bankruptcy Code." *JELD-WEN, Inc. v. Van Brunt* (*In re Grossman's Inc.*), 607 F.3d 114, 125 (3d Cir. 2010) (citation omitted).

[181] *In re W.R. Grace & Co.*, 281 B.R. at 862. *But see Sharp v. Chase Manhattan Bank USA, N.A.* (*In re Commercial Fin. Servs., Inc.*), 350 B.R. 520, 536 n.13 (Bankr. N.D. Okla. 2005) (noting that there is a difference "between claims allowable against the bankruptcy estate and liabilities recognizable on a solvency balance sheet").

[182] *In re W.R. Grace & Co.*, 281 B.R. at 865.

[183] *Id.* at 857.

[184] *Id.* at 865.

[185] *Id.* at 863.

[186] *Id.* at 865 ("The liability may have been unknown and the best estimates may have erred in protecting who could come forward with a claim of asbestos injury. This does not mean that liability for such claims was contingent.").

evidence."[187] As such, "courts may consider information originating subsequent to the transfer date if it tends to shed light on a fair and accurate assessment of the asset or liability as of the pertinent date."[188]

While this divergent case law arguably results in some confusion regarding when hindsight is appropriate in an insolvency analysis, the Examiner believes that the cases could be synthesized by focusing on what the debtors in the *Grace* and *Lippe* cases knew about their respective asbestos liabilities at the time of the challenged transfers. In *Lippe,* Keene reasonably thought the worst of the asbestos litigation was over at the times of the challenged transfers and, therefore, the court did not find it necessary to revise Keene's low calculations of its probable liabilities at those times.[189] But, in *Grace,* the allegedly fraudulent transfer took place ten years after the transfers reviewed in the *Lippe* case, by which time the dangers of asbestos and "W.R. Grace's asbestos liability in particular were nationally known and had been so for decades."[190] Grace's estimate of its asbestos liabilities, as required by the UFTA, arguably needed to reflect better the liabilities ultimately faced by Grace, because its lower estimates of such liabilities were arguably not reasonable at the time of the allegedly fraudulent transfer.[191]

Based on the foregoing, the Examiner concludes that the *Grace* decision has not changed the traditional "known or knowable" standard (as developed in the case law and relevant valuation literature) for valuing contingent and unliquidated liabilities in this case.

### b.  *Financial Analysis*

The Examiner's Financial Advisors considered the implications of contingent and/or unliquidated liabilities in evaluating ResCap's insolvency. For purposes of assessing insolvency under the Market Approach, the Examiner's Financial Advisors relied upon the market's contemporaneous evaluation of such contingent and/or unliquidated liabilities as manifested in the market pricing of ResCap's debt securities. Debt pricing used in the Observable Market Value Method should reflect the market's expectation of ResCap's contingent and/or unliquidated liabilities based on information that was known or knowable by the market as of each quarterly measurement date. To the extent the market was not sufficiently incorporating such contingent and/or unliquidated liabilities, ResCap's liabilities and any associated condition of insolvency would increase by those unknown amounts, pursuant to the legal principles discussed in Section VI.B.5.a.

---

[187] *Id.* at 868.

[188] *Id.* at 869.

[189] *Lippe v. Bairnco Corp.*, 249 F. Supp. 2d 357, 366 (S.D.N.Y. 2003).

[190] *In re W.R. Grace & Co.*, 281 B.R. at 856.

[191] *See Wright v. Boston Scientific* (*In re Guidant Corp. Implantable Defibrillators Prods. Liability Litig.*), No. MDL 05–1708DWFAJB, 2006 WL 763212, at *4 (D. Minn. Mar. 24, 2006) (determining whether debtor was insolvent under Minnesota's UFTA, and refusing to add "unadjudicated, speculative damages" to balance sheet at time of transfer when lawsuit that would give rise to such damages was still pending).

With respect to the Examiner's Financial Advisors' application of the Asset-Based Approach, it was necessary to estimate the value of any contingent and/or unliquidated off-balance sheet liabilities and include the estimated amount for purposes of determining whether ResCap was insolvent.

