AFI disclosed the following in its March 31, 2012 quarterly report under the header "Potential Losses":

> We currently estimate that ResCap's reasonably possible losses over time related to the litigation matters and potential repurchase obligations and related claims described above could be between $0 and $4 billion over existing accruals. This estimated range is based on significant judgment and numerous assumptions that are subject to change, and which could be material. However, as a result of ResCap's current financial position, we believe ResCap's ability to pay for any such losses is very limited.[213]

In May 2012, the ResCap Board resolved to enter into the RMBS Plan Support Agreement which included a proposed allowed unsecured claim of $8.7 billion related to securitizations issued by ResCap between 2004 and 2007.[214]

The Examiner and the Examiner's Professionals recognize the formation of the RMBS Investor Clearing House in early 2010 as a catalyst for the pursuit of representation and warranty-related claims by PLS investors. The formation of the RMBS Investor Clearing House established a formal process for PLS investors to assert their claims and substantially increased the likelihood that associated contingent and/or unliquidated liabilities would become liquidated, as well as the probable amount of those liabilities. As a result, by 2010, it was reasonably foreseeable that ResCap's contingent and/or unliquidated liabilities for non-Agency representation and warranty-related claims would materially exceed its accounting reserves. The Examiner's Financial Advisors estimated the potential incremental liabilities for ResCap's representation and warranty-related claims beginning in 2010, and recorded an adjustment for such amounts in excess of existing accounting reserves.

The original principal balance for ResCap's PLS securitizations between 2004 through 2007 was approximately $221 billion.[215] The Examiner's Financial Advisors judgmentally estimated and applied a range of put-back percentages to the original principal balance of $221 billion to calculate the total contingent and/or unliquidated liabilities related to representation and warranty-related claims as of each quarterly measurement date from March 31, 2010 through December 31, 2011. These total contingent and/or unliquidated liability amounts reflect the estimated payments that would be incurred by ResCap to settle repurchase claims, adjusted for probability of realization. The total contingent and/or unliquidated liabilities were reduced by ResCap's existing non-Agency reserves to arrive at a range of the total incremental contingent and/or unliquidated liabilities related to

---

[213] Ally Financial Inc., Quarterly Report (Form 10-Q) (Apr. 27, 2012), at 73; *see also* Memorandum, Legal/Rep and Warrant—Range of Reasonably Possible Loss Disclosure Considerations—Q1 2012, dated Apr. 27, 2012 [ALLY_PEO_0074712].

[214] *See* Section III.J.4.d.

[215] This included 392 securitizations. *See* PLS Trust Spreadsheet [EXAM00339947].

representation and warranty-related claims.[216] These incremental liability amounts were applied in the application of the Asset-Based Approach as of the respective measurement dates.[217]

EXHIBIT VI.B.5(b)

**Estimated Contingent and/or Unliquidated Liabilities Related to PLS Claims**

2010 – 2011

*($ in Millions)*

| | 03/31/10 | | 06/30/10 | | 09/30/10 | | 12/31/10 | |
|---|---|---|---|---|---|---|---|---|
| | Low | High | Low | High | Low | High | Low | High |
| ResCap PLS securitizations (2004 – 2007) [1] | $ 220,988 | $ 220,988 | $ 220,988 | $ 220,988 | $ 220,988 | $ 220,988 | $ 220,988 | $ 220,988 |
| Times: Estimated put-back percentage [2] | 0.50% | 1.00% | 0.50% | 1.00% | 1.00% | 1.50% | 1.00% | 1.50% |
| Estimated total contingent and/or unliquidated liability | 1,105 | 2,210 | 1,105 | 2,210 | 2,210 | 3,315 | 2,210 | 3,315 |
| Less: Balance sheet non-Agency reserves [3] | (575) | (575) | (553) | (553) | (729) | (729) | (633) | (633) |
| Incremental contingent and/or unliquidated liability | 530 | 1,635 | 552 | 1,657 | 1,481 | 2,586 | 1,577 | 2,682 |
| Incremental contingent and/or unliquidated liability, rounded | $ 530 | $ 1,630 | $ 550 | $ 1,660 | $ 1,480 | $ 2,590 | $ 1,580 | $ 2,680 |

| | 03/31/11 | | 06/30/11 | | 09/30/11 | | 12/31/11 | |
|---|---|---|---|---|---|---|---|---|
| | Low | High | Low | High | Low | High | Low | High |
| ResCap PLS securitizations (2004 – 2007) [1] | $ 220,988 | $ 220,988 | $ 220,988 | $ 220,988 | $ 220,988 | $ 220,988 | $ 220,988 | $ 220,988 |
| Times: Estimated put-back percentage [2] | 1.00% | 1.50% | 1.50% | 2.00% | 1.50% | 2.00% | 1.50% | 2.00% |
| Estimated total contingent and/or unliquidated liability | 2,210 | 3,315 | 3,315 | 4,420 | 3,315 | 4,420 | 3,315 | 4,420 |
| Less: Balance sheet non-Agency reserves [4] | (633) | (633) | (633) | (633) | (633) | (633) | (633) | (633) |
| Incremental contingent and/or unliquidated liability | 1,577 | 2,682 | 2,682 | 3,787 | 2,682 | 3,787 | 2,682 | 3,787 |
| Incremental contingent and/or unliquidated liability, rounded | $ 1,580 | $ 2,680 | $ 2,680 | $ 3,790 | $ 2,680 | $ 3,790 | $ 2,680 | $ 3,790 |

[1] *This included 392 securitizations. See PLS Trust Spreadsheet [EXAM00339947].*

[2] *The Examiner's Financial Advisors judgmentally estimated and applied a range of put-back percentages as adjusted for probability of realization.*

[3] *Non-Agency reserves include reserves for potential claims related to PLS, monolines and whole loan purchasers. For purposes of this analysis, the Examiner's Financial Advisors assumed that the entirety of the non-Agency reserves related to potential PLS claims. This assumption results in a conservative estimate of ResCap's potential incremental off-balance sheet liability for PLS representation and warranty-related claims. See Domestic Rep & Warranty Expense Presentation, undated [EXAM00338625].*

[4] *ResCap's total reserves (Agency and non-Agency) did not materially change from Dec. 31, 2010 through Dec. 31, 2011. Therefore, the Examiner's Financial Advisors held the non-Agency reserves constant at the Dec. 31, 2010 levels throughout fiscal year 2011. Source: Originating & Servicing and Legacy Portfolio & Other Q3 2011 Preliminary Earnings Presentation, dated Oct. 14, 2011, at 5 [EXAM12242367]; Residential Capital, LLC, Consolidated Financial Statements for the Years Ended December 31, 2011 and 2010, dated Mar. 28, 2012, at 66 [EXAM00122651].*

*Source: Appendix VI.B.4.b.*

---

[216] Non-Agency reserves include reserves for potential claims related to PLS, monolines and whole loan purchasers. For purposes of this analysis, the Examiner's Financial Advisors assumed that the entirety of the non-Agency reserves related to potential PLS claims. This assumption results in a conservative estimate of ResCap's potential incremental off-balance sheet liability for PLS representation and warranty-related claims.

[217] As previously discussed, the Examiner's Financial Advisors relied on the market's contemporaneous evaluation of such contingent and/or unliquidated liabilities as manifested in the market pricing of ResCap's debt securities in applying the Market Approach. Accordingly, no adjustment for contingent and/or unliquidated liabilities was made to the Market Approach on any measurement date.

## C.  UNREASONABLY SMALL CAPITAL

### 1.  Introduction

The "unreasonably small capital" or "inadequate capital"[218] test is the second of three independent determinations of financial distress recognized in the Bankruptcy Code and applicable state law. The Examiner evaluated the adequacy of ResCap's capitalization from its inception in 2005 through the Petition Date. The Examiner approached the issue from a broad perspective, considering quantitative and qualitative factors in his evaluation of the adequacy of capital. Although each of these factors informs the determination of whether a debtor is inadequately capitalized, usually a consideration of the totality of the factors presents a more complete image of a debtor's capitalization. In this regard, the Examiner considered the relevant facts, individually and in totality, in determining whether ResCap was left with unreasonably small capital at any time over the course of its existence. The Examiner further assessed these facts and circumstances in the context of events occurring within the industry and economy during the relevant time period.

This subsection initially introduces the conceptual framework and key indicators of inadequate capital as established in the applicable law. Special attention is paid to important themes developed through the cases that have addressed the concept underlying, and meaning of, the statutory term "unreasonably small capital." Next, this subsection presents the Examiner's conclusions on whether ResCap was left with unreasonably small capital during the relevant time period. This subsection then turns to the application of facts developed through the Investigation and an assessment of whether various key indicators of inadequate capital are present in these circumstances.

### 2.  Conceptual Framework

The Bankruptcy Code and applicable state statutes do not define "unreasonably small capital." Thus, courts have been left with the task of formulating the test for determining when a debtor has "unreasonably small capital" as a result of a transfer or obligation. Nevertheless, several themes, and a litany of factors, may be distilled from the authorities addressing this question in the context of sophisticated business parties and transactions.

---

[218] For purposes of this report, "Unreasonably Small Capital" is considered to be equivalent to the concepts of "Unreasonably Small Assets" and/or "Inadequate Capital," while the inverse is referred to as "Adequate Capital" or "Capital Adequacy."

### a. Industry And Company-Specific Capital Needs

First, the unreasonably small capital test requires a fact-intensive assessment of the capital needs of a specific debtor in a particular industry. This is often accomplished by an assessment of the historic performance, liquidity, leverage, and other operational characteristics of the debtor in the context of the relevant industry and broader economy. As stated in Collier on Bankruptcy:

> Adequate capitalization is . . . a variable concept according to which specific industry of business is involved. The nature of the enterprise, normal turnover of inventory rate, method of payment by customers, etc., from the standpoint of what is normal and customary for other similar businesses in the industry, are all relevant factors in determining whether the amount of capital was unreasonably small at the time of, or immediately after, the transfer.[219]

Capital needs can vary greatly by industry and, therefore, the industry in which a debtor operates is relevant in determining whether its capital is adequate.[220] The concept of capital adequacy recognizes that there is no universal metric applicable in all situations. An assessment must take into account the nature and circumstances of the company at hand. Certain businesses in certain industries will need more capital than others, and the need for capital may be affected by the current state of the industry or economy. Thus, the following factors (among others) will affect an analysis of capital adequacy:

> (1) Industry Volatility—Companies operating in industries subject to high volatility in supply and demand, associated revenues, costs, profits, and cash flows require more capital than those operating in less volatile industries;
>
> (2) Industry Cyclicality—Companies operating in industries with greater cyclicality require more capital than those operating in less cyclical industries;
>
> (3) Stage of Business Cycle—Companies heading into an industry downturn, or in the midst of a decline in a business sector, require more capital than those facing an industry upturn;

---

[219] COLLIER ON BANKRUPTCY ¶ 548.05[3] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2010).

[220] *MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Servs. Co.*, 910 F. Supp. 913, 917, 944 (S.D.N.Y. 1995) (noting that working capital needs matter in a determination of unreasonably small capital and that, for example, in the fixed-base operations industry comprised of "airport-based businesses that provide fuel, maintenance, hangaring and other services to aviation customers . . . companies with rapid inventory turnover can operate with small working capital").

(4) Degree of Leverage—Highly leveraged companies (e.g., leveraged buyout companies) require more capital than those with reduced amounts of leverage;

(5) Credit Worthiness—Companies with poor credit ratings require more capital than those with strong credit ratings;

(6) Capital Intensity—Companies that have high working capital, fixed costs, and capital expenditure needs require more capital than those with mostly lower working capital, mostly variable costs, and lower capital expenditure needs; and

(7) Contingent Needs—Companies operating in industries with reasonably foreseeable contingencies require more capital than those without such needs.

Courts may consider a wide range of factors in determining whether a debtor has been left with unreasonably small capital, including: (1) the nature of the business; (2) the stability or volatility of income; (3) the likelihood of future growth or contraction by the company; (4) the current secured and unsecured debts; (5) the likelihood of collateral backing secured debt retaining, gaining, or losing value; (6) the likelihood of incurring substantial consensual debt in the future;[221] (7) if a transferor is a guarantor, the likelihood that primary debtors will default; (8) the spending and saving habits of the entity; (9) the composition of the asset portfolio; (10) the track record of prior incidents and claims; (11) the amount of insurance; (12) the type of insurance coverage; and (13) whether the transferor reasonably discounted the likelihood that certain assets or liabilities would materialize.[222]

### b.   Operating Performance And Capital Cushion

A debtor's operating performance and capital cushion are relevant factors in considering whether a debtor has been left with unreasonably small capital. These two factors are assessed before and after the transaction.[223] Essentially, the inadequate capital test gauges whether a

---

[221] *See United States v. Gleneagles Inv. Co.*, 565 F. Supp. 556, 580 (M.D. Pa. 1983), *aff'd sub nom. United States v. Tabor Court Realty Corp.*, 803 F.2d 1288 (3d Cir. 1986).

[222] *See* John E. Sullivan III, *Future Creditors and Fraudulent Transfers: When a Claimant Doesn't Have a Claim, When a Transfer Isn't a Transfer, When a Fraud Doesn't Stay Fraudulent, and Other Important Limits to Fraudulent Transfers Law for the Asset Protection Planner*, 22 DEL. J. CORP. L. 955, 1010–12 (1997).

