As shown in Exhibit VI.C.4.d above, AFI provided support to ResCap through numerous secured financings from 2008 to 2012. ResCap was, however, able to regain limited access to certain third-party financing sources in 2010. On May 13, 2010, Goldin Associates reported to the Independent Directors that banks were considering new financing against residential mortgage assets, compared to late 2009 when mortgage lenders were reducing lines of credit.[401] On May 14, 2010, ResCap entered into two secured financing agreements with third-party lenders with initial maximum facility amounts of $300 million each.[402] ResCap subsequently obtained a $250 million secured financing agreement with BMMZ, a wholly-owned subsidiary of AFI, in December 2011.[403] That facility replaced secured financing agreements with unaffiliated third-party liquidity providers.[404]

### e. ResCap's Creditworthiness

A company's creditworthiness is analyzed on a recurring basis by rating agencies, trade creditors, lenders, bondholders, debt traders, and even regulators in certain industries. Accordingly, relevant indicators for evaluating creditworthiness include credit ratings, outlooks, and market pricing of debt securities. These indicators provide insight into a company's ability to access the capital markets and associated financing costs.

#### (1) Credit Ratings

ResCap was assigned an investment grade rating by Moody's, Fitch, and S&P when it entered the credit markets to seek financing in 2005.[405] As shown in Exhibit VI.C.4.e(1) below, ResCap maintained an investment grade rating with all three credit rating agencies until the seizure of global credit markets in August 2007.

---

[401] Goldin Associates Presentation to the Committee of Independent Members of the Board of Directors of Residential Capital, LLC Regarding the Addition of Certain Assets to the Collateral Package Pledged to Secure the December 30, 2009 Line of Credit with Ally Financial Inc., dated May 13, 2010, at GOLDIN00131489 [GOLDIN00131468].

[402] Residential Capital, LLC Consolidated Financial Statements for the Years Ended December 31, 2010 and 2009, dated Feb. 28, 2011, at 40 [EXAM00123128].

[403] Residential Capital, LLC Consolidated Financial Statements for the Years Ended December 31, 2011 and 2010, dated Mar. 28, 2012, at 10 [EXAM00122651].

[404] Id.

[405] VICTORIA WAGNER & JOHN K. BARTKO, S&P, RESEARCH UPDATE: RESIDENTIAL CAPITAL CORP. ASSIGNED 'BBB-/A-3' RATINGS (Jun. 9, 2005); PHILIP KIBEL & JOHN J. KRIZ, MOODY'S, RATING ACTION: MOODY'S ASSIGNS BAA2 ISSUER RATING TO RESIDENTIAL CAPITAL CORPORATION; RATING OUTLOOK IS NEGATIVE (Jun. 9, 2005); CHRISTOPHER D. WOLFE & PHILIP S. WALKER, JR., FITCH, FITCH ASSIGNS 'BBB' & 'F2' RATINGS TO RESIDENTIAL CAPITAL CORP. (Jun. 9, 2005)

EXHIBIT VI.C.4.e(1)
**ResCap Historical Credit Ratings**
December 2004 – May 2012



*Source: Moody's; Fitch; S&P.*

Following the seizure of the credit markets, Moody's and Fitch downgraded the rating of ResCap's senior debt to non-investment grade on August 16, 2007,[406] triggering a hundred basis point step-up in the interest due under ResCap's bonds.[407] Moody's indicated that the ratings remained under review for possible further downgrade and that its ratings actions reflected:

> [T]he continued, significant funding and valuation volatility in the single-family mortgage market, coupled with ResCap's challenges in restructuring its residential financial group, as well as an adverse business environment that could create further profit pressure at the firm.[408]

Moody's further downgraded ResCap senior debt on November 1, 2007, following the release of ResCap's third-quarter results, its fourth consecutive quarterly loss. Moody's stated:

> The downgrade and negative outlook reflect the company's significant asset quality issues and potential franchise impairment. The non-performing level of ResCap's held-for-investment portfolio is well above its rated peer group across loan types, and Moody's expects elevated provisioning levels for several more quarters . . . Additionally, Moody's has concerns about potential franchise impairment at ResCap . . . 'the current market disruption requires ResCap to shift its origination channel, product mix, and secondary marketing strategies. The business model that will return ResCap to adequate profitability is unclear' . . . . In regards to liquidity, the company is inherently weaker than many of its mortgage banking peers due to its focus on secured market funding versus retail deposits and Federal Home Loan Bank advances. As a result, the company has a very low level of unencumbered assets which leave it vulnerable to disruptions in the wholesale markets.[409]

On November 1, 2007, S&P downgraded ResCap's senior debt to non-investment grade based on unfavorable third-quarter earnings and expectations of continued weak profitability.[410]

---

[406] PHILIP KIBEL & JOHN J. KRIZ, MOODY'S, RATING ACTION: MOODY'S DOWNGRADES RESCAP TO BA1, FROM BAA3; RATINGS REMAIN ON REVIEW DOWN (Aug. 16, 2007), http://www.moodys.com/research/Moodys-downgrades-ResCap-to-Ba1-from-Baa3-ratings-remain-on—PR_139425; MOHAK RAO & PETER SHIMKUS, FITCH, FITCH LOWERS COUNTRYWIDE IDR TO 'BBB+' & RESCAP TO 'BB+' (Aug. 16, 2007).

[407] ResCap Business Update, dated Aug. 21, 2007, at RC00016866 [RC00016856].

[408] PHILIP KIBEL & JOHN J. KRIZ, MOODY'S, RATING ACTION: MOODY'S DOWNGRADES RESCAP TO BA1, FROM BAA3; RATINGS REMAIN ON REVIEW DOWN (Aug. 16, 2007), http://www.moodys.com/research/Moodys-downgrades-ResCap-to-Ba1-from-Baa3-ratings-remain-on—PR_139425.

[409] CRAIG A. EMRICK & BRIAN L. HARRIS, MOODY'S, RATING ACTION: MOODY'S DOWNGRADES RESCAP TO BA3, FROM BA1; OUTLOOK NEGATIVE (Nov. 1, 2007), http://www.moodys.com/research/Moodys-downgrades-ResCap-to-Ba3-from-Ba1-outlook-negative—PR_143543.

[410] JOHN K. BARTKO ET AL., S&P, RESEARCH UPDATE: RESIDENTIAL CAPITAL LLC RATINGS OFF WATCH NEG, LOWERED TO 'BB+/B' FROM 'BBB-/A-3'; OUTLOOK NEG (Nov. 1, 2007).

ResCap's credit rating was further downgraded by Moody's on February 5, 2008. The downgrade reflected the decline in ResCap's liquidity and the risk of its net worth falling below its minimum TNW covenant absent parent support, which was not assured. The downgrade also reflected Moody's view of ResCap's impaired franchise and limited ability to gain market share and return to robust profitability.[411]

Moody's downgraded ResCap again on April 23, 2008, following the announcement of the resignation of the two Independent Directors, stating that "[t]he absence of independent directors increases the likelihood that ResCap will take actions that are negative for creditors."[412]

Following the announcement of a debt exchange offer, ResCap was downgraded by Moody's on to "Ca" (Extremely Speculative) May 2, 2008. Moody's noted:

> Despite the benefits this exchange could have on ResCap's ability to service its debt, the ratings remain under review for downgrade. This is because ResCap has not proven it has a business model that can produce the required operating cash flow to service and ultimately repay these reduced obligations.[413]

S&P also downgraded ResCap to "CC" (Extremely Speculative) on May 2, 2008, noting that "if the [debt] exchange fails, Residential Capital LLC might file for bankruptcy protection."[414]

Moody's again downgraded ResCap's debt rating to "C" (In Default) following AFI's announcement of an exchange offer for certain ResCap debt on November 20, 2008. Moody's noted:

> This transaction illustrates that ResCap cannot produce the required cash flow to service and ultimately repay its obligations. "It is our opinion that ResCap would not be a going concern without support from [AFI]. . . . Each month requires additional support from [AFI] to prevent ResCap from violating its debt covenants and defaulting on its debt service."[415]

---

[411] ROBERT YOUNG & CRAIG A. EMRICK, MOODY'S, RATING ACTION: MOODY'S DOWNGRADES RESCAP TO B2, OUTLOOK NEGATIVE (Feb. 5, 2008), http://www.moodys.com/research/Moodys-downgrades-ResCap-to-B2-outlook-negative—PR_148851.

[412] ROBERT YOUNG & CRAIG A. EMRICK, MOODY'S, RATING ACTION: MOODY'S DOWNGRADES RESCAP TO CAA1, RATINGS ON REVIEW DOWN (Apr. 23, 2008), http://www.moodys.com/research/Moodys-downgrades-ResCap-to-Caa1-ratings-on-review-down—PR_153927.

[413] ROBERT YOUNG & CRAIG A. EMRICK, MOODY'S, RATING ACTION: MOODY'S DOWNGRADES RESCAP TO CA, RATING UNDER REVIEW DOWN (May 2, 2008), http://www.moodys.com/research/Moodys-downgrades-ResCap-to-Ca-rating-under-review-down—PR_154705.

[414] JOHN K. BARTKO ET AL., S&P, RESEARCH UPDATE: RESIDENTIAL CAPITAL LLC DOWNGRADED TO 'CC'; STILL ON CREDIT WATCH NEGATIVE (May 2, 2008).

[415] ROBERT YOUNG & CRAIG A. EMRICK, MOODY'S, RATING ACTION: MOODY'S DOWNGRADES RESCAP TO C (Nov. 20, 2008), http://www.moodys.com/research/Moodys-downgrades-ResCap-to-C—PR_167799.

Moody's and Fitch maintained ResCap at their respective "In Default" grades throughout 2009.[416] S&P upgraded ResCap within the non-investment grade category during 2009.[417] Citing the expected improvement in ResCap's TNW resulting from the 2009 Bank Transaction, S&P raised ResCap's rating to "CCC" (In Poor Standing) in February 2009 following AFI's receipt of TARP funding in December 2008.[418] On December 31, 2009, Moody's reported that the $2.7 billion capital infusion from AFI:

> [A]lthough positive, [was] insufficient to stabilize the company . . . Moody's considers ResCap's obligations to be highly speculative as the company has been unprofitable on a quarterly basis for three years, its liquidity position is tenuous, capital insufficient and franchise impaired . . . . [T]he company has significant maturities in the first half of 2010 which it is unable to service with its current liquidity resources while staying compliant with its covenant to maintain liquidity of $750 million daily and unrestricted liquidity of $250 million daily.[419]

S&P again raised its rating to "B" (Highly Speculative) in January 2010 after the U.S. Treasury converted its preferred investment in AFI to common equity, [420] while Moody's and Fitch maintained ResCap at their respective "In Default" grades throughout 2010.

S&P once again upgraded its rating of ResCap to "B+" (Highly Speculative) on May 4, 2011, noting improved capital, credit quality, earnings, and liquidity.[421] However, S&P cautioned that "ResCap's financial status remains tenuous and its capital slim. Our rating on ResCap reflects the funding and capital support [AFI] has provided. Any change in [AFI's] willingness or ability to support ResCap—which we don't expect—would likely pressure ResCap's rating substantially."[422] Moody's and Fitch also upgraded ResCap in 2011, with Moody's moving to "Ca" (Extremely Speculative) and Fitch to "B" (Highly Speculative) in

―――――――――――――――――――――――――

[416] *See* Exhibit VI.C.4.e(1).

[417] *See* Exhibit VI.C.4.e(1).

[418] John K. Bartko et al., S&P, Research Update: Gmac LLC and Residential Capital LLC Ratings Raised to 'CCC/C'; Outlook Negative (Feb. 4, 2009).

[419] Robert Young & Craig A. Emrick, Moody's, Announcement: Moody's: Although Positive, ResCap Not Stabilized by GMAC Actions (Dec. 31, 2009), http://www.moodys.com/research/Moodys-Although-positive-ResCap-not-stabilized-by-GMAC-actions—PR_192808.

[420] John K. Bartko & Vikas Jhaveri, S&P, Research Update: GMAC Inc., Residential Capital LLC Ratings Raised to 'B' From 'CCC', Outlook Stable (Jan. 27, 2010).

