## VII. REVIEW AND ANALYSIS OF ESTATE CAUSES OF ACTION IMPLICATED BY AFFILIATE TRANSACTIONS AND THE RELATIONSHIP AND COURSE OF DEALING AMONG RESCAP, AFI, ALLY BANK, AND CERBERUS

### A. SINGLE ENTITY THEORIES OF LIABILITY

#### 1. Piercing The Corporate Veil And Alter Ego Claims

The Examiner has been charged with investigating any potential claim(s) against AFI under theories of piercing the corporate veil and/or alter ego liability.[1] The Examiner concludes that Delaware law would govern and recognizes the existence of a potential claim by ResCap to pierce its own corporate veil that, if successful, could result in a judgment holding AFI liable for all of ResCap's debts.[2] The Examiner further concludes, however, that it is unlikely that any such potential veil-piercing claim would prevail.

Courts do not lightly pierce the corporate veil. A successful veil-piercing claim would require proof both (1) that ResCap and AFI operated as a "single economic entity"; and (2) of the presence of an "overall element of injustice or unfairness." Proof that AFI and ResCap operated as a "single economic entity" would have to do more than show that ResCap was AFI's wholly owned subsidiary or that AFI exercised the degree of control over ResCap that is typical of parent-subsidiary relationships. Likewise, the requisite "injustice or unfairness" must be something akin to fraud and the mere fact that ResCap is now unable to satisfy all the claims of its creditors would not be enough. Although the likelihood of success of a potential veil-piercing claim cannot be determined with complete certainty,[3] here the evidence would pose obstacles to any plaintiff seeking to surmount these high legal hurdles.

---

[1]    *See* AFI Settlement and Plan Sponsor Agreement, at 1; Examiner Scope Approval Order. The Examiner's description of the potential liability of AFI under such a theory as a "claim" is not a conclusion concerning whether such a theory is best described under applicable law as an equitable remedy or as a cause of action. *See, e.g.*, *Stern v. Singh Factors, LLC* (*In re Shore to Shore Realty Inc.*), Adv. No. 09-08296, 2011 Bankr. LEXIS 415, at *17 (Bankr. E.D.N.Y. Feb. 1, 2011) ("While piercing the corporate veil is sometimes referred to as a cause of action or a claim, it is also viewed as a remedy imposed based on the facts and circumstances of the case.").

[2]    Courts have often used the terms "alter ego," "veil piercing," and "instrumentality" liability interchangeably when analyzing claims to disregard corporate separateness. *See Pearson v. Component Tech. Corp.*, 247 F.3d 417, 485 n.2 (3d Cir. 2001) ("Although the tests employed to determine when circumstances justifying 'veil-piercing' exist are variously referred to as the 'alter ego,' 'instrumentality,' or 'identity' doctrines, the formulations are generally similar, and courts rarely distinguish them."); *Mobil Oil Corp. v. Linear Films, Inc.*, 718 F. Supp. 260, 266 (D. Del. 1989) ("The terminology used by courts in considering whether a parent corporation will be held liable for the actions of its subsidiary has not been a model of clarity . . . . A subsidiary found to be the 'alter ego' of its parent company could likewise be designated its 'instrumentality.'"). Unless specifically noted otherwise, the Examiner does not distinguish between those terms.

[3]    *See PSG Poker, LLC v. DeRosa-Grund*, Civ. No. 06-1104, 2008 U.S. Dist. LEXIS 4225, at *36 (S.D.N.Y. Jan. 22, 2008) (noting that "the standard to be met [to pierce the corporate veil under Delaware law] is high (and, it should be recognized, less than clear)"); *Allied Capital Corp. v. GC-Sun Holdings, LP*, 910 A.2d 1020, 1043 (Del. Ch. 2006) ("[T]he tests used to determine whether a corporate veil should be pierced, or an entity should be considered a mere alter ego, yield few predictable results.") (quotation marks omitted).

The Investigation has uncovered evidence indicating the presence of certain indicia that ResCap and AFI operated as a single economic entity. ResCap's conduct in connection with certain Affiliate Transactions (e.g., the 2006 Bank Restructuring, the MSR Swap and the Pipeline Swap, the First 2009 Tax Allocation Agreement and the Second 2009 Tax Allocation Agreement, and the allocation of liability in connection with the FRB/FDIC Settlement and the DOJ/AG Settlement) departed in some important respects from appropriate corporate formalities, including the requirements of ResCap's Operating Agreement. For example, as detailed in Section V.A, the 2006 Bank Restructuring, whereby ResCap transferred its 100% controlling interest in Old GMAC Bank for a non-voting interest in IB Finance and other consideration (with a value of approximately $390–465 million less than the value of the controlling interest in Old GMAC Bank that it parted with), was approved by the ResCap Board without any formal fairness opinion or valuation and without disclosure to the Independent Directors of material information about potential alternatives that would have been more favorable to ResCap. Moreover, there is evidence—in particular after the closing of the Cerberus PSA—of interference in the day-to-day operations of ResCap by AFI and Cerberus (particularly Cerberus personnel who had assumed positions with AFI) outside the normal lines of corporate authority.

The Investigation also revealed evidence that could be used to attempt to prove that certain Affiliate Transactions constituted a "siphoning" of assets from ResCap, including with respect to the 2006 Bank Restructuring and the Second 2009 Tax Allocation Agreement. Affiliate Transactions where ResCap received less than fair market value appear, however, to have been the exception—not the rule. Apart from those exceptions, the various asset sales, financings, and derivatives transactions ResCap entered into with AFI and its affiliates provided ResCap with essential liquidity and resulted in ResCap's receipt of at least—and sometimes more than—fair value. Moreover, any inference of "siphoning" that could otherwise arise would be undermined by the more than $8 billion in financial support that ResCap received from AFI beginning in 2007 in the form of cash contributions, debt forgiveness, and contributions of other assets.

There is also other evidence in the factual record that is inconsistent with the theory that ResCap and AFI operated as a single economic entity. For example, rather than being set up for financial failure, ResCap was neither inadequately capitalized nor insolvent at or around its formation. Instead, AFI contributed to ResCap in 2005 the subsidiaries RFC and GMAC Mortgage together with $2 billion in capital in the form of debt forgiveness. ResCap soon thereafter raised billions of dollars in outside financing and would report hundreds of millions of dollars of net income in 2005 and 2006. ResCap is also unlikely to be considered a "mere façade" for AFI, given that ResCap and its subsidiaries operated multiple businesses, employed thousands of people, and entered into independent contractual relationships with a wide variety of outside parties.

Even assuming arguendo that ResCap and AFI were proven to be a single economic entity, a plaintiff would still face significant obstacles to establishing the second "injustice or unfairness" element of any veil-piercing claim. The available evidence does not appear to fit

the typical paradigm of "injustice or unfairness" sometimes found sufficient to pierce the corporate veil, where a subsidiary became unable to satisfy its creditors either because it was undercapitalized by its parent at formation or later siphoned of assets by its parent. By contrast, here ResCap was not undercapitalized at formation, and those Affiliate Transactions where ResCap received less than fair value were dwarfed in size by the $8 billion in contemporaneous financial support provided by AFI. The better view of the evidence appears to be that ResCap became unable to satisfy its creditors because of the billions of dollars in operating losses it recorded beginning in the fourth quarter of 2006[4] through the end of 2007[5] (which were sufficient to render ResCap insolvent), followed by billions of dollars in additional operating losses in 2008 and 2009[6]—not because of an abuse of the corporate form by AFI.

The Examiner does not expect any potential alternative theories of "injustice or unfairness" to fare better. For example, although the evidence supports the proposition that AFI's financial support of ResCap was at all times self-interested and generally inadequate to do more than maintain ResCap on "life support," the Investigation has uncovered no significant evidence that ResCap or its creditors were harmed as a result. That AFI may have continued to support ResCap as a means to the end of achieving bank holding company status and obtaining TARP funds does not change the effect of that support on ResCap's balance sheet. Without more, the Examiner expects that such theories would prove insufficient to warrant piercing the corporate veil and therefore concludes that such claims would not succeed.

### a. Choice Of Law

The Second Circuit Court of Appeals and lower courts in this circuit have in general recognized that "[t]he law of the state of incorporation determines when the corporate form

---

[4]   *See* Residential Capital, LLC, Annual Report (Form 10-K) (Mar. 13, 2007), at 54 (fourth quarter 2006 operating loss of $651 million); *see also* Section III.F.

[5]   *See* Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2008), at 56 (2007 net loss of $4.3 billion); *see also* Section III.G.

[6]   *See* Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 3, 2009), Item 9.01 (2008 net loss of $5.6 billion); *see also* Sections III.H and III.I.

will be disregarded and liability will be imposed on shareholders."[7] According to those courts, "[b]ecause a corporation is a creature of state law whose primary purpose is to insulate shareholders from legal liability, the state of incorporation has the greater interest in determining when and if that insulation is to be stripped away."[8] Under this approach, Delaware law would apply to any potential veil-piercing claim brought on behalf of ResCap against AFI, because ResCap (i.e., the entity with the "corporate veil" that needs to be "pierced" to reach indirect parent AFI) is organized under the laws of Delaware.[9]

Nonetheless, certain decisions by courts in this circuit have held or suggested that, at least in limited circumstances, the substantive law of a jurisdiction other than the jurisdiction of incorporation might be applied to a veil-piercing claim. For example, at least one such court has recognized that the veil-piercing law of the jurisdiction of incorporation may be "disregard[ed] . . . when the Defendant's contacts and the events at issue in the case substantially implicate [a different jurisdiction]" and contacts with the jurisdiction of

---

[7]   *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995) ("Because [subsidiary] Atex was a Delaware corporation, Delaware law determines whether the corporate veil can be pierced in this instance."); *see also Quinn v. Teti*, No. 99-9433, 2000 U.S. App. LEXIS 27210, at *7–8 & n.2 (2d Cir. Oct. 27, 2010) (assuming that Idaho law applies to veil-piercing claims where subsidiary "was an Idaho corporation"); *Kalb, Voorhis & Co., v. Am. Fin. Corp.*, 8 F.3d 130, 132 (2d Cir. 1993) ("Texas substantive law applies to this alter ego claim because Texas is the place of [the subsidiary's] incorporation"); *Official Comm. of Unsecured Creditors v. Bay Harbour Master Ltd.* (*In re BH S&B Holdings LLC*), 420 B.R. 112, 133 (Bankr. S.D.N.Y. 2009) (Glenn, J.) ("Since Holdings, Holdco and most of the other corporate entities here are based in Delaware, Delaware law applies to the veil-piercing and fiduciary-breach claims."); *In re Alper Holdings USA*, Case No. 07-12148, 2008 Bankr. LEXIS 522, at *16 n.7 (Bankr. S.D.N.Y. Feb. 25, 2008) ("[T]he law of the state of incorporation controls the analysis of alter ego claims and, accordingly, Delaware law controls our analysis."); *Official Comm. of Unsecured Creditors of RSL Com Primecall, Inc. v. Beckoff* (*In re RSL Com Primecall, Inc.*), Adv. Proc. No. 03-2176, 2003 Bankr. LEXIS 1635, at *24 (Bankr. S.D.N.Y. Dec. 11, 2003) (applying Delaware veil-piercing law "[s]ince [subsidiary] RSL USA is a Delaware corporation"); *Duke Energy Trading and Mktg., LLC v. Enron Corp.* (*In re Enron Corp.*), Adv. Proc. No. 02-3609A, 2003 Bankr. LEXIS 330, at *10 n.11 (Bankr. S.D.N.Y. Apr. 17, 2003) (applying Delaware law to determine "whether the Debtors have the right to assert a claim to pierce their own corporate veils" where the debtors "whose corporate veils the Duke Entities seek to pierce, are Delaware corporations or, in one instance, a Delaware limited liability company").

[8]   *Kalb, Voorhis & Co.*, 8 F.3d at 132 (quoting *Soviet Pan Am Travel Effort v. Travel Comm.*, 756 F. Supp. 126, 131 (S.D.N.Y. 1991)).

[9]   Assuming arguendo that the veil of ResCap's direct parent GMAC Mortgage Group LLC would separately need to be pierced, it too is organized under the laws of Delaware. As discussed at Section VII.A.1.c, there appear to be unsettled questions of Delaware law concerning whether and how intermediate entities like GMAC Mortgage Group LLC should be taken into consideration when assessing a veil-piercing claim against an indirect parent entity (here, AFI).

incorporation are minimal or nonexistent.[10] Moreover, "a separate line of cases . . . has applied substantive New York state law to veil piercing claims" where the parties "agreed, by briefing the veil piercing claim solely under New York law or otherwise, to apply New York law to the claim," and New York law and the law of the jurisdiction of incorporation are "virtually identical."[11]

Although the case law is not entirely uniform in this respect, the Examiner concludes that the application of Delaware law to the assessment of potential veil-piercing claims is consistent with the weight of authority in this circuit. Moreover, none of the parties has argued that the law of a different jurisdiction should apply here.[12]

### b. Can A Debtor Pierce Its Own Corporate Veil?

AFI, the Creditors' Committee, and the Debtors agree that "Delaware law allows a subsidiary to maintain an action [to pierce its own corporate veil] against a corporate

---

[10] *See Hayden Capital USA, LLC v. Northstar Agri Indus., LLC*, Civ. No. 11-594, 2012 U.S. Dist. LEXIS 58881, at *17–19 (S.D.N.Y. Apr. 23, 2012) (applying law of "Delaware, as the state of incorporation" to successor liability claim where although defendants' "contacts with Delaware are minimal, their contacts with New York are non-existent"); *see also UBS Sec. LLC v. Highland Capital Mgmt., LP*, 93 A.D.3d 489, 490 (N.Y. App. Div. 2012) (holding that "[t]he motion court correctly ruled that New York law governs plaintiff's veil-piercing claim" where entity was incorporated in Cayman Islands but had no other ties there); *Serio v. Ardra Ins. Co.*, 304 A.D.2d 362, 362 (N.Y. App. Div. 2003) (New York law applied to claim to pierce the veil of entity "incorporated in Bermuda, [where its] contacts with that jurisdiction were minimal").

[11] *See Wausau Bus. Ins. Co. v. Turner Constr. Co.*, 141 F. Supp. 2d 412, 417 (S.D.N.Y. 2001) ("As the standards for piercing the corporate veil are substantially similar under Delaware and New York law, New York law will be applied as per the parties' submissions.") (internal citation omitted); *Kempf v. Mitsui Plastics, Inc.*, Civ. No. 96-1106, 1996 U.S. Dist. LEXIS 17240, at *9 n.1 (S.D.N.Y. Nov. 18, 1996) ("Since there is no dispute between the parties, and they have not briefed the law of any other jurisdiction, I will apply New York law. I note, however, that the parties' assumption is probably incorrect [because Delaware was the state of incorporation]."); *S.J. Berwin & Co. v. Evergreen Entm't Group, Inc.*, Civ. No. 92-6209, 1995 U.S. Dist. LEXIS 15155, at *5–6 (S.D.N.Y. Oct. 12, 1995) ("Although it is clear that Delaware law should have applied to the piercing claim [of a Delaware corporation] from the outset, the law of the case doctrine, the conduct of the parties, and the fact that Delaware's piercing standard is not all that different from the one used in New York suggest that New York law should continue to apply.").

[12] *See* AFI Submission Paper, dated Dec. 19, 2012, at 3 ("Delaware law will govern any claim to pierce the corporate veil"); Debtors' Submission Paper, dated Dec. 18, 2012, at 86 ("Delaware law applies to any alter ego claims asserted against AFI or the Debtors"); Creditors' Committee Submission Paper, dated Mar. 7, 2013, at 88 n.71 ("Delaware law governs the Committee's veil-piercing claim"); Wilmington Trust Submission Paper, dated Oct. 24, 2012, at 30 ("Delaware law applies to any veil piercing analysis . . . .").

parent."[13] Although the Examiner concludes that those parties are correct, further discussion is warranted because "there is a great deal of ambiguity regarding whether [such] an alter ego claim or remedy [is available and] constitutes property of the estate."[14] "Bankruptcy courts normally determine whether any alter ego claims are included in the bankruptcy estate by looking at the law of the state where the corporate debtor is incorporated."[15] "[B]ecause the issue of whether alter ego claims constitute estate assets turns on state law, courts in different jurisdictions have come to different conclusions."[16]

---

[13] Debtors' Amended Joinder to Motion By Ally Financial Inc. and Ally Bank for an Order Enforcing the Automatic Stay Pursuant to 11 U.S.C. Section 362(a)(3) (Feb. 4, 2013) [Docket No. 2834] at 7; *see also* Motion By Ally Financial Inc. and Ally Bank for an Order Enforcing the Automatic Stay Pursuant to 11 U.S.C. § 362(a)(3) (Dec. 21, 2012) [Docket No. 2511] at 9 ("[A] bankruptcy trustee or debtor in possession has the right [under Delaware law] to assert a veil-piercing or alter ego claim on behalf of the estate."); AFI Submission Paper, dated Dec. 19, 2012, at 25 ("[E]ven if there were a potentially viable veil-piercing claim against AFI (and there is not), such a claim is the property of ResCap's estate . . . ."); Creditors' Committee Submission Paper, dated Mar. 7, 2013, at 87 n.68 ("[A]s a general matter, the veil-piercing claim belongs to the estate.").

[14] *In re Flintkote Co. and Flintkote Mines Ltd.*, 486 B.R. 99, 119 (Bankr. D. Del. 2012); *see also Limor v. Buerger* (*In re Del-Met Corp.*), 322 B.R. 781, 830 (Bankr. M.D. Tenn. 2005) ("A variety of fact patterns, difficult or nonexistent state law and not altogether consistent interpretations of state law by federal courts have produced a patchwork of reported decisions addressing whether a bankruptcy trustee has standing to disregard corporate form in an action to reach the assets of a nondebtor or to hold a nondebtor responsible for debts of the debtor."); *Raytheon Co. v. Boccard USA Corp.*, 369 S.W.3d 626, 636 (Tex. Ct. App. 2012) ("The decisions [concerning] whether a trustee has standing to assert an alter ego claim on behalf of the bankruptcy estate . . . vary widely from state to state.").

[15] *MeccaTech, Inc. v. Kiser*, Civ. No. 05-570, 2008 U.S. Dist. LEXIS 30829, at *36 (D. Neb. Apr. 15, 2008); *see also Kalb, Voorhis & Co. v. Am. Fin. Corp.*, 8 F.3d 130, 132 (2d Cir. 1993) ("If under governing state law the debtor could have asserted an alter ego claim to pierce its own corporate veil, that claim constitutes property of the bankrupt estate and can only be asserted by the trustee or the debtor-in-possession."); *Mixon v. Anderson* (*In re Ozark Restaurant Equip. Co.*), 816 F.2d 1222, 1226 n.7 (8th Cir. 1987) ("It is possible that some states permit the corporation or its stockholders to assert an alter ego cause of action to pierce the corporate veil, and thus, that a bankruptcy trustee would be able to enforce the claim . . . ."); *Mannucci v. Cabrini Med. Ctr.* (*In re Cabrini Med. Ctr.*), Civ. No. 12-6661, 2012 U.S. Dist. LEXIS 180896, at *20 (S.D.N.Y. Dec. 20, 2012) ("[T]he question of whether a veil-piercing claim is property of the estate . . . is a matter determined by the source of law giving rise to the veil piercing claim."); *Krasny v. Bagga* (*In re Jamuna Real Estate, LLC*), 365 B.R. 540, 563 (Bankr. E.D. Pa. 2007) ("[T]he majority of the decisions have allowed a trustee to bring an alter ego claim, but the result is a function of the underlying state law."); *Turner v. Bolduc* (*In re Crowe Rope Indus., LLC*), 307 B.R. 1, 6 (Bankr. D. Me. 2004) ("Whether a corporation can pierce its own veil must be determined under state law."); *Duke Energy Trading and Mktg., LLC v. Enron Corp.* (*In re Enron Corp.*), Adv. Proc. N 02–3609A, 2003 Bankr. LEXIS 330, at *10 (Bankr. S.D.N.Y. Apr. 17, 2003) ("Where a debtor has a right to assert an alter ego claim to pierce its own corporate veil under applicable state law, that claim is property of the debtor's estate and the claim may only be asserted by the trustee or debtor-in-possession."); 5 [COLLIER ON BANKRUPTCY] 541.07[5] (16th Ed. 2012) ("Bankruptcy trustees sometimes sue corporate affiliates of the debtor under a theory of alter ego. The standing of the trustee . . . generally depends upon whether, under nonbankruptcy law, the debtor itself would have had standing.").

[16] *In re Flintkote Co. and Flintkote Mines Ltd.*, 486 B.R. at 120 & n.57 (confirming plan of reorganization that provided for "abandonment of the alter ego claim, to the extent the estate holds one") (collecting cases); *see also* William T. Vukovich, *Civil Remedies in Bankruptcy for Corporate Fraud*, 6 AM. BANKR. INST. L. REV. 439, 461–62 (Winter 1998) ("Because different states answer this question differently, some cases hold that it is the right of the estate and assertable by the trustee while others conclude that it is the right of creditors and may not be asserted by the trustee.").

Although "[i]t may seem strange to allow a corporation to pierce its own veil, since it cannot claim to be . . . a creditor that was deceived or defrauded by the corporate fiction," various courts have recognized that the laws of several states permit "a debtor corporation to pursue a claim based upon such a theory."[17] Courts that have recognized such a claim have done so in part because, under the applicable substantive law, "piercing the corporate veil or alter ego causes of action are based upon preventing inequity or unfairness" and "are not based solely on a policy of protecting creditors."[18] Those courts also have "reasoned that allowing the representative of a corporation's bankruptcy estate to assert the claim, rather than

---

[17] *Phar-Mor, Inc. v. Coopers & Lybrand*, 22 F.3d 1228, 1240 n.20 (3d Cir. 1994); *see also Baillie Lumber Co., LP v. Thompson*, 413 F.3d 1293, 1295 (11th Cir. 2005) (Georgia law); *Steyr-Daimler-Puch of Am. Corp. v. Pappas*, 852 F.2d 132, 136 (4th Cir. 1988) (Virginia law); *Koch Refining v. Farmers Union Cent. Exch., Inc.*, 831 F.2d 1339, 1346 (7th Cir. 1987) (Illinois and Indiana law); *S.I. Acquisition, Inc. v. Eastway Delivery Serv., Inc.* (*In re S.I. Acquisition, Inc.*), 817 F.2d 1142, 1153 (5th Cir. 1987) (Texas law); *St. Paul Fire and Marine Ins. Co v. PepsiCo, Inc.*, 884 F.2d 688, 703 (2d Cir. 1989) (Ohio law); *Schupper v. Gefreh* (*In re Monument Gun Shop, Inc.*), Civ. No. 98-2288, 1999 U.S. Dist. LEXIS 23590, at *33–34 (D. Colo. Sept. 30, 1999) (Colorado law); *Towe v. Martinson*, 195 B.R. 137, 140–41 (D. Mont. 1996) (Montana law); *ANR Limited Inc. v. Chattin*, 89 B.R. 898, 904 (D. Utah 1988) (Utah law); *In re Cabrini Med. Ctr.*, Bankr. Case. No. 09-14398, 2012 Bankr. LEXIS 2747, at *28 (Bankr. S.D.N.Y. June 15, 2012) (New York law), *aff'd*, Civ. No. 12-6661, 2012 U.S. Dist. LEXIS 180896, at *21 (S.D.N.Y. Dec. 20, 2012); *Slone v. Lorenz* (*In re Lorenz*), Adv. No. 10-3264, 2011 Bankr. LEXIS 738, at *30 (Bankr. S.D. Ohio Mar. 8, 2011) (Ohio law); *In re Jamuna Real Estate, LLC*, 365 B.R. at 564 (Pennsylvania law); *In re Bridge Info. Sys., Inc.*, 325 B.R. 824, 833–34 (Bankr. E.D. Mo. 2005) (Missouri Law), *aff'd*, 344 B.R. 587, 596 (E.D. Mo. 2006); *Tsai v. Buildings By Jamie, Inc.* (*In re Buildings By Jaime, Inc.*), 230 B.R. 36, 41 (Bankr. D.N.J. 1998) (New Jersey law); *Henderson v. Buchanan* (*In re W. World Funding, Inc.*), 52 B.R. 743, 784 (Bankr. D. Nev. 1985) (Nevada law), *aff'd in part and rev'd in part*, 131 B.R. 859 (D. Nev. 1990), *rev'd*, 985 F.2d 1021 (9th Cir. 1993).

[18] *Phar-Mor, Inc.*, 22 F.3d at 1240 n.20; *see also St. Paul Fire and Marine Ins. Co.*, 884 F.2d at 703 ("If injustice would result from a corporation's not being recognized as the alter ego of its subsidiary, and that subsidiary brought an alter ego action against the parent, there is nothing to indicate that such an action would not be recognized in Ohio."); *In re S.I. Acquisition, Inc.*, 817 F.2d at 1152 ("[T]he predominate policy of Texas alter ego law is that the control entity that has misused the corporation form will be held accountable for the corporation's obligations. Since the corporation has an independent existence at law, we do not believe it is inconsistent in light of the above policy to say that a corporation may pierce its own corporate veil and hold accountable those who have misused the corporation in order to meet its corporate obligations.") (internal citations omitted); *Raytheon Co.*, 369 S.W.3d at 638 (concluding that Delaware and Pennsylvania law afford an insolvent corporation "standing to pierce its own corporate veil" and explaining that "[t]he focus of Delaware and Pennsylvania law is on the conduct of the corporation rather than on the relationship between the corporation and its creditors"); *Baillie Lumber Co. v. Thompson*, 612 S.E.2d 296, 300 (Ga. 2005) ("Georgia alter ego law is not focused solely on the relationships between parties, but also is premised on equitable principles designed to prevent unjust treatment in appropriate circumstances. We are convinced that this reasoning . . compels that we recognize that in these circumstances, a corporation has a right to pursue an alter ego action [in bankruptcy].") (internal citation omitted).

an individual creditor, furthers a goal of the Bankruptcy Code of providing similarly situated creditors with an equal distribution."[19] "Otherwise, any creditor could seek remuneration from the debtor's [parent], and the multi-jurisdictional, first-come/first-served, unequal distribution, which cuts against the policies of the Code, would be promoted."[20]

By contrast, courts applying the laws of certain "other states, including Arkansas, North Dakota, Missouri, Michigan, and Maryland, have held that a corporation may not pierce its own veil."[21] Such courts have "generally held that, in those states, piercing the corporate veil

---

[19]   *In re iPCS Wireless, Inc.*, 297 B.R. 283, 297–98 (Bankr. N.D. Ga. 2003) (recognizing estate veil-piercing claim under Delaware law); *see also Kalb, Voorhis & Co.,* 8 F.3d at 133 ("granting the bankruptcy trustee exclusive standing to assert alter ego claims furthers the bankruptcy policy of ensuring that all similarly situated creditors are treated fairly"); *Koch Refining*, 831 F.2d at 1346 ("[T]his logical procedure obviates multiple liability of the debtor to separate creditors and accords with the Bankruptcy Code's ultimate goal of balancing the equities . . . in a bankruptcy case."); *In re Monument Gun Shop, Inc.*, 1999 U.S. Dist. LEXIS 23590, at *34 ("By confining the alter-ego claim to the bankruptcy forum, it promotes the overriding policy of the Bankruptcy Code of 'equality of distribution among creditors,' as any recovery the bankruptcy trustee may have inures to the benefit of the bankruptcy estate.") (quotation marks omitted); *In re Enron Corp.*, 2003 Bankr. LEXIS 330, at *12 ("The trustee or debtor-in-possession is given exclusive right to assert alter ego claims to ensure fair and equitable treatment of all similarly situated creditors."); *Moore v. Kumer* (*In re Adam Furniture Indus., Inc.*), 191 B.R. 249, 255 (Bankr. S.D. Ga. 1996) ("Within the bankruptcy context . . . it is entirely reasonable that an objective third-party, the trustee, would pursue the claim to enhance the debtor's estate.").

[20]   *In re Schimmelpenninck*, 183 F.3d 347, 356 (5th Cir. 1999); *see also In re Enron Corp.*, 2003 Bankr. LEXIS 330, at *12 ("Allowing the trustee or debtor-in-possession to pursue the claim avoids the prospect of creditors . . . pursuing the alter ego claims on a first-come, first-serve basis.").

[21]   *Elegant Custom Homes, Inc. v. Dusharm* (*In re Elegant Custom Homes, Inc.*), Civ. No. 06-2574, 2007 U.S. Dist. LEXIS 35564, at *9–11 (D. Ariz. May 14, 2007) (Arizona law); *see also Ahcom, Ltd. v. Smeding*, 623 F.3d 1248, 1252 (9th Cir. 2010) (California law); *Spartan Tube and Steel, Inc. v. Himmelspach* (*In re RCS Engineered Prods. Co.*), 102 F.3d 223, 226 (6th Cir. 1996) (Michigan law); *Mixon v. Anderson* (*In re Ozark Restaurant Equip. Co.*), 816 F.2d 1222, 1226 & n.7 (8th Cir. 1987) (Arkansas law); *Regions Bank v. JP Realty Partners, Ltd.*, Civ. No. 12-01113, 2012 U.S. Dist. LEXIS 173210, at *35 (M.D. Tenn. Dec. 6, 2012) (Tennessee law); *Turner v. Bolduc* (*In re Crowe Rope Indus., LLC*), 307 B.R. 1, 7 (Bankr. D. Me. 2004) (Maine law); *Nat'l City Bank of Minneapolis v. Lapides (In re Transcolor Corp.),* 296 B.R. 343, 365 (Bankr. D. Md. 2003) (Maryland law); *Mar-Kay Plastics, Inc. v. Reid Plastics, Inc.* (*In re Mar-Kay Plastics, Inc.*)*,* 234 B.R. 473, 481–82 (Bankr. W.D. Mo. 1999) (Missouri law); *Limor v. Buerger* (*In re Del-Met Corp.*), 322 B.R. 781, 833–34 (Bankr. M.D. Tenn. 2005) (Tennessee law); *Amazing Enters. v. Jobin* (*In re M&L Bus. Mach. Co.*), 136 B.R. 271, 278 (Bankr. D. Colo. 1992) (Colorado law); *Armstrong v. Pedie* (*In re Dakota Drilling, Inc.*), 135 B.R. 878, 884 (Bankr. D.N.D. 1991) (North Dakota law); *Robert K. Morrow, Inc. v. Kelson* (*In re Morgan-Staley Lumber Co., Inc.*), 70 B.R. 186, 188 (Bankr. D. Or. 1986) (Oregon law); *Selcke v. Hartford Fire Ins. Co.* (*In re Rehabilitation of Centaur Ins. Co.*), 632 N.E.2d 1015, 1017 (Ill. 1994) (Illinois law).

is designed to protect the rights of third party creditors, not to protect the rights of the corporation itself."[22] Certain of those courts also have concluded that, under applicable state law, "an alter ego claim is not by itself a cause of action" and therefore cannot give rise to an estate claim.[23] For example, in *Ahcom, Ltd. v. Smeding*, the U.S. Court of Appeals for the Ninth Circuit reversed the dismissal of a veil-piercing claim asserted by a creditor against the debtor's owners, in part because California law does not "permit[] a corporation to bring a general alter ego claim against its owners."[24] The Ninth Circuit reasoned that, under California law, "there is no such thing as a substantive alter ego claim at all," and it was a "made-up cause of action."[25]

No party has identified any controlling decision on point applying Delaware law and the Examiner's Professionals have not located any such decision.[26] Courts in the Second Circuit and other jurisdictions have "found that a Delaware court would permit a debtor corporation to

---

[22] *Raytheon Co.*, 369 S.W.3d at 636; *see also In re RCS Engineered Prods. Co.*, 102 F.3d at 226 ("[T]he corporate veil is pierced only for the benefit of third parties, and never for the benefit of the corporation or its stockholders."); *In re Ozark Restaurant Equip. Co.*, 816 F.2d at 1225 ("[T]he obligations and liabilities of an action to pierce the corporate veil in Arkansas do not run to the corporation, but to third parties, *e.g.*, creditors of the corporation."); *In re Elegant Custom Homes, Inc.*, 2007 U.S. Dist. LEXIS 35564, at *11 ("[O]nly third parties who deal with the corporation may bring a veil piercing action."); *In re M&L Bus. Mach. Co.*, 136 B.R. at 278 ("The [veil-piercing] liability itself arises from fraud or injustice perpetrated not on the corporation, but on third persons dealing with the corporation."); *In re Dakota Drilling, Inc.*, 135 B.R. at 884 ("The trustee does not identify from where his power to invoke an alter ego remedy was derived, but . . . piercing of a corporate veil must never be made for the benefit of the corporation or its shareholders."); *In re Rehabilitation of Centaur Ins. Co.*, 632 N.E.2d at 1018 ("The alter ego doctrine was developed for and has been traditionally used by third persons injured due to their reliance on the existence of a distinct corporate entity."). Nonetheless, some courts have concluded that "the usual requirement of third-party benefit for a veil-piercing claim is, in fact, met in the case of an insolvent corporation [in] bankruptcy," because "any alter ego claim asserted by the corporation itself will necessarily benefit third parties by providing more money with which to satisfy unsecured claims." *Baillie Lumber Co.*, 612 S.E.2d at 300.

[23] *In re RCS Engineered Prods. Co.*, 102 F.3d at 226; *see also* Mark L. Prager, *Pursuing Alter-Ego Liability Against Non-Bankrupt Third Parties: Structuring a Comprehensive Conceptual Framework*, 35 St. Louis U.L.J. 657, 690 (1991) ("Alter ego is not a cause of action in itself; rather, it is an equitable remedy which permits a creditor to impose on owners the liability for a pre-existing claim against the corporation. A corporation, of course, cannot possess a claim against itself. Thus, it possesses no cause of action for which it may shift the liability to its owners under the alter ego doctrine."); Richard L. Epling, *Trustee's Standing to Sue in Alter Ego or Other Damage Remedy Actions*, 6 Bankr. Dev. J. 191, 196 (1989) ("There is the strong sense . . . that federal courts [recognizing that a corporation may pierce its own corporate veil] are creating, not construing, state law in order to reach an appropriate policy result. These courts have made a determination that . . . the trustee is the best party to bring suit.").

[24] 623 F.3d at 1251.

[25] *Id.* at 1251–52.

