## VII. REVIEW AND ANALYSIS OF ESTATE CAUSES OF ACTION IMPLICATED BY AFFILIATE TRANSACTIONS AND THE RELATIONSHIP AND COURSE OF DEALING AMONG RESCAP, AFI, ALLY BANK, AND CERBERUS

### B. DEBT RECHARACTERIZATION

#### 1. Introduction

AFI has asserted in the Chapter 11 Cases various claims against ResCap, RFC, and GMAC Mortgage, including claims of not less than $747 million under the A&R Secured Revolver Loan Agreement and $380 million under the A&R Line of Credit Agreement.[1]This Section examines whether certain of AFI's claims against ResCap and its principal Subsidiaries, RFC and GMAC Mortgage, may be recharacterized as equity. If the AFI Secured Revolver Facility Claim and the AFI Line of Credit Agreement Claim were to be recharacterized as equity interests in ResCap, AFI would likely not receive anything on account of such interests. AFI, itself, has acknowledged that certain ResCap debt that it held may be vulnerable to recharacterization.[2]

In a presentation to the Examiner, the Creditors' Committee questioned whether the "debt" that was forgiven by AFI under the January 30 Letter Agreement should be properly characterized as equity.[3] Under the January 30 Letter Agreement, AFI agreed to provide capital support to ResCap and GMAC Mortgage by forgiving $196.5 million of indebtedness under the A&R Line of Credit Agreement.[4]

Wilmington Trust has asserted that Unsecured Notes and Senior Secured Notes in the aggregate face amount of $2.4 billion that were exchanged by AFI for, among other things, ResCap Preferred Interests in the 2008 Bank Transaction and ResCap's remaining IB Finance Class M Shares as part of the 2009 Bank Transaction, should be recharacterized as equity.[5] Should the Unsecured Notes and the Senior Secured Notes be recharacterized as equity, their

---

[1]  Although outstanding as of the Petition Date, another financing, the BMMZ Repo Facility terminated on May 16, 2012 in connection with the transactions consummated under the Barclays DIP Financing Agreement. *See* Section VI.E.9. AFI has asserted several additional claims in the Chapter 11 Cases including, with limitation, surety bond claims, FRB consent order obligations, DOJ/AG settlement obligations, claims related to shared services, litigation claims, tax claims, contract claims, and claims for subrogation, setoff, recoupment and insurance.

[2]  *See* GMAC LLC Board Meeting, Support for Rescap [sic] LLC, dated June 10, 2009, at 3 [ALLY_0240200] ("There is some risk that any loan would be re-characterized as equity in a bankruptcy given [AFI's] status as a lender of last resort under the doctrine of Debt Re-characterization."); *see also* Ally Financial Inc. (Amendment No. 6 to Form S-1 (Apr. 12, 2012), at 60 (noting that "it is possible that other ResCap creditors would seek to recharacterize loans to ResCap as equity contributions or to seek equitable subordination of our claims").

[3]  *See* Kramer Levin Presentation to Hon. Arthur J. Gonzalez, Examiner, dated Oct. 18, 2012, at 10.

[4]  Terms of Support Relating to Possible DOJ/State Attorneys' General Settlement, dated Jan. 30, 2012 [ALLY_0182747].

[5]  Reply in Further Support of Wilmington Trust, National Association's Submission to Arthur J. Gonzalez, dated Mar. 8, 2013, at 42–43.

transfer by AFI to ResCap as consideration for the 2008 Bank Transaction and the 2009 Bank Transaction would not have provided reasonably equivalent value[6] and accordingly those transactions may be subject to avoidance on constructive fraudulent transfer grounds.

### 2. *Overview*

As a court of equity, a bankruptcy court is not bound by a party's characterization of a transaction.[7] A bankruptcy court may, where appropriate, acknowledge economic reality by recharacterizing debt as equity.[8] "In a recharacterization analysis, if the court determines that the advance of money is equity and not debt, the claim is recharacterized and the *effect* is subordination of the claim 'as a proprietary interest because the corporation repays capital

---

[6]   The Examiner concludes that ResCap and its Subsidiaries RFC and GMAC Mortgage were balance sheet insolvent from December 31, 2007 through the Petition Date. *See* Section VI.A; Section VI.E. The equity of an insolvent enterprise is valueless and the transfer of such equity could not constitute reasonably equivalent value or fair consideration.

[7]   *See, e.g., Pepper v. Litton,* 308 U.S. 295, 305 (1939) (noting that a bankruptcy court's equitable powers "have been invoked to the end that fraud will not prevail, that substance will not give way to form, that technical considerations will not prevent substantial justice from being done"); *see also Cohen v. KB Mezzanine Fund II, LP* (*In re Submicron Sys. Corp.*), 432 F.3d 448, 456 (3d Cir. 2006) (noting "the characterization as debt or equity is a court's attempt to discern whether the parties called an instrument one thing when in fact they intended it as something else"); *In re Cold Harbor Assocs.*, 204 B.R. 904, 915 (Bankr. E.D. Va. 1997) ("This Court is not required to accept the label of 'debt' or 'equity' placed by the debtor upon a particular transaction . . . .").

[8]   *See, e.g.*, *Rockville Orthopedic & Sports Assocs., P.C. v. Kort* (*In re Rockville Orthopedic Assocs., P.C.*), 377 B.R. 438, 442 (Bankr. D. Conn. 2007) (citing *Fairchild Dornier GMBH v. Official Comm. of Unsecured Creditors* (*In re Official Comm. of Unsecured Creditors for Dornier Aviation (N. Am.), Inc.*), 453 F.3d 225, 233 (4th Cir. 2006)). "Although the Second Circuit Court of Appeals has yet to address the issue, the Circuit Courts of Appeal that have considered it have all concluded 'that the bankruptcy court has the power to recharacterize a debt as an equity contribution.'" *Id.*; *see also Official Comm. of Unsecured Creditors v. Bay Harbour Master Ltd.* (*In re BH S&B Holdings LLC*), 420 B.R. 112, 157 n.17 (Bankr. S.D.N.Y. 2009) (noting that "courts in this jurisdiction . . . have held that courts do have equitable power to recharacterize debt as equity"), *aff'd*, 807 F. Supp. 2d 199 (S.D.N.Y. 2011).

contributions only after satisfying all other obligations of the corporation.'"[9] In general, a court may recharacterize a loan as equity if it determines that the parties intended the transaction to be an equity investment.[10]

### 3. Legal Standards For Recharacterization

Although similar in some ways to equitable subordination, recharacterization is different because it does not require a showing of inequitable conduct.[11] "[W]hen both issues are raised, recharacterization should be considered first, because if a 'particular advance is a capital contribution . . . equitable subordination never comes into play.'"[12]

While courts have adopted a variety of recharacterization tests,

> They devolve to an overarching inquiry: the characterization as debt or equity is a court's attempt to discern whether the parties called an instrument one thing when in fact they intended it as something else. That intent may be inferred from what the

---

[9] *Bayer Corp. v. MascoTech, Inc.* (*In re AutoStyle Plastics, Inc.*), 269 F.3d 726, 749 (6th Cir. 2001). "To be a creditor in bankruptcy the debtor must owe a debt to the claimant. The issue is whether the claim is an indebtedness or whether it is a proprietary interest. If it is determined that the claim is a proprietary interest the claim will be subordinated, not equitably subordinated, as a matter of course since 'the essential nature of a capital interest is a fund contributed to meet the obligations of a business and which is to be repaid only after all other obligations have been satisfied.'" *Diasonics, Inc. v. Ingalls*, 121 B.R. 626, 630 (Bankr. N.D. Fla. 1990) (citation omitted). "In a case in which a creditor has contributed capital to a debtor in the form of a loan, but the loan has the substance and character of an equity contribution, the court may recharacterize the debt as equity regardless of whether other requirements of equitable subordination have been satisfied." *Herzog v. Leighton Holdings, Ltd.* (*In re Kids Creek Partners, L.P.*), 212 B.R. 898, 931 (Bankr. N.D. Ill. 1997) (citation omitted), *aff'd*, 233 B.R. 409 (N.D. Ill. 1999), *aff'd*, 200 F.3d 1070 (7th Cir. 2000).

[10] The "overarching inquiry" in the recharacterization analysis is that "the characterization as debt or equity is a court's attempt to discern whether the parties called an instrument one thing when in fact they intended it as something else. That intent may be inferred from what the parties say in their contracts, from what they do through their actions, and from the economic reality of the surrounding circumstances." *In re Submicron Sys. Corp.*, 432 F.3d at 456.

[11] *See, e.g.*, *In re Dornier Aviation (N. Am.), Inc.*, 453 F.3d at 232 ("While a bankruptcy court's recharacterization decision rests on the *substance of the transaction* giving rise to the claimant's demand, its equitable subordination decision rest on its assessment of the *creditor's behavior*."); *see also In re AutoStyle Plastics, Inc.*, 269 F.3d at 748–49; *Adelphia Commc'ns Corp. v. Bank of Am., N.A.* (*In re Adelphia Commc'ns Corp.*), 365 B.R. 24, 74 (Bankr. S.D.N.Y. 2007) (noting that "recharacterization and equitable subordination analyses differ from each other in that recharacterization analyses focus on the substance of the transaction, whereas equitable subordination analyses focus on the creditor's behavior").

[12] *Fidelity Bond & Mort. Co. v. Brand* (*In re Fidelity Bond & Mort. Co.*), 340 B.R. 266, 302 (Bankr. E.D. Pa. 2006) (citation omitted).

