## VII. REVIEW AND ANALYSIS OF ESTATE CAUSES OF ACTION IMPLICATED BY AFFILIATE TRANSACTIONS AND THE RELATIONSHIP AND COURSE OF DEALING AMONG RESCAP, AFI, ALLY BANK, AND CERBERUS

## C.  EQUITABLE SUBORDINATION

The Creditors' Committee and Wilmington Trust assert that all claims held by AFI against ResCap, including AFI's claims under the A&R Secured Revolver Loan Agreement ($747,127,553.38) and the A&R Line of Credit Agreement ($380,000,000), should be equitably subordinated to other allowed claims in the Chapter 11 Cases.[1] As set forth in the Examiner's Work Plan the Examiner has reviewed the merits of these assertions.

Section 510(c) of the Bankruptcy Code provides that a court may:

> (1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or
>
> (2) order that any lien securing such a subordinated claim be transferred to the estate.[2]

Through equitable subordination, a claim may be subordinated or relegated to the "bottom rung of claims," or it may be dropped below the claims of those creditors injured by the conduct of the holder of the claim to be subordinated.[3] Equitable subordination is a "drastic and unusual remedy," which should be applied in limited circumstances.[4] "As a threshold matter, equitable subordination . . . require[s] filing a proof of claim: '[i]f a creditor has not filed a claim, there is nothing to subordinate nor any case or controversy to resolve.'"[5]

### 1.  Factors To Determine Whether Equitable Subordination Is Appropriate

In determining whether the equitable subordination of a claim or interest is appropriate, courts, including those in the Southern District of New York, have uniformly applied the three-pronged test set

---

[1]  *See* Creditors' Committee Submission Paper, dated Mar. 7, 2013, at 120–21; Wilmington Trust Reply Submission Paper, dated Mar. 8, 2013, at 52–53; Wilmington Trust Submission Paper, dated Oct. 24, 2012, at 44–46.

[2]  11 U.S.C. § 510(c).

[3]  5 COLLIER ON BANKRUPTCY ¶ 510.05[1] (Alan N. Resnick & Henry J. Sommer eds., 16th ed.). "The plain language and legislative history of § 510(c) indicate that a claim may be subordinated to another claim and an interest may be subordinated to another interest under court-developed principles of equitable subordination." *Adelphia Recovery Trust v. Bank of Am.*, 390 B.R. 80, 98–99 (S.D.N.Y. 2008) adhered to on reconsideration, 05 CIV. 9050 (LMM), 2008 WL 1959542 (S.D.N.Y. May 5, 2008).

[4]  *Springfield Assocs., L.L.C. v. Enron Corp* (*In re Enron Corp.*), 379 B.R. 425, 434 (S.D.N.Y. 2007) (citations omitted); *see In re Featherworks Corp.*, 25 B.R. 634, 649 (Bankr. E.D.N.Y. 1982) ("Equitable subordination is a harsh remedy.").

[5]  *Official Comm. of Unsecured Creditors v. Bay Harbour Master Ltd.* (*In re BH S& B Holdings LLC*), 420 B.R. 112, 154 (Bankr. S.D.N.Y. 2009) (citations omitted), *aff'd as modified*, 807 F. Supp. 2d 199 (S.D.N.Y. 2011); *see O'Connell v. Arthur Andersen LLP* (*In re AlphaStar Ins. Group Ltd.*), 383 B.R. 231, 276 (Bankr. S.D.N.Y. 2008) ("If a creditor has not filed a claim, there is nothing to subordinate nor any case or controversy to resolve.").

forth in *Benjamin v. Diamond* (*In re Mobile Steel Corp.*).[6] In that case, the Fifth Circuit held that a court may equitably subordinate a claim when: (1) the claimant engaged in some type of inequitable conduct; (2) the misconduct resulted in injury to other creditors or conferred an unfair advantage on the claimant; and (3) equitable subordination is consistent with bankruptcy law.[7]

### a. Inequitable Conduct

A court will not equitably subordinate a claim in the absence of inequitable conduct.[8] An inequitable result, by itself, will not justify equitable subordination.[9]

Inequitable conduct is a "very slippery concept with little predictive value," making it a difficult prong to apply.[10] General descriptions of inequitable conduct have included everything from unlawful acts, such as fraudulent conduct, to lawful conduct that "shocks one's good conscience."[11] Notably, the inequitable conduct warranting subordination does not need to be related to the acquisition or assertion of the claim:[12]

---

[6] 563 F.2d 692 (5th Cir. 1977); *see Adelphia Commc'ns Corp. v. Bank of Am., N.A.* (*In re Adelphia Commc'ns Corp.*), 365 B.R. 24, 68 (Bankr. S.D.N.Y. 2007) ("Courts in this district, and elsewhere, regularly apply the standards set forth in the Fifth Circuit's decision in *Mobile Steel,* even though *Mobile Steel,* like *Pepper,* was a case under the former Act.") (footnote omitted), *aff'd in part sub nom. Adelphia Recovery Trust,* 390 B.R. 64; *see also In re BH S&B Holdings,* 420 B.R. at 155 (noting that "courts look to the three factors set out by the Fifth Circuit in *[Mobile Steel]*").

[7] *In re Mobile Steel,* 563 F.2d at 700 (cited with approval in *United States v. Noland,* 517 U.S. 535, 538 (1996)); *see Merrimac Paper Co. v. Harrison* (*In re Merrimac Paper Co. Inc.*), 420 F.3d 53, 59 (1st Cir. 2005); *Official Comm. of Unsecured Creditors v. Austin Fin. Serv., Inc.* (*In re KDI Holdings, Inc.*), 277 B.R. 493, 508–09 (Bankr. S.D.N.Y. 1999); *80 Nassau Assocs. v. Crossland Fed. Sav. Bank (In re 80 Nassau Assocs.)*, 169 B.R. 832, 837 (Bankr. S.D.N.Y. 1994); *see also Schubert v. Lucent Techs. Inc.* (*In re Winstar Commc'ns, Inc.*), 554 F.3d 382, 411 (3d Cir. 2009); *Wooley v. Faulkner* (*In re SI Restructuring, Inc.*), 532 F.3d 355, 360 (5th Cir. 2008); *In re Kreisler,* 546 F.3d 863, 866 (7th Cir. 2008); *In re Enron Corp.,* 379 B.R. at 433 ("Even after the enactment of section 510(c), the vast majority of courts have continued *to* apply the *Mobile Steel* test.").

[8] *See* Richard C. Solow, *The Very Limited No-Fault Equitable Subordination Theory: Why Section 510(c) Requires Misconduct in Nearly All Cases,* 22 NORTON J. OF BANKR. L. AND PRACT. 101, 122 (2013) (noting that, other than cases involving punitive claims, "not a single decision has applied no-fault subordination before or after the 1978 Bankruptcy Code was enacted"); *see also In re 80 Nassau Assocs.,* 169 B.R. at 837 ("Equitable subordination requires proof of 'inequitable conduct.'").

[9] *See Official Comm. of Unsecured Creditors v. Blomen* (*In re Hydrogen, L.L.C.*), 431 B.R. 337, 362 (Bankr. S.D.N.Y. 2010) (noting that a court will analyze the second prong only if inequitable conduct is demonstrated).

[10] *In re 80 Nassau Assocs.*, 169 B.R. at 837.

[11] *In re Adelphia Commc'ns Corp.,* 365 B.R. at 68; *see also In re Ticketplanet.com,* 313 B.R. 46, 65 (Bankr. S.D.N.Y. 2004); *Picard v. Katz,* 462 B.R. 447, 456 (S.D.N.Y. 2007); *In re Enron,* 379 B.R. at 433 n.39; *In re Adler, Coleman Clearing Corp.,* 277 B.R. 520, 563 (Bankr. S.D.N.Y. 2002).

