**VII. REVIEW AND ANALYSIS OF ESTATE CAUSES OF ACTION IMPLICATED BY AFFILIATE TRANSACTIONS AND THE RELATIONSHIP AND COURSE OF DEALING AMONG RESCAP, AFI, ALLY BANK, AND CERBERUS**

**E.  CAUSES OF ACTION AGAINST RESCAP'S DIRECTORS AND OFFICERS**

ResCap faced increasingly challenging financial circumstances over time, and confronted a tangled relationship with AFI dating from execution of the 2005 Operating Agreement. ResCap fiduciaries often operated under stressful and harried conditions, and the protocol, processes, and functioning of the ResCap Board were not always optimal. Yet there exist only a few potentially actionable claims with respect to breaches of fiduciary duties by ResCap's directors and officers. Certain potential claims for breaches of duties by ResCap fiduciaries will be discussed below, following a recitation of general legal principles relevant to those claims.[1] For discussion of fiduciary duty claims related to the parties' tax transactions, see Section VII.K.

  *1.  General Legal Principles Governing Potential Fiduciary Duty Claims*

      *a.  Delaware Law Applies To Breach Of Fiduciary Duty Claims*

Bankruptcy courts generally apply state choice-of-law rules.[2] Courts within the Second Circuit follow the "internal affairs doctrine," which states that "questions relating to the internal affairs of corporations are decided in accordance with the law of the place of incorporation."[3] This doctrine applies to breach of fiduciary duty claims.[4] Accordingly, Delaware law will apply to a plaintiff's breach of fiduciary duty claims against ResCap's directors and officers, because ResCap was incorporated in Delaware, and is now a limited liability company formed pursuant to the Delaware Limited Liability Company Act.[5] By initially incorporating in Delaware and later becoming a Delaware limited liability company, ResCap submitted to application of Delaware law to the governance of its internal affairs, including with respect to the fiduciary duties owed by its directors and officers.

---

[1]  Other types of claims grounded upon the same sets of facts as those underlying potential fiduciary duty claims (such as possible contractual violations of the Operating Agreements) are discussed elsewhere in Section VII.

[2]  *See Stanek Corp. v. Dev. Specialists, Inc.* (*In re Coudert Bros. LLP*), 673 F.3d 180, 186 (2d Cir. 2012).

[3]  *Scottish Air Int'l, Inc. v. British Caledonian Group, PLC*, 81 F.3d 1224, 1234 (2d Cir. 1996); *KDW Restructuring & Liquidation Servs. LLC v. Greenfield,* 874 F. Supp. 2d 213, 221, (S.D.N.Y. June 12, 2012) ("New York courts decide questions relating to corporate internal affairs 'in accordance with the law of the place of incorporation.'"); *Official Comm. of Unsecured Creditors of Hydrogen, L.L.C. v. Blomen* (*In re Hydrogen, L.L.C.*), 431 B.R. 337, 346–47 (Bankr. S.D.N.Y. 2010); s*ee also Brandt v. Hicks, Muse & Co., Inc.* (*In re Healthco Int'l, Inc.*), 208 B.R. 288, 300 n.18 (Bankr. D. Mass. 1997).

[4]  The doctrine also applies in the limited liability company context. *See In re Hydrogen, L.L.C.*, 431 B.R. at 347; *Ritchie Capital Mgmt. L.L.C. v. Coventry First LLC*, No. 07 Civ. 3494, 2007 WL 2044656, at *4 (S.D.N.Y. July 17, 2007).

[5]  *See e.g., KDW Restructuring*, 874 F. Supp. at 221, ("Jennifer is a Delaware corporation; therefore, Delaware law governs this breach of fiduciary duty claim."); *In re Hydrogen, L.L.C.*, 431 B.R. at 346–47; *Marino v. Grupo Mundial Tenedora, S.A.*, 810 F. Supp. 2d 601, 606–07 (S.D.N.Y. 2011); *Kipperman v. Onex Corp.*, 411 B.R. 805, 867 n.35 (N.D. Ga. 2009) ("The parties agree, and the Court has already concluded, that Delaware law applies to Plaintiff's breach of fiduciary duty claim based on the 'internal affairs doctrine.'").

ResCap became an LLC on October 24, 2006. GMAC Mortgage Group LLC was the sole member of ResCap LLC, and the sole member of GMAC Mortgage Group LLC was AFI.[6] The 2006 ResCap LLC Agreement did not materially modify, limit, or eliminate any default fiduciary duties.[7] Accordingly, as discussed below, the members of the ResCap Board, as the managers of the LLC,[8] continued to owe the traditional duties that fiduciaries owe a corporation.[9]

### b.  Legal Standards For Fiduciary Duty Claims

Under Delaware law, fiduciary duties are owed by directors, officers, and controlling shareholders.[10] In general, fiduciary duties consist of the (1) duty of due care, and (2) duty of loyalty and good faith.[11] In order to prevail on a claim of breach of fiduciary duty under Delaware law, a plaintiff must prove "(i) that a fiduciary duty exists; and (ii) that a fiduciary breached that duty."[12]

### (1) Fiduciaries Owe A Duty Of Due Care

When a fiduciary exercises discretionary authority by making a business decision on behalf of a corporation, the fiduciary must do so with due care. The duty of care focuses on the decision-making process, and requires that a fiduciary be informed of all material information reasonably available before making a business decision.[13]

A party can state a claim for a breach of the duty of care by alleging that fiduciaries failed to exercise due care in informing themselves before approving a certain transaction. A successful claim for breach of the duty of care must prove conduct that reaches the level of "gross negligence," which requires showing that fiduciaries acted with so little information that their decision was unintelligible and unadvised or outside the bounds of reason and reckless.[14] Although fiduciaries may argue that they could not have acted with gross

---

6  *See* Section III.E.6.

7  *See* 2006 ResCap LLC Agreement, at 1 [ALLY_0255865].

8  *Id.* at § 14.

9  *See In re Atlas Energy Res. LLC*, C.A. No. 4589-VCN, 2010 WL 4273122, at *6 (Del. Ch. Oct. 28, 2010) ("[I]n the absence of explicit provisions in an [LLC] agreement to the contrary, the traditional fiduciary duties owed by corporate directors . . . apply in the [LLC] context.");

10  *See In re Hechinger Inv. Co.*, 274 B.R. at 93; *Harris v. Carter*, 582 A.2d 222, 234 (Del. Ch. 1990).

11  *See McMullin v. Beran*, 765 A.2d 910, 917 (Del. 2000); *Malone v. Brincat*, 722 A.2d 5, 10 (Del. 1998); *see also Buckley v. O'Hanlon*, No. 04-955GMS, 2007 WL 956947, at *3 (D. Del. Mar. 28, 2007); *Official Comm. of Unsecured Creditors of Fedders N. Am. v. Goldman Sachs Credit Partners L.P., (In re Fedders N. Am., Inc.)*, 405 B.R. 527, 539 (Bankr. D. Del. 2009).

12  *Legatski v. Bethany Forest Assoc., Inc.*, No. 03C-10-011, 2006 WL 1229689, at *3 (Del. Super. Ct. Apr. 28, 2006); *Estate of Eller v. Bartron*, 31 A.3d 895, 897 (Del. 2011) (citing *Heller v. Kiernan*, No. 1484-K, 2002 WL 385545, at *3 (Del. Ch. Feb. 27, 2002)); *KDW Restructuring*, 74 F. Supp. 2d at 221.

13  *See In re Healthco Int'l, Inc.*, 208 B.R. at 305.

14  "Gross negligence has a 'stringent meaning' in Delaware corporate law, involving 'indifference amounting to recklessness.'" *KDW Restructuring*, 874 F. Supp. 2d at 221 (citing *Disney II*, 906 A.2d at 67).

negligence because they relied on the advice of experts, it may be possible to overcome such defense by alleging that the fiduciaries did not consider certain information "so obvious that [their] failure to consider it was grossly negligent regardless of the expert's advice or lack of advice."[15]

The gravity of a business decision is relevant when determining whether the duty of due care has been breached:

> The more significant the subject matter of the decision, the greater is the requirement to probe and consider alternatives. For example, when the decision is to sell the company or to engage in a recapitalization that will change control of the firm, the gravity of the transaction places a special burden on the directors to make sure they have a basis for an informed view.[16]

A director will thus have heightened duties where approval of a transaction results in a sale or change of control.[17] In such circumstances, the directors have a duty to maximize value.[18]

### (2) Fiduciaries Owe A Duty Of Loyalty And Good Faith

Fiduciaries also owe a duty of loyalty and good faith. Delaware courts generally treat good faith as encompassed within the duty of loyalty rather than as a fully discrete duty.[19]

### (a) Duty Of Loyalty

The duty of loyalty requires, among other things, that a fiduciary not put his or her personal financial interests above the interests of the corporation.[20] A fiduciary may have breached his duty of loyalty if the fiduciary (1) was on both sides of a transaction, or (2) the fiduciary derived a personal financial benefit by self-dealing.[21]

---

[15] *Brehm v. Eisner*, 746 A.2d 244, 262 (Del. 2000) (*"Disney I"*); *see also Cal. Pub. Employees' Ret. Sys. v. Coulter*, 2002 WL 31888343, at *12 (Del. Ch. Dec. 18, 2002) (director's reliance on expert valuation report when approving acquisition was "grossly negligent" where "[e]ither the [directors] knew the report was based on grossly inaccurate data . . . or they worked very hard not to know that information").

[16] *In re Healthco Int'l, Inc.*, 208 B.R. at 305.

[17] *See Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*, 506 A.2d 173 (Del. 1986).

[18] *Id.* at 182 (noting that the duty of the board had changed from the preservation of Revlon as a corporate entity to maximization of the company's value at a sale for stockholders' benefit); *see also Lyondell Chem. Co. v. Ryan*, No. 401, 2008, 2009 WL 1024764, at *3 (Del. Supr. March 15, 2009).

[19] *See, e.g., Nagy v. Bistricer*, 770 A.2d 43, 49 n.2 (Del. Ch. 2000) ("If it is useful at all as an independent concept, the good faith iteration's utility may rest in its constant reminder (1) that a fiduciary may act disloyally for a variety of reasons other than personal pecuniary interest; and (2) that, regardless of his motive, a director who consciously disregards his duties to the corporation and its stockholders may suffer a personal judgment for monetary damages for any harm he causes.").

[20] *In re Healthco Int'l, Inc.*, 208 B.R. at 302.

[21] *See Liquidation Trust of Hechinger Inv. Co. of Del., Inc. v. Fleet Retail Fin. Group* (*In re Hechinger Inv. Co.*), 327 B.R. 537, 549 (D. Del. 2005), *aff'd*, 278 F.3d Appx. 125 (3d Cir. 2008).

A plaintiff can state a claim for a breach of the duty of loyalty by alleging that the directors were "interested or lack[ed] independence relative to the [approval of the transaction]."[22] If a fiduciary is an interested actor (i.e., has some kind of self-interest in the transaction) and is accused of breaching his or her duty of loyalty, the fiduciary will be liable unless (1) the fiduciary disclosed the self-interest, and (2) a majority of disinterested directors approved the transaction.[23]

In determining whether the duty of loyalty has been breached in the parent-subsidiary context, "[t]he parent/subsidiary cases have provided courts with difficult issues in defining whether self-dealing exists."[24] The directors of a subsidiary owe a fiduciary duty to the parent, as either the sole shareholder (in the context of a wholly owned subsidiary) or majority shareholder.[25] When self-dealing occurs between a parent and subsidiary, the business judgment rule, which provides great deference to the business decisions of directors (as discussed below), may not apply: "When the situation involves a parent and a subsidiary, with the parent controlling the transaction and fixing the terms, the test of intrinsic fairness, with its resulting shifting of the burden of proof, is applied."[26]

However, the intrinsic fairness standard will not apply to all parent-subsidiary dealings:

> [P]arent-subsidiary dealings . . . alone will not evoke the intrinsic fairness standard. This standard will be applied *only* when the fiduciary duty is accompanied by self-dealing—the situation when a parent is on both sides of a transaction with its subsidiary. Self-dealing occurs when the parent, by virtue of its domination of the subsidiary, causes the subsidiary to act in such a way that the parent receives something from the subsidiary to the exclusion of, and detriment to, the minority stockholders of the subsidiary.[27]

If the intrinsic fairness test applies, the burden of proof shifts to the defendant "to prove, subject to careful judicial scrutiny, that its transactions with [the subsidiary] were objectively fair."[28]

---

[22] *Disney I*, 746 A.2d at 264 n.66.

[23] *In re Healthco Int'l, Inc*., 208 B.R. at 303.

[24] 1 F. HODGE O'NEAL AND ROBERT B. THOMPSON, OPPRESSION OF MINORITY SHAREHOLDERS AND LLC MEMBERS § 3:24 (1st ed. 2004).

[25] *See ASARCO LLC v. Ams. Mining Corp.*, 396 B.R. 278, 395 (S.D. Tex. 2008).

[26] *Sinclair Oil Corp. v. Levien*, 280 A.2d 717, 720 (Del. 1971); *see also Trans World Airlines, Inc. v. Summa Corp.*, 374 A.2d 5 (Del. Ch. 1977) (parent had engaged in self-dealing when subsidiary was not allowed to purchase its own jet aircraft, while parent was able to lease its own newly acquired aircraft to subsidiary at profit).

[27] *Sinclair Oil Corp.*, 280 A.2d at 720 (emphasis added); *see also Matsumura v. Benihana Nat. Corp.*, 2010 WL 882968, at *10 n.25 (S.D.N.Y. Mar. 5, 2010).

[28] *Sinclair Oil Corp.*, 280 A.2d at 720.

The duty of loyalty subsumes within it a corollary duty of disclosure and candor. "Delaware courts have long held that a certain duty to disclose inheres in the duty of loyalty."[29] Directors "ha[ve] an 'unremitting obligation' to deal candidly with their fellow directors."[30] Officers have a duty to inform directors of information material to a corporation's affairs:

> The duty of an officer includes the obligation to inform the superior officer to whom, or the board of directors or the committee thereof to which, the officer reports of information about the affairs of the corporation known to the officer, within the scope of the officer's functions, and known to the officer to be material to such superior officer, board, or committee . . . .[31]

This duty of disclosure flowing from management is required as "a board of directors could not function without the information provided to it by senior officers."[32] "At a minimum, this rule dictates that fiduciaries . . . may not use superior information or knowledge to mislead others in the performance of their own fiduciary obligations. The actions of those who join in such misconduct are equally tainted."[33]

Yet a fiduciary's duty to disclose is not unlimited:

> [A duty to disclose] is not a general duty to disclose everything the director knows about transactions in which the corporation is involved . . . . Rather, it is [t]he intentional failure or refusal of a director to disclose to the board a defalcation or scheme to defraud the corporation of which he has learned, [which] itself constitutes a wrong.[34]

Further, the duty to disclose has generally been confined to certain circumstances. In *Big Lots Stores, Inc. v. Bain Capital Fund VII, LLC*, the Delaware Chancery Court explained: "[T]he

---

[29] *Big Lots Stores, Inc. v. Bain Capital Fund VII, LLC*, 922 A.2d 1169, 1184 (Del. Ch. 2006); *see also Eurofins Pharma US Holdings v. BioAlliance Pharma SA*, 623 F.3d 147, 158 (3d Cir. 2010).

[30] *HMG/Courtland Properties, Inc. v. Gray*, 749 A.2d 94, 119 (Del. Ch. 1999) (citing *Mills Acquisition Co. v. Macmillan, Inc.*, 559 A.2d 1261, 1283 (Del. 1989)).

[31] *Hampshire Group, Ltd. V. Kuttner*, C.A. No. 3607-VCS 2010 WL 2739995, at *13 n.85 (Del. Ch. July 12, 2010); *see also* Megan Wischmeier Shaner, *Restoring The Balance Of Power In Corporate Management: Enforcing An Officer's Duty Of Obedience*, 66 BUS. L.J. 27, 47 (2010) ("Shaner") ("In fact, in the context of the duty to disclose information to the board, the Delaware courts have found officers to occupy roles similar to those of agents of the corporation.").

[32] Shaner at 226.

[33] *Mills Acquisition Co. v. Macmillan, Inc.*, 559 A.2d 1261, 1283 (Del. 1989).

[34] *Eurofins Pharma US Holdings v. BioAlliance Pharma SA*, 623 F.3d 147, 158 (3d Cir. 2010) (citing *Big Lots Stores, Inc. v. Bain Capital Fund VII, LLC*, 922 A.2d 1169, 1184 (Del. Ch. 2006)); *Big Lots Stores, Inc. v. Bain Capital Fund VII, LLC*, 922 A.2d 1169, 1184 (Del. Ch. 2006); *Thorpe v. CERBCO, Inc.*, 676 A.2d 436 (Del.1996) (finding a duty to disclose where controlling shareholders and directors failed to tell disinterested directors of an offer to buy the company and instead arranged to sell their own shares only).

director disclosure cases decided in Delaware courts have implicated circumstances in which the director is personally engaged in transactions harmful to the corporation, but beneficial to the director."[35] Accordingly, "[d]irector disclosure cases are thus typically characterized at least in part by an element of self-dealing on the part of the director."[36]

Cases in which lack of disclosure has led to a finding of breach of fiduciary duty, therefore, have generally involved defendants who obtained a personal benefit at the expense of the company they served. For example, in *Hollinger International v. Black*, the court found that the controlling shareholder (also a director) breached his fiduciary duties when he did not disclose "that he was 'shopping' the company in violation of a signed contract that forbade him to do so."[37] The court emphasized that the fiduciary breached his duty by "diverting [a strategic] opportunity to himself . . . [and] improperly using confidential information belonging to [the company] to advance his own personal interests and not those of [the company], without authorization from his fellow directors."[38]

The court in *Thorpe v. CERBCO, Inc*. reached a similar conclusion, finding that two controlling shareholders and directors had a duty to disclose to disinterested directors an offer to buy the company, where they instead arranged with the bidder to sell their own shares only, benefiting themselves and potentially injuring the company.[39] Likewise, in *Mills Acquisition Co. v. Macmillan*, certain officers and directors breached their fiduciary duties, and stood to profit personally from their misconduct, where they leaked a bid to a potential buyer without informing the board. The court reasoned that "[g]iven the materiality of these tips, and the silence of [the defendant fiduciaries] in the face of their rigorous affirmative duty of disclosure at the . . . board meeting, there can be no dispute but that such silence was misleading and deceptive. In short, it was a fraud upon the board."[40]

Proof of damages is generally not required to demonstrate a breach of the duty of loyalty.[41] In *Shocking Technologies, Inc. v. Michael*, the court held that "damages constitute

---

[35] *Big Lots Stores, Inc. v. Bain Capital Fund VII, LLC*, 922 A.2d 1169, 1184 (Del. Ch. 2006) (applying Ohio law to the claims but referring to Delaware law for guidance).

