## VII. REVIEW AND ANALYSIS OF ESTATE CAUSES OF ACTION IMPLICATED BY AFFILIATE TRANSACTIONS AND THE RELATIONSHIP AND COURSE OF DEALING AMONG RESCAP, AFI, ALLY BANK, AND CERBERUS

### F.  AVOIDANCE ACTIONS[1]

Chapter 5 of the Bankruptcy Code sets forth several "avoiding powers" that the trustee, debtor-in-possession, or authorized estate representative can exercise to avoid prepetition transactions and return property to the estate for the benefit of all creditors. The Investigation focused specifically on transactions between the Debtors, on the one hand, and any of AFI, Cerberus, and Ally Bank, including any Affiliates or Subsidiaries of AFI, Cerberus, and Ally Bank, on the other hand.[2]

Based on the facts set forth in Section V, the Examiner concludes that there are certain transactions that may be avoidable based on: (1) the Minnesota "Insider Preference" statute as made applicable through section 544(b) of the Bankruptcy Code; (2) preference actions under section 547 of the Bankruptcy Code; and (3) constructive fraudulent transfer actions under either section 544 or 548 of the Bankruptcy Code. The proper recovery for the Debtors' Estates based on these avoidance actions would be governed by section 550 of the Bankruptcy Code.

Set forth below is the Examiner's analysis, as well as the Examiner's conclusions, with respect to potential avoidance actions that could be brought by one or more of the Debtors' Estates. Section VII.F.1 discusses which, if any, liens may be set aside pursuant to the section 544(a) strong-arm power. Section VII.F.2 discusses section 544 of the Bankruptcy Code, which permits an estate representative to access certain state law-based avoidance powers, and the choice of law principles that will determine which state's law is likely to control various avoidance actions. Section VII.F.3 discusses certain "safe harbor" defenses to avoidance actions created by section 546 of the Bankruptcy Code, as well as a potential method of bypassing the safe harbor defenses regarding claims that arise under state avoidance law. The Examiner has determined that Minnesota substantive law, as well as Minnesota's statute of limitations, is likely to control a number of avoidance actions, and Section VII.F.4 therefore discusses Minnesota's "Insider Preference" statute, as well as transactions that may be vulnerable to avoidance under that statute. Section VII.F.5 discusses the preference avoidance power created by section 547 of the Bankruptcy Code. Section VII.F.6 discusses general fraudulent transfer law—whether actual or constructive and whether based on state law or section 548 of the Bankruptcy Code—and identifies potentially avoidable transactions. Section VII.F.7 addresses avoidance of a postpetition transfer pursuant to section 549. Finally, Section VII.F.8 discusses the ability of the Debtors' Estates to recover avoided transfers pursuant to section 550 of the Bankruptcy Code.

---

[1]   This Section discusses all transactions identified by the Examiner that arguably give rise to colorable avoidance claims, including those that the Examiner believes are unlikely to succeed. Given the volume of transactions covered by the Investigation, this Section only discusses transactions as to which the Investigation has revealed sufficient evidence to support a colorable avoidance claim.

[2]   *See* Examiner Scope Approval Order, at 4. The Report does not analyze potential claims against other parties-in-interest or inter-Debtor claims.

1.  *Strong Arm Powers Of Bankruptcy Trustee Under Section 544(a) Of The Bankruptcy Code*

Section 544(a) of the Bankruptcy Code confers on the trustee in bankruptcy the status of a hypothetical judgment lien creditor.[3] The trustee is treated as if it had extended credit to the debtor at the time of the bankruptcy filing and, at that moment, obtained a judicial lien on all property in which the debtor has any interest and that could be reached by a creditor.[4] Section 544(a) thus creates a "legal fiction that permits [a] trustee to assume the guise of a creditor with a judgment against the debtor."[5] "Under that guise, the trustee may invoke whatever remedies [are] provided by state law to judgment lien creditors to satisfy judgments against the debtor."[6]

The purpose of these "strong arm" powers under section 544(a) is to allow the bankruptcy trustee to cut off any secret or unperfected security interests on debtor property that would bind only the debtor, but not the debtor's judgment creditor, who typically enjoys priority under state debtor and creditor laws (subject to any other validly perfected liens).[7] The extent of the trustee's priority and rights as a newly created 544(a) judgment creditor are determined by applicable state law.[8] On the other side of the equation, section 544(a) allows the trustee to avoid defective security interests and relegate the attendant secured claims to the status of general unsecured claims.[9]

As of the Petition Date, according to the Debtors' stipulations in the AFI DIP Order, the aggregate principal amount outstanding: (1) under the A&R Secured Revolver Loan Agreement was at least $747 million; and (2) under the A&R Line of Credit Agreement was at least $380 million plus accrued and unpaid interest thereon, in each case.[10]

According to the Debtors' trial balance as of February 29, 2012, attached as Exhibit A to the AFI DIP Order, the Debtors stipulated (and no party to date has disputed) that: (1) the A&R Secured Revolver Loan Agreement is secured by at least $1.3 billion of assets;[11] and (2) the A&R Line of Credit Agreement is secured by approximately $1.7 billion of assets.[12] Accordingly, assuming due and proper perfection, AFI appears to be substantially oversecured

---

3   *See Musso v. Ostashko*, 468 F.3d 99, 104 (2d Cir. 2006) (citing 11 U.S.C. § 544(a)(1)).

4   *Id.* (citing *Robinson v. Howard Bank* (*In re Kors, Inc.*), 819 F.2d 19, 22–23 (2d Cir. 1987)).

5   *Picard v. JPMorgan Chase & Co.*, 460 B.R. 84, 93 (S.D.N.Y. 2011) (quoting *Zilkha Energy Co. v. Leighton*, 920 F.2d 1520, 1523 (10th Cir. 1990)).

6   *Id.*

7   *Id.*; *see also Canney v. Merchs. Bank* (*In re Canney*), 284 F.3d 362, 374 (2d Cir. 2002).

8   *See Musso*, 468 F.3d at 104–05; *In re Kors Inc.*, 819 F.2d at 22–23.

9   *See Neilson v. Chang* (*In re First T.D. & Inv., Inc.*), 253 F.3d 520, 525 (9th Cir. 2001).

10   AFI DIP Order, ¶ 5(b).

11   *See id.* Ex. A. The trial balance also identified certain "Blanket Lien" assets of approximately $1.1 billion purportedly securing the A&R Secured Revolver Loan Agreement and the Junior Secured Notes. *See id.*

12   *See id.*

with respect to its claims under the A&R Secured Revolver Loan Agreement and A&R Line of Credit Agreement.[13] The Examiner did not undertake an independent collateral valuation exercise.

AFI's secured claims are neither secret nor undisclosed. Accordingly, the only relevant consideration is whether AFI's liens are unperfected or otherwise invalid. The Examiner's Professionals reviewed the UCC financing statements filed by AFI identifying ResCap LLC, GMAC Mortgage, RFC, and numerous other entities as debtors. The financing statements identify AFI or Wells Fargo Bank, N.A. (as agent on behalf of AFI), as secured party, with respect to the Secured Revolver Loan Agreement, A&R Secured Revolver Loan Agreement, the Initial Line of Credit Facility, the Second Line of Credit Facility, and the A&R Line of Credit Facility.[14]

In connection with the Secured Revolver Loan Agreement, and contemporaneously with the closing of that transaction on June 4, 2008, AFI filed UCC financing statements covering "all assets" against ResCap LLC, RFC, GMAC Mortgage, and numerous other entities. In connection with the A&R Secured Revolver Loan Agreement, UCC financing statements were filed on January 8, 2010, nine days after the date of that closing.[15]

In connection with the Initial Line of Credit Facility and the Second Line of Credit Facility, AFI filed UCC financing statements covering the assets specified by the related security agreements[16] against ResCap LLC, RFC, GMAC Mortgage, and numerous other entities. Those financing statements were filed contemporaneously with the closing of those transactions on November 20, 2008 and June 1, 2009, respectively. AFI did not file additional UCC financing statements in connection with the A&R Line of Credit Facility, but was not required to do so because that agreement was simply an amendment and restatement of the previously perfected Initial Line of Credit Facility and the Second Line of Credit Facility.

The Examiner concludes that AFI's liens on assets that can be perfected by the filing of a UCC financing statement are perfected to such an extent as not to jeopardize AFI's status as an oversecured creditor. Therefore, the use of section 544(a) would not yield any additional

---

[13]  *See id.*; *see also* RFC and GMAC Mortgage AFI Line of Credit Monthly Borrowing Base Report, Reporting Period Ending May 13, 2012, dated May 31, 2012 [EXAM00221834]; AFI—ResCap Secured Revolver Borrowing Base Report, Reporting Period Ending May 13, 2012, dated May 31, 2012 [EXAM00221438].

[14]  ResCap LLC, GMAC Mortgage, and RFC are each incorporated in Delaware. Accordingly, AFI's UCC financing statements related to those entities are properly filed in Delaware. *See* UCC §§ 9-301, 9-307(e), 9-501.

[15]  AFI was likely not required to file additional UCC financing statements in connection with the A&R Secured Revolver Loan Agreement because that agreement was simply an amendment and restatement of the Secured Revolver Loan Agreement. Accordingly, the brief delay in filing after the closing under the A&R Secured Revolver Loan Agreement does not appear to create any issues of delayed perfection.

[16]  The security agreements that relate to the Initial Line of Credit Facility and the Second Line of Credit Facility are the Initial Line of Credit Security Agreement and the Second Line of Credit Security Agreement, respectively.

recoveries for general unsecured creditors because AFI is substantially oversecured on both the A&R Secured Revolver Loan Agreement and the A&R Line of Credit Agreement.[17]

### 2. Invocation Of State Avoidance Law Under Section 544(b) Of The Bankruptcy Code

Section 544(b) of the Bankruptcy Code serves as a conduit for state fraudulent transfer laws,[18] "borrowing" such laws[19] and applying them in bankruptcy cases provided certain criteria are met. Section 544(b) allows a trustee to stand in the shoes of an actual, existing unsecured creditor and to bring such state law claims that such actual creditor could bring.[20] Application of section 544(b) necessitates three distinct steps: (1) performing a choice of law analysis to determine what state's law should be invoked by section 544; (2) establishing the existence of an actual unsecured creditor who, at the time of the bankruptcy filing, held a claim under state law and could have avoided the transfer at issue (also known as a "triggering creditor"); and (3) applying the relevant state law to determine if the transfer can be avoided.

---

[17] According to the Creditors' Committee, there is no deadline in the AFI DIP Order for any party-in-interest to challenge the claims and liens of AFI. *See* Motion of the Official Committee of Unsecured Creditors for Entry of an Order Authorizing it to Prosecute and Settle Certain Claims on Behalf of the Debtors' Estates [Docket No. 1546] at 11.

[18] *Stalnaker v. DLC, Ltd*. (*In re DLC, Ltd.*), 295 B.R. 593, 601 (B.A.P. 8th Cir. 2003) (noting that "section 544(b) [acts] as a conduit to assert state law-based fraudulent conveyance actions in bankruptcy").

[19] *Le Café Creme, Ltd*. *v. Le Roux* (*In re Le Café Creme, Ltd.*), 244 B.R. 221, 238 (Bankr. S.D.N.Y. 2000) ("Section 544(b) of the Bankruptcy Code 'borrows' applicable nonbankruptcy law which would be available to an unsecured creditor of the debtor . . . .").

[20] *Silverman v. Sound Around, Inc*. (*In re Allou Distribs., Inc.*), 392 B.R. 24, 32 (Bankr. S.D.N.Y. 2008) ("Next, a trustee must show that the triggering creditor is also 'a creditor holding an unsecured claim that is allowable under section 502 . . . .'"); *Young v. Paramount Commc'ns Inc.* (*In re Wingspread Corp.*), 178 B.R. 938, 945 (Bankr. S.D.N.Y. 1995) (noting that "the trustee must show that at least one . . . unsecured creditor[   ] . . . holds an allowable claim, against whom the transfer . . . was invalid under applicable state or federal law").

Because most states have adopted some version of either the Uniform Fraudulent Conveyance Act (the "UFCA") or the Uniform Fraudulent Transfer Act (the "UFTA"), analysis of section 544 claims usually requires the application of one of those uniform laws, as modified by individual state legislatures and interpreted by judicial decisions.[21] Here, as discussed below, the possible state laws that could apply include Delaware, Michigan, Minnesota, Pennsylvania, and New York. Delaware, Michigan, Minnesota, and Pennsylvania have all adopted the UFTA.[22] In contrast, New York is one of the only states that still applies the UFCA,[23] which is codified through New York's Debtor and Creditor Law (the "NY DCL").[24] While the UFTA and the NY DCL are "substantially similar,"[25] there are distinctions between the statutes that, as discussed below, can alter the outcome of fraudulent transfer litigation. Moreover, individual states' codification of the UFTA can vary in important ways, particularly with respect to statutes of limitation. Given these variations, the ultimate determination of whether a particular transaction may be avoided may turn on which state's law governs.

_____

[21] Although there are various laws addressing fraudulent transfers, they share many similarities and, as such, case law interpreting one law is often used by courts in analyses of the other laws. *See, e.g., Sharp Int'l Corp. v. State St. Bank & Trust Co.* (*In re Sharp Int'l Corp.*), 403 F.3d 43, 55 (2d Cir. 2005) (citing *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 634 n.8 (2d Cir. 1995)) (noting "New York's policy in favor of national uniformity in UFCA law"); *HBE Leasing Corp.,* 48 F.3d at 634 n.8 (2d Cir. 1995) ("In order to promote a uniform national interpretation of the UFCA, both this Circuit and the courts of New York have encouraged recourse to the case law of other jurisdictions."); *Tronox Inc. v. Anadarko Petrol. Corp.* (*In re Tronox Inc.*), 464 B.R. 606, 613 (Bankr. S.D.N.Y. 2012) ("Since the substantive provisions of state statutes under the Uniform Fraudulent Transfer Act and the earlier Uniform Fraudulent Conveyance Act are largely the same as § 548, a trustee's reliance on state fraudulent conveyance provisions may only have the effect of extending the statute of limitations, as the federal limitations period is shorter than the period in most state laws."); *Nisselson v. Empyrean Inv. Fund, L.P.* (*In re Marketxt Holdings Corp.*), 376 B.R. 390, 420, n.42 (Bankr. S.D.N.Y. 2007) (noting that "there is no dispute that Federal and State law are virtually identical as to their requirements for proving a constructive fraudulent conveyance"); *Official Comm. of Asbestos Prop. Damage Claimants of W.R. Grace & Co. v. Sealed Air Corp. & Cryovac, Inc.* (*In re W.R. Grace & Co.*), 281 B.R. 852, 857–58 (Bankr. D. Del. 2002) (noting that interpreting case law applying the UFTA the court "must be guided also by cases interpreting other, similarly worded statutes" and that "[t]he insolvency element of the Bankruptcy Code's constructive fraudulent conveyance section . . . is very close to the parallel provision in section 5 of the UFTA," such that after "[m]aking due allowance for differences of purpose and context, the Court will be guided by whatever case law exists interpreting these statutes"). Exceptions to this general concept occur, of course, where the specific nuances of the laws differ (for example, with respect to statutes of limitations).

[22] *See* Delaware Uniform Fraudulent Transfer Act, DEL. CODE ANN. tit. 6 §§ 1301–12; MICH. COMP. LAWS §§ 566.31–.42; MINN. STAT. §§ 513.41–.51; Pennsylvania Uniform Fraudulent Transfers Act, 12 PA. CONS. STAT. ANN. §§ 5101–10. Unless an individual state's adoption of the model UFTA contains a notable difference from the model UFTA, throughout this Section reference will be made to the model UFTA provisions as opposed to individual state statutes.

[23] N.Y. C.P.L.R. 270–81.

[24] N.Y. DEBT. & CRED. LAW §§ 273–75. Throughout this Section, relevant provisions will be referred to using their NY DCL designations as opposed to their model UFCA designations.

[25] *Drenis v. Haligiannis*, 452 F. Supp. 2d 418, 426 (S.D.N.Y. 2006).

### a. Choice Of Law Principles As Applied To Claims Under Section 544(b) Of The Bankruptcy Code

Many of the transactions reviewed during the Investigation occurred outside the two-year look-back period contained in the federal fraudulent transfer statue.[26] Therefore, an estate representative seeking to avoid such transactions will be required to rely on section 544(b) of the Bankruptcy Code and its invocation of applicable state law.[27] To determine whether a transfer may be avoided under section 544(b), it is therefore necessary to determine which state's law is the "applicable law" to the transfer at issue.[28]

Although a representative of one or more of the Debtors' estates could choose to bring an action under section 544(b) of the Bankruptcy Code in a number of possible venues,[29] the Examiner believes that, in this case, such an action would likely be brought as an adversary proceeding in the Bankruptcy Court because the Bankruptcy Court's choice of law rules would likely result in the application of law that would favor a number of potential causes of action.

In Second Circuit jurisdictions, "bankruptcy courts confronting state law claims that do not implicate federal policy concerns should apply the choice-of-law rules of the forum state."[30] Accordingly, federal courts sitting in New York generally apply the choice of law rules of New York when deciding what law governs a claim under section 544(b).[31] However, a minority of courts have departed from this approach, and instead applied federal common law choice of law principles, because federal courts "possess[] federal question jurisdiction over any claim based on section 544(b) of the Bankruptcy Code."[32] Because it is the majority rule, the Examiner believes that the Bankruptcy Court would likely apply New York choice of

---

[26]  11 U.S.C. § 548(a)(1) ("The trustee may avoid any transfer . . . of an interest of the debtor in property, or any obligation . . . incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition . . . .").

[27]  *See* U.S.C. § 544(b).

[28]  *See Official Comm. of Unsecured Creditors of Hydrogen, L.L.C. v. Blomen* (*In re Hydrogen*), 431 B.R. 337, 353 (Bankr. S.D.N.Y. 2010).

[29]  *See* 28 U.S.C. § 1409(d).

[30]  *Bianco v. Erkins* (*In re Gaston & Snow*), 243 F.3d 599, 601–02 (2d Cir. 2001); *see also In re PSINet Inc.*, 268 B.R. 358, 376 (Bankr. S.D.N.Y. 2001) ("Where, as here, this Court's subject matter jurisdiction is based on 28 U.S.C. § 1334, the Court applies, with respect to matters of state law, the conflicts of law principles of the forum state, *i.e.*, the State of New York.").

[31]  *See O'Toole v. Karnani* (*In re Trinsum Grp., Inc.*), 460 B.R. 379, 389 (Bankr. S.D.N.Y. 2011) ("When performing a choice-of-law analysis, a court should follow the choice-of-law rules of the forum state.") (citing *In re Gaston & Snow*, 243 F.3d at 607–08) .

[32]  *In re WorldCom, Inc.*, No. 02-13533, 2003 WL 23861928, at *40 (Bankr. S.D.N.Y. Oct. 31, 2003); *In re Best Prods. Co., Inc.*, 168 B.R. 35, 51 (Bankr. S.D.N.Y. 1994), *aff'd*, 68 F.3d 26 (2d Cir. 1995) (citing *Corporacion Venezolana de Fomento v. Vintero Sales Corp.*, 629 F.2d 786, 795 (2d Cir. 1980)); *see also Koreag, Controle et Revision S.A. v. Refco F/X Assocs., Inc.* (*In re Koreag, Controle et Revision S.A.*), 961 F.2d 341, 350 (2d Cir. 1992).

law principles in this case. However, because the Bankruptcy Court could also reasonably adopt federal common law choice of law rules, the Examiner will address both New York and federal common law choice of law rules.

### (1) New York Choice Of Law Rules Applied To Claims Under Section 544(b)

#### (a) Whether A Choice Of Law Agreement Governs

New York choice of law rules would require the Bankruptcy Court to first determine whether an enforceable contractual choice of law provision governs the dispute at issue. As a general rule, "New York recognizes the right of contracting parties to agree to the choice-of-law."[33] However, "[u]nder New York law, a contractual choice-of-law provision governs only a cause of action sounding in contract, not one sounding in tort . . . unless the express language of the choice-of-law provision is sufficiently broad as to encompass the entire relationship between the contracting parties."[34] Fraudulent transfer or conveyance claims sound in tort, and are therefore not governed by contractual choice of law provisions unless such provisions are sufficiently broad to capture all conduct between the contracting parties.[35]

Courts applying New York law are generally reluctant to read choice of law clauses with sufficient breadth to control torts related to an underlying contract.[36] For example, a choice of law provision reading "[t]his Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware" has been held to be insufficiently broad to require application of Delaware law to fraudulent transfer claims arising from the agreement.[37] Nevertheless, in *Roselink Investors, L.L.C. v. Shenkman*, a virtually identical choice of law clause reading "[t]his Note shall be governed by and construed in accordance with the laws of the State of New York," when combined with a broad forum selection clause, led one court to conclude that "under the forum selection clause in [the relevant contracts] . . . New York law

---

[33] *Roselink Investors, L.L.C. v. Shenkman*, 386 F. Supp. 2d 209, 225 (S.D.N.Y. 2004) (citing *Turtur v. Rothschild Registry Int'l, Inc.*, 26 F.3d 304, 310 (2d Cir. 1994)).

[34] *H.S.W. Enters., Inc. v. Woo Lae Oak, Inc.,* 171 F. Supp. 2d 135, 141 n.5 (Bankr. S.D.N.Y. 2001) (*citing Lazard Freres & Co. v. Protective Life Ins. Co.,* 108 F.3d 1531, 1540 (2d Cir. 1997)); *accord Turtur,* 26 F.3d at 309–10; s*ee also Fin. One Pub. Co. Ltd. v. Lehman Bros. Special Fin., Inc.,* 414 F.3d 325, 335 (2d Cir. 2005) (citing *Krock v. Lipsay,* 97 F.3d 640, 645 (2d Cir. 1996); *Twinlab Corp. v. Paulson,* 724 N.Y.S.2d 496, 496 (N.Y. App. Div. 2001)) ("Under New York law . . . tort claims are outside the scope of contractual choice-of-law provisions that specify what law governs construction of the terms of the contract . . . . Presumably a contractual choice-of-law clause could be drafted broadly enough to reach such tort claims.").

[35] *See Geron v. Robinson & Cole LLP*, 476 B.R. 732, 737–38 (S.D.N.Y. 2012).

[36] *Fin. One Pub. Co. Ltd.*, 414 F.3d at 335.

[37] *See Drenis v. Haligiannis*, 452 F. Supp. 2d 418, 425–26 (S.D.N.Y. 2006) (citing *Knieriemen v. Bache Halsey Stuart Shields, Inc.*, 427 N.Y.S.2d 10 (N.Y. App. Div. 1980), *overruled on other grounds*, *Rescildo v. R.H. Macy's*, 594 N.Y.S.2d 139 (N.Y. App. Div. 1993)).

[was] the applicable law . . . ." with respect to a fraudulent transfer claim.[38] *Roselink*, however, is factually distinguishable from this case in that: (1) all creditors bringing the fraudulent conveyance claims in *Roselink* were parties to the agreements containing the applicable choice of law clause; (2) that the fraudulent conveyance claim arose out of the contract that contained the choice of law clause; and (3) the action was not part of a larger bankruptcy case, and so did not directly affect the rights of other creditors who were non-parties to the choice of law agreement.

Highlighting the importance of this distinction, a number of courts have held that "parties to a contractual conveyance cannot in their contract make a choice-of-law that binds creditors who allege they were defrauded by the conveyance."[39] As one court put it, a choice of law agreement "will not be regarded where it would operate to the detriment of strangers to the agreement, such as creditors or lienholders."[40] The Examiner believes that these cases are well-reasoned and persuasive because it is difficult to see why a contractual choice of law provision between two parties should govern the rights of a third party with respect to a fraudulent transfer claim. Based on the foregoing, the Examiner concludes that it is unlikely that a contractual choice of law provision would be found to govern fraudulent transfer or conveyance claims arising from a contract.

### (b) Whether An Actual Conflict Of Law Exists Between New York Law And The Laws Of Other Interested Jurisdictions

If the Bankruptcy Court finds that a choice of law clause governs a particular claim, the analysis ends and the Bankruptcy Court will apply the agreed-upon law.[41] However, if no applicable choice of law clause exists or the Bankruptcy Court concludes that a such a clause does not govern the claim at issue, "[t]he first step of New York's choice-of-law rules is to

---

[38]   *Roselink*, 386 F. Supp. 2d at 226 (citing *Turtur*, 26 F.3d at 310). The forum selection clause in *Roselink* reads:

> The parties hereby agree that any dispute which may arise between them arising out of or in connection with this Subscription Agreement shall be adjudicated before a court located in New York City and they hereby submit to the exclusive jurisdiction of the courts of the State of New York located in New York, New York and of the federal courts in the Southern District of New York with respect to any action or legal proceeding commenced by any party.

*Roselink*, 386 F. Supp. 2d at 226.

[39]   *Green v. Zukerkorn* (*In re Zukerkorn*), 484 B.R. 182, 200 (B.A.P. 9th Cir. 2012) (*quoting Ferrari v. Barclays Bus. Credit* (*In re Morse Tool, Inc.*), 108 B.R. 384, 386 (Bankr. D. Mass. 1989)); *see also Kraken Invs. Ltd. v. Jacobs* (*In re Salander-O'Reilly Galleries, LLC*), 475 B.R. 9, 32 (S.D.N.Y. 2012) (citing *In re Salander-O'Reilly Galleries,* 453 B.R. 106, 120 (Bankr. S.D.N.Y. 2011)).

[40]   *Marine Midland Bank v. Portnoy* (*In re Portnoy*), 201 B.R. 685, 701 (Bankr. S.D.N.Y. 1996) (quoting *Hong Kong & Shanghai Banking Corp., Ltd. v. HFH USA Corp.,* 805 F. Supp. 133, 140 (W.D.N.Y. 1992)); *Carlson v. Tandy Computer Leasing,* 803 F.2d 391 (8th Cir. 1986); *In re Morse Tool, Inc.,* 108 B.R. at 386.

[41]   *See Roselink*, 386 F. Supp. 2d at 226 (citing *Turtur*, 26 F.3d at 310).

determine whether there is an actual conflict between the laws of the jurisdictions involved."[42] In the absence of an actual conflict, New York law will apply.[43]

In this case, jurisdictions that are potentially interested in one or more of the transactions investigated by the Examiner include Delaware,[44] Michigan,[45] Minnesota,[46] New York,[47] and Pennsylvania.[48] As discussed in Section VI, the NY DCL is based on the UFCA. In contrast, the fraudulent transfer laws of Delaware, Michigan, Minnesota, and Pennsylvania are all based on the UFTA. Consequently, where a transaction has connections with jurisdictions other than New York, the Bankruptcy Court may need to determine whether an actual conflict exists between the specific provisions of the UFCA and the UFTA implicated by the dispute.[49]

Where the issue in dispute "would turn out the same under both forums' law . . . no true conflict exists."[50] Accordingly, if the litigants fail to present evidence of the difference between the laws of two potential forums, the Bankruptcy Court may conclude that no actual conflict exists.[51] Similarly, if the parties were to stipulate that no actual conflict of law exists as to the issue in dispute, the Bankruptcy Court may acquiesce and apply the law of New York, the forum state.[52] However, the parties need not show that a difference in law will

---

[42] *Paradigm BioDevices, Inc. v. Viscogliosi Bros., LLC*, 842 F. Supp. 2d 661, 665 (S.D.N.Y. 2012) (citing *Drenis*, 452 F. Supp. 2d at 426).

[43] *See Paradigm BioDevices*, 842 F. Supp. 2d at 665.

[44] AFI, GMAC Mortgage, ResCap, and RFC are all incorporated in or otherwise organized under the laws of Delaware.

[45] AFI's principal place of business is located in Michigan.

[46] RFC's principal place of business is located in Minnesota. ResCap's principal place of business was located in Minnesota until at least March 10, 2012. According to the Debtors and AFI, ResCap's principal place of business was relocated to New York on March 10, 2012.

[47] According to the First Day Affidavit, ResCap "maintains its headquarters at its New York office located at 1177 Avenue of the Americas, New York, New York 10036." First Day Affidavit, at 3. The Debtors further stated that "the New York office has served as the primary office for the senior executives and core management team of the largest operating Debtors—ResCap, Residential Funding Company LLC . . . and GMAC Mortgage, LLC." *Id.*

[48] GMAC Mortgage's principal place of business is in Pennsylvania.

[49] Whether a true conflict exists must be determined on a claim by claim basis. Thus, whether a court finds a true conflict between the laws of two jurisdictions will depend on the specific aspects of those laws implicated by a particular transaction. A court might thus reasonably find that no true conflict exists between the NY DCL and the UFTA of another state with respect to one type of fraudulent transfer claim, but find that a true conflict does exist with respect to another type of claim.

[50] *Elgin Sweeper Co. v. Melson Inc.*, 884 F. Supp. 641, 648 (N.D.N.Y. 1994) (citing *Howard v. Clifton Hydraulic Press Co.*, 830 F. Supp. 708, 712 (E.D.N.Y. 1993)).

[51] *See Paradigm BioDevices, Inc. v. Viscogliosi Bros., LLC*, 842 F. Supp. 2d 661, 665 n.1 (S.D.N.Y. 2012) ("[P]laintiff does not point to any specific differences between the UFTA and UFCA that show a conflict between Massachusetts's UFTA and New York's fraudulent conveyance statute to warrant the application of Massachusetts law to the fraudulent transfer claim in the present action.").

[52] *See, e.g.*, *FCC v. NextWave Pers. Commc'ns, Inc.* (*In re NextWave Pers. Commc'ns, Inc.*), 200 F.3d 43, 56 n.13 (2d Cir. 1999).

definitely affect the dispute for the Bankruptcy Court to find that an actual conflict of law exists. Instead, an actual conflict of law exists so long as there are differences "that may eventually prove relevant to plaintiffs' claims in [the] litigation."[53]

Although authority on the issue is not uniform, certain courts applying New York's choice of law principles have found an actual conflict between the NY DCL and the UFTA.[54] As an example of an area where an actual conflict may exist, there are significant differences between the concept of "reasonably equivalent value" under the UFTA—which requires approximate equivalence between what is given and what is received by the debtor[55]—and the concept of "fair consideration" under the NY DCL—which requires "good faith" in addition to approximate equivalence between what is given and what is received by the debtor.[56] Where these statutory differences may be outcome-determinative, the Bankruptcy Court is likely to find an actual conflict of law.[57]

Actual conflicts of law have also been found to exist with respect to intentional fraudulent transfer or conveyance claims.[58] For example, under both the UFTA and the NY DCL, a transfer is potentially avoidable if the transferor acted with fraudulent intent. However, the UFTA provides a defense to transferees who either gave reasonably equivalent value or acted in good faith. In contrast, under the NY DCL, "every conveyance with actual intent to defraud present or future creditors is fraudulent, irrespective of transferee's good faith (or lack thereof) or exchange of fair consideration."[59] Given that the recipient of an alleged intentional fraudulent transfer will often be in a position to assert a colorable argument of good faith or reasonably equivalent value, and the outcome-determinative nature of such an assertion, some courts have found a fundamental conflict between the UFTA and the NY DCL with respect to intentional fraud claims.[60]

The Examiner concludes that it is likely that the Bankruptcy Court would find that an actual conflict exists between the NY DCL and the laws of the jurisdictions that employ the UFTA with respect to fraudulent conveyance or fraudulent transfer claims wherever the

--------------------------------------------------

[53]  *Drenis v. Haligiannis*, 452 F. Supp. 2d 418, 426 (S.D.N.Y. 2006).

[54]  *See, e.g.*, *O'Toole v. Karnani* (*In re Trinsum Grp., Inc.*), 460 B.R. 379, 389–94 (Bankr. S.D.N.Y. 2011) (finding that a conflict requiring application of choice of law principles existed between the NY DCL and Delaware constructive fraudulent transfer law, and analyzing, among other things, differing treatment of claims against insiders in the two jurisdictions).

[55]  *See Viscount Air Servs., Inc. v. Cole* (*In re Viscount Air Servs., Inc.*), 232 B.R. 416 (Bankr. D. Ariz. 1998) ("[R]easonably equivalent value ordinarily means 'similar to fair market value.'") (citing *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 545 (1994)).

[56]  *See* N.Y. DEBT. & CRED. LAW § 272.

[57]  *See Drenis*, 452 F. Supp. 2d at 426–27.

[58]  *See id.*

[59]  *Id.* (citing N.Y. DEBT. & CRED. LAW § 276).

[60]  *Id.*

statutory differences would be outcome determinative. The Examiner notes that actual conflicts of law are likely to exist where a debtor transferred property to an insider either for less than market value or in satisfaction of an antecedent debt, or where the recipient of an alleged intentional fraudulent conveyance or transfer has a plausible basis for asserting a defense of good faith or the provision of reasonably equivalent value.

### (c) The Jurisdiction With The Greatest Interest

If the Bankruptcy Court were to find that an actual conflict of law exists with respect to a potential fraudulent transfer claim under section 544(b) of the Bankruptcy Code, it would "conduct[] an interest analysis, and appl[y] the law of the jurisdiction having the greatest interest in the litigation."[61] In deciding which jurisdiction has the greatest interest, the Bankruptcy Court would consider "(1) what are the significant contacts and in which jurisdiction are they located; and, (2) whether the purpose of the law is to regulate conduct or allocate loss."[62]

In determining which jurisdiction has the most significant contacts, the Bankruptcy Court would consider: (1) the domicile, residence, place of incorporation, and place of business of the parties; (2) the place of injury; and (3) the place of injury-causing contact.[63]

However, "where . . . regulation of conduct is at issue, the state where the alleged tort took place has the greater interest."[64] Fraudulent conveyance laws are conduct-regulating rather than loss-allocating.[65] Accordingly, when considering a fraudulent transfer action under section 544(b) of the Bankruptcy Code, the Bankruptcy Court would likely apply the law of the state where the alleged fraudulent transfer occurred.

---

[61]   *Geron v. Robinson & Cole LLP*, 476 B.R. 732, 738 (S.D.N.Y. 2012) (quoting *Istim, Inc. v. Chem. Bank*, 581 N.E.2d 1042 (N.Y. 1991) (quoting *Schultz v. Boy Scouts of Am., Inc.*, 480 N.E.2d 679 (N.Y. 1985))) (internal quotation marks omitted); *see also Krock v. Lipsay*, 97 F.3d 640, 645 (2d Cir. 1996) (requiring the court to conduct an "interest analysis" to determine "the jurisdiction having the greatest interest in the litigation."); *Paradigm BioDevices, Inc. v. Viscogliosi Bros., LLC*, 842 F. Supp. 2d 661, 665 (S.D.N.Y. 2012) ("If there is a conflict of law in tort actions, New York's choice-of-law rules use an 'interest analysis' that applies the laws of the jurisdiction with the greatest interest in the application of its law 'based on the occurrences within each jurisdiction, or contacts of the parties with each jurisdiction, that 'relate to the purpose of the particular law in conflict.'") (quoting *Pension Comm. of Univ. of Montreal Pension Plan v. Banc. of Am. Secs., LLC*, 446 F. Supp. 2d 163, 192 (S.D.N.Y. 2006)); *Official Comm. of Unsecured Creditors of Hydrogen, L.L.C. v. Blomen* (*In re Hydrogen*), 431 B.R. 337, 353–54 (Bankr. S.D.N.Y. 2010).

[62]   *Padula v. Lilarn Props. Corp.*, 644 N.E.2d 1001 (N.Y. 1994) (citing *Schultz*, 480 N.E.2d at 684–85).

[63]   *In re Hydrogen*, 431 B.R. at 353–54 (citations omitted).

[64]   *Geron*, 476 B.R. at 738 (citing *GFL Advantage Fund, Ltd. v. Colkitt*, No. 03 Civ. 1256, 2003 WL 21459716, at *3 (S.D.N.Y. June 24, 2003)); *see also Drenis v. Haligiannis*, 452 F. Supp. 2d 418, 427 (S.D.N.Y. 2006) ("[T]he law of the jurisdiction where the tort occurred will generally apply because that jurisdiction has the greatest interest in regulating behavior within its borders.") (quoting *Pension Comm. of Univ. of Montreal Pension Plan*, 446 F. Supp. 2d at 192 (quoting *GlobalNet Financial.com, Inc. v. Frank Crystal & Co., Inc.*, 449 F.3d 377, 384 (2d Cir. 2006))).

[65]   *Roselink Investors, L.L.C. v. Shenkman*, 386 F. Supp. 2d 209, 225 (S.D.N.Y. 2004) ("A fraudulent conveyance statute is conduct regulating rather than loss allocating.") (quoting *GFL Advantage*, 2003 WL 21459716, at *3).

In determining where a fraudulent transfer occurred:

> a court's "paramount" concern is the locus of the fraud, that is, "the place where the injury was inflicted," as opposed to the place where the fraudulent act originated. The place in which the injury is deemed to have occurred is "usually where the plaintiff is located."[66]

Determining where the "plaintiff" is located for fraudulent transfer purposes is complicated by the fact that, in bankruptcy, the debtor's estate, which is typically the nominal plaintiff, acts on behalf of the creditor body as a whole. As a result, the Bankruptcy Court may consider both the location of the transferor-debtor (based on its state of incorporation and principal place of business) and the locations of the debtor's various creditors.[67] However, where the transferor's creditors are widely dispersed, their location will be given only limited weight.[68] Additionally, little weight will be given to the transferor's state of incorporation unless the transaction at issue has some other nexus with that state.[69] Consequently, if the Bankruptcy Court were to find that: (1) an actual conflict of law exists between the NY DCL and the fraudulent transfer laws of other interested jurisdictions; (2) the transferor-debtor's creditors are widely dispersed; (3) the transaction at issue is not otherwise linked to the transferor-debtor's state of incorporation; and (4) no controlling choice of law agreement exists, it would likely apply the substantive law of the state in which the transferor-debtor's principal place of business is located.

---

[66] *Cromer Fin. Ltd. v. Berger*, 137 F. Supp. 2d 452, 492 (S.D.N.Y. 2001); *see also H.S.W. Enters., Inc. v. Woo Lae Oak, Inc.*, 171 F. Supp. 2d 135, 142 (S.D.N.Y. 2001) (citing *La Luna Enters. v. CBS Corp.*, 74 F. Supp. 2d 384, 389 (S.D.N.Y. 1999); *Krock*, 97 F.3d at 645) ("Although the law is somewhat unresolved on this point, New York courts consider the locus of a fraud to be the place where the injury was inflicted and not the place where the fraudulent act originated."); *RCA Corp v. Tucker*, 696 F. Supp. 845, 856 (E.D.N.Y. 1988) ("The authorities are unanimous that in fraud cases where the wrongful acts occur in a state other than that in which the injury is suffered, the case is governed by the law of the state where the injury or economic loss is felt.") (citing *Indus. Consultants, Inc. v. H.S. Equities, Inc.*, 646 F.2d 746 (2d Cir. 1981); *Sack v. Low*, 478 F.2d 360 (2d Cir. 1973); *Maiden v. Biehl*, 582 F. Supp. 1209 (S.D.N.Y. 1984); *Posner v. Merrill Lynch, Pierce, Fenner & Smith*, 469 F. Supp. 972, 979–80 (S.D.N.Y. 1979)) .

[67] *See In re Hydrogen*, 431 B.R. at 353–54; *In re WorldCom, Inc.*, No. 02–13533, 2003 WL 23861928, at *40 (Bankr. S.D.N.Y. Oct. 31, 2003) (citing *In re Best Prods. Co., Inc.*, 168 B.R. 35, 51 (Bankr. S.D.N.Y. 1994), *aff'd*, 68 F.3d 26 (2d Cir. 1995)).

[68] *See In re Hydrogen*, 431 B.R. at 354 n.10.

[69] *See Savage & Assocs., P.C. v. Mandl* (*In re Teligent, Inc.*), 380 B.R. 324, 332 n.6 (Bankr. S.D.N.Y. 2008) (conducting an "interest analysis," and holding the state of the debtor's incorporation—Delaware— inapplicable to fraudulent transfer claim since the fraudulent transfer occurred in another jurisdiction); *Faulkner v. Kornman* (*In re Heritage Org. L.L.C.*), 413 B.R. 438, 462 (Bankr. N.D. Tex. 2009) (conducting a "most significant factor" choice of law analysis and holding Delaware fraudulent transfer law inapplicable because the "only connection the Trustee's fraudulent transfer claims have to Delaware is that [transferor] and the [transferees] are Delaware entities"); *Official Comm. of Asbestos Pers. Injury Claimants v. Sealed Air Corp.* (*In re W.R. Grace & Co.*), 281 B.R. 852, 855 (Bankr. D. Del. 2002) (conducting choice of law analysis and holding Delaware fraudulent transfer law inapplicable because "Delaware's only contact with this matter is that it is the state of incorporation of the transferee and the subsidiary that is the subject of this fraudulent transfer action").

Based on a review of the Debtors' schedules and the numerous claims and causes of action that have been asserted in this case, the Examiner concludes that the creditors of each of the relevant Debtors are widely dispersed. Where the remaining three conditions discussed above are satisfied, the Examiner concludes that it is likely that: (1) Minnesota's substantive fraudulent transfer law would govern claims brought by the estates of, among others, ResCap[70] and RFC; and (2) Pennsylvania's substantive fraudulent transfer law would govern claims brought by the estate of GMAC Mortgage.

### (d) The Internal Affairs Doctrine

The internal affairs doctrine "recognizes that only one state should have the authority to regulate a corporation's internal affairs—matters peculiar to the relationships among or between the corporation and its current officers, directors and shareholders—because otherwise a corporation could be faced with conflicting demands."[71] "However, in certain circumstances 'application of the local law of some other state is required by reason of the overriding interest of that other state in the issue to be decided.'"[72] As a result, "the New York Court of Appeals has rejected 'any automatic application of the so-called 'internal affairs' choice-of-law rule.'"[73] Indeed, several courts have expressly declined to apply the internal affairs doctrine to fraudulent transfer or conveyance claims, even where the only aggrieved creditors were partners of the transferor-debtor.[74] Accordingly, the Examiner concludes that the Bankruptcy Court is unlikely to apply the internal affairs doctrine to any of the potential fraudulent transfer or fraudulent conveyance actions discussed below.

_____

[70] Because all of the state-law based claims and causes of action discussed below arose prior to March 2012, when the Debtors and AFI contend that ResCap's principal place of business was shifted to New York, it is unnecessary for the Examiner to opine on whether that asserted shift in fact occurred.

[71] *Edgar v. MITE Corp.*, 457 U.S. 624, 645 (1982).

[72] *Drenis v. Haligiannis*, 452 F. Supp. 2d 418, 427 (S.D.N.Y. 2006) (quoting *Stephens v. Nat'l Distillers & Chem. Corp.*, No. 91 Civ. 2901, 1996 WL 271789, at *4 (S.D.N.Y. May 21, 1996) (quoting RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 302 cmt. b (1971))).

[73] *Drenis*, 452 F. Supp. 2d at 427 (quoting *Stephens*, 1996 WL 271789, at *4 (quoting *Greenspun v. Lindley*, 330 N.E.2d 79, 81 (N.Y.1975))).

[74] *See Drenis*, 452 F. Supp. 2d at 427; *see also Goodman v. H.I.G. Capital, LLC* (*In re Gulf Fleet Holdings, Inc.*), No. 11-50713, 2013 WL 13432751, at *7 (Bankr. W.D. La. Apr. 2, 2013) (citing *In re Heritage Org.*, 413 B.R. at 463); *Stanziale v. Dalmia* (*In re Allserve Sys. Corp.*), 379 B.R. 69, 79–80 (Bankr. D.N.J. 2007)).

### *(2) Federal Common Law Choice Of Law Analysis*

Federal common law choice of law rules require application of the "law of the jurisdiction with the most significant relationship to the transaction and to the parties."[75] This test appears to be indistinguishable from New York's greatest interest test.[76] Accordingly, federal common law choice of law analysis would only yield a different result than analysis under New York choice of law rules in instances where a court applying the New York rules finds no actual conflict between New York law and the laws of other potentially interested jurisdictions, in which case the choice of law issue would be moot by definition.

### b.   *Statutes Of Limitation And New York's Borrowing Statute*

Courts in the Southern District of New York have applied New York's choice of law rules to determine the applicable statute of limitations.[77] Under New York's "borrowing statute," the Bankruptcy Court would apply the shorter of New York's statute of limitations or that of the state in which the plaintiff resides.[78] "When a bankruptcy trustee sues as a representative of the estate of the bankrupt corporation, it is the residency of the corporation which is applicable."[79] Residency in this context has generally been held to be a corporation's or limited liability company's principal place of business.[80] In this instance, the applicable

---

[75]   *See In re Worldcom, Inc.*, No. 02-13533, 2003 WL 23861928, at *40 (Bankr. S.D.N.Y. Oct. 31, 2003) (citing *In re Best Prods. Co., Inc.*, 168 B.R. 35, 51 (Bankr. S.D.N.Y. 1994), *aff'd*, 68 F.3d 26 (2d Cir. 1995)).

[76]   *See Kraken Invs. Ltd. v. Jacobs* (*In re Salander-O'Reilly Galleries, LLC*), 475 B.R. 9, 31 (S.D.N.Y. 2012) (quoting *Koreag, Controle et Revision S.A. v. Refco F/X Assocs., Inc.* (*In re Koreag, Controle et Revision S.A.*), 961 F.2d 341, 350 (2d Cir. 1992)) ("I need not determine whether the Bankruptcy Court should have applied federal or New York choice-of-law rules because both apply 'the law of the jurisdiction having the greatest interest in the litigation.'").

[77]   *See, e.g.*, *Official Comm. of Asbestos Claimants of G-I Holding, Inc. v. Heyman*, 277 B.R. 20, 30 (S.D.N.Y. 2002); *Adelphia Commc'ns Corp. v. Bank of Am. N.A.* (*In re Adelphia Commc'ns Corp.*), 365 B.R. 24, 57 n.136 (Bankr. S.D.N.Y. 2007) ("Where, as here, the Court is exercising bankruptcy jurisdiction over state law claims under 28 U.S.C. § 1334(b), the court applies the choice of law rules of the forum state to determine the applicable statute of limitations."). Where the claim asserted before the bankruptcy court is derived from another claim pending in an out of state non-bankruptcy proceeding commenced prior to the bankruptcy case, the court should apply the choice of law rules of the state in which the original claim was brought to determine the applicable statute of limitations. *See Statek Corp. v. Dev. Specialists, Inc.* (*In re Coudert Bros. LLP*), 673 F.3d 180, 182 (2d Cir. 2012).

[78]   *See In re Adelphia Commc'ns Corp.*, 365 B.R. at 57–58.

[79]   *Heyman*, 277 B.R. at 30.

[80]   *See, e.g.*, *id.*; *In re Adelphia Commc'ns Corp.*, 365 B.R. at 58 n.137.

jurisdiction may be Delaware,[81] Michigan,[82] Minnesota,[83] New York,[84] or Pennsylvania.[85] Thus, the Bankruptcy Court would compare the statute of limitations for fraudulent transfer or conveyance claims in New York against the statute of limitations of Michigan, Minnesota, or Pennsylvania, depending on which Debtor's Estate was asserting such claims.[86]

Delaware, Michigan, Minnesota, and Pennsylvania have all adopted the UFTA, which generally provides a four-year statute of limitations for general fraudulent transfer claims and one year for "Insider Preference" fraudulent transfer claims, which are unique to the UFTA.[87] Michigan, Minnesota, and Pennsylvania, however, have non-uniform statutes of limitation. Under Michigan law, general fraudulent transfer claims are subject to a six-year statute of limitations, while Insider Preference fraudulent transfer claims have a one-year statute of limitations.[88] Under Minnesota law, all fraudulent transfer claims, including Insider Preference fraudulent transfer claims, have a six-year statute of limitations.[89] Pennsylvania adopted the UFTA's four-year statute of limitations for general fraudulent transfer claims.[90] However,

---

[81]   AFI, GMAC Mortgage, ResCap, and RFC are all incorporated in, or otherwise organized under the laws of, Delaware.

[82]   AFI's principal place of business is located in Michigan.

[83]   RFC's principal place of business is located in Minnesota. ResCap's principal place of business was located in Minnesota until at least March 10, 2012. According to the Debtors and AFI, ResCap's principal place of business was relocated to New York on March 10, 2012. Because residency under New York's borrowing statute is measured as of the date on which a cause of action accrues, and all relevant transactions occurred prior to the alleged relocation of ResCap's principal place of business, the Examiner concludes that it is unnecessary to determine whether ResCap relocated its principal place of business to New York in March 2012.

[84]   As noted above, ResCap and AFI assert that ResCap's principal place of business was relocated to New York in March 2012. In the First Day Affidavit, the Debtors stated that ResCap "maintains its headquarters at its New York office located at 1177 Avenue of the Americas, New York, New York 10036." First Day Affidavit, at 3. The Debtors further stated that "the New York office has served as the primary office for the senior executives and core management team of the largest operating Debtors—ResCap, Residential Funding Company LLC . . . and GMAC Mortgage, LLC." *Id.*

[85]   GMAC Mortgage's principal place of business is in Pennsylvania.

[86]   In *Adelphia*, the court decided to compare the statute of limitations of New York to the limitations period in Pennsylvania, where the Adelphia debtors resided. In coming to its decision, the court rejected the argument that it should compare the New York's period to the limitations period in states where subsidiary debtors resided. 365 B.R. 24, 58 n.138 (Bankr. S.D.N.Y. 2007). "There are no allegations in the complaint that any Adelphia subsidiaries were under independent control, or directed by the Rigases or anyone else in different states." *Id.*

[87]   *See* UFTA § 9(a).

[88]   *See* Mich. Comp. Laws Ann. §§ 566.39, 600.5813, 600.5855.

[89]   *See* Minn. Stat. Ann. § 541.05; *see also Georgen-Running v. Grimlie* (*In re Grimlie*), 439 B.R. 710, 720 n.25 (B.A.P. 8th Cir. 2010) (citing Minn. Stat. Ann. §541.05(6)) (ruling, in the context of a fraudulent transfer action, that "[i]n Minnesota, cases involving fraud have a statute of limitations of six years"); *In re Curry*, 160 B.R. 813, 819 n.5 (Bankr. D. Minn. 1993) (noting that fraudulent conveyance actions under Minnesota's Uniform Fraudulent Transfer Act have a statute of limitations of six years pursuant to § 541.05(6)).

[90]   *See* 12 Pa. Cons. Stat. Ann. § 5109.

because Pennsylvania did not adopt the portion of the UFTA addressing Insider Preference fraudulent transfer claims, it also did not adopt the one-year statute of limitations for such claims.[91] Instead, Pennsylvania generally applies a two-year statute of limitations to claims that sound in fraud, and that two-year statute would likely apply to Insider Preference claims in the event that such a claim could be brought under another state's laws but subject to Pennsylvania's statute of limitations.[92] New York law applies a six-year statute of limitations to all fraudulent conveyance claims.[93]

Under New York's borrowing statute, the Examiner concludes that it is likely that the Bankruptcy Court would apply a four-year statute of limitations to general fraudulent transfer claims and a one-year statute of limitations to Insider Preference fraudulent transfer claims brought by the Estate of any Debtor that resides in Delaware. The Examiner concludes that it is likely that the Bankruptcy Court would apply a four-year statute of limitations to general fraudulent transfer claims and a two-year statute of limitations to Insider Preference fraudulent transfer claims brought by the Estate of any Debtor found to reside in Pennsylvania, including GMAC Mortgage. The Examiner concludes that it is likely that the Bankruptcy Court would apply a six-year statute of limitations to general fraudulent transfer claims and a one-year statute of limitations to Insider Preference fraudulent transfer claims brought by the Estate of any Debtor found to reside in Michigan. Finally, the Examiner concludes that the Bankruptcy Court would likely apply a six-year statute of limitations to any fraudulent transfer claims brought by the Estate of any Debtor found to reside in New York or Minnesota, including ResCap and RFC. Out of an abundance of caution, the Examiner will analyze all transactions that could potentially be challenged as fraudulent transfers if a six-year statute of limitations were applicable, even where the Examiner believes that a shorter statute of limitations is likely to apply. The Examiner will note which statute of limitations he believes is most likely to apply to each claim discussed in this Section.

### c. *Triggering Creditors*

To commence an action under section 544(b) of the Bankruptcy Code, the trustee must identify a creditor or class of creditors holding an allowable claim as of the date of the commencement of the case with standing to avoid a transfer under state law to pursue a

---

[91]   *See* 12 PA. CONS. STAT. ANN. §§ 5105, 5109.

[92]   *See* 42 PA. CONS. STAT. ANN. § 5524(7). Such a result could occur if the Bankruptcy Court were to conclude that Minnesota had the most significant contacts with a transfer made by GMAC Mortgage (perhaps based on the fact that GMAC Mortgage and RFC transferred property as part of an integrated transaction and RFC's involvement in the transfer predominated). The Bankruptcy Court would then apply Minnesota substantive law, but, because of the New York borrowing statute, would apply Pennsylvania's statute of limitations to claims brought by GMAC Mortgage's estate.

[93]   *See, e.g.*, *Liberty Co. v. Boyle*, 272 A.D.2d 380, 381 (N.Y. App. Div. 2000); *see Bobash, Inc. v. Festinger*, No. 03908/05, 2007 WL 969435, at *2 (N.Y. Sup. Ct. Mar. 30, 2007).

fraudulent transfer action under section 544(b).[94] These "triggering creditors" do not need to exist at the time the action is filed, nor does the trustee need to identify a specific creditor by name.[95] Furthermore, while a "triggering creditor" needs to hold a claim on both the date of the transfer and the petition date (i.e., be the same creditor), it does not need to hold the same claim, holding any qualifying claim on those two dates is sufficient.[96] Once a transfer is voidable under section 544(b), the entire fraudulent transfer may be recovered for the benefit of all creditors, not just to the extent necessary to satisfy the individual creditor actually holding the avoidance claim.[97] Because the trustee is "stepping into the shoes" of an actual unsecured creditor for purposes of section 544(b), the trustee "is subject to any defenses that could be asserted against the unsecured creditor."[98] As such, if a claim is time-barred against the "triggering creditor," it would also be time-barred if asserted by the trustee.

In this case, the Examiner concludes that the evidence supports the proposition that "triggering creditors" existed at each of the relevant Debtors at all relevant times. Triggering creditors for the ResCap Estates include, among others, holders of, and the indenture trustees for, the Unsecured Notes. Triggering creditors for the Estates of RFC and GMAC Mortgage include the holders of RMBS, who held repurchase claims at least as early as 2004.

_____

[94] *See* 11 U.S.C. § 544(b); *see also Silverman v. Sound Around, Inc*. (*In re Allou Distribs., Inc*.) 392 B.R. 24, 31 (Bankr. E.D.N.Y. 2008) ("In order for a trustee to maintain an action for avoidance of a fraudulent conveyance, the trustee must show that at least one of the present unsecured creditors of the estate holds an allowable claim, against whom the transfer or obligation was invalid under applicable state or federal law.") (citing *Young v. Paramount Commc'ns, Inc*. (*In re Wingspread Corp*.), 178 B.R. 938, 945 (Bankr. S.D.N.Y. 1995)).

[95] *In re Bernard L. Madoff Inv. Secs. LLC*, 445 B.R. 206, 234 (Bankr. S.D.N.Y. 2011) (noting that "simply pleading the existence of an unsecured creditor generally will suffice to satisfy" the trustee's pleading requirements).

[96] *In re Allou Distribs., Inc*., 392 B.R. at 34 (noting that "a triggering creditor must be the same creditor on both the [t]ransfer [d]ate and the [p]etition [d]ate," but does not need to hold the same claim on both these dates).

[97] This doctrine is commonly referred to as the doctrine of *Moore v. Bay*, because of the Supreme Court decision on which it is based. *See Moore v. Bay* (*In re Estate of Sassard & Kimball, Inc.*), 284 U.S. 4, 5 (1931); *see also* Bankruptcy Reform Act of 1978, Pub. L. 95-598, 1978 U.S.C.C.A.N. (92 Stat. 2549) 5963, 6328; Bankruptcy Reform Act of 1978, Pub. L. 95-598, 1978 U.S.C.C.A.N. (92 Stat. 2549) 5787, 5873 (confirming that congressional intent was to retain the rule of that case); *Tronox Inc. v. Anadarko Petrol. Corp*. (*In re Tronox Inc*.) 464 B.R. 606, 616 (Bankr. S.D.N.Y. 2012) ("Section 544(b) of the Bankruptcy Code adopts the ruling of the Supreme Court in *Moore v. Bay* . . . where the Court allowed a trustee to avoid a fraudulent transfer without regard to the size of the claim of the creditor whose rights and powers the trustee was asserting, with the rights of the trustee 'to be enforced for the benefit of the estate.'").

[98] *In re Allou Distribs., Inc*., 392 B.R. at 34 (citing *Belfance v. Bushey* (*In re Bushey*), 201 B.R. 95, 100 (B.A.P. 6th Cir. 1997)) (noting that "a trustee's standing is 'completely derivative of that of an actual unsecured creditor'" and that the trustee is therefore subject to any defenses that could have been asserted against that unsecured creditor); *Hayes v. Palm Seedlings Partners* (*In re Agric. Research & Tech. Grp., Inc.*), 916 F.2d 528, 541 (9th Cir. 1990) (holding that trustee "stands in the overshoes of the debtor corporation's unsecured creditors").

### 3. Section 546 Safe Harbors

Section 546 of the Bankruptcy Code establishes certain "safe harbor" defenses that prohibit avoidance of prepetition transfers on any theory, except claims of actual fraudulent transfer under section 548(a)(1)(A). If applicable, these safe harbors prohibit avoidance on any other type of claim brought under chapter 5 of the Bankruptcy Code, including claims brought by an estate representative under section 544(b) of the Bankruptcy Code. The defenses set forth in section 546 are in addition to certain affirmative defenses specific to the particular type of claim in question.[99] This subsection addresses two relevant safe harbor defenses that apply generally to all avoidance actions (except actual fraudulent transfer claims) discussed in this Section.

#### a. Settlement Payment Defense

Section 546(e) of the Bankruptcy Code prohibits the avoidance, except pursuant to actual fraud under section 548(a)(1)(A) of the Bankruptcy Code, of transfers that are margin payments or settlement payments, as defined in section 741(8) of the Bankruptcy Code,[100] made by, to, or for the benefit of a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency.[101] The purpose of section 546(e) is "to minimize the displacement caused in the commodities and securities markets in the event of a major bankruptcy affecting those industries."[102] If all of the

_____

[99] For example, section 548's "good faith transferee for value" defense has no application in an action to avoid a preferential transfer under section 547. *See* 11 U.S.C. § 548(c).

[100] Section 741(8) of the Bankruptcy Code provides that a "'settlement payment' means a preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement payment on account, a final settlement payment, or any other similar payment commonly used in the securities trade." *Id.* § 741(8).

[101] Section 546(e) provides in full as follows:

Notwithstanding sections 544, 545, 547, 548(a)(1)(B), and 548(b) of this title, the trustee may not avoid a transfer that is a margin payment, as defined in section 101, 741, or 761 of this title, or settlement payment, as defined in section 101 or 741 of this title, made by or to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency, or that is a transfer made by or to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant or securities clearing agency, in connection with a securities contract, as defined in section 741(7), commodity contract, as defined in section 761(4), or forward contract, that is made before the commencement of the case, except under section 548(a)(1)(A) of [the Bankruptcy Code].

*Id.* § 546(e).

[102] *Picard v. Katz*, 462 B.R. 447, 452 (S.D.N.Y. 2011) (quoting *Gredd v. Bear, Stearns Sec. Corp.* (*In re Manhattan Inv. Fund Ltd.*), 310 B.R. 510, 513 (Bankr. S.D.N.Y. 2002)); *see also Kaiser Steel Corp v. Charles Schwab & Co., Inc.*, 913 F.2d 846, 848 (10th Cir. 1990) (citation omitted) (stating that section 546(e) is intended "to protect the nation's financial markets from the instability caused by the reversal of settled securities transactions").

elements of a section 546(e) safe harbor defense are satisfied, the defense is established and will be strictly applied, regardless of whether application of the defense in any particular instance is necessary to meet the goals of Congress.[103]

Section 546(e) requires that three elements be satisfied for a challenged transfer to fall within the safe harbor. First, there must be a prepetition transfer.[104] Second, the challenged transfer must have been made by, to, or for the benefit of a "financial institution,"[105] a "financial participant,"[106] or one of the other types of enumerated market participants.[107] Third, the transfer must *either*: (1) constitute a "margin payment" or a "settlement payment;" or (2) have been made in connection with a securities contract, commodity contract, or forward contract. With respect to this final element, the only types of transfers potentially implicated by the transactions analyzed in this Section are: (1) a settlement payment; and (2) a payment in connection with a securities contract.[108]

The Examiner did not independently analyze whether AFI, ResCap, or RFC meet the requirements of a "financial participant" under the Bankruptcy Code, but the Examiner's Counsel did request information on this point from both the Debtors and AFI.[109] Neither party asserted that AFI, ResCap, or RFC qualifies as one of the market participants listed in section 546(e). Accordingly, the Examiner proceeded with his analysis on the basis that none of

---

[103] *Lehman Bros. Holdings Inc. v. JPMorgan Chase Bank, N.A.* (*In re Lehman Bros. Holding*), 469 B.R. 415, 436 (Bankr. S.D.N.Y. 2012) ("Consistent with its approach in *Quebecor*, the Court will strictly construe the plain meaning of section 546(e) in judging whether the claims set forth in the Amended Complaint are subject to the safe harbors of that section of the Bankruptcy Code.").

[104] The Bankruptcy Code defines the term "transfer" to include: (1) the creation of a lien; (2) the retention of title as a security interest; (3) the foreclosure of a debtor's equity of redemption, or (4) each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or an interest in property. 11 U.S.C. § 101(54).

[105] The Bankruptcy Code defines a "financial institution" as "a Federal reserve bank, or an entity that is a commercial or savings bank . . . ." *Id.* § 101(22).

[106] The Bankruptcy Code's definition of a "financial participant" is intended to protect major market participants—an entity may qualify as a financial participant only if it has at least $1 billion in notional principal value of derivative contracts or $100 million in gross mark-to-market positions (aggregated across all counterparties but excluding affiliates) at certain times and during certain periods specified by the Bankruptcy Code. *See id.* § 101(22A).

[107] *Id.* § 546(e).

[108] It does not appear that any of the transactions at issue constitute "margin payments." *See id.* § 741(5) (defining margin payment as a "payment or deposit of cash, a security, or other property, that is commonly known in the securities trade as original margin, initial margin, maintenance margin, or variation margin, or as a mark-to-market payment, or that secures an obligation of a participant in a securities clearing agency."); *see also id.* § 101(38) (similarly defining "margin payment" for purposes of the forward contract portions of the Bankruptcy Code). Similarly, none of the transactions appear to involve commodities or forward contracts. *See id.* § 761(4) (defining "commodity contract"); *id.* § 101(25) (defining "forward contract").

[109] Although Ally Bank is a "financial institution," AFI is not. *See id.* § 101(22).

ResCap, RFC, or AFI qualified as a "financial participant" and, accordingly, that none of those entities would qualify for the safe harbor protections of section 546(e) of the Bankruptcy Code.

Assuming that AFI could establish that one or more of the transactions at issue involved a "financial participant," the inquiry would then shift to whether the transfer at issue either: (1) qualifies as a settlement payment; or (2) was made in connection with a securities contract.

### (1) Settlement Payment

The Bankruptcy Code defines settlement payment, somewhat circuitously, as "a preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement payment on account, a final settlement payment, or any other similar payment commonly used in the securities trade."[110] The last phrase of this definition, "commonly used in the securities trade," limits only the words "other similar payment," and therefore underscores the breadth of the settlement payment defense rather than substantively limiting it.[111] Several circuit courts have agreed that "courts should interpret the definition, 'in the context of the securities industry,' as 'the transfer of cash or securities made to complete [a] securities transaction.'"[112] Additionally, the term "settlement payment" has been read as "'extremely broad' and intended to encompass most payments that can be considered settlement payments."[113]

In *Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V*, the Second Circuit held that Enron's early retirement of outstanding unsecured notes fell within the plain language of "settlement payment" and was thus protected from avoidance under section 546(e).[114] Looking to the plain language of the relevant provisions, the Second Circuit explained that the "payments at issue were made to redeem commercial paper, which the Bankruptcy Code

---

[110] *Id.* § 741(8); *see also id.* § 101(51A) (similarly defining "settlement payment" for purposes of the forward contract portions of the Bankruptcy Code).

[111] *See Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V.*, 651 F.3d 329, 337 (2d Cir. 2011) ("[W]e hold that the phrase "commonly used in the securities industry" limits only the phrase immediately preceding it; it does not limit the other transactions that § 741(8) defines as settlement payments."); *see also QSI Holdings, Inc. v. Alford* (*In re QSI Holdings, Inc.*), 571 F.3d 545, 549 (6th Cir. 2009) (emphasis omitted) (citation omitted) (characterizing the words "other similar payment commonly used in the securities trade" as "a catchall phrase intended to underscore the breadth of the § 546(e) exemption").

[112] *Enron*, 651 F.3d at 334 (quoting *Contemporary Indus. Corp. v. Frost*, 564 F.3d 981, 985 (8th Cir. 2009)).

[113] *Contemporary Indus. Corp.*, 564 F.3d at 985; *see also Lowenschuss v. Resorts Int'l, Inc.* (*In re Resorts, Int'l, Inc.*), 181 F.3d 505, 514–15 (3d Cir. 1999); *Jonas v. Resolution Trust Corp.* (*In re Comark*), 971 F.2d 322, 326 (9th Cir. 1992); *Kaiser Steel Corp. v. Charles Schwab & Co.,* 913 F.2d 846, 848 (10th Cir. 1990).

[114] 651 F.3d at 335–36 ("We find no basis in the Bankruptcy Code or the relevant caselaw to interpret § 741(8) as excluding the redemption of debt securities."); *see also Official Comm. of Unsecured Creditors of Quebecor World (USA) Inc. v. Am. United Life Ins. Co.* (*In re Quebecor World (USA) Inc.*), 480 B.R. 468, 475–76 (S.D.N.Y. 2012) (holding that a prepetition payment made by the debtor to a financial institution acting as trustee for noteholders, to repurchase and cancel privately-placed promissory notes, qualified as a "settlement payment").

defines as a security."[115] Accordingly the payments "constitute[d] the 'transfer of cash . . . made to complete [a] securities transaction' and [were] settlement payments . . . ."[116] In so ruling, the *Enron* court rejected several limitations proposed by the debtor, including that the settlement payment safe harbor should: (1) only protect "common" securities transactions; (2) apply only to the purchase or sale of securities; and (3) require that the transfer involve a financial intermediary.[117]

Courts interpreting the *Enron* decision have explained that its direction is "both uncomplicated and crystal clear."[118] These courts have refused to read into section 546(e) various limitations, including that: (1) the transfer must involve a formal settlement process using broker-dealers and clearing agencies to effect the exchange and payment;[119] (2) the safe harbor should cover only legitimate (non-fraudulent) securities transactions;[120] or (3) that the transfer be of a nature that, if avoided, would disrupt financial markets.[121] In short, courts have adhered to the basic premise that "in the context of the securities industry, a settlement payment means simply the transfer of cash or securities made to complete a securities transaction."[122]

### (2) In Connection With A Securities Contract

The term "securities contract" is defined in the Bankruptcy Code,[123] and was expanded in the 2006 amendments to the Bankruptcy Code to include "any extension of credit for the clearance or settlement of securities transactions."[124] In relevant part, the Bankruptcy Code defines a securities contract to mean "a contract for the purchase, sale, or loan of a security, a certificate of deposit, a mortgage loan, a group or index of securities, certificates of deposit, or mortgage loans or interests therein . . . or option on any of the foregoing . . . ."[125] The phrase "in connection with," as used in section 546(e), "means that the transfer must be 'related to'

---

[115] *Enron*, 651 F.3d at 339; *see also* 11 U.S.C. § 101(49) (defining securities to also include notes, bonds, stocks, debentures, etc.).

[116] *Enron*, 651 F.3d at 339.

[117] *Id.* at 335.

[118] *In re Quebecor World*, 453 B.R. at 215 ("The test has become quite simple and all-encompassing and does not lend itself easily to the formulation of nuanced exceptions."); *see also Secs. Investor Prot. Corp. v. Bernard L. Madoff Inv. Secs. LLC*, 476 B.R. 715, 721 (S.D.N.Y. 2012) ("[W]hereas some courts in this Circuit have accepted [the argument that § 546(e)'s coverage should be limited to legitimate brokerage firms and transactions], in this Court's view it cannot survive the broad and literal interpretation given § 546(e) in *Enron*.").

[119] *See In re Quebecor World*, 480 B.R. at 476; *AP Servs. LLP v. Silva*, 483 B.R. 63, 68 (S.D.N.Y 2012).

[120] *See Secs. Investor Prot. Corp.*, 476 B.R. at 721.

[121] *See AP Servs.*, 483 B.R. at 70.

[122] *See In re Quebecor World*, 480 B.R. at 476.

[123] *See* 11 U.S.C. § 741(7) (defining "securities contract").

[124] *Id.* § 741(7)(A)(v).

[125] *Id.* § 741(7).

the securities contract, commodity contract or forward contract at issue."[126] Unlike the settlement payments provision at issue in *Enron*, the securities contract provision of section 546(e) has been read to require that the security contract at issue be "for the purchase, sale, or loan" of securities.[127] Accordingly, there seems to be an open question about whether the "redemption" of outstanding notes would qualify for this safe harbor provision. At least one court avoided this question by explaining that a debtor's acquisition and cancellation of its outstanding debt obligations was ultimately structured as a "purchase" (or "repurchase").[128]

###### b. Swap Payment Defense

Section 546(g) of the Bankruptcy Code similarly prohibits avoidance of any payment "made by or to (or for the benefit of) a swap participant or financial participant, under or in connection with any swap agreement and that is made before the commencement of the case, except under section 548(a)(1)(A) of [the Bankruptcy Code]."[129]

A defendant claiming the protection of a 546(g) safe harbor must prove that: (1) there is an agreement which is properly classified as a "swap agreement"; (2) the challenged transfer was made by, to, or for the benefit of a swap participant or financial participant; (3) the challenged transfer was made "under" or "in connection with" the swap agreement; and (4) the transfer occurred prior to the commencement of the bankruptcy case.

The first inquiry with respect to any asserted section 546(g) defense is whether a "swap agreement" exists. The term "swap agreement" is defined broadly and generally means:

> a bilateral agreement, frequently between a commercial entity involved with commodities or subject to interest rate, currency or equity price fluctuations and a financial intermediary, whereby cash payments are exchanged periodically (or a lump sum at termination) between the parties based upon changes in the price of the underlying asset or index as determined by an agreed-upon benchmark.[130]

---

[126] *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC* (*In re Madoff Sec.*), No. 12 MC 115(JSR), 2013 WL 1609154, at \*9 (S.D.N.Y. Apr. 15, 2013) (citations omitted); *see also Lehman Bros. Holdings Inc. v. JPMorgan Chase Bank, N.A.* (*In re Lehman Bros. Holding*), 469 B.R. 415, 442 (Bankr. S.D.N.Y. 2012) (citation omitted) ("It is proper to construe the phrase 'in connection with' broadly to mean 'related to.'").

[127] *In re Quebecor World*, 480 B.R. at 479.

[128] *Id.*

[129] 11 U.S.C. § 546(g).

[130] *Nisselson v. Empyrean Inv. Fund, L.P.* (*In re MarketXT Holdings Corp.*), 376 B.R. 390, 423 (Bankr. S.D.N.Y. 2007) (citations omitted).

Specific types of agreements recognized as swap agreements by the Bankruptcy Code include, among others:

> any agreement, including the terms and conditions incorporated by reference in such agreement, which is—
>
> (I) an interest rate swap, option, future, or forward agreement, including a rate floor, rate cap, rate collar, cross-currency rate swap, and basis swap;
>
> . . .
>
> (VI) a total return, credit spread or credit swap, option, future, or forward agreement . . . .[131]

Moreover, the Bankruptcy Code specifically provides that any similar types of agreements that become the subject of recurrent dealings in the market may, subject to certain conditions, be treated as swap agreements.[132] The term swap agreement is thus expansive and malleable, and it can encompass a wide variety of transactions that allow parties to exchange future risk exposures.

Once it has been established that a swap agreement exists, the next inquiry is whether the challenged transfer was made by, to, or for the benefit of a "swap participant" or a "financial participant." Both terms are clearly defined by the Bankruptcy Code. A "swap participant" includes any "entity that, at any time before the filing of the petition, has an outstanding swap agreement with the debtor."[133] As set forth in Section VII.F.3.a, the term "financial participant" encompasses institutions with significant derivatives or mark-to-market positions with non-affiliated entities.[134]

If a defendant can establish that: (1) a swap agreement exists; and (2) the challenged transfer was made by, to, or for the benefit of a swap participant or financial participant, it must then prove that the transfer occurred under or in connection with the swap agreement.[135] A transfer occurs "under" a swap agreement "when it is accomplished according to the

---

[131] *See* 11 U.S.C. § 101(53B)(A)(i)(I), (VI).

[132] *See id.* § 101(53B)(A)(ii).

[133] *Id.* § 101(53C).

[134] *Id.* § 101(22A).

[135] Prior to the effective date of the 2005 amendments to the Bankruptcy Code, a defendant asserting a section 546(g) safe harbor defense was required to prove that the challenged transfer was made both under and in connection with a swap agreement. *See Interbulk, Ltd. v. Louis Dreyfus Corp.* (*In re Interbulk, Ltd.*), 240 B.R. 195, 202 (Bankr. S.D.N.Y. 1999) ("The phrases 'under,' [and] 'in connection with' . . . are conjunctive phrases, so each element must be met for a transfer to be unavoidable as a swap."). This phraseology was recognized as being inconsistent with the legislative history and likely intent of Congress, but it was nevertheless enforced accordingly to its unambiguous meaning. *See id.* at 202 n.10 (citation omitted). In 2005 Congress amended section 546(g) to make the "under" and "in connection with" tests disjunctive and, therefore, alternative means of establishing a safe harbor defense. *See* 11 U.S.C. § 546(g).

method prescribed in the agreement itself."[136] Alternatively, a transfer occurs "in connection with" a swap agreement, regardless of whether the payment was according to the mechanism specified in the agreement, so long as the transfer was related to the agreement.[137] The final element of the defense, which requires proof that the challenged transfer occurred "before the commencement of the case," is self-explanatory.

### c. The Tribune/Lyondell Workaround

As described above, the section 546 safe harbor provisions broadly protect certain types of financial transactions from avoidance by an estate representative in bankruptcy. However, the safe harbors may be limited in an important respect—they purport only to limit avoidance actions brought under sections 544, 545, 547, 548(a)(1)(B), and 548(b) of the Bankruptcy Code.[138] The UFCA and UFTA, however, do not contain safe harbor analogues. Consequently, creditors—who have direct standing to bring UFCA- or UFTA-based claims without resort to section 544 of the Bankruptcy Code—may seek to bring claims outside of bankruptcy that would be barred by the safe harbors within the bankruptcy context.

Outside of bankruptcy, the UFTA and UFCA permit a creditor of an insolvent transferor to recover certain transfers from the recipient of those transfers.[139] Once the transferor files for bankruptcy relief, the Bankruptcy Code prohibits creditors from commencing (or continuing to prosecute) such causes of action and vests in the trustee the exclusive right to pursue such causes of action for the benefit of all creditors of the debtor-transferor.[140] Nevertheless, the filing of a bankruptcy petition does not extinguish creditors' rights to pursue state law fraudulent transfer causes of action. Those rights are merely suspended in recognition of the trustee's exclusive power under section 544 of the Bankruptcy Code to bring such actions on behalf of the estate for the benefit of all creditors. Pursuant to section 546(a) of the Bankruptcy Code, the trustee (or other estate representative) has until the later of two years from the petition date or one year after the trustee's appointment or election (if such appointment or election occurs less than two years after the petition date) to commence

---

[136]  *In re Interbulk, Ltd.*, 240 B.R. at 202.

[137]  *Id.* ("A natural reading of 'in connection with' suggests a broader meaning similar to 'related to.'").

[138]  *See* 11 U.S.C. § 546(e), (f), (g).

[139]  *See* UFCA §§ 9, 10; UFTA § 7.

[140]  *See, e.g., FDIC v. Hirsch* (*In re Colonial Realty Co.*), 980 F.2d 125, 137 (2d Cir. 1992) (holding that a fraudulent conveyance action brought by a creditor was stayed); *Romagosa v. Thomas* (*In re Van Diepan, P.A.*), 236 F. App'x. 498, 501–02 (11th Cir. 2007) (stating that trustee has sole authority to prosecute fraudulent conveyance action); *Neb. State Bank v. Jones*, 846 F.2d 477, 478 (8th Cir. 1988) (finding that the Bankruptcy Code provides for the trustee to pursue a fraudulent conveyance cause of action under 11 U.S.C. §§ 548 and 544).

avoidance actions.[141] If that period expires or the bankruptcy case is closed before the trustee brings a particular state law avoidance action, the right to bring such action reverts to individual creditors.[142]

Accordingly, if an estate representative were to conclude that otherwise potentially valuable state law-based avoidance actions would be barred by the Bankruptcy Code's safe harbor provisions if brought pursuant to section 544 of the Bankruptcy Code, it could either: (1) attempt to abandon those rights of action to creditors; or (2) simply allow its exclusive period for bringing such claims to lapse.

In two recent major bankruptcy cases—*In re Tribune Co.* and *In re Lyondell Chem. Co.*—the debtors' estates pursued the latter strategy, and in the *Lyondell* case (although not in the case of *Tribune*) the plan of reorganization created a creditors' trusts to aggregate electing individual creditors' state law fraudulent transfer claims for collective prosecution outside the bankruptcy case and with no participation by estate representatives. In both cases, the parties who are the targets of those causes of actions objected on several grounds, arguing, among other things, that: (1) the section 546 safe harbor defenses preempt state law avoidance rights after the filing of a bankruptcy petition to the extent that such rights are inconsistent with the safe harbor defenses; and (2) the creditors lack standing to pursue fraudulent transfer claims. In both cases, those issues remain *sub judice*.

The *Tribune/Lyondell* safe harbor "workaround" may be relevant here because, as discussed below, although a close question, the Examiner concludes that it is more likely than not that the Bankruptcy Code's safe harbor provisions could prevent the avoidance, in an action commenced in the Bankruptcy Court, of certain transactions that would likely otherwise be avoidable. Although evaluating the merits of the safe harbor workaround is beyond the scope of this Report, the Examiner nevertheless believes that the parties should recognize that the section 546 safe harbor defenses may not provide absolute protection to the recipients of transfers that are avoidable under state law.

---

[141] *See* 11 U.S.C. § 546(a).

[142] *See Hatchett v. United States,* 330 F.3d 875, 886 (6th Cir. 2003) (holding that creditors could commence state law avoidance actions after the closure of a bankruptcy case); *Unisys Corp v. Dataware Prods., Inc.,* 848 F.2d 311, 314 (1st Cir. 1988) (allowing creditors to pursue fraudulent transfer claims after termination of the automatic stay); *Kathy B. Enters., Inc. v. United States,* 779 F.2d 1413, 1415 (9th Cir. 1986) (noting that the issue of whether the automatic stay precluded the IRS from collecting was not raised in the court below, but concluding that the IRS could pursue fraudulently conveyed assets, even if it did violate the automatic stay); *FDIC v. Davis,* 733 F.2d 1083, 1085 (4th Cir. 1984) (finding that once a bankruptcy case had been closed, creditors could pursue their state law fraudulent conveyance claims independently of the trustee).

### 4. Transfers Fraudulent As To Present Creditors Under Minn. Stat. § 513.45(b)

This Section discusses Minnesota's "Insider Preference" statute, codified at Minnesota Statutes section 513.45(b)[143] as part of the Minnesota UFTA.[144] Because the analysis of that statute implicates several specific or non-uniform aspects of Minnesota law, the Examiner retained Leonard, Street and Deinard Professional Association ("Leonard Street") as his Special Minnesota Counsel. Leonard Street participated in the preparation of this Section and the analysis and conclusions contained herein have been reviewed by Leonard Street.[145]

#### a. Overview

In addition to the "classic" types of fraudulent transfer actions described in Section VII.F.6 of the Report, the UFTA contains a cause of action that allows a creditor to avoid certain transfers between a debtor and its insiders for antecedent debts. This "Insider Preference" cause of action—which is based upon, but differs in several important respects from, section 547 of the Bankruptcy Code—has been adopted by a majority of states (including Minnesota).[146] It provides that:

> A transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time, and the insider had reasonable cause to believe that the debtor was insolvent.[147]

A transfer is fraudulent under the Insider Preference statute if: (1) there exists a creditor of the transferor-debtor whose claim arose before the transfer; (2) the transfer was made to an insider of the debtor; (3) the transfer was made for an antecedent debt; (4) the debtor was insolvent at the time of the transfer; and (5) the insider had reasonable cause to believe the debtor was insolvent.[148] The premise of this cause of action "is that an insolvent debtor is

---

[143]  *See* MINN. STAT. ANN. § 513.45(b).

[144]  *See* MINN. STAT. ANN. §§ 513.41–513.51.

[145]  The Examiner's retention of Leonard Street was approved by order of the Bankruptcy Court entered on April 29, 2013. *See* Order Authorizing the Employment and Retention of Leonard, Street and Deinard Professional Association as Special Minnesota Counsel to the Examiner *Nunc Pro Tunc* to April 15, 2013 [Docket No. 3549].

[146]  In all, 35 states and the District of Columbia have adopted the Insider Preference cause of action: Alabama, Arkansas, Colorado, Connecticut, Delaware, District of Columbia, Florida, Hawaii, Idaho, Illinois, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Rhode Island, South Dakota, Texas, Utah, Vermont, Washington, West Virginia, and Wisconsin.

[147]  MINN. STAT. ANN. § 513.45(b).

[148]  *Prairie Lakes Health Care Sys., Inc. v. Wookey*, 583 N.W. 2d 405, 413 (S.D. 1998) (citing *Alcan Bldg. Prods. v. Peoples*, 124 Idaho 338, 859 P.2d 374, 376–77 (Ct. App. 1993)). Although *Prairie Lakes* interpreted South Dakota's enactment of the UFTA, the substantive provisions of the statute that it analyzed and discussed were substantially identical to the model language adopted by Minnesota.

obliged to pay debts to creditors not related to him before paying those who are insiders."[149] "This provision attempts to diminish the unfair advantage insiders sometimes possess when they are familiar with the debtor's financial substance."[150] In essence, the cause of action subordinates insiders' rights of payment from insolvent debtors on antecedent debts during the preference period.

A plaintiff pursuing an Insider Preference cause of action bears the burden of proof on each element of the claim.[151] A creditor that can establish every element may obtain, subject to certain defenses, "avoidance of the transfer or obligation to the extent necessary to satisfy the creditor's claim . . . ."[152] Moreover, as discussed above, pursuant to section 544(b) of the Bankruptcy Code, a trustee may assert a claim under applicable Insider Preference laws so long as there exists a "triggering" unsecured creditor who (a) had a claim predating the transfer the trustee wishes to challenge and (b) still has a claim on the petition date.[153] As discussed in greater detail in Section VII.F.2.c and Section VII.F.7, if the trustee establishes that a transfer can be avoided under the UFTA as to one creditor, the transfer can be avoided in full and recovered for the benefit of all creditors of the transferor-debtor's estate.[154] As discussed in Section VII.F.2.c of the Report, this "triggering creditor" requirement is satisfied with respect to ResCap and its two principal subsidiaries, GMAC Mortgage and RFC.

### b. *Statute Of Limitations*

Because of the similarity between the UFTA's "Insider Preference" cause of action and section 547 of the Bankruptcy Code, state law Insider Preference actions are rarely litigated and have been characterized as "an underutilized tool in the creditors' remedies' toolbox."[155] Indeed, because the UFTA's "Insider Preference" cause of action is generally subject to a one-year statute of limitations,[156] there is seldom any reason to bring such a claim in bankruptcy,

---

[149] UFTA, Prefatory Note, at 4.

[150] *Prairie Lakes Health Care Sys.*, 583 N.W. 2d at 413.

[151] *See First Res. Bank v. Rehbein*, No. 12–206 (PAM/SER), 2013 WL 618164, at *1 (D. Minn. Feb 19, 2013) ("First Resource bears the burden to prove each element of [section 513.45(b)] to prevail on its contention that the transfer must be set aside.").

[152] MINN. STAT. ANN. § 513.47(a)(1).

[153] *See* 11 U.S.C. § 544(b); *Girard v. Michener* (*In re Michener*), 217 B.R. 263, 270 (Bankr. D. Minn. 1998); *Moratzka v. Clark* (*In re Metro. Cosmetic Reconstructive Surgery P.A.*), 125 B.R. 556, 557 (Bankr. D. Minn. 1991).

[154] *See Bergquist v. Theisen* (*In re Theisen*), 45 B.R. 122, 126–27 (Bankr. D. Minn. 1984).

[155] Cass S. Weil, *Subsection 5(b) of the Uniform Fraudulent Transfers Act: An Underused Creditors' Remedy?*, Cass S. Weil, ABI Committee News. July 2009, www.abiworld.org/committees/newsletters/CFTF/vol6num2/5b.html.

[156] *See* UFTA § 9(c) ("A claim for relief cause of action with respect to a fraudulent transfer or obligation under this [Act] is extinguished unless action is brought: . . . (c) under Section 5(b), within one year after the transfer was made or the obligation was incurred.").

where section 547 of the Bankruptcy Code also provides a one-year insider reach-back period and does not require proof that the insider-transferee "had reasonable cause to believe the debtor was insolvent."[157]

As discussed in Section VII.F.2.a, the Examiner has concluded that the Bankruptcy Court would likely apply substantive Minnesota law when determining whether certain of the transactions reviewed during the Investigation are avoidable as fraudulent transfers pursuant to section 544 of the Bankruptcy Code. In particular, the Examiner has concluded that Minnesota law is likely to govern fraudulent transfer claims, including Insider Preference fraudulent transfer claims, with respect to transactions in which ResCap or RFC was the debtor-transferor.

Additionally, the Examiner has concluded that, under New York's borrowing statute, the Bankruptcy Court would likely refer to the limitations periods provided by Minnesota law and New York law with respect to transactions in which ResCap or RFC was the debtor-transferor. Minnesota, unlike every other state that has adopted the UFTA, neither adopted section 9 of the UFTA—which establishes the statutes of limitation for claims thereunder—nor specifically provided an alternative statute of limitation.[158] As a result, courts applying Minnesota's fraudulent transfer statutes have applied either Minnesota's statute of limitations for claims sounding in fraud[159] or, in one case, Minnesota's "catch-all" statute of limitations for statutory causes of action.[160] Those statutes provide that:

> [T]he following actions shall be commenced within *six years*:
>
> . . .
>
> (2) upon a liability created by statute, other than those arise upon a penalty or forfeiture or where a shorter period is provided by section 541.07
>
> . . .

---

[157]   *See* 11 U.S.C. § 547(b)(4)(B).

[158]   *See* MINN. STAT. ANN. § 513.41–51.

[159]   *See, e.g.*, *In re Curry*, 160 B.R. 813, 819 n.5 (Bankr. D. Minn. 1993)) (noting that fraudulent conveyance actions under Minnesota's Uniform Fraudulent Transfers Act have a statute of limitations of six years pursuant to § 541.05(6)); *Georgen-Running v. Grimlie* (*In re Grimlie*), 439 B.R. 710, 720 n.25 (8th Cir. B.A.P. 2010) (citing MINN. STAT. ANN. § 541.05(6)) (ruling, in the context of a fraudulent transfer action, that "[i]n Minnesota, cases involving fraud have a statute of limitations of six years."); *Bergquist v. Vista Dev., Inc.* (*In re Quality Pontiac Buick GMC Truck, Inc.*), 222 B.R. 865, 868 n.6 (Bankr. D. Minn. 1998) ("The Minnesota UFTA does not contain its own statute of limitations. Its remedies thus are subject to the general statutes of limitation. MINN. STAT. § 541.05, subd. 1 provides, in pertinent part: . . . the following actions shall be commenced within six years: . . . (6) For relief on the ground of fraud, in which case the cause of action shall not be deemed to have accrued until the discovery by the aggrieved party of the facts constituting the fraud . . . .").

[160]   *Finn v. Alliance Bank*, No. 19HA–CV–11–2856, 2011 WL 5006458 (Minn. Dist. Ct., Aug. 16, 2011) (holding that a six-year statute of limitations, with no tolling for discovery, applied pursuant to MINN. STAT. ANN. § 541.05, subd. 1(2)).

> (6) for relief on the ground of fraud, in which case the cause of action shall be deemed to have accrued until the discovery by the aggrieved party of the facts constituting the fraud . . . .[161]

Minnesota law thus provides, at a minimum, a six-year statute of limitations for causes of action under the Minnesota UFTA, including claims to avoid Insider Preferences. As set forth above, New York also applies a six-year statute of limitations for fraudulent transfer actions.[162] Accordingly, under New York's borrowing statute, the Bankruptcy Court would likely find that a six-year statute of limitations applies to actions under the Minnesota Insider Preference statute brought by the estates of ResCap or RFC.[163] Once a bankruptcy petition is filed, section 546 of the Bankruptcy Code converts that statute of limitations into a six-year reach-back period from the petition date.[164] As a result, every transaction between those Debtors and an insider of such Debtor as to which Minnesota fraudulent transfer law would apply and that occurred within six years of the Petition Date will be subject to an Insider Preference analysis and, if appropriate, avoided.[165]

---

[161] MINN. STAT. ANN. § 541.05, subd. 1 (emphasis added).

[162] *See*, *e.g.*, *Liberty Co. v. Boyle*, 272 A.D.2d 380, 381 (N.Y. App. Div. 2000); *see Bobash, Inc. v. Festinger*, No. 03908/05, 2007 WL 969435, *3 (N.Y. Sup. Mar. 30, 2007).

[163] Notwithstanding the fact that the Minnesota Insider Preference statute is codified as part of Minnesota's UFTA, it is possible that a New York court might conclude that the Insider Preference cause of action does not sound in fraud, and might therefore apply New York's shorter three-year statute of limitations for statutory rights of actions. *See* N.Y. C.P.L.R. § 214(2). However, an estate representative could overcome this artificial limitation by commencing any suit requiring the longer limitations period in the United States District Court for the District of Minnesota. *See* 28 U.S.C. § 1409 (authorizing a trustee to commence suit under section 544(b) of the Bankruptcy Code in the United States District Court of any district in which a creditor could have brought the action in the absence of the bankruptcy case). A Minnesota court hearing an Insider Preference claim brought by the trustee of a debtor whose principal place of business was in Minnesota at the time the action accrued would likely apply Minnesota substantive law as well as Minnesota's statute of limitations.

[164] *See In re Bernard L. Madoff Inv. Sec. Inc.*, 445 B.R. 206, 231 (Bankr. S.D.N.Y. 2011) ("Although the New York statute of limitations for fraudulent conveyance actions allows a creditor to recover transfers made six years before the filing of the complaint, it is well established that once a bankruptcy petition is filed, section 546(a) of the Code is triggered, allowing a trustee to recover transfers made six years before the petition date."); *O'Toole v. Karani* (*In re Trinsum Grp., Inc.*, 460 B.R. 379, 390 (Bankr. S.D.N.Y. 2011) (quoting *In re Bernard L. Madoff Inv. Sec. Inc.*, 445 B.R. at 231) (same).

[165] Because a six-year reach-back period from the Petition Date is more than sufficient to reach all transfers that occurred on or after December 31, 2007, the date on which the Examiner has concluded that the evidence supports the proposition that ResCap and its principal subsidiaries became insolvent, there is no need to determine whether the reach-back period could be more than six years based upon the dates on which any allegedly fraudulent transfer was discovered.

### c. Construction Of The Statute

Interpretation of Minnesota statutes is a question of law[166] and must begin with an examination of the language of the statute itself.[167] "If the statute is plain and unambiguous, [a court must] apply the words of the statute according to their plain meaning and engage in no further construction."[168] "Where failure of expression rather than ambiguity of expression concerning the elements of the statutory standard is the vice of the enactment, courts are not free to substitute amendment for construction and thereby supply the omissions of the legislature."[169] Moreover, "the rules of construction forbid adding words or meaning to a statute that were intentionally or inadvertently left out."[170]

However, "[w]here the words of a law are not explicit, the intent of the legislature may be ascertained by considering other laws upon the same or similar subjects."[171] Thus, if the Bankruptcy Court were to find portions of the Minnesota Insider Preference statute ambiguous, it could consult section 547 of the Bankruptcy Code or Minnesota statutes (even on unrelated topics) using similar phrasing and terminology to discern the Minnesota legislature's intent.[172]

The United States Bankruptcy Court for the Southern District of New York recently discussed how these principles of statutory construction should be applied to the Minnesota Insider Preference statute in the *Musicland Holding Corp.* chapter 11 cases ("*Musicland*").[173] In the decisions issued by the *Musicland* court to date,[174] the primary issue was the proper interpretation of the "new value" defense provided under Minnesota law, which, as discussed in greater detail in Section VII.F.4.e.2, provides that a "transfer is not voidable under section 513.45(b) . . . to the extent the insider gave new value to or for the benefit of the debtor after the transfer was made unless the new value was secured by a valid lien . . . ."[175] Unlike section

---

[166] *See Reiter v. Kiffmeyer*, 721 N.W.2d 908, 910 (Minn. 2006) (citing *Camacho v. Todd & Leiser Homes*, 706 N.W.2d 49, 53 (Minn. 2005)) ("We approach the construction of a statute as a question of law.").

[167] *See Reiter*, 721 N.W.2d at 910 (citing *Zurich Am. Ins. Co. v. Bjelland*, 710 N.W.2d 64, 68 (Minn. 2006)) ("We begin with the language of the statute, inquiring first whether the statute is ambiguous.").

[168] *Reiter*, 721 N.W.2d at 910 (Minn. 2006) (citing *Wynkoop v. Carpenter*, 574 N.W.2d 422, 425 (Minn. 1998)).

[169] *State v. Moseng*, 95 N.W.2d 6, 11–12 (Minn. 1959) (cited in *Responsible Pers. of Musicland Holding Corp. v. Best Buy Co.* (*In re Musicland Holding Corp.*), 462 B.R. 66, 73 (Bankr. S.D.N.Y. 2011)).

[170] *Genin v. 1996 Mercury Marquis*, 622 N.W.2d 114, 117 (Minn. 2001) (cited in *In re Musicland Holding Corp*, 462 B.R. at 73).

[171] *Shields v. Golestky* (*In re Butler*), 552 N.W.2d 226, 231 (Minn. 1996).

[172] *See In re Butler*, 552 N.W.2d at 231.

[173] *See In re Musicland Holding Corp.*, 462 B.R. at 73.

[174] The *Musicland* court recently completed a trial on the merits of a claim under Minn. Stat § 513.45(b) as well as multiple affirmative defenses to that claim. Post-trial briefing is underway.

[175] MINN. STAT. ANN. § 513.48(f)(1). The new value defense, along with all other potentially-applicable affirmative defenses, is discussed in detail in Section VII.F.4.e. The discussion of *Musicland* in this Section is included to illustrate the principles of statutory construction that a court would likely apply to any construction or interpretation issue arising under the Minnesota Insider Preference statute.

547(c)(4) of the Bankruptcy Code, the Minnesota Insider Preference statute does not, on its face, require that the new value "remain unpaid."[176]

Although the Minnesota Insider Preference statute contains no language suggesting that new value must remain unpaid, the plaintiff in *Musicland* argued that the Bankruptcy Court should nevertheless read that requirement into the defense so that the result under the Minnesota Insider Preference statute would be consistent with section 547(c)(4) of the Bankruptcy Code. As the plaintiff noted, and the Bankruptcy Court agreed, allowing the defendant to assert a new value defense while keeping payments received on account of the new value would "give[] double credit for the new value, and leave[] the estate unreplenished."[177] As the Bankruptcy Court further noted, this oddity was compounded by the fact that the Minnesota statute requires new value to be provided on an unsecured basis, presumably because of exactly the same concern regarding potential double counting of new value.[178]

Despite the harm that such a result would cause to unsecured creditors, the *Musicland* court concluded that it could not impose a requirement that new value remain unpaid. As the court reasoned, "the Minnesota Act unambiguously excludes a limitation on the new value defense resulting from payment for the new value and the Court cannot rewrite the statute to add it."[179] In sum, where the Minnesota UFTA creates unexpected results by employing different phraseology than is used in the Bankruptcy Code, "[a]ny necessary fix resides with the Minnesota legislature."[180]

The Examiner agrees with the well-reasoned approach to interpretation of the Minnesota Insider Preference statute adopted in *Musicland* and concludes that the Bankruptcy Court would likely apply the same principles of statutory construction in this case and reject similar efforts to incorporate Bankruptcy Code-based requirements or defenses into the Minnesota Insider Preference statute where such requirements or defenses are otherwise unsupported by the text of the Minnesota statute. This is an important point because, as set forth below, application of the unambiguous meaning of the Minnesota Insider Preference statute creates results that may vary from the operation of section 547 of the Bankruptcy Code.

---

[176] As the *Musicland* court explained, "[s]aying that the new value must remain 'unpaid' is merely a shorthand method of describing § 547(c)(4)(B)," which provides that the "new value" defense is only available if "the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor" on account of the new value. 462 B.R. at 71; *see also* 11 U.S.C § 547(c)(4)(B).

[177] *In re Musicland Holding Corp.*, 462 B.R. at 71.

[178] *Id.* at 73; *see also* UFTA § 8 cmt. 6 ("If the insider receiving the preference thereafter extends new credit to the debtor but also takes security from the debtor, the injury to the other creditors resulting from the preference remains undiminished by the new credit. On the other hand, if a lien taken to secure the new credit is itself voidable by a judicial lien creditor of the debtor, the new value received by the debtor may appropriately be treated as unsecured and applied to reduce the liability of the insider for the preferential transfer.").

[179] *In re Musicland Holding Corp.*, 462 B.R. at 73 (citing *Genin v. 1996 Mercury Marquis*, 622 N.W.2d 114, 117 (Minn. 2001); *State v. Moseng*, 95 N.W.2d 6, 11–12 (Minn. 1959)).

[180] *In re Musicland Holding Corp.*, 462 B.R. at 73.

### d. Elements Of The Minnesota Insider Preference Statute

#### (1) Pre-Existing Creditor

As an initial matter, an estate representative seeking to avoid a transfer as an Insider Preference under the UFTA must establish the existence of an unsecured creditor whose claim predates the transfer.[181] This element, which closely resembles the "triggering creditor" requirement of section 544(b) of the Bankruptcy Code, is essentially self-explanatory, except insofar as dispute may arise as to when a creditor's claim arose.

Under the UFTA:

> "Claim" means a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured.[182]

Courts determining when a claim arises for purposes of the Insider Preference statute have broadly construed this definition, finding, for example, that a claim on a guarantee arises the moment that the guarantee is executed (as opposed to when a default on the guaranteed obligation occurs or when a notice of default is served).[183] Breach of contract claims arise at the time of the breach.[184]

As set forth in section VII.F.2.c, the evidence supports the proposition that unsecured creditors existed continuously at each of the Debtors whose transfers would be governed by the Minnesota UFTA, including ResCap and RFC, from December 31, 2007, the date on which the Examiner has concluded the Debtors became insolvent, through the Petition Date. For example, the Unsecured Notes, which are unsecured obligations of ResCap, were issued beginning in 2005 and remain outstanding. RFC's unsecured creditors consist of, among others, parties holding claims for breaches of representations and warranties under RMBS that were issued, and breached, as early as 2004.

---

[181] *See Leonard v. Norman Vinitsky Residuary Trust* (*In re Jolly's, Inc.*), 188 B.R. 832, 846 (Bankr. D. Minn. 1995) (citing *Lippi v. City Bank*, 955 F.2d 599, 606 (9th Cir. 1992); *Kupetz v. Wolf*, 845 F.2d 842, 849–850 (9th Cir. 1988); *In re Richmond Produce Co., Inc.*, 151 B.R. 1012, 1016 n.5 (N.D. Cal. 1993); *In re Ohio Corrugating Co.*, 91 B.R. 430, 435 (Bankr. N.D. Ohio 1988)) ("To establish the bankruptcy estate's standing under these provisions of the UFTA, a trustee must demonstrate that at least one creditor's claim that existed as of the date of the transfer survived unsatisfied to the commencement of the bankruptcy case.").

[182] MINN. STAT. ANN. § 513.41(3).

[183] *See First Res. Bank v. Rehbein*, No. 12–206 (PAM/SER), 2013 WL 618164, at *2 (D. Minn. Feb 19, 2013) ("Under the very broad definition of claim in the MFTA, Patriot had a claim against Myrna the minute she signed the guaranty. Thus, it didn't matter whether there was a notice of default or a cure period; the claim arose the day she signed each guaranty. It might have been a contingent, unmatured claim, but for purposes of the MFTA, contingent, unmatured claims are claims nonetheless. First Resource is entitled to summary judgment on this element of its MFTA claim.").

[184] *See Parkhill v. Minn. Mut. Life Ins. Co.*, 174 F. Supp. 2d 951, 956 (D. Minn. 2000) (citing *Levin v. C.O.M.B. Co.*, 441 N.W.2d 801, 803 (Minn. 1989)) ("A breach of contract action 'accrue[s] at the time of the breach . . . .'"), *aff'd*, 286 F.3d 1051 (8th Cir. 2002).

### (2) Transfer To An Insider

The second element of the Insider Preference statute, although simple on its face, requires the application of several statutory definitions. The result of these definitions is that, while AFI, Ally Bank, and GMAC CF are insiders of ResCap and all of its subsidiaries for purposes of the Minnesota UFTA, conveyances of the Debtors' property to those insiders were not "transfers" (and are therefore outside the scope of the statute) to the extent the transferred property was encumbered by a validly perfected and unavoidable lien.

Under the Minnesota UFTA:

> "Transfer" means every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease, and creation of a lien or other encumbrance.[185]

Although similar to the definition of transfer under the Bankruptcy Code, the Minnesota UFTA's definition contains an important limitation, which is incorporated through the statute's definition of the word "asset." "'Asset' means property of the debtor, but the term does not include . . . property to the extent it is encumbered by a valid lien . . . ."[186] A "'valid lien' means a lien that is effective against the holder of a judicial lien subsequently obtained by legal or equitable process or proceedings."[187] Property is therefore not an "asset" and cannot be subject to a "transfer" within the meaning of the Minnesota UFTA to the extent it is encumbered by an unavoidable perfected lien.[188]

This limitation on the term "asset" is itself limited—it only excludes property *to the extent* of a valid lien.[189] Consequently, property that is worth more than the amount of any valid encumbering liens constitutes an asset to the extent of such excess. Alternatively, as one court construing the Minnesota UFTA has reasoned, "[u]nder the Uniform Commercial Code, a security interest in collateral is only enforceable against the debtor and third parties if value

---

[185] Minn. Stat. Ann. § 513.41(12). The Minnesota legislature carved-out certain conveyances to charitable organizations from the definition of transfer. *See id.* None of the transactions investigated by the Examiner involve conveyances to chartable organizations.

[186] Minn. Stat. Ann. § 513.41(2)(i).

[187] *Id.* § 513.41(13).

[188] *See Clarinda Color LLC v. BW Acquisition Corp.*, No. 00–CV–722 JMR/FLN, 2004 WL 2862298, at *3 (D. Minn. June 14, 2004) (citing Minn. Stat. § 513.41(2)(i)); *Ries v. Wintz Props., Inc.* (*In re Wintz Cos.*), 230 B.R. 848, 860 (B.A.P. 8th Cir. 1999); *Lorenz Bus Serv., Inc. v. Richfield Bus Co.*, No. C2-02-56, 2002 WL 2005468, *3 (Minn. Ct. App. Sept. 3, 2002)) ("[P]roperty is not an 'asset' under the statute to the extent it is encumbered by a valid lien.").

[189] Minn. Stat. Ann. § 513.41(2)(i).

has been given."[190] Accordingly, "[t]o the extent the value of the property exceeds the value of the security interest, the excess is an 'asset' subject to the UFTA."[191]

Examples of actions that have been found to be transfers include, but are not limited to the granting of a lien,[192] the release of claims[193] and the cancellation of a contract.[194]

The second part of the element—"to an insider"—is more straightforward. Insiders of a debtor corporation (including a limited liability company), include: (1) a director of the debtor; (2) an officer of the debtor; (3) a person in control of the debtor; (4) a partnership in which the debtor is a general partner; (5) a general partner of a partnership in which the debtor is a general partner; (6) a relative of a general partner, director, officer or person in control of the debtor;[195] (7) an affiliate of the debtor; or (8) an insider of an affiliate of the debtor.[196] Moreover, this broad definition has been held to be illustrative rather than exhaustive.[197]

The word affiliate is also broadly defined, and encompasses, among others:

> (i) a person who directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor, other than a person who holds the securities,
>
> > (A) as a fiduciary or agent without sole discretionary power to vote the securities; or
> >
> > (B) solely to secure a debt, if the person has not exercised the power to vote . . . .
>
> (ii) a corporation 20 percent or more of whose outstanding voting securities are directly or indirectly owned, controlled, or

---

[190] *Clarinda Color LLC*, 2004 WL 2862298, at *3 (citing MINN. STAT. § 336.9–203(b)(1)).

[191] *Clarinda Color LLC*, 2004 WL 2862298, at *3 (citing *Preferred Funding, Inc. v. Jackson*, 61 P.3d 939, 942 (Or. App. 2003) (construing identically-worded Oregon statute)); *see also Achille Bayart & CIE v. Crowe*, 238 F.3d 44, 47 (1st Cir. 2001) ("To recover under the Maine UFTA, a plaintiff must prove that there was some determinable amount of value in the assets of the debtor over and above the amount of the secured debt."); *PDVSA Petroleo S.A. v. Trigeant, Ltd.*, No. C-09-38, 2012 WL 3249531, at *9–10 (S.D. Tex. Aug. 7, 2012) (holding foreclosure sale was transfer under Texas UFTA where property had liquidation value in excess of the lien).

[192] *See Stoebner v. Ritchie Capital Mgmt., L.L.C.* (*In re Polaroid Corp.*), 472 B.R. 22, 32 n.8 (Bankr. D. Minn. 2012).

[193] *Hedback v. Am. Family Mut. Ins. Co.* (*In re Mathews*), 207 B.R. 631, 650 (Bankr. D. Minn. 2007).

[194] *Shileds v. Goldestky* (*In re Butler*), 552 N.W.2d 226, 234 (Minn. 1996).

[195] *See* MINN. STAT. ANN. § 513.41(7)(ii).

[196] *See id.* § 513.41(7)(iv).

[197] *See Leonard v. Mylex Corp.* (*In re Northgate Computer Sys., Inc.*), 240 B.R. 328, 362 (Bankr. D. Minn. 1999) (describing the definitions of the term "insider" under MINN. STAT. § 513.41(7)(ii) and (iv) as "non-exclusive examples").

> held with power to vote, by the debtor or a person who directly
> or indirectly owns, controls, or holds with power to vote, 20
> percent or more of the outstanding voting securities of the
> debtor, other than a person who holds the securities.[198]

Under these definitions, AFI is an "insider" of, among others, ResCap and RFC because it directly or indirectly owns 100% of their outstanding voting securities.[199] Ally Bank and GMAC CF are also insiders of ResCap and RFC because they are indirectly wholly-owned by AFI, which in turn owns 100% of the Debtors' voting securities.[200]

### (3) For An Antecedent Debt

As under section 547 of the Bankruptcy Code, a transfer may only be avoided under the Minnesota Insider Preference statute if the transfer was made for an antecedent debt.[201] Because of the similarities between the Minnesota Insider Preference statute and section 547 of the Bankruptcy Code on this point, the only court that has meaningfully discussed the phrase "antecedent debt" under the Minnesota UFTA looked to well-established Bankruptcy Code-based precedents.[202] In that case, the court observed that "[u]nder § 547, the meaning of 'antecedent debt' is straightforward: A debt is 'antecedent' if it is incurred before the transfer, period."[203] Based on these precedents and the similarities between the Minnesota Insider Preference statute and section 547 of the Bankruptcy Code, the court concluded that the term "'antecedent debt' in § 513. 45(b) likewise means nothing more than debt that exists before the transfer."[204]

However, other jurisdictions applying the UFTA have concluded that a transfer is not made for an "antecedent debt" if the debt in question was incurred relatively contemporaneously with the transfer at issue.[205] Courts have reached this conclusion by

---

[198] MINN. STAT. ANN. § 513.41(1).

[199] *See* First Day Affidavit, Ex. 2-1.

[200] *See* First Day Affidavit, Ex. 2-1, 2-4.

[201] *See* MINN. STAT. ANN. § 513.45(b).

[202] *See Elliot & Callan, Inc v. Crofton*, 615 F. Supp. 2d 963, 968–69 (D. Minn. 2009). In *Elliot & Callan*, the United States District Court for the District of Minnesota construed the Minnesota UFTA's definition of "antecedent debt," but the Examiner is unaware of any meaningful guidance on this issue from the state courts of Minnesota.

[203] *Id.* at 969 (citing *Velde v. Kirsch*, 543 F.3d 469, 472 (8th Cir. 2008) (noting that it was undisputed that a check was a preferential transfer because it paid a "preexisting obligation"); *Southmark Corp. v. Schulte Roth & Zabel* (*In re Southmark Corp.*), 88 F.3d 311, 316 (5th Cir. 1996) ("A debt is antecedent if it is incurred before the transfer"); *Lindquist v. Dorholt* (*In re Dorholt, Inc.*), 224 F.3d 871, 873 (8th Cir. 2000) (finding the loan was "antecedent" to grant of security interest where, although company executed a security agreement on the same day as it received the loan, the security interest was not perfected until sixteen days later); 5 COLLIER ON BANKRUPTCY, ¶ 547.03 [4] (Lawrence P. King et al. eds., 15th ed. 2000)).

[204] *Elliot & Callan, Inc.*, 615 F. Supp. 2d at 969.

[205] *See Hasbro, Inc. v. Serafino*, 37 F. Supp. 2d 94, 97 (D. Mass. 1999) (discussing statute identical to MINN. STAT. Ann. 513.45(b) and holding that mortgage granted at "essentially the same time" as loan did not cover antecedent debt); *Truelove v. Buckley*, 733 S.E.2d 499, 502 (Ga. Ct. App. 2012) (no preferential transfer where property transferred "at essentially the same time" after purchase).

looking to the equivalent of section 513.43(c) of the Minnesota statute, which reads: "[a] transfer is made for present value if the exchange between the debtor and the transferee is intended by them to be contemporaneous and is in fact substantially contemporaneous."[206] Commentators on the uniform law have reached the same conclusion, stating:

> Finally, to provide the rule necessary to the operation of the section 5(b) preference rule, section 3(c) provides that a disposition of property is made for a present value when the parties intend that the exchange be contemporaneous and it is in fact contemporaneous. As long as a transfer is in exchange for a present value rather than an antecedent obligation, the insider preference provision of the UFTA, section 5(b), will have no application.[207]

Although the issue has not been resolved as a matter of Minnesota law, and is therefore inherently uncertain and a close question, the Examiner concludes that it is more likely than not that the Bankruptcy Court, if called to interpret the Minnesota Insider Preference statute, would impose a "contemporaneous exchange" limitation when determining whether any given transaction occurred on account of an antecedent debt.

### (4) Insolvency

As under the Bankruptcy Code, a transfer is only avoidable under the Minnesota Insider Preference statute if the transferor-debtor was insolvent at the time of the transfer. For purposes of the Minnesota Insider Preference statute, a "debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets, at fair valuation."[208] Although the Balance Sheet Test is the only measure of insolvency under the Minnesota Insider Preference statute, a "debtor who is generally not paying debts as they become due is presumed to be insolvent."[209] As discussed in detail in Section VI.B and VI.E of the Report, the Examiner has concluded that the evidence supports the proposition that ResCap and its principal subsidiaries were insolvent under the Balance Sheet Test from December 31, 2007 through the Petition Date.

### (5) Insider Had Reasonable Cause To Believe Debtor Was Insolvent

Finally, unlike section 547 of the Bankruptcy Code, the Minnesota Insider Preference statute only permits avoidance of a transfer if "the insider had reasonable cause to believe that

---

[206] MINN. STAT. ANN. § 513.43(c).

[207] PETER A. ALCES, LAW OF FRAUDULENT TRANSFERS § 5:64 (2012).

[208] MINN. STAT. ANN. § 513.42(a). The statute further provides that "[d]ebts under this section do not include an obligation to the extent it is secured by a valid lien on property of the debtor not included as an asset." *Id.* § 513.42(e). The purpose of subsection (e) is to avoid "render[ing] a person insolvent . . . by counting as a debt an obligation secured by property of the debtor that is not counted as an asset. *See* UFTA § 2 cmt. 4.

[209] MINN. STAT. ANN. § 513.42(b).

the debtor was insolvent."[210] This requirement was adapted from section 547 of the Bankruptcy Code as it existed prior to 1984, which contained an identical requirement, and similar language from predecessor statutes dating back at least as far as the Bankruptcy Act of 1867.[211] An insider need not have actual knowledge of a debtor's insolvency to have "reasonable cause to believe that the [debtor] is insolvent."[212] Moreover, a plaintiff need not demonstrate that the insider actually believed that the debtor was insolvent—only that the insider had reasonable cause to so believe.[213] In judging whether an insider had reasonable cause to believe the debtor was insolvent, "[i]t is for the court to make a determination of the particular facts known, and to draw all inferences reasonably to be drawn from the *mise-en-scene*."[214]

> [A] creditor may be said to have reasonable cause to believe his debtor to be insolvent when such a state of facts is brought to his notice respecting the affairs and pecuniary condition of his debtor, in a case like the present, as would lead a prudent business man to the conclusion that he, the debtor, is unable to meet his obligations as they mature in the ordinary course of business.[215]

---

[210] *Id.*

[211] *See, e.g.*, *Buchanan v. Smith*, 83 U.S. (1 Wall.) 277 (1872) (construing the meaning of the phrase "reasonable cause to believe that the debtor was insolvent" as used in the preference provisions of the Bankruptcy Act of 1867); *Britton v. Payne*, 4 F.Cas. 183 (S.D.N.Y. 1874) (same). The 1984 Amendments to section 547 of the Bankruptcy Code eliminated the "reasonable cause to believe" element formerly included in that section.

[212] *See Kravetz v. Joange Bldg. Corp.*, 341 F.2d 561, 563 (2d Cir. 1965) ("Knowledge of insolvency is not necessary, nor even actual belief thereof; all that is required is a reasonable cause to believe that the debtor was insolvent at the time of the preferential transfer."); *Fisher v. Aztec Mktg. Corp.* (*In re Nat'l Merritt Inc.*), 11 B.R. 102, 104 (S.D.N.Y. 1981) ("Actual knowledge, however, is not the controlling standard, for all that is required is reasonable cause to believe."); *Hudson Feather & Down Prods., Inc. v. B&B Assocs., Inc.* (*In re Hudson Feather & Down Prods., Inc.*), 22 B.R. 247, 252 (Bankr. E.D.N.Y. 1982) (citation omitted) ("[K]nowledge of insolvency, or even actual belief, is unnecessary; all that is required is 'reasonable cause to believe.'"); *Beldock v. Faberge, Inc.* (*Matter of S & W Exps., Inc.*), 16 B.R. 941, 948 (Bankr. S.D.N.Y. 1982) (citation omitted) ("Knowledge of insolvency is not necessary, nor even actual belief thereof; all that is required is reasonable cause to believe that the debtor was insolvent at the time of the preferential transfer."); *Herald Publ'g Co. v. Barberino*, No. 93-0454680S, 1993 WL 498798, at *4 (Conn. Super. Oct. 27, 1993) (citing Levy v. Carter, Rice & Co., 136 Conn. 216, 219 (1949)) ("Reasonable cause to believe is not actual knowledge of the insolvency . . . .").

[213] *See In re Nat'l Merritt Inc.*, 11 B.R. at 104 (quoting *In re O'Neill Enters., Inc.*, 359 F. Supp. 940 (W.D. Va.1973) ("It is the cause to believe and not the belief itself that is determinative . . . .").

[214] *In re Nat'l Merritt Inc.*, 11 B.R. at 104.

[215] *Britton*, 4 F. Cas. at 186; *see also Buchanan*, 83 U.S. (1 Wall.) at 308; *Sharfman v. Tharpe & Co.*, 381 F. Supp. 1394, 1396 (S.D.N.Y. 1974) ("A creditor has reasonable cause to believe that a debtor is insolvent when such a state of facts is brought to the creditor's notice, respecting the affairs and pecuniary condition of the debtor, as would lead a prudent business person to the conclusion that the debtor is insolvent"); *Kravetz v. Joange Bldg. Corp.*, 341 F.2d 561, 563 (2d Cir. 1965); *Robinson v. Commerical Bank of N. Am.*, 320 F.2d 106, 107 (2d Cir. 1963).

Moreover, "where circumstances are such as would incite a man of ordinary prudence to make inquiry, the creditor is chargeable with notice of all facts which a reasonably diligent inquiry would have disclosed . . . ."[216]

The Examiner concludes that the evidence supports the proposition that AFI likely had reasonable cause to believe that ResCap and its principal subsidiaries were insolvent no later than December 31, 2007—the date on which the Examiner has concluded that ResCap and its principal subsidiaries actually became insolvent under the Balance Sheet Test. As discussed in greater detail in Section III.G, ResCap and its subsidiaries suffered a steep financial decline during the second half of 2007, which ultimately resulted in the Debtors' insolvency by year-end. The pertinent facts concerning the Debtors' financial distress were well-known to AFI, and would have led a reasonably prudent person to conclude that the Debtors were insolvent or, at the very least, to undertake an investigation that would have revealed such insolvency. Moreover, as discussed in greater detail in Section III.G.3 of the Report, the evidence suggests that AFI actually believed ResCap was insolvent, or would imminently become insolvent, no later than the third quarter of 2007.

For example, during the September 7, 2007 meeting of the ResCap Board, Rossi was nominated and elected as a Director of ResCap and Chairman of the ResCap Board, with the purpose of organizing a turnaround/restructuring for ResCap and its subsidiaries.[217] During that meeting, ResCap's outside counsel, Mayer Brown, gave a presentation on the fiduciary duties of directors of financially distressed companies.[218] Numerous senior officers and directors of AFI attended that meeting, including Solomon (AFI General Counsel), Feldstein, de Molina, Khattri, Walker and Zukauckas (all AFI Directors), and Bossidy (Office of the AFI Chair).[219] Solomon not only attended, but "participated in the discussion and commented on the duties owed by the directors to shareholders and creditors when a company reaches the zone of insolvency or becomes insolvent."[220] Following that presentation, the ResCap Board

---

[216] *Baranow v. Gibraltar Factors Corp.* (*In re Hygrade Envelope Corp.*), 366 F.2d 584, 586–87 (2d Cir. 1966) (citing *Levy v. Weinberg & Holman, Inc.*, 20 F.2d 565, 567 (2d Cir. 1927); *Pender v. Chatham Phx. Nat'l Bank & Trust Co.*, 58 F.2d 968, 970 (2d Cir. 1932); *Margolis v. Gem Factors Corp.*, 201 F.2d 803, 805 (2d Cir. 1953); *Robinson v. Commercial Bank of N. Am.*, 320 F.2d 106, 107–08 (2d Cir. 1963)); *see also In re Nat'l Merritt Inc.*, 11 B.R. at 104 (citing *Kravetz*, 341 F.2d 561; *Robinson*, 320 F.2d 106.

[217] *See* Minutes of a Regular Meeting of the Board of Directors of Residential Capital, LLC, Sept. 7, 2007, at RC40005619 [RC40005558]; Memorandum, November MD Meeting—Follow-up Q&A for Associates, dated Nov. 14, 2007, at EXAM10125766 ("[AFI] and our shareholders have put into place a team that has turnaround experience and works well together.").

[218] *See* Minutes of a Regular Meeting of the Board of Directors of Residential Capital, LLC, Sept. 7, 2007, at RC40005620–21 [RC40005558]; Mayer Brown Presentation on Fiduciary Duties of Directors and Related Legal Issues, dated Sept. 7, 2007, at RC40012709–20 [RC40012695].

[219] *See* Minutes of a Regular Meeting of the Board of Directors of Residential Capital, LLC, Sept. 7, 2007, at RC40005619 [RC40005558].

[220] *Id.* at RC40005620.

discussed, among other things, "the potential need for additional equity and strategic reasons supporting a capital injection in the near-term."[221] As a general rule, to which the Examiner sees no basis for exception here, knowledge of an officer or director of a Delaware corporation, such as AFI, is imputed to the corporation.[222] Accordingly, even in the absence of additional information, the Examiner concludes the evidence supports the proposition that AFI likely had knowledge of facts that would have led a reasonably prudent person to inquire into ResCap's solvency no later than September 7, 2007.

AFI's knowledge of ResCap's financial difficulties was not limited to what it learned in meetings of the ResCap Board. As described in greater detail in Section VIII.A by late 2007 AFI exercised close control over every major aspect of the Debtors' operations. Under those circumstances, it is inconceivable that AFI was not aware of the Debtors' financial state.

Moreover, by November 2007 even the public was well aware of ResCap's financial turmoil. On November 1, 2007, Moody's downgraded ResCap's senior debt to Baa1 with negative outlook, noting, among other things, that ResCap had suffered four consecutive quarterly losses and required a capital injection from AFI and observing that "[t]he business model that will return ResCap to adequate profitability is unclear."[223] On November 15, 2007, AFI CEO Feldstein emailed AFI COO de Molina observing that the "[m]arket has completely lost confidence in ResCap."[224] On November 19, 2007, Bloomberg published an article in which an independent bond analyst concluded that ResCap's exposure to homebuilders could result in a bankruptcy filing in which recoveries "may be even lower than implied by current distressed levels."[225] Indeed, according to the article, "[t]he implied probability of default assumes funds would be worth 40 cents on the dollar in the event of bankruptcy."[226] AFI was aware of these concerns, given that Cohen, of Cerberus, forwarded the November 19 Bloomberg article, without comment, to Tessler.[227]

---

[221] *Id.* at RC40005622.

[222] *See Am. Int'l Grp., Inc. v. Greenberg* (*In re Am. Int'l Grp., Inc.*), 976 A.2d 872, 883 n.25 (Del. Ch. 2009) (citing *Teachers' Ret. Sys. of La. v. Aidinoff*, 900 A.2d 654, 671 n.23 (Del. Ch. 2006) ("It is the general rule that knowledge of an officer or director of a corporation will be imputed to the corporation."); *Albert v. Alex. Brown Mgmt. Servs., Inc.*, No. 762-N, 2005 WL 2130607, at *11 (Del. Ch. Aug. 26, 2005) ("Delaware law states the knowledge of an agent acquired while acting within the scope of his or her authority is imputed to the principal."); 3 AM. JUR. 2D *Agency* § 273 (principals are generally bound by the knowledge of their agents)).

[223] Shannon D. Harrington, *ResCap Credit Swaps Soar on Concern It May Default*, BLOOMBERG, Nov. 15, 2007. http://www.bloomberg.com/apps/news/?pid=newsarchive &sid=aTXFFjlPAPUk.

[224] *See* E-mail from E. Feldstein to A. de Molina (Nov. 15, 2007), at CCM00496802 [CCM00496800].

[225] *See* E-mail from S. Cohen to L. Tessler (Nov. 19, 2007) [CCM00176101], sending the article. *See also* Caroline Salas and Shannon D. Harrington, *ResCap Investments May Lead to Bankruptcy, Gimme Credit Says*, BLOOMBERG, Nov. 19, 2007.

[226] Caroline Salas and Shannon D. Harrington, *ResCap Investments May Lead to Bankruptcy, Gimme Credit Says*, BLOOMBERG, Nov. 19, 2007.

[227] *See* E-mail from S. Cohen to L. Tessler (Nov. 19, 2007) [CCM00176101].

By year end, ResCap required yet another capital injection from AFI, which came in the form of a contribution of $1.1 billion in face amount of bonds that AFI bought on the market for approximately $763 million.[228] Even accounting for the gain ResCap experienced from this debt cancellation, ResCap experienced a quarterly loss of $921 million – its fifth consecutive quarterly loss.[229]

Based on the above, as well as the other aspects of ResCap's ongoing financial deterioration described in more detail in Section III.G, the Examiner concludes that the evidence supports the proposition that no later than December 31, 2007, and at all times after that date, AFI likely had reasonable cause to believe that ResCap and its principal subsidiaries were insolvent.

  e.   *Affirmative Defenses*

  *(1) Good Faith Transferee (Minn. Stat. § 513.48(d))*

Minn. Stat. 513.48(d) provides that:

> Notwithstanding the voidability of a transfer or an obligation under sections 513.41 to 513.51, a good faith transferee or obligee is entitled, to the extent of the value given the debtor for the transfer or obligation, to
>
> (1) a lien on or a right to retain any interest in the asset transferred;
>
> (2) enforcement of any obligation incurred; or
>
> (3) a reduction in the amount of the liability on the judgment.[230]

Because satisfaction of an antecedent obligation constitutes "value" under the Minnesota UFTA,[231] section 513.48(d) (a general defense to claims under the Minnesota UFTA and not specifically targeted at the Insider Preference statute) appears, at first glance, to provide a defense to Insider Preference claims so long as the insider takes in good faith. This would be a particularly odd result given that Minnesota UFTA section 513.48(f)(3), which is a defense specifically applicable to the Insider Preference statute, establishes a defense only where good faith is coupled with the transferee (1) providing present value to rehabilitate the debtor and (2) securing antecedent debt.[232]

This apparent contradiction is resolved by the rule that "[k]nowledge of the facts rendering [a] transfer voidable [is] inconsistent with the good faith that is required of a

---

[228]   *See* Section III.G.2.f.

[229]   *See* Residential Capital, LLC, Current Report (Form 8-K) (Feb. 5, 2008), Ex. 99.1, at 1.

[230]   Minn. Stat. Ann. § 513.48(d).

[231]   *See id.* § 513.43(a) ("Value is given for a transfer or obligation if, in exchange for the transfer or obligation, property is transferred or an antecedent debt is secured or satisfied . . . .").

[232]   *See id.* § 513.48(f)(3).

protected transferee" for purposes of Minnesota UFTA section 513.45(d).[233] Indeed, finding good faith to exist even where an insider received property with knowledge of the Debtors' insolvency would make both the Insider Preference statute itself and the specific defense to that statute provided by Minnesota UFTA section 513.48(f)(3) meaningless. Such a result would be inconsistent with the "elementary canon of construction that a statute should be interpreted so as not to render one part inoperative."[234] Consequently:

> [a]n insider who receives property or an obligation from an insolvent debtor as security for or in satisfaction of an antecedent debt of the transferor or obligor is not a good faith transferee or obligee if the insider has reasonable cause to believe that the debtor was insolvent at the time the transfer was made or the obligation was incurred.[235]

In essence, an insider is not a good faith transferee for purposes of section 513.48(d) of the Minnesota UFTA if the insider receives a transfer that falls within the Insider Preference statute. The Examiner therefore concludes that it is unlikely that the "good faith transferee for value" defense provided by section 513.48(d) of the Minnesota statute is applicable to Insider Preference claims.

### (2) New Value Under The Minnesota UFTA

Minnesota UFTA section 513.48(f) provides three affirmative defenses that are specifically aimed at protecting certain transactions that would otherwise run afoul of the Minnesota Insider Preference statute. In each case, the burden of proving the defense rests with the party asserting it.[236] The first of these defenses provides that a transfer is not avoidable as an Insider Preference "to the extent the insider gave new value to or for the

---

[233] UFTA § 2 cmt. 1.

[234] *Colautti v. Franklin,* 439 U.S. 379, 392 (1979) (citing *United States v. Menasche*, 348 U.S. 528, 538–39 (1955)).

[235] UFTA § 8 cmt. 4.

[236] *See Elliot & Callan, Inc. v. Crofton*, 615 F. Supp. 2d 963, 971 (D. Minn. 2009) (stating, in the context of a defendant assert a "new value" defense that defendant "has the burden of proving this affirmative defense"); *Prairie Lakes Health Care Sys., Inc*. v. *Wookey*, 583 N.W. 2d 405, 414 (S.D. 1998) (stating that "the UFTA then authorizes three possible defenses to forestall avoidance" under the Insider Preference theory of avoidance and that "[t]he burden of qualifying for these falls to the one asserting them").

benefit of the debtor after the transfer was made unless the new value was secured by a valid lien."[237] The party asserting the new value defense bears the burden of quantifying the new value received by the debtor.[238]

In determining whether new value has been provided, it is first necessary to determine if "value" has been given at all. For purposes of the Minnesota UFTA, "[v]alue is given for a transfer or obligation if, in exchange for the transfer or obligation, property is transferred or an antecedent debt is secured or satisfied."[239] "'[V]alue' includes 'property,' which would obviously include . . . money . . . loaned or advanced . . . ."[240] Satisfaction of an antecedent debt, whether through payment or forgiveness, likewise constitutes "value."[241]

After determining whether "value" has been provided, the court must determine whether that value is "new value" that can offset Insider Preference liability from prior transfers. Because Minnesota's UFTA uses but does not define the term "new value," the few courts that have interpreted the statute have looked to the Bankruptcy Code's definition of new value for guidance.[242] Under the Bankruptcy Code:

> "new value" means money or money's worth in goods, services, or new credit, or release by a transferee of property previously transferred to such transferee in a transaction that is neither void nor voidable by the debtor or the trustee under any applicable law, including proceeds of such property, but does not include an obligation substituted for an existing obligation.[243]

---

[237] MINN. STAT. ANN. § 513.48(f)(1).

[238] *See Lowrey v. U.P.G., Inc.* (*In re Robinson Bros. Drilling, Inc.*), 877 F.2d 32, 34 (10th Cir. 1989) (citing *In re Jet Fla. Sys., Inc.*, 861 F.2d 1555, 1559 (11th Cir. 1988)) ("While under *In re George Rodman, Inc.* the court will not inquire into the value of the liens released by Richardson . . . it is the defendants' burden to prove with specificity that Richardson gave new value equivalent to the remainder of the debt not secured by these liens."); *Gray v. Chace* (*In re Bos. Publ'g Co.*), 209 B.R. 157, 176 (Bankr. D. Mass. 1997) ("[I]t was incumbent upon Chace to quantify what he gave up at the time of the restructuring—full, or most likely, partial payment of his outstanding loans, as compared with what, if anything, he would receive."); *see also Creditors' Comm. v. Spada* (*In re Spada*), 903 F.2d 971, 976 (3d Cir. 1990) (quoting *In re Jet Fla. Sys., Inc.*, 861 F.2d 1555, 1558 (11th Cir. 1988)) ("[A] party seeking the shelter of section 547(c)(1) must prove the specific measure of the new value given to the debtor in the exchange.").

[239] *Elliot & Callan, Inc.*, 615 F. Supp. 2d at 972 (quoting MINN. STAT. § 513.43(a)).

[240] *Elliot & Callan, Inc.*, 615 F. Supp. 2d at 972.

[241] *See* MINN. STAT. ANN. § 513.43(a).

[242] *See Elliot & Callan, Inc.*, 615 F. Supp. 2d at 972 (quoting 11 U.S.C. § 547(a)(2)) ("Similarly, under the section of the Bankruptcy Code on preferential transfers, 'new value' includes 'money or money's worth in goods, services, or new credit.'").

[243] 11 U.S.C. § 547(a)(2).

Accordingly, new value can include, among other things, loans, advances or infusions of cash or cash-equivalents.[244]

In addition to infusions of cash or cash equivalents and extensions of new credit, forgiveness of antecedent debt may, under certain circumstances, qualify as "new value" for purposes of the Minnesota Insider Preference statute. There does not, however, appear to be a consensus regarding how such debt forgiveness should be evaluated. Even under section 547 of the Bankruptcy Code, cases addressing new value in the context of debt forgiveness are sparse and inconsistent. As a general principle, the relevant inquiry is "whether the new value replenishes the estate."[245] Courts generally agree that forgiveness of fully secured debt or the outright release of a valid lien or security interest replenishes the estate and therefore constitutes "new value."[246] At the opposite end of the spectrum, "the forgiveness of an antecedent, highly contingent obligation does not qualify as 'new value.'"[247] For transactions involving the forgiveness of debt that fall between those poles—i.e., debt that is unsecured but that likely has significant recovery value in bankruptcy—the result is uncertain. Some courts have suggested that forgiveness of such a debt cannot constitute new value.[248] Other decisions suggest that forgiveness of debt may constitute "new value," but only to the extent of the

---

[244]  *See Elliot & Callan, Inc.*, 615 F. Supp. 2d at 972–73 ("The Court therefore concludes that, to the extent that Crofton made loans or advances to SCC after receiving transfers from SCC, those loans or advances are 'new value' that can offset previous transfers.").

[245]  *Kroh Bros. Dev. Co. v. Cont'l Constr. Eng'rs* (*In re Kroh Bros. Dev. Co.*), 930 F.2d 648, 652 (8th Cir. 1991).

[246]  *See Cocolat, Inc. v. Fisher Dev., Inc.* (*In re Cocolat, Inc.*), 176 B.R. 540, 548 (Bankr. N.D. Cal.1995) ("The release of a lien enlarges the estate from the point of view of unsecured creditors. Thus, a payment made in exchange for the release of a lien of equal amount does not diminish the estate."); *see also* UFTA § 8 cmt. 6 (stating that the new value defense to the Insider Preference statute "is adapted from § 547(c)(4) of the Bankruptcy Code, which permits a preferred creditor to set off the amount of new value subsequently advanced against the recovery of a voidable preference by a trustee in bankruptcy to the debtor without security. The new value may consist not only of money, goods, or services delivered on unsecured credit but also of the release of a valid lien").

[247]  *Jones v. Ryder Integrated Logistics, Inc.* (*In re Jotan, Inc.*), 264 B.R. 735, 752 (Bankr. M.D. Fla. 2001).

[248]  *See, e.g.*, *News Journal Co. v. Little Caesars of Del., Inc.*, No. CRIM.A.1999-04-241, 2000 WL 33653432, at *4 (Del. Ct. Com. PI. Oct. 20, 2000) ("LCE states in defense of the purchase that they gave 'new value' for the assets, as opposed to forgiveness of an antecedent debt.").

actual value, rather than nominal value, of the debt forgiven.[249] Still other decisions merely conclude that forgiveness of an unsecured debt (or an agreement to exchange unsecured debt for equity) "arguably" constitutes new value.[250]

Based on a review of the pertinent authority, the Examiner concludes that the Bankruptcy Court would likely treat forgiveness of fully-secured debt owed by a Debtor—accompanied by a corresponding reduction in the value of liens on such Debtor's assets—as a dollar-for-dollar extension of "new value." The Examiner further concludes that the Bankruptcy Court would be unlikely to treat forgiveness of unsecured debt owed by a Debtor as a dollar-for-dollar extension of "new value." Instead, the Examiner concludes that, although a close question, it is more likely than not that the Bankruptcy Court would treat forgiveness of unsecured debt owed by a Debtor as an extension of "new value" on a less than dollar-for-dollar basis and would impose on the party asserting the defense the burden of definitively quantifying the value received by the Debtor as a result of such debt forgiveness.[251]

If a transfer meets all the requirements for "new value," it must still overcome three hurdles before it can offset Insider Preference exposure. First, as with the similar "new value" defense afforded under section 547(c)(4) of the Bankruptcy Code, only unsecured new value (or new value secured by an unperfected or otherwise invalid lien) can offset Insider

_____

[249] *See In re Jotan, Inc.*, 264 B.R. at 752–53 ("The Court notes that it is likely that the proposed 'new value' provided by Defendants was almost worthless. Evidence of hypothetical value does not satisfy the specific proof requirement of Jet Florida. Defendant proved that it surrendered $722,398.24 in hypothetical dollars in potential judgments against Debtors. But Defendant did not prove that it surrendered any real dollars of the sort Debtors paid it in exchange for its hypothetical sacrifice during the ninety days prior to the petition date.").

[250] *See Gray v. Chace* (*In re Bos. Publ'g Co.*), 209 B.R. 157, 176 (Bankr. D. Mass. 1997) (citing *Trans World Airlines, Inc. v. Travellers Int'l AG* (*In re Trans World Airlines, Inc.*), 180 B.R. 389, 403 (Bankr. D. Del. 1994); *In re Cocolat, Inc.*, 176 B.R. at 548) ("[T]he Court finds that Chace arguably provided the Debtor with new value when he subordinated his debt to equity, as opposed to merely forbearing from collecting the obligations owed to him by the Debtor."); *see also Lowrey v. U.P.G., Inc.* (*In re Robinson Bros. Drilling, Inc.*), 877 F.2d 32, 34 (10th Cir. 1989) ("The defendants argue that, in addition to the release of valid liens, Richardson transferred new value in the form of new credit and forgiveness of debt. However, the record is devoid of any evidence of new credit extended to Robinson Brothers, and the fact that Richardson may have promised to continue to do business with Robinson Brothers if it paid its bills is not new credit or new value to the estate.").

[251] Given the inherent difficulties in proving value received by an insolvent debtor for having an unsecured debt forgiven, this requirement may, as a practical matter, be fatal to a creditor's new value defense. *See, e.g.*, *In re Bos. Publ'g Co.*, 209 B.R. at 176 (noting that although creditor's subordination of debt to equity arguably provided new value to debtor, new value defense failed because creditor did not quantify the extent of the new value received as a result of that subordination); *In re Jotan, Inc.*, 264 B.R. at 752 ("Defendant did provide evidence of the maximum value of its proposed 'new value'—$227,786.24 in 'waived' old balance plus about $494,612.00 for waiver of the new equipment obligation. However, these maximum values do not reflect the actual value of the 'waiver' of the old balance and of the waiver of the equipment purchase obligation in light of Debtors' extremely strained financial condition at the execution of and during the term of the new agreement.").

Preference liability.[252] Second, new value under the Minnesota Insider Preference statute only flows backwards—it cannot offset contemporaneous transfers.[253] Nor can new value offset later transfers.[254] Third, new value must be provided to the debtor (or for the debtor's benefit) by the same legal entity that is liable for the preferential transfer. "Third party" new value, even when provided by an entity closely related to, or controlled by, the entity that received the Insider Preference, cannot offset liability.[255] This point was most clearly illustrated in the recent *Musicland* decision. In that case, Best Buy Co., Inc. was the recipient of a transfer that was allegedly avoidable under the Minnesota Insider Preference statute. Best Buy moved for summary judgment, arguing, among other things, that new value it had provided to the plaintiff through its wholly-owned subsidiary provided it with a defense. The court rejected that argument, holding that "Best Buy cannot base a subsequent new value defense on services provided by its affiliate . . . ."[256] On the plaintiff's subsequent motion for summary judgment on the same issue, the court largely confirmed its reasoning, noting that, except where "reverse veil piercing" is appropriate, third-party new value cannot be counted as new value.[257]

Finally, despite the similarities between the "new value" defense under the Minnesota UFTA and the Bankruptcy Code, and the willingness of courts to look to section 547(c)(4) of the Bankruptcy Code in interpreting portions of the state law defense, critical differences exist. Most importantly, as described above, Minnesota UFTA's "new value" defense does not require that the new value "remain unpaid" to be credited against past preferential transfers and courts have expressly refused to read that Bankruptcy Code-based concept into a statute

---

[252] *Prairie Lakes Health Care Sys., Inc.* v. *Wookey*, 583 N.W. 2d 405, 415 (S.D. 1998) (citing 11 U.S.C. § 547(c)(4); UFTA § 8 cmt. 6.) ("This defense is an adaptation from the Bankruptcy Code § 547(c)(4) and like that provision its availability is limited to creditors who make unsecured advances.").

[253] *Prairie Lakes Health Care Sys.*, 583 N.W. 2d at 415 ("Moreover, the 'new value' must be made after, rather than contemporaneously with, the transfer. The note [defendant] gave was at the same time as the . . . transfer, thus the defense is unavailable.").

[254] *See Elliot & Callan, Inc. v. Crofton*, 615 F. Supp. 2d 963, 973 (D. Minn. 2009) ("The loans and advances cannot, however, offset *later* transfers, as § 513.48(f) expressly requires that 'new value' be given '*after* the transfer was made.'"); *see also Responsible Pers. of Musicland Holding Corp. v. Best Buy Co* (*In re Musicland Holding Corp.*), 462 B.R. 66, 70 (Bankr. S.D.N.Y. 2011) (citing *Mosier v. Ever-Fresh Food Co.* (*In re IRFM, Inc.*), 52 F.3d 228, 231 (9th Cir. 1995)) ("The party relying on the defense must show that it gave unsecured new value after the preferential transfer.").

[255] *See In re Musicland Holding Corp.*, 462 B.R. at 74 (Bankr. S.D.N.Y. 2011) ("The Minnesota Act, like its bankruptcy analog, requires the transferee to provide the new value, *i.e.*, third-party new value does not count.").

[256] *Id.*

[257] S*ee Responsible Pers. of Musicland Holding Corp. v. Best Buy Co.* (*In re Musicland Holding Corp.*), No. 08–01203, 2012 WL 769473, at *3 (Bankr. S.D.N.Y. Mar. 7, 2012) ("Best Buy relies on the control test, used to determine whether the transferred property was 'property of the debtor,' to argue that a preferred creditor can rely on subsequent new value provided by a wholly-owned subsidiary it controls. Although there are very limited situations, discussed below, that permit a shareholder to disregard the corporate identity of a subsidiary to shield itself from liability, Best Buy has failed to satisfy those requirements or provide any support for its argument that a preferred creditor can utilize third-party new value . . . .").

whose text does not support it.[258] Accordingly, "new value" that is itself paid for through an unavoidable transfer may nevertheless offset preference exposure under the Minnesota Insider Preference statute.

### (3) Ordinary Course Of Business (Minn. Stat § 513.48(f)(2))

The second affirmative defense under the Minnesota Insider Preference statute provides that a transfer is not avoidable "if made in the ordinary course of business or financial affairs of the debtor and the insider . . . ."[259] Like the new value defense, the "ordinary course" defense is derived from the Bankruptcy Code, albeit with important distinctions.[260] The most obvious of these differences are that the "ordinary course" defense under the UFTA: (1) omits the requirement that the debt being repaid have been incurred in the ordinary course of business; and (2) does not protect payments made according to ordinary business terms.[261] Accordingly, under the UFTA, "only the parties' prior dealings are examined to decide whether a transfer was made in the ordinary course . . . ."[262] As explained in official comment to the UFTA:

> Whether a transfer was in the "ordinary course" requires a consideration of the pattern of payments or secured transactions engaged in by the debtor and the insider prior to the transfer challenged under § 5(b). The defense provided by paragraph (2) is available, irrespective of whether the debtor or the insider or both are engaged in business, but the prior conduct or practice of both the debtor and the insider-transferee is relevant.[263]

Because it is the parties' history of dealings, rather than wider industry standards, that is controlling, "[c]ourts must engage in a 'peculiarly factual' analysis" to decide whether a

---

[258] *In re Musicland Holding Corp.*, 462 B.R. at 73 (citing *Genin v. 1996 Mercury Marquis*, 622 N.W.2d 114, 117 (Minn. 2001); *State v. Moseng*, 95 N.W.2d 6, 11–12 (Minn. 1959)) ("[T]he Minnesota Act unambiguously excludes a limitation on the new value defense resulting from payment for the new value, and the Court cannot rewrite the statute to add it."); *Elliot & Callan, Inc.*, 615 F. Supp. 2d at 973 ("The 'new value' provided by [defendant] in the form of loans or advances need not have remained unpaid in order to offset previous transfers.").

[259] MINN. STAT. ANN. § 513.48(f)(2).

[260] *See Prairie Lakes Health Care Sys., Inc. v. Wookey*, 583 N.W. 2d 405, 415 (S.D. 1998) (citing 11 U.S.C. § 547(c)(2)) ("Like the new value defense, § 8(f)(2) is also derived from the Bankruptcy Code.").

[261] *See Prairie Lakes Health Care Sys.*, 583 N.W. 2d at 415 (S.D. 1998) (citing 11 U.S.C. §§ 547(c)(2)(A), (C)) ("Unlike the Bankruptcy Code, however, § 8(f)(2) does not require that the transfer be made in payment of a debt incurred in the ordinary course of business, or that it be made according to ordinary business terms.").

[262] *Prairie Lakes Health Care Sys.*, 583 N.W. 2d at 415.

[263] UFTA § 8 cmt. 6 (citations omitted).

transfer occurred in the ordinary course of business.[264] As suggested by the comment to the UFTA above, "this means looking at the payment history to decide if a preferential transfer was made in the ordinary course."[265]

There are very few cases interpreting the "ordinary course" defense under the UFTA. Indeed, the only written decision applying Minnesota's version of the defense known to the Examiner is designated as unpublished and not for citation.[266] Because of this paucity of authority, courts applying that UFTA defense have typically looked to decisions interpreting the relevant portion of the Bankruptcy Code—11 U.S.C. § 547(c)(2)(A)—for guidance.[267]

A court seeking to determine whether a challenged transfer falls within the protection afforded by the Bankruptcy Code's "ordinary course as between the parties" defense may consider:

> (1) the time the parties engaged in the type of dealing at issue, (2) whether the subject transfer was for an amount more than usually paid, (3) if the payment was tendered in a manner different from previous payments, (4) whether there was unusual action by either the debtor or the creditor to collect or pay on the debt, and (5) whether the creditor did anything to gain an advantage (such as gain additional security) in light of the debtor's deteriorating financial condition.[268]

Before a court can properly evaluate these factors, however, the creditor asserting the defense must first establish a "baseline" of dealings between itself and the debtor-transferor.[269] In determining the proper baseline of dealings, courts look exclusively to the period prior to

---

[264] *Prairie Lakes Health Care Sys.*, 583 N.W. 2d at 415 (citing *Lovett v. St. Johnsbury Trucking*, 931 F.2d 494, 497 (8th Cir. 1991).

[265] *Prairie Lakes Health Care Sys.*, 583 N.W. 2d at 415.

[266] *See Thommes v. Thommes*, No. A11-1591, 2012 WL 2368877, at *5 (Minn. Ct. App. June 25, 2012) (finding that interest-only payments followed by lump-sum principal payments when funds became available fell within ordinary course of business between debtor and insider when loan agreement provided for payment on such terms).

[267] *Prairie Lakes Health Care Sys.*, 583 N.W. 2d at 415 ("Because there are so few reported cases interpreting the UFTA § 8(f)(2) defense and because this provision is derived from the Bankruptcy Code's exception to avoidance in 11 U.S.C. § 547(c)(2), we explore bankruptcy decisions interpreting the latter provision for insight into the meaning of the concept of ordinary course of business or financial affairs.").

[268] *Id.* at 416 (citing *Sulmeyer v. Suzuki* (*In re Grand Chevrolet, Inc.*), 25 F.3d 728, 732 (9th Cir.1994); *Logan v. Basic Distrib. Corp.* (*In re Fred Hawes Org.*), 957 F.2d 239, 244 (6th Cir. 1992)).

[269] *See Womack v. Horob Livestock Inc.* (*In re Horob Livestock Inc.*), 382 B.R. 459, 486 (Bankr. D. Mont. 2007) (quoting *In re Healthcentral.com*, 504 F.3d 775,790 (9th Cir. 2007)) ("First, the creditor must show a baseline of past practices between itself and the debtor.").

the preference period.[270] "Numerous decisions support the view that the historical baseline should be based on a time frame when the debtor was financially healthy."[271] As a result, under the Bankruptcy Code, "when the debtor-creditor relationship is of recent origin the industry norm becomes crucial because 'there is no baseline against which to compare the pre-petition transfers at issue to confirm the parties would have reached the same terms absent the looming bankruptcy.'"[272] However, unlike the Bankruptcy Code, the Minnesota Insider Preference statute does not permit the court to refer to wider industry norms in the absence of an established baseline of dealings between the parties.[273] Accordingly, a creditor who cannot establish an appropriate baseline of dealings between the parties is unlikely to be able to prevail on an ordinary course of business defense.[274]

The rule that creditors must establish a baseline of their own prior dealings that predates the preference period poses special challenges when applied in the context of the Minnesota Insider Preference statute.[275] While the Bankruptcy Code contains a one-year reach-back period for preferential transfers to insiders, the Minnesota Insider Preference statute imposes a six-year limitations period which, in bankruptcy, is converted to a six-year reach-back period. Accordingly, when applying the Minnesota Insider Preference statute, the Bankruptcy Court

---

[270] *Advo-Sys., Inc. v. Maxway Corp.*, 37 F.3d 1044 (4th Cir. 1994) (quoting *In re Tolona Pizza Prods. Corp.*, 3 F.3d 1029, 1032 (7th Cir.1993)) (explaining that the ordinary course test is whether payments "conform to the norm established by the debtor and the creditor in the period before, preferably well before, the preference period").

[271] *In re Quebecor World (USA), Inc.*, No. 08-10152, 2013 WL 1741946, at *5 (Bankr. S.D.N.Y. Apr. 23, 2013) (citing *Luper v. Columbia Gas of Ohio, Inc.* (*In re Carled, Inc.*), 91 F.3d 811 (6th Cir. 1996); *Fiber Lite Corp. v. Molded Acoustical Prods., Inc.* (*In re Molded Acoustical Prods., Inc.*), 18 F.3d 217 (3rd Cir. 1994); *Clark v. Baclor Real Estate Fin., Inc.* (*In re Meridith Hoffman Partners*), 12 F.3d 1549 (10th Cir. 1993); *Moltech Power Sys. v. Tooh Dineh Indus., Inc.* (*In re Moltech Power Sys. Inc.*), 327 B.R. 675 (Bankr. N.D. Fla. 2005); *Gonzales v. DPI Food Prod. Co.* (*In re Furrs Supermarkets, Inc.*), 296 B.R. 33 (Bankr. D.N.M. 2003)); *see also Official Comm. of Unsecured Creditors of TOUSA, Inc. v. Citicorp N. Am., Inc.* (*In re TOUSA, Inc.*), 422 B.R. 783, (Bankr. S.D. Fla. 2009) (citing *Caillouet v. First Bank & Trust* (*In re Entringer Bakeries, Inc.*), 368 B.R. 520, 532 (E.D. La. 2007); *Hechinger Inv. Co. of Del., Inc. v. Universal Forest Prods., Inc.* (*In re Hechinger Inv. Co. of Del., Inc.*), 489 F.3d 568, 578 (3d Cir. 2007); *J.P. Fyfe, Inc. of Fla. v. Bradco Supply Corp.*, 891 F.2d 66 (3d Cir. 1989)) (finding that payments made on account of debt that was restructured on an emergency basis while the debtor was financially distressed were not in the ordinary course), *aff'd*, 680 F.3d 1298 (11th Cir. 2012).

[272] *Advo-Sys., Inc.*, 37 F.3d at 1049–50 (quoting *In re Molded Acoustical Prods., Inc.*, 18 F.3d at 226).

[273] *See Prairie Lakes Health Care Sys.*, 583 N.W. 2d at 415 ("[O]nly the parties' prior dealings are examined to decide whether a transfer was made in the ordinary course of the parties' business affairs.").

[274] *See In re Horob Livestock Inc.*, 382 B.R. at 486 (citing *Mordy v. Chemcarb, Inc.* (*In re Food Catering & Housing, Inc.*), 971 F.2d 396, 398 (9th Cir. 1992)) ("Second the creditor must show that the relevant payments were 'ordinary in relation to these past practices.'").

[275] *See Advo-Sys., Inc.*, 37 F.3d at 1049 (quoting *In re Tolona Pizza Prods. Corp.*, 3 F.3d at 1032) (ordinary course test requires reference to baseline of dealings prior to the preference period); *In re Quebecor World (USA), Inc.*, 2013 WL 1741946, at * (citing *In re Carled, Inc.*, 91 F.3d 811; *In re Molded Acoustical Products, Inc.*, 18 F.3d 217; *In re Meridith Hoffman Partners*, 12 F.3d 1549; *In re Moltech Power Sys. Inc.*, 327 B.R. 675; *In re Furrs Supermarkets, Inc.*, 296 B.R. 33) (holding that baseline of dealings must be based on the parties' pattern of conduct during the period before the debtor became financially distressed).

could potentially look to the period before, and possibly well-before, that six-year reach-back period to evaluate the parties' baseline of dealings. Even if the Bankruptcy Court were instead to look only to the period before the Debtors became financially distressed, it would be required to look to parties' dealings before mid-2007 at the latest.

Here, however, the parties' course of dealings with respect to the transactions that may be subject to avoidance under Minnesota's Insider Preference statute occurred entirely during the Insider Preference period and while the Debtors were insolvent. Indeed, the transactions at issue were all undertaken as a *response* to the Debtors' financial distress.[276] It therefore appears that there is no ordinary course "baseline of dealings" against which the transactions that may be challenged under the Minnesota Insider Preference statute can be compared.[277]

Finding that payments on account of any of the transactions discussed below were made in the ordinary course of business would require a departure from the well-established rule that the Bankruptcy Court should look to the pre-preference period and pre-insolvency period in determining the parties' baseline of dealings for purposes of an ordinary course of business defense under the Minnesota Insider Preference statute. Moreover, such a finding would require the Bankruptcy Court to overlook the Debtors' chaotic financial situation through the entire reach-back period, the very condition that prompted most of the transactions under review.[278] Accordingly, the Examiner concludes that the ordinary course of business defense under the Minnesota Insider Preference statute is unlikely to apply to any of the transactions discussed below.

### (4) Good Faith Effort To Rehabilitate While Securing Present Value And Antecedent Debt (Minn. Stat § 513.48(f)(3))

Finally, a transfer may not be avoided under the Minnesota Insider Preference statute "if made pursuant to a good faith effort to rehabilitate the debtor and the transfer secured present value given for that purpose as well as an antecedent debt of the debtor."[279] This provision has no analogue in the Bankruptcy Code.[280] Instead it "reflects a policy judgment that an insider who has previously extended credit to a debtor should not be deterred from extending further credit to the debtor in a good faith effort to save the debtor from a forced liquidation in bankruptcy or otherwise."[281]

The Examiner has been unable to locate a reported decision in which this "good faith effort to rehabilitate" defense was substantively analyzed, whether under Minnesota law or the

---

[276]  *See* Section III.G.

[277]  *See, e.g.,* Section III.G.

[278]  *See, e.g.*, Section III.G.

[279]  MINN. STAT. ANN. § 513.48(f)(3).

[280]  *See* UFTA § 8 cmt. 6.

[281]  *Hill v. Gibson Dunn & Crutcher LLP* (*In re MS55, Inc.*), 420 B.R. 806, 824 n.11 (Bankr. D. Colo. 2009) (quoting UFTA § 8 cmt. 6).

law of another state that has adopted the UFTA (although the Examiner expects that the forthcoming trial decision in *Musicland* will do so). As a result, the Examiner does not have the benefit of case precedent on which to make an assessment of the defense.

The "good faith effort to rehabilitate" defense has three components.[282] First, the transferee must undertake a good faith effort to rehabilitate the debtor. Second, the transferee must provide present value that is secured with the goal of achieving that rehabilitation.[283] Third, the debtor must grant the transferee a security interest with respect to an antecedent debt. If the first two elements of the defense are met, the preferential transfer embodied in the third element is excused.[284] The defense may therefore be thought of as a carefully-circumscribed "contemporaneous new value" defense, as that term is used in the Bankruptcy Code.

While the second and third elements of the defense are self-explanatory, the first—which requires a good faith effort to rehabilitate the debtor—is more challenging and requires that two questions be answered. First, what does the term "good faith" mean in the context of the Minnesota Insider Preference statute? Second, what does it mean to attempt to "rehabilitate" a debtor?

Of these two inquiries, the first is the more straightforward: "good faith is determined according to an objective or 'reasonable person' standard, and not based on the subjective knowledge or belief of the transferee."[285] With respect to the "good faith effort to rehabilitate" defense, the term "good faith" modifies the phrase "effort to rehabilitate." Accordingly, the Examiner concludes that a party likely engages in a "good faith" effort to rehabilitate a debtor when it takes action that constitutes an objectively reasonable effort to rehabilitate such debtor. Such reasonableness can be objectively measured by, among other things, "the amount of the present value given, the size of the antecedent debt secured, and the likelihood of success for the rehabilitative effort . . . ."[286]

The second inquiry—the meaning of the word "rehabilitate"—can be resolved by principles of statutory construction. Minnesota courts have held that, "[w]here a statute is plain and unambiguous, [a court should] apply the words of the statute according to their plain

---

[282] *See* MINN. STAT. ANN. § 513.48(f)(3).

[283] "A transfer is made for present value if the exchange between the debtor and the transferee is intended by them to be contemporaneous and is in fact substantially contemporaneous." MINN. STAT. ANN. § 513.43(c). Thus, the second element of the defense is satisfied if, contemporaneously with the other transfers contemplated by the defense, the debtor receives value on a secured basis.

[284] *See* MINN. STAT. ANN. § 513.48(f)(3).

[285] *Roeder v. Lockwood* (*In re Lockwood Auto Grp., Inc.*), 428 B.R. 629, 636 (Bankr. W.D. Pa. 2010); *see also Armstrong v. Collins*, Nos. 01-2437, 2010 WL 1141158, at *19 (S.D.N.Y. Mar. 24, 2010) (quoting *Terry v. June*, 432 F. Supp. 2d 635, 641 (W.D. Va. 2006) ("In order to establish the element of good faith, the transferee must prove that he received the transfer 'in objective good faith.'"); *Terry*, 432 F. Supp. 2d at 641 (same); *Ameriserv Fin. Bank v. Commercebank, N.A.*, No. 07-1159, 2009 WL 890583, at *5 (W.D. Pa. Mar. 26, 2009).

[286] UFTA § 8 cmt. 6.

meaning and engage in no further construction."[287] When a statute uses a term but does not define it, both federal courts and Minnesota state courts will give the term its "ordinary" or "plain" meaning by examining its dictionary definition.[288] The Examiner's Professionals have reviewed a number of the dictionaries most commonly cited by the Supreme Court of the United States and the Supreme Court of Minnesota, which variously define the word "rehabilitate," in a financial or business context, to mean:

> To restore to a previous condition; to set up again in proper condition.[289]
>
> To restore to good condition, operation, or management, as a bankrupt business.[290]
>
> The process of reorganizing a debtor's financial affairs—under Chapter 11, 12, or 13 of the Bankruptcy Code—so that the debtor may continue to exist as a financial entity, with creditors satisfying their claims from the debtor's future earnings.[291]
>
> To restore to a state of solvency or efficiency.[292]

While differing in their phraseology, these definitions have a common element—each requires more than maintenance of the status quo and the prevention of a debtor's collapse into a forced liquidation. Instead, they require restoration to a proper condition, reorganization to allow an enterprise to survive and creditors to satisfy their claims from a debtor's future earnings (as opposed to satisfying their claims from a liquidation of the debtor's assets), or, most tellingly, a return to *solvency*.[293]

---

[287] *Reiter v. Kiffmeyer*, 721 N.W.2d 908, 910 (Minn. 2006) (citing *Wynkoop v. Carpenter*, 574 N.W.2d 422, 425 (Minn. 1998)).

[288] *See, e.g., Taniguchi v. Kan Pac. Saipan, Ltd.*, 132 S. Ct. 1997, 2002 (2012) (citing THE AMERICAN HERITAGE DICTIONARY, THE SCRIBNER–BANTAM ENGLISH DICTIONARY, THE RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE, THE OXFORD ENGLISH DICTIONARY, CHAMBERS TWENTIETH CENTURY DICTIONARY, BLACK'S LAW DICTIONARY and WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY); *Ransom v. FIA Card Servs., N.A.*, 131 S. Ct. 716, 724 (2011) (citing WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY, THE NEW OXFORD AMERICAN DICTIONARY and THE OXFORD ENGLISH DICTIONARY); *State v. Hartmann*, 700 N.W.2d 449, 453–54 (Minn. 2005) (citing WEBSTER'S DICTIONARY); *Larson v. State*, 790 N.W.2d 700, 703 (Minn. 2010) (citing THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE and BLACK'S LAW DICTIONARY).

[289] OXFORD ENGLISH DICTIONARY 527 (James. A. H. Murray et al. eds., 2d ed. 1991).

[290] THE RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE 1625 (Stuart Berg Flexner ed., 2d ed. 1987).

[291] BLACK'S LAW DICTIONARY 1399 (9th ed. 2009).

[292] WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1914 (Philip Babcock Grove, Jr., et al. eds., 1993).

[293] Use of the word rehabilitate elsewhere in Minnesota law likewise suggests that an effort directed at a true restoration to financial health, rather than merely maintaining the status quo by preventing complete collapse, is required. *See, e.g., Morgan Assocs., Inc. v. Midwest Mut. Ins. Co.*, 519 N.W.2d 499, 502 (Minn. Ct. App. 1994) ("An attempt to rehabilitate [an insurance agency requires] a good faith effort by the insurance company to reach a mutual agreement with the agent on a written plan for rehabilitation.").

The commentary to the model UFTA, however, arguably supports a lesser standard for "rehabilitate." According to the drafters:

> Paragraph (3) [the good faith rehabilitation defense] is new and reflects a policy judgment that an insider who has previously extended credit to a debtor should not be deterred from extending further credit to the debtor in a good faith effort *to save the debtor from a forced liquidation in bankruptcy or otherwise*. A similar rationale has sustained the taking of security from an insolvent debtor for an advance to enable the debtor to stave off bankruptcy and extricate itself from financial stringency.[294]

One reading of this commentary is that *any* effort to avoid forced liquidation—even if that effort was not aimed at restoring the debtor to true financial health—may satisfy the "effort to rehabilitate" prong of the defense.

Though a close question, the Examiner concludes it is more likely than not that the "good faith effort to rehabilitate" defense to the Minnesota Insider Preference statute requires the insider-transferee to prove that it engaged in a good-faith effort to restore the debtor to solvency. As an initial matter, the plain meaning of the word "rehabilitate," as used in section 513.48(f)(3) of the Minnesota statute, requires more than merely preventing a forced liquidation. Under Minnesota law, where the language of a statute is unambiguous, courts must apply the plain meaning of the statute regardless of whether extrinsic sources suggest a contrary legislative intent. Therefore, even if a court were to construe the model UFTA commentary as suggesting a lesser standard for "rehabilitate," the ordinary meaning of that term would likely control. Moreover, the Examiner is skeptical that the drafters of the UFTA intended to depart from the ordinary usage of the term "rehabilitate." In this regard, it bears noting that the drafters analogized to a case where the transfer at issue was intended to help the debtor "extricate itself from financial stringency."[295] Such language is consistent with the conclusion that "rehabilitate" requires an effort to restore a debtor to solvency.

### f.   *Whether A Transfer To A Secured Creditor Can Be Avoided*

Unlike section 547 of the Bankruptcy Code, the Minnesota Insider Preference statute does not require, as a condition for avoidance of a transfer, a showing that the recipient of the transfer received more that it would have received under the hypothetical chapter 7 test.[296] Instead, Minnesota law provides two specific protections for secured creditors. First, as

---

[294]   UFTA § 8 cmt. 6 (emphasis added).

[295]   UFTA § 8 cmt. 6. This language, combined with the clear statement that the premise of the Insider Preference statute "is that an insolvent debtor is obliged to pay debts to creditors not related to him before paying those who are insiders," suggests that a circumspect reading of the rehabilitative effort defense is appropriate. *Id.* Prefatory Note, at 4.

[296]   *See* 11 U.S.C. § 547(b)(5).

discussed above, a conveyance of a debtor's property will not be regarded as a "transfer," and thus cannot be the subject of any avoidance action under the Minnesota UFTA, if the property conveyed is subject to a valid lien and the value of the conveyed property does not exceed the value of that lien.[297] Second, and irrelevant as to any of the transactions reviewed by the Examiner during the Investigation, a transfer that is the result of "enforcement of a security interest in compliance with article 9 of the Uniform Commercial Code" may not be avoided under the Minnesota UFTA, except as an actually fraudulent transfer.[298] Between these two protections, the Minnesota Insider Preference statute leaves a significant gap—it provides no explicit protection to secured creditors who receive payments on account of secured obligations from a debtor's unencumbered funds (or property).

At least one court (not in Minnesota) has held that a payment to a secured creditor, even from unencumbered funds, may not be avoided under the Insider Preference provisions of the UFTA. In *In re Maine Poly, Inc.*, the United States Bankruptcy Court for the District of Maine concluded that payments to a non-insider secured creditor, whose claim was guaranteed by an insider of the debtor, could not be recovered from the insider-guarantor as Insider Preferences under Maine's UFTA.[299] In that case, the debtor relied on a secured revolving line of credit for its working capital.[300] After the debtor's bankruptcy filing, the trustee sought to avoid a number of prepetition payments on the revolver as Insider Preferences under the Maine UFTA, arguing that the resulting reduction of the insider's guarantee obligations effectively converted the payments into transfers to an insider.[301] The court rejected this argument and noted that, because the lender was oversecured, the debtor's payments merely decreased the value of its lien on the debtor's assets and may have thereby benefitted creditors.[302] Moreover, the court found that any benefit to the debtor's insider was merely incidental to the payments.[303] Accordingly, the court concluded that the payments did not "represent[] a 'transfer' to insiders" and therefore could not be avoided as an Insider Preference.[304]

Despite its clear holding, the Examiner believes that *Maine Poly* is unlikely to be treated as particularly persuasive. First, *Maine Poly* is readily distinguishable in that, unlike the transactions in this case, *Maine Poly* did not involve a true conveyance to an insider. Instead, as the court noted, "[r]eduction of the defendant(s)' guaranty liability was an incidental

---

[297] *See* MINN. STAT. ANN. §§ 513.41(2), 513.41(12); *Clarinda Color LLC v. BW Acquisition Corp.*, No. 00-CV-722 JMR/FLN, 2004 WL 2862298, at *3 (D. Minn. June 14, 2004); *Lorenzo Bus Serv., Inc. v. Richfield Bus Co.*, No. C2-02-56, 2002 WL 2005468, at *3–4 (Minn. Ct. App. Sept. 3, 2002); *Knight v. Prod. Res. Grp., LLC*, No. Civ. 036443 (MJD/JGL), 2005 WL 1630523, at *4 (D. Minn. July 11, 2005).

[298] MINN. STAT. ANN. § 513.48(e)(2).

[299] *Turner v. JPB Enters., Inc.* (*In re Maine Poly, Inc.*), 317 B.R. 1, 13 (Bankr. D. Me. 2004). The Insider Preference provisions of the Maine UFTA are substantially identical to those of the Minnesota UFTA. *Compare* MINN. STAT. ANN. § 213.45(b), *with* ME. REV. STAT. ANN. 14 § 3576(2).

[300] *See In re Maine Poly*, 317 B.R. at 4.

[301] *See id.* at 5.

[302] *See id.* at 13.

[303] *See id.*

[304] *Id.*

consequence" of the transfer.[305] Unlike section 547 of the Bankruptcy Code, the UFTA's Insider Preference provisions are limited to transfers *to* an insider, rather than transfers *to or for the benefit of* a creditor.[306] Thus, the transfers at issue in *Maine Poly* arguably did not even implicate the UFTA's Insider Preference provision. The court could have properly reached its ultimate conclusion—that the payments to a third-party creditor under an insider-guaranteed credit agreement were not avoidable as Insider Preferences because they were not transfers to an insider—without addressing the fact that the revolver was fully secured.

Second, and more important, *Maine Poly*'s rationale does not appear to be grounded in either the text of the statute or case law.[307] As set forth above, the Bankruptcy Court for the Southern District of New York recently held that the Minnesota Insider Preference statute must be strictly construed where it is unambiguous, holding that "the Court cannot rewrite the statute to add" language excluded by the statute's drafters.[308] The Minnesota UFTA unambiguously fails to include language similar in effect to the "hypothetical liquidation test" contained in section 547 of the Bankruptcy Code. If *Musicland* is to be applied consistently, "[a]ny necessary fix resides with the Minnesota legislature."[309]

Accordingly, the Examiner concludes that it is likely that the Bankruptcy Court would not apply a hypothetical chapter 7 test in evaluating claims of avoidability under the Minnesota Insider Preference statute.

---

[305] *Id.*

[306] *Compare* UFTA § 5(b), *with* 11 U.S.C. § 547(b)(1).

[307] *Maine Poly* also appears to reach a result that would be contrary to the intent of the Minnesota legislature. As discussed above, under Minnesota law, "[t]he intention of the drafters of a uniform act becomes the legislative intent upon enactment." *Shields v. Goldetsky* (*In re Butler*), 552 N.W.2d 226, 231 (Minn. 1996) (citing *Layne-Minn. Co. v. Regents of the Univ. of Minn.*, 123 N.W.2d 371, 376 n.13 (Minn. 1963)). Accordingly, the Minnesota legislature's intent "is that an insolvent debtor is obliged to pay debts to creditors not related to him before paying those who are insiders." UFTA, Prefatory Note, at 4.

[308] *Responsible Pers. of Musicland Holding Corp. v. Best Buy Co.* (*In re Musicland Holding Corp.*), 462 B.R. 66, 73 (Bankr. S.D.N.Y. 2011) (citing *Genin v. 1996 Mercury Marquis*, 622 N.W.2d 114, 117 (Minn. 2001); *State v. Moseng*, 95 N.W.2d 6, 11–12 (Minn. 1959)).

[309] *In re Musicland Holding Corp.*, 462 B.R. at 73.

### g. *Transactions That Implicate Insider Preferential Transfer Law*

The following seven transactions or loan facilities[310] implicate potential claims under Minnesota's Insider Preference Statute: (1) the Secured Revolver Facility; (2) the A&R Line of Credit Facility; (3) the Secured MSR Facility; (4) the Servicing Advance Factoring Facility; (5) the Resort Finance Facility; (6) the 2008 Bank Transaction; and (7) the 2009 Bank Transaction.

As set forth above, the Examiner has concluded that the evidence supports the propositions that the following prima facie elements of an Insider Preference claim are met with respect to each of those seven transactions: (1) the Debtor-transferor had a "triggering creditor";[311] (2) AFI (or the relevant AFI-affiliate transferee)[312] is an insider of the Debtor-transferor;[313] (3) the Debtor-transferor was insolvent at the time of transaction;[314] and (4) AFI (or the relevant AFI-affiliate transferee) had reasonable cause to believe that the Debtor-transferor was insolvent at the time of transaction.[315] The Examiner has also concluded that the hypothetical chapter 7 test is not relevant under the Minnesota Insider Preference statute.[316] Thus, for the prima facie Insider Preference claim to be established, the only questions that need to be answered on a transaction-by-transaction basis are: (1) whether the conveyance was "made for an antecedent debt"; and (2) whether what was conveyed was an "asset" of the Debtor-transferor that could be subject to a "transfer" within the meaning of the Minnesota UFTA.[317]

Further, the Examiner has concluded that, except where otherwise noted, the safe harbor, good faith transferee, ordinary course, and good faith effort to rehabilitate defenses are not

---

[310] The Examiner also considered whether the ResMor Loan Facility and the BMMZ Repo Facility raise potentially-significant claims under the Minnesota Insider Preference statute. However, RFC only reported a payment of $563,000 in connection with the ResMor Loan Facility. S*ee* ResCap Interest Journal Entry Spreadsheet, at Tab Ally ResMor-2020200001 [EXAM00338636]; Residential Funding Company, LLC Consolidated Financial Statements as of and for the Years Ended December 31, 2008 and 2007, Mar. 25, 2009, at 78 [EXAM00124988]. RFC only made payments of $332,000 and $1,448,756 in connection with the BMMZ Repo Facility. *See* Residential Funding Company, LLC, Consolidated Financial Statements as of and for the Years Ended December 31, 2011 and 2010, dated Mar. 28, 2012, at 61 [EXAM00232321]; ResCap Interest Journal Entry Spreadsheet [EXAM00338636] (see "Ally BMMZ-2020200025" worksheet); ResCap Interest Payable As of May 13, 2012 [EXAM00345973]. Given the de minimis nature of these payments and the potential defenses available to payments relating to the BMMZ Repo under section 546(f) of the Bankruptcy Code, the Report does not include a detailed analysis regarding these payments.

[311] *See* Section VII.F.4.d(1).

[312] GMAC CF, and not AFI, was the counterparty to RFC and GMAC Mortgage in the Servicing Advance Factoring Facility. GMAC CF, like AFI, is an insider of RFC. The evidence also supports the proposition that GMAC CF, as a wholly-owned subsidiary of AFI, had reasonable cause to believe that RFC was insolvent at the time of transfers.

[313] *See* Section VII.F.4.d(2).

[314] *See* Section VII.F.4.d(4).

[315] *See* Section VII.F.4.d(5).

[316] *See* Section VII.F.4.f.

[317] *See* MINN. STAT. § 513.45(b).

available to AFI in connection with the transfers described below for the reasons explained in Sections VII.F.3,[318] VII.F.4.e(1), VII.F.4.e(3), and VII.F.4.e(4), respectively. Consequently, the Examiner has concluded that new value is the only affirmative defense that will generally be available to AFI in connection with Insider Preference claims concerning these seven transactions. Because the new value defense must be considered in the aggregate, rather than on a transaction-by-transaction basis, it is addressed separately in Section VII.F.4.h.

### (1) 2008 Secured Revolver Facility

The Investigation has uncovered potential Minnesota Insider Preference claims associated with the Secured Revolver Facility transaction, whereby RFC and GMAC Mortgage agreed to (i) become directly liable as borrowers under the $3.5 billion Secured Revolver Facility and (ii) secure the $3.5 billion Secured Revolver Facility with substantially all of their assets (the "2008 Secured Revolver Transaction"). Based on the analysis below, the Examiner concludes it is likely that certain of those Insider Preference claims would prevail.

### (a) Background

While the facts related to the Secured Revolver Facility are fully set forth in Section V.E and Appendix V.E.3, a brief summary is helpful to this analysis.

### (i) 2005 Third Party Facilities

On July 28, 2005, ResCap, as borrower, entered into three separate unsecured syndicated credit facilities with various financial institutions, as lenders, and with JPMorgan Chase as administrative agent (collectively, the "2005 Third Party Facilities"): (1) a $1.75 billion term loan facility that matured on July 28, 2008 (the "2005 Term Loan Facility"); (2) an $875 million three-year revolving credit facility (the "2005 Three-Year Revolver"); and (3) an $875 million 364-day revolving credit facility (the "2005 364-day Revolver"). The 2005 Third Party Facilities were guaranteed by RFC and GMAC Mortgage on an unsecured basis pursuant to a separate Subsidiary Guarantee Agreement entered into for each of the 2005 Third Party Facilities.

The 2005 364-day Revolver was replaced twice, most recently on June 11, 2007 with a new $875 million unsecured 364-day revolver (the "2007 364-day Revolver").[319] The 2005 Three-Year Revolver was also replaced on June 11, 2007 with a new $875 million unsecured three-year revolver (the "2007 Three-Year Revolver" and together with the 2007 364-day Revolver, the "2007 Revolvers").[320] No amounts were ever drawn under the 2007 Revolvers.

---

[318] The Examiner's Counsel solicited information from AFI with respect to its potential eligibility to assert the settlement payment safe harbor defense provided by section 546(e) of the Bankruptcy Code. In its response to the Examiner's Counsel, AFI did not assert the settlement payment defense as to any of the transactions or facilities reviewed in this Section. Accordingly, the Examiner has proceeded on the assumption that no settlement payment safe harbor defense is available to AFI (or its affiliates). Additionally, none of the transactions discussed in this Section involve swap agreements. Accordingly, the swap agreement safe harbor provided by section 546(g) of the Bankruptcy Code is irrelevant to this Section.

[319] *See* JPMorgan Chase 364-Day Facility [EXAM00344999]. As with the 2005 364-day Revolver, the 2007 364-day Revolver was guaranteed by RFC and GMAC Mortgage. *See id.*

[320] As with the 2005 Third Party Facilities, the 2007 Revolvers were provided by unaffiliated third-party lenders.

*(ii) 2008 Secured Revolver Transaction*

On or around June 4, 2008, the 2005 Term Loan Facility was refinanced, and the 2007 Revolvers were replaced, with a new $3.5 billion Secured Revolver Facility, under which AFI acted as lender. RFC and GMAC Mortgage, which were guarantors under the 2005 Term Loan Facility and the 2007 Revolvers, became direct borrowers, while ResCap, which had previously been a direct borrower, became a guarantor (along with various subsidiaries of ResCap). Although an integrated transaction, the 2008 Secured Revolver Transaction is most easily understood through its component transactions, each of which occurred on or around June 4, 2008:

- AFI acquired, by way of assignment from ResCap's various third-party lenders, approximately $1.29 billion of the $1.75 billion principal amount of outstanding loans under the 2005 Term Loan Facility (the "$1.29 Billion AFI Term Loan").[321]

- AFI, as lender, RFC and GMAC Mortgage, as borrowers, and ResCap and certain other subsidiaries of ResCap, as guarantors, entered into the Secured Revolver Facility.[322]

- The 2007 Revolvers were terminated.

- The $1.29 Billion AFI Term Loan, which was previously unsecured, was converted into a secured term loan under the Secured Revolver Facility.[323]

- RFC and GMAC Mortgage borrowed approximately $458 million under the Secured Revolver Facility to repay the remaining loans outstanding under the 2005 Term Loan Facility.[324]

- RFC and GMAC Mortgage borrowed $1.29 billion under the Secured Revolver Facility to fund the bond exchange described in Section V.E.3.[325]

- RFC and GMAC Mortgage borrowed approximately $457 million "to acquire other assets and for other working capital needs."[326]

Through these transactions, on or about June 4, 2008, RFC and GMACM borrowed the entire $3.5 billion available under Secured Revolver Facility, but retained no net proceeds from those borrowings.[327]

---

[321] *See* Master Assignment and Assumption Agreement, dated as of a date on or before June 6, 2008 among the Initial Lender and the Term Loan Lenders [ALLY_0043831].

[322] *See* Secured Revolver Loan Agreement [RC00024234].

[323] *See id.* § 2.01(c).

[324] Residential Capital, LLC, Current Report (Form 8-K) (June 3, 2008), Item 1.01.

[325] *See* Ally Revolver Use of Funds – June 2008 [EXAM00345926]; *see also* Residential Capital, LLC, Current Report (Form 8-K) (June 9, 2008), at 2; Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2009), at 100.

[326] Ally Revolver Use of Funds – June 2008 [EXAM00345926].

[327] In fact, it appears that, although technically borrowed by RFC and GMAC Mortgage, the loan proceeds were transferred directly to ResCap. *See* Ally Revolver Use of Funds – June 2008 [EXAM00345926].

According to ResCap's SEC filings, on or about July 28, 2008—the date on which the $1.29 Billion AFI Term Loan portion of Secured Revolver Facility was due to mature—RFC and GMAC Mortgage drew approximately $1.29 billion under the Secured Revolver Facility to repay the $1.29 Billion AFI Term Loan.[328] Such a draw should not have been possible under the terms of the Secured Revolver Credit Agreement because the Secured Revolver Facility was already fully drawn. Although the Examiner's Financial Advisors discussed this apparent contradiction with the Debtors, they were unable to provide any explanation or documentation to resolve the issue.[329] The Examiner therefore believes that the $1.29 Billion AFI Term Loan was informally converted into a regular borrowing under the Secured Revolver Facility when it otherwise would have matured.

### (iii) Accounting For The 2008 Secured Revolver Transaction[330]

Prior to November 2008, the Secured Revolver Facility remained on ResCap's accounting records, and was not posted to the accounting records of RFC or GMAC Mortgage. Because of the complexity of the facility, including its varied collateral and advance rates across the two entities, ResCap accounting personnel first focused on the collateral reporting aspect and only at year-end 2008 did legal entity accounting become a consideration. On November 30, 2008, RFC and GMAC Mortgage each recorded its share of the amount outstanding on the Secured Revolver Facility in its respective accounting records, with a corresponding reduction in intercompany payables owed to ResCap. The allocation of the outstanding loan balance to each of RFC and GMAC Mortgage at the end of each month was calculated based on the collateral values remaining at each entity at month end (which are estimated to have been 90 percent to RFC and 10 percent to GMAC Mortgage).

### (iv) The A&R Secured Revolver Loan Agreement

On December 30, 2009, the parties to the Secured Revolver Facility executed the A&R Secured Revolver Loan Agreement, which converted $1.55 billion in then-outstanding revolving loans into term loans.[331] The A&R Secured Revolver Loan Agreement had an initial maturity date of May 2010.[332] That maturity date was extended several times through the Petition Date. As of the Petition Date, $747 million was outstanding under the A&R Secured Revolver Loan Agreement.[333]

---

[328] *See* Residential Capital, LLC, Quarterly Report (Form 10-Q) (Nov. 10, 2008), at 78.

[329] Based on oral discussions with Barbara Westman (ResCap's Senior Director of Accounting Operations).

[330] The following details are based on oral discussions with Barbara Westman (ResCap's Senior Director of Accounting Operations).

[331] *See* A&R Secured Revolver Loan Agreement [ALLY_0066146]. There were no other amounts outstanding on the Secured Revolver Facility as of that date. *See id.*

[332] *See* A&R Secured Revolver Loan Agreement [ALLY_0066146].

[333] *See* First Day Affidavit, at 26.

*(v) Summary Of Payments Pursuant To The Secured Revolver Facility*
*And The A&R Secured Revolver Loan Agreement*

The Secured Revolver Facility began with a fully-drawn amount owed of $3.5 billion as of June 4, 2008, and ended as the A&R Secured Revolver Loan Agreement with a balance of $747 million outstanding on the Petition Date, a difference of approximately $2.753 billion. The following payments were made pursuant to the Secured Revolver Facility:[334]

---

[334] Although RFC and GMAC Mortgage had the right to redraw amounts repaid under the Secured Revolver Facility, no such reborrowings occurred. Additionally, no amounts owing under the Secured Revolver Facility were forgiven.

EXHIBIT VII.F.4.g(1)(a)(v)

**Secured Revolver Facility – Borrowings and Payments**

2008 – 2012

*($ in Millions)*

| | | Payments | | | |
|---|---|---|---|---|---|
| | **Borrowings** | **Principal** | **Interest[1]** | **Fees[2]** | **Total** |
| Jun-08 | ($3,500.0) | | $13.5 | $17.5 | $31.0 |
| Jul-08 | | $279.0 | 14.9 | | 293.9 |
| Aug-08 | | 134.6 | 14.1 | 1.1 | 149.8 |
| Sep-08 | | 164.3 | 13.1 | | 177.4 |
| Oct-08 | | 253.3 | 15.2 | | 268.5 |
| Nov-08 | | 236.7 | 11.8 | | 248.5 |
| Dec-08 | | 76.2 | 8.8 | | 85.0 |
| Jan-09 | | 37.8 | 6.4 | | 44.2 |
| Feb-09 | | 50.2 | 6.7 | | 56.9 |
| Mar-09 | | 98.1 | 6.2 | | 104.3 |
| Apr-09 | | 75.5 | 5.8 | | 81.3 |
| May-09 | | 45.6 | 5.6 | | 51.2 |
| Jun-09 | | 48.6 | 5.2 | | 53.8 |
| Jul-09 | | 169.6 | 4.9 | | 174.5 |
| Aug-09 | | 32.3 | 4.7 | | 37.0 |
| Sep-09 | | 109.1 | 4.4 | | 113.5 |
| Oct-09 | | 52.4 | 4.3 | | 56.7 |
| Nov-09 | | 27.7 | 4.1 | | 31.8 |
| Dec-09 | | 63.8 | 4.0 | | 67.8 |
| Jan-10 | | 15.7 | 3.8 | | 19.5 |
| Feb-10 | | 41.7 | 3.5 | | 45.2 |
| Mar-10 | | 76.0 | 3.8 | | 79.8 |
| Apr-10 | | 82.1 | 3.4 | | 85.5 |
| May-10 | | 98.7 | 3.4 | | 102.1 |
| Jun-10 | | 171.7 | 3.0 | | 174.7 |
| Jul-10 | | 24.6 | 2.8 | | 27.4 |
| Aug-10 | | 37.6 | 2.6 | | 40.2 |
| Sep-10 | | 10.3 | 2.5 | | 12.8 |
| Oct-10 | | 89.2 | 2.4 | | 91.6 |
| Nov-10 | | 9.1 | 2.2 | | 11.3 |
| Dec-10 | | 42.6 | 2.3 | | 44.9 |
| Jan-11 | | 3.9 | 2.2 | | 6.1 |
| Feb-11 | | 7.5 | 2.0 | | 9.5 |
| Mar-11 | | 41.7 | 2.1 | | 43.8 |
| Apr-11 | | 11.8 | 2.0 | | 13.8 |
| May-11 | | 4.1 | 2.0 | | 6.1 |
| Jun-11 | | 2.5 | 1.9 | | 4.4 |
| Jul-11 | | 1.4 | 2.0 | | 3.4 |
| Aug-11 | | 2.3 | 2.0 | | 4.3 |
| Sep-11 | | 4.4 | 1.9 | | 6.3 |
| Oct-11 | | 1.3 | 1.9 | | 3.2 |
| Nov-11 | | 5.7 | 1.9 | | 7.6 |
| Dec-11 | | 3.3 | 2.0 | | 5.3 |
| Jan-12 | | 2.2 | 2.0 | | 4.2 |
| Feb-12 | | 1.3 | 1.8 | | 3.1 |
| Mar-12 | | 2.4 | 1.9 | | 4.3 |
| Apr-12 | | 1.9 | 1.9 | | 3.8 |
| May-12 | | 0.9 | - | | 0.9 |
| | ($3,500.0) | $2,752.7 | $220.9 | $18.6 | $2,992.2 |

[1] *Although ResCap did not provide monthly interest payment information, ResCap did confirm that payments were made on account of interest expense. Monthly interest payments are based on monthly interest payable calculations provided by AFI. Interest payments for 2008 include interest incurred on account of GM's and Cerberus's share of this facility of $18.4 million and $19.3 million, respectively.*

[2] *ResCap did not provide information on any other fees paid on the Secured Revolver Facility.*

*Source: AFI Intercompany Loan to ResCap — Credit Facility 2008–2012, at ALLY_0182825-43[ALLY_0182793]; ResCap Credit Facility Journal Entry Spreadsheet, at Tab Ally Revolver – 2010000009, – 02(SS), – 02(PS) [EXAM00338635];Residential Capital, LLC Interest Payable—Ally Debt Facilities as of May 13, 2002 [EXAM00345973]; Wire Confirmation for Fees Related to the Secured Revolver Facility, dated Aug. 18, 2008 [EXAM00345974]; Wire Confirmation for Fees Related to the Secured Revolver Facility, dated June 4, 2008 [EXAM00345976].*

In summary, RFC and GMAC Mortgage made the following payments on account of the Secured Revolver Facility between June 8, 2008 (the date on which the first payment under the Secured Revolver Facility was made) and the Petition Date: (1) $2,752,872,447 in principal; (2) an estimated $220,629,677 in interest; and (3) $18,556,000 in fees and costs.

The Minnesota Insider Preference statute raises two separate questions with respect to the Secured Revolver Facility. First, are the liens granted for the benefit of AFI in connection with the conversion of the $1.29 Billion AFI Term Loan into a secured loan under the Secured Revolver Facility avoidable? Second, are the repayments made under the Secured Revolver Facility avoidable? Because these questions are analytically distinct, the Examiner will discuss them separately.

### (b) Application of Minn. Stat. § 513.45(b) To The $1.29 Billion AFI Term Loan

### (i) Remaining Prima Facie Elements

The Examiner concludes that ResCap's and RFC's transfer of the liens to AFI in connection with the conversion of the $1.29 Billion AFI Term Loan into a secured loan under the Secured Revolver Facility likely meets the remaining prima facie elements of an Insider Preference. The grant of a lien is a statutorily-defined "transfer."[335] Thus, ResCap and RFC engaged in "transfers" by granting liens on their assets in connection with the Secured Revolver Facility. Because the liens were granted on June 4, 2008 to secure the $1.29 Billion AFI Term Loan,[336] which arose on July 28, 2005,[337] the transfer was on account of an antecedent debt. Thus, ResCap's and RFC's respective grants of liens to AFI in connection with the $1.29 Billion AFI Term Loan are prima facie avoidable under the Minnesota Insider Preference statute.

### (ii) Good Faith Effort To Rehabilitate

As set forth in Section VII.F.4.d(4), the Minnesota UFTA provides an affirmative defense to an Insider Preference action for those transferees who can prove that: (1) it engaged in a good faith effort to rehabilitate the debtor-transferee; (2) the transfer secured present value given; and (3) the transfer secured an antecedent debt.[338] Because the second and third elements of the defenses are easily addressed, the Examiner will begin his analysis with those issues.

---

[335] MINN. STAT. § 513.41(12).

[336] *See* Secured Revolver Loan Agreement, § 2.01(c) [RC00024234].

[337] *See* JPMorgan 2005 Term Loan Facility [EXAM00345163].

[338] *See* MINN. STAT. § 513.48(f)(3).

### (A) The Transfer Also Secured Present Value Given

The Examiner concludes that the evidence supports proposition that the Secured Revolver Facility secured present value given. "A transfer is made for present value if the exchange between the debtor and the transferee is intended by them to be contemporaneous and is in fact substantially contemporaneous."[339] "Value" includes, among other things, money loaned.[340] The Examiner concludes that the evidence supports the proposition that the parties to the Secured Revolver Facility intended that ResCap's and RFC's grants of liens and AFI's advances of new money thereunder would occur contemporaneously.[341] The Examiner further concludes that the evidence supports the proposition that AFI did in fact advance approximately $2.2 billion of new money under the Secured Revolver Facility contemporaneously with receiving liens on ResCap's and RFC's assets.[342]

### (B) The Transfer Secured An Antecedent Debt

The Examiner also concludes that the evidence supports the proposition that the Secured Revolver Facility secured an antecedent debt of ResCap and RFC. Upon execution of the Secured Revolver Credit Agreement, the $1.29 Billion AFI Term Loan, which was then unsecured, was converted into a loan under the Secured Revolver Facility subject to the liens created by the Secured Revolver Credit Agreement and its ancillary documents.[343] As a result, the $1.29 Billion AFI Term Loan became a secured obligation of RFC, as borrower, and ResCap, as guarantor. ResCap's and RFC's debts with respect to the $1.29 Billion AFI Term Loan were antecedent to this grant of security—which occurred on June 4, 2008—because they arose on July 28, 2005 when the parties entered into the 2005 Term Loan Facility.[344]

### (C) The Transfer Was Not A Good Faith Effort To Rehabilitate ResCap Or RFC

In assessing whether AFI's actions with respect to the Secured Revolver Facility were a good faith effort to rehabilitate the debtor, the Bankruptcy Court would undertake an objective inquiry and would consider, among other things: (1) the amount of antecedent debt secured;

---

[339] MINN. STAT. § 513.43(c).

[340] *See Elliot & Callan, Inc. v. Crofton*, 615 F. Supp. 2d 963, 973 (D. Minn. 2009) ("'Value' includes 'property,' which would obviously include the money that Crofton loaned or advanced to SCC.").

[341] *See* Secured Revolver Loan Agreement, § 2.01(c) [RC00024234]; First Priority Security Agreement [RC00038119].

[342] *See* Ally Revolver Use of Funds – June 2008 [EXAM00345926].

[343] *See* Secured Revolver Loan Agreement, § 2.01(c) [RC00024234]; First Priority Security Agreement [RC00038119].

[344] Although RFC was only a guarantor under the 2005 Term Loan Facility, a debt on a guarantee arises the moment such guarantee is executed. *See First Res. Bank v. Rehbein*, No. 12–206 (PAM/SER), 2013 WL 618164, at *2 (D. Minn. Feb. 19, 2013) ("Under the very broad definition of claim in the MFTA, Patriot had a claim against Myrna the minute she signed the guaranty. Thus, it didn't matter whether there was a notice of default or a cure period; the claim arose the day she signed each guaranty. It might have been a contingent, unmatured claim, but for purposes of the MFTA, contingent, unmatured claims are claims nonetheless. First Resource is entitled to summary judgment on this element of its MFTA claim.").

(2) the amount of present value provided to the Debtors; and (3) the likelihood that the challenged transfer would result in the successful rehabilitation of the Debtors.[345] After undertaking such an objective analysis, the Examiner concludes that evidence does not support the proposition that AFI engaged in a good faith effort to rehabilitate ResCap or RFC in connection with the 2008 Secured Revolver Facility. The Examiner concludes that the evidence does not support the proposition that, on or about June 4, 2008, there existed any reasonable possibility that the parties' entry into the Secured Revolver Facility, and the liens granted by ResCap and RFC (among others) thereunder, would lead to the Debtors' rehabilitation.[346] Instead, the Examiner concludes that the evidence supports the proposition that ResCap's and RFC's financial failure was all but inevitable following their entry into the Secured Revolver Facility.

Many of the facts and conclusions set forth in Section VI of the Report support the conclusion that ResCap and RFC could not be rehabilitated as the Examiner believes that term to be used in Minnesota UFTA section 513.48(f)(3). Several of the more salient points that have led the Examiner to conclude that it is not likely that this affirmative defense would succeed include: (1) the purpose for which the Secured Revolver Facility was provided; (2) ResCap's financial condition and capital needs on or about June 4, 2008; and (3) the markets' perception of ResCap's default risk.

First, while the Secured Revolver Facility was nominally intended to provide ResCap and its subsidiaries with needed liquidity, it did not do so. Instead, as noted above, the vast majority of the availability under the Secured Revolver Facility was used to: (1) refinance the maturing obligations under the 2005 Term Loan Facility; and (2) fund ResCap's June 6, 2008 bond exchange.[347] As a result, the Debtors retained only approximately $457 million of the $3.5 billion "to acquire other assets and for other working capital purposes."[348]

Even after the Secured Revolver Facility was consummated, ResCap and RFC continued to be dependent on AFI to support their liquidity and capital needs through a series of asset sales, secured loans and capital contributions, and AFI arranged certain asset sales to affiliates to support the near term liquidity needs of ResCap and RFC. These included: (1) the Servicing Advance Factoring Agreement in June 2008; (2) the Excess Servicing Rights sale in July 2008; (3) the Resort Finance Sale in July 2008; (4) the September 2008 Model Home Sale; and (5) the November 2008 ResMor Sale.[349] AFI also provided additional secured loans to ResCap and RFC subsequent to the Secured Revolver Facility, including the Initial Line of

--------------------------------------------------

[345] *See* UFTA § 8 cmt. 6.

[346] As discussed in Section VII.F.4.d(4), although a close question, the Examiner believes that a "good faith effort to rehabilitate" a debtor, as that phrase is used in MINN. STAT. § 513.48(f)(3), requires an objectively reasonable effort to return the debtor to state of solvency or good operation.

[347] *See* Section VI.C.4.d.

[348] *See* Ally Revolver Use of Funds – June 2008 [EXAM00345926].

[349] *See* Exhibit VI.C.4.f(4)(c).

Credit in November 2008,[350] and agreed to amend and extend existing borrowing facilities between AFI and ResCap subsequent to the Secured Revolver Facility because ResCap was unable to meet the terms and maturities of such facilities, most notably, the Secured MSR Facility in October 2008.[351] AFI also provided ResCap with capital contributions in September 2008 and again in December 2008, totaling $1.1 billion, each time to prevent ResCap from violating its TNW covenants.[352]

ResCap and RFC continued to experience chronic liquidity stress in 2008[353] and ResCap's access to the capital markets remained impaired.[354] As discussed in Section VI.C.4.d, ResCap's existing third party secured financing providers had been reducing ResCap's borrowing availability since June 2008, and ResCap's advisors reported to the ResCap Board in December 2008 that ResCap was unable to borrow against its unencumbered assets from new or existing third party lenders. These liquidity concerns forced ResCap to consider various strategic alternatives, including a potential bankruptcy filing in June 2008, September 2008, and December 2008.[355]

Second, the deterioration of conditions in the housing and related finance markets that caused many mortgage companies to file for bankruptcy in 2007 continued through 2008.[356] These adverse market conditions adversely affected ResCap's and RFC's financial performance during this time. ResCap incurred a net loss of $2.7 billion for the six months ended June 30, 2008,[357] which grew to $5.6 billion for the year ended December 31, 2008.[358] As discussed in Section VI.C.4.f(2), ResCap continued to revise its cash flow forecasts downward as 2008 progressed. In its June 16, 2008 executive liquidity report, ResCap projected $1.5 billion in liquidity shortfalls for the subsequent twelve months.[359] ResCap's and RFC's continuing losses left them unable to service their debts from their dramatically reduced operations and income producing assets, leaving them dependent on AFI for continued support to meet liquidity and capital needs.[360]

---

[350]  *See* Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2009), at 98; s*ee also*, Section VI.C.4.c(4).

[351]  *See* Residential Capital, LLC, Current Report (Form 8-K) (Oct. 23, 2008).

[352]  *See* Section VI.C.4.f(4)(b); Exhibit VI.C.4.f(4)(b)—2.

[353]  *See* Section VI.C.4.c(4).

[354]  *See* Section VI.C.4.d.

[355]  *See* Int. of T. Pohl, Feb. 26, 2013, at 35:20–36:6; *see also* Minutes of an Executive Session of the Board of Directors of Residential Capital, LLC, Sept. 23, 2008, at RC40006865 [RC40006865]; Skadden and Lazard Project Scout Presentation, dated Oct. 2008, at EXAM20020826 [EXAM20020824]; Project Scout Presentation, dated Oct. 10, 2008, at EXAM10490752 [EXAM10490750].

[356]  *See* Section VI.C.4.a.

[357]  Residential Capital, LLC, Quarterly Report (Form 10-Q) (Aug. 8, 2008), at 4.

[358]  Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2009), at 119.

[359]  *See* GMAC ResCap Executive Liquidity Report, dated Jun. 16, 2008, at Tab Mon_ResCap_Revised [EXAM10055935].

[360]  *See* ResCap Bond Exchange Accounting Assessment, dated Jul. 1, 2008, at ALLY_0242724 [ALLY_0242723].

Third, contrary to any suggestion that the market perceived the June refinancing as potentially rehabilitating ResCap, the market's views of ResCap *worsened* subsequent to the consummation of the Secured Revolver Facility. The marketplace considered ResCap to be at risk of imminent default on its debts in June 2008 as shown by the market prices for ResCap's unsecured bonds and CDS. In particular, ResCap's 6.5% bond due April 2013 was trading at 54 percent of par on May 2, 2008, just prior to the May 5, 2008 announcement of the contemplated Secured Revolver Facility and the June 6, 2008 bond exchange offer.[361] By June 4, 2008, the bond price had fallen to 47.5 percent of par.[362] By June 30, 2008, the bond price had fallen further to 39 percent of par.[363] CDS spreads for such bonds were 4,431 basis points on May 2, 2008, temporarily improved to 3,445 basis points on June 4, 2008, and then widened to 4,304 basis points by June 30, 2008 and 5,563 basis points by July 31, 2008.[364] It was reported in June 2008 that ResCap's "[c]redit-default swap prices [gave] ResCap a 100 percent chance of default within the next five years, based on a JPMorgan model."[365] Additionally, ResCap's new secured bonds issued pursuant to the June 9, 2008 bond exchange were rated Caa2 and Caa3.[366] Moody's commented on June 16, 2008, that "ResCap has not proven it has a business model that can produce the required operating cash flow to ultimately service these obligations."[367]

In sum, regardless of AFI's motivations for entering into the Secured Revolver Facility, the evidence does not support the proposition that the refinancing was an objectively reasonable effort to rehabilitate the Debtors. Instead, the evidence supports the proposition that the 2008 Secured Revolver merely postponed the Debtors' bankruptcy while elevating AFI's exposure with respect to the $1.29 Billion AFI Term Loan from an unsecured claim to a secured claim. Accordingly, the Examiner concludes that it is unlikely that AFI would prevail on a "good faith effort to rehabilitate" defense to avoidance of ResCap's and RFC's grant of liens with respect to the $1.29 Billion AFI Term Loan.

### (iii) Conclusion With Respect To $1.29 Billion AFI Term Loan

The Examiner concludes that ResCap's and RFC's transfer of liens to AFI to secure the $1.29 Billion AFI Term Loan likely meets the prima facie test for avoidance as an Insider Preference under Minnesota law. The Examiner further concludes that it is unlikely that AFI would prevail on a "good faith effort to rehabilitate" defense to avoidance of ResCap's and RFC's lien transfers with respect to the $1.29 Billion AFI Term Loan. Accordingly, the Examiner concludes that, except to the extent that AFI's liability may be offset by new value,

---

[361] Pricing per Interactive Data Corporation.

[362] *Id.*

[363] *Id.*

[364] Pricing per Advantage Data, Inc.

[365] Ari Levy & Caroline Salas, *GMAC's $60 Billion Deal Loses Traction as Cash Burns (Update1)*, BLOOMBERG, Jun. 24, 2008, http://www.bloomberg.com/apps/news?pid=newsarchive&refer=home&sid=aFREd.COhlF4.

[366] Caroline Salas, *GMAC Debt Downgraded One Level by Moody's on ResCap (Update1)*, BLOOMBERG, Jun. 16, 2008, http://www.bloomberg.com/apps/news?pid=newsarchive&refer=bond253&sid=aTFVUWpf2WSE.

[367] *Id.*

AFI's liens with respect to the $1.29 Billion AFI Term Loan (as subsequently converted to or repaid with regular borrowings under the Secured Revolver Facility) would likely be avoided.

### (c) Application Of Minn. Stat. § 513.45(b) To Repayments Of Amounts Advanced Under The Secured Revolver Facility

#### (i) Remaining Prima Facie Elements

The Examiner concludes that payments made by ResCap or RFC to AFI on account of amounts outstanding under the Secured Revolver Facility are unlikely to meet the remaining prima facie elements of an Insider Preference. First, the evidence supports the proposition that all repayments were made for antecedent debts—namely RFC's primary obligation and ResCap's guarantee obligation under the Secured Revolver Facility. ResCap's and RFC's obligations under the Secured Revolver Facility were incurred either in July 2005 (with respect to amounts owed under the $1.29 Billion AFI Term Loan portion of the Secured Revolver Facility)[368] or on June 4, 2008 (with respect to amounts owed under the remainder of the Secured Revolver Facility).[369] As shown on Exhibit VII.F.4.g(1)(a)(v) above, all payments made by ResCap and RFC with respect to amounts owed under the Secured Revolver Facility were made after those dates. Accordingly, the Examiner concludes that the evidence supports the proposition that such payments were made on account of antecedent debts.

However, based on discussions with the Debtors' accounting professionals, the Examiner concludes that the evidence supports the proposition that some or all of the funds used to repay the 2008 Secured Revolver were encumbered by valid liens.[370] As a result, to the extent of any such liens, such repayments were not "transfers" of "assets" susceptible to avoidance under the Minnesota UFTA.[371] Although the Debtors were unable to provide the Examiner with detailed accounting records showing that each payment of amounts owed under the Secured Revolver Facility was made from either cash collateral or traceable proceeds of collateral, the sample flow-of-funds entries provided by the Debtors were consistent with that conclusion.[372] The terms of the Secured Revolver Credit Agreement likewise indicate that the Secured Revolver Facility was intended to be repaid from the net proceeds of collateral dispositions.[373] Because a forensic examination of the Debtors' accounting records is beyond the scope of the Investigation, the Examiner has not undertaken such an analysis to determine conclusively whether all amounts paid under the Secured Revolver Facility were cash collateral or the traceable proceeds of collateral sales. Nevertheless, the Examiner concludes that the evidence supports the proposition that some or all of the funds used to repay the

---

[368] *See* JPMorgan 2005 Term Loan Facility [EXAM00345163].

[369] *See* Secured Revolver Loan Agreement [RC00024234].

[370] Based on oral discussions with Barbara Westman (ResCap's Senior Director of Accounting Operations).

[371] *See* MINN. STAT. ANN. § 513.41(2), (12).

[372] *See* AFI Revolver Flow of Funds Example [EXAM00345253].

[373] *See* Secured Revolver Loan Agreement, § 2.08(c) [RC00024234]

Secured Revolver Facility were encumbered by valid liens and that such repayments, to the extent of any such liens, were therefore not "transfers" of "assets" susceptible to avoidance under the Minnesota UFTA.[374]

### (ii) Conclusion With Respect To Payments of Amounts Owed Under The Secured Revolver Facility

The Examiner concludes that payments on account of the Secured Revolver Facility are unlikely to meet the prima facie test for avoidance as Insider Preferences to the extent that such payments were made from cash collateral or the traceable proceeds of collateral sales.[375]

### (2) Line Of Credit Facilities

While the facts of this transaction are fully set forth in Section V.E and Appendices V.E.5, V.E.7, and V.E.8, a brief summary is helpful to this analysis.

### (a) Background

On November 20, 2008, certain of ResCap's subsidiaries, as borrowers, RFC and GMAC Mortgage, among others, as guarantors, and AFI, as lender, entered into the $430 million Initial Line of Credit Facility.[376] To obtain additional liquidity for ResCap, on June 1, 2009, the parties entered into the $370 million Second Line of Credit Facility.[377] These lines of credit served as parallel liquidity sources for the Debtors, and were only available when ResCap's liquidity fell below designated threshold levels.[378]

On December 30, 2009, RFC and GMAC Mortgage and certain of the other Debtors, as borrowers, ResCap, as a guarantor, and AFI, as agent and lender, entered into the secured A&R Line of Credit Facility, with an initial amount of $1.1 billion. The A&R Line of Credit Facility amended, restated, and consolidated under one agreement the terms and provisions of the Initial Line of Credit Agreement and the Second Line of Credit Agreement.[379] As of the Petition Date, there was approximately $380 million outstanding under the A&R Line of Credit Facility.

---

[374] *See* MINN. STAT. ANN. § 513.41(2), (12).

[375] As explained above, to the extent that the cash used to make such payments was encumbered by a valid lien, such payments were not "transfers" of "assets" susceptible to avoidance under the Minnesota UFTA. *See id.*.

[376] *See* Initial Line of Credit Agreement [ALLY_0023145].

[377] *See* Second Line of Credit Agreement [ALLY_0023953]. On June 12, 2009, availability under the Second Line of Credit Facility was increased from $370 million to $470 million. *See* Amendment No. 1 to the Second Line of Credit Agreement, dated June 12, 2009, §2.2(a) [ALLY_0026615].

[378] *See* Initial Line of Credit Agreement, § 2.03 [ALLY_0023145]; Second Line of Credit Agreement, § 2.03 [ALLY_0023953].

[379] *See* A&R Line of Credit Agreement [ALLY_0240633].

*(b) Payments Pursuant To The A&R Line Of Credit Facility*

The following is a summary of payment and reborrowing activity under the A&R Line of Credit Facility:

EXHIBIT VII.F.4.g(2)(b)
**Line of Credit Facilities and A&R Line of Credit Facility – Borrowings and Payments**
2008 – 2012
*($ in Millions)*

| | Borrowings | Principal Payments | Net Payment (Borrowings) | Interest Payments[1] | Total Payments Net of Borrowings[2] |
|---|---|---|---|---|---|
| Nov-08 | ($480.0) | $152.0 | ($328.0) | $0.3 | ($327.7) |
| Dec-08 | - | 328.0 | 328.0 | - | 328.0 |
| Feb-09 | (72.0) | 72.0 | - | - | - |
| May-09 | (645.3) | 215.3 | (430.0) | 0.4 | (429.6) |
| Jun-09 | (896.3) | 752.4 | (143.9) | 1.9 | (142.0) |
| Jul-09 | (818.5) | 811.6 | (6.9) | 1.2 | (5.7) |
| Aug-09 | (531.5) | 597.4 | 65.9 | 1.6 | 67.5 |
| Sep-09 | (715.7) | 920.7 | 205.0 | 1.3 | 206.3 |
| Oct-09 | (1,359.1) | 1,068.6 | (290.5) | 1.1 | (289.4) |
| Nov-09 | (704.6) | 697.3 | (7.3) | 1.5 | (5.8) |
| Dec-09 | (918.0) | 1,182.2 | 264.2 | 2.1 | 266.3 |
| Jan-10 | (726.3) | 614.0 | (112.3) | 1.0 | (111.3) |
| Feb-10 | (642.2) | 880.3 | 238.1 | 0.5 | 238.6 |
| Mar-10 | (677.0) | 846.3 | 169.3 | 0.3 | 169.6 |
| Apr-10 | (652.8) | 598.2 | (54.6) | 0.3 | (54.3) |
| May-10 | (726.8) | 829.8 | 103.0 | 0.3 | 103.3 |
| Jun-10 | (305.0) | - | (305.0) | - | (305.0) |
| Jul-10 | (780.5) | 912.0 | 131.5 | 0.6 | 132.1 |
| Aug-10 | (407.6) | 581.1 | 173.5 | 0.3 | 173.8 |
| Sep-10 | (771.9) | 439.9 | (332.0) | 0.3 | (331.7) |
| Oct-10 | (1,065.0) | 1,008.0 | (57.0) | 0.9 | (56.1) |
| Nov-10 | (880.0) | 615.0 | (265.0) | 1.1 | (263.9) |
| Dec-10 | (1,226.0) | 1,199.0 | (27.0) | 1.7 | (25.3) |
| Jan-11 | (538.0) | 884.0 | 346.0 | 1.2 | 347.2 |
| Feb-11 | (1,159.0) | 878.0 | (281.0) | 1.3 | (279.7) |
| Mar-11 | (733.0) | 802.0 | 69.0 | 1.6 | 70.6 |
| Apr-11 | (785.0) | 710.0 | (75.0) | 1.5 | (73.5) |
| May-11 | (678.0) | 911.0 | 233.0 | 1.4 | 234.4 |
| Jun-11 | (839.0) | 741.0 | (98.0) | 1.1 | (96.9) |
| Jul-11 | (520.0) | 446.0 | (74.0) | 1.3 | (72.7) |
| Aug-11 | (938.0) | 1,061.0 | 123.0 | 1.3 | 124.3 |
| Sep-11 | (755.0) | 776.0 | 21.0 | 1.1 | 22.1 |
| Oct-11 | (637.0) | 455.0 | (182.0) | 1.6 | (180.4) |
| Nov-11 | (570.0) | 509.0 | (61.0) | 1.6 | (59.4) |
| Dec-11 | (785.0) | 1,152.0 | 367.0 | 1.5 | 368.5 |
| Jan-12 | (591.0) | 318.0 | (273.0) | 0.8 | (272.2) |
| Feb-12 | (746.5) | 903.0 | 156.5 | 0.4 | 156.9 |
| Mar-12 | (922.0) | 615.6 | (306.4) | 0.7 | (305.7) |
| Apr-12 | (296.0) | 400.0 | 104.0 | 1.0 | 105.0 |
| May-12 | (244.0) | 170.0 | (74.0) | - | (74.0) |
| | ($27,738.6) | $27,052.7 | ($685.9) | $38.1 | ($647.8) |

[1] *Although ResCap did not provide monthly interest payment information, ResCap did confirm that payments were made on account of interest expense. Monthly interest payments are based on monthly interest payable calculations provided by AFI.*
[2] *ResCap did not provide information on fees paid on the Line of Credit Facilities and A&R Line of Credit Facility.*
Source: *AFI Intercompany Loan to ResCap – Credit Facility 2008 – 2012, at ALLY_0182799–821[ALLY_0182793]; AFI Intercompany Loan to ResCap – GMAC Credit Agreement 2009 Spreadsheet [ALLY_0435012]; AFI Intercompany Loan to ResCap – Capital Cash Concentration Spreadsheet [ALLY_0435015];ResCap Credit Facility Journal Entry Spreadsheet,at Tab Ally LOC_CA [EXAM00338635]; ResCap Interest Payable As of May 13, 2012 [EXAM00345973].*

*(c) Application*

*(i) Remaining Prima Facie Elements*

The Examiner concludes that payments made by ResCap or RFC to AFI on account of amounts outstanding under the A&R Line of Credit Facility likely meet the remaining prima facie elements of an Insider Preference.[380] First, the evidence supports the proposition that all repayments were made for antecedent debts—namely RFC's primary obligation and ResCap's guarantee obligation under the A&R Line of Credit Facility. As shown on Exhibit VII.F.4.g(2)(b) above, the A&R Line of Credit Facility (and its predecessor facilities) was used as a typical revolving credit facility, with the borrowers first drawing money under the facility (thereby incurring a debt) and later repaying the money drawn, plus interest thereon (thereby satisfying that preexisting debt). Accordingly, the Examiner concludes that evidence supports the proposition that payments for amounts outstanding under the A&R Line of Credit Facility (and its predecessor facilities) were made on account of antecedent debts.

Second, the Examiner concludes that the evidence supports the proposition that payments for amounts outstanding under the A&R Line of Credit Facility were "transfers" of "assets" within the meaning of the Minnesota UFTA. Based on discussions with the Debtors' accounting professionals, the Examiner understands that the cash used to pay amounts owed under the A&R Line of Credit Facility was not cash collateral or the traceable proceeds of collateral.[381] Accordingly, and based on the information provided by the Debtors, the Examiner concludes that payments made by ResCap or RFC on account of the A&R Secured Line of Credit Facility (as well as its predecessor facilities, the Initial Line of Credit Facility and the Second Line of Credit Facility) meet the prima facie test for avoidance as Insider Preferences.

*(d) Conclusion*

The Examiner concludes that the payments made by ResCap or RFC to AFI in respect of amounts outstanding under the A&R Line of Credit Facility likely meet the prima facie test for avoidance under the Minnesota Insider Preference statute. The Examiner further concludes that, except to the extent such amounts are protected by the new value defense, as set forth in Section VII.F.4.h, they are likely to be avoidable as Insider Preferences and recoverable under section 550 of the Bankruptcy Code.

The Examiner notes that, because the A&R Line of Credit Facility and its predecessor facilities continuously revolved on a secured basis, literal application of the statute—which would seemingly call for avoidance of every payment made by ResCap or RFC while not acknowledging amounts reborrowed as new value—would lead to an absurd result in which

---

[380] As with payments made for amounts owed under the Secured Revolver Facility, payments on account of amounts owed under the A&R Line of Credit Facility (or its predecessor facilities) would not implicate the Minnesota Insider Preference statute to the extent that they were made by GMAC Mortgage. *See* Section VII.F.2.a.

[381] Based on oral discussions with Barbara Westman (ResCap's Senior Director of Accounting Operations).

AFI's Insider Preference liability with respect to the A&R Line of Credit Facility would vastly exceed the maximum amount available to be borrowed at any time under the facility. Although there is no case law or other authority on point, the Examiner concludes, after consultation with the Examiner's Counsel and his Minnesota counsel, that such a result would not likely be upheld by the courts of Minnesota or any other court.

The Examiner concludes that any court would instead likely resolve this issue in a way that comports with the premise of the statute, which is that an insolvent debtor should be obliged to pay debts to unrelated creditors before paying those who are insiders.[382] With this purpose in mind, AFI's Insider Preference liability for transfers that occurred prior to December 30, 2009 is likely to be completely offset by contributions of new value. The highest balance drawn on the A&R Line of Credit Facility after that date was approximately $1.03 billion, which occurred on February 23, 2011.[383] Deducting from that amount the balance that remained unpaid on the Petition Date—approximately $380 million—would yield a total Insider Preference liability on the A&R Line of Credit Facility of $650 million (which could be further reduced by new value contributed by AFI after December 30, 2009). However, the Examiner notes that the particular manner in which a court would treat debt forgiveness for calculating Insider Preference liability in the context of a continuously revolving secured line of credit is uncertain. The Examiner stresses that a court could reasonably calculate AFI's Insider Preference liability with respect to payments made on account of the A&R Line of Credit Facility in a variety of ways that would yield different results than those presented in this Report and its accompanying Exhibits.

### (3) Secured MSR Facility

While the facts of this transaction are fully set forth in Section V.E.2 and Appendix V.E.2, a brief summary is helpful to this analysis.

### (a) Background

On April 18, 2008, RFC and GMAC Mortgage entered into the Secured MSR Facility, whereby AFI agreed to provide a revolving loan in the initial amount of the lesser of $750 million (which was later increased to $1.2 billion on June 2, 2008)[384] or the then existing borrowing base.[385] The Secured MSR Facility Collateral served as the borrowing base and included: (1) certain MSRs and the related Servicing Contracts; (2) certain pledged Fannie Mae, Freddie Mac and Ginnie Mae securities; and (3) certain pledged U.S. treasury securities.[386] AFI forgave indebtedness under the Secured MSR Facility in an aggregate

---

[382] *See* UFTA Prefatory Note at 4.

[383] *See* Ally Financing Inc. Summary of Intercompany Balances with ResCap, dated May 28, 2012, at ALLY_0182812 [ALLY_0182793].

[384] Amendment No. 3 to the Secured MSR Facility, dated June 2, 2008 [RC00037692].

[385] Secured MSR Loan Agreement [RC00024114]; s*ee* Appendix V.E.2.b.

[386] Secured MSR Loan Agreement, Art. IV [RC00024114].

amount of over $1.1 billion from inception until the facility was terminated on December 2009,[387] when all remaining outstanding indebtedness thereunder (including accrued and unpaid interest) was forgiven.[388]

### (b) Summary Of Payments Pursuant To The Secured MSR Facility

RFC's accounting records show that between April 2008 and December 2009, it paid approximately $213 million in principal and $26 million in interest under the Secured MSR Facility to AFI, for a total of $239 million.[389] These payments are shown on Exhibit VII.F.4.g(3)(b) below.[390]

_____

[387] *See* Exhibit V.E.2 (showing debt forgiveness amounts).

[388] Letter from GMAC Inc. Re: Forgiveness of Certain Indebtedness and Termination of MSR Facility (Dec. 30, 2009), at 1–3 [ALLY_0353025].

[389] *See* AFI Intercompany Loan to ResCap – MSR 2008/09 Spreadsheet [ALLY_0401819]; ResCap Credit Facility Journal Entry Spreadsheet, at Tabs Ally MSR-2010000001, Ally MSR-23000005 [EXAM00338635]; ResCap Interest Journal Entry Spreadsheet, at Tab Ally MSR-20202000 [EXAM00338636]; Residential Funding Company, LLC, Consolidated Financial Statements for the Years Ended December 31, 2008 and 2007, dated Mar. 25, 2009, at 78 [EXAM00124988]; Residential Funding Company, LLC, Consolidated Financial Statements for the Years Ended December 31, 2009 and 2008, dated Mar. 19, 2010, at 78 [EXAM00124670]. As discussed in Section VII.F.4.g.(2) addressing the A&R Line of Credit Facility, because the Secured MSR Facility continuously revolved on a secured basis, literal application of the statute—which would seemingly call for avoidance of every payment made by RFC while not acknowledging amounts reborrowed as new value—would lead to an absurd result that would not likely be enforced by the courts of Minnesota or the Bankruptcy Court. Because all payments on the Secured MSR Facility were made before December 2009, any liability of AFI under the Minnesota Insider Preference statute is likely to be offset in any event by new value.

[390] *See* ResCap Credit Facility Journal Entry Spreadsheet, at Tabs Ally MSR-2010000001, Ally MSR-23000005 [EXAM00338635]. As noted in Exhibit VII.F.4.g(3)(b), based on journal entries provided by ResCap, the Examiner's Financial Advisors have identified the possibility that RFC did not make payments directly to AFI, but instead made them to GMAC Mortgage, which then passed them to AFI. If GMAC Mortgage did serve as an intermediary between RFC and AFI for such payments, GMAC Mortgage may—depending on the facts—be considered a mere conduit, as discussed further below in Section VII.F.8.a.(1). This would be the case if GMAC Mortgage did not exert dominion and control over the funds, with the right to use the funds for its own purposes. *See Christy v. Alexander & Alexander of N.Y. Inc.* (*In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey*), 130 F.3d 52, 57 (2d Cir. 1997) (citation omitted). The Examiner does not have facts sufficient to make a determination of this issue. Given that RFC was making payments to repay amounts loaned by AFI, it seems likely that GMAC Mortgage did not have dominion and control over such funds. For the purposes of the Report, the Examiner assumes that AFI is the initial transferee under Bankruptcy Code section 550(a)(1), and that any payments which satisfy the requirements of the Minnesota Insider Preference statute would be recoverable as against AFI.

EXHIBIT VII.F.4.g(3)(b)
**Secured MSR Facility – Borrowings and Payments by RFC** [1]
2008 – 2009
*($ in Millions)*

| | Borrowings | Principal Payments | Net Payment (Borrowings) | Interest Payments [2] | Total Payments Net of Borrowings [3] |
|---|---|---|---|---|---|
| Apr-08 | ($412.0) | | ($412.0) | | ($412.0) |
| May-08 | (45.0) | | (45.0) | | (45.0) |
| Jun-08 | (321.0) | | (321.0) | | (321.0) |
| Sep-08 | - | | - | | - |
| Oct-08 | - | $126.0 | 126.0 | | 126.0 |
| Nov-08 | - | 7.2 | 7.2 | | 7.2 |
| Dec-08 | (4.3) | - | (4.3) | $18.8 | 14.5 |
| Jun-09 | (77.4) | 13.0 | (64.4) | | (64.4) |
| Jul-09 | (18.0) | 20.0 | 2.0 | | 2.0 |
| Aug-09 | - | 10.5 | 10.5 | | 10.5 |
| Sep-09 | - | 6.5 | 6.5 | | 6.5 |
| Oct-09 | (6.0) | 21.1 | 15.1 | | 15.1 |
| Nov-09 | - | 9.0 | 9.0 | | 9.0 |
| Dec-09 | (59.0) | - | (59.0) | 6.9 | (52.1) |
| | ($942.7) | $213.3 | ($729.4) | $25.7 | ($703.7) |

[1] *Journal entries provided by ResCap indicate that borrowings and repayments on the Secured MSR Facility may have been first recorded at GMAC Mortgage before being transferred to RFC.*
[2] *Although ResCap did not provide monthly interest payment information, ResCap did confirm that payments were made on account of interest expense. As such, interest expense reported for 2008 was assumed to be equivalent to interest payments for that year.*
[3] *ResCap did not provide information on fees paid on the Secured MSR Facility.*
*Source: AFI Intercompany Loan to ResCap – MSR 2008/09 Spreadsheet [ALLY_0401819]; ResCap Credit Facility Journal Entry Spreadsheet, at Tabs Ally MSR-2010000001, Ally MSR - 23000005 [EXAM00338635]; ResCap Interest Journal Entry Spreadsheet, at Tab Ally MSR-202020001 [EXAM00338636]; Residential Funding Company, LLC, Consolidated Financial Statements for the Years Ended December 31, 2008 and 2007, dated Mar. 25, 2009, at 78 [EXAM00124988]; Residential Funding Company, LLC, Consolidated Financial Statements as of and for the Years Ended December 31, 2009 and 2008, dated Mar. 19, 2010, at 78 [EXAM00124670].*

### (c) Application

The Examiner concludes that RFC's repayments on the Secured MSR Facility likely fall within the prima facie case for avoidance under the Minnesota Insider Preference statute. Payments made to AFI in respect of amounts outstanding under the Secured MSR Facility were transfers made for an antecedent debt—namely amounts drawn under the Secured MSR Facility. The Investigation has not uncovered any evidence indicating that cash transferred to AFI in satisfaction of amounts outstanding under the Secured MSR Facility was encumbered by valid liens securing the obligations under the Secured MSR Facility.[391] Accordingly, the Examiner concludes that it is likely that payments made by RFC to AFI in respect of amounts outstanding under the Secured MSR Facility between April 2008 and December 2009 meet the prima facie test for avoidance under the Minnesota Insider Preference statute.

---

[391] To the extent these payments were made from the traceable proceeds of collateral, such as the Servicing Contracts or pledged securities, in which AFI held a validly perfected and unavoidable lien, the payments would not be considered a "transfer" of an "asset," and would not be avoidable. *See* MINN. STAT. ANN. § 513.41(2), (12).

### (d) Conclusion

The Examiner concludes that it is likely that the payments of approximately $239 million made by RFC to AFI in respect of amounts outstanding under the Secured MSR Facility between April 2008 and December 2009 meet the prima facie test for avoidance under the Minnesota Insider Preference statute. However, as set forth in Section VII.F.4.h, the Examiner concludes that AFI's Insider Preference liability with respect to such payments would likely be offset by AFI's subsequent contributions of new value.

### (4) Servicing Advance Factoring Facility

While the facts of this transaction are fully set forth in Section V.E.4 and Appendix V.E.4, a brief summary is helpful to this analysis.

### (a) Background

On June 17, 2008, RFC and GMAC Mortgage,[392] as sellers, and GMAC CF, as purchaser, entered into the Servicing Advance Factoring Facility. Unlike other credit facilities entered into with AFI, AFI required that the Servicing Advance Factoring Facility (which was entered into with GMAC CF) be structured as a "true sale" of receivables and not as a financing.[393] GMAC CF committed to purchase receivables arising from Servicing Advances made by the Servicing Advance Factoring Sellers under certain designated Servicing Contracts, subject to a $600 million cap. Servicing Advances consisted of (1) P&I Advances (Servicing Advances relating to delinquent interest and/or principal); (2) T&I Advances (Servicing Advances relating to real estate taxes and/or hazard, flood or primary mortgage insurance premiums); and (3) Corporate Advances (Servicing Advances relating to preservation of properties, expenses for foreclosure actions and other expenses to maximize collateral value).[394]

### (b) Summary Of Payments Pursuant To The Servicing Advance Factoring Facility

On at least three occasions, RFC and GMAC Mortgage transferred additional property to GMAC CF under the Servicing Advance Factoring Facility. First, according to AFI, the initial sale of receivables pursuant to the Servicing Advance Factoring Facility "included approximately $3.7 million worth of receivables that were . . . ineligible under the

---

[392] GMAC Mortgage's transfers are unlikely to be subject to avoidance because, as discussed in section VII.F.2, the Examiner has concluded that Pennsylvania law would likely govern fraudulent transfer issues relating to GMAC Mortgage. Pennsylvania law, unlike Minnesota does not recognize an Insider Preference cause of action. With respect to the transfers described in this Section, it is unclear which entity actually made the transfers. For the purposes of this analysis, it is assumed that RFC made the transfers.

[393] Minutes of Meeting of the Board of Directors of Residential Capital, LLC, June 1, 2008, at RC40005752 [RC40005652] (De Molina stated that AFI could commit to the "GMAC Factoring Facility so long as it could be structured as a 'true sale' rather than as a financing."); *see also* Int. of B. Hall, Dec. 13, 2012, at 130:8–131:17.

[394] Servicing Advance Factoring Agreement [ALLY_0041874]; *see* Appendix V.E.4.b.

Agreement."[395] By a letter dated June 20, 2008, GMAC CF agreed to reassign the ineligible receivables to RFC and GMAC Mortgage, as applicable, "as a one time accommodation" in exchange for an assignment of replacement securities of approximately the same value.[396]

Second, by letter dated October 1, 2008, RFC informed GMAC CF that it, as well as GMAC Mortgage, had breached the terms Servicing Advance Factoring Facility by selling to GMAC CF ineligible receivables with an aggregate value of approximately $27 million. GMAC CF thereafter reassigned the ineligible receivables to RFC and GMAC Mortgage in exchange for a cash payment equal to the unpaid principal amount of the ineligible receivables.[397] As noted in Section V.E.4, the Factoring Facility contained provisions commonly found in factoring transactions whereby the sellers had an obligation to repurchase receivables upon a breach of a representation pertaining to such purchased receivable.

Third, by letter dated October 22, 2008, RFC and GMAC Mortgage informed GMAC CF that they had breached the terms of the Servicing Advance Factoring Facility by inadvertently selling to GMAC CF receivables that were not principal and interest receivables, and were thus ineligible receivables under the agreement. As a result of this breach of the Servicing Advance Factoring Facility, RFC and GMAC Mortgage thereafter paid GMAC CF $1.5 million.[398]

In total, RFC and GMAC Mortgage transferred cash and securities worth approximately $32 million to GMAC CF on account of obligations under the Servicing Advance Factoring Facility in the three transactions described above.[399]

### (c) Application

It is likely that the transfers made by RFC on account of its obligations under the Servicing Advance Factoring Facility meet the prima facie test for avoidance under the Minnesota Insider Preference statute. The transfers documented in RFC's letters dated June 20, 2008, October 1, 2008 and October 22, 2008, were made for antecedent debts stemming from breaches of the Servicing Advance Factoring Facility.

As noted above, jurisdictions applying the UFTA have concluded that a transfer is not made for an antecedent debt if the debt in question was incurred relatively contemporaneously with the transfer at issue. Here, certain receivables included in the sale to GMAC CF were identified as ineligible for purchase under the Servicing Advance Factoring Facility. Accordingly, within a short period of time these ineligible receivables were exchanged for cash or securities. While these transfers were made on short notice, it is likely that they would

---

[395] AFI Response to Examiner's Information Request, dated Apr. 18, 2013, at 1.

[396] *Id.*

[397] *See id.*

[398] *See id.*

[399] *See id.*

still be considered to be made for an antecedent debt. Additionally, the property transferred was not subject to any liens, and would likely satisfy the definition of "assets."[400] Accordingly, the Examiner concludes that it is likely that these transfers satisfy the prima facie elements of the Minnesota Insider Preference statute.

### (d) Affirmative Defenses—New Value

Two of the transfers described above were followed by the return of the ineligible receivables previously sold to GMAC CF.[401] GMAC CF would have a new value defense to the avoidance of the transfers to the extent GMAC CF could establish that these ineligible receivables provided value. Although the Examiner's Financial Advisors have attempted to determine the value of these receivables, they were unable to obtain sufficient information to do so. To the extent that GMAC CF (which would have the burden of proof on the affirmative defense of new value) could establish the value of the returned receivables, it would likely have the benefit of a new value defense.

### (e) Conclusion

The Examiner concludes that it is likely that the transfers made pursuant to the Servicing Advance Factoring Facility satisfy the prima facie elements for avoidance under the Minnesota Insider Preference statute. However, to the extent that GMAC CF could satisfy its burden of establishing the value of the ineligible receivables returned in connection with the June 20, 2008 and October 1, 2008 transfers, GMAC CF would have likely have a new value defense relating to those transfers. No such defense is available with respect to the October 22, 2008 transfer of approximately $1.5 million, as this transfer was not followed by a return of receivables. Additionally, the new value discussed in Section VII.F.4.h is inapplicable, as GMAC CF would not have the benefit of a new value defense for new value contributed by AFI.

### (5) Resort Finance Facility

While the facts of this transaction are fully set forth in Section V.E.1 and Appendix V.E.1, a brief summary is helpful to this analysis.

---

[400] On June 17, 2008, concurrently with the execution of the Servicing Advance Factoring Agreement, AFI, as Lender Agent under the Secured Revolver Loan Agreement and First Priority Collateral Agent, entered into a release agreement with respect to the subject Servicing Advances with GMAC CF and the Servicing Advance Factoring Sellers, which provided that upon the purchase by GMAC CF of any Servicing Advances, AFI and the First Priority Collateral Agent agreed to an automatic release of all liens and security interests on the purchased Servicing Advances, which served as collateral securing the Secured Revolver Facility, the Senior Secured Notes and the Junior Secured Notes. Release Agreement with respect to the Servicer Advance receivables, dated June 17, 2008 [ALLY_0118954].

[401] The transfer related to the October 22, 2008 transfer does not appear to include a return of ineligible receivables by GMAC CF. See AFI Response to Examiner's Information Request, dated Apr. 18, 2013. Instead, it is described as a purchase price adjustment. Id.

### (a) Background

On February 21, 2008, RFC entered into the $750 million Resort Finance Facility with AFI. That facility was intended to serve as bridge financing while ResCap searched for a third party to purchase its resort finance business.[402] The facility was secured and provided that repayment was to be made solely from collections on collateral, which consisted of certain loans made by RFC to developers in connection with resort financing transactions.[403] These loans included certain: (1) eligible developer loans; (2) construction loans; and (3) loans extended to finance the sale of time shares.[404] Upon the consummation of the Resort Finance Sale, the obligations of RFC under the Resort Finance Facility were transferred to, and assumed by, GMAC CF.[405] The facility was thereafter repaid in full.[406]

### (b) Summary Of Payments Pursuant To The Resort Finance Facility

The only payment made by RFC to AFI under the Resort Finance Facility evidenced by RFC's accounting records is an interest payment of $17.8 million made in 2008.[407]

### (c) Application

Further factual development is necessary to determine whether the interest payment made with respect to the Resort Finance Facility satisfies the prima facie elements for avoidance under the Minnesota Insider Preference statute. The questions that need to be resolved for the prima facie case to be established are whether RFC made a "transfer" of an "asset" and whether such transfer was made for an antecedent debt.

For purposes of the Minnesota UFTA, conveyances of RFC's property were not "transfers" of "assets" to the extent the transferred property was encumbered by a validly

───────────────────────────────

[402] E-mail from S. Khattri (Feb. 12, 2008) [EXAM11309438].

[403] Resort Finance Agreement, § 2.7(f) [ALLY_0116311] (providing that all payments were to be made only from collateral proceeds, and only to the extent sufficient payment from such proceeds was received).

[404] *Id.*, § 1.1 (definition of "Borrowing Base").

[405] Asset Purchase Agreement between Residential Funding Company, LLC, GMAC Residential Funding of Canada Limited, and GMAC Commercial Finance LLC, dated July 2, 2008, § 2.2 [RC00024026].

[406] Residential Capital, LLC, Quarterly Report (Form 10-Q) (May 11, 2009), at 56 ("On February 21, 2008, RFC entered into [the Resort Finance Facility] with GMAC, as a lender and as agent, to provide RFC with a revolving credit facility with a principal amount of up to $750.0 million. As part of the sale of the Resort Finance business to [GMAC CF] in the third quarter of 2008, the Resort Finance Facility was paid in full.").

[407] Although ResCap did not provide monthly interest payment information, ResCap did confirm that payments were made on account of interest expense. As such, interest expense reported for 2008 was assumed to be equivalent to interest payments for that year. *See* Residential Funding Company, LLC, Consolidated Financial Statements for the Years Ended December 31, 2008 and 2007, dated Mar. 25, 2009, at 78 [EXAM00124988].

perfected and unavoidable lien.[408] Under a stand-alone pledge agreement,[409] RFC pledged and granted to AFI a security interest in: (1) all its membership or other ownership interests in RFC Resort Funding, LLC; (2) certain scheduled loans; and (3) all collections relating to the collateral. AFI filed a UCC financing statement to perfect these interests.[410] It is unclear, however, whether AFI maintained a validly perfected and unavoidable lien with respect to the collections.[411]

The collections (in which AFI allegedly had a perfected security interest) were to be used to repay the Resort Finance Facility.[412] If the collections were subject to a perfected security interest in favor of AFI, they would not constitute an "asset" for the purposes of the Minnesota UFTA. However, if AFI's security interest in such collections was extinguished because the collections were commingled with RFC's other cash, the interest payments made by RFC would likely satisfy the prima facie elements of the Minnesota Insider Preference Statute. The payment would be considered a transfer, made for an antecedent debt—namely draws under the Resort Finance Facility.

### (d) Conclusion

The Examiner is unable to reach a definitive conclusion with respect to application of the Minnesota Insider Preference statute to the payment made by RFC to AFI under the Resort Finance Facility based on the facts currently available. If it could be shown that AFI's security interest in the collateral under the Resort Finance Facility was extinguished because the collections were commingled, it is likely that the prima facie elements of the Minnesota Insider Preference statute would be satisfied. However, as set forth in Section VII.F.4.h, the Examiner concludes that AFI's Insider Preference liability with respect to such payments would likely be offset by AFI's subsequent contributions of new value.

---

[408] *See* MINN. STAT. ANN. § 513.41(2), (12).

[409] Pledge Agreement among Residential Funding Company, LLC and GMAC LLC, dated Feb. 21, 2008 [RC00036826].

[410] *See* UCC Financing Statement, dated Feb. 21, 2008, at ALLY_0116514 [ALLY_0116512].

[411] The Resort Finance Facility did not require establishment of deposit accounts to hold proceeds from the collections and under the terms of the Resort Finance Facility control agreements were not required with respect to existing deposit accounts of RFC. *See* Resort Finance Agreement [ALLY_0116311]. To the extent that RFC accepted payments with respect to the scheduled loans serving as collateral and placed those funds into an account where they were commingled with other funds, AFI's perfected security interest in the collections may have been extinguished. *See* DEL. CODE ANN. tit. 6, § 9-315(a)(2), (b)(2) (security interests attach to proceeds of collateral, except to the extent that such proceeds are commingled and not identifiable by a method of tracing). The Examiner's Financial Advisors have attempted to ascertain the mechanics of payments under the Resort Finance Facility, but have not been able to obtain adequate information to determine this issue.

[412] Resort Finance Agreement, § 2.7(f) [ALLY_0116311] (providing that all payments were to be made only from collateral proceeds, and only to the extent sufficient payment from such proceeds was received).

### (6) 2008 Bank Transaction[413]

Before considering whether the 2008 Bank Transaction may be avoided pursuant to the Minnesota Insider Preference statute, this Section provides a brief summary of that transaction, which is described in more detail in Section V.A.1.b.

#### (a) Background

Following the 2006 Bank Restructuring, ResCap's mortgage banking operations and AFI's automotive banking operations both resided within Ally Bank, which was directly held by IB Finance. IB Finance, in turn, was held jointly by ResCap LLC and AFI, with ResCap LLC holding two million non-voting IB Finance Class M Shares, and AFI holding two million IB Finance Class A shares. The IB Finance interests held by ResCap LLC and AFI entitled them to the economic rights in Ally Bank's mortgage and automotive divisions, respectively.

In March 2008, to address an imminent breach of ResCap's TNW covenants, the ResCap Board approved the 2008 Bank Transaction. Pursuant thereto, AFI contributed to ResCap approximately $1.5 billion in ResCap bonds that AFI had purchased on the open market during the first quarter of 2008. In return, ResCap transferred to AFI ResCap Preferred Interests that were convertible, at AFI's option, into IB Finance Preferred Interests at any time on or after January 1, 2009, as long as neither ResCap nor any of its significant subsidiaries was the subject of a bankruptcy proceeding on or before that date. If exercised, AFI's conversion of the ResCap Preferred Interests into IB Finance Preferred Interests would reduce ResCap's IB Finance Class M Shares on a unit-for-unit basis.

The transaction was approved by the ResCap Board on March 28, 2008, and then modified on March 31, 2008 to permit it to occur in two separate tranches. The first tranche was exchanged on March 31, 2008, when AFI contributed to ResCap bonds with a face amount of approximately $1.2 billion and a reported FMV at the time of approximately $607.192 million. In return, ResCap provided AFI with 607,192 ResCap Preferred Interests. The second tranche was exchanged on June 3, 2008, when AFI contributed to ResCap bonds with a face amount of approximately $249 million and a reported FMV of $199.152 million. In return, ResCap provided AFI with an additional 199,152 ResCap Preferred Interests.

In Section V.A.2.c(1), the Examiner concludes that the ResCap Preferred Interests had little to no value, given the Examiner's conclusion that ResCap was insolvent, inadequately capitalized, and could not have reasonably believed it was able to pay its debts as they became due, both immediately before and after the 2008 Bank Transaction.[414] Accordingly, the Examiner's Professionals conclude that the true value transferred from ResCap in the 2008 Bank Transaction was the right of AFI to convert the ResCap Preferred Interests into IB

---

[413] As explained more fully in Section V.A.1, the Ally Bank Transactions consist of three separate transactions: (1) the 2006 Bank Restructuring; (2) the 2008 Bank Transaction; and (3) the 2009 Bank Transaction. Because the Examiner has concluded that the evidence does not support the proposition that ResCap was insolvent at the time of the 2006 Bank Restructuring, only the 2008 Bank Transaction and the 2009 Bank Transaction are subject to possible claims under the Minnesota Insider Preference statute.

[414] *See* Section V.A.2.c(1).

Finance Preferred Interests.[415] The Examiner's Financial Advisors estimate that the value of the right to convert the ResCap Preferred Interests was approximately $403—504 million for the March tranche and approximately $168–210 million for the June tranche, for a combined total value of $571–714 million.[416] The Examiner's Financial Advisors determined that the bonds contributed by AFI to ResCap in March had a value of $595.1 million and the bonds contributed in June had a value of $246.3 million, for a total aggregate value of $841.4 million.[417]

### (b) Application

The Examiner concludes that the 2008 Bank Transaction likely satisfies the remaining prima facie elements for avoidance under the Minnesota Insider Preference statute. First, the Examiner concludes that the evidence supports the proposition that the ResCap Preferred Interests (and the conversion rights related thereto) conveyed to AFI as part of the 2008 Bank Transaction were "assets" of ResCap within the meaning of the Minnesota UFTA. The Investigation has not uncovered any evidence that such interests were encumbered by any validly perfected and unavoidable liens. Second, the Examiner concludes that the evidence supports the proposition that the transfers were made "for an antecedent debt" because the ResCap Preferred Interests were exchanged for ResCap's then-existing unsecured debt, which AFI had purchased on the open market.[418]

### (c) Conclusion

The Examiner concludes that it is likely that the 2008 Bank Transaction satisfies the prima facie elements for avoidance under the Minnesota Insider Preference statute. However, the Examiner also concludes, for the reasons discussed in Section VII.F.4.h, that it is likely that a court would find that AFI's potential Insider Preference liability for the 2008 Bank Transaction should be offset (in part or in full) by new value that AFI provided to ResCap.

### (7) 2009 Bank Transaction

Before considering whether the 2009 Bank Transaction may be avoided pursuant to the Minnesota Insider Preference statute, this Section provides a brief summary of that transaction, which is described in more detail in Section V.A.1.c.

### (a) Background

In the fall of 2008, ResCap continued to experience ongoing liquidity and TNW difficulties. The ResCap and AFI Boards considered several initiatives throughout the end of

---

[415] *See* Section V.A.2.c(2).

[416] *See* Section V.A.2.c(2).

[417] In connection with the 2008 Bank Transaction, ResCap also received a right to redeem the ResCap Preferred Interests and/or the IB Finance Interests at par, thereby regaining its full economic interest in Ally Bank. However, as explained in Section V.A.2.c(5)(a), the Examiner's Financial Advisors did not attribute value to this right because of its speculative nature and ResCap's likely inability to obtain the funds needed to make the redemption.

[418] *See* Minutes of a Meeting of the Special Committee of the Independent Directors of the Board of Residential Capital, LLC, Mar. 24, 2008, at MELZER.008985 [MELZER.008984].

2008 to ease these problems, and ResCap eventually resolved to sell its remaining interest in IB Finance to AFI. At the time of the transaction, ResCap LLC's remaining IB Finance Class M Shares appear to have been subject to the liens of AFI and the Senior and Junior Secured Notes.[419]

On January 30, 2009, AFI exercised its option to convert the ResCap Preferred Interests it had acquired in the 2008 Bank Transaction into an equal number of IB Finance Preferred Interests. This conversion reduced ResCap's two million IB Finance Class M Shares by 806,344 (leaving 1,193,656). Contemporaneously with the conversion, AFI purchased ResCap's remaining IB Finance Class M Shares. As consideration for the purchase, AFI contributed to ResCap Senior Secured Notes with a face amount of approximately $830.5 million and a then-reported FMV of approximately $608.5 million.[420] In connection with the closing of the 2009 Bank Transaction, the IB Finance Class M Shares were released from the liens of AFI and the Senior and Junior Secured Notes.[421]

The Examiner's Financial Advisors estimate that the value transferred from ResCap in the 2009 Bank Transaction (ResCap's remaining IB Finance Class M Shares) was approximately $107–218 million.[422] The Examiner's Financial Advisors estimate that the value of the bonds received by ResCap in the 2009 Bank Transaction was approximately $600 million.[423]

---

[419] *See* Membership Interest Purchase Agreement, dated Jan. 30, 2009, § 3.2 at ALLY_0031031 [ALLY_0031012] (indicating that such liens would be released as of the closing of the 2009 Bank Transaction); Consent and Direction to Release Collateral, dated Jan. 30, 2009, at ALLY_0031153–56 [ALLY_0031012] (contemplating the release of AFI's liens); Letter from T. Hamzehpour, Regarding Senior Secured Notes Collateral (Jan. 30, 2009), at ALLY_0031205–06 [ALLY_0031012] (concluding that ResCap had properly requested the release of the Senior Secured Notes' liens on the IB Finance Class M Shares); Letter from T. Hamzehpour, Regarding Junior Secured Notes Collateral (Jan. 30, 2009), at ALLY_0031207–08 [ALLY_0031012] (concluding that ResCap had properly requested the release of the Junior Secured Notes' liens on the IB Finance Class M Shares).

[420] While AFI previously contemplated that its forgiveness of ResCap debt on September 30, 2008 and December 31, 2008 would be credited toward its purchase price of ResCap's remaining interest in IB Finance, the debt forgiveness does not appear to have been included as consideration in the final sale terms. *See* Section V.A.1.c(2).

[421] *See* Membership Interest Purchase Agreement, dated Jan. 30, 2009, § 3.2 at ALLY_0031031 [ALLY_0031012] (providing that, as of January 30, 2009, ResCap was the "owner of all right, title and interest (record and beneficial) in and to the [IB Finance Class M Shares], free an clear of any Lien, other than . . . Liens securing the [AFI] Revolver, the Second Lien Notes and the Third Lien Notes (*which Liens will be released as of the Closing Date*)") (emphasis added); UCC Financing Statement Amendment No. 2009-0326311, dated Jan. 30, 2009, at ALLY_0031218 [ALLY_0031012] (releasing AFI's liens on the IB Finance Class M Shares); Officer's Certificate, dated Jan. 30, 2009, at ALLY_0031187–94 [ALLY_0031012] (requesting release of the IB Finance Class M Shares from the liens of the Senior Secured Notes); Officer's Certificate, dated Jan. 30, 2009, at ALLY_0031195–98 [ALLY_0031012] (requesting release of the IB Finance Class M Shares from the liens of the Junior Secured Notes).

[422] *See* Section V.A.2.d.

[423] *See* Section V.A.2.d.

### (b) Application

The Examiner concludes that the 2009 Bank Transaction is unlikely to satisfy the remaining prima facie elements for avoidance under the Minnesota Insider Preference statute. The Examiner concludes that the evidence supports the proposition that, up until the time of the transfer, ResCap's interest in IB Finance was encumbered by liens in favor of AFI, the holders of the Senior Secured Notes, and the holders of the Junior Secured Notes and was unavailable to satisfy the claims of unsecured creditors.[424] The Examiner therefore concludes that the evidence supports the proposition that the IB Finance Class M Shares did not constitute an "asset" that could be the subject of a "transfer" within the meaning of the Minnesota UFTA.[425]

### (c) Conclusion

The Examiner concludes that it is unlikely that the 2009 Bank Transaction could be avoided pursuant to the Minnesota Insider Preference statute. The IB Finance Class M Shares were encumbered up until the time of the transfer by the liens of AFI and the Senior and Junior Secured Notes. Accordingly, the IB Finance Class M Shares were not an "asset" that could be the subject of a "transfer" for purposes of the Minnesota UFTA. Even if a court were to find the 2009 Bank Transaction avoidable, however, the Examiner also concludes for the reasons discussed in Section VII.F.4.h, that it is likely that a court would find that AFI's potential Insider Preference liability for the 2009 Bank Transaction should be offset (in part or in full) by new value that AFI provided to ResCap.

### (8) Miscellaneous Additions To Collateral Packages

The Examiner has also identified a number of instances in which one or more of the Debtors granted liens in favor of AFI on additional property to further secure their obligations under one or more of the secured financing facilities described above during the period in which the evidence supports the propositions that: (1) the Debtors were insolvent; and (2) AFI had reasonable cause to believe that the Debtors were insolvent. As discussed above, the granting of a lien is a statutorily-defined "transfer" for purposes of the Minnesota UFTA.[426]

---

[424] *See* UCC Financing Statement Amendment No. 2009-0326311, dated Jan. 30, 2009, at ALLY_0031218 [ALLY_0031012] (releasing AFI's liens on the IB Finance Class M Shares); UCC Financing Statement Amendment No. 2009-0326287, dated Jan. 30, 2009, at ALLY_0031216 [ALLY_0031012] (releasing from the Senior Secured Notes' collateral the IB Finance Class M Shares); UCC Financing Statement Amendment No. 2009-0326303, dated Jan. 30, 2009, at ALLY_0031217 [ALLY_0031012] (releasing from the Junior Secured Notes' collateral the IB Finance Class M Shares). The Examiner did not independently verify the validity and/or extent of these liens.

[425] *See* MINN. STAT. ANN. § 513.41(2), (12). If the liens on the IB Finance Class M Shares were for any reason determined to be invalid, the Examiner concludes that it is likely that the 2009 Bank Transaction would be avoidable pursuant to the Minnesota Insider Preference Statute. In addition to satisfying the prima facie elements discussed above, the transfer of the IB Finance Class M Shares was made in exchange for a contribution of ResCap's second lien notes, thus satisfying the antecedent debt requirement. *See* Residential Capital, LLC, Current Report (Form 8-K) (Feb. 3, 2009), Item 1.01; *see also* Certificate of Forgiveness of Indebtedness of Residential Capital, LLC, dated Jan. 30, 2009, at ALLY_0031136–39 [ALLY_0031012].

[426] *See* MINN. STAT. ANN. § 513.41(12).

The Examiner concludes that all such additional lien transfers, to the extent made by ResCap or RFC, meet the prima facie test for avoidance under the Minnesota Insider Preference statute. The Examiner further concludes that no affirmative defense—except for new value, which is discussed in Section VII.F.4.—is likely to apply with respect to such transfers. The additional lien transfers that the Examiner has identified as avoidable Insider Preferences are as follows:[427]

EXHIBIT VII.F.4.g(8)
**Agreements Granting Additional Collateral**

| Facility | Document | Date | Bates No |
|---|---|---|---|
| **Secured MSR Facility** | Omnibus Security Agreement | May 18, 2009 | ALLY_0024357 |
| | First Amendment to Omnibus Security Agreement | May 19, 2009 | ALLY_0058509 |
| | Third Amendment to Omnibus Security Agreement | June 5, 2009 | ALLY_0058544 |
| | Fourth Amendment to Omnibus Security Agreement | June 30, 2009 | ALLY_0028184 |
| | Fifth Amendment to Omnibus Security Agreement | September 18, 2009 | ALLY_0063306 |
| | Sixth Amendment to Omnibus Security Agreement | November 6, 2009 | ALLY_0075526 |
| | Seventh Amendment to Omnibus Security Agreement | December 16, 2009 | ALLY_0075538 |
| **Secured Revolver Facility ($3.5 Billion)** | First Amendment to First Priority Security Agreement | August 14, 2008 | ALLY_0048947 |
| | Second Amendment to First Priority Security Agreement | January 14, 2009 | ALLY_0051671 |
| | Third Amendment to First Priority Security Agreement | January 30, 2009 | ALLY_0056791 |
| | Real Estate Subsidiary Pledge and Security Agreement and Irrevocable Proxy | December 30, 2009 | ALLY_0066748 |
| **Initial Line of Credit Facility** | First Amendment to Initial Line of Credit Security Agreement | March 18, 2009 | ALLY_0058368 |
| | Second Amendment to Initial Line of Credit Security Agreement | May 19, 2009 | ALLY_0058381 |
| | Fourth Amendment to Initial Line of Credit Security Agreement | June 5, 2009 | ALLY_0058410 |
| | Fifth Amendment to Initial Line of Credit Security Agreement | June 30, 2009 | ALLY_0028155 |
| | Fifth Amendment to Omnibus Security Agreement | September 18, 2009 | ALLY_0063306 |
| | Sixth Amendment to Omnibus Security Agreement | November 6, 2009 | ALLY_0075526 |
| | Seventh Amendment to Omnibus Security Agreement | December 16, 2009 | ALLY_0075538 |
| **Second Line of Credit Facility** | First Amendment to Second Line of Credit Security Agreement | June 5, 2009 | ALLY_0362340 |
| | Second Amendment to Second Line of Credit Security Agreement | June 30, 2009 | ALLY_0026693 |
| | Fifth Amendment to Omnibus Security Agreement | September 18, 2009 | ALLY_0063306 |
| | Sixth Amendment to Omnibus Security Agreement | November 6, 2009 | ALLY_0075526 |
| | Seventh Amendment to Omnibus Security Agreement | December 16, 2009 | ALLY_0075538 |
| **A&R Line of Credit Facility** | Real Estate Subsidiary Pledge and Security Agreement and Irrevocable Proxy | December 30, 2009 | ALLY_0066748 |
| | First Amendment to A&R Initial Line of Credit Security Agreement | May 14, 2010 | ALLY_0071363 |
| | Second Amendment to A&R Initial Line of Credit Security Agreement | May 27, 2011 | GOLDIN00120856 |

---

[427]  Given the variety of collateral implicated by these transactions, and the lack of clarity as to the value, or even the owner of much of that collateral, the Examiner has not attempted to identify the specific assets that were subjected to these additional liens or to quantify the value of such assets.

### h.  Availability Of The New Value Defense

#### (1) General Overview

The Examiner considered the ability of AFI to assert a new value defense to offset otherwise avoidable Insider Preferences made by ResCap or RFC to AFI. AFI would have an affirmative defense to the extent AFI provided unsecured new value to or for the benefit of ResCap or RFC after the avoidable transfer was made.

In Section VII.F.4.g, the Examiner has identified several transactions where transfers were made by ResCap and by RFC, respectively, to AFI that are likely subject to avoidance under the Minnesota Insider Preference statute. These transactions include: (1) the Secured Revolver Facility transaction; (2) the A&R Line of Credit Facility transaction; (3) the 2008 Bank Transaction; (4) the 2009 Bank Transaction; (5) the Secured MSR Facility transaction; and (6) the Resort Finance Facility transaction. AFI could use the new value defense provided by section 513.48(f) of the Minnesota statute to offset these preferential transfers to the extent AFI provided new value to ResCap or RFC, respectively, following receipt of the preferential transfers.[428] However, new value cannot be used to offset contemporaneous or subsequent preferential transfers.[429]

Exhibit VII.F.4.h(1)—1 identifies significant transfers of value from AFI to or for the benefit of ResCap that took place from 2008 through 2012. These transfers took several forms, including cash contributions, debt forgiveness, and asset contributions. Subject to the "valuation-related" caveats discussed below, it appears that AFI may have provided as much as $2.6 billion of new value to ResCap through these transfers. All of these transfers occurred from March 2008 through December 2009. In December 2009 alone, AFI contributed assets valued by the Debtors at $916 million to ResCap, mainly in the form of a cash contribution. Because new value can only offset preferential transactions that occurred before the contribution, AFI will have at least this amount (subject to the "valuation-related" caveats discussed below) to offset any avoidable ResCap transfers that took place prior to December 2009.

---

[428]  *See* Minn. Stat. Ann. § 513.48(f)(1).

[429]  *See Elliot & Callan, Inc. v. Crofton*, 615 F. Supp. 2d 963, 973 (D. Minn. 2009); *see also Responsible Pers. of Musicland Holding Corp. v. Best Buy Co.* (*In re Musicland Holding Corp.*), 462 B.R. 66, 70 (Bankr. S.D.N.Y. 2011) (citing *Mosier v. Ever-Fresh Food Co.* (*In re IRFM, Inc.*), 52 F.3d 228, 231 (9th Cir. 1995)).

EXHIBIT VII.F.4.h(1)—1
**New Value Provided by AFI to ResCap**
2008 – 2012
*($ in Millions)*

| | Cash | Receivables | Payables | Debt Forgiveness ResCap Bonds | Total |
|---|---|---|---|---|---|
| Mar-08 | | | | $142.7 | $142.7 |
| Jun-08 | | | | 21.3 | 21.3 |
| Sep-08 | | | $19.1 | 53.5 | 72.6 |
| Dec-08 | | | | 219.9 | 219.9 |
| Mar-09 | | | | 263.1 | 263.1 |
| Apr-09 | | | | 34.7 | 34.7 |
| May-09 | | | | 112.6 | 112.6 |
| Jun-09 | | | | 750.8 | 750.8 |
| Nov-09 | | | | 23.6 | 23.6 |
| Dec-09 | $600.0 | $316.2 | | | 916.2 |
| 2008 to 2012 | $600.0 | $316.2 | $19.1 | $1,622.3 | $2,557.6 |

*Source: Capital Contributions to ResCap Legal Entity as of Jan. 31, 2012 [ALLY_PEO_0075634]; Residential Capital, LLC, Consolidated Financial Statements for the Years Ended Dec. 31, 2009 and 2008, at 100 [EXAM00124455].*

Exhibit VII.F.4.h(1)—2 identifies significant transfers of value from AFI to or for the benefit of RFC that took place from 2008 through 2012. These transfers took several forms, including debt forgiveness and asset contributions. Subject to the "valuation-related" caveats discussed below, it appears that AFI may have provided as much as $2.4 billion of new value to or for the benefit of RFC through these transfers. Almost all of these transfers occurred from March 2008 through December 2009. In December 2009 alone, AFI contributed assets valued by the Debtors at $1.8 billion to RFC, mainly in the form of the contribution of the HFS Portfolio. Because new value can only offset preferential transactions that occurred prior to the contribution, AFI will have at least this amount (subject to the "valuation-related" caveats discussed below) to offset any avoidable RFC transfers that took place prior to December 2009. After 2009, AFI provided new value to RFC on two other occasions: in December 2011 and January 2012, AFI forgave secured debt of approximately $116 million owed by RFC.

EXHIBIT VII.F.4.h(1)—2
**New Value Provided by AFI to RFC** [(1)]
2008 – 2012
*($ in Millions)*

| | HFS | Payables | Debt Forgiveness | | Total |
| | | | Secured MSR Facility | A&R Line of Credit Facility | |
|---|---|---|---|---|---|
| Sep-08 | | | $37.6 | | $37.6 |
| Oct-08 | | | 140.5 | | 140.5 |
| Nov-08 | | | 264.4 | | 264.4 |
| Nov-09 | | | 52.4 | | 52.4 |
| Dec-09 | $1,435.6 | $195.0 | 164.2 | | 1,794.8 |
| Dec-11 | | | | $43.5 | 43.5 |
| Jan-12 | | | | 72.3 | 72.3 |
| 2008 to 2012 | $1,435.6 | $195.0 | $659.1 | $115.8 | $2,405.5 |

[(1)] *Certain new value provided by AFI to RFC was transferred through ResCap.*
*Source: AFI Affiliate Debt Entries, at Tab Ally MSR-2010000001 [EXAM00338635]; Residential Funding Company, LLC, Consolidated Financial Statements for the Years Ended December 31, 2009 and 2008, at 79 [EXAM00124670]; Residential Funding Company, LLC, Consolidated Financial Statements for the Years Ended December 31, 2011 and 2010, at 61 [EXAM00215221].*

### (2) New Value Defense Is Debtor-Specific

As described in Section VII.F.4.e(2), the new value defense is only available to offset avoidable payments made by a debtor to the extent such debtor, and not an affiliate of the debtor, is the recipient of the new value.[430] As a result, AFI will not be entitled to offset preferential payments made by RFC using new value that was provided to or for the benefit of ResCap, and vice versa. Simply put, to invoke the new value defense AFI will have to show that it provided new value to or for the benefit of the specific Debtor that made the avoidable transfer in question. It is important therefore to distinguish between new value provided by AFI to or for the benefit of ResCap and new value provided by AFI to or for the benefit of RFC.

Exhibit VII.F.4.h(1)—1 does this and shows that AFI's transfers to ResCap may have had a total value of as much as $2.6 billion (subject to the "valuation-related" caveats discussed below). AFI's transfers to ResCap are comprised of contributions of ResCap secured and unsecured notes, cash, and intercompany receivables. Exhibit VII.F.4.h(1)—2 further shows that AFI's transfers to RFC may have had a total value of as much as $2.4 billion (subject to the "valuation-related" caveats discussed below). AFI's transfers to RFC are comprised of debt forgiveness by AFI under the Secured MSR Facility and the A&R Line of Credit Facility, the contribution of the HFS Portfolio, and the release of affiliate payables.

Notably, certain of the contributions made by AFI to RFC may have passed through ResCap. For example, the HFS Portfolio, valued by the Debtors at $1.4 billion (subject to the "valuation-related" caveats discussed below), was contributed by AFI to RFC through a chain of holding

---

[430]  *See* Minn. Stat. Ann. § 513.48(f)(1).

companies, including ResCap.[431] The fact that new value may have passed through ResCap to RFC would not invalidate the new value defense so long as ResCap was merely a conduit or an intermediary, or if it can be shown that the contribution to ResCap was for RFC's benefit.[432]

To successfully offset the avoidable transfers from RFC where AFI later contributed new value that passed through ResCap to RFC, AFI must show that ResCap was a mere conduit, meaning that ResCap never acquired an interest in the property, or that the contribution to ResCap (to the extent it did not flow through to RFC) was nevertheless made for RFC's benefit.[433] In this case, for example, AFI's contribution of the HFS Portfolio to RFC passed through ResCap and other affiliates. The contribution was clearly made to RFC, not to ResCap or any of the other affiliates, because the ResCap Board accepted the contribution and approved the further contribution of the HFS Portfolio down a chain of entities to RFC in one resolution.[434] The ResCap Board stated in the resolution that it was "necessary and desirable" to contribute the HFS Portfolio down the chain of holding companies to RFC.[435] Accordingly, AFI would be considered to have provided new value to or for the benefit of RFC to the extent of the actual value of the HFS Portfolio (which may differ from the $1.4 billion value ascribed to it by the Debtors) even though AFI's contribution to RFC was indirect.

In contrast, if AFI were to fail to meet its burden to establish that ResCap was a mere conduit with respect to other contributions by AFI ostensibly to RFC or that such contributions were not really made for RFC's benefit, such contributions would not constitute new value from AFI to RFC that could offset RFC's preferential transfers.

[431] There may have been other instances where transfers from AFI to RFC may have passed through ResCap. For example, on December 30, 2009, the AFI Board approved AFI's "capital contribution to ResCap, and ResCap's contribution to RFC (through sequential contributions to, and by, intermediate subsidiaries)." Unanimous Consent To Action of the GMAC Board of Directors, dated Dec. 30, 2009, at ALLY_0169105 [ALLY_0169104] (AFI Board approval was required pursuant to the Reservation of Authorities of the Board.). It is not clear as to what specific transfer this board resolution refers.

[432] The Examiner is not aware of any case law addressing whether a contribution passing through affiliates would be considered new value provided by the defendant under the Minnesota Insider Preference statute. Nevertheless, there is considerable case law considering whether property that transfers through a debtor to an affiliate is property of the estate under the federal bankruptcy law. The new value defense to the Insider Preference statute is adapted from section 547(c)(4) of the Bankruptcy Code. *See* UFTA § 8 cmt. 6. As described above, if the Bankruptcy Court were to find portions of the Minnesota Insider Preference statute ambiguous, it could consult section 547 of the Bankruptcy Code and relevant authorities thereunder in order to discern the Minnesota legislature's intent. *See* Section VII.F.4.c; *see also Shields v. Goldetsky (In re Butler),* 552 N.W.2d 226, 231 (Minn. 1996).

[433] *See, e.g., City of Springfield v. Ostrander (In re Lan Tamers, Inc.)*, 329 F.3d 204, 210 (1st Cir. 2003) ("The plain text of § 541(d) excludes property from the estate where the bankrupt entity is only a delivery vehicle and lacks any equitable interest in the property it delivers."); *T & B Scottdale Contractors, Inc. v. United States*, 866 F.2d 1372, 1376 (11th Cir. 1989) (when the debtor held funds that were to be paid out to certain individuals, the debtor was simply an intermediary and the funds were not property of the estate); *see also* Minn. Stat. Ann. § 513.48(f)(1).

[434] *See* Minutes of a Special Meeting of the Board of Residential Capital, LLC, Dec. 29, 2009, at RC40006359–60 [RC40005949].

[435] *Id.* at RC40006360.

### (3) Potential New Value

The Examiner identified and investigated significant contributions made from AFI to ResCap and RFC from March 2008 through the Petition Date. As noted above, the transactions analyzed include contributions in the form of: (1) cash; (2) secured and unsecured notes; (3) debt forgiveness under the A&R Line of Credit Facility; (4) debt forgiveness under the Secured MSR Facility; (5) forgiveness of miscellaneous payables owed; and (6) other assets, such as the HFS Portfolio and an intercompany receivable.

#### (a) Cash

AFI contributed $600 million of the cash on December 30, 2009 to help ResCap comply with its TNW covenants.[436] This cash contribution constitutes new value to ResCap on a dollar-for-dollar basis.[437]

#### (b) Debt Forgiveness

AFI forgave substantial amounts of ResCap debt and RFC debt from 2008 through 2011. There are four categories of debt that were forgiven: (a) ResCap secured and unsecured notes, (b) borrowings under the Secured MSR Facility (under which RFC was a borrower), (c) drawings under the A&R Line of Credit Facility, and (d) affiliate payables. As discussed in Section VII.F.4.e(2), forgiveness of antecedent debt may, under certain circumstances, constitute new value for purposes of the Minnesota Insider Preference statute. Courts generally treat the forgiveness of fully secured debt as new value on a dollar-for-dollar basis.[438] On the other hand, there is little guidance on how to value debt forgiveness when it involves unsecured debt or under-secured debt. Courts generally are reluctant to treat the

---

[436] *See* Residential Capital, LLC, Consolidated Financial Statements for the Years Ended Dec. 31, 2009 and 2008, dated Feb. 26, 2010, at 100 [EXAM00124455]. For a detailed summary of ResCap's difficulties in complying with its TNW covenants and its reliance on contributions from AFI throughout 2009, see Sections III.I.1–3.

[437] Certain parties have suggested that cash contributed by AFI to ResCap would not qualify as new value because it purportedly would be captured by the blanket lien in favor of AFI and would only enhance AFI's collateral package. The Examiner does not find this argument persuasive. Putting aside the issue of whether cash contributions from AFI became subject to a perfected lien in favor of AFI, the fact that the cash itself may be pledged as collateral once contributed does not appear to implicate the statutory exception that excludes new value only if "the *new value* was secured by a valid lien." *See* MINN. STAT. ANN. § 513.48(f)(1) (emphasis added). Based on the statutory language, the exception clearly applies to the circumstance where the recipient of an avoidable transfer subsequently extends credit on a secured basis. The Examiner has been unable to find any case law or other legal support suggesting that the statutory exception would apply to other forms of new value. Moreover, a strong argument exists that cash contributed to ResCap, even if part of AFI's collateral package, "replenishes" the estate if AFI were deemed to be oversecured (which no party appears to dispute). *See Kroh Bros. Dev. Co. v. Cont'l Constr. Eng'rs* (*In re Kroh Bros. Dev. Co.*), 930 F.2d 648, 652 (8th Cir. 1991) (stating that the relevant inquiry in determining whether a transfer provides new value is "whether the new value replenishes the estate").

[438] *See, e.g.*, *Cocolat, Inc. v. Fisher Dev., Inc.* (*In re Cocolat, Inc.*), 176 B.R. 540, 548 (Bankr. N.D. Cal.1995); *see also* UFTA § 8 cmt. 6 (1984).

forgiveness of unsecured debt or under-secured debt as new value on a dollar-for-dollar basis,[439] if at all,[440] and the party asserting the affirmative defense bears the burden of proving the amount of new value that it provided through such debt forgiveness.[441]

### (i) Secured And Unsecured Notes

AFI contributed ResCap secured and unsecured notes to ResCap for retirement throughout 2008 and 2009. ResCap reported these transfers in its financial statements as capital contributions in the amounts of AFI's cost basis in the notes. Exhibit VII.F.4.h(1)—1, above, uses the amounts reported in ResCap's financial statements (recognizing that there may be significant valuation issues) in describing the amounts of new value that AFI may have provided.

Beginning in the fourth quarter of 2007, and continuing into 2008, AFI purchased ResCap unsecured notes at deep discounts in the open market.[442] According to ResCap's financial statements, AFI contributed approximately $218 million of these unsecured notes to ResCap from March 2008 through September 2008 to enable ResCap to maintain compliance with its TNW covenants.[443] In December 2008, AFI completed a private exchange and cash tender offer for the acquisition of ResCap secured and unsecured notes.[444] On December 31, 2008, ResCap continued to face liquidity concerns and, as a result, AFI contributed approximately $220 million of unsecured notes to ResCap to prevent ResCap from breaching its TNW covenants.[445]

---

[439] *See, e.g.*, *Jones v. Ryder Integrated Logistics, Inc.* (*In re Jotan, Inc.*), 264 B.R. 735, 752–53 (Bankr. M.D. Fla. 2001).

[440] *See Gray v. Chace* (*In re Bos. Publ'g Co.*), 209 B.R. 157, 176 (Bankr. D. Mass. 1997) (citing *Trans World Airlines, Inc. v. Travellers Int'l AG* (*In re Trans World Airlines, Inc.*), 180 B.R. 389, 403 (Bankr. D. Del. 1994) and *In re Cocolat, Inc.*, 176 B.R. at 548); *see also Lowrey v. U.P.G., Inc.* (*In re Robinson Bros. Drilling, Inc.*), 877 F.2d 32, 34 (10th Cir. 1989).

[441] *See In re Robinson Bros. Drilling, Inc.*, 877 F.2d at 34 ("While . . . the court will not inquire into the value of the liens released by Richardson . . . it is the defendants' burden to prove with specificity that Richardson gave new value equivalent to the remainder of the debt not secured by these liens." (citing *Jet Fla., Inc. v. Am. Airlines, Inc.* (*In re Jet Fla. Sys., Inc.*), 861 F.2d 1555, 1559 (11th Cir. 1988))); *In re Bos. Publ'g Co.*, 209 B.R. at 176 ("[I]t was incumbent upon Chace to quantify what he gave up at the time of the restructuring—full, or most likely, partial payment of his outstanding loans, as compared with what, if anything, he would receive on his resulting equity investment."); *see also Creditors' Comm. v. Spada* (*In re Spada*), 903 F.2d 971, 976 (3d Cir. 1990) ("[A] party seeking the shelter of section 547(c)(1) must prove the specific measure of the new value given to the debtor in the exchange." (quoting *In re Jet Fla. Sys., Inc.*, 861 F.2d at 1558)).

[442] *See* Residential Capital, LLC, Quarterly Report (Form 10-Q) (Nov. 10, 2008), at 40.

[443] *See id.* at 7; Residential Capital, LLC, Quarterly Report (Form 10-Q) (Aug. 7, 2008), at 7; Residential Capital, LLC, Quarterly Report (Form 10-Q) (May 8, 2008), at 7, 48. For a more detailed summary of ResCap's difficulties in complying with its TNW covenants and its reliance on contributions from AFI throughout 2008, see Sections III.G.3, III.H.3–5.

[444] *See* Residential Capital, LLC, Annual Report (Form 10-K/A) (Aug. 25, 2009), at 89.

[445] *See id.*

During 2009, AFI contributed approximately $1.185 billion of the secured and unsecured notes it acquired in the December 2008 private exchange and cash tender offer to ResCap to help ResCap comply with its TNW covenants.[446] All of the bonds contributed by AFI in 2009 were either Junior Secured Notes or senior unsecured notes.[447] The total amount of secured debt that AFI contributed was $1.150 billion, and the total amount of unsecured debt that AFI contributed was $35 million.[448] The secured debt, however, was significantly under-secured due to the existence of higher priority liens on the collateral.[449] Accordingly, all of the $1.622 billion in notes contributed by AFI to ResCap during 2008 and 2009 was either unsecured or significantly under-secured.[450]

A court may not value these note contributions on a cost basis because the notes were unsecured or significantly under-secured. Given the lack of judicial guidance, it is unclear what "new value," if any, is attributable to this debt forgiveness. Again, AFI would bear the burden of substantiating the amount of new value if it were to raise the affirmative defense.

### (ii) Secured MSR Facility

During 2008 and 2009, AFI forgave outstanding debt owed by RFC under the Secured MSR Facility. RFC had borrowed from AFI under the Secured MSR Facility, which was secured by the Secured MSR Facility Collateral and guaranteed on a full recourse basis by ResCap.[451] AFI forgave a total of approximately $659 million of RFC's outstanding debt and interest under the Secured MSR Facility from September 2008 through December 2009 to help ResCap comply with its consolidated TNW covenants.[452] The Examiner concludes that

---

[446]   *See* Residential Capital, LLC, Consolidated Financial Statements for the Years Ended Dec. 31, 2009 and 2008, dated Feb. 26, 2010, at 100–101 [EXAM00124455]. For a more detailed summary of ResCap's difficulties in complying with its TNW covenants and its reliance on contributions from AFI throughout 2009, see Sections III.I.1–3.

[447]   *See* Residential Capital, LLC, Consolidated Financial Statements for the Years Ended Dec. 31, 2009 and 2008, dated Feb. 26, 2010, at 100–01 [EXAM00124455].

[448]   *See id.* at 9.

[449]   *See* Residential Capital, LLC, Consolidated Financial Statements for the Years Ended Dec. 31, 2009 and 2008, dated Feb. 26, 2010, at 38 [EXAM00124455]; Secured Revolver Facility Borrowing Base Report, dated Jan. 19, 2009 [EXAM00221203].

[450]   Notably, all of the Junior Secured Notes were guaranteed by RFC and GMAC Mortgage. The law is unclear on how new value should be allocated among affiliates where the debt that is forgiven was guaranteed by an affiliate. AFI would have to prove how much new value, if any, should be allocated to the guarantors. For illustrative purposes, all new value has been allocated to ResCap, as the borrower under the Junior Secured Notes.

[451]   Secured MSR Loan Agreement, § 4.01 [RC00024114]; Guarantee by Residential Capital, LLC, for Secured MSR Facility, dated Apr. 18, 2008, § 3 [RC00037568].

[452]   *See* AFI Intercompany Loan to ResCap – MSR 2008/09 Spreadsheet, at Tab Summary [ALLY_0401819] (providing the aggregate amounts of RFC and GMAC Mortgage debts under the facility that were forgiven); AFI Affiliate Debt Journal Entries, at Tab ALLY MSR-2010000001 [EXAM00338635] (providing the amounts of RFC debts under the facility that were forgiven); Minutes of a Special Meeting of the Board of Residential Capital, LLC, Oct. 1, 2008, at RC40005875 [RC40005652] (describing recent contributions in the form of debt forgiveness that satisfied ResCap's TNW covenants and immediate cash needs).

this debt forgiveness constituted new value to RFC and, perhaps, ResCap as well as guarantor, on a dollar-for-dollar basis because the debt was fully secured. The affirmative defense to avoidance of a preferential transfer under the Minnesota Insider Preference statute applies only to new value provided by the insider to the specific debtor that made the avoidable transfer in question. As noted above, the law is unclear on how new value should be allocated among affiliates where the debt that is forgiven was guaranteed by an affiliate. Because AFI bears the burden of quantifying new value, AFI would have to prove how much new value should be allocated to each of ResCap and RFC.

### (iii) A&R Line Of Credit Facility

On December 30, 2011, AFI forgave $109 million of the outstanding balance of the A&R Line of Credit Facility, under which RFC and GMAC Mortgage were both liable.[453] ResCap and several of its affiliates guaranteed RFC's and GMAC Mortgage's obligations under the A&R Line of Credit Facility.[454] It appears that $44 million of the $109 million in debt forgiveness was allocated to RFC for purposes of the affiliates' financial statements based on AFI's journal entries.[455] Because the forgiven debt was fully secured, this debt forgiveness constitutes new value to RFC on a dollar-for-dollar basis to the extent that it was allocated to RFC (as opposed to GMAC Mortgage, ResCap, or the other guarantors). This new value, however, presents the same difficulties discussed above regarding the allocation of new value between borrowers and guarantors, and the Investigation has not uncovered evidence regarding the methodology used by AFI or the Debtors in allocating the debt forgiveness among RFC, GMAC Mortgage, ResCap, and the other guarantors. As a result, the Examiner is unable to quantify the allocation of new value attributable to RFC and ResCap, respectively.

On January 30, 2012, AFI forgave another $196.5 million of the outstanding balance on the A&R Line of Credit Facility.[456] $72 million of the $196.5 million in debt forgiveness was allocated to RFC for purposes of the affiliates' financial statements.[457] A portion of the $196.5 million in debt forgiveness was subject to the March 14 Earmark Agreement under which the amounts forgiven were required to be used to fund the payment of obligations (including obligations for which AFI, ResCap, RFC, and GMAC Mortgage were jointly liable) owed to

_____

[453] *See* Residential Capital, LLC, Consolidated Financial Statements for the Years Ended Dec. 31, 2011 and 2010, at 38–39 [EXAM00215221].

[454] A&R Line of Credit Agreement, § 11.01 [ALLY_0240633]

[455] *See* AFI Affiliate Debt Journal Entries, Tab ALLY LOC-2010000001 [EXAM00338635].

[456] *See* Residential Capital, LLC, Consolidated Financial Statements for the Years Ended Dec. 31, 2011 and 2010, at 38–39 [EXAM00215221].

[457] *See* Residential Funding Company, LLC, Consolidated Financial Statements for the Years Ended December 31, 2011 and 2010, dated Mar. 28, 2012, at 11, 61 [RC00032246] (stating that on January 30, 2012, RFC "recognized a capital contribution . . . of $72.3 million, and a corresponding reduction in our borrowings under the [A&R Line of Credit Agreement]"); AFI Affiliate Debt Journal Entries, at Tab ALLY LOC-2010000001 [EXAM00338635]; Memorandum, Significant Transaction: Mortgage Fine, Waivers and Debt Forgiveness, dated Feb. 2012, at EXAM00220159–60 [EXAM00220147].

the U.S. government pursuant to the DOJ/AG Consent Judgment.[458] However, the evidence reveals that only the debt forgiveness allocated to GMAC Mortgage was used to fund the payment of the government settlement because GMAC Mortgage remitted the full fine of $109,628,425 to an escrow account created pursuant to the DOJ/AG Consent Judgment on March 14, 2012.[459] There is no evidence that any of the debt forgiveness allocated to RFC was used to fund the payment of the government settlement or any other obligation for which AFI was liable.[460] The Examiner therefore concludes that it is likely that the $72 million of debt forgiveness in favor of RFC would constitute new value.[461] For a more detailed discussion of the uses of the $196.5 million in debt forgiveness and the application of the earmarking doctrine in the consideration of preferential transfers, see Section VII.F.5.c(1).

### (iv) Affiliate Payables

On December 30, 2009, AFI released a $195 million payable owed to it by RFC on account of management fees.[462] This release is equivalent to the forgiveness of an unsecured debt. As discussed above, it is unclear how much new value, if any, a court would attribute to the release of the payable. The full amount of the payable in Exhibit VII.F.4.h(1)—2 is used for illustrative purposes only.

In addition, ResCap appears to have received $19.1 million from AFI as a result of a tax settlement between the two parties in September 2008.[463] The Investigation has not uncovered any information regarding the tax settlement, including the tax liabilities or tax refunds to which the settlement pertained. The Investigation revealed evidence in which the tax settlement was considered to be a capital contribution by AFI to ResCap,[464] but also revealed evidence from 2008 in which the tax settlement was not considered to be a capital contribution because the tax settlement was "not part of GMAC's initiative to support ResCap."[465] If the

---

[458] *See* Earmark Agreement, ¶¶ 1–4 [ALLY_0000001] ("ResCap reaffirms and agrees that $109,628,425.00 of the liquidity provided by AFI pursuant to the January 30 Letter Agreement will be used solely to fund the Direct Payment Settlement Amount . . . .").

[459] *See* E-mail from C. Dondzila (Mar. 15, 2012) [EXAM11004487]; ResCap Liquidity Update: A Presentation for the ResCap Board of Directors, dated Mar. 23, 2012, at RC40020491 [RC40020488]; Special Examiner Presentation: DOJ/AG Settlement, dated Dec. 11, 2012, at EXAM00220908 [EXAM00220897]; ResCap Consolidating Financial Statements—2012, dated Oct. 29, 2012 [ALLY_0244598] (showing GMAC Mortgage remitted the actual funds).

[460] For a more detailed discussion of the allocation of liability under the DOJ/AG Consent Judgment and the payments made and actions taken by each legal entity in accordance with the settlement, see Section V.C.1.d–g.

[461] *See Kroh Bros. Dev. Co. v. Cont'l Constr. Eng'rs* (*In re Kroh Bros. Dev. Co.*), 930 F.2d 648, 652 (8th Cir. 1991) (stating that the relevant inquiry in determining whether a transfer provides new value is "whether the new value replenishes the estate").

[462] *See* Residential Funding Company, LLC, Consolidated Financial Statements for the Years Ended Dec. 31, 2009 and 2008, dated Mar. 19, 2010, at 79 [EXAM00124670].

[463] *See* Capital Contributions to ResCap Legal Entity as of Jan. 31, 2012 [ALLY_PEO_0075634].

[464] *See, e.g.*, *id.*

[465] ResCap Capital Contributions from AFI for Year Ended Dec. 31, 2008, at tab GMAC contributions [ALLY_0327055].

tax settlement was a payment to ResCap on account of an intercompany receivable on ResCap's books, then the $19.1 million would not constitute new value because the payment merely converted a receivable into cash without replenishing the estate.[466] On the other hand, if the tax settlement does constitute a real contribution to ResCap, it would be akin to the forgiveness of an unsecured debt. As a result, it is unclear how much new value, if any, a court would attribute to ResCap on account of the tax settlement.

### (c) Asset Contributions

On December 30, 2009, AFI contributed assets to RFC and ResCap to prevent ResCap from breaching its consolidated TNW covenants. The contributed assets consisted of the HFS Portfolio and certain intercompany receivables. These contributions may have provided new value to RFC and ResCap.

### (i) HFS Portfolio

According to RFC's financial statements, AFI contributed the HFS Portfolio with a book value of approximately $1.436 billion to RFC on December 30, 2009.[467] As discussed in Section VII.F.4.h(4), AFI transferred the HFS Portfolio to RFC through a series of contributions to holding companies, including ResCap, which acted as mere conduits.[468] The HFS Portfolio, therefore, constitutes new value for RFC. The book value of the HFS Portfolio is shown in Exhibit VII.F.4.h(1)—2, but AFI would bear the burden of proving that the book value used by RFC was consistent with the actual market value of the HFS Portfolio at the time of contribution.

### (ii) Intercompany Receivables

According to ResCap's financial statements AFI contributed certain intercompany receivables in the amount of $316 million to ResCap on December 30, 2009.[469] The Investigation has not uncovered more specifics about these intercompany receivables, including which affiliate(s) had the obligation(s) to pay the receivables, or how the receivables were valued for purposes of financial reporting. The amount of new value attributable to an intercompany receivable may depend, in part, on the likelihood of the receivable being satisfied.[470] If the possibility that a receivable will be satisfied is highly contingent, the

---

[466]   *See In re Kroh Bros. Dev.*, 930 F.2d at 652.

[467]   *See* Residential Funding Company, LLC, Consolidated Financial Statements for the Years Ended Dec. 31, 2009 and 2008, dated Mar. 19, 2010, at 79 [EXAM00124670].

[468]   *See* Minutes of a Special Meeting of the Board of Residential Capital, LLC, Dec. 29, 2009, at RC40006359–60 [RC40005949] (resolving that ResCap initially accepts the contribution of the HFS Portfolio from AFI, through GMAC Mortgage Group, LLC, and that it then "necessary and desirable" to contribute it down the chain of entities to RFC).

[469]   *See* Residential Capital, LLC, Consolidated Financial Statements for the Years Ended Dec. 31, 2009 and 2008, dated Feb. 26, 2010, at 100 [EXAM00124455].

[470]   *See, e.g., Jones v. Ryder Integrated Logistics, Inc.* (*In re Jotan, Inc.*), 264 B.R. 735, 752–53 (Bankr. M.D. Fla. 2001); *News Journal Co. v. Little Caesars of Del., Inc.*, No. CRIM.A.1999-04-241, 2000 WL 33653432, at *4 (Del. Com. Pl. Oct. 20, 2000).

contribution of such intercompany receivables may be of little or no value. It is therefore uncertain how much new value, if any, a court would attribute to the contribution of the intercompany receivables. Exhibit VII.F.4.h(1)—1 shows a value of $316 million, which is the amount set forth in ResCap's financial statements. AFI would bear the burden of proving that this reflects an accurate valuation of the intercompany receivables at the time of contribution.

### (4) Applying New Value to Avoidable Transfers

As described in Section VII.F.4.g, the Examiner has concluded that the following transactions may give rise to transfers to AFI that are avoidable as Insider Preference payments:

VII.F.4.h(4)
**Summary of Avoidable Preferential Transfers**
*($ in Millions)*

| Transaction | Debtor-Transferor | Amount | Date of Transfers |
|---|---|---|---|
| 2008 Bank Transaction | ResCap | $403 – $504 | Mar. 30, 2008 |
| 2008 Bank Transaction | ResCap | $168 – $210 | Jun. 3, 2008 |
| Secured Revolver Facility | RFC | $1,300 [1] | Jun. 4, 2008 |
| Resort Finance Facility | RFC | $18 | 2008 |
| Secured MSR Facility | RFC | $239 [2] | Apr. 2008 – Dec. 2009 |
| A&R Line of Credit Facility | RFC | $650 | Jan. 2010 – May 2012 |

*[1] This amount is on account of lien avoidance.*
*[2] This is the total amount of principal and interest payments made by RFC on the Secured MSR Facility from April 2008 through December 2009 as shown in Exhibit VII.F.4.g(3)(b). These payments would not constitute avoidable transfers to the extent that the funds used to make the payments were encumbered by valid liens.*
*Source: See Section VII.F.4.g.*

As described above, to offset new value against an avoidable preferential transfer, the new value must have been received by the transferor: (1) after the avoidable transfer; and (2) from the transferee (i.e., new value provided by a third party is not valid). Exhibit VII.F.4.h(4) above shows that only avoidable transfers made by ResCap relate to the 2008 Bank Transaction, while the rest of the avoidable transfers were made by RFC.

As set forth in Exhibit VII.F.4.h(4), the Examiner has concluded that AFI received transfers from ResCap that are likely avoidable under the Minnesota Inside Preference Statute in an amount of up to $714 million. The latest of these transfers occurred in June 2008. With respect to new value provided by AFI to ResCap, Exhibit VII.F.4.h(1)—1 shows that ResCap received as much as $2.6 billion in new value from AFI, with approximately $2.4 billion received after June 2008. Therefore, to the extent that AFI would be able to substantiate the amounts of new value set forth in Exhibit VII.F.4.h(1)—1, *which amounts AFI would have the burden of establishing*, the new value would appear to be sufficient to offset all of the avoidable preferential transfers by ResCap to AFI.

As set forth in Exhibit VII.F.4.h(4), the Examiner has concluded that AFI received transfers from RFC that are likely avoidable under the Minnesota Inside Preference Statute in an amount of up to $2.2 billion. Of this amount, $1.55 billion in transfers were made prior to the December 30, 2009, and $650 million in transfers were made after December 30, 2009. With respect to new value provided by AFI to RFC, Exhibit VII.F.4.h(1)—2 shows that RFC received as much as $2.4 billion in new value from AFI, with $1.79 billion received in December 2009. The amount of new value received just in December 2009 is sufficient to offset all of the preferential transfers made prior to that time. With respect to the period after December 30, 2009, it appears that AFI would have approximately $116 million of new value to offset the portion of the $650 million in avoidable transfers that was made prior to RFC's receipt of new value. In sum, the Examiner concludes that, to the extent that AFI would be able to substantiate the amounts of new value set forth in Exhibit VII.F.4.h(1)—2, *which amounts AFI would have the burden of establishing*, the new value would appear to be sufficient to offset all but $534 million of the avoidable preferential transfers by RFC to AFI.

### 5. *Preferential Transfers Under Bankruptcy Code Section 547*

#### a. *Overview Of Elements*

"A preference is a transfer that enables a creditor to receive payment of a greater percentage of his claim against the debtor than he would have received if the transfer had not been made and he had participated in the distribution of the assets of the bankrupt estate."[471] Preferential transfer claims may be brought under section 547 of the Bankruptcy Code or under section 544 of the Bankruptcy Code, implementing state preferential transfer laws, as discussed in Section VII.F.4. Claims under section 547 do not implicate choice-of-law issues, as courts apply the governing federal law of the circuit in which it sits, here the Second Circuit.

##### (1) *Section 547 Of The Bankruptcy Code*

Under section 547 of the Bankruptcy Code, an estate representative may avoid any transfer of an interest of the debtor in property if five conditions are satisfied and unless one of the defined affirmative defenses is applicable. Section 547 provides that a trustee or debtor-in-possession may avoid as a preference any transfer of an interest of the debtor in property made:

- to or for the benefit of a creditor;

- for or on account of an antecedent debt;

- while the debtor was insolvent;

- on or within ninety days of the petition date or up to one year before the petition date if such creditor was an insider at the time of the transfer; and

---

[471] Bankruptcy Reform Act of 1978, Pub. L. No. 95-598, 1978 U.S.C.C.A.N. (92 Stat. 2546) 5963, 6138.

- that enables such creditor to receive more than such creditor would receive if:

  - the case was a chapter 7 case;

  - the transfer had not been made; and

  - such creditor received payment of such debt to the extent provided by the Bankruptcy Code.[472]

The estate representative has the burden of proving each of these elements by a preponderance of evidence. A transfer is not avoidable as a preference unless every element is proven.[473]

### (2) Elements Of A Preference Claim

#### (a) Transfer Of An Interest Of The Debtor In Property

As a threshold matter, only a "transfer of an interest of the debtor in property"[474] is subject to possible avoidance under section 547. The Bankruptcy Code defines "transfer"[475] as "(A) the creation of a lien; (B) the retention of title as a security interest; (C) the foreclosure of a debtor's equity of redemption; or (D) each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with—(i) property; or (ii) an interest in property."[476] This definition should be viewed in the broadest sense possible.[477] "Transfer of possession, custody or control fall within" this definition.[478] Federal law determines what constitutes a "transfer" for purposes of section 547, and also when such transfer is complete.[479]

Property is broadly construed to include "all legal or equitable interests of the debtor in property as of the commencement of the case."[480] In other words, "property of the debtor" includes property that would have been available for distribution to creditors had it not been

---

[472] 11 U.S.C. § 547(b); *Cadle Co. v. Mangan* (*In re Flanagan*), 503 F.3d 171, 180 (2d Cir. 2007).

[473] 11 U.S.C. § 547(g) ("[T]he trustee has the burden of proving the avoidability of a transfer under subsection (b) of this section."); *In re Flanagan*, 503 F.3d at 180 (providing that the burden rests on the trustee "to establish each of [the] elements by a preponderance of the evidence").

[474] 11 U.S.C. § 547(b).

[475] Section 101 defines a "transfer" to include "each mode, direct, or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with—(i) property or (ii) with an interest in property." *Id.* § 101(54)(D).

[476] *Id.* § 101(54).

[477] Act of July 14, 1978, Pub. L. 95-598, 1978 U.S.C.C.A.N. (92 Stat. 2549) 5787.

[478] *Le Café Creme, Ltd. v. Le Roux* (*In re Le Café Creme, Ltd.*), 244 B.R. 221, 233 (Bankr. S.D.N.Y. 2000).

[479] *Barnhill v. Johnson*, 503 U.S. 393, 397 (1992).

[480] 11 U.S.C. § 541(a)(1).

transferred before the commencement of the bankruptcy case.[481] In the absence of controlling federal law, what constitutes "property" is determined by state law.[482]

### (b) To Or For The Benefit Of A Creditor

Under section 547(b)(1) a transfer is avoidable only if it was to or for the benefit of a creditor.[483] There is no requirement that the benefit which accrues to a creditor be direct. Indeed, transfers that result in indirect benefits to creditors can be avoided as preferences.[484]

The Bankruptcy Code defines "creditor" in broad terms to include any "entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor."[485] "Claim" is in turn broadly defined as:

> (A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or (B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.[486]

---

[481] *See Begier v. IRS,* 496 U.S. 53, 58 (1990).

[482] *Barnhill*, 503 U.S. at 398 (citing *McKenzie v. Irving Trust Co.*, 323 U.S. 365, 369–70 (1945)) ("In the absence of any controlling federal law, 'property' and 'interests in property' are creatures of state law."); *Butner v. United States*, 440 U.S. 48, 54 (1979) ("Congress has generally left the determination of property rights in the assets of a bankrupt's estate to state law.").

[483] 11 U.S.C. § 547(b)(1).

[484] *Nat'l Bank of Newport v. Nat'l Herkimer Cnty. Bank,* 225 U.S. 178, 184 (1912) ("To constitute a preference, it is not necessary that the transfer be made directly to the creditor. It may be made to another for his benefit."); *Am. Universal Ins. Co. v. Dunlap* (*In re Microwave Prods. of Am., Inc.*), 118 B.R. 566 (Bankr. W.D. Tenn. 1990) (holding that a transfer which benefits a creditor indirectly may still constitute a preference under 11 U.S.C. § 547(b)).

[485] The Bankruptcy Code's full definition of "creditor" is as follows:

> (A) entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor;
>
> (B) entity that has a claim against the estate of a kind specified in section 348(d), 502(f), 502(g), 502(h) or 502(i) of this title; or
>
> (C) entity that has a community claim.

11 U.S.C. § 101(10).

[486] *Id.* § 101(5).

Even the United States government, if it is determined to otherwise be a creditor of the debtor, is not immune from preference actions brought by the trustee in bankruptcy.[487]

### (c) On Account Of An Antecedent Debt

A transfer can be avoided as a preference only if it was made on account of an antecedent debt,[488] that is, if the debt was incurred before the alleged preferential transfer.[489]

### (d) While Debtor Was Insolvent

Under section 547(b)(3) a transfer is avoidable only if it was made while the debtor was insolvent.[490] With respect to a corporation or limited liability corporation (such as ResCap, GMAC Mortgage or RFC), "insolvent" is defined in the Bankruptcy Code as a "financial condition such that the sum of an entity's debts is greater than all of the entity's property, at a fair valuation, exclusive of . . . property transferred, concealed, or removed with intent to hinder, delay, or defraud [the] entity's creditors."[491] This definition of insolvency is the same for preference actions under section 547 and fraudulent conveyance actions under section 548.[492] Under the Bankruptcy Code, there is a rebuttable presumption that a debtor is "insolvent on and during the 90 days immediately preceding the date of the filing of the petition."[493]

### (e) Transfers Made Within Ninety Days Or One Year

Section 547(b)(4) requires that the transfer to be avoided have been made within ninety days before the petition date or, if the transfer was made to an insider, within one year before the petition date.[494]

The Bankruptcy Code provides for a one year look-back period, instead of the otherwise applicable ninety-day look-back period, if the creditor who received the allegedly preferential

---

[487] *See In re Husher*, 131 B.R. 550, 552–53 (E.D.N.Y. 1991) (noting that Congress has waived the government's sovereign immunity with respect to preference actions brought under section 547 of the Bankruptcy Code by the operation of section 106(c) of the Bankruptcy Code).

[488] 11 U.S.C. § 547(b)(2).

[489] *See Breeden v. L.I. Bridge Fund, L.L.C.* (*In re the Bennett Funding Grp., Inc.*) 220 B.R. 739, 742 (B.A.P. 2d Cir. 1998) (noting that "'an antecedent debt' is a pre-existing debt that was incurred when the debtor previously obtained a property interest in the consideration provided by the creditor that gave rise to the debt").

[490] 11 U.S.C. § 547(b)(3).

[491] *Id.* § 101(32)(A); *accord Statutory Comm. of Unsecured Creditors on behalf of Iridium Operating LLC v. Motorola, Inc.* (*In re Iridium Operating LLC*), 373 B.R. 283, 344 (Bankr. S.D.N.Y. 2007).

[492] *See Official Comm. of Former Partners v. Brennan (In re Labrum & Doak, LLP),* 227 B.R. 383, 387 (Bankr. E.D. Pa. 1998). For a more complete discussion of the tests for determining insolvency, see Section VI.B.

[493] 11 U.S.C. § 547(f); *see, e.g.*, *In re Iridium Operating LLC*, 373 B.R. at 343; *Jacobs v. Matrix Capital Bank* (*In re AppOnline.com, Inc.*), 315 B.R. 259, 281–82 (Bankr. E.D.N.Y. 2004).

[494] 11 U.S.C. § 547(b)(4).

transfer was an "insider" at the time of such transfer.[495] The term "insider" is defined in the Bankruptcy Code to include directors, officers, and any other person in control of the debtor.[496] However, this definition of "insider" is not exhaustive and, as such, courts have been left "to define the limits of non-statutory insider status."[497] To determine whether a person is a non-statutory insider, courts perform a fact-intensive analysis on a case-by-case basis.[498] In performing this analysis, courts consider the following two factors: "(1) the closeness of the relationship between the debtor and the transferee, and (2) whether the transactions between the transferee and the debtor were conducted at arm's length."[499] In making this determination, courts examine the relevant facts at hand, including:

> (1) [w]hether the loan made to the debtor was documented (e.g., promissory note, mortgage, and specified repayment terms); (2) [w]hether the loans were made on an unsecured basis and without inquiring into the debtor's ability to repay the loans; (3) [w]hether the transferee knew that the debtor was insolvent at the time the debtor made the loans or recorded the security agreements; (4) [w]hether there were numerous loans between the parties; (5) [w]hether there were any strings attached as to how the debtor could use loan proceeds; (6) [w]hether the loans were commercially motivated; (7) [w]hether the transferee had an ability to control or influence the debtor; (8) [w]hether there was a personal, business, or professional relationship between the transferee and the debtor allowing the transferee to gain an

---

[495] *Id.* § 547(b)(4)(B).

[496] Section 101 of the Bankruptcy Code defines an "insider" as, in pertinent part:

. . . (B) if the debtor is a corporation –

(i) director of the debtor;

(ii) officer of the debtor;

(iii) person in control of the debtor;

(iv) partnership in which the debtor is a general partner;

(v) general partner of the debtor; or

(vi) relative of a general partner, director, officer or person in control of the debtor;

(E) affiliate, or insider of an affiliate as if such affiliate were the debtor; and

(F) managing agent of the debtor.

*Id.* § 101(31).

[497] *Hirsch v. Tarricone* (*In re A. Tarricone, Inc.*), 286 B.R. 256, 262 (Bankr. S.D.N.Y. 2002).

[498] *Id.*

[499] *Id.*; *see also Le Café Creme, Ltd. v. Le Roux* (*In re Café Creme, Ltd.*), 244 B.R. 221, 233 (Bankr. S.D.N.Y. 2000) (citing *In re F & S Cent. Mfg., Corp.*, 53 B.R. 842, 848 (Bankr. E.D.N.Y.1985)) (noting that "[a] creditor who does not deal at arms length with the debtor but who has a special relationship with the debtor through which it can compel payment of its debt, has sufficient control over the debtor to be deemed an insider").

advantage such as that attributable simply to affinity;
(9) [w]hether the transferee had authority to make business
decisions for the debtor; (10) [w]hether there is evidence of a
desire to treat the transferee differently from all other general
unsecured creditors; and (11) [w]hether there was an agreement
among the parties to share profits and losses from business
transactions.[500]

As explained in greater detail in Section VII.F.8, the Bankruptcy Code separates the
concepts of avoidance and recovery. Section 550 of the Bankruptcy Code governs affirmative
recovery beyond avoidance in situations where the estate representative seeks to recover the
property transferred by the avoidable transaction or the value of such property. Prior to 1994,
a line of cases, led by the Seventh Circuit's decision in *Levit v. Ingersoll Rand Financial
Corp.* (*In re Deprizio Constr. Co.*),[501] permitted estate representatives to recover payments
made to non-insiders a full year prior to the bankruptcy filing, in situations where an insider
benefitted from the transfer in some way.[502] Subsequent amendments to the Bankruptcy Code,
through changes to section 547 and 550, explicitly corrected the "*DePrizio* problem" and
clarified that the ninety-day look-back period applies to non-insiders.[503] But *DePrizio's*
general rule that transferees and entities for whose benefit the transfer was made are equally
liable under section 550 for recoveries of avoidable transfers remains undisturbed by these
statutory amendments.[504]

---

[500] *Schreiber v. Stephenson* (*In re Emerson*), 235 B.R. 702, 707 (Bankr. D. N.H. 1999) (citations omitted); *see
also In re Café Creme, Ltd.*, 244 B.R. at 233 (citing *In re F & S Cent. Mfg., Corp.*, 53 B.R. at 848) (noting
that "[a] creditor who does not deal at arms length with the debtor but who has a special relationship with the
debtor through which it can compel payment of its debt, has sufficient control over the debtor to be deemed
an insider").

[501] 874 F.2d 1186 (7th Cir. 1989).

[502] *See id.* at 1195–96 (7th Cir. 1989) (holding both (1) that a one-year statutory look-back period could apply to
non-insiders where the insider benefitted in some way from the transfer to the non-insider and (2) that the
liability of the transferee and the entity "for whose benefit" the transfer was made is coextensive, and that
"[a] single payment therefore is one 'transfer,' no matter how many persons gain thereby").

[503] *See* 140 Cong. Rec. H10767 (daily ed. Oct. 4, 1994) (noting that the addition of new section 550(c)
"overrules the *Deprizio* line of cases and clarifies that non-insider transferees should not be subject to the
preference provisions of the Bankruptcy Code beyond the 90-day statutory period"); Bankruptcy Abuse
Prevention and Consumer Protection Act of 2005, 2005 U.S.C.C.A.N. 88.

[504] *See, e.g.*, *Official Comm. of Unsecured Creditors of 360networks* (*USA*) *Inc. v. U.S. Relocation Servs., Inc.*
(*In re 360networks* (*USA*) *In*c.), 338 B.R. 194, 207 n.15 (Bankr. S.D.N.Y. 2005) ("However, both
amendments relate to the applicable preference period and do not otherwise affect the general rule of
coextensive liability between transferees and entities for whose benefit the transfer was made.").

AFI and Ally Bank are insiders of the Debtors. AFI was ResCap's parent company and sole shareholder at all relevant times and therefore is an "insider."[505] Ally Bank, another wholly-owned subsidiary of AFI, was also an affiliate of the Debtors at all relevant times and therefore is an "insider."[506]

There is no presumption of insolvency outside of the ninety-day period preceding the petition date, and the burden is therefore on the trustee to establish the debtor's insolvency on the date of the transfer by a preponderance of the evidence in an insider preference case where the challenged transfer took place more than ninety days before the petition date.[507]

### (f) Hypothetical Chapter 7 Test

Finally, section 547(b)(5) requires that a transfer must enable a creditor to receive more than it would have received in a chapter 7 liquidation had the challenged transfer not been made.[508] This provision is often referred to as the "hypothetical chapter 7 test" and is considered the most important element of the preference analysis "because it determines whether the defendant received more than other similarly classified claimants would in a hypothetical Chapter 7 distribution."[509] While all other elements of a preference pursuant to

_____

[505] 11 U.S.C. § 101(31)(B)(iii) (defining "person in control of the debtor" as a statutory insider); First Day Affidavit at 1, n.1.

[506] 11 U.S.C. § 101(31)(E) (defining "affiliate" as a statutory insider); *id.* § 101(2)(B) (defining "affiliate" as a "corporation 20 percent or more of whose outstanding voting securities are directly or indirectly owned, controlled or held with power to vote . . . by an entity that directly or indirectly owns, controls or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor . . . "); First Day Affidavit, at 8 ("The Debtors are affiliated with Ally Bank, which is an indirect wholly owned subsidiary of AFI.").

[507] *See, e.g.*, *Pryor v. Zerbo* (*In re Zerbo*), 397 B.R. 642, 657 (Bankr. E.D.N.Y. 2008) (noting that "[s]ection 547(f) creates a presumption that the Debtor was insolvent, but that presumption applies only to the ninety (90) days preceding the petition date"); *Pummill v. McGivern* (*In re Am. Eagle Coatings, Inc.*), 353 B.R. 656, 669 (Bankr. W.D. Mo. 2006); *Roblin Indus., Inc. v. Ford Motor Co.* (*In re Roblin Indus., Inc.*), 78 F.3d 30, 34 (2d Cir. 1996) (noting that the trustee bears the burden of proving insolvency by a preponderance of the evidence).

[508] 11 U.S.C. § 547(b)(5); *Tese-Milner v. Edidin & Assocs. (In re Operations N.Y. LLC),* No. 12-01783, 2013 WL 1187879, at *13 (Bankr. S.D.N.Y. Mar. 21, 2013) (noting that the hypothetical chapter 7 test "essentially imposes an improvement of position test, and the plaintiff must plead facts showing that there are creditors in the same class that would receive less than 100% of their claims from the bankruptcy state"); *Savage & Assocs., P.C. v. Mandl (In re Teligent Inc.),* 380 B.R. 324, 339 (Bankr. S.D.N.Y. 2008) ("The proponent must construct a hypothetical chapter 7 case, and determine the percentage distribution that the defendant would have received on the petition date."); *Aspen Data Graphics, Inc. v. Boulton (In re Aspen Data Graphics, Inc.),* 109 B.R. 677, 681 (Bankr. E.D. Pa. 1990) (noting that "to prove this element the trustee merely has to show that the creditors would receive less . . . in liquidation").

[509] *See McGoldrick v. Juice Farms, Inc.* (*In re Ludford Fruit Prods., Inc.*), 99 B.R. 18, 22 (Bankr. C.D. Cal. 1989); *cf. Pereira v. Summit Bank*, No. 94-1565, 2001 WL 563730, at *15 (S.D.N.Y. May 23, 2001) (citing 5 COLLIER ON BANKRUPTCY ¶ 547.03[7] (Lawrence P. King et al. eds., 15th ed. 2000)) (noting that the hypothetical chapter 7 test is "a central element of the preference section").

section 547(b) are determined as of the time the transfer was made, a determination that a creditor received more than it would have received in liquidation is measured "as of the time of filing the petition."[510]

Under this sub-section, "the court must focus on the relative distribution between classes as well as the amount that will be received by the members of the class of which the preferee is a member."[511] It is generally acknowledged that, unless creditors would receive a full payout, "any unsecured creditor who receives a payment during the preference period is in a position to receive more than it would have received under a Chapter 7 liquidation."[512] In contrast, payments to a fully secured creditor are generally not preferential under section 547.[513]

In short, when a plaintiff brings a section 547 preference claim, the court is required to determine (1) "what a targeted creditor would have received if the" challenged transfer had not been made and "the estate had been liquidated and distributed to the creditors as provided

---

[510] *Hassett v. Goetzmann* (*In re CIS Corp.*), 195 B.R. 251, 262 (Bankr. S.D.N.Y. 1996) ("Thus, the [section] 547(b)(5) analysis is to be made as of the time the Debtor filed its bankruptcy petition."); *see, e.g.*, *Falcon Creditor Trust v. First Ins. Funding* (*In re Falcon Prods., Inc.*), 381 B.R. 543, 547 (B.A.P. 8th Cir. 2008) (noting that "Supreme Court precedent requires that the hypothetical liquidation test be conducted as of the petition date").

[511] Bankruptcy Reform Act of 1978, Pub. L. 95-598, 1978 U.S.C.C.A.N. (92 Stat. 2549) 5963, 6328; Bankruptcy Reform Act of 1978, Pub. L. 95-598, 1978 U.S.C.C.A.N. (92 Stat. 2549) 5787, 5873.

[512] *Velde v. Reinhardt,* 366 B.R. 894, 898 (D. Minn. 2007); *see also Jacobs v. Matrix Capital Bank* (*In re AppOnline.com, Inc.*), 315 B.R. 259, 281 (Bankr. E.D.N.Y. 2004) (quoting *Elliott v. Frontier Props.* (*In re Lewis W. Shurtleff, Inc.*), 778 F.2d 1416 (9th Cir. 1986)) (noting that "as long as the distribution in bankruptcy is less than one-hundred percent, *any* payment 'on account' to an unsecured creditor during the preference period will enable that creditor to receive more than he would have received in liquidation had the payment not been made").

[513] *Buchwald Capital Advisors, LLC v. Metl-Span I., Ltd.* (*In re Pameco Corp.*), 356 B.R. 327, 336 (Bankr. S.D.N.Y. 2006) ("Generally, a prepetition transfer to a fully secured creditor will not be considered preferential because such creditor would be paid in full in a hypothetical chapter 7 liquidation as a result of realization on its claim."); *see also Batlan v. TransAmerica Commercial Fin. Corp.* (*In re Smith's Home Furnishings, Inc.*), 265 F.3d 959, 964, 969 (9th Cir. 2001); *Comm. of Creditors Holding Unsecured Claims v. Koch Oil Co.* (*In re Powerine Oil Co.*), 59 F.3d 969, 972 (9th Cir. 1995); *Ray v. City Bank & Trust Co.* (*In re C-L Cartage Co.*), 899 F.2d 1490, 1493 (6th Cir. 1990); *Velde v. Kirsch*, 366 B.R. 902, 906 n.4 (D. Minn. 2007), *aff'd*, 543 F.3d 469 (8th Cir. 2008); *Savage Assocs., P.C. v. Cnty. of Fairfax, Va.* (*In re Teligent, Inc.*), 2006 WL 1030417, *3 (Bankr. S.D.N.Y. Apr. 13, 2006).

Section VII.F.4 discusses whether a court applying the Minnesota Insider Preference statute would apply a hypothetical chapter 7 test even though the Minnesota UFTA does not contain any provision comparable to Bankruptcy Code section 547(b)(5).

in chapter 7 on the date that the bankruptcy petition was filed," and (2) "whether the creditor in question received more than that amount" taking into account the challenged transfer.[514]

### b. Overview Of Defenses

There are several affirmative defenses to preferential transfer allegations that are provided by the Bankruptcy Code or that have been developed through judicial rulings. Only the defenses that are relevant to the transactions covered by the Investigation are discussed in this Section. The defendant has the burden of proving these affirmative defenses by a preponderance of the evidence.[515]

#### (1) Contemporaneous New Value

Under section 547(c)(1), a trustee may not avoid a transfer to the extent it was: (1) intended by the debtor and the transferee to be a contemporaneous exchange for new value given to the debtor; and (2) in fact a substantially contemporaneous exchange.[516]

Section 547(a)(2) defines "new value" as

> money or money's worth in goods, services, or new credit or release by a transferee of property previously transferred to such transferee in a transaction that is neither void nor voidable by the debtor or the trustee under any applicable law, including proceeds of such property, but does not include an obligation substituted for an existing obligation.[517]

_____

[514] *Gouveia v. Cahillane* (*In re Cahillane*), 408 B.R. 175, 210 (Bankr. N.D. Ind. 2009); *see also In re Superior Toy & Mfg. Co., Inc.*, 78 F.3d 1169, 1171 (7th Cir. 1996); *Neuger v. United States* (*In re Tenna Corp.*), 801 F.2d 819, 822 (6th Cir. 1986); 4 COLLIER ON BANKRUPTCY, ¶ 547.08, at 547–45 (Lawrence P. King et al. eds., 15th ed. 1995); *cf. Savage & Assocs., P.C. v. Mandl* (*In re Teligent Inc.*), 380 B.R. 324, 339 (Bankr. S.D.N.Y. 2008) ("The proponent must construct a hypothetical chapter 7 case, and determine the percentage distribution that the defendant would have received on the petition date.").

[515] 11 U.S.C. § 547(g); *Lawson v. Ford Motor Co.* (*In re Roblin Indus., Inc.*), 78 F.3d 30, 39 (2d Cir. 1996).

[516] 11 U.S.C. § 547(c)(1); *see also Official Comm. of Unsecured Creditors of 360networks* (*USA*) *Inc. v. U.S. Relocation Services, Inc.* (*In re 360networks* (*USA*) *Inc.*), 338 B.R. 194, 204 (Bankr. S.D.N.Y. 2005).

[517] 11 U.S.C. § 547(a)(2).

The determination of "new value" is a question of fact.[518] There is no requirement that the new value provided to the debtor be made by the defendant; value provided by a third party is sufficient.[519]

The second element of the defense requires a determination of whether the parties intended a contemporaneous exchange for new value.[520] Intent is a question of fact and may be proved by circumstantial objective evidence, including the terms in any documents or memoranda between the parties.[521]

Finally, the contemporaneous new value defense will only be available to a defendant if the challenged transfer and the provision of new value were actually made at substantially the same time. Whether a transfer is substantially contemporaneous requires a "case-by-case

---

[518] *In re Rustia*, 20 B.R. 131 (Bankr. S.D.N.Y. 1982); *In re Duffy*, 3 B.R. 263 (Bankr. S.D.N.Y. 1980).

[519] *See In re 360networks (USA) Inc.*, 338 B.R. at 205. This rule differs from the new value defense under the Minnesota Insider Preference statute and from the subsequent new value defense of section 547(c)(4), neither of which generally recognizes value provided by a third party in applying those defenses. This distinction arises from the varying language of the statutes. Section 547(c)(4) requires that "such creditor" (i.e., the creditor that received the possibly preferential transfer) gives new value, 11 U.S.C. § 547(c)(4), and the Minnesota UFTA similarly provides that a transfer is not avoidable "to the extent the insider gave new value." MINN. STAT. ANN. § 513.48(f)(1). These sections therefore require that the creditor/insider that is the target of the preferential transfer allegation give new value in order for the affirmative defense to apply. In contrast, section 547(c)(1) merely requires that a transfer be intended by the debtor and creditor to be a contemporaneous exchange for new value and that such transfer actually be a substantially contemporaneous exchange, but includes no requirement that the new value come from the defendant-creditor itself. 11 U.S.C. § 547(c)(1).

[520] *Buchwald Capital Advisors, LLC v. Metl-Span I., Ltd.* (*In re Pameco Corp.*), 356 B.R. 327, 338 (Bankr. S.D.N.Y. 2006) (noting that the Bankruptcy Code requires that both the debtor and the transferee intended the transfer to be contemporaneous); *In re 360networks (USA) Inc.*, 338 B.R. at 207 (noting that the relevant intent is that of the debtor and either (1) the entity to whom the transfer was made or (2) the entity for whose benefit such transfer was made); *see, e.g.*, *Hechinger Inv. Co. of Del., Inc. v. Universal Forest Prods., Inc.* (*In re Hechinger Inv. Co.*), 489 F.3d 568, 574 (3d. Cir. 2007); *Official Plan Comm. v. Expeditors Int'l of Wash., Inc.* (*In re Gateway Pac. Corp.*), 153 F.3d 915, 918 (8th Cir. 1998); *Sulmeyer v. Suzuki* (*In re Grand Chevrolet, Inc.*), 25 F.3d 728, 733 (9th Cir. 1994); *Tyler v. Swiss Am. Sec., Inc.* (*In re Lewellyn & Co., Inc.*), 929 F.2d 424, 428 (8th Cir. 1991); *Silverman Consulting, Inc. v. Canfor Wood Prods. Mktg.* (*In re Payless Cashways, Inc.*), 306 B.R. 243, 248 (B.A.P. 8th Cir. 2004), *aff'd*, 394 F.3d 1082 (8th Cir. 2005); *Feltman v. City Nat'l Bank of Fla.* (*In re Sophisticated Commc'ns., Inc.*), 369 B.R. 689, 703 (Bankr. S.D. Fla. 2007).

[521] *In re 360networks (USA) Inc.*, 338 B.R. at 209; *see, e.g.*, *In re Lewellyn & Co., Inc.*, 929 F.2d at 427 ("The existence of intent, contemporaneousness, and new value are questions of fact."); *Ray v. Sec. Mut. Fin. Corp.* (*In re Arnett*), 731 F.2d 358, 360 (5th Cir. 1984); *In re Payless Cashways, Inc.*, 306 B.R. at 249 ("Since parties rarely testify as to their intent, courts look to the circumstances surrounding each situation."); *Eide v. U.S.* (*In re Quade*), 108 B.R. 681, 683 (Bankr. N.D. Iowa 1989); *see also In re Gateway Pac. Corp.*, 153 F.3d at 918; *Schnittjer v. Pickens* (*In re Pickens*), 2008 WL 63251, *2 (Bankr. N.D. Iowa Jan. 3, 2008); *Tomsis v. Sales Consultants of Bos, Inc.* (*In re Salience Assocs., Inc.*), 371 B.R. 578, 587 (Bankr. D. Mass. 2007); *Ganton Techs., LLC v. Chemtool, Inc.* (*In re Intermet Corp.*), 372 B.R. 358, 365–66 (Bankr. E.D. Mich. 2007).

inquiry into all relevant circumstances,"[522] including the length of delay, the reasons for any delays, and industry standards.[523] "Courts have consistently held that payments on account of an antecedent debt are not contemporaneous exchanges" for new value.[524]

### (2) Ordinary Course Of Business

Section 547(c)(2) of the Bankruptcy Code provides an "ordinary course" affirmative defense to the avoidance of facially preferential transfers. A transfer that satisfies all of the elements of a preference is nevertheless unavoidable if:

> (1) the transfer was in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee; and (2) such transfer was (a) made in the ordinary course of business or financial affairs of the debtor and the transferee, or (b) made according to ordinary business terms.[525]

The Bankruptcy Code does not define "ordinary course of business"; however, courts have looked to the legislative history which states that this section is designed to "leave undisturbed normal financial relations."[526]

If the defendant can establish that the debtor incurred the antecedent debt in the ordinary course of business, it must then establish that the debtor paid that debt in the ordinary course as well. When determining whether a transfer was made in the ordinary course of business, the bankruptcy court will undertake an objective analysis (i.e., whether the transfer was "made in

---

[522] *In re 360networks (USA) Inc.*, 338 B.R. at 209 (quoting *Pine Top Ins. Co. v. Bank of Am. Natl. Trust & Sav. Assoc.,* 969 F.2d 321, 328 (7th Cir.1992)) (noting that "the modifier 'substantial' makes clear that contemporaneity is a flexible concept which requires a case-by-case inquiry into all relevant circumstances").

[523] *See Telecash Indus., Inc. v. Universal Assets (In re Telecash Indus., Inc.)*, 104 B.R. 401, 403–04 (Bankr. D. Utah 1989) (noting issue of contemporaneous exchange is "a question of fact"); *Gropper v. Samuel Kunstler Textiles, Inc. (In re Fabric Buys of Jericho, Inc.)*, 22 B.R. 1013, 1016 (Bankr. S.D.N.Y. 1989) (finding that over ninety days is not contemporaneous); *Jahn v. First Tenn. Bank (In re Burnette)*, 14 B.R. 795, 803 (Bankr. E.D. Tenn. 1981) (finding twenty days is contemporaneous); *see also Pine Top Ins. Co.*, 969 F.2d at 328; *Moser v. JP Morgan Chase Bank, N.A. (In re Brown)*, 375 B.R. 348, 354 (Bankr. E.D. Tex. 2007); *Kerst v. Wray State Bank (In re Kerst)*, 347 B.R. 418, 426 (Bankr. D. Colo. 2006).

[524] *In re 360networks (USA) Inc.*, 338 B.R. at 205 (citing *Sapir v. Keener Lumber Co. (In re Ajayem Lumber Corp.)*, 143 B.R. 347, 352 (Bankr. S.D.N.Y.1992)) (finding that transfer intended by the parties to be for or on account of antecedent debt was not a contemporaneous exchange for new value given to the debtor).

[525] 11 U.S.C. § 547(c)(2).

[526] Bankruptcy Reform Act of 1978, Pub. L. 95-598, 1978 U.S.C.C.A.N. (92 Stat. 2549) 5963, 6329 (stating that the purpose of this defense "is to leave undisturbed normal financial relations, because it does not detract from the general policy of the preference section to discourage unusual action by either the debtor or [its] creditors during the debtor's slide into bankruptcy"); *Lawson v. Ford Motor Co. (In re Roblin Indus., Inc.)*, 78 F.3d 30, 41 (2d Cir. 1996); *see also Courtney v. Octopi, Inc. (In re Colonial Discount Corp.)*, 807 F.2d 594, 600 (7th Cir. 1986) ("The purpose of the ordinary course of business exception is to ensure that normal commercial transactions are not caught in the net of the trustee's avoidance powers."); *Marathon Oil Co. v. Flatau (In re Craig Oil Co.)*, 785 F.2d 1563, 1566 (11th Cir. 1986).

the ordinary course of business or financial affairs of the debtor and the transferee") and a subjective analysis (i.e., whether the transfer was "made according to ordinary business terms").[527] Because these two tests are disjunctive, satisfying either prong is sufficient to shield a payment from avoidance (so long as the underlying debt was incurred in the ordinary course).[528]

Although the ordinary course defense has generated a substantial volume of case law defining its scope and limits, the Examiner does not believe this defense is even arguably relevant to the three transfers discussed in Section VII.F.5.c and, accordingly, the Report does not include an encyclopedic exposition of that body of law.

### (3) Subsequent New Value

Under section 547(c)(4), a trustee cannot avoid the transfer if the transferee can show that, after having received the transfer, it gave new value to the debtor on an unsecured basis.[529] This affirmative defense recognizes that the "new value" provided by the transferee essentially repays the earlier preferential transfer and therefore offsets the harm done to the debtor's other creditors.[530] To prevail on this defense the transferee must prove that: (1) it extended new value to the debtor after receiving a preference; (2) the new value was unsecured; and (3) such new value remains unpaid.[531]

### (4) Earmarking

The earmarking doctrine is not set forth in the Bankruptcy Code but rather is a judge-made equitable exception[532] that prohibits the avoidance of a transfer otherwise avoidable as a preference if: (1) a new lender agrees to advance funds to a debtor on the condition that the

---

[527]  11 U.S.C. § 547(c)(2).

[528]  For bankruptcy cases filed prior to October 17, 2005, the ordinary course of business defense required establishing that the payment was objectively in the ordinary course, as measured against the industry standard. However, for cases filed after Congress's 2005 amendments to the Bankruptcy Code became effective, satisfaction of either the subjective or objective prongs of the test is sufficient. *See Cellmark Paper, Inc. v. Ames Merch. Corp.* (*In re Ames Dep't Stores, Inc.*), 470 B.R. 280, 284 n.5 (S.D.N.Y. 2012) ("As the Bankruptcy Court noted, section 547(c)(2) of the Bankruptcy Code was amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 . . . In the amended version of section 547(c)(2), a creditor need only prove, in addition to the first element, that either the second or third element are met, rather than both.") (citations omitted).

[529]  11 U.S.C. § 547(c)(4).

[530]  *Savage & Assocs., P.C. v. Level(3) Commc'ns* (*In re Teligent, Inc.*), 315 B.R. 308, 315 (Bankr. S.D.N.Y. 2004) (quoting *Kroh Bros. Dev. Co. v. Cont'l Constr. Eng'r, Inc.* (*In re Kroh Bros. Dev. Co.*), 930 F.2d 648, 652 (8th Cir. 1991)) ("Accordingly, 'the relevant inquiry under section 547(c)(4) is whether the new value replenishes the estate.'").

[531]  *In re Teligent, Inc.,* 315 B.R. at 315 ("A transferee, may, under § 547(c)(4), offset a preferential transfer to the extent he gave the debtor 'new value' *after* the date of the transfer, and the 'new value' remains unpaid.") (citations omitted); *Bruno Mach. Corp. v. Troy Die Cutting Co., LLC* (*In re Bruno Mach. Corp.*), 435 B.R. 819, 847 (Bankr. N.D.N.Y. 2010).

[532]  *In re Maxwell Newspapers, Inc.*, 151 B.R. 63 (Bankr. S.D.N.Y. 1993).

debtor use funds to pay a specified antecedent debt; (2) the parties perform the agreement according to its terms; and (3) the transaction, when viewed as a whole, does not diminish the debtor's estate.[533] The specifics of this defense will be addressed below where applicable.

### c. *Transactions That Implicate Bankruptcy Code Section 547*

#### (1) *March 2012 Payments Made Pursuant To The FRB/FDIC Settlement And The DOJ/AG Settlement*

##### (a) *Background*

As described in detail in Section V.C, GMAC Mortgage ultimately paid the full fine of approximately $109.6 million pursuant to the DOJ/AG Consent Judgment on March 14, 2012.[534] This payment to the government appears to meet all of the conditions of a preferential transfer: (1) it was a transfer of GMAC Mortgage's interest in property for the benefit of the government on account of its antecedent obligations under the DOJ/AG Consent Judgment;[535] (2) GMAC Mortgage was insolvent at the time of the transfer;[536] (3) the transfer was made within ninety days of the filing date of the Debtors' bankruptcy petitions; and (4) the government would have received less than the full payment if the payment had not been made and it had received a distribution as an unsecured creditor in a hypothetical chapter 7 liquidation of GMAC Mortgage.[537] However, as noted in Section V.C, the Examiner Scope Approval Order specifically limited the scope of the Investigation in this regard "to the propriety of the allocation of obligations as among the Debtors and AFI under the [FRB/FDIC Consent Order], [DOJ/AG Consent Judgment], and [CMP]."[538]

Consistent with the limitations of the Examiner Scope Approval Order, the Examiner has analyzed whether GMAC Mortgage could assert that the March 2012 payment made to the government is avoidable under section 547 and is recoverable from AFI as "the entity for

---

[533] *See Cadle Co. v. Mangan* (*In re Flanagan*), 503 F.3d 171, 184–85 (2d Cir. 2007) (citing *McCuskey v. Nat'l Bank of Waterloo* (*In re Bohlen Enters.*)), 859 F.2d 561, 566 (8th Cir. 1988); *Kaler v. Cnty. First Nat'l Bank* (*In re Heitkamp*), 137 F.3d 1087, 1088–89 (8th Cir. 1998).

[534] *See* E-mail from C. Dondzila (Mar. 15, 2013) [EXAM11004487]; ResCap Consolidating Financial Statements—2012, dated Oct. 29, 2012 [ALLY_0244598].

[535] *See* DOJ/AG Earmark and Indemnification Agreement, dated Mar. 9, 2012 [ALLY_0001865].

[536] *See* Section VI.B for the Examiner's analysis and conclusions as to ResCap's solvency.

[537] The payment at issue here was not a payment on a tax claim that would have priority under section 507(a)(8) of the Bankruptcy Code. Tax priority claims are senior to the claims of the Debtors' general unsecured creditors for purposes of the hypothetical chapter 7 test.

[538] Examiner Scope Approval Order, at 4 n.2.

whose benefit such transfer was made" under Bankruptcy Code section 550 (the Examiner does not consider any such claims that could be made against the government).[539] This Section analyzes that potential claim.[540]

### (b) Analysis

#### (i) AFI As Co-Obligor On The $109.6 Million Payment

As noted in Section V.C, the DOJ/AG Consent Judgment provides by its terms that ResCap, AFI, and GMAC Mortgage (as the collective "Defendant" under the DOJ/AG Consent Judgment) shall collectively pay the $109.6 million hard dollar payment.[541] The DOJ/AG Consent Judgment also provides that the terms of the exhibits attached to the judgment shall govern in the event of a conflict between the judgment and the exhibits.[542] Exhibit I of the DOJ/AG Consent Judgment, in turn, provides that ResCap, GMAC Mortgage, and RFC shall pay the $109.6 million hard dollar payment but is silent as to AFI's payment obligation.[543] But the exhibit specifically provides that the parties agreed to this payment "[i]n recognition of . . . the agreements of AFI with respect to the payment of settlement funds in the event [ResCap, GMAC Mortgage, and RFC] do not perform certain obligations"[544] and

---

[539]  11 U.S.C. § 550(a)(1). Notably, AFI and the government contemplated the possibility that these payments would be preferential transfers, as evidenced by the DOJ/AG Earmark and Indemnification Agreement, dated Mar. 9, 2012 [ALLY_0001865], which indemnifies the U.S. government and certain states from any payments required to be made as a result of a chapter 5 avoidance actions.

[540]  In any action to recover the March 2012 payment, sovereign immunity, nondischargeablity or some other government-specific defense may be asserted in an effort to defeat the underlying preference claim (as against the government) and prevent recovery. Although the merits of potential preference claims against the government and defenses against those claims are not within the scope of the Investigation, it does not appear to the Examiner that meritorious defenses exist given: (1) section 106(a) of the Bankruptcy Code, which provides that, among other things, sovereign immunity is abrogated as to a governmental unit (defined in section 101(27) of the Bankruptcy Code to include the United States and any State) with respect to claims asserted under section 547; and (2) the substantial body of law addressing preference suits against the States. *See, e.g.*, 11 U.S.C. § 106(a); *Cent. Va. Cmty. College v. Katz*, 546 U.S. 356 (2006) (holding that, inter alia, sovereign immunity does not protect States from preference avoidance and recovery); *Murray v. Withrow* (*In re PM-II Assocs., Inc.*), 100 B.R. 94 (Bankr. S.D. Ohio 1989) (holding that a preferential transfer action seeking recovery of civil penalties paid to the State of Ohio (pursuant to a consent judgment settling claims related to violations of Ohio state law) would not be barred by sovereign immunity because, in part, of an earlier codification of section 106 of the Bankruptcy Code); *State Comp. Ins. Fund v. Zamora* (*In re Silverman*), 616 F.3d 1001 (9th Cir. 2010); *Reynolds v. Dixie Nissan* (*In re Car Renovators*), 946 F.2d 780 (11th Cir. 1991); *Babitzke v. Mantelli* (*In re Mantelli*), 149 B.R. 154 (B.A.P. 9th Cir. 1993) (holding that nondischargeability is not a relevant issue with respect to the hypothetical chapter 7 test and that collection with respect to a nondischargeable debt can still be compelled even if a transfer is avoided as a preference). However, if the initial transfer to the government is subject to a meritorious defense, AFI would not be liable for the March 2012 payment under section 550 because there would be no underlying avoidable transfer.

[541]  DOJ/AG Consent Judgment, ¶ 3. The judgment specifically states that "Defendant" shall pay the settlement amount, *id*. ¶ 3, and defines "Defendant" as ResCap, AFI, and GMAC Mortgage, collectively, *id.* at 1.

[542]  *Id.* ¶ 19.

[543]  *Id.* Ex. I ¶ 1.

[544]  *Id.* Ex. I, at 1.

with the understanding that, pursuant to the terms of the DOJ/AG Earmark and Indemnification Agreement, AFI agreed to indemnify the United States government from any payments required to be made as a result of chapter 5 avoidance actions directed against the government.[545] Although the documentation is not as clear as the documentation of the CMP Order,[546] these provisions read together support the proposition that ResCap, GMAC Mortgage, RFC, and AFI were all financially liable to the government for the payments, with ResCap, GMAC Mortgage, and RFC required to make the payments in the first instance. There are also consistent extrinsic indications that the DOJ and AGs viewed AFI as responsible for the relief provided in the DOJ/AG Consent Judgment in the event that ResCap could not pay.[547]

The March 14 Earmark Agreement, agreed to by AFI and ResCap, provides that "pursuant to the Consent Judgment, ResCap is required to pay" the $109.6 million hard dollar payment. Although AFI could contend that this statement is an acknowledgement by ResCap of its sole responsibility for making these payments, the Examiner concludes that the evidence (in this case, the DOJ/AG Consent Judgment itself) supports the proposition that AFI was liable to the government along with ResCap, GMAC Mortgage, and RFC.

An examination of what would happen in a hypothetical chapter 7 liquidation of ResCap and its subsidiaries illustrates this point. If ResCap and its subsidiaries had filed for bankruptcy prior to making the $109.6 million payment to the government, the government would have enforced the payment against AFI (as "Defendant" obligated to make the payments provided for in paragraph 3 of the DOJ/AG Consent Judgment) and AFI, in turn, would have asserted a claim for that amount in the hypothetical chapter 7 liquidation. Although AFI and ResCap apparently agreed between themselves that ResCap and its subsidiaries would make the hard dollar payment, that agreement did not change the obligations of AFI to the government under the DOJ/AG Consent Judgment.

The Examiner therefore concludes that the evidence supports the proposition that AFI was liable, together with ResCap, RFC, and GMAC Mortgage, for the $109.6 million hard dollar payment and that AFI therefore received a benefit in the amount of $109.6 million from the payment made by GMAC Mortgage.

### (ii) AFI As Beneficiary Of DOJ/AG Settlement Release

Even if AFI were not liable for the $109.6 million hard dollar payment, it would still have received a benefit from that payment because AFI received a release as a result of GMAC Mortgage's payment. The DOJ/AG Consent Judgment by its terms provides for a release of AFI from certain claims and remedies assertable by the DOJ and the state AGs in

---

[545] *Id.* Ex. I, at 1–12.

[546] CMP Order, ¶ 1 (explicitly providing that AFI, ResCap and GMAC Mortgage and its subsidiaries are jointly and severally responsible for the $207 million CMP).

[547] *See* Int. of J. Pensabene, Jan. 9, 2013, at 189:8–190:2 (noting that in discussions regarding the DOJ/AG Settlement "the discussion with the government about the [hard dollar] amount was just whether or not [AFI] would be a party to the settlement" and that the government "insisted" that AFI be a party "because of concern's about ResCap's ability to pay the fine").

consideration for, in part, the payment of the $109.6 million hard dollar payment.[548] Regardless of whether AFI was co-liable for the hard dollar payment, AFI indisputably received a benefit from that payment in the form of a release from any potential civil or administrative claims arising from conduct that occurred prior to the settlement agreement.[549]

While not exactly on-point, the decision of the U.S. Bankruptcy Court for the Northern District of Texas in *Carolyn's Kitchen* v. *Cybergenics Corp*.[550] is instructive. In *Carolyn's Kitchen*, the debtor made prepetition payments to a creditor on account of a settlement agreement for which a non-debtor party was also a co-obligor and then sought to avoid these transfers as preferential payments under Bankruptcy Code section 547. After examining the transaction, the bankruptcy court held that the Debtor's payment of $122,500 on account of the settlement agreement was a preferential transfer.[551] The bankruptcy court also held that the non-debtor party that was a "co-maker" of the settlement obligations was "an entity for whose benefit such transfer was made within the meaning of §550(a)(1) and is jointly and severally liable with [the recipient of the avoidable transfer] for such . . . payment subject to the limitation of a single satisfaction set forth in §550(c)."[552] While the *Carolyn's Kitchen* case does not provide a substantive analysis of this issue, it does indicate that there is authority to hold a co-obligor under a settlement agreement responsible for the full value of preferential transfers made pursuant to that settlement agreement.

### (iii) Recovery From AFI Under Section 550

The evidence therefore supports the proposition that AFI was an "entity for whose benefit" the avoidable $109.6 million transfer was made, whether or not it was financially liable to make the payment.[553]

Because: (1) the Examiner concludes that the evidence supports the proposition that AFI was liable to the government along with ResCap, GMAC Mortgage, and RFC; (2) the Examiner concludes that the evidence supports the proposition that AFI received a direct,

---

[548]  DOJ/AG Consent Judgment, ¶¶ 9–10, Ex. G, H. The consideration set forth in the DOJ/AG Consent Judgment for this release also includes the $200 million in consumer relief that was ultimately provided by ResCap and its subsidiaries. Pursuant to the terms set forth in Ex. I of the DOJ/AG Consent Judgment, AFI agreed to provide this $200 million in consumer relief to the extent that ResCap, GMAC Mortgage, and RFC did not perform such obligations. *Id*. Ex. I ¶ 3.

[549]  *Id.* Ex. G, H. These releases were effective upon payment of the $109.6 million "Direct Payment Settlement Amount." *Id*. Ex. I, ¶ 3.c.

[550]  209 B.R. 204 (Bankr. N.D. Tex. 1997).

[551]  *Id*. at 208.

[552]  *Id.* at 209.

[553]  As fully explained in Section V.C.1(f), AFI did believe that there was some benefit to the release that it received under the DOJ/AG Settlement, but ultimately determined that there was no "good mechanism" to determine an appropriate fair value of the release. *See, e.g*., DOJ/AG Settlement—Allocation Scenarios, dated Feb. 13, 2012 [EXAM10999353] (attached to E-mail from H. McKay (Feb. 13, 2012) [EXAM10999352]); Int. of D. DeBrunner, Apr. 18, 2013, at 77:17–24, 81:20–82:8.

ascertainable, and quantifiable benefit commensurate with the full amount of the value transferred by being relieved of its obligations to make the $109.6 million payment in the event ResCap and its subsidiaries did not make the payment; (3) there is authority to suggest that a co-obligor under a settlement agreement is an "entity for whose benefit" a payment under that settlement agreement is made; (4) whether or not AFI was liable to make the payment, AFI received a benefit from GMAC Mortgage's transfer of the $109.6 million by obtaining a release from certain claims and remedies assertable by the DOJ and the state AGs; and (5) an entity for whose benefit an avoidable transfer was made would be jointly and severally liable with the recipient of an avoided transfer in a recovery action under section 550 of the Bankruptcy Code, the Examiner concludes it is likely that a preference claim under section 550 of the Bankruptcy Code against AFI for $109.6 million would prevail.

### (iv) Effect Of The March 14 Earmark Agreement And AFI's $196.5 Million Debt Forgiveness

If faced with the argument that all or a portion of the $109.6 million payment is recoverable against it under section 550, AFI would likely argue that the March 14 Earmark Agreement, clarifying the January 30 Letter Agreement, invokes the protection of the "earmarking doctrine" and would prevent AFI from being held responsible for this transfer. If the earmarking doctrine does apply, the funds transferred by GMAC Mortgage were never part of GMAC Mortgage's assets and therefore do not meet the threshold requirements of section 547 of the Bankruptcy Code.[554] The earmarking doctrine is a judicially-crafted doctrine that focuses on the requirement that a preferential transfer must be a transfer "of an interest of the debtor in property" and recognizes that, "where a third party lends money to the debtor for the specific purposes of paying a selected creditor," no transfer of the debtor's property has occurred because such transferred funds were "earmarked."[555]

Pursuant to the terms of the January 30 Letter Agreement, AFI agreed to forgive $196.5 million of indebtedness under the A&R Line of Credit Agreement, under which RFC and GMAC Mortgage were borrowers and ResCap and certain other affiliates were guarantors. As explained in Section V.E, the A&R Line of Credit Agreement was entered into on December 30, 2009 by amending, restating, and consolidating the Initial Line of Credit Agreement and the Second Line of Credit Agreement. These secured revolver facilities were designed to provide ResCap and its subsidiaries with additional liquidity.

_____

[554] *See, e.g.*, *Chase Manhattan Mort. Corp. v. Shapiro* (*In re Lee*), 530 F.3d 458, 468 (6th Cir. 2008) ("The earmarking doctrine, then, is a judicially-created defense that may be invoked by a defendant to a preference action in an attempt to negate § 547(b)'s threshold requirement—a transfer of an interest of the debtor in property.").

[555] *See, e.g*, *Cadle Co. v. Mangan* (*In re Flanagan*)*,* 503 F. 3d 171, 184 (2d Cir. 2007).

On January 30, 2012, AFI forgave the $196.5 million of indebtedness as set forth in the January 30 Letter Agreement.[556] ResCap then allocated $124.2 million of this forgiveness to GMAC Mortgage and the remaining $72.3 million of forgiveness to RFC.[557] GMAC Mortgage then took advantage of this additional availability under the A&R Line of Credit Agreement to borrow $112 million, of which $109.6 million was paid to the government on March 14, 2012.[558]

The March 14 Earmark Agreement provides that ResCap "reaffirms and agrees" that: (1) the debt forgiveness provided by AFI was to allow ResCap to make the $109.6 million hard dollar payment; (2) without the debt forgiveness provided by AFI, ResCap would be unable to make the $109.6 million hard dollar payment; (3) $109.6 million of the liquidity provided by the $196.4 million debt forgiveness will be used solely to fund the $109.6 million hard dollar payment; and (4) AFI's provision of capital support and ResCap's use of that capital support "viewed as a whole, does not result in any additional debt obligations or other diminution of ResCap."[559]

In the classic earmarking case, a third party makes a loan to a debtor specifically to enable that debtor to satisfy the claim of a designated creditor. As Collier's notes:

> Under the "earmarking doctrine," funds provided to a debtor for the purpose of paying a specific indebtedness may not be recoverable as a preference from the creditor to which they are paid, on the premise that the property "transferred" in such a situation was never property of the debtor and so the transfer did not disadvantage other creditors. One creditor has been substituted for another; Thus when new funds are provided by the new creditor to or for the benefit of the debtor for the purpose of paying the obligation owed to the older creditor, the funds are said to be "earmarked" and the payment is held not to be a voidable preference.[560]

To determine if the earmarking doctrine should apply, courts have developed a three-part test which examines: (1) whether there is an agreement between the new lender and the debtor

---

[556] *See* GMAC Mortgage, LLC Consolidated Financial Statements for the Years Ended December 31, 2011 and 2010 (Mar. 28, 2012), at 11, 69 [RC00032177] (stating that on January 30, 2012 GMAC Mortgage "recognized a capital contribution . . . of $124.2 million, and a corresponding reduction in borrowings under the [A&R Line of Credit Agreement]"); Residential Funding Company, LLC Consolidated Financial Statements for the Years Ended December 31, 2011 and 2010 (Mar. 28, 2012), at 11, 61 [RC00032246] (stating that on January 30, 2012, RFC "recognized a capital contribution . . . of $72.3 million, and a corresponding reduction in our borrowings under the [A&R Line of Credit Agreement]").

[557] Memorandum, Significant Transaction Memo: General Information and Transaction Description Re Mortgage Fine, Waivers and Debt Forgiveness, dated Feb. 2012, at EXAM00220160 [EXAM00220147].

[558] *See* ResCap Daily Liquidity Rollforward, dated Mar. 14, 2012 [EXAM00010050].

[559] March 14 Earmark Agreement, ¶ 1–4.

[560] 5 COLLIER ON BANKRUPTCY, ¶ 547.03[2][a] (Alan N. Resnick & Henry J. Sommer eds., 16th ed.).

that the new funds will be used to pay a specified antecedent debt; (2) whether that agreement was performed according to its terms; and (3) whether the transaction viewed as a whole (including the transfer in of the new funds and the transfer out to the old creditor) does not result in any diminution of the estate.[561] Notably, "the doctrine will only protect a transfer from avoidance to the extent it did not diminish the debtor's estate."[562] "[W]here a debtor replaces an unsecured obligation with a secured obligation, the payment is voidable to the extent of the collateral transferred by the debtor."[563] In other words, where a debtor offers its own property as collateral for the loan that is allegedly subject to the earmarking doctrine, the debtor has "transferred an interest in its property and therefore the earmarking defense is not available."[564]

The Examiner concludes that the transaction described above does not satisfy the requirements for invoking the earmarking doctrine in favor of AFI. GMAC Mortgage paid an unsecured obligation owed to the government by drawing down $112 million on its pre-existing secured loan agreement, $109.6 million of which was then used to pay the fine.[565] This draw was made under the A&R Line of Credit Agreement and accompanying A&R Line of Credit Security Agreement, which granted a lien in favor of AFI over specified collateral to the extent that any obligations under the A&R Line of Credit Agreement remain outstanding.[566] The obligations, including the obligations arising from this draw, were secured by the liens on GMAC Mortgage's assets granted under the A&R Line of Credit Security Agreement.[567] As discussed in Section VI.F.1, the collateral securing the A&R Line of Credit Facility was worth more than the outstanding amount of that obligation, i.e., the facility was oversecured. Given that GMAC Mortgage therefore exchanged an unsecured obligation for a secured obligation, the Examiner concludes that the evidence does not support the proposition that the earmarking doctrine would apply to this transaction.

### (v) Limitation On Recovery To The Value Received By AFI

AFI may seek to limit its liability for the full $109.6 million based on the argument that it was not jointly and severally obligated on the DOJ/AG Consent Judgment and/or that it did

---

[561] *See, e.g, Cadle Co. v. Mangan* (*In re Flanagan*), 503 F. 3d 171, 184–85 (2d Cir. 2007) (citing *McCuskey v. Nat'l Bank of Waterloo* (*In re Bohlen Enters.*), 859 F.2d 561, 566 (8th Cir. 1988)).

[562] *In re Flanagan*, 503 F. 3d at 185 (citing *Glinka v. Bank of Vt.* (*In re Kelton Motors, Inc.*), 97 F.3d 22, 28 (2d Cir. 1996)).

[563] *In re Flanagan*, 503 F. 3d at 185–86 (citing *In re Kelton Motors, Inc.*, 97 F.3d at 28).

[564] *In re Kelton Motors, Inc.*, 97 F.3d at 29.

[565] The total amount that GMAC Mortgage drew down was actually $112 million, which draw occurred on March 14, 2012 (the same day of the payment to the government) and was tied to the payment of the hard dollar fine under the DOJ/AG Consent Judgment. *See* ResCap Daily Liquidity Rollforward, dated Mar. 14, 2012 [EXAM00010050].

[566] A&R Line of Credit Security Agreement, ¶ 2 [EXAM00110733].

[567] At the time of this draw, it is clear that the A&R Line of Credit Agreement was oversecured. *See* A&R Line of Credit Agreement Monthly Borrowing Base Report for the Reporting Period Ending on Mar, 31, 2012, dated Apr. 16, 2012 [EXAM00221830].

not receive the entire benefit from the payment in question. This argument would likely rest on: (1) an assertion that the terms of the DOJ/AG Consent Judgment and its accompanying exhibits were unclear and therefore do not make AFI liable for the hard dollar payment; (2) the agreement by ResCap and its subsidiaries to make the payment; and (3) the fact that some courts have held that transfer beneficiary liability "should be limited to the value of the benefit actually received" by such entity.[568]

The Examiner has concluded that the evidence supports the proposition that AFI was jointly liable to the government for the $109,628,425 hard dollar payment. Even if this conclusion is incorrect, there is a body of case law holding that section 550(a)(1) of the Bankruptcy Code permits an avoided transfer to be recovered from either the initial transferee or the entity for whose benefit such transfer was made and that such liability is "coextensive."[569] The Examiner therefore concludes it is unlikely that an effort by AFI to limit the amount of its liability for this transfer would prevail.

### (vi) Other Possible Defenses

AFI may assert that one or more of the affirmative defenses found in section 547(c) should apply to prevent avoidance and recovery. The Examiner concludes it is unlikely that the ordinary course defense of section 547(c)(2) would be applicable here because the payment on account of the DOJ/AG Settlement was a one-time transaction and was incurred and paid under extraordinary circumstances.[570]

AFI may argue that this transfer should be protected by the new value defenses contained in section 547(c)(1) because the transfer of the $109.6 million payment provided GMAC Mortgage with a release from its obligations under the DOJ/AG Consent Judgment. This argument has been rejected by courts on the basis that "settlement agreements which require

---

[568] *Terry v. Meredith* (*In re Stephen S. Meredith, CPA, P.C.*), 367 B.R. 558, 562 (E.D. Va. 2007).

[569] *Official Comm. of Unsecured Creditors of 360networks* (*USA*) *Inc. v. U.S. Relocation Servs., Inc.* (*In re 360networks* (*USA*) *Inc.*), 338 B.R. 194, 207 (Bankr. S.D.N.Y. 2005) ("[Section 550] provides that a transfer that is avoided under § 547 can be recovered from either the initial transferee or the entity 'for whose benefit such transfer was made.' The liability of these two parties is coextensive."); *see also* Section VII.F.8.

[570] *See Official Comm. of Unsecured Creditors of Enron Corp. v. Martin* (*In re Enron Creditors Recovery Corp.*), 376 B.R. 442, 462 (Bankr. S.D.N.Y. 2007) ("[F]or a 'first time' transfer to qualify for application of the defense [in 11 U.S.C. § 547(c)(2)], it should be of a type that could have been a 'recurring, customary trade transaction had the parties continued their business relationship—not a single isolated transaction that would never have been repeated in any case."); *Durant's Rental Ctr., Inc. v. United Truck Leasing, Inc.* (*In re Durant's Rental Ctr., Inc.*), 116 B.R. 362, 365 (Bankr. D. Conn. 1990) (finding that the parties' settlement "was a one time, non-recurring transaction outside of the ordinary course of their business" because 11 U.S.C. § 547(c)(2) is not meant to protect "one time payments in settlement of contractual claims"); *Intercontinental Publ'ns, Inc. v. Perry* (*In re Intercontinental Publ'ns, Inc.*), 131 B.R. 544, (Bankr. D. Conn. 1991) (finding that severance and attorney's fee payment to former editor-in-chief of magazine resulting from publisher's violation of employment contract was not a "recurring" transaction within the meaning of 11 U.S.C. § 547(c)(2)).

expenditures by the debtor without tangible enhancement of the estate rarely provide new value of the sort contemplated by § 547(a)(2)."[571] Or, in the words of the Seventh Circuit:

> [A] payment is not a preference unless the debtor is insolvent and the creditor receives more than he would have otherwise received. Therefore, in a preference situation a release is likely to be worthless to other creditors. The release does not free up any assets for other creditors because the debtor could not have paid the preferred claim anyway. All the payment for the settlement and release does is deplete the debtor's estate at the other creditors' expense, frustrating Congress's intent to promote fair distribution among creditors.[572]

Given this authority, the Examiner concludes it is unlikely that a defense based on new value provided to GMAC Mortgage as a result of a release from the judgment would succeed.

Finally, the Examiner also concludes it is unlikely that an argument that AFI provided contemporaneous new value under section 547(c)(1) by forgiving a portion of GMAC Mortgage's indebtedness under the A&R Line of Credit Agreement on January 30, 2012 would prevail. Even if the debt forgiveness is assumed to be contemporaneous (a matter that is not self-evident), GMAC Mortgage had to re-borrow the entire amount needed to pay the fine under the A&R Line of Credit Agreement,[573] thereby eliminating any new value arguably provided by the January 30, 2012 debt forgiveness.[574]

AFI may also argue that it provided some form of subsequent new value to GMAC Mortgage and that the $109.6 million payment would therefore be protected by section 547(c)(1) or 547(c)(4) of the Bankruptcy Code. However, as set forth in Section VII.F.4, the last possible new value provided by AFI to GMAC Mortgage occurred on January 30, 2012, when AFI forgave $196.5 million of indebtedness under the A&R Line of Credit

---

[571] *Phx. Rest. Grp, Inc. v. Fuller, Fuller & Assocs., P.A.* (*In re Phx. Rest. Grp., Inc.*), 316 B.R. 671, 680 (Bankr. M.D. Tenn. 2004); *see also Carolyn's Kitchen, Inc. v. Cybergenics Corp.* (*In re Carolyn's Kitchen, Inc.*), 209 B.R. 204 (Bankr. N.D. Tex. 1997); *Bioplasty, Inc. v. First Trust Nat'l Ass'n* (*In re Bioplasty, Inc.*), 155 B.R. 495 (Bankr. D. Minn. 1993).

[572] *Energy Co-op., Inc. v. SOCAP Int'l, Ltd.* (*In re Energy Co-op., Inc.*), 832 F.2d 997, 1003–04 (7th Cir. 1987).

[573] The total amount that GMAC Mortgage drew down was actually $112 million, which draw occurred on March 14, 2012 (the same day of the payment to the government) and was tied to the payment of the hard dollar fine under the DOJ/AG Consent Judgment. *See* ResCap Daily Liquidity Rollforward, dated Mar. 14, 2012 [EXAM00010050].

[574] *See* GMAC Mortgage, LLC Consolidated Financial Statements for the Years Ended December 31, 2011 and 2010 (Mar. 28, 2012), at 11, 69 [RC00032177] (stating that on January 30, 2012 GMAC Mortgage "recognized a capital contribution . . . of $124.2 million, and a corresponding reduction in borrowings under the [A&R Line of Credit Agreement]"); Residential Funding Company, LLC Consolidated Financial Statements for the Years Ended December 31, 2011 and 2010 (Mar. 28, 2012), at 11, 61 [RC00032246] (stating that on January 30, 2012, RFC "recognized a capital contribution . . . of $72.3 million, and a corresponding reduction in our borrowings under the [A&R Line of Credit Agreement]").

Agreement.[575] Given that the debt forgiveness occurred fifteen days before GMAC Mortgage's payment of the $109.6 million, it does not qualify as a subsequent infusion of new value.[576]

### (c) Conclusion[577]

The Examiner concludes that it is likely that the $109.6 million payment made by GMAC Mortgage to the government on March 14, 2012 on account of the obligations under the DOJ/AG Consent Judgment would be avoidable as a preferential transfer under section 547 and that the payment would be recoverable from AFI under section 550 as an entity for whose benefit the transfer was made.

### (2) March 2012 Payments Made To Ally Bank Pursuant To The MMLPSA And Pipeline Swap

### (a) Background

As set forth in greater detail in Section V.B, the Examiner has concluded that revenues on loans brokered by GMAC Mortgage were likely improperly allocated to Ally Bank for the period between January 1, 2009 and May 2012, when the MMLPSA and the Pipeline Swap were terminated. That allocation appears to have been in breach of GMAC Mortgage's and Ally Bank's agreement, as documented in the MMLPSA and the Pipeline Swap, that all revenues (except net carry) from the GMAC Mortgage-brokered loans would be payable to GMAC Mortgage. Section V.B sets forth in detail the facts underlying this issue and, in Section V.B, the Examiner concludes that GMAC Mortgage likely would succeed on a contractual claim that the allocation of revenues (to GMAC Mortgage) from January 1, 2009 to July 31, 2009 were proper and that GMAC Mortgage is entitled to payment of the revenues thereafter misallocated to the Bank. Accordingly, the preference issue discussed in this Section would be moot if, as the Examiner has concluded is likely, such a contractual claim by GMAC Mortgage were to prevail and would be relevant only if (contrary to the Examiner's conclusion) such a contractual claim were not to prevail.

As discussed in greater detail in Section V.B, GMAC Mortgage did in the first instance receive revenues for the period between January 1, 2009 and July 31, 2009, with Ally Bank earning only net interest carry during that period. In early 2012, Ally Bank demanded that ResCap pay to Ally Bank the funds received by GMAC Mortgage during the first half of 2009

---

[575] *See* ResCap 2011 Financial Statements, at 39 [EXAM00122651]. Only $124.2 million of this total forgiveness was allocated to GMAC Mortgage. *See* GMAC Mortgage, LLC Consolidated Financial Statements for the Years Ended December 31, 2011 and 2010 (Mar. 28, 2012), at 11, 69 [RC00032177].

[576] *See Eisenberg v. O. Censor & Co., (In re Baumgold Bros.)*, 103 B.R. 436, 439 (Bankr. S.D.N.Y. 1989) ("[A] preferential transfer may be set off only against new value advanced *after* the preference was received.").

[577] As noted in Section VII.F.3 above, because fraudulent transfer issues related to GMAC Mortgage are likely governed by Pennsylvania law and Pennsylvania (unlike Minnesota) has not adopted an Insider Preference avoidance statute, there are no alternative state law preference recovery issues that need to be analyzed regarding this transaction.

(plus interest). On March 27, 2012, at Ally Bank's demand,[578] GMAC Mortgage paid $51.4 million to Ally Bank for what the parties noted was a reimbursement of revenues and expenses that was allegedly owed to Ally Bank for the period between January 1, 2009 and July 31, 2009. At the same time, contingent on GMAC Mortgage's payment to Ally Bank, AFI forgave an equivalent amount of intercompany debt owed by GMAC Mortgage to AFI.

### (b) Analysis

The Examiner concludes that it is likely that GMAC Mortgage's $51.4 million payment to Ally Bank meets the prima facie elements of a preferential transfer: (1) it was a transfer of GMAC Mortgage's interest in property (cash) to and for the benefit of Ally Bank to satisfy amounts owed pursuant to the MMLPSA and the Pipeline Swap (antecedent debts); (2) GMAC Mortgage was insolvent at the time of the transfer; (3) the transfer was made within ninety days of the filing date of the Debtors' bankruptcy petitions; and (4) Ally Bank would have received less than the full $51.4 million under the hypothetical chapter 7 liquidation test.

### (c) Possible Defenses

Even though it is likely that GMAC Mortgage could establish a prima facie case that its March 27 payment of $51.4 million to Ally Bank was an avoidable preference, the Examiner nonetheless concludes that it is likely that Ally Bank could establish, pursuant to section 546(g) of the Bankruptcy Code, a valid safe harbor defense to avoidance of that payment.

As set forth above, section 546(g) precludes avoidance of a transfer, except pursuant to section 548(a)(1)(A) of the Bankruptcy Code, if: (1) a swap agreement exists; (2) the challenged transfer was made by, to or for the benefit of a swap or financial participant; (3) the challenged transfer was made "under" or "in connection with" the swap agreement; and (4) the transfer occurred prior to the commencement of the bankruptcy case.[579] The Examiner concludes that GMAC Mortgage's March 27, 2012 payment to Ally Bank likely meets all of these criteria.

First, the Pipeline Swap falls squarely within the definition of a "swap agreement."[580] It was documented under an International Swaps and Derivatives Association ("ISDA") Master Agreement—Multicurrency-Cross Border (1992 form) and related Schedule,[581] and was

---

[578] The ordinary course defense of section 547(c)(2) is not applicable here. Payments made as a result of unusual economic pressure or debt collection practices do not fall within the "ordinary course of business." *See, e.g.*, *Buchwald Capital Advisors, LLC v. Metl-Span I., Ltd.* (*In re Pameco Corp.*), 356 B.R. 327, 340 (Bankr. S.D.N.Y. 2006).

[579] *See* 11 U.S.C. § 546(g).

[580] *See* 11 U.S.C. § 101(53B).

[581] 2004 Pipeline Swap [ALLY_0041583]; 2004 Pipeline Swap Schedule [ALLY_0041808]. The Pipeline Swap was amended several times and eventually was documented under a 2002 ISDA Master Agreement, dated as of April 1, 2011, an Amended and Restated Schedule to the 2002 ISDA Master Agreement, dated as of April 1, 2011, and an ISDA Credit Support Annex to the Schedule to the Master Agreement, dated as of April 1, 2011. The April 2002 ISDA Master Agreement, Amended and Restated Schedule and Credit Support Annex also applied to the MSR Swap. There were separate confirmations for the Pipeline Swap and the MSR Swap.

designed to hedge the Bank from any changes in the fair market value of loans (generally because of market interest rate changes) between "rate lock" and "funding" of the loans.[582] The definition of "swap agreement" is very broad,[583] and includes "an interest rate swap, option, future, or forward agreement."[584]

Second, Ally Bank, the recipient of the transfer, is a "swap participant" because it had an outstanding swap agreement—namely the Pipeline Swap—with GMAC Mortgage prior to the Petition Date.[585]

Third, although the payment does not appear to have been made "under" the Pipeline Swap, as it was not "accomplished according to the method prescribed in the agreement itself,"[586] it nevertheless occurred "in connection with" the Pipeline Swap. As discussed more in Section V.B.5, GMAC Mortgage and Ally Bank did not account for mortgage loans sold from Ally Bank to GMAC Mortgage in strict compliance with the terms of the MMLPSA and Pipeline Swap, but the net effect was to get to the same economic result.[587] Had GMAC Mortgage and Ally Bank accounted for the transfer of funds strictly in accordance with the terms of the agreements, the amount "repaid" by GMAC Mortgage to Ally Bank in March 2012 would have been with respect to funds owing "under" the Pipeline Swap. As discussed in more detail in Section V.B.6.b, it was the combined effect of the 2008 MMLPSA and the Pipeline Swap by which GMAC Mortgage purchased loans from Ally Bank and funds relating to those loans flowed between the two parties with respect to those loans. At a minimum, therefore, the funds paid by GMAC Mortgage to the Bank were "in connection with" the Pipeline Swap.[588]

Fourth, the payment occurred on March 27, 2012, before the Petition Date. With this, all four elements of the section 546(g) defense are present, and the Examiner concludes that it is likely that Ally Bank would prevail on a defense that the entire payment is not subject to avoidance under section 547 of the Bankruptcy Code by reason of the safe harbor defense.[589]

---

[582] See Section V.B.4 for more information on the Pipeline Swap.

[583] *See Hutson v. E.I. DuPont de Nemours & Co.* (*In re Nat'l Gas Distrib., LLC*), 556 F.3d 247, 253 (4th Cir. 2009) ("With the 2005 Amendments to the Bankruptcy Code, adopted in the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, 119 Stat. 23 (2005) . . . Congress substantially expanded the protections it had given to financial derivatives participants and transactions by expanding the definition of 'swap participants' and 'swap agreements' that are exempted from the automatic stay and from trustees' avoidance powers.").

[584] 11 U.S.C. § 101(53B)(A)(i)(I).

[585] *See id.* § 101(53C).

[586] *Interbulk, Ltd v. Louis Dreyfus Corp.* (*In re Interbulk, Ltd.*), 240 B.R. 195, 202 (Bankr. S.D.N.Y. 1999).

[587] *See* Section V.B.5. Note that reaching the same economic result under the MMLPSA and Pipeline Swap requires an assumption that the Pipeline Swap is to include the period from funding to sale, and to include originated loans, as discussed in more detail in Section V.B.

[588] *See Casa de Cambio Majapara S.A. de C.V. v. Wachovia Bank, N.A.* (*In re Casa de Cambio Majapara S.V. de C.V.*), 390 B.R. 595, 598–99 (Bankr. N.D. Ill. 2008) (noting that section 546(g) only requires "that the transfer be 'under *or* in connection with any swap agreement,'" and that the court's analysis does not end simply because the payments were not "under" the swap agreement).

[589] 11 U.S.C. § 546(g).

#### (d) Conclusion[590]

The Examiner concludes that is unlikely that a preferential transfer claim related to the March 2012 payments to Ally Bank Pursuant to the MMLPSA and Pipeline Swap would prevail.

### (3) May 2012, Loan Modification Reimbursement Payments

#### (a) Background

As described more fully in Section V.C, on May 10 and 11, 2012, GMAC Mortgage made multiple payments, totaling approximately $48.4 million,[591] to Ally Bank pursuant to the January 30 Letter Agreement and the terms of the A&R Servicing Agreement's AG Menu Matrix.[592] Under the A&R Servicing Agreement, GMAC Mortgage was permitted to modify certain Ally Bank loans to a greater extent than it was permitted to under the Original Servicing Agreement. However, GMAC Mortgage was required to indemnify Ally Bank for loss incurred as a result of such loan modifications to the extent such modifications exceeded those permitted under the Original Servicing Agreement.

#### (b) Analysis

The Examiner concludes that it is likely that an action to avoid the May 10 and 11, 2012 payments as preferential transfers would prevail. First, the Examiner concludes that the evidence supports the propositions that Ally Bank, for whose benefits the payments were made, was a creditor of GMAC Mortgage and that the payments were made on account of an antecedent debt. Although the A&R Servicing Agreement was not executed until after the May 10 and 11, 2012 payments were made, the Examiner concludes that GMAC Mortgage was likely nevertheless required to make the payments at issue by the terms of the January 30 Letter Agreement, which bound GMAC Mortgage to comply with the A&R Servicing Agreement.[593] Indeed, Jim Young, Chief Financial Executive for Ally Bank, specifically rejected the notion that the fact that GMAC Mortgage had not yet signed the A&R Servicing Agreement limited GMAC Mortgage's responsibility to pay, stating that "[o]nce they [(meaning GMAC Mortgage)] have performed the principal reductions in line with the [January 30 Letter Agreement], they owe [Ally Bank] the money."[594] Further, the transfers

---

[590] As noted in Section VII.F.2 above, because fraudulent transfer issues related to GMAC Mortgage are likely governed by Pennsylvania law, and Pennsylvania (unlike Minnesota) has not adopted an Insider Preference avoidance statute, there are no alternative state law preference recovery issues that need to be analyzed regarding this transaction.

[591] As noted in Exhibit V.C.1.d(4)(b)(iii)(A), GMAC Mortgage ultimately paid $96.8 million pursuant to the January 30 Letter Agreement and the A&R Servicing Agreement. Only the $48.4 million discussed here was paid prepetition and therefore is the subject of this analysis.

[592] The May 10, 2012 payment totaled $45 million and the May 11, 2012 payment totaled $3.4 million. *See* Exhibit V.C.1.d(4)(b)(iii)(A).

[593] *See* Section V.C.2.e.

[594] E-mail from J. Young to H. Benton, B. Yastine, C. Evans, D. Shevsky, and P. Murray (May 7, 2013), at EXAM20272697 [EXAM20272696] (discussing Ally Bank's right to immediate payment under the Amended Subservicing Agreement).

occurred well within the preference period, occurring only days before the Petition Date. Finally, the Examiner concludes that these payments enabled Ally Bank to receive more than it would have received under the hypothetical chapter 7 test.[595]

### (c) Possible Defenses

The Investigation has not uncovered any potential preference defenses that would apply to these payments.[596] In particular, the Examiner concludes it is likely that any argument that these payments were contemporaneous exchanges for new value would fail. These payments were not made to secure any "new value" attributable to Ally Bank's agreement to enter into the A&R Servicing Agreement on May 11, 2012, but rather were payments of a debt incurred in accordance with the January 30 Letter Agreement.[597] The evidence supports this proposition. Ally Bank's invoices for these payments stated that the payments related to "loan modification activities performed by GMAC Mortgage, LLC as sub-servicer, prior to April 30, 2012 and in connection with the DOJ/State AG Settlement."[598] Barbara Yastine, the CEO of Ally Bank, stated in an e-mail to Thomas Marano that "[u]nder the terms of the [January 30 Letter Agreement], ResCap committed to reimbursing [Ally] Bank for DOJ modifications as a condition to doing such modifications . . . ."[599] She further expressly stated the payments were not related to the A&R Servicing Agreement, noting that "tying reimbursement to the new servicing agreement puts ResCap in breach of the January 30 [Letter] Agreement."[600] Marano replied to Yastine in a letter on May 9, 2012: "[Ally] Bank authorized the use of its portfolio for modifications . . . . This was done . . . on the condition that [Ally] Bank would be reimbursed for its losses consistent with the language in the [January 30 Letter Agreement] . . . ."[601] Finally, the parties expressly set out their understanding in a May 11, 2012 agreement, which specified that "[t]he parties acknowledge

---

[595] E-mail from H. Benton to J. Young, B. Yastine et al. (May 7, 2012), at EXAM20272697 [EXAM20272696] (stating that he spoke to Ray Schrock and that Ray indicated "[b]etter to have the money and fight over a preference than have an unsecured claim").

[596] As noted above, the last possible subsequent new value provided by AFI to GMAC Mortgage occurred on January 30, 2012 when it forgave indebtedness under the A&R Line of Credit Agreement. Given that this debt forgiveness occurred over two months before GMAC Mortgage's payment to Ally Bank, it does not qualify as subsequent new value. *See, e.g., Eisenberg v. O. Censor & Co., Inc.* (*In re Baumgold Bros., Inc.*), 103 B.R. 436, 439 (Bankr. S.D.N.Y. 1989) ("[A] preferential transfer may be set off only against new value advanced *after* the preference was received."). Furthermore, the ordinary course defense of section 547(c)(2) is not applicable here. Payments made as a result of unusual economic pressure or debt collection practices do not fall within the "ordinary course of business." *See, e.g., Buchwald Capital Advisors, LLC v. Metl-Span I., Ltd.* (*In re Pameco Corp.*), 356 B.R. 327, 340 (Bankr. S.D.N.Y. 2006). As fully set forth in Section V.C.2.e, such pressure occurred here.

[597] *See* Section V.C.2.e.

[598] *See* Invoice from Ally Bank to ResCap (May 9, 2012) [ALLY_0196290]; Invoice from Ally Bank to ResCap (May 10, 2012) [ALLY_0196308]; *see also* E-mail from J. Pensabene (May 9, 2012) [ALLY_0196286] ("The money will be transferred first thing tomorrow.").

[599] E-Mail from B. Yastine to T. Marano (May 8, 2012), at ALLY_0182249 [ALLY_0182247].

[600] *Id.*

[601] Letter from T. Marano to B. Yastine (May 9, 2012), at EXAM20208564 [EXAM20208564].

that [the loan modifications performed] are conditioned on full reimbursement to Ally Bank of all losses in accordance with the [January 30 Letter Agreement]."[602] The parties did not intend for these payments to be contemporaneous exchanges for any value attributable to Ally Bank's entry into the A&R Servicing Agreement on May 11, 2012.

Nor did Ally Bank provide contemporaneous new value to GMAC Mortgage by permitting GMAC Mortgage to modify Ally Bank's loans in order to comply with the DOJ/AG Settlement. While GMAC Mortgage may have received value from its ability to modify Ally Bank's loans through compliance with the government settlements (and, as noted above, new value provided under section 547(c)(1) does not need to come from the transferor), there is simply no evidence that the value GMAC Mortgage received was contemporaneous with the payments made on May 10 and 11. In fact, the evidence indicates that Ally Bank believed these payments were on behalf of value that Ally Bank had *already* provided to GMAC Mortgage.[603] As the Seventh Circuit has explained:

> To insist that "new value" be "new" is not reading an additional requirement into the statutory definition. . . . Congress intended the definition of "new value" to codify the principle of consideration from contract law. That familiar principle requires "consideration" to be something that the promisor is not already obliged to give to the promisee (that is, something additional or new); the "[p]erformance of a legal duty owed to a promisor . . . is not consideration."[604]

The continued compliance by Ally Bank with its obligation to permit GMAC Mortgage to modify its loan portfolio in exchange for reimbursement in accordance with the parties' January 30 agreement is not new value. Payments made by GMAC Mortgage for debts owed under the parties' agreement would be on account of antecedent debts and would therefore by

---

[602] Agreement for AG Settlement Loan Modifications For April 2012, dated May 11, 2012 [ALLY_PEO_0087335].

[603] *See* E-mail from B. Yastine to T. Marano (May 8, 2012), at ALLY_0182249 [ALLY_0182247]; Invoice from Ally Bank to ResCap (May 9, 2012) [ALLY_0196290] (stating that the invoices were for "loan modification activities performed by GMAC Mortgage, LLC as sub-servicer, prior to April 30, 2012 and in connection with the DOJ/State AG Settlement"); Invoice from Ally Bank to ResCap (May 10, 2012) [ALLY_0196308] (same).

[604] *Gouveia v. RDI Grp.* (*In re Globe Bldg. Materials, Inc.*), 484 F.3d 946, 949 (7th Cir. 2007) (citing *In re Spada,* 903 F.2d 971, 976 (3d Cir. 1990); RESTATEMENT (SECOND) OF CONTRACTS § 73). *Globe Building* was distinguished by *Ames Merchandising Corp. v. Revere Mills Inc.* (*In re Ames Department Stores, Inc.*) on the grounds that its holding would not apply to contracts where the provision of goods came simultaneously with or shortly after payments were wired by allegedly preferential transferee. No. 01-42217, 2010 WL 2403104 (Bankr. S.D.N.Y. June 10, 2010). This distinction is not applicable here, where the alleged value was provided by Ally Bank on January 30 and payments were not made until May.

definition not be contemporaneous exchanges for new value.[605] Given all of these facts, the Examiner concludes it is unlikely that the payments totaling $48.4 million made by GMAC Mortgage to Ally Bank would be protected under the contemporaneous exchange for new value defense.

### (d)  Conclusion

Based on the above analysis, the Examiner concludes it is likely that a claim under Bankruptcy Code section 547 challenging GMAC Mortgage's May 2012 payments to Ally Bank pursuant to the January 30 Letter Agreement and the terms of the A&R Servicing Agreement's AG Menu Matrix in the amount of approximately $48.4 million would prevail.

### 6.  Fraudulent Transfers

Transfers made or obligations incurred by a debtor may be avoided if the transfer or incurrence was either actually or constructively fraudulent. Actual fraudulent transfer claims require a showing that the transferor made the transfer with the actual intent to hinder, delay, or defraud its creditors. In contrast, constructive fraudulent transfer claims do not require proof of actual fraudulent intent, but rather a showing that: (1) the transferor did not receive reasonably equivalent value for the transfer; and (2) at the time of the transfer the transferor was suffering from one or more statutorily-defined forms of financial distress. Section VI contains both a detailed discussion of the tests for financial distress under the relevant statutes, as well as the Examiner's specific conclusions as to periods during which ResCap and its principal subsidiaries were and remained financially distressed within the meaning of each of those statutory tests. In a bankruptcy case, fraudulent transfer claims may be brought under both section 548 of the Bankruptcy Code, which codifies federal fraudulent conveyance law, and section 544 of the Bankruptcy Code, which enables a representative of a debtor's estate to invoke state fraudulent transfer laws.

### a.  Actual Fraudulent Transfers

#### (1)  Section 548(a)(1)(A): Intentional Fraudulent Transfers Under Federal Law

The Bankruptcy Code recognizes a federal cause of action based on intentional or actual fraud. Section 548(a)(1)(A) provides that a debtor's transfer of an interest in its property or the incurrence of an obligation, within two years before the date of its bankruptcy petition, may be avoided if the debtor "made such transfer or incurred such obligation with actual intent to

---

[605] "A payment made on account of an antecedent debt is not a contemporaneous exchange." *Buchwald Capital Advisors LLC v. Metl-Span I., Ltd.* (*In re Pameco Corp.*), 356 B.R. 327, 338 (Bankr. S.D.N.Y. 2006) (citing *In re 360networks* (*USA*) *Inc.*, 338 B.R. 194, 206 (Bankr. S.D.N.Y. 2005); *Sapir v. Keener Lumber Co., Inc.* (*In re Ajayem Lumber Corp.*), 143 B.R. 347, 352 (Bankr. S.D.N.Y. 1992); *In re Alpex Computer Corp.*, 60 B.R. 315, 319 (Bankr. D. Colo. 1986)).

hinder, delay or defraud" its creditors.[606] Because these elements are disjunctive, a finding of any one of the proscribed states of intent would satisfy the statutory requirement. Furthermore, the impermissible intent need not be directed towards any specific creditor; a general intent directed at the debtor's present or future creditors is sufficient.[607] There is no requirement that the trustee prove insolvency, either before or after the challenged transaction, in order to avoid a transaction as an intentional fraudulent transfer.

Although it is generally the intent of the debtor-transferor (and not that of the transferee) that is relevant in assessing actual fraudulent intent,[608] the intent of the transferee can be imputed to the debtor where—as here with AFI and ResCap—the transferee is an insider of the debtor or otherwise "is in a position to control the disposition of property of the debtor."[609]

---

[606]  11 U.S.C. § 548(a)(1)(A). Section 548(a)(1)(A) reads, in relevant part, as follows:

(a)(1) The trustee may avoid any transfer (including any transfer to or for the benefit of an insider under an employment contract) of an interest of the debtor in property, or any obligation (including any obligation to or for the benefit of an insider under an employment contract) incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

(A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted . . . .

[607]  *See, e.g.*, *Bayou Accredited Fund, LLC v. Redwood Growth Partners, L.P.* (*In re Bayou Grp., LLC*), 396 B.R. 810, 826 (Bankr. S.D.N.Y. 2008) ("[A] plaintiff need not prove that the debtor intended to hinder, delay or defraud the transferee or any other particular creditor."), *rev'd on other grounds*, 439 B.R. 284 (S.D.N.Y. 2010).

[608]  *See, e.g.*, *Lippe v Bairnco Corp.*, 249 F. Supp. 2d 357, 374 (S.D.N.Y. 2003) (analyzing actual fraudulent intent under New York's Debtor and Creditor Law, which contains "hinder, delay, or defraud" language similar to that in section 548(a)(1)(A) of the Bankruptcy Code); *Silverman v. Actrade Capital, Inc.* (*In re Actrade Fin. Techs. Ltd.*), 337 B.R. 791, 808 (Bankr. S.D.N.Y. 2005) ("Cases under § 548(a)(1)(A) indicate that it is the intent of the transferor and not the transferee that is relevant for purposes of pleading a claim for intentional fraudulent conveyance under the Bankruptcy Code.") (citations omitted); *Gredd v. Bear Stearns Sec. Corp.* (*In re Manhattan Inv. Fund Ltd.*), 310 B.R. 500, 505 (Bankr. S.D.N.Y. 2002) ("The operative requirement for a transfer to be avoided under this section is the *debtor's* actual fraudulent intent."); *Picard v. Estate of Stanley Chais* (*In re Bernard L. Madoff Inv. Sec. LLC*), 445 B.R. 206, 220 (Bankr. S.D.N.Y. 2011) (noting that, to adequately plead an actual fraud claim, the complaint must state with particularity the factual circumstances constituting fraud under Federal Rule of Civil Procedure 9(b) and that "[u]nder the [Bankruptcy Code], the trustee must show such intent on the part of the debtor-transferor." (citing *Andrew Velez Constr., Inc. v. Consol. Edison Co. of N.Y., Inc.* (*In re Andrew Velez Constr., Inc.*), 373 B.R. 262, 269 (Bankr. S.D.N.Y. 2007)); 5 COLLIER ON BANKRUPTCY ¶ 548.04 (Alan N. Resnick & Henry J. Sommer eds., 16th ed.) ("Section 548(a)(1)(A) does not contain any reference to the state of mind or knowledge of the transferee. The only inquiry concerning actual intent that matters is that of the debtor: whether the debtor causing the transfer or incurring the obligation intended to hinder, delay or defraud its creditor. As a result, 'for the purposes of avoidance pursuant to § 548 the transferee's good faith or lack of it does not matter.'") (footnotes omitted).

[609]  *In re Andrew Velez Constr., Inc.*, 373 B.R. at 269–70 (noting that "imputation of the transferee's intent to the transferor [is] justified . . . where the person or entity exercising control over the disposition of the debtor's property stands in a position to do so by reason of a relationship of ownership, executive office or other insider role") (citing *Jackson v. Mishkin* (*In re Adler, Coleman Clearing Corp.*), 263 B.R. 406, 447–49 (S.D.N.Y. 2001)); *Krol v. Wilcek* (*In re H. King & Assocs.*), 295 B.R. 246, 283 (Bankr. N.D. Ill. 2003) ("Where the transferee is an insider of the debtor and is in a position to control the disposition of property of the debtor, the transferee's intent is imputed to the debtor.").

Generally, an intentional fraudulent transfer requires that the transferor engage in some form of wrongdoing that is related to the transfer or obligation that the trustee seeks to avoid.[610] But the bad conduct need not rise to the level of tortious fraud to be avoidable as an actual fraudulent transfer.[611] For example, "a general scheme or plan to strip the debtor of its assets that does not have the primary purpose of defrauding creditors has been held to support a finding of fraudulent intent."[612]

When dealing with a corporate debtor, courts will examine the knowledge and intent of the debtor's directors, officers, and other agents.[613] This "fundamental principal of agency" dictates "that the misconduct of [agents] within the scope of their employment will normally be imputed to the corporation."[614] In situations involving fraud, courts impute the fraud of an officer to a corporation when the officer commits the fraud: (1) in the course of his employment; and (2) for the benefit of the corporation.[615]

---

[610] *See*, *e.g.*, *In re Actrade Fin. Techs., Ltd.*, 337 B.R. at 809 (noting that intentional fraudulent conveyance claims are concerned with situations "where there is a knowing intent on the part of the defendant to damage creditors" and that "although [*In re Sharp Int'l Corp.*] only directly addressed pleading under [New York's Debtor and Creditor Law], there is no reason why its reasoning" that the fraud must be related to the transaction that the trustee seeks to avoid "should not be applicable to claims of intentional fraudulent conveyance under the Bankruptcy Code as well") (citing *Sharp Int'l Corp. v. State St. Bank & Trust Co.* (*In re Sharp Int'l Corp.*), 403 F.3d 43, 56 (2d Cir. 2005). "However, the intentional fraudulent conveyance claims fails for the independent reason that Sharp inadequately alleges fraud with respect to the transaction that Sharp seeks to void, *i.e.*, Sharp's $12.25 million payment to State Street." *In re Sharp Int'l Corp.*, 403 F.3d at 56.

[611] *Plotkin v. Pomona Valley Imps.* (*In re Cohen*), 199 B.R. 709, 716 (B.A.P. 9th Cir. 1996) (noting, with respect to actual fraudulent transfers under the Bankruptcy Code and the UFTA, that "[f]raud, in the sense of morally culpable conduct, need not be present in either category of fraudulent transfer. An actually fraudulent transfer could, in principle, occur without genuine fraud."); *Christian Bros. High Sch. Endowment v. Bayou No Leverage Fund* (*In re Bayou Grp., LLC*), 439 B.R. 284, 304–05 (S.D.N.Y. 2010) (evaluating actual fraudulent transfer claims asserted under the Bankruptcy Code).

[612] *Adelphia Commc'ns Corp. v. Bank of Am., N.A.*, (*In re Adelphia Commc'ns Corp.*), 365 B.R. 24, 35 (Bankr. S.D.N.Y. 2007) (citing *Wieboldt Stores, Inc. v. Schottenstein*, 94 B.R. 488, 504 (N.D. Ill. 1988)); *see Responsible Pers. of Musicland Holding Corp. v. Best Buy Co.* (*In re Musicland Holding Corp.*), 398 B.R. 761, 774 (Bankr. S.D.N.Y. 2008) ("A strong inference of fraudulent intent 'may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.'") (citing *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994)).

[613] *Baker v. Latham Sparrowbush Assocs.*, 72 F.3d 246, 255 (2d Cir. 1995) ("The knowledge of a director, officer, sole shareholder or controlling person of a corporation is imputable to that corporation.") (citations omitted) (internal quotation marks omitted).

[614] *Bankr. Servs., Inc. v. Ernst & Young* (*In re CBI Holding Co.*), 529 F.3d 432, 448 (2d Cir. 2008) (also noting that this tenet is "based on the presumption that an agent will normally discharge his duty to disclose to his principal all the material facts coming to his knowledge with reference to the subject of his agency and thus any misconduct engaged in by a manager is with—at least—his corporation's tacit consent.") (citations omitted).

[615] *See, e.g.*, *McNamara v. PFS* (*In re Pers. & Bus. Ins. Agency*), 334 F.3d 239, 242–43 (3d Cir. 2003) (citations omitted).

Actual intent is a difficult element to prove[616] because evidence of a transferor's state of mind is often difficult to unearth.[617] Therefore, to assist in determining whether actual intent exists, courts examine "the circumstances surrounding the transfer"[618] to look for common indicia or "badges of fraud,"[619] including:

- The lack, or inadequacy, of consideration;

- A close relationship between the parties;[620]

- The retention of possession, benefit, or use of the property in question;

- The financial condition of the party that made the transfer or obligation both before and after the transaction in question;

- The existence or cumulative effect of a pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency, or threat of suits by creditors; and

- The general chronology of the events and transactions under inquiry.[621]

---

[616] The plaintiff has the burden of showing that the transfer was made with actual fraudulent intent, and must do so under the clear and convincing standard. *See Mendelsohn v. Jacobwitz* (*In re Jacobs*), 394 B.R. 646, 661 (Bankr. E.D.N.Y. 2008).

[617] "Persons whose intention it is to shield their assets from creditor attack while continuing to derive the equitable benefit of those assets rarely announce their purpose. Instead, if their intention is to be known, it must be gleaned from inferences drawn from a course of conduct." *Sacklow v. Vecchione* (*In re Vecchione*), 407 F. Supp. 609, 615 (E.D.N.Y. 1982) (citing *In re Saphire*, 139 F.2d 34, 35 (2d Cir. 1943)).

[618] *Brown v. Third Nat'l Bank* (*In re Sherman*), 67 F.3d 1348, 1353 (8th Cir. 1995) ("Because proof of actual intent to hinder, delay or defraud creditors may rarely be established by direct evidence, courts infer fraudulent intent from the circumstances surrounding the transfer.") (citations omitted).

[619] *Id.*; *Roeder v. Lockwood* (*In re Lockwood Auto Grp., Inc.*), 450 B.R. 557, 571 (Bankr. W.D. Pa. 2011) ("The use of badges of fraud in this regard is done in recognition of the fact that it is often difficult to adduce direct evidence of fraud. The theory is that badges of fraud represent circumstances that so frequently accompany fraudulent transfers that their very presence may give rise to an inference of intent.") (citations omitted).

[620] *Kipperman v. Onex Corp.*, 411 B.R. 805, 854–59 (N.D. Ga. 2009).

[621] *Le Café Créme, Ltd. v. Roux* (*In re Le Café Créme, Ltd.*), 244 B.R. 221, 239 (Bankr. S.D.N.Y. 2000) (citing *Salomon v. Kaiser* (*In re Kaiser*), 722 F.2d 1574, 1582 (2d Cir. 1983)); *see also Kelly v. Armstrong*, 206 F.3d 794, 798 (8th Cir. 2000) (noting badges of fraud may also include: "(1) actual or threatened litigation against the debtor; (2) a transfer of all or substantially all of the debtor's property; (3) insolvency on the part of the debtor; (4) a special relationship between the debtor and the transferee; and (5) retention of the property by the debtor after the transfer") (citations omitted) (internal quotation marks omitted); *Lippe v. Bairnco Corp.*, 249 F. Supp. 2d 357, 374–75 (S.D.N.Y. 2003); *Pereira v. Grecogas Ltd.* (*In re Saba Enters., Inc.*), 421 B.R. 626, 643 (Bankr. S.D.N.Y. 2009) (listing, among the badges of fraud, "secrecy, haste, or unusualness of the transaction"). The "badges" apply to proving both intent to defraud, as well as intent to hinder or delay. *See, e.g.*, *Adamson v. Bernier* (*In re Bernier*), 282 B.R. 773, 781–82 (Bankr. D. Del. 2002).

A trustee does not need to show all of these badges of fraud to prove fraudulent intent, though the presence of a single badge is generally not sufficient.[622] The presence of multiple badges may constitute "conclusive evidence of an actual intent to defraud"[623] and, depending on the context of the alleged fraudulent conduct, certain badges of fraud will carry more weight.[624] Courts have also held that a legitimate business purpose can negate an inference of actual fraudulent intent caused by the presence of several badges of fraud and other indicia.[625]

### (2) Intentional Fraudulent Transfers Under The UFTA

In addition to federal law causes of action under section 548(a)(1)(A) of the Bankruptcy Code, an estate representative may also use Bankruptcy Code section 544(b) to pursue claims of intentional fraudulent transfer arising under applicable state law. As noted in Section VII.F.3, the potential jurisdictions with interests in the transactions reviewed by the Examiner include Delaware, Pennsylvania, Michigan, Minnesota, and New York.[626] Delaware, Pennsylvania, Michigan, and Minnesota have all adopted some form of the UFTA.

The UFTA provides for a cause of action based on intentional fraud "if the debtor made the transfer or incurred the obligation . . . with actual intent to hinder, delay or defraud any creditor of the debtor."[627] The UFTA explicitly states that a court determining actual intent may consider, among other factors, whether:

> (1) the transfer or obligation was to an insider; (2) the debtor
> retained possession or control of the property transferred after
> the transfer; (3) the transfer or obligation was disclosed or

---

[622] *In re Sherman*, 67 F.3d at 1354 ("The presence of a single badge of fraud is not sufficient to establish actual fraudulent intent . . . ." (citing *Max Sugarman Funeral Home, Inc. v. A.D.B. Investors*, 926 F.2d 1248, 1254–55 (1st Cir. 1991). "The presence of a single badge of fraud may spur mere suspicion; the confluence of several can constitute conclusive evidence of an actual intent to defraud, absent 'significantly clear' evidence of a legitimate supervening purpose." *Max Sugarman Funeral Home, Inc.*, 926 F.2d at 1254–55.

[623] *Picard v. Taylor* (*In re Park South Sec., LLC*), 326 B.R. 505, 518 (Bankr. S.D.N.Y. 2005) (noting that "absent 'significantly clear' evidence of a legitimate supervening purpose" the "confluence of several [badges of fraud] can constitute conclusive evidence of an actual intent to defraud" (citing *Max Sugarman Funeral Home, Inc.*, 926 F.2d at 1254–55)).

[624] *MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Servs. Co.*, 910 F. Supp. 913, 934–35 (S.D.N.Y. 1995) (deciding actual fraud under New York state law and noting that "[d]epending on the context, badges of fraud will vary in significance, though the presence of multiple indicia will increase the strength of the inference").

[625] *ASARCO LLC v. Ams. Mining Corp.*, 396 B.R. 278, 391–93 (S.D. Tex. 2008) (noting that "even though Plaintiff proved that AMC had the requisite [actual fraudulent] intent, AMC may still prevail on this claim if it can prove that there was a legitimate supervening purpose for the transaction" but ultimately determining that "even though there was a legitimate business purpose for the transfer," the other aspects of the transaction had no legitimate business purpose and thus the inference of actual fraud was not rebutted (citing *Kelly*, 206 F.3d at 801; *In re Harris*, Case No. 02-05803, 2003 WL 23096966, at *2 (Bankr. D. Del. Dec. 30, 2003)).

[626] As discussed in Section VII.F.3.a above, the Examiner concludes that it is unlikely that New York law would apply to any of the transactions reviewed in this section.

[627] UFTA § 4(a)(1).

concealed; (4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit; (5) the transfer was of substantially all the debtor's assets; (6) the debtor absconded; (7) the debtor removed or concealed assets; (8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred; (9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred; (10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and (11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.[628]

The commentary to the model UFTA also states that when considering the factors set forth in section 4(b), "a court should evaluate all the relevant circumstances involving a challenged transfer or obligation. Thus the court may appropriately take into account all indicia negativing as well as those suggesting fraud."[629]

Under Pennsylvania law,[630] actual fraudulent transfer claims are extinguished unless an action is brought "within four years after the transfer was made or the obligation was incurred or, if later, within one year after the transfer or obligation was or could reasonably have been discovered by the claimant."[631] Under Minnesota law, actual fraudulent transfer claims have a six-year statute of limitations.[632] Although Minnesota's six-year statute of limitations for fraud claims runs from discovery, the applicability of the discovery rule is not relevant in this case because all of the transfers in question happened within six years before the Petition Date.

---

[628] *Id.* § 4(b).

[629] *Id.* § 4(b) cmt. 6.

[630] As discussed in Section VII.F.3.a above, the Examiner concludes that either Pennsylvania or Minnesota law would apply to the transactions reviewed in this section.

[631] 12 Pa. Cons. Stat. Ann. § 5109.

[632] *See* Minn. Stat. Ann. § 541.05(6) (noting that actions for relief on the ground of fraud shall be commenced within six years and that such an action "shall not be deemed to have accrued until the discovery by the aggrieved party of the facts constituting fraud"); *see also Georgen-Running v. Grimlie* (*In re Grimlie*), 439 B.R. 710, 720 n.25 (B.A.P. 8th Cir. 2010) (ruling, in the context of a fraudulent transfer action, that "[i]n Minnesota, cases involving fraud have a statute of limitations of six years") (citing §541.05(6)); *In re Curry*, 160 B.R. 813, 819 n.5 (Bankr. D. Minn. 1993)) (noting that fraudulent conveyance actions under Minnesota's UFTA have a statute of limitations of six years pursuant to § 541.05(6)).

### b.   Constructive Fraudulent Transfers

#### (1) Section 548(a)((1)(B): Constructive Fraudulent Transfers Under Federal Law

Bankruptcy Code section 548(a)(1)(B) empowers a bankruptcy trustee to avoid a transfer[633] or obligation incurred within two years of the petition date if: (1) the debtor received less than a reasonably equivalent value in exchange for the transfer or obligation; and (2) the debtor: (a) was insolvent on the date of the transfer or obligation or became insolvent as a result of the transfer or obligation; (b) was left with unreasonably small capital to carry on its business or a contemplated transaction; or (c) intended to incur, or believed it would incur, debts beyond its ability to pay as debts matured.[634]

#### (2) Bankruptcy Code Section 544(b): Constructive Fraudulent Transfers Under UFTA

Section 544(b) of the Bankruptcy Code permits the trustee or estate representative to "step into the shoes" of an actual unsecured creditor with standing to seek the avoidance of a transfer under applicable state fraudulent transfer laws.[635] Section 544(b) functionally integrates relevant applicable state fraudulent transfer law into the Bankruptcy Code. To assert a claim under section 544(b), the trustee or estate representative must prove that: (1) there was a transfer of an interest of the debtor in property; (2) there actually exists an unsecured creditor holding an allowable claim; and (3) applicable law allows that unsecured creditor to void the transfer.

In such a case, the trustee or estate representative could invoke section 4(2) of the UFTA,[636] which provides that transfers are fraudulent as to both present and future creditors if the debtor made the transfer or incurred the obligation: (1) without receiving reasonably

---

[633]   Pursuant to section 101(54) of the Bankruptcy Code, the term "transfer" means—

   A. the creation of a lien;

   B. the retention of title as a security interest;

   C. the foreclosure of a debtor's equity of redemption; or

   D. each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with—

      (i) property; or

      (ii) an interest in property.

[634]   *See* 11 U.S.C. § 548(a)(1)(B). A separate test, not relevant to the Report, allows for the avoidance of transfers for less than reasonably equivalent value if the debtor made such transfer to or for the benefit of an insider under an employment contract and outside of the ordinary course of business.

[635]   *See id.* § 544(b) (the ability to avoid "any transfer of an interest of the debtor in property . . . that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under [section 502 of the Bankruptcy Code].").

[636]   Minnesota and Pennsylvania have largely adopted verbatim section 4 of the model UFTA. S*ee* Minn. Stat. Ann. § 513.44; 12 Pa. Cons. Stat. Ann. § 5104.

equivalent value in exchange for the transfer or obligation; and (2) the debtor (a) "was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction"; or (b) "intended to incur, or believed or reasonably should have believed that" it would incur, debts beyond its ability to pay as they became due.[637] The trustee or estate representative could also invoke section 5(a) of the UFTA,[638] which provides that transfers are fraudulent as to present creditors if the debtor did not receive reasonably equivalent value in exchange for the transfer or obligation and the transfer or obligation was made or incurred while the debtor was insolvent or where the debtor became insolvent as a result of the transfer or obligation.[639]

### c. *Reasonably Equivalent Value For Constructive Fraudulent Transfer Purposes*

#### (1) *Definitions Of Reasonably Equivalent Value*

Section 548(a)(1)(B) of the Bankruptcy Code requires that the trustee prove by a preponderance of the evidence[640] that the debtor did not receive "reasonably equivalent value" in exchange for the challenged transfer or obligation. Section 548(d)(2) of the Bankruptcy Code defines "value" as "property, or satisfaction or securing of a present or antecedent debt of the debtor, but does not include an unperformed promise to furnish support to the debtor or to a relative of the debtor."[641] The Bankruptcy Code does not define when value is "reasonably equivalent," leaving such determination to the courts. In analyzing "reasonably equivalent value," courts determine "the value of the consideration exchanged between the parties at the time of the conveyance or incurrence of debt which is challenged."[642]

> In determining whether the value received by one party is so disproportionately small as to constitute a lack of fair consideration, the "court need not strive for mathematical precision" but must "keep the equitable purposes of the statute firmly in mind, recognizing that any significant disparity

---

[637] S*ee* MINN. STAT. ANN. § 513.44; 12 PA. CONS. STAT. ANN. § 5104.

[638] Minnesota and Pennsylvania have adopted section 5(a) of the model UFTA nearly verbatim. S*ee* MINN. STAT. ANN. § 513.45; 12 PA. CONS. STAT. ANN. § 5105.

[639] As explained in Section VII.F.2.c, once a transfer is voidable under section 544(b), the entire fraudulent transfer may be recovered for the benefit of all creditors, not just to the extent necessary to satisfy the individual creditor actually holding the avoidance claim.

[640] *Togut v. RBC Dain Correspondent Servs.* (*In re S.W. Bach & Co.*), 435 B.R. 866, 875 (Bankr. S.D.N.Y. 2010) (burden on movant to demonstrate the elements of a constructive fraudulent transfer claim by preponderance of evidence).

[641] 11 U.S.C. § 548(d)(2)(A).

[642] *Liquidation Trust v. Daimler AG* (*In re Old Carco LLC*), No. 11-5279-BK, 2013 WL 335993, at *1 (2d Cir. Jan. 30, 2013) (citing *In re NextWave Pers. Commc'ns, Inc.*, 200 F.3d 43, 56 (2d Cir. 1999)) (emphasis omitted) (internal quotation marks omitted) (citations omitted).

> between the value received and the obligation assumed . . . will
> have significantly harmed the innocent creditors of that
> [party]."[643]

Like the Bankruptcy Code, the UFTA recognizes a claim for a constructive fraudulent transfer when a debtor transfers assets for less than "reasonably equivalent value" at a time when it is in one or more of the states of financial distress defined in the UFTA. The concept of "reasonably equivalent value" in section 548 of the Bankruptcy Code and the UFTA are identical, and courts considering whether "reasonably equivalent value" has been provided in transactions subject to avoidance under the UFTA may look to cases decided under section 548 of the Bankruptcy Code for guidance on reasonably equivalent value issues.[644]

### (2) Determining Whether Value Was Reasonably Equivalent To What The Debtor Transferred

Whether reasonably equivalent value was received is normally a question of fact,[645] and valuation factors will turn "on the case-specific circumstances surrounding the debtor's decision to enter into the challenged transaction."[646] Courts look to, among other things:

---

[643] *In re Old Carco LLC*, 2013 WL 335993, at *1 (citing *Rubin v. Mfrs. Hanover Trust Co.*, 661 F.2d 979, 994 (2d Cir. 1981) (discussing § 67(d) of the Bankruptcy Act of 1898, predecessor to § 548 of the Bankruptcy Code)).

[644] *See*, *e.g.*, *Cardiello v. Casale* (*In re Phillips Grp., Inc.*), 382 B.R. 876, 887 (Bankr. W.D. Pa. 2008) (noting that, because the phrase "reasonably equivalent value" as used in the Pennsylvania UFTA is patterned after Bankruptcy Code section 548(a) "we may look to interpretations of the phrase as it appears in the latter to understand its use in the former"); *Chorches v. Fleet Mortg. Corp.* (*In re Fitzgerald*), 255 B.R. 807, 812 n.14 (Bankr. D. Conn. 2000) ("The UFTA . . . concept of 'reasonably equivalent value' is identical to the Section 548(a)(1)(B) concept of 'reasonably equivalent value.'") (citing *Leibowitz v. Parkway Bank & Trust Co.* (*In re Image Worldwide, Ltd.*), 139 F.3d 574, 577 (7th Cir. 1998)); *Leonard v. Mylex Corp.* (*In re Northgate Computer Sys., Inc.*), 240 B.R. 328, 366–67 (Bankr. D. Minn. 1999) (noting that the Minnesota UFTA contains a nearly identical provision to the Bankruptcy Code's constructive fraudulent transfer provision and "because of the near-identity of the statutory elements and the inherently-factual nature of the primary issue, the analysis under the federal-law analog is applicable here and no further discussion is warranted").

[645] *Tex. Truck Ins. Agency, Inc*. *v. Cure* (*In re Dunham*), 110 F.3d 286, 288–89 (5th Cir. 1997); *Jacoway v. Anderson* (*In re Ozark Rest. Equip. Co.*), 850 F.2d 342, 344 (8th Cir. 1988); *Klein v. Tabatchnick*, 610 F.2d 1043, 1047 (2d Cir. 1979) ("Fairness of consideration is generally a question of fact.") (citations omitted); *Alberts v. HCA Inc*. (*In re Greater Se. Cmty. Hosp. Corp. I*), Bankr. No. 02-02250, 2008 WL 2037592, *8 (Bankr. D.C. May 12, 2008); *Daley v. Chang* (*In re Joy Recovery Tech. Corp.*), 286 B.R. 54, 75 (Bankr. N.D. Ill. 2002); *In re Northgate Computer Sys., Inc*., 240 B.R. at 365. *But see In re Old Carco*, 2013 WL 335993 (concluding as a matter of law that the plaintiff in a fraudulent transfer suit failed to plausibly allege that the debtor received less than reasonably equivalent value).

[646] *Lowe v. B.R.B. Enters., Ltd*. (*In re Calvillo*), 263 B.R. 214, 220 (W.D. Tex. 2000); *see, e.g., Lindquist v. JNG Corp.* (*In re Lindell*), 334 B.R. 249, 255 (Bankr. D. Minn. 2005) ("There is no bright line rule used to determine when reasonably equivalent value is given."); *Weaver v. Kellogg*, 216 B.R. 563, 574 (S.D. Tex. 1997) (examining reasonably equivalent value under the Bankruptcy Code and Texas state law and noting that defendants do not need to prove "a dollar-for-dollar exchange in order to show" that reasonably equivalent value was received) (citing *Butler Aviation Int'l, Inc. v. Whyte* (*In re Fairchild Aircraft Corp.*), 6 F.3d 1119 (5th Cir. 1993)).

(1) whether the value of what was transferred is equal to the value of what was received; (2) the market value of what was transferred and received; (3) whether the transaction took place at arm's length; and (4) the good faith of the transferee.[647] The inquiry of whether reasonably equivalent value was received "is fundamentally one of common sense, measured against market reality."[648]

Reasonable, not exact, equivalence is all that is required.[649] In *In re Calvillo*, the bankruptcy court noted "[t]here is no set minimum percentage or monetary amount necessary" for a court to find that the debtor received reasonably equivalent value.[650] In evaluating whether reasonably equivalent value has been given to a debtor, a court must compare the benefits the debtor received as a result of the transaction against the obligations the debtor incurred in exchange.[651] Both direct and indirect benefits may be considered,[652] though generally courts will not recognize "indirect benefits" unless they are "fairly concrete."[653]

### (a) Direct Benefits

Section 548(d)(2)(A) of the Bankruptcy Code and section 3(a) of the UFTA both explicitly provide that the satisfaction or securing of an antecedent debt constitutes value.[654]

---

[647] *See Barber v. Golden Seed Co.*, 129 F.3d 382, 387 (7th Cir. 1997); *Mellon Bank v. Official Comm. of Unsecured Creditors of R.M.L., Inc.* (*In re R.M.L. Inc.*), 92 F.3d 139, 149 (3d Cir. 1996).

[648] *In re Northgate Computer Sys., Inc*., 240 B.R. at 365; *accord Sullivan v. Schultz* (*In re Schultz*), 368 B.R. 832, 836 (Bankr. D. Minn. 2007) (citing *In re Northgate Computer Sys., Inc.*, 240 B.R. at 365); *In re Lindell*, 334 B.R. at 256 (same).

[649] *See In re Fairchild Aircraft Corp*., 6 F.3d at 1125–26; *Rubin v. Mfrs. Hanover Trust Co*., 661 F.2d 979, 994 (2d Cir. 1981); *Waste Mgmt., Inc*. *v. Danis Indus. Corp*., No. 3:00cv256, 2009 WL 347773 at *21 (S.D. Ohio Feb. 10, 2009); *In re Calvillo*, 263 B.R. at 220; *MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Servs. Co.*, 910 F. Supp. 913, 937 (S.D.N.Y. 1995); *Coan v. Fleet Credit Card Servs., Inc*. (*In re Guerrera*), 225 B.R. 32, 36 (Bankr. D. Conn. 1998) ("It is not necessary that there be 'mathematical precision' or a 'penny-for-penny' exchange . . . .") (citing *Rubin,* 661 F.2d at 994); *Murphy v. Meritor Savings Bank* (*In re O'Day Corp*.), 126 B.R. 370, 393 (Bankr. D. Mass. 1991).

[650] *In re Calvillo*, 263 B.R. at 220.

[651] *Mellon Bank, N.A*. *v. Metro Commc'ns, Inc*., 945 F.2d 635, 647 (3d Cir. 1991).

[652] *HBE Leasing Corp*. *v. Frank*, 48 F.3d 623, 638 (2d Cir. 1995) (holding that "under the well established doctrine of *Rubin*, the fact that the consideration initially goes to third parties may be disregarded to the extent that the debtor indirectly receives a benefit from the entire transaction"); *Rubin*, 661 F.2d at 993 (decided under the Bankruptcy Act and recognizing that indirect benefits can constitute reasonably equivalent value but also noting that the lower court had failed to "quantify the indirect benefits" provided to the debtor and therefore a determination of whether fair consideration (the Bankruptcy Act's measure of value) had been provided was impossible; *see Pension Transfer Corp. v. Beneficiaries Under the Third Amendment to Fruehauf Trailer Corp. Ret. Plan No. 003* (*In re Fruehauf Trailer Corp*.), 444 F.3d 203, 212 (3d Cir. 2006); *Mellon Bank, N.A*., 945 F.2d at 646; 5 COLLIER ON BANKRUPTCY ¶ 548.05 (Alan N. Resnick & Henry J. Sommer eds., 16th ed.) (noting that a finding of reasonably equivalent value in such circumstances "requires the indirect benefit to be reasonably certain and quantifiable") (footnote omitted).

[653] *Silverman v. Paul's Landmark, Inc*. (*In re Nirvana Rest., Inc*.), 337 B.R. 495, 502 (Bankr. S.D.N.Y. 2006). (citing *Leibowitz v. Parkway Bank & Trust Co*. (*In re Image Worldwide Ltd*.), 139 F.3d 574, 578 (7th Cir. 1997)).

[654] 11 U.S.C. § 548(d)(2)(A); UFTA § 3(a).

Indeed, for fraudulent transfer purposes (as distinct from preferences under Bankruptcy Code section 547 and the Insider Preference statute contained in the UFTA), a debtor receives dollar-for-dollar value for the reduction of its debt, even where it is insolvent and the payment in full of one creditor could disadvantage remaining creditors,[655] provided the debt reduction equals the value of the asset transferred, and the debt reduction occurs at or about the time of the transfer.[656] In contrast, courts have consistently held that corporate dividends and the redemption of equity interests are not transfers for reasonably equivalent value or fair consideration.[657]

---

[655] *See Lisle v. John Wiley & Sons, Inc.* (*In re Wilkinson*), 196 F. App'x 337, 343 (6th Cir. 2006). In *Wilkinson*, the debtor, while insolvent, paid $1 million to a publisher on behalf of a bookstore in which the debtor owned a majority interest. *Id.* at 339. In exchange, the bookstore reduced by $1 million the debt owed to it by the debtor. *Id.* The court held that, as appropriately measured on the date of the transfer, the debtor received reasonably equivalent value for its transfer to the publisher through the dollar-for-dollar debt reduction, and that the debtor's net worth was unaffected by the transfer. *Id.* at 343.

[656] *See, e.g., Butler Aviation Int'l, Inc. v. Whyte* (*In re Fairchild Aircraft Corp.*), 6 F.3d 1119, 1126 (5th Cir. 1993); *Walker v. Sonafi Pasteur* (*In re Aphton Corp.*), 423 B.R. 76, 89 (Bankr. D. Del. 2010) (noting that "when a transfer is made to pay an antecedent debt, the transfer may not be set aside as constructively fraudulent"); *see also Pardo v. Gonzaba* (*In re APF Co.*), 308 B.R. 183, 187 (Bankr. D. Del. 2004) (dismissing constructive fraud claim, holding "the payments made on the promissory note were made for value—satisfaction of an antecedent debt"); *Sierra Invs., LLC v. SHC, Inc.* (*In re SHC, Inc.*), 329 B.R. 438, 445–46 (Bankr. D. Del. 2005); *Stalnaker v. Gratton* (*In re Rosen Auto Leasing, Inc.*), 346 B.R. 798, 805 (B.A.P. 8th Cir. 2006); *B.Z. Corp. v. Cont'l Bank, N.A.* (*In re B.Z. Corp.*), 34 B.R. 546, 548 (Bankr. E.D. Pa. 1983) ("The loan payments made [by the debtor] are not avoidable since under § 548(d)(2)(A) the payments were made for value, *i.e.*, 'the satisfaction of . . . antecedent debt . . . .'") (internal quotation marks omitted).

[657] *See, e.g.*, *Fisher v. Hamilton* (*In re Teknek, LLC*), 343 B.R. 850, 861 (Bankr. N.D. Ill. 2006) (noting that a dividend is "not a transfer in exchange for reasonably equivalent value"); *Fid. Bond & Mortg. Co. v. Brand* (*In re Fid. Bond & Mortg. Co.*), 340 B.R. 266, 286–88 (Bankr. E.D. Pa. 2006) (holding that debtor did not receive reasonably equivalent value for a dividend after noting that "[o]ther courts have held that a dividend or reduction in capital through the purchase of stock adds no value for creditors"); *see also Brandt v. Hicks, Muse & Co.* (*In re Healthco Int'l, Inc.*), 195 B.R. 971, 980 (Bankr. D. Mass. 1996) (distributions in termination of stock interests, by their very nature, are not for consideration).

### *(b) Indirect Benefits*

Courts have concluded that, under certain circumstances, indirect benefits can provide reasonably equivalent value,[658] as long as the value received is reasonably equivalent to what the debtor parted with in the challenged transaction.[659] This requirement has been interpreted to mean that any indirect benefit, to constitute reasonably equivalent value, must be concrete and quantifiable.[660] The burden is on the party claiming to have delivered value to quantify such value.[661] However, there is disagreement among courts about how precise the

---

[658] *See, e.g., Mellon Bank, N.A. v. Metro Commc'ns, Inc.*, 945 F.2d 635, 647 (3d Cir. 1991) (noting that the "strong synergy" created by the affiliation of the target-debtor and its acquirer in a leveraged buyout provided value and enabled the debtor to "establish[   ] a permanent relationship with a production company with highly sophisticated equipment and an experienced and reputable production and technical staff," thus allowing for the apparent creation of "a stronger and more profitable combination."); *Mellon Bank, N.A. v. Official Comm. of Unsecured Creditors of R.M.L., Inc.* (*In re R.M.L., Inc.*), 92 F.3d 139, 149–50 (3d Cir. 1996) (recognizing that the ability to access credit may constitute an indirect benefit for purposes of the reasonably equivalent value calculus, but nevertheless finding that the debtor's purported ability to obtain credit was not reasonably equivalent to the fees paid to the lender because the anticipated future financing was so contingent on a number of improbable events that the likelihood of the debtor ever realizing the actual benefits of the financing was minimal); *Marquis Prods., Inc. v. Conquest Carpet Mills, Inc.* (*In re Marquis Prods., Inc.*), 150 B.R. 487, 491 (Bankr. D. Me. 1993) ("Indirect benefits can arise in a variety of circumstances in the parent/subsidiary context. For instance, a subsidiary which guarantees a parent's debt may benefit indirectly by securing a future sale, or by improving its public image through consummating a large transaction.").

[659] *Mellon Bank N.A.*, 945 F.2d at 646–47; *see HBE Leasing Corp. v. Frank*, 48 F.3d 623, 638–39 (2d Cir. 1995); *see Official Comm. of Unsecured Creditors of Hechinger Inv. Co. of De. Inc. v. Fleet Retail Fin. Grp.* (*In re Hechinger Inv. Co. of Del.*), 274 B.R. 71, 82 (D. Del. 2002); *Collegeville/Imagineering, L.P. v. L.J. Liff & Assocs., Ltd.* (*In re Collegeville/Imagineering, L.P.*), No. 95-1619, 1999 WL 33220041 at *7 (D. Del. 1999).

[660] *In re Wilkinson*, 196 F. App'x at 342 (noting that some courts have held that once it has been established that an indirect benefit exists, the burden of demonstrating and quantifying such benefit shifts to the defendant and that "[t]he burden of showing that the benefit is concrete and quantifiable can be challenging in a case where the alleged benefit is goodwill, corporate synergy, a business opportunity, the continuation of a business relationship, or some other intangible benefit") (citing *Fid. Bond & Mortg. Co. v. Brand* (*In re Fid. Bond & Mortg. Co.*), 340 B.R. 266, 287 (Bankr. E.D. Pa. 2006)); *Henshaw v. Field* (*In re Henshaw*), 485 B.R. 412, 422 (D. Haw. 2013) ("Although the court may determine 'value' based on both direct and indirect benefits received, the value of the benefit must be tangible and quantifiable.").

[661] *Braunstein v. Walsh* (*In re Rowanoak Corp.*), 344 F.3d 126, 131–33 (1st Cir. 2003) ("[O]nce the Trustee establishes his prima facie case, he need not affirmatively disprove every other potential theory.") (affirming bankruptcy court's finding third-party transfers fraudulent in absence of documentation of loan); *First Nat'l Bank in Anoka v. Minn. Utility Contracting, Inc.* (*In re Minn. Utility Contracting, Inc.*), 110 B.R. 414, 419 (D.Minn.1990) (holding that once a trustee has established that consideration for the transfer passed to a third party, the burden of demonstrating and quantifying reasonably equivalent value for the transfer shifts to the creditor); *Leonard v. First Commercial Mortg. Co.* (*In re Circuit Alliance, Inc.*), 228 B.R. 225, 231 (Bankr. D. Minn. 1998) (when trustee establishes transfer was made on account of third party's debt or obligation, burden shifts to defendant to demonstrate debtor received benefit that was "tangible, of concrete economic value, and reasonably equivalent to what the debtor gave up"); 5 COLLIER ON BANKRUPTCY ¶ 548.05 (Alan N. Resnick & Henry J. Sommer eds., 16th ed.) (noting that if an indirect benefit can be quantified then "the transferee bears the burden of establishing that quantification") (footnote omitted).

defendant's quantification must be, with some courts holding that value must be quantified with "reasonable precision"[662] and with other courts noting that even intangible benefits that are "incapable of precise measurement" can confer value.[663]

### d. Transactions That Potentially Implicate Fraudulent Transfer Laws

Several of the transactions reviewed by the Examiner implicate potential constructive or actual fraudulent transfer claims. Because fraudulent transfer claims related to the Debtors' tax sharing arrangements and other tax-related issues are inextricably intertwined with the complex facts surrounding those arrangements, fraudulent transfer issues relating to those matters are not discussed in this Section but are instead presented in Section VII.K. With that exception, this Section analyzes and presents the Examiner's conclusions as to each of the fraudulent transfer claims reviewed by the Examiner.

To determine which state law would be available to challenge certain transactions, the Examiner performed the choice-of-law analysis set forth in Section VII.F.2 above. Based on that analysis, the Examiner concludes that fraudulent transfer claims brought on behalf of the estate of ResCap or RFC would likely be governed by Minnesota law, and fraudulent transfer claims brought on behalf of the estate of GMAC Mortgage would likely be governed by

---

[662] *Blixseth v. Kirschner* (*In re Yellowstone Mountain Club, LLC*), 436 B.R. 598, 666 (Bankr. D. Mont. 2010) (evaluating claims under Montana's state fraudulent transfer law and noting that the burden of proof on a defendant in a fraudulent transfer action is to show that any indirect benefits were tangible and concrete, and to quantify their value with reasonable precision) (citations omitted).

[663] *See Mellon Bank, N.A.,* 945 F.2d at 646–47; *see also In re R.M.L., Inc.*, 92 F.3d at 151 ("Significantly, the court in *Metro Communications, Inc.*, went on to discover several *potential*, intangible benefits, that, although incapable of precise measurement, conferred value on Metro despite their failure to materialize.").

Pennsylvania law. Courts in both Minnesota[664] and Pennsylvania[665] have held that each state's version of the UFTA with respect to actual and constructive fraudulent transfer claims is substantially the same as Bankruptcy Code section 548 and that the statutes should be treated as *in pari materia*. Because each of the transactions identified below occurred outside of the Bankruptcy Code's two-year look-back period,[666] the Examiner analyzes each of the transactions below under the relevant state's UFTA (made applicable through section 544(b)).

---

[664] Many cases have noted that the fraudulent transfer provisions of Minnesota's UFTA are substantially the same as the Bankruptcy Code and have ruled on Minnesota fraudulent transfer claims using the guidance from Bankruptcy Code cases. *See, e.g., Kaler v. Craig* (*In re Craig*), 144 F.3d 587, 593 (8th Cir. 1998) (outlining that Congress intended to bring federal bankruptcy law of fraudulent transfers into conformity with analogous state law); *Brown v. Third Nat'l Bank* (*In re Sherman*), 67 F.3d 1348, 1353–54 (8th Cir. 1995); *Stoebner v. Ritchie Capital Mgmt., LLC* (*In re Polaroid Corp.*), 472 B.R. 22, 55 (Bankr. D. Minn. 2012) ("The Minnesota enactment of the Uniform Fraudulent Transfer Act has a provision that is functionally identical to § 548(a)(1)(A), Minn.Stat. § 513.44(a)(1). In the Eighth Circuit, corollary provisions in the federal and state law that address intentionally-fraudulent transfers receive the same construction and application.") (citing *In re Graven*, 936 F.2d 378, 383 (8th Cir. 1991) (Uniform Fraudulent Conveyance Act and § 548(a)(1) use "the same standard")); *Stoebner*, 472 B.R. at 34 ("Whether styled under 11 U.S.C. § 548(a)(1) or under a state-law analog (here Minn. Stat. § 513.44(a)(1)) . . . ."); *Leonard v. Mylex Corp.* (*In re Northgate Computer Sys., Inc.*), 240 B.R. 328, 361 n.45 (Bankr. D. Minn. 1999) ("In recent years, the [Eighth] Circuit has given a uniform construction to the law of actually-fraudulent transfers under state statute and the Bankruptcy Code.") (citations omitted).

[665] Pennsylvanian courts have consistently held that the fraudulent transfer provisions of Pennsylvania's UFTA "mirror" those of the Bankruptcy Code and have looked to cases interpreting the Bankruptcy Code as authoritative on issues of law arising under the Pennsylvania UFTA. *See, e.g., Image Masters, Inc. v. Chase Home Fin.*, No. 10-1141, 2013 WL 878832, at *6 (E.D. Pa. Mar. 11, 2013) (analyzing case law interchangeably for claims asserted under the Bankruptcy Code and the Pennsylvania UFTA); *Bohm v. Titus* (*In re Titus*), 467 B.R. 592, 616 (Bankr. W.D. Pa. 2012) (applying other states' versions of the UFTA and the Bankruptcy Code, since all the statutes were "similarly worded to and similarly construed with" the relevant Pennsylvania UFTA provisions of 12 Pa. C.S.A. § 5104) (citations omitted); *Cardiello v. Casale* (*In re Phillips Grp., Inc.*), 382 B.R. 876, 887 (Bankr. W.D. Pa. 2008) (noting that, because the phrase "reasonably equivalent value" as used in the Pennsylvania UFTA is patterned after Bankruptcy Code section 548(a) "we may look to interpretations of the phrase as it appears in the latter to understand its use in the former"); *Bohm v. Dolata* (*In re Dolata*), 306 B.R. 97, 115 (Bankr. W.D. Pa. 2004) (noting that, to the extent the language of the statutes parallels each other, the fraudulent transfer provisions of the Bankruptcy Code and the Pennsylvania UFTA should be construed consistently with each other); *Satriale v. Key Bank USA, N.A.* (*In re Burry*), 309 B.R. 130, 134 (Bankr. E.D. Pa. 2004) (noting that the Bankruptcy Code and the Pennsylvania UFTA "mirror each other in terms of causes of action" related to both constructive and actual fraud) (footnotes omitted).

[666] 11 U.S.C. § 548(a)(1) ("The trustee may avoid any transfer . . . of an interest of the debtor in property, or any obligation . . . incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition . . . .").

### *(1) 2006 Bank Restructuring*

The Creditors' Committee asserts that there are potential constructive and intentional fraudulent transfer claims relating to the Ally Bank Transactions.[667] The Examiner has analyzed these matters and concludes it is unlikely that these fraudulent transfer claims would prevail.

As discussed in Section V.A.1.a, effective November 20, 2006, and before ResCap became financially distressed under any of the applicable statutory tests, ResCap transferred: (1) $360 million in cash and debt to IB Finance; and (2) 100% of the equity of Old GMAC Bank. In exchange, ResCap received: (1) the value of a de-linked credit rating (an indirect benefit); and (2) two million IB Finance Class M Shares. Section V.A.2.b contains the Examiner's detailed analysis and conclusion that the evidence supports the proposition that ResCap did not receive reasonably equivalent value in the 2006 Bank Restructuring.[668]

#### *(a) Actual Fraudulent Transfer Analysis*

##### *(i) Badges Of Fraud Present In The 2006 Bank Restructuring*

An actual fraudulent transfer claim relating to the 2006 Bank Restructuring would likely be governed by Minnesota's version of the UFTA, as incorporated by Bankruptcy Code section 544(b).[669] Minnesota courts often look to cases decided under the Bankruptcy Code as well as the Minnesota UFTA,[670] which sets forth a non-exclusive list of certain badges of fraud that, if present in a "confluence," can provide a rebuttable presumption of the debtor's intent to defraud.[671] The following two badges of fraud are present in the 2006 Bank Restructuring:

> (1) the transfer or obligation was to an insider; . . . [and] (8) the value of the consideration received by the debtor was not reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred.[672]

---

[667] Committee's Motion for Entry of an Order Authorizing It to Prosecute and Settle Certain Claims on Behalf of the Debtors' Estates [Docket No. 3412] at 37, ¶ 63.

[668] For a full analysis of this issue, see Section V.A.2.b.

[669] *See* Section VII.F.3.

[670] MINN. STAT. ANN. § 513.44 (a)(1). The Eighth Circuit, which includes Minnesota, has concluded that law of actual fraudulent transfers under the UFTA and the Bankruptcy Code is identical. *See Graven v. Fink* (*In re Graven*), 936 F.2d 378, 383 (8th Cir. 1991); *Kaler v. Craig* (*In re Craig*), 144 F.3d 587, 593 (8th Cir. 1998); *see also Hedback v. Am. Family Mut. Ins. Co.* (*In re Mathews*), 207 B.R. 631, 646 n.24 (D. Minn. 1997) (noting that the Eighth Circuit gives identical construction to the language "with actual intent to hinder, delay, or defraud creditors" regardless of whether it is interpreting state fraudulent transfer laws or the Bankruptcy Code) (citations omitted).

[671] *Kelly v. Armstrong*, 206 F.3d 794, 798 (8th Cir. 2000) (examining actual fraudulent transfer claims under section 548 of the Bankruptcy Code and stating that "[i]f there is a confluence of the 'badges of fraud,' then the Trustee is entitled to a presumption of fraudulent intent. To overcome a presumption, a 'legitimate supervening purpose' for the transfers must be shown by the bankrupt").

[672] MINN. STAT. ANN. § 513.44(b).

First, as shown in Section VII.F.3, AFI is an "insider" of ResCap.[673] Second, as shown in Section V.A.2.b, the Examiner has concluded that ResCap did not receive reasonably equivalent value in the 2006 Bank Restructuring.

#### (ii) Evidence Suggesting An Absence Of Fraud In The 2006 Bank Restructuring

There is no bright-line rule regarding the number of badges of fraud that must be present for fraudulent intent to be found, but courts have generally held that "several" badges of fraud need to be present to raise the presumption of actual fraudulent intent.[674] The Eighth Circuit has held that once the party seeking to avoid a transfer as actually fraudulent establishes a confluence of *several* badges of fraud it is entitled to a presumption of fraudulent intent.[675]

---

[673]  A transfer to an insider, without further evidence of fraud, is insufficient to find an actual fraudulent transfer occurred. For example, in the case of *Kipperman v. Onex Corp.*, 411 B.R. 805, 854–59 (N.D. Ga. 2009), the district court addressed whether an actual fraudulent transfer had occurred. Plaintiff pointed to the fact that the transferee was an "affiliate" of the debtor as evidence of a badge of fraud supporting the actual fraud allegation. *Id.* at 854. The district court held that the transferee was "an 'affiliate' of and thus an 'insider' with respect to the Debtors" and that the transferee benefitted from the allegedly fraudulent transfer "in the form of management fees, an ownership interest in the Debtors, and potential tax credits." *Id*. at 854, 856. "Because the court finds that the [transfers] were made to benefit the [transferees], the court finds that the transfers were made 'for the benefit of insiders' and satisfy this badge of fraud." *Id*. However, because the plaintiffs were unable to establish any other badges of fraud, the district court granted summary judgment for the transferees on the issue of actual fraud. *Id*. at 854–59.

[674]  *See, e.g., Glassman v. O'Brian* (*In re Valley Bldg. & Const. Corp.*), 435 B.R. 276, 286 (Bankr. E.D. Pa. 2010) (interpreting Pennsylvania's UFTA and noting that "[a] 'goodly' number of these factors or badges of fraud must be proven to support a claim of actual fraud") (citing *Provident Life & Accident Ins. Co. v. Gen. Syndicators of Am., Managers, Inc.*, Nos. CIV.A 97-3135, 95-19102DAS, 1997 WL 587288, at *5 (E.D. Pa. Sept. 8, 1997)); *Kipperman*, 411 B.R. at 853–54 ("'While a single badge of fraud may only create a suspicious circumstance and may not constitute the requisite fraud to set aside a conveyance . . . several of them when considered together may afford a basis to infer fraud.'") (citing *Gen. Trading, Inc. v. Yale Materials Handling Corp.,* 119 F.3d 1485, 1498–99 (11th Cir. 1997) (applying Florida's UFTA)); *Silverman v. Actrade Capital, Inc.* (*In re Actrade Fin. Techs. Ltd.*), 337 B.R. 791, 809 (Bankr. S.D.N.Y. 2005) (noting that "the existence of several badges of fraud can constitute clear and convincing evidence of actual intent"). At least one court has held outright that "[a]s a matter of law, a finding of fraudulent intent cannot properly be inferred from the existence of just one 'badge of fraud.'" *See Ingalls v. SMTC Corp.* (*In re SMT Mfg. of Tex.*), 421 B.R. 251, 300 (Bankr. W.D. Tex. 2009) (citations omitted). While one court has stated that the existence of insolvency and lack of fair consideration alone could justify a finding of fraudulent intent due to the importance of these two factors, that court ultimately ruled that a transfer was actually fraudulent where nearly all of the badges of fraud were present. *Liebersohn v. Zisholtz* (*In re Martin's Aquarium, Inc.*), 225 B.R. 868, 876 (Bankr. E.D. Pa. 1998).

[675]  *Kelly,* 141 F.3d 799, 802 (8th Cir. 1998).

Just as there are badges of fraud, courts and the UFTA commentary note that certain contrary facts may serve to negate or counter any suggestion of fraudulent intent. For example, the court in *Lippe v. Bairnco Corp.*[676] stated:

> [T]he flip side of [the] badges of fraud is that their absence—or evidence that fair consideration was paid, the parties dealt at arm's-length, the transferor was solvent, the transfer was not questionable or suspicious, the transfer was made openly, or the transferor did not retain control—would constitute evidence that there was no intent to defraud.[677]

Although *Lippe* involved the New York Debtor and Creditor Law rather than the UFTA,[678] courts have made it clear that analysis of these issues proceeds in a very similar manner regardless of which statute is being applied. For example, the court in *MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Services Co.*[679] examined actual fraudulent transfer claims from a leveraged buy-out transaction that arose under the fraudulent conveyance statutes of New York, Minnesota, and Delaware and determined that the laws of these three states were similar and had the same origin, and therefore performed one combined analysis of the actual fraudulent transfer claims at issue.[680] In addition to this authority, the commentary to the model UFTA also states that a court "may appropriately take into account all indicia negativing as well as those suggesting fraud."[681]

Several facts relating to the 2006 Bank Restructuring weigh against a finding of actual intent. An important fact is that ResCap was not financially distressed under any of the statutory tests at the time of or after giving effect to the 2006 Bank Restructuring.[682] As the

---

[676] 249 F. Supp. 2d 357, 375 (S.D.N.Y. 2003) (examining actual fraud issues under the New York Debtor and Creditor Law).

[677] *Id.*

[678] *Id*.

[679] 910 F. Supp. 913 (S.D.N.Y. 1995).

[680] *Id.* at 933–34 (noting that the laws of New York, Minnesota and Delaware "trace their origins to the 'statute of 13 Elizabeth,' enacted by the English Parliament in 1571" and that the "laws of Minnesota and Delaware are similar" to the actual fraudulent transfer law of New York). In examining the circumstances surrounding the transaction, the District Court determined that even though several badges of fraud were present actual intent was not present. *Id.* at 935–36. In making that determination, the District Court noted several badges of fraud that were missing, including a lack of secrecy surrounding the transaction. *Id.* at 935 ("The transaction was not secretive, nor was it structured in some manner unusual for an LBO.").

[681] UFTA § 4(b) cmt. 6.

[682] *See* Section VI.

court noted in *Allstate Insurance Co. v. Countrywide Financial Corp.*,[683] insolvency is one of the "most compelling" badges of fraud.[684]

The Minnesota UFTA also lists as a valid consideration whether "the transfer or obligation was disclosed or concealed."[685] Here, the 2006 Bank Restructuring[686] was publicly disclosed through SEC filings as early as April 2006, with updates regarding the transaction disclosed throughout 2006.[687] Courts have treated disclosure as a relevant fact weighing against a finding of actual intent. For example, in *Leonard v. Mylex Corp.* (*In re Northgate Computer Sys., Inc.*), the court determined that, under section 548(a)(1) of the Bankruptcy Code, there was no basis for an intentional fraudulent transfer claim because, in part, there was no evidence of "conceal[ment] [of] the payments from any party that might be interested in them."[688] The court analyzed various other factors, ultimately determining that the only applicable badge of fraud was the debtor's "mounting insolvency," which, standing alone, was insufficient to establish an intentional fraudulent transfer.

The terms of the 2006 Bank Restructuring were disclosed and ResCap's creditors, and the credit markets in general, did not consider the transaction to be alarming. The only bond rating changes that occurred during the three months before and after the 2006 Bank Restructuring was that, in November 2006, after the 2006 Bank Restructuring, both S&P and Fitch raised their rating on ResCap's senior debt from BBB- to BBB. ResCap's unsecured bonds traded at or near par following the announcement of the 2006 Bank Restructuring. The following Exhibit, detailing activity with respect to ResCap's 6.5% bonds maturing on April 17, 2013, illustrates this point:[689]

---

[683]   842 F. Supp. 2d 1216 (C.D. Cal. 2012). This case involved the actual fraudulent transfer provisions of the Illinois UFTA, which is similar to the Minnesota UFTA. *Compare* MINN. STAT. ANN. § 544.44(a)(1), *with* 740 ILL. COMP. STAT. ANN. 160/5(a)(1).

[684]   *Id.* at 1224 ("Though solvency and adequacy of consideration are only two of the eleven statutorily enumerated badges of fraud, they are among the most compelling . . . .").

[685]   MINN. STAT. ANN. § 513.44(b)(3).

[686]   Even though there was a failure to disclose alternative structures considered with respect to the 2006 Bank Restructuring, which may have other implications as fully analyzed in Section VII.L.1, that does not change the fact that the terms of the actually consummated deal were publicly disclosed.

[687]   *See* Residential Capital Corporation, Current Report (Form 8-K) (Apr. 3, 2006); Residential Capital Corporation, Quarterly Report (Form 10-Q) (Aug. 8, 2006), at 10; Residential Capital, LLC, Quarterly Report (Form 10-Q) (Nov. 7, 2006), at 11; Residential Capital, LLC, Current Report (Form 8-K) (Nov. 27, 2006).

[688]   240 B.R. 328, 360–62 (D. Minn. 1999). The court also found that actual fraud was not made out under section 513.44(a)(1) under Minnesota law because it contains a "nearly identical" provision to section 548(a)(1) of the Bankruptcy Code. *Id.* at 366; s*ee also Felker v. McGhan Med. Corp.* (*In re Minn. Breast Implant Litig.*), 36 F. Supp. 2d 863, 882 (D. Minn. 1998) (noting that the public disclosure of the sale of a business argued against an actual fraudulent intent).

[689]   An analysis was performed of the historical pricing trends of ResCap's 6.5% bond maturing on April 17, 2013. *See* Section VI.B.4.a.



EXHIBIT VII.F.6.d(1)(a)(ii)—1
**ResCap Bond Pricing Activity – Three Months Before and After the 2006 Bank Restructuring**
August 2006 – March 2007

*Source: Pricing per Interactive Data Corporation, a provider of securities pricing data.*

Spreads for CDS on which ResCap was the reference entity also showed little movement in response to the news of the 2006 Bank Restructuring, as the following exhibit shows:



EXHIBIT VII.F.6.d(1)(a)(ii)—2
**ResCap Five Year Credit Default Swap Spreads – Three Months Before and After the 2006 Bank Restructuring**
August 2006 – March 2007

*Source: Advantage Data Inc.*

The cases that mention disclosure of a transaction's terms as a relevant factor suggesting an absence of actual intent to hinder, delay, or defraud creditors do not explain exactly why disclosure is inconsistent with fraudulent intent. But, as a matter of common sense and logic, one of the purposes and effects of disclosure is to permit creditors to invoke their legal remedies if they believe a transaction has harmed them, and/or to sell (or purchase CDS protection against) their debt positions if they believe the transaction left their obligor significantly weakened. The fact that neither litigation, nor a decline in ResCap's bond pricing or unsecured debt ratings, nor an increase in the cost of CDS protection on ResCap obligations, followed the announcement of the 2006 Bank Restructuring suggests that ResCap's creditors did not view the transaction as harmful.

A review of the other relevant considerations set forth in the Minnesota UFTA reveals that the 2006 Bank Restructuring shows many signs negating actual fraud: (1) there is no evidence that ResCap retained possession or control of the property transferred; (2) there is no evidence that ResCap was sued or threatened with suit prior to the transfers; (3) the transfers were not of substantially all of ResCap's assets; (4) ResCap did not "abscond" following the transfer; and (5) there is no indication that ResCap removed or concealed assets.[690]

The Examiner also concludes that the evidence supports the proposition that there was a legitimate business purpose for the 2006 Bank Restructuring.[691] As fully explained in Section V.A.1.a(1), the 2006 Bank Restructuring was necessary to allow the Cerberus deal to close. The Cerberus transaction provided substantial benefits to ResCap, including allowing ResCap to avoid a potential credit rating downgrade.

### (iii) Conclusion

Based on the totality of the facts and circumstances presented by the Investigation, the Examiner concludes it is unlikely that actual fraudulent transfer claims related to the 2006 Bank Restructuring would prevail.

---

[690] MINN. STAT. ANN. § 513.44(b).

[691] *Kelly v. Armstrong*, 206 F.3d 794, 798 (8th Cir. 2000) (examining actual fraudulent transfer claims under section 548 of the Bankruptcy Code and stating that "[i]f there is a confluence of the 'badges of fraud,' then the Trustee is entitled to a presumption of fraudulent intent. To overcome a presumption, a 'legitimate supervening purpose' for the transfers must be shown by the bankrupt") (citations omitted); *ASARCO LLC v. Ams. Mining Corp.*, 396 B.R. 278, 391–93 (S.D. Tex. 2008) (noting that "even though Plaintiff proved that AMC had the requisite [actual fraudulent] intent, AMC may still prevail on this claim if it can prove that there was a legitimate supervening purpose for the transaction" but ultimately determining that "even though there was a legitimate business purpose for the transfer" the other aspects of the transaction had no legitimate business purpose and thus the inference of actual fraud was not rebutted) (citing *Kelly*, 206 F.3d at 801); *Burch v. Harris* (*In re Harris*), Nos. 02-10938, 02-05803, 2003 WL 23096966, at *2 (Bankr. D. Del. Dec. 30, 2003).

### *(b) Constructive Fraudulent Transfer Analysis*

Because ResCap was not financially distressed within the meaning of any applicable fraudulent transfer statutes at the time of this transaction,[692] the Examiner concludes that a plaintiff would be unable to establish a prima facie case for a constructive fraudulent transfer claim.

### *(2) 2008 Secured Revolver Transaction*

The facts relating to the 2008 Secured Revolver Transaction are fully set forth in Section V.E.3 and are also briefly summarized in Section VII.F.4.h above. For purposes of a fraudulent transfer analysis of the 2008 Secured Revolver Transaction, it is necessary to identify the transfers made and obligations incurred by RFC and GMAC Mortgage[693] and then to assess the difference in the direct and indirect value received in exchange.[694]

RFC and GMAC Mortgage incurred secured obligations for the entire $3.5 billion Secured Revolver Facility.[695] In exchange for these secured obligations, RFC and GMAC Mortgage received: (1) a release of their obligations as guarantors under the $1.75 billion 2005 Term Loan Facility; (2) a release of their obligations as guarantors under the undrawn $1.75 billion 2007 Revolvers (which facilities were never drawn); (3) a release of their guarantees of $1.29 billion of bonds (those bonds were retired as a result of the June 6, 2008 bond exchange); and (4) an offset of at least $2.43 billion of intercompany debt owed by RFC and GMAC Mortgage to ResCap.[696]

---

[692] For a full analysis of the Debtors' financial condition during relevant periods, see Section VI.

[693] Because ResCap received reasonably equivalent value in this transaction through receipt of the loan proceeds (in exchange for its obligations as guarantor), an extended constructive fraudulent transfer analysis with respect to ResCap's potential claims is not necessary.

[694] The Examiner concludes that it is likely that the Bankruptcy Court would apply Minnesota (as to RFC) or Pennsylvania (as to GMAC Mortgage) law to fraudulent transfer issues arising from the 2008 Secured Revolver Transaction based on the analysis set forth in Section VII.F.3.a above. Because the transaction occurred outside the Bankruptcy Code's two-year reach-back period, section 548(a)(1)(B) of the Bankruptcy Code is not applicable. *See* 11 U.S.C. § 548(a)(1).

[695] As noted above, many transfers occurred in connection with the 2008 Secured Revolver Transaction, including RFC and GMAC Mortgage's grant of security interests on a second- and third-lien basis over substantially all of their assets as guarantors under the Senior Secured Notes and the Junior Secured Notes. Consistent with the scope of the Investigation, this analysis focuses on potential fraudulent transfer claims associated with transfers to or for the benefit of or obligations incurred to, or for the benefit of, AFI, Cerberus, and their respective affiliates.

[696] As discussed below, ResCap recorded the Secured Revolver Transaction in its accounting records in June 2008, but did not record any indebtedness arising from the Secured Revolver Transaction in RFC's or GMAC Mortgage's accounting records until November 30, 2008, after which the accounting records allocated the outstanding indebtedness under the Secured Revolver Facility to RFC and GMAC Mortgage based on collateral values at each through the Petition Date. Between June 2008 and November 2008, approximately $1.07 billion in payments were made on the Secured Revolver Facility. It is unclear, though likely, that RFC and GMAC Mortgage were the source of the funds for these payments. In such event, in addition to the $2.43 billion in debt forgiveness recorded on November 30, 2008, RFC and GMAC Mortgage would have received additional reductions of intercompany debt owed to ResCap in the amount of $1.07 billion.

### (a) Actual Fraudulent Transfer Claims

Only two badges of fraud are present with respect to the 2008 Secured Revolver Transaction: (1) the transfers were made to AFI, an insider; and (2) the transfers were made at a time when the Examiner has concluded that ResCap, RFC, and GMAC Mortgage each: (a) were balance sheet insolvent; (b) had unreasonably small capital (assets); and (c) reasonably should have believed that it would incur debts beyond its ability to pay.[697]

Several significant facts serve to counter these two badges of fraud. The most important of these is the Examiner's conclusion that each of ResCap, RFC, and GMAC Mortgage received reasonably equivalent value in exchange for the transfers made in connection with the 2008 Secured Revolver Transaction (as explained below). In addition, these transactions were disclosed to the public in SEC filings,[698] constituting evidence that the transfers and obligations were not concealed. Disclosure weighs against a finding of actual fraud, as does the absence of any other badges of fraud.[699] There is no evidence that ResCap, RFC, and/or GMAC Mortgage: (1) retained possession or control of the property transferred; (2) were sued or threatened with suit prior to the transfers; (3) transferred substantially all of their assets; (4) absconded following the transfer; or (5) removed or concealed assets.

The Examiner therefore concludes, based upon all the facts and circumstances surrounding these transfers, that it is unlikely that actual fraudulent transfer claims arising from the 2008 Secured Revolver Transaction would prevail.

### (b) Constructive Fraudulent Transfer Claims

A debtor incurring an obligation under a credit agreement will normally receive a direct benefit from the loan proceeds it receives as a result of the transaction. When the 2008 Secured Revolver Facility transaction was consummated, $1.29 billion of the 2005 Term Loan Facility was assigned to AFI and became part of the Secured Revolver Facility.[700] AFI also provided $2.21 billion of new funds under the Secured Revolver Facility. Although RFC and GMAC Mortgage were the borrowers under the Secured Revolver Facility, and the publicly stated reason for the facility was, in part, for working capital purposes,[701] RFC and GMAC Mortgage did not directly receive any of the $2.21 billion of new funds. Rather, AFI sent the loan proceeds directly to ResCap, which in turn: (1) used approximately $458 million to repay

---

[697] *See* Section VI.E.2.

[698] *See* Section V.E.

[699] *See Official Comm. of Unsecured Creditors of Fedders N. Am., Inc. v. Goldman Sachs Credit Partners L.P.* (*In re Fedders N. Am., Inc.*), 405 B.R. 527, 545–46 (Bankr. D. Del. 2009) ("[T]he facts pled in the complaint show that Fedders' dealings with Lenders were anything but concealed. Fedders' borrowing was disclosed in a public filing with the SEC, as was the fact that it was seeking refinancing it ultimately obtained from the Lenders.").

[700] *See* Master Assignment and Assumption Agreement, dated as of a date on or before June 6, 2008 among the Initial Lender and the Term Loan Lenders [ALLY_0043831].

[701] GMAC LLC, Current Report (Form 8-K) (June 9, 2008), at 6 ("The proceeds will be used to repay existing indebtedness of ResCap, to acquire certain assets, and for other working capital purposes.").

the portion of the 2005 Term Loan Facility not assumed by AFI;[702] (2) paid certain cash obligations related to the June 6, 2008 bond exchange, totaling approximately $1.29 billion[703] (the bond exchange resulted in the cancellation of $8.6 billion of tendered notes and the issuance of $5.7 billion of Senior and Junior Secured Notes);[704] and (3) used approximately $457 million "to acquire other assets and for other working capital needs."[705] As a result of these transfers, RFC and GMAC Mortgage's liability to third parties as guarantors of the 2005 Term Loan and the 2007 Revolvers was released.

"[P]ayments on an existing guarantee generally are considered to be for reasonably equivalent value"[706] because such payments are on account of an antecedent debt.[707] RFC and GMAC Mortgage were liable as guarantors under the 2005 Term Loan, the 2007 Revolvers, and ResCap's unsecured bonds. Approximately $3.04 billion of the Secured Revolver Facility was used to retire or replace these guaranteed obligations.[708]

In June 2008, ResCap recorded the Secured Revolver Facility in its accounting records. On November 30, 2008, ResCap allocated $1 billion of the Secured Revolver Facility to GMAC Mortgage and $1.43 billion to RFC.[709] In return, each received a dollar-for-dollar reduction in debt owed to ResCap.[710] Satisfaction of a bona fide antecedent debt is, by definition, for fair consideration or reasonably equivalent value.[711] This holds true even where the antecedent debt in question is intercompany debt.[712]

---

[702] Ally Revolver Use of Funds—June 2008 [EXAM00345926].

[703] *Id.*; *see also* Residential Capital, LLC, Current Report (Form 8-K) (June 9, 2008), at 2; Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2009), at 100.

[704] *See* Residential Capital, LLC, Current Report (Form 8-K) (June 12, 2008), at 1.

[705] Ally Revolver Use of Funds—June 2008 [EXAM00345926]. It is likely that GMAC Mortgage and RFC received some if not all of the funds used for working capital. However, a tracing of these funds is outside the scope of the Investigation.

[706] *Official Comm. of Unsecured Creditors of R.M.L., Inc. v. Conceria Sabrina S.P.A.* (*In re R.M.L., Inc.*), 195 B.R. 602, 618 (Bankr. M.D. Pa. 1996).

[707] *Id.* at 618 (Bankr. M.D. Pa. 1996) (noting that "courts generally recognize that '[a] proportionate reduction in rights or liability constitutes an exchange of reasonably equivalent value for fraudulent transfer purposes under the Bankruptcy Code'") (citations omitted).

[708] Ally Revolver Use of Funds—June 2008 [EXAM00345926].

[709] *Id*. As noted above, these allocations were based on the collateral values at each entity.

[710] *Id*.

[711] *See, e.g., Pereira v. Dow Chem. Co.* (*In re Trace Int'l Holdings, Inc*.), 301 B.R. 801, 805 (Bankr. S.D.N.Y. 2003) ("Past consideration is good consideration. An 'antecedent debt' satisfies the requirement of fair consideration and reasonably equivalent.") (citations omitted), *vacated on other grounds*, No. 04-1295, 2009 WL 1810112 (S.D.N.Y. June 25, 2009); *In re Capmark Fin. Grp. Inc.*, 438 B.R. 471, 518 (Bankr. D. Del. 2010) ("Where a bona fide antecedent debt exists, a debtor's payment on account of that creditor's claim, even if it has the result of preferring that creditor over others, is not by itself a fraudulent transfer.").

[712] *Official Unsecured Creditors Comm. of Valley-Vulcan Mold Co. v. Ampco-Pittsburgh Corp.* (*In re Valley-Vulcan Mold Co.*), 5 F. App'x 396, 398 (6th Cir. 2001) ("The repayment of intercompany debt was a dollar-for-dollar transaction that, by definition, satisfied fair consideration."); *Scharffenberger v. Phila. Health Care Trust* (*In re Allegheny Health, Educ. & Research Found.*), 253 B.R. 157, 171–72 (Bankr. W.D. Pa. 2000) (concluding that elimination of an intercompany debt by simultaneous elimination of an intercompany receivable constituted reasonably equivalent value. However, not all intercompany debts are bona fide debts. For example, an intercompany debt that is not scrupulously recorded as a liability on a company's financial statements may not be treated as a bona fide debt for purposes of determining fair consideration or reasonably equivalent value. *See Murphy v. Meritor Sav. Bank* (*In re O'Day Corp.*), 126 B.R. 370, 397 (Bankr. D. Mass. 1991). Here there is no indication that these intercompany debts should not be treated as bona fide debts. *See* Section VII. B–D.

Thus, after the 2008 Secured Revolver Transaction was consummated, RFC and GMAC Mortgage were indebted as borrowers on the $3.5 billion Secured Revolver Facility. Of this amount $1.29 billion was simply an exchange of debt on a dollar-for-dollar basis. While RFC and GMAC Mortgage were now borrowers rather than guarantors on the new debt, which was now secured rather than unsecured, as ResCap's principal operating subsidiaries, RFC's and GMAC Mortgage's assets were the principal source of repayment in either case. In exchange for the $2.21 billion of proceeds, for which RFC and GMAC Mortgage became liable under the Secured Revolver Facility, RFC and GMAC Mortgage received: (1) releases from approximately $1.75 billion of guaranteed indebtedness to third parties; and (2) the offset of at least $2.43 billion of intercompany debt. Because RFC and GMAC Mortgage each received reasonably equivalent value, the Examiner concludes it is unlikely that constructive fraudulent transfer claims related to the 2008 Secured Revolver Transaction would prevail.[713]

### (3) Other Transactions

The following transactions were identified during the course of the Investigation as being potential actual or constructive fraudulent transfers: (1) June 2008 Model Home Sale; (2) Resort Finance Sale; (3) 2008 Bank Transaction; and the (4) 2009 Bank Transaction.

### (a) Actual Fraudulent Transfer Analysis

For each of these transactions the same two badges of fraud are present: (1) the transfers were to an insider; and (2) the transfers were made while the Debtor-transferor(s) was financially distressed.

These transactions also present significant countervailing facts and circumstances that case law and the official commentary to the UFTA specifically note as tending to negate an assertion of actual fraudulent intent. The most important of these is that the Examiner has concluded that for each of these transactions, the Debtor-transferor(s) received reasonably equivalent value.[714] The receipt of reasonably equivalent value is strong evidence against a

---

[713] The delay in the "push down" for accounting treatment from ResCap to RFC and GMAC Mortgage of the cash and debt forgiveness may pose a question of whether the cash and/or debt forgiveness constituted value received by RFC and GMAC Mortgage in exchange for the obligation incurred and property transferred. The documentation of the 2008 Secured Revolver Transaction contemplates that all the events were to take place substantially contemporaneously. *See, e.g.,* Master Assignment and Assumption Agreement, dated on or before June 6, 2008 [ALLY_0043831]; Ally Revolver Use of Funds—June 2008 [EXAM00345926]. The Examiner concludes that the delay in completing the internal accounting for the Secured Revolver Transaction is immaterial to his conclusions in these circumstances.

[714] *See* Sections VII.F.4.h, V.F, V.A.1.

finding that the transaction was actually fraudulent,[715] given that "adequacy of consideration" is one of the "most significant" badges of fraud.[716]

Second, the material terms of all of these transactions were disclosed to the public in SEC filings.[717] The June 2008 Model Home Sale was the result of an auction process[718] and the Resort Finance Sale was completed only after significant marketing efforts were made in an attempt to sell these assets to an independent third party.[719] These facts indicate that secrecy and concealment were not present with respect to any of these transactions and that, in fact, the June 2008 Model Home Sale and the Resort Finance Sale were both completed only after the proposed transactions had been exposed to the market.

Finally, additional relevant considerations under the Minnesota UFTA and the Pennsylvania UFTA also tend to negate an assertion of actual fraudulent intent because there is no evidence that any of the Debtors: (1) retained possession or control of the relevant property after these transfers; (2) were sued or threatened with suit prior to the transfers; (3) transferred substantially all of its assets; (4) absconded following the transfer; or (5) removed or concealed assets.[720]

Based on an evaluation of all the facts and circumstances surrounding each of these transfers, the Examiner concludes that it is unlikely that actual fraudulent transfer claims arising from these transfers would prevail.

---

[715] *See Lippe v. Bairnco Corp.*, 249 F. Supp. 2d 357, 375–76 (S.D.N.Y. 2003) (noting that the plaintiff's failure to show damages resulting from an alleged actual fraudulent transfer weighed against a finding of actual fraud and stating "[i]t is hornbook law that '[a] conveyance cannot be fraudulent as to creditors if the debtor's solvency is not affected thereby, that is, if the conveyance does not deplete or otherwise diminish the value of the assets of the debtor's estate remaining available to creditors") (citations omitted); *Geltzer v. Bloom* (*In re Silverman Laces, Inc.*), 404 B.R. 345, 360 (Bankr. S.D.N.Y. 2009) (evaluating a claim under New Jersey's UFTA and noting that "[a]lthough it is possible for a transfer for reasonably equivalent value to be avoided as long as actual intent to hinder, delay or defraud creditors is proven [a review of the UFTA's badges of fraud] shows the importance of whether reasonably equivalent value was provided in exchange for the transfer, or whether the transfer depleted assets otherwise available for creditors") (citing *United States v. McCombs*, 30 F.3d 310, 327–28 (2d Cir. 1994)).

[716] *Liebersohn v. Zisholtz* (*In re Martin's Aquarium, Inc.*), 225 B.R. 868, 876 (Bankr. E.D. Pa. 1998) ("[T]he issues of adequacy of consideration and insolvency of the transferor . . . are 'the most significant' of the badges."); *see also Allstate Ins. Co v. Countrywide Fin. Corp.*, 842 F. Supp. 2d 1216, 1224 (C.D. Cal. 2012).

[717] *See* Sections V.A.1, V.E.3, V.F. Public disclosure of a transaction's terms has been held to constitute evidence that a transfer was not concealed and such disclosure weighs against a finding of actual fraud. *See Official Comm. of Unsecured Creditors of Fedders N. Am., Inc. v. Goldman Sachs Credit Partners L.P.* (*In re Fedders N. Am., Inc.*), 405 B.R. 527, 545–46 (Bankr. D. Del. 2009) ("[T]he facts pled in the complaint show that Fedders' dealings with Lenders were anything but concealed. Fedders' borrowing was disclosed in a public filing with the SEC, as was the fact that it was seeking the refinancing it ultimately obtained from the Lenders.").

[718] *See* Section V.F.

[719] *See id.*

[720] Minn. Stat. Ann. § 513.44(b); 12 Pa. Const. Stat. Ann. § 5104(b).

### (b) Constructive Fraudulent Transfer Analysis

The transactions described above all fit into the following fact pattern: (1) they occurred outside of the Bankruptcy Code's two-year reach-back period and therefore would likely be governed by the Minnesota UFTA (as to ResCap and RFC) or the Pennsylvania UFTA (as to GMAC Mortgage),[721] in either case as invoked by section 544(b) of the Bankruptcy Code; (2) in each case, as set forth in Section VI, the relevant Debtor-transferor was suffering from one or more of the statutorily defined forms of financial distress at the time of the transaction; and (3) in each case the relevant Debtor-transferor received reasonably equivalent value in exchange for the transfers it made or obligations it incurred.[722]

Because each of these transactions resulted in the relevant Debtor(s) receiving reasonably equivalent value, the Examiner concludes it is unlikely that constructive fraudulent transfer claims arising from any of these transactions would prevail.[723]

### (4) Transactions Implicating Collapsing Or "Step Transaction" Doctrine

As discussed in Section V.A.1, the Ally Bank Transactions consist of three separate transactions: (1) the November 2006 restructuring of Old GMAC Bank and GMAC Automotive Bank; (2) ResCap's March 2008 and June 2008 issuance of ResCap Preferred Interests in exchange for debt forgiveness by AFI; and (3) AFI's January 2009 conversion of the ResCap Preferred Interests and purchase of ResCap's remaining interest in IB Finance. Certain parties-in-interest have argued that these three separate transactions should not be reviewed separately, but rather should be viewed (in some combination) as one single transaction pursuant to the "step transaction" doctrine. For the purposes of applying fraudulent transfer laws, courts may collapse parts of a complex transaction into one transaction by application of the "step transaction" or "collapsing" doctrine.[724] Here, the Investigation has uncovered no evidence that the Ally Bank Transactions were "part of one integrated transaction" for purposes of the "collapsing" doctrine. To the contrary, as fully explained in Section V.A.1, each of the Ally Bank Transactions was motivated independently by separate

---

[721] *See* Section VII.F.3.

[722] *See* Sections V.A.1, V.F.

[723] While a close question, the Examiner concludes it is more likely than not that a constructive fraudulent transfer claim with respect to the June 2008 Model Home Sale would not succeed, because it is more likely than not that a court would find the value received by RFC from the transaction to constitute reasonable equivalent value based on the totality of the circumstances. *See* Section V.F.3.

[724] *United States v. Tabor Court Realty Corp.*, 803 F.2d 1288, 1302–03 (3d Cir. 1986) (holding two loans constituted one integrated transaction for purposes of considering whether the loan was a fraudulent conveyance); *Official Comm. of Unsecured Creditors of M. Fabrikant & Sons, Inc. v. JP Morgan Chase Bank, N.A.* (*In re M. Fabrikant & Sons, Inc.*), 394 B.R. 721, 731 (Bankr. S.D.N.Y. 2008) ("Under appropriate circumstances, multiple transactions will be collapsed and treated as steps in a single transaction for analysis under the fraudulent conveyance laws.") (citing *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 635 (2d Cir. 1995)); *MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Servs. Co.*, 910 F. Supp. 913, 934 (S.D.N.Y. 1995) ("No single transfer would take place without the expectation that the entire transaction will be consummated.").

business considerations. The Examiner therefore concludes that the evidence does not support the proposition that any or all of the Ally Bank Transactions should be collapsed for purposes of a fraudulent transfer analysis.

### 7.  Transfers Avoidable Under Section 549 Of The Bankruptcy Code

Pursuant to section 549(a) of the Bankruptcy Code, a court may "avoid a transfer of property of the estate . . . that occurs after the commencement of the case . . . and . . . that is not authorized under this title or by the court."[725] Section 363 governs the use, sale, or lease of property by debtors.[726] If a transaction is outside of the ordinary course of business, notice and a hearing are required under section 363(b) before a payment can be authorized.[727] Postpetition transactions not in the ordinary course of business, made without court approval, are thereby subject to avoidance under section 549.[728]

### a.  Background

The Debtors filed a motion on May 14, 2012 seeking authority to continue to perform under the A&R Servicing Agreement.[729] The motion generally discussed the A&R Servicing Agreement as well as the DOJ/AG Settlement.[730] The motion specifically referenced borrower relief required by the DOJ/AG Settlement, which would include "loan modifications, such as principal reductions, rate modifications, and refinancing for borrowers" with respect to mortgage loans owned by Ally Bank.[731] The motion did not explicitly mention that GMAC Mortgage was required to indemnify Ally Bank for losses suffered in connection with these loan modifications or the amount of any such indemnification.[732] However, the A&R Settlement Agreement, which contained the indemnity provision, was attached as an exhibit to

---

[725]  11 U.S.C. § 549(a); *see, e.g.*, *Marathon Petrol. Co., LLC v. Cohen* (*In re Delco Oil, Inc.*), 599 F.3d 1255 (11th Cir. 2010) (trustee avoided debtor's unauthorized postpetition transfers of cash collateral under section 549); *Aalfs v. Wirum* (*In re Straightline Invs. Inc.*), 525 F.3d 870, 879 (9th Cir. 2008) (finding postpetition transfer of accounts receivable avoidable under section 549).

[726]  11 U.S.C. § 363.

[727]  *Id.*

[728]  *See In re Straightline Invs. Inc.*, 525 F.3d at 879.

[729]  Debtors' Motion for Interim and Final Orders Under Bankruptcy Code Sections 105(a) and 363 Authorizing the Debtors to Continue to Perform Under the Ally Bank Servicing Agreement in the Ordinary Course of Business [Docket No. 47].

[730]  *Id.* at 7.

[731]  *Id.*

[732]  *Id.*

the motion.[733] The motion also specifically stated that the Debtors were "not seeking to pay any prepetition claims through or pursuant to the [A&R] Servicing Agreement."[734]

The court entered an interim order on May 16, 2012 authorizing the Debtors to continue to perform under the A&R Servicing Agreement.[735] The interim order stated only that the Debtors were authorized to "continue to perform under the terms of the [A&R] Servicing Agreement . . . ."[736] The interim order did not refer to, or specifically permit, indemnity payments related to the loan modifications.[737]

On June 13, 2012, the Debtors made a postpetition transfer of $19.9 million to Ally Bank pursuant to the indemnity obligation set forth in section 10.01(e) of the A&R Servicing Agreement. A portion of this payment, $12.9 million, related to loan modifications which were performed prepetition.[738] Based on the analysis below, the Examiner has concluded that the payment was not made in the ordinary course of the Debtors' business and was not authorized by the Court.

      *b.   Analysis*

          *(1) The Indemnity Payment Was Not Made In The Ordinary Course Of The Debtors' Business*

"The term 'ordinary course of business' has generally been accepted 'to embrace the reasonable expectations of interested parties of the nature of transactions that the debtor would likely enter in the course of its normal, daily business.'"[739] "[T]wo tests have emerged to

---

[733] *See id.* Ex. 3, §10.01(e). While the Debtors did not specifically reference the indemnity provision and the amount of indemnity payments, the Investigation did not reveal evidence that the Debtors intentionally withheld information.

[734] Debtors' Motion for Interim and Final Orders Under Bankruptcy Code Sections 105(a) and 363 Authorizing the Debtors to Continue to Perform Under the Ally Bank Servicing Agreement in the Ordinary Course of Business [Docket No. 47] at 15.

[735] Interim Order Pursuant to Sections 105(a) and 363 of the Bankruptcy Code Authorizing the Debtors to Continue to Perform Under the Ally Bank Servicing Agreements in the Ordinary Course of Business [Docket No. 90].

[736] *Id.* at 2.

[737] *Id.*

[738] *See* Letter from L. Nashelsky to R. Schrock (July 9, 2012), at 3 (attached to Declaration of Thomas Marano, Chief Executive Officer of Residential Capital, LLC, in Further Support of Debtors' Ally Servicing Motion [Docket No. 793-1], Ex. 7); Statement of the Official Committee of Unsecured Creditors Regarding the Debtors' Motion for an Order Authorizing the Debtors to Continue to Perform Under the Ally Bank Servicing Agreement in the Ordinary Course of Business [Docket No. 1280] at 6; Declaration of Thomas Marano, Chief Executive Officer of Residential Capital, LLC, in Further Support of Debtors' Ally Servicing Motion [Docket No. 793-1] at 6.

[739] *Med. Malpractice Ins. Assoc. v. Hirsch* (*In re Lavigne*), 114 F.3d 379, 384 (2d Cir. 1997) (citations omitted).

determine whether a transaction is 'ordinary.' These tests are (1) the 'creditor's expectation test' also known as the 'vertical test,' and (2) the 'industry-wide test' also known as the 'horizontal test.'"[740]

The indemnification payments made to Ally Bank were required because ResCap and GMAC Mortgage needed to perform loan modifications on loans owned by Ally Bank to satisfy the DOJ/AG Settlement. Like the $48.4 million prepetition payment discussed in Section VII.F.5, the postpetition indemnification payment made to Ally Bank was not similar to payments ResCap and GMAC Mortgage had made in the past. As the obligations to make such payments stem from GMAC Mortgage's responsibilities under a one-time settlement with the government, the payment would not likely be within "interested parties' reasonable expectations."[741] Accordingly, the payment would fail the vertical test, and would not be considered an ordinary course payment. Such payment could therefore only be made if authorized by the court after notice and a hearing.[742]

### (2) The Indemnity Payment Was Not Authorized By The Court

The interim order entered on May 16, 2012 authorized the Debtors to "continue to perform under the terms of the [A&R] Servicing Agreement . . . ."[743] This language is broad, and arguably covers the $12.9 million payment. However, the Debtors' motion seeking entry of the interim order explicitly stated that the Debtors were "not seeking to pay any prepetition claims through or pursuant to the [A&R] Servicing Agreement."[744] This straightforward representation clarifies any ambiguity found in the interim order regarding whether payments relating to prepetition obligations were authorized.

Additionally, the indemnification obligations under the A&R Servicing Agreement were not conspicuously disclosed in the Debtors' motion, and there was no mention of the amount of payments to be made. While it is a close question, based on the Debtors' express representations in the motion and lack of disclosure, it appears more likely than not that the interim order did not authorize the Debtors to make payments to satisfy obligations incurred prepetition.

---

[740] *Id*. (citations omitted).

[741] *Id*. (citations omitted). The payment would also likely fail the horizontal test. While a number of other financial institutions in the mortgage industry were party to the DOJ/AG Settlement, the transaction at issue was not the "type that other similar businesses would engage in as ordinary business." *Id*. at 385 (citations omitted). As stated, this was a one-time settlement of a unique nature.

[742] 11 U.S.C. § 363.

[743] Interim Order Pursuant to Sections 105(a) and 363 of the Bankruptcy Code Authorizing the Debtors to Continue to Perform Under the Ally Bank Servicing Agreements in the Ordinary Course of Business [Docket No. 90] at 1.

[744] Debtors' Motion for Interim and Final Orders Under Bankruptcy Code Sections 105(a) and 363 Authorizing the Debtors to Continue to Perform Under the Ally Bank Servicing Agreement in the Ordinary Course of Business [Docket No. 47] at 15.

### c.  Conclusion

The Examiner concludes that the Debtors likely were required to seek authority to make payments based on the indemnity provisions of the A&R Servicing Agreement, which related to prepetition obligations as such payments were not made in the ordinary course of the Debtors' business. The May 14, 2012 motion and the May 16, 2012 interim order did not authorize indemnification payments for obligations incurred prepetition. Accordingly, the Examiner concludes that, while a close question, it is more likely than not that the Debtors' approximately $12.9 million postpetition payment relating to obligations incurred prepetition may be avoided under section 549(a) of the Bankruptcy Code.[745]

## 8.  Recovery Under Bankruptcy Code Section 550

To the extent that a transfer of a debtor's property is avoided under Bankruptcy Code sections 544, 547, or 548, as discussed above, Bankruptcy Code section 550 permits a trustee to "recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property."[746] The purpose of section 550 is "to restore the estate to the financial condition that it would have enjoyed if the transfer had not occurred."[747] In seeking recovery under section 550, a trustee must, among other things, identify the entities from which recovery may be obtained.[748]

---

[745] AFI and Ally Bank urge that the indemnification obligations are administrative expenses. Statement of Ally Financial Inc. and Ally Bank in Support of the Stipulation and Proposed Order Reserving Rights With Respect to Debtors' Motion to Approve Subservicing Agreement with Ally Bank [Docket No. 1279] at 6. The status of any claim that Ally Bank may have, however, likely has no bearing on whether the $12.9 million postpetition payment is avoidable under section 549. *See Sapir v. CPQ Colorchrome Corp.* (*In re Photo Promotion Assocs., Inc.*) 881 F.2d 6, 10 (2d Cir. 1989) (holding that creditor guilty of an "end-run around § 364(c)" must, pursuant to sections 549 and 550, "first return the funds it obtained. After that, [the creditor] must wait in line with the other § 503(b) creditors . . . for its pro rata share"); *Martino v. First Nat'l Bank of Harvey* (*In re Garofalo's Finer Foods, Inc.*), 186 B.R. 414, 435 (N.D. Ill. 1995) (requiring bank to disgorge payments under sections 549 and 550 despite status of claims as administrative expenses).

[746] 11 U.S.C. § 550(a). The Bankruptcy Code allows a trustee to avoid both transfers and obligations in appropriate circumstances. *See* 11 U.S.C. §§ 544, 548. Section 550 addresses only the recovery of avoided "transfers," not avoided "obligations." *Id.* § 550(a). There is nothing to "recover" when an obligation is avoided because such avoidance simply decreases the claims against property in the debtor's possession. *See In re Asia Global Crossing, Ltd.*, 333 B.R. 199, 202 (Bankr. S.D.N.Y. 2005).

[747] *Andrew Velez Constr., Inc. v. Consol. Edison Co.* (*In re Andrew Velez Constr., Inc.*), 373 B.R. 262, 274 (Bankr. S.D.N.Y. 2007) (citing *Hirsch v. Gersten* (*In re Centennial Textiles, Inc.*), 220 B.R. 165, 176 (Bankr. S.D.N.Y. 1998)).

[748] *Pereira v. Grecogas Ltd.* (*In re Saba Enters., Inc.*), 421 B.R. 626, 657 (Bankr. S.D.N.Y. 2009) (citing *Sec. Investor Prot. Corp. v. Stratton Oakmont, Inc.*, 234 B.R. 293, 312 (Bankr. S.D.N.Y. 1999)). "The particular theory under which a transfer has been avoided is, for all intents and purposes, irrelevant to the liability of the transferee against whom the trustee claims recovery of the property." 5 COLLIER ON BANKRUPTCY ¶ 550.01 (Alan N. Resnick & Henry J. Sommer eds., 16th ed.) (footnote omitted).

### a. Recovery Under Section 550(a)(1)

To the extent that a trustee successfully avoids a transfer of an interest of the debtor in property, the trustee may seek recovery of such property (or its value) pursuant to Bankruptcy Code section 550(a)(1) from either the "initial transferee" *or* any "entity for whose benefit such transfer was made."[749] The liability of the initial transferee and the beneficiary entity is "coextensive."[750] Additionally, Bankruptcy Code section 550(a)(2) allows recovery from subsequent transferees, subject to certain limitations.[751]

The distinction between initial transferees and entities for whose benefit a transfer was made, on the one hand, and subsequent transferees, on the other hand, is important because neither an initial transferee nor an entity for whose benefit a transfer was made may avail itself of the protections afforded to subsequent transferees under Bankruptcy Code section 550(b).[752] In other words, the Bankruptcy Code establishes strict liability under section 550(a)(1) for initial transferees or entities for whose benefit such transfer was made.[753]

### (1) Initial Transferee

"The Bankruptcy Code does not define 'initial transferee' and there is no helpful legislative history."[754] The Second Circuit has adopted the "mere conduit" test for determining who is an initial transferee under Bankruptcy Code section 550, recognizing that the initial transferee is not necessarily "the owner of the first pair of hands to touch the property . . . ."[755] Rather, "the minimum requirement of status as a 'transferee' is dominion over the money or

---

[749] *See* 11 U.S.C. § 550(a)(1); *Christy v. Alexander & Alexander of N.Y. Inc.* (*In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey*), 130 F.3d 52, 56 (2d Cir. 1997); *Enron Creditors Recovery Corp. v. J.P. Morgan Sec., Inc.* (*In re Enron Creditors Recovery Corp.*), 407 B.R. 17, 34 (Bankr. S.D.N.Y. 2009), *rev'd on other grounds*, 422 B.R. 423 (S.D.N.Y. 2009).

[750] *Official Comm. of Unsecured Creditors of 360networks* (*USA*) *Inc. v. U.S. Relocation Servs., Inc.* (*In re 360networks* (*USA*) *In*c.), 338 B.R. 194, 207 (Bankr. S.D.N.Y. 2005) (citation omitted).

[751] *See* 11 U.S.C. § 550(a)(2)–(b).

[752] *Id.* § 550(b); *see also* 5 COLLIER ON BANKRUPTCY ¶ 550.02[4][c] (Alan N. Resnick & Henry J. Sommer eds., 16th ed.) (footnote omitted). Section 550(b) provides that a trustee may not recover under section 550(a)(2) from either (1) a subsequent "transferee that takes for value, including satisfaction or securing of a present or antecedent debt, in good faith, and without knowledge of the voidability of the transfer avoided"; or (2) "any immediate or mediate good faith transferee of [that] subsequent transferee." 11 U.S.C. § 550(b).

[753] *See In re Finley, Kumble*, 130 F.3d at 57; *Stratton Oakmont*, 234 B.R. at 312.

[754] *Tese-Milner v. Moon* (*In re Moon*), 385 B.R. 541, 552 (Bankr. S.D.N.Y. 2008) (citing *Bonded Fin. Servs., Inc. v. European Am. Bank*, 838 F.2d 890, 893 (7th Cir. 1988)).

[755] *In re Finley, Kumble*, 130 F.3d at 56 (citations omitted) (noting that "[n]umerous courts have recognized the distinction between the initial recipient—that is, the first entity to touch the disputed funds—and the initial transferee under section 550").

other asset, the right to put the money to one's own purposes."[756] Accordingly, "an initial transferee is the [entity that] has dominion and control over the subject of the initial transfer to the extent that [it] may dispose of it as [it] pleases . . . ."[757]

### (2) Entity For Whose Benefit A Transfer Was Made

Unlike the initial transferee, the entity for whose benefit a transfer was made does not exercise dominion and control over the subject of the transfer—the benefit arises "without the beneficiary ever holding the money or property, precisely because someone else received it."[758] The archetype of the "entity for whose benefit a transfer [was] made is a guarantor" of the debtor.[759] "Even though the guarantor does not receive any payment, the guarantor is 'no longer exposed to liability on its guarantee because the underlying obligation has been satisfied.'"[760]

"The key to pegging the entity for whose benefit a transfer was made" is a two-part inquiry: (1) "the entity must [have been] the intended beneficiary" of the transfer; and (2) "the intended benefit must have originated from the initial transfer."[761] With respect to the intent requirement, "showing a direct, ascertainable and quantifiable monetary benefit to the defendant would obviate the need to show intent."[762] Therefore, "[i]n order to establish liability for [an entity] for whose benefit the transfer was made, [t]he benefit must be direct, ascertainable and quantifiable and must correspond to, or be commensurate with, the value of the property that was transferred."[763]

### (3) AFI Was The Initial Transferee Or The Entity For Whose Benefit Certain Transfers Were Made

In certain of the transfers discussed in this Section, the property at issue passed through certain ResCap entities before ultimately being transferred to AFI or one of its affiliates. In such instances, AFI was the initial transferee within the meaning of section 550(a)(1) because either (1) the last ResCap entity to exercise dominion and control over the property transferred

---

[756] *Id.* at 57 (quoting *Bonded Fin. Servs.,* 838 F.2d at 893).

[757] *Stratton Oakmont,* 234 B.R. at 313 (citations omitted).

[758] *Id.* at 313–14 (citing *In re Finley, Kumble*, 130 F.3d at 57; *Bowers v. Atlanta Motor Speedway, Inc.* (*In re Se. Hotel Props Ltd. P'ship*), 99 F.3d 151, 155 (4th Cir. 1996); *Danning v. Miller* (*In re Bullion Reserve of N. Am.*), 922 F.2d 544, 547–48 (9th Cir. 1991); *Bonded Fin. Servs.,* 838 F.2d at 895)).

[759] *Gowan v. Amaranth LLC* (*In re Dreier LLP*), 452 B.R. 451, 466 (Bankr. S.D.N.Y. 2011) (citing *Bonded Fin. Servs.,* 838 F.2d at 890).

[760] *Id.* (quoting *Enron Creditors Recovery Corp. v. J.P. Morgan Sec., Inc* (*In re Enron Creditors Recovery Corp.*), 407 B.R. 17, 32–33 (Bankr. S.D.N.Y. 2009), *rev'd on other grounds*, 422 B.R. 423 (S.D.N.Y. 2009)).

[761] *Id.* (quoting *Stratton Oakmont*, 234 B.R. at 314).

[762] *In re Enron Creditors Recovery Corp.*, 407 B.R. at 34.

[763] *In re Dreier LLP*, 452 B.R. at 466 (alternation in original) (quoting *In re Enron Creditors Recovery Corp.*, 407 B.R. at 33) (internal quotation marks omitted).

it directly to AFI; or (2) an intermediate ResCap entity that initially received property could be characterized as a "mere conduit" between the transferor ResCap entity and AFI. In certain other of the transfers discussed in this Section, AFI was an "entity for whose benefit such transfer was made" within the meaning of section 550(a)(1) because it received a direct, ascertainable, and quantifiable benefit commensurate with the full amount of the value transferred. Therefore, the Examiner concludes that, to the extent that any of transfers identified in this Section are avoided, such transfers are recoverable under Bankruptcy Code section 550(a)(1) and that it is unlikely that AFI or its affiliates would prevail in asserting any of the defenses available only to subsequent transferees under Bankruptcy Code section 550(b).

### b. Recovery Limited To A Single Satisfaction

As discussed above, under Bankruptcy Code section 550(a), to the extent a transfer is avoided, the trustee is permitted to recover from any of the initial transferee, an entity for whose benefit such transfer was made, or a subsequent transferee (subject, in the case of a subsequent transferee, to the limitations set forth in Bankruptcy Code section 550(b)). However, pursuant to section 550(d), "[t]he trustee is entitled to only a single satisfaction under [section 550](a)."[764] Therefore, even though more than one entity may be liable with respect to an avoided transfer, the trustee's remedy is limited to the recovery of the transferred property (or its value), and not damages.[765]

### c. Statute Of Limitations Governing Section 550

Under section 550(f), an action to recover avoided transfers of property must be brought no later than the earlier of (1) one year after the transfer was avoided; or (2) the date the bankruptcy case is closed or dismissed.[766] The limitations period runs from the date the transfer in question has been avoided, not from the date the transfer was made.[767]

_____

[764] 11 U.S.C. § 550(d).

[765] *Andrew Velez Constr., Inc. v. Consol. Edison Co.* (*In re Andrew Velez Constr., Inc.*), 373 B.R. 262, 274–75 (Bankr. S.D.N.Y. 2007) (citation omitted) ("The trustee is not entitled to double recovery, or a windfall that would benefit the estate.").

[766] 11 U.S.C. § 550(f); *Enron Corp. v. J.P. Morgan Sec. Inc.*, (*In re Enron Corp.*), 361 B.R. 36, 50 n.7 (Bankr. S.D.N.Y. 2006) (citation omitted).

[767] *See Picard v. Madoff* (*In re Bernard L. Madoff Inv. Sec. LLC*), 468 B.R. 620, 632 (Bankr. S.D.N.Y. 2012) (quoting *Official Comm. of Unsecured Creditors of M. Fabrikant & Sons, Inc. v. J.P. Morgan Chase Bank, N.A.* (*In re M. Fabrikant & Sons, Inc.*), 394 B.R. 721, 745 n.23 (Bankr. S.D.N.Y. 2008)) ("[W]ithout the judgment of avoidance, the period of limitations under § 550(f) would never start to run.").