## VII. REVIEW AND ANALYSIS OF ESTATE CAUSES OF ACTION IMPLICATED BY AFFILIATE TRANSACTIONS AND THE RELATIONSHIP AND COURSE OF DEALING AMONG RESCAP, AFI, ALLY BANK, AND CERBERUS

## K. ESTATE CAUSES OF ACTION ARISING OUT OF RESCAP'S TAX SHARING ARRANGEMENTS AND RESCAP'S CONVERSION TO DISREGARD ENTITY STATUS

Section VII contains an analysis of various Estate causes of action arising from Affiliate Transactions and the relationship and course of dealing among ResCap, AFI, Ally Bank, and Cerberus. In general, the legal analysis in Section VII is organized and presented on a "cause of action by cause of action" basis, whereby the Examiner identifies a specific cause of action and then analyzes all transactions that may give rise to such a claim.

This Section, however, which addresses potential "tax-related" claims and causes of action, is presented differently. Instead of presenting the tax claims by cause of action, they are presented on a "transaction by transaction" basis, whereby the Examiner identifies a specific tax-related transaction and then analyzes all potential claims arising from it. The Examiner believes this approach is particularly appropriate here because of: (1) the unique nature of certain of the tax claims, which do not fit squarely into any of the standard causes of action; and (2) the interplay and interdependency between certain of the claims.

Although several transactions are analyzed below, the primary focus of this Section is on ResCap's entry into a tax allocation agreement that was effective beginning in the 2009 tax year. As described below, the Examiner has concluded that, while a close question, it is more likely than not that a first version of the tax allocation agreement (i.e., the First 2009 Tax Allocation Agreement), that was approved by the ResCap Board and signed by AFI, is an enforceable contract, despite not having been signed by a ResCap officer. The Examiner has also concluded that it is likely that a second version of the tax allocation agreement (i.e., the Second 2009 Tax Allocation Agreement), that was signed by both AFI and ResCap and that purports to supersede the First 2009 Tax Allocation Agreement, may be avoided as a constructive fraudulent transfer. Based on the Examiner's conclusions, ResCap may have a contractual claim against AFI under the First 2009 Tax Allocation Agreement based on AFI's use of ResCap's tax benefits that have passed since the 2009 tax year. As discussed below, ResCap's contract claim against AFI could be as much as $1.77 billion, depending on how much of ResCap's tax benefits AFI ultimately uses.

### 1. ResCap's 2006 Conversion To A Limited Liability Company And Election To Become A Disregarded Entity For Tax Purposes

As described in Section V.D.3, on October 24, 2006 ResCap converted from a corporation to a single member limited liability company and initially chose to continue to be treated as a corporation for tax purposes. In November 2006, ResCap changed its tax classification to a disregarded entity effective November 21, 2006.[1] A disregarded entity does not pay federal income taxes. Instead, it is treated as a branch or division of its member who

---

[1]  Notably, a limited liability company's member must consent to the company's election to be treated as a disregarded entity. *See* Treas. Reg. § 301.7701-3(c)(2) (2006).

reports its income or losses on its own income tax returns. As a result of ResCap's conversion to a single member limited liability company and related election to be treated as a disregarded entity, ResCap was no longer a taxpayer and lost the ability to use its tax attributes, including its NOLs. As described in Section V.D.2.c(2), since the 2006 election, ResCap has generated large NOLs that have passed to AFI.[2] The Examiner has analyzed whether there are any claims for fraudulent conveyance, unjust enrichment, or breach of fiduciary duty arising from ResCap's 2006 conversion and election to be treated as a disregarded entity. For the reasons described below, the Examiner concludes it is unlikely that claims for fraudulent conveyance, unjust enrichment, and breach of fiduciary duty related to the 2006 conversion and election would prevail.

### a. Fraudulent Conveyance

#### (1) Significance Of The Choice Of Law Analysis

The Bankruptcy Code imposes a time limitation (sometimes referred to as a look-back period) on the avoidance of fraudulent transfers. A debtor may only avoid a constructively fraudulent transfer under section 548 of the Bankruptcy Code if the transfer was made within two years of the date of the debtor's bankruptcy filing. Because ResCap elected to become a disregarded entity more than five years prior to the Petition Date, section 548 of the Bankruptcy Code does not provide a basis to avoid that transaction, even if the remaining elements of a fraudulent transfer could be established. However, section 544(b) of the Bankruptcy Code permits a trustee to bring a state law fraudulent conveyance action.[3]

As described in Section VII.F.2.a(1), New York's choice of law rules will apply to determine which state law would govern a constructive fraudulent transfer claim brought in the Bankruptcy Court. "The first step of New York's choice-of-law rules is to determine whether there is an actual conflict between the laws of the jurisdictions involved."[4] In the absence of an actual conflict, New York law will apply.[5]

In determining whether a conflict exists, the potentially relevant jurisdictions, other than New York, are Minnesota and Delaware. As further described in Section VII.F.2.a(1), under the "greatest interest" analysis, courts will look to the location of the transferor-debtor based on its principal place of business and state of incorporation. ResCap is incorporated in Delaware, and its principal place of business is located in Minnesota (and was located there during the relevant time periods). Notably, little weight will be given to a debtor's state of

---

[2]   AFI was itself a pass-through entity until it elected to be taxed as a corporation as of July 1, 2009. Prior to this election, ResCap's NOLs passed through AFI and up to GM and Cerberus.

[3]   *See Picard v. Chais* (*In re Bernard L. Madoff Inv. Secs. LLC*), 445 B.R. 206, 231–32 (Bankr. S.D.N.Y. 2011).

[4]   *Paradigm BioDevices, Inc. v. Viscogliosi Bros., LLC*, 842 F. Supp. 2d 661, 665 (S.D.N.Y. 2012) (citing *Drenis v. Haligiannis*, 452 F. Supp. 2d 418, 426 (S.D.N.Y. 2006) (quoting *In re Allstate Ins. Co.*, 613 N.E.2d 936, 937 (N.Y. 1993))).

[5]   *See Paradigm BioDevices, Inc*., 842 F. Supp. 2d at 665–65.

incorporation unless the transaction at issue has some other nexus with that state.[6] Here, however, the 2006 election transaction involved ResCap changing its corporate and tax status. By its very nature, the transaction implicates Delaware's corporate law.

Both Delaware and Minnesota fraudulent transfer law are derived from the UFTA, while New York fraudulent transfer law is derived from the UFCA. Although, as described in Section VII.F, there are certain material differences between the UFTA and UFCA, here the result of the fraudulent transfer analysis will be the same regardless of which state's law applies. As described in more detail in Sections VII.K.1.a(2)(a) and VI, the Examiner concludes that ResCap was solvent when it elected to be treated as a disregarded entity for tax purposes in November 2006. And, as discussed below, ResCap received fair consideration in connection with its election to be treated as a disregarded entity. Therefore, none of the material differences between the fraudulent transfer laws of Minnesota, Delaware, or New York are relevant or outcome determinative to this analysis. Where the issue in dispute "would turn out the same under both forums' law . . . no true conflict exists."[7] Based on the foregoing, the Examiner believes it is appropriate to analyze ResCap's tax election under New York's fraudulent conveyance law.

With respect to statute of limitations, under New York's "borrowing statute," the Bankruptcy Court would apply the shorter of New York's statute of limitations or that of the state in which the plaintiff resides.[8] Residency in this context has generally been held to be a business entity's principal place of business.[9] Again, ResCap's principal place of business is located in Minnesota, which has a six-year statute of limitations.[10] New York also has a six-year statute of limitations.[11] Accordingly, a state law fraudulent transfer claim brought under section 544(b) of the Bankruptcy Code would not be time-barred.

---

[6] *See Savage & Assoc. v. Mandl* (*In re Teligent, Inc.*), 380 B.R. 324, 332 n.6 (in conducting a choice-of-law interest analysis, holding the state of the debtor's incorporation—Delaware—inapplicable to a fraudulent transfer claim since the fraudulent transfer occurred in another jurisdiction); *Faulkner v. Kornman* (*In re Heritage Org., L.L.C.*), 413 B.R. 438, 462 (Bankr. N.D. Tex. 2009) (in conducting a "most significant factor" choice-of-law analysis, holding Delaware fraudulent transfer law inapplicable because the "only connection the Trustee's fraudulent transfer claims have to Delaware is that [transferor] and the [transferees] are Delaware entities"); *Official Comm. of Asbestos Pers. Injury Claimants v. Sealed Air Corp.* (*In re W.R. Grace & Co.*), 281 B.R. 852, 855 (Bankr. D. Del. 2002) (in choice-of-law analysis, holding Delaware fraudulent transfer law inapplicable because "Delaware's only contact with this matter is that it is the state of incorporation of the transferee and the subsidiary that is the subject of this fraudulent transfer action").

[7] *Elgin Sweeper Co. v. Melson Inc.*, 884 F. Supp. 641, 648 (N.D.N.Y. 1994) (citing *Howard v. Clifton Hydraulic Press Co.*, 830 F. Supp. 708, 712 (E.D.N.Y. 1993)).

[8] *See Adelphia Commn'cs Corp. v. Bank of Am. N.A.* (*In re Adelphia Commn'cs Corp.*), 365 B.R. 24, 57–58 (Bankr. S.D.N.Y. 2007).

[9] *See, e.g.*, *Official Comm. of Asbestos Claimants of G-I Holding, Inc. v. Heyman*, 277 B.R. 20, 30 (S.D.N.Y. 2002); *In re Adelphia Commn'cs Corp.*, 365 B.R. at 58 n.137.

[10] MINN. STAT. § 541.05(6) (2013).

[11] N.Y. C.P.L.R. 213(8) (McKinney 2013).

### *(2) ResCap's Election To Be Treated As A Disregarded Entity Does Not Satisfy The Elements Of A Fraudulent Conveyance Claim Under New York Law*

Section 544(b) provides that a trustee may avoid a transfer of a debtor's property interest under applicable state law. Under New York law, a transfer is constructively fraudulent[12] where: (1) the transfer was made without fair consideration; and (2) either (a) the debtor was insolvent or was rendered insolvent by the transfer, (b) the debtor was left with unreasonably small capital, or (c) the debtor intended or believed that it would incur debts beyond its ability to pay as the debts matured.[13]

### *(a) ResCap Was Solvent At The Time Of Its Election To Be Treated As A Disregarded Entity*

As an initial matter, no constructive fraudulent conveyance can be found where a transferor was solvent at the time it made the transfer. Insolvency under the UFCA refers to: (1) bankruptcy insolvency (a deficit net worth immediately after the conveyance) and (2) equitable insolvency (an inability to pay debts as they mature).[14] Proof of insolvency can be demonstrated by satisfying one of the following three tests: (1) the "balance sheet" test, i.e., the transferor is insolvent or will be rendered insolvent by the transfer in question;[15] (2) the "unreasonably small capital" test, i.e., the transferor is engaged in or is about to engage in a business transaction for which its remaining property constitutes unreasonably small capital;[16] and (3) the "ability to pay debts" test, i.e., the transferor believes that it will incur debt beyond its ability to pay.[17]

---

[12] The Investigation has uncovered no evidence to suggest that any party acted with an actual intent to defraud ResCap's creditors in connection with ResCap's conversion and election to be treated as a disregarded entity. Accordingly, this analysis will focus on constructive fraudulent transfer only.

[13] N.Y. DEBT. & CRED. LAW §§ 273–275 (McKinney 2013). Throughout this Section, New York Debtor and Creditor Law provisions will be referred to using their NY DCL designations. *See* Section VII.F.6 (providing a detailed discussion of the case law regarding constructive fraudulent conveyance under New York law).

[14] *See Moody v. Sec. Pac. Bus. Credit, Inc.*, 971 F.2d 1056, 1066, 1066 n.13 (3d Cir. 1992) (citing cases).

[15] NY DCL § 273 ("Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration.").

[16] NY DCL § 274. ("Every conveyance made without fair consideration when the person making it is engaged or is about to engage in a business or transaction for which the property remaining in his hands after the conveyance is an unreasonably small capital, is fraudulent as to creditors and as to other persons who become creditors during the continuance of such business or transaction without regard to his actual intent."). By its terms, therefore, NY DCL section 274 only applies to conveyances and therefore cannot be relied on to invalidate guaranties or other types of obligations. *See Official Comm. of Unsecured Creditors of M. Fabrikant & Sons, Inc. v. JP Morgan Chase Bank, N.A.* (*In re M. Fabrikant & Sons, Inc.*), 394 B.R. 721, 734 n.13 (Bankr. S.D.N.Y. 2008) ("By its terms [NY DCL section 274] . . . applies to conveyances but not obligations, and cannot be relied on to invalidate the debtors' loan debt or guaranties . . . .").

[17] NY DCL § 275 ("Every conveyance made and every obligation incurred without fair consideration when the person making the conveyance or entering into the obligation intends or believes that he will incur debts beyond his ability to pay as they mature, is fraudulent as to both present and future creditors.").

Here, ResCap's conversion and election to be treated as a disregarded entity occurred in late 2006. As discussed in Section VI, ResCap was solvent and not otherwise in financial distress as prescribed by applicable law in late 2006 at the time it elected treatment as a disregarded entity. Accordingly, it is unlikely that a claim to avoid ResCap's election on constructive fraudulent conveyance grounds would prevail. Nevertheless, because: (1) there is always the possibility (however remote) that a court may reach a different conclusion regarding solvency; and (2) the election to treat ResCap as a disregarded entity resulted in it losing the ability to use what has turned out to be several billions of dollars of NOLs, the Examiner has analyzed the remainder of the elements for a fraudulent conveyance claim under New York law.

### (b) For Avoidance Purposes, ResCap's Tax Treatment Election Constitutes Debtor's Property

A trustee or debtor-in-possession cannot use the strong-arm powers of section 544(b) of the Bankruptcy Code and avoid a transfer under state law if the threshold requirement that the debtor have an interest in the transferred property is not met.[18] Accordingly, before considering the other elements of New York's fraudulent conveyance law, a preliminary issue to consider is whether ResCap's election to be treated as a disregarded entity constitutes "property of the debtor" under section 544.

The term "property of the debtor" has generally been interpreted to be co-extensive with the term "property of the estate," which is defined by section 541 of the Bankruptcy Code. "The scope of [section] 541 is very broad and includes property of all descriptions, tangible and intangible."[19] Moreover, an "interest [in property] is not outside its reach because it is novel or contingent or because enjoyment must be postponed."[20] Accordingly, a debtor's property is generally understood to include all things that, if transferred to another party, would diminish the assets available to pay creditors.[21]

Given the extremely broad scope of what constitutes a debtor's property, courts uniformly hold that a debtor's tax attributes (and the right to use those attributes) are "property of the debtor" for purposes of a fraudulent conveyance claim.[22] A debtor's right to elect whether to be treated as

---

[18] *See ASARCO LLC v. Am. Mining Corp.*, 396 B.R. 278, 316 (S.D. Tex. 2008); *Williams v. Tomer* (*In re Tomer), 147 B.R. 461, 455 (S.D. Ill. 1993*).

[19] *Ramsay v. Dowden* (*In re Cent. Ark. Broad. Co.*), 68 F.3d 213, 214 (8th Cir. 1995) (internal citation omitted); *see also Official Comm. of Unsecured Creditors of Forman Enters. v. Forman* (*In re Forman Enters.*), 281 B.R. 600, 611 (Bankr. W.D. Pa. 2002) (citing *United States v. Whiting Pools*, 462 U.S. 198, 205 n.9 (1983)) ("[t]he legislative history of § 541(a) indicates that it is expansive and includes 'all kinds of property, including tangible or intangible property, causes of action . . . and all other forms of property . . . .'").

[20] *United States v. Towers* (*In re Feiler*), 230 B.R. 164, 167 (B.A.P. 9th Cir. 1999) (citing *Neuton v. Danning* (*In re Neuton*), 922 F.2d 1379, 1382 (9th Cir. 1990) (internal citation omitted)).

[21] *In re Forman Enters.*, 281 B.R. at 612 (citing *In re Merchants Grain, Inc.*, 93 F.3d 1347, 1353 (7th Cir. 1996); *In re Bullion Reserve of N.A.*, 836 F.2d 1214, 1217 (9th Cir. 1988)).

[22] *See United States v. Sims* (*In re Feiler*), 218 F.3d 948, 955–56 (9th Cir. 2000); *Unofficial Comm. of Unsecured Creditors v. PSS S.S. Co.* (*In re Prudential Lines, Inc.*), 928 F.2d 565, 571–72 (2d. Cir. 1991); *Gibson v. United States* (*In re Russell*), 927 F.2d 413, 417–18 (8th Cir. 1991); *Parker v. Saunders* (*In re Bakersfield Westar, Inc.*), 226 B.R. 227, 233–35 (B.A.P. 9th Cir. 1998); *Guinn v. Lines* (*In re Trans-Lines W., Inc.*), 203 B.R. 653, 661–62 (Bankr. E.D. Tenn. 1996).

a taxable entity or a pass-through entity (which includes a disregarded entity) for tax purposes, which may have an impact on the debtor's right to use its tax attributes, is also generally treated as property of the debtor.[23] Accordingly, ResCap's right to elect to become a disregarded entity would be treated as "property of the debtor" for purposes of a fraudulent conveyance analysis.

### (c) For Avoidance Purposes, ResCap's Tax Treatment Election Is A Conveyance

Similar to the Bankruptcy Code's broad definition of the term "transfer,"[24] the term "conveyance" is broadly defined under New York DCL to include "every payment of money, assignment, release, transfer, lease, mortgage or pledge of tangible or intangible property, and also the creation of any lien or encumbrance."

Based on this broad definition, almost any means by which a debtor may dispose of a property right constitutes a conveyance for avoidance purposes. Given that a debtor has a property right in its tax status, courts not surprisingly conclude that elections that have an impact on a debtor's tax status, which may increase debtor's tax liability or affect a debtor's ability to use its tax attributes, constitute "transfers"[25] for purposes of avoidance. For example, in *In re Trans-Lines West, Inc.*, the court held that the debtor corporation had a property interest in its subchapter S status, reasoning that the IRC affords a corporation that elects subchapter S-corporation status the "guaranteed, indefinite right to use, enjoy and dispose of that status."[26] The court thus held that "the [d]ebtor's prepetition revocation of its subchapter S status constitute[d] a 'transfer'" for avoidance purposes.[27]

Similarly, in *In re Bakersfield Westar, Inc.*, the United States Court of Appeals for the Ninth Circuit held that a shareholder's prepetition revocation of a debtor's subchapter S status

---

[23] *See In re Bakersfield Westar, Inc*., 226 B.R. at 233–34 (finding that debtor's right to make or revoke its subchapter S status is property of the estate); *Frank Funaro Inc. v. Funaro* (*In re Frank Funaro Inc.*), 263 B.R. 892, 898 (B.A.P. 8th Cir. 2001) (adopting *Bakersfield* for proposition that debtor has property interest in S-corporation status); *In re Trans-Lines W., Inc.*, 203 B.R. at 661–62 (finding that an S-corporation's tax status constitutes property interest under the Bankruptcy Code).

[24] The Bankruptcy Code's definition of a transfer includes "each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with . . . property; or . . . an interest in property." 11 U.S.C. § 101(54)(D) (2012); *see also Barnhill v. Johnson*, 503 U.S. 393, 400 (1992) ("We acknowledge that § 101(54) adopts an expansive definition of transfer").

