## VII. REVIEW AND ANALYSIS OF ESTATE CAUSES OF ACTION IMPLICATED BY AFFILIATE TRANSACTIONS AND THE RELATIONSHIP AND COURSE OF DEALING AMONG RESCAP, AFI, ALLY BANK, AND CERBERUS

### L.  CONTRACTUAL ISSUES AND RELATED CLAIMS

The transactions between ResCap and ResCap Subsidiaries, on the one hand, and AFI and Ally Bank on the other hand, may implicate a number of contractual issues and related claims, including the following:

> 1. Claims for breach of, and tortious interference with, the 2005 Operating Agreement, and fraud, arising from the 2006 Bank Restructuring;
>
> 2. Contractual claims related to the MMLPSA, the Pipeline Swap, the MSR Swap, and the Broker Agreement; and
>
> 3. Claims regarding the Debtors' indemnity obligations for loan modifications under the January 30 Letter Agreement and the A&R Servicing Agreement.

These issues are addressed below.[1]

### 1. Contract And Tort Claims Related To 2006 Bank Restructuring

Pursuant to the analysis in Section V.A.2.b, summarized in Section V.A.1.a(5), the Examiner has concluded that ResCap did not receive reasonably equivalent value in the 2006 Bank Restructuring, in large measure because ResCap was not fully compensated for the non-voting nature and other qualities of the IB Finance Class M Shares that ResCap received in the transaction.[2] There are troubling facts associated with the 2006 Bank Restructuring and, after summarizing the circumstances of that transaction, this Section considers whether the estate may have viable fraud claims or contract claims arising from the 2005 Operating Agreement with respect to the 2006 Bank Restructuring.[3]

#### a. Summary Of Factual Background

In 2006, ResCap in essence sold the assets and liabilities of Old GMAC Bank to AFI in exchange for a non-voting, partial ownership interest in IB Finance, the newly established holding company for Ally Bank (f/k/a GMAC Automotive Bank).[4] That interest was

---

[1]  In addition to these issues, there is a further contractual issue regarding the enforceability of the First 2009 Tax Allocation Agreement, which is addressed in Section VII.K.

[2]  ResCap had a controlling interest in Old GMAC Bank; it received a non-voting, non-controlling interest in relatively unmarketable tracking shares of IB Finance. *See* Section V.A.1.a (2006 Bank Restructuring narrative); Section V.A.2.b (2006 Bank Restructuring REV explanation); Appendix V.A.2.b (supporting data and calculations).

[3]  Similar potential claims by third-party beneficiaries of the 2005 Operating Agreement are addressed in Section VIII.C.5.b. Elsewhere in this Report, the Examiner considers the 2006 Bank Restructuring with respect to: (1) alter ego/veil piercing; (2) equitable subordination; (3) fraudulent transfer claims; and (4) fiduciary duty claims. *See* Sections VII.A.1.f, VII.C.4.c(1), VII.F.6.f(1)(a), VII.E.2.a (respectively).

[4]  For a more detailed narrative of the 2006 Bank Restructuring, refer to Section V.A.1.

represented by two million IB Finance Class M Shares.[5] The Independent Directors, who (together with the ResCap Board) approved the transaction, were told by ResCap and AFI management and directors that the transfer was necessary in order to close the Cerberus investment in AFI.[6] ResCap stood to benefit from the Cerberus transaction through avoidance of a credit rating decline (although no formal valuation of this benefit was conducted at the time). In order to ensure that Cerberus would not become a bank holding company through its ownership interest in AFI, the Cerberus PSA required the removal of Old GMAC Bank (a federal thrift) from the Cerberus ownership chain, and specified that the assets and liabilities of Old GMAC Bank were to be transferred to Ally Bank (a Utah industrial bank).[7] But accomplishing this, and obtaining the expected credit rating impact of the transaction, did not require that ResCap be left with no voting interest in Ally Bank, nor did it require ResCap to be under-compensated for its loss of control. The Cerberus PSA, in fact, did not specify how that transfer was to be accomplished nor how Ally Bank and its holding company were to be structured; indeed, it specifically acknowledged that ResCap could be given sole ownership of Ally Bank.[8] In particular, the Cerberus PSA did not mandate that ResCap trade its interest in Old GMAC Bank, at book value, for non-voting interests in a newly established holding company that would own the industrial bank formerly known as GMAC Automotive Bank.[9]

Indeed, ResCap and AFI management initially explored multiple potential ownership structures for the reorganized bank, only one of which called for the approach ultimately implemented, i.e., 100% AFI voting control of IB Finance, only non-voting interests in IB Finance for ResCap, and proportional earnings distribution to ResCap based on Ally Bank's mortgage operation.[10] The evidence shows, however, that the Independent Directors were never told that any such alternative structures were possible or were considered (or could or should have been considered by the ResCap Board), much less told whether such alternative

---

[5]   ResCap received $1.161 billion, which it contributed to IB Finance. After closing, ResCap was immediately called upon to contribute additional capital of $360 million to the mortgage division of Ally Bank. *See* Section V.A.1.a.

[6]   *See* Walker Report, at 9 [RC40008925]. Note that David Walker, a ResCap director, also had an affiliation with AFI, as did others involved in this transaction. *See also* Memorandum, Proposed Restructuring of GMAC U.S. Banking Entities, dated May 5, 2006, at 1 [EXAM10258913] (attached to E-mail from K. Sabatowski to T. Melzer and T. Jacob (May 4, 2006) [EXAM10258912]) (explaining that absent completion of the 2006 Bank Restructuring described therein, including AFI ownership of the voting shares, the Cerberus PSA would not close).

[7]   Cerberus PSA, § 4.1(e)(i) [CERB000521].

[8]   The Cerberus PSA did not specify a particular structure for GMAC Automotive Bank's future ownership other than that it had to be "directly or indirectly wholly owned" by AFI. *Id.; see also id.* Ex. H, at 1 ("[AFI] *or ResCap* will wholly own the Industrial Bank, or it will be co-owned by [AFI] and ResCap.") (emphasis added).

[9]   As addressed in Section V.A.1.a, interviews of Cerberus officers are consistent with the conclusion that Cerberus did not require a specific form of ownership for the restructured bank and, in any event, no such requirement was reflected in the Cerberus PSA.

[10]   *See* Draft Memorandum, IB Alternatives, dated Apr. 4, 2006, at 1 [EXAM11237439] (attached to E-mail from D. Applegate to B. Paradis (Apr. 4, 2006) [EXAM11237438]).

structures were viable, or the reason or reasons that they were rejected in favor of the structure ultimately adopted, i.e., under which ResCap's shares of IB Finance were non-controlling and non-voting.[11]

Further, the April 20, 2006 memorandum by ResCap General Counsel David Marple,[12] which was addressed to David Applegate and copied to multiple ResCap officials,[13] was never shared with the Independent Directors. That memorandum stated that "[AFI] maintains that it must control the Industrial Bank in order for its automotive businesses to be covered under the 'call option' provided by [the Cerberus PSA]."[14] Marple's memorandum posited three ways in which the contemplated transaction conflicted with the 2005 Operating Agreement:[15] (1) the loss of control would violate the "arm's-length" and "fair value" requirement for agreements between ResCap and AFI;[16] and the new structure would contravene (2) the AFI affiliate investment prohibition;[17] and (3) the requirement that ResCap run its business separately from that of AFI.[18] Marple's memorandum also observed that "if either of the independent directors believes that the amendment is a 'close call' under the Operating Agreement—they will likely veto the amendment."[19]

The misgivings concerning the loss of "controlling interest in a bank" expressed by Applegate, and his proposal in an April 24, 2006 memorandum to AFI President William Muir of an alternative structure whereby ResCap would manage and control at least 51% of the restructured bank,[20] were apparently never shared with the Independent Directors.[21] Instead, a

---

[11]  *See* Section V.A.1.a.

[12]  *See* Memorandum, GMAC Bank Restructuring, dated Apr. 20, 2006 [EXAM11248642].

[13]  The memorandum was also copied to William Solomon, AFI General Counsel, to whom Marple had at least a dotted line reporting relationship. *See* Int. of D. Marple, Jan. 22, 2013, at 46:15–18 ("So my solid line was into Bruce Paradis. My dotted was into Bill. Bill probably saw fewer spaces between those dots than others, but, you know.").

[14]  Memorandum, GMAC Bank Restructuring, dated Apr. 20, 2006, at 2 [EXAM11248642].

[15]  *See id.* at 3–5.

[16]  2005 Operating Agreement, § 2(b) [ALLY_0140795].

[17]  *Id.* § 2(a)(ii).

[18]  *Id.* § 2(f).

[19]  Memorandum, GMAC Bank Restructuring, dated Apr. 20, 2006, at 6 [EXAM11248642].

[20]  Memorandum, ILC Ownership and Control, dated Apr. 24, 2006 [EXAM11248641].

[21]  When interviewed by the Examiner's Professionals, Muir suggested that he did not even consider Applegate's proposal to be a serious proposal. *See* Int. of W. Muir, Mar. 1, 2013, at 26:2–7 ("Well, I would say my recollection is that it wasn't a—how can I put it? It wasn't a seriously considered proposition. It was not something that, I don't think, Dave himself ever really thought was reasonable and was going to fly. But it didn't hurt to ask."); *see also* Int. of E. Schenk, Apr. 24, 2013, at 55:2–14 (Schenk, who was counsel to the Independent Directors, was unfamiliar with the contents of Applegate's memorandum).

few days after Applegate wrote to Muir, ResCap Chairman (and AFI Chairman) Eric Feldstein explained to the Independent Directors how AFI would "divest [ ] itself of its thrift charter," as required by Cerberus.[22]

In this first presentation to the Independent Directors on the topic, Feldstein's memorandum advised that "[o]ne alternative considered" was that of ResCap obtaining the charter of a "new industrial bank," into which Old GMAC Bank's business could be transferred, but that "this is not a viable option" due to time constraints.[23] Thus, while not explicitly stating that the structure was mandated by the terms of the Cerberus PSA, Feldstein's memorandum "propose[d] an alternative" in order to move forward with the Cerberus PSA, whereby Old GMAC Bank would be restructured in a manner such that its assets, liabilities, management, employees, and operations would be transferred to Ally Bank; "economic ownership" would be split proportionally between AFI and ResCap; and "voting ownership . . . would remain 100% with [AFI]."[24] Feldstein's memorandum said:

> Given the proposed structure preserves the economics to ResCap and that this transaction would only be completed in connection with the sale of 51% of [AFI] (which should result in [AFI] and ResCap ratings being de-linked from GM's ratings), this approach is prudent and sound for ResCap.[25]

The memorandum further advised the Independent Directors that "[t]he ResCap Board . . . is prepared to approve the bank restructuring and related waivers in the Operating Agreement" and noted that "each of you (as independent directors) must also approve the waivers if they materially and adversely affect the rights of the rated debt."[26] Feldstein's memorandum, which concluded by expressing the hope that "you can agree with the proposed course of action," and a request for the Independent Directors' "thoughts,"[27] did not mention: (1) the alternative structures that were considered in Applegate's April 4 memorandum; (2) that such structures had been rejected by AFI management, apparently as an accommodation to GM; or (3) that Applegate had misgivings about the loss of control.

A few days later, through their counsel (Erika Schenk of Bryan Cave), the Independent Directors raised with Marple a number of questions concerning the proposal; however, apparently accepting that the structure was a necessary aspect of the transaction with

---

[22] Memorandum, Proposed Restructuring of GMAC U.S. Banking Entities, dated May 5, 2006, at 1 [EXAM10258913] (attached to E-mail from K. Sabatowski to T. Melzer and T. Jacob (May 4, 2006) [EXAM10258912]). This memorandum was copied to everyone who was then a member of the ResCap Board.

[23] *Id*.

[24] *Id.*

[25] *Id*. at 2.

[26] *Id.*

[27] *Id.*

Cerberus, the Independent Directors simply noted the subject of "the economic stake of ResCap and the voting rights in the IB"[28] as an issue, but did not ask any questions about it. Marple—who two weeks earlier had advised Applegate and others that "[i]t is not reasonable to believe that ResCap's leadership would agree to transfer a material business to a third-party under a similar arrangement"[29]—provided only a sparing response: "let me know if you would like any further information in connection with your consideration of this matter."[30] A more complete and candid response would have disclosed the possibility of alternative structures obviating or ameliorating control issues, or would have provided information or advice regarding his views of the contemplated transaction in light of the restrictions on inter-company transactions under the 2005 Operating Agreement.[31] The Investigation has found no evidence that the Independent Directors or their counsel questioned Marple's response.[32] More generally, the Investigation has revealed no evidence showing that the Independent Directors were ever informed of the possibility of alternative ownership structures in connection with the 2006 Bank Restructuring which, inter alia, may have included proportional voting control[33] or compensation to ResCap for its loss of control.[34]

The AFI officials in control of the transaction and related communications with the Independent Directors included the chief architects and proponents of the sale of 51% of AFI to Cerberus—Feldstein and David Walker—and given the contents of Marple's memorandum and Applegate's memorandum, they had reason to fear that the Independent Directors would find that the transaction was not in the best interests of ResCap and its creditors. The Examiner concludes that material information regarding possible alternative structures was withheld from the Independent Directors by AFI or officials under its control, as was the fact that accommodation of GM's call option played a role in, and may have been a primary reason

_____

[28] E-mail from E. Schenk to D. Marple (May 10, 2006) [JACOB.000010]. Melzer was aware that "voting shares would have been better." Int. of T. Melzer, Oct. 10, 2012, at 206:18–25, 208:25–209:7.

[29] Memorandum, GMAC Bank Restructuring, dated Apr. 20, 2006, at 4 [EXAM11248642].

[30] Memorandum, GMAC Bank Restructuring, dated May 12, 2006, at Question 4 [ALLY_0401600].

[31] *See* Memorandum, GMAC Bank Restructuring, dated Apr. 20, 2006 [EXAM11248642].

[32] Schenk said that she could not "recall with specificity" whether she asked for additional information. Int. of E. Schenk, Apr. 24, 2013, at 89:19–90:1. And she said in her experience if Marple "knew we were interested in an issue, he was always very good about coming back even if we hadn't requested something and saying . . . I just saw this and here it is." *Id.* at 68:9–19. No additional correspondence between Marple and the Independent Directors or their counsel on the subject of voting rights was located in the Investigation (nor any reference to such correspondence), and the Examiner concludes that the evidence supports the proposition that no such correspondence occurred.

[33] *See* Int. of S. Khattri, Oct. 25, 2012, at 73:10–17 ("[Q:] Was there any presentation to the independent directors that suggested that it was an option that ResCap receive something other than a non-voting interest? [A:] To the best of my knowledge no.").

[34] *See* Int. of T. Jacob, Apr. 17, 2013, at 77:9–19.

for, AFI's rejection of alternative structures at that time.[35] Instead, incomplete and, consequently, misleading information was provided. It is apparent, moreover, that the AFI proponents of the Cerberus PSA communicated the urgent view, and the Independent Directors were led to believe,[36] that the failure of ResCap to execute the 2006 Bank Restructuring in the proposed manner would cause the Cerberus PSA to fail to the detriment of both AFI and ResCap.[37]

In November 2006, after approval by the FDIC and DFI of the restructuring of GMAC Automotive Bank,[38] the ResCap Board, including the Independent Directors, were presented with the Walker Report in connection with their November 20, 2006 vote on the restructuring of Old GMAC Bank.[39] The Walker Report stated: "Successful completion of the bank restructuring is a condition to the closing of the [AFI] Sale."[40] It explained, further, that if the "[AFI] Sale" did not close, statements from ratings agencies "clearly indicate prompt and adverse actions,"[41] e.g., "Moody's would relink [AFI's] credit rating with GM's rating."[42] Given the linkage between AFI's credit rating and that of ResCap, the Walker Report explained, "we expect that if [AFI] is downgraded, ResCap will be downgraded to non-investment grade."[43]

The Walker Report included no explanation, however, for the non-voting status of the IB Finance Class M Shares under the transaction the ResCap Board was being asked to approve.

---

[35] As noted in Section VI.A.1.a, Muir's suggestion that alternative structures were rejected by AFI in order to ensure that Ally Bank spoke to regulators with only "one voice" is difficult to reconcile with the record. *See* Int. of W. Muir, Mar. 1, 2013, at 35:19–36:15.

[36] *See, e.g.*, Walker Report, at 9 [RC40008925] ("Successful completion of the bank restructuring is a condition to the closing of the [AFI] Sale. This sale is intended to de-link ResCap's credit rating from GM, and may facilitate ratings upgrades . . . . Conversely, if the [AFI] Sale does not close . . . statements from the ratings agencies clearly indicate prompt and adverse actions.").

[37] *See, e.g.*, Int. of W. Muir, Mar. 1, 2013, at 22:7–19. ("And so, as a part of that process, the ResCap executives—I would put it in the category, 'Well, it doesn't hurt to ask'—said, 'Well, we'd like to control the bank.' And basically they weren't given that opportunity, because we didn't feel it was in the best interests of the bank or the parent company to let that happen. And, since—you know, basically it was ResCap's choice as to whether or not they wanted to participate along the terms that we were providing, which we felt were economically very fair and in everybody's best interests and going to be a good deal for one and all.").

[38] *See* DFI, Findings, Conclusions & Order Conditionally Approving Application, Nov. 15, 2006 [CERB003827]; *see also* FDIC Approval Letter from S. L. Thompson (Nov. 15, 2006) [GOLDIN00093066].

[39] *See* Walker Report [RC40008925]. The ResCap Board had a draft of the Walker Report a month earlier. *See* Draft Report to the Board of Directors of ResCap, dated Oct. 16, 2006, at RC00016557 [RC00016501] (included in the materials circulated to the ResCap Board in advance of its October 19, 2006 meeting).

[40] Walker Report, at 9 [RC40008925].

[41] *Id.*

[42] *Id.*

[43] *Id.*

The Walker Report stated that notwithstanding the non-voting shares it would receive, "ResCap's control over the bank would . . . be unchanged," because AFI (the putative owner of all of the voting shares in IB Finance) was and would remain the sole member of ResCap and thus "controls the ResCap [B]oard."[44]

Moreover, the Walker Report notably mentioned only two of the three relevant provisions of the 2005 Operating Agreement highlighted in Marple's April 20, 2006, memorandum.[45] In particular, the Walker Report did not mention the requirement under section 2(b) of the 2005 Operating Agreement that any material transaction between ResCap and AFI be "on terms and conditions that are . . . arm's-length . . . and for fair value."[46] Similarly, it did not mention Marple's prior conclusion and advice to management that the proposed restructuring ran afoul of those section 2(b) requirements.[47]

The conduct surrounding communications with the Independent Directors with respect to the 2006 Bank Restructuring suggests that ResCap and AFI officials chose to manage the information flow on this subject to minimize the likelihood that the Independent Directors would "veto"[48] the transaction. The failure specifically to mention section 2(b) in the Walker Report appears to have been an intentional effort to manage the vote of the Independent Directors so that they would not veto the amendment. Even Applegate, who expressed misgivings to Muir in his April 24 memorandum, had said in an earlier e-mail that "[t]he goal is to solidify our leadership of the process and end ownership."[49]

The 2006 Bank Restructuring was approved unanimously by the ResCap board members present at its November 20, 2006 meeting,[50] and the ResCap Board granted a "waiver of the Operating Agreement,"[51] although only sections 2(a) and 2(f) thereof were specifically

---

[44]  *Id.* at 9–10.

[45]  Memorandum, GMAC Bank Restructuring, dated Apr. 20, 2006 [EXAM11248642].

[46]  2005 Operating Agreement, § 2(b) [ALLY_0140795].

[47]  *See* Memorandum, GMAC Bank Restructuring, dated Apr. 20, 2006, at 4 [EXAM11248642]. In addition, while accommodating GM's call option was a key predicate for the restructuring proposal that the ResCap Board was considering (a fact not mentioned in the Walker Report), the Walker Report said that any risk of GM exercising the option, leaving ResCap without access to bank funding, was remote. *See* Walker Report, at 7 [RC40008925]. The Walker Report suggested that by the time GM was in any financial condition to do so, ResCap would have acquired a new industrial bank of its own. *See id.*

[48]  Memorandum, GMAC Bank Restructuring, dated Apr. 20, 2006, at 6 [EXAM11248642].

[49]  E-mail from D. Applegate to J. Barr and R. Hall (Mar. 21, 2006) [EXAM11740324].

[50]  The minutes reflect that ResCap CEO Bruce Paradis was not present. Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Nov. 20, 2006, at RC40006837 [RC40006748]. Paradis had been appointed to AFI's "Executive Committee" a few days earlier. *See* Minutes of a Regular Meeting of the Board of Directors of GMAC LLC, Nov. 16, 2006, at ALLY_0002358 [ALLY_0002260].

[51]  Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Nov. 20, 2006, at RC40006839 [RC40006748]. Under section 8 of the 2005 Operating Agreement, such a waiver could only be valid if "a majority of . . . ResCap's Board . . . including a majority of the Independent Directors" approved it.

mentioned in the ResCap board minutes memorializing that action.[52] There was no fairness opinion or any independent third-party valuation report in connection with the transaction.[53] ResCap was under-compensated for its interest in Old GMAC Bank: the REV shortfall was between $390-465 million.[54] The difference in the equity value of Old GMAC Bank and the 2 million IB Finance Class M Shares was between $533 and $608 million.[55]

### b. Fraud

The facts just outlined are, as noted above, disconcerting. Despite the presence of the 2005 Operating Agreement, the Independent Directors clearly were not fully advised regarding the transaction, and therefore made a less-than fully informed decision when they agreed to a waiver under the 2005 Operating Agreement. ResCap received considerably less value in the form of non-voting IB Finance Class M Shares than that which it gave up, i.e. ownership of Old GMAC Bank, and the Independent Directors may well have pressed for ResCap to receive more value if they had known the facts that were kept from them.

The analysis of potential claims in this area is subject to an initial question about whether a wholly owned subsidiary can bring a claim sounding in fraud against its parent and sole shareholder. In a 1972 *per curiam* ruling, the Minnesota Supreme Court affirmed the dismissal of a fraud counterclaim brought by a former subsidiary against its parent on several grounds, one of which was that "[w]e think the subsidiary is without standing to challenge the acts of its parent."[56] The case, which cites no authority for this proposition, has not been cited for this proposition in the 41 years since it was issued, and involved complex facts. Nearly twenty years later, an Illinois federal district court, in a much more developed discussion, allowed a contract claim by a wholly owned subsidiary against its parent to proceed, stating, inter alia, a parent cannot "reap[ ] the benefits of its subsidiary's independent corporate existence . . .

---

[52] *Id.* The minutes state that "full and robust deliberation" preceded the ResCap Board's vote. *Id.* The Investigation has revealed no suggestion that the discussion addressed the very information which appears to have been purposefully left out of related correspondence and reports. *See* Int. of S. Khattri, Oct. 25, 2012, at 73:10–16 (stating there was no presentation to the Independent Directors suggesting any option for ResCap to receive other than non-voting interest); Int. of E. Feldstein, Dec. 14, 2012, at 112:25–113:10 (stating there was no discussion with the Independent Directors of voting shares versus non-voting shares); Int. of D. Walker, Nov. 28, 2012, at 147:22–23 ("I'm saying I don't recall whether they were presented with that."); Int. of E. Schenk, Apr. 24, 2013, at 57:22–58:1 ("[Q:] So, and to your knowledge, was it always presented to them that [AFI] would retain 100 percent of voting interest in the bank? [A:] Yes.").

[53] *See* Int. of T. Melzer, Oct. 10, 2012, 213:5–15 ("So as to not leave the . . . bank discussion open, there were aspects of that transaction that concern me. But, on balance, all things considered, I felt it was in the best interests of all stakeholders . . . . [W]e did not have independent valuations of the interests in this particular case. But I think it was probably a book value transaction, which is not uncommon, and I wasn't uncomfortable with that approach.").

[54] *See* Section V.A.2.b; Appendix V.A.2.b.

[55] *See* Section V.A.2.b; Appendix V.A.2.b.

[56] *See Blenda Life Corp. v. Blenda Life, Inc.*, 196 N.W.2d 925, 927 (Minn. 1972) (per curiam) (terming this issue "dispositive").

while at the same time side-stepping its reciprocal pit-falls."[57] This issue of suits by wholly owned subsidiaries against parents is further complicated here because the power that a parent corporation typically enjoys with respect to its wholly owned subsidiary is qualified to a certain extent in the AFI-ResCap relationship by the structure and procedures created by the 2005 Operating Agreement.[58] The Examiner's Professionals have not been able to identify other judicial precedents addressing a situation of this kind. Whether Minnesota courts today would apply an unsupported statement made in a *per curiam* decision from 1972 to bar claims in the circumstances of the present case is far from clear.

Assuming, however, that a wholly owned subsidiary can bring a claim sounding in fraud against its parent and sole shareholder, the *Wagoner* rule and the doctrine of *in pari delicto* are likely to present an impediment to such claim in this instance.

### (1) Choice Of Law And Statute Of Limitations

New York law governs the 2005 Operating Agreement.[59] In New York courts, however, a contractual choice-of-law provision does not govern a cause of action sounding in tort, absent express agreement or an exceptionally broad choice of law provision (neither of which is the case here).[60] Minnesota courts, on the other hand, recognize that "tort claims 'rais[ing] issues of performance' under a contract . . . are governed by the contract's choice-of-law clause."[61] Accordingly, and consistent with the choice-of-law analysis in Section VII.F.2.a, a potential action for fraud is examined both with respect to New York law and with respect to the law of the jurisdiction that is likely to be applicable based on general choice-of-law principles. For the reasons outlined in Section VII.F.2.a, the Examiner therefore considers the substantive law and the statutes of limitations under the law of New York and of Minnesota.

The limitations period for fraud under either New York[62] or Minnesota[63] law is six years. Under Minnesota law the statute does not begin to run until "the discovery by the aggrieved party of the facts constituting the fraud."[64] However, it is plaintiff's burden to establish that it

---

[57] *Stamp v. Inamed Corp.*, 777 F. Supp. 623, 627–28 (N.D. Ill. 1991); *cf. Teleglobe USA Inc. v. BCE, Inc. (In re Teleglobe Commc'ns Corp.)*, 493 F.3d 345, 371–72 (3d Cir. 2007) (reasoning similarly in the context of a privilege dispute).

[58] 2005 Operating Agreement [ALLY_0140795].

[59] *Id.* § 13.

[60] *See H.S.W. Enters., Inc. v. Woo Lae Oak, Inc.*, 171 F. Supp. 2d 135, 141 n.5 (Bankr. S.D.N.Y. 2001).

[61] *Ceres Envtl. Serv., Inc. v. Arch Specialty Ins. Co.*, 853 F. Supp. 2d 859, 865 (D. Minn. 2012); *see also Fla. State Bd. of Admin. v. Law Eng'g & Envtl. Serv., Inc.*, 262 F. Supp. 2d 1004, 1012–15 (D. Minn. 2003) (concluding under Minnesota law that contractual Florida choice-of-law provision applies to tort claims, including breach of fiduciary duty, negligence, and negligent misrepresentation, because they are all "closely related to the parties' contractual relationship").

[62] N.Y. C.P.L.R. § 213(8).

[63] MINN. STAT. § 541.05, subd. 1(6).

[64] *Id.*

could not have discovered the facts any sooner than within six years of when the action is commenced.[65] Similarly, New York law holds that a claim for fraud is timely if commenced either within six years of the date the fraud occurs, or within two years of the date the fraud is discovered or through reasonable diligence should have been discovered, whichever is longer.[66] The question of when a fraud reasonably should have been or could have been discovered is one of fact[67] or a mixed question of fact and law.[68] In this instance, because the conduct underlying the claim of fraud continued at least until November 20, 2006, and ResCap's estate has the benefit of the two-year extension under the Bankruptcy Code,[69] the statute of limitations should not be an impediment.

### (2) Standing (The Wagoner Rule) And In Pari Delicto

Under the *in pari delicto* doctrine,[70] or its Second Circuit analogue—the *Wagoner* rule[71]—"[w]hen it comes to common law claims . . . a bankruptcy trustee is often barred from bringing claims on behalf of the debtor's estate because . . . [the doctrine] generally precludes a wrongdoer . . . from recovering from another wrongdoer."[72] While the *Wagoner* rule is technically addressed to standing in the bankruptcy context, whereas *in pari delicto* is a state

---

[65] *Alliance Bank v. Dykes*, No. A12-0455, 2012 Minn. App. Unpub. LEXIS 1253, at *44 (Minn. Ct. App. Dec. 31, 2012) (citing *Jane Doe 43C v. Diocese of New Ulm*, 787 N.W.2d 680, 684 (Minn. Ct. App. 2010)), *review denied*, 2013 Minn. LEXIS 166 (Minn. Mar. 19, 2013); *see also Veldhuizen v. A.O. Smith Corp.*, 839 F. Supp. 669, 675–76 (D. Minn. 1993) (limitation period begins to run when plaintiff is "aware of facts sufficient to put a reasonable person on notice that a fraud claim may exist").

[66] *See Liberty Co. v. Boyle*, 708 N.Y.S.2d 122, 125 (N.Y. App. Div. 2000); *see also Bobash, Inc. v. Festinger*, No. 03908/05, 839 N.Y.S.2d 431 (Table) (N.Y. Sup. Ct. Mar. 30, 2007), *appeal dismissed as academic*, 868 N.Y.S.2d 747 (N.Y. App. Div. 2008).

[67] *See Barry v. Barry*, 78 F.3d 375, 380 (8th Cir. 1996).

[68] *See Saphir Int'l, SA v. UBS PaineWebber Inc.*, 807 N.Y.S.2d 58, 59 (N.Y. App. Div. 2006).

[69] *See* 11 U.S.C. § 108(a).

[70] *See Kirschner v. KPMG, LLP*, 938 N.E.2d 941, 950–51 (N.Y. 2010); *State v. AAMCO Automatic Transmissions, Inc.*, 199 N.W.2d 444, 448 (Minn. 1972); *Christians v. Grant Thornton, LLP*, 733 N.W.2d 803, 810 (Minn. Ct. App. 2007).

[71] *Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114, 118–20 (2d Cir. 1991).

