## VIII. THIRD-PARTY CLAIMS AGAINST THE AFI DEFENDANTS

## A.  INVESTIGATION OF THIRD-PARTY CLAIMS

The AFI Settlement and Plan Sponsor Agreement provided for, among other things, a broad Third-Party Release of the AFI Released Parties from any and all causes of action arising from or related in any way to the Debtors.[1] The Examiner Scope Approval Order directs the Examiner to: (1) investigate the merits of the claims to be released pursuant to the Third-Party Release; (2) analyze the sufficiency of the consideration to be provided for the Third-Party Release; and (3) solicit the parties' views concerning the merits of such claims and the potential amount of damages arising therefrom (but not to independently quantify such damages).[2] Following the expiration of the AFI Settlement and Plan Sponsor Agreement on February 28, 2013,[3] the Examiner determined, in consultation with the Bankruptcy Court and representatives of the Debtors, the Creditors' Committee, and AFI, that such an analysis remained important to any potential global settlement and plan of reorganization. Accordingly, the Investigation of Third-Party Claims proceeded as contemplated by the Examiner Scope Approval Order.

### 1.  Scope Of Third-Party Claims Investigation

Given the potential breadth of claims and the time frame available to investigate them, the Investigation focused primarily on identifying claims that could materially affect the terms of a settlement with AFI and corresponding Third-Party Release. The Investigation identified

---

[1]    AFI Settlement and Plan Sponsor Agreement, § 3.1(d)(ii). The Third-Party Release, as originally proposed, provided in relevant part as follows:

> On and as of the Effective Date, the holders of Claims and Interests shall be deemed to provide a full discharge and release to the Released Parties and their respective property from any and all Causes of Action, whether known or unknown, whether for tort, fraud, contract, violations of federal or state securities laws, veil piercing or alter-ego theories of liability, or otherwise, arising from or related in any way to the Debtors, including those in any way related to residential mortgage backed securities issued and/or sold by Debtors and/or the Chapter 11 Cases or the Plan; provided that claims of the Debtors' directors and officers against Ally pursuant to Ally's indemnification obligations and Section 2.2 hereof (as well as any applicable insurance related thereto) shall not be released. . . . The Confirmation Order will permanently enjoin the commencement or prosecution by any person or entity, whether directly, derivatively or otherwise, of any Claims, obligations, damages, demands, debts, rights, suits, Causes of Action, judgments, or liabilities released pursuant to the Plan.

> *Id.* "Released Parties" refers to AFI "on behalf of its direct and indirect subsidiaries and affiliates" as well as "each of theirs and the Debtors' respective members, officers, directors, agents, financial advisors, attorneys, employees, partners, affiliates, and representatives." *Id.* § 1.2.

[2]    Examiner Scope Approval Order, at 5.

[3]    *See* Response of the Official Committee of Unsecured Creditors to Debtors' Motions for (I) Appointment of a Chief Restructuring Officer and (II) Entry of an Order Further Extending Their Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptance Thereof [Docket No. 3042] at 7.

four main categories of claims that merit discussion: (1) claims against the Debtors and the AFI Defendants on account of residential mortgage-backed securities (the "RMBS Claims"); (2) claims against the Debtors' and the AFI Defendants' directors and officers related to mortgage-backed securities (the "D&O RMBS Claims"); (3) claims against the Debtors and the AFI Defendants related to areas of the Debtors' businesses other than the securitization of mortgage loans (the "Non-RMBS Claims"); and (4) the potential causes of action assertable by holders of the Unsecured Notes (the "Unsecured Noteholder Causes of Action").

The RMBS Claims represent one of the most significant sources of potential liability for the Debtors and the AFI Defendants.[4] Of the four types of claims described above, the RMBS Claims are the only type explicitly identified in the Third-Party Release.[5] This is unsurprising given the fact that the pending actions related to the RMBS Claims (the "RMBS Actions") are large-scale, complex litigations, some of which have been pending in state or federal court for years.[6]

The RMBS Claims are based upon various legal theories, including breach of contract, fraud, negligence, and violation of state and federal securities laws. They arise from the same body of underlying facts as the claims implicated in the RMBS Trust Settlement Agreements, but differ with respect to the types of claims asserted and the parties asserting them. The representation and warranty claims proposed to be released by the RMBS Trust Settlement Agreements relate to breach of contract claims assertable on behalf of the RMBS trusts and arise from the Debtors' failure to repurchase defective loans.[7] Because the Debtors intend to address those claims in conjunction with the RMBS Trust Settlement Agreements, they were

---

[4]   *See, e.g.*, Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the RMBS Trust Settlement Agreements [Docket No. 320] at 3 ("The R&W Claims are the single largest set of disputed claims against the Debtors' estates by a wide margin").

[5]   *See* AFI Settlement and Plan Sponsor Agreement, § 3.1(d)(ii) (releasing claims "in any way related to residential mortgage backed securities issued and/or sold by Debtors . . . .").

[6]   *See, e.g.*, Am. Compl., *MBIA Ins. Corp. v. Residential Funding Co., LLC*, Case No. 603552/2008, Docket No. 28 (N.Y. Sup. Ct. Mar. 19, 2010); Compl., *MBIA Ins. Corp. v. GMAC Mortg., LLC*, Case No. 600837/2010, Docket No. 2 (N.Y. Sup. Ct. Apr. 1, 2010); Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 For Approval of the RMBS Trust Settlement Agreements [Docket No. 320] at 24–26. Debtors' Second Supplemental Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the RMBS Trust Settlement Agreements [Docket No. 1887] at 27–28 ("[T]he litigation of alleged representation and warranty breaches alone is extremely complex, labor-intensive, costly and time-consuming. The discovery required to resolve claims based on the 1.6 million loans in the Trusts would be massive, as the relevant documents and information will differ from case to case. . . . ResCap's experience in *MBIA Insurance Corp. v. Residential Funding Company, LLC* illustrates the true enormity and difficulty of such litigation. . . . [F]act discovery has not been completed over three and a half years after MBIA first sued RFC.").

[7]   *See* Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the RMBS Trust Settlement Agreements [Docket No. 320] at 2 ("The RMBS Trust Settlement resolves . . . alleged and potential representation and warranty claims . . . held by up to 392 securitization trusts . . . [which] allegedly arise under Pooling and Servicing Agreements, Assignment and Assumption Agreements, Indentures, Mortgage Loan Purchase Agreements and other documents governing the Trusts . . . .").

not included in the Investigation of Third-Party Claims. By contrast, the RMBS Claims are mostly securities law and tort-based causes of action asserted by investors who purchased securities from the Debtors.[8]

With respect to the AFI Defendants, and as discussed further below, many of the RMBS Claims rely on derivative liability theories, such as alter ego and "control person" liability under state and federal securities laws. To succeed on such theories, plaintiffs must essentially make two showings: (1) that the Debtors are liable for a primary violation; and (2) that the facts warrant holding the AFI Defendants responsible for the Debtors' conduct. Given the Examiner's mandate to determine whether the AFI Defendants have provided sufficient consideration for the Third-Party Release, the Investigation focused primarily on the second showing—the extent to which the AFI Defendants might be held derivatively liable for the Debtors' RMBS-related conduct (assuming the Debtors are found liable for the underlying primary claims).[9]

Further, given this focus, the Examiner's Professionals did not undertake certain activities necessary to evaluate the Debtors' primary liability, such as loan-level diligence, re-underwriting of loan files, or calculation of breach rates, loss-share rates, or the securitization trusts' estimated lifetime losses. While these issues are contested and could significantly affect any ultimate findings of liability and/or quantum of damages, a full investigation into the Debtors' underlying liability and the corresponding defenses was outside the scope of the Investigation. Accordingly, the Examiner's findings with respect to the RMBS Claims are not meant to represent a dispositive analysis of all outstanding claims. Rather, they represent an evaluation of the claims most likely to affect the value of any future AFI settlement and Third-Party Release. Unless otherwise noted, the Examiner has not reached any definitive conclusions with respect to the Third-Party Claims, all of which would require further factual development before final determinations of liability could be made.

One final noteworthy aspect of the RMBS Claims and RMBS Actions is that the Third-Party Claimants themselves have, for the most part, conducted only limited investigation of the underlying facts. Only a handful of the RMBS Actions have progressed beyond motions to

---

[8]  One potential area of overlap between the Investigation of Third-Party Claims and the RMBS Trust Settlements is the claims of monoline insurers, such as FGIC and MBIA. *See* Debtors' Reply Brief re Non-*Iridium* Issues in Support of Motion for Approval of RMBS Settlement Agreements [Docket No. 2804] at 18 ("If the Debtors' view is correct, then MBIA's and FGIC's fraudulent inducement claims fall within the scope of the release set out in section 7.01 [of the RMBS Trust Settlements]. MBIA and FGIC, of course, may argue that their fraudulent inducement claims exist independently of the governing agreements."). Accordingly, the Investigation of Third-Party Claims included these claims, but the Examiner notes that their viability may be affected by the RMBS Trust Settlements.

[9]  In analyzing these claims, the Examiner's Professionals also considered RMBS Actions that do not, as of yet, explicitly name any of the AFI Defendants. The Examiner's Professionals considered these claims because (1) they are substantially similar to the RMBS Actions that do name the AFI Defendants; and (2) some parties that did not initially plead claims against the AFI Defendants, and have not had an opportunity to amend their complaints, have advised the Examiner's Professionals that they believe they do in fact hold such claims.

dismiss and none have yet proceeded to trial. This status is not limited to the RMBS Actions identified herein, but is generally representative of RMBS-related litigation as a whole.[10] As the Debtors' RMBS litigation expert, Jeffrey Lipps, has represented to the Court, the RMBS Actions pose "unique legal and evidentiary challenges, many of which have not fully developed in a definitive way in the case law to date, and none of which have been litigated to resolution with respect to the Debtors specifically."[11] The Examiner's Professionals have surveyed the relevant decisions in this area (several of which were issued during the course of the Investigation) and note that this area of law is relatively underdeveloped and it is not yet clear as to how it may eventually evolve.

With respect to the D&O Claims and the Non-RMBS Claims, for the reasons discussed in Sections VIII.C.3 and VIII.C.4, the Examiner does not believe that the merits or magnitude of these claims should have a material effect on the consideration to be provided for the Third-Party Release. Accordingly, the Report provides information regarding these claims, but unless otherwise noted, the Examiner does not reach conclusions with respect to their merits. Finally, an analysis of the Unsecured Noteholder Causes of Action is provided in Section VIII.C.5.

### 2. Conduct Of The Third-Party Claims Investigation

The Examiner's Professionals identified approximately thirty-eight RMBS Actions, twenty-nine of which name at least one of the AFI Defendants. A list of the RMBS Actions can be found at Appendix VIII.A—1. In addition, the Examiner's Professionals identified approximately eighteen pending lawsuits that assert claims against the Debtors and/or the AFI Released Parties related to other aspects of the Debtors' businesses, such as loan origination and servicing. A list of pending lawsuits related to the Non-RMBS Claims (the "Non-RMBS Actions") can be found at Appendix VIII.A—2. The Examiner's Professionals relied upon a number of sources to identify the Debtors' and AFI Defendants' significant pending litigations, including filings in the Chapter 11 Cases,[12] public filings made by the Debtors and AFI,[13] documents produced by the Debtors and AFI,[14] and presentations by the Debtors, AFI, and the Creditors' Committee,[15] among others.

---

[10] One notable exception is the merits decision in *Assured Guar. Mun. Corp. v. Flagstar Bank*, *FSB*, No. 11-2375, 2013 WL 440114 (S.D.N.Y. 2013), which was issued by Judge Rakoff on February 5, 2013 and discussed below.

[11] Supplemental Declaration of Jeffrey A. Lipps [Docket No. 1887-4] at 7.

[12] *See, e.g.*, Appendix to Declaration of Jeffrey Lipps [Docket No. 320-9]; Proof of Claim No. 3974, filed by AFI on Nov. 12, 2012 [Case No. 12-12060], at 19–21, Ex. C; Compl., *Residential Capital, LLC v. Allstate Ins. Co.*, Case No. 12-1671, Docket No. 1 (Bankr. S.D.N.Y. May 25, 2012) (requesting that the Bankruptcy Court extend the automatic stay to or enjoin the continuation of several of the RMBS Actions).

[13] *See, e.g.*, Ally Financial Inc., Annual Report (Form 10-K) (Feb. 28, 2012), at 228–30 (discussing the Debtors' and AFI's mortgage-backed securities litigation).

[14] *See, e.g.*, Appendix to the Presentation to the AFI Board of Directors, dated Sept. 23, 2011, at 51–58 [ALLY_0157478].

[15] *See* AFI Presentation to the Examiner, dated Aug. 2, 2012, at 57–60.

As part of the Third-Party Claims Investigation, the Examiner Scope Approval Order required that the Examiner "solicit [third] parties' views concerning the merits of such claims and the potential amount of damages arising from such claims."[16] The Examiner's Professionals accomplished this objective through two separate requests for third-party analyses and information.

First, on September 21, 2012, the Examiner's Professionals sent a letter to twenty parties requesting Submission Papers "setting forth any arguments, analyses and/or supporting documents" that could bear meaningfully upon the Investigation of Third-Party Claims.[17] The letter also requested that the parties provide their "views concerning the potential amount of damages arising from such claims."[18] The letter stated that the Submission Papers would not be confidential and that they would be shared with "the Debtors and . . . existing or potential adversaries identified therein in order to solicit their substantive responses."[19] Given the large number of potential Third-Party Claimants, the Examiner's Professionals determined that requesting substantive briefs from all identifiable parties would be duplicative and excessive. Accordingly, the Examiner's Professionals selected twenty recipients representing a cross-section of the types of Third-Party Claims at issue, as well as several parties that had otherwise been active in the Chapter 11 Cases and could contribute to the analysis of the relevant issues. The Examiner's Professionals subsequently conferred with all of these parties by e-mail and/or phone, and in some cases held in-person meetings with the parties solicited. Of the twenty parties solicited, eight ultimately provided Submission Papers.[20] The Examiner's Professionals shared the Submission Papers with the Debtors, AFI, and the Creditors' Committee to solicit their responses. The Debtors and AFI responded with substantial written responses, which were in turn shared with the third parties to whom they were directed, as well as with the Creditors' Committee. Certain of the solicited parties then submitted replies to the responses of the Debtors and AFI.[21] This exercise assisted the Investigation by identifying and narrowing points of legal and factual contention.

Second, on December 21, 2012, the Examiner's Professionals sent a second letter to an additional thirty-one parties that had filed and/or threatened litigation against AFI or its

---

[16]   Examiner Scope Approval Order, at 5.

[17]   Letter from the Examiner to Third Parties (Sept. 21, 2012), at 1. A copy of this letter is attached to the Report as Appendix VIII.A—3.

[18]   *Id.*

[19]   *Id.* at 2.

[20]   The Examiner received Submission Papers from the following parties: Allstate, AIG, Mass Mutual, and Prudential (joint submission); the Federal Home Loan Banks of Boston, Chicago, and Indianapolis; FGIC; the Ad Hoc Group of Junior Secured Noteholders; MBIA; the RMBS Steering Committee; the Talcott Franklin Group; and Wilmington Trust. Additional limited responses were received from the FHFA, John Hancock Life Insurance Co., Stichting Pensioenfonds ABP, and Huntington Bancshares (joint submission).

[21]   The Examiner received reply submissions from Wilmington Trust, MBIA, and Allstate, AIG, MassMutual, and Prudential (jointly).

affiliates on account of the Debtors' businesses.[22] This letter requested that the recipients provide a "quantification of the damages arising from [their] existing or potential litigation . . . ." (each a "Damages Letter").[23] Additionally, the letter requested that the recipients address "any additional theories of liability" not identified in their respective pleadings.[24] The recipients of the December 21, 2012 letter represented all of the remaining Third-Party Claimants identified by the Examiner's Professionals that had not received the Examiner's letter of September 21, 2012. In response to the December 21, 2012 letter, eleven parties submitted Damages Letters.[25] The remaining parties that received the December 21 letter declined to respond to Examiner's Counsel's request.[26]

In addition to analyzing the Submission Papers, the Investigation of Third-Party Claims relied on document discovery and witness interviews. With respect to document discovery, to manage the potentially vast amount of responsive information, the Examiner's Professionals in many cases requested representative samples of various types of deal documentation and communications. With respect to interviews, in addition to officers and directors of AFI and the Debtors, the subject matter of Third-Party Claims required the Examiner's Professionals to interview several witnesses from the Debtors' operating subsidiaries who were closer to the Debtors' relevant day-to-day business activities. The time frame at issue presented another challenging aspect of the Investigation of Third-Party Claims. Many of the Third-Party Claims, and in particular the RMBS Claims, relate to events (typically securitization deals) going back to as early as 2004 and most ending prior to 2008. Few of the Debtors' and AFI's personnel from that early time period remain employed with the companies, and several of those interviewed by the Examiner's Professionals remembered few details. The Examiner's Professionals also requested documents from the Debtors and AFI from this earlier time period, focusing upon the Debtors' origination and securitization activities. In some cases, certain documents, such as e-mail communications, had not been preserved and therefore could not be produced to the Examiner.[27]

_____

[22] Letter from the Examiner to Third Parties (Dec. 21, 2012). A copy of this letter is attached to the Report as Appendix VIII.A—4.

[23] *Id.* at 2.

[24] *Id.*

[25] For an indication of which parties submitted Damages Letters, see Appendix VIII.D.1.

[26] Many plaintiffs declined the Examiner's request for damages quantifications out of concern for the impact a response could potentially have upon their pending litigation.

[27] For example, AFI informed the Examiner's Professionals that AFI had not preserved certain e-mail communications for its officers and directors from 2004–2007. AFI explained that its document retention policy for that period was to maintain e-mail backup tapes for rolling thirty-day periods, after which backup tapes were re-used and any data on the tapes was overwritten. In addition, computer hard drives, e-mail inboxes, and any documents maintained on shared drives were typically deleted thirty days after an employee was terminated (provided that the employee was not the subject of a legal hold). Accordingly, the Investigation of this time period was constrained in certain respects by the unavailability of historical materials.

### 3. The Debtors' Underlying Liability

The RMBS Claims against the Debtors and the AFI Defendants are symptomatic of the contingent liability problem that has beset the mortgage banking industry for the past several years.[28] The Financial Crisis Inquiry Commission ("FCIC"), which conducted a sixteen-month investigation into the type of business activities underlying the claims against the Debtors, catalogued a "rising incidence of mortgage fraud, which flourished in an environment of collapsing lending standards and lax regulation."[29] Among other things, the FCIC observed that the "major financial institutions ineffectively sampled loans they were purchasing to package and sell to investors."[30] These institutions "knew a significant percentage of the sampled loans did not meet their own underwriting standards or those of the originators" but a review of "many prospectuses provided to investors found that this critical information was not disclosed."[31] While the FCIC's final report does not provide any specific findings with respect to the Debtors' business, it does report indicia of negligence and fraud throughout the relevant industry during this time.[32]

The Debtors were by no means immune from these problems, as demonstrated by the substantial settlements that they and AFI have entered into relating to the Debtors' conforming and non-conforming securitization businesses.[33] Some claimants, such as the RMBS Steering

---

[28]    *See, e.g.*, Rick Rothacker & Aruna Viswanatha, *Bank of America, Other Banks Move Closer to Ending Mortgage Mess*, CHI. TRIB., Jan. 7, 2013, http://articles.chicagotribune.com/2013-01-07/business/sns-rt-us-bofa-msrs-salebre9060d2-20130107_1_countrywide-and-bank-banks-move-jonathan-finger ("Bank of America Corp announced more than $14 billion of legal settlements over bad mortgages it sold to investors and flaws in its foreclosure process, taking the bank a step closer to ending the home loan problems that have dogged it for years."); Nelson D. Schwartz, *Federal Regulators Sue Big Banks Over Mortgages*, N.Y. TIMES, Sept. 2, 2011, http://www.nytimes.com/2011/09/03/business/bank-suits-over-mortgages-are-filed.html ("A bruising legal fight pitting the country's most powerful banks against the full force of the United States government began Friday, as federal regulators filed suits against 17 financial institutions that sold the mortgage giants Fannie Mae and Freddie Mac nearly $200 billion in mortgage-backed securities that later soured."); *see also* Jia Lynn Yang, *Federal Lawsuit Accuses S&P of Defrauding Investors*, WASH. POST, Feb. 5, 2013, http://articles.washingtonpost.com/2013-02-05/business/36755795_1_s-p-analyst-s-p-and-other-ratings-ratings-agency ("The actions of S&P and other ratings agencies, such as Moody's, have drawn criticism because they issued top ratings for toxic securities whose values were based on residential mortgages. These ratings caused investors to think the products were safe, but when housing prices nose-dived, the securities lost their value, nearly wiping out the finances of the biggest banks in the country.").

[29]    FINANCIAL CRISIS INQUIRY COMMISSION, FINANCIAL CRISIS INQUIRY COMMISSION REPORT: FINAL REPORT OF THE NATIONAL COMMISSION ON THE CAUSES OF THE FINANCIAL AND ECONOMIC CRISIS IN THE UNITED STATES (Jan. 2011), at xxii, http://fcic.law.stanford.edu/report.

[30]    *Id.*

[31]    *Id.*

[32]    *Id.* at xxii, 110–11, 190, 215.

[33]    *See, e.g.*, RMBS Trust Settlement Agreement, § 5.01; *Ally Financial in $462 Million Settlement with Fannie*, REUTERS, Dec. 27, 2010, http://www.reuters.com/article/2010/12/27/us-fanniemae-ally-idUSTRE6BQ3OA20101227 ("Ally Financial Inc, the lender formerly known as GMAC, on Monday said it agreed to pay $462 million to Fannie Mae to avoid having to repurchase poorly underwritten mortgages sold to the housing finance giant.").

Committee Group, have argued that "[t]he massive losses suffered by the RMBS Trusts, and the high levels of breaches of representations and warranties associated with mortgages originated and sold by [GMAC Mortgage] and RFC into the trusts . . . suggest strongly that intentional fraud was pervasive in the . . . origination process."[34] While the Examiner offers no conclusions regarding whether the losses suffered by the RMBS trusts and other RMBS investors were the result of fraud, the fact remains that the Debtors continue to face substantial potential liabilities related thereto. This potential or alleged liability could remain the subject of litigation and settlement negotiations for years.

## B. THE MORTGAGE SECURITIZATION BUSINESS

To assess the merits of the RMBS Claims, an understanding of the RMBS securitization process is necessary, both in terms of industry norms and, more specifically, as conducted by ResCap from 2004 to 2007.[35]

### 1. The Securitization Market In General

Securitization consists of pooling assets and then selling securities backed by those assets into the bond market. In the case of RMBS, the assets that are pooled are individual residential mortgage loans. By securitizing loans and selling the resulting securities, mortgage lenders create income streams that require less capital than holding the individual mortgages on their balance sheets.

---

[34]  Steering Committee Group Submission Paper, dated Oct. 17, 2012, at 7.

[35]  The year in which a mortgage loan was originated is often referred to as its "vintage." The vintages with the highest rates of defaulting borrowers have been 2006 and 2007, and to a somewhat lesser degree 2005. The 2006 and 2007 vintages are characterized as having weaker underwriting standards coupled with a loss of liquidity in the mortgage market, which appear to have been the driving factors causing high delinquencies and defaults. Secondary factors include declining home prices and a decline in the economy, causing high unemployment which continued to hamper loss mitigation efforts; further stressing the securitizations from those vintages and earlier. *See* S&P, U.S. RMBS CREDIT QUALITY RESTS ON SEVERAL KEY HOUSING MARKET TRENDS (June 15, 2012), at 3, http://www.standardandpoors.com/ratings/articles/en/us/?articleType=HTML&assetID=1245335672130.

RMBS come in two basic varieties: Agency[36] and PLS. Agency securitizations are issued to investors through GSEs such as Fannie Mae, Freddie Mac, and Ginnie Mae.[37] By contrast, PLS or "non-Agency" RMBS are sold directly to investors. Loans purchased by the GSEs must conform to the respective agency's standards, and are therefore commonly referred to as "conforming" loans. Conversely, loans that do not conform to the GSE loan standards are commonly referred to as "non-conforming." The PLS market is comprised largely of non-conforming loans.

Conforming loans typically involve "prime" borrowers, while non-conforming loans can include both prime and "subprime" borrowers. The primary difference between prime (low credit risk) and subprime (high credit risk) loans is the borrower's credit history.[38] A subprime borrower's FICO score is generally 660 or below, and the borrower's credit history may include past delinquent payments, defaults, or bankruptcies.[39] As such, a subprime borrower generally has a higher probability of default than a prime borrower.

### a. Key Securitization Parties

The principal parties involved in mortgage securitization include:

- **Borrower**—The individual responsible for making mortgage payments on the mortgage note.[40]

---

[36] Fannie Mae and Freddie Mac, both chartered by Congress, participate in the mortgage market by buying mortgage loans and mortgage-related securities in the secondary market, and then issuing guaranties on mortgage-backed securities. *See* COMPANY PROFILE, FREDDIE MAC, http://www.freddiemac.com/corporate/company_profile; FANNIE MAE CHARTER, FANNIE MAE, http://www.fanniemae.com/portal/about-us/governance/our-charter.html. Ginnie Mae provides a guaranty of the principal and timely interest payments on certain government-sponsored mortgage loans, such as those provided by FHA or VA programs. COMPANY OVERVIEW, GINNIE MAE, http://www.ginniemae.gov/pages/default.aspx. Before September 2009, Fannie Mae's and Freddie Mac's guarantee was not explicitly backed by the U.S. government, but both entities had the right to draw on the U.S. Treasury. Because of Fannie Mae's and Freddie Mac's implied backing by the government, rating agencies and the market treated their securities as government-agency issuances. FRANK J. FABOZZI, THE HANDBOOK OF MORTGAGE BACKED SECURITIES 47 (6th ed. 2005). It wasn't until September 2009, after Fannie Mae and Freddie Mac were placed into the FHFA's conservatorship, that Freddie Mac and Fannie Mae received the U.S. government's guarantee. *See* U.S. Treasury, Press Release, *Statement by Secretary Henry M. Paulson, Jr. on Treasury and Federal Housing Finance Agency Action to Protect Financial Markets and Taxpayers* (Sept. 7, 2009), http://www.treasury.gov/press-center/press-releases/Pages/hp1129.aspx.

[37] FEDERAL RESERVE BANK OF SAN FRANCISCO, MORTGAGE LOAN SECURITIZATION AND RELATIVE LOAN PERFORMANCE (Aug. 2011), at 6, http://www.frbsf.org/publications/economics/papers/2009/wp09-22bk.pdf.

[38] [FDIC] SUBPRIME BACKGROUND DEFINITIONS, http://www.fdic.gov/about/comein/background.html.

[39] *Id.*

[40] COMPTROLLER OF THE CURRENCY ADMINISTRATION OF NATIONAL BANKS, ASSET SECURITIZATION, COMPTROLLER'S HANDBOOK (Nov. 1997), at 8, http://www.occ.gov/publications/publications-by-type/comptrollers-handbook/assetsec.pdf.

- **Credit Enhancer (Bond Insurer Monoline)**—A third-party entity that provides a guarantee of principal and timely interest payments on part or all of a given securitization.[41]

- **Custodian**—A third-party entity that serves as agent for the trustee and has a contractual obligation to: (1) assume ownership of the mortgage notes; (2) review the mortgage notes to ensure they were properly executed and endorsed; (3) provide notification to the trustee and various other transaction parties of representation and warranty breaches; and (4) upon proper authorization, release the mortgage notes to the trustee or servicer.[42]

- **Depositor**—An intermediary which sells or "deposits" loans into the trust.[43]

- **Investor**—Purchases the RMBS in the market.[44]

- **Originator/Lender**—Interacts directly with borrowers to create the mortgage loans that will ultimately be securitized.[45]

- **Rating Agency**—Evaluates the credit quality of the various tranches of RMBS issued by the trust and provides credit ratings to assist investors in assessing risk and making investment decisions.[46]

- **Servicer**—Responsible for the daily administration of the mortgage loans from the time of funding until they are paid in full. This includes mailing monthly statements and collecting principal and interest payments. The servicer also monitors delinquencies and pursues loss mitigation on defaulted loans. Typically, the servicer receives a small percentage of the monthly interest remitted (e.g., .25%, .50%) as compensation. The mortgage servicing rights may be retained by the originator or sold/subcontracted to a third party.[47]

---

[41]   *Id.* at 11. A credit enhancer is generally a triple AAA rated insurance company (e.g. AMBAC, FGIC, FSA, etc.). *See* Timothy C. Leixner, *Securitization of Financial Assets*, Sept. 1, 1999, at 5, http://mx.nthu.edu.tw/~chclin/Class/Securitization.htm.

[42]   *See, e.g.*, Custodial Agreement between JPMorgan Chase Bank, as trustee, GMAC Mortgage Corporation, as servicer, and GMAC Bank, as custodian, dated July 27, 2004, § 2.1–2.4 [ALLY_0032656].

[43]   MOODY'S, DEAL SPONSOR AND CREDIT RISK OF U.S. ABS AND MBS SECURITIES (Dec. 2006), at 9, http://www.moodys.com/sites/products/DefaultResearch/2006200000426039.pdf.

[44]   COMPTROLLER OF THE CURRENCY ADMINISTRATOR OF NATIONAL BANKS, ASSET SECURITIZATION, COMPTROLLER'S HANDBOOK (Nov. 1997), at 12, http://www.occ.gov/publications/publications-by-type/comptrollers-handbook/assetsec.pdf.

[45]   *Id.* at 9.

[46]   *See id.* at 11.

[47]   *Id.* at 10.

- **Sponsor (Seller/Issuer)**—Purchases mortgage assets from originators to form a pool of assets to be securitized. Also creates the trust into which the depositor will ultimately deposit the mortgage assets.[48]

- **Trust**—The special purpose entity ("SPE")[49] that holds the rights to the cash flows on the underlying assets and issues the RMBS representing a beneficial interest in the trust.[50]

- **Trustee**—A third party retained to administer the trust holding the mortgage assets. The trustee oversees the proceeds generated by the assets and distributes them based on a prescribed formula. The trustee is also responsible for enforcing the obligations of the various parties involved in the securitization. For example, the trustee is responsible for ensuring that the servicer is performing its obligations.[51]

- **Underwriter**—Markets the RMBS directly to investors. The underwriter, which in most cases is an independent investment banking institution, also acts in an advisory role. The underwriter knows investors' preferences and advises the sponsor on structuring and marketing the RMBS. A securitization may have multiple underwriters (typically, a lead underwriter and one or more co-underwriters). The lead underwriter is responsible for the management of the securitization process. Co-underwriters assist with the sale of the securities into the market.[52]

---

[48] MOODY'S, DEAL SPONSOR AND CREDIT RISK OF U.S. ABS AND MBS SECURITIES (Dec. 2006), at 10, http://www.moodys.com/sites/products/DefaultResearch/2006200000426039.pdf.

[49] An SPE is a bankruptcy remote legal entity with limited operations, generally created by the sponsor, set up for the purpose of holding the securitized assets. *See* NATIONAL BUREAU OF ECONOMIC RESEARCH, THE RISKS OF FINANCIAL INSTITUTIONS, SPECIAL PURPOSE VEHICLES AND SECURITIZATION (Jan. 2007), at 549–50, http://www.nber.org/chapters/c9619.pdf.

[50] COMPTROLLER OF THE CURRENCY ADMINISTRATION OF NATIONAL BANKS, ASSET SECURITIZATION, COMPTROLLER'S HANDBOOK, at 23 (Nov. 1997), http://www.occ.gov/publications/publications-by-type/comptrollers-handbook/assetsec.pdf.

[51] *Id.* at 10.

[52] *Id.* at 12.

### b.  Securitization Process

Below is a diagram of the basic steps in the securitization process. Several of these steps are discussed in more detail below.

EXHIBIT VIII.B.1.b
**Securitization Overview**



### (1) Loan Origination[53]

The RMBS securitization process begins with an originator marketing a loan product to a borrower. The originator underwrites the loan, a process which requires the borrower to provide specific financial information and an assessment on the value of the mortgaged property. Loan underwriting is critical in assessing a borrower's ability to repay a loan as well as the mortgage note holder's ability to recover from the underlying collateral in the event that the borrower defaults.[54]

---

[53]  For a more detailed discussion of the loan origination and acquisition processes see Appendix VIII.B.1.b(1).

[54]  *See* FRANK J. FABOZZI, THE HANDBOOK OF MORTGAGE BACKED SECURITIES 17 (6th ed. 2005).

### *(2) Loan Acquisition*

Originators that do not securitize or hold loans on their balance sheet typically act as a broker or correspondent for a sponsor.[55] Brokers perform the initial borrower review based upon the sponsor's underwriting guidelines but do not make any underwriting decisions or fund the loans—two tasks reserved for the sponsor.[56] By contrast, correspondents both underwrite *and* fund their own loans, and then sell the loans to sponsors through a bidding process.[57] Typically, as a condition of purchase, the sponsor will receive loan-level representations and warranties from the brokers and correspondents.[58] The representations and warranties are covenants written into the sale agreement regarding, among other things, the quality of the loan underwriting. In the event of a breach of the representations and warranties, the sponsor may "put back" a loan to the originator for repurchase or replacement.[59]

### *(3) Structuring The Securitization*

Structuring a securitization requires isolating and distributing credit risk, usually through various credit enhancement techniques.[60] The structuring process consists of four primary stages: (1) segregating the assets; (2) adding credit enhancement to mitigate risk and improve salability; (3) creating an SPE or trust to hold the assets; and (4) issuing interests in the asset pool (i.e., RMBS).[61]

The process of securitization is overseen by the sponsor who typically works with a third party investment bank in the role of lead underwriter.[62] Together the sponsor and lead underwriter structure the RMBS to be offered. The lead underwriter typically has several

---

[55]  *See* THE FINANCIAL CRISIS INQUIRY COMMITTEE, FINAL REPORT OF THE NATIONAL COMMISSION ON THE CAUSES OF THE FINANCIAL AND ECONOMIC CRISIS IN THE UNITED STATES (Jan. 2011), at 88–89, http://www.gpo.gov/fdsys/pkg/GPO-FCIC/pdf/GPO-FCIC.pdf.

[56]  CONSUMER FINANCIAL PROTECTION BUREAU, EXAMINATION PROCEDURES MORTGAGE ORIGINATION (Jan. 11, 2012), at 5, http://files.consumerfinance.gov/f/2012/01/Mortgage-Origination-Examination-Procedures.pdf.

[57]  *Id.*

[58]  Adam B. Ashcroft & Til Schuermann, *Understanding the Securitization of Subprime Mortgage Credit*, FED. RES. BANK N.Y. STAFF REP., Mar. 2008, at 5–6, http://www.newyorkfed.org/research/staff_reports/sr318.pdf. Examples of certain representations and warranties that would accompany a mortgage loan being purchased relate to the underlying property, applicable documentation in the loan file and the loan origination process, among others. AMERICAN SECURITIZATION FORUM, ASF MODEL RMBS REPRESENTATIONS AND WARRANTIES (Jul. 15, 2009), at 4, http://www.americansecuritization.com/uploadedfiles/asf_restart_representations_rfc_071509.pdf.

[59]  Adam B. Ashcroft & Til Schuermann, *Understanding the Securitization of Subprime Mortgage Credit*, FED. RES. BANK N.Y. STAFF REP., Mar. 2008, at 6, http://www.newyorkfed.org/research/staff_reports/sr318.pdf.

[60]  COMPTROLLER OF THE CURRENCY ADMINISTRATION OF NATIONAL BANKS, ASSET SECURITIZATION, COMPTROLLER'S HANDBOOK (Nov. 1997), at 12–13, http://www.occ.gov/publications/publications-by-type/comptrollers-handbook/assetsec.pdf.

[61]  *Id.*

[62]  *See* Nicola Cetorelli & Stavros Peristiani, *The Role of Banks in Asset Securitization*, FED. RES. BANK N.Y. ECON. POL'Y REV., July 2012, at 49, http://www.newyorkfed.org/research/epr/12v18n2/1207peri.pdf.

additional responsibilities such as: (1) contracting with the loan due diligence firm; (2) interacting with rating agencies, bond insurers, and legal counsel; and (3) assisting in the selection of the servicer, trustee and custodian entities.[63] A more detailed outline of the securitization process is contained in Appendix VIII.B.1.b(3).

### 2. ResCap Securitization Processes

The description of the ResCap securitization process contained in this Section is based upon documentation provided to the Examiner, as well as interviews and deposition testimony.[64] However, because of the limitations on witness testimony and document discovery noted in Section VIII.A.2, the summary below primarily describes how the process was intended to work and may not accurately represent the operations in practice at any given point in time. The Examiner's Professionals conducted a high-level investigation into ResCap's operations during 2004 through 2007, but a comprehensive description of every level of ResCap and AFI's organizational structure and respective operations would be outside the scope of the Investigation.

#### a. Overview

ResCap both originated its own loans and acquired previously-originated or "closed" loans. Loans were originated through its direct lending networks and mortgage brokers, while closed loans were acquired through correspondent and institutional lenders.[65] Regardless of whether ResCap originated or acquired particular loans, it generally disposed of them through two means: securitization and whole-loan sales.[66]

From 2005 to 2007, RFC and GMAC Mortgage did business as RFG.[67] RFC had a larger securitization program than GMAC Mortgage and issued a wider array of product types, specifically subprime and non-conforming loans.[68] GMAC Mortgage, which primarily performed whole-loan sales with the GSEs and private investors,[69] had a considerably smaller PLS program.[70]

---

[63]   *See id.*

[64]   Dep. Testimony, *MBIA Ins. Corp. v. Residential Funding Co.,* Case No. 603552/2008 (N.Y. Sup. Ct. 2010).

[65]   Residential Capital, LLC, Annual Report (Form 10-K) (Mar. 13, 2007), at 4.

[66]   *Id.* at 8.

[67]   Between 2005–2006, ResCap focused on integrating the operations of GMAC Mortgage and RFC into RFG. From 2006 on, the operations of RFC, described below in Section VIII.B.2.d, were performed under ResCap's RFG. *See* Interagency Review of Homecomings and RFC Business Overview, dated Mar. 5, 2008, at 9 [MBIADEPEXH0039908].

[68]   RFC issued 351 out of ResCap's 392 securitizations between 2004–2007. *See* PLS Trust Spreadsheet [EXAM00339947].

[69]   Residential Capital, LLC, Annual Report (Form 10-K) (Mar. 13, 2007), at 3–9.

[70]   Carpenter Lipps Presentation on ResCap PLS Overview, dated Jan. 30, 2013, at EXAM00234435 [EXAM00234431].

### b.  Types Of Loans

Through RFC and GMAC Mortgage, ResCap originated and acquired the following types of mortgage loans. However, as noted above, GMAC Mortgage specialized in the conforming loans while RFC acquired most of the non-conforming, second lien and non-prime loans.

- **Prime Conforming Loans**—Prime first-lien loans secured by single-family residences which conformed to GSE underwriting guidelines.[71]

- **Prime Non-Conforming Loans**—Prime first-lien loans secured by single-family residences which did not conform to the GSE's underwriting guidelines.[72]

- **Government Mortgage Loans—**First-lien government program loans (e.g. FHA, VA loans, etc.), secured by single-family residences.[73]

- **Prime Second-Lien Mortgage Loans**—Home equity loans secured by a second-lien on single-family residences.[74]

- **Nonprime Mortgage Loans**—Subprime first-and second-lien loans secured by single-family residences.[75]

### c.  ResCap Depositor Entities And Shelves

RFC and GMAC Mortgage issued 392 RMBS securitizations between 2004 and 2007.[76] In the aggregate, the original deal balance of the 392 securitizations was $221 billion.[77] Ally Securities served as a lead or joint-lead underwriter on approximately 105 of the 392 securitizations.[78]

RFC and GMAC Mortgage, as the sponsors, generally issued securitizations through five Depositor Entities.[79] All of the Depositor Entities were subsidiaries of RFC Holding.[80] RFC filed various base prospectuses, known as "shelves," with the SEC for the different types of securitizations.[81] The shelves allowed RFC to issue securities without waiting for SEC

---

[71]  Residential Capital, LLC, Annual Report (Form 10-K) (Mar. 13, 2007), at 5.

[72]  *Id.*

[73]  *Id.*

[74]  *Id.*

[75]  *Id.*

[76]  *See* PLS Trust Spreadsheet [EXAM00339947]; *see also* Appendix VIII.B—1 (discussing details (principal balance, underwriters, originator, etc.) on all 392 securitizations issued under the RMBS Trust Settlement Agreement).

[77]  PLS Trust Spreadsheet [EXAM00339947].

[78]  *See* Appendix VIII.B—2.

[79]  RFC "branded" certain shelves with unique names to help investors identify the type/characteristics of loans they were purchasing. The names corresponded to the particular depositor entity used to deposit the assets into the SPE. (e.g., RALI, RAMP, and RASC). *See* Int. of C. Blahut, Mar. 13, 2013, at 54:7–11.

[80]  ResCap Organizational Structure, dated Jan. 31, 2007 [RC40005141].

[81]  Int. of C. Blahut, Mar. 13, 2013, at 54:18–22.

approval of each offering. With each offering, RFC filed a prospectus supplement, which contained information about the specific offering that was not included in the shelf prospectus.[82] For example, prospectus supplements provided detailed information about the loan pool collateralizing particular RMBS offerings, including FICO scores, DTI, LTV, geography of the underlying properties, and information on the underwriting guidelines of the primary loan originators.[83]

### d. RFC's PLS Business

Within RFC, the day-to-day operations of loan acquisition and securitization resided within certain designated divisions, each with specific functions and responsibilities, including, Capital Markets,[84] Credit Policy,[85] and the Service Delivery Group.[86]

### (1) Loan Acquisition

RFC did not originate loans in the traditional sense, but rather acted as a conduit that acquired mortgage loans from third parties with the intent to sell those loans as part of whole-loan transactions or securitizations.[87] RFC acquired "closed" loans from correspondents who are originators that fund their loans prior to sale.[88] In many cases the correspondents funded

---

[82] *See, e.g.*, Residential Funding Corporation, RFMSI Series 2004-S4 Trust, Prospectus Supplement (Apr. 27, 2004); Residential Funding Corporation, RAMP Series 2006-EFC1 Trust, Prospectus Supplement (Jan. 26, 2006).

[83] Int. of C. Blahut, Mar. 13, 2013, at 56:13–23.

[84] Capital Markets was a group composed of several sub-groups, namely Trading, Structured Finance, Product Management, and Investor Relations, each with their own respective functions. Carpenter Lipps Presentation on ResCap PLS Overview, dated Jan. 30, 2013, at EXAM00234442 [EXAM00234431]. Trading was ultimately responsible for purchasing loans and assisting in negotiating the structure of the securitization. *See id*. at EXAM00234441–44 [EXAM00234431]. Structured Finance assisted in the securitization process by pooling loans, developing structure, and overseeing the preparation of documentation. *See id.* at EXAM00234444–45 [EXAM00234431]. Product Management worked with and received input from multiple groups (Trading, Structured Finance, etc.) in deciding which loan types to acquire. *See id.* at EXAM00234439. Investor Relations provided information to investors in ResCap's RMBS and responsible for creation of RFC's Vision website. *See* Int. of J. Steinhagen, Apr. 3, 2013, at 18:6–10, 23:3–12; *see also* Section VIII.B.2.d(2) (discussing RFC's Vision website).

[85] The Credit Policy group was responsible for overseeing RFC's "Client Guide" (underwriting guidelines). Carpenter Lipps Presentation on ResCap PLS Overview, dated Jan. 30, 2013, at EXAM00234437 [EXAM00234431].

[86] The Service Delivery Group supported the acquisition of loans through operations and underwriting functions. *See id.* Operations first performed basic reviews of loans received through RFC's automated underwriting system Assetwise while underwriting served as a second review when exceptions were noted. *See id.* at EXAM00234441. *See also* Sections VIII.B.2.d(1)(a), VIII.B.2.d(1)(b) (discussing these processes in greater depth).

[87] Carpenter Lipps Presentation on ResCap PLS Overview, dated Jan. 30, 2013, at EXAM00234435 [EXAM00234431].

[88] Conference call with Carpenter Lipps, Counsel for Debtors, and FTI, Financial Advisor to Debtors (Feb. 7, 2013).

the loans using warehouse lending facilities provided by RFC.[89] RFC also acquired loans from brokers who are originators that sell unfunded loans.[90] Unfunded loans would typically be acquired by RFC subsidiary Homecomings Financial which would fund the loan.[91] RFC typically acquired loans in two ways: (1) through bulk or group loan transactions; or (2) on a continuous loan-by-loan flow basis.[92] These transactions were entered into with three channels of clients:

- **Correspondent**—This channel was comprised of smaller to mid-size correspondents that typically committed loans to RFC on a flow or bulk basis.[93] GMAC Mortgage was considered a correspondent client.[94]

- **Institutional**—This channel consisted of larger companies that typically committed loans to RFC on a bulk basis.[95]

- **Broker or Wholesale**—This channel was essentially Homecomings Financial, an RFC subsidiary that worked with brokers to fund loans.[96]

### (a) Bulk Sale Acquisitions

Bulk deals were primarily purchased from larger correspondent and institutional clients.[97] The size of these deals could range from ten to over fifteen thousand loans.[98] Such sales were initiated when a client sent RFC a file consisting of loan data and a request that RFC bid on the loans.[99] These bid requests provided general information on the loan group, along with certain client conditions and stipulations (e.g., servicing retained or released, settlement date,

---

[89] RFC's warehouse lending facilities gave a competitive advantage in loan acquisition based on RFC's relationship with and access to capital from GMAC.

[90] Conference call with Carpenter Lipps, Counsel for Debtors, and FTI, Financial Advisor to Debtors (Feb. 7, 2013).

[91] *Id*.

[92] Carpenter Lipps Presentation on ResCap PLS Overview, dated Jan. 30, 2013, at EXAM00234441 [EXAM00234431]. The RFC origination process was to buy loans from their clients, and "basically acquiring mortgage loans . . . from correspondents, which are other banks or mortgage banks and mortgage bankers that are originating loans with borrowers." Int. of E. Scholtz, Mar. 28, 2013, at 25:16–19.

[93] *See* Dep. of J. Larson, May 11, 2011, at 11:22–23.

[94] GMAC Mortgage, LLC, Consolidated Financial Statements (Dec. 31, 2006), at 50.

[95] Dep. of J. Larson, May 11, 2011, at 11:24–12:7.

[96] *Id.* at 12:8–22.

[97] GMAC-RFC Presentation on CM Trading Business Overview, dated Dec. 1, 2005, at MBIADEPEXH0003578 [MBIADEPEXH0003443].

[98] *Id.*

[99] Draft ResCap Presentation on CM Trading Overview: Bulk Bidding, dated Jan. 18, 2006, at MBIADEPEXH0003669 [MBIADEPEXH0003664].

and custodian).[100] The Trading group would then run loan-level data through a number of diligence processes.[101] Pricing of the loans was done by using loan models and industry benchmarks.[102]

To test the loans for compliance with RFC's underwriting guidelines, loan data was entered into one of its underwriting diligence systems.[103] If the diligence process resulted in a loan falling outside of RFC's underwriting guide or the client-specific negotiated criteria,[104] Underwriting was expected to take one of several actions with respect to each loan: (1) correct the error and approve the loan; (2) approve the loan with an exception, but without a price adjustment; (3) approve the loan with an exception and request a price adjustment; or (4) decline the loan.[105] Underwriting, within RFC's Service Delivery Group, relayed any exceptions to Trading before the loans were funded.[106] Trading would then approve the final price of the bulk sale or negotiate a price adjustment with the client.[107]

### (b) Loan Flow Acquisition

Loan flow acquisitions were completed through RFC's correspondent and wholesale/broker clients.[108] In this process, clients and Trading would enter into commitment agreements[109] pursuant to which the client would commit to sell loans on a flow or individual

---

[100] *Id.* at MBIADEPEXH0003676.

[101] *Id.* at MBIADEPEXH0003684. Diligence included an automated valuation model ("AVM"), which provided automated property values based upon, among other factors, comparable property sales, characteristics, and neighborhood trends. *See* Susan Allen, *What's in Your AVM?*, CORELOGIC, 2012, at 2–3, http://www.corelogic.com/downloadable-docs/whats-in-your-avm.pdf.

[102] *See* Draft ResCap Presentation on CM Trading Overview: Bulk Bidding, dated Jan. 18, 2006 at MBIADEPEXH0003691–92 [MBIADEPEXH0003664].

[103] *See* Second Mortgage Review/Diligence—Current State, Jan. 2007, at MBIADEPEXH0005585 [MBIADEPEXH0005582].

[104] *See id.*

[105] *Id.*

[106] Trading did not review each loan file to determine if the loan conformed with established guidelines. *See* Int. of L. Lundsten, Feb. 20, 2013, at 43:13–15 ("Trading is not looking at each loan file . . . Acquisition is looking at the loans as they come in.").

[107] *See* ResCap Presentation on CM Trading Overview: Bulk Bidding, at MBIADEPEXH0003701 [MBIADEPEXH0003664]. Prices were re-negotiated if the loans were economically (e.g., rate, product type, etc.) different than the loans that were originally bid on. *See* Int. of E. Scholtz, Mar. 28, 2013, at 53:4–9, 81:2–15.

[108] GMAC-RFC Presentation on CM Trading Business Overview, dated Dec. 1, 2005, at MBIADEPEXH0003582 [MBIADEPEXH0003443].

[109] Conference call with Carpenter Lipps, Counsel for Debtors, and FTI, Financial Advisor to Debtors (Feb. 7, 2013).

basis.[110] An automated underwriting system, Assetwise, would then process the loan information[111] and render an automated decision that would either: (1) approve the loan with conditions; or (2) decline the loan.[112]

When a price adjustment was required, the loan was referred by Underwriting to Trading which had the authority to negotiate price adjustments with the client.[113] Once a loan was approved, the loan was purchased and a wire would be sent to the client.[114]

### (c) Quality Control

A second review for loan compliance, known as "post-fund quality control," was then conducted to ensure that acquired loans were in compliance with applicable policies and legal requirements.[115] Loans were both randomly selected, using a basic sampling tool to include a variation of product types and geographies, and specifically targeted based on risk.[116]

### (2) RFC Securitization Process

The majority of the loans implicated by the RMBS Claims were loans acquired by RFC. Allegations regarding GMAC Mortgage loans were primarily addressed through the settlements with the GSEs.[117]

The non-conforming loan securitization process primarily resided within RFC at Capital Markets, specifically Trading and Structured Finance.[118] Trading would engage an investment bank[119] to serve as lead underwriter.[120] One of the responsibilities of the lead underwriter was to distribute the securities to investors and also make certain decisions on the structuring of

---

[110]  *See* Dep. of S. Klein, Sept. 27, 2011, at 18:10–18.

[111]  Loan information included automated property valuations, credit reports, debt, bankruptcy history, etc. Dep. of R. Torborg, Apr. 27, 2011, at 34:19–35:8.

[112]  *Id.* at 37:12–15. Approved loans required a diligence check similar to that performed in the bulk bid process. *See* Second Mortgage Review/Diligence—Current State, Jan. 2007, at MBIADEPEXH0005585 [MBIADEPEXH0005582].

[113]  Dep. of S. Klein, Sept. 27, 2011, at 24:23–25:16.

[114]  Dep. of R. Torborg, Apr. 27, 2011, at 43:2–6.

[115]  Dep. of S. McCumber, Mar. 4, 2011, at 35:10–17, 93:14–21.

[116]  *Id.* at 89:23–90:13.

[117]  *See* Section III.I.12 (providing additional details).

[118]  *See* Carpenter Lipps Presentation on ResCap PLS Overview, dated Jan. 30, 2013, at EXAM00234436–46[EXAM00234431].

[119]  Investment banks were often chosen based upon which ones were providing valuable services throughout the organization (e.g., funding, etc.). *See* Int. of E. Scholtz, Mar 28, 2013, at 40:4–15. The determination of whether to use RFS as lead/co underwriter was made by Scholtz as head of Capital Markets. *See id.* at 60:16–19 ("[I]n 2006, I'd send [sic] a general strategy . . . [with] the desk that say, 'Include RFS in some way, shape or form in 25% of the transactions.'").

[120]  *Id.* at 27:11–14.

the securities that they would be selling to investors (e.g., use of bond insurer enhancement and sizing of tranches).[121] Structured Finance would pool the loans[122] and perform a pool diligence resulting in an asset pool which matched anticipated securitization parameters.[123] Trading was to address any critical issues (e.g., high LTVs or loan delinquencies) that were highlighted by the diligence review prior to their approval/denial of the pool.[124]

If approved, Trading would provide a list of assets to be added or removed from the preliminary pool or would define new parameters (e.g., subordination or different overcollateralization levels).[125] At this stage in the process, the rating agencies worked with Trading and Structured Finance to achieve investment grade ratings on certain classes or tranches of the certificates.[126]

A loan pool due diligence was then performed by an independent third party[127] that was generally hired by the lead underwriter.[128] The lead underwriter would select the loan sample to be reviewed.[129] However, when a bond insurer was involved, the insurer also would participate in the selection of the diligence firm[130] and the review of loan sample to be reviewed.[131]

Where the securitization was insured, the bond insurer received a loan tape for analysis and would provide preliminary credit enhancement targets (e.g., overcollateralization levels

---

[121] *Id.* at 29:10–13.

[122] *See* Int. of L. Lundsten, Feb. 20, 2013, at 17:17–18 (Structured Finance employees' role was, in part, to "make sure that everything was in order in the files and that the pool was ready to sell").

[123] GMAC-RFC Securitization Transaction Activity Diagram, dated Sept. 18, 2000, at MBIADEPEXH0000059–60 [MBIADEPEXH0000056] (attached to E-mail from H. Peterson (Aug. 30, 2006) [MBIADEPEXH0000056]).

[124] *Id.* at MBIADEPEXH0000060.

[125] *Id.* at MBIADEPEXH0000062.

[126] *Id.* at MBIADEPEXH0000064.

[127] *See* Int. of L. Lundsten, Feb. 20, 2013, at 79:25–80:15 (indicating these independent third parties included Clayton and The Bohan Group, Inc.). These firms perform a comprehensive review of loan files for compliance with investor preference and not necessarily if loans complied with RFC's client guide. *See* Conference call with Carpenter Lipps, Counsel for Debtors, and FTI, Financial Advisor to Debtors (Feb. 7, 2013).

[128] A lead underwriter has more responsibility in the securitization process, as opposed to a co-underwriter, because, among other duties, they create the structure for the classes and "bring in investor demand." Int. of E. Scholtz, Mar. 28, 2013, at 28:24–29:13.

[129] GMAC-RFC Securitization Transaction Activity Diagram, dated Sept. 18, 2000, at MBIADEPEXH0000065 [MBIADEPEXH0000056].

[130] *See* Int. of L. Lundsten, Feb. 20, 2013, at 78:14–19 (rather than performing separate due diligence, the insurer would "piggyback" on the underwriter's due diligence and "the two of them would decide together how many loans they wanted to review and how they wanted to review it").

[131] GMAC-RFC Securitization Transaction Activity Diagram, dated Sept. 18, 2000, at MBIADEPEXH0000065 [MBIADEPEXH0000056].

and letters of credit) to Trading.[132] Trading, Structured Finance, the lead underwriter, and the bond insurer would negotiate credit enhancement targets until an agreement was reached.[133] A deal structure was agreed upon by Trading and the underwriter,[134] driven by the preliminary risk levels and market conditions.[135] The lead underwriter would then create marketing materials which would be distributed to potential investors.[136] In some instances RFC would sell the loans to the lead underwriter, who would distribute the securities on its own.[137] The determination by RFC of whether to sell the loans to the underwriter or hold them until the securitization got executed was based upon profitability and risk appetite.[138]

The lead underwriter would provide pricing information on the securities to Trading based upon feedback received from investors.[139] Structured Finance would manage the production of the preliminary deal documents, including the indenture, mortgage loan purchase agreements, and insurance and indemnity agreements.[140] Structured Finance created tables for the prospectus supplement that contained information about the loan pool, such as the distribution of credit scores, original loan balances, and LTVs,[141] and worked with the lead underwriter to review the deal documents to provide any necessary changes to both in-house and external counsel.[142]

For the transaction to close, the independent accounting firm compared the data in the pool to the respective loan files and finalized the comfort letter.[143] Structured Finance facilitated the registration of the security and the final prospectus supplement was filed with the SEC in addition to other deal information.[144] Registration of the physical securities with

---

[132] *Id.* at MBIADEPEXH0000067.

[133] *Id.*

[134] *Id.* at MBIADEPEXH0000069.

[135] *Id.*

[136] *Id.* at MBIADEPEXH0000068.

[137] Int. of E. Scholtz, March 28, 2013, at 27:14–16.

[138] *See id.* at 43:23–44:1.

[139] However if the underwriter(s) owned the loans, RFC did not participate in the pricing discussions with investors. *See id.* at 30:19–25 ("If [the underwriters] own it, we don't care because they own it at a dollar price. If we still own it and they are working as our underwriter, then they're getting pricing feedback. They come back to us and say, 'These are where the bonds are going to trade' . . . and we work with them.").

[140] GMAC-RFC Securitization Transaction Activity Diagram, dated Sept. 18, 2000, at MBIADEPEXH0000080 [MBIADEPEXH0000056].

[141] *Id.* at MBIADEPEXH0000076.

[142] *Id.* at MBIADEPEXH0000080.

[143] *Id.* at MBIADEPEXH0000066;–81.

[144] *Id.* at MBIADEPEXH0000082–85.

the Depository Trust Company was done by the trustee.[145] Once funds were wired to RFC per the funding statement, Structured Finance would mark the pool as sold and provide a verbal confirmation to release the bonds.[146]

Upon securitization closing, or immediately prior, the custodian would take receipt of the mortgage notes associated with the pool of loans for the securitization. The custodian would confirm to the trustee that all of the relevant mortgage notes were received and that the mortgage notes were executed and endorsed, as required under the pooling and servicing agreement.[147]

---

[145] *Id.* at MBIADEPEXH0000084.

[146] The Depository Trust Company would release the securities to the trustee, who then released the securities to the investors. *See id.* at MBIADEPEXH0000095–96. For monitoring of securities or investor tracking, RFC had a proprietary database, Vision, which was designed to provide investors with as much transparency as possible with respect to the performance of loans backing their certificates. The Vision database "had extensive information that [RFC] provided investors in terms of performance of our securities." Int. of E. Scholtz, Mar. 28, 2013, at 31:6–9. Through Vision, the investor could manipulate loan level data (e.g., delinquency, foreclosure, REO, losses, etc) to derive its own perspective of performance of a given securitization. *See id.* at 31:12–22.

[147] In the event there were missing or defective mortgage notes, the custodian was required to notify the trustee, servicer, and RFC. The custodian also had an ongoing responsibility to provide timely notification to the sponsor and trustee if it discovered a breach of the representations and warranties made by the sponsor. *See, e.g.*, Custodial Agreement, RALI Series 2007-QH6, dated June 1, 2007, §§ 2.1, 2.3(a), 2.4 [GSResCap0000117072].

### e. *GMAC Mortgage's PLS Business*

#### (1) Sources Of Loan Production

GMAC Mortgage both originated and acquired loans.[148] Its primary sources for originations were through direct lending[149] and mortgage brokerages,[150] while it acquired loans through correspondent lenders[151] and Ally Bank.[152]

#### (a) GMAC Mortgage Loan Origination

Loan origination through GMAC Mortgage's direct lending and broker networks was similar in nature to that of RFC's, with the following notable differences:

- Different underwriting/exceptions process, mostly managed by brick and mortar retail operations across the country.[153]

- As noted above, GMAC Mortgage's Underwriting guidelines were structured more around GSE standards and conforming products rather than the more exotic, high yield products that came through RFC.[154]

---

[148] Carpenter Lipps Presentation on ResCap PLS Overview, dated Jan. 30, 2013, at EXAM00234435 [EXAM00234431].

[149] GMAC Mortgage conducted origination in this channel through retail branches, the internet and telephone operations. Through their servicing platform, GMAC Mortgage was able to originate loans by refinancing borrower's mortgage loans. *See* Residential Capital, LLC, Annual Report (Form 10-K) (Mar. 13, 2007), at 4.

[150] Through this network, mortgage brokers served as liaisons between GMAC Mortgage and borrowers. A mortgage broker assisted in identifying potential borrowers, compiled necessary information/documents and completed the loan application. GMAC Mortgage was responsible for underwriting, setting the interest rate and funding the loan. *See id.*

[151] Correspondent lenders closed and funded their own loan originations, and subsequently sold the loans to GMAC Mortgage. Larger correspondent lenders were known as institutional lenders. These sales could take the form of bulk acquisitions. *See id*.

[152] GMAC Mortgage often sold loans it originated or acquired to Ally Bank for a holding period. Pursuant to the MMLPSA, Ally Bank subsequently sold these loans, along with other loans it had originated and acquired, back to GMAC Mortgage prior to sale or securitization by GMAC Mortgage. *See* Memorandum, GMAC Mortgage to GMAC Bank Loan Transfer SAB99 Review, dated Jan. 6, 2009, at 1–2 [EXAM12042904]. For a more in depth discussion of the relationship between Ally Bank and GMAC Mortgage, see Section V.B.1.b. To take advantage of Ally Bank's lower cost of funds, sales of these loans were conducted through a standard client correspondent agreement under Regulation W of section 23 of the Federal Reserve Act. Under exemption 250.250, Ally Bank was permitted to purchase up to 50% of GMAC Mortgage's loan production in a 12 month period. *See* Residential Capital, LLC, Annual Report (Form 10-K) (Mar. 13, 2007), at 29.

[153] Carpenter Lipps Presentation on ResCap PLS Overview, dated Jan. 30, 2013, at EXAM00234457 [EXAM00234431].

[154] *Id.*

*(b) GMAC Mortgage Securitization*

The process of mortgage securitization was similar in nature to that of RFC's, with the following notable differences:

- RFC, through the Structured Finance Group, would structure the transactions (i.e., deciding on senior/subordinate, credit enhancement, utilizing bond insurers, etc.), while GMAC Mortgage relied more upon third-party underwriters for this process.[155]

- GMAC Mortgage issued different representations and warranties than RFC (e.g., it did not use an underwriting representation and warranty in second lien deals and usually did not make any fraud representations and warranties).[156]

- GMAC Mortgage's PLS often had different structures such as, inter alia, a revolving structure which enabled them to add loans after the deal closed by using proceeds, from the initial sale of the RMBS, to purchase the additional loans.[157]

## C. ANALYSIS OF CLAIMS

### 1. Choice Of Law

A comprehensive choice-of-law analysis with respect to each of the Third-Party Claims would not have been practicable because of the number of relevant actions pending in different state and federal courts. The relevant choice-of-law questions are complicated by: (1) numerous states of incorporation and principal places of business of the plaintiffs and defendants; (2) varying locations of the subject transactions; and (3) differing choice-of-law rules for various venues and causes of action.[158] Accordingly, unless otherwise noted, the Examiner has analyzed Third-Party Claims issues under New York and Second Circuit law. This approach was appropriate given that the RMBS Actions, which as noted above are the

---

[155] *Id.* at EXAM00234458.

[156] *Id.*

[157] *Id.*

[158] *See* Debtors' Omnibus Response to Third-Party Submissions, dated Dec. 18, 2012, at 46 n.48 ("The PLS Investors' claims present choice-of-law issues given the varying residences of the investors, the Debtors and the varying locations of the subject transactions. Nonetheless, for purposes of this submission, the Debtors will look to the law of New York as setting forth the basic factors applicable to common-law fraud claims.").

most significant actions in monetary terms, are pleaded under New York and Second Circuit law[159] and the agreements governing the Debtors' securitization transactions typically designate New York law as controlling.[160]

New York courts generally enforce choice-of-law provisions.[161] However, choice-of-law provisions that specify a contract will be governed by a certain body of law do "not dispositively determine the law which will govern a tort claim arising incident to a contract."[162] Generally, "tort claims are outside the scope of contractual choice of law provisions" unless the "express language of the provision [is] 'sufficiently broad' as to encompass the entire relationship between the contracting parties."[163] Nevertheless, under the New York "interest analysis," the New York and Second Circuit law of torts arising incident to a contract is applied where the underlying facts of the case have "significant contacts" with New York.[164] The Second Circuit has stated that "[i]n all interest analyses, the significant

---

[159] FHFA's Mem. of Law in Opp. to Def.'s Mot. to Dismiss Am. Compl., *FHFA v. Ally Fin. Inc.*, Case No. 11-07010, Docket No. 205, at 14–15, 23–24 (S.D.N.Y. Sep. 7, 2012); AFI's Mem. of Law in Supp. of Mot. to Dismiss Am. Compl., *Union Cent. Life Ins. Co. v. Ally Fin. Inc.*, Case No. 11-02890, Docket No. 219, at 2–6 (S.D.N.Y. July 27, 2012); Mem. of Law in Opp. to Def.'s Mot. to Dismiss, *N.J. Carpenters Health Fund v. Residential Capital, LLC*, Case No. 08-08781, Docket No. 194, at 5 (S.D.N.Y. Dec. 3, 2012); Pl.'s Mem. of Law in Opp. to Def.'s Mot. to Dismiss, *MBIA Ins. Corp. v. Residential Funding Co., LLC*, Case No. 603552/2008, Docket No. 08, at 8 (N.Y. Sup. Ct. Feb. 3, 2009); Joint Mem. of Law in Supp. of Def.'s Mot. to Dismiss Compl., *FDIC v. Chase Mortg. Fin. Co.,* Case No. 12-6166, Docket No. 70, at 4, 34 (S.D.N.Y. Nov. 13, 2012). The Non-RMBS Actions have been filed in more diverse jurisdictions, but the Examiner has not undertaken an in-depth analysis of the choice of law issues that may arise (if any) in these cases.

[160] *See, e.g.*, Standard Terms of Pooling and Servicing Agreement, dated Nov. 1, 2006, § 11.02 [EXAM00234978]; Underwriting Agreement—RALI 2006-Q09, dated Nov. 28, 2006, §12 [EXAM00234794]; Pooling and Servicing Agreement—RASC 2006-KS3, dated Mar. 1, 2006, § 11.04 [EXAM00236698]; FGIC Insurance and Indemnity Agreement—RASC 2007-EMX1, dated Mar. 12, 2007, § 6.04 [EXAM30905047] (providing that "[t]his Insurance Agreement shall be governed by and construed in accordance with the laws of the State of New York"); MBIA Insurance Agreement—RFMS 2007-HSA1, dated Feb. 27, 2007, § 6.04 [EXAM30412508] ("This insurance agreement shall be governed by and construed in accordance with the Laws of the State of New York without regard to choice of law provisions.").

[161] *See MBIA Ins. Corp. v. Royal Bank of Canada*, No. 12238/09, 2010 WL 3294302, at *21 (N.Y. Sup. Ct. 2010) ("Choice of law clauses are accorded *prima facie* validity and are to be enforced absent a strong showing that the clause resulted from fraud or overreaching, that it is unreasonable or unfair, or that enforcement would contravene some strong public policy of the forum.") (citation omitted).

[162] *Krock v. Lipsay,* 97 F.3d 640, 645 (2d Cir. 1996) (emphasis omitted); *see also Fin. One Pub. Co. Ltd. v. Lehman Bros. Spec. Fin., Inc.*, 414 F.3d 325, 333 (2d Cir. 2005) ("New York courts decide the scope of [a contractual choice of law clause] under New York law, not under the law selected by the clause . . . .").

[163] *Fin. One Pub. Co. Ltd.,* 414 F.3d at 335; *Krock,* 97 F.3d at 645; *Winter-Wolff Int'l., Inc. v. Alcan Packaging Food & Tobacco Inc.*, 499 F. Supp. 2d 233, 240 (E.D.N.Y. 2007) (citation omitted) ("[T]he Second Circuit surveyed New York cases and found that there were *no* reported New York state cases where a contractual choice-of-law clause was drafted broadly enough to reach tort claims.").

[164] *Fin. One Pub. Co. Ltd.,* 414 F.3d at 337.

contacts are, almost exclusively, the parties' domiciles and the locus of the tort,"[165] and Third-Party Claimants are generally New York plaintiffs who have pleaded that "substantial activity giving rise to the claims . . . occurred within New York County."[166]

Regardless of what law controls in each particular case, in light of the similarities between the causes of action in the potentially relevant jurisdictions[167] and the fact that the Submission Papers did not raise any significant choice-of-law issues, it seems likely that any jurisdictional variation among the causes of action will be slight.[168] Nonetheless, to ensure

---

[165] *Krock*, 97 F.3d at 646 (citations omitted).

[166] Compl., *FGIC v. Residential Funding Co. LLC*, Case No. 11-09736, Docket No. 1-1, at 6 (N.Y. Sup. Ct. Dec. 30, 2011); Compl., *MBIA Ins. Corp. v. Ally Fin. Inc.*, Case No. 12-18889, at 8 (Minn. Dist. Ct. Sept. 17, 2012); Compl., *Assured Guar. Mun. Corp. v. GMAC Mortg., LLC*, Case No. 12-03776, Docket No. 1, at 5 (S.D.N.Y. May 11, 2012); Second Am. Compl., *Rothstein v. Ally Fin. Inc.*, Case No. 12-03412, Docket No. 39, at 5 (S.D.N.Y. Jan. 22, 2013).

[167] For instance, state blue-sky statutes are typically construed in accordance with federal securities laws. *See, e.g.*, *Kesling v. Kesling*, 546 F. Supp. 2d 627, 636 n.4 (N.D. Ind. 2008) ("The Supreme Court of Indiana recently noted that reference to federal authority is often appropriate in interpreting the Indiana Securities Act."); *Fenoglio v. Augat, Inc.*, 50 F. Supp. 2d 46, 59 (D. Mass. 1999) ("These provisions of the Massachusetts blue sky law are 'substantially similar to the federal securities laws and therefore decisions construing the federal statutory language are applicable to the state statute as well.'"); *Adler v. William Blair & Co.*, 271 Ill. App. 3d 117, 130 (4th Dist. 1995) ("Illinois courts therefore look to Federal case law to interpret these provisions."). Similarly, the elements of fraud and aiding and abetting are substantially similar in New York and Minnesota, the two states where such claims have most frequently been brought. *Compare Eurycleia Partners, L.P. v. Seward & Kissel, LLP*, 910 N.E.2d 976, 979 (N.Y. 2009) (under New York law, "[t]he elements of a cause of action for fraud require a material misrepresentation of fact, knowledge of its falsity, an intent to induce reliance, justifiable reliance by the plaintiff and damages") (citations omitted), *and Prickett v. N.Y. Life Ins. Co.*, No. 09 Civ. 3137, 2012 WL 4053810, at *11 (S.D.N.Y. 2012) (aiding and abetting fraud under New York law requires "a primary violation, actual knowledge of the violation on the part of the aider and abettor, and substantial assistance") (citation omitted), *with Valspar Refinish, Inc. v. Gaylord's, Inc.*, 764 N.W.2d 359, 369 (Minn. 2009) (noting that under Minnesota law, fraud requires: (1) a false representation of a past or existing material fact susceptible of knowledge; (2) made with knowledge of the falsity of representation or made without knowing whether it was true or false; (3) with the intention to induce the claimant to act in reliance thereon; (4) that the representation caused the claimant to act in reliance thereon; and (5) that the claimant suffered pecuniary damages as a result of the reliance), *and Witzman v. Lehrman, Lehrman & Flom*, 601 N.W.2d 179,187 (Minn. 1999) (outlining that to establish aiding and abetting, a plaintiff must show: (1) the primary tortfeasor committed a tort that caused an injury to the plaintiff; (2) the defendant knew the primary tortfeasor's conduct constituted a breach of duty; and (3) the defendant substantially assisted or encouraged the primary tortfeasor in the achievement of the breach).

[168] The first step in a choice of law analysis "is to determine whether there is an actual conflict between the laws of the jurisdictions involved." *In re Allstate Ins. Co.*, 613 N.E.2d 936, 937 (1993). An actual conflict is present "[w]here the applicable law from each jurisdiction provides different substantive rules." *Curley v. AMR Corp.*, 153 F.3d 5, 12 (2d Cir. 1998). If the laws of the relevant jurisdictions are substantively the same, a court may avoid the choice of law analysis. *See id.* (citing *J. Aron & Co. v. Chown*, 231 A.D.2d 426, (N.Y. App. Div. 1996) ("It is only when it can be said that there is no actual conflict that New York will dispense with a choice of law analysis.")).

consideration of all relevant issues, the Examiner's Professionals have noted legal developments in other potentially relevant jurisdictions where appropriate.[169]

### 2. RMBS Claims

The RMBS Claims appear to fall into two broad categories: (1) claims by the financial guaranty (i.e., monoline) companies that insured various of the Debtors' RMBS offerings (the "RMBS Insurer Claims"); and (2) claims by purchasers of RMBS, including private and public investors (the "RMBS Investor Claims"). The RMBS Insurer Claims typically allege fraud and/or breach of contractual representations and warranties contained in the insurance and RMBS documentation.[170] The RMBS Investor Claims typically allege material misrepresentations and omissions in connection with the sale of RMBS in violation of state and federal securities laws, as well as state common law.[171]

#### a. Claims Against AFI

A variety of Third-Party Claimants either have asserted or may assert claims against AFI seeking to impose liability on it for underlying RMBS Claims asserted against one or more of the Debtors and/or Ally Securities. Such claims are premised upon one of three principal theories of liability: (1) piercing the corporate veil of the Debtors to hold AFI liable for underlying claims asserted against those Debtors; (2) "control person" claims seeking to hold AFI liable under federal or state securities laws for alleged primary securities law violations by the Debtors and/or Ally Securities in connection with the issuance of RMBS; and (3) common law aiding and abetting claims to hold AFI liable for alleged fraud or fraudulent inducement by the Debtors and/or Ally Securities in connection with their issuance of RMBS or their procurement of financial guaranty insurance for RMBS.

Because each of those theories of liability requires Third-Party Claimants to prove an underlying claim against one or more of the Debtors or Ally Securities, and as noted above definitive conclusions as to the likelihood of success of those underlying claims are beyond the scope of the Investigation, the Examiner does not reach definitive conclusions as to the ultimate merits of theories seeking to impose those unproven liabilities on AFI. With those necessary limitations, the Examiner reaches certain factual and legal conclusions as to the RMBS claims that have been or may be asserted against AFI under those three theories of liability.

First, the Examiner concludes it is unlikely that any pending or potential claims by Third-Party Claimants seeking to hold AFI liable on a veil-piercing or alter ego theory of liability for

---

[169] Other potentially relevant jurisdictions include Delaware (the Debtors' place of organization), Minnesota (the Debtors' place of business), Michigan (AFI's place of business), and Utah (Ally Bank's place of organization).

[170] *See, e.g.*, Compl., *FGIC v. Ally Fin., Inc*., Case No. 12-01601, Docket No. 1 (S.D.N.Y. Mar. 5, 2012); Am. Compl., *MBIA Ins. Corp. v. Residential Funding Co., LLC*, Case No. 603552/2008, Docket No. 28 (N.Y. Sup. Ct. Mar. 19, 2010).

[171] *See, e.g.*, Compl., *John Hancock Life Ins. Co. v. Ally Fin. Inc.*, Case No. 12-01841, Docket No. 1 (D. Minn. July 27, 2012); Am. Compl., *FHFA v. Ally Fin. Inc.*, Case No. 11-07010 (S.D.N.Y. June 12, 2012).

RMBS Claims asserted against the Debtors would prevail. For the reasons explained above, the Examiner has concluded that a potential veil-piercing claim asserted on behalf of the Debtors to hold AFI liable for all of those Debtors' debts is unlikely to prevail.[172] Veil-piercing claims asserted by Third-Party Claimants would be governed by the same applicable Delaware law and would face many of the same legal and factual hurdles as a potential veil-piercing claim asserted on behalf of the Debtors.

Moreover, any veil-piercing claim asserted by Third-Party Claimants seeking to hold AFI liable for RMBS Claims against the Debtors would face the additional hurdle of standing. Delaware law recognizes the existence of a claim of an entity to pierce its own corporate veil and that such claim constitutes property of the bankruptcy estate. Accordingly, an individual creditor lacks standing to assert veil-piercing claims against the shareholders of the debtor unless its alleged injury is peculiar and personal to that creditor or a group of creditors (rather than general and common to the debtor and all creditors). Third-Party Claimants seeking to hold AFI liable for underlying RMBS Claims against the Debtors would appear vulnerable to such a standing defense because their alleged injury—that the Debtors are insolvent and cannot satisfy any judgment that may be obtained—may be deemed to be "generalized" in nature and common to all creditors.

Second, with respect to "control person" claims asserted against AFI under federal or state securities laws, several such claims—although not all—have survived motions to dismiss. Although the case law in this area continues to develop, several courts have found allegations that a parent company exercised direction and control over a vertically integrated structure of wholly owned subsidiaries that issued RMBS to be sufficient to plead that the parent was a "controlling person" of the subsidiaries and the alleged primary securities law violators. Of course, even if Third-Party Claimants succeed at the pleading stage in alleging "control," it does not necessarily mean they would succeed in proving their claims. While a close question, the Examiner concludes that it is more likely than not that a court would not find the requisite control by AFI over the alleged primary securities violators.

The totality of the evidence indicates that it would be difficult to prove the necessary degree of control during the relevant time period of 2004–2007. The Investigation has not uncovered evidence that AFI—notwithstanding the existence of overlapping officers and directors and certain shared corporate functions and services—had any direct involvement in any of the Debtors' securitizations. Moreover, even if Third-Party Claimants were to succeed in proving a prima facie case for control person liability, certain of those securities claims appear subject to potential affirmative defenses. For example, certain of the securities claims asserted by Third-Party Claimants—including in particular certain claims under the Minnesota Securities Act—may be susceptible to a defense that they are time-barred by the applicable statutes of limitations and/or repose.

Third, with respect to common law aiding and abetting fraud claims asserted against AFI, Third-Party Claimants in general face higher pleading standards and burdens of proof than many of the claims asserted under state and federal securities laws. Despite the need to plead

---

[172]   *See* Section VII.A.1.

with particularity to meet those standards, aiding and abetting fraud claims asserted by one of the Third-Party Claimants have to date survived the pleading stage and proceeded to discovery. That said, the Investigation has revealed no evidence that supports the assertion that AFI provided substantial assistance to the conduct alleged to give rise to Third-Party Claimants' common law fraud claims. The available evidence does not indicate that AFI had any direct involvement in any of the securitizations at issue that could be considered the proximate cause of the Debtors' alleged fraud. Evidence concerning the financial support that AFI provided to the Debtors and the corporate functions and services shared with AFI is not likely to suffice. Not only is such general assistance to the Debtors' businesses unlikely to be deemed the proximate cause of the Debtors' alleged fraud, but much of that assistance came after the Debtors ceased private label securitizations in 2007. Subject to discovery of contradictory facts, such evidence is unlikely to be enough to hold AFI liable for the alleged fraud of its subsidiaries.

### *(1) Piercing The Corporate Veil And Alter Ego Claims*

The Examiner concludes it is unlikely that any pending or potential claims by Third-Party Claimants seeking to hold AFI liable on a veil-piercing or alter ego theory of liability for RMBS Claims asserted against the Debtors would prevail. The Examiner applies Delaware law—the law of the jurisdiction of organization of each of AFI, GMAC Mortgage Group, LLC, ResCap, GMAC Mortgage, and RFC—to any such veil-piercing claim.[173] Courts do not lightly pierce the corporate veil.[174] Under Delaware law, a successful veil-piercing claim would require proof both that: (1) the defendant Debtors and AFI "operated as a single economic entity"; and (2) an "overall element of injustice or unfairness is present."[175] In the context of assessing potential veil-piercing claims that could be asserted on behalf of the Debtors against AFI, the Examiner concludes that the evidence does not support the proposition that the Debtors and AFI should be considered a single economic entity.[176] That same evidence alone makes unlikely to prevail any claims asserted by Third-Party Claimants seeking to pierce the corporate veil of the Debtors to impose liability upon AFI.

---

[173]   *See* Section VII.A.1.a.

[174]   *See BASF Corp. v. POSM II Props. P'ship*, No. 3608, 2009 Del. Ch. LEXIS 33, at *32 n.50 (Del. Ch. Mar. 3, 2009) ("[P]ublic policy does not lightly disregard the separate legal existence of corporations."); *Official Comm. of Unsecured Creditors v. Bay Harbour Master Ltd.* (*In re BH S&B Holdings LLC*), 420 B.R. 112, 133 (Bankr. S.D.N.Y. 2009) ("In general, the corporate form is sacrosanct and courts will not disturb it to hold shareholders of a corporation, or members of an LLC, liable.").

[175]   *In re BH S&B Holdings LLC*, 420 B.R. at 133–34 (quotation marks omitted); *see also NetJets Aviation, Inc. v. LHC Commc'ns, LLC*, 537 F.3d 168, 177 (2d Cir. 2008).

[176]   *See* Section VII.A.1. To reach that conclusion, the Examiner considered evidence including without limitation concerning each of the following factors: "(1) undercapitalization, (2) failure to observe corporate formalities, (3) nonpayment of dividends, (4) insolvency of the debtor corporation at the time, (5) siphoning off of the corporation's funds by the dominant parent, (6) absence of corporate records, and (7) the fact that the corporation is merely a facade for the operations of the dominant parent." *In re BH S&B Holdings LLC*, 420 B.R. at 134; *see also NetJets Aviation, Inc.*, 537 F.3d at 176–77.

Even assuming arguendo that Third-Party Claimants were to prevail on their underlying claims against the Debtors and then prove that the Debtors and AFI should be considered a single economic entity, each of Third-Party Claimants would still need to prove that it had suffered the requisite "injustice or unfairness." That "fraud or inequity 'must be found in the defendants' use of the corporate form.'"[177] Neither the "[t]he underlying cause of action"[178] nor "the possibility that a plaintiff may have difficulty enforcing a judgment"[179] suffices. The Investigation has revealed evidence inconsistent with the assertion by Third-Party Claimants that theirs is the type of "typical situation" where "fraud or injustice" may warrant piercing the corporate veil when a subsidiary becomes unable to satisfy its creditors either because it was undercapitalized at formation or later siphoned of its assets.[180] Although the Examiner has concluded that ResCap was left with unreasonably small capital and balance sheet insolvent from August 15, 2007 and December 31, 2007, respectively, the available evidence indicates that the primary drivers of that inadequacy of capital and insolvency were ResCap's substantial operating losses reported beginning in the fourth quarter of 2006—not any conduct of AFI.[181] In light of that evidence, the Examiner expects that it would be difficult for Third-Party Claimants to prove that AFI used the Debtors as an "incorporated pocketbook"[182] or for "some sort of elaborate shell game."[183]

---

[177] *Soroof Trading Dev. Co. LTD v. GE Microgen, Inc.*, Civ. No. 10-1391, 2012 U.S. Dist. LEXIS 67736, at *27 (S.D.N.Y. May 11, 2012) (quoting *Trevino v. Merscorp, Inc.*, 583 F. Supp. 2d 521, 530 (D. Del. 2008)); *see also In re BH S&B Holdings LLC*, 420 B.R. at 133 ("There must be an abuse of the corporate form to effect a fraud or an injustice–some sort of elaborate shell game.") (quotation marks omitted).

[178] *NetJets Aviation, Inc.*, 537 F.3d at 183 ("To hold otherwise would render the fraud or injustice element meaningless.") (quotation marks omitted); *see also Mobil Oil Corp. v. Linear Films, Inc.*, 718 F. Supp. 260, 268 (D. Del. 1989) (explaining that although "[a]ny breach of contract and any tort – such as patent infringement – is, in some sense, an injustice," "[t]he underlying cause of action does not supply the necessary fraud or injustice").

[179] *Trevino*, 583 F. Supp. 2d at 530 (allegation that subsidiary was "ill-equipped to handle potential liability arising from this action" not sufficient to allege necessary "injustice") (quotation marks omitted); *see also Secured Sys. Tech., Inc. v. Frank Lill & Son, Inc.*, Civ. No. 08-6256, 2012 U.S. Dist. LEXIS 141845, at *14 (W.D.N.Y. Oct. 1, 2012) ("[T]he required 'fraud or injustice' is not established merely because the alleged-subsidiary corporation may now be judgment proof.") (applying Delaware law).

[180] *Official Comm. of Unsecured Creditors of Sunbeam Corp. v. Morgan Stanley & Co., Inc. (In re Sunbeam Corp.)*, 284 B.R. 355, 368 (Bankr. S.D.N.Y. 2002) (explaining that "the corporate form was used to effect a fraud or injustice" where "an entity completely controls an undercapitalized subsidiary or affiliate and, through that dominance, causes the underfunded-controlled entity to engage in inequitable conduct" and then "shields itself from liability behind the facade of the shell corporation").

[181] *See* Section VII.A.1.f(1)(b).

[182] *See Tese-Milner v. TPAC, LLC (In re Ticketplanet.com)*, 313 B.R. 46, 70 (Bankr. S.D.N.Y. 2004).

[183] *See Official Comm. of Unsecured Creditors v. Bay Harbour Master Ltd.* (*In re BH S&B Holdings LLC*), 420 B.R. 112, 133 (Bankr. S.D.N.Y. 2009) (quotation marks omitted). The Examiner reaches no definitive conclusions as to the likelihood that any of the Third-Party Claimants, if they were to prevail on an underlying claim against the Debtors and prove that the Debtors and AFI should be considered a single economic entity, could then succeed in proving the requisite "injustice or unfairness." Addressing such a hypothetical would require an assessment of the Third-Party Claimants' individual facts and circumstances and the particular theory or theories of "injustice or unfairness" asserted thereby.

The Examiner has identified ten pending RMBS Actions where a Third-Party Claimant seeks to hold AFI liable on a veil-piercing or alter ego theory of liability.[184] FGIC is the plaintiff in each of those actions, which are pending in the U.S. District Court for the Southern District of New York.[185] FGIC asserts that its claims "arise from certain financial guaranty insurance policies . . . issued by FGIC in connection with several securitization transactions . . . sponsored by [the Debtors]."[186] FGIC's claims include causes of action against certain of the Debtors for "fraudulent inducement of FGIC's participation in the [t]ransactions" and "material breaches of their insurance agreements."[187] FGIC seeks to hold AFI liable for the Debtors' alleged fraud and breach of contract in part on the theory that AFI and the Debtors "were and continue to be alter egos of each other."[188] To date, each of the ten actions brought by FGIC remains stayed by Order of the Bankruptcy Court.[189]

For the same reasons set forth above that the Examiner concludes it is unlikely that any veil-piercing claims asserted by Third-Party Claimants seeking to hold AFI liable for RMBS Claims against the Debtors would prevail, the Examiner concludes it is unlikely that the particular veil-piercing claims asserted by FGIC would prevail. Moreover, and as explained further below, the Examiner concludes it is likely that a defense that FGIC lacks standing to assert its alleged veil-piercing claims against AFI would prevail. Although the law is unsettled as to whether a veil-piercing claim asserted by a creditor against a shareholder of a debtor is "peculiar" or "personal" to that creditor or a group of creditors—and therefore not property of the estate—a court would likely consider FGIC's veil-piercing allegations "generalized" in nature. Absent allegations that the conduct that warrants piercing the corporate veil is at least in part the same conduct that directly harmed the plaintiff (rather than indirectly harmed the plaintiff by rendering the Debtors judgment proof), any future veil-piercing claim brought by other Third-Party Claimants seeking to hold AFI liable for RMBS Claims against the Debtors would appear vulnerable to the same defense.

---

[184] *See* Am. Compl., *FGIC v. Ally Fin. Inc.*, Civ. No. 11-09729, Docket No. 29 (S.D.N.Y. Mar. 30, 2012); Compl., *FGIC v. Ally Fin., Inc.*, Civ. No. 12-00338, Docket No. 1 (S.D.N.Y. Dec. 27, 2011); Compl., *FGIC v. Ally Fin., Inc.*, Civ. No. 12-00339, Docket No. 1 (S.D.N.Y. Dec. 27, 2011); Compl., *FGIC v. Ally Fin., Inc.*, Civ. No. 12-00340, Docket No. 1 (S.D.N.Y. Dec. 27, 2011); Compl., *FGIC v. Ally Fin., Inc.*, Civ. No. 12-00341, Docket No. 1 (S.D.N.Y. Dec. 15, 2011); Compl., *FGIC v. Ally Fin., Inc.*, Civ. No. 12-00780, Docket No. 1 (S.D.N.Y. Jan. 31, 2012); Compl., *FGIC v. Ally Fin., Inc.*, Civ. No. 12-01658, Docket No. 1 (S.D.N.Y. Mar. 6, 2012); Compl., *FGIC v. Ally Fin., Inc.*, Civ. No. 12-01860, Docket No. 1 (S.D.N.Y. Mar. 13, 2012); Compl., *FGIC v. Ally Fin., Inc.*, Civ. No. 12-01601, Docket No. 1 (S.D.N.Y. Mar. 5, 2012); Compl., *FGIC v. Ally Fin., Inc.*, Civ. No. 12-01818, Docket No. 1 (S.D.N.Y. Mar. 12, 2012).

[185] *See id*. FGIC also asserts RMBS Insurer Claims against certain of the Debtors (but not AFI) in two other actions pending in the U.S. District Court for the Southern District of New York. *See* Compl., *FGIC v. Residential Funding Co. LLC*, Civ. No. 11-09736, Docket No. 1 (S.D.N.Y. Nov. 29, 2011); Compl., *FGIC v. Residential Funding Co. LLC*, Civ. No. 11-09737, Docket No. 1 (S.D.N.Y. Nov. 29, 2011).

[186] FGIC Submission Paper, dated Oct. 17, 2012, at 2.

[187] *Id*.

[188] *Id*. The Examiner below assesses the aiding and abetting fraud claims asserted against AFI by certain Third-Party Claimants including FGIC. *See* Section VIII.C.2.a(3).

[189] *See* Stipulation and Order with Respect to Debtors' Motion to Extend the Automatic Stay or, in the Alternative, for Injunctive Relief [Case No. 12–01671; Docket No. 90].

### *(a) Standing To Pursue Veil-Piercing Claims*

#### *(i) Legal Principles*

Delaware law recognizes the existence of a claim of an entity to pierce its own corporate veil.[190] Moreover, such a veil-piercing claim "constitutes property of the debtor corporation, and the debtor-in-possession or bankruptcy trustee, rather than individual creditors, has exclusive standing to assert the claim."[191] That a debtor may possess a potential claim to pierce its own corporate veil does not necessarily divest a creditor of standing to assert a claim outside of the bankruptcy seeking to pierce the corporate veil of the debtor and recover from a shareholder.[192] "In determining whether a [veil-piercing] claim should be brought [on behalf of the debtor] or by the individual creditors, the court must consider whether the injury alleged is peculiar and personal to the claimant or is general and common to the corporation and creditors."[193]

An individual creditor possesses "standing to maintain [a veil-piercing] cause of action" where the claim is "peculiar and personal" to that creditor rather than "general and common to

---

[190]  *See* Section VII.A.1.b.

[191]  *See Kalb, Voorhis & Co. v. Am. Fin. Corp.*, 8 F.3d 130, 131 (2d Cir. 1993); *see also Duke Energy Trading and Mktg., LLC v. Enron Corp.* (*In re Enron Corp.*), Adv. No. 02-3609A, 2003 Bankr. LEXIS 330, at *11 (Bankr. S.D.N.Y. Apr. 17, 2003) ("[T]he trustee or debtor-in-possession would have exclusive standing to maintain a Delaware corporation's alter ego claim of a general nature.").

[192]  *See Kalb, Voorhis & Co. v. Am. Fin. Corp.*, Civ. No. 92-7754, 1993 U.S. Dist. LEXIS 6558, at *20 n.1 (S.D.N.Y. May 14, 1993) ("[S]ome veil piercing claims may be specific to individual creditors."), *aff'd*, 8 F.3d 130 (2d Cir. 1993); *see also Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC* (*In re Bernard L. Madoff*), 429 B.R. 423, 433 (Bankr. S.D.N.Y. 2010) ("[I]t is possible for a bankruptcy estate and a creditor to own separate claims against third parties arising out of the same general conduct.").

[193]  *Labarbera v. United Crane and Rigging Servs., Inc.*, Civ. No. 08-3274, 2011 U.S. Dist. LEXIS 20939, at *16 (E.D.N.Y. Mar. 2, 2011); *see also Levey v. Sys. Div., Inc.* (*In re Teknek LLC*), 563 F.3d 639, 647 (7th Cir. 2009) ("To determine whether an action accrues individually to a claimant or generally to a corporation, then, we must look to the injury for which relief is sought. We must consider whether that injury is 'peculiar and personal to the claimant or general and common to the corporation and creditors.'") (quoting *Koch Refining v. Farmers Union Cent. Exch., Inc.*, 831 F.2d 1339, 1349 (7th Cir. 1987)); *St. Paul Fire and Marine Ins. Co v. PepsiCo, Inc.*, 884 F.2d 688, 701 (2d Cir. 1989) ("If a claim is a general one, with no particularized injury arising from it, and if that claim could be brought by any creditor of the debtor, the trustee is the proper person to assert the claim, and the creditors are bound by the outcome of the trustee's action."); *Flake v. Alper Holdings USA, Inc.* (*In re Alper Holdings USA, Inc.*), 398 B.R. 736, 759 (S.D.N.Y. 2008) (claim to pierce debtor's corporate veil is "property of the estate" where it is "general to the corporation rather than personal to the creditors"); *Duke Energy Trading and Mktg., LLC*, 2003 Bankr. LEXIS 330 at *11-12 ("What must be considered is whether the injury alleged is peculiar and personal to the claimant or is general and common to the corporation and creditors.").

the [debtor] and creditors."[194] "A cause of action is considered 'personal' if there is injury to only one or a select group of specific creditors, and other creditors have no interest in the action."[195] "For example, where the debtor and its corporate shareholder falsely hold themselves out to some creditors but not to others as being a single entity rather than two distinct corporations, a veil piercing claim intended to hold the shareholder liable for the debtor's debts could be deemed specific to the creditors misled into believing that the two corporations are a single entity."[196]

"Where the harm suffered by the claimant is no different than the harm suffered by other creditors, the action belongs to the trustee or debtor-in-possession."[197] "The injury [to the

---

[194] *Duke Energy Trading and Mktg., LLC*, 2003 Bankr. LEXIS 330, at *11–12, 26 (granting motion to dismiss creditor's "general [veil-piercing] claim that similarly affects all of the creditors of the respective Debtors' estates"); *see also Hamilton v. Am. Corrective Counseling Servs., Inc.*, Civ. No. 05-434, 2009 U.S. Dist. LEXIS 30753, at *13 (N.D. Ind. Apr. 8, 2009) ("The plaintiffs' alter ego claims are based on a particularized injury, not a generalized injury common to all creditors and the corporation, so their claims aren't the property of the bankruptcy estate."); *Trustees of the Bricklayers Local 7 Pension Trust v. Stileitaliano Int'l*, Civ. No. 04-952, 2004 U.S. Dist. LEXIS 15928, at *13 (N.D. Cal. Aug. 6, 2004) ("Plaintiffs have adequately plead a sufficiently particularized injury to confer upon them standing to bring this [veil-piercing] claim."); *Variable-Parameter Fixture Dev. Corp. v. Morpheus Lights, Inc.*, 945 F. Supp. 603, 608 (S.D.N.Y. 1996) (declining to extend automatic stay to creditor's veil-piercing claims that alleged "a 'particularized injury' and hence . . . are not property of the bankruptcy estate"). In *Steinberg v. Buczynski*, the Seventh Circuit described this use of the terms "personal" and "general" as "not an illuminating usage." *See* 40 F.3d 890, 893 (7th Cir. 1994); *see also Highland Capital Mgmt. LP v. Chesapeake Energy Corp.* (*In re Seven Seas Petroleum Inc.*), 522 F.3d 575, 588 (5th Cir. 2008) ("We agree with Judge Posner . . . . These terms are perhaps best understood as descriptions to be applied after a claim has been analyzed to determine whether it is properly assertable by the debtor or creditor, and not as a substitute for the analysis itself."). "The point is simply that the trustee is confined to enforcing entitlements of the corporation. . . . [T]here is a difference between a creditor's interest in the claims of the corporation against a third party, which are enforced by the trustee, and the creditor's own direct–not derivative–claim against the third party, which only the creditor himself can enforce." *Steinberg*, 40 F.3d at 893.

[195] *Mannucci v. Cabrini Med. Ctr.* (*In re Cabrini Med. Ctr.*), Bankr. Case. No. 09-14398, 2012 Bankr. LEXIS 2747, at *29 (Bankr. S.D.N.Y. June 15, 2012), *aff'd*, *In re Cabrini Med. Ctr.*, Civ. No. 12-6661, 2012 U.S. Dist. LEXIS 180896 (S.D.N.Y. Dec. 20, 2012); *see also Highland Capital Mgmt. LP*, 522 F.3d at 588 ("We . . . wish to dispel any notion that a claim belongs to the estate or is otherwise only assertable by the trustee merely because it could be brought by a number of creditors, instead of just one.").

[196] *Kalb, Voorhis & Co.*, 1993 U.S. Dist. LEXIS 6558 at *20 n.1; *see also Autobacs Strauss, Inc. v. Autobacs Seven Co.* (*In re Autobacs Strauss, Inc.*), 473 B.R. 525, 555–56 (Bankr. D. Del. 2012) (rejecting argument that creditor "failed to allege any particularized harm" and lacked standing to assert veil-piercing claim where creditor alleged that it was "fraudulently induced by [parent defendants] to endorse the . . . Plan [of reorganization of the subsidiary]").

[197] *Duke Energy Trading and Mktg., LLC v. Enron Corp.* (*In re Enron Corp.*), Adv. No. 02-3609A, 2003 Bankr. LEXIS 330, at *12 (Bankr. S.D.N.Y. Apr. 17, 2003); *see also Labarbera*, 2011 U.S. Dist. LEXIS 20939, at *22 ("[A]n alter ego claim is general where the allegations supporting the claim were suffered by all other creditors, thus making the alter ego claim available to all creditors."); *In re Eagle Enters., Inc.*, 265 B.R. 671, 678 (Bankr. E.D. Pa. 2001) ("Appellants' alter ego theory is predicated on USA Waste's alleged domination of debtors and disregard of their separate corporate existence. Any creditor could seek to impose liability on USA Waste for debtors' debts on these allegations. . . . The Bankruptcy Court properly considered appellants' alter ego claim to be property of the estate subject to the automatic stay.").

creditor] must be a particular injury that can be traced to the conduct of the entity controlling the debtor corporation."[198] "If the direct injury stemming from the misuse of the corporate form and misappropriation of corporate assets is to the controlled entity, and merely reduces assets available to pay creditors, the cause of action belongs to the corporation."[199] Accordingly, veil-piercing claims alleging that a parent company engaged in "fraudulent transfer[s]" that resulted in "gross undercapitalization" of a debtor subsidiary have been found to be "of a generalized nature" and, therefore, property of the estate.[200] At least one court, however, has found that creditors had "standing to bring their alter ego claim" where they alleged "they were injured in a way that other creditors of [the debtor] were not" because the debtor's "undercapitalization was achieved specifically [by the debtor and its alter ego] to avoid financial obligations to Plaintiffs."[201]

The assertion of a breach of contract or tort claim against the debtor by one creditor, without more, "fail[s] to distinguish it from [the debtor's] other creditors" or to give rise to "standing to assert . . . alter ego/veil piercing claims . . . against [the shareholder of the

---

[198] *In re Cabrini Med. Ctr.*, 2012 Bankr. LEXIS 2747, at *29; *see also St. Paul Fire and Marine Ins. Co.*, 884 F.2d at 704 (creditor lacked standing to assert veil-piercing claim where alleged injury "was not a particular one that can be directly traced to [parent entity's] conduct" but instead "a secondary effect from harm done to [the debtor subsidiary]").

[199] *In re Cabrini Med. Ctr.*, 2012 Bankr. LEXIS 2747, at *30; *see also Maney v. Fischer*, Civ. No. 96-0561, 1998 U.S. Dist. LEXIS 4077, at *5 (S.D.N.Y. Mar. 31, 1998) ("Where plaintiffs are harmed because of the injury the alter ego does to the controlled corporation, the alter ego claim belongs to the bankruptcy estate.").

[200] *See In re Alper Holdings USA*, Case No. 07-12148, 2008 Bankr. LEXIS 522, at *20 (Bankr. S.D.N.Y. Feb. 25, 2008); *see also St. Paul Fire and Marine Ins. Co*, 884 F.2d at 704 (affirming dismissal of creditor's veil-piercing claim for lack of standing where "[plaintiff's] harm is precisely that suffered by all other creditors of [debtors]: because [debtors] were used by [the parent company] to preferentially pay off debts owed to [the parent], all other creditors . . . fell into disfavored positions"); *Mannucci v. Cabrini Med. Ctr.* (*In re Cabrini Med. Ctr.*), Civ. No. 12-6661, 2012 U.S. Dist. LEXIS 180896, at *40 (S.D.N.Y. Dec. 20, 2012) ("[T]he kind of harm alleged by the [complaint] was no different from the harm suffered by the unsecured creditors of Cabrini generally, i.e. that due to the diminution of Cabrini's assets by Missionary Sisters, they would not fully recover their claims."); *The Mediators, Inc. v. Manney* (*In re The Mediators, Inc.*), Adv. No. 93-2304, 1996 U.S. Dist. LEXIS 7639, at *5, 19 (S.D.N.Y. June 3, 1996) (denying motion to dismiss creditors' committee's veil-piercing claim asserted against sole shareholder of debtor where the "complaint asserts an indirect injury common to every member of the creditors' committee" and alleged that shareholders "misappropriated corporate assets . . . so as to place those assets beyond the reach of creditors and enrich themselves at [debtor's] expense"); *Murray v. Miner*, 876 F. Supp. 512, 517 (S.D.N.Y. 1995) ("The amended complaint avers only that [shareholder] MMAR wasted [debtor's] assets . . . . Under such circumstances, plaintiffs may assert a veil-piercing claim only if the claim has been abandoned by the trustee."); *Duke Energy Trading and Mktg., LLC*, 2003 Bankr. LEXIS 330, at *15 (granting creditors' committee's motion to dismiss individual creditor's veil-piercing claim for lack of standing where "[t]he conduct described in the Amended Complaint by which various Debtors were allegedly looted and controlled by other of the Debtors and which allegedly caused the [individual creditor] to suffer injury is the same conduct that allegedly injured all of the other creditors").

[201] *Trustees of the Bricklayers Local 7 Pension Trust v. Stileitaliano Int'l*, Civ. No. 04-952, 2004 U.S. Dist. LEXIS 15928, at *14–15 (N.D. Cal. Aug. 6, 2004).

debtor]."[202] Courts have explained that "all of [the debtor's] creditors have some contractual or tortious ground for their individual claims against [the debtor], none of these creditors have been fully paid as a result of [the debtor's] insolvency, and all share the same general interest . . . in [piercing the debtor's corporate veil to reach the shareholder]."[203] Nonetheless, some courts have allowed a veil-piercing claim against a shareholder of the debtor by one creditor to proceed where the creditor alleged that the shareholder "directly and actively participated" in the conduct that gave rise to the claim of that creditor against the debtor.[204]

For example, in *Variable-Parameter Fixture Dev. Corp. v. Morpheus Lights, Inc.*, the U.S. District Court for the Southern District of New York granted the plaintiff's motion for discovery sanctions as to a defendant who was the sole shareholder of a debtor, and rejected the argument that plaintiff's veil-piercing claim against the shareholder was "generalized" and "exclusively the property of the debtor."[205] According to the district court, the shareholder's

---

[202] *Kalb, Voorhis & Co. v. Am. Fin. Corp.*, Civ. No. 92-7754, 1993 U.S. Dist. LEXIS 6558, at *20, 23 (S.D.N.Y. May 14, 1993), *aff'd*, 8 F.3d 130 (2d Cir. 1993); *see also Murray*, 876 F. Supp. at 513 (denying motion for leave to amend to assert veil-piercing claim "that seeks to hold [the shareholder] liable . . . for the contractual obligations of [debtors]"); *Gosconcert v. Hillyer*, 158 B.R. 24, 25, 29 (S.D.N.Y. 1993) (granting motion to dismiss creditor's "action against [controlling shareholder] alleging that she exerted such domination and control over [debtor] that the company was a 'mere instrumentality' and that, as a result, [the shareholder] should be held jointly liable for [debtor's] breach of contract"; explaining that complaint "contains no allegations which uniquely affected Plaintiffs"); *In re Cabrini Med. Ctr.*, 2012 Bankr. LEXIS 2747, at *2, *37 (denying "[creditors'] renewed motion to lift the automatic stay to pursue alter ego causes of action against the NY Missionary Sisters" to hold that non-debtor corporation liable for breach of "certain deferred compensation agreements" entered into by creditors and debtor Cabrini Medical Center; explaining that "the alter ego causes of action at issue belong to the Debtor's estate" because creditors' allegations "specify no direct or particularized injury to [them] from the conduct of the NY Missionary Sisters"); *Raytheon Co. v. Boccard USA Corp.*, 369 S.W.3d 626, 628–29 (Tex. Ct. App. 2012) (vacating for lack of standing trial court's judgment where creditor "sued Raytheon Company seeking to hold it liable for a breach of contract by Raytheon Company's former third-tier subsidiary [the debtor] based on the theory of alter ego").

[203] *Kalb, Voorhis & Co.*, 1993 U.S. Dist. LEXIS 6558, at *20, 24; *see also Levey v. Sys. Div., Inc. (In re Teknek LLC)*, 563 F.3d 639, 644 (7th Cir. 2009) ("[T]he fact that the underlying harm suffered by [creditor] SDI was patent infringement does not, by itself, make [its veil-piercing claim against shareholders of debtor] a claim no other creditor could assert. By such logic, all creditors' claims would be personal to the specific creditor: a supplier's claim for payment on supplies would be deemed personal because no other creditor could claim payment for the same supplies; an employee's claim for his back pay would be personal to the extent that no other employee could claim back pay for that employee's hours worked. If all such claims were 'personal,' no creditor would have to wait in line behind the bankruptcy trustee to assert her claims.").

[204] *Variable-Parameter Fixture Dev. Corp. v. Morpheus Lights, Inc.*, 945 F. Supp. 603, 607 (S.D.N.Y. 1996); *see also Hamilton v. Am. Corrective Counseling Servs., Inc.*, Civ. No. 05-434, 2009 U.S. Dist. LEXIS 30753, at *12–13 (N.D. Ind. Apr. 8, 2009) ("These plaintiffs assert that as the alter egos of [debtor], the non-case debtor defendants directly harmed them by acting as debt collectors through their corporate shells."); *MeccaTech, Inc. v. Kiser*, Civ. No. 05-570, 2008 U.S. Dist. LEXIS 30829, at *39–40 (D. Neb. Apr. 18, 2008) ("A RICO claim, where the shareholders were instrumental in the fraud, provides a case where the injury to the creditor is different from a general one which can be brought by any creditor. . . . In this case, [plaintiff] MTI has an injury that is distinct from the general creditors in that O'Hara [the sole owner of the debtor], in conjunction with Lange, has used [debtor] SGS and ESP LLC, to engage in a pattern of racketeering to harm MTI.").

[205] 945 F. Supp. at 607.

"characterization of [plaintiff's] claims . . . is simply incorrect."[206] Although the plaintiff's complaint "does allege that [the shareholder] siphoned assets from [the debtor] and thereby damaged [the debtor]," the "gist of the claim against [the shareholder]" was instead that "as the alter ego of [the debtor], [the shareholder directly and actively participated in infringing on plaintiff's patent and] caused harm directly to [plaintiff]."[207] Accordingly, "[plaintiff's] alter ego claims against [the shareholder] do not fall into the category of a 'generalized alter ego' claim" and "do not fall within the ambit of the automatic stay."[208]

Certain subsequent decisions have distinguished *Variable-Parameter*, including on grounds that, unlike there, "the 'gist' of the alter ego claim [at issue was] a general alter ego claim based upon injuries inflicted on the corporation as a whole."[209] In *Labarbera v. United Crane and Rigging Servs., Inc.*, for example, the U.S. District Court for the Eastern District of New York denied plaintiffs' motion for summary judgment on their "successorship and alter ego claim" against a non-debtor and dismissed that claim for lack of standing because the debtor's "bankruptcy proceedings are ongoing, and Plaintiffs' claim is the property of [debtor's] bankruptcy estate."[210] According to the district court, "case law [including *Variable-Parameter*] demonstrates that an alter ego or successorship claim is personal, and thus can be asserted by an individual creditor, only if the conduct that supports [such] claim is the same conduct that directly harmed the creditor in the underlying cause of action."[211] By contrast, in *Labarbera* the plaintiffs failed to "assert allegations in support of their alter ego claims that are associated with the underlying harm for which they seek damages."[212] Although plaintiffs asserted that the non-debtor defendant was "in cahoots" with the debtor

---

[206] *Id.*

[207] *Id.* at 607–08; *see also Trustees of the Bricklayers Local 7 Pension Trust v. Stileitaliano Int'l*, Civ. No. 04-952, 2004 U.S. Dist. LEXIS 15928, at *14 (N.D. Cal. Aug. 6, 2004) ("That some of Plaintiffs' allegations could support an alter ego claim brought by another creditor of [debtor] does not mean that Plaintiffs are asserting a generalized injury to the corporation for which only the trustee can seek redress.").

[208] *Variable-Parameter Fixture Dev. Corp.*, 945 F. Supp. at 608.

[209] *In re Landmark Fence Co.*, Civ. No. 10-00143, 2010 U.S. Dist. LEXIS 130250, at *12–13 (C.D. Cal. Dec. 3, 2010) (holding that "[plaintiff's] alter ego claim is a general alter ego claim and belongs to the estate rather than to [plaintiffs]" where "[t]he vast majority of this evidence [asserted in support of plaintiff's alter ego claim] relates to activities that affect all creditors equally" and "[o]nly the evidence with respect to the falsification of the payroll reports and the policies of underpayment relate directly to [plaintiff's] injury"); *see also Ginger Root Office Assocs., LLC v. Farmer* (*In re Advanced Packaging and Prods. Co.*), 426 B.R. 806, 823 (C.D. Cal. 2010) ("The plaintiff in *Variable-Parameter* . . . alleged that the president/director participated in the infringement in his role as alter ego of the corporation. Here, by contrast, [plaintiff] does not connect [the alleged parent company's] contamination of its property to its alleged role as [the debtor's] alter ego. Rather, [plaintiff] alleges that [the parent] independently acted to contaminate its property; it asserts direct claims – not alter ego claims – against [the parent] on this basis.").

[210] Civ. No. 08-3274, 2011 U.S. Dist. LEXIS 20939, at *3, 15 (E.D.N.Y. Mar. 2, 2011).

[211] *Id.* at *19.

[212] *Id.* at *23.

that avoided ERISA contributions owed to plaintiffs' pension fund, "there are no allegations in the complaint that their working 'in cahoots' was in any way related to [debtor's] avoidance of ERISA contributions."[213]

### (ii) Application To RMBS Claims

AFI asserts that Third-Party Claimants including FGIC "lack standing" to assert a veil-piercing claim against AFI and that "such a claim is the property of ResCap's estate."[214] According to AFI, "[t]he veil-piercing claim that [Third-Party Claimants] . . . would assert is property of the estate because it is a general veil-piercing claim . . . and not an individual veil-piercing claim that is particular to one creditor."[215] The Examiner agrees that, as alleged, FGIC's veil-piercing claims are likely to be considered "generalized" in nature and to lack any "particularized injury" stemming from them.[216] The Examiner concludes it is likely that a defense that FGIC lacks standing to assert its alleged veil-piercing claims against AFI would prevail.

Much of what FGIC alleges in support of its claim that "[AFI], ResCap, and [GMAC Mortgage] were and continue to be alter egos of each other"[217] is consistent with a veil-piercing claim that "could be brought by any creditor of the debtor."[218] For example, FGIC alleges that AFI "exercised . . . domination and control over its subsidiaries," used "ResCap as an intermediary instrument to achieve its goals," "shares resources, management and employees with its subsidiaries," "considers its mortgage businesses to be 'units' of its business," and "has consistently been involved in the day-to-day operations of its subsidiaries."[219] Moreover, FGIC alleges that this "domination and control" by AFI caused

---

[213]  *Id.*

[214]  AFI Submission Paper, dated Dec. 19, 2012, at 25; *see also* Debtors Submission Paper, dated Dec. 18, 2012, at 13 ("[O]nly the Debtors have standing to bring these claims.").

[215]  AFI Submission Paper, dated Dec. 19, 2012, at 25–26 (emphases omitted); *see also* Debtors Submission Paper, dated Dec. 18, 2012, at 12-13, 85.

[216]  *See Duke Energy Trading and Mktg., LLC v. Enron Corp.* (*In re Enron Corp.*), Adv. No. 02-3609A, 2003 Bankr. LEXIS 330, at *11–12, 26 (Bankr. S.D.N.Y. Apr. 17, 2003) (granting motion to dismiss creditor's "general [veil-piercing] claim that similarly affects all of the creditors of the respective Debtors' estates"); *see also St. Paul Fire and Marine Ins. Co v. PepsiCo, Inc.*, 884 F.2d 688, 701 (2d Cir. 1989).

[217]  *E.g.*, Am. Compl., *FGIC v. Ally Fin. Inc.*, Civ. No. 11-09729, Docket No. 29, at 94 (S.D.N.Y. Mar. 30, 2012).

[218]  *St. Paul Fire and Marine Ins. Co*, 884 F.2d at 701.

[219]  *E.g.*, Am. Compl., *FGIC v. Ally Fin. Inc.*, Civ. No. 11-09729, Docket No. 29, at 2–3, 71, 78 (S.D.N.Y. Mar. 30, 2012).

harm to the Debtors.[220] To the extent FGIC intends to assert that it suffered particularized injuries from the "fraudulent inducement" and "breach of [contractual] representations, warranties, and covenants" it alleges,[221] the Examiner is not persuaded that a court would find such allegations sufficient to give rise to standing.[222] FGIC does not allege that those injuries were the direct result of any abuse of the corporate form.[223]

Nor do FGIC's allegations present a case where a veil-piercing claim might be deemed "specific to the creditors misled into believing that the two corporations are a single entity" because "the debtor and its corporate shareholder falsely [held] themselves out to some creditors [including FGIC] but not to others as being a single entity."[224] FGIC variously alleges that "at least one" AFI employee was "on a working group list for transactions involving ResCap subsidiaries that FGIC insured," that a ResCap employee "communicated with FGIC regarding rescission requests using an [AFI] email address," and that FGIC was "specifically instructed" to send "'official letters' regarding several AFI subsidiaries" to "[AFI's] internal counsel."[225] FGIC does not, however, allege that AFI or any one or more of the Debtor defendants ever represented to FGIC that they were a single entity, or that FGIC

---

[220] *See, e.g.*, Am. Compl., *FGIC v. Ally Fin. Inc.*, Civ. No. 11-09729, Docket No. 29, at 71 ("[AFI] has a business relationship with its subsidiaries designed to benefit itself at [their] expense . . . [AFI] treated ResCap as an extension of itself, rather than a subsidiary whose dealings were at arm's length"), 78–79 ("[AFI]—at least in the view of certain of ResCap's bondholders—is believed to have stripped assets from its subsidiary. . . [AFI] is currently using its subsidiaries' resources as its own in order to earn favorable ratings by credit rating agencies.") (S.D.N.Y. Mar. 30, 2012). FGIC's allegations that AFI caused harm to the Debtors are not entirely consistent. *See id.* at 71 ("[AFI] also provided ResCap with liquidity and capital."); *id.* at 74 ("[AFI] has also agreed to directly pay the losses or expenses of ResCap."); *id.* at 76 ("There is also substantial evidence that billions of dollars of TARP funds meant to stabilize [AFI] were given to ResCap by [AFI]."); *id.* at 241 ("In addition to the direct financial support [AFI] contributed to ResCap, it was also instrumental in obtaining outside investments that flowed directly to its mortgage subsidiaries.").

[221] *See, e.g.*, Am. Compl., *FGIC v. Ally Fin. Inc.*, Civ. No. 11-09729, Docket No. 29, at 83–94 (S.D.N.Y. Mar. 30, 2012).

[222] *See Kalb, Voorhis & Co. v. Am. Fin. Corp.*, Civ. No. 92-7754, 1993 U.S. Dist. LEXIS 6558, at *20 (S.D.N.Y. May 14, 1993) ("Kalb's contractual claims based on the Debentures fail to distinguish it from Circle K's other creditors: all of Circle K's creditors have some contractual or tortious ground for their individual claims against Circle K, none of these creditors have been fully paid as a result of Circle K's insolvency, and all share the same general interest as Kalb in the alter ego claim alleged in the Complaint."), *aff'd*, 8 F.3d 130 (2d Cir. 1993); *see also Levey v. Sys. Div., Inc.* (*In re Teknek LLC*), 563 F.3d 639, 644 (7th Cir. 2009) ("[T]he fact that the underlying harm suffered by [creditor] SDI was patent infringement does not, by itself, make [its veil-piercing claim against shareholders of debtor] a claim no other creditor could assert.").

[223] *See Labarbera v. United Crane & Rigging Servs., Inc.*, Civ. No. 08-3274, 2011 U.S. Dist. LEXIS 20939, at *19 (E.D.N.Y. Mar. 2, 2011) ("[A]n alter ego or successorship claim is personal, and thus can be asserted by an individual creditor, only if the conduct that supports the claim is the same conduct that directly harmed the creditor in the underlying cause of action.").

[224] *See Kalb, Voorhis & Co.*, 1993 U.S. Dist. LEXIS 6558 at *20 n.1.

[225] *See, e.g.*, Am. Compl., *FGIC v. Ally Fin. Inc.*, Civ. No. 11-09729, Docket No. 29, at 78–82 (S.D.N.Y. Mar. 30, 2012).

was misled by such alleged representations.[226] To the contrary, FGIC concedes that the Debtors—and not AFI—were parties to the agreements FGIC entered into in connection with the disputed transactions.[227]

Although the Examiner can reach no definitive conclusions concerning standing to pursue potential veil-piercing claims, the foregoing analysis of FGIC's pending claims suggests that other veil-piercing claims that may be brought by Third-Party Claimants are likely to be vulnerable to a lack of standing defense.[228]

### (2) Control Person Liability Under Federal And State Securities Laws

The Examiner has identified six pending RMBS Investor Actions where Third-Party Claimants seek to hold AFI liable as a "control person" under federal and/or state securities laws for an alleged primary securities law violation by one or more of the Debtors and/or Ally Securities.[229] Those actions are pending in state and federal courts located in Illinois,

---

[226] FGIC's allegations that AFI "describes its subsidiaries as its own business units" in certain public SEC filings and on an AFI website could be asserted by any creditor. *See, e.g.*, Am. Compl., *FGIC v. Ally Fin. Inc.*, Civ. No. 11-09729, Docket No. 29, at 78–79 (S.D.N.Y. Mar. 30, 2012). The Examiner has explained that his assessment of whether the Debtors and AFI could be deemed a single economic entity does not ascribe significant weight to similar allegations that they held themselves out to the public as such. *See* Section VII.A.1.f(4).

[227] *See, e.g.*, Am. Compl., *FGIC v. Ally Fin. Inc.*, Civ. No. 11-09729, Docket No. 29, at 28–31 (S.D.N.Y. Mar. 30, 2012).

[228] The Examiner's conclusion that a lack of standing defense is likely to prevail against the veil-piercing claim asserted by Third-Party Claimant FGIC should not, however, be interpreted as a conclusion that no individual creditor or group of creditors could possess standing to hold AFI liable on a veil-piercing theory of liability. The potential veil-piercing claim that Wilmington Trust intends to assert on behalf of the Unsecured Noteholders, for example, appears to be on a different footing. *See* Motion of Wilmington Trust, National Association, Solely in its Capacity as Indenture Trustee for the Senior Unsecured Notes issued by Residential Capital, LLC for an Order Authorizing it to Prosecute Claims and Other Causes of Action on Behalf of the Residential Capital, LLC Estate [Docket No. 3475], Ex. B at 69–71. Although Wilmington Trust's Proposed Complaint contains allegations of "asset stripping" that allege harm to ResCap, *id.* at 60, it further alleges that the Unsecured Noteholders suffered a "unique injury" from an alleged breach of the "substantially all" covenant in section 11.01 of the 2005 Indenture. *See id.* at 71. While a close question, the Examiner concludes it is more likely than not that a lack of standing defense would not prevail against such an alleged veil-piercing claim. As alleged, this "unique injury" could be deemed to have been directly caused by the same "asset stripping" allegations alleged to support the Unsecured Noteholders' veil-piercing theory of liability (rather than indirectly caused by such "asset stripping" because it rendered ResCap unable to satisfy its debts). *See Labarbera*, 2011 U.S. Dist. LEXIS 20939, at *19 ("[A]n alter ego or successorship claim is personal, and thus can be asserted by an individual creditor, only if the conduct that supports claim is the same conduct that directly harmed the creditor in the underlying cause of action.").

[229] *See* Am. Compl., *FHFA v. Ally Fin. Inc.*, Civ. No. 11-7010, Docket No. 114 (S.D.N.Y. June 13, 2012); Am. Compl., *FHLB of Boston v. Ally Fin., Inc.*, Civ. No. 11-10952, Docket No. 180 (D. Mass. June 29, 2012); Am. Compl., *FHLB of Chicago v. Banc of Am. Funding Corp.*, Case No. 10-CH-45033 (Ill. Cir. Ct. Apr. 8, 2011); Am. Compl., *John Hancock Life Ins. Co. (U.S.A.) v. Ally Fin. Inc.*, Civ. No.12-01841, Docket No. 84 (D. Minn. Oct. 15, 2012); Am. Compl., *Stichting Pensioenfonds ABP v. Ally Fin. Inc.*, Civ. No. 12-01381, Docket No. 101 (D. Minn. Oct. 11, 2011); Am. Compl., *Union Central Life Ins. Co. v. Ally Fin., Inc.*, Civ. No. 11-02890, Docket No. 146 (S.D.N.Y. May 4, 2012).

Massachusetts, Minnesota, and New York.[230] AFI filed pre-answer motions to dismiss the control person claims asserted against it in each of those actions.[231] To date, Third-Party Claimants' control person claims have survived AFI motions to dismiss, in whole or in part, in two of those six actions.[232] According to Third-Party Claimants, those two actions are now "in the early stages of discovery."[233]

AFI's motion to dismiss control person claims asserted against it in one of the six actions was granted and those claims were dismissed without prejudice and with an opportunity to seek leave to amend.[234] AFI's motions to dismiss remain pending as to the control person

---

[230] *See* Am. Compl., *FHFA v. Ally Fin. Inc.*, Civ. No. 11-7010, Docket No. 114 (S.D.N.Y. June 13, 2012); Am. Compl., *FHLB of Boston v. Ally Fin., Inc.*, Civ. No. 11-10952, Docket No. 180 (D. Mass. June 29, 2012); Am. Compl., *FHLB of Chicago v. Banc of Am. Funding Corp.*, Case No. 10-CH-45033 (Ill. Cir. Ct. Apr. 8, 2011); Am. Compl., *John Hancock Life Ins. Co. (U.S.A.) v. Ally Fin. Inc.*, Civ. No.12-01841, Docket No. 84 (D. Minn. Oct. 15, 2012); Am. Compl., *Stichting Pensioenfonds ABP v. Ally Fin. Inc.*, Civ. No. 12-01381, Docket No. 101 (D. Minn. Oct. 11, 2011); Am. Compl., *Union Central Life Ins. Co. v. Ally Fin., Inc.*, Civ. No. 11-02890, Docket No. 146 (S.D.N.Y. May 4, 2012).

[231] *See* Mem. of Law in Supp. of Ally Fin. Inc.'s and GMAC Mortg. Group, Inc's Mot. to Dismiss the Am. Compl., *FHFA v. Ally Fin. Inc.*, Civ. No. 11-7010, Docket No. 149 (S.D.N.Y. July 13, 2012); Defs.' Mem. of Law in Supp. of Their Mot. to Dismiss the Am. Compl., *FHLB of Boston v. Ally Fin., Inc.*, Civ. No. 11-10952, Docket No. 200 (D. Mass. Oct. 11, 2012); Defs.' Joint Mem. of Law in Supp. of Their Joint Combined Mot. to Dismiss Pl.'s Am. Compl. for Rescission and Damages, *FHLB of Chicago v. Banc of Am. Funding Corp.*, Case No. 10-CH-45033 (Ill. Cir. Ct. June 3, 2011); Mem. in Supp. of the Ally Defs.' Mot. to Dismiss the Am. Compl., *John Hancock Life Ins. Co. (U.S.A.) v. Ally Fin. Inc.*, Civ. No.12-01841, Docket No. 104 (D. Minn. Dec. 14, 2012); Mem. in Supp. of the Ally Defs.' Mot. to Dismiss the Am. Compl., *Stichting Pensioenfonds ABP v. Ally Fin. Inc.*, Civ. No. 12-01381, Docket No. 129 (D. Minn. Mar. 11, 2013); Ally Fin. Inc.'s Mem. of Law in Supp. of Mot. to Dismiss the Am. Compl., *Union Central Life Ins. Co. v. Ally Fin., Inc.*, Civ. No. 11-02890, Docket No. 219 (S.D.N.Y. July 27, 2012).

[232] *See FHFA v. Ally Fin., Inc.*, Civ. No. 11-7010, 2012 U.S. Dist. LEXIS 179768, at *11–15 (S.D.N.Y. Dec. 19, 2012); Order, *FHLB of Chicago v. Banc of Am. Funding Corp.*, Case No. 10-CH-45033, at 33 (Ill. Cir. Ct. Sept. 19, 2012).

[233] *See* Joint Submission Paper of Federal Home Loan Banks of Boston, Chicago, and Indianapolis, dated Oct. 19, 2012, at 7.

[234] *See* Order, *Union Central Life Ins. Co. v. Ally Fin., Inc.*, Civ. No. 11-02890, Docket No. 263, at 7 n.7 (S.D.N.Y. Mar. 29, 2013) (granting plaintiffs opportunity to "file a letter motion to amend which attaches a proposed amended complaint within sixty (60) days").

claims asserted against it in the other three actions.[235] No final judgment has been entered as to the control person claims in any of these six RMBS Investor Actions.[236]

Of those six RMBS Investor Actions, one asserts control person claims against AFI under section 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77o.[237] One other of those actions asserts control person claims against AFI under section 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78t(a).[238] Five of those six actions assert control person claims against AFI under state securities (sometimes known as "blue sky") laws of Illinois (the Illinois Securities Law of 1953 (the "Illinois Securities Law"), 815 Ill. Comp. Stat. Ann. 5/1 *et seq.*), Massachusetts (the Massachusetts Uniform Securities Act (the "MUSA"), Mass. Gen. Law. ch. 110A §§ 101 *et seq.*), Minnesota (the Minnesota Securities Act, Minn. Stat. §§ 80A.40 *et seq.*), North Carolina (the North Carolina Securities Law, N.C. Gen. Stat. §§ 78A-1 *et seq.*), and/or Virginia (the Virginia Securities Act, Va.

---

[235] *See* Defs.' Mem of Law in Supp. of Their Mot. to Dismiss the Am. Compl., *FHLB of Boston v. Ally Fin., Inc.*, Civ. No. 11-10952, Docket No. 200 (D. Mass. Oct. 11, 2012); Mem. in Supp. of the Ally Defs.' Mot. to Dismiss the Am. Compl., *John Hancock Life Ins. Co. (U.S.A.) v. Ally Fin. Inc.*, Civ. No.12-01841, Docket No. 104 (D. Minn. Dec. 14, 2012); Mem. in Supp. of the Ally Defs.' Mot. to Dismiss the Am. Compl., *Stichting Pensioenfonds ABP v. Ally Fin. Inc.*, Civ. No. 12-01381, Docket No. 129 (D. Minn. Mar. 11, 2013).

[236] The Examiner has identified one additional RMBS Investor Action that was dismissed with prejudice, including the control person claims asserted against AFI under the Minnesota Securities Act. *See* Order Granting Defs.' Mot. to Dismiss Compl., *Huntington Bancshares, Inc. v. Ally Fin. Inc.*, Case No. 27-cv-11-20276 (Minn. Dist. Ct. Dec. 11, 2012).

[237] *See* Am. Compl., *FHFA v. Ally Fin. Inc.*, Civ. No. 11-7010, Docket No. 114, at 124–27 (S.D.N.Y. June 13, 2012). Certain Third-Party Claimants have asserted section 15 claims against Ally Securities and officers and directors of one or more of the Debtors. *See* Second Am. Compl., *N.J. Carpenters Health Fund v. Residential Capital, LLC*, Civ. No. 08-8781, Docket No. 121, at 98–99 (S.D.N.Y. Jan. 3, 2011); Am. Compl., *John Hancock Life Ins. Co. (U.S.A.) v. Ally Fin. Inc.*, Civ. No.12-01841, Docket No. 84, at 330–32 (D. Minn. Oct. 15, 2012).

[238] *See* Am. Compl., *Union Central Life Ins. Co. v. Ally Fin., Inc.*, Civ. No. 11-02890, Docket No. 146, at 240–43 (S.D.N.Y. May 4, 2012). Third-Party Claimants also assert therein a claim against AFI under section 20(b) of the Exchange Act, which provision states that it "shall be unlawful for any person . . . to do any act or thing which it would be unlawful for such person to do under the [the Exchange Act] through or by means of any other person." 15 U.S.C. § 78t(b). "There is a dearth of authority construing [s]ection 20(b), which has been thought largely superfluous in 10b-5 cases." *Janus Capital Group, Inc. v. First Derivative Traders*, 131 S. Ct. 2296, 2311 (2011) (Breyer, J., dissenting) (quotation marks omitted). Those "[f]ew reported cases [to] discuss the applicability of [s]ection 20(b)" suggest that it requires a showing that a "controlling person knowingly used the controlled person to commit the illegal act." *Cohen v. Citibank, N.A.*, 954 F. Supp. 621, 630 (S.D.N.Y. 1996) (quotation marks omitted). The Examiner does not address separately section 20(b) of the Exchange Act.

Code. Ann. §§ 13.1-501 *et seq.*).[239] The Examiner has identified twelve other RMBS Investor Actions where federal and/or state securities law claims are pending against one or more of the Debtors and/or Ally Securities, but where, to date, no control person claims have been asserted against AFI.[240]

Control person liability "is a separate inquiry from that of primary liability and provides an alternative basis of culpability."[241] "Typically, a control person is a parent corporation, the employer of the primary violator, or a director or officer of the primary violator corporation."[242] Section 15 and section 20(a) are "roughly parallel control person provisions" under the federal securities laws.[243] "Section 15 [of the Securities Act] imposes joint and several vicarious liability for violations of §§ 11 and 12 [of that statute] on any person who 'controls' the primary violator."[244] "Section 20(a) of the [Exchange] Act imposes joint and several liability on any person who controls another person who violates [provisions of that statute including section 10(b)]."[245]

---

[239] *See* Am. Compl., *FHFA v. Ally Fin. Inc.*, Civ. No. 11-7010, Docket No. 114, at 130–33 (S.D.N.Y. June 13, 2012) (Virginia Securities Act); Am. Compl., *FHLB of Boston v. Ally Fin., Inc.*, Civ. No. 11-10952, Docket No. 180, at 406–20 (D. Mass. June 29, 2012) (MUSA); Am. Compl., *FHLB of Chicago v. Banc of Am. Funding Corp.*, Case No. 10-CH-45033, at 268–92 (Ill. Cir. Ct. Apr. 8, 2011) (Illinois Securities Law and North Carolina Securities Act); Am. Compl., *John Hancock Life Ins. Co. (U.S.A.) v. Ally Fin. Inc.*, Civ. No.12-01841, Docket No. 84, at 314–18 (D. Minn. Oct. 15, 2012) (Minnesota Securities Act); Am. Compl., *Stichting Pensioenfonds ABP v. Ally Fin. Inc.*, Civ. No. 12-01381, Docket No. 101, at 200–04 (D. Minn. Oct. 11, 2011) (Minnesota Securities Act). In *Mass. Mut. Life Ins. Co. v. Residential Funding Co., LLC*, Third-Party Claimants assert a MUSA § 410(b) claim against certain officers and directors of one or more of the Debtors—but not against AFI. *See* First Am. Compl., Civ. No. 11-30035, Docket No. 86, at 77–78 (D. Mass. Feb. 29, 2012).

[240] *See* Am. Compl., *Cambridge Place Inv. Mgmt., Inc. v. Morgan Stanley & Co.*, Case No. 10-2741 (Mass. Super. Ct. Oct. 14, 2011); Am. Compl., *Cambridge Place Inv. Mgmt., Inc. v. Morgan Stanley & Co.*, Case No. 11-0555 (Mass. Super. Ct. Oct. 14, 2011); Second Am. Compl., *Charles Schwab Corp. v. BNP Paribas Securities Corp.*, Case No. 10-501610 (Cal. Super. Ct. Apr. 9, 2012); Am. Compl., *FDIC v. Bear Stearns Asset Back Sec. I, LLC*, Civ. No. 12-4000, Docket No. 76 (S.D.N.Y. Oct. 12, 2012); Compl., *FDIC v. CitiGroup Mortg. Loan Trust Inc.*, Case No. 12-901036 (Ala. Cir. Ct. Aug. 10, 2012); Am. Compl., *FDIC v. Chase Mortg. Fin. Co.*, Civ. No. 12-6166, Docket No. 72 (S.D.N.Y. Aug. 10, 2012); Second Am. Compl., *FDIC v. Ally Securities LLC*, Case No. 12-2522, Docket No. 91 (Tex. Dist. Ct. Nov. 19, 2012); First Am. Compl., *Mass. Mutual Life Ins. Co. v. Residential Funding Co., LLC*, Civ. No. 11-30035, Docket No. 86 (D. Mass. Feb. 29, 2012); First Am. Compl., *Nat'l Credit Union Admin. Bd. v. Goldman, Sachs & Co.*, Civ. No. 11-6521, Docket No. 129 (C.D. Cal. Oct. 29, 2012); First Am. Compl., *Nat'l Credit Union Admin. Bd. v. RBS Securities Inc.*, Civ. No. No. 11-2340, Docket No. 123 (D. Kan. Aug. 24, 2012); Second Am. Securities Class Action Compl., *N.J. Carpenters Health Fund v. Residential Capital, LLC*, Civ. No. 08-8781, Docket No. 121 (S.D.N.Y. Jan. 3, 2011); Am. Compl., *W. & S. Life Ins. Co. v. Residential Funding Co., LLC*, Case No. A1105042 (Ohio Ct. Com. Pl. Sept. 9, 2011).

[241] *See Suez Equity Investors, LP v. Toronto-Dominion Bank*, 250 F.3d 87, 101 (2d Cir. 2001).

[242] *Kalin v. Xanboo, Inc.*, 526 F. Supp. 2d 392, 404 (S.D.N.Y. 2007).

[243] *See Wyo. State Treasurer v. Moody's Investors Serv., Inc.* (*In re Lehman Bros. Mortgage-Backed Sec. Litig.*), 650 F.3d 167, 185 (2d Cir. 2011).

[244] *Iowa Pub. Emps.' Ret. Sys. v. MF Global, Ltd.*, 620 F.3d 137, 140 n.3 (2d Cir. 2010).

[245] *Carr v. Equistar Offshore, Ltd.*, Civ. No. 94-5567, 1995 U.S. Dist. LEXIS 13703, at *46 (S.D.N.Y. Sept. 20, 1995).

Several state securities laws, including state securities laws relied upon by Third-Party Claimants, have been described by courts as analogous to provisions of federal securities laws in certain respects.[246] Accordingly, courts applying those state securities laws have looked to decisions applying federal securities laws for guidance.[247] For these reasons, the Examiner frames his discussion of pending or potential control person claims against AFI in terms of federal securities laws, with additional discussion of state securities laws where appropriate.

Whether asserted under section 15 or section 20(a) or the aforementioned provisions of the securities laws of Illinois, Massachusetts, Minnesota,[248] North Carolina, or Virginia,

---

[246] *See Capital Ventures Int'l v. J.P. Morgan Mortg. Acquisition Corp.*, Civ. No. 12-10085, 2013 U.S. Dist. LEXIS 19227, at *5 (D. Mass. Feb. 13, 2013) ("These MUSA provisions [including § 410(b)] are modeled on similar provisions in the federal [Securities Act], and the Massachusetts legislature has directed courts to interpret MUSA in accordance with its federal counterpart."); *Marram v. Kobrick Offshore Fund, Ltd.*, 809 N.E.2d 1017, 1025 (Mass. 2004) ("[W]e interpret the [MUSA] in coordination with the Securities Act of 1933."); *Minneapolis Emps. Retirement Fund v. Allison-Williams Co.*, 519 N.W.2d 176, 179 (Minn. 1994) ("The Minnesota Securities Act is patterned after federal law."); *Hunt v. Miller*, 908 F.2d 1210, 1214 n.5 (4th Cir. 1990) ("The controlling person provision of the North Carolina Securities Act, § 78A-56(c), has been interpreted by reference to federal law."); *Andrews v. Browne*, 662 S.E.2d 58, 62 (Va. 2008) ("[T]he Virginia Securities Act should receive similar construction as the 1933 and 1934 Acts."); *Atocha Ltd. P'Ship v. Witness Tree, LLC*, 65 Va. Cir. 213, 225 (Va. Cir. Ct. 2004) ("[T]he VSA [control person] section at issue closely tracks . . . § 20(a).").

[247] *See Fenoglio v. Augat, Inc.*, 50 F. Supp. 2d 46, 59 (D. Mass. 1999) ("[D]ecisions construing the federal statutory language are applicable to the [MUSA] as well.") (quotation marks omitted); *Marram*, 809 N.E.2d at 1025 ("[W]e look to Federal decisions under § 12(2) [of the Securities Act], as well as to the plain language of the statute and decisions of our appellate courts, for our interpretation of [MUSA § 410(a)(2)]."); *Stephenson v. Deutsche Bank AG*, 282 F. Supp. 2d 1032, 1060 n.22 (D. Minn. 2003) ("The parties agree that control-person liability under [the Minnesota Securities Act] follows the federal law."); *Minneapolis Emps. Retirement Fund*, 519 N.W.2d at 179 ("Federal case law is of considerable value in deciding issues arising under the [Minnesota Securities] Act."); *Andrews v. Fitzgerald*, Civ. No. 89-649, 1992 U.S. Dist. LEXIS 9315, at *9 (M.D.N.C. Feb. 7, 1992) ("Section § 78A-56(c) [of the North Carolina Securities Act] parallels the federal law . . . in this area, however. Therefore, other courts' analyses of the 'controlling person' doctrine with those federal statutes are helpful.") (internal citations omitted); *Dunn v. Borta*, 369 F.3d 421, 428 (4th Cir. 2004) ("judicial constructions of section 12(2) of the [Securities Act], a statute substantially identical to section 13.1-522(A) of the [Virginia Securities] Act" are "instructive"); *Andrews*, 662 S.E.2d at 62 ("When engaged in interpretation of a term used in the Virginia Securities Act, it is appropriate to look to the federal courts' interpretation of the same term in the context of the 1933 and 1934 Acts.") (internal citations and quotation marks omitted); *Witness Tree, LLC*, 65 Va. Cir. at 225 ("Given the close similarity between the [Virginia and federal securities] statutes, federal cases concerning control are informative.").

[248] "Effective August 1, 2007, Minnesota Statutes §§ 80A.01-.31 (2006) were repealed and replaced" by Minn. Stat. §§ 80A.40–90. *See Risdall v. Brown-Wilbert, Inc.*, 753 N.W.2d 723, 727 n.1 (Minn. 2008). Nonetheless, the replaced statute "continues to govern all actions based on conduct occurring before that date." *Trooien v. Mansour*, 608 F.3d 1020, 1027 n.2 (8th Cir. 2010); *see also* MINN. STAT. § 80A.90(a) ("The predecessor act exclusively governs all actions or proceedings that are pending on August 1, 2007, or may be instituted on the basis of conduct occurring before August 1, 2007 . . . ."). The Examiner applies Minn. Stat. §§ 80A.01–31 to the Minnesota Securities Act claims asserted by Third-Party Claimants because, as alleged, they arise in whole or in principal part from conduct occurring on or before August 1, 2007. *See* Am. Compl., *John Hancock Life Ins. Co. (U.S.A.) v. Ally Fin. Inc.*, Civ. No. 12-01841; Docket No. 84, at 40–41 (D. Minn. Oct. 15, 2012); Am. Compl., *Stichting Pensioenfonds ABP v. Ally Fin. Inc.*, Civ. No. 12-01381, Docket No. 101, at 31 (D. Minn. Oct. 11, 2011).

common elements of a control person claim that must be pleaded and proved by any plaintiff include: (1) the existence of a primary securities law violation by the controlled person; and (2) the presence of control of the primary violator.[249] Some courts have required plaintiffs asserting control person claims under federal securities laws also to plead and prove the

_____

[249] *See Wyo. State Treasurer v. Moody's Investors Serv., Inc.* (*In re Lehman Bros. Mortgage-Backed Sec. Litig.*), 650 F.3d 167, 186 (2d Cir. 2011) ("To establish § 15 liability, a plaintiff must show a 'primary violation' of § 11 and control of the primary violator by defendants."); *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007) ("To establish a prima facie case of control person liability [under section 20(a)], a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud."); *Capital Ventures Int'l v. UBS Sec. LLC*, Civ. No. 11-11937, 2012 U.S. Dist. LEXIS 140663, at *52 (D. Mass. Sept. 28, 2012) ("For 'control person' liability to attach [under the MUSA], [plaintiff] must allege (1) an underlying violation by the controlled entity, and (2) that the 'control person' controlled the violator."); *Wooton v. CL, LLC*, Civ. No. 09-34, 2010 U.S. Dist. LEXIS 101182, at *24 (E.D.N.C. Sept. 27, 2010) ("An individual who directly or indirectly controls one who unlawfully sells such a security is also liable under the [North Carolina Securities Act]."); *Au v. ADSI, Inc.*, 74 Va. Cir. 219, 220 (Va. Cir. Ct. 2007) ("Should the Court determine that one or more of the defendants acted as . . . control person and that materially false or misleading information was also conveyed in connection with such sale of securities, then the burden of avoiding liability shifts to the defendant(s)."); *Jacobs v. James*, 574 N.E.2d 1292, 1295 (Ill. App. Ct. 1991) ("[Defendant] is liable [under the Illinois Securities Law] as a controlling person in that he was part of a group of persons acting in concert in the illegal sale of the [securities]."); *Murrin v. Mosher*, Case No. 08-1418, 2009 Minn. App. Unpub. LEXIS 863, at *27–29 (Minn. Ct. App. Aug. 4, 2009) (unpublished) (control person claim under Minnesota Securities Act requires "predicate liability" and that "defendant is a controlling person").

"culpable participation" of the alleged control person in the primary violation.[250] In its submissions to the Examiner, AFI has not asserted that Third-Party Claimants must plead and prove culpable participation to prevail on any of the control person claims they assert against

---

[250] Put another way, "some courts view the pleading burden for a [control person] claim more akin to pleading [s]ection 10(b) scienter, while other courts find that a plaintiff need allege no more than control status in order to survive a motion to dismiss [such a] claim." *Edison Fund v. Cogent Inv. Strategies Fund, Ltd.*, 551 F. Supp. 2d 210, 231 (S.D.N.Y. Mar. 31, 2008). The Second Circuit Court of Appeals has stated that "[t]o establish a prima facie case of [section 20(a)] control person liability, a plaintiff must show . . . that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *ATSI Commc'ns, Inc.*, 493 F.3d at 108. District courts in this circuit are split concerning whether such precedent obligates a section 20(a) plaintiff to affirmatively plead and prove "culpable participation." *Compare Meridian Horizon Fund, L.P. v. Tremont Group Holdings, Inc.*, Civ. No. 09-3708, 2012 U.S. Dist. LEXIS 175760, at *5 (S.D.N.Y. Dec. 11, 2012) ("[T]his court regards the need for a plaintiff to plead 'culpable participation' [under section 20(a)] to be the law of the Second Circuit."); *with In re Lehman Bros. Sec. and ERISA Litig.*, 799 F. Supp. 2d 258, 307 (S.D.N.Y. 2011) (holding that "a [s]ection 20(a) plaintiff need not allege culpable participation at the pleading stage" and noting that it is a "question [that] remains open in this Circuit").

Among those district courts in the Second Circuit that *have* required section 20(a) plaintiffs to plead "culpable participation," there is a further "split . . . as to whether 'culpable participation' must [likewise] be pleaded to state a claim under [s]ection 15." *See In re Sec. Capital Assurance Ltd. Sec. Litig.*, Civ. No. 07-11086, 2011 U.S. Dist. LEXIS 112926, at *23 n.4 (S.D.N.Y. Sep. 23, 2011); *see also Wyo. State Treasurer*, 650 F.3d at 186 ("The parties dispute whether we should further adopt the [culpable participation] requirement . . . for purposes of § 15. That issue has divided district courts in this Circuit.") (internal citation omitted). Although multiple district courts in this circuit have held or suggested that "culpable participation" is a required element of a section 15 claim, an "apparent majority" have disagreed. *See Am. Homes High-Income Trust v. AlliedSignal*, 329 F. Supp. 2d 534, 549 n.10 (S.D.N.Y. 2004); *see also Deutsche Bank AG Sec. Litig.*, Civ. No. 09-1714, 2011 U.S. Dist. LEXIS 93867, at *35 (S.D.N.Y. Aug. 19, 2011) ("It would be incongruous to require allegations regarding 'state of mind' . . . when the [s]ection 11 claims on which the [s]ection 15 claims are premised contain no 'state of mind' element."); *In re WorldCom, Inc.*, 377 B.R. 77, 103 (Bankr. S.D.N.Y. 2007) ("[A]lthough a split exists, 'culpable participation' is generally a requirement of [s]ection 20 claims but not of [s]ection 15 claims."). *But see In re Am. Bank Note Holographics, Inc. Sec. Litig.*, 93 F. Supp. 2d 424, 441 (S.D.N.Y. 2000) ("applying the same test" to claims under sections 15 and 20(a), including "culpable participation" element).

An apparent majority of courts in other circuits, including several Circuit Courts of Appeals, have declined to require a plaintiff asserting a claim under section 20(a)—let alone section 15—to plead and prove culpable participation. *See Belmont v. MB Inv. Partners, Inc.*, 708 F.3d 470, 484 n.20 (3d Cir. 2013) (noting that "a difference of opinion has emerged among district courts of this Circuit as to the pleading requirements for a § 20(a) claim" and declining to "resolve [it] at this time"); *Lustgraaf v. Behrens*, 619 F.3d 867, 873–74 (8th Cir. 2010) ("Culpable participation . . . is not part of a [section 20(a)] plaintiff's prima facie case."); *Adams v. Kinger-Morgan, Inc.*, 340 F.3d 1083, 1109 (10th Cir. 2003) ("[W]e have expressly rejected those decisions that may be read to require a plaintiff to show the defendant actually or culpably participated in the primary violation.") (quotation marks omitted); *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000) ("Plaintiff need not show that the [section 20(a)] defendant was a culpable participant in the violation . . . ."); *Harrison v. Dean Witter Reynolds, Inc.*, 79 F.3d 609, 614 (7th Cir. 1996) ("we have never used any test similar to the culpable participant test"); *In re Credit Suisse – AOL Sec. Litig.*, Civ. No. 02-12146, 2011 U.S. Dist. LEXIS 95889, at *26 (D. Mass. Aug. 26, 2011) (holding that section 20(a) "does not require proof . . . of 'culpable participation'" but noting that "the First Circuit has reserved the issue").

AFI.[251] Moreover, the prevailing view among courts in pertinent jurisdictions appears to be that plaintiffs are not required to plead or prove culpable participation, with the potential exception in the Second Circuit of claims asserted under section 20(a). For those reasons, the Examiner does not further address any "culpable participation" element.[252]

The Examiner's factual and legal conclusions concerning certain elements or defenses relevant to Third-Party Claimants' control person claims are discussed below.

### (a) Pleading Standard And Burden Of Proof

In assessing whether a plaintiff asserting a control person claim has adequately alleged the requisite primary securities law violation, "several circuits have distinguished between allegations of fraud and allegations of negligence, applying Rule 9(b) only to claims pleaded under [s]ection 11 and [s]ection 12(a)(2)," or state securities law provisions that likewise do not require proof of scienter, if those claims "sound in fraud."[253] Accordingly, a court may "conduct a preliminary inquiry into whether plaintiffs' allegations are premised on fraud so as to require

---

[251] *See* AFI Submission Paper, dated Dec. 19, 2012, at 30–36; AFI Submission Paper, dated Apr. 14, 2013, at 4–5. AFI did, however, move to dismiss on the ground of failure to plead "culpable participation" the control person claims asserted by Third-Party Claimants under federal securities law in actions pending in the Second Circuit. *See* Mem. of Law in Supp. of Ally Fin. Inc.'s and GMAC Mortg. Group, Inc.'s Mot. to Dismiss the Am. Compl., *FHFA v. Ally Fin. Inc.*, Civ. No. 11-7010, Docket No. 149, at 8 n.5 (S.D.N.Y. July 31, 2012) ("The Court also should dismiss FHFA's [s]ection 15 claim because it has failed to plead AFI's . . . 'culpable conduct.'"); Ally Financial, Inc's Mem. of Law in Supp. of Mot. to Dismiss the Am. Compl., *Union Central Life Ins. Co. v. Ally Fin., Inc.*, Civ. No. 11-02890, Docket No. 219, at 6 (S.D.N.Y. July 27, 2012) ("control person liability under § 20(a) requires a plaintiff to show . . . that the defendant was, in some meaningful sense, a culpable participant"). In *FHFA v. Ally Fin., Inc.*, the district court denied AFI's motion to dismiss the section 15 claims asserted against it by the FHFA without any apparent consideration of any "culpable participation" requirement. *See* Civ. No. 11-7010, 2012 U.S. Dist. LEXIS 179768, at *11–15 (S.D.N.Y. Dec. 19, 2012). In *Union Central Life Ins. Co. v. Ally Fin., Inc.*, the district court granted AFI's motion to dismiss the section 20 claims asserted against it without reaching whether section 20(a) required the pleading of "culpable participation." *See* Order, Civ. No. 11-02890, Docket No. 263, at 3–4 (S.D.N.Y. Mar. 29, 2013) (granting motion to dismiss "claims against [AFI] for violations of [s]ection 20(a) and 20(b) of the Exchange Act").

[252] In the event that AFI's assertion that "securities claims against AFI fail for the independent reason that [Third-Party Claimants] cannot show that AFI had knowledge of the Debtors' alleged misstatements" is intended to argue culpable participation. *See* AFI Submission Paper, dated Dec. 19, 2012, at 35–36. The Examiner addresses this assertion below in Section VIII.C.2.a(3)(c)(ii).

[253] *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004) (collecting cases); *see also Wagner v. First Horizon Pharm. Corp.*, 464 F.3d 1273, 1277 (11th Cir. 2006) ("[W]e hold that Rule 9(b) applies when the misrepresentation justifying relief under the Securities Act is also alleged to support a claim for fraud under the Exchange Act and Rule 10b-5."); *Sears v. Likens*, 912 F.2d 889, 893 (7th Cir. 1990) (suggesting that Securities Act claims sounding in fraud must be pleaded with particularity). But see Carlon v. Thaman (*In re NationsMart Corp. Sec. Litig.*), 130 F.3d 309, 314 (8th Cir. 1997) ("We hold that the particularity requirement of Rule 9(b) does not apply . . . because proof of fraud or mistake is not a prerequisite to establishing liability under § 11.").

satisfaction of the heightened pleading standards of Fed. R. Civ. P. 9(b)."[254] Courts have declined to apply Rule 9(b) to securities claims where the "plaintiffs' complaint explicitly does not allege fraud" but instead alleges that the defendant "acted negligently in preparing its Registration Statement and Prospectus."[255] By contrast, where the alleged primary securities law violation is pleaded under section 10(b) of the Exchange Act, then the plaintiff must "plead fraud with particularity sufficient to satisfy the requirements of Fed. R. Civ. P. 9(b) . . . and of the PSLRA."[256]

Courts have described the determination of "whether a person is a controlling person [under federal or state securities laws as] a fact-intensive inquiry" that "generally should not be resolved on a motion to dismiss."[257] "At the pleading stage, allegations of . . . control need not be set forth with particularity."[258] Instead, "[c]ontrol allegations are evaluated under the

---

[254] *Wyo. State Treasurer*, 650 F.3d at 174 (quotation marks omitted); *see also In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 374 (S.D.N.Y. 2011) ("determining whether Securities Act claims sound in fraud necessarily requires a case-by-case analysis of particular pleadings") (quotation marks omitted).

[255] *See Litwin v. Blackstone Group, L.P.*, 634 F.3d 706, 715 (2d Cir. 2011); *see also Hutchison v. Deutsche Bank Sec. Inc.*, 647 F.3d 479, 484 (2d Cir. 2011) (declining to apply Rule 9(b) to Securities Act claims where plaintiffs "expressly disclaim any allegation of fraud and Defendants do not contend otherwise") (quotation marks omitted); *FHFA v. JPMorgan Chase & Co.*, Civ. No. 11-6188, 2012 U.S. Dist. LEXIS 158442, at *16 n.10 (S.D.N.Y. Nov. 5, 2012) (declining to apply Rule 9(b) to Securities Act claims where complaint "explicitly disclaims any suggestion of fraud"); *N.J. Carpenters Health Fund v. NovaStar Mortg., Inc.*, Civ. No. 08-5310, 2012 U.S. Dist. LEXIS 56010, at *10–11 (S.D.N.Y. Mar. 29, 2012) ("Since Plaintiff's allegations [that the underwriting guidelines set forth in the offering documents were systematically disregarded] and [Securities Act] claims sound in strict liability, not fraud, the [complaint] is subject to the standards of Rule 8(a), not to the heightened pleading requirements of Rule 9(b)."); *Emps.' Ret. Sys. of the Gov't of the Virgin Is. v. J.P. Morgan Chase & Co.*, 804 F. Supp. 2d 141, 152 (S.D.N.Y. 2011) (Rule 9(b) not applicable to Securities Act claim alleging misrepresentations "concerning underwriting standards, appraisal standards, LTV ratios, and investment ratings"); *N.J. Carpenters Health Fund v. Residential Capital, LLC*, Civ. No. 08-8781, 2010 U.S. Dist. LEXIS 32058, at *13 (S.D.N.Y. Mar. 31, 2010) ("Defendants argue that Plaintiffs' [Securities Act] claims sound in fraud, but Plaintiffs expressly disclaim any allegations of fraud, and their allegations focus on the alleged negligent omission of information.").

[256] *See Rombach*, 355 F.3d at 170. Among other requirements, a complaint must "'specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.'" *See id.* (quoting 15 U.S.C. § 78u-4(b)(1)(B)).

[257] *See Citilines Holdings, Inc. v. iStar Fin., Inc.*, 701 F. Supp. 2d 506, 517 (S.D.N.Y. 2010) (quotation marks omitted); *see also In re Citigroup Inc. Bond Litig.*, 723 F. Supp. 2d 568, 596 (S.D.N.Y. 2010); *CompuDyne Corp. v. Shane*, 453 F. Supp. 2d 807, 829 (S.D.N.Y. 2006).

[258] *In re Am. Int'l Group, Inc.*, *2008 Sec. Litig.*, 741 F. Supp. 2d 511, 535 (S.D.N.Y. 2010); *see also Dobina v. Weatherford Int'l Ltd.*, Civ. No. 11-1646, 2012 U.S. Dist. LEXIS 160663, at *61 (S.D.N.Y. Nov. 7, 2012) ("[A]llegations of control [need not] be pleaded with particularity."); *Sgalambo v. McKenzie*, 739 F. Supp. 2d 453, 474 (S.D.N.Y. 2010) ("Allegations of control are not averments of fraud and therefore need not be pleaded with particularity.") (quoting *In re Parmalat Sec. Litig.*, 414 F. Supp. 2d 428, 440 (S.D.N.Y. 2006)).

liberal pleading standard set forth in Federal Rule of Civil Procedure 8(a)."[259] Even under that standard, conclusory allegations of control do not suffice.[260] "While a party cannot be held liable for both a primary violation and as a control person, alternative theories of liability are permissible at the pleading stage."[261]

Where a plaintiff succeeds in stating a claim under section 15 of the Securities Act, section 20(a) of the Exchange Act, or the control person provisions of pertinent state securities laws, the plaintiff will then bear the burden of proving each element of the claim by a preponderance of the evidence.[262] Likewise, where the alleged control person asserts an

---

[259] *In re Moody's Corp. Sec. Litig.*, 599 F. Supp. 2d 493, 517 (S.D.N.Y. 2009); *see also In re Scottish Re Group Sec. Litig.*, 524 F. Supp. 2d 370, 386 (S.D.N.Y. 2007) ("at the pleading stage, the extent to which the control must be alleged will be governed by Rule 8's pleading standard") (quotation marks omitted). Most of those courts that have required plaintiffs to plead "culpable participation" under sections 15 and/or 20(a) appear to have concluded that this element "is subject to the heightened pleading requirements of the [Private Securities Litigation Reform Act (the "PSLRA")]." *See Pa. Pub. Sch. Emps.' Ret. Sys. v. Bank of Am. Corp.*, Civ. No. 11-733, 2012 U.S. Dist. LEXIS 96317, at *69 (S.D.N.Y. July 11, 2012) (quotation marks omitted). Some courts have instead concluded that the "culpable participation" element "is not the same as scienter" and is "governed by Rule 8's pleading standard." *See Tronox, Inc. Sec. Litig.*, Civ. No. 09-6220, 2010 U.S. Dist. LEXIS 67664, at *64 (S.D.N.Y. June 28, 2010); *see also Sedona Corp. v. Ladenburg Thalmann & Co.*, Civ. No. 03-3120, 2005 U.S. Dist. LEXIS 16382, at *54 (S.D.N.Y. Aug. 9, 2005) ("A plaintiff's pleading as to these elements [including culpable participation] must meet the requirements of [Rule 8(a)] . . . since neither the PSLRA (because scienter is not an essential element), nor Rule 9(b) (because fraud is not an essential element), apply to a [s]ection 20(a) claim.") (quotation marks omitted).

[260] *See Suez Equity Investors, LP v. Toronto-Dominion Bank*, 250 F.3d 87, 102 (2d Cir. 2001) (finding a section 20(a) claim "insufficient . . . as a matter of law" where allegations of control were "conclusory at best"); *N.J. Carpenters Health Fund v. Residential Capital, LLC*, Civ. No. 08-8781, 2011 WL 2020260, at *4 (S.D.N.Y. May 19, 2011) (dismissing section 15 claim as "purely conclusory" where complaint alleged that underwriter defendants possessed "power to influence, and exercised that power and influence" over primary violators); *Emps.' Ret. Sys. of the Gov't of the Virgin Is.*, 804 F. Supp. 2d at 157 ("The Second Amended Complaint's further allegation that JPMC 'had the power to, and did, direct JPM Acceptance' is too conclusory to warrant an inference in the plaintiff's favor.").

[261] *In re Am. Int'l Group, Inc., 2008 Sec. Litig.*, 741 F. Supp. 2d 511, 534–35 (S.D.N.Y. 2010).

[262] *See Healey v. Chelsea Res. Ltd.*, 947 F.2d 611, 617 (2d Cir. 1991) (noting that plaintiff was required to prove Securities Act claims "by a preponderance of the evidence"); *SEC v. Moran*, 922 F. Supp. 867, 887 (S.D.N.Y. 1996) ("There is no doubt that in a private securities action, the correct standard of proof is preponderance of the evidence."); *Polycast Tech. Corp. v. Uniroyal, Inc.*, 792 F. Supp. 244, 251 (S.D.N.Y. 1992) ("In federal securities cases the plaintiff's burden of proof is the 'preponderance-of-the-evidence standard generally applicable in civil actions.'") (quoting *Herman & MacLean v. Huddleston*, 459 U.S. 375, 390 (1983)); *Access Cardiosystems, Inc. v. Fincke (In re Access Cardiosystems, Inc.)*, 404 B.R. 593, 672 (Bankr. D. Mass. 2009) (assessing MUSA § 410(a)(2) claim under "preponderance of the evidence" standard).

affirmative defense to liability, including for example his "good faith" or lack of knowledge, that defendant bears the burden of proof under a preponderance standard.[263]

### (b) Primary Violation

"Any claim for 'control person' liability under [section 15 of the Securities Act or section] 20(a) of the Exchange Act must be predicated on a primary violation of securities law."[264] To establish "control person liability pursuant to Section 20(a)," a plaintiff must demonstrate "a primary violation of [the Exchange Act such as a violation of] [s]ection 10(b) and Rule 10b-5."[265] Similarly, "to succeed on a claim under section 15, a plaintiff must demonstrate primary liability under section 11 or 12 [of the Securities Act]."[266] "Control person" claims under either section are routinely dismissed where the plaintiff fails to state a corresponding "primary violation."[267] Any claim for control person liability under the

---

[263] *See Dietrich v. Bauer*, 126 F. Supp. 2d 759, 764 (S.D.N.Y. 2001) ("[T]o establish a good faith defense, the burden is on the defendant . . . ."); *Mecca v. Gibraltar Corp. of Am.*, 746 F. Supp. 338, 341 (S.D.N.Y. 1990) (noting that defendants "could have avoided [control person] liability if they had proven to the jury by a preponderance of the evidence . . . that they acted in good faith"); *Access Cardiosystems, Inc.*, 404 B.R. at 640 ("Once the [MUSA § 410(a)(2)] plaintiff has demonstrated that the defendant has made an untrue statement of material fact . . . the burden shifts to the defendant to demonstrate either that the plaintiff knew of the falsity or omission or that the defendant did not know and could not, in the exercise of reasonable care, have known of the falsity or omission.").

[264] *Pac. Inv. Mgmt. Co. LLC v. Mayer Brown LLP*, 603 F.3d 144, 160 (2d Cir. 2010); *see also Rombach v. Chang*, 355 F.3d 164, 177–78 (2d Cir. 2004) ("Each of these [section 15 and 20(a)] claims is necessarily predicated on a primary violation of securities law.").

[265] *See Oughtred v. E*Trade Fin. Corp.*, Civ. No. 08-3295, 2011 U.S. Dist. LEXIS 35712, at *36 (S.D.N.Y. Mar. 31, 2011) (dismissing section 20(a) claim for failure to plead a primary violation).

[266] *See Fait v. Regions Fin. Corp.*, 655 F.3d 105, 109 n.2 (2d Cir. 2011).

[267] *See id.* at 109 n.2 (2d Cir. 2011) ("Since we conclude that the district court properly dismissed the section 11 and 12 claims, we also find no error in the court's dismissal of plaintiffs' section 15 claims."); *Wilson v. Merrill Lynch & Co., Inc.*, 671 F.3d 120, 139 (2d Cir. 2011) ("Having concluded that [plaintiff] failed to state a claim for any primary violation of the securities laws, we affirm the district court's dismissal of his [s]ection 20(a) claim alleging that Merrill Lynch & Co. is liable as a controlling person."); *Pac. Inv. Mgmt. Co. LLC*, 603 F.3d at 160 (affirming dismissal of section 20(a) claim "[b]ecause we hold that plaintiffs failed to state a claim for a primary violation"); *ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 207 (2d Cir. 2009) (affirming dismissal of "control person liability claim pursuant to section 15 of the Securities Act and section 20 of the Exchange Act . . . for want of a primary violation"); *In re Lehman Bros. Sec. & ERISA Litig.*, Md. No. 09-2017, 2012 U.S. Dist. LEXIS 148177, at *57 (S.D.N.Y. Oct. 15, 2012) ("Absent a primary violation of [s]ection 11 or 12 by another person, there can be no liability for a controlling person under [s]ection 15.").

securities laws of Illinois, Massachusetts, Minnesota, North Carolina, or Virginia likewise must be predicated upon a primary violation of the respective securities laws of that state.[268]

"In a typical [section 10(b)] action a plaintiff must prove: (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."[269] "[U]nlike securities fraud claims pursuant to [section 10(b)], plaintiffs bringing claims under sections 11 and 12(a)(2) need not allege scienter, reliance, or loss causation."[270] Instead, the elements of a claim under section 11 of the Securities Act include that: "(1) [the plaintiff] purchased a registered security, either directly from the issuer or in the aftermarket following the offering; (2) the defendant participated in the offering in a manner sufficient to give rise to liability under section 11; and (3) the registration statement 'contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading.'"[271] In turn, the elements of a claim under section 12(a)(2) of the Securities Act include that: "(1) the defendant is a 'statutory seller'; (2) the sale was effectuated 'by means of a prospectus or oral communication'; and (3) the prospectus or oral communication 'included an untrue statement of a material fact or omitted to state a material fact necessary in order to make the statements . . . not misleading.'"[272]

Although their elements vary, in general the provisions of state securities laws relied upon by Third-Party Claimants share more in common with claims under section 11 or 12(a)(2) of the

---

[268] *See Capital Ventures Int'l v. UBS Sec. LLC*, Civ. No. 11-11937, 2012 U.S. Dist. LEXIS 140663, at *53 (D. Mass. Sept. 28, 2012) (granting motion to dismiss control person claims under MUSA § 410(b) where plaintiff had "not adequately pled primary violations"); *Dunn v. Ronbotics Corp.*, Civ. No. 02-952, 2003 U.S. Dist. LEXIS 27951, at *31 (E.D. Va. Feb. 23, 2003) ("Because the Court fails to find that any of the Defendants are primarily liable under the Virginia statute, the Court dismisses [the control person claim] against all Defendants."), *rev'd on other grounds*, 369 F.3d 421 (4th Cir. 2004); *Murrin v. Mosher*, Case No. 08-1418, 2009 Minn. App. Unpub. LEXIS 863, at *29 (Minn. Ct. App. Aug. 4, 2009) (affirming dismissal of control person claim under Minnesota Securities Act where "appellants failed to establish the predicate liability of any of the defendants in this case").

[269] *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008).

[270] *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 359 (2d Cir. 2010).

[271] *Id.* (quoting 15 U.S.C. § 77k(a)).

[272] *Id.* (quoting 15 U.S.C. § 77l(a)(2)).

Securities Act than claims under section 10(b) of the Exchange Act.[273] In particular, Third-Party Claimants need not plead or prove scienter to prevail on a primary securities claim under pertinent provisions of the Illinois Securities Law,[274] the MUSA,[275] the Minnesota Securities

---

[273]   *See Carlucci v. Han*, 886 F. Supp. 2d 497, 528 (E.D. Va. 2012) ("[T]o state a claim under the Virginia Securities Act, a plaintiff must plead a material misrepresentation."); *Elipas v. Jedynak*, Civ. No. 07-3026, 2011 U.S. Dist. LEXIS 48340, at *36 (N.D. Ill. May 5, 2011) ("[P]laintiffs [asserting claims under 815 Ill. Comp. Stat. Ann. 5/12(F)-(G)] must show at a minimum that [defendant] (1) made a misstatement or omission, (2) of material fact, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiffs relied.") (quotation marks omitted); *NNN Durham Office Portfolio 1, LLC v. Highwoods Realty Ltd. P'ship*, Case No. 12-3945, 2013 NCBC Lexis 11, at *64 (N.C. Super. Ct. Feb. 19, 2013) ("[N.C. Gen. Stat. § 78A-56(a)(2)] provides a cause of action against the offeror or seller of a security who (1) makes any untrue statement of a material fact, or (2) fails to state a material fact necessary for a statement which was made to not be misleading."); *Marram v. Kobrick Offshore Fund, Ltd.*, 809 N.E.2d 1017, 1026–27 (Mass. 2004) ("It is enough [under MUSA § 410(a)(2)] for the plaintiff to establish that (1) the defendant offers or sells a security; (2) in Massachusetts; (3) by making any untrue statement of a material fact or by omitting to state a material fact; (4) the plaintiff did not know of the untruth or omission; and (5) the defendant knew, or in the exercise of reasonable care would have known of the untruth or omission.") (quotation marks omitted); *Siler v. Principal Fin. Sec., Inc.*, Case No. 1-00-576, 2000 Minn. App. LEXIS 1239, at *8–9 (Minn. App. Ct. Dec. 12, 2000) (unpublished) ("To present a claim under Minn. Stat. § 80A, the plaintiff must allege a misstatement or omission in connection with his own decision to purchase or sell a security.").

[274]   *See Elipas v. Jedynak*, Civ. No. 07-3026, 2011 U.S. Dist. LEXIS 48340, at *36 (N.D. Ill. May 5, 2011) ("The elements of a [815 ILL. COMP. STAT. ANN. 5/12(F)-(G)] claim mirror the elements of a Rule 10b-5 claim, except that the plaintiff is not required to prove scienter and loss causation.") (citations omitted); *Lucas v. Downtown Greenville Investors Ltd. P'ship*, 671 N.E.2d 389, 400 (Ill. App. Ct. 1996) ("Lacking any express statutory language or other authority which requires that the plaintiffs prove 'loss causation,' we decline to impose such a requirement."); *Foster v. Alex*, 572 N.E.2d 1242, 1245 (Ill. App. Ct. 1991) (holding that "scienter need not be pled nor proved in a civil case brought under sections 12(F) and 12(G) of the Illinois Securities Act"). Some courts have stated that the 815 ILL. COMP. STAT. ANN. 5/12(F)-(G) plaintiff is required to plead reliance on the alleged misrepresentation. *See Tirapelli v. Advanced Equities, Inc.*, 813 N.E.2d 1138, 1142 (Ill. App. Ct. 2004) ("[R]easonable reliance is an element of sections 12(F), 12(G), and 12(I) of the Illinois Securities Law.").

[275]   *See Mass. Mut. Life Ins. Co. v. Residential Funding Co.*, LLC, 843 F. Supp. 2d 191, 200 (D. Mass. 2012) ("Plaintiff does not need [under MUSA § 410(a)(2)] to prove negligence, scienter, reliance, or loss causation."); *Marram*, 809 N.E.2d at 1026–27 (MUSA § 410(a)(2) does not require the plaintiff "to prove either negligence or scienter" or "reliance").

Act,[276] the North Carolina Securities Act,[277] or the Virginia Securities Act.[278] Moreover, like sections 11 and 12(a)(2) of the Securities Act, some of those state securities laws make available to defendants affirmative defenses, including that: (1) the defendant exercised "due diligence" or "reasonable care";[279] (2) there was an absence of loss causation;[280] and/or (3) the plaintiff knew of the alleged untruth or omission at the time of purchase.[281]

---

[276] *See Trooien v. Mansour*, 608 F.3d 1020, 1027–28 (8th Cir. 2010) (holding that "claims arising under § 80A.01(b) require only a showing of negligence" and explaining that its "plain language . . . contains no words of intent, no reference to fraud, or deceit"); *see also Minneapolis Emps.' Ret. Fund v. Allison-Williams Co.*, 519 N.W.2d 176, 181 (Minn. 1994) ("Minn. Stat. §§ 80A.01(b) and 80.01(c) may in some instances proscribe negligent as well as intentional misconduct."); *Sprangers v. Interactive Techs., Inc.*, 394 N.W.2d 498, 503 (Minn. Ct. App. 1986) ("Minn. Stat. § [80A.01(b)] does not require scienter, but supports a negligence-based theory of recovery."). *But see Loop Corp. v. McIlroy*, Case No. 04-362, 2004 Minn. App. LEXIS 1146, at *16 (Minn. App. Ct. Oct. 5, 2004) (unpublished) ("[W]e agree with the district court that scienter is required [to state a claim under Minn. Stat. § 80A.01]."). Those Third-Party Claimants asserting claims against AFI under the Minnesota Securities Act take the position (in opposition to AFI's motions to dismiss) that they must plead scienter. *See* Pls.' Omnibus Opp. to Defs.' Mots. to Dismiss the Am. Compl., *John Hancock Life Ins. Co. (U.S.A.) v. Ally Fin. Inc.*, Civ. No.12-01841, Docket No. 118, at 90–91 n.62 (D. Minn. Feb. 15, 2013) ("Scienter also is an element of the violation."); Pls.' Ombibus Mem. of Law in Opp. to Defs.' Mot. to Dismiss the Am. Compl., *Stichting Pensioenfonds ABP v. Ally Fin. Inc.*, Civ. No. 12-01381, Docket No. 142, at 75 n.47 (D. Minn. Mar. 11, 2013) (same).

[277] *See NNN Durham Office Portfolio 1, LLC v. Highwoods Realty Ltd. P'ship*, Case No. 12-3945, 2013 NCBC LEXIS 11, at *66 (N.C. Super. Ct. Feb. 19, 2013) ("[N.C. Gen. Stat. § 78A-56(a)(2)] does not additionally require proof of scienter or justifiable reliance."); *see also Venturtech II, LP v. Learning Res. Inc.*, 790 F. Supp. 576, 588 (E.D.N.C. 1992) ("[§ 78A-56(a)(2)] closely parallels § [12(a)(2)] of the [Securities Act]").

[278] *See Dunn v. Borta*, 369 F.3d 421, 433 (4th Cir. 2004) ("We therefore decline to read the elements of reliance and causation into the [Virginia Securities Act]."); *Carlucci*, 886 F. Supp. 2d at 528 n.25 ("Scienter, reliance, and causation are not required elements of a Virginia Securities Act claim.").

[279] *See In re Fuwei Films Sec. Litig.*, 634 F. Supp. 2d 419, 435 n.10 (S.D.N.Y. 2009) ("Section 12(a)(2) provides for a defense of reasonable care, which . . . may be asserted by all 'sellers' under section 12(a)(2), including the issuer of a security.") (quotation marks omitted); *In re Worldcom, Inc. Sec. Litig.*, 346 F. Supp. 2d 628, 662 (S.D.N.Y. 2004) ("[T]wo of the affirmative defenses available [to defendants other than the issuer] under [s]ection 11(b) are collectively known as the 'due diligence' defense."); MASS. GEN. LAW. ch. 110A § 410(a)(2) (defendant may "sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the untruth or omission"); Minn. Stat. § 80A.23(4) (same); N.C. GEN. STAT. § 78A-56(a)(2) (same); VA. CODE ANN. § 13.1-522(A) (same).

[280] *See Iowa Pub. Emps.' Ret. Sys. v. MF Global, Ltd.*, 620 F.3d 137, 145 (2d Cir. 2010) ("Loss causation is not an element of a plaintiff's prima facie case [under section 11 or 12(a)(2)]; rather, the absence of loss causation is an affirmative defense."); *see also In re Mass. Mut. Life Ins. Co.*, 2012 U.S. Dist. LEXIS 149145 at *24–26 (denying as "simply too early" a motion to strike a "loss causation" affirmative defense to a MUSA § 410 claim and explaining that merely because the plaintiff "need not prove the cause of its loss, does not necessarily mean that a lack of causation is not an affirmative defense"); *Premier Capital Mgmt., LLC v. Cohen*, Civ. No. 02-5368, 2008 U.S. Dist. LEXIS 23484, at *61 (N.D. Ill. Mar. 24, 2008) (holding that the absence of "loss causation is not an affirmative defense to claims under the [Virginia Securities Act]" because the statute "does not require loss causation").

[281] *See In re IPO Sec. Litig.*, 483 F.3d 70, 73 n.1 (2d Cir. 2007) (section 11 or 12(a)(2) defendant "can assert a defense that the plaintiff knew of the untruth or omission at the time of his or her acquisition of the security"); MASS. GEN. LAW. ch. 110A § 410(a)(2) (plaintiff "knowing of the untruth or omission" may not recover); N.C. GEN. STAT. § 78A-56(a)(2) (same); VA. CODE ANN. § 13.1-522(A) (same).

Third-Party Claimants assert that the primary securities law claims underlying the control person claims brought against AFI either have or "will survive motions to dismiss and proceed to discovery."[282] They anticipate that discovery and "direct access to . . . the underlying loan files" will substantiate allegations that offering materials contained misrepresentations concerning, inter alia, compliance with underwriting guidelines, appraisal practices and LTV ratios, investment ratings, and owner-occupancy statistics.[283] Although AFI concedes that "certain of the [Third-Party Claimants] apparently have learned how to plead their claims to survive dismissal," AFI asserts that Third-Party Claimants will be unable to "prove . . . their claims" and withstand potential affirmative defenses.[284] AFI argues that Third-Party Claimants' primary securities law claims will "fail on every element" including because the offering materials "disclosed . . . the very facts that [Third-Party Claimants] now assert are misrepresentations."[285]

---

[282]  *See* Joint Submission Paper of AIG, Allstate Life Ins. Co., Mass. Mut. Life Ins. Co., and Prudential Ins. Co. of Am., dated Oct. 17, 2012, at 3–4; *see also* Joint Submission Paper of Federal Home Loan Banks of Boston, Chicago, and Indianapolis, dated Oct. 19, 2012, at 20–21 ("[T]he FHLBs' effectively universal success in defeating Defendants' motions to dismiss provides support for the conclusion that [their] claims have merit.").

[283]  *See* Joint Submission Paper of AIG, Allstate Life Ins. Co., Mass. Mut. Life Ins. Co., and Prudential Ins. Co. of Am., dated Oct. 17, 2012, at 23; *see also* Joint Submission Paper of Federal Home Loan Banks of Boston, Chicago, and Indianapolis, dated Oct. 19, 2012, at 7.

[284]  *See* AFI Submission Paper, dated Apr. 14, 2013, at 8.

[285]  *See* AFI Submission Paper, dated Dec. 19, 2012, at 50–52.

As AFI acknowledges, many of the primary securities law claims asserted by RMBS investors against the Debtors and Ally Securities[286] or against other unaffiliated issuers and

---

[286] *See Mass. Mut. Life Ins. Co. v. Residential Funding Co, LLC*, 843 F. Supp. 2d 191, 200 (D. Mass. 2012) (denying motion to dismiss MUSA § 410(a)(2) claim asserted against Ally Securities where complaint alleged that "representations about the underwriting process" were "false because the originators systematically violated the underwriting standards by, for example, issuing loans on the basis of overstated incomes, inflated appraisals, and unjustified exceptions to the standards"); *FHFA v. Ally Fin., Inc.*, Civ. No. 11-7010, 2012 U.S. Dist. LEXIS 179768, at *18 (S.D.N.Y. Dec. 19, 2012) (denying in part motions to dismiss section 11 and 12(a)(2) claims and Virginia Securities Act claims asserted against Ally Securities); Order, *FHLB of Chicago v. Banc of Am. Funding Corp.*, Case No. 10-CH-45033, at 15–29 (Ill. Cir. Ct. Sept. 19, 2012) (denying motion to dismiss primary claims asserted against Ally Securities under the Illinois Securities Law and the North Carolina Securities Act); *N.J. Carpenters Health Fund v. Residential Capital, LLC*, Civ. No. 08-8781, 2010 U.S. Dist. LEXIS 32058, at *4, 21 (S.D.N.Y. Mar. 31, 2010) (denying in part motions to dismiss section 11 and 12(a)(2) claims asserted against certain of the Debtors and Ally Securities, allowing "[c]laims related to [misrepresentations concerning] the alleged disregard of underwriting guidelines [to] proceed," and explaining that those alleged misrepresentations "are not cured by the risk disclosures . . . in the Offering Documents"); *Cambridge Place Inv. Mgmt., Inc. v. Morgan Stanley & Co.*, Case No. 2010-02741, 2012 Mass. Super. LEXIS 272, at *29 (Mass. Super. Ct. Sept. 28, 2012) (denying motion to dismiss MUSA § 410(a)(2) claim against Ally Securities alleging "misrepresentation with respect to underwriting guidelines, LTV ratios and appraisal standards, owner-occupancy rates, debt-to-income ratios, . . . and credit enhancements"); *W. & S. Life Ins. Co. v. Residential Funding Co., LLC*, Case No. A1105042, 2012 Ohio Misc. LEXIS 100, at *23 (Ohio Ct. Com. P. June 6, 2012) (denying motion to dismiss Ohio securities law claims against Ally Securities alleging misrepresentations concerning underwriting guidelines, the appraisal process, investment ratings, and owner occupancy). *But see* Order, *Union Cent. Life Ins. Co. v. Ally Fin., Inc.*, Civ. No. 11-02890, Docket No. 263, at 3 (S.D.N.Y. Mar. 29, 2013) (dismissing without prejudice claims asserted under section 10(b) of the Exchange Act against AFI and Ally Securities where plaintiffs "have not pled any facts with particularity to demonstrate . . . scienter" and failed to specify "which defendant engaged in any specific conduct").

underwriters of RMBS[287] have survived in whole or in part motions to dismiss for failure to state a claim, notwithstanding the risk disclosures in the offering materials at issue. In at least one case, securities claims asserted against an unaffiliated issuer of RMBS (neither Debtors

---

[287] *See N.J. Carpenters Health Fund v. Royal Bank of Scot. Group, PLC*, 709 F.3d 109, 122 (2d Cir. 2013) (reversing in part decision dismissing section 11 and 12(a)(2) claims and explaining that such claims should "proceed where the plaintiff has provided a 'fairly specific' account of how the relevant underwriters had systematically disregarded the guidelines disclosed in a security's registration statement"); *Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, 632 F.3d 762, 773 (1st Cir. 2011) (finding allegations of "wholesale abandonment of underwriting standards" sufficient to state a Securities Act claim); *FHFA v. UBS Ams. Inc.*, 858 F. Supp. 2d 306, 332 (S.D.N.Y. 2012) (denying motion to dismiss Securities Act claims where plaintiff alleged "widespread failure to conduct any underwriting"); *In re Bear Stearns Mortg. Pass-Through Certificates Litig.*, 851 F. Supp. 2d 746, 767–69 (S.D.N.Y. 2012) (finding that the complaint "properly states a [section 11 and 12(a)(2)] claim as to the underwriting allegations."); *Capital Ventures Int'l v. UBS Sec. LLC*, Civ. No. 11-11937, 2012 U.S. Dist. LEXIS 140663, at *53 (D. Mass. Sept. 28, 2012) (denying in part motion to dismiss MUSA § 410(a)(2) claim alleging misrepresentations "regarding underwriting guidelines, owner-occupancy rates, appraisals and LTV ratios"); *Nat'l Credit Union Admin. Bd. v. RBS Sec., Inc.*, Civ. No. 11-2340, 2012 U.S. Dist. LEXIS 103170, at *95 (D. Kan. July 25, 2012) (denying motion to dismiss section 11 and 12(a)(2) claims insofar as they allege that "underwriting standards . . . were systematically abandoned"); *Plumbers' & Pipefitters' Local #562 Supplemental Plan & Trust v. J.P. Morgan Acceptance Corp. I*, Civ. No. 08-1713, 2012 WL 601488, at *17 (E.D.N.Y. Feb. 23, 2012) (denying motion to dismiss section 11 claim alleging "systematic deviation" from underwriting guidelines); *Dexia Holdings, Inc. v. Countrywide Fin. Corp.*, Civ. No. 11-07165, 2012 WL 1798997, at *2 (C.D. Cal. Feb. 17, 2012) ("Plaintiffs' [section 11] claim that Countrywide abandoned its underwriting standards . . . is adequately pleaded."); *Emps.' Ret. Sys. of the Gov't of the Virgin Is. v. J.P. Morgan Chase & Co.*, 804 F. Supp. 2d 141, 153-54 (S.D.N.Y. 2011) ("allegations regarding deviations from underwriting standards are sufficient to survive dismissal"); *In re Morgan Stanley Mortg. Pass-Through Certificates Litig.*, 810 F. Supp. 2d 650, 672 (S.D.N.Y. 2011) ("Plaintiffs have adequately alleged actionable misstatements or omissions . . . [concerning] the alleged systematic disregard of underwriting criteria . . . ."); *Pub. Emps.' Ret. Sys. of Miss. v. Goldman Sachs Group, Inc.*, Civ. No. 09-1110, 2011 U.S. Dist. LEXIS 3267, at *34 (S.D.N.Y. Jan. 12, 2011) ("Plaintiff has pled sufficient factual allegations [under section 11] to plausibly infer that the underwriting guidelines were disregarded . . . in conflict with the disclosures made in the Offering Documents."); *Boilermakers Nat'l Annuity Trust Fund v. WaMu Mortg. Pass-Through Certificates, Series AR1*, 748 F. Supp. 2d 1246, 1254–55 (W.D. Wash. 2010) (denying motion to dismiss section 11 claim alleging "improper deviations from underwriting guidelines"); *In re Lehman Bros. Sec. & ERISA Litig.*, 684 F. Supp. 2d 485, 493 (S.D.N.Y. 2010) (denying motion to dismiss section 11 claim with respect to allegations that underwriting guidelines were "systematically disregarded"). *But see Footbridge Ltd. Trust v. Countrywide Home Loans, Inc.*, Civ. No. 09-4050, 2010 U.S. Dist. LEXIS 102134, at *32 (S.D.N.Y. Sept. 28, 2010) (dismissing section 10(b) claim and holding that allegations that "defendants were too flexible in the underwriting decisions" were "insufficient to set forth a plausible claim of fraud based on the heightened pleading requirements of Rule 9(b) and the PSLRA").

nor AFI is a party) also have survived a motion for summary judgment.[288] Of course, here "[d]iscovery may reveal that the actual facts support the inferences drawn by [AFI], rather than those drawn by the [Third-Party Claimants]."[289] Definitive conclusions concerning the likelihood of success of the primary securities law claims underlying Third-Party Claimants' control person claims in these six pending RMBS Investor Actions (and other such claims) are outside the scope of the Investigation. The Examiner describes, in Section VIII.C.2.b, the primary claims asserted against Ally Securities under federal and state securities laws.

### (c)  Control Over A Primary Violator

#### (i)  Legal Principles

"Control over a primary violator may be established by showing that the defendant possessed 'the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.'"[290] "Actual control over the wrongdoer and the transactions in question is necessary for control person liability."[291] "Control in this context is not the mere ability to persuade, but almost always means the practical ability to *direct* the actions of people who issue or sell

---

[288]  *See In re Wash. Mut. Mortg. Backed Sec. Litig.*, Civ. No. 09-37, 2012 U.S. Dist. LEXIS 102064, at *37 (W.D. Wash. July 23, 2012). There, as here, the plaintiffs' section 11 claims were premised in part on allegations that the defendant RMBS issuer "systematically deviated from its underwriting guidelines so as to render the statements in the offering documents false." *Id*. at *31. "Taking the facts in the light most favorable to Plaintiffs," the court found "a dispute of material fact" that precluded summary judgment. *Id*. at *37. The court clarified that plaintiffs would not "have to show the underwriting guidelines ceased to exist in order to prevail in this case," but instead "show a pattern of deviations from the underwriting practices caused the disclosures to be materially misleading or false." *Id*. at *30–31. Plaintiffs' evidence that defendant's "internal risk management concluded there were substantial deviations in loan quality that far exceeded the [underwriting] benchmarks" and "expert reports finding that 37.1% of the loans sampled suffered from material defects" sufficed at this stage "to sustain the § 11 claims." *Id*. at *32. According to the court, the "countervailing facts" presented by defendants might lead a jury to "reach[] a verdict in Defendants' favor," but "do not negate the extensive evidence Plaintiffs present" or "foreclose Plaintiffs' § 11 claims" from reaching trial. *Id*. at *34–37.

[289]  *See N.J. Carpenters Health Fund v. Royal Bank of Scot. Group, PLC*, 709 F.3d 109, 125 (2d Cir. 2013).

[290]  *See SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472–73 (2d Cir. 1996) (quoting 17 C.F.R. § 240.12b-2); *see also Wyo. State Treasurer v. Moody's Investors Serv., Inc. (In re Lehman Bros. Mortgage-Backed Sec. Litig.)*, 650 F.3d 167, 185 (2d Cir. 2011) ("Because § 15 and § 20(a) are roughly parallel control person provisions . . . we here adopt the quoted *First Jersey* definition of control for § 15 claims."); *In re AOL Time Warner, Inc. Sec. & ERISA Litig.*, 381 F. Supp. 2d 192, 234 (S.D.N.Y. 2004) ("means of exercising control pursuant to [s]ections 15 and 20(a)" include "stock ownership," "business relationships, interlocking directors, family relationships, and the power to influence and control the activities of another").

[291]  *Cromer Fin. Ltd. v. Berger*, 137 F. Supp. 2d 452, 484 (S.D.N.Y. 2001); *see also Cohen v. Stevanovich*, 722 F. Supp. 2d 416, 435 (S.D.N.Y. 2010) ("The [s]ection 20(a) defendant must not only have actual control over the primary violator, but have actual control over the *transaction* in question.") (quotation marks omitted); *In re Refco Sec. Litig.*, 503 F. Supp. 2d 611, 637 (S.D.N.Y. 2007) ("To prevail on a § 15 claim, a plaintiff is required to prove actual control, not merely control person status.") (quotation marks omitted); *In re Livent, Inc. Sec. Litig.*, 78 F. Supp. 2d 194, 221 (S.D.N.Y. 1999) ("Actual control is essential to control person liability.").

securities."[292] Some courts in the Second Circuit have clarified that "control requires only the ability to direct the actions of the controlled person, and not the active exercise thereof."[293] Courts in certain other jurisdictions have required that "the alleged control person actually exercised control over the general operations of the primary violator" and "possessed—but did not necessarily exercise—the power to determine the specific acts or omissions upon which the underlying violation is predicated."[294]

"A court 'must consider the total effect of the various indicia of control in combination,' rather than examining any one indicia in isolation."[295] "Allegations that an entity was the parent corporation of a primary violator, standing alone, do not make out a claim of

---

[292] *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 352 F. Supp. 2d 429, 458 (S.D.N.Y. 2005) (quotation marks omitted); *see also Wyo. State Treasurer*, 650 F.3d at 18 ("[A]llegations of advice, feedback, and guidance fail to raise a reasonable inference that the Rating Agencies had the power to direct, rather than merely inform, the banks' ultimate structuring decisions. Put another way, providing advice that the banks chose to follow does not suggest control."); *N.J. Carpenters Health Fund v. NovaStar Mortg., Inc.*, Civ. No. 08-5310, 2011 U.S. Dist. LEXIS 36363, at *29 (S.D.N.Y. Mar. 31, 2011) ("Plaintiff's allegations do not demonstrate control, but only the power to influence or persuade those who issued or sold the securities."); *In re Alstom Sec. Litig.*, 406 F. Supp. 2d 433, 487 (S.D.N.Y. 2005) ("[E]xercise of influence, without power to direct or cause the direction of management and policies . . . is not sufficient to establish control for purposes of [s]ection 20(a).").

[293] *See CompuDyne Corp. v. Shane*, 453 F. Supp. 2d 807, 829 (S.D.N.Y. 2006) (quoting *Dietrich v. Bauer*, 126 F. Supp. 2d 759, 764 (S.D.N.Y. 2001)); *see also Epstein v. Haas Sec. Corp.*, 731 F. Supp. 1166, 1175 n.5 (S.D.N.Y. 1990) (rejecting argument that "plaintiffs must show that defendants actually exercised control over the conduct constituting the violation" because it "clearly runs counter" to the rule that "the plaintiff need not allege that the defendant actively exercised the control in the transaction in question").

[294] *See Lustgraaf v. Behrens*, 619 F.3d 867, 873 (8th Cir. 2010) (applying section 20(a) of the Exchange Act); *see also In re Credit Suisse – AOL Sec. Litig.*, Civ. No. 02-12146, 2011 U.S. Dist. LEXIS 95889, at *25 (D. Mass. Aug. 26, 2011) (same); *Premier Capital Mgmt., LLC v. Cohen*, Civ. No. 02-5368, 2008 U.S. Dist. LEXIS 23484, at *26 (N.D. Ill. Mar. 24, 2008) ("First, [under section 15] the 'control person' needs to have actually exercised general control over the operations of the wrongdoer, and second, the control person must have had the power or ability—even if not exercised—to control the specific transaction or activity that is alleged to give rise to liability.") (quoting *Donohoe v. Consol. Operating & Prod. Corp.*, 30 F.3d 907, 911– 12 (7th Cir. 1994)); *Semrad v. Edina Realty, Inc.*, 493 N.W.2d 528, 532–33 (Minn. 1992) (applying same standard under Minn. Stat. § 80A.23). To the extent AFI argues that Third-Party Claimants must instead demonstrate that AFI "exercised operational control over . . . the securitizations they challenge," *see* AFI Submission Paper, Dec. 19, 2012, at 30, 34, that argument is inconsistent with what appears to be the prevailing view. None of the decisions relied upon by AFI are to the contrary. *See, e.g.*, *Ho v. Duoyuan Global Water, Inc.*, 887 F. Supp. 2d 547, 579 (S.D.N.Y. 2012) (dismissing section 15 claims where complaint failed to allege that defendant *possessed* "actual control over the transaction in question," without suggesting that plaintiff was required to plead that defendant *exercised* such control over that transaction) (quotation marks and emphasis omitted).

[295] *In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.*, 398 F. Supp. 2d 244, 262 (S.D.N.Y. 2005) (quoting *In re Leslie Fay Cos., Inc. Sec. Litig.*, 918 F. Supp. 749, 763 (S.D.N.Y. 1996)); *see also United States v. Corr*, 543 F.2d 1042, 1050 (2d Cir. 1976) (explaining that "[w]hile there is no statutory definition of 'control,' its concept is not a narrow one," but "depends upon the totality of the circumstances").

control."[296] By itself, "[t]he parent/subsidiary relationship is an insufficient basis from which to infer control because a parent corporation and its subsidiary are regarded as legally distinct entities."[297] "Minority stock ownership [by a parent] and the ability to appoint a minority of the board," without more, "do not create power to direct management and policies, and thus do not constitute sufficient control."[298] The existence of overlapping officers or directors among parent and subsidiary entities likewise may not "create any presumption of control for purposes of establishing control person liability."[299] "Moreover, the right [of a parent] to access another [affiliated] firm's books and records, without more, does not suggest any concomitant right to control that firm."[300]

Nonetheless, "[i]n cases involving parent-subsidiary relationships, courts have regularly based findings of control person liability on allegations of substantial stock ownership and

---

[296] *Emps.' Ret. Sys. of the Gov't of the Virgin Is. v. J.P. Morgan Chase & Co.*, 804 F. Supp. 2d 141, 157 (S.D.N.Y. 2011) (dismissing section 15 claim as against parent entity); *see also Suez Equity Investors, LP v. Toronto-Dominion Bank*, 250 F.3d 87, 102 (2d Cir. 2001) (finding a section 20(a) claim "insufficient . . . as a matter of law" where allegations that "Holdings controlled various of the other corporate defendants" were "conclusory at best"); *Pub. Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co. Inc.*, 714 F. Supp. 2d 475, 484 (S.D.N.Y. 2010) (dismissing section 15 claim where plaintiffs "failed to allege beyond 'formulaic recitation' how Merrill . . . exercised control over [the alleged primary violators]" where plaintiffs "merely allege that [they] were Merrill subsidiaries and affiliates of each other"); *In re Global Crossing, Ltd., Sec. Litig.*, Civ. No. 02-910, 2005 U.S. Dist. LEXIS 16232, at *13 (S.D.N.Y. Aug. 5, 2005) ("The mere existence of a parent/subsidiary relationship may be an insufficient basis from which to infer control for allegations of [s]ection 15 liability, but plaintiffs have pled more than that.") (citation omitted); *Alameda Co. Emps.' Ret. Ass'n v. Ebbers (In re WorldCom, Inc. Sec. Litig.)*, Civ. Nos. 02-3288 & 03-0890, 2004 U.S. Dist. LEXIS 8661, at *10–11 (S.D.N.Y. May 18, 2004) (granting motion to dismiss section 15 claim where complaint "does not allege any ownership of voting securities or other basis for asserting that the Holding Company Defendants have the power to direct or cause the direction of the management or policies of the defendant subsidiaries").

[297] *Pub. Emps.' Ret. Sys. of Miss.*, 714 F. Supp. 2d at 484 (quotation marks omitted).

[298] *In re Alstom Sec. Litig.*, 406 F. Supp. 2d at 492 (dismissing section 20(a) claim where "Alcatel was a [24%] minority shareholder"); *see also In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 352 F. Supp. 2d 429, 458 (S.D.N.Y. 2005) (allegations that "Verizon owned 30% of Flag's voting shares and had the power to appoint three members to Flag's Board of Directors" not adequate to establish "control"); *In re Deutsche Telekom AG Sec. Litig.*, Civ. No. 00-9475, 2002 U.S. Dist. LEXIS 2627, at *19 (S.D.N.Y. Feb. 20, 2002) (deciding that allegation that "KfW owned 22 percent of Deutche Telekom" was "insufficient by itself to infer control of Deutsche Telecom by KfW, especially given the 43% ownership share of Deutsche Telekom by the Federal Republic of Germany").

[299] *See In re WorldCom, Inc.*, 377 B.R. 77, 105 (Bankr. S.D.N.Y. 2007) (denying plaintiff's motion for summary judgment as to control person liability where it was undisputed that "the same individual, Lawrence Tucker, simultaneously served as a member on the board of directors for both [alleged control person] WorldCom and [alleged primary violator] WAXS"); *see also Suez Equity Investors, LP v. Toronto-Dominion Bank*, 250 F.3d 87, 102 (2d Cir. 2001) ("vague allegations . . . indicating only that certain employees worked for multiple defendants" are "insufficient under § 20 as a matter of law" to plead that "Holdings controlled various of the other corporate defendants"); *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 308 F. Supp. 2d 249, 274 (S.D.N.Y. 2004).

[300] *In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278, 311 (S.D.N.Y. 2005) ("Plaintiffs' [section 20] claim in respect of GT-USA, however, falls short. The only non-conclusory allegations of control are that of relative size and GT-USA's access to member firms' books and records.").

common principals."[301] Allegations that a "control person" defendant "was not simply the corporate parent" of its subsidiary but instead exercised day-to-day direction or supervision over that subsidiary's actions have been found indicative of control.[302] Similarly, allegations

---

[301] *STMicroelectronics v. Credit Suisse Group*, 775 F. Supp. 2d 525, 536 (E.D.N.Y. 2011) (quoting *Kalin v. Xanboo, Inc.*, 526 F. Supp. 2d 392, 406 (S.D.N.Y. 2007)); *see also Healey v. Chelsea Res. Ltd.*, 947 F.2d 611, 626 (2d Cir. 1991) (noting that "[w]hether or not sufficient, such proof [of a parent-wholly-owned-subsidiary relationship] would at least seem relevant" to determination of "control"); *In re Citigroup Inc. Bond Litig.*, 723 F. Supp. 2d 568, 595 (S.D.N.Y. 2010) (denying motion to dismiss section 15 claim where alleged primary violator was the "wholly-owned subsidiary" of the alleged control person); *In re Prestige Brands Holdings, Inc. Sec. Litig.*, Civ. No. 05-6924, 2006 U.S. Dist. LEXIS 81980, at *7 (S.D.N.Y. Nov. 9, 2006) (denying motion to dismiss section 15 claim where plaintiff's allegations of control included that "GTCR formed Prestige and owned 85.2% of its stock" and "GTCR placed two of its principals on Prestige's five member Board of Directors"); *In re Parmalat Sec. Litig.*, 375 F. Supp. 2d at 311 ("[A]llegations that the top executives of [alleged control person] Deloitte & Touche LLP held the top two positions at [affiliate] DTT and that at least one of those executives was involved in the Parmalat audit are sufficient to give rise to an inference of control."); *Dietrich v. Bauer*, 126 F. Supp. 2d 759, 765 (S.D.N.Y. 2001) ("A sole shareholder of the company that is the primary wrongdoer has been held to be a control person within the meaning of [s]ection 20(a), as ownership strongly suggests that the defendant has the potential power to influence and direct the activities of the wrongdoer."); *Pollack v. Laidlaw Holdings, Inc.*, Civ. No. 90-5788, 1995 U.S. Dist. LEXIS 5909, at *59 (S.D.N.Y. May 2, 1995) (denying motion to dismiss control person claims because "plaintiffs have provided prima facie evidence of Laidlaw Holdings' status as a controlling person" where it was alleged that "Laidlaw Holdings controlled both Laidlaw Equities and Laidlaw Asset Management through one hundred percent stock ownership and through common officers and directors"); *Borden, Inc. v. Spoor Behrins Campbell & Young, Inc.*, 735 F. Supp. 587, 591 (S.D.N.Y. 1990) (holding that "plaintiffs have sufficiently stated control status and therefore, a [s]ection 20 claim" because "[p]laintiffs' allegation that defendants were sole shareholders of [alleged primary violator] SBCY clearly meets [the 'control'] standard").

[302] *See FHFA v. UBS Ams. Inc.*, 858 F. Supp. 2d 306, 333 (S.D.N.Y. 2012) (denying motion to dismiss section 15 claim where plaintiff alleged that "UBS Americas was not simply the corporate parent of UBS Securities and MASTR but, in practice, controlled their actions in issuing and selling RMBS certificates"); *see also Kalin v. Xanboo, Inc.*, 526 F. Supp. 2d 392, 405 (S.D.N.Y. 2007) (finding that "[p]laintiff has sufficiently pled that RDI is a 'control person' over the primary violator Xanboo" where plaintiff alleged "a mix of substantial stock ownership, shared officers and principals, and at least some direct involvement in Xanboo by officers of RDI"); *In re Global Crossing, Ltd., Sec. Litig.*, Civ. No. 02-910, 2005 U.S. Dist. LEXIS 16232, at *13–14 (S.D.N.Y. Aug. 5, 2005) (plaintiffs' allegations were "sufficient to state a claim of control under [s]ection 15" where plaintiffs "alleged that Securities is JPMC's wholly owned subsidiary, that the directors of both corporations were 'interchangeable,' and that JPMC 'had direct involvement in the day-to-day operations of Securities'") (internal citations omitted); *Cromer Fin. Ltd. v. Berger*, 137 F. Supp. 2d 452, 484 (S.D.N.Y. 2001) (denying motion to dismiss section 20(a) claim complaint alleged that defendant entity "exercis[ed] 'direct, daily supervision, oversight and control' through common personnel and shared offices" with affiliates).

that a parent used its subsidiary as a vehicle to conduct the parent's business may also be relevant to a finding of control.[303]

In recent years, courts have applied these standards to decide motions to dismiss control person claims asserted by investors under federal or states securities laws against the parents or affiliates of issuers or underwriters of RMBS. Some courts granted such motions to dismiss explaining that "[a]llegations that an entity was the parent corporation of a primary violator, standing alone, do not make out a claim of control."[304] Several other courts, however, denied motions to dismiss control person claims where the plaintiff did more than plead mere corporate ownership or affiliation including, for example, by alleging facts showing that a parent "operated its subsidiaries as a collective enterprise with respect to the origination of mortgage loans"[305] or "structured [its affiliates] to facilitate the issuance and sale of the [RMBS] and controlled them directly."[306] Some courts denying motions to dismiss have also

---

[303] *See In re Indep. Energy Holdings PLC Sec. Litig.*, 154 F. Supp. 2d 741, 770 (S.D.N.Y. 2001) (finding that "[p]laintiffs have pled sufficient facts supporting an inference that DLJ Inc. controlled DLJ Securities and DLJ International" where plaintiffs alleged that "DLJ Inc. conducts its business domestically and internationally through [those] wholly-owned subsidiaries" and that "DLJ Inc. was running the business of DLJ Securities through common management") (quotation marks omitted); *Cromer Fin. Ltd. v. Berger*, 137 F. Supp. 2d 452, 484 (S.D.N.Y. 2001) (denying motion to dismiss section 20(a) claim and finding that complaint "adequately alleges . . . actual control" where, among other allegations, the complaint stated that "EYB identified FASB and K&W as 'the corporate vehicles through which' EYB provided administrative services to its clients"); *see also Emps.' Ret. Sys. of the Gov't of the Virgin Is. v. J.P. Morgan Chase & Co.*, 804 F. Supp. 2d 141, 157 (S.D.N.Y. 2011) ("Nor is the fact that the J.P Morgan name appeared prominently on the Prospectus Supplement [issued by its subsidiary], lending the investment the imprimatur of the larger corporation, enough to establish control person liability.").

[304] *See Emps.' Ret. Sys. of the Gov't of the Virgin Is.* 804 F. Supp. 2d at 157 (granting motion to dismiss section 15 claim asserted against parent of issuer and underwriter of RMBS despite allegations "that the [parent's] name appeared prominently on the Prospectus Supplement"); *see also Pub. Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co. Inc.*, 714 F. Supp. 2d 475, 485 (S.D.N.Y. 2010) (granting motion to dismiss section 15 claim where plaintiffs "failed to allege beyond formulaic recitation how Merrill . . . exercised control over Merrill Depositor" and "merely allege that . . . [the defendants] were Merrill subsidiaries and affiliates of each other") (quotation marks omitted).

[305] *See Mass. Mut. Life Ins. Co. v. Countrywide Fin. Corp.*, 2012 U.S. Dist. LEXIS 121702, at *17 (C.D. Cal. Aug. 17, 2012) (denying motion to dismiss state-law control person claims asserted against Countrywide Financial Corporation, "the corporate parent of [primary violator] CSC," where the complaint "alleged that CFC operated its subsidiaries as a collective enterprise with respect to the origination of mortgage loans, while maintaining high-level control"); *see also In re Wash. Mut., Inc.*, 462 B.R. 137, 141 (Bankr. D. Del. 2011) (denying objection to control person claims asserted by creditor under section 15 and California securities laws where plaintiff adequately alleged that the parent "controlled the offering entities as divisions of an integrated mortgage-backed securities production 'factory'").

[306] *See Me. State Ret. Sys. v. Countrywide Fin. Corp.*, Civ. No. 10-0302, 2011 U.S. Dist. LEXIS 125203, at *45 (C.D. Cal. May 5, 2011) (denying motion to dismiss section 15 claim asserted against Countrywide Financial Corporation where the plaintiff "alleges that CFC structured the [primary violator] Issuer Defendants to facilitate the issuance and sale of the [RMBS] and controlled them directly"); *see also Capital Ventures Int'l v. J.P. Morgan Mortg. Acquisition Corp.*, Civ. No. 12-10085, 2013 U.S. Dist. LEXIS 19227, at *30 (D. Mass. Feb. 13, 2013) (denying motion to dismiss MUSA § 410(b) claim where the complaint alleged that the securitization sponsor "had day-to-day control" over the primary violations including control over "select[ing] the loans that would be securitized" and "the disclosures made in connection with the related securitizations").

found relevant allegations of a "significant overlap in the controlling executives and directors of each entity [involved in the securitization process]."[307]

### (ii) Application To RMBS Claims

Third-Party Claimants allege that AFI "had the practical ability to and in fact exercised direction and control of [its] subsidiaries in coordinating the [vertically-integrated] securitization process, determining the structure of each offering, and issuing and selling the [securities] purchased by [Third-Party Claimants]."[308] In support of such allegations, Third-Party Claimants further allege, inter alia, that (1) "[AFI], [GMAC Mortgage Group, LLC], ResCap, and [RFC] shared overlapping management with each other and/or [the Depositor Entities]"; (2) AFI "supports its subsidiaries financially"; (3) AFI "publicly reports on its own business and that of its subsidiaries on an integrated basis"; (4) AFI "provides various services to [the Debtors], which demonstrate the integrated nature of the . . . businesses"; and (5) "[u]nlike typical arm's length securitizations, [these] involved various [AFI] subsidiaries and affiliates at virtually each step in the chain."[309]

---

[307] *See Genesee Co. Emps.' Ret. Sys. v. Thornburg Mortg. Sec. Trust 2006-3*, 825 F. Supp. 2d 1082, 1222 (D.N.M. 2011) (denying motion to dismiss section 15 claim where the complaint's allegations that "[control person] RBS Securities created [primary violator] GC Acceptance and receives basically all of its revenue from securitizations" and that there was "significant overlap in the controlling executives and directors of each entity" were sufficient to "demonstrate that RBS Securities had the practical ability to direct the actions of the primary violator"); *see also Capital Ventures Int'l*, 2013 U.S. Dist. LEXIS 19227, at *30 (denying motion to dismiss MUSA § 410(b) control person claim where complaint alleged "details about how the depositors were organized and managed" including that "the management of the depositor and sponsor often overlap").

[308] *See* Am. Compl., *FHFA v. Ally Fin. Inc.*, Civ. No. 11-07010, Docket No. 114, at 25–26 (S.D.N.Y. June 13, 2012); *see also* Am. Compl., *FHLB of Boston v. Ally Fin., Inc.*, Civ. No. 11-10952, Docket No. 180, at 46–47 113 (D. Mass. June 29, 2012) ("[AFI] possessed the practical ability to direct or cause the direction of the management, policies, and actions of Defendants . . . and in fact exercised such direction and control . . . related to the issuance and sale of the Certificates."); Am. Compl., *FHLB of Chicago v. Banc of Am. Funding Corp.*, Case No. 10-CH-45033, at 20, 200–201 (Ill. Cir. Ct. Apr. 8, 2011); Am. Compl., *John Hancock Life Ins. Co. (U.S.A.) v. Ally Fin. Inc.*, Civ. No.12-01841, Docket No. 84, at 12 (D. Minn. Oct. 15, 2012) ("[AFI] is the ultimate corporate parent of all the other [defendants] and controls the policy of the . . . business operation. In this capacity, [AFI] pursued the securitizations at issue . . . at the expense of Plaintiffs."); Am. Compl., *Stichting Pensioenfonds ABP v. Ally Fin. Inc.*, Civ. No. 12-01381, Docket No. 101, at 10–11 (D. Minn. Oct. 11, 2011) (same); Am. Compl., *Union Central Life Ins. Co. v. Ally Fin., Inc.*, Civ. No. 11-02890, Docket No. 146, at 13, 240–241 (S.D.N.Y. May 4, 2012).

[309] *See* Am. Compl., *FHFA v. Ally Fin. Inc.*, Civ. No. 11-7010, Docket No. 114, at 26–31 (S.D.N.Y. June 13, 2012); *see also* Am. Compl., *FHLB of Boston v. Ally Fin., Inc.*, Civ. No. 11-10952, Docket No. 180, at 278 (D. Mass. June 29, 2012); Am. Compl., *FHLB of Chicago v. Banc of Am. Funding Corp.*, Case No. 10-CH-45033, at 200–202 (Ill. Cir. Ct. Apr. 8, 2011); Am. Compl., *John Hancock Life Ins. Co. (U.S.A.) v. Ally Fin. Inc.*, Civ. No.12-01841, Docket No. 84, at 263–269 (D. Minn. Oct. 15, 2012); Am. Compl., *Stichting Pensioenfonds ABP v. Ally Fin. Inc.*, Civ. No. 12-01381, Docket No. 101, at 162–168 (D. Minn. Oct. 11, 2011); Am. Compl., *Union Cent. Life Ins. Co. v. Ally Fin., Inc.*, Civ. No. 11-02890, Docket No. 146, at 240–241 (S.D.N.Y. May 4, 2012).

To date, two courts have found such allegations sufficient as a matter of law to plead that AFI was a "controlling person" of one or more alleged primary violators.[310] In *FHFA v. Ally Fin., Inc.*, the U.S. District Court for the Southern District of New York denied AFI's motion to dismiss the section 15 claims asserted by the FHFA.[311] The district court rejected AFI's argument that the FHFA's allegations of control were "insufficient" and found adequate the complaint's allegations that AFI "(1) exercised direction and control over a vertically integrated structure of wholly owned subsidiaries that sold the [RMBS] Certificates, (2) shared officers and directors with those subsidiaries, (3) supplied them with essential services and financial support, and (4) profited substantially from this vertically integrated approach to the securitization process."[312] In *FHLB of Chicago v. Banc of Am. Funding Corp.*, the Circuit Court in Cook County, Illinois, denied AFI's motion to dismiss control person claims asserted under the Illinois Securities Law and the North Carolina Securities Act.[313] Those courts that have granted motions to dismiss control person claims asserted by Third-Party Claimants against AFI do not appear to have done so on the ground of a failure to plead control.[314]

Of course, the denial of a motion to dismiss "is not to say that [such] claims are strong, or that they will necessarily succeed."[315] To prevail on the merits of their control person claims against AFI, Third-Party Claimants will be required to prove by a preponderance of the evidence the necessary control (among other elements).[316] In their submissions to the Examiner, Third-Party Claimants have asserted that they expect to "demonstrate the controlling person status of [AFI] through [its] extensive operational control of the relevant debtor affiliates, such as their control over all major decisions respecting the debtor affiliates

---

[310] *See FHFA v. Ally Fin., Inc.*, Civ. No. 11-7010, 2012 U.S. Dist. LEXIS 179768, at *11–15 (S.D.N.Y. Dec. 19, 2012); Order, *FHLB of Chicago v. Banc of Am. Funding Corp.*, Case No. 10-CH-45033, at 33 (Ill. Cir. Ct. Sept. 19, 2012).

[311] Civ. No. 11-7010, 2012 U.S. Dist. LEXIS 179768, at *11–15 (S.D.N.Y. Dec. 19, 2012).

[312] *Id*. at *12–13; *see also FHFA v. UBS Americas, Inc.*, 858 F. Supp. 2d 306, 333 (S.D.N.Y. 2012) (Cote, J.) (denying motion to dismiss section 15 claim where the complaint "alleges that [control person] UBS Real Estate was actively involved in coordinating the securitization process and determining the structure of each offering and that [control person] UBS Americas was not simply the corporate parent of UBS Securities and MASTR but, in practice, controlled their actions in issuing and selling RMBS certificates").

[313] *See* Order, *FHLB of Chicago v. Banc of Am. Funding Corp.*, Case No. 10-CH-45033, at 33 (Ill. Cir. Ct. Sept. 19, 2012) ("The [FHLB] correctly argues that it has stated a claim for 'control person' liability because it has properly stated claims for primary violations of securities laws.").

[314] *See* Order, *Union Cent. Life Ins. Co. v. Ally Fin., Inc.*, Civ. No. 11-02890, Docket No. 263, at 3–4 (S.D.N.Y. Mar. 29, 2013) (granting motion to dismiss "claims against [AFI] for violations of [s]ection 20(a) and 20(b) of the Exchange Act" where plaintiffs "have not pled any facts with particularity to demonstrate [defendants'] scienter" and such allegations were "wholly conclusory"); *Huntington Bancshares, Inc. v. Ally Fin. Inc.*, Case No. 27-cv-11-20276, at 9 (Minn. Dist. Ct. Dec. 11, 2012) (dismissing with prejudice Minnesota Securities Act claims asserted against AFI as "barred as a matter of law by the three-year statute of limitations").

[315] *See City of Ann Arbor Emps.' Ret. Sys. v. Citigroup Mortg. Loan Trust Inc.*, Civ. No. 08-1418, 2010 U.S. Dist. LEXIS 137290, at *16–17 (E.D.N.Y. Dec. 23, 2010) (denying motion to dismiss Securities Act claims alleging a "departure from underwriting standards").

[316] *See* Section VIII.C.2.a(2)(a).

and shared personnel," and that "discovery will yield even more evidence."[317] AFI disagrees, contending that Third-Party Claimants "offer no evidence" and cannot prove that "AFI ever exercised operational control over ResCap (or its operating subsidiaries), much less that it did so with respect to the securitizations."[318]

While a close question, the Examiner concludes that it is more likely than not that a court would not find the requisite control of AFI over the alleged primary securities violators. To reach this conclusion, the Examiner considered the parties' arguments and the available evidence, including with respect to: (A) the Operating Agreement; (B) overlapping officers and directors; (C) shared functions and services; (D) AFI's audits of the Debtors; and (E) certain statements by AFI and the Debtors concerning their relationship.

### (A) The Operating Agreement

AFI asserts that it "was walled off from ResCap as a result of ResCap's Operating Agreement" and that those "restrictions . . . collectively precluded AFI from exercising actual control over ResCap's operations . . . and . . . ResCap's conduct in connection with the RMBS transactions at issue here."[319] To the extent that AFI intends to argue that the Operating Agreement alone could defeat Third-Party Claimants' control person claims, that argument has been rejected by one court and does not persuade the Examiner.[320]

In *FHFA v. Ally Fin., Inc.*, the district court concluded that the "operating agreement entered into between AFI and ResCap in June 2005" failed to "demonstrate[] as a matter of law that [AFI] did not exercise control over [RFC] and the [Depositor Entities] during the period that the securitizations at issue were sold."[321] According to the court, the complaint contained allegations that "call into question the appearance of independence that might be conveyed by the Operating Agreement in isolation" including that "in several instances officers of AFI served on the board of ResCap or its subsidiaries."[322] Although "[i]t may be the case that, whether because of the Operating Agreement or for other reasons, the involvement of [AFI] in ResCap's securitization activities was not sufficient to give rise to control-person liability," such a finding could not be made as a matter of law based on the text of the Operating Agreement alone.[323]

---

[317]  *See* Joint Submission Paper of Federal Home Loan Banks of Boston, Chicago and Indianapolis, dated Oct. 19, 2012, at 23–24, 28; *see also* Joint Submission Paper of AIG, Allstate Life Ins. Co., Mass. Mut. Life Ins. Co., and Prudential Ins. Co. of Am., dated Oct. 17, 2012, at 25 ("The Investors have powerful claims that [AFI] aided and abetted the fraud of the debtor and non-debtor entities which issued the RMBS . . . . The Examiner likely will find further evidence of [AFI's] vicarious liability through the discovery into [AFI's] management of ResCap and the other Debtors prior to the financial crisis.").

[318]  *See* AFI Submission Paper, Dec. 19, 2012, at 30.

[319]  *See id.* at 32 (emphasis omitted).

[320]  *See* Section VII.A.1.f(4)(b)(i) (explaining that the Operating Agreement is not dispositive of whether the Debtors observed all appropriate corporate formalities).

[321]  *FHFA v. Ally Fin., Inc.*, Civ. No. 11-7010, 2012 U.S. Dist. LEXIS 179768, at *13 (S.D.N.Y. Dec. 19, 2012).

[322]  *Id.* at *14–15.

[323]  *Id.* at *15.

Indeed, the Investigation has revealed evidence that, in some cases, ResCap's officers and directors failed to follow or inconsistently followed certain provisions of the Operating Agreement.[324] Moreover, the terms of the Operating Agreement are not necessarily inconsistent with the type of control required by the pertinent securities laws.[325] The Operating Agreement authorizes AFI to appoint each member of the ResCap Board, including its Independent Directors.[326] Although the Operating Agreement imposes certain limitations on related-party transactions and contains a series of provisions "so that ResCap will maintain its separate legal existence and identity," it does not purport to expressly prevent AFI's involvement in any one or more aspects of the securitization process at ResCap and its subsidiaries.[327]

The Examiner is conversely not persuaded by Third-Party Claimants' assertion that the "Operating Agreement enabled [AFI] to financially control ResCap, by preventing ResCap from declaring dividends or paying off debt owed to [AFI]."[328] The stated purpose of such restrictions was to "create separation between GM and [GMAC], on the one hand, and ResCap, on the other" so that ResCap could "obtain[] investment grade credit ratings for its unsecured indebtedness that are separate from [GMAC's] ratings and the ratings of GM."[329] The Investigation has revealed no evidence that would suggest that limitations on the circumstances in which ResCap was permitted to make payments to AFI somehow gave rise to AFI's "'power to direct or cause the direction of the management and policies of [the Debtors].'"[330]

---

[324] *See* Section VII.A.1.f(4)(b)(i).

[325] *See, e.g.*, *In re Prestige Brands Holdings, Inc. Sec. Litig.*, Civ. No. 05-6924, 2006 U.S. Dist. LEXIS 81980, at *7 (S.D.N.Y. Nov. 9, 2006) (denying motion to dismiss section 15 claim where plaintiff's allegations of control included that "GTCR formed Prestige and owned 85.2% of its stock" and "GTCR placed two of its principals on Prestige's five member Board of Directors").

[326] *See* 2005 Operating Agreement, section 2(g)(i) [ALLY_0140795]; *see also* 2006 Amended Operating Agreement, § 2(f)(i) (attached to Residential Capital, LLC, Current Report (Form 8-K) (Nov. 30, 2006), Ex. 10.1).

[327] *See* 2005 Operating Agreement, §§ 2(b), (f) [ALLY_0140795]; *see also* 2006 Amended Operating Agreement, § 2(b), (e) (attached to Residential Capital, LLC, Current Report (Form 8-K) (Nov. 30, 2006), Ex. 10.1). Notably, the 2006 Amended Operating Agreement removed the requirement that "ResCap shall at all times . . . cause to be conducted the business operations of itself and its Subsidiaries by its or their own employees and officers, who will not also be employees or officers of any GMAC Affiliates." *Compare* 2005 Operating Agreement, § 2(f) [ALLY_0140795], *with* 2006 Amended Operating Agreement, § 2(e) (attached to Residential Capital, LLC, Current Report (Form 8-K) (Nov. 30, 2006), Ex. 10.1).

[328] *See* Joint Submission Paper of AIG, Allstate Life Ins. Co., Mass. Mut. Life Ins. Co., and Prudential Ins. Co. of Am., dated Oct. 17, 2012, at 25; *see also* Joint Submission Paper of Federal Home Loan Banks of Boston, Chicago, and Indianapolis, dated Oct. 19, 2012, at 28 n.18 (noting the "financial dependence of ResCap on Ally").

[329] *See* General Motors Acceptance Corporation, Annual Report (Form 10-K) (March 28, 2006), at 5.

[330] *See* SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1472–73 (2d Cir. 1996) (quoting 17 C.F.R. § 240.12b-2).

In sum, whether AFI had the requisite control over one or more alleged primary violators "depends upon the totality of the circumstances," and the text of the Operating Agreement alone is unlikely to be dispositive.[331]

### (B) Overlapping Officers And Directors

Third-Party Claimants assert as evidence of control that AFI "shared overlapping management with [its] controlled entities."[332] AFI responds that "the existence of some common management and directors" is a "common characteristic[] of a parent-subsidiary relationship" and "insufficient to establish control person liability."[333] According to AFI, its officers and directors did not have "any involvement in selecting loans for collateral pools, conducting due diligence on the loans, approving individual RMBS issuances, drafting offering materials, or marketing RMBS for sale."[334]

It is undisputed that the management of AFI overlapped with that of ResCap.[335] AFI exercised its authority under the Operating Agreement to elect each of the directors that served on the ResCap Board—including the Independent Directors.[336] From 2004 through 2007, several of the directors that served on the ResCap Board were affiliated with AFI and/or Cerberus.[337] Moreover, many officers and other employees of ResCap also possessed dual affiliations.[338] Although overlapping management among a parent and wholly owned

---

[331] *See United States v. Corr*, 543 F.2d 1042, 1050 (2d Cir. 1976). For the same reasons, the text of the Operating Agreement is unlikely to be dispositive of the aiding and abetting common law fraud claims asserted against AFI. *See FHFA v. Ally Fin., Inc.*, Civ. No. 11-7010, 2012 U.S. Dist. LEXIS 179768, at *15 (S.D.N.Y. Dec. 19, 2012) (denying motion to dismiss aiding and abetting claim asserted against AFI and rejecting argument that the Operating Agreement could defeat such claims as a matter of law).

[332] *See* Joint Submission Paper of Federal Home Loan Banks of Boston, Chicago, and Indianapolis, dated Oct. 19, 2012, at 27-28; *see also* Joint Submission Paper of AIG, Allstate Life Ins. Co., Mass. Mut. Life Ins. Co., and Prudential Ins. Co. of Am., dated Oct. 17, 2012, at 25 ("The management of [AFI] and the Debtors substantially overlapped.").

[333] *See* AFI Submission Paper, dated Dec. 19, 2012, at 33.

[334] *Id.* at 35.

[335] *See* Appendix IV.A—1, —3.

[336] *See* 2005 Operating Agreement, § 2(g)(i) [ALLY_0140795]; 2006 Amended Operating Agreement, § 2(f)(i) (attached to Residential Capital, LLC, Current Report (Form 8-K) (Nov. 30, 2006), Ex. 10.1); E-mail from W. Solomon (Apr. 14, 2008) [MELZER.004778] ("I am writing on behalf of GMAC to confirm that you [T. Melzer and T. Jacob] were originally recruited, and continue to serve, as independent directors of Residential Capital, LLC at the request of GMAC, the sole shareholder of that company.").

[337] *See* Appendix IV.A—3.

[338] *See* Appendix IV.A—1.

subsidiary may perhaps not be unusual, courts have nonetheless considered it relevant to establishing the requisite control.[339]

The Investigation has not, however, uncovered evidence that AFI—through such overlapping directors and officers or otherwise—had any direct involvement in any of the Debtors' securitizations. Sanjiv Khattri, AFI CFO and ResCap Board member, described the degree of involvement, if any, of AFI in the securitizations of RFC or GMAC Mortgage as "[n]one whatsoever, to the best of my knowledge."[340] According to Khattri and others inside AFI and its subsidiaries during the relevant time period, the "departments [within ResCap and its subsidiaries] were very strong and independent" and "siloed."[341] In particular, those interviewed by the Examiner's Professionals did not recall any direct involvement by AFI in

_____

[339] *See Healey v. Chelsea Res. Ltd.*, 947 F.2d 611, 626 (2d Cir. 1991) (noting that "[w]hether or not sufficient, such proof [of a parent wholly owned subsidiary relationship] would at least seem relevant" to determination of "control"); *STMicroelectronics v. Credit Suisse Grp.*, 775 F. Supp. 2d 525, 536 (E.D.N.Y. 2011) (denying motion to dismiss section 20(a) claim where "CSS is a wholly-owned subsidiary of CSG and that the entities' executives overlap significantly at the highest levels"); *In re Prestige Brands Holdings, Inc. Sec. Litig.*, Civ. No. 05-6924, 2006 U.S. Dist. LEXIS 81980, at *7 (S.D.N.Y. Nov. 9, 2006) (denying motion to dismiss section 15 claim where "GTCR placed two of its principals on Prestige's five member Board of Directors"); *In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278, 311 (S.D.N.Y. 2005) ("[A]llegations that the top executives of [alleged control person] Deloitte & Touche LLP held the top two positions at [affiliate] DTT and that at least one of those executives was involved in the Parmalat audit are sufficient to give rise to an inference of control."); *Pollack v. Laidlaw Holdings, Inc.*, Civ. No. 90-5788, 1995 U.S. Dist. LEXIS 5909, at *59 (S.D.N.Y. May 2, 1995) (denying motion to dismiss control person claims where it was alleged that "Laidlaw Holdings controlled both Laidlaw Equities and Laidlaw Asset Management through one hundred percent stock ownership and through common officers and directors"). AFI's reliance on *In re Parmalat Sec. Litig.* appears misplaced, as that decision concerned an agency theory of liability and not a control person claim asserted under pertinent federal or state securities laws. 501 F. Supp. 2d 560, 588 (S.D.N.Y. 2007) (granting motion to dismiss complaint and rejecting theory that defendant accounting firm was the "agent" of its affiliate, notwithstanding that the affiliates "share officers and directors") (cited by AFI Submission Paper, dated Dec. 19, 2012, at 33).

[340] Int. of S. Khattri, Apr. 5, 2013, at 5:4–18.

[341] *Id.* at 8:8–16, 52:10–21 (describing "the culture at RFC and ResCap" as "independent" and "very siloed"); *see also* Int. of J. Steinhagen, Apr. 3, 2013, at 19:4–5 ("I didn't pay much attention to what was going on at [AFI]."); Int. of D. Olson, Apr. 26, 2013, at 14:6–7 ("[W]e [at RFC] were operating fairly independently or very independently before [the formation of ResCap] and continued that way."); Int. of E. Scholtz, Mar. 28, 2013, at 18:8–22 (answering "No" to whether there were "any [AFI] representatives on the RFC Executive Committee [or any of the other senior management committees in which Scholtz participated]," whether "[AFI] personnel attend[ed] any of those meetings," and whether he "ever report[ed] to anyone who was an officer or employee of [AFI or GM]"). Eric Scholtz, Head of Capital Markets at RFC, did recall, without specific details, that AFI officer David Walker "may have sat in a couple of those meetings" of the "Funding Liquidity Committee [in 2005 or 2006] where we would discuss . . . all of the support that all these [investment] banks were providing in each individual area of the company." *Id.* at 41:6–43:4.

any securitization with respect to acquisition of the mortgage loans,[342] pooling of the loans and structuring of the securitizations,[343] due diligence performed by underwriters and/or third-party vendors,[344] whether and under what terms to obtain financial guaranty insurance,[345]

---

[342] *Id.* at 44:22–45:4 (stating that "details as to what the underwriters would do, what the quality control folks would do, what the fraud folks would do [in connection with acquiring loans]" did not reach his level), 58:6–14 ("That was three levels below me and, frankly, I had a lot of people in a lot of departments to manage so I didn't get involved in the detailed work of a three level below trader [concerning bulk sale agreements and negotiated criteria agreements].").

[343] Int. of S. Khattri, Apr. 5, 2013, at 5:19–23 ("[Q:] [N]either GM nor GMAC supervised any of the securitizations or participated in structuring those deals? [A:] No, no."); Int. of L. Lundsten, Feb. 20, 2013, at 44:1–8 ("[Q:] [A]re you aware of any situations where . . . [AFI] would be involved in product development. . . ? [A:] I'm not aware of any, no."), 65:6–14 ("[Q:] [A]re you aware of any circumstances where a question about whether to include or remove loans from a pool went above RFC . . . to anyone in [AFI]? [A:] No, I'm not aware. . . . [T]hey did not get that I recall ever involved at that level of detail . . . not even close. It generally stayed within Capital Markets.").

[344] Int. of S. Khattri, Apr. 5, 2013, at 6:11–15 ("[Q:] Do you know if [AFI] recommended which . . . [underwriters] RFC might use in connection with a securitization? [A:] To the best of my knowledge, nowhere."); Int. of D. Olson, Apr. 26, 2013, at 74:6–23 (Olson did not recall AFI involvement in "picking underwriters for deals").

[345] Int. of S. Khattri, Apr. 5, 2013, at 11:13–19 ("[Q:] Do you have any understanding as to what criteria, if any, were used by RFC . . . to determine whether to obtain an insurance [w]rap for a securitization? [A:] I'm not aware of it actually, no."), 11:20–25 ("[Q:] Do you know how it is that RFC or ResCap would determine which monoline to use? [A:] I was not privy to that process at all. They were independent."); Int. of L. Lundsten, Feb. 20, 2013, at 140:3–17 ("[Q:] Can you recall any instance where someone from ResCap or [AFI] became involved with . . . the terms of any insurance agreement in a deal that was securitized by RFC? [A:] [N]o, I can't remember any specific instance. . . . [B]ased on my recollection, it would have seemed odd for them to get into that level of detail."); Int. of E. Scholtz, Mar. 28, 2013, at 37:2–6 ("[T]raders were probably three levels below me after 2001 in terms of management levels, so I wouldn't have been involved at that level of specificity [in determining whether to obtain financial guaranty insurance for a securitization].").

obtaining ratings from ratings agencies,[346] preparing the offering materials,[347] or marketing RMBS to investors.[348] Further discovery would permit these recollections to be tested against a full factual record and to reach definitive conclusions with respect to Third-Party Claimants' allegations of day-to-day AFI control over the Debtors and their securitizations.[349]

### (C) Shared Functions And Services

Third-Party Claimants assert that AFI and the Debtors "shared services" at relevant times.[350] The Investigation has revealed evidence that supports Third-Party Claimants' assertion. AFI provided certain financial, operational, and administrative services to the

---

[346] Int. of S. Khattri, Apr. 5, 2013, at 6:11–15 ("[Q:] Do you know if [AFI] had any input into the selection which rating agency . . . RFC might use? [A:] To the best of my knowledge, no, none whatsoever."), 7:14–15 ("[B]ecause of the firewall, all the rating agency issues were handled by ResCap."), 6:21–25 ("[Q:] Did you attend any of the rating agency meetings [with] either RFC or ResCap in connection with any securitization? [A:] No, I did not."); Int. of E. Scholtz, Mar. 28, 2013, at 39:18–21 ("[Q:] Do you recall if [AFI] ever had any input into which rating agencies RFC should consider using? [A:] Never."), 108:23–109:1 ("[Q:] Did you ever have conversations with [AFI] relating to rating actions taken on various RFC offerings? [A:] Never."); Int. of D. Olson, Apr. 26, 2013, at 74:6–23 (Olson did not recall any AFI involvement in "dealing with rating agencies"). The Investigation revealed evidence that, at least on one occasion, AFI officers provided high–level guidance concerning the selection of rating agencies for the Debtors' securitizations. *See* E-mail from D. Walker (Mar. 18, 2005) [EXAM11735388] (Walker wrote to ResCap CFO Davee Olson and others "to make you aware of . . . Sanjiv [Khattri's] vision and to request your support" for increasing the number of ratings agencies used by the Debtors to "improv[e] the competitiveness of the ratings industry").

[347] Int. of L. Lundsten, dated Feb. 20, 2013, at 93:12–95:10 (Lundsten recalled that she was "layer[s] removed" from the preparation of offering materials for RFC securitizations, which process involved RFC "deal managers . . . working with outside counsel"); *see also* Int. of D. Olson, Apr. 26, 2013, at 14:6–7 ("[Q:] [D]o you recall [AFI] weighing in on various transactions that RFC might have been involved in? [A:] I don't recall [AFI] weighing in on transactions. We would have utilized their expertise to help advise us on things and . . . asked the lawyers or something up at the [AFI] level what they thought to see for consistency. . . . I don't have any recollection of seeking advice [from AFI concerning the securitization process].").

[348] Int. of S. Khattri, Apr. 5, 2013, at 8:18–21 ("[Q:] Did representat[ives] of [AFI] participate in meetings with RMBS investors? [A:] No, they did not, to the best of my knowledge."); Int. of J. Steinhagen, Apr. 3, 2013, at 112:3–11 ("[Q:] Did [AFI] ever attend [investor conferences] in connection with the mortgage operations? [A:] No.").

[349] The Investigation has revealed no evidence to support Third-Party Claimants' assertion that AFI was a party to any of the "Pooling and Servicing Agreement, Mortgage Loan Purchase Agreement, Servicing Agreement, [or] Assignment, Assumption and Recognition Agreement" executed in connection with the issuance of RMBS by its affiliates. *See* Joint Submission Paper of Federal Home Loan Banks of Boston, Chicago, and Indianapolis, dated Oct. 19, 2012, at 25. Instead, such agreements were entered into by other parties including entities affiliated with AFI acting as sponsor, depositor, or servicer. *See*, *e.g.*, Pooling and Servicing Agreement for Home Equity Mortgage Asset-Backed Pass-Through Certificates Series 2006-KS3, dated Mar. 1, 2006 [EXAM00236698] (entered into by RFC as Master Servicer, RASC as Depositor, and U.S. Bank National Association, as Trustee); Assignment and Assumption Agreement, dated Nov. 29, 2006 [EXAM00235471] (entered into by RFC and RALI); *see also* Section VIII.B.1.b.

[350] *See* Joint Submission Paper of Federal Home Loan Banks of Boston, Chicago, and Indianapolis, dated Oct. 19, 2012, at 26–27.

Debtors for which it was paid management fees from 2004 through 2007 (and later).[351] The available evidence also offers, however, at least two reasons to expect that such evidence would be of minimal probative value with respect to allegations of AFI's control over the Debtors' securitization process during the relevant time period.

First, many of the corporate functions and services identified by the Debtors as being "shared" or "integrated" with AFI do not implicate control by AFI of the Debtors' securitization process.[352] As of the date of the Debtors' bankruptcy petition, AFI provided to the Debtors certain services in areas including information technology, human resources, finance, treasury, supply chain, capital markets, and facilities.[353] AFI's provision of such ordinary corporate services likely could not, without more, demonstrate the requisite "actual control over the transaction in question" (i.e., over the Debtors' securitization process).[354]

Second, to the extent certain of the services provided by AFI to the Debtors could be probative of the requisite control, those services may not have been provided until *after* the alleged securities law violations. For example, Third-Party Claimants assert that the "shared services" provided by AFI to the Debtors included "legal services."[355] It was not until March 2007, however, that AFI CEO Eric Feldstein announced that "[t]he staff functions of GMAC [would] be realigned into strong global functions" in areas including legal, finance, information technology, communications, and human resources.[356] According to Feldstein, AFI's "historical business model" had "emphasized autonomous business units."[357] Indeed, the evidence indicates that it was not until 2008 or later that legal and other "global functions"

---

[351] *See* Section V.H (describing arrangements for sharing of certain services); *see also* Residential Capital Corporation, Annual Report (Form 10-K) (Mar. 28, 2006), at 142 ("[AFI] has provided [ResCap] with certain services for which a management fee was paid. [ResCap] paid [AFI] management fees of $8.7 and $5.4 million for 2005 and 2004, respectively."); Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2009), at 206 (disclosing management fees paid by ResCap to AFI from 2006–2008 for services in areas including "finance, information technology, communication, corporate marketing, procurement, and services related to facilities").

[352] *See* Debtors' Motion for Interim and Final Orders Under Bankruptcy Code sections 105(a) and 363(b) Authorizing Residential Capital, LLC to Enter into a Shared Services Agreement with Ally Financial Inc. *Nunc Pro Tunc* to the Petition Date for the Continued Receipt and Provision of Shared Services Necessary for the Operation of the Debtors' Business [Docket No. 41] at 4, 14–16.

[353] *See id.* at 14.

[354] *See Cohen v. Stevanovich*, 722 F. Supp. 2d 416, 435 (S.D.N.Y. 2010) (emphasis omitted).

[355] *See* Joint Submission Paper of Federal Home Loan Banks of Boston, Chicago, and Indianapolis, dated Oct. 19, 2012, at 26–27.

[356] *See* Memorandum, GMAC Global Functions, dated Mar. 15, 2007 [EXAM10063058].

[357] *See id.*; *see also* Int. of L. Tessler, Feb. 28, 2013, at 34:7–14 ("ResCap was and has always been operated as a standalone company . . . . And, [by] definition, you have redundancies in cost structure as a result of that.").

were centralized within AFI.[358] Evidence of alleged control by AFI that did not commence until after most if not all of the securities law violations alleged by Third-Party Claimants would not support their control person claims.[359]

### (D) AFI's Audits Of The Debtors

Third-Party Claimants assert as evidence of AFI control that AFI "was responsible for auditing ResCap and other of the Debtors' loan acquisition, distribution, servicing and underwriting processes and procedures."[360] The Investigation has revealed evidence to support Third-Party Claimants' assertion.

Audit Services, a "global" business function, performed an internal "audit function" at AFI and its subsidiaries.[361] Audit Services performed audits at AFI subsidiaries including GMAC Mortgage, RFC, Homecomings Financial, Ally Securities, and Ally Bank.[362] The Audit Services personnel that conducted audits at the Debtors were employees of the Debtors who considered themselves "independent" and reported to Audit Services at GM and later AFI.[363] From 2004 through 2007, the areas audited by Audit Services included several related to the Debtors' securitization process such as certain aspects of loan acquisition, loan pooling

---

[358] *See* Int. of T. Hamzehpour, Oct. 5, 2012, at 67:16–24 ("The GMAC organization historically was an organization of business unit silos and he viewed that as redundant and he wanted centralized functions. So all of the functions—finance, compliance, risk, legal were expected to centralize, and legal was one of the last ones [in January 2009]."); Int. of L. Tessler, Feb. 28, 2013, at 33:23–34:3 ("[T]here are two ways to survive a crisis. You know, raise revenues and reduce expenses and raise liquidity. And I suspect all of those options were on the table [in June 2008].").

[359] *See Ho v. Duoyuan Global Water, Inc.*, 887 F. Supp. 2d 547, 579 (S.D.N.Y. 2012) (dismissing section 15 claims where the defendant's "veto power [over the actions of the alleged primary violator] ceased prior to the IPO . . . and thus provides no support for Plaintiffs' contention that [the defendant] was a control person during the § 11 violations alleged in this action.").

[360] *See* Joint Submission Paper of AIG, Allstate Life Ins. Co., Mass. Mut. Life Ins. Co., and Prudential Ins. Co. of Am., dated Oct. 17, 2012, at 25; *see also* MBIA Submission Paper, Nov. 9, 2012, at 28–30.

[361] *See* Int. of S. Khattri, Apr. 5, 2013, at 46:12–15 ("[T]he audit was a global function . . . and the department was called GMAC Audit."), 14:20–15:6. Before "GMAC became an independent company," the "audit function of GMAC" and its subsidiaries was performed by GM Audit Services as "part of the audit function of GM." *Id*. at 14:7–15:6. The Examiner uses the term "Audit Services" to refer both to GM Audit Services and its successor GMAC Audit.

[362] *See* Int. of H. McKenzie, Apr. 23, 2013, at 7:12–15 ("GM Audit Services actually oversaw audit practices basically for all of the GM subsidiaries which included [AFI] and in that case included [RFC]."); *see also* Report on Audit of GMACM – Pool Delivery and Collateral Curative, dated Oct. 22, 2004 [ALLY_0220624]; Report on Audit of GMAC-RFC Homecomings Financial Network, dated Nov. 1, 2004 [ALLY_0220627]; Report on Audit of GMAC-RFC Securities, dated Nov. 4, 2004 [ALLY_0220643]; Report on Audit of GMAC Bank – Trust & Custody Services, dated Sept. 23, 2005 [ALLY_0220368]; Audit Report of: GMAC-RFC Service Delivery Group, dated May 18, 2006 [EXAM12501048].

[363] *See* Int. of H. McKenzie, Apr. 23, 2013, at 36:9–12 ("I reported to the ResCap director [Bill Russell]. The ResCap director reported to the GMAC director who reported to the GM Financial."), at 70:13–18 ("[B]ecause the internal audit function is required to be independent of the organization, the reporting line for internal audit actually went up to GM Audit Services."), 81:2–6 ("[Q:] When you went in as a team to . . . conduct this audit, your team, were they all [RFC] employees? [A:] Yes.").

and structuring, and the preparation of deal documents.[364] The typical stated objective of those audits was "to identify risk exposures and evaluate the adequacy and effectiveness of internal controls, risk management practices, and corporate governance."[365]

Audit Services prepared audit reports containing "a summary of [its] conclusions, [the] issues, and a brief description of the objectives and scope of the audit."[366] Those audit reports often assigned an overall "Rating" to the areas audited of "1" ("Satisfactory"), "2" ("Needs Improvement"), or "3" ("Unsatisfactory").[367] In general, they set also forth any "Matters Requiring Management's Attention" and "Management's Action Plan" to address the identified matters.[368] For example, an Audit Services report titled "GMAC ResCap— Creating & Accounting for Structured Finance Transactions," dated January 31, 2007, identified certain "Matters Requiring Management Attention" including that "Finance does not formally review security and whole loan transaction documents . . . to determine the appropriate accounting treatment under GAAP."[369] The corresponding "Management Action Plan" stated that management would "improve the control by implementing a detailed checklist," assigned "Implementation Responsibility" to Lisa Lundsten, Managing Director of

---

[364] *See* Int. of L. Lundsten, Feb. 20, 2013, at 153:22–25 ("There was a group from GMAC that did conduct a formal audit [of the Structured Finance Group within RFC] on a number of occasions."); Audit Report of: GMAC-RFC Service Delivery Group, dated May 18, 2006, at 2 [ALLY_0220776] ("[T]his audit focused on Asset Acquisition processes including loan serviceability, salability and funding."); GMAC ResCap— Creating & Accounting for Structured Finance Transactions, dated Jan. 31, 2007, at 2 [EXAM10380373] ("This audit focused on pooling of assets, accuracy of disclosures, compliance with SEC filing requirements, inventory management, [and] approval of deal structures . . . .").

[365] *See* Report on Audit of: GMAC Residential Funding – Warehouse Lending Operations, dated Feb. 2, 2004 [ALLY_0220507]; *see also* Int. of H. McKenzie, Apr. 23, 2013, at 31:3–6 ("[T]he bulk of . . . our work and our focus was on the control environment as it related to the established policies and practices that had been defined.").

[366] *See, e.g.*, GMAC ResCap—Creating & Accounting for Structured Finance Transactions, dated Jan. 31, 2007 [EXAM10380373].

[367] *See* Int. of S. Khattri, Apr. 5, 2013, at 23:10–17 ("[M]ost of the time we were rating and I think we had Unsat, Sat, and Needs Improvement. You know, so, 1, 2, 3, something like that."); Int. of H. McKenzie, Apr. 23, 2013, at 98:2–7 ("[I]t's satisfactory, needs improvement, and unsatisfactory."), 142:11–15; GMAC ResCap—Creating & Accounting for Structured Finance Transactions, dated Jan. 31, 2007 [EXAM10380373] (assigning "Rating: 2" and concluding that "[t]he system of internal control needs improvement"); Report on Audit of GMAC Residential Funding – Warehouse Lending Operations, dated Feb. 2, 2004, at 1 [ALLY_0220507] (assigning "Rating: Satisfactory" and concluding that "[t]he overall system of internal controls for Warehouse Lending is satisfactory").

[368] *See* Audit Report: GMAC-RFC Master Servicing, dated Jan. 13, 2006 [ALLY_0220429]; *see also* Int. of H. McKenzie, Apr. 23, 2013, at 21:10–22:21 ("[D]eficiencies that are identified are documented. Those were provided to management in a note saying this is the issue that we've identified. In some cases you would have a recommendation . . . the goal was to get management to determine what actions they were going to take to actually remediate the issue and the management action plan was owned by management. . . . [T]hen it moves on to the next phase which is monitoring and on a regular basis we would monitor all the issues that had been identified previously and then we provided reporting up to the audit committee of any issues that were again outstanding . . . .").

[369] *See* GMAC ResCap—Creating & Accounting for Structured Finance Transactions, dated Jan. 31, 2007, at 1 [EXAM10380373].

the Structured Finance Group of RFC, and set an "Expected Implementation Date."[370] Lundsten recalled that RFC complied with this "Management Action Plan" as "part of the process."[371]

Audit Services reports were generally circulated to members of the senior management of AFI, ResCap, RFC, and GMAC Mortgage, as well as to the respective outside auditors of AFI and ResCap.[372] The available evidence indicates that, as in the example above, Audit Services's findings and recommendations often prompted action from the Debtors. In response to one Audit Services report dated May 6, 2005, GMAC Mortgage CFO David Walker wrote RFC CEO David Applegate that they should "move on this stuff quickly."[373] Similarly, upon receiving an Audit Services report dated January 17, 2006, Eric Scholtz, head of Capital Markets at RFC, wrote that "[w]e need to be prepared to get after these issues."[374] On another occasion, Applegate wrote Scholtz concerning an Audit Services report dated May 18, 2006, and stated that "I know you are working on this—you need to be the disciplinarian and push all parties including the channels to clean up their acts."[375]

The evidence also indicates that, in certain cases, AFI management took additional steps to monitor compliance by the Debtors with Audit Services findings and recommendations. AFI CFO (and ResCap Board member) Sanjiv Khattri considered himself to have "ultimate oversight as the CFO of [AFI]" over the "internal audit" process.[376] Accordingly, Khattri would "definitely read the [Audit Services reports] that had some critical comments [in] them" and, "depending on what the issue was, [would] raise the issue or have a discussion, or find out what has been done to fix it."[377] Khattri was "sure there were many, many instances where [he] would get involved—especially if the report was not good."[378] Indeed, upon receipt of

---

[370] *See id.* at 3.

[371] *See* Int. of L. Lundsten, Feb. 20, 2013, at 162:9–18; *see also* Int. of H. McKenzie, Apr. 23, 2013, at 33:2–13 ("Most of the disagreements [with management concerning findings of Audit Services] were tied to a need for additional clarity or just making sure that the facts as we had them documented were accurate . . . . But in terms of our role within the organization we were independent of the business and ultimately again once we got our facts straight . . . there was no real kind of disagreement I guess from that perspective.").

[372] *See* Int. of H. McKenzie, Apr. 23, 2013, at 33:17–34:21 ("[W]e had pretty broad distribution."); GMAC ResCap—Creating & Accounting for Structured Finance Transactions, dated Jan. 31, 2007, at 7 [EXAM10380373] (recipient list includes, among others, ResCap COO David Applegate, ResCap CFO James Giertz, Chairman of the AFI Board Eric Feldstein, AFI CFO Khattri, and AFI Controller Linda Zuckauckas).

[373] *See* E-mail from D. Walker (May 6, 2005) [EXAM11956737]; *see also* Report on Audit of GMACM—Home Connects Lending Services, dated May 6, 2005 [ALLY_0220732].

[374] *See* E-mail from E. Scholtz (Jan. 18, 2006) [EXAM12500763]; *see also* Report on Audit of GMAC Mortgage—Capital Markets Pricing, dated Jan. 17, 2006 [EXAM12500764].

[375] *See* E-mail from D. Applegate (May 20, 2006) [EXAM12499915]; *see also* Report on Audit of GMAC-RFC Service Delivery Group, dated May 18, 2006 [ALLY_0220776].

[376] Int. of S. Khattri, Apr. 5, 2013, at 21:1–18.

[377] *Id.* at 21:18–22:19; *see also* Int. of H. McKenzie, Apr. 23, 2013, at 46:18–25 ("I didn't work directly with Sanjiv [Khattri] . . . but Bill Russell would have in his role as the ResCap audit director.").

[378] Int. of S. Khattri, Apr. 5, 2013, at 22:22–24.

one Audit Services report Walker advised Applegate that it "doesn't read well" and he should expect to receive "other love notes from Sanjiv."[379]

The Examiner considers below, in Section VIII.C.2.a(2)(d)(ii), the assertion by Third-Party Claimants that the Audit Services reports evidence knowledge of the alleged securities law violations.

### (E) Statements By AFI And The Debtors Concerning Their Relationship

Third-Party Claimants assert that they expect to "demonstrate the controlling person status of [AFI]" in part from public statements in SEC filings and elsewhere by which AFI "admitted" that it "operated its consolidated subsidiaries as a collective enterprise."[380] For example, Third-Party Claimants rely upon language in AFI's SEC filings stating that "*We* originate, purchase, service, sell and securitize residential and commercial mortgage loans" and that "*Our* business activities include the . . . securitization of residential mortgage loans."[381] Third-Party Claimants further rely upon statements such as the statement in the FRB/FDIC Consent Order that AFI "indirectly owns and controls Ally Bank . . . and numerous direct and indirect nonbank subsidiaries, including [ResCap and its subsidiaries]."[382]

Although similar statements have been found relevant in the context of a motion to dismiss for failure to state a claim, the Examiner affords them little weight when assessing whether Third-Party Claimants would succeed in proving the requisite control. In *FHFA v. Ally Fin., Inc.*, the district court denied AFI's motion to dismiss the FHFA's section 15 claim in part because a registration statement filed with the SEC by ResCap stated that AFI "controls all fundamental matters affecting ResCap."[383] The district court explained that while this and other allegations sufficed to preclude "a finding [of the absence of control] as a matter of law," the facts might yet show that "the involvement of AFI . . . in ResCap's securitization activities was not sufficient to give rise to control-person liability."[384] Without more, the

---

[379]  E-mail from D. Walker (May 6, 2005) [EXAM11956737].

[380]  *See* Joint Submission Paper of Federal Home Loan Banks of Boston, Chicago, and Indianapolis, dated Oct. 19, 2012, at 24; *see also* Joint Submission Paper of AIG, Allstate Life Ins. Co., Mass. Mut. Life Ins. Co., and Prudential Ins. Co. of Am., dated Oct. 17, 2012, at 25 ("[AFI] repeatedly represented to the market and regulators that it owns and controls the Debtors.").

[381]  *See* General Motors Acceptance Corp., Annual Report (Form 10-K) (Mar. 28, 2006), at 1 (emphasis added); GMAC LLC, Annual Report (Form 10-K) (Mar. 13, 2007), at 3 (emphasis added).

[382]  *See* FRB/FDIC Consent Order (Apr. 13, 2011), at 1; *see also* Residential Capital Corporation, Registration Statement (Form S-4) (Feb. 27, 2008), at 23 ("GM and GMAC control all fundamental matters affecting us"; "GMAC indirectly owns all of our outstanding common stock and has the power to elect and remove all of our directors."); Residential Capital, LLC, Annual Report (Form 10-K) (Mar. 13, 2007), at 43 ("GMAC controls all fundamental matters affecting us, and its interests may differ from ours.") (emphasis omitted).

[383]  *See* Civ. No. 11-7010, 2012 U.S. Dist. LEXIS 179768, at *14–15 (S.D.N.Y. Dec. 19, 2012).

[384]  *Id*. at *14–15.

Examiner does not consider such public statements of AFI's "control" over its subsidiaries to be probative of AFI's "actual control over the transaction in question" (i.e., the Debtors' securitization process).[385]

Nor does the Examiner consider probative of control Third-Party Claimants' allegation that AFI was "prominently identified . . . in the Offering Documents."[386] Although the offering documents for the securitizations typically identified affiliates of the transaction parties including AFI,[387] such statements only repeated the undisputed fact that AFI was the indirect parent of each of the Debtors.[388] Courts have found similar language in offering materials to be insufficient as a matter of law to establish control.[389]

### (d) Good Faith Or Lack Of Knowledge Defense

#### (i) Legal Principles

"[O]nce control is established, section 15 and section 20(a) each contain an affirmative exception to liability."[390] Section 20(a) provides for an affirmative defense that "exempts a controlling person from liability if 'the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the underlying violation or cause of action.'"[391] Similarly, "lack of knowledge (i.e., lack of 'culpable participation') is an affirmative defense under section 15: the text of the statute eliminates Securities Act 'control person' liability where the alleged control person 'had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person

---

[385] *See Cohen v. Stevanovich*, 722 F. Supp. 2d 416, 435 (S.D.N.Y. 2010) (emphasis omitted).

[386] *See* Joint Submission Paper of Federal Home Loan Banks of Boston, Chicago, and Indianapolis, dated Oct. 19, 2012, at 25.

[387] *See, e.g.*, Prospectus Supplement for Mortgage Asset-Backed Pass-Through Certificates Series 2006-QO9, dated Nov. 28, 2006 [EXAM00234465], at S-50 (diagram that "illustrates the various relationships among the affiliated transaction parties").

[388] *Emps.' Ret. Sys. of the Gov't of the Virgin Is. v. J.P. Morgan Chase & Co.*, 804 F. Supp. 2d 141, 157 (S.D.N.Y. 2011) ("Allegations that an entity was the parent corporation of a primary violator, standing alone, do not make out a claim of control."); *Pub. Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co. Inc.*, 714 F. Supp. 2d 475, 484 (S.D.N.Y. 2010) (dismissing section 15 claim where plaintiffs "failed to allege beyond 'formulaic recitation' how Merrill . . . exercised control over [the alleged primary violators]" where plaintiffs "merely allege that [they] were Merrill subsidiaries and affiliates of each other").

[389] *See Emps.' Ret. Sys.*, 804 F. Supp. 2d at 157 ("Nor is the fact that the J.P Morgan name appeared prominently on the Prospectus Supplement [issued by its subsidiary], lending the investment the imprimatur of the larger corporation, enough to establish control person liability.").

[390] *Cordius Trust v. Kummerfeld (In re Kummerfeld)*, 444 B.R. 28, 43 (Bankr. S.D.N.Y. 2011).

[391] *See In re WorldCom, Inc. Sec. Litig.*, Civ. No. 02-3288, 2005 U.S. Dist. LEXIS 4193, at *49 (S.D.N.Y. Mar. 21, 2005) (quoting 15 U.S.C. § 78t(a)).

is alleged to exist.'"[392] Pertinent state securities laws recognize an analogous affirmative defense where the alleged control person proves that it did not and could not reasonably have known of the primary violation.[393]

"In order to establish a good faith defense, the burden is on the defendant to 'prove that he exercised due care in his supervision of the violator's activities in that he maintained and enforced a reasonable and proper system of supervision and internal controls.'"[394] Evidence that the control person "had no notice of any alleged wrongdoing" may not suffice to establish a "good faith defense" if the evidence shows that the control person "should have known of the primary fraud, but was willfully blind to the facts."[395] Moreover, "[i]t is not enough on a motion for summary judgment to demonstrate that plaintiffs fall short of producing evidence of culpable conduct; rather, the defendant must put forth her own evidence of this defense sufficient to direct a conclusion of law that she is entitled to the defense."[396]

---

[392] *McKenna v. Smart Techs. Inc.*, Civ. No. 11-7673, 2012 U.S. Dist. LEXIS 47134, at *60 (S.D.N.Y. Apr. 3, 2012) (quoting 15 U.S.C. § 77o(a)); *see also DeMarco v. Edens*, 390 F.2d 836, 841–42 (2d Cir. 1968) (section 15 "specifically provide[s] that a defendant may exculpate himself from liability by fulfilling his burden of proving that he did not know . . . of the existence of the facts by reason of which the liability of the controlled person is alleged to exist"); *In re Ambac Fin. Group, Inc. Sec. Litig.*, 693 F. Supp. 2d 241, 281 (S.D.N.Y. 2010) (noting that section 15 claims are "subject only to the defense of 'good faith'"); *In re IPO Sec. Litig.*, 241 F. Supp. 2d 281, 352 n.84 (S.D.N.Y. 2003) (section 15 "defendant may raise, as an affirmative defense, that the underlying violation occurred without her knowledge").

[393] *See* MASS. GEN. LAWS ch. 110A § 410(b) (control person liable unless he "sustains the burden of proof that he did not know, and in exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist."); VA. CODE ANN. § 13.1-522(C) (same); N.C. GEN. STAT. § 78A-56(c)(1) (same). The Illinois Securities Law does not contain the same language and the Examiner's Professionals have not identified any controlling decision on point concerning whether such an affirmative defense is available to an alleged control person. *See* 815 ILL. COMP. STAT. ANN. 5/2.4 & 5/13.

[394] *Dietrich v. Bauer*, 126 F. Supp. 2d 759, 764 (S.D.N.Y. 2001) (quoting *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1473 (2d Cir. 1996)).

[395] *See id.* at 768 (S.D.N.Y. 2001) (rejecting defendant's argument that he "is entitled to summary judgment [on section 20(a) claim] based on a good faith defense" where "there is sufficient evidence from which a jury could conclude that [defendant] knew or should have known of the primary fraud, but was willfully blind to the facts"); *see also In re Ivan F. Boesky Sec. Litig.*, MDL No. 732, 1995 U.S. Dist. LEXIS 10759, at *3 (S.D.N.Y. Aug. 1, 1995) ("[W]illful blindness . . . cannot form the basis for a defense of good faith to a charge under § 20(a)."); *Ingenito v. Bermec Corp.*, 441 F. Supp. 525, 533 (S.D.N.Y. 1977) ("If the perpetration of fraud went unnoticed because of willful or reckless disregard, the good faith defense is unavailable.").

[396] *In re Ivan F. Boesky Sec. Litig.*, 1995 U.S. Dist. LEXIS 10759, at *3–4 (denying defendant's motion for summary judgment on section 20(a) claim because "[t]he possibility that [alleged control person] Seema Boesky may have recklessly or intentionally disregarded the alleged primary violations leaves open a triable issue of fact on which the defendant bears the burden of proof"); *see also In re WorldCom, Inc. Sec. Litig.*, 2005 U.S. Dist. LEXIS 4193, at *54 (denying alleged control person's motion for summary judgment on section 15 claim where defendant failed to show "that there is no material disputed issue of fact that he had no reasonable ground to believe in the facts constituting the violation").

### (ii) Application To RMBS Claims

AFI asserts that "AFI simply could not have known, or even had reason to know, of any misrepresentations in the Offering Materials for the securitizations at issue here."[397] According to AFI, it could not have possessed such knowledge because it did not have "any involvement in selecting loans for collateral pools, conducting due diligence on the loans, approving individual RMBS issuances, drafting offering materials, or marketing RMBS for sale."[398] Moreover, the alleged misrepresentations "including supposed inflated valuations, inaccurate owner-occupancy statistics, and abandonment of underwriting standards . . . have nothing to do with the business of AFI."[399] Third-Party Claimants respond that "Ally plainly knew of the Debtor subsidiaries' fraudulent origination and securitization practices" and suggest that evidence of such knowledge will be developed through discovery.[400]

---

[397] *See* AFI Submission Paper, dated Dec. 19, 2012, at 36; *see also* AFI Submission Paper, dated Apr. 14, 2013, at 5. The Examiner is not persuaded that Third-Party Claimants bear the burden of proving AFI's knowledge of the alleged securities law violations. *See* AFI Submission Paper, dated Dec. 19, 2012, at 36; *see also* AFI Submission Paper, dated Apr. 14, 2013, at 5. Except by those courts that have held that section 15 and/or section 20(a) requires the plaintiff to plead and prove culpable participation, the alleged control person's lack of knowledge is solely an affirmative defense to liability under the federal securities laws that must be proven by the defendant. *See McKenna*, 2012 U.S. Dist. LEXIS 47134, at *60 ("[L]ack of knowledge (i.e., lack of 'culpable participation') is an affirmative defense under section 15: the text of the statute eliminates Securities Act 'control person' liability where the alleged control person 'had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist.'") (quoting 15 U.S.C. § 77o(a)); *In re WorldCom, Inc. Sec. Litig.*, 2005 U.S. Dist. LEXIS 4193, at *49 (noting that section 20(a) affirmative defense "exempts a controlling person from liability if 'the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the underlying violation or cause of action'") (quoting 15 U.S.C. § 78t(a)). The same is true of certain of those state securities laws under which Third-Party Claimants assert control person claims against AFI. *See* MASS. GEN. LAWS ch. 110A § 410(b) (control person liable "unless the non-seller who is so liable sustains the burden of proof that he did not know, and in exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist"); MINN. STAT. § 80A.23(4) (same); N.C. GEN. STAT. § 78A-56(c)(1) (same); VA. CODE ANN. § 13.1-522(C) (same). Although the Illinois Securities Law requires a plaintiff to prove that an alleged control person "act[ed] in concert in the offer or sale of a security," AFI identifies no authority requiring proof that the alleged control person acted with knowledge of a material misrepresentation made in violation of 815 ILL. COMP. STAT. ANN. 5/12(F)–(G). *See* 815 ILL. COMP. STAT. ANN. 5/2.4; *see also Froehlich v. Matz*, 417 N.E.2d 183, 190 (Ill. App. Ct. 1981) ("While overt action by a member of a controlling group would not always be required, there must be some showing of assent, approval or concurrence, albeit tacit approval, in the action of the group in selling securities, before an individual will be held liable for the actions of the controlling group."). Notably, scienter is not an element of a primary violation alleged under those provisions of the Illinois Securities Law. *See Foster v. Alex*, 572 N.E.2d 1242, 1245 (Ill. App. Ct. 1991) ("scienter need not be pled nor proved . . . under sections 12(F) and 12(G)").

[398] *See* AFI Submission Paper, dated Dec. 19, 2012, at 35.

[399] *See id.* at 35–36.

[400] *See* Joint Submission Paper of AIG, Allstate Life Ins. Co., Mass. Mut. Life Ins. Co., and Prudential Ins. Co. of Am., dated Oct. 17, 2012, at 10, 25; *see also* Joint Submission Paper of Federal Home Loan Banks of Boston, Chicago, and Indianapolis, dated Oct. 19, 2012, at 28.

As explained above, definitive conclusions concerning the facts underlying the primary securities law violations alleged by Third-Party Claimants against the Debtors and Ally Securities are outside the scope of the Investigation. Accordingly, the likelihood that AFI could succeed in proving an affirmative defense of lack of knowledge of such as yet unproven facts also is outside the scope of the Investigation. With those important caveats, the Examiner has considered the available evidence concerning AFI's assertion that it did not have "knowledge of the Debtors' alleged misstatements."[401] Third-Party Claimants have not produced nor has the Investigation located any evidence to support the assertion that AFI possessed knowledge of the primary securities law violations alleged by Third-Party Claimants.[402] The Investigation has, however, revealed evidence that could support attempts by Third-Party Claimants to cast doubt on AFI's blanket statement that it "simply could not have known, or even had reason to know, of any misrepresentations."[403]

For example, it is undisputed that there was significant overlap among the officers and directors of AFI and the Debtors.[404] Moreover, the available evidence does indicate that, at least in certain circumstances and on an informal basis, management of the Debtors would communicate with and report to management of AFI.[405] If, as Third-Party Claimants assert, there was an abandonment of underwriting standards at the Debtors, such overlapping management and lines of communication could have the potential, with further discovery, to undermine an AFI defense that it "had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist."[406]

---

[401]  *See* AFI Submission Paper, dated Dec. 19, 2012, at 35.

[402]  Although certain of Third-Party Claimants' submission papers define "Ally" to mean AFI, the term "Ally" is used interchangeably therein to refer to any one or more of AFI and its direct and indirect subsidiaries. *See* Joint Submission Paper of AIG, Allstate Life Ins. Co., Mass. Mut. Life Ins. Co., and Prudential Ins. Co. of Am., dated Oct. 17, 2012, at 1. For example, in support of the assertion that "Ally plainly knew of the Debtor subsidiaries' fraudulent origination and securitization practices," Third-Party Claimants rely on information allegedly provided by a director of Ally Securities concerning Ally Securities—not AFI. *See id.* at 10–11. Absent evidence that *AFI* knew such information, which Third-Party Claimants have not provided, the Examiner affords no weight to such allegations when assessing the evidence of AFI's knowledge of the alleged securities fraud violations.

[403]  *See* AFI Submission Paper, dated Dec. 19, 2012, at 36; *see also* AFI Submission Paper, dated Apr. 14, 2013, at 5.

[404]  *See* Section VIII.C.2.a(2)(c)(ii)(B).

[405]  *See* Int. of D. Olson, Apr. 26, 2013, at 63:24–64:12 ("I would characterize my relationship as I had solid line reporting to the CEOs of ResCap and dotted line reporting to Sanjiv [Khattri]. . . . "[S]olid line, day-to-day interaction would have been with the CEOs direction and all that. Dotted line would have been more periodic or random as necessary to Sanjiv."); Int. of E. Scholtz, Mar. 28, 2013, at 20:2–21:10 (recalling generally that he "had conversations with Eric [Feldstein] from time to time" but that those conversations did not involve "the securitization process").

[406]  *McKenna v. Smart Techs. Inc.*, Civ. No. 11-7673, 2012 U.S. Dist. LEXIS 47134, at *60 (S.D.N.Y. Apr. 3, 2012) (quoting 15 U.S.C. § 77o(a)); s*ee also In re WorldCom, Inc. Sec. Litig.*, Civ. No. 02–3288, 2005 U.S. Dist. LEXIS 4193, at *55 (S.D.N.Y. Mar. 21, 2005) (denying alleged control person's motion for summary judgment on section 15 claim "[b]ecause sufficient evidence exists to create a question of fact regarding whether [that defendant] had no reasonable grounds to believe that financial improprieties were present").

The same is true of evidence concerning the series of audits of AFI's subsidiaries conducted by Audit Services from 2004 through 2007, including several with respect to areas related to the Debtors' securitization process.[407] Audit Services interviewed personnel and collected information from AFI's subsidiaries concerning aspects of that process.[408] Audit Services prepared reports that were circulated to and reviewed by members of senior management of AFI including AFI CFO Khattri.[409] Assuming arguendo that Third-Party Claimants were to prevail in proving the alleged underlying securities law violations, AFI's access through Audit Services to information concerning the Debtors' securitization process could, subject to discovery of contradictory evidence, potentially undermine an AFI "good faith" or lack of knowledge defense.

The available Audit Services reports do not purport on their face to make any findings of the facts Third-Party Claimants allege give rise to their primary securities law claims. Of the dozens of Audit Services reports from 2004 through 2007 that were identified by the Examiner, only a small minority assigned a rating to the areas audited of "2" or "Needs Improvement," and even fewer assigned a rating of "3" or "Unsatisfactory."[410] Although certain Third-Party Claimants contend otherwise, the findings in those Audit Services reports are unlikely to be sufficient to demonstrate AFI's knowledge of the alleged securities law violations.[411] Moreover, Humphrey McKenzie, a Director in Audit Services who performed audits at RFC during 2004 through 2007, did not recall encountering any indication that there

---

[407] *See* Section VIII.C.a(2)(c)(ii)(D).

[408] *See* Int. of L. Lundsten, Feb. 20, 2013, at 157:10–158:6 (when performing an audit of RFC's Structured Finance Group, Audit Services would "come in and talk to [Lundsten] and [her] managers," "ask[] for information," and then "go off and do their work"); Int. of H. McKenzie, Apr. 23, 2013, at 19:18–21:17 (Audit Services would develop an "audit plan" including by "work[ing] with management to get due diligence information" and then "go in and execute whatever control testing is needed to review and validate").

[409] *See* Int. of S. Khattri, Apr. 5, 2013, at 21:18–22:19; GMAC ResCap—Creating & Accounting for Structured Finance Transactions, dated Jan. 31, 2007, at 7 [EXAM10380373] (recipient list).

[410] *See* Int. of S. Khattri, Apr. 5, 2013, at 23:18–24:11 ("[Q:] Do you recall ever seeing an audit report of either ResCap or RFC that had a 3 rating?" [A:] Which would be unsatisfactory? I don't think so."). Those audit reports identified by the Examiner to which a rating of "3" or "Unsatisfactory" was assigned generally do not implicate the facts Third-Party Claimants allege give rise to their primary securities law claims. *See, e.g.*, Nerve Center Project Audit, dated Sept. 21, 2007, at 2 [EXAM11280122]; RFG Finance – Servicing Loan Accounting, dated Sept. 28, 2007, at 2 [EXAM10385423].

[411] MBIA identifies certain Audit Services reports that it considers evidence that AFI "had actual and constructive knowledge of the Debtors' fraudulent conduct." MBIA Submission Paper, Nov. 9, 2012, at 26, 29–30. The Examiner is not persuaded, however, that the findings of those identified reports could, without more, demonstrate such knowledge. For example, Audit Services's finding of "inadequate management reporting on the levels, trends and root causes of . . . unsalable loans" does not evidence that "unsalable loans" were included in any relevant securitizations when they should not have been or prove any alleged misrepresentations in the offering documents issued in connection with those securitizations. *See* Report on Audit of GMAC-RFC Service Delivery Group, dated May 18, 2006, at 1 [ALLY_0220776]. Instead, that Audit Services report represents that such "unsalable loans" would be "in need of repair prior to being included in a loan pool" and sets forth a management action plan to "develop new reporting" and "update existing training." *See id.* at 5.

had been an abandonment of underwriting standards.[412] Nonetheless, further discovery concerning the information and judgments that resulted in the findings set forth in the audit reports—and any other information that may have been discovered in the course of the audit and communicated to AFI but not reflected in any audit reports—would be necessary to determine whether AFI had no knowledge of or reasonable grounds to believe in the existence of the facts alleged by Third-Party Claimants.

### (e) Statute Of Limitations Defenses

AFI asserts that those Third-Party Claimants that have brought control person claims against it "did not bring their securities claims until well after the applicable statutes of limitations had run."[413] Third-Party Claimants respond that "all of [their] claims are timely."[414] In each of the six pending RMBS Investor Actions identified by the Examiner where Third-Party Claimants assert control person claims against AFI, AFI has moved to dismiss such claims as time-barred.[415] Where those motions to dismiss have been denied—to date they have been denied in two of those six actions—AFI seeks to prove as an affirmative defense that such control person claims are time-barred.[416]

The Examiner concludes it is likely that AFI's statute of limitations defense will prevail with respect to certain of the alleged control person claims subject to statutes of repose. The Examiner does not reach any definitive conclusions concerning the likelihood that AFI's timeliness defenses will prevail as to those statute of limitations provisions that begin to run

---

[412]  Int. of H. McKenzie, Apr. 23, 2013, at 53:19–54:2 ([Q]: "[D]id you in internal audit ever identify any concern or red flags that underwriting standards were being ignored or not follow[ed] closely for the sake of being able to continue to write volume of business? [A:] As far as I know, no.").

[413]  AFI Submission Paper, dated Dec. 19, 2012, at 50.

[414]  Joint Submission Paper of AIG, Allstate Life Ins. Co., Mass. Mut. Life Ins. Co., and Prudential Ins. Co. of Am., dated Mar. 15, 2013, at 19; *see also* Joint Submission Paper of Federal Home Loan Banks of Boston, Chicago and Indianapolis, dated Oct. 19, 2012, at 21 ("FHLB's effectively universal success in defeating Defendants' motions to dismiss . . . . cast[s] doubt on the merits of Defendants' affirmative defenses, many of which [including the statute of limitations] were raised by Rule 12 motions.").

[415]  *See* Mem. of Law in Supp. of Ally Fin. Inc.'s and GMAC Mortg. Group, Inc's Mot. to Dismiss the Am. Compl., *FHFA v. Ally Fin. Inc.*, Civ. No. 11-7010, Docket No. 149, at 15 (S.D.N.Y. July 13, 2012); Def.'s Mem. of Law in Supp. of Their Mot. to Dismiss the Am. Compl., *FHLB of Boston v. Ally Fin., Inc.*, Civ. No. 11-10952, Docket No. 200, at 54 (D. Mass. Oct. 11, 2012); Def.'s Joint Mem. of Law in Supp. of Their Joint Combined Mot. to Dismiss Pl.' s Am. Compl. for Rescission and Damages, *FHLB of Chicago v. Banc of Am. Funding Corp.*, Case No. 10-CH-45033, at 12–19 (Ill. Cir. Ct. June 3, 2011); Mem. in Supp. of the Ally Defs.' Mot. to Dismiss the Am. Compl., *John Hancock Life Ins. Co. (U.S.A.) v. Ally Fin. Inc.*, Civ. No.12-01841, Docket No. 104, at 16 (D. Minn. Dec. 14, 2012); Mem. in Supp. of the Ally Defs.' Mot. to Dismiss the Am. Compl., *Stichting Pensioenfonds ABP v. Ally Fin. Inc.*, Civ. No. 12–01381, Docket No. 129, at 16 (D. Minn. Mar. 11, 2013); Ally Financial, Inc's Mem. of Law in Supp. of Mot. to Dismiss the Am. Compl., *Union Cent. Life Ins. Co. v. Ally Fin., Inc.*, Civ. No. 11-02890, Docket No. 219, at 5 (S.D.N.Y. July 27, 2012).

[416]  *See* Def. Ally Fin. Inc. and GMAC Mortg. Group, Inc's Answer, Defenses and Affirmative Defenses to FHFA's Am. Compl., *FHFA v. Ally Fin. Inc.*, Civ. No. 11-7010, Docket No. 371, at 74 (S.D.N.Y. Feb. 1, 2013) ("Each of FHFA's claims is time-barred, in whole or in part, by the applicable statute of limitations and/or repose.").

only when Third-Party Claimants possess actual or constructive knowledge of sufficient facts. As to those claims, however, the available evidence and pertinent case law appear to present potential hurdles to AFI's attempts to prove that the time for Third-Party Claimants to bring their securities claims began to run as early as 2007. Finally, although the Examiner can reach no definitive conclusions as to potential claims, any similar control person claim asserted against AFI in the future by Third-Party Claimants that have not to date asserted claims against AFI would appear presumptively time-barred under applicable statutes of limitations and/or repose.

The Examiner's conclusions concerning AFI's asserted statute of limitations defenses turn in part upon the particularities of the timing provisions of each of the federal and state securities laws invoked by Third-Party Claimants. "Because [s]ection 20 merely creates a derivative liability for violations of other sections of the [Exchange] Act, claims under [s]ection 20 are governed by the limitations periods for those other sections."[417] Specifically, "claims brought under § 10(b) and § 20(a) of the Exchange Act may be brought no later than the earlier of: (1) two years after the discovery of the facts constituting the alleged fraud, or (2) five years after such fraud."[418] The "same limitations period" applicable to claims under section 11 or 12(a)(2) of the Securities Act also "applies to [s]ection 15 claims."[419] All such claims are "subject to the two-pronged timing provision of [s]ection 13 of the Securities Act."[420] "The first prong of [s]ection 13 is a statute of limitations, which provides that claims

---

[417] *Dodds v. Cigna Sec., Inc.*, 12 F.3d 346, 350 n.2 (2d Cir. 1993); *see also Glonti v. Stevenson*, Civ. No. 08-8960, 2009 U.S. Dist. LEXIS 13857, at *14 (S.D.N.Y. Feb. 6, 2009) ("A [s]ection 20(a) claim alleges derivative liability based on someone else's violation of [s]ection 10(b). Therefore, the statute of limitations for [s]ection 20(a) claims is identical to that of . . . [s]ection 10(b) claims."); *In re MBIA Inc. Sec. Litig.*, Civ. No. 05-03514, 2007 U.S. Dist. LEXIS 10416, at *27 (S.D.N.Y. Feb. 13, 2007) ("Plaintiffs' claims for control person liability under [s]ection 20(a) of the Exchange Act are subject to the same statute of limitations as Section 10(b) claims . . . ."); *Shah v. Morgan Stanley*, Civ. No. 03-8761, 2004 U.S. Dist. LEXIS 20897, at *44 n.12 (S.D.N.Y. Oct. 15, 2004) ("Since the Court dismisses plaintiff's § 10(b) claim as untimely, the § 20(a) claim against Purcell, which is dependant on the underlying § 10(b) claim and shares the same limitations period, is also dismissed.").

[418] *Pro Bono Invs., Inc. v. Gerry*, Civ. No. 03-4347, 2005 U.S. Dist. LEXIS 22348, at *23 n.5 (S.D.N.Y. Sept. 30, 2005); *see also* 28 U.S.C. § 1658(b). The two-year "limitations period commences not when a reasonable investor would have begun investigating, but when such a reasonable investor conducting such a timely investigation would have uncovered the facts constituting a violation." *City of Pontiac Gen. Emps.' Ret. Sys. v. MBIA, Inc.*, 637 F.3d 169, 174 (2d Cir. 2011); *see also FirstBank P.R. v. La Vida Merger Sub, Inc.*, 638 F.3d 37, 38 (1st Cir. 2011) ("[An Exchange Act] cause of action accrues (1) when the plaintiff did in fact discover, or (2) when a reasonably diligent plaintiff would have discovered, the facts constituting the violation—whichever comes first.") (quotation marks omitted). In *Merck & Co. v. Reynolds*, the U.S. Supreme Court rejected an argument that "the limitations period began to run" as to an Exchange Act claim at the "point the plaintiffs were on 'inquiry notice.'" *See* 130 S. Ct. 1784, 1797, 1799 (2010). The Court explained that it could not accept such an argument "[b]ecause the statute contains no indication that the limitations period should occur at some earlier moment before 'discovery,' when a plaintiff would have *begun* investigating." *Id*. at 1797 (emphasis in original).

[419] *See In re Morgan Stanley Mortg. Pass-Through Certificates Litig.*, 810 F. Supp. 2d 650, 662 (S.D.N.Y. 2011); *see also Dodds*, 12 F.3d at 350 n.1 ("Since [s]ection 15 merely creates a derivative liability for violations of [s]ections 11 and 12, [s]ection 13 applies to it as well.").

[420] *In re Bear Stearns Mortg. Pass-Through Certificates Litig.*, 851 F. Supp. 2d 746, 761 (S.D.N.Y. 2012).

must be brought within one year of 'the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence.'"[421] The second prong of section 13 contains "a three year statute of repose."[422]

Control person claims asserted under pertinent state securities laws are governed by limitations periods of two years (the Virginia Securities Act), three years (the Illinois Securities Law, the Minnesota Securities Act, and the North Carolina Securities Act), or four

---

[421] *Id.* (quoting 15 U.S.C. § 77m). There is "conflicting law" in the Second Circuit and certain other jurisdictions concerning whether the "inquiry notice standard . . . applies [to Securities Act claims] following the Supreme Court's decision in *Merck*." *Pa. Pub. Sch. Emps.' Ret. Sys. v. Bank of Am. Corp.*, 874 F. Supp. 2d 341, 364 (S.D.N.Y. 2012) (collecting cases). Several courts have "declined to apply *Merck* to [s]ection 11 [or 12(a)(2)] claims" because "the *Merck* Court construed . . . the limitations statute applicable to [s]ection 10(b) claims" and "[t]he text of [that provision] is different from [section 13]." *Id.* at 364–65; *see also Lighthouse Fin. Grp. v. Royal Bank of Scot. Grp., PLC*, Civ. No. 11-398, 2012 U.S. Dist. LEXIS 146640, at *36–37 n.11 (S.D.N.Y. Sept. 27, 2012) (declining to apply *Merck* to Securities Act claims); *Pension Trust Fund for Operating Eng'rs v. Mortg. Asset Securitization Transactions, Inc.*, Civ. No. 10-898, 2012 U.S. Dist. LEXIS 106542, at *13 n.5 (D.N.J. July 31, 2012) (same); *In re IndyMac Mortgage-Backed Sec. Litig.*, 793 F. Supp. 2d 637, 648 (S.D.N.Y. 2011) (same); *In re Barclays Bank PLC Sec. Litig.*, Civ. No. 09-1989, 2011 U.S. Dist. LEXIS 2667, at *24 (S.D.N.Y. Jan. 5, 2011) (same). Other courts have reasoned that "although [*Merck*] concerns the statute of limitations [for Exchange Act claims], to apply them to a Securities Act cause of action is consistent with the Securities Act's statute of limitations." *See Brecher v. Citigroup Inc.*, Civ. No. 09-7359, 2011 U.S. Dist. LEXIS 131104, at *10 n.1 (S.D.N.Y. Nov. 14, 2011); *see also FHFA v. UBS Ams. Inc.*, 858 F. Supp. 2d 306, 319 (S.D.N.Y. 2012) ("[T]he majority of district courts that have considered the matter have concluded that [*Merck* applies to Securities Act claims].") (internal citations omitted); *In re Bear Stearns Mortg. Pass-Through Certificates Litig.*, 851 F. Supp. 2d at 763 (applying *Merck* to Securities Act claims); *Nat'l Credit Union Admin. Bd. v. RBS Sec., Inc.*, Civ. No. 11-2340, 2012 U.S. Dist. LEXIS 103170, at *60 (D. Kan. July 25, 2012) (same); *In re Direxion Shares ETF Trust*, Civ. No. 09-8011, 2012 U.S. Dist. LEXIS 29709, at *9 n.3 (S.D.N.Y. Mar. 6, 2012) (same); *N.J. Carpenters Health Fund v. Residential Capital, LLC*, Civ. Nos. 08-8781 and 08-5093, 2011 U.S. Dist. LEXIS 46066, at *23-24 (S.D.N.Y. Apr. 28, 2011) (same); *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 371 n.39 (S.D.N.Y. Mar. 31, 2011) (same).

[422] *In re IndyMac Mortgage-Backed Sec. Litig.*, 718 F. Supp. 2d 495, 507 (S.D.N.Y. 2010); *see also* 15 U.S.C. § 77m ("In no event shall any such action be brought to enforce a liability created under section 11 or section 12(a)(1) more than three years after the security was bona fide offered to the public, or under section 12(a)(2) more than three years after the sale."). "[T]he three year statute of repose set forth in [s]ection 13 provides an absolute limit." *In re Lehman Bros. Sec. & ERISA Litig.*, Md. No. 09-2017, 2012 U.S. Dist. LEXIS 148177, at *25 (S.D.N.Y. Oct. 15, 2012). With respect to a section 15 control person claim alleging an underlying primary violation of section 11, the three-year period "normally begins to run when the security is *first* bona fide offered" to the public at the effective date of the registration statement. *See id.* at *26; *see also P. Stolz Family P'ship L.P. v. Daum*, 355 F.3d 92, 99–100 (2d Cir. 2004) (agreeing with "vast majority of courts" and holding that the section 13 "three-year period begins to run when the security is first bona fide offered"). As to a section 15 claim alleging a primary violation of section 12(a)(2), the three-year period begins to run at the time of "sale." *See* 15 U.S.C. § 77m; *see also Finkel v. Stratton Corp.*, 962 F.2d 169, 173 (2d Cir. 1992) ("[A] sale occurs for [section 12(a)(2)] purposes when the parties obligate themselves to perform what they had agreed to perform even if the formal performance of their agreement is to be after a lapse of time.") (quotation marks omitted).

years (the MUSA).[423] The three-year limitations period under the Illinois Securities Law runs from "the date upon which the party bringing the action has notice of facts which in the exercise of reasonable diligence would lead to actual knowledge of the alleged violation."[424] The Illinois Securities Law also features a five-year statute of repose, beyond which the discovery rule cannot toll the otherwise applicable limitations period.[425] The three-year limitations period under the North Carolina Securities Act runs from the date when "the

---

[423] *See* 815 ILL. COMP. STAT. ANN. 5/13(D) (three years); MASS. GEN. LAWS ch. 110A § 410(e) (four years); MINN. STAT. § 80A.23(7) (three years); N.C. GEN. STAT. § 78A-56(f) (three years); VA. CODE ANN. § 13.1–522(D) (two years). To the extent that Third-Party Claimants have asserted or may assert a claim against AFI under the Minnesota Securities Act "on the basis of conduct occurring [on or after] August 1, 2007," Minn. Stat. § 80A.90, then such claim would instead be timely if brought "within the earlier of two years after discovery of the facts constituting the violation or five years after the violation." *See* MINN. STAT. § 80A.76(j)(2).

[424] 815 ILL. COMP. STAT. ANN. 5/13(D)(2). There is disagreement concerning what triggers the running of this limitations period. *Compare Blumenthal v. Flynn*, Case No. 11–2306, 2012 Ill. App. Unpub. LEXIS 2441, at *16-18 (Ill. App. Ct. Sept. 28, 2012) ("[T]he language of the statute of limitations at issue in [*Merck*] differs significantly from the language of [the Illinois] Securities Law"; the 815 Ill. Comp. Stat. Ann. 5/13 limitations period runs from when the plaintiff obtains actual "notice of facts which in the exercise of reasonable diligence, would lead to actual knowledge of [defendant's] acts and omissions."), Order, *FHLB of Chicago v. Banc of Am. Funding Corp.*, Case No. 10-CH-45033, at 13–14 (Ill. Cir. Ct. Sept. 19, 2012) (denying motion to dismiss Illinois Securities Law claims as untimely where "Defendants' exhibits fail to show that the [plaintiff] had 'actual knowledge'"), *and Allstate Ins. Co. v. Countrywide Fin. Corp.*, 824 F. Supp. 2d 1164, 1182–83 (C.D. Cal. 2011) ("If facts sufficient to support a claim [under 815 Ill. Comp. Stat. Ann. 5/13] were public and/or discoverable by Allstate, then the clock began to run when Allstate had notice of facts that should have triggered an investigation into its Countrywide-issued RMBS. . . . The Court understands this to require that Allstate must have had actual, not constructive, notice of facts that should have triggered an investigation."), *with Stone v. Chicago. Inv. Grp. LLC*, Civ. No. 11-51, 2011 U.S. Dist. LEXIS 149153, at *7–8 (N.D. Ill. Dec. 29, 2011) ("The language of the statute indicates that the three-year period begins to run when the plaintiff is on inquiry notice . . . . It is not clear how Illinois Courts will interpret this provision in light of *Merck*, but . . . both parties agree that an inquiry notice standard applies to the state law claim."), *and Grumhaus v. Comerica Secs., Inc.*, Civ. No. 99-1776, 2003 U.S. Dist. LEXIS 11033, at *7 (N.D. Ill. June 27, 2003) ("[A]s in federal securities actions, the limitations begins to run when the plaintiff has 'inquiry notice' of the conduct giving rise to the claim. . . . This is an objective test: not whether plaintiffs actually knew of the conduct but whether they reasonably should have known.").

[425] *See* 815 ILL. COMP. STAT. ANN. 5/13(D)(2) ("[I]n no event shall the period of limitation so extended be more than 2 years beyond the expiration of the 3 year period otherwise applicable."); *see also Klein v. George G. Kerasotes Corp.*, 500 F.3d 669, 671 (7th Cir. 2007) ("[T]he total period of repose expires five years after the violation, no matter when it was discovered.").

person discovers facts constituting the violation."[426] The four-year limitations period under the MUSA "runs from the date of 'the discovery by the person bringing the action of a violation.'"[427]

The two-year limitations period under the Virginia Securities Act, by contrast, begins to run at the time of the "transaction upon which it is based,"[428] and "does not provide for a discovery rule."[429] Similarly, the three-year limitations period under the Minnesota Securities Act runs from "the occurrence of the act or transactions constituting the violation,"[430] and is not tolled by any "discovery rule" or "fraudulent concealment."[431]

The bases for the Examiner's conclusions are set forth below concerning the application of the foregoing statutes of limitations and repose to the control person claims asserted (or that might be asserted in the future) against AFI by Third-Party Claimants.

---

[426] N.C. Gen. Stat. § 78A-56(f); *see also Kelley v. CINAR Corp. (In re CINAR Corp. Sec. Litig.)*, 186 F. Supp. 2d 279, 321 (E.D.N.Y. 2002) (providing that N.C. Gen. Stat. § 78A-56(f) limitations period runs "from the time when the fraud reasonably should have been discovered"). The statute further provides that "[n]o person may sue under this section . . . later than five years after the sale or contract of sale, except that if a person who may be liable under this section engages in any fraudulent or deceitful act that conceals the violation or induces the person to forgo or postpone commencing an action based upon the violation, the suit may be commenced not later than three years after the person discovers or should have discovered that the act was fraudulent or deceitful." N.C. Gen. Stat. § 78A-56(f).

[427] *Capital Ventures Int'l v. UBS Sec. LLC*, Civ. No. 11-11937, 2012 U.S. Dist. LEXIS 140663, at *43 (D. Mass. Sept. 28, 2012) (quoting Mass. Gen. Law. ch. 110A § 410(e)). According to one district court, "courts are divided" as to "whether the statute of limitations for section 410 of MUSA is tied to inquiry notice or to the discovery rule." *See Capital Ventures Int'l v. J.P. Morgan Mortg. Acquisition Corp.*, Civ. No. 12-10085, 2013 U.S. Dist. LEXIS 19227, at *22–23 n.8 (D. Mass. Feb. 13, 2013) (declining to "resolve that question here"); *see also Capital Ventures Int'l*, 2012 U.S. Dist. LEXIS 140663, at *43–44 ("The limitations period [of MUSA § 410(e)] does not begin [until] the later date on which an investor, alerted by storm warnings and thereafter exercising reasonable diligence, would have discovered the fraud.") (quotation marks omitted); *Mass. Mut. Life Ins. Co. v. Residential Funding Co., LLC*, 843 F. Supp. 2d 191, 208 (D. Mass. 2012) ("Claims under MUSA section 410(a) are subject to a four-year statute of limitations that runs from the date the plaintiff is put on inquiry notice of its claims.").

[428] Va. Code Ann. § 13.1-522(D).

[429] *Libon v. Infineon Techs.,* AG, Civ. No. 04-929, 2006 U.S. Dist. LEXIS 76430, at *35 (E.D. Va. Aug. 7, 2006) ("[T]he claim for violation of the Virginia Securities Act, filed more than two years after its accrual, is barred by the applicable statute of limitations."); *see also Caviness v. Derand Res. Corp.*, 983 F.2d 1295, 1306 (4th Cir. 1993) ("[W]e conclude from the plain meaning of the statute that the Virginia legislature intended to provide unqualifiedly that a claim must be brought within two years 'after the transaction upon which it is based.'").

[430] Minn. Stat. § 80A.23(7).

[431] *See Kopperud v. Agers*, 312 N.W.2d 443, 446–47 (Minn. 1981); *see also Hayden v. McDonald*, 742 F.2d 423, 437 (8th Cir. 1984) ("We view this authority as favoring a continued strict interpretation of the limitations period in section 80A.23(7) of the present statute, especially in actions based entirely upon the nonregistration of securities."); *Semrad v. Edina Realty, Inc.*, 470 N.W.2d 135, 140 (Minn. Ct. App. 1991) ("We conclude that fraud does not toll the limitations period for claims under section 80A.23 . . . ."), *rev'd in part on other grounds*, 493 N.W.2d 528, 534 (Minn. 1992) ("The court of appeals affirmed [the trial court's statute of limitations] ruling and the plaintiffs do not complain of it here.").

### (i) Application Of Statutes Of Limitations To RMBS Claims

AFI moved to dismiss certain of the control person claims asserted by Third-Party Claimants under section 15 and 20(a) of the federal securities laws and under the Illinois Securities Law, the MUSA, and the North Carolina Securities Act, on the ground that such claims were in whole or part barred by applicable statutes of limitations.[432] According to AFI, "all evidence demonstrates that [Third-Party Claimants] have known [or reasonably should have known] the facts underlying their securities claims for years" including because they were "among the most sophisticated purchasers of [RMBS]" and the "originator practices" they now allege were "the subject of intense public scrutiny and numerous critical media and government reports" before the end of 2007.[433] Third-Party Claimants respond that certain courts have denied motions to dismiss filed by AFI and rejected the "same arguments as [AFI] makes here."[434] "[K]nowledge that RMBS in general were risky," Third-Party Claimants assert, is different from knowledge that "the loans underlying [their] Certificates were being misrepresented."[435]

The Examiner reaches no definitive conclusions concerning the likelihood that AFI's statute of limitations defenses will prevail. Determining when any of Third-Party Claimants possessed actual or constructive knowledge of "sufficient facts" to begin the running of a statute of limitations is "a fact-intensive inquiry and, thus, generally ill-suited for resolution at the motion to dismiss stage."[436] In most cases "a motion to dismiss will only be granted where

---

[432] *See* Mem. of Law in Supp. of Ally Fin. Inc.'s and GMAC Mortg. Group, Inc's Mot. to Dismiss the Am. Compl., *FHFA v. Ally Fin. Inc.*, Civ. No. 11-7010, Docket No. 149, at 16 (S.D.N.Y. July 13, 2012) (noting that one-year limitations period for section 15 claim "expired long ago with respect to two of the Securitizations" where certain tranches received credit rating downgrades beginning in July 2007); Defs.' Mem. of Law in Supp. of Their Mot. to Dismiss the Am. Compl., *FHLB of Boston v. Ally Fin., Inc.*, Civ. No. 11-10952, Docket No. 200, at 55 (D. Mass. Oct. 11, 2012) ("[T]here were 'storm warnings' sufficient to alert FHLB Boston as to the 'possibility' of its [MUSA § 410] claims more than four years before it filed the Complaint on April 20, 2011."); Defs.' Joint Mem. of Law in Supp. of Their Joint Combined Mot. to Dismiss Pl.'s Am. Compl. for Rescission and Damages, *FHLB of Chicago v. Banc of Am. Funding Corp.*, Case No. 10-CH-45033 (Ill. Cir. Ct. June 3, 2011) ("[FHLB] knew or should have known of the issues in the complaint [giving rise to its Illinois Securities Law and North Carolina Securities Act claims] more than three years before it filed suit in October 2010."); Ally Fin. Inc's Mem. of Law in Supp. of Mot. to Dismiss the Am. Compl., *Union Cent. Life Ins. Co. v. Ally Fin., Inc.*, Civ. No. 11-02890, Docket No. 219, at 5 (S.D.N.Y. July 27, 2012) (section 20 claims are time-barred); *see also* Ally Securities' Mem. of Law in Supp. of Mot. to Dismiss the Am. Compl., *Union Cent. Life Ins. Co. v. Ally Fin., Inc.*, Civ. No. 11-02890, Docket No. 222, at 9 (S.D.N.Y. July 28, 2012) ("Because Plaintiffs failed to bring [these claims under section 10(b) of the Exchange Act] within two years after the April 6, 2009 [credit rating] downgrades, their federal securities claims are untimely and should be dismissed.").

[433] AFI Submission Paper, dated Dec. 19, 2012, at 44, 46.

[434] *See* Joint Submission Paper of AIG, Allstate Life Ins. Co., Mass. Mut. Life Ins. Co., and Prudential Ins. Co. of Am., dated Mar. 15, 2013, at 19; *see also* Joint Submission Paper of Federal Home Loan Banks of Boston, Chicago, and Indianapolis, dated Oct. 19, 2012, at 21 ("FHLB's effectively universal success in defeating Defendants' motions to dismiss . . . . cast[s] doubt on the merits of Defendants' affirmative defenses, many of which [including the statute of limitations] were raised by Rule 12 motions.").

[435] Joint Submission Paper of AIG, Allstate Life Ins. Co., Mass. Mut. Life Ins. Co., and Prudential Ins. Co. of Am., dated Mar. 15, 2013, at 19.

[436] *See In re Bear Stearns Mortg. Pass-Through Certificates Litig.*, 851 F. Supp. 2d 746, 763 (S.D.N.Y. 2012).

uncontroverted evidence irrefutably demonstrates that the plaintiff discovered or should have discovered facts sufficient to [begin the running of the statute of limitations]."[437] Accordingly, and without discovery from Third-Party Claimants, the fact that certain courts have issued decisions denying AFI's motions to dismiss is not necessarily dispositive of the statute of limitations defenses asserted by AFI.[438] With that qualification, the Examiner considers those decisions—and others deciding motions by the Debtors or unaffiliated defendants seeking to dismiss securities claims asserted by RMBS investors—to be instructive of potential hurdles AFI may face in proving that the time for Third-Party Claimants to bring their securities claims began to run as early as 2007.

At least at the motion to dismiss stage, some courts have appeared "reluctant to conclude that purchasers of mortgage-backed securities were on inquiry notice of [potential securities] claims as late as mid-2008, let alone as early as 2007."[439] Indeed, several courts have found evidence of public knowledge of general problems in the housing or RMBS markets to be insufficient, without more, to warrant dismissal on statute of limitations grounds of Securities

---

[437] *Id.* (denying motion to dismiss Securities Act claims on statute of limitations grounds); *see also In re IPO Sec. Litig.*, 341 F. Supp. 2d 328, 345 (S.D.N.Y. 2004) ("[D]efendants bear a heavy burden in establishing that the plaintiff was on inquiry notice as a matter of law. Inquiry notice exists only when uncontroverted evidence irrefutably demonstrates when plaintiff discovered or should have discovered the fraudulent conduct.") (quotation marks omitted).

[438] *See FHFA v. Ally Fin., Inc.*, Civ. No. 11-7010, 2012 U.S. Dist. LEXIS 179768, at *18 (S.D.N.Y. Dec. 19, 2012); Order, *FHLB of Chicago v. Banc of Am. Funding Corp.*, Case No. 10-CH-45033, at 13 (Ill. Cir. Ct. Sept. 19, 2012). Unlike other Third-Party Claimants, FHFA has recourse to the statute of limitations provisions of the Housing and Economic Recovery Act of 2008 ("HERA"). *See FHFA v. UBS Ams., Inc.*, 858 F. Supp. 2d 306, 311 (S.D.N.Y. 2012), *aff'd*, No. 12-3207, 2013 U.S. App. LEXIS 6962 (2d Cir. Apr. 5, 2013). HERA "affords FHFA three years from the [September 6, 2008] date of conservatorship [over the GSEs] to bring suit on its Securities Act claims, irrespective of any other provision of law." *Id.* at 317; *see also* 12 U.S.C. § 4617(b)(12). Notably, "HERA explicitly provides that the statute does not revive claims for which the statute of limitations had expired prior to the conservatorship unless the claim arose from 'fraud, intentional misconduct resulting in unjust enrichment, or intentional misconduct resulting in substantial loss to the regulated entity.'" *FHFA*, 858 F. Supp. 2d at 317–18 (quoting 12 U.S.C. § 4617(b)(13)).

[439] *Mass. Mut. Life Ins. Co. v. Residential Funding Co, LLC*, 843 F. Supp. 2d 191, 208–09 (D. Mass. 2012).

Act claims.[440] Downgrades in the investment ratings of RMBS have, however, been found sufficient in certain circumstances to begin the running of the statute of limitations.[441] That said, "downgrades alone do not convey facts sufficient to plead a [s]ection 11 or 12(a)(2)

---

[440] *See FHFA*, 858 F. Supp. 2d at 321 ("[E]ven under the pre-*Merck*, duty-of-inquiry standard for accrual, generalized reports like [the 2007 reports, lawsuits and investigations regarding loan origination practices] relied upon by defendants are insufficient to trigger the statute of limitations."); *In re Bear Stearns Mortg. Pass-Through Certificates Litig.*, 851 F. Supp. 2d at 763–64 ("news articles" reporting "[a]llegations of industry-wide or market-wide troubles" were "unconnected to any of the entities that were involved in the origination, packaging, and sale of the BSMF 2006-AR1 trust" and insufficient to warrant dismissal) (quotation marks omitted); *Capital Ventures Int'l v. UBS Secs. LLC*, Civ. No. 11-11937, 2012 U.S. Dist. LEXIS 140663, at *45 (D. Mass. Sept. 28, 2012) (denying motion to dismiss MUSA claim on limitations grounds where "the sources upon which the Defendants rely . . . deal with the mortgage industry generally"); *Nat'l Credit Union Admin. Bd. v. RBS Sec., Inc.*, Civ. No. 11-2340, 2012 U.S. Dist. LEXIS 103170, at *64 (D. Kan. July 25, 2012) ("[F]ind[ing] that the general information regarding troubling issues in the [RMBS] market is insufficient to [start running the statute of limitations] under § 11 or § 12(a)(2)."); *Plumbers' & Pipefitters' Local #562 Supplemental Plan & Trust v. J.P. Morgan Acceptance Corp. I*, Civ. No. 08-1713, 2012 WL 601488, at *11 (E.D.N.Y. Feb. 23, 2012) (denying motion to dismiss section 11 claim where defendants reference "seventy news stories" but "none of stories refer to the offerings, the Certificates, or tie the originators to securities offered by the defendants"); *In re Morgan Stanley Mortg. Pass-Through Certificates Litig.*, Civ. No. 09-2137, 2012 U.S. Dist. LEXIS 98669, at *7–8 (S.D.N.Y. Jul. 16, 2012) ("Defendants' exhibits do not persuade the Court that . . . there was enough information in the public domain for Plaintiffs to have filed a complaint that could survive a 12(b)(6) motion. The exhibits paint a vivid picture of a distressed [RMBS] industry, but not one references by name any of the entities that were involved in the origination, packaging, and sale of the Certificates at issue here."); *In re Morgan Stanley Mortg. Pass-Through Certificates Litig.*, 810 F. Supp. 2d 650, 665 (S.D.N.Y. 2011) ("The cited [news] articles and [SEC] report were not specifically about Morgan Stanley and were therefore too general to provide inquiry notice."); *N.J. Carpenters Vacation Fund v. Royal Bank of Scot. Grp., PLC*, 720 F. Supp. 2d 254, 267 (S.D.N.Y. 2010) ("Although Defendants point to a number of publicly available documents generally related to the weakening and outright disregard for underwriting guidelines by subprime originators, this information alone does not relate directly to the misrepresentations and omissions alleged [here].") (quotation marks omitted).

[441] *See In re Morgan Stanley Mortg. Pass-Through Certificates Litig.*, Civ. No. 09-2137, 2010 WL 3239430, at *8 (S.D.N.Y. Aug. 17, 2010) (granting motion to dismiss Securities Act claims and finding it "plain that inquiry notice arose well before May 2008" where "thirteen of sixteen downgrades by Moody's of 2007–11AR occurred before May 2008, and four out of sixteen downgrades by S&P of 2007–11AR occurred before May 2008"); *see also FHFA*, 858 F. Supp. 2d at 322 ("[I]t cannot be said that [the GSEs] should have 'discovered' that those securitizations in fact contained loans that failed to meet the standards set out in the offering materials until they were alerted to this possibility by the ratings agencies in early 2008 [when the securities they held were downgraded from investment grade to near-junk status].").

claim" and "can occur for any number of reasons."[442] The limitations period may not be considered to have started to run until the investment ratings of the specific certificates or tranches purchased by the plaintiff were downgraded.[443] Prior lawsuits and regulatory actions concerning the particular defendants or RMBS at issue have also been deemed, when sufficiently similar, to put investors on notice of their potential securities claims.[444]

Courts deciding motions by AFI and the Debtors to dismiss federal and state securities claims have shown similar reluctance to find as a matter of law that statutes of limitations began to run in 2007. For example, in *N.J. Carpenters Health Fund v. Residential Capital, LLC*, the U.S. District Court for the Southern District of New York denied the Debtors' motion to dismiss

---

[442] *In re Bear Stearns Mortg. Pass-Through Certificates Litig.*, 851 F. Supp. 2d at 766 (denying motion to dismiss complaints on statute of limitations grounds); *Pub. Emps.' Ret. Sys. of Miss. v. Goldman Sachs Grp. Inc.*, Civ. No. 09-1110, 2011 U.S. Dist. LEXIS 3267, at *26-27 (S.D.N.Y. Jan. 12, 2011) (denying motion to dismiss section 11 claims as untimely where ratings agencies "downgraded their ratings of the Certificates by December 2007" but "it was not until [2008]" that one of the ratings agencies "downgraded the GSAMP Trust Series 2006-S2 Certificates to below investment grade"); *Pub. Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co. Inc.*, 714 F. Supp. 2d 475, 479–80 (S.D.N.Y. 2010) (Securities Act claims are not time barred where "the certificates at issue were not downgraded below investment grade until April 2008, that is, after the March 27, 2008 limitation date, and, even then, the downgrade was not premised on the discovery of fraud but only on a perceived increase in risk"); *cf. Carlucci v. Han*, 886 F. Supp. 497, 516 (E.D. Va. 2012) (rejecting "the notion that poor performance of an investment is in itself sufficient to commence the limitations period [for a section 10(b) claim]").

[443] *See In re Bear Stearns Mortg. Pass-Through Certificates Litig.*, 851 F. Supp. 2d at 766–67 (denying motion to dismiss complaints on statute of limitations grounds where plaintiff "purchased exclusively from the AAA-rated tranches" of the RMBS issuance that were "(at least as judged by the ratings) seemingly untarnished by the problems that plagued the [RMBS] industry as a whole"); *see also In re Morgan Stanley Mortg. Pass-Through Certificates Litig.*, 810 F. Supp. 2d at 664–65 ("In light of the maintenance of investment-grade ratings on the 2006-14SL Trust well into the one-year limitation period . . . the cited delinquency rates and ratings changes are insufficient to warrant dismissal of [plaintiff's] claim as untimely as a matter of law.").

[444] *See FDIC v. Countrywide Fin. Corp.*, Civ. No. 12-4354, 2012 U.S. Dist. LEXIS 167696, at *9–14 (C.D. Cal. Nov. 21, 2012) (granting motion to dismiss section 11 claim as untimely where defendants "submitted ten complaints filed against Countrywide entities before May 22, 2008," certain of which "had survived a motion to dismiss"); *Lighthouse Fin. Grp. v. Royal Bank of Scot. Grp. PLC*, Civ. No. 11-398, 2012 U.S. Dist. LEXIS 146640, at *39 (S.D.N.Y. Sept. 27, 2012) (dismissing Securities Act claims as untimely in part because plaintiff's filing of earlier lawsuit against defendant "undermines their contention that they could not have known about [defendant's] alleged misstatements and omissions" until later); *In re Morgan Stanley Mortg. Pass-Through Certificates Litig.*, 2010 WL 3239430, at *8 (granting motion to dismiss Securities Act claims and finding it "plain that inquiry notice arose well before May 2008" where "Lead Plaintiff's counsel [had filed an earlier lawsuit], which involved similar allegations regarding [RMBS-related] misconduct by . . . the key originator of mortgages held by 2007–11AR"); *Nat'l Credit Union Admin. Bd.*, 2012 U.S. Dist. LEXIS 103170, at *81 ("A reasonably diligent investor who was aware of this [FDIC] cease and desist order [against defendant Fremont Investment and Loan] would have been alerted to discover facts prior to March 20, 2008 which would support a plausible claim against the issuers, underwriters and sellers of the Fremont certificates."); *Boilermakers Nat'l Annuity Trust Fund v. WaMu Mortg. Pass Through Certificates, Series AR1*, 748 F. Supp. 2d 1246, 1258 (W.D. Wash. 2010) (granting motion to dismiss Securities Act claims of one of the named plaintiffs in a consolidated class action because the first named plaintiff's complaint was "sufficient to put other holders of WaMu certificates on notice of underwriting and appraisal issues," notwithstanding that "the two [complaints] involved different securities").

section 11 and 12(a)(2) claims on statute of limitations grounds.[445] There, the Debtors argued that "claims relating to the 2006-QS8 offering must be dismissed as time-barred because [plaintiff] failed to bring them within one year of being on inquiry notice."[446] According to the district court, "the clock starts to tick when 'a reasonably diligent plaintiff would have discovered the facts constituting the violation.'"[447] The court concluded that "[d]efendants fail[ed] to show that a reasonably diligent plaintiff would have discovered the facts constituting the violation over a year before bringing this action, or by May 18, 2008."[448] In particular, that "delinquency rates for 2006-QS8 approached 15%" was "not enough," and that a ratings agency "put the relevant securities on ratings watch for possible downgrades" was considered "an even further reach."[449]

In *FHLB of Chicago v. Banc of America Funding Corp.*, the Circuit Court in Cook County, Illinois, denied AFI's motion to dismiss as time-barred control person claims asserted against it by a Third-Party Claimant under the Illinois Securities Law and the North Carolina Securities Act.[450] The court found that the plaintiff "pled facts demonstrating that its claims were brought [on October 15, 2010] within two years of discovery of the defendants' wrongs, which means that the claims are timely under Illinois . . . and North Carolina law."[451] In particular, plaintiff pleaded that it had no "access to the loan files" and no "way of testing the rating agencies' triple-A ratings," which "began to be downgraded only in 2008."[452] The court rejected AFI's argument that the plaintiff was "on inquiry notice prior to October 2007."[453] As an initial matter, when the statute of limitations begins to run is "ordinarily a question of fact . . . unless only one conclusion can be drawn at some particular point from undisputed

---

[445] *See* Civ. Nos. 08–8781 and 08–5093, 2011 U.S. Dist. LEXIS 46066, at *23–26 (S.D.N.Y. Apr. 28, 2011); *see also Mass. Mut. Life Ins. Co. v. Residential Funding Co., LLC*, 843 F. Supp. 2d 191, 208–09 (D. Mass. 2012) (denying Debtors' motion to dismiss MUSA section 410(a) claims on statute of limitations grounds where "generalized reports on the industry" and "reports show[ing] an increase in the number of loans going into default" may "have indicated that the loans were performing poorly, [but] did not put Plaintiff on notice [by early 2007] that the specific underwriting and appraisal practices represented in the offering materials were false").

[446] *N.J. Carpenters Health Fund v. Residential Capital,* LLC, Civ. Nos. 08–8781, 05–5093, 2011 U.S. Dist. LEXIS 46066, at *23 (S.D.N.Y. Apr. 28, 2011).

[447] *Id.* at *24 (quoting *Merck & Co. v. Reynolds*, 130 S. Ct 1784, 1797 (2010)).

[448] *Id.* at *25.

[449] *Id.* at *25–26.

[450] Order, *FHLB of Chicago v. Banc of Am. Funding Corp.*, Case No. 10-CH-45033, at 13 (Ill. Cir. Ct. Sept. 19, 2012).

[451] *Id*.

[452] *Id*.

[453] *Id*. at 14.

facts."[454] Moreover, "generalized information about the mortgage market or about certain mortgage originators cannot trigger the statute of limitations."[455]

Although the law in this area continues to evolve, it may pose obstacles to AFI prevailing on statute of limitations defenses (including its pending motions to dismiss) premised upon arguments that general "public scrutiny and numerous critical media and government reports" started limitations periods running in 2007.[456] Discovery could perhaps permit AFI to prove that, notwithstanding the limited information available to the public at that time, one or more of Third-Party Claimants had knowledge sufficient for the applicable statute of limitations period to have run before it filed its claims against AFI.[457] Moreover, this body of case law also suggests that any Third-Party Claimants that have not to date asserted claims against AFI would face potential dismissal of future control person claims asserted under federal or state securities laws. Even under the four-year limitations period that governs control person claims asserted under MUSA § 410(b), a Third-Party Claimant asserting such a claim for the first time now would be required to allege that it lacked sufficient knowledge of the alleged misrepresentations as late as mid-2009.[458] In light of intervening credit rating downgrades and

---

[454] *Id*. at 12.

[455] *Id*. at 14. The court also denied AFI's motion to dismiss under 815 Ill. Comp. Stat. Ann. 5/13(B). *See id.* at 8–10. That provision requires a plaintiff asserting a claim under the Illinois Securities Law to have given written notice "within 6 months after the purchaser shall have knowledge that the sale of the securities to him or her is voidable, to each person from whom recovery will be sought." 815 ILL. COMP. STAT. ANN. 5/13(B). AFI argued that the FHLB of Chicago had failed to "plead affirmative facts demonstrating that it served notices of rescission on defendants within six months of acquiring constructive knowledge that each certificate was voidable." *See* Order, *FHLB of Chicago v. Banc of Am. Funding Corp.*, Case No. 10–CH– 45033, at 8 (Ill. Cir. Ct. Sept. 19, 2012). The court declined to find as a matter of law that the notices of rescission sent by the FHLB of Chicago in July 2010 were untimely. *See id*. at 9–10. The court explained that "the six-month period begins when a party gains actual or constructive knowledge that the purchase is legally voidable . . . rather than . . . of the facts underlying the claim." *Id*. at 9. In the context of a motion to dismiss, AFI had not met the "burden of showing that the Bank has failed to comply with the six-month notice provision." *See id*. The Examiner reaches no conclusion concerning whether the FHLB of Chicago complied with this six-month notice provision, which is a "mixed question of law and fact" that to answer would require discovery concerning the circumstances by which the plaintiff "learned that the sale was voidable." *See 766347 Ontario Ltd. v. Zurich Capital Markets Inc.*, 249 F. Supp. 2d 974, 989 (N.D. Ill. 2003) (quotation marks omitted); *see also Reshal Assocs., Inc. v. Long Grove Trading Co.*, 754 F. Supp. 1226, 1236 (N.D. Ill. 1990) ("Illinois courts have been lenient in their interpretation of what constitutes knowledge of voidability. They have held that the time for notice begins to run not from the time of knowledge of the underlying facts, but rather from the time of knowledge that those facts give rise to a right of rescission.").

[456] *See* AFI Submission Paper, dated Dec. 19, 2012, at 46–47; *see also* Defs.' Mem. of Law in Supp. of Their Mot. to Dismiss the Am. Compl., *FHLB of Boston v. Ally Fin., Inc.*, Civ. No. 11-10952, Docket No. 200, at 55 (D. Mass. Oct. 11, 2012) ("[T]here were 'storm warnings' sufficient to alert FHLB Boston as to the possibility of its [MUSA § 410] claims more than four years before it filed the Complaint on April 20, 2011.").

[457] For example, AFI asserts—but would need to prove—that "if [Third-Party Claimants'] allegations of systematic abandonment of underwriting guidelines were true, there would be no entity that would have been more aware of that fact than Freddie/Fannie" because "Freddie Mac personnel visited nearly every originator in the business." *See* AFI Submission Paper, dated Dec. 19, 2012, at 47 (emphasis omitted).

[458] *See* MASS. GEN. LAWS ch. 110A § 410(e) ("No person may sue under this section more than four years after the discovery by the person bringing the action of a violation . . . .").

the filing of other lawsuits concerning the Debtors' securitizations, such a claim could be susceptible to dismissal as time-barred as a matter of law.[459]

### (ii) Application Of Statutes Of Repose To RMBS Claims

AFI moved to dismiss claims asserted by Third-Party Claimants under section 20(a) of the Exchange Act, the Minnesota Securities Act, and the Virginia Securities Act as barred by applicable statutes of repose.[460] In *Union Central Life Ins. Co. v. Ally Fin., Inc.*, AFI's motion to dismiss section 20(a) claims was granted on other grounds.[461] In *FHFA v. Ally Fin., Inc.*, the plaintiff agreed to "abandon" Virginia Securities Act claims as to "securitizations it

---

[459] *See In re Morgan Stanley Mortg. Pass-Through Certificates Litig.*, Civ. No. 09–2137, 2010 WL 3239430, at *8 (S.D.N.Y. Aug. 17, 2012) (granting motion to dismiss Securities Act claims and finding it "plain that inquiry notice arose well before May 2008" where "Lead Plaintiff's counsel [had filed an earlier lawsuit], which involved similar allegations regarding [RMBS-related] misconduct by . . . the key originator of mortgages held by 2007–11AR"); *Nat'l Credit Union Admin. Bd. v. RBS Sec., Inc.*, Civ. No. 11-2340, 2012 U.S. Dist. LEXIS 103170, at *81 (D. Kan. July 25, 2012) ("A reasonably diligent investor who was aware of this [FDIC] cease and desist order [against defendant Fremont Investment and Loan] would have been alerted to discover facts prior to March 20, 2008 which would support a plausible claim against the issuers, underwriters and sellers of the Fremont certificates."); *In re Morgan Stanley Mortg. Pass-Through Certificates Litig.*, 2010 WL 3239430, at *8 (granting motion to dismiss Securities Act claims and finding it "plain that inquiry notice arose well before May 2008" where "thirteen of sixteen downgrades by Moody's of 2007–11AR occurred before May 2008, and four out of sixteen downgrades by S & P of 2007–11AR occurred before May 2008"). The Examiner reaches no definitive conclusions concerning whether any potential control person claims asserted against AFI would be subject to dismissal as time-barred under these or other federal or state securities laws.

[460] *See* Mem. of Law in Supp. of Ally Fin. Inc.'s and GMAC Mortg. Group, Inc's Mot. to Dismiss the Am. Compl., *FHFA v. Ally Fin. Inc.*, Civ. No. 11-7010, Docket No. 149 (S.D.N.Y. July 13, 2012) (Virginia Securities Act); Mem. in Supp. of the Ally Defs.' Mot. to Dismiss the Am. Compl., *John Hancock Life Ins. Co. (U.S.A.) v. Ally Fin. Inc.*, Civ. No.12-01841, Docket No. 104 (D. Minn. Dec. 14, 2012) (Minnesota Securities Act); Mem. in Supp. of the Ally Defs.' Mot. to Dismiss the Am. Compl., *Stichting Pensioenfonds ABP v. Ally Fin. Inc.*, Civ. No. 12-01381, Docket No. 129 (D. Minn. Mar. 11, 2013) (Minnesota Securities Act); Ally Fin, Inc's Mem. of Law in Supp. of Mot. to Dismiss the Am. Compl., *Union Cent. Life Ins. Co. v. Ally Fin., Inc.*, Civ. No. 11-02890, Docket No. 219 (S.D.N.Y. July 27, 2012) (section 20 of the Exchange Act).

[461] *See* Order, Civ. No. 11-02890, Docket No. 263, at 7 n.7 (S.D.N.Y. Mar. 29, 2013) (granting plaintiffs opportunity to "file a letter motion to amend which attaches a proposed amended complaint within sixty (60) days"). Assuming arguendo that plaintiffs were to seek and be granted leave to file an amended complaint asserting section 20 claims AFI would presumably again assert the defense that such claims are barred by the five-year statute of repose because AFI "was not named as a defendant in this action until . . May 4, 2012" and "all of the certificates . . . were issued in 2005 or 2006." *See* Ally Fin. Inc's Mem. of Law in Supp. of Mot. to Dismiss the Am. Compl., Civ. No. 11-02890, Docket No. 219, at 5 (S.D.N.Y. July 27, 2012). Plaintiffs opposed dismissal on the theory that their section 20 claims against AFI "relate[] back to the date of the original pleading" pursuant to Rule 15(c) of the Federal Rules of Civil Procedure. *See* Pl.'s Opp. to Defs. Ally Sec., LLC, Ally Fin. Inc. and Bruce J. Paradis' Mots. to Dismiss the Am. Compl., Civ. No. 11-02890, Docket No. 234, at 11 (S.D.N.Y. Oct. 1, 2012). The Examiner reaches no conclusions concerning the likelihood of success of a statute of repose defense with respect to these section 20 claims. The Examiner does note, however, that the "relation back" doctrine under Rule 15(c) requires, inter alia, "a mistake concerning the proper party's identity." *See* FED. R. CIV. P. 15(c)(1)(C)(ii).

purchased before September 6, 2006."[462] AFI's motions to dismiss remain pending as to the Minnesota Securities Act claims asserted against it in two RMBS Investor Actions in the U.S. District Court for the District of Minnesota.[463]

AFI argues that "claims brought [therein by Third-Party Claimants] for violations of the [Minnesota Securities Act] based on 'conduct occurring' before August 1, 2007" are time-barred because they were not asserted within three years.[464] Those two actions were commenced on October 11, 2011 and July 27, 2012, respectively.[465] The Examiner concludes it is likely that AFI's statute of limitations defense will prevail as to all Minnesota Securities Act claims asserted in those two actions and based upon conduct occurring before August 1, 2007.[466]

Minnesota Securities Act claims asserted against AFI in *Huntington Bancshares, Inc. v. Ally Financial, Inc.* were recently dismissed with prejudice by the Minnesota District Court for Hennepin County.[467] The court granted AFI's motion to dismiss such claims as "barred as a matter of law . . . because the [three-year] statute of repose expired on September 29, 2009."[468] The court explained that plaintiff waited until 2011 to bring its claims but "[a]ll of the claims asserted in Plaintiff's complaint" concern "Offering Documents [that] were issued

---

[462] Civ. No. 11-7010, 2012 U.S. Dist. LEXIS 179768, at *8 n.4 (S.D.N.Y. Dec. 19, 2012).

[463] *See* Mem. in Supp. of the Ally Defs.' Mot. to Dismiss the Am. Compl., *John Hancock Life Ins. Co. (U.S.A.) v. Ally Fin. Inc.*, Civ. No.12-01841, Docket No. 104 (D. Minn. Dec. 14, 2012); Mem. in Supp. of the Ally Defs.' Mot. to Dismiss the Am. Compl., *Stichting Pensioenfonds ABP v. Ally Fin. Inc.*, Civ. No. 12–01381, Docket No. 129 (D. Minn. Mar. 11, 2013).

[464] Mem. in Supp. of the Ally Defs.' Mot. to Dismiss the Am. Compl., *John Hancock Life Ins. Co. (U.S.A.) v. Ally Fin. Inc.*, Civ. No. 12-01841, Docket No. 104, at 16 (D. Minn. Dec. 14, 2012); *see also* Mem. in Supp. of the Ally Defs.' Mot. to Dismiss the Am. Compl., *Stichting Pensioenfonds ABP v. Ally Fin. Inc.*, Civ. No. 12–01381, Docket No. 129, at 16-19 (D. Minn. Mar. 11, 2013).

[465] *See* Compl., *John Hancock Life Ins. Co. (U.S.A.) v. Ally Fin. Inc.,* Civ. No.12-01841, Docket No. 1 (D. Minn. July 27, 2012); Compl., *Stichting Pensioenfonds ABP v. Ally Fin. Inc.,* Case No. 27–CV–11–20426 (Minn. Dist. Ct. Oct. 11, 2011).

[466] AFI concedes that the Minnesota Securities Act claims asserted as to one of the securitizations at issue (RALI 2007-QS11) would not, as alleged, be barred by the three-year statute of repose because the prospectus was issued on September 27, 2007 (i.e., after the August 1, 2007 effective date of Minn. Stat. § 80A.76). *See* Mem. in Supp. of the Ally Defs.' Mot. to Dismiss the Am. Compl., *John Hancock Life Ins. Co. (U.S.A.) v. Ally Fin. Inc.*, Civ. No.12-01841, Docket No. 104, at 18-19 (D. Minn. Dec. 14, 2012). AFI argues that claims as to that securitization are nonetheless time-barred under the applicable statute of limitations because plaintiffs "had knowledge of the facts . . . more than two years before they brought this suit" as a result of credit rating downgrades and the filing of lawsuits by other plaintiffs concerning other of Debtors' securitizations. *See id.*; MINN. STAT. § 80A.76(j)(2) (claims must be brought "within . . . two years after discovery of the facts constituting the violation"). The Examiner discussed above similar statute of limitations defenses raised by AFI in other RMBS Investor Actions. *See* Section VIII.C.2.a(2)(e)(i).

[467] *See* Order Granting Defs.' Mots. to Dismiss Compl., Case No. 27-CV-11-20276, at 9 (Minn. Dist. Ct. Dec. 11, 2012).

[468] *Id.*

between July 11, 2003 and September 29, 2006."[469] The Examiner finds no reason to expect a different result as to those Minnesota Securities Act claims that remain pending against AFI.[470]

The statutes of repose that govern control person claims asserted under sections 15 and 20(a) of the federal securities laws and several state securities laws also have potential implications for whether any Third-Party Claimants that have not to date asserted any claims against AFI could in the future timely assert control person claims against AFI. The available evidence suggests that many such future claims would be time-barred. Even under the five-year statute of repose applicable to control person claims asserted under section 20(a) of the Exchange Act (and the Illinois Securities Law), any such claim asserted on May 10, 2013 would be subject to an apparent time bar unless it accrued no earlier than May 10, 2008.[471] A control person claim asserted on May 10, 2013 under section 15 of the Securities Act would be subject to an apparent time bar by the three-year statute of repose unless it accrued no earlier than May 10, 2010.[472] Accordingly, given that the Debtors ceased private label securitizations by 2007, any future control person claims asserted under federal or state securities laws governed by a statute of repose of five years or less would appear presumptively time-barred.[473]

---

[469] *See id.*

[470] The Examiner is not persuaded that the three-year statute of repose under Minn. Stat. § 80A.23(7) is only applicable to claims that "could have been instituted . . . prior to August 1, 2007." *See* Pls.' Omnibus Opp. to Defs.' Mots. to Dismiss the Am. Compl., *John Hancock Life Ins. Co. (U.S.A.) v. Ally Fin. Inc.*, Civ. No.12-01841, Docket No. 118, at 88 (D. Minn. Feb. 15, 2013). Such an interpretation is inconsistent with the plain meaning of the relevant statute and has not been adopted by the courts. *See* MINN. STAT. § 80A.90(a) ("The predecessor act exclusively governs all actions or proceedings that are pending on August 1, 2007, or may be instituted on the basis of conduct occurring before August 1, 2007 . . . ."); *Trooien v. Mansour*, 608 F.3d 1020, 1027 n.2 (8th Cir. 2010) (predecessor statute "continues to govern all actions based on conduct occurring before that date"); Order Granting Defs.' Mots. to Dismiss Compl., *Huntington Bancshares, Inc. v. Ally Fin. Inc.*, Case No. 27-CV-11-20276, at 9 (Minn. Dist. Ct. Dec. 11, 2012) ("[A]ny claims brought for violation of the MSA based on conduct occurring before August 1, 2007 are governed by the prior version of the MSA . . . ."). Notably, Third-Party Claimants concede that, even under Minn. Stat. § 80A.76(j)(2), their Minnesota Securities Act claims would be time-barred by its five-year statute of repose as to at least some of the securitizations at issue. *See* Pls.' Omnibus Opp. to Defs.' Mots. to Dismiss the Am. Compl., *John Hancock Life Ins. Co. (U.S.A.) v. Ally Fin. Inc.*, Civ. No.12-01841, Docket No. 118, at 92 (D. Minn. Feb. 15, 2013) ("While some of Plaintiffs' claims are barred by the five-year statute of repose, many are not"); *see also* Pls.' Ombibus Memo. of Law in Opp. to Defs.' Mot. to Dismiss the Am. Compl., *Stichting Pensioenfonds ABP v. Ally Fin. Inc.*, Civ. No. 12-01381, Docket No. 142, at 77 (D. Minn. Apr. 25, 2013) (same).

[471] *See* 28 U.S.C. § 1658(b); 815 ILL. COMP. STAT. ANN. 5/13(D).

[472] *See* 15 U.S.C. § 77m.

[473] *See* Section III.G; Int. of J. Gray, Mar. 1, 2013, at 61:8–63:23. The Examiner reaches no definitive conclusions concerning whether any potential control person claims asserted against AFI would be subject to dismissal as time-barred under these or other federal or state securities laws. Such conclusions would require a case-by-case assessment of the facts and the law including, for example, whether any tolling agreement might permit otherwise time-barred claims to proceed.

### *(3) Aiding And Abetting Fraud And Fraudulent Inducement*

The Examiner has identified fourteen pending RMBS Actions where Third-Party Claimants seek to hold AFI liable for aiding and abetting an alleged common law fraud by one or more of the Debtors.[474] Those actions are pending in federal district courts located in Minnesota and New York.[475] Of those fourteen actions, ten are RMBS Insurer Actions brought by either FGIC or MBIA, who contracted to provide financial guaranty insurance in connection with issuances of RMBS by the Debtors.[476] The other four actions are RMBS Investor Actions brought by purchasers of RMBS issued by the Debtors.[477]

AFI filed pre-answer motions to dismiss the aiding and abetting claims asserted against it in five of those fourteen actions (the other nine actions brought by FGIC remain stayed by

---

[474] *See* Am. Compl., *FGIC v. Ally Fin., Inc.*, Civ. No. 11-09729, Docket No. 29, at 86–88 (S.D.N.Y. Mar. 30, 2012); Compl., *FGIC v. Ally Fin., Inc.*, Civ. No. 12-00338, Docket No. 1, at 67–68 (S.D.N.Y. Dec. 27, 2011); Compl., *FGIC v. Ally Fin., Inc.*, Civ. No. 12-00339, Docket No. 1, at 63 (S.D.N.Y. Dec. 27, 2011); Compl., *FGIC v. Ally Fin., Inc.*, Civ. No. 12-00340, Docket No. 1, at 69 (S.D.N.Y. Dec. 27, 2011); Compl., *FGIC v. Ally Fin., Inc.*, Civ. No. 12-00341, Docket No. 1, at 57 (S.D.N.Y. Dec. 15, 2011); Compl., *FGIC v. Ally Fin., Inc.*, Civ. No. 12-01658, Docket No. 1, at 88–90 (S.D.N.Y. Mar. 6, 2012); Compl., *FGIC v. Ally Fin., Inc.*, Civ. No. 12-01860, Docket No. 1, at 88–89 (S.D.N.Y. Mar. 13, 2012); Compl., *FGIC v. Ally Fin., Inc.*, Civ. No. 12-01601, Docket No. 1, at 85 (S.D.N.Y. Mar. 5, 2012); Compl., *FGIC v. Ally Fin., Inc.*, Civ. No. 12-01818, Docket No. 1, at 91–92 (S.D.N.Y. Mar. 12, 2012); Am. Compl., *FHFA v. Ally Fin. Inc.*, Civ. No. 11-07010, Docket No. 114, at 135 (S.D.N.Y. June 13, 2012); Am. Compl., *John Hancock Life Ins. Co. (U.S.A.) v. Ally Fin. Inc.*, Civ. No.12-01841 Docket No. 84, at 278–82 (D. Minn. Oct. 15, 2012); Compl., *MBIA Ins. Co. v. Ally Fin. Inc.*, Case. No. Civ. No. 12–02563, Docket No. 1, at 49–55 (D. Minn. Sept. 17, 2012); Am. Compl., *Stichting Pensioenfonds ABP v. Ally Fin. Inc.*, Civ. No. 12–01381, Docket No. 101, at 176-80 (D. Minn. Oct. 11, 2011); Am. Compl., *Union Cent. Life Ins. Co. v. Ally Fin., Inc.*, Civ. No. 11-02890, Docket No. 146, at 237-38 (S.D.N.Y. May 4, 2012).

[475] *See id.*

[476] *See* Am. Compl., *FGIC v. Ally Fin., Inc.*, Civ. No. 11-09729, Docket No. 29 (S.D.N.Y. Mar. 30, 2012); Compl., *FGIC v. Ally Fin., Inc.*, Civ. No. 12-00338, Docket No. 1 (S.D.N.Y. Dec. 27, 2011); Compl., *FGIC v. Ally Fin., Inc.*, Civ. No. 12-00339, Docket No. 1 (S.D.N.Y. Dec. 27, 2011); Compl., *FGIC v. Ally Fin., Inc.*, Civ. No. 12-340, Docket No. 1 (S.D.N.Y. Dec. 27, 2011); Compl., *FGIC v. Ally Fin., Inc.*, Civ. No. 12-341, Docket No. 1 (S.D.N.Y. Dec. 15, 2011); Compl., *FGIC v. Ally Fin., Inc.*, Civ. No. 12-01658, Docket No. 1 (S.D.N.Y. Mar. 6, 2012); Compl., *FGIC v. Ally Fin., Inc.*, Civ. No. 12-1860, Docket No. 1 (S.D.N.Y. Mar. 13, 2012); Compl., *FGIC v. Ally Fin., Inc.*, Civ. No. 12-1601, Docket No. 1 (S.D.N.Y. Mar. 5, 2012); Compl., *FGIC v. Ally Fin., Inc.*, Civ. No. 12–1818, Docket No. 1 (S.D.N.Y. Mar. 12, 2012); Compl., *MBIA Ins. Co. v. Ally Fin. Inc.*, Case. No. Civ. No. 12–02563, Docket No. 1 (D. Minn. Sept. 17, 2012).

[477] *See* Am. Compl., *FHFA v. Ally Fin. Inc.*, Civ. No. 11–7010, Docket No. 114 (S.D.N.Y. June 13, 2012); Am. Compl., *John Hancock Life Ins. Co. (U.S.A.) v. Ally Fin. Inc.*, Civ. No.12-01841 Docket No. 84 (D. Minn. Oct. 15, 2012); Am. Compl., *Stichting Pensioenfonds ABP v. Ally Fin. Inc.*, Civ. No. 12-01381, Docket No. 101 (D. Minn. Oct. 11, 2011); Am. Compl., *Union Cent. Life Ins. Co. v. Ally Fin., Inc.*, Civ. No. 11-02890, Docket No. 146 (S.D.N.Y. May 4, 2012).

Order of the Bankruptcy Court).[478] To date, Third-Party Claimants' aiding and abetting claims in one of those actions have survived an AFI motion to dismiss and are in discovery,[479] while aiding and abetting claims in one other action were dismissed without prejudice.[480] The three other AFI motions to dismiss remain pending. No final judgment has been entered as to the aiding and abetting claims asserted against AFI in any of these fourteen RMBS Actions.[481] The Examiner has identified six other RMBS Actions where common law fraud claims are pending against one or more of the Debtors, but where, to date, no aiding and abetting claims have been asserted against AFI.[482]

"The purpose of an aiding and abetting claim is to draw in defendants who would not be liable on the main fraud claim, but who are alleged to have actual knowledge of the fraud and substantially assisted it."[483] Accordingly, any plaintiff asserting a claim that a defendant aided and abetted an underlying fraud must plead and prove the following elements: (1) the existence of the fraud; (2) knowledge of the fraud by that defendant; and (3) substantial

---

[478] *See* Mem. of Law in Supp. of Ally Fin. Inc.'s and GMAC Mortg. Group, Inc's Mot. to Dismiss the Am. Compl., *FHFA v. Ally Fin. Inc.*, Civ. No. 11–7010, Docket No. 149 (S.D.N.Y. July 13, 2012); Mem. in Supp. of the Ally Defs.' Mot. to Dismiss the Am. Compl., *John Hancock Life Ins. Co. (U.S.A.) v. Ally Fin. Inc.*, Civ. No.12–01841, Docket No. 104 (D. Minn. Dec. 14, 2012); Am. Mem. of Law in Supp. of Defs.' Mot. to Dismiss, *MBIA Ins. Co. v. Ally Fin. Inc.*, Civ. No. 12–02563, Docket No. 36 (D. Minn. Mar. 12, 2013); Mem. in Supp. of the Ally Defs.' Mot. to Dismiss the Am. Compl., *Stichting Pensioenfonds ABP v. Ally Fin. Inc., et al.*, Civ. No. 12–01381, Docket No. 129 (D. Minn. Mar. 11, 2013); Ally Fin., Inc's Mem. of Law in Supp. of Mot. to Dismiss the Am. Compl., *Union Cent. Life Ins. Co. v. Ally Fin., Inc.*, Civ. No. 11–02890, Docket No. 219 (S.D.N.Y. July 27, 2012); Stipulation and Order with Respect to Debtors' Motion to Extend the Automatic Stay or, in the Alternative, for Injunctive Relief [Case No. 12–01671; Docket No. 90].

[479] *See FHFA v. Ally Fin., Inc.*, Civ. No. 11–7010, 2012 U.S. Dist. LEXIS 179768, at *15 (S.D.N.Y. Dec. 19, 2012).

[480] *See* Order, *Union Cent. Life Ins. Co. v. Ally Fin., Inc.*, Civ. No. 11–02890, Docket No. 263, at 7 n.7 (S.D.N.Y. Mar. 29, 2013) (granting plaintiffs opportunity to "file a letter motion to amend which attaches a proposed amended complaint within sixty (60) days").

[481] One additional RMBS Investor Action that asserted aiding and abetting claims against AFI was dismissed with prejudice. *See* Order Granting Defs.' Mot. to Dismiss Compl., *Huntington Bancshares, Inc. v. Ally Fin. Inc.*, Case No. 27–cv–11–20276 (Minn. Dist. Ct. Dec. 11, 2011).

[482] *See* First Am. Compl., *Allstate Ins. Co. v. GMAC Mortgage LLC*, Case No. 11–3480 (Minn. Dist. Ct. Apr. 15, 2011); Compl., *FGIC v. Residential Funding Co. LLC*, Civ. No. 11–9736, Docket No. 1 (S.D.N.Y. Nov. 29, 2011); Compl., *FGIC v. Residential Funding Co. LLC*, Civ. No. 11–9737, Docket No. 1 (S.D.N.Y. Nov. 29, 2011); First Am. Compl., *MBIA Ins. Corp. v. Residential Funding Co., LLC*, Index No. 603552/2008 (N.Y. Sup. Ct. Mar. 19, 2010); Compl., *MBIA Ins. Corp. v. GMAC Mortg., LLC*, Index No. 600837/2010 (N.Y. Sup. Ct. Apr. 1, 2010); Compl., *W. Va. Inv. Mgmt. Bd. v. Residential Accredit Loans, Inc.*, Civ. No. 10-0461, Docket. No. 1 (S.D.W.V. Apr. 7, 2010).

[483] *380544 Canada, Inc. v. Aspen Tech., Inc.*, 633 F. Supp. 2d 15, 36 (S.D.N.Y. May 5, 2009) (citation omitted).

assistance in the commission of the fraud by that defendant.[484] "Rule 9(b)'s particularity requirement for fraud applies equally to a claim for aiding and abetting."[485] Thus, a plaintiff must "plead facts with the requisite particularity" to show the defendant's "actual knowledge of fraud."[486] If the plaintiff satisfies this pleading burden, then "[a] claim for aiding and abetting fraud must be proven by clear and convincing evidence."[487]

---

[484] *See Dexia SA/NV v. Bear, Stearns & Co., Inc.*, Civ. No. 12-4761, 2013 U.S. Dist. LEXIS 30916, at * 28–29 (S.D.N.Y. Feb. 26, 2013) ("U]nder New York law, plaintiffs must allege (1) the existence of an underlying fraud, (2) actual knowledge of the fraud, and (3) substantial assistance in the commission of the fraud."); *Christopher v. Hanson*, Civ. No. 09-3703, 2011 U.S. Dist. LEXIS 60201, at *33 (D. Minn. June 6, 2011) ("Aiding and abetting tortious conduct has three elements [under Minnesota law]: (1) the primary tort-feasor must commit a tort that causes an injury to the plaintiff; (2) the defendant must know that the primary tort-feasor's conduct constitutes a breach of duty; and (3) the defendant must substantially assist or encourage the primary tort-feasor in the achievement of the breach."). Because these fourteen RMBS Actions are pending in Minnesota and New York courts, the discussion of the law of aiding and abetting common law fraud relies upon both Minnesota and New York law. With certain distinctions to be discussed below, the laws of those jurisdictions do not appear to be in conflict. *See Am. Bank of St. Paul v. TD Bank, N.A.*, 2013 U.S. App. LEXIS 8489, at *11 n.4 (8th Cir. Apr. 26, 2013) ("New York and Minnesota both follow the Second Restatement approach to aiding and abetting."); *Thrivent Fin. for Lutherans v. Countrywide Fin. Corp.*, Civ. No. 11-71376, 2012 U.S. Dist. LEXIS 71376, at *18 (C.D. Cal. Feb. 17, 2012) (noting that Minnesota and New York apply the same elements to claims of aiding and abetting fraud claims).

[485] *E-Shops Corp. v. U.S. Bank Nat'l Ass'n*, 678 F.3d 659, 663 (8th Cir. 2012); *see also Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 292–93 (2d Cir. 2006). "[C]onclusory allegations" do not suffice and "[i]nstead, the complaint must set forth the who, what, when, where, and how surrounding the alleged fraud." *See E-Shops Corp.*, 678 F.3d at 663 (quotation marks omitted); *see also Lerner*, 459 F.3d at 290 ("[I]n order to comply with Rule 9(b), the complaint must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.") (quotation marks omitted).

[486] *See Lerner*, 459 F.3d at 292–93; *see also E-Shops Corp.*, 678 F.3d at 663 (affirming dismissal of aiding and abetting fraud claim that failed to "plead with particularity how [defendant] knowingly and substantially assisted the underlying fraud" and explaining that "[a]n aider and abettor's knowledge of the wrongful purpose is a crucial element in aiding or abetting cases") (quotation marks omitted). Courts in the Second Circuit have explained that "pleading knowledge for purposes of an aiding and abetting claim requires allegations of facts that give rise to a 'strong inference' of actual knowledge." *Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC*, 479 F. Supp. 2d 349, 367 (S.D.N.Y. 2007) (quoting *Lerner*, 459 F.3d at 293).

[487] *Mazzaro De Abreu v. Bank of Am. Corp.*, 812 F. Supp. 2d 316, 322 (S.D.N.Y. 2011) (quotation marks omitted) (applying New York law). If a court were instead to apply Minnesota law, however, "'[t]he standard of proof in all fraud cases is the preponderance of the evidence standard.'" *Cornerstone Home Builders, Inc. v. Guyers Dev., LLC*, Case No. A09-1178, 2010 Minn. App. Unpub. LEXIS 342, at *7 (Minn. App. Cr. Apr. 20, 2010) (unpublished) (quoting *State by Humphrey v. Alpine Air Prods., Inc.*, 500 N.W.2d 788, 791 (Minn. 1993)).

The Examiner's factual and legal conclusions concerning certain elements or defenses relevant to Third-Party Claimants' aiding and abetting claims are discussed below.[488]

### (a) Primary Violation

Any aiding and abetting fraud claim requires the plaintiff to plead and prove "the existence of an underlying fraud."[489] "Absent a sufficient claim of a primary fraud, a claim for aiding and abetting fraud must fail without regard to whether the remaining elements are satisfied."[490] The elements of a cause of action for common law fraud include that: "(1) the defendant made a material false representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result of such reliance."[491]

---

[488] In its submissions to the Examiner, AFI in general does not assert that the common law aiding and abetting frauds claims asserted by Third-Party Claimants would be time-barred by an applicable statute of limitations. Although AFI in its initial submission argued that "MBIA's recently asserted [aiding and abetting fraud] claims against AFI . . . will also fail as time-barred," AFI Submission Paper, dated Dec. 17, 2012, at 74–75, AFI's subsequent amended motion to dismiss those claims appears to abandon such arguments. *See* Am. Mem. of Law in Supp. of Defs.' Mot. to Dismiss, *MBIA Ins. Corp. v. Ally Fin. Inc.*, Civ. No. 12-02563, Docket No. 36 (D. Minn. Mar. 12, 2013). Accordingly, the Examiner does not further address the timeliness of Third-Party Claimants' aiding and abetting fraud claims except to note that the limitations periods applicable to such claims under the laws of certain potentially relevant jurisdictions appear lengthier than those applicable to Third-Party Claimants' securities law claims. *See, e.g.*, MINN. STAT. § 541.05(6) (six-year statute of limitations for fraud claims "shall not be deemed to have accrued until the discovery by the aggrieved party of the facts constituting the fraud"); N.Y. C.P.L.R. § 213(8) (statute of limitations for fraud claims "the greater of six years from the date the cause of action accrued or two years from the time the plaintiff or the person under whom the plaintiff claims discovered the fraud, or could with reasonable diligence have discovered it").

[489] *Dexia* SA/NV, 2013 U.S. Dist. LEXIS 30916, at *28–29; *see also Christopher*, 2011 U.S. Dist. LEXIS 60201, at *33–34.

[490] *See In re Lehman Bros. Sec. & ERISA Litig.*, Case No. 09-MD-2017, 2012 U.S. Dist. LEXIS 148177, at *82 (S.D.N.Y. Oct. 15, 2012); *see also Kittay v. Atl. Bank of N.Y. (In re Global Serv. Group LLC)*, 316 B.R. 451, 462 (Bankr. S.D.N.Y. 2004) ("Without a primary violation, there is no wrongdoing to aid and abet."); *Alliance Bank v. Dykes*, Case No. A12-0455, 2012 Minn. App. Unpub. LEXIS 1253, at *33–34 n.12 (Minn. Ct. App. Dec. 31, 2012) (unpublished) (affirming decision granting defendant's motion for summary judgment on aiding and abetting claim in part "under the first element of such a claim because it is contingent on the conclusion that [the primary tortfeasor] breached its fiduciary duty").

[491] *Banque Arabe et Internationale D'Investissement v. Md. Nat'l Bank*, 57 F.3d 146, 153 (2d Cir. 1995) (applying New York law); *see also Eurycleia Partners, LP v. Seward & Kissel, LLP*, 12 N.Y.3d 553, 559 (N.Y. 2009) ("The elements of a cause of action for fraud [under New York law] require a material misrepresentation of a fact, knowledge of its falsity, an intent to induce reliance, justifiable reliance by the plaintiff and damages."); *Damon v. Groteboer*, Civ. No. 10-92, 2013 U.S. Dist. LEXIS 45223, at *38 (D. Minn. Mar. 29, 2013) ("Under Minnesota law, the elements of fraud are: (1) there was a false representation by a party of a past or existing material fact susceptible of knowledge; (2) made with knowledge of the falsity of the representation or made as of the party's own knowledge without knowing whether it was true or false; (3) with the intention to induce another to act in reliance thereon; (4) that the representation caused the other party to act in reliance thereon; and (5) that the party suffer pecuniary damage as a result of the reliance.").

Third-Party Claimants assert that, like certain of their securities law claims, the common law fraud claims underlying the aiding and abetting claims brought against AFI either will or "have already survived motions to dismiss, and will proceed to trial."[492] Certain common law fraud claims asserted by Third-Party Claimants against the Debtors and Ally Securities have foundered at the pleading stage for failure to plead fraud with the requisite particularity.[493] In several other cases, however, such primary claims have survived the pleading stage and proceeded to discovery.[494]

Definitive conclusions concerning the likelihood of success of the primary fraud claims underlying Third-Party Claimants' aiding and abetting claims in these fourteen pending RMBS Actions (and other such underlying claims) are outside the scope of the Investigation. The Examiner further describes, in Section VIII.C.2.b, the primary common law fraud claims that have been asserted against Ally Securities.

---

[492] Joint Submission Paper of AIG, Allstate Life Ins. Co., Mass. Mut. Life Ins. Co., and Prudential Ins. Co. of Am., dated Oct. 17, 2012, at 35; *see also* Joint Submission Paper of Federal Home Loan Banks of Boston, Chicago, and Indianapolis, dated Oct. 19, 2012, at 21 ("[T]he FHLBs' effectively universal success in defeating Defendants' motions to dismiss provides support for the conclusion that [their] claims have merit.").

[493] *See* Order, *Union Cent. Life Ins. Co., et al. v. Ally Fin., Inc.*, Civ. No. 11-02890, Docket No. 263, at 3 (S.D.N.Y. Mar. 29, 2013) (dismissing without prejudice common law fraud claims because plaintiffs "have not pled any facts with particularity to demonstrate [defendants'] scienter"); Order Granting Defendants' Motions to Dismiss Compl., *Huntington Bancshares, Inc. v. Ally Fin., Inc.*, Case No. 27-CV-11-20276, at 6– 7 (Minn. Dist. Ct. Dec. 11, 2012) (dismissing common law fraud claim where "Plaintiff has not pled with particularity which specific [defendant] was responsible for the alleged misrepresentation or omission and . . . has not identified the specific misrepresentation or omission"); *see also Footbridge Ltd. Trust v. Countrywide Home Loans, Inc.*, Civ. No. 09-4050, 2010 U.S. Dist. LEXIS 102134, at \*69–70 (S.D.N.Y. Sept. 28, 2010) (dismissing common law fraud claims for failure to plead with particularity "a material, false representation or that defendants made such statements with an intent to defraud the plaintiffs").

[494] *See FHFA v. Ally Fin., Inc.*, Civ. No. 11-7010, 2012 U.S. Dist. LEXIS 179768, at \*18 (S.D.N.Y. Dec. 19, 2012) (denying in part motion to dismiss common law fraud claims asserted against Ally Securities); *Allstate Ins. Co. v. GMAC Mortgage, LLC*, Case No. 27-cv-11-3480, at 12 (Minn. Dist. Ct. Nov. 28, 2011) (denying motion to dismiss common law fraud claims asserted against certain of the Debtors and Ally Securities in part because "[a]llegations of wholesale abandonment of underwriting standards that loan originators purported to follow, but in fact ignored, meet the particularity requirement for fraud"); *W. & S. Life Ins. Co. v. Residential Funding Co., LLC*, Case No. A1105042, 2012 Ohio Misc. LEXIS 100, at \*28 (Ohio Ct. Com. Pl. June 6, 2012) (denying motion to dismiss common law fraud claim against Ally Securities and rejecting argument that complaint "fails to state the fraud and misrepresentation claims with particularity"); *MBIA Ins. Co. v. Residential Funding Co., LLC*, Index No. 603552/08, 2009 N.Y. Misc. LEXIS 3523, at \*13 (N.Y. Sup. Ct. Dec. 22, 2009) (denying motion to dismiss common law fraud claim); *see also Dexia Holdings, Inc. v. Countrywide Fin. Corp.*, Civ. No. 11-07165, 2012 WL 1798997, at \*5 (C.D. Cal. Feb. 17, 2012) (denying motion to dismiss common law fraud claims as to alleged misrepresentations concerning "underwriting standards" and "appraisals, [LTV] ratios, and ratings"). Notably, in *MBIA Insurance Co. v. Ally Financial Inc.*, AFI's pending motion to dismiss MBIA's aiding and abetting fraud claim does not argue that MBIA fails to adequately plead an underlying fraud. *See* Am. Mem. of Law in Supp. of Defs.' Mot. to Dismiss, *MBIA Ins. Corp. v. Ally Fin. Inc.*, Civ. No. 12-02563, Docket No. 36, at 12 (D. Minn. Mar. 12, 2013) ("Whether MBIA was in fact defrauded by the Securitization Sponsors can be left for another day, for it is clear that the Complaint fails to plead adequately the elements of aiding and abetting fraud.").

### (b) Knowledge Of Fraud

#### (i) Legal Principles

The elements of a cause of action for aiding and abetting fraud include that "the defendant had actual knowledge of the wrongful conduct committed, not simply that the defendant should have known of the conduct."[495] Thus, actual, not "constructive knowledge" is required.[496] Although the "burden of demonstrating actual knowledge is a heavy one," the

---

[495] *Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 372, 442 (S.D.N.Y. 2010) (applying New York law); *see also Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 292 (2d Cir. 2006) ("actual knowledge is required to impose liability on an aider and abettor under New York law") (quotation marks omitted); *Thrivent Fin. for Lutherans v. Countrywide Fin. Corp.*, Civ. No. 11-07154, 2012 U.S. Dist. LEXIS 71376, at *18 (C.D. Cal. Feb. 17, 2012) ("Minnesota, like New York, requires a plaintiff to show . . . actual knowledge of the primary violation . . . ."); *Witzman v. Lehrman, Lehrman & Flom*, 601 N.W.2d 179, 188 (Minn. 1999) ("[W]here the conduct is not a facial breach of duty, courts have been reluctant to impose liability on an alleged aider and abettor for anything less than actual knowledge that the primary tort-feasor's conduct was wrongful.") (applying Minnesota law). "[U]nder certain circumstances, some courts [in the Second Circuit] have found that a plaintiff met the actual knowledge requirement for aiding and abetting fraud or a breach of fiduciary duty through allegations of conscious avoidance." *Clarke v. Cosmo (In re Agape Litig.)*, 773 F. Supp. 2d 298, 308 (E.D.N.Y. 2011). "Lower courts disagree whether conscious avoidance is legally equivalent to actual knowledge." *Krys v. Butt*, 486 Fed. Appx. 153, 157 n.5 (2d Cir. 2012) (collecting cases). Some of the courts considering the question have, however, construed "the difference [as] a narrow one" that will not always be "material." *Krys v. Sugrue (In re Refco Inc. Sec. Litig.)*, Civ. Nos. 08-3065, 08-3086, 2012 U.S. Dist. LEXIS 108305, at *17 (S.D.N.Y. July 28, 2012); *see also Boyarsky v. Hoberman (In re Jeweled Objects LLC)*, Adv. Pro. No. 10-03198, 2012 Bankr. LEXIS 3877, at *27 (Bankr. S.D.N.Y. Aug. 22, 2012) ("The distinction between actual knowledge and conscious avoidance is, at most miniscule, however: consciously avoiding something is tantamount to knowing it.").

[496] *See Chemtex, LLC v. St. Anthony Enters., Inc.*, 490 F. Supp. 2d 536, 546 (S.D.N.Y. 2007) ("New York courts . . . have uniformly required that a defendant have actual knowledge of the alleged fraud to sustain a claim for aiding and abetting."); *see also Kolbeck v. LIT Am. Inc.*, 939 F. Supp. 240, 246 (S.D.N.Y. 1996) ("New York common law . . . has not adopted a constructive knowledge standard for imposing aiding and abetting liability."). The Minnesota Supreme Court has suggested that "constructive knowledge" may arise where a defendant has a "long-term or in-depth relationship" with a tortfeasor whose "conduct is clearly tortious or illegal." *See Witzman*, 601 N.W.2d at 188 (allegations failed to satisfy "actual knowledge" requirement where "most of [the primary tortfeasor's] activities regarding the trusts were not clear violations of the broad discretionary authority he held as trustee"). Subsequent decisions have disagreed concerning the scope of this apparent exception to the "actual knowledge" requirement. *Compare Christopher v. Hanson*, Civ. No. 09-3703, 2011 U.S. Dist. LEXIS 60201, at *34–35 (D. Minn. June 6, 2011) (granting defendant's motion for summary judgment on aiding and abetting claim where there was no "evidence of actual knowledge", despite "in-depth familial relationship" of the defendants, because the determination of an underlying breach of duty "requires a fact-intensive look at [the primary tortfeasor's] conduct in comparison with that of a prudent person"); *with Bank of Montreal v. Avalon Capital Grp. Inc.*, Civ. No. 10-591, 2012 U.S. Dist. LEXIS 46935, at *21 (D. Minn. Apr. 3, 2012) (denying motion to dismiss aiding and abetting claim where "the facts pled . . . are sufficient to create a plausible implication of constructive knowledge [of the sole manager and owner of the primary tortfeasor] of clearly tortious or illegal conduct"). In *Huntington Bancshares, Inc. v. Ally Financial Inc.*, the Minnesota District Court for Hennepin County granted AFI's motion to dismiss aiding and abetting claims in part on the ground that the plaintiff had "not adequately pled actual knowledge of the alleged fraud." *See* Order Granting Defs.' Mots. to Dismiss Compl., Case No. 27-CV-11-20276, at 8 (Minn. Dist. Ct. Dec. 11, 2012) (applying Minnesota law). According to the court, "actual knowledge" was necessary because "the alleged primary tortfeasor's conduct is not a clear breach of a clear duty." *Id.*

defendant's "actual knowledge does not have to be based on defendant's explicit acknowledgment of the fraud."[497] "Rather, actual knowledge may be inferred from circumstantial evidence, provided that the central inquiry remains whether the evidence permits a reasonable finder of fact to infer that the defendant *actually knew* of the underlying fraud."[498] An inference of actual knowledge may arise from, inter alia, "facts showing a motive for participating in a fraudulent scheme and a clear opportunity to do so."[499]

A corporation may be charged with the knowledge of its directors, officers, and employees.[500] Without more, the parent-subsidiary relationship has in general not been found

---

[497] *IMG Fragrance Brands, LLC v. Houbigant, Inc.*, 759 F. Supp. 2d 363, 385 (S.D.N.Y. 2010); *see also Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 652 F. Supp. 2d 495, 503–04 (S.D.N.Y. 2009) (denying defendant's motion for summary judgment on aiding and abetting claim despite that "every . . . employee [of the defendant] has denied any actual knowledge of the fraud" and there was "no email, memorandum, or other . . . document that expressly admits knowledge of the fraud," because there was other evidence that "would permit a reasonable jury to infer that [defendant] had actual knowledge"); *Silverman v. United Talmudical Acad. Torah Vyirah, Inc. (In re Allou Distribs., Inc.)*, 446 B.R. 32, 51 (Bankr. E.D.N.Y. 2011) ("[A] defendant's admission of actual knowledge of the underlying fraud is likely to be rare. But such direct evidence of actual knowledge is not necessary to establish this element of the claim.").

[498] *In re Allou Distribs., Inc.*, 446 B.R. at 51; *see also Am. Bank of St. Paul v. TD Bank, N.A.*, Civ. No. 09-2240, 2011 U.S. Dist. LEXIS 49646, at *22 (D. Minn. May 9, 2011) ("Actual knowledge is usually a question of fact, as it must be inferred from circumstantial evidence.").

[499] *AHT Corp. v. Bioshield Techs., Inc. (In re AHT Corp.)*, 292 B.R. 734, (S.D.N.Y. 2003), *aff'd*, 123 Fed. Appx. 17 (2d Cir. 2005). An "ordinary economic motive" does not suffice. *See Burns v. Del. Charter Guar. & Trust Co.*, 805 F. Supp. 2d 12, 30 (S.D.N.Y. 2011) (dismissing aiding and abetting claim where "[d]efendants had no motive to assist Westgate in perpetrating a fraud on their investors, and any motive would have been ordinary economic motive").

[500] *See City of Monroe Emps.' Ret. Sys. v. Hartford Fin. Servs. Group, Inc.*, Civ. No. 10-2835, 2011 U.S. Dist. LEXIS 106046, at *48 (S.D.N.Y. Sept. 19, 2011) ("Courts routinely impute to the corporation the intent of officers and directors acting within the scope of their authority."); *In re Medtronic Inc., Sec. Litig.*, 618 F. Supp. 2d 1016, 1035 (D. Minn. 2009) ("Plaintiffs [may] establish corporate scienter by adequately alleging the scienter of individual corporate officers."); *In re Marsh & McLennan Cos., Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 481 (S.D.N.Y. 2006) ("A corporate defendant's scienter is necessarily derived from its employees. While there is no simple formula for how senior an employee must be in order to serve as a proxy for corporate scienter, courts have readily attributed the scienter of management-level employees to corporate defendants.") (citation omitted); *Adams v. RTC*, 831 F. Supp. 1471, 1480 (D. Minn. 1993) (granting defendant corporation's motion for summary judgment as to aiding and abetting securities fraud claim where the plaintiff "failed to produce any evidence demonstrating that an employee, officer, or director of [the corporation] had actual knowledge of any misrepresentations contained in, or omissions made from, the debenture offering documents").

sufficient to impute knowledge from one entity to another.[501] Likewise, that a parent company of an alleged primary violator "was vested generally with 'management and control' of [the subsidiary]" and "had the authority to require [the subsidiary] to comply with applicable laws" has been found insufficient to "permit an inference that [the parent] had actual knowledge of the alleged fraud."[502] More is needed to charge a parent with knowledge of a fraud by its subsidiary. For example, allegations that "high-level executives of the [parent] knew and participated in creating policies that incentivized high-risk lending and reduced controls [at its subsidiaries] in order to increase profits by creating greater numbers of RMBS regardless of quality" could, if proven, "satisfy the knowledge . . . requirement[ ] of aiding and abetting fraud."[503]

### (ii) Application To RMBS Claims

Third-Party Claimants assert that "[t]he evidence will show that [AFI] had actual and constructive knowledge that the Debtors were perpetrating a fraud through the securitizations."[504] AFI responds that it "had limited knowledge of the Debtors' day-to-day business" and that there is "no evidence that AFI had knowledge regarding any specific securitization transaction, let alone the alleged fraudulent conduct."[505]

As explained above, the Investigation revealed evidence suggesting that—if the facts underlying the alleged fraud were to be proven—there may be a basis to expect that Third-Party Claimants could prove that AFI had at least constructive knowledge of those facts.[506] For example, the existence of overlapping officers or directors among AFI and the Debtors presents a potential avenue for proof of knowledge that could be imputed to AFI.[507] Similarly, the audits AFI conducted through Audit Services of the mortgage and securitization operations

---

[501] *Compare Valentini v. Citigroup, Inc.*, 837 F. Supp. 2d 304, 317 (S.D.N.Y. 2011) ("[T]he mere existence of a parent-subsidiary or affiliate relationship is not on its own sufficient to impute the scienter of the subsidiary to the parent or affiliate. Instead, plaintiffs must demonstrate that the parent or affiliate possessed some degree of control over, or awareness about, the fraud."), *and Defer LP v. Raymond James Fin., Inc.*, 654 F. Supp. 2d 204, 218 (S.D.N.Y. 2009) ("[T]here is no . . . rule requiring the imputation of a subsidiary's knowledge to its parent, at least where there are no allegations as to the existence of an agency relationship or other foundation on which to premise the parent's vicarious liability."), *with Marino v. Grupo Mundial Tenedora, S.A.*, Civ. No. 10-4126, 2011 U.S. Dist. LEXIS 27543, at *15 (S.D.N.Y. Mar. 17, 2011) (holding that "knowledge of the transaction should be attributed to [defendant]" that was "a wholly-owned and controlled shell subsidiary of [the alleged primary violator] set up for the sole purpose of receiving the proceeds of the below fair market value sale . . . to disguise the self-dealing transaction").

[502] *Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt. LLC*, 376 F. Supp. 2d 385, 412–13 (S.D.N.Y. 2005).

[503] *Dexia SA/NV v. Bear, Stearns & Co., Inc.*, Civ. No. 12-4761, 2013 U.S. Dist. LEXIS 30916, at *29–30 (S.D.N.Y. Feb. 26, 2013).

[504] MBIA Submission Paper, dated Nov. 9, 2012, at 25.

[505] *See* AFI Submission Paper, dated Dec. 19, 2012, at 36–37.

[506] *See* Section VIII.C.2.a(2)(d)(ii).

[507] *See id*.

of its subsidiaries from 2004 through 2007 offer another potential opportunity where additional discovery would clarify whether the audit process resulted in AFI obtaining knowledge of the facts underlying the alleged fraud.[508]

However, Third-Party Claimants have not produced nor has the Investigation revealed any evidence to support the assertion that AFI possessed actual knowledge of the facts underlying the fraud alleged by Third-Party Claimants. MBIA asserts that "[i]n early 2007, AFI replaced management throughout the Debtors with hand-picked executives," which "provided AFI with additional knowledge . . . of the Debtors' . . . securitization practices."[509] In particular, MBIA asserts that two of those "hand-picked" executives—Jim Redmond (ResCap Chief Risk Officer) and Luke Hayden (Head of Capital Markets)—may have obtained "insight into the deficient aspects of the Debtors' securitization practices."[510] The available evidence supports the proposition that after the close of the Cerberus PSA various members of the Debtors' management were replaced by individuals (including Redmond and Hayden) who were recruited, directly or indirectly, by Cerberus and AFI.[511] Nonetheless, there are at least two reasons why knowledge of facts underlying the alleged fraud possessed by Redmond and Hayden, if any, may not be probative of AFI's knowledge of those same facts at a relevant time. First, neither joined ResCap earlier than March 2007, which MBIA acknowledges was after the closing of all but two of the seven transactions it challenges (and months or years after many of the securitizations challenged by other Third-Party Claimants).[512] Second, MBIA does not assert that after Redmond and Hayden were "installed" by AFI they also served as officers of AFI.[513] Subject to evidence that they or other "hand-picked" executives of the Debtors communicated such facts to AFI, therefore, their knowledge may not be imputed to AFI on the basis of the parent-subsidiary relationship alone.[514]

---

[508]   *See id.*

[509]   *See* MBIA Submission Paper, dated Nov. 9, 2012, at 27.

[510]   *See id.* at 27–28; Int. of J. Redmond, Nov. 13, 2012, at 5:22–6:25.

[511]   *See* Sections III.E, VII.A.1.f(4)(b)(iv); *see also* Int. of J. Redmond, Nov. 13, 2012, at 5:22–6:25 ("In 2006 . . . some people I'd worked with before . . . . asked me to come help them with the [Cerberus] diligence on the GMAC portal portfolio [as a consultant]. . . . [T]hat's primarily what I was doing until sometime in the first part of January '07, when Jim Jones reached out and said would I like to come to work for ResCap . . . . Eventually I joined the team . . . sometime between March and April of '07 and that's how I got involved with ResCap."). Cerberus and AFI also installed Cerberus and COAC employees at ResCap as consultants pursuant to the April 1, 2007 Consulting Agreement. *See* Section III.E.

[512]   *See* MBIA Submission Paper, dated Nov. 9, 2012, at 4, 32; *see also* Int. of J. Redmond, Nov. 13, 2012, at 6:22–25 ("I joined the [ResCap] team . . . sometime between March and April of '07"). For the same reason, MBIA's assertion that "Khattri met with MBIA in [July] 2007 to discuss expanding the relationship between MBIA and the Debtors" is not, without more, probative of AFI knowledge of the facts underlying the alleged fraud. *See* MBIA Submission Paper, dated Nov. 9, 2012, at 4, 32.

[513]   *See* MBIA Submission Paper, dated Nov. 9, 2012, at 27–28.

[514]   *See Valentini v. Citigroup, Inc.*, 837 F. Supp. 2d 304, 317 (S.D.N.Y. 2011) ("[T]he mere existence of a parent-subsidiary or affiliate relationship is not on its own sufficient to impute the scienter of the subsidiary to the parent or affiliate.").

The evidence of AFI's knowledge proffered by FGIC has similar limitations. FGIC asserts that "at least one [AFI] employee . . . appeared on the working group list for [certain securitization transactions insured by FGIC] and received all distributions . . . including all drafts, final versions, and communications concerning the Operative and Offering Documents."[515] FGIC did not provide the Examiner with any such communications that it considered probative of that unidentified AFI employee's knowledge of the alleged fraud and, without evidence that such communications were further shared with officers or directors of AFI, any such knowledge possessed by that "employee" is unlikely to be imputed to AFI.[516]

That Third-Party Claimants have not provided and the Investigation has not uncovered evidence to support the assertion that AFI possessed actual knowledge of the facts underlying the alleged fraud is not, of course, dispositive of whether Third-Party Claimants would succeed after conducting further discovery in proving the requisite knowledge with respect to each challenged securitization.

### (c) Substantial Assistance

#### (i) Legal Principles

Third-Party Claimants must further plead and prove "substantial assistance" in the alleged primary violation, which exists "where a defendant affirmatively assists, helps conceal, or by virtue of failing to act when required to do so enables the fraud to proceed."[517] "[T]he actions of the aider/abettor [must have] proximately caused the harm on which the primary liability is predicated."[518] Accordingly, "'[b]ut-for' causation is insufficient; aider and

---

[515] FGIC Submission Paper, dated Oct. 17, 2012, at 24.

[516] *See In re Marsh & McLennan Cos., Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 481 (S.D.N.Y. 2006) ("While there is no simple formula for how senior an employee must be in order to serve as a proxy for corporate scienter, courts have readily attributed the scienter of management-level employees to corporate defendants.") (internal citation omitted).

[517] *Fezzani v. Bear, Stearns & Co., Inc.*, 592 F. Supp. 2d 410, 423 (S.D.N.Y. 2008) (quoting *Cromer Fin. Ltd. v. Berger*, 137 F. Supp. 2d 452, 470 (S.D.N.Y. 2001)).

[518] *Cromer Fin. Ltd.*, 137 F. Supp. 2d at 470; *see also Metge v. Baehler*, 762 F.2d 621, 624 (8th Cir. 1985) ("Regarding the 'substantial assistance' factor, we note that the district court properly held that the appellants had the burden of showing that the secondary party proximately caused the violation."); *In re TMJ Implants Prods. Liab. Litig.*, 880 F. Supp. 1311, 1319 (D. Minn. 1995) ("A plaintiff seeking to demonstrate aiding-abetting liability must also show proximate cause . . . .").

abettor liability requires the injury to be a direct or reasonably foreseeable result of the conduct."[519] "Inaction is actionable participation only when the defendant owes a fiduciary duty directly to the plaintiff."[520]

Several courts have found the provision of routine business services to, or the entry into ordinary course transactions with, an alleged primary violator, without more, to be insufficient to demonstrate substantial assistance.[521] However, even conduct "routinely performed in the course of business" can "constitute substantial assistance under some circumstances, such as

---

[519] *Cromer Fin. Ltd.*, 137 F. Supp. 2d at 470; *see also In re TMJ Implants Prods. Liab. Litig.*, 880 F. Supp. at 1319 (proximate cause requires a "substantial causal connection between the culpable conduct of the alleged aider and abettor and the harm to the plaintiff" or that "the encouragement or assistance is a substantial factor in causing the resulting tort") (quotation marks omitted).

[520] *Cromer Fin. Ltd.*, 137 F. Supp. 2d at 470 (quotation marks omitted); *see also Am. Bank of St. Paul v. TD Bank, N.A.*, Civ. Nos. 12-1806, 12-1862, 12-23999, 2013 U.S. App. LEXIS 8489, at *7 (8th Cir. Apr. 26, 2013) ("Some affirmative step is required, because the mere presence of the particular defendant at the commission of the wrong, or his failure to object to it, is not enough to charge him with responsibility.") (applying Minnesota law); *Christopher v. Hanson*, Civ. No. 09-3703, 2011 U.S. Dist. LEXIS 60201, at *34–35 (D. Minn. June 6, 2011) (granting defendant's motion for summary judgment on aiding and abetting claim where "the showing of substantial assistance . . . amounts to a failure to monitor"); *J.P. Morgan Chase Bank v. Winnick*, 406 F. Supp. 2d 247, 258 (S.D.N.Y. 2005) ("Mere presence [at meetings], and passive receipt of email, cannot, by definition, constitute affirmative assistance.").

[521] *See Greenberg v. Bear, Stearns & Co.*, 220 F.3d 22, 29 (2d Cir. 2000) ("The simple providing of normal clearing services to a primary broker who is acting in violation of the law does not make out a case of aiding and abetting against the clearing broker.") (quotation marks omitted); *Halo Tech Holdings, Inc. v. Cooper*, Civ. No. 07-489, 2008 U.S. Dist. LEXIS 24831, at *66 (D. Conn. Mar. 26, 2008) (granting motion to dismiss aiding and abetting fiduciary duty claim despite allegations that defendants provided substantial assistance "by performing due diligence, providing financial advice, participating in negotiations, and continuing their financial support," because those actions were merely "steps to complete the [transaction]" that had been commenced before defendants learned of the alleged breach of fiduciary duty) (applying Connecticut law); *Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 446 F. Supp. 2d 163, 174 (S.D.N.Y. 2006) (granting motion to dismiss aiding and abetting fraud claim against "prime broker and custodian" to hedge funds allegedly defrauded by their manager despite allegations that broker provided the manager "with dial-in access to its computer network and allow[ed] him to generate false position statements"; explaining that "routine functions such as clearing trades, administrative tasks, and portfolio management" did not, in this context, plead "substantial assistance" in the underlying fraud); *Felker v. McGhan Med. Corp. (In re Minn. Breast Implant Litig.)*, 36 F. Supp. 2d 863, 877 (D. Minn. 1998) (dismissing claim that defendant that allegedly "sold the division knowing that the breast implants were defective" had aided and abetted the subsequent torts of the third party that purchased the division; allegations that defendant "allowed [the third party] to purchase the implant division on credit" and "reorganized the debt twice following the . . . sale" did not "rise to the level of substantial assistance") (applying Arizona law); *In re TMJ Implants Prods. Liab. Litig.*, 880 F. Supp. at 1319 (granting defendant parent company's motion for summary judgment on aiding and abetting claim where the parent provided "research assistance and facilities" to its primary violator subsidiary but "[t]here [was] no evidence . . . that [the subsidiary] was 'heavily dependent' upon [its parent] for any assistance regarding the manufacture of [the allegedly defective] TMJ implants").

where there is an extraordinary motivation to aid the fraud."[522] "The critical test is not . . . whether the alleged aiding and abetting conduct was routine, but whether it made a substantial contribution to the perpetration of the fraud."[523]

Some courts have required that "where the alleged primary violations consist of misrepresentations in a document, the defendant must be alleged to have given substantial assistance to the making and dissemination of that document."[524] If otherwise, "in most situations, [the plaintiffs] could not say that their losses were proximately caused by the aider and abettor's actions."[525] For example, in *Dexia Holdings, Inc. v. Countrywide Financial Corp.*, the U.S. District Court for the Central District of California granted a motion to dismiss aiding and abetting fraud claims asserted under New York law against a defendant that "operates [one of the alleged primary violators] as a subsidiary."[526] The district court explained that the defendant "must have assisted with the allegedly false statements [concerning mortgage loan underwriting standards, appraisal and LTV ratios, investment ratings, and title transfers] that form the basis of the complaint; assistance with underwriting at Countrywide generally does not suffice."[527] Other courts have determined that a plaintiff need not prove that a defendant "assist[ed] in the preparation of the documents themselves" if those documents were but one part of a "highly interdependent scheme in which both parties

---

[522] *Winnick*, 406 F. Supp. 2d at 257 (denying motion by in-house counsel to dismiss aiding and abetting claim where he was "alleged to have been directly involved in bringing about—including negotiating—transactions, which while not themselves necessarily fraudulent, are alleged to have been carried out solely for the purpose of inflating revenue and thus could reasonably be understood as a proximate cause leading foreseeably to defrauding the [plaintiffs]") (quotation marks omitted); *see also K&S P'ship v. Cont'l Bank, N.A.*, 952 F.2d 971, 980 (8th Cir. 1991) ("[A] party's involvement in only routine business transactions will not necessarily protect it from aiding and abetting liability.") (applying federal common law); *Primavera Familienstiftung v. Askin*, 130 F. Supp. 2d 450, 511 (S.D.N.Y. 2001) (collecting cases where participation in "ordinary course transactions" or "financing the fraudulent scheme" was considered "substantial assistance" in context). Courts applying Minnesota law have evaluated knowledge and substantial assistance "in tandem" and, thus, "where there is a minimal showing of substantial assistance, a greater showing of scienter is required." *Witzman v. Lehrman, Lehrman & Flom*, 601 N.W.2d 179, 188 (Minn. 1999) (quotation marks omitted).

[523] *Id.* at 257.

[524] *Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC*, 479 F. Supp. 2d 349, 371 (S.D.N.Y. 2007); *see also Morin v. Trupin*, 711 F. Supp. 97, 113 (S.D.N.Y. 1989) (granting motion to dismiss aiding and abetting claim where "plaintiffs acknowledge that the . . . defendants had no involvement in the preparation or dissemination of the offending documents").

[525] *Fraternity Fund Ltd.*, 479 F. Supp. 2d at 371.

[526] *See* Civ. No. 11-07165, 2012 U.S. Dist. LEXIS 71374, at *25 (C.D. Cal. Feb. 17, 2012).

[527] *Id.* at *24.

benefitted from [the primary violator's] fraudulent activity."[528] "In such circumstances, allegations that a defendant actively assisted and facilitated the fraudulent scheme itself . . . are sufficient."[529]

### (ii) Application To RMBS Claims

Third-Party Claimants assert that AFI "provided substantial assistance to the Debtors' [fraud]" including through "managerial and financial assistance."[530] AFI responds that it never "provided substantial assistance in support of . . . any fraud" and that Third-Party Claimants "only point to alleged conduct occurring after the . . . securitizations at issue."[531]

The Investigation has revealed no evidence that supports the assertion that AFI provided substantial assistance to the conduct alleged to give rise to Third-Party Claimants' common law fraud claims. The Examiner discusses below the parties' arguments and the available evidence, including with respect to: (A) direction and control of the securitizations at issue; (B) financial support; and (C) shared functions and services.

### (A) Direction And Control Of The Debtors' Securitizations

Third-Party Claimants assert as evidence of substantial assistance that "AFI controlled the Debtors and directed their loan acquisition, underwriting and securitization practices."[532] Third-Party Claimants note that there were "shared officers and directors among and between [AFI] and its subsidiaries" with "overlapping responsibilities."[533] As discussed above, there was extensive overlap of the directors and officers of AFI with those of ResCap, and each member of the ResCap Board was elected by AFI.[534] Moreover, at least in certain circumstances and on an informal basis, certain members of the management of the Debtors

---

[528] *ABF Capital Mgmt. v. Askin Capital Mgmt., L.P.*, 957 F. Supp. 1308, 1328 (S.D.N.Y. 1997).

[529] *Id.* ("[T]he allegations related to the Brokers' involvement in the fraudulent scheme need not be limited to assistance with the preparation of the materials themselves, and their provision of the allegedly 'toxic' securities and lenient financing constitute substantial assistance in the fraud."); *see also Nathel v. Siegal*, 592 F. Supp. 2d 452, 470 (S.D.N.Y. 2008) (denying motion to dismiss aiding and abetting fraud claim where defendants "signed Partnership Agreements that misrepresented their expertise and permitted [the primary violator] to represent them as experts in the oil and gas field," despite that defendants did not assist in the preparation of the allegedly misleading offering memoranda provided to plaintiffs); *Gabriel Capital, LP v. NatWest Fin., Inc.*, 94 F. Supp. 2d 491, 495 n.1, 512 (S.D.N.Y. 2000) (denying motion to dismiss aiding and abetting fraud claim where the complaint did not "allege that [defendant] participated in the drafting of the [misleading] Offering Memorandum or slides," but defendant's "participation in this scheme played a substantial role in inducing . . . investors to purchase the [debt securities]" issued pursuant to that offering memorandum for an experimental steel mill venture because defendant was the "owner of a well-regarded [similar] operation").

[530] MBIA Submission Paper, dated Nov. 9, 2012, at 25, 31; *see also* FGIC Submission Paper, dated Oct. 17, 2012, at 24; Joint Submission Paper of AIG, Allstate Life Ins. Co., Mass. Mut. Life Ins. Co., and Prudential Ins. Co. of Am., dated Oct. 17, 2012, at 25–26.

[531] *See* AFI Submission Paper, dated Dec. 19, 2012, at 36, 40 (emphasis omitted).

[532] MBIA Submission Paper, Nov. 9, 2012, at 31.

[533] FGIC Submission Paper, dated Oct. 17, 2012, at 23.

[534] *See* Section VIII.C.2.a(2)(c)(ii)(B); Appendix IV.A.

would report to management of AFI.[535] AFI disputes that any of its directors and officers had "any involvement in selecting loans for collateral pools, conducting due diligence on the loans, approving individual RMBS issuances, drafting offering materials, or marketing RMBS for sale."[536]

The Investigation has not uncovered evidence that AFI—through such overlapping directors and officers or otherwise—had any direct involvement in any of the Debtors' securitizations.[537] Those individuals interviewed by the Examiner's Professionals either denied or could not recall any such involvement.[538] The evidence provided to the Examiner by Third-Party Claimants does not, without more, suggest an inference to the contrary. For example, FGIC asserts that AFI officer David Walker "acting as a director of [RAMP]" was "a signatory to RAMP's December 20, 2005 'Unanimous Written Consent of Directors in Lieu of Meeting of Board of Directors,' which was included among the closing documents for [a securitization transaction for which FGIC provided insurance]."[539] FGIC does not, however, provide evidence that Walker was involved with the acquisition of relevant mortgage loans, the pooling of those loans in securitizations, the preparation of the deal documents for those securitizations, or any of the alleged misrepresentations allegedly made to FGIC.[540] If accurate, the Examiner considers the fact that an AFI officer signed a written consent as a director of one of the Depositor Entities, which was then "included among" insurance transaction documents, to be unlikely, by itself, to weigh in favor of a finding that AFI made "a substantial contribution to the perpetration of the fraud."[541]

### (B) Financial Support

Third-Party Claimants also assert as evidence of substantial assistance that "AFI made $1 billion worth of capital infusions into ResCap over the first four months of 2007."[542] AFI responds that "AFI's financial investment . . . in ResCap" is "common . . . of a parent-subsidiary relationship" and that "helping ResCap continue in business" did not "proximately cause[ ] any of the losses for which [Third-Party Claimants] seek redress."[543] The timing and

---

[535]  *See* Section VIII.C.2.a(2)(d)(ii).

[536]  *See* AFI Submission Paper, dated Dec. 19, 2012, at 35.

[537]  *See* Section VIII.C.2.a(2)(c)(ii)(B).

[538]  *See id.*

[539]  FGIC Submission Paper, dated Oct. 17, 2012, at 23.

[540]  *Id.*

[541]  *J.P. Morgan Chase Bank v. Winnick*, 406 F. Supp. 2d 247, 257 (S.D.N.Y. 2005).

[542]  MBIA Submission Paper, Nov. 9, 2012, at 32; *see also* FGIC Submission Paper, dated Oct. 17, 2012, at 21 ("[AFI] also provided ResCap with liquidity and capital in order to perpetuate the securitization business"); Joint Submission Paper of AIG, Allstate Life Ins. Co., Mass. Mut. Life Ins. Co., and Prudential Ins. Co. of Am., dated Oct. 17, 2012, at 25 ("[AFI's] 2011 Form 10-K states that 'ResCap remains heavily dependent on [AFI] and its affiliates for funding and capital support.'").

[543]  *See* AFI Submission Paper, dated Dec. 19, 2012, at 33, 40.

circumstances of AFI's financial support of ResCap are likely to pose hurdles to Third-Party Claimants' efforts to rely upon that support as evidence of substantial assistance of the alleged primary violations.

First, AFI's financial support of ResCap occurred after most, if not all, of the fraudulent misrepresentations alleged by Third-Party Claimants and therefore could not have assisted in causing such misrepresentations. Although AFI provided more than \$8 billion in financial support to ResCap in advance of the Petition Date in 2012, that support did not begin until March 2007.[544] Before the end of 2007, the Debtors had ceased private label securitizations.[545] Second, to the extent Third-Party Claimants' primary fraud claims rely upon misrepresentations that occurred on or after the date AFI commenced its financial support of ResCap, such support may be viewed as the type of ordinary business conduct that does not, without more, constitute "substantial assistance."[546] The Examiner expects that it would be difficult, given the available evidence, for Third-Party Claimants to prove that AFI's capital contributions to ResCap provided the requisite substantial assistance to the alleged fraud in connection with the securitizations at issue.[547]

The Examiner reaches similar conclusions concerning FGIC's assertion as evidence of substantial assistance that AFI "modif[ied] its corporate structure" to "improve and maintain the investment-grade rating and profitability of [its] mortgage securitization business."[548] Presumably referring to the formation of ResCap and contribution in 2005 of RFC and GMAC Mortgage to ResCap, FGIC is correct that the available evidence indicates that this restructuring was intended to allow the mortgage business, through ResCap, to "obtain[] investment grade credit ratings for its unsecured indebtedness that are separate from [AFI's and GM's] ratings."[549] As with AFI's direct financial support of the Debtors, the Examiner expects it would be challenging, given the available evidence, to prove that lowering the

---

[544] *See* Section VI.B.

[545] *See* Section III.G; Int. of J. Gray, Mar. 1, 2013, at 61:8–63:23 ("I think in early August [2007] there was a significant pullback in the marketplace in terms of what investors were willing to buy and I think that was the major impetus for [shutting down non-conforming products].").

[546] *See Felker v. McGhan Med. Corp.(In re Minn. Breast Implant Litig.)*, 36 F. Supp. 2d 863, 877 (D. Minn. 1998) (dismissing claim that defendant that allegedly "sold the division knowing that the breast implants were defective" had aided and abetted the subsequent torts of the third party that purchased the division; allegations that defendant "allowed [the third party] to purchase the implant division on credit" and "reorganized the debt twice following the . . . sale" did not "rise to the level of substantial assistance") (applying Arizona law).

[547] *Cf. Henry v. Lehman Commercial Paper, Inc.*, 471 F.3d 977, 995 (9th Cir. 2006) (finding evidence that parent "satisfied all of [its mortgage origination subsidiary's] financing needs" sufficient to support jury finding of "substantial assistance" in "a situation where [the subsidiary's] whole business is built like a house of cards on a fraudulent enterprise").

[548] FGIC Submission Paper, dated Oct. 17, 2012, at 22, 24.

[549] *See* General Motors Acceptance Corporation, Annual Report (Form 10-K) (March 28, 2006), at 5; *see also* Section III.B.

Debtors' costs of raising capital via a 2005 restructuring was a proximate cause of the alleged fraudulent inducement of FGIC to provide insurance in connection with the Debtors' securitizations.[550]

### (C) Shared Functions And Services

Third-Party Claimants assert that AFI provided "managerial . . . and strategic assistance to its subsidiaries"[551] and that such "seemingly routine business practices give rise to aiding and abetting liability."[552] As explained above, AFI provided certain financial, operational, and administrative services to the Debtors for which it was paid management fees from 2004 through 2007 (and later).[553] The available evidence suggests, however, that such services would likely be found to be of minimal probative value as to AFI's alleged substantial assistance of fraud during the relevant time period. Certain corporate functions and services identified by the Debtors as being "shared" or "integrated" with AFI (e.g., in areas including information technology, human resources, finance, treasury, supply chain, capital markets, and facilities)[554] appear to be the type of ordinary business functions and services that would not, without more, be expected to have substantially assisted the alleged fraud.[555]

---

[550] *See Cromer Fin. Ltd. v. Berger*, 137 F. Supp. 2d 452, 470 (S.D.N.Y. 2001); *In re TMJ Implants Prods. Liab. Litig.*, 880 F. Supp. 1311, 1319 (D. Minn. 1995).

[551] FGIC Submission Paper, dated Oct. 17, 2012, at 24.

[552] MBIA Submission Paper, dated Nov. 9, 2012, at 31–32.

[553] *See* Section V.H (describing arrangements for sharing of certain services); *see also* Residential Capital Corporation, Annual Report (Form 10-K) (Mar. 28, 2006), at 143 ("[AFI] has provided [ResCap] with certain services for which a management fee was paid. [ResCap] paid [AFI] management fees of $8.7 and $5.4 million for 2005 and 2004, respectively."); Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2009), at 206 (disclosing management fees paid by ResCap to AFI from 2006–2008 for services in areas including "finance, information technology, communication, corporate marketing, procurement, and services related to facilities").

[554] *See* Debtors' Motion for Interim and Final Orders Under Bankruptcy Code [s]ections 105(a) and 363(b) Authorizing Residential Capital, LLC to Enter into a Shared Services Agreement with Ally Financial Inc. *Nunc Pro Tunc* to the Petition Date for the Continued Receipt and Provision of Shared Services Necessary for the Operation of the Debtors' Business [Docket No. 41] at ¶ 14.

[555] *See Greenberg v. Bear, Stearns & Co.*, 220 F.3d 22, 29 (2d Cir. 2000) ("The simple providing of normal clearing services to a primary broker who is acting in violation of the law does not make out a case of aiding and abetting against the clearing broker.") (quotation marks and citations omitted); *Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 446 F. Supp. 2d 163, 174, 203–04 (S.D.N.Y. 2006) (granting motion to dismiss aiding and abetting fraud claim against "prime broker and custodian" to hedge funds allegedly defrauded by their manager despite allegations that broker provided the manager "with dial-in access to its computer network and allow[ed] him to generate false position statements"; explaining that "routine functions such as clearing trades, administrative tasks, and portfolio management" did not, in this context, plead "substantial assistance" in the underlying fraud); *In re TMJ Implants Prods. Liab. Litig.*, 880 F. Supp. at 1319 (granting defendant parent company's motion for summary judgment on aiding and abetting claim where the parent provided "research assistance and facilities" to its primary violator subsidiary but "[t]here [was] no evidence . . . that [the subsidiary] was 'heavily dependent' upon [its parent] for any assistance regarding the manufacture of [the allegedly defective] TMJ implants").

Moreover, the evidence indicates that it was not until 2008 or later that many of the "global functions" including the in-house legal function were centralized within AFI.[556]

### b.  Claims Against Ally Securities As Securities Underwriter

#### (1) Ally Securities' Role As Underwriter Of RFC Offerings

The RMBS Claims involving Ally Securities focus on Ally Securities' role as underwriter in the applicable securitizations. Generally speaking, the role of an underwriter in a private label securitization is to bring the security into the marketplace.[557] From 2004 to 2007, Ally Securities underwrote "a significant portion of ResCap's securitization activity."[558] Specifically, it underwrote mortgage-backed securities issued by its affiliates of approximately $8.6 billion in 2004,[559] $14.3 billion in 2005,[560] $13.5 billion in 2006,[561] and $10.3 billion in 2007.[562]

#### (a) Lead Underwriter And Co-Underwriter

Ally Securities' role as underwriter varied in the securitizations. As detailed in Appendix VIII.B–1, Ally Securities was an underwriter on 236 of the 392 RFC and GMAC Mortgage securitizations. Of those securitizations, Ally Securities served as lead or joint lead

---

[556] *See* Int. of T. Hamzehpour, Oct. 5, 2012, at 67:16–68:3 ("The GMAC organization historically was an organization of business unit silos and he viewed that as redundant and he wanted centralized functions. So all of the functions—finance, compliance, risk, legal were expected to centralize, and legal was one of the last ones [in January 2009]."); Int. of L. Tessler, Feb. 28, 2013, at 33:23–34:3 ("[T]here are two ways to survive a crisis. You know, raise revenues and reduce expenses and raise liquidity. And I suspect all of those options were on the table [in June 2008].").

[557] Dep. of J. Getchis, Apr. 21, 2011, at 10:16–25 [MBIADEP0000278]. For a discussion of the role of an underwriter in securitizations, see Section VIII.B.1.a.

[558] Draft Goldin Associates Presentation to the Committee of Independent Members of the Board of Directors of Residential Capital, LLC Regarding the Purchase of Residential Funding Securities, LLC and RFC Investments Limited by GMAC, LLC, dated Mar. 18, 2009, at 11 [GOLDIN00132386]; Int. of K. Dammen, Apr. 25, 2013, at 14:20–24 ("[C]apital markets could create a security, have one of the Wall Street firms being the lead and [Ally Securities] as a co-lead or a co-manager, and place securities to certain accounts that we were in touch with.").

[559] Residential Funding Securities, Corporation Financial Statements and Supplementary Schedules, Dec. 31, 2004, at 11 [FHFA-AS-0314592].

[560] Residential Funding Securities Corporation Financial Statements and Supplementary Schedules, Dec. 31, 2005, at 11 [FHFA-AS-0314471].

[561] Residential Funding Securities, LLC Financial Statements and Supplementary Schedules, Dec. 31, 2006, at 11 [FHFA-AS-0314430].

[562] Residential Funding Securities, LLC Financial Statements and Supplementary Schedules, Dec. 31, 2007, at 11 [FHFA-AS-0314450].

underwriter 105 times, and served as co-underwriter 131 times.[563] Ally Securities typically served as lead underwriter in single issuer deals,[564] which were generally smaller.[565]

All underwriters, whether lead or otherwise, have certain roles and duties, as set forth in the applicable underwriting agreements.[566] These roles and duties are discussed in Section VIII.B.1.a. The role of lead underwriter carries more responsibility and a higher profile.[567] The lead underwriter takes the lead in structuring the securities with the sponsor, and has "a higher responsibility to bring in investor demand."[568] John Getchis, Chief Operational Officer of Ally Securities, described the difference in responsibility as follows:

> The lead underwriter would generally interact with the issuer to effect . . . the design and structure of the securitization in its final form; it would be responsible for the development of the offer[ing] materials; and primarily responsible for the price talk and setting expectations . . . of the proceeds they could expect in the marketplace for that particular securitization.[569]

Generally, the co-underwriter assists the lead underwriter in selling the RMBS into the marketplace.[570]

### (b) Due Diligence

Ally Securities purported to follow general procedures regarding due diligence performed on underlying loan pools.[571] These procedures provided that the diligence that Ally Securities performed was essentially a function of two variables: whether the loans were RFC collateral

---

[563] *See* Appendix VIII.B—1 and VIII.B—2. Data was obtained from RMBS prospectus supplements.

[564] Single issuer deals were deals where RFC capital markets purchased all of the loans from one correspondent. Int. of K. Dammen, Apr. 25, 2013, at 155:1–2.

[565] *Id.* at 121:10–12 ("I know that we were lead typically on single issuer deals which were considerably smaller.").

[566] *See* Section VIII.B.1.a.

[567] Int. of K. Dammen, Apr. 25, 2013, at 26:9–16 ("The lead underwriter is going to create the structure of the different classes or the different tranches. And they're going to buy the lion's share of the bonds. They're going to run the books . . . . And their name is going to be on the prospectus in the biggest letters.").

[568] Int. of E. Scholtz, Mar. 28, 2013, at 29:6–7.

[569] Dep. of J. Getchis, Apr. 21, 2011, at 13:24–14:10 [MBIADEP0000278].

[570] IAN GIDDY, THE SECURITIZATION PROCESS, Stern School of Business, New York University, 2001, at 41, http://people.stern.nyu.edu/igiddy/ABS/absprocess.pdf; Int. of E. Scholtz, Mar. 28, 2013, at 28:9–15.

[571] *See* Residential Funding Securities Policies and Supervisory Procedures Manual, updated Mar. 30, 2007, at 56 [EXAM12503903].

(i.e., RFC had purchased and diligenced the underlying loans)[572] and whether Ally Securities was a sole underwriter or a co-underwriter (either lead or otherwise).[573]

If the loans were RFC collateral and Ally Securities was the sole underwriter, Ally Securities would "rel[y] on the front-end review done by [RFC], additional due diligence [was] not conducted for each deal . . . ."[574] This was subject to two exceptions: monoline-insured deals and senior-subordinated deals.[575] Getchis explained that where Ally Securities was the sole underwriter, it was the only interested party—there was no other "interested party in [the] transaction to conduct additional diligence or insist upon additional diligence with the specific asset."[576] While Dennis Crosson, Director of Ally Securities, disagreed with the assertion that additional due diligence was not conducted where Ally Securities was the sole underwriter, stating that Ally Securities "always did a sample,"[577] evidence does not support this proposition.[578]

If the loans were RFC collateral and Ally Securities was a co-underwriter, the underwriters on a given deal would confer in hiring an outside due diligence firm and would share the results of this diligence.[579] Crosson explained that generally the lead underwriter would retain the third-party due diligence firm to conduct the due diligence by re-underwriting a sample of loans.[580] The use of this process is discussed in a January 2013 presentation

---

[572]  *See* Int. of K. Dammen, Apr. 25, 2013, at 33:14–16. The loans would not be considered RFC collateral if purchased from a correspondent who diligenced the loans. *See id.* at 155:3–24.

[573]  *See* Residential Funding Securities Policies and Supervisory Procedures Manual, updated Mar. 30, 2007, at 56 [EXAM12503903].

[574]  *Id.*

[575]  *Id.*; Underwriting Procedures, at FHFA-AS-0363175–76 [FHFA-AS-0363173]. Evidence indicates that these exceptions occurred frequently. In the Dammen interview, Jeffrey Lipps states that the monoline deals and the senior-subordinated deals were "a big portion of the securitizations." This was confirmed by Dammen. *See* Int. of K. Dammen, Apr. 25, 2013, at 35:4–36:8.

[576]  Dep. of J. Getchis, Apr. 21, 2011, at 156:15–158:7 [MBIADEP0000278].

[577]  Dep. of D. Crosson, Apr. 20, 2011, at 124:10–125:8 [MBIADEP0000500].

[578]  E-mail from J. Blaschko (Jan 8, 2007), at FHFA-AS-0255786 [FHFA-AS-0255785].

[579]  *E.g.,* AFI Submission Paper, dated Dec. 19, 2012, at 76.

[580]  Dep. of D. Crosson, Apr. 20, 2011, at 48:14–49:2 [MBIADEP0000500]. In some circumstances, the lead underwriter might conduct its own diligence. Residential Funding Securities Policies and Supervisory Procedures Manual, updated Mar. 30, 2007, at 56 [EXAM12503903]; Underwriting Procedures, at FHFA-AS-0363175 [FHFA-AS-0363173]. Ally Securities did not conduct its own diligence. *Id.*

prepared by Carpenter Lipps, summarizing the diligence related to the ResCap PLS process.[581] When Ally Securities retained an outside diligence firm, it typically retained Office Tiger LLC.[582]

If the loans were not RFC collateral with Ally Securities as sole underwriter, Ally Securities would hire an outside firm to perform diligence, which would either be a sample or a 100% review, depending on Ally Securities' comfort level with the loans.[583] If Ally Securities was a co-underwriter, it would share in the diligence with the other underwriters.[584] Employees of Ally Securities at the time believed that Ally Securities' loan review selection process was standard for the industry.[585]

Ally Securities was aware of the existence of problematic loans. For example, Ally Securities was aware in 2006 that RFC Trading was relying more on the originators' diligence process and that certain loans were underperforming.[586] That same year, Cerberus, in connection with its acquisition of AFI, brought in Navigant Consulting Inc., a third-party consulting firm, to go to Ally Securities and "check into the business and understand . . . what

---

[581] Carpenter Lipps ResCap PLS Overview Presentation, Jan. 30, 2013, at EXAM00234446 [EXAM00234431]. The presentation generally characterized the underwriting process in stages: (1) the underwriter oversees loan file diligence; (2) the lead underwriter retains an external diligence firm; (3) the underwriter randomly selects a loan sample; (4) the diligence firm reviews the actual loan files and provides initial results; (5) RFC's diligence underwriting team responds to these results by providing missing documents, clarifying the application of underwriting guidelines, and identifying compensating factors; and (6) the underwriter makes a final decision regarding whether to keep a loan or remove it from the pool. *Id.; see also* Int. of K. Dammen, Apr. 25, 2013, at 148:2–20 ("The process would be that if we were ever involved in diligence, which would be when we're a lead and could have been when we were co . . . . RFC does a quality control process for every loan that theyor for a sampling of loans that they buy. . . . [Ally Securities], though, we would diligence anywhere from a hundred percent to a lesser number, if we were the lead.").

[582] *E.g.,* AFI Submission Paper, dated Dec. 19, 2012, at 76. Evidence shows that Ally Securities also used Clayton at times. *See* Int. of K. Dammen, Apr. 25, 2013, at 145:25–146:3.

[583] Residential Funding Securities Policies and Supervisory Procedures Manual, updated Mar. 30, 2007, at 56 [EXAM12503903].

[584] *Id.*

[585] Int. of K. Dammen, Apr. 25, 2013, at 218:3–10 ("I believe that Dennis [Crosson] and John [Getchis] were consistent with the way the street was diligencing loans. . . . I believe the broker-dealer was doing diligence in a comparable way to other street firms."); E-mail from D. Crosson (Oct. 30, 2006), at 1 [FHFA-AS-0255028] ("GRS as Lead Underwriter has a selection process that we work to keep in line with other Street selection trends for diligence."). Crosson also noted that Ally Securities' underwriting process also covered Fannie Mae and Freddie Mac requirements, however the types of loans sold to such GSEs were typically conforming loans, rather than subprime and non-conforming loans. E-mail from D. Crosson (Feb. 7, 2007), at FHFA-AS-0115852 [FHFA-AS-0115849].

[586] E-mail from B. Cleary (Sept. 28, 2006) [FHFA-AS-0146218]; *see* Carpenter Lipps ResCap PLS Overview Presentation, Jan. 30, 2013, at EXAM00234442 [EXAM00234431] (listing B. Cleary under Trading in RFC).

we had bought, but maybe also what we were buying."[587] Navigant was also "reviewing processes and loan data."[588] After this review, "they had questions and subsequently either suggestions or directives on things that they might want changed."[589] Evidence indicates that Navigant found certain credits to have issues, including one which had "extremely liberal" underwriting guidelines.[590]

### (c) Offering Documents

The underwriter of a securitization had an obligation to ensure that disclosures in offering documents were accurate. This included testing the accuracy of the information disclosed in a prospectus against information from the issuer.[591] Getchis viewed lead or co-underwriters as having equal liability and therefore an equal interest in ensuring that the disclosures in offering materials were accurate.[592]

Ally Securities' policies and procedures manuals provided that in any securitization in which Ally Securities was an underwriter, RFG's Structured Finance group was to review the prospectus to ensure that the prospectus was adequately prepared and complied with all legal requirements.[593] The manuals provided that where Ally Securities was sole underwriter, RFG Structured Finance was to take the lead role on behalf of the underwriter, and coordinate all interactions. If Ally Securities was a co-underwriter, RFG Structured Finance was to assist

---

[587] Int. of K. Dammen, Apr. 25, 2013, at 65:9–12; Int. of D. Olson, Apr. 26, 2013, at 113:6–12 ("I viewed Navigant's role as being a resource to my group in making sure that we were on top of our credits and minimizing any losses that . . . would be occurring coming out of the . . . backing away, by Wall Street of buying mortgage loans.").

[588] Int. of K. Dammen, Apr. 25, 2013, at 65:18–23.

[589] *Id.*

[590] E-mail from J. DelPonti, Navigant Consulting (Dec. 21, 2006), at EXAM11336243 [EXAM11336242]; *see also* Int. of D. Olson, Apr. 26, 2013, at 114:3–8.

[591] Dep. of J. Getchis, Apr. 21, 2011, at 11:16–23; 33:19–25 [MBIADEP0000278]; *see* Int. of K. Dammen, Apr. 25, 2013, at 198:19–20 ("The underwriter has to make the—be comfortable with the reps and warrants made in the pro supp.").

[592] Dep. of J. Getchis, Apr. 21, 2011, at 15:7–15; *see also* Int. of K. Dammen, Apr. 25, 2013, at 29:17–30:10 ("[O]ur role at [Ally Securities] was to be comfortable with what capital markets has created, so understand that they're giving us sufficient information to describe those bonds to our investors. . . . And then our role . . . was to tell that story within the rules of how one tells a story to sell bonds. . . . [W]e always would describe the bonds within the purview of what we did as a broker/dealer and the SEC.").

[593] Residential Funding Securities Policies and Supervisory Procedures Manual, updated Mar. 30, 2007, at 58 [EXAM12503903]; Underwriting Procedures, at FHFA-AS-0363177 [FHFA-AS-0363173]; Underwriting Procedures, at EXAM30974518–20 [EXAM30974511]. The RFG Structured Finance Group were "the people that basically put the securities together, interact[ed] with the attorneys and accountants and the rating agencies and things of that nature, and create the different securities on the different shelves that RFC issued on." Int. of K. Dammen, April 25, 2013, at 13:8–13. Dammen also noted that "people on my staff would very carefully review the pro supp to make sure what they were saying was correct." *Id.* at 170:11–13.

Ally Securities in negotiations concerning allocation, pricing, fees, and expense sharing.[594] The manuals did not specify the process that applied where there was more than one underwriter, with Ally Securities as lead underwriter.[595]

### *(2) Description Of Claims Against Ally Securities*

Based upon Ally Securities' activities as underwriter, Third-Party Claimants generally assert that "[n]on-debtor Ally Securities . . . is directly liable for false statements in the Offerings Materials."[596] These plaintiffs allege that "[a]s underwriter for most of the certificates at issue, Ally Securities directly participated in the structuring of the RMBS, the preparation of the Offering Materials, and the marketing of the RMBS to investors."[597] Plaintiffs have asserted several causes of action against Ally Securities including claims based on (1) federal and state securities law; (2) common law fraud and fraudulent inducement; (3) aiding and abetting fraud; and (4) negligent misrepresentation.[598]

---

[594] Residential Funding Securities Policies and Supervisory Procedures Manual, updated Mar. 30, 2007, at 58–59 [EXAM12503903]; Underwriting Procedures, at FHFA-AS-0363177–78 [FHFA-AS-0363173]; Underwriting Procedures, at EXAM30974512–21 [EXAM30974511]. The manuals further provided that in deals where RFC did not provide collateral but was sole underwriter or co-underwriter, RFG Structured Finance represented Ally Securities to all external parties. Residential Funding Securities Policies and Supervisory Procedures Manual, updated Mar. 30, 2007, at 58–59 [EXAM12503903]; Underwriting Procedures, at FHFA-AS-0363177–78 [FHFA-AS-0363173]; Underwriting Procedures, at EXAM309745120–21 [EXAM30974511]; *see also* Dep. of J. Getchis, Apr. 21, 2011, at 193:14–23 [MBIADEP0000278] (describing the role of underwriter at other firms with respect to interactions with monoline insurers: "the underwriter would get the call and the underwriter would interact with monoline insurers. RFC had a different approach, is that the issuer would take on that relationship").

[595] Residential Funding Securities Policies and Supervisory Procedures Manual, updated Mar. 30, 2007, at 58–59 [EXAM12503903]; Underwriting Procedures, at FHFA-AS-0363177–78 [FHFA-AS-0363173]; Underwriting Procedures, EXAM309745120–21 [EXAM30974511].

[596] AIG, Allstate, MassMutual, and Prudential Joint Reply Submission Paper, dated Feb. 12, 2013, at 3.

[597] *Id.*

[598] These theories of recovery account for the overwhelming majority of claims against Ally Securities. Certain Third-Party Claimants have raised claims based on other theories which are not discussed as they have only been raised in a very limited context. Third-Party Claimant Union Central Life Insurance Co. brought a claim based on unjust enrichment, which was recently dismissed without prejudice. *Union Cent. Life Inc. Co. v. Ally Fin., Inc.*, Case No. 11-cv-2890, Docket No. 261 (S.D.N.Y. Mar. 29, 2013). Allstate Insurance Co. has brought a claim under the Minnesota Consumer Fraud Act, which has survived a motion to dismiss (along with its common law fraud claims). *See* Order, *Allstate Ins. Co. v. GMAC Mortg., LLC*, Case No. 27-cv-11-3480, Docket No. 740 at 24–34 (Minn. Dist. Ct. Nov. 28, 2011). However, this is the only instance in which such a claim is raised, and the parties do not address it at length in their submissions. Accordingly, while this claim may have some value, the Examiner focuses on the most significant disputed claims.

All of these theories of liability stem from alleged misrepresentations made in the RMBS Offering Documents. A number of Third-Party Claimants have separately described these misrepresentations or omissions in their complaints and submissions. The majority of these alleged misrepresentations are substantively similar, including that:

- ***The loans underlying the RMBS would be generated in accordance with underwriting guidelines***. Plaintiffs allege that the RMBS Offering Documents represent that the loans underlying the mortgage pools were originated in accordance with certain underwriting guidelines. However, these underwriting guidelines were systematically abandoned, and thus the loans underlying the RMBS were substantially riskier than advertised, and therefore much more likely to default.[599]

- ***The loans had specific LTV features and were based on valid appraisals performed in accordance with specific regulations and standards.*** Plaintiffs generally allege that despite representing that LTV and other ratios would not exceed specified percentages, Ally Securities routinely ignored this requirement. Further, it is alleged that the appraisals underlying such ratios were not performed in accordance with stated standards and were inflated without justification.[600]

- ***A specified percentage of the mortgage loan properties were the primary residence of the borrower***. Plaintiffs allege that the RMBS Offering Documents misstated and omitted information regarding the primary residence status of the mortgaged properties. They allege that Ally Securities knew that many of those properties were being purchased as investment properties or vacation homes rather than as a primary residence.[601]

- ***The ratings agencies conducted analyses that were designed to assess the likelihood of delinquency and defaults in the underlying mortgage pools.*** Plaintiffs allege that the ratings set forth in the RMBS Offering Documents were corrupted by unreliable data and faulty assumptions, which made representations that the process would assess the likelihood of receipt of payment misleading.[602]

---

[599] *E.g.,* AIG, Allstate, MassMutual, and Prudential Joint Reply Submission Paper, dated Feb. 12, 2013, at 5; Pl.'s Original Pet. for Damages, *FDIC v. Ally Sec. LLC*, Case No. 12-002522, Docket No. 1, at 23–30 (Tex. 200th Dist. Aug. 17, 2012).

[600] *E.g.,* AIG, Allstate, MassMutual, and Prudential Joint Reply Submission Paper, dated Mar. 15, 2013, at 7; AIG, Allstate, MassMutual, and Prudential Joint Reply Submission Paper, dated Feb. 12, 2013, at 8; Federal Home Loan Banks of Boston, Chicago, and Indianapolis Submission Paper, dated Oct. 19, 2012, at 11.

[601] *E.g.,* AIG, Allstate, MassMutual, and Prudential Joint Reply Submission Paper, dated Feb. 12, 2013, at 8–9; Federal Home Loan Banks of Boston, Chicago, and Indianapolis Submission Paper, dated Oct. 19, 2012, at 19. Plaintiffs state that these allegations are "just the tip of the iceberg. This is because the Offering Materials made representations as to numerous risk features beyond loan-to-value ratios and occupancy status that can only be scrutinized by reviewing the actual loan files, which the Investors largely do not have." AIG, Allstate, MassMutual, and Prudential Joint Reply Submission Paper, dated Mar. 15, 2013, at 4.

[602] *E.g.,* AIG, Allstate, MassMutual, and Prudential Joint Reply Submission Paper, dated Feb. 12, 2013, at 9–10; Federal Home Loan Banks of Boston, Chicago and Indianapolis Submission Paper, dated Oct. 19, 2012, at 18.

Third-Party Claimants adduce certain evidence of the falsity of these representations, which, as stated in complaints and submissions to the Examiner, is also substantively similar. In supporting their theories of liability, plaintiffs generally rely on the following evidence:

- ***Loan-Specific Forensic Analyses***. A number of Third-Party Claimants have engaged consultants to conduct investigations of the mortgage pools underlying the RMBS at issue. These consultants sampled loans from the RMBS transactions using an automated valuation model analysis. The claimants generally assert that these analyses show that a significant percentage of the loans sampled were inconsistent with representations in the RMBS Offering Documents, which evidences a systematic disregard of stated underwriting guidelines.[603]

- ***Review of Actual Loan Files***. Certain Third-Party Claimants were able to obtain and review samples of loan files for some RMBS. These claimants allege that the results of such reviews demonstrate that a large percentage of the loans did not comply with stated underwriting guidelines.[604]

- ***Confidential Witness Statements***. Third-Party Claimants assert that they have interviewed confidential witnesses, who have provided details regarding the improper origination and securitization practices employed with respect to the RMBS.[605]

- ***Rising Default Rates and Plummeting Credit Ratings***. Further, claimants point to existing defaults, high delinquency rates of the mortgage loans, and other "industry- and originator- specific facts" as evidence of the systematic abandonment of underwriting standards.[606]

Based on the alleged misrepresentations or omissions and the purported evidence of these misrepresentations or omissions, Third-Party Claimants have advanced several theories of liability against Ally Securities.[607]

---

[603] *E.g.,* AIG, Allstate, MassMutual, and Prudential Joint Reply Submission Paper, dated Feb. 12, 2013, at 6 ("The results not only show that the specific data-points were misrepresented, but also confirm a systemic underwriting abandonment problem. For example, AIG's analysis of nearly 14,400 loans revealed a breach rate of 36.5%, and Prudential's analysis of 22,400 loans revealed a breach rate of 41.66%."); Pl.'s Original Pet. for Damages, *FDIC v. Ally Sec. LLC*, Case No. 12-002522, Docket No 1, at 23–30 (Tex. 200th Dist. Aug. 17, 2012).

[604] *E.g.,* AIG, Allstate, MassMutual, and Prudential Joint Reply Submission Paper, dated Feb. 12, 2013, at 6–7 (stating that the results of AIG's review show "that over 90% of the loans failed to comply with underwriting guidelines" and that MBIA found "breach rates of 88 and 89%" across a sample of "thousands of mortgages") (emphasis omitted).

[605] *E.g.,* AIG, Allstate, MassMutual, and Prudential Joint Reply Submission Paper, dated Mar. 15, 2013, at 15.

[606] *E.g.,* AIG, Allstate, MassMutual, and Prudential Joint Reply Submission Paper, dated Feb. 12, 2013, at 5, 9–10.

[607] A discussion of potential damages under these theories of liability is set forth in Section VIII.D. Additionally, a discussion of potentially applicable statutes of limitation and repose is provided in Section VIII.C.2.a.3.e.

*(3) Analysis Of Claims*

*(a) Federal And State Securities Law*

Sections 11 and 12(a)(2) of the Securities Act of 1933[608] "impose liability on certain participants in a registered securities offering when the publicly filed documents used during the offering contain material misstatements or omissions."[609] "Section 11 . . . prohibits materially misleading statements or omissions in registration statements filed with the SEC" and "provides for a cause of action by the purchaser of the registered security against the security's issuer, its underwriter, and certain other statutorily enumerated parties."[610] "Section 12(a)(2) provides similar redress" against so-called "statutory sellers" where "the securities at issue were sold using prospectuses or oral communications."[611]

"[U]nlike securities fraud claims pursuant to [section 10(b) of Exchange Act], plaintiffs bringing claims under sections 11 and 12(a)(2) need not allege scienter, reliance, or loss causation."[612] Instead, the elements of a claim under section 11 require that:

> (1) [The plaintiff] purchased a registered security, either directly from the issuer or in the aftermarket following the offering; (2) the defendant participated in the offering in a manner sufficient to give rise to liability under section 11; and (3) the registration statement 'contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading.'[613]

---

[608] 15 U.S.C. §§ 77k(a); 77l(a)(2). Third-Party Claimants have also brought analogous state law claims. *E.g.. Mass. Mut. Life Ins. Co. v. Residential Funding Co, LLC*, 843 F. Supp. 2d 191 (D. Mass. 2012) (claims brought under Massachusetts Uniform Securities Act § 410(a)(2)); *W. & S. Life Ins. Co. v. Residential Funding Co., LLC*, Case No. A1105042, 2012 Ohio Misc. LEXIS 100 (Ohio Ct. Com. Pl. June 6, 2012) (claims under Ohio securities law).

[609] *Lindsay v. Morgan Stanley* (*In re Morgan Stanley Info. Fund Sec. Litig.*), 592 F.3d 347, 358 (2d Cir. 2010).

[610] *Id.*; *see also Wyo. State Treasurer v. Moody's Investors Serv., Inc.* (*In re Lehman Bros. Mortg.-Backed Sec. Litig.*), 650 F.3d 167, 175 (2d Cir. 2011). In *Wyo. State Treasurer*, the court found that:

> The imposition of strict liability [under Section 11] is limited, however, to statutorily enumerated parties: (1) signatories of the registration statement; (2) directors or partners of the issuer at the time of filing; (3) persons consenting to be named as about to become a director or partner; (4) accountants or other experts consenting to be named as preparing or certifying part of the registration statement; and (5) underwriters of the security at issue.

650 F.3d at 175.

[611] *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d at 359 (explaining that section 12(a)(2) liability is limited to "statutory sellers," which term has been interpreted to include parties that "(1) passed title, or other interest in the security, to the buyer for value, or (2) successfully solicited the purchase of a security, motivated at least in part by a desire to serve his own financial interests or those of the securities' owner").

[612] *Id.*

[613] *Id.* at 358–59 (quoting 15 U.S.C. § 77k(a)).

The elements of a claim under section 12(a)(2) require that:

> (1) the defendant is a 'statutory seller'; (2) the sale was
> effectuated 'by means of a prospectus or oral communication';
> and (3) the prospectus or oral communication 'included an
> untrue statement of a material fact or omitted to state a material
> fact necessary in order to make the statements . . . not
> misleading.''[614]

The elements of a section 11 or 12(a)(2) claim must be proven "by a preponderance of the evidence."[615] Defendants bear the burden of proof with respect to any affirmative defenses to liability.[616]

Debtors' and AFI's submissions to the Examiner do not purport to challenge any of the Third-Party Claimants' standing or that any of the named defendants participated in the RMBS offerings at issue in a manner sufficient to give rise to liability.[617] Accordingly, two elements are central to the claimants' section 11 and 12(a)(2) claims: "(1) the existence of either a misstatement or an unlawful omission; and (2) materiality."[618]

To satisfy the first of these two elements, a plaintiff must allege: "(1) a misrepresentation; (2) an omission in contravention of an affirmative legal disclosure obligation; [or] (3) an omission of information that is necessary to prevent existing disclosures from being misleading."[619] The second "[m]ateriality" element "is satisfied when a plaintiff

---

[614] *Id.* at 359 (quoting 15 U.S.C. § 77l(a)(2)).

[615] *See Healey v. Chelsea Res. Ltd.*, 947 F.2d 611, 617 (2d Cir. 1991) (affirming judgment entered after trial dismissing of section 12(a)(2) claims); *cf. Herman & MacLean v. Huddleston*, 459 U.S. 375, 387 (1983) (stating that "plaintiffs must prove their [section 10(b) of the Exchange Act claim] by a preponderance of the evidence," as in "a typical civil suit for money damages").

[616] *See In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d at 359, n.7 ("Generally speaking, defendants bear the burden of demonstrating the applicability of each of these defenses, which are therefore unavailing as a means of defeating a motion to dismiss . . . ."); *Loftin v. Bande* (*In re Flag Telecom Holdings, Ltd. Sec. Litig.*), 574 F.3d 29, 36 (2d Cir. 2009) (noting that defendant "bears the burden of demonstrating that something other than the misstatement at issue caused plaintiff's loss"); *Miles v. Merrill Lynch & Co.* (*In re IPO Sec. Litig.*), 483 F.3d 70, 73 n.1 (2d Cir. 2007) (noting that section 11 defendant "can assert a defense that the plaintiff knew of the untruth or omission at the time of his or her acquisition of the security," but there is no "reliance element" that plaintiff must prove) (quotation marks omitted); *In re Turkcell Iletisim Hizmetleri, A.S. Sec. Litig.*, 202 F. Supp. 2d 8, 12 (S.D.N.Y. 2001) ("[T]he burden of proof for the [due diligence defenses] is on the defendants.").

[617] *See, e.g.*, AIG, Allstate, MassMutual, and Prudential Joint Reply Submission Paper, dated Mar. 15, 2013, at 20–21. Case law and commentary generally agree. The distinction between lead and other underwriters in Securities Act cases is normally only considered in the application of the due diligence defense. *See, e.g.*, William K. Sjostrom, Jr., *The Due Diligence Defense Under Section 11 of the Securities Act of 1933*, 44 BRANDEIS L.J. 549, 592 (Spring 2006) ("Section 11 does not make a distinction between lead underwriters and participating underwriters—both are potential Section 11 defendants.").

[618] *See In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d at 360.

[619] *See id.*

alleges 'a statement or omission that a reasonable investor would have considered significant in making investment decisions.'"[620]

"In the wake of the recent collapse of the housing market, courts within the Second Circuit [and other jurisdictions] have repeatedly dealt with suits brought under the Securities Act against issuers of mortgage-backed securities."[621] The majority of courts considering motions to dismiss Securities Act (and state securities law) claims premised on the misrepresentations summarized above have found, at least in part, that plaintiffs have adequately alleged a claim.[622] The same is true for similar claims against Ally Securities.[623]

---

[620] *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 716–17 (2d Cir. 2011) (quoting *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161–62 (2d Cir. 2000)).

[621] *Emps.' Ret. Sys. of the Gov't of the Virgin Is. v. J.P. Morgan Chase & Co.*, 804 F. Supp. 2d 141, 152 (S.D.N.Y. 2011).

[622] *See, e.g.*, *N.J. Carpenters Health Fund v. Royal Bank of Scot. Grp., PLC*, 709 F.3d 109 (2d Cir. 2013); *Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, 632 F.3d 762 (1st Cir. 2011); *FHFA v. UBS Ams., Inc.*, 858 F. Supp. 2d 306 (S.D.N.Y. 2012); *In re Bear Stearns Mortg. Pass-Through Certificates Litig.*, 851 F. Supp. 2d 746 (S.D.N.Y. 2012); *Plumbers' & Pipefitters' Local #562 Supplemental Plan & Trust v. J.P. Morgan Acceptance Corp. I*, No. 08-1713, 2012 U.S. Dist. LEXIS 132057 (E.D.N.Y. Feb. 23, 2012); *Emps.' Ret. Sys. of the Gov't of the Virgin Is.*, 804 F. Supp. 2d 141. State law claims have seen similar results. *See, e.g.*, *Capital Ventures Int'l v. UBS Sec. LLC*, No. 11-11937, 2012 U.S. Dist. LEXIS 140663 (D. Mass. Sept. 28, 2012).

[623] *See Mass. Mut. Life Ins. Co. v. Residential Funding Co., LLC*, 843 F. Supp. 2d 191, 200 (D. Mass. 2012) (denying motion to dismiss MUSA § 410(a)(2) claim asserted against Ally Securities where complaint alleged that "representations about the underwriting process" in the offering materials "were false because the originators systematically violated the underwriting standards by, for example, issuing loans on the basis of overstated incomes, inflated appraisals, and unjustified exceptions to the standards"); *FHFA v. Ally Fin., Inc.*, Civ. No. 11-7010, 2012 U.S. Dist. LEXIS 179768, at *18 (S.D.N.Y. Dec. 19, 2012) (denying in part motions to dismiss Section 11 and 12(a)(2) and primary Virginia Securities Act claims asserted against Ally Securities); Order, *Fed. Home Loan Bank of Chicago v. Banc of Am. Funding Corp.*, Case No. 10-CH-45033, at 15–29 (Ill. Cir. Ct. Sept. 19, 2012) (denying motion to dismiss primary claims asserted against Ally Securities under the Illinois Securities Law and the North Carolina Securities Act); *N.J. Carpenters Health Fund v. Residential Capital, LLC*, Civ. No. 08-8781, 2010 U.S. Dist. LEXIS 32058, at *4, 21 (S.D.N.Y. Mar. 31, 2010) (denying in part motions to dismiss Section 11 and 12(a)(2) claims asserted against certain of the Debtors and Ally Securities, allowing "[c]laims related to [misrepresentations concerning] the alleged disregard of underwriting guidelines [to] proceed," and explaining that those alleged misrepresentations "are not cured by the risk disclosures Defendants point to in the Offering Documents"); *Cambridge Place Inv. Mgmt., Inc. v. Morgan Stanley & Co.*, Case No. 2010-02741, 2012 Mass. Super. LEXIS 272, at *29 (Mass. Super. Ct. Sept. 28, 2012) (denying motion to dismiss MUSA § 410(a)(2) claim against Ally Securities alleging "misrepresentation with respect to underwriting guidelines, LTV ratios and appraisal standards, owner-occupancy rates, debt-to-income ratios . . . and credit enhancements"); *W. & S. Life Ins. Co. v. Residential Funding Co., LLC*, Case No. A1105042, 2012 Ohio Misc. LEXIS 100, at *23 (Ohio Ct. Com. Pl. June 6, 2012) (denying motion to dismiss Ohio securities law claims against Ally Securities alleging misrepresentations concerning underwriting guidelines, the appraisal process, investment ratings, and owner occupancy). *But see* Order, *Union Cent. Life Ins. Co. v. Ally Fin., Inc.*, Case No. 11-02890, Docket No. 263, at 3 (S.D.N.Y. Mar. 29, 2013) (dismissing without prejudice claims asserted under Section 10(b) of the Exchange Act against AFI and Ally Securities where plaintiffs "have not pled any facts with particularity to demonstrate . . . scienter" and failed to specify "which defendant engaged in any specific conduct").

The parties do not appear to dispute this. AFI has essentially acknowledged that such claims are sufficient to survive a motion to dismiss.[624]

### (i) Affirmative Defenses

### (A) Due Diligence And Reasonable Care Defenses

"[S]ection 11 provides for two distinct 'due diligence' defenses for all of the statutorily enumerated [defendants] other than the issuer of a security."[625] "Section 12(a)(2) provides for a defense of reasonable care, which . . . may be asserted by all 'sellers' under section 12(a)(2), including the issuer of a security."[626]

"[T]wo of the affirmative defenses available under [s]ection 11(b) are collectively known as the 'due diligence' defense."[627] The first such defense protects a defendant from liability where "'he had, after reasonable investigation, reasonable ground to believe and did believe, at the time . . . the registration statement became effective, that the statements therein were true and that there was no omission to state a material fact required . . . to make the statements therein not misleading.'"[628] The second such due diligence defense, sometimes labeled "the reliance defense," "applies when a [s]ection 11 defendant is entitled to rely upon the opinion of an expert."[629]

---

[624] *See* AFI Submission Paper, dated April 14, 2013, at 8 ("The lengthy string cites that the Allstate Reply touts . . . are wholly beside the point. No one is disputing that some RMBS plaintiffs—including certain of the Investor Claimants—have apparently learned how to plead their claims to survive dismissal on a facial basis.").

[625] *In re Fuwei Films Sec. Litig.*, 634 F. Supp. 2d 419, 435 n.10 (S.D.N.Y. 2009); *see also* 15 U.S.C. §§ 77k(b) (providing for Section 11 due diligence defenses); Lindsay v. Morgan Stanley (*In re Morgan Stanley Info. Fund Sec. Litig.*), 592 F.3d 347, 360 n.7 (2d Cir. 2010) ("[S]ection 11 provides several due diligence defenses available to non-issuer defendants."); *Degulis v. LXR Biotechnology, Inc.*, 928 F. Supp. 1301, 1314 (S.D.N.Y. 1996) ("Unlike certain other Section 11 defendants, the issuer has no 'due diligence' defense available.").

[626] *In re Fuwei Films Sec. Litig.*, 634 F. Supp. 2d at 435 n.10 (quotation marks omitted); *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d at 360 n.7 ("[S]ection 12(a)(2) contains a 'reasonable care' defense."); 15 U.S.C. § 77l(a)(2) (providing Section 12(a)(2) defense where defendant "sustain[s] the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of [the] untruth or omission").

[627] *In re Worldcom, Inc. Sec. Litig.*, 346 F. Supp. 2d 628, 662 (S.D.N.Y. 2004).

[628] *Id.* (quoting 15 U.S.C. § 77k(b)(30(A))).

[629] *Id.* at 663.

The section 12(a)(2) defense of "reasonable care" has been construed by some courts as "less demanding than the duty of due diligence imposed under [s]ection 11."[630] "A defendant may show 'reasonable care' by introducing evidence that the allegedly fraudulent prospectus was the result of reasonable investigation."[631]

### (B) Loss Causation Defense

"Loss causation is not an element of a plaintiff's prima facie case [under section 11 or 12(a)(2)]; rather, the absence of loss causation is an affirmative defense."[632] Accordingly, the defendant "bears the burden of demonstrating that something other than the misstatement at issue caused plaintiff's loss."[633] For example, the defendant may demonstrate that "the plaintiffs' losses were not attributable to the misrepresentations . . . but resulted . . . from general market decline."[634] "Although 'not insurmountable,' defendants' burden in establishing this defense is heavy since 'the risk of uncertainty' is allocated to defendants."[635]

---

[630] *See id.*; *see also John Nuveen & Co., Inc. v. Sanders*, 450 U.S. 1005 (1981) (Powell, J. dissenting) (arguing that section 12(a)(2) "reasonable care" standard is lower than section 11 "reasonable investigation" standard); *In re Fuwei Films Sec. Litig.*, 634 F. Supp. 2d at 435 n.10 (finding the "reasonable care" defense "less demanding than the duty of due diligence under section 11") (quotation marks omitted). *But see Dannenberg v. PaineWebber Inc.* (*In re Software Toolworks Inc.*), 50 F.3d 615, 621 (9th Cir. 1994) ("Because section 11's 'reasonable investigation' standard is similar, if not identical, to section 12(2)'s 'reasonable care' standard, the analysis of each on summary judgment is the same.") (citations omitted); *Sanders v. John Nuveen & Co.*, 619 F.2d 1222, 1228 (7th Cir. 1980) ("[T]he reasonable care standard required [a] reasonable investigation . . . . Since what constitutes reasonable care under § 12(2) depends upon the circumstances, we . . . do not intimate that the duty of a seller under § 12(2) is always the same as that of an underwriter in a registration offering under § 11."); *In re MetLife Demutualization Litig.*, 262 F.R.D. 217, 235 (E.D.N.Y. 2009) ("Courts have likened [s]ection 12(a)(2)'s 'reasonable care' standard to the requirement that sellers make a 'reasonable investigation' in order to avoid liability under Section 11 for making fraudulent misrepresentations in a registration statement.").

[631] *In re MetLife Demutualization Litig.*, 262 F.R.D. at 235.

[632] 15 U.S.C. § 77k(e) (providing that section 11 does not permit recovery to the extent that "defendant proves that any portion or all of [plaintiff's] damages represents other than the depreciation in value of such security resulting from . . . the registration statement . . . not being true or omitting to state a material fact required to be stated therein or necessary to make the statements therein not misleading"); 15 U.S.C. § 77l(b) (providing that section 12(a)(2) does not permit recovery to the extent the defendant demonstrates "that any portion or all of the amount recoverable under subsection (a)(2) represents other than the depreciation in value of the subject security resulting from . . . the prospectus or oral communication . . . not being true or omitting to state a material fact required to be stated therein or necessary to make the statement not misleading"); *Iowa Pub. Emps.' Ret. Sys. v. MF Global, Ltd.*, 620 F.3d 137, 145 (2d Cir. 2010); *see also In re Fuwei Films Sec. Litig.*, 634 F. Supp. 2d at 444 ("Plaintiff is not required to demonstrate loss causation to plead adequately claims under sections 11 and 12(a)(2), as he would be if bringing a claim pursuant to section 10(b).").

[633] *Loftin v. Bande* (*In re Flag Telecom Holdings, Ltd. Sec. Litig.*), 574 F.3d 29, 36 (2d Cir. 2009); *see also In re Fuwei Films Sec. Litig.*, 634 F. Supp. 2d at 444 ("Defendants bear the burden of 'negating' causation, an affirmative defense sometimes referred to as 'negative causation.'").

[634] *Kaye v. Fast Food Operators, Inc.*, 99 F.R.D. 161, 163 (S.D.N.Y. 1983).

[635] *In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d at 408 (quoting *Akerman v. Oryx Commc'ns, Inc.*, 810 F.2d 336, 341 (2d Cir. 1987)).

### (C) Knowledge Of Misrepresentations Defense

"A plaintiff 'may not recover under [sections] 11 or 12(a)(2) if the plaintiff knew of the alleged untruth or omission at the time of purchase.'"[636] "Knowledge that a misstatement or omission exists is sufficient to defeat a [section] 11 or 12(a)(2) claim; defendants need not demonstrate plaintiffs' actual knowledge of the truth."[637] Accordingly, the defendant "can assert a defense that the plaintiff knew of the untruth or omission at the time of his or her acquisition of the security."[638]

### (ii) Conclusions

As stated above, the Debtors and AFI do not challenge the Third-Party Claimants' standing, nor do they challenge that any of the named defendants, including Ally Securities, participated in the RMBS offerings in a manner sufficient to give rise to liability under the Securities Act. Thus, the two remaining elements central to Third-Party Claimants' section 11 and 12(a)(2) claims are: (1) whether the RMBS Offering Documents contained untrue statements; and (2) whether those statements were material. Claimants would have to demonstrate both elements by a preponderance of the evidence. In most of the RMBS Actions that have advanced to litigation, courts have held that Third-Party Claimants' have adequately alleged that Ally Securities made misrepresentations in the RMBS Offering Documents. Generally, Third-Party Claimants have also adequately alleged that, if proven to be untrue, these statements would be material.[639] Accordingly, the success of these claims will ultimately hinge upon whether Third-Party Claimants can effectively demonstrate that these statements were untrue.

This showing will require an intensive inquiry into the circumstances surrounding each challenged securitization transaction, including a review of underlying loan data and related materials. Such an inquiry is not within the scope of the Investigation. The Examiner notes that some Third-Party Claimants, including MBIA, AIG, and the FHLBs, for example, have devoted several years of discovery to investigating these issues and prepared expert reports

---

[636] *In re Barclays Bank PLC Sec. Litig.*, No. 09-1989, 2011 U.S. Dist. LEXIS 2667, at *36 (S.D.N.Y. Jan. 5, 2011) (quoting *In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 441 (S.D.N.Y. 2001)); *see also* 15 U.S.C. § 77k(a) (providing that section 11 plaintiff may recover "unless it is proved that at the time of such acquisition he knew of [the] untruth or omission"); 15 U.S.C. § 77l(a)(2) (providing that section 12(a)(2) plaintiff may recover where "not knowing of [the] untruth or omission"). *Mayer v. Oil Field Sys. Corp.*, 803 F.2d 749, 755 (2d Cir. 1986) (holding that plaintiff may not "recover under §§ 11 and 12(2) of the 1933 Act unless . . . plaintiff had no knowledge of the untruth or omission").

[637] *In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d at 441; *see also In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.*, No. 03-1529, 2007 U.S. Dist. LEXIS 66911, at *21–22 (S.D.N.Y. Sept. 7, 2007) ("[P]laintiffs aware that a statement is false need not be shown to know the truth behind it to have their claims barred.").

[638] *Miles v. Merrill Lynch & Co.* (*In re IPO Sec. Litig.*), 483 F.3d 70, 73 n.1 (2d Cir. 2007).

[639] *See, e.g.*, Order, *Allstate Ins. Co. v. GMAC Mortg., LLC*, Case No. 27-cv-11-3480, Docket No. 740, at 10 (Minn. Dist. Ct. Nov. 28, 2011) ("Allstate adequately alleges the existence of material misrepresentations. Each subject above informs investors of the underlying loans' risk profiles, which affects the perceived value of the underlying loans.").

detailing what they allege to be significant evidence of the systematic abandonment of underwriting standards, as well as other allegations in the complaints.[640] If these reports are found to be persuasive and accurate, the section 11 and 12(a)(2) claims are likely to succeed. However, the Debtors have also commenced the preparation of similar reports, which have been delayed because of the pendency of the Chapter 11 Cases. Thus, the Examiner recognizes that this underlying dispute will remain contested.

In addition to attempting to undermine the Third-Party Claimants' prima facie claims, Ally Securities will likely assert a number of defenses. These include the section 11 due diligence defense, the section 12(a)(2) reasonable care defense, loss causation defense, and the knowledge of misrepresentation defense. Both the due diligence and reasonable care defenses would defeat a prima facie section 11 or section 12(a)(2) claim, respectively, if Ally Securities is able to show that after a reasonable investigation (or after the exercise of reasonable care) Ally Securities believed that the alleged misstatements made in the RMBS Offering Documents were true.[641] As these are affirmative defenses, and are generally not raised as a basis for dismissal at the pleading stage, there has been little discussion of these defenses in the existing RMBS Actions.

Ally Securities will likely argue that Third-Party Claimants' losses were not attributable to the misrepresentations, but instead resulted from the deterioration of the housing market generally, as well as other macroeconomic factors.[642] To date, courts in other RMBS cases have discussed loss causation and have rejected this as a defense to liability at the pleading stage.[643] However, this defense may be more successful at later stages of litigation given more factual development.

---

[640] *E.g.*, AIG, Allstate, MassMutual, and Prudential Joint Reply Submission Paper, dated Feb. 12, 2013, at 6–7 (stating that the results of AIG's review show "that over 90% of the loans failed to comply with underwriting guidelines" and that MBIA found "breach rates of 88 and 89%" across a sample of "thousands of mortgages") (emphasis omitted); Federal Home Loan Banks of Boston, Chicago, and Indianapolis Submission Paper, dated Oct. 19, 2012, at 8–9.

[641] AFI asserts that the due diligence defense renders any Securities Act claims worthless. *See* AFI Submission Paper, dated April 14, 2013, at 5–6; AFI Submission Paper, dated Dec. 19, 2012, at 75–76. As with many of the claims discussed herein, the success or failure of these claims will largely be determined by the facts. Both AFI and Third-Party Claimants cite Ally Securities' diligence in support of their respective positions. In asserting the due diligence defense, AFI is stating that Ally Securities conducted diligence which would lead it to reasonably believe that the representations in the RMBS Offering Documents were true. Third-Party Claimants take the exact opposite viewpoint, as they must, with respect to their fraud claims discussed below. Third-Party Claimants argue that because Ally Securities conducted diligence, they had knowledge of the purported misrepresentations and their falsity. Arriving at a conclusion would require a review of each individual securitization at issue, as Ally Securities' procedures regarding such diligence differed deal by deal, as noted above.

[642] *See* AFI Submission Paper, dated Dec. 19, 2012, at 78 ("Nor can Claimants demonstrate that any alleged misrepresentations or omissions caused their losses, in light of the nationwide plunge in home values and the Great Recession.").

[643] *See, e.g.*, *FHFA v. JPMorgan Chase & Co.*, No. 11-6188, 2012 WL 5395646, at *18 (S.D.N.Y. Nov. 5, 2012) (noting that the Second Circuit has emphasized that loss causation is "a matter of proof at trial and not to be decided on a . . . motion to dismiss").

The knowledge of misrepresentation defense requires that Ally Securities show that the Third-Party Claimants knew that the alleged misrepresentations were false at the time they purchased the RMBS. This defense has been raised at the pleading stage by certain defendants in RMBS cases. To date, courts have noted that lack of knowledge is presumed, and thus the defense has not been successful.[644] This defense would likely be developed by Ally Securities as the RMBS Actions progress, where Ally Securities may argue that Third-Party Claimants are sophisticated investors who had access to information which would have made them aware of the alleged misrepresentations.

With respect to claims for violation of the Securities Act, as well as other claims discussed below for fraud, aiding and abetting fraud, and negligent misrepresentation, Third-Party Claimants' alleged damages against Ally Securities and their ability to collect on a judgment are discussed in Section VIII.D.

### (b) Common Law Fraud And Fraudulent Inducement

Fraud and fraudulent inducement are essentially identical claims, often used interchangeably.[645] Indeed, numerous New York courts have stated that the elements of claims for fraud and fraudulent inducement are the same.[646] In order to demonstrate a claim for either fraud or fraudulent inducement, a plaintiff is required to show (1) a misrepresentation or omission of material fact which was false and known to be false by defendant; (2) made with the intent to induce reliance; (3) justifiable reliance; and (4) damages cause by the misrepresentation.[647] Each element of the fraud claim must be shown by clear and convincing evidence.[648]

---

[644] *See, e.g.*, *N.J. Carpenters Health Fund v. Residential Capital, LLC*, No. 08-8781, 2011 U.S. Dist. LEXIS 46066, at *27 (S.D.N.Y. Apr. 28, 2011).

[645] *E.g., Centro Empresarial Cempresa v. Am. Movil*, 952 N.E.2d 995, 1000 (N.Y. 2011) (citation omitted) (providing that a plaintiff alleging fraudulent inducement must "establish the basic elements of fraud, namely a representation of material fact, the falsity of that representation, knowledge by the party who made the representation that it was false when made, justifiable reliance by the plaintiff, and resulting injury"); *N.Y. Univ. v. Cont' Ins. Co.*, 662 N.E.2d 763, 768–69 (N.Y. 1995) ("In plaintiff's fifth cause of action, sounding in fraud, it alleges that defendants induced plaintiff to purchase and maintain the insurance policy . . . .The essential elements of a cause of action for fraud are 'representation of a material existing fact, falsity, scienter, deception and injury.'") (citation omitted).

[646] *E.g., Dexia SA/NV v. Deutsche Bank AG*, No. 5672, 2013 WL 98063, at *3 (S.D.N.Y Jan. 4, 2013) ("In order to make out a claim for fraud under New York law, the plaintiffs must plausibly allege 'a material misrepresentation of a fact, knowledge of its falsity, an intent to induce reliance, justifiable reliance by the plaintiff and damages.' . . . The plaintiffs must plead the same elements in order to make out a claim for fraudulent inducement.") (citations omitted); *Dandong v. Pinnacle Performance Ltd.*, No. 8086, 2011 U.S. Dist. LEXIS 126552, at *41–42 (S.D.N.Y. Oct. 31, 2011); *UniCredito Italiano SPA v. JPMorgan Chase Bank*, 288 F. Supp. 2d 485, 498 (S.D.N.Y. Dec. 12, 2003).

[647] *See Banque Arabe et Internationale D'Investissement v. Md. Nat'l Bank*, 57 F.3d 146, 153 (2d Cir. 1995); *Eurycleia Partners*, 910 N.E.2d 976, 979 (N.Y. 2009); *Lama Holding Co. v. Smith Barney Inc.*, 668 N.E.2d 1370, 1373 (N.Y. 1996); *Mateo v. Senterfitt*, 918 N.Y.S.2d 438 (N.Y. App. Div. 2011).

[648] *Century Pac., Inc. v. Hilton Hotels Corp.*, 528 F. Supp. 2d 206, 219 (S.D.N.Y. 2007).

As with Securities Act claims, a number of courts considering a motion to dismiss claims based on common law fraud have found that plaintiffs have adequately alleged fraud.[649] This includes claims against Ally Securities.[650]

### (i) Conclusions

Third-Party Claims for fraud and fraudulent inducement are similar to the claims under section 11 and section 12(a)(2) of the Securities Act described above. With respect to fraud, Third-Party Claimants have generally asserted that the RMBS Offering Documents contained various material representations which Ally Securities knew were false. Claimants state that they justifiably relied on these misrepresentations and that they were damaged as a result. As stated in Section VIII.A, ascertaining facts which might lead to a definitive conclusion on the merits of such claims is outside the scope of the Investigation. The Examiner notes, however, that Third-Party Claimants' allegations of fraud and fraudulent inducement will be more difficult to prove than the Securities Act claims, as such claims require an affirmative showing of Ally Securities' knowledge of the fraud, intent to defraud, justifiable reliance, and damages causation. Ultimately, it is possible that a plaintiff with the benefit of full discovery could prove such elements, but this would require additional factual development.

### (A) Knowledge And Intent To Defraud

Claims against Ally Securities based upon allegations of fraud have survived motions to dismiss.[651] The fraud claims against Ally Securities are generally premised upon the notion that Ally Securities, in its role as underwriter, performed and had access to diligence performed on the underlying loans and would therefore be in a position to have knowledge of the alleged fraud. Plaintiffs will have to demonstrate this knowledge at trial, which may be difficult. Regardless, plaintiffs have asserted that given appropriate discovery, they will be able to procure such evidence. The Investigation has not determined whether such evidence exists. Accordingly, the Examiner can make no determinations regarding whether Ally Securities intended to defraud the Third-Party Claimants.

---

[649] *See, e.g., Dexia SA/NV*, 2013 WL 98063; *Stichting Pensioenfonds ABP v. Credit Suisse Grp. AG*, Case No. 653665, Docket No. 110 (N.Y. Sup. Ct. Nov. 30, 2012). Recently, a claim for common law fraud survived a motion for summary judgment in a similar RMBS case. *See* Order, *MBIA Ins. Co. v. Countrywide Home Loans, Inc.,* Case No. 08-602825, Docket No. 4092 (N.Y. Sup. Ct. Apr. 29, 2013).

[650] *FHFA v. Ally Fin. Inc.*, No. 11-7010, 2012 WL 6616061, at *3 (S.D.N.Y. Dec. 19, 2012) ("As to Ally Securities, it is likewise true that, given the firm's representations that it reviewed portions of the loan pool for compliance with guidelines, the high defect rate alleged . . . is strongly suggestive that the firm knew the loans were underwritten to standards lower than those reported in the Offering Documents. . . . [T]hese allegations are more than adequate to plead fraud with respect to the [RMBS Offering Documents] representations regarding mortgage-underwriting standards."); Order, *Allstate Ins. Co. v. GMAC Mortg., LLC*, Case No. 27-cv-11-3480, Docket No. 740, at 15–16 (Minn. Dist. Ct. Nov. 28, 2011) (denying motion to dismiss common law fraud claims asserted against certain Debtors and Ally Securities); *W. & S. Life Ins. Co. v. Residential Funding Co., LLC*, No. A1105042, 2012 Ohio Misc. LEXIS 100, at *27 (Ohio Ct. C.P. June 6, 2012).

[651] *See, e.g.*, *FHFA v. Ally Fin. Inc.*, 2012 WL 6616061.

### (B) Reliance And Loss Causation

Third-Party Claimants' common law fraud claims also require establishing reasonable reliance and loss causation. These elements required to establish fraud are similar to the knowledge of misrepresentation defense and the loss causation defense discussed in connection with the Securities Act claims above, with the difference being that the plaintiff bears the burden of demonstrating these elements when alleging fraud. If the claims were to advance to trial, Ally Securities would likely argue that the plaintiffs had knowledge of the risks involved in purchasing the RMBS at issue and that their losses were caused by intervening factors rather than Ally Securities' activities.[652] Given the parties' sophistication, an argument that the claimants did not justifiably rely on the alleged misrepresentations could be made at trial. Similarly, it is possible that a court might find that the overall market decline was the proximate cause of claimants' losses.

### (c) Aiding And Abetting Common Law Fraud And Fraudulent Inducement

To state a claim for aiding and abetting fraud, plaintiffs must allege (1) the existence of an underlying fraud; (2) knowledge of the fraud; and (3) substantial assistance in the commission of the fraud.[653] Each element of aiding and abetting fraud must be established by clear and convincing evidence.[654]

Claims for aiding and abetting fraud in the RMBS context have survived motions to dismiss, including claims against AFI.[655] With respect to Ally Securities, only MBIA has asserted a claim for aiding and abetting fraud.[656] MBIA generally alleges that Ally Securities had knowledge of the Debtors' underlying fraud as it "received information about all aspects of

---

[652] *See* AFI Submission Paper, dated Dec. 29, 2012, at 78 ("Nor can Claimants demonstrate that any alleged misrepresentations or omissions caused their losses, in light of the nationwide plunge in home values and the Great Recession."); Debtors' Submission Paper, dated Dec. 18, 2012, at 58 ("Generally, the PLS Investors' claims require proof of causation. Some courts have held that the market collapse can serve as a defense to claims under securities statutes, as well as common law claims for fraud and negligent misrepresentation.").

[653] *E.g., Dexia/NV*, 2013 WL 98063, at *3 (citing *VTech Holdings, Ltd. v. Pricewaterhouse Coopers, LLP*, 348 F. Supp. 2d 255, 269 (S.D.N.Y. 2004)); *UniCredito Italiano SPA v. JPMorgan Chase Bank*, 288 F. Supp. 2d 485, 503 (S.D.N.Y. 2003).

[654] *King Cnty., Wash. v. IKB Deutsche Industriebank AG*, No. 09-8387, 2013 WL 45878, at *2 (S.D.N.Y. Jan. 3, 2013) ("In New York, a plaintiff alleging fraud must establish each element of its fraud claim by 'clear and convincing evidence.' The same is true for a plaintiff asserting a claim of aiding and abetting fraud.").

[655] *FHFA v. Ally Fin. Inc.*, 2012 WL 6616061, at *4; *see also Dexia SA/NV v. Bear, Stearns & Co., Inc.*, No. 12-4761, 2013 U.S. Dist. LEXIS 30916, at *29 (S.D.N.Y. Feb. 26, 2013) (alleging that "high-level executives of the defendant entities knew and participated in creating policies that incentivized high-risk lending and reduced controls in order to increase profits by greater number of RMBS regardless of quality" were sufficient to satisfy both knowledge and participation requirements of aiding and abetting fraud); *Stichting Pensioenfonds ABP v. Credit Suisse Grp. AG*, Case No. 653665, Docket No. 110 (N.Y. Sup. Ct. Nov. 30, 2012).

[656] *See* Compl., *MBIA Ins. Co. v. Ally Fin. Inc.*, Case No. 27-CV-12-18889, Docket No. 1, at 3–5, 47–49 (Minn. Dist. Ct. Sept. 17, 2012) (removed to the United States District Court for the District of Minnesota (12-2563)).

the Debtors' securitization business, including results of third-party diligence, underwriting guidelines, loan performance and transaction losses, loans 'kicked out' of securitization pools and loan details for the securitization pools."[657] MBIA also asserts that "Ally Securities substantially assisted the Debtors' fraud by contemporaneously providing underwriting services in connection with the Securitizations."[658] A motion to dismiss is pending in that case.[659]

### (i) Conclusions

To succeed on claims against Ally Securities for aiding and abetting fraud, Third-Party Claimants must show that there was an underlying fraud, as well as that Ally Securities knew of that fraud and provided substantial assistance to the Debtors in perpetrating that fraud. The Examiner concludes that if Third-Party Claimants can demonstrate an underlying fraud against the Debtors, it is likely that a claim of aiding and abetting fraud against Ally Securities would prevail as well. As noted above in Section VIII.B, an underwriter, particularly the lead underwriter, plays an integral role throughout the life of a securitization transaction. Given Ally Securities' position as underwriter, it is possible, perhaps even probable, that Ally Securities had knowledge of the Debtors' alleged fraud[660] and, in marketing the RMBS, it could be determined that Ally Securities substantially assisted in the fraud.

### (d) Negligent Misrepresentation

Negligent misrepresentation is a traditional common law cause of action that generally has three elements: (1) a misstatement by one party in a transaction; (2) reasonable reliance by the counterparty leading to a loss; and (3) a duty of care on the part of the communicating party towards the aggrieved party. Thus far, plaintiffs have had difficulty pursuing negligent misrepresentation claims in the context of RMBS transactions—and have frequently seen their complaints dismissed at the pleading stage—due to their inability to show a duty of care. As a general rule, courts have concluded that sophisticated commercial parties engaged in RMBS transactions do not owe each other a duty of care that can support a negligent misrepresentation claim, even where the parties have a history of doing business.[661] Allstate's

---

[657]   MBIA Reply Submission Paper, dated Mar. 18, 2013, at 58.

[658]   *Id.* at 62.

[659]   *See* Am. Memo. of Law in Supp. of Defs.'s Mot. to Dismiss, *MBIA Ins. Co. v. Ally Fin. Inc.*, Case No. 12-CV-02563, Docket No. 36 (D. Minn. Mar. 12, 2013) (removed from Minnesota state court (27-CV-12-18889)).

[660]   AFI essentially admits as much in its submissions. *See* AFI Submission Paper, dated Dec. 20, 2012, at 76 ("Where Ally Securities served as the lead underwriter for a securitization, it typically retained Office Tiger to review the loans in the securitization and to identify any loans that might be defective. Through Office Tiger, Ally Securities investigated samples of loans included in each securitization . . . ."). Thus, given Ally Securities' due diligence, if fraud existed, it would likely have been aware of it.

[661]   *E.g., Woori Bank v. RBS Sec., Inc.*, No. 12 4254, 2012 WL 6703352, at *8 (S.D.N.Y. Dec. 27, 2012); *Stichting Pensioenfonds ABP v. Credit Suisse Grp. AG*, Case No. 653665, Docket No. 110, at 25 (N.Y. Sup. Ct. Nov. 30, 2012) (discussing the relationship between a purchaser and issuer of RMBS and stating that "[t]he transactions at issue in this case were arm's length interactions between two sophisticated entities, and did not create any duty which might support a claim of negligent misrepresentation"); *MBIA Ins. Co. v. Residential Funding Co., LLC*, 906 N.Y.S.2d 781 (N.Y. Sup. Ct. 2009).

claim against Ally Securities for negligent misrepresentation was dismissed.[662] However, some recent cases, including two cases against Ally Securities, have passed the pleading stage.[663]

With respect to the FHLB of Indianapolis's claim of negligent misrepresentation brought against Ally Securities in Indiana state court, it appears that Indiana law is unclear on the nature of the relationship required to support a claim.[664] The court in *Western & Southern Life Insurance Co. v. Residential Funding Co., LLC*, did not examine the nature of the relationship between the purchaser of the RMBS and the seller in any depth, but stated only that plaintiffs had "adequately plead[ed] a claim for negligent misrepresentation, including their relationship to Defendants."[665] Accordingly, while these claims have survived a motion to dismiss, they do not otherwise provide any significant guidance.

### (i) Conclusions

The success of claims made under the theory of negligent misrepresentation appears to turn on whether plaintiffs can demonstrate a special relationship with defendants. A review of the relationships between individual Third-Party Claimants and Ally Securities is beyond the scope of the Investigation. Accordingly, the Examiner does not come to a conclusion on whether claims of negligent misrepresentation will ultimately be successful. Based upon a review of the case law, however, while some negligent misrepresentation claims against Ally Securities have survived motions to dismiss, these decisions only seem to allow plaintiffs to proceed to discovery, rather than being indicative of potential future success. In most cases where the court examined in more depth the nature of the parties' relationship in an RMBS

---

662  Order, *Allstate Ins. Co. v. GMAC Mortg., LLC*, Case No. 27-cv-11-3480, Docket No. 740, at 22–24 (Minn. Dist. Ct. Nov. 28, 2011).

663  *See Dexia SA/NV v. Bear, Stearns & Co., Inc.*, No. 12-4761, 2013 U.S. Dist. LEXIS 30916, at *31 (S.D.N.Y. Feb. 26, 2013) (ruling that plaintiff's claim for negligent misrepresentation, most specifically its allegation of a special relationship, raised a question of fact that was better reserved for determination after discovery); Order on Mot. to Dismiss, *Fed. Home Loan Bank v. Banc of Am. Mortg. Sec.*, Case No. 49D05 1010 PL 45071, at 6 (Ind. Super. Ct. July 3, 2012); *W. & S. Life Ins. Co. v. Residential Funding Co., LLC*, No. A1105042, 2012 Ohio Misc. LEXIS 100, at *27 (Ohio Ct. C.P. June 6, 2012).

664  The seminal case in the state, *Eby v. York-Division, Borg-Warner*, 455 N.E.2d 623 (Ind. Ct. App. 1983), specifically limited the recognition of negligent misrepresentation to the context of an employer-employee relationship. In a number of post-*Eby* decisions, the Indiana appellate courts have declined to recognize the tort of negligent misrepresentation outside the context of an employment relationship. *Trytko v. Hubbell, Inc.*, 28 F.3d 715, 720 (7th Cir. 1994). In *Trytko*, the Seventh Circuit considered whether Indiana recognizes the tort and ultimately concluded that Indiana would continue to recognize the tort of negligent misrepresentation, but only in circumstances closely analogous to those present in *Eby*. *Id.* at 721. Recent cases have echoed this interpretation. *Mart v. Forest River, Inc.*, 854 F. Supp. 2d 577, 595 (N.D. Ind. 2012) ("The tort of negligent misrepresentation is recognized in Indiana in the limited circumstance of the employer-employee relationship."). Thus, it appears that the tort of negligent misrepresentation is limited to an employer-employee relationship in the State of Indiana. The court in *Federal Home Loan Bank v. Banc of America Mortg. Securities* did not discuss this issue at all, so the validity of that decision may be questioned in the future.

665  2012 Ohio Misc. LEXIS 100, at *27.

transaction, the court concluded that a special relationship did not exist.[666] Irrespective of this, two of the claims for negligent misrepresentation asserted against Ally Securities remain pending.

### c. *Claims Against Ally Bank As Loan Originator And Custodian*

#### (1) *Description Of Claims*

Third-Party Claimants assert claims directly against Ally Bank on several theories of liability. First, certain monolines have alleged breach of contract claims against Ally Bank on account of its role as loan custodian.[667] In connection with certain GMAC Mortgage securitizations, Ally Bank (and previously Old GMAC Bank) entered into custodial agreements, "whereby it agreed to serve as Custodian of the underlying mortgage loan notes on behalf of the respective RMBS trusts."[668] The monolines assert that they are third-party beneficiaries of the custodial agreements and that pursuant to those agreements, Ally Bank received "substantial fees" in return for its obligation to "ensure that the Mortgage Loans for the [securitizations] contained complete and accurate information and that [GMAC Mortgage] was in compliance with its representations and warranties regarding the origination, selection, and underlying characteristics of those loans."[669] The monolines further assert that as custodian, "[i]f Ally Bank determined that GMAC Mortgage was not in compliance, its custodial duties obligated Ally Bank to give prompt written notice to [the monolines]."[670] The monolines allege that Ally Bank breached the custodial agreements by (1) failing to notify them that mortgage notes were missing from certain loan files; (2) providing inaccurate and/or incomplete certifications regarding mortgage loans; and (3) failing to notify the monolines of breaches by GMAC Mortgage of the representations and warranties contained in certain

---

[666] *E.g., Stichting Pensioenfonds ABP v. Credit Suisse Grp. AG*, Case No. 653665, Docket No. 110, at 25 (N.Y. Sup. Ct. Nov. 30, 2012) (discussing the relationship between a purchaser and issuer of RMBS and stating that "[t]he transactions at issue in this case were arm's length interactions between two sophisticated entities, and did not create any duty which might support a claim of negligent misrepresentation").

[667] *See* FGIC Submission Paper, dated Oct. 17, 2012, at 25–26; Compl., *MBIA Ins. Corp. v. Ally Fin. Inc*., Case No. 27-CV-12-18889, at 56 (Minn. Dist. Ct. Sept. 17, 2012); Compl., *Assured Guar. Mun. Corp. v. GMAC Mortg., LLC,* Case No. 12-03776, Docket No. 1, at 40 (S.D.N.Y. May 11, 2012) ("Ally Bank has materially breached its obligations under the Custodial Agreement by failing to provide documents relating to Subsequent Mortgage Loan transfers to [Assured] and by failing to notify [Assured]of [GMAC Mortgage's] breaches of its representations and warranties.").

[668] FGIC Submission Paper, dated Oct. 17, 2012, at 25 ("For these transactions, Ally Bank agreed that it would hold a document known as the Mortgage Note that it would review and deliver to FGIC a certification of 'the completeness of the receipt of the Mortgage Notes.'").

[669] *Id.* at 25; *see also* MBIA Submission Paper, dated Nov. 9, 2012, at 33–34 (same); Compl., *Assured Guar. Mun. Corp. v. GMAC Mortg., LLC,* Case No. 12-03776, Docket No. 1, at 3 (S.D.N.Y May 11, 2012).

[670] MBIA Submission Paper, dated Nov. 9, 2012, at 34 (citation omitted); *see also* FGIC Submission Paper, dated Oct. 17, 2012, at 25 ("Ally Bank further agreed to notify FGIC of breaches of the [mortgage loan purchase agreements] by [GMAC Mortgage], by providing that: 'Upon discovery by the Custodian of a breach of any representation or warranty made by [GMAC Mortgage] in the Purchase Agreement . . . with respect to a Mortgage Loan . . . the Custodian shall give prompt written notice to [FGIC].'").

mortgage loan purchase agreements.[671] Additionally, the monolines assert that because Ally Bank originated a majority of the loans underlying the relevant GMAC Mortgage securitizations, "it must have been keenly aware of the breadth and scope of the underwriting failures with respect to those loans."[672]

Second, Third-Party Claimants allege that Ally Bank is liable for aiding and abetting fraud by virtue of its role as loan originator and custodian with respect to certain GMAC Mortgage securitizations.[673] According to Third-Party Claimants, Ally Bank, as an originator of mortgages underlying the Debtors' securitizations, was "well aware of the true nature of the loan pool"[674] and is therefore "directly liable for passing false information to underwriters and

---

[671] *See* FGIC Submission Paper, dated Oct. 17, 2012, at 25–26; *see also* MBIA Submission Paper, dated Nov. 9, 2012, at 33–34; Compl., *MBIA Ins. Corp. v. Ally Fin. Inc.,* Case No. 27-CV-12-18889, at 49 (Minn. Dist. Ct. Sept. 17, 2012) (alleging that "a review of a sample of mortgage loan documents has uncovered numerous breaches of the representations and warranties guaranteed under the Custodial Agreements, including missing Mortgage Notes or other documents necessary for closing on the loan, as well as breaches for incurable credit and compliance breaches.").

[672] FGIC Submission Paper, dated Oct. 17, 2012, at 26; *see also* MBIA Submission Paper, dated Nov. 9, 2012, at 32 ("Ally Bank was responsible for the origination or acquisition of 80% of the loans in the GMAC Mortgage [s]ecuritizations.").

[673] FGIC Submission Paper, dated Oct. 17, 2012, at 26–27; *see also* Compl., *MBIA Ins. Corp. v. Ally Fin. Inc.*, Case No. 27-CV-12-18889, at 49, 54–55 (Minn. Dist. Ct. Sept. 17, 2012). The plaintiffs in *John Hancock Life Insurance. Co. v. Ally Financial Inc.*, assert additional claims against Ally Bank, including common law fraud, securities fraud, and negligent misrepresentation. Case No. 12-01841 (D. Minn. 2012). With respect to the fraud claims, the alleged fraudulent conduct is the same as that alleged by most plaintiffs to give rise to aiding and abetting liability. Because fraud and aiding and abetting fraud are similar claims and it is unlikely that a plaintiff will be found liable for fraud but not aiding and abetting fraud, this Section analyzes Ally Bank's liability under an aiding and abetting standard. With respect to the *John Hancock* plaintiffs' securities fraud claims, the Examiner is not aware of any allegation that Ally Bank helped draft or disseminate securities offering materials or "controlled" the otherwise responsible entities. With respect to John Hancock's claims for negligent misrepresentation, such claims have typically been dismissed for failure to establish the requisite "special relationship." *See, e.g.*, *AllState Ins. Co. v. GMAC Mortg., LLC*, No. 27-CV-11-3480, 2011 WL 7943021 (Minn. Dist. Ct., Nov. 28, 2011) (dismissing Allstate's claim for negligent misrepresentation because under Minnesota law "no negligent representation claim lies where parties deal at arm's length in a commercial transaction, even if one party supplies guidance to another"); *MBIA Ins. Co. v. Residential Funding Co., LLC*, 906 N.Y.S.2d 781, 781 (N.Y. Supr. Ct. Dec. 22, 2009) ("Generally, the requisite 'special relationship' does not exist between sophisticated commercial entities that enter into an agreement through an arm's-length business transaction."). For an analysis of these types of claims against Ally Securities, see Section VIII.C.2.b.

[674] FGIC Submission Paper, dated Oct. 17, 2012, at 26; *see also* AIG, Allstate, MassMutual, and Prudential Joint Submission Paper, dated Oct. 17, 2012, at 24 ("Ally Bank was an originator of loans in many of the RMBS at issue and is liable both for the false information it transmitted to securitizing and underwriting entities—typically its sister companies—that it then passed on to the Investors, as well as for collaborating with Ally affiliates in the dissemination of that information.").

sponsors, knowing it would be disseminated to investors."[675] These claimants argue that "[b]ut for Ally Bank's financing activities, a significant number of the loans could not have been included in the [s]ecuritizations . . . ."[676] Claimants argue that if ResCap had stopped issuing securitizations, Ally Bank would have been left holding deficient, risky loans.[677] Finally, claimants assert that as a direct loan originator, "Ally Bank issued loans in violation of guidelines, and then passed on false information about the credit quality of the loans . . . to the securitizing trusts and underwriting banks."[678] Additionally, the plaintiffs allege that Ally Bank substantially assisted GMAC Mortgage's fraud by representing to insurers that, as loan custodian, it would "hold and monitor certain key information and documentation" regarding the mortgage loans and would provide notice of any breaches of representations and warranties by GMAC Mortgage.[679] Claimants allege that rather than report deficiencies, "Ally Bank facilitated the Debtors' fraudulent activities by concealing the deficiencies in the loans and GMAC Mortgage's misrepresentations . . . ."[680]

### (2) Analysis Of Claims

As a preliminary matter, this Section analyzes the conduct of both Old GMAC Bank and its successor, Ally Bank. While substantially all of the assets and liabilities of Old GMAC Bank were transferred to Ally Bank in connection with the 2006 Bank Restructuring, the Examiner has concluded in Section VII.L.2.a(1)(a)(i) that a court is unlikely to conclude that Ally Bank is a successor in liability of Old GMAC Bank.[681] Because a Third-Party Release will likely only affect claims against Ally Bank, this Section refers to Old GMAC Bank where it is necessary to distinguish between the two entities. However, where it is not necessary to distinguish between the two entities, this Section simply refers to both entities as the Bank.

---

[675] AIG, Allstate, MassMutual, and Prudential Joint Reply Submission Paper, dated Feb. 12, 2013, at 3; Compl., *MBIA Ins. Corp. v. Ally Fin. Corp.*, Case No. 27-CV-12-18889, at 54–55 (Minn. Dist. Ct. Sept. 17, 2012) ("Ally Bank profited from extending warehouse financing to the originators of non-compliant loans acquired and securitized by the Securitization Sponsors. If the fraudulent scheme ended, and the Securitization Sponsors no longer acquired non-compliant mortgage loans, the originators selling such loans would stop originating such loans, and therefore no longer need financing from Ally Bank.").

[676] MBIA Submission Paper, dated Nov. 9, 2012, at 32–33; *see also* Compl., *John Hancock Life Ins. Co. v. Ally Fin. Inc.*, Case No. 12-01841, Docket No. 1, at 56 (D. Minn. July 27, 2012) ("Defendant Ally Bank . . . was the vehicle through which Defendant Ally Financial funded and controlled its vertically-integrated mortgage operations, including its mortgage origination, securitization, and servicing activities.").

[677] Compl., *MBIA Ins. Corp. v. Ally Fin. Corp.*, Case No. 27-CV-12-18889, at 55 (Minn. Dist. Ct. Sept. 17, 2012). This claim is somewhat inaccurate given that the June 4, 2002 addendum to the 2001 MMLPSA required GMAC Mortgage to purchase on a "mandatory delivery basis" all first lien loans originated or acquired by Old GMAC Bank. *See* Second Addendum to 2001 MMLPSA, dated June 4, 2002, § 2.1 [ALLY_0018245]. This requirement was later extended to second lien loans in June 2007. *See* 2007 MMLPSA, dated June 1, 2007, § 2.1 [ALLY_0018275]. For further discussion regarding the MMLPSA and its terms, see Section V.B.3.

[678] AIG, Allstate, MassMutual, and Prudential Joint Submission Paper, dated Oct. 17, 2012, at 24.

[679] FGIC Submission Paper, dated Oct. 17, 2012, at 27; *see also* MBIA Submission Paper, dated Nov. 9, 2012, at 33–34.

[680] MBIA Submission Paper, dated Nov. 9, 2012, at 34.

[681] *See* Section VII.L.2.a(1)(a)(i).

### (a) Breach Of Custodial Agreements

#### (i) Bank Obligations Under The Custodial Agreements

From mid-2004 through late 2007,[682] the Bank was enlisted as loan custodian for approximately thirty-four of ResCap's 392 PLS securitizations.[683] Before the 2006 Bank Restructuring, custodial agreements were entered into between GMAC Mortgage and Old GMAC Bank.[684] Following the 2006 Bank Restructuring, existing custodial agreements were "repapered" with Ally Bank, and future custodial agreements were entered into between Ally Bank and GMAC Mortgage.[685] Throughout the relevant period, the Bank provided document custody services through its Document Custody Division ("DCD"), which was housed in its Horsham, Pennsylvania and Waterloo, Iowa facilities.[686] Ally Bank continues to provide custodial services on the relevant securitizations through the present.

Generally, the loan custodian of a securitization serves as an agent for the trustee and has a contractual obligation to hold and review the mortgage notes underlying the securitizations and to provide certain notices to the loan servicer, the securitization trustee, and, in certain

---

[682] As discussed throughout the Report, the Debtors effectively halted their private label securitization business in the late summer/early fall of 2007. *See* Int. of J. Gray, Mar. 1, 2013, at 61:8–63:23 ("I think in early August there was a significant pullback in the marketplace in terms of what investors were willing to buy and I think that was the major impetus for [shutting down non-conforming products].").

[683] *See* Appendix VIII.B—3 (providing information on the securitizations for which Ally Bank and Old GMAC Bank served as custodian). Int. of M. Hebling, Apr. 16, 2013, at 12:13–13:7, 13:18–19 ("[In July 2004, Old] GMAC Bank was entering the document custody business. . . . And taking over a business from Escrow Bank USA, [which was] an on-site custodian to GMAC Mortgage. And the intent was that the bank would enter that business, provide that service to the affiliate."); It appears that Old GMAC Bank served as custodian for at least one RFC securitization, but for the vast majority of the Debtors' securitization deals, other banks such as JPMorgan, Wells Fargo, or U.S. Bank served as custodian. *See* Int. of M. Hebling, Apr. 16, 2013, at 45:18–46:7 ("We held one small deal [for RFC that] we inherited from Escrow Bank USA.").

[684] *See, e.g.,* Custodial Agreement—GMACM 2006-HE2, dated June 29, 2006 [ALLY_0033251]. As of June, 2005, DCD held more than 1.7 million mortgage notes in custody, with GMAC Mortgage generating "more than 90% of all loans handled and stored by [Old] GMAC Bank." Report on Audit of GMAC Bank—Trust & Custody Services, Sept. 23, 2005, at 1 [ALLY_0220368].

[685] *See* Summary—Review of GMAC Bank Affiliate Agreements (Draft), Nov. 14, 2006, at ALLY_0402127–29 [ALLY_0402056]; Minutes of a Special Meeting of the Board of Directors of GMAC Bank (Draft), Nov. 22, 2006, at ALLY_0401911–12 [ALLY_0401905]. Documents related to the 2006 Bank Restructuring suggest it was easier for Ally Bank to simply enter into new custodial agreements (or "repaper") with GMAC Mortgage rather than assign the existing custodial agreements. *See* Bank Restructuring Project Plan, Oct. 17, 2006, at EXAM10255917 [EXAM10255899].

[686] Report on Audit of GMAC Bank—Trust & Custody Services, Sept. 23, 2005, at 1 [ALLY_0220368].

circumstances, the monoline.[687] At the Bank, DCD is responsible for the certification, safeguarding, retrieval, and release of loan collateral documents (i.e., mortgage notes).[688] DCD provides this service for agency clients, including Fannie Mae, Freddie Mac, and Ginnie Mae, as well as for private securitization sponsors, such as its affiliate, GMAC Mortgage.[689] Ally Bank bills each customer, including GMAC Mortgage, monthly service fees based upon standard rates under the terms of individuallly negotiated agreements.[690]

The Bank's obligations as custodian are controlled by the custodial agreements contained in each securitization's closing set.[691] Pursuant to these agreements, the Bank had, and in some cases continues to have, several responsibilities. First, it must acquire and hold mortgage notes (sometimes referred to as loan agreements) in trust for the use and benefit of the trustee and investors.[692] Typically, the mortgage notes were acquired by the Bank staff directly from

---

[687] *See* Custodial Agreement—GMACM 2006-HE2, dated June 29, 2006, §§ 2.1–2.3 [ALLY_0033251]; Custodial Agreement—GMACM 2006-HE4, dated Sept. 27, 2006, §§ 2.1–2.3 [ALLY_0033295]; Custodial Agreement—GMACM 2007-HE1, dated Mar. 29, 2007, §§ 2.1–2.3 [ALLY_0033359]; Custodial Agreement, RALI Series 2007-QH6, dated June 1, 2007, §§ 2.1, 2.3(a) [GSResCap0000117072]; Int. of M. Hebling, Apr. 16, 2013, at 14:11–16 ("[The Document Custody Division] handled the receipt, review, and certification of collateral to an investor as well as safeguarded that collateral once it had been certified to an investor. So, we maintained a vault of collateral."). The monoline insurers are express third-party beneficiaries of the custodial agreements related to their respective transactions. *See* Custodial Agreement—GMACM 2006-HE2, dated June 29, 2006, § 5.6 [ALLY_0033251]; Custodial Agreement—GMACM 2006-HE4, dated Sept. 27, 2006, § 5.6 [ALLY_0033295]; Custodial Agreement—GMACM 2007-HE1, dated Mar. 29, 2007, § 5.6 [ALLY_0033359].

[688] *See* Report on Audit of GMAC Bank—Trust & Custody Services, Sept. 23, 2005, at 1 [ALLY_0220368].

[689] *See id.*; Int. of M. Hebling, Apr. 16, 2013, at 18:6–15 ("With each of our clients we had a bi-party custodial agreement . . . . For each client that we provided agency or Fannie Mae, Freddie Mac, or Ginnie Mae custodial services there's an agency custodial agreement . . . . And then at times we were party to certain securitization agreements where we provided custodial services.").

[690] *See* Report on Audit of GMAC Bank—Trust & Custody Services, Sept. 23, 2005, at 1 [ALLY_0220368].

[691] *See* Int. of M. Hebling, Apr. 16, 2013, at 18:6–23.

[692] *See, e.g*., Custodial Agreement—GMACM 2006-HE2, dated June 29, 2006, § 2.1 [ALLY_0033251]; Custodial Agreement—GMACM 2006-HE4, dated Sept. 27, 2006, § 2.1 [ALLY_0033295]; Custodial Agreement—GMACM 2007-HE1, dated Mar. 29, 2007, § 2.1 [ALLY_0033359]. A typical provision reflecting this obligation is as follows:

Acceptance of the Mortgage Notes. The Custodian, as the duly appointed agent of the Indenture Trustee for these purposes acknowledges receipt of the Loan Agreement relating to each of the Initial Mortgage Loans listed on Schedule A hereto (the "Mortgage Loan Schedule") and declares that it holds and will hold the Mortgage Notes relating to any Subsequent Mortgage Loan as agent solely for the Indenture Trustee in trust, for the use and benefit of the Securityholders. The Servicer agrees to promptly deliver to the Custodian any amended Mortgage Loan Schedule necessary to reflect the addition of any Subsequent Mortgage Loans.

Custodial Agreement—GMACM 2006-HE2, dated June 29, 2006, § 2.1 [ALLY_0033251].

GMAC Mortgage, but in some circumstances, DCD reached out directly to title companies.[693] Second, on or prior to the securitization closing date, the Bank was required to issue an "Initial Certification" to the trustee evidencing the custodian's receipt of the mortgage notes.[694] Third, within a certain amount of time following the closing date, the Bank was required to review each mortgage note and issue a "Final Certification" evidencing the completeness of the receipt of the mortgage notes.[695] Fourth, the Bank was required to confirm that the mortgage notes were "properly executed and are appropriately endorsed," but was "under no duty or obligation to inspect, review or examine such Mortgage Notes to determine that the same are genuine, enforceable, or appropriate for the represented purpose or that they are other than what they purport to be on their face."[696] If in performing this post-closing review, the Bank found that a mortgage note was defective, it was required to promptly notify the trustee.[697] Fifth, and finally, the Bank was required to give prompt written notice to the trustee, sponsor,

---

[693]  *See* Int. of M. Hebling, Apr. 16, 2013, at 22:7–11; 45:5–15; 52:15–18 ("As custodian, we would receive collateral related to this particular deal or securitization, which we would then be required to hold on behalf of that investor. . . . If collateral had not been received, we would proactively call the title company or research where the collateral was to try and make sure that it arrived.").

[694]  *See, e.g*., Custodial Agreement—GMACM 2006-HE2, dated June 29, 2006, § 2.2(a) [ALLY_0033251]; Custodial Agreement—GMACM 2006-HE4, dated Sept. 27, 2006, § 2.2(a) [ALLY_0033295]; Custodial Agreement—GMACM 2007-HE1, dated Mar. 29, 2007, § 2.2(a) [ALLY_0033359]. A typical provision reflecting this obligation is as follows:

> Review of the Mortgage Notes. The Custodian shall deliver to the Indenture Trustee, as pledgee of the Issuer, with respect to the Mortgage Notes related to the Initial Mortgage Loans and the Mortgage Notes related to any Subsequent Mortgage Loans, on or prior to the Closing Date or the related Subsequent Transfer Date, as applicable, an Initial Certification . . . evidencing receipt of the Mortgage Notes for each Initial Mortgage Loan and the Mortgage Notes for each Subsequent Mortgage Loan listed on the Mortgage Loan Schedule or amended Mortgage Loan Schedule.

Custodial Agreement—GMACM 2006-HE2, dated June 29, 2006, § 2.2(a) [ALLY_0033251].

[695]  *See, e.g*., Custodial Agreement—GMACM 2006-HE2, dated June 29, 2006, § 2.2(b) [ALLY_0033251]; Custodial Agreement—GMACM 2006-HE4, dated Sept. 27, 2006, § 2.2(b) [ALLY_0033295]; Custodial Agreement—GMACM 2007-HE1, dated Mar. 29, 2007, § 2.2(b) [ALLY_0033359]. A typical provision reflecting this obligation is as follows:

> Within 90 days from the Closing Date or Subsequent Transfer Date, as applicable, the Custodian agrees to review in accordance with the provisions of Section 2.1(f) of [the Mortgage Loan Purchase Agreement], each [Loan Agreement/Mortgage Loan], and shall deliver to the Indenture Trustee, as pledgee of the Issuer and to [the monoline insurer], a Final Certification . . . evidencing the completeness of the receipt of the Mortgage Notes, provided that upon reasonable request of the Indenture Trustee delivered from time to time in writing to the Custodian, the Custodian shall deliver updates of any exceptions to the Indenture Trustee electronically.

Custodial Agreement—GMACM 2006-HE2, dated June 29, 2006, § 2.2(b) [ALLY_0033251].

[696]  Custodial Agreement—GMACM 2006-HE2, dated June 29, 2006, § 2.2(b) [ALLY_0033251]; Custodial Agreement—GMACM 2006-HE4, dated Sept. 27, 2006, § 2.2(b) [ALLY_0033295]; Custodial Agreement— GMACM 2007-HE1, dated Mar. 29, 2007, § 2.2(b) [ALLY_0033359].

[697]  *See* Custodial Agreement—GMACM 2006-HE2, dated June 29, 2006, § 2.2(b) [ALLY_0033251]; Custodial Agreement—GMACM 2006-HE4, dated Sept. 27, 2006, § 2.2(b) [ALLY_0033295]; Custodial Agreement— GMACM 2007-HE1, dated Mar. 29, 2007, § 2.2(b) [ALLY_0033359].

and monoline if it discovered "a breach of any representation or warranty."[698] With respect to this final obligation, the Bank had "no duty to review and know the substantive content of such representations and warranties or to actively police any breach of such representations and warranties."[699] The custodian is typically indemnified and held harmless by the servicer for any claims that may arise from the custodial duties.[700]

### *(ii) Applicable Law*

The custodial agreements under which Ally Bank serves as custodian are governed by Pennsylvania law.[701] To establish a breach of contract claim under Pennsylvania law, a plaintiff must plead: (1) the existence of a contract, including its essential terms; (2) a breach of a duty imposed by the contract; and (3) resultant damages.[702] The Pennsylvania statute of limitations for a breach of contract claim is four years from the date of breach.[703] The Examiner has not conducted a timeliness analysis of these claims with respect to any particular securitization.

The Submission Papers received by the Examiner have not raised any issues with respect to the existence of the Bank's obligations under the custodial agreements or the timeliness of

---

[698] Custodial Agreement—GMACM 2006-HE2, dated June 29, 2006, § 2.3 [ALLY_0033251]; Custodial Agreement—GMACM 2006-HE4, dated Sept. 27, 2006, § 2.3 [ALLY_0033295]; Custodial Agreement—GMACM 2007-HE1, dated Mar. 29, 2007, § 2.3 [ALLY_0033359].

[699] Custodial Agreement—GMACM 2006-HE2, dated June 29, 2006, § 2.3 [ALLY_0033251]; Custodial Agreement—GMACM 2006-HE4, dated Sept. 27, 2006, § 2.3 [ALLY_0033295]; Custodial Agreement—GMACM 2007-HE1, dated Mar. 29, 2007, § 2.3 [ALLY_0033359].

[700] *See* Custodial Agreement—GMACM 2006-HE2, dated June 29, 2006, § 3.2 [ALLY_0033251]; Custodial Agreement—GMACM 2006-HE4, dated Sept. 27, 2006, § 3.2 [ALLY_0033295]; Custodial Agreement—GMACM 2007-HE1, dated Mar. 29, 2007, § 3.2 [ALLY_0033359]; *see also* Debtors' Omnibus Reply Submission Paper, dated Dec. 18, 2012, at 22 ("Ally Bank has indemnity rights against GMAC Mortgage . . . under certain custodial agreements entered into between, among others, Ally Bank and [GMAC Mortgage] in connection with a series of home equity loan transactions. . . . Therefore, to the extent that AFI or its subsidiaries incur defense costs and losses in connection with the [custodial agreements], AFI will have direct claims against the Debtors' estates on account of these indemnification obligations . . . ."). While these indemnification rights will affect which entity ultimately bears the loss associated with such claims, indemnification has no bearing on the validity of the initial claim against the custodian and therefore does not alter the Examiner's analysis with respect to claims against Ally Bank as custodian.

[701] *See* Custodial Agreement—GMACM 2006-HE2, dated June 29, 2006, § 5.3 [ALLY_0033251] ("Governing Law. This Agreement shall be deemed a contract made under the laws of the state of Pennsylvania and shall be construed and enforced in accordance with and governed by the laws of the state of Pennsylvania."); Custodial Agreement—GMACM 2006-HE4, dated Sept. 27, 2006, § 5.3 [ALLY_0033295] (same); Custodial Agreement—GMACM 2007-HE1, dated Mar. 29, 2007, § 5.3 [ALLY_0033359] (same).

[702] *See Guerra v. Redevelopment Auth.*, 27 A.3d 1284, 1289 (Pa. Super. Ct. 2011); *Omicron Sys., Inc. v. Weiner*, 860 A.2d 554, 564 (Pa. Super. Ct. 2004); *Cole v. Lawrence*, 701 A.2d 987, 989 (Pa. Super. Ct. 1997). These elements must be proven by a preponderance of the evidence. *See Ferranti Int'l, PLC v. Jasin*, 47 F. App'x 103, 107 (3d Cir. 2002); *Snyder v. Gravell*, 666 A.2d 341, 343 (Pa. Super. Ct. 1995).

[703] 42 PA. CONS. STAT. § 5525(a)(8); *see also Steiner v. Markel*, 968 A.2d 1253, 1255 n.5 (Pa. 2009) ("The statute of limitations for a breach of contract claim is four years.").

claims asserted with respect thereto. Accordingly, the Investigation focused on whether the custodial agreements have been breached. Consistent with the Examiner Scope Approval Order, the Examiner offers no opinion on the damages resulting from any breach.

### (iii) Evidence Related To The Bank's Breach Of The Custodial Agreements

The Investigation did not include an audit of the mortgage notes held by DCD, but did review documents produced to the Examiner for evidence of missing notes. An internal audit by Audit Services in September, 2005 "did not observe or detect any significant control weaknesses" with respect to collateral certifications, obtainment, and processing, among other things.[704] Similarly, e-mail communications among custodial associates suggest that throughout 2006 and 2007, the Bank was largely successful in acquiring and holding mortgage notes for the securitizations on which it served as custodian.[705] These documents suggest that during the relevant period of time, the Bank did not experience any significant disruption in acquiring mortgage notes, as required by the custodial agreements.

There is, however, some evidence to suggest that Ally Bank had difficulty acquiring certain modified mortgage notes beginning in early 2009.[706] For instance, a February 2009 presentation by DCD to ResCap's Operations Risk Committee explained that DCD was "experiencing a significant increase in missing collateral and Note deficiencies due to loan modifications."[707] Loan modifications occurred when the borrower and servicer agreed to change one or more of the loan's terms as reflected in the original mortgage note. When such a modification occurred (typically after the loan had been repurchased from a securitization trust), DCD would acquire and review the new, modified mortgage note.[708] During this time period, modified loans represented sixty-eight percent of all loans received in the "collateral curative unit" of DCD.[709] DCD further reported that it took an average of 35.8 days to "cure"

---

704 Report on Audit of GMAC Bank—Trust & Custody Services, Sept. 23, 2005, at 2 [ALLY_0220368].

705 *See* E-Mail from C. Hodder (May 2, 2007) [EXAM10823010] (indicating that for the period from October 2006 through March 2007, Ally Bank received in excess of 99.6% of first lien mortgage notes and 99.75% of second lien mortgage notes within twenty days of closing or subsequent transfer); Int. of M. Hebling, Apr. 16, 2013, at 53:2–25 ("My recollection is that would mean 99.9 percent of the collateral is received by the custodian within 20 days of funding.").

706 *See, e.g.*, GMAC Bank and RFG Operations Risk Committee Minutes, Aug. 27, 2009, at 1–2 [EXAM11072090] ("Ms. Krawczun noted that rework continues to significantly increase in DCD due to missing collateral and note deficiencies due to loan modifications that are repurchased, modified, and re-delivered. Mr. Rizzo questioned if repurchases meant from distressed loans or loans pulled out of a pool by Servicing. Ms. Krawczun replied both types.").

707 Operations Risk Committee—GMAC ResCap Loan Modification Process Issues, at 2 [EXAM12310627].

708 *See* Int. of M. Hebling, Apr. 16, 2013, at 132:3–14 ("Loans were repurchased by GMAC Mortgage, became portfolio loans, many of those loans had been modified and we were requested to do a new audit of that loan, which would require us to review the Loan Modification document, which is comparable to the note at that point, to the data that they currently had. One of the issues that we had was when we were being asked to perform this review . . . we did not have the Loan Modification in our custody to perform the audit.").

709 Operations Risk Committee—GMAC ResCap Loan Modification Process Issues, at 2 [EXAM12310627].

modified loans—i.e., to acquire the new mortgage notes following loan modifications by the servicer—and that it had identified twenty-three loans aged over 360 days that were "unlikely to cure."[710] It appears, however, that these missing notes related primarily to loans that had already been repurchased from the RMBS trusts, and thus would have had limited, if any, impact on the securitizations insured by the monolines.[711]

As an affiliate of ResCap, Ally Bank had certain intercompany relationships that third party custodians lacked, such as "direct access to channels and customers" and "the ability to load information directly onto [AFI's] systems providing real-time information."[712] These systems included (1) Loan Serve, a servicing platform used by GMAC Mortgage; (2) WALT, a correspondent management system used by GMAC Mortgage; and (3) CMS, GMAC Mortgage's capital markets system.[713] However, this direct access to intercompany systems seems only to have been used by Bank associates in limited ways, namely to compare and correct basic borrower information including names and addresses.[714] DCD did not review mortgage notes for compliance with representations and warranties, except in limited circumstances where this type of review was explicitly provided for in the relevant documentation.[715]

---

[710] *Id.*

[711] Int. of M. Hebling, Apr. 16, 2013, at 132:3–18 ("Loans were repurchased by GMAC Mortgage, became portfolio loans, many of those loans had been modified and we were requested to do a new audit of that loan, which would require us to review the Loan Modification document, which is comparable to the note at that point . . . . One of the issues that we had was when we were being asked to perform this review, after the loan was repurchased it became a portfolio [loan], we did not have the Loan Modification in our custody to perform the audit. So our goal at some point was to figure out where in the process these modifications were so that we could help GMAC Mortgage get them into our custody so that we could perform the review for them."). Reports from late 2008 through 2010 suggest that Ally Bank continued to experience the highest note deficiency rates for loans in GMAC Mortgage's "Repurchase/Reinstatement" channel, as opposed to its correspondent and consumer channels. *See, e.g*., Operations Risk Management Monthly Report, dated Nov. 2008, at 18 [EXAM12335998] (reflecting a 10.96% overall deficiency rate and a repurchases/reinstatements rate of over 80%); Operations Risk Management Monthly Report, dated Mar. 2009, at 35 [EXAM12310632]; Quality Metric Deck—Gess/Glemser Monthly Report, dated Apr. 30, 2010, at 13–14 [EXAM12030111].

[712] FTI Consultants, Custodian Analysis (Draft), dated July 23, 2008, at 11–12 [EXAM20003577].

[713] Int. of M. Hebling, Apr. 16, 2013, at 56:19–57:20; 59:9–60:14; 144:24–146:25.

[714] *Id.*, at 56:19–57:20; 59:11–23; 145:12–21 ("[Q:] [W]hat is Loan Serve? . . . [A:] It's the servicing system for the loan servicer. . . . ("[Q:] And did your department work with this system? [A:] In a very small way. . . . Some associates had access to view parts of that system and fewer associated had direct access to make minor changes in that system. . . . After the note review was performed, if a defect was found, a typo in the name or address, a certain group of associates could go into that system and make the correction to that spelling.").

[715] *Id.* at 35:17–36:11, 101:1–6 ("[Q:] I just want to confirm that the note audit process that your department conducted did not include a review for breaches of reps and warranties, is that correct? [A:] We only reviewed the original note.").

From a diligence standpoint, it seems that as loan custodian, the Bank was required to perform only a minimal level of diligence on the mortgage notes they received and held.[716] As provided by the custodial agreements, DCD's review of the mortgage notes was limited to information that appeared on the mortgage notes themselves, such as the borrower's name, the property address, the interest rate, and perhaps the first payment date.[717] This information was checked against a data file provided by the servicer, such as GMAC Mortgage.[718] Any defects or "exceptions" were reported to GMAC Mortgage's capital markets group.[719] While the Investigation revealed evidence that, on at least one recent occasion, technical flaws in the mortgage note review software caused underreporting of note defects,[720] the problem appears to have been limited to repurchased or HFS loans, not loans held by a securitization trust.[721]

### (iv) Defenses Asserted by AFI/Ally Bank

As a defense to Ally Bank's potential liability, AFI points to the non-policing nature of the custodian's responsibilities, arguing that "Ally Bank is not required to police the loans for

---

[716] *See* Int. of C. Blahut, Mar. 13, 2013, at 172:9–20 ("[Q:] Does the custodian check over all of these loan files to make sure that it has the information that would be needed to foreclose on someone? [A:] Probably after the fact. If they were probably notified that they might be taking some sort of enforcement of that, they might open it up and start taking a look and making sure, and then giving somebody the heads up. But, you know, there's just such a flow of documentation that there's no quality control with what comes in."); Int. of M. Hebling, Apr. 16, 2013, at 82:24–83:10 ("Again, we're only reviewing the original note. We're reviewing it after the loan has closed prior to the loan being sold to any type of investor. And for an individual note, an auditor never probably takes, I don't know, less than five minutes to review a note. . . . ("[Q:] So it's [a] quick [  ] check . . . . Make sure everything is there, follow up and then they just continuously go through notes. . . . [A:] Yes.").

[717] *See* Int. of M. Hebling, Apr. 16, 2013, at 25:21–26:6 ("We would make sure that the document was complete and executed, and that certain data elements on that note or terms of that note were correct or matched the data that we were provided. . . . We would look at a borrower's name, the property, address, and interest rate, perhaps the first payment date, depending on the type of loan that it was."). While the custodial agreements do not specify which pieces of information need to be reviewed by the custodian, the custodial agreements typically referenced the related mortgage loan purchase agreements, which required the custodian to identify any "material defect" that would "materially and adversely affect" the value of the mortgage note collateral. *See, e.g.*, Custodial Agreement—GMACM 2006-HE4, dated Sept. 27, 2006, § 2.2(b) [ALLY_0033251] ("[T]he Custodian agrees to review in accordance with the provisions of Section 2.1(f) of [the Mortgage Loan Purchase Agreement], each Loan Agreement . . . ."); Mortgage Loan Purchase Agreement—GMACM 2006-HE4, dated Sept. 27, 2006, § 2.1(f) [GOLDIN00076207] (requiring the servicer to cure, repurchase, or replace any mortgage loan for which the custodian discovers any "material defect in any Loan Agreement . . . which may materially and adversely affect the value of the related Mortgage Loan . . . .").

[718] *See* Int. of M. Hebling, Apr. 16, 2013, at 26:11–15.

[719] *See id.* at 29:13–30:7.

[720] *See* E-mail from D. Chiodo (Sept. 26, 2012) [EXAM30003806] ("On Monday, our Team in Iowa identified a potential issue in our exception report for the Legacy loans . . . . We determined that the report was not selecting all of the exceptions for the report. The issue was identified as faulty logic in the reporting query . . . .").

[721] *See* Int. of M. Hebling, Apr. 16, 2013, at 94:11–95:21 ("They had given us a population of loans that they were intending to sell, asked that we do a pre-review to a certain standard and let them know if there were any defects with the documents that we had as portfolio loans . . . . We were not the custodian for these loans. We were providing a review prior to sale so that they knew what exceptions their new custodian would give them. . . . They were loans that were in a portfolio status as far as we tracked in our system.").

which it is custodian for potential breaches, but simply to issue a notice '[u]pon discovery' of an actual breach."[722] AFI's articulation of the Bank's responsibilities under the custodial agreements is correct and, as discussed earlier, it appears that the Bank's custodial associates completed only a limited review of the mortgage notes, thus implicating only a subset of the representations and warranties given on any particular securitization deal.[723] However, the monolines do not only allege that the Bank failed to police the quality of the mortgage notes, but also that it had actual knowledge of representation and warranty breaches that it did not convey to the trustees or monolines.[724] While the monolines have not identified any evidence that conclusively demonstrates this knowledge, the relationship between the Bank and GMAC Mortgage, including overlapping officers and directors, the close operational proximity in which their personnel worked, and the fact that the Bank sold to GMAC Mortgage many of the loans for which it was serving as custodian,[725] do support an inference that Bank personnel would have been aware, to some extent, of the quality of the loans for which it was serving as custodian. This aspect of shared knowledge between ResCap entities and the Bank is explored in more depth in Section VIII.C.2.c(2)(b)(ii)(A).

In response to the monolines' contention that the Bank must have known of actual breaches of the representations and warranties because it originated loans in the relevant trusts, AFI argues that "knowledge of certain Ally Bank employees involved in originating loans cannot be imputed to entirely different Ally Bank employees involved in performing custodial duties for securitization transactions."[726] According to AFI, "[w]hile a corporation may be charged with the collective knowledge of its employees, a plaintiff 'may not use this principle to shore up a claim of essentially fraudulent conduct when it is unable to allege that any specific employee(s) has the requisite knowledge.'"[727] Under Pennsylvania law, however, this principal seems limited to instances where a plaintiff attempts to use collective knowledge to establish a state of mind, and would not necessarily hold true for a breach of contract

---

[722]  AFI Submission Paper, dated Dec. 19, 2012 at 79.

[723]  *See, e.g.*, MBIA Reply Submission Paper, dated Mar. 18, 2013, at 8, 18–21 (alleging misrepresentations that would not have been apparent from review of only a mortgage note, such as income level, LTV, CLTV, and DTI levels, borrower occupancy status, credit score, and application of underwriting criteria); Joint Submission Paper of AIG, Allstate, MassMutual, and Prudential, dated Oct. 17, 2012, at 3–4 (same).

[724]  *See* FGIC Submission Paper, dated Oct. 17, 2012, at 26–27; Compl., *MBIA Ins. Corp. v. Ally Fin. Inc.*, Case No. 27-CV-12-18889, at 49 (Minn. D. Ct. Sept. 17, 2012) ("Because Ally Bank originated or acquired over 80% of the loans at issue in the GMAC Mortgage Securitizations, it was aware of the deficiencies of these loans, but nevertheless did nothing to correct or make MBIA aware of these pervasive problems.").

[725]  *Compare* Appendix VIII.B—3, *with* PLS Trust Spreadsheet [EXAM00339947] (indicating that the securitizations for which the Bank served as custodian contained as much as 89% Bank-attributable loans).

[726]  AFI Submission Paper, dated Dec. 19, 2012, at 80 (citing *Midfirst Bank, SSB v. C.W. Haynes & Co.*, 893 F. Supp. 1304, 1316 (D.S.C. 1994)).

[727]  AFI Submission Paper, dated Dec. 19, 2012, at 80 (citing *Musalli Factory for Gold & Jewelry v. JPMorgan Chase Bank, N.A.*, 261 F.R.D. 13, 24 n.11 (S.D.N.Y. 2009); *Midfirst Bank*, 893 F. Supp. at 1316).

claim.[728] Further, the need to rely on the collective knowledge of the company is reduced, given the monolines' allegations that some of ResCap and AFI's most senior directors and officers (who in some cases overlapped with those of the Bank) were aware of the Debtors' alleged breaches of representations and warranties, as well as the alleged deficient underwriting.[729]

AFI's final defense to the Bank's alleged liability as loan custodian is to assert that the Bank was only required to certify its receipt of mortgage notes, not full mortgage files, and that claimants have failed to assert that the Bank certified the receipt of any mortgage note that was not actually received.[730] Because the Examiner's Professionals did not conduct an audit of mortgage notes held by DCD, the Examiner offers no conclusions with respect to specific notes.

### (v) Conclusion With Respect To Ally Bank's Liability For Breach Of The Custodial Agreements

The Investigation has revealed no evidence to support the Third-Party Claimants' assertions that the Bank breached its custodial obligations to obtain, review, and certify mortgage notes. However, because the Examiner's Professionals did not conduct an audit of individual mortgage notes held by the Bank pursuant to the custodial agreements, this observation should not be considered dispositive of the monolines' claims. Further, the Investigation has revealed no evidence to support the Third-Party Claimants' assertions that the Bank breached its obligations to alert the trustees and monolines as to breaches of representation and warranties related to the securitizations. Given that Bank custodial associates only performed a limited review of mortgage notes, not entire loan files, it is unlikely that this review would have alerted the custodial division to the broad breaches of representations and warranties alleged by Third-Party Claimants. Whether such knowledge was held by other Bank employees, including its officers and directors, is discussed in Section VIII.C.2.c(2)(b)(ii)(A).

### (b) Aiding And Abetting Fraud

### (i) Applicable Law

Below is a brief summary of the law regarding aiding and abetting fraud. A more robust discussion of these principles is contained in Section VIII.C.2.a(3). To state a claim for aiding and abetting fraud, plaintiffs must allege (1) the existence of an underlying fraud;

---

[728] *Lind v. Jones, Lang Lasalle Ams., Inc.*, 135 F. Supp.2d 616, 622 n.6 (E.D. Pa. 2001) ("Although knowledge possessed by employees is aggregated so that a corporate defendant is considered to have acquired the collective knowledge of its employees, specific intent cannot be aggregated similarly.") (citations omitted).

[729] *See, e.g.*, MBIA Submission Paper, dated Nov. 9, 2012, at 27 ("AFI officers, directors or employees knew about the Debtors' fraudulent activities from their active involvement in the day-to-day business activities of the Debtors.").

[730] AFI Submission Paper, dated Dec. 19, 2012 at 80–81; *accord* Int. of M. Hebling, Apr. 16, 2013, at 101:1–6 ("[Q:] I just want to confirm that the note audit process that your department conducted did not include a review for breaches of reps and warranties, is that correct? [A:] We only reviewed the original note.").

(2) knowledge of the fraud; and (3) substantial assistance in the commission of the fraud.[731] New York courts require actual knowledge of the primary wrong by the alleged aider and abetter.[732] "The 'knowledge' element of an aiding and abetting fraud claim is not identical to the scienter required for the underlying fraud."[733] While a strong inference of scienter can be satisfied by a showing of "facts that constitute strong circumstantial evidence of . . . recklessness," aiding and abetting requires actual knowledge.[734]

New York courts have defined "substantial assistance" to require that a defendant "affirmatively assists, helps conceal, or by virtue of failing to act when required to do so enables the fraud to proceed."[735] Substantial assistance requires the plaintiff to allege that the actions of the aider/abettor proximately caused the harm on which the primary liability is predicated.[736] "But-for" causation is insufficient; aider and abettor liability requires the injury to be a direct or reasonably foreseeable result of the alleged wrongful conduct.[737] "Executing transactions, even ordinary course transactions, can constitute substantial assistance under some circumstances, such as where there is an extraordinary economic motivation to aid in the fraud."[738]

---

[731] *E.g., Dexia SA/NV v. Deutsche Bank AG*, Nos. 11 Civ. 5672, 6141, 2013 WL 98063 at *3 (S.D.N.Y. Jan. 4, 2013) (citing *VTech Holdings, Ltd. v. Pricewaterhouse Coopers, LLP*, 348 F. Supp. 2d 255, 269 (S.D.N.Y. 2004)); *UniCredito Italiano SPA v. JPMorgan Chase Bank*, 288 F. Supp. 2d 485, 502 (S.D.N.Y. 2003).

[732] *Williams v. Bank Leumi Trust Co. of N.Y.*, 1997 WL 289865 at *5 (S.D.N.Y. 1997); *Kolbeck v. LIT Am., Inc.*, 939 F. Supp. 240, 246 (S.D.N.Y. 1996) ("New York common law, which controls the analysis here, has not adopted a constructive knowledge standard for imposing aiding and abetting liability. Rather, New York and federal courts in this district, have required actual knowledge."); *see also Holtkamp v. Parlex Assocs.*, 926 N.Y.S.2d 344 (NY Sup. Ct. 2011) (explaining that constructive knowledge of the underlying fraud is insufficient to establish an aiding and abetting claim).

[733] *King Cnty., Wash. v. IKB Deutsche Industriebank AG*, No. 09 Civ. 8387(SAS), 2013 WL 45878, at *3 (S.D.N.Y. 2013) (quoting *JPMorgan Chase Bank v. Winnick*, 406 F. Supp. 2d 247, 253 n.4 (S.D.N.Y. 2005)).

[734] *Id.; Kolbeck*, 939 F. Supp. at 246 ("New York common law, which controls the analysis here, has not adopted a constructive knowledge standard for imposing aiding and abetting liability. Rather, New York courts and federal courts in this district, have required actual knowledge."). Under Minnesota law, constructive knowledge may be sufficient where the primary tortfeasor's conduct is "clearly tortious or illegal." *See Witzman v. Lehrman, Lehrman & Flom*, 601 N.W.2d 179, 188 (Minn. 1999) ("In cases where the primary tortfeasor's conduct is clearly tortious or illegal, some courts have held that a defendant with a long-term or in-depth relationship with that tortfeasor may be deemed to have constructive knowledge that the conduct was indeed tortious."). Given the complexity of the alleged fraud underlying the RMBS Claims, this standard is unlikely to govern these claims, even where Minnesota law arguably applies.

[735] *Cromer Fin. Ltd. v. Berger*, 137 F. Supp. 2d 452, 470 (S.D.N.Y. 2001) (citation omitted).

[736] *Id.*; *see also Houbigant, Inc. v. Deloitte & Touche*, 303 A.D.2d 92, 100 (N.Y. App. Div. 2003) ("[T]he plaintiff must only allege facts from which it may be inferred that the defendant was aware that its misrepresentations would be reasonably relied upon by the plaintiff, not that the defendant intended to induce the particular acts of detrimental reliance ultimately undertaken by the plaintiff.").

[737] *Cromer Fin.*, 137 F. Supp. 2d at 470.

[738] *Primavera Familienstifung v. Askin*, 130 F. Supp. 2d 450, 511 (S.D.N.Y. 2001), *abrogated on other grounds by Casey v. Merck & Co.*, 653 F.3d 95, 100 (2d Cir. 2011).

In certain jurisdictions, warehouse lending and origination activities have been deemed sufficient to support allegations of "substantial assistance."[739] While there are no cases directly on point in New York, or certain other potentially relevant jurisdictions such as Minnesota or Pennsylvania, there appears to be some support under New York law for considering financing activities to constitute substantial assistance, if the financing activities are atypical and accompanied by a sufficient level of knowledge regarding the alleged fraud.[740]

### (ii) Analysis Of Aiding And Abetting Fraud Claims Against Ally Bank

#### (A) Knowledge

As a preliminary matter, the Investigation did not reveal any evidence of the Bank's overt knowledge of the type of fraud alleged by Third-Party Claimants. However, the close relationship between the Bank and ResCap (specifically, GMAC Mortgage), suggests that their management and personnel kept in close contact and were generally very knowledgeable as to the business operations of the various affiliate entities.

At the officer and director level, there were several instances of overlap between the Bank and ResCap. For instance, David Applegate, ResCap's co-CEO from late 2004 to late 2005 and later its Chief Operating Officer, served as a Director of Ally Bank from late 2006 through early 2007.[741] Davee Olson, who was ResCap's CFO from late 2004 through late 2006 and a Director of Ally Securities from 1992 through 2006, served as a Director of Ally Bank from late 2006 through mid-2007.[742] James Van Orman, who was a Director and Vice President of ResCap in 2004 and 2005, served as Chairman of the Board of Directors of Old GMAC Bank from early 2005 through late 2006 and continued as a Director of Ally Bank through early 2007.[743] These individuals received updates from ResCap management with

---

[739]  *See Henry v. Lehman Comm. Paper, Inc.* (*In re First Alliance Mortg. Co.*), 471 F.3d 977, 994–95 (9th Cir. 2006) (refusing to disturb a jury determination that warehouse lender's financing of mortgage origination, when coupled with lender's knowledge that originator employed "dubious lending practices," was sufficient to support "substantial assistance" element of aiding and abetting fraud); *Jordan v. Paul Fin., LLC*, 285 F.R.D. 435, 453–54 (N.D. Cal. 2012) (finding a genuine issue of material fact existed as to whether RBS provided substantial assistance to mortgage originator's fraud where it was "uncontroverted that RBS was one of [the originator's] major secondary market purchasers, as well as the affiliate to a major warehouse lender" and "[h]undreds of millions of dollars, if not billions, flowed through [the originator] because of RBS' involvement").

[740]  *See also Rolf v. Blyth, Eastman Dillon & Co.,* 570 F.2d 38, 48 (2d Cir. 1978) ("[S]ubstantial assistance might include . . . executing transactions or investing proceeds, or perhaps . . . financing transactions." (quoting 2 A. Bromberg, Securities Law § 8.5 (515) (1974))); *In re Gas Reclamation, Inc. Sec. Litig.*, 659 F. Supp. 493, 504 (S.D.N.Y. 1987) ("[T]he Court concludes that the Investors have alleged active wrongdoing by these defendants satisfying the substantial assistance requirement. These include, *inter alia,* allegations that the defendants reviewed and approved the first [private placement memorandum], devised the marketing and financing scheme for [the defendant entity], and *engaged in atypical financing transactions*.") (emphasis added).

[741]  *See* AFI Employee Profiles, David Applegate, at ALLY_0004706 [ALLY_0004637].

[742]  *See* AFI Employee Profiles, Davee Olson, at ALLY_0004714 [ALLY_0004637].

[743]  *See* AFI Employee Profiles, Jerome Van Orman, Jr., at ALLY_0004718 [ALLY_0004637].

respect to increases in nontraditional mortgage products and loan performance,[744] as well as audits of various ResCap and affiliate functions.[745] A more detailed discussion of AFI's audit process is contained in Section VIII.C.2.a(3)(c)(ii)(D).

At an operations level, ResCap and Bank management and personnel served on various committees together to, among other things, help centralize their diligence and risk management procedures.[746] One such effort, the RFG Diligence Forum, focused on areas such as "credit/appraisal, legal, servicing and compliance, which are critical components to the product offerings [made to] clients and investors."[747] Another similar effort sought to "[a]lign

---

[744] *See, e.g.*, ResCap Board Performance and Market Update, dated June 22, 2006, at RC40011855, RC40011874, [RC40011836] (distributed to Applegate and Olson and indicating that "RFG continues to expand market share despite market contraction. . . . Growth is due to increases in all products, with non-conforming products supporting the increase in the third and fourth quarters [of 2006]."); ResCap Board Performance and Market Update, dated Sept. 15, 2006, at RC40011956, RC40011980 [RC40011954] (distributed to Applegate and indicating that "[s]ubprime delinquencies and severities have been slightly worse than expectations over the past quarter, with the 2006 vintage performing much weaker than expectations"); GMAC ERM Committee Meeting Presentation, dated Nov. 15, 2006, EXAM11443901 [EXAM11443901] (indicating Van Orman's attendance and participation in a meeting focused on various aspects of AFI's risk management, including residential mortgage operations); E-mail from L. Zukauckas to J. Li, J. Young, J. Van Orman, and D. Olson (Jan. 18, 2006) [EXAM10832755] ("Jim—Today you are expected to get us a plain english explanation on why your provision has decreased when the portfolio has increased and other credit trends (proportion of subprime in portfolio, etc) seem to indicate increased risk.").

[745] *See, e.g.*, GM Audit Services, Report on Audit of GMAC RFC—Warehouse Lending Operations, dated Aug. 8, 2005, at 3 [ALLY_0220358] (indicating distribution to Olson); GM Audit Services, Report on Audit of GMAC Bank—Wholesale Lending, dated Oct. 3, 2005, at 3 [ALLY_0220375] (indicating distribution to Applegate). For a detailed discussion of these types of reports, see GM Audit Services, Report on Audit of GMAC-RFC Service Delivery Group, dated May 18, 2006, at 1, 6 [ALLY_0220776] (indicating distribution to Applegate and Olson and finding "insufficient resources to clear servicing exceptions on new loans" and "inadequate management reporting on the levels, trends and root causes of F-status loans (i.e. unsaleable loans)"). The overlap between Ally Bank and ResCap officer does not appear to have been limited to only the most senior positions. *See, e.g.*, Int. of S. Blitzer, Mar. 5, 2013, at 7:23–8:20 (explaining that he was a vice president at GMAC Mortgage and "had dual officership for GMAC Bank" though he was "not necessarily an employee of the bank").

[746] *See, e.g.*, Strategic Initiatives Minutes, Aug. 12, 2005, at 1 [EXAM11762755] (indicating attendance by David Applegate of ResCap, and Jay Barr and Robert Groody of Old GMAC Bank); Draft RFG Corporate Governance—Proposal on Risk Committee Structure Presentation, dated Mar. 10, 2006, at 7 [EXAM11377135] (proposing a financial risk committee to include, among others, Groody, Barr, Applegate, Scholtz, and Flees); Financial Risk Committee Minutes, Sept. 7, 2006 [EXAM11754507]; RFG Diligence Forum Charter (Draft), dated Oct. 6, 2006, at MBIADEPEXH0028479–81 [MBIADEPEXH0028464] (providing for various Old GMAC Bank personnel to sit on both the "core team" and the "advisory team"); Memorandum, Product and Business Strategy Management Product Approval Process, dated Oct. 11, 2006, at 1 [EXAM10011774] (addressed to "EC Committee Members," including Barry Bier of Old GMAC Bank, Keenen Dammen of Ally Securities, and Applegate); Responsible Practices Committee Meeting Agenda, Dec. 15, 2006, at 1 [EXAM11244367] (indicating membership, though not attendance by Applegate, Bier, and Dammen, among many others).

[747] *See* RFG Diligence Forum Charter (Draft), Oct. 6, 2006, at MBIADEPEXH0028479 [MBIADEPEXH0028464].

the risk governance structure" of ResCap and Old GMAC Bank.[748] A proposal for this joint risk committee suggested that personnel from various ResCap entities, including Old GMAC Bank, would "[p]rovide oversight on all responsible lending and servicing assessments" and help "[e]stablish underwriting policy."[749] Representation and warranty policies also appear to have been discussed and communicated between ResCap and Old GMAC Bank, suggesting that their personnel often worked as an integrated enterprise.[750]

One example of the collaboration between Old GMAC Bank and ResCap is a working group session called to formulate a response to the December 2005 interagency guidance on nontraditional mortgage products, which was proposed by certain federal regulators, including the FDIC, OTS, and FRB.[751] In those discussions, Al Celini, then Chief Credit and Risk Officer of Old GMAC Bank,[752] expressed disagreement with changing ResCap and Old GMAC Bank's underwriting practices in response to the proposed guidance.[753] However, Celini advised the group that they should be cautious with their response, because it could potentially "be spun into 'we made the loan with a primary repayment source that is a refinance.'"[754] Celini thought that "[e]ven though this is a reality, it probably is not best to officially state."[755]

Despite defending the issuance of nontraditional mortgage products by ResCap as a whole, Celini expressed his belief that Old GMAC Bank's portfolio in particular had borrowers with strong credit scores and lower default risk.[756] A presentation to the Ally Bank Board from late 2006 (just one week after the 2006 Bank Restructuring) confirms Celini's

---

[748] RFG Corporate Governance—Proposal on Risk Committee Structure, Mar. 1, 2006, at 2 [EXAM11741476].

[749] *Id.* at 4 (providing that Jay Barr, then President of Old GMAC Bank, would serve on the committee).

[750] *See* E-mail from L. Lundsten (June 16, 2006) [EXAM11247435] (listing several Old GMAC Bank personnel along with RFC personnel).

[751] *See* MRizzo RFG Interview Notes, Proposed Interagency Guidance on Nontraditional Mortgage Products, dated Mar. 16, 2006, at EXAM11361090 [EXAM11361090]; GMAC Bank Nontraditional Mortgage Products Risks Presentation, distributed Nov. 21, 2006, at ALLY_0401992 [ALLY_0401905] ("Cross-enterprise [nontraditional mortgage products] Working Group convened in Feb-Apr'06. The Working Group included associates from Credit, Ops Risk, Legal and Product Development Personnel . . . and included Bank (MRizzo—leader, ACelini), GMACR and RFC representation.").

[752] Int. of A. Celini, Feb. 18, 2013, at 9:3–10:13.

[753] *See* MRizzo RFG Interview Notes, Proposed Interagency Guidance on Nontraditional Mortgage Products, dated Mar. 16, 2006, at EXAM11361092 [EXAM11361090].

[754] *Id.*

[755] *Id.* (adding that "[f]rom the bank perspective, these assets are not purchased with the expectation that they will be 30 year assets. Duration is much shorter.").

[756] *See id.*

observation that loans originated and held by the Bank (typically prime, conforming loans) were of a higher quality than those originated by RFC's brokers and correspondents.[757]

Another aspect of the Bank and GMAC Mortgage's operations that supports an inference of knowledge is their shared information systems. As discussed in Section VIII.C.2.c, in connection with its role as loan custodian, the Bank had access to at least three GMAC Mortgage systems, which allowed the Bank to confirm and correct certain pieces of mortgage loan data.[758] One of these systems was a shared capital markets system, which GMAC Mortgage personnel "used to understand what loans were available in total to be pooled . . . ."[759] Through this system, GMAC Mortgage personnel could look to the Bank's HFS portfolio, select loans that fit their desired criteria, and request that the loans be sold to GMAC Mortgage for securitization.[760]

The close relationship between ResCap and Old GMAC Bank appears to have been uninterrupted by the 2006 Bank Restructuring. ResCap and Ally Bank personnel continued to work closely in setting and adhering to product policies,[761] and Ally Bank remained a high-volume source of loans for GMAC Mortgage.[762]

---

[757] *Compare* Minutes of a Regular Meeting of the Board of Directors of GMAC Bank, Nov. 30, 2006, at 4–5 [ALLY_PEO_0020880] ("In the review of [Ally] Bank payment option ARMs ('POAs'), Mr. Rizzo informed the Board that the HFI account has no exposure to POAs and that, as of September 30, 2006, 11% of the HFS account consists of POAs."), *with* ResCap Board Performance and Market Update, dated Dec. 12, 2006, at RC40012260 [RC40012214] (indicating that payment-option ARM products accounted for 15.7% of ResCap's year-to-date mortgage funding as of September 2006); *see also* Enterprise Risk Management Committee Meeting Minutes, Sept. 28, 2006, at EXAM10010358 [EXAM10010357] (indicating that approximately 90% of borrowers were "making minimum payments and are therefore negatively amortizing"); Int. of C. Blahut, Mar. 13, 2013, at 31:3–10 ("[Old GMAC Bank] had more of the . . . franchise on dealing with prime or conforming originations. They dealt with a lot of jumbo prime that might be the fixed rate . . . or they did some hybrid ARMs. But it was generally prime first and second liens. I'm not familiar with them doing any type of Alt-A or reduced documentation underwriting."); Int. of J. Gray, Mar. 1, 2013, at 13:4–9 (GMAC Mortgage was organized around products that were more conventional).

[758] *See* Section VIII.C.2.c.

[759] Int. of R. Groody, Dec. 17, 2012, at 85:16–19.

[760] *See id.*, at 85:16–86:6.

[761] *See* E-mail from J. Young (Dec. 6, 2006) [EXAM10166101]; E-mail from A. Peacock (Mar. 1, 2007) [EXAM10119873]; E-mail from P. Fossell (Oct. 24, 2007) [EXAM10059604] (circulating updates to underwriting authority policies); E-mail from R. Scott (July 5, 2007) [EXAM10120526]. Additionally, it appears that in later years, Ally Bank employees performed work for its affiliates, including AFI. *See* E-mail from S. McCumber (Nov. 18, 2010) [EXAM31587084]; Bank Associates Doing Work for Affiliates Spreadsheet [EXAM31590681] (indicating that some Ally Bank employees spent as much as 40% of their time performing work for affiliates). It is not clear if this type of cross-enterprise work was performed during the period of time when ResCap is alleged to have made misrepresentations with respect to their private label securitizations (2004–2007).

[762] *See* Audit Services, GMAC Bank—Mortgage Loan Sales, dated Mar. 29, 2007, at 1 [EXAM10081553] ("During 2006, [Old GMAC Bank] and [Ally Bank] sold $18 billion in first mortgage loans, and $5 billion in home equity loans/lines, to [GMAC Mortgage].").

### (B) Substantial Assistance

To succeed on a claim for aiding and abetting fraud against the Bank, claimants must show not only that the Debtors engaged in an underlying fraud, but that the Bank knew of the fraud and provided substantial assistance to the Debtors in furtherance of the fraud.[763] Consideration of whether the Bank affirmatively assisted the Debtors' alleged fraud will turn on a number of factors, including the nature of services provided by the Bank and the volume of loans sold by the Bank to GMAC Mortgage.

Old GMAC Bank (and later Ally Bank)[764] served as a source of loan production for GMAC Mortgage since 2001.[765] As Robert Groody, formerly CFO of Old GMAC Bank and Chief Mortgage Accountant at Ally Bank, put it, "the bank was built to be primarily a funding vehicle for the benefit of GMAC Mortgage, and then ultimately . . . ResCap."[766] While the Bank represented only one source of funding for RFC and GMAC Mortgage, it was a strategic source because of its funding advantage relative to other sources of financing.[767] Loans funded or acquired by the Bank were sold to GMAC Mortgage primarily for the purpose of GSE securitization.[768] These were typically conforming loans, of better quality than those that were pooled into private securitizations.[769] These activities were conducted pursuant to six principal agreements between GMAC Mortgage and the Bank related to mortgage origination, servicing, and hedging, most of which were not arm's length and incorporated terms that were not available in the market.[770]

_____

[763]  *See* Section VIII.C.2.c(2)(b)(i).

[764]  Neither the Submitting Parties nor AFI have raised any issues with respect to Ally Bank's successor liability for the liabilities of Old GMAC Bank. However, the 2006 Bank Restructuring could present a barrier to Ally Bank's liability for pre-November 2006 Bank conduct, as the Examiner concludes in Section VII.L.2.a(1)(a)(i) that a court is unlikely to find that Ally Bank is the successor in liability of Old GMAC Bank.

[765]  *See* Sections V.B.3. It is possible that loans originated by Old GMAC Bank and Ally Bank also made their way into RFC securitizations, but such occurrences were likely rare. *See* Int. of E. Scholtz, Mar. 28, 2013, at 176:8–13 ("[Q:] Did RFC securitize any loans that were acquired or written by GMAC Bank? [A:] I would guess they did. It was just a funding vehicle, so it was another funding source.").

[766]  Int. of R. Groody, Dec. 17, 2012, at 19:15–18; *see also* Int. of A. Celini, Feb. 18, 2013, at 21:13–22:23 ("The bank's primary business during [2003 to 2004] was really to serve as a funding conduit. . . . We would originate through our correspondents or brokers. . . . And we would sell back to the affiliate for them to deliver and execute into the market.").

[767]  *See* Sections V.A.1.a; V.B.

[768]  *See* Int. of R. Groody, Dec. 17, 2012, at 73:12–25; Int. of A. Celini, Feb. 18, 2013, at 27:14–19 ("[Q:] My understanding is the bread and butter was [the] conforming loan business. . . . [A:] That was the overwhelming majority of the assets that were going through.").

[769]  *See* Int. of R. Groody, Dec. 17, 2012, at 73:12–74:8.

[770]  *See* Section V.B (discussing the Correspondent Agreement, MMLPSA, the Pipeline Swap, the Broker Agreement, the Original Servicing Agreement, and the MSR Swap).

The Bank also sold non-conforming loans (primarily HELOCs) to GMAC Mortgage for inclusion in private securitizations.[771] Loans originated or acquired by the Bank were included in approximately 124 of the Debtors' 392 private label securitizations.[772] In those 124 securitizations, loans sold from the Bank to GMAC Mortgage comprised anywhere from 0.03% to 89% of a given loan pool.[773] While data was not available to evaluate the performance of Bank loans contained in the Debtors' private securitizations, the Debtors have noted that "[h]istorically Bank production was high credit quality, which could lead to better performance."[774]

Old GMAC Bank had three primary channels of loan production: (1) the broker channel, whereby Old GMAC Bank funded loan origination in its own name; (2) the correspondent channel, whereby Old GMAC Bank purchased already-funded loans; and (3) GMAC Mortgage, which acted like a correspondent that would sell loans to the Bank and later buy them back for securitization.[775] Additionally, the Bank had a warehouse facility, whereby it provided a line of credit to correspondent originators who would draw upon the line of credit to fund loans and then sell the loans to the Bank using the sale proceeds to repay the facility.[776] While the Bank had its own underwriting criteria for both conforming and nonconforming loan products,[777] these criteria appear to have been developed by GMAC Mortgage and adopted by the Bank.[778] Additionally, the Bank entered into agreements with

---

[771] *See* Int. of R. Groody, Dec. 17, 2012, at 73:12–25, 80:21–81:1; Int. of A. Celini, Feb. 18, 2013, at 27:14–28:10 (approximating that conforming loan products represented ninety percent of Old GMAC Bank's production, while nonconforming products, such as jumbo loans and HELOCs, accounted for the remaining ten percent). For more information regarding GMAC Mortgage's private securitization deals, see Section VIII.B.1.

[772] *See* PLS Trust Spreadsheet [EXAM00339947]; *see also* Appendix VIII.B-1 (showing which securitization prospectuses disclosed that at least ten percent of their loans were acquired from the Bank).

[773] *See* PLS Trust Spreadsheet [EXAM00339947] (indicating that, among other things, 8 of the securitizations contained more than 75% Bank-attributable loans; 9 securitizations contained between 50 to 75%; and 17 contained between 25% and 50%). Notably, this securitization-level information does not provide information as to whether the loans in question were first sold to the Bank by GMAC Mortgage. *See* Section V.B.2 (explaining that pursuant to the Correspondent Agreement, GMAC Mortgage sold loans it had acquired or originated to the Bank).

[774] PLS Trust Spreadsheet, Disclaimer/Note 6 [EXAM00339947].

[775] *See* Int. of A. Celini, Feb. 18, 2013, at 22:23–23:22; 24:8–11.

[776] *See id.*; *see also* Int. of C. Blahut, Mar. 13, 2013, at 34:17–35:7 ("[The warehouse facility is] sort of a symbiotic type of relationship where they're able to extend financing to them and it helps deepen the relationship with the originator so that they would be able to aggregate more loans.").

[777] *See* Int. of A. Celini, Feb. 18, 2013, at 25:19–23; 44:20–45:4.

[778] *See id.* at 285:6–16 ("[Q:] I think what you said is the affiliate had a set of underwriting standards. The bank looked at them and approved them and adopted [them] as bank underwriting standards. [A:] Right. . . . And we went through them and we actually suggested revisions . . . .").

third-party correspondents that paralleled the correspondent agreements that GMAC Mortgage had in place with the same correspondents.[779] These parallel agreements allowed the entities to help each other identify and fund particular loans, with certain processing and underwriting fees paid between them.[780]

While many of the loans exchanged between Old GMAC Bank and GMAC Mortgage were originated by third-party correspondent lenders,[781] pursuant to the 2001 MMLPSA, Old GMAC Bank was required to provide GMAC Mortgage with loan-level information.[782] Additionally, for each loan sold to GMAC Mortgage pursuant to the 2001 MMLPSA, Old GMAC Bank provided a lengthy series of representation and warranties, including that the loans had been originated in accordance with applicable underwriting standards.[783] While the Examiner concludes that it is more likely than not that a court would find that the 2001 MMLPSA was orally modified in January 2002 to exclude representations and warranties on first lien loans,[784] the Bank continued providing representations and warranties on second lien loans to GMAC Mortgage through June 2007.[785] These representations and warranties were substantially similar to those that were passed on through ResCap's Depositor Entities and the issuing trusts, to RMBS investors.[786] Further, because the Bank was required to provide loan-level information to GMAC Mortgage, the Bank was intimately aware of the characteristics of a large percentage of the loans placed into GMAC Mortgage securitizations.[787]

### (iii) Defenses Asserted By AFI/Ally Bank

As a defense to the Bank's potential liability for aiding and abetting fraud, AFI asserts that Ally Bank did not know the quality of the loans it was funding because its warehouse facilities operated on a "wet-funding" basis, meaning that the Bank funded the loans before

---

[779] *See id.* at 285:24–287:20 ("[GMAC Mortgage] had its own correspondent agreement . . . with the third-party correspondent, [and] [Old GMAC Bank] had one . . . that was there as well. They were co-terminus. They had the same.").

[780] *See id.* at 285:24–287:20 (indicating that this practice "wasn't a prevalent activity" but "it happened from time to time").

[781] *See* Section VIII.B.2.e.

[782] *See* Second Addendum to 2001 MMLPSA, dated June 4, 2002, § 2.2(a) [ALLY_0018245].

[783] *See* 2001 MMLPSA, dated Dec. 15, 2001, Art. IV [ALLY_0018253].

[784] *See* Section VII.L.2.a(1)(c) (discussing Old GMAC Bank's representations and warranties to GMAC Mortgage).

[785] *See* 2007 MMLPSA, dated June 1, 2007, Art. IV [ALLY_0018275].

[786] *See, e.g.*, Int. of R. Groody, Dec. 17, 2012, at 122:4–11 ("[Q:] But for loans that were purchased from third parties, . . . they would give you reps and warrants. You, in turn, would pass on reps and warrants to GMAC Mortgage. And GMAC Mortgage would be able to go back up the chain to the original correspondent. [A:] Correct."); Int. of K. Patrick, Mar. 18, 2013, at 268:15–268:20 ("[Q:] Where did they fall on the flow of the rep and warranty liability? [A:] They have front-line rep and warrant liability with the originator. The depositor and the seller both have rep and warrant liability.").

[787] As discussed earlier, certain of the securitization trusts contained as much as 89% Bank-attributable loans. *See* PLS Trust Spreadsheet [EXAM00339947].

the loan files were sent to the Bank.[788] This alleged lack of knowledge does not alter the fact that the loans were required to be underwritten to Bank guidelines,[789] eventually delivered to the Bank by the third-party originator, and passed on to GMAC Mortgage for later securitization. Further, AFI asserts that "once the loans were securitized and Ally Bank was paid as warehouse lender, Ally Bank no longer retained any security interest in the loans and would not have had any knowledge of their compliance with underwriting guidelines."[790] This argument seemingly contradicts the MMLPSA'a requirement that the Bank provide GMAC Mortgage with loan-level information, as discussed further in Section V.B.3.

### (iv) Conclusion With Respect To Ally Bank's Liability For Aiding And Abetting Fraud

The Examiner offers no conclusions with respect to the existence of an underlying fraud committed by the Debtors. With respect to Ally Bank's knowledge of any fraud committed by ResCap, Third-Party Claimants solicited by the Examiner were unable to identify any evidence of actual knowledge of the alleged fraud. This lack of evidence is not wholly determinative, however, given the limited discovery conducted by most of the Submitting Parties. Generally, the Investigation has revealed evidence to support the Third-Party Claimants' assertions that Ally Bank personnel were intricately involved in ResCap's operations. This evidence includes overlap between Ally Bank and ResCap leadership, the existence of several inter-company committees designed to centralize product and risk management, and shared information systems. While an inference of knowledge would not be sufficient for an aiding and abetting claim to succeed under New York law, such an inference suggests that a Third-Party Claimant with the benefit of full discovery may, in time, also uncover evidence of actual knowledge.

Similarly, the Investigation has revealed evidence to support the Third-Party Claimants' assertions that Ally Bank's financing activities would be considered a form of substantial assistance to the extent ResCap is found to have engaged in fraudulent conduct. This finding is primarily supported by the fact that Ally Bank was created to serve as a conduit for funding GMAC Mortgage's securitization activity, which the entities carried out through a series of

---

[788] AFI Submission Paper, dated Dec. 19, 2012 at 82.

[789] Int. of C. Blahut, Mar. 13, 2013, at 42:16–25 ("[Q:] So is there a separate set of criteria for what [the client] can put into the warehouse? Towards the quality of collateral. [A:] Yes, generally they try to. Generally they try to because . . . you don't want bad loans being held in a warehouse that are unmarketable. So yes, they do try to create a criteria.").

[790] AFI Submission Paper, dated Dec. 19, 2012 at 82.

atypical and non-arm's-length financing transactions. While Ally Bank represented only one of many sources of loan origination for GMAC Mortgage, it was a strategic and steady source nonetheless.[791]

Finally, as discussed in more depth in Section VIII.D, the RMBS Claims against Ally Bank may be limited by the Examiner's conclusion that, under Utah law,[792] a court is unlikely to find that Ally Bank is a successor in liability of Old GMAC Bank.[793] If a court were to agree with this finding, RMBS Claims against Ally Bank may be limited to those securitizations that contain loans sold by Ally Bank after the 2006 Bank Restructuring.[794]

### 3. D&O RMBS Claims

#### a. Generally

The Examiner's Professionals have identified several pending actions on account of D&O RMBS Claims (the "D&O RMBS Actions").[795] The Examiner believes that the D&O RMBS Actions are generally representative of the types of RMBS Claims that could be asserted by Third-Party Claimants against Debtor and AFI directors and officers.

---

[791] Although Third-Party Claimants also allege that the Bank's role as custodian supports an aiding and abetting fraud claim, the Bank's custodial role was considerably less integral to ResCap's securitization business than was the Bank's funding, as loan custodial services could be, and often were, provided by independent third-parties. *See* Appendix VIII.B (showing that a third-party bank, namely Wells Fargo, routinely provided this service for both RFC and GMAC Mortgage securitizations); Int. of M. Hebling, Apr. 16, 2013, at 139:24–140:3 ("GMAC Mortgage is treated as a client, as we would treat any other client. The custodial agreement, the designated fee schedule, and all the services are provided according to that agreement."); *see also Rosner v. Bank of China*, 528 F. Supp. 2d 419, 427 (S.D.N.Y. 2007) ("Financial transactions that are not considered 'atypical' or 'non-routine' do not constitute substantial assistance.").

[792] As discussed further in Section VII.L.2.a(1)(a)(i), New York and Utah law are consistent with respect to all of the traditional exceptions to the general rule of successor liability, except the de facto merger exception. With respect to this limited conflict, the Examiner concludes that a New York court would likely apply the law of the state in which the defendant was formed, in this case, Utah.

[793] See Section VII.L.2.a(1)(a)(i).

[794] See Section V.A.1.a for a discussion of the 2006 Bank Restructuring. Additionally, for a discussion of Ally Bank's potential contractual liability on loans sold to GMAC Mortgage after the 2006 Bank Restructuring, see Section VII.L.2.

[795] *See e.g.*, Compl., *John Hancock Life Ins. Co. (U.S.A.) v. Ally Fin. Inc*., Case No. 12-01841, Docket No. 1 (D. Minn. July 27, 2012); Am. Compl., *Mass. Mut. Life Ins. Co. v. Residential Funding Co., LLC*, Case No. 11-30035, Docket No. 68-1 (D. Mass. Feb. 29, 2012); Second Am. Compl., *N.J. Carpenters Health Fund v. Residential Capital, LLC*, Case No. 08-8781, Docket No. 121 (S.D.N.Y. Jan. 3, 2011); Compl., *Stichting Pensioenfonds ABP v. Ally Fin., Inc*., Case No. 11-20426 (Minn. Dist. Ct. Oct. 11, 2011); Am. Compl., *Union Cent. Life Ins. Co. v. Ally Fin. Inc.*, Case No. 11-2890, Docket No. 146 (S.D.N.Y. May 4, 2012); Am. Compl., *W. & S. Life Ins. Co. v. Residential Funding Co., LLC*, Case No. A1105042 (Ohio Ct. Com. Pl. Sept. 9, 2011); Compl., *White v. GMAC Mortg., LLC*, Case No. 2809-CV-2011 (Pa. Ct. Com. Pl. Mar. 28, 2011).

The D&O RMBS Actions assert claims against the following defendants:[796]

- **Kenneth Duncan**: Duncan served as CFO of various of the Debtors' depositor entities (RALI, RAMP, RASC and RFMSI) and Executive VP and director of RFC and Homecomings.[797]

- **Ralph Flees**: Flees worked at RFC beginning in 1996 and served as Chief Accounting Officer and Controller of ResCap from April 2008 until January 2009.[798]

- **Jack Katzmark**: Katzmark served as Treasurer and Controller of various depositor entities (RFC, RASC, RAMP, RALI and RFMSI) and as managing director of RFC and ResCap.[799]

- **Lisa Lundsten**: Lundsten worked in various positions at RFC and Ally Securities beginning in 1991 and served as the head of the structured finance group beginning in 2005.[800]

- **Davee Olson**: Olson served as Executive VP, CFO, and director of RFMSI and RALI; director of RASC; CFO of ResCap; and a director of GMAC RFC, RFC and Homecomings.[801]

---

[796] The titles and tenures of the officers and directors were identified by plaintiffs in their respective actions. For further information, refer to Appendix IV.A, which lists all the ResCap and AFI directors and officers and their tenures.

[797] Compl., *John Hancock Life Ins. Co. (U.S.A.) v. Ally Fin. Inc.*, Case No. 12-01841, Docket No. 1, at 17 (D. Minn. July 27, 2012); Am. Compl., *Mass. Mut. Life Ins. Co. v. Residential Funding Co., LLC,* Case No. 11-30035, Docket No. 68-1, at 5 (D. Mass. Feb. 29, 2012); Second Am. Compl., *N.J. Carpenters Health Fund v. Residential Capital, LLC*, Case No. 08-8781, Docket No. 121, at 19 (S.D.N.Y. Jan. 3, 2011); Compl., *Stichting Pensioenfonds ABP v. Ally Fin., Inc.*, Case No. 11-20426, at 11 (Minn. Dist. Ct. Oct. 11, 2011); Am. Compl., *W. & S. Life Ins. Co. v. Residential Funding Co., LLC*, Case No. A1105042, at 9 (Ohio Ct. Com. Pl. Sept. 9, 2011).

[798] Compl., *John Hancock Life Ins. Co. (U.S.A.) v. Ally Fin. Inc.*, Case No. 12-01841, Docket No. 1, at 18 (D. Minn. July 27, 2012); Am. Compl., *Mass. Mut. Life Ins. Co. v. Residential Funding Co., LLC,* Case No. 11-30035, Docket No. 68-1, at 5 (D. Mass. Feb. 29, 2012); Second Am. Compl., *N.J. Carpenters Health Fund v. Residential Capital, LLC*, Case No. 08-8781, Docket No. 121, at 19 (S.D.N.Y. Jan. 3, 2011); Compl., *Stichting Pensioenfonds ABP v. Ally Fin., Inc.*, Case No. 11-20426, at 11 (Minn. Dist. Ct. Oct. 11, 2011); Am. Compl., *W. & S. Life Ins. Co. v. Residential Funding Co., LLC*, Case No. A1105042, at 9 (Ohio Ct. Com. Pl. Sept. 9, 2011).

[799] Compl., *John Hancock Life Ins. Co. (U.S.A.) v. Ally Fin. Inc.*, Case No. 12-01841, Docket No. 1, at 18 (D. Minn. July 27, 2012).

[800] *Id.* at 19; Second Am. Compl., *N.J. Carpenters Health Fund v. Residential Capital, LLC*, Case No. 08-8781, Docket No. 121, at 19 (S.D.N.Y. Jan. 3, 2011); Compl., *Stichting Pensioenfonds ABP v. Ally Fin., Inc.*, Case No. 11-20426, at 12 (Minn. Dist. Ct. Oct. 11, 2011).

[801] Compl., *John Hancock Life Ins. Co. (U.S.A.) v. Ally Fin. Inc.*, Case No. 12-01841, Docket No. 1 (D. Minn. July 27, 2012); Am. Compl., *Mass. Mut. Life Ins. Co. v. Residential Funding Co., LLC,* Case No. 11-30035, Docket No. 68-1, at 4–5 (D. Mass. Feb. 29, 2012); Second Am. Compl., *N.J. Carpenters Health Fund v. Residential Capital, LLC*, Case No. 08-8781, Docket No. 121, at 19 (S.D.N.Y. Jan. 3, 2011); Compl., *Stichting Pensioenfonds ABP v. Ally Fin., Inc.*, Case No. 11-20426, at 12 (Minn. Dist. Ct. Oct. 11, 2011); Am. Compl., *W. & S. Life Ins. Co. v. Residential Funding Co., LLC*, Case No. A1105042, at 8 (Ohio Ct. Com. Pl. Sept. 9, 2011).

- **Bruce Paradis**: Paradis worked as head of marketing at RFC beginning in 1983, as President of RFC beginning in 1994, and CEO of ResCap from 2005 to 2007.[802]

- **David Walker**: Walker began working for the GMAC organization in 1985 and served as CFO of GMAC Mortgage from 2000 to 2006 and Treasurer of GMAC from 2007 to 2009.[803]

- **Diane Wold**: Wold served as GMAC RFC's Senior VP of Securitization Management until 2005, when she became head of investor relations and corporate finance at ResCap.[804]

- **James Jones**: Jones served as COO of ResCap from March 2007 until June 2007 and CEO of ResCap from June 2007 until July 2008.[805]

- **David Bricker**: Bricker served as director and CFO of RALI in addition to CFO of GMAC Mortgage and GMAC RFC.[806]

- **James Young**: Young served in various financial accounting titles at ResCap beginning in 2005 through 2011, including Chief Accounting Officer and Controller, Deputy CFO, Principal Accounting Officer, and CFO.[807]

---

[802] Compl., *John Hancock Life Ins. Co. (U.S.A.) v. Ally Fin. Inc.*, Case No. 12-01841, Docket No. 1, at 20 (D. Minn. July 27, 2012); Am. Compl., *Mass. Mut. Life Ins. Co. v. Residential Funding Co., LLC*, Case No. 11-30035, Docket No. 68-1, at 4 (D. Mass. Feb. 29, 2012); Second Am. Compl., *N.J. Carpenters Health Fund v. Residential Capital, LLC*, Case No. 08-8781, Docket No. 121, at 18 (S.D.N.Y. Jan. 3, 2011); Compl., *Stichting Pensioenfonds ABP v. Ally Fin., Inc.*, Case No. 11-20426, at 12 (Minn. Dist. Ct. Oct. 11, 2011); Am. Compl., *Union Cent. Life Ins. Co. v. Ally Fin. Inc.*, Case No. 11-2890, Docket No. 146, at 15 (S.D.N.Y. May 4, 2012); Am. Compl., *W. & S. Life Ins. Co. v. Residential Funding Co., LLC*, Case No. A1105042, at 8 (Ohio Ct. Com. Pl. Sept. 9, 2011).

[803] Compl., *John Hancock Life Ins. Co. (U.S.A.) v. Ally Fin. Inc.*, Case No. 12-01841, Docket No. 1, at 20–21 (D. Minn. July 27, 2012); Am. Compl., *Mass. Mut. Life Ins. Co. v. Residential Funding Co., LLC*, Case No. 11-30035, Docket No. 68-1, at 5 (D. Mass. Feb. 29, 2012); Compl., *Stichting Pensioenfonds ABP v. Ally Fin., Inc.*, Case No. 11-20426, at 12 (Minn. Dist. Ct. Oct. 11, 2011); Am. Compl., *W. & S. Life Ins. Co. v. Residential Funding Co., LLC*, Case No. A1105042, at 8–9 (Ohio Ct. Com. Pl. Sept. 9, 2011).

[804] Compl., *John Hancock Life Ins. Co. (U.S.A.) v. Ally Fin. Inc.*, Case No. 12-01841, Docket No. 1, at 21 (D. Minn. July 27, 2012); Compl., *Stichting Pensioenfonds ABP v. Ally Fin., Inc.*, Case No. 11-20426, at 12 (Minn. Dist. Ct. Oct. 11, 2011).

[805] Compl., *John Hancock Life Ins. Co. (U.S.A.) v. Ally Fin. Inc.*, Case No. 12-01841, Docket No. 1, at 21 (D. Minn. July 27, 2012); Compl., *Stichting Pensioenfonds ABP v. Ally Fin., Inc.*, Case No. 11-20426, at 12 (Minn. Dist. Ct. Oct. 11, 2011).

[806] Compl., *John Hancock Life Ins. Co. (U.S.A.) v. Ally Fin. Inc.*, Case No. 12-01841, Docket No. 1, at 21 (D. Minn. July 27, 2012); Am. Compl., *Mass. Mut. Life Ins. Co. v. Residential Funding Co., LLC*, Case No. 11-30035, Docket No. 68-1, at 5 (D. Mass. Feb. 29, 2012); Second Am. Compl., *N.J. Carpenters Health Fund v. Residential Capital, LLC*, Case No. 08-8781, Docket No. 121, at 19 (S.D.N.Y. Jan. 3, 2011); Compl., *Stichting Pensioenfonds ABP v. Ally Fin., Inc.*, Case No. 11-20426, at 11 (Minn. Dist. Ct. Oct. 11, 2011); Am. Compl., *W. & S. Life Ins. Co. v. Residential Funding Co., LLC*, Case No. A1105042, at 9 (Ohio Ct. Com. Pl. Sept. 9, 2011).

[807] Compl., *John Hancock Life Ins. Co. (U.S.A.) v. Ally Fin. Inc.*, Case No. 12-01841, Docket No. 1, at 22 (D. Minn. July 27, 2012); Second Am. Compl., *N.J. Carpenters Health Fund v. Residential Capital, LLC*, Case No. 08-8781, Docket No. 121, at 19 (S.D.N.Y. Jan. 3, 2011); Compl., *Stichting Pensioenfonds ABP v. Ally Fin., Inc.*, Case No. 11-20426, at 12 (Minn. Dist. Ct. Oct. 11, 2011).

- **Frank Ruhl**: Ruhl served as VP of GMAC Mortgage.[808]

The Third-Party Claimants asserting D&O RMBS Claims consist primarily of RMBS investors and individual borrowers. The D&O RMBS Claims include common-law as well as federal and state statutory causes of action. The common-law causes of action include fraud, aiding and abetting fraud, civil conspiracy, negligent misrepresentation, intentional deceit, and negligent supervision with respect to the roles these individuals played within their organizations.[809] Most of the statutory causes of action include violations of sections 11 and 15 of the Securities Act, section 20(a) and (b) of the Exchange Act, and various state securities laws for the alleged material misstatements and omissions in registration statements and offering materials issued in connection with RMBS transactions.[810] The facts and circumstances underlying the D&O RMBS Claims are substantially the same as those raised in many of the claims asserted against the AFI Defendants, as discussed further in Section VIII.C.[811] Director and officer indemnification and/or insurance may provide coverage if the director and officer defendants are ever found to be liable. For a detailed analysis of ResCap's and AFI's indemnification and insurance policies, see Section IV.B.

The complaints most commonly allege liability against the directors and officers for signing registration statements. Section 11 of the Securities Act provides that, where a registration statement "contained an untrue statement of a material fact or omitted to state a

---

[808] Compl., *White v. GMAC Mortg., LLC*, Case No. 2809-CV-2011, at 8 (Pa. Ct. Com. Pl. Mar. 28, 2011). Ruhl is the only director or officer defendant named in a Non-RMBS Action. The plaintiffs in this action allege that Ruhl committed fraud by signing and filing a false assignment of mortgage.

[809] *See, e.g.*, Compl., *John Hancock Life Ins. Co. (U.S.A.) v. Ally Fin. Inc*., Case No. 12-01841, Docket No. 1, at 2 (D. Minn. July 27, 2012) (alleging aiding and abetting fraud and negligent misrepresentation); Compl., *Stichting Pensioenfonds ABP v. Ally Fin., Inc*., Case No. 11-20426, at 1 (Minn. Dist. Ct. Oct. 11, 2011) (alleging aiding and abetting fraud and negligent misrepresentation); Compl., *W. & S. Life Ins. Co. v. Residential Funding Co., LLC*, Case No. A1105042, at 1 (Ohio Ct. Com. Pl. Sept. 9, 2011) (alleging civil conspiracy and common law fraud); Compl., *White v. GMAC Mortg., LLC*, Case No. 2809-CV-2011, at 9, 21 (Pa. Ct. Com. Pl. Mar. 28, 2011) (alleging common law fraud, intentional deceit and negligent supervision).

[810] *See e.g.*, Compl., *John Hancock Life Ins. Co. (U.S.A.) v. Ally Fin. Inc*., Case No. 12-01841, Docket No. 1, at 2 (D. Minn. July 27, 2012) (alleging violations of the Minnesota Securities Act, and sections 11 and 15 of the Securities Act); Compl., *Stichting Pensioenfonds ABP v. Ally Fin., Inc*., Case No. 11-20426, at 1 (Minn. Dist. Ct. Oct. 11, 2011) (alleging violations of the Minnesota Securities Act); Am. Compl., *Mass. Mut. Life Ins. Co. v. Residential Funding Co., LLC,* Case No. 11-30035, Docket No. 68-1, at 1 (D. Mass. Feb. 29, 2012) (alleging violations of the Massachusetts Uniform Securities Act); Second Am. Compl., *N.J. Carpenters Health Fund v. Residential Capital, LLC*, Case No. 08-8781, Docket No. 121, at 1 (S.D.N.Y. Jan. 3, 2011) (alleging violations of sections 11 and 15 of the Securities Act); Am. Compl., *Union Cent. Life Ins. Co. v. Ally Fin. Inc.*, Case No. 11-2890, Docket No. 146, at 7, 242 (S.D.N.Y. May 4, 2012) (alleging violations of section 20 of the Exchange Act); Compl., *W. & S. Life Ins. Co. v. Residential Funding Co., LLC*, Case No. A1105042, at 1 (Ohio Ct. Com. Pl. Sept. 9, 2011) (alleging violations of the Ohio Securities Act).

[811] The *John Hancock* director and officer defendants have a motion to dismiss pending before the court. *See* Mem. of Law in Supp. of Individual Defs.' Mot. to Dismiss the Compl., *John Hancock Life Ins. Co. (U.S.A.) v. Ally Fin. Inc*., Case No. 12-01841, Docket No. 95, at 2 (D. Minn. Dec. 14, 2012) ("Plaintiffs seek to plead their case against the Individual Defendants based on a misguided theory of *res ipsa loquitur*, assuming that their losses can only be explained by fraud, and that the Individual Defendants should be held liable simply because of their positions as directors and/or officers of various entities.").

material fact," an investor may sue "every person who signed the registration statement . . . ."[812] Further, the SEC has also stated that "prospectus supplements and the information contained in them are subject to liability under [s]ection 11."[813] Thus, if it is determined that the registration statements or prospectus supplements at issue did in fact contain untrue statements of material fact or omitted to state a material fact, the signatory defendants may be held liable under section 11. As noted above, the Investigation did not focus upon the underlying allegations as to each securitization transaction.

Third-Party Claimants also allege common-law causes of action, noting that the defendants either knew or were reckless in not knowing about their organizations' "abandonment" of underwriting standards and were "familiar with and participated in [AFI's] RMBS operations through . . . top-ranking positions with ResCap."[814] The plaintiffs in *Union Cent. Life Ins. Co.* state:

> [Defendants], by virtue of their status and their high-level positions, as well as their participation in and awareness of their respective organization's operations and public statements, were able to and did influence and control their organization's decision making, including controlling the content and dissemination of the documents that . . . contained materially false and misleading information . . . .[815]

To the extent that the D&O RMBS Claims rely upon theories of liability similar to those alleged against the AFI Defendants, such as alter ego, aiding and abetting, and control person theories of liability, those theories are discussed further in Section VIII.C.

### 4.  Non-RMBS Claims

The Examiner's Professionals identified approximately twenty-four pending actions on account of the Non-RMBS Claims. In these cases, Third-Party Claimants allege both statutory and common-law causes of action related to mortgage ownership, underwriting practices, disclosure failures, insurance schemes, foreclosure practices, and other servicing practices. Of these cases, 15 are borrower class actions. One of the cases, *Mitchell v. Residential Funding Corp.*,[816] is specifically discussed in Section VI.G. As with the RMBS Actions and the RMBS

---

[812]  15 U.S.C. § 77k.

[813]  Securities Offering Reform, 70 Fed. Reg. 44,722, 44, 771 n.445 (Aug. 3, 2005); *see also In re Marsh & Mclennan Cos., Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 491 (S.D.N.Y. 2006) (stating that "at least since 1998, the SEC believed that 'prospectus statements and the information contained in them are subject to liability under [s]ection 11'") (citation omitted).

[814]  Compl., *John Hancock Life Ins. Co. (U.S.A.) v. Ally Fin. Inc.*, Case No. 12-01841, Docket No. 1, at 167–75 (D. Minn. July 27, 2012).

[815]  Am. Compl., *Union Cent. Life Ins. Co. v. Ally Fin. Inc.*, Case No. 11-2890, Docket No. 146, at 241 (S.D.N.Y. May 4, 2012); *see also* Am. Compl., *Mass. Mut. Life Ins. Co. v. Residential Funding Co., LLC,* Case No. 11-30035, Docket No. 68-1, at 72–76, 77–78 (D. Mass. Feb. 29, 2012).

[816]  Case Nos. WD70210, WD 70227, WD70244, WD70263 (Mo. Dist. Ct. App. 2008.).

Claims, the Examiner believes that the Non-RMBS Actions are generally representative of the types of Non-RMBS Claims that could be asserted by Third-Party Claimants.

As a preliminary matter, most Third Party Claimants in the Non-RMBS Actions assert claims against AFI related to the underwriting, servicing, and foreclosure of mortgages that are derivative or alternative to claims asserted against the Debtor entities. In addition, as set forth in Section VIII.D, with one exception, the damages sought in the Non-RMBS Actions appear to be relatively minimal.

### a. Claims Relating To Origination, Acquisition, And Servicing Of Loans

The first category of Non-RMBS Actions is comprised of class action or individual suits based upon the origination, acquisition, and servicing of loans (including damages from foreclosures).[817] Plaintiffs in these actions allege that they were harmed by defendants' unchecked abandonment of underwriting guidelines, inflated appraisals, poor disclosure practices, inaccurate valuations, fraudulent foreclosure affidavits, and the use of electronic mortgage registries to exploit local recording statutes and lending standards.[818] Many of the Non-RMBS Actions in this category include generally vague allegations of liability against multiple defendants, including non-Debtor and non-AFI entities that are unrelated to the Chapter 11 Cases.[819] The allegations in these complaints are particularly vague with respect to AFI. [820] Of course, some of these factual inaccuracies or vague allegations could potentially be clarified with amendments to the complaints.

---

[817] *See, e.g.*, Second Am. Compl., *Abraham v. Am. Home Mortg. Servicing. Inc*., Case No. 12-4686, Docket No. 94 (E.D.N.Y. Nov. 8, 2012); Am. Compl., *Abucay v. GMAC Mortg. Corp.*, Case No. 11-05523, Docket No. 25 (D.N.J. Aug. 14, 2012); Am. Compl., *Adams v. US Bank, NA*, Case No. 12-04640, Docket No. 77 (E.D.N.Y. Dec. 18, 2012); Am. Compl., *Anctil v. Ally Fin. Inc.*, Case No. 12-08572, Docket No. 32 (S.D.N.Y. Jan. 28, 2013); Compl., *LaFitte v. Ally Fin.*, Case No. 10-02820, Docket No. 1 (D.S.C. Nov. 1, 2010); Compl., *Dennis v. Homecomings Fin., LLC.*, Case No. 11-00066, Docket No. 1 (D. Wyo. Feb. 22, 2011); Compl., *Kalugin v. Geithner*, Case No. 12-1792, Docket No. 1 (D.D.C. Oct. 31, 2012); Compl., *Kanagaki v. Ally Fin. Inc.*, Case No. 12-03955, Docket No. 1 (C.D. Cal. May 7, 2012); Compl., *White v. GMAC Mortg., LLC*, Case No. 2809-CV-2011 (Pa. Ct. Com. Pl. Mar. 28, 2011).

[818] *See, e.g.*, Second Am. Compl., *Abraham v. Am. Home Mortg. Servicing Inc*., Case No. 12-4686, Docket No. 94, at 150–53 (E.D.N.Y. Nov. 8, 2012).

[819] *See, e.g.*, *id.*; Am. Compl., *Adams v. US Bank, NA*, Case No. 12-04640, Docket No. 77 (E.D.N.Y. Dec. 18, 2012).

[820] *See* AFI Submission Paper, dated Dec. 19, 2012, at A-9 ("[Plaintiffs] simply assume that the non-debtor Ally entities are liable for the acts of their subsidiaries without any allegation or assertion for why that is so. . . . The sole allegation concerning AFI is that it owns Debtor GMAC Mortgage."). In addition, certain actions list AFI as a defendant because GMAC Mortgage is its "ultimate successor" in liability. *See* Am. Compl., *Abucay v. GMAC Mortg. Corp.*, Case No. 11-05523, Docket No. 25, at 3 (D.N.J. Aug. 14, 2012). Other Complaints confuse the role of AFI and the Debtor entities that perform mortgage servicing. *See* Am. Compl., *Adams v. US Bank, NA*, Case No. 12-04640, Docket No. 77, at 6 (E.D.N.Y. Dec. 18, 2012) ("Defendant ALLY, NA is the alleged 'servicer' of the loan and purported agent for Defendant GMAC in connection with a non-judicial foreclosure proceeding as to the Property."); *see also* Compl., *LaFitte v. Ally Fin.*, Case No. 10-02820, Docket No. 1, at 1 (D.S.C. Nov. 1, 2010) ("[U]pon information and belief, GMAC [LLC] operated also under the name of GMAC Mortg. CO., LLC.").

The Non-RMBS Actions allege several common-law and statutory causes of action. The common-law causes of action include breach of contract, negligence, slander of title, ejectment, concert of action, joint enterprise, unjust enterprise, and fraudulent, intentional, and negligent misrepresentation, among others.[821] The statutory causes of action include violations of state laws against unlawful and deceptive trade practices, the Truth in Lending Act ("TILA"),[822] the Real Estate Settlement Procedures Act ("RESPA"),[823] the Fair Debt Collection Practices Act,[824] the Fair Credit Reporting Act,[825] the Racketeer Influenced and Corrupt Organizations Act ("RICO"),[826] the Home Ownership and Equity Protection Act,[827] and the Equal Credit Opportunity Act.[828]

As noted, however, the Non-RMBS Actions asserting these claims fail to articulate any particularized allegations against AFI. Unless substantially amended, most, if not all, of the complaints in this category of Non-RMBS Actions likely would not survive a motion to dismiss.

### b. Claims Relating To Alleged Insurance Schemes

The second category of Non-RMBS Actions consists of two complaints asserting that the defendants participated in insurance schemes that allegedly provided AFI with illegal kickbacks under RESPA and RICO. Specifically, these actions allege direct liability against Ally Bank and indirect liability against AFI.[829]

---

[821] Second Am. Compl., *Abraham v. Am. Home Mortg. Servicing Inc*., Case No. 12-4686, Docket No. 94, at 150–67 (E.D.N.Y. Nov. 8, 2012) (alleging fraud, deceit, and fraudulent concealment; intentional misrepresentation; negligent misrepresentation; breach of contract; constructive trust; negligence; slander of title; ejectment; concert of action and joint enterprise; and unjust enrichment); Am. Compl., *Adams v. US Bank, NA*, Case No. 12-04640, Docket No. 77, at 13–23 (E.D.N.Y. Dec. 18, 2012) (alleging conversion, conspiracy to commit conversion, fraudulent concealment, negligent misrepresentation, intentional misrepresentation, promissory estoppel, breach of contract, and unjust enrichment); Am. Compl., *Anctil v. Ally Fin. Inc.*, Case No. 12-08572, Docket No. 32, at 37 (S.D.N.Y. Jan. 28, 2013) (alleging unjust enrichment); Compl., *LaFitte v. Ally Fin.*, Case No. 10-02820, Docket No. 1 (D.S.C. Nov. 1, 2010) (alleging slander of title, fraud, trespass, and wrongful foreclosure); Compl., *Dennis v. Homecomings Fin., LLC*., Case No. 11-00066, Docket No. 1, at 6–10 (D. Wyo. Feb. 22, 2011) (alleging fraud, breach of contract, and intentional infliction of emotional distress); Compl., *Kanagaki v. Ally Fin. Inc.*, Case No. 12-03955, Docket No. 1, at 2 (C.D. Cal. May 7, 2012) (alleging privity of contract and negligence); Compl., *White v. GMAC Mortg., LLC*, Case No. 2809-CV-2011, at 9–15, 21–22 (Pa. Ct. Com. Pl. Mar. 28, 2011) (alleging fraud and intentional deceit, negligent misrepresentation, fraudulent concealment, and negligent supervision).

[822] 15 U.S.C. §§ 1601–1667f.

[823] 12 U.S.C. § 2601.

[824] 15 U.S.C. § 1692.

[825] *Id.* §§ 1681–81x.

[826] 18 U.S.C. §§ 1961–68.

[827] 15 U.S.C. § 1639.

[828] *Id.* §§ 1691–91f.

[829] AFI addressed these causes of action by noting that "[l]ender-placed insurance is not a 'settlement service' under RESPA because it is not paid at closing" and that "plaintiffs fail to plead a RICO enterprise, any participation by AFI and/or Ally Bank, or causation." AFI Submission Paper, dated Dec. 19, 2012, at A-11.

In the first case, *Rothstein v. GMAC Mortg., LLC*,[830] the plaintiffs allege that GMAC Mortgage, along with certain providers of hazard insurance and a subcontracted insurance tracker called Newport Management Corporation, devised a scheme to defraud borrowers and loan owners by overcharging them for the insurance.[831] Specifically, the *Rothstein* plaintiffs allege that the insurance providers paid GMAC Mortgage secret rebates and that GMAC Mortgage kept the rebates while fraudulently billing borrowers based upon the purported full price of the insurance.[832]

The *Rothstein* plaintiffs claim that AFI is liable for the alleged insurance fraud under the alter ego theory.[833] Specifically, the complaint alleges that AFI exercised complete domination and control over its subsidiaries and "caused GMAC [Mortgage] to engage in the misconduct alleged herein, and used GMAC [Mortgage's] corporate form to accomplish the fraudulent and extortionate objectives alleged herein to injure Plaintiffs and the Class."[834] See Section VIII.C. for a discussion of alter ego liability, which is equally applicable in this context.

The *Rothstein* plaintiffs also argue that "Ally Bank is [directly] liable under . . . agency principles for the misconduct of its agent, GMAC [Mortgage], and for the misconduct of its sub-agent, Newport [Management Corporation]."[835] Plaintiffs emphasize that "insurance tracking" is a "servicing responsibility" created by the servicing agreements that GMAC Mortgage subcontracted to Newport Management Corporation.[836] In addition, plaintiffs allege that GMAC Mortgage "possessed actual authority to service the loans of Plaintiffs . . . by

---

[830] Second Am. Compl., *Rothstein v. GMAC Mortg., LLC*, Case No. 12-03412, Docket No. 39 (S.D.N.Y. Jan. 22, 2013). This case was filed in the later stages of the Investigation.

[831] *Id.* at 1–3.

[832] *Id.* at 3–4 (alleging that such conduct violated RICO).

[833] The Examiner notes that AFI and Ally Bank have filed a motion later joined by the Debtors seeking, inter alia, an order enjoining the veil-piercing claims asserted against AFI in the putative class action captioned *Rothstein v. Ally Financial, Inc.,* Civ. No. 12-3412 (S.D.N.Y.). *See* Motion By Ally Financial Inc. and Ally Bank for an Order Enforcing the Automatic Stay Pursuant to 11 U.S.C. § 362(a)(3) (Dec. 21,2012) [Docket No. 2511]; Debtors' Amended Joinder to Motion By Ally Financial Inc. and Ally Bank for an Order Enforcing the Automatic Stay Pursuant to 11 U.S.C. Section 362(a)(3) (February 4, 2013) [Docket No. 2834]. On April 2, 2013, the Committee responded to that motion by joining the request of AFI, Ally Bank, and the Debtors that *Rothstein* be stayed, but asking that the Court do so without "reach[ing] the issue of whether any [creditor] will be permitted to pursue individual veil-piercing or alter ego claims." *See* Response by Committee to the Motion By Ally Financial Inc. and Ally Bank for an Order Enforcing the Automatic Stay Pursuant to 11 U.S.C. § 362(a)(3) (Apr. 2, 2013) [Docket No. 3345] at 4. That same day, the plaintiffs in *Rothstein* objected to the motion, arguing in part that its veil-piercing claims against AFI are "based on allegations of 'particularized injury'" and "outside the ambit of the automatic stay." *See* Objection by Plaintiffs in *Rothstein* to the Motion By Ally Financial Inc. and Ally Bank for an Order Enforcing the Automatic Stay Pursuant to 11 U.S.C. § 362(a)(3) (Apr. 2, 2013) [Docket No. 3343] at 2. To date, that motion remains pending.

[834] Second Am. Compl., *Rothstein v. GMAC Mortg., LLC*, Case No. 12-03412, Docket No. 39, at 51–82 (S.D.N.Y. Jan. 22, 2013). For a discussion of alter ego claims, see Section VIII.C.

[835] *Id.* at 4.

[836] *Id.* at 2.

virtue of sub-servicing agreements between Ally Bank and GMAC [Mortgage], [such that,] "[w]hen GMAC [Mortgage] engaged in the [alleged] misconduct . . . , it was acting in the course and scope of its authority as an authorized agent of Ally Bank."[837]

Plaintiffs' claim that GMAC Mortgage had "actual authority" from Ally Bank to service loans "by virtue of contract" is at odds with the express terms of the Original Servicing Agreement.[838] Specifically, section 11.1 of the Original Servicing Agreement states:

> The parties hereto do not intend to create herby a partnership or joint venture between them, and nothing herein contained shall be construed to create such a partnership or joint venture. The services rendered by GMAC [Mortgage] hereunder are rendered by GMAC [Mortgage] as an independent contractor and shall be so construed for all purposes.[839]

Case law discussing the creation of an actual agency relationship states that if "an agreement specifically precludes the creation of an agency relationship, courts will not create one."[840] Thus, the language of the Original Subservicing Agreement itself is likely to preclude the Rothstein plaintiffs' assertions that GMAC Mortgage possessed "actual authority" by virtue of the subservicing agreements.[841]

Additional theories of agency law, however, can create an agency relationship even if an express provision of the contract precludes one. Under New York law, an agency relationship "is not determined by what [the purported agent] is called but is to be determined from what [the purported agent] does."[842] Courts in other relevant jurisdictions note that "the parties'

---

[837] *Id.* at 48.

[838] Objection of Plaintiffs in *Rothstein v. GMAC Mortg., LLC* to the Motion of Ally Financial, Inc. and Ally Bank For an Order Enforcing the Automatic Stay Pursuant to 11 U.S.C. §362(A)(3) For (1) Enjoining Prosecution of Alter Ego and Veil Piercing Claims in *Rothstein*, and (2) Declaring Such Claims Void *Ab Initio*; and Cross-Motion for an Order Granting Relief From the Automatic Stay Pursuant to 11 U.S.C. §362(D) to the Extent Any Claims Asserted by Plaintiffs are Subject to the Automatic Stay [Docket No. 3343] at 11.

[839] Original Servicing Agreement, §11.1 [ALLYKE000000741].

[840] *Municipality of Bremanger v. Citigroup Global Mkts. Inc.,* No. 09 Civ. 7058(VM), 2013 WL 1294615, at *19 (S.D.N.Y. Mar. 28, 2013) (quoting *Tellium, Inc. v. Corning Inc.,* No. 03 Civ. 8487, 2004 WL 307238, at *6 (S.D.N.Y. 2004)); *see also Encyc. Brown Prods., Ltd. v. Home Box Office, Inc.,* 25 F. Supp. 2d 395, 403 (S.D.N.Y. 1998) (finding an absence of agency where the agreements at issue specifically disclaimed any such relationship, among other reasons); *Bellino Schwartz Padob Adver., Inc. v. Solaris Mktg. Grp., Inc.,* 635 N.Y.S.2d 587, 588 (N.Y. App. Div. 1995) (holding that there was no agency relationship when the agreement specifically stated that nothing in the agreement would be construed to create an agency relationship between the parties).

[841] Second Am. Compl., *Rothstein v. GMAC Mortg., LLC,* Case No. 12-03412, Docket No. 39, at 48 (S.D.N.Y. Jan. 22, 2013).

[842] *Guardian Life Ins. Co. of Am. v. Chem. Bank,* 727 N.E.2d 111, 116 (N.Y. 2000) (citations omitted).

characterization of a relationship is without consequence when determining whether an agency relationship exists."[843] Thus, an "agreement . . . deny[ing] the existence of an agency relationship is not in itself determinative of the manner."[844] "Rather, it is the nature and the extent of control, as established by the practice of the parties, that is controlling."[845]

Apparent authority, for example, is "'the power to affect the legal relations of another person by transactions with third persons, professedly as agent for the other, arising from and in accordance with the other's manifestations to such third persons.'"[846] "[A]pparent authority is created only by the representations of the principal to the third party, and explicitly rejects the notion that an agent can create apparent authority by his own actions or representations."[847] The Rothstein plaintiffs allege certain facts indicating that Ally Bank may have had knowledge of the alleged fraud or misrepresentations.[848] For example, plaintiffs note that "the agreements . . . required the disclosure of all of GMAC [Mortgage's] vendor and subcontractor agreements to Ally Bank" and that Ally Bank "regularly received (i) reports relating to insurance tracking and (ii) certifications attesting to compliance with the insurance requirements."[849] In addition, plaintiffs source Ally Bank's knowledge from (1) disclosure obligations in the agreements providing Ally Bank with "'management reports' and 'electronic data' in connection with the administration of the loans"; (2) Ally Bank's access to GMAC Mortgage's internal books and records; (3) Ally Bank's and GMAC Mortgage's shared officers, directors, and personnel; and (4) Ally Bank's consent order with the FRB and FDIC obligating Ally Bank "to oversee, supervise, and monitor the mortgage servicing

---

[843] *Meredith v. Oakwood Healthcare, Inc.*, No. 288507, 2010 WL 1404426, at *2 (Mich. Ct. App. Apr. 8, 2010) (citation omitted). *But see WaveDivision Holdings, LLC v. Highland Capital Mgmt., L.P*., 49 A.3d 1168, 1177 (Del. 2012) (footnotes omitted) ("[A]lthough the 'label' that the parties ascribe to their relationship is not controlling, 'whether or not the parties believe they are creating the relation of master and servant' is one of the relevant factors under the Restatement for determining whether an agency relationship exists.").

[844] *Drexel v. Union Prescription Ctrs*., 582 F.2d 781, 786 (3d Cir. 1978); *see also Drummond v. Hilton Hotel Corp.*, 501 F. Supp. 29, 31 (E.D. Pa.1980) (citation omitted) ("[T]he mere fact that there is express denial of the existence of an agency relationship is not in itself determinative of the matter.").

[845] *Sauers v. Pancoast Pers., Inc*., 294 Pa. Super. 306, 312 (citation omitted) (1982).

[846] *In re Worldcom, Inc.,* No. 02–13533 (AJG), 2007 WL 735021, at *5 (Bankr. S.D.N.Y. Mar. 9, 2007) (quoting RESTATEMENT (SECOND) OF AGENCY § 8 (1958)).

[847] *Fennell v. TLB Kent Co.,* 865 F.2d 498, 502 (2d Cir. 1989) (citations omitted); *see also William B. Tanner Co., Inc. v. WIOO, Inc*., 528 F.2d 262, 266 (3d Cir. 1975) ("Under Pennsylvania law, apparent authority flows from the conduct of the principal and not that of the agent."); *Billops v. Magness Constr. Co*., 391 A.2d 196, 198 (Del.1978) (citations omitted) ("In order to establish a chain of liability to the principal based on apparent agency, a litigant must show reliance on the indicia of authority originated by the principal, and such reliance must have been reasonable."); *Auto-Owners Ins. Co. v. Ryder Truck Rental*, No. 222114, 2002 WL 207550, at *4 (Mich. Ct. App. Feb. 8, 2002) (emphasis in original) (citation omitted) ("Fundamental principles of agency law provide that an agent's apparent authority to bind a principle does not arise by virtue of the agent's actions, but rather, arises by virtue of actions undertaken by the *principle* which lead a third party to reasonably believe that an agency relationship exists.").

[848] Second Am. Compl., *Rothstein v. GMAC Mortg., LLC*, Case No. 12-03412, Docket No. 39, at 48–49 (S.D.N.Y. Jan. 22, 2013).

[849] *Id.* at 49.

operations that GMAC [Mortgage] performs on behalf of Ally Bank."[850] Plaintiffs do not allege that Ally Bank directly made representations to them to create an apparent authority relationship.[851]

Courts, however, have noted that "silence . . . in the face of unauthorized acts of a purported agent can serve as the basis of establishing apparent authority [but] only where the purported principal knew of the unauthorized acts and took no action."[852] Without evidence that Ally Bank "knew of or authorized" GMAC Mortgage's actions, Ally Bank's "silence . . . in the face of unauthorized acts of [GMAC Mortgage] [cannot] serve as the basis for establishing apparent authority."[853] Investigating GMAC Mortgage's individual insurance transactions is outside the scope of the Investigation; therefore, the Examiner does not reach any conclusions as to whether Ally Bank had sufficient knowledge of the alleged insurance fraud that could give rise to liability. Nor did the Examiner investigate the underlying merits of the alleged insurance fraud.

In the second action, *Moore v. GMAC Mortg., LLC*,[854] plaintiffs allege GMAC Mortgage and Ally Bank were engaged in an illegal captive reinsurance arrangement.[855] The plaintiffs allege that GMAC Mortgage and Ally Bank "acted in concert with their affiliated reinsurer, Cap Re" to capture illegal referral payments in violation of RESPA, which "prohibits lenders from accepting kickbacks or referral fees from any person providing a real estate settlement service, including providers of private mortgage insurance.[856] According to the plaintiffs, GMAC Mortgage referred borrowers to private mortgage insurers who agreed to reinsure with Cap Re.[857] The plaintiffs allege that "the actual risk" transferred to the reinsurer was "hardly commensurate with the premiums it extract[ed] from the primary insurer" and that lenders, in this case, GMAC Mortgage, received illegal referral fees as a result of this arrangement.[858]

The Moore complaint further alleges that Ally Bank "provides funding for residential mortgage loans originated by the GMAC mortgage group[,] . . . provides residential mortgage

---

[850] *Id.* at 49–50.

[851] *Municipality of Bremanger v. Citigroup Global Mkts. Inc.*, No. 09 Civ. 7058(VM), 2013 WL 1294615, at *20 (S.D.N.Y. Mar. 28, 2013).

[852] *Id.* at *21 (citations omitted); *accord Hall v. F.A. Halamicek Enters., Inc.*, 669 S.W.2d 368, 375 (Tex. Ct. App. 2002) (citation omitted) ("Without the principal's participation, either through his acts or knowledge of, and acquiescence in those of the agent, no mere combination of circumstances which may mislead persons into a false inference of authority, however reasonable, will serve as a predicate for apparent authority."); *Deere & Co. v. Int'l Trade Comm'n*, 605 F.3d 1350, 1357 (Fed. Cir. 2010) (citation omitted) (internal quotation marks omitted) (holding apparent authority may exist if the principal "silently act[s] in a manner which creates a reasonable appearance of an agent's authority.").

[853] *See Municipality of Bremanger*, 2013 WL 1294615, at *21 (emphasis added) (citations omitted).

[854] Third Am. Compl., *Moore v. GMAC Mortg., LLC*, Case No. 07-04296, Docket No. 163 (E.D. Pa. Nov. 26, 2010).

[855] *Id.* at 1–2.

[856] *Id.*

[857] *Id.* at 2 (citation omitted).

[858] *Id.* at 13. *But see* AFI Submission Paper, dated Dec. 19, 2012, at A-11 ("[Cap Re] has paid more than $300 million in claims, making clear that the reinsurance obligations were real and not a violation of RESPA.").

loan and home equity loans to consumers, . . . and participates in the acquisition of mortgage loans from GMAC [Mortgage's] correspondent lenders."[859] The complaint does not specify with any particularity the role of Ally Bank in the alleged scheme.

As with the first category of Non-RMBS Actions discussed above, this complaint would need to be amended in order to state a claim that would survive an Ally Bank motion to dismiss. Alternatively, if the plaintiff is articulating a theory of alter ego or aiding and abetting liability, the analysis would likely be similar to that discussed in Section VIII.C.

### c.   Claims Unrelated To The Mortgage Business

The third category of Non-RMBS Claims involves claims against the AFI Defendants alleging (1) wrongful eviction and/or termination of tenancy practices; or (2) overcharge fees from automatic payment systems or overtime labor violations.[860] These cases similarly do not discuss specific allegations against AFI but, instead, describe behavior directly attributable to Debtor entities, such as the failure to pay overtime and provide proper meal or rest periods to underwriter employees,[861] wrongful self-help eviction, breach of the covenant of quiet use and enjoyment,[862] and overcharging for property inspections and other fees.[863] Plaintiffs also allege violations of state labor and fair lending laws and common law causes of action such as misrepresentation, breach of contract, negligence, trespass, and infliction of emotional distress. Arguably, similar indirect alter ego or veil piercing claims may be applied here

---

[859]  Third Am. Compl., *Moore v. GMAC Mortg., LLC*, Case No. 07-04296, Docket No. 163, at 5 (E.D. Pa. Nov. 26, 2010).

[860]  *See, e.g.*, Am. Compl., *Bollinger v. Residential Capital, LLC*, Case No. 10-01123, Docket No. 113 (W.D. Wash. 2010); Compl., *Chatman v. GMAC LLC*, Case No. 2008-90015 (Ala. Cir. Ct. Apr. 10, 2008); Compl., *Chao v. Wells Fargo Bank, N.A.*, Case No. RG12633544, Docket No. 1 (Cal. Super. Ct. June 7, 2012); Am. Compl., *Donaldson v. GMAC Mortg., LLC*, Case No. 9-3359D, Docket No. 1 (Ga. Super. Ct. Feb. 17, 2010); Second Am. Compl., *Robinson v. Homecomings Fin., LLC*, Case No. 2008-900007 (Ala. Cir. Ct. July 3, 2012). In addition, *Chao v. Wells Fargo Bank, N.A.*, names non-Debtor and non-AFI entity defendants in addition to AFI and Debtor entities. Compl., *Chao v. Wells Fargo Bank, N.A.*, Case No. RG12633544, Docket No. 1 (Cal. Super. Ct. June 7, 2012).

[861]  Am. Compl., *Bollinger v. Residential Capital, LLC*, Case No. 10-01123, Docket No. 1, at 2 (W.D. Wash. Nov. 23, 2011); *see also* AFI Submission Paper, dated Dec. 19, 2012, at A-8 ("The plaintiffs' only basis for any recovery from AFI would be theories of derivative liability. They utterly fail to articulate any such theory, and their claims against AFI are meritless.").

[862]  Compl., *Chao v. Wells Fargo Bank, N.A.*, Case No. RG12633544, Docket No. 1, at 5–7 (Cal. Super. Ct. June 7, 2012).

[863]  Compl., *Chatman v. GMAC LLC*, Case No. 2008-90015, at 1 (Ala. Cir. Ct. Apr. 10, 2008).

against AFI as in other contexts discussed above. However, none of the complaints specifically articulate this type of allegation and, regardless, the damages implicated by these claims appears to be relatively minor.[864]

### d.  Cases Not Naming The AFI Defendants

The fourth and final category of Non-RMBS Actions involves cases that do not name any of the AFI Defendants.[865] However, the Investigation includes these actions because they allege similar actions as are described in the preceding categories and could, presumably, be amended to include AFI or its affiliates as defendants. Further, AFI included these Non-RMBS Actions in the summary of potential litigation it provided to the Examiner. Specifically, as with the others, these actions involve the behavior of Debtor entities in the underwriting, servicing, and foreclosure of mortgages. Plaintiffs in these actions cite several common-law and statutory causes of action, including misrepresentation, breach of contract, negligence, slander of title, ejectment, concert of action, joint enterprise, and unjust enterprise.[866] The statutory causes of action include violations of state laws protecting against unlawful and deceptive trade practices, TILA, RESPA, and RICO.[867]

The plaintiffs in one action, *In re Community Bank of N. Va*, have moved to certify class claims filed against the Debtors under the direction of Rowena Drennen, a member of the Creditors' Committee.[868] The complaint to date has not alleged liability against AFI.[869]

_____

[864]  Some of the plaintiffs in these actions have disclosed the amount in controversy in their complaints. *See id.* at 19 (plaintiffs seek to recover compensatory damages not exceeding $74,500); Second Am. Compl., *Robinson v. Homecomings Fin., LLC*, Case No. 2008-900007, at 18 (Ala. Cir. Ct. July 3, 2012) (plaintiffs also seek to recover compensatory damages not exceeding $74,500). Additionally, the Examiner has received damage letters from several parties. However, only the Bollinger Damages Letter gave a specific estimate of damages. *See* Bollinger Damages Letter, dated Jan. 4, 2013 (estimating damages in the amount of several million dollars, including liquidated damages for unpaid overtime compensation and allegedly based on the applicable statute of limitations). *See also* Donaldson, Chatman, and Robinson Damages Letter, dated Jan. 21, 2013.

[865]  *See, e.g.*, Am. Compl., *In re Cmty. Bank of N. Va.*, Case Nos. 03-0425, 02-1201, 05-0688, 05-1386, Docket No. 71 (W.D. Pa. Oct. 4, 2011); Compl., *Kelly. v. Am. Home Mortg. Holdings, Inc.*, Case No. 12-06240, Docket Nos. 1–2 (N.Y. Sup. Ct. Dec. 19, 2012); Am. Compl., *Kral v. GMAC Mortg., LLC*, Case No. 12-01023, Docket No. 9 (C.D. Cal. Apr. 25, 2012).

[866]  Compl., *Kelly. v. Am. Home Mortg. Holdings, Inc.*, Case No. 12-06240, Docket Nos. 1–2 (N.Y. Sup. Ct. Dec. 19, 2012) (alleging fraud, deceit, fraudulent conveyance, intentional misrepresentation, negligent misrepresentation, breach of contract, constructive trust, negligence, slander of title, ejectment, concert of action, and unjust enrichment).

[867]  Am. Compl., *In re Cmty. Bank of N. Va.*, Case Nos. 03-0425, 02-1201, 05-0688, 05-1386, Docket No. 71 (W.D. Pa. Oct. 4, 2011) (alleging violations of RESPA, TILA, and RICO); Am. Compl., *Kral v. GMAC Mortg., LLC*, Case No. 12-01023, Docket No. 9 (C.D. Cal. Apr. 25, 2012) (alleging violations of TILA and state law).

[868]  *See* Notice of Motion to Apply Bankruptcy Rule 7023 and to Certify Class Claims [Docket No. 2044].

[869]  Drennen declined the Examiner's request to submit a Submission Paper and did not respond to the damages request.

To the extent these complaints were amended to include AFI or its affiliates or to the extent Third-Party Claimants bring additional or new claims based upon these causes of action or limitations issues, the relevant analysis articulated above and in other sections of the Report would apply.[870]

### 5.  Unsecured Noteholder Causes Of Action

#### a.  Tortious Interference With The 2005 Indenture

##### (1) Description Of The Claim

In addition to the RMBS Claims and Non-RMBS Claims discussed above, the Investigation considered a potential tortious interference with contract claim by the Unsecured Noteholders against AFI. Wilmington Trust, solely in its capacity as indenture trustee under the 2005 Indenture and on behalf of the Unsecured Noteholders, alleges that AFI caused ResCap to breach the "all or substantially all" covenant included in the 2005 Indenture.[871] Specifically, the Unsecured Noteholders allege that AFI induced ResCap to embark upon a series of transactions in furtherance of a pre-arranged plan of AFI self-preservation that caused ResCap to (1) forgive indirect and direct debts owed to it by certain of its subsidiaries, including GMAC Mortgage and RFC, and (2) enter into the 2009 Bank Transaction. The Unsecured Noteholders argue that these transactions resulted in the transfer of substantially all of ResCap's assets in violation of the 2005 Indenture. Further, the Unsecured Noteholders allege that AFI tortiously interfered with the 2005 Indenture because a contract existed, AFI knew about the 2005 Indenture provisions, and AFI took intentional steps to cause its breach without justification.[872]

###### (a) The Unsecured Noteholders' Arguments

Section 11.01 of the 2005 Indenture prohibits, subject to certain exceptions, the transfer of all or substantially all of ResCap's assets unless the transferee assumes liability for the

---

[870] *See* Section VIII.C.

[871] Wilmington Trust Submission Paper, dated Oct. 24, 2012, at 24–25. The Unsecured Noteholders initially argue that AFI is liable for the breach as an alter ego of ResCap. If AFI and ResCap are viewed as separate entities, the Unsecured Noteholders alternatively argue that AFI is liable for breach of the "substantially all" provision of the 2005 Indenture because it tortiously interfered by causing ResCap's assets to become fully depleted. *Id*. at 24–25, 33.

[872] *Id*. at 34.

applicable Unsecured Notes.[873] The Unsecured Noteholders assert that at the end of 2008, ResCap's assets were comprised principally of: (1) intercompany receivables from its operating subsidiaries; (2) its ownership of common and preferred units in IB Finance, the holding company of Ally Bank; and (3) its equity interests in its operating subsidiaries.[874] The Unsecured Noteholders contend that the forgiveness of debt by ResCap from 2008 to 2009 and ResCap's transfer of its interest in IB Finance interest effectively left ResCap with no material assets by the end of 2009.[875] Because no transferee assumed the obligations under the 2005 Indenture, the Unsecured Noteholders argue that the "all or substantially all" provision of the 2005 Indenture was breached.[876] Finally, the Unsecured Noteholders allege that these transactions were orchestrated by AFI and constituted a scheme to allow AFI to obtain ResCap's interest in IB Finance and avoid the risk of losing Ally Bank in the event of a ResCap bankruptcy filing.[877]

The Unsecured Noteholders assert that they can satisfy each element of a claim for tortious interference with contract because it has demonstrated: (1) the existence of the 2005 Indenture; (2) AFI's knowledge of the 2005 Indenture; (3) AFI's intentional inducement of ResCap to breach the 2005 Indenture without justification; (4) actual breach of the 2005

---

[873]  2005 Indenture,§11.01[EXAM40024737]. Section 11.01 states:

> Section 11.01. Corporation May Consolidate, etc., on Certain Terms. The Company covenants that it will not merge or consolidate with any other Corporation or sell, assign, transfer, lease or otherwise convey all or substantially all of its property or assets to any Person, unless (i) either the Company shall be the continuing Corporation, or the successor Person (if other than the Company) shall be a Corporation organized and existing under the laws of the United States of America or a state thereof and such Corporation shall expressly assume the due and punctual payment of the principal of (and premium, if any), interest, if any, and Additional Amounts, if any, on all the Securities and any Coupons, according to their tenor, and the due and punctual performance and observance of all of the covenants and conditions of this Indenture to be performed by the Corporation by supplemental indenture satisfactory to the Trustee, executed and delivered to the Trustee by such Corporation, (ii) each Guarantor shall, by supplemental indenture, confirm that their Guarantee shall apply to the surviving entity's obligations under the Securities and this Indenture, as modified by such supplemental indenture, and confirm the due and punctual performance of the Guarantee and the covenants of the Guarantor in this Indenture, and (iii) the Company or such successor Corporation, as the case may be, shall not, immediately after such merger or consolidation, or such sale or conveyance, be in default in the performance of any such covenant or condition.

> For purposes of the foregoing, any sale, assignment, transfer, lease or other conveyance of the properties and assets of one or more Significant Subsidiaries (other than to the Company or another Subsidiary of the Company), which, if such assets were owned by the Company, would constitute all or substantially all of the properties and assets of the Company, shall be deemed to be the transfer of all or substantially all of the properties and assets of the Company.

> *Id.*

[874]  Wilmington Trust Submission Paper, dated Oct. 24, 2012, at 25, 27. The Unsecured Noteholders argue that the equity interests were in fact worthless because the mortgage-related liabilities faced by those subsidiaries combined with existing market conditions rendered them insolvent. *Id*. at 27.

[875]  *Id*. at 28.

[876]  *Id*. at 25.

[877]  *Id*. at 9–10.

Indenture; and (5) pecuniary damages.[878] Additionally, the Unsecured Noteholders argue that they have standing to assert the tortious interference claim against AFI because the claim is a direct claim based upon a particularized injury to the Unsecured Noteholders, which cannot be brought by any other creditor or group of creditors.[879]

### (b) The Debtors And AFI's Response

First, in their Submission Papers, the Debtors and AFI assert three defenses to the tortious interference claim that the Unsecured Noteholders lack standing to pursue the proposed tortious interference claim. The Debtors claim that the proposed tortious interference claim is an allegation that the 2009 Bank Transaction and ResCap's forgiveness of intercompany debt rendered ResCap insolvent and, as a result, is essentially a fraudulent conveyance claim belonging to the estate.[880]

Second, the Debtors assert that there is no evidence to support the allegation that the 2009 Bank Transaction and the forgiveness of debt transactions were prearranged parts of a single transaction. Despite that the transactions partially overlap chronologically and were generally intended to avoid the breach of certain TNW covenants and increase liquidity, the Debtors claim that each of the transactions could stand alone without the others and that the 2009 Bank Transaction did not create any binding commitment to later engage in the forgiveness of debt transactions.[881] Further, even if the transactions could be treated as a singular transaction, the Debtors argue that the transactions do not constitute a transfer of substantially all of ResCap's assets because ResCap's equity in its operating subsidiaries had value.[882]

Finally, the Debtors and AFI argue that the Unsecured Noteholders have failed to show the necessary elements of a tortious interference claim because the Unsecured Noteholders made no showing of several necessary elements, including that AFI intentionally induced ResCap to breach the "substantially all" provision of the 2005 Indenture.[883] The Debtors claim

---

[878] Wilmington Trust Submission Paper, dated Mar. 8, 2013, at 30 (citing *Lama Holding Co. v. Smith Barney Inc.*, 668 N.E.2d 1370 (N.Y. 1996)).

[879] Wilmington Trust Submission Paper, dated Mar. 8, 2013, at 32–33 (citing *In re Ionosphere Clubs, Inc.*, 156 B.R. 414, 439–40 (S.D.N.Y. 1993); *Caplin v. Marine Midland Grace Trust Co.*, 406 U.S. 416, 434 (1972)).

[880] Debtors' Submission Paper, dated Jan. 7, 2013, at 29–30. "Thus, while the proposed tortious interference claim and the 'fraudulent conveyance claim do not contain identical elements, that all share the same underlying focus' (i.e., allegations of fraud or other unlawful actions related to the Debtors' forgiveness of intercompany debt and the IB Finance Transaction)." *Id*. at 29–30 (citing *Nat'l Am. Ins. Co. v. Ruppert Landscaping Co.*, 187 F.3d 439, 441 (4th Cir. 1999)).

[881] Debtors' Submission Paper, dated Jan. 7, 2013, at 23.

[882] *Id*. at 24.

[883] *See id*. at 30–32; AFI Submission Paper, dated Dec. 19, 2012, at A-6. The Debtors also question whether the 2009 Bank Transaction and the forgiveness of intercompany debt caused any pecuniary damage to the holders of the Unsecured Notes. Debtors Submission Paper, dated Jan. 7, 2013, at 32.

that ResCap independently concluded, based upon advice from independent advisors, that it was in ResCap's interests to enter into the 2009 Bank Transaction.[884] Additionally, the Debtors claim that economic justifications for the 2009 Bank Transaction and the forgiveness of intercompany debt counter the Unsecured Noteholder's claim for tortious interference.[885]

### (c) The Unsecured Noteholders' Standing Motion

On April 19, 2013, the Unsecured Noteholders filed a motion seeking standing and authority to prosecute and, if appropriate, settle certain claims and causes of action held by ResCap in conjunction with third-party claims belonging to the Unsecured Noteholders.[886] Along with the motion, the Unsecured Noteholders filed a proposed complaint that sets forth each of their alleged claims (the "Proposed Complaint").[887] The Proposed Complaint sets forth the tortious interference claim raised by the Unsecured Noteholders in the Submission Papers. Specifically, the fourth cause of action in the proposed complaint is a tortious interference with contract claim against AFI, by which the Unsecured Noteholders assert that AFI "intentionally, maliciously, willfully, improperly, and in bad faith, induced, caused and procured" ResCap's breach of the "substantially all" covenant of the 2005 Indenture as part of a unified plan by AFI to benefit itself at the expense of the ResCap's creditors and were intended to insulate AFI and Ally Bank from the RMBS crisis that AFI created.[888]

### (2) The Unsecured Noteholders' Standing To Assert Tortious Interference With Contract Claim

Before analyzing the disputed factors of tortious interference, the Examiner first considered whether the Unsecured Noteholders would have standing to assert the tortious interference with contract claim. "[S]tanding is a threshold inquiry, and an indispensable part of a plaintiff's case; failure to establish standing generally obviates the need to consider the merits of a dispute."[889] In the bankruptcy context, "when a claim is a general one with no particular injury arising from it and if that claim could be brought by any creditor of the debtor, the trustee is the proper person to assert the claim."[890] In order for the Unsecured

---

[884]  Debtors' Submission Paper, dated Jan. 7, 2013, at 31; see AFI Submission Paper, dated Dec. 19, 2012, at A-7.

[885]  Debtors' Submission Paper, dated Jan. 7, 2013, at 31–32.

[886]  Motion of Wilmington Trust, National Association, Solely in its Capacity as Indenture Trustee for the Senior Unsecured Noteholders Issued by Residential Capital, LLC for an Order Authorizing it to Prosecute Claims and Other Causes of Action on Behalf of the Residential Capital, LLC Estate [Docket No. 3475].

[887]  *Id*.

[888]  *Id*.

[889]  *WTC Families for a Proper Burial, Inc. v. City of N.Y.*, 567 F. Supp. 2d 529, 536 (S.D.N.Y. 2008).

[890]  *Kalb, Voorhis & Co. v. Am. Fin. Corp.*, 8 F.3d 130, 132 (2d Cir. 1993) (holding that under Texas law, a veil-piercing action should be brought by the trustee because, if proven, such a claim would inure to the benefit of all creditors).

Noteholders to assert the tortious interference claim, the Unsecured Noteholders must have suffered a particularized injury significantly different from the injuries to ResCap's other general unsecured creditors.[891]

As noted in the Debtors' Submission, some courts have denied standing to a party asserting a tortious interference claim if the court determines that the claim is in fact a restatement of a fraudulent conveyance claim that belongs to the debtor's estate. For example, in *National American Insurance Co. v. Ruppert Landscaping Co.*, the court held that creditors lacked standing to assert a tortious interference claim against a third party because the claim depended upon a showing of fraud or unlawful action and all creditors, not just the creditors asserting the claim, had a stake in exposing the impropriety of the underlying transaction.[892] In *In re Ionosphere Clubs, Inc. v. American National Bank and Trust Company of Chicago*, the debtor's preferred shareholders asserted that actions of the debtor's management rendered the debtor insolvent. They alleged that that conduct amounted to tortious interference with the debtor's contractual obligations under the preferred stock certificates to pay preferred dividends.[893] The court noted that although the shareholders' right to receive preferred dividends was unique to their status as preferred shareholders, the nature of the injury stemmed from the damage done to the debtor by the debtor's management and that would affect all creditors the same.[894] Accordingly, the court held that the tortious interference with contract claim, which was based upon acts rendering the debtor insolvent and unable to pay its contractual debts to the preferred shareholders, "is for fraudulent conveyance properly brought by the trustee."[895]

*Retired Partners of Coudert Brothers Trust v. Baker & McKenzie LLP (In re Coudert Brothers LLP)* is another case that addressed individual standing to assert a tortious interference claim. *Coudert Brothers* involved a trust of retired partners of the debtor who brought, among other things, tortious interference with contract claims against three law firms who had each bought a large share of the debtor's business while it was winding down.[896] The contract at issue was a partnership agreement that entitled the retired partners to payment of

---

[891] *See Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 429 B.R. 423, 431 (S.D.N.Y. 2010) (citing *In re Sage Enter., Inc.*, 2006 WL 1722582, at *15 (Bankr. N.D. Ill. Apr. 28, 2006)) ("[W]here the creditors' injury, while having some personal elements, overlaps with injury suffered by other creditors . . . the question to be answered is whether the injury to the creditor is significantly different from the injuries to other creditors in general.").

[892] 187 F.3d 439, 440–41 (4th Cir. 1999) (stating that two sureties of the debtor challenged asset transfers between the debtor and a third party alleging, among other things, tortious interference with contract claims against the third party).

[893] 156 B.R. 414, 439 (S.D.N.Y. 1993). The preferred shareholders asserted that the debtor was rendered insolvent through a series of transactions by which management approved actions to allow the debtor's parent corporation to transfer many of the debtor's valuable assets to affiliated corporations also owned by the parent. *In re Ionosphere Clubs, Inc. v. Am. Nat'l Bank & Trust Co.*, 17 F.3d 600, 602 (2d Cir. 1994).

[894] *Airline Pilots Assoc., Int'l v. Am. Nat'l Bank & Trust Co. of Chicago (In re Ionosphere Clubs, Inc.)*, 156 B.R. 414, 439 (S.D.N.Y. 1993).

[895] *Id.*

[896] 2012 WL 1267827 (S.D.N.Y. April 12, 2012).

retirement income from the partnership or a successor partnership in the event the original partnership was sold.[897] The trust alleged that the firms tortiously interfered with the partnership agreement by luring away the debtor's employees and buying pieces of the business large enough to render the debtor insolvent, but small enough to avoid successor liability.[898] The court observed that

> if this theory works for the [t]rust, it would also work for every other creditor of [the debtor]: each could say that the [f]irms tortiously interfered with its contract by rendering [the debtor] unable to perform. Nor is the Trust's theory limited to creditors who entered contracts with [the debtor]; a judgment creditor, or a tort creditor, could claim that the asset sales rendered the [debtor] insolvent and therefore constituted a fraudulent transfer.[899]

As a result, the court held that the trust's claim was in fact a disguised fraudulent conveyance claim, which belonged to the estate and, as a result, could not be brought by the trust to pursue on behalf of its members.[900]

To counter the above authority, the Unsecured Noteholders cite to *In re HHL Financial Services, Inc.*[901] *In re HHL Financial Services, Inc.* involved a claim by noteholders against the defendants for tortiously interfering with the notes. More specifically, the noteholders argued that the defendants diverted significant revenues from the debtor, causing the debtor to default on promissory notes and which ultimately led to the debtor's bankruptcy filing.[902] The court found that the nature of the wrongs asserted and injuries suffered with respect to the tortious interference claim were specific to the plaintiffs as noteholders, not creditors in general and, as a result, were not related to the debtor's chapter 11 proceeding.[903]

The Examiner considered both the nature of the wrongs alleged and the nature of the injury for which the relief would be brought for purposes of determining whether the Unsecured Noteholders would have standing to assert the tortious interference with contract

---

[897] *Id.* at *1. The retired partner's entitlement to retirement income, however, was conditioned upon the firm generating profits sufficient to meet the debtor's obligations to higher priority claimants. *Id.*

[898] *Id.* at *7.

[899] *Id.*

[900] *Id.* at *8.

[901] 2001 WL 34367298 (Bankr. D. Del. 2001). The plaintiffs had filed suit alleging substantially similar claims against the defendants in state court and in an adversary proceeding in connection with the debtor's chapter 11 proceeding. *See id.* at *1. The case involved a decision on the plaintiffs motion for abstention in order to allow the claims to be decided in the state court action. *See id.*

[902] *Id.* at *7.

[903] *Id.* at *2.

claim.[904] The Unsecured Noteholders argue that they have particularized claims related to the 2005 Indenture that are unique to the Unsecured Noteholders.[905] The nature of the wrongs alleged by the Unsecured Noteholders is that AFI induced ResCap to breach the "substantially all" provision of the 2005 Indenture by "causing [ResCap's] assets to become fully depleted."[906] The nature of the injury for which relief is brought is that "there are no assets to support the [Unsecured Notes] as bargained for under the [2005] Indenture."[907]

Unlike *Ruppert Landscaping,* the nature of the wrong caused by the alleged tortious interference with the 2005 Indenture does not depend upon allegations of fraud or breach of fiduciary duty and is not available to all estate creditors. Instead, the nature of the wrong is similar to that asserted in *Ionosphere*, *Coudert Brothers Trust*, and *HHL Financial Services*, where the courts found the nature of a breach of contract to be unique to the plaintiffs. Unlike *Ionosphere* and *Coudert Brothers Trust*, however, the Unsecured Noteholders' claim is not premised upon a theory that the breach of the 2005 Indenture was a result of AFI rendering ResCap insolvent through the forgiveness of intercompany debt and the 2009 Bank Transaction. Rather, the Unsecured Noteholders' claim is premised upon a theory that when AFI allegedly caused ResCap to breach the "substantially all" provision, the Unsecured Noteholders were denied their right to a degree of continuity of ResCap's assets as bargained for pursuant to section 11.01 of the 2005 Indenture.[908] Similar to *HHL Financial Services,*[909] the nature of the injury asserted by the Unsecured Noteholders is not available to all of the Debtors' creditors, but unique to the Unsecured Noteholders. As a result, the Examiner concludes that it is more likely than not that a court would find that the Unsecured Noteholders have standing to assert the tortious interference with contract claim against AFI.

*(3) Analysis Of The Tortious Interference With Contract Claim*

As noted above, in order to establish tortious interference with contract, a plaintiff must prove "(1) existence of a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of the contract; (3) the defendant's intentional procurement of the third-party's breach of contract without justification; (4) actual breach of the contract; and

---

[904] Opinion, *Retired Partners of Coudert Bros. Trust v. Deltour* (*In re Coudert Bros., LLP*), Adv. No.09-01215, at 6 (Bankr. S.D.N.Y. June 15, 2010) (citing *In re Granite Partners, L.P.*, 194 B.R. 318, 324 (Bankr. S.D.N.Y. 1996); *In re The 1031 Tax Grp., LLC*, 397 B.R. 679–80 (Bankr. S.D.N.Y. 2008)).

[905] Wilmington Trust Submission Paper, dated Oct. 24, 2012, at 33.

[906] *Id*.

[907] *Id*. at 34.

[908] *Cf. Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*, 691 F.2d 1039, 1050–51 (2d Cir. 1982) (noting that the purpose of successor obligor clauses is to protect a borrower's right to merge or liquidate all of its assets, while protecting a lender's right to a degree of continuity of assets).

[909] *In re HHL Fin. Serv. Inc.,* 2001 WL 34367298, at *2 (Bankr. D. Del. 2001).

(5) damages resulting therefrom."[910] AFI does not contest that the 2005 Indenture is a valid contract or that it had knowledge of the 2005 Indenture.[911] Accordingly, the issue is whether the Unsecured Noteholders can show an actual breach of the contract with damages resulting therefrom, as well as AFI's intentional procurement of the ResCap's breach without justification.

### (a) Breach Of The "Substantially All" Provision Of The 2005 Indenture

The Unsecured Noteholders allege that the 2005 Indenture was breached when "substantially all" of ResCap's assets were stripped away in furtherance of a "unified plan to preserve and insulate [AFI] and Ally Bank from the consequences of the RMBS crisis that [AFI] had created."[912] In 2008, the Unsecured Noteholders assert that ResCap's assets comprised of (1) intercompany receivables from its operating subsidiaries; (2) its ownership of common and preferred units in IB Finance; and (3) its equity interests in its operating subsidiaries.[913] By the beginning of 2010, the Unsecured Noteholders claim that ResCap had transferred substantially all of its assets.[914] The Unsecured Noteholders recognize that none of these transactions taken individually would constitute a transfer of "substantially all" of ResCap's assets. Instead, to support their claim they seek to aggregate the 2009 Bank Transaction with a series of intercompany debt forgiveness transactions.[915] As a result, the Unsecured Noteholder's allegation that AFI caused ResCap to breach the "substantially all"

---

[910] *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 401–02 (2d Cir. 2006) (citing *Lama Holding Co. v. Smith Barney Inc.*, 668 N.E.2d 1370 (N.Y. 1996)); *see also White Plains Coat & Apron Co., Inc. v. Cintas Corp.*, 460 F.3d 281, 285 (2d Cir. 2006); *Winter-Wolff Int'l, Inc. v. Alcan Packaging Food & Tobacco Inc.*, 499 F. Supp. 2d 233, 241 (E.D.N.Y. 2007); *Hidden Brook Air, Inc. v. Thabet Aviation Int'l Inc.*, 241 F. Supp. 2d. 246, 278 (S.D.N.Y. 2002); *Rupert v. Krautheimer (In re Krautheimer)*, 241 B.R. 330, 336 (Bankr. S.D.N.Y. 1999).

A choice of law analysis may be avoided when there is no conflict in law with respect to a tortious interference with contract claim. *See Curley v. AMR Corp.*, 153 F.3d 5, 12 (2d Cir. 1998) (citing *J. Aron & Co. v. Chown*, 647 N.Y.S.2d 8 (N.Y. App. Div. 1996)). The Unsecured Noteholders, AFI, and the Debtors do not dispute applicable law in their respective Submission Papers, and the Unsecured Noteholders relied on New York law in their most recent Submission Paper. There is no conflict in the applicable law between Minnesota, New York, or other applicable states, therefore the Examiner looked to New York law to the analysis of the Unsecured Noteholders' claims.

[911] AFI Submission Paper, dated Dec. 19, 2012.

[912] Motion of Wilmington Trust, National Association, Solely in its Capacity as Indenture Trustee for the Senior Unsecured Noteholders Issued by Residential Capital, LLC for an Order Authorizing it to Prosecute Claims and Other Causes of Action on Behalf of the Residential Capital, LLC Estate [Docket No. 3475], Ex. B, at 47.

[913] *Id*. at 47; Wilmington Trust Submission Paper, dated Oct. 24, 2012, at 25, 27.

[914] Motion of Wilmington Trust, National Association, Solely in its Capacity as Indenture Trustee for the Senior Unsecured Noteholders Issued by Residential Capital, LLC for an Order Authorizing it to Prosecute Claims and Other Causes of Action on Behalf of the Residential Capital, LLC Estate [Docket No. 3475], Ex. B, at 47.

[915] *Id*. Wilmington Trust Submission Paper, dated Oct. 24, 2012, at 27.

covenant of the 2005 Indenture is dependent upon (1) the aggregation of the intercompany debt forgiveness transactions with the 2009 Bank Transaction and (2) the equity held by ResCap in its operating subsidiaries being worthless at the time the assets at issue were transferred.

### (i)  Aggregation Of The Transactions

### (A) The Sharon Steel Standard

Under New York law, a series of transactions can be aggregated for the purpose of determining whether a "substantially all" provision in an indenture has been breached.[916] *Sharon Steel Corp. v. Chase Manhattan Bank, N.A.* has been cited as the "leading decision on aggregating transactions for purposes of a substantially all analysis in the context of a successor obligor provision."[917] In *Sharon Steel,* the obligor of certain notes, UV Industries Inc. ("UV"), decided to liquidate its assets through a series of transactions over a 12 month period.[918] UV first sold a number of its assets to unrelated purchasers and then sold its remaining assets to Sharon Steel, which agreed to assume the notes. UV relied upon the successor obligation provisions in the underlying indentures to transfer the notes to Sharon Steel without noteholder approval.[919]

The indenture trustee and the noteholders challenged Sharon Steel's assumption of the notes and argued that the sale did not constitute the transfer of "substantially all" of UV's assets to Sharon Steel.[920] Sharon Steel argued it was permitted to assume the notes because it had acquired all of UV's assets in the final sale of a multi-step liquidation plan. The court disagreed with Sharon Steel's literal read of the "substantially all" provision. It held that because all of the sales were designed to "accomplish the predetermined goal of liquidating UV under a formal plan of liquidation, even though only one asset sale had been indentified at the time the liquidation plan was adopted," it would be inappropriate to review the transaction with Sharon Steel in isolation.[921] In coming to this conclusion, the court distinguished a plan of liquidation from sales of assets in the regular course of business that stand on their own merits without reference to another.[922]

---

[916]  *Bank of N.Y. Mellon Trust Co., N.A. v. Liberty Media Corp.*, 29 A.3d 225, 243 (Del. 2011). Given that 2005 Indenture is governed by New York law, the Examiner applied New York law to determine whether ResCap has breached the "substantially all" covenant in the 2005 Indenture. *See, e.g.*, *id*. at 237 (applying New York law to a "substantially all" analysis because the indenture was governed by New York law).

[917]  *Bank of N.Y. Mellon Trust Co.*, 29 A.3d at 237 (internal quotation marks omitted).

[918]  *See Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*, 691 F.2d 1039 (2d Cir. 1982).

[919]  *See id*.

[920]  *See id*.

[921]  *See id*. at 1050.

[922]  *See id*. at 1050–51 ("To the extent that a decision to sell off some properties is not part of an overall scheme to liquidate and is made in the regular course of business it is considerably different from a plan of piecemeal liquidation. . . [a] sale in the absence of a plan to liquidate is undertaken because the directors expect the sale to strengthen the corporation as a going concern.").

The court then looked to UV's assets at the time UV adopted the plan to liquidate—before the first sales transaction—and compared them to the assets transferred to Sharon Steel.[923] The court held that while UV transferred all of its assets through the series of transactions over a period of time, UV did not transfer "substantially all" of its assets to Sharon Steel in the last transaction of the series because the transferred assets were responsible for 38% of UV's operating revenues and 13% of UV's operating profits and constituted 41% of the book value of UV's operating properties and 51% of UV's total assets.[924]

### (B) Subsequent Court Application Of The Sharon Steel Standard

There is limited additional case law on the aggregation of multiple transactions for purposes of a "substantially all" provision in an indenture. However, one court has held that

> in the context of the "substantially all" analysis under a boilerplate successor obligor provision in an indenture, . . . the principles articulated in *Sharon Steel* are the proper basis of determining under New York law, the nature and degree of interrelationship that will warrant aggregation of otherwise separate and individual transactions as part of a "series."[925]

In *Bank of New York Mellon Trust Co., N.A. v. Liberty Media Corp.*, the Delaware Supreme Court addressed whether a proposed split-off by Liberty Media Corp. in June 2010, which would be the company's fourth major distribution of assets since March 2004, should be aggregated with three prior dispositions for purposes of determining whether a transfer of "substantially all" of the company's assets had occurred.[926] The proposed split-off, by itself, would not have constituted a transfer of "substantially all" of the assets. [927] The court noted that "[i]n *Sharon Steel*, the Second Circuit focused on the fact that all of the sales were pursued to accomplish the predetermined goal of liquidating [the debtor] under a formal plan of liquidation" and emphasized that "[t]he *Sharon Steel* court was careful to distinguish the piecemeal liquidation at issue in that case from situations where a company disposes of assets over time and not as part of a preconceived plan of liquidation."[928] The court concluded that Liberty Media's transactions were not part of an overall plan to liquidate or to strip its assets from the corporate structure, but were the result of a discrete, context-based decision applying

---

[923] *See id*. at 1051.

[924] *Bank of N.Y. Mellon Trust Co., N.A. v. Liberty Media Corp.*, 29 A.3d 225, 237–38 (Del. 2011) (discussing *Sharon Steel Corp.*, 691 F.2d at 1051).

[925] *Bank of N.Y. Mellon Trust Co.*, 29 A.3d at 243. The court noted the near absence of any authoritative New York case law on the issue in coming to its conclusion. *See id*.

[926] *See id*. at 237.

[927] *See id.* If aggregated together, the transactions would have constitute a transfer of 67% of Liberty Media's assets.

[928] *See id*. at 237–38 (citing *Sharon Steel Corp.*, 691 F.2d 1039).

the company's overarching business strategy.[929] Because the strategy was not part of an overall plan to deplete Liberty Media's assets, the transactions at issue should not be aggregated.[930]

In *Bank of New York v. Tyco Int'l Group, S.A.*, the District Court for the Southern District of New York applied the *Sharon Steel* standard in determining whether the spin-off of two businesses constituted a breach of a "substantially all" provision of an indenture.[931] The court held that the transfers could not be aggregated under *Sharon Steel* because the case involved a company restructuring, not a liquidation, and the transferred assets stayed within the conglomeration.[932] The transfers at issue "clearly resulted from a decision to sell off some properties made in the regular course of business" as opposed to a plan of liquidation.[933]

### (C) Application Of The Sharon Steel Standard To The Transactions At Issue

The Examiner reviewed the evidence to determine whether the forgiveness of intercompany debt by ResCap and the 2009 Bank Transaction were part of an overall scheme to liquidate the assets of ResCap or would otherwise justify aggregation of the transactions under the *Sharon Steel* standard. As set forth in the Proposed Complaint, the Unsecured Noteholders allege that the transactions were part of a unified plan designed by AFI to preserve itself and Ally Bank.[934] While a close question, the Examiner concludes that it is more likely than not that a court would not find that the transactions at issue should be aggregated under the *Sharon Steel* standard.

As discussed in Section V.A.1.b(1), throughout 2007 and the first quarter of 2008, ResCap faced ongoing challenges with respect to its liquidity and TNW covenants in light of volatile market conditions.[935] It became clear toward the end of 2007 that AFI and ResCap would need to consider potential solutions to ResCap's TNW covenants for the first quarter of 2008.[936] In early March 2008, AFI considered a substantial equity infusion into ResCap to ensure ResCap would meet its TNW covenants.[937] ResCap's interest in IB Finance does not appear to have been part of the discussion surrounding the potential equity infusion at that time.[938]

---

[929]   *See Bank of N.Y. Mellon Trust Co.*, 29 A.3d 225 at 237.

[930]   *Id.* at 243 ("[A]ggregation is appropriate only when a series of transactions are part of a 'plan of piecemeal liquidations' and 'an overall scheme to liquidate' and not where each transaction stands on its own merits without reference to the others.").

[931]   *Bank of N.Y. v. Tyco Int'l Grp., S.A.*, 545 F. Supp. 2d 312, 320–21 (S.D.N.Y. 2008).

[932]   *Id.*

[933]   *Id.* at 321.

[934]   *See* Wilmington Trust Submission Paper, dated Mar. 8, 2013.

[935]   *See* Section V.A.1.b(1).

[936]   *See id.*

[937]   *See id.*

[938]   *See id.*

On March 28, 2008, AFI proposed the 2008 Bank Transaction to ResCap as a solution to help improve ResCap's financial condition.[939] Corey Pinkston of GMAC Financial Services informed the Independent Directors of the ResCap Board that

> he had been working with [AFI] management and PricewaterhouseCoopers on a structure for the contribution by [AFI] of the bonds in a manner that would clearly be considered "shareholder equity" for the purposes of compliance with ResCap's [TNW] covenants, but that would also provide some flexibility to allow [AFI] to maximize the value of the contribution.[940]

A few days later, Pohl advised the ResCap Board that based upon his extensive expertise in bankruptcy, "it was his feeling that a covenant default by ResCap for failing to meet the [TNW] Test and the resulting consequences thereof would be very detrimental to ResCap, its enterprise value and the value of the outstanding bonds."[941] ResCap's legal and financial advisors confirmed that if the proposed transaction was not approved, ResCap would not meet its TNW covenants, which most likely would cause a bankruptcy filing and an immediate loss of significant value to its public bondholders.[942] The ResCap Board subsequently approved the transaction.[943] That same day, the AFI Board discussed ResCap's status and outlook, including actions that had been taken to stabilize ResCap's performance and "focus the business model on core activities."[944] AFI discussed and approved the 2008 Bank Transaction and incremental capital injections only to the extent ResCap needed it to meet the TNW covenants.[945] The

---

[939] *See* Minutes of a Special Meeting of the Board of GMAC LLC, Mar. 28, 2008, ALLY_PEO_0001027–28 [ALLY_PEO_0001009].

[940] Minutes of a Meeting of the Special Committee of the Independent Directors of the Board of Residential Capital, LLC, Mar. 24, 2008, at RC40006616 [RC40006611].

[941] Minutes of a Special Meeting of the Board of Residential Capital, dated Mar. 28, 2008, at RC40005677 [RC40005652].

[942] *Id.* at RC40005678.

[943] *Id.*; *see also* Minutes of a Special Meeting of the Board of Residential Capital, LLC, dated Mar. 25, 2008, at RC40006621 [RC40006611]; Minutes of a Special Meeting of the Board of Residential Capital, LLC, dated Mar. 26, 2008, at RC40006625 [RC40006611]. Pohl and Daniel Ammann from Morgan Stanley (financial advisor for ResCap) noted to the ResCap board that the only option available to ResCap if it did not accept GMAC's proposal for the contribution of bonds with the ResCap board, which was to draw down the entire unsecured credit facility in March and then to file for bankruptcy protection in April. *Id.*

[944] Minutes of a Special Meeting of the Board of GMAC LLC, dated Mar. 28, 2008, at ALLY_PEO_0001026–28 [ALLY_PEO_0001009] (resolving to make capital contributions to ResCap "due to the volatility and uncertainty of market conditions and ResCap's financial condition" that required assessment on a day-to-day basis).

[945] *Id.* at ALLY_PEO_0001028–30 (resolving to make capital contributions to ResCap "due to the volatility and uncertainty of market conditions and ResCap's financial condition" that required assessment on a day-to-day basis).

transaction was consummated on March 31, 2008.[946] There is no indication that the 2008 Bank Transaction was structured so as to inevitably lead to the 2009 Bank Transaction or that the 2009 Bank Transaction had even been contemplated at this time.[947]

On March 26, 2008, the Executive Committee of ResCap's Board approved a capital injection into RFC in the form of forgiveness of affiliate borrowings from ResCap in the amount of $2 billion or other amount as necessary to meets its TNW covenants in RFC's borrowing facilities.[948] The capital allocation would "ensure[  ] RFC's compliance with the financial covenants in its debt agreements as of March 31, 2008, and [was] expected to provide sufficient net worth to ensure compliance with RFC's financial covenants through June 30, 2008."[949] Throughout 2008 and into 2010, ResCap infused additional capital into its operating subsidiaries in the form of intercompany debt forgiveness.[950] On December 30, 2009, the AFI Board approved AFI's capital contribution to ResCap, and ResCap's subsequent capital contribution of over $50 million to RFC, as required under the AFI Board's Reservation of Authorities.[951]

The Investigation did not uncover any evidence that would suggest AFI considered acquiring ResCap's remaining interest in IB Finance until late summer/early fall of 2008.[952] At that time, ResCap had yet to stabilize and, as a result, ResCap considered a potential sale of its remaining interest in IB Finance to AFI in order to alleviate ResCap's ongoing liquidity and TNW difficulties.[953] For AFI, the "[i]ntention of the acquisition [was] to simplify [Ally] Bank ownership issues to support long-term GMAC access to bank funding."[954] On September 30, 2008, the AFI Board "discussed continued volatility and disruption in the capital markets and the probability of completing planned asset sale transactions which themselves [were] paramount to ensuring that ResCap has sufficient liquidity required to

---

[946] Minutes of a Special Meeting of the Board of Residential Capital, LLC, dated Apr. 25, 2008, at RC40005744 [RC40005652].

[947] *See* Section V.A.1.b(1).

[948] Minutes of a Special Meeting of the Executive Committee Board of Directors of Residential Capital, LLC, dated Mar. 26, 2008, at RC40006438–39 [RC40006437].

[949] *Id*. at RC40006438.

[950] *See* ResCap—Intercompany Transactions—Draft Presentation, prepared by Morrison Foerster and FTI Consulting, dated April 4, 2013, at 10 [EXAM00345894].

[951] Unanimous Consent to Action by the GMAC Board of Directors, dated Dec. 30, 2009, at ALLY_0169105 [ALLY_0169104] ("WHEREAS, under the Reservation of Authorities of the Board, the Board must approve [AFI's] capital contribution to ResCap, and ResCap's contribution to RFC (through sequential contributions to, and by, intermediate subsidiaries) to the extent each contribution is $50 million or more.").

[952] *See* Section V.A.1.b(1).

[953] *See* Section V.A.1.c (discussing early consideration of the 2009 Bank Transaction); *see also* Minutes of a Regular Meeting of the Board of GMAC LLC, dated Sept. 11, 2008, at ALLY_PEO_0001234–39 [ALLY_PEO_0001009]. On September 11, 2008, Samuel Ramsey presented to the AFI Board on a potential opportunity for the sale of ResCap's interest in the Ally Bank to AFI). *Id*; *see also* Minutes of a Regular Meeting of the Board of Residential Capital, LLC, dated Sept. 12, 2008, at RC40005864–65 [RC40005652].

[954] GMAC Bank Transaction Update for the Board of GMAC LLC, dated Sept. 29, 2008, at 1 [ALLY_0238653].

continue its restructuring efforts and return to profitability."[955] However, ResCap and AFI were unable to finalize the proposed Ally Bank sale and the AFI Board passed a resolution providing ResCap with up to $400 million in debt forgiveness to satisfy ResCap's TNW covenants and immediate cash needs.[956] The AFI Board was concerned that a ResCap bankruptcy filing would interfere with AFI's future acquisition of Ally Bank, by delaying FDIC approval of the transfer, allowing another purchaser to acquire ResCap's shares of IB Finance through a bankruptcy auction, or by giving the FDIC cause to seize the bank.[957] On October 16, 2008, Thomas Marano abruptly informed the ResCap Board that AFI was no longer considering the purchase of Ally Bank.[958] AFI's decision to walk away from the potential purchase of IB Finance at this time appears to have been driven, at least in part, by its own economic difficulties[959] as well as concerns over fraudulent transfer liability in the event of a ResCap bankruptcy filing.[960]

In December 2008, AFI again considered acquiring ResCap's interest in IB Finance in connection with its decision to become a bank holding company.[961] If AFI converted to a charter that triggered bank holding company requirements, Ally Bank would be able to offer demand deposit accounts and to provide full banking services.[962] As described in more detail in Section V.A.1.c(2) and Section V.A.1.c(3), AFI exercised its option to exchange the ResCap Preferred Interests for the IB Finance Preferred Interests on January 30, 2009 and, immediately following the exchange, ResCap sold its remaining IB Finance Class M Shares in

---

[955] Minutes of a Special Meeting of the Board of GMAC LLC, dated Sept. 30, 2008, at ALLY_PEO_0001288 [ALLY_PEO_0001009].

[956] Agenda and Supporting Materials, GMAC Board of Directors Meeting, Sept. 30, 2008, at ALLY_PEO_0003732 [ALLY_PEO_0003715]; Minutes of a Special Meeting of the Board of Residential Capital, LLC, Oct. 1, 2008, at RC4000587576 [RC40005652].

[957] *See* Section VI.A.3.a (discussing early consideration of an IB Finance/All Bank sale) (citing to Agenda and Supporting Materials, GMAC Board of Directors Meeting, Sept. 30, 2008, at ALLY_PEO_0003722 [ALLY_PEO_0003715]); Int. of S. Ramsey, Dec. 10, 2012, at 157:24–158:4 ("The joint ownership of the bank could've been very disruptive with the regulators. If there was a single ownership of the bank by GMAC when a [ResCap bankruptcy] occurred, if it was to occur, it would be less risk. It was that simple.").

[958] *See* Section V.A.3.a.

[959] *See, e.g.*, E-mail from T. Marano to N. Kashkari and J. Lambright (Oct. 30, 2008) [CCM00199669] ("I have been offered limited shorter term support from our parent GMAC. I have yet to receive longer term support as they themselves are challenged."); Int. of M. Neporent, Feb. 6, 2013, at 172:24–174:10.

[960] *See* Minutes of a Special Meeting of the Board of GMAC LLC, Sept. 30, 2008, at ALLY_PEO_0001287–88 [ALLY_PEO_0001009] ("Mr. Ramsey presented materials that . . . provided an overview of the risks to GMAC in the event of a ResCap bankruptcy filing. . . . Management and the advisors in attendance at the meeting responded to questions raised regarding the disposition of GMAC Bank; the impact on GMAC's 11:1 leverage ratio covenant; and matters associated with preference and fraudulent transfers."); Agenda and Supporting Materials, GMAC Board of Directors Meeting, Sept. 30, 2008, at ALLY_PEO_0003722–24 [ALLY_PEO_0003715].

[961] Int. of L. Tessler, Nov. 16, 2012, at 177:6–15 (as member of the AFI Board).

[962] *Id*. (as member of the AFI Board)

exchange for AFI's contribution of the 8.5% Second Lien Notes.[963] Following the transfer, AFI owned all of the equity interest in Ally Bank.[964]

As required by *Sharon Steel*, the Examiner considered whether the evidence supports the proposition that ResCap adopted a plan of liquidation before December 31, 2008 that would justify aggregating the 2009 Bank Transaction with the series of intercompany debt forgiveness transactions that took place in 2009. Similar to *Liberty,* no evidence was found to support the allegation that AFI engaged in an overall scheme of liquidation to transfer substantially all of ResCap's assets. Instead, the evidence supports the proposition that in early 2008, AFI's business strategy was for ResCap to have sufficient liquidity to continue its restructuring efforts and return to profitability. By late 2008, AFI was concerned with its own survival, which was dependent upon ResCap's survival and ability to maintain its TNW covenants. The intercompany debt forgiveness ensured that ResCap' operating subsidiaries maintained TNW covenants. The 2009 Bank Transaction provided ResCap with much needed liquidity and allowed AFI to become a bank holding company. As in *Liberty*, the evidence supports the proposition that the transactions at issue could each stand on their own merits without reference to the other. As a result, the Examiner concludes that it is more likely than not that a court would not find that all of the transactions should be aggregated for purposes of determining whether the "substantially all" provision on the 2005 Indenture was breached under the *Sharon Steel* standard.

### (D)Step-Transaction Doctrine

The Investigation also considered the Unsecured Noteholder's argument that the step-transaction doctrine justifies aggregating the transactions.[965] The step-transaction doctrine is traditionally a tax principle that looks to the substance of a series of transactions, not the form,

---

[963]   *See* Section V.A.1.c(3) (discussing the January 2009 conversion of the ResCap Preferred Interests and sale of the IB Finance Class M Shares).

[964]   *See* Section V.A.1.c(3).

[965]   *See Bank of N.Y. Mellon Trust Co., N.A. v. Liberty Media Corp.*, 29 A.3d 225, 237 (Del. 2011) (concluding that it is unnecessary to decide whether the step-transaction doctrine would be applicable under New York law in determining whether to aggregate a series of transactions in a "substantially all" analysis).

to govern the transaction's tax treatment.[966] Courts, however, have applied the step transaction concept in other contexts as well, such as corporate governance, contract interpretation, and fraudulent conveyances.[967]

In *Liberty Media Corp*., the trustee argued that the step-transaction was legally irrelevant for purposes of determining whether multiple transactions constituted a transfer of "substantially all" assets.[968] The lower court previously held that the transactions at issue did not trigger the step-transaction doctrine because they were not part of a plan to remove assets from the corporate form or to evade the bondholders claims.[969]

The *Liberty Media Corp.* court implicitly rejected the lower court's adoption of the step-transaction doctrine.[970] Instead, the court concluded that the *Sharon Steel* standard was the proper basis to determine the interrelationship of transactions and that "it [was] unnecessary to reach or decide whether the step transaction doctrine and its three component tests would be adopted . . . to determine whether to aggregate a series of transactions in a 'substantially all' analysis."[971] Despite the holding, and at the urging of the Unsecured Noteholders, the Examiner considered whether the transactions at issue could be aggregated under the step-transaction doctrine.

The step-transaction doctrine "treats the 'steps' in a series of formally separate but related transactions involving the transfer of property as a single transaction, if all the steps are

---

[966] *See Comm'r v. Clark*, 489 U.S. 726, 738 (1989) ("By thus linking together all interdependent steps with legal or business significance, rather than taking them in isolation, federal tax liability may be based on a realistic view of the entire transaction."); *G.D. Parker, Inc. v. Comm'r*, 2012 WL 5935661, at *10 (U.S. Tax. Ct. 2012) (citing *Del Commercial Props., Inc. v. Comm'r*, 251 F.3d 210, 213–14 (D.C. Cir. 2001), *aff'g T.C. Memo.* 1999-411) ("'Under the step transaction doctrine, a particular set in a transaction is disregarded for tax purposes if the taxpayer could have achieved its objective more directly, but instead included the step for no other purpose than to avoid U.S. Taxes.'"); *see also Greene v. United States*, 13 F.3d 577, 583 (2d Cir. 1994) ("By emphasizing substance over form, the step transaction doctrine prevents a taxpayer from escaping taxation.").

[967] *See Big V Supermarkets, Inc. v. Wakefern Food Corp. (In re Big V Holding Corp.)*, 267 B.R. 71, 92 (Bankr. D. N.J. 2001) (citing *Voest-Alpine Trading USA, Corp. v. Vantage Steel Corp.*, 919 F.2d 206, 21113 (3d Cir. 1990); *United States v. Tabor Court Realty Corp.*, 803 F.2d 1288, 1303 (3d Cir. 1986); *In re Crowthers McCall Pattern, Inc.*, 120 B.R. 279, 290 (Bankr. S.D.N.Y. 1990)).

[968] *See Bank of N.Y. Mellon Trust Co.*, 29 A.3d at 228.

[969] *See id.* at 239 ("The Court of Chancery added a second layer of the analysis, which it described as 'doctrinal hindsight,' to conclude that the *Sharon Steel* holding 'fits within the step-transaction framework' and proceeded to apply that analytical framework to the facts of this case.")

[970] *See id.* at 239, 244 ("The Court of Chancery could have ended its analysis with the above-described application of the *Sharon Steel* holding to the facts of this case.").

[971] *See id.* at 244.

substantially linked."[972] Courts apply three alternative tests in determining whether to invoke the step transaction doctrine.[973]

> First, under the "end result test," the doctrine will be invoked "if it appears that a series of separate transactions were prearranged parts of what was a single transaction, cast from the outset to achieve the ultimate result." Second, under the "interdependence test," separate transactions will be treated as one if "the steps are so interdependent that the legal relations created by one transaction would have been fruitless without a completion of the series." The third and "most restrictive alternative is the binding-commitment test under which a series of transactions are combined only if, at the time the first step is entered into, there was a binding commitment to undertake the later steps."[974]

The circumstances surrounding the transactions need only satisfy one of the tests in order for the step transaction doctrine to apply.[975]

The Unsecured Noteholders have asserted that the transactions at issue satisfy both the end result test and the interdependence test and, as a result, should be aggregated for the "substantially all" analysis.[976] The Unsecured Noteholders do not attempt to argue that the transactions would fit within the binding commitment test and the Investigation has found no evidence of a binding commitment that required ResCap to forgive the intercompany debt and to enter into the January 2009 Bank Transaction.

The Unsecured Noteholders argue that their claim satisfies the end result test because the 2009 Bank Transaction and the intercompany debt forgiveness were part of a single plan of self preservation designed by AFI. Under the end-result test, a series of closely related steps in a transaction will be treated as a single transaction if the steps were taken to reach a particular end result.[977] It focuses upon the actual intent of the parties at the time of the transactions. The transactions will not be viewed as one unless it can be shown that at the time the parties engaged in each of the individual steps, they contemplated a single end result.[978]

The Examiner considered whether the transactions were in fact "prearranged parts" of a single transaction "cast from the outset to achieve the ultimate result." Before the 2009 Bank

---

[972] *See id.* at 239.

[973] *See id.* at 240.

[974] *Id.* (citing *Noddings Inv. Grp., Inc. v. Capstar Commc'ns, Inc*, 1999 WL 182565 (Del. Ch. Mar. 24, 1999), *aff'd* 741 A.2d 16 (Del. 1999)).

[975] *See Bank of N.Y. Mellon Trust Co., N.A.*, 29 A.3d at 240.

[976] Wilmington Trust Submission Paper, dated Mar. 8, 2013, at 7, 9, 57.

[977] *See Kornfeld v. Comm'r*, 137 F.3d 1231, 1235 (10th Cir. 1998); *G.D. Parker, Inc. v. Comm'r*, 2012 WL 5935661, at *10 (U.S. Tax. Ct. 2012); *Greene v. U.S.*, 13 F.3d 577, 583 (2d Cir. 1994).

[978] *See G.D. Parker, Inc. v. Comm'r,* 2012 WL 5935661, at *11 (U.S. Tax. Ct. 2012).

Transaction, the Investigation uncovered evidence that AFI intended to acquire Ally Bank in connection with AFI's conversion to a bank holding company.[979] A bankruptcy filing by ResCap could have jeopardized AFI's ability to acquire the bank either by delaying FDIC approval of the transfer, allowing a purchaser to acquire ResCap's shares of IB Finance through a bankruptcy auction or by giving the FDIC cause to seize the bank.[980] The capital infusions into ResCap and its operating subsidiaries allowed ResCap to maintain its TNW covenants and, in January 2009, AFI obtained Ally Bank. By that time, AFI had become a bank holding company and AFI was operating under the assumption that it would be imprudent to allow a subsidiary of a bank holding company to file for bankruptcy.[981] ResCap needed to continue meeting its TNW covenants in order to avoid filing for bankruptcy. It is undisputed that throughout 2009, ResCap forgave intercompany debt owed to it by its operating subsidiaries. The Investigation uncovered evidence that these transactions were intended to enable ResCap and its operating subsidiaries to meet their TNW covenants and liquidity needs, which avoided a ResCap bankruptcy filing.[982] As a result, the Examiner concludes while it is a close question, it is more likely than not that a court would find that the 2009 Bank Transaction and the intercompany debt forgiveness transactions were part of a plan to reach the end result of obtaining and maintaining Ally Bank.

The Unsecured Noteholders also assert that their claim satisfies the interdependent test because the acquisition of Ally Bank would have been futile without the intercompany debt forgiveness.[983] The interdependence test is a variation of the end result that requires a court to determine "whether the individual steps had 'independent significance or whether they had meaning only as part of a larger transaction.'"[984] The Examiner reviewed whether the transactions were distinct corporate events that could have stood on their own merits and would not have been fruitless in isolation. Although the 2009 Bank Transaction may have been interdependent on the intercompany debt forgiveness transactions, the intercompany debt

---

[979] *See* Section V.A.3.b.

[980] *See* Section V.A.1.c(1) (discussing early consideration of an IB Finance/All Bank sale) (citing to Agenda and Supporting Materials, GMAC Board of Directors Meeting, Sept. 30, 2008, at ALLY_PEO_0003722 [ALLY_PEO_0003715]; Int. of S. Ramsey, Dec. 10, 2012, at 157:24–158:4 ("The joint ownership of the bank could've been very disruptive with the regulators. If there was a single ownership of the bank by GMAC when a [ResCap bankruptcy] occurred, if it was to occur, it would be less risk. It was that simple.")).

[981] *See* Int. of A. de Molina, Nov. 20, 2012, at 170:6–172:25 (explaining that a bankruptcy filing by ResCap after AFI obtained bank holding status would be imprudent and could risk AFI's relationship with the FDIC); *see also* Int. of T. Marano, Nov. 26, 2012, at 157:1–12 ("Once we became a bank holding company, it—one of the key reasons why [ResCap] didn't think [ResCap would] ever file is . . . that [the Fed] had never let a subsidiary of a bank holding company file for bankruptcy before.").

[982] Unanimous Consent to Action by the GMAC Board, dated Dec. 30, 2009, at ALLY_0115311-19 [ALLY_0114717]; Material for a GMAC Board of Directors Meeting, dated Sept. 30, 2008 [ALLY_PEO_0003715]; *see* ResCap—Intercompany Transactions—Draft Presentation, prepared by Morrison Foerster and FTI Consulting, dated April 4, 2013, at 12 [EXAM00345894].

[983] Wilmington Trust Submission Paper, dated Mar. 8, 2013, at 9–10.

[984] *Greene v. United States*, 13 F.3d 577, 584 (2d Cir. 1994) (citing *Penrod v. Comm'r*, 88 T.C. 1415, 1430 (Tax Ct. 1987)); *see also Kornfeld v. Comm'r*, 137 F.3d 1231, 1235 (10th Cir. 1998).

forgiveness transactions had their own independent significance apart from the 2009 Bank Transaction in that the transactions enabled ResCap's operating subsidiaries to maintain their TNW covenants. As a result, the Examiner concludes that it is unlikely that a court would find that the interdependency test warrants aggregation of the intercompany debt forgiveness transactions with the 2009 Bank Transaction.

Although the transactions may satisfy the step-transaction doctrine if they trigger the end-result test, given the holding in *Liberty Media Corp.*, it is unlikely that a court would apply the step-transaction test but would instead apply the *Sharon Steel* standard. Under that test, as noted above, the Examiner concludes that it is more likely than not that the Unsecured Noteholders' argument to aggregate the transactions would fail.

### *(ii) Transfer of Substantially All Of ResCap's Assets*

Should a court nevertheless find that the transactions could be aggregated, the issue of whether the transactions at issue constituted a transfer of "substantially all" of ResCap's assets in the context of the 2005 Indenture would still need to be determined. The case law interpreting the "all or substantially all" language in context of successor obligor clauses is limited.[985] The first published case to interpret the meaning of "substantially all" in the context of an indenture found that the sale of stock held in another company constituted a sale of "substantially all" of the corporation's assets because the stock comprised more than 75% of the corporation's total assets and was the only substantial income-producing asset.[986] Since then, courts have not applied a mechanical test to determine if a transfer involves "all or substantially all" of a corporation's assets, but instead examine all facts and circumstances surrounding the transfer using both qualitative and quantitative analyses.[987]

---

[985] Given the lack of guidance in context of an indenture, a court may consider case law deciding "substantially all" in context of shareholder-protection statutes. Shareholder-protection statutes prohibit a corporation from selling all or substantially all of its assets without shareholder approval. *See, e.g.*, N.Y.CLS BUS. CORP. § 909 (requires approval of two thirds of the stockholders entitled to vote if a corporation desires to transfer not in the regular course of its business all or substantially all of its assets that are essential to the conduct of the business of the corporation); Del. Code Ann. Tit. 8, § 271 (requires majority shareholder vote of approval before the corporation may sell lease or exchange all or substantially all of its property and assets).

At least one court has held that cases interpreting "substantially all" in context of shareholder-protection statutes are helpful in interpreting "substantially all" in context of an indenture. *U.S. Bank Nat'l Ass'n v. Angeion Corp.*, 615 N.W.2d 425, 432 (Minn. Ct. App. 2000) ("Because the shareholder-protection statutes have identical language and a similar purpose, we conclude that these interpretations may have affected the parties' understanding at the time they entered the indenture and thus are relevant to intent and reasonable expectations.").

[986] *B.S.F. Co. v. Philadelphia Nat'l Bank*, 204 A.2d 746, 750 (Del. 1964) (applying Pennsylvania law to determine whether a corporation transferred "substantially all" of its assets when it sold a substantial block of another company's stock).

[987] *See, e.g.*, *Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*, 691 F.2d 1039, 1050–51 (2d Cir. 1982); *Bank of N.Y. v. Tyco Int'l Grp., S.A.*, 545 F. Supp. 2d 312 (S.D.N.Y. 2008); *In re BankAtlantic Bancorp, Inc. Litig.*, 39 A.3d 824, 843 (Del. 2012); *Angeion Corp.*, 615 N.W.2d 425 (holding that, under New York law, the "substantially all" provision on an indenture is measured both quantitatively and qualitatively, but there was genuine issues of material facts that precluded summary judgment on trustee's claim for breach of the substantially all provision in the underlying indenture).

A qualitative analysis considers whether the transfer violated the intent of the lenders and whether the transfers rendered the issuer incapable of operating as a going concern.[988] A quantitative analysis, on the other hand, may look to the percentage of operating revenue, operating profits, operating assets, or total assets transferred.[989] Transfers involving higher percentages of a corporation's assets are more likely to be deemed a transfer of "all or substantially all" of the assets of the corporation, regardless of the character or nature of the assets being sold.[990] Less weight will be given to the percentage significance of the assets transferred if such assets are central to the corporation's business.[991]

The Unsecured Noteholders argue that a quantitative and qualitative analysis supports their position that the forgiveness of intercompany debt and the transfer of ResCap's interest in IB Finance constitute a transfer of significantly all of ResCap's assets by 2009, or alternatively, by 2010.[992] The Examiner first considered the quantitative factors of the transactions at issue to determine the percentage of transferred assets in relation to ResCap's total assets and operating assets held prior to the 2009 Bank Transaction.[993]

---

[988] *See In re BankAtlantic Bancorp, Inc. Litig.*, 39 A.3d at 842 (applying New York law to determine whether a transaction conveyed "substantially all" of a company's assets).

[989] *See id.* at 838–42 (applying New York law to determine whether a transaction conveys "substantially all" of a company's assets).

[990] *See id.* (finding that a proposed sale transaction would constitute a transfer of "substantially all" of the corporation's assets because the transaction conveyed 85–90% of the corporation's assets and would transform completely the nature of the corporation's operations).

[991] *See id.*

[992] The Unsecured Noteholders in their Submission Paper argue that ResCap's forgiveness of intercompany debt owed to it between 2008 through 2009 was part of the AFI's plan of self-preservation. *See* Wilmington Trust Submission Paper, dated Oct. 24, 2012, at 17; Wilmington Trust Submission Paper, dated Mar. 8, 2013, at 7. To support this argument, the Unsecured Noteholders provided two separate "substantially all" analysis. The first analyzed the intercompany debt forgiveness from 2008 through 2009. Supplement to Wilmington Trust's Submission Paper, dated Dec. 11, 2012. The second, however, analyzed the intercompany debt forgiveness from 2009 through 2010. Supplement to Wilmington Trust's Submission Paper, dated Mar. 22, 2013.

[993] Courts have considered what percentage of operating revenue, operating profit or book value of the transferred assets represented in deciding whether a "substantially all" provision in an indenture has been triggered. *See Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*, 691 F.2d 1039, 1051 (2d Cir. 1982) (considering operating revenues, operating profits, and book value of operating assets and total assets); *In re BankAtlantic Bancorp, Inc. Litig.*, 39 A.3d at 839 (considering book value of total assets); *U.S. Bank Nat'l Ass'n v. Angeion Corp*., 615 N.W.2d 425, 433 (Minn. Ct. App. 2000) (applying New York law and holding that without information on operating revenue, operating profit or book value of the transferred assets, "it is nearly impossible to weigh any of the factors that have been used by the courts to determine whether a corporation has transferred all or substantially all assets").

An analysis of operating revenues or operating profits was not applicable as ResCap's two primary revenue sources in 2008 were net financing revenues and gains on extinguishment of debt of $133 million and $1.925 billion, respectively. *See* Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2009), at 216.

As reported in its annual report on Form 10-K for the year ended December 31, 2008, the most recent annual filing before the 2009 Bank Transaction, ResCap's total assets as of that date had a book value of approximately $12.422 billion.[994] ResCap's total assets primarily were comprised of equity interests in its subsidiaries, intercompany receivables owed to ResCap by its subsidiaries, and additional assets including cash, accounts receivables and other assets.[995] The book value of ResCap's total assets as of December 31, 2008 are summarized below:

EXHIBIT VIII.C.5.a(3)(a)(i)(A)(ii)
**ResCap Total Assets**
As of December 31, 2008
*($ in Millions, rounded)*

| Total Assets | | Book Value 12/31/2008 |
|---|---|---|
| Cash and cash equivalents | $ | 563 |
| Accounts receivable | | 49 |
| Intercompany loans receivable: | | |
| Note receivable from RFC | | 3,042 |
| Note receivable from GMAC Holding | | 2,610 |
| Subtotal | | 5,651 |
| | | |
| Investment in subsidiaries: | | |
| RFC Holding | | 1,970 |
| GMAC Holding | | 1,819 |
| Ally Bank | | 1,829 |
| Other | | 46 |
| Subtotal | | 5,664 |
| | | |
| Other assets | | 495 |
| | | |
| Total assets | $ | 12,422 |

*Source: ResCap HoldCo Balance Sheets Analysis, prepared by ResCap [EXAM00345975]; Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2009), at 215.*

---

[994] Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2009), at 215. Given the holding in *Sharon Steel,* the quantitative analysis looked to ResCap's assets at the time AFI allegedly adopted the plan to liquidate—prior to the 2009 Bank Transaction—and compared them to the assets transferred at the end of 2009 and 2010.

[995] *Id.*

The quantitative analysis considered both the book value and FMV of the assets transferred.[996] On a book value basis, ResCap's transfer of its interest in Ally Bank and the debt forgiveness transactions in 2009 resulted in an approximate 47.0% reduction in ResCap total assets and an approximate 51.6% reduction in ResCap's operating assets.[997] Alternatively, ResCap's transfer of its interest in Ally Bank and the debt forgiveness transactions that took place in 2009 and adding debt forgiveness transactions that took place in 2010 resulted in an approximate 52.0% to 57.1% reduction in ResCap's total assets and operating assets, respectively. The book value analysis can be found at Appendix VIII.C.6.c.

On a FMV basis, ResCap's transfer of its interest in Ally Bank and the debt forgiveness transactions that took place in either 2009 or in 2009 throughout 2010 resulted in an approximate 34.8% reduction in ResCap's total assets and an approximate 100% reduction in ResCap's operating assets. The FMV analysis can also be found at Appendix VIII.C.6.c.

In contrast to the book value analysis, the FMV analysis contained certain fair-value adjustments to ResCap's equity interest in its subsidiaries, Ally Bank, RFC Holding and GMAC Holding, and ResCap's intercompany receivables owed by RFC and GMAC Holding, and their subsidiaries, at December 31, 2008. Specifically, ResCap's equity interest in Ally Bank was reduced to $592 million, or the value of the IB Finance Preferred Interests and the Remaining IB Finance Class M Shares transferred in connection with the 2009 Bank Transaction.[998] ResCap's equity interests in RFC Holding and GMAC Holding, the holding companies of RFC and GMAC Mortgage, were valued at zero as the Examiner concluded that RFC and GMAC Mortgage each: (1) was balance sheet insolvent from December 31, 2007, through the Petition Date; (2) had unreasonably small capital (assets) from August 15, 2007, through the Petition Date; and (3) reasonably should have believed that it would incur debts beyond its ability to pay from August 15, 2007, through the Petition Date.[999] As a result of RFC's and GMAC Mortgage's insolvency, ResCap's intercompany receivables due from RFC and GMAC Holding, and their subsidiaries, were also impaired. See Section VI.E.3 for further discussion regarding financial distress of ResCap's subsidiaries. The FMV analysis can be found at Appendix VIII.C.6.c.

In light of the holding in *Sharon Steel,* a court may place less emphasis on qualitative factors in concluding that there has been no transfer of "substantially all" assets when less than 50% of a company's total and operating assets have been transferred. On the other hand,

---

[996] While most courts consider book value of the transferred assets, "[n]othing in New York law suggests that a court is limited to book value when evaluating a parent corporation's 100% equity interest in an operating subsidiary." *In re BankAtlantic Bancorp, Inc. Litig.*, 39 A.3d at 839 (the court, however, considered the book value of total assets given that it was a conservative metric).

[997] For purposes of this quantitative analysis, the operating assets include the equity interests in its subsidiaries and the intercompany receivables. It is not entirely clear whether the intercompany receivables would constitute "operating assets" in context of a "substantially all" analysis, but the analysis includes them for purposes of providing a conservative evaluation of the assets transferred.

[998] *See* Appendix V.A.2.d.(6). For purposes of this analysis, the midpoint of the range of value for the IB Finance Preferred Interests and the remaining IB Finance Class M Shares (non-marketable, non-controlling) at January 30, 2009 was utilized.

[999] *See* Section VI.E.2.

it is unclear as to what percentage over 50% will be so compelling to resolve the question of whether a transaction constitutes a transfer of "substantially all" assets based on quantitative factors alone. In *B.S.F. Co. v. Philadelphia Nat'l Bank,* the court held that the sale of a company's asset constituted a sale of "substantially all" assets because the asset comprised more than 75% of the corporation's total assets and was the only substantial income-producing asset.[1000] In *In re BankAtlantic Bancorp, Inc. Litigation,* the court held that a proposed sale transaction would constitute a transfer of "substantially all" of the corporation's assets because the transaction conveyed 85-90% of the corporation's assets and would transform completely the nature of the corporation's operations.[1001] The *B.S.F.* court and the *BankAtlantic* court both took into account the qualitative nature of the transferred assets despite the high percentage of the quantitative factors.

Similar to *Sharon Steel*, the book value of operating assets and total assets transferred by ResCap in 2009 fall within a range that is less than or barely above 50%. However, the quantitative analysis also took into account (1) the FMV of operating assets and total assets transferred in 2009 and (2) the book value and FMV of the operating assets and total assets transferred in 2009 through 2010. Combining the two different types of analyses changes the total range of percentages from thirty-four percent to one-hundred percent. This uncertainty does not present a clear quantitative conclusion. As a result, the Examiner weighed both the quantitative and qualitative factors as a totality.[1002]

"The guiding inquiry when evaluating a transaction qualitatively is whether the debtor 'would cease to operate the business to which, in practical effect the [noteholders] have looked for payment of the [notes].'"[1003] In ResCap's annual report for the year ended December 31, 2008, ResCap listed its businesses as including "the origination, purchase, servicing, sale and securitization of residential mortgage of loans."[1004] The transactions at issue did not alter the fundamental nature of ResCap's business. By the end of 2009, ResCap was conducting its operations through two operating businesses, its core originating and servicing business and its non-core asset business.[1005] ResCap's non-core asset management business included the legacy Principal Investment Activity, Business Capital Group, and International Business Groups.[1006] From a qualitative perspective, the evidence does not support the proposition that the transactions completely changed the nature of ResCap's operations. ResCap continued operating after the 2009 Bank Transaction substantially as before the sale.

---

[1000] *See B.S.F. Co. v. Philadelphia Nat'l Bank*, 204 A.2d 746, 750 (Del. 1964) (applying Pennsylvania law to determine whether a corporation transferred "substantially all" of its assets when it sold a substantial block of another company's stock).

[1001] *See In re BankAtlantic Bancorp, Inc. Litig.*, 39 A.3d at 838–42.

[1002] *See id.* at 838 ("In the typical case involving a significant sale, however, a court will need to weigh both quantitative and qualitative factors as a totality.").

[1003] *Id.* at 843 (Del. 2012) (applying New York law in evaluating whether the qualitative factors of a transaction).

[1004] *See* Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2009), at 3.

[1005] ResCap Consolidated Financial Statements for the Years Ended December 31, 2009 and 2008, at EXAM00124464 [EXAM00124455].

[1006] ResCap Consolidated Financial Statements for 2009, at EXAM11163041 [EXAM11163031].

Because the quantitative analysis on its own does not clearly demonstrate a transfer of "substantially all" assets and the character of the assets transferred did not transform the operations of ResCap, the Examiner concludes that it is more likely than not that a court would not find there was an actual breach of the "all or substantially all" covenant of the 2005 Indenture. Without an actual breach of the 2005 Indenture, the Unsecured Noteholders could not pursue a tortious interference with contract claim against AFI.

### (b) AFI's Intentional Procurement Of ResCap's Breach Of The 2005 Indenture Without Justification

Given that a court might find—contrary to the conclusion of the Examiner—that there was a breach of the "substantially all" covenant of the 2005 Indenture, the Investigation considered whether AFI could be found to have tortiously interfered with the contract by intentionally procuring ResCap's breach of the 2005 Indenture without justification. "[D]eliberate or intentional interference may be shown where the defendant is certain, or substantially certain, that his actions will result in a breach of contract."[1007] The Unsecured Noteholders must be able to show that AFI was at least substantially certain that its actions would result in a breach of the 2005 Indenture.[1008] If intentional procurement of the breach can be established, AFI may rebut liability for tortious interference by raising the economic interest defense, which would require AFI to show that it acted to protect its own legal or financial stake in the breaching party's business.[1009]

The Unsecured Noteholders allege that AFI intentionally procured, without justification, the breach of the "substantially all" covenant of the 2005 Indenture by dictating ResCap's role in the 2009 Bank Transaction and ordering ResCap to engage in the intercompany debt forgiveness transactions for AFI's ultimate benefit.[1010] Further, the Unsecured Noteholders

---

[1007] *High Falls Brewing Co., LLC v. Boston Beer Corp.*, 852 F. Supp. 2d 306, 311 (W.D.N.Y. 2011) ("The rule applies . . . to an interference that is incidental to the actor's independent purpose and desire but known to him to be a necessary consequence of his action.") (citing RESTATEMENT (SECOND) OF TORTS § 766, comment j (1979)); *see also In re Refco Inc. Sec. Litig.*, 826 F. Supp. 2d 478, 521 (S.D.N.Y. 2010) ("Whatever the Defendants might have intended by their alleged wrongs, their goal was not to cause a breach of contractual relations . . . [a]t best any breach . . . was a collateral effect of the Defendants' [actions]."); *Watt v. Jackson Hewitt Tax Serv. Inc.*, 675 F. Supp. 2d 274, 282 (E.D.N.Y. 2009) (citing *Innovative Networks, Inc. v. Young*, 978 F. Supp. 167, 180 (S.D.N.Y. 1997)).

[1008] *See High Falls Brewing Co., LLC*, 852 F. Supp. 2d at 311–12.

[1009] *White Plains Coat & Apron Co., Inc. v. Cintas Corp.*, 867 N.E.2d 381, 383 (N.Y. 2007); *see Felsen v. Sol Café Mfg. Corp.*, 24 N.Y.2d 682, 687 (N.Y. 1969) (noting that a corporation that has a financial interest in the business of another "is privileged to interfere with a contract with that . . . business had with a third person . . . to protect [its] own interest," as long as it does so without employing improper means); *Picard v. Chais (In re Bernard L. Madoff Inv. Secs. LLC)*, 440 B.R. 282, 294 (Bankr. S.D.N.Y. 2010) ("Under New York law, actions taken to protect an economic interest are justified and cannot give rise to a tortious interference with contract claim.").

[1010] Motion of Wilmington Trust, National Association, Solely in its Capacity as Indenture Trustee for the Senior Unsecured Noteholders Issued by Residential Capital, LLC for an Order Authorizing it to Prosecute Claims and Other Causes of Action on Behalf of the Residential Capital, LLC Estate [Docket No. 3475], Ex. B, at 48; Wilmington Trust Submission Paper, dated March 8, 2013, at 5–7.

claim that AFI's actions were unjustified because the transactions "were neither fair or on arm's length terms, were contrary to the promise [AFI] made in the Operating Agreement, and were improper means of promoting AFI's interests . . . at a time when AFI knew that the companies' respective interests in these transactions were diametrically opposed."[1011]

The Debtors and AFI assert that there is no evidence that AFI intentionally induced ResCap to breach the "substantially all" covenant of the 2005 Indenture because ResCap (1) forgave intercompany debt after written consent by the ResCap Board and (2) entered into the 2009 Bank Transaction based on advice from its independent advisors and approval by the ResCap board.[1012] To the extent AFI intentionally induced the breach, AFI and the Debtors argue that AFI was economically justified in doing so in order to protect "its interest in ResCap and/or advancing ResCap's own financial interests, and there has been no showing of malice, fraud, or illegality."[1013]

There is evidentiary support that AFI was aware of the "substantially all" covenant of the 2005 Indenture.[1014] The Investigation, however, did not uncover any evidence that AFI intended the 2009 Bank Transaction and the intercompany debt forgiveness to cause a breach of the 2005 Indenture. AFI's goal, to the extent the transactions could be aggregated as suggested by the Noteholders, was to acquire and maintain Ally Bank. The breach of the "substantially all" covenant of the 2005 Indenture was therefore a collateral effect of AFI's alleged role in the transactions. Even if AFI intentionally procured the breach, however, the Examiner concludes that it is likely that an economic interest defense would prevail.

In response to a tortious interference claim, a defendant may raise the economic interest defense to defeat a tortious interference claim if the defendant acted to protect its own legal or financial stake in the breaching party's business.[1015] Therefore, "where a third party has an 'economic interest' in an entity and interferes with an existing contractual relationship between the plaintiff and that entity, such interference is considered privileged."[1016] Liability

---

[1011] Motion of Wilmington Trust, National Association, Solely in its Capacity as Indenture Trustee for the Senior Unsecured Noteholders Issued by Residential Capital, LLC for an Order Authorizing it to Prosecute Claims and Other Causes of Action on Behalf of the Residential Capital, LLC Estate [Docket No. 3475], Ex. B, at 48.

[1012] *See* Debtors' Submission Paper, dated Jan. 7, 2013, at 31; *see* AFI Submission Paper, dated Dec. 19, 2012, at A-7.

[1013] AFI Submission Paper, dated April 12, 2013, at 21.

[1014] For instance, after Tessler suggested to De Molina that AFI consider exchanging ResCap notes held by AFI for ResCap's in IB Finance, De Molina responded that "perhaps the servicing business works in as well." E-mail from A. de Molina to L. Tessler (Aug. 9, 2008) [CCM00121378]. Tessler, however, noted that "[w]e can't hollow out all of ResCap or we are going to have a problem with Bonds." *Id*.

[1015] *See Howe v. Bank of N.Y. Mellon*, 783 F. Supp. 2d 466 (S.D.N.Y. 2011); *White Plains Coat & Apron Co. v. Cintas Corp.*, 460 F.3d 281 (2d Cir. 2006); *Foster v. Churchill*, 665 N.E.2d 153 (N.Y. 1996).

[1016] *Id.* at 283 (citing *Foster*, 665 N.E.2d 153; *Felsen v. Sol Café Mfg. Corp.*, 24 N.Y.2d 682, 687 (1969)).

for tortious interference may still be imposed in spite of a defense of economic interest if it can be shown that the interfering party acted with malice or employed fraudulent or illegal means to procure the breach of contract.[1017]

A parent corporation is generally presumed to have an economic interest in its subsidiaries and its subsidiaries' contracts.[1018] The relationship between a parent and its subsidiary, however, is not enough to establish an economic justification; the parent must also establish that it acted to protect its economic interest.[1019] The case of *WMW Machinery Co., Inc. v. Koerber AG* is instructive. The case involved a corporation that acquired manufacturers who had exclusive distribution contracts with a certain distributor and then terminated the contracts. The court found such termination to be economically justified because the corporation, as parent to the manufacturers, had an economic interest in the manufacturers and that the distributor was not performing under the contract. Given that the corporation did not employ fraudulent or illegal means and did not act maliciously, the corporation's economic justification for the termination of the contracts precluded the distributor's claims of tortious interference with contract.[1020]

ResCap is a wholly-owned, indirect subsidiary of AFI.[1021] As its parent, AFI held an economic interest in ResCap during the 2009 Bank Transaction and throughout ResCap's intercompany debt forgiveness transactions. Before the 2009 Bank Transaction, it was apparent to AFI that it had to support ResCap if it wanted to preserve the full benefits of Ally

---

[1017] *Armstrong Pump, Inc. v. Hartman*, 745 F. Supp. 2d 227, 239 (W.D.N.Y. 2010) (citing *Foster*, 665 N.E.2d 153); *see also Howe v. Bank of N.Y. Mellon*, 783 F. Supp. 2d at 481 (citing *Vinas v. Chubb Corp.*, 499 F. Supp. 2d 427, 431 (S.D.N.Y 2007)) (noting that to the extent a defendant has an economic interest in the contract, a plaintiff must demonstrate that interference with the contract was malicious or involved conduct rising to the level of criminality or fraud."); *Shaker Loudon Assocs. v. Burlington Coat Factory Warehouse Corp.,* 1996 U.S. Dist. LEXIS 5228, at *3 (W.D.N.Y. Apr. 16, 1996) (holding that a complaint properly alleged malice on the part of a corporate parent by claiming that the parent interfered with its subsidiary's contract "without legal or moral justification . . . and an outrage warranting the imposition of punitive damages"); *Felsen v. Sol Café Mfg. Corp.*, 24 N.Y.2d 682, 687 (1969).

[1018] *See, e.g.*, *Multi-Juice, S.A. v. Snapple Beverage Corp.*, 2003 WL 1961636, at *4 (S.D.N.Y. Apr. 25, 2003) (citing *Koret Inc. v. Christian Dior, S.A.*, 161 A.D.2d 156, 157 (N.Y. App. Div. 1990)); *Koret, Inc.,* 161 A.D.2d at 157 (given the evidence that indicated that the parent interfered with its subsidiary's contract to protect its economic interest, the parent could not be liable for tortious interference with contract); *MTI/Image Grp. v. Fox Studios E.,* 240 A.D.2d 400 (N.Y. Sup. Ct. 1997) (dismissing of a tortious interference with contract claim asserted against a parent company because the parent had an economic interest in the subsidiary's contract, the plaintiff failed to demonstrate malice, and the corporate agent who allegedly committed the tort also acted as agent for the subsidiary in negotiating and executing the underlying contract).

[1019] *MDC Corp. v. John H. Harland Co.*, 228 F. Supp. 2d 387, 39899 (S.D.N.Y. 2002) (citing *U.S. Fid. & Guar. Co. v. Petroleo Brasileiro S.A. Petrobras*, 2001 WL 300735, at *24 (S.D.N.Y. Mar. 27, 2001); *Preferred Health Care, Ltd. v. Empire Blue Cross & Blue Shield*, 1997 WL 160489, at *3 (S.D.N.Y. Apr. 7, 1997)).

[1020] *WMW Mach. Co., Inc. v. Koerber AG*, 658 N.Y.S.2d 385 (N.Y. Sup. Ct. 1997).

[1021] *See* Section III.B.1.

Bank and ensure its own survival.[1022] Without AFI's support, ResCap faced the possibility of failing to meet its TNW covenants.[1023] If ResCap or its operating subsidiaries defaulted on their TNW covenants, ResCap most likely would have been forced to file for bankruptcy.[1024] A bankruptcy filing by ResCap would have had a negative impact on AFI for several reasons. First, it could have required AFI to renegotiate its covenants with its lenders.[1025] In the environment at the time, AFI believed that it was highly uncertain whether renegotiation could be accomplished and, if so, at what price.[1026] AFI also believed that the failure to renegotiate could result in its own bankruptcy filing and the loss of substantial enterprise value.[1027]

Second, AFI believed that a bankruptcy filing by ResCap could jeopardize AFI's acquisition of Ally Bank. As described in more detail in Section V.A.1.c(1)., in December 2008, AFI considered acquiring ResCap's interest in IB Finance to facilitate approval of its bank holding application and to simplify Ally Bank ownership."[1028] AFI believed that a bankruptcy filing by ResCap would have interfered with AFI's future acquisition of Ally Bank.

As discussed above, the 2009 Bank Transaction and ResCap's intercompany debt forgiveness were intended to enable ResCap and its operating subsidiaries to meet their TNW covenants and liquidity needs.[1029] This enabled ResCap to avoid defaulting on its TNW covenants, thereby avoiding filing for bankruptcy, and AFI was able to acquire and maintain Ally Bank. The Examiner therefore concludes that the evidence supports the proposition that AFI had a legitimate business purpose and acted to protect its economic interest to the extent AFI procured the breach of the 2005 Indenture.

---

[1022] *See* Section V.A.1.c(1). The AFI Board considered that bankruptcy filing by ResCap could necessitate AFI to renegotiate its covenants with its lenders and, given the environment at the time, it was uncertain whether it could be accomplished and, if so, at what price. Material for a GMAC Board of Directors Meeting, dated Sept. 30, 2008, at 4 [ALLY_PEO_0003715]. To the extent AFI failed to renegotiate covenants, it could result in a bankruptcy proceeding by AFI and the loss of substantial enterprise value. *See id.*

[1023] Unanimous Consent to Action by the GMAC Board of Directors, dated Dec. 30, 2009, at ALLY_0115311 [ALLY_0114717]; Material for a GMAC Board of Directors Meeting, dated Sept. 30, 2008 [ALLY_PEO_0003715].

[1024] Unanimous Consent to Action by the GMAC Board of Directors, dated Dec. 30, 2009, at ALLY_0115311 [ALLY_0114717]; Material for a GMAC Board of Directors Meeting, dated Sept. 30, 2008 [ALLY_PEO_0003715].

[1025] Material for a GMAC Board of Directors Meeting, dated Sept. 30, 2008, at 4 [ALLY_PEO_0003715].

[1026] *Id.*

[1027] *Id.*

[1028] GMAC Bank Transaction Update for the Board of GMAC LLC, dated Sept. 29, 2008, at 1 [ALLY_0238653].

[1029] Unanimous Consent to Action by the GMAC Board of Directors, dated Dec. 30, 2009, at ALLY_0115311 [ALLY_0114717]; Material for a GMAC Board of Directors Meeting, dated Sept. 30, 2008 [ALLY_PEO_0003715].

Further, the Investigation did not uncover any evidence that AFI employed malice, fraud, or illegality in connection with the 2009 Bank Transaction and the intercompany debt forgiveness transactions.[1030] As noted in Section V.A.2, the Examiner found that neither the 2008 Bank Transaction nor the 2009 Bank Transaction resulted in ResCap receiving less than reasonably equivalent value or were a result of actual fraud or other illegality. In fact, the Examiner found that the value of the consideration received by ResCap with respect to the 2008 Bank Transaction and the 2009 Bank Transaction likely exceeded the value of the assets transferred by ResCap. With respect to the intercompany debt forgiveness transactions, the investigation did not uncover any evidence that AFI intended to injure ResCap or employed any fraudulent or illegal means to the extent AFI procured the breach of the 2005 Indenture. Instead, the available evidence supports the argument that the intercompany debt forgiveness transactions were done to ensure that ResCap's operating subsidiaries maintained their TNW covenants and liquidity needs for the benefit of ResCap and AFI.

The Examiner finds that the evidence does not support the proposition that AFI intentionally procured ResCap's breach of the "all or substantially all" covenant of the 2005 Indenture without justification and, therefore, the Examiner concludes it is unlikely that the Unsecured Noteholders tortious interference with contract claim against AFI would prevail.

### b.  Claims Related To The 2006 Bank Restructuring

As summarized in Section VII.L.1.a, there are troubling facts and circumstances in connection with the 2006 Bank Restructuring,[1031] which raise questions concerning whether AFI complied with the 2005 Operating Agreement regarding that transaction. Pursuant to the analysis in Section V.A.2.b and as summarized in Section V.A.1.a(5), the Examiner has concluded that ResCap did not receive reasonably equivalent value in the 2006 Bank Restructuring, in large measure because ResCap was not compensated for the non-voting nature and other qualities of the IB Finance Class M Shares received by ResCap in the transaction.[1032] The Unsecured Noteholders are intended third-party beneficiaries of the 2005 Operating Agreement.[1033] This Section considers potential claims by the Unsecured

_____

[1030] *See* Section V.A.

[1031] For a more complete narrative concerning the 2006 Bank Restructuring, refer to Section V.A.1.a.

[1032] ResCap had a controlling interest in Old GMAC Bank; it received 2 million non-voting, non-controlling and relatively unmarketable tracking shares of IB Finance. *See* Section V.A.1.a. The FMV shortfall was between $390–465 million, and the difference in the equity value of Old GMAC Bank and the 2 million IB Finance Class M Shares was between $533 and $608 million. *See* Section V.A.2.b; Appendix V.A.2.b.

[1033] *See* 2005 Operating Agreement, § 11 [ALLY_0140795] ("The holders of Rated Indebtedness and any lenders under any credit facility under which ResCap is a borrower shall be deemed third party beneficiaries of this Agreement.").

Noteholders against AFI for breach of the 2005 Operating Agreement, or for tortiously interfering with it, as well as a potential claim against AFI for fraud.[1034]

### (1) Breach Of Contract

Potential bases for, and obstacles to, a claim by ResCap that AFI breached the 2005 Operating Agreement are outlined in Section VII.L.1.c. Certain of the obstacles discussed there would not apply to a claim by the Unsecured Noteholders, most notably, the doctrine of *in pari delicto* and the *Wagoner* rule. However, the Unsecured Noteholders nonetheless face what appears to be an insurmountable impediment to any contract claim predicated on the 2006 Bank Restructuring: the claim accrued not later than November 22, 2006.[1035] Unlike ResCap, the Unsecured Noteholders do not have the benefit of the two-year extension under Bankruptcy Code section 108.[1036] Consequently, it appears that the putative action would be time-barred under the governing six-year statue of limitations.[1037]

---

[1034] The Examiner considers it more likely than not that a court would find that injuries to the Unsecured Noteholders from the alleged wrongdoing in connection with the 2006 Bank Restructuring are particularized to them in light of their rights under the 2005 Operating Agreement, and that they would have standing to assert such claims. *See Fisher v. Apostolou*, 155 F.3d 876, 881 (7th Cir. 1998) (finding that a group of creditor-investors may be able to show particularized harm based on fraud, separate and distinct to each creditor); *Bankers Trust Co. v. Rhoades*, 859 F.2d 1096, 1100–01 (2d Cir. 1988) (holding that creditor that brought fraud-based claims against debtor's officers had standing to bring RICO claim, despite fact that debtor might also have suffered identical injury for which it had similar right); *Andrew Greenberg, Inc. v. Svane, Inc.*, 830 N.Y.S.2d 358, 361 (N.Y. App. Div. 2007) (holding that plaintiff-creditor's claims for tortious interference with contract and breach of contract alleged a "direct injury to property rights unique to plaintiff rather than the corporation or all of the creditors, and recovery of damages by the corporation would not rectify plaintiff's injury"); *Nw. Racquet Swim & Health Clubs, Inc. v. Deloitte & Touche*, 535 N.W.2d 612, 619 (Minn. 1995) (holding in an action by debenture noteholder for misrepresentation against auditor for insolvent debenture issuer, that the debenture noteholder's claims against auditor were not derivate, and finding that noteholder "also alleges specific misrepresentations in the audit report that affected [noteholder] directly in its decision to purchase the debentures"); *see also Larson v. Ernst & Young*, C3-94-2514, 1995 WL 434466, at *3 (Minn. Ct. App. July 25, 1995). Further, the Examiner concludes in Section VII.L.1 that it is more likely than not that the estate does not have the ability to pursue fraud and breach of contract claims arising under the 2005 Operating Agreement with respect to the 2006 Bank Restructuring. To the extent that such claims are not property of the estate, they are property of creditors. *See In re Bennett Funding Grp., Inc*., 336 F.3d 94, 102 (2d Cir. 2003) (citing *Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114, 120 (2d Cir.1991)).

[1035] The 2006 Bank Restructuring was approved unanimously by the ResCap Board members present at its November 20, 2006 meeting, and the ResCap Board granted a "waiver of the Operating Agreement" by resolution at that meeting. *See* Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Nov. 20, 2006, at RC40006839 [RC40006748]. The transaction closed on November 22, 2006. *See* Residential Capital, LLC, Current Report (Form 8-K) (Nov. 27, 2006), at 2.

[1036] *See* 11 U.S.C. § 108(a).

[1037] *See* 2005 Operating Agreement, § 13 [ALLY_0140795] (New York governing law); *see also* N.Y. C.P.L.R. § 213(2) (six-year limitations for actions on contract).

Accordingly, the Examiner concludes that it is unlikely that a claim by the Unsecured Noteholders against AFI for breach of the express terms of the 2005 Operating Agreement and/or the covenant of good faith and fair dealing thereunder, arising from the 2006 Bank Restructuring, would prevail.[1038]

### (2) Tortious Interference With Contract

As addressed in Section VII.L.1.d, "only a stranger can commit the tort of interference with contract."[1039] Accordingly, the Examiner concludes that it is unlikely that a claim by the Unsecured Noteholders against AFI for tortious interference with the 2005 Operating Agreement would prevail.

### (3) Fraud

Potential bases for, and obstacles to, a claim by ResCap against AFI for fraud arising from the 2006 Bank Restructuring are outlined in Section VII.L.1.b. Certain of the obstacles discussed there would not apply to a claim by the Unsecured Noteholders, most notably, the doctrine of *in pari delicto* and the *Wagoner* rule. The Unsecured Noteholders would nonetheless face a challenging obstacle to a fraud claim predicated on the 2006 Bank Restructuring: the difficulty of establishing the detrimental reliance-in-fact element necessary to prove a claim of fraud. It is possible that such a claim would be governed by the substantive tort law of New York, pursuant to which there may be an avenue to pursue a fraud claim under a "third-party reliance" theory, but the law is unsettled and it is uncertain whether the Unsecured Noteholders could successfully invoke third-party reliance.

#### (a) New York Law Likely Would Apply If The Claim Were Brought In Minnesota; Minnesota Law Likely Would Apply If The Claim Were Brought In New York

As discussed below in Section VIII.C.5.b(3)(b), the viability of the Unsecured Noteholders' fraud claim against AFI may turn in part upon whether they can invoke New York's "third-party reliance" doctrine. The answer to that question may turn on where the claim is heard. The 2005 Operating Agreement has a New York governing law provision.[1040] A New York court would be unlikely to consider that provision in determining the law applicable to a fraud claim, however.[1041] "Under New York's 'interest analysis,' the important factors         determining         the         proper         law         to         apply         are         the

---

[1038] Remedies available to third-party beneficiaries are limited to "specific performance." 2005 Operating Agreement, § 11 [ALLY_0140795]. It may be possible on a showing of conduct that "smacks of intentional wrongdoing" to overcome such a limitation. *See* Section VI.L.1.c(4).

[1039] DAN B. DOBBS, PAUL T. HAYDEN, AND ELLEN M. BUBLICK, THE LAW OF TORTS § 635 (2d ed. 2012).

[1040] 2005 Operating Agreement, § 13 [ALLY_0140795].

[1041] *See, e.g., BrandAid Mktg. Corp. v. Biss*, 03 CIV. 5088 (WHP), 2008 WL 190494, at *4 (S.D.N.Y. Jan. 22, 2008), *aff'd*, 08-0941-CV, 2009 WL 742077 (2d Cir. Mar. 23, 2009) ("While [the choice-of-law] provision is effective as to breach of contract claims, it does not apply to fraud claims, which sound in tort.") (quotation and citation omitted); *see also H.S.W. Enters., Inc. v. Woo Lae Oak, Inc.*, 171 F. Supp. 2d 135, 141 n.5 (Bankr. S.D.N.Y. 2001) (stating that unless expressly agreed upon by the parties or exceptionally broad, contractual choice-of-law provisions do not govern a cause of action sounding in tort).

parties' domiciles and the locus of the tort."[1042] Thus, where the parties are domiciled in different states, the place or location of the tort is "paramount."[1043] Accordingly, a court in New York is unlikely to conclude that New York law would apply to the Unsecured Noteholders' fraud claim against AFI, because New York is not meaningfully connected to the tort. Rather, as addressed in Section VII.L, a New York court likely would apply the substantive law of Minnesota to the claim.

Were the fraud claim brought in a Minnesota court, on the other hand, it is possible that the court would, in deference to the governing law provision of the 2005 Operating Agreement, find that the tort law of New York is applicable. Minnesota law recognizes that "tort claims 'rais[ing] issues of performance' under a contract . . . are governed by the contract's choice-of-law clause."[1044] Minnesota law also holds that it is the law of the forum state which determines the scope of a contract's governing law clause.[1045] Thus, if a fraud action against AFI were brought in Minnesota, a court would likely find that the law of Minnesota, and not that of New York, would determine the applicability to the claim of the New York governing law provision of the 2005 Operating Agreement. Given the entanglement of the fraud claim with the 2005 Operating Agreement, and the authority cited above, it is likely that a Minnesota court would find that the claim falls within the scope of the contract's governing law provision, and therefore that New York law would govern the fraud claim.[1046]

### (b) If The Claim Is Brought In Minnesota, The Unsecured Noteholders May Be Able To Show Reliance Based Upon New York Law

As described in the preceding section, if the Unsecured Noteholders brought a claim for fraud against AFI in a New York court, Minnesota law likely would apply. Conversely, if the

---

[1042] *BrandAid Mktg. Corp.*, 2008 WL 190494, at *4 (quotation and citation omitted); *see also Winter-Wolff Int'l, Inc. v. Alcan Packaging Food & Tobacco Inc.*, 499 F. Supp. 2d 233, 240 (E.D.N.Y. 2007) ("As the tort claim is not covered by the choice of law provision in the contract, this Court must apply New York's interest analysis which gives controlling effect to the law of the jurisdiction which, because of its relationship or contact with the occurrence or the parties, has the greatest concern with the specific issue raised in the litigation.") (quotation and citation omitted); *Krock v. Lipsay*, 97 F.3d 640, 646 (2d Cir. 1996) ("in all interest analyses, the significant contacts are, almost exclusively, the parties' domicile and the locus of the tort." (quotation and citation omitted)).

[1043] *Rosenberg v. Pillsbury Co.*, 718 F. Supp. 1146, 1150 (S.D.N.Y. 1989); *see also Winter-Wolff*, 499 F. Supp. 2d at 241.

[1044] *Ceres Envtl. Serv., Inc. v. Arch Specialty Ins. Co.*, 853 F. Supp. 2d 859, 865 (D. Minn. 2012); *see also Fla. State Bd. of Admin. v. Law Eng'g & Envtl. Serv., Inc.*, 262 F. Supp. 2d 1004, 1012–15 (D. Minn. 2003) (concluding under Minnesota law that contractual Florida choice of law provision applies to tort claims, including breach of fiduciary duty, negligence, and negligent misrepresentation, because they are all "closely related to the parties' contractual relationship").

[1045] *Ceres Envtl. Serv.*, 853 F. Supp. 2d at 866.

[1046] *See, e.g., Fla. State Bd. of Admin.*, 262 F. Supp. 2d at 1014 (finding that negligent misrepresentation claim was "closely related to defendant's performance of the contract because the allegation is premised upon plaintiff's allegation that the report defendant delivered pursuant to the contract did not accurately reflect the condition of the structure, the extent of project repair or the total cost of maintenance").

claim were brought in a Minnesota court, New York law is likely to apply because of the treatment under that state's law of the governing law provision of the 2005 Operating Agreement. This section considers the "reliance" element of a fraud claim under the law of both jurisdictions.

### (i)  The Elements Of Fraud

The elements of fraud under Minnesota law are: "(1) a false representation . . . of a past or existing material fact susceptible of knowledge; (2) made with knowledge of the falsity of the representation or made without knowing whether it was true or false; (3) with the intention to induce [plaintiff] to act in reliance thereon; (4) that the representation caused [plaintiff] to act in reliance thereon; and (5) that [plaintiff] suffered pecuniary damages as a result of the reliance."[1047] The elements of fraud under New York law are similar.[1048]

### (ii) Reliance Under Minnesota Law

As discussed in Section VII.L.1.b, certain facts and circumstances leading up to the November 20, 2006 ResCap Board resolution, which waived the 2005 Operating Agreement in connection with the 2006 Bank Restructuring, raise concerns as to whether representations by AFI through its agents to the Independent Directors in connection with that transaction were fraudulently incomplete and misleading. "A representation is not actionable unless the plaintiff in fact relies upon it. To rely, the plaintiff must enter a transaction in whole or part because of the representation."[1049] The Unsecured Noteholders arguably suffered pecuniary damages as a result of the 2006 Bank Restructuring, inasmuch as ResCap received much less than reasonably equivalent value.[1050] Yet, because it does not appear that any misrepresentations were actually made to the Unsecured Noteholders, it is unlikely that they can meet the usual requirement of "reliance-in-fact."[1051]

The law of Minnesota incorporates such a requirement as an element of proof for a claim of fraud. "Under Minnesota law, one of the elements of a claim of fraudulent misrepresentation is 'communication of the false statement to plaintiff.'"[1052] Thus, a fraud claim "cannot survive unless the alleged misrepresentation was actually repeated to a person to whom the defendant intends or has reason to expect to have it repeated."[1053]

---

[1047] *Valspar Refinish, Inc. v. Gaylord's, Inc.*, 764 N.W.2d 359, 368 (Minn. 2009).

[1048] *See* Section VII.L.1.b.

[1049] DAN B. DOBBS, PAUL T. HAYDEN, AND ELLEN M. BUBLICK, THE LAW OF TORTS § 671 (2d ed. 2012).

[1050] *See* Section V.A.2.b; Appendix V.A.2.b.

[1051] DAN B. DOBBS, PAUL T. HAYDEN, AND ELLEN M. BUBLICK, THE LAW OF TORTS § 671 (2d ed. 2012).

[1052] *Bank of Montreal v. Avalon Capital Grp., Inc.*, No. 10-591 (MJD/AJB), 2012 WL 1110691, at *7 (D. Minn. Apr. 3, 2012) (citations omitted).

[1053] *Id.* (citations and internal quotation marks omitted); s*ee also LaFleche v. Clark Prods., Inc.*, No. 05-2549 MJD/AJB, 2007 WL 2023564, at *15 (D. Minn. July 9, 2007) (determining that the plaintiff could not assert a fraud claim based on a representation that was made by the defendant to a third-party but was not transmitted to the plaintiff before he entered into an agreement with the defendant).

As the above quotation suggests, however, Minnesota law allows for a degree of indirect reliance in some instances such that "a defendant may be liable for making fraudulent misrepresentations to a third party if it intended or had reason to expect that they would be communicated to the plaintiff and influence the plaintiff's conduct."[1054] An example of such a "chain of reliance" fraud occurred when an accounting firm made misrepresentations to the Commissioner of Insurance regarding a firm's financial condition and, in reliance on the representations, the Commissioner made a further representation to plaintiff regarding the solvency of the subject firm.[1055]

That decision and similar cases have been described as applying "in limited circumstances,"[1056] but even such a "chain of reliance" rubric is in accord with the Restatement view, and is not in derogation of the usual reliance-in-fact requirement:

> The maker of a fraudulent misrepresentation is subject to liability for pecuniary loss to another who acts in justifiable reliance upon it if the misrepresentation, although not made directly to the other, is made to a third person and the maker intends or has reason to expect that its terms will be repeated or its substance communicated to the other, and that it will influence his conduct in the transaction or type of transaction involved.[1057]

Because the Investigation did not uncover evidence to suggest that any of the arguably fraudulent misrepresentations described in Section VII.L.1.b were made to or relied upon by the Unsecured Noteholders, whether directly or indirectly, it appears that the Unsecured Noteholders likely would be unable to establish a claim of fraud against AFI under Minnesota law.

### (iii) Third-Party Reliance Under New York Law

New York law, however, may recognize a more expansive "third-party reliance" doctrine, which "operates as an exception to the normal justifiable reliance element of common law fraud," whereby a plaintiff alleging fraud can "show that a third-party relied

---

[1054] *Corporate Comm'n of Mille Lacs Band of Ojibwe Indians v. Money Ctrs. of Am., Inc.*, No. 12-1015 (RHK/LIB), 2012 WL 5439170, at *7 (D. Minn. Nov. 7, 2012) (citations omitted).

[1055] *See Bonhiver v. Graff*, 248 N.W.2d 291, 298–301 (Minn. 1976).

[1056] *Nat'l City Bank v. Coopers & Lybrand,* 409 N.W.2d 862, 869 (Minn. 1987); *see also Dakota Bank v. Eiesland,* 645 N.W.2d 177, 178–79 (Minn. Ct. App. 2002) (defendant accountants knew that their financial statements contained false information and that the bank would rely on these financial statements in determining whether to loan money to accountant's client); *see generally* RESTATEMENT (SECOND) OF TORTS § 552 (1977).

[1057] RESTATEMENT (SECOND) OF TORTS § 533 (1977); *see also Corporate Comm'n of Mille*, 2012 WL 5439170, at *5–7 (citing § 533 of the RESTATEMENT and noting limited circumstances in which "indirect fraud" is actionable).

upon a misrepresentation by the defendant, which resulted in injury to the plaintiff."[1058] For example, in one recent case, plaintiff patentee sued defendant (a competitor) whom it alleged "fraudulently placed a false patent number" on its products, which were sold to the public.[1059] In seeking dismissal, defendant argued that plaintiff failed to plead reliance on any alleged misrepresentation. The court, denying the motion to dismiss, stated that: "While [defendant] is correct that Plaintiffs never pled their own reliance on misrepresentations, New York allows plaintiffs to bring claims based on a theory of third party reliance. . . . [I]t is clear that the Plaintiffs are claiming that customers relied on . . . the false patent number, when buying Defendants' products. . . [and] Plaintiffs were harmed by customers' reliance on Defendants' misstatements."[1060]

In New York, the third-party reliance doctrine has a somewhat checkered history. In 1998, the Second Circuit Court of Appeals rejected the notion of third-party reliance, viewing it as an incorrect statement of New York law.[1061] But a 2012 decision from the Southern District of New York concluded that the New York Court of Appeals would "allow recovery for common law fraud based on third party reliance,"[1062] explicitly calling into "further doubt" the aforementioned Second Circuit decision.[1063]

Moreover, although the New York Court of Appeals has not considered the question since the 19th century,[1064] the Appellate Division of the New York Supreme Court has in modern cases determined that a plaintiff's fraud claim can exist "where a false representation is made to a third party, resulting in injury to the plaintiff."[1065] Within the past several months,

---

[1058] *Prestige Builder & Mgmt. LLC v. Safeco Ins. Co. of Am.*, No. 12 Civ. 1947(ILG)(LB), 2012 WL 4801769, at *3 (E.D.N.Y. Oct. 10, 2012) (footnote omitted) (citation omitted).

[1059] *See My First Shades v. Baby Blanket Suncare*, No. 08-CV-4599 (MKB), 2012 WL 6675118, at *10 (E.D.N.Y. Dec. 21, 2012).

[1060] *Id.* at *11; *see also Buxton Mfg. Co., Inc. v. Valiant Moving & Storage Inc.*, 657 N.Y.S.2d 450, 451 (N.Y. App. Div. 1997) (denying summary judgment on fraud claim against defendant, a prime contractor, whose allegedly fraudulent progress payment certification to customer resulted in customer releasing funds which would otherwise have been available to pay plaintiff).

[1061] *Cement & Concrete Workers Distr. Council Welfare Fund v. Lollo*, 148 F.3d 194, 196–97 (2d Cir. 1998).

[1062] *Chevron Corp. v. Donziger*, 871 F. Supp. 2d 229, 256–57 (S.D.N.Y. 2012) (citing cases and noting that in the 1800's the New York Court of Appeals "held not once, but three times, that a claim for common law fraud may rest on third-party reliance").

[1063] *Chevron*, 871 F. Supp. 2d at 257 (citing *Cement & Concrete*, 148 F.3d 194); *see also Prestige*, 2012 WL 4801769, at *5 ("The third-party reliance doctrine is good law in New York.").

[1064] *See Eaton, Cole & Burnham Co. v. Avery*, 83 N.Y. 31, 33–34 (1880); *Rice v. Manley*, 66 N.Y. 82, 87 (1876); *Bruff v. Mali*, 36 N.Y. 200, 205–06 (1867).

[1065] *Buxton Mfg.*, 657 N.Y.S.2d at 451 (citations omitted); *see also Litvinov v. Hodson*, 905 N.Y.S.2d 400, 401 (N.Y. App. Div. 2010).

however, a U.S. District Court, noting that in 2008 "the Second Circuit settled the matter,"[1066] stated that "New York law is ambivalent as to whether reliance by a third party is sufficient to support a fraud claim."[1067]

Whether in fact the Second Circuit has "settled the matter" is unclear. As noted, there are 2012 District Court decisions (from both the Southern and Eastern Districts of New York) supporting the third-party reliance doctrine. Moreover, despite the Second Circuit's expressed opposition to the third-party reliance doctrine under New York law, that court has also in recent years summarily affirmed at least two cases from the Eastern District of New York and the Southern District of New York that referenced the third-party reliance doctrine as valid under New York law.[1068]

Finally, in 2013, a U.S. District Court denied a motion for an order certifying for interlocutory appeal the question of "whether New York law permits a claim for fraud based on injury suffered as a result of detrimental reliance by a person other than the plaintiff."[1069] In determining that an interlocutory appeal would not materially advance the case, the court recognized that the Second Circuit has stated "that New York law does not permit fraud claims based on third party reliance."[1070] Nevertheless, in the same decision, the court emphasized that the New York Court of Appeals is the ultimate decision maker on issues of New York law and stated that New York does in fact recognize fraud claims based on third-party reliance.[1071]

### (iv) Whether A Minnesota Court Would Apply New York's Third-Party Reliance

Given the conflicting authority, it is unclear in general whether even a court sitting in New York would consider the third-party reliance doctrine valid. It is similarly unclear, therefore, how a court sitting in Minnesota, but applying New York law, would treat this question.

---

[1066] *Chapin Home for the Aging v. McKimm,* No. 11-CV-667 (FB)(RER), 2013 WL 948110, at *3 (E.D.N.Y. Mar. 11, 2013) (citing *City of N.Y. v. Smokes-Spirits.com*, 541 F.3d 425, 454 (2d Cir. 2008), *rev'd and remanded on other grounds*, *Hemi Group, LLC v. City of N.Y.*, 559 U.S. 1 (2010)).

[1067] *Chapin Home for the Aging,* 2013 WL 948110, at *2.

[1068] *See O'Brien v. Argo Partners, Inc.*, 736 F. Supp. 2d 528, 537 (E.D.N.Y. 2010) (citation omitted), *aff'd*, 426 F. App'x 36 (2d Cir. 2011); *Liberty Life Assurance Co. of Bos. v. Bahan*, No. 09 Civ. 4715(JRS), 2010 WL 3431147, at *2 n.4 (S.D.N.Y. Aug. 23, 2010) (citations omitted), *aff'd,* 441 F. App'x 21 (2d Cir. 2011).

[1069] *Chevron Corp. v. Donziger,* No. 11 Civ. 0691(LAK), 2013 WL 98013, at *1, 5 (S.D.N.Y. Jan. 7, 2013) (footnote omitted).

[1070] *Chevron Corp.*, 2013 WL 98013, at *3.

[1071] *See id.*

(c) *The Statute Of Limitations Applicable To This Claim Is Likely Tolled By A Discovery Rule*

As addressed in Section VII.L.1.b, both New York and Minnesota have six-year statutes of limitations for fraud claims.[1072] The Unsecured Noteholders are not entitled to the benefit of the two-year extension under the Bankruptcy Code.[1073] Under Minnesota law, the limitations period does not begin to run until "the discovery by the aggrieved party of the facts constituting the fraud."[1074] However, it is plaintiff's burden to establish that it could not have discovered the facts any sooner than within six years of when the action is commenced.[1075]

Pursuant to the Uniform Conflict of Laws-Limitations Act,[1076] as adopted in Minnesota, if a court in that state determines that the Unsecured Noteholders' fraud claim is governed by the law of New York, then Minnesota will also apply New York's statute of limitations.[1077] New York law holds that a claim for fraud is timely if commenced either within six years of the date the fraud occurs, or within two years of the date the fraud is discovered or through reasonable diligence should have been discovered, whichever is longer.[1078] The question of when a fraud reasonably should have been or could have been discovered is a mixed question of fact and law under New York law.[1079]

New York courts employ a two-step test to determine the accrual date of the two-year discovery rule: "whether and when the plaintiff had (1) inquiry notice and (2) constructive knowledge of the alleged fraud."[1080] The inquiry notice requirement protects a plaintiff "who has no reason to suspect that he has been defrauded."[1081] Once the plaintiff is on inquiry notice, the limitations period will begin running when plaintiff is "aware of enough operative facts so that, with reasonable diligence, he could have discovered the fraud."[1082]

---

[1072] *See* N.Y. C.P.L.R. § 213(8); MINN. STAT. § 541.05, subdiv. 1(6) (2012).

[1073] *See* 11 U.S.C. § 108(a).

[1074] MINN. STAT. § 541.05, subdiv. 1(6).

[1075] *Alliance Bank v. Dykes*, No. A12-0455, 2012 Minn. App. Unpub. LEXIS 1253, at *44 (Minn. Ct. App. Dec. 31, 2012) (citing *Jane Doe 43C v. Diocese of New Ulm*, 787 N.W.2d 680, 684 (Minn. Ct. App. 2010)), *review denied*, 2013 Minn. LEXIS 166 (Minn. Mar. 19, 2013),; *see also Veldhuizen v. A.O. Smith Corp.*, 839 F. Supp. 669, 675–76 (D. Minn. 1993) (limitation period begins to run when plaintiff is "aware of facts sufficient to put a reasonable person on notice that a fraud claim may exist").

[1076] UNIF. CONFLICT OF LAWS-LIMITATIONS ACT § 2, U.L.A. (1982).

[1077] *See* MINN. STAT. § 541.31, subdiv. 1(a)(1).

[1078] *See Liberty Co. v. Boyle*, 708 N.Y.S.2d 122, 125 (N.Y. App. Div. 2000); *Bobash, Inc. v. Festinger*, No. 03908/05, 839 N.Y.S.2d 431, at *3 (Table) (N.Y. Sup. Ct. Mar. 30, 2007), *appeal dismissed as academic*, 868 N.Y.S.2d 747 (N.Y. App. Div. 2008); *see also* N.Y. C.P.L.R. § 213(8).

[1079] *See Saphir Int'l, SA v. UBS PaineWebber Inc.*, 807 N.Y.S.2d 58, 59 (N.Y. App. Div. 2006). Under Minnesota law it is considered a question of fact. *See Barry v. Barry*, 78 F.3d 375, 380 (8th Cir. 1996).

[1080] *Kelly v. Legacy Benefits Corp.*, 950 N.Y.S.2d 608, at *7 (N.Y. Cty. 2012).

[1081] *Id.* (citation and quotation omitted).

[1082] *Id.*

The operative facts concerning a possible fraud regarding the 2006 Bank Restructuring likely occurred in the time frame between May 5, 2006—the date of Eric Feldstein's memorandum to the Independent Directors[1083]—and November 22, 2006, when the 2006 Bank Restructuring was executed, two days after approval by the Independent Directors.[1084] The accrual date for a fraud claim is, therefore, likely not later than November 22, 2006. If the New York limitations period applies, the action became time-barred not later than November 22, 2012, unless the Unsecured Noteholders did not discover or, with reasonable diligence, could not have discovered the fraud. In that case an action on the fraud must be commenced not later than two years after actual or constructive knowledge.[1086]

"The test as to when fraud should with reasonable diligence have been discovered is an objective one. . . . [W]here the circumstances are such as to suggest to a person of ordinary intelligence the probability that he has been defrauded, a duty of inquiry arises, and if he omits that inquiry when it would have developed the truth, and shuts his eyes to the facts which call for investigation, knowledge of the fraud will be imputed to him."[1087]

Notably, within a few days of the transaction, ResCap filed a public report addressing the 2006 Bank Restructuring.[1088] That report included the "Purchase and Assumption Agreement between [Old GMAC Bank] and GMAC Automotive Bank" executed on November 22, 2006, and related that "ResCap's board of directors (including both [I]ndependent [D]irectors) unanimously waived compliance with the provisions of the Operating Agreement."[1089] It also disclosed that the transfer of Old GMAC Bank was for book value, and that ResCap satisfied a $360 million capital call immediately after the transfer.[1090] Additionally, the report disclosed the nature of ResCap's interest in the newly formed IB Finance:

> Immediately following the P&A Transaction, [AFI] contributed all of its shares of GMAC Automotive Bank to [AFI's] wholly-owned subsidiary, IB Finance Holding Company LLC, a newly created limited liability holding company

---

[1083] *See* Memorandum, Proposed Restructuring of GMAC U.S. Banking Entities, dated May 5, 2006 [EXAM10258913] (attached to E-mail from K. Sabatowski to T. Melzer and T. Jacob (May 4, 2006) [EXAM10258912]).

[1084] Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Nov. 20, 2006, at RC40006839 [RC40006748].

[1085] *See* Walker Report [RC40008925].

[1086] *See Gutkin v. Siegal*, 926 N.Y.S.2d 485, 486 (N.Y. App. Div. 2011).

[1087] *Id.* (quotations and citations omitted).

[1088] *See* Residential Capital, LLC, Current Report (Form 8-K) (Nov. 27, 2006). Further, pursuant to the 2005 Operating Agreement, following the waiver, ResCap was required to "provide each Class Agent and Bank Agent a copy of any amendment or waiver." 2005 Operating Agreement, § 8 [ALLY_0140795].

[1089] Residential Capital, LLC, Current Report (Form 8-K) (Nov. 27, 2006), at 2.

[1090] *Id.*

> subsidiary of [AFI]. ResCap purchased certain non-voting interests in IB Finance Holding Company LLC from [AFI] for $1.161 billion pursuant to an Equity Purchase Agreement. [AFI] retained the voting interests in IB Finance Holding Company LLC.[1091]

Thus, substantial public information was available regarding the 2006 Bank Restructuring at the time the transaction occurred.

Nonetheless, without access to some or all of the key documents, such as David Marple's memorandum,[1092] David Applegate's memorandum,[1093] Feldstein's note to the Independent Directors,[1094] Marple's responses to the Independent Directors' questions,[1095] and the Walker Report,[1096] it seems unlikely that the Unsecured Noteholders could have had actual knowledge of a fraud. Further, while the Investigation has not focused on communications between ResCap or AFI on the one hand, and the Unsecured Noteholders on the other hand, nor on what other sources of information may have been available to the Unsecured Noteholders, the Investigation has not revealed circumstances which would have put the Unsecured Noteholders on notice of a possible fraud, nor has it revealed circumstances suggesting that the Unsecured Noteholders should be charged with constructive knowledge of a possible fraud.

The Examiner therefore concludes that, while a close question, it is more likely than not that a statute of limitations defense would not prevail as to a claim by the Unsecured Noteholders against AFI for fraud arising from the 2006 Bank Restructuring.

### (d) Conclusion As To Fraud Claim

While the facts surrounding the 2006 Bank Restructuring raise serious concerns, a claim by the Unsecured Noteholders against AFI for fraud would nonetheless face difficult challenges. Such a claim would have little chance of success unless the court concludes that the "third-party reliance" doctrine remains good law in New York and is applicable to the Unsecured Noteholders' claim. But the state of the law on this rarely invoked doctrine is entirely unsettled. Further, even if one concludes that the Unsecured Noteholders have a

---

[1091] *Id.*

[1092] Memorandum, GMAC Bank Restructuring, dated Apr. 20, 2006 [EXAM11248642].

[1093] Memorandum, ILC Ownership and Control, dated Apr. 24, 2006 [EXAM11248641].

[1094] Memorandum, Proposed Restructuring of GMAC U.S. Banking Entities, dated May 5, 2006 [EXAM10258913] (attached to E-mail from K. Sabatowski to T. Melzer and T. Jacob (May 4, 2006) [EXAM10258912]).

[1095] Memorandum, GMAC Bank Restructuring, dated May 12, 2006 [ALLY_0401600].

[1096] Walker Report [RC40008925].

compelling case on the remaining issues (including the statute of limitations and the other aspects of a fraud claim addressed above and in Section VII.L.1.b), resolution of those issues in the Unsecured Noteholders' favor is not certain. Accordingly, weighing these considerations and all the facts and circumstances, the Examiner concludes that, while it is a close question, it is more likely than not that the Unsecured Noteholders' fraud claim would not prevail.

Were a fraud action viable, damages could be substantial, likely amounting to not less than the FMV shortfall of between $390 to $465 million,[1097] and perhaps as much as the difference between the equity value of ResCap's interest in Old GMAC Bank, which it transferred, and the equity interest in IB Finance, which it received, i.e., between $533 and $608 million.[1098]

## D. POTENTIAL ALLEGED DAMAGES

### 1. Disclosed Alleged Damages

The Examiner Scope Approval Order provides that the Examiner should "solicit the parties' views concerning . . . the potential amount of damages arising from [Third-Party Claims], but . . . not attempt to independently quantify such damages."[1099] Consistent with that directive, the Examiner's Professionals solicited damages information from Third-Party Claimants in the Examiner's September 21, 2012 letter requesting Submission Papers and Examiner's Counsel's December 21, 2012 letter requesting Damages Letters.[1100] Where parties declined the Examiner's requests for information, the Examiner's Professionals collected information from Third-Party Claimants' various complaints and proofs of claim filed in the Debtors' Chapter 11 Cases.[1101] Consistent with the Examiner Scope Approval Order,[1102] however, the Examiner's Professionals did not independently calculate such damages information.

As a general matter, the damages information received and compiled by the Examiner relates to those Third-Party Claims that have progressed to litigation. While pending litigation likely represents only a subset of the potential universe of Third-Party Claims, the Investigation has not identified every RMBS investor or mortgage borrower potentially

---

[1097] *See* Section V.A.2.b; Appendix V.A.2.b. These figures take into account $143 million on the value received side, accounting for the avoidance of a credit rating downgrade. *See id.*

[1098] *See* Section V.A.2.b; Appendix V.A.2.b.

[1099] *See* Examiner Scope Approval Order at 5.

[1100] *See* Section VIII.A.2. These letters are attached as Appendices VIII.A—3 and VIII.A—4, respectively.

[1101] While the proofs of claim filed in the Chapter 11 Cases may be more reflective of claims against the Debtors than against the AFI Defendants, many of the Third-Party Claimants filed proofs of claim that include allegations against the AFI Defendants or simply attach RMBS Action complaints that contain similar accusations against the AFI Defendants. Accordingly, certain of the proofs of claim appear to be relevant to the AFI Defendants' potential liability as well as to the Debtors' potential liability.

[1102] *See* Examiner Scope Approval Order, at 5.

affected by the Debtors and the AFI Defendants' conduct (nor could the Investigation have done so). Accordingly, the alleged damages disclosed to the Examiner likely represent only a portion of the potential claims that could be asserted against the AFI Defendants. Given the outstanding principal balance and the estimated lifetime losses of the Debtors' RMBS, which as of March/April 2012 were $62.4 billion and $43.8 billion, respectively, such further potential damages could be substantial.[1103]

In response to the Examiner's Professionals' solicitations, the plaintiffs in the RMBS Actions have reported approximately $6.3 billion in alleged damages against AFI and the Debtors on account of the Debtors' issuance of RMBS and the AFI Defendants' purported role therein.[1104] Alleged damages relating to the D&O RMBS Actions, which are largely on account of the same conduct as the RMBS Actions and have been pleaded as components thereof, are included within those damages disclosures. Additionally, plaintiffs in the Non-RMBS Actions have reported approximately $987.5 million in alleged damages, almost all of which reflects the damages asserted in *Rothstein v. GMAC Mortgage*.[1105] Finally, the Unsecured Noteholders assert that their potential Causes of Action are worth in excess of $1 billion.[1106]

### a. Additional Factors Relevant To Potential RMBS Claims Damages

It is important to note that the potential Third-Party Claims damages assertable against Ally Securities and Ally Bank may be limited in certain respects. As discussed in Sections VIII.C.2.b and VIII.C.2.c, liability is asserted directly against these entities on account of their role in the securitization process—i.e., Ally Securities as underwriter and Ally Bank as loan originator/funder and custodian. Accordingly, any potential damages assertable against these entities are likely limited by the number of securitizations in which they participated and the original or outstanding principal balance of those securitizations.

Ally Bank, as loan originator, purchaser, and warehouse financer, contributed loans to 124 GMAC Mortgage and RFC securitizations, in the approximate aggregate amount of $16 billion in original deal balance.[1107] In connection with the RMBS Trust Settlement Agreements, the Debtors estimated the lifetime losses on each of their 392 securitizations.[1108]

---

[1103] *See* PLS Trust Spreadsheet [EXAM00339947]. In some cases, claims that have not yet been pleaded may be time-barred. *See, e.g.*, Section VIII.C.a.1 (discussing the statutes of limitations for securities law claims). In other circumstances, additional Third-Party Claimants may elect to join an existing class action or may be able to invoke other arguments that would support the tolling of applicable statutes of limitations. In any event, as a practical matter, the Investigation was only able to solicit damages information from readily identifiable Third-Party Claimants, namely the plaintiffs in the RMBS and Non-RMBS Actions.

[1104] *See* Appendix VIII.D.1.

[1105] *See* Appendix VIII.D.1; Damages Letter from M. Strauss (Jan. 11, 2013).

[1106] *See* Appendix VIII.D.1. This estimate corresponds with the aggregate outstanding amount of the Unsecured Notes. *See* Wilmington Trust Submission Paper, dated Oct. 24, 2012, at 1.

[1107] *See* PLS Trust Spreadsheet [EXAM00339947].

[1108] *See id.*

In that analysis, the portion of the securitizations' losses attributable to Bank loans is approximately $2.8 billion.[1109] However, it is likely that this amount overstates the losses properly allocable to the Bank's loans, because the allocation assumes that loans purchased from the Bank performed the same as all other loans in the pertinent securitization. While data was not available to evaluate the performance of particular groups of loans within the Debtors' securitizations, the Debtors have noted that "[h]istorically Bank production was high credit quality, which could lead to better performance."[1110] Accordingly, the losses attributable to Bank loans are likely less than $2.8 billion. This amount relates to both Old GMAC Bank and Ally Bank because their respective losses cannot be segregated based on the available data. However, given that a majority of these securitizations were completed before the 2006 Bank Restructuring, much of these losses are likely attributable to Old GMAC Bank.

In terms of the Bank's custodial role, Old GMAC Bank served as original loan custodian for twenty-eight GMAC Mortgage securitizations and Ally Bank served as original loan custodian for six GMAC Mortgage securitizations, together representing an aggregate original principal balance of approximately $21.7 billion.[1111]

Ally Securities served as lead or joint lead underwriter on 105 of the Debtors' 392 PLS deals, representing an original principal balance of approximately $57.2 billion.[1112] Ally Securities served as a co-underwriter on an additional 131 PLS deals.[1113] However, RMBS Claims against Ally Securities may be limited by the amount of assets it has available to satisfy potential judgments. As of December 31, 2012, Ally Securities had assets of approximately $14.5 million, liabilities of approximately $2.8 million, and net equity of approximately $11.7 million.[1114] The Investigation has revealed no evidence of indemnification rights of Ally Securities against AFI for claims in connection with Ally Securities' underwriting role.[1115] However, the Investigation has identified certain recent transfers by Ally Securities to AFI that may give rise to fraudulent transfer liability. These transactions are discussed in Section VIII.D.5.

---

[1109] *See id.*

[1110] *Id.* at Disclaimer/Note 6 [EXAM00339947].

[1111] *See* Appendix VIII.B—3.

[1112] *See* Appendix VIII.B—2.

[1113] *See* Appendix VIII.B—1, n.2.

[1114] Ally Securities LLC Financial Statements as of and for the Year Ended Dec. 31, 2012, Supplementary Schedules as of the Year Ended Dec. 31, 2012, at 3 [ALLY_0424625].

[1115] In response to a request to AFI's counsel to provide the Examiner with indemnification agreements in connection with Ally Securities' underwriting role, AFI's counsel provided a sample underwriting agreement, which provides for: (1) indemnification by the issuer and master servicer (the Debtors) in favor of the underwriters (including Ally Securities) and their directors, officers, and any person controlling them within the meaning of section 15 of the Securities Act or section 20 of the Exchange Act; and (2) indemnification by the underwriters in favor of the issuer and master servicer and their directors, officers, and any person controlling them within the meaning of section 15 of the Securities Act or section 20 of the Exchange Act. *See* Underwriting Agreement, dated Aug. 29, 2007 [ALLY_0402298]. AFI's counsel confirmed that no other indemnification arrangements exist between Ally Securities and AFI.

### b. Additional Factors Relevant To Potential Non-RMBS Claims Damages

The substantial majority of the damages asserted with respect to the Non-RMBS Actions come from *Rothstein v. GMAC Mortgage*.[1116] There, the plaintiffs assert approximately $971 million in damages.[1117] As discussed in Section VIII.C.4.b, those claims are currently the subject of a motion in the Bankruptcy Court, brought by AFI and Ally Bank, to enjoin the prosecution of alter-ego claims by anyone other than by representatives of the Debtors' estates.[1118] To the extent that motion succeeds, the alleged damages associated with the Non-RMBS Actions (at least as disclosed to the Examiner) would likely become negligible as compared with the RMBS Actions and the Unsecured Noteholders' Causes of Action.

### 2. Release Of Third-Party Claims

Given the Examiner's conclusion that the proposed consideration under the AFI Settlement and Plan Sponsor Agreement would not have been adequate to support a release of the Debtors' Estates' claims against AFI,[1119] it follows that the Examiner also concludes that the proposed $750 million cash contribution is inadequate to secure the additional release of Third-Party Claims.[1120]

### 3. Transfer Of Liability In Connection With The Sale Of Ally Bank

In November 2006, ResCap and AFI completed a restructuring of their U.S. banking entities. Pursuant to that restructuring, Old GMAC Bank transferred substantially all of its assets and liabilities to GMAC Automotive Bank, an industrial bank then wholly owned by AFI. ResCap's equity in Old GMAC Bank was then sent by dividend to GM, thus removing the entity from Cerberus, AFI, and ResCap's ownership. Old GMAC Bank subsequently changed its name from "GMAC Bank" to "National Motors Bank FSB," and was eventually voluntarily dissolved in February 2009. Contemporaneously, AFI contributed 100% of its interests in GMAC Automotive Bank to a newly created limited liability holding company, IB Finance. AFI retained an interest in IB Finance that entitled AFI to earnings and distributions from the automotive division of GMAC Automotive Bank, while ResCap purchased an interest in IB Finance that represented a non-voting economic interest in the mortgage division of GMAC Automotive Bank.[1121]

The Purchase and Assumption Agreement entered into between Ally Bank and Old GMAC Bank in connection with the 2006 Bank Restructuring expressly stated that Ally Bank only assumed the liabilities set forth on a schedule to the agreement and not any other

---

[1116] Case No. 12-03412 (S.D.N.Y. 2012).

[1117] Damages Letter from M. Strauss (Jan. 11, 2013), at 1.

[1118] *See* Section VIII.C.4.b.

[1119] *See* Sections I.I, IX.B (discussing the merits of AFI's proposed $750 million cash contribution in connection with the AFI Settlement and Plan Sponsor Agreement).

[1120] *See* Section IX.C.

[1121] For a more detailed explanation of these transactions, see Section V.A.1.

liabilities.[1122] There is no provision in the schedules to the Purchase and Assumption Agreement that relate to general tort liability or contractual obligations under the custodian agreements between Old GMAC Bank and GMAC Mortgage.[1123] Additionally, the Examiner has concluded that it is unlikely that a court would find that Ally Bank is the successor in liability of Old GMAC Bank.[1124] Accordingly, there appears to be limited basis for holding Ally Bank responsible for the potential liabilities of Old GMAC Bank.

### 4. Transfer Of Liability In Connection With The Sale Of Ally Securities

During the period 2004 through 2007 when Ally Securities was an underwriter of the securities at issue, Ally Securities was a direct subsidiary of RFC. It was incorporated on February 17, 1989 as a Delaware corporation, under the name Residential Funding Securities Corporation[1125] and was registered with the National Association of Securities Dealers, Inc. on June 6, 1990.[1126]

On June 1, 2006, Ally Securities was converted to a Delaware limited liability company, under the name Residential Funding Securities, LLC[1127] and continued to be owned by RFC.[1128] Under Delaware law, assets and liabilities automatically carry over from converted former corporations to new limited liability companies,[1129] and the existence of a limited liability company is deemed to have commenced on the date that the converted former corporation was incorporated.[1130] As such, all liabilities of Residential Funding Securities Corporation continued to be liabilities of Residential Funding Securities, LLC.

---

[1122] *See* Purchase and Assumption Agreement, dated Nov. 20, 2006, § 2.3 [ALLY_PEO_0021066].

[1123] *See id.*, Scheds. B, C (listing (1) the contracts assigned from Old GMAC Bank to Ally Bank and (2) the Old GMAC Bank liabilities assumed by Ally Bank). As explained in Section VIII.C.2.c, the Old GMAC Bank's custodial obligations were "repapered" with Ally Bank after the 2006 Bank Restructuring.

[1124] *See* Section VII.L.2.a(1)(a)(i).

[1125] Certificate of Incorporation of Residential Funding Securities Corporation, dated Feb. 17, 1989 [ALLY_0402297].

[1126] Residential Funding Securities Policies and Supervisory Procedures Manual, updated Mar. 30, 2007, at 6 [EXAM12503903].

[1127] Ally Securities' name was changed from Residential Funding Securities, LLC to Ally Securities LLC effective Aug. 1, 2011. Certificate of Amendment, dated Aug. 1, 2011, filed July 25, 2011 [ALLY_0402275]. While it was Residential Funding Securities, LLC and Residential Funding Securities Corporation, it did business as "GMAC RFC Securities" and was internally referred to as "GRS." Dep. of J. Getchis, Apr. 21, 2011, at 26:16–27:8 [MBIADEP0000278]; Dep. of D. Crosson, Apr. 20, 2011, at 5:4–15 [MBIADEP0000500].

[1128] Certificate of Conversion to Limited Liability Company, dated June 1, 2006 [ALLY_0402360]; Limited Liability Company Agreement, dated June 1, 2006, Sched. A [ALLY_0402277].

[1129] DEL. CODE ANN. tit. 6, § 18-214(f) (2013).

> [A]ll debts, liabilities and duties of the other entity that has converted shall remain attached to the domestic limited liability company to which such other entity has converted, and may be enforced against it to the same extent as if said debts, liabilities and duties had originally been incurred or contracted by it in its capacity as a domestic limited liability company.

[1130] *Id.* § 18-214(d).

RFC owned Ally Securities[1131] until May 1, 2009,[1132] when AFI purchased all of the membership interests of Ally Securities from RFC pursuant to a Membership Interest and Share Purchase Agreement dated March 31, 2009.[1133] In a transfer of membership interests, the purchaser takes ownership of the limited liability company, and the limited liability company continues to own its assets and retains its liabilities (rather than the purchaser acquiring specific assets and/or liabilities). The liabilities of Ally Securities continued to be retained by Ally Securities and are its own liabilities rather than those of its member (i.e., AFI).[1134]

Generally, pursuant to a purchase agreement the seller and purchaser will be subject to certain representations and warranties for a certain period of time. The Membership Interest and Share Purchase Agreement contained certain representations and warranties by RFC as seller, including relating to liabilities and obligations, material contracts, and litigation and representations and warranties by AFI as purchaser relating to authority, membership certificates, consents and approvals, financing, and brokers and finder's fees.[1135] RFC and AFI agreed to indemnify each other for certain breaches of the representations and covenants in the Membership Interest and Share Purchase Agreement.[1136] The indemnification provisions generally survived only until the 24-month anniversary of the closing date (i.e., until May 1,

---

[1131] Limited Liability Company Agreement, dated June 1, 2006, Sched. A [ALLY_0402277].

[1132] Residential Funding Securities, LLC Financial Statements and Supplementary Schedules, Dec. 31, 2009, at 7 [FHFA-AS-0314518].

[1133] Membership Interest and Share Purchase Agreement between Residential Funding Company, LLC and GMAC LLC, dated Mar. 31, 2009 [RC00026472]; Assignment and Assumption of Limited Liability Company Interests, dated May 1, 2009 [EXAM00339023]. See Section V.F.4.g for a discussion of the terms of the sale of Ally Securities.

[1134] DEL. CODE ANN. tit. 6, § 18-303(a). Except in certain circumstances as set forth in chapter 18 (the Delaware Limited Liability Company Act):

> debts, obligations and liabilities of a limited liability company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the limited liability company, and no member . . . shall be obligated personally for any such debt, obligation or liability of the limited liability company . . . solely by reason of being a member . . . .

The exceptions set forth in the chapter relate to contributions and distributions prior to or upon dissolution. *Id.* §§ 18-502, 607. See also Ally Securities' Limited Liability Company Agreement, specifically providing that:

> [e]xcept as otherwise provided by the Act, the debts, obligations and liabilities of [Ally Securities], whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of [Ally Securities], and [AFI] shall not be obligated personally for any such debt, obligation or liability of [Ally Securities] solely by reason of being a member of [Ally Securities].

Limited Liability Company Agreement, dated June 1, 2006, § 9 [ALLY_0402277].

[1135] Membership Interest and Share Purchase Agreement between Residential Funding Company, LLC and GMAC LLC, dated Mar. 31, 2009, Art. 3, 4 [RC00026472]; Disclosure Letter from RFC (Mar. 31, 2009) [ALLY_0127990].

[1136] Membership Interest and Share Purchase Agreement between Residential Funding Company, LLC and GMAC LLC, dated Mar. 31, 2009, §§ 8.2, 8.3 [RC00026472].

2011).[1137] Notwithstanding this limitation, the Membership Interest and Share Purchase Agreement contained an exception in the event of a representation or warranty that constituted fraud, in which case such breach would not be subject to the indemnification basket, cap, or any other limitation set forth in the Membership Interest and Share Purchase Agreement.[1138] The Investigation has revealed no evidence that AFI has asserted, or contemplates asserting, any claims against RFC for indemnification under the Membership Interest and Share Purchase Agreement.[1139] The Investigation has revealed no evidence that RFC would have an indemnification claim against AFI under the Membership Interest and Share Purchase Agreement.[1140]

### 5. Potential Fraudulent Conveyance Exposure Of Ally Securities

#### a. Ally Securities Recapitalizes In 2011, Ceases Operations In 2012, And Makes Dividend Payments To AFI

In April 2011, Ally Securities sought and obtained authority from the Financial Industry Regulatory Authority to recapitalize and resume previous trading levels and underwriting activity.[1141] Ally Securities also requested authority to become an eligible member of the Ginnie Mae Real Estate Mortgage Investment Conduits securities underwriting group.[1142] In connection with this grant of authority and resumption of trading activities, Ally Securities received a capital contribution in the amount of $175 million from AFI in July 2011.[1143] AFI also contributed $50 million of Ally Securities' subordinate debt in exchange for capital.[1144]

---

[1137] *Id.*

[1138] *Id.* § 8.9.

[1139] AFI Submission Paper, dated Dec. 19, 2012. No proofs of claims for indemnification under the Membership Interest and Share Purchase Agreement were filed by AFI.

[1140] Indemnification for breaches of representations that constitute fraud survived the 24-month post-closing period but AFI's representations were limited to those relating to authority, membership certificates, consents and approvals, financing, and brokers and finder's fees. Membership Interest and Share Purchase Agreement between Residential Funding Company, LLC and GMAC LLC, dated Mar. 31, 2009, Art. 4, §§ 8.3, 8.9 [RC00026472].

[1141] *See* Letter to the Financial Industry Regulatory Authority (May 16, 2011) [ALLY_0424717]; *see also* Letter to the Financial Industry Regulatory Authority (Apr. 7, 2011) [ALLY_0424724]. Prior to 2011, Ally Securities' mortgage trading operations had not recovered to pre-2007 levels.

[1142] Ally Securities LLC Presentation on Capital Reduction, dated Apr. 2012, at 3 [ALLY_PEO_0094439].

[1143] Ally Securities LLC Financial Statements as of and for the Year Ended Dec. 31, 2011, Supplementary Schedules as of the Year Ended Dec. 31, 2011, at 13 [FHFA-AS-0314565]; E-mail from P. Lagermasini (Dec. 19, 2012) [ALLY_0434973]; *see also* Letter to Financial Industry Regulatory Authority from Ally Securities (Apr. 7, 2011) [ALLY_0424724] (providing that "[t]he purpose of the Recapitalization [was] to (x) position RFS to resume its previous levels of trading and underwriting operations, (y) to meet GAAP equity thresholds such that RFS would become an eligible member of [Ginnie Mae's] securities underwriting group, and (3) to strengthen RFS as a credit counterparty to institutional investors").

[1144] Ally Securities LLC Financial Statements as of and for the Year Ended Dec. 31, 2011, Supplementary Schedules as of the Year Ended Dec. 31, 2011, at 13 [FHFA-AS-0314565]; E-mail from P. Lagermasini (Dec. 19, 2012) [ALLY_0434973].

Nine months later in April 2012, Ally Securities paid a dividend in the amount of $200 million to AFI in connection with its decision to cease all mortgage operations.[1145] In a letter to the SEC and Financial Industry Regulatory Authority, Ally Securities explained that it had decided to exit all mortgage-related securities underwriting and trading activities.[1146] Ally Securities represented to the SEC and the Financial Industry Regulatory Authority that following the distribution, Ally Securities would have adequate excess net capital to continue its then-current operations and to meet its obligations to its creditors.[1147] In August 2012, Ally Securities made another dividend payment to AFI in the amount of $25.5 million.[1148] In an August 2012 letter to the SEC and Financial Industry Regulatory Authority, Ally Securities stated that the amount of excess net capital remaining after the August 2012 dividend payment would be sufficient to meet the obligations of the firm to its creditors.[1149]

---

[1145] *See* Ally Securities LLC Financial Statements as of and for the Year Ended Dec. 31, 2012, Supplementary Schedules as of the Year Ended Dec. 31, 2012, at 10 [ALLY_0424625]; E-mail from P. Lagermasini (Dec. 19, 2012) [ALLY_0434973]; *see also* E-mail from S. Polimine (Apr. 13, 2012), at ALLY_0424621 [ALLY_0424620] (Financial Industry Regulatory Authority approving Ally Securities' $200 million dividend payment to AFI); Ally Securities LLC Consent to Action, Apr. 11, 2012 [ALLY_0424624] (Board of Directors consent to payment of $200 million distribution to AFI).

[1146] Letter to SEC and Financial Industry Regulatory Authority (Apr. 10, 2012) [ALLY_0424689].

[1147] *See id.* at ALLY_0424689; *see also* Ally Securities LLC Presentation on Capital Reduction, dated Apr. 2011, at 3 [ALLY_PEO_0094439] ("[Ally Securities] is overcapitalized to the extent that [Ginnie Mae] issuance is less relevant as a percentage of the revenue stream. . . . GMAC Mortgage [Ginnie Mae] loan production has decreased by ~50% since 2010, which has reduced the need and ability for [Ally Securities] to distribute this product through Agency CMO securitization.").

[1148] *See* E-mail from P. Lagermasini (Dec. 19, 2012) [ALLY_0434973]; Letter to SEC and Financial Industry Regulatory Authority (Aug. 20, 2012), at ALLY_0434974 [ALLY_0434974] ("Please be advised that . . . Ally Securities . . . has determined to make a distribution of excess net capital to its parent and sole member, [AFI] . . . in the amount of $25,500,000."); *see also* Ally Securities LLC Consent to Action, Aug. 17, 2012 [ALLY_0434979] (Board of Directors consent to payment of $25.5 million distribution to AFI).

[1149] *See* Letter to SEC and Financial Industry Regulatory Authority (Aug. 20, 2012), at ALLY_0434975 [ALLY_0434974].

b. *Financial Condition Of Ally Securities At The Time Of The April 2012 And August 2012 Transfers*

During 2012, Ally Securities ceased all mortgage-related trading activities and as of December 31, 2012 no longer held financial instruments.[1150] At year-end 2012, Ally Securities had total assets of $14,451,620 (essentially cash), total liabilities of $2,773,500 (primarily a payable to affiliate), and total members' equity of $11,678,120.[1151] Exhibit VIII.D.5.b shows its total assets, total liabilities and total equity for the years 2004 through 2012:

EXHIBIT VIII.D.5.b
**Ally Securities LLC – Balance Sheet Information**
2004 – 2012

|  | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 |
|---|---|---|---|---|---|---|---|---|---|
| Total Assets | $1,021,435,917 | $550,864,201 | $1,441,869,041 | $285,945,782 | $96,772,985 | $110,480,802 | $124,581,493 | $695,170,481 | $14,451,620 |
| Total Liabilities | 935,795,910 | 461,089,404 | 1,345,727,356 | 217,557,799 | 50,759,449 | 78,775,374 | 94,212,416 | 446,998,195 | 2,773,500 |
| Total Equity | 85,640,007 | 89,774,797 | 96,141,685 | 68,387,983 | 46,013,536 | 31,705,428 | 30,369,077 | 248,172,286 | 11,678,120 |

*Source: FHFA-AS-0314592; FHFA-AS-0314471; FHFA-AS-0314430; FHFA-AS-0314450; FHFA-AS-0314492; FHFA-AS-0314518; FHFA-AS-0314542; FHFA-AS-0314565; ALLY_0424625.*

The Examiner's Professionals attempted to pinpoint the exact amount of assets and liabilities held by Ally Securities at the time of the transfers. However, the Examiner's Professionals were unable to identify financial statements for the dates surrounding the April and August 2012 transfers. Accordingly, the Examiner's Professionals attempted to estimate Ally Securities' financial condition at the time of the transfers.

On April 16 and August 20, 2012, Ally Securities made transfers of $200 million and $25.5 million to AFI, respectively. Because the transfers were made after Ally Securities had ceased any trading activities,[1152] the Examiner's Financial Advisors used the remaining total capital on April 16 and August 20 as a proxy for Ally Securities' total equity on those

---

[1150] Ally Securities LLC Financial Statements as of and for the Year Ended Dec. 31, 2012, Supplementary Schedules as of the Year Ended Dec. 31, 2012, at 8 [ALLY_0424625].

[1151] *Id.* at 3.

[1152] Trading activity would "cease at the end of the week of April 9th." Market Risk Committee Presentation on Ally Financial & Ally Bank, dated Apr. 17, 2012, at EXAM00014087 [EXAM00014072].

dates.[1153] Letters from Ally Securities to the SEC and Financial Industry Regulatory Authority note that Ally Securities' total capital following the April 16 and August 20 transfers was $49.5 million[1154] and $16.3 million,[1155] respectively.

### c.   The Dividend Payments Are Likely To Be Constructive Fraudulent Transfers

The Examiner concludes that it is likely that a constructive fraudulent transfer claim with respect to the April 2012 and August 2012 dividend payments from Ally Securities to AFI would prevail. The April 2012 and August 2012 payments satisfy all of the elements of a constructive fraudulent transfer: the transfers were made by Ally Securities while insolvent and for less than reasonably equivalent value.

#### (1) Solvency

As stated above, at the time of the April 2012 dividend payment, Ally Securities' assets exceeded its fixed liabilities by approximately $49.5 million. As of the August 2012 transfer, assets exceeded fixed liabilities by approximately $16.3 million. As of April 2012, Ally Securities was a defendant in ten RMBS-related lawsuits, three of which had survived a motion to dismiss at that time.[1156] These lawsuits alleged that plaintiffs had suffered billions of dollars in damages because of Ally Securities' actions.[1157] Prior to the August 2012 dividend payment, another five RMBS-related lawsuits were filed against Ally Securities, and two other cases survived motions to dismiss.

In evaluating a debtor's insolvency, both present and contingent assets and liabilities are to be considered, so long as the contingency is capable of reasonable estimation and provided

_____

[1153] This appears to be a fair approximation of total equity. Ally Securities financial statements of the year-ended December 31, 2011 reflected total equity of $248.1 million and total capital of $247.2 million and Ally Securities had a net loss of $11 million for the year-ended Dec. 31, 2012. Ally Securities, LLC Financial Statements as of and for the Year Ended Dec. 31, 2011, Supplementary Schedules as of the Year Ended Dec. 31, 2011, at 19 [FHFA-AS-0314565]. Total capital was computed on Ally Securities' supplemental schedules by adjusting total equity for items specified by the SEC. Adjustments include deductions for ownership equity not allowable for net capital, the addition of liabilities subordinated to claims of general creditors allowable in computation of net capital and other deductions and credits. *See* SEC Form X-17A-5 Financial and Operational Combined Uniform Single Report, Part II, at 11, http://www.sec.gov/about/forms/formx-17a-5_2.pdf.

[1154] *See* Letter to SEC and Financial Industry Regulatory Authority (Apr. 10, 2012), at ALLY_0424689 [ALLY_0424689]

[1155] *See* Letter to SEC and Financial Industry Regulatory Authority (Aug. 20, 2012), at ALLY_0434974 [ALLY_0434974].

[1156] Three other claims have survived similar motions since, while several others await decisions on a motion to dismiss.

[1157] These lawsuits and their relative merits are discussed in more detail in Section VIII.C.2.b.

that such contingent assets or liabilities are properly discounted.[1158] "It makes no difference whether the firm has a contingent asset or a contingent liability; the asset or liability must be reduced to its present, or expected, value before a determination can be made whether the firm's assets exceed its liabilities."[1159] Under these circumstances, a court would have to determine the expected value of Ally Securities' RMBS-related lawsuits as of the April 2012 and August 2012 dividend payments. Given that some of these claims had passed the pleading stage, and that AFI, the Debtors and certain other parties in interest were discussing a global settlement of these and other massive claims at the time of the April 2012 transfer, it is reasonable to assume that Ally Securities would have ascribed at least some value to these actions. While the Examiner has not quantified the potential liabilities for these lawsuits, in light of the significant alleged damages, the Examiner concludes that a reasonable quantification of these liabilities would likely overwhelm Ally Securities' $49.5 million in equity as of the April 2012 transfer as well as the $16.3 million as of the August 2012 transfer, and that the evidence supports the proposition that Ally Securities was insolvent at both the April 2012 and August 2012 transfers.[1160]

### (2) Reasonably Equivalent Value

The Examiner concludes that it is likely that the April 2012 and August 2012 discretionary dividend payments to AFI were not made for reasonably equivalent value. Numerous courts have held that dividends paid to members of a limited liability company are not made for value.[1161] Ally Securities was under no obligation, contractually or otherwise, to

---

[1158] *Mellon Bank, N.A. v. Official Comm. of Unsecured Creditors of R.M.L., Inc.* (*In re R.M.L., Inc.*), 92 F.3d 139, 156 (3d Cir. 1996) ("[I]f a debtor's treatment of an item as an 'asset' depends for its propriety on the occurrence of a contingent event, a court must take into consideration the likelihood of that event occurring from an objective standpoint."); *In re Xonics Photochemical, Inc.*, 841 F.2d 198, 200 (7th Cir. 1988) ("By definition, a contingent liability is not certain—and often is highly unlikely—ever to become an actual liability. To value the contingent liability it is necessary to discount it by the probability that the contingency will occur and the liability will become real."). A complete discussion of the valuation of contingent assets and liabilities for solvency purposes can be found in Section VI.5.

[1159] *In re Xonics Photochemical, Inc.*, 841 F.2d at 200.

[1160] *See also In re Xonics Photochemical, Inc.*, 841 F.2d at 200 ("[An] asset or liability must be reduced to its present, or expected, value before a determination can be made whether the firm's assets exceed its liabilities."). As stated, nearly any quantification of these liabilities would render Ally Securities insolvent for fraudulent transfer purposes.

[1161] *E.g., Fisher v. Hamilton* (*In re Teknek, LLC*), 343 B.R. 850, 861 (Bankr. N.D. Ill. 2006) (holding that dividend paid to limited liability company members was not a transfer for reasonably equivalent value); *see Michaelson v. Farmer* (*In re Appleseed's Intermediate Holdings, LLC*), 470 B.R. 289, 300 (D. Del. 2012) ("Defendants have not persuaded the Court that a voluntarily disbursed dividend to preferred shareholders, even if some payments are a return of capital, constitutes reasonably equivalent value. Defendants do not suggest that Debtors were otherwise required to return the capital . . . ."); *United States v. Rocky Mountain Holdings, Inc.*, 782 F. Supp. 2d 106, 122–23 (E.D. Pa. 2011) (nothing that equity interests are not debt, thus "limited partnership distributions do not qualify as 'antecedent debt' constituting an exchange 'for value'"); *Freeland v. Enodis Corp.* (*In re Consol. Indus. Corp.*), 2006 WL 3136924, at *8 (N.D. Ind. 2006); *Sherman v. FSC Realty* (*In re Brentwood-Lexford Partners, LLC*), 292 B.R. 255, 267 (Bankr. N.D. Tex. 2003); *Pereira v. Equitable Life Ins. Soc'y of the U.S.* (*In re Trace Int'l Holdings, Inc.*), 289 B.R. 548, 557 (Bankr. S.D.N.Y. 2003).

make either the April 2012 dividend payment or the August 2012 dividend payment. Thus, as these were discretionary dividends to AFI which did not satisfy any antecedent debt or otherwise provide value to Ally Securities, a court would likely conclude that this payment was made for less than reasonably equivalent value.

### d. Whether The Dividend Payments Constitute An Actual Fraudulent Transfer Is A Close Question

The Examiner concludes that, while a close question, it is more likely than not that an actual fraudulent transfer claim with respect to the April 2012 and August 2012 dividend payments would also prevail.[1162] A transfer may be avoided if the transferor made the transfer with the actual intent to hinder, delay or defraud its present or future creditors.[1163] Courts have generally held that actual fraudulent intent must be proven by clear and convincing evidence, which may be inferred from the circumstances surrounding the transaction.[1164] This inference

_____

[1162] While it is possible that creditors could bring fraudulent transfer actions against Ally Securities in several jurisdictions, the laws of the states most relevant to the analysis, Delaware (the state of incorporation of Ally Securities) and Minnesota (the principal place of business of Ally Securities), both of which have incorporated the UFTA, are substantially the same for the purposes herein. Even if a party in interest sought to apply the law of a jurisdiction which had incorporated the UFCA, such as New York, the actual fraud analysis, as well as the solvency and reasonably equivalent value analyses under the different acts are essentially the same. *See, e.g.*, *Nisselson v. Empyrean Inv. Fund, L.P.* (*In re MarketXT Holdings Corp.*), 376 B.R. 390, 420 n.42 (Bankr. S.D.N.Y. 2007) (noting that "there is no dispute that Federal and State law are virtually identical as to their requirements for proving a constructive fraudulent conveyance"). Additionally, though there are various laws addressing fraudulent transfers, they share many similarities and, as such, case law interpreting one law is often used by courts in analyses of the other laws. *See, e.g.*, *Sharp Int'l Corp. v. State St. Bank & Trust Co.* (*In re Sharp Int'l Corp.*), 403 F.3d 43, 55 (2d Cir. 2005) (citing *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 634 n.8 (2d Cir. 1995) (noting "New York's policy in favor of national uniformity in UFCA law"); *HBE Leasing Corp.*, 48 F.3d at 634 n.8 ("In order to promote a uniform national interpretation of the UFCA, both this Circuit and the courts of New York have encouraged recourse to the case law of other jurisdictions."). As the transactions occurred within the last 13 months, there are no statute of limitation issues. Thus, the Examiner has not engaged in a choice of law analysis.

[1163] *See, e.g.*, UFTA § 4(a)(1); N.Y. DEBT. & CRED. LAW § 276.

[1164] *See, e.g.*, *HBE Leasing Corp.*, 48 F.3d at 639; *In re Dreier LLP*, 452 B.R. 391, 408 (Bankr. S.D.N.Y. 2011) ("[C]ourts have recognized that allegations of circumstantial evidence are sufficient to establish fraudulent intent, because the trustee's lack of personal knowledge is compounded with complicated issues and transactions which extend over lengthy periods of time.") (internal citations and quotation marks omitted).

can be made by relying on "badges of fraud."[1165] The April 2012 and August 2012 dividend payments implicate several badges of fraud. The transfers, which comprised substantially all of Ally Securities' property,[1166] were made: (1) for no consideration (as discussed above); (2) between a parent and its wholly owned subsidiary; (3) while Ally Securities was likely insolvent (as discussed); and (4) under the threat of massive pending litigation. Thus, there are a number of badges of fraud present.

Additionally, the general chronology of events and circumstances surrounding the transfers supports an inference of fraud. From April 2011 to August 2012, the outlook for Ally Securities grew progressively worse. Ally Securities faced mounting litigation, with more parties filing RMBS-related complaints as time progressed. Additionally, as noted above, plaintiffs began to have some success in their litigation, defeating several motions to dismiss. Both AFI and the Debtors were aware of this, as there is evidence that the parties viewed the equity of Ally Securities as having little value just prior to the April 2012 dividend payment. At a meeting that took place on or about March 23, 2012, Michael Carpenter, CEO of AFI, outlined various restructuring alternatives for ResCap, one of which included a contribution of all of the equity of Ally Securities, in addition to cash and other considerations. According to John Mack, a ResCap Board director, the "ancillary items," including the equity of Ally Securities, "ultimately didn't really have value."[1167] Gary Lee of Morrison & Foerster also stated that the perception was that the cash was the only thing of value in the settlement offer.[1168] Lee further stated that "it was ResCap's view that the value of Ally Securities was functionally zero and maybe even a negative number."[1169] After Carpenter attempted to include Ally Securities in a settlement offer, and it was refused as adding little or no value,

_____

[1165] These may include, but are not limited to:

> (1) the lack or inadequacy of consideration; (2) [a] close associate relationship between the parties; (3) the retention of possession, benefit or use of the property in question; (4) the financial condition of the party that made the transfer or obligation both before and after the transaction in question; (5) the existence or cumulative effect of a pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and (6) the generally chronology of events and transactions under inquiry.

> *Le Café Creme, Ltd. v. Le Roux* (*In re Le Café Creme, Ltd.*), 244 B.R. 221, 239 (Bankr. S.D.N.Y. 2000) (citing *Salomon v. Kaiser* (*In re Kaiser*), 722 F.2d 1574, 1582–83 (2d Cir. 1983)); *see also Kelly v. Armstrong*, 206 F.3d 794, 798 (8th Cir. 2000) (noting badges of fraud may also include "(1) actual or threatened litigation against the debtor; (2) a transfer of all or substantially all of the debtor's property; (3) insolvency on the part of the debtor; (4) a special relationship between the debtor and the transferee; and (5) retention of the property by the debtor after the transfer").

[1166] *See* Letter to SEC and Financial Industry Regulatory Authority (Apr. 10, 2012), at ALLY_0424689 [ALLY_0424689] ("[T]his amount represents approximately 96.49% of the excess capital of Ally Securities . . . .").

[1167] Dep. of J. Mack, Nov. 14, 2012, at 97:4–8.

[1168] *See* Int of G. Lee, Feb. 20, 2013, at 264:6–266:9.

[1169] *Id.* at 265:24–266:1. This settlement offer is more fully discussed in Section III.J.

less than a month later Ally Securities began transferring substantially all of its "excess capital" to AFI. This chronology, together with the presence of multiple badges of fraud, can constitute "conclusive evidence of an actual intent to defraud."[1170]

This inference of actual fraudulent intent may be negated by a legitimate business purpose.[1171] As noted above, Ally Securities has stated that it made the April 2012 and August 2012 transfers because it had "made the decision to exit all mortgage-related securities underwriting and trading activities."[1172] Thus, the payments were a "return of capital . . . devoted to the mortgage-related securities activities, including the $175 million . . . in capital that [AFI] invested in Ally Securities in 2011 in order to permit Ally Securities to become a Ginnie Mae [Real Estate Mortgage Investment Conduits] underwriter."[1173] The presence of this potential legitimate business purpose creates a close question. However, given the multiple badges of fraud and circumstances described above, the Examiner concludes that, while a close call, it is more likely than not that a court would find the strong inference of fraudulent intent outweighs the stated business purpose. Accordingly, the April 2012 and August 2012 dividend payments may be recovered by creditors of Ally Securities as actual fraudulent transfers.

### e.  It Is Unlikely That The Dividend Payments Would Be Unlawful Dividends

The Examiner concludes that it is unlikely that a court would determine that the April 2012 dividend payment and the August 2012 dividend payment would constitute unlawful dividends. "Under Delaware law, the directors of a corporation may declare and pay a dividend to the shares of its capital stock only out of the corporation's surplus."[1174] "A corporation's surplus is 'the excess of net assets over the par value of the corporation's issued stock.'"[1175] "Net assets are the amount by which total assets exceed total liabilities."[1176] Accordingly, whether the dividend payments would be considered unlawful would turn on a determination of whether the dividend payments came out of the corporate surplus of Ally

---

[1170] *Picard v. Taylor* (*In re Park S. Sec., LLC*), 326 B.R. 505, 518 (Bankr. S.D.N.Y. 2005) (noting that "absent 'significantly clear' evidence of a legitimate supervening purpose" the "confluence of several [badges of fraud] can constitute conclusive evidence of an actual intent to defraud") (citing *Max Sugarman Funeral Home, Inc. v. A.D.B. Investors*, 926 F.2d 1248, 1254–55 (1st Cir. 1991)).

[1171] *Picard*, 326 B.R. at 518 (noting that "absent 'significantly clear' evidence of a legitimate supervening purpose" the "confluence of several [badges of fraud] can constitute conclusive evidence of an actual intent to defraud") (citing *Max Sugarman Funeral Home, Inc.*, 926 F.2d at 1254–55).

[1172] *See* Letter to SEC and Financial Industry Regulatory Authority (Aug. 20, 2012), at ALLY_0434974 [ALLY_0434974].

[1173] *See id.* at ALLY_0434974.

[1174] *U.S. Bank Nat'l Ass'n v. Verizon Commc'ns Inc.*, 892 F. Supp. 2d 805, 822 (N.D. Tex. 2012).

[1175] *Id.* at 822 (citing *Klang v. Smith Food & Drug Ctrs., Inc.*, 702 A.2d 150, 153 (Del. 1997)).

[1176] *U.S. Bank Nat'l Ass'n*, 892 F. Supp. 2d at 822 (citing DEL. CODE ANN. tit. 8, § 154 (2012)).

Securities. Ally Securities stated that the payments were made out of "excess capital."[1177] It is unclear whether this would constitute surplus, regardless of how it was identified by Ally Securities. As one court has stated, "directors . . . have almost unfettered discretion in defining the extent of the corporation's surplus."[1178] "The easy manipulation of a corporation's surplus has prompted one commentator to note that statutes prohibiting payment of dividends out of surplus are 'virtually meaningless.'"[1179] Thus, it is difficult to predict whether a court would treat Ally Securities' "excess capital" as surplus. There are few cases which discuss such a calculation. Given the massive potential liabilities of Ally Securities, a creditor could argue that these payments were not made from a surplus, and that Ally Securities' liabilities exceeded its assets, as discussed above. However, it is unclear how much deference a court would give to Ally Securities' directors' judgment. If a court were to find these dividends to be unlawful, they would be voidable, and may be recovered as a fraudulent transfer.[1180] This could give creditors of Ally Securities an alternative basis for recovery. In light of the conclusions above with respect to actual and constructive fraud, this may be unnecessary.

---

[1177] *See* Letter to SEC and Financial Industry Regulatory Authority (Apr. 10, 2012), at ALLY_0424689 [ALLY_0424689] ("Please be advised that . . . Ally Securities . . . has determined to make a distribution of excess net capital to its parent and sole member, [AFI] . . . in the amount of $200,000,000. This amount represents approximately 96.49% of the excess capital of Ally Securities . . . .").

[1178] *Official Comm. of the Unsecured Creditors of Color Tile, Inc. v. Blackstone Family Inv. P'ship* (*In re Color Tile, Inc.*), 200 WL 152129, at *3 (D. Del. 2000).

[1179] *Id.*

[1180] *Pereira v. Equitable Life Ins. Soc'y of the United Sates* (*In re Trace Int'l Holdings, Inc.*), 289 B.R. 548, 560 (Bankr. S.D.N.Y. 2003) (applying Delaware law).