## IX. EVALUATION OF CONSIDERATION FOR RELEASES

### A. REVIEW OF PROPOSED RELEASE OF ESTATE AND THIRD-PARTY CLAIMS UNDER NOW-TERMINATED SETTLEMENT AGREEMENT WITH AFI

The AFI Settlement and Plan Sponsor Agreement proposed to settle all Estate Causes of Action and Third-Party Claims against the AFI Released Parties. AFI proposed a cash contribution of $750 million (plus other non-cash contributions to the Debtors) to achieve the settlement of *both* Estate Causes of Action *and* Third-Party Claims.

Under the AFI Settlement and Plan Sponsor Agreement, the Debtors agreed to include in their proposed chapter 11 plan the Debtor Release and a Third-Party Release in favor of the AFI Released Parties.[1] The Debtors also agreed, pursuant to the AFI Settlement and Plan Sponsor Agreement, to include in the confirmation order relating to such plan a provision permanently enjoining the commencement or prosecution by any person or entity of any causes of action released pursuant to such plan.[2]

During the course of the Investigation, the Debtors terminated the AFI Settlement and Plan Sponsor Agreement.[3] Accordingly, no Debtor Release or Third-Party Release in favor of the AFI Released Parties is now before the Bankruptcy Court. However, the parties may well contemplate a new settlement between the Debtors and AFI, one which would include a release of Claims, including Third-Party Claims, against the AFI Released Parties.[4]

To provide some guidance to parties in connection with any potential future settlement, the Examiner has reviewed the terms of the AFI Settlement and Plan Sponsor Agreement to determine whether a Debtor Release or Third-Party Release would have been warranted based on AFI's proposed contributions as part of that earlier settlement. The Examiner concludes that it is unlikely that a court would have found that AFI's contributions to the Debtors, as contemplated under the now-terminated AFI Settlement and Plan Sponsor Agreement, supported the proposition that the AFI Released Parties were entitled to the Debtor Release, much less a Third-Party Release. Section IX sets forth the rationale for that conclusion.

---

[1]  *See* AFI Settlement and Plan Sponsor Agreement, § 3.1(d)(ii).

[2]  *Id.*

[3]  The Debtors terminated the AFI Settlement and Plan Sponsor Agreement as of February 28, 2013. *See* Ally Financial Inc., Annual Report (Form 10-K) (Mar. 1, 2013), at 17.

[4]  AFI has not withdrawn its offer to provide a $750 million cash contribution to the Debtors' Estates in the event that a new settlement is agreed. *See* Ally Financial Inc., Annual Report (Form 10-K) (May 1, 2013), at 11.

## B. EVALUATION OF CONSIDERATION PROPOSED IN EXCHANGE FOR RELEASE OF ESTATE CLAIMS AGAINST AFI

### 1. Legal Standard Applicable To Debtors' Settlement Of Debtors' Claims Against AFI

Pursuant to Bankruptcy Rule 9019, a bankruptcy court may "approve a compromise or settlement" if the settlement is "fair, equitable, and in the best interests of the estate."[5] In considering the settlement's terms, a bankruptcy court must "canvass the issues and see whether the settlement falls below the lowest point in the range of reasonableness."[6] If a bankruptcy court correctly concludes that a proposed settlement falls within the range of reasonableness and approves the settlement on that basis, that approval will not be reversed on appeal even if a better or more favorable settlement was possible.[7]

In determining whether the proposed settlement falls within the range of reasonableness, a bankruptcy court is not required to conduct a "mini-trial" to decide the individual issues of fact and law implicated by a proposed settlement.[8] Instead, a bankruptcy court need only apprise itself "of those facts that are necessary to enable it to evaluate the settlement and to make a considered and independent judgment."[9] "In evaluating the necessary facts, a court may rely on the opinion of the debtor, parties to the settlement, and the professionals."[10]

---

[5]  *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424–25 (1968); *HSBC Bank USA, N.A. v. Fane* (*In re MF Global Inc.*), 466 B.R. 244, 247 (Bankr. S.D.N.Y. 2012); *Air Line Pilots Assoc. v. Am. Nat'l Bank & Trust Co. of Chi.* (*In re Ionosphere Clubs, Inc.*), 156 B.R. 414, 426 (S.D.N.Y. 1993).

[6]  *In re MF Global Inc.* 466 B.R. at 247 (citing *In re Chemtura Corp.*, 439 B.R. 561, 594 (Bankr. S.D.N.Y. 2010); *In re Adelphia Commc'ns Corp.*, 327 B.R. 145, 159 (Bankr. S.D.N.Y. 2005) (quoting *In re W.T. Grant Co.*, 699 F.2d 599, 608 (2d Cir. 1983)).

[7]  *See Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972) ("[T]here is a range of reasonableness with respect to a settlement—a range which recognizes the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion—and the judge will not be reversed if the appellate court concludes that the settlement lies within that range."); *In re Adelphia Commc'ns Corp.*, 327 B.R. at 159 (citing *In re Penn Cent. Transp. Co.*, 596 F.2d 1102, 1114 (3d Cir. 1979); *Official Comm. of Unsecured Creditors of Int'l Distrib. Ctrs., Inc. v. James Talcott, Inc.* (*In re Int'l Distrib. Ctrs., Inc.*), 103 B.R. 420, 423 (Bankr. S.D.N.Y. 1989)).

[8]  *In re Adelphia Commc'ns Corp.*, 327 B.R. at 159 (citing *In re Purofied Down Prods. Corp.*, 150 B.R. 519, 522 (S.D.N.Y. 1993); *In re Int'l Distrib. Ctrs., Inc.*, 103 B.R. at 423).

[9]  *In re Adelphia Commc'ns Corp.*, 327 B.R. at 159 (citing *In re Purofied Down Prods. Corp.*, 150 B.R. at 522; *In re Energy Coop., Inc.*, 886 F.2d 921, 924–25 (7th Cir. 1989)).

[10]  *In re Purofied Down Prods. Corp.*, 150 B.R. at 522–23; *In re Dewey & LeBoeuf LLP*, 478 B.R. 627, 641 (Bankr. S.D.N.Y. 2012) (citing *In re Chemtura Corp.*, 439 B.R. at 594). Of these opinions that *may* be considered, courts generally agree that the business judgment of the debtor recommending the settlement is a factor that *should* be considered. *See In re Dewey & LeBoeuf LLP*, 478 B.R. at 641; *In re MF Global Inc.*, 466 B.R. at 247 (noting that "[a]lthough courts have discretion to approve settlements, the business judgment of the debtor in recommending the settlement should be factored into the court's analysis . . . . At the same time, a court may not simply defer to a debtor in possession's judgment, but must independently evaluate the reasonableness of the settlement") (internal citation omitted); *JPMorgan Chase Bank, N.A. v. Charter Commc'ns Operating LLC* (*In re Charter Commc'ns*), 419 B.R. 221, 252 (Bankr. S.D.N.Y. 2009).

In the Second Circuit, bankruptcy courts consider seven factors, known as the *Iridium* factors, in evaluating whether a proposed settlement is fair and equitable for purposes of approval pursuant to Bankruptcy Rule 9019:

- the balance between the litigation's possibility of success and the settlement's future benefits;

- the likelihood of complex and protracted litigation, with its attendant expense, inconvenience, and delay, including the difficulty in collecting on the judgment;

- the paramount interests of the creditors, including each affected class's relative benefits and the degree to which creditors either do not object to or affirmatively support the proposed settlement;

- whether other parties in interest support the settlement;

- the competency and experience of counsel supporting, and the experience and knowledge of the bankruptcy court judge reviewing, the settlement;

- the nature and breadth of releases to be obtained by officers and directors; and

- the extent to which the settlement is the product of arm's-length bargaining.[11]

### 2.  Analysis Of Debtors' Proposed Settlement Of The Estates' Claims Against AFI

As discussed in Section I, the Debtors' Estates may assert claims of not less than $1.31 billion against AFI that the Examiner concludes are likely to succeed, and additional claims of not less than $1.78 billion against AFI that, while, a close question, the Examiner concludes are more likely than not to succeed.

Given AFI's large potential litigation exposure to the Debtors, the Examiner concludes that it is unlikely that a court would have approved a Bankruptcy Rule 9019 settlement of the Estate Causes of Action against the AFI Released Parties in exchange for the consideration proposed under the now-terminated AFI Settlement and Plan Sponsor Agreement, particularly because the settlement set forth in the AFI Settlement and Plan Sponsor Agreement did not have the support of any creditor group or party in interest, other than the RMBS Institutional

---

[11] *Motorola, Inc. v. Official Comm. of Unsecured Creditors* (*In re Iridium Operating LLC*), 478 F.3d 452, 462 (2d Cir. 2007) (citing *In re WorldCom, Inc.*, 347 B.R. 123, 137 (Bankr. S.D.N.Y. 2006); *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968); *In re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d 285, 292 (2d Cir. 1992) (internal quotations and alterations omitted)). When the proposed settlement is one with an insider, such as AFI, the settlement's terms may be subject to heightened level of scrutiny. *In re Charter Commc'ns*, 419 B.R. at 240–41 (court viewed debtor's settlement with its controlling shareholder "with heightened scrutiny and some skepticism").

Investors.[12] As discussed above, two of the *Iridium* factors (the paramount interests of creditors and whether other parties in interest support the settlement) require the Bankruptcy Court to take into consideration the amount of support afforded to a proposed settlement.[13]

### a. AFI's Non-Cash Contributions To The Debtors' Estates

Pursuant to the AFI Settlement and Plan Sponsor Agreement, AFI was to provide the Debtors with $750 million and other non-cash contributions as consideration for the settlement. In this Section, the Examiner reviews the Debtors' and AFI's valuation of certain of AFI's non-cash contributions to the Debtors' Estates.

In the AFI Settlement and Plan Sponsor Agreement, AFI had agreed that it would make the following contributions to the Debtors:

- serve as the stalking horse bidder for the Debtors' whole loan portfolio, which the Debtors asserted provided up to $200 million in additional value;

- enter into the Shared Services Agreement with the Debtors;

- provide use of AFI cash collateral;

- enter into a Transition Services Agreement with the purchaser of the Debtors' platform;

- provide up to $220 million in financing pursuant to the AFI DIP Financing Agreement;

- support GMAC Mortgage Group LLC's retirement plan; and

- support the Debtors' continued origination of mortgage loans, which the Debtors valued at approximately $100 million.[14]

The Debtors ascribed settlement value of not less than $300 million to AFI's willingness to provide these contributions, attributing, as noted above, $200 million to AFI's willingness to

---

[12] Pursuant to the Junior Secured Noteholders' Plan Support Agreement, the Consenting Junior Secured Noteholders agreed to vote to accept, and support confirmation of, a plan that included the Debtor Release and a Third-Party Release. *See* Junior Secured Noteholders' Plan Support Agreement, § 4.1(f), (g). As discussed in Section III.J.5, the Junior Secured Noteholders' Plan Support Agreement was terminated by the Consenting Junior Secured Noteholders on or about September 28, 2012, and they were no longer bound to—and in fact ceased to—support the Debtors' proposed settlement and release of claims against the AFI Released Parties.

