# Exhibit 1

1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

-----------------------------------x

In Re:                              Case No.

RESIDENTIAL CAPITAL, LLC, et. al,      12-12020(MG)

              Debtors.

-----------------------------------x

DEPOSITION OF JEFFREY A. LIPPS

New York, New York

November 19, 2012

10:13 a.m.

Reported by:
JENNIFER OCAMPO-GUZMAN, CRR, CLR
JOB NO: 27971

2

1

2

3

4

5

6

7

8               November 19, 2012

9                 10:13 a.m.

10

11          Deposition of JEFFREY A. LIPPS,

12      held at the offices of Kramer, Levin,

13      Naftalis & Frankel, 1177 Avenue of the

14      Americas, New York, New York, pursuant

15      to Notice, before Jennifer

16      Ocampo-Guzman, a Certified Real-Time

17      Shorthand Reporter and Notary Public of

18      the State of New York.

19

20

21

22

23

24

25

29

1                        Lipps

2          Q.   So is it fair to say that --

3          A.   I would also add, there is one

4     other, there is one other thing that you

5     would take into account.  To the extent the

6     information is available, you would also want

7     to have an understanding as to what value is

8     being experienced in other, similar

9     litigation.

10              For example, just take a very

11     simple situation, if you have a broken leg

12     case, you would want to know what values or

13     ranges of exposure and/or settlements are out

14     there on broken leg cases.

15              So in addition to the law and

16     looking at exposure, if you have that data,

17     then you would factor that in.

18          Q.   And generally speaking, how do you

19     go about making your assessment as to where

20     in the range between top and bottom a fair

21     settlement would be?

22          A.   Well, it would depend on the

23     circumstances of the individual matter and

24     the cases.

25              I mean here, I sort of described

30

1                           Lipps

2        how, well, I actually have described how I

3        went about assessing the reasonableness.  I

4        surveyed the issues and tried to determine

5        whether or not there were dispositive rulings

6        out there that would impact what your likely

7        exposure was, and then you evaluate what the

8        top line exposure is and a baseline exposure,

9        which could be, if you want to approach it

10       from a pure defense verdict standpoint, zero.

11           Q.   So in this methodology that you

12       typically apply in evaluating a settlement,

13       do you assign numbers to any issues?

14              MR. RAINS:  Objection, vague and

15           ambiguous.

16           A.   I'm not sure what you mean by

17       numbers, do I assign numbers.

18           Q.   Are you familiar with the term

19       "litigation risk analysis"?

20           A.   I don't know.  I may.  Just depends

21       on what you mean by that term.

22           Q.   Are you familiar with --

23              MR. BENTLEY:  Strike that.

24           Q.   In analyzing a settlement, one

25       thing you do, I think, is you try to

33

1                          Lipps

2        don't have a clear recollection of going

3        through that type of an analysis,

4        specifically, in a request from a client.

5             Q.   Have you ever done that kind of an

6        analysis in an RMBS-related matter?

7             A.   No.

8             Q.   And I take it you didn't do that

9        kind of an analysis, in connection with this

10       settlement?

11            MR. RAINS:  Objection, vague and

12            ambiguous.

13            A.   I don't know that I can say that.

14       I don't know that I can say that.

15            Q.   Did you assign any percentage

16       likelihoods to different, to any different

17       possible outcomes in this case?

18            A.   I don't think, as you can tell in

19       this report, I don't think -- let me take a

20       step back.

21                 As you can tell in this report,

22       this area of the law is in, at best, its

23       formative stages.  It's -- it's still

24       evolving, it's still developing.  And there

25       is so much uncertainty on so many issues that

34

Lipps

1    I don't think it would be meaningful to sit

2    and try and assess a percentage attached to a

3    particular outcome.

4           I think you have to look at the

5    two points, which is, what's your maximum

6    exposure out there and then what is your

7    likely exposure, to try and evaluate a range

8    of reasonableness.

9        Q.   And --

10       MR. BENTLEY:   Strike that.

11       Q.   Do you claim to have any expertise

12   in quantitative matters?

13       MR. RAINS:   Objection, vague and

14       ambiguous.

15       A.   I don't know what it is.

16       Q.   Do you claim to have any expertise

17   in the field of statistics?

18       A.   I don't think I'm offering myself

19   as an expert statistician, if that's what

20   you're asking.

21       Q.   Do you have any education or

22   training in statistics?

23       A.   I certainly, I took statistics back

24   when I was in school, and I've also been

68

Lipps

1

2      make any attempt to review the sale

3      agreements to determine how common EPD stips

4      were in those agreements?

5          A.   No, but I did look at what the

6      aggregate repurchase number had been of loans

7      subject to loss, to get a data point that

8      would allow me to assess whether the

9      settlement was fair and reasonable.