ResCap, through its operating entities, RFC and GMAC Mortgage, sold loans that took the form of PLS, securitizations guaranteed by GSEs, and whole-loan sales.[192] In connection with these activities, ResCap "provide[d] to the GSEs, investors, and financial guarantors (monolines), and whole-loan purchasers various representations and warranties related to the loans sold."[193]

ResCap's methodology of reserving for liabilities associated with these representations and warranties was based on its history with individual purchasers (or investors). As disclosed in ResCap's financial statements for the years ended December 31, 2009 and 2010, ResCap considered "historical and recent demand trends in establishing the reserve" for representation and warranty-related liabilities.[194] In cases where ResCap did not have historical demand experience with an investor, ResCap acknowledged that it was "difficult to predict and estimate the level and timing of any potential future demands . . . and a liability [wa]s not recognized."[195]

With respect to non-Agency securitizations, ResCap's December 31, 2009 and 2010 financial statements noted that ResCap's "exposure to representation and warranty claims is most significant for loans sold between 2004 through 2008, specifically the 2006 and 2007 vintages which were originated and sold prior to enhanced underwriting standards and risk-mitigation actions implemented in 2008 . . . ." The financial statements, however, also noted the hurdles imposed on PLS investors seeking to make contractual claims for representations and warranties:

> In order to successfully assert a claim, an investor must prove breach of the representations and warranties that materially and adversely affects the interest of all investors. Securitization documents typically provide the investors with a right to request that the trustee investigate and initiate a repurchase claim. However, a class of investors generally are required to coordinate with other investors in that class comprising no less than 25% of the voting rights in securities for that class issued by the trust to pursue claims for breach of representation and warranties.[196]

These hurdles made it difficult for PLS investors to pursue representation and warranty-related claims against mortgage originators like ResCap. Beginning in early 2010, however,

---

[192] *See* Residential Capital, LLC Consolidated Financial Statements for the Years Ended December 31, 2010 and 2009, dated Feb. 28, 2011, at 18 [EXAM00123128].

[193] *Id.*

[194] *Id.* at 68.

[195] *Id.*

[196] *Id.* at 69–70.

investors banded together to obtain the 25% of voting rights in securitizations necessary to pursue claims for breach of representations and warranties.[197] In February 2010, PIMCO organized a conference and pitched MBS investors on a clearinghouse model to pursue potential MBS claims.[198] A July 2010 Reuters article stated that "using a clearinghouse model to aggregate positions is a milestone for investors who have been unable to organize . . . investors have finally reached a mechanism whereby they can act collectively to enforce their contractual rights," and "investors are eager to scrutinize loans against reps and warranties in ways [they] haven't been able to before."[199]

In July 2010, an investor group purportedly representing $500 billion in MBS sent letters to numerous trustees of mortgage-backed securitizations requesting that they enforce alleged servicing breaches related to allegedly improperly originated loans.[200]

An August 2010 presentation prepared by Elliott Associates and received by ResCap management,[201] noted that the dollar amount of non-Agency repurchase requests was only 13% of the Agencies' repurchase requests in 2006 and 2007, and that "one of the key reasons behind this phenomenon is the practical hurdles imposed by the 25% required vote on directing Trustees to take collective action."[202] The presentation went on to state that "the creation of an RMBS Investor Clearing House dramatically increases the likelihood that holders would meet the required 25% voting threshold," and that "as a result, the assumption that non-Agency repo request rates will remain a tiny fraction of Agency request rates looks tenuous at best."[203] Elliott Associates noted that under certain scenarios, ResCap's June 30, 2010 reserve balance of $855 million "would prove inadequate to the tune of $6.5 billion."[204]

In November 2010, the Congressional Oversight Panel released its November Oversight Report, titled "Examining the Consequences of Mortgage Irregularities for Financial Stability and Foreclosure Mitigation." The report stated that:

> [I]nvestors are beginning to take collective action, suggesting
> that the 25 percent threshold may not be an enormous burden for
> organized investors. A registry created by RMBS Clearing

---

[197] Alison Frankel, *Did Gibbs Pre-empt Rival Investor Group in BofA's MBS Deal?*, REUTERS, Oct. 3, 2011, http://blogs.reuters.com/alison-frankel/2011/10/03/did-gibbs-pre-empt-rival-investor-group-in-bofas-mbs-deal/.