[223] *Official Comm. of Unsecured Creditors of Norstan Apparel Shops, Inc. v. Lattman* (*In re Norstan Apparel Shops, Inc.*), 367 B.R. 68, 79–80 (Bankr. E.D.N.Y. 2007) (noting that "for the five and a half years before the LBO, Norstan's working capital averaged 29% of its net sales and 30% of its total assets," but that after the LBO, "Norstan's working capital [allegedly] averaged 2.1% of its net sales and 1% of its total assets," and holding that these allegations were sufficient to plead an allegation of unreasonably small capital).

debtor has sufficient capital to generate profits, or minimally cash flow, and maintain operations in accordance with its present and future business plan, thus meeting its obligations.[224]

An analysis of whether a debtor has been left with unreasonably small capital addresses the sufficiency of funding sources reasonably available to a debtor so that it may execute its business plan, maintain adequate liquidity and reserves, and satisfy its obligations as those obligations mature.[225] Thus, "[o]nly those cash inflows that were reasonable for a company to have expected to receive . . . whether through new equity, cash from operations, or available credit . . . are considered."[226] The critical determination is whether a debtor was rendered unable to access internal or external sources of capital and unable to generate sufficient cash flows to sustain operations.[227] Sources of capital can include operating profits, ongoing liquidity and working capital, availability on committed lines of secured and unsecured credit (including prospects of refinancing), potential sales of unencumbered and non-core assets to fund operations, and access to additional debt or equity through either the capital markets or affiliate support. Importantly, capitalization is considered adequate when a debtor has sufficient capital resources and cash flows to operate its business *and* withstand a reasonable range of foreseeable downside fluctuations in company specific, industry, and economic conditions.[228] It is unnecessary for a debtor to have sufficient resources to withstand "any and all setbacks."[229] "In undertaking an analysis of unreasonably small capital, courts

---

[224] *Moody v. Sec. Pac. Bus. Credit, Inc.*, 971 F.2d 1056, 1070 (3d Cir. 1992); *In re Tribune Co.*, 464 B.R. 126, 168 (Bankr. D. Del. 2011) (citing *Moody*, 971 F.2d at 1070)*; Vadnais Lumber Supply, Inc. v. Byrne* (*In re Vadnais Lumber Supply, Inc.*), 100 B.R. 127, 137 (Bankr. D. Mass. 1989).

[225] *See Brandt v. Hicks, Muse & Co.* (*In re Healthco Int'l, Inc.*), 208 B.R. 288, 302 (Bankr. D. Mass. 1997); *Salisbury v. Tex. Commerce Bank-Hous., N.A.* (*In re WCC Holding Corp.*), 171 B.R. 972, 985 (Bankr. N.D. Tex. 1994).

[226] *Statutory Comm. of Unsecured Creditors ex rel. Iridium Operating LLC v. Motorola, Inc.* (*In re Iridium Operating LLC*)*,* 373 B.R. 283, 345 (Bankr. S.D.N.Y. 2007).

[227] *Moody*, 971 F.2d at 1070; *Killips v. Schropp* (*In re Prime Realty, Inc.*), 380 B.R. 529, 537 (B.A.P. 8th Cir. 2007) (finding debtor left with unreasonably small capital where debtor has insufficient amounts in checking account to pay checks sent to creditors); *MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Servs. Co.,* 910 F. Supp. 913, 944 (S.D.N.Y. 1995); *WRT Creditors Liquidation Trust v. WRT Bankr. Litig. Master File Defendants* (*In re WRT Energy Corp.*), 282 B.R. 343, 411 (Bankr. W.D. La. 2001); *Yoder v. T.E.L. Leasing, Inc.* (*In re Suburban Motor Freight, Inc.*), 124 B.R. 984, 999 (Bankr. S.D. Ohio 1990); *see Dahar v. Jackson* (*In re Jackson*), 459 F.3d 117, 123 (1st Cir. 2006); *West v. Seiffert* (*In re Hous. Drywall, Inc.*), Case No. 05-95161-H4-7, 2008 WL 2754526, at *28 (Bankr. S.D. Tex. Jul. 10, 2008); *In re Vadnais Lumber Supply, Inc.,* 100 B.R. at 137 (Bankr. D. Mass. 1989).

[228] *See, e.g.*, *Moody*, 971 F.2d at 1073; COLLIER ON BANKRUPTCY ¶ 548.05[3][b] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2010).

[229] *In re Iridium Operating LLC*, 373 B.R. at 345 (citing *MFS/Sun Life Trust*, 910 F. Supp. at 944); *see also MFS/Sun Life Trust*, 910 F. Supp. at 943 ("We know, with hindsight, that the forecasts were not realized. But the question the court must decide is not whether [the] projection was correct, for clearly it was not, but whether it was reasonable and prudent when made.").

compare a debtor's projected cash inflows with the debtor's capital needs throughout a reasonable period of time after the questioned transfer."[230]

### c. Reasonable Foreseeability

The unreasonably small capital test is also generally understood to measure a condition short of balance sheet or equitable insolvency (the two other independent tests for financial distress under applicable fraudulent transfer law). The test recognizes that an undercapitalized business, even if solvent today, might become insolvent at some point in the future,[231] thus harming its creditors. "[A] transaction leaves a company with unreasonably small capital when it creates an unreasonable risk of insolvency, not necessarily a likelihood of insolvency."[232] The unreasonably small capital test is designed to capture situations where a transaction may leave a debtor technically solvent but so depleted that it is "doomed to fail."[233]

Unreasonably small capital "connotes a condition of financial debility short of insolvency . . . but which makes insolvency reasonably foreseeable."[234] At least one court has likened this test to a test for negligence:

> In other words, a transaction leaves a company with unreasonably small capital when it creates an unreasonable risk of insolvency, not necessarily a likelihood of insolvency. This is similar to the concept of negligence, which is conduct that creates an unreasonable risk of harm to another's person or property.[235]

"The test of 'unreasonably small capital' is 'reasonable foreseeability,' tested by an objective standard anchored in projections of cash flow, sales, profit margins, and net profits and losses, including difficulties that are likely to arise."[236] In sum, an evaluation of

---

[230] *In re Iridium Operating LLC*, 373 B.R. at 345 (citing *Moody*, 971 F.2d at 1071–72).

[231] *Brandt v. Samuel, Son & Co.* (*In re Longview Aluminum, L.L.C.*), Case No. 03 B 12184, 2005 WL 3021173, at *6 (Bankr. N.D. Ill. Jul. 14, 2005) (citing *In re Vadnais Lumber Supply, Inc.*, 100 B.R. at 137), *aff'd sub nom. Baldi v. Samuel Son & Co.*, 548 F.3d 579 (7th Cir. 2008).

[232] *Brandt v. Hicks, Muse & Co.* (*In re Healthco Int'l, Inc.*), 208 B.R. 288, 302 (Bankr. D. Mass. 1997).

[233] *MFS/Sun Life Trust*, 910 F. Supp. at 944 (citing *Moody*, 971 F.2d at 1070 n.22) ("The test is aimed at transferees that leave the transferor technically solvent but doomed to fail.").

[234] *In re Healthco Int'l, Inc.*, 208 B.R. at 302; *see also Moody*, 971 F.2d at 1064 (noting that the "better view would seem to be that 'unreasonably small capital' denotes a financial condition short of equitable insolvency").

[235] *In re Healthco Int'l, Inc.*, 208 B.R. at 302.

[236] *Ring v. Bergman* (*In re Bergman*), 293 B.R. 580, 584 (Bankr. W.D.N.Y. 2003) (citing *Moody*, 971 F.2d at 1073 ("To a degree, parties must also account for difficulties that are likely to arise, including interest rate fluctuations and general economic downturns, and otherwise incorporate some margin for error.")).

unreasonably small capital should entail examining the financial performance of the business under a range of scenarios and assessing whether the debtor possesses or has reasonable access to sufficient capital to accommodate such scenarios.

Although courts may consider events occurring after the date of the questioned transfer, generally, only information known or knowable at the time of the transfer should be considered.[237] The determination of whether a debtor is adequately capitalized will be made as of the date of the transfer in question;[238] the test is prospective, however and a critical question is whether the debtor's demise was reasonably foreseeable.[239] Therefore, it is also necessary to consider the length of time between the transfer date and the failure of the business.[240] Courts may be less likely to find a company inadequately capitalized if the debtor continued to operate in the ordinary course of business and pay its creditors for an extended period of time after the transfer.[241] Further, courts have also found it relevant whether a debtor's decline in capitalization occurs in connection with a cause unrelated to the allegedly fraudulent transfer.[242]

### d. Leverage And Debt Capacity

As indicated above, highly leveraged companies require more capital resources than those with less leverage. The greater the debt, generally, the greater the risk associated with a

_____

[237] *WRT Creditors Liquidation Trust v. WRT Bankr. Litig. Master File Defendants* (*In re WRT Energy Corp.*), 282 B.R. 343, 414 (Bankr. W.D. La. 2001) (citing *Moody*, 971 F.2d at 1070); *Salisbury v. Tex. Commerce Bank-Hous., N.A.* (*In re WCC Holding Corp.*), 171 B.R. 972, 985 (Bankr. N.D. Tex. 1994).

[238] *See, e.g.*, *In re WRT Energy Corp.*, 282 B.R. at 385 (internal citations omitted).

[239] *Moody*, 971 F.2d at, 1073; *see also Fid. Bond & Mortg. Co. v. Brand* (*In re Fid. Bond & Mortg. Co.*), 340 B.R. 266, 294 (Bankr. E.D. Pa. 2006) (citing *Moody*, 971 F.2d at 1073), *aff'd*, 371 B.R. 708 (E.D. Pa. 2007).

[240] *In re Fid. Bond & Mortg. Co.*, 340 B.R. at 299 (citing *Daley v. Chang* (*In re Joy Recovery Tech. Corp.*), 286 B.R. 54, 76 (Bankr. N.D. Ill. 2002)).

[241] *See Moody*, 971 F.2d at 1074 (no unreasonably low capital where creditors paid for twelve months after transaction); *MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Servs. Co.*, 910 F. Supp. 913, 944 (S.D.N.Y. 1995) ("That the company remained viable [for eight months] after the LBO strongly suggests that its ultimate failure cannot be attributed to inadequacy of capital as of the date of the buyout."); *In re Fid. Bond & Mortg. Co.*, 340 B.R. at 299; (*In re Joy Recovery Tech. Corp.*, 286 B.R. at 76 ("Courts will not find that a company had unreasonably low capital if the company survives for an extended period of time after the subject transaction."). *But see Boyer v. Crown Stock Distrib., Inc.*, 587 F.3d 787 (7th Cir. 2009) (holding that a transferor's survival for three and a half years after an allegedly fraudulent transaction still left the transaction open to attack).

[242] *See Moody*, 971 F.2d at 1071, 1074–75 (noting that there is a "standard of causation which looks for a link between the challenged conveyance and the debtor's insolvency," but that, in the case before it, the debtor's insolvency was properly attributed to a "substantial drop in orders and sales" due to "increased foreign and domestic competition"); *MFS/Sun Life Trust*, 910 F. Supp. at 944 (holding that "the more persuasive view is that [the debtor] failed because of a concurrence of factors not related to the [allegedly fraudulent conveyance]" and pointing to increased competition, increased fees relating to operations, and the failure to implement cost-savings strategies as contributing factors to the debtor's failure).

firm, and the more likely it is that a firm is inadequately capitalized.[243] Debt capacity, defined as the amount of leverage a firm can reasonably support, is generally referenced as a relevant and reliable factor in assessing capital adequacy. Debt capacity often is evaluated by the use and analysis of various financial ratios.

Financial ratio analysis generally consists of examining the relationship between two or more numbers on financial statements. The ratios are used as metrics to evaluate the financial condition of a debtor. This form of analysis is employed in an effort to highlight a debtor's financial strengths and weaknesses. Leverage and coverage ratios can be informative with respect to debt capacity and capitalization, especially when compared to historic ratios for a subject company and/or comparable company ratios across a given industry. Leverage ratios measure the extent to which a firm has been financed by debt. A common measure of leverage is the debt-to-equity ratio, which is typically calculated using the face value of debt compared to the book value of equity. Coverage ratios generally provide a measure of a firm's ability to service its financing costs from operations. A common measure of coverage is the fixed-charge ratio, which is typically calculated using earnings before interest expense compared to interest expense.

### 3.  Summary Of Examiner's Conclusions

The Examiner concludes that the evidence supports the proposition that ResCap was adequately capitalized on May 4, 2005, the date that AFI announced the capitalization of ResCap,[244] and was left with unreasonably small capital from August 15, 2007 through the Petition Date. [245] The Examiner's conclusions are based upon a detailed quantitative and qualitative analysis of ResCap's historical and projected financial and performance characteristics, focusing upon the evolution in ResCap's business model and capitalization needs in response to rapidly changing market conditions from 2005 through the Petition Date. This analysis included an assessment of ResCap's profitability and performance, operating cash flows, liquidity, leverage, and debt capacity. Additionally, the Examiner considered all reasonable external and internal sources of funds available to ResCap, including its ability to access capital markets through debt or equity issuances, and its ability to monetize assets to fund imminent financial needs. The Examiner considered the viability of ResCap's business model over time, including the reasonableness of ResCap's financial projections, liquidity forecasts, and business plans. The Examiner also considered the financial support received by ResCap from AFI in the form of intercompany loans, cash equity infusions, contributions of ResCap bond debt in the form of equity, and other forms of related-party support, including purchases of certain ResCap assets by affiliates. Furthermore, the Examiner considered events occurring within the mortgage industry and the economy.

---

[243] *MFS/Sun Life Trust*, 910 F. Supp. at 917, 944.

[244] General Motors Acceptance Corporation, Current Report (Form 8-K) (May 4, 2005), Ex. 99.1.

[245] The Examiner's conclusion that ResCap was adequately capitalized on May 4, 2005 also pertains to RFC and GMAC Mortgage.

Specifically, the Examiner based his conclusion that ResCap was left with unreasonably small capital as of August 15, 2007 through the Petition Date on a number of factors including, but not limited to, the following:

(1) The deterioration of the U.S. housing market intensified over the course of 2007, focusing primarily in subprime and other non-conforming mortgage related products. Increasing delinquencies and defaults on subprime mortgages led to the impairment of related mortgage-backed structured finance securities. As a result, the mortgage markets experienced significantly increased volatility and substantially reduced liquidity.