[421] Brenden Brown & John K. Bartko, S&P, Research Update: Ally Financial Inc., Residential Capital Rating Raised To 'B+' from 'B' (May 4, 2011).

[422] *Id.*

February 2011.[423] The upgrades were short lived; by November 2011, both S&P and Fitch had downgraded ResCap once again to "CCC" (In Poor Standing), noting deterioration in year-to-date performance.[424] All three agencies subsequently downgraded ResCap, to an "In Default" rating by the Petition Date.

As discussed above, ResCap lost its investment credit rating in August 2007 and was subsequently rated speculative or highly speculative through the Petition Date. The rating actions reflected the significant increase in ResCap's credit risk throughout this time period.

### (2) Bond And CDS Pricing

The credit concerns of the major credit rating agencies were echoed by the broader market as indicated by the trading prices of ResCap's debt. As shown in Exhibit VI.C.4.e(2)—1 below, the pricing of ResCap's 6.5% bond maturing April 17, 2013, which had been trading around par since issuance, began to decline in 2007, reaching 67% of par on August 16, 2007, and declined further in the following months, falling to 53% of par by November 19, 2007.[425]

---

[423] Marc L. Wasden & Robert Young, Moody's, Rating Action: Moody's Upgrades Ally Financial Senior Unsecured to B1, ResCap to Ca (Feb. 7, 2011), http://www.moodys.com/research/Moodys-upgrades-Ally-Financial-senior-unsecured-to-B1-ResCap-to- PR_213605; Mohak Rao & Peter Shimkus, Fitch, Fitch Upgrades ResCap's IDR to 'B'; Outlook Stable (Feb. 3, 2011).

[424] Brendan Browne & John K. Bartko, S&P, Research Update: Residential Capital LLC Rating Lowered to 'CCC' and Placed on CreditWatch Negative (Nov. 10, 2011); Mohak Rao & Justin Fuller, Fitch, Fitch Downgrades ResCap's IDR to 'CCC' (Nov. 11, 2011).

[425] Pricing per Interactive Data Corporation.

EXHIBIT VI.C.4.e(2)—1
**ResCap Bond Pricing Activity**
May 31, 2006 – August 31, 2012



Source: Pricing per Advantage Data Inc.; Interactive Data Corporation.

The price of five-year CDS on ResCap secured debt increased from 141 bps on May 31, 2007 to 1,372 bps on August 21, 2007, signaling significant financial distress.[426] The price increased to 3,021 bps by November 20, 2007, meaning a buyer of protection against a ResCap default would need to pay over 30% of the face amount being protected. At that time, CDS protection on ResCap became more expensive than similar protection on its peers. The CDS spread on Countrywide, which had also been downgraded in August 2007, increased to 265 bps price in August, while the spread for WaMu CDS increased to 120 bps.[427] As shown in Exhibit VI.C.4.e(2)—2 below, the market prices for ResCap's credit default swaps indicated the market's decreasing confidence in the adequacy of ResCap's capitalization and ability to perform on its obligations as they matured.

---

[426] Pricing per Advantage Data Inc.

[427] GMAC Bank "Counterparty Exposure Review: ResCap" Presentation, dated Oct. 2007, at ALLY _PEO_0006067 [ALLY_PEO_0005941].

EXHIBIT VI.C.4.e(2)—2
**ResCap Credit Default Swap Spreads** [1]
August 1, 2005 – December 31, 2011



[1] *Five year CDS spreads depicted; one year CDS spreads not depicted. Default probabilities per contemporaneous analyst commentary.*
[2] *Karen Brettell, US Credit –ResCap Debt Risk as Swaps Imply Distress, REUTERS, Aug. 21, 2007,*
  *http://uk.reuters.com/article/2007/08/21/markets-credit-idUKN2157256720070821.*
[3] *Karen Brettell, US Credit –ResCap Swaps Imply 72 Percent Default Risk, REUTERS, Nov. 20, 2007,*
  *http://www.reuters.com/article/2007/11/20/markets-credit-idUKN205364462007120.*
[4] *Ari Levy & Caroline Salas, GMAC's $60 Billion Deal Loses Traction as Cash Burns (Update1), BLOOMBERG, Jun. 24, 2008,*
  *http://www.bloomberg.com/apps/news?pid=newsarchive&refer=home&sid=aFREd.COhlF4.*
*Source: Pricing per Advantage Data Inc.*

ResCap initiated a tender offer to repurchase up to $750 million of certain of its senior unsecured notes on November 21, 2007. The purchase of those notes at a discount was intended to "increase ResCap's income in the fourth quarter of 2007 and its consolidated [TNW] as of the end of the year above the levels that would have occurred in the absence of acquiring notes pursuant to the tender offer."[428] Pricing on ResCap's 6.115% bond due in 2009 improved "to 69.63 cents on the dollar . . . from 60.25 cents"[429] following the announcement of its tender offer. However, analysts were "wary of the lowest dollar/longest maturity bonds because [they] believe[d] Cerberus [would] only put a finite amount of time/additional capital to turn around ResCap" and "the risk of ResCap sliding into bankruptcy remain[ed]."[430] ResCap's bondholders tendered $389 million of ResCap's outstanding unsecured debt and in December 2007 ResCap recognized $152 million of income on extinguishment of debt pursuant to the tender offer.[431]

---

[428] Residential Capital, LLC, Current Report (Form 8-K) (Nov. 21, 2007), Ex. 99.1, at 2.

[429] Karen Brettell, *US CREDIT–ResCap Debt Improved, Cerberus Support Key,* REUTERS, Nov. 27, 2007, http://www.reuters.com/article/2007/11/27/markets-credit-idUSN2756015020071127.

[430] *Id.*

[431] Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2008), at 58, 79.

It was publicly reported in December 2007 that by mid-November, the purchase of five-year default insurance on ResCap bonds "cost more than 40 points up front and 500 basis points per year," which meant "buying protection on $10 million of ResCap bonds cost more than $4 million up front plus $500,000 per year."[432] The five-year CDS spread on ResCap's secured debt increased significantly in 2008, indicating a further increase in default risk. ResCap's spreads reached 15,372 bps in November 2008, which mirrored the decline in its bond pricing and signaled an expected bankruptcy. According to a market analyst: "ResCap's credit default swaps have been trading at levels that indicate investors have been expecting bankruptcy since the fall of 2007."[433] Similarly, the pricing of ResCap's 6.5% bond maturing in 2013 continued to decline in 2008, decreasing to 40% of par on June 27, 2008, and then declining further to 9% of par on November 25, 2008.

The pricing of ResCap's 6.5% bond maturing in 2013 increased significantly during the first half of 2009, from 20 on January 5, 2009, to 70 on May 22, 2009. As previously discussed in Section VI.B, the market prices of ResCap's publicly traded securities post TARP no longer reflected the economic fundamentals of ResCap's business. This anomaly became even clearer in January 2010, after AFI disclosed that it had received an additional $3.8 billion from the U.S. Treasury and that AFI would contribute $2.7 billion to ResCap:

> The cost of insuring ResCap's debt in the credit default swap market [p]lunged to a spread equivalent of around 887 basis points, or $887,000 per year for five years to insure $10 million in debt, from more than 2,200 basis points, indicating significantly lower expectations of a default, according to Markit Intraday. ResCap's 8.375 percent bond due 2010 jumped to 94 cents on the dollar from 61 cents in mid-December, when it was last actively traded, according to MarketAxess.[434]

---

[432] MICHAEL LEWITT, THE WAGES OF FINANCIAL SIN (undated), *reprinted in* John Mauldin*, Credit Crunch Withdrawal of Capital as General Motors and Freddie Mac Stare into the Abyss*, THE MARKET ORACLE, Dec. 4, 2007, http://www.marketoracle.co.uk/Article2975.html.

[433] Cynthia Koons, *ResCap Bonds Command Pricey Insurance*, WALL ST. J., Aug. 2, 2008, http://online.wsj.com/article/SB121759683223604485.html.

[434] Karen Brettell, *US Credit–ResCap Rallies on Capital Support, Risks Remain*, REUTERS, Jan. 4, 2010, http://www.reuters.com/article/2010/01/04/markets-credit-idUSN0457155120100104.

Although the distressed debt trading market may have interpreted the U.S. Treasury support and AFI capital contribution as a sign of stability for ResCap, certain analysts expressed concern:

> Moody's Investors Service said [t]hat the capital injection, while positive for ResCap, would not be sufficient to stabilize the company. The rating agency also cited the risk of further deterioration in the company's mortgage securities remains and that government support for the unit could ebb. 'Should parental support be discontinued, we believe ResCap would eventually default on its obligations and unsecured creditors would face substantial losses,' Moody's said.[435]

#### f.   Other Considerations

##### (1) ResCap's Operating Cash Flow

Operating cash flow is a measure of a company's ability to generate cash from operating its business, as opposed to cash from financing or investing activities. The analysis of operating cash flow measures a company's ability to generate cash to meet its debt service obligations and reinvest in its operations. The analysis of operating cash flow also necessarily includes testing a company's ability to weather reasonably foreseeable downsides, stresses, and contingencies.

ResCap developed a liquidity reporting process in December 2007 which was referred to as Executive Liquidity Reports ("ELRs"). The ELRs, which were issued weekly through 2010 and monthly thereafter, provided projections of cash flows for the subsequent twelve months. Each of the ELRs, prepared at or around the end of each quarter from December 2007 through March 2010, projected substantial negative cash flows over the subsequent twelve month projection period. Further, the ELRs indicated that ResCap's projected operating cash flows were insufficient to service its debt obligations after December 2007, as shown in Exhibits VI.C.4.f(1)—1 and VI.C.4.f(1)—2 below.

---

[435] *Id.*

EXHIBIT VI.C.4.f(1)—1
**ResCap Projected Operating Cash Flow After Debt Service**
**Rolling One-Year Projections per Executive Liquidity Reports (ELR)**
December 31, 2007 – March 31, 2013
*($ in Millions)*



*Source: ALLY_0193580; ALLY_0193670; ALLY_0194078; ALLY_0194181; ALLY_0194266; ALLY_0297477; ALLY_0383598;*
*ALLY_PEO_0084328; EXAM10055830; EXAM10055877; EXAM10055944; EXAM10055957; EXAM10055973; EXAM10056015;*
*EXAM10056051; EXAM10056078; EXAM10056100; EXAM10056125.*

EXHIBIT VI.C.4.f(1)—2
**ResCap Projected Twelve Month Net Cash Flow**
December 31, 2007 – March 31, 2013
*($ in Millions)*

| ELR Report Date | Projected Operating Cash Flow | Projected Interest and Principal Payments | Projected Operating Cash Flow After Debt Service | Projected Asset Sale Proceeds | Projected Net Cash Activity | Projected Ending Unrestricted Liquidity |
|---|---|---|---|---|---|---|
| 12/31/07 | $3,475 | ($5,460) | ($1,984) | - | ($1,984) | $284 |
| 03/31/08 | 1,429 | (4,840) | (3,411) | - | (3,411) | (2,418) |
| 06/30/08 | 400 | (1,770) | (1,369) | - | (1,369) | (295) |
| 10/06/08 | (1,312) | (1,654) | (2,966) | - | (2,966) | (2,824) |
| 12/29/08 | (1,623) | (1,450) | (3,073) | - | (3,073) | (2,465) |
| 03/30/09 | (883) | (1,161) | (2,044) | - | (2,044) | (923) |
| 06/29/09 | (1,440) | (1,660) | (3,101) | - | (3,101) | (2,889) |
| 09/28/09 | (800) | (2,098) | (2,899) | - | (2,899) | (2,629) |
| 12/28/09 | 298 | (2,000) | (1,702) | - | (1,702) | (1,502) |
| 03/22/10 | 129 | (1,979) | (1,850) | $117 | (1,733) | (1,475) |
| 07/05/10 | 333 | (642) | (308) | 479 | 171 | 520 |
| 09/13/10 | 218 | (1,496) | (1,278) | 1,225 | (54) | 352 |
| 12/06/10 | 82 | (424) | (342) | 73 | (269) | 121 |
| 03/21/11 | 547 | (638) | (91) | 106 | 15 | 300 |
| 06/20/11 | 442 | (470) | (28) | - | (28) | 300 |
| 10/10/11 | 339 | (571) | (232) | 91 | (141) | 300 |
| 01/16/12 | 349 | (375) | (26) | - | (26) | 300 |
| 04/16/12 | 1,141 | (1,197) | (56) | - | (56) | 311 |

Source:  ALLY_0193580; ALLY_0193670; ALLY_0194078; ALLY_0194181; ALLY_0194266; ALLY_0297477; ALLY_0383598;
ALLY_PEO_0084328; EXAM10055830; EXAM10055877; EXAM10055944; EXAM10055957; EXAM10055973; EXAM10056015;
EXAM10056051; EXAM10056078; EXAM10056100; EXAM10056125.