[26] *See MC Asset Recovery, LLC v. S. Co.*, Civ. No. 06-0417, 2006 U.S. Dist. LEXIS 97034, at *40–42 (N.D. Ga. Dec. 11, 2006) (noting that "there are no Delaware cases directly on-point," apparently "because no Delaware court has ever addressed that question"); *Raytheon Co.*, 369 S.W.3d at 633 ("No Delaware . . . state court has answered this question.").

assert a claim to pierce its own corporate veil."[27] This finding has in part been "[b]ased on the fact that Delaware law allows a subsidiary [in certain other contexts] to maintain an action against a corporate parent."[28] In *Murray v. Miner*, for example, the U.S. District Court for the Southern District of New York explained that "[a]lthough no cases have been found holding that a trustee of a debtor corporation in bankruptcy may bring such a [veil-piercing] claim, several cases make clear that under Delaware law, a subsidiary may maintain an action against its corporate parent or controlling shareholder."[29] According to the *Murray* court, "[t]hese cases indicate that under Delaware law, because of a corporate parent's fiduciary duties to a subsidiary, the subsidiary may institute proceedings against the parent if it has sustained liability to third parties as a result of the parent's control."[30] Certain litigants have criticized *Murray* and its progeny for a "lack of analysis," but their criticisms appear not to have been met with success.[31]

---

[27]  *See Duke Energy Trading and Mktg., LLC v. Enron Corp.* (*In re Enron Corp.*), Adv. Proc. No. 03-2176, 2003 Bankr. LEXIS 330, at *11(Bankr. S.D.N.Y. Apr. 17, 2003); *see also MeccaTech, Inc. v. Kiser*, Civ. No. 05-570, 2008 U.S. Dist. LEXIS 30829, at *38 n.14 (D. Neb. Apr. 15, 2008) ("[T]he claim of a corporate debtor to pierce its own corporate veil is permitted under Delaware law."); *MC Asset Recovery, LLC*, 2006 U.S. Dist. LEXIS 97034, at *42 ("agree[ing] that Delaware law would allow [an action by a corporation to pierce its own corporate veil]"); *Murray v. Miner*, 876 F. Supp. 512, 517 (S.D.N.Y. 1995) ("[T]he trustee has sole standing to raise all alter ego claims of a general nature asserted [under Delaware law] by the Gnubrokers Companies' creditors."); *In re Alper Holdings USA*, Case No. 07-12148, 2008 Bankr. LEXIS 522, at *17 (Bankr. S.D.N.Y. Feb. 25, 2008) ("Under Delaware law, an alter ego cause of action constitutes a corporate right."); *In re Spiegel, Inc.*, Case No. 03-11540, 2006 Bankr. LEXIS 2158, at *25 (Bankr. S.D.N.Y. Aug. 16, 2006) ("[T]he alter ego type claims . . . are by law property of the Debtors . . . ."); *In re iPCS Wireless, Inc.*, 297 B.R. 283, 297 (Bankr. N.D. Ga. 2003) (agreeing that "Delaware law would allow a bankrupt corporation to pierce its own corporate veil" and granting creditors' committee's application for leave to assert veil-piercing claim to hold "the Sprint Companies . . . liable for the Debtors' debts"); *Raytheon Co.*, 369 S.W.3d at 638 ("[U]nder Delaware and Pennsylvania law, a corporation, particularly an insolvent one, has standing to pierce its own corporate veil under an alter ego theory to reach the assets of its parent."). Still other opinions have decided motions to dismiss claims asserted on behalf of a debtor seeking to pierce the debtor's own corporate veil without discussion of whether such claims are permitted by Delaware law. *See Burtch v. Opus, LLC* (*In re Opus East, LLC*), 480 B.R. 561, 571 (Bankr. D. Del. 2012) (granting on other grounds motion to dismiss without prejudice veil-piercing claim asserted by trustee against debtor's parent); *Official Comm. of Unsecured Creditors v. Bay Harbour Master Ltd.* (*In re BH S&B Holdings LLC*), 420 B.R. 112, 52 n.15 (Glenn, J.) (Bankr. S.D.N.Y. 2009) (granting motion to dismiss veil-piercing claim asserted by the creditors' committee and noting that "[t]he Complaint here only asserts claims belonging to the Debtors"); *Official Comm. of Unsecured Creditors of Verestar, Inc. v. Am. Tower Corp.* (*In re Verestar, Inc.*), 343 B.R. 444, 462, 465 (Bankr. S.D.N.Y. 2006) (denying motion to dismiss veil-piercing claim asserted by creditors' committee on behalf of debtor seeking judgment declaring that parent "should be liable for all of their debts").

[28]  *See In re Enron Corp.*, 2003 Bankr. LEXIS 330, at *11.

[29]  876 F. Supp. at 516.

[30]  *Id.* at 516–17 (S.D.N.Y. 1995).

[31]  *Raytheon Co.*, 369 S.W.3d at 633, 638; *see also MC Asset Recovery, LLC*, 2006 U.S. Dist. LEXIS 97034, at *40–41 (rejecting "attempt to question the holdings of [*Murray* and its progeny]" and noting that the defendant "can cite to no cases supporting [the] proposition [that Delaware law does not permit a subsidiary to pierce its own corporate veil]").

Accordingly, and although the issue is not entirely free from doubt in light of the apparent absence of controlling authority, the Examiner concludes that Delaware law recognizes the existence of a claim on behalf of a debtor to pierce its own corporate veil. Such an "alter ego claim constitutes property of the debtor corporation, and the debtor-in-possession or bankruptcy trustee, rather than individual creditors, has exclusive standing to assert the claim."[32] If granted standing by the Bankruptcy Court, a creditors' committee may pursue such a veil-piercing claim on behalf of the debtor's estate.[33] A debtor that succeeds in piercing its own corporate veil may "hold [its parent] liable for all of the Debtors' debts."[34]

---

[32]  *Kalb, Voorhis & Co. v. Am. Fin. Corp.*, 8 F.3d 130, 133 (2d Cir. 1993); *see also In re Enron Corp.*, 2003 Bankr. LEXIS 330, at *11 ("[T]he trustee or debtor-in-possession would have exclusive standing to maintain a Delaware corporation's alter ego claim of a general nature."). The Examiner considers whether those Third-Party Claimants that have asserted claims against AFI on a veil-piercing theory have standing to pursue such claims in Section VIII.C.

[33]  *See Official Comm. of Unsecured Creditors v. Bay Harbour Master Ltd.* (*In re BH S&B Holdings LLC*), 420 B.R. 112, 52 & n.15 (Glenn, J.) (Bankr. S.D.N.Y. 2009) (granting motion to dismiss veil-piercing claim asserted by the creditors' committee; noting that a prior order had granted the committee standing to pursue estate claims and "[t]he Complaint here only asserts claims belonging to the Debtors"); *Official Comm. of Unsecured Creditors of Verestar, Inc. v. Am. Tower Corp.* (*In re Verestar, Inc.*), 343 B.R. 444, 458–59 (Bankr. S.D.N.Y. 2006) (denying motion to dismiss veil-piercing claim asserted by creditors' committee and noting that the court had previously "approved a stipulation . . . granting the Committee standing to pursue claims on behalf of the Debtors").

[34]  *Official Comm. of Unsecured Creditors of RSL Com Primecall, Inc. v. Beckoff* (*In re RSL Com Primecall, Inc.*), Adv. Proc. No. 03-2176, 2003 Bankr. LEXIS 1635, at *49 (Bankr. S.D.N.Y. Dec. 11, 2003) (granting motion to dismiss veil-piercing claim for failure to state a claim); *see also Palmer v. Am. Bodyworks, Inc.* (*In re Secure Buildout, LLC*), Adv. No. 12-05063, 2012 Bankr. LEXIS 4554, at *13 (Bankr. N.D. Ga. Aug. 22, 2012) ("Georgia law allows a corporation to pierce its own veil to hold the corporation's principals liable for the entirety of the corporations debts."); *In re Verestar, Inc.*, 343 B.R. at 462 (denying motion to dismiss veil-piercing claim asserting "that the Debtors should be treated as [the parent's] alter ego, and that [the parent] should be liable for all of their debts."); *In re iPCS Wireless, Inc.*, 297 B.R. 283, 298 (Bankr. N.D. Ga. 2003) ("[T]he injury is one that has been suffered by the corporation because of the exertion of control by another corporation, and the equitable remedy would be one that would provide a recovery to all of the Debtors' creditors, rather than to a particular creditor.") (applying Delaware law); William T. Vukovich, *Civil Remedies in Bankruptcy for Corporate Fraud*, 6 AM. BANKR. INST. L. REV. 439, 461 (1998) ("[T]he effect of disregarding the corporate veil is to hold the shareholders liable for the corporate debts.").

   c.  *How Many Corporate Veils Must Be Pierced To Reach The Ultimate Parent Company?*

Were a claim to be brought seeking to pierce the corporate veil of ResCap to impose liability on AFI, a question might arise as to whether it would be necessary also to plead and prove that the corporate veil of GMAC Mortgage Group LLC, ResCap's direct parent, should be pierced. The state of the law as to this question has been described as "far from clear" and there does not appear to be any controlling precedent on point.[35] Courts applying Delaware law to veil-piercing claims in circumstances involving intermediate entities have reached different conclusions. In *Faulkner v. Kornman (In re Heritage Org., LLC)*, for example, the Bankruptcy Court for the Northern District of Texas concluded that under Delaware law the test for veil-piercing liability "must be applied to, and satisfied at, each level or layer of ownership applicable within the multi-faceted entity structure."[36] That court further explained that veil-piercing "does not work on . . . a global basis" to "collapse" all related entity defendants.[37]

---

[35]  *See In re BH S&B Holdings LLC*, 420 B.R. at 135 ("Since . . . the Committee has not adequately pled a veil-piercing theory . . . the Court does not have to reach the question whether the Committee would have to pierce each veil separately."); *see also Sykes v. Mel Harris and Assocs., LLC*, 757 F. Supp. 2d 413, 430 & n.15 (S.D.N.Y. 2010) ("The law in this jurisdiction is unclear as to whether a plaintiff is required to pierce the veil of each layer of alleged corporate control. Deciding that issue is not necessary here, as I find a plausible claim of veil-piercing against LNC with respect to the seven other corporate entities.") (internal citation omitted).

[36]  413 B.R. 438, 514 (Bankr. N.D. Tex. 2009) (entering judgment against plaintiff after trial on veil-piercing claims); *see also Soroof Trading Dev. Co. v. GE Microgen, Inc.*, Civ. No. 10-1391, 2012 U.S. Dist. LEXIS 67736, at *26 n.9 (S.D.N.Y. May 11, 2012) (granting motion for leave to filed amended complaint and noting that "it is necessary to pierce the corporate veil at each 'level or layer' of ownership" under Delaware law); *Hechinger Liquidation Trust v. Cooper Bussmann, Inc.* (*In re Hechinger Inv. Co. of Del., Inc.*), 297 B.R. 390, 393 n.3 (Bankr. D. Del. 2003) (denying motion for leave to file amended complaint and noting that "[t]echnically, in order to pierce the corporate veil to reach [proposed additional defendant] Cooper, Plaintiff would need to show that Bussmann was a mere instrumentality of its parent, McGraw-Edison, and that McGraw-Edison was a mere instrumentality of its parent, Cooper").

[37]  *In re Heritage Org., LLC*, 413 B.R. at 515.

Notably, in *Official Comm. of Unsecured Creditors v. Bay Harbour Master Ltd. (In re BH S&B Holdings LLC)*, the Court appeared to express misgivings with the *In re Heritage Org., LLC* approach, explaining that "courts in other contexts . . . have refused to permit the corporate structure to stand in the way of a finding of liability," and adding that "[p]ermitting corporate actors to erect a series of shell corporations to make it more difficult for prospective plaintiffs to sue the real owners also makes little sense from a policy standpoint."[38] The Court dismissed the veil-piercing claims at issue on other grounds and, therefore, found it unnecessary to resolve the question of whether the plaintiff "would have to pierce each veil separately."[39]

More recently still, in *Official Comm. of Unsecured Creditors of Moll Indus., Inc. v. Highland Capital Mgmt. LP (In re Moll Indus., Inc.)*, the Delaware bankruptcy court rejected the view that a plaintiff must "establish alter ego liability at all layers of subsidiaries ranging from [the debtor] to [the indirect parent]."[40] At least where the plaintiff "is only seeking to treat [the debtor] and [the indirect parent] as one entity and is not seeking to hold any of the intermediaries liable," the court concluded a plaintiff's "failure to allege alter ego through all levels of the corporate structure does not warrant the claim's dismissal."[41] The court explained that it had found "no indication" in Delaware law that veil-piercing liability "may only be applied to a direct relationship such as a parent and subsidiary."[42]

---

[38]  *In re BH S&B Holdings LLC*, 420 B.R. at 135; *see also Official Comm. of Unsecured Creditors of Buckhead Am. Corp. v. Reliance Capital Group, Inc.* (*In re Buckhead Am. Corp.*), 178 B.R. 956, 975 (D. Del. 1994) (rejecting view that "alter ego claims can be defeated and defendants can insulate themselves from liability by using corporate intermediaries and other complex business structures, thereby indirectly doing that which lawfully cannot be accomplished directly").

[39]  *In re BH S&B Holdings LLC*, 420 B.R. at 135.

[40]  454 B.R. 574, 587 (Bankr. D. Del. 2011).

[41]  *Id.* at 587–88.

[42]  *Id.* 587–88 (Bankr. D. Del. 2011); *see also United States v. Golden Acres, Inc.*, 702 F. Supp. 1097, 1113 n.7 (D. Del. 1988) (rejecting argument that "it is necessary for us to pierce the corporate veils of both [the parent company] and [its subsidiary] to hold [the individual owners of the parent] personally liable for the debts of [the subsidiary]") (applying federal common law).

The Examiner finds it unnecessary to decide this unsettled legal question. GMAC Mortgage Group LLC is a holding company that had no operations and few employees.[43] Assuming arguendo that a court were to conclude that the evidence warrants piercing the corporate veil of ResCap, then the Examiner would view as a remote possibility a different conclusion as to GMAC Mortgage Group LLC.[44]

### d. Elements That Must Be Pleaded And Proved

"[P]ublic policy does not lightly disregard the separate legal existence of corporations."[45] "The corporate form was created to allow shareholders to invest without incurring personal liability for the acts of the corporation. These principles are equally applicable when the shareholder is, in fact, another corporation, and hence, mere ownership of a subsidiary does not justify the imposition of liability on the parent."[46] The use of the corporate form to limit liability "is seen as wealth-creating for society as it allows investors to cabin their risk and therefore encourages the investment of capital in new enterprises."[47] However, "upon a proper

---

[43]  *See* Int. of D. Bricker, Mar. 15, 2013, at 12:19–13:3.

[44]  The Examiner's reasoning is similar with respect to the potential claims that could be brought on behalf of ResCap indirect subsidiaries GMAC Mortgage and RFC—both also organized under Delaware law—seeking to pierce their respective corporate veils and impose liability on AFI for their respective debts (as opposed to the debts of ResCap). If a court were to hold that it were necessary to pierce the corporate veil between ResCap and AFI before such veil-piercing claims by GMAC Mortgage and RFC could prevail against AFI, then the Examiner concludes that such claims against AFI would be unlikely to prevail for that reason alone, given the Examiner's conclusion that a veil-piercing claim on behalf of ResCap against AFI is unlikely to prevail. Assuming arguendo that a court were to instead conclude that GMAC Mortgage and RFC need not pierce the corporate veil of ResCap before their veil-piercing claims could prevail against AFI, the Examiner concludes that any such claims would be unlikely to prevail for the reasons set for in Section VII.A.1.g(2).

[45]  *BASF Corp. v. POSM II Properties P'ship*, Case No. 3608, 2009 Del. Ch. LEXIS 33, at *32 n.50 (Del. Ch. Mar. 3, 2009) (applying Delaware law); *see also Mason v. Network of Wilmington, Inc.*, Civ. No. 19434, 2005 Del. Ch. LEXIS 99, at *9 (Del. Ch. July 1, 2005) ("Persuading a Delaware Court to disregard the corporate entity is a difficult task.") (quoting *David v. Mast*, Civ. No. 1369, 1999 Del. Ch. LEXIS 34, at *5 (Del. Ch. Mar. 2, 1999); *Official Comm. of Unsecured Creditors v. Bay Harbour Master Ltd.* (*In re BH S&B Holdings LLC*), 420 B.R. 112, 133 (Glenn, J.) (Bankr. S.D.N.Y. 2009) ("In general, the corporate form is sacrosanct and courts will not disturb it to hold shareholders of a corporation, or members of an LLC, liable.").

[46]  *Pearson v. Component Tech. Corp.*, 247 F.3d 471, 484 (3d Cir. 2001); *see also Trevino v. Merscorp, Inc.*, 583 F. Supp. 2d 521, 530 (D. Del. 2008) ("[L]imiting one's personal liability is a traditional reason for a corporation. Unless done deliberately, with specific intent to escape liability for a specific tort or class or torts, the cause of justice does not require disregarding the corporate entity.") (quotation marks omitted); *Mabon, Nugent & Co. v. Tex. Am. Energy Corp.*, Civ. No. 8578, 1990 Del. Ch. LEXIS 46, at *14 (Del. Ch. Apr. 12, 1990) ("[T]he separate corporate existences of parent and subsidiary will not be set aside merely . . . on a showing that the parent owned all the stock of the subsidiary.").

[47]  *BASF Corp.*, 2009 Del. Ch. LEXIS 33, at *32 n.50.

showing corporate entities as between parent and subsidiary may be disregarded and the ultimate party in interest, the parent, be regarded in law and fact as the sole party."[48]

"Under Delaware law, to pierce the corporate veil and establish alter-ego liability, a plaintiff must show (1) that the parent and subsidiary 'operated as a single economic entity,' and (2) that an 'overall element of injustice or unfairness is present.'"[49] In general, "[t]he fact that [it] is a limited liability company does not change the analysis."[50]

### e. Pleading Standard And Burden Of Proof

"Although the question of domination is generally one of fact, courts have granted motions to dismiss as well as motions for summary judgment in favor of defendant parent companies where there has been a lack of sufficient evidence to place the alter ego issue in dispute."[51] "[B]ecause Delaware public policy does not lightly disregard the separate legal existence of

---

[48] *In re BH S&B Holdings LLC*, 420 B.R. at 133 (quoting *Pauley Petroleum, Inc. v. Cont'l Oil Co.*, 239 A.2d 629, 633 (Del. 1968)); *see also Pearson*, 247 F.3d at 484 ("under both state and federal common law, abuse of the corporate form will allow courts to employ the 'tool of equity' known as veil-piercing"); *Mason*, 2005 Del. Ch. LEXIS 99, at *9 ("Corporate form will be disregarded and individuals will be held personally liable 'in the interest of justice, when such matters as fraud, contravention of law or contract, public wrong, or where equitable consideration among members of the corporation require it, are involved'").

[49] *In re BH S&B Holdings LLC*, 420 B.R. at 133-34 (quoting *Trevino*, 583 F. Supp. 2d at 528 ); *see also NetJets Aviation, Inc. v. LHC Commc'ns, LLC*, 537 F.3d 168, 177 (2d Cir. 2008) (same).

[50] *Nat'l Gear & Piston, Inc. v. Cummins Power Sys., LLC*, Civ. No. 10-4145, 2012 U.S. Dist. LEXIS 72879, at *86 n.14 (S.D.N.Y. May 17, 2012); *see also NetJets Aviation, Inc.,* 537 F.3d at 176 ("Given the similar liability shields that are provided by corporations and LLCs to their respective owners, emerging caselaw illustrates that situations that result in a piercing of the limited liability veil are similar to those that warrant piercing the corporate veil.") (quotation marks omitted); *Luster v. Greenhill Capital Partners II, LLP* (*In re CLK Energy Partners, LLC*), Adv. No. 09-05042, 2010 Bankr. LEXIS 1564, at *19 (Bankr. W.D. La. May 12, 2010) ("Delaware courts have also held that the alter ego jurisprudence developed in cases involving corporations similarly applies to Delaware LLC's.").

[51] *Fletcher v. Atex*, 68 F.3d 1451, 1458 (2d Cir. 1995); *see also In re Buckhead Am. Corp.*, 178 B.R. at 975 (denying motion to dismiss veil-piercing claim and explaining that "the nature and extent of the dominion and control exercised by defendants over [the subsidiary is] a question of fact, not subject to resolution on a motion to dismiss"); *Youkelsone v. Wash. Mut., Inc.* (*In re Wash. Mut., Inc.*), Adv. No. 09-50039, 2010 Bankr. LEXIS 2453, at *30 (Bankr. D. Del. Aug. 13, 2010) ("[C]ourts routinely consider, and grant, motions to dismiss for failure to allege facts sufficient to support the imputation of liability on an alleged alter ego."); *Official Comm. of Unsecured Creditors of Sunbeam Corp. v. Morgan Stanley & Co., Inc.* (*In re Sunbeam Corp.*), 284 B.R. 355, 365 (Bankr. S.D.N.Y. 2002) ("Ordinarily the determination of the nature and extent of domination is a question of fact.").

corporations, a plaintiff must do more than plead that one corporation is the alter ego of another in conclusory fashion in order for the Court to disregard their separate legal existence."[52]

Whether a veil-piercing claim is also subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b)—made applicable to adversary proceedings by Federal Bankruptcy Rule 7009—has been described by courts in this circuit as a "knotty question."[53] Because a veil-piercing plaintiff can prevail without proving fraud, "veil-piercing claims are generally subject to the pleading requirements imposed by Fed. R. Civ. P. 8(a)."[54] However, "[w]hen a veil-piercing claim is based on fraud, it is subject to the requirements of [Rule 9(b)], which requires the pleading of 'particularized facts that give rise to a strong inference that defendant acted with fraudulent intent.'"[55] "[T]he Rule 9(b) pleading standard applies only to those components of fraud-based [veil-piercing] claims that relate to fraud. Thus, allegations

---

[52] *MicroStrategy Inc. v. Acacia Research Corp.*, Civ. No. 5735, 2010 Del. Ch. LEXIS 254, at *46 (Del. Ch. Dec. 30, 2010); *see also Spagnola v. Chubb Corp.*, 264 F.R.D. 76, 86 (S.D.N.Y. 2010) (collecting cases from other jurisdictions granting motions to dismiss veil-piercing claims); *In re Wash. Mut., Inc.*, 2010 Bankr. LEXIS 2453, at *36–37 (dismissing veil-piercing claim where complaint included "mere conclusions that [the parent] controlled [its subsidiary] but offer[ed] no factual allegations which would lead to a plausible inference that [the parent] directed [the subsidiary] to engage in misconduct specifically related to the servicing of Youkelsone's mortgage") (applying Washington law); *O'Connell v. Arthur Andersen LLP* (*In re AlphaStar Ins. Group Ltd.*), 383 B.R. 231, 279 (Bankr. S.D.N.Y. 2008) (dismissing veil-piercing claim where it appeared to be "another conclusory allegation of control based on share ownership and the nomination of its employees to positions on the Board") (applying Bermuda law).

[53] *Gabriel Capital, LP v. NatWest Fin., Inc.*, 122 F. Supp. 2d 407, 433 (S.D.N.Y. 2000) (quoting *Old Republic Ins. Co. v. Hansa World Cargo Serv., Inc.*, 170 F.R.D. 361, 374 (S.D.N.Y. 1997)).

[54] *EED Holdings v. Palmer Johnson Acquisition Corp.*, 228 F.R.D. 508, 512 (S.D.N.Y. 2005); *see also Rolls-Royce Motor Cars, Inc. v. Schudroff*, 929 F. Supp. 117, 122 (S.D.N.Y. 1996). At least one district court has concluded that Rule 9(b) has no application to veil-piercing claims. *See Time Warner Cable, Inc. v. Networks Group, LLC*, Civ. No. 09-10059, 2010 U.S. Dist. LEXIS 93855, at *12–13 (S.D.N.Y. Sept. 9, 2010) ("Several district courts in this district have applied Rule 9(b) to claims to pierce the corporate veil that are based on a defendant's fraudulent conduct. Until the Court of Appeals revisits its holding in *International Controls*, however, Rule 8 is the appropriate standard to weigh the sufficiency of the plaintiff's allegations to pierce the corporate veil.") (internal citations omitted) (citing *Int'l Controls Corp. v. Vesco*, 490 F.2d 1334, 1351 n.23 (2d Cir. 1974) (Rule 9(b) "is inapplicable here since [plaintiff] did not proceed on the theory that Vesco & Co., itself, committed fraud, but rather that Vesco perpetrated the securities violations and then sought to shield his assets from the reach of his victim by transferring them to Vesco & Co")).

[55] *TradeWinds Airlines, Inc. v. Soros*, Civ. Nos. 08-5901, 10-8175, 2012 U.S. Dist. LEXIS 39459, at *14 (S.D.N.Y. Mar. 22, 2012) (quoting *EED Holdings*, 228 F.R.D. at 512 (requirements of Rule 9(b) apply to veil-piercing claim that "sounds in fraudulent inducement")); *see also Pereria v. Greco Gas Ltd.* (*In re Saba Enters., Inc.*), 421 B.R. 626, 652 (Bankr. S.D.N.Y. 2009) ("To the extent that the Trustee's allegations related to the veil piercing claim involve fraud, they must satisfy the heightened standard for pleading fraud under [Rule 9(b)]; otherwise, the post-*Twombly* 'flexible plausibility' standard under [Rule 8(a)] governs the determination of the sufficiency of the Trustee's pleading.").

of dominance and control, for example, are not subject to the heightened pleading standard, even where the veil-piercing claim is based on an allegation that the corporate form was abused to perpetrate fraud."[56]

The standard of proof applicable to a veil-piercing claim under Delaware law is likewise a knotty question and one that remains unsettled.[57] The Delaware bankruptcy court analyzed the issue in *Foxmeyer Drug Co. v. G.E. Elec. Capital Corp. (In re Foxmeyer Corp.)*, where "the parties disagree[d] as to the appropriate standard of proof by which one must prove a case for a piercing of the corporate veil under Delaware law."[58] Although the court agreed with the plaintiff that "there does not appear to be any relevant caselaw that applies Delaware law wherein the clear and convincing evidence standard is utilized," that did not end the court's analysis.[59] Relying upon case law reciting the general difficulty of piercing the corporate veil under Delaware law, the bankruptcy court "f[ound] it nonsensical to suggest that the most minimal evidentiary standard of a preponderance of the evidence is equivalent to 'a very heavy burden.'"[60] The bankruptcy court held, therefore, "that the appropriate standard of proof by which one must prove a case for a piercing of the corporate veil under Delaware law is, if not a clear and convincing evidence standard, at least somewhat greater than merely a preponderance of the evidence standard."[61]

Other courts have disagreed. In *ASARCO LLC v. Americas Mining Corp.*, the U.S. District Court for the Southern District of Texas concluded that "Delaware would apply the

---

[56] *Sofia Classic S.A. De C.V. v. Hurowitz*, 444 F. Supp. 2d 231, 241 (S.D.N.Y. 2006); *see also In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278, 292 (S.D.N.Y. 2005) ("The domination and control elements of the [veil-piercing] claim, however, need comply only with Rule 8."); *Network Enters., Inc. v. APBA Offshore Productions, Inc.*, Civ. No. 01-11765, 2002 U.S. Dist. LEXIS 17256, at \*16 (S.D.N.Y. Sept. 10, 2002) (rejecting "suggest[ion] that the domination and control elements of an alter ego claim are also subject to heightened pleading").

[57] The parties have not directed the Examiner to any controlling decision on point under Delaware law, nor have the Examiner's Professionals located any such decision. *Cf. Gadsden v. Home Preservation Co.*, Civ. No. 18888, 2004 Del. Ch. LEXIS 14, at \*11–12 (Del. Ch. Feb. 20, 2004) (noting defendant's contention that plaintiff "must prove her case by clear and convincing evidence" but finding "adequate grounds to disregard Home Preservation's separate corporate existence" without ruling on standard of proof).

[58] 290 B.R. 229, 237 (Bankr. D. Del. 2003).

[59] *Id.* at 237. Some courts appear to have applied a clear and convincing standard of proof to veil-piercing claims, albeit under the laws of certain other jurisdictions. *See Trustees of the Nat'l Elevator Indus. Pension, Health Benefit and Educ. Funds v. Lutyk*, 332 F.3d 188, 192 (3d Cir. 2003) ("Because alter ego is akin to and has elements of fraud theory, we think it too must be shown by clear and convincing evidence.") (quotation marks omitted) (applying federal common law); *Int'l Controls and Measurements Corp. v. Watsco, Inc.*, 853 F. Supp. 585, 591 (N.D.N.Y. 1994) ("[T]he plaintiff has failed to provide clear and convincing evidence of control, fraud or any other mechanism by which Watsco, Inc. operates Gemaire as a mere instrumentality. Absent such a showing, the court will not pierce the corporate veil.") (applying federal common law).

[60] *In re Foxmeyer Corp.*, 290 B.R. at 237. *Cf. Pearson*, 247 F.3d at 485 (describing veil-piercing test as "notoriously difficult for plaintiffs to meet").

[61] *Id.* (finding that the plaintiff "does not even satisfy the minimal preponderance of the evidence standard when attempting to prove his case for a piercing of the corporate veil").

preponderance of the evidence standard" to veil-piercing claims.[62] That court explained that "the prevailing default standard in Delaware civil cases dictates the use of the preponderance of the evidence" and "[t]here is no authority stating that the standard under Delaware law is clear and convincing evidence."[63] Disagreeing with *Foxmeyer*, the *ASARCO* court "acknowledge[d] that it is not easy for a party to prevail on a veil-piercing claim, but [concluded that] this is due to the difficulty in demonstrating that the corporate form was used for a fraud or an injustice, not because there is a heightened burden of proof."[64]

In light of the lack of controlling authority imposing a heightened burden of proof on such claims, the Examiner assumes for the purposes of his analysis that ResCap would be required to prove each of the elements of its potential veil-piercing claim by a preponderance of the evidence.

### f. Single Economic Entity

Factors considered by courts applying Delaware law to determine whether a parent and subsidiary should be deemed a "single economic entity" include:

> (1) undercapitalization, (2) failure to observe corporate formalities, (3) nonpayment of dividends, (4) insolvency of the debtor corporation at the time, (5) siphoning off of the corporation's funds by the dominant parent, (6) absence of corporate records, and (7) the fact that the corporation is merely a facade for the operations of the dominant parent.[65]

Although this "list of factors is not exhaustive and no single factor is dispositive, some combination is required."[66] "[T]he absence of one or two factors may be sufficiently outweighed by the other considerations when balanced on whole."[67] And, "in the absence of

---

[62] 396 B.R. 278, 318 (S.D. Tex. 2008); *see also Hillsborough Holdings Corp. v. Celotex Corp.* (*In re Hillsborough Holdings Corp.*), 166 B.R. 461, 468 (Bankr. M.D. Fla. 1994) ("In order to pierce the corporate veil under Florida and Delaware law, it is the claimant's burden to establish by a preponderance of the evidence [the relevant factors].").

[63] *ASARCO LLC*, 396 B.R. at 318.

[64] *Id*. The *ASARCO* court also collected cases from a "majority of [other state] jurisdictions" that "apply a preponderance of the evidence standard to veil-piercing actions." *Id*.

[65] *Official Comm. of Unsecured Creditors v. Bay Harbour Master Ltd.* (*In re BH S&B Holdings LLC*), 420 B.R. 112, 134 (Bankr. S.D.N.Y. 2009); *see also NetJets Aviation, Inc.v. LHC Commc'ns*, 537 F.3d 168, 176–77 (2d Cir. 2008) (same).

[66] *Blair v. Infineon Technologies AG*, 720 F. Supp. 2d 462, 471 (D. Del. 2010); *see also Burtch v. Opus L.L.C.* (*In re Opus East, LLC*), 480 B.R. 561, 571 (Bankr. D. Del. 2012) (granting motion to dismiss veil-piercing claim where "[t]he Trustee's only facially plausible allegation is that the dividend payments . . . left the Debtor undercapitalized" because alleging "one element of the single economic entity test . . . is not, on its own, enough").

[67] *Blair*, 720 F. Supp. 2d at 472-73.

allegations of these specific factors," a plaintiff may still state a veil-piercing claim with "other relevant allegations."[68] Each of the enumerated factors is discussed below and, for convenience and where appropriate, certain of those factors are discussed together. For the reasons below, the Examiner concludes that the evidence does not support the proposition that AFI and ResCap should be considered a single economic entity.

### (1) Undercapitalization And Insolvency

#### (a) Legal Principles

"A shortage of capital, as with all the factors of the alter ego doctrine, is not *per se* a reason to pierce the corporate veil."[69] "If lack of adequate capitalization were alone enough to justify piercing the corporate veil, the veil of every insolvent subsidiary or failed start-up corporation could be pierced."[70] "Rather, the inquiry into corporate capitalization is most relevant for the inference it provides into whether the corporation was established to defraud its creditors or other improper purpose such as avoiding the risks known to be attendant to a type of business."[71]

"When determining whether a subsidiary was adequately capitalized, courts focus on the initial capitalization: whether a corporate entity was or was not set up for financial failure."[72] Although "courts usually analyze capitalization at the inception of a corporation," an analysis of capitalization may also be appropriate when, as a result of actions of the parent, "the corporation distinctly changes the nature or magnitude of its business."[73] Indeed, evidence of a

---

[68] *Official Comm. of Unsecured Creditors of Sunbeam Corp. v. Morgan Stanley & Co., Inc.* (*In re Sunbeam Corp.*), 284 B.R. 355, 365 (Bankr. S.D.N.Y. 2002); *see also Union Carbide Corp. v. Montell N.V.*, 944 F. Supp. 1119, 1145 (S.D.N.Y. 1996).

[69] *Trustees of the Nat'l Elevator Indus. Pension, Health Benefit and Educ. Funds v. Lutyk*, 332 F.3d 188, 197 (3d Cir. 2003) (applying federal common law); *see also In re BH S&B Holdings LLC*, 420 B.R. at 137 (dismissing veil-piercing claim in part because allegations that subsidiary was undercapitalized "would not support disregarding the corporate form" without "more unusual facts or circumstances," where subsidiary has "sufficient funds to operate for at least a few months" at its inception).

[70] *In re RSL Com Primecall, Inc.*, 2003 Bankr. LEXIS 1635, at *53.

[71] *Trevino*, 583 F. Supp. 2d at 530 (quotation marks omitted) (dismissing veil-piercing claim where plaintiffs admitted that company "was created for a legitimate purpose" and failed to "allege in their Amended Complaint any other factors, besides undercapitalization").