> parties say in their contracts, from what they do through their actions, and from the economic reality of the surrounding circumstances. Answers lie in facts that confer context case-by-case.[13]

The party seeking to recharacterize a claim bears the burden of proof.[14] In determining whether to recharacterize a loan, some courts, including those located in the Southern District of New York, consider the following factors identified by the Sixth Circuit Court of Appeals in *Bayer Corp. v. MascoTech, Inc.* (*In re AutoStyle Plastics, Inc.*):[15]

(1)  the names given to the instruments;

(2)  the presence or absence of a fixed maturity date and schedule of payments;

(3)  the presence or absence of a fixed rate of interest and interest payments;

(4)  the source of repayments;

(5)  the adequacy or inadequacy of capitalization;

(6)  the identity of interest between the creditor and shareholder;

(7)  the security for the advances;

(8)  the corporation's ability to obtain financing elsewhere;

(9)  the extent to which the advances were subordinated;

(10) the extent to which the advances were used to acquire capital assets; and

(11) the presence or absence of a sinking fund to provide repayment.

---

[13]  *In re Submicron Sys. Corp.*, 432 F.3d at 456 (referring to *AutoStyle* factors and noting other factors considered by courts).

[14]  *See Viera v. AGM II, LLC* (*In re Worldwide Wholesale Lumber, Inc.*), 378 B.R. 120, 124 (Bankr. D.S.C. 2007) ("The party seeking to reclassify a debt as an equity contribution needs to demonstrate that the intent of the parties at the time they entered into the transaction was to enter into an investment relationship, not a lending relationship.").

[15]  269 F.3d at 747–48 (adopting factors used in *Roth Steel Tube Co. v. Comm'r*, 800 F.2d 625, 630 (6th Cir. 1986); *see also Official Comm. of Unsecured Creditors v. Bay Harbour Master Ltd.* (*In re BH S&B Holdings LLC*), 420 B.R. 112, 154 (Bankr. S.D.N.Y. 2009), *aff'd*, 807 F. Supp. 2d 199 (S.D.N.Y. 2011); *In re Adelphia Commc'ns Corp.*, 365 B.R. at 74. The list set forth herein is generally referred to as the "*AutoStyle*" or "*Roth Steel*" factors.

"[T]he determination of whether an asserted debt should be recharacterized as equity depends on the facts and circumstances as they existed at the time of the issuance of the [alleged debt]."[16] None of the *Autostyle* factors is dispositive, and a court will likely weigh them differently depending upon the circumstances.[17] A court may dismiss a recharacterization claim "if the plaintiff fails 'to plead facts [that] trigger the applicability of the *Autostyle* factors, or a meaningful subset of them.'"[18] A more complete discussion of each of the *Autostyle* factors follows.

### a. Names Given To, And Terms Of, The Instruments

Although not bound to the labels given by the parties to the transaction documents, a court will examine the names and terms of the documents to determine the nature of, and the parties' intent with regard to, the transaction.[19] To state the obvious, "[w]ith respect to the first factor, '[t]he issuance of a stock certificate indicates an equity contribution; the issuance of a bond, debenture, or note is indicative of bona fide indebtedness.'"[20] In analyzing this factor, courts have noted that provisions in the transaction documents requiring the purported borrower "to pay for all 'reasonable out-of-pocket expenses' including attorneys' fees associated with the enforcement of the [transaction]" would be indicative of a loan.[21] Further, a court may consider the description of the transaction set forth in other documents, such as

---

[16] *Rockville Orthopedic Assocs., P.C. v. Kort* (*In re Rockville Orthopedic Assocs., P.C.*), 377 B.R. 438, 442 (Bankr. D. Conn. 2007) (citing *In re Cold Harbor Assoc., L.P.*, 204 B.R. 904, 916–17 (Bankr. E.D. Va. 1997)); *see, e.g.*, *In re AutoStyle Plastics, Inc*., 269 F.3d at 747–48 ("Recharacterization is appropriate where the circumstances show that a debt transaction was 'actually [an] equity contribution [ ] *ab initio*.'"); *see also In re BH S& B Holdings LLC*, 420 B.R. at 157 (citing *In re AutoStyle Plastics, Inc*., 269 F.3d at 747–48).

[17] *See Sender v. Bronze Grp. Ltd*. (*In re Hedged-Invs. Assocs., Inc*.), 380 F.3d 1292, 1298-99 (10th Cir. 2004) ("None of these factors is dispositive and their significance may vary depending upon circumstances."). "No mechanistic scorecard suffices. And none should . . . ." *In re Submicron Sys. Corp*., 432 F.3d at 456.

[18] *In re BH S&B Holdings LLC*, 420 B.R. at 158 (Bankr. S.D.N.Y. 2009) (quoting *In re Adelphia Commc'ns Corp*., 365 B.R. at 74), *aff'd*, 807 F. Supp. 2d 199 (S.D.N.Y. 2011).

[19] *See* Section VII.B.1; *see also Official Unsecured Creditors' Comm. v. Highland Capital Mgmt. L.P.* (*In re Broadstripe, LLC*), 444 B.R. 51, 95 (Bankr. D. Del. 2010) (concluding that this factor "weighs heavily in favor" of debt where the advances were provided under a "credit facility," "consistently referred to as 'loans' or 'debt' and are evidenced by 'notes'").

[20] *In re BH S&B Holdings LLC*, 420 B.R. at 158 (quoting *Stinnett's Pontiac Serv., Inc. v. Comm'r,* 730 F.2d 634, 638 (11th Cir. 1984)), *aff'd*, 807 F. Supp. 2d 199 (S.D.N.Y. 2011).

[21] *See Farr v. Phase-I Molecular Toxicology* (*In re Phase-I Molecular Toxicology*), 287 B.R. 571, 577 (Bankr. N.M. 2002).

SEC filings and UCC-1 financing statements, to determine the parties' intent.[22] The absence of debt instruments, such as notes, or other clear indicia of a loan may indicate that the transaction is an equity contribution and not a loan.[23] Nevertheless, courts have noted that "[t]he manner of documentation is only one factor in the recharacterization analysis."[24]

### b. Presence Or Absence Of A Fixed Maturity Date And Schedule Of Payments

"The absence of a fixed maturity date and a fixed obligation to repay is an indication that the advances were capital contributions and not loans."[25] Treatment of maturity dates as "illusory" and the failure to require the borrower to make principal payments as they become due may be indicative of an equity contribution.[26] Extensions of a maturity date, however, are not necessarily indicative of an equity contribution.[27]

### c. Presence Or Absence Of A Fixed Rate Of Interest And Interest Payments

"The absence of a fixed rate of interest and interest payments is a strong indication that the advances were capital contributions rather than loans."[28] The presence of both a fixed maturity date and a fixed (or specified), agreed-upon rate of interest is indicative of a loan.[29] For purposes of this factor, a "fixed" rate of interest refers to periodic interest payments,

---

[22] *See In re Submicron Sys. Corp*., 432 F.3d at 457 ("The Court also found evidence of the parties' intent to create a debt investment outside the lending documents.").

[23] *See, e.g*., *Bayer Corp. v. MascoTech, Inc*. (*In re AutoStyle Plastics, Inc*.), 269 F.3d 726, 747–48 (6th Cir. 2001) ("The absence of notes or other instruments of indebtedness is strong indication that the advances were capital contributions and not loans."); *Autobacs Strauss, Inc. v. Autobacs Seven Co., Ltd. (In re Autobacs Strauss, Inc.)*, 473 B.R. 525, 573 (Bankr. Del. 2012) (same); *see also In re Adelphia Commc'ns Corp,* 368 B.R. at 192 (noting absence of contemporaneous documentation supports equity argument).

[24] *In re Micro-Precision Techs., Inc*., 303 B.R. 238, 247 (Bankr. N.H. 2003).

[25] *In re AutoStyle Plastics, Inc*., 269 F.3d at 750 (citation omitted); *see also Official Unsecured Creditors' Comm. v. Highland Capital Mgmt, L.P.* (*In re Broadstripe, LLC*), 444 B.R. 51, 95 (Bankr. D. Del. 2010).

[26] *In re Autobacs Strauss, Inc*., 473 B.R. at 573–74 (Bankr. Del. 2012).

[27] *Herzog v. Leighton Holdings, Ltd*. (*In re Kids Creek Partners, L.P*.), 212 B.R. 898, 932 (Bankr. N.D. Ill. 1997) (noting that "the mere fact that the loan terms were flexible does not demonstrate that the loans should be recharacterized"), *aff'd*, 233 B.R. 409 (N.D. Ill. 1999), *aff'd*, 200 F.3d 1070 (7th Cir. 2000).

[28] *In re AutoStyle Plastics, Inc*., 269 F.3d at 750.

[29] *Daewoo Motor Am., Inc. v. Daewoo Motor Co., Ltd*. (*In re Daewoo Motor Am., Inc*.), 471 B.R. 721, 737 (C.D. Calif. 2012).

including fluctuating ones.[30] Further, a party's subsequent agreement to forbear from collecting payment of principal or interest does not by itself support recharacterization,[31] particularly when the forbearance was agreed to by a pre-existing lender.[32]

### d. Source Of Repayment

"If the expectation of repayment depends solely on the success of the borrower's business, the transaction has the appearance of a capital contribution."[33] A court would likely consider "the underlying economic reality and the general tie between the loan's repayment and the success of the business" to determine the source of repayment.[34] The existence of multiple sources of repayment, including collateral securing the advance, would be indicative of a loan.[35] Where, however, the only source of repayment is the borrower's earnings and the advance is unsecured, this factor would favor recharacterization.[36]

---

[30] *See In re Moll Indus., Inc*., 454 B.R. at 582 (concluding that fixed rate refers to the periodic payment of interest). "When a transaction is intended as equity, there is usually no interest paid or interest payments are sporadic because the investor is more interested in seeing the value of its investment grow rather than receiving periodic payments." *Id*. In this case, the court concluded that the periodic payment of interest at rates that, although fluctuating, "are typical in the market place for debt instruments" and that, therefore, this factor would not support recharacterization. *Id*.