[12] *See In re KDI Holdings, Inc.,* 277 B.R. at 509; *Anaconda-Ericsson, Inc. v. Hessen* (*In re Teletronics Servs., Inc.*), 29 B.R. 139, 168 (Bankr. E.D.N.Y. 1983); *In re Mobile Steel,* 563 F.2d at 700–01; *see also Enron Corp. v. Avenue Special Situations Fund II, LP* (*In re Enron Corp.*), 333 B.R. 205, 210 (Bankr. S.D.N.Y. 2005) (noting that "equitable subordination can apply to claims unrelated to any inequitable conduct held by the claimant alleged to have engaged in that conduct, limited by the amount of damages stemming from the inequitable conduct that is not otherwise compensated to that class"), *leave to appeal granted,* 2006 WL 2548592 (S.D.N.Y. 2008).

> The inequity which will entitle a bankruptcy court to regulate the distribution to a creditor, by subordination or other equitable means, need not therefore be specifically related to the creditor's claim, either in its origin or its acquisition, but it may equally arise out of any unfair act on the part of the creditor, which affects the bankruptcy results to other creditors and so makes it inequitable that he should assert a parity with them in the distribution of the estate.[13]

In considering whether the claimant engaged in inequitable conduct, courts will often first determine whether the claimant is an "insider" of the debtor. The legislative history of section 101(31) of the Bankruptcy Code—which defines "insiders"—states that the "term applies to 'one who has a sufficiently close relationship with the debtor that his conduct is made subject to closer scrutiny than those dealing at arm's length with the debtor.'"[14] Courts uniformly hold that the insider definition must be flexibly applied on a case-by-case basis.[15]

Insider status or control alone is not a sufficient basis for equitable subordination, but insiders are subject to a higher level of scrutiny than non-insiders due to the enhanced opportunities to adjust their position in a way that may prejudice other creditors.[16] "The reason that transactions of insiders will be

---

[13] *In re Adelphia Commc'ns Corp.*, 365 B.R. at 69 (quoting *In re 80 Nassau Assocs.*, 169 B.R. at 838), *Bank of Am. N.A.*, 390 B.R. 64 (S.D.N.Y. 2008), *adhered to on reconsideration*, 05 CIV. 9050 (LMM), 2008 WL 1959542 (S.D.N.Y. May 5, 2008).

[14] *In re KDI Holdings, Inc.*, 277 B.R. at 511 (quoting S. Rep. No. 989 (1978), as reprinted in 1978 U.S.C.C.A.N. 5785, 5810, 6269); *see In re Winstar Commc'ns, Inc.*, 554 F.3d at 396–97 (holding that "it is not necessary that a non-statutory insider have actual control; rather, the question 'is whether there is a close relationship [between debtor and creditor] and . . . anything other than closeness to suggest that any transactions were not conducted at arm's length'").

[15] *See Pan Am Corp. v. Delta Air Lines, Inc.*, 175 B.R. 438, 499 (S.D.N.Y. 1994) (noting that "courts have uniformly held that the Bankruptcy Code's definition is merely illustrative and that the term "insider" must be flexibly applied on a case-by-case basis"):

> In determining whether a creditor is an 'insider' of the debtor under this flexible approach, courts have considered a wide variety of factors, including whether the creditor: (i) received information from the debtor that was not available to other creditors, shareholders and the general public; (ii) attempted to influence decisions made by the debtor; (iii) selected new management for the debtor; (iv) had special access to the debtor's premises and personnel; (v) was the debtor's sole source of financial support; and (vi) generally acted as a joint venture or prospective partner with the debtor rather than an arms-length [sic] creditor.

*Id.* at 500 (citations omitted); *see also In re Adler, Coleman Clearing Corp.*, 277 B.R. 520, 564–65 (Bankr. S.D.N.Y. 2002) ("The Court is not limited to that list [set forth in the insider definition], and may consider whether one is an insider based on the totality of the circumstances.").

[16] *See Official Comm. of Unsecured Creditors v. Blomen* (*In re Hydrogen, L.L.C.*), 431 B.R. 337, 361 (Bankr. S.D.N.Y. 2010) ("The scrutiny for presence of inequitable conduct is more stringent with respect to creditors who are insiders of the debtor . . . ."); *Official Comm. of Unsecured Creditors v. Bay Harbour Master Ltd.* (*In re BH S&B Holdings LLC*), 420 B.R. 112, 156 (Bankr. S.D.N.Y. 2009) ("When the defendant is an insider, his conduct is subject to greater scrutiny."), *aff'd*, 807 F. Supp.2d 199 (S.D.N.Y. 2011); *In re AlphaStar Ins. Grp. Ltd.*, 383 B.R. 231, 276 (Bankr. S.D.N.Y. 2008) ("If the creditor is an insider, his conduct is subject to greater scrutiny.").

closely studied is because such parties usually have greater opportunities for such inequitable conduct, not because the relationship itself is somehow grounds for subordination."[17] This distinction between insider and non-insider is thus important because "the severity of misconduct required to be shown and the degree to which the court will scrutinize the claimant's actions toward the debtor or its creditors" depends on whether the creditor is an insider or non-insider.[18]

An insider's claim can be equitably subordinated if the insider breached a fiduciary duty or otherwise engaged in unfair conduct.[19] "Inequitable conduct by an insider may also include unjust enrichment caused by unconscionable, unjust, unfair, or foul conduct."[20] Courts have equitably subordinated insider claims in cases involving: "(1) fraud, illegality or breach of fiduciary duty, (2) undercapitalization, and (3) control or use of the debtor as an alter ego for the benefit of the claimant."[21] Undercapitalization alone, however, is generally insufficient to equitably subordinate an insider's claim.[22]

When addressing equitable subordination of a parent's claim, courts have concluded that the requisite inequitable conduct would include: "(i) . . . the 'looting' of [a subsidiary by its parent] during the period of [the subsidiary's] financial decline; (ii) the creation of false documentation for the purpose of improving the parent's position; and (iii) unjust double-dealing."[23] Use of a subsidiary as a mere

---

[17] *Blasblag v. Tarro (In re Hyperion Enters.)*, 158 B.R. 555, 563 (D.R.I. 1993) (citations omitted).

[18] *In re Teletronics Servs., Inc*., 29 B.R. at 169; *see In re Hyperion*, 158 B.R. 555, 563 (D.R.I. 1993) ("Insider status goes only to determining the standard under which the creditor's conduct is reviewed.").

[19] *See In re Hydrogen, L.L.C.*, 431 B.R. at 361 (noting that "a breach of fiduciary duty or even mere engagement in conduct that is "somehow unfair" on the part of the insider may constitute inequitable conduct"); *see also Liberty Mut. Ins. Co. v. Lerory Holding Co., Inc.*, 226 B.R. 746, 755 (N.D.N.Y. 1998) ("This closer scrutiny means that an insider's claim will be subordinated if it is proven that the insider either breached a fiduciary duty or engaged in conduct that is somehow unfair.").

[20] *Liberty Mut. Ins. Co.,* 226 B.R. at 755 (citation omitted).

[21] *In re KDI Holdings, Inc*., 277 B.R. at 511 (holding that committee's claims of creditor self-dealing and impermissible leveraging of debtor's assets were sufficient to allow court to find that creditor had control of debtor and creditor's contingent secured claims should be equitably subordinated to claims of general unsecured creditors) (citing *In re 80 Nassau Assocs*., 169 B.R. at 837)); *see Nisselson v. Ford Motor Co*. (*In re Monahan Ford Corp.*), 340 B.R. 1, 45 (Bankr. E.D.N.Y 2006).