[36] *In re PMTS Liquidating Corp.*, 452 B.R. 498, 509 n.3 (Bankr. D. Del. 2011).

[37] *Big Lots Stores, Inc. v. Bain Capital Fund VII, LLC*, 922 A.2d 1169, 1184 (Del. Ch. 2006) (citing *Hollinger International v. Black*, 844 A.2d 1022, 1061 (Del. Ch. 2004)); *see also Eurofins Pharma US Holdings v. BioAlliance Pharma SA,* 623 F.3d 147, 159 (3d Cir. 2010); *Int'l Equity Capital Growth Fund v. Clegg,* No. Civ.A. 1499 5, 1997 WL 208955, at *5–6, (Del. Ch. Apr. 22, 1997) (finding duty to disclose where an interested director induced board to purchase manufacturing plant that he knew, at time of purchase, manufactured "poor quality" defective products).

[38] *Hollinger International v. Black*, 844 A.2d 1022, 1061-62 (Del. Ch. 2004).

[39] *Thorpe v. CERBCO, Inc,* 676 A.2d 436 (Del. 1996).

[40] *Mills Acquisition Co. v. Macmillan, Inc.*, 559 A.2d 1261, 1283 (Del. 1989).

[41] *In re Fuqua Industries, Inc.*, No. Civ.A. 11974, 2005 WL 1138744, at *6 (Del. Ch. May 6, 2005) ("[I]n cases of the breach of the duty of loyalty, the plaintiff need not prove damages to establish a breach of that duty"); *Cline v. Grelock,* C.A. No. 404C-VCN, 2010 WL 761142, at *3 (Del. Ch. Mar. 2, 2010) (costs of actions were assessed against defendant for breach of fiduciary duty even though plaintiff was unable to show harm or damages).

an element of the tort," yet it went on to state that "a breach of the fiduciary duty of loyalty may be shown without proof of proximate damages."[42] As noted in *Thorpe*, a duty of loyalty breach "loosen[s] the stringent requirements of causation and damages."[43]

### *(b) Duty Of Good Faith*

In order to state a claim for breach of the duty of good faith, "a subsidiary element of the duty of loyalty," a plaintiff must demonstrate one of three actions:

> 1) [W]here the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation; 2) where the fiduciary acts with the intent to violate applicable positive law; or 3) where the fiduciary intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties.[44]

"Bad faith" conduct has been defined as an "intentional dereliction of duty, a conscious disregard for one's responsibilities."[45] For example, fiduciaries can act in bad faith by approving a transaction in "conscious disregard of their duties."[46] In the event that a plaintiff successfully alleges such conduct, the burden would shift to the fiduciaries to "demonstrate that the challenged act or transaction was entirely fair to the corporation and its shareholders."[47]

### *c. Fiduciary Duty Breaches May Be Continuing In Nature*

A breach of fiduciary duty can potentially be protracted in duration. The "continuing wrong" doctrine can toll the pertinent statute of limitations for a breach of fiduciary duty claim that is premised on recurring misconduct. For example, in *Kaymakcian v. Board of Managers of Charles House Condominium,* the court held that a condominium board's failure to repair the terrace of an apartment was a continuing wrong that was not "referable exclusively to the day the original wrong was committed," because "pursuant to the

_____

[42] *Shocking Techs., Inc. v. Michael*, C.A. No. 7164-VCN, 2012 WL 4482838 n.66 (Del. Ch. Oct. 1, 2012); *see also Se. Pa. Transp. Auth. v. Volgenau*, C.A. No. 6354-VCN, 2012 WL 4038509, at *3 n.17 (Del. Ch. Aug. 31, 2012) ("Thus, SEPTA's claim for breach of fiduciary duty in Count IV could conceivably be the Complaint's one ultimately successful claim. SEPTA, of course, will likely only be able to recover on that claim if it can show damages flowing from the disparate treatment that Volgenau received.").

[43] *Thorpe v. CERBCO, Inc*., 676 A.2d 436, 445 (Del. Supr. 1996) (citing *Guth v. Loft, Inc*., 5 A.2d 503, 510 (Del. Supr. 1939)).

[44] *In re Direct Response Media, Inc.,* 466 B.R. 626, 652 (Bankr. D. Del. 2012) (citing *Disney II*, 906 A.2d at 67).

[45] *Disney II*, 906 A.2d at 66–67.

[46] *Id.*

[47] *Id.* at 52.

condominiums' by-laws, respondents had a continuing duty to repair the building's limited common elements."[48] Similarly, in *Butler v. Gibbons,* the court found that "plaintiff's allegations that defendant breached his fiduciary duty, by his repeated and continuing failure to account and turn over proceeds earned from renting certain properties, constituted a continuing wrong."[49]

However, the doctrine is employed somewhat sparingly. For example, in *Pike v. New York Life Ins. Co*., the court held that the continuing wrong doctrine did not apply where plaintiffs alleged that they were induced to purchase unsuitable insurance policies, because they could "not point to any specific wrong that occurred each time they paid a premium, other than having to pay it."[50] The court concluded that "any wrong accrued at the time of purchase of the policies, not at the time of payment of each premium."[51]

### d.   *Fiduciary Duties In Context Of Limited Liability Companies*

Managers of an LLC owe fiduciary duties to the members and to the LLC.[52] This is because "[m]ost LLC statutes mandate that managers, including members who manage the LLC, have fiduciary duties to the members and the LLC," and "[e]ven in states whose LLC statutes do not specifically impose fiduciary duties on a manager, courts have ruled that managers including member-managers have fiduciary duties to the members."[53] Whether members of an LLC owe other members fiduciary duties is a more difficult question and varies by state.[54]

Delaware courts have generally, in the absence of provisions in the limited liability company agreement explicitly disclaiming the applicability of default principles of fiduciary duty, treated LLC managers and members as owing each other and the LLC the traditional

---

[48] 854 N.Y.S.2d 52 (N.Y. App. Div. 2008); *Merine on Behalf of Prudential–Bache Util. Fund, Inc. v. Prudential–Bache Util. Fund, Inc.*, 859 F. Supp. 715, 718 (S.D.N.Y. 1994) (holding that where defendant allegedly breached its fiduciary duty by charging plaintiff excessive servicing fees for a mutual fund, a continuing wrong occurred each time it charged the allegedly excessive fee).

[49] *Spitzer v. Schussel,* 792 N.Y.S.2d 798, 803 (N.Y. Sup. 2005) (discussing *Butler v. Gibbons*, 569 N.Y.S.2d 722 (N.Y. App. Div. 1991).

[50] 901 N.Y.S.2d 76, 81 (N.Y. App. Div.).

[51] 901 N.Y.S.2d 76, 81 (N.Y. App. Div.); *see also Schandler v. N.Y. Life Ins. Co*., No. 09 Civ. 10463, 2011 WL 1642574, at *11 (S.D.N.Y. Apr. 26, 2011); *Korn v. Merrill,* 403 F. Supp. 377, 388 (S.D.N.Y. 1975); *Barbara v. MarineMax, Inc*., No. 12-CV-0368, 2012 WL 6025604, at *9 (E.D.N.Y. Dec. 4, 2012).

[52] *See* Nicholas Karembelas, Limited Liability Companies: Law, Practice & Forms § 10:2 (1st ed. 2012).

[53] *Id.*

[54] *Id.*

duties that fiduciaries owe a corporation.[55] Similar to the Delaware General Corporation Law (the "DGCL"), the Delaware Limited Liability Company Act (the "LLC Act") does not explicitly state that traditional fiduciary duties apply by default.[56] A recent Delaware Chancery Court decision indicated, however, that the LLC Act is even more explicit than the DGCL regarding whether equitable fiduciary duties are incorporated.[57] Referencing Section 18-1004 of the LLC Act, which states that "[i]n any case not provided for in this chapter, the rules of law and equity . . . shall govern,"[58] the court held that, unlike in the corporate context, the rules of equity apply in the LLC context "by statutory mandate," and under traditional principles of equity, an LLC manager or member is a fiduciary of the LLC and its members, owing fiduciary duties of care and loyalty.[59] As such, the court held that the LLC Act provides that managers of limited liability companies owe enforceable fiduciary duties.[60]

The Delaware Supreme Court has yet to explicitly rule on whether there are default fiduciary duties in the LLC context.[61] A long line of Delaware Chancery Court decisions,

---

[55] *See Auriga Capital Corp. v. Gatz Props., LLC*, 40 A.3d 839, 853–55 (Del. Ch. Jan. 27, 2012); *Feeley v. NHAOCG, LLC*, --- A.3d ----, 2012 WL 6840577, at *7–8 (Del. Ch. Nov. 28, 2012) ("Numerous Court of Chancery decisions hold that the managers of an LLC owe fiduciary duties."); *Bay Center Apartments Owner, LLC v. Emery Bay PKI, LLC*, C.A. No. 3658-VCS 2009 WL 1124451, at *8 n.33 (Del. Ch. Apr. 20, 2009) ("The Delaware LLC Act is silent on what fiduciary duties members of an LLC owe each other, leaving the matter to be developed by the common law. The LLC cases have generally, in the absence of provisions in the LLC agreement explicitly disclaiming the applicability of default principles of fiduciary duty, treated LLC members as owing each other the traditional fiduciary duties that directors owe a corporation."); *Paron Capital Mgmt., LLC v. Crombie*, No. 7154-CS 2012 WL 2045857, at *7 n.22 (Del. Ch. May 22, 2012); *Phillips v. Hove*, C.A. No. 3644-VCL, 2011 WL 4404034, at *24 (Del. Ch. Sept. 22, 2011) ("Unless limited or eliminated in the entity's operating agreement, the member-managers of a Delaware limited liability company . . . owe traditional fiduciary duties to the LLC and its members."); *In re Atlas Energy Res. LLC*, C.A. No. 4589-VCN, 2010 WL 4273122, at *6 (Del. Ch. Oct. 28, 2010) ("[I]n the absence of explicit provisions in an [LLC] agreement to the contrary, the traditional fiduciary duties owed by corporate directors . . . apply in the [LLC] context."); *Kelly v. Blum*, Civ.A. No. 4516-VCP, 2010 WL 629850, at *10 (Del. Ch. Feb. 24, 2010) ("Delaware cases interpreting Section 18-1101(c) have concluded that, despite the wide latitude of freedom of contract afforded to contracting parties in the LLC context, 'in the absence of a contrary provision in the LLC agreement,' LLC managers and members owe 'traditional fiduciary duties of loyalty and care' to each other and to the company.").

[56] *See Auriga*, 40 A.3d at 850.

[57] *Id.*

[58] *Id.* at 849.

[59] *Id.* at 850.

[60] *Id.*

[61] *See Gatz Props., LLC v. Auriga Capital Corp*., 59 A.3d 1206, 1215 (Del. Supr. Nov. 7, 2012).

however, indicates that a bankruptcy court will likely find that default fiduciary duties apply in the LLC context, absent a limitation or elimination of such duties in the LLC agreement.[62]

### e. Standing To Assert Fiduciary Duty Claims

#### (1) Corporate Context

Traditionally, under Delaware law, directors, officers, and controlling shareholders owe fiduciary duties to the corporation and its shareholders and not to the corporation's creditors.[63] In the absence of insolvency, the fiduciary duty may be enforced derivatively only by the corporation's shareholders, as it is the shareholders who have standing to bring derivative actions on behalf of the corporation because they are the ultimate beneficiaries of the corporation's growth and increased value.[64] Creditors of a solvent corporation have no right, as a matter of law, to assert direct claims for breach of fiduciary duty.[65]

In contrast, when a corporation is insolvent, creditors of the corporation "take the place of the shareholders as the residual beneficiaries of any increase in value."[66] As a result, "the creditors of an insolvent corporation have standing to maintain derivative claims against

---

[62] *See Burtch v. Opus E., L.L.C.*, 480 B.R. 561, 572 (Bankr. D. Del. 2012) ("Because the duties owed by fiduciaries are the same whether it be a corporation or limited liability company, the fiduciary duties the Defendants owe the Debtor are derived from common law and not dependent on the LLC Agreement."). Courts will generally look to the agreement in determining the applicable fiduciary duties, because "in the alternative entity context, it is frequently impossible to decide fiduciary duty claims without close examination and interpretation of the governing instrument of the entity giving rise to what would be, under default law, a fiduciary relationship." *Douzinas v. Am. Bureau of Shipping, Inc.*, 888 A.2d 1146, 1149–50 (Del. Ch. 2006) (citing *Flight Options Int'l, Inc. v. Flight Options, LLC*, No. Civ. A. 1459-N, 2005 WL 2335353 (Del. Ch. Sept. 20, 2005); *see also Gelfman v. Weeden Investors, L.P.*, 859 A.2d 89 (Del. Ch. 2004); *Miller v. Am. Real Estate Partners, L.P.*, No. Civ. A. 16788, 2001 WL 1045643 (Del. Ch. Sept. 6, 2001); *R.S.M., Inc. v. Alliance Capital Mgmt. Holdings, L.P.*, 790 A.2d 478 (Del. Ch. 2001); *Cont'l Ins. Co. v. Rutledge & Co., Inc.*, 750 A.2d 1219 (Del. Ch. 2000); *Sonet v. Timber* Co., 722 A.2d 319 (Del. Ch. 1998). As noted above, the 2006 ResCap LLC Agreement did not modify or eliminate default fiduciary duties.

[63] *N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 99 (Del. 2007); *In re Hechinger Inv. Co.*, 274 B.R. at 89.

[64] *Gheewalla*, 930 A.2d at 101. Trustees have standing to pursue claims for breaches of fiduciary duties and for aiding and abetting breaches of fiduciary duties. *See ASARCO LLC v. Ams. Mining Corp.*, 396 B.R. 278, 924 (S.D. Tex. 2008) (citing *Rosener v. Majestic Mgmt., Inc.* (*In re OODC, LLC*), 321 B.R. 128, 143 (Bankr. D. Del. 2005)).

[65] *Gheewalla*, 930 A.2d at 103.

[66] *Id.* at 101.

directors on behalf of the corporation for breaches of fiduciary duties."[67] However, even if a corporation is insolvent, a creditor has no standing for a direct claim for breach of fiduciary duty:

> [I]ndividual creditors of an insolvent corporation have no right to assert direct claims for breach of fiduciary duty against corporate directors. Creditors may nonetheless protect their interest by bringing derivative claims on behalf of the insolvent corporation or any other direct nonfiduciary claim . . . that may be available for individual creditors.[68]

### (2) Limited Liability Company Context

Pursuant to a recent Delaware Supreme Court decision, creditors of a Delaware limited liability company have no standing to assert derivative claims on behalf of the limited liability company, even if the limited liability company is insolvent.[69] The court premised its ruling on the plain language of Section 18-1002 of the LLC Act, which states that only LLC members and assignees of an LLC interest have standing to bring derivative claims on behalf of the LLC.[70] The court held that "[b]ecause section 18-1002 is unambiguous, is susceptible of only one reasonable interpretation, and does not yield an absurd or unreasonable result, we apply its plain language. Only LLC members or assignees of LLC interests have derivative standing to sue on behalf of an LLC—creditors do not."[71] Accordingly, creditors of an insolvent Delaware LLC have more limited standing rights than creditors of an insolvent Delaware corporation.[72]

### f.  Fiduciary Duties In The Parent-Subsidiary Context

### (1) Duties Of Subsidiary Entity Fiduciaries

### (a) Duties of Fiduciaries Of A Solvent Wholly Owned Subsidiary

In *Anadarko Petroleum Corp. v. Panhandle Eastern Corp.*, the Delaware Supreme Court stated in dicta that "in a parent and wholly-owned subsidiary context, the directors of the subsidiary are obligated only to manage the affairs of the subsidiary in the best interests of the

---

[67]  *Id; see also In re AMC Investors, LLC,* No. 08-12264 2009 WL 1565823, at *7 (Bankr. D. Del. June 5, 2009); *In re Magnesium Corp. of Am.*, 399 B.R. at 759; *Miller v. McCowen De Leeuw & Co., Inc.,* (*In re The Brown Schools)*, 368 B.R. 394, 409 (Bankr. D. Del. 2007); *Schoon v. Smith,* No. 554, 2006, 2007 WL 3021625 (Del. Supr. Aug. 22, 2007); *Official Comm. of Unsecured Creditors of TOUSA, Inc. v. Tech. Olympic, S.A.* (*In re TOUSA, Inc.*), 437 B.R. 447, 456 (Bankr. S.D. Fla. 2010).

[68]  *Gheewalla*, 930 A.2d at 103.

[69]  *See CML v. LLC v. Bax*, 28 A.3d 1037, 1041–42 (Del. Sept. 2, 2011).

[70]  DEL. CODE ANN. tit 6, § 18-1002 (2013).