[25] The Investigation has not turned up any cases addressing whether a company's tax election is a "conveyance" under New York state fraudulent conveyance law. However, several cases have addressed whether a debtor's tax election is a "transfer" under federal bankruptcy law. Courts have held that a transaction that would constitute a "transfer" under the Bankruptcy Code would also constitute a "conveyance" under the UFCA. *See, e.g*., *In re Trans-Lines W., Inc.*, 203 B.R. at 664 ("Given that it has already been determined that the Debtor's revocation of its Subchapter S status constituted a 'transfer' under the Bankruptcy Code, the court does not see why the same act would not constitute a 'conveyance' under [the UFCA]"). Accordingly, the cases cited in this Section are instructive, and the reasoning of the cases should apply with equal force to an analysis under New York fraudulent conveyance law.

[26] *Id*. at 661.

[27] *Id*. at 663.

constituted a "transfer" that could be avoided as a fraudulent conveyance.[28] The court reasoned that the revocation of the debtor's subchapter S-corporation status caused the debtor to "dispose" of its right to pass its tax liabilities through to the debtor's principals.[29] Accordingly, the court concluded that, by electing to revoke the debtor's subchapter S-corporation status, the shareholder transferred a heavy tax burden to the bankruptcy estate and thereby diminished the assets available to satisfy the claims of creditors.[30]

More recently, in *In re Majestic Star Casino, LLC*, the Bankruptcy Court for the District of Delaware considered whether a non-debtor parent's revocation of its subchapter S-corporation election, which resulted in the termination of its subsidiary debtor's pass-through tax status, was an avoidable transfer.[31] In concluding that the revocation was in fact a transfer, the court relied on the broad definition of transfer as set forth in the Bankruptcy Code as well as the decisions by the courts in *In re Bakersfield Westar, Inc.* and *In re Trans-Lines West, Inc.* that held that the revocation of a debtor's subchapter S-corporation election was a transfer of property of the estate.[32]

Based on the foregoing cases, the Examiner concludes that it is likely that AFI's consent and ResCap's election to treat itself as a disregarded entity, which resulted in the forfeiture of the use of its future NOLs, would be deemed to be a "conveyance" for fraudulent conveyance purposes.

### (d) ResCap's Tax Treatment Election Is Not A Conveyance Made Without Fair Consideration

"Fair consideration" is expressly defined in the UFCA and, by extension, the NY DCL. Section 272 of the NY DCL states that:

> Fair consideration is given for property, or obligation,
>
> a.  When in exchange for such property, or obligation, as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied, or
>
> b.  When such property, or obligation is received in good faith to secure a present advance or antecedent debt in amount not disproportionately small as compared with the value of the property, or obligation obtained.[33]

---

[28] *In re Bakersfield Westar, Inc.*, 226 B.R. at 233–34.

[29] *See id.* at 234.

[30] *See id.*

[31] *Majestic Star Casino LLC v. Barden Dev., Inc.* (*In re Majestic Star Casino, LLC*), 466 B.R. 666 (Bankr. D. Del. 2012).

[32] *Id.* at 678. The ruling in *In re Majestic Star Casino, LLC* is currently on appeal to the United States Court of Appeals for the Third Circuit. Oral argument occurred on February 19, 2013. Transcript of Oral Argument, *Majestic Star Casino LLC v. Barden Dev., Inc.* (*In re Majestic Star Casino, LLC*), Nos. 12-3200, 3201 (3d Cir. Feb. 19, 2013), Document 003111184937. No decision had been issued as of the date of this Report.

[33] NY DCL § 272.

The fair consideration test therefore requires an analysis of whether: (1) the recipient of the debtor's property either (a) conveyed property in exchange, or (b) discharged an antecedent debt in exchange; (2) such exchange was a "fair equivalent" of the property received; and (3) such recipient made the exchange "in good faith."[34]

While *In re Bakersfield Westar, Inc.*, *In re Trans-Lines West, Inc.*, and *In re Majestic Star Casino, LLC* make clear that a debtor's conversion from a non-taxable subchapter S-corporation to a taxable corporation may be an avoidable transfer, it is not clear that the reverse is true. Each of these decisions was premised, at least in part, on the fact that conversion from a non-taxable entity to a taxable entity deprived the estate of value by imposing a tax burden on the debtor. Indeed, these cases recognized the intrinsic value to a company of having pass-through tax status.[35] However, where a debtor converts from a taxable entity to a non-taxable entity, it is not clear that the assets available to pay the debtor's creditors have been diminished.

In this case, it is difficult to see how ResCap's election to be treated as a disregarded entity can, on the whole, be said to have deprived ResCap's Estate of any asset or resulted in a loss of value. By electing to become a disregarded entity, ResCap's unused pre-conversion NOLs and other tax attributes passed to GM, and its post-conversion tax attributes, including its NOLs, were reported by AFI and then passed to Cerberus (51%) and GM (49%).[36] However, since there was no agreement requiring ResCap to make any federal income tax payments to AFI,[37] that election also excused ResCap from any obligation to pay federal taxes that it otherwise would have had to pay. Although, with the benefit of hindsight, it is now known that ResCap generated mostly losses following the 2006 tax year, the expectation of GM and AFI in 2006 was that ResCap was going to be profitable and, consequently, would benefit from the conversion.[38]

---

[34] *Sharp Int'l Corp. v. State St. Bank & Trust Co.* (*In re Sharp Int'l Corp.*), 403 F.3d 43, 53 (2nd Cir. 2005) (quoting *HBE Leasing Corp. v. Frank*, 61 F.3d 1054, 1058–59 (2nd Cir. 1995)).

[35] *Parker v. Saunders* (*In re Bakersfield Westar, Inc.*), 226 B.R. 227, 234 (B.A.P. 9th Cir. 1998) ("The ability to not pay taxes has a value to the debtor-corporation in this case."); *In re Majestic Star Casino, LLC*, 466 B.R. at 674 (citing numerous cases for the proposition that "the 'S' corporation's status is property of the estate because of the tax benefits that status confers on the debtor.").

[36] *See* Residential Capital, LLC Rating Agency Review Presentation, dated Nov. 2006, at 8 [EXAM10124762] (stating that the purpose of the LLC conversion was to "obtain significant tax benefits, including . . . ResCap and its U.S. subsidiaries will no longer pay Federal (or most state) income taxes. Rather, ResCap's shareholders (GM and other investors) will be subject to tax on the income.").

[37] For a three-year period following ResCap's election to be treated as a disregarded entity (from December 2006 until November 2009), ResCap did not operate under a tax allocation agreement with respect to federal income taxes.

[38] *See* Report to the Board of Directors of Residential Capital, LLC, dated Nov. 20, 2006, at RC00016783 [RC00016782] (stating that "[t]he present value of the ability to use GM's tax losses to offset the taxable income of [ResCap] by using the LLC conversion structure has been estimated at $1.1 billion.").

Moreover, in 2008, ResCap generated excess inclusion income in the approximate amount of $28.6 million.[39] By operation of law, ResCap could not offset this income against its losses. Nevertheless, as a result of being a disregarded entity, ResCap did not have to pay federal income taxes on the excess inclusion income. Had ResCap remained a corporate taxpayer, ResCap would have been obligated to pay these taxes.

In addition, at the time of ResCap's conversion to a disregarded entity, it was a party to the Implemented 2005 Tax Allocation Agreement.[40] ResCap's conversion and Cerberus's purchase of AFI's equity interests resulted in termination of the agreement. However, the termination of that agreement does not appear to have deprived ResCap of any value.

As described in Section V.D2.c, the Implemented 2005 Tax Allocation Agreement was not particularly favorable to ResCap. Under the Implemented 2005 Tax Allocation Agreement, ResCap was obligated to pay AFI for all tax obligations that ResCap would hypothetically have been required to pay on a stand-alone basis. However, ResCap's right to be compensated for the use of its tax benefits by AFI was conditional and speculative. ResCap was compensated for the use of its tax benefits only where both GM and AFI were able to make use of them (although ResCap's ability to use its tax benefits was not a condition to payment).

Finally, ResCap's conversion and disregarded entity status election were requirements of the Cerberus PSA and appeared to be key components of a transaction that conferred benefits upon all the entities involved in the Cerberus PSA, including ResCap.[41]

Based on the foregoing, the Examiner concludes that ResCap's election to be treated as a disregarded entity did not result in a "conveyance" for less than fair consideration that deprived ResCap's Estate of assets that "otherwise could be utilized to satisfy the allowable claims of creditors."[42] Accordingly, the Examiner concludes that, even if there were a finding that ResCap was insolvent at the time of its tax election in November 2006, it is unlikely that a constructive fraudulent conveyance claim would prevail.

### b.  *Post-2006 NOL Transfers Are Not Subject To Avoidance*

An additional and related question the Examiner considered is whether ResCap's transfer of its tax benefits through AFI to GM and Cerberus at the end of each taxable year subsequent to 2006, including years in which ResCap might have been in financial distress, might be subject to avoidance on fraudulent conveyance grounds. The Examiner does not believe that fraudulent conveyance law provides a basis to provide relief to ResCap for the loss of its tax

---

[39]  *See* GMAC LLC, U.S. Return of Partnership Income (I.R.S. Form 1065) for Calendar Year 2008, at ALLY_03900052, 114 [ALLY_0390037].

[40]  *See* Implemented 2005 Tax Allocation Agreement [ALLY_0178779].

[41]  *See* Residential Capital, LLC Rating Agency Review Presentation, dated Nov. 2006, at 37 [EXAM10124762] (stating that Cerberus provided numerous benefits to ResCap in connection with Cerberus's purchase of 51% of AFI).

[42]  *Official Comm. of Unsecured Creditors of Forman Enters. v. Forman* (*In re Forman Enters.*), 281 B.R. 600, 612 (Bankr. W.D. Penn. 2002).

benefits. Once ResCap elected to become a disregarded entity, ResCap's right to use any future tax benefits inured to the benefit of GM and Cerberus by operation of tax law.[43] As described below, ResCap was merely a conduit—treated under federal income tax law as a division of AFI—from which the tax benefits and the right to use them redounded to the benefit of AFI and its owners. Accordingly, no transfer of a debtor's interest in property occurred.[44]

A company's election to be treated as either a taxable entity or pass-through entity (including a disregarded entity) for federal tax purposes does not per se determine the company's ownership rights with respect to its tax attributes, including its NOLs.[45] Indeed, the tax regulations do not expressly address a disregarded entity's ownership rights in its tax attributes. The tax regulations only provide that if an "entity [LLC] is disregarded, *its activities are treated in the same manner* as a sole proprietorship, branch, or division of the owner."[46] Further, as described in Section VII.K.1.a(2)(b), a debtor's tax attributes generally qualify as property of the estate.[47] However, a company's status as a pass-through or disregarded entity can affect its right to use its tax attributes. This is important because the transfer of property in which a debtor holds bare legal title, but no equitable interest, is not subject to avoidance because such a transfer does not diminish the debtor's estate.[48]

There is a glaring lack of case law addressing whether the tax attributes of a disregarded entity constitute "property of a debtor" for purposes of avoidance claims under the Bankruptcy Code. One case, however, *In re Forman Enterprises, Inc.*, squarely addressed the issue in analyzing whether tax refunds received or to be received by a debtor's parent (based on the carry-back of the debtor subchapter S-corporation's NOLs) were avoidable as postpetition transfers under section 549 of the Bankruptcy Code.[49] The court answered in the negative,

---

[43] *See* Treas. Reg. § 301.7701-2(a) (2006); *see also In re Forman Enters.*, 281 B.R. at 612 ("Under the provisions of the Internal Revenue Code . . . the NOL and the right to use it automatically passed through by operation of law to defendants as S corporate shareholders.").

[44] As described in Section VII.K.1.a, any fraudulent conveyance analysis under New York or other state law, made applicable through section 544(b) of the Bankruptcy Code, requires a showing that the debtor has an interest in the property being transferred (i.e., that the property transferred would qualify as "property of the estate" under the Bankruptcy Code). *See ASARCO LLC v. Am. Mining Corp.*, 396 B.R. 278, 316 (S.D. Tex. 2008); *Williams v. Tomer* (*In re Tomer*), 147 B.R. 461, 255 (S.D. Ill. 1993).

[45] In promulgating regulations under section 7701 of the IRC concerning disregarded entities, the Treasury Department stated that "[w]hether an organization is treated as an entity for federal tax purposes is a matter of federal tax law, and does not affect the rights and obligations of its owners under local law." T.D. 8697, 1997-1 C.B. 215.

[46] Treas. Reg. § 301.7701-2(a) (2006) (emphasis added).

[47] *See, e.g.*, *IRS v. Luongo* (*In re Luongo*), 259 F.3d 323, 335 (5th Cir. 2001); *United States v. Towers* (*In re Feiler*), 230 B.R. 164, 167–68 (B.A.P. 9th Cir. 1999).

[48] *See* 11 U.S.C. § 541(d) (2012); *Cage v. Wyo-Ben, Inc.* (*In re Ramba, Inc.*), 437 F.3d 457, 460 (5th Cir. 2006); *Geremia v. Dwyer* (*In re Dwyer*), 250 B.R. 472, 474–45 (Bankr. D.R.I. 2000); *Furr v. Reynolds* (*In re Reynolds*), 151 B.R. 974, 977 (Bankr. S.D. Fla. 1993).

[49] *Official Comm. of Unsecured Creditors of Forman Enters. v. Forman* (*In re Forman Enters.*), 281 B.R. 600, 600 (Bankr. W.D. Pa. 2002).

finding that the requisite "transfer of a debtor's property" did not occur.[50] The court held that a pass-through entity's NOLs are not property of the estate because, under the IRC, NOLs and the debtor's right to use them passed through to the debtor's shareholders by operation of law. Specifically, the court noted that "[a]ny tax benefits resulting from the NOL and the right to use it inure solely to the benefit of . . . shareholders and would not be available to satisfy claims of the corporation's creditors."[51] Accordingly, the court held that the debtor, as a pass-through entity, was "merely a 'conduit' through which the NOL and right to use it passed to them."[52]

Under the "mere conduit" theory, property over which the debtor has no control and that merely "passes through" the debtor does not give rise to a transfer of an interest of the debtor in property for avoidance purposes under section 544 of the Bankruptcy Code, which, as described above, is a threshold requirement for avoidance under applicable state law.[53] The Examiner concludes that the *Forman* court's invocation of the conduit theory was proper for avoidance purposes and provides a sound basis to conclude that it is unlikely that a claim to avoid ResCap's post-2006 transfers of its tax benefits would prevail.[54]

### c. The 2006 Conversion And Election Does Not Result In Unjust Enrichment Or Breach Of Fiduciary Duty

As discussed in Section VII.I.1.b, New York choice of law principles will apply to any unjust enrichment claim because of the pendency of the Chapter 11 Cases in the Southern District of New York. In New York, "[t]he first step in any case presenting a potential choice of law issue is to determine whether there is an actual conflict between the laws of the

---

[50] *Id.* at 612.

[51] *Id.*

[52] *Id.*

[53] *See*, *e.g.*, *Miller v. Credit Suisse First Boston Next Fund, Inc.* (*In re Refco, Inc. Secs. Litig.*), 07 MDL No. 1902, Nos. 09 Civ. 2885, 2990, 2992, 2009 U.S. Dist. LEXIS 129944, at *52–54 (S.D.N.Y. 2009) (noting that "[s]ection 541(d) of the Bankruptcy Code provides that the debtor must have an 'equitable interest' in property in order for it to become property of the estate" and that "an asset is property of the estate when the debtor had 'control' over that property"); *City of Springfield v. Ostrander* (*In re Lan Tamers, Inc.*), 329 F.3d 204, 210 (1st Cir. 2003) ("The plain text of § 541(d) excludes property from the estate where the bankrupt entity is only a delivery vehicle and lacks any equitable interest in the property it delivers."); *T & B Scottsdale Contractors, Inc. v. United States*, 866 F.2d 1372, 1376 (11th Cir. 1989) (when the debtor held funds that, pursuant to contract, were to be paid out to certain individuals, the debtor was simply an intermediary and the funds were not property of the estate).

[54] ResCap's tax status as a disregarded entity impacts another issue that was raised during the course of the Investigation. It was suggested that AFI's forgiveness of debts owed by ResCap in the aggregate amount of $2.4 billion from March 2008 through June 2009 and in November 2009 may have adversely affected ResCap's rights under certain tax allocation agreements in place with AFI. *See* Capital Contributions to ResCap Legal Entity as of January 31, 2012 [ALLY_PEO_0075634]. Notably, all these transfers of debt from AFI to ResCap occurred when ResCap was a disregarded entity treated as a branch or division of AFI for federal income tax purposes. As a result, no debt transfers occurred for federal income tax purposes, and the debt forgiveness did not create income that would absorb any of ResCap's beneficial tax attributes.

jurisdictions involved."[55] If the laws of the relevant jurisdictions are substantively the same, a court may avoid a choice of law analysis.[56] Here, it appears that there is no material difference between the unjust enrichment law of New York[57] and that of Delaware (ResCap's state of incorporation),[58] Minnesota (ResCap's principal place of business)[59] and Michigan (AFI's principal place of business).[60] Thus, the Bankruptcy Court would likely apply New York law.[61]

Although New York's substantive law is likely to apply to an unjust enrichment claim, as further discussed in Section VII.I.1.c, under New York's "borrowing statute," it is likely that a court would apply the statute of limitations in Minnesota because that was the location of ResCap's principal place of business in 2006.[62] In Minnesota, the statute of limitations for a claim of unjust enrichment is six years,[63] which is the same as the statute of limitations in New York.[64] Under a six-year statute of limitations, ResCap would not be barred from bringing a claim based on conduct that occurred in 2006.

---

55  *In re Allstate Ins. Co.*, 613 N.E.2d 936, 937 (N.Y. 1993). An actual conflict is present "[w]here the applicable law from each jurisdiction provides different substantive rules." *Curley v. AMR Corp.*, 153 F.3d 5, 12 (2d Cir. 1998) (citing cases).

56  *See Curley,* 153 F.3d at 12 (citing *J. Aron & Co. v. Chown*, 647 N.Y.S.2d 8, 8 (N.Y. App. Div. 1996)) ("It is only when it can be said that there is no actual conflict that New York will dispense with a choice of law analysis.").

57  In New York, a plaintiff asserting an unjust enrichment claim must establish: "(1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution." *Tasini v. AOL, Inc.*, 851 F. Supp. 2d 734, 739 (S.D.N.Y. 2012) (quoting *Mid-Island Hosp., Inc. v. Empire Blue Cross Blue Shield* (*In re Mid-Island Hosp., Inc.*), 276 F.3d 123, 129–30 (2d Cir. 2002)).

58  In Delaware, unjust enrichment requires: "(1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and the impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law." *Jackson Nat'l Life Ins. Co. v. Kennedy*, 741 A.2d 377, 393 (Del. Ch. 1999) (footnote omitted). *See also O'Toole v. Karnani* (*In re Trinsum Grp., Inc.*), 460 B.R. 379, 395 (Bankr. S.D.N.Y. 2011) ("The elements for unjust enrichment claims under Delaware law are similar to that of New York law.").

59  To establish an unjust enrichment claim under Minnesota law, "a plaintiff must demonstrate 'that another party knowingly received something of value to which he was not entitled, and that the circumstances are such that it would be unjust for that person to retain the benefit.'" *T.B. Allen & Assocs., Inc. v. Euro-Pro Operating LLC*, No. 11-3479, 2012 WL 2508021, at *3 (D. Minn. June 28, 2012) (citation omitted).