[72] *Picard v. HSBC Bank PLC*, 454 B.R. 25, 29 (S.D.N.Y. 2011), *amended on other grounds*, No. 11 Civ. 763 (JSR), 2011 WL 3477177 (S.D.N.Y. Aug. 8, 2011). "'[T]here is no practical difference between the [*in pari delicto* and *Wagoner*] doctrines, for both seek to test whether, on the face of the pleadings, there is wrongdoing imputed to the plaintiffs that prevents them from pursuing their claims.'" *Cobalt Multifamily Investors I, LLC v. Shapiro*, 857 F. Supp. 2d 419, 429 n.5 (S.D.N.Y. 2012) (quoting *Krys v. Sugrue (In re Refco Sec. Litig.)*, 779 F. Supp. 2d 372, 374 n.1 (S.D.N.Y. 2011), *aff'd sub nom. Krys v. Butt*, 486 F. App'x 153 (2d Cir. 2012)). Federal courts in other jurisdictions address the issue without reference to the *Wagoner* "standing" approach. *See generally McHale v. Citibank, N.A. (In re 1031 Tax Grp., LLC)*, 420 B.R. 178, 197 (Bankr. S.D.N.Y. 2009) (noting that the First, Third, Fifth, Eighth, and Eleventh Circuits do not follow the Second Circuit's approach); *Moratzka v. Morris (In re Senior Cottages of Am., LLC)*, 482 F.3d 997, 1004 (8th Cir. 2007) ("We agree with the First, Third, Fifth, and Eleventh Circuits that the collusion of corporate insiders with third parties to injure the corporation does not deprive the corporation of standing to sue the third parties . . . .").

law affirmative defense,[73] "[t]he two concepts are similar and are both grounded in common law agency principles."[74] Both may be resolved on a motion to dismiss.[75]

The New York Court of Appeals has emphasized when reviewing the law of *in pari delicto* (in the context of a fraud claim) on certified questions from both the Second Circuit and the Delaware Supreme Court that "all corporate acts . . . are subject to the presumption of imputation. . . . [T]here are strong considerations of public policy underlying this precedent."[76] "A corporation must . . . be responsible for the acts of its authorized agents even if particular acts were unauthorized."[77]

To the extent that the circumstances regarding the 2006 Bank Restructuring are suggestive of wrongdoing on the part of AFI, through its agents (e.g., Feldstein, Walker), they are also suggestive of wrongdoing on the part of ResCap, through its agents—both insiders (such as Marple and Applegate), and those with dual affiliation (again, e.g., Feldstein, Walker). There is little doubt that, absent an applicable exception, a fraud claim by the trustee against AFI would be barred by the *Wagoner* rule and *in pari delicto*.

"[T]he principle that a wrongdoer should not profit from his own misconduct is so strong in New York that we have said the defense applies even in difficult cases and should not be 'weakened by exceptions.'"[78] Therefore, exceptions to these doctrines are narrowly construed.[79] The primary exception to the *in pari delicto* defense is the "adverse interest exception," which acts to prevent the imputation to a corporation of its agents' wrongdoing in circumstances where such imputation is not defensible under agency law principles from which the *in pari delicto* doctrine derives.[80] This is, however, the "most narrow of exceptions."[81]

Thus, "[t]o come within the exception, the agent must have totally abandoned his principal's interest and be acting entirely for his own or another's purposes [and] [i]t cannot

---

[73] *See* Kirschner, 938 N.E.2d at 946 n.3.

[74] *McHale*, 420 B.R. at 197 (noting the "near total congruency of the two concepts" and citing *Wight v. BankAmerica Corp.*, 219 F.3d 79, 86 (2d Cir. 2000)).

[75] *See Kirschner*, 938 N.E.2d at 946 n.3.

[76] *Id.* at 951 (citation omitted).

[77] *Id.* at 950 (citation omitted); *see also State v. AAMCO Automatic Transmissions, Inc.*, 199 N.W.2d 444, 448 (Minn. 1972) ("Generally, anyone who engages in a fraudulent scheme forfeits all right to protection, either at law or in equity.") (quoting *Kansas City Operating Corp. v. Durwood*, 278 F.2d 354, 357 (8th Cir. 1960)).

[78] *Kirschner*, 938 N.E.2d at 950 (citation omitted).

[79] *See McConnell v. Commonwealth Pictures Corp.*, 166 N.E.2d 494, 497 (N.Y. 1960) ("We are not working here with narrow questions of technical law. We are applying fundamental concepts of morality and fair dealing not to be weakened by exceptions.").

[80] *See Kirschner*, 938 N.E.2d at 952; *see also Christians v. Grant Thornton, LLP*, 733 N.W.2d 803, 810 (Minn. Ct. App. 2007) ("The 'adverse interest' exception prevents imputation, however, if the individual's conduct provides *no* benefit to the corporation.") (citing RESTATEMENT (SECOND) OF AGENCY § 228(1) (1958)).

[81] *Kirschner*, 938 N.E.2d at 952.

be invoked merely because he has a conflict of interest or because he is not acting primarily for his principal."[82] "Total abandonment" is not shown merely by actions that are "detrimental to the corporation's interest" or even "entirely adverse to" the corporation.[83]

In analyzing whether the adverse interest exception may apply, so that the estate's putative fraud claim against AFI would not be *in pari delicto*, the result may turn upon whether the restructuring of Ally Bank should be considered in isolation, or considered in the context of the Cerberus investment transaction in which it played a part. There are arguments in support of either approach—with potentially opposing results under the adverse interest exception—but on balance the more reasonable approach is the latter. First, it is clear that all actors considered the restructuring in the context of the Cerberus PSA.[84] Second, and fundamentally, it is clear that the 2006 Bank Restructuring occurred because of the Cerberus transaction. The Investigation has revealed no evidence suggesting otherwise; it was a requirement under the Cerberus PSA that the Old GMAC Bank be removed from the AFI ownership chain so that Cerberus, as the new 51% shareholder, would not become a bank holding company.[85]

Considered in this manner, the adverse interest exception is unlikely to apply. It is common ground that the Cerberus transaction was conceived and executed with the intention of benefitting AFI and ResCap. By bringing in a new majority owner, Cerberus, AFI and ResCap hoped and expected that GM would cease to be a drag on the companies' credit ratings. There is no reason to believe that this view was anything other than sincere. Thus, regardless of whether ResCap suffered a detriment with respect to the 2006 Bank Restructuring itself—even a very sizable one—it is difficult to conclude that any relevant conduct by the ResCap directors and officers involved was akin to "outright theft or looting or embezzlement—where the insider's misconduct benefits only himself or a third party."[86]

Accordingly, it appears that the adverse interest exception would not be applicable and, if that is so, then the fraud claim would be blocked by the *Wagoner* rule or *in pari delicto*.

Some courts have pointed to an "innocent insider" exception to the *Wagoner* rule or *in pari delicto*.[87] However, to the extent it applies under New York or Minnesota law, "innocent insider" is a much narrower exception than its name suggests. In a thoughtful 2004 decision

---

[82] *Id.* (internal quotation marks omitted).

[83] *Mediators, Inc. v. Manney (In re Mediators, Inc.)*, 105 F.3d 822, 827 (2d Cir. 1997) (citing *Center v. Hampton Affiliates, Inc.*, 488 N.E.2d 828, 829–30 (N.Y. 1985)).

[84] *See, e.g.*, Int. of E. Feldstein, Dec. 14, 2012, at 125:13–21; Int. of B. Paradis, Dec. 14, 2012, at 120:16–21; Int. of W. Muir, Mar. 1, 2013, at 20:11–21:5; Int. of D. Applegate, Mar. 14, 2013, at 46:11–25; Int. of S. Khattri, Oct. 25, 2012, at 103:3–104:13, Int. of T. Melzer, Mar. 22, 2013, at 83:22–84:7; Int. of T. Jacob, Nov. 7, 2012, at 136:25–137:5; Int. of L. Zukauckas, Oct. 19, 2012, at 130:24–131:17.

[85] *See* Cerberus PSA, § 4.1(e)(i) [CERB000521].

[86] *Kirschner*, 938 N.E.2d at 952.

[87] For example, in *SEC v. Lee*, 720 F. Supp. 2d 305 (S.D.N.Y. 2010), the court commented that the "innocent insider" exception may save a claim otherwise subject to *in pari delicto* when "there is another agent within the corporation who had no knowledge of the fraud and who had the will and the ability to stop the fraud had it come to his or her attention." *Id.* at 332.

a court "reject[ed]" the "so-called 'innocent insider' exception,"[88] and provided an extensive analysis of its origin and misapplication. The court explained that, at most, "innocent insider" functions as a gloss on the so-called "sole actor" exception[89] to the adverse interest exception. "[U]nless the adverse interest exception to the presumption of imputation applies, it is immaterial whether innocent insiders exist[ ]; the agent is still acting on behalf of the company, and his actions will be imputed to the company notwithstanding the existence of those innocent insiders."[90]

Because the adverse interest exception is likely not applicable here, there is no occasion to consider whether the "sole actor" exception to the adverse interest exception should apply given AFI's status as ResCap's sole shareholder. There likewise is no occasion to consider whether the Independent Directors should be regarded as "innocent insiders" whose role and performance under the 2005 Operating Agreement would defeat application of the sole actor exception here were it otherwise applicable.[91]

Notwithstanding the foregoing analysis of the *Wagoner* rule and the *in pari delicto* defense, these doctrines are subject to a degree of interpretation if for no other reason than the complexity of the range of "exceptions to exceptions." And, as noted, if a court were to analyze the "adverse interest" exception more narrowly—considering only the 2006 Bank Restructuring and not the larger Cerberus investment transaction of which it was a part— conceivably it could find that these doctrines do not bar the claim. While a close question, the Examiner concludes it is more likely than not that the *Wagoner* rule or the affirmative

---

[88] *Ernst & Young v. Bankr. Servs., Inc. (In re CBI Holding Co., Inc.)*, 311 B.R. 350, 372 (S.D.N.Y. 2004), *aff'd in part and rev'd in part*, 529 F.3d 432 (2d Cir. 2008); *see also McHale v. Citibank, N.A. (In re 1031 Tax Grp., LLC)*, 420 B.R. 178, 203 (Bankr. S.D.N.Y. 2009) ("While other courts have employed the innocent insider exception as an independent exception to both the *Wagoner* rule and *in pari delicto doctrine*, this Court is skeptical that this is the law. New York state cases do not recognize 'innocent insider' as an independent exception that stands alone from the adverse interest exception.").

[89] "This exception to the adverse interest exception, styled the 'sole actor rule,' operates most clearly in the context of a corporation owned and managed by a single person. When that person, in his role as manager, defrauds the corporation in order to benefit only himself, he has acted outside of the scope of his agency; technically, the agent's fraudulent actions should not be imputed to the company pursuant to the 'adverse interest' exception." *Ernst & Young*, 311 B.R. at 373; *see also* RESTATEMENT (THIRD) OF AGENCY § 5.04 note c (2006) (viewing "innocent insider" as a gloss on the "sole actor" exception).

[90] *Ernst & Young*, 311 B.R. at 372; *see also Ernst & Young*, 529 F.3d at 447 n.5 ("Judge Wood's analysis of the innocent insider exception and its likely genesis as a product of courts' confusion regarding the relationship between the normal rule of imputation, the adverse interest exception to that rule, and the sole actor exception to that exception is extremely persuasive.").

[91] *See generally Breeden v. Kirkpatrick & Lockhart LLP (In re Bennett Funding Grp., Inc.)*, 336 F.3d 94, 101 (2d Cir. 2003). It is not entirely clear whether the "innocent insider" gloss on the "sole actor" exception to the "adverse interest" exception exists under Minnesota law, as there appear to be no cases precisely on point. *See, e.g.*, *Sussel Co. v. First Fed. Sav. & Loan Ass'n of St. Paul*, 238 N.W.2d 625, 628 (Minn. 1976) (supporting sole actor exception to independent fraudulent act exception to imputation principle but not addressing "innocent insider"). In any event, as noted, there is no occasion to consider "innocent insider" because the "adverse interest" exception does not apply in the first place.

defense of *in pari delicto* would prevail, thereby precluding the estate's fraud claim against AFI. Because the *Wagoner* rule and *in pari delicto* analysis are close questions, which a court may view differently, the fraud claim is also considered on the merits in the following Section.

### (3) The Claim And Its Elements

The elements of a claim for fraud under New York law are: "(1) a material misrepresentation or omission of fact (2) made by defendant with knowledge of its falsity (3) and intent to defraud; (4) reasonable reliance on the part of the plaintiff; and (5) resulting damage to plaintiff."[92] The elements under Minnesota law are substantially similar: "(1) a false representation . . . of a past or existing material fact susceptible of knowledge; (2) made with knowledge of the falsity of the representation or made without knowing whether it was true or false; (3) with the intention to induce [plaintiff] to act in reliance thereon; (4) that the representation caused [plaintiff] to act in reliance thereon; and (5) that [plaintiff] suffered pecuniary damages as a result of the reliance."[93]

The law in both jurisdictions recognizes instances in which silence, i.e., non-disclosure rather than "affirmative misrepresentation,"[94] may be the premise for fraud. "Special circumstances"[95] where there may be such a duty to disclose include:

> First, "[o]ne who speaks must say enough to prevent his words from misleading the other party." Second, "[o]ne who has special knowledge of material facts to which the other party does not have access may have a duty to disclose these facts to the other party." Third, "[a] duty to disclose facts may exist when a fiduciary relationship exists between the parties . . . ."[96]

Thus, non-disclosure typically serves as a premise for a claim of fraud "only when the party concealing the material fact is under a legal or equitable obligation to communicate that fact to the other party who in turn is entitled to disclosure of the material fact."[97]

---

[92] *Del Carmen Onrubia de Beeck v. Costa*, 959 N.Y.S.2d 628, 637 (N.Y. Sup. Ct. 2013) (quoting *Crigger v. Fahnestock & Co.*, 443 F.3d 230, 234 (2d Cir. 2006)); *see also Ross v. Louise Wise Servs., Inc.*, 868 N.E.2d 189, 195 (N.Y. 2007).

[93] *Valspar Refinish, Inc. v. Gaylord's, Inc.*, 764 N.W.2d 359, 368 (Minn. 2009).

[94] *Kaufman v. Cohen*, 760 N.Y.S.2d 157, 165 (N.Y. App. Div. 2003).

[95] *Trenholme v. QRS Diagnostic, LLC*, No. A05-2472, 2006 WL 2601664, at *3 (Minn. Ct. App. Sept. 12, 2006) (citing *Klein v. First Edina Nat'l Bank*, 196 N.W.2d 619, 622 (Minn. 1972)).

[96] *Trenholme*, 2006 WL 2601664, at *3 (quoting *Heidbreder v. Carton*, 645 N.W.2d 355, 367 (Minn. 2002); *Klein*, 196 N.W.2d at 622) (citations omitted).

[97] *Trenholme*, 2006 WL 2601664, at *3 (citing *Richfield Bank & Trust Co. v. Sjogren*, 244 N.W.2d 648, 650 (Minn. 1976)); *see also Kaufman*, 760 N.Y.S.2d at 165 ("[A] fraud cause of action may be predicated on acts of concealment where the defendant had a duty to disclose material information.").

"Concealment," as distinguished from "non-disclosure," may also serve as a premise for a claim of fraud: "Concealment of a fact can be as effective a misrepresentation as an outright lie . . . ."[98] Accordingly:

> [I]f a party conceals a fact material to the transaction, and peculiarly within his own knowledge, knowing that the other party acts on the presumption that no such fact exists, it is as much a fraud as if the existence of such facts were expressly denied, or the reverse of it expressly stated.[99]

Similarly, there can be circumstances where a duty to disclose arises from the possession of superior knowledge:

> Under New York law, a duty to disclose material facts arises in one of three ways: (1) where the parties stand in a confidential fiduciary relationship, (2) *where one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge,* or (3) where a party to a business transaction has made a partial or ambiguous statement, on the theory that once a party has undertaken to mention a relevant fact to the other party it cannot give only half of the truth.[100]

Finally, "[o]ne who speaks must say enough to prevent his words from misleading the other party."[101] Failure to do so, again, serves as a premise for a claim of fraud. "A misrepresentation may be made by an affirmative statement that is itself false or by concealing or not disclosing certain facts that render facts disclosed misleading."[102]

The evidence described above demonstrates that the information which these AFI and dual-hat ResCap insiders provided to the Independent Directors regarding the contemplated transaction could only be rendered non-misleading by more complete disclosure. This is

---

[98] *Thorp Credit & Thrift Co. v. Pommerer (In re Pommerer)*, 10 B.R. 935, 939 (Bankr. D. Minn. 1981) (citing *In re Schnabel*, 61 F. Supp. 386, 392 (D. Minn. 1945)); *see also* RESTATEMENT (SECOND) OF TORTS § 550 (1977) ("One party to a transaction who by concealment or other action intentionally prevents the other from acquiring material information is subject to the same liability to the other, for pecuniary loss as though he had stated the nonexistence of the matter that the other was thus prevented from discovering.").

[99] *Thomas v. Murphy*, 91 N.W. 1097, 1098 (Minn. 1902).

[100] *Abu Dhabi Commercial Bank v. Morgan Stanley & Co.*, No. 08 Civ. 7508(SAS), 2012 WL 4762039, at *3 (S.D.N.Y. Oct. 5, 2012).

[101] *Klein*, 196 N.W.2d at 622 (citation omitted); *see also Am. Computer Trust Leasing v. Boerboom Int'l, Inc.*, 967 F.2d 1208, 1212 (8th Cir. 1992) (stating that fraud occurs "when disclosure is necessary to clarify misleading information already disclosed").

[102] *Heidbreder v. Carton*, 645 N.W.2d 355, 367 (Minn. 2002) (citing *M.H. v. Caritas Family Servs.*, 488 N.W.2d 282, 289 (Minn. 1992)).

particularly true of Feldstein's May 5, 2006 note to the Independent Directors,[103] and the Walker Report.[104] Considered in the context of the 2005 Operating Agreement, which could only function as intended if all insiders dealt in good faith with the Independent Directors, partial disclosures take on added significance—even more so in light of the unqualified trust the Independent Directors held for the dual-hat AFI directors.[105]

Hence, whether viewed in light of the requirement at law not to stand idly by while the Independent Directors proceeded on the basis of mistaken knowledge, or the requirement at law not to provide only "half truth," the facts respecting this transaction appear to support the claim.

In order to succeed on a claim of fraud, the estate would have to establish scienter, i.e., false representation (or concealment) made with intent to defraud (New York) or intent to induce reliance (Minnesota). The standards are similar. "[S]hort of the defendant's own admission, the plaintiff can often prove knowing falsehood only by circumstantial evidence. Such evidence must not be merely speculative, but if it is strong enough, it is not only admissible but may meet the clear and convincing standard."[106]

Under New York law, "knowledge of falsity or reckless pretense of knowledge may establish scienter."[107] Similarly, under Minnesota law, "[t]here is no doubt of fraudulent intent when the misrepresenter knows or believes the matter is not as he or she represents it to be."[108] "Fraudulent intent is, in essence, dishonesty or bad faith. What the misrepresenter knows or

---

[103] Memorandum, Proposed Restructuring of GMAC U.S. Banking Entities, dated May 5, 2006 [EXAM10258913] (attached to E-mail from K. Sabatowski to T. Melzer and T. Jacob (May 4, 2006) [EXAM10258912]).

[104] Walker Report [RC40008925].

[105] "[W]ith respect to management that was running the company when Tom [Jacob] and I got involved . . . ResCap management and . . . [AFI] management and there were representatives of [AFI] including the chairman and CEO and the CFO and so forth that were on the board of ResCap . . . . [W]e had really the utmost confidence in those individuals and their motivations at that point in time. . . . [W]e were appropriately relying on that." Int. of T. Melzer, Mar. 22, 2013, at 17:3–15.

[106] DAN B. DOBBS, PAUL T. HAYDEN, & ELLEN M. BUBLICK, THE LAW OF TORTS § 665 (2d ed. 2012); *see also* RESTATEMENT (SECOND) OF TORTS § 525 (1977) (requiring a "purpose" of inducing reliance). Under Minnesota law, however, proof of fraud is not subject a heightened evidentiary standard. *See Humphrey v. Alpine Air Prods., Inc*., 500 N.W.2d 788, 790 (Minn. 1993) ("Minnesota common law . . . favors the use of the preponderance of the evidence standard in a civil fraud case."); *cf. Merrick Gables Ass'n, Inc. v. Hempstead*, 691 F. Supp. 2d 355, 361 (E.D.N.Y. 2010) (noting that under New York law, the clear and convincing standard applies).

[107] *Bd. of Educ. v. Sargent*, 539 N.Y.S.2d 814, 820 (N.Y. App. Div. 1989).

[108] *Noske v. Friedberg* 713 N.W.2d 866, 876 (Minn. Ct. App. 2006) (quoting *Florenzano v. Olson* 387 N.W.2d 168, 173 (Minn. 1986).

believes is the key to proof of intent. Wrongful intent, as a state of mind, is rarely proved directly, e.g. by an admission of bad faith, but is normally established through circumstantial evidence."[109]

In this regard, as already outlined, there is little question that AFI directors and ResCap directors and management with obvious loyalties to AFI had more complete knowledge of the background of the 2006 Bank Restructuring, and that the Independent Directors were knowingly kept in the dark. Marple's memorandum,[110] for example, went to Applegate, who at the time in addition to being ResCap COO and a ResCap Board member, was a board member of GMAC Mortgage Holdings LLC (a non-ResCap subsidiary of AFI). It also went to Bruce Paradis, ResCap CEO and ResCap Board member, and later a member of AFI's "Executive Committee." Marple himself had a reporting relationship to William Solomon, AFI General Counsel, who also was a recipient of the April 20, 2006 memorandum. There is no basis to conclude that the memorandum and its contents were ever shared with the Independent Directors.

Applegate's April 24, 2006 memorandum[111]—which attached a copy of Marple's April 20 "GMAC Bank Restructuring" memorandum[112] and expressed misgivings about the proposed transaction structure—was addressed to Muir (AFI President) and copied to (1) Sanjiv Khattri (AFI Board member and CFO, as well as ResCap Board member); (2) Walker (AFI CFO for Mortgage Operations, CFO and board member of GMAC Mortgage Group, as well as ResCap Board member); and (3) Paradis (member of AFI's "Executive Committee"). Karen Sabatowski (GMAC Mortgage), another recipient of Applegate's April 24, 2006 memorandum, sent Feldstein's (AFI CEO and Chairman, and ResCap Board member) May 5, 2006 "Proposed Restructuring" note to the two ResCap Independent Directors. Marple sent, and Sabatowski and Walker were copied on, the May 12, 2006 response memorandum to the questions posed by the Independent Directors and their counsel on May 10, 2006.[113]

It appears that Walker, whose report to the ResCap Board would later be the basis of the ResCap Board's vote in favor of the 2006 Bank Restructuring, did not address Marple's obvious failure to provide greater disclosure respecting voting rights for ResCap under the new structure (even though Marple himself had addressed the Operating Agreement implications in his April 20, 2006 memorandum, and Walker had been a recipient of Applegate's April 24, 2006 memorandum). In his November 20, 2006 report to the ResCap Board regarding the proposed bank restructuring, Walker made no mention of possible alternative structures, no mention of any management misgivings, and no mention of section 2(b) of the Operating Agreement. In that presentation, Walker advised that "ResCap's control over the bank would also be unchanged relative to its current position," because although

---

[109] *Florenzano*, 387 N.W.2d at 173.

[110] Memorandum, GMAC Bank Restructuring, dated Apr. 20, 2006 [EXAM11248642].

[111] Memorandum, ILC Ownership and Control, dated Apr. 24, 2006 [EXAM11248641].

[112] Memorandum, GMAC Bank Restructuring, dated Apr. 20, 2006 [EXAM11248642].

[113] Memorandum, GMAC Bank Restructuring, dated May 12, 2006 [ALLY_0401600].

"[AFI] would own 100% of the voting shares of the bank," it also owned ResCap and "control[led] the ResCap board."[114]

There is no evidence that Feldstein did anything to correct the statements in his May 5, 2006 memorandum (which also went to Applegate, Khattri, Marple, Muir, Paradis, Walker, Davee Olson, and Linda Zukauckas) implying that the transfer of voting control to AFI was a condition of the Cerberus PSA. That memorandum—which did not address the section 2(b) requirements of the Operating Agreement—advised Jacob and Melzer that "[t]he ResCap Board of Directors is prepared to approve the bank restructuring" and that the proposed structure "preserves the economics to ResCap."[115]

The November 20, 2006 ResCap board minutes reflect that the 2006 Bank Restructuring and associated 2005 Operating Agreement waiver, were (as Feldstein predicted in his May 5, 2006 note to the Independent Directors) approved by every inside ResCap board member, as well as by the two Independent Directors.[116]

The only inside ResCap board member who conceivably might be viewed as a non-AFI insider, James Giertz,[117] had very little concrete recollection of the ResCap Board's consideration regarding any aspect of the 2006 Bank Restructuring, and none at all regarding voting rights,[118] although he did state generally that "it was our duty to protect the interest of ResCap."[119] He did not recall voting for the transaction nor, when advised that there had been a unanimous vote, did he remember what if anything caused him to believe the adopted structure was appropriate.[120] Zukauckas (ResCap board member and AFI official) said that

---

[114] Walker Report, at 9–10 [RC40008925]. Applegate thought Walker was correct as regards control of the ResCap Board and "was never confused on who ultimately called the shots." Int. of D. Applegate, Dec. 7, 2012, at 242:24–243:2. When interviewed, the Independent Directors were equivocal as to whether they agreed with Walker's explanation. Jacob said: "[W]e concluded that the control of the bank essentially remained unchanged because although [AFI] had the 100 percent voting rights [AFI] also owned 100 percent of ResCap and controlled the ResCap board." Int. of T. Jacob, Apr. 17, 2013, at 76:6–10. And Melzer said that "the reality is that [AFI] controlled that bank both before and after." Int. of T. Melzer, Mar. 22, 2013, at 88:17–89:15. Yet, in an earlier interview Melzer expressed disagreement. *See* Int. of T. Melzer, Oct. 10, 2012, at 207:14–18 ("[Q:] Do you agree with that statement? [A:] No. No, not if you're sitting there looking after the interests of ResCap's creditors."); *see also id.* at 208:7 ("[I]n terms of control, there is a change. . . . Because of the voting/nonvoting securities.").

[115] Memorandum, Proposed Restructuring of GMAC U.S. Banking Entities, dated May 5, 2006, at 2 [EXAM10258913] (attached to E-mail from K. Sabatowski to T. Melzer and T. Jacob (May 4, 2006) [EXAM10258912]).

[116] Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Nov. 20, 2006, at RC40006837–40 [RC40006748].

[117] Giertz had a dotted line reporting relationship to AFI's Khattri, however. *See* Int. of J. Giertz, Jan. 25, 2013, at 19:17–20.

[118] *Id.* at 64:5–79:12.

[119] *Id.* at 69:15–23.

[120] *Id.* at 78:22–79:12.

she did not know why AFI obtained all of the voting rights in the 2006 Bank Restructuring and acknowledged that she did not recall "any probing" by the ResCap Board on that aspect of the transaction.[121]

Non-board members Marple, Solomon, and Sabatowski were present at the November 20, 2006 ResCap Board meeting.[122] Despite a notation in the minutes that there had been "full and robust deliberation" of the proposed restructuring (which was presented by Sabatowski),[123] Jacob said that nobody ever mentioned to him any possibility of structuring the transaction in way that would preserve a voting interest in Ally Bank for ResCap or indeed that any alternative structure may have been possible.[124] The proposal for 100% voting ownership to AFI—as reflected in Feldstein's May 5, 2006 memorandum—was the only structure ever shared by ResCap or AFI management with the Independent Directors.[125]

Jacob said that he and Melzer concluded that ResCap was receiving "fair value" in the transaction because its approval would allow the Cerberus PSA to close.[126] Indeed, it is apparent that Melzer and Jacob viewed the 2006 Bank Restructuring—as structured—to be part and parcel of the Cerberus PSA, and that they believed that without closing the bank transaction—as structured—the Cerberus PSA would not close either. Melzer said that he "didn't look at the bank transaction as a separate transaction"[127] and that "[d]oing that transaction enabled the Cerberus transaction."[128] They did not consider putting a value on the lost control.[129] Because they believed ResCap was receiving "fair value" in the transaction, Jacob explained that the Independent Directors did not believe they were waiving section 2(b) of the 2005 Operating Agreement (contrary to the explanation appearing in Marple's memorandum, which they never saw, and not mentioned in the Walker Report, which they did see).[130]

These observations are consistent with comments from Schenk, who was counsel to the Independent Directors regarding their consideration of the 2006 Bank Restructuring: "We

---

[121] Int. L. Zukauckas, Oct. 19, 2012, at 161:9–18.

[122] Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Nov. 20, 2006, at RC40006837 [RC40006748].

[123] *Id.* at RC40006839.

[124] *See* Int. of T. Jacob, Apr. 17, 2013, at 59:24–60:16, 70:7–22; *see also* Int. of T. Melzer, Mar. 22, 2013, at 74:6–9.

[125] *See* Int. of T. Jacob, Apr. 17, 2013, at 71:14–72:4; *see also* Int. of T. Melzer, Mar. 22, 2013, at 85:18–19 ("What was presented to us was really the model that was ultimately approved.").

[126] *See* Int. of T. Jacob, Apr. 17, 2013, at 76:1–5, 77:13–19.

[127] Int. of T. Melzer, Mar. 22, 2013, at 80:6–7. "[W]e didn't look at the arm's-length and fair value narrowly in the context of just the bank transfer." *Id*. at 82:8–10.

[128] *Id.* at 82:14–15.

[129] *See* Int. of T. Jacob, Apr. 17, 2013, at 77:9–19.

[130] *Id.* at 81:12–25. Yet, Jacob recalled that they did waive the "arms-length" requirement. *Id*. at 82:7–13.

would have been looking . . . at the entirety of the circumstances surrounding the sale."[131] As Schenk explains it, the 2006 Bank Restructuring could only have closed on the terms presented, and the interests of ResCap's creditors were protected because absent the transaction, the Cerberus PSA would fail, leading to a series of detrimental events.[132] She saw the benefits of the Cerberus transaction as immediate,[133] while the consequences of the loss of ownership rights were remote.[134] In hindsight, such comments from the Independent Directors and their counsel may suggest a lack of purposefulness in thinking through the loss of control,[135] and perhaps a degree of post-hoc rationalization. They do not, however, change the evident facts that the Independent Directors were not advised of Marple's conclusions,[136] did not know of Applegate's misgivings,[137] and were faced with evaluating the 2006 Bank Restructuring (as presented) as a sole option,[138] inextricably connected to the success or failure of the Cerberus investment.[139]

As already observed, AFI officials in control of the transaction and related communications with the Independent Directors included the chief architects and proponents of the sale of 51% of AFI to Cerberus—Feldstein and Walker. Given the contents of Marple's memorandum[140] and Applegate's memorandum,[141] they had reason to fear that the Independent Directors would find that the transaction was not in the best interests of ResCap

---

[131] Int. of E. Schenk, Apr. 24, 2013, at 69:14–16.