[13] While creditors' views of a settlement are not dispositive, courts consider carefully the reasonable view of creditors. *See O'Connell v. Packles* (*In re Hilsen*)*,* 404 B.R. 58, 70, 76 (Bankr. E.D.N.Y. 2009) (noting that a court "must carefully consider the reasonable views of creditors, but it may also exercise its discretion to approve a settlement over the objection of some creditors, a majority of creditors, or even the sole creditor, if after weighing all the factors, the settlement falls above the lowest point in the range of reasonableness") (citations omitted).

[14] *See* AFI Settlement and Plan Sponsor Agreement, § 2.1; *see also* AFI Submission Paper, dated Dec. 19, 2012, at 96–99; Debtors' Submission Paper, dated Dec. 18, 2012, at 30–39.

serve as the stalking horse bidder for the HFS Portfolio and $100 million to AFI's willingness to allow the Debtors to continue originating loans.[15] Accordingly, the Examiner has focused on the value of these two non-cash contributions. The Examiner's review of certain other of AFI's non-cash contributions provided to the Debtors is set forth in Section III.J.

> *(1) AFI Support For The Debtors' Origination And Servicing Of Mortgage Loans*

AFI agreed to allow the Debtors to continue originating (by serving as a broker to Ally Bank) and servicing loans during the pendency of the Chapter 11 Cases. AFI attributed significant value to this agreement, characterizing it as an unprecedented accomplishment that added "substantial" value to the Debtors' Estates.[16] AFI asserted that the Debtors' ability to continue originating and servicing loans during the Chapter 11 Cases resulted in: (1) a sale of the Debtors' servicing platform, servicing rights, and servicing advances for $3 billion; and (2) approximately $160 million to $180 million in market-based broker fees paid by Ally Bank to the Debtors for loans originated since the bankruptcy filing.[17]

The Debtors have been more conservative in ascribing value to AFI's origination and servicing support, describing this contribution as worth approximately $100 million to the Debtors.[18] In support of this estimate, the Debtors had provided projections for the period of May 2012 through March 2013, which included $118 million in origination profit ($265 million in broker fees and other revenue less associated expenses).[19] According to FTI,

---

[15] *See* Dep. of M. Puntus, Nov. 5, 2012, at 42:5–49:4 (stating that AFI "asked for monetary credit for both the willingness to originate loans as well as their willingness to be the stalking horse bidder for the whole loan portfolio" at a value that was higher than the next higher bidder and noting that AFI wanted $200 million in settlement credit for its stalking horse bid); Debtors' Omnibus Response to Third-Party Submissions, dated Dec. 18, 2012, at 29 (asserting continued consumer lending origination support provided approximately $100 million in value).

[16] AFI Submission Paper, dated Dec. 19, 2012, at 94–95.

[17] *Id*. at 95.

[18] Debtors' Submission Paper, dated Dec. 18, 2012, at 31. While the Debtors have focused on AFI's origination support, GMAC Mortgage also benefited from its ability to continue to service the Ally Bank portfolio, which permitted GMAC Mortgage to maintain operations at historical levels and may have positively affected the Debtors' ultimate ability to sell their mortgage servicing assets. *See* Int. of J. Pensabene, Jan. 9, 2013, at 245:4–12 ("If we lost rights to service one-third of our overall portfolio and . . . even more as it relates to just the value of the portfolio then the auction of the business would not have been nearly as successful as it turned out to be. The value of the platform would have been diminished dramatically."). *See also* Joint Servicing – Ally Subservicing Agreement Presentation by Centerview, Morrison Foerster and FTI, dated July 17, 2012, at RC00075961 [RC00075960] ("The discontinuation of the subservicing agreement would result in collateral damage to the Company's servicing platform overall, which would influence potential buyers when submitting their bids for the business . . . . Rejection of the agreement would also result in distractions in transferring approximately 700K loans to Ally Bank's designated servicer.").

[19] Projected ResCap Origination P&L [EXAM00219982] (this document includes May 2012 as the first projected period and was prepared for the first day hearings in the Chapter 11 Cases). Meeting with Evercore, Financial Advisor to AFI, in N.Y., N.Y. (Sept. 6, 2012) (noting that FTI prepared cash flow projections supporting the approximately $100 million of value attributed to originations during the prepetition negotiations).

however, the actual volume of originations was lower than originally projected.[20] In December 2012, FTI therefore estimated that the continuation of mortgage origination would result in profit to the Debtors of only $50 million.[21]

AFI also benefited from enabling the Debtors to continue originating loans as a broker to Ally Bank, originally projecting earning a profit of $400 million[22] from these activities as well as generating $100 million in additional MSR assets for Ally Bank.[23] AFI subsequently calculated Ally Bank's profit from consumer lending in the postpetition period through January 2013 and projected pre-tax profit in a run-off period thereafter totaling $291 million, net of broker fees paid to the Debtors of $195 million, as shown in the following exhibit.[24] This amount of broker fees is consistent with FTI's comments regarding a reduced level of originations as compared to the Debtors' original projections and would imply that the Debtors in turn earned a profit of approximately $87 million, using the profit margin from FTI's original analysis.[25]

_____

[20] FTI asserted that the actual volume of originations for the period of May 2012 through September 2012 was lower than projected because of reduced staffing levels at the Debtors and more disruption than anticipated from the bankruptcy filing. Origination volume was in-line with projections for October 2012 through December 2012. Meeting with FTI, Financial Advisor to the Debtors, via telephone (Dec. 21, 2012).

[21] Meeting with FTI, Financial Advisor to the Debtors, via telephone (Dec. 21, 2012) and Projected ResCap Origination P&L [EXAM00219982]. FTI indicated that they were unable to produce an updated schedule of origination profit because of personnel departures, E-mail from FTI to Examiner's Financial Advisors (Apr. 9, 2013).

[22] Evercore, Kirkland & Ellis and Mayer Brown Project Rodeo Presentation, dated Apr. 23, 2012, at 4 [CCM00335615].

[23] *Id*.

[24] Ally Financial Consumer Lending Income Contribution [ALLY_PEO_0089616].

[25] Projected ResCap Origination P&L [EXAM00219982] ($118 million profit / $265 million revenue = 44.5%).

EXHIBIT IX.B.2.a(1)

**Income Earned by Ally Bank from Postpetition Residential Mortgage Loan Originations**

*($ in Millions)*

| | May 2012 – December 2012 | January 2013 & Run-off | Total |
|---|---|---|---|
| **Revenue** | | | |
| Net interest income | $        16 | $        4 | $        21 |
| Gain on sale | 160 | 15 | 174 |
| Loan processing fees | 284 | 70 | 354 |
| Total revenue | 460 | 89 | 549 |
| **Expenses** | | | |
| Compensation & benefit expenses | 4 | 2 | 6 |
| Broker fee expense | 150 | 45 | 195 |
| Other expenses | 15 | 4 | 19 |
| Total expense | 170 | 51 | 220 |
| Pre-tax income | 290 | 39 | 329 |
| Expense allocation | 33 | 6 | 39 |
| Pre-tax income with expense allocation | $     258 | $     33 | $     291 |

*Source: Ally Financial Consumer Lending Income Contribution [ALLY_PEO_0089616].*

AFI asserts that, while no other third party was willing to enter into an arrangement with the Debtors to allow continued origination of Mortgage Loans postpetition, the postpetition broker agreement was on market terms.[26]

Finally, Centerview also acknowledged that Ally Bank profited from the continued loan origination. In fact, negotiations with AFI regarding originations started as a stand-alone issue that was only later "roped in" to the ResCap/AFI settlement discussions when determining how much settlement consideration was provided by AFI.[27]

As to the increase in value achieved in the Postpetition Asset Sales, the evidence supports the proposition that AFI's actions supported the Debtors' continued operation as a going concern and thus likely enhanced the value achieved. It is difficult to regard auctions that

---

[26] *See* AFI Submission Paper, dated Dec. 19, 2012, at 94 ("Ally entered into a broker agreement with the Debtors that calls for Ally to fund the mortgages on market terms—a step that no other third party was willing to take."); Int. of G. Lee, Feb. 20, 2013, at 353:7–14 ("I don't think that any bankrupt entity is going to be able to broker loans to a federally chartered bank anywhere in the world.").

[27] Meeting with Centerview, Investment Bankers for the Debtors, in N.Y., N.Y. (Jan. 18, 2013). Centerview and Houlihan Lokey took the position that continued loan origination was part of a "status quo" scenario without a settlement. However, AFI in its prepetition negotiations with ResCap stated it was unwilling to broker loans in bankruptcy if settlement value was not assigned. E-mails between J. Strelcova, J. Young, K. Chopra and J. Lewis (May 7, 2012) [ALLY_0157778] (discussing AFI settlement value for continued originations in bankruptcy).

generated approximately $800 million (or 22%) in incremental value above the stalking horse bids and enabled the continued operations of the Debtors' businesses as anything but a success.[28]

How much of this success can be attributed to AFI, however, is difficult to quantify. Numerous market and competitive factors may also have affected the ultimate purchase price. As one example, the Debtors have asserted that the RMBS Institutional Investors had significant influence on the Debtors' ability to sell the Platform Assets,[29] and without the RMBS Trust Settlement Agreements, the Platform Assets may have sold for less in the auction.[30]

On balance, the Examiner concludes that the evidence does not support the proposition that AFI provided significant settlement value to the Debtors' Estates in allowing the Debtors to continue mortgage origination.