10         Q.   You looked at the debtor's

11     prepetition repurchase experience, is that

12     what you're saying?

13         A.   As I said, I understand that there

14     was 1.16 billion out of some $30 billion

15     worth of losses that had been repurchased, so

16     that was something in the three or

17     four percent range.

18             I also know that in one of the

19     litigations, the MBIA litigation with respect

20     to five securitizations, there was repurchase

21     activity that was done prior to any request

22     being made by either investors in those

23     executions or MBIA, some of which would be

24     loans that would be considered to be EPDs and

25     at least one, maybe two of those

75

1                        Lipps

2       but -- less expansively, but nonetheless

3       touched upon, which was GMAC Mortgage.  So if

4       you ask me that in terms of familiarity, I

5       can't agree with you on that.

6                 However, it wasn't part of what I

7       was evaluating, as I was evaluating this

8       settlement.

9            Q.   As --

10           A.   So I haven't refreshed myself on

11      it, let's say.

12           Q.   You have not refreshed yourself?

13           A.   I have not refreshed myself on the

14      very granular specific of what time period

15      would give rise to an audit and what specific

16      circumstances would give rise to an audit.

17           Q.   In connection with preparing your

18      supplemental declaration, you didn't feel it

19      was necessary to be familiar with the details

20      of that process?

21           A.   What I utilized from that process,

22      for purposes of evaluating the settlement,

23      was a couple data points.  One was the data

24      point that I've indicated before, which is,

25      out of roughly $30-plus billion worth of

76

1                          Lipps

2      losses, ResCap had repurchased 1.16 billion.

3      So that gave me a three to four percent data

4      point on what percentage of exposure would be

5      repurchased; and secondly, I also considered,

6      in determining the range of reasonableness

7      experienced, with which I was familiar in the

8      MBIA RFC litigation, where there was a wave

9      of put-backs that were presented by MBIA.  I

10     can't remember the exact number of loans, but

11     there was a wave of them in roughly May of

12     2008, which ran through the process at RFC of

13     evaluating those and resulted in something in

14     the 20 percent range of repurchases out of

15     those loans that were put back.  And those

16     were defaulted loans, it was my

17     understanding.

18            So I used those two data points as

19     information that I then fed into my analysis

20     and evaluation to sort of figure a low-end

21     prospect for exposure, three to five percent,

22     six percent.  Okay.  So that's how I utilized

23     that information.  I didn't get into the

24     details of how many loans were audited and

25     what circumstances would give rise to an

77

                            Lipps

1

2       audit.  I looked at the numbers I've

3       described.

4            Q.   So let me just try to unpack what

5       you just described.

6                 You testified that you noted that

7       ResCap had repurchased about, had paid about

8       $1.6 billion to repurchase loans.

9            A.   1.16 on $30 billion worth of

10      losses.

11           Q.   Now the repurchases in response to

12      MBIA demands, those are a subset of that

13      1.16 billion?

14           A.   I would assume those dollar values

15      would be packed into the 1.16.

16           Q.   Okay.  Do you know the breakdown,

17      the breakout of --

18                MR. BENTLEY:  Strike that.

19           Q.   With respect to the $1.16 billion,

20      did you try to understand what portion of

21      that consisted of voluntary purchase and what

22      portion was nonvoluntary?

23           A.   No, I didn't need to know that.

24           Q.   Did you try to understand the

25      different components of the voluntary

95

1                          Lipps

2      other counsel that had been defending these

3      cases, and I, together with people on my

4      team, discussed our experience in the RMBS

5      litigation and, in the course of that,

6      addressed RMBS exposure.

7           Q.    This is a meeting with Jamie Levitt

8      and others at her firm?

9           A.    She was one that was in attendance.

10          Q.    When did you first discuss with --

11               MR. BENTLEY:  Strike that.

12          Q.    When did you first learn of

13     settlement discussions that were happening

14     with Kathy Patrick?

15          A.    Let me make a couple of things

16     clear.  I was not involved in any settlement

17     discussions with Kathy Patrick and was not

18     involved in presenting to the board or anyone

19     any information regarding the settlement.

20               I seem to recall that sometime in

21     early May, given our experience with respect

22     to these securitizations and the transaction

23     documents, I was asked to have people on my

24     team prepare a shell agreement that would

25     contain certain provisions that would be part

97

1                              Lipps

2        filled in.  But I don't know whether the

3        amount was ever filled in while I was aware

4        of it.

5                  I then went off on other projects.

6                  MR. RAINS:  The question was

7           conversations.

8           A.   Well, the conversations would only

9        be in the context of a draft agreement.

10          Q.   Were you at any point asked to give

11       any advice, in connection with the potential

12       settlement with Ms. Patrick?

13          A.   I was not.

14          Q.   Did you ever at any point give any

15       advice in that regard?