[198] *Id.*

[199] Al Yoon, *Mortgage Bond Holders Get Legal Edge; Buybacks Seen,* REUTERS, Jul. 21, 2010, http://www.reuters.com/article/2010/07/21/mortgages-investors-idUSN2115720720100721.

[200] CHRIS GAMAITONI ET AL., COMPASS POINT RESEARCH & TRADING, LLC, MORTGAGE REPURCHASES PART II: PRIVATE LABEL RMBS INVESTORS TAKE AIM—QUANTIFYING THE RISKS (Aug. 17, 2010).

[201] E-mail from D. Cederholm (Aug. 6, 2010) [EXAM11122998].

[202] Ally Financial (GMAC Inc.) Repurchase Liability Analysis Presentation, dated Aug. 2010, at 4 [EXAM11123000].

[203] *Id.* at 7–8.

[204] *Id.* at 5, 11.

> House is providing a confidential data bank whose purpose is to
> identify and organize certificate holders into groups that can
> meet threshold requirements . . . .[205]
>
> RMBS Clearing House claims to represent more than 72 percent
> of the certificate holders of 2,300 mortgage-backed securities,
> more than 50 percent of holders of 900 mortgage-backed
> securities, and more than 66 percent of the holders of 450
> mortgage-backed securities representing, in the aggregate, a face
> amount of $500 billion, or approximately one-third of the
> private label mortgage-backed securities market.[206]

The Congressional Oversight Panel used assumptions from analyst reports to provide "a top-level illustration of the cost of mortgage put-backs [related to the $1.5 trillion of PLS sold to investors between 2005 and 2008] could inflict on bank balance sheets."[207] The Congressional Oversight Panel estimated representations and warranty put-backs for these securities could be $16 billion on total issuances of $1.358 trillion, or 1.18%.[208]

The Examiner's Financial Advisors also noted that Bank of America settled its loan repurchase liabilities for $8.5 billion in June 2011.[209] Shortly after the announcement of that settlement, internal e-mail correspondence indicated that ResCap's potential PLS repurchase exposure could be $4 billion based on the Bank of America settlement (which implied a put-back percentage of approximately 2.0% of the original principal balance of Bank of America's securitizations).[210]

On October 17, 2011, AFI received a letter from Gibbs & Bruns LLP informing AFI that the firm represented investment advisers and holders of RMBS "issued and/or underwritten by Ally Financial, Inc. and/or its affiliates."[211] The letter also stated: "[t]here is widespread, readily available evidence suggesting that large numbers of mortgages securing the certificates held by our clients were sold or deposited into the RMBS pools based on false and/or fraudulent representations and warranties. . . ."[212]

---

[205] CONG. OVERSIGHT PANEL, NOVEMBER OVERSIGHT REPORT: EXAMINING THE CONSEQUENCES OF MORTGAGE IRREGULARITIES FOR FINANCIAL STABILITY AND FORECLOSURE MITIGATION (Nov. 16, 2010), at 30, http://www.gpo.gov/fdsys/pkg/CPRT-111JPRT61835/pdf/CPRT-111JPRT61835.pdf.

[206] *Id.* at 30 n.91.

[207] *Id.* at 70.

[208] *See Id.* at 72.

[209] Hugh Son, *BofA Settles Soured Mortgages for $8.5 Billion,* BLOOMBERG, Jun. 29, 2011, http://www.bloomberg.com/news/2011-06-29/bofa-reaches-8-5-billion-settlement-on-soured-mortgages-with-bondholders.html.

[210] E-mail from A. Norton (Jun. 29, 2011) [EXAM20206599].

[211] *See* Letter from K. Patrick to W. Solomon (Oct. 17, 2011) [ALLY_0212896]; *see also* Section III.J.4.c.

[212] *See* Letter from K. Patrick to W. Solomon (Oct. 17, 2011) [ALLY_0212896].