(2) ResCap eliminated sub-prime originations and reduced other non-conforming products from its core business in 2007. This process was the result of the rapid deterioration of the sub-prime and non-conforming mortgage markets, which resulted in the failure of many mortgage businesses.

(3) The global credit markets experienced a significant dislocation on or about August 9, 2007, which was characterized by dramatically increasing interest rate spreads on interbank lending, commercial paper, and other securities relative to risk free rates as reflected in U.S. Treasury securities. As a result, ResCap's access to the capital markets was impaired and ResCap's access to the secondary securitization markets was virtually eliminated.

(4) ResCap incurred billions of dollars in losses in 2007, 2008, and 2009. ResCap's continuing losses left it unable to service its debts from its operations, leaving it dependent upon support from AFI to meet its capital needs. Notwithstanding AFI's support, ResCap experienced chronic liquidity stress commencing in the Summer of 2007, and intensifying in 2008 and 2009. These liquidity concerns forced ResCap to consider various strategic alternatives, including an orderly liquidation as early as September 2007, and to consider a potential bankruptcy filing in the first half of 2008. After 2009, ResCap's liquidity was maintained at minimal levels pursuant to the structure of ResCap's line of credit agreement with AFI.

(5) ResCap's available cash dropped to a low point of $328 million on August 16, 2007. This liquidity crisis resulted in the expedited sale of Health Capital to AFI for $900.5 million in August 2007 and a $1 billion capital infusion from AFI in September 2007. ResCap's short-term projections in September 2007 indicated that it would be unable to service its obligations in the ordinary course and maintain sufficient liquidity. ResCap continued to project liquidity shortfalls in its 2008 and 2009 short-term projections.

(6) ResCap's ability to prepare reliable long-term financial projections and business plans was impaired by the rapid deterioration within its businesses and the concomitant deterioration within the mortgage industry and global economy in 2007, 2008, and 2009, among other causes.

(7) The marketplace considered ResCap to be at significant risk of future default on its debts in 2007, 2008, and 2009, as shown by the market price for ResCap's bonds and CDS over this time period. While the market price for ResCap's bonds recovered in 2010 (and its CDS prices declined), the recovery was recognized as being directly linked to the receipt of TARP funds by AFI.

(8) ResCap undertook significant changes to its business model in 2007 and 2008 as it attempted to adapt to rapidly changing market conditions and to survive as a going concern. Notwithstanding these changes, ResCap was not viable as a stand-alone business subsequent to August 15, 2007, because of ResCap's inability to generate profits or access sufficient capital to effectively restructure its business. As a result of its inability to service its obligations in the ordinary course and maintain sufficient liquidity, ResCap was dependent on AFI for continued financial support.

(9) AFI infused more than $8 billion in capital into ResCap from 2007 through 2012 in the form of $2.6 billion in direct contributions of cash, $3.8 billion in debt forgiveness, and $2 billion in other assets. Generally, AFI's contributions of cash to ResCap were made in an effort to address imminent liquidity needs. AFI's contributions of debt were made to address pending covenant default issues. In addition, excluding the Ally Bank Transactions, AFI purchased more than $3.3 billion of ResCap's assets from 2007 through 2012 for consideration of $2.2 billion in cash and $1.1 billion in assumed debt. AFI's support was insufficient to resolve ResCap's chronic undercapitalization issues.

The Examiner now turns to a detailed discussion of the various indicators and factors considered in the Examiner's evaluation of capital adequacy.

*4. Analysis Of ResCap's Capitalization*

Within the context of the themes discussed above, a variety of indicators and factors have emerged from the case law that have become part of the legal literature regularly referenced in assessing unreasonably small capital.[246] Such items are discussed below.

---

[246] *See, e.g.*, *MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Servs. Co*, 910 F. Supp. 913, 944 (S.D.N.Y 1995) ("In order to determine the adequacy of capital, a court will look to such factors as the company's debt to equity ratio, its historical capital cushion, and the need for working capital in the specific industry at issue." (citation omitted)); *Kipperman v. Onex Corp.*, 411 B.R. 805, 836 (Bankr. N.D. Ga. 2009) (citing *MFS/Sun Life Trust*, 910 F. Supp. at 944 (S.D.N.Y. 1995)).

### a. Industry And Economic Considerations

An analysis of ResCap's capitalization from 2005 to 2012 requires appropriate consideration of the mortgage industry and the economy during this time period. As previously discussed in Section III, ResCap was seriously affected by the rapid deterioration in the market for subprime mortgage-backed securities in the summer of 2007, and the seizure of global credit markets on August 9, 2007. Many mortgage companies either filed for bankruptcy relief in 2007 or were subsequently acquired by larger enterprises. This industry crisis was the result of a confluence of many factors, including the inability of these enterprises to generate sufficient capital to sustain their respective business models during a time of severe market dislocation. Indeed, the failure of various mortgage origination and servicing businesses during this period resulted from a series of liquidity crises, which in turn were symptomatic of chronic undercapitalization issues within the industry. For example, New Century filed for bankruptcy relief after a spike in margin calls following a February 2007 announcement that it would be restating its financials.[247] Aegis ceased all mortgage origination activity as of August 3, 2007.[248] Aegis, American Home, and First Magnus filed for bankruptcy relief days after the credit markets seized in August 2007 because they were all unable to meet their margin calls, and because of the loss of their warehouse facilities.[249]

The FRB described the issues which led to the failure of many mortgage origination businesses as follows:

> Domestic and international financial markets experienced substantial strains and volatility in 2007 that were sparked by the ongoing deterioration of the subprime mortgage sector and emerging worries about the near-term outlook for U.S. economic growth. Substantial losses on structured products related to subprime mortgages caused market participants to reassess the risks associated with a wide range of other structured financial instruments. The result was a drying up of markets for subprime and nontraditional mortgage products as well as a significant impairment of the markets for asset-backed commercial paper and leveraged syndicated loans.[250]

[247] Declaration of Monika L. McCarthy in Support of Chapter 11 Petitions and First Day Relief, *In re New Century TRS Holdings, Inc.,* Case No. 07-10416, Docket No. 2, at 10–14.

[248] Declaration of Edward S. Robertson, Executive Vice President and Chief Financial Officer of the Debtors, in Support of First Day Motions, *In re Aegis Mortg. Corp.,* Case No. 07-11119, Docket No. 3, at 3.

[249] Decl. of Michael Strauss in Supp. of Chapter 11 Petitions and First Day Relief, *In re American Home Mortg. Holdings Inc.,* Case No. 07-11047, Docket No. 2, at 10–12; Decl. of Edward S. Robertson, Executive Vice President and Chief Financial Officer of the Debtors, in Supp. of First Day Motions, *In re Aegis Mortg. Corp.,* Case No. 07-11119, Docket No. 3, at 12–15; Decl. of Gurpreet S. Jaggi in Supp. of Debtor's Chapter 11 Petition and First Day Motions, In re First Magnus Financial Corp., Case No. 4:07-bk-01578, Docket No. 6, at 7–9.

[250] BD. OF GOVERNORS OF THE FED. RESERVE SYS., MONETARY POLICY REPORT TO THE CONGRESS (Feb. 27, 2008), at 23, http://www.federalreserve.gov/monetarypolicy/files/20080227_mprfullreport.pdf.

The failure of mortgage companies with large concentrations in subprime products in 2007 was directly attributable to funding issues:

> Over this period, mortgage companies specializing in subprime products began to experience considerable funding pressures, and many failed, because rising delinquencies on recently originated subprime mortgages required those firms to repurchase the bad loans from securitized pools. Financial markets calmed in April [2007], however, and liquidity in major markets remained ample. In June [2007], rating agencies downgraded or put under review for possible downgrade the credit ratings of a large number of securities backed by subprime mortgages. Shortly thereafter, a few hedge funds experienced serious difficulties as a result of subprime-related investments.[251]

Ultimately, the issues associated with subprime and other non-conforming mortgage products led to the virtual shut-down of the secondary securitization markets:

> Prices of indexes of credit default swaps on residential mortgage-backed securities backed by subprime mortgages—which had already weakened over the first half of 2007 for the lower-rated tranches—dropped steeply in July for both lower-rated and higher-rated tranches. Subsequently, investor demand for securities backed by subprime and alt-A mortgage pools dwindled, and the securitization market for those products virtually shut down. Those developments amplified credit and funding pressures on mortgage companies specializing in subprime mortgages; with no buyers for the mortgages they originated, more of those firms were forced to close or drastically reduce their operations, and subprime originations slowed to a crawl. Originations of alt-A mortgages—which had held up over the first half of the year—also dropped sharply beginning in July. . . In contrast, the market for conforming mortgages for prime borrowers was affected relatively little. Indeed, the issuance of securities carrying guarantees from Fannie Mae or Freddie Mac rose somewhat in the second half of the year.[252]

---

[251] *Id.*

[252] *Id.* at 23–24.

The disruption in the subprime mortgage market described above extended to the broader credit markets in August 2007. As described by Alan Greenspan, former chairman of the FRB:

> On [August] 9, 2007, and the days immediately following, financial markets in much of the world seized up. Virtually overnight the seemingly insatiable desire for financial risk came to an abrupt halt as the price of risk unexpectedly surged. Interest rates on a wide range of asset classes, especially interbank lending, asset-backed commercial paper and junk bonds, rose sharply relative to riskless U.S. Treasury securities.[253]

The August 2007 credit crisis was a seminal event in the mortgage industry and the global economy. At that time, the crisis was so severe that it affected the willingness of financial institutions to lend among themselves. As described by the FRB:

> At the same time, term interbank funding markets in the United States and Europe came under pressure. Banks recognized that the difficulties in the markets for mortgages, syndicated loans, and commercial paper could lead to substantially larger-than-anticipated calls on their funding capacity. Moreover, creditors found they could not reliably determine the size of their counterparties' potential exposures to those markets, and concerns about valuation practices added to the overall uncertainty. As a result, banks became much less willing to provide funding to others, including other banks especially for terms of more than a few days.[254]

While conditions improved in the credit markets in September and October 2007, in part because of quantitative easing by the Federal Reserve, the stress on the credit markets intensified in late 2007:

> The improvements in market functioning proved to be short lived, in part because of a further worsening in the outlook for the housing sector and associated concerns about possible effects on financial institutions and the economy.
>
> The strains in financial markets intensified during November and December [2007]. The syndicated loan market again ground to a halt.[255]

---

[253] Alan Greenspan, *The Roots of the Mortgage Crisis,* Wall St. J., Dec. 12, 2007, http://online.wsj.com/article/SB119741050259621811.html.

[254] Bd. of Governors of the Fed. Reserve sys., Monetary Policy Report to the Congress (Feb. 27, 2008), at 25, http://www.federalreserve.gov/monetarypolicy/files/20080227_mprfullreport.pdf.

[255] *Id.* at 28.

Mortgage origination businesses with concentrations in subprime mortgage products experienced severe funding stress as a result of the deterioration of the subprime and non-conforming mortgage markets in 2007. This stress resulted in the failure of many mortgage businesses, as described above. ResCap also experienced the same market dynamics, which resulted in the virtual elimination of its subprime origination and secondary securitization business. AFI's financial support during this period, however, enabled ResCap to avoid a fate similar to that suffered by many mortgage businesses in 2007.

In 2008, the housing and related mortgage financing industries continued to decline. In July, the FRB reported "Housing demand, residential construction, and home prices have all continued to fall so far this year. Following a decline at an annual rate of 43 percent in the second half of 2007, sales of new homes decreased at an annual rate of 32 percent in the first five months of 2008."[256] In January 2008, Markit stopped issuing indices for the subprime market.[257] Delinquencies on subprime mortgages climbed above 17% by March, and increased to over 20% in September.[258] The problems in housing and finance began to spill over into the general economy as well. Unemployment increased to 5.1% in March, and continued rising from there, ending 2008 at 7.3%.[259] The FRB reported "[t]he U.S. economy remained sluggish in the first half of 2008, and steep increases in commodity prices boosted consumer price inflation."[260]

In March 2008, the stress from illiquid markets forced investment bank Bear Stearns to seek federal government support. By the end of March, JPMorgan Chase, working with the FRB, acquired Bear Stearns.[261] The FRB reported to Congress in July 2008 that:

> Substantial losses on even the highest-rated structured products based on subprime mortgages caused market participants to reassess the risks associated with other structured financial instruments and raised concerns about the exposures of major financial institutions to these assets. As liquidity in markets for structured products evaporated, banks were forced, at least temporarily, to hold more assets on their balance sheets than they anticipated. In addition, banks' losses on mortgage-related

---

[256] BD. OF GOVERNORS OF THE FED. RESERVE SYS., MONETARY POLICY REPORT TO THE CONGRESS (Jul. 15, 2008), at 3, http://www.federalreserve.gov/monetarypolicy/files/20080715_mprfullreport.pdf.

[257] *See* PERMANENT SUBCOMM. ON INVESTIGATIONS, U.S. SENATE COMM. ON HOMELAND SEC. AND GOVERNMENTAL AFFAIRS, WALL STREET AND THE FINANCIAL CRISIS: ANATOMY OF A FINANCIAL COLLAPSE (Apr. 13, 2011), at 47, .http://www.hsgac.senate.gov//imo/media/doc/Financial_Crisis/FinancialCrisisReport.pdf?attempt=2.

[258] *See* Exhibit III.F.1.c.

[259] *See* United States Department of Labor, Bureau of Labor Statistics, http://data.bls.gov/cgi-bin/surveymost.

[260] BD. OF GOVERNORS OF THE FED. RESERVE SYS., MONETARY POLICY REPORT TO THE CONGRESS (Jul. 15, 2008), at 1, http://www.federalreserve.gov/monetarypolicy/files/20080715_mprfullreport.pdf.