### (2) ResCap's Projections

A central component of evaluating adequacy of capital and the viability of a business is an analysis of contemporaneous financial projections, including an assessment of the purpose for such projections and whether such projections were "reasonable and prudent" when made.[436] Such projections must be carefully scrutinized and evaluated in light of prior company performance, existing business, industry and economic trends, and reasonably foreseeable downsides, stresses, and contingencies.

---

[436] *Statutory Comm. of Unsecured Creditors ex rel. Iridium Operating LLC v. Motorola, Inc.* (*In re Iridium Operating LLC*), 373 B.R. 283, 345 (Bankr. S.D.N.Y. 2007) (citation omitted).

ResCap's ability to prepare reliable financial projections diminished after 2006 because of the rapid deterioration within its businesses, the concomitant deterioration within the mortgage industry, and global economy, among other causes. This is evident in the significant variance between ResCap's actual results as compared to its financial projections, as summarized in Exhibit VI.C.4.f(2)—1 below.

EXHIBIT VI.C.4.f(2)—1
**ResCap Financial Performance and Projections - Net Income (Loss)**
2006 – 2011
*($ in Millions)*

|  | Net Income (Loss) | | Variance |
| --- | --- | --- | --- |
| **Year Ended** | **Plan** | **Actual** | **from Plan** |
| 12/31/06 | $951 | $705 | ($246) |
| 12/31/07 | 1,015 | (4,346) | (5,361) |
| 12/31/08 | (1,718) | (5,611) | (3,893) |
| 12/31/09 | (1,072) | (4,544) | (3,472) |
| 12/31/10 | 367 | 575 | 208 |
| 12/30/11 | 311 | (845) | (1,156) |

*Source:  EXAM00122651; EXAM00123128; EXAM00124455; EXAM00295529; RC40007361; RC40012214; RC40012974; RC40015763; RC40017167; Residential Capital, LLC, Annual Report (Form 10-K) (Mar. 13, 2007), at 101; Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2008), at 101; Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2009), at 119.*

In addition to the external factors affecting ResCap's ability to prepare reliable financial projections, ResCap had internal limitations as noted by David Applegate, ResCap's co-CEO, in January 2007 when he expressed "low confidence in [ResCap's] ability to predict HFI non-prime performance" because ResCap did not have "good tools" and "non-prime [HFI] and [MSRs] are difficult to forecast."[437] Flees, ResCap's controller and chief accounting officer, stated that the industry's historical models "were failing to predict what was going on."[438]

ResCap projected net income of $1.015 billion for 2007 in its 2007 Plan.[439] The net income projected for 2007 was virtually identical to the net income that ResCap had achieved in 2005 of $1.021 billion, prior to the downturn in the mortgage industry. As shown in Exhibit VI.C.4.f.(2)-2, despite ResCap having incurred a loss of $233 million in 2006, excluding the $415 million gain on sale of equity investments and $523 million gain on conversion to LLC, its 2007 Plan predicted a return its 2005 levels of performance in 2007. Further, ResCap's 2007 Plan projected continued growth in net income from 2007 through 2009, irrespective of the

---

[437] E-mail from D. Applegate (Jan. 27, 2007), at EXAM10163217 [EXAM10163216].

[438] Int. of R. Flees, Jan. 18, 2013, at 92:12–93:4.

[439] ResCap 2007–2009 Operating Plan Review, dated Dec. 2006, at RC40012385 [RC40012214] ("2007 Plan").

explicit assumption that the mortgage industry was in the midst of a significant downturn.[440] ResCap's 2007 Plan was not sufficiently grounded in recent events occurring within the Company or the industry. ResCap ultimately reported a net loss of $4.3 billion for 2007 (as compared to plan of $1.015 billion net income) as the downturn in the mortgage industry accelerated throughout the year.[441]



EXHIBIT VI.C.4.f(2)—2
**ResCap Net Income – Actual and 2007 Plan**
2005 – 2009
*($ in Millions)*

*(1) 2006 actual net income was adjusted to exclude $415 million gain on sale of equity investments and $523 million gain on conversion to LLC.*

*Source: Residential Capital Corporation, Annual Report (Form 10-K) (Mar. 28, 2006), at 95; Residential Capital, LLC, Annual Report (Form 10-K) (Mar. 13, 2007), at 101; ResCap 2007–2009 Operating Plan Review, dated Dec. 2006, at RC40012386 [RC40012214].*

ResCap's 2008 Plan[442] assumed risk reduction and shrinkage of ResCap's balance sheet through asset disposition and run-off to manage income statement volatility, limitation

---

[440] The 2007 Plan included an updated assessment of the market which reflected continued weakness in the mortgage industry for 2007 and only modest improvement in 2008. The 2007 Plan made specific reference to the rapid downturn in median home prices which occurred in 2006 and the implications for future delinquencies. The 2007 Plan noted that the housing market was cooling, that there was going to be an increase in 2007 delinquencies, and that margins would continue to fall. *Id.* at RC40012380, RC40012384.

[441] Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2008), at 56.

[442] ResCap Global Debt Restructuring Due Diligence Presentation, dated Mar. 13, 2008, at RC40007365 [RC40007361] ("2008 Plan").

of U.S. loan production to assets with market liquidity, and limitation of international production to assets with known exit strategies.[443] A net loss of $1.7 billion was projected for 2008, as compared to the actual net loss of $4.3 billion in 2007.[444] The 2008 Plan assumed "modest market improvement in late 2009 and into 2010,"[445] resulting in projected net income of $34 million for 2009, and $296 million for 2010.[446]

However, ResCap's ELRs issued in 2008 indicated that ResCap was downwardly revising its cash flow forecasts as the year progressed, as shown in Exhibit VI.C.4.f(2)—3 below. ELRs issued at or around each quarter end indicated that ResCap had difficulty providing reasonable forecasts of its cash flows on a quarterly basis. The ELR prepared as of March 31, 2008 forecasted operating cash flow of $9 million for the second quarter of 2008, compared to approximately $1.7 billion that had been forecasted for the same period in the ELR prepared just ninety days earlier. Further, the forecasted operating cash flow for the second half of 2008, as prepared on March 31, 2008, was almost identical to that projected as of December 31, 2007, notwithstanding the forecasted 99.5% reduction in operating cash flow for the second quarter of 2008.

EXHIBIT VI.C.4.f(2)—3
**ResCap Projected Operating Cash Flow**
Quarter 1, 2008 – Quarter 4, 2008
*($ in Millions)*

| Report Date | Q1 2008 | Q2 2008 | Q3 2008 | Q4 2008 |
|---|---|---|---|---|
| 12/31/07 | $492 | $1,670 | $840 | $474 |
| 03/31/08 | | 9 | 774 | 460 |
| 06/30/08 | | | 461 | (237) |
| 10/06/08 | | | | (970) |

*Source: Draft ResCap Executive Liquidity Report, dated Dec. 31, 2007 [EXAM10055830]; ResCap Executive Liquidity Report, dated Mar. 31, 2008 [EXAM10055877]; ResCap Executive Liquidity Report, dated Jun. 30, 2008 [EXAM10055944]; ResCap Executive Liquidity Report, dated Oct. 6, 2008 [EXAM10055957].*

---

[443] *Id.* at RC40007386.

[444] *Compare* ResCap Global Debt Restructuring Due Diligence Presentation, dated Mar. 13, 2008, at RC40007389 [RC40007361] ("2008 Plan"), *with* Residential Capital, LLC, Current Report (Form 8-K) (Feb. 5, 2008), Ex. 99.1, at 1 (noting AFI contribution to ResCap of $1.5 billion (face value) of ResCap's debt purchased in the open market, and ResCap recognition of a gain of $521 million on debt extinguishment in the fourth quarter of 2007; ResCap's operating loss for 2007 would have been $4.9 billion excluding the gain on debt extinguishment).

[445] ResCap Global Debt Restructuring Due Diligence Presentation, dated Mar. 13, 2008, at RC40007386 [RC40007361].

[446] *Id.* at RC40007389.

ResCap incurred an actual net loss of $5.6 billion in 2008, compared to the projected loss of $1.7 billion in the 2008 Plan.[447] Excluding gains on debt extinguishment, ResCap's operating loss for 2008 was $7.5 billion.[448]

ResCap projected a loss of $1.1 billion for 2009 in its 2009 Plan,[449] after incurring losses of $7.5 billion in 2008 and losses of $4.9 billion in 2007, excluding gains on debt extinguishment.[450] ResCap's 2009 Plan focused on "leveraging ResCap's capital market expertise and winding down [its] non-core businesses" after the sale of ResCap's interest in Ally Bank and ResMor.[451] In 2009, ResCap continued to assume recovery in its financial performance that was not reasonably supported by its actual results in prior periods or by its prior performance against previous financial projections. ResCap's financial performance in 2009 continued to be negatively affected by distressed conditions in the mortgage industry, which led to higher credit related costs and losses from disposition of its international assets. ResCap incurred a net loss of $4.5 billion in 2009, compared to the projected loss of $1.1 billion in the 2009 Plan.[452] ResCap's actual operating loss for 2009 was $6.3 billion, excluding gains on debt extinguishment.[453]

The overall economy became more stable in 2010 compared to 2009, as several measures of economic activity showed positive trends. Mortgage rates had fallen to historic lows in 2009. These historic lows benefitted homeowners and homebuyers, if not necessarily the business of mortgage servicing. The FRB cut its target funds rate to near zero, reaching 0.01%

---

[447] *Compare* Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2009), at 119, *with* 2008 Plan, at RC40007389.

[448] *See* Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2009), at 119.

[449] ResCap 2009 Business Plan Review, dated Mar. 26, 2009, at EXAM00295545 [EXAM00295529] ("2009 Plan").

[450] *See* Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2009), at 119.

[451] ResCap 2009 Business Plan Review, dated Mar. 26, 2009, at EXAM00295530 [EXAM00295529].

[452] *Compare* Residential Capital, LLC Consolidated Financial Statements for the Years Ended December 31, 2009 and 2008, dated Feb. 26, 2010, at 5 [EXAM00124455], *with* ResCap 2009 Business Plan Review, dated Mar. 26, 2009, at EXAM00295545 [EXAM00295529].

[453] *See* Residential Capital, LLC Consolidated Financial Statements for the Years Ended December 31, 2009 and 2008, dated Feb. 26, 2010, at 5 [EXAM00124455].

in December 2009.[454] The yield curve, which had inverted in 2006 and 2007 when short-term interest rates exceeded long-term rates, had normalized as the FRB held short-term rates low.[455] Marano stated that he believed the mortgage and capital markets business to be "a very good opportunity in 2010."[456] ResCap reported net income of $575 million for 2010, compared to its plan of $367 million.[457]

ResCap projected net income of $311 million for 2011 in its 2011 Plan.[458] The 2011 Plan projected lower net revenue and net income for 2011 than the 2010 Plan as a result of lower production and margins.[459] ResCap's financial performance turned down again in 2011, resulting in a net loss of $845 million,[460] primarily because of losses on the valuation and hedging of its servicing assets, additional reserves for representation and warranty expenses, and mortgage-related fines levied by government agencies.

### (3) ResCap's Leverage

An analysis of capital adequacy should also consider the degree to which leverage is used in a company's capital structure and business plan. Highly leveraged companies will likely have greater exposure to losses in downside environments and will have fewer capital resources, such as unencumbered assets and excess borrowing capacity, to obtain needed funds.