[72] *In re BH S&B Holdings LLC*, 420 B.R. at 136 (quotation marks omitted).

[73] *Pharmacia Corp. v. Motor Carrier Servs. Corp.*, 309 Fed. Appx. 666, 672 (3d Cir. Feb. 10, 2009) (quotation marks omitted) (applying New Jersey law) (rejecting argument that the district court had "improperly concluded that [the company] was undercapitalized" where "the nature of [the company's] business changed significantly when it was purchased" by the defendant and after that sale it "had no revenue at all").

subsidiary's undercapitalization at a time after its formation may be relevant whenever that undercapitalization is caused by the parent.[74] Although one decision by a Delaware court may have gone farther in suggesting that a parent company could have an "ongoing duty to maintain adequate capitalization" of a subsidiary, the Examiner does not consider that to be an accurate statement of Delaware law.[75]

Like undercapitalization, "[i]nsolvency, in and of itself, does not justify piercing the corporate veil."[76] Insolvency is not dispositive without more because:

> If creditors could enter judgments against shareholders every time that a corporation becomes unable to pay its debts as they become due, the limited liability characteristic of the corporate form would be meaningless. Thus, the insolvency inquiry must have a different purpose. Instead, insolvency is one factor to be considered in assessing whether the corporation engaged in conduct that unjustly shields its assets from its creditors. If so, and especially if particular shareholders benefited from and

---

[74] *See Official Comm. of Unsecured Creditors of Moll Indus., Inc. v. Highland Capital Mgmt. LP* (*In re Moll Indus., Inc.*), 454 B.R. 574, 588 (Bankr. D. Del. 2011) (dismissing veil-piercing claim where plaintiff "failed to allege that [the subsidiary] was inadequately capitalized at its inception or that [its parent] caused the undercapitalization or insolvency," and explaining that allegations that "various financial covenants and obligations were relaxed" would have "help[ed] (rather than hurt) [the subsidiary's] financial condition"); *see also Autobacs Strauss, Inc. v. Autobacs Seven Co.* (*In re Autobacs Strauss, Inc.*), 473 B.R. 525, 553 (Bankr. D. Del. 2012) (denying motion to dismiss veil-piercing claim where plaintiff alleged that subsidiary "ABST had no ability to access capital aside from its parent because of the controlling AB7-related ABST Directors" and "all it could do was ask . . . for operational funding for AB7 with hopes that 'Mama' would provide"); *In re Saba Enters., Inc.*, 421 B.R. at 653 (denying motion to dismiss veil-piercing claim where complaint alleged that "valuable assets of the Debtor . . . were siphoned off . . . thereby leaving the Debtor undercapitalized") (applying Colorado law); *In re Foxmeyer Corp.*, 290 B.R. at 244 ("[T]he Court agrees . . . that such factors are only relevant from a veil piercing standpoint if such subsidiary was inadequately capitalized and/or insolvent from its inception or such adverse status was subsequently caused by acts of the subsidiary's parent.").

[75] *United States v. Golden Acres, Inc.*, 702 F. Supp. 1097, 1105 (D. Del. 1988) (entering judgment in favor of the plaintiff's veil-piercing claim where "the corporation continued to be undercapitalized after defendants took control") (applying federal common law); *see also DeWitt Truck Bros., Inc. v. W. Ray Flemming Fruit Co.*, 540 F.2d 681, 686 (4th Cir. 1976) ("[T]he obligation to provide adequate capital begins with incorporation and is a continuing obligation thereafter during the corporation's operations.") (quotation marks omitted) (applying South Carolina law). The Examiner is not aware of any decision holding that a parent's failure to maintain the adequate capitalization of a subsidiary is a basis for veil-piercing liability under Delaware law, and such a rule would appear to invite courts to pierce the veil of "every insolvent subsidiary or failed start-up corporation." *See In re RSL Com Primecall, Inc.*, 2003 Bankr. LEXIS 1635, at *53.

[76] *EBG Holdings LLC v. Vredezicht's Gravenhage 109 B.V.*, Civ. No. 3184, 2008 Del. Ch. LEXIS 127, at *53 (Del. Ch. Sept. 2, 2008).

> controlled that conduct, then justice would require the piercing of the corporate veil in order to hold the benefiting shareholders responsible.[77]

As with evidence of undercapitalization, evidence of a subsidiary's insolvency after its formation may weigh in favor of veil-piercing liability if caused by the parent.[78]

### (b) Application To Facts

The Examiner has concluded that the evidence does not support the proposition that ResCap was inadequately capitalized or insolvent at or around its formation.[79] After March 2005, when AFI transferred subsidiaries RFC and GMAC Mortgage to ResCap and ResCap commenced operations, AFI contributed $2 billion in capital through debt forgiveness providing ResCap with an equity balance of approximately $6.4 billion.[80] AFI also converted certain intercompany borrowings from a single revolving facility to provide ResCap with a $5 billion ten-year subordinated note, $1.5 billion one-year term loan, and $2.5 billion two-year revolving line of credit.[81] ResCap obtained additional outside funding in 2005, including $3.5 billion in syndicated bank credit facilities and $1.25 billion of unsecured debt issued pursuant to a $12 billion shelf registration statement.[82]

This evidence does not support an inference that ResCap was "set up for financial failure."[83] To the contrary, the evidence indicates that ResCap was formed to hold AFI's mortgage operations and "enhance the liquidity and cost effectiveness of the financing" thereof by obtaining "a stand-alone credit rating."[84] Those mortgage operations were viewed by management as "very profitable" and a "crown jewel."[85] Consistent with that view, in 2005 and 2006, ResCap reported net income of $1 billion and $705.1 million, respectively.[86]

---

[77]  *Mason*, 2005 Del. Ch. LEXIS at *12–13 (denying plaintiff's motion for summary judgment on veil-piercing claim where "even if [the corporation] was insolvent, there is no evidence in the record demonstrating that its assets were transferred in an attempt to avoid its creditors").

[78]  *See In re Moll Indus., Inc.*, 454 B.R. at 588; *In re Foxmeyer Corp.*, 290 B.R. at 244.

[79]  *See* Sections VI.B and VI.C.

[80]  *See* Residential Capital, LLC, Annual Report (Form 10-K) (Mar. 28, 2006), at 73.

[81]  *Id.*

[82]  *Id.*

[83]  *See In re BH S&B Holdings LLC*, 420 B.R. at 136–37 (quotation marks omitted) (complaint's allegations "cannot support a finding that [debtor] was undercapitalized" where debtor "had cash on hand, and . . . sufficient funds to operate for at least a few months" and was at least "initially a legitimate business").

[84]  General Motors Acceptance Corp., Current Report (Form 8-K) (Jan. 13, 2005); *see also* Section III.A.

[85]  Int. of E. Feldstein, Dec. 14, 2012, at 67:18–22.

[86]  *See* Residential Capital, LLC, Annual Report (Form 10-K) (Mar. 28, 2006), at 57; Residential Capital, LLC, Annual Report (Form 10-K) (Mar. 13, 2007), at 55.

The Examiner's conclusion that ResCap was not inadequately capitalized or insolvent at or around its formation does not, however, end the inquiry. The Examiner has concluded that the evidence supports the proposition that ResCap was (1) left with unreasonably small capital from August 15, 2007 through the date of ResCap's chapter 11 bankruptcy filing; and (2) balance sheet insolvent from December 31, 2007 through the date of ResCap's chapter 11 bankruptcy filing.[87] Such evidence could weigh in favor of piercing the corporate veil if ResCap's inadequacy of capital and/or insolvency during those time periods was caused by the conduct of AFI.[88] The available evidence indicates that proving such a theory would be difficult.

In particular, that evidence indicates that the primary drivers of ResCap's inadequacy of capital and insolvency were the substantial operating losses reported beginning in the fourth quarter of 2006, which included a net loss of $4.3 billion in 2007.[89] Those reported losses reflected, inter alia, lower loan production and gain on sale margins, higher provisions for loan losses, and higher losses on foreclosed real estate.[90] The Examiner has not found evidence of any potential siphoning of assets by AFI from ResCap that could be shown to have been of a magnitude to have caused ResCap's inadequacy of capital and/or insolvency.[91] Although ResCap entered into various Affiliate Transactions, the Examiner has concluded—with certain exceptions—that ResCap received at least fair value in those transactions.[92] Moreover, those exceptional transactions with respect to which the Examiner finds that ResCap received less than fair value (i.e., the 2006 Bank Restructuring and the Second 2009 Tax Allocation Agreement)[93] were dwarfed in scale both by ResCap's operating losses and the more than

---

[87] *See* Sections VI.B and VI.C.

[88] *See In re Autobacs Strauss, Inc.*, 473 B.R. at 553; *In re Moll Indus., Inc.*, 454 B.R. at 588; *In re Saba Enters., Inc.*, 421 B.R. at 653; *In re Foxmeyer Corp.*, 290 B.R. at 244.

[89] *See* Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2008), at 56; *see also* Sections VI.B–D.

[90] *See* Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2008), at 57.

[91] *See In re Saba Enters., Inc.*, 421 B.R. at 653 (denying motion to dismiss veil-piercing claim where complaint alleged that "valuable assets of the Debtor . . . were siphoned off . . . thereby leaving the Debtor undercapitalized") (applying Colorado law); *In re Verestar, Inc.*, 343 B.R. at 464–65 (denying motion to dismiss veil-piercing claim where complaint alleged that parent "stripped [debtor] of assets" and that debtor was "undercapitalized").

[92] *See* Section V. The Examiner considers whether there is evidence that AFI siphoned assets from ResCap in Section VII.A.1.f(2).

[93] This conclusion does not change if the misallocation of revenues on brokered loans discussed in Sections V.B.6, VII.L.2, and VII.A.1.f(2)(b) is included in the analysis.

$8 billion in financial support that AFI would provide to ResCap in the form of cash contributions, debt forgiveness, and other asset contributions.[94]

Nor has the Examiner encountered substantial evidence that AFI prevented ResCap from obtaining needed financing.[95] Instead, the factual record reflects that, beginning on or before the end of 2007, ResCap became unable to obtain financing in the market and became dependent upon AFI to meet its liquidity and capital needs.[96]

A plaintiff could in theory attempt to prove that ResCap would have obtained TARP funds on its own behalf but for the interference of AFI and that—with direct access to such funding rather than the periodic, indirect infusions of TARP funds that ResCap received from AFI—ResCap could have avoided bankruptcy.[97] The Examiner concludes that the evidence does not support that proposition. ResCap could not have obtained TARP funds without

---

[94]   *See* Section VI.C.4.f(4). The $8 billion figure includes the contribution in December 2009 of $1.4 billion in "higher risk mortgage assets" that AFI purchased from Ally Bank and then contributed to ResCap. *See* GMAC Inc., Current Report (Form 8-K), (Dec. 30, 2009) at 2–3. The Creditors' Committee characterizes this as a "contribution of toxic assets." *See* Creditors' Committee Submission Paper, dated Mar. 7, 2013, at 71 & n.43. It has not been possible to separately value these assets based on the available information. However, the assets had an unpaid principal balance of $3.6 billion and a carrying value of $2.8 billion before their purchase from the Bank; GMAC Inc. purchased them for $1.4 billion (identified in SEC filings as "fair value"), and contributed capital to the Bank to make up the difference between the purchase price and the carrying value. *Id.* at 3. ResCap notably conducted a number of asset sales in 2010 on which it booked gains. *See* Residential Capital LLC Consolidated Financial Statements for the Years Ended December 31, 2009 and 2010 [EXAM00123128]. The Examiner's Professionals were not able to trace which of these assets contributed by AFI were (or were not) included in these sales. In any event, the Investigation has not disclosed evidence that the write-down of the assets to $1.4 billion was inadequate, that the assets were worth less than this amount, or that ResCap was somehow injured or disadvantaged by their contribution. Nonetheless, even if it were appropriate to discount or ignore the contribution of these assets, given the remaining contributions of over $6.5 billion by AFI, the Examiner's conclusions here would remain unaltered.

[95]   *See In re Autobacs Strauss, Inc.*, 473 B.R. at 553 (denying motion to dismiss veil-piercing claim where plaintiff alleged that subsidiary "ABST had no ability to access capital aside from its parent because of the controlling AB7-related ABST Directors").

[96]   *See* Section VI.B.

[97]   *See* Section III.H (explaining that ResCap explored a potential application for TARP funds until it learned that AFI and Cerberus were also seeking such funds).

becoming a bank holding company,[98] which required Ally Bank's abandonment of its industrial bank charter and conversion to a charter subject to Bank Holding Company Act (BHCA) regulation, and would have triggered BHCA requirements for AFI (and Cerberus). This conversion could not have occurred without AFI's agreement and active involvement, which it was not obligated to provide.

---

[98] TARP, created pursuant to the Emergency Economic Stabilization Act of 2008, 12 U.S.C. § 5211, ultimately comprised several different programs. These programs had not been fully developed at the time of Marano's October 2008 proposal, which thus does not specify which program it seeks to invoke. *See* ResCap: Proposal for the TARP, at 1–9 [CCM00012373]; *see also* Minutes of a Special Meeting of the Board of Residential Capital, LLC, Oct. 10, 2008, at 2 (discussion of Marano's proposal) [EXAM00073840]. The Capital Purchase Program, a preferred stock and equity warranty purchase program (under which AFI sought and obtained relief), appears to have been the most likely program, but to be eligible, an entity had to be a "bank, savings association, bank holding company [or] savings and loan holding company organized under the laws of the United States." *See* U.S. Department of the Treasury, Process-related FAQs for Capital Purchase Program, www.financialstability.gov/roadtostability/CPPappdocs_faq1.htm. ResCap might also have sought relief under the Capital Assistance Program, but, it too, was limited to "bank holding companies, financial holding companies, insured depository institutions and savings and loan holding companies," and, further, no entity ever received funding under the program. *See* Application Guidelines for Capital Assistance Program, http://www.treasury.gov/initiatives/financial-stability/TARP-Programs/bank-investment-programs/scap-and-cap/Documents/CAP_App-Guidelines.pdf; Supervisory Capital Assessment Program & Capital Assistance Program Purpose and Overview, http://www.treasury.gov/initiatives/financial-stability/TARP-Programs/bank-investment-programs/scap-and-cap/Pages/default.aspx.

Two other TARP programs, the Asset Guarantee Program and the Targeted Investment Program, were limited to institutions deemed "systemically significant" and were applied with "extreme discretion"; only two institutions, Bank of America and Citigroup Inc., were deemed to meet these standards. *See* Asset Guarantee Program Purpose and Overview, http://www.treasury.gov/initiatives/financial-stability/TARP-Programs/bank-investment-programs/agp/Pages/default.aspx; U.S. Treasury Report to Congress Pursuant to Section 102 of the Emergency Economic Stabilization Act, at 1–2 (Dec. 31, 2008); Targeted Investment Program: Program Purpose and Overview, http://www.treasury.gov/initiatives/financial-stability/TARP-Programs/bank-investment-programs/tip/Pages/ default.aspx. Particularly in light of the views the U.S. Treasury expressed about ResCap (discussed in text), it appears highly unlikely that ResCap could have qualified for relief under these programs.

It appears ResCap would not have been eligible for the remaining TARP programs, such as (1) the Community Development Capital Initiative, a program to provide "low-cost capital to Community Development Financial Institutions as a means of helping them fulfill their mission of provident credit to small businesses and individuals in underserved communities," *see* Memorandum to CDCI Participants, http://www.treasury.gov/initiatives/financial-stability/TARP-Programs/bank-investment-programs/tip/Pages/default.aspx; Bank-Thrift Application Guidelines for TARP Community Development Capital Initiative, http://www.treasury.gov/initiatives/financial-stability/TARP-Programs/bank-investment-programs/cdci/Documents/ Bank20Thrift20CDCI20Application20Updated20Form.pdf, or (2) the Term Asset-Backed Securities Loan Facility, available to the holders of asset-backed securities where the "underlying credit exposures" are "auto loans, student loans, credit card loans, or small business loans guaranteed by the Small Business Administration." *See* Term Asset-Backed Securities Loan Facility (TALF) Terms and Conditions, http://www.federalreserve.gov/newsevents/monetary20081125a1.pdf.

As a practical matter, it does not appear likely that the federal government would have looked positively on separate, arguably competing applications from the parent and its subsidiary, and in light of AFI's own need for TARP assistance, it is not surprising that a single AFI application was pursued. Moreover, the evidence suggests that, even had a separate ResCap application otherwise been acceptable, the U.S. Treasury is unlikely to have looked favorably on ResCap's application. First, the U.S. Treasury itself "stated that . . . it regarded ResCap as 'marginal, at best' as a factor in the decision to support [AFI]."[99] Instead, the U.S. Treasury "defend[ed] its assistance to GMAC as crucial to supporting its extensive investments in GM and Chrysler, which, in turn were made for a variety of reasons, including the fear of shock to the economy—perhaps rising to the level of systemic risk if the domestic auto industry were to fail."[100] Notably, the federal government did not mandate that any portion of the TARP funds provided to AFI be given to ResCap.[101] When a Congressional Oversight Panel reviewed the matter in 2010, issuing a report entitled, "The Unique Treatment of GMAC Under the TARP," it noted that "while ResCap was once a profitable venture for GMAC, and ResCap holds significant market shares in both the mortgage origination and mortgage servicing sectors, there has been no suggestion that the disruption of these businesses caused by a bankruptcy would have any direct systemic effect."[102]

Although AFI's support for ResCap was never adequate to do more than maintain ResCap on "life support," the Examiner has not encountered evidence sufficient to demonstrate that such support was a cause—rather than a symptom—of ResCap's inadequacy of capital and insolvency.[103]

---

[99] CONGRESSIONAL OVERSIGHT PANEL, MARCH OVERSIGHT REPORT: THE UNIQUE TREATMENT OF GMAC UNDER THE TARP, at 79, http://cybercemetery.unt.edu/ archive/cop/20110402042135/http://cop.senate.gov/ documents/cop-031110-report.pdf. Tessler's observation that "[ResCap] was one of the significant reasons the Fed and FDIC decided to support [AFI] in becoming a BHC" does not compel a different conclusion. *See* E-mail from L. Tessler to M. Carpenter (Dec. 3, 2009), at CCM00065542 [CCM00065540]. Bank holding company status required approval by entities other than the U.S. Treasury, which made decisions concerning TARP approval (although they presumably coordinated efforts). Further, Tessler had little interaction with the federal government in connection with the TARP application. *See* Int. of L. Tessler, Feb. 28, 2013, at 94:21–97:15, 113:19–114:12.

[100] CONGRESSIONAL OVERSIGHT PANEL, MARCH OVERSIGHT REPORT: THE UNIQUE TREATMENT OF GMAC UNDER THE TARP, at 78.

[101] *See* TARP LETTER AGREEMENT BETWEEN U.S. DEPARTMENT OF THE TREASURY AND GMAC LLC (Dec. 29, 2008) (online at http://www.treasury.gov/initiatives/financial-stability/TARP-Programs/automotive-programs/ Documents/ GMAC%20Agreement%20Dated%2029%20December%202008.pdf.).

[102] CONGRESSIONAL OVERSIGHT PANEL, MARCH OVERSIGHT REPORT: THE UNIQUE TREATMENT OF GMAC UNDER THE TARP, at 78–79.

[103] *See* Section VI.B. ResCap's restructuring beginning in late 2008 likewise was a reaction to and not the cause of its ongoing undercapitalization. *See* Section III.H (describing proposed restructuring that would, inter alia, close GMAC Mortgage retail offices, curtail international business activities, and eliminate several thousand jobs). Accordingly, and given that this restructuring reduced the scope of ResCap's business, this is not a case where an entity's post-formation undercapitalization may be deemed relevant for purposes of veil piercing because the entity "change[d] the nature or magnitude of its business." *See Pharmacia Corp.*, 309 Fed. Appx. at 672 (quotation marks omitted) (applying New Jersey law).

### (2) Siphoning Of The Subsidiary's Assets By A Parent

#### (a) Legal Principles

"Siphoning" has been described as "the improper taking of funds [from an entity] that the owner was not legally entitled to receive."[104] The transfer of assets from a subsidiary to its parent may, in certain circumstances, be deemed "siphoning" that weighs in favor of a finding that the parent and subsidiary were a "single economic entity."[105] In *Official Comm. of Unsecured Creditors of Verestar, Inc. v. Am. Tower Corp. (In re Verestar, Inc.)*, for example, a veil-piercing claim was brought on the debtor's behalf alleging that "when it was clear that [the debtor] would ultimately have to be liquidated," its parent implemented "a scheme entitled 'Project Harvest,' a program to transfer as many of [the debtor's] assets and as much of its value as possible to [the parent] before [the debtor's] inevitable collapse."[106] The bankruptcy court denied a motion to dismiss that claim notwithstanding that there was "much in the Complaint inconsistent with a viable alter ego claim" or "merely indicative of many unremarkable parent-subsidiary relationships."[107] Nonetheless, the court explained, "[t]he key to a finding of alter ego liability is that the controlling owners operated the subsidiary as an 'incorporated pocketbook,'" and the plaintiff had adequately alleged that the parent "stripped [the debtor] of assets" while "attempting to shield itself from [the debtor's] liabilities."[108]

"[T]he mere making of payments and transfers [between a parent and subsidiary] alone does not create alter ego liability."[109] A transfer made for adequate consideration and with a

---

[104] *Autobacs Strauss, Inc. v. Autobacs Seven Co.* (*In re Autobacs Strauss, Inc.*), 473 B.R. 525, 557 (Bankr. D. Del. 2012) (quotation marks omitted).

[105] *Trustees of the Nat'l Elevator Indus. Pension, Health Benefit and Educ. Funds v. Lutyk*, 332 F.3d 188, 195 (3d Cir. 2003) (affirming summary judgment piercing corporate veil based in part on sole shareholder's "irregularly scheduled, erratic, but not insignificant 'drawings'" on corporate assets and "'loans' that [the shareholder] caused [the corporation] to repay him") (applying federal common law); *In re Saba Enters., Inc.*, 421 B.R. at 653 (denying motion to dismiss veil-piercing claim where complaint alleged that "valuable assets of the Debtor, in the form of those subsidiaries with value-generating operations as opposed to abandoned oil wells, were siphoned off to . . . its ultimate parent . . . prior to the filing of the Petition" in exchange for "nominal consideration") (applying Colorado law); *Gadsden*, 2004 Del. Ch. LEXIS 14, at *14–15 (entering judgment after trial in favor of plaintiff on veil-piercing claim where "after each Home Preservation project was completed, [its sole shareholder] Conaway transferred any excess cash from the company to his personal accounts"); *Mabon, Nugent & Co.*, 1990 Del. Ch. LEXIS 46, at *16 (denying defendant's motion for summary judgment on veil-piercing claim where subsidiary guaranteed loans of parent and "received no compensation in return").

[106] *In re Verestar, Inc.*, 343 B.R. at 457.

[107] *Id.* at 464.

[108] *Id.* at 465.

[109] *Liafail, Inc. v. Learning 2000, Inc.*, Nos. 01-599 & 01-678, 2002 U.S. Dist. LEXIS 22620, at *37–38 (D. Del. 2002) (granting defendant's motion for summary judgment on veil-piercing claim where plaintiff failed to "identify any facts from which the court, or a jury, could reasonably determine that [the payments and transfers] were improper").

legitimate business purpose is unlikely to be viewed as "siphoning" assets.[110] Moreover, evidence that the parent transferred assets *to* the subsidiary in an effort to stave off insolvency may, in certain circumstances, negate an inference that the parent "siphoned" assets from that subsidiary.[111]

Infusions of assets by a parent to its subsidiary do not, however, invariably defeat any allegation that the parent was abusing the corporate form.[112] For example, in *United States v. Golden Acres, Inc.*, the U.S. District Court for the District of Delaware's entry of judgment in favor of the plaintiff's veil-piercing claim relied in part on evidence that "defendants were siphoning funds out of the corporation at regular intervals," notwithstanding a record of certain "cash infusions into the corporation."[113] The district court explained that those "cash infusions" were "by short-term loan only" and, therefore, were consistent with the conclusion that defendants "had no concern for [the corporation's] balance sheet, they just wanted to keep the apartment project secure enough to continue generating funds."[114]

More recently, in *Autobacs Strauss, Inc. v. Autobacs Seven Co. (In re Autobacs Strauss, Inc.)*, the Delaware bankruptcy court denied a motion to dismiss a veil-piercing claim and rejected the argument that the parent "could not have siphoned money out of [the subsidiary]"

_____

[110] *See id.*; *Harco Nat'l Ins. Co. v. Green Farms, Inc.*, Civ. No. 1131, 1989 Del. Ch. LEXIS 114, at *16 (Del. Ch. Sept. 19, 1989) (denying plaintiff's motion for summary judgment on veil-piercing claim in part because: "[A] transfer of assets [involving a corporation's repayment of shareholder loans], however, is not necessarily a basis for piercing the corporate veil. The plaintiffs must also show that such transfers were done to defraud creditors or were done merely to siphon off corporate assets, rather than to repay outstanding loans. This has not yet been done.").

[111] *See Alberto v. Diversified Group, Inc.*, 55 F.3d 201, 207 (5th Cir. 1995) (affirming granting of parent's motion for summary judgment on veil-piercing claim where bankrupt subsidiary was "already in desperate financial straits" when it was purchased and "was not bled white for the benefit of its new 'grandparent,' DGI; to the contrary, DGI . . . attempted to resuscitate [the subsidiary] by funneling millions of dollars of capital into the struggling company") (applying Delaware law); *In re Moll Indus., Inc.*, 454 B.R. at 590 (plaintiff did not adequately allege that the parent "siphoned funds" when it directed the subsidiary "to purchase the Tucson facility," where "the actual net result of this transaction was an increase in the money lent to [the subsidiary]"); *Tese-Milner v. TPAC, LLC* (*In re Ticketplanet.com*), 313 B.R. 46, 71 (Bankr. S.D.N.Y. 2004) (dismissing veil-piercing claim despite allegation "that the Debtor merely served as a tool to further Defendants' interests," where the debtor had "received a substantial cash infusion from [defendant affiliate entity]").

[112] *See NetJets Aviation, Inc.*, 537 F.3d at 180, 182 (reversing grant of summary judgment dismissing veil-piercing claim where there was "ample" evidence to find that "[sole owner] Zimmerman completely dominated [limited liability company] LHC and that he essentially treated LHC's bank account as one of his pockets, into which he reached when he needed or desired funds for his personal use," notwithstanding the evidence of "numerous transfers of money by Zimmerman to LHC").

[113] *United States v. Golden Acres, Inc.*, 702 F. Supp. 1097, 1106 (D. Del. 1988).

[114] *Id.*

when the parent "put 'net' cash into the [subsidiary]."[115] The court explained that a net cash infusion may not always immunize from veil-piercing liability a parent that causes improper distributions by an insolvent subsidiary:

> The question is not what they put in the company, but when they took it out. If the infusions were, in fact, loans, then the insider was siphoning cash by requiring payments to be made under his loan at a time when the company was insolvent. If the infusions were, in fact, capital contributions, it is worse. The controlling insider was making dividends to itself at a time when the company was insolvent.[116]

The determination of whether any transfers of debts or assets to or from a subsidiary constitute a "siphoning" that could weigh in favor of veil-piercing liability must, therefore, turn on the terms of that transfer and the surrounding circumstances.

### (b) Application To Facts

The factual record does not evidence any simple looting by AFI of cash or other assets from ResCap. Rather than "crude corporate abuse" involving "diverted corporate funds," the Creditors' Committee asserts, "[t]his case is about practiced corporate abuse" making use of "large and often complicated corporate transactions."[117] The Examiner's analysis of the multitude of Affiliate Transactions entered into by ResCap in part considered whether there is evidence that any of those transactions resulted in ResCap receiving less than fair market value.[118] With certain exceptions, the Examiner concludes that the evidence supports the proposition that ResCap did not receive less than fair market value in those Affiliate Transactions. The bases for the Examiner's conclusions are set forth in greater detail below as to each of: (1) the Ally Bank Transactions; (2) the Second 2009 Tax Allocation Agreement; (3) the misallocation of certain brokered-loan revenues beginning in 2009; (4) the various asset sales and financings; (5) derivatives including the MSR Swap and the Pipeline Swap; and (6) the allocation of liability in connection with government settlements including the FRB/FDIC Settlement and the DOJ/AG Settlement.

Those Affiliate Transactions that were exceptions that resulted in ResCap's receipt of less than fair market value include the 2006 Bank Restructuring and the Second 2009 Tax Allocation Agreement.[119] The misallocation of revenues on loans brokered by GMAC Mortgage to Ally Bank, and more specifically, the response in early 2012, when the

---

[115] *In re Autobacs Strauss, Inc.*, 473 B.R. at 557.

[116] *Id.* at 557–58.

[117] Creditors' Committee Submission Paper, dated Mar. 7, 2013, at 100.

[118] *See* Section V (analyzing Affiliate Transactions).

[119] *See* Sections V.A, V.D.

misallocation was discovered, arguably should also be included in this analysis.[120] The Examiner concludes, however, that the finding that the 2006 Bank Restructuring and the Second 2009 Tax Allocation Agreement were for less than fair market value, and that Ally Bank retained brokered-loan revenues due to ResCap in 2012, does not—on balance and when viewed under all the circumstances—support the proposition that AFI engaged in "siphoning."[121] As an initial matter, the approximate total amounts by which the 2006 Bank Restructuring (i.e., $390–465 million) and the Second 2009 Tax Allocation Agreement (i.e., $50 million and the avoidance of an obligation now known to be worth up to $1.77 billion) fell short of fair market value, combined with the approximately $520.5 million at issue in connection with brokered loans, pale in comparison to the $8 billion in financial support that AFI provided to ResCap from 2007 to the Petition Date in 2012.[122] Specifically, AFI contributed to ResCap $2.9 billion in cash, $3.3 billion in debt forgiveness, and $1.9 billion in other assets during that time period.[123] That $8 billion figure does not account for the other Affiliate Transactions where ResCap received at least fair value, many of which provided ResCap with much-needed liquidity.[124] Indeed, the Examiner finds that at least a few such transactions resulted in ResCap's receipt of more than fair value.[125] In at least two instances, AFI required its subsidiary GMAC CF to purchase assets from ResCap despite the substantial concerns of that entity's management that the assets were over-valued.[126]

Although the Examiner agrees with the Creditors' Committee that net asset infusions by a parent to its subsidiary do not necessarily preclude a finding of "siphoning,"[127] here the

---

[120] *See* Section V.B.6, VII.L.2. As discussed there, while it appears that the misallocation of revenues that occurred from and after August 2009 was originally inadvertent, following the discovery of the issue in December 2011, the process which led to Ally Bank's retention of those revenues (and the requirement that ResCap repay revenues from the period January 1, 2009, to July 31, 2009) appears less benign. The events in 2012 arguably involve only the taking of an additional $51.4 million from GMAC Mortgage; the remaining $469.1 million had been taken unwittingly, but was not returned. For purposes of argument, the entire $520.5 million is considered as part of the "siphoning" analysis.

[121] The Examiner elsewhere considers whether one or more of those transactions may give rise to any other causes of action against AFI. *See* Sections VII.G, VII.H, and VII.L.2.

[122] *See* Sections V. This approximate dollar amount by which the non-voting IB Finance Class M Shares received by ResCap in the 2006 Bank Restructuring were less than the value transferred from ResCap was calculated including an indirect benefit to ResCap of avoiding the potential credit downgrade that may have occurred had the Cerberus PSA failed to close, which the Examiner has valued at approximately $143 million. *See* Section V.A.1.

[123] *See* Section VI.C.2, Ex. VI.C.4.f(4)(b)–1; *see also* Section VII.A.1.f(1)(b) (discussing Creditors' Committee's characterization of certain of the assets contributed by AFI as "toxic").

[124] *See* Sections V.E, V.F.

[125] *See* Section V.A.1.b (approximate excess value from 2008 Bank Transaction of $127–270 million); Section V.A.1.c (approximate excess value from 2009 Bank Transaction of $382–493 million); Section V.B.12 (GMAC Mortgage received a net benefit from the Pipeline Swap, the MSR Swap, and the related market hedges).

[126] *See* Section V.F (Health Care Finance and Resort Finance transactions).

[127] *See* Creditors' Committee Submission Paper, dated Mar. 7, 2013, at 102–3.

Examiner finds that any inference of "siphoning" is undermined by both the amount of AFI's financial support, and the lack of evidence that such support had the intent or effect of disguising or making possible further harm to ResCap and its creditors.[128]

Nor has the Investigation uncovered evidence of any broader plan to siphon assets from ResCap. Although AFI and various advisors explored from 2007 through 2011 a series of strategic initiatives for restructuring ResCap,[129] the available evidence distinguishes each of those initiatives from the type of "scheme" like the "Project Harvest" alleged in *Official Comm. of Unsecured Creditors of Verestar, Inc. v. Am. Tower Corp.* (*In re Verestar, Inc.*).[130] Unlike in *Verestar*, here there is no evidence that any of the AFI strategic initiatives contemplated causing ResCap "to sell certain assets to [AFI] for little or no consideration and to convey other assets to third parties and divert the proceeds to [AFI]."[131] For example, the AFI initiative once known as "Project Origin" and later as "Project Timex" contemplated an "out of court" purchase by AFI of ResCap's origination and servicing business.[132] Rather than a transfer of assets for little or no consideration, however, that initiative proposed a purchase price of $3.8 billion, offset by certain liabilities, and an AFI capital contribution of $600 million.[133] Moreover, AFI's proposal was the subject of counter-proposals from ResCap that sought increased consideration and other concessions from AFI.[134] In any event, none of the AFI strategic initiatives exploring an "out of court" restructuring of ResCap were ever implemented.[135]

The Creditors' Committee cites to an August 2008 e-mail exchange between Tessler, AFI Director and Managing Director of Cerberus, and de Molina, CEO of AFI, concerning the

---

[128] *Compare Golden Acres,* 702 F. Supp. at 1106 (entry of judgment in favor of the plaintiff's veil-piercing claim in part because cash infusions" were "by short-term loan only" and consistent with the conclusion that defendants "just wanted to keep the apartment project secure enough to continue generating funds"). The Investigation has not uncovered facts comparable to those alleged in *In re Autobacs Strauss, Inc.*, where the parent company provided its subsidiary "with a $12.3 million cash infusion" in order to avoid a "going concern qualification" on the subsidiary's audit report, and then compelled the subsidiary to "return $10.6 million and to treat the transaction as a 'loan prepayment'" less than two weeks later. *See In re Autobacs Strauss, Inc.* 473 B.R. 525, 549 (Bankr. D. Del. 2012) (denying motion to dismiss veil-piercing claim).