[31] *See In re AutoStyle Plastics, Inc*., 269 F.3d at 747–48; *see also Drake v. Franklin Equip. Co*. (*In re Franklin Equip. Co*.), 418 B.R. 176, 195–96 (Bankr. E.D. Va. 2009) ("If such forbearance could retroactively convert a good loan to equity that would indeed validate the saying that 'no good deed goes unpunished.'"). *But see Friedman's Liquidating Trust v. Goldman Sachs Credit Partners, L.P.* (*In re Friedman's Inc.*), 452 B.R. 512, 521 (Bankr. D. Del. 2011) (noting the "deferral of interest payments, the below prime interest rate" and the failure to repay loans from potential source of funding was indicative of the equity).

[32] *See In re Moll Indus., Inc*., 454 B.R. at 583 ("In the case of a pre-existing lender, it is legitimate for the lender to take actions to protect its existing loans, including extending additional credit or granting forbearance.").

[33] *In re AutoStyle Plastics, Inc*., 269 F.3d at 751.

[34] *Autobacs Strauss, Inc. v. Autobacs Seven Co., Ltd*. (*In re Autobacs Strauss, Inc*.), 473 B.R. 525, 575 (Bankr. Del. 2012) (comparing cases).

[35] *See id.* at 575 (comparing cases); *see also In re Franklin Equip. Co*., 416 B.R. at 513 (noting that alternative sources of repayment is indicative of a loan).

[36] *See In re Autobacs Strauss, Inc*., 473 B.R. at 576 (courts have noted that the use of the proceeds of a subsequent sale of the borrower to repay a "bridge" loan made to cover the borrower's operating expense until such sale is indicative of a loan); *see also Farr v. Phase-I Molecular Toxicology* (*In re Phase-I Molecular Toxicology*), 287 B.R. 571, 577 (Bankr. N.M. 2002) ("This weighs in favor of characterizing the transaction as a loan, since the source of intended repayment when the advance was made was not dependant solely on the future success of the Debtor's business.").

### e. Adequacy Or Inadequacy Of Capital

Thin or inadequate capitalization is strongly indicative that the transaction is not a loan but rather an equity contribution.[37] However, a court "should not put too much emphasis on this factor . . . because all companies in bankruptcy are in some sense undercapitalized."[38]

Some courts have held that capitalization should be assessed not only at initial capitalization, but also at the time of the transaction being challenged.[39] Other courts have held that the initial capitalization is more significant.[40] "Whether the Debtor was undercapitalized at the time of the transaction, though relevant, is not determinative."[41]

_____

[37] *In re Franklin Equip. Co.*, 418 B.R. at 197 (citation omitted) ("Thin or inadequate capitalization is strong evidence that the advances are capital contributions rather than loans.").

[38] *Official Comm. of Unsecured Creditors v. Bay Harbour Master Ltd.* (*In re BH S&B Holdings LLC*), 420 B.R. 112, 159 (Bankr. S.D.N.Y. 2009), *aff'd*, 807 F. Supp. 2d 199 (S.D.N.Y. 2011).

[39] *See In re Autobacs Strauss, Inc.*, 473 B.R. at 576 ("Capitalization is assessed both at the times of initial capitalization and subsequent transactions."); *United States v. Colorado Invesco, Inc.*, 902 F. Supp. 1339, 1342 (D. Co. 1995) (noting that "theory looks either to the initial amount of capital in a corporation or its financial status at the time the loans were made").

[40] *See In re N & D Props., Inc.*, 799 F.2d 726, 733 (11th Cir. 1986) ("Shareholder loans may be deemed capital contributions . . . where the trustee proves initial undercapitalization . . . ."); *Diasonics, Inc. v. Ingalls*, 121 B.R. 626, 631 (Bankr. N.D. Fla. 1990) ("It is the trustee's burden to show that the corporation was initially undercapitalized . . . .").

[41] *In re Phase-I Molecular Toxicology*, 287 B.R. at 578.

Because the possibility of recharacterization may discourage loans to distressed corporations, a claimant's status as an insider and a debtor's undercapitalization alone will normally be insufficient to justify recharacterization of an insider's claim.[42] "However, when other factors indicate that the transaction is not a loan at all, recharacterization is appropriate to ensure the consistent application of the Bankruptcy Code."[43] A court may recharacterize a loan by an insider to an undercapitalized debtor that results in the insider obtaining "rights to pervasively control the Debtor" or the right to convert the loan into an equity interest in the debtor.[44]

---

[42] *See, e.g.*, *Fairchild Dornier GMBH v. Official Comm. of Unsecured Creditors* (*In re Official Comm. of Unsecured Creditors for Dornier Aviation (N. Am.), Inc.*), 453 F.3d 225, 234 (4th Cir. 2006) (noting that "a claimant's insider status and a debtor's undercapitalization alone will normally be insufficient to support the recharacterization of a claim"); *Herzog v. Leighton Holdings, Ltd*. (*In re Kids Creek Partners, L.P.*), 212 B.R. 898, 932 (Bankr. N.D. Ill. 1997) (noting that "insiders and others [may] shy away from lending to a corporation in financial distress or venture at a higher than usual risk."), *aff'd*, 233 B.R. 409 (N.D. Ill. 1999), *aff'd*, 200 F.3d 1070 (7th Cir. 2000). "In many cases, an insider will be the only party willing to make a loan to a struggling business, and recharacterization should not be used to discourage good faith loans." *In re Dornier Aviation (N. Am.), Inc.*), 453 F.3d at 234. *But see In re N & D Props., Inc*., 799 F.2d at 733 ("Shareholder loans may be deemed capital contributions in one of two circumstances: where the trustee proves initial undercapitalization or where the trustee proves that the loans were made when no other disinterested lender would have extended credit."). Commentators have stated that the Eleventh Circuit's test in *In re N & D Properties, Inc.* for recharacterization is "simple," "alternative," "puzzling," and "disturbing" and emphasized that this test is a "minority approach . . . [that] has failed to gain traction" among courts other than those lower courts in the Eleventh Circuit. James M. Wilton & Stephen Moeller-Sally, *Debt Recharacterization Under State Law*, 62 BUS. LAW. 1257, 1260–61 (2007).

[43] *In re Dornier Aviation (N. Am.), Inc*., 453 F.3d at 234 "The 'paradigmatic' recharacterization case involves a situation where 'the same individuals or entities (or affiliates of such) control both the transferor and the transferee, and inferences can be drawn that the funds were put into an enterprise with little or no expectation that they would be paid back along with other creditor claims.'" *In re BH S&B Holdings LLC*, 420 B.R. at 157 (quoting *Adelphia Commc'ns Corp. v. Bank of Am., N.A.* (*In re Adelphia Commc'ns Corp.*), 365 B.R. 24, 74 (Bankr. S.D.N.Y. 2007)), *aff'd*, 807 F. Supp. 2d 199 (S.D.N.Y. 2011). The presence of an "equity kicker" will not necessarily result in the recharacterization of a claim. *See Kalisch v. Maple Trade Fin. Corp.* (*In re Kalisch*), 413 B.R. 115 (Bankr. S.D.N.Y. 2008) ("The equity component was an inducement to the [sic] make the Loan, and was never a substitute for repayment."). "The more such an exchange appears to reflect the characteristics of such an arm's length negotiation, the more likely such a transaction is to be treated as debt." *In re Cold Harbor Assocs., LP*, 204 B.R. 904, 915 (Bankr. E.D. Va. 1997)).

[44] *Aquino v. Black* (*In re AtlanticRancher, Inc*.), 279 B.R. 411, 435 (Bankr. D. Mass. 2002).

### f.   Identity Of Interest Between The Creditor And Shareholder

"The identity-of-interest factor typically comes into play when multiple creditors make 'loans' to a debtor corporation . . . ."[45] Where stockholders make advances in proportion to their equity interests, this factor is indicative of an equity contribution.[46] Where there is no correlation to equity interests or only one or a handful of shareholders make a loan and there is "no evidence that other existing shareholders made contributions to the loan proportionate to their respective stock ownership," this factor would be indicative of a loan.[47]

### g.   Security For The Advances

"The absence of a security for an advance is a strong indication that the advances were capital contributions rather than loans."[48] Debt owed to pre-existing lenders, however, should not be recharacterized simply because additional loans were extended without additional security.[49]

---

[45]   *See Daewoo Motor Am., Inc. v. Daewoo Motor Co., Ltd.* (*In re Daewoo Motor Am., Inc.*), 471 B.R. 721, 742 (C.D. Calif. 2012) (citation omitted).

[46]   *See Bayer Corp. v. MascoTech, Inc.* (*In re AutoStyle Plastics, Inc.*), 269 F.3d 726, 751 (6th Cir. 2001).

[47]   *See id.* at 747–48 (noting "a sharply disproportionate ratio between a stockholder's percentage interest in stock and debt is indicative of bona fide debt"); *Farr v. Phase-I Molecular Toxicology* (*In re Phase-I Molecular Toxicology*), 287 B.R. 571, 577 (Bankr. N.M. 2002) (noting that lack of evidence of other stockholders making contributions proportionate to their equity is indicative of a loan); *see also Drake v. Franklin Equip. Co.* (*In re Franklin Equip. Co.*), 416 B.R. 483, 517 (E.D. Va. 2009) (noting that this factor was indicative of a loan where the source of the advance was one shareholder and the other shareholders did not participate in the debt arrangement). *But see Autobacs Strauss, Inc. v. Autobacs Seven Co., Ltd.* (*In re Autobacs Strauss, Inc.*), 473 B.R. 525, 576 (Bankr. Del. 2012) (concluding that this factor weighed in favor of recharacterization where the advances were fully funded by entity indirectly holding 100% equity interest in the borrower).

[48]   *In re AutoStyle Plastics, Inc.*, 269 F.3d at 752 (citation omitted).

[49]   *See Cohen v. KB Mezzanine Fund II, LP* (*In re Submicron Sys. Corp.*), 432 F.3d 448, 457 (3d Cir. 2004).