[22] *See In re Hydrogen, L.L.C.*, 431 B.R. at 362; *see also In re Herby's Foods, Inc.*, 2 F.3d 128, 132 (5th Cir. 1993). Capitalization is generally measured at the time of a company's formation. *See Le Café Creme, Ltd. v. Xavier Le Roux* (*In re Le Café Creme, Ltd.*), 244 B.R. 221, 235–36 (Bankr. S.D.N.Y. 2000). "Proof of subsequent undercapitalization may be further proof of inequitable conduct, such as actions of gross mismanagement, self interest, and the like." *Id*. (citations omitted).

[23] *Official Comm. of Unsecured Creditors v. Verestar, Inc.* (*In re Verestar, Inc.*), 343 B.R. 444, 461 (Bankr. S.D.N.Y. 2006).

instrumentality may also give rise to equitable subordination claims.[24] Domination of a subsidiary alone will not automatically result in the equitable subordination of a parent's claim.[25] Domination and exploitation of a subsidiary for the benefit of the parent may, however, lead to the equitable subordination of a parent's claim.[26] In addition, management of the subsidiary solely for the benefit of the parent's interests (and not for the benefit of the interests of the subsidiary's other creditors) may lead to the equitable subordination of the parent's claim, and "proof of fraud or illegality is not necessary" in such a situation.[27]

The insider and non-insider distinction is also important because, if a creditor is an insider, "once the proponent provides a substantial basis to support the charge of unfairness, the burden shifts to the insider to show the fairness of his claim."[28]

_____

[24] *See N.Y. Trust Co. v. Island Oil & Transport Corp.*, 56 F.2d 580, 584 (2d Cir. 1932) ("If a subsidiary is a mere instrumentality and its business is really that of the parent company, a loan by the parent to the subsidiary will be subordinated to the claims of creditors of the subsidiary."); *see also In re Otsego Waxed Paper Co.*, 14 F. Supp. 15, 16 (W.D. Mich. 1935) ("The applicable principle is that, where a corporation is so organized and controlled as to make it a mere instrumentality or adjunct of another, and the subsidiary becomes bankrupt, the parent corporation cannot have its claim paid until all other claims are first satisfied.").

[25] "[E]ven total control of a debtor's affairs does not necessarily lead to equitable subordination; debts owed stockholders and directors are not automatically denied equality of distribution." *In re Featherworks*, 25 B.R. 634, 648 (Bankr. E.D. N.Y. 1982) (citations omitted); *see Liberty Mut. Ins. Co.,* 226 B.R. at 756 (noting that, while parent dominated subsidiary, there was no showing of wrongful conduct); *see also In re All Prods.Co*., 32 B.R. 811, 816 (Bankr. E.D. Mich. 1983) ("Domination of a subsidiary by a parent standing alone is not sufficient to invoke the doctrine.").

[26] *See Pepper v. Litton*, 308 U.S. 295, 308–310 (1939). In *Pepper*, the Supreme Court noted that equitable subordination would be appropriate where there is a "history of spoliation, mismanagement, and faithless stewardship of the affairs of the subsidiary by [the parent] to the detriment of the public investors." *Id.* The Supreme Court gave further examples where equitable subordination or disallowance would be appropriate:

> It is reached where the claim asserted is void or voidable because the vote of the interested director or stockholder helped bring it into being or where the history of the corporation shows dominancy and exploitation on the part of the claimant. It is also reached where on the facts the bankrupt has been used merely as a corporate pocket of the dominant stockholder, who, with disregard of the substance or form of corporate management, has treated its affairs as his own.

*Id.* at 309 (footnotes omitted) (citations omitted).

[27] *Gannett Co. v. Larry*, 221 F.2d 269, 275 (2d Cir. 1955).

[28] *In re 80 Nassau Assocs*., 169 B.R. at 839 n.5 (citations omitted); *see Wallach v. Buchheit* (*In re Northstar Dev. Corp.*), 465 B.R. 6, 16 (Bankr. W.D.N.Y. 2012) (noting that the plaintiff has "the initial burden to establish the necessary elements of . . . equitable subordination" and once established "the burden then shifts to [the insider] to demonstrate its good faith and the fairness of its conduct"); *Le Café Creme, Ltd*. *v. Xavier Le Roux* (*In re Le Café Creme, Ltd*.), 244 B.R. 221, 235 (Bankr. S.D.N.Y. 2000); *see also In re Heartland Chemicals, Inc*., 136 B.R. 503, 516–17 (Bankr. C.D. Ill. 1992) (noting "once some inequity is demonstrated vis-à-vis an insider, the insider then has the burden of demonstrating the underlying fairness of the transaction").

### b.  Injury To Creditors Or An Unfair Advantage For The Claimant

To satisfy the second element of the *In re Mobile Steel* test, "the proponent of equitable subordination need only allege 'that general creditors are less likely to collect their debts' as a result of the allegedly inequitable conduct."[29] In general, this element would be satisfied by identifying how the inequitable conduct affected or was unfair to other creditors.[30] If no unfair advantage was gained as a result of inequitable conduct, a court will not be justified in subordinating a creditor's claim.[31] Further, this element limits subordination to the extent necessary to remedy the harm.[32]

### c.  Equitable Subordination Must Not Be Inconsistent With Bankruptcy Law

The third element is relevant only after the first two elements have been satisfied. Some courts have concluded that by virtue of the enactment of section 510(c) and the codification of the bankruptcy court's ability to equitably subordinate claims, which was not the case when *Mobile Steel* was decided, this element is likely moot.[33] "Accordingly, a complaint that satisfies the first two prongs of the *Mobile Steel* test would survive a motion to dismiss."[34] Indeed, where the first two elements are satisfied, it is

---

[29] *In re KDI Holdings, Inc*., 277 B.R. at 509 (citing *In re 80 Nassau Assocs*., 169 B.R. at 840) ("If the misconduct results in harm to the entire creditor body the objecting party need not identify the injured creditors or quantify their injury, but need only show that the creditors were harmed in some general, concrete manner."). "There is no requirement that the purported misconduct be a major cause of the debtor's bankruptcy." *Liberty Mut. Ins. Co*., 226 B.R. at 757 (citation omitted).

[30] *See 201 Forest Street LLC v. LBM Fin. LLC* (*In re 201 Forest St. LLC*), 409 B.R. 543, 572–73 (Bankr. D. Mass. 2009) ("The presence of inequitable conduct alone is not sufficient, as the second prong requires the bankruptcy court to identify how the inequitable conduct affected or was unfair to other creditors."). "If the misconduct harmed the entire creditor class, it is sufficient to show as harm that general creditors will be less likely to collect their debts as a result of the misconduct. When a specific creditor is the only party affected by the misconduct, the offending claimant should be subordinated only to that claim." *Liberty Mut. Ins. Co*., 226 B.R. at 757.

[31] *Liberty Mut. Ins. Co*., 226 B.R. at 757 (refusing to equitably subordinate claims where there was no showing that other creditors suffered harm or were prejudiced).

[32] *See Official Comm. of Unsecured Creditors v. Bay Harbour Master Ltd. (In re BH S&B)*, 420 B.R. 112, 156 (Bankr. S.D.N.Y. 2009) ("Under this prong, that claim is subordinated only to the extent necessary to offset the harm which the bankrupt and its creditors suffered on account of the inequitable conduct.").