[71]  *Bax,* 28 A.3d at 1043; *see also Bank of Am., N.A. v. Knight*, 875 F. Supp. 2d 837, 850 (N.D. Ill. 2012).

[72]  *Bax,* 28 A.3d at 1042 n.16 (citing *Gheewalla*, 930 A.2d at 101).

parent and its shareholders."[73] Despite this statement, whether directors owe a fiduciary duty to the subsidiary itself is a point in controversy.[74] Several courts construing Delaware law have stated that directors of a wholly owned subsidiary owe a duty to the parent corporation, and not to the subsidiary corporation.[75] However, other courts have limited the *Anadarko* dicta to the facts of that case and found that the directors of a wholly owned subsidiary also owe a duty to that subsidiary, in addition to the parent corporation.[76] This may be in part because, "[e]ven before *Anadarko*, Delaware law recognized that individuals who act in a dual capacity

---

[73] 545 A.2d 1171, 1174 (Del. 1988); *see also* J. Haskell Murray, *"Latchkey Corporations": Fiduciary Duties in Wholly Owned, Financially Troubled Subsidiaries*, 36 DEL. J. CORP. L. 577, 593–94 (2011) (*Latchkey Corporations*). As described in more detail below, fiduciary duties are not owed to the creditors of a solvent corporation. *See id.*

[74] *See Latchkey Corporations*, 36 DEL. J. CORP. L. at 594.

[75] *Anadarko Petroleum Corp. v. Panhandle E. Corp.*, 545 A.2d 1171, 1174 (Del. 1988) ("[I]n a parent and wholly-owned subsidiary context, the directors of the subsidiary are obligated only to manage the affairs of the subsidiary in the best interests of the parent and its shareholders."); *The Responsible Pers. of Musicland Holding Corp. v. Best Buy Co., Inc.* (*In re Musicland Holding Corp.*), 398 B.R. 761, 786 (Bankr. S.D.N.Y. 2008) ("Ordinarily, the directors of a wholly owned subsidiary 'are obligated only to manage the affairs of the subsidiary in the best interests of the parent and its shareholders.'"); *Teleglobe USA Inc. v. BCE Inc.,* (*In re Teleglobe Commc'ns Corp*.), 493 F.3d 345, 366 (3d Cir. 2007) (stating in dicta that pursuant to Delaware law, "all of the duties owed to the subsidiaries flow back up to the parent"); *Aviall, Inc. v. Ryder Sys., Inc*., 913 F. Supp. 826, 832 (S.D.N.Y. 1996), *aff'd on other grounds*, 110 F.3d 892 (2d Cir. 1997) ("When one company wholly owns another, the directors of the parent and the subsidiary are obligated to manage the affairs of the subsidiary in the best interests only of the parent and its shareholders."); *Official Comm. of Unsecured Creditors v. Bay Harbour Master Ltd.* (*"In re BHS & B Holdings LLC"*), 420 B.R. 112, 144 (Bankr. S.D.N.Y. 2009) ("[I]n a parent and wholly-owned subsidiary context, directors of the subsidiary are obligated only to manage the affairs of the subsidiary in the best interests of the parent and its shareholders.").

[76] *See Latchkey Corporations*, 36 DEL. J. CORP. L. at 594–95 (citing *First Am. Corp. v. Al-Nahyan*, 17 F. Supp. 2d 10, 26 (D.D.C. 1998) (a wholly owned subsidiary had standing to sue its directors for breach of fiduciary duties because "the directors of a wholly-owned subsidiary owe the corporation fiduciary duties, just as they would any other corporation"); *In re Mirant Corp*., 326 B.R. 646, 651 (Bankr. N.D. Tex. 2005) (holding that the defendant had engaged in an "overly-broad reading of Anadarko" and noting that Anadarko "held that directors of a parent owed no fiduciary duty to prospective shareholders of the subsidiary prior to a spinoff, not that the subsidiary's directors owed no duty to the subsidiary"); *Claybrook v. Morris* (*In re Scott Acquisition Corp*.), 344 B.R. 283, 286–87 (Bankr. D. Del. 2006) ("The Southwest court relied on the Delaware Supreme Court's decision in [*Anadarko*] for the proposition that the directors of a wholly-owned insolvent subsidiary owe fiduciary duties to the parent but not the subsidiary corporation. I do not believe that Anadarko advances this position."); *Williams v. McGreevy* (*In re Touch Am. Holdings, Inc*.), 401 B.R. 107, 129 (Bankr. D. Del. 2009) (in the context of solvent wholly owned subsidiary, holding that "directors of a wholly-owned subsidiary owe fiduciary duties to both the subsidiary and to the sole shareholder, the parent corporation") (emphasis added); *Official Comm. of Unsecured Creditors of RSL Com Primecall, Inc. v. Beckoff* (*In re RSL COM Primecall, Inc.*), No. 01-11457 (ALG), 2003 WL 22989669, at *14 (Bankr. S.D.N.Y. Dec. 11, 2003) ("The Anadarko line of authority cannot be applied blindly to immunize an insolvent subsidiary's Board from liability for action in disregard of its own interests and those of its creditors.").

as directors of two corporations, one of whom is parent and the other subsidiary, owe the same duty of good management to both corporations . . . ."[77]

### (b) Duties of Fiduciaries Of An Insolvent Wholly Owned Subsidiary

As a general rule, fiduciaries owe duties only to the corporation and its shareholders, and not to creditors.[78] However, Delaware has adopted an "insolvency exception" to the general rule that there is no fiduciary duty to creditors.[79] When a wholly owned subsidiary becomes insolvent, the director's fiduciary duties to the corporation now "run to the benefit of the creditors . . . . The directors' focus is no longer solely on its shareholders' interests, but also on the creditors' interests."[80]

There is still some uncertainty with regard to whether an insolvent subsidiary's directors continue to owe any fiduciary duties to shareholders (i.e., the parent entity):

> There appears to be some difference of opinion regarding whether, in the case of insolvency, directors still owe any fiduciary duties to the shareholders, or rather, if the creditors essentially take the place of the shareholders as residual beneficiaries. Some courts seem to take a "community of interests" approach, while others recognize that the creditors and shareholders switch places.[81]

New York courts have held that, under Delaware law, directors and officers of an insolvent wholly owned subsidiary owe fiduciary duties to the subsidiary and its creditors, in addition to

---

[77] *See Latchkey Corporations*, 36 DEL. J. CORP. L. at 594 (citing *Weinberger v. UOP, Inc.*, 457 A.2d 701, 710 (Del. 1983)) (holding that "the long-existing principle of Delaware law that [parent] designated directors on [a subsidiary's] board still owed [the subsidiary] and its shareholders an uncompromising duty of loyalty," and noting that "[t]here is no dilution of this obligation where one holds dual or multiple directorships, as in a parent-subsidiary context").

[78] *See ASARCO LLC v. Ams. Mining Corp.*, 396 B.R. 278, 395 (S.D. Tex. 2008) (applying Delaware law); *see also Anadarko*, 545 A.2d at 1174.

[79] *See ASARCO*, 396 B.R. at 395 (citing *In re Scott Acquisition Corp.*, 344 B.R. 283, 289 (Bankr. D. Del. 2006)) (holding that a subsidiary's creditors and the subsidiary itself are owed a fiduciary duty upon insolvency); *Prod. Res. Group, LLC v. NCT Group*, 863 A.2d 772, 790–91 (Del. Ch. 2004) ("When a firm has reached the point of insolvency . . . the firm's directors are said to owe fiduciary duties to the company's creditors."); *see also Latchkey Corporations*, 36 DEL. J. CORP. L. at 596–97 (citing *Gheewalla*, 930 A.2d at 101).

[80] *ASARCO*, 396 B.R. at 395; *see also Prod. Res. Group, LLC*, 863 A.2d at 790–91 ("The fact of insolvency places the creditors in the shoes normally occupied by the shareholders—that of residual risk-bearers.").

[81] *ASARCO*, 396 B.R. at 395 (citing *VFB LLC v. Campbell Soup Co.*, 482 F.3d 624, 635–36 (3d Cir. 2007)).

the parent corporation.[82] Accordingly, "[t]here is no basis for the principle . . . that the directors of an insolvent subsidiary can, with impunity, permit it to be plundered for the benefit of its parent corporation."[83]

### (2) Duties Of Parent Entity Fiduciaries

As a general rule, fiduciaries of a parent corporation do not owe duties to the parent's wholly owned subsidiary,[84] as fiduciaries owe duties only to the corporation and its shareholders (which excludes entities owned by the parent). This general rule is distinguished from a situation in which a subsidiary is not wholly owned, as the parent (the dominant shareholder) will then owe fiduciary duties to minority shareholders.[85] The rationale for this exception "is that when minority shareholders are involved, the subsidiary does not exist solely for the parent's benefit. Recognition of a fiduciary duty in the dominant shareholder is designed to protect the entire community."[86]

Directors of a parent corporation to an insolvent subsidiary generally do not owe fiduciary duties to either the insolvent subsidiary or the insolvent subsidiaries' creditors.[87] However, as noted in *ASARCO*, because Delaware law recognizes a claim against a parent for aiding and abetting a breach of duty by a subsidiary's fiduciary, that claim "can serve this gap-filling purpose; thus, there is no need to impose a duty directly on the parent corporation."[88]

[82] *See Latchkey Corporations*, 36 DEL. J. CORP. L. 577, 597–98 (2011) (citing *In Re RSL COM Primecall, Inc.*, No. 01-11457 (ALG), 2003 WL 22989669, at *13 ("It would be absurd to hold that the doctrine that directors owe special duties after insolvency is inapplicable when the insolvent company is a subsidiary of another corporation. That is precisely when a director must be most acutely sensitive to the needs of a corporation's separate community of interests, including both the parent shareholder and the corporation's creditors."); *Roselink Investors, LLC v. Shenkman*, 386 F. Supp. 2d 209, 215 (S.D.N.Y. 2004) ("[D]irectors of a wholly owned subsidiary, who otherwise would owe fiduciary duties only to the parent, also owe fiduciary duties to creditors of the subsidiary when the subsidiary enters 'the zone of insolvency.'").

[83] *In re TOUSA, Inc.*, 437 B.R. at 458 (citing *In re Scott Acquisition*, 344 B.R. at 288; *ASARCO*, 396 B.R. at 395; *RSL Commc'n PLC ex rel. Jervis v. Bildirici*, No. 04-CV-5217 (KMK), 2006 WL 2689869, at *9 (S.D.N.Y. Sept. 14, 2006)).

[84] *See ASARCO*, 396 B.R. at 414 (citing *Trenwick Am. Litig. Trust v. Ernst & Young, LLP*, 906 A.2d 168, 191 (Del. Ch. 2006); *Citron v. Fairchild Camera & Instrument Corp.*, 569 A.2d 53, 70 (Del. 1989)); *see also Anadarko Petroleum Corp. v. Panhandle E. Corp.*, 545 A.2d 1171, 1174 (Del. 1988); *Official Comm. of Unsecured Creditors of Hydrogen, LLC v. Blomen (In re Hydrogen, LLC)*, 431 B.R. 337, 347 (Bankr. S.D.N.Y. 2010) ("[T]he weight of authority around the country holds that the directors of a parent corporation owe no fiduciary duties to a wholly owned subsidiary.").

[85] *See ASARCO*, 396 B.R. at 414 (citing *Anadarko*, 545 A.2d at 1171).

[86] *Id.* (citing *Pepper v. Litton*, 308 U.S. 295, 307 (1939)).

[87] *See id.* 415–16 (denying a claim by wholly owned subsidiary against parent corporation for breach of fiduciary duty). *But see In re RSL COM Primecall, Inc.*, No. 01-11457 (ALG), 2003 WL 22989669, at *14 ("[D]irectors of the parent cannot be compelled at such time to attend only to the interests of the subsidiary, especially where (as here) both were insolvent.").

[88] *ASARCO,* 396 B.R. at 415–16 (explaining that "under . . . Delaware law, the aiding and abetting claim [the subsidiary] brought requires knowing participation by a *non-fiduciary*. Thus, by finding a parent corporation can be liable for aiding and abetting its subsidiary's directors' breach of fiduciary duty, courts, including this one, have implicitly acknowledged that the parent corporation has no fiduciary obligation to its insolvent wholly owned subsidiary or its subsidiary's creditors.").

### g. *Potential Defenses To A Claim For Breach Of Fiduciary Duty*

#### (1) *The Business Judgment Rule Protects Certain Conduct*

The Delaware Supreme Court has articulated the "business judgment rule" as follows:

> The business judgment rule has been well formulated by *Aronson*[89] and other cases. ("It is a presumption that in making a business decision the directors . . . acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the corporation.") Thus, directors' decisions will be respected by courts unless the directors are interested or lack independence relative to the decision, do not act in good faith, act in a manner that cannot be attributed to a rational business purpose or reach their decision by a grossly negligent process that includes the failure to consider all material facts reasonably available.[90]

Directors may avoid liability for breach of fiduciary duties by invocation of the business judgment rule.[91] The business judgment rule has four elements: "(1) a business decision; (2) disinterestedness and independence; (3) due care; and (4) good faith," and the presumption that the business judgment rule applies "can be rebutted by demonstrating that one of these elements is not present."[92] If a plaintiff can meet its burden and demonstrate that a director breached a fiduciary duty, the burden shifts and the director must prove the "entire fairness" of the transaction.[93] Entire fairness has two elements, fair dealing and fair price, and a director must prove both.[94]

---

[89] *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984).

[90] *Brehm v. Eisner*, 746 A.2d 244, 264 n.66 (Del. 2000) ("*Disney II*") (internal citation omitted); *see Responsible Person v. Best Buy Co., Inc. (In re Musicland Holding Corp.)*, 398 B.R. 761, 788 (Bankr. S.D.N.Y. 2008); *FLI Deep Marine LLC v. McKim*, No. 04-V-5217 (KMK), 2009 WL 1204363, at *2-3 (Del. Ch. April 21, 2009).

[91] *Aronson,* 473 A.2d at 812; *see Halpert Enter., Inc. v. Harrison*, No. 07-1144-CV 2008 WL 4585466, at *1 (2d Cir. Oct. 15, 2008); *In re Tower Air, Inc.*, 416 F.3d at 238; *Lemond v. Manzulli*, No. OS Civ. 2222 (ILG), 2009 WL 1269840, at *4 (E.D.N.Y. Feb. 9, 2009); *IT Litig. Trust v. D'Aniello (In re IT Group Inc.)*, No. 02-10118, 2005 WL 3050611, at *7 (D. Del. Nov. 15, 2005); *McMullin v. Beran*, 765 A.2d 910, 916 (Del 2000). The Delaware Supreme Court has also articulated the business judgment rule in terms of gross negligence: "While the Delaware cases use a variety of terms to describe the applicable standard of care, our analysis satisfies us that under the business judgment rule director liability is predicated upon concepts of gross negligence." *Aronson*, 473 A.2d at 812; *see also Auburn Chevrolet-Oldsmobile-Cadillac, Inc. v. Branch*, Civil Case No. 5:06-CV-0362, 2009 WL 667430, at *13 n.21 (N.D.N.Y. Mar. 10, 2009); *In re Ply Gem Indus., Inc. Shareholders Litig.*, No. Civ.A. 15779-NC, 2001 WL 1192206, at *1 n.4 (Del. Ch. Oct 3, 2001); *Brittingham v. Bd. of Adjustment of City of Rehoboth Beach*, No. Civ.A. 03A-08-002, 2005 WL 1653979, at *3 n.2 (Del. Supr. Jan. 14, 2005).

[92] *ASARCO*, 396 B.R. at 405 (citing *Roselink Investors, L.L.C. v. Shenkman*, 386 F. Supp. 2d 209, 217–21 (S.D.N.Y. 2004) (applying Delaware law)).

[93] *Liquidation Trust of Hechinger Inv. Co. of Del., Inc. v. Fleet Retail Fin. Group* (*In re Hechinger Inv. Co.*), 327 B.R. 537, 549 (D. Del. 2005), *aff'd*, 278 F.3d Appx. 125 (3d Cir 2008).

[94] *See Weinberger v. UOP, Inc.*, 457 A.2d 701, 711 (Del. 1983).

A director will be considered interested if he either: "(1) stands on both sides of the transaction; or (2) expects to derive a personal financial benefit from the transaction."[95] A New York federal court, applying Delaware law, has held that "where the directors of a wholly owned subsidiary stand on both sides of a transaction by virtue of the fact that they also serve on the parent's board, this does not automatically rebut the business judgment rule presumption."[96] Other courts applying Delaware law have disagreed. The *ASARCO* court explained that it:

> disagrees with this rationale as it ignores the fact that the directors of an insolvent wholly owned subsidiary have divided loyalties (between the parent, their corporation (the subsidiary), and the subsidiary's creditors), and "[w]hen faced with such divided loyalties, directors have the burden of establishing the entire fairness of the transaction to survive careful scrutiny by the courts."[97]

Delaware courts, and other courts applying Delaware law, have followed *ASARCO*'s reasoning. For example, in *In re Digex, Inc. S'holders Litig.*, the court held that:

> [w]hen the directors of a Delaware corporation appear on both sides of a transaction, the presumption in favor of the business judgment rule is rebutted and the directors are required to demonstrate their "utmost good faith and the most scrupulous inherent fairness of the bargain . . . . Where a director holds dual directorships in the parent-subsidiary context, there is no dilution of this obligation to demonstrate the entire fairness of specific board actions.[98]

*In re Musicland Holding Corp.*, came to a similar conclusion. In that case, breach of fiduciary duty claims filed against officers and directors of a corporate subsidiary and related entities were found to be sufficient to rebut the business judgment rule because the complaint alleged that debt instruments between the parent and subsidiary and payments made pursuant to those instruments "were the product of dual loyalties and self-dealing" of the defendants.[99] The court found that the defendants had "significant financial interests" in the parent or owed fiduciary duties to both parent and subsidiary and related entities.[100] Accordingly, "because of

---

[95] *ASARCO*, 396 B.R. at, 405 (citing *Roselink Investors, L.L.C. v. Shenkman*, 386 F. Supp. 2d 209, 217 (S.D.N.Y. 2004)); *Aronson v. Lewis,* 473 A.2d 805, 812 (Del. 1984).