60  "Under Michigan law, the elements of an unjust enrichment claim are "(1) the receipt of a benefit by defendant from plaintiff, and (2) an inequity resulting to plaintiff because of the retention of the benefit by the defendant." *Ajuba Int'l, L.L.C. v. Saharia*, No. 11-12936, 2012 WL 1672713, at *17 (E.D. Mich. May 14, 2012) (citation omitted).

61  *See* Section VII.I.1.b (providing a more comprehensive analysis of the application of New York's "choice of law" principles to unjust enrichment claims).

62  *See*, *e.g.*, *Adelphia Commn'cs Corp. v. Bank of America N.A.* (*In re Adelphia Commn'cs Corp.*), 365 B.R. 24, 58 n.137 (Bankr. S.D.N.Y. 2007); *Official Comm. of Asbestos Claimants of G-I Holding, Inc. v. Heyman*, 277 B.R. 20, 30 (S.D.N.Y. 2002).

63  *See Block v. Litchy*, 428 N.W.2d 850, 854 (Minn. Ct. App. 1988) ("The applicable time limit for bringing an action in unjust enrichment is six years.").

64  *See Golden Pac. Bancorp v. FDIC.*, 273 F.3d 509, 518 (2d Cir. 2001) ("The statute of limitations in New York for claims of unjust enrichment . . . is generally six years.").

Under New York law, a plaintiff seeking to recover under a theory of unjust enrichment must establish the elements of the claim by a preponderance of the evidence.[65] In particular, the plaintiff must demonstrate: "(1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution."[66] Courts have noted that "[t]he essential inquiry in any action for unjust enrichment . . . is whether it is against equity and good conscience to permit the defendant to retain what is sought to be recovered."[67] Thus, a plaintiff that cannot show "some expectation of compensation that was denied" cannot recover on an unjust enrichment claim.[68]

Assuming that ResCap's election to be treated as a disregarded entity is not subject to avoidance as a fraudulent conveyance (which the Examiner concludes is the likely result), there is no basis for an unjust enrichment claim against AFI with respect to ResCap's NOLs. Indeed, as a disregarded entity, ResCap's post-conversion tax benefits passed to GM and Cerberus by operation of tax law, just the same as ResCap's potential tax liabilities passed to GM and Cerberus. Accordingly, as a disregarded entity, ResCap could not possibly have had "some expectation of compensation that was denied" (i.e., an expectation that it would be able to use its NOLs), which is a requirement for an unjust enrichment claim.

Moreover, a claim for unjust enrichment requires a showing that it would be "against equity and good conscience to permit the defendant to retain what is sought to be recovered."[69] This showing requires more than merely demonstrating unfairness. In *In re Forman Enterprises, Inc.,* the bankruptcy court rejected a claim of unjust enrichment, holding that while it might be "disconcerting" to creditors for the corporation's shareholders to retain for themselves tax refunds arising from NOLs while the corporation went through Chapter 7

---

[65] *Republic of Benin v. Mezel*, No. 96 Civ 870, 2011 WL 4373921, at *7 (S.D.N.Y. Sept. 20, 2011) ("A claim for unjust enrichment or restitution must be proven by the claimant by a preponderance of the evidence.").

[66] *Tasini v. AOL, Inc*., 851 F. Supp. 2d 734, 739 (S.D.N.Y. 2012) (quoting *Mid-Island Hosp., Inc. v. Empire Blue Cross Blue Shield* (*In re Mid-Island Hosp., Inc*.), 276 F.3d 123, 129–30 (2d Cir. 2002)). *See Khreativity Unltd. v. Mattel, Inc*., 101 F. Supp. 2d 177, 184 (S.D.N.Y. 2000) ("In order to sustain a claim for unjust enrichment, plaintiff must demonstrate that (1) defendants were enriched; (2) such enrichment was at plaintiff's expense; and (3) under the circumstances it would be unjust not to compensate plaintiff.") (citing *R.B. Ventures, Ltd. v. Shane*, 112 F.3d 54, 60 (2d Cir. 1997)).

[67] *Tasini v. AOL, Inc.*, 851 F. Supp. 2d at 739–40 (omission in original) (quoting *Dragon Inv. Co. II LLC v. Shanahan*, 854 N.Y.S.2d 115, 118 (N.Y. App. Div. 2008)).

[68] *See Tasini*, 851 F. Supp. 2d at 741 (concluding that "under New York law, a plaintiff must plead some expectation of compensation that was denied in order to recover under a theory of unjust enrichment"). *But see Gidatex, S.r.L. v. Companiello Imps., Ltd*., 49 F. Supp. 2d 298, 302–03 (S.D.N.Y. 1999) (concluding that expectation of compensation is not required to succeed on unjust enrichment claim). Subsequent decisions have been critical of the court's reasoning in *Gidatex. Tasini,* 851 F. Supp. 2d at 740 n.3 ("The opinion in *Gidatex* is contrary to the great majority of well-reasoned cases. It is also contrary to the subsequent clear statement by the Court of Appeals for the Second Circuit . . . .") (citing *Leibowitz v. Cornell Univ.*, 584 F.3d 487 (2d Cir. 2009)).

[69] *Tasini*, 851 F. Supp. 2d at 741 (quoting *Dragon Inv. Co. II LLC v. Shanahan*, 854 N.Y.S.2d 115, 118 (2008)).

liquidation, there was nothing inequitable or unjustifiable in the shareholders' retention of the refunds of a kind required to support a claim for unjust enrichment.[70] In so holding, the court explained:

> The trustee offered no evidence showing that this arrangement between debtor and defendants was "done on the sly" or that it was artifice devised by defendants to benefit themselves and to deprive debtor's creditors should debtor become insolvent.[71]

Here, ResCap's conversion to a disregarded entity appears to have been done in an attempt to improve ResCap's liquidity—not harm it. Additionally, the decision was made in conjunction with extensive advice from independent third parties and based on the consent of the Independent Directors, at a time when ResCap was solvent and was not yet in financial distress. In short, the Investigation has uncovered no evidence to suggest that GM or AFI intended to harm ResCap in connection with ResCap's conversion to a disregarded entity. Accordingly, the Examiner concludes that it is unlikely that a claim for unjust enrichment would prevail.

Moreover, if ResCap's conversion and election does not constitute a fraudulent conveyance or result in unjust enrichment, then it is unlikely that ResCap's directors breached any associated duties of due care and loyalty and good faith.[72] ResCap's conversion and election to be treated as a disregarded entity was implemented as part of Cerberus's acquisition of AFI, which was the subject of significant discussion and analysis by and among the ResCap Independent Directors, inside counsel, outside counsel, independent auditors, accountants and Cerberus personnel as well. The Investigation has revealed ample evidence that extensive analysis was done regarding the ultimate impact of ResCap's conversion and election. Accordingly, the Examiner concludes that it is unlikely that a claim based on breach of fiduciary duty would prevail.

### d. Payment Of The LLC Conversion Dividend Does Not Constitute A Fraudulent Conveyance

As described in Section V.D.3.b, the LLC Conversion Dividend purportedly was made to reflect an increase in the equity value of ResCap attributable to the write-off of tax assets and tax liabilities required as a result of ResCap's conversion to a disregarded entity. Although the write-off of tax assets and liabilities was required under FAS 109 because ResCap was relieved of its obligation to pay future taxes, there was no corresponding requirement that

---

[70] *Official Comm. of Unsecured Creditors of Forman Enters. v. Forman* (*In re Forman Enters.*), 281 B.R. 600, 609 (Bankr. W.D. Pa. 2002).

[71] *Id.* at 609. It should also be noted that the court in *In re Forman Enterprises, Inc.* analyzed the claim for unjust enrichment under both Pennsylvania and Delaware law. However, there is no discernible difference between the laws of New York, Pennsylvania, and Delaware regarding unjust enrichment claims, and, therefore, the analysis provided in *In re Forman Enterprises, Inc.* should apply with equal force in New York.

[72] *Id.* at 610 (holding that if the trustee was unable to demonstrate a claim for unjust enrichment, then a cause of action for breach of fiduciary duty arising from the same transaction must also fail).

ResCap distribute the resulting increase in equity. ResCap's decision to approve and make the LLC Conversion Dividend to GM was discretionary. The Investigation has uncovered no evidence to suggest that the LLC Conversion Dividend was a condition to, or requirement of, the conversion transaction.[73] Accordingly, there does not appear to be any basis to collapse the conversion and the LLC Conversion Dividend in considering whether ResCap received fair consideration in exchange for the dividend payment.[74]

Courts have generally held that the payment of a dividend is deemed to be for no consideration.[75] However, certain courts have held that a dividend by a subchapter S-corporation or other pass-through tax entity may be for REV if the dividend is intended to satisfy, and does not exceed, the pass-through tax liability of the subchapter S-corporation.[76] For example, in *In re Northlake Foods, Inc.*, the court held that a dividend that a corporate debtor paid to its shareholder, in the exact amount of the shareholder's proportionate share of pass-through income tax liability, incurred as a result of the corporation's status as a subchapter S-corporation, was not avoidable as a constructively fraudulent transfer.[77] The court explained that the tax benefit to the debtor as a result of its subchapter S-corporation status was "reasonably equivalent value" for its corresponding obligation to pay the dividend, of a kind sufficient to preclude a constructive fraudulent transfer claim.[78]

However, the *Northlake* case is distinguishable from the present case because: (1) here, the LLC Conversion Dividend was not made pursuant to a shareholder agreement or any other contractual obligation; and (2) the amount of the LLC Conversion Dividend was not based on ResCap's pass-through tax liability. Rather, it reflected the purported increase in equity value

---

[73] In considering whether transactions should be collapsed for fraudulent transfer purposes, courts have generally considered three factors: "(1) whether all of the parties involved had knowledge of the multiple transactions; (2) whether each transaction would have occurred on its own; and (3) whether each transaction was dependent or conditioned on other transactions." *Mervyn's LLC v. Lubert-Adler Grp. IV, LLC* (*In re Mervyn's Holdings, LLC*), 426 B.R. 488, 497 (Bankr. D. Del. 2010) (internal citations omitted).

[74] As with ResCap's tax status election described above, the result of any fraudulent transfer analysis with respect to the LLC Conversion Dividend will be the same regardless of what state law applies, because the Examiner has concluded that ResCap was solvent in November 2006. Accordingly, New York's fraudulent conveyance law would likely apply to consideration of the LLC Conversion Dividend.

[75] *See* 5 COLLIER ON BANKRUPTCY ¶ 548.05[2][c] (Alan N. Resnick & Henry J. Sommer eds., 16th ed.). ("Dividends or other distributions to equity owners in respect of their equity interests are transfers for which the corporation or other entity receives no value"); *See, e.g.*, *Fisher v. Hamilton* (*In re Teknek, LLC*), 343 B.R. 850, 861 (Bankr. N.D. Ill. 2006) (noting a dividend is "not a transfer in exchange for reasonably equivalent value"); *Fidelity Bond & Mortg. Co. v. Brand* (*In re Fidelity Bond & Mortg. Co.*), 340 B.R. 266, 286–88 (Bankr. E.D. Pa. 2006) (holding that debtor did not receive reasonably equivalent value for dividend after noting that "[o]ther courts have held that a dividend or reduction in capital through the purchase of stock adds no value for creditors").

[76] *See Crumpton v. Stephens* (*In re Northlake Foods, Inc.*), 483 B.R. 247 (M.D. Fla. 2012); *Gold v. United States* (*In re Kenrob Info. Tech. Solutions, Inc.*), 474 B.R. 799 (Bankr. E.D. Va. 2012).

[77] *In re Northlake Foods, Inc.*, 483 B.R. at 252–53.

[78] *Id.* It is also important to note that in *Northlake*, the corporation agreed to reimburse its shareholders for any resulting tax liability at the time of their election for subchapter S-corporation status.

as a result of the conversion from a taxable corporation to a disregarded entity. Accordingly, it is likely that the LLC Conversion Dividend would be deemed to be for no consideration.

Ultimately, the above analysis may prove to be academic because, as explained in Section VII.K.1.a(2)(a), a claim for fraudulent conveyance will ultimately fail unless the Debtors can demonstrate that the dividend was paid at a time when ResCap was insolvent or in financial distress as defined by the relevant statute, and the Examiner has concluded that ResCap did not become financially distressed until approximately nine months after the date of the LLC Conversion Dividend.[79] For that reason, even though the LLC Conversion Dividend was for less than fair consideration, the Examiner concludes that it is unlikely that a constructive fraudulent conveyance claim would prevail.[80]

### e. *ResCap Has A Contractual Claim For Compensation Under The Implemented 2005 Tax Allocation Agreement*

From March 2005 through November 30, 2006, ResCap was included in the GM consolidated federal income tax return. During this period, AFI and ResCap were parties to the Implemented 2005 Tax Allocation Agreement. Pursuant to the Implemented 2005 Tax Allocation Agreement, ResCap was entitled to be compensated by AFI to the extent that ResCap's NOLs and other tax benefits were used by both GM and AFI to reduce each of their separate group tax liabilities, which was a hypothetical computation in the case of AFI. As described in Section V.D.2.c(1), ResCap received a payment from AFI in the amount of $85.9 million for GM's and AFI's use of ResCap tax benefits for the tax year ending November 30, 2006. However, when the 2006 GM consolidated federal income tax returns were prepared in 2007, the parties determined that ResCap generated potential tax savings for GM in the amount of $101 million for such tax year. Accordingly, ResCap still had a contingent right under the Implemented 2005 Tax Allocation Agreement to the remaining $15.1 million in potential tax savings generated by ResCap, which would become fixed, in whole or in part, if and when GM used the tax benefits. During the course of the Investigation, GM confirmed that it has used all of ResCap's tax benefits that were originally unused by GM in 2006.

The Examiner has considered whether ResCap may have a contract claim against AFI under the Implemented 2005 Tax Allocation Agreement based on the tax benefits that were generated by ResCap and passed to, but were unused by, GM in 2006, prior to when the agreement terminated.

---

[79]  As discussed in Section VI, the Examiner concludes as follows: (1) ResCap was insolvent as of December 31, 2007, through the Petition Date; (2) ResCap was left with unreasonably small capital as of August 15, 2007, through the Petition Date; and (3) ResCap reasonably believed that it had incurred debts beyond its ability to pay as of August 15, 2007, through the Petition Date.

[80]  The question of whether the dividend constituted an impermissible dividend under Delaware General Corporation Law was considered as well. However, the dividend was paid after ResCap converted to a limited liability company. Accordingly, the payment of the dividend must instead be analyzed under the terms of the Delaware Limited Liability Company Act and that statute does not contain similar provisions to those found in the Delaware General Corporation Law, which would potentially render a dividend impermissible. Nor does it appear that the Delaware General Corporation Law applies in the absence of such provisions in the Delaware Limited Liability Company Act.

As a threshold matter, the Implemented 2005 Tax Allocation Agreement is governed by Michigan law.[81] Under Michigan law, a claim to recover damages for breach of contract must be brought within six years after the claim accrues.[82] A contract claim accrues when a promise is breached, i.e., when a party fails to perform under the contract.[83] Here, AFI's obligation to compensate ResCap (i.e., its duty to perform) is triggered when ResCap's tax benefits can be used by GM and AFI to reduce each of their separate group taxes. Although it is not precisely known when the remaining portion of ResCap's 2006 tax benefits were used by AFI and GM, the evidence establishes that they were not used until some time after 2006.[84] Accordingly, ResCap's contract claim[85] against AFI under the Implemented 2005 Tax Allocation Agreement could not have accrued until, at the earliest, some time after 2006. Therefore, ResCap's contract claim will not be time barred.

Moreover, ResCap's right to payment on account of its 2006 tax benefits would be unaffected by the subsequent termination of the Implemented 2005 Tax Allocation Agreement. The Implemented 2005 Tax Allocation Agreement provided that, even if terminated, it would "continue to apply to all years and that part of a year ending prior to the date of termination."[86] According to its plain meaning, the agreement "continue[s] to apply" to determine the parties' respective rights and obligations for the 2006 tax year.[87] In this case, ResCap's right to payment against AFI, albeit contingent and conditional, arose when it performed under the Implemented 2005 Tax Allocation Agreement (i.e., when it generated tax benefits through November 30, 2006 that passed to GM).[88]

Based on the foregoing, the Examiner concludes that it is likely that a contract claim in the approximate amount of $15.1 million against AFI arising under the Implemented 2005 Tax Allocation Agreement would prevail.

### 2. The 2009 Tax Allocation Agreement

ResCap operated as a disregarded entity without a federal income tax allocation agreement from December 1, 2006 through November 1, 2009. During this period, ResCap paid no federal income taxes, nor did it make any payments to its owners or any other entity

---

[81] Implemented 2005 Tax Allocation Agreement, § 6.05 [ALLY_0178779].

[82] *See* MICH. COMP. LAWS ANN. § 600.5807(8) (West 2013); *see also Miller-Davis Co. v. Ahrens Constr., Inc.*, 817 N.W.2d 609, 613 (Mich. Ct. App. 2012).

[83] *See Miller-Davis Co. v. Ahrens Constr., Inc.*, 817 N.W.2d 609, 614; *see also* 31 WILLISTON on CONTRACTS § 79:14 (4th ed. 2004) ("[I]f the promise is to pay a debt . . . a right of action is complete, and the statute begins to run as soon as the debt is due and unpaid.").

[84] *See* Section V.D.2.c(1) (providing a discussion regarding the use of ResCap's tax benefits by AFI and GM).

[85] The maximum amount of the contract claim, assuming all of ResCap's 2006 tax benefits were used by GM and AFI, would be approximately $15.1 million, which reflects the difference between the $27.5 million of remaining tax benefits and the $12.4 million overestimation of GM's utilization made on November 30, 2006.

[86] Implemented 2005 Tax Allocation Agreement, § 6.08 [ALLY_0178779].

[87] *Id.*

[88] *See Munderloh v. Comm'r*, 48 T.C. 452 (1967) (distinguishing between when a contract party's obligation to make a payment exists, and when the party's duty to perform may arise).

on account of federal income tax obligations. In December 2009, AFI proposed that a tax allocation agreement be put in place between ResCap and AFI to be effective as of the date when ResCap became part of AFI's corporate consolidated group, November 1, 2009.[89] The First 2009 Tax Allocation Agreement was drafted to treat ResCap as if it were a stand-alone taxpayer, with an additional proviso that was very favorable to ResCap: AFI would pay ResCap for ResCap's tax benefits that AFI could currently use even if ResCap could not yet use the tax benefits on a stand-alone basis.[90]

The First 2009 Tax Allocation Agreement was unanimously approved by the ResCap Board at an August 6, 2010 meeting, at which time it was resolved that "each of the officers of [ResCap] is authorized and empowered, in the name and on behalf of [ResCap] and its relevant subsidiaries, to make or cause to be made, and to execute and deliver, the [First 2009 Tax Allocation Agreement] . . . ."[91] The First 2009 Tax Allocation Agreement was viewed by the ResCap Board as being so objectively fair to ResCap that the Board did not believe it was necessary for the agreement to first be considered and recommended by the Special Committee of Independent Directors, which was normal protocol for consideration of affiliate agreements.[92] As of October 13, 2010, the First 2009 Tax Allocation Agreement was executed by all parties (including AFI),[93] except for ResCap, as Young, ResCap's CFO at the time[94] and the officer who was designated to execute the agreement[95] on behalf of ResCap, claims to have never executed it.[96]

---

[89]   *See* E-mail from W. Marx (Dec. 6, 2009) [EXAM12308200].

[90]   *See id*.