[132] *Id.* at 78:21–79:13 ("The Cerberus transaction would not have gone through . . . . They would have stayed out of the GM family. They would have been downgraded appropriately. . . . to non-investment grade. . . . Then your access to funds is really depleted. And . . . likely they would end up having to sell off ResCap's assets in a fire sale . . . . And at the end of the day that was not in the best interest of ResCap.").

[133] *Id.* at 70:4–10 ("And so, we had an opportunity . . . for ResCap to improve its position from what would . . . at that point be the inevitable conclusion that its rating would be downgraded . . . which would have been devastating to ResCap.").

[134] *Id.* at 77:14–23 ("The voting versus non-voting . . . certainly that is a difference. . . . But at the end of the day, I'm not sure it made much difference, particularly since ResCap was a subsidiary of [AFI].").

[135] *Id.* at 82:11–15 ("So the change of ownership [to] an economic-only ownership from one that had also the voting side of things was not necessarily considered to be a particularly significant change.").

[136] *E.g., id.* at 53:24–54:1 ("[Q:] Did Mr. Marple ever convey that view to you? [A:] No.").

[137] *E.g., id.* at 55:13–14 ("I don't recall any of these specific arguments being discussed with me.").

[138] "I remember the transaction being presented as this is the transaction . . . there was no presentation of alternatives . . . ." *Id.* at 35:24–36:5.

[139] "The transaction was presented to us as a package, and we were evaluating the transaction as a package." *Id.* at 87:1–3.

[140] "However, ResCap will not be given any voting control with regard to either these material business activities or the entity itself. It is not reasonable to believe that ResCap's leadership would agree to transfer a material business to a third party under a similar arrangement." Memorandum, GMAC Bank Restructuring, dated Apr. 20, 2006, at 4 [EXAM11248642].

[141] Memorandum, ILC Ownership and Control, dated Apr. 24, 2006 [EXAM11248641].

and its creditors.[142] And the evidence shows that important information was withheld or provided in an incomplete and, therefore, misleading manner. It is clear that the Independent Directors were never privy to any discussion with management on the subject of voting control.[143] While Walker said that he does not recall whether the notion of a transaction that preserved voting rights for ResCap was discussed with the Independent Directors[144] he emphasized that "the Toms [Jacob and Melzer] were smart, independent, thoughtful, thorough people. . . . they were not pushovers."[145] Ultimately, such comments support the conclusion that the Independent Directors did not know that other structures were possible and had actually been considered by management, and that as "independent, thoughtful, thorough people" they would have been able to better protect the "interest of ResCap, including its creditors"[146] had such information not been withheld.

Were a fraud action viable, damages could be substantial, likely amounting to not less than the Fair Market Value shortfall of between $390 to $465 million,[147] and perhaps as much as the difference between the equity value of ResCap's interest in Old GMAC Bank, which it transferred, and the equity interest in IB Finance, which it received, i.e., between $533 and $608 million.[148]

#### (4) Conclusion As To Fraud Claim

While a close question, the Examiner concludes that, particularly in light of the threshold issues under the *Wagoner* rule and the *in pari delicto* doctrine, it is more likely than not that a claim by the estate against AFI for fraud arising from the 2006 Bank Restructuring would not prevail.

### c. Breach Of Contract

Under section 2(b) of the 2005 Operating Agreement, ResCap was prohibited from engaging in material transactions with AFI "unless such transactions [were] on terms and conditions that are consistent with those that parties at arm's-length would agree to and for

---

[142] "The proposed restructuring of [Old] GMAC Bank raises potential conflicts under ResCap's Operating Agreement. While these conflicts could be waived . . . any such amendment would require the affirmative vote of both of ResCap's independent directors. This approval cannot be assured . . . ." Memorandum, GMAC Bank Restructuring, dated Apr. 20, 2006, at 1 [EXAM11248642].

[143] *See* Int. of T. Melzer, Mar. 22, 2013, at 89:22–25.

[144] "I'm saying I don't recall whether they were presented with that." Int. of D. Walker, Nov. 28, 2012, at 147:22–23.

[145] *Id.* at 148:3–7.

[146] 2005 Operating Agreement, § 8 [ALLY_0140795].

[147] *See* Section V.A.2.b; Appendix V.A.2.b. These figures take into account $143 million on the value received side, accounting for the avoidance of a credit rating downgrade. *See id.*

[148] *See* Section V.A.2.b; Appendix V.A.2.b.

fair value."[149] As reflected in Marple's memorandum,[150] and given the conclusion in Section V.A.2.b regarding fair value, there is little question that the 2006 Bank Restructuring did not comply with this restriction, and no exception under the 2005 Operating Agreement was applicable.[151] The facts surrounding the transaction demonstrate that the AFI and ResCap insiders had material information regarding the transaction that was not completely and accurately shared with the Independent Directors. Accordingly, although the ResCap Board, including the Independent Directors, resolved to waive the provisions of the 2005 Operating Agreement, as permitted by section 8 of the 2005 Operating Agreement,[152] from the perspective of the Independent Directors the waiver was not "knowing," a requirement for any waiver to be valid.[153]

This section considers whether ResCap's estate has a viable claim against AFI for breach of the 2005 Operating Agreement in connection with the 2006 Bank Restructuring. Such a claim is unlikely to be time-barred,[154] assuming the accrual date was November 22, 2006 (when the 2006 Bank Restructuring closed) or any date later than May 14, 2006 (six years before the Petition Date).[155]

### (1) The Claim And Its Elements

To establish breach of contract, New York requires proof of four elements: (1) existence of a contract; (2) performance under the contract by the plaintiff; (3) breach by the defendant; and (4) that the plaintiff was damaged as a result.[156] As with the fraud claim potentially arising

---

[149] 2005 Operating Agreement, § 2(b) [ALLY_0140795].

[150] Memorandum, GMAC Bank Restructuring, dated Apr. 20, 2006 [EXAM11248642].

[151] *See* 2005 Operating Agreement, § 2(c) [ALLY_0140795].

[152] "[N]o amendment or waiver that materially and adversely affects the rights of any Class of Rated Indebtedness shall become effective unless such amendment or waiver as been approved by a majority of the members of ResCap's Board of Directors, including a majority of the Independent Directors. In acting or otherwise voting on matters referred to in this Section 8 that materially and adversely affect the rights of any Class of Rated Indebtedness, to the fullest extent permitted by law, the Independent Directors shall consider only the interest of ResCap, including its creditors." *Id.* § 8.

[153] *See generally Gen. Motors Acceptance Corp. v. Clifton-Fine Cent. Sch. Dist.*, 647 N.E.2d 1329, 1331 (N.Y. 1995); *Nassau Trust Co. v. Montrose Concrete Prods. Corp.*, 436 N.E.2d 1265, 1269–70 (N.Y. 1982) (stating that contractual rights may be waived if they are knowingly, voluntarily and intentionally abandoned); *Weeks Dredging & Contracting, Inc. v. Hendry Corp.*, No. 84 CIV 2424 (CSH), 1988 U.S. Dist. LEXIS 3482, at *8–9 (S.D.N.Y. Apr. 21, 1988).

[154] *See* 2005 Operating Agreement, § 13 [ALLY_0140795] (specifying that New York law governs); *Notaro v. Sterling Transp. Servs., LLC*, 943 N.Y.S.2d 793 (Table) (N.Y. Sup. Ct. 2012) ("New York courts will generally enforce a clear and unambiguous choice-of-law clause contained in an agreement so as to give effect to the parties' intent."). The applicable statute of limitation is six years. *See* N.Y. C.P.L.R. § 213(2).

[155] ResCap's estate generally has at least two years from the Petition Date to commence an action that ResCap could have brought on the Petition Date. *See* 11 U.S.C. § 108(a).

[156] *See JP Morgan Chase v. J.J. Elec. of N.Y., Inc.*, 893 N.Y.S.2d 237, 239 (N.Y. App. Div. 2010).

from the same operative facts, a breach of contract claim would be subject to challenge based on the *Wagoner* rule and the *in pari delicto* doctrine. In addition, two specific terms of the agreement present impediments to an action for breach of contract: (1) the "sole obligation"[157] provision; and (2) the "sole remedy"[158] provision.

### (2) Standing (The Wagoner Rule) And In Pari Delicto

When a contract claim arises from and involves the same underlying facts as a fraud claim, the contract claim likewise is subject to the *Wagoner* rule and *in pari delicto*.[159] The analysis of the *Wagoner* rule and *in pari delicto* as to the breach of contract claim is thus the same as provided in Section VII.L.2.b.(2). The Examiner accordingly concludes that, while a close question, it is more likely than not that a claim by the estate against AFI for breach of the 2005 Operating Agreement arising from the 2006 Bank Restructuring would be precluded by these doctrines. In the event a court were to conclude differently, the breach of contract claim is also considered on the merits in the following Sections.

### (3) "Sole Obligation"

An obstacle to the estate's breach of contract claim is presented by the prescription of section 7 of the 2005 Operating Agreement, establishing that AFI's "sole obligation"[160] thereunder is "to comply with the Independent Director provisions of Section 2(g) and the provisions of Sections 2(h) and 2(i)."[161] Specifically, section 2(g) requires only that AFI appoint at least two Independent Directors, promptly fill any vacancies, and not bring any action for breach of fiduciary duty against any Independent Director for acting pursuant to the provisions of the Operating Agreement.[162] In short, AFI's conduct surrounding the 2006 Bank Restructuring does not appear to have violated any explicit obligation under the 2005 Operating Agreement, because AFI's undertaking was limited to those specific obligations referenced in section 2(g).

Notwithstanding the difficulty in identifying any breach of an express contractual obligation by virtue of the "sole obligation" clause, the 2005 Operating Agreement incorporates an implied covenant of good faith and fair dealing, as do all contracts governed by New York law.[163] Under New York law, the duty of good faith and fair dealing establishes

---

[157] 2005 Operating Agreement, § 7 [ALLY_0140795].

[158] *Id.*

[159] *See Mediators, Inc. v. Manney (In re Mediators, Inc.)*, 105 F.3d 822, 827 (2d Cir. 1997); *Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1092–94 (2d Cir. 1995); *Ernst & Young v. Bankr. Servs., Inc. (In re CBI Holding Co.)*, 318 B.R. 761, 765–66 (S.D.N.Y. 2004), *aff'd in part and rev'd in part*, 529 F.3d 432 (2d Cir. 2008); *see also State v. AAMCO Automatic Transmissions, Inc.*, 199 N.W.2d 444, 448 (Minn. 1972).

[160] 2005 Operating Agreement, § 7 [ALLY_0140795].

[161] *Id.*

[162] *Id.* § 2(g)(i). Sections 2(h) and 2(i), which relate to AFI's financial statements and to AFI's obligation to hold ResCap and its subsidiaries out as separate and distinct legal entities, are not relevant to this analysis.

[163] *See generally Fleisher v. Phoenix Life Ins. Co.*, 858 F. Supp. 2d 290, 298–88 (S.D.N.Y. 2012); *Spread Enters., Inc., v. First Data Merch. Servs. Corp.*, No. 11-CV-4743 (ADS) (ETB), 2012 WL 3679319, at *3 (E.D.N.Y. Aug. 22, 2012).

that "neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract."[164] The duty of good faith and fair dealing "protects the promisee not against a breach of the express terms of a contract but of the reasonable expectations and inferences otherwise derived from the agreement.[165]

A claim based on a breach of the duty of good faith and fair dealing "may be brought . . . only where one party's conduct, though not breaching the terms of the contract in a technical sense, nonetheless deprived the other party of the benefit of its bargain."[166] Here, it would be reasonable for ResCap to expect that AFI, including any officials with dual ResCap affiliation, would exhibit candor in disclosing to the Independent Directors information related to a transaction covered by sections 2(b) and 8 of the 2005 Operating Agreement.[167] All insiders were undoubtedly aware that the Independent Directors were dependent upon them for information. While the explicit terms of the 2005 Operating Agreement do not require AFI to have exhibited candor in its dealings with the Independent Directors, absent such candid disclosures the Independent Directors would be hindered in their ability to evaluate such a transaction and the associated waivers under the 2005 Operating Agreement, particularly in their ability to "consider only the interests of ResCap, including its creditors."[168]

Such a failure to more candidly inform the Independent Directors could not form the basis for a claim of breach of an explicit contract term against AFI, due to the "sole obligation" limitation. Whether an action based on the duty of good faith and fair dealing could be premised on such failings by AFI is debatable. Indeed, actions based on the duty of good faith and fair dealing rarely survive a motion to dismiss because they are generally

---

[164] *Fleisher*, 858 F. Supp. 2d at 298–99 (citations omitted).

[165] *Net2Globe Int'l, Inc. v. Time Warner Telecom of N.Y.*, 273 F. Supp. 2d 436, 467 (S.D.N.Y. 2003) (citing *Sauer v. Xerox Corp.*, 95 F. Supp. 2d 125, 132 (W.D.N.Y. 2000)).

[166] *Sauer*, 95 F. Supp. 2d at 132.

[167] *See, e.g., Hampshire Grp., Ltd. v. Kuttner*, No. 3607-VCS, 2010 WL 2739995, at *13 (Del. Ch. July 12, 2010) (noting fiduciaries have a duty to inform other fiduciaries of information material to the affairs of the corporation). In view of their "duty of candor," the Delaware Supreme Court has recognized that "[a]t a minimum . . . fiduciaries, corporate or otherwise, may not use superior information or knowledge to mislead others in the performance of their own fiduciary obligations." *Mills Acquisition Co. v. Macmillan, Inc.,* 559 A.2d 1261, 1283 (Del. 1989); *see generally* Section VII.E.2.a.(1) (concluding that, while not certain under Delaware law, ResCap insiders likely did not have a fiduciary duty of disclosure to the Independent Directors). Without suggesting that there is an actionable fiduciary duty from AFI to ResCap, the overlapping presence of AFI officials and managers on the ResCap Board informs the Examiner's understanding of the standard of conduct one would expect when such officials interact with the Independent Directors.

[168] 2005 Operating Agreement, § 8 [ALLY_0140795].

viewed as duplicative of a claim for breach of the explicit terms of the contract.[169] That is not always the case, however.[170] On balance, the Examiner concludes that while it is a close question, it is more likely than not that a court would find in these circumstances that AFI's conduct amounted to a breach of the covenant of good faith and fair dealing.

### (4) "Sole Remedy"

The 2005 Operating Agreement includes a second provision which may preclude ResCap from recovering on a breach of contract claim against AFI. Section 7 of the 2005 Operating Agreement specifies that the "sole remedy" available from AFI is "specific performance."[171] Such a remedy is at this point unlikely to be of value to the estate. Section 7 also specifies: "Under no circumstances shall . . . [AFI] be liable for damages for breach of this Agreement."[172]

Contractual liability limitations are presumptively enforceable, as the manifestation of the parties' bargain.[173] That presumption may in some circumstances be overcome in the case of a "special relationship between the parties."[174] Moreover, "an exculpatory agreement, no matter how flat and unqualified its terms, will not exonerate a party from liability under all circumstances."[175]

---

[169] *See, e.g.*, *Fleisher v. Phoenix Life Ins. Co.*, 858 F. Supp. 2d 290, 299 (S.D.N.Y. 2012) (stating that a court will dismiss as "redundant" or "duplicative" a claim for breach of the covenant of good faith and fair dealing "where the conduct allegedly violating the implied covenant is also the predicate for breach of covenant of an express provision of the underlying contract.").

[170] *See JFK Family Ltd. P'ship v. Millbrae Natural Gas Dev. Fund 2005, L.P.*, 873 N.Y.S.2d 234, 234 (N.Y. Sup. Ct. 2008). The JFK decision relies in part upon *Fitzgerald v. Cantor*, 1998 Del. Ch. LEXIS 212, at *4–6 (Del. Ch. 1998). Both cases denied defendant's motion to dismiss a claim for breach of the covenant of good faith and fair dealing. *See also Travelers Int'l, A.G. v. Trans World Airlines, Inc.*, 41 F.3d 1570, 1577 (2d Cir. 1994) (confirming judgment finding liability for breach of the covenant of good faith and fair dealing); *House of Diamonds v. Borgioni, LLC*, 737 F. Supp. 2d 162, 169–71 (S.D.N.Y. 2010) (granting summary judgment for breach of covenant of good faith and fair dealing).

[171] 2005 Operating Agreement, § 7 [ALLY_0140795].

[172] *Id.*

[173] *See Metro. Life Ins. Co. v. Noble Lowndes Int'l, Inc.*, 643 N.E.2d 504, 507 (N.Y. 1994)

[174] *Peluso v. Tauscher Cronacher Prof'l Eng'rs, P.C.*, 704 N.Y.S.2d 289, 290 (N.Y. App. Div. 2000).

[175] *Kalisch-Jarcho, Inc. v. City of N.Y.*, 448 N.E.2d 413, 416 (N.Y. 1983) (finding limitation on contractor's delay damages could be invalidated on showing that city acted in bad faith and with deliberate intent delayed the plaintiff in the performance of its obligation).

The standard for overcoming a liability limitation is a high one—i.e., "conduct that evinces a reckless indifference to the rights of others."[176] Thus:

> [A]n exculpatory agreement . . . will not exonerate a party from liability under all circumstances. . . . [I]t will not apply to exemption of willful or grossly negligent acts . . . [or when] the misconduct for which it would grant immunity smacks of intentional wrongdoing. This can be explicit, as when it is fraudulent, malicious or prompted by the sinister intention of one acting in bad faith. Or when, as in gross negligence, it betokens a reckless indifference to the rights of others, it may be implicit.[177]

Given the purposes of the 2005 Operating Agreement, the dependence of the Independent Directors (and the third-party beneficiaries) upon the good faith and candor of the insiders in order to fulfill their role in effectuating that purpose, and the evident lack of candor by, for example, Feldstein and Walker, AFI's conduct appears to "smack[ ] of intentional wrongdoing," and as discussed in Section VII.L.1.b above, was arguably fraudulent.

There are countervailing considerations, however. For example, the importance of closing the Cerberus PSA in order to prevent a detrimental credit rating downgrade for both AFI and its ResCap subsidiary may present a partial, and credible, explanation for the conduct of the inside directors and others who had loyalties to AFI. Acting out of expediency or even carelessness is not necessarily "reckless indifference to the rights of others."[178]

### (5) Conclusion As To Breach Of Contract Claim

While a close question, the Examiner concludes that particularly in light of the threshold issues under the *Wagoner* rule and the *in pari delicto* doctrine, it is more likely than not that a claim by the estate against AFI for breach of either the express terms of the 2005 Operating Agreement and/or the covenant of good faith and fair dealing thereunder, arising from the 2006 Bank Restructuring, would not prevail.

---

[176] *Sommer v. Fed. Signal Corp.*, 593 N.E.2d 1365, 1370–71 (N.Y. 1992) (placing as a jury question whether alarm company's failure to report alarm amounted to "reckless indifference" which would overcome contractual liability limitation). *See also Castagna, & Son, Inc. v. Bd. of Educ.*, 570 N.Y.S.2d 286, 287 (N.Y. App. Div. 1991) (finding despite no-damages-for-delay clause, "plaintiffs have presented sufficient evidence to raise triable issues of fact as to whether the delay damages were caused by the Board's bad faith, or its willful, malicious or grossly negligent conduct with respect to its performance under the parties' contract").

[177] *Net2Globe Int'l, Inc. v. Time Warner Telecom of N.Y., 273* F. Supp. 2d 436, 450 (S.D.N.Y. 2003) (quoting *Kalisch-Jarcho, Inc.,* 448 N.E.2d at 416–17.

[178] *Kalisch-Jarcho, Inc.*, 448 N.E.2d at 416–17; *cf. Deutsche Lufthansa AG v. Boeing Co.*, No. 06 CV 7667 (LBS), 2007 U.S. Dist. LEXIS 9519, at *8–11 (S.D.N.Y. Feb. 2, 2007) (finding that defendant had not acted with "purpose of injuring [plaintiff]" and therefore enforcing $100,000 damages limit even though plaintiff spent over $1 million preparing to meet supply needs of defendant, who had not disclosed to plaintiff that it was considering exiting business line).

Were a breach of contract action viable here, damages could be substantial:

> It is well settled that in breach of contract actions "the nonbreaching party may recover general damages which are the natural and probable consequence of the breach." Special, or consequential damages, which "do not so directly flow from the breach," are also recoverable in limited circumstances. . . . "[I]n order to impose on the defaulting party a further liability than for damages [which] naturally and directly [flow from the breach], i.e., in the ordinary course of things, arising from a breach of contract, such unusual or extraordinary damages must have been brought within the contemplation of the parties as the probable result of a breach at the time of or prior to contracting."[179]

As noted, the Fair Market Value shortfall was between $390 to $465 million.[180] These figures take into account $143 million on the value-received side, accounting for the avoidance of a credit rating downgrade.[181] More broadly, the difference between the equity value of ResCap's interest in Old GMAC Bank, which it transferred, and the equity interest in IB Finance, which it received, was between $533 and $608 million.[182] Damages for breach of contract in this instance are most likely to fall within one of these ranges, corresponding to the terms which ResCap could and likely would have achieved had the breach not occurred, such that the Independent Directors would have been prompted to obtain a valuation of the transaction and press for a more fair outcome.[183]

### d.  Tortious Interference With Contract

The elements of tortious interference with contract under the law of New York and Minnesota are substantially similar. Under Minnesota law, the elements are: "'(1) the existence of a contract; (2) the alleged wrongdoer's knowledge of the contract; (3) intentional

---

[179] *Bi-Economy Mkt., Inc. v. Harleysville Ins. Co. of N.Y.*, 886 N.E.2d 127, 130 (N.Y. 2008) (quoting *Kenford Co. v. Cnty. of Erie*, 537 N.E.2d 176, 178 (N.Y. 1989); *Am. List Corp. v. U.S. News & World Report, Inc.*, 549 N.E.2d 1161, 1164 (N.Y. 1989)).

[180] *See* Section V.A.2.b; Appendix V.A.2.b.

[181] *See* Section V.A.2.b.

[182] *See* Section V.A.2.b; Appendix V.A.2.b.

[183] As the valuation performed in the course of the Investigation demonstrates, such damages are capable of measurement, and a valuation could have been done in connection with the 2006 Bank Restructuring. Damages which are too speculative may not be recovered. *Kenford Co. v. Cnty. of Erie*, 493 N.E.2d 234, 235 (N.Y. 1986) (affirming denial of damages for loss of future profits as too speculative). *But see Vidas Cousins Realty Corp. v. PB & J Assocs., Inc.*, SP 005616/07, 39 Misc. 3d 1204(A) (N.Y. Dist. Ct. Apr. 1, 2013) (finding loss of future profit caused by the landlord's failure to repair a leaking roof, requiring a business to close, may be recoverable if the loss is "capable of proof with reasonable certainty").

procurement of its breach; (4) without justification; and (5) damages.'"[184] Under New York law, the elements are: "(1) the existence of a valid contract between plaintiff and a third party; (2) the defendant's knowledge of the contract; (3) the defendant's intentional procuring of the breach; and (4) damages."[185] Fatal to a claim of tortious interference with the 2005 Operating Agreement in either jurisdiction is the established rule that only a third party, unrelated to the contract, may be liable for tortious interference. "Plaintiffs cannot state a claim for tortious interference against one of the contracting parties."[186] Accordingly, the Examiner concludes that is unlikely that an estate claim against AFI for tortious interference with the 2005 Operating Agreement, arising from conduct surrounding the 2006 Bank Restructuring, would prevail.[187]

---

[184] *E-Shops Corp. v. U.S. Bank Nat'l Ass'n*, 678 F.3d 659, 664 (8th Cir. 2012) (quoting *Furlev Sales & Assocs., Inc. v. N. Am. Auto. Warehouse, Inc*., 325 N.W.2d 20, 25 (Minn. 1982)).

[185] *Foster v. Churchill*, 665 N.E.2d 153, 156 (N.Y. 1996); s*ee also Maillet v. Frontpoint Partners, LLC*, No. 02 Civ. 7865 (GBD), 2003 WL 21355218, at *2 (S.D.N.Y. 2003).

[186] *Maillet,* 2003 WL 21355218, at *2 (quotation and citations omitted); *Shearin v. E.F. Hutton Grp., Inc.* 652 A.2d 578, 590 (Del. Ch. 1994); *Bouten v. Richard Miller Homes, Inc*., 321 N.W.2d 895, 900–01 (Minn. 1982); *see generally* DAN B. DOBBS, PAUL T. HAYDEN, AND ELLEN M. BUBLICK, THE LAW OF TORTS § 635 (2d ed. 2012) ("[O]nly a stranger can commit the tort of interference with contract.").

[187] The *Wagoner* rule would likely also apply and, under the law of New York but not of Minnesota, *in pari delicto* might also present a defense to a tortious interference action by the estate against AFI. S*ee BrandAid Mktg. Corp. v. Biss*, 462 F.3d 216, 218–19 (2d Cir. 2006); *Bieter Co. v. Blomquist*, 848 F. Supp. 1446, 1451 (D. Minn. 1994). The applicable New York statute of limitations is three years. *See* N.Y. C.P.L.R. § 214(4). Under Minnesota law, the statute of limitations is six years. *See* MINN. STAT. § 541.05 (2000); *see also Wallin v. Minn. Dep't of Corrs.*, 598 N.W.2d 393, 401 (Minn. Ct. App. 1999).

2. *Contractual Claims Related To The MMLPSA, Pipeline Swap, MSR Swap, And Broker Agreement*

The parties' dealings in connection with the MMLPSA, Pipeline Swap, MSR Swap, and Broker Agreement, detailed in Section V.B, give rise to the following potential contractual claims:

(1) Claims concerning representation and warranty liabilities under the 2001 and 2006 MMLPSAs;

(2) Claims that entry into various of these agreements or amendments thereto violated the pertinent Operating Agreement because the Independent Directors did not waive the arm's length and fair value requirements for affiliate transactions;

(3) Claims that application of the Pipeline Swap to the period from funding to sale and to brokered loans violated the terms of that agreement;

(4) Claims that revenues on loans GMAC Mortgage brokered to Ally Bank were misallocated; and

(5) Claims under the MSR Swap that Ally Bank improperly failed to pay GMAC Mortgage the value of correspondent-loan MSRs and purchased MSRs.

Each of these claims is analyzed below.

a. *Contractual Representation And Warranty Liabilities Under The 2001 And 2006 MMLPSAs*

As discussed in Sections V.B.3.a(4) and V.B.3.b(3), under the 2001 MMLPSA as written, Old GMAC Bank provided representations and warranties for all mortgage loans, while under the 2006 MMLPSA as written, Ally Bank provided representations and warranties for Second Lien Loans[188] only. ResCap/GMAC Mortgage assumed financial responsibility in later years for repurchase and representation and warranty liabilities on loans purchased from Old GMAC Bank and Ally Bank under the MMLPSA, e.g., when ResCap entered into settlements with Fannie Mae and Freddie Mac in 2010.[189] The discussion that follows addresses whether ResCap/GMAC Mortgage have claims against AFI and/or Ally Bank with respect to such liabilities.

---

[188] As used in this Section, "Second Lien Loan" shall mean: (1) an individual mortgage loan secured by a mortgage that creates a second priority lien upon the pledged collateral; (2) a HELOC; and/or (3) in the context of an MMLPSA, a "Second Lien Mortgage Loan" as defined in the applicable MMLPSA.

[189] *See* Section III.I (discussing the Fannie Mae and Freddie Mac settlements).

### (1) Representation And Warranty Liabilities Under The 2001 MMLPSA

For the reasons detailed below, the Examiner concludes that any claim against AFI or Ally Bank for loan representations and warranties under the 2001 MMLPSA is not likely to prevail.

#### (a) Successor Liability And Indemnification Theories Are Not Likely To Prevail

As discussed in Section V.B.3.a(6), the 2001 MMLPSA was not assumed by Ally Bank in the 2006 Bank Restructuring.[190] Accordingly, to assert a contractual claim against AFI or Ally Bank with respect to loans purchased under the 2001 MMLPSA, ResCap would have to show either that (1) Ally Bank is responsible for the liabilities of Old GMAC Bank under a theory of successor liability; or (2) AFI is responsible for Old GMAC Bank's liabilities under (a) the indemnification provided in connection with the OTS approval of the 2006 Bank Restructuring or (b) the indemnification provisions of the 2005 Operating Agreement or the 2006 Amended Operating Agreement.

##### (i) Successor Liability

###### (A) Choice Of Law

In the Second Circuit, the choice-of-law rules of the forum state apply to claims premised on state law, unless state law would conflict with a federal policy or interest.[191] Thus, New York choice-of-law principles will apply to any successor-liability claim here because of the apparent absence of any federal interest and the pendency of the Chapter 11 Cases in the Southern District of New York.

In New York, "[t]he first step in any case presenting a potential choice of law issue is to determine whether there is an actual conflict between the laws of the jurisdictions involved."[192] If the laws of the relevant jurisdictions are substantively the same, a court may

---

[190] Minutes of a Regular Meeting of the Board of Directors of GMAC Bank, Nov. 30, 2006, at 2 [ALLY_PEO_0020880]; Review of GMAC Bank Affiliate Agreements Assigned from GMAC Bank FSB to GMAC Bank ILB, dated Nov. 30, 2006, at ALLY_0260095–97 [ALLY_0260087]; Purchase and Assumption Agreement, Sched. B [ALLY_PEO_0021066].

[191] *Bianco v. Erkins (In re Gaston & Snow)*, 243 F.3d 599, 601–02 (2d Cir. 2001) ("Because federal choice of law rules are a type of federal common law, which federal courts have only a narrow power to create, we decide that bankruptcy courts confronting state law claims that do not implicate federal policy concerns should apply the choice of law rules of the forum state."). "[W]here (1) the claim before the bankruptcy court is wholly derived from another legal claim already pending in a parallel, out-of-state, non-bankruptcy proceeding; and (2) the pending original, or 'source,' claim was filed in a court prior to the commencement of the bankruptcy case, bankruptcy courts should apply the choice of law rules of the state where the underlying prepetition claim was filed." *Statek Corp. v. Dev. Specialists, Inc.* (*In re Coudert Bros. LLP*), 673 F.3d 180, 182 (2d Cir. 2012).