### *(2) Stalking Horse Bid On HFS Portfolio*

AFI asserts that its willingness to serve as the stalking horse bidder for the Debtors' HFS Portfolio provided value of at least $200 million to the Debtors' Estates by, among other things, setting the floor for the bidding to continue at auction.[31] However, when AFI first requested settlement credit for the extra $200 million that AFI would have paid if the assets were sold pursuant to a plan incorporating the Third-Party Release, ResCap debated whether such value should be allocated to the settlement.[32] Puntus stated that Centerview viewed the $200 million settlement credit as "ridiculous" at the time it was first proposed[33] and was

---

[28] As described in Section III.J, as of the Petition Date, the stalking horse bids, which totaled $3.7 billion were comprised of a $2.3 billion bid by Fortress in the Platform Sale and a $1.4 billion bid by AFI in the Legacy Sale (pursuant to a section 363 sale, or $1.6 billion pursuant to a plan of reorganization). Before the auction, the stalking horse bids were modified and increased to $2.4 billion by Fortress in the Platform Sale and $1.45 billion by Berkshire Hathaway in the Legacy Sale. The ultimate auction resulted in proceeds of $4.5 billion, comprised of the Platform Sale to Ocwen and Walter for $3.0 billion and the Legacy Sale to Berkshire Hathaway for $1.5 billion. Sales Procedure Motion, ¶ 6; Nationstar Mortgage LLC, Current Report (Form 8-K) (July 5, 2012), at Item 1.01; Order Approving Sale Procedures, at 4; Third AFI DIP Order, at 2–3.

[29] *See* Int. of G. Lee, Feb. 20, 2013, at 122:12-20 ("…we had been thinking about how to achieve the sale of a live platform. And we were very conscious of the fact that the parties that would have perhaps, after AFI, the most influence on our ability to do so would be the investors who control the trustees."), 152:11-21 ("I mean, the reality is, if the investors directed the trustees to say, 'We want you to take back the trusts' or, 'we don't like this servicer,' I mean, her group, because they control the trust to a sufficient extent, could kill a sale, full stop."); *see also* Int. of J. Ilany, Nov. 28, 2012, at 173:19-24 ("How much of this $3 billion is that it is [an] operating company and it inures to the agreement with [AFI] and how much inures to the fact that [the platform's] inoculated? Sir, this is really–you divvy it up.").

[30] *See also* Int. of J. Ilany, Nov. 28, 2012, at 173:6-24 ("… I believe that without getting a release from the trustees, this transaction is not closing. If anybody thinks that this transaction[   ] closes on January 31st without a release from trustees, people are in for tears. It's not closing because nobody's buying….").

[31] *See* AFI Submission Paper, dated Dec. 19, 2012, at 94.

[32] *See* Dep. of M. Puntus, Nov. 5, 2012, at 123:6–14.

[33] Meeting with Centerview, Investment Bankers for the Debtors, in N.Y., N.Y. (Jan. 18, 2013).

"skeptical as to whether that did or did not actually constitute settlement value."[34] Rather than spend a lot of time disputing the issue with AFI, according to Puntus, Centerview "said, okay, you call it what you want, I think it was referenced as settlement value; and then as the case proceeds, we will see whether it's settlement value or sale value."[35] In other words, Centerview's opinion was that if AFI were overbid during the auction, the $200 million had no settlement value but more accurately reflected the assets' actual value.[36]

AFI was concerned that ResCap would not confirm settlement credit of $200 million if AFI was overbid.[37] ResCap was concerned about losing AFI's bid, so it agreed in the AFI Settlement and Plan Sponsor Agreement to give AFI the settlement credit even if it was overbid.[38] ResCap believed that, in any case, the allocation of $200 million to the settlement credit would ultimately be decided by a judge.[39]

The Examiner concludes that the evidence does not support the proposition that AFI should be credited with any settlement value for its willingness to serve as the stalking horse bidder in the sale of the HFS Portfolio.

### (3) Examiner's Conclusion Concerning The Value Of AFI's Non-Cash Contributions

While the Debtors previously had attributed, and AFI continues to attribute, significant value to AFI's participation and contributions in the Chapter 11 Cases, the Examiner concludes that the evidence does not support the proposition that significant settlement value should have been ascribed to AFI's non-cash contributions in connection with the now-terminated AFI Settlement and Plan Sponsor Agreement.

---

[34] *See* Dep. of M. Puntus, Nov. 5, 2012, at 42:5–13.

[35] *See id.* at 47:16–20.

[36] Meeting with Centerview, Investment Bankers for the Debtors, in N.Y., N.Y. (Jan. 18, 2013). Puntus noted that, in light of how the auction transpired, it was hard to say at that point that the $200 million had any settlement value. *Id.* As of August 16, 2012, in the then most recent waterfall analysis provided by the Debtors, FTI assumed an AFI settlement contribution of only $850 million, which consisted of $750 million in cash and $100 million in origination support. FTI Hypothetical Waterfall Analysis Presentation, dated Aug. 16, 2012, at 4 [EXAM00176577]. The Examiner believes AFI's bid on the HFS Portfolio was not given any settlement value in this FTI waterfall analysis because AFI was no longer serving as the stalking horse bidder. *See also* Dep. of T. Marano, Nov. 12, 2012, at 254:6-255:10 (when presented with an e-mail noting that AFI's settlement contribution was "750 plus 200 plus 100," Marano could not recall "what the 200 was for," (although he recalled that $100 million related to the value of AFI's enabling the Debtors "to originate through bankruptcy")).

[37] E-mail from L. Tessler to J. Ilany (Apr. 28, 2012) [EXAM11114982] (AFI bid on HFS Portfolio).

[38] E-mail from J. Ilany to J. Tanenbaum and T. Marano (Apr. 28, 2012) [EXAM11114982] (AFI bid on HFS Portfolio).

[39] E-mail from T. Marano to J. Ilany (Apr. 29, 2012) [EXAM11114982] (AFI bid on HFS Portfolio).

## C. EVALUATION OF CONSIDERATION PROPOSED IN EXCHANGE FOR RELEASE OF THIRD-PARTY CLAIMS AGAINST AFI

As discussed in the next Section, the threshold for obtaining third-party releases in the Second Circuit is extremely high and, absent the consent of all or substantially all creditors, very difficult to obtain. The Second Circuit has admonished that such releases should be granted only rarely and only in "unique" circumstances.[40] The Examiner concludes that the evidence does not support the proposition that those unique circumstances existed to justify a Third-Party Release in favor of AFI under the terms proposed by the AFI Settlement and Plan Sponsor Agreement.

Given the high threshold for obtaining non-consensual third-party releases in the Second Circuit, it would be extremely difficult to craft a confirmable Plan that includes a non-consensual Third-Party Release absent a negotiated consensual settlement encompassing all, or substantially all, of the claims held by third parties.

### 1. Legal Standard Applicable To The Release Of Third Parties' Claims Against AFI

Third-party releases and injunctions are neither explicitly permitted nor prohibited by the Bankruptcy Code. Bankruptcy Code section 524(e) provides that the "discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt."[41] The circuit courts are split as to section 524(e)'s effect, if any, on a bankruptcy court's authority to release the liability of non-debtors. The Fifth, Ninth, and Tenth Circuits limit the propriety of non-consensual third-party non-debtor releases to the asbestos context under Bankruptcy Code section 524(g), and to committee members for their work performed pursuant to Bankruptcy Code section 1103(c).[42] The Second, Third, Fourth, Sixth,

---

[40] *Deutsche Bank AG v. MetroMedia Fiber Network, Inc.* (*In re Metromedia Fiber Network, Inc.*), 416 F.3d 136, 141–42 (2d Cir. 2005).

[41] 11 U.S.C. § 524(e).

[42] *See*, *e.g*., *Bank of N.Y. Trust Co. v. Official Unsecured Creditors Comm.* (*In re Pac. Lumber Co.*), 584 F.3d 229, 252 (5th Cir. 2009); *Resorts Int'l v. Lowenschuss* (*In re Lowenschuss*), 67 F.3d 1394, 1401 (9th Cir. 1995); *Landsing Diversified Props.-II v. First Nat'l Bank & Trust Co.* (*In re W. Real Estate Fund, Inc.*), 922 F.2d 592, 600 (10th Cir. 1990), *modified by Abel v. West*, 932 F.2d 898 (10th Cir. 1991).

and Seventh Circuits permit third-party non-debtor releases in limited circumstances.[43] The circumstances in which third-party, non-debtor releases have been granted are nuanced and, in the Second Circuit, proponents of such releases must demonstrate that "truly unusual" circumstances warrant such relief.[44]

Given that the Bankruptcy Code does not expressly authorize bankruptcy courts to release third-party claims against non-debtors, a review of a bankruptcy court's jurisdiction provides a good framework in which to consider the scope of the Bankruptcy Court's authority to rule on third-party claims. The next section provides an overview of Congress's grant of jurisdiction to bankruptcy courts.

> ### a. Overview Of A Bankruptcy Court's Jurisdiction And Authority To Enjoin Claims Against Non-Debtor Third Parties

Consideration of a bankruptcy court's subject matter jurisdiction begins with 28 U.S.C. § 1334. District courts are granted original "and exclusive" jurisdiction over bankruptcy cases.[45] As to all other civil proceedings "arising under," "arising in," or "related to" a case under title 11, district courts are granted original "but not exclusive" jurisdiction.[46] The district courts may refer these bankruptcy-related proceedings to bankruptcy courts pursuant to 28

---

[43] *See*, *e.g*., *Behrmann v. Nat'l Heritage Found.*, 663 F.3d 704, 712 (4th Cir. 2011) (noting that approval of non-debtor releases "should be granted cautiously and infrequently"); *In re Ingersoll, Inc*., 562 F.3d 856, 865 (7th Cir. 2009) (upholding third-party non-debtor release included in plan as "narrowly tailored and critical to the plan as a whole"); *Johns-Manville Corp. v. Chubb Indem. Ins. Co.* (*In re Johns-Manville, Corp*.) (*Manville II*), 517 F.3d 52, 66 (2d Cir. 2008), *rev'd on other grounds and remanded sub nom. Travelers Indem. Co. v. Bailey*, 557 U.S. 137 (2009); *Airadigm Comm. v. FCC* (*In re Airadigm Comm., Inc*.), 519 F.3d 640, 657 (7th Cir. 2008) (Bankruptcy Code sections 105 and 1123(b)(6) give bankruptcy courts "residual authority" to approve non-consensual releases but whether a particular release is "appropriate" is "fact intensive and depends on the nature of the reorganization."); *In re Metromedia Fiber Network, Inc.*, 416 F.3d at 142–43; *Class Five Nev. Claimants v. Dow Corning Corp.* (*In re Dow Corning Corp*.), 280 F.3d 648, 658 (6th Cir. 2002) (holding that non-consenting creditors' claims could be enjoined against a non-debtor when seven factors were present); *Gillman v. Continental Airlines* (*In re Continental Airlines, Inc*.), 203 F.3d 203, 214 (3d Cir. 2000) (while the court of appeals did not establish a rule regarding the conditions that would justify or permit a non-debtor release or injunction, it noted that the "hallmarks of permissible non-consensual releases" were fairness, necessity to the reorganization and specific factual findings to support these conclusions); *Menard-Sanford v. Mabey* (*In re A.H. Robins Co.*), 880 F.2d 694, 702 (4th Cir. 1989) (approving permanent injunction against thousands of direct claims for birth control devices which protected among others insurer, present and former officers and directors and certain attorneys, based in part upon payments made by some of them and in part upon some of them holding indemnification rights against the debtors); *In re Wash. Mut., Inc*., 442 B.R. 314, 352 (Bankr. D. Del. 2011) (noting that any release of a non-debtor "must be based on consent of the releasing party (by contract or the mechanism of voting in favor of the plan)").