16          A.   Well, I've offered an opinion here

17       as to whether I think the settlement is fair

18       and reasonable.

19          Q.   Let me try again.

20                  At any time before the execution of

21       that settlement, did you give any advice to

22       anybody about it?

23          A.   No.  As I told you, we weren't

24       involved in negotiations.  We were not

25       involved in any presentations to the board.

98

1                           Lipps

2          Q.   Or giving advice to anybody?

3          A.   I didn't give advice to anybody

4     about the settlement.

5          Q.   At either the debtors or at Ally?

6          A.   I had no discussions with Ally

7     about the situation we're talking about right

8     now.

9          Q.   When did you first begin to

10    consider the issues addressed in your

11    settlement declaration?

12         A.   You know, I've thought about that,

13    because I knew you were going to go ask me

14    that.  And I seem to recall that I had been

15    asked by Morrison & Foerster to do the

16    analysis that is reflected in my supplemental

17    declaration sometime maybe in August, I want

18    to say, just because I think there was a

19    deadline that was then extended to the end of

20    September.

21              And so I would have had some early

22    first discussion about this exercise, and I

23    want to say it was sometime around August;

24    but with the schedule then changed, I started

25    working on it over, you know, the course

111

1                    Lipps

2       A.   Nothing was prescribed to me.  I

3  was to bring my expertise and experience to

4  the process and offer an opinion.  Were I

5  able to do so, as it turned out, I was.

6       Q.   In forming your opinion, what

7  factors did you consider?

8       A.   I think I've written about it in my

9  declaration.  I mean I went through and

10 evaluated the rep and warranty claims which

11 were being released in the settlement.  I had

12 direct experience in many cases in dealing

13 with the legal issues that would need to be

14 addressed or resolved were there not to be a

15 settlement.  And I've gone through those in

16 here, and we can go through them if you want

17 specifically; but the bottom line is, if I

18 were to have found a dispositive principle

19 then that could impact how I evaluated the

20 settlement.  With the state of the law,

21 uncertain as it was, that was a part of how I

22 evaluated it.

23          The other part of it is I have

24 direct experience in the litigation with

25 claims being made that there was rep and

112

1                    Lipps

2        warranty exposure in the range of 80, 90, I

3        think even some of them were approaching

4        100 percent defect rate on these loans.  So

5        what you have to look at when you look at the

6        settlement, you look at the top side,

7        anywhere from 80 to 100 percent of potential

8        exposure out there in an environment of

9        uncertain legal issues with good arguments

10       often on both sides.  Some of the law that's

11       favorable to the plaintiff is in the context

12       of the monoline industry, which may not be

13       directly imported into those nonwrapped

14       securitizations, so I took that into account.

15               I've indicated the data points that

16       I've looked at with respect to the

17       repurchase, voluntary repurchase experience,

18       and those instances that I was aware of where

19       there were put-backs demands by MBIA and what

20       that experience was, and then I also added,

21       as an additional data point, what I was able

22       to evaluate or obtain, I guess -- not

23       evaluate.  I did evaluate it -- but obtained

24       from public filings with respect to other

25       settlements of rep and warranty claims,

113

                              Lipps

1

2        specifically Bank of America and the Lehman

3        estimating process.

4               And there were some studies in

5        terms of breach rates that were reflected

6        within the Bank of America settlement, and

7        then there were some expert opinions that

8        were being offered in the Lehman estimating

9        procedure.  So I used that data point to

10       evaluate where in other contexts rep and

11       warranty claims were being valued, and when I

12       factored in the uncertainty as I wrote on the

13       various legal issues and took into account

14       that at the end of the day there would be

15       percentages even were we able to prevail on

16       everything, where we were buying out a

17       settlement of 19 -- roughly 19 to 20 cents on

18       a dollar is a fair and reasonable range,

19       given the state of the law and these other

20       sources of information regarding how rep and

21       warranty claims are valued.

22          Q.    I want to return to each of the

23       points you made.  But first, let's try to

24       start on a big picture level and then drill

25       down into the details, if that's okay with

199

1

2

3                    C E R T I F I C A T E

4       STATE OF NEW YORK    )

5                                : ss.

6       COUNTY OF NEW YORK   )

7

8             I, Jennifer Ocampo-Guzman, a Notary

9       Public within and for the State of New York,

10       do hereby certify:

11             That JEFFREY A. LIPPS, the

12       witness whose deposition is hereinbefore set

13       forth, was duly sworn by me and that such

14       deposition is a true record of the testimony

15       given by the witness.

16             I further certify that I am not

17       related to any of the parties to this action

18       by blood or marriage, and that I am in no

19       way interested in the outcome of this

20       matter.

21             IN WITNESS WHEREOF, I have

22       hereunto set my hand this 20th day of

23       November 2012.

24       _____

25       JENNIFER OCAMPO-GUZMAN, CRR, CLR