[261] FED. RESERVE BANK OF ST. LOUIS, THE FINANCIAL CRISIS: A TIMELINE OF EVENTS AND POLICY ACTIONS (undated), at 5, http://timeline.stlouisfed.org/pdf/CrisisTimeline.pdf.

securities and other assets prompted credit concerns among counterparties. Both of these factors contributed to strains in bank funding markets. The resulting deleveraging in the financial sector reduced the availability of credit to the overall economy.[262]

The first half of 2008 turned out to be the better half, as the global economy, and more specifically the financial markets, took a turn for the worse as summer ended:

The second half of 2008 saw an intensification of the financial and economic strains that had initially been triggered by the end of the housing boom in the United States and other countries and the associated problems in mortgage markets. The ensuing turmoil in global credit markets affected asset values, credit conditions, and business and consumer confidence around the world. Over the summer, a weakening U.S. economy and continued financial turbulence led to a broad loss of confidence in the financial sector. In September, the government-sponsored enterprises Fannie Mae and Freddie Mac were placed into conservatorship by their regulator, and Lehman Brothers Holdings filed for bankruptcy. The insurance company American International Group, Inc., or AIG, also came under severe pressure, and the Federal Reserve, with the full support of the Treasury, agreed to provide substantial liquidity to the company. In addition, a number of other financial institutions failed or were acquired by competitors. As a result of the Lehman Brothers bankruptcy, a prominent money market mutual fund suffered capital losses, which prompted investors to withdraw large amounts from such funds. The resulting massive outflows undermined the stability of short-term funding markets, particularly the commercial paper market, upon which corporations rely heavily to meet their short-term borrowing needs. Against this backdrop, investors pulled back broadly from risk-taking in September and October, liquidity in short-term funding markets vanished for a time, and prices plunged across asset classes. Securitization markets, with the exception of those for government-supported mortgages, essentially shut down.[263]

---

[262] BD. OF GOVERNORS OF THE FED. RESERVE SYS., MONETARY POLICY REPORT TO THE CONGRESS (Jul. 15, 2008), at 23, http://www.federalreserve.gov/monetarypolicy/files/20080715_mprfullreport.pdf.

[263] BD. OF GOVERNORS OF THE FED. RESERVE SYS., MONETARY POLICY REPORT TO THE CONGRESS (Feb. 24, 2009), at 1, http://www.federalreserve.gov/monetarypolicy/files/20090224_mprfullreport.pdf.

In September and October 2008, in response to the turmoil, the FRB and U.S. Treasury began a number of federally-sponsored programs (including most notably TARP) to assist numerous companies and financial institutions facing severe financial distress. A number of these converted to bank holding companies to take advantage of the low-cost funding programs offered by the federal government.

Economic conditions continued to deteriorate in the first half of 2009, with unemployment increasing to 9.5%,[264] subprime delinquencies increasing to 25%,[265] and home prices declining an additional 7% to 18%.[266] The second half of 2009 however, was marked by a degree of stabilization in several sectors after more than two years of negative economic news:

> After declining for a year and a half, economic activity in the United States turned up in the second half of 2009, supported by an improvement in financial conditions, stimulus from monetary and fiscal policies, and a recovery in foreign economies. These factors, along with increased business and household confidence, appear likely to boost spending and sustain the economic expansion. However, the pace of the recovery probably will be tempered by households' desire to rebuild wealth, still-tight credit conditions facing some borrowers, and, despite some tentative signs of stabilization, continued weakness in labor markets.[267]

With the federal funds rate set as low as 0.01% by December 2009, and held below 1% since, the economy generally remained stable from 2010 through 2012. Slow improvements in the labor market resulted in unemployment dropping from a high of 10% in October 2009, to 7.8% in December 2012.[268] The S&P Case-Shiller Home Price Appreciation Index remained relatively flat after suffering through the steep declines of 2007 and 2008, and subprime mortgage delinquencies abated, dropping below 20% by the end of 2012.[269] "Financial market conditions improved notably in the fall of 2010, partly in response to actual and expected increases in monetary policy accommodation. In addition, later in the year, the tenor of incoming economic news strengthened somewhat, and the downside risks to economic growth

---

[264] *See* United States Department of Labor, Bureau of Labor Statistics, http://data.bls.gov/cgi-bin/surveymost.

[265] *See* Exhibit III.F.1.c.

[266] BD. OF GOVERNORS OF THE FED. RESERVE SYS., MONETARY POLICY REPORT TO THE CONGRESS (Jul. 21, 2009), at 4–5, http://www.federalreserve.gov/monetarypolicy/files/20090721_mprfullreport.pdf.

[267] BD. OF GOVERNORS OF THE FED. RESERVE SYS., MONETARY POLICY REPORT TO THE CONGRESS (Feb. 24, 2010), at 1, http://www.federalreserve.gov/monetarypolicy/files/20100224_mprfullreport.pdf.

[268] *See* United States Department of Labor, Bureau of Labor Statistics, http://data.bls.gov/cgi-bin/surveymost.

[269] *See* Exhibit III.F.1.c.

appeared to recede."[270] Though the economy in general showed signs of stabilization, and in some instances, slight improvement in the years 2010, 2011, and 2012, the FRB reported in February 2012:

> Activity in the housing sector remains depressed by historical standards. Although affordability has been boosted by declines in house prices and historically low interest rates for conventional mortgages, many potential buyers either lack the down payment and credit history to qualify for loans or are discouraged by ongoing concerns about future income, employment, and the potential for further declines in house prices. Yet other potential buyers—even those with sufficiently good credit records to qualify for a mortgage insured by one of the housing government-sponsored enterprises (GSEs)—continue to face difficulty in obtaining mortgage financing. Moreover, much of the demand that does exist has been channeled to the abundant stock of relatively inexpensive, vacant single-family houses, thereby limiting the need for new construction activity.[271]

### b. Changes In ResCap's Business Model

#### (1) Summary

As a result of the dislocation of the credit and securitization markets in August 2007, ResCap's business model was no longer viable as conceived. At that time, ResCap was engaged in the origination of residential mortgage loans using short-term third-party funding sources, then selling or securitizing such mortgage originations. The simultaneous dislocation of the credit and securitization markets compromised ResCap's business model because it was forced to use its available short-term credit to fund originations it could not subsequently sell. In addition, as the housing and mortgage markets continued to deteriorate, the value of the mortgage loans ResCap was forced to hold declined along with market-based advance rates, leading to increased margin calls and a corresponding evaporation of available liquidity.

#### (2) Background

Upon its initial formation, ResCap operated through four distinct operating segments: GMAC Residential, RCG, BCG, and IBG.[272] Its primary business activities included the origination, purchase, sale, securitization, and servicing of residential mortgage loans through each of GMAC Residential and RCG. While GMAC Residential had "a greater focus on the

---

[270] BD. OF GOVERNORS OF THE FED. RESERVE SYS., MONETARY POLICY REPORT TO THE CONGRESS (Mar. 1, 2011), at 1, http://www.federalreserve.gov/monetarypolicy/files/20110301_mprfullreport.pdf.

[271] BD. OF GOVERNORS OF THE FED. RESERVE SYS., MONETARY POLICY REPORT TO THE CONGRESS (Feb. 29, 2012), at 8, http://www.federalreserve.gov/monetarypolicy/files/20120229_mprfullreport.pdf.

[272] Residential Capital Corporation, Annual Report (Form 10-K) (Mar. 28, 2006), at 2.

direct origination of mortgage loans with consumers of prime credit quality that generally conform[ed] to the underwriting requirements of Fannie Mae or Freddie Mac,"[273] RCG "focus[ed] primarily on the purchase of residential mortgage loans in the secondary market and the origination of loans through mortgage brokers."[274] In addition, RCG's products ranged from prime to non-prime and "generally d[id] not conform to the underwriting requirements of Fannie Mae or Freddie Mac. [RCG's] mortgage loans [were] generally considered non-conforming because of the size of the loans or because they have more expansive documentation, property, or credit-related features (e.g., higher debt-to-income or loan-to-value ratios)."[275] "[RCG] was the fifth-largest non-agency issuer of mortgage-backed and mortgage-related asset-backed securities in the United States in 2005."[276]

### (3) Significant Changes In Originations

Beginning in the second half of 2006, as previously discussed in Section III, the U.S. housing and mortgage industries experienced distress as home price appreciation slowed, and in some instances declined, and subprime mortgage originations experienced increased delinquencies. As a result of the distress that affected subprime borrowers, ResCap recorded lower than expected earnings of $83 million for the quarter ended September 30, 2006, $200 million lower than the same period in 2005.[277] Later that year, ResCap reported an operating loss of $651 million in the quarter ended December 31, 2006, primarily because of large loss reserve adjustments to its subprime mortgage portfolio.[278] This was the first quarterly operating loss in ResCap's brief history.

"Beginning January 1, 2007, based on changes in the organizational structure and management of the GMAC Residential and [RCG] operating business segments, these segments [were] combined and [were] reported as one reportable operating segment, Residential Finance Group."[279] The change in operating segments coincided with ResCap's first restructuring, announced in January 2007 as an expense reduction initiative, whereby ResCap intended to reduce headcount by 800, not fill 200 open positions, accelerate the integration of GMAC Residential and RCG's operations and technology, and combine its servicing platforms into one. The press release in January 2007 noted, "ResCap's decision to reduce its workforce and accelerate its integration process is being driven by a number of factors, including slower originations, shifts in home prices and appreciation rates, a challenging interest rate environment and the continued deterioration of the sub-prime sector."[280]

---

[273] *Id.* at 12.

[274] *Id.* at 14.

[275] *Id.*

[276] *Id.* at 15.

[277] Residential Capital, LLC, Quarterly Report (Form 10-Q) (Nov. 7, 2006), at 4.

[278] Residential Capital, LLC, Current Report (Form 8-K) (Mar. 13, 2007), Ex. 99.1.

[279] Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2008), at 3.

[280] Residential Capital, LLC, Current Report (Form 8-K) (Jan. 16, 2007), at 2.

As 2007 progressed, the housing market and mortgage finance industries continued to encounter distress, primarily as a result of the continued deterioration in the subprime mortgage markets. ResCap reported a net loss of $910 million for the quarter ended March 31, 2007.[281] ResCap reported a $254 million loss for the quarter ended June 30, 2007.[282] ResCap reported, "[o]ur domestic loan production decreased 32.7% in the three months ended June 30, 2007 and 23.8% in the six months ended June 30, 2007"[283] in its quarterly financial statements. It further disclosed that:

> [D]omestic loan production decreased due to a decline in our non-prime, prime-nonconforming and prime second-lien products as a result of unfavorable market conditions. Non-prime loan production totaled $0.7 billion and $3.9 billion for the three- and six-months ended June 30, 2007, respectively, compared to $6.1 billion and $15.2 billion for the same period in 2006.[284]

By mid-2007 ResCap began encountering difficulties securitizing mortgage loans as well. ResCap reported this difficulty in its June 30 financial statements as follows:

> Gain on sale of mortgage loans, net decreased $239.5 million, or 71.0%, for the three months ended June 30, 2007 and $780.9 million, or 145.3%, for the six months ended June 30, 2007, compared to the same periods in 2006. The decrease in gain on sale of mortgage loans was primarily due to the decline in the fair value of our delinquent non-prime and prime second-lien loans in the held for sale portfolio. In addition, the gain on sale of current mortgage loans was reduced due to lower investor demand and lack of market liquidity. This severely affected our ability to securitize these loans at favorable margins. Finally, lower origination volume contributed to lower gain on sale income.[285]

As shown in Exhibit VI.C.4.b(3)—1 below, ResCap's mortgage origination business experienced a significant decline in 2007, as subprime originations effectively ended by the start of the third quarter, and continued distress in the housing market negatively affected originations of prime mortgages as well.

---

[281] Residential Capital, LLC, Quarterly Report (Form 10-Q) (May 8, 2007), at 4.

[282] Residential Capital, LLC, Quarterly Report (Form 10-Q) (Aug. 7, 2007), at 4.

[283] *Id.* at 29.

[284] *Id.*

[285] *Id.* at 34.

EXHIBIT VI.C.4.b(3)—1
**ResCap U.S. Loan Production**
December 31, 2005 – December 31, 2008
*($ in Millions)*



*Source: Residential Capital Corporation, Annual Report (Form 10-K) (Mar. 28, 2006), at 6; Residential Capital, LLC, Annual Report (Form 10-K) (Mar. 13, 2007), at 6; Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2008), at 7; Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2009), at 7.*

In June and July 2007, the major credit ratings agencies downgraded many subprime securitization ratings. This, in turn, caused substantial distress in the capital markets in July and August 2007 as lenders became wary of the credit risk of their counterparties. In early August 2007, the credit markets seized as commercial paper counterparties refused to roll maturities and banks refused to lend other than for the very short-term. The resulting impact on mortgage originators who relied on asset-backed commercial paper and other short-term funding sources was devastating as few had sufficient capital to overcome immediate commitments absent unimpaired access to the credit markets. A number of mortgage companies filed for bankruptcy, while others required rescue financing. ResCap's available cash dropped to a low of $328 million as of August 16, 2007, as margin calls increased, necessitating the immediate sale of Health Capital to AFI for $900.5 million.

In a September 7, 2007 ResCap Board presentation, ResCap's management explained "[m]acro mortgage market challenges continue to include: Significant erosion of non-conforming product margins characterized by extremely limited secondary market for most of these products."[286] It went on to discuss:

> Global credit markets continue to be severely stressed across a broad range of asset classes—Stress has spread from non-prime mortgages into prime non-conforming mortgages (Jumbos/Alt-A) and the broader credit markets (e.g., commercial paper)—Extremely limited liquidity for non-conforming loans has led to a significant buildup of HFS assets—This asset build-up has consumed significant funding capacity while margin calls and lower funding advance rates on eroding asset values have posed a drain on cash balances.[287]

Although ResCap had taken steps to eliminate subprime originations from its mortgage business, its business model was not able to accommodate both the deteriorating market conditions and seizure of the capital markets. ResCap's business model was to originate or purchase mortgage loans using low-cost, short-term funding, such as asset-backed commercial paper. These loans would then be securitized or sold to generate the funds necessary to repay the short term debt. As the securitization and credit markets froze, ResCap was left holding mortgages it intended to sell in the ordinary course. This posed two significant problems for ResCap: (1) ResCap's available funding capacity was consumed, leaving it with limited availability to continue originations; and (2) as the market value of its mortgage loans decreased, ResCap was required to post additional collateral to its lenders.