---

[454] The FRB Federal Open Market Committee stated in part:

> The Committee will maintain the target range for the federal funds rate at 0 to 1/4 percent and continues to anticipate that economic conditions, including low rates of resource utilization, subdued inflation trends, and stable inflation expectations, are likely to warrant exceptionally low levels of the federal funds rate for an extended period. To provide support to mortgage lending and housing markets and to improve overall conditions in private credit markets, the Federal Reserve is in the process of purchasing $1.25 trillion of agency mortgage-backed securities and about $175 billion of agency debt. In order to promote a smooth transition in markets, the Committee is gradually slowing the pace of these purchases, and it anticipates that these transactions will be executed by the end of the first quarter of 2010. The Committee will continue to evaluate the timing and overall amounts of its purchases of securities in light of the evolving economic outlook and conditions in financial markets.

Press Release, FRB, Untitled Fed. Open Market Comm. Statement (Dec. 16, 2009), http://www.federalreserve.gov/newsevents/press/monetary/20091216a.htm.

[455] Larry Kudlow, *The Yield Curve Is Signaling Bigger Growth* (Dec. 22, 2009), http://www.creators.com/opinion/lawrence-kudlow/the-yield-curve-is-signaling-bigger-growth.html.

[456] Int. of T. Marano, Nov. 26, 2012, at 71:23–72:18.

[457] *Compare* Residential Capital, LLC Consolidated Financial Statements for the Years Ended December 31, 2010 and 2009, dated Feb. 28, 2011, at 5 [EXAM00123128], *with* ResCap Preliminary 2010–2012 Business Plan, dated Mar. 19, 2010, at RC40015782 [RC40015763] ("2010 Plan").

[458] ResCap Preliminary 2011–2013 Business Plan, dated Dec. 22, 2010, at RC40017182, RC40017189 [RC40017167] ("2011 Plan").

[459] *Id.* at RC40017189.

[460] Residential Capital, LLC Consolidated Financial Statements for the Years Ended December 31, 2011 and 2010, dated Mar. 28, 2012, at 5 [EXAM00122651].

ResCap entered the 2006 industry downturn in a highly-leveraged position. ResCap incurred significant losses as it reduced its business and equity base to a fraction of its 2005 levels as the industry downturn progressed. ResCap's reported equity as of December 31, 2011 was only 1.2% of its December 31, 2005 balance.[461] ResCap was unable to service its fixed charges, primarily interest expense, with its operating income in 2006 through 2009, and again in 2011.[462]

Leverage can be measured by analyzing various financial ratios. The following financial ratios were calculated and analyzed for the period of 2005 to 2011 to evaluate ResCap's leverage: (1) debt to capitalization (book value)—interest bearing debt divided by the sum of interest bearing debt and book value of equity; and (2) fixed charge ratio—earnings before taxes and interest divided by interest expense.

### (a) Debt To Capitalization (Book Value)

The debt-to-capitalization ratio is a financial measure of leverage that evaluates the proportion of invested capital funded by debt relative to the total capitalization of a company. As shown in Exhibit VI.C.4.f(3)(a) below, ResCap was highly leveraged from its inception, with debt representing 93% of its total capitalization. ResCap's declining equity base resulted in further deterioration of this ratio after 2007, except in 2010 when ResCap's financial position improved briefly.

---

[461] *Compare* Residential Capital Corporation, Annual Report (Form 10-K) (Mar. 28, 2006), at 94, *with* Residential Capital, LLC Consolidated Financial Statements for the Years Ended December 31, 2011 and 2010, dated Mar. 28, 2012, at 4 [EXAM00122651].

[462] *See* Section VI.C.4.f(3)(b) (discussing ResCap's fixed charge ratio).

EXHIBIT VI.C.4.f(3)(a)
**ResCap Financial Ratios – Debt as Percentage of Capitalization** [(1)]
December 31, 2005 – December 31, 2011
*($ in Millions)*

|  | **Total Debt** | **Book Equity** | **Total Capitalization** | **Debt as Percentage of Capitalization** |
|---|---|---|---|---|
| 12/31/05 | $103,576 | $7,464 | $111,040 | 93% |
| 12/31/06 | 105,901 | 6,082 | 111,983 | 95% |
| 12/31/07 | 50,981 | 4,045 | 55,026 | 93% |
| 12/31/08 | 19,746 | 358 | 20,104 | 98% |
| 12/31/09 | 11,394 | 275 | 11,669 | 98% |
| 12/31/10 | 8,049 | 846 | 8,895 | 90% |
| 12/30/11 | 6,725 | 92 | 6,817 | 99% |

*[(1)] The above analysis excludes debt and equity related to Ally Bank.*
*Source: EXAM00122651; EXAM00123128; EXAM00124455; EXAM0012546. EXAM00125532; Residential Capital*
*    Corporation, Annual Report (Form 10-K) (Mar. 28, 2006), at 94; Residential Capital, LLC, Annual Report (Form 10-K) (Mar. 13,*
*    2007), at 100; Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2008), at 100; Residential Capital, LLC, Annual*
*    Report (Form 10-K) (Feb. 27, 2009), at 118.*

### (b) Fixed Charge Ratio

The fixed charge ratio compares an entity's earnings before tax and interest to its interest expense. This ratio is a measure of whether a company is able to service its fixed obligations—primarily financing expenses—with its operating income.

ResCap's reported net income included one-time items such as gains from sale of equity investments, gains on debt extinguishment, gains on its conversion to an LLC, and goodwill impairment, all of which were excluded for purposes of an analysis of ResCap's fixed charge ratio for the period of 2005 through 2011. As shown in Exhibits VI.C.4.f(3)(b)—1 and VI.C.4.f(3)(b)—2 below, ResCap had insufficient operating income to cover its fixed charges in 2006 and 2007. In 2008 and 2009, ResCap's fixed charge ratio turned negative as ResCap incurred operating losses before interest expense during those years. ResCap recorded an operating profit in 2010, primarily due to an increase in net revenues from servicing asset valuation and hedge activities, and a decrease in representation and warranty-related expenses. This resulted in improved fixed charge coverage for 2010. The improved fixed charge coverage reversed in 2011, when ResCap again incurred operating losses before interest expense.



EXHIBIT VI.C.4.f(3)(b)—1
**ResCap Fixed Charge Ratio** [1]
December 31, 2005 – December 31, 2011



[1] *Fixed charge ratio is a measure of the operating earnings available to a company to service its fixed obligations. Earnings/(Deficit) in the above analysis were adjusted to exclude gain on sale of equity investments, gain on conversion to LLC , goodwill impairment, impairment of held-for-sale businesses and gain on debt extinguishment.*

*Source: EXAM00122651; EXAM00123128; EXAM00124455; Residential Capital Corporation, Annual Report (Form 10-K) (Mar. 28, 2006), at 95; Residential Capital, LLC, Annual Report (Form 10-K) (Mar. 13, 2007), at 101; Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2008), at 101; Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2009), at 119.*

EXHIBIT VI.C.4.f(3)(b)—2
**ResCap Earnings/(Deficit) in Excess of Fixed Charges** [1]
December 31, 2005 – December 31, 2011
*($ in Millions)*



[1] *Earnings/(Deficit) in the above analysis were adjusted to exclude gain on sale of equity investments, gain on conversion to LLC, goodwill impairment, impairment of held-for-sale businesses and gain on debt extinguishment.*
*Source: EXAM00122651; EXAM00123128; EXAM00124455; Residential Capital Corporation, Annual Report (Form 10-K) (Mar. 28, 2006), at 95; Residential Capital, LLC, Annual Report (Form 10-K) (Mar. 13, 2007), at 101; Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2008), at 101; Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2009), at 119.*

Taken together, these ratios show that ResCap was highly leveraged at all relevant times. This leverage increased ResCap's operational risk, restricted its flexibility, and limited its ability to weather economic downturns, all of which became evident in the Summer of 2007 through the Petition Date.

### (4) ResCap's Financial Support Received From AFI

#### (a) Summary

AFI's financial support was critical to ResCap's survival from 2007 through 2011. Recognizing that ResCap's risk profile had worsened with the decline in the residential mortgage industry in 2007 and 2008, AFI engaged in an ongoing process of infusing capital and/or liquidity into ResCap to avoid imminent covenant or payment defaults. Such infusions were insufficient, however, to address ResCap's chronic undercapitalization that commenced on or about August 15, 2007, and continued through the Petition Date. Instead, the evidence indicates that those capital infusions were defensive in nature, not only forestalling a potential bankruptcy filing by ResCap, but also protecting AFI from the consequences of such a filing. These consequences included potential cross defaults across various AFI credit agreements that could, in turn, have resulted in the bankruptcy of AFI, the potential for federal regulators to seize Ally Bank or ResCap's interest therein, and the potential for the GSEs to terminate servicing contracts with ResCap.

### (b) Capital Support

The capital support received from AFI over the relevant time period is particularly relevant (although not determinative) to the Examiner's evaluation of ResCap's capitalization. AFI infused more than $8 billion in capital into ResCap from 2007 through 2012 in the form of $2.6 billion in direct contributions of cash, $3.8 billion in debt forgiveness, and $2 billion in other assets. Generally, AFI's contributions of cash to ResCap were made in an effort to address imminent liquidity needs, whereas contributions of debt were made to address impending covenant issues. The nature of the contributions made by AFI to ResCap is therefore both informative as to, and symptomatic of, ResCap's larger capitalization issues at the time of such contribution.

That ResCap was subject to financial covenants under certain of its credit facilities is important in an analysis of ResCap's capitalization and leverage. Before June 2008, the most restrictive covenant required that ResCap maintain quarterly minimum consolidated TNW of $5.4 billion.[463] Following the June 2008 debt restructuring, ResCap was subject to new financial covenants that included a monthly minimum consolidated TNW requirement of $250 million (excluding the equity ResCap held in Ally Bank), minimum daily consolidated liquidity of $750 million, and unrestricted liquidity of $250 million.[464]

ResCap relied upon capital contributions from AFI to meet its TNW covenants throughout the period from 2007 to 2009. These capital contributions supported ResCap's TNW (equity) and reduced ResCap's outstanding debt. This, in turn, had a direct impact on compliance with various capitalization and leverage requirements during this period. Capital contributions from AFI during 2005 to 2011 are shown in Exhibit VI.C.4.f(4)(b)—1 below.

---

[463] Under GAAP, consolidated tangible net worth is defined as consolidated net worth less intangible assets.

[464] Secured Revolver Loan Agreement

EXHIBIT VI.C.4.f(4)(b)—1

**AFI Capital Contributions to ResCap**

2005 – 2012

*($ in Millions)*



*(1)* *Other capital contributions of $1.9 billion in December 2009 consisted of $1.4 billion HFS loans, $316 million receivables and $195 million affiliate payables.*

*Source:  AFI Capital Contributions to ResCap Legal Entity Spreadsheet, [ALLY_PEO_0075634]; Residential Capital Corporation, Annual Report (Form 10-K) (Mar. 28, 2006), at 98; Residential Capital, LLC Consolidated Financial Statements for the Years Ended December 31, 2011 and 2010, dated Mar. 28, 2012, at 77 [EXAM00122651].*

EXHIBIT VI.C.4.f(4)(b)—2
**AFI Capital Contributions to ResCap**
2005 – 2012
*($ in Millions)*

| Quarter Ended | Cash Contributions | Other Capital Contributions[1] | Debt Forgiveness | Total AFI Support | Cumulative AFI Support |
|---|---|---|---|---|---|
| Jun-05 | - | - | $2,000 | $2,000 | $2,000 |
| Mar-07 | $500 | - | - | 500 | 2,500 |
| Jun-07 | 500 | - | - | 500 | 3,000 |
| Sep-07 | 1,000 | $24 | - | 1,024 | 4,024 |
| Dec-07 | - | - | 763 | 763 | 4,787 |
| Mar-08 | - | - | 143 | 143 | 4,930 |
| Jun-08 | - | - | 21 | 21 | 4,951 |
| Sep-08 | - | 19 | 155 | 174 | 5,125 |
| Dec-08 | - | - | 910 | 910 | 6,035 |
| Mar-09 | - | 5 | 259 | 264 | 6,299 |
| Jun-09 | - | - | 898 | 898 | 7,197 |
| Dec-09 | 600 | 1,947 | 339 | 2,886 | 10,083 |
| Dec-11 | - | - | 109 | 109 | 10,192 |
| Mar-12 | - | - | 197 | 197 | 10,389 |
| | $2,600 | $1,995 | $5,794 | $10,389 | |