[129] *See* Sections III.G–J.

[130] *See In re Verestar,* 343 B.R. at 457.

[131] *See id.* at 457. The Examiner expresses no opinion as to whether any of the strategic initiatives for restructuring ResCap that were explored by AFI could have, if implemented, resulted in ResCap receiving less than fair market value (or otherwise implicated any potential causes of action).

[132] *See* Section III.I.f; *see also* Project Timex Update, prepared for a Special Meeting of the Board of Directors of GMAC Inc., dated Sept. 10, 2009, at 2 [ALLY_0003185].

[133] *See id.*

[134] *See* Section III.I; *see also* Board Materials prepared for a Special Meeting of the Board of Directors of Residential Capital, LLC, dated Aug. 12, 2009 [EXAM00007335]; Non-Negotiable Items Draft Discussion Document, prepared for a Special Meeting of the Board of Directors of Residential Capital, LLC, dated Aug. 17, 2009 [EXAM00096379].

[135] *See* Section III.

possibility of a sale of ResCap's mortgage servicing business to AFI as evidence of a plan to siphon assets from ResCap.[136] The Examiner finds that e-mail exchange to be equivocal, at best, and not probative of any plan to siphon assets from ResCap for less than fair value. The e-mail exchange could also be read as evidence of a concern to avoid a transaction that could "hollow out all of ResCap" and violate obligations to its bondholders.[137] Moreover, ResCap never did transfer its mortgage servicing business to AFI—let alone transfer it for less than fair market value.

In sum, the Examiner concludes that the evidence does not support the proposition that AFI "siphoned" assets from ResCap.

### (i)  The Ally Bank Transactions

In the 2006 Bank Restructuring, ResCap relinquished its controlling, 100% equity interest in Old GMAC Bank and, as required by the DFI, contributed $360 million in cash/ debt to IB Finance.[138] In exchange, ResCap received two million non-voting IB Finance Class M Shares.[139] The Examiner has found that the 2006 Bank Restructuring resulted in ResCap receiving less than reasonably equivalent value.[140] In particular, the value of the IB Finance Class M Shares ResCap received, as a consequence of the absence of voting rights and the concomitant loss of control, was approximately $533–608 million less than the value ResCap transferred in the transaction.[141] Giving AFI credit for the indirect benefit to ResCap of avoiding the potential credit downgrade that may have occurred had the Cerberus PSA failed to close (which the Examiner has valued at approximately $143 million), ResCap received approximately $390–465 million less than fair value.[142]

Although individuals interviewed after the fact by the Examiner's Professionals in general sought to minimize the value of ResCap's loss of control, evidence arguably suggests that the 2006 Bank Restructuring was executed with knowledge or intent that ResCap would

---

[136] *See* Creditors' Committee Submission Paper, dated Mar. 7, 2013, at 50 (citing E-mail from L. Tessler to A. de Molina (Aug. 9, 2008) [CCM00121380] ("We can't hollow out all of ResCap or we are going to have a problem with Bonds but I am sure we can figure out something that works.")).

[137] *See* E-mail from L. Tessler to A. de Molina (Aug. 9, 2008) [CCM00121380]; *see also* Int. of L. Tessler, Feb. 28, 2013, at 60:23–61:11 ("Most bonds have a 'substantially all' provision. And you can't sell all of the assets of an organization without triggering those obligations."). The Examiner considers in Section VIII whether the "substantially all" covenant in ResCap's bonds was violated.

[138] *See* Section V.A.1.a.

[139] *See* Section V.A.1.a.

[140] *See* Section V.A.1.a.

[141] *See* Section V.A.1.e.

[142] *See* Section V.A. (estimating the approximate total value of the 100% interest in Old GMAC Bank and the cash/debt contribution to IB Finance at $1.98–2.26 billion and the approximate total value of the IB Finance Class M Shares, together with an indirect benefit to ResCap of avoiding potential credit downgrades that may have occurred had the Cerberus sale failed to close, at $1.59–1.80 billion).

thereby receive less than fair value for the assets transferred, particularly given ResCap's loss of a controlling interest in the Bank.[143] The facts concerning this issue are detailed in Sections V.A.1, VII.E, and VII.L.1.

The Examiner does not reach the same conclusions with respect to the subsequent 2008 Bank Transaction and 2009 Bank Transaction. The Examiner has found that the 2008 Bank Transaction, through which ResCap transferred to AFI the ResCap Preferred Interests and the right to exchange those interests for IB Finance Preferred Interests and AFI contributed to ResCap certain ResCap bonds, did not result in ResCap receiving less than FMV.[144] The Examiner has also found that the 2009 Bank Transaction, through which ResCap transferred to AFI its remaining IB Finance Class M Shares and AFI transferred to ResCap certain ResCap bonds, likewise did not result in ResCap receiving less than FMV.[145] Indeed, in both the 2008 Bank Transaction and the 2009 Bank Transaction, the Examiner has found that the value of the consideration received by ResCap likely exceeded the value of the assets transferred by ResCap.[146] The approximate amount of the "excess" value received by ResCap in the 2008 Bank Transaction and the 2009 Bank Transaction was $127–270 million and $382–493 million, respectively.[147]

### (ii) Second 2009 Tax Allocation Agreement

As discussed in Section V.D.3, the Second 2009 Tax Allocation Agreement, one of several agreements entered into by ResCap and AFI to allocate responsibility for payment of

---

[143] *See* Int. of S. Khattri, Oct. 25, 2012, at 97:18–21 ("I think the focus was this was considered a successful way where we were enabling the transaction and also protecting everybody's funding sources."); Int. of J. Young, Sept. 28, 2012, at 91:24–25 ("ResCap ended up in the same position they would've had before."); Int. of E. Feldstein, Dec. 14, 2012, at 110:17–18 ("I don't recall that being an issue."); Int. of M. Neporent, Feb. 6, 2013, at 26:1–3 ("[T]he voting or non-voting interest sort of seemed irrelevant at the time, at least from my perspective."). *But see* Int. of T. Melzer, Oct. 10, 2012, at 206:23–25 ("I think . . . voting would be better."); Int. of T. Hamzehpour, Oct. 5, 2012, at 157:17–19 (describing "a feeling personally that we should have at least had a voting interest versus a non–voting interest"); Int. of T. Marano, Nov. 26, 2012, at 35:21–36:23 (describing as "odd" and "kind of a remarkable thing" that ResCap "could own 51% of the company and have no voting rights").

[144] *See* Section V.A.

[145] *See* Section V.A. The Examiner attributed no material value to ResCap's loss of the right to redeem its IB Finance Preferred Interests at par value, which interests had an estimated value at the time of the 2009 Bank Transaction of below par. *See* Section V.A. Nor did the Examiner attempt to quantify the value of the sixty-day extension of the Initial Line of Credit Facility that was provided to ResCap by AFI pursuant to the 2009 Bank Transaction, which facility was undrawn at the time of the 2009 Bank Transaction. *See* Section V.A.

[146] *See* Sections V.A.

[147] *See* Section V.A. (estimating the total value of the bonds contributed by AFI in 2008 at approximately $841 million and the total value of the right transferred to AFI to exchange the ResCap Preferred Interests for IB Finance Preferred Interests at approximately $571–714 million); *id.* (estimating the total value of the bonds contributed by AFI at approximately $600 million and the total value of ResCap's remaining IB Finance Class M Shares at approximately $107–218 million).

income tax liabilities and the right to tax refunds, was fully executed on January 26, 2011.[148] AFI may use a total of up to $5 billion in tax benefits generated by ResCap, which (at a federal tax rate of 35%) would result in tax savings of up to $1.77 billion for AFI.[149] Had the First 2009 Tax Allocation Agreement remained in place, the amount of tax savings AFI realized would be payable to ResCap, though it is not clear how much of this benefit the parties should have anticipated would be payable to ResCap at the time they entered into the Second 2009 Tax Allocation Agreement.

The Examiner has concluded that the Second 2009 Tax Allocation Agreement resulted in ResCap receiving less than fair market value (regardless of whether the First 2009 Tax Allocation Agreement is held enforceable).[150] By its terms, there are no circumstances under which AFI would be required to make any payment to ResCap.[151] That agreement does, however, purport to require ResCap to make payments to AFI with respect to any tax on account of excess inclusion income generated by ResCap.[152] Under that agreement, ResCap paid to AFI approximately $32 million for the tax on account of excess inclusion income generated by ResCap from November 2, 2009 through December 31, 2011, and would be expected to make an additional payment of approximately $17.7 million to AFI for the tax on account of excess inclusion income projected to be generated for the following year.[153] Absent any tax allocation agreement and on a stand-alone basis, as a disregarded entity ResCap would not have had *any* income tax liability arising from its excess inclusion income (or otherwise).[154] As discussed in Section VII.K.2.c, the Examiner concludes that the approximately $50 million in ResCap payments under the Second 2009 Tax Allocation Agreement have not been made for FMV and may be avoided as fraudulent transfers. Given that the Examiner concludes that the First 2009 Tax Allocation Agreement is more likely than not to be deemed enforceable, the shortfall in value ResCap received in the Second 2009 Tax Allocation Agreement would include not just the $50 million, but also the value, at the time, of the AFI obligations to ResCap under the First 2009 Tax Allocation Agreement.

As detailed in Section V.D.2.b(3) and VII.K.2, the Investigation uncovered conflicting evidence as to whether the ResCap Board or its members knew, when they approved the Second 2009 Tax Allocation Agreement, that ResCap would have been entitled to significant payments under the First 2009 Tax Allocation Agreement and would receive nothing under

_____

[148] *See* Section V.D.

[149] *See* Section V.D.

[150] *See* Section V.D.

[151] *See* Second 2009 Tax Allocation Agreement, at sections 1.03D, 2.03 [RC40016871]; *see also* Section V.D.

[152] *See* Second 2009 Tax Allocation Agreement, at sections 1.03D, 2.03 [RC40016871]; *see also* Section V.D.

[153] *See* Section V.D. The available evidence indicates that approximately $3 million of the $32 million billed by and paid to AFI corresponds to excess inclusion income generated by ResCap from July 1, 2009 through November 1, 2009—before the effective date of the Second 2009 Tax Allocation Agreement. *See* Section V.D.

[154] *See* Section V.D.

the Second 2009 Tax Allocation Agreement. Nonetheless, the evidence does not, ultimately, support a conclusion that the Second 2009 Tax Allocation Agreement was entered into with the intent to hinder, delay or defraud creditors.[155]

### (iii) Misallocation Of Brokered-Loan Revenues

As discussed in Sections V.B and VII.L.2, beginning August 1, 2009, Ally Bank retained revenues on brokered loans that, under the terms of the parties' agreement in connection with the Brokering Consumer Loans to Bank project, should have been allocated to GMAC Mortgage, revenues that totaled approximately $469.1 million. At least before the issue was discovered in December 2011, there is no evidence that this was intentional. On the contrary, the misallocation arose as the apparently unwitting result of the Ally Bank's fair-value election. When the issue came to light and then was investigated in early 2012, Ally Bank did not pay the amounts it had retained. Instead, ResCap was prevailed upon to pay Ally Bank the amounts it received from January 1, 2009 to July 31, 2009 (when revenues had been allocated as the parties agreed), plus interest, totaling $51.4 million, while AFI forgave an equivalent amount of debt upon this payment. As explained in Section VII.L.2, the evidence suggests that the 2012 resolution of this matter stemmed not from a fair, objective attempt to address the issue, but from an overarching concern, on the eve of ResCap's bankruptcy filing, to avoid restating prior financials, particularly those for Ally Bank, and the regulatory scrutiny that would have ensued. Nonetheless, given that Ally Bank's original retention of monies was not intentional, and that, for the most part, what is at issue is not taking additional funds from GMAC Mortgage, but failure when the issue came to light in 2012 to pay the additional monies due, it is debatable whether such sums should be considered for these purposes. For purposes of argument, however, the entire $520.5 million is considered as part of the siphoning analysis.

### (iv) Asset Sales And Financings

With respect to prepetition, related-party asset sales that ResCap entered into between August 2007 and May 2009, the Examiner has concluded that ResCap did not receive less than FMV in the Health Capital Sale, Excess Servicing Rights Sale, June 2008 Model Home Sale, September 2008 Model Home Sale, Resort Finance Sale, ResMor Sale, or US/UK Broker-Dealer Sale.[156] The approximate combined total of the gross cash consideration received by ResCap in those assets sales was approximately $1.75 billion.[157] The Examiner

---

[155] *See* Sections VII.K.2.

[156] *See* Section V.F.4. As discussed there, with respect to the June 2008 Model Home Sale the Examiner has concluded that, while a close question, the evidence supports the proposition that although the consideration ResCap received arguably was slightly below fair market value, particularly when the difficult market circumstances and surrounding exigencies are considered, ResCap received reasonably equivalent value.

[157] *See* Section V.F.4. The breakdown of the approximate gross cash consideration received in those asset sales is as follows: Healthcare Sale ($900.5 million); Excess Servicing Rights Sale ($282 million); June 2008 Model Home Sale ($230 million); September 2008 Model Home Sale ($59.2 million); Resort Finance Sale ($96.1 million); ResMor Sale (C$82 million, which was approximately US $67 million as of Dec. 31, 2008); US/UK Broker/Dealer Sale ($110.4 million). *See id.*

has likewise concluded that ResCap did not receive less than FMV in any of the prepetition, related-party financing transactions it entered into beginning in 2007.[158] Each of those financings was entered into on terms no less favorable—and in several cases more favorable—than those that could have been obtained in the market.[159]

The Investigation has not uncovered evidence that any of these asset sales or financings were executed with knowledge or intent that ResCap would receive less than FMV.[160] To the contrary, much of the available evidence appears to be inconsistent with such knowledge or intent. For example, the genesis of the Resort Finance Sale appears to have been as part of an effort to address "the fading asset sales and other situations" at ResCap by raising $650 million to $1 billion in cash.[161] The terms of the Resort Finance Sale were negotiated by ResCap, including the addition of a profit-sharing clause (that later proved inapplicable).[162] Indeed, management of GMAC CF appears to have believed that the Resort Finance Sale was executed on terms too favorable to ResCap and better than ResCap could have obtained from a third party.[163]

### (v) Derivatives

The Examiner's Professionals have concluded that, considered separately from GMAC Mortgage's market hedges, the Pipeline Swap was near break-even, that the MSR Swap was "in the money," and that GMAC Mortgage received a net benefit from the Pipeline Swap, the MSR Swap, and the related market hedges, considering the entirety of the economics of these transactions as they were implemented by the parties.[164] With respect to the MSR Swap—the transaction that seems to have engendered the most suspicion about its impact on ResCap—records reflect cumulative net cash payments made by Ally Bank to GMAC Mortgage of approximately $700 million over the period from its September 2007 inception through

---

[158] *See* Section V.E.

[159] *See id.*

[160] *See* Sections V.F.4 and V.E.

[161] *See* E-mail from J. Young (May 23, 2008) [EXAM10175040]; *see also* Section V.F.4.c.

[162] *See* Section V.F.4.c; Int. of L. Voss, Dec. 13, 2012, at 77:15–78:6 (describing negotiations and stating that "[t]here's no way that deal could have been a bad deal for ResCap").

[163] *See* Section V.F.4.c; Int. of W. Hall, Dec. 13, 2012, at 29:19–30:5, 177:2–177:12; Int. of L. Voss, Dec. 13, 2012, at 77:15–78:6; Minutes of a Special Meeting of the Board of Directors of GMAC Commercial Finance LLC, June 23, 2008, at ALLY_PEO_0001822 [ALLY_PEO_0001813] ("[AFI] has decided that the Business should be acquired by the Company and has directed the Company to enter into an asset purchase agreement with RFC for the purchase of the business.").

[164] *See* Sections V.B.12.a and V.B.12.b.

April 2012.[165] Accordingly, the Examiner concludes that the evidence concerning the MSR Swap and the Pipeline Swap does not support the proposition that either transaction constituted "siphoning."[166]

### (vi) Government Settlements

The Examiner concludes that evidence concerning the allocation of costs among ResCap and AFI in connection with the FRB/FDIC Settlement and the DOJ/AG Settlement does not support the proposition that such allocation constituted "siphoning."[167] ResCap and its subsidiaries, as the mortgage servicers, were responsible for a significant portion of the actionable issues that were the subject of those settlements. Although there may have been problematic aspects to ResCap's acceptance of an allocation of 92% of the settlement costs, that allocation appears to have been limited in effect to ResCap's and AFI's accounting. AFI further agreed to provide $196.5 million in debt forgiveness, thereby resulting in an effective allocation to AFI of approximately 25% of the total settlement costs. The Investigation has not located evidence to suggest that the allocation of costs was agreed to with knowledge or intent that ResCap would thereby be allocated a share of costs greater than its actual share of liability.[168]

### (3) Nonpayment Of Dividends

In certain circumstances, the failure to pay dividends has been found, like the absence of corporate formalities or adequate recordkeeping, to suggest that a company is not being operated like "a viable corporation, trying to maximize profits, pay off debt and distribute excess earnings."[169] However, context matters. Indeed, "many jurisdictions actually hold that the payment of dividends at a time when a corporation is insolvent *favors* piercing the corporate veil."[170]

With the exception of the LLC Conversion Dividend declared by the ResCap Board on November 27, 2006 and paid in the amount of $575 million, ResCap did not declare or pay any

---

[165] *See* Section V.B.12.b.

[166] The Examiner's conclusion concerning the MSR Swap and the Pipeline Swap excludes the misallocation of brokered revenues, which was discussed separately above. *See* Section VII.A.1.f(2)(b)(iii).

[167] *See* Section V.C.

[168] *See* Sections IV.A.2, V.C.1.f(4).

[169] *See United States v. Golden Acres*, 702 F. Supp. 1097, 1106 (D. Del. 1988).

[170] *Trustees of the Nat'l Elevator Indus. Pension, Health Benefit and Educ. Funds v. Lutyk*, 332 F.3d 188, 196 (3d Cir. 2003) (agreeing with district court's decision to "not afford any weight to . . . [the company's] failure to pay dividends" in a veil-piercing analysis) (emphasis in original); *see also Official Comm. of Unsecured Creditors of Moll Indus., Inc. v. Highland Capital Mgmt. LP* (*In re Moll Indus., Inc.*), 454 B.R. 574, 591 (Bankr. D. Del. 2011) ("[T]he Court finds that a [subsidiary's] failure to pay a dividend (especially in light of [subsidiary's] financial distress) is not enough to state a claim that [the subsidiary and parent] were a single economic enterprise.").

dividends to AFI.[171] By their terms, the 2005 Operating Agreement and the 2006 Amended Operating Agreement restricted ResCap from declaring or paying any dividend unless its stockholder's equity exceeded $6.5 billion and, even in such circumstances, imposed limitations on the amount of any dividend.[172] The stated purpose of this restriction (and others) was to "create separation between GM and [AFI], on the one hand, and ResCap, on the other" so that ResCap could "obtain[] investment grade credit ratings for its unsecured indebtedness that are separate from [AFI's] ratings and the ratings of GM."[173] In light of this context, and ResCap's distressed financial condition during 2007 through 2012, the Examiner does not afford any weight to ResCap's non-payment of dividends.[174]

### (4) Failure To Observe Corporate Formalities And Absence Of Corporate Records

#### (a) Legal Principles

Relevant factors include, without limitation, consideration of "whether adequate corporate records were kept, directors and shareholders met regularly, and corporate directors and officers functioned properly."[175] "When those formalities are not respected, the legal fiction of corporateness becomes less 'real' in the everyday experience of those involved in the firm's operations and any expectation that others would treat it as a distinct, liability-limiting entity becomes less reasonable."[176] "In the alter-ego analysis of an LLC, somewhat less emphasis is placed on whether the LLC observed internal formalities because fewer such formalities are legally required."[177] "[T]he Delaware Limited Liability Company Act . . . requires little more than that an LLC execute a proper certificate of formation, maintain a

---

[171] *See* Residential Capital, LLC, Annual Report (Form 10-K) (Mar. 13, 2007), at 80, 116. Because the LLC Conversion Dividend was authorized by the 2006 Amended Operating Agreement and declared and paid while ResCap was solvent, the Examiner concludes that the evidence does not support the proposition that it constituted "siphoning." *See* Section V.D.3.b.

[172] *See* 2005 Operating Agreement, § 2(d) [ALLY_0140795]; 2006 Amended Operating Agreement, § 2(d) [ALLY_0041818].

[173] General Motors Acceptance Corporation, Annual Report (Form 10-K) (Mar. 28, 2006), at 5; *see also* Section III.B.

[174] *See Trustees of the Nat'l Elevator Indus. Pension Funds*, 332 F.3d at 196; *In re Moll Indus., Inc.*, 454 B.R. at 591.

[175] *Golden Acres,* 702 F. Supp. at 1105, *see also Phoenix Can. Oil Co. v. Texaco, Inc.*, 842 F.2d 1466, 1476 (3d Cir. 1988) (noting that relevant facts may include "overlapping directorates and officers, separate record keeping, payment of taxes and filing of consolidated returns, maintenance of separate bank accounts, level of parental financing and control over the subsidiary, and subsidiary authority over day-to-day operations"); *PSG Poker, LLC*, 2008 U.S. Dist. LEXIS 4225, at *29 (finding that company and it sole shareholder were a "single economic entity" where the company "held no corporate meetings, employed no one other than [the shareholder], had no other officers or directors, . . . operated out of [the shareholder's] home," and "maintained no corporate records").

[176] *Irwin & Leighton, Inc. v. W.M. Anderson Co.*, 532 A.2d 983, 989 (Del. Ch. 1987).

[177] *NetJets Aviation, Inc.*, 537 F.3d at 178.

registered office in Delaware, have a registered agent for service of process in Delaware, and maintain certain records for membership and tax purposes."[178]

Evidence of a parent's and its subsidiary's shared officers, directors, employees, offices, corporate functions or services, and/or bank accounts may, in certain circumstances, be indicative of a "single economic entity."[179] But, such evidence must show something other than what is common in a normal parent-subsidiary relationship.[180] For example, "wholly-owned subsidiaries may share officers, directors and employees with their parent" and, without more, the court need not "infer that the subsidiary is a mere instrumentality for the

---

[178] *Official Comm. of Unsecured Creditors v. Bay Harbour Master Ltd.* (*In re BH S&B Holdings LLC*), 420 B.R. 112, 138 (Bankr. S.D.N.Y. 2009) (dismissing veil-piercing claim despite allegations that limited liability company "Holdings had no Board meetings" and explaining that "Holdings had a single Manager at all times" pursuant to "the Holdings LLC Agreements"). The Delaware Limited Liability Company Act affords "broad discretion [to alter its default rules] in drafting the [Operating] Agreement." *See Elf Atochem N.A., Inc. v. Jaffari*, 727 A.2d 286, 291 (Del. 1999); *see also* DEL. CODE ANN. tit. 6, § 18-1101(b) ("It is the policy of this chapter to give the maximum effect to the principle of freedom of contract . . . .").

[179] *See TradeWinds Airlines, Inc.*, 2012 U.S. Dist. LEXIS 39459, at *16–17 (denying motion to dismiss veil-piercing claim where plaintiff alleged that defendant "disregarded corporate formalities, failed to keep proper records, and comingled C-S Aviation's funds with those of other companies"); *Sykes*, 757 F. Supp. 2d at 430 (denying motion to dismiss veil-piercing claim where plaintiff alleged "overlap in ownership, officers, directors, and personnel, common office space among the corporate entities") (quotation marks omitted); *Mabon, Nugent & Co.*, 1990 Del. Ch. LEXIS 46, at *16 (denying defendant's motion for summary judgment on veil-piercing claim in part because "the [parent's] and [subsidiary's] boards are substantially, if not wholly, identical").

[180] *See Upjohn Co. v. Syntro Corp.*, Civ. No. 89-107, 1990 U.S. Dist. LEXIS 11512, at *15 (D. Del. Mar. 9, 1990) (granting summary judgment in favor of defendant on veil-piercing claim where "plaintiff establishes merely a normal, legitimate parent-subsidiary relationship" and "has adduced no evidence of [the subsidiary's] failure to keep separate records or accounts, or any lack of authority over its day-to-day operations").

parent" or "that those officers and directors were not functioning properly."[181] "[T]he fact that a parent holds out to the public that a subsidiary is a department of its own business increases the likelihood that the parent will be held liable for the subsidiary's acts."[182] Such evidence has, however, been found insufficient—without more—to establish that a parent and its subsidiary were "a single economic entity."[183]

Evidence that a subsidiary failed to adequately maintain separate corporate records (e.g., financial statements, tax returns, minutes of board meetings) has been found probative of a

---

[181] *In re BH S&B Holdings LLC*, 420 B.R. at 138; *see also Fletcher v. Alex, Inc.*, 68 F.3d 1451, 1460 (2d Cir. 1995) (finding existence of one overlapping director between parent and subsidiary to be "negligible" and explaining that "[p]arents and subsidiaries frequently have overlapping boards of directors while maintaining separate business operations"); *Spagnola*, 264 F.R.D. at 87 (dismissing veil-piercing claims and explaining that "some overlap between the operations of Chubb and its subsidiaries" is "not unusual and Plaintiffs' allegations do not rise to the level that indicates the kind of complete domination and control that is required") (applying Minnesota and Indiana law); *In re Ticketplanet.com*, 313 B.R. at 71 ("An overlap in ownership, officers and directors and responsibilities is not uncommon or impermissible."); *Official Comm. of Unsecured Creditors of RSL Com Primecall, Inc. v. Beckoff* (*In re RSL Com Primecall, Inc.*), 2003 Bankr. LEXIS 1635, at *53 (Bankr. S.D.N.Y. Dec. 11, 2003) (dismissing veil-piercing claim in part because allegations of "extensive overlapping officers and directors," "managerial and other services that [the parent] provided to [the subsidiary], and "unspecified involvement in the day-to-day business affairs of [the subsidiary] by several officers and directors of [the parent]," merely "describe[d] a 'typical' relationship between parent and subsidiary"); *In re Foxmeyer Corp.*, 290 B.R. at 245 (finding that evidence of whether "corporate formalities of [subsidiary] Fox Drug were observed" was "equivocal at best" where there was a "certain overlap in ownership, officers, directors, and personnel between Fox Drug and [parent] Fox Corp., and that both entities used common office space, addresses, and telephone numbers," but "Fox Drug maintained corporate records, elected directors, held board meetings, and compiled minutes for such meetings"); *Case Fin., Inc. v. Alden*, Civ. No. 1184, 2009 Del. Ch. LEXIS 153, at *12–15 (Del. Ch. Aug. 21, 2009) (entering judgment after trial rejecting attempt by parent "to pierce its own corporate veil" where parent "Case Financial admits that [subsidiary] Case Capital's Board of Directors had some formal meetings or acted by written consent in lieu of such meetings," despite "overlapping boards of directors" and the "limited number of board meetings" by that subsidiary).

[182] *Japan Petroleum Co.* (*Nigeria*), *Ltd. v. Ashland Oil Co.*, 456 F. Supp. 831, 841 (D. Del. 1978); *see also Gabriel Capital, LP*, *v. NatWest Fin., Inc.*, 122 F. Supp. 2d 407, 434 (S.D.N.Y. 2005) (denying motion to dismiss veil-piercing claim where "documents and representatives of the NatWest defendants referred interchangeably to NatWest Finance, NatWest Capital and NatWest Bank").

[183] *Fletcher*, 68 F.3d at 1460 ("[T]he district court properly rejected the plaintiffs' argument that the descriptions of [the subsidiary Atex as a 'division' of the parent Kodak] and the presence of the Kodak logo in Atex's promotional literature justify piercing the corporate veil."); *Nat'l Gear & Piston, Inc.*, 2012 U.S. Dist. LEXIS 72879, at *83 (dismissing veil-piercing claim where plaintiff alleged that parent and subsidiary "shared the email address '@cummins.com'"); *Akzona Inc. v. E.I. DuPont De Nemours & Co.*, 607 F. Supp. 227, 237–38 (D. Del. 1984) (excerpts from the parent company's annual report and the testimony of an officer of the subsidiary referring to the subsidiary as a "division" of the parent were not sufficient evidence to support veil-piercing); *In re Wash. Mut., Inc.*, 2010 Bankr. LEXIS 2453, at *39 ("[A] common trade name is frequently used in parent-subsidiary relationships and is not a basis for disregarding the corporate form.") (applying Washington law).

single economic entity.[184] On the other hand, the practice of preparing consolidated financial statements and tax returns, where permitted by applicable accounting principles and regulations, has in general not been considered evidence of such a failure.[185]

Courts have "refuse[d] to pierce the veil just because parent corporations retain decision-making authority over subsidiaries."[186] The Second Circuit Court of Appeals has observed that the fact that a parent required its subsidiary "to seek its approval and/or participation" for major transactions "is typical of a majority shareholder or parent corporation."[187] Evidence

---

[184] *Compare Kacprzycki v. A.C. & S., Inc.*, Civ. No. 88-34, 1990 U.S. Dist. LEXIS 16552, at *6 (D. Del. Oct. 31, 1990) (granting defendant's motion for summary judgment on veil-piercing claim where subsidiary "kept its own books and records" and the "respective boards of directors of the [parent and subsidiary] held separate meetings and each kept their own minutes of such meetings"); *and In re Opus East, LLC*, 480 B.R. at 571 (granting motion to dismiss veil-piercing claim in part because allegation that "the Secretary was told to keep 'bare-bones' minutes does not create a facially plausible allegation that . . . the Debtor lacked proper corporate records"); *with Leber Associates, LLC v. Entm't Group Fund, Inc.*, Civ. No. 00-3759, 2003 U.S. Dist. LEXIS 13009, at *45 (S.D.N.Y. July 22, 2003) (issues of fact precluded summary judgment on veil-piercing counterclaim where the plaintiff "was unable to produce any corporate records or financial documents in response to defendants' discovery requests"); *Golden Acres*, 702 F. Supp. at 1106 ("Defendants also failed to meet their duty to observe corporate formalities with respect to the corporate records of Golden Acres. While corporate tax returns were filed and accounting books maintained, the corporate kit and record book were never even opened."); *Autobacs Strauss, Inc. v. Autobacs Seven Co.* (*In re Autobacs Strauss, Inc.*), 473 B.R. 525, 558 (Bankr. D. Del. 2012) (denying motion to dismiss veil-piercing claim in part because "plaintiffs have sufficiently alleged there was an inappropriate absence of corporate records" where "none of the loan agreements were circulated to the full ABST board for approval, no resolutions were passed, and no minutes of meetings exist"); *and Harco Nat'l Ins. Co.*, 1989 Del. Ch. LEXIS 114, at *15-16 (denying plaintiff's motion for summary judgment but noting that evidence of "lack of corporate formalities in operating Green Farms, Inc., especially [with respect to] the maintenance of adequate corporate records" would "seemingly present a good case for [veil] piercing").

[185] *See Alberto v. Diversified Group, Inc.*, 55 F.3d 201, 207 (5th Cir. 1995) (affirming granting of parent's motion for summary judgment on veil-piercing claim where parent "properly employed consolidated financial statements and consolidated tax returns for itself and its subsidiaries") (applying Delaware law); *McAnaney*, 665 F. Supp. 2d at 145 n.12 ("The fact that [defendants] consolidated the financial results of their subsidiaries in publicly filed statements merely reflects compliance with the SEC requirement that corporations consolidate the results of subsidiaries for which they own a 50 percent or more interest in such statements, and is not probative of control for corporate veil piercing purposes.") (applying New York law); *see also Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp.,* 751 F.2d 117, 121 n.3 (2d Cir. 1984) (noting that "rules regarding the consolidation of subsidiaries are controlled by generally accepted accounting principles, which require parent corporations to consolidate subsidiaries if the parent owns more than 50 percent of the subsidiary's stock").

[186] *In re BH S&B Holdings LLC*, 420 B.R. at 138 (allegations that "parents retained decision-making authority" over subsidiary insufficient to pierce veil) (collecting cases); *see also Upjohn Co.*, 1990 U.S. Dist. LEXIS 11512, at *14 ("Even the exercise of a significant degree of control by a parent over a subsidiary will not suffice to warrant the disregard of separate corporate entities.").

[187] *Fletcher*, 68 F.3d at 1459–60.

that the parent's management made decisions on behalf of a subsidiary without the subsidiary's management observing appropriate corporate formalities, however, may weigh in favor of a finding that the two were a "single economic entity."[188]

### (b) Application To Facts

This is a case where certain evidence concerning corporate formalities appears "inconsistent with a viable alter ego claim."[189] For example, ResCap has maintained a board of directors from its commencement of operations in 2005 to the present, which held meetings (ranging in number from four in 2005 to eighty-six in 2009), retained legal and financial advisors, considered resolutions, and kept minutes.[190] ResCap likewise has maintained corporate officers from its commencement of operations to the present including, among other officers, a Chief Executive Offer, Chief Financial Officer, Chief Operating Officer, Treasurer, and Secretary.[191] Moreover, ResCap maintained, separate from those of AFI, corporate headquarters, subsidiaries, employees, bank accounts, and books and records.[192] Such evidence is not, however, necessarily dispositive of whether Rescap observed all appropriate corporate formalities.[193]

To the contrary, the Examiner concludes that the evidence supports the proposition that ResCap failed to follow or followed inconsistently certain appropriate corporate formalities. For example, ResCap did not always follow certain provisions of the Operating Agreement including those requiring that (1) all "material" Affiliate Transactions be entered into on "arm's-length" terms and for "fair value"; (2) ResCap at all times maintain two Independent Directors; and (3) ResCap at all times maintain a tax allocation agreement that provides "for

---

[188] *Compare Sykes v. Mel Harris and Assocs.*, 757 F. Supp. 2d 413, 430 (S.D.N.Y. 2010) (denying motion to dismiss veil-piercing claim alleging "low amount of business discretion displayed by the allegedly dominated corporations") (quotation marks omitted); *and In re Autobacs Strauss, Inc.*, 473 B.R. at 556 (denying motion to dismiss veil-piercing claim in part because "Plaintiffs have sufficiently alleged the failure of [parent] AB7 and [subsidiary] ABST to observe corporate formalities" where "AB7 made decisions in Japan, communicated them to the Individual Defendants, and those decisions were implemented without observing corporate formalities at the [subsidiary]"); *with Fletcher*, 68 F.3d at 1461 (rejecting argument that subsidiary "Atex's assignment of its former CEO's mortgage to [parent] Kodak in order to close the sale of Atex's assets to a third party is evidence of Kodak's domination of Atex" where "[f]ormal contracts were executed, and the two companies observed all corporate formalities").