### h.   The Debtor's Ability To Obtain Financing Elsewhere

"When there is no evidence of other outside financing, the fact that no reasonable creditor would have acted in the same manner is strong evidence that the advances were capital contributions rather than loans."[50] Indeed, several courts have held that proof of a debtor's inability to obtain a loan from a disinterested lender is sufficient to recharacterize a loan as an equity contribution.[51] Other courts have, however, concluded that the inability to obtain alternative financing does not by itself "tip the scale."[52] Evidence that would support the assertion that no other lender would provide a loan on similar terms includes (i) a low interest rate; (ii) the lack of security; (iii) the borrower's negative cash flow and financial condition; and (iv) the borrower's failure to provide its own financials when dealing with trade creditors or other potential lenders.[53]

### i.   The Extent To Which The Advances Were Subordinated

"Subordination of advances to claims of all other creditors indicates that the advances were capital contributions and not loans."[54] Failure to enforce demand interest payments or principal payments at maturity may be evidence of de facto subordination that could weigh in favor of recharacterization.[55]

_____

[50]   *In re AutoStyle Plastics, Inc.*, 269 F.3d at 752 (citation omitted); *see In re Phase-I Molecular Toxicology*, 287 B.R. at 577 (noting that this factor supports a capital contribution where "the Debtor was unable to obtain loans from other lenders at the time of the transaction"). "[T]he proper question is 'whether a reasonable outside creditor would have made a loan to the debtor on similar terms.'" *In re Autobacs Strauss, Inc.*, 473 B.R. at 579 (footnote omitted).

[51]   *See In re N&D Props., Inc.*, 799 F.2d 726, 733 (11th Cir. 1986) ("Shareholder loans may be deemed capital contributions…where the trustee proves that the loans were made when no other disinterested lender would have extended credit."); *Diasonics, Inc. v. Ingalls*, 121 B.R. 626, 631 (Bankr. N.D. Fla. 1990) ("It is the trustee's burden to show that … the loans were made when no other disinterested lender would have extended credit.").

[52]   *In re Phase-I Molecular Toxicology*, 287 B.R. at 578 (Bankr. N.M. 2002). "Existing lenders are often the only source of funding when a debtor faces distress. Therefore, inability to obtain alternative financing is insufficient to support recharacterization." *Official Comm. of Unsecured Creditors v. Highland Capital Mgmt. L.P.* (*In re Moll Indus., Inc.*), 454 B.R. 574, 584 (Bankr. D. De. 2011). "While the fact that the Debtor could not obtain a loan from any other disinterested lender weighs in favor of treating the advance as a capital contribution, [sic] by itself does not tip the scale." *Official Comm. of Unsecured Creditors v. Credit Suisse First Boston*, 299 B.R. 732, 742 (Bankr. D. Del. 2003) (internal quotations omitted) (quoting *In re Phase-I Molecular Toxicology*, 287 B.R. at 578 ).

[53]   *See In re Autobacs Strauss, Inc.*, 473 B.R. at 579–80.

[54]   *In re AutoStyle Plastics, Inc.*, 269 F.3d at 752 (citation omitted).

[55]   *See In re Autobacs Strauss, Inc.*, 473 B.R. at 580.

### j. The Extent To Which The Advances Were Used To Acquire Capital Assets

Capital contributions are typically made to start a business enterprise or to fund capital improvements.[56] "Use of advances to meet the daily operating needs of the corporation, rather than to purchase capital assets, is indicative of bona fide indebtedness."[57] Similarly, use of advances to refinance existing debt is also indicative of a loan.[58]

### k. Presence Or Absence Of A Sinking Fund To Provide Repayment

"A sinking fund is 'a fund consisting of regular deposits that are accumulated with interest to pay off a long-term debt.'"[59] While some courts have found the absence of a sinking fund to be a factor,[60] others have given it little weight.[61] Moreover, security for advances may minimize the significance of a sinking fund.[62] Indeed, the Bankruptcy Court previously noted in another matter that "[i]f the loan is secured by a lien, however, there is no need for a sinking fund."[63]

---

[56] See Raymond v. United States., 511 F.2d 185, 191 (6th Cir. 1975) (affirming district court's conclusion that advances made to corporation were capital contributions where, among other things, "the advances were made in starting the corporation").

[57] In re AutoStyle Plastics, Inc., 269 F.3d at 752 (citation omitted).

[58] Official Unsecured Creditors' Comm. v. Highland Capital Mgmt., L.P. (In re Broadstripe), LLC, 444 B.R. 51, 101 (Bankr. D. Del. 2010) (noting use of advances "to refinance existing secured debt" is indicative of a loan). But see Riley v. Tencara, LLC (In re Wolverine, Proctor & Schwarz, LLC), 447 B.R. 1, 40 (Bankr. D. Mass. 2011) (noting that "use of the funds to satisfy existing debt rather than to acquire capital assets . . . might suggest that the advance was equity").

[59] Turkmani v. Republic of Bol., 193 F. Supp. 2d 165, 167 (D.D.C. 2002) (quoting BLACK'S LAW DICTIONARY 682 (7th ed. 1999)).

[60] In re AutoStyle Plastics, Inc., 269 F.3d at 753 ("The failure to establish a sinking fund for repayment is evidence that the advances were capital contributions rather than loans.").

[61] Official Comm. of Unsecured Creditors v. Highland Capital Mgmt. L.P. (In re Moll Indus., Inc.), 454 B.R. 574, 585 (Bankr. D. Del. 2011).

[62] See In re AutoStyle Plastics, Inc., 269 F.3d at 753.

[63] Official Comm. of Unsecured Creditors v. Bay Harbour Master Ltd. (In re BH S&B Holdings LLC), 420 B.R. 112, 158 (Bankr. S.D.N.Y. 2009)

### l.  Other Factors

In addition to the factors set forth above, a court may consider (i) the right to enforce payment of principal and interest; (ii) the lender's participation in management of the borrower; (iii) the parties' intent; (iv) the failure of the debtor to repay on the due date; and (v) the ratio of shareholder loans to capital.[64]

### 4.  Statute Of Limitations

A recharacterization claim does not appear to be subject to any statute of limitations because such claim is typically "brought under the Bankruptcy Code, as part of seeking a determination from the Court regarding the proper treatment of [claims], for purposes of distribution from the bankruptcy estate."[65] The Bankruptcy Court may nevertheless conclude that a recharacterization claim is subject to the law of the forum state—New York—and apply the six-year statute of limitations set forth in CPLR § 213(1), which governs causes of action for which no specific period has been provided.[66] In any event, because the debt subject to recharacterization assertions was issued within the six-year period immediately preceding the Petition Date, the Examiner concludes that the statute of limitations would not bar an effort to recharacterize AFI's claims under the A&R Secured Revolver Agreement, the A&R Line of Credit Agreement, the Senior Secured Notes, or the Junior Secured Notes.

---

[64]  *See Cohen v. KB Mezzanine Fund II, LP* (*In re Submicron Sys. Corp.*), 432 F.3d 448, 456 n.8 (3d Cir. 2006) (referring to the recharacterization test adopted by the Fifth and Eleventh Circuit in the tax context); *see also In re Mangia Pizza Invs, LP*, No. 10-13235, 2012 WL 2194145, at *34 (Bankr. W.D. Tex. June 14, 2012) (noting that Texas recharacterization test consists of 16 factors); *Moglia v. Quantum Indus. Partners, LDC* (*In re Outboard Marine Corp.*), 2003 WL 21697357, at *5 (N.D. Ill. July 22, 2003) (considering the *Autostyle* factors and (a) "the ratio of shareholder loans to capital," and (b) "the amount or degree of shareholder control"). In a case under the Small Business Investment Act, the United States District Court for the District of Colorado noted that "[r]elevant factors used by courts to determine if a loan should be recharacterized include the amount of initial operating capital, the length of time the corporation was in operation and how the transactions were treated when made." *United States v. Colorado Invesco, Inc.*, 902 F. Supp 1339, 1342 (D. Co. 1995). In a recent case, the United States Bankruptcy Court for the District of Delaware note that (i) the presence of voting rights and (ii) lack of formalities would weigh in favor of recharacterization. *Autobacs Strauss, Inc. v. Autobacs Seven Co., Ltd.* (*In re Autobacs Strauss, Inc.*), 473 B.R. 525, 581 (Bankr. Del. 2012). In context of a small, closely held corporation, the lack of formalities may have little bearing on the recharacterization analysis. *See Internet Navigator Inc.*, 289 B.R. 133, 137 (Bankr. N.D. Iowa 2003).

[65]  *Official Comm. of Unsecured Creditors v. Foss* (*In re Felt Mfg. Co., Inc.*), 371 B.R. 589, 629 (Bankr. D.N.H. 2007) (concluding "no applicable statute of limitations"); *see In re Maxim Truck Co., Inc.*, 415 B.R. 346, 359 (S.D. Ind. 2009) ("A claim to recharacterize debt as equity is not statutorily based and there is no explicit statute of limitations.").

[66]  *See PSINet, Inc. v. Cisco Sys. Capital Corp.* (*In re PSINet, Inc.*), 271 B.R. 1, 39–41 (Bankr. S.D.N.Y. 2001) (holding that New York's six-year statute of limitations applicable to claims for which no statute of limitation is prescribed, including equity actions, applies to a claim for recharacterization of a lease as a disguised security arrangement).

### 5.  AFI Was And Is An Insider Of ResCap

At all times relevant to the Investigation, ResCap was a wholly owned indirect subsidiary of AFI, and RFC and GMAC Mortgage were indirect, wholly owned subsidiaries of ResCap. Thus, AFI was and is an "insider" of ResCap, RFC and GMAC Mortgage as that term is defined in the Bankruptcy Code.[67] As an insider, AFI's claims are subject to close scrutiny.[68]

The Examiner concludes that ResCap and its Subsidiaries RFC and GMAC Mortgage were inadequately capitalized from and after August 15, 2007 and Balance Sheet Insolvent from and after December 31, 2007.[69] Thus, the AFI claims subject to recharacterization challenge were on account of advances made or debt securities transferred to ResCap at a time when it was undercapitalized. The facts alone will not result in recharacterization as "[a] claimant's insider status and a debtor's undercapitalization alone will normally be insufficient to support the recharacterization of a claim. In many cases, an insider will be the only party willing to make a loan to a struggling business, and recharacterization should not be used to discourage good faith loans."[70]

### 6.  Recharacterization Is A Fact-Intensive Analysis

"Recharacterization cases turn on whether a debt actually exists."[71] In determining whether to recharacterize a claim as equity, a court analyzes whether "the parties called an instrument one thing when in fact they intended it as something else."[72] The recharacterization analysis has been described as "fact sensitive," because it depends on the circumstances and

---

[67]  *See* 11 U.S.C. §101(31).