[33] *See Official Comm. of Unsecured Creditors v. Blomen* (*In re Hydrogen, L.L.C*.), 431 B.R. 337, 360–61 (Bankr. S.D.N.Y. 2010) ("The third prong of the *Mobile Steel* test carries minimal significance today because the current Bankruptcy Code provides explicitly for the remedy of equitable subordination, whereas the former Bankruptcy Act—under which *In re Mobile Steel Co*. was decided—did not."); *In re 80 Nassau Assocs*., 169 B.R. at 840 (noting that "since the Bankruptcy Code, unlike its predecessors, expressly authorizes the remedy of equitable subordination, the third prong of the *Mobile Steel* test is likely to be moot"). *But see Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims*, 160 F.3d 982, 990 (3d Cir. 1998) ("This requirement 'has been read as a reminder to the bankruptcy court that although it is a court of equity, it is not free to adjust the legally valid claim of an innocent party who asserts the claim in good faith merely because the court perceives the result is inequitable.'").

[34] *In re Hydrogen, L.L.C*., 431 B.R. at 361.

likely that a court would equitably subordinate the claim.[35] Nevertheless, courts have acknowledged that the third *Mobile Steel* element generally serves as a reminder that although bankruptcy courts are courts of equity, they should not lightly alter the statutory priority scheme.[36]

### 2. Burden Of Proof And Statute Of Limitations

Generally, "the burden of proving all the elements of subordination is on the objectant."[37] However, where "the validity of the underlying claim is in issue, the claimant has the burden of proving both the amount and legitimacy of the claim."[38] Once the claimant satisfies its burden, then "the objectant must prove *by a preponderance of the evidence* that the claimant engaged in such substantial inequitable conduct to the detriment of the debtor's other creditors that subordination is warranted."[39] As discussed above, there is a shifting of the burden in the insider context.[40]

---

[35] *In re 80 Nassau Assocs.*, 169 B.R. at 841 (noting that, "if a court determines that the party advocating equitable subordination has satisfied the first two prongs of the Mobile Steel test, it is difficult to imagine a situation in which equitable subordination would not be warranted by bankruptcy law").

[36] *See In re BH S&B Holdings LLC*, 420 B.R. at 156 (citations omitted). "This element recognizes that the doctrine is not a mechanism to be used by courts to alter the statutory scheme in an effort to reach a result the court considers more equitable than the distribution scheme provided for in the Bankruptcy Code." *Id.* (quoting *Official Comm. of Unsecured Creditors v. Morgan Stanley & Co.* (*In re Sunbeam Corp.*), 284 B.R. 355, 364 (Bankr. S.D.N.Y. 2002)).

[37] *Matter of Teltronics Servs, Inc*., 29 B.R. 139, 168 (Bankr. E.D.N.Y. 1983) (citation omitted).

[38] *Id.* at 168–9 (citation omitted).

[39] *Id.* at 169 (emphasis added) (citation omitted); *see In re Heartland Chemicals, Inc*., 136 B.R. 503, 517 (Bankr. C.D. Ill. 1992) (citations omitted) (stating that "the plaintiff must justify equitable subordination by a preponderance of the evidence"); *Le Café Crème, Ltd. v. Le Roux (In re Le Café Crème, Ltd.*), 244 B.R. 221, 235 (Bankr. S.D.N.Y. 2000) (citations omitted) (stating that "[u]nder the Mobile Steel test, a claim is equitably subordinated if there is a showing by a preponderance of the evidence" of the three prongs of the equitable subordination test).

[40] *See* Section VII.C.1(a)(1).

"There is no specific statute of limitations applicable to equitable subordination claims."[41] An equitable subordination claim may, however, be subject to estoppel,[42] or barred by laches.[43] At least one court has concluded that equitable subordination is not time barred even if the underlying inequitable conduct forms the basis of a cause of action that is time barred.[44]

### 3. Other Limitations On Equitable Subordination

While courts have broad discretion in determining when equitable subordination is appropriate, there are limitations to the court's power to equitably subordinate a claim. Courts have described equitable subordination as "an unusual remedy, which should be applied only in limited circumstances."[45] The Supreme Court in *United States v. Noland* noted that a court may not "adjust the legally valid claim of an innocent party who asserts a claim in good faith merely because the court perceives that the result is inequitable."[46] Nor may the court "set up a subclassification of claims . . . and fix an order of priority for the sub-classes according to its theory of equity."[47] In *United States v. Reorganized CF&I Fabricators of Utah, Inc*., the Supreme Court further explained that its holding in *Noland* stands for the proposition that "categorical reordering of priorities [by a court] that takes place at the legislative level of consideration is beyond the scope of judicial authority to order equitable subordination under 510(c)."[48]

---

[41] *In re GNK Enters., Inc.*, 197 B.R. 444, 449 (Bankr. S.D. N.Y. 1996) (citing *In re Badger Freightways, Inc*., 106 B.R. 971, 974 (Bankr. N.D. Ill. 1989)); *see also In re 201 Forest St. LLC*, 409 B.R. 543 (Bankr. D. Mass. 2009) (noting that there is no statute of limitations with respect to equitable subordination actions); *In re Emergency Monitoring Techs. Inc*., 366 B.R. 476, 509 (Bankr. W.D. Pa. 2007) ("[T]he law is clear that a statute of limitations does not exist with respect to equitable subordination actions brought under §510(c)."); *In re Southwest Supermarkets, LLC*, 325 B.R. 417, 427 (Bankr. D. Ariz. 2005) ("[T]here has never been a statute of limitations for some other remedies, such as . . . equitable subordination.").

[42] *See, e.g., In re Assante*, 470 B.R. 707, 713 (Bankr. S.D.N.Y.) (holding that chapter 11 debtor was barred by collateral estoppel effect of state court's judgment from asserting same alleged misconduct as basis for equitably subordination claim).

[43] *See In re Badger Freightways, Inc*., 106 B.R. at 974 (noting in connection with equitable subordination claim that "[a] statute of limitations bars a cause of action based solely on the passage of time. In contrast, the laches doctrine arises due to a change in the conditions of the parties"); *see also In re Patt Freeman, Inc*., 42 B.R. 224, 231 (Bankr. Ohio. 1984) (holding that laches would not bar plaintiff's equitable subordination claim because plaintiff acted in a timely manner); *In re Octagon Roofing*, 141 B.R. 968, 983, n.5 (Bankr. N.D. Ill. 1992) (noting that argument of subordination would have to be weighed against defenses of waiver, estoppel, unclean hands and laches if not for court's ruling against the plaintiff).

[44] *In re Emergency Monitoring Techs. Inc*., 366 B.R. at 509 (concluding that trustee was not time barred from asserting inequitable conduct in connection with equitable subordination claim, "notwithstanding that such conduct perhaps cannot now be attacked via a fraudulent conveyance action").

[45] *Le Café Crème, Ltd. v. Xaxier Le Roux (In re Le Café Crème, Ltd.)*, 244 B.R. 221, 235 (Bankr. S.D.N.Y. 2000) (citing *Fabricators, Inc. v. Technical Fabricators, Inc.*, 926 F.2d 1458, 1464 (5th Cir. 1991); *see also Enron Corp. v. Springfield Assocs., L.L.C. (In re Enron Corp.)*, 379 B.R. 425, 434 (S.D.N.Y. 2007) (citations omitted) (stating that "many courts view equitable subordination as a 'drastic and unusual remedy'"); *Assante v. E. Savs. Bank, FSB*, No. 12-CV-5309 (CS), 2013 WL 787968, at *3 (S.D.N.Y. Mar. 4, 2013) (describing equitable subordination as an "unusual remedy").

[46] 517 U.S. 535, 539 (1996).

[47] *Id*. at 543 (citations omitted).

[48] 518 U.S. 213, 228–29 (1996).