[96] *ASARCO,* 396 B.R. at, 405 n.149 (citing *Roselink Investors, L.L.C. v. Shenkman*, 386 F. Supp. 2d 209, 217 (S.D.N.Y. 2004) ("However, presence on both sides of the transaction does not automatically rebut the business judgment rule presumption.")).

[97] *ASARCO*, 396 B.R. at, 405 n.149.

[98] 789 A.2d 1176, 1206 (Del. Ch. 2000); *see also Seidel v. Byron*, 405 B.R. 277, 290–91 (N.D. Ill. 2009) (applying Delaware law).

[99] 398 B.R. 761, 788 (Bankr. S.D.N.Y. 2008).

[100] *Id.*

their connection to or relationship with [the parent], the Pre–Sale Individual Defendants were dependent upon [the parent] for continued employment and compensation and were therefore beholden to [the parent] to the detriment of [the subsidiary]," and therefore "lacked independence."[101] The court did not discuss applicability of the entire fairness standard, but did find that the business judgment rule was rebutted.[102]

### (2) Fiduciaries May Be Entitled To Rely On Expert Advice

Directors of Delaware corporations can "properly delegate responsibility to qualified experts in a host of circumstances,"[103] and "directors of Delaware corporations are fully protected in relying in good faith on the reports of officers and experts."[104] Specifically, under section 141(e) of the Delaware General Corporation Law, directors of a corporation may be protected from breach of the fiduciary duty of care claims on the basis that they relied in good faith on a qualified expert.[105] Section 141(e) provides:

> A member of the board of directors, or a member of any committee designated by the board of directors, shall, in the performance of such member's duties, be fully protected in relying in good faith upon the records of the corporation and upon such information, opinions, reports or statements presented to the corporation by any of the corporation's officers or employees, or committees of the board of directors, or by any other person as to matters the member reasonably believes are within such other person's professional or expert competence and who has been selected with reasonable care by or on behalf of the corporation.[106]

---

[101] *Id.* at 788–89.

[102] *Id.*

[103] *Ash v. McCall*, No. Civ.A. 17132, 2000 WL 1370341, at *9 (Del. Ch. Sept. 15, 2000) (dismissing breach of fiduciary duty of care claim where complaint "allege[d] that the . . . directors were advised by their experts . . . and that they relied on their expertise in conducting due diligence ancillary to the proposed merger").

[104] *In re Citigroup Inc. S'holder Derivative Litig.*, 964 A.2d 106, 132 (Del. Ch. 2009).

[105] *Brehm v. Eisner*, 746 A.2d 244, 261 (Del. 2000) ("*Disney I*") (citing DEL. CODE ANN. tit. 8 § 141(e) (2010)).

[106] DEL. CODE ANN. tit. 8, § 141(e) (2010).

For example, section 141(e) applies where a director relies on advice of counsel[107] or an investment banking firm delivers a fairness opinion.[108]

In order to survive a motion to dismiss a shareholder derivative action alleging breach of the duty of care, "where an expert has advised the board in its decisionmaking process," a complaint must allege facts that would show that:

> (a) the directors did not in fact rely on the expert; (b) their reliance was not in good faith; (c) they did not reasonably believe that the expert's advice was within the expert's professional competence; (d) the expert was not selected with reasonable care by or on behalf of the corporation, and the faulty selection process was attributable to the directors; (e) the subject matter that was material and reasonably available was so obvious that the board's failure to consider it was grossly negligent regardless of the expert's advice or lack of advice; or (f) that the decision of the board was so unconscionable as to constitute waste or fraud.[109]

With regard to legal advice, "[a] number of cases have held that it is the existence of legal advice that is material to the question of whether the board acted with due care, not the substance of that advice."[110] For example, in *Hollinger International, Inc. v. Black*, the court dismissed a breach of fiduciary duty claim because it found that the defendants had sufficiently informed themselves by seeking the advice of counsel.[111] In dismissing the claim, the court emphasized that it did not rely on the content of the advice in making its determination, but rather that the seeking of advice demonstrated the directors' effort to inform themselves properly.[112]

Fiduciaries are generally not held to a lesser standard when dealing with complex or difficult issues. Rather, "given the complex situations and business issues boards must address, in order to meet their fiduciary obligations to be fully informed, directors often must rely on lawyers, financial advisors, economists, and other specialized experts to advise

---

[107] *Gagliardi v. TriFoods Int'l, Inc*., 683 A.2d 1049, 1051 n.2 (Del. Ch. 1996) ("There can be no personal liability of a director for losses arising from illegal transactions if a director were financially disinterested, acted in good faith, and relied on advice of counsel reasonably selected in authorizing a transaction.").

[108] *Crescent / Mach I Partners, L.P. v. Turner*, 846 A.2d 963, 985 (Del. Ch. 2000) ("Section 141(e) of Delaware's corporation law provides that directors are protected from a breach of the duty of care when the directors reasonably believe the information upon which they rely has been presented by an expert selected with reasonable care and is within that person's professional or expert competence.").

[109] *Brehm v. Eisner*, 746 A.2d 244, 262 (Del. 2000) ("*Disney I*").

[110] *In re Comverge, Inc. S'holders Litig*., Civil Action No. 7368-VCP, 2013 WL 1455827, at *4 (Del. Ch. April 10, 2013).

[111] 844 A.2d 1022, 1084 (Del. Ch. 2004), *aff'd*, 872 A.2d 559 (Del. 2005).

[112] *Id.* at 1085; *see also Baxter Int'l, Inc. v. Rhône–Poulenc Rorer Inc*., No. Civ.A. 19328, 2004 WL 2158051, at *3 (Del. Ch. Sept. 17, 2004) (noting that "while the subject matter of the emails may be at issue (as is often the case with privileged material), the communications themselves are not").

them."[113] Delaware courts have recognized that "[d]irectors of Delaware corporations quite properly delegate responsibility to qualified experts in a host of circumstances."[114]

### (3) An Exculpation Clause May Insulate Certain Conduct

#### (a) Corporate Context

A defendant may also avoid responsibility for breach of fiduciary duties by relying on an exculpation clause in a corporate charter.[115] In general, an exculpation clause will release a director from liability for a breach of duty of care, but not for a breach of duty of loyalty.[116]

Assuming that a plaintiff can adequately show a breach of fiduciary duty sufficient to avoid application of the business judgment rule, a director may still invoke DEL. CODE. ANN. tit. 8, § 102(b)(7) as an affirmative defense if the pertinent exculpation provision reflects the language in § 102(b)(7).[117] However, this does not necessarily mean that duty of care claims would be subject to dismissal at the Rule 12(b)(6) stage. Courts have held that such dismissal would be premature where the complaint also adequately alleges damages resulting from breaches of the duty of loyalty or good faith, as such damages cannot be exculpated under § 102(b)(7).[118]

#### (b) Limited Liability Company Context

An exculpatory clause found in an LLC agreement "is functionally akin" to the exculpatory charter provision authorized under Delaware corporate law.[119] Accordingly, an exculpatory clause of an LLC agreement, like a corporate charter, can limit common law

---

[113] R. FRANKLIN BALOTTI ET AL., SAFE HARBOR FOR OFFICER RELIANCE: COMPARING THE APPROACHES OF THE MODEL BUSINESS CORPORATION ACT AND DELAWARE'S GENERAL CORPORATION LAW, at 170 (2011).

[114] *Ash v. McCall*, No. 17132, 2000 WL 1370341, at *9 (Del. Ch. Sept. 15, 2000); *see also Perrine v. Pennroad Corp.*, 43 A.2d 721, 727 (Del. Ch. 1945). However, "Delaware courts have indicated that they may take into account the specialized skills of a particular individual in concluding whether that individual has met his or her fiduciary obligations." R. FRANKLIN BALOTTI ET AL., SAFE HARBOR FOR OFFICER RELIANCE: COMPARING THE APPROACHES OF THE MODEL BUSINESS CORPORATION ACT AND DELAWARE'S GENERAL CORPORATION LAW, at 174 n.49 (2011). *See, e.g., In re Emerging Commc'ns, Inc. S'holders Litig.*, No. 16415, 2004 WL 1305745, at *39–40 (Del. Ch. May 3, 2004) (director with special expertise could not perfunctorily rely on advice of experts and could be held liable for breach of fiduciary duty based on knowledge that price was unfair).

[115] DEL. CODE ANN. tit. 8, § 102(b)(7) (2010); *In re Direct Response,* 466 B.R. at 651.

[116] *See Graham v. Taylor Capital Group, Inc.* (*In re Reliance Sec. Litig.*), 135 F. Supp. 2d 480, 519 (D. Del. 2001); *see also KDW Restructuring*, 874 F. Supp. 2d at 221 (citing *In re NYMEX S'holder Litig.*, 2009 WL 3206051, at *6 (Del. Ch. Sept. 30, 2009)); *In re Direct Response*, 466 B.R. at 651.

[117] *See* Section IV.B (discussing exculpation provisions and principles pertinent to ResCap fiduciaries).

[118] *See Bridgeport Holdings Inc. Liquidating Trust v. Boyer*, 388 B.R. 548, 568 (Bankr. D. Del. 2008); *In re Direct Response*, 466 B.R. at 651.

[119] *In re Opus*, 2012 WL 4867169, at *7 (citing *Auriga Capital Corp. v. Gatz Props.*, 40 A.3d 839, 859 (Del. Ch. 2012)).

fiduciary duties.[120] As in the corporate context, invocation by a fiduciary of such an exculpatory clause will be considered an affirmative defense.[121]

### h. Burden With Respect To Fraud-Based Fiduciary Duty Claim

A plaintiff alleging fraud as part of a claim for breach of fiduciary duty must satisfy the pleading requirements of Federal Rule of Civil Procedure 9(b).[122] However, "the normally rigorous particularity rule [of 9(b)] has been relaxed somewhat where the factual information is peculiarly within the defendant's knowledge or control."[123] "A bankruptcy trustee, as a third party outsider to the debtor's transactions, is generally afforded greater liberality under the more relaxed standard."[124] Despite this relaxed standard, "boilerplate and conclusory allegations will not suffice. Plaintiffs must accompany their legal theory with factual allegations that make their theoretically viable claim plausible."[125]

### i. Potential Remedies For Fiduciary Duty Breaches Can Vary

A successful claim for breach of fiduciary duty in a derivative action can allow recovery of monetary damages for the corporation.[126] A breach of fiduciary duty claim can also give rise to equitable relief, including requiring the fiduciary to disgorge profits, such as forcing an executive to surrender compensation.[127]

_____

[120] *See id.*

[121] *Id.* (citing *Auriga Capital Corp. v. Gatz Props.*, 40 A.3d 839, 859 (Del. Ch. 2012) (citing *Ad Hoc Comm. of Equity Holders of Tectonic Network, Inc. v. Wolford*, 554 F. Supp. 2d 538, 561 (D. Del. 2008); *Mervyn's LLC v. Lubert-Adler Group IV, LLC* (*In re Mervyn's Holdings, LLC*), 426 B.R. 488, 502 (Bankr. D. Del. 2010)).

[122] *Marino v. Grupo Mundial Tenedora, S.A.*, 810 F. Supp. 2d 601, 606 (citing *DeBlasio v. Merrill Lynch & Co., Inc.*, No. 07 Civ. 318, 2009 WL 2242605, at *10 (S.D.N.Y. July 27, 2009) (claims for breach of fiduciary duty and aiding and abetting breach of fiduciary duty that sound in fraud must meet Rule 9(b)); *Pacific Elec. Wire & Cable Co. v. Set Top Int'l. Inc.*, No. 03 Civ. 9623, 2005 WL 2036033, at *15 (S.D.N.Y. 2005) (holding that "[b]oth counts [for breach of fiduciary duties and aiding and abetting breach of fiduciary duties] state that Defendants breached their fiduciary duties to Plaintiffs by making material misrepresentations to Plaintiffs. These claims sound in fraud and must meet the heightened pleading standard of Rule 9(b)").

[123] *In re Opus East, L.L.C.*, 480 B.R. 561, 573 (Bankr. D. Del. 2012) (citing *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1418 (3d Cir. 1997)).

[124] *Id.* (citing *Global Link Telecom Corp.*, 327 B.R. at 717); *see also Rosener v. Majestic Mgmt., Inc.* (*In re OODC, LLC*), 321 B.R. 128, 140 (Bankr. D. Del. 2005) (holding that 9(b) "requirement is relaxed even more when the plaintiff is a third party, such as a trustee, because a third party generally has less information on which to base its allegation").

[125] *In re Opus East, L.L.C.*, 480 B.R. 561, 573 (Bankr. D. Del. 2012) (citing *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1418 (3d Cir. 1997)).

[126] *See* 1 ROGER J. MAGNUSON, SHAREHOLDER LITIGATION § 10:21 (1st ed. 1982); *Official Comm. of Unsecured Creditors v. Fleet Retail Fin. Group* (*In re Hechinger Inv. Co.*), 274 B.R. 71, 89 n.8 (D. Del. 2002).

[127] *See* 1 ROGER J. MAGNUSON, SHAREHOLDER LITIGATION § 10:21 (1st ed. 1982).

### *(1) Monetary Damages May Be Available*

"Whether the action is direct or derivative, [a] plaintiff can recover damages that flow directly from defendant's breach of fiduciary duty."[128] Monetary damages suffered by a corporation as a result of a breach can be collected if the claim is part of a derivative action, or monetary damages suffered by an individual can be collected if the claim is part of a direct action.[129]

The appropriate quantum of damages is the amount lost as a result of the breach.[130] "Where this Court finds that a breach of fiduciary duty has occurred, the specificity and amount of evidence required from the Plaintiff on the issue of damages is minimal."[131] Delaware courts do not require absolute certainty in the award of damages so long as "a wrong has been proven and injury established,"[132] and damages resulting from a breach of the fiduciary duty of loyalty will be "liberally calculated."[133] "[A]lthough a damage award cannot be based on 'speculation' or 'conjecture,'[134] . . . as long as there is a responsible basis for an estimate of damages, 'mathematical certainty' is not required."[135] If evidentiary uncertainty

---

[128] *Id.*

[129] *Id.*; *Official Comm. of Unsecured Creditors v. Fleet Retail Fin. Group* (*In re Hechinger Inv. Co.*), 274 B.R. 71, 89 n.8 (D. Del. 2002).

[130] *Beard Research, Inc. v. Kates*, 8 A.3d 573, 615 (Del. Ch. 2010) ("the loss in value of Plaintiffs' business and the lost cash flow,[was] sufficient to support a responsible estimate of the damages suffered by CB and BR as a result of the wrongs alleged in this action"); *Thorpe v. CERBCO, Inc.*, Civ.A. No. 11713, 1993 WL 443406, at *12 (Del. Ch. Oct. 29, 1993) ("It is, of course, fundamental that a fiduciary who breaches his duty is liable for any loss suffered by the beneficiary of his trust."); *Ash v. Board of Managers of 155 Condominium*, 23 Misc.3d 1103(A), 881 N.Y.S.2d 361 (Table), at *8 (N.Y. Sup. Aug. 29, 2008) ("[T]he measure of damages for breach of fiduciary duty is the amount of the loss sustained."); *National Union Fire Ins. Co. v. Proskauer Rose Goetz & Mendelsohn*, 165 Misc.2d 539, 546, 634 N.Y.S.2d 609, 615 (N.Y. Sup. 1994) ("[t]he appropriate measure of damages [for a breach of fiduciary duty] requires placing [plaintiff] in the same condition it would have been had the wrong not occurred").

[131] *Encite LLC v. Soni*, Civil Action No. 2476-VGG 2011 WL 5920896, at *25; *Hampshire Group, Ltd. v. Kuttner*, 2010 WL 2739995, at *50 (Del. Ch. July 12, 2010); *Gotham Partners, L.P. v. Hallwood Realty Partners, L.P.*, 817 A.2d 160, 176 (Del. 2002) ("[T]he scope of recovery for a breach of the duty of loyalty is not to be determined narrowly.").

[132] *Encite*, 2011 WL 5920896, at *25 (citing *Beard Research, Inc. v. Kates*, 8 A.3d 573, 613 (Del. Ch. 2010); *Great Am. Opportunities, Inc. v. Cherrydale Fundraising, LLC*, Civil Action No. 3718-VCP, 2010 WL 338219, at *22 (Del. Ch. Jan. 29, 2010)).

[133] *Auriga Capital Corp. v. Gatz Props.*, 40 A.3d 839, 879 (Del. Ch. 2012) (citing *Thorpe v. CERBCO, Inc.*, 676 A.2d 436, 444–45 (Del. 1996)).

[134] *Id.* (citing *Acierno v. Goldstein*, No. Civ.A. 20056-NC, 2005 WL 3111993, at *6 (Del. Ch. Nov. 16, 2005)).