[91]   *See* Minutes of a Regular Meeting of the Board of Residential Capital LLC, Aug. 6, 2010, at RC40018821–22 [RC40018729].

[92]   *See id*.

[93]   As described in Section V.D.2.b(3), Examiner's Counsel requested, but did not receive, an executed or partially executed copy of the First 2009 Tax Allocation Agreement. Nevertheless, David DeBrunner, AFI's VP and Chief Accounting Officer in late 2010, confirmed during his interview that he executed the agreement on behalf of AFI. *See* Int. of D. DeBrunner, Apr. 18, 2013, at 116:3–22.

[94]   Young was also a director of ResCap at this time. *See* Appendix IV.A—3.

[95]   The August 6, 2010 ResCap Board resolution did not specifically designate Young as ResCap's signatory on the First 2009 Tax Allocation Agreement. However, there does not appear to be a question that Young would be the ResCap officer signing. As Young explained during his interview, "we just looked at the board minutes where the board delegated the authority to a ResCap officer and it didn't say Jim Young, chief financial officer, but I was an officer of ResCap, and it would make perfect sense that I was the one signing a tax allocation agreement being that I'm the chief financial officer of the company." Int. of J. Young, Apr. 22, 2013, at 200:12–201:9. Notably, Young's name appeared on the signature block for ResCap in the draft of the agreement that was presented to the ResCap Board at the August 6, 2010 board meeting, and he was the signatory on prior tax allocation agreements, as well as the signatory on the Second 2009 Tax Allocation Agreement. *See* First 2009 Tax Allocation Agreement, at RC40016384 [RC40016362]; *see also* 2006 Tax Allocation Agreement, at ALLY_0178791 [ALLY_0178779]; Second 2009 Tax Allocation Agreement, at 6 [RC00028796].

[96]   *See* Int. of J. Young, Apr. 22, 2013, at 146:19–147:4.

Despite having already signed the First 2009 Tax Allocation Agreement around September 13, 2010,[97] in October 2010 AFI had a change of heart and decided it did not want to move forward with implementing the agreement.[98] Instead, AFI proposed a modification of the First 2009 Tax Allocation Agreement that removed ResCap's right to receive payments from AFI for AFI's utilization of ResCap tax benefits without substituting any provision that would be favorable to ResCap.[99] ResCap's Independent Directors discussed the revised agreement with their counsel, who characterized this key aspect of the revised tax allocation agreement as being "very unfair" to ResCap.[100] However, after certain revisions were made to the Second 2009 Tax Allocation Agreement, the Independent Directors believed that the fairness concerns had been addressed to their counsel's satisfaction.[101] The ResCap Board approved the agreement and it was executed on January 26, 2011.[102] The Second 2009 Tax Allocation Agreement was made retroactive to November 1, 2009, and is still putatively in effect today. ResCap's entry into the Second 2009 Tax Allocation Agreement has resulted in it having to pay AFI for tax on excess inclusion income, which from 2009 through 2012 totaled approximately $50 million. ResCap has not received, and will never be entitled to receive, any payments under the Second 2009 Tax Allocation Agreement (other than an adjustment for an erroneous overpayment).

ResCap's decision to enter into the Second 2009 Tax Allocation Agreement is troubling because: (1) the ResCap Board had previously approved a much more favorable tax allocation agreement; and (2) when they authorized its execution, the Independent Directors were unaware that ResCap would be required to make payments to AFI on account of taxes on excess inclusion income. There are multiple bases to be considered to challenge the Second 2009 Tax Allocation Agreement and recover the payments made by ResCap to AFI thereunder. There may also be a basis for ResCap to enforce the First 2009 Tax Allocation Agreement and assert claims against AFI arising thereunder based on tax benefits that have passed (and are likely in the future to pass) to AFI.

---

[97] *See* Int. of D. DeBrunner, Apr. 18, 2013, at 110:14–111:19, 115:11–116:22 (stating that "Bill Marx told me that I would be getting a binder of tax allocation agreements that needed to be executed by an officer of [AFI]" and "So, I signed those agreements, I gave the binder back or sent the binder back to Bill."); Int. of W. Marx, Apr. 18, 2013, at 57:20–58:9 ("So Monday the 13th, I believe I walked the binder down to David's office . . . . I don't recall exactly how long it was before I got it back. It might have been a day or two, or he might have gotten it back to me the same day.").

[98] *See* E-mail from W. Marx (Oct. 13, 2010) [ALLY_0245484] (estimating that AFI's payments to ResCap under the First 2009 Tax Allocation Agreement "may be on the order of $200 to $250m, due 10/31. (Additional $300 to $400m would likely be due for the 2010 tax year, payable this time next year)").

[99] *See* Discussion Items for Residential Capital, LLC Board Meeting, dated Nov. 5, 2010, at RC40016933 [RC40016871]; *see also* E-mail from T. Hamzehpour (Nov. 10 2010), at EXAM10432502–03 [EXAM10432501].

[100] E-mail from M. Connolly (Dec. 16, 2010), at EXAM10432518 [EXAM10432517].

[101] *See* Int. of P. West, Apr. 16, 2013, at 91:21–24.

[102] *See id*. at 28:2–15, 90:6–91:24.

### a. *The First 2009 Tax Allocation Agreement Likely Constitutes A Valid And Enforceable Contract*

The ResCap Board, of which Young was a member, unanimously passed a resolution on August 6, 2010 authorizing and empowering him, as an officer of the company, to execute the First 2009 Tax Allocation Agreement on behalf of ResCap. AFI signed the agreement, but Young failed to do so for ResCap. During his interview conducted on March 15, 2013, Young was unable to explain why he had not signed the First 2009 Tax Allocation Agreement. In fact, during his interview, Young stated "I don't recall," when asked if he had ever signed the First 2009 Tax Allocation Agreement.[103] Marx, however, said during his interview that he did not mail the agreement to Young for signature until around October 15, 2010.[104] During Young's subsequent interview under oath, conducted on April 22, 2013,[105] Young still had difficulty recalling many events surrounding his failure to execute the First 2009 Tax Allocation Agreement, but he did recall the reason for not signing the agreement. Young stated that he did not sign the First 2009 Tax Allocation Agreement because he was told by a high-ranking AFI officer (James Mackey) that the agreement had not been properly vetted or approved within AFI.[106]

Despite Young's failure to sign the agreement on behalf of ResCap, the first issue the Examiner has considered is whether the First 2009 Tax Allocation Agreement could be deemed to be a valid and enforceable contract based on AFI's signing, and the ResCap Board's approval, of the agreement. This analysis is significant because, as described below, the Examiner believes that there is a basis to avoid the Second 2009 Tax Allocation Agreement as a fraudulent transfer. If the First 2009 Tax Allocation Agreement is enforceable, and the Second 2009 Tax Allocation Agreement is voided, then ResCap would have significant claims against AFI based on tax benefits that have passed from ResCap to AFI since November 1, 2009.

### (1) *Michigan Law Governs Enforcement Of The Contract*

New York courts will give effect to a choice of law provision if the parties have included one in their agreements.[107] The Implemented 2005 Tax Allocation Agreement, which the First 2009 Tax Allocation Agreement purported to amend, as well as the First 2009 Tax Allocation Agreement itself, both designate Michigan law as the controlling law.[108]

---

[103] *See* Int. of J. Young, Mar. 15, 2013, at 37:13–16.

[104] *See* Int. of W. Marx, Apr. 18, 2013, at 65:7–12.

[105] Young was asked by the Examiner to submit to an interview under oath, because during the course of the Investigation certain information and/or statements were attributed to Young that were not consistent with the information provided by Young during his interview conducted on March 15, 2013.

[106] *See* Int. of J. Young, Apr. 22, 2013, at 11:3–11:10, 97:13–21, 160:14–161:10.

[107] *See, e.g., Gambar Enters. v. Kelly Servs.,* 418 N.Y.S.2d 818, 822 (N.Y. App. Div. 1979) (applying choice of law provision in contract specifying application of Michigan law).

[108] *See* Implemented 2005 Tax Allocation Agreement, § 6.05 [ALLY_0178779]; First 2009 Tax Allocation Agreement, § 5.05 [RC40016362].

### *(2) Michigan Contract Analysis*

Under Michigan law, the elements of a valid contract are: "(1) parties competent to contract, (2) a proper subject matter, (3) a legal consideration, (4) mutuality of agreement, and (5) mutuality of obligation."[109] Mutuality of agreement means that there must be "mutual assent or a meeting of the minds on all material or essential terms" in order to form a contract.[110] An objective standard is used to determine whether there was a meeting of the minds, which involves considering the express words and visible acts of the parties and not their subjective states of mind.[111] Further, for certain types of contracts to be enforceable, the Michigan statute of frauds provides that they must be "in writing and signed with an authorized signature by the party to be charged" with the agreement.[112]

With respect to the First 2009 Tax Allocation Agreement, there is no dispute regarding whether the parties were competent to contract, whether the contract involved a proper subject matter or adequate legal consideration, or if there was a mutuality of obligation. The critical issue here is whether, from an objective standpoint, there was "mutual assent or a meeting of the minds" between ResCap and AFI as to the essential terms of the agreement, including whether the First 2009 Tax Allocation Agreement was intended to be enforceable upon its approval by the parties or only upon it being signed by all parties.

Under Michigan law, there is support for the proposition that an unsigned contract can be enforceable:

> If the party sought to be charged intended to close a contract prior to the formal signing of a written draft, or if he signified such an intention to the other party, he will be bound by the contract actually made, though the signing of the written draft be omitted. If, on the other hand, such party neither had nor signified such an intention to close the contract until it was fully expressed in a written instrument, and attested by signatures, then he will not be bound until the signatures are affixed. The expression of the idea may be attempted in other words: If the written draft is viewed by the parties merely as a convenient memorial or record of their previous contract, its absence does not affect the binding force of the contract. If, however, it is viewed as the consummation of the negotiation, there is no contract until the written draft is finally signed.[113]

---

[109] *Hess v. Cannon Twp.*, 696 N.W.2d 742, 748 (2005) (citations omitted).

[110] *Garrison Co. v. Bishop Int'l Airport Auth.*, No. 293415, 2010 WL 4679501, at *3 (Mich. Ct. App. Nov. 18, 2010) (citation omitted).

[111] *Id.*

[112] Mich. Comp. Laws Ann. § 566.132 (West 2012).

[113] *Am. Bentonite Corp. v. Clark Equip. Co.*, 43 F.2d 392 (W.D. Mich. 1928) (quoting *Mississippi & Dominion S.S. Co. v. Swift*, 29 A. 1063, 1066–67 (Me. 1894). *See also High v. Capital Senior Living Props. 2-Heatherwood, Inc.*, 594 F. Supp. 2d 789, 798 (E.D. Mich. 2008) ("The absence of a signature is not necessarily fatal to a finding of an agreement. Michigan law permits an inference that an offeree accepted the terms of the agreement when she signaled her assent through conduct.") (citations omitted).

Courts will look to the intent of the contracting parties to determine whether their unsigned contracts were intended to be enforceable upon the assent of the parties or only upon formal signing.[114] Notably, a partially-signed agreement may be enforceable against the party executing the agreement unless it can be shown that the parties did not intend to be bound unless and until all other parties signed.[115] The "question as to whether those who have signed are bound is generally to be determined by the intention and understanding of the parties at the time of the execution of the instrument."[116] Where "a written agreement is silent as to whether the persons who sign it intend to be become legally obligated to each other before all persons named in it as parties have signed, parole evidence is admissible to show the intention of the parties."[117]

Here, the First 2009 Tax Allocation Agreement contains no express provision providing that it is effective and enforceable only upon being signed by all parties to the agreement.[118] Accordingly, it is appropriate to consider parole evidence to determine if the parties intended to be bound by the First 2009 Tax Allocation Agreement. The first issue to consider is whether the ResCap Board's approval of the First 2009 Tax Allocation Agreement is evidence of ResCap's intent to be bound by the agreement, despite the fact that an officer of ResCap never signed the agreement.

In a case with facts similar to those here, the Michigan Court of Appeals held that a company's board resolution that authorized its officer to execute a contract resulted in a "valid contractual relationship," even though the contract was not formally signed thereafter. In *Garrison Co. v. Bishop International Airport Authority*, an airport's governing board accepted a construction company's offer to perform a construction project in accordance with bid

---

[114] *See Wiegand v. Tringali*, 177 N.W.2d 435, 437–38 (Mich. Ct. App. 1970).

[115] *See id.* at 437 n.5 (citing *Cox v. Berry*, 431 P.2d 575, 579 (Utah 1967) ("Even where it appears that it was intended that others sign an agreement, it is not necessarily invariably true that all must sign before any are bound. This depends upon the agreement and whether it appears that part of the consideration for signing was that others would also sign and be bound jointly with them. It is usually to be assumed that the parties signing an agreement are bound thereby unless it appears that they did not so intend unless others also signed.")); *see also Dillon v. Anderson*, 43 N.Y. 231, 235 (1870).

[116] *Wiegand v. Tringali*, 177 N.W.2d at 438 (quoting 17 C.J.S. CONTRACTS § 62 (2011)).

[117] *See Wiegand v. Tringali,* 177 N.W.2d at 483 n.7.

[118] The First 2009 Tax Allocation Agreement does contain a merger clause (section 5.04) and does contain language preceding the signature block that reads: "IN WITNESS WHEREOF, the parties hereto have executed this AGREEMENT on the date indicated below…." *See* First 2009 Tax Allocation Agreement, § 5.04 [RC40016362]. These are fairly standard contractual provisions, but some courts have found that the presence of these provisions, in certain circumstances (usually in combination with other contractual provisions and/or communications between the parties that there be formal execution), may be factors to conclude that the parties did not intend to be bound prior to the execution of a written agreement. *See Kargo, Inc. v. Pegaso PCS, S.A. de CV.*, No, 05 Civ. 10528. 2008 WL 4579758, at *8 (S.D.N.Y. Oct. 14. 2008); *Nat'l Gear & Piston, Inc. v. Cummins Power Sys., LLC*, 861 F. Supp. 2d 344, 357 (S.D.N.Y. 2012). Moreover, the 2006 Tax Allocation Agreement, which the First 2009 Tax Allocation purported to amend, provides that any amendment must be in writing, but does not expressly state that the document must be fully signed in order to be effective. *See* 2006 Tax Allocation Agreement, § 6.04 [ALLY_0178779].

documents which comprehensively described the work to be done.[119] Although the board "authorized" its CEO to sign the necessary contracts to carry out the project, the CEO did not sign the contracts.[120] Nevertheless, e-mails between the construction company and the airport's architect suggested that the parties were proceeding as if a contractual relationship existed and that the signing of the agreements was a mere formality.[121] However, the airport attempted to rescind its acceptance a month after it approved the bid and the construction company brought suit claiming the airport breached the contract.[122]

In holding that a valid contract existed, the court in *Garrison* found that there was "objective evidence of a meeting of minds on the essential terms of a contract" based on the board's resolution accepting the construction company's bid and the board's communication of its acceptance to the other party.[123] The court noted that the board resolution was not conditional, further negotiations were not envisioned, and there was not enough support for the airport board's position that the parties did not intend to be bound until the construction contracts were fully executed.[124] Given that both parties had already agreed to the contracts as part of the bidding process, the court found that "the act of formally executing the construction contracts was not a step that had to be completed before a valid contractual relationship arose."[125] Furthermore, the court pointed out that although there may have been minor contractual details that remained to be addressed, the essential terms of a contract were already in place.[126]

The *Garrison* case supports the position that the First 2009 Tax Allocation Agreement could be enforceable based on the ResCap Board's approval of the agreement. First, as in the *Garrison* case, there is ample evidence to find that the ResCap Board was fully aware of the salient terms of the First 2009 Tax Allocation Agreement when it approved the agreement.[127] ResCap's counsel reviewed and commented on the agreement, and provided the ResCap Board with a memorandum dated July 11, 2010 summarizing the key terms of the agreement.[128] Moreover, at its August 6, 2010 meeting, the ResCap Board discussed the Joint

---

[119] *Garrison Co. v. Bishop Int'l Airport Auth.*, No. 293415, 2010 WL 4679501, at *2 (Mich. Ct. App. Nov. 18, 2010).

[120] *Id.*

[121] *Id*.

[122] *Id.* at *2–3.

[123] *Id.* at *4.

[124] *Id*.

[125] *Id*.

[126] *Id*.

[127] To enforce an unsigned contract, it must be shown that the party who failed to sign the agreement fully understood the terms thereof. *See High v. Capital Senior Living Properties 2-Heatherwood, Inc*., 594 F. Supp. 789, 798 (E.D. Mich. 2008). This is especially important, because "the absence of a signature deprives the defendant of a presumption that it otherwise might enjoy: that one who signs a written agreement is presumed to know the nature of the document and to understand its contents." *Id*.

[128] Memorandum, Revised Tax Allocation Agreement Draft, dated July 11, 2010 [EXAM20269709].

ResCap-AFI Tax Memorandum to ResCap Board that attached, and explained in detail, the First 2009 Tax Allocation Agreement.[129] The fact that the memorandum presented to the ResCap Board was prepared by officers of both ResCap and AFI lends further support that the First 2009 Tax Allocation Agreement was understood by both parties and that there was a "meeting of the minds" on the salient terms of the agreement.

Second, there is no doubt that ResCap's Board intended for ResCap to execute and be bound by the First 2009 Tax Allocation Agreement. The recitals preceding the ResCap Board resolution approving the First 2009 Tax Allocation Agreement provided that "management has recommended that . . . [ResCap Board] approve the execution and delivery" of the agreement, and the resolution itself unequivocally stated that each of ResCap's officers was authorized to "execute and deliver" the agreement.[130] As in the *Garrison* case, the ResCap Board resolution was unconditional and did not contemplate further negotiations. Indeed, Pamela West, one of ResCap's Independent Directors, stated at her interview that following Board approval of the First 2009 Tax Allocation Agreement, the ResCap Board "assumed that [ResCap's officers] would execute and deliver the agreement [because] [w]e authorized them to do that."[131]

AFI also believed that ResCap viewed the First 2009 Tax Allocation Agreement as being "resolved" and "done." In an e-mail from Marx to Mackey, sent on October 15, 2010, two months after ResCap's Board approved the agreement, Marx stated that "[p]eople at ResCap think the method of allocation has been resolved and we are just finalizing docs and the allocation will follow."[132] In a follow-up e-mail the same day from Marx to Mackey, Marx further stated that "I would go back to Jim Young at this time merely as a courtesy to let him know that we have more work to do here because he has been in the loop on the development of these [tax allocation] agreements and thinks they are done."[133] There is also evidence that AFI viewed the First 2009 Tax Allocation Agreement as final (i.e., they "weren't expecting additional edits") when it was sent out for execution in early September 2010.[134]

Third, AFI was aware that the ResCap Board approved the First 2009 Tax Allocation Agreement when AFI executed the agreement. In a September 9, 2010 memorandum from Marx to all designated signatories of the First 2009 Tax Allocation Agreement, Marx noted

---

[129] *See* Minutes of a Regular Meeting of the Board of Directors of Residential Capital, LLC, Aug. 6, 2010, at RC40018820–22 [RC40018729].

[130] *Id.*

[131] *See* Int. of P. West, Apr. 16, 2013, at 58:17–19.

[132] E-mail from W. Marx (Oct. 15, 2010), at ALLY_0424663 [ALLY_0424660].