[192] *In re Allstate Ins. Co.*, 613 N.E.2d 936, 937 (1993). An actual conflict is present "[w]here the applicable law from each jurisdiction provides different substantive rules." *Curley v. AMR Corp.*, 153 F.3d 5, 12 (2d Cir. 1998).

avoid the choice-of-law analysis.[193] However, if there is a conflict, New York courts apply an "interest analysis" in order to determine which state law governs a successor liability claim.[194] In applying the interest analysis to successor-liability claims, New York courts enforce the law of the state in which the defendant was formed, unless the law of that state is the same as New York law.[195] In this case, the state of incorporation of the potential defendant, Ally Bank, is Utah.

While Utah successor-liability law is less robust than New York law in certain respects, both Utah and New York apply the four traditional exceptions to the general rule that a successor entity that acquires the assets of another is not liable for the obligations of the predecessor entity: (1) where the successor expressly assumed the debt at issue; (2) the transaction constitutes a de facto merger; (3) the successor is a mere continuation of the predecessor; or (4) the transaction was entered into fraudulently to escape obligations of the predecessor.[196] As discussed in more detail below, although Utah and New York law differ with respect to the de facto merger exception, they appear to be consistent with respect to the other three exceptions.

### (B) Exceptions To The General Rule Of No Successor Liability

For the reasons detailed below, the Examiner concludes that each of the four exceptions is likely to be held inapplicable here, so that Ally Bank is unlikely to be held liable on a successor-liability theory.

### i.   Assumption Of Liability

While Utah courts recognize the assumption of liability exception to the general rule of no successor liability, there is no case under Utah law that explains or analyzes the application

---

[193] *See Curley*, 153 F.3d at 12 (citing *J. Aron & Co. v. Chown*, 231 A.D.2d 426 (N.Y. Sup. Ct. 1996)) ("It is only when it can be said that there is no actual conflict that New York will dispense with a choice of law analysis.").

[194] *Planet Payment, Inc. v. Nova Info. Sys., Inc.*, No. 07-cv-2520, 2011 WL 1636921, at *6 (E.D.N.Y. Mar. 31, 2011) (citing *Fin. One Pub. Co. Ltd. v. Lehman Bros. Special Fin., Inc.*, 414 F.3d 325, 336 (2d Cir. 2005)).

[195] *Hayden Capital USA, LLC v. Northstar Agri Indus., LLC*, 2012 WL 1449257, at *7 (S.D.N.Y. April 23, 2012); *U.S. Fidelity & Guar. Co. v. Petroleo Brasileiro S.A.-Petrobras*, No. 98 Civ. 3099(THK), 2005 WL 289575, at *5 (S.D.N.Y. Feb. 4, 2005); *Planet Payment*, 2011 WL 1636921, at *7 (holding that Georgia, as defendant's state of incorporation had the greatest interest because "claims of successor liability which . . . involve questions of corporate liability for the acts of others are of greater interest to the state of incorporation and residence of the defendants") (internal quotations omitted); *Soviet Pan Am Travel Effort v. Travel Comm., Inc.*, 756 F. Supp. 126, 131 (S.D.N.Y. 1991) (applying Maryland law to successor liability claim where defendants were incorporated there); *Howard v. Clifton Hydraulic Press Co.*, 830 F. Supp. 708, 712 (E.D.N.Y. 1993) (applying both New York and New Jersey law where defendant was incorporated in New Jersey, because "the issue of successor liability does not turn out differently under New York or New Jersey law").

[196] *See Schumacher v. Richards Shear Co.*, 451 N.E.2d 195, 198 (N.Y. 1983); *Decius v. Action Collection Serv., Inc.*, 105 P.3d 956, 958-59 (Utah Ct. App. 2004) (citing *Florom v. Elliott Mfg.*, 867 F.2d 570, 575 n.2 (10th Cir. 1989)).

of the exception.[197] New York, which has a more robust body of law on the exception, looks to the language of the governing contract to determine whether the buyer expressly or impliedly agreed to assume liabilities of the successor.[198]

As noted above, the 2001 MMLPSA was not assumed by Ally Bank under the Purchase and Assumption Agreement. Further, the Purchase and Assumption Agreement expressly states that Ally Bank assumes only those liabilities set forth on a schedule to the agreement, and assumes no other liabilities.[199] None of the items on the schedule would encompass liabilities under the 2001 MMLPSA or, in particular, representation and warranty liabilities for loans sold thereunder.[200] The Examiner therefore concludes that an assumption theory is unlikely to prevail.

### ii.  De Facto Merger

Utah and New York law governing the de facto merger exception appear to differ. New York considers whether there is: (1) continuity of ownership between the predecessor and successor corporation; (2) cessation of ordinary business and dissolution of the predecessor corporation; (3) assumption of liabilities ordinarily necessary for the continuation of the predecessor's business; and (4) continuity of management, personnel, physical location, assets and general business operation.[201] Utah, in contrast, (a) considers "whether the business operations and management continued" and (b) requires that "the buyer paid for the asset purchase with its own stock."[202] Because the analysis required under Utah law differs from that under New York law, Utah law, as the law of the jurisdiction of Ally Bank's incorporation, would govern the de facto merger analysis.

Applying the Utah de facto merger test to the facts here, it appears that the first requirement is met, but that the second cannot be satisfied. Old GMAC Bank was headquartered in Horsham, Pennsylvania and most of its 550 employees were located there at the time of the bank restructuring.[203] Following the consummation of the restructuring, the management, employees, location, and operations of the mortgage banking division largely remained the same despite the new ownership structure.[204] Officers from Old GMAC Bank

---

[197] *See Decius*, 105 P.3d at 958–59.

[198] *See Hartford Acc. & Indem. Co., Inc. v. Canron, Inc.* 373 N.E.2d 364, 364–65 (N.Y. 1977); *Valenta Enters., Inc. v. Columbia Gas of N.Y., Inc.*, 455 N.Y.S. 2d 996, 998 (N.Y. App. Div. 1982); *Emrich v. Kroner*, 434 N.Y.S.2d 491, 492 (N.Y. App. Div. 1980).

[199] Purchase and Assumption Agreement, § 2.3 [ALLY_PEO_0021066].

[200] *Id.* at Sched. C.

[201] *See In re Seventh Dist. Asbestos Litig.*, 788 N.Y.S.2d 579, 583 (N.Y. Sup. Ct. 2005); *Sweatland v. Park Corp.*, 587 N.Y.S.2d 54, 56 (N.Y. App. Div. 1992); *New York v. Nat'l Serv. Indus., Inc.*, 460 F.3d 201, 209 (2d Cir. 2006).

[202] *See Decius*, 105 P.3d at 959 (citations omitted) (internal quotation marks omitted) (citing *Travis* v. *Harris Corp.*, 565 F.2d 443, 447 (7th Cir. 1977)).

[203] Walker Report, at 1 [RC40008925].

[204] *See* Int. of D. Walker, Nov. 28, 2012, at 76:4–14; Int. of R. Groody, Dec. 17, 2012, at 60:20–61:3, 61:21–62:1.

became the officers of the mortgage division within the restructured bank.[205] Although the buyer was and remained headquartered in Utah, the mortgage division and operations remained in Horsham, Pennsylvania and nearly all of the employees of Old GMAC Bank were retained and remained there as well.[206] Thus, the continuity of business and operations requirement appears to be met.

Nonetheless, application of the de facto merger doctrine would be precluded by Utah's requirement that the buyer have paid for the asset purchase with its own stock. Under the Purchase and Assumption Agreement, cash was paid as consideration for the assets and liabilities transferred.[207] Accordingly, the Examiner concludes that a de facto merger theory is unlikely to prevail.

### iii. Mere Continuation

Under the "mere continuation" exception, Utah courts consider "not whether the business operation[s] continued, but whether the corporate entity continued . . . . A mere continuation demands a common identity of stock, directors and stockholders and the existence of only one corporation at the completion of the transfer."[208] Similarly, New York courts have not found "mere continuation" if the selling corporation continues to exist after the asset sale—even if the selling corporation is stripped of its assets.[209]

Old GMAC Bank continued to exist for three years after the asset sale.[210] Accordingly, the Examiner concludes that a "mere continuation" theory is also unlikely to prevail.

### iv. Fraud

Utah case law adopts the fraud exception, but has not explained or defined the exception in detail.[211] Similarly, New York courts recognize the fraud exception,[212] but there is relatively little case law analyzing the exception's requirements. Of two New York cases briefly addressing the fraud exception: (1) one held that in order for the fraud exception to apply, a plaintiff must plead that the transaction was entered into with the intent to escape liability to the predecessor's creditors;[213] and (2) the other held that the fraud exception did not apply because there can be no fraudulent intent where there was a legitimate business explanation

---

[205] *See* Int. of R. Groody, Dec. 17, 2012, at 60:15–19; Int. of D. Walker, Nov. 28, 2012, at 126:6–10; *see, e.g.*, Walker Report, at 5 [RC40008925].

[206] *See* Int. of D. Walker, Nov. 28, 2012, at 126:6–21; *see, e.g.*, Walker Report, at 5 [RC40008925].

[207] Purchase and Assumption Agreement, §3.1(c) [ALLY_PEO_0021066].

[208] *Decius v. Action Collection Serv., Inc.*, 105 F.3d 956, 959 (Utah Ct. App. 2004).

[209] *Ladjevardian v. Laidlaw-Coggeshall, Inc*., 431 F. Supp. 834, 839 (S.D.N.Y. 1977).

[210] Institution Directory—National Motors Bank FSB, FDIC, http://www2.fdic.gov/idasp/confirmation_outside.asp?inCert1=35054 (last updated Dec. 20, 2012).

[211] *See Decius,* 105 P.3d at 958–59.

[212] *See Schumacher v. Richards Shear Co., Inc.*, 451 N.E.2d 195 (N.Y. 1983).

[213] *See Beck v. Roper Whitney, Inc*., 190 F. Supp. 2d 524, 539 (W.D.N.Y. 2001).

for the transaction.[214] Other jurisdictions applying this exception have examined whether there was a lack of good faith, as where there is inadequate consideration and the creditors of the predecessor are not provided for.[215] Here, there is no evidence that the aim of the transfer of Old GMAC Bank's assets was to defraud *the Bank's* creditors.[216] And there is no evidence that the parties at the time anticipated the magnitude of the representation and warranty liabilities that would later arise with respect to the loans sold by Old GMAC Bank (or, as discussed below, that the Bank would bear such liabilities). Accordingly, the Examiner concludes that an attempt to hold Ally Bank responsible for the liabilities of Old GMAC Bank under the fraud exception to the doctrine of successor liability is unlikely to prevail.

### (ii) AFI Indemnification

#### (A) Indemnification In Connection With The OTS Approval Of The 2006 Bank Restructuring

The OTS approved the transfer of assets under the 2006 Bank Restructuring subject to certain conditions, including the provision of a "holding company guarantee confirming responsibility for any of [Old GMAC Bank's] contingent liabilities following the consummation of the transaction" and the receipt of written non-objection thereto from the OTS.[217] An indemnification on these terms, if made in favor of ResCap/GMAC Mortgage, arguably would have covered the representation and warranty claims at issue because they arose from contingent liabilities of Old GMAC Bank and the indemnity, as phrased by the OTS, was broad enough to cover both contingent liabilities of Old GMAC Bank that were transferred to Ally Bank as well as those that remained with Old GMAC Bank. In AFI's November 10, 2006 response to the OTS's request, however, AFI agreed only to "indemnify, defend and hold harmless [Old GMAC Bank] with respect to any post-closing claims or

---

[214] *See Krisher v. Monarch Mach. Tool Co*., 1994 WL 705264, at *3 (N.D.N.Y. 1994).

[215] *See Huray v. Fournier NC Programming, Inc*, No. C9-02-1852, 2003 WL 21151772 at *3 (Minn. Ct. App. May 20, 2003); *McKee v. Harris-Seybold Co.*, 264 A.2d 98, 107 (N.J. Law Div. 1970); *Welco Indus., Inc. v. Applied Cos.*, 617 N.E.2d 1129, 1134 (Ohio 1993); *In re Thorotrast Cases*, 26 Phila. Co. Rptr. 479, 488–89 (Pa. Com. Pl. 1994); *Ostrowski v. Hydra-Tool Corp*., 479 A.2d 126, 127 (Vt. 1984)).

[216] It is a separate issue whether the fact that ResCap received a non-voting interest in IB Finance involved fraud or a lack of good faith (which is analyzed in Section VII.L.1). The proper focus of the present analysis is instead whether the transfer of Old GMAC Bank's assets was itself done with an intent to defraud Old GMAC Bank's creditors. *See Eagle Pac. Ins. Co. v. Christensen Motor Yacht Corp*., 934 P.2d 715, 721 (Wash. Ct. App. 1997) (holding that in the case of a successor corporation created solely to hinder the creditors of the predecessor, the plaintiff had sufficiently shown a fraudulent purpose to impose liability on the successor); *Schumacher*, 451 N.E.2d at 199; *Decius*, 105 P.3d at 958–59.

[217] Letter from OTS to J. Feinberg (Aug. 16, 2006) [EXAM10221739].

liabilities relating to the assets sold to [Ally Bank]" as described in the applications to the OTS.[218] This indemnification was narrower than that requested by the OTS. Nevertheless, the OTS issued a non-objection letter with respect to the indemnity AFI provided.[219]

The indemnification AFI provided would not cover the claims here. First, it was made for the benefit of Old GMAC Bank, not ResCap/GMAC Mortgage. Second, the indemnity was limited to liabilities "relating to the assets sold to [Ally Bank]"; neither the 2001 MMLPSA nor the loans previously sold thereunder were among the assets sold to Ally Bank in the 2006 Bank Restructuring. Accordingly, the Examiner concludes it is unlikely that a claim for indemnification under AFI's November 10, 2006 letter to the OTS would prevail.

### (B) Indemnification Under The ResCap Operating Agreements

As discussed in Section III.B, AFI agreed in both the 2005 Operating Agreement and the 2006 Amended Operating Agreement to "indemnify, defend and hold harmless ResCap and its Subsidiaries from and against any Losses related to GMAC Indemnifiable Liabilities (*other than 'GM Indemnifiable Liabilities'*)."[220] As discussed below, while representation and warranty liabilities of Old GMAC Bank likely would be subject to the indemnification obligation under the 2006 Amended Operating Agreement were it not for the "other than 'GM Indemnifiable Liabilities'" carveout, this limitation likely would defeat any indemnification claim here.

The 2005 Operating Agreement and the 2006 Amended Operating Agreement defined "GMAC Indemnifiable Liabilities" to include, in pertinent part:

> all Liabilities of any GMAC Affiliate to the extent such Liabilities (a) relate to, (b) arise out of or (c) result principally from any of the following items:
>
> (i) the failure of any GMAC Affiliate to pay, perform or promptly discharge any Liabilities of such GMAC Affiliate in accordance with their terms; or
>
> (ii) the GMAC Affiliate Business.[221]

_____

[218] Letter from S. Khattri to R. Albanese (Nov. 10, 2006) [ALLY_0402156]. In consideration of AFI's agreement to provide the holding company guarantee requested by the OTS, ResCap agreed to counter-indemnify AFI with respect to the same post-closing claims or liabilities. Letter from S. Khattri to B. Paradis (Nov. 10, 2006) [ALLY_0018335]. This indemnity was approved by the ResCap Board. Certificate of C. Quenneville (Nov. 22, 2006) [CERB001616].

[219] Letter from R. Albanese to J. Feinberg (Nov. 20, 2006) [ALLY_0401904].

[220] 2005 Operating Agreement, § 3 [ALLY_0140795] (emphasis added); 2006 Amended Operating Agreement, § 3 (Residential Capital, LLC, Current Report (Form 8-K) (Nov. 30, 2006), Ex. 10.1) (emphasis added).

[221] 2005 Operating Agreement, § 1 [ALLY_0140795]; 2006 Amended Operating Agreement, § 1 (Residential Capital, LLC, Current Report (Form 8-K) (Nov. 30, 2006), Ex. 10.1).

"GMAC Affiliate Business" in turn, was defined to include "all business and operations (whether or not such businesses or operations are terminated, divested or discontinued) of the GMAC Affiliates as conducted from time to time."[222] "GM Indemnifiable Liabilities" and "GM Affiliate Business" were defined similarly (save for the use of "GM Affiliate" instead of "GMAC Affiliate").[223]

A "GM Affiliate" was defined as "an Affiliate of GM other than GMAC and its Subsidiaries,"[224] while a "GMAC Affiliate" was defined as "GM, GMAC and any Person that is an Affiliate of GM or GMAC, other than ResCap and its Subsidiaries."[225] An "Affiliate" is a person or entity "directly or indirectly Controlling or Controlled by or under direct or indirect common Control with" the person or entity in question.[226]

Before the 2006 Bank Restructuring, Old GMAC Bank, as a ResCap Subsidiary, would not have qualified as a "GMAC Affiliate." However, from and after the time when Old GMAC Bank was sent as a dividend to GM as part of the 2006 Bank Restructuring,[227] Old GMAC Bank was both a "GMAC Affiliate" and a "GM Affiliate," since it was then controlled by GM and was no longer a ResCap Subsidiary.

Old GMAC Bank's liabilities, if any, for breach of representations and warranties likely would constitute Liabilities arising from "(i) the failure of [a] GMAC Affiliate to pay, perform or otherwise promptly discharge any Liabilities of such GMAC Affiliate in accordance with their terms; or (ii) the GMAC Affiliate Business." However, they would, by the same token, constitute Liabilities arising from "(i) the failure of [a] GM Affiliate to pay, perform or otherwise promptly discharge any Liabilities of such GM Affiliate in accordance with their terms; or (ii) the GM Affiliate Business." Consequently, the Liabilities would constitute "GM Indemnifiable Liabilities," and would therefore be excluded from the scope of the indemnification provided by GMAC, which is limited to Liabilities "other than GM Indemnifiable Liabilities."[228]

---

[222] 2005 Operating Agreement, § 1 [ALLY_0140795]; 2006 Amended Operating Agreement, § 1 (Residential Capital, LLC, Current Report (Form 8-K) (Nov. 30, 2006), Ex. 10.1).

[223] 2005 Operating Agreement, § 1 [ALLY_0140795]; 2006 Amended Operating Agreement, § 1 (Residential Capital, LLC, Current Report (Form 8-K) (Nov. 30, 2006), Ex. 10.1).

[224] 2005 Operating Agreement, § 1 [ALLY_0140795]; 2006 Amended Operating Agreement, § 1 (Residential Capital, LLC, Current Report (Form 8-K) (Nov. 30, 2006), Ex. 10.1).

[225] 2005 Operating Agreement, § 1 [ALLY_0140795]; 2006 Amended Operating Agreement, § 1 (Residential Capital, LLC, Current Report (Form 8-K) (Nov. 30, 2006), Ex. 10.1).

[226] 2005 Operating Agreement, § 1 [ALLY_0140795]; 2006 Amended Operating Agreement, § 1 (Residential Capital, LLC, Current Report (Form 8-K) (Nov. 30, 2006), Ex. 10.1).

[227] *See* Certificate of Share Transfer, dated Nov. 21, 2006 [ALLY_0401265]; Transfer of Shares Agreement, dated Nov. 22, 2006 [CERB001787].

[228] 2005 Operating Agreement, § 3(b) [ALLY_0140796-97]; 2006 Amended Operating Agreement, § 3(b) (Residential Capital, LLC, Current Report (Form 8-K) (Nov. 30, 2006), Ex. 10.1).

Accordingly, the Examiner concludes it is unlikely that a claim against AFI for indemnification under either the 2005 Operating Agreement or the 2006 Amended Operating Agreement for representation and warranty liabilities of Old GMAC Bank would prevail.

### (b) The MMLPSA's Two-Year Survival Clause Likely Bars All Claims For Loans Sold Thereunder

The MMLPSA is governed by Delaware law.[229] The governing statute of limitations for a breach of contract claim under Delaware law is typically three years.[230] However, the MMLPSA includes a "survival" clause that provides as follows:

> Each party hereto covenants and agrees that the representations and warranties, covenants and obligations contained in Articles III through VI of this Agreement shall survive the execution hereof, and the Closing Date, and any inspection, investigation, or determination made by, or on behalf of, either party, and expiration or termination of this Agreement, for a period of two (2) years from the applicable Closing Date.[231]

---

[229] Section 8.5 of the 2001 MMLPSA specifies that the agreement is to be governed by Delaware law. 2001 MMLPSA, § 8.5 [ALLY_0018253]. New York courts generally honor such contractual choice-of-law provisions. *See, e.g.*, *Millennium Falcon Corp. v. WRD Sales, Inc*., 848 N.Y.S.2d 707, 708–09 (N.Y. App. Div. 2007) ("Since the parties to the note agreed that it would be governed by Connecticut law, we must apply the substantive law of that forum . . . ."); *Notaro v. Sterling Transp. Servs., LLC*, 943 N.Y.S.2d 793 (N.Y. Sup. Ct. 2012) ("New York courts will generally enforce a clear and unambiguous choice-of-law clause contained in an agreement so as to give effect to the parties' intent."). "Choice of law clauses are accorded *prima facie* validity and are to be enforced absent a strong showing that the clause resulted from fraud or overreaching, that it is unreasonable or unfair, or that enforcement would contravene some strong public policy of the forum." *MBIA Ins. Corp. v. Royal Bank of Can.*, No. 12238/09, 2010 WL 3294302, at *21 (N.Y. Sup. Ct. Aug. 19, 2010) (citing *Hirschman v. Nat'l Textbook Co*., 184 A.D.2d 494, 495 (N.Y. App. Div. 1992)); *see also Composite Holdings v. Westinghouse Elec. Corp*., 992 F. Supp. 367, 370 n.25 (S.D.N.Y. 1998) (noting that the "public policy of New York strongly supports enforcement of forum selection clauses").

[230] DEL. CODE ANN. tit. 10 § 8106 (West 2008); *Wedderien v. Collins*, 937 A.2d 140 (Del. 2007).

[231] 2001 MMLPSA, § 8.3 [ALLY_0018253]; 2006 MMLPSA, § 8.3 [ALLY_0018291] (same); 2007 MMLPSA, § 8.3 [ALLY_0018275] (same).

While this provision is not a model of clarity, Delaware courts have typically construed survival clauses such as this one to be contractual statutes of limitation.[232] "[C]ase law in Delaware has read survival clauses . . . as acting to shorten the statute of limitations and require that suit be brought before the relevant survival period expires."[233] Accordingly, the MMLPSA's survival clause likely would be read to require that GMAC Mortgage bring any claims related to breach of the representations and warranties within two years of the date of the pertinent loan sale.[234] Because GMAC Mortgage stopped buying loans from Old GMAC Bank under the 2001 MMLPSA in November 2006, the survival period for any claims related to breach of Old GMAC Bank's representations and warranties expired, at latest, in November 2008.

_____

[232] *See GRT, Inc. v. Marathon GTF Tech., Ltd.*, No. 5571-CS, 2011 WL 2682898, at *3 (Del. Ch. 2011); *Sterling Network Exch., LLC v. Digital Phoenix Van Buren, LLC*, No. 07C-08-050WLW, 2008 WL 2582920, at *5 (finding that the time in which the purchaser could bring claims related to representations and warranties was contractually limited by survival clauses); *see also State St. Bank & Trust Co. v. Denman Tire Corp.*, 240 F.3d 83, 87–88 (1st Cir. 2001) (applying Illinois law to provision that representations and warranties "shall expire on the second (2nd) anniversary of the Closing" and holding that such language "was reasonably susceptible to only one meaning: that any claim based on warranties contained in the Purchase Agreement must be brought within [the specified time period] of the closing") (quotation omitted); LOU R. KLING & EILEEN T. NUGENT, 2 NEGOTIATED ACQUISITIONS OF COMPANIES, SUBSIDIARIES AND DIVISIONS § 15.02[2] (explaining that in merger and acquisition agreements, "[t]he survival period is, in effect, a contractual statute of limitations").

[233] *GRT, Inc. v. Marathon GTF Tech., Ltd.*, No. 5571-CS, 2011 WL 2682898, at *3 (Del. Ch. 2011) ("Delaware law does not have any bias against contractual clauses that shorten statutes of limitations because they do not violate the legislatively established statute of limitations, there are sound business reasons for such clauses, and our case law has long upheld such clauses as a proper exercise of the freedom to contract."); *see also Shaw v. Aetna Life Ins.*, 395 A.2d 384, 386 (Del. Super. Ct. 1978) ("[A]n express provision in a contract which [a]bbreviates the time for filing a claim, so long as it remains a reasonable time, hastens the enforcement and complements the policy behind the statute of limitations . . . .") (citing 1A CORBIN ON CONTRACTS § 218 (1963)).

[234] 2001 MMLPSA, § 1.7 [ALLY_0018253] (defining "Closing Date" to mean, "with respect to each purchase of Mortgage Loans . . . , the date on which such purchase shall occur and the applicable Purchase Price shall be paid . . ."). Other states, such as New York and California generally refuse to read survival clauses related to representations and warranties as shortening the applicable statute of limitations absent "clear and explicit" language. *See, e.g.*, *W. Filter Corp. v. Argan, Inc.*, 540 F.3d 947, 953 (9th Cir. 2008). However, "[u]nder Delaware law, which is more contractarian than that of many other states, parties' contractual choices are respected and there is no special rule requiring that in order to contractually shorten the statute of limitations, parties utilize 'clear and explicit' language." *GRT, Inc. v. Marathon GTF Tech., Ltd.*, No. 5571-CS, 2011 WL 2682898, at *12 (Del Ch. July 11, 2011).

Similarly, the MMLPSA's survival clause likely limits any right GMAC Mortgage would otherwise have for indemnification against Old GMAC Bank. Pursuant to the 2001 MMLPSA, Old GMAC Bank agreed to indemnify GMAC Mortgage against "any losses, damages, deficiencies, claims, causes of action, [etc.] . . . which result from any material breach of any representation, warranty or covenant . . . ."[235] However, the survival clause contained in section 8.3 of the MMLPSA explicitly limits obligations contained in Article VI of the MMLPSA, which include Old GMAC Bank's indemnification of GMAC Mortgage. It appears that under Delaware law, such remedy provisions can be limited in the same manner as the representations and warranties themselves.[236]

Absent the contractual limitations of the survival clause, claims by GMAC Mortgage concerning loans sold pursuant to the 2001 MMLPSA likely would be barred only to the extent that they relate to repurchases or settlements occurring more than three years before the Debtors' bankruptcy filing (i.e., before May 14, 2009). This is because while Delaware's three-year statute of limitations for contract claims "begins to run when the contract is breached" and would thus bar any action for breach of the representations and warranties themselves,[237] claims for indemnification do not accrue until the "indemnitor-liability

---

[235] 2001 MMLPSA, § 6.1 [ALLY_0018253].

[236] *See GRT, Inc. v. Marathon GTF Tech., Ltd.*, No. 5571-CS, 2011 WL 2682898, at *16 (Del. Ch. July 11, 2011) ("The Survival Clause at issue in this case . . . not only expressly terminates the . . . Representations upon the expiration of the Survival Period, it also terminates the 'remedies provided pursuant to Section 7.4.' The parties' decision to terminate the . . . Representations and the sole remedy for their breach, from an objective point of view, is further evidence of an intent to give . . . one-year [to] . . . file a claim for breach . . . .").

[237] *Aronow Roofing Co. v. Gillbane Bldg. Co.,* 902 F.2d 1127, 1128 (3d Cir. 1990); *see Baron v. Allied Artists Pictures Corp.,* 717 F.2d 105, 108 (3d Cir. 1983) ("A cause of action for breach of contract accrues at the time of the breach and a cause of action in tort accrues at the time of the injury.") (citation omitted); *E.I. duPont de Nemours & Co. v. Medtronic Vascular, Inc.,* No. N10C-09-058-MMJ, 2013 WL 261415, at *11 (Del Super. Ct. Jan. 29, 2013) ("The cause of action accrues 'at the time of the wrongful act, even if the plaintiff is ignorant of the cause of action.' The wrongful act in a breach of contract claim is the breach and the cause of action accrues at the time of breach.") (citations omitted); *see also Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Holdings LLC,* No. 5140-CS, 2012 WL 3201139, at *17 (Del. Ch. Aug. 7, 2012) ("'Because representations and warranties about facts pre-existing, or contemporaneous with, a contract's closing are to be true and accurate when made,' a breach of such representations and warranties 'occurs on the date of the contract's closing and hence the cause of action accrues on that date.'") (citations omitted). For contracts involving severable performances, such as the MMLPSA (periodic loan sales), "the statute of limitations generally begins to run on each severable portion when a party breaches that portion of the contract." *SPX Corp. v. Garda USA, Inc.,* No. N10C-10-162, 2012 WL 6841398, at *3 (Del. Super. Ct. Dec. 6, 2012) (citation omitted).

becomes fixed and ascertained or as soon as the debt becomes due."[238] "The point at which the indemnitee suffers loss or damage through payment of a claim after judgment or settlement is the determining factor."[239] Accordingly, absent the survival clause discussed above, indemnification claims by GMAC Mortgage against Old GMAC Bank for repurchases and settlements that occurred after May 14, 2009 (within three years of the Petition Date and the tolling afforded by section 108 of the Bankruptcy Code) would be timely.[240]

---

[238] *Oliver B. Cannon & Son, Inc. v. Fidelity & Cas. Co. of N.Y.,* 484 F. Supp. 1375, 1389 (D. Del. 1980) (citation omitted); *see also Ne. Controls, Inc. v. Fisher Controls Int'l, LLC*, No. 06-412-SLR, 2008 WL 181336, at \*4 n.5 (D. Del. Jan. 18, 2008) (overruled on other grounds) ("[I]n the case of a contract for indemnity, the cause of action accrues and 'the statute of limitations begins to run when the indemnitor-liability becomes fixed and ascertained or as soon the debt becomes due.'" ) (citation omitted); *Sorensen v. Overland Corp.*, 142 F. Supp. 354, 361 (D. Del. 1956) ("Indemnity against loss or damage does not accrue (nor does the statute begin to run) until the indemnitee has made payment or has actually suffered loss or damage."); *Stifel Fin. Corp. v. Cochran*, 809 A.2d 555, 559 (Del. 2002) ("[B]ecause indemnification is a right conferred by contract, under statutory auspice, actions seeking indemnification are subject to the three year limitations period."); *Witco Corp. v. Adriatic Ins. Co.*, No. Civ.A. 95C-06-030, 2000 WL 302079, at \*2 (Del Super. Ct. Jan. 31, 2000) ("The duty to indemnify does not arise until final judgment against [the] insured or [the] insured enters into a settlement."); *Marcucilli v. Boardwalk Builders, Inc.*, No. Civ.A 99C-02-007, 1999 WL 1568612, at \*8 (Del Super. Ct. Dec. 22, 1999) ("[T]he limitations period on a claim for indemnification does not begin to run until the cause of action for indemnity arises or the indemnity suffers damage.").