[44] *In re Metromedia Fiber Network, Inc.*, 416 F.3d at 143 (2d Cir. 2005); *Kenton Cnty. Bondholders Comm. v. Delta Airlines, Inc.* (*In re Delta Air Lines, Inc.*)*,* 374 B.R. 516, 525-26 (S.D.N.Y. 2007); *In re Spiegel Inc*., No. 03-11540, 2006 WL 2577825, at *7 (Bankr. S.D.N.Y. Aug. 16, 2006).

[45] 28 U.S.C. § 1334(a) (2012).

[46] 28 U.S.C. § 1334(b).

U.S.C. § 157(a).[47] The statutory language supports a broad grant of jurisdiction to bankruptcy courts,[48] but the jurisdiction conferred is not intended to be "limitless."[49]

Depending on the circumstances, a bankruptcy court's jurisdiction may extend to litigation between two non-debtors pursuant to the "related to" jurisdiction granted it by Congress.[50] Like other circuits, the Second Circuit has adopted an expansive interpretation of "related to" jurisdiction, holding that the test for determining whether a bankruptcy court has jurisdiction over litigation is "whether its outcome might have any 'conceivable effect' on the bankrupt estate."[51] In considering whether a court has jurisdiction to approve a third-party release, the Second Circuit has articulated this test slightly differently, holding that a bankruptcy court has jurisdiction to enjoin third-party claims against non-debtors if those claims directly affect the property of the bankruptcy estate.[52]

Before 2008, most courts in the Second Circuit considered whether they had jurisdiction to approve third-party releases pursuant to a somewhat perfunctory "shared or common facts" analysis that found jurisdiction if the claims to be released could be said to have some

---

[47] The District Court for the Southern District of New York refers all cases arising under title 11 to the bankruptcy court in this district pursuant to its Amended Standing Order of Reference, 12 Misc. 00032 (S.D.N.Y. Jan. 31, 2012). *See In re FairPoint Commc'ns, Inc.*, 452 B.R. 21, 27 (S.D.N.Y. 2011).

[48] *See Celotex Corp. v. Edwards*, 514 U.S. 300 (1995). In *Celotex*, the Supreme Court noted that Congress's choice of words in section 1334(b) of the Bankruptcy Code suggested the grant of jurisdiction was "of some breadth." *Id.* at 308. Section 1334(b)'s grant of jurisdiction is distinctly different from that conferred under prior Acts, which had limited the basis for jurisdiction to either possession of property by the debtor or consent. *Id.* (citing S. Rep. No. 95-989, 2nd Sess., at 153, 154 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5939, 5940).

[49] *See id.* (citing *Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir. 1984)). In *Pacor*, John and Louise Higgins filed a lawsuit in state court against Pacor, a chemical supplies distributor, alleging injuries caused by exposure to asbestos contained in Pacor's products. Pacor filed a third-party complaint impleading Johns-Manville, the initial asbestos manufacturer. After Johns-Manville filed for bankruptcy, the Higgins sought to remove their lawsuit to the related bankruptcy court. The bankruptcy denied removal. The Third Circuit affirmed, concluding that "related to" jurisdiction did not extend to the state court lawsuit because the lawsuit was, at best, "a mere precursor to the potential third-party claim for indemnification by [defendant] against [the debtor]." *Pacor v. Higgins*, 743 F.2d at 995. Because Johns-Manville could not be bound automatically by the Higgins-Pacor lawsuit, it was not "related to" debtor Johns-Manville's bankruptcy case.

[50] *Celotex v. Edwards*, 514 U.S. at 308 n.5 ("Proceedings 'related to' the bankruptcy include (1) causes of action owned by the debtor which become property of the estate pursuant to 11 U.S.C. § 541, and (2) suits between third parties which have an effect on the bankruptcy estate.").

[51] *Pfizer Inc. v. Law Offices of Peter G. Angelos* (*In re Quigley Co.*), 676 F.3d 45, 57 (2d Cir. 2012) ("the touchstone for bankruptcy jurisdiction remains 'whether its outcome might have any "conceivable effect" on that bankruptcy estate.'" (citing *In re Cuyhoga Equip. Corp.*, 980 F.2d 110, 114 (2d. Cir. 1992)). The test for determining whether the court has bankruptcy jurisdiction has also been described as "an inquiry whether the third-party action has 'a significant connection' with the bankruptcy case in question." *In re Quigley Co.,* 676 F.3d at 57 (*citing Turner v. Ermiger* (*In re Turner*), 724 F.2d 338, 341 (2d Cir. 1983)).

[52] *See In re Quigley Co.*, 676 F.3d at 56 (citing *Johns-Manville Corp. v. Chubb Indem. Ins. Co.* (*In re Johns-Manville, Corp.*) (*Manville II*), 517 F.3d 52, 66 (2d Cir. 2008), *rev'd on other grounds and remanded sub nom. Travelers Indem. Co. v. Bailey*, 557 U.S. 137 (2009)).

conceivable effect on the bankruptcy estate or if the claims simply shared facts in common with the third party's relationship with the debtor.[53] After quickly dispatching with this jurisdictional issue, if addressing it at all,[54] courts concentrated on whether the circumstances of the case justified the granting of an injunction in favor of third parties.[55] However, in 2008 the Second Circuit made it explicit that courts must consider carefully whether they have jurisdiction to approve third-party releases and that this jurisdictional evaluation turns on whether the claims to be enjoined would have a direct effect on the bankruptcy estate.[56] That claims indirectly affect the estate or arise out of facts relating to the third party's relationship with the debtor is not enough to give bankruptcy courts jurisdiction to release and enjoin such claims.[57]

_____

[53] In 1988 the Second Circuit did address at some length the scope of the court's jurisdiction over third-party claims. *See MacArthur Co. v. Johns-Manville Corp. (In re Johns-Manville Corp.) (Manville I)*, 837 F.2d 89 (2d Cir. 1988). The cases following, however, did not. *See supra* text accompanying note 54.

[54] The two Second Circuit decisions before *Manville II* addressing third-party claims did not discuss subject matter jurisdiction at all. *See In Deutsche Bank AG v. MetroMedia Fiber Network, Inc.* (*In re Metromedia Fiber Network, Inc.*), 416 F.3d 136 (2d Cir. 2005); *SEC v. Drexel Burnham Lambert Grp.* (*In re Drexel Burnham Lambert Grp.*), 960 F.2d 285 (2d Cir. 1992). *See also JPMorgan Chase Bank, N.A. v. Charter Commc'ns Operating LLC* (*In re Charter Commc'ns*), 419 B.R. 221, 258 (Bankr. S.D.N.Y. 2009) (no reference to subject matter jurisdiction). The Examiner notes these courts' lack of discussion regarding subject matter jurisdiction not to suggest that the courts inappropriately exercised jurisdiction but rather to highlight the shift in 2008 in the Second Circuit's approach to analyzing whether to approve third-party releases.

[55] *See*, *e.g.*, *Kenton Cnty. Bondholders Comm. v. Delta Airlines, Inc.* (*In re Delta Air Lines, Inc.*)*,* 374 B.R. 516, 525–26 (S.D.N.Y. 2007) (in dismissing an argument that bankruptcy court lacked jurisdiction or power to approve releases of claims against non-debtors, the district court noted that the releases at issue were of the kind listed as acceptable by *Metromedia*, 416 F.3d at 142, and cited to *Drexel*, 960 F.2d at 293, for the proposition that a court may approve the release of claims against third parties where the releases play an "important part" in a debtor's reorganization plan); *Cartalemi v. Karta Corp.* (*In re Karta Corp.*), 342 B.R. 45, 53–57 (S.D.N.Y. 2006) (holding that the claims to be enjoined against the non-debtor third parties were of the type permissible under *Metromedia* and *Drexel* given the unique circumstances present, the importance of the releases to the plan, and other factors. The court did note that the specific language of the release needed to be modified so as not to apply to claims that had nothing to do with the debtor's business, focusing on the facts giving rise to the proposed enjoined claims rather than the effect of the claims on the estate, if successful); *In re Spiegel Inc.*, No. 03-11540, 2006 WL 2577825, at \*7 (Bankr. S.D.N.Y. Aug. 16, 2006) (noting that the court has the power to enjoin claims against non-debtor third parties where the actions have "at least a conceivable effect upon the Debtors or implicate the interpretation or enforcement of this Court's orders." (citing *LTV Corp. v. Back* (*In re Chateaugay Corp.*), 201 B.R. 48, 66 (Bankr. S.D.N.Y. 1996)), and reviewing whether the proposed third-party non-debtor release was warranted under the *Metromedia* analysis); *Rosenberg v. XO Commc'ns, Inc.* (*In re XO Commc'ns, Inc.*), 330 B.R. 394, 440 (Bankr. S.D.N.Y. 2005) (finding that the substantial consideration provided by the lenders, the identity of interest present as a result of the indemnification/contribution exposure of the debtor and the necessity of satisfying a plan condition that certain litigation be resolved all supported the conclusion that the unique circumstances necessary under *Metromedia* for allowing non-debtor releases were present with respect to breach of fiduciary type actions).

[56] *Johns-Manville Corp. v. Chubb Indem. Ins. Co. (In re Johns-Manville, Corp.)* (*Manville II)*, 517 F.3d 52 (2d Cir. 2008), *rev'd on other grounds and remanded sub nom. Travelers Indem. Co. v. Bailey*, 557 U.S. 137 (2009).

[57] *Id.* at 66.

Accordingly, before releasing claims against non-debtors, a bankruptcy court must first confirm that it has subject matter jurisdiction over the claims that would be subject to the requested injunction and release, which jurisdiction will exist only if the court determines that the claims would, if not enjoined or released, directly affect the property of the bankruptcy estate.[58] If a bankruptcy court determines it has subject matter jurisdiction, it must then consider whether the circumstances warrant approval of an injunction, with the understanding that circumstances sufficiently unique to justify such relief will occur only rarely.[59]

While the analysis to be undertaken by courts can be summed up simply, its implementation is complex. As noted by the Bankruptcy Court in this case, third-party releases raise many difficult legal and factual issues.[60] The next Section reviews the evolution of the Second Circuit's analysis regarding when third-party releases are appropriate.