The September 7, 2007 ResCap Board Presentation noted the impact of liquidity constraints on ResCap's business:

> Limited access to liquidity has forced ResCap to further curtail asset originations
>
> – Non-prime originations essentially shut-off
>
> – Non-conforming originations reduced to 50% of Q2 2007 levels
>
> – Conforming originations continuing but at a slightly reduced levels
>
> – BCG is restricting additional credit approvals
>
> – IBG has raised pricing/eliminated products universally to reduce funding demands[288]

---

[286] ResCap Consolidated Operating Review Presentation, dated Sept. 7, 2007, at RC40012734 [RC40012695].

[287] *Id.* at RC40012735.

[288] *Id.* at RC40012736.

Recent ResCap initiatives include:

– Execution of significant underwriting changes to minimize origination of products with limited profitability or limited funding opportunities

– Re-classification of HFS portfolios to HFI, where appropriate, based on limited secondary market options

– Reduction in expense base in light of significant decline in production and margins

– Reduction/capping of balance sheet exposures

– Establishment of an operating model and go-to-market strategy that is more reflective of current mortgage market realities

– Appointment of Mike Rossi to lead ResCap turnaround[289]

ResCap disclosed in its public filings it had "[a]ctively managed our product offerings in light of changing market conditions and significantly reduced our non-conforming product offerings, including an effective suspension of our nonprime product offering."[290]

In its 2007 Annual Report (Form 10-K), ResCap noted:

During the second half of 2007, the change in the U.S. mortgage market has limited our ability to securitize many of our non-conforming loan products and has also resulted in a lack of demand and liquidity for the subordinate interests from these securitizations. This lack of liquidity has also reduced the level of whole loan transactions of certain non-conforming mortgages.[291]

ResCap further explained throughout the document that it had reduced its prime non-conforming, and effectively halted non-prime, originations because of market conditions, and had also reduced its warehouse lending and BCG activities as well. ResCap's Annual Report for 2007 disclosed:

In the short-term, it is probable the mortgage industry will continue to experience both declining mortgage origination volumes and reduced total mortgage indebtedness due to the deterioration of the non-prime and non-conforming mortgage market. Due to these market factors, including interest rates, the

---

[289] *Id.* at RC40012734–35.

[290] Residential Capital, LLC, Quarterly Report (Form 10-Q) (Nov. 8, 2007), at 39.

[291] Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2008), at 8.

business of acquiring and selling mortgage loans is cyclical. We do not expect the current market conditions to turn favorable in the near term.

The persistence of the global dislocation in the mortgage and credit markets referred to above may continue to negatively affect the value of our mortgage related assets. These markets continue to experience greater volatility, less liquidity, widening of credit spreads, repricing of credit risk and a lack or price transparency. We operate in these markets with exposure to loans, trading securities, derivatives and lending commitments. Our access to capital markets continues to be restricted, both domestically and internationally, impacting the renewal of certain facilities and our cost of funding. It is difficult to predict how long these conditions will exist and which markets, products and businesses will continue to be affected. Accordingly, these factors could continue to adversely impact our results of operations in the near term.

We have experienced a series of credit downgrades with the rating agencies during 2007 and 2008 due to the disruption in the capital markets. The actions of the rating agencies triggered an increase in our cost of funds due to the step up in coupon on our unsecured debt. A rating agency downgrade on February 22, 2008, resulted in an additional and final step-up of 50 basis points to our senior unsecured debt. We have also been impacted by margin calls and changes to advance rates on our secured facilities.[292]

Although ResCap executed a number of strategic decisions in an attempt to address the immediate issues it faced during this time period, as discussed later, it still required significant support from AFI. The challenges inherent in ResCap's business model were reflected in its financial performance, as shown in Exhibit VI.C.4.b(3)—2 below.

_____

[292] *Id.* at 48.



EXHIBIT VI.C.4.b(3)—2
**ResCap Net Income**
Years Ended 2005 – 2011
*($ in Millions)*

*Source: EXAM00122651; EXAM00123128; EXAM00124455; Residential Capital Corporation, Annual Report (Form 10-K) (Mar. 28, 2006),
at 95; Residential Capital, LLC, Annual Report (Form 10-K) (Mar. 13, 2007), at 101; Residential Capital, LLC, Annual Report
(Form 10-K) (Feb. 27, 2008), at 101; Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2009), at 119.*

### (4) Effects Of International Business

The severe stress that affected the domestic market spread to foreign markets in the latter half of 2007. While IBG had increased originations from $19.7 billion in the nine months ended September 30, 2006 to $23.3 billion in the nine months ended September 30, 2007, it came at a cost. Net income for IBG of $72.8 million for the nine months ended September 30, 2006 turned to a net loss of $438.2 million for the nine months ended September 30, 2007.[293] ResCap reported that IBG's results "[w]ere impacted by the spread of the liquidity market tightening in Canada, the United Kingdom and Continental Europe during the [third] quarter."[294] In addition, ResCap reported "[m]argins in which deals were executed significantly decreased during the period due to lower investor demand and a lack of market liquidity."[295] In its Annual Report (Form 10-K) for 2007, ResCap disclosed that:

> During 2007, the mortgage and capital markets have experienced severe stress due to credit concerns and housing market contractions in the United States. During the second half of the year, these negative market conditions spread to the

---

[293] Residential Capital, LLC, Quarterly Report (Form 10-Q) (Nov. 8, 2007), at 42.

[294] *Id.*

[295] *Id.* at 42–43.

foreign markets in which we operate, predominantly in the
United Kingdom and Continental Europe.[296]

*(5) ResCap's Restructuring Efforts, Including Potential Liquidation*

As previously discussed, in January 2007 ResCap announced its first restructuring,
including the reduction of one thousand positions and acceleration of certain integration
activities in an effort to reduce costs. This was followed in October 2007, with a larger, formal
restructuring plan as a result of "severe weakness in the housing market and mortgage
industry."[297] This restructuring was intended to further streamline operations and provide
ResCap with a scalable operating structure that would be easier to change as the operating
environment changed. The most significant component of the restructuring plan was:

> [R]educing [ResCap's] current worldwide workforce of 12,000
> associates by approximately 25 percent, or by approximately
> 3,000 associates, with the majority of reductions occurring in the
> fourth quarter of 2007. This reduction in workforce is in
> addition to the measures undertaken in the first half of 2007 in
> which 2,000 positions were eliminated.[298]

ResCap's Annual Report (Form 10-K) for 2007 further detailed the costs of the plan,
explaining:

> The total restructuring charge of $127 million exceeded initial
> estimates of between $90 and $110 million due to unanticipated
> fixed asset write-downs and facility costs connected with certain
> workforce reductions. We believe we incurred substantially all
> of the restructuring costs in the fourth quarter of 2007 and that
> the plan will be operationally complete by mid 2008. As a result
> of a fully executed restructuring plan, we project we will realize
> annual cost reductions of $160 million in compensation and
> benefits and a further $25 million of reduced rent and asset
> depreciation.[299]

The restructuring plan had been in development since early September 2007 as indicated
by presentations to the ResCap Board. One such presentation prepared for the September 26,
2007 ResCap Board meeting offered three possible scenarios:

> (1) Current Path: Aggressively restructure; Achieve profitability
> in 2008; Inject $725 [million] equity; Stabilize operations,

---

[296] Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2008), at 48.

[297] Residential Capital, LLC, Current Report (Form 8-K) (Oct. 17, 2007), Ex. 99.1, at 1.

[298] *Id.*

[299] Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2008), at 50.

preserve the franchise and fight for survival until conditions improve; Return to Board within 60 days to discuss capital situation and other business options;

(2) [Joint Venture or] Sale: Explore opportunities to sell ResCap in whole or in part; Understand valuation for whole business/ parts of the business (i.e. RFG, IBG, BCG, Servicing) in the current environment; Identify potential acquisitions and/or JV partners; Discuss potential M&A options with Board within 60 days; and

(3) Orderly Liquidation/Other: Explore viability and economics of an orderly liquidation; Explore viability and economics of other exit or partial exit options.[300]

Even under the most optimistic of these three scenarios ("Current Path"), ResCap recognized it needed a $725 million cash equity contribution, stabilization of its operations, and "would fight for survival until conditions improve[d]." The presentation recognized ResCap's liquidity issues at the time and noted "ResCap liquidity position improved since August but [was] still fragile" and "will likely need more equity in Q4 depending on status at that time."[301]

### c.   ResCap's Liquidity

The term "liquidity" is generally understood to consist of a company's available cash balances, excess working capital, and available credit on committed lines that, when combined, represent funds available to the enterprise in the ordinary course of business. An assessment of liquidity includes an analysis of funds that can be generated from operating the business (cash flows from operations), and cash that might be realized through the sale of non-core assets to the extent that such assets can be monetized in a timely manner to satisfy imminent financial needs. Such an analysis can often provide compelling information regarding the sufficiency of a company's liquidity resources to support its business over a relevant time period, especially as it relates to a company's ability to deal with potential downturns, stresses, and contingencies. An evaluation of a company's liquidity must be performed in the context of its specific business needs, viewed through the lens of industry conditions and the macro-economic environment.

ResCap focused its liquidity management and reporting processes on its domestic liquidity portfolio, which included cash readily available to cover operating demands across its business operations. ResCap's domestic liquidity portfolio excluded certain cash balances, specifically international cash balances, cash balances maintained at Ally Bank, and certain

---

[300] ResCap Review Presentation, dated Sep. 26, 2007, at RC40012952 [RC40012907].

[301] *Id.* at RC40012914.

operating cash maintained within business segments to cover timing related outflows.[302] After June 2008, ResCap projected and reported its (i) unrestricted liquidity (unencumbered cash held in the United States by ResCap and its subsidiaries); and (ii) consolidated liquidity (cash and cash equivalents, excluding cash and cash equivalents maintained at Ally Bank) as required by certain financial covenants under the Secured Revolver Facility Loans.[303]

### (1) ResCap Was A Liquidity-Intensive Business

ResCap was a liquidity-intensive business in part due to the volatility inherent in its assets and the dependence of its business model on access to liquid capital.[304] In 2006, ResCap disclosed:

> Our liquidity needs are significant and we rely on access to capital markets to provide financing and fund asset growth. Our primary liquidity management objective is ensuring that we have adequate, reliable access to liquidity across all market cycles and in periods of financial stress. We meet our financing needs in a variety of ways, through whole-loan sales, the public debt capital markets, mortgage conduit facilities and asset-backed securities markets, as well as through the deposit-gathering and other financing activities of [Ally] Bank.[305]

Accordingly, an evaluation of ResCap's process for managing its liquidity needs provides valuable insight into ResCap's capital adequacy.

---

[302] ResCap focused on its domestic liquidity portfolio as certain sources of liquidity within the ResCap consolidated group of entities were not readily accessible to meet imminent liquidity needs, including: (1) IBG's available liquidity, which was located in several foreign countries and was subject to legal and tax repatriation issues, *see* Int. of J. Lombardo, Mar. 18, 2013, at 9:3–10:3; (2) cash for operating needs, which was "maintained within business segments to cover timing related outflows," *see* Residential Capital, LLC, Quarterly Report (Form 10-Q) (Nov. 8, 2007), at 48; (3) cash balances of "[Ally] Bank (& Auto Bank) Cash [that was] not available to ResCap and [was] earmarked to fund balance sheet growth," *see* ResCap Weekly Cash Rollforward and Dashboard [CERB011709] (quoting ResCap Total Cash & Cash Equivalent report on the "04.30.08" worksheet); and (4) unused revolvers, which were maintained as backup funding to support commercial paper and other short term secured funding facilities, *see* Section VI.C.4.c(2)(c).

[303] Secured Revolver Loan Agreement, § 7.02 [RC00024234]; Initial Line of Credit Agreement, §§ 2.03, 7.02 [ALLY_0023145].

[304] Residential Capital, LLC, Annual Report (Form 10-K) (Mar. 13, 2007), at 76.

[305] *Id.* at 76–77.

### *(2) ResCap's Processes And Procedures For Managing Liquidity*

ResCap outlined detailed processes and procedures by which it managed its liquidity risk.[306] These processes and procedures were comprised of, among other things, (1) maintaining sufficient short-term and long-term financing; (2) maintaining diversified sources of funding; (3) maintaining sufficient liquidity reserves; (4) maintaining an active dialogue with its credit rating agencies; and (5) employing a prudent management oversight and governance process.[307]

### *(a) Short-Term And Long-Term Financing*

ResCap tied its need for short-term financing to its various short-term asset classes, including HFS mortgage loans, lending receivables, and other liquid assets.[308] ResCap's need for long-term financing was tied to financing its longer term assets such as HFI mortgage loans, MSRs, real estate investments, and assets used as excess collateral for its various funding conduits.[309] ResCap focused on its liquidity daily, managing its debt maturities and credit facility expirations to minimize its liquidity risk.[310] ResCap stated it had achieved what it believed to be a "well-laddered" unsecured debt maturity profile as of December 31, 2006.[311] Notwithstanding the above, ResCap's ability to operate its business and deal with its pending debt maturities, as shown in Exhibit VI.C.4.c(2)(a) below, was dependent upon its ability to refinance billions of dollars in credit facilities that, in turn, was dependent upon ResCap's creditworthiness and continued access to the capital markets.