[1] *Other capital contributions of $1.9 billion in December 2009 consisted of $1.4 billion HFS loans, $316 million receivables and $195 million affiliate payables.*

*Source: AFI Capital Contributions to ResCap Legal Entity Spreadsheet, [ALLY_PEO_0075634]; Residential Capital Corporation, Annual Report (Form 10-K) (Mar. 28, 2006), at 98; Residential Capital, LLC Consolidated Financial Statements for the Years Ended December 31, 2011 and 2010, dated Mar. 28, 2012, at 77 [EXAM00122651].*

### (c) Asset Sales

AFI and Cerberus acted as primary sources of needed liquidity for ResCap by purchasing certain ResCap non-core assets at various times. ResCap undertook a series of transactions to monetize assets to fund imminent financial needs beginning in August 2007, with the sale of Health Capital to GMAC CF. The majority of those transactions were facilitated by AFI, through affiliated entities. Those transactions included the following:

EXHIBIT VI.C.4.f(4)(c)
**ResCap Asset Sale Transactions**
2007 – 2012
*($ in Millions)*

|        | Description                           | Counterparty | Total Consideration |
|--------|---------------------------------------|--------------|---------------------|
| Aug-07 | Health Capital Sale                   | GMAC CF      | $901                |
| Jun-08 | Servicing Advance Factoring Agreement | GMAC CF      | 987                 |
| Jul-08 | Excess Servicing Rights Sales         | Cerberus     | 282                 |
| Jul-08 | Resort Finance Sale                   | GMAC CF      | 1,236               |
| Aug-08 | June 2008 Model Home Sale             | Cerberus     | 230                 |
| Sep-08 | September 2008 Model Home Sale        | Cerberus     | 59                  |
| Jan-09 | ResMor Sale                           | AFI          | 67 [1]              |
| Jan-09 | 2009 Bank Transaction                 | AFI          | 609 [2]             |
| May-09 | US/UK Broker-Dealer Sale              | AFI          | 110 [1]             |
|        |                                       |              | $4,481              |

*[1] ResMor Sale and US/UK Broker-Dealer Sale were sales of equity interests. The amounts shown above represent the net proceeds from the sale of these equity interests.*

*[2] Represents fair value of bonds contributed by AFI as additional consideration in the 2009 Bank Transaction.*

*Source: Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2009) at 16, 90; Residential Capital, LLC Condensed Consolidated Financial Statements for the Periods Ended September 30, 2009 and 2008, dated Sept. 30, 2009, at 68 [EXAM00124278]; Residential Capital, LLC, Current Report (Form 8-K) (Feb. 3, 2009) at 1; Residential Capital, LLC, Quarterly Report (Form 10-Q) (Nov. 8, 2007) at 41; Residential Capital, LLC, Quarterly Report (Form 10-Q) (Aug. 8, 2008) at 39; Residential Capital, LLC, Quarterly Report (Form 10-Q) (Nov. 10, 2008) at 42, 71; Residential Capital, LLC, Quarterly Report (Form 10-Q) (Aug. 7, 2009) at 64.*

Other than the transactions listed above with AFI or Cerberus, ResCap was unable to monetize other material unencumbered assets to fund its liquidity needs.[465]

### (5) AFI's Receipt Of TARP Funds

AFI's receipt of TARP funds proved to be a seminal event in the history of both AFI and ResCap. As discussed previously, AFI received its initial payment from TARP on December 28, 2008, averting a planned bankruptcy filing by ResCap around that time. A potential bankruptcy filing for ResCap in the latter half of 2008 was thoroughly planned and appeared imminent absent continued support from AFI. Further, AFI's continued support of ResCap without TARP funds was highly doubtful because of AFI's own financial difficulties during the global financial crisis in 2008.

---

[465] *See* Int. of W. Casey, Jan. 31, 2013, at 181:10–182:16.

AFI's receipt of TARP funds enabled ResCap to continue operations, although by that time ResCap's business model had largely changed from that of a mortgage originator and servicer to that of a mortgage broker and servicer. However, as described above, any such support was insufficient to restore ResCap's capitalization to a point where one could reasonably conclude the business was adequately capitalized. Indeed, following the receipt of TARP funds, AFI increasingly viewed ResCap as a substantial burden, resulting in the exploration of various options for the sale or liquidation of all or parts of ResCap's business.[466]

## D.  ABILITY TO PAY DEBTS AS DUE

### 1.  Introduction

The third disjunctive test for financial distress focuses on a debtor's intent or belief that it is or will be unable to pay its debts as they become due, a condition often referred to as "equitable insolvency."[467] This subsection addresses whether ResCap intended or believed that it was or would become unable to pay its debts as they became due, as that phrase is understood under the Bankruptcy Code, the UFCA, and the UFTA, for the period from 2005 through the Petition Date.

Like many other features of applicable fraudulent transfer law, the equitable insolvency test, particularly the intent element, is not defined or self-evident. Moreover, the "intent or belief" language is different in the UFTA than in the Bankruptcy Code or UFCA. The Bankruptcy Code asks whether the debtor "intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured."[468] The UFCA, as enacted in New York, uses virtually the same language.[469] Both the Bankruptcy Code and the UFCA appear to require a determination of the debtor-transferor's subjective

---

[466] *See* Int. of M. Carpenter, Mar. 4, 2013, at 42:9–44:7, 51:5–52:1.

[467] *MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Servs. Co.*, 910 F. Supp. 913, 943 (S.D.N.Y. 1995) (citation omitted).

[468] 11 U.S.C. § 548(a)(1)(B)(ii)(III). The "to incur" and "would incur" language of the statute suggests a purely forward-looking inquiry. However, the Examiner is unaware of any case in which a court limited its inquiry to whether a debtor believed, as of the date of the challenged transfer, that its *future* incurrence of debt would render the debtor unable to pay those future debts as they mature. The only court that the Examiner is aware of that has squarely faced this argument elided the issue. *See Heller Ehrman LLP v. Jones Day* (*In re Heller Ehrman LLP*), No. 08-32514DM, 2013 WL 951706, at *7 (Bankr. N.D. Cal. Mar. 11, 2013) ("Orrick argues that the so-called 'intent or belief' test of those sections only looks forward to determine whether a debtor could pay debts incurred after the transfer. Intending to pay or paying future debt in full while making no or partial payments on existing debt *is* incurring debt beyond the debtor's ability to pay, whether a subjective or objective test of intent or belief is applied.").

[469] N.Y. Debt. & Cred. Law § 275 ("Every conveyance made and every obligation incurred without fair consideration when the person making the conveyance or entering into the obligation intends or believes that he will incur debts beyond his ability to pay as they mature, is fraudulent as to both present and future creditors.").

intent or belief.[470] Nevertheless, courts generally permit reasonable inferences regarding a debtor's subjective intent to be drawn from objective facts, which blurs the distinction between subjective and objective inquiry.[471] In contrast, the UFTA explicitly permits an objective inquiry (in addition to a subjective inquiry), asking whether the debtor "[i]ntended to incur, or believed *or reasonably should have believed* that [it] would incur, debts beyond [its] ability to pay as they became due."[472]

As discussed in Section VII.F, the Examiner has concluded that the Bankruptcy Court will likely apply Pennsylvania, Minnesota, or possibly (with respect to certain fraudulent transfer claims arising from tax transactions) Delaware law to constructive fraudulent transfer claims brought under section 544 of the Bankruptcy Code.[473] Minnesota, Pennsylvania, and Delaware have adopted the UFTA's standard equitable insolvency test.[474] Accordingly, the Examiner has analyzed the transactions at issue under both the objective and subjective standards.

---

[470] *Tese-Milner v. Edidin & Assocs.* (*In re Operations N.Y. LLC*), No. 10-13446, 2013 WL 1187879, at *9 (Bankr. S.D.N.Y. Mar. 21, 2013) ("[T]he 'ability to pay' financial test requires proof of the transferor's subjective intent or belief that it will incur debt it cannot pay at maturity.") (citing *MFS/Sun Life Trust*, 910 F. Supp. at 943); *WRT Creditors Liquidation Trust v. WRT Bankr. Litig. Master File Defendants* (*In re WRT Energy Corp.*), 282 B.R. 343, 415 (Bankr. W.D. La. 2001) (observing that "the statute suggests a standard based on subjective intent"); *In re Taubman*, 160 B.R. 964, 986 (Bankr. S.D. Ohio 1993) ("This prong of § 548(a)(2)(A)–(B) requires the court to undergo a subjective, rather than an objective, inquiry into a party's intent.").

[471] *See, e.g., ASARCO LLC v. Ams. Mining Corp.*, 396 B.R. 278, 399 (S.D. Tex. 2008) ("Intent may be inferred from the facts and circumstances surrounding the transaction.") (citation omitted); *Official Comm. of Unsecured Creditors of TOUSA, Inc. v. Citicorp N. Am., Inc.* (*In re TOUSA, Inc.*), 422 B.R. 783, 862–63 (Bankr. S.D. Fla. 2009) ("The 'inability to pay debts' prong of section 548 is met if it can be shown that the debtor made the transfer or incurred an obligation contemporaneous with an intent or belief that subsequent creditors likely would not be paid as their claims matured. While the statute suggests a standard based on subjective intent, the courts have held that the intent requirement can be inferred where the facts and circumstances surrounding the transaction show that the debtor could not have reasonably believed that it would be able to pay its debts as they matured . . . .") (quoting *In re WRT Energy Corp.*, 282 B.R. at 415 (citations omitted)), *aff'd in relevant part sub nom. Senior Transeastern Lenders v. Official Comm. of Unsecured Creditors* (*In re TOUSA, Inc.*), 680 F.3d 1298 (11th Cir. 2012); *In re Taubman*, 160 B.R. at 986 ("The record is silent as to any expressed intention or belief by the Debtor to incur debts beyond her ability to pay; however, the record does offer facts and circumstances from which such an intention may be found.") (citing *Yoder v. T.E.L. Leasing, Inc.* (*In re Suburban Motor Freight, Inc.*), 124 B.R. 984, 1000 n.14 (Bankr. S.D. Ohio 1990).

[472] UFTA § 4(a)(2)(ii) (emphasis added).

[473] The Examiner's choice of law analysis indicates that the jurisdictions whose substantive fraudulent transfer law would likely be applied by a New York federal or state court with respect to the transactions covered by this Report are Minnesota (as to most transfers by ResCap and RFC), Pennsylvania (as to transfers by GMAC Mortgage) or possibly Delaware (as to certain tax-related transfers by ResCap). That analysis is set forth in Section VII.F.

[474] *See* MINN. STAT. § 513.44(a)(2)(ii); 12 PA. CONS. STAT. § 5104(a)(2)(ii); 6 DEL. CODE ANN. tit. 6 § 1304(a)(2)(b).

## 2. *Conceptual Framework*

A debtor's contemporaneous subjective belief that it is or will be unable to pay its debts as they become due satisfies the financial distress requirement of all three fraudulent transfer statutes. This issue is not often litigated because of the difficulty of proof arising from the subjective intent requirement.[475] However, most courts have permitted proof of subjective intent through reasonable inferences drawn from facts and circumstances surrounding the transfer made or obligation incurred.[476] These factors include a debtor's contemporaneous cash flow projections prepared by management, payment history and practices during the relevant time period; short pays on invoices, holds on checks to vendors; past due accounts, demand letters and other collection efforts against the debtor, and liquidity and leverage issues similar to those analyzed under the unreasonably small capital test.[477]

For example, a debtor's cash flow projections developed contemporaneously with a challenged transfer generally form the starting point for testing its ability to pay debts as they become due. The key to unlocking intent from a debtor's cash flow projections is to assess the reasonableness of the projections over a relevant period based on information known or knowable as of the transfer date.[478] The relevant period will depend on the amount and term of the debts that a debtor carries and the timing of its projected cash flows. Thus, the debt that is

---

[475] *Yoder v. T.E.L. Leasing, Inc.* (*In re Suburban Motor Freight, Inc.*), 124 B.R. 984, 1000 n.14 (Bankr. S.D. Ohio 1990) ("There are few rulings on this particular prong of § 548(a)(2)(A)–(B), and it is rarely used by parties seeking to avoid a transfer as it appears to require the courts to undergo a subjective, rather than objective, inquiry into a party's intent.") (citation omitted).