[189] *Official Comm. of Unsecured Creditors of Verestar, Inc. v. Am. Tower Corp.* (*In re Verestar, Inc.*), 343 B.R. 444, at 464 (Bankr. S.D.N.Y. 2006).

[190] *See* Section IV.A.

[191] *See* Appendix IV.A.

[192] *See* Residential Capital Corporation, Annual Report (Form 10-K) (Mar. 28, 2006), at Item 1 (describing business and operations of ResCap).

[193] *See In re Verestar, Inc.*, 343 B.R. at 464 (denying motion to dismiss veil-piercing claim notwithstanding that subsidiary had officers and directors, "its own employees and subsidiaries," and "a separate business with separate headquarters").

two-way sharing payments" between ResCap and AFI.[194] In connection with certain Affiliate Transactions (e.g., the 2006 Bank Restructuring and the Second 2009 Tax Allocation Agreement), ResCap's officers and directors—many of whom were burdened by multiple affiliations and potentially divided loyalties—failed to function properly both with respect to the requirements of the Operating Agreement and otherwise. Moreover, the lines of authority within ResCap were sometimes blurred, as a result in part of initiatives that centralized a number of corporate functions and services within AFI and of day-to-day interference in ResCap's operations by Cerberus and AFI employees who held no positions at ResCap.

The Examiner discusses in detail below the evidence uncovered by the Investigation concerning those and other corporate formalities, including: (i) ResCap's compliance with its Operating Agreement; (ii) the functioning of ResCap's officers and directors; (iii) corporate functions and services shared by ResCap and AFI; (iv) ResCap's authority over its day-to-day operations; (v) ResCap's and AFI's statements concerning their relationship; and (vi) ResCap's consolidated financial reporting and tax returns.

### (i) Compliance With ResCap's Operating Agreement

The Examiner's analysis of whether appropriate corporate formalities were followed includes the extent of ResCap's compliance with the provisions of its Operating Agreement. The Operating Agreement was entered into with a stated purpose to "create separation between GM and [AFI], on the one hand, and ResCap, on the other" so that ResCap could "obtain[] investment grade credit ratings for its unsecured indebtedness that are separate from [AFI's] ratings and the ratings of GM."[195] Section 2 of the Operating Agreement includes provisions restricting the ability of ResCap to, inter alia, enter into any "material transactions" with any "GMAC Affiliate" unless "on terms and conditions that are consistent with those that parties at arm's-length would agree to and for fair value."[196] That section also requires ResCap to have "at least two Independent Directors" and that it at all times maintain separate from any "GMAC Affiliate": (1) "books, records and financial statements"; (2) "bank accounts and cash management and account receivable systems"; (3) assets, which it must maintain in a manner not "costly or difficult to segregate, ascertain or identify" and must not "commingle"; (4) "asset investment and hedging programs and systems"; (5) use of "its own stationary, invoices, checks and business forms"; and (6) its identity as "a legal entity separate and distinct" including by holding itself out to the public as such.[197] It further requires ResCap to

---

[194] 2005 Operating Agreement, §§ 2(a)–(d) [ALLY_0140795]; *see also* 2006 Amended Operating Agreement, §§ 2(a)–(d) (attached to Residential Capital, LLC, Current Report (Form 8-K) (Nov. 30, 2006), Ex. 10.1).

[195] *See* General Motors Acceptance Corporation, Annual Report (Form 10-K) (March 28, 2006), at 5; *see also* Section III.B.

[196] *See* 2005 Operating Agreement, § 2(b) [ALLY_0140795]; *see also* 2006 Amended Operating Agreement, § 2(b) (attached to Residential Capital, LLC, Current Report (Form 8-K) (Nov. 30, 2006), Ex. 10.1); Section III.B.

[197] *See* 2005 Operating Agreement, § 2(f) [ALLY_0140795]; *see also* 2006 Amended Operating Agreement, § 2(e) (attached to Residential Capital, LLC, Current Report (Form 8-K) (Nov. 30, 2006), Ex. 10.1); Section III.B.

"maintain in effect an income tax allocation agreement [with AFI] that shall provide for two-way sharing payments based on the separately calculated tax liability or benefit of ResCap."[198]

To the extent that AFI intends to suggest that the Operating Agreement alone could defeat a potential veil-piercing claim, the Examiner is not persuaded.[199] If a plaintiff were to prove that material terms of the Operating Agreement were in practice disregarded, then the mere existence of the Operating Agreement would not shield AFI from a conclusion that ResCap and AFI operated as a single economic entity.[200] To the contrary, such proof would be evidence of a failure to observe appropriate corporate formalities.[201] On the other hand, that the ResCap Board waived or amended certain provisions of its Operating Agreement does not, without more, evidence that ResCap failed to observe appropriate corporate formalities. The Operating Agreement has by its terms always provided that its provisions could be "amended or waived" by agreement of the parties thereto and, in the case of "an amendment or waiver that materially and adversely affects the rights of any Class of Rated Indebtedness," subject to the additional requirement of approval by a majority of both the ResCap Board and its Independent Directors who shall "consider only the interest of ResCap, including its creditors."[202]

The Investigation has uncovered evidence that, in some cases, ResCap's officers and directors failed to follow or followed inconsistently certain provisions of its Operating Agreement. First, ResCap entered into certain "material" Affiliate Transactions that were not, contrary to section 2(b) of the Operating Agreement, "on terms and conditions that are consistent with those that parties at arm's-length would agree to and for fair value."[203] Neither the 2006 Bank Restructuring nor the Second 2009 Tax Allocation Agreement met those requirements.[204] Those Affiliate Transactions were executed without the parties obtaining any

---

[198] 2005 Operating Agreement, § 2(b)(iii) [ALLY_0140795]; 2006 Amended Operating Agreement, § 2(b)(iii) (attached to Residential Capital, LLC, Current Report (Form 8-K) (Nov. 30, 2006), Ex. 10.1); *see also* Section V.D.

[199] *See* AFI Submission Paper, dated Dec. 19, 2012, at 10 ("Claimants have no answer for the Operating Agreement—and the binding institutional measures of separation it contractually imposed.").

[200] *See FHFA v. Ally Fin., Inc.*, Civ. No. 11-7010, 2012 U.S. Dist. LEXIS 179768, at *13 (S.D.N.Y. Dec. 19, 2012) (denying motion to dismiss control person claim asserted against AFI under federal securities law and concluding that the "operating agreement entered into between AFI and ResCap in June 2005" failed to "demonstrate[] as a matter of law that [AFI] did not exercise control over the ResCap Sponsor and the ResCap Depositors during the period that the securitizations at issue were sold").

[201] *See In re BH S&B Holdings LLC*, 420 B.R. at 137 (considering terms of "the Holdings LLC Agreements" when determining whether the plaintiff had adequately pleaded that "Holdings failed to observe certain corporate formalities").

[202] 2005 Operating Agreement, § 8 [ALLY_0140795]; *see also* 2006 Amended Operating Agreement, § 8 (attached to Residential Capital, LLC, Current Report (Form 8-K) (Nov. 30, 2006), Ex. 10.1); Section III.B.

[203] 2005 Operating Agreement, § 2(b) [ALLY_0140795]; *see also* 2006 Amended Operating Agreement, § 2(b) (attached to Residential Capital, LLC, Current Report (Form 8-K) (Nov. 30, 2006), Ex. 10.1); Section III.B.

[204] *See* Sections V.A.2 and V.D.

third-party fairness opinions or valuations, despite that ResCap received less than FMV.[205] ResCap was not represented by outside counsel in connection with the negotiation or execution of the 2006 Bank Restructuring (although the Independent Directors retained Bryan Cave).[206]

Notwithstanding that the Independent Directors considered it their duty to review each Affiliate Transaction for compliance with section 2(b) of the Operating Agreement, and that material transactions which deviated from the arm's length and fair value requirements were a breach of section 2(b) absent waiver by the Independent Directors, such transactions were not uniformly presented to the ResCap Board for approval.[207] Instead, it appears that ResCap management sometimes elected not to seek the approval of the ResCap Board where, for example, management concluded that an Affiliate Transaction was not "material" and, in any event, "met the standard for arms length" and "fair value."[208] In other cases where Affiliate Transactions were executed without presentation to the ResCap Board for approval, the Investigation has revealed no evidence that any such determination that they satisfied section 2(b) of the Operating Agreement had been made by ResCap management.[209]

For example, the MMLPSA, the Pipeline Swap, the MSR Swap, and the amendments thereto, were, except for certain amendments in 2010 and 2011, never brought to the ResCap Board (or the GMAC Mortgage board of directors) for approval.[210] The 2010 MSR Swap amendment, entered into in or after November 2010 with a retroactive effective date of July 1, 2010, appears to be the first instance where such an amendment was approved by the ResCap Board.[211] Even then, it appears GMAC Mortgage and Ally Bank applied the new terms (including the increased Funding Fee interest rate) provided for by the 2010 Net Funding Schedule before it was executed or approved (and without obtaining any fairness opinion).[212]

---

[205] *See* Sections V.A.1.a(2) (2006 Bank Restructuring), V.D. (Second 2009 Tax Allocation Agreement). Those were not the only Affiliate Transactions where no third-party valuation or fairness opinion was obtained. *See, e.g.*, V.F.4.b(3) (June 2008 Model Home Sale).

[206] *See* Section V.A.1.a; Int. of T. Melzer, Oct. 10, 2012, at 184:9–186:7; Memorandum, Bank Restructuring Projects Plan, dated July 25, 2006, at Tasks E.19, E.20 [EXAM10256021].

[207] *See* Section IV.A.2. The Operating Agreement does not by its terms require that the ResCap Board or the Independent Directors approve Affiliate Transactions. *See* 2006 Amended Operating Agreement, § 2(b) (attached to Residential Capital, LLC, Current Report (Form 8-K) (Nov 30, 2006), Ex. 10.1).

[208] E–mail from T. Hamzehpour (Dec. 11, 2009) [MELZER.006946] (responding to e–mail from counsel for Independent Directors concerning a November 2007 Affiliate Transaction with Cerberus for a "sales price of $3.2 million" that was not presented to the ResCap Board); *see also* Section IV.A.2.

[209] *See* Section IV.A.2; *see also* 2006 Amended Operating Agreement, § 2(b) (attached to Residential Capital, LLC, Current Report (Form 8-K) (Nov. 30, 2006), Ex. 10.1).

[210] *See* Section V.B.1.a.

[211] *See* Sections V.B.9.d, VII.L.2; Minutes of a Special Meeting of the Board of Residential Capital, LLC, Nov. 5, 2010, at RC40018847–48 [RC40018729].

[212] *See* Section V.B.9.d; E-mail from A. Glassner (Aug. 26, 2010) [EXAM10436075].

Similarly, the allocation among ResCap and AFI of liability in connection with the FRB/FDIC Settlement and the DOJ/AG Settlement was not presented for the approval of the ResCap Board.[213] Instead, decisions concerning that allocation appear to have been made by ResCap accounting personnel in consultation with AFI and AFI's auditors Deloitte & Touche LLP.[214] ResCap thereby agreed to an allocation where it would bear 92% of the costs associated with the government settlements while AFI would bear 8% of those costs, which was consistent with an FRB press release dated February 9, 2012, despite that such an allocation was not specified by the DOJ/AG Settlement or the CMP.[215]

As another example of inconsistent application of section 2(b) of the Operating Agreement, the Investigation has not located any evidence that the 2006 Tax Allocation Agreement was ever presented to the ResCap Board for approval.[216] Three other income tax allocation agreements (i.e., the Implemented 2005 Tax Allocation Agreement, the First 2009 Tax Allocation Agreement, and the Second 2009 Tax Allocation Agreement), by contrast, were presented to the ResCap Board for approval.[217] Notably, both of the Affiliate Transactions where the Examiner has found that ResCap received less than FMV (i.e., the 2006 Bank Restructuring and the Second 2009 Tax Allocation Agreement) were presented to and approved by the ResCap Board.[218]

Second, the Investigation also has located evidence that ResCap at least arguably did not comply with the Operating Agreement's requirement that it "shall at all times have . . . at least two Independent Directors," when the ResCap Board approved certain Affiliate Transactions

---

[213] *See* Sections IV.A, V.C; *see also* Int. of T. Marano, Feb. 27, 2013, at 51:17–23 ("I am not aware that [the ResCap Board] specifically approved the allocation.").

[214] *See* Section V.C; *see also* Int. of T. Marano, Feb. 27, 2013, at 21:4–17, 49:19–20 (allocation to "one or the other, I think was the decision of the accountants"); Int. of C. Dondzila, Nov. 9, 2012, at 196:15–18 ("after consultation with our parent and with our auditors, the decision was made . . . [as to] the appropriate way to allocate the obligation").

[215] *See* Section V.C; Int. of C. Dondzila, Nov. 9, 2012, at 195:15–197:8, 198:1–8 ("[B]ecause the press release was final and was public, the conclusion was to go with that."); Memorandum, Accrual for DOJ Settlement at December 31, 2011, dated Feb. 28, 2012, at 8–9 [EXAM00220938] ("While neither the DOJ/AG Settlement nor the CMP Order specifically allocate a portion of the fine to AFI, such an allocation was inferred in a press release issued by the [FRB] . . . ."). As explained above, AFI agreed to provide capital support to ResCap in connection with these costs pursuant to the January 30 Letter Agreement, which was approved by the ResCap Board on January 30, 2012. *See* Section V.C; Minutes of a Special Meeting of the Board of Residential Capital, LLC, Jan. 30, 2012, at RC40019197 [RC40019179].

[216] *See* Section V.D.

[217] *See* Section V.D; Unanimous Consent to Action of the Board of Directors of Residential Capital Corporation, June 15, 2006, at 2 [RC40005468] (Implemented 2005 Tax Allocation Agreement); Minutes of a Regular Meeting of the Board of Directors of Residential Capital, LLC, Aug. 6, 2012, at RC40018820–22 [RC40018729] (First 2009 Tax Allocation Agreement); Minutes of Special Meeting of Board of Directors of Residential Capital, LLC, Dec. 22, 2010, at 6 [RC40018729] (Second 2009 Tax Allocation Agreement). The Other 2005 Tax Allocation Agreement, which was not followed by the parties, was not presented to the ResCap Board for approval. *See* Section V.D.

[218] *See* Sections V.A.1.a(2) and V.D.2.b(3).

absent a second Independent Director.[219] Independent Directors Tom Jacob and Tom Melzer resigned from the ResCap Board on April 20, 2008.[220] It was not until June 12, 2008 that both Edward Smith and Karin Hirtler-Garvey had been installed to replace them and, meanwhile, the Secured Revolver Facility and Resort Finance Sale were approved by the ResCap Board with Smith voting as the sole Independent Director.[221]

Third, there is evidence that ResCap was, at certain times, not in compliance with section 2(b)(iii) of the Operating Agreement, which required ResCap to "maintain in effect an income tax allocation agreement [with AFI] that shall provide for two-way sharing payments based on the separately calculated tax liability or benefit of ResCap."[222] For example, the 2006 Tax Allocation Agreement was entered into by ResCap and AFI effective December 1, 2006, but was not drafted or executed until late 2008 (and only after AFI's Director of Tax Allocation and Analysis noticed that an income tax allocation agreement was required by the 2006 Amended Operating Agreement).[223] Moreover, the Second 2009 Tax Allocation Agreement did not, contrary to section 2(b)(iii) of the Operating Agreement, provide for "two-way sharing payments" between ResCap and AFI.[224] Rather, there are no circumstances under which that agreement requires that any payments be made by AFI to ResCap.[225] The Investigation has not uncovered any evidence that the ResCap Board considered the requirements of section 2(b)(iii) of the Operating Agreement when it approved the Second 2009 Tax Allocation Agreement.[226]

---

[219] *See* 2005 Operating Agreement, § 2(g)(i) [ALLY_0140795]; *see also* 2006 Amended Operating Agreement, § 2(f)(i) [ALLY_0041818]. That question is not free from doubt. This section of the Operating Agreement further provides that "[i]n the event of a vacancy . . . [AFI] shall, as promptly as practicable, elect a successor Independent Director." *See id.* The Operating Agreement does not define "promptly" or specify whether the ResCap Board has the power to issue resolutions during such a vacancy. *See id.*

[220] *See* E-mail from A. de Molina (Apr. 20, 2008) [EXAM12336204]; Section IV.A.

[221] *See* Minutes of a Meeting of the Board of Directors of Residential Capital, LLC, June 1, 2008, at RC40005749, 55–56 [RC40005652]; Section IV.A.

[222] *See* 2006 Amended Operating Agreement, § 2(b)(iii) [ALLY_0041818]; *see also* Section V.D.

[223] *See* Section V.D.2.a; *see also* 2006 Tax Allocation Agreement, at ALLY_0178791 [ALLY_0178779]; Letter from W. Marx to D. DeBrunner (Sept. 30, 2008), at ALLY_0178792 [ALLY_0178779] ("To comply with the terms of the Operating Agreement, we have drafted the attached new tax allocation agreement between [AFI] and ResCap.").

[224] *See* 2006 Amended Operating Agreement, § 2(b)(iii) (attached to Residential Capital, LLC, Current Report (Form 8-K) (Nov. 30, 2006), Ex.10.1); *see also* Section V.D.

[225] *See* Second 2009 Tax Allocation Agreement, §§ 1.03D, 2.03 [RC40016871]; *see also* Section V.D.

[226] *See* Section V.D.

*(ii) Functioning Of ResCap's Officers And Directors*

AFI exercised its authority under the Operating Agreement to elect each of the directors that served on the ResCap Board—including the Independent Directors.[227] The Rescap Board was consistently populated by directors affiliated with AFI and/or Cerberus.[228] As permitted under the 2006 Amended Operating Agreement (after the restrictions imposed under the 2005 Operating Agreement were eliminated with the approval of the Independent Directors), many officers and other employees of ResCap also possessed such multiple affiliations.[229] Without more, these facts do not support an inference that "the subsidiary is a mere instrumentality for the parent" or "that those officers and directors were not functioning properly."[230] The Investigation has revealed evidence suggesting, however, that ResCap officers and directors— perhaps as result of these potentially divided loyalties—failed in certain circumstances to function properly.

In particular, and in addition to the failures described above to follow consistently certain provisions of the Operating Agreement, ResCap directors and officers did not function properly in connection with the 2006 Bank Restructuring. With respect to the 2006 Bank Restructuring, the Investigation has uncovered no evidence that the Independent Directors were ever informed that an alternative transaction structure was possible where ResCap could have retained a voting interest in IB Finance (or in fact that such an alternative had been proposed by ResCap Chief Operations Officer David Applegate).[231] Neither the Cerberus PSA nor bank regulators mandated that ResCap lose its voting interest.[232] Nonetheless, and notwithstanding that ResCap General Counsel David Marple had warned management that as proposed the restructuring "cannot reasonably be deemed a transaction to which parties at arm's-length would agree," no evidence has been located that any of ResCap's inside directors or officers advised the Independent Directors that it could have been otherwise.[233]

_____

[227] *See* 2005 Operating Agreement, § 2(g)(i) [ALLY_0140795]; 2006 Amended Operating Agreement, § 2(f)(i) (attached to Residential Capital, LLC, Current Report (Form 8-K) (Nov. 30, 2006), Ex.10.1); E-mail from W. Solomon (Apr. 14, 2008) [MELZER.004778] ("I am writing on behalf of [AFI] to confirm that you [T. Melzer and T. Jacob] were originally recruited, and continue to serve, as independent directors of Residential Capital, LLC at the request of [AFI], the sole shareholder of that company.").

[228] *See* Section IV.A; Appendix IV.A.

[229] Examples include without limitation: (1) Eric Feldstein, Chairman of the ResCap Board and AFI CEO; (2) Sanjiv Khattri, ResCap Director and AFI CFO; and (3) David Walker, Director of ResCap (and other Debtors) and AFI officer. *See* Appendix IV.A.

[230] *In re BH S&B Holdings LLC*, 420 B.R. at 138.

[231] *See* Section V.A.1.a; *see also* Memorandum, ILC Ownership and Control, dated Apr. 24, 2006 [EXAM11248641].

[232] *See* Section V.A.1.a; *see also* Int. of L. Tessler, Nov. 16, 2012, at 27:21–23 ("The specifics of how that [bank restructuring] ultimately got structured was more likely left in the hands of [AFI] and ResCap . . . .").

[233] Section V.A.1.a; *see also* Memorandum, GMAC Bank Restructuring, dated Apr. 20, 2006, at 4 [EXAM11248642].

As discussed in Section VII.K.2, the Examiner concludes that, although it is a close question in both cases, neither Young's actions with respect to the First 2009 Tax Allocation Agreement nor the ResCap Board's approval of the Second 2009 Tax Allocation Agreement involved a breach of fiduciary duty. Nonetheless, for the reasons discussed in Section VII.K.2, both circumstances arguably bespeak a level of dysfunction that the Examiner has considered as part of the present veil-piercing analysis.

Similarly, the process and decision-making in 2012 in connection with the allocation of revenues on brokered loans seems to reflect a failure by ResCap management to function properly and to defend ResCap's interests.[234] The initial, unvarnished reaction of ResCap and Ally Bank personnel when the issue was discovered in December 2011 was that Ally Bank had improperly retained a portion of the gain on sale. This was in contravention not only of the parties' specific agreements in connection with the Brokering Consumer Loans to Bank project, but of the long-standing arrangement that GMAC Mortgage, in exchange for assuming all the risk (including representation and warranty risk), was to receive the gain on sale. The process that followed discovery of the issue, however, appears to have been dominated by AFI and Ally Bank, particularly Young (who left ResCap for Ally Bank in mid-2011), and then left to accountants for resolution, without an effective advocate for ResCap. The result in 2012—in which ResCap not only did not pursue the additional $469 million the Examiner concludes likely would be held due to ResCap, but paid $51.4 million to Ally Bank—does not appear to be the product of a fair or balanced attempt to determine the parties' intent.

Likewise, as discussed in Section V.C, the process which led to the FRB/FDIC Settlement and the DOJ/AG Settlement and the allocation of costs under those settlements also reflects some level of dysfunction. For example, ResCap's officers only retained Bradley Arant as counsel, which also represented AFI (despite ResCap's and AFI's potentially adverse interests). AFI, on the other hand, was also represented by separate counsel at Sullivan & Cromwell (although it is unclear what, if any, effect this ultimately had on the settlement agreements). Further, the 92/8 allocation of the settlements between ResCap and AFI seems to have been settled on by the accountants, without involvement or approval by the ResCap Board.

### (iii) Shared Functions and Services

The Investigation has uncovered evidence reflecting that, over time, AFI and ResCap became increasingly intertwined with respect to a range of corporate functions and services.[235] Although the overlap of certain corporate functions and services among affiliated corporations is not unusual, the facts here depart to some extent from the "'typical' relationship between

_____

[234] *See* Sections V.B and VII.L.2.

[235] *See* Section V.H.

parent and subsidiary" in the scale of overlap, the degree of confusion in the lines of corporate reporting that resulted, and the undocumented basis on which certain services were shared.[236]

In March 2007, AFI CEO Eric Feldstein announced that "[t]he staff functions of GMAC [would] be realigned into strong global functions" in areas including, Finance, Information Technology, Communications, Human Resources, and Legal.[237] According to Feldstein, AFI's "historical business model" had "emphasized autonomous business units."[238] That structure had in many cases "led to the creation of duplicate and sometimes disparate support systems and fragmented staff functions."[239] By creating these "global functions," AFI anticipated "as much as $500 million in cost savings by eliminating redundant work, aligning processes, and integrating systems."[240] Although "local functional leadership [would] remain responsible for supporting individual business units as they [had] in the past, they [would] now also be charged to operate on a unified global basis within their function."[241]

Beginning in 2008, in an effort led by AFI CEO de Molina, additional steps were taken to further eliminate duplication and centralize the "global functions" of AFI and its subsidiaries.[242] Among other changes, the centralization of "global functions" resulted in certain ResCap employees reporting directly to employees of AFI, and vice versa. For example, as part of the "global" legal function Tammy Hamzehpour was both "the general counsel of ResCap but . . . also chief counsel for Ally's corporate services attorneys."[243] Moreover, "all of the litigation team that [had] reported to [Hamzehpour] . . . became reports of [AFI]."[244]

---

[236] *Official Comm. of Unsecured Creditors of RSL Com Primecall, Inc. v. Beckoff* (*In re RSL Com Primecall, Inc.*), Adv. Proc. No. 03-2176, 2003 Bankr. LEXIS 1635, at *53 (Bankr. S.D.N.Y. Dec. 11, 2003) (dismissing veil-piercing claim in part because allegations of "managerial and other services that [the parent] provided to [the subsidiary]" merely "describe[d] a 'typical' relationship between parent and subsidiary").

[237] *See* Memorandum, GMAC Global Functions, Mar. 15, 2007 [EXAM10063058].

[238] *See id.*

[239] *See id.*; *see also* Int. of L. Tessler, Feb. 28, 2013, at 34:7–14 ("ResCap was and has always been operated as a standalone company . . . . And, but definition, you have redundancies in cost structure as a result of that."); Int. of J. Whitlinger, Nov. 30, 2012, at 11:4–5 ("[Y]ou had two companies [RFC and GMAC Mortgage] that had two of everything. We called it Noah's Ark.").

[240] Memorandum, GMAC Global Functions, Mar. 15, 2007 [EXAM10063058].

[241] *See id.*

[242] *See* Int. of T. Hamzehpour, Oct. 5, 2012, at 67:21–68:3 ("The [AFI] organization historically was an organization of business unit silos and he viewed that as redundant and he wanted centralized functions. So all of the functions—finance, compliance, risk, legal were expected to centralize, and legal was one of the last ones [in January 2009]."); Int. of L. Tessler, Feb. 28, 2013, at 33:23–34:3 ("[T]here are two ways to survive a crisis. You know, raise revenues and reduce expenses and raise liquidity. And I suspect all of those options were on the table [in June 2008].").

[243] *See* Int. of T. Hamzehpour, Oct. 5, 2012, at 67:5–7.

[244] Int. of T. Hamzehpour, Oct. 5, 2012, at 63:20–22.

From the beginning, certain individuals within ResCap were concerned that this centralization of "global functions" within AFI could decrease ResCap's independence.[245] ResCap CFO James Giertz viewed these changes as part of a "drive to dismantle the ResCap structure and replace it with a more substantial infrastructure within the parent company [AFI]."[246] Giertz resigned in March 2007 citing this and other reasons.[247] A year later, ResCap Treasurer Bill Casey voiced similar complaints in an e-mail sent to Jim Jones, ResCap CEO, where Casey stated that he had been "left without direction, support or guidance from the senior management team in dealing with the past and current [AFI] leadership" and that "[o]ver the past nine months [his] reporting lines changed repeatedly" from reporting to ResCap, to AFI, then back again to ResCap.[248] Casey left ResCap a few months later.[249]

As of the Debtors' bankruptcy filing, ResCap and AFI continued to provide each other with a variety of services in areas including information technology, human resources, finance, compliance, risk management, treasury, legal, supply chain, capital markets, marketing, and facilities.[250] According to the Debtors, such services were "historically" provided "on an undocumented basis."[251]

---

[245] *See* Int. of T. Marano, Nov. 26, 2012, at 190:23–191:2 (Q: "Were there any concerns expressed . . . that by having shared functions it might erode the firewall that existed between ResCap and [AFI]?" A: "Yes."); E-mail from K. Tietjen (Apr. 17, 2008) [CCM00005242] ("Things are a little dicey at ResCap/RFG with the [AFI] corporate functions having been given the green light by Al to really start driving their agendas into the business units . . . . I'm fearful there will be a mass exodus of the leadership team at [ResCap] . . . if Al's team continues to treat them like second class citizens / impose the corporate agenda on the leaders without their input."). Marano agreed that the centralization of global functions "would get [ResCap] more entangled in [AFI]," but considered that an "advantage" because it would "probably make it harder for them to let us file." Int. of T. Marano, Nov. 26, 2012, at 191:9–14.

[246] E-mail from J. Giertz (Mar. 26, 2007) [EXAM10166630].

[247] *See id.*

[248] E-mail from W. Casey (Apr. 28, 2007), at EXAM10173944 [EXAM10173943]; *see also* Int. of J. Jones, Nov. 30, 2012, at 148:23–149:3 ("I think that the tension [that] was created for those functional managers [like Bill Casey] of well, do I report to you, Jones and Company, as the business heads [of ResCap] or do I report to the functional head of these activities at [AFI]. . . generally, the answer to that was yes.").

[249] *See* Int. of W. Casey, Jan. 31, 2013, at 6:12–16 (Casey resigned from ResCap in "June or July of [2008,] approximately").

[250] *See* Debtors' Motion for Interim and Final Orders Under Bankruptcy Code Sections 105(a) and 363(b) Authorizing Residential Capital, LLC to Enter into a Shared Services Agreement with Ally Financial Inc. *Nunc Pro Tunc* to the Petition Date for the Continued Receipt and Provision of Shared Services Necessary for the Operation of the Debtors' Business [Docket No. 41] at 14–16.

[251] *Id.* at 6; *see also* Appendix to Ally Sept. 23, 2011 Board Presentation, at ALLY_0157506 [ALLY_0157478] ("Many intercompany administrative service agreements are being revised subject to approval by the FDIC. ResCap services under these agreements are currently provided to Ally Bank at no charge."); E-mail from J. Lombardo (Nov. 4, 2008) [ALLY_0324332] (describing "concerns" raised by J. Peterson including "the cost of services provided by ResCap to the Bank and the lack of true 'billing' between the two parties"). As discussed in Section V.H, for those periods where available information permits a conclusion to be drawn, the Examiner concludes that ResCap received adequate consideration for these services, when unallocated AFI Stewardship Costs for services provided to ResCap are taken into account.

### (iv) Authority Over Day-To-Day Operations

The Investigation has uncovered evidence of certain instances of interference by AFI and its affiliates in the day-to-day operations of ResCap. After the closing of the Cerberus PSA in particular, there is evidence that, in the words of one Cerberus employee, "[t]he lines of authority and accountability [became] blurred among [AFI], ResCap and Cerberus."[252] Upon his resignation in March 2007, ResCap CFO James Giertz would similarly observe that it was not "clear to [him] who is making the key decisions within the business but certainly the official management structure and decision making processes are not being respected frequently."[253]

Upon completion of the 2006 Cerberus acquisition of 51% of AFI, a number of high-ranking Cerberus personnel joined the AFI Board, including Leonard Tessler (Managing Director, Cerberus Capital Management), Mark Neporent (COO and General Counsel, Cerberus Capital Management), Frank Bruno, and Seth Plattus. They remained on AFI's Board until early 2009, when, in connection with AFI's becoming a bank holding company and its receipt of TARP funds, Cerberus entered the passivity agreement and Stephen Feinberg, co-founder, CEO, and Chief Investment Officer of Cerberus, became the Cerberus appointee to the AFI Board.

As of April 1, 2007, AFI entered into the Consulting Agreement with Cerberus.[254] Although ResCap was not a party to that agreement, it nonetheless provided for dozens of Cerberus employees to be embedded as consultants at ResCap.[255] This arrangement lasted until Cerberus entered into the passivity agreement in 2009. The evidence supports the proposition that, in certain instances, employees of Cerberus (who also held positions with AFI, or reported to those who did)—without holding any position at ResCap—gave instructions to employees of ResCap or its subsidiaries. For example, in April 2007 a ResCap trader reported to Ralph Flees, then the Controller of RFC, that "Frank Bruno . . . of Cerberus

---

[252] Memorandum (undated) [CCM00045982] (attached to an e-mail from R. Wechsler to L. Tessler (June 11, 2008) [CCM00045981]).

[253] E-mail from J. Giertz (Mar. 26, 2007) [EXAM10166630] ("I submitted my resignation to Bruce [Paradis] late last week . . . ."); *see also* Int. of E. Feldstein, Dec. 14, 2012, at 200:25–201:2 (explaining that he has resigned as CEO of AFI in part because "Cerberus had injected people into ResCap and other places who had felt like they were reporting to Cerberus not to me").

[254] *See* Section III.E.11; Consulting Agreement [ALLY_0401248].

[255] *See* Section III.E.11; Consulting Agreement, Ex. A [ALLY_0401248] (listing fifty-nine Cerberus employees to provide consulting services to ResCap). The Investigation has not located any evidence that ResCap executed a copy of the addendum to the Consulting Agreement to "opt-in" to that agreement. *See* Section III.E.11.

has requested that we begin selling portions of the HFI Book."[256] Similarly, in January 2008, Tessler negotiated terms of ResCap's engagement of Bear Stearns to market Resort Finance to third parties.[257]

Indeed, the evidence further indicates that members of ResCap senior management were replaced by Cerberus and AFI—rather than by the ResCap Board as the ResCap LLC Agreement contemplates.[258] For example, ResCap Chief Operating Officer David Applegate and CEO Bruce Paradis resigned in early 2007.[259] According to Tessler, they were replaced because "we lacked confidence in the ability of Mr. Paradis and Mr. Applegate to execute the underwriting discipline we thought was appropriate for the environment that the company was now operating in."[260] It was only after the fact that the ResCap Board acknowledged "recently announced organizational changes" and "accepted" the resignations of Applegate and Paradis.[261]

### (v)  Statements By AFI And ResCap Concerning Their Relationship

Certain parties have argued to the Examiner that ResCap and AFI should be considered a single economic entity in part because they "held themselves out to the public as a single

---

[256] E-mail from F. Dibias to R. Flees (Apr. 4, 2007) [EXAM10164490]; *see also* Int. of R. Flees, Jan. 18, 2013, at 177:15–184:12.

[257] *See* Int. of L. Tessler, Feb. 28, 2013, at 12:9–12 ("I do recall being somewhat more involved in trying to market [R]esort [F]inance. I had some participation with Bear Stearns in this process."); E-mail from M. St. Charles (Jan. 18, 2008) [EXAM11309086] ("Steve Lipman spoke to Leonard Tessler last night about the $6 [million] fee that Bear [Stearns] has proposed for Time Off. Leonard spoke with Mike Rossi and they agreed that $6m was an appropriate fee for this transaction.").

[258] *See* Section III.F.2.d(2); 2006 ResCap LLC Agreement, § 16 (authorizing the ResCap Board to appoint and remove officers).

[259] *See* Section III.F.2.d(2).