[68]  *See Algonquin Power Income Fund v. Ridgewood Heights, Inc. (In re Franklin Indus. Complex, Inc.)*, No. 06-80254, 2007 WL 2509709, at *15 (Bankr. N.D.N.Y. 2007) ("Another rule of thumb in recharacterization analyses is that 'the claims of creditors who were corporate insiders and/or had conducted their transactions with the debtors in some inequitable manner are closely scrutinized [in recharacterization cases].'").

[69]  *See* Section VI.

[70]  *Rockville Orthopedic & Sports Assocs., P.C. v. Kort* (*In re Rockville Orthopedic Assocs., P.C.*), 377 B.R. 438, 442–43 (Bankr. D. Conn. 2007).

[71]  *Adelphia Commc'ns Corp. v. Bank of Am., N.A.* (*In re Adelphia Commc'ns Corp.*), 365 B.R. 24, 73 (Bankr. S.D.N.Y. 2007)), *aff'd*, 807 F. Supp. 2d 199 (S.D.N.Y. 2011).

[72]  *Cohen v. KB Mezzanine Fund II, LP* (*In re Submicron Sys. Corp.*), 432 F.3d 448, 456 (3d Cir. 2006) (referring to *AutoStyle* factors and noting other factors considered by courts).

facts existing at the time of the alleged debt.[73] Recharacterization is a rare remedy that is "becoming more narrow," with very few instances of a court recharacterizing a debt.[74]

### 7. Analysis Of The AFI Secured Revolver Facility Claim

#### a. The Secured Revolver Facility

As described in greater detail in Section V.E.3, the Secured Revolver Facility was initially placed in 2008 and amended and restated at year-end 2009.[75] The Secured Revolver Loan Agreement was modified to convert $1.55 billion of Secured Revolver Facility Revolver Loans into Secured Revolver Facility Term Loans, eliminating the ability of the Secured Revolver Facility Borrowers to draw any new loans under the Secured Revolver Facility.[76]

The Secured Revolver Facility was intended to replace existing indebtedness that could not be refinanced by existing lenders on a timetable suitable to ResCap.[77] Sam Ramsey, Chief Risk Officer of AFI at the time, in discussing the impetus for AFI entering into the Secured Revolver Agreement noted:

> And so, you know, as I said, we had to get through a negotiation with the four banks and a proposal that they could endorse and that their credit committees would approve prior to taking it out to the broader universe of syndicate participants or—and, in this case, bilateral institutions. And so, it was just simply not getting any particular constructive offer back from the bank group in terms of meeting ResCap's needs. And so, we decided to just take them out of that conversation, and for [AFI] to be the lender to ResCap. And that's why that facility was put into place as part of the overall renewal and restructuring of the bank facilities for both entities.[78]

---

[73] 4 COLLIER ON BANKRUPTCY, ¶ 510.02[3] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2012).

[74] Marvin C. Ruth & Scott K. Brown, *Pacific Express—On the Rise or Falling? An Update on Loan Recharacterization and Its Interplay with 11 U.S.C. § 510(B)*, 2007 No. 7 NORTON BANKR. L. ADVISER 2 (2007); *see also* Thomas R. Fawkes & Devon J. Eggert, *Recharacterization of Debt to Equity*, COMM. BANKR. LITIG. § 19:8 (2013) (stating that "it is infrequently the case that courts rule in favor of recharacterization, as evidenced by the scarcity of reported decisions in which a debt is recharacterized as equity").

[75] *See* Appendix V.E.8.

[76] *See id.*

[77] *See* Section V.E.3 (discussing the Secured Revolver Facility and the events leading to its entry).

[78] Int. of S. Ramsey, Dec. 10, 2012, 77:17–78:7. De Molina recalls the bank group initially agreed to fund half of the $3.5 billion available under the Secured Revolver Facility. Ultimately, however, he "decided because I was—the—we were getting a junior position, I decided to take the full three and a half." Int. of A. de Molina, Nov. 20, 2012, at 144:25–145:2.

AFI initially committed to make the Secured Revolver Facility Loans to the Secured Revolver Facility Borrowers, up to the lesser of $3.5 billion and the then existing borrowing base.[79] The borrowing base was determined by calculating the aggregate "value" of the First Priority Collateral, which, as set forth in Table V.E.3.b, was subject to a discount factor that varied depending on the type of asset.

As noted, the parties' subjective intent and expectations, including a lender's expectations regarding the repayment of advances, are important factors in the debt recharacterization analysis. The Investigation has not revealed any evidence indicating that AFI (or, for that matter, ResCap) ever intended, considered, or treated, the Secured Revolver Facility Loans as anything other than genuine loans, which ResCap was obligated to repay in accordance with the loans' terms.[80]

To the contrary, the evidence reflects that the parties always treated the advances under the Secured Revolver Facility as loans that were required contractually to be repaid—if necessary by liquidating collateral secured by liens.[81] According to de Molina, to ensure repayment, AFI "instead of taking the second behind guys that I thought would liquidate [i.e, the bank group] and leave us with nothing, we took a pari passu on the full pool."[82] In addition, ResCap was required to prepay Secured Revolver Facility Loans (1) to the extent the outstanding principal balance exceeded the borrowing base; and (2) with the net cash proceeds from certain collateral dispositions.[83] In addition, on June 4, 2008, AFI sold to GM and Cerberus a $750 million first loss participation interest in the Secured Revolver Facility, which is further evidence that AFI and third parties regarded the advances as loans.[84]

The Examiner's Financial Advisors confirmed that ResCap made payments under the Secured Revolver Facility significantly reducing its indebtedness over time. Indeed, in 2010 and 2011, ResCap paid $789.523 million of the balance due to AFI under the Secured Revolver Facility.[85]

---

[79] *See* Appendix V.E.3.b.

[80] The Secured Revolver Loan Agreement was approved by the ResCap Board and the boards of RFC and GMAC Mortgage. *See* Section V.E.3 (discussing approval of the Secured Revolver Loan Agreement). The A&R Secured Revolver Agreement was approved by the ResCap Board and the boards of RFC and GMAC Mortgage in December 2009. *See* Section V.E.8 (discussing approval of the A&R Secured Revolver Agreement).

[81] *See* Appendix V.E.3.g.

[82] Int. of A. de Molina, Nov. 20, 2102, at 145:11–13.

[83] *See* Section V.E.3.

[84] Memorandum, ResCap: Significant Capital Contributions and Related-Party Transactions, dated June 9, 2009, at 4 [ALLY_0240180]; Participation Agreement between GMAC LLC, GM and Cerberus ResCap Financing LLC, dated as of June 4, 2008 [ALLY_0043807]. The first loss participation was subsequently contributed to AFI on December 29, 2008 in exchange for equity in AFI. Participation Agreement between GMAC LLC, GM and Cerberus ResCap Financing LLC, dated as of June 4, 2008 [ALLY_0043807].

[85] Residential Capital, LLC Consolidated Financial Statements for the Years Ended December 31, 2009 and 2008 (Feb. 26, 2010), at 42 [EXAM00124455]; Residential Capital, LLC Consolidated Financial Statements for the Years Ended December 31, 2011 and 2010 (Mar. 28, 2012), at 38 [EXAM00122651].

Courts have acknowledged that the inability of a debtor to obtain a loan on similar terms from an independent third party in some instances may be indicative of an equity contribution.[86] Here, it appears that the Secured Revolver Facility was on better terms than a third party lender would provide.[87] However, "[i]n many cases, an insider will be the *only* party willing to make a loan to a struggling business, and recharacterization should not be used to discourage good-faith loans."[88] The Secured Revolver Facility fits that criterion, because it was made for legitimate purposes, including to repay existing indebtedness and for working capital purposes.[89]

Based on the foregoing, the Examiner concludes that when AFI and ResCap entered into the Secured Revolver Loan Facility, the parties intended the Secured Revolver Facility to be a loan with AFI expecting in good faith the repayment of the advances in accordance with the terms of the underlying agreements.

### b. An Examination Of The AFI Secured Revolver Facility Claim Under The Autostyle Factors

It has been noted that the "paradigmatic" recharacterization case involves a situation where the same party controls both the transferor and the transferee, and inferences can be drawn that the funds were put into an enterprise with little or no expectation that they would be paid back along with other creditor claims.[90] In considering recharacterization in the

---

[86] *See Gernsbacher v. Campbell (In re Equip. Equity Holdings, Inc.)*, No. 11-0362, 2013 WL 1335951, at *52 (Bankr. N.D. Tex. 2013) (noting that "the court recognizes that the fact that a corporation is unable to attract similar loans from other investors may weigh in favor of recharacterization"); *see also Official Comm. of Unsecured Creditors v. Bay Harbour Master Ltd*. (*In re BH S&B Holdings LLC*), 420 B.R. 112, 158 (Bankr. S.D.N.Y. 2009) (noting that "[t]he fact that no reasonable creditor would have acted in the same manner is strong evidence that the advances were capital contributions rather than loans"), *aff'd*, 807 F. Supp. 2d 199 (S.D.N.Y. 2011).

[87] *See* Section V.E.3 (discussing the terms of the A&R Secured Revolver Agreement).