Bankruptcy courts are also limited by the fact that "equitable subordination is remedial, not penal . . . a claim will be subordinated only to the extent necessary to offset the harm that resulted."[49] Although Examiner's Counsel found no reported case that says so expressly, given the remedial nature of the equitable subordination remedy, a court would likely consider the entire course of dealing and conduct of an offending claimant to determine whether such conduct, when considered in light of all relevant facts and circumstances, requires that the claimant should not share in accordance with the priority asserted for its claim.[50]

4.   *The Examiner Investigated Each Affiliate Transaction And AFI's General Course Of Dealings With ResCap And GMAC Mortgage For Evidence Of Inequitable Conduct And Resulting Harm To Creditors That Would Support A Claim Of Equitable Subordination*

During the course of the Investigation, the Examiner and his professionals analyzed the Affiliate Transactions individually and collectively, as well as AFI's general course of conduct and dealings with ResCap and GMAC Mortgage, for any evidence of: (1) fraud; (2) illegality; (3) breach of fiduciary duty; (4) unconscionable, unjust, unfair, or foul conduct; (5) undercapitalization, or (6) AFI's control or use of ResCap as an alter ego for AFI's benefit. The Examiner and the Examiner's Professionals also analyzed whether creditors were harmed by AFI's conduct.

a.   *AFI And Ally Bank's Claims Against ResCap*

Section 510(c) of the Bankruptcy Code expressly provides that a court may equitably subordinate allowed claims. AFI and its non-debtor affiliates have (including Ally Bank) filed approximately 149 proofs of claim in the Chapter 11 Cases. Pursuant to section 502(a) of the Bankruptcy Code, a claim, proof of which is filed, is deemed allowed unless a party in interest objects.[51] AFI has asserted in the Chapter 11 Cases various claims against ResCap, RFC, and GMAC Mortgage including claims in the amounts of not less than $747,127,553.38 under the A&R Secured Revolver Loan Agreement and $380,000,000 under the A&R Line of Credit Agreement. Ally Bank has filed ten proofs of claim against the Debtors, including unliquidated claims against ResCap, RFC, and GMAC Mortgage.

---

[49]  *In re KDI Holdings, Inc.*, 277 B.R. at 509 (citing *In re 80 Nassau Assocs.*, 169 B.R. at 840); *see In re Mobile Steel Corp.*, 563 F.2d at 701 (citing *Pepper v. Litton*, 308 U.S. 295, 304 (1935)); *see also Official Comm. of Unsecured Creditors v. Bay Harbour Master Ltd.* (*In re BH S&B Holdings LLC*), 420 B.R. 112, 156 (Bankr. S.D.N.Y. 2009) ("This sets the 'limit of the remedy regardless of the nature of the claimant's conduct.'"); *Enron Corp. v. Ave. Special Situations Fund II, LP (In re Enron Corp.*), 333 B.R. 205, 219 (Bankr. S.D.N.Y. 2005) ("The application of the Mobile Steel test ensures that the full breath of the remedy of equitable subordination is available while ensuring that its reach does not violate any provision of the Bankruptcy Code or become punitive as opposed to remedial.").

[50]  *See In re Clap*, 5 F. Cas. 816, 817 (D. Mass. 1873) (noting "a court of equity will consider all circumstances and decline to assist the creditor, if, upon the whole, justice so requires"); *see also In re Porter*, 50 B.R. 510 (Bankr E.D. Va. 1985) (concluding that residual claim should not be subordinated because payment of settlement purged claimant's participation in fraudulent conveyance).

[51]  11 U.S.C. § 502(a).

### b.  AFI Was And Is An Insider Of ResCap And GMAC Mortgage

At all times relevant to the Investigation, ResCap was a wholly-owned indirect subsidiary of AFI and GMAC Mortgage was a wholly-owned, indirect subsidiary of ResCap. Thus, AFI was and is an "insider" of ResCap and GMAC Mortgage as that term is defined in the Bankruptcy Code.[52] As an insider, AFI's conduct with respect to ResCap and GMAC Mortgage is subject to a higher degree of scrutiny than would be the conduct of a non-insider.[53]

### c.  The Nature Of AFI's Conduct In Connection With The Affiliate Transactions And AFI's General Course Of Dealing

#### (1) Whether AFI's Conduct In Connection With The 2006 Bank Restructuring Was Unfair Or Inequitable[54]

As discussed in Sections V.A, VII.E, and VII.L, ResCap and AFI explored multiple potential ownership structures for the reorganized bank, only one of which called for the approach ultimately implemented, i.e., 100% AFI ownership of voting control of IB Finance, non-voting interests for ResCap, and proportional earnings distribution to ResCap based on Ally Bank's mortgage operation.[55] It does not appear, however, that the Independent Directors were ever informed that alternative structures were viable and should be considered by the ResCap Board. These alternative structures could have avoided the result where ResCap's shares in IB Finance were non-voting.[56]

AFI's conduct surrounding communications with the Independent Directors with respect to the 2006 Bank Restructuring suggests that AFI chose to manage the information flow on this subject to minimize the likelihood that the Independent Directors would veto the transaction. As discussed more fully in Sections V.A, VII.E, and VII.L, the Examiner concluded that AFI withheld or caused to be withheld certain critical information from the Independent Directors regarding the 2006 Bank Restructuring, including the possibility of entering into a different transaction pursuant to which ResCap would retain a voting interest in IB Finance.[57]

---

[52]  *See* 11 U.S.C. § 101(31).

[53]  *See* Section VII.C.1.a.

[54]  *See* Section V.A (discussing the 2006 Bank Restructuring).

[55]  *See* Draft Memorandum, IB Alternatives, April 4, 2006, at 1 [EXAM11237439] (attached to E-mail from D. Applegate to B. Paradis) (April 4, 2006) [EXAM11237438], more fully addressed in Section V.A and VII.L.

[56]  *See* Section V.A.

[57]  *Id.* As explained in Section V.A.1.a(5) the Examiner concluded that the 2006 Bank Restructuring resulted in ResCap receiving less than reasonably equivalent value, one of the two elements of a constructive fraudulent transfer claim. An insider's receipt of a constructively fraudulent transfer may constitute grounds for the equitable subordination of the insider's claim in the transferor's subsequent bankruptcy case. *See Webster v. Barbara (In re Otis & Edwards, P.C.),* 115 B.R. 900, 921 (Bankr. E.D. Mich. 1990). However, as further explained in Sections VI. and VII.F, the Examiner has concluded that ResCap was not insolvent at the time of the 2006 Bank Restructuring or rendered insolvent by that transaction. Therefore, the lack of reasonably equivalent value in connection with the 2006 Bank Restructuring, by itself, does not support the proposition that AFI engaged in unfair or inequitable conduct in connection with the 2006 Bank Restructuring. As discussed in Section VII.A, the failure to pay reasonably equivalent value may be cited as evidence of siphoning, which is one element relevant to an alter-ego analysis. As described in that Section, the Examiner concluded that the evidence does not support the proposition that AFI siphoned assets from ResCap.

The Examiner concludes that AFI engaged in unfair and inequitable conduct by withholding or causing to be withheld certain critical information from the Independent Directors regarding the 2006 Bank Restructuring, including the possibility of entering into a different transaction pursuant to which ResCap would retain a voting interest in IB Finance.

### (2) Whether AFI's Conduct In Connection With The Second 2009 Tax Allocation Agreement Was Unfair Or Inequitable

As discussed in Section VII.K.2.e, although the Second 2009 Tax Allocation Agreement may have been unfair to ResCap, it would be difficult to find that it was the result of "gross and palpable overreaching" by AFI. Indeed, the Investigation revealed no direct evidence that AFI exerted undue influence over ResCap to execute the Second 2009 Tax Allocation Agreement.[58] Although ResCap's decision ultimately to approve the Second 2009 Tax Allocation Agreement was questionable, the decision-making process was thorough and ResCap's entry into the agreement appears to have been of its own free will.[59]

As discussed in Section VII.K.2.c, it appears that ResCap received no consideration, much less fair consideration or reasonably equivalent value, in exchange for entering into the Second 2009 Tax Allocation Agreement at a time when ResCap was insolvent.[60] As set forth in Section VII.K.2.c, the Examiner has concluded that a claim to avoid the Second 2009 Tax Allocation Agreement on constructive fraudulent transfer grounds is likely to prevail. A constructive fraudulent transfer to an insider is evidence of unfair or inequitable conduct that would support the remedy of equitable subordination.[61]

Accordingly, the Examiner concludes that AFI engaged in unfair and inequitable conduct by entering into the Second 2009 Tax Allocation Agreement with ResCap.