[135] *Id.* (citing *Bomarko, Inc. v. Int'l Telecharge, Inc.*, 794 A.2d 1161, 1184 (Del. Ch. 1999), *aff'd*, 766 A.2d 437 (Del. 2000)).

exists in ascertaining damages attributable to the misconduct, the ambiguity will be construed against the defendant.[136]

Where a transaction is determined to be unfair, the measure of damages for a breach of fiduciary duty "is not necessarily limited to the difference between the price offered and the true value as determined under the appraisal proceedings . . . . [T]he [court] may fashion any form of equitable and monetary relief as may be appropriate, including rescissory damages."[137]

### (2) Equitable Remedies May Be Available

Constructive trusts are an example of a type of equitable remedy, where the fiduciary "is viewed as having taken the money subject to a trust which is constructed for him by the court."[138] The fiduciary then "must account in full" for the money improperly taken, and "pay back the highest of either his earnings with the trust assets, or what he could have earned in another investment."[139] The remedy that will apply with respect to any particular breach of fiduciary duty will ultimately turn on specific factual circumstances; "[b]ecause the breaches of duty are so variegated, the type and extent of damages recovered have no fixed pattern."[140]

### j.   Choice Of Law Regarding Statutes Of Limitations Is Uncertain

Choice-of-law issues exist with respect to determining the application of statutes of limitation to claims for breach of fiduciary duty.[141]

_____

[136] *See id.* ("Given his own breaches of loyalty, the attendant uncertainties cut against [defendant], not against the victims of his infidelity."); *Encite LLC v. Soni*, 2011 WL 5920896, at *25 C.A. No. 20213-VCN, ("Any uncertainty in awarding damages is resolved against the wrongdoer."); *Gentile v. Rossette*, 2010 WL 2171613, at *11 (Del. Ch. May 28, 2010) (uncertainties in accessing damages "may cut against the fiduciary who has not faithfully discharged his duties."); *Eastman Kodak Co. of N.Y. v. S. Photo Materials Co*., 273 U.S. 359, 379, (1927) ("[A] defendant whose wrongful conduct has rendered difficult the ascertainment of the precise damages suffered by the plaintiff is not entitled to complain that they cannot be measured with the same exactness and precision as would otherwise be possible.").

[137] *Cinerama, Inc. v. Technicolor, Inc*., 663 A.2d 1156, 1166 (Del. 1995). Where defendant directors breach "their fiduciary duties of care and loyalty by allowing the company and its subsidiaries to take on additional debt in a fiscally irresponsible manner and by misusing corporate assets," deepening insolvency can be a valid theory of damages for the breach of fiduciary duty claim. *See In re The Brown Schools*, 386 B.R. 37, 48 (Bankr. D. Del. 2008) (citing *Alberts v. Tuft* (*In re Greater Southeast Cmty. Hosp. Corp. I*), 353 B.R. 324, 333 (Bankr. D.C. 2006)). *But see Seitz v. Detweiler, Hershey and Associates, P.C.* (*In re CitX Corp.*), 448 F.3d 672, 677-78 (3d Cir. 2006).

[138] 1 ROGER J. MAGNUSON, SHAREHOLDER LITIGATION § 10:21 (1st ed. 1982).

[139] *Id.*

[140] *Id.*

[141] *See Buchwald v. Renco Group, Inc.* (*In re Magnesium Corp. of Am.*), 399 B.R. 722, 743 (Bankr. S.D.N.Y. 2009).

### *(1) Claim Brought In New York Federal Court*

Assuming a claim were brought in federal court in New York, pursuant to N.Y. C.P.L.R. 202[142] New York has a "borrowing statute," "which requires the application of New York's statute of limitations when 'the cause of action accrued in favor of a resident of the state.'"[143] Essentially, this means that "for a non-resident of New York, a restrictive [Delaware] statute of limitations could not be circumvented by bringing suit in New York instead."[144] Because the New York borrowing statute is only consulted if a nonresident plaintiff's cause of action accrued outside the state of New York, whether N.Y. C.P.L.R. 202 applies will depend on the plaintiff's residence.

If the plaintiff were a non-resident of New York, and N.Y. C.P.L.R. 202 were applicable because the cause of action accrued in a state with a limitations period shorter than New York's (such as Delaware), N.Y. C.P.L.R. 202 "requires application of the shorter of the statute of limitations of New York and the statute of limitations of the state in which the cause of action accrued."[145] The location of a plaintiff's injury determines the place of accrual for purposes of N.Y. C.P.L.R. 202.[146] For claims of breach of fiduciary duty, because the "alleged injury is purely economic, the place of injury usually is where the plaintiff resides and sustains the economic impact of the loss."[147] For claims brought on behalf of incorporated entities, the claim accrues where the corporation sustained the economic impact of the alleged breach, which is either the state of its incorporation or its principal place of business.[148]

---

[142] N.Y. C.P.L.R. 202 provides that "[a]n action based upon a cause of action accruing without the state cannot be commenced after the expiration of the time limited by the laws of either the state or the place without the state where the cause of action accrued, except that where the cause of action accrued in favor of a resident of the state the time limited by the laws of the state shall apply."

[143] *Bianco v. Erkins* (*In re Gaston & Snow*), 243 F.3d 599, 604 (2d Cir. 2001). New York's borrowing statute will not be utilized if a court finds that federal choice-of-law rules apply. *See Bianco v. Erkins* (*In re Gaston & Snow*), 243 F.3d 599, 605 (2d Cir. 2001) ("By contrast, if federal choice of law rules are to be utilized, the borrowing statute would not be considered and there is little doubt that New York's statute of limitations would not apply."). However, in *In re Gaston & Snow*, the court held that "where no significant federal policy, calling for the imposition of a federal conflicts rule, exists," bankruptcy courts should apply the choice-of-law rules of the forum state. *In re Gaston & Snow*, 243 F.3d at 607; *see also In re Hydrogen, LLC*, 431 B.R. at 346 ("Bankruptcy courts adjudicating a state law claim should apply the choice-of-law rules of the forum state in the absence of federal policy concerns."); *In re Adelphia Commc'ns Corp.*, 365 B.R. 24, 58 n.136 (Bankr. S.D.N.Y. 2007) ("Where, as here, the Court is exercising bankruptcy jurisdiction over state law claims under 28 U.S.C. § 1334(b), the court applies the choice of law rules of the forum state to determine the applicable statute of limitations.").

[144] *Buchwald v. Renco Group, Inc.* (*In re Magnesium Corp. of Am.*), 399 B.R. 722, 744 n.51 (Bankr. S.D.N.Y. 2009).

[145] *In re Gaston & Snow*, 243 F.3d at 608–09. *See also In re Adelphia Commc'ns Corp.*, 365 B.R. at 57–58 ("[N.Y. C.P.L.R. 202] provides that where a plaintiff is not a New York resident (as here), the court should apply the shorter of New York's period of limitations or the statute of limitations applicable where the plaintiff resides.").

[146] *See Global Financial Corp. v. Triarc Corp.*, 93 N.Y.2d 525, 529–31 (N.Y. 1999).

[147] *Cantor Fitzgerald Inc. v. Lutnick*, 313 F.3d 704, 710 (2d Cir. 2002).

[148] *See id.* at 711.

### (2) Claim Brought In Minnesota State Court

If a claim for breach of fiduciary duty were to be brought in Minnesota state court, a three-year limitations period would apply unless a specific residency carveout could be invoked. For claims arising after April 2004, Minnesota's "borrowing statute" provides that "if a claim is substantively based . . . (1) upon the law of one other state, the limitation period of that state applies."[149] Accordingly, another state's statute of limitations applies in Minnesota if that other state's substantive law governs a case.[150] Thus, if Delaware's substantive law applies to a claim brought in a Minnesota court, the Delaware statute of limitation would also apply.[151] Minnesota applies the internal affairs doctrine, which holds that "the law of the state of incorporation normally determines issues relating to the internal affairs of a corporation."[152] Delaware law would apply to a breach of fiduciary duty claim relating to ResCap in a Minnesota case, and thus there would be no conflict between Minnesota and Delaware law.[153] Because Delaware's substantive law would apply to breach of fiduciary duty claims brought in a Minnesota court, the three-year Delaware statute of limitations would seemingly apply to those claims.[154]

However, Minnesota statute section 541.31 contains a carveout for Minnesota residents, which could be available with respect to a fiduciary duty claim brought by a plaintiff on ResCap's behalf. Where a plaintiff is a Minnesota resident and the cause of action arises under the law of another jurisdiction but is time-barred under the foreign jurisdiction's limitations period, the action may be brought in Minnesota if (1) the plaintiff has owned the cause of action since it accrued, and (2) the cause of action is not time-barred under the applicable

---

[149] Minn. Stat. § 541.31, 541.34 (2013). While Minn. Stat. § 541.33 (2013) provides that "[i]f the court determines that the limitation period of another state applicable under sections 541.31 and 541.32 is substantially different from the limitation period of this state and has not afforded a fair opportunity to sue upon, or imposes an unfair burden in defending against, the claim, the limitation period of this state applies," Minnesota courts have stated that the exception or "escape clause should 'rarely be employed' only in 'extreme cases.'" *See Burks v. Abbott Labs.*, 639 F. Supp. 2d 1006, 1019 (D. Minn. 2009). "[T]he mere difference between the prescriptive time periods" is not sufficient. *See id.*

[150] *See Huggins v. Stryker Corp.*, Civil No. 09-1250, 2013 WL 1191058, at *7 n.8 (D. Minn. Mar. 25, 2013); *Whitney v. Guys, Inc.*, 700 F.3d 1118, 1123 n.6 (8th Cir. 2012). Note that the statute expressly does not apply to claims arising from incidents that occurred before August 1, 2004. *Id.*

[151] *Whitney v. Guys, Inc.*, 700 F.3d 1118, 1126 (8th Cir. 2012).

[152] *See Matson Logistics, LLC v. Smiens*, Civil No, 12-400, 2012 WL 2005607, at *5 (D. Minn. June 5, 2012) (citing *Rupp v. Thompson*, No. C5-03-347, 2004 WL 3563775 (Minn. Dist. Ct. Mar. 17, 2004)); *Calleros v. FSI Intern., Inc.*, 892 F. Supp. 2d 1163, 1169 n.7 (D. Minn. 2012) ("Under the 'internal affairs' doctrine, fiduciary-duty claims against FSI's directors are governed by Minnesota law because FSI is a Minnesota corporation.") (citing *Atherton v. FDIC*, 519 U.S. 213, 223–24, 117 S.Ct. 666, 136 L.Ed.2d 656 (1997)); *Transocean Group Holdings Pty Ltd. v. South Dakota Soybean Processors*, LLC, 663 F. Supp. 2d 731, 742 n.5 (D. Minn. 2009) (citing *Potter v. Pohlad*, 560 N.W.2d 389, 391 (Minn. Ct. App. 1997)).

[153] *Matson Logistics, LLC v. Smiens*, 2012 WL 2005607, at *6-7; *Lagermeier v. Boston Scientific Corp.*, 2011 WL 2912642, at *8 (D. Minn. Sept. 29, 2011).

[154] *See Whitney v. Guys, Inc.*, 700 F.3d 1118, 1123 (8th Cir. 2012) (applying Delaware substantive law and the Delaware statute of limitations to a breach of fiduciary duty claim).

Minnesota limitations period.[155] Accordingly, if ResCap were determined to be a Minnesota resident as of the time of accrual of the claim, the six-year statute of limitations would likely apply to a claim for breach of fiduciary duty brought on its behalf.[156]

### (3) Potentially Applicable Statutes Of Limitations Vary

Under Delaware law (including as may be applied to a claim brought in Minnesota state court), the statute of limitations for a breach of fiduciary duty claim is three years.[157] By contrast, New York does not provide for a unitary limitations period for breach of fiduciary duty claims.[158] Determining the applicable statute of limitations for a breach of fiduciary duty claim under New York law generally depends upon the requested remedy:

> Where the relief sought is equitable in nature, the six-year limitations period of N.Y. C.P.L.R. 213(1) applies. On the other hand, where suits alleging a breach of fiduciary duty seek only money damages, courts have viewed such actions as alleging injury to property, to which a three-year statute of limitations applies.[159]

However, the determination may also be shaped by other factual and legal circumstances. Where a plaintiff does not allege fraud or the breach of a particular provision of an agreement, the three-year statute of limitations applies,[160] but where a plaintiff alleges fraud in relation to a breach of fiduciary duty claim, courts apply a six-year limitations period under N.Y. C.P.L.R. 213(8), even if the remedy sought is monetary in nature.[161]

---

[155] *See* MINN. STAT. § 541.31(2) (2013).

[156] *Hunt v. Nev. State Bank*, 285 Minn. 77, 104 n.28, 172 N.W.2d 292, 308 n.28 (Minn. 1969) (corporation with its principal place of business or other significant business contacts in state is deemed resident for purposes of long-arm statute); *United Barge Co. v. Logan Charter Serv., Inc*., 237 F. Supp. 624, 629–30 (D. Minn. 1964) (concluding entity was a "resident[ ] of Minnesota" because it had its principal place of business as well as "permanent offices and employees" in the state pursuant to long-arm statute); *Caddy Products, Inc. v. American Seating Co*., No. Civ. 05-800 2005 WL 2401910, at *3 (D. Minn. Sept. 28, 2005) ("For the purposes of venue, however, corporations are considered to be residents of the state of their incorporation and of the state where they maintain their principal place of business.").

[157] *See In re Tyson Foods, Inc.*, 919 A.2d 563, 584 (Del. Ch. 2007) (citing 10 DEL. CODE ANN. tit. 10, § 8106 (2008)).

[158] *See Donenfeld v. Brilliant Techs. Corp.*, 20 Misc.3d 1139(A), at *2, 872 N.Y.S.2d 690 (Table) (N.Y. Sup. 2008); *see also Williams v. Sidley Austin Brown & Wood, L.L.P.*, 15 Misc.3d 1125(A), at *5, 841 N.Y.S.2d 222 (Table) (N.Y. Sup. 2007) (citing *Lonegard v. Santa Fe Indus., Inc*., 70 N.Y.2d 262, 266 (N.Y. 1987)).

[159] *Donenfeld*, 20 Misc.3d 1139(A), at *2, 872 N.Y.S.2d 690 (Table) (N.Y. Sup. 2008) (citing N.Y. C.P.L.R. 214[4]; *Kaufman v. Cohen*, 307 A.D.2d 113, 118, 760 N.Y.S.2d 157 (N.Y. App. Div. 2003) (citations omitted).

[160] *See Donenfeld*, 20 Misc.3d 1139(A), at *2, 872 N.Y.S.2d 690 (Table) (N.Y. Sup. 2008) (citing *Kaszirer v. Kaszirer*, 286 A.D.2d 598, 599, 730 N.Y.S.2d 87 (N.Y. App. Div. 2001)); *see also Mejia-Ricart v. Bear Stearns & Co.*, 1996 WL 94810, at *3 (S.D.N.Y. Mar. 4, 1996) (six-year limitations period applies to contract-based claim for breach of fiduciary duty seeking monetary damages).

[161] *See Kelly v. Legacy Benefits Corp.*, 34 Misc.3d 1242(A), at *9–10, 950 N.Y.S.2d 608 (Table) (N.Y. Sup. Mar. 12, 2012); *Donenfeld v. Brilliant Techs. Corp.*, 20 Misc.3d 1139(A), at *2, 872 N.Y.S.2d 690 (Table) (N.Y. Sup. 2008) (citing *Kaszirer v. Kaszirer*, 730 N.Y.S.2d 87 (N.Y. App. Div. 2001)).

A fiduciary duty claim must be scrutinized to assess whether the related fraud allegations are integral to it. "[I]f the fraud allegation is only incidental to the allegation of breach of fiduciary duty, and not essential to it, then the three-year statute of limitations will apply."[162] Accordingly, "where an allegation of fraud is not essential to the cause of action pleaded except as an answer to an anticipated defense of the Statute of Limitations, courts 'look for the reality, and the essence of the action and not its mere name.'"[163] "Otherwise, fraud would be used as a means to litigate stale claims."[164] "The test is whether the fraud is the gravamen of the action, the fraud statute contemplating only those causes of action in which there would be no injury except for the fraud."[165]

New York courts will thus look to see if a fraud claim could survive on the facts of the breach of fiduciary duty claim.[166] For example, in *Oxbow Calcining USA Inc. v. Am. Indus. Partners*, the court found N.Y. C.P.L.R. 213(8) to be applicable because:

> the essence of plaintiffs' claim is that AIP, as the holder of a controlling interest in GLC, breached its fiduciary duty to ensure that any self-dealing transaction between GLC and PASE would be entirely fair to GLC and its shareholders, by employing bait-and-switch tactics and making numerous misrepresentations to GLC's independent committee and management in order to fraudulently induce GLC to enter into the [agreement].[167]

---

[162] *Monaghan v. Ford Motor Co.*, 71 A.D.3d 848, 850, (N.Y. App. Div. 2010) (citing *Kaufman v. Cohen*, 60 N.Y.S.2d 157 (N.Y. App. Div. 2003)).

[163] *Kaufman v. Cohen*, 60 N.Y.S.2d 157, 165 (N.Y. App. Div. 2003) (quoting *Brick v. Cohn–Hall–Marx Co.,* 276 N.Y. 259, 264).

[164] *Kaufman*, 60 N.Y.S.2d 157, 165 (N.Y. App. Div. 2003) (citing *Powers Mercantile Corp. v. Feinberg*, 490 N.Y.S.2d 190, *aff'd* 67 N.Y.2d 981)). N.Y. C.P.L.R. 213(8) would not apply to a fiduciary duty claim based on failure to use care because fraud is not integral to such a claim. *See Carbon Capital Mgt., LLC v. American Express Co.*, 88 A.D.3d 933, 932 N.Y.S.2d 488 (N.Y. App. Div. 2011) ("the claim that [defendant] breached a fiduciary duty to [plaintiff] by failing to diligently ascertain Derivium's fitness as a lender is not based upon actual fraud and, therefore, that claim is governed by the three-year statute of limitations, and is time-barred").

[165] J. Gebauer et al., Carmody-Wait 2d New York Practice with Forms, § 13:169 (2013); *see also Paolucci v. Mauro*, 903 N.Y.S.2d 584, 587 (N.Y. App. Div. 2010).