[133] E-mail from W. Marx (Oct. 15, 2010), at ALLY_0424662 [ALLY_0424660]. Although Marx's contemporaneous belief in October 2010 was that Young viewed the First 2009 Tax Allocation Agreement as being "done," Young stated during his interview that he did not intend for the First 2009 Tax Allocation Agreement to be binding until he signed the agreement, nor does he believe that anyone on the ResCap side intended for ResCap to be bound by the agreement until it was signed by a ResCap officer. *See* Int. of J. Young, Apr. 22, 2013, at 209:20–210:10.

[134] *See* Int. of W. Marx, Apr. 18, 2013, at 55:12–24. Marx now states that he never viewed the First 2009 Tax Allocation Agreement as being binding because it was not fully executed. *Id.* at 143:18–144:13.

that "the [First 2009 Tax Allocation Agreement] has been reviewed by outside legal counsel representing the ResCap Board and ResCap General Counsel Tammy Hamzehpour, and has been approved by the ResCap Board."[135] Notably, David DeBrunner, AFI's Chief Accounting Officer at the time and the officer designated to sign the agreement on behalf of AFI, was a recipient of the memorandum. Thus, when AFI executed the First 2009 Tax Allocation Agreement some time around September 13, 2010,[136] it was aware that the ResCap Board had already approved the agreement.

Moreover, it appears that AFI expected the First 2009 Tax Allocation Agreement to be implemented. AFI calculated its expected payment obligations to ResCap under the First 2009 Tax Allocation Agreement and discussed those payments with their outside accountants. In an October 13, 2010 e-mail from Marx to James Mackey, AFI's CFO at the time, with the subject line "High Priority-Tax Allocation- Large Payment Possibly due ResCap October 30," Marx expressly noted that under the First 2009 Tax Allocation Agreement, AFI would be required to pay ResCap for the losses used by the AFI group and then estimates that those payments "may be on the order of $200 to $250m, due 10/31. (Additional $300 to $400 m would likely be due for the 2010 tax year, payable this time next year.)."[137] Marx also sent a follow-up e-mail to Mackey on October, 15, 2010, in which Marx stated that "[c]alculations were started immediately upon filing the first consolidated return on September 15."[138]

Finally, as discussed in detail in Section VII.L.2, there were several prior occasions when AFI and ResCap engaged in contractual arrangements where they did not stand on ceremony or formality in carrying out and enforcing their agreements. The parties' prior course of conduct with respect to other contracts supports the conclusion that AFI and ResCap viewed execution of the agreement as a mere formality.

Accordingly, the Examiner concludes that the evidence supports the proposition that there was a "meeting of the minds" or mutual assent between AFI and ResCap on all material terms of the First 2009 Tax Allocation Agreement and that the ResCap Board's approval of the agreement evidences ResCap's intent to be bound by the agreement. In reaching this conclusion, the Examiner is aware that Young stated during his interview that, despite ResCap Board approval, he did not intend for the First 2009 Tax Allocation Agreement to be binding until he signed the agreement, and that he did not believe that "anyone on the ResCap side" intended for ResCap to be bound by the agreement until it was signed by a ResCap officer.[139]

---

[135] *See* Memorandum, Action Required—ResCap Tax Allocation Agreements for Execution, dated Sept. 9, 2010 [ALLY_0435003].

[136] DeBrunner could not recall the precise date that he executed the First 2009 Tax Allocation Agreement on behalf of AFI. *See* Int. of D. DeBrunner, Apr. 18, 2013, at 122:8–14. But Marx recalled that he hand-delivered the agreement to DeBrunner for execution on or around September 13, 2010. *See* Int. of W. Marx, Apr. 18, 2013, at 57:20–58:5.

[137] E-mail from W. Marx (Oct. 13, 2010) [ALLY_0245484]. Marx further states that the payments to ResCap "would be a Q4 event and will be treated as a capital contribution to ResCap. Deloitte concurs." *Id*.

[138] *See* E-mail from W. Marx (Oct. 15, 2010), at ALLY_0424661 [ALLY_0424660].

[139] *See* Int. of J. Young, Apr. 22, 2013, at 209:20–210:10.

However, the Examiner finds it difficult to give any weight to Young's opinion as to whether others at ResCap, and in particular the ResCap Board, intended for the First 2009 Tax Allocation Agreement to be binding and enforceable given that Young has no specific recollection of speaking to anyone on the ResCap Board about why he did not sign the agreement or what was said if, in fact, he did discuss the agreement with the Board.[140]

The Examiner also concludes that the evidence supports the proposition that AFI's execution of the agreement evidences AFI's intent to the bound by the agreement, despite ResCap's failure to sign the agreement. While the Investigation turned up several communications between Marx and other officers at AFI wherein he indicates that the First 2009 Tax Allocation Agreement was not binding on AFI,[141] these statements were all made *after* AFI had already signed the First 2009 Tax Allocation Agreement and the ResCap Board had approved the agreement. Marx's opinion aside, the Investigation has uncovered no evidence to establish that AFI required signature by ResCap to be a condition to the agreement being enforceable.

Moreover, the Examiner is not aware of any basis to conclude that AFI should not be bound by its execution of the First 2009 Tax Allocation Agreement because it was a "mistake" that obligated AFI to make large payments to ResCap.[142] The Investigation has uncovered no evidence that supports this conclusion. The provision in the First 2009 Tax Allocation Agreement requiring AFI to compensate ResCap for its tax benefits was fully understood by AFI when the agreement was first proposed in December 2009. In fact, the evidence demonstrates that this provision was intentional and strategic. At his interview, Marx, who drafted the agreement,[143] stated that the "primary driver" of the payment provision was to find a way to maximize the use of ResCap's deferred tax assets in order to permit ResCap to get an "equity bump."[144] Marx further stated that this strategy was "explored" with AFI's external

---

[140] *Id.* at 146:20–147:16.

[141] *See* E-mail from W. Marx (Oct. 13, 2010) [ALLY_0245484] (wherein Marx describes various "options" for AFI, including "[d]o not complete execution of the [First 2009 Tax Allocation Agreement]." Marx goes on to state that "[a]bsent a signed agreement, the accounting should default to stand-alone treatment under GAAP."). This statement suggests that Marx believed that the agreement was not yet enforceable. *See also* E-mail from W. Marx (Oct. 15, 2010), at ALLY_0424663 [ALLY_0424660] (wherein Marx says to Mackey "[a]s we do not have a fully executed agreement with ResCap at this point, I don't think we need to respect the deadlines in the proposed agreement."). Moreover, during his interview, Marx stated that he did not believe the First 2009 Tax Allocation Agreement was binding and enforceable until it was fully executed. However, he noted that he never sought legal advice with respect to the issue. *See* Int. of W. Marx, Apr. 18, 2013, at 82:15–24, 143:18–144:13.

[142] *See* Int. of P. West, Apr. 16, 2013, at 20:3–8; Int. of D. DeBrunner, Apr. 18, 2013, at 116:13–22, 118:8–23, 125:16–22.

[143] *See* Int. of W. Marx, Apr. 18, 2013, at 36:24–37:6.

[144] *See id.* at 29:14–31:3.

auditors.[145] Moreover, in an e-mail sent on December 6, 2009, Marx explicitly describes the benefit of the First 2009 Tax Allocation Agreement to ResCap:

> If ResCap or any of its relevant sub-groups or subsidiaries generates foreign tax credits, net operating losses, or capital losses that it would not be able to use on a stand-alone basis in the current period, but the [AFI] group can utilize the benefits on the consolidated [AFI] return, then the ResCap entity will be paid currently for those benefits. This deviation from strict stand-alone accounting will in all cases be either neutral or more beneficial to ResCap than strict stand-alone. We drafted the agreements in this manner to be consistent with other allocation agreements in the Group (Bank and Insurance have similar agreements already in place).[146]

The evidence establishes that AFI changed its mind *after* executing the agreement, when it calculated its expected payment obligation to ResCap and realized that its payment obligation to ResCap would be hundreds of millions of dollars. This desire to get out from the First 2009 Tax Allocation Agreement is set out in an October 18, 2010 e-mail from Marx to Young and Hamzehpour, when Marx explains:

> The [First 2009 Tax Allocation Agreement] was initially drafted and proposed under a previous [AFI] senior financial management team. In light of the potentially large capital contributions that could result under such an agreement, I have requested review and approval by [AFI's] current senior leadership.[147]

If there was any "mistake" made here, it was AFI's unilateral mistake in failing to anticipate the magnitude of its monetary obligation under the First 2009 Tax Allocation Agreement.[148]

AFI's failure to appreciate the financial consequences of the First 2009 Tax Allocation Agreement does not provide a basis to nullify or reform the agreement. "While a court has the power to reform a contract to avoid an unconscionable harm, reformation is not appropriate

---

[145] *See id.* at 30:12–31:7.

[146] *See* E-mail from W. Marx (Dec. 6, 2009) [EXAM12308200]. DeBrunner, who executed the First 2009 Tax Allocation Agreement on behalf of AFI, was copied on this e-mail. The beneficial nature of the First 2009 Tax Allocation Agreement to ResCap was also set out in the Joint ResCap-AFI Tax Memorandum to ResCap Board which Marx took part in preparing. *See* Memorandum, Agreements for Allocation of Taxes, dated Aug. 6, 2010, at RC40016374–84 [RC40016362].

[147] E-mail from W. Marx (Oct. 18, 2010) [ALLY_0424659].

[148] Marx stated during his interview that "we didn't intend to be making major capitalization decisions with respect to ResCap in the tax department. . . . I simply didn't consider the ramifications of putting an agreement in place that could compel very large capital contributions when that's something the board was very focused on." Int. of W. Marx, Apr. 18, 2013, at 62:9–12, 75:8–12.

simply because the contract produces a suboptimal or inconvenient result viewed in hindsight."[149] Moreover, if the terms of an agreement are accurate and agreed upon, the court will honor the writing and will not modify those terms to alleviate "a hard or oppressive bargain" subsequently realized.[150] The mistake must be a *mutual* mistake of fact, and not a mistake as to the legal effect or consequences of the contract.[151] Indeed, a unilateral mistake is not sufficient to warrant reformation.[152] Accordingly, AFI's remorse based on the unexpected amount of compensation owed to ResCap under the First 2009 Tax Allocation Agreement does not provide a basis to nullify or reform the agreement to the extent that it is otherwise deemed to be valid and enforceable.

It was also suggested by DeBrunner during the course of the Investigation that AFI should not be bound by the First 2009 Tax Allocation Agreement because board approval is required before AFI is authorized to make any sizeable capital contributions.[153] Notably, AFI's failure to obtain proper senior level approval is the reason given by Young for having failed to sign the agreement on behalf of ResCap.[154] A resolution adopted by the AFI Board on October 5, 2009, provides, in relevant part, that the AFI Board has sole authority with respect to "[a]n injection of equity into any company or joint venture where, as a result of such capital injection, [AFI] invests $50 million or more or ends up with significant operating control."[155] AFI also had an accounting policy in place since December 23, 2009 providing that "[a]ll tax sharing agreements must be approved by the respective boards of directors or appropriate management designee."[156]

Despite the foregoing governance provisions, the Examiner does not find this position to be persuasive. Regardless of how payments under a tax allocation agreement may be treated

---

[149] 66 Am. Jur. 2d Reformation of Instruments § 11 (2013) (citing *Chandler v. Hayden*, 215 P.3d 485 (Idaho 2009)).

[150] *See id*. (citing *LaSalle Bank, N.A. v. Reeves*, 919 A.2d 738 (Md. 2007)); *see also George Backer Mgmt. Corp. v. Acme Quilting Co., Inc*., 385 N.E.2d 1062, 1066–67 (N.Y. 1978) (holding that a contract that subsequently resulted in monetary consequences to a party that the party did not anticipate was still valid because the contract was highly negotiated, and the party could not show that the consequence of the contract was due to a mistake in the contract).

[151] *See Casey v. Auto Owners Ins. Co.*, 729 N.W.2d 277, 284–85 (Mich. Ct. App. 2006); *see also VoiceAge Corp. v. RealNetworks, Inc*., No. 5753, 2013 WL 680932 (S.D.N.Y. Feb. 26, 2013); *Cobalt Multifamily Investors I, LLC v. Bridge Capital (USVI), LLC*, No. 5738, 2007 WL 2584926 (S.D.N.Y. Sept. 7, 2007).

[152] *See Casey v. Auto Owners Ins. Co.*, 729 N.W.2d 277, 284–85 (Mich. Ct. App. 2006).

[153] *See* Int. of D. DeBrunner, Apr. 18, 2013, at 118:8–23, 125:16–126:1 (BeDrunner stated that the First 2009 Tax Allocation Agreement "was not intended to be a, quote-unquote, 'backdoor for capital contributions' because I was fully aware that that required the approval of the [AFI Board] for anything over $50 million. So again, you know, there was a delegated authority. If it were anything up to that amount I could sign on behalf . . . . Anything over and above that would require a specific board action."); *see also* Int. of W. Marx, Apr. 18, 2013, at 126:10–25.

[154] *See* Int. of J. Young, Apr. 22, 2013, at 10:14–11:7, 97:8–21.

[155] *See* Minutes of a Special Meeting of the Board of GMAC Inc., Oct. 5, 2009, at ALLY_0115241, –43 [ALLY_0114717].

[156] AFI Accounting Policy 3330: Accounting for Income Taxes, effective Oct. 1, 2010, at EXAM12354101 [EXAM12354093].

on AFI's books for accounting purposes,[157] The Examiner is aware of no legal authority for the proposition that payments under a tax allocation agreement should be characterized as capital contributions.

Moreover, when DeBrunner signed the First 2009 Tax Allocation Agreement, he believed he was acting under "delegated authority."[158] AFI's in-house counsel was of the same belief. A September 9, 2010 memorandum circulated by Marx provides that AFI's in-house counsel had advised that "no additional governance is required at the [AFI] level" in connection with execution of the First 2009 Tax Allocation Agreement.[159] Notably, the Investigation did not reveal any evidence of the AFI Board ever considering the approval of any tax allocation agreements, including the Second 2009 Tax Allocation Agreement, which was signed by DeBrunner but not approved by the AFI Board. The process for AFI's entry into the First 2009 Tax Allocation Agreement appears to have been no different than the process for its entry into other tax allocation agreements.[160]

### (3) The Statute Of Frauds Is Not Applicable To The First 2009 Tax Allocation Agreement

Before deciding the issue of the enforceability of the First 2009 Tax Allocation Agreement, the Examiner also considered whether Michigan's statute of frauds has an impact on whether the First 2009 Tax Allocation Agreement would be enforceable. The Examiner concludes that it is unlikely that the statute of frauds would invalidate the First 2009 Tax Allocation Agreement.

The only provision of the Michigan statute of frauds that is potentially applicable to the First 2009 Tax Allocation Agreement is the requirement that "[a]n agreement that, by its terms is not to be performed within 1 year from the making of the agreement" must be "in writing and signed with an authorized signature by the party to be charged."[161] Michigan courts have "declined to adopt narrow and rigid rules for compliance with the statute of frauds," and instead use a "case-by-case approach."[162]

According to the Michigan Supreme Court, "[t]o determine whether an agreement comes within this section, the proper inquiry is whether the contract is capable of performance within

---

[157] E-mail from W. Marx (Oct. 13, 2010) [ALLY_0245484] ("This payment [under the First 2009 Tax Allocation Agreement] would be a Q4 event and will be treated as a capital contribution to ResCap. Deloitte concurs.").

[158] *See* Int. of D. DeBrunner, Apr. 18, 2013, at 125:9–126:9 ("As an officer of the company, they asked me to be the signer on it. My recollection is it had been reviewed with multiple parties around the company and I was asked to sign on that . . . . So, again, you know, there was a delegated authority.").

[159] *See* Memorandum, Action Required—ResCap Tax Allocation Agreements for Execution, dated Sept. 9, 2010 [ALLY_0435003].

[160] *See, e.g.*, Letter from W. Marx to D. DeBrunner (Sept. 30, 2008), at ALLY_0178793 [ALLY_0178779] (enclosing 2006 Tax Allocation Agreement for DeBrunner's signature on behalf of AFI); Letter from W. Marx to J. Young (Nov. 13, 2008), at ALLY_0178792 [ALLY_0178779] (enclosing same for Young's signature on behalf of ResCap, and noting the Agreement has "already been executed by David DeBrunner").

[161] MICH. COMP. LAWS ANN. § 566.132(1)(a) (West 2012).

[162] *See Kelly-Stehney & Assocs., Inc. v. Mac Donald's Indus., Prods., Inc.*, 693 N.W.2d 394, 397–98 (Mich. Ct. App. 2005) (citations omitted).

one year of [entry into the agreement]."[163] Significantly, "if there is any possibility that [a] contract is capable of being completed within a year, it is not within the statute of frauds, even though it is clear that the parties may have intended and thought it probable that it would extend over a longer period, and even though it does so extend."[164] Finally, "a contract for an indefinite term has traditionally been considered capable of performance within the first year."[165]

Section 5.08 of the First 2009 Tax Allocation Agreement provides that it "shall be effective as of November 1, 2009, and shall continue in effect until ResCap is no longer included in the consolidated Federal income tax return of [AFI] . . . ."[166] On its face, the term of the First 2009 Tax Allocation Agreement is not delineated by a finite end date, but rather remains effective until the occurrence of an event (i.e., ResCap no longer being included in AFI's consolidated federal income tax returns). The term of the agreement is of an indefinite duration, and was capable of performance within the first year. Accordingly, the First 2009 Tax Allocation Agreement is not subject to the one-year rule set forth in Michigan's statute of frauds.

While a close question, the Examiner concludes that it is more likely than not that the First 2009 Tax Allocation Agreement is an enforceable contract.[167] The Examiner has qualified his conclusion as being "a close question" primarily because cases assessing whether a partially executed, unexecuted or oral agreement is enforceable focus on whether the parties' conduct or performance reflects an intent to be bound by the contract. By the nature of a tax allocation agreement, which generally does not require the parties to engage in any overt acts until payments are made thereunder, it is difficult to glean "intent" based on performance or lack thereof. Other than AFI calculating its potential payment obligations to ResCap under the First 2009 Tax Allocation Agreement (which was required under section 3.02 of the

---

[163] *Wolding v. Clark*, No. 10-10644, 2010 WL 4739432, at *6 (E.D. Mich. Nov. 16, 2010) (citations omitted).

[164] *Drummey v. Henry*, 320 N.W.2d 309, 312 (Mich. Ct. App. 1982); *see also Southwell v. Parker Plow, Co.*, 207 N.W. 872, 873 (Mich.1926) (citing *Smalley v. Mitchell*, 68 N.W. 978, 979 (Mich. 1896)).

[165] *Adell Broad. Corp. v. Cablevision Indus.*, 854 F. Supp. 1280, 1290 (E.D. Mich. 1994) (citation omitted); *see also Phinney v. Verbrugge*, 564 N.W.2d 532, 542 (Mich. Ct. App. 1997) (finding that an agreement for an indefinite period of employment does not fall within the purview of the statute of frauds).

[166] First 2009 Tax Allocation Agreement, § 5.08 [RC40016362].