[239] *Council of Unit Owners of Sea Colony, Phase III Condo. v. Carl M. Freeman Assocs., Inc.,* 1989 WL 40973, at \*3 (Del Super. Ct. Apr. 11, 1989); *Oliver B. Cannon & Son, Inc.*, 484 F. Supp. at 1388 (citation omitted) ("Liability becomes fixed and ascertained only upon the entry of a final judgment against the indemnitee"); *see also Shively v. Ken-Crest Ctrs. for Exceptional Pers.*, No. 96C-05-316, 1998 WL 960719, at \*3 (Del Super. Nov. 19, 1998) ("An indemnification contract, by its very nature, cannot be breached until one party is liable and seeks indemnification from the other.").

[240] The decision in *CertainTeed Corp. v. Celotex Corp.,* No. Civ.A 471, 2005 WL 217032 (Del. Ch. Jan. 24, 2005), is not to the contrary. *CertainTeed* held that a buyer's claim for indemnification arising from breach of contractual representations and warranties accrued on the date of the transaction, when the contractual rights were breached. *Id*. at \*5. However, the court drew a distinction between indemnification claims for injuries suffered directly by the indemnified party as a result of the breach and claims for losses resulting from liability to a third party. *Id*. "[I]n the case of counts for breach of contract and misrepresentation, where claims involve direct injury to [the plaintiff]—e.g., claims resting on the assertion that [plaintiff] was injured because a . . . condition was not as represented in the Agreement—timeliness is to be measured by the statute of limitations for breach of contract and torts, respectively, with accrual occurring at the date of breach or injury, absent tolling." *Id*. By contrast, "if the underlying claim for contractual indemnification is actually a claim for losses resulting from liability to a third party (i.e., like a common law indemnity claim) . . . [plaintiff's] claim accrue[s] at the time when the last dollar of loss is ascertainable." *Id*. Accordingly, where a defendant's breach of contractual representations and warranties causes the plaintiff to incur liability to a third party, the plaintiff's indemnity cause of action accrues when such liability becomes fixed. *See Jolly v. MPTC Holdings, Inc.*, No. 3:08-CV-1374-M, 2009 WL 4279379, at \*4–5 (N.D. Tex. Dec. 1, 2009) (interpreting Delaware law, including *CertainTeed*, to find that a purchaser's post-closing claim for indemnification had not yet accrued, despite an undisputed breach of representations and warranties by the seller, because no third party had yet made a claim against the purchaser and the potential loss had not been ascertained).

The statute of limitations may only be tolled where the defendant has "fraudulently concealed the basis for [the plaintiff's] claims."[241] While the Investigation has not encompassed a review of the details of every loan sale under the 2001 MMLPSA, it has not disclosed any evidence of fraudulent concealment by Old GMAC Bank. Moreover, given that Old GMAC Bank was a ResCap Subsidiary when the 2001 MMLPSA was in effect, and that GMAC Mortgage was the loan servicer and was intimately aware of the loans' characteristics, it is unlikely that GMAC Mortgage would have a viable claim that the statute of limitations should be tolled for fraudulent concealment of any representation and warranty breaches.[242]

In sum, by virtue of the two-year survival clause contained in section 8.3 of the MMLPSA, all claims by GMAC Mortgage against Old GMAC Bank related to the 2001 MMLPSA are likely time-barred. Even if the survival clause were not construed as shortening the statute of limitations, contractual indemnification claims against Old GMAC Bank related to repurchases and settlements that occurred before May 14, 2009 would be untimely.

### (c) Whether Old GMAC Bank Provided Representations And Warranties To GMAC Mortgage

Even if a claimant could overcome the obstacles just discussed, the question would remain whether Old GMAC Bank had enforceable representation and warranty obligations to GMAC Mortgage under the 2001 MMLPSA.

Under Delaware law, the elements of a breach of contract claim are: (1) a contractual obligation; (2) a breach of that obligation; and (3) resulting damages.[243] The key issue here

---

[241] *See SmithKline Beecham Pharm. Co. v. Merck & Co., Inc.*, 766 A.2d 442, 450 (Del. Super. Ct. 2000); *David B. Lilly Co. v. Fisher*, 18 F.3d 1112, 1117 (3d Cir. 1994) ("Under Delaware law, the statute of limitations generally 'begins to run at the time of the wrongful act, and, ignorance of a cause of action, absent concealment or fraud, does not stop it.'"); *Isaacson, Stolper & Co. v. Artisans' Sav. Bank*, 330 A.2d 130, 132 (Del. 1974) ("It is well established in common law jurisdictions generally that ignorance of the facts is in the ordinary case no obstacle to the operation of a statute of limitations. There are, of course, certain well defined exceptions, such as infancy, incapacity, certain types of fraud, or concealment of the facts . . . .") (citation omitted). The Delaware Supreme Court has also established a "discovery exception," but it is narrowly confined to medical malpractice cases and situations where an injury is both "inherently unknowable" and sustained by a "blamelessly ignorant" plaintiff. *See David B. Lilly Co.*, 18 F.3d at 1117; *Kaufman v. C.L. McCabe & Sons, Inc*., 603 A.2d 831, 835 (Del. 1992) ("The time of discovery exception, in cases other than those of medical malpractice, is narrowly confined in Delaware to injuries which are both: (a) 'inherently unknowable'; and (b) sustained by a 'blamelessly ignorant' plaintiff."); *see also Layton v. Allen*, 246 A.2d 794 (Del. 1968) (establishing the discovery exception in Delaware).

[242] *See E.I. DuPont De Nemours & Co. v. Medtronic Vascular, Inc.*, No. N10C-09-058-MMJ, 2013 WL 261415, at *12 (Del Super. Ct. 2013) ("The doctrines of inherently unknowable injury, and fraudulent concealment, do not apply when the plaintiff has actual knowledge of the breach and potential injuries to follow.").

[243] *Interim Healthcare, Inc. v. Spherion Corp.*, 884 A.2d 513, 548 (Del. Super. 2005), *aff'd*, 886 A.2d 1278 (Del. 2005).

appears to be whether the express contractual representation and warranty obligations under the 2001 MMLPSA remained in effect, or whether the agreement was modified or amended through the parties' subsequent actions to eliminate those obligations.[244]

The general rule in Delaware is that a written contract may be modified by agreements which themselves are not formally written.[245] The 2001 MMLPSA requires that amendments be written, stating:

> This Agreement may not be changed orally but only by an agreement in writing, signed by the party against whom enforcement of any waiver, change, modification or discharge is sought.[246]

Delaware law, however, nonetheless contemplates that even where the written contract explicitly forbids oral modifications, the parties can, "by their conduct, substitute a new oral contract without a formal abrogation of the written agreement."[247] But Delaware courts do not freely permit such modifications: "To make such a leap of faith. . . the Court must first rule out the possibility that the asserting party has alleged an oral modification in an attempt to unilaterally alter a pre-existing, but unfavorable, agreement."[248] The evidence of such a modification "must be of such specificity and directness as to leave no doubt of the intention

---

[244] The original inclusion of the written representations and warranties in the written agreement does not appear to have been the result of a mistake or scrivener's error. Celini explained that the 2001 MMLPSA, including its representations and warranties, had been copies from a third-party arrangement. Int. of A. Celini, Feb. 18, 2013, at 64:11–18. Celini asserts that the parties then agreed that the Bank would not have representation and warranty exposure in connection with negotiation of the January 2002 Addendum revising the First Lien Loan pricing provisions. *See id.* at 69:11–71:15.

[245] *Haft v. Dart Grp. Corp.*, 841 F. Supp. 549, 567 (D. Del. 1993) (citing *Pepsi-Cola Bottling Co. v. Pepsico, Inc.*, 297 A.2d 28, 33 (Del. 1972)).

[246] 2001 MMLPSA, § 8.8 [ALLY_0018253].

[247] *Pepsi-Cola Bottling Co.*, 297 A.2d at 33 (Del. 1972); *see also Reeder v. Sanford Sch., Inc.*, 397 A.2d 139, 141 (Del. Super. Ct. 1979) (holding "[t]he general rule is that a written contract may be modified by subsequent oral agreement").

[248] *Cont'l Ins. Co. v. Rutledge & Co., Inc.*, 750 A.2d 1219, 1230 (Del. Ch. 2000).

of the parties to change what they previously solemnized by formal document."[249] Further, the modification must be based on mutual consideration; past consideration is not sufficient to form an enforceable modification.[250]

While the application of this standard here is not a matter that is entirely free from doubt, the Examiner concludes it is more likely than not that AFI/Ally Bank would prevail on a claim that the 2001 MMLPSA had been modified to eliminate representations and warranties with respect to First Lien Loans.[251] According to Celini, in connection with the negotiation of First Lien Loan pricing in the January 2002 Addendum, there was explicit discussion and agreement that the agreed-upon cost-basis pricing meant that Old GMAC Bank would not have representation and warranty liability.[252] Old GMAC Bank was realizing only net carry on the loans, consistent with its limited role as a financing conduit for GMAC Mortgage's purchase of First Lien Loans.[253] ResCap-side personnel, while not recalling the specific discussions Celini referenced, agreed that the understanding reached was that Old GMAC Bank would not have representation and warranty liability to GMAC Mortgage.[254]

Of course, the fact that the parties did not document this understanding in the January 2002 Addendum when they documented the First Lien Loan pricing, and waited to do so until adoption of the 2006 MMLPSA, is a significant factor weighing against finding a modification. But the parties' conduct (including the lack of Bank reserves and the assumption of liabilities by GMAC Mortgage) seems to have consistently reflected an understanding that the Bank had no such liability. None of the documents produced suggest that the parties ever had another understanding, and none of the witnesses interviewed held a contrary view.

---

[249] *See Reeder,* 397 A.2d at 141 (finding that defendant's promise through his statement to change the termination clause and to modify the salary term of a contract constituted extrinsic evidence and may be used to negate the mutuality of assent to the original agreement); *Cont'l Ins. Co.*, 750 A.2d at 1230–32 (plaintiffs asserted that they orally modified a withdrawal provision in their limited partnership agreement to reflect their new investment strategy but the court, relying on letters and affidavits, found the evidence insufficient to meet the high burden to establish that the parties had agreed upon the alteration of withdrawal rights); *Tunney v. Hilliard,* No. 1317-VCN, 2008 WL 3975620, at *5 (Del. Ch. Aug. 20, 2008) (Del. 2009) (court held against the finding of a modification because of a lack of testimony from credible witnesses or first-hand knowledge of the alleged oral agreement, and found no clear evidence that plaintiff undertook the responsibilities alleged as part of the modified agreement), *aff'd*, 970 A.2d 257 (Del. 2009); *see also Pegasus Dev. Corp. v. Hane*, 314 F. App'x 489, 492 (3d Cir. 2009) (holding that a single e-mail exchange submitted by defendant to show intent to modify agreement was insufficient to meet the burden established in *Reeder*).

[250] *See Cont'l Ins. Co.*, 750 A.2d at 1232.

[251] As used in this Section, "First Lien Loan" shall mean: (1) an individual mortgage loan (other than a HELOC) secured by a mortgage that creates a first priority lien upon the pledged collateral; and/or (2) in the context of an MMLPSA, a "First Lien Mortgage Loan" as defined in the applicable MMLPSA.

[252] *See* Int. of A. Celini, Feb. 18, 2013, at 71:9–74:5.

[253] *See id.* at 71:9–74:5.

[254] Int. of B. Bier, Feb. 22, 2013, at 22:8–24:5; Int. of J. Whitlinger, Nov. 30, 2012, at 51:2–14; Int. of S. Blitzer, Mar. 5, 2013, at 26:18–28:15. Kenneth Blackburn had no recollection whether or not, as part of the process whereby the Bank sold loan to GMAC Mortgage, the Bank provided any representations and warranties on such loans. Int. of K. Blackburn, Mar. 26, 2013, at 11:1–14:3. *See also* Int. of J. Young, Sept. 28, 2012, at 262:22–263:23; Int. of R. Groody, Dec. 17, 2012, at 121:21–122:18, 127:12–128:4.

Instead, the parties seem to have agreed early on to Groody's axiom that the recipient of the gain on sale (GMAC Mortgage) would retain the representation and warranty risk.

By the same token, however, it seems likely that an AFI/Ally Bank assertion that the 2001 MMLPSA had been modified to exclude representation and warranty liability for Second Lien Loans would fail. Celini's discussions about limiting representation and warranty liability arose in the context of an agreement that the purchase price on First Lien Loans would be at cost, limiting the Bank's revenues to net carry. The pricing on Second Lien Loans was not modified by the January 2002 Addendum and, moreover, included a premium over the Bank's cost during the entire life of the 2001 MMLPSA (and beyond, as discussed below).[255] While Celini protested that this premium remained too small to support representation and warranty liability,[256] the Bank was receiving more than net carry. Further, when the parties "cleaned up" the representation and warranty provisions in the 2006 MMLPSA, excluding First Lien Loans from their scope, the Agreement explicitly maintained representations and warranties for Second Lien Loans (on which the Bank continued to receive a premium above its cost).[257] Neither Celini nor Groody could provide an explanation for why these provisions were included in the 2006 MMLPSA if it was understood that the Bank would have no representation and warranty liability for Second Lien Loans.[258] The MMLPSA was amended to eliminate Second Lien Loan representation and warranties only in the 2007 MMLPSA (when Second Lien Loan pricing was placed on the same basis as First Lien Loans).[259]

It is true that the personnel interviewed generally understood that the Bank provided no representations and warranties for *any* loans, and that the Bank maintained no reserves for Second Lien Loan representation and warranty liabilities. Nevertheless, given the First Lien Loan pricing context of Celini's original representation and warranty discussions, the disparate pricing between First and Second Lien Loans, and the evidence of the parties' intent supplied by the 2006 MMLPSA, it is likely that the 2001 MMLPSA representation and warranty provisions would be deemed effective for Second Lien Loans.

### (d) The Representation And Warranty Liabilities GMAC Mortgage Incurred For Loans Purchased Under The 2001 MMLPSA

While the Examiner concludes that it is not likely that a claim against AFI or Ally Bank for 2001 MMLPSA representation and warranty liabilities will prevail, the Examiner's Professionals undertook analyses to evaluate the liabilities GMAC Mortgage incurred for

---

[255] 2001 MMLPSA, Ex. C [ALLY_0018253] (setting premium at 450 basis points); Third Addendum to 2001 MMLPSA, dated Jan. 1, 2003 [ALLY_0018247] (modifying premium to 175 basis points).

[256] Int. of A. Celini, Feb. 18, 2013, at 72:15–24.

[257] 2006 MMLPSA, Art. IV, Ex. C [ALLY_0018291].

[258] *See* Section V.B.3.b(3).

[259] 2007 MMLPSA, Art. IV (eliminating all loan-level representations and warranties), §§ 1.13, 1.9, 1.24 (pricing provisions do not distinguish between First and Second Lien Loans) [ALLY_0018275].

repurchases and settlement of representation and warranty claims in connection with loans purchased from Old GMAC Bank under the 2001 MMLPSA. This effort involved an analysis of ResCap's records related to (1) loans repurchased from investors (for which available records are limited to repurchases in and after 2008); (2) the loans covered by the Debtors' settlements with Fannie Mae and Freddie Mac; and (3) the Trust R&W Claims.[260] That analysis is, as discussed below, limited in several ways by the data maintained by the Debtors, particularly for the last of these categories, the Trust R&W Claims.

For the first two categories, the Examiner's Professionals estimate that the total dollar amount of representation and warranty and settlement liabilities incurred by GMAC Mortgage on First Lien Loans sold by Old GMAC Bank under the 2001 MMLPSA is approximately $278.2 million, including $255.2 million in repurchases from and after May 14, 2009.[261] This estimate includes charge-offs incurred as a result of repurchases made through 2012,[262] the settlements with Fannie Mae and Freddie Mac in 2010, and the related 2013 "cure" settlements with those entities. Loans the Bank purchased from GMAC Mortgage are excluded (because GMAC Mortgage provided representations and warranties to the Bank on such loans). This amount does not take into account any recoveries made by GMAC Mortgage through subsequent disposition of the loan (and to that extent may be overstated).

The dollar amount of representation and warranty settlement liabilities incurred by GMAC Mortgage on Second Lien Loans sold by Old GMAC Bank under the 2001 MMLPSA (excluding loans purchased from GMAC Mortgage) for charge-offs (all incurred as a result of repurchases made on or after May 14, 2009) totaled approximately $5.1 million. (Second Lien Loans are not included in the Fannie Mae and Freddie Mac settlements.)

It is clear that there were also loans, including First and Second Lien Loans, sold by Old GMAC Bank under the 2001 MMLPSA that are included in the securitizations that comprise the Trust R&W Claims. However, while it appears that the representation and warranty liability associated with such loans was no more than $400 million (including $343 million for Second Lien Loans), these numbers are likely overstated due to limitations in the available data.[263] For example, the data does not permit segregation of loans purchased by the Bank from GMAC Mortgage. Given the limited and imprecise nature of the Debtors' records concerning these securitizations, the Examiner's Professionals are unable to provide a more accurate estimate of this liability.

---

[260] *See* 2008–2011 GMACM Repurchases Chargeoff Info Final [EXAM00339948]; FHLMC 2010 Settlement LL [EXAM00338680]; FNMA 2010 Settlement LL [EXAM00338681]; ResCap PLS Spreadsheet [EXAM00339947]; 2008–2011 GMACM Repurchases Chargeoff Info Final v2 [EXAM00345890]; #4 Cure Claim Allocation [EXAM00345891].

[261] As discussed in Section VII.L.2.a(1)(b), the 2001 MMLPSA's two-year survival provisions likely bar all claims concerning loans sold under the agreement; even absent the two-year survival provision, claims related to repurchases made before May 14, 2009, would still be barred.

[262] 2008–2011 GMACM Repurchases Chargeoff Info Final v.2 [EXAM00345890].

[263] ResCap PLS Spreadsheet [EXAM00339947].

### (i) Representation And Warranty Charge-Offs For Loans Purchased Under The 2001 MMLPSA

The Examiner's Professionals analyzed the Debtors' records concerning charge-offs on a per-loan basis for loans sold by Old GMAC Bank under the 2001 MMLPSA (excluding loans the Bank purchased from GMAC Mortgage in the first instance). The available records are limited to repurchases in and after 2008.[264]

These charge-offs related to both Fannie Mae/Freddie Mac loans and to non-Agency loans. The charge-offs represented the difference between the unpaid balance of the loans at the time of repurchase and the Debtors' estimate of the loan value at that time. The Debtors' records included, among other data, the year the charge-off was recorded on the Debtors' general ledger, the amount of the charge-off, the effective date of the loan sale as recorded on the Debtors' general ledger, categorization of the entity that initially funded and underwrote the loan, identification of First Lien Loans and Second Lien Loans, the amount wired to the investor for the repurchase of the loan, and, where applicable, any recoveries the Debtors realized from third-party correspondents from whom the loans were purchased.

The Debtors' records for charge-offs did not include any recoveries GMAC Mortgage realized through the subsequent disposition of the repurchased loans or foreclosed properties. As a result, the estimates of costs associated with the charge-offs provided below do not include the effect of any such recoveries. Charge-offs were categorized as impairment, make whole, or interest expense during 2010 through 2012.[265] Loan-level detail for 2008 and 2009 did not include the distinction between impairments and interest expense, though the charge-off was inclusive of both.

---

[264] *See* 2008–2011 GMACM Repurchases Chargeoff Info Final [EXAM00339948]; 2008–2011 GMACM Repurchases Chargeoff Info Final v2 [EXAM00345890] (providing information on charge-off activity by individual loan for 2008 through 2012).

[265] 2008–2011 GMACM Repurchases Chargeoff Info Final [EXAM00339948]; 2008–2011 GMACM Repurchases Chargeoff Info Final v2 [EXAM00345890]. Impairment is the amount charged to the Debtors' general ledger to record the difference between the amounts paid to repurchase the loan, less the current value of the loan. Make whole is the amount the Debtors paid to third party investors for the losses incurred on the loan. Interest expense is the amount paid to third party investors for accrued interest on the loan.

Based on an analysis of the Debtors' records for repurchases occurring in and after 2008, GMAC Mortgage's total liability for repurchases of loans purchased from Old GMAC Bank (net of recoveries from correspondents) totaled approximately $5.1 million for Second Lien Loans (all repurchased on or after May 14, 2009) and $77.8 million for First Lien Loans (including an estimated $54.9 million for First Lien Loans repurchased on or after May 14, 2009).[266] The table below provides a summary of these charge-offs:

EXHIBIT VII.L.2.a(1)(d)(i)
**Estimated Liability Related to Repurchase Activity for Loans Sold Under the 2001 MMLPSA** [(1)]
2008 – 2012
*($ in Millions)*

| | 2008 | | Year of Repurchase Charge-Off 2009 | | | 2010 | 2011 | 2012 | Total | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Jan 1 – May 13 | May 14 – Dec 31 | Total | | | | | 2008 - 2012 | May 14, 2009 - 2012 |
| First Lien Loans | | | | | | | | | | |
| Repurchase charge-offs | $ 12.7 | $ 11.2 | $ 19.5 | $ 30.7 | $ 28.8 | $ 4.9 | $ 3.9 | $ 81.0 | $ 57.2 |
| Recoveries | (0.7) | (0.3) | (0.5) | (0.8) | (1.6) | (0.1) | (0.2) | (3.2) | (2.3) |
| Estimated liability under 2001 MMLPSA | 12.0 | 10.9 | 19.0 | 29.9 | 27.3 | 4.9 | 3.7 | 77.8 | 54.9 |
| Second Lien Loans | | | | | | | | | | |
| Repurchase charge-offs | - | - | - | - | 3.4 | 1.7 | - | 5.1 | 5.1 |
| Recoveries | - | - | - | - | - | - | - | - | - |
| Estimated liability under 2001 MMLPSA | - | - | - | - | 3.4 | 1.7 | - | 5.1 | 5.1 |
| Total estimated liability under 2001 MMLPSA | $ 12.0 | $ 10.9 | $ 19.0 | $ 29.9 | $ 30.7 | $ 6.6 | $ 3.7 | $ 83.0 | $ 60.0 |

[(1)] *For loans where no sale effective date was available, the analysis assumes that loans were sold after 2001. This assumption is consistent with the Debtors' records which reflect that less than 1% of loans sold by Old GMAC Bank and repurchased between 2008 and 2011 related to pre-2002 loan vintages.*
*Source: 2008–2011 GMACM Repurchases Chargeoff Info Final [EXAM00339948]; 2008–2011 GMACM Repurchases Chargeoff Info Final v2 [EXAM00345890].*

### (ii) Representation and Warranty Liability Related To The 2010 Fannie Mae And Freddie Mac Settlements For Loans Purchased Under the 2001 MMLPSA

The Examiner's Professionals analyzed liabilities for the 2010 Fannie Mae and Freddie Mac settlements.[267] The available data included the unpaid principal balances as of the settlement date, the year the loan was funded, the entity that funded and underwrote the loan, and the Debtors' allocation of the total settlement amount on a per-loan basis. The Debtors allocated the total settlement amounts pro rata based on the unpaid principal balances of the loans included in the settlements. Because the loans at issue are Fannie Mae and Freddie Mac loans, they consist of First Lien Loans.

---

[266] Because the Debtors' records contained only the year in which the loans were repurchased, and not the specific day or month, it was necessary to allocate the 2009 First Lien Loan repurchases to estimate the portion that occurred before May 14, 2009. The 2009 repurchases were allocated on the assumption that they occurred evenly over the course of the year. Accordingly, 2009 charge-offs were reduced by 36.4% (133 days/365 days).

[267] *See* FHLMC 2010 Settlement LL [EXAM00338680]; FNMA 2010 Settlement LL [EXAM00338681].

As summarized in the table below, approximately $97.6 million of the total $461.5 million 2010 Fannie Mae settlement, and $65.5 million of the total $325 million 2010 Freddie Mac settlement relate to loans sold by Old GMAC Bank under the 2001 MMLPSA (excluding loans purchased from GMAC Mortgage):

EXHIBIT VII.L.2.a(1)(d)(ii)
**Estimate of 2010 Fannie Mae and Freddie Mac Settlement Amounts
Related to Loans Sold Under the 2001 MMLPSA** [1]
*($ in Millions)*

|  | Total Settlement Amount | | Estimated Portion Related to Loans Sold Under the 2001 MMLPSA |
|---|---|---|---|
| 2010 Fannie Mae settlement | $ | 461.5 | $ | 97.6 |
| 2010 Freddie Mac settlement |  | 325.0 |  | 65.5 |
| Total | $ | 786.5 | $ | 163.1 |

[1] *The Debtors' records did not include the specific sale dates of the Fannie Mae and Freddie Mac loans included in the 2010 settlements. Allocation of the settlements related to 2001 and 2006 assumes that loan sales occurred evenly over the course of those years. Accordingly, the Fannie Mae and Freddie Mac total settlement values during 2001 and 2006 were allocated to the effective dates of the 2001 MMLPSA (December 15, 2001 – October 31, 2006) based on the following; 4.7% for 2001 (17 days/365 days) and 83.3% for 2006 (304 days/365 days).*

*Source: GMAC ResCap, Significant Transaction Memo #1458, Q4 2010 FNMA Settlement, dated Dec. 29, 2010, at 1 [EXAM00221485]; GMAC ResCap, Significant Transaction Memo #1385, FHLMC Repurchase Settlement, dated Mar. 31, 2010, at 2 [EXAM00220583]; FHLMC 2010 Settlement LL [EXAM00338680]; FNMA 2010 Settlement LL [EXAM00338681].*

### (iii) Representation And Warranty Liability Related To The 2013 Fannie Mae And Freddie Mac Cure Settlements For Loans Purchased Under The 2001 MMLPSA

The Examiner's Professionals analyzed the claims under the 2013 "cure" settlements with Fannie Mae and Freddie Mac. These settlements encompassed claims excluded from the 2010 Fannie Mae and Freddie Mac settlements such as claims for mortgage insurance coverage and title defects, as well as servicing-related claims.[268] Because the cure claims relate to Fannie Mae and Freddie Mac loans, the loans at issue by definition are First Lien Loans, rather than Second Lien Loans.

_____

[268] Proof of Claim No. 4875, filed by Freddie Mac on Nov. 15, 2012 [Case No. 12-12019]; Proof of Claim No. 4899, filed by Freddie Mac on Nov. 15, 2012 [Case No. 12-12032]; Proof of Claim No. 4852, filed by Fannie Mae on Nov. 16, 2012 [Case No. 12-12019]; Proof of Claim No. 4853, filed by Fannie Mae on Nov. 16, 2012 [Case No. 12-12020]; Proof of Claim No. 4854, filed by Fannie Mae on Nov. 16, 2012 [Case No. 12-12032]; Proof of Claim No. 4855, filed by Fannie Mae on Nov. 16, 2012 [Case No. 12-12033]; Proof of Claim No. 4849, filed by Fannie Mae on Nov. 16, 2012 [Case No. 12-12042].

### (A) The Freddie Mac Cure Settlement

On November 15, 2012, Freddie Mac filed proofs of claim against the Debtors totaling $73.5 million.[269] These claims were settled for a total of $39.4 million.[270] Exhibit A to the proofs of claim allocates the $73.5 million to nine categories of "outstanding and projected obligations."[271] Two of the categories involve, or potentially involve, representation and warranty claims, including a "representations and warranties" category containing claims totaling $2.4 million,[272] and an "outstanding repurchases" category containing claims totaling $5.6 million.[273] The remaining claim categories appear not to involve representation and warranty liabilities.[274]

From the available information, it is not clear how much of the $39.4 million settlement is attributable to the two categories of claims potentially related to representation and warranty liability. The $8 million in claims in these two categories equates to 11% of the total $73.5 million in filed claims. Simply allocating the $39.4 million settlement on this basis would indicate that these potential representation and warranty claims accounted for $4.3 million of the settlement.

This figure would have to be further reduced to eliminate loans not purchased from Old GMAC Bank and loans the Bank purchased from GMAC Mortgage. Unfortunately, the available information does not include loan-level data permitting analysis of these issues. Given that the Bank played a relatively smaller role in GMAC Mortgage's production in earlier years, it seems likely that most of the claims at issue were not purchased from the Bank or were sold to the Bank in the first instance by GMAC Mortgage. Even if 50% of remaining total survived these hurdles (which seems unlikely), the net liability at issue would be reduced to just over $2 million.

---

[269] Proof of Claim No. 4875, filed by Freddie Mac on Nov. 15, 2012 [Case No. 12-12019]; Proof of Claim No. 4899, filed by Freddie Mac on Nov. 15, 2012 [Case No. 12-12032].

[270] Stipulation and Order Relating to the Assumption and Assignment of Certain Agreements of Freddie Mac Pursuant to section 365 of the Bankruptcy Code and Related Relief [Docket No. 2894] at 3.

[271] Proof of Claim No. 4875, filed by Freddie Mac on Nov. 15, 2012, Ex. A [Case No. 12-12019].

[272] *Id.*

[273] Debtor personnel involved in the cure settlement process assert that this category actually relates predominantly to servicing violations, but the available data did not permit verification of this assertion.

[274] The remaining categories include: (1) performing loan fees; (2) outstanding compensatory fees; (3) compensatory fees not yet billed; (4) foreclosure timeline violation; (5) loan prospector fees; (6) seller fees; and (7) servicing error repurchases. Proof of Claim No. 4875, filed by Freddie Mac on Nov. 15, 2012, Ex. A [Case No. 12-12019].

### *(B) The Fannie Mae Cure Settlement*

On November 16, 2012, Fannie Mae filed proofs of claim totaling $382.7 million.[275] According to the proofs of claim, a total of approximately $290 million of the total $382.7 million related to representation and warranty issues (though the proofs do not provide loan-level detail of claim size); the remainder of the $382.7 million related to servicing.[276] These claims settled in 2013 for a total of $265 million.[277] Allocating the settlement on a pro rata basis based on claim size, $200.8 million of the total $265 million settlement would be attributable to representation and warranty issues.