> ### b. The Evolution Of The Second Circuit's View Of The Propriety Of Third-Party Non-Debtor Releases
>
> #### (1) Manville I[61]—1988

In 1988, the Court of Appeals for the Second Circuit considered whether a bankruptcy court had authority to enjoin third-party actions against a debtor's insurers, which, in essence,

---

[58] *Id.* Courts considering the appropriateness of third-party non-debtor releases after the Second Circuit's 2008 decision have undertaken a careful analysis of whether they have subject matter jurisdiction over the claims to be released and/or enjoined. *See In re Dreier LLP*, 429 B.R. 112, 131–32 (Bankr. S.D.N.Y. 2010) (court must decide whether it has subject matter jurisdiction before determining whether the proponent of an injunction has demonstrated unusual circumstances to justify it); *Pfizer Inc. v. Law Offices of Peter G. Angelos* (*In re Quigley Co.*), 676 F.3d 45, 56 (2d Cir. 2012) (bankruptcy court jurisdiction is appropriate over "third-party non-debtor claims that directly affect the res of the bankruptcy estate") (citing *Manville II*, 517 F.3d at 66); *In re FairPoint Commc'ns, Inc.*, 452 B.R. at 27–30 (confirming bankruptcy court had subject matter jurisdiction to approve third-party injunction included in plan and that sufficient circumstances existed to justify such injunction).

[59] *In re Metromedia Fiber Network, Inc.*, 416 F.3d at 141–42.

[60] Memorandum Opinion and Order Granting Berkshire Hathaway's Motion to Appoint an Examiner Under 11 U.S.C. §1104(c) [Docket. No. 454] at n.10 (citing *Johns-Manville Corp. v. Chubb Indem. Ins. Co.* (*In re Johns-Manville Corp.*) (*Manville III*), 600 F.3d 135 (2d Cir. 2010) (adhering to jurisdictional limitation for approving third-party non-debtor releases); *Manville II*, 517 F.3d at 66 (finding that a bankruptcy court "only has jurisdiction to enjoin third-party non-debtor claims that directly affect the res of the bankruptcy estate"); *In re Metromedia Fiber Network, Inc.*, 416 F.3d at 141 ("[A] nondebtor release is a device that lends itself to abuse. By it, a nondebtor can shield itself from liability to third parties. In form, it is a release; in effect, it may operate as a bankruptcy discharge arranged without a filing and without the safeguards of the Code. The potential for abuse is heightened when releases afford blanket immunity."); *In re Metcalfe & Mansfield Alt. Invs.*, 421 B.R. 685, 695–96 (Bankr. S.D.N.Y. 2010); *In re Dreier*, 429 B.R. at 132 (finding that before a court can even decide if the "unusual circumstances" standard delineated in *Metromedia* is met, it must first determine whether it has subject matter jurisdiction under *Manville*)). *See also In re The 1031 Tax Grp., LLC*, 397 B.R. 670, 687 (Bankr. S.D.N.Y. 2008) ("Cases make clear that the bankruptcy courts in this Circuit have very limited power to approve settlements or chapter 11 plans containing permanent or channeling injunction in favor of non-debtors.") (citing cases).

[61] *MacArthur Co. v. Johns-Manville Corp.* (*In re Johns-Manville Corp.*) (*Manville I*), 837 F.2d 89 (2d Cir. 1988).

operated as a discharge of claims against those non-debtor parties.[62] Before it filed for bankruptcy, the debtor Johns-Manville Corporation ("Manville") was one of the largest manufacturers and distributors of asbestos products in the United States. As a result, Manville was faced with the possibility of lawsuits by many thousands of asbestos victims, with potential liability of more than \$2 billion.[63] When it filed for bankruptcy, Manville was engaged in litigation with its insurance carriers regarding their coverage of these asbestos-related claims. During the course of its bankruptcy case, Manville agreed to settle these insurance claims with its insurers for approximately \$770 million.[64] The insurance settlements provided that the insurers would be released of all obligations relating to the relevant insurance policies and would also receive the benefit of injunctions which barred third-party claims against them based on the insurers' obligations under the insurance policies. The third-party claims were instead channeled to a "Manville Personal Injury Settlement Trust" (the "Manville Trust"), which was funded with the insurers' \$770 million settlement payment. The Manville Trust funds were to be used to satisfy asbestos claims against Manville, whether asserted against Manville at the time of the bankruptcy or thereafter by persons who had not yet manifested symptoms of asbestos-related illnesses.

Manville's settlements with its insurers were approved pursuant to two orders—the "Insurance Settlement Order" and the "Manville Confirmation Order." These orders enjoined all persons from commencing and/or continuing any suit, arbitration or other proceeding of any type or nature for "policy claims" against any or all members of the settling insurer group.[65] The insurers were to have no further duties or obligations based upon, arising out of or related to the policies and were thereafter released from any and all insurance policy claims.[66] The policy claims included any and all claims (whether or not presently known) which could be asserted by any person against any of the settling insurers "based upon, arising out of or relating to" any or all of the policies.[67] The Insurance Settlement Order was incorporated by reference into the Manville Confirmation Order.

MacArthur Company ("MacArthur"), a distributor of Manville's asbestos products, objected to the injunctions in the Insurance Settlement Order and Manville Confirmation Order, arguing that they impaired MacArthur's contractual right to coverage pursuant to "vendor endorsements"[68] that had been added to the insurance policies subject to the

---

[62] *See id.*

[63] *Id.* at 90.

[64] *Id*. In confirming Manville's chapter 11 plan, the bankruptcy court found that the present asbestos claimants would receive 100% on their claims under the plan. *Kane v. Johns-Manville Corp*., 843 F.2d 636, 649 (2d Cir. 1988). 95.8% of the present health asbestos claims voted in favor of the plan. *Id*. at 641.

[65] *In re Johns-Manville Corp*., 2004 WL 1876046, at *15 ¶ 61 (Bankr. S.D.N.Y. Aug. 17, 2004).

[66] *Id.*

[67] *Id.* at *15 ¶ 62.

[68] Vendor endorsements entitled distributors to insurance coverage for liability that resulted from the vendor's sale of Manville products. *Manville I,* 837 F.2d at 90.

IX-15

settlements. The bankruptcy court overruled MacArthur's objections, asserting that MacArthur's "interest in the policies is highly speculative."[69] The district court affirmed and MacArthur appealed to the Court of Appeals for the Second Circuit.

MacArthur's principal argument on appeal was that the bankruptcy court lacked jurisdiction and authority to enjoin claims against the debtor's insurers, and the injunction was a "*de facto* discharge" of non-debtor party liability.[70] The Second Circuit overruled the objection, noting that it is "well established" that a bankruptcy court has jurisdiction over property of a debtor's estate, and the insurance policies were property of the estate.[71] In rejecting MacArthur's "*de facto* discharge" argument, the Second Circuit noted that "the injunction orders do not offer the umbrella protection of a discharge in bankruptcy. Rather, they preclude only those suits against the settling insurers that arise out of or relate to Manville's insurance policies.[72]

The court of appeals then noted that: (1) MacArthur's rights in the insurance policies under the vendor endorsements were derivative of Manville's rights; and (2) MacArthur's claims sought to recover against the insurance policies based on Manville's conduct.[73] With these findings, the court of appeals held that the bankruptcy court had authority to enjoin actions that threatened or diminished the insurance policies and to channel those claims to the proceeds of the Manville Trust.[74]

### (2) Drexel Burnham[75]—1992

Four years later, the Second Circuit was again called upon to review the appropriateness of a third-party plan injunction in the bankruptcy case of *Drexel Burnham Lambert Group*.[76] Before Drexel filed for bankruptcy protection, the SEC commenced a lawsuit against Drexel, alleging that Drexel had violated federal law in securities transactions.[77] Drexel and the SEC ultimately agreed to settle the lawsuit and, as part of the settlement, Drexel created a $350 million fund (the "SEC Fund") for the benefit of the victims of Drexel's illegal transactions in "junk bonds."[78] Drexel paid $200 million into the SEC Fund, but then filed a petition for

---

[69] *Id*. at 91.

[70] *Id.*

[71] *Id*. at 90.

[72] *Id.* at 91. As discussed below, in *Manville II*, the court of appeals focused on the limits of the bankruptcy court's subject matter jurisdiction and stressed that such jurisdiction was limited to third-party actions that affected the estate property. While there has been some commentary suggesting that *Manville II* departed from prior Second Circuit decisions addressing third-party releases, *Manville II*'s focus on the bankruptcy court's in rem jurisdiction is consistent with the Second Circuit's analysis in *Manville I*.

[73] *Id.* at 92–93.

[74] *Id.* at 93.

[75] *SEC v. Drexel Burnham Lambert Grp.* (*In re Drexel Burnham Lambert Grp.*), 960 F.2d 285 (2d Cir. 1992).

[76] *Id.*

[77] *Id.* at 287–88.

[78] *Id.* at 288.

bankruptcy relief under chapter 11 before paying the final $150 million it owed. The SEC promptly filed a claim for $150 million in Drexel's bankruptcy case. Many other parties filed claims as well, resulting in 850 proofs of claim based on Drexel's actions in buying, selling, and underwriting securities (the "Securities Claims").[79]

In an attempt to facilitate settlement, the Securities Claims were withdrawn from the bankruptcy court and a "Securities Litigation Claimants Group" was formed. The claimants and Drexel negotiated and ultimately reached a settlement that, among other things, required that the 850 securities claimants be certified as a mandatory, non-opt-out class that was divided into two subclasses.[80] Subclass A mainly included several failed banks being administered by the FDIC or the Resolution Trust Corporation and claimants asserting derivative suits against Drexel. Subclass B consisted of claimants whose actions against Drexel had been consolidated by the Panel on Multidistrict Litigation.[81]

For its part, Drexel was required to pay the $150 million it still owed to the SEC Fund. The fund's entire $350 million was then divided into two subclasses—A and B—for distribution to the two subclasses of claimants. Subclass A was to receive 75% of the SEC Fund. Subclass B was to receive 25% of the SEC Fund. Drexel's remaining assets were also to be divided between the subclasses in the same 75%–25% ratio. Finally, Drexel agreed to pool any recoveries from lawsuits against its former officers and directors with subclass A. However, members of subclass B were not entitled to share in these recoveries and were enjoined from bringing any future lawsuits against the former officers and directors[82] (these lawsuits were eventually settled and provided for a total pooled recovery of $1.3 billion).