---

[306] The Federal Reserve Bank of San Francisco has explained:

> Liquidity is generally defined as the ability of a financial firm to meet its debt obligations without incurring unacceptably large losses. An example is a firm preferring to repay its outstanding one-month commercial paper obligations by issuing new commercial paper instead of by selling assets. Thus, 'funding liquidity risk' is the risk that a firm will not be able to meet its current and future cash flow and collateral needs, both expected and unexpected, without materially affecting its daily operations or overall financial condition. Financial firms are especially sensitive to funding liquidity risk since debt maturity transformation (for example, funding longer-term loans or asset purchases with shorter-term deposits or debt obligations) is one of their key business areas.

> JOSE A. LOPEZ, FED. RESERVE BANK OF S.F., FRBSF ECONOMIC LETTER 2008-33: WHAT IS LIQUIDITY RISK? 1 (Oct. 24, 2008), http://www.frbsf.org/publications/economics/letter/2008/el2008-33.pdf.

[307] Residential Capital, LLC, Annual Report (Form 10-K) (Mar. 13, 2007), at 77–79.

[308] *Id.* at 77.

[309] *Id*.

[310] *Id.*

[311] *Id.*

EXHIBIT VI.C.4.c(2)(a)
**ResCap Unsecured Long-Term Debt Maturities**
Years Ended 2007 – 2012
*($ in Millions)*



*Source: Residential Capital, LLC, Annual Report (Form 10-K) (Mar. 13, 2007), at 77.*

### (b) Diversified Sources Of Funding

ResCap endeavored to use a diversified array of funding sources, depending, in part, on the type and nature of the associated asset being financed. This diversification was intended to enhance ResCap's pricing across its debt facilities to reduce its reliance on any single source of liquidity. Diversification of financing options was important to ResCap's profitability and viability because ResCap operated a "spread business." ResCap distinguished three primary strategies to improve its debt pricing and access to liquidity. The first strategy focused on ResCap's secured funding programs through the mortgage and asset-backed securities markets, as well as long-term funding for ResCap's HFI portfolio. The second strategy focused on ResCap's unsecured funding sources at the ResCap LLC level. The third strategy focused on leveraging ResCap's relationship with Ally Bank to access deposits and FHLB advances. Maintaining diversified sources of financing was an important aspect of ResCap's operating strategy because ResCap recognized that dependence on any single source of capital would present significant risks to its business.

ResCap lost access to secondary market trading and securitization programs previously established to provide long-term financing for its mortgage loans following the dislocation of the capital markets in August 2007. In addition, short-term facilities such as its commercial paper conduits were also affected by the August 2007 dislocation of the capital markets.[312] As discussed previously, the August 2007 dislocation also presented challenges to IBG because lenders did not renew expiring facilities. ResCap faced new challenges in 2008 because its near-term maturities and a lack of third party lender support required it to seek continued support from AFI.

---

[312] Residential Capital, LLC, Quarterly Report (Form 10–Q) (Nov. 8, 2007), at 50.

### (c)  Liquidity Reserves

As of December 31, 2006, ResCap maintained liquidity reserves in the form of a portfolio of money market instruments and two $875 million, domestic, unsecured revolving credit facilities (one maturing July 2007, and the other maturing July 2008).[313] These reserves totaled $2.95 billion, of which $1.9 billion was unused and available as of December 31, 2006.[314] However, ResCap's ability to draw on its two $875 million "backup" revolving lines of credit was limited as a matter of practice—for example, the minutes of ResCap's "Liquidity and Funding Committee" stated that the "revolver is supposed to be viewed as contingency not as term funding. [ResCap] can borrow from time to time, but to use it consistently would be a problem."[315] Further, ResCap needed 100% committed backup lines to access the commercial paper market for funding.[316] In other words, ResCap's need to keep the revolving lines in place to access the commercial paper market also effectively restricted its ability to draw on them. Additionally, drawing on these facilities would impede ResCap's ability to negotiate secured financing with lenders.[317] Fitch stated that "[when] a company draws on its [backup] bank lines, it just basically gives off the impression that it has run out of options."[318] As such, any drawdown on these lines would likely exacerbate rather than alleviate ResCap's liquidity issues over time.

### (d)  Dialogue With Credit Rating Agencies

ResCap recognized that its credit rating was a critical factor in maintaining adequate liquidity because of the effect its credit rating had on the cost and availability of its existing facilities, and because of the effect its credit rating had on its ongoing access to the capital markets. Accordingly, an important component of ResCap's strategy for managing its liquidity centered on ResCap's commitment to maintain an investment-grade credit rating.[319]

---

[313] Residential Capital, LLC, Annual Report (Form 10-K) (Mar. 13, 2007), at 78–79.

[314] *Id.* at 79 (showing that the $2.96 billion was comprised of a $1.07 billion liquidity portfolio (domestic and international), $1.75 billion available under two $875 million unsecured revolving credit facilities and $145 million of international bank lines).

[315] Minutes of a Meeting of the Liquidity and Funding Committee of Residential Capital, LLC, Aug. 23, 2006, at EXAM10377281 [EXAM10377279].

[316] *Id.* at EXAM10377282, EXAM10377311.

[317] Int. of W. Casey, Jan. 31, 2013, at 54:12–55:3, 55:19–56:03; Int. of J. Pruzan, Mar. 28, 2013, at 54:25–55:16; ResCap Materials for Discussion of Debt Restructuring/Bond Exchange, dated Apr. 18, 2008, at RC40007702 [RC40007696].

[318] Thomas Lee, *More Mortgage Fallout: ResCap Debt Cut to Junk*, STAR TRIBUNE, Aug. 16, 2007, http://www.startribune.com/printarticle/?id=11218491.

[319] Residential Capital, LLC, Annual Report (Form 10-K) (Mar. 13, 2007), at 79.

ResCap established an investment-grade credit rating in June 2005.[320] ResCap believed that an active dialogue with the credit rating agencies was crucial to maintaining that investment-grade rating. Such a dialogue was, therefore, an important component of its liquidity management plan. ResCap's recognition of the importance of its investment-grade credit rating implicitly acknowledged that any future credit downgrades would have significant consequences for ResCap's continued access to capital markets, from both a cost of funds and credit availability perspective.

### (e) Liquidity Management Oversight And Governance Process

ResCap employed a number of mechanisms to monitor its liquidity and capital needs, and those mechanisms evolved over time. In 2006, ResCap's "Liquidity and Funding Committee," chaired by the ResCap's CFO with participation by the corporate treasurer and various business unit officers, was tasked with determining optimal capital structure, overseeing ongoing liquidity needs, and monitoring contingency funding plans. ResCap's global treasury function, comprised of business unit treasurers, was tasked with evaluating liquidity needs and communicating such needs to senior management. ResCap's daily liquidity management was designed to manage cash and liquidity centrally with input from each business segment.[321]

### (3) Effect Of Mortgage Crisis On ResCap's Liquidity In 2007

ResCap was unable to address its liquidity needs adequately during 2007. This was not unique to ResCap; industry-wide liquidity issues reached an apex with the virtual shutdown of the credit and securitization markets in August 2007. Although the mortgage crisis was initially limited to subprime products, it became apparent in 2007 that the issues extended to Alt-A and other non-conforming mortgages. ResCap's losses mounted as a result of the decline in production, increasing loan losses, and continued deterioration across its businesses both domestically and internationally as 2007 progressed.[322]

ResCap's liquidity was "dramatically impacted"[323] during this period. As shown in Exhibit VI.C.4.c(3) below, ResCap's domestic liquidity was at a "cash low point" of $328 million on August 16, 2007.[324] This liquidity shortfall led to the sale of Health Capital on August 17, 2007. AFI purchased Health Capital on an expedited basis for an initial payment of $775 million[325] and a subsequent true-up to $900.5 million based upon a valuation performed by Houlihan.[326]

---

[320] VICTORIA WAGNER & JOHN K. BARTKO, S&P, RESEARCH UPDATE: RESIDENTIAL CAPITAL CORP. ASSIGNED 'BBB-/A-3' RATINGS (Jun. 9, 2005); PHILIP KIBEL & JOHN J. KRIZ, MOODY'S, RATING ACTION: MOODY'S ASSIGNS BAA2 ISSUER RATING TO RESIDENTIAL CAPITAL CORPORATION; RATING OUTLOOK IS NEGATIVE (Jun. 9, 2005); CHRISTOPHER D. WOLFE & PHILIP S. WALKER, JR., FITCH, FITCH ASSIGNS 'BBB' & 'F2' RATINGS TO RESIDENTIAL CAPITAL CORP. (Jun. 9, 2005).

[321] Residential Capital, LLC, Annual Report (Form 10-K) (Mar. 13, 2007), at 79.

[322] Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2008), at 56.

[323] Treasury/Funding Analysis Presentation, dated Sept. 7, 2007, at RC40012729 [RC40012695].

[324] ResCap Liquidity Update, dated Oct. 15, 2007, at RC40012768 [RC40012763].

[325] Id.

[326] E.g., Houlihan Lokey HMO Valuation Materials, dated Sept. 28, 2007, at ALLY_0030374 [ALLY_0030363].

EXHIBIT VI.C.4.c(3)

**ResCap Daily Available Domestic Liquidity**
June 30, 2007 – June 18, 2008
*($ in Millions)*



*Source: ALLY_0272658; ALLY_0273141; CERB018489; EXAM10609907; EXAM10612983; RC40012763.*

The significant decline in ResCap's liquidity during July and August 2007 was driven by increasing margin calls, unfunded production, and the increasing liquidity needs of IBG.[327] Indeed, the impact of the U.S. subprime mortgage market collapse spread globally. IBG's liquidity was negatively affected by "margin calls, revocation of existing credit lines, unwillingness of creditors to renew credit facilities, and increased borrowing costs."[328] The tipping point came on August 9, 2007, with the seizure of the global credit markets, followed by the August 16, 2007 downgrade of ResCap by Moody's and Fitch to non-investment grade.[329] This credit downgrade was expected to increase ResCap's borrowing costs under its existing indebtedness significantly. At that time, ResCap estimated that those costs would increase by $175 million per year.[330] ResCap's access to capital markets was severely impaired and its ability to securitize mortgage loans in the secondary market was virtually eliminated at that time. Thomas Jacob, an Independent Director, noted that he believed ResCap was

---

[327] ResCap Consolidated Operating Review Presentation, dated Sept. 7, 2007, at RC40012736 [RC40012695].

[328] IBG Business Review Presentation, dated Sept. 7, 2007, at RC40012745 [RC40012695].

[329] Philip Kibel & John J. Kriz, Moody's, Rating Action: Moody's Downgrades ResCap to Ba1, From Baa3; Ratings Remain on Review Down (Aug. 16, 2007), http://www.moodys.com/research/Moodys-downgrades-ResCap-to-Ba1-from-Baa3-ratings-remain-on—PR_139425; Mohak Rao & Peter Shimkus, Fitch, Fitch Lowers Countrywide IDR to 'BBB+' & ResCap to 'BB+' (Aug. 16, 2007).

[330] GMAC Special Board Meeting Business Update, dated Aug. 22, 2007, at ALLY_PEO_0004045 [ALLY_PEO_0004035].

in the zone of insolvency in "August of 2007 when [ResCap] had this credit crunch."[331] At the September 7, 2007 ResCap Board meeting, Mayer Brown presented "Fiduciary Duties of Directors and Related Legal Issues"[332] to the ResCap Board, including "the duties owed by the directors to shareholders and creditors when a company reaches the zone of insolvency or becomes insolvent."[333] An August 21, 2007 research report by JPMorgan stated:

> Liquidity and recovery are the operative words for [ResCap]. We believe ResCap has enough committed unused secured facilities for the near term, but we believe the business model is broken in the current environment. We give credit to new management for taking the right steps, but it seems that the market is always two steps ahead.[334]

From August 16, 2007 to September 28, 2007, ResCap's available domestic liquidity improved from $328 million to $3.3 billion, primarily because the Health Capital sale generated $900.5 million in proceeds and AFI contributed cash of $1 billion to ResCap's capital.[335] On September 26, 2007, ResCap management reported to the ResCap Board that its "liquidity position [had] improved since August but [was] still fragile."[336] ResCap management presented liquidity projections to the ResCap Board that forecasted a decline in cash balances from $2.9 billion in September 2007 to (1) $181 million in February 2008, then an increase to $821 million in March 2008, under the "Baseline" scenario;[337] (2) a deficit of $11.0 billion in February 2008 and a deficit of $10.9 billion in March 2008, under a "Risk Adjusted/Draconian" scenario;[338] and (3) a deficit of $9.9 billion in February 2008 and a deficit of $9.7 billion in March 2008, under a "Risk Adjusted/Draconian with Opportunities" scenario.[339] ResCap was projecting billions of dollars in net cash outflows over the six-month period in each of these liquidity projections. None of these projections addressed ResCap's $4.5 billion unsecured debt maturing in 2008, of which $1.5 billion was due in the second quarter of that year.[340]

---

[331] Int. of T. Jacob, Nov. 7, 2012, at 197:1–198:20.

[332] Mayer Brown Fiduciary Duties of Directors and Related Legal Issues Presentation, dated Sept. 7, 2007, at RC40012709 [RC40012695].

[333] Minutes of a Regular Meeting of the Board of Directors of Residential Capital, LLC, dated Sept. 7, 2007, at RC40005620 [RC40005558].

[334] KABIR CAPRIHAN & MONICA PAREKH, JPMORGAN, COUNTRYWIDE AND RESIDENTIAL CAPITAL CORP RECOVERY, LIQUIDITY, BALANCE SHEET BURN, ETC. 1 (Aug. 21, 2007).

[335] See ResCap Liquidity Update, dated Oct. 15, 2007, at RC40012768 [RC40012763]; Residential Capital, LLC, Quarterly Report (Form 10-Q) (Nov. 8, 2007), at 33.