[476] *See, e.g.*, *WRT Creditors Liquidation Trust v. WRT Bankr. Litig. Master File Defendants* (*In re WRT Energy Corp.*), 282 B.R. 343, 415 (Bankr. W.D. La. 2001) ("While the statute suggests a standard based on subjective intent, the courts have held that the intent requirement can be inferred where the facts and circumstances surrounding the transaction show that the debtor could not have reasonably believed that it would be able to pay its debts as they matured.").

[477] *See, e.g.*, *ASARCO LLC v. Ams. Mining Corp.*, 396 B.R. 278, 399–400 (S.D. Tex. 2008) ("In March 2002, Jim O'Neil, then ASARCO's Vice President of Finance testified that ASARCO had $138 million in past-due debts at the end of 2001 and that ASARCO was not able to pay those debts. At this time, ASARCO was in arrears to most of its vendors and was generally not paying its debts as they became due . . . . [ASARCO's treasurer] testified that perhaps thousands of vendors, service providers, and other creditors were having trouble getting paid in early 2003. ASARCO's past due and liquidated asbestos obligations exceeded $13.7 million in early March 2003, and ASARCO was in arrears with its own defense lawyers for over $3 million. The strongest evidence of ASARCO's belief that it was unable to pay its debts is that there were extensive 'hold lists' during the relevant time.") (citations omitted).

[478] *VFB LLC v. Campbell Soup Co.*, 482 F.3d 624, 631 (3d Cir. 2007) ("True, earnings projections 'must be tested by an objective standard anchored in [a] company's actual performance,' but such a test applies to information about a company's performance available 'when [the projection is] made.'") (alterations in original) (quoting *Moody v. Sec. Pac. Bus. Credit, Inc.*, 971 F.2d 1056, 1073 (3d Cir. 1992)).

coming due and a debtor's available liquidity must be evaluated in the context of the debtor's financial projections:

> A projection of the amount of liquidity available to the company to meet its debt requirements is estimated . . . To calculate a company's liquidity available for debt repayment, the analyst should project each of the following for several periods after the transaction: (1) any excess cash on hand, (2) free cash flows earned during each period, and (3) the company's borrowing availability on each due date to pay its debts.[479]

Although courts may adopt a presumption that management's projections were reasonable for these purposes,[480] a historically consistent trend of significant variances between actual and projected cash flows rebuts the presumption.[481] Additionally, whether a debtor was not paying debts as due in a timely manner (e.g., the company was stretching its payables, short paying its invoices, or holding checks) is a key indicator of intent.[482] Whether a debtor has access to sufficient available liquidity to continue to pay debts as due over the relevant time period is also an important indicator of intent.

Under the objective intent requirement, proof concerns are relaxed as the question becomes whether a debtor intended to incur or believed (or reasonably should have believed) that it would incur debts beyond its ability to pay as of the date of the challenged transfer. Many of the same factors employed in assessing inadequate capital are relevant indicators of a belief or reasonable basis to believe that a debtor could not pay its debts as they became due, but with a focus on liquidity, cash flows, risk, and shorter-term cash needs.

---

[479] ROBERT F. REILLY & ROBERT P. SCHWEIHS, HANDBOOK OF ADVANCED BUSINESS VALUATION 341–42 (1999).

[480] *See, e.g.*, *Cede & Co. v. JRC Acquisition Corp*, No. Civ.A. 18648-NC, 2004 WL 286963, at *2 (Del. Ch. Feb. 10, 2004) ("Regardless of the methodology, however, this Court prefers valuations based on management projections available as of the date of the merger and holds a healthy skepticism for post-merger adjustments to management projections or the creation of new projections entirely. Expert valuations that disregard contemporaneous management projections are sometimes completely discounted.") (citations omitted).

[481] *See, e.g.*, *Lids Corp. v. Marathon Inv. Partners, L.P.* (*In re Lids Corp.*), 281 B.R. 535, 544 (Bankr. D. Del. 2002) ("We . . . find that Houlihan has improperly relied on Lids' projections to calculate value. Over the last few years, Lids has consistently failed to meet its projections; in 2000 alone, Lids' budget was revised three times to account for poor performance. Despite these revisions, Lids still missed its projections for 2000. Furthermore, the Houlihan Report assumed that after October 31, 2000, when Lids' EBITDA was negative $6,299,000, the company would nonetheless turn around. Houlihan relied on Lids' projections that at FYE January 27, 2001, its EBITDA would increase to negative $3,456,000, and that at FYE January 26, 2002, its EBITDA would be positive $5,513,000. There is no evidence to support the assumption that such a dramatic change would occur. Therefore, any conclusions based on these projections are unconvincing.").

[482] *See, e.g.*, *ASARCO*, 396 B.R. at 399–400 (S.D. Tex. 2008) (evidence of intent included past-due debts, failing to pay vendors on time, and check hold lists).

### 3. Summary Of Examiner's Conclusions

The Investigation has not uncovered evidence that ResCap possessed a subjective intent to incur, or belief that it would incur, debts beyond its ability to pay as they became due. The Investigation also revealed no evidence that any officer or ResCap Board member possessed a subjective intent for ResCap to incur (or belief that ResCap would incur) debts beyond its ability to pay at the time from 2005 through the Petition Date.

However, with respect to the objective intent element, the Examiner concludes that the evidence supports the proposition that ResCap reasonably should have believed that it would incur debts beyond its ability to pay from August 15, 2007 through the Petition Date. The Examiner rests this conclusion on a detailed quantitative and qualitative analysis of ResCap's ability to service its debts from 2005 through the Petition Date, giving full consideration to resources reasonably available to ResCap (such as available liquidity, cash flows, committed credit lines, reasonable sources of capital, and monetization of non-core assets through sales) to meet its imminent financial needs and to repay or refinance its longer term obligations.

Although the inadequacy of capital test and the inability to pay test consider many of the same indicators and factors, the two tests address two different questions—consequences of a debtor's actions and the intent of a debtor's actions. The issue of a debtor being left with unreasonably small capital involves an assessment of the consequences of a challenged transfer or obligation, including an assessment of risk, cash flows, and downside scenarios; whereas the issue of a debtor intending or believing that it is incurring debts that it cannot pay involves an assessment of intent (both subjective and objective) contemporaneous with the transfer or obligation, inferred from matching likely cash flow projections to debt maturities, past due payments, and other unusual credit or collection activity. Thus, both tests are designed to complement each other and, together with the Balance Sheet Test, capture transfers and obligations potentially harmful to the unsecured creditors of a bankruptcy estate.

### 4. Analysis Of Ability To Pay Debts As Due

#### a. Subjective Intent Inquiry

ResCap's perceived liquidity needs and its response to those needs are key indicators of ResCap's intent. ResCap recognized it operated a liquidity-intensive business because of the volatility inherent in its assets and the dependence of its business model on access to liquid capital.[483] ResCap, therefore, established detailed processes and procedures by which it managed its liquidity risk. Those processes and procedures are described in Section VI.C. ResCap actively managed its liquidity through, among other things, the development and implementation of a liquidity plan, matching short-term and long-term financing debt and asset classes, and diversifying sources of funds.

ResCap also recognized that its credit rating was a critical factor in maintaining adequate liquidity. This was because of the effect its credit rating had on the cost and availability of

---

[483] Residential Capital, LLC, Annual Report (Form 10-K) (Mar. 13, 2007), at 76.

its existing facilities, and because of the potential effect its credit rating had on its ongoing access to the capital markets. Accordingly, an important component of ResCap's strategy for managing its liquidity centered on ResCap's commitment to maintain an investment grade credit rating. The importance of investment-grade credit ratings to ResCap's liquidity and capital needs is discussed in Section VI.C.

ResCap employed a number of mechanisms to monitor its liquidity and capital needs, with those mechanisms evolving over time. ResCap received liquidity support from its parent to pay its debts and, until December 2009, generally believed that this support would continue.[484] Although the Examiner has concluded that ResCap was left with unreasonably small capital as of August 15, 2007 through the Petition Date, the totality of the circumstances does not support the proposition that ResCap possessed the specific intent or belief that it was incurring debts beyond its ability to pay such debts as they matured at any time from 2005 through the Petition Date.

### b. Objective Intent Inquiry

Under an objective intent assessment, the evidence supports the proposition that ResCap reasonably should have believed that it would incur debts beyond its ability to pay from August 15, 2007 through the Petition Date. For example, Thomas Jacob, an Independent Director, noted that he believed ResCap was in the zone of insolvency in "August 2007 when [ResCap] had this credit crunch."[485] Subsequently, on September 7, 2007, the law firm of Mayer Brown made a presentation to the ResCap Board centered on duties owed by a director to various constituencies when a company is in the "zone of insolvency."[486] Included in this presentation was advice concerning potential fraudulent transfers at a time of financial distress.[487] Mayer Brown advised the ResCap Board that "if insolvency (or potentially a zone of insolvency) is present, the Company's directors should carefully consider the disinterestedness and independence of directors . . . in the context of any proposed transaction among the Company . . . or any of [its] respective affiliates."[488]

---

[484] *See* Int. of P. West, Jan. 11, 2013, at 101:2–6 ("We felt like it was getting less and less in their benefit to make that support. The closing of the books that year end was painful. And so, it was looking to us like that support was less and less forthcoming."); *id.* at 102:2–9 ("Because it seemed very difficult for us to get that support at the end of the year. And frankly, the support that we got gave us very little, if no wiggle room at all . . . . And it was a month to month kind of support look and that becomes untenable at a certain point.").

[485] Int. of T. Jacob, Nov. 7, 2012, at 197:1–6.

[486] Mayer Brown Presentation on Fiduciary Duties of Directors and Related Legal Issues, dated Sept. 7, 2007 [RC40012695].

[487] *Id.* at RC40012721–23. Mayer Brown gave a similar presentation regarding directors' fiduciary duties in distressed financial circumstances to the AFI Board in May 2008. *See* Minutes of a Special Meeting of the Board of Directors of GMAC LLC, May 30, 2008, at ALLY_PEO_0001080–81 [ALLY_PEO_0001009]. Independent Director Jacob stated that he believed ResCap had neared the "zone of insolvency" in August 2007, shortly before Mayer Brown gave its fiduciary duty presentation to the ResCap Board. Int. of T. Jacob, Nov. 7, 2012, at 197:1–198:25.

[488] Mayer Brown Presentation on Fiduciary Duties of Directors and Related Legal Issues, dated Sept. 7, 2007, at RC40012726 [RC40012695].

Timothy Pohl, a ResCap advisor, stated that "ResCap was undercapitalized" after the dramatic changes in 2007 and 2008 that affected the mortgage industry.[489] He further stated that ResCap was facing potential liquidity, covenant, and bond maturity issues in the near future that could trigger the need for ResCap to file for bankruptcy around May 2008.[490]

On September 23, 2008, Lazard advised "ResCap's balance sheet and current liquidity situation place it within the zone of insolvency and . . . the best course of action for the Directors is to act as if the company were insolvent and consider the best interest of all its creditors."[491] By October 2008, the ResCap Board was presented with various materials regarding pre-bankruptcy planning.[492] Bankruptcy planning was discussed again by the ResCap Board in June and July, 2009.[493]

In 2010 and 2011, AFI's advisors and officers made periodic presentations to the ResCap Board reflecting AFI's deliberations about ResCap's future.[494] On November 5, 2010, Michael Constantino of AFI's Capital Markets Group reported on the results of a bidding process organized by AFI for the sale of ResCap's assets.[495] Notably, the materials presented by Constantino to the ResCap Board indicated that all three potential bids implied a transaction loss and negative cash at closing of a sale, suggesting a market view of ResCap's financial distress.[496]

In addition to the observations by advisors to the ResCap Board and the AFI Board about zone of insolvency and insolvency concerns, a number of other facts and circumstances support the Examiner's conclusion of an inability to pay debts on an objective basis.