[260] *See* Int. of L. Tessler, Nov. 16, 2012, at 86:14–19; *see also* Int. of M. Neporent, Feb. 6, 2013, at 55:7–9 (performance of Applegate and Paradis was a "general board issue at GMAC"); *id.* at 55:23–56:7 ("[W]e did not think that they were being properly responsive to the changes in the market and weren't recognizing . . . some tectonic changes in the . . . way the business had to be run. . . . I can't pinpoint who, or what, or when."); Section III.F.2.d(2).

[261] *See* Minutes of a Regular Meeting of the Board of Directors of Residential Capital LLC, Mar. 23, 2007, at 1–2 [EXAM00066636] ("The Chairman remarked on recently announced organizational changes and recommended that the Board accept David M. Applegate's resignation as a Director and Chief Operating Officer."); *see also* Minutes of a Regular Meeting of the Board of Directors of Residential Capital, LLC, May 11, 2007, at EXAM00066659 [EXAM00066660] (accepting resignation of Paradis); 2007 ResCap Update Report to GMAC Board of Directors, Mar. 15, 2007, at ALLY_0007505 [ALLY_0007439] (stating that a "new strategic plan is being implemented" and that ResCap had "[i]nstalled new senior management"); Memorandum, RFG Leadership, dated Mar. 5, 2007 [EXAM10255578] (reporting replacement of Applegate and Scholtz).

entity."[262] Those parties in principal part rely upon various public statements including, for example, language in AFI's SEC filings stating that "*We* are a leading real estate finance company" or referring to "*Our* Origination and Servicing Operations."[263] The Examiner does not find those or similar statements to be remarkable, or probative that AFI and ResCap held themselves out as a single entity. As an initial matter, those very same SEC filings disclose the existence of ResCap as a separate legal entity through which AFI conducts certain of its mortgage businesses.[264] Moreover, ResCap made its own SEC filings as a separate legal entity from AFI, including annual reports, quarterly reports, and current reports.[265] Courts have found inadequate allegations of similar statements in a parent corporation's annual report describing a subsidiary as part of a "division" where, as here, "[t]he annual report makes it clear that the . . . 'division' is composed of separate corporations."[266]

The Creditors' Committee and other parties have further argued that "ResCap employees held themselves out to the world as one with AFI" by "using email addresses with the 'ally.com' domain name."[267] It is undisputed that certain officers or employees of ResCap

---

[262] *See* Wilmington Trust Submission Paper, dated Mar. 8, 2013, at 15–17; *see also* FGIC Submission Paper, dated Oct. 17, 2012, at 14–18 ("[AFI] describes its subsidiaries as its own business units rather than separate and distinct entities.").

[263] GMAC LLC, Annual Report (Form 10-K) (Feb. 27, 2008), at 2 (emphasis added); Ally Financial, Inc., Annual Report (Form 10-K) (Feb. 25, 2011), at 5 (emphasis added); *see also* General Motors Acceptance Corporation, Annual Report (Form 10-K) (Mar. 28, 2006), at 1; GMAC LLC, Annual Report (Form 10-K) (Feb. 26, 2009), at 2; GMAC Inc., Annual Report (Form 10-K) (Feb. 26, 2010), at 3; 2011; Ally Financial, Inc., Annual Report (Form 10-K) (Feb. 28, 2012), at 4.

[264] *See* General Motors Acceptance Corporation, Annual Report (Form 10-K) (Mar. 28, 2006), at 1, 5 ("We operate directly and through our subsidiaries and affiliate in which we or GM have equity investments"; describing "Residential Capital Corporation" as "the holding company for our residential mortgage business"); GMAC LLC, Annual Report (Form 10-K) (Feb. 27, 2008), at 6 (noting that the mortgage business is run by "Residential Capital, LLC or ResCap" and defining "[t]he terms 'GMAC', 'the company', 'we', and 'us' [to] refer to GMAC LLC and its subsidiaries as a consolidated entity"); Ally Financial, Inc., Annual Report (Form 10-K) (Feb. 25, 2011), at 11 ("These [mortgage] operations are conducted through . . . subsidiaries of the Residential Capital, LLC (ResCap) legal entity in the United States.").

[265] *See, e.g.*, Residential Capital, LLC, Annual Report (Form 10-K) (Mar. 13, 2007); *see also* Section III.I.5 (explaining that the SEC permitted ResCap to discontinue filings in 2009).

[266] *Akzona Inc.*, 607 F. Supp. at 237. The Examiner reaches the same conclusion as to the other similar public statements identified by the parties, including, for example, certain excerpts from an AFI web site and ResCap marketing materials. *See* FGIC Submission Paper, dated Oct. 17, 2012, at 14–18 & Exs. 25, 28. Statements that ResCap was part of a "family of companies" or a "business unit" of AFI are not fairly construed under the circumstances as statements that ResCap and AFI were a single legal entity. *See id.*

[267] Creditors' Committee Submission Paper, dated Mar. 7, 2013, at 16; *see also* Wilmington Trust Submission Paper, dated Mar. 8, 2013, at 15–17; Wilmington Trust Submission Paper, dated Oct. 24, 2012, at 3–4 ("[ResCap] employees used 'ally.com' e-mail addresses, and letters and presentations were often made on AFI stationary"); FGIC Submission Paper, dated Oct. 17, 2012, at 11, 17–18.

maintained at various times an additional e-mail account with an AFI or Ally Bank domain name. This practice may have become more prevalent with the centralization of certain services and functions among ResCap and AFI beginning in 2007.[268] It also appears to be undisputed that certain ResCap marketing materials, presentations, and written correspondence sometimes bore AFI logos.[269] But, courts have often found such facts, without more, to be of little or no probative value when assessing whether a parent and subsidiary should be considered a single economic entity.[270]

The Examiner reaches the same conclusion here. Without more, evidence that ResCap employees used AFI e-mail addresses or that ResCap promotional materials or letterhead bore an AFI logo does not present a case where, for example, the "blur" between ResCap and AFI was so "pervasive" that the two entities were used interchangeably in contracts with third parties.[271] Nor has the Investigation uncovered evidence that any ResCap creditor was misinformed as to the separate legal identities of ResCap and AFI, or relied upon such misinformation as a promise that AFI would guarantee ResCap's obligations.[272] Although the Examiner is aware of certain instances where a third party (e.g., UBS Securities LLC, Berkshire Hathaway Inc.) appeared to have mistakenly referred in correspondence to a ResCap officer as an officer of AFI, or vice versa, such instances alone do not evidence that those parties perceived ResCap and AFI as sharing a legal identity.[273]

---

[268] *See* E-mail from E. Halloran (May 3, 2010) [EXAM20040019] ("[B]ecause we [in the GMAC Treasury group] are a global function our emails and business cards will change [to reflect the change from GMAC to AFI].").

[269] *See, e.g.,* AFI Submission Paper, dated Dec. 19, 2012, at 13–16. AFI does, of course, dispute that these things are of any moment.

[270] *See Fletcher*, 68 F.3d at 1460 ("[T]he district court properly rejected the plaintiffs' argument that the descriptions of [the subsidiary Atex as a 'division' of the parent Kodak] and the presence of the Kodak logo in Atex's promotional literature justify piercing the corporate veil."); *Nat'l Gear & Piston, Inc*., 2012 U.S. Dist. LEXIS 72879, at *83 (dismissing veil-piercing claim where plaintiff alleged that parent and subsidiary "shared the email address '@cummins.com'"); *In re Wash. Mut., Inc.*, 2010 Bankr. LEXIS 2453, at *39 ("[A] common trade name is frequently used in parent-subsidiary relationships and is not a basis for disregarding the corporate form.") (applying Washington law).

[271] *See Motown Record Co. v. iMesh.com, Inc.*, Civ. No. 03-7339, 2004 U.S. Dist. LEXIS 3972, at *14–16 (S.D.N.Y. Mar. 12, 2004) (denying motion to dismiss veil-piercing claim where lawsuit commenced by parent company was settled by an agreement naming its subsidiary as the releasor) (applying Delaware law).

[272] *Cf. Gabriel Capital, L.P. v. NatWest Fin. Inc.*, 122 F. Supp. 2d 407, 434–35 (S.D.N.Y. 2000), 122 F. Supp. 2d at 434–35 (denying motion to dismiss veil-piercing claim where "documents and representatives of the NatWest defendants referred interchangeably to NatWest Finance, NatWest Capital and NatWest Bank" and plaintiffs "were unaware of the role of [alleged alter ego] NatWest Bank when they purchased the Notes").

[273] *See* Letter from R.T. Weschler to M. Carpenter (May 4, 2012) [CCM00637385] (addressing T. Marano as "Chief Executive Officer Mortgage Operations and Chief Capital Markets Executive, Ally Financial Inc."); Letter from UBS Securities LLC to T. Marano (undated) [EXAM00220064] (addressed to T. Marano at "GMAC, LLC").

In sum, the Examiner's assessment of whether ResCap and AFI could be deemed a single economic entity does not ascribe significant weight to allegations that they held themselves out to the public as such.

### (vi) Consolidated Financial Reporting And Tax Returns

Wilmington Trust and other parties have argued that ResCap and AFI should be considered a single economic entity in part because ResCap "stopped filing public financial statements after the second quarter of 2009."[274] By letter dated November 3, 2009, the SEC approved ResCap's request to "stop filing periodic and current reports under the Securities Exchange Act of 1934."[275] Thereafter, AFI continued to file with the SEC consolidated financial statements.[276] Without more, the Examiner does not consider consolidated financial reporting to be probative of a failure to observe appropriate formalities.[277] The Investigation has not uncovered evidence that, as Wilmington Trust asserts, consolidated financial reporting concealed "the true state of [ResCap's] financial health and the extent of AFI's asset-stripping program."[278] Indeed, it appears that, even after deregistration, ResCap continued to make separate, unconsolidated financial statement available to bondholders.[279]

---

[274] Wilmington Trust Submission Paper, dated Mar. 8, 2013, at 24–25; *see also* FGIC Submission Paper, dated Oct. 17, 2012, at 16 (noting that AFI reported on the businesses "of its subsidiaries in later filings on an integrated basis").

[275] SEC No Action Letter (Nov. 3, 2009); *see also* Section III.I.5.

[276] *See, e.g.*, GMAC LLC, Annual Report (Form 10-K) (Mar. 1, 2010), at 120.

[277] *See Alberto*, 55 F.3d at 207 (affirming granting of parent's motion for summary judgment on veil-piercing claim where parent "properly employed consolidated financial statements . . . for itself and its subsidiaries") (applying Delaware law); *McAnaney v. Astoria Fin. Corp.*, 665 F. Supp. 2d 132, 145 n.12 (E.D.N.Y. 2009) ("The fact that [defendants] consolidated the financial results of their subsidiaries in publicly filed statements merely reflects compliance with the SEC requirement that corporations consolidate the results of subsidiaries for which they own a 50 percent or more interest in such statements, and is not probative of control for corporate veil piercing purposes.") (applying New York law); *see also Volkswagenwerk Aktiengesellschaft*, 751 F.2d at 121 n.3 (noting that "rules regarding the consolidation of subsidiaries are controlled by generally accepted accounting principles, which require parent corporations to consolidate subsidiaries if the parent owns more than 50 percent of the subsidiary's stock").

[278] Wilmington Trust Submission Paper, dated Mar. 8, 2013, at 24–25.

[279] The June 2008 Indentures provide that, if ResCap were not required to file with the SEC, then it would "maintain a non-public website on which Holders of Notes . . . may access the quarterly and annual financial information of [ResCap], and [ResCap would] direct Holders of Notes . . . on its publicly available website to contact [ResCap's CFO] to obtain access to the non-public website." *See* Senior Secured Notes Indenture, § 4.03(b); Junior Secured Notes Indenture, § 4.03(b) (same). During its deliberations concerning deregistration, the ResCap Board contemplated that certain more limited financial information would continue to be provided to debt investors and full audited financial statements would continue to be prepared by ResCap. *See* Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, June 24, 2009, at RC40006226–27 [RC40005949]; ResCap Board Presentation: ResCap's De-registration from SEC Filing Requirements, presented at a Special Meeting of the Board of Directors of Residential Capital, LLC, June 24, 2009 [EXAM11625696]. The available evidence indicates that ResCap continued to prepare such financial statements in the years after deregistration. *See* Residential Capital, LLC, Consolidated Financial Statements for the Years Ended December 31, 2011 and 2010 [EXAM00122651].

Nor does the Examiner find the consolidated income tax returns of AFI and ResCap to be probative of a failure to follow appropriate corporate formalities. Following ResCap's conversion to a limited liability company on October 24, 2006, ResCap elected to change its federal tax classification to that of a disregarded entity.[280] This treatment of ResCap as a "division" of AFI for federal income tax purposes is not, however, evidence that ResCap and AFI should be considered a single economic entity for all purposes.[281]

### (5) Merely A Facade For The Operations Of The Dominant Parent

#### (a) Legal Principles

"When a parent corporation exercises significant control over a subsidiary's operations and finances, an inference may arise that Defendants created a facade."[282] This factor requires that the control be in a nature outside of "a prototypical parent-subsidiary relationship."[283] One Delaware court has described this factor as satisfied where a corporation is "ignored" by its shareholders, who instead "operate[] the [corporation's business] as if they own[] it outright" despite the corporation's obligations to creditors.[284] Other courts applying Delaware law have suggested that "[t]he extent of the domination and control must preclude the controlled entity from having legal or independent significance of its own."[285] Moreover, several courts have

---

[280] *See* Sections III.E.5 and V.D; Memorandum, Final Tax Liabilities Allocated from GM, dated Jan. 25, 2008, at ALLY_0208456 [ALLY_0208456].

[281] *See Alberto*, 55 F.3d at 207 (affirming granting of parent's motion for summary judgment on veil-piercing claim where parent "properly employed . . . consolidated tax returns for itself and its subsidiaries" and explaining that "[t]he Internal Revenue Code allows a parent corporation to file consolidated income tax returns with its subsidiaries" in certain circumstances) (applying Delaware law and quotation marks omitted).

[282] *In re Autobacs Strauss, Inc.*, 473 B.R. at 558 (denying motion to dismiss veil-piercing claim); *see also Blair*, 720 F. Supp. 2d at 472 ("[Plaintiff's] other allegations also give rise to the inference that the Infineon defendants created a facade by exercising significant control over the Qimonda Subsidiaries' operations, finances, and the ultimate decision to close their plants in the United States.").

[283] *In re Autobacs Strauss, Inc.*, 473 B.R. at 558.

[284] *See Golden Acres*, 702 F. Supp. at 1106 ("Golden Acres was merely a facade for defendants' operations. Defendants operated the apartment complex as if they owned it outright, not as shareholders in a corporation which had defaulted on its mortgage on the building and still had payments to make. Now they are trying to rely on the very entity they ignored to shield themselves from liability to the corporation's creditors.") (applying federal common law).

[285] *In re BH S&B Holdings LLC*, 420 B.R. at 140–41 (quotation marks omitted); *see also Wallace v. Wood*, 752 A.2d 1175, 1184 (Del. Ch. 1999) (same).

recognized that "the existence of separate operating companies usually negates a piercing of the veils," finding such circumstances "inconsistent" with the allegation that a subsidiary was a "mere shell" or facade.[286]

### (b) Application To Facts

The Examiner expects that it would be a challenge to establish that ResCap was no more than a "shell" or "façade" for AFI. As an initial matter, the Examiner is not persuaded by the arguments of the Creditors' Committee and other parties that ResCap and AFI have "admitted" to the requisite degree of control.[287] Those parties cite to public statements concerning AFI's "control" of ResCap including, for example, a statement in the FRB/FDIC Consent Order that AFI "indirectly owns and controls Ally Bank . . . and numerous direct and indirect nonbank subsidiaries, including [ResCap and its subsidiaries]."[288] Courts have considered such statements insufficient to show that the subsidiary was a mere façade for its parent or that the subsidiary and parent were a single economic entity.[289] Were the rule otherwise, every parent company of a wholly owned subsidiary would be subject to

_____

[286] *In re RSL Com Primecall, Inc.*, 2003 Bankr. LEXIS 1635, at *54 (dismissing veil-piercing claim); *see also Japan Petroleum Co.* (*Nigeria*), *Ltd. v. Ashland Oil Co.*, 456 F. Supp. 831, 843 (D. Del. 1978) (declining to pierce veil where subsidiary "AON is in no way a shell corporation, but is an operating company with extensive obligations and rights of its own under the Production Sharing Contract"); *In re Moll Indus., Inc.*, 454 B.R. at 589 (dismissing veil-piercing claim where plaintiff admitted that subsidiary and parent "conducted fundamentally different businesses," namely that the parent was "a hedge fund" and the subsidiary was "in the injection molding and manufacturing business"); *In re Foxmeyer Corp.*, 290 B.R. at 244 (finding that plaintiff "failed to produce evidence that would . . . demonstrate that [subsidiary] Fox Drug simply functioned as a facade for [parent] Fox Corp" where "Fox Drug existed in order to carry on Fox Corp.'s pharmaceutical distribution business" and "Fox Corp., as a holding company, conducted several discrete, albeit related healthcare businesses"); *Case Fin., Inc.*, 2009 Del. Ch. LEXIS 153, at *12–15 (entering judgment after trial rejecting attempt by parent "to pierce its own corporate veil" to establish standing to bring suit against CEO of subsidiary where parent "Case Financial did not prove that Case Capital operated as a mere facade for Case Financial; rather, Case Financial acted as a holding company and Case Capital acted as an operating subsidiary, which served a specific purpose within the . . . corporate family").

[287] *See* Creditors' Committee Submission Paper, dated Mar. 7, 2013, at 17 ("AFI's control was admitted in many public and private documents"); *see also* Wilmington Trust Submission Paper, dated Mar. 8, 2013, at 15–17; Wilmington Trust Submission Paper, dated Oct. 24, 2012, at 3–4; FGIC Submission Paper, dated Oct. 17, 2012, at 11, 17–18.

[288] FRB/FDIC Consent Order (Apr. 13, 2011), at 1.

[289] *See PSG Poker, LLC*, 2007 U.S. Dist. LEXIS 46661, at *10–11 (explaining that defendant's admission "to being the sole shareholder . . . and that he supervised and controlled the act of the corporations" he owned was "not sufficient to satisfy the rigorous standards for piercing the corporate veil [of those corporations] under Delaware law"); *see also Fletcher*, 68 F.3d at 1460 ("[T]he district court properly rejected the plaintiffs' argument that the descriptions of [the subsidiary Atex as a 'division' of the parent Kodak] and the presence of the Kodak logo in Atex's promotional literature justify piercing the corporate veil.").

veil-piercing liability. That is not the law.[290] Similar statements concerning the "control" of AFI over ResCap contained within ResCap SEC filings[291] and ResCap Board materials[292] are unavailing for the same reasons.

As set forth above, the Examiner has concluded that the evidence supports the proposition that ResCap failed to follow or followed inconsistently certain appropriate corporate formalities.[293] That conclusion in part relied upon evidence suggesting that the lines of authority within ResCap were sometimes blurred by initiatives that centralized a number of corporate functions and services within AFI and by day-to-day interference in ResCap's operations by Cerberus and AFI employees who held no positions at ResCap.[294] Nonetheless, the Examiner concludes that such evidence does not support the proposition that ResCap was so dominated and controlled as to be precluded from having any legal or independent significance of its own.[295]

Such evidence would likely be weighed against the undisputed facts that ResCap and its subsidiaries operated multiple businesses including, for example, domestic and international residential mortgage loan origination, acquisition, sale and securitization, management of a portfolio of HFI loans and retained interests from securitizations, servicing of residential mortgage loans, and financing homebuilders and residential land developers.[296] Owing to these and other businesses, ResCap reported net income in 2005 and 2006 of $1 billion and $705.1 million, respectively.[297] ResCap and it subsidiaries employed—at peak in or around

---

[290] *See Pearson*, 247 F.3d at 484 ("[M]ere ownership of a subsidiary does not justify the imposition of liability on the parent.").

[291] *See* Residential Capital Corporation, Registration Statement (Form S-4) (Feb. 27, 2008), at 23 ("GM and [AFI] control all fundamental matters affecting us"; "[AFI] indirectly owns all of our outstanding common stock and has the power to elect and remove all of our directors"); Residential Capital, LLC, Annual Report (Form 10-K) (Mar. 13, 2007), at 43 ("[AFI] controls all fundamental matters affecting us, and its interests may differ from ours.") (emphasis and italics omitted).

[292] Report to the Board of Directors Residential Capital Corporation, D.C.W. No. 3, dated Nov. 20, 2006, at RC40008940 [RC40008925] ("[AFI] would own 100% of the voting shares of the bank, but since [AFI] currently wholly owns ResCap and controls the ResCap Board, there would be no effective change in control."); *see also* E-mail from S. Cohen (Dec. 11, 2009) [ALLY_0307981] (responding to certain "accounting notes" and stating that "[s]ince [AFI] has voting control of ResCap the decision to change intent by the [AFI] board would carry through to the underlying assets (at the [AFI] level) since [AFI] is presumed to control decisions of ResCap").

[293] *See* Section VII.A.1.f(4)(b).

[294] *See* Section VII.A.1.f(4)(b)(iii)–(iv).

[295] *See In re BH S&B Holdings LLC*, 420 B.R. at 140–41; *Wallace v. Wood*, 752 A.2d 1175, 1184 (Del. Ch. 1999).

[296] *See* Section III.C.

[297] *See* Residential Capital, LLC, Annual Report (Form 10-K) (Mar. 28, 2006), at 57; Residential Capital, LLC, Annual Report (Form 10-K) (Mar. 13, 2007), at 55.

2006—approximately 14,000 people.[298] Moreover, AFI operated additional businesses with which ResCap and its subsidiaries had no operational involvement including the automotive finance and insurance businesses.[299] These facts are likely to be considered "inconsistent with the contention that [ResCap] was a mere shell" or façade.[300] A court instead would more likely find this to be a case of a parent company and an "operating subsidiary, which served a specific purpose within the . . . corporate family."[301]

### g.   Overall Element Of Injustice Or Unfairness

#### (1) Legal Principles

Applying Delaware law, the Second Circuit Court of Appeals has recently reiterated that "[t]o prevail under the alter-ego theory of piercing the veil, a plaintiff need not prove that there was actual fraud but must show . . . an 'overall element of injustice or unfairness.'"[302] Certain Delaware Chancery Court decisions could be read to the contrary and have stated that, in order to pierce the corporate veil, "[e]ffectively, the corporation must be a sham and exist for no other purpose than as a vehicle for fraud."[303] At least one New York district court has expressly declined to follow those "lower court decisions in Delaware [that] appear to require a showing of fraud," explaining that "until the Delaware Supreme Court makes a definitive ruling on the requirements of Delaware law, we are bound to follow Second Circuit precedent."[304]

---

[298] *See* Residential Capital, LLC, Annual Report (Form 10-K) (Mar. 13, 2007) at 34.

[299] *See* GMAC LLC, Annual Report (Form 10-K) (Mar. 13, 2007), at 2–3 (describing AFI "lines of business" including automotive finance and insurance as operated separately from ResCap's mortgage business).

[300] *In re RSL Com Primecall, Inc.*, 2003 Bankr. LEXIS 1635, at *54 (dismissing veil-piercing claim).

[301] *Case Fin., Inc.*, 2009 Del. Ch. LEXIS 153, at *12–15 (rejecting attempt by parent "to pierce its own corporate veil" to establish standing to bring suit against CEO of subsidiary); *see also In re RSL Com Primecall, Inc.*, 2003 Bankr. LEXIS 1635, at *54 (dismissing claim seeking to pierce the veil of company that "operated three business units (some or all acquired as operating concerns) and had its own employees responsible for its day-to-day operations").

[302] *Kertesz v. Korn*, 698 F.3d 89, 92 (2d Cir. 2012) (quotation marks omitted); *see also Fletcher*, 68 F.3d at 1457 ("[U]nder Delaware law, the alter ego theory of liability does not require any showing of fraud."); *Harco Nat'l Ins. Co.*, 1989 Del. Ch. LEXIS 114, at *10 (Del. Ch. Sept. 19, 1989) ("Fraud has traditionally been sufficient reason to pierce the corporate veil. Other grounds also exist.") (internal citation omitted); *Irwin & Leighton, Inc.*, 532 A.2d at 987 ("[C]onduct short of the active intent to deceive required to establish fraud may, nevertheless, occasion the 'piercing of the corporate veil,' to use the standard shorthand."); *In re Sunbeam Corp.*, 284 B.R. at 365 (same); *In re Verestar, Inc.*, 343 B.R. at 464 n.7 ("fraud is not a necessary element of a claim for alter ego liability"); *In re Ticketplanet.com*, 313 B.R. at 70 ("[t]here is no requirement of fraud").

[303] *Wallace v. Wood*, 752 A.2d 1175, 1184 (Del. Ch. 1999); *see also Mason*, 2005 Del. Ch. LEXIS 99, at *10 ("Delaware Courts have built on this analysis and require an element of fraud to pierce the corporate veil."); *In re Sunstates Corp. S'holder Litig.*, 788 A.2d 530, 534 (Del. Ch. 2001).

[304] *Leber Assocs., LLC*, 2003 U.S. Dist. LEXIS 13009, at *44 n.11.

Assuming arguendo that "fraud, strictly speaking, is not the only basis for finding an alter-ego relationship and piercing the corporate veil," in the absence of evidence of fraud, "something like it is required."[305] "[T]o meet the standard, fraud or inequity 'must be found in the defendants' use of the corporate form.'"[306] "The underlying cause of action does not supply the necessary fraud or injustice."[307] Moreover, without more, "the possibility that a plaintiff may have difficulty enforcing a judgment is not an injustice warranting piercing the corporate veil."[308] That said, "nothing prevents a court, in determining whether there is sufficient evidence of fraud or unfairness, from taking into account relevant evidence that is also pertinent to the question of whether the two entities in question functioned as one."[309] Finally, "the plaintiff need not prove that the corporation was created with fraud or unfairness in mind. It is sufficient to prove that it was so used."[310]

A "typical situation" where "fraud or injustice" may warrant piercing the corporate veil has been said to arise:

> [W]here an entity completely controls an undercapitalized subsidiary or affiliate and, through that dominance, causes the underfunded-controlled entity to engage in inequitable conduct. When, as a result of that conduct, the injured party attempts to obtain redress, the controlling entity shields itself from liability behind the facade of the shell corporation, while the injured

---

[305] *Mobil Oil Corp.*, 718 F. Supp. at 268; *see also In re Moll Indus., Inc.*, 454 B.R. at 591 (Delaware law does not require a showing of fraud but "something like fraud must be proven" and the difference is "largely superficial") (quotation marks omitted). Certain "[c]ourts and commentators have noted that this standard is less than clear and has been criticized for its ambiguity and randomness." *Soroof Trading Dev. Co.*, 2012 U.S. Dist. LEXIS 67736, at *27 (quotation marks omitted) (collecting cases).

[306] *Soroof Trading Dev. Co.*, 2012 U.S. Dist. LEXIS 67736, at *27 (quoting *Trevino*, 583 F. Supp. 2d at 530); *see also In re BH S&B Holdings LLC*, 420 B.R. at 133 ("There must be an abuse of the corporate form to effect a fraud or an injustice–some sort of elaborate shell game.") (quotation marks omitted).

[307] *NetJets Aviation, Inc.*, 537 F.3d at 183 ("To hold otherwise would render the fraud or injustice element meaningless.") (quotation marks omitted); *see also Mobil Oil Corp.*, 718 F. Supp. at 268 (explaining that although "[a]ny breach of contract and any tort – such as patent infringement – is, in some sense, an injustice," "[t]he underlying cause of action does not supply the necessary fraud or injustice" for veil-piercing; *In re CLK Energy Partners, LLC*, 2010 Bankr. LEXIS 1564, at *20 ("[P]roof of an underlying tort or contract claim against a corporate defendant does not, standing alone, support an alter ego finding against the corporation's principals. . . . The Complaint . . . fails to tie [the] alleged misrepresentations to a misuse by each of the Choctaw defendants of the limited liability afforded by CLK's LLC form.").

[308] *Trevino*, 583 F. Supp. 2d at 530 (allegation that subsidiary was "ill-equipped to handle potential liability arising from this action" not sufficient to allege necessary "injustice" to pierce its veil) (quotation marks omitted); *see also Secured Sys. Tech., Inc. v. Frank Lill & Son, Inc.*, Civ. No. 08-6256, 2012 U.S. Dist. LEXIS 141845, at *14 (W.D.N.Y. Oct. 1, 2012) ("[T]he required 'fraud or injustice' is not established merely because the alleged-subsidiary corporation may now be judgment proof.") (applying Delaware law).

[309] *NetJets Aviation, Inc.*, 537 F.3d at 183.

[310] *Id.* at 177.

> party has no recourse against the undercapitalized shell
> corporation. In that instance, the corporate form was used to
> effect a fraud or injustice and the corporate veil is pierced to
> allow the injured party to obtain redress from the actual
> wrongdoer who has the wherewithal to pay any damages
> awarded.[311]

Accordingly, the necessary "fraud or injustice" has been found in several cases where a parent siphoned funds from a subsidiary to the detriment of the subsidiary's creditors.[312]

### (2) Application To Facts

The Examiner concludes that the evidence does not support the proposition that AFI engaged in the type of "injustice or unfairness" necessary to warrant piercing the corporate veil. This case does not present the "typical situation" where "fraud or injustice" may warrant piercing the corporate veil when a subsidiary becomes unable to satisfy its creditors either

---

[311] *In re Sunbeam Corp.*, 284 B.R. at 367; *see also On Command Video Corp. v. Roti*, 2013 U.S. App. LEXIS 848, at *12 (7th Cir. Jan. 14, 2013) (applying Illinois law) ("Whether adherence to the fiction of . . . corporate separateness would 'promote injustice' is a vague test. But it is best understood as asking whether there has been an abuse of limited liability, as when the owner of a party to a contract strips the party of assets so that if it breaks the contract the other party will have no remedy."); *In re Ticketplanet.com*, 313 B.R. at 70 ("To survive a motion to dismiss, a plaintiff must allege facts that the controlling owners operated the company as an 'incorporated pocketbook' and used the corporate form to shield themselves from liability.").

[312] *See NetJets Aviation, Inc.*, 537 F.3d at 183 (reversing grant of summary judgment dismissing veil-piercing claim where there was sufficient evidence such that a factfinder "could infer that [sole owner] Zimmerman's payments to [limited liability company] LHC were deliberately mischaracterized as loans in order to mask the fact that Zimmerman was making withdrawals from LHC that were forbidden by law, and could thereby properly find fraud or an unfair siphoning of LHC's assets"); *Soroof Trading Dev. Co.*, 2012 U.S. Dist. LEXIS 67736, at *29-30 (allegations of parent's "siphoning of funds" from subsidiaries and using those subsidiaries "to make promises that they could not meet" sufficient to grant leave to amend to add veil-piercing claim); *TradeWinds Airlines, Inc.*, 2012 U.S. Dist. LEXIS at *18-19 (finding "adequate injustice" to support veil-piercing claim where plaintiffs alleged that "Defendants siphoned funds from C-S Aviation" and thereby "deprived Plaintiffs of the ability to recover damages on its fraudulent inducement claim"); *Blair*, 720 F. Supp. 2d at 473 (denying motion to dismiss veil-piercing claim and concluding that plaintiff "sufficiently alleged that the [parent] defendants may have perpetrated an element of fraud or injustice" where it was alleged that "[parent] defendants misdirected funds, exercised crippling control, and purposely siphoned profits from the Qimonda Subsidiaries"); *PSG Poker, LLC*, 2008 U.S. Dist. LEXIS 4225, at *38 (granting plaintiff summary judgment on veil-piercing claim where there was "ample evidence in the record that [sole shareholder] DeRosa-Grund siphoned the funds received by [the company] for his personal benefit" and "sought to mislead and defraud" creditors); *In re Buckhead Am. Corp.*, 178 B.R. at 974 (denying motion to dismiss veil-piercing claim where plaintiff alleged that the parent caused its subsidiary "to make transfers and incur debts solely for the benefit of defendants (and others) to the detriment of [subsidiary] and its creditors"); *In re Autobacs Strauss, Inc.*, 473 B.R. at 559 (plaintiffs "sufficiently allege that [parent] may have perpetrated fraud . . . or something similar" when it "misdirected funds, exercised crippling control, and purposely siphoned money from [its subsidiary]"). *Cf. Fletcher*, 68 F.3d at 1461 (affirming grant of defendant's motion for summary judgment on veil-piercing claim where "[t]here is no indication that Kodak sought to defraud creditors and consumers or to siphon funds from its subsidiary").

because it was undercapitalized at formation or later siphoned of assets by its parent.[313] Here, the Examiner has concluded that the evidence does not support either proposition.[314] Instead, the factual record revealed by the Investigation reflects that ResCap was not inadequately capitalized or insolvent when it commenced operations but that it later became unable to satisfy its creditors because of billions of dollars in operating losses it recorded beginning in the fourth quarter of 2006 as market conditions steeply declined.[315]

Although ResCap entered into certain Affiliate Transactions, including the 2006 Bank Restructuring and the Second 2009 Tax Allocation Agreement for less than fair market value, and Ally Bank retained brokered-loan revenues due to ResCap in 2012, the Examiner has concluded that—on balance and when viewed under all the circumstances—the evidence does not support the proposition that AFI engaged in "siphoning."[316] In any event, the approximate amounts at issue with respect to the 2006 Bank Restructuring (i.e., $390-465 million), the Second 2009 Tax Allocation Agreement (i.e., $50 million, and the avoidance of an obligation now known to be worth up to $1.77 billion), and the misallocation of brokered-loan revenues ($567 million), while substantial, would likely be viewed in the context of the more than $8 billion in financial support that AFI provided to ResCap from 2007 to the petition date in 2012.[317] In the context of that financial support—which AFI did not begin to provide to ResCap until months *after* the close of the 2006 Bank Restructuring—it would be difficult to prove from those Affiliate Transactions that AFI used ResCap as an "incorporated pocketbook"[318] or for "some sort of elaborate shell game."[319]

The Creditors' Committee and other parties have suggested that there may be an element of "injustice or unfairness" in AFI's financial support of ResCap because that support was self-interested and generally inadequate to do more than maintain ResCap on "life support." The Examiner is not persuaded. Without more, this sort of allegation that ResCap "served as a tool to further [AFI's] interests" is unlikely to be considered "injustice or unfairness" arising from an abuse of the corporate form that could warrant piercing the corporate veil.[320]

---

[313] *See In re Sunbeam Corp.*, 284 B.R. at 368.