[88] *Fairchild Dornier GMBH v. Official Comm. of Unsecured Creditors (In re Official Comm. of Unsecured Creditors for Dornier Aviation (N. Am.), Inc.)*, 453 F.3d 225, 234 (4th Cir. 2006) (emphasis added); *see* Rockville Orthopedic & Sports Assocs., P.C. v. Kort *(In re Rockville Orthopedic Assocs., P.C.)*, 377 B.R. 438, 442–43 (Bankr. D. Conn. 2007) (citing *Dornier Aviation*, 453 F.3d at 34).

[89] *See* Section V.E.3; Section V.E.8; *see also* GMAC LLC, Current Report (Form 8-K) (June 4, 2008), at 6.

[90] *In re BH S&B Holdings LLC*, 420 B.R. at 157 (quoting *Adelphia Commc'ns Corp. v. Bank of Am., N.A.* (*In re Adelphia Commc'ns Corp*.), 365 B.R. 24, 74 (Bankr. S.D.N.Y. 2007)), *aff'd*, 807 F. Supp. 2d 199 (S.D.N.Y. 2011).

paradigmatic situation, a court would likely undertake an analysis of the *Autostyle* factors.[91] The following *Autostyle* factors are indicative of the AFI Secured Revolver Facility being a loan:

(1) **The names given to, and the terms of, the instruments**: The AFI Secured Revolver Facility Claim refers to Claims arising under, derived from, or based upon the A&R Secured Revolver Loan Agreement and the A&R First Priority Security Agreement. The names of the underlying documents reflect that the transactions were intended to be loans and not equity contributions.[92] Promissory notes were executed and delivered in connection with the advances made.[93] In addition, as noted in Section V.E.8, the A&R Secured Revolver Loan Agreement contained representations and warranties, covenants, events of default and indemnification provisions that were standard for facilities of comparable size and nature (and would have been typical for a syndicated credit facility with unaffiliated lenders). Moreover, the Secured Revolver Facility was publicly described as a loan in SEC filings and UCC financing statements.[94]

(2) **The presence of a fixed maturity date and schedule of payments**: The Secured Revolver Loan Agreement and the A&R Secured Revolver Loan Agreement had a stated maturity date at closing, which would have been typical for a syndicated credit facility with unaffiliated lenders.[95] Although extended, the maturity date of the A&R Secured Revolver Loan Agreement was not allowed to lapse.[96] The extension of a maturity date should not

---

[91] *See In re BH S&B Holdings LLC*, 420 B.R. at 157–58.

[92] The A&R Secured Revolver Loan Agreement is defined as "the Amended and Restated Credit Agreement, dated as of December 30, 2009 (as amended, supplemented, or otherwise modified), by and among . . . ."

[93] *See, e.g.,* Promissory Note of RFC and GMAC Mortgage, dated Dec. 30, 2009 [ALLY_0066913].

[94] *See* Residential Capital, LLC, Current Report (Form 8-K) (June 3, 2008) (describing loan terms and noting "[u]nder the Facility, [AFI] has agreed to make revolving loans to RFC and GMAC Mortgage"); *see, e.g.,* UCC-1 Financing Statement, naming RFC as debtor and Wells Fargo Bank, N.A. as Collateral Control Agent, as the secured party [ALLY_0069179]; UCC-1 Financing Statement, naming GMAC Mortgage as debtor and Wells Fargo Bank, N.A. as Collateral Control Agent, as the secured party [ALLY_0069180]; UCC-1 Financing Statement, naming ResCap as debtor and Wells Fargo Bank, N.A. as Collateral Control Agent, as the secured party [ALLY_0069181]; *see also* UCC-3 Amendment filing, naming RFC as debtor and GMAC as the secured party [ALLY_0072614]; UCC-3 Amendment filing, naming GMAC Mortgage as debtor and GMAC as the secured party [ALLY_0072639]; UCC-3 Amendment filing, naming ResCap as debtor and GMAC as the secured party [ALLY_0072664].

[95] *See* Appendix V.E.3.c (discussing the maturity of the Secured Revolver Loan Agreement); Appendix V.E.3.j (discussing the maturity of the A&R Secured Revolver Loan Agreement).

[96] *See* Appendix V.E.3.k(1), (4), (5) (discussing extensions to the maturity date of the A&R Secured Revolver Facility).

change a court's conclusion that this factor is indicative of a loan.[97]
Moreover, the evidence reflects that ResCap made payments totaling
approximately $789.5 million under the Secured Revolver Loan Facility.[98]

(3) **The presence of an agreed rate of interest and interest payments:**
Interest on the Secured Revolver Facility Loans accrued at a rate of LIBOR
+ 2.75% per annum.[99] A specified, agreed upon rate of interest, whether
fixed or floating, is indicative of a loan.[100] The evidence reflects that
interest payments typically were made.[101]

(4) **The source of repayments:** The Secured Revolver Facility Loans were
required to be repaid from, among other things, net cash proceeds from
certain collateral dispositions. In addition, (1) the Secured Revolver Facility
was secured by the First Priority Collateral, and (2) the other Secured
Revolver Facility Guarantors guaranteed the obligations under the Secured
Revolver Facility pursuant to an unconditional guarantee that was in form
and substance typical for transactions of this nature. The existence of
multiple sources of repayment is indicative of a loan.

(5) **The security for the advances:** The Secured Revolver Facility was
secured by collateral, including all then unencumbered assets of the
Secured Revolver Facility Borrowers and Secured Revolver Facility

---

[97] *See Daewoo Motor Am., Inc. v. Daewoo Motor Co., Ltd. (In re Daewoo Motor Am., Inc.)*, 471 B.R. 721, 738-
39 (Bankr. C.D. Cal. 2012) ("Forbearance until a debtor's cash flow improves may be good judgment to keep
a loan out of bankruptcy court, and that is all to be concluded from [the creditor]'s forbearance for a time in
connection with [Debtor]'s debt . . . . If such forbearance could retroactively convert a good loan to equity,
that would indeed validate the saying that 'no good deed goes unpunished.'").

[98] *See* Residential Capital, LLC Consolidated Financial Statements for the Years Ended December 31, 2009 and
2008, dated Feb. 26, 2010, at 42 [EXAM00124455]; Residential Capital, LLC Consolidated Financial
Statements for the Years Ended December 31, 2011 and 2010, Mar. 28, 2012, at 38 [EXAM00122651].

[99] *See* Appendix V.E.3.c.

[100] *See, e.g., Official Comm. of Unsecured Creditors v. Highland Capital Mgmt. L.P. (In re Moll Indus., Inc.)*,
454 B.R. 574, 582 (Bankr. Del. 2011) (concluding that interest payable periodically at fluctuating rates are
typical in the market and would be "insufficient to support a recharacterization claim"); *Bayer Corp. v.
MascoTech, Inc.* (*In re AutoStyle Plastics, Inc.*), 269 F.3d 726, 750 (6th Cir. 2001) (concluding that 2% over
the prime rate was a fixed interest rate); *see also In re Daewoo Motor Am., Inc.*, 471 B.R. at 738–39 (Bankr.
C.D. Cal. 2012) (noting that bankruptcy court did not err in finding this factor weighs "strongly against
recharacterization" where rate of interest was generally LIBOR plus 6%).

[101] Although ResCap did not provide monthly interest payment information, ResCap confirmed to the
Examiner's Professionals that payments were made on account of interest expense. As such, interest expense
reported at each year end was assumed to be equivalent to interest payments for the year. Interest payments
for 2012 were based on interest expense and unpaid interest information provided by ResCap for that year.

Guarantors, including, among other assets, accounts, chattel paper, commercial tort claims, certain deposit and securities accounts, intellectual property, investment property, specific pledged shares and equity interests and specific pledged promissory notes.[102] The presence of such security is generally indicative of a loan.

(6) **The corporation's ability to obtain financing elsewhere**: It appears that financing for at least a portion of the advances provided by AFI was available elsewhere. The original structure of the facilities, as described in the minutes of a ResCap Board meeting, contemplated a $1.75 billion two-year first lien facility to be provided by ResCap's existing bank lenders, led by JP Morgan and Citibank.[103] In addition, AFI would provide ResCap with a new $1.75 billion term loan that would be secured on a second lien basis and would rank pari passu with the liens securing the proposed Senior Secured Notes. During the April 18, 2008 ResCap Board meeting,[104] Ramsey stated that AFI's management was considering a change in the structure for the credit facility, whereby AFI would replace the bank syndicate and provide the entire $3.5 billion facility and all of AFI's exposure thereunder would be secured by a first priority lien position in the collateral ahead of the proposed Senior Secured Notes and the Junior Secured Notes.[105] Such a structure would be "less complex and would allow ResCap to liquidate assets and repay the loan in a more attractive manner."[106] At a subsequent meeting of the ResCap Board held on April 20, 2008 it was reported that the new $3.5 billion credit facility would in fact be provided solely by AFI.[107] The partial availability of alternative financing provides some additional support for the conclusion that the Secured Revolver Facility should be treated as a loan.[108]

---

[102] *See* Appendix V.E.3.g.

[103] Minutes of a Special Meeting of the Board of Directors of ResCap, Apr. 18, 2008, at RC40005719–22 [RC40005652].

[104] *Id*.

[105] *Id*.

[106] *Id.*; *see* Int. of L. Hall, Nov. 29, 2012, at 130:3–130:5 ("[I]t made a lot more sense for GMAC to do the entire facility, which gave more flexibility to ResCap, better pricing, better terms . . . .").

[107] Minutes of a Special Meeting of the Board of Directors of ResCap, Apr. 20, 2008, at RC40005723–25 [RC40005652].

[108] Daniel Ammann and Jon Pruzan, representatives from Morgan Stanley, compared the facility being proposed by AFI (the Secured Revolver Facility), to a facility being proposed by the banks, stating that "the fees and advance rates between the two were similar; that [AFI] was willing to provide a full $3.5 billion, whereas the bank syndicate had offered only $1.75 billion; that the [AFI] covenant structure was more favorable to [ResCap] than that proposed by the bank syndicate." Ammann and Pruzan concluded ResCap would not have been able at the time to obtain a comparable secured facility in the market absent AFI's willingness to provide it. *See* Minutes of a Meeting of the Board of Residential Capital, LLC, June 1, 2008, at RC40005753 [RC40005652].