### (3) Whether AFI's And Ally Bank's Conduct In Connection With The Misallocation Of Revenues On Loans Brokered By GMAC Mortgage Was Unfair Or Inequitable

As discussed in Section V.B, when Ally Bank and GMAC Mortgage initially implemented the Broker Agreement, the revenue and expense allocation was implemented as they had agreed. Effective August 1, 2009, Ally Bank elected to implement the fair value option to account for HFS loans in accordance with FASB Accounting Standard Codification Topic 825, Financial Instruments. Consequently, rather than realizing the profits and loss benefit of points and other origination income as the parties had agreed, GMAC Mortgage instead received the cost-based, below-market broker fee.

---

[58]  *See* Section VII.K.2.e (citing Int. of W. Marx, Apr. 18, 2013, at 131:2–12).

[59]  Section VII.K.2.e.

[60]  *See* Section VI.

[61]  *See In re Otis & Edwards, P.C.,* 115 B.R. at 921 (concluding that an insider was the recipient of a constructively fraudulent transfer and insider's claims could be equitably subordinated).

As explained in Section VII.L.2.d, there is some evidence that AFI and Ally Bank squelched the review of the problem in late 2011 (that Ally Bank had retained gain on sale revenue due to GMAC Mortgage), and in 2012, AFI and Ally Bank, in the face of ResCap's impending bankruptcy, avoided restating Ally Bank's financials (and the regulatory scrutiny that would have ensued), rather than a fair and objective attempt to resolve the matter.

Based on the foregoing, the Examiner concludes that it is more likely than not that a court would find that AFI and Ally Bank engaged in unfair and inequitable conduct by refusing to disclose the misallocation, to rectify the situation, and by continuing the misallocation of funds.[62]

### (4) Whether AFI's Conduct In Connection With ResCap's Forgiveness Of Subsidiary Indebtedness And The 2009 Bank Transaction Was Unfair Or Inequitable

Wilmington Trust argues that AFI caused ResCap to breach the "all or substantially all" covenant included in the 2005 Indenture.[63] Specifically, Wilmington Trust alleges that AFI induced ResCap to embark upon a series of transactions in furtherance of a pre-arranged plan of AFI self-preservation that caused ResCap: (1) to forgive indirect and direct debts owed to it by certain of its subsidiaries, including GMAC Mortgage and RFC; and (2) to enter into the 2009 Bank Transaction. Wilmington Trust argues that these transactions resulted in the transfer of substantially all of ResCap's assets in violation of the 2005 Indenture. As discussed in Section VIII, the Examiner concluded that the evidence does not support the proposition that there was an actual breach of the "all or substantially all" covenant of the 2005 Indenture.[64] Accordingly, the conduct cited by Wilmington Trust does not provide support for the proposition that AFI engaged in unfair or inequitable conduct.

### (5) Whether AFI's Conduct In Connection With The Line Of Credit Facilities Was Unfair Or Inequitable

The Ad Hoc Group argues that AFI misappropriated collateral in favor of the Line of Credit Facilities and therefore, AFI's claims on account of the A&R Line of Credit Facility should be equitably subordinated to the claims of Junior Secured Noteholders.[65] Moreover, the Ad Hoc Group alleges that AFI knew that ResCap's entry into the Line of Credit Facilities was not an arm's-length transaction and

---

[62] As described in Section VII.L, the Examiner has also concluded GMAC Mortgage likely would succeed on a contractual claim that the allocation of revenues from January 1, 2009 to July 31, 2009 was proper, and that it is entitled to payment of the revenues misallocated to the Ally Bank from and after August 1, 2009.

[63] Wilmington Trust Submission Paper, dated Oct. 24, 2012, at 24–28.

[64] Moreover, as discussed in Section VIII, the Examiner concluded that the evidence does not support the proposition that AFI intentionally procured ResCap's breach of the "all or substantially all" covenant of the 2005 Indenture without justification and, therefore, the Examiner concluded that it is unlikely that the Wilmington Trust tortious interference with contract claim against AFI would prevail.

[65] *See* Preliminary Submission Paper of Ad Hoc Group of Junior Secured Noteholders, dated Nov. 14, 2012, at 32–33.

violated the Junior Secured Notes Indenture. According to the Ad Hoc Group, the pledging of released collateral to the Line of Credit Facilities left AFI's first priority position with respect to those assets intact, while effectively punishing the Junior Secured Noteholders.

As discussed in Section V.E.5, certain collateral was released from a blanket lien securing the Secured Revolver Facility, the Senior Secured Notes and the Junior Secured Notes and thereby made available to secure the Initial Line of Credit Facility. The collateral release provisions set forth in the Secured Revolver Loan Agreement,[66] the Senior Secured Notes Indenture,[67] the Junior Secured Notes Indenture[68] and the Intercreditor Agreement[69] made such a release possible.

Moreover, as discussed in Section V.E.5, AFI structured the Line of Credit Facilities to benefit ResCap; the Line of Credit Facilities contained provisions that were more favorable to the Initial Line of Credit Borrowers than would have been obtained in a syndicated credit facility with unaffiliated lenders, including no ongoing commitment or facility fees payable by the borrowers.[70]

Based upon the foregoing, the Examiner concludes that AFI's conduct in connection with the Line of Credit Facilities was not unfair or inequitable.

### (6) Equitable Subordination Based On Alter-Ego, Asset Stripping, And Aiding And Abetting Breach Of Fiduciary Duty Allegations

As noted above, a court may equitably subordinate claims held by a parent on the basis of the parent's treatment of the subsidiary debtor as its alter-ego.[71] In addition, aiding and abetting a breach of fiduciary duty may support a finding of inequitable conduct.[72]

The Creditors' Committee and Wilmington Trust argue that AFI's claims against the Debtors should be subordinated, because (1) AFI asserted its domination and control of ResCap for its sole benefit and (2) this misconduct gave AFI an unfair advantage by allowing AFI to strip ResCap of its sole material assets.[73] In addition, the Creditors' Committee and Wilmington Trust assert aiding and abetting breach of fiduciary claims against AFI.

---

[66]  Secured Revolver Loan Agreement, §12.11 [RC00024234].

[67]  Senior Secured Notes Indenture, §8.04(a) [RC00024456].

[68]  Junior Secured Notes Indenture, §8.04(a) [RC00037197].

[69]  Intercreditor Agreement, §5.1(a) [ALLY_0066819].

[70]  See Section V.E.5.

[71]  See Section VII.C. 2.a.

[72]  See Rosener v. Majestic Mgmt., Inc. (In re OODC, LLC), 321 B.R. 128, 146 (Bankr. D. Del. 2005) (citation omitted).

[73]  See Wilmington Trust Reply Submission Paper, dated Mar. 8, 2013, at ¶93; see also Wilmington Trust Submission Paper, dated Oct. 24, 2012, at ¶¶88 ("AFI's allowed claims should be subordinated to the claims of the Trustee and the Noteholders as a result of AFI's actions over many years of misconduct in connection with the mortgage business, and later, its use of Residential Capital as a shield from liability when the business failed, all at the expense of the Noteholders."). According to the Creditors' Committee, AFI's claims should be equitably subordinated, because "AFI pushed its undercapitalized subsidiaries into bankruptcy only after stripping value, imposing insurmountable liabilities, and otherwise protecting itself to the detriment of other creditors." Creditors' Committee Submission Paper, dated Mar. 7, 2013, at 121.