[166] *See Kaufman*, 60 N.Y.S.2d 157, 167 n.4 (N.Y. App. Div. 2003) ("The timeliness of plaintiffs' breach of fiduciary duty claim, therefore, turns on the viability of plaintiffs' fraud cause of action, an issue to which we now turn."); *IDT Corp. v. Morgan Stanley Dean Witter & Co.*, 12 N.Y.3d 132, 140, (N.Y. 2009) (not applying N.Y. C.P.L.R. 213(8) because the court did not "conclude that IDT's breach of fiduciary duty cause of action is a sufficiently pleaded fraud action").

[167] *Oxbow Calcining USA Inc. v. Am. Indus. Partners*, 96 A.D.3d 646, 651, 948 N.Y.S. 2d 24, 31 (1 Dep't. 2012) (citing *Carbon Capital Mgt., LLC v. American Express Co.*, 88 A.D.3d 933, 939–40, 932 N.Y.S.2d 488, 495 (N.Y. App. Div. 2011); *Monaghan v. Ford Motor Co.*, 71 A.D.3d 848, 897 N.Y.S.2d 482 (N.Y. 2010)).

Similarly, in *Carbon Capital Mgt., LLC v. American Express Co.*, the court held that:

> the claims that [defendant] breached his fiduciary duty to
> [plaintiff] by misrepresenting Derivium's legitimacy as a lender,
> the tax consequences of the alleged loan, and whether Derivium
> would hold the floating-rate notes as collateral are, in essence,
> fraud-based claims, and the Supreme Court correctly determined
> that these claims were governed by the six-year statute of
> limitations, and were timely.[168]

In *Kaufman v. Cohen*, in determining whether N.Y. C.P.L.R. 213(8) applied to a breach of fiduciary duty claim, the court ruled that "instead of an affirmative misrepresentation, a fraud cause of action may be predicated on acts of concealment where the defendant had a duty to disclose material information . . . . Thus, where a fiduciary relationship exists, 'the mere failure to disclose facts which one is required to disclose may constitute actual fraud, provided the fiduciary possesses the requisite intent to deceive.'"[169] In addition, where the claim for breach of fiduciary duty is based on actual fraud, "that is, fraud claims alleging an intent to deceive," the discovery rule applies, meaning that the claim accrues "only upon the plaintiff's actual or constructive discovery of the facts constituting the fraud."[170] "Claims of constructive fraud, i.e., a fiduciary's simple nondisclosure of facts it is obligated to disclose, accrue upon breach."[171]

Application of New York's three-year or six-year limitations period may also hinge on the corporate status of the nominal plaintiff. Claims for breach of fiduciary duty brought on behalf of a corporation against fiduciaries of that corporation will be governed by the six-year statute of limitations of N.Y. C.P.L.R. 213(7), regardless of whether such claims are legal or equitable in nature.[172] A bankruptcy estate trustee can bring claims on behalf of a debtor corporation under the six-year N.Y. C.P.L.R. 213(7) limitations period.[173]

_____

[168] 932 N.Y.S.2d 488 (N.Y. App. Div. 2011). However, "the claim that [defendant] breached a fiduciary duty to [plaintiff] by failing to diligently ascertain Derivium's fitness as a lender is not based upon actual fraud and, therefore, that claim is governed by the three-year statute of limitations, and is time-barred." *Id.*

[169] 60 N.Y.S.2d 157, 165 (N.Y. App. Div. 2003) (citing *Whitney Holdings, Ltd. v. Givotovsky*, 988 F. Supp. 732, 748–49 (S.D.N.Y. 1997)).

[170] *Whitney Holdings, Ltd. v. Givotovsky*, 988 F. Supp. 732, 744 (S.D.N.Y. 1997).

[171] *Id.*

[172] *See Oxbow Calcining USA Inc. v. Am. Indus. Partners*, 948 N.Y.S.2d 24, 31 (N.Y. App. Div. 2012).

[173] *See Pereia v. Centel Corp.* (*In re Argo Commc'ns Corp.*), 134 B.R. 776, 786–87 (Bankr. S.D.N.Y. 1991) ("[W]e agree with [the] Trustee that the six-year limitations period applies here . . . . It is a basic principle of bankruptcy law that title to a debtor's causes of action vest in the trustee at the time of his or her appointment. In the matter *sub judice*, [the] Trustee was empowered to bring actions that the corporation itself could have initiated in its own name but for the filing of a bankruptcy petition.").

With respect to application of either the three-year or six-year limitations period under New York law, New York statutes of limitations are narrowly construed.[174] "It is well settled that a statute of limitations should not be applied to cases not clearly within its provisions, nor should it be extended by construction."[175] Accordingly, a court applying New York law would likely find that N.Y. C.P.L.R. 213(7) does not apply to claims brought on behalf of a limited liability company. As the Bankruptcy Court for the Southern District of New York has stated:

> N.Y. C.P.L.R. 213(7), by its terms, only applies to a actions [sic] brought by or on behalf of a "corporation." In the present matter, the Debtor is not a corporation; it is a limited liability company, formed in New York, and, as such, subject to the New York Limited Liability Company Law (the "NYLLCL"). None of the cases cited by the Trustee applies N.Y. C.P.L.R. 213(7) to an entity other than a corporation, and the Trustee's argument is devoid of the slightest merit.[176]

The court's determination comports with the general strict applicability of N.Y. C.P.L.R. 213(7).[177] Significantly, New York courts have not yet addressed whether N.Y. C.P.L.R. 213(7) would apply where the nominal plaintiff was a corporation when the fiduciary duty claim accrued but had converted to a limited liability company by the time the claim was brought.

### 2. Potential Claims Exist For Breaches Of Duties By ResCap Fiduciaries

#### a. Potential Fiduciary Duty Claims Relating To 2006 Bank Restructuring

Dual-affiliated ResCap fiduciaries may have engaged in misconduct related to securing the approval by Independent Directors Jacob and Melzer of the 2006 Bank Restructuring.[178] There is evidence that ResCap and AFI insiders, in an effort to facilitate the transaction, purposefully concealed certain material information from the Independent Directors relating to the option of ResCap obtaining voting interests in the restructured bank. The Independent Directors were led to believe that closing of the Cerberus transaction, and obtaining the expected credit rating boost for ResCap that would flow from the transaction, hinged on approval of the 2006 Bank Restructuring on the specific terms presented to them.

---

[174] *See Sunken Pond Estates Homeowners Ass'n, Inc. v. Sunken Pond Estates*, 36 Misc.3d 1209(A), 954 N.Y.S.2d 762 (Table), at *3 (N.Y. Sup. Ct. 2012).

[175] *Id.* (citing *N.Y. Med. & Diagnostic Ctr., Inc. v. Shah*, 941 N.Y.S.2d 460, 468 [2012 N.Y. Slip Op 22052]).

[176] *O'Connell v. Shallo* (*In re Die Fliedermaus LLC*), Bankruptcy No. 01-42518, 2005 WL 3789333, at *1 (Bankr. S.D.N.Y. May 6, 2005).

[177] *See Roslyn Union Free Sch. Dist. v. Barkan*, 950 N.E.2d 85, 88 (N.Y. 2011) (a school district qualifies as a corporation within the meaning of N.Y. C.P.L.R. 213(7), based on a straightforward statutory analysis of terms found in General Construction Law § 65 and defined in General Construction Law § 66); *Sunken Pond Estates Homeowners Ass'n, Inc. v. Sunken Pond Estates*, 36 Misc.3d 1209(A), 954 N.Y.S.2d 762 (Table), at *3 (N.Y. Sup. Ct. 2012) (N.Y. C.P.L.R. 213(7) not applicable to a condominium because, unlike a corporation, a condominium is not an entity recognized at law).

[178] *See* Sections V.A and VII.L.1 (discussing the facts surrounding the 2006 Bank Restructuring).

They were *not* informed, however, that achieving those objectives did not require ResCap to relinquish efforts to obtain a voting interest in Ally Bank or negotiate for improved terms.

Thus, the Independent Directors' approval of the 2006 Bank Restructuring was arguably procured on false premises. The reality is that ResCap did not receive reasonably equivalent value in the transaction primarily because it was not adequately compensated for the non-voting nature of the Ally Bank shares that it received in return for the assets it surrendered.[179] Yet, despite troubling factual circumstances surrounding the 2006 Bank Restructuring, formidable legal obstacles exist to the viability of a breach of fiduciary duty claim relating to it. While a close question, the Examiner concludes it is more likely than not that a claim for breach of duty by ResCap fiduciaries relating to the 2006 Bank Restructuring would not prevail.

### (1) ResCap Fiduciaries' Duty To Disclose Material Information To Fellow Fiduciaries

The analysis of a claim for breach of the duty of disclosure, which is subsumed within the duty of loyalty, is premised on the conclusion that dual-affiliated ResCap fiduciaries who potentially breached their duties would not be entitled to invoke the protection of the business judgment rule. The context of a transaction between a parent and subsidiary, in which ResCap directors and officers had affiliations to parties on both sides of the transaction, would trigger application of the intrinsic fairness test.[180] The lack of "disinterestedness" of the dual-affiliated ResCap fiduciaries would rebut the presumptive application of the business judgment rule.[181]

As discussed in Section VII.E.1.b(2)(a), the fiduciary duty of loyalty encompasses a duty of disclosure and candor. Directors generally must deal candidly with their fellow directors, and officers must inform directors of information material to a company's affairs.[182] Any such duty of disclosure would be owed by fiduciaries to corporate entities rather than to individuals.[183] ResCap fiduciaries, most of them with affiliations to AFI, arguably breached that duty.

The Independent Directors were never informed by their fellow ResCap fiduciaries that 100% AFI voting control of IB Finance was not inevitable and was not mandated by the terms of the Cerberus PSA.[184] As reflected in David Applegate's April 24, 2006 memorandum to

---

[179] *See* Section V.A.2.b (analyzing reasonably equivalent value with respect to the 2006 Bank Restructuring).

[180] *See* Section VII.E.1.b(2)(a).

[181] *See* Section VII.E.1.g(1).

[182] *See Big Lots Stores, Inc. v. Bain Capital Fund VII, LLC,* 922 A.2d 1169, 1184 (Del. Ch. 2006); *Eurofins Pharma US Holdings v. BioAlliance Pharma SA,* 623 F.3d 147, 158 (3d Cir. 2010); *HMG/Courtland Properties, Inc. v. Gray,* 749 A.2d 94, 119 (Del. Ch. 1999) (citing *Mills Acquisition Co. v. Macmillan, Inc.,* 559 A.2d 1261, 1283 (Del. 1989)); *Hampshire Group, Ltd. V. Kuttner,* C.A. No. 3607-VCS, 2010 WL 2739995, at *13 n.85 (Del. Ch. July 12, 2010); *see also* Megan Wischmeier Shaner, *Restoring The Balance Of Power In Corporate Management: Enforcing An Officer's Duty Of Obedience,* 66 Bus. Law. 27, 47 (2010).

[183] *See* Section VII.E.1.f(1)(a) (discussing duties owed by fiduciaries of a solvent wholly owned subsidiary).

[184] For a complete exposition of the facts relevant to the ResCap insiders' potential breach of the duty of disclosure, see Sections V.A.1.a and VII.L.1.

AFI President William Muir, ResCap management had misgivings about losing its controlling interest in the bank. Indeed, Applegate proposed to Muir an alternative structure for IB Finance through which ResCap—and not AFI—would control at least 51% of the restructured bank.[185] Days earlier, on April 20, 2006, David Marple had stated in a memorandum to various ResCap and AFI directors that "ResCap will not be given any voting control with regard to . . . material business activities or the entity itself" and that it is "not reasonable to believe that ResCap's leadership would agree to transfer a material business to a third-party under a similar agreement."[186] Marple had further opined that "the restructuring of [Ally] Bank as currently proposed cannot reasonably be deemed a transaction to which parties at arm's-length would agree" as was required by the Operating Agreement.[187] Jacob and Melzer, whose approval of waivers to the 2005 Operating Agreement was a prerequisite to closing of the 2006 Bank Restructuring, and their counsel at Bryan Cave, were never informed about any of those facts.[188] When Jacob and Melzer were presented with the proposed terms of the 2006 Bank Restructuring on May 4, 2006, via a memorandum from ResCap Board Chair (and AFI Board Chair) Eric Feldstein, 100% AFI voting control of the restructured bank was already a fait accompli.[189] Jacob and Melzer, and the rest of the ResCap Board, ultimately approved the proposed transaction without dissent on November 20, 2006, and ResCap thereby obtained a non-voting interest in the restructured bank.[190]

As a factual matter, it is clear that various dual-affiliated ResCap fiduciaries who were aware that the Cerberus PSA did not preclude granting ResCap a voting interest in IB Finance did not disclose that material information to the Independent Directors to help inform the Independent Directors' consideration of and decision-making regarding the proposed transaction. Jacob and Melzer never found out that alternative bank ownership structures were viable. Among other opportunities by ResCap fiduciaries to inform the Independent Directors of such information in advance of the ResCap Board meeting at which the 2006 Bank Restructuring was approved, Marple, ResCap's then General Counsel, had a specific occasion to do so.

On May 10, 2006, not long after Marple's and Applegate's respective memoranda expressing concerns about the terms of the proposed transaction, Schenk, counsel to Jacob and Melzer at Bryan Cave, sent a list of issues to Marple raising questions about the transaction. Apparently accepting the false premise that the specific ownership structure of IB Finance as

---

[185] Memorandum, ILC Ownership and Control, dated Apr. 24, 2006 [EXAM11248641].

[186] Memorandum, GMAC Bank Restructuring, dated Apr. 20, 2006, at 4 [EXAM11248642].

[187] *Id.*

[188] Int. of T. Jacob, Apr. 17, 2013, at 51:15–52:9, 60:14–16, 70:9–22, 74:24–75:3, 77:2–8; Int. of T. Melzer, Mar. 22, 2013, at 62:25–63:12, 89:16–25, 91:17–23; Int. of E. Schenk, Apr. 24, 2013, at 35:20–36:6, 44:13–20, 47:5–10, 54:18–55:14, 86:17–87:10.

[189] Memorandum, Proposed Restructuring of GMAC U.S. Banking Entities, dated May 5, 2006, at 1 [EXAM10258913] (attached to E-mail from K. Sabatowski (May 4, 2006) [EXAM10258912]).

[190] Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Nov. 20, 2006 [RC00016852].

reflected in the proposed transaction was a necessary byproduct of the Cerberus transaction, Schenk stated that "[a]lthough not a direct request for information, the independent directors have noted and are considering the impact of the difference between the economic stake of ResCap and the voting rights in the IB / directorship positions."[191] Notably, that issue in Schenk's list was the only one of nine "questions" not actually framed in the form of a question. Marple responded to Schenk's "question" by simply stating: "Please let me know if you would like any further information in connection with your consideration of this matter."[192] Marple did not use the back-and-forth exchange with the Independent Directors' counsel to inform them of ResCap's prior endorsement of the option of ResCap obtaining a voting interest in the bank nor of Marple's own previously expressed concern about the arm's-length nature of the transaction.

However, as a technical legal matter it is uncertain that ResCap fiduciaries in possession of the withheld information had a fiduciary duty to disclose it to the Independent Directors. At the time of the events surrounding the 2006 Bank Restructuring, ResCap was a solvent entity.[193] As a threshold matter, fiduciary duties of the directors and officers of a solvent wholly owned subsidiary generally are owed to the subsidiary's sole shareholder (here, AFI), although some cases have stated that fiduciary duties are also owed to the subsidiary on whose board they sit.[194] Only if the inside fiduciaries had a duty of loyalty owed to ResCap (in addition to a duty to AFI)—which they may have had in light of certain legal authority indicating that they also owed fiduciary duties to the subsidiary—could they arguably have breached that duty in failing to disclose material information to Jacob and Melzer,[195] thereby wholly and improperly abandoning ResCap's interests in favor of AFI's.

Moreover, even if the inside fiduciaries were obligated to consider ResCap's interests and not entitled to completely forsake them in favor of AFI's (which is uncertain as a matter of law), cases applying the duty of disclosure toward a finding of breach of fiduciary duty (described in Section VII.E.1.b(2)(a)) have generally predicated that finding on the breaching fiduciary having obtained a personal benefit in the process of failing to disclose information. That type of direct personal self-dealing appears to be absent from this situation, although indirect benefits would accrue to AFI-affiliated ResCap fiduciaries through a transaction that favored AFI's interests at ResCap's expense. Thus, although information concerning a substantial transaction appears to have been concealed from the Independent Directors, the Examiner concludes that, while a close question, it is more likely than not that the inside fiduciaries would not be charged with a duty of disclosure owed to ResCap, and so could not have breached a duty that likely was unenforceable.

[191] E-mail from E. Schenk to D. Marple (May 10, 2006) [JACO.B000010].

[192] Memorandum from D. Marple to E. Schenk (May 12, 2006) [ALLY_0401600].

[193] *See* Section VI (discussing ResCap's financial condition at the time of the 2006 Bank Restructuring).

[194] *See* Section VII.E.1.f(1)(a) (discussing split in authority relating to the issue of whether fiduciaries of a solvent wholly owned subsidiary owe duties exclusively to the parent entity or also to the subsidiary).

[195] There appears to be no clear legal authority to support a potential argument that a duty of disclosure ran from one ResCap fiduciary to another, rather than from the fiduciaries to either or both of the parent and subsidiary entities.