[167] In reaching this conclusion, the Examiner also considered whether the officers of a corporation have any discretion to ignore or otherwise deviate from the clear and unconditional instructions given by a board of directors. There is minimal case law addressing this issue. However, the Examiner was able to find at least one other situation where a corporation's board resolution on a matter was found to be enforceable and bind the company even when the officers did not implement the action approved by the board. *See Landis v. Sci. Mgmt. Corp.*, No. 7483, 1991 WL 19848 (Del. Ch. Feb. 15, 1991) (Defendant corporation's board approved a finder's fee of up to $200,000 to be payable upon the consummation of an acquisition of a target company found by Plaintiffs. Defendant's board authorized its officers to pay such fee; however the fee was not paid. Plaintiffs brought suit. In holding for the Plaintiffs, the court found that the board resolution satisfied the requirements of the statute of frauds and established Defendant's obligation to pay the fee.); *see also Onslow Wholesale Plumbing & Elec. Supply, Inc. v. Fisher*, 298 S.E.2d 718, 720–21 (N.C. Ct. App. 1982) (failure of corporate officer to comply with board resolution deemed to be breach of fiduciary duty).

agreement),[168] the Investigation has uncovered no evidence of performance by either party. Nevertheless, based on the analysis above, including that there was a clear "meeting of the minds" as to all terms of the First 2009 Tax Allocation Agreement, the Examiner believes that the agreement is more likely than not an enforceable contract.

### (4) Potential Damages Could Be Significant

If the First 2009 Tax Allocation Agreement is found to be enforceable, and is not deemed to be superseded by the Second 2009 Tax Allocation Agreement, ResCap would be entitled to compensation for AFI's use of ResCap's tax benefits that have passed to AFI since November 1, 2009. As described in Section V.D.2.c(3), AFI will have approximately $5.056 billion in ResCap tax benefits available for use as of the end of the tax year in which the Chapter 11 Cases conclude. Applying a 35% federal income tax rate, that amount corresponds to $1.770 billion in potential tax savings. AFI expects to use a substantial portion of the $5.056 billion in tax benefits before the end of 2014 and may eventually use all of the tax benefits. Assuming all of ResCap's tax benefits are eventually used by AFI, ResCap would have a contractual claim against AFI in the approximate amount of $1.770 billion.

### b. Whether James Young's Failure To Execute The First 2009 Tax Allocation Agreement Constitutes A Breach Of Fiduciary Duty

In connection with the First 2009 Tax Allocation Agreement, the Examiner has also considered whether Young's failure to comply with the ResCap Board resolution and sign the agreement gives rise to a claim for breach of fiduciary duty.

As a threshold matter, with respect to choice of law, New York courts follow the "internal affairs doctrine," which provides that "questions relating to the internal affairs of corporations are decided in accordance with the law of the place of incorporation."[169] This doctrine applies to breach of fiduciary duty claims.[170] Accordingly, Delaware law will apply to

---

[168] *See* First 2009 Tax Allocation Agreement, § 3.02 [RC40016362]. Section 3.02 of the agreement provides as follows:

> Within forty-five (45) days following the filing of the [AFI] Group consolidated Federal income tax return . . . [GMAC Mortgage Group LLC] shall notify ResCap of the amount of the Separate ResCap Group Tax Liability. Within fifteen (15) days after such notification, Rescap shall pay to [GMAC Mortgage Group LLC] or [GMAC Mortgage Group LLC] will pay to ResCap as the circumstances warrant, the difference between the Separate ResCap Group Tax Liability and the estimated tax payments previously made by ResCap.

[169] *Scottish Air Int'l, Inc. v. British Caledonian Grp.*, 81 F.3d 1224, 1234 (2d Cir. 1996); *accord KDW Restructuring & Liquidation Servs. LLC v. Greenfield*, 874 F. Supp. 2d 213, 221 (S.D.N.Y. 2012) ("New York courts decide questions relating to corporate internal affairs in accordance with the law of the place of incorporation.") (citations omitted); *Official Comm. of Unsecured Creditors of Hydrogen, L.L.C. v. Blomen* (*In re Hydrogen, L.L.C.*), 431 B.R. 337, 346–47 (Bankr. S.D.N.Y. 2010).

[170] The doctrine also applies in the limited liability company context. *See In re Hydrogen, L.L.C.*, 431 B.R. at 347; *Ritchie Capital Mgmt. L.L.C. v. Coventry First LLC*, No. 07 Civ. 3494, 2007 WL 2044656, at *4 (S.D.N.Y. July 17, 2007).

consideration of a breach of fiduciary duty claim against Young, because ResCap is domiciled in Delaware.[171]

As described in Section VII.E, once a company becomes insolvent, the company's officers and directors owe a fiduciary duty, including a duty of good faith,[172] to the company and its creditors.[173] Specifically, a fiduciary will be found to have violated the duty of good faith under any of the following circumstances:

> 1) [W]here the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation; 2) where the fiduciary acts with the intent to violate applicable positive law; or 3) where the fiduciary intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties.[174]

In the event that a plaintiff successfully alleges bad-faith conduct by a fiduciary, the burden shifts to the director to "demonstrate that the challenged act or transaction was entirely fair to the corporation and its shareholders."[175] "Bad faith" conduct has been defined as an "intentional dereliction of duty, a conscious disregard for one's responsibilities."[176] Notably, the "business judgment" rule will not immunize an officer's decision or action if the officer is interested or lacks independence relative to the decision, does not act in good faith, acts in a manner that

---

[171] *See, e.g., KDW Restructuring & Liquidation Servs. LLC,* 874 F. Supp. 2d 213, 221 (S.D.N.Y. 2012) ("Jennifer is a Delaware corporation; therefore, Delaware law governs this breach of fiduciary duty claim."); *In re Hydrogen, L.L.C.*, 431 B.R. at 346–47; *Marino v. Grupo Mundial Tenedora, S.A.*, 810 F. Supp. 2d 601, 606–07 (S.D.N.Y. 2011); *Kipperman v. Onex Corp.*, 411 B.R. 805, 867 n.35 (N.D. Ga. 2009) ("The parties agree, and the Court has already concluded, that Delaware law applies to Plaintiff's breach of fiduciary duty claim based on the 'internal affairs doctrine.'").

[172] While some courts characterize good faith as a separate duty, the courts in Delaware generally treat it as subsumed within the duty of loyalty. *See, e.g., Nagy v. Bistricer*, 770 A.2d 43, 49 n.2 (Del. Ch. 2000) ("If it is useful at all as an independent concept, the good faith iteration's utility may rest in its constant reminder (1) that a fiduciary may act disloyally for a variety of reasons other than personal pecuniary interest; and (2) that, regardless of his motive, a director who consciously disregards his duties to the corporation and its stockholders may suffer a personal judgment for monetary damages for any harm he causes").

[173] *See ASARCO LLC v. Am. Mining Corp.*, 396 B.R. 278, 314 (S.D. Tex. 2008) (citing *Claybrook v. Morris* (*In re Scott Acquisition Corp.*), 344 B.R. 283, 289–90 (Bankr. D. Del. 2006) (holding that a subsidiary's creditors and the subsidiary itself are owed a fiduciary duty upon insolvency); *Prod. Res. Grp., L.L.C. v. NCT Grp., Inc.*, 863 A.2d 772, 790–91 (Del. Ch. 2004) ("When a firm has reached the point of insolvency . . . the firm's directors are said to owe fiduciary duties to the company's creditors.")). *See also* J. Haskell Murray, "*Latchkey Corporations*": *Fiduciary Duties in Wholly Owned, Financially Troubled Subsidiaries,* 36 DEL. J. CORP. L. 577, 596–97 (citing *N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 101 (Del. 2007)).

[174] *Burtch v. Seaport Capital, LLC* (*In re Direct Response Media, Inc.*), 466 B.R. 626, 652 (Bankr. D. Del. 2012) (citing *Brehm v. Eisner* (*In re Walt Disney Co. Derivative Litig.*)*,* 906 A.2d 27, 67 (Del. 2006)).

[175] *In re Walt Disney Co. Derivative Litig.*, 906 A.2d at 52.

[176] *Id*. at 66–67.

cannot be attributed to a rational business purpose, or reaches his decision by a grossly negligent process that includes the failure to consider all material facts reasonably available.[177]

The case law provides very little guidance as to whether an officer's failure to comply with a board resolution is a per se violation of the officer's fiduciary duty. However, there is at least one case that supports the proposition that an officer's failure to comply with a board's directive may amount to a breach of fiduciary duty. In *Onslow Wholesale Plumbing & Elec. Supply, Inc*. *v. Fisher*,[178] the general manager of a corporation bought shares of the corporation's stock in his own name, and then transferred the shares to his son. The corporation alleged a breach of fiduciary duty because the president and director of the corporation instructed the manager to buy the shares for the corporation rather than for himself or his son.[179] The court, considering agency law, held that the "defendant . . . breached a duty to plaintiff corporation by willfully failing to carry out the directive of the board of directors."[180] In reaching this holding, the court reasoned that "[t]he directive given to defendant by plaintiff's president and chairmen of the board of directors constituted board action and was therefore within the scope of defendant's agency. [The board] had every reason to believe that defendant would carry out this directive faithfully . . . ."[181]

Young's failure to execute the First 2009 Tax Allocation Agreement raises concerns because the agreement was unanimously approved by the ResCap Board and was highly beneficial to ResCap. Moreover, Young was a co-author of the Joint ResCap-AFI Tax Memorandum to ResCap Board that was presented to the ResCap Board on August 6, 2010 and recommended approval of the agreement.[182] Additionally, the Investigation has uncovered no evidence that Young attempted to inform other members of the ResCap Board that he did not intend to sign the agreement or explain his reasons for not signing. Young himself had no specific recollection of speaking to anyone on the ResCap Board about why he did not sign the agreement or what was said if, in fact, he did discuss this issue with the ResCap Board.[183] Therefore, as in *Onslow*, it would appear that the ResCap Board had every reason to believe, and in fact did believe, that Young would carry out the ResCap Board's directive faithfully.[184]

---

[177] *Brehm v. Eisner*, 746 A.2d 244, 264 n.66 (Del. 2000) (internal citation omitted). *See also Responsible Person v. Best Buy Co.* (*In re Musicland Holding Corp.*), 398 B.R. 761, 788 (Bankr. S.D.N.Y. 2008); *FLI Deep Marine LLC v. McKim*, No. 4138, 2009 WL 1204363, at *2–3 (Del. Ch. Apr. 21, 2009).

[178] 298 S.E.2d 718, 719 (N.C. Ct. App. 1982).

[179] *See id*.

[180] *See id*. at 721–22.

[181] *See id*. (finding that officer breached both a statutory duty and also a contractual duty to follow the directions of the corporation's board); *see also* 3 WILLIAM MEADE FLETCHER ET AL., FLETCHER CYCLOPEDIA OF THE LAW OF PRIVATE CORPORATIONS § 1011 (West 2012) (citing the *Onslow* case for the proposition that "[o]fficers have a duty to follow the orders, advice, and direction of the board of directors.").

[182] *See* Memorandum, Agreements for Allocation of Taxes, dated Aug. 6 2010, at RC40016374–78 [RC40016362]; Minutes of a Regular Meeting of the Board of Directors of Residential Capital, LLC, Aug. 6, 2010, at RC40018820–22 [RC40018729].

[183] *See* Int. of J. Young, Apr. 22, 2013, at 146:20–147:16.

[184] *See* Int. of P. West, Apr. 16, 2013, at 58:17–19.

Here, there is no factual dispute that Young failed to execute the First 2009 Tax Allocation Agreement and fulfill the ResCap Board's resolution.[185] However, the issue is whether Young's conduct rises to the level of a breach of fiduciary duty, which requires a showing that Young intentionally acted with a purpose other than to advance ResCap's interests or intentionally failed to act in dereliction of his duties. The first issue the Examiner considered is *why* Young failed to carry out ResCap's Board resolution to execute the agreement.

Young's recollection of the events surrounding his failure to execute the First 2009 Tax Allocation Agreement, and in particular the timing of those events, was spotty.[186] Nevertheless, there is evidence that Young was not presented with an execution copy of the First 2009 Tax Allocation Agreement until mid-October 2010, approximately two months after the ResCap Board authorized Young to sign the agreement.[187] The evidence establishes that Marx, who was overseeing and coordinating execution of the First 2009 Tax Allocation Agreement by all parties,[188] did not send Young an execution copy of the First 2009 Tax Allocation Agreement until around October 15, 2010.[189]

There is evidence that on or around October 18, 2010, shortly after the time that Young allegedly received an execution copy of the First 2009 Tax Allocation Agreement, he was contacted by Marx who expressed concern that the First 2009 Tax Allocation Agreement would require AFI to pay what he described as "potentially large capital contributions" to ResCap.[190] Marx informed Young that he would be proposing changes to the agreement to make it "strict stand-alone" (i.e., he would be removing AFI's obligation to pay ResCap for AFI's use of ResCap's tax benefits).[191] It was also around this time, although Young does not recall precisely when, that someone at AFI (Young believed that to be Mackey) told Young not to sign the First 2009 Tax Allocation Agreement because it had not been properly vetted and approved by senior-level management at AFI.[192]

There is evidence to suggest that, at this juncture, Young did not advocate for ResCap's interests in seeking to enforce or preserve the First 2009 Tax Allocation Agreement. First, it

---

[185] Notably, Young believed that the August 6, 2010 ResCap Board resolution provided him with discretion not to sign the First Tax Allocation Agreement if in reviewing the final document "there was something amiss." Int. of J. Young, Apr. 22, 2013, at 92:6–20.

[186] *See* Int. of J. Young, March 15, 2013, at 37:13–16; Int. of J. Young, Apr. 22, 2013, at 101:4–104:18.

[187] *See* Int. of W. Marx, Apr. 18, 2013, at 65:7–12.

[188] *See id.* at 54:19–25, 57:16–58:5.

[189] *See id.* at 59:14–18, 65:7–12.

[190] *See* E-mail from W. Marx (Oct. 18, 2010) [ALLY_0424659] ("In light of the potentially large capital contributions that could result under such an agreement, I have requested review and approval by Ally's current senior leadership."). Notably, Young did not have any recollection of the timeline with respect to when he received the execution copy of the First 2009 Tax Allocation Agreement as compared to when he was contacted by AFI officers and told not to execute the agreement. *See* Int. of J. Young, Apr. 22, 2013, at 101:4–104:18.

[191] *See* E-mail from W. Marx (Oct. 18, 2010) [ALLY_0424659].

[192] *See* Int. of J. Young, Apr. 22, 2013, at 10:14–11:7, 97:8–21.

appears that Young never considered signing the First 2009 Tax Allocation Agreement after being told by AFI that the agreement had not been properly vetted or approved by AFI.[193] On October 18, 2010, the same day that Young first received e-mails from AFI about the proposed change in the tax allocation agreement, and without apparently consulting any other member of the ResCap Board, Young sent an e-mail to AFI:

> Since all tax benefits will ultimately belong to Ally, this is more about how to managerially show the tax impacts on the legal entity of ResCap LLC. ResCap board would only be concerned if cash was being extracted from LLC in an "unfair" way via the tax allocation agreement . . . but I don't see that happening.[194]

Additional communications between Marx and Young confirm that Young did not oppose AFI's efforts to replace the First 2009 Tax Allocation Agreement with a tax allocation agreement that would be much less favorable to ResCap. An e-mail from Marx to Mackey sent on November 2, 2010[195] summarizes Marx's discussion with Young about the proposed new tax allocation agreement (i.e., the Second 2009 Tax Allocation Agreement) and shows that Young essentially acquiesced to removing the favorable payment provision in favor of ResCap:[196]

- I had a call with Jim Young on an unrelated matter, and tacked on a discussion on the tax allocation to ResCap.

- I shared with him the reason why we stopped the execution of the draft agreements, i.e., they would have compelled capital contributions to ResCap on the order of hundreds of millions for 2009 and 2010 tax years, versus a cash payment to Ally of $6m if we removed the beneficial language with respect to NOL's, capital losses and foreign tax credits.

- He understood the reason and did not think changing the draft agreements was disadvantageous to ResCap because the change would eliminate beneficial treatment which Ally is not compelled to provide to ResCap.

- Jim's view was that we need to move ahead and present a revised, stand-alone agreement to the ResCap Board for approval and that an executed agreement would be required to allow remittance of funds.

---

[193] *See id.* at 97:13–21.

[194] *See* E-mail from J. Young (Oct. 18, 2010), at EXAM20317195 [EXAM20317195].

[195] *See* E-mail from W. Marx (Nov. 2, 2010), at ALLY_0424660 [ALLY_0424660].

[196] Marx characterized his discussions with Young as being "never really adversarial" and stated that: "[Young] seemed to agree with what we were saying. And you know, there was no coaching, cajoling, convincing." Int. of W. Marx, Apr. 18, 2013, at 131:2–12.

It is troubling that Young was so quickly supportive of the Second 2009 Tax Allocation
Agreement, especially after being informed that: (1) ResCap would have received significant
sums of money under the First 2009 Tax Allocation Agreement (estimated by AFI to be
approximately $600 million for the 2009 and 2010 tax years);[197] and (2) ResCap would be
obligated to pay tax on excess inclusion income in the amount of $6 million to AFI under the
Second 2009 Tax Allocation Agreement.[198]

Nevertheless, as described above, establishing "bad faith" conduct requires a high level
of proof and the evidence must establish that Young *intentionally* failed to advance ResCap's
interests or failed to act in a way that would demonstrate a conscious disregard for his duties.

Young explained that he did not sign the First 2009 Tax Allocation Agreement because
he did not believe that it would be enforceable based on AFI's alleged failure to receive proper
signing authority:

> I found out that [AFI] had not gone through the proper level of
> governance from their perspective. . . . [A]lthough I don't know
> their governance process, . . . I was informed that whoever
> signed the documents didn't have the authority to do so. And, as
> you know, of course I'm not going to enter into a transaction
> where it's not going to stand up.[199]

Moreover, although Young does not have a recollection of any specific discussions he
had as to whether the agreement would have been enforceable had he signed it, he believes
that he may have discussed this issue with Tammy Hamzehpour, ResCap's General Counsel at
the time.[200] Hamzehpour was aware of AFI's position as she was a recipient or was copied on
several of the e-mails, including the October 18, 2010 e-mail from Marx where he explains
that AFI may be proposing changes to the agreement.[201] The Investigation has uncovered no
evidence that Hamzehpour urged Young to sign the First 2009 Tax Allocation Agreement
after AFI changed its mind or requested that a different ResCap officer sign the agreement.
Young also explained that, based on his constant dealings with AFI, he "had no reason to
believe that what [he] was being told was not true,"[202] and that he "took [AFI's] word that
they understood their governance and that they were being honest and truthful of which [he]

---

[197] Young does not recall ever disclosing to the ResCap Board the amount that ResCap might have been owed
under the First 2009 Tax Allocation Agreement. *See* Int. of J. Young, Apr. 22, 2013, at 148:2–149:11.

[198] *See* e-mail from W. Marx (Nov. 2, 2010), at ALLY_0424660 [ALLY_0424660]; *see also* E-mail from W.
Marx (Dec. 22, 2010) at ALLY_0424667 [ALLY_0424667] (noting that "Jim Young was very supportive" of
AFI's efforts to address the fairness concerns raised by counsel to the Independent Directors concerning the
Second 2009 Tax Allocation Agreement).

[199] *See* Int. of J. Young, Apr. 22, 2013, at 97:13–21.

[200] *See id.* at 98:5–15.

[201] *See* E-mail from W. Marx (Oct. 18, 2010) [ALLY_0424659].

[202] *See* Int. of J. Young, Apr. 22, 2013, at 98:14–15.

never had a reason to doubt."[203] The Investigation has uncovered no evidence to dispute that what Young says he believed is not true.