Records obtained from ResCap provide certain loan-level detail for $273.1 million of the $290 million in representation and warranty claims.[278] This data specifies which loans were sold by Old GMAC Bank to GMAC Mortgage, whether the loan was originally purchased from GMAC Mortgage, the unpaid principal balance of each loan, and further, the sale date of the loan as recorded on the Debtors' general ledger. This data shows that 18.5% of the unpaid principal balance of loans in the representation and warranty category related to loans sold by Old GMAC Bank under the 2001 MMLPSA that Old GMAC Bank had not purchased from GMAC Mortgage. Because the data available does not include the per-loan claim amount, it is not possible to allocate the settlement based on this factor. Allocating the $200.8 million portion of the settlement related to representation and warranty based on the 18.5% of the total unpaid principal balance attributable to loans which were acquired from Old GMAC Bank (excluding loans the Bank acquired from GMAC Mortgage) under the 2001 MMLPSA yields an estimate of $37.2 million attributable to such loans.

---

[275] Proof of Claim No. 4852, filed by Fannie Mae on Nov. 16, 2012 [Case No. 12-12019]; Proof of Claim No. 4853, filed by Fannie Mae on Nov. 16, 2012 [Case No. 12-12020]; Proof of Claim No. 4854, filed by Fannie Mae on Nov. 16, 2012 [Case No. 12-12032]; Proof of Claim No. 4855, filed by Fannie Mae on Nov. 16, 2012 [Case No. 12-12033]; Proof of Claim No. 4849, filed by Fannie Mae on Nov. 16, 2012 [Case No. 12-12042]; #4 Cure Claim Allocation [EXAM00345891].

[276] Proof of Claim No. 4852, filed by Fannie Mae on Nov. 16, 2012, Sched. 1 [Case No. 12-12019].

[277] Stipulation and Order for the Assumption and Assignment of Certain Agreements of Fannie Mae Pursuant to section 365 of the Bankruptcy Code and Related Relief [Docket No. 2769] at 4; Proof of Claim No. 4852, filed by Fannie Mae on Nov. 16, 2012, Sched. 1 [Case No. 12-12019].

[278] #4 Cure Claim Allocation [EXAM00345891]. GMAC Mortgage Risk Officer Jeff Cancelliere has explained that a variety of issues related to the data for the remaining $16.9 million in representation and warranty claims prevented provision of this data for such claims. E-mail from J. Cancelliere to Mesirow Financial (Apr. 19, 2013).

### (iv) 2001 MMLPSA Loans Covered By The $8.7 Billion Proposed RMBS Trust Settlement Agreement

The Examiner's Professionals reviewed data provided by the Debtors related to the 392 securitizations included in the proposed $8.7 billion settlement for the Trust R&W Claims.[279] The securitization detail provided by the Debtors included for each securitization, among other data, the following: (1) securitization name; (2) issue year of the securitization; (3) original principal balance; (4) estimated long-term loss; (5) cumulative collateral losses incurred on the securitization through March/April 2012; (6) estimated future losses on the remaining collateral based on a third-party vendor model; (7) total estimated losses on the securitization; (8) categorization of the loan product (includes both First Lien and Second Lien Loans); and (9) percentage of each securitization originated by the Bank and subsequently sold to GMAC Mortgage.[280]

The original principal balance of these securitizations was approximately $221 billion.[281] In schedules that the Debtors prepared in connection with the negotiation of the RMBS Trust Settlement Agreements, the Debtors estimated the losses associated with each of the 392 securitizations, including both cumulative losses through March/April 2012 and estimated future losses; the estimated losses totaled $43.8 billion.[282] As part of their analysis, the Debtors allocated the $8.7 billion allowed claim among the 392 securitizations pro rata based upon each securitization's share of the estimated total losses.[283]

The Debtors' records and prospectus supplements disclosed that Old GMAC Bank or Ally Bank was a source of loans for 124 of the 392 securitizations included in the Trust R&W Claims. Of these 124 Securitizations, sixty-six were issued before November 22, 2006, the date of the 2006 Bank Restructuring.[284] The table below provides a break-down of these sixty-six securitizations by lien type and original principal balance:

---

[279] ResCap PLS Spreadsheet [EXAM00339947].

[280] The Debtors' records for GMAC Mortgage securitizations include the percentage of the loans originated by Old GMAC/Ally Bank as disclosed in the prospectus supplements. For securitizations issued by RFC, the data included information extracted from GMAC Mortgage's subledger system. The Examiner's Professionals identified certain inconsistencies between the Debtors' records and the filed prospectus supplements and in those instances relied upon the data in the prospectus supplements.

[281] ResCap PLS Spreadsheet, Box K-411 [EXAM00339947].

[282] *Id.* at Box O-411.

[283] *Id.* at Box P-411.

[284] It is unclear from the prospectus supplement for a Second Lien Loan securitization issued November 28, 2006 whether or what portion of the loans included were purchased from Old GMAC Bank under the 2001 MMLPSA, or from Ally Bank under the 2006 MMLPSA. The estimates provided here assume that these loans were purchased from Ally Bank.

EXHIBIT VII.L.2.a(1)(d)(iv)–1

**Securitizations Included in Trust R&W Claims and Containing Loans Originated or Purchased by Old GMAC Bank**

January 1, 2004 – November 21, 2006

*($ in Millions)*

|  | First Lien | Second Lien | Total |
|---|---|---|---|
| Number of securitizations | 54 | 12 | 66 |
| Original principal balance | $ 32,331 | $ 11,994 | $ 44,325 |

*Source: ResCap PLS Spreadsheet [EXAM00339947].*

These sixty-six securitizations have an original principal balance of approximately $44.3 billion, or 20.1% of the total original principal balance of all 392 securitizations included in the Trust R&W Claims.[285] Under the Debtors' allocation based on estimated total losses, the portion of the RMBS Trust Settlement Agreements associated with these sixty-six securitizations is $1.7 billion.[286]

The prospectus supplements and the Debtors' records set forth the percentage of loans in each securitization attributable to the Bank, but do not provide information as to whether the loans in question were first sold to the Bank by GMAC Mortgage.[287] The table below summarizes the percentage of loans attributed to Old GMAC Bank for those securitizations:

EXHIBIT VII.L.2.a(1)(d)(iv)–2

**Percentage of Loans Disclosed as Originated or Sold by Old GMAC Bank for Securitizations Included in Trust R&W Claims**

January 1, 2004 – November 21, 2006

|  | First Lien | Second Lien | Total |
|---|---|---|---|
| 0-25% | 37 | 0 | 37 |
| 26-50% | 15 | 1 | 16 |
| 51-75% | 1 | 6 | 7 |
| >75% | 1 | 5 | 6 |
|  | 54 | 12 | 66 |

*Source: ResCap PLS Spreadsheet [EXAM00339947].*

If the $8.7 billion allowed claim is allocated based on the percentage of each securitization attributed to the Bank, and on the allocation of the allowed claim to the various securitizations based upon the Debtors' estimate of total losses associated with each securitization (the $1.7 billion calculated above), the portion of the settlement that would be attributed to loans sold by Old GMAC Bank under the 2001 MMLPSA would be $400 million. Dividing this further between First and Second Lien Loans, the allocation would be approximately $57 million for First Lien Loans, and $343 million for Second Lien Loans.

---

[285] ResCap PLS Spreadsheet [EXAM00339947].

[286] *Id.*

[287] *See, e.g.,* GMAC Mortgage Corporation, GMACM Home Equity Loan Trust 2005-HE1, Prospectus Supplement (Mar. 23, 2005), at S-4; GMAC Mortgage Corporation, GMACM Mortgage, LLC Home Equity Loan Trust 2006-HE1, Prospectus Supplement (Mar. 29, 2006), at S-5; GMAC Mortgage Corporation, GMACM Home Equity Loan Trust 2006-HE2, Prospectus Supplement (June 27, 2006), at S-5.

There are, however, important reasons for believing that these amounts would overstate the liability properly allocable to loans purchased from Old GMAC Bank. First, as noted above, the data does not permit segregation of loans that the Bank acquired in the first instance from GMAC Mortgage. Second, the allocation assumes that the loans purchased from Old GMAC Bank performed the same as all other loans in the pertinent securitization. Available data does not permit an evaluation of this assumption; however, as the Debtors' analysis noted, "[h]istorically Bank production was high credit quality, which could lead to better performance[.]"[288] In light of the limitations in the available data, the Examiner's Professionals are unable to provide a more accurate estimate of the liability associated with the RMBS Trust Settlement Agreements attributable to loans purchased from Old GMAC Bank under the 2001 MMLPSA.

In any event, for the reasons discussed in Sections VII.L.2.a(1)(a) and VII.L.2.a(1)(b), the Examiner concludes that a claim against AFI or Ally Bank for recovery of amounts related to representation and warranty liabilities for loans sold under the 2001 MMLPSA is unlikely to prevail.

> ### (2) While The 2006 MMLPSA Likely Would Be Interpreted As Imposing Representation And Warranty Obligations On Ally Bank For Second Lien Loans, The MMLPSA's Two-Year Survival Clause Likely Bars All Claims For Loans Sold Thereunder

Ally Bank is a party to the 2006 MMLPSA, unlike the 2001 MMLPSA. As discussed in Section VII.L.2.a(1)(c), the 2001 MMLPSA likely would be interpreted as maintaining Second Lien Loan representations and warranties. This result seems even more likely for the 2006 MMLPSA, given that while the 2006 MMLPSA eliminates Bank representations and warranties for First Lien Loans, it explicitly retains them for Second Lien Loans.[289] This revision is difficult to interpret as anything other than a reaffirmation that the Bank is providing representations and warranties for Second Lien Loans.

Of course, the 2006 MMLPSA remained in effect for only seven months, from October 31, 2006 to June 1, 2007, when the 2007 MMLPSA took effect. As discussed above, the 2007 MMLPSA eliminated the separate pricing provisions previously applicable to Second Lien Loans and eliminated all loan-level representation and warranty provisions.

In any event, the Examiner concludes that claims concerning loans purchased under the 2006 MMLPSA, including Second Lien Loans, are not likely to prevail because the 2006 MMLPSA includes a two-year survival clause identical to the one contained in the 2001 MMLPSA.[290] Consequently, all claims by GMAC Mortgage against Ally Bank related to the representations and warranties under the 2006 MMLPSA likely would be held to have expired

---

[288] ResCap PLS Spreadsheet [EXAM00339947].

[289] 2006 MMLPSA, Art. IV [ALLY_0018291].

[290] *Id.* § 8.3; *see also* Section VII.L.2.a(1)(b) (discussing the enforceability and application of the 2001 MMLPSA's survival clause).

as of June 1, 2009, two years after the last loans were sold to GMAC Mortgage pursuant to the 2006 MMLPSA. Absent this survival clause, it is likely that Delaware's three-year statute of limitations for indemnification claims, and the fact that such claims accrue when the indemnifiable liability becomes fixed,[291] would have preserved claims by GMAC Mortgage against Ally Bank for repurchases or settlements related to Second Lien Loans occurring after May 14, 2009.[292]

While the Examiner concludes that claims related to loans sold under the 2006 MMLPSA are not likely to prevail, the Examiner's Professionals analyzed the available data to evaluate the liabilities GMAC Mortgage incurred for repurchases and settlement of representation and warranty claims in connection with Second Lien Loans purchased under the 2006 MMLPSA. It appears from the Debtors' records that there were no repurchases of Second Lien Loans of this vintage (before or after May 14, 2009).[293] There were, however, loans purchased from Ally Bank included among the securitizations issued by GMAC Mortgage in late 2006 and in 2007 that would be covered by the proposed $8.7 billion RMBS Trust Settlement Agreements. The available information concerning the precise volume and nature of these loans is limited, but they include Second Lien Loans. Ally Bank was identified as an originator or purchaser of loans in the prospectus supplements or the Debtors' records for thirty-eight securitizations issued between November 22, 2006 and May 31, 2007,[294] the period during which GMAC Mortgage purchased loans from Ally Bank under the 2006 MMLPSA. Of these thirty-eight

---

[291] *See* Section VII.L.2.a(1)(b) (for a discussion of the law concerning the statute of limitations applicable to claims for indemnification).

[292] *See* Section VII.L.2.a(1)(b); 2007 MMLPSA, § 6.1 [ALLY_0018275] (indemnification provision).

[293] 2008–2011 GMAC Repurchases Charged Info Final [EXAM00339948].

[294] GMAC Mortgage, LLC, GMACM Home Equity Loan Trust 2006-HE5, Prospectus Supplement (Nov. 28, 2006), at S-5; GMAC Mortgage, LLC, GMACM Home Equity Loan Trust 2007-HE, Prospectus Supplement (Mar. 28, 2007), at S-5. It is unclear from the prospectus supplements for securitizations issued in November 2006 after the November 22, 2006 Bank Restructuring whether or to what extent loans were purchased from Old GMAC Bank under the 2001 MMLPSA or from Ally Bank under the 2006 MMLPSA. For purposes of this analysis, the lone November 2006 Second Lien Loan securitization dated after November 22, 2006 is assumed to consist of Ally Bank loans.

securitizations, the disclosures identify two as containing Second Lien Loans.[295] These two securitizations have an original principal balance of approximately $2.4 billion, or 1.1% of the total original principal balance of all securitizations included in the Trust R&W Claims. The Exhibit below provides a summary of these two securitizations:

EXHIBIT VII.L.2.a(2)

**Securitizations Included in Trust R&W Claims and Containing Second Lien Loans Purchased from Ally Bank Under the 2006 MMLPSA**

November 22, 2006 – May 31, 2007

*($ in Millions)*

| Securitization Name | Original Principal Balance | Estimated Bank % | % of Total $8.7 Billion Settlement |
|---|---|---|---|
| 2006 - HE5 | $    1,244 | 86.0% | 0.6% |
| 2007 - HE1 | 1,186 | 83.0% | 0.5% |
| Total | $    2,430 | | 1.1% |

*Source: ResCap PLS Spreadsheet [EXAM00339947]; GMAC Mortgage, LLC, GMACM Home Equity Loan Trust 2006-HE5, Prospectus Supplement, at S-5 (Nov. 28, 2006); GMAC Mortgage, LLC, GMACM Home Equity Loan Trust 2007-HE1, at S-5 (Mar. 28 2007).*

As discussed in Section VII.L.2.a(1)(d)(iv), the Debtors allocated the $8.7 billion allowed claim pro rata based on an analysis of the estimated losses on each of the 392 securitizations. Under that allocation, the portion of the allowed claim attributed to these two securitizations was $102 million.[296] Based on the percentage of each securitization consisting of loans sold by Ally Bank identified in the prospectus supplements, the portion of the settlement attributable to such loans would be $86.1 million.[297]

However, as with the analysis in Section VII.L.2.a(1) of loans purchased under the 2001 MMLPSA, there are important reasons for believing that these amounts would overstate the liability properly allocable to loans purchased from Ally Bank. The same considerations noted there apply here. First, the available data does not permit segregation of loans that the Bank acquired in the first instance from GMAC Mortgage. Second, the allocation assumes that the loans purchased from the Bank performed the same as all other loans in the pertinent securitization. The data available do not permit an evaluation of this assumption; however, as the Debtors' spreadsheet analyzing the claims noted, "[h]istorically Bank production was high credit quality, which could lead to better performance[.]"[298]

In sum, the Examiner concludes that, while Ally Bank likely would be held to have provided representations and warranties for Second Lien Loans under the 2006 MMLPSA, a claim against the Bank for loans sold under the 2006 MMLPSA is unlikely to prevail because it would be time-barred under the two-year survival provision. If such claims were viable, based on the available data, it appears that the amount at issue would be less than $86.1 million.

---

[295] GMAC Mortgage, LLC, GMACM Home Equity Loan Trust 2006-HE5, Prospectus Supplement (Nov. 28, 2006), at S-5; GMAC Mortgage, LLC, GMACM Home Equity Loan Trust 2007-HE1, Prospectus Supplement (Mar. 28, 2007), at S-5.

[296] ResCap PLS Spreadsheet [EXAM00339947].

[297] *Id.*

[298] *Id.*

### b. Failure To Obtain Independent Director Approval/Waivers Under The Operating Agreements

As discussed in Section V.B, there are numerous agreements and revisions to agreements, including the 2006 MMLPSA and later revisions thereto, the 2007 through 2009 versions of the Pipeline Swap, and the 2007 MSR Swap, as well as the 2008 agreements regarding brokering loans to the Bank, that occurred between the inception of the 2005 Operating Agreement and November 2010, none of which were presented to the ResCap Board, or more particularly, to the Independent Directors.[299] Each of the 2005 Operating Agreement and the 2006 Amended Operating Agreement barred ResCap transactions with GMAC Affiliates that were not "consistent with those that parties at *arm's length* would agree to and for fair value,"[300] absent waiver of these restrictions by the Independent Directors.[301] As the parties themselves (and the regulators) repeatedly recognized, the MMLPSA, Pipeline Swap, and MSR Swap (considered singly or together) were not on terms that were available in the market, to which parties at arm's length would have agreed.

That GMAC Mortgage, rather than ResCap, entered into the agreements did not render the 2005 Operating Agreement's or the 2006 Amended Operating Agreement's affiliate transaction restrictions inapplicable; both the 2005 Operating Agreement and the 2006 Amended Operating Agreement explicitly required that ResCap's subsidiaries comply with the restrictions on affiliate transactions.[302] As David Walker, a former CFO of GMAC Mortgage Group and one of the architects of ResCap's formation and the 2005 Operating Agreement,[303] stated, the Operating Agreement's provisions concerning transactions with affiliates should be read to require approval of ResCap's subsidiaries' contracts with affiliates that were not ResCap subsidiaries "[b]ecause the point of the Operating Agreement is that ResCap's business, which would include that subsidiary activity, needs to be distinct from, you know, the rest of [AFI] . . . ."[304]

Walker, however, further suggested that ResCap/GMAC Mortgage transactions with the Bank would not trigger those provisions because the mortgage side of the Bank essentially should be viewed as a ResCap subsidiary, even after the 2006 Bank Restructuring

---

[299] The July 2010 MSR Swap revisions were approved by the ResCap Board in November 2010. Minutes of a Special Meeting of the Board of Residential Capital, LLC, Nov. 5, 2010, at RC40018844–45 [RC40018729].

[300] 2005 Operating Agreement, § 2(b) [ALLY_0140795] (emphasis added); 2006 Amended Operating Agreement, § 2(b) (Residential Capital, LLC, Current Report (Form 8-K) (Nov. 30, 2006), Ex. 10.1) (emphasis added).

[301] 2005 Operating Agreement, § 8 [ALLY_0140795]; 2006 Amended Operating Agreement, § 8 (Residential Capital, LLC, Current Report (Form 8-K) (Nov. 30, 2006), Ex. 10.1).

[302] 2005 Operating Agreement, § 2(b) [ALLY_0140795]; 2006 Amended Operating Agreement, § 2(b) (Residential Capital, LLC, Current Report (Form 8-K) (Nov. 30, 2006), Ex. 10.1) (ResCap required to assure that "its Subsidiaries" comply with restrictions on transactions with GMAC Affiliates).

[303] Int. of D. Walker, Nov. 28, 2012, at 11:10–21:24.

[304] *Id.* at 31:11–14.

(*see* Section V.A.1) occurred.[305] Of course, ResCap had no interest in Ally Bank at the time the 2006 MMLPSA was executed. But even after ResCap acquired its interest in IB Finance, under the terms of the 2006 Amended Operating Agreement, because ResCap's interest was non-voting, Ally Bank remained a "GMAC Affiliate" subject to the Operating Agreement's restrictions on Affiliate Transactions; and Ally Bank was not a ResCap "Subsidiary" to whom the restrictions did not apply.[306] Further, whatever logical force this position might have held in earlier years, it no longer held after January 2009, when ResCap sold the balance of its non-voting interest in Ally Bank; yet 2009 amendments to the Pipeline Swap and the MSR Swap were not presented to the ResCap Board or the Independent Directors.[307]

Nonetheless, the Examiner concludes there are significant obstacles that make it unlikely that any claim for breach of the Operating Agreements would result in any recovery against AFI.

First, as discussed in Sections V.B.12.a and V.B.12.b, the agreements at issue do not appear to have resulted in losses to GMAC Mortgage. While not on arm's-length terms, it does not appear that the agreements themselves were economically unfair to ResCap (though there are issues as to whether there were breaches of the agreements, discussed separately below). In short, the agreements do not appear to have materially and adversely affected ResCap's creditors.[308]

Second, and perhaps in contrast to the 2006 Bank Restructuring, the information obtained in the Investigation does not suggest that AFI or Ally Bank was responsible for the determination as to whether the agreements in question were submitted to the Independent Directors for review. Further, AFI's obligations under the Operating Agreements are narrowly

---

[305] *Id.* at 32:5–17 ("GMAC Mortgage engaging with the mortgage side of the bank is really like staying within the ResCap walls.").

[306] After the 2006 Bank Restructuring, GMAC Bank was wholly owned by IB Finance, which in turn was owned by AFI with 2 million IB Finance Class A Shares and ResCap with 2 million IB Finance Class M Shares. *See* Section V.A. To qualify as a "Subsidiary" of ResCap under the 2006 Amended Operating Agreement, ResCap had to own "a majority of the *voting interests*" of such company, either directly or indirectly. *See* 2006 Amended Operating Agreement, § 1 (Residential Capital, LLC, Current Report (Form 8-K) (Nov. 30, 2006), Ex. 10.1) (definition of "Subsidiary") (emphasis added). Here, ResCap owned no voting interests of GMAC Bank. Instead, GMAC held all of the voting interests of GMAC Bank, making GMAC Bank a Subsidiary of GMAC and a "GMAC Affiliate." *See id.* § 1. Consequently, transactions between GMAC Bank, on the one hand, and ResCap or its "Subsidiaries" (including GMAC Mortgage), on the other hand, clearly fell within the scope of transactions subject to restrictions pursuant to the 2006 Amended Operating Agreement's section 2(b) *Id.* § 2(k).

[307] *See* Sections V.B.1.a, VII.L.2.b.

[308] 2005 Operating Agreement, § 8 [ALLY_0140795]; 2006 Amended Operating Agreement, § 8 (Residential Capital, LLC, Current Report (Form 8-K) (Nov. 30, 2006), Ex. 10.1).

circumscribed,[309] and the Investigation has not revealed evidence of any breach of AFI's implied contractual duty of good faith[310] in connection with the execution of these agreements or the failure to submit them to the Independent Directors or ResCap's Board.

Third, and finally, as discussed in Section III.B, under the Operating Agreements, the remedies of third-party beneficiary creditors are "limited to specific enforcement of the provisions of th[e] Agreement";[311] there is a similar limitation of the remedies available against AFI to specific performance, coupled with an express prohibition on liability for damages.[312] With respect to the agreements at issue here, it does not appear that there is a basis for avoiding this limitation on remedies based on bad faith, fraud or conduct that "smacks of intentional wrongdoing."[313] Of course, the agreements in question were later replaced by successor versions approved by the Independent Directors and/or terminated.

Consequently, the Examiner concludes that any claims that the Operating Agreements were breached because the MMLPSA, Pipeline Swap, MSR Swap, or broker-related agreements were not on terms that parties at arm's length would have agreed to, and that this departure was not waived by the Independent Directors, are not likely to prevail.

### c.   Application Of The Pipeline Swap To The Funding To Sale Period And To Bank-Originated Loans

As discussed in Sections V.B.5 and V.B.10.b(1), when HFS loans were added to the Pipeline Swap in July 2008 (contemporaneously with adoption of the 2008 MMLPSA), the parties did not revise the terms of the Pipeline Swap to extend the period covered beyond the rate lock to funding time period to include the time from the loan's funding to its sale to GMAC Mortgage under the MMLPSA.[314] They likewise failed to modify the Pipeline Swap's definition of Subject Transactions to include loans "originated" by the Bank, so that the Pipeline Swap by its terms remained limited to loans "purchased" by the Bank. Yet, it is clear

---

[309]   2005 Operating Agreement, § 7 [ALLY_0140795]; 2006 Amended Operating Agreement, § 7 (Residential Capital, LLC, Current Report (Form 8-K) (Nov. 30, 2006), Ex. 10.1). AFI's obligations under these provisions do not encompass section 2(b)'s covenant that ResCap and its "Subsidiaries" will not enter into affiliate agreements that are not on arm's length, fair-value terms, or section 8's provisions for waiver by the Independent Directors.

[310]   *See* Section VII.L.1.

[311]   2005 Operating Agreement, § 11 [ALLY_0140795]; 2006 Amended Operating Agreement, § 11 (Residential Capital, LLC, Current Report (Form 8-K) (Nov. 30, 2006), Ex. 10.1).

[312]   2005 Operating Agreement, § 7 [ALLY_0140795]; 2006 Amended Operating Agreement, § 7 (Residential Capital, LLC, Current Report (Form 8-K) (Nov. 30, 2006), Ex. 10.1).

[313]   *See* Section VII.L.1; *Deutsche Lufthansa A.G. v. Boeing Co.*, 2007 U.S. Dist. LEXIS 9519, at *7 (S.D.N.Y. Feb. 2, 2007); *Indus. Risk Insurers v. Port Auth.*, 387 F. Supp. 2d 299, 305 (S.D.N.Y. 2005); *Net2Globe Int'l, Inc. v. Time Warner Telecomm. of N.Y.*, 273 F. Supp. 2d 436, 454 (S.D.N.Y. 2003).

[314]   As discussed in Section V.B.4, "rate lock" refers to the date upon which the Bank commits to fund or purchase a loan; "funding" refers to the date on which the Bank purchases or funds the loan, and "sale" refers to the date of sale under the MMLPSA.

that from and after July 2008 the Swap was applied as though it encompassed the period from funding to sale for HFS loans, and was applied to brokered loans originated by Ally Bank.

The issue, then, is whether application of the Pipeline Swap in this fashion should be considered a breach of the Pipeline Swap, or whether, notwithstanding the Pipeline Swap's seemingly unambiguous language, this application of the Pipeline Swap should be considered consonant with the parties' agreement. To resolve this question requires consideration of: (1) whether the doctrine of mistake should be applied to reform the Pipeline Swap's terms; and (2) whether, even if the doctrine of mistake is inapplicable, the parties modified the terms of the Pipeline Swap through their subsequent dealings.

### (1) Mutual Mistake

The Pipeline Swap is governed by New York law.[315] Under New York law, "[a] written agreement may be reformed for mutual mistake where the parties have reached an oral agreement and, unknown to either, the signed writing does not express that agreement."[316] Reformation is proper to "restate the intended terms of an agreement when the writing that memorializes that agreement is at variance with the intent of both parties."[317] A mistake in the reduction of the agreement to writing, no matter if the mistake is by a scrivener or a party, and

---

[315] March 2008 Pipeline Swap Schedule, part 4(h) [ALLY_0018074]; July 2008 Pipeline Swap Schedule, part 4(h) [ALLY_0018237]; Amended and Restated Schedule to the 2002 ISDA Master Agreement, dated as of Apr. 1, 2011, part 4(h) [RC00027879].

[316] *CRP/Extell Parcel I, L.P. v. Cuomo*, 34 Misc. 3d 1214(A), at *5 (N.Y. Sup. Ct. 2012), *aff'd*, 101 A.D.3d 473 (2012) (citing *Ebasco Constructors, Inc. v. Aetna Ins. Co.*, 260 A.D.2d 287, 290 (N.Y. App. Div. 1999); *see also Travelers Indem. Co. of Ill. v. CDL Hotels USA, Inc*., 322 F. Supp. 2d 482, 495 (S.D.N.Y. 2004) ("Reformation or rescission may be appropriate where a writing does not set forth the actual agreement of the parties."); *Resort Sports Network Inc. v. PH Ventures III, LLC*, 67 A.D.3d 132, 135 (N.Y. App. Div. 2009) (same). By contrast, New York only permits reformation for a "unilateral mistake" where the mistake is coupled with fraud. *See Travelers Indem. Co. of Ill*., 322 F. Supp. 2d at 498. Further, if the terms of the written agreement accurately memorialize the parties' agreement, the court will honor the writing and will not reform those terms to "alleviate a hard or oppressive bargain" subsequently realized. *George Backer Mgmt. Corp. v. Acme Quilting Co., Inc*., 385 N.E.2d 1062, 1066 (N.Y. 1978) (holding that a contract that subsequently resulted in monetary consequences to a party that the party did not anticipate was still valid because the contract was highly negotiated, and the party could not show that the consequence of the contract was due to a mistake in the contract).

[317] *US Bank Nat'l Ass'n v. Lieberman*, 98 A.D.3d 422, 423–24 (N.Y. App. Div. 2012) (finding reformation not warranted where evidence proffered by plaintiff showed that the written agreement conformed to the intent of the parties). A claim for reformation of the 2008 Pipeline Swap would be timely. An action for reformation is governed by the six-year statute of limitations governing contracts in New York. N.Y.C.P.L.R. 213 (McKinney 2004); *Wilshire Credit Corp. v. Ghostlaw*, 300 A.D.2d 971, 973 (N.Y. App. Div. 2002) (citing *Wallace v. 600 Partners Co*., 658 N.E.2d 715, 716 (N.Y. 1995)); *Schmitt v. Schmitt*, 123 A.D.2d 617 (N.Y. App. Div. 1986). The statute of limitations for such a claim begins to run from the time the asserted error was allegedly committed. *See Wallace*, 658 N.E.2d at 717.

no matter how the mistake occurred, can be corrected by reformation.[318] However, where the language of the contract is unambiguous, claims that the agreement does not reflect the parties' agreement face a heightened evidentiary burden.[319] The proponent of reformation must present "a high level of proof, free from contradiction or equivocation, that the instrument is not written as intended by both parties."[320] This requires "clear and convincing evidence"[321] of a prior agreement between the parties, showing exactly what the parties agreed upon.[322]

### (2) Modification

Under New York law, a written contract generally can be modified by agreement, whether express or implied.[323] The Pipeline Swap, however, explicitly provides that amendments to the agreement must be in writing:

> No amendment, modification or waiver in respect of this Agreement will be effective unless in writing (including a writing evidenced by a facsimile

---

[318] *Simek v. Cashin*, 292 A.D.2d 439, 440 (N.Y. App. Div. 2002); *see also Ebasco Constructors,* 260 A.D.2d at 290 (finding that plaintiffs overwhelmingly established the occurrence of a scrivener's error that justified remedy of reformation because evidence showed numerous errors in the insurance policy).