The district court found that the proposed settlement was fair and approved its terms over objections filed by only eight of the proposed 850 class members. Three of the class members appealed, arguing among other things that the settlement provisions that entitled subclass A to receive all of the pooled recoveries from the lawsuit against Drexel's directors and officers and enjoined the subclass B members from pursuing actions against the same directors and officers, should have been stricken.[83]

---

[79] *Id.*

[80] *Id*.

[81] *Id.*

[82] *Id.* at 289.

[83] *Id.* at 293.

In affirming the district court's findings on appeal, the Second Circuit dismissed the appellants' challenge to the injunction, stating:

> In bankruptcy cases, a court may enjoin a creditor from suing a third-party, provided the injunction plays an important part in a debtor's reorganization plan. *See In re: A.H. Robins Co.*, 880 F.2d 694, 701 (4th Cir.) . . . . The Settlement Agreement is unquestionably an essential element of Drexel's ultimate reorganization. In turn, the injunction is a key component of the Settlement Agreement. As the district court noted, the injunction limits the number of lawsuits that may be brought against Drexel's former directors and officers. This enables the directors and officers to settle these suits without fear that future suits will be filed. Without the injunction, the directors and officers would be less likely to settle. Thus, we hold that the district court did not abuse its discretion in approving the injunction.[84]

How to determine whether an injunction was sufficiently "important" was not discussed by the court of appeals, giving lower courts great leeway in approving third-party releases, so long as parties could make a case that such release was "important" or "essential" to the debtor's plan.

### (3) Metromedia Fiber Network, Inc.[85]—2005

The Second Circuit revisited the issue of third-party releases in 2005 in the Metromedia Fiber Network, Inc. bankruptcy cases. The Metromedia debtors were part of the large conglomerate Metromedia Company, which was owned by John Kluge. As part of the plan of reorganization, Kluge and certain other "insiders" were released from all claims relating to Metromedia. The release, referred to in the plan as the "Kluge Comprehensive Release," provided that a trust established by Kluge and other insiders:

> shall receive a full and complete release, waiver and discharge from . . . any holder of a claim of any nature . . . of any and all claims, obligations, rights, causes of action and liabilities arising out of or in connection with any matter related to [Metromedia] or one or more subsidiaries . . . based in whole or in part upon any act or omission or transaction taking place on or before the Effective Date.[86]

---

[84] *Id.*

[85] *Deutsche Bank AG v. Metromedia Fiber Network, Inc.* (*In re Metromedia Fiber Network, Inc.*), 416 F.3d 136 (2d Cir. 2005).

[86] *Id.* at 141.

In exchange for this release, Kluge agreed that his trust would: (1) forgive approximately $150 million in unsecured claims it held against the estate; (2) convert $15.7 million in senior secured claims to equity in AboveNet, Inc. (the reorganized entity); (3) invest approximately $12.1 million in AboveNet; and (4) agree to backstop the purchase of up to $25 million of common stock in AboveNet's planned stock offering.[87] Subordinated noteholders objected to the plan of reorganization, arguing that the Kluge Comprehensive Release and two other releases in favor of certain non-debtors were not authorized by the Bankruptcy Code.[88] The bankruptcy court overruled the noteholders' objections to the plan, and its decision was affirmed by the district court. The noteholders appealed to the Second Circuit, arguing that the releases were unauthorized by the Bankruptcy Code.

Reviewing its decision in the *Drexel* case, the court of appeals acknowledged that none of its prior decisions explained when a release of a non-debtor is "important" to a debtor's plan, but asserted that "such release [would be] proper only in rare cases."[89] The court of appeals expressed a "reluctance" to approve third-party releases, stating first that the only explicit authorization for non-debtor releases is section 524(g) of the Bankruptcy Code, which authorizes releases only in asbestos cases and even there only when specified conditions are met, including the creation of a trust to satisfy future claims.[90] The court of appeals then noted that a third-party release "is a device that lends itself to abuse" because it in effect operates as a bankruptcy discharge without requiring a bankruptcy filing and the oversight and safeguards of the Bankruptcy Code.[91]

In an attempt to provide more guidance regarding the type of "rare" cases in which a third-party non-debtor release may be appropriate, the court of appeals noted that in earlier cases such releases had been approved when: (1) the estate received substantial consideration;[92] (2) the enjoined claims were "channeled" to a settlement fund rather than

---

[87] *Id.*

[88] *Id.*

[89] *Id.*

[90] *Id.* at 142.

[91] *Id.*

[92] *Id.* (*citing SEC v. Drexel Burnham Lambert Grp.* (*In re Drexel Burnham Lambert Grp.*), 960 F.2d 285, 293 (2d Cir. 1992)). Since *Metromedia Fiber Network*, other courts have cited to substantial contributions to be made by released parties in support of a finding that unique circumstances exist to justify third-party releases. *See, e.g., In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 268 (Bankr. S.D.N.Y. 2007) (third-party release in favor of parties who had provided substantial consideration to the reorganization was allowed); *JPMorgan Chase Bank, N.A. v. Charter Commc'ns Operating LLC* (*In re Charter Commc'ns*), 419 B.R. 221, 258 (Bankr. S.D.N.Y. 2009) (noting that third-party releases were permissible where among other things debtors were to receive substantial financial and non-financial consideration and there was an identity of interest between the debtors and the non-debtor releasees by indemnification agreements); *In re Metropolitan 885 Third Ave. Leasehold, LLC*, No. 10-16106, 2010 WL 6982778 (Bankr. S.D.N.Y Dec. 22, 2010), ¶ 32 (finding that (1) the case was "unique" and that "unusual circumstances" existed that made the third-party releases essential to the plan; (2) that the released parties had tendered substantial consideration to the debtor by reducing claims and waiving distributions (which allowed all other unsecured creditors to receive a 100% distribution on allowed claims) and making other substantial contributions to accommodate the debtor's business objectives; and (3) that there were no pending claims or causes of action against the released parties).

extinguished;[93] (3) the enjoined claims would indirectly impact the debtor's reorganization "by way of indemnity or contribution;"[94] (4) the plan otherwise provided for the full payment of the enjoined claims;[95] or (5) the affected creditors consented to the non-debtor releases.[96] However, the court of appeals immediately noted that a determination of whether a third-party release is appropriate should not be considered a matter of "factors and prongs," and it stressed that no case has permitted third-party releases absent "unique" circumstances.[97]

Turning to the appeal before it, the Second Circuit stated that the only justification for the Kluge Comprehensive Release was the fact that the Kluge trust had made a "material contribution" to the estate. The Second Circuit found this insufficient, stating that "a non-debtor release in a plan of reorganization should not be approved absent the finding that truly unusual circumstances render the release terms important to the success of the plan, focusing on the considerations [noted above.]"[98] After the *Metromedia* decision, courts continued to approve third-party releases, but stressed the "unique circumstances" that justified them.[99]

---

[93] *In re Metromedia Fiber Network, Inc.*, 416 F.3d at 142 (citing *MacArthur Co. v. Johns-Manville Corp.* (*In re Johns-Manville Corp.*) (*Manville I*), 837 F.2d 89, 93–94 (2d Cir. 1988); *Menard-Sanford v. Mabey* (*In re A.H. Robins Co.*), 880 F.2d 694, 701 (4th Cir. 1989)).

[94] *In re Metromedia Fiber Network, Inc.*, 416 F.3d at 142 (citing *Manville I*, 837 F.2d at 93–94; *In re A.H. Robins Co.*, 880 F.2d at 701).

[95] *Id.*

[96] *Id.; see also In re Ion Media Networks, Inc.*, 419 B.R. 585, 602 (Bankr. S.D.N.Y. 2009) (finding that the releases were appropriate under *Metromedia Fiber Network*, and noting, among other things, that the third-party releases had been consented to by a vast majority of the affected creditors).

[97] *In re Metromedia Fiber Network, Inc.*, 416 F.3d at 142.

[98] *Id.* at 143. While insufficient findings would normally be remedied by remand, the court of appeals dismissed the appeal as equitably moot because the chapter 11 plan had been substantially consummated. *Id.* at 143–44.

[99] *Cartalemi v. Karta Corp. (In re Karta Corp.)*, 342 B.R. 45, 56 (S.D.N.Y. 2006) (based on unique circumstances, court found that the releases "are exactly the sort of releases that should be sanctioned under *Metromedia/Drexel*"); *JPMorgan Chase Bank, N.A. v. Charter Commc'ns Operating LLC* (*In re Charter Commc'ns*), 419 B.R. 221, 258 (Bankr. S.D.N.Y. 2009) (after acknowledging that non-debtor releases should be rare, the court found that the record before it justified the non-debtor releases. The debtors were to receive substantial financial and non-financial consideration in exchange for such releases; there was an identity of interest between the debtors and non-debtors by indemnification agreements; and the case involved "truly unusual circumstances" to make the releases important to the plan); *In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 267 (Bankr. S.D.N.Y. 2007) (noting that *Metromedia* "requires the bankruptcy community in this Circuit to be much more circumspect in providing third-party releases than it used to be."); *In re XO Commc'ns, Inc.*, 330 B.R. 394, 440 (Bankr. S.D.N.Y. 2005) (finding the record supported unique circumstances necessary, under *Metromedia*, for allowing non-debtor releases concerning breach of fiduciary duty type claims).

*(4) Manville II[100]—2008*

In 2008, the Second Circuit was again called upon to consider the third-party non-debtor releases granted in *Manville I* in the 1986 Insurance Settlement Order and incorporated into the Manville Confirmation Order (together, the "1986 Orders"). In the years that followed Manville's reorganization, groups of plaintiffs, undeterred by the injunction in the two 1986 Orders, brought "direct action" lawsuits[101] against the settling insurers, asserting claims fitting into two broad categories: claims based on statutory regulation of insurance practices and claims based on common law theories.[102]

In response to the large number of lawsuits filed against it, Travelers[103] filed a motion in the bankruptcy court seeking to enjoin twenty-six independent actions pending in Louisiana, Massachusetts, Texas, and West Virginia state courts, pursuant to the 1986 Orders.[104] The matter was referred to mediation, and three classes of plaintiffs settled with Travelers. The settlements were conditioned upon the bankruptcy court's entry of an order clarifying that the state court lawsuits were, and always had been, prohibited by the 1986 Orders.[105] The bankruptcy court approved the settlement agreements and entered the requested "Clarifying Order," specifying that the direct actions were barred by the 1986 Orders. In connection with its ruling, the bankruptcy court found that because "the gravamen of [the state court lawsuits] were acts or omissions by Travelers arising from or relating to Travelers' insurance relationship with Manville, . . . all claims against Travelers based on such actions or omissions necessarily 'arise out of' and [are] 'related to' the [insurance policies]."[106]

The district court upheld the Clarifying Order on appeal, and multiple state court asbestos plaintiffs and Chubb Indemnity Insurance Company, none of whom were party to the more recent settlements agreements with Travelers, appealed to the Second Circuit. The appellants argued that the bankruptcy court did not have jurisdiction to enjoin the third-party suits against Travelers. The Second Circuit agreed, noting that the courts below had erroneously focused solely on the relationship between Manville and Travelers in considering whether jurisdiction

---

[100] *Johns-Manville Corp. v. Chubb Indem. Ins. Co*. (*In re Johns-Manville, Corp.*) (*Manville II*), 517 F.3d 52 (2d Cir. 2008).