[336] ResCap Review Presentation, dated Sept. 26, 2007, at RC40012914 [RC40012907].

[337] Id. at RC40012924.

[338] Id.

[339] Id.

[340] Treasury/Funding Analysis Presentation, dated Sept. 7, 2007, at RC40012731 [RC40012695].

As ResCap closed out the year, its liquidity portfolio, exclusive of its back-up lines of credit, declined from $4.0 billion as of September 30, 2007, to $2.2 billion as of December 31, 2007.[341] ResCap's liquidity position of $2.2 billion as of December 31, 2007 was bolstered by $2 billion of prior cash contributions from AFI and $900.5 million from sale of Health Capital. ResCap's liquidity would have been negative but for these cash inflows. ResCap described its liquidity issues in its Annual Report (Form 10-K) for the year ended December 31, 2007, as follows:

> Throughout most of 2007, the domestic and international residential real estate and capital markets experienced significant dislocation. As a result, our liquidity was negatively impacted by margin calls, changes to advance rates on our secured facilities, and the loss of significant asset-backed commercial paper conduit financing capacity along with other secured sources of liquidity, including weak securitization markets. This market dislocation prompted our liquidity providers to evaluate their risk tolerance for their exposure to mortgage related credits.[342]

### (4) ResCap's Liquidity Remained Stressed Throughout 2008

ResCap's liquidity position remained stressed as it entered 2008, despite $2 billion in cash contributions received from AFI in 2007.[343] Notwithstanding its distressed financial condition, ResCap asserted in its public filings that its plans would provide adequate liquidity for 2008. Such plans included:

> [S]trategic alternatives that will improve our liquidity, such as, continued strategic reduction of assets, focus our production on prime conforming products which currently provide more liquidity options, explore potential alliances and joint ventures with third parties involving portions of our business, potential dispositions of one or more of our businesses, and strategic acquisitions.[344]

ResCap's plans also included potentially tapping its backup committed unsecured lines of credit and exploring options for continued funding and capital support from AFI. ResCap acknowledged, however, that there could be no assurances that AFI would agree to provide such support.[345]

---

[341] *Compare* Residential Capital, LLC, Quarterly Report (Form 10-Q) (Nov. 8, 2007), at 48, *with* Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2008), at 76.

[342] Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2008), at 106.

[343] *Id.* at 49.

[344] *Id.* at 80–81.

[345] *Id.* at 81.

ResCap's liquidity position worsened in early 2008. In January 2008, ResCap retained financial advisors to assess restructuring options.[346] Casey, ResCap's treasurer, stated on April 2, 2008: "[ResCap's] current cash position is tight (forecasted to close tonight less than $700mm) and [ResCap's] forecasted cash position is dangerously low in mid-April ($121mm on the 18th)."[347] This was confirmed in ResCap's April 4, 2008 liquidity report:

> Domestic available liquidity is forecasted to go negative by the June month end due to repayment of $1.8 billion unsecured Bank Term Loan and continues its downward trend thru year end in conjunction with the repayment of $2.2 billion of unsecured debt . . . set to mature in 2008 . . . . ResCap has engaged counsel & key banking relationships to address this forecasted cash shortfall.[348]

In his interview, Casey also stated that ResCap lost existing credit facilities during the fourth quarter of 2007 through the early part of 2008 because its banks were not renewing its credit facilities upon maturity.[349]

The "May 2008 Project Duvall Discussion Materials" noted that the "[k]ey objective of [ResCap's] restructuring plan is to create enough liquidity runway so that the company has adequate time to restructure its business including orderly monetization or run-off of non-core assets."[350] The materials further noted that "the debt restructuring alone will not provide sufficient liquidity to satisfy its obligations."[351] Evidence of mounting liquidity concerns was confirmed by Timothy Pohl, a ResCap advisor, who stated that "ResCap was undercapitalized" due to the dramatic changes in 2007 and 2008 that affected the industry.[352] He further stated that ResCap was facing potential liquidity, covenant, and bond maturity issues that could trigger the need for ResCap to file for bankruptcy around May 2008.[353]

ResCap's inability to fund its operations and service its existing debts were noted in an internal document reviewing the accounting treatment of the June 2008 debt exchange:

> ResCap is highly leveraged relative to its cash flows with a declining liquidity portfolio (i.e., cash readily available to cover

---

[346] *See, e.g.*, Letter from D. Ammann to J. Jones (Feb. 13, 2008) [MELZER.008816].

[347] E-mail from W. Casey (Apr. 2, 2008) [EXAM10158807].

[348] ResCap Total Liquidity Roll Forward, dated Apr. 4, 2008 [CERB011671] (noting "Key Take Aways" on the "Cash Rollforward" worksheet).

[349] Int. of W. Casey, Jan. 31, 2013, at 143:14–21.

[350] Morgan Stanley Project Duvall Board of Directors Presentation, dated May 29, 2008, at RC40008095 [RC40008087].

[351] *Id.*

[352] Int. of T. Pohl, Feb. 26, 2013, at 23:11–16.

[353] *Id.* at 23:11–25:19.

> operating demands from across its business operations and
> maturing obligations). As a result of challenging credit markets
> and tight liquidity compounded by a cyclical downturn in the
> mortgage market, the Company absent the current modification
> could not obtain a new term facility outside the related party
> group at an effective interest rate equal to the current market
> interest rate for 'similar debt of a non-troubled debtor.'
>
> Additionally, ResCap's baseline projections (including
> restructuring initiatives but excluding possible opportunities) as
> of May 31, 2008 indicated that operating and financing cash
> flows beginning in early 2009 are expected to be insufficient to
> fund operations and service its existing debt pursuant to
> contractual terms. . . . .
>
> While ResCap initiated the bond exchange and tender offer to
> alleviate these immediate liquidity pressures, a large percentage
> of bond holders were willing to accept the proposed concessions
> in an effort to keep the company afloat and to facilitate an
> orderly disposition of non-core assets.[354]

ResCap's available domestic liquidity fell to a low of $299 million on May 21, 2008. The two $875 million unsecured revolving credit facilities were terminated in June 2008 in connection with the June 2008 debt restructuring. Further, ResCap no longer had access to any committed backup funding facilities because the credit facilities extended by AFI as part of the June 2008 debt restructuring were fully drawn during June 2008.

Following the June 2008 debt restructuring, ResCap was required to maintain daily consolidated liquidity of $750 million and unrestricted liquidity of $250 million.[355] However, the June 2008 restructuring failed to provide ResCap with sufficient liquidity to address its continuing undercapitalization issues. Within months, ResCap was faced with yet another liquidity crisis and imminent violations of its financial covenants. ResCap's advisors noted at a September 2008 ResCap Board meeting that ResCap should consider itself to be "within the zone of insolvency"[356] and presented analyses indicating that ResCap's liquidity would be exhausted within weeks.[357]

Lazard and Skadden prepared an analysis of the impact of a ResCap bankruptcy filing on its liquidity and potential creditor recoveries.[358] Lazard and Skadden reported that ResCap

---

[354] ResCap Bond Exchange Accounting Assessment, dated July 1, 2008, at ALLY_0242724 [ALLY_0242723].

[355] Initial Line of Credit Agreement, §§ 2.03, 7.02 [ALLY_0023145].

[356] Minutes of an Executive Session of the Board of Directors of Residential Capital, LLC, Sept. 23, 2008, at RC40006865 [RC40006865].

[357] Skadden and Lazard Project Scout Presentation, dated Oct. 2008, at 3 [EXAM20020824]; Skadden & Lazard Project Scout Presentation, dated Oct. 10, 2008, at 3 [EXAM10490750].

[358] Skadden and Lazard Project Scout Presentation, undated, at RC40008685 [RC40008678].

would "deplete its liquidity on November 17, [2008]" without a sale of its interest in Ally Bank or another cash infusion.[359] ResCap projected that it would deplete its liquidity by March 2009, even under scenarios where ResCap was projected to receive cash consideration from the sale of its shares in IB Finance to AFI.[360]

Goldman Sachs reported to the AFI Board on October 24, 2008 that "ResCap is dealing with liquidity shortfalls that are even more acute than AFI's liquidity issues."[361] ResCap's unrestricted liquidity was projected to be fully exhausted by November 5, 2008.[362] One of the strategic alternatives presented by Goldman Sachs to the AFI Board was a possible ResCap bankruptcy filing "prior to month-end."[363]

Tom Marano, ResCap's CEO, wrote in an e-mail, dated October 30, 2008 to the U.S. Treasury that "[ResCap] is extremely challenged from a liquidity and net worth point of view."[364] Marano asked the U.S. Treasury to "focus on [his] proposal to access TARP" as "the impact on the markets, borrowers, and the availability of mortgage credit will be staggering if we fail."[365] Ultimately, AFI instructed Marano to withdraw ResCap's request because AFI had separately applied for TARP funds.[366] ResCap prepared itself for a possible bankruptcy filing while awaiting word of whether AFI would receive TARP approval.

Goldman Sachs noted in a confidential capital committee memorandum in November 2008 that "ResCap management anticipates a liquidity hole of $0.8bn and a capital hole of $1.0bn by year-end 2008. Management has estimated that $1[bn] to $6bn of further capital injections may be required to support ResCap in a run-off scenario assuming its assets are held to maturity."[367]

While ResCap was dependent on AFI for funding, AFI was also facing its own financial difficulties. Goldman Sachs noted that AFI was "facing severe near term and long-term liquidity issues . . . [was] undercapitalized with only ~$8bn of tangible equity supporting a $211bn balance sheet" and was at risk of breaching its leverage covenant.[368]

AFI provided ResCap with the Initial Line of Credit Facility on November 20, 2008 as a source of contingency funding.[369] ResCap could only draw against this facility when its consolidated liquidity was less than $750 million, or its unrestricted liquidity was less than

---

[359] Id.

[360] Id.

[361] Goldman Sachs Discussion Materials, dated Oct. 24, 2008, at ALLY_0258942 [ALLY_0258921].

[362] Id. at ALLY_0258953.

[363] Id. at ALLY_0258955.

[364] E-mail from T. Marano to N. Kashkari (Oct. 30, 2008) [CCM00199669].

[365] Id.

[366] Int. of T. Marano, Nov. 26, 2012, at 24:7–15, 204:3–14, 208:3–16.

[367] Memorandum, Confidential Capital Committee Memo, dated Nov. 19, 2008, at 11 [GSResCap0000092038].

[368] Id. at 3, 11.

[369] Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2009), at 98.

$250 million, and was required to make mandatory repayments when its consolidated liquidity and unrestricted liquidity exceeded these amounts.[370] ResCap continued to plan intermittently for bankruptcy through December 2008; however, preparations for an imminent bankruptcy filing were suspended on or about December 24, 2008, when AFI received notification that its application for TARP had been approved.[371]

### (5) Continued Liquidity Constraints—2009 Through 2012

Although the receipt of TARP funds by AFI averted an almost certain ResCap bankruptcy filing on or about December 24, 2008, ResCap's liquidity issues continued throughout 2009. ResCap projected in January 2009 that it would exhaust its cash by May 2009, necessitating a draw on the Initial Line of Credit Facility to meet its minimum cash covenants.[372] ResCap's projections also indicated that a negative cash balance for July 2009 would exceed availability under the Initial Line of Credit Facility.[373] ResCap's liquidity outlook did not improve in March and April 2009 and, with cash outflows for 2009 projected to exceed ResCap's available liquidity, ResCap had to rely on uncertain funding from AFI to supplement its liquidity.[374] ResCap experienced significant cash outflows because of the rise in interest rates in the weeks leading up to June 10, 2009, which led to losses on hedge positions related to the value of ResCap's MSR assets and the corresponding need for ResCap to post cash collateral.[375] ResCap posted $1.1 billion in cash collateral on its hedges between May 19, 2009 and June 10, 2009, which was partially offset by incremental borrowings on its MSR facility from higher MSR values.[376] ResCap was experiencing daily cash flow issues by the summer of 2009, with the ResCap Board meeting daily to monitor ResCap's liquidity position.[377] Materials presented to the ResCap Board during its June 10, 2009 meeting included information from its financial advisors for Project Scout II,[378] which stated that:

> Ongoing market volatility may result in material cash out flows related to posting collateral for hedging activity, causing ResCap to run out of available liquidity to operate. Moreover, increased interest expense related to servicing advances, higher delinquency rates, and losses from legacy portfolios serve to exacerbate ResCap's already tenuous liquidity position . . . .

---

[370] *Id.* Ex.10.8.

[371] Int. of T. Pohl, Feb. 26, 2013, at 35:21–36:6.

[372] Executive Liquidity Report, dated Jan. 12, 2009, at RC40011090 [RC40011078].

[373] *Id.*

[374] ResCap Liquidity Update, dated Mar. 29, 2009, at RC40011128–34 [RC40011125]; ResCap Liquidity Update, dated Apr. 30, 2009, at RC40011188–94 [RC40011173].

[375] GMAC LLC Strategy Group "Support for ResCap LLC" Presentation, dated Jun. 10, 2009, at RC40011260 [RC40011250].

[376] *Id.*

[377] Int. of P. West, Dec. 18, 2012, at 129:1–6, 165:16–19.

[378] Draft Project Scout II Presentation, undated, at RC40011255 [RC40011250].

> Absent the funding sought [from AFI], ResCap could be forced
> to file for bankruptcy . . . .[379]

Goldin Associates stated in its June 24, 2009 and September 16, 2009 fairness opinion presentations to the Independent Directors that "ResCap [had] been unable to borrow against its unencumbered assets from new or existing third party lenders," and lenders had reduced ResCap's borrowing availability since June 2008.[380]

ResCap's access to third-party financing continued to decrease during 2009. ResCap reported in its 2009 audited financial statements that "[t]he market deterioration has led to fewer sources and significantly reduced levels, of liquidity available to finance the Company's operations."[381] ResCap considered bankruptcy contingencies numerous times during 2009.[382] UBS noted in its November 2009 presentation to the ResCap Board that "ResCap has been living month to month with the aid of AFI, via continuous debt forgiveness."[383]

Pamela West, a ResCap Independent Director, stated that after 2009, it seemed that AFI's support was more uncertain and tenuous:

> We felt like it was getting less and less in their benefit to make
> that support. The closing of the books that year end was painful.
> And so, it was looking to us like that support was less and less
> forthcoming . . . .[384]
>
> Because it seemed very difficult for us to get that support at the
> end of the year. And frankly, the support that we got gave us
> very little, if no wiggle room at all . . . . And it was a month to
> month kind of support look and that becomes untenable at a
> certain point.[385]

---

[379] Id.