- First, as previously detailed in Section VI.C, ResCap had intensive liquidity needs and experienced challenges, stresses, and chronic liquidity shortfalls from

---

[489] Int. of T. Pohl, Feb. 26, 2013, at 23:11–16.

[490] Int. of T. Pohl, Feb. 26, 2013, at 25:4–17.

[491] Minutes of a Meeting of an Executive Session of the Board of Residential Capital, LLC, Sept. 23, 2008, at RC40006865 [RC40006865].

[492] *See, e.g.*, Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Oct. 8, 2008, at RC40005877-78 [RC40005652]; Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Oct. 10, 2008, at RC40005880–81 [RC40005652]; Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Oct. 17, 2008, at RC40005884–85 [RC40005652]; Minutes of a Meeting of the Board of Directors of Residential Capital, LLC, Oct. 20, 2008, at RC40005887–88 [RC40005652]; Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Oct. 23, 2008, at RC40005891–93 [ RC40005652].

[493] *See, e.g.*, Project Scout II Presentation, Jun. 10, 2009, at RC40011255–59 [RC40011250]; Lazard Project Scout II Presentation, dated Jul. 2009, at RC40010900 [RC40010890].

[494] *See, e.g.*, Mercer Oliver Wyman, Citibank & Goldman Sachs "Strategic Evaluation of AFI's Mortgage Business" Presentation, dated Apr. 30, 2010 [EXAM10424634].

[495] Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Nov. 5, 2010, at RC40018846 [RC40018729].

[496] Mortgage Strategic Alternatives Presentation, dated Oct. 29, 2010, at RC40016894, RC40016897–98 [RC40016871].

August 15, 2007, through the Petition Date. By August 21, 2007, the ResCap Board had been made aware that liquidity issues were affecting ResCap's operations.[497] Thereafter, most ResCap Board meetings included a discussion of ResCap's liquidity position. By June 2009, the ResCap Board was meeting daily to manage liquidity issues.

- Second, the capital intensive nature of ResCap's business and the volatility of ResCap's assets exacerbated and amplified the liquidity shortfalls and stresses.

- Third, because of its liquidity and leverage concerns, ResCap was unreasonably vulnerable to risks associated with changes in the credit markets, industry, and economy.

- Fourth, the global credit markets experienced a significant dislocation on or about August 9, 2007, impairing ResCap's access to the capital markets and virtually eliminating its access to the secondary securitization markets.

- Fifth, the deterioration of its once-investment grade credit rating also left ResCap in a precarious financial position, especially in consideration of its business plan and needs for capital.

- Sixth, an analysis of baseline cash flow projections in ResCap's ELRs[498] indicated that in each of its projections prepared quarterly from December 2007 through April 2012, ResCap projected negative or minimal net cash flows over the subsequent 12 months.

- Seventh, ResCap entered the industry downturn commencing in 2006 in a highly-leveraged position. ResCap incurred significant losses as it reduced its business and equity base to a fraction of its pre-downturn levels while the industry downturn progressed. ResCap's reported equity as of December 31, 2011, was only 1.2% of its December 31, 2005 balance.[499] ResCap was unable to service its fixed charges, primarily interest expense, from its operating income in 2006 through 2009, and again in 2011.[500]

---

[497] *See* Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Aug. 21, 2007, at RC40005617 [RC40005558].

[498] The Executive Liquidity Report, or ELR, as discussed further in Section VI.C.4.f, was a report developed and utilized by ResCap management along with its Board to analyze ResCap's current liquidity position, as well as its forecasted liquidity for the ensuing twelve month period.

[499] *Compare* Residential Capital, LLC, Annual Report (Form 10-K) (Mar. 28, 2006), at 94, *with* Residential Capital, LLC Consolidated Financial Statements for the Years Ended December 31, 2011 and 2010, dated Mar. 28, 2012, at 4 [EXAM00122651].

[500] *See* Exhibits VI.C.4.f(3)(b)—1 and VI.C.4.f(3)(b)—2

- Eighth, ResCap's ability to prepare reliable financial projections was negatively affected after 2006 because of, among other factors, the rapid deterioration within its businesses and the concomitant deterioration within the mortgage industry and global economy. This is evident in the significant variance between ResCap's actual results as compared to its financial projections, thus exacerbating liquidity and performance concerns.

- Finally, AFI's financial support was critical to ResCap's survival from 2007 through the Petition Date. Recognizing that ResCap's risk profile had worsened with the corresponding decline in the residential mortgage industry in 2007 and 2008, AFI engaged in an ongoing process of infusing capital and/or liquidity into ResCap to avoid imminent covenant or payment defaults. However, such infusions were insufficient to address the chronic undercapitalization that commenced on or about August 15, 2007, and continued through the Petition Date, all as fully analyzed in Section VI.C.

## E. FINANCIAL CONDITION TESTS AS APPLIED TO RESCAP'S SUBSIDIARIES

### 1. Introduction

ResCap was a holding company for a number of direct and indirect subsidiaries including RFC and GMAC Mortgage, its principal operating subsidiaries. These subsidiaries conducted ResCap's mortgage-related businesses, which comprised the vast majority of ResCap's overall business activities. Because certain potential claims and causes of action discussed in Section VII would be asserted by ResCap's subsidiaries for the benefit of their separate estates and creditors (as distinct from those of ResCap), the Examiner analyzed the three disjunctive financial condition tests discussed above as to RFC and GMAC Mortgage.

### 2. Summary Of Examiner's Conclusions

The Examiner concludes that the evidence supports the proposition that RFC and GMAC Mortgage each was balance sheet solvent and adequately capitalized on May 4, 2005, the date that AFI announced the capitalization of ResCap.[501] The Examiner concludes that the evidence supports the proposition that RFC and GMAC Mortgage each: (1) was balance sheet insolvent from December 31, 2007 through the Petition Date; (2) had unreasonably small capital from August 15, 2007 through the Petition Date; and (3) reasonably should have believed that it would incur debts beyond its ability to pay from August 15, 2007 through the Petition Date.

Based on an analysis of certain financial and factual information made available to the Examiner, the Examiner determined that the financial condition of RFC and GMAC Mortgage could be reasonably estimated from 2005, through the Petition Date through: (1) a detailed analysis of the financial condition and operating results of ResCap on a consolidated basis, recognizing ResCap had no significant operations separate and apart from its subsidiaries; (2) an assessment as to the relative size and operating performance of RFC and GMAC Mortgage, as reflected in ResCap's consolidated financial statements and subsidiary trial

---

[501] General Motors Acceptance Corporation, Current Report (Form 8-K) (May 4, 2005), Ex. 99.1.

balances; (3) an assessment of various intercompany receivables and/or payables, between and among ResCap, RFC, GMAC Mortgage, and their respective subsidiaries; (4) an evaluation of the nature and timing of certain intercompany account activity between and among ResCap, RFC, GMAC Mortgage, and their respective subsidiaries; (5) consideration of potential contingent and/or unliquidated liabilities, including those arising from certain RFC and GMAC Mortgage guarantee obligations; and (6) consideration of the effects of industry and economic conditions on RFC and GMAC Mortgage over the relevant time period.

### 3. Analysis Of Separate Subsidiary Financial Distress

#### a. Solvency

As previously discussed, an assessment of balance sheet solvency requires an assessment of whether the sum of a debtor's debts exceeds its assets, at a "fair valuation." Two additional important issues arise when evaluating the solvency of subsidiaries. First, it is common in large companies that affiliates share liquidity through a centralized cash management system implemented through an overall treasury policy. Fund transfers between affiliates are generally recorded through intercompany accounts, including payables/receivables, due to/due from accounts, and, in some instances, notes payables/notes receivables. Because these intercompany transfers are generally eliminated in consolidation, there is often a question of how reliable and accurate the internal accounting has been and whether the intercompany accounting reflects a reasonable and fair depiction of the relationships between the affiliates. Moreover, because there are potentially thousands of intercompany transfers occurring over a given time period, it is often impractical to attempt to untangle the web of intercompany accounts such that reliable separate entity financial statements can be reconstructed for purposes of assessing a subsidiary's solvency. Further, a full forensic analysis of intercompany transfers between ResCap and its subsidiaries is not contemplated by the Examiner Scope Approval Order. Second, contingent liabilities, such as obligations under any guaranties by subsidiaries or a parent, must be reasonably estimated and that amount then reduced by any corresponding offsets arising from the value of any equitable rights that may be exercised by a guarantor, including rights of reimbursement against the primary obligor and contribution against any co-guarantors.

The Examiner's Financial Advisors determined that the ability of ResCap to fund RFC, GMAC Mortgage, and their respective subsidiaries from its own resources and sources of capital was significantly impaired from August 15, 2007 through the Petition Date. RFC and GMAC Mortgage each reported significant intercompany receivables due from their subsidiaries at various times over the relevant time period. An analysis of intercompany receivables must necessarily consider their collectability. The intercompany activity between RFC and GMAC Mortgage and their subsidiaries primarily represented advances to fund capital needs and operating deficits. Based on a review of RFC's and GMAC Mortgage's general ledgers, the intercompany receivables due to RFC and GMAC Mortgage from their subsidiaries were impaired from August 15, 2007 through the Petition Date. These subsidiaries required significant capital contributions in the form of intercompany advances from RFC and GMAC Mortgage to cover operating losses commencing in 2007. The Investigation revealed no evidence that either RFC's or GMAC Mortgage's subsidiaries

possessed the capability, individually or in the aggregate, to repay these receivables subsequent to August 15, 2007. The need for capital by these subsidiaries increased as the credit crisis and global financial crisis intensified, resulting in the ultimate forgiveness of billions of dollars in intercompany obligations throughout the consolidated enterprise.

Turning to an assessment of RFC's and GMAC Mortgage's contingent liabilities arising from guarantee obligations, ResCap had issued $15.3 billion in public debt guaranteed by RFC and GMAC Mortgage as of December 31, 2007.[502] RFC and GMAC Mortgage served as guarantors of this public debt until June 2008. GMAC Mortgage disclosed this contingency in its annual financial statements.[503] Additionally, in June 2008, ResCap issued approximately $5.7 billion of senior and junior secured notes in exchange for approximately $8.6 billion of ResCap unsecured notes.[504] RFC and GMAC Mortgage, among other ResCap subsidiaries, served as guarantors on these debts,[505] and both disclosed this contingency in their annual financial statements.[506]

RFC and GMAC Mortgage also served as guarantors on certain unsecured revolving lines of credit and an unsecured term loan that ResCap maintained with various third-party lenders from June 2005 to June 2008.[507] In June 2008, ResCap's unsecured revolving lines of credit and unsecured term loan were refinanced. As part of that refinancing, AFI provided a $3.5 billion facility to RFC and GMAC Mortgage, secured by the assets of RFC and GMAC Mortgage.[508] In summary, both RFC and GMAC Mortgage guaranteed ResCap's unsecured public debt and unsecured line of credit/term loan facilities through June 2008.

These contingent liabilities—and any corresponding equitable rights—should be considered in any application of the financial distress tests to the two subsidiaries. The Examiner's Financial Advisors determined that these contingent liabilities would only worsen already existing conditions of financial distress at RFC and GMAC Mortgage. As upstream guarantors, RFC's and GMAC Mortgage's assets were at risk, and there existed little to no

---

[502] *See, e.g.*, Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2008), at 81; Residential Capital Corporation, Registration Statement (Form S-4) (July 15, 2005), Ex. 4.1 (ResCap Indenture, dated Jun. 24, 2005) (reflecting GMAC Mortgage and RFC as guarantors of ResCap's obligations).

[503] GMAC Mortgage, LLC Consolidated Financial Statements as of and for the Years Ended December 31, 2007 and 2006, dated Mar. 25, 2008, at 50 [EXAM00232043].

[504] Residential Capital, LLC, Amend. No. 1 to Annual Report (Form 10-K/A) (Aug. 25, 2009), at 100.

[505] *See* Residential Capital, LLC, Quarterly Report (Form 10-Q) (Aug. 8, 2008), Ex. 4.3 (8.5% Senior Secured Guaranteed Notes Indenture, dated June 6, 2008) (reflecting GMAC Mortgage and RFC as guarantors); Residential Capital, LLC, Quarterly Report (Form 10-Q) (Aug. 8, 2008), Ex. 4.4 (9.625% Junior Secured Guaranteed Notes Indenture, dated June 6, 2008) (reflecting GMAC Mortgage and RFC as guarantors).