[314] *See* Sections VII.A.1(f)(1)(b) and VII.A.1(f)(2)(b).

[315] *See* Section VII.A.1(f)(1)(b).

[316] *See* Section VII.A.1(f)(2)(b).

[317] *Id*.

[318] *In re Ticketplanet.com*, 313 B.R. at 70.

[319] *In re BH S&B Holdings LLC*, 420 B.R. at 133 (quotation marks omitted).

[320] *In re Ticketplanet.com*, 313 B.R. at 71 (dismissing veil-piercing claim despite allegation "that the Debtor merely served as a tool to further Defendants' interests," where the debtor had "received a substantial cash infusion from [defendant affiliate entity]"); *see also In re RSL Com Primecall, Inc.*, 2003 Bankr. LEXIS 1635, at *53-54 (granting motion to dismiss veil-piercing claim where plaintiff argued that the subsidiary "merely served as a tool to further Defendants' interests" and explaining that "[t]his claim alone cannot support a finding that [the subsidiary] was used improperly for the benefit of its . . . affiliates, nor does it show overall fraud or injustice from the use of the corporate form").

Although the available evidence indicates that the precise motives for AFI's financial support of ResCap changed over time, there can be no dispute that AFI (not surprisingly) provided such support only when AFI believed it to be in AFI's interest.[321] When that financial support began in 2007, AFI believed that ResCap was a viable and valuable business that should receive support to weather what was viewed as a temporary crisis.[322] By November 2008, AFI considered bank holding company approval and eligibility for TARP funds to be critical to its survival and concluded that it was necessary for AFI to continue to provide financial support to ResCap to achieve that goal.[323] AFI also worried that a precipitous ResCap bankruptcy filing would have put AFI's access to financing and its control over Ally Bank at risk.[324] According to Tessler, AFI Board Member and Managing Director of Cerberus, the "unfortunate reality" was that because of these circumstances AFI "was forced to provide [ResCap] inter company loans and engage in the affiliated transactions."[325] By December 2009, if not earlier, AFI had come to view ResCap as a "millstone around the neck" that held "no businesses that are strategic for the future."[326] AFI continued to provide financial support to ResCap in part because, as late as December 2011, AFI was concerned about the effects of a ResCap bankruptcy given the "operational entanglement of the Bank and ResCap."[327]

That AFI may have continued to support ResCap as a means to its own shifting ends does not change the effect of that support on ResCap's balance sheet.[328] The Investigation has not

---

[321] Indeed, AFI acknowledges that it "only provided capital to ResCap when it was in the interest of AFI and its stakeholders." *See* AFI Submission Paper, dated Dec. 19, 2012, at 19.

[322] *See* Section III.F; Int. of L. Tessler, Nov. 16, 2012, at 143:24–147:4; Int. of A. de Molina, Nov. 20, 2012, at 25:12–26:16.

[323] *See* Section III.H.5; *see also* Board Agenda & Supporting Materials, GMAC LLC, Nov. 28, 2008, at EXAM10277378 [EXAM10277369] ("management believes that BHC status is achievable, but has been advised that support for ResCap is a prerequisite"); Int. of A. de Molina, Nov. 20, 2012, at 101:25–102:2 ("I was so petrified that [a ResCap bankruptcy] would derail the entire bank holding company strategy."); Int. of R. Hull, Feb. 7, 2013, at 177:8–11 ("it became clear that a filing of ResCap at all in the context of this BHC [request], it would complicate matters immensely").

[324] *See* E-mail from L. Tessler to M. Carpenter (Dec. 3, 2009), at CCM00065542 [CCM00065540] ("[T]he historic choices regarding what to do with ResCap have always resulted in the same conclusion which is, filing ResCap will bring down [AFI] . . . . Any actions taken to divorce ResCap from [AFI] during this period [before the close of the 2008 Bank Transaction] would have resulted in [AFI's] bank lines either being pulled or not renewed and the probable los[s] of the Bank to the FDIC."); Board Agenda and Supporting Material, GMAC LLC, Sept. 30, 2008, at ALLY_0361451 [ALLY_0361444] ("It is unclear whether the FDIC would seize the bank in the event of a [ResCap] bankruptcy. The bank is critical to [AFI's] future liquidity. This uncertainty poses a significant risk.").

[325] E-mail from L. Tessler to M. Carpenter (Dec. 3, 2009), at CCM00065542 [CCM00065540].

[326] Presentation to the U.S. Department of the Treasury: GMAC Request for SCAP Funding, dated Dec. 11, 2009, at 4-5 [ALLY_0231352]; *see* E-mail from M. Carpenter to L. Tessler (Dec. 6, 2009) [CCM00065540] (stating that he would "sell the whole company [(*i.e.*, ResCap)] for a dollar").

[327] E-mail from B. Yastine (Dec. 1, 2011) [ALLY_0304495].

[328] *See* Section VI.C.4.f(4).

uncovered evidence that ResCap and its creditors were defrauded or otherwise harmed by AFI's self-interested financial support. The Examiner does not consider this or any other alternative theory of "injustice or unfairness" to be any more likely to succeed.

Accordingly, the Examiner concludes that any veil-piercing claims asserted on behalf of ResCap against AFI are unlikely to prevail.[329]

---

[329] The Examiner likewise concludes that any potential veil-piercing claim asserted on behalf of GMAC Mortgage or RFC seeking to hold AFI liable for their respective debts would be unlikely to prevail. As explained above, the law is unsettled as to whether the veils of each intermediate entity between a subsidiary and its ultimate parent must be pierced. *See* Section VII.A.1.c. Assuming arguendo that it is unnecessary to pierce intermediate veils, a veil-piercing claim on behalf of RFC or GMAC Mortgage against AFI would still be unlikely to prevail for similar reasons as a veil-piercing claim on behalf of ResCap against AFI. The evidence indicates that RFC and GMAC Mortgage were not insolvent at creation and were not rendered insolvent by the actions of their parent entities, but by operating losses. *See* Sections VI.E and VII.A.1.f(1)(b). There is no viable evidence of any program to siphon assets from either entity. Old GMAC Bank was a subsidiary of neither RFC nor GMAC Mortgage. *See* May 19, 2006, Application to OTS [ALLY_0401697] (Old GMAC Bank was wholly owned subsidiary of GMAC Residential Holding Corp., a direct subsidiary of ResCap). The tax allocation agreement issues are germane to ResCap, not RFC or GMAC Mortgage. The misallocation of brokered-loan revenues does implicate GMAC Mortgage (but not RFC). However, while Ally Bank withheld $469.1 million the Examiner concludes should have been paid to GMAC Mortgage, those amounts originally had been withheld by mistake, not design; the argument for "siphoning" is stronger for the additional $51.4 million GMAC Mortgage paid to Ally Bank. Moreover, GMAC Mortgage had itself been the beneficiary of more than $2.5 billion in AFI debt forgiveness. *See* GMAC Mortgage LLC Consolidated Financial Statements for the Years Ended December 31, 2009 and 2008, at 35 [EXAM00124578]. The evidence concerning corporate formalities would be similar on a RFC or GMAC Mortgage claim; the analysis would be augmented perhaps by the fact that neither of these entities seems to have had any board meetings, and to have operated instead by written consent of their all-insider boards, but this seems to have been consistent with the requirements of their respective operating agreements. *See* GMAC Mortgage LLC Agreement, § 15.d (Apr. 13, 2006) [ALLY_0118835]; RFC LLC Agreement, § 15.d (Oct. 6, 2006) [GSResCap0000124921]; RFC LLC Agreement, § 15.d (Apr. 2, 2007) [EXAM00294621]. Nonetheless, as with respect to ResCap, there is no evidence that these entities were a "mere façade" for AFI. Finally, given the absence of either undercapitalization at formation or siphoning, there does not appear to be any "injustice or unfairness" arising from abuse of the corporate form that could warrant piercing the veil between RFC or GMAC Mortgage and AFI.

## 2. *Substantive Consolidation*

Several parties in interest have asserted that grounds exist to support the substantive consolidation of AFI into ResCap's bankruptcy case.[330]

While there is some evidentiary support for a claim of substantive consolidation, the Examiner concludes it is unlikely that an attempt to substantively consolidate AFI with and into the Estate of any Debtor would prevail.

### a. *Introduction*

Substantive consolidation is a doctrine of federal bankruptcy law under which bankruptcy courts may, in the exercise of their general equitable powers under section 105(a) of the Bankruptcy Code, consolidate the assets and liabilities of affiliated entities and treat them as one for purposes of the bankruptcy proceeding.[331] Intercompany claims of the consolidated debtors are eliminated, the assets of the consolidated debtors are treated as common assets, and the claims of outside creditors against any of the debtors are treated as claims against the consolidated entity.[332]

The purpose of substantive consolidation is to provide for the equitable treatment of all creditors, without any undue prejudice to any particular set of creditors.[333] If companies inappropriately disregard corporate formalities to the detriment of their creditors, the court may order relief that disregards corporate boundaries to remedy the harm to injured parties.[334] Before the equitable remedy of substantive consolidation was created, courts employed other

---

[330] *See, e.g.,* Wilmington Trust Submission Paper, dated Mar. 8, 2013, at 56 ("AFI and Residential Capital should be substantively consolidated").

[331] *See In re Owens Corning*, 419 F.3d 195, 205 (3d Cir. 2005) ("Substantive consolidation, a construct of federal common law, emanates from equity."); *Union Savings Bank v. Augie/Restivo Baking Co.* (*In re Augie/Restivo Baking Co.*)*,* 860 F.2d 515, 518 n.1 (2d Cir. 1988) ("Courts have found the power to consolidate substantively in the court's general equitable powers as set forth in 11 U.S.C. § 105.") (citing cases); *James Talcott, Inc. v. Wharton* (*In re Cont'l Vending Mach. Corp.*), 517 F.2d 997, 1000 (2d Cir. 1975) ("The power to consolidate is one arising out of equity. . . ."). There is no direct statutory authority or prescribed standard for substantive consolidation. *See In re Augie/Restivo Baking Co.,* 860 F.2d at 518–19; *Alexander v. Compton* (*In re Bonham*), 229 F.3d 750, 765–66 (9th Cir. 2000). *But see In re Cyberco Holdings, Inc.*, 431 B.R. 404, 430–31 (Bankr. W.D. Mich. 2010) (concluding that Bankruptcy Code section 542 and, to a lesser extent, Bankruptcy Code section 502(j) serve as the statutory authority for substantive consolidation); *In re Stone & Webster, Inc.*, 286 B.R. 532, 541–42 (Bankr. D. Del. 2002) (holding that Bankruptcy Code section 1123(a)(5)(C) authorizes substantive consolidation).

[332] *See In re Augie/Restivo Baking Co.,* 860 F.2d at 518; *In re Owens Corning*, 419 F.3d at 202.

[333] *See FDIC v. Colonial Realty Co.*, 966 F.2d 57, 61 (2d Cir. 1992) (sole aim of substantive consolidation is fairness to all creditors); *Windels Marx Lane & Mittendorf, LLP v. Source Enters., Inc.* (*In re Source Enters., Inc.*), 392 B.R. 541, 552 (S.D.N.Y. 2008) (noting that the "sole purpose" of substantive consolidation is "to ensure the equitable treatment of all creditors") (citing *In re Augie/Restivo Baking Co.,* 860 F.2d at 518); *In re Richton Intern. Corp.*, 12 B.R. 555, 558 (Bankr. S.D.N.Y. 1981).

[334] *See In re Owens Corning*, 419 F.3d at 205.

remedies to rectify the misuse of corporate forms by related entities. These remedies included veil-piercing, equitable subordination, debt recharacterization, avoidance of fraudulent conveyances to an insider, and turnover actions.[335]

As discussed below, courts have formulated different tests to be used in determining when substantive consolidation is warranted. Regardless of the test, courts have recognized that substantive consolidation may result in a harsh redistribution of value to some creditors at the expense of others[336] and, therefore, the remedy is an extraordinary one that must be exercised sparingly.[337]

### b. The Evolution Of Substantive Consolidation

#### (1) Sampsell v. Imperial Paper & Color Corp.

Substantive consolidation as an independent remedy was first recognized by the Supreme Court in 1941 in *Sampsell v. Imperial Paper & Color Corp*.[338] In *Sampsell*, an individual named Downey incurred significant debt that he was unable to repay. The same month that he incurred the debt, he formed a corporation, of which he, his wife, and his son were the only stockholders, directors, and officers. He transferred his personal assets on credit to the company, which continued Downey's business.[339] Downey then filed for bankruptcy. In bankruptcy, the trustee sought to marshal the assets of the company for the benefit of Downey's creditors. The trustee's petition was granted, based on the referee's finding that Downey's transfer of property to the company was made with the intent to place the assets beyond the reach of Downey's creditors. The court ordered that the property of the company was property of Downey's bankruptcy estate to be administered for the benefit of the creditors of the estate.[340]

---

[335] *See* Timothy E. Graulich, *Substantive Consolidation—A Post-Modern Trend*, 14 AM. BANKR. INST. L. REV. 527 (2006); *see also In re Owens Corning*, 419 F.3d at 205–06 (identifying remedies utilized for corporate disregard prior to creation of substantive consolidation remedy).

[336] *See Drabkin v. Midland-Ross Corp*. (*In re Auto-Train Corp, Inc*.), 810 F.2d 270, 276–77 (D.C. Cir. 1987) (noting "consolidation almost invariably redistributes wealth among the creditors of the various entities").

[337] *See Bank of N.Y. Trust Co*. *v. Official Unsecured Creditors' Comm*. (*In re Pac. Lumber Co*.), 584 F.3d 229, 249 (5th Cir. 2009); *Wells Fargo Bank of Tex. N.A. v. Sommers* (*In re Amco Ins*.), 444 F.3d 690, 696 n.5 (5th Cir. 2006) (noting that those jurisdictions that allow substantive consolidation emphasize that such relief should be granted sparingly); *In re Owens Corning*, 419 F.3d at 210–11*; Gandy v. Gandy* (*In re Gandy*), 299 F.3d 489, 499 (5th Cir. 2002) (substantive consolidation is "an extreme and unusual remedy"); *FDIC v. Colonial Realty Co*., 966 F.2d at 61 ("Certainly this Court has insisted that substantive consolidation be invoked 'sparingly because of the possibility of unfair treatment of creditors'") (citing *Chem. Bank N.Y. Trust Co*. *v. Kheel*, 369 F.2d 845, 847 (2d Cir. 1966)); *In re Augie/Restivo Baking Co.,* 860 F.2d at 518); *James Talcott, Inc*. *v. Wharton* (*In re Cont'l Vending Mach. Corp*.), 517 F.2d 997, 1001 (2d Cir. 1975) (noting consolidation should be used sparingly because of possibility of unfair treatment of creditors); *Flora Mir Candy Corp*. *v. R. S. Dickson & Co*., 432 F.2d 1060, 1062–63 (2d Cir. 1970); *In re Source Enters. Inc.,* at 392 B.R. 552 (citing *In re Augie/Restivo, Baking Co.,* 860 F.2d at 518); *In re Snider Bros., Inc.,* 18 B.R. 230, 234 (Bankr. D. Mass. 1982).

[338] *Sampsell v. Imperial Paper & Color Corp*., 313 U.S. 215 (1941).

[339] *Id.* at 216.

[340] *Id.* at 217.

Thereafter, a creditor of Downey's company filed a claim seeking priority to distributions from the company's assets. The referee refused to grant the claim priority, and instead allowed it as a general unsecured claim against the estate. On appeal, the court of appeals reversed, and the trustee petitioned the Supreme Court for certiorari. The Supreme Court ultimately affirmed the referee's decision and, in the process, implicitly approved the referee's earlier decision "consolidating the estates" of the company and Downey.[341] The issue of substantive consolidation was not discussed in great detail, but courts following *Sampsell* have cited it as the seminal case from which the remedy of substantive consolidation evolved.[342]

### *(2) Courts Begin To Recognize Substantive Consolidation*

The very next year the Fourth Circuit invoked *Sampsell's* substantive consolidation remedy[343] in *Stone v. Eacho*.[344] In that case, Stone, the trustee for Tip Top Tailors, Inc., a corporation in bankruptcy in Delaware, filed a claim in the bankruptcy proceeding of one of its subsidiaries pending in Virginia for funds owed to the Delaware parent. Eacho, the trustee appointed in the bankruptcy proceeding of the Virginia subsidiary, objected to the claim, arguing that it should be subordinated to payment of other unsecured creditors on the basis that the Virginia corporation was not a separate entity, but merely a department of the Delaware corporation, and that the funds for which Stone sought repayment represented an advancement of operating capital.[345] The matter was referred to a special master who, siding with Eacho, found that Stone's claim should be subordinated to the claims of the unsecured creditors of the Virginia debtor. In response, Stone filed a petition seeking consolidation of the Virginia and Delaware entities. The district court denied Stone's petition and upheld the findings of the special master. Stone appealed.

On appeal, the Fourth Circuit noted that the subsidiary had no real separate existence from its parent: among other things it had no separate officers; it executed no contracts; it did not pay its own employees' salaries; and it kept none of its records on site. Noting that courts "will not be blinded by corporate forms," the Fourth Circuit stated "there is no reason why the

---

[341] *Id.* at 217.

[342] *See In re Owens Corning*, 419 F.3d at 206 ("the Supreme Court [in *Sampsell*] . . . approved (at least indirectly and perhaps inadvertently) what became known as substantive consolidation"); *Alexander v. Compton* (*In re Bonham*), 229 F.3d 750, 764 (9th Cir. 2000); *In re Cyberco Holdings, Inc.*, 431 B.R. 404, 411 n.19 (Bankr. W.D. Mich. 2010); *Gold v. Winget* (*In re NM Holdings*), 407 B.R. 232, 273–74 (Bankr. E.D. Mich. 2009)*; In re Coleman*, 417 B.R. 712, 725 (Bankr. S.D. Miss. 2009); *Simantob v. Lahijani* (*In re Lahijani*), No. SV 98-15561 GM, 2005 WL 4658490 at *6 (Bankr. C.D. Cal. Oct. 3, 2005); *In re Am. HomePatient, Inc.*, 298 B.R. 152, 165 (Bankr. M.D. Tenn. 2003); *In re Stone & Webster, Inc.*, 286 B.R. 532, 538 (Bankr. D. Del. 2002); *Gill v. Sierra Pac. Constr., Inc.* (*In re Parkway Calabasas Ltd.*), 89 B.R. 832, 837 (Bankr. C.D. Cal. 1988); *White v. Creditors Serv. Corp.* (*In re Creditors Serv. Corp.*), 195 B.R. 680, 689 n.4 (Bankr. S.D. Ohio 1996).

[343] The Third Circuit points out that the actual term "substantive consolidation" was not used in a reported case until 1975. *See In re Owens Corning,* 419 F.3d at 206 n.11 (3d Cir. 2007) (discussing in *James Talcott, Inc. v. Wharton* (*In re Cont'l Vending Mach. Corp.*), 517 F.2d 997, 1004 n.3 (2d Cir. 1975)).

[344] *Stone v. Eacho*, 127 F.2d 284 (4th Cir. 1942).

[345] *Id.* at 287.

courts should not face the realities of the situation and ignore the subsidiary for all purposes, allowing the creditors of both corporations to share equally in the pooled assets."[346]

Other circuits were slower to recognize substantive consolidation. It was not until 1964 that the Second Circuit recognized substantive consolidation in *Soviero v. Franklin National Bank*.[347] In that case, the trustee of Raphan Carpet Corporation sought the turnover of assets of fourteen entities, none of which were in bankruptcy. The facts were not disputed: the same individuals were the sole directors and stockholders of the debtor and each affiliate; the affiliates had no working capital; the debtor paid all obligations of the affiliates, including their leases, advertising and insurance charges; all individual accounting records were kept by the same staff at the debtor's place of business; no separate corporate minutes were maintained by the affiliates; and the affiliates had no real separate existences of their own.[348] Based on these facts the referee concluded that the affiliated companies were really mere instrumentalities of the debtor and to adhere to a "separate corporate entities" theory would result in injustice. Based on this conclusion, turnover was warranted. The court of appeals agreed and, citing to *Stone v. Eacho*, noted that ignoring the corporate entity of a subsidiary was appropriate based on the facts because only then could "all the creditors receive that equality of treatment which it is the purpose of the bankruptcy act to afford."[349]

Two years later the Second Circuit again invoked the remedy of substantive consolidation in *Chemical Bank New York Trust Co. v. Kheel*.[350] In *Kheel*, the referee recommended consolidation of eight debtor shipping companies that were operated as a single entity under the control of one individual. The Second Circuit affirmed the district court's grant of substantive consolidation, reasoning that consolidation was warranted due to the hopeless commingling of the debtors' assets and liabilities:

> Moreover, we have here an additional factor not present in *Soviero* or *Stone v. Eacho*, the expense and difficulty amounting to practical impossibility of reconstructing the financial records of the debtors to determine intercorporate claims, liabilities and ownership of assets. The power to consolidate should be used sparingly because of the possibility of unfair treatment of creditors of a corporate debtor who have dealt solely with that debtor without knowledge of its interrelationship with others. Yet in the rare case such as this, where the interrelationships of the group are hopelessly obscured and the time and expense necessary even to attempt to unscramble them so substantial as

---

[346] *Id.* at 288.

[347] *Soviero v. Franklin Nat'l Bank*, 328 F.2d 446 (2d Cir. 1964).

[348] *Id.* at 447.

[349] *Id.* at 449 (citing *Stone v. Eacho*, 127 F.2d at 288).

[350] *Chem. Bank N.Y. Trust Co. v. Kheel*, 369 F.2d 845 (2d Cir. 1966).

> to threaten the realization of any net assets for all creditors, equity is not helpless to reach a rough approximation of justice to some rather than deny any to all.[351]

In the cases that followed *Kheel*, courts in the Second Circuit considered numerous factors in determining whether substantive consolidation would result in equitable treatment for creditors. Courts evaluated: (1) whether creditors knowingly dealt with the companies to be consolidated as a unit;[352] (2) the presence of parent and inter-corporate guarantees;[353] (3) the presence of asset transfers without observance of corporate formalities;[354] (4) the presence of consolidated financial statements;[355] (5) whether the interrelationships of the group were closely entangled;[356] and (6) whether the cost of untangling would outweigh the benefit to creditors.[357]

In 1988, the Second Circuit reviewed prior decisions and synthesized the substantive consolidation factors into a two-prong test. That test is described in the next section.[358]

---

[351] *Id*. at 847. The Second Circuit again recognized the remedy of substantive consolidation in 1970 and 1975. *See Flora Mir Candy Corp. v. R.S. Dickson & Co.*, 432 F.2d 1060 (2d Cir. 1970); *James Talcott, Inc. v. Wharton* (*In re Cont'l Vending Mach. Corp.*), 517 F.2d 997 (2d Cir. 1975).

[352] *See Union Savings Bank v. Augie/Restivo Baking Co.* (*In re Augie/Restivo Baking Co.*), 860 F.2d 515, 518 (2d Cir. 1988) (citing *In re Cont'l Vending Mach. Corp.*, 517 F.2d at 1001).

[353] *See In re Augie/Restivo Baking Co.*, 860 F.2d at 518 (citing *In re Donut Queen, Ltd.*, 41 B.R. 706 (Bankr. E.D.N.Y. 1984)).

[354] *See In re Augie/Restivo Baking Co.*, 860 F.2d at 518 (citing *In re Donut Queen, Ltd.*, 41 B.R. 706).

[355] *See In re Augie/Restivo Baking Co.*, 860 F.2d at 518 (citing *In re Donut Queen, Ltd.*, 41 B.R. 706).

[356] *See In re Augie/Restivo Baking Co.*, 860 F.2d at 518 (citing *Flora Mir Candy Corp. v. R.S. Dickson & Co.*, 432 F.2d 1060 and *In re Donut Queen, Ltd.*, 41 B.R. 706).

[357] *See In re Augie/Restivo Baking Co.*, 860 F.2d at 518 (2d Cir. 1988) (citing *Chem. Bank N.Y. Trust Co. v. Kheel*, 369 F.2d 845 (2d Cir. 1966)).

[358] Other circuits have developed different tests in determining whether substantive consolidation is appropriate. Some courts have designated certain factors, or elements, to be considered in determining the appropriateness of substantive consolidation. Some of the factors considered by courts include, among others: common officers and directors; one entity financing the other entity; the parent referring to the subsidiary as department or division of the parent; presence or absence of consolidated financial statements; commingling of assets and business functions; unity of interests and ownership between entities; existence of parent and intercorporate guarantees on loans; and transfers of assets without formal observance of corporate formalities. *See In re Tureaud*, 45 B.R. 658, 662 (Bankr. N.D. Okla. 1985) (citing *Fish v. East*, 114 F.2d 177 (10th Cir. 1940) and *FDIC v. Hogan* (*In re Gulfco Inv. Corp.*), 593 F.2d 921 (10th Cir. 1979); *In re Vecco Constr. Indus., Inc.*, 4 B.R. 407 (Bankr. E.D. Va. 1980). Other courts take these elements into account within the context of a balancing test in which the interests of the parties objecting to substantive consolidation are considered. *See Drabkin v. Midland-Ross Corp.* (*In re Auto-Train Corp.*), 810 F.2d 270, 277 (D.C. Cir. 1987); *Eastgroup Props. v. S. Motel Ass'n.*, 935 F.2d 245, 249 (11th Cir. 1991).

### c. Substantive Consolidation In The Second Circuit Today

In *In re Augie/Restivo Baking Co.*,[359] the Second Circuit set forth alternative tests to determine whether substantive consolidation is warranted:

- whether creditors dealt with the entities as a single economic unit and did not rely on their separate identities in extending credit (corporate separateness test); or

- whether the entities' affairs are so entangled that substantive consolidation will benefit all creditors (entanglement test).[360]

The presence of either factor is sufficient to grant substantive consolidation.[361] Numerous courts have adopted and explained the alternative tests,[362] and the bankruptcy courts in the Southern District of New York have found a variety of factors persuasive in connection with

---

[359] 860 F.2d 515 (2d Cir. 1988).

[360] *See id.* at 518. The Second Circuit reaffirmed these tests in *FDIC v. Colonial Realty Co.*, 966 F.2d 57, 61 (2d Cir. 1992).

[361] *See In re Augie/Restivo Baking Co.,* 860 F.2d at 518; *Alexander v. Compton* (*In re Bonham*), 229 F.3d 750, 766 (9th Cir. 2000). *See also In re 599 Consumer Elecs., Inc.*, 195 B.R. 244, 250 (S.D.N.Y. 1996) ("A finding that creditors knew they were dealing with separate entities does not necessarily preclude substantive consolidation on the ground that it is impossible or prohibitively expensive to unravel the debtors' commingled finances.").

[362] *See, e.g.*, *Windels Marx Lane & Mittendorf, LLP v. Source Enters., Inc.* (*In re Source Enters., Inc.*), 392 B.R. 541, 553–54 (S.D.N.Y. 2008); *ACC Bondholder Grp. v. Adelphia Comm'ns Corp.* (*In re Adelphia Comm'ns Corp.*), 361 B.R. 337, 359 (S.D.N.Y. 2007); *In re 599 Consumer Elecs., Inc.*, 195 B.R. at 247–48; *In re Jennifer Convertibles, Inc.*, 447 B.R. 713, 723 (Bankr. S.D.N.Y. 2011); *In re Reserve Capital Corp.*, No. 03-60071–78, 2007 WL 880600, at *3–4 (Bankr. N.D.N.Y. Mar. 21, 2007); *Official Comm* of *Unsecured Creditors v. Am. Tower Corp.* (*In re Verestar, Inc.*), 343 B.R. 444, 462–63 (Bankr. S.D.N.Y. 2006); *In re Worldcom, Inc.*, No. 02–13533, 2003 WL 23861928, at *35–37 (Bankr. S.D.N.Y. Oct. 31, 2003); *In re I.R.C.C., Inc.*, 105 B.R. 237, 241–42 (Bankr. S.D.N.Y. 1989); *see also In re Bonham*, 229 F.3d at 766. In *In re Owens Corning*, the Third Circuit also followed the Second Circuit's test, which it recharacterized as follows: "what must be proven (absent consent) concerning the entities for whom substantive consolidation is sought is that (i) prepetition they disregarded separateness so significantly their creditors relied on the breakdown of entity borders and treated them as one legal entity, or (ii) postpetition their assets and liabilities are so scrambled that separating them is prohibitive and hurts all creditors." *In re Owens Corning*, 419 F.3d 195, 211 (3d Cir. 2005) (footnotes omitted). In expanding on the "corporate separateness" prong of the *Augie/Restivo* tests, the Third Circuit held that a prima facie case for substantive consolidation exists when, based on the parties' prepetition dealings, a proponent can prove "corporate disregard creating contractual expectations of creditors that they were dealing with debtors as one indistinguishable entity." *Id.* at 212. (footnote omitted). To this end, proponents of substantive consolidation "must also show that, in their prepetition course of dealing, they actually and reasonably relied on debtors' supposed unity." *Id.* An opponent of consolidation can defeat this prima facie showing by proving it is "adversely affected and actually relied on debtors' separate existence." *Id.* With respect to the entanglement test, the Third Circuit held that a proponent of substantive consolidation must demonstrate that every creditor will benefit from consolidation and, moreover, "the benefit to creditors should be from cost savings that make assets available rather than from the shifting of assets to benefit one group of creditors at the expense of another." *Id.* at 214. Benefit to only some creditors or administrative benefit to the court "falls far short" of that necessary to justify substantive consolidation. *Id.*

the "corporate separateness" test, including, inter alia: (1) operation under unified direction and control; (2) failure to observe corporate formalities; (3) dissemination of consolidated financial information to creditors; (4) use of consolidated cash management systems; and (5) whether one entity was run in the interest of another.[363]

### (1) Review Of Augie/Restivo

In the *Augie/Restivo* case, Union Savings Bank ("Union") extended credit to Augie's Baking Company ("Augie's"). Thereafter, Augie's entered into an agreement with Restivo Brothers Bakers, Inc. ("Restivo") pursuant to which Restivo acquired all of Augie's stock in exchange for fifty percent of Restivo's stock. After the stock exchange, Restivo changed its name to Augie/Restivo Baking Company, Ltd. ("Augie/Restivo"). Augie/Restivo became the sole operating company, but Augie's was not dissolved. Shortly after the name change, Manufacturers Hanover Trust Company ("MHTC") lent funds to Augie/Restivo, at the same time requiring a guarantee from Augie's. (MHTC had previously lent money to Restivo as well.) During this period, various other trade creditors extended credit to Augie/Restivo.[364]

The next year, Augie/Restivo and Augie's were forced into bankruptcy. In bankruptcy, the debtors sought the substantive consolidation of Augie/Restivo and Augie's, which was granted over Union's objection. Union appealed.[365]

In considering Union's appeal, the court of appeals reviewed the considerations of other courts in determining whether substantive consolidation was warranted and distilled those considerations into the two alternative tests noted above—the corporate separateness test and the entanglement test.[366]

In reviewing the corporate separateness test, the court of appeals asserted that creditors' expectations at the time of lending funds to a debtor create "significant equities," and lender expectations in the case before it did not justify substantive consolidation. The court of appeals noted that at the time that Union lent money to Augie's, the loan was based solely on Augie's financial condition and, at that time, Union had no knowledge of the merger negotiations between Augie's and Restivo. It was only after Union became a creditor of Augie's that Augie's and Restivo merged. The court of appeals also noted that MHTC, like Union, operated on the assumption that it was dealing with separate entities when it loaned

---

[363] *See In re The Leslie Fay Cos*., 207 B.R. 764, 771, 780 (Bankr. S.D.N.Y. 1997); *In re Lionel L.L.C*., No. 04-17324, 2008 Bankr. LEXIS 1047, at *31 (Bankr. S.D.N.Y. Mar. 31, 2008) (finding that, "[a]s a result of the Debtors' integrated and interdependent operations, substantial intercompany guaranties, common officers and directors, common control and decision making, reliance on a consolidated cash management system, and dissemination of principally consolidated financial information to third parties, the Debtors believe that they operated, and creditors dealt with the Debtors, as a single, integrated economic unit."); *cf. In re 599 Consumer Elecs., Inc.*, 195 B.R. at 249 (consolidation was not appropriate under the first prong of the *Augie/Restivo* test where there was no evidence of creditor confusion as to the debtors' separateness).

[364] *In re Augie/Restivo Baking Co.,* 860 F.2d at 516–17.

[365] *Id.* at 517.

[366] *Id.* at 518. The Second Circuit reaffirmed these tests in *FDIC v. Colonial Realty Co*., 966 F.2d 57, 61 (2d Cir. 1992).

money to Augie/Restivo, evidenced by its request that Augie's guarantee the debt of Augie/
Restivo. With these circumstances, even though other trade creditors may have believed they
were dealing with a single entity in extending credit to Augie/Restivo, consolidation was not
warranted.[367]

In reviewing the "entanglement test," the court of appeals established a stringent standard
for the degree to which the debtors' affairs need to be obscured by commingled funds or lax
corporate form before consolidation is appropriate. Reversing the lower court's substantive
consolidation order, the court of appeals held:

> Resort to consolidation in such circumstances [corporate
> affiliates with commingled assets and business functions],
> however, should not be Pavlovian. Rather, substantive
> consolidation should be used only after it has been determined
> that all creditors will benefit because untangling is either
> impossible or so costly as to consume the assets . . . .
> Commingling, therefore, can justify substantive consolidation
> only where "the time and expense necessary even to attempt to
> unscramble them [is] so substantial as to threaten the realization
> of any net assets for all the creditors" . . . or where no accurate
> identification and allocation of assets is possible. In such
> circumstances, all creditors are better off with substantive
> consolidation.[368]

Under the "entanglement" analysis, poor or nonexistent record keeping of separate assets
(particularly cash and other liquid assets) and liabilities and interaffiliate transactions is one of
the more common reasons for imposing substantive consolidation. When the combination of
affiliates' assets, liabilities and business affairs is so "hopelessly entangled" that segregation is
either prohibitively expensive or impossible, courts are more willing to grant substantive
consolidation. The degree of entanglement is the central question to be examined because the
potentially prejudicial effect of substantive consolidation is not likely to be justified based on
mere contentions of administrative convenience.[369]

---

[367] *See In re Augie/Restivo Baking Co.,* 860 F.2d at 519.

[368] *See id.* (citations omitted).