(7) **The extent to which the advances were subordinated**: Under the terms of the Intercreditor Agreement,[109] liens securing the Secured Revolver Facility and the AFI Hedge Agreements were senior and prior to the liens securing the Senior Secured Notes and the Junior Secured Notes. The lack of subordination is indicative of a loan.

(8) **The extent to which the advances were used to acquire capital assets**: The proceeds from the loans under the Secured Revolver Loan Facility were to be used to repay existing indebtedness of ResCap and for working capital purposes.[110] The Secured Revolver Facility was fully drawn in the amount of $3.5 billion as of June 6, 2008, with the proceeds having been used to exchange direct unsecured ResCap obligations owed to unaffiliated third parties (represented by the JPMorgan 2005 Term Loan Facility that was assigned and repaid and by the ResCap bonds tendered and/or exchanged) for direct secured obligations of the Secured Revolver Facility Borrowers owed to AFI.[111]

Based on the foregoing, the Examiner concludes that it is unlikely that an effort to recharacterize the AFI Secured Revolver Facility Claim would prevail.

8. *Analysis Of The AFI Line Of Credit Agreement Claim*

a. *The Line Of Credit Facilities And The A&R Line Of Credit Facility*

As described in greater detail in Section V.E.5, the Initial Line of Credit Facility (a precursor to the A&R Line of Credit Facility) was initially placed in 2008 and as described in greater detail in Section V.E.7, the Second Line of Credit Facility (the other precursor to the A&R Line of Credit Facility) was entered into on June 1, 2009. The A&R Line of Credit Agreement was executed at year-end 2009 to combine the Line of Credit Facilities, which at the time had borrowing limits of $430 million on the Initial Line of Credit Facility and $670 million on the Second Line of Credit Facility, respectively.[112]

AFI initially committed to make the A&R Line of Credit Loans to the A&R Line of Credit Borrowers, up to the lesser of (i) $1.1 billion and (ii) the then existing borrowing base reduced to the extent there was hedging exposure in favor of AFI.[113] At closing, the aggregate principal amount of A&R Line of Credit Loans outstanding totaled $949.4 million. The

---

[109] Intercreditor Agreement, dated June 6, 2008 [ALLY_0229287].

[110] GMAC LLC, Current Report (Form 8-K) (June 4, 2008), at 6.

[111] *See* Section V.E.3.

[112] *See* Appendix V.E.5.a (showing commitment amount of the Initial Line of Credit Facility); Appendix V.E.7.h.(10) (amendment to the Second Line of Credit Facility).

[113] *See* Appendix V.E.8.b.

borrowing base was determined by calculating the aggregate "value" of the A&R Line of Credit Collateral, which, as set forth in Table V.E.8.b, was subject to a discount factor that varied depending on the type of asset.

The Investigation has not revealed any evidence indicating that AFI (or, for that matter, ResCap) ever intended, considered, or treated the Initial Line of Credit Loans, the Second Line of Credit Loans, or the A&R Line of Credit Loans as anything other than genuine loans, which ResCap was obligated to repay in accordance with the loans' terms.[114] To the contrary, the evidence reflects that the parties always treated the advances made as loans. The evidence revealed during the course of the Investigation reflects that AFI made the loans under the Line of Credit Facilities and the A&R Line of Credit Facility for legitimate purposes, including to assist ResCap address liquidity concerns and comply with TNW covenants.[115] And repayment was expected—if necessary, by liquidating collateral. Indeed, the Initial Line of Credit Loans, the Second Line of Credit Loans, and the A&R Line of Credit Loans were secured by liens on certain collateral.[116] ResCap made regular payments under the Line of Credit Facilities and the A&R Line of Credit Facility.[117] Indeed, in 2011, ResCap made net payments of $388 million under the A&R Line of Credit Facility.[118]

Based on the foregoing, the Examiner concludes that when AFI and ResCap entered into the Line of Credit Facilities and the A&R Line of Credit Facility, the parties intended the advances thereunder to be loans with AFI expecting in good faith the repayment of the advances in accordance with the terms of the underlying agreements.

---

[114] The A&R Line of Credit Facility was formally documented and approved by the ResCap Board, including the Independent Directors. *See* Action by Written Consent of the Board of Directors of Residential Capital, LLC, dated Dec. 29, 2009 [ALLY_0072506] (approving A&R Line of Credit).

[115] See Section V.E.5 (describing the Initial Line of Credit Facility) and Section V.E.8 (describing the A&R Line of Credit Facility).

[116] *See* Appendix V.E.5.(g) (discussing Initial Line of Credit Loans); Appendix V.E.7.(g) (discussing Second Line of Credit Loans); Appendix V.E.8.(g) (discussing A&R Line of Credit Loans).

[117] See Ally Financial Inc. Summary of Intercompany Balances with ResCap, dated Sept. 25, 2012, at ALLY_0182799–824 [ALLY_0182793].

[118] Ally Financial Inc. Summary of Intercompany Balances with ResCap, dated Sept. 25, 2012, at ALLY_0182811–819 [ALLY_0182793].

   b.  *An Examination Of AFI Line Of Credit Agreement Claim Under The Autostyle
        Factors*

The following *Autostyle* factors are indicative of the AFI Line of Credit being a loan:

   (1) **The names given to, and terms of, the instruments**: The AFI
        Credit Agreement Claim refers to Claims arising under, derived from, or
        based upon the A&R Line of Credit Agreement, the A&R Initial Line of
        Credit Security Agreement, and the A&R Second Line of Credit Security
        Agreement. The names of the underlying documents reflect that the
        transactions were intended to be loans and not equity contributions.[119]
        Promissory notes were executed and delivered in connection with the
        closing of the A&R Line of Credit Facility.[120] In addition, as noted in
        Sections V.E.5, 7 and 8, the Initial Line of Credit Agreement, the Second
        Line of Credit Agreement and the A&R Line of Credit Agreement
        contained representations and warranties, covenants, events of default and
        indemnification provisions that were standard for facilities of comparable
        size and nature (and would have been typical for a syndicated credit facility
        with unaffiliated lenders). Moreover, the Line of Credit Facilities and the
        A&R Line of Credit Facility were publicly described as loans in UCC
        financing statements.[121] The Line of Credit Facilities were described as
        loans in SEC filings[122] and the A&R Line of Credit Facility was reported in
        ResCap's financial statements.[123]

   (2) **The presence of a fixed maturity date and schedule of payments**: Each of
        the Initial Line of Credit Agreement, the Second Line of Credit Agreement
        and the A&R Line of Credit Agreement had a stated maturity date at closing,
        which is typical of third-party financings negotiated at arm's length.[124]
        Although extended, the maturity date was not allowed to lapse.[125]

---

[119] The A&R Line of Credit Agreement is defined as "the Amended and Restated Loan Agreement, dated as of
December 30, 2009 (as amended, supplemented, or otherwise modified), by and among . . . ."

[120] *See* Amended and Restated Note of RFC and GMAC Mortgage, dated Dec. 30, 2009 [ALLY_0071281].

[121] *See, e.g.,* UCC-1 Financing Statement, naming RFC as debtor and the First Priority Collateral Agent as the
secured party [ALLY_0045675]; UCC-1 Financing Statement, naming GMAC Mortgage as debtor and the
First Priority Collateral Agent as the secured party [ALLY_0045685]; UCC-1 Financing Statement, naming
ResCap as debtor and the First Priority Collateral Agent as the secured party [ALLY_0045692].

[122] Residential Capital, LLC, Current Report (Form 10-K) (Feb. 27, 2009), at 89; Residential Capital, LLC,
Current Report (Form 10-Q) (May 11, 2009), at 24; Residential Capital, LLC, Current Report (Form 10-Q)
(Aug 7, 2009), at 65.

[123] Residential Capital, LLC, Consolidated Financial Statements for the Years Ended December 31, 2010 and
2009 (Feb. 28, 2011) [GOLDIN00006898].

[124] *See* Appendix V.E.5.a (discussing Initial Line of Credit Facility); Appendix V.E.7.a (discussing Second Line
of Credit Facility); V.E.8.a (discussing A&R Line of Credit Facility).

[125] *See* Appendix V.E.5.h.(2), (3), (4), (10), (11), (13), (16) (discussing amendments to Initial Line of Credit);
Appendix V.E.7.h(2), (3), (5), (8) (discussing amendment to Second Line of Credit); Appendix V.E.7.h.(1),
(5), (7) (discussing amendments to the A&R Line of Credit Facility).

Moreover, the evidence reflects that the parties' performance under the Line of Credit Facilities and the A&R Line of Credit Facility is indicative of a loan. Indeed, in 2011, ResCap repaid approximately $388 million of the advances made under the A&R Line of Credit Agreement.[126] Thereafter, on two separate occasions, AFI forgave indebtedness totaling $305.9 million under the A&R Line of Credit Facility, consisting of (1) $109.4 million in December 2011, and (2) $196.5 million on January 31, 2012.[127] One might argue that advances made subsequent to the debt forgiveness by AFI should be recharacterized as equity because of AFI's apparent willingness to forgive debt to enable ResCap to remain in compliance with TNW covenants. The extension of credit juxtaposed with contemporaneous debt forgiveness reflects a conflict that may signal a lack of confidence in repayment, thereby suggesting that the advance is an equity contribution in disguise. That argument is not particularly persuasive here because at the time AFI had no reason to suspect that its secured claim under the A&R Line of Credit Facility was less than fully secured.[128]

(3) **The presence of an agreed rate of interest and interest payments**: Interest on the A&R Line of Credit Loans accrued at a rate of LIBOR + 2.75% per annum.[129] A specified, agreed upon rate of interest, whether fixed or floating, is indicative of a loan. The evidence reflects that interest payments typically were made.[130]

(4) **The source of repayments**: The A&R Line of Credit Loans were supposed to be repaid by, among other things, the Liquidity Excess Amount (as defined in the A&R Line of Credit Agreement), which was a function of unencumbered cash available to ResCap. In addition, (1) the A&R Line of Credit Facility was secured by certain liens under the A&R Line of Credit

---

[126] *See* Ally Financial Inc. Summary of Intercompany Balances with ResCap, ALLY_0182811–819 [ALLY_0182793].