As described in Section VII.A, the Examiner concluded that (1) the evidence does not support the proposition that AFI "siphoned" assets from ResCap and (2) any alter-ego claims asserted on behalf of ResCap against AFI are unlikely to prevail. Similarly, for the reasons set forth in Section VII.G, there appear to be no viable claims against AFI for aiding and abetting breaches of fiduciary duties by ResCap directors and officers.

Accordingly, the Examiner concludes that AFI's claims are not subject to equitable subordination on the basis that AFI engaged in unfair or inequitable conduct by (1) siphoning or stripping assets from ResCap, or (2) using ResCap as its alter-ego, or (3) by aiding and abetting breaches of fiduciary duties.

### d.   The Harm Resulting From AFI And Ally Bank's Conduct

As previously noted, inequitable conduct alone is not sufficient to justify the equitable subordination of a creditor's claims.[74] There must also be some injury to creditors or an unfair advantage conferred.[75] "If the misconduct results in harm to the entire creditor body, the [trustee] need not identify the injured creditors or quantify the injury, but need only show that the creditors were harmed in some general, concrete manner."[76]

Having concluded that AFI engaged in unfair or inequitable conduct towards ResCap and GMAC Mortgage with regard to the 2006 Bank Restructuring, the Second 2009 Tax Allocation Agreement, and the misallocation of revenues on loans brokered by GMAC Mortgage, the inquiry turns to whether ResCap and GMAC Mortgage and their creditors were harmed, and to what extent, by such unfair or inequitable conduct.

---

[74] *See 201 Forest Str. LLC v. LBM Fin. LLC (In re 201 Forest St. LLC)*, 409 B.R. 543, 572–73 (Bankr. D. Mass. 2009) ("The presence of inequitable conduct alone is not sufficient, as the second prong requires the bankruptcy court to identify how the inequitable conduct affected or was unfair to other creditors.").

[75] *Official Comm. of Unsecured Creditors v. Bay Harbour Master Ltd. (In re BH S& B Holdings LLC)*, 420 B.R. 112, 156 (Bankr. S.D.N.Y. 2009) ("The second prong requires a finding that the claimant's conduct injured the debtor or its creditors, or resulted in an unfair advantage to the claimant."). *But see Midlantic Nat'l Bank N., N.A. v. Borg-Warner Acceptance Corp. (In re Mayo)*, 112 B.R. 607, 651 (Bankr. D. Vt. 1990):

> Although the standard of "either injury to the debtor or other creditors" or "unfair advantage to the claimant" is much cited, it is not entirely clear whether the standard is in the conjunctive or disjunctive. *Mobile*, *supra*, articulates a disjunctive test, *In re Westgate, supra*, puts forth a conjunctive test. We hold that the test should be in the conjunctive because of the "no harm, no foul" rule. For one creditor to have achieved an unfair advantage there must have been a benefit. It must then be shown that such unfair advantage hurt the debtor or its creditors. Without the harm there would be no reason to apply equitable subordination to the claim.

*Id*, *see White Current Corp. v. Rural Util. Serv. (In re Vt. Elec. Generation & Transmission Coop., Inc.)*, 240 B.R. 476 (Bankr. D. Vt. 1999), *see also Chorches v. Ogden (In re Bolin & Co., LLC)*, 437 B.R. 731, 761 (D. Conn. 2010) (concluding that test is conjunctive and citing the Bankruptcy Court's decision in *80 Nassau Assocs.* as "implying that the test is disjunctive").

[76] *Springfield Assocs., L.L.C. v. Enron Corp. (In re Enron Corp.)*, 379 B.R. 425, 434, 487 (S.D.N.Y. 2007) (alteration in original).

*(1) Harm Resulting From AFI's Conduct In Connection With The 2006 Bank Restructuring*

The Examiner concluded that AFI engaged in unfair or inequitable conduct by withholding material information from the Independent Directors in connection with the 2006 Bank Restructuring. As discussed in Section VII.E, there is a threshold question of whether any harm actually resulted. Interview testimony creates some uncertainty regarding whether the concealment of information from the Independent Directors relating to ResCap obtaining a voting interest in the restructured bank ultimately made any difference regarding the transaction that the ResCap Board approved.

As explained in Section VII.E, the Examiner concluded that the evidence supports the proposition that had Jacob and Melzer known that the option of ResCap obtaining a voting interest in the restructured bank was a viable one or, at least, a negotiable term, they could have—and likely would have—exploited that leverage to extract better terms for ResCap in the transaction. At minimum, armed with the knowledge that a voting interest in the restructured bank was negotiable, the Independent Directors could have sought to make up the shortfall in the value that ResCap received in compensation for relinquishing control of the bank.

Accordingly, the Examiner concludes that AFI's unfair or inequitable conduct harmed ResCap by causing it to cede the voting interest for less than fair value. While it is difficult to speculate what greater value might have been obtainable by the Independent Directors, damages would likely be not less than the reasonably equivalent value deficiency of between $390 to $465 million,[77] and may be as much as the difference between the equity value of ResCap's interest in Old GMAC Bank, which it transferred, and the equity interest in IB Finance, which it received—between $533 and $688 million.[78]

*(2) Harm Resulting From AFI's Conduct In Connection With The Second 2009 Tax Allocation Agreement*

As set forth in Section VII.K.2.c, the Examiner concluded that a claim to avoid the Second 2009 Tax Allocation Agreement on constructive fraudulent transfer grounds is likely to prevail. Accordingly, payments made by ResCap under that Agreement would likely be avoidable as constructively fraudulent and subject to recovery pursuant to section 550 of the Bankruptcy Code. The Examiner currently estimates those amounts to be, in the aggregate, approximately $50 million.[79]

Accordingly, the Examiner concludes that AFI's unfair or inequitable conduct in connection with the Second 2009 Tax Allocation Agreement harmed ResCap in the amount of not less than $50 million.

---

[77] *See* Section V.A.2.b; Appendix V.A.2–4. These figures take into account $143 million on the value received side, accounting for the avoidance of a credit rating downgrade. *See* Section V.A.2.b; Appendix V.A.2–4.

[78] *See* Section V.A.2.b; Appendix V.A.2–4.

[79] *See* VII.K.2.c. If the Second 2009 Tax Allocation Agreement is avoided as a fraudulent transfer, ResCap could seek to reinstate the First 2009 Tax Allocation Agreement. As discussed in Section VII.K.2.a, if that effort were successful, it would give rise to a significant contractual claim against AFI. Assuming all of ResCap's tax benefits are eventually used by AFI, ResCap would have a contractual claim against AFI under the First 2009 Tax Allocation Agreement in the approximate amount of $1.77 billion. *See* VII.K.2.a(4). However, that potential claim is not directly attributable to AFI's inequitable conduct in connection with the Second 2009 Tax Allocation Agreement.

*(3) Harm Resulting From The Conduct Of AFI And Ally Bank In Connection With The Misallocation Of Revenues On Loans Brokered By GMAC Mortgage*

The Examiner concluded that AFI and Ally Bank engaged in unfair and inequitable conduct in connection with the misallocation of revenues on loans brokered by GMAC Mortgage. For the reasons set forth in Section VII.L, the Examiner concluded that the harm to creditors resulting from such unfair and inequitable conduct to be not less than $520.5 million.