Further, even if an enforceable fiduciary duty was breached, it was somewhat mitigated by the incomplete diligence by the Independent Directors and their counsel in investigating and pursuing the viability of ResCap obtaining a voting share in the restructured bank. Jacob and Melzer were clearly aware that ResCap was receiving only a non-voting interest, and were never misled about the ultimate terms of ownership of Ally Bank through the transaction. Yet the Independent Directors' own assessment of that ownership outcome was not exhaustive. The Independent Directors solicited no fairness opinion or third-party valuation report in connection with the proposed transaction, which could have further highlighted the voting rights issue by exposing that there was a shortfall between what ResCap was getting and giving up. And Schenk's noting to Marple the Independent Directors' consideration of the voting rights issue, without posing a specific question inquiring whether that transaction term was negotiable, was not framed optimally to elicit disclosure of the information that remained concealed. Marple's polite answer was technically responsive to Schenk's issue, which posed no question. Nevertheless, the answer did not provide information directly pertinent to the underlying issue, which Marple and other ResCap fiduciaries persistently withheld from Jacob and Melzer.

### (2) Fiduciary Duty Claims May Be Time-Barred

Even if ResCap fiduciaries (including Marple, Applegate, Feldstein, Walker, and Khattri) had a duty owed to ResCap to disclose information to, and deal candidly with, the Independent Directors regarding the potential viability of ResCap obtaining a voting interest in the restructured bank, and assuming that they violated an enforceable duty of disclosure (as a species of their duty of loyalty), a related claim for breach of fiduciary duty may be time-barred.

Assuming claims were brought in New York federal court, New York's statute of limitations may bar breach of fiduciary duty claims arising from the 2006 Bank Restructuring, which would be subject to New York's choice-of-law rules governing statutes of limitations.[196] New York's borrowing statute, N.Y. C.P.L.R. 202, requires that claims brought in New York by a non-resident be timely under the statutes of limitations of both New York and the state where the claim accrued.[197] As discussed below, the applicable New York statute of limitations for a breach of fiduciary duty claim is three years unless a plaintiff could show that (1) the claim is entitled to the six-year limitations period applicable to a corporation; (2) the claim is based on fraudulent conduct; or (3) the claim sought only an equitable remedy. Under a three-year limitations period (pursuant to New York law or to choice-of-law principles applied to a claim brought in Minnesota state court),[198] any claim based on 2006 conduct would be untimely. A fiduciary duty claim relating to the 2006 Bank Restructuring could possibly be timely only if a six-year limitations period applied, and even then would face challenging timeliness hurdles.

---

[196] *See Stanek Corp. v. Dev. Specialists, Inc.* (*In re Coudert Bros. LLP*), 673 F.3d 180, 188–89 (2d Cir. 2012) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496, (1941)); *Bianco v. Erkins* (*In re Gaston & Snow*), 243 F.3d 599, 604, 609 (2d Cir. 2001).

[197] *See Oxbow Calcining USA Inc. v. Am. Indus. Partners*, 948 N.Y.S.2d 24, 31 (N.Y. App. Div. 2012) (citing Global Fin. Corp. v. Triarc Corp., 93 N.Y.2d 525, 528, (N.Y. 1999)).

[198] A claim for breach of fiduciary duty brought in Minnesota state court could be deemed timely under Minnesota's borrowing statute if the residency carveout were determined to apply. *See* Section VII.E.1.j(2).

A corporation's residence for purposes of N.Y. C.P.L.R. 202 is its principal place of business, rather than its state of incorporation.[199] The principal place of business:

> [i]s the place that Courts of Appeals have called the corporation's "nerve center." And in practice it should normally be the place where the corporation maintains its headquarters— provided that the headquarters is the actual center of direction, control, and coordination, i.e., the "nerve center," and not simply an office where the corporation holds its board meetings (for example, attended by directors and officers who have traveled there for the occasion).[200]

A New York court may not apply N.Y. C.P.L.R. 202 if "a plaintiff is either incorporated in New York or maintains its principal place of business there."[201] Although ResCap is a limited liability company, the same standard used for determining residency will likely be applied.[202] In cases relating to alternate forms of business entities, New York courts have determined that residency for purposes of N.Y. C.P.L.R. 202 is generally where the principal place of business is located.[203]

Under N.Y. C.P.L.R. 202, residency is determined as of the date the action accrued. *See THC Holdings Corp. v. Chinn*, 1998 WL 50202, at *5 (S.D.N.Y. Feb. 06, 1998) ("Under CPLR § 202, residency is determined at the date that the action accrued") (citing *Besser v. E.R. Squibb & Sons, Inc.*, 146 A.D.2d 107, 539 N.Y.S.2d 734, 739 (1st Dep't 1989), *aff'd*, 75 N.Y.2d 847, 552 N.Y.S.2d 923, 552 N.E.2d 171 (N.Y. 1990)); *Braune v. Abbott Laboratories*, 895 F. Supp. 530, 558 (E.D.N.Y. 1995) ("The controlling date for determining plaintiffs'

---

[199] *See McMahan & Co. v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 727 F. Supp. 833, 834 (S.D.N.Y. 1989) (citing *Allegaert v. Warren*, 480 F. Supp. 817, 820 (S.D.N.Y. 1979)); *Pereira v. Cogan*, No. 00 Civ. 619 2001 WL 243537, at *18 (S.D.N.Y. Mar. 8, 2001) (finding that a corporation's state of residence, for purposes of the borrowing statute is New York, was where it maintained its principal place of business); *Brinckerhoff v. JAC Holding Corp.*, 263 A.D.2d 352, 352–353 (N.Y. App. Div. 999) (finding applicable statute of limitations of derivative breach of fiduciary duty claim to be Georgia where the state of incorporation was Delaware, but the principal place of business was Georgia); *Oxbow Calcining USA Inc. v. Am. Indus. Partners*, 948 N.Y.S.2d 24, 31 (N.Y. App. Div. 2012).

[200] *Hertz Corp. v. Friend*, 130 S.Ct. 1181, 1192, (2010); *see also Albstein v. Six Flags Entm't Corp.*, No. 10 Civ. 5840 2010 WL 4371433, at *1 (S.D.N.Y. Nov. 4, 2010). Note that residency is a factual determination not to be decided on a motion to dismiss. *See Oxbow*, 948 N.Y.S.2d at 3.

[201] *In re Countrywide Fin. Corp. Mortg. Backed Secs. Litig*. 834 F. Supp. 2d 949, 958 (C.D. Cal. 2012) ("The goal of the statute is to prevent foreign claimants from flooding into New York courts to take advantage of New York's favorable limitations period . . . (in the context the borrowing statute's residency requirement) a person may have more than one residence . . . Accordingly, the Court will not apply the borrowing statute if a plaintiff is either incorporated in New York or maintains its principal place of business there.").

[202] *See Kat House Prod., LLC v. Paul, Hastings, Janofsky & Walker, LLP*, 897 N.Y.S.2d 90 (N.Y. App. Div. 2010) (limited liability company plaintiff's residence for purposes of N.Y. C.P.L.R. 202 was California, where its principal place of business was located).

[203] *See id.*; *Proforma Partners, LP v. Skadden Arps Slate Meagher & Flom, LLP*, 720 N.Y.S.2d 139, 140 (N.Y. App. Div. 2001).

residence [for borrowing statute purposes] is the date on which the cause of action accrued[,] not the date when the action is commenced."). In 2006, ResCap's principal place of business was Minnesota, where its headquarters and principal executive offices were located.[204]

Claims for breach of fiduciary duty accrue "where the plaintiff resides and sustains the economic impact of the loss."[205] Courts will look at where a plaintiff "most 'acutely' sustained the loss," and ask "who became poorer and where did they become poorer,"[206] rather than asking where directors met or voted.[207] The potential breach of fiduciary duty claims against ResCap's officers and directors accrued in Minnesota, where ResCap maintained its principal executive offices during the period of the 2006 Bank Restructuring. Minnesota is effectively where ResCap's "officers direct[ed], control[ed], and coordinate[d] the corporation's activities."[208]

Minnesota applies a six-year statute of limitations to fiduciary duty claims,[209] and a claim brought on ResCap's behalf could be timely under Minnesota's choice-of-law law principles.[210] As noted above, however, a fiduciary duty claim in a New York federal court under N.Y. C.P.L.R. 202 must also be timely under New York's statute of limitations rules.

Although a close question, the six-year statute of limitations set forth in N.Y. C.P.L.R. 213(7) likely does not apply here because it is restricted by its terms to actions brought by a corporation. ResCap, while previously a corporation, since October 24, 2006 has been a

---

[204] *See* Residential Capital Corp. Current Report (Form 10-K) (Mar. 28, 2006), at 1, 3; Residential Capital, LLC, Current Report (Form 10-K) (March 13, 2007), at 1, 3; Residential Capital, LLC, Current Report (Form 10-K) (Feb. 27, 2008), at 1, 4.

[205] *Oxbow Calcining USA Inc. v. Am. Indus. Partners,* 948 N.Y.S.2d 24, 31 (N.Y. App. Div. 2012) (citing *Global Fin. Corp. v. Triarc Corp*., 93 N.Y.2d 525, 529 (N.Y. 1999)); *see also Cantor Fitzgerald Inc. v. Lutnick*, 313 F.3d 704, 710 (2d Cir. 2002). There is an "extremely rare" exception to the rule that the harm occurs where the plaintiff resides. *See In re Countrywide Financial Corp. Mortgage-Backed Securities Litig.*, 834 F. Supp. 2d 949, 959 (C.D. Cal. 2012) (applying N.Y. C.P.L.R. 202). In these instances, it is the plaintiff who has the burden to demonstrate that extraordinary circumstances justify a departure from the standard rule. *See id.* In determining whether a plaintiff has met this burden, the court must consider all relevant factors. *See id.* For example, the "financial base" doctrine may apply [w]here a plaintiff 'maintains a separate financial base' and where the impact of the financial loss is felt at that location." However, the *Countrywide* court made clear that only two cases could be identified where the exception was applied. *See Countrywide*, 628 F. Supp. 2d at 960 n.11. Because these extraordinary circumstances do not appear to be present in this case, such an exception would likely not apply.

[206] *Countrywide,* 834 F. Supp. 2d at 957 (citing *Global Fin. Corp.*, 93 N.Y.2d 530).

[207] If a corporation is authorized to do business in New York but does not have its principal place of business there, those facts are generally insufficient to deem the corporation a New York resident for purposes of N.Y. C.P.L.R. 202. *See Allegaert v. Warren,* 480 F. Supp. 817, 820 (1979). Accordingly, if directors met and voted in a state other than the state of its incorporation or principal place of business, the action would generally not accrue in that state. *See Sompo Japan Ins. Co. of Am. v. Travelers Indem. Co.*, No. 118223/2003, 2004 WL 5487929, at *1 (Sup. Ct. N.Y. July 6, 2004) ("[A] foreign corporation will not be held a resident for purposes of the borrowing statute based on the mere fact that it is licensed to do business or is doing business in New York.").

[208] *Hertz Corp. v. Friend*, 130 S.Ct. 1181, 1192 (2010).

[209] *See* MINN. STAT. § 541.05 (2013).

[210] *See* Section VII.E.1.j(2).

limited liability company.[211] Statutes of limitations are narrowly construed in New York,[212] and application of N.Y. C.P.L.R. 213(7) has been expressly rejected in the LLC context.[213] As noted previously, however, the issue of whether N.Y. C.P.L.R. 213(7) applies where the plaintiff was a corporation when the claim (arguably) accrued, but a limited liability company when the claim was brought, has not been squarely addressed. However, the narrow construction of New York statutes of limitations likely militates against application of N.Y. C.P.L.R. 213(7) in the circumstance of ResCap's transition during the relevant period from a corporation to an LLC.[214]

A six-year limitations period is also potentially available under New York law, pursuant to N.Y. C.P.L.R. 213(8), where a plaintiff alleges fraud as integral to a fiduciary duty claim.[215] To trigger application of N.Y. C.P.L.R. 213(8), fraud allegations must be essential and not incidental to the claim for breach of fiduciary duty, and a fraud claim must be predicated on a duty to disclose the withheld information.[216] Material information was withheld from the Independent Directors, who relied on the good-faith conduct of the ResCap directors and officers to provide them with thorough and honest information for purposes of decision-making regarding proposed Affiliate Transactions. Jacob and Melzer were never apprised of Marple's conclusions regarding the proposed transaction, of Applegate's promotion of the option of ResCap retaining a voting share in the restructured bank, or that the Cerberus transaction did not predetermine an Ally Bank ownership result for ResCap. However, with respect to fiduciary duty claims relating to the 2006 Bank Restructuring, although a close call, it is more likely than not that N.Y. C.P.L.R. 213(8) would not apply. Although ResCap fiduciaries concealed material information from the Independent Directors, they likely owed no enforceable fiduciary duty to disclose such information.[217] In addition, any related fraud claim would likely be subject to successful affirmative defenses.[218]

_____

[211] *See* Residential Capital, LLC, Current Report (Form 8-K) (Oct. 24, 2006).

[212] *See Sunken Pond Estates Homeowners Ass'n, Inc. v. Sunken Pond Estates*, 36 Misc.3d 1209(A), at *3 (N.Y. Sup. Ct. 2012).

[213] *See In re Die Fliedermaus LLC*, 2005 WL 3789333, at *1.

[214] In addition, as discussed below, a claim for breach of fiduciary duty relating to the 2006 Bank Restructuring arguably accrued after October 24, 2006, i.e., after ResCap had already converted from a corporation to an LLC.

[215] *See Oxbow Calcining USA Inc. v. Am. Indus. Partners*, 948 N.Y.S.2d 24, 31 (N.Y. App. Div. 2012) (citing *IDT Corp. v. Morgan Stanley Dean Witter & Co.*, 12 N.Y.3d 132, 139 (N.Y. 2009)).

[216] *See Monaghan v. Ford Motor Co.*, 71 A.D.3d 848, 850 N.Y.S.2d 482 (N.Y. App. Div. 2010) (citing *Kaufman v. Cohen*, 307 A.D.2d 113, 60 N.Y.S.2d 157 (N.Y. App. Div. 2003)).

[217] *See* Section VII.E.2.a(1).

[218] *See* Section VII.E.I.j(3) (discussing legal standards for application of N.Y. C.P.L.R. 213(8)); Section VII.L.1. (discussing the viability of a fraud claim against AFI related to the 2006 Bank Restructuring, including the applicability of potentially successful affirmative defenses).

If recovery on a claim for breach of fiduciary duty were limited to equitable remedies under N.Y. C.P.L.R. 213(1), a plaintiff could avail itself of the six-year limitations period.[219] However, a plaintiff pursuing a fiduciary duty claim would likely seek monetary damages, as equitable remedies may not be available,[220] and therefore would need to invoke either N.Y. C.P.L.R. 213(7) or N.Y. C.P.L.R. 213(8) to gain the benefit of the longer limitations period.

Yet even if a six-year limitations period were available under New York law through application of (1) N.Y. C.P.L.R. 213(7); (2) N.Y. C.P.L.R. 213(8); or (3) N.Y. C.P.L.R. 213(1), the timeliness of a fiduciary duty claim relating to the 2006 Bank Restructuring would still not be guaranteed. To be timely, a fiduciary duty claim would need to have accrued no earlier than May 14, 2006 (i.e., six years before the Petition Date).[221] Such a claim generally accrues, and the limitations period begins to run, upon the date of the alleged breach,[222] which occurs "as soon as the claim becomes enforceable, i.e., when all the elements of the tort can be truthfully alleged in a complaint."[223]

A fiduciary duty claim relating to the 2006 Bank Restructuring arguably accrued as early as May 4, 2006, when Feldstein's memorandum was sent to the Independent Directors outlining the terms of the proposed transaction, which did not reference the option of ResCap retaining a voting interest in the restructured bank despite the fact that various ResCap insiders (including Applegate and Marple) had discussed that option shortly before delivery of the memorandum. That date marks the initial occasion of ResCap insiders' withholding of information relating to the transaction, which they sought to persuade Jacob and Melzer to approve. If the claim accrued on May 4, 2006, it is time-barred even with the benefit of a six-year limitations period.

Yet, even if the claim accrued as early as May 4, 2006, through application of the "continuing wrong" doctrine[224] arguably the breach continued until the ResCap Board approved the 2006 Bank Restructuring on November 20, 2006, as the information regarding the transaction that was concealed from the Independent Directors could still have been disclosed at any time in advance of that Board approval. For example, the withheld information could have been disclosed by Marple on May 12, 2006 in response to Schenk's list of questions; by Walker on November 20, 2006 in his report to the ResCap Board regarding the proposed transaction before the Board approved it; and on any date in the several intervening months when Jacob and Melzer were considering the merits of the transaction, including several dates on which written communications regarding the

---

[219] *See* Section VII.E.1.j(3).

[220] *See* Section VII.I (discussing viability of constructive trust as potential remedy).

[221] Claims brought on behalf of ResCap's estate could invoke the benefit of tolling pursuant to the Bankruptcy Code. *See* 11 U.S.C. § 108(c).

[222] *See Sunken Pond Estates Homeowners Ass'n, Inc. v. Sunken Pond Estates, Inc.*, 36 Misc.3d 1209(A), at *3 (N.Y. Sup. Ct. June 21, 2012).

[223] *Kelly v. Legacy Benefits Corp.*, 34 Misc.3d 1242(A), at *12 (N.Y. Sup. Ct. Mar. 12, 2012).

[224] *See* Section VII.E.1.c.

transaction occurred.[225] The "continuing wrong" doctrine must be applied to preserve a fiduciary duty claim that definitively accrued as early as May 4, 2006, yet applicability of the doctrine is uncertain in light of limited case law.

However, it is more likely that a fiduciary duty claim accrued after May 4, 2006, when the possible harm caused by the potential breach of duty occurred. Arguably there was no actual injury until the ResCap Board approved the 2006 Bank Restructuring on November 20, 2006. Further, even if possible injury was caused as early as when the approval applications tied to the proposed transaction were submitted to the regulatory authorities on May 19, 2006,[226] the related fiduciary duty claim would still be timely if given the benefit of a six-year limitations period. It is likely that a claim for breach of fiduciary duty accrued at some point after May 14, 2006 when injury arguably occurred.