Moreover, Young testified that he did not attempt to compel AFI to perform under the First 2009 Tax Allocation Agreement because he believed that doing so would possibly strain the AFI/ResCap relationship and make it less likely that ResCap would receive needed capital infusions from AFI in the future:

> [S]omewhere along the line before these agreements were executed, we learned that our counterparty hadn't vetted it. And this counterparty by the way is very important to us. They were providing capital and liquidity to separate transactions for a long period of time where we couldn't go to third parties. Very important for us. And the fact that they hadn't gone through their process, certainly as a businessperson at that time, given the importance of this counterparty, *we weren't going to talk about a short-term forcing them into a transaction that could ultimately turn off our ability to do further transactions with them*.[204]

Although the Investigation has uncovered no evidence beyond Young's testimony to support the notion that AFI would be less inclined or less incentivized to support ResCap if the First 2009 Tax Allocation Agreement had been enforced by ResCap,[205] the Examiner has no basis to doubt Young's concerns. Significantly, regardless of whether Young's belief was correct, it may demonstrate that his actions were motivated by what he believed was in ResCap's best interests.

Finally, Young's state of mind is relevant in determining whether his actions or inactions were motivated by bad faith. During his interview, Young testified that he did not (and still does not) view a tax allocation agreement as a tool for capital-generation purposes. On multiple occasions, Young stated his belief that a tax allocation agreement is intended to allocate tax attributes between companies on a "stand-alone" basis and to be used as an accounting tool to assist readers of financial statements so they can understand financial results, but it is not intended to "transfer value" or be a vehicle through which a subsidiary compels capital contributions from its parent.[206] Based on Young's understanding of the purpose of a tax allocation agreement, Young viewed the favorable payment provision to ResCap in the First 2009 Tax Allocation Agreement as a "windfall," because it was better than stand-alone treatment.[207] Putting aside Young's misconception of the purpose of a tax

---

[203] *See id.* at 162:9–13.

[204] *See id.* at 160:19–161:10 (emphasis added).

[205] *See id.* at 173:16–22 (Question: "Did anyone at [AFI] ever suggest in words or substance to you that if ResCap sought to enforce the [First 2009 Tax Allocation Agreement], that there would be consequences to doing so?" Answer: "No discussion like that ever occurred.").

[206] *See id.* at 63:10–22, 77:8–78:2, 82:16–83:23, 139:18–21.

[207] *See id.* at 76:10–16.

allocation agreement,[208] the evidence suggests that Young's lack of vigor in seeking to enforce the First 2009 Tax Allocation Agreement against AFI can be explained by his belief that the agreement should not be used to compel capital contributions against AFI.

Young's belief also appears to have been shared by the ResCap Board, as evidenced by the fact that the ResCap Board unanimously approved the Second 2009 Tax Allocation Agreement. Moreover, the Investigation has uncovered no evidence that anyone at ResCap, including the Independent Directors, were ever critical of Young for failing to sign, or for failing to seek to compel AFI to be bound by, the First 2009 Tax Allocation Agreement. To the contrary, West, like Young, described the favorable payment provision in the First 2009 Tax Allocation Agreement as a "windfall" and was satisfied to achieve "stand-alone" treatment for ResCap under a tax allocation agreement.[209]

Based on the evidence revealed in the Investigation concerning Young's motivations and actions, the Examiner concludes that, while a close question, it is more likely than not that a claim for breach of fiduciary duty[210] against Young, based on his failure to carry out the ResCap Board's resolution authorizing him to sign the First 2009 Tax Allocation Agreement, would not prevail.

### c. The Second 2009 Tax Allocation Agreement Is Likely To Be Avoided As A Fraudulent Transfer

The Examiner next considers whether there is any basis to challenge the Second 2009 Tax Allocation Agreement, which, by its terms, "supersede[d] any earlier agreement for the allocation of income taxes between the parties."[211] The Examiner first considered whether ResCap's entry into the agreement is avoidable as a constructive fraudulent transfer. By its plain terms, section 548 of the Bankruptcy Code permits the avoidance of an obligation incurred within two years before the commencement date of a bankruptcy filing,[212] including

---

[208] The purpose of a tax allocation agreement is to allocate the responsibilities for payment of tax liabilities and the right to receive tax refunds among affiliated entities (not to determine how tax attributes are reported in financial statements). These agreements are put into place to determine cash flow rights and may provide for different treatment than strict "stand-alone." *See* Section V.D.1.b (providing a complete discussion regarding the purpose of tax allocation agreements).

[209] *See* Int. of West, Apr. 16, 2013, at 17:20–24, 39:23–40:19.

[210] The circumstances surrounding Young's failure to execute the First 2009 Tax Allocation Agreement appear to implicate the fiduciary duty of good faith more so than the duty of care. However, for many of the same reasons discussed above, the Examiner believes that a claim based on a breach of duty of care would not prevail. In any event, a breach based on a violation of the duty of care (in the absence of willful misconduct or bad faith) is subject to the exculpation and indemnification provisions contained in the 2008 ResCap Amended LLC Agreement. *See* 2008 ResCap Amended LLC Agreement, §§ 17, 18 [KL000000433]; *see also* Section IV.B.1.e(3)–(4) (providing a more detailed discussion of the 2008 ResCap Amended LLC Agreement).

[211] *See* Second 2009 Tax Allocation Agreement, § 5.04 [RC00028796].

[212] *See* 11 U.S.C. § 548(a)(1) (2012); *see also* 5 COLLIER ON BANKRUPTCY ¶ 548.03[4] (Alan N. Resnick & Henry J. Sommer eds., 16th ed) ("Section 548 not only gives the estate representative the power to avoid transfers, but also the power to avoid obligations.").

contractual obligations incurred within the two-year reach-back period.[213] Given that
ResCap's entry into the Second 2009 Tax Allocation Agreement occurred in January 2011,
ResCap's obligations under the agreement were incurred within the two-year reach-back
period contained in section 548 of the Bankruptcy Code.[214] Moreover, the Second 2009 Tax
Allocation Agreement was executed in January 2011, at a time when ResCap was insolvent.[215]
Therefore, the key issue is whether ResCap received reasonably equivalent value for entering
into the Second 2009 Tax Allocation Agreement.

Based on the Examiner's prior conclusion that there may be a basis to find that the First
2009 Tax Allocation Agreement is enforceable, the proper starting point is to compare the
consideration ResCap would be entitled to under the Second 2009 Tax Allocation Agreement
as opposed to the First 2009 Tax Allocation Agreement. When the agreements are compared,
there is little doubt that the Second 2009 Tax Allocation Agreement placed ResCap in a much
worse position and provided no benefit to ResCap at all.[216] ResCap went from being a party to
an agreement obligating AFI to pay ResCap for AFI's use of ResCap's tax benefits, to being a
party to an agreement that eliminated this benefit and provided no possibility of payments
being made to ResCap.[217] In fact, there is no provision in the Second 2009 Tax Allocation
Agreement that permits any possibility of payments being made to ResCap (other than an
adjustment for an erroneous overpayment).[218] ResCap could only take into account the tax
benefits it generates as carryovers in calculating its positive tax liability on a stand-alone basis
for a future year.[219]

---

[213] *See Edner v. Mathews*, 58 F. Supp. 486, 488 (W.D. Pa. 1944) (considering whether the contract in question
was subject to avoidance on constructive fraud grounds but rejecting claim based on exchange of fair
consideration); *Sw. Holdings, L.L.C., v. Kohlberg & Co.* (*In re Sw. Supermkts., LLC*), 325 B.R. 417, 431
(Bankr. D. Az. 2005) (noting that "if the underlying contracts are avoidable as fraudulent transfers, then the
Debtor did not receive reasonably equivalent value by satisfying an obligation that is void or voidable").

[214] *See* 5 Collier on Bankruptcy ¶ 548.03[5] (Alan N. Resnick & Henry J. Sommer eds., 16th ed) ("[A]n
obligation is incurred when it becomes legally binding under applicable nonbankruptcy law.") (citing
*Advanced Telecomm. Network, Inc. v. Allen* (*In re Advanced Telecomm. Network, Inc.*), 490 F.3d 1325 (11th
Cir. 2007) and *TSIC, Inc. v. Thalheimer* (*In re TSIC, Inc.*), 428 B.R. 103 (Bankr. D. Del. 2010) for the
proposition that obligations arising under settlement and severance agreements, respectively, incurred when
agreements executed by parties).

[215] *See* Section VI (setting forth the solvency analysis).

[216] Even Marx acknowledges that the Second 2009 Tax Allocation Agreement, which AFI has characterized as a
strict stand-alone agreement, is not as beneficial to ResCap as the First 2009 Tax Allocation Agreement. *See*
E-mail from W. Marx (Oct. 13, 2010) [ALLY_0245484] ("[AFI] would propose a new strict stand-alone
agreement with ResCap for which the ResCap Board would likely require a fairness opinion of outside
counsel . . . . This will likely be unpopular as the Board has already been presented and approved a more
beneficial agreement.").

[217] *Compare* First 2009 Tax Allocation Agreement, at RC40016379–84 [RC40016362], *with* Second 2009 Tax
Allocation Agreement, §§ 1.03D, 2.03 [RC00028796].

[218] *See* Second 2009 Tax Allocation Agreement, §§ 1.03D, 2.03 [RC00028796].

[219] *See id.* § 1.03D [RC00028796] ("For the avoidance of doubt, any [tax benefits] that are generated by the
ResCap Group in any taxable period (to the extent not previously utilized pursuant to this sentence in prior
periods) shall be taken into account and treated as available and unutilized in determining the Separate
ResCap Group Tax Liability for any subsequent periods . . . .").

Even when the Second 2009 Tax Allocation Agreement is considered on its own (and assuming that the First 2009 Tax Allocation Agreement was not enforceable and looking at ResCap's situation as it existed before the First 2009 Tax Allocation Agreement), serious questions arise as to whether ResCap received any consideration at all. The only foreseeable consequence of ResCap's entry into the Second 2009 Tax Allocation Agreement was the incurrence of an obligation by ResCap to pay AFI amounts of tax on account of excess inclusion income[220]—*an obligation that ResCap did not have prior to the Second 2009 Tax Allocation Agreement because it was a disregarded entity*—without any corresponding right to be compensated for its tax benefits. Again, the Second 2009 Tax Allocation Agreement contained no provision permitting any possibility of payments being made to ResCap.

Although an argument can be asserted that ResCap may have received value because the 2006 Amended Operating Agreement required that ResCap and AFI be parties to a tax allocation agreement,[221] such argument is unpersuasive in light of ResCap's financial condition at the time and the fact that the Second 2009 Tax Allocation Agreement did not provide for two-way payments. Although the Second 2009 Tax Allocation Agreement provides for "stand-alone" treatment, it provides for one-way stand-alone treatment in favor of AFI. To comply with the 2006 Amended Operating Agreement, the Second 2009 Tax Allocation Agreement should have provided for two-way stand-alone treatment, even if the parties did not believe that ResCap would be in a position to be able to use its losses any time soon. Moreover, given ResCap's financial condition and the fact that its obligation to pay taxes on excess inclusion income was known, the agreement could have been drafted to allow ResCap to use its substantial losses to offset the excess inclusion income, even though such offset is not available under federal tax laws. Based on the foregoing, the Examiner concludes that the evidence supports the proposition that ResCap received no consideration, much less fair consideration or REV in exchange for entering into the Second 2009 Tax Allocation Agreement.

In reaching this determination, the Examiner is conscious of the fact that AFI made significant capital contributions to ResCap in and around the time that the Second 2009 Tax Allocation Agreement was executed and may have conferred other benefits upon ResCap.[222] However, the Examiner finds no basis to link ResCap's entry into the Second 2009 Tax Allocation Agreement with any other transaction. The Investigation has uncovered no document or any other evidence suggesting that any transaction, including the payment of any capital contribution from AFI to ResCap, was conditioned or dependent on ResCap's entry into the Second 2009 Tax Allocation Agreement.

---

[220] Well before the Second 2009 Tax Allocation Agreement was entered in January 2011, Marx informed officers of both AFI and ResCap that one consequence of the Second 2009 Tax Allocation Agreement would be that ResCap would have to pay AFI income of the magnitude of approximately $6 million for 2009. *See* E-mail from W. Marx (Oct. 15, 2010), at ALLY_0424662 [ALLY_0424660]; E-mail from W. Marx (Nov. 2, 2010), at ALLY_0424660 [ALLY_0424660].

[221] 2006 Amended Operating Agreement, § 2(b)(iii) [ALLY_0041818].

[222] *See* Capital Contributions to ResCap Legal Entity as of January 31, 2012 [ALLY_PEO_0075634].

Based on the foregoing, the Examiner concludes that a claim to avoid the Second 2009 Tax Allocation Agreement on constructive fraudulent transfer grounds is likely to prevail. The impact of avoidance is to nullify the transfer in question and place the parties back in the position that they were prior to the transaction.[223] Voiding the Second 2009 Tax Allocation Agreement has two important implications. First, if the First 2009 Tax Allocation Agreement could be found to be enforceable as discussed in Section VII.K.2.a, it would give rise to a significant contractual claim against AFI. Second, the Debtors would be able to recover any amounts paid by ResCap to AFI under the Second 2009 Tax Allocation Agreement (regardless of whether or not the First 2009 Tax Allocation Agreement is enforceable). If the Second 2009 Tax Allocation Agreement is avoided, then any payments made pursuant to the agreement will not have been made for REV and may themselves be avoided as constructive fraudulent transfers. In addition, the Debtors may seek equitable remedies against AFI, such as unjust enrichment, to recover amounts paid under the Second 2009 Tax Allocation Agreement. The Examiner currently estimates those amounts to be, in the aggregate, approximately $50 million.[224]

### d. Potential Additional Basis To Set Aside A Tax Allocation Agreement Between A Parent Company And Its Subsidiary

The Examiner has also considered whether there are any grounds, in addition to constructive fraudulent conveyance, to challenge the Second 2009 Tax Allocation Agreement.

Courts generally agree that members of a consolidated tax filing group are free to adjust among themselves each member's rights and responsibilities regarding tax payments and refunds.[225] In the context of a parent corporation and its subsidiaries or affiliates, courts generally enforce the terms of tax allocation agreements absent evidence of fraud or overreaching.[226] Typically, courts express this proposition by stating that a tax allocation agreement will not be set aside absent "gross and palpable overreaching" by the parent company.[227] One factor courts

---

[223] *See Gibson v. United States* (*In re Russell*), 927 F.2d 413, at 417; *see also* 5 COLLIER ON BANKRUPTCY ¶ 548.10[2] (Alan N. Resnick & Henry J. Sommer eds., 16th ed.) ("Avoidance is the setting aside or nullification of a transaction. Nullification generally means that the transfer is retroactively ineffective and . . . the trustee may act as if the transfer had not occurred. If the trustee avoids an obligation, nullification means that the transferee acquired no rights as a result of the transaction and that the trustee need not consider the obligation valid as against the estate.").

[224] *See* Ordinary & Capital Losses Generated by ResCap Companies Analysis, prepared by AFI [ALLY_0424653].

[225] *See Unofficial Comm. of Unsecured Creditors v. PSS S.S. Co.* (*In re Prudential Lines, Inc.*), 928 F.2d 565, 570 (2d Cir. 1991); *W. Dealer Mgmt., Inc. v. England* (*In re Bob-Richards Chrysler-Plymouth Corp.*), 473 F.2d 262, 264–65 (9th Cir. 1973); *Superintendent of Ins. v. First Central Fin. Corp.* (*In re First Central Fin. Corp.*), 269 B.R. 481, 488–89 (Bankr. E.D.N.Y. 2001).

[226] *Franklin Sav. Corp. v. Franklin Sav. Ass'n* (*In re Franklin Sav. Corp.*), 159 B.R. 9, 29–30 (Bankr. D. Kan. 1993). *See also In re First Cent. Fin. Corp.*, 269 B.R. at 489–90; *In re All Prods. Co.,* 32 B.R. 811, 814 (E.D. Mich. 1983) (citing *In re Bob Richards Chrysler-Plymouth Corp*, 473 F.2d 262, 264 n.4 (9th Cir. 1973)).

[227] *See In re Franklin Sav. Corp.,* 159 B.R. at 30 (quoting 18A AM. JUR. 2d CONVERSION § 802 (Feb. 2013)); *see also In re Coral Petroleum, Inc.,* 60 B.R. 377, 389–90 (Bankr. S.D. Tex. 1986); *In re All Prods. Co.,* 32 B.R. at 814.

consider is whether entry into the contract in question was the result of a breach of fiduciary duty. For example, in *In re First Central Financial Corp.*, the court held that "in the absence of overreaching or breach of fiduciary duty in the creation or implementation of the [t]ax [a]llocation [a]greement, the [a]greement will be given effect. . . ."[228]

In short, a determination as to whether a parent has engaged in conduct that amounts to overreaching is extremely fact-specific, and the courts have established a high threshold to set aside a tax allocation agreement. The Examiner was able to locate only one example where a court determined that a tax allocation agreement between a parent and its subsidiary was the product of such improper conduct to warrant invalidating the contract. In *Lincoln Savings & Loan v. Wall*, a parent company was strapped for funds to meet debt service on a $51 million obligation and had stored up NOL carryforwards that it could use against its subsidiary's earnings.[229] In order to upstream funds from the subsidiary to the parent, tax agreements were executed that required the subsidiary to remit to its parent on a quarterly basis the tax it would owe based on its "net profits" calculated under GAAP.[230] As the tax agreements were interpreted and applied by the parent company, the subsidiary was required to forward all of its GAAP profits to the parent even though it owed no taxes on a stand-alone basis.[231] The court ultimately determined that because the subsidiary owed no taxes, it was in effect making unsecured loans to its parent when it remitted payments under the agreements.[232] The court referred to the tax allocation agreement as a "pretext for improperly stripping [the debtor] of its funds."[233] Moreover, the court also held that the tax allocation agreements at issue were improperly used to pass fictitious profits of contrived transactions from the subsidiary to the parent in order to fund the parent's needs for its own obligations.[234]

The Examiner considers below whether ResCap's entry into the Second 2009 Tax Allocation Agreement was the result of overreaching on the part of AFI such as would warrant setting aside the contract.

>        e. *The Second 2009 Tax Allocation Agreement Is Not The Product Of Overreaching By AFI*

As set forth in Section V.D.2.c(3), the Second 2009 Tax Allocation Agreement purports to be a pure stand-alone agreement in that ResCap is obligated to pay to AFI its hypothetical

---

[228] *In re First Cent. Fin. Corp.,* 269 B.R. at 500–01 (citing *In re Franklin Sav. Corp.,* 159 B.R. at 33); *Nisselson v. Drew Indus.* (*In re White Metal Rolling & Stamping Corp.*), 222 B.R. 417, 423 (Bankr. S.D.N.Y. 1998); *see also In re Franklin Sav. Corp.,* 159 B.R. at 30, 33 (holding that "the agreement will control unless it can be shown that the advantaged member has acted 'unfairly' in the fiduciary relationship." According to the court, "the concept of unfairness equates to 'gross and palpable overreaching'").

[229] *Lincoln Sav. & Loan v. Wall*, 743 F. Supp. 901, 908 (D.D.C. 1990).

[230] *Id*.

[231] *Id*. at 910.

[232] *Id*. at 911.

[233] *Id*. at 910.