[319] *See S. Fork Broad. Corp. v. Fenton*, 141 A.D.2d 312 (N.Y. App. Div. 1988) (finding that conclusory assertions by a sophisticated party that the writing did not express the terms of the agreement cannot defeat summary judgment because the party must overcome a heavy presumption that a deliberately prepared and executed written instrument manifests the true intention of the parties).

[320] *CRP/Extell Parcel*, 34 Misc. 3d 1214(A), at *6–7 (citing 16 N.Y. JUR.2D CANCELLATION OF INSTRUMENTS § 92); *see also S. Fork Broad. Corp.*, 141 A.D.2d at 315 ("The proponent of reformation must show in no uncertain terms not only that mistake or fraud exists, but exactly what was really agreed upon between the parties."). The burden of proof for reformation is high in part because it implicates the type of danger against which the parol evidence rule and Statute of Frauds were meant to protect, namely, "the danger that a party, having agreed to a written contract that turns out to be disadvantageous, will falsely claim the existence of a different, oral contract." *Resort Sports Network*, 67 A.D.3d at 135 (citing *Chimart Assoc. v. Paul*, 489 N.E.2d 231, 234 (N.Y. 1986)).

[321] *See Healy v. Rich Prods. Corp.*, 981 F.2d 68, 73 (2d Cir. 1992); *Yu Han Young v. Chiu*, 49 A.D.3d 535, 536 (N.Y. App. Div. 2008).

[322] *See Lieberman*, 98 A.D.3d at 424 (stating that reformation based upon a scrivener's error requires proof of a prior agreement between parties); *K.I.D.E. Assocs., Ltd. v. Garage Estates Co*., 280 A.D.2d 251, 253 (N.Y. App. Div. 2001) (noting that the evidence must show what parties agreed upon, particularly if the negotiations were conducted by sophisticated and counseled parties).

[323] *See S. Fed. Sav. & Loan Ass'n of Ga. v. 21-26 E. 105th St. Assocs*., 145 B.R. 375, 380 (S.D.N.Y. 1991), *aff'd,* 978 F.2d 706 (2d Cir. 1992); *see also Robotic Vision Sys., Inc. v. Gen. Scanning, Inc.*, 96-CV-3884 (JG), 1997 WL 1068696, at *6 (E.D.N.Y. Sept. 8, 1997) (stating that "[p]arties to a contract may modify the terms of a written contract by a subsequent course of conduct").

transmission) and executed by each of the parties or confirmed by an exchange of telexes or electronic messages on an electronic messaging system.[324]

New York law concerning such provisions is similar to Delaware law.[325] "Under certain conditions, however, a written agreement which provides that it cannot be modified except by a writing, can be modified by a course of conduct or actual performance."[326] To demonstrate a modification, there must be mutual assent of each party.[327] It is not enough to simply show that the parties acted inconsistently with the terms of the written contract;[328] the parties' altered performance must be "unequivocally referable" to a modified oral agreement.[329] On the other hand, the course of performance and conduct of parties will hold great weight as to whether there was a modified oral agreement, as courts have held that "[t]he practical interpretation of a contract by the parties, manifested by their conduct subsequent to its formation for any considerable length of time before it becomes a subject of controversy, is

---

[324] ISDA Master Agreement, dated as of Oct. 1, 2004, § 9(b) [ALLY_0041583]; *see also* ISDA 2002 Master Agreement, dated as of Apr. 1, 2011, § 9(b) [RC00027962]:

An amendment, modification or waiver in respect of this Agreement will only be effective if in writing (including a writing evidenced by a facsimile transmission) and executed by each of the parties or confirmed by an exchange of telexes or by an exchange of electronic messages on an electronic messaging system.

[325] *See* Section VII.L.2.a(1)(c) (discussing Delaware law).

[326] *S. Fed. Sav. & Loan Ass'n*, 145 B.R. at 380 (citing *Seven-Up Bottling Co. (Bangkok), Ltd. v. PepsiCo, Inc.*, 686 F. Supp. 1015, 1022 (S.D.N.Y. 1988)).

[327] *See Larson v. Eney*, 741 F. Supp. 2d 459, 465 (S.D.N.Y. 2010) (noting that mutual assent includes a meeting of the minds as to all material terms); *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 783 (2d Cir. 2003) ("[A] single act of accepting payment is not a course of performance sufficient to demonstrate mutual assent.").

[328] *See, e.g.*, *Airway Maint., LLC v. N. Fork Bank*, No. 0015081/2004, 2007 WL 4846194 (N.Y. Sup. Ct. Nov. 21, 2007) (finding that conduct itself could not produce a modification, particularly where plaintiffs did not produce any evidence of an oral agreement to modify); *Robotic Vision Sys.*, 1997 WL 1068696, at *6 (rejecting as insufficient a party's claim that a confidentiality agreement, which required oral designations of confidentiality to be followed by a written designation, was modified by the parties' course of conduct because the parties never designated anything in writing); *S. Fed. Sav. & Loan Ass'n*, 145 B.R. at 380–81 (finding that a bank's conduct, which demonstrated an intention to ignore restrictions and limitations in the contract and to use undisbursed funds to pay hard and soft costs, did not amount to a modification by conduct because there was no evidence that the parties had mutually assented and agreed to modification).

[329] *See S. Fed. Sav. & Loan Ass'n*, 145 B.R. at 380–81 (stressing that the party must show evidence that the conduct and verbal agreement refers specifically to the modification, rather than only to an intent to modify or to an action inconsistent with the written contract. Without this implied agreement to modify, conduct on its own is insufficient); *Airway Maint.*, 2007 WL 4846194 (stating that plaintiff needs to prove that conduct is unequivocally referable to the alleged oral modification and that the conduct conferred some benefit on the party against whom enforcement is sought); *Ballard v. Parkstone Energy, LLC*, 522 F. Supp. 2d 695, 709 (S.D.N.Y. 2007) ("For a course of performance to demonstrate mutual assent to a modification, it must be 'unequivocally referable' to the modification.").

entitled to great, if not controlling weight in the construction of the contract."[330] Further, a valid modification must include consideration—legal detriment incurred by both parties—to support the change.[331]

Here, given the available evidence and the exacting standard, while the applicability of the doctrine of mistake is a closer question, there appears to be a strong argument for modification.

As discussed in Section V.B.5, the Bank's HFS portfolio historically had been hedged through the application of the MMLPSA and its cost-based pricing. The 2008 revision of the MMLPSA and the addition of the HFS portfolio to the Pipeline Swap, were by all accounts aimed at maintaining the hedged status of the portfolio.[332] The contemporaneous MMLPSA pricing revisions, with their reference to hedge accounting, appear to reflect a similar intent.[333] Moreover, it appears that, from the outset, the parties performed as though the HFS portfolio was fully hedged, so that, in combination with the MMLPSA, the loans would be transferred to GMAC Mortgage at cost, as they always had. None of the personnel interviewed, and none of the documents produced, evidence any other view.

The language of the Swap, however, unambiguously refers solely to the rate lock to funding period, and Bank personnel, at least, realized that this was the language in the agreement.[334] There seems to be no doubt that the language used was language the parties

---

[330] *Viacom Int'l, Inc. v. Lorimar Prods., Inc.*, 486 F. Supp. 95, 98 n.3 (S.D.N.Y. 1980); *see also Austin v. Barber*, 227 A.D.2d 826, 828 (N.Y. App. Div. 1996) (finding that, despite a contractual provision barring modification except in writing, the conduct of the parties demonstrated a modification because evidence showed plaintiff requested certain additions to a construction contract, and defendant performed those requests).

[331] *See Rooney v. Slomowitz*, 11 A.D.3d 864, 867 (N.Y. App. Div. 2004) ("Consideration is necessary to prove the existence of an oral modification of a written agreement."); *Metzger v. Aetna Ins. Co.,* 229 A.D. 2, 6 (N.Y. App. Div. 1930) (finding sufficient consideration where defendant received a larger premium and plaintiff was relieved from danger of immediate cancellation); *Pactiv Corp. v. Multisorb Techs. Inc.*, 823 F. Supp. 2d 840, 847 (N.D. Ill. 2011) (applying New York law and rejecting as insufficient a party's claim that a confidentiality agreement between food packaging manufacturer and its competitor was modified through conduct so as to include oral disclosures and non-designated documents as confidential information under the agreement when there was no consideration for these additional inclusions); *Ballard*, 522 F. Supp. 2d at 710 (finding that there was no consideration for the seller's purported waiver of a 60 day deadline); *Estate of Anglin v. Estate of Kelley*, 270 A.D.2d 853 (N.Y. App. Div. 2000) (holding no modification by conduct to have been made because there was no consideration made by either party for any change to plaintiff's entitlement under a buy-sell agreement).

[332] Int. of R. Groody, Dec. 17, 2012, at 160:10–161:6, 164:25–165:13, 167:9–174:14; Int. of A. Celini, Feb. 18, 2013, at 196:22–197:18; GMAC Bank Affiliate Transaction Memorandum, July 1, 2008 Schedule to ISDA Master Agreement, dated June 30, 2008, at 3 [ALLY_0017919] (asserting that the transaction results in a "perfect hedge for the Bank").

[333] 2008 MMLPSA, § 1.9 [ALLY_0201210].

[334] *See* GMAC Bank Affiliate Transaction Memorandum, July 1, 2008 Schedule to ISDA Master Agreement, dated June 30, 2008, at 1 [ALLY_0017919] (noting swap covers changes in value "from the rate lock date to the time of funding for HFI and HFS").

knew they were using. The Investigation has uncovered no evidence that the parties specifically agreed that the period covered should be rate lock to sale,[335] and that this simply did not get transcribed in the document.

Instead, the problem appears to be that these were complicated transactions, and, whether through carelessness in analysis, sloppiness in preparation of the agreements (of which there are numerous examples),[336] or otherwise, the parties simply seem not to have understood that to achieve their agreed general purpose, this language should have been revised to extend the period to which the Swap applied to the date of sale. While hedging the HFI portfolio only for the period from lock to funding fit the business purpose of that portion of the transaction, hedging the HFS portfolio only for this shorter period and leaving the portfolio unhedged from funding to sale would have made little business sense. The parties' consistent conduct following adoption of the 2008 Pipeline Swap and MMLPSA revisions was to apply the Swap to the full rate lock to sale period; GMAC Mortgage, for example, hedged the risk in the market as though it had fully assumed the risk, rather than leaving the risk for the funding to sale period with Ally Bank.[337]

Whether the contract would be reformed under the doctrine of mistake based on these facts is a close question, but the Examiner concludes that a court more likely than not would reform the contract.

The argument for application of the mistake doctrine to reform the 2008 Pipeline Swap to encompass brokered loans is weaker. In July 2008, the volume of brokered, Bank-originated loans was very small.[338] There appears to be no evidence that these loans were specifically discussed in the discussions leading up to adoption of the 2008 Pipeline Swap.

However, it is abundantly clear from the written record of the Brokering Consumer Loans to Bank Project, described in Section V.B.6.a and in Section V.B.6.d, that the parties intended that the Pipeline Swap apply not only to brokered loans, but also to the "funding to sale" period. Those documents, including e-mails exchanged between the parties documenting their agreement on the economics, reflect an agreement that the Pipeline Swap will apply to brokered loans, and will apply from rate lock to sale; indeed, the whole analysis of the allocation of revenues undertaken in connection with the project turns upon application of the Swap in this fashion. Consequently, even if one were to conclude that the doctrine of mistake was inapplicable to the contract terms as originally written, there appears to be a very strong argument that, at minimum, the contract terms were modified in connection with the Brokering Consumer Loans to Bank Project.

--------------------------------------------------------

[335] As discussed in Section V.B.4, "rate lock" is when the funding price to the borrower or purchase price to a third party is fixed and "sale" is when the loan is sold to GMAC Mortgage.

[336] *See, e.g.*, Section V.B.4.d (discussing the May 2007 Pipeline Swap).

[337] *See* Int. of S. Blitzer, Mar. 5, 2013, at 105:21–107:24; *see also* Int. of J. Whitlinger, Nov. 30, 2012, at 134:19–135:5, 137:10–20, 147:25–148:11.

[338] *See* Int. of A. Celini, Feb. 18, 2013, at 41:19–23.

Accordingly, the Examiner concludes that it is unlikely that a claim that the Pipeline Swap was breached when it was applied to the funding to sale period would prevail, and it is unlikely that a claim that application of the Swap to brokered loans was a breach would prevail.

### d. The Misallocation Of Net Revenues On Loans Brokered By GMAC Mortgage

Section V.B.6 sets forth in detail the facts underlying this issue, and the Examiner's evaluation of the evidence concerning the negotiation of the brokering arrangement, the implementation of the agreed allocation of revenues in January–July 2009, the effect of the Bank's fair-value election, and the 2011–12 investigation of and response to the revenue-allocation issue.

In sum, the evidence shows that the participants in the Brokering Consumer Loans to Bank Project agreed to an allocation of revenues on loans GMAC Mortgage brokered to the Bank that was consistent with the prior allocation of revenues on 250.250 loans, and with the application of the pricing and swap provisions of the MMLPSA and Pipeline Swap. While the Bank initially was to receive certain revenues such as points and origination fees, and to incur certain expenses such as broker expense, the BCL2B Presentation and contemporaneous e-mail exchanges between Bank and ResCap representatives all demonstrate that the parties contemplated that, through the application of FAS 91 deferrals, the economic effect of all these revenues and expenses would be transferred to GMAC Mortgage. The accounting examples provided in the BCL2B Presentation are equally clear on this point. It is telling that the parties upon inception of the brokering arrangement implemented the revenue allocation in just this fashion.

The parties' agreement, moreover, reflected the parties' fundamental approach to the allocation of revenues, repeatedly articulated by Bank officers Celini and Groody: the Bank would act as a financing conduit, collecting net carry, while GMAC Mortgage would assume the risks on the transaction, including representation and warranty risk, hedging risk, etc., and was consequently entitled to the gain on sale.

Later claims in 2012 that the BCL2B Presentation was somehow "unclear" appear to simply ignore the repeated demonstration of how the parties in 2008 (and afterwards) understood the revenue allocation would work (perhaps, in the case of KPMG, because it lacked access to all of the available information). There is ample fodder here for an argument that the initial reaction of those reviewing the problem in late 2011 (that the Bank had retained gain on sale revenue due to GMAC Mortgage) was squelched, and that the result in 2012 was the product of a desire, in the face of ResCap's impending bankruptcy, to avoid restating Ally Bank's financials (and the regulatory scrutiny that would have ensued), rather than a fair and objective attempt to resolve the matter.[339]

_____

[339] It might be possible to fashion a breach of fiduciary duty claim against ResCap officials who apparently succumbed to AFI's and the Bank's desires. As discussed in Section VII.E.2.c, such claims face a variety of substantial obstacles. More to the point, they would appear in this instance to be wholly redundant of the recoveries the Examiner concludes are already available to Debtors under contract law.

The evidence shows that the Bank's August 1, 2009 conversion to fair-value accounting, even if unintentionally, resulted in a straightforward breach of the parties' agreement, documented in the MMLPSA and Pipeline Swap and in the parties' communications and documentation concerning the Brokering Consumer Loans to Bank Project and in their subsequent conduct from January 1, 2009 to July 31, 2009.[340] There is no evidence that GMAC Mortgage agreed to the fundamental reallocation of revenues wrought by the Bank's fair-value accounting election—that it agreed that it would continue to absorb the risks related to the loan transaction while allowing the Bank to retain a portion of the gain on sale. Indeed, neither party seems to have even understood that the fair-value election had effected this change until December 2011. In any case, as the Bank's Sponsor of the Brokering Consumer Loans to Bank Project, Celini, noted, to alter the revenue allocation that had been agreed upon (whether through a change in accounting or otherwise) would have required an affirmative agreement of the parties, and there was no such agreement here. There thus does not appear to be any basis to conclude that the fair-value election reflected a modification of the parties' agreements.

Accordingly, the Examiner concludes that GMAC Mortgage likely would prevail on a contractual claim that the allocation of revenues from January 1, 2009 to July 31, 2009 was proper, and that it is entitled to payment of the revenues misallocated to the Bank from and after August 1, 2009.[341] GMAC Mortgage would be entitled not only to return of the $51.4

---

[340] Even if the contemplated allocation of revenues was not mandated by the terms of the 2008 MMLPSA and Pipeline Swap, the contemporaneous Brokering Consumer Loans to Bank Project documentation and the parties ensuing implementation of the arrangement would constitute a written modification of those agreements to provide for the contemplated revenue allocation. *See* Section V.B.6; ISDA Master Agreement, dated as of Oct. 1, 2004, § 9(b) [ALLY_0041583] (acknowledging agreement to modify through electronic messages); 2008 MMLPSA, § 8.8 [ALLY_0201210]. Although the 2008 MMLPSA requires that any modification include a signed writing, Delaware courts have held that modifications to agreements may nevertheless be valid even if such modifications do not comply with the terms set forth for modifications in the original agreement. *See Pepsi-Cola Bottling Co. v. Pepsico Inc.*, 297 A.2d 28, 33 (Del. 1972) ("We think, therefore, that a written agreement between contracting parties, despite its terms, is not necessarily only to be amended by formal written agreement."); *see also Cont'l Ins. Co. v. Rutledge & Co., Inc.*, 750 A.2d 1219, 1229 (Del. Ch. 2000) ("[I]t is settled law that contract provisions deeming oral modifications unenforceable can be waived orally or by a course of conduct just like any other contractual provision.").

[341] The claim would be predicated upon the MMLPSA, governed by Delaware law, and the Pipeline Swap, governed by New York law, and the parties' agreements reflected in the documentation of the Brokering Consumer Loans to Bank Project. See 2001 MMLPSA, § 8.5 [ALLY_0018253]; March 2008 Pipeline Swap, part 4(h) [ALLY_0018074]; July 2008 Pipeline Swap Schedule, part 4(h) [ALLY_0018237]; Amended and Restated Schedule to the 2002 ISDA Master Agreement, dated as of Apr. 1, 2011, part 4(h) [RC00027879]. Under either Delaware's three-year statute of limitations (and Bankruptcy Code section 108's tolling provisions) or New York's six-year statute, the claims would be timely. New York law would call for the application of interest at the rate of 9% per annum. See N.Y. C.P.L.R. § 5004. Under Delaware law, the applicable rate would be 5% above the Federal Reserve discount rate. See DEL. CODE ANN. tit. 6, § 2301(a); see also Chaplake Holdings Ltd. v. Chrysler Corp., No. Civ.A 94C-04-164-JO, 2003 WL 22853462, at *5 (Del. Super. Ct. Oct. 30, 2003). Precisely which rate a court would apply in these circumstances is unclear, but the pertinent rate would be applied to the $51.4 million component repaid to Ally Bank from the repayment date, and to the $469.1 million in revenues retained by the Bank for the period August 1, 2009 through April 2012 from the date on which each of the constituent portions of those revenues was due to GMAC Mortgage (i.e., the sale date of the pertinent loan).

million paid to Ally Bank in March 2012,[342] but also to payment of over $469 million in additional revenues (net of the below-market broker fee) that it would have received had the parties' agreed revenue allocation been abided by from August 1, 2009 to April 30, 2012, when the MMLPSA and Pipeline Swap were terminated.

### e. Failure To Pay The Value Of Correspondent-Loan And Purchased MSRs To GMAC Mortgage Under The MSR Swap

As discussed in Section V.B.10.b.(2), Ally Bank has, as part of its payments under the MSR Swap, paid to GMAC Mortgage the value of MSRs arising from Bank-originated loans upon their initial capitalization, but has not done so for MSRs arising from loans the Bank purchased from correspondents or for purchased MSRs. GMAC Mortgage has a potential claim that Ally Bank breached the Swap's requirements by failing to pay to GMAC Mortgage the value of such newly recognized MSRs. The value of the MSRs not paid to GMAC Mortgage is approximately $1.725 billion, including $1.329 billion for the period before the April 2011 revision of the MSR Swap.[343] As discussed below, this claim raises issues similar to those under the 2001 MMLPSA and the Pipeline Swap, discussed in Sections VII.L.2.a(1)(c) and VII.L.2.c, involving the parties' consistent implementation of a contract in a fashion that conflicts with its written terms. However, the proper resolution of those issues in this context is less clear-cut.

The MSR Swap's FMV Schedule (before the April 2011 revisions) defined the "Subject Transaction" as the "dollar amount of mortgage servicing rights owned by [Ally Bank] as reported on the accounting general ledger of [the Bank]," and requires periodic payment of the "FMV Change," defined as "in respect of a Subject Transaction . . . the FAS 156 mark to market for the Valuation Period as recorded by [Ally Bank] against the mortgage servicing right asset."[344] These FMV Swap provisions do not explicitly distinguish between "FAS 156 mark to market" changes related to bank-originated loan MSRs and those related to the recognition of correspondent-loan MSRs or purchased MSRs. By their terms, the provisions turn on the value of the MSRs on the balance sheet, not on whether the Bank has recognized a gain on the asset in its income statement.

As a preliminary matter, the evidence does not appear to support Young's assertions concerning this issue. As discussed in Section V.B.10.b(2), Young contended that the increases in the value of the Bank's MSR portfolio due to newly recognized MSRs were not required to be paid under the MSR Swap's FMV Schedule because they are not part of the "FAS 156 mark to market," and that the Bank had instead paid the capitalized value of Bank-originated loan MSRs to GMAC Mortgage not under the FMV Swap, but as part of the Net Servicing Fee. As Young pointed out, the Bank recognizes a gain, or earnings, on MSRs arising from Bank-originated loans (having paid nothing to purchase the MSR), while, for

---

[342] Whether the payment of the $51,419,494 constituted a voidable preference is addressed separately in Section VII.F.5.c(3).

[343] *See* Section V.B.10.b(2), Ex. V.B.10.b(2).

[344] 2007 FMV Schedule, parts 6(a)(iii), (v) [RC00027822].

purchased MSRs and correspondent-loan MSRs for which the Bank paid an SRP (servicing-released premium), it does not recognize a gain because it records the MSR at the value for which it was purchased. The same is true for excess servicing rights (where the capitalized value of the excess servicing rights for both Bank-originated loans and correspondent loans also corresponded to a gain). Were Young's explanation correct, the Bank's treatment of newly recognized MSRs would be consistent with the MSR Swap.

The Examiner concludes, however, that Young's attempt to reconcile the parties' practices with the terms of the MSR Swap is not likely to prevail for several reasons reflected in the discussion in Section V.B.10.b(2):

> (1) First, FAS 156 *does* encompass the initial recognition of an asset on an entity's balance sheet.

> (2) Second, the original Net Servicing Fee definition, when speaking to "amounts collected or earned by" the Bank, referred to these amounts as "*i.e.* normal servicing fees and ancillary income" (not, "*e.g.* normal servicing fees and ancillary income"); Young acknowledged that the amounts in question are neither.

> (3) Third, while the documentary evidence concerning the portion of the MSR Swap under which the capitalization of Bank-originated MSRs was paid is limited, it reflects that the parties understood the payment was made under the FMV Swap.

> (4) Fourth, Cortese, who was heavily involved in implementation of the Swaps, plainly understood that these payments were made under the FMV Swap (before and after the April 2011 revisions).

Further, the April 2011 revisions to the MSR Swap do not appear to eliminate the applicability of the FMV Swap to recognition of new MSRs on the Bank's balance sheet (including capitalization of the correspondent-loan MSRs and purchased MSRs). On the contrary, the FMV and FMV Change definitions adopted in April 2011 speak simply of changes in the "estimated valuation of the mortgage servicing rights then owned by [the Bank],[345] abandoning the requirement that the change be the "FAS 156 mark to market." To the extent Young's argument that the FMV Swap was inapplicable because recognition of a new MSR is not a "FAS 156 mark to market" had any force, it is inapplicable to the revised language adopted in April 2011.

On the other hand, it is true that the April 2011 MSR Swap Confirmation's definition of Actual Net Servicing Fee eliminates the reference to "normal servicing fees and ancillary income" found in the Net Servicing Fee definition in earlier versions of the Swap. Instead, the Actual Net Servicing Fee definition as written encompasses *any* amounts "posted to all servicing and mortgage servicing rights related income statement accounts" in the Bank's general ledger, not limited to normal servicing fees and ancillary income. This would

---

[345] April 2011 MSR Swap Confirmation, § 2 [ALLY_0041799] (definitions of FMV Change and FMV Value).

encompass the gains on Bank-originated loan MSR capitalization and the recognition of excess servicing rights, but not the recognition of correspondent-loan MSRs or purchased MSRs (which involve no gain). But, by the same token, if this definition is not limited to normal servicing fees and ancillary income, then it also encompasses the amounts Young concedes were always covered by the FMV Swap—the periodic adjustments to fair value (mark to market) of MSRs previously capitalized on the Bank's general ledger, because those amounts are also posted to mortgage servicing rights income statement accounts in the Bank's general ledger.[346] Consequently, that the revised Actual Net Servicing Fee definition is broad enough to encompass capitalization of MSRs for Bank-originated loans does not resolve whether the FMV Swap also applies.

Focusing first on the period before the April 2011 amendment, the question is whether application of the FMV Swap to encompass changes in the value of MSRs arising from Bank-originated loans, but not to MSRs arising from correspondent loans or to purchased MSRs, is consistent with the parties' agreement. As Cortese's explanation of the disparate treatment of the different types of MSRs reflects, it rested on a notion that the "Swap is more of a revenue, of a P&L view, than, say, the balance sheet," and the MSRs were differentiated based on whether they involved a "gain or loss," rather than whether their recognition involved a "change[] in the balance sheet." But this is plainly at odds with the language of the FMV Schedule, which explicitly and unambiguously speaks to the balance sheet—"the dollar amount of mortgage servicing rights owned by [the Bank] as reported on the accounting general ledger of [the Bank]"—not to whether the Bank's initial booking of the asset involves a gain or loss.

Nevertheless, here, as in other instances discussed above, the parties appear to have consistently applied the agreement in a way that is at odds with its language. The question then, is whether the parties should be understood to have agreed to different terms than those reflected in the language of their agreement, based either on the doctrine of mistake or on a claim that they modified the terms of their contract.

The MSR Swap is governed by New York law.[347] New York law governing the doctrines of mistake and modification is discussed in Sections VII.L.2.c(1) and VII.L.2.c(2).

The doctrine of modification does not appear to be the proper rubric for analysis of this issue, at least before the April 2011 revisions (which are analyzed below). There is no suggestion here of an agreement after the Swap was adopted to alter its terms (in contrast to Celini's statements concerning an agreement to modify the 2001 MMLPSA representation and warranty provisions, *see* Section V.B.3, and the Broker to Bank evidence of agreement that the Pipeline Swap would govern brokered loans, *see* Section V.B.6). Like the MMLPSA

---

[346] *See* Mortgage Segment Legacy YTD Consolidating Trial Balance (Dec. 31, 2011) [EXAM00228758]. Although this is undoubtedly not what the parties intended, applied in accordance with its terms, the revised Actual Net Servicing Fee language would arguably require double payments to GMAC Mortgage of the gain on MSR and excess servicing fee capitalization.

[347] *See* 2007 FMV Schedule, part 4(h) [RC00027822] (stating that New York law governs); 2007 Net Funding Schedule, part 4(h) [RC00027852] (same); 2010 FMV Schedule, part 4(h) [ALLY_0018110] (same); 2010 Net Funding Schedule, part 4(h) [ALLY_0018118] (same); Amended and Restated Schedule to the 2002 ISDA Master Agreement, dated as of Apr. 1, 2011, part 4(h) [RC00027879] (same).

and the Pipeline Swap, the MSR Swap barred oral modifications.[348] Consequently, as discussed above, to establish a modification, it is not enough to show that the parties acted inconsistently with a contract's written terms; the parties' altered performance must be "unequivocably referable" to a modified oral agreement.[349] Of course, in evaluating claims that there was such an oral modification, the parties' subsequent conduct would be entitled to great weight.[350] But, again, before April 2011, there is no claim of modification here and no event that seems to entail a modification. Further, it does not appear that a modification in which GMAC Mortgage simply gave up the right to receive the newly recognized value of correspondent-loan MSRs and purchased MSRs would be supported by mutual consideration.[351]

Instead, the claim, best articulated by Cortese, is that the parties always intended the agreement to operate in the fashion in which it was applied, and, implicitly, that the inconsistent language in the FMV Swap—which unambiguously applies to the value of MSRs on the balance sheet, rather than their impact on the income statement—should be understood

---

[348] The MSR Swap provides:

> No amendment, modification or waiver in respect of this Agreement will be effective unless in writing (including a writing evidenced by a facsimile transmission) and executed by each of the parties or confirmed by an exchange of telexes or electronic messages on an electronic messaging system.

ISDA Master Agreement, dated June 12, 2007, § 9(b) [ALLY_0041610].

[349] *See S. Fed. Sav. & Loan Ass'n of Ga. v. 21-26 E. 105th St. Assocs.*, 145 B.R. 375, 380–81 (S.D.N.Y. 1991), *aff'd*, 978 F.2d 706 (2d Cir. 1992) (stressing that the party must show evidence that the conduct and verbal agreement refers specifically to the modification, rather than only to an intent to modify or to an action inconsistent with the written contract. Without this implied agreement to modify, conduct on its own is insufficient); *Airway Maint., LLC v. N. Fork Bank*, No. 0015081/2004, 2007 WL 4846194 (N.Y. Sup. Ct. Nov. 21, 2007) (stating that plaintiff needs to prove that conduct is unequivocally referable to the alleged oral modification and that the conduct conferred some benefit on the party against whom enforcement is sought); *Ballard v. Parkstone Energy, LLC*, 522 F. Supp. 2d 695, 709 (S.D.N.Y. 2007) ("For a course of performance to demonstrate mutual assent to a modification, it must be 'unequivocally referable' to the modification.").

[350] *Viacom Int'l, Inc. v. Lorimar Prods., Inc.*, 486 F. Supp. 95, 98 n.3 (S.D.N.Y. 1980); *see also Austin v. Barber*, 227 A.D.2d 826, 828 (N.Y. App. Div. 1996) (finding that, despite a contractual provision barring modification except in writing, the conduct of the parties demonstrated a modification because evidence showed plaintiff requested certain additions to a construction contract, and defendant performed those requests).