[101] A "direct action" in the insurance context is a suit in which the injured party steps into the shoes of the tortfeasor and can assert any right of the tortfeasor-insured against the insurance company. *Pfizer Inc. v. Law Offices of Peter G. Angelos* (*In re Quigley Co.*), 676 F.3d 45, 55 n.10 (2d Cir. 2012) (internal citations omitted).

[102] *Manville II*, 517 F.3d at 57–58.

[103] The Court referred to The Travelers Indemnity Company, Travelers Casualty and Surety Company, Travelers Property Casualty Corp., Citigroup Inc., The Travelers Insurance Company, Travelers Life and Annuity Company, and each of their respective direct or indirect parents, subsidiaries, and sister companies, as well as each of their respective predecessors, successors, assigns, officers, and directors, together, as "Travelers." *Id.* at 55 n.3.

[104] *Id.* at 58.

[105] *Id.*

[106] *Id.* at 59 (internal citation omitted).

over the claims existed. Asserting that this factual inquiry regarding the parties' relationship "was only half of the equation," the court of appeals looked to the laws of the states where the claims arose to determine if Travelers had an independent legal duty in its dealings with the appellants.[107] The nature of the claims would determine the source of funds used to satisfy any judgment—the Manville Trust or Travelers.

This more focused review on the nature of the claims being released had not been undertaken in the *Metromedia* decision, and instead appears to have been inspired by the Second Circuit's review of the Fifth Circuit's decision in the *Zale* bankruptcy cases.[108] In *Zale*, the Fifth Circuit noted that:

> Those cases in which courts have upheld "related to" jurisdiction over third-party actions do so because the subject of the third-party dispute is property of the estate, or because the dispute over the asset would have an effect on the estate. Conversely, courts have held that a third-party action does not create "related to" jurisdiction when the asset in question is not property of the estate and the dispute has no effect on the estate. Shared facts between the third-party action and a debtor-creditor conflict do not in and of themselves suffice to make the third-party action "related to" the bankruptcy . . . . [T]he district court's desire to "foster and encourage and then preserve settlement in federal court" does not in and of itself confer jurisdiction.[109]

Here, the appellants sought to recover directly from Travelers based on its independent wrongdoing.[110] Accordingly, the court of appeals held that the bankruptcy court did not have jurisdiction to enjoin such claims because they made "no claim against an asset of the bankruptcy estate, nor [did] their actions affect the estate."[111] The Second Circuit went on to note the fact that the settling insurers had contributed funds to the estate was not relevant to its jurisdictional analysis. Given the inherent risk of abuse in permitting third-party releases,

---

[107] *Id.* at 63.

[108] *Feld v. Zale Corp.* (*In re Zale Corp.*), 62 F.3d 746 (5th Cir. 1995).

[109] *Manville II,* 517 F.3d at 64 (citing *In re Zale Corp,* 62 F.3d at 753–54).

[110] *Manville II,* 517 F.3d at 65. The court of appeals noted that in West Virginia, claims based on Travelers' alleged violations of West Virginia's Unfair Trade Practices Act could entitle the plaintiff appellants to recover attorneys' fees and punitive damages, if successful. The settlement of a claim against a tortfeasor in West Virginia also did not preclude independent recovery against the tortfeasor's insurer out of alleged bad faith insurance practice. Accordingly, West Virginia plaintiffs' claims were clearly independent tort claims. *Id.* at 63.

[111] *Id.* at 65.

such releases cannot be justified solely on the basis of the third party's financial contribution to the estate.[112] If that were the case, the Second Circuit observed, then:

> a debtor could create subject matter jurisdiction over any non-debtor third-party by structuring a plan in such a way that it depended upon third-party contributions. As we have made clear, subject matter jurisdiction cannot be conferred by consent of the parties. Where a court lacks subject matter jurisdiction over a dispute, the parties cannot create it by agreement even in a plan of reorganization.[113]

In conclusion, the court of appeals held that the district court lacked subject matter jurisdiction to enjoin claims against Travelers that were predicated, as a matter of state law, on Travelers' own alleged misconduct and unrelated to the property of Manville's estate.[114]

### (5) Travelers v. Bailey[115]—2009

Travelers sought and obtained certiorari review by the Supreme Court. After considering the expansive definition of insurance policy claims enjoined as against Travelers by the 1986 Orders, the Supreme Court agreed with Travelers that the state court lawsuits filed by the appellees were based on the type of claims barred by the 1986 Orders.[116]

After noting that the Clarifying Order properly interpreted the 1986 Orders to bar such claims, the question for the Supreme Court was whether the bankruptcy court, in approving the Clarifying Order, had subject matter jurisdiction to do so. The Supreme Court easily found that such jurisdiction did exist, on the principle that the court "plainly had jurisdiction to interpret and enforce its own prior orders."[117]

This ended the necessary inquiry as far as the Supreme Court was concerned. The Supreme Court stated that whether the bankruptcy court had jurisdiction to approve the injunction in favor of the settling insurers in 1986 was not properly before the court of appeals in 2008 and, therefore, not properly before the Supreme Court.[118] Accordingly, the Supreme Court found that the court of appeals erred in reevaluating the bankruptcy court's exercise of jurisdiction with respect to its 1986 Orders.[119] Once those orders became final on direct

---

[112] *Id.* at 66.

[113] *Id.* (citing *In re Combustion Eng'g, Inc.* 391 F.3d 190, 228 (3d Cir. 2004)).

[114] *Manville II,* 517 F.3d at 66–68.

[115] *Travelers Indem. Co. v. Bailey,* 557 U.S. 137 (2009).

[116] *Id.* at 148–51.

[117] *Id.* at 151 (citing *Local Loan Co. v. Hunt*, 292 U.S. 234, 239 (1934)).

[118] *Travelers v. Bailey,* 557 U.S. at 148.

[119] *Id.* at 151.

review, they became res judicata to the "parties and those in privity with them, not only as to every matter which was offered and received to sustain or defeat the claim or demand, but as to any other admissible matter which might have been offered for that purpose."[120] The fact that the proposed challenge to those orders was one of subject matter jurisdiction did not change this analysis.[121]

In closing, the Supreme Court made explicit that its holding was narrow and not one of jurisdiction, stating that it was not resolving "whether a bankruptcy court, in 1986 or today, could properly enjoin claims against non-debtor insurers that are not derivative of the debtor's wrongdoing."[122]

The Supreme Court did not decide which parties were bound by the 1986 Orders. Chubb Indemnity Insurance had consistently asserted that it was not given sufficient notice of the 1986 Orders and that due process mandated that it not be bound by those orders. The Supreme Court instructed the Second Circuit to consider this due process argument, as well as other properly preserved objections.

### (6) Manville III[123]—2010

On remand, the Second Circuit again found it necessary to delve into the circumstances giving rise to the Insurance Settlement Order and the Manville Confirmation Order. The issue was whether those 1986 Orders, and the injunction of claims against Travelers, could be enforced against Chubb, who had received no notice of the orders. After reviewing "bedrock concepts of due process of law,"[124] the court of appeals held that Chubb was not adequately represented in the bankruptcy proceedings and did not receive constitutionally sufficient notice of the 1986 Orders.[125] Accordingly, Chubb was not bound by the 1986 Orders or the 2004 Clarifying Order, and was free to challenge the bankruptcy court's subject matter jurisdiction in issuing the 1986 Orders.

---

[120] *Id.* at 152 (internal citations omitted).

[121] *Id.* ("[e]ven subject-matter jurisdiction . . . may not be attacked collaterally.") (citing *Kontrick v. Ryan*, 540 U.S. 443, 455 n.9 (2004)).

[122] *Travelers v. Bailey,* 557 U.S. at 155.

[123] *Johns-Manville Corp. v. Chubb Indem. Ins. Co.* (*In re Johns-Manville Corp.*) (*Manville III*), 600 F.3d 135, 138 (2d Cir. 2010).

[124] *Id.*

[125] *Id.* at 158. In its analysis of Chubb's due process argument, the Second Circuit focused on the in personam nature of the 1986 Orders, as interpreted by the bankruptcy court. As stated by the court of appeals, a court is exercising in personam jurisdiction when it addresses a claim for liability against a particular party. *Id.* at 153 n.13 (citing Restatement (Second) of Judgments § 2 cmt. B, at 36–37). The contribution and indemnity claims asserted by Chubb against Travelers did not seek to collect from the Manville Trust funds. Accordingly, in approving the Clarifying Order to bar Chubb's claims against Travelers, the bankruptcy court was interpreting the 1986 Orders, whatever their language, to bar claims having no effect on the res of the Manville estate, giving them an in personam effect. *Manville III*, 600 F.3d at 152–53. The in personam nature of the 1986 Orders required a more rigorous due process analysis and, after considering the lack of notice given in 1986 to Chubb, the Second Circuit held that Chubb had not received constitutionally sufficient notice of the 1986 Orders, as interpreted by the Clarifying Order. *Id.* at 158.