[380] Goldin Associates Presentation to the Committee of Independent Members of the Board of Directors of Residential Capital, LLC Regarding the June 1, 2009 Secured Line of Credit with GMAC, LLC, dated Jun. 24, 2009, at GOLDIN00129194 [GOLDIN00129173]; Goldin Associates Presentation to the Committee of Independent Members of the Board of Directors of Residential Capital, LLC Regarding Amendments to the June 1, 2009 Secured Line of Credit and the November 20, 2008 Secured Line of Credit with GMAC, Inc., dated Sept. 16, 2009, at GOLDIN00129392 [GOLDIN00129361].

[381] Residential Capital, LLC Consolidated Financial Statements for the Years Ended December 31, 2009 and 2008, dated Feb. 26, 2010, at 10 [EXAM00124455].

[382] Int. of T. Pohl, Feb. 26, 2013, at 97:8–21; 99:3–7; 102:19–24; 103:14–104:5; 107:9–108:4.

[383] UBS Exchange Alternatives Discussion Materials, dated Nov. 24, 2009, at RC40016955 [RC40016938].

[384] Int. of P. West, Jan. 11, 2013, at 101:2–6.

[385] Id. at 102:2–9.

EXHIBIT VI.C.4.c(5)
**ResCap Daily Available Domestic Liquidity**
June 30, 2007 – May 10, 2012
*($ in Millions)*



*Source: ALLY_0080946; ALLY_0081503; ALLY_0272658; ALLY_0273141; ALLY_0275088; ALLY_0275797; ALLY_0276886;*
*ALLY_0280277; ALLY_0283223; ALLY_0284342; ALLY_0285555; CCM00028777; CCM00028940; CCM00029223;*
*CCM00059068; CCM00109218; CERB018489; EXAM00114686; EXAM00114687; EXAM00114688; EXAM00114689;*
*EXAM00114690; EXAM00114692; EXAM00114694; EXAM00114695; EXAM00114696; EXAM00114698; EXAM00114700;*
*EXAM00114702; EXAM00114704; EXAM00114706; EXAM00114708; EXAM00114709; EXAM00114711; EXAM00114713;*
*EXAM00114715; EXAM10158701; EXAM10609907; EXAM10612983; EXAM10667290; LAZ-RSCP-XMR00002342; RC40012763.*

Liquidity remained at minimal levels in 2010, 2011, and 2012, notwithstanding the substantial capital restructuring effected in December 2009 pursuant to which AFI contributed $2.9 billion to ResCap's equity with a combination of cash, debt forgiveness, and asset contributions.[386] Capital and liquidity were held to minimum levels as a result of the change in ResCap's business model from an originator, securitizer, and servicer of mortgage loans to a broker and servicer, as well as the covenants contained in its debt agreements with AFI.

In a February 2010 liquidity update to the ResCap Board, ResCap stated that the sale to Fortress of UK performing loans and domestic non-core assets "must be executed to ensure minimum liquidity is maintained to avoid a liquidity covenant breach."[387] In addition, other funding and risk management activities were identified as important for "ResCap [to have] adequate liquidity through August 2010."[388]

---

[386] *See* Residential Capital, LLC Consolidated Financial Statements for the Years Ended December 31, 2009 and 2008, dated Feb. 26, 2010, at 10 [EXAM00124455]; *see also* Exhibit VI.C.4.f(4)(b).

[387] ResCap Liquidity Update, dated Feb. 23, 2010, at RC40015645 [RC40015641].

[388] *Id.* at RC40015646.

In response to a possible liquidity need by ResCap in January 2011, Marano noted in an e-mail in November 2010 that "[l]iquidity and [profit and loss are] an issue. We are doing dumb stuff to maintain a charade of a fig leaf."[389] Further, a December 2010 e-mail from Lara Hall, of AFI Capital Markets, noted:

> There are only two ways to operate a finance company with assets of long duration and short duration liabilities unless [Michael A. Carpenter] wants to go to board with every need. 1) Capitalize it so that it can refinance its debts as they come due and support the $3B volatile asset on its balance sheet 2) take down operating agreement and run it like any other sub with the support of capital and liquidity at parent.[390]

In late 2010 and early 2011, liquidity remained stressed when Marano indicated:

> I would suggest you start thinking about making up a $500mm liquidity line or injection available to [ResCap] to see us through the next few months while we determine if we can find other sources of liquidity or decide to manage the MSR for cash as opposed to managing it for asset protection.[391]

ResCap's liquidity continued to be stressed throughout 2010, 2011, and 2012, although ResCap reported profits in 2010. In 2011 and 2012, ResCap incurred continuing losses because of unfavorable valuation adjustments, hedging of the servicing assets, mounting legal expenses, and additional provisions for representation and warranty issues.

In sum, liquidity was a chronic issue for ResCap from mid-2007 through the Petition Date. ResCap recognized that the maintenance of adequate liquidity was critical to its ability to operate as a going concern. Despite this recognition, ResCap was unable to generate sufficient liquidity to operate its business from its operations or from the capital markets, and found itself reliant upon billions of dollars of support from AFI.

### d. ResCap's Access To Capital Markets

ResCap's access to capital markets was essential to its continuing viability. As previously discussed, ResCap historically relied on a variety of external funding sources including "whole-loan sales, the public debt capital markets, mortgage conduit facilities, and asset-backed securities markets."[392] However, ResCap's access to these sources of funding

---

[389] E-mail from T. Marano (Nov. 22, 2010) [ALLY_0359049].

[390] E-mail from L. Hall (Dec. 15, 2010) [ALLY_0218118].

[391] E-mail from T. Marano (Dec. 15, 2010) [ALLY_0200834].

[392] Residential Capital, LLC, Annual Report (Form 10-K) (Mar. 13, 2007), at 76.

was disrupted in August 2007 because of the seizure of the global credit markets. This disruption adversely affected ResCap's ability to obtain financing from external funding sources. As a result, ResCap became dependent on AFI for continuing support.

Further, the disruption in the global credit markets also negatively affected ResCap's ability to finance or otherwise monetize its unencumbered assets. Casey stated that ResCap was unable to obtain financing for its unencumbered assets in November 2007.[393] Goldin Associates further confirmed ResCap's inability to obtain third-party financing in its December 19, 2008 presentation to the Independent Directors in connection with ResCap's proposed increase in the Initial Line of Credit Facility (by adding collateral), stating that "ResCap has been unable to borrow against its unencumbered assets from new or existing third party lenders."[394] Goldin Associates repeated their December 19, 2008 comment on ResCap's inability to borrow against unencumbered assets in their June 24, 2009 and September 16, 2009 fairness opinion presentations to the Independent Directors.[395]

ResCap had $3.5 billion in syndicated unsecured bank credit facilities before the disruption in the global credit markets in August 2007. These facilities consisted of a $1.75 billion term loan due in 2008, an unused $875.0 million revolving credit facility due in 2008, and an unused $875.0 million revolving credit facility due in 2010. Following the disruption of the global credit markets in August 2007, ResCap's lenders were unwilling to renew or extend credit facilities to ResCap. William Casey stated that ResCap lost existing credit facilities during the fourth quarter of 2007 through the early part of 2008 because banks were not renewing the credit facilities upon maturity.[396] Sam Ramsey stated that ResCap's lenders could not put forth any constructive offer to renew ResCap's credit facilities or meet ResCap's needs, and "were not willing to provide even a secured loan on the terms that were constructive."[397] Lombardo also confirmed the unavailability of marketplace financing for ResCap.[398] Goldin Associates noted in their December 19, 2008 presentation to the Independent Directors that "ResCap's existing third party secured financing providers: Lehman Brothers, The Royal Bank of Scotland, Credit Suisse and JPMorgan Chase, have

---

[393] Int. of W. Casey, Jan. 31, 2013, at 181:10–182:9.

[394] Goldin Associates Presentation to the Committee of Independent Members of the Board of Directors of Residential Capital, LLC Regarding Proposed Amendment to the Secured Line of Credit with GMAC, LLC, dated Dec. 19, 2008, at GOLDIN00129114 [GOLDIN00129101].

[395] Goldin Associates Presentation to the Committee of Independent Members of the Board of Directors of Residential Capital, LLC Regarding the June 1, 2009 Secured Line of Credit with GMAC, LLC, dated Jun. 24, 2009, at GOLDIN00129194 [GOLDIN00129173]; Goldin Associates Presentation to the Committee of Independent Members of the Board of Directors of Residential Capital, LLC Regarding Amendments to the June 1, 2009 Secured Line of Credit and the November 20, 2008 Secured Line of Credit with GMAC, Inc., dated Sept. 16, 2009, at GOLDIN00129392 [GOLDIN00129361].

[396] Int. of W. Casey, Jan. 31, 2013, at 143:14–21.

[397] Int. of S. Ramsey, Dec. 10, 2012, at 82:14–20.

[398] Int. of J. Lombardo, Mar. 18, 2013, at 19:18–20:2.

reduced ResCap's borrowing availability since June 2008."[399] As a result of ResCap's inability to obtain adequate bank financing, AFI provided $3.5 billion in Secured Revolver Facility Loans to ResCap in June 2008. ResCap used $1.75 billion of this amount to repay its outstanding unsecured term loan, and subsequently used the majority of the remaining capacity to fund its June 2008 bond exchange.

AFI also assisted ResCap with monetizing its otherwise illiquid assets. AFI provided the $750 million Resort Finance Facility to ResCap in February 2008 to provide liquidity while Bear Stearns continued marketing Resort Finance. That facility was to be repaid from proceeds of the sale of Resort Finance, which was ultimately purchased by GMAC CF, a subsidiary of AFI. AFI also provided ResCap with the $750 million Secured MSR Facility in April 2008 as a means of providing additional liquidity. AFI increased the $750 million Secured MSR Facility to $1.2 billion in June 2008, arranged for GMAC CF to provide the $600 million Servicing Advance Factoring Facility, and arranged for GMAC CF to purchase Resort Finance, providing an additional $250 million advance on such sale to be credited at closing. Cerberus also purchased certain assets from ResCap for approximately $571 million in the third quarter of 2008.

ResCap also obtained $430 million under the Initial Line of Credit Facility from AFI on November 20, 2008. This facility was a source of contingency funding with borrowings only permitted when ResCap's liquidity fell below certain levels. AFI agreed to purchase ResCap's Canadian subsidiary, ResMor, and advanced ResCap $67 million to be applied to the ultimate purchase price, also in November 2008.

_____

[399] Goldin Associates Presentation to the Committee of Independent Members of the Board of Directors of Residential Capital, LLC Regarding Proposed Amendment to the Secured Line of Credit with GMAC, LLC, dated Dec. 19, 2008, at GOLDIN00129114 [GOLDIN00129101].

ResCap reported in its 2009 audited financial statements that "[t]he market deterioration has led to fewer sources and significantly reduced levels, of liquidity available to finance the Company's operations."[400] ResCap obtained the $370 million Second Line of Credit Facility from AFI on June 1, 2009. That facility was subsequently increased to $470 million on June 12, 2009, and to $670 million on December 21, 2009.

EXHIBIT VI.C.4.d
**ResCap Financing Received from AFI**
**Committed Facilities**
2008 – 2012
*($ in Millions)*

| | Resort Finance Facility | Secured MSR Facility | Secured Revolver Facility | ResMor Loan Facility | Initial Line of Credit Facility | Second Line of Credit Facility | A&R Line of Credit Facility [(1)] | BMMZ Repo Facility |
|---|---|---|---|---|---|---|---|---|
| | *(Secured)* | *(Secured)* | *(Secured)* | *(Secured)* | *(Secured)* | *(Secured)* | *(Secured)* | *(Secured)* |
| 02/21/08 | $750 | | | | | | | |
| 04/18/08 | | $750 | | | | | | |
| 06/01/08 | | $450 | | | | | | |
| 06/04/08 | | | $3,500 | | | | | |
| 11/20/08 | | | | $67 | | | | |
| 11/20/08 | | | | | $430 | | | |
| 06/01/09 | | | | | | $370 | | |
| 06/12/09 | | | | | | $100 | | |
| 12/21/09 | | | | | | $200 | | |
| 12/30/09 | | | | | | | $1,100 | |
| 12/23/10 | | | | | | | $500 [(2)] | |
| 12/21/11 | | | | | | | | $250 |
| 04/10/12 | | | | | | | ($500) [(2)] | |
| | $750 | $1,200 | $3,500 | $67 | $430 | $670 | $1,100 | $250 |

[(1)] *The Initial Line of Credit Facility and Second Line of Credit Facility were merged into a single $1.1 billion facility on Dec. 30, 2009.*
[(2)] *The $500 million capacity added on Dec. 23, 2010 was unsecured. It was subsequently modified from unsecured to secured status on Sep. 23, 2011 and this incremental capacity was eliminated on Apr. 10, 2012.*
*Source: EXAM00122651; EXAM00124455; RC00025831; RC00025655; Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2009), at 89, 90, 208; Residential Capital, LLC, Quarterly Report (Form 10-Q) (Aug. 7, 2009), at 65.*

---

[400] Residential Capital, LLC Consolidated Financial Statements for the Years Ended December 31, 2009 and 2008, dated Feb. 26, 2010, at 10 [EXAM00124455].