[506] *See, e.g.*, GMAC Mortgage, LLC Consolidated Financial Statements as of and for the Years Ended December 31, 2008 and 2007, dated Mar. 25, 2009, at 69 [EXAM00126182]; Residential Funding Company, LLC Consolidated Financial Statements as of and for the Years Ended December 31, 2008 and 2007, Mar. 25, 2009, at 77 [EXAM00124988].

[507] *See* Subsidiary Guarantee Agreement, dated July 28, 2005, [EXAM00345139] (reflecting GMAC Mortgage and RFC as guarantors of ResCap's obligations, in favor of JPMorgan).

[508] Residential Capital, LLC, Current Report (Form 8-K) (Mar. 13, 2007), Ex. 99.1.

value in the right of reimbursement against ResCap. From August 15, 2007, ResCap was inadequately capitalized and also reasonably should have believed that it would incur debts beyond its ability to pay as they became due, and from December 31, 2007, ResCap was insolvent under the Balance Sheet Test. Thus, while the guarantees were in effect, ResCap, as the primary obligor on the guaranteed indebtedness, was in financial distress, rendering any right of reimbursement against it of little to no value.

The Examiner observes that certain guarantee agreements, though creating joint and several liability of RFC and GMAC Mortgage, had both "contribution" and "savings" clauses to prevent a contingent liability under the guarantee from causing RFC or GMAC Mortgage to become insolvent or be rendered insolvent.[509] Notwithstanding the recent debate concerning the enforceability of these types of savings clauses in guarantee agreements, the Examiner concludes that the evidence supports the proposition that RFC and GMAC Mortgage were each insolvent from December 31, 2007 through the Petition Date.

### b.  Unreasonably Small Capital

Where a parent company is left with "unreasonably small capital" to operate its business, it logically follows that its subsidiaries will be inadequately capitalized absent their own independent sources of funds. This observation is generally supported in those cases where the corporate group maintains a centralized cash management system or where there is direct or indirect funding support from a parent to its subsidiaries or affiliates.[510] In both situations, a parent's access to capital and its present capital condition serve as the primary, if not exclusive, source of capital for its direct and indirect subsidiaries.

RFC and GMAC Mortgage maintained secured financing arrangements with third-party lenders through the Petition Date that provided advances for originating and acquiring mortgage assets for subsequent sale or securitization,[511] but both relied on ResCap (and ultimately AFI) for unsecured credit facilities and equity infusions to cover any shortfall in the

---

[509] *See, e.g.*, Residential Capital Corporation, Registration Statement (Form S-4) (Jul. 15, 2005), Ex. 4.1, at 56–57 (ResCap Indenture, dated Jun. 24, 2005, §§ 14.03, 14.05).

[510] *See Teleglobe USA, Inc. v. BCE Inc.* (*In re Teleglobe Commc'ns Corp.*), 392 B.R. 561, 602–03 (Bankr. D. Del. 2008) (holding that the test for subsidiary solvency should not exclude "the funding support actually given" by the immediate corporate parent until the point when it would no longer be reasonable to expect such support).

[511] Residential Funding Company, LLC Consolidated Financial Statements as of and for the Years Ended December 31, 2008 and 2007, dated Mar. 25, 2009, at 36 [EXAM00124988]; Residential Funding Company, LLC Consolidated Financial Statements as of and for the Years Ended December 31, 2010 and 2009, dated Mar. 10, 2011, at 36 [EXAM00123277]; GMAC Mortgage, LLC Consolidated Financial Statements as of and for the Years Ended December 31, 2008 and 2007, dated Mar. 25, 2009, at 32 [EXAM00126182]; GMAC Mortgage, LLC Consolidated Financial Statements as of and for the Years Ended December 31, 2010 and 2009, dated Mar. 10, 2011, at 34 [EXAM00123214].

advance rates provided by the secured facilities and to fund operating deficits.[512] Further, ResCap and its subsidiaries shared liquidity through a centralized cash management system.[513] ResCap's inadequate capitalization therefore reverberated through its subsidiaries, including RFC and GMAC Mortgage.

RFC and GMAC Mortgage experienced similar consequences from the dislocation in the capital and secondary mortgage markets in August 2007. At that time, the market for securitizations of subprime, Alt-A, and otherwise non-conforming loans was virtually closed.[514] GMAC Mortgage was left predominantly with government agencies as a purchaser of conforming-only product.[515] Commercial paper conduits closed and short-term funding sources were very limited. Additionally, certain HFS loans had to be reclassified to HFI loans because there was no market channel available to sell the product. RFC was also hemorrhaging cash as margin calls were mounting. In fact, "all hands [were] on deck" in Minneapolis over the summer of 2007 to find possible solutions to the liquidity crisis.[516] Further, both companies reported significant losses in the third quarter of 2007, requiring them to obtain financial support from ResCap,[517] which, as discussed in Sections VI.B through VI.D, was itself undercapitalized at that time.

---

[512] *Compare* GMAC Mortgage, LLC Consolidated Financial Statements as of and for the Years Ended December 31, 2009 and 2008, dated Mar. 19, 2010, at 31 [EXAM00124578] and Residential Funding Company, LLC Consolidated Financial Statements as of and for the Years Ended December 31, 2009 and 2008, dated Mar. 19, 2010, at 31 [EXAM00124670], *with* GMAC Mortgage, LLC Consolidated Financial Statements as of and for the Years Ended December 31, 2007 and 2006, dated Mar. 25, 2008, at 33 [EXAM00232043] and Residential Funding Company, LLC Consolidated Financial Statements as of and for the Years Ended December 31, 2007 and 2006, dated Mar. 26, 2008, at 31 [EXAM00231913], respectively. *See also* Residential Funding Company, LLC Consolidated Financial Statements as of and for the Years Ended December 31, 2008 and 2007, dated Mar. 25, 2009, at 40 [EXAM00124988]; Int. of W. Casey, Jan. 31, 2013, at 143:14–21; Int. of S. Ramsey, Dec. 10, 2012, at 82:14–20; Int. of J. Lombardo, Mar. 18, 2013, at 19:18–20:2; Goldin Associates Presentation to the Committee of Independent Members of the Board of Directors of Residential Capital, LLC Regarding Proposed Amendment to the Secured Line of Credit with GMAC, LLC, dated Dec. 19, 2008, at GOLDIN00129114 [GOLDIN00129101].

[513] *See* Affidavit of James Whitlinger, Chief Financial Officer of Residential Capital, LLC, in Support of Chapter 11 Petitions and First Day Pleadings [Docket No. 6] at 53.

[514] BD. OF GOVERNORS OF THE FED. RESERVE SYS., MONETARY POLICY REPORT TO THE CONGRESS (Feb. 27, 2008), at 23, http://www.federalreserve.gov/monetarypolicy/files/20080227_mprfullreport.pdf.

[515] *Id.*

[516] *See* Int. of W. Casey, Jan. 31, 2013, at 41:23–42:13.

[517] Residential Funding Company, LLC Consolidated Financial Statements as of and for the Years Ended December 31, 2007 and 2006, dated Mar. 26, 2008, at 53 [EXAM00231913]; GMAC Mortgage, LLC Consolidated Financial Statements as of and for the Years Ended December 31, 2007 and 2006, dated Mar. 25, 2008, at 5 [EXAM00232043].

The credit markets were virtually closed to ResCap for new financing in 2008. Existing lenders were unwilling to extend credit facilities beyond current maturities.[518] As a result, AFI became the lender of last resort for RFC and GMAC Mortgage, as well as ResCap LLC. From April 2008 to the Petition Date, AFI extended secured credit facilities to both RFC and GMAC Mortgage.[519] RFC and GMAC Mortgage were unable to fund their operations with third-party unsecured credit facilities during this period.[520] In essence, RFC and GMAC Mortgage were no longer bankable entities. ResCap, itself inadequately capitalized, became the sole source of unsecured funding for RFC and GMAC Mortgage. The existence of both the public debt and line of credit/term loan guaranties prior to June 2008, and the guarantees under ResCap's secured public debt after June 2008,[521] served as both liabilities in an economic sense and debt overhang, dissuading any third-party funding and exacerbating their precarious financial condition. Based on the facts and circumstances, the Examiner concludes that the evidence supports the proposition that RFC and GMAC Mortgage each had unreasonably small capital from August 15, 2007 through the Petition Date.

### c.   *Ability To Pay Debts As Due*

The Investigation has not uncovered evidence that RFC or GMAC Mortgage possessed a subjective intent to incur, or belief that it would incur, debts beyond its ability to pay as they became due. Further, neither RFC nor GMAC Mortgage had independently acting boards of directors, but rather each depended on the ResCap Board for supervision. The Investigation has not uncovered evidence that the ResCap Board intended for either RFC or GMAC Mortgage to incur debts beyond its ability to pay. Nevertheless, the Examiner concludes that the evidence supports the proposition that RFC and GMAC Mortgage each reasonably should have believed it would incur debts beyond its ability to pay from August 15, 2007 through the Petition Date.

This finding is based on the issues discussed in Section VI.D as applied to RFC and GMAC Mortgage and their respective obligations within the consolidated enterprise. RFC and

---

[518] *See* Int. of W. Casey, Jan. 31, 2013, at 143:14–21.

[519] Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2009), at 98; Residential Capital, LLC Consolidated Financial Statements as of and for the Years Ended December 31, 2009 and 2008, dated Feb. 26, 2010, at 42–43 [EXAM00124455]; Residential Capital, LLC Consolidated Financial Statements as of and for the Years Ended December 31, 2010 and 2009, dated Feb. 28, 2011, at 39 [EXAM00123128]; Residential Capital, LLC Consolidated Financial Statements as of and for the Years Ended December 31, 2011 and 2010, dated Mar. 28, 2012, at 38–39 [EXAM00122651].

[520] ResCap Bond Exchange Accounting Assessment, dated July 1, 2008, at ALLY_0242724 [ALLY_0242723]; Int. of W. Casey, Jan. 31, 2013, at 143:14–21; Int. of S. Ramsey, Dec. 10, 2012, at 82:14–20; Int. of J. Lombardo, Mar. 18, 2013, at 19:18–20:2; Goldin Associates Presentation to the Committee of Independent Members of the Board of Directors of Residential Capital, LLC Regarding Proposed Amendment to the Secured Line of Credit with GMAC, LLC, dated Dec. 19, 2008, at GOLDIN00129114 [GOLDIN00129101].

[521] GMAC Mortgage, LLC Consolidated Financial Statements as of and for the Years Ended December 31, 2008 and 2007, dated Mar. 25, 2009, at 69 [EXAM00126182]; Residential Funding Company, LLC Consolidated Financial Statements as of and for the Years Ended December 31, 2008 and 2007, dated Mar. 25, 2009, at 77 [EXAM00124988].

GMAC Mortgage each received substantial capital infusions from ResCap, which was itself in financial distress as discussed above.[522] RFC and GMAC Mortgage were each dependent on payment of amounts due from its subsidiaries. Each of these subsidiaries had increasing operating deficits, making it unlikely that the subsidiaries would be capable of repaying either RFC or GMAC Mortgage, as the case may be. Finally, AFI's financial support enabled ResCap, RFC, and GMAC Mortgage to continue operations from 2007 through the Petition Date. AFI infused capital and/or liquidity into ResCap, and through ResCap's centralized cash management system, to RFC and GMAC Mortgage, to avoid imminent covenant or payment defaults. However, such infusions were insufficient to address the chronic undercapitalization of ResCap, RFC, and GMAC Mortgage that commenced on or about August 15, 2007 through the Petition Date, all as fully discussed in Section VI.C.

_____

[522] Residential Funding Company, LLC Consolidated Financial Statements as of and for the Years Ended December 31, 2007 and 2006, dated Mar. 26, 2008, at 53 [EXAM00231913]; GMAC Mortgage, LLC Consolidated Financial Statements as of and for the Years Ended December 31, 2007 and 2006, dated Mar. 25, 2008, at 5 [EXAM00232043].