[369] *See Windels Marx Lane & Mittendorf, LLP v. Source Enters., Inc.* (*In re Source Enters., Inc.*), 392 B.R. 541,
553–54 (S.D.N.Y. 2008) ("The question, of course, is not whether some affairs were not entangled, but rather
whether the commingling in this case was so pervasive that 'the time and expense necessary even to attempt
to unscramble' the debtors' books would be 'so substantial as to threaten the realization of any net assets for
all the creditors . . .' or where no accurate identification and allocation of assets is possible.'") (citing *In re
Augie/Restivo Baking Co.,* 860 F.2d at 519). *See also In re Owens Corning*, 419 F.3d 195, 214 (3d Cir. 2005)
("Neither the impossibility of perfection in untangling the affairs of the entities nor the likelihood of some
inaccuracies in efforts to do so is sufficient to justify consolidation.").

#### d. Review Of Evidence Relating To Claim Of Substantive Consolidation

##### (1) AFI's Eligibility For Substantive Consolidation

As an initial matter, the fact that AFI is not a debtor under title 11 would not prevent the Bankruptcy Court from ordering the substantive consolidation of AFI's assets and liabilities with those of the Debtors in these bankruptcy cases, assuming the circumstances warranted the extraordinary remedy of substantive consolidation.

While there is some disagreement among courts as to whether a non-debtor may be substantively consolidated with other debtors,[370] the majority of courts, including those in the

---

[370] Some courts have raised jurisdictional concerns or asserted that substantive consolidation should not be used to bypass the requirements to place an entity into a bankruptcy proceeding involuntarily. *See In re Pearlman*, 462 B.R. 849 (Bankr. M.D. Fla. 2012) (noting among things that substantive consolidation of a non-debtor into a debtor would "circumvent" Bankruptcy Code section 303's procedures for involuntary bankruptcy proceedings); *Helena Chem. Co. v. Circle Land and Cattle Corp.* (*In re Circle Land and Cattle Corp.*), 213 B.R. 870 (Bankr. D. Kan. 1997) (dismissing complaint seeking to substantively consolidate assets of debtor's corporate parent company with debtor's estate on basis that to grant relief would be contrary to the Bankruptcy Code limitations on an involuntary bankruptcy filing and outside the bankruptcy court's jurisdiction); *Weinman v. Hamilton Props. Corp.* (*In re Hamilton*), 186 B.R. 991 (Bankr. D. Colo. 1995) (dismissing complaint seeking to "reverse pierce" the corporate veil to hold non-debtor entity liable for individual debtor's liabilities); *In re Julien Co.*, 120 B.R. 930 (Bankr. W.D. Tenn. 1990) (denying motion to amend petition to add debtor's shareholder as "debtor" based upon substantive consolidation theory); *Goldman v. Haverstraw Assoc.* (*In re R.H.N. Realty Corp.*), 84 B.R. 356 (Bankr. S.D.N.Y. 1988) (same); *In re DRW Prop. Co. 82*, 54 B.R. 489 (Bankr. N.D. Tex. 1985) (denying application for substantive consolidation of 109 related non-debtor partnerships with estate of affiliated debtor); *In re Alpha & Omega Realty, Inc.*, 36 B.R. 416 (Bankr. D. Idaho 1984) (denying motion to substantively consolidate non-debtor partnership with estate of affiliated debtor raising jurisdictional concerns and the issue that consolidation would violate due process rights otherwise protected by Bankruptcy Code section 303); Kurt A. Mayr, *Back to Butner's Basic Rule—the Fundamental Flaw of Nondebtor Substantive Consolidation*, 16 NORTON J. BANKR. L. & PRAC., 77 (Feb. 2007) (citing cases). *See also United States v. AAPC, Inc.* (*In re AAPC, Inc.*), 277 B.R. 785 (Bankr. D. Utah 2002) (ordering that notice of requested consolidation be given to all creditors of non-debtor and requesting that parties brief the issue of how and under what circumstances the provisions and safeguards of Bankruptcy Code section 303 may be defeated by Bankruptcy Code section 105 for purposes of consolidating a non-debtor individual into a corporate bankruptcy); *In re Horsley*, No. 99–30458, 2001 WL 1682013 (Bankr. D. Utah Aug. 17, 2001) (questioning propriety of proposed substantive consolidation of non-debtor with individual debtor control person of non-debtor); *Raslavich v. Ira S. Davis Storage Co.* (*In re Ira S. Davis, Inc.*), Bankr. No. 92-14259S, Adv. No. 93-0530S, 1993 WL 384501 (E.D. Pa. Sept. 22, 1993) (clarifying that prior *Lease-A-Fleet* decision should be read to render non-debtor substantive consolidation "doubtful in *any* circumstances") (emphasis in original); *Morse Operations, Inc. v. Robins Le-Cocq, Inc.* (*In re Lease-A-Fleet, Inc.*), 141 B.R. 869, 872–78 (Bankr. E.D. Pa. 1992) (noting "conceptual difficulties" in consolidating a non-debtor with debtor and suggesting that more conventional, expressly Code-sanctioned methods are preferable).

Second Circuit, have permitted the substantive consolidation of non-debtor entities with a debtor pursuant to the same standard applicable to the consolidation of multiple debtors.[371]

### (2) Standard For Substantive Consolidation—*Augie/Restivo*

The Second Circuit's standard for substantive consolidation, as articulated in the *Augie/Restivo* cases, will govern the Court's review of whether substantive consolidation is warranted in these circumstances.[372] As discussed in Section VII.A.2.c, the court of appeals created two alternative tests to determine when substantive consolidation is warranted.[373]

### (a) "Corporate Separateness" Test

The Examiner concludes that the evidence does not support the proposition that creditors reasonably relied on ResCap and AFI as a single economic unit at the time they extended credit to ResCap. Actions by creditors after they extended credit to ResCap that demonstrate a hope or expectation that such debt will be satisfied by AFI will not satisfy the corporate separateness test.

---

[371] *See*, *e.g.*, *Alexander v. Compton* (*In re Bonham*), 229 F.3d 750, 765 (9th Cir. 2000) (noting that the substantive consolidation of a debtor with non-debtors is within the equitable powers of the bankruptcy court and citing cases); *Soviero v. Franklin Nat'l Bank of Long Island*, 328 F.2d 446 (2d Cir. 1964) (permitting consolidation of assets and liabilities of fourteen non-debtors into debtor in bankruptcy); *Kapila v. S & G Fin. Servs., LLC*, (*In re S & G Fin. Servs. of S. Fla., Inc.*), 451 B.R. 573, 580–82 (Bankr. S.D. Fla. 2011) (holding that allegations in complaint seeking substantive consolidation with non-debtors were sufficient to withstand motion to dismiss); *Logistics Info. Sys., Inc. v. Braunstein* (*In re Logistics Info. Sys., Inc.*), 432 B.R. 1, 10–11 (Bankr. D. Mass. 2010) (holding that substantive consolidation with a non-debtor was warranted under the *Auto-Train* and veil-piercing test and noting that the majority of courts have found non-debtor consolidation to be appropriate in some circumstances); *see also In re Owens Corning*, 419 F.3d at 208 n.13. (noting that courts "have not restricted the remedy to debtors, allowing the consolidation of debtors with non-debtors," and citing cases); *Majik Market v. TOC Retail, Inc.* (*In re Munford, Inc.*), 115 B.R. 390, 397–98 (Bankr. N.D. Ga. 1990) (denying motion to dismiss debtor's action to substantively consolidate non-debtor licensee and management services company after determining that complaint's allegations sufficiently asserted grounds for relief under the *Augie/Restivo* substantive consolidation test); *cf. Official Comm of Unsecured Creditors v. Am. Tower Corp.* (*In re Verestar, Inc.*), 343 B.R. 444, 463 (Bankr. S.D.N.Y. 2006) (stating, "[a]lthough there is some authority to the contrary, it is assumed that in an appropriate case, it would be possible for the bankruptcy court to substantively consolidate debtor and non-debtor entities."); *Creditors Servs. Corp. v. Cooley* (*In re Creditors Servs. Corp.*), 182 F.3d 916 (Table), No. 98-3838, 1999 WL 519296, at *1–2 (6th Cir. July 15, 1999) (unpublished decision). Some courts have suggested that a stricter standard would apply. *See*, *e.g.*, *Wells Fargo Bank of Tex. N.A. v. Sommers* (*In re Amco Ins.*), 444 F.3d 690, 695–96 n.3 (5th Cir. 2006) (recognizing that some courts "have cautioned that 'as careful as the courts must be in allowing substantive consolidation of debtors to occur . . . , the caution must be multiplied exponentially in a situation where a consolidation of a debtor's case with a non-debtor is attempted.") (quoting *In re Lease-A-Fleet*, 141 B.R. 872).

[372] Substantive consolidation is a creation of federal bankruptcy law and its analysis is not driven by state law. Therefore, the fact that AFI is a Delaware company with its principal office located in Michigan will not require application of law outside the circuit where the bankruptcy cases are pending.

[373] *Augie/Restivo Baking Co.*, 860 F.2d at 518. The Second Circuit reaffirmed these tests in *FDIC v. Colonial Realty Co*., 966 F.2d 57, 61 (2d Cir. 1992).

The Examiner reviews below the arguments that have been made by the parties in these Chapter 11 Cases with respect to whether substantive consolidation is warranted under the first prong of the Augie/Restivo test—whether creditors extended credit to ResCap on the belief that ResCap and AFI were a single economic unit.

### (i) Lack Of Corporate Formalities

As discussed in Section VII.A.1 in connection with the Examiner's review of an "alter ego" claim, several parties in interest have asserted that AFI and ResCap operated as a single economic unit. Some (but not all) of the factors that support a "single entity" finding in connection with an alter ego claim may also be considered by courts in connection with the "corporate separateness" test articulated by the Second Circuit in Augie/Restivo. These "single entity" factors include: operation under unified direction and control, failure to observe corporate formalities, and consolidated financial statements.[374]

In support of this prong of the test, one party in interest has asserted that ResCap and AFI did not observe sufficient corporate formalities, arguing that: (1) AFI and ResCap had overlapping directors and officers; (2) Ally Bank personnel sat on the GMAC Mortgage committee that managed interest rate and credit risk for all MSR investments; (3) AFI directed ResCap's management, business, and legal strategies; (4) ResCap employees frequently shuttled between employment at different AFI entities; (5) ResCap paid for services provided to Ally Bank; and (6) AFI publicly admitted its control over all fundamental matters affecting ResCap. Wilmington Trust has likewise asserted that substantive consolidation is warranted because AFI and ResCap operated as an integrated single economic unit[375] and that AFI and ResCap routinely disregarded corporate formalities.[376] Wilmington Trust asserts that AFI executives often simultaneously held executive positions in ResCap and AFI, and employees often did not know for which entity they worked or from which entity they were paid.[377] Wilmington Trust alleges that ResCap employees used "Ally" email domains, AFI stationary and received compensation from AFI,[378] and that ResCap did not file any standalone financial statements after 2009.[379]

---

[374] *See In re The Leslie Fay Cos.*, 207 B.R. 764, 771, 780 (Bankr. S.D.N.Y. 1997); *In re Lionel L.L.C.*, No. 04-17324, 2008 Bankr. LEXIS 1047, at *31 (Bankr. S.D.N.Y. Mar. 31, 2008) (finding that, "[a]s a result of the Debtors' integrated and interdependent operations, substantial intercompany guaranties, common officers and directors, common control and decision making, reliance on a consolidated cash management system, and dissemination of principally consolidated financial information to third parties, the Debtors believe that they operated, and creditors dealt with the Debtors, as a single, integrated economic unit."); *cf. In re 599 Consumer Elecs., Inc.*, 195 B.R. 244, 249 (S.D.N.Y. 1996) (consolidation was not appropriate under the first prong of the *Augie/Restivo* test where there was no evidence of creditor confusion as to the debtors' separateness).

[375] Wilmington Trust Submission Paper, dated Oct. 24, 2012, at 31–32, 34–35; Wilmington Trust Submission Paper, dated Mar. 8, 2013, at 14–23, 56–58.

[376] Wilmington Trust Submission Paper, dated Oct. 24, 2012, at ¶ 30.

[377] *Id.* ¶¶ 4–5.

[378] *Id.* ¶ 5.

[379] *Id.* ¶ 5.

The Debtors acknowledge that there is an overlap of senior employees and board members that would support an argument that ResCap and AFI operated as a single economic unit.[380] The Debtors also concede that AFI and ResCap shared services and, during the three years prior to the Petition Date, AFI centralized corporate functions, including the IT, legal, procurement, risk, treasury, finance and audit departments.[381] In addition, contracting was centralized and substantially all vendor arrangements ran through AFI.[382]

Cutting against a "single economic unit" argument, however, the Debtors assert that ResCap maintained an independent board composed of both inside and outside directors, and had its own management team, its own headquarters, and its own auditors.[383]

For its part, AFI argues that it and ResCap complied with corporate formalities, noting that AFI and ResCap had separate boards, separate corporate headquarters and facilities, separate financial statements, separate external auditors, separate bank accounts, and issued separate debt.[384] Several ResCap officers have disputed any claim of conflicting loyalties.[385] ResCap's Independent Directors testified that their duties were owed to ResCap, not AFI.[386]

In Section VII.A.1.f(4), the Examiner reviews the parties' assertions described above and evaluates whether ResCap and AFI observed appropriate corporate formalities. Based on the Examiner's analysis and discussion in that Section, the Examiner concludes that, while a close question, it is more likely than not that a court would find that ResCap and AFI operated as a single economic unit for purposes of the first prong of the Augie/Restivo test (this is not a conclusion concerning the "single economic entity" veil-piercing test, which involves additional factors and different standards). But, the Examiner has uncovered no credible evidence that creditors dealt with ResCap and AFI as such. As discussed in Section VII.A.1.f(4), the evidence does not support a finding that ResCap creditors—when extending credit to ResCap—did so on the expectation that a single economic unit comprised of ResCap and AFI was responsible for ResCap's obligations.

---

[380] *See* ResCap Presentation to Unsecured Creditors' Committee Regarding Ally Claims Investigation and Settlement, dated June 8, 2012, at 20–21 [RC00067790].

[381] *See id.* at 22.

[382] *Id.* at 22.

[383] *See* Debtors' Submission Paper, dated Jan. 7, 2013, at 12–13.

[384] AFI Submission Paper, dated Dec. 19, 2012, at 13.

[385] *See, e.g.*, Dep. of T. Marano, Nov. 11, 2012, at 205:8–206:15 (explaining that he always protected ResCap's interests); Dep. of J. Whitlinger, Nov. 15, 2012, at 56:9–57:12 (same); Dep. of J. Ruckdaschel, Nov. 8, 2012, 17:25–18:4, 22:16–19 (explaining that he is a ResCap employee and that the "the client for me was always ResCap," not AFI); Int. of D. Debrunner, Sept. 13, 2012, at 72:19–74:14 (explaining that as a member of ResCap's board of directors he acted in the interests of ResCap).

[386] *See, e.g.*, Int. of E. Smith, Nov. 30, 2012, at 139:12–20 (rejecting the notion that ResCap's independent directors were anything other than protectors of ResCap's best interests), 132:12–140:20 (concerned about voting in the best interest of only ResCap and its creditors when making decisions about proposed Affiliate Transactions); Int. of T. Melzer, Oct. 10, 2012, at 55:21–56:8, 104:1–16 (same); Int. of K. Hirtler-Garvey, Dec. 20, 2012, at 94:21–5:19 (explaining that she acted to protect the interests of ResCap, its creditors, and its stakeholders), 105:2–107:20 (rejecting suggestion of divided loyalty).

### (ii) Trading Activity In ResCap's Bonds

The Debtors have suggested that after TARP, ResCap bondholders assumed that AFI would back-stop ResCap.[387] As seen by the chart below, ResCap bonds jumped in price at the time of AFI's receipt of TARP funding. This correlation could be used to argue that bondholders assumed AFI would use some or all of the TARP funds for ResCap's benefit.

EXHIBIT VII.A.2.d(2)(a)(ii)
**ResCap Bond Pricing Activity**



*Source: Pricing per Interactive Data Corporation.*

The Examiner is not persuaded, however, that ResCap bond pricing activity supports a conclusion that AFI may have agreed to satisfy ResCap obligations after TARP. The jumps in ResCap bond pricing in connection with AFI's receipt of TARP funding can be readily

---

[387] ResCap Presentation to Unsecured Creditors' Committee Regarding Ally Claims Investigation and Settlement, dated June 8, 2012, at 23 [RC00067790].

explained by the fact that AFI announced that it would contribute some of the TARP funding to ResCap, not that AFI was signaling its guarantee of ResCap debt.[388]

AFI at no time overtly promised ResCap bondholders that they could look to AFI for satisfaction. The bonds were issued pursuant to the 2005 Indenture and the June 2008 Indentures. Those indentures stated clearly that the notes and other obligations arising under the indentures were solely those of ResCap and its subsidiary guarantors. AFI did not guarantee any of the obligations under the 2005 Indenture or June 2008 Indentures. Indeed, the indentures explicitly state that there is no recourse against ResCap's stockholders for any obligations contained in the indentures.[389] Accordingly, at the time the bondholders extended credit to ResCap under the 2005 Indenture and June 2008 Indentures, they could not have had any reasonable expectation that AFI and ResCap formed a unified source of repayment of ResCap's obligations to the bondholders.

As Moody's observed in December 2009:

> The US Treasury's actions increase [AFI's] ability to support ResCap, and the $2.7 billion capital contribution represents the latest in a long series of actions [AFI] has taken to provide ResCap with capital and liquidity support. However, despite this historical support, there remains no guarantee that [AFI] will support ResCap in the future. Should parental support be

---

[388] *See, e.g.*, GMAC Financial Services, Press Release, *GMAC Financial Services Announces Key Capital and Strategic Actions* (Dec. 30, 2009), http://media.ally.com/index.php?s=43&item=377 (noting that AFI would receive a $3.79 billion capital infusion from the U.S. Treasury and that ResCap would receive approximately $2.7 billion in additional capital); Karen Brettell, *US CREDIT—ResCap Rallies on Capital Support, Risks Remain*, Reuters, Jan. 4, 2010, http://www.reuters.com/article/2010/01/04/markets-credit-idUSN0457155120100104 ("[AFI] . . . said on Wednesday it would receive another $3.8 billion from the U.S. Treasury, and would inject $2.7 billion into ResCap."). In late 2008, AFI announced its receipt of TARP funds and two days later noted that it had completed the notes exchange offers for certain of ResCap's notes. *See* GMAC Financial Services, Press Release, *GMAC Receives $5.0 Billion Investment from the U.S. Treasury* (Dec. 29, 2008), http://media.ally.com/index.php?s= 43&item=299; GMAC Financial Services, Press Release, *GMAC Announces Consummation of Its Notes Exchange Offers* (Dec. 29, 2008), http://media.ally.com/index.php?s=43&item=301.

[389] *See* 2005 Indenture, § 13.01 (noting the indenture and securities were solely corporate obligations, with no recourse against any past, present or future incorporator, stockholder, officer or director); Junior Secured Notes Indenture, § 12.07 (noting that no director, officer, employee, incorporator or stockholder of ResCap or any of the listed guarantors would have any liability for any objections of the company of an guarantor under the notes, the indenture or the related guarantees); Senior Secured Notes Indenture, § 12.07 (noting that no director, officer, employee, incorporator or stockholder of ResCap or any of the listed guarantors would have any liability for any objections of the company of a guarantor under the notes, the indenture or the related guarantees). In 2008, ResCap was a limited liability company that did not have stock. The June 2008 Indentures' definitions note that "Capital Stock" includes membership interests for limited liability companies, making the "stockholder" reference applicable to ResCap's members.

discontinued, we believe ResCap would eventually default on its obligations and unsecured creditors would face substantial losses.[390]

### (iii) CDS Pricing And Credit Ratings

The CDS spreads, set out in the exhibit below, suggest that the market viewed ResCap and AFI as separate and distinct entities.



EXHIBIT VII.A.2.d(2)(a)(iii)
**TARP Funding: GMAC and ResCap CDS Spread Activity**

*Note: Yellow lines represent GMAC's receipt of TARP Funding ($5 billion on 12/29/2008, $7.5 billion on 5/20/2009, $3.8 billion on 12/30/2009).*
*Source: Pricing per Interactive Data Corporation.*

As is evidenced by this exhibit, prior to AFI's receipt of TARP funds, the five-year CDS spread on ResCap's secured debt was higher than the spread on AFI's secured debt. The higher CDS spread for ResCap reflected the market's perception that there was a greater risk of ResCap defaulting on its secured debt than of AFI defaulting on its secured debt. This difference in risk perceptions demonstrates that during this time period, the market did not view ResCap and AFI as a single, integrated economic unit.

---

[390] *See* Moody's Investors Service, Press Release, *Although Positive, ResCap not Stabilized by GMAC Actions* (Dec 31, 2009) [ALLY_0215406] (emphasis added).

The difference in CDS spreads for ResCap's debt and AFI's debt continued until the third infusion of TARP funds. Thereafter, as discussed in Section VI.B, market prices no longer reflected the economic fundamentals of ResCap's business. The CDS spreads for both ResCap's debt and AFI's debt were minimal, arguably in recognition by the market that the U.S. Treasury was willing to backstop each entity's obligations, not because of any market perception that AFI and ResCap had morphed into a single economic unit at that point.

Lastly, in reviewing market evidence regarding creditors' perceptions of AFI and ResCap, the Examiner notes that AFI and ResCap had separate credit ratings. These credit ratings are reviewed in more detail in Section III.E. The rating agencies did not view AFI and ResCap as a single economic unit.

The Examiner does not believe that AFI's and ResCap's CDS spreads and credit ratings support the proposition that the market viewed AFI and ResCap as a single economic unit.

### (iv) Consolidated Financial Statements

Wilmington Trust has also argued that ResCap's failure to file any standalone financial statements after the second quarter of 2009 supports a finding that AFI and ResCap acted as a single economic unit.[391] As discussed in Section III.I.5, in November 2009 ResCap received approval from the SEC to stop filing periodic and current reports under the Securities Exchange Act of 1934.[392] Thereafter, the Debtors' financial information was included in consolidated financial statements filed with AFI. The fact that the Debtors did not file separate financial statements, however, is not remarkable for affiliated entities.[393]

AFI continued to state in its consolidated financial statements that ResCap's financial troubles were not necessarily financial troubles of AFI and that AFI should not be relied upon to prop up ResCap. Starting in early 2009, AFI consistently asserted in its financial statements

---

[391] Wilmington Trust Submission Paper, dated Oct. 24, 2012, at 21, 22, 32.

[392] *See* SEC No-Action Letter (Nov. 3, 2009), http://www.sec.gov/divisions/corpfin/cf-noaction/2009/residentialcapital110309-12h3.htm.

[393] Note also that the ResCap Board discussed that even with deregistering ResCap, financial information (albeit more limited than what would be included in SEC filings) would be provided to debt investors and full audited financial statements would continue to be required of ResCap. *See* Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, June 24, 2009, at RC40006226–27 [RC40005949]; SEC de-Registration Presentation to the ResCap Board, dated June 24, 2009, at RC40010462 [RC40010460].; *see also* Senior Secured Notes Indenture, § 4.03(b) (ResCap covenanted that if it was not required to file reports with the SEC, it "will maintain a non-public website on which Holders of Notes, prospective investors and securities analysts may access the quarterly and annual financial information of [ResCap], and [ResCap] will direct Holders of Notes, prospective investors and securities analysts on its publicly available website to contact [ResCap's] Chief Financial Officer to obtain access to the non-public website."); Junior Secured Notes Indenture, § 4.03(b) (same). Accordingly, the fact that separate financial statements were not filed for ResCap does not support a finding that substantive consolidation is warranted under the "entanglement" prong, because ResCap's financial affairs continued to be accounted for separately from those of AFI.

that, while it continued to believe ResCap was an important subsidiary, AFI's continued support of ResCap should not be assumed. In its Form 8-K filed January 9, 2009, AFI stated:

> In response to various questions that have come to [AFI's] attention, [AFI] reiterates that Residential Capital, LLC ("ResCap") is an important subsidiary of [AFI], and we have made significant progress in reshaping ResCap to better align it with current market conditions. [AFI] believes that the support it has provided to ResCap to date was in the best interests of [AFI] stakeholders. If ResCap were to need additional support, [AFI] would provide that support so long as it was in the best interests of [AFI] stakeholders. While there can be no assurances, [AFI's] recently approved status as a regulated bank holding company has increased the importance of its support for ResCap.[394]

In its Form 10-K for 2008, filed on February 27, 2009, AFI reiterated that its support was not unlimited and that it was not guaranteeing ResCap's obligations. In that report, AFI stated that "ResCap remains heavily dependent on [AFI] and its affiliates for funding and there can be no assurances that [AFI] or its affiliates will continue such actions"[395] and that AFI "would provide [ResCap] support so long as it was in the best interests of [AFI's] stakeholders."[396]

AFI made similar statements each following year noting that its contributions to ResCap were not assured and would be made only so long as they benefited AFI's stakeholders.[397] In AFI's Form 10-K filed for year 2011, AFI noted:

> In the future, [AFI] or ResCap may take additional actions with respect to ResCap as each party deems appropriate. These

---

[394] GMAC LLC, Current Report (Form 8-K) (Jan. 8, 2009), Item 7.01 (emphasis added).

[395] GMAC LLC, Annual Report (Form 10-K) (Feb. 27, 2009), at 72.

[396] *Id.*

[397] *See* GMAC Inc., Annual Report (Form 10-K) (Feb. 26, 2010), Note 1, at 128.

"ResCap remains heavily dependent on [AFI] and its affiliates for funding and capital support, and there can be no assurance that [AFI] or its affiliates will continue such actions or that [AFI] will be successful in executing one or more sales, spin-offs, or other potential transactions with respect to ResCap. Although our continued actions through various funding and capital initiatives demonstrate support for ResCap, other than as described above, there are currently no commitments or assurances for future funding and/or capital support. Consequently, there remains substantial doubt about ResCap's ability to continue as a going concern. Should we no longer continue to support the capital or liquidity needs of ResCap or should ResCap be unable to successfully execute other initiatives, it would have a material adverse effect on ResCap's business, results of operations, and financial position."

*See also* Ally Financial Inc., Annual Report (Form 10-K) (Feb. 25, 2011), Item 1A, at 21 ("ResCap remains heavily dependent on [AFI] for funding and capital support, and there can be no assurance that [AFI] will continue to provide such support."); Ally Financial Inc., Annual Report (Form 10-K) (Feb. 28, 2012), Note 1, at 128.

> actions may include [AFI] providing or declining to provide
> additional liquidity and capital support for ResCap . . . . ResCap
> remains heavily dependent on [AFI] and its affiliates for funding
> and capital support, and there can be no assurance that [AFI] or
> its affiliates will continue such actions or that [AFI] will choose
> to execute any further strategic transactions with respect to
> ResCap or that any transactions undertaken will be successful.
> Consequently, there remains substantial doubt about ResCap's
> ability to continue as a going concern. Should [AFI] no longer
> continue to support the capital or liquidity needs of ResCap or
> should ResCap be unable to successfully execute other
> initiatives, it would have a material adverse effect on ResCap's
> business, results of operations, and financial position.[398]

The Examiner concludes that ResCap's failure after 2009 to file separate financial statements with the SEC does not support a finding that substantive consolidation of AFI and ResCap is warranted.

### (v)  Lack Of Guarantees

Some courts have cited to the presence of guarantees as a sign that creditors did not rely on the separate identity of the entities when extending credit to one.[399] If AFI had guaranteed a significant amount of ResCap's obligations, ResCap's creditors could argue they reasonably relied on the combined creditworthiness of ResCap and AFI. From ResCap's inception, however, AFI made clear that it was not providing a guarantee of ResCap's obligations. The 2005 Operating Agreement expressly states that the agreement is not a guarantee by GM or AFI of ResCap's indebtedness.[400]

---

[398] Ally Financial Inc., Annual Report (Form 10-K) (Feb. 28, 2012), Note 1, at 128 (emphasis added).

[399] *See In re Vecco Constr. Indus., Inc.,* 4 B.R. 407, 410 (Bankr. E.D. Va. 1980) (stating and elaborating on seven factors); *see also In re Mortgage Inv. Co.*, 111 B.R. 604, 610 (Bankr. W.D. Tex. 1990) (applying *Vecco* factors); *Gould v. Bank of N.Y.* (*Holywell Corp. v. Bank of N.Y.*), 59 B.R. 340, 347 (S.D. Fla. 1986) (same). *But see In re Owens Corning*, 419 F.3d 195, 212–13 (3d Cir. 2005) (noting it is not unusual for entities to demand (and obtain) guarantees from affiliated entities in finance transactions and the presence of guarantees by themselves do not evidence a prepetition disregard of an entity's separateness).

[400] *See* 2005 Operating Agreement, § 7 [ALLY_0140795] ("This Agreement is not, and shall not be construed to be, a guarantee by GM or [AFI] of any indebtedness of ResCap or an agreement by GM or [AFI] to contribute additional capital to ResCap.").

The Examiner is aware of only one guarantee issued by AFI for the benefit of Ally Bank, which guaranteed the repayment of obligations of GMAC Mortgage to Ally Bank under the MMLPSA, MSR Swap, the Pipeline Swap and the Original Servicing Agreement.[401] As discussed in Section V.B.9, on October 5, 2010, and in response to FDIC pressures, AFI provided a guarantee to Ally Bank of all of GMAC Mortgage's obligations under the Original Servicing Agreement and the MSR Swap.[402] In April 2011, and again in response to continued FDIC concern about Ally Bank's exposure to GMAC Mortgage, AFI reaffirmed its October 5, 2010 Guarantee, extending its scope to include the Pipeline Swap and the MMLPSA.[403]

The presence of a guarantee, properly documented, by itself does not evidence a disregard of an entity's separateness. The fact that Ally Bank required the documentation of AFI's guarantee of GMAC Mortgage's obligations can be cited as an indication that Ally Bank was acutely aware of the separateness of GMAC Mortgage and AFI and was not relying on the treatment of GMAC Mortgage and AFI as a single economic unit.[404] Finally, this guarantee was issued only to Ally Bank. Any other creditor would be hard-pressed to prove that it reasonably relied on an AFI guarantee to Ally Bank in extending its own credit to the Debtors.

### (b) "Entanglement" Test

The Examiner concludes that the evidence does not support the proposition that AFI's and ResCap's affairs are so hopelessly entangled and confused that substantive consolidation would benefit all creditors.

Under the *Augie/Restivo* "entanglement" analysis, poor or nonexistent record keeping of separate assets (particularly cash and other liquid assets) and liabilities and interaffiliate transactions is one of the more common reasons for imposing substantive consolidation. When affiliates' assets, liabilities and business affairs are so "hopelessly entangled" that segregation is either prohibitively expensive or impossible, courts are more willing to grant substantive consolidation.

---

[401] Letter from J. Mackey to Ally Bank (Apr. 1, 2011) [RC00067937] (amending the agreements covered by the guarantee to included, inter alia, "the Confirmation of the Swap Relating to Loans in the Held For Sale Portfolio, dated April 1, 2011"). As discussed above, even if AFI had issued guarantees of more of ResCap's obligations, such guarantees would not necessarily evidence a prepetition disregard of an entity's separateness. *See, e.g.*, *In re Owens Corning*, 419 F.3d at 212–13. It is not unusual for entities to demand (and obtain) guarantees from affiliated entities in finance transactions.

[402] Letter from J. Mackey to Ally Bank (Oct. 5, 2010) [ALLY_0018084].

[403] Letter from J. Mackey to Ally Bank (Apr. 1, 2011) [RC00067937].

[404] *See In re Owens Corning*, 419 F.3d at, 212–13 (noting it is not unusual for entities to demand (and obtain) guarantees from affiliated entities in finance transactions and the presence of guarantees by themselves do not evidence a prepetition disregard of an entity's separateness).

*(i) 2005 Operating Agreement And 2006 Amended Operating Agreement*

As discussed in Section III.B.3, ResCap entered into the 2005 Operating Agreement in order to erect a "firewall" between GM and GMAC, and ResCap.[405] Section 2(f) of the 2005 Operating Agreement included many of the provisions used to mitigate the risk of substantive consolidation. In particular, the 2005 Operating Agreement provided that ResCap shall at all times:

- Maintain its books, records, and financial statements separate from those of any and all AFI affiliates;

- Maintain its assets in a manner such that it would not be costly to segregate and identify such assets from those of any and all AFI affiliates;

- Maintain bank accounts and cash management and account receivable collections systems separate from any and all AFI affiliates;

- Maintain its own asset investment, risk management, and hedging programs separate for those of any and all AFI affiliates;

- Pay its own liabilities out of its own funds;

- Conduct the business operations of ResCap and its subsidiaries by its or their own employees and officers, who will not also be employees or officers of any AFI affiliate;[406]

- Not commingle funds or other assets with those of any AFI affiliate; and

- Otherwise take such action so that ResCap will maintain its separate legal existence and identity.[407]

The 2006 Amended Operating Agreement continued to include many of these separateness provisions, removing only the requirement that ResCap have employees that were not also employees of other AFI affiliates (as defined in the 2005 Operating Agreement).[408]

The 2006 Amended Operating Agreement did provide that ResCap and its Subsidiaries (as defined in the 2006 Amended Operating Agreement) could use trademarks and names of AFI affiliates (as defined in the 2006 Amended Operating Agreement) notwithstanding these separateness covenants.[409]

---

[405] Int. of B. Paradis, Dec. 14, 2012, at 40:15–17 ("The primary concern of the rating agencies was the 'firewall' or the independence between [AFI] and ResCap.").

[406] This separateness provision in the 2005 Operating Agreement was deleted in the 2006 Amended Operating Agreement.

[407] *See* 2005 Operating Agreement, § 2(f) [ALLY_0140795].

[408] *See* 2006 Amended Operating Agreement, § 2(e).

[409] *See id.* § 2(e)(ix).

While it may be argued that ResCap did not fully comply with all provisions of the 2005 Operating Agreement and 2006 Amended Operating Agreement (particularly in entering into transactions with affiliates),[410] the Investigation has not uncovered any material evidence that ResCap failed to account for its assets and liabilities separately from those of AFI. The Debtors maintained separate accounts, books and records and the Examiner has not found the Debtors' financial affairs to be commingled, much less "hopelessly commingled," with those of AFI such that substantive consolidation of AFI into the Debtors would benefit all creditors.

### e.  Examiner's Conclusion

Based on the foregoing, the Examiner concludes it is unlikely that a proponent of substantive consolidation of AFI with and into the Estate of any Debtor would prevail.

---

[410] *See* Section VII.L.