[127] *See* Residential Capital, LLC Consolidated Financial Statements for the Years Ended December 31, 2011 and 2010, at EXAM00122689 [EXAM00122651]. The $196.5 million was forgiven in accordance with the terms of the January 30 Letter Agreement, pursuant to which AFI agreed to provide capital support to ResCap and GMAC Mortgage so that ResCap would meet its obligations under the FRB Order and the DOJ/State AG Settlement. Terms of Support Relating to Possible DOJ/State Attorneys' General Settlement, dated Jan. 30, 2012 [ALLY_0182747].

[128] *See Official Comm. of unsecured creditors V. Highland Capital Mgmt. L.P. (In re Moll Indus., Inc.)*, 454 B.R. 574, 583–84 (Bankr. D. Del. 2011) (citation omitted) (noting that "it is legitimate for [a pre-existing] lender to take actions to protect its existing loans, including extending additional credit or granting forbearance"); *see also In re Randor Holdings Corp.*, 353 B.R. 820, 839 (Bankr. D. Del. 2006) (citation omitted).

[129] *See* Appendix V.E.8.c.

[130] Although ResCap did not provide monthly interest payment information, ResCap confirmed to the Examiner's Professionals that payments were made on account of interest expense. As such, interest expense reported at each year end was assumed to be equivalent to interest payments for the year. Interest payments for 2012 were based on interest expense and unpaid interest information provided by ResCap for that year.

Security Agreement, and (2) ResCap and the other A&R Line of Credit Guarantors guaranteed the obligations under the A&R Line of Credit Agreement pursuant to an unconditional guarantee that was in form and substance typical for transactions of this nature. The existence of multiple sources of repayment is indicative of a loan.

(5) **The security for the advances:** Pursuant to the A&R Line of Credit Security Agreement, the A&R Line of Credit Borrowers and the A&R Line of Credit Guarantors granted a security interest in favor of AFI, as lender agent, to secure the obligations owed under the A&R Line of Credit Agreement. The presence of such security is generally indicative of a loan.

(6) **The extent to which the advances were subordinated**: Under the A&R Line of Credit Agreement, the advances were not subordinated and the obligations thereunder were secured by the A&R Line of Credit Security Agreement. The lack of subordination is indicative of a loan.

(7) **The extent to which the advances were used to acquire capital assets**: The proceeds from the A&R Line of Credit Loans were used to meet operating needs, which further supports a finding of a loan.

Based on the foregoing, the Examiner concludes that it is unlikely that an effort to recharacterize the AFI Line of Credit Agreement Claims would prevail.

*9. Recharacterization Of The Unsecured Notes And Senior Secured Notes*

In connection with the 2008 and 2009 Bank Transactions, AFI exchanged Unsecured Notes and Senior Secured Notes in the face amount of $2.4 billion for ResCap Preferred Interests and ResCap's IB Finance Class M Shares.[131] Wilmington Trust has asserted that ResCap's indebtedness evidenced by the Unsecured Notes and Senior Secured Notes should be recharacterized as equity because AFI had no expectation of repayment at the time of their acquisition in the open market.[132] AFI has not asserted a claim for such debt by filing a proof of claim or otherwise because the indebtedness was exchanged for ResCap Preferred Interests and IB Finance Class M Shares in the 2008 Bank Transaction and the 2009 Bank Transaction, respectively, and retired.[133] If the Unsecured Notes and Senior Secured Notes are retroactively

---

[131] *See* Section VI.A.2 (discussing the 2008 Bank Transaction); Section VI.A.3 (discussing the 2009 Bank Transaction).

[132] Reply in Further Support of Wilmington Trust, National Association's Submission to Arthur J. Gonzalez dated Mar. 8, 2013, 42–43.

[133] Similarly, AFI has not asserted a claim for any debt under the MSR Facility given that all of such debt was forgiven prior to the Petition Date. The Investigation has not disclosed any evidence that suggests that the MSR Facility should be recharacterized as debt. *See* Section V.E.2 (discussing the MSR Facility).

recharacterized as equity, their transfer by AFI to ResCap as consideration for the 2008 Bank
Transaction and the 2009 Bank Transaction would not have provided reasonably equivalent
value and accordingly those transactions may be subject to avoidance on constructive
fraudulent transfer grounds.

There is a split of authority in this District as to whether a claim for which a proof of
claim has not been filed may be recharacterized. According to the court's decision in *In re BH
S& B Holdings LLC,* a proof of claim is a prerequisite to recharacterization.[134] According to
the Court, "[a]s a threshold matter . . . recharacterization require[s] filing a proof of claim: '[i]f
a creditor has not filed a claim, there is nothing to subordinate nor any case or controversy to
resolve.'"[135] The court therefore concluded that recharacterization claims could not be
sustained against the entities that had not filed proofs of claim where the bar date had
passed.[136]

In the chapter 11 case of *Musicland Holding Corp.*, the court was presented with a
complaint against Best Buy Co., Inc. alleging that the financing it provided to Musicland
Holding Corp. was nothing "more than window dressing to cover the return of Best Buy's
equity."[137] Indeed, Best Buy "had never imposed any repayment terms" until well after the
funds had been advanced. Rather than contesting the allegations, Best Buy argued that the
recharacterization claim should be dismissed because the purported loans had been repaid
prior to Musicland's chapter 11 case and Best Buy had not filed a claim. The court, however,
disagreed and noted that "[t]he recharacterization claim, in this regard, is essentially one to

---

[134] *Official Comm. of Unsecured Creditors v. Bay Harbour Master Ltd.* (*In re BH S&B Holdings LLC*), 420 B.R.
112, 154 (Bankr. S.D.N.Y. 2009) *aff'd as modified*, 807 F. Supp. 2d 199 (S.D.N.Y. 2011). In this decision,
United States Bankruptcy Judge Martin Glenn held that "recharacterization require[s] filing a proof of claim."
*Id*; *see Togut v. RBC Dain Correspondent Servs. (In re S.W. Bach & Co.)*, 425 B.R. 78, 85 n.5 (Bankr.
S.D.N.Y. 2010) (Judge Glenn notes that "recharacterization require[s] filing a proof of claim"); *see also Gold
v. Winget (In re NM Holdings Co., LLC)*, 407 B.R. 232, 289 (Bankr. E.D. Mich. 2009) (concluding that absent
a proof of claim, "there is no debt to recharacterize").

[135] *In re BH S&B Holdings LLC*, 420 B.R. at 154. (citations omitted).

[136] *In re BH S&B Holdings LLC*), 420 B.R. at 154 ("[The parties had not] filed proofs of claim here and the bar
date has long since passed. Claims for equitable subordination or recharacterization cannot be sustained
against them.").

[137] *Responsible Person v. Best Buy Co., Inc. (In re Musicland Holding Corp.)*, 398 B.R. 761, 775 (Bankr.
S.D.N.Y. 2008). The *Musicland* decision was issued by United States Bankruptcy Judge Stuart M. Bernstein.
*See also Miller v. Dow (In re Lexington Oil & Gas Ltd.)*, 423 B.R. 353, 378 (Bankr. E.D. Okla. 2010)
(recharacterizing secured debt that was fully satisfied prepetition as equity and avoiding payments made on
account of the recharacterized debt as constructive fraudulent transfers).

declare Debt Instruments void, and is integral to the fraudulent transfer claims."[138] Thus, a court may conclude that it has the authority to recharacterize a claim that was paid prior to a bankruptcy filing.[139] The Examiner, however, need not decide whether a court may retroactively recharacterize a claim for which a proof of claim has not been filed.

At the time of their issuance, the Unsecured Notes and Senior Secured Notes were undeniably debt. Indeed, no party in interest has contested that fact. Instead, Wilmington Trust has argued that certain Unsecured Notes and Senior Secured Notes somehow transformed into equity upon their acquisition by AFI, because AFI, allegedly, at that time had no expectation of repayment. Such a result would be inconsistent with a recharacterization analysis, which examines debt at the time of its issuance.[140] Moreover, the Examiner has not found any instance in which a court has recharacterized validly-issued debt upon its acquisition by an insider. Accordingly, the Examiner believes that there is no basis to recharacterize the Unsecured Notes and the Senior Secured Notes used by AFI as consideration in connection with the 2008 Bank Transaction and the 2009 Bank Transaction.

### 10. Summary Of Examiner's Conclusions

For the reasons set forth above, the Examiner concludes that it is unlikely that an attempt to recharacterize the A&R Secured Loan Revolver Claim and the AFI Line of Credit Agreement Claim reflected in AFI's proofs of claim would prevail. In addition, the Examiner concludes that it is unlikely that an attempt to retroactively recharacterize the debt reflected in the Unsecured Notes and Senior Secured Notes held by AFI as equity would prevail.

---

[138] *In re Musicland Holding Corp.*, 398 B.R. at 775.

[139] The court in *Musicland* did not recharacterize Best Buy's claim. Instead, the court denied a motion to dismiss the claim holding that the claim should "be read as a claim to avoid the Debt Instruments as fraudulent obligations under the *fraudulent transfer laws*." *Id.* at 775 (emphasis added). "Viewing the [recharacterization claim] in this light, it states a right to relief under the fraudulent transfer laws . . . ." *Id*.

[140] *See Rockville Orthopedic & Sports Assocs., P.C. v. Kort* (*In re Rockville Orthopedic Assocs., P.C.*), 377 B.R. 438, 444 (Bankr. D. Conn. 2007) (noting "expectation of repayment is relevant to the nature of the transaction only at the time of the transaction").