*e. The Harm Caused By AFI And Ally Bank May Be Offset In Whole Or In Part By Other Action Taken By AFI To Support ResCap*

Equitable subordination is remedial, not penal.[80] In that regard, courts in this District have noted that: (1) "the principle of equitable subordination . . . empowers and requires the Bankruptcy Court to tailor the remedy to *fit the harm*,"[81] and (2) "subordination is confined to *offsetting 'specific harm that creditors have suffered* on account of the inequitable conduct.'"[82]

Thus, AFI's and Ally Bank's claims should be equitably subordinated only to the extent necessary to remedy the harm suffered by creditors. If the harm caused by inequitable or unfair conduct is otherwise offset by other meritorious conduct that may have benefited creditors of ResCap and GMAC Mortgage, the absence of any net harm may be cause to deny equitable subordination.

After the 2006 Bank Restructuring, AFI (1) made cash contributions to ResCap in the aggregate amount of $2.916 billion; (2) made other capital contributions to ResCap in the aggregate amount of $1.942 billion; and (3) forgave ResCap debt in the aggregate amount of $3.531 billion.[83] In light of this substantial financial support by AFI, the Examiner concludes that AFI's unfair and inequitable conduct in connection with the 2006 Bank Restructuring has been "purged"[84] and would not support the equitable subordination of AFI's claims against ResCap. Accordingly, the Examiner concludes that it is likely that a proponent of the equitable subordination of AFI's claims against ResCap on the basis of AFI's inequitable conduct in connection with the 2006 Bank Restructuring would not prevail.

It is not clear under the relevant case law whether a claimant's "good" or assuaging conduct must come after the inequitable conduct in temporal order, or whether a court is free to evaluate the

---

[80] *See In re Enron Corp.*, 379 B.R. 425, 434 (S.D.N.Y. 2007); *Picard v. Madoff (In re Bernard L. Madoff Inv. Sec. LLC)*, 458 B.R. 87, 121 (Bankr. S.D.N.Y.), *appeal denied,* 464 B.R. 578 (S.D.N.Y. 2011); *80 Nassau Assocs. v. Crossland Fed. Savs. Bank (In re 80 Nassau Assocs.)*, 169 B.R. 832, 840 (Bankr. S.D.N.Y. 1994).

[81] *In re 80 Nassau Assocs.*, 169 B.R. 832, 840 (Bankr. S.D.N.Y. 1994) (emphasis added); *see Le Café Crème, Ltd. v. Le Roux (In re Le Café Crème, Ltd.)*, 244 B.R. 221, 235 (Bankr. S.D.N.Y. 2000) (quoting *In re 80 Nassau*, 169 B.R. at 840).

[82] *In re Bernard L. Madoff Inv. Sec. LLC*, 458 B.R. 87, 121 (Bankr. S.D.N.Y. 2011) (emphasis added), *appeal denied,* 464 B.R. 578 (S.D.N.Y. 2011).

[83] *See* Section VI.C.4.f.4.

[84] *In re Porter*, 50 B.R. 510, 520 (Bankr. E. D. Va. 1985).

claimant's entire course of conduct during the relevant time period such that prior good conduct may be seen to ameliorate subsequent bad conduct, as part of a balancing of support on the one hand, against harm cause by inequitable conduct, on the other.

The vast majority of AFI's support of ResCap in the form of cash and other capital contributions and debt forgiveness occurred before AFI's misconduct in connection with the misallocation of brokered loan revenue and the Second 2009 Tax Allocation Agreement. While AFI thereafter forgave debt in December 2011 and January 2012 in the amounts of $109 million and $197 million, respectively, the sum of this debt forgiveness is quantitatively less than the harm occasioned by AFI's prior inequitable conduct in connection with the misallocation of brokered loan revenue and the Second 2009 Tax Allocation Agreement.

The Examiner is of the view that because equitable subordination is remedial and not punitive, and is a "drastic and unusual remedy," which should be applied in limited circumstances,[85] while a close question, it is more likely than not that a court would take a more expansive view of AFI's overall support of ResCap and would not be constrained by unquestioning devotion to the temporal sequence of AFI's inequitable and good conduct. Accordingly, the Examiner concludes that, while a close question, AFI's support of ResCap from 2007 until January of 2012 in the aggregate amount of $8.1 billion would be considered to offset the harm caused by AFI's and Ally Bank's misconduct in connection with the misallocation of brokered loan revenue and AFI's misconduct in connection with the Second 2009 Tax Allocation Agreement.

The Examiner therefore concludes it is more likely than not that a proponent of the equitable subordination of AFI's and Ally Bank's claims against GMAC Mortgage on account of their misconduct in connection with the misallocation of brokered loan revenue would not prevail. Further, the Examiner concludes it is more likely than not that a proponent of the equitable subordination of AFI's claims against ResCap on account of AFI's misconduct in connection with the Second 2009 Tax Allocation Agreement would not prevail.

### f. Claims Satisfied Before A Bankruptcy Filing And For Which No Proof Of Claim Has Been Filed May Not Be Equitably Subordinated

AFI exchanged certain claims represented by Unsecured Notes and Senior Secured Notes (aggregating $2.4 billion in face principal amount) for, inter alia, ResCap Preferred Interests in the 2008 Bank Transaction[86] and ResCap's remaining IB Finance Class M Shares as part of the 2009 Bank Transaction.[87] In addition, AFI forgave other debt in connection with the acquisition of ResMor.[88] Although no party has so asserted, the Examiner's Professionals examined whether ResCap debt that was transferred, surrendered, or forgiven by AFI in exchange for ResCap assets before the Petition Date might be subject to equitable subordination to the claims of all other creditors immediately prior to the transaction date. If so, and on the presumption that ResCap was insolvent on the dates of the

---

[85] *In re Enron Corp.*, 379 B.R. 425, 434 (S.D.N.Y. 2007) (citations omitted); *see In re Featherworks Corp.*, 25 B.R. 634, 649 (Bankr. E.D.N.Y. 1982) ("Equitable subordination is a harsh remedy.").

[86] *See* Section V.A.1.b (discussing exchange of ResCap bonds for convertible preferred interests).

[87] *See* Section V.A.1.c (discussing conversion of preferred interests and sale of remaining interests in IB Finance).

[88] *See* section V.F.4.f (discussing ResMor sale).

transactions, the debt transferred, surrendered, or forgiven by AFI in exchange for ResCap property would arguably be of little or no worth for reasonably equivalent value purposes, resulting in the potential avoidance of ResCap's transfers on a constructive fraud theory.

Significantly, there is no statutory basis or case law precedent for the equitable subordination of claims against a debtor that were irrevocably satisfied before the bankruptcy filing. To the contrary, the inability to retroactively subordinate retired debt is supported by the language of section 510(c) of the Bankruptcy Code, which provides, in pertinent part, as follows:

> (1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest . . . .[89]

A claim is defined as a "right to payment."[90] A right to payment cannot exist if the corresponding debt was extinguished. Thus, a debt satisfied prior to bankruptcy would not result in a claim, much less an "allowed" claim subject to equitable subordination. Stated differently, in the absence of an *allowed* claim, there is no claim to subordinate.

Moreover, there does not appear to be any reported case where a court equitably subordinated a claim that had been satisfied before the petition date so as to avoid a transfer made by the debtor in exchange for the transferee's transfer, surrender, or forgiveness of the debt. Accordingly, a creditor who acquires an asset from an insolvent debtor before the bankruptcy filing in exchange for the debtor's debt is likely not subject to a fraudulent transfer challenge on the basis that the debt (1) should be equitably subordinated to all other claims; (2) is therefore of no value; and (3) cannot possibly have conferred reasonably equivalent value to the debtor.

---

[89]  11 U.S.C. § 510(c)(emphasis added).

[90]  *See Id.* §101(5).