Overall, a claim for breach of fiduciary duty relating to the 2006 Bank Restructuring would have to overcome several impediments to be deemed timely. Although a close question, the Examiner concludes it is more likely than not that a fiduciary duty claim could not successfully trigger application of a six-year limitations period, which would be necessary to preserve the timeliness of the claim.

### (3) Proof Of Harm Resulting From A Potential Breach Of Fiduciary Duty May Be Uncertain

Although proof of damages is likely not required to demonstrate that the duty of loyalty has been breached, as stringent requirements are loosened in connection with a duty of loyalty breach,[227] nevertheless to earn a monetary recovery a claim based on a breach of fiduciary duty must ultimately show some accompanying harm. Even assuming that the inside fiduciaries owed an enforceable duty of loyalty to ResCap, which they breached in failing to disclose the withheld information to the Independent Directors, and that any related fiduciary duty claim could be deemed timely under a six-year limitations period, there is a threshold question of whether any harm to ResCap actually resulted from the possible breach.[228]

There is some uncertainty regarding whether the concealment of information from the Independent Directors relating to ResCap obtaining a voting interest in the restructured bank ultimately made any difference regarding the transaction that the ResCap Board approved. That is, the Independent Directors may possibly have approved the 2006 Bank Restructuring

---

[225] *See generally* Section V.A.1.

[226] *See id*.

[227] *See* Section VII.E.1.b(2)(a).

[228] Because it is unlikely that a viable legal argument could be advanced that the duty of loyalty was owed by the inside fiduciaries directly to the Independent Directors rather than to ResCap (if a duty was owed to ResCap at all), it is similarly unlikely that any possible injury to the Independent Directors would be relevant to a potential claim. In any event, to date the Independent Directors arguably have suffered no harm as a result of the possible breach.

on the same terms as those agreed to even had they been provided with the concealed information. Jacob and Melzer stated that they conceived of the 2006 Bank Restructuring as a prerequisite for consummation of the Cerberus transaction, which they deemed beneficial to AFI and ResCap, and believed that ResCap received "fair value" in the transaction on the terms they approved.[229]

Nevertheless, the Examiner concludes that evidence supports the proposition that had Jacob and Melzer known that the option of ResCap obtaining a voting interest in the restructured bank was a viable or, at least, a negotiable term, they could—and likely would—have exploited that leverage to extract better terms for ResCap in the transaction.[230] At minimum, armed with the knowledge that a voting interest in the restructured bank was a negotiable transaction term, the Independent Directors could have sought to make up the shortfall in the value that ResCap received in compensation for relinquishing control of the bank. Potential damages on a fiduciary duty claim, reflecting harm to ResCap resulting from the possible breach, are (depending on the damages theory) $390–$465 million (FMV shortfall) or $533–$688 million (difference in value of equity interests transferred and received by ResCap).[231]

### (4) ResCap's Independent Directors Likely Did Not Breach Their Fiduciary Duties Of Care

Independent Directors Jacob and Melzer arguably breached their fiduciary duties of care in failing to exercise more thorough diligence regarding the 2006 Bank Restructuring. As noted above, the list of questions regarding the proposed transaction that Schenk sent to Marple on behalf of the Independent Directors did not technically solicit a response regarding the voting rights issue. At no time did the Independent Directors or their counsel at Bryan Cave, despite having considered the voting rights issue (as confirmed in Schenk's list of questions to Marple), actually ask anyone at ResCap whether ResCap could obtain a voting interest in the restructured bank. Had the Independent Directors or their counsel posed that question to ResCap managers, the withheld information regarding the voting rights issue may well have been exposed to them. Additionally, the Independent Directors commissioned no valuation of, or fairness opinion regarding, the interests in the restructured bank that they were receiving or relinquishing, which may call into question the informed basis upon which they approved the 2006 Bank Restructuring as being at arm's length and for fair value under the 2006 Amended Operating Agreement.

_____

[229] See Int. of T. Jacob, Apr. 17, 2013, at 76:1–5; 77:9–19; 81:12–25; Int. of T. Melzer, Mar. 22, 2013, at 80:6–7; 82:14-15; see also Int. of E. Schenk, Apr. 24, 2013, at 67:14–16; 68:4–10; 77:14–23; 78:21–79:14; 82:11–15; see Section VII.L (discussing facts relevant to the post-hoc assessment of the significance of the concealed information).

[230] See Sections IV.A.1, IV.A.2, V.A.1, VII.L.1 (discussing independence of Jacob and Melzer in other contexts, particularly with respect to proposed affiliate transactions in 2008 preceding their simultaneous resignations).

[231] See Section V.A.2.b, Appendix V.A.2—4 (discussion of these damages calculations).

Yet the Examiner concludes it is unlikely that a claim against the Independent Directors for breach of the duty of care would prevail. Jacob and Melzer relied on the advice of counsel in assessing the proposed transaction, as well as on the candor of their ResCap co-fiduciaries. They performed certain—even if less than optimal—due diligence regarding the proposed transaction. In any event, any such breach of the duty of care would be exculpated under ResCap's charter.[232]

### b. Potential Breach Of Fiduciary Duty Claims Relating To Prepetition Asset Sales

While as many as three Prepetition Asset Sales (most notably the Health Capital Sale in August 2007) arguably occurred in a hurried manner, with negotiations and closings taking place on an accelerated schedule,[233] the Examiner concludes it is unlikely that any claim for breach of fiduciary duty with respect to the Prepetition Asset Sales would prevail. There is no indication in connection with any of the Prepetition Asset Sales that ResCap's fiduciaries lacked adequate information upon which to make an informed decision to sell on the proposed terms.

If anything, the speed at which Prepetition Asset Sales occurred likely benefited ResCap. The Health Capital Sale is illustrative. The purchase agreement contained a one-way true-up provision, requiring GMAC CF to pay to ResCap the difference between the earnest money deposit and a third-party valuation of the business. Because a premium was placed on providing ResCap with liquidity in short order, AFI was willing to deposit $775 million in earnest money without a signed purchase agreement and without a true-down provision in the final agreement. AFI agreed to a transaction structure that ensured that ResCap could keep the earnest money and potentially gain the benefit of an upward valuation adjustment, which could inure only to ResCap's benefit. The transaction structure and pace were therefore in ResCap's favor.

There is also no indication that ResCap's directors and officers disregarded corporate formalities with respect to any of the Prepetition Asset Sales. ResCap board minutes make clear that ResCap's directors and officers understood that they were obligated to obtain a fair price for each Prepetition Asset Sale, and to ensure that transaction terms overall were at least as beneficial to ResCap as those that might be available from an unrelated party. There is no evidence indicating that the ResCap Board acted in an unreasonable or uninformed fashion in concluding that each particular transaction met the required criteria. The documentary record (ResCap board minutes in particular) reflects that the Board routinely took steps to ensure compliance with pertinent requirements in the 2006 Amended Operating Agreement. Each Prepetition Asset Sale had a legitimate business reason—to improve ResCap's liquidity position—rendering each asset sale reasonable and justifiable in context.

Further, even assuming arguendo that ResCap fiduciaries breached duties with respect to asset sales that were negotiated and closed quickly, ResCap was not harmed in the process.

---

[232] *See generally* Section IV.B.

[233] *See* Section V.F (discussing pertinent facts related to the various related-party asset sales).

ResCap received fair value with respect to each of these transactions.[234] Here, too, the Health Capital Sale is illustrative. The record suggests that if ResCap had not sold the business to GMAC CF in August 2007, ResCap may have been unable to provide this business with the continued financing necessary for the business to preserve value going forward, potentially resulting in an appreciable loss of value if Health Capital were sold at a later time.

  c. *Potential Breach Of Fiduciary Duty Claims Relating To The January 30 Letter Agreement, $48.4 million Prepetition Indemnity Payment, And A&R Servicing Agreement*

  The Investigation considered whether potential claims may exist for breaches of fiduciary duties relating to the January 30 Letter Agreement, a related $48.4 million prepetition indemnity payment to Ally Bank, and the A&R Servicing Agreement.[235] The Examiner concludes it is unlikely that such claims for breaches of fiduciary duties would prevail, although potential claims related to the prepetition indemnity payment are a close question.

  Fiduciary duty claims relating to the January 30 Letter Agreement likely would not prevail. The January 30 Letter Agreement was the product of extensive negotiations involving sophisticated counsel for parties on both sides.[236] The agreement provided fair value to both ResCap and GMAC Mortgage, as it effectively required AFI to pay government fines through forgiveness of ResCap debt, to make additional capital contributions as might be needed, and to waive defaults under existing loan arrangements.[238] This allowed ResCap and GMAC Mortgage to continue to operate as going concerns in light of impending government penalties.[239] The ResCap Board considered the terms of the January 30 Letter Agreement at two separate meetings, with the Board, including three of the four Independent Directors, approving the agreement prior to its execution.[240] The evidence supports the proposition that the relevant ResCap fiduciaries negotiated the best possible deal for ResCap in what they viewed as a contentious situation.[241]

---

[234] *See* Section V.F.

[235] *See* Section V.C (discussing the facts relevant to these various issues and potential fiduciary duty claims).

[236] *See* Section V.C.2.a(3) (discussing these negotiations).

[237] *See* Section V.C.2 (detailing GMAC Mortgage's receipt of reasonably equivalent value with respect to the January 30 Letter Agreement and A&R Servicing Agreement transactions).

[238] *See* January 30 Letter Agreement [ALLY_0194817].

[239] Int. of S. Abreu, Jan. 22, 2013, at 370:4–22; Dep. of J. Whitlinger, Aug. 3, 2012, at 52:14–53:17 (if "ResCap didn't have the funds available" from AFI pursuant to the January 30 Letter Agreement, ResCap and GMAC Mortgage could not have entered into the DOJ/AG Settlement as they lacked the requisite net worth or liquidity.).

[240] Minutes of a Special Meeting of the Board of Residential Capital, LLC, Jan. 30, 2012, at RC40019197 [RC40019179]. Independent Director Ilany was absent from the January 30, 2012 special meeting for unidentified reasons.

[241] Int. of T. Marano, Feb. 27, 2013, at 70:18–20 ("[T]his is like every agreement was [sic] extremely contentious between us and [AFI] . . . ."); *see* E-mail from P. West to J. Whitlinger (Jan. 31, 2012) [EXAM10345463] (West thought that the end result was "Great. Looks like we got most of what we wanted. Good work."). *See generally* Section V.C.2.a(3).

The Examiner concludes that, while a close question, it is more likely than not that fiduciary duty claims relating to prepetition payment by ResCap to Ally Bank of $48.4 million for certain indemnification obligations would not prevail. The claims would be based on improper authorization by ResCap fiduciary Marano, in the absence of ResCap or GMAC Mortgage board approval, of a prepetition payment that would likely be subject later to challenge as an avoidable preference in the wake of ResCap's imminent bankruptcy filing. Yet the terms of the payment were negotiated at arm's length,[242] and the payment was due to Ally Bank pursuant to the January 30 Letter Agreement.[243] Although it may be a close question, payment of that debt, even without board consideration, was likely a reasonable exercise of the ResCap and GMAC Mortgage fiduciaries' business judgment, particularly in light of those entities' ongoing obligations. Additionally, evidence indicates that while GMAC Mortgage was contractually obligated to make the payment, Ally Bank also considered this payment a prerequisite for Ally Bank's entry into the A&R Servicing Agreement, which ResCap and GMAC Mortgage viewed as valuable.[244] The prepetition indemnity payment, made pursuant to an existing agreement between the parties, arguably helped ensure AFI's and Ally Bank's continued support leading up to ResCap's bankruptcy filing.

Potential fiduciary duty claims relating to the A&R Servicing Agreement likely would not prevail. The A&R Servicing Agreement was also the product of extensive, arm's-length negotiations that took place over the course of several months, with sophisticated counsel representing both parties.[245] Entry into the A&R Servicing Agreement was seen as critical to the preservation of GMAC Mortgage's servicing platform, which was ultimately the subject of a favorable postpetition disposition that benefited the Debtors' estate.[246] Although, as with the $48.4 million prepetition indemnity payment, there was no related approval by the GMAC Mortgage board of directors, the transaction would likely be considered by a court to be at arm's length and for fair value, and thus a claim would be unlikely to prevail.

---

[242] In connection with the payment, Ally Bank stated that a failure to make the payment would constitute a breach under the January 30 Letter Agreement, which would have serious consequences. *See* E-mail from B. Yastine to T. Marano (May 8, 2012) [RC40027250]. During the course of negotiations, Marano did what he could to further the interests of ResCap and GMAC Mortgage. *See* E-mail from T. Marano to J. Pensabene (May 8, 2012) [RC40032271] ("I will not be bullied. We will honor our specific contractual obligations and advise them professionally of what they need to do to protect their and our interests.").

[243] While the January 30 Letter Agreement did not expressly require the payment, subsequent written correspondence between the parties evidences their intent regarding the loan modifications and related indemnification obligations. Both February 9, 2012 e-mail correspondence and a May 11, 2012 agreement between the parties set forth the parties' understanding regarding the requirement to indemnify Ally Bank for modifications to loans in its portfolio. This agreement was also embedded in the A&R Servicing Agreement. *See* Sections V.C.2.a (2), V.C.2.e.

[244] *See* Section V.C.2.e (discussing the negotiations surrounding the $48.4 million prepetition indemnity payment).

[245] *See* Section V.C.2.d. (discussing a more detailed recitation of these negotiations).

[246] *See* Int. of J. Pensabene, Jan. 9, 2013, at 245:5–12 ("If we lost rights to service one-third of our overall portfolio and . . . even more as it relates to just the value of the portfolio then the auction of the business would not have been nearly as successful as it turned out to be. The value of the platform would have been diminished drastically.").

### d. Potential Breach Of Fiduciary Duty Claims Relating To The Work Of The Special Review Committee And ResCap Board Regarding Approval Of The AFI And RMBS Trust Settlements

The Investigation considered potential claims that might exist for breaches of fiduciary duties relating to approval by the ResCap Board of the (1) AFI Settlement and Plan Sponsor Agreement (which is now terminated) and (2) RMBS Trust Settlement Agreements. The work of the Special Review Committee of the ResCap Board, comprised of "super" Independent Directors Ilany and Mack, is particularly implicated by the ResCap Board's approval of the AFI Settlement and Plan Sponsor Agreement. The processes underlying the Board's approval of the AFI Settlement were flawed and are open to criticism. Despite the apparent deficiencies, no viable claims likely exist for breaches of fiduciary duties connected to those ResCap Board approval processes.

### (1) AFI Settlement And Plan Sponsor Agreement

Although the performance of the Independent Directors who comprised the Special Review Committee responsible for the claims investigation that led to the now-terminated AFI Settlement and Plan Sponsor Agreement was incomplete, tainted by certain conflicts of its counsel[247] and otherwise defective, those deficiencies do not rise to the level of a breach of fiduciary duties. The ResCap Board reasonably approved the settlement and related agreement based on the investigation of its legal counsel, even if the input of the Special Review Committee was virtually nonexistent.[248] The disinterestedness of Independent Directors Ilany and Mack cannot be seriously challenged.

The work of Ilany and Mack on the Special Review Committee was not marked by any particular diligence, or even conformity with the express terms of the ResCap Board resolutions that authorized their efforts. However, although a close question, their efforts on the Special Review Committee more likely than not did not violate their fiduciary duties. Ilany and Mack relied heavily on the advice of legal counsel in assessing the value of the claims to be settled, and believed in good faith that they had secured a favorable settlement for ResCap and its creditors. Based on the investigation that Morrison & Foerster conducted, the ResCap Board concluded that the AFI settlement was a reasonable resolution of complex and challenging litigation claims. The Special Review Committee and ResCap Board were entitled to delegate responsibility to their legal counsel for assessing the value of those litigation claims, and to rely on that expertise. The conclusions of the ResCap Board are entitled to the protection of the business judgment rule, and there is no credible basis to rebut the presumption that the ResCap Board and the Independent Directors upheld their fiduciary duties in the process of approving the settlement.

_____

[247] *See* Sections III.J.1.c(6), III.J.3.g(1) (discussing conflicts related to Morrison & Foerster's investigation of potential legal claims against AFI).

[248] *See* Sections III.J.3.g, IV.A.5 (discussing facts related to the flawed process leading to the AFI Settlement and Plan Sponsor Agreement and underlying the work of the Special Review Committee).

*(2) RMBS Trust Settlement Agreements*

The process that led to the RMBS Trust Settlement Agreements was also not a model of optimal board decision-making. The ResCap Board approved the settlement of momentous litigation claims within a highly condensed timeframe and based on imperfect expert advice.

Yet while the May 9, 2012 advisor presentation to the ResCap Board upon which the decision to approve the settlement may have been flawed, the Examiner does not believe such flaws undermine the conclusion that settlement negotiations were conducted at arm's length.[249] The settlement agreement was negotiated primarily by ResCap's outside counsel, upon whom the ResCap Board was entitled to rely to conduct negotiations competently and effectively. Although the comparative data points included in the May 9, 2012 presentation potentially misled or confused the ResCap Board, the Examiner concludes that, while a close question, it is more likely than not that breach of fiduciary duty claims related to approval of the RMBS Trust Settlement Agreements would not prevail. That the ResCap Board may have approved the settlement on a basis other than a pure assessment of the claims' legal merits is not dispositive. The ResCap Board acted on a sufficiently informed basis, in good faith, and with an honest and reasonable belief that the settlement of major claims—perceived by the Board as facilitating the efficacy of ResCap's imminent bankruptcy filing through eliminating an obstacle to sale of ResCap's assets—was in the best interests of ResCap and its creditors.

_____

[249] *See* Section III.J.4.h (discussing facts related to the process leading to the RMBS Trust Settlement Agreements).