[234] *Id*. at 911.

separate tax liability each year. However, the Second 2009 Tax Allocation Agreement does not appear to operate as a pure stand-alone agreement because there is nothing requiring AFI to compensate ResCap for any refund that ResCap might be entitled to on a stand-alone basis. There is simply no provision in the Second 2009 Tax Allocation Agreement that provides for any payment (other than an adjustment for an erroneous overpayment) to ResCap. Additionally, the agreement was executed at a time (January 2011) when all of the available evidence suggests that ResCap was in financial distress and could ill afford to make payments it otherwise would not be required to make. Accordingly, on its face, the Second 2009 Tax Allocation Agreement only benefits AFI and appears to be objectively unfair to ResCap and its creditors. Moreover, in the absence of a tax allocation agreement, ResCap, as a disregarded entity, would have had no liability whatsoever to make tax payments.

Although the Second 2009 Tax Allocation Agreement may have been unfair to ResCap, it would be difficult to find that it was the result of "gross and palpable overreaching" by AFI. As is discussed in Section VII.K.2.d, courts are highly reluctant to set aside tax allocation agreements that are willingly entered into between a parent and its subsidiary, even if such agreements only benefit the parent or appear one-sided.

Here, there are several facts that militate both for and against a finding that the Second 2009 Tax Allocation Agreement should be set aside on equitable grounds. On one hand, ResCap was insolvent when the Second 2009 Tax Allocation Agreement was executed. AFI proposed an agreement which imposed a one-sided payment obligation on ResCap at a time when ResCap could least afford to dispense with its capital.

Moreover, section 2(b)(iii) of the 2006 Amended Operating Agreement contains an express requirement that ResCap and AFI maintain "an income tax allocation agreement that shall provide for two-way sharing payments based on the separately calculated tax liability or benefit of ResCap." The Second 2009 Tax Allocation Agreement would fail to qualify as a "two-way-sharing agreement," even under the most expansive interpretation of that phrase. Accordingly, the Second 2009 Tax Allocation Agreement would likely be found to be in violation of the 2006 Amended Operating Agreement.[235] This violation further supports the conclusion that the agreement is unfair based on the standard established by the parties.[236]

On the other hand, the Investigation revealed no direct evidence that AFI exerted undue influence over ResCap to execute the Second 2009 Tax Allocation Agreement.[237] To the

---

[235] A third-party beneficiary creditor might bring suit to invalidate the Second 2009 Tax Allocation Agreement as violation of the 2006 Amended Operating Agreement, but its remedy would be limited to specific performance. *See* 2006 Amended Operating Agreement, §11.

[236] Interestingly, Marx is of the view that the First 2009 Tax Allocation Agreement was probably not in compliance with the 2006 Amended Operating Agreement because it provided, in his view, better than "stand-alone" treatment to ResCap. Int. of W. Marx, Apr. 18, 2013, at 34:3–12.

[237] *See id.* at 131:2–12 ("No, no, there was no coaching or counseling. It was, you know, my recollection of this whole back and forth was that as soon as we brought up our issue with the first agreement, [Young] was like, 'Oh yeah, I see that. You know, that's okay. If we need to have some further discussion, let's do it.' You know, he got it. He seemed to agree with what we were saying. And you know, there was no coaching, cajoling, convincing. It was just, oh yeah, I understand that. That makes sense.").

contrary, the Investigation revealed that the ResCap Board engaged in a thorough review process before approving the Second 2009 Tax Allocation Agreement. Significantly, and as described further below, the Second 2009 Tax Allocation Agreement was approved by the Independent Directors of ResCap, who had their own counsel. Counsel to the Independent Directors reviewed and commented on the agreement and engaged in direct discussions with AFI concerning the terms of the agreement.[238] Although the ResCap Board's decision to approve the Second 2009 Tax Allocation Agreement was questionable, the decision-making process was thorough and ResCap's entry into the agreement appears to have been of its own free will.

Moreover, unlike the facts in *Lincoln Savings & Loan v. Wall,* the Investigation has uncovered no evidence that the Second 2009 Tax Allocation Agreement was devised by AFI as a nefarious scheme to extract significant payments from ResCap. Indeed, putting aside ResCap's favorable position under the First 2009 Tax Allocation Agreement, the Second 2009 Tax Allocation Agreement actually had little impact on ResCap as compared to its status as a disregarded entity. As a result of ResCap's disregarded entity status, AFI had the right to use ResCap's tax benefits *before* the parties entered into a tax allocation agreement for the 2009 tax year. Moreover, the amount of the payments that ResCap made to AFI under the Second 2009 Tax Allocation Agreement on account of excess inclusion income (an obligation that ResCap did not have as a disregarded entity prior to entering into the Second 2009 Tax Allocation Agreement) was relatively small, totaling approximately $50 million over a three-year period.[239]

Finally, the evidence supports the finding that AFI proposed the Second 2009 Tax Allocation Agreement because it did not want to be contractually obligated under the First 2009 Tax Allocation Agreement to have to make what it described as "potentially large capital contributions" to ResCap.[240] Notably, AFI had provided ResCap with approximately $2.7 billion in capital in the year preceding entry into the Second 2009 Tax Allocation Agreement. AFI's position was that any additional capital contributions to ResCap needed to be approved by the AFI Board.[241] Putting aside the issue of whether AFI's position was correct, the evidence establishes that the "capital contribution" issue was the reason for AFI proposing the Second 2009 Tax Allocation Agreement.[242] As such, from AFI's perspective, the Second 2009 Tax Allocation Agreement was intended to put the parties in a neutral or "stand-alone" position.

---

[238] E-mail from W. Marx (Dec. 22, 2010), at ALLY_0424667 [ALLY_0424667]; E-mail from M. Connolly (Dec. 16, 2010), at EXAM10432518 [EXAM10432517].

[239] *See* Exhibit V.D.2.c(3)—2.

[240] *See* E-mail from W. Marx (Oct. 18, 2010) [ALLY_0424659].

[241] *See id*.

[242] *See id*.

It appears, however, that ResCap's obligation to pay tax on excess inclusion income was simply not given significant consideration by the parties.[243]

In short, while the Second 2009 Tax Allocation Agreement may not be fair to ResCap under the circumstances, after considering and weighing the evidence uncovered during the Investigation, the Examiner does not believe that the agreement was the result of "overreaching" by AFI that would warrant setting the agreement aside. The Examiner's conclusion is influenced by the fact that the Second 2009 Tax Allocation Agreement was approved by ResCap's Independent Directors who were advised by their own counsel.

Accordingly, given the high threshold established by the cases to set aside a written tax allocation agreement, while a close question, the Examiner concludes it is more likely than not that a claim to set aside the Second 2009 Tax Allocation Agreement on equitable theories relating to overreaching would not prevail. As such, ResCap would not be entitled to seek equitable remedies against AFI, including a claim based on unjust enrichment.[244]

### f.   The ResCap Board's Approval Of The Second 2009 Tax Allocation Agreement Likely Does Not Constitute A Breach Of Fiduciary Duty

The Examiner has also considered whether ResCap's entry into the Second 2009 Tax Allocation Agreement gives rise to a breach of fiduciary duty claim against ResCap's directors. In general, fiduciary duties consist of the: (1) duty of due care; and (2) duty of loyalty and good faith.[245] New York courts have held that, under Delaware law, directors and officers of an insolvent wholly owned subsidiary owe fiduciary duties to the subsidiary and its

---

[243] Although Marx informed Young that one consequence of the Second 2009 Tax Allocation Agreement would be ResCap's obligation to pay AFI $6 million in tax on excess inclusion income, the Investigation has revealed that this was not considered by the ResCap Board. *See* Int. of P. West, Apr. 16, 2013, at 95:14–96:13, 97:25–98:8. Notably, during the interview of Isaac Grossman, tax counsel for the Independent Directors of ResCap, he stated that he was not aware of the possibility of ResCap having to pay tax on excess inclusion income in his review and analysis of the Second 2009 Tax Allocation Agreement. *See* Int. of I. Grossman, Apr. 16, 2013, at 27:22–28:9.

[244] *See Goldman v. Met Life Ins. Co*., 841 N.E.2d 742, 746–47 (N.Y. 2005) (holding that under New York law, equitable remedies are inappropriate when remedies at law are available under an existing contract); *Petrello v. White*, 412 F. Supp. 2d 215, 233 (E.D.N.Y. 2006) ("New York Courts and the Second Circuit have consistently held 'that the existence of a written agreement precludes a finding of unjust enrichment.'") (citations omitted). The Examiner's conclusion in Section VII.K.2.e of the Report does not impact his earlier conclusion that the Second 2009 Tax Allocation Agreement may be avoided as a constructive fraudulent transfer and payments made thereunder may be recoverable on equitable grounds, including unjust enrichment.

[245] *See McMullin v. Beran*, 765 A.2d 910, 917 (Del. 2000); *Malone v. Brincat*, 722 A.2d 5, 10 (Del. 1998); *see also Buckley v. O'Hanlon*, No. 04-955, 2007 WL 956947, at *3 (D. Del. Mar. 28, 2007); *Official Comm. of Unsecured Creditors of Fedders N. Am. v. Goldman Sachs Credit Partners L.P.* (*In re Fedders N. Am., Inc.*), 405 B.R. 527, 539 (Bankr. D. Del. 2009).

creditors, in addition to the parent corporation.[246] When ResCap entered into the Second 2009 Tax Allocation Agreement in January 2011, ResCap was insolvent. Accordingly, the ResCap Board had a duty to act in the best interest of ResCap and its creditors when it authorized the company to enter into the agreement.

Here, a difficult question is presented as to whether the ResCap Board may have breached its fiduciary duties to ResCap and its creditors. On the one hand, the Second 2009 Tax Allocation Agreement was unfavorable to ResCap, especially in comparison to the First 2009 Tax Allocation Agreement approved by the ResCap Board (but not signed by Young on behalf of ResCap). Although the Second 2009 Tax Allocation Agreement may have been described as a "stand-alone" tax agreement, the agreement contained no provision providing even a possibility that ResCap would receive any payments from AFI (other than an adjustment for an erroneous overpayment). The ResCap Board knew this, or should have known this, as Morrison Cohen, counsel to the Independent Directors, characterized key aspects of the agreement as being "very unfair" and suggested substantive revisions.[247] Certain of Morrison Cohen's comments were incorporated into the Second 2009 Tax Allocation Agreement, but those comments simply clarified ResCap's ability to use carryovers of tax benefits as an offset in calculating its stand-alone tax liability in future years. They did not address the fact that there was no possibility that ResCap could receive a cash payment under the agreement. Yet, the ResCap Board approved entry into the Second 2009 Tax Allocation Agreement anyway.

On the other hand, as described above, the Investigation revealed that the ResCap Board engaged in a thorough review and approval process. A draft of the Second 2009 Tax Allocation Agreement was discussed at a November 5, 2010 ResCap Board meeting and then discussed again at a subsequent ResCap Board meeting that took place on December 9, 2010.[248] Following that meeting, Morrison Cohen reviewed and commented on the agreement.[249] Then on December 21, 2010, a conference call occurred between ResCap, AFI

_____

[246] *See* J. Haskell Murray, "*Latchkey Corporations": Fiduciary Duties in Wholly Owned, Financially Troubled Subsidiaries,* 36 DEL. J. CORP. L. 577, 597–78 (citing *Official Comm. of Unsecured Creditors of RSL Com Primecall, Inc. v. Beckoff* (*In Re RSL COM Primecall, Inc.*), Nos. 01-11457-69, Adv. 03-2176, 2003 WL 22989669, at \*13 (Bankr. S.D.N.Y. Dec. 11 2003) ("It would be absurd to hold that the doctrine that directors owe special duties after insolvency is inapplicable when the insolvent company is a subsidiary of another corporation. That is precisely when a director must be most acutely sensitive to the needs of a corporation's separate community of interests, including both the parent shareholder and the corporation's creditors."); *Roselink Investors, L.L.C. v. Shenkman*, 386 F. Supp. 2d 209, 215 (S.D.N.Y. 2004) ("[D]irectors of a wholly-owned subsidiary, who otherwise would owe fiduciary duties only to the parent, also owe fiduciary duties to creditors of the subsidiary when the subsidiary enters 'the zone of insolvency.'")).

[247] E-mail from M. Connolly (Dec. 16, 2010), at EXAM10432518 [EXAM10432517].

[248] *See* Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Nov. 5, 2010, at RC40018848 [RC40018729]; E-mail from T. Hamzehpour (Dec. 16, 2010), at EXAM10432502 [EXAM10432501].

[249] E-mail from M. Connolly (Dec. 16, 2010), at EXAM10432518 [EXAM10432517].

and Morrison Cohen, in which it appears that ResCap and Morrison Cohen "pressed AFI fairly hard about" and "took several runs at" the fairness issue.[250]

Based on the foregoing, it would be difficult to prove that the ResCap Board breached its "duty of care,"[251] which focuses on the decision-making process and generally requires a fiduciary to inform himself of all material information reasonably available before making a business decision.[252] Indeed, as described in Section VII.E, a director's or officer's reliance on legal or other expert advice is almost a per se defense to a claim based on a breach of a duty of care.[253]

The fact that the Second 2009 Tax Allocation Agreement was considered and approved by the Independent Directors also cuts strongly against any claim that the ResCap Board may have breached its "duty of loyalty." Here, despite the fact that certain aspects of the Second 2009 Tax Allocation Agreement may be unfair, the Investigation has uncovered no evidence to establish that the ResCap Board engaged in self-dealing. To the contrary, the Investigation has revealed that the Board, including the Independent Directors, specifically considered whether any "interested directors" had a conflict of interest, and concluded there were no conflicts.[254] There is also evidence that the Independent Directors believed that the Second 2009 Tax Allocation Agreement was favorable to ResCap.[255]

_____

[250] *See* Conference call invitation (subject: "Discuss ResCap—Ally Tax Allocation Agreement") from T. Hamzehpour [EXAM10902438]; *see also* E-mail from W. Marx (Dec. 20, 2010), at EXAM10432501 [EXAM10432501]; E-mail from W. Marx (Dec. 22, 2010), at ALLY_0424667 [ALLY_0424667].

[251] As described above, a breach based on a violation of the duty of care (in the absence of willful misconduct or bad faith) is subject to the exculpation and indemnification provisions contained in the 2008 ResCap Amended LLC Agreement. *See* 2008 ResCap Amended LLC Agreement, §§ 17, 18 [KL000000433]. Therefore, even if a breach of the duty of care can be sustained, absent any proof of willful misconduct or bad faith, such a claim will not prevail.

[252] *Brandt v. Hicks, Muse & Co.* (*In re Healthco Int'l, Inc.*), 208 B.R. 288, 305 (Bankr. D. Mass. 1997) (applying Delaware law.)

[253] *See, e.g.*, *Hollinger Int'l, Inc. v. Black*, 844 A.2d 1022, 1084 (Del. Ch. 2004), *aff'd*, 872 A.2d 559 (Del. 2005) (dismissing a breach of fiduciary duty claim because defendant had sufficiently informed themselves by seeking advice of counsel). Notably, the defense may be overcome, but requires a showing that the directors failed to consider information "so obvious that the board's failure to consider it was grossly negligent regardless of the expert's advice or lack of advice." *Brehm v. Eisner*, 746 A.2d 244, 262 (Del. 2000); *see also Cal. Pub. Emps.' Ret. Sys. v. Coulter*, No. 19191, 2002 WL 31888343, at *12 (Del. Ch. Dec. 18, 2002) (director's reliance on expert valuation report when approving acquisition was "grossly negligent" where "[e]ither the [directors] knew the report was based on grossly inaccurate data . . . or they worked very hard not to know that information").

[254] *See* Int. of P. West, Apr. 16, 2013, at 55:22–57:23.

[255] *See id.* at 65:7–22.

Finally, the Examiner has considered whether the ResCap Board may have breached its duty of good faith, which is generally treated as being subsumed within the duty of loyalty.[256] A breach of duty of good faith may be found where:

> 1) the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation; 2) where the fiduciary acts with the intent to violate applicable positive law; or 3) where the fiduciary intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties.[257]

Here, there are facts that suggest that the ResCap Board's decision to authorize ResCap to enter into the Second 2009 Tax Allocation Agreement was not done with the purpose of advancing the best interests of ResCap. As described above, the ResCap Board approved an agreement that: (1) counsel to the Independent Directors characterized originally as "very unfair," (2) provided no basis for ResCap to get paid for AFI's use of ResCap's tax benefits, and (3) resulted in ResCap having to pay AFI taxes on account of excess inclusion income at a time when ResCap was in financial distress.

Moreover, as discussed above, it is likely that the Second 2009 Tax Allocation Agreement would be found to be in violation of the 2006 Amended Operating Agreement, which further supports the conclusion that the agreement was not in the best interest of ResCap.

On the other hand, the Investigation has uncovered no evidence that the ResCap Board *intentionally* acted against ResCap's interests or intentionally disregarded its duties. To the contrary, the Independent Directors were advised by independent counsel who was tasked with reviewing and commenting on the Second 2009 Tax Allocation Agreement. The evidence establishes that counsel for the Independent Directors identified potential issues with the agreement and conveyed them to the Independent Directors. There is further evidence that counsel for the Independent Directors engaged in discussions with AFI about their concerns and pushed AFI hard to revise the agreement. Moreover, the evidence suggests that counsel for the Independent Directors ultimately became comfortable with the Second 2009 Tax Allocation Agreement after certain of its comments were incorporated into the agreement.

Although counsel was not successful in remedying the lack of reciprocal payment obligations under the agreement, it appears that the Independent Directors were under the belief that Morrison Cohen's comments that were incorporated into the agreement adequately

---

[256] *See, e.g.*, *Nagy v. Bistricer*, 770 A.2d 43, 49 n.2 (Del. Ch. 2000) ("If it is useful at all as an independent concept, the good faith iteration's utility may rest in its constant reminder (1) that a fiduciary may act disloyally for a variety of reasons other than personal pecuniary interest; and (2) that, regardless of his motive, a director who consciously disregards his duties to the corporation and its stockholders may suffer a personal judgment for monetary damages for any harm he causes.").

[257] *Burtch v. Seaport Capital, LLC* (*In re Direct Response Media, Inc.*), 466 B.R. 626, 652 (Bankr. D. Del. 2012) (citing *Brehm v. Eisner* (*In re Walt Disney Co. Derivative Litig.*), 906 A.2d 27, 67 (Del. 2006)).

addressed any fairness concerns and made the agreement a "two-way street."[258] Although the correctness of the Independent Directors' characterization of the Second 2009 Tax Allocation Agreement as being a "two-way street" is debatable, the Independent Directors relied on the advice of counsel and kept informed of the status of negotiations.

In short, although certain aspects of the Second 2009 Tax Allocation Agreement are unfavorable to ResCap, the Examiner concludes that the evidence does not support the proposition that the ResCap Board intentionally flouted their duties or failed to advance ResCap's interests.

Based on the foregoing, while a close question, the Examiner concludes that it is more likely than not that a claim for breach of the fiduciary duty of good faith against the members of the ResCap Board would not prevail.[259]

---

[258] *See* Int. of P. West, Apr. 16, 2013, at 28:2–15, 90:6–91:24.

[259] Based on the fact that a claim for breach of fiduciary duty against the ResCap Board is unlikely to prevail, any related claim for aiding and abetting a breach of fiduciary duty against AFI would also fail. *See Marino v. Grupo Mundial Tenedora, S.A*., 810 F. Supp. 2d 601, 613 (S.D.N.Y. 2011); *Official Comm. of Unsecured Creditors of Hydrogen, L.L.C. v. Blomen* (*In re Hydrogen, L.L.C*.), 431 B.R. 337, 352 (Bankr. S.D.N.Y. 2010). *See* Section VII.G.1 (providing a detailed discussion of claims based on aiding and abetting breach of fiduciary duty).