[351] *See Rooney v. Slomowitz*, 11 A.D.3d 864, 867 (N.Y. App. Div. 2004) ("Consideration is necessary to prove the existence of an oral modification of a written agreement."); *Metzger v. Aetna Ins. Co.*, 229 A.D. 2, 6 (N.Y. App. Div. 1930) (finding sufficient consideration where defendant received a larger premium and plaintiff was relieved from danger of immediate cancellation); *Pactiv Corp. v. Multisorb Techs. Inc.*, 823 F. Supp. 2d 840, 847 (N.D. Ill. 2011) (applying New York law and rejecting as insufficient a party's claim that a confidentiality agreement between food packaging manufacturer and its competitor was modified through conduct so as to include oral disclosures and non-designated documents as confidential information under the agreement when there was no consideration for these additional inclusions); *Ballard v. Parkstone Energy, LLC*, 522 F. Supp. 2d 695, 710 (S.D.N.Y. 2007) (finding that there was no consideration for the seller's purported waiver of a 60 day deadline); *Estate of Anglin v. Estate of Kelley*, 270 A.D.2d 853 (N.Y. App. Div. 2000) (holding no modification by conduct to have been made because there was no consideration made by either party for any change to plaintiff's entitlement under a buy-sell agreement).

as a mistake in the drafting of the agreement. As discussed in Section VII.L.2.c(1), where the language of the contract is unambiguous, claims that the agreement does not reflect the parties' agreement face a heightened evidentiary burden.[352] The proponent of reformation must present "a high level of proof, free from contradiction or equivocation that the instrument is not written as intended by both parties."[353] This requires "clear and convincing evidence"[354] of a prior agreement between the parties, showing exactly what the parties agreed upon.[355]

According to Cortese, the focus on whether the MSR involved a gain for the Bank was attributable to the fact that "[t]he intent of the swap was to have all those economics, net cash flows, go back to GMAC Mortgage," since "[t]he Bank was holding the MSR for, I think, purely financing purposes."[356] Cortese, of course, was not a party to the negotiation of the MSR Swap, and, unfortunately, the recollection of the participants in those negotiations, particularly with respect to the issue of the treatment of newly recognized MSRs, was limited.[357]

However, the documentary record shows that from the outset, the MSR Swap was conceptualized as a "total return swap."[358] Under this "total return swap," all of the economics of the MSRs would be traded to GMAC Mortgage in exchange for a fixed rate of return,

---

[352] *See S. Fork Broad. Corp. v. Fenton*, 141 A.D.2d 312 (N.Y. App. Div. 1988) (finding that conclusory assertions by a sophisticated party that the writing did not express the terms of the agreement cannot defeat summary judgment because the party must overcome a heavy presumption that a deliberately prepared and executed written instrument manifests the true intention of the parties).

[353] *CRP/Extell Parcel I, L.P. v. Cuomo*, 34 Misc. 3d 1214(A), at *6–7 (N.Y. Sup. Ct. 2012), *aff'd*, 101 A.D.3d 473 (2012) (citing 16 N.Y. Jur.2d Cancellation of Instruments § 92); *see also S. Fork Broad. Corp.*, 141 A.D.2d at 315 ("The proponent of reformation must show in no uncertain terms not only that mistake or fraud exists, but exactly what was really agreed upon between the parties."). The burden of proof for reformation is high in part because it implicates the type of danger against which the parol evidence rule and Statute of Frauds were meant to protect, namely, "the danger that a party, having agreed to a written contract that turns out to be disadvantageous, will falsely claims the existence of a different, oral contract." *Resort Sports Network Inc. v. PH Ventures III, LLC*, 67 A.D.3d 132, 135 (N.Y. Sup. Ct. 2009) (citing *Chimart Assoc. v. Paul*, 489 N.E.2d 231, 234 (N.Y. 1986)).

[354] *See Healy v. Rich Prods. Corp*., 981 F.2d 68, 73 (2d Cir. 1992); *Yu Han Young v. Chiu*, 49 A.D.3d 535, 536 (N.Y. App. Div. 2008).

[355] *See U.S. Bank Nat. Ass'n v. Lieberman*, 98 A.D.3d 422, 424, 950 N.Y.S.2d 127, 129 (N.Y. App. Div. 2012) (stating that reformation based upon a scrivener's error requires proof of a prior agreement between parties); *K.I.D.E. Assocs., Ltd. v. Garage Estates Co*., 280 A.D.2d 251, 253 (N.Y. App. Div. 2001) (noting that the evidence must show what parties agreed upon, particularly if the negotiations were conducted by sophisticated and counseled parties).

[356] Int. of J. Cortese, Mar. 7, 2013, at 28:19–29:9.

[357] *See* Int. of R. Groody, Dec. 17, 2012, at 215:21–216:5; Int. of B. Bier, Feb. 22, 2013, at 154:23–158:5.

[358] *See* Preliminary Analysis of Bank Opportunity [EXAM11248134] (referring to total return swap) (attached to e-mail from B. Bier to D. Applegate (Dec. 14, 2006) [EXAM11232773]).

eliminating risk (other than counterparty risk) to the Bank.[359] Precisely what this meant in the context of the recognition and capitalization of new MSRs does not appear from the available evidence to have been specifically addressed at the time; the principal focus was instead on the volatility of the asset. The Bank did recognize a gain on the capitalization of new MSRs for Bank-originated loans that it did not recognize for the other MSRs in question, and passing this gain on to GMAC Mortgage preserved the Bank's profit and loss neutrality. Further, Groody's August 2007 presentation to the Bank Board, after saying that "the Bank will pay cash to GMAC [Mortgage] in the event the market value of the asset increases" (and vice versa if the market value decreases), states that "[t]he swap will use the recorded amounts in the Bank's income statement at the basis for the cash settlement of the swap to ensure all monthly income statement volatility is removed from the Bank each month." The presentation is not specific to MSR capitalization or recognition, and, again, is not particularly detailed, but, like Cortese, it does focus on "income statement" impact.

However, the parties nevertheless chose to draft the FMV Swap to call for payments based on changes to the balance sheet value of the Bank's MSR assets. The Investigation has revealed no evidence to suggest use of this specific language was somehow unintended, or that the parties had intended that other language be used. As with the Pipeline Swap, discussed in Section VII.L.2.c, the issue instead seems to be that the language was included intentionally, but did not accomplish the parties' agreed purpose (or match the parties' consistent implementation of the agreement).

Notably, in light of the absence of any provision for unwinding the MSR Swap on termination, discussed in Section V.B.9.b(5), it is questionable whether the economics of the transaction ultimately make sense, even as applied, with the payment for capitalization of MSRs limited to those for Bank-originated loans. The terms of the MSR Swap permit GMAC Mortgage to keep the remaining value of the MSRs (to the extent not already repaid to Ally Bank through amortization and market-driven declines in value) upon termination of the agreement, even though it had not paid an SRP to acquire the MSR (as it would have done before implementation of the MSR Swap). As discussed in Section V.B.9.b(5), this could be viewed as akin to permitting the borrower on a loan to retain the loan's remaining unpaid principal balance upon termination. One might have expected the MSR Swap's termination provisions to include a provision for a run-off of the existing MSR portfolio or for a return of the remaining value of the MSRs to the Bank on termination. But they contain no such provisions, and, as a result, upon termination of the MSR Swap, results were simply trued up through the termination date. The Bank paid GMAC Mortgage approximately $364 million under the MSR Swap for Bank-originated loan MSRs from 2007 through April 2012,[360] and GMAC Mortgage kept the unamortized portion of those MSRs at termination.

Whatever one concludes about the economics of the Swap as implemented, it would make little economic sense to enforce the pre-April 2011 MSR Swap as written and require

---

[359] *See, e.g.*, Minutes of a Regular Meeting of the Board of Directors of GMAC Bank, Aug. 22, 2007, at ALLY_PEO_0001451 [ALLY_PEO_0001400].

[360] *See* Section V.B.12.b(1), Ex. V.B.12.b(1)-3.

payment to GMAC Mortgage of the value of correspondent-loan MSRs and purchased MSRs, which totaled $1.329 billion for the period from the inception of the Swap until its amendment in April 2011 (including $402 million in 2007 and 2008 before the 2009 Bank Transaction).[361] The Bank had paid to purchase these MSRs (either through payment of an SRP or by purchasing the MSR separately from a loan). Requiring that their value be paid to GMAC Mortgage when the MSR was recorded on the Bank's balance sheet and not recovered on termination is more difficult to justify than paying GMAC Mortgage the value of Bank-originated loan MSRs. While Ally Bank owned all of these MSRs, and GMAC Mortgage paid an SRP for none of them, paying over Bank-originated loan MSRs at least preserved P&L neutrality for the Bank.

The MSR Swap, as discussed in Section V.B.9, was a recurring subject of concern for the Bank's regulators. It is not clear that they (or anyone else) understood this aspect of the MSR Swap's functioning with respect to Bank-originated loan MSRs. It may be that the Bank would have substantial arguments that the arrangement would not have withstood regulatory scrutiny had it been applied to require payment of the value of purchased and correspondent-loan MSRs upon recognition. And the Bank, of course, had the right to terminate the MSR Swap upon relatively short notice, particularly after the September 2009 amendment permitting the Bank to terminate on thirty days' notice.

Accordingly, as with the application of the Pipeline Swap, based on the available evidence and the exacting standard which governs the application of the doctrine of mistake, while it is a close question, the Examiner concludes that a court more likely than not would reform the pre-April 2011 MSR Swap to require payment of the value of newly recognized MSRs only for those MSRs on which the Bank recognized a gain.

Turning, then, to the period from adoption of the April 2011 MSR Swap Confirmation through termination of the Swap, the first issue is whether the revisions establish that the value of newly purchased MSRs or correspondent-loan MSRs would not be captured by the FMV portion of the Swap.[362] However, as discussed above, the April 2011 FMV Change and FMV definitions are, if anything, even clearer in their applicability, given the elimination of the "FAS 156 mark to market" reference. Apart from that revision, the only substantive April 2011 change to the FMV Swap is the introduction of the "MSR Amount" adjustment to the FMV Change.[363] However, as Young pointed out, that provision applies only to circumstances where the Bank has sold MSRs, requiring adjustment of the FMV Change based on the gain or loss realized in such sales. While calculation of the Bank's gain or loss on such sales does take into account any gain the Bank realized on capitalization of the MSRs, the reference to gain on capitalization is limited to this context, and is not made applicable to the calculation of the FMV Change except where there has been a sale of MSRs.

---

[361] *See* Section V.B.10.b(2), Ex V.B.10.b(2).

[362] *See Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 466–67 (2d Cir. 2010); *R/S Assocs. v. New York Job Dev. Auth.*, 771 N.E.2d 240, 242 (N.Y. 2002); *W.W.W. Assocs., Inc. v. Giancontieri*, 566 N.E.2d 639, 642 (N.Y. 1990).

[363] April 2011 MSR Swap Confirmation, § 2, at 4 [ALLY_0041799] (definition of MSR Amount).

The issue, therefore, again becomes whether the doctrine of mistake is applicable. All of the same considerations applicable to the analysis of the pre-April 2011 MSR Swap set forth above are similarly applicable to the April 2011 MSR Swap Confirmation. Added to these considerations is the fact that, by April 2011, the parties' practice had long been in place, that, as Cortese testified, the accountants had gone to those preparing the revised language to tell them "this is how we're doing it" and seek "language that coincided with how [the accountants] were doing it."[364] On the other hand, the requested revisions seem not to have been executed in a way that accomplished this purpose. Further, the disparate economic result of transferring the newly recognized value of purchased MSRs and correspondent-loan MSRs to GMAC Mortgage, MSRs for which it had paid no SRP, would be an additional $397 million for the period when the April 2011 MSR Swap was in effect.[365]

Considering all of the facts and circumstances, the Examiner concludes that, while it is a close question, a court more likely than not would reform the April 2011 MSR Swap Confirmation to require payment of the value of newly recognized MSRs only for those MSRs on which the Bank recognized a gain.

### 3.   Dispute Regarding Application Of Indemnity Cap

As discussed in Section V.C.2, the interpretation of the provisions set forth in the January 30 Letter Agreement, the Servicing Agreement Modification Terms, and ultimately the A&R Servicing Agreement, have been the subject of a dispute. The Debtors assert that the January 30 Letter Agreement, and thus the A&R Servicing Agreement, provides for a cap on indemnity payments to be made to Ally Bank by GMAC Mortgage relating to the modification of loans in the Ally Bank portfolio. AFI and Ally Bank argue that the A&R Servicing Agreement, which constitutes the entire agreement of the parties, is unambiguous, does not include a cap on indemnity payments relating to loan modifications, and is consistent with the terms of the January 30 Letter Agreement.

### a.   The Terms Of The January 30 Letter Agreement

The "reimbursement" and "indemnity" provisions set forth in the January 30 Letter Agreement and the Servicing Agreement Modification Terms, respectively, are not identical and appear to cover distinct situations. A closer examination of these provisions illustrates the differences.

---

[364] Int. of J. Cortese, Mar. 7, 2013, at 37:24–38:13.

[365] *See* Section V.B.10.b(2); Ex. V.B.10.b(2).

The reimbursement provision of the January 30 Letter Agreement, paragraph 5, provides that:

> ResCap and [GMAC Mortgage] each acknowledges and agrees to fully reimburse AFI and Ally Bank for any and all amounts expended by AFI or Ally Bank in connection with AFI's or Ally Bank's performance or satisfaction of obligations under any [DOJ/AG Settlement] or FRB/FDIC Consent Order and for any fines, penalties or other amounts levied against AFI or Ally Bank, in each case, as a result of the failure of ResCap, [GMAC Mortgage] or their subsidiaries to perform their obligations under any [DOJ/AG Settlement] or FRB/FDIC Consent Order.[366]

This provision is expressly limited by the following language:

> ResCap and [GMAC Mortgage] shall not have any further obligation to reimburse AFI or Ally Bank for Settlement Costs pursuant to this Paragraph 5 from and after the time ResCap and [GMAC Mortgage] have effected the hard dollar payments . . . and have earned $200,000,000 of funds paid or credited as a result of mitigation, remediation or other financial accommodation to mortgage loan borrowers or other third parties . . . pursuant to the [DOJ/AG Settlement].[367]

This reimbursement obligation (and the subsequent limitation) covers "amounts expended by AFI and Ally Bank . . . as a result of the failure of ResCap, [GMAC Mortgage] or their subsidiaries to perform their obligations under any [DOJ/AG Settlement] . . ." and is capped as set forth therein.[368]

In contrast, the indemnity provision set forth in Servicing Agreement Modification Terms provides that GMAC Mortgage "shall indemnify Ally Bank for any loss suffered by Ally Bank with respect to Subject Loans as a result of any modification or loss mitigation . . . ."[369] These two provisions, covering "amounts expended . . . for any fines, penalties, or other amounts levied against AFI or Ally Bank" as opposed to "loss[es] suffered" as a result of loan modification activity provide distinct and targeted language crafted to address two different

---

[366] January 30 Letter Agreement, ¶ 5 [ALLY_0194817].

[367] *Id*.

[368] *Id*.

[369] *Id*. Ex. C-1.

issues.[370] The indemnity provision included in the Servicing Agreement Modification Terms lacks a limitation similar to that provided in paragraph 5 of the January 30 Letter Agreement. The only limiting provision prohibits GMAC Mortgage from performing "modifications or other loss mitigation activities once indemnification payments to Ally Bank pursuant to the Modification Amendment exceed $75,000,000 in the aggregate."[371]

A review of drafts of the January 30 Letter Agreement distributed during negotiation also highlights this distinction.[372] For example, paragraphs 4 and 5 of AFI's January 25 draft agreement, detailed in Section V.C.2.a, have separate provisions with language almost identical to the separate provisions discussed above.[373] The inclusion of both provisions in the text of the same draft agreement would indicate that the drafter considered these two separate and distinct provisions. ResCap's response to this draft agreement corroborates this interpretation. ResCap's mark-up of AFI's January 25 draft agreement incorporated a cap on the reimbursement for "amounts expended by AFI or Ally Bank" in connection with the DOJ/AG Settlement "from and after the time ResCap and [GMAC Mortgage] have effected the hard dollar payments . . . and $200 million of soft dollar credits pursuant to the DOJ/State AG Settlement."[374] However, ResCap only deleted most of what was paragraph 5 of AFI's January 25 draft agreement regarding the reimbursement of "Ally Bank for any loss suffered by Ally Bank with respect to any mortgage loan as a result of any modification or loss mitigation" in connection with the DOJ/AG Settlement,[375] rather than proposing a cap as it had in the other provision.

### b. The Terms Of The A&R Servicing Agreement

The A&R Servicing Agreement incorporates the indemnity provision required by the Servicing Agreement Modification Terms. Specifically, the A&R Servicing Agreement provides that "[GMAC Mortgage] shall indemnify [Ally Bank] for losses suffered by [Ally Bank] as a result of any action taken in accordance with the AG Menu Items attached hereto as Exhibit 4-B; provided, that [GMAC Mortgage] shall not be required to indemnify [Ally Bank] for any losses in connection with any such action that also would have been permitted under the terms of the Standard Matrix."[376] Exhibit 4-B provides the framework for "ResCap AG Consumer Relief," or the implementation of the consumer relief required by the DOJ/AG Settlement.

---

[370] Employees of GMAC Mortgage admit that, at the very least, the language in the Servicing Agreement Modification Terms is more specific to modification activity. *See* Int. of J. Pensabene, Jan. 9, 2013, at 205:19–21 (when asked about the language in Exhibit C to the January 30 Letter Agreement in comparison to the language in paragraph 5, Pensabene noted that it was "language clearly much more specific to modification activity.").

[371] January 30 Letter Agreement, Ex. C-2 [ALLY_0194817].

[372] An in-depth discussion of the negotiation of the January 30 Letter Agreement is included in Section V.C.2.a.

[373] AFI Draft Terms of Support Relating to Possible DOJ/State Attorneys' General Settlement, dated Jan. 25, 2012, ¶¶ 4–5 [EXAM20276340].

[374] Draft Terms of Support Relating to Possible DOJ/State Attorneys' General Settlement—ResCap Comments, dated Jan. 26, 2012, ¶ 4 [RC00067767].

[375] *Id*. ¶ 6.

[376] A&R Servicing Agreement, § 10.01(e) [ALLY_0114469].

The A&R Servicing Agreement also includes the limitation on modifications as set forth
in the Servicing Agreement Modification Terms, which states that "[i]n no case shall [GMAC
Mortgage] evaluate additional Portfolio Loans for actions pursuant to the AG Menu Items in
the month following the month in which indemnification payments to [Ally Bank] . . . exceed
$75,000,000 in the aggregate."[377] The A&R Servicing Agreement notably omits, however, any
cap on indemnity such as the cap included in paragraph 5 of the January 30 Letter Agreement,
which limits GMAC Mortgage's reimbursement liabilities once the "hard dollar payments"
have been made under the DOJ/AG Settlement, and ResCap and GMAC Mortgage have
earned $200 million of "soft dollar credits."[378]

### c. Ambiguity

The January 30 Letter Agreement and the A&R Servicing Agreement are governed by
New York law.[379] Under New York law, an ambiguity exists when an agreement "on its face"
is "reasonably susceptible" to more than one interpretation.[380]

No ambiguity exists when contract language has "a definite and precise meaning,
unattended by danger of misconception in the purport of the [agreement] itself, and
concerning which there is no reasonable basis for a difference of opinion."[381] In addition,
contractual "[l]anguage whose meaning is otherwise plain does not become ambiguous merely
because the parties urge different interpretations," unless each is a reasonable interpretation.[382]
When determining whether a particular provision is ambiguous, the agreement must be read
"as a whole to ensure that undue emphasis is not placed upon particular words and phrases."[383]
Taking the agreement "as a whole" should involve the recognition of contrasting provisions[384]
and may eliminate any ambiguity.[385]

---

[377] *Id*. § 10.01(f).

[378] January 30 Letter Agreement, ¶ 5 [ALLY_0194817].

[379] *Id*. ¶ 13; A&R Servicing Agreement, § 12.07 [ALLY_0114469].

[380] *Greenfield v. Philles Records, Inc.*, 780 N.E.2d 166, 171 (N.Y. 2002); *Chimart Assocs. v. Paul*, 489 N.E.2d
231, 233 (N.Y. 1986); *see, e.g.*, *Readco, Inc. v. Marine Midland Bank*, 81 F.3d 295, 299 (2d Cir. 1996).

[381] *Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 467 (2d Cir. 2010); *Greenfield*, 780
N.E.2d at 170–71; *Hunt Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir. 1989); *Breed v. Ins.
Co. of N.A.*, 385 N.E.2d 1280, 1282–83 (N.Y. 1978).

[382] *Law Debenture Trust Co.*, 595 F.3d at 467 (citing *Hunt Ltd.* 889 F.2d at 1277).

[383] *Id*. (citing *Bailey v. Fish & Neave*, 868 N.E.2d 956, 959 (N.Y. 2007)); *Crow & Sutton Assocs., Inc. v. Welliver
McGuire, Inc.*, 820 N.Y.S.2d 179, 179 (N.Y. App. Div. 2006); *see also Lockheed Martin Corp. v. Retail
Holdings, N.V.*, 639 F.3d 63, 69 (2d Cir. 2011).

[384] *See, e.g.*, *W.W.W. Assocs., Inc. v. Giancontieri*, 566 N.E.2d 639, 642 (N.Y. 1990).

[385] *Law Debenture Trust Co.*, 595 F.3d at 467 (citing *Readco, Inc.*, 81 F.3d at 299) ("[W]here consideration of
the contract as a whole will remove the ambiguity created by a particular clause, there is no ambiguity."); *see
also Hudson-Port Ewen Assocs., L.P. v. Chien Kuo*, 578 N.E.2d 435, 435 (N.Y. 1991).

The primary objective of contract interpretation is to construe an agreement in accordance with the parties' "expressed" intent,[386] and "the best evidence of what parties to a written agreement intend is what they say in their writing."[387] Accordingly, "a written agreement that is complete, clear and, unambiguous on its face must be [interpreted] according to the plain meaning of its terms,"[388] without any assistance from extrinsic evidence.[389]

While evidence "outside the four corners of a document as to what was really intended . . . is generally inadmissible to add to or vary the writing,"[390] extrinsic evidence of the parties' intent may be considered if an agreement is ambiguous.[391] However, "extrinsic and parol evidence is not admissible to create an ambiguity" in an otherwise complete and clear agreement.[392]

### d. Analysis

The Examiner concludes that it is likely that a court would find that AFI's and Ally Bank's position, that there was no cap on the indemnity obligation set forth in the Servicing Agreement Modification Terms and the A&R Servicing Agreement, would prevail.

The indemnity provision of the A&R Servicing Agreement is likely to be considered unambiguous. The only limitation with respect to this provision is that modifications must cease when indemnification payments reach $75 million in the aggregate, and may only resume upon agreement by the parties. The A&R Servicing Agreement does not incorporate a cap relating to the payment of the hard dollar payments and the earning of $200 million in soft dollar credits. The Debtors do not dispute this. They instead argue that the A&R Servicing

---

[386] *Hunt Ltd.*, 889 F.2d at 1277; *Law Debenture Trust Co.*, 595 F.3d at 467; *see also Welsbach Elec. Corp. v. MasTec N.A., Inc.*, 859 N.E.2d 498, 500 (N.Y. 2006); *Greenfield v. Philles Records, Inc.*, 780 N.E.2d 166, 170 (N.Y. 2002).

[387] *Greenfield*, 780 N.E.2d at 170 (citing *Slamow v. Del Col*, 594 N.E.2d 918, 919 (N.Y. 1992)); *see, e.g., Wallace v. 600 Partners Co.*, 658 N.E.2d 715, 717 (N.Y. 1995); *Breed v. Ins. Co. of N.A.*, 385 N.E.2d 1280, 1282 (N.Y. 1978).

[388] *Law Debenture Trust Co.*, 595 F.3d at 467 (citing *Greenfield*, 780 N.E.2d at 170); *see, e.g., R/S Assocs. v. N.Y. Job Dev. Auth.*, 771 N.E.2d 240, 242 (N.Y. 2002); *Reiss v. Fin. Performance Corp.*, 764 N.E.2d 958, 960 (N.Y. 2001); *Bailey v. Fish & Neave*, 868 N.E.2d 956, 959 (N.Y. 2007) ("[W]here the language is clear, unequivocal and unambiguous, the contract is to be interpreted by its own language.") (internal quotation marks omitted); *W.W.W. Assocs., Inc.*, 566 N.E.2d at 642 ("[W]hen parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms.").

[389] *Int'l Multifoods Corp. v. Commercial Union Ins. Co.*, 309 F.3d 76, 83 (2d Cir. 2002); *Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's, London, England,* 136 F.3d 82, 86 (2d Cir.1998); *see, e.g., State v. Home Indem. Co.*, 486 N.E.2d 827, 828–29 (N.Y. 1985).

[390] *Law Debenture Trust Co.*, 595 F.3d at 466; *R/S Assocs.*, 771 N.E.2d at 242; *W.W.W. Assocs., Inc.*, 566 N.E.2d at 642.

[391] *Law Debenture Trust Co.*, 595 F.3d at 467; *Greenfield*, 780 N.E.2d at 170.

[392] *S.Rd. Assocs., LLC v. Int'l Bus. Machines Corp.*, 826 N.E.2d 806, 809 (N.Y. 2005) (citing *W.W.W. Assocs., Inc.*, 566 N.E.2d at 642); *R/S Assocs.*, 771 N.E.2d at 242–43; *Reiss*, 764 N.E.2d at 961.

Agreement must be read in conjunction with the January 30 Letter Agreement, and that the January 30 Letter Agreement "capped the Debtors' reimbursement obligations to AFI and Ally Bank once the Debtors had made the $110 million cash payment and earned $200 million in Soft Dollar Credits."[393]

Even assuming the Debtors are correct, and these documents cannot be interpreted independently of each other,[394] the Examiner's conclusion remains the same, as a court would likely conclude that the terms of the January 30 Letter Agreement are also unambiguous. Taking the January 30 Letter Agreement as a whole, and considering contrasting the provisions of paragraph 5 and the Servicing Agreement Modification Terms likely eliminates any ambiguity. As stated above, the reimbursement provision in paragraph 5 of the January 30 Letter Agreement and the indemnity provision set forth in the Servicing Agreement Modification Terms and the A&R Servicing Agreement are different. The provision in paragraph 5 has a cap, while the provisions in the Servicing Agreement Modification Terms and the A&R Servicing Agreement are subject only to the limitation relating to the payment of $75 million in the aggregate. While individuals interviewed by the Examiner have stated that the parties had a business understanding that there was to be a cap on indemnity payments made under the terms of the Servicing Agreement Modification Terms and the A&R Servicing Agreement,[395] a plain reading of the document would be unlikely to support such an interpretation.

Moreover, even if a court were to find the January 30 Letter Agreement ambiguous, and thus look to extrinsic evidence, the Examiner finds it likely that a court would determine that the parties did not intend to include a cap on the indemnity payments related to loan modifications. As provided herein, a review of the drafts of the January 30 Letter Agreement does not indicate any intent of the parties to include an indemnity cap, but instead supports the proposition that the provisions were distinct. In two ancillary writings, which provided the parties an opportunity to clarify their alleged business understanding, a February 9, 2012

---

[393] Letter from L. Nashelsky to R. Schrock (July 9, 2012) (attached to Declaration of Thomas Marano, Chief Executive Officer of Residential Capital, LLC, in Further Support of Debtors' Ally Servicing Motion [Docket No. 793-1] at Ex. 7).

[394] The Examiner has not been asked to opine on this issue, and it appears unlikely that the Examiner's ultimate conclusion would be impacted either way.

[395] *See, e.g.*, Int. of J. Whitlinger, Feb. 27, 2013, at 206:25–207:8 ("[O]ur view was—and I was very clear when we were negotiating some of this—that 'You're giving us debt forgiveness of $196.5 million. And once we hit above that amount, we don't have to pay anymore. Because you only gave us debt forgiveness up to that amount. Yes.?' 'Yes.' That was the business understanding."). Despite this, Whitlinger acknowledged that this understanding may not have made it into the actual agreement. *See id.* at 209:5–12 (responding to a question of whether this understanding made it into the January 30 Letter Agreement or elsewhere and stating that "[w]hat you have is what you have. That's why we were debating it for my other deposition"); Int. of J. Pensabene, Jan. 9, 2013, at 242:19–24 ("It was my understanding that one, we had exceeded our estimate—internal estimates indicated that we had exceeded $200 million worth of credit and as a result we were not required to make any further reimbursement to the bank.").

e-mail[396] and a May 11, 2012 agreement regarding the reimbursement obligations of ResCap and GMAC Mortgage,[397] the parties specifically refer to the use of Ally Bank's loan portfolio in exchange for "full reimbursement" to Ally Bank, rather than discussing a cap in any manner. The course of conduct of the parties supports this proposition as well. In reviewing voluminous correspondence concerning the lengthy negotiation of the A&R Servicing Agreement, the negotiation of the AG Menu Matrix, or the discussions regarding the prepetition indemnity payment, the Examiner did not encounter any evidence of the parties discussing any indemnity cap. There were numerous discussions regarding the $75 million aggregate cap and how to deal with that issue, both pre- and postpetition.[398] While this aggregate limit was the cause of great concern for the parties, at no time prior to June 20 did ResCap and GMAC Mortgage indicate that the alleged cap on indemnity payments was an issue.

---

[396] E-mail from J. Young to R. Zachary, H. Benton, T. Hamzehpour, J. Pensabene, C. Evans, and J. Whitlinger (Feb. 9, 2012), at EXAM20169859–60 [EXAM20169858] (responding to a request for e-mail confirmation regarding the ability to perform modifications in Ally Bank's loan portfolio, Young stated "[y]es, under the agreement of full reimbursement for all losses related to loan preservation activities").

[397] *See* Agreement for AG Settlement Loan Modifications For April 2012, dated May 11, 2012 [ALLY_PEO_0087335] ("The parties acknowledge that such modifications, which are required in order . . . to comply with the terms of the [DOJ/AG Settlement], are conditioned on full reimbursement to Ally Bank of all losses in accordance with the [January 30 Letter Agreement], as well as the [AG Menu Matrix] . . . .").

[398] *See* Sections V.C.2.b, V.C.2.c, V.C.2.d. Further, the majority of discussions involving the $75 million aggregate cap involved concern over whether the cap would prevent GMAC Mortgage from performing the required modifications. *See* E-mail from C. Schares (Apr. 12, 2012) [EXAM00001279] (responding to a question from Rosen of whether reimbursements were capped at $75 million, Schares responded "[u]nfortunately, yes. But we could still argue for our interpretation and we can also ask to increase the cap"). This seems inconsistent with the existence of an indemnity cap as the Debtors allege.