While the court of appeals could have limited its analysis to this due process issue on remand, it went on to reiterate its analysis in *Manville II*, noting that a bankruptcy court only has jurisdiction to enjoin third-party non-debtor claims that directly affect the res of the estate.[126] Accordingly, it "remain[ed] persuaded" on remand that the 1986 Orders, as interpreted in 2004, exceeded the scope of the bankruptcy court's in rem jurisdiction[127] and found that Chubb's jurisdictional attack had merit.[128]

### c.    *The Second Circuit Landscape After Manville III*

*Manville II*, as reaffirmed by *Manville III*, remains the law of the Second Circuit. Since its entry, courts called upon to judge the propriety of third-party non-debtor releases must consider first whether the court has subject matter "related to" jurisdiction over the claims to be enjoined.[129] If the court determines that the claims to be released or enjoined directly affect the estate, it may then consider whether unique circumstances that would justify the release are present.[130] Parties cannot contract around this initial jurisdictional hurdle.[131]

---

[126] *Id.* at 152. (citing *In re Combustion Eng'g, Inc*., 391 F.3d 190, 225 (3d Cir. 2004) ("[T]he exercise of bankruptcy power must be grounded in statutory bankruptcy jurisdiction."); *Universal Oil Ltd v. Allfirst Bank* (*In re Millennium Seacarriers, Inc.*), 419 F.3d 83, 92 (2d Cir. 2005) ("Congress has granted the . . . courts expansive bankruptcy jurisdiction to adjudicate claims against a debtor's estate.").

[127] *Manville III*, 600 F.3d at 153.

[128] *Id.* at 158. The Second Circuit's reiteration of its jurisdiction analysis of third-party releases may have been a response to some uncertainty voiced by lower courts after the Supreme Court's ruling in *Travelers v. Bailey*. *See In re Metcalfe & Mansfield Alt. Invs.*, 421 B.R. 685, 695 (Bankr. S.D.N.Y. 2010) (decided two months before *Manville III*, the bankruptcy court stated that after the Supreme Court's reversal of *Manville II*, "[i]t is unclear whether the circuit panel's decision [in *Manville II*] remains binding law in this Circuit on other issues decided by the panel—specifically on the jurisdictional limits on a bankruptcy courts' power to approve a third-party non-debtor release and injunction. Even if the circuit panel decision is not binding, it may nevertheless be persuasive with respect to the jurisdictional issue.").

[129] *See*, *e.g*., *In re FairPoint Commc'ns, Inc*., 452 B.R. 21 (Bankr. S.D.N.Y. 2011) (third-party non-debtor claims that would, if successful, trigger a debtor's duty to indemnify or make a contribution to that third-party sufficiently affect the bankruptcy estate such that bankruptcy jurisdiction exists); *In re Dreier LLP*, 429 B.R. 112 (Bankr. S.D.N.Y. 2010) (requested injunction was too broad and barred claims outside court's jurisdiction); *but see In re Metropolitan 885 Third Ave. Leasehold, LLC*, No. 10-16103, 2010 WL 6982778 (Bankr. S.D.N.Y Dec. 22, 2010) (not discussing whether court had subject matter jurisdiction over claims).

[130] *See In re Dreier LLP*, 429 B.R. at 131–32 (reviewing the history of third-party releases in the Second Circuit).

[131] It is black letter law that parties cannot consent or stipulate to jurisdiction where it does not exist. *Ins. Corp. of Ir., Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982) ("[N]o action of the parties can confer subject-matter jurisdiction upon a federal court."); *Geruschat v. Ernst Young LLP* (*In re Seven Fields Dev. Corp.*), 505 F.3d 237, 262 n.23 (3d Cir. 2007).

## 2. *Analysis Of Possible Release Of Third-Party Claims Against AFI*

### a. *Jurisdictional Issues Faced By Parties In Releasing Third-Party Claims*

The tenet that a bankruptcy court has jurisdiction to release only those third-party claims that directly affect the res of the bankruptcy estate is not disputed.[132] What is disputed in this case, however, is the identity of those Third-Party Claims that fall within the scope of the Bankruptcy Court's jurisdiction and that may therefore be released as part of any future chapter 11 plan.[133]

The Examiner finds it premature to undertake an evaluation of whether the Bankruptcy Court has subject matter jurisdiction to release each and every potential cause of action that may be asserted against the AFI Released Parties. There is currently no proposed settlement of Third-Party Claims before the Bankruptcy Court, and the scope of any third-party release that may be proposed may differ from that included in the now-terminated AFI Settlement and Plan Sponsor Agreement. Based on a review of recent cases addressing third-party releases, the Examiner notes that the broader the scope of the release, the more likely the court will find that it does not have jurisdiction over all claims proposed to be released.[134]

---

[132] *See* AFI Submission Paper, dated Dec. 19, 2012, at 82–83 (citing *Johns-Manville Corp. v. Chubb Indem. Ins. Co. (In re Johns-Manville, Corp.)* (*Manville II*), 517 F.3d 52, 66 (2d Cir. 2008)); Debtors' Submission Paper, dated Dec. 18, 2012, at 6 (citing *same*); Joint Submission Paper of Paper of AIG, Allstate, Mass Mutual and Prudential, dated Oct. 17, 2012, at 26–27 (citing *same*); Joint Submission Paper of the Federal Home Loan Banks of Boston, Chicago and Indianapolis, dated Oct. 19, 2012, at 30 (citing *same*).

[133] *See* Debtors' Submission Paper, dated Dec. 18, 2012, at 8–24; AFI Submission Paper, dated Dec. 19, 2012, at 82–91; Joint Submission Paper of AIG, Allstate, Mass Mutual and Prudential, dated Feb. 12, 2013, at 26–27; Joint Submission Paper of Paper of AIG, Allstate, Mass Mutual and Prudential, dated Oct. 17, 2012, at 27–28; Joint Submission Paper of the Federal Home Loan Banks of Boston, Chicago and Indianapolis, dated Oct. 19, 2012, at 30–32; Federal Housing Finance Agency Letter to Examiner, dated Oct. 12, 2012.

[134] *In re Dreier LLP*, 429 B.R. at 133 (holding that the proposed bar order went "well beyond derivative claims, and ultimately exceed[ed] the Court's subject matter jurisdiction" because creditors and parties could have direct claims against the parties to be released that were unrelated to their status as creditor or parties in interest in the bankruptcy cases); *In re FairPoint Commc'ns, Inc*., 452 B.R. 21, 29 (Bankr. S.D.N.Y. 2011) (holding that bankruptcy court had subject matter jurisdiction to enter an injunction "which is carefully crafted so that it is limited to actions that create contingent obligations against the estate").

Some plan proponents, in including a third-party release in a proposed chapter 11 plan, have limited the scope of the third-party release so that, by its own terms, the release only operates "to the maximum extent permitted by applicable law."[135] If the parties were to reach agreement on a settlement that provided for a third-party release in favor of the AFI Released Parties, this type of scope limitation may permit the Bankruptcy Court to confirm a chapter 11 plan without ruling on whether it has jurisdiction over each and every claim proposed to be released.

### b. After Determining The Scope Of Its Jurisdiction, The Court Must Consider Whether Circumstances Merit Approval Of A Third-Party Release

Assuming the Bankruptcy Court determines that it has subject matter jurisdiction to approve a release of Third-Party Claims as part of a proposed future plan settlement, it would then have to consider whether unique circumstances that justify the release exist.[136] As discussed above, in the seminal case reviewing what circumstances justify the approval of a third-party release—*Metromedia Fiber Network*—the Second Circuit asserted that "such a release is proper only in rare cases."[137] The Debtors and AFI both asserted that sufficiently unique circumstances existed to justify the granting of a third-party release in favor of the AFI Released Parties, based in large part on AFI's proposed cash and non-cash contributions to the Chapter 11 Cases.[138]

---

[135] *See* Confirmation Order, ¶¶ 26, 27, *In re Metro-Goldwyn-Mayer Studios, Inc.*, No. 10-15774 (Bankr. S.D.N.Y. Dec. 6, 2010), ECF No. 173 (confirming Amended Joint Prepackaged Plan of Reorganization at § 9.3, filed Nov. 23, 2010, ECF No. 142); Confirmation Order, ¶¶ 30,31, *In re RHI Entm't, Inc.*, No. 10-16536 (Bankr. S.D.N.Y. Mar. 29, 2011), ECF No. 323 (confirming Final Cumulative Joint Prepackaged Plan of Reorganization at § 11.8, filed Apr. 1, 2011, ECF No. 329). *See also In re Chemtura*, 439 B.R. 561, 610 (Bankr. S.D.N.Y. 2010) (holding that fact that proposed third-party releases included in plan were impermissible under *Metromedia Fiber Network* did not make plan unconfirmable because of "self-correction" features that the releases be limited to "the extent permitted by applicable law;" instead, court held the releases to be unenforceable); *Rosenberg v. XO Commc'ns, Inc.* (*In re XO Commc'ns, Inc.*), 330 B.R. 394, 412 n.13 (Bankr. S.D.N.Y. 2005) (third-party release in confirmed plan was limited in scope, releasing non-consensual third-party claims "to the fullest extent permissible under applicable law, as such law may be extended or interpreted subsequent to the Effective Date").

[136] *See In re Dreier LLP*, 429 B.R. at 131–32 (reviewing the history of third-party releases in the Second Circuit).

[137] *In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 141 (2d Cir. 2005).

[138] The Debtors and AFI also asserted that the Third-Party Release was justified because the enjoined claims would indirectly impact the Debtors' reorganization through indemnity or contribution. *See* Debtors' Omnibus Response to Third-Party Submissions, dated Dec. 18, 2012, at 37–41; AFI Submission Paper, dated Dec. 19, 2012, at 99. Courts note that an "identity of interest" exists between the parties when the enjoined claims would affect the estate, through indemnification or otherwise. *See JPMorgan Chase Bank, N.A. v. Charter Commc'ns Operating LLC* (*In re Charter Commc'ns*), 419 B.R. 221, 258 (Bankr. S.D.N.Y. 2009) (noting identity of interest between debtors and non-debtor releases by indemnification agreements); *In re XO Commc'ns, Inc.*, 330 B.R. at 411 (identity of interest is generally established as a result of indemnification/contribution exposure of the debtor). Whether this "identity of interest" factor supports a third-party release requires an in-depth analysis of each claim to be released and its potential effect on the estate. That analysis is similar to the required jurisdictional analysis discussed above. Because the proposed settlement is no longer before the Bankruptcy Court, the Examiner has not undertaken any such analysis.

The Examiner has concluded above that it is unlikely that a court would have approved a settlement of the Debtors' claims against AFI in exchange for the contributions by AFI contemplated by the now-terminated AFI Settlement and Plan Sponsor Agreement. It follows that the consideration proposed by the AFI Settlement and Plan Sponsor Agreement would have been deemed insufficient to justify a non-consensual release of Third-Party Claims against the AFI Released Parties. The Examiner therefore concludes that a court would have found that AFI's contributions to the Debtors, as contemplated by the now-terminated Settlement and Plan Sponsor Agreement, did not support the proposition that the AFI Released Parties would have been entitled to a Third-Party Release.