# Exhibit 3

HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, New York 10004
Telephone: (212) 837-6000
Facsimile:  (212) 422-4726

Attorneys for James W. Giddens,
Trustee for the SIPA Liquidation of MF Global Inc.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re<br><br>　　　　MF GLOBAL INC.,<br><br>　　　　　　　　　　　　　Debtor. | Case No. 11-2790 (MG) SIPA |

**NOTICE OF TRUSTEE'S MOTION FOR APPROVAL OF AN AGREEMENT
PROVIDING FOR THE RETURN OF MFGI PROPERTY, EXTINGUISHMENT OF
DUPLICATE CLAIMS FILED WITH CME GROUP INC., AND ALLOCATION
OF THE MFGI PROPERTY TO CUSTOMERS OF THE MFGI ESTATE**

**PLEASE TAKE NOTICE** that on June 14, 2012, James W. Giddens (the

"<u>Trustee</u>"), as Trustee for the liquidation of the business of MF Global Inc. ("<u>MFGI</u>" or the

"<u>Debtor</u>"), under the Securities Investor Protection Act ("<u>SIPA</u>") of 1970, as amended, 15 U.S.C.

§ 78aaa *et seq.*, by and through his undersigned counsel, filed a motion (the "<u>Motion</u>"), for entry

of an order (the "<u>Order</u>") approving the Limited Agreement and Reservation of Rights (the

"<u>Agreement</u>")[1] between the Trustee and CME Group Inc. ("<u>CMEG</u>"), on its own behalf and on

behalf of each and all of its exchange subsidiaries,[2] and GFX Corporation ("<u>GFX</u>") (collectively,

"<u>CME Group</u>") that provides for disposition of the MFGI Property as provided for in the

---

1.　Capitalized terms used herein but not defined shall have the meaning ascribed to them in the Agreement.

2.　Chicago Mercantile Exchange Inc. ("<u>CME</u>"), Board of Trade of the City of Chicago, Inc. ("<u>CBOT</u>"), New York
　　Mercantile Exchange, Inc. ("<u>NYMEX</u>"), and Commodity Exchange, Inc. ("<u>COMEX</u>," and collectively with
　　CME, CBOT, and NYMEX, the "<u>Exchanges</u>").

Agreement, including but not limited to: (i) subordination of the CME Claim and the GFX

Claims to all customer claims; (ii) liquidation and/or sale of the Exchange Memberships and

CME Group Shares; (iii) disposition of claims asserted under the Exchange Rules and

modification of the automatic stay in the SIPA Proceeding to the extent necessary; and (iv)

allocation of a portion of the MFGI Property to MFGI's customer estates.

        **PLEASE TAKE FURTHER NOTICE** that a hearing on the Motion will be held

before the Honorable Martin Glenn, United States Bankruptcy Judge, at the United States

Bankruptcy Court for the Southern District of New York, Courtroom 501, One Bowling Green,

New York, New York, 10004 (the "Bankruptcy Court"), on **July 11, 2012 at 10:00 a.m.**

(Prevailing Eastern Time) or as soon thereafter as counsel may be heard (the "Hearing").

        **PLEASE TAKE FURTHER NOTICE** that responses, if any, to entry of the

Order must (i) be in writing; (ii) state the name and address of the objecting party and nature of

the claim or interest of such party; (iii) state with particularity the legal and factual bases of such

objection; (iv) conform to the Federal Rules of Bankruptcy Procedure and Local Bankruptcy

Rules; (v) be filed with the Bankruptcy Court, together with proof of service, electronically, in

accordance with General Order M-399, by registered users of the Court's Electronic Case Filing

System, and by all other parties in interest, on a 3.5 inch disk, compact disk, or flash drive,

preferably in Portable Document Format (PDF), WordPerfect or any other Windows-based word

processing format no later than **June 28, 2012 at 4:00 p.m.** (Prevailing Eastern Time) (the

"Response Deadline"); and (vi) be served on (a) Hughes Hubbard & Reed LLP, One Battery

Park Plaza, New York, New York, 10004, Attn: Christopher K. Kiplok, Esq., Jeffrey S.

Margolin, Esq., and Eleni D. Theodosiou-Pisanelli, Esq.; (b) the Securities Investor Protection

Corporation, 805 Fifteenth Street, N.W., Suite 800, Washington, D.C., 20005, Attn: Josephine

Wang, Esq. and Christopher H. LaRosa, Esq.; (c) the Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street N.W., Washington, D.C., 20581, Attn: Martin B. White, Esq.; (d) CME Group Inc., 20 South Wacker Drive, Chicago, Illinois 60606, Attn: Lisa A. Dunsky, Esq.; and (e) Jenner & Block LLP, 353 N. Clark Street, Chicago, Illinois 60654, Attn: Vincent E. Lazar, Esq., with a courtesy copy to the chambers of the Honorable Martin Glenn, United States Bankruptcy Court, Courtroom 501, One Bowling Green, New York, New York, 10004.

   **PLEASE TAKE FURTHER NOTICE** that if no objections are timely filed and served with respect to the Motion, the Trustee may, on or after the Response Deadline, submit to the Bankruptcy Court an order substantially in the form of the proposed order annexed to the Motion, which may be entered with no further notice of opportunity to be heard offered to any party.

Dated: New York, New York
   June 14, 2012

       HUGHES HUBBARD & REED LLP

       By: /s/ James B. Kobak, Jr.
        James B. Kobak, Jr.
        Christopher K. Kiplok
        Anson B. Frelinghuysen
        Eleni D. Theodosiou-Pisanelli
       One Battery Park Plaza
       New York, New York 10004
       Telephone: (212) 837-6000
       Facsimile:  (212) 422-4726

       Attorneys for James W. Giddens,
       Trustee for the SIPA Liquidation of
       MF Global Inc.

HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, New York 10004
Telephone:  (212) 837-6000
 Facsimile:  (212) 422-4726

Attorneys for James W. Giddens,
Trustee for the SIPA Liquidation of MF Global Inc.

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re | |
| MF GLOBAL INC., | Case No. 11-2790 (MG) SIPA |
| Debtor. | |

### MOTION FOR APPROVAL OF AN AGREEMENT PROVIDING FOR THE RETURN OF MFGI PROPERTY, EXTINGUISHMENT OF DUPLICATE CLAIMS FILED WITH CME GROUP INC., AND ALLOCATION OF MFGI PROPERTY TO CUSTOMERS OF THE MFGI ESTATE

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ..................................................................................2

JURISDICTION AND VENUE ...............................................................................3

FACTUAL BACKGROUND.......................................................................................3

I.      THE FCM ACCOUNT TRANSFERS ..........................................................4

II.     CLAIMS AGAINST THE MFGI ESTATE ..................................................5

        A.      Claims Asserted In The SIPA Proceeding ......................................5

        B.      Claims Asserted Through the Exchange Rules.................................6

III.    THE AGREEMENT BETWEEN THE TRUSTEE AND CME GROUP.........8

        A.      MFGI Property Addressed by the Agreement ..................................9

        B.      Disposition of Claims Asserted Under the Exchange Rules................10

                1.      Customer Claims....................................................................10

                2.      Fee Rebate Claims ................................................................11

                3.      Non-Customer Claims ..........................................................11

        C.      Disposition of Claims Asserted In The SIPA Proceeding ...................12

                1.      CME Claim ...........................................................................12

                2.      GFX Claims ..........................................................................12

        D.      Allocation of the MFGI Property .....................................................12

        E.      Satisfaction of Exchange Rules .......................................................13

RELIEF REQUESTED..............................................................................................13

BASIS FOR RELIEF REQUESTED.........................................................................14

I.      THE AGREEMENT IS WELL WITHIN THE RANGE OF
        REASONABLENESS PRESCRIBED BY BANKRUPTCY RULE 9019. ......14

II.     THE AGREEMENT OBTAINS THE BEST VALUE FOR THE EXCHANGE
        MEMBERSHIPS  AND THE CME GROUP SHARES. ...................................16

        A.      Liquidation of the CME Group Shares Will Be At Market Value. .......16

61967371_1

# TABLE OF CONTENTS

*(continued)*

|  |  |  | **Page** |
| --- | --- | --- | --- |

B.    The Agreement's Provision to Sell the Exchange Memberships Gradually and Pursuant to the Exchanges' Sale Procedures Complies With Bankruptcy Code Section 363. ...............................................................16

III.    THE AGREEMENT RETURNS MORE PROPERTY TO THE MFGI ESTATE THAN THROUGH PURE OPERATION OF THE EXCHANGE RULES. ....................19

A.    The Subordination Of The CME Claim And The GFX Claims Substantially Increases The Amount Returned To The Trustee. ...........................20

B.    The Agreement Extinguishes Hundreds of Duplicate Claims In An Efficient, Fair, and Cost-Effective Manner...........................................................21

C.    Cause Exists to Modify The Automatic Stay To The Extent Necessary To Permit CME Group to Perform Under the Agreement. .........................................23

IV.    THE TRUSTEE IS AUTHORIZED TO IMMEDIATELY ALLOCATE A PORTION OF THE MFGI PROPERTY TO MFGI'S CUSTOMER ESTATES. ............24

A.    The Best Interest Of The MFGI Estate Permits the Trustee To Immediately Allocate A Portion Of The Returned Property To Customer Account Classes. ...................................................................................................25

B.    Allocation Of A Portion Of The MFGI Property To The Customer Account Classes Is Also Within The Trustee's Discretion....................................25

C.    The Exchange Rules' Requirement That Member Property Be Used To Reimburse Customers Supports Allocation Of The MFGI Property To Customers Under The Part 190 Regulations.........................................................27

D.    The Trustee's Allocation to Multiple Classes of Customers Is Permitted Under His Discretion and Pursuant the Bankruptcy Rule 9019. ...........................28

NOTICE......................................................................................................................................29

NO PRIOR REQUEST ..............................................................................................................30

CONCLUSION...........................................................................................................................30

61967371_1

HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, New York 10004
Telephone: (212) 837-6000
Facsimile: (212) 422-4726

Attorneys for James W. Giddens,
Trustee for the SIPA Liquidation of MF Global Inc.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re | |
| MF GLOBAL INC., | Case No. 11-2790 (MG) SIPA |
| Debtor. | |

### MOTION FOR APPROVAL OF AN AGREEMENT PROVIDING FOR THE RETURN OF MFGI PROPERTY, EXTINGUISHMENT OF DUPLICATE CLAIMS FILED WITH CME GROUP INC., AND ALLOCATION OF MFGI PROPERTY TO CUSTOMERS OF THE MFGI ESTATE

James W. Giddens (the "Trustee"), as Trustee for the liquidation of the business

of MF Global Inc. ("MFGI" or the "Debtor") under the Securities Investor Protection Act of

1970, as amended ("SIPA"), 15 U.S.C. §§ 78aaa *et seq.*,[1] by and through his undersigned

counsel, respectfully makes this motion (the "Motion") for entry of an order (the "Order,"

attached as Exhibit A) approving the Limited Agreement and Reservation of Rights (the

"Agreement," attached hereto as Exhibit B) between the Trustee and CME Group Inc.

("CMEG"), on its own behalf and on behalf of each and all of its exchange subsidiaries,[2] and

GFX Corporation ("GFX") (collectively, "CME Group") that provides for (i) disposition of the

---

1.    For convenience, subsequent references to SIPA will omit "15 U.S.C."

2.    Chicago Mercantile Exchange Inc. ("CME"), Board of Trade of the City of Chicago, Inc. ("CBOT"), New York Mercantile Exchange, Inc. ("NYMEX"), and Commodity Exchange, Inc. ("COMEX," and collectively with CME, CBOT, and NYMEX, the "Exchanges").

MFGI Property,[3] (ii) subordination of the CME Claim and the GFX Claims to all customer

claims; (iii) liquidation and/or sale of the Exchange Memberships and CME Group Shares; (iv)

disposition of claims asserted under the Exchange Rules and modification of the automatic stay

in the SIPA Proceeding to the extent necessary; and (v) allocation of a portion of the MFGI

Property to MFGI's customer estates.  In support of the Motion, the Trustee respectfully states as

follows:

## PRELIMINARY STATEMENT

1.    The Motion seeks the Court's approval of an agreement that ultimately

allocates at least $130 million toward the payment of allowed customer claims in the SIPA

liquidation of MFGI.  The Agreement provides for the complete disposition of all MFGI

property at CME Group:  of over $175 million in property at issue, only $16.5 million will be

directed towards payment of certain Exchange Rule-based claims; the remainder transfers to the

Trustee, with the vast majority earmarked for customers.  The Agreement also eliminates a

duplicate customer claims process from unfolding under the Exchange Rules and memorializes

the voluntary subordination of more than $30 million in claims by CME Group to the claims of

customers.  This overwhelmingly positive result for MFGI's former customers and creditors is

reached at basically no cost to the MFGI estate.

2.    After extensive discussions and arm's length negotiations aimed at

reaching a cooperative and consensual result, the terms of the Agreement not only satisfy the

Parties but also provide an equitable solution to extremely complex issues, an outcome that is

ultimately in the best interest of the MFGI estate.  The Agreement ensures that all MFGI

---

3.    Capitalized terms used herein but not defined shall have the meaning ascribed to them in the Agreement.

customers will be treated fairly, while simultaneously avoiding the need for formal and costly

litigation.  The Agreement is consistent with the Trustee's statutory mandate and should

accordingly be approved by the Court.

## JURISDICTION AND VENUE

3.      Following removal to this Court, this Court has "all of the jurisdiction,

powers, and duties conferred by [SIPA] upon the court to which application for the issuance of

the protective decree was made."  SIPA § 78eee(b)(4).

4.      Venue is proper in this Court pursuant to SIPA § 78eee(a)(3) and

15 U.S.C. § 78aa.

## FACTUAL BACKGROUND

5.      On October 31, 2011 (the "Filing Date"), the Honorable Paul A.

Engelmayer, United States District Court Judge for the Southern District of New York, entered

an order (the "MFGI Liquidation Order," ECF No. 1) commencing the liquidation of MFGI

pursuant to the provisions of SIPA in the case captioned Securities Investor Protection Corp. v.

MF Global Inc., Case No. 11-CIV-7750 (PAE).

6.      The MFGI Liquidation Order, inter alia: (i) determined that MFGI's

customers were in need of the protections afforded by SIPA; (ii) appointed James W. Giddens as

Trustee for the liquidation of the business of MFGI pursuant to SIPA § 78eee(b)(3);

(iii) removed the case to this Court as required for SIPA cases by SIPA § 78eee(b)(4) (the "SIPA

Proceeding"); and (iv) authorized the Trustee to take immediate possession of the property of

MFGI, wherever located.  (MFGI Liquidation Order ¶¶ I, II, XIII.)

7.      Prior to the Filing Date, MFGI was a futures commission merchant

("FCM") and a significant clearing member on the Exchanges.  On the Filing Date, CME

suspended MFGI as a clearing member under its rules (collectively with the rules promulgated

by the Exchanges, the "Exchange Rules").[4]

8.      Four classes of property have been identified as existing in the liquidation

of MFGI's FCM:  (i) property related to commodity futures and options trading by former MFGI

customers on domestic exchanges ("Section 4d Property"); (ii) property related to commodity

futures and options trading by former MFGI customers on non-domestic exchanges ("Rule 30.7

Property" and together with Section 4d Property, "Segregated Property"); (iii) property related to

warehouse receipts, precious metal certificates, shipping certificates, and other certificates of title

for commodities held by MFGI for its customers ("Delivery Property"); and (iv) all other

property of the MFGI estate, including property that is or was proprietary to MFGI's FCM

business ("Non-Segregated Property").

## I.      THE FCM ACCOUNT TRANSFERS

9.      Immediately upon his appointment and over the course of subsequent

weeks, the Trustee and his professionals, working closely with the Securities Investor Protection

Corporation ("SIPC"), the Commodity Futures Trading Commission ("CFTC"), and CME

Group, transferred in three parts the commodity futures accounts of MFGI's former customers

transacting through domestic exchanges to FCMs other than MFGI.  The First Bulk Transfer

Order (ECF No. 14) authorized the transfer of accounts containing open domestic commodity

contracts and a percentage of the associated margining collateral posted with respect to those

contracts.  The Second Bulk Transfer Order (ECF No. 316) authorized the transfer of 60% of the

net liquidating value ("NLV") of accounts containing only cash or cash-equivalents on the Filing

---

4.   The Exchange Rules can be found at http://www.cmegroup.com/market-regulation/rulebook.

Date.  The Third Bulk Transfer Order (ECF No. 717) increased the transfer amount to 72% of

NLV and broadened the population of eligible accounts (collectively, "FCM Account

Transfers").  In furtherance of the FCM Account Transfers, the Court also entered the 363

Purchase Order (ECF No. 1281) authorizing the sale of certain Delivery Property in the Trustee's

possession.  CME Group maintained over $2.4 billion of Section 4d Property relating to MFGI's

former commodities customers on the Filing Date.  All such property has now either been

transferred to transferee FCMs at the Trustee's direction or returned to the Trustee for his

administration.

> 10.     On November 17, 2011, the Court instructed the Trustee, SIPC, and the

CFTC to submit briefs on the rules and procedures applicable to the allocation and distribution of

property within the MFGI estate.  On December 12, 2011, the Trustee, SIPC, and the CFTC each

complied with this request.  (*See generally* ECF Nos. 726, 725, 724.)

> 11.     On the Trustee's Motion (ECF No. 1086), the Court entered the Order

allowing the Trustee's Motion to Approve the First Interim Distribution for Allowed Commodity

Futures Claims on April 26, 2012 (the "First Interim Claims Distribution Order," ECF No.

1450), which authorized distribution to customer claimants who have received and agreed to the

final determination of their claim of up to approximately $600 million of Section 4d Property,

approximately $50 million of Rule 30.7 Property, and approximately $35 million of Delivery

Property (the "First Interim Claims Distribution").

## II.     CLAIMS AGAINST THE MFGI ESTATE

### A.     *Claims Asserted In The SIPA Proceeding*

> 12.     On November 23, 2011, the Court entered an Order Granting Trustee's

Expedited Application Establishing Parallel Customer Claims Processes and Related Relief (the

"Claims Process Order," ECF No. 423).  The Claims Process Order approved and implemented a

claims process in accordance with SIPA and, *inter alia*, approved the forms and procedures for filing, determining, and adjudicating claims against the MFGI estate. The Claims Process Order established January 31, 2012 as the deadline for filing commodity customer claims and June 2, 2012 as the deadline for filing all claims in the SIPA Proceeding.

13.    GFX, a CME Group affiliate, maintained two commodity futures customer accounts at MFGI and posted a $15 million letter of credit with MFGI to margin, guarantee, secure, purchase, or sell commodities contracts (the "GFX Letter of Credit"). GFX previously submitted commodity customer claims in the SIPA Proceeding, which were assigned Claim Nos. 900006632 and 900007779 (the "GFX Claims"). On June 6, 2012, GFX transferred $4,663,120 (representing 20% of its accounts' NLV plus $1,625,530 previously received from the Trustee as part of the FCM Account Transfers) to the Trustee, and the Trustee returned the GFX Letter of Credit to GFX. Accordingly, GFX received 80% of its accounts' NLV pursuant to the FCM Account Transfers and as an advance on the First Interim Claims Distribution.

14.    Pursuant to its rules, CME Group has asserted substantial claims against the MFGI estate arising out of unpaid clearing fees, exchange fees, rent, indemnification, and other MFGI obligations to CME Group and its affiliates, as detailed in CME Group's claim submitted in the SIPA Proceeding and assigned Claim No. 300000652 (the "CME Claim").

**B.    *Claims Asserted Through the Exchange Rules***

15.    As set forth more fully in CME Group's Joinder to this Motion (the "CME Joinder"), the Exchange Rules provide that certain claims may be asserted against MFGI property held at CME and direct CME Group's methods and procedure for determining and satisfying them. (*See* CME Joinder ¶¶ 10-11.)

16.     CME Rule 913.B ("Rule 913.B") directs the satisfaction of specified

obligations from a withdrawing firm's guaranty fund deposit and other property, providing, in

pertinent part:

> When a clearing member withdraws from clearing membership (whether voluntarily or involuntarily), its guaranty fund deposit, the proceeds from the sale of its memberships assigned for clearing qualification or any other deposits required by the Clearing House, and any remaining assets available to the Exchange including, but not limited to, memberships will be released when Exchange staff determines that the following has occurred: (1) all contracts and obligations with the Exchange have been settled and paid, (2) all sums owing to the Exchange have been paid, (3) all obligations to other members and customers arising out of claims directly related to futures transactions cleared on the Exchange have been paid or otherwise provided for . . . .

17.     CME Rule 110, CBOT Rule 110, and NYMEX Rule 110 (collectively,

"Rule 110") direct the satisfaction of certain member and non-member obligations from the

proceeds of the sale of exchange memberships.  CME Rule 110[5] provides, in pertinent part:

> All claims against the seller's membership or its proceeds shall be submitted in writing to the [Membership] Department within 20 days of the posting of notice of the sale of said membership.  At the conclusion of the 20-day claim filing period, the Market Regulation Department and the Department shall conduct an investigation of all claims properly filed against the seller's membership or its proceeds.  This investigation shall be completed within 20 days unless the investigation cannot be resolved within that period.
>
> The total proceeds of the sale or in the case of a transfer, the value at the mid-point of the bid-offer spread as of the

---

5.   CME, CBOT, NYMEX, and COMEX each have their own rules (NYMEX and COMEX rules are combined). Although there are some differences among the rules, for purposes of the Agreement CME Rule 110, CBOT Rule 110 and NYMEX Rule 110 are substantially identical.

date of the transfer, of the membership shall be applied to the following purposes and in the following order of priority:

a. Payment of all dues, fines, contributions, charges and other indebtedness due to the Exchange, the CME Guaranty Fund or GFX Corporation;

. . .

c. Payment of amounts due to other clearing members on claims filed which the Exchange staff determines to have arisen directly out of transactions on the Exchange;

d. Payment of amounts due to members and member firms on claims filed which the Exchange staff determines to have arisen directly out of transactions on the Exchange;

e. Payment of amounts due to public customers of the seller based on claims filed by such customers or based on reports of the Market Regulation Department, which claims are determined by the Exchange staff to be based upon misappropriation of customer funds, improperly executed transactions, unpaid credit balances, or other similar matters, directly related to transactions on the Exchange;

No other claims against the proceeds of the sale of a membership shall be recognized and administered by the Exchange, but the creditors of the seller of a membership not falling in the foregoing categories may pursue other legal means of securing payment of their obligations.

## III.    THE AGREEMENT BETWEEN THE TRUSTEE AND CME GROUP[6]

18.    The Agreement provides for:  (i) the liquidation and delivery of over $160 million in MFGI property held or controlled by CME Group; (ii) the elimination of a duplicate customer claims process under the Exchange Rules, including the bulk determination,

---

6.    This summary is qualified in its entirety by the terms set forth in the Agreement (annexed hereto as Exhibit B) and is intended to be used for information purposes only.  It shall not, in any way, affect the meaning or interpretation of the Agreement, which shall govern in the event of any conflict or inconsistency.

disposition, or limited payment of such claims, and the modification of the automatic stay to the extent necessary; (iii) the subordination and disposition of the CME Claim and the GFX Claims in the SIPA Proceeding; and (iv) the allocation of a portion of the MFGI Property to MFGI's customer estates.

### A.   MFGI Property Addressed by the Agreement

19.   CME Group represents in the Agreement that at the close of business on the Filing Date, CME Group maintained Section 4d Property relating to MFGI's former commodities customers of $2,430,038,750.  CME Group no longer holds any property of MFGI that was, or should have been, segregated for MFGI's commodity futures and options customers. (Agreement § 1.1.1.)

20.   CME Group represents in the Agreement that it maintains possession or control over the following:

- $161,048,885.71 in cash and cash equivalents (the "Guaranty Fund Deposit") collectively held by the Exchanges and posted to them by MFGI as guaranty fund money pursuant to CME Rule 816 (Agreement § 1.1.2);

- $13,416,113.97 in cash and cash equivalents (the "House Origin Funds") in MFGI's house origin account at the Exchanges, which is the remainder in the account subsequent to the auction (organized and effectuated by CME Group) and transfer of certain open proprietary commodity futures positions and associated margin to a third party on November 1, 2011 (Agreement § 1.1.3);

- 12,000 shares of CME Group Inc. common stock (the "CME Group Shares") held through the stock registrar/transfer agent (Agreement § 1.1.4); and

- 35 memberships of various classes on various Exchanges (the "Exchange Memberships") (Agreement § 1.1.5).

The Agreement defines such property as the "MFGI Property" (Agreement § 1.2), and CME Group represents that except for the MFGI Property:

CME Group does not control or hold any other property that is or was property belonging to, held for, or owed to MFGI, or any of its former customers, as of the Filing Date, or which, subsequent to the Filing Date, came into CME Group's control and is owed to the MFGI estate or any of its former customers.

(Agreement § 1.1.6.)

21.    Under the terms of the Agreement, the following will occur to effect the disposition of the MFGI Property:

- CME Group will deliver the full amount of the Guaranty Fund Deposit and House Origin Funds to the Trustee, less sixteen and a half million dollars ($16,500,000) (the "Set-Aside Funds") (Agreement § 3.1.1);

- The Trustee will request that the stock registrar/transfer agent transfer the CME Group Shares and transfer any post-Filing Date dividend payments, to the Trustee, and CME Group shall provide the stock registrar/transfer agent with appropriate approvals, confirmations, and/or other documentation as may be required to complete such transfer. The Trustee will thereafter liquidate all CME Group Shares (Agreement § 3.1.2); and

- The Trustee will sell the Exchange Memberships in an orderly process pursuant to the Exchange Rules and without the need of further Court approval, and upon the sale of each Exchange Membership, CME Group will transfer the full proceeds of such sale to the Trustee. (Agreement § 3.1.3)

**B.    *Disposition of Claims Asserted Under the Exchange Rules***

### 1.    Customer Claims

22.    With the exception of Customer Claims relating to exchange fee rebates that have not been credited to MFGI customer accounts ("Fee Rebate Claims"), under the Agreement, all Customer Claims asserted under the Exchange Rules will be deemed determined and provided for in accordance with the provisions of the Agreement. To the extent further notice must be provided to customers regarding their claims filed with the Exchanges, CME Group will provide such notice. (Agreement § 3.2.1.) The CME Joinder describes the basis for CME Group's ability to so-determine such claims. (*See* CME Joinder ¶¶ 36-39.)

## 2.   **Fee Rebate Claims**

23.    The Agreement provides that, within thirty (30) days of the Effective
Date, the Trustee will provide to CME Group a list of the customer accounts entitled to CME
Group fee rebates.  Each such customer whose rebate has not been credited to their MFGI
customer account may be deemed to have filed a claim under Rule 913 and/or Rule 110 without
the need to submit a formal claim with CME Group, and CME Group may rely upon the list
provided by the Trustee in making distributions on account of the Fee Rebate Claims.
(Agreement § 3.2.2.)

## 3.   **Non-Customer Claims**

24.    The Agreement provides that within ninety (90) days of the Effective
Date, the Exchanges will review and make initial determinations of all Non-Customer Claims
and Fee Rebate Claims pursuant to the Exchange Rules and will provide the Trustee with
summaries of the determinations made.  (Agreement § 3.2.3.)

25.    The Agreement further provides that CME Group may pay allowed Fee
Rebate Claims and Non-Customer Claims using the Set-Aside Funds.  To the extent the total
amount allowed on Non-Customer Claims and Fee Rebate Claims (the Exchange Claim Allowed
Amount") exceeds the value of the Set-Aside Funds, CME Group will distribute the funds on a
*pro rata* basis, as otherwise provided for in the Exchange Rules.  Any payments made by CME
Group to claimants for allowed Fee Rebate Claims and Non-Customer Claims will be considered
by the Trustee when making distributions on allowed claims in the SIPA Proceeding.
(Agreement § 3.2.3.1.)  To the extent the Set-Aside Funds are greater than the Exchange Claim
Allowed Amount, CME Group will transfer the excess to the Trustee. (Agreement § 3.2.3.2.)

26.    For CME Group to use the Set-Aside Funds to pay directly the Fee Rebate
Claims and the Non-Customer Claims, and otherwise determine claims arising under the

Exchange Rules as provided in the Agreement, the automatic stay effective in the SIPA

Proceeding will be modified to the extent necessary and appropriate.  (Agreement § 3.2.3.3.)

### C.    *Disposition of Claims Asserted In The SIPA Proceeding*

#### 1.    **CME Claim**

27.    Under the Agreement, CME Group waives priority of payment under the

Exchange Rules of the CME Claim.  In exchange, the Trustee has agreed (to the extent the CME

Claim is allowed) to provide CME Group with a priority unsecured claim against any MFGI

general estate, approved by subsequent order of this Court, entitled to higher priority than all

allowed unsecured claims under 11 U.S.C. § 726(a)(2) (as made applicable to the SIPA

Proceeding under SIPA §§ 78fff(b) and 78fff-1(a)).  (Agreement § 3.3.)

#### 2.    **GFX Claims**

28.    Similar to the CME Claim, the Agreement provides that GFX waives

priority of payment under the Exchange Rules of the GFX Claim or any other claim it may have

against MFGI.  Under the Agreement, the GFX Claim shall be deemed an allowed commodity

futures customer claim to Section 4d Property in the aggregate amount of $14,953,012, of which

80% shall have been deemed already transferred to GFX pursuant to the FCM Account Transfers

and the First Interim Claims Distribution.  GFX agrees to waive its right to object to the

Trustee's determination of the GFX Claims, and upon its return of the Declaration and Release

accompanying the determination, GFX shall be entitled to distribution of its allowed claim at the

same rate and in the same manner as any other MFGI customer with an allowed claim to Section

4d Property.  (Agreement § 3.4.)

### D.    *Allocation of the MFGI Property*

29.    Under the terms of the Agreement, upon receipt of the MFGI Property, the

Trustee shall allocate such property in accordance with his rights and duties under the

Bankruptcy Code, SIPA, and the Part 190 Regulations as follows:  (i) not less than sixty-five million dollars ($65,000,000) to the Section 4d Property account class; and (ii) not less than sixty-five million dollars ($65,000,000) to the Rule 30.7 Property account class.  (Agreement § 3.5.)

### E.     *Satisfaction of Exchange Rules*

30.     The Agreement provides that upon completion of the actions contemplated by the Parties and entry of the Order, the requirements for satisfaction of Rule 913.B and Rule 110 will be deemed to have occurred solely for purposes of the Exchange Rules.  (Agreement §§ 3.6, 3.7; *see also*, CME Joinder ¶¶ 31-33.)

31.     The Agreement provides that CME Group shall be responsible for providing notice of the Agreement and this Motion (and any other notice it deems appropriate) to all persons who have asserted claims under the Exchange Rules.  (Agreement § 3.8.)

### RELIEF REQUESTED

32.     By this Motion, the Trustee respectfully seeks entry of an Order, in the form attached hereto, approving the Agreement as in the best interest of the MFGI estate and authorizing: (i) the disposition of the MFGI Property as provided for in the Agreement; (ii) subordination of the CME Claim and the GFX Claims to all customer claims; (iii) liquidation and/or sale of the Exchange Memberships and CME Group Shares; (iv) determination and limited payment of claims asserted under the Exchange Rules and modification of the automatic stay in the SIPA Proceeding to the extent necessary; and (v) allocation of a portion of the MFGI Property to MFGI's customer estates.

## BASIS FOR RELIEF REQUESTED

**I.    THE AGREEMENT IS WELL WITHIN THE RANGE OF
REASONABLENESS PRESCRIBED BY BANKRUPTCY RULE 9019.**

33.    Rule 9019(a) of the Federal Rules of Bankruptcy Procedures ("Bankruptcy

Rules") provides, in relevant part, that "[o]n motion by the trustee and after notice and a hearing,

the court may approve a compromise and settlement."  Fed. R. Bankr. P. 9019(a).  In

determining whether to approve a proposed settlement pursuant to Bankruptcy Rule 9019(a), a

court must find that the proposed settlement is fair and equitable, reasonable, and in the best

interests of the debtor's estate.  *Vaughn v. Drexel Burnham Lambert Grp., Inc. (In re Drexel

Burnham Lambert Grp., Inc.)*, 134 B.R. 499, 505 (Bankr. S.D.N.Y. 1991); *Protective Comm. for

Independent Stockholders of TMT Trailer Ferry Inc. v. Anderson*, 390 U.S. 414, 424 (1968); *see

also Topwater Exclusive Fund III, LLC v. SageCrest II, LLC (In re SageCrest II)*, Nos.

3:10cv978 (SRU), 3:10cv979 (SRU), 2011 U.S. Dist. LEXIS 3517, at *27-29 (D. Conn. Jan. 14,

2011); *Cousins v. Pereira (In re Cousins)*, No. 09 Civ. 1190(RJS), 2010 U.S. Dist. LEXIS

136139, at *10 (S.D.N.Y. Dec. 22, 2010); *In re Chemtura Corp.*, 439 B.R. 561, 593-94 (Bankr.

S.D.N.Y. 2010); *In re Lehman Bros. Holdings*, 435 B.R. 122, 134 (S.D.N.Y. 2010).

34.    In determining whether to approve a proposed settlement, a bankruptcy

court need not decide the numerous issues of law and fact raised by the settlement but, rather,

should "canvas the issues and see whether the settlement 'falls below the lowest point in the

range of reasonableness.'"  *Cosoff v. Rodman (In re W.T. Grant Co.)*, 699 F.2d 599, 608 (2d Cir.

1983); *In re Purofied Down Prods.*, 150 B.R. 519, 522 (S.D.N.Y. 1993) (in making the

determination of reasonableness, the court need not conduct a "mini-trial" on the merits).  "All

that [the proponent of the settlement] must do is establish [that] it is prudent to eliminate the

risks of litigation to achieve specific certainty though admittedly [the settlement] might be

considerably less (or more) than were the case fought to the bitter end." *Florida Trailer &*
*Equip. Co. v. Deal*, 284 F.2d 567, 573 (5th Cir. 1960) (citation omitted).  The business judgment
of the debtor in recommending the settlement should be factored into the court's analysis.  *JP*
*Morgan Chase Bank, N.A. v. Charter Commc'ns Operating LLC (In re Charter Commc'ns)*, 419
B.R. 221, 252 (Bankr. S.D.N.Y. 2009).  In addition, a bankruptcy court should exercise its
discretion "in light of the general public policy favoring settlements."  *In re Hibbard Brown &*
*Co., Inc.*, 217 B.R. 41 (Bankr. S.D.N.Y. 1998); *see also Nellis v. Shugrue*, 165 B.R. 115, 123
(S.D.N. Y. 1994) ("the general rule [is] that settlements are favored and, in fact, encouraged by
the approval process outlined above").

35.    The Second Circuit outlined the test for consideration of settlements under
the Bankruptcy Rules in *Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium*
*Operating LLC)*, 478 F.3d 452, 462 (2d Cir. 2007).  The factors to be considered are:

> (1) the balance between the litigation's possibility of
> success and the settlement's future benefits; (2) the
> likelihood of complex and protracted litigation, "with its
> attendant expense, inconvenience, and delay," including
> the difficulty in collecting on the judgment; (3) "the
> paramount interests of the creditors," including each
> affected class's relative benefits "and the degree to which
> creditors either do not object to or affirmatively support
> the proposed settlement;" (4) whether other parties in
> interest support the settlement; (5) the "competency and
> experience of counsel" supporting, and "[t]he experience
> and knowledge of the bankruptcy court judge" reviewing,
> the settlement; (6) "the nature and breadth of releases to be
> obtained by officers and directors;" and (7) "the extent to
> which the settlement is the product of arm's length
> bargaining."

*Id*. (internal citations omitted).

36.    The Agreement satisfies the applicable considerations outlined in *Iridium*:

- The Agreement provides immediate benefit to the MFGI estate
  whereas litigation into the complexities of resolving disputes between

the Part 190 Regulations and the Exchange Rules would be complex, expensive, and provide no clear likelihood of success;

- The Agreement provides for the expedient and cost-efficient administration of the MFGI estate; and

- The Agreement is the product of arm's length negotiations.

37.     The Agreement clearly falls within the range of reasonableness detailed in *Iridium*.  By resolving all claims related to the MFGI Property, approval of the Agreement not only provides guidance and finality as to the complex issues of claims arising under both the Exchange Rules and the Part 190 Regulations, it also saves the MFGI estate the cost of any litigation between the Parties.  Accordingly, the Agreement should be approved and the Order should be entered by the Court.

## II.    THE AGREEMENT OBTAINS THE BEST VALUE FOR THE EXCHANGE MEMBERSHIPS  AND THE CME GROUP SHARES.

38.     The Trustee and CME Group's agreement regarding the Exchange Memberships and the CME Group Shares represents the best means of liquidating property of the MFGI estate at maximum value and at minimum cost.

### A.     *Liquidation of the CME Group Shares Will Be At Market Value.*

39.     CME Group Shares trade on NASDAQ on a regular basis and at a volume far greater than MFGI's position.  Achieving actual value for MFGI's positions will be straightforward once the restrictions on their sale are lifted as provided for in the Agreement.  Therefore, the method and process for liquidating the CME Group Shares is reasonable and within the Trustee's sound business judgment.

### B.     *The Agreement's Provision to Sell the Exchange Memberships Gradually and Pursuant to the Exchanges' Sale Procedures Complies With Bankruptcy Code Section 363.*

40.     The Exchange Membership sales contemplated in the Agreement are permissible under Bankruptcy Code § 363 (made applicable to the SIPA Proceeding by SIPA §§

78fff(b) and 78fff-1(a)).  Courts may allow debtors or trustees to sell assets outside the ordinary

course of business by private sale when the debtors demonstrate that the sale is permissible

pursuant to  Bankruptcy Code § 363.  Bankruptcy Rule 6004(f)(1) provides that "[a]ll sales not

in the ordinary course of business may be by private sale or by public auction." Fed. R. Bankr.

Pro. 6004(f)(1).  *See, e.g.*, *In re Lehman Brothers Holdings Inc., et al.*, Case No. 08-13555

(JMP), (Bankr. S.D.N.Y. Jan. 13, 2012) (order authorizing monetization of certain equity

interests); *In re Loral Space & Commc'ns Ltd., et al.*, Case No. 03-41710 (RDD) (Bankr.

S.D.N.Y. Sept. 30, 2005); *In re Int'l Wire Grp., Inc., et al.*, Case No. 04-11991 (BRL) (Bankr.

S.D.N.Y. June 10, 2004); *Palermo v. Pritam Realty, Inc. (In re Pritam Realty, Inc.)*, 233 B.R.

619 (D.P.R. 1999) (upholding the bankruptcy court's approval of a private sale conducted by

debtor); *In re Wieboldt Stores, Inc.*, 92 B.R. 309 (N.D. Ill. 1988) (affirming right of debtor to

transfer assets by private sale); *In re Condere Corp.*, 228 B.R. 615 (Bankr. S.D. Miss. 1998)

(approving a private sale of debtor's assets where the standards of section 363(b) were met).

41.     Courts in the Second Circuit and elsewhere, in applying Bankruptcy Code

§ 363, have required that the transaction be based upon the sound business judgment of the

debtor or trustee.  *See In re Chateaugay Corp.*, 973 F.2d 141 (2d Cir. 1992) (holding that a judge

reviewing a section 363(b) application must find from the evidence presented a good business

reason to grant such application); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel

Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983) (same).  It is generally understood that "[w]here the

debtor articulates a reasonable basis for its business decisions (as distinct from a decision made

arbitrarily or capriciously), courts will generally not entertain objections to the debtor's

conduct." *In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986).  The

Agreement's orderly liquidation and sale of the Exchange Memberships is a result of the

Trustee's sound business judgment.  It is more than reasonable for the Trustee to liquidate these

assets for which he has no further need to maximize the MFGI estate.  And it would be cost-

effective for the Court to now authorize the Agreement's provision that the Trustee need not

return to the Court for approval of the sale of each Exchange Membership.

42.     Once a court is satisfied that there is a sound business justification for the

proposed use or sale, the court must then determine whether (i) the debtor or trustee has provided

the interested parties with adequate and reasonable notice, (ii) the sale price is fair and

reasonable, and (iii) the purchaser is proceeding in good faith.  *See, e.g.*, *In re Betty Owens Sch.*,

96 Civ. 3576 (PKL), 1997 U.S. Dist. LEXIS 5877 (S.D.N.Y. 1997); *accord In re Delaware and

Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991).  By virtue of filing this Motion, the Trustee

is providing adequate and reasonable notice to interested parties with respect to the sales of the

Exchange Memberships.  Interested parties have the current opportunity to object to the proposed

sales.  Further, Exchange Memberships sales will be undertaken pursuant to the longstanding

procedures in place under the Exchange Rules, as provided in the Agreement.  These procedures

provide a detailed mechanism by which a fair and reasonable value will be received in exchange

for the Exchange Memberships.  And by spreading the sale of the Exchange Memberships over

an extended period of time, the Trustee avoids the risk of flooding the market and driving down

prices.  By approving the Agreement, the Court is augmenting the amount of property returned to

the MFGI estate because the Agreement disallows any further claims against the proceeds of the

Exchange Memberships.  CME Group will remit to the Trustee the full proceeds of each

Exchange Membership sale.

## III.   THE AGREEMENT RETURNS MORE PROPERTY TO THE MFGI ESTATE THAN THROUGH PURE OPERATION OF THE EXCHANGE RULES.

43.     In broad strokes, the Agreement transfers over $160 million and the full proceeds of the Exchange Memberships to the Trustee for his administration while allowing a pre-return deduction by CME Group of $16.5 million for satisfaction of certain claims asserted under the Exchange Rules.  Absent agreement between the Trustee and CME Group, significantly less property would have been returned to the MFGI estate.  The MFGI Property would have been subject to various and multiple deductions provided for by the Exchange Rules, with far less than $160 million returning to the Trustee.  And that property would have run the risk of being distributed to MFGI's customers and creditors inequitably.  By approving the Agreement, the Court is ensuring a maximum recovery of property by the Trustee and that all customers with valid customer claims in the SIPA Proceeding share ratably in a significant portion of that recovery.

44.     As set forth more fully in the CME Joinder, CME Group is entitled to withhold the return of a withdrawing member's property until claims asserted against the withdrawing member under the Exchange Rules are addressed.  (CME Joinder ¶¶ 17, 24, 27, 32.)  The Exchange Rules prioritize payment to CME Group and its affiliates.  Two primary results of the Agreement are to subordinate CME Group's claims[7] to the MFGI Property and to swiftly return the MFGI Property to the Trustee, making it available for his administration pursuant to SIPA and the Part 190 Regulations.

---

7.   On January 31, 2012, CME Group filed an omnibus claim related to the November 30, 2011 guarantee from CME Group to the Trustee, which was assigned claim number 100003918 (the "CME Omnibus Customer Claim").  The CME Omnibus Customer Claim is not affected in any way by the Agreement.

45.     Pursuant to the Claims Process Order, the Trustee is authorized "to compromise and settle any customer claim at any time, as appropriate, without further order of this Court." (*See* Claims Process Order at 5.)   Therefore, while the voluntary subordination of the CME Claim and the GFX Claims and the Trustee's disposition of claims asserted under the Exchange Rules (to the extent each qualify as a customer claim) do not require the Court's approval, such provisions only enhance the reasonableness of the Agreement, lending even more weight as to why the Agreement should be approved and the Order entered.

**A.      *The Subordination Of The CME Claim And The GFX Claims Substantially Increases The Amount Returned To The Trustee.***

46.     By subordinating the CME Claim and the GFX Claims, the Agreement increases the amount of MFGI Property returned to the Trustee by more than $30 million.  Under the Exchange Rules, CME Group would be able to deduct from the MFGI Property the value of their claims as a first priority.  (CME Joinder ¶¶ 10-11, 15, 28.)  However, in furtherance of CME Group's goal of providing for MFGI's former customers, by the Agreement, CME Group and GFX voluntarily waive the priority that their claims enjoy under Exchange Rules.  This voluntary concession significantly increases the amount of funds available for allocation by the Trustee to the customer account classes.

47.     In addition to the known amounts asserted in the CME Claim and the GFX Claims, CME Group could even, under certain conditions pursuant to the Exchange Rules, be entitled to indemnity from the MFGI Property for losses and costs related to MFGI's failure. (CME Joinder ¶ 28.)  The Agreement eliminates the risk that these unliquidated amounts could be asserted against the MFGI Property.  It also avoids the need for CME Group to hold the MFGI Property pending a determination — which could be some time in coming — that it is entitled to amounts above those asserted in the CME Claim.

48.     Approval of the Agreement confirms the Trustee's designation of the
CME Claim as a priority unsecured claim to the extent the CME Claim is allowed.  Creation of
this priority claim subordinates CME Group to all allowed customer claims but gives CME
Group a higher priority than all allowed unsecured claims under Bankruptcy Code § 726(a)(2)
(as made applicable to the SIPA Proceeding under SIPA §§ 78fff(b) and 78fff-1(a)).  The Trustee
seeks authority for allowance of this non-ordinary course priority claim to most efficiently
authorize the Trustee's performance of his duties to customers and creditors and is thus within
the scope of Bankruptcy Rule 9019 and Bankruptcy Code § 105(a).

**B.    The Agreement Extinguishes Hundreds of Duplicate Claims
In An Efficient, Fair, and Cost-Effective Manner.**

49.     Aside from the CME Group claims allowable under the Exchange Rules,
certain other claims against a defaulting member's property at the Exchanges are also
permissible and payable to such claimants in advance of CME Group returning property to a
defaulting FCM.  (*See* CME Joinder ¶¶ 10-11, 32-34.)  In the case of MFGI's collapse, hundreds
of claims with an asserted value of well over the $175 million at CME Group were lodged with
CME Group against the MFGI Property.  (CME Joinder ¶ 12.)  Under the Exchange Rules,
claimants could continue to file claims against the proceeds of the sale of the Exchange
Memberships as each is sold.   The Agreement provides for direct payment to claimants entitled
to assert claims under the Exchange Rules of only $16.5 million on those claims, with the
remainder of property returning to the Trustee.  The vast majority of the claims — both in
numbers and value — are moved into the established SIPA Proceeding claims process, which is
injected with the MFGI Property under the Agreement to "otherwise provide for" MFGI's
former customers under the Exchange Rules.

50.    Without the Agreement, CME Group would disburse the MFGI Property in a customer claims process outside the auspices of the Bankruptcy Court, and potentially only to those customers savvy enough to submit claims under the Exchange Rules.[8]  Moreover, MFGI Property only would be distributed to customers whose claims CME Group determines are "directly related to" Exchange transactions.  And the methodology to be used by CME Group in allocating the MFGI Property among customers is not specified in any of the Exchange Rules. The Agreement avoids potentially inequitable outcomes and any disputes concerning the distribution methodology, ensuring that all customers with valid customer claims are able to share ratably in an immediate allocation of a portion of the MFGI Property.

51.    The Trustee and CME Group's negotiated solution provides that CME Group reviews the claims arising under the Exchange Rules in the first instance.  Depending on the claim type, they are either satisfied directly by CME Group from the Set-Aside Funds or deemed "determined and provided for" by the Agreement.  The Trustee believes that this outcome is exceedingly reasonable, and, under Bankruptcy Rule 9019, that is suitable grounds for approving the Agreement.

52.    The Agreement's resolution of claims arising under the Exchange Rules eliminates the Court's need to consider the interplay between the Exchange Rules and the Part 190 Regulations.  This bulk determination and resolution of hundreds of claims in a fair and equitable manner also saves and/or eliminates litigation costs.  Litigation between CME Group and the Trustee regarding priority of payment under the Exchange Rules versus under the Part

---

8.    That only several hundred claims were filed with CME Group versus the tens of thousands filed in the SIPA Proceeding speaks to the possible inequities.

190 Regulations would not only venture into novel areas of law, but would also be time consuming and expensive, which would be to the ultimate detriment of MFGI's former customers and creditors.

      53.    The Agreement eliminates the potential for double recoveries by MFGI customers and creditors because it requires CME Group and the Trustee to coordinate on CME Group's claim determinations. And while the Agreement provides for $16.5 million to be paid out directly by CME Group to claimants, it also provides that the Trustee shall consider these payments when making distributions on claims.

      54.    The 913.B Customer Claims are generally claims to the unrecovered portions of these former customers' NLV and accordingly duplicative of commodity customer claims asserted by such customers in the SIPA Proceeding. As the Court is aware, the Trustee is advancing the process of determining and paying customer claims as quickly as possible.[9] In lieu of having to calculate the amount owed to these claimants under the Exchange Rules and then deduct that from any distribution by the Trustee, the Agreement transfers the claim into the SIPA Proceeding's existing claims process.

**C.**     ***Cause Exists to Modify The Automatic Stay To The Extent Necessary To Permit CME Group to Perform Under the Agreement***.

      55.    The filing of a bankruptcy petition triggers a stay of any act to "exercise control over property of the estate." 11 U.S.C. § 362(a)(3); *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 369 (1988). The MFGI Property is estate property protected by the automatic stay in this SIPA Proceeding. *In re Drexel Burnham Lambert Grp.,*

---

9.  *See* Trustee's First Interim Report for the Period October 31, 2011 through June 4, 2012, ECF No. 1865, ¶ 7.

*Inc.,* 120 B.R. 724, 734 (Bankr. S.D.N.Y. 1990). However, to effectuate the terms of the

Agreement, the automatic stay must be modified to allow CME Group to determine and satisfy

claims arising from Exchange Rules as contemplated by the Settlement Agreement. Under the

Bankruptcy Code, an automatic stay can be modified or lifted under the Bankruptcy Code, *inter*

*alia*, "for cause." 11 U.S.C. § 362(d)(1). Since the Agreement is in the best interests of the

MFGI estate, appropriate and adequate cause exists to modify the automatic stay, to the extent

necessary, for CME Group to perform their obligations under the terms of the Agreement.

## IV.    THE TRUSTEE IS AUTHORIZED TO IMMEDIATELY ALLOCATE A PORTION OF THE MFGI PROPERTY TO MFGI'S CUSTOMER ESTATES.

56.    The Trustee's immediate allocation of $130 million of the MFGI Property,

a specific condition for CME Group's consideration of the Agreement, will have a significant

and beneficial impact on the MFGI estate. The Trustee is authorized to allocate a portion of the

returned MFGI Property to the MFGI customer account classes under SIPA, the Bankruptcy

Code, and the Part 190 Regulations because certain of the MFGI Property is readily associable

with MFGI customer activity and because the Exchange Rules direct for its application to

customer shortfalls in the event of an FCM's failure. Though not set aside specifically for

customers, Rule 110 and Rule 913.B contemplate the Guaranty Fund Deposit and the proceeds of

Exchange Membership sales as sources of recovery for MFGI's customers in the event of a

disaster. Therefore, it is within the Trustee's broad discretion to allocate those funds to

customers in the process of recovering from MFGI's collapse.[10]

---

10.    The extent and scope of customers' rights to general estate property of MFGI is not addressed by the Agreement
       or by this Motion. *E.g.*, Reply Brief of the Commodity Futures Trading Commission Regarding the Legal
       Principles and Framework Applicable to the Allocation and Distribution of Customer Property, ECF No. 853, at
       Section I(c) (stating that the Court need not address Section 190.08(a)(1)(ii)(J) at this time).

**A.** **The Best Interest Of The MFGI Estate Permits the Trustee To Immediately Allocate A Portion Of The Returned Property To Customer Account Classes.**

57.     The Trustee believes that immediately allocating $130 million to customers in exchange for both subordinating claims of at least $30 million and eliminating claims of significantly greater value is in the best interest of the estate.  Had the Trustee not agreed to this condition, the ultimate recovery of MFGI Property would have been significantly depleted as CME Group applied the various Exchange Rules and priority claims as described in Section II.  Achieving this positive result for the estate via agreement is itself a sufficient basis under Bankruptcy Rule 9019 for the Court to approve the immediate allocation of the MFGI Property as provided for in the Agreement.

**B.** **Allocation Of A Portion Of The MFGI Property To The Customer Account Classes Is Also Within The Trustee's Discretion.**

58.     SIPA, the Bankruptcy Code, and the Part 190 Regulations recognize that, in appropriate cases, the Court may approve the Trustee's allocation of estate property to certain account classes.  SIPA trustees are generally accorded considerable discretion in carrying out their responsibilities, discretion greater than that of a trustee in a bankruptcy liquidation.  *See Kusch v. Mishkin (In re Adler, Coleman Clearing Corp.)*, No. 95-08203 (JLE), 1998 Bankr. LEXIS 1076, at *97 (Bankr. S.D.N.Y. Aug. 24, 1998) (application of SIPA is "committed to the broad discretion of a SIPA trustee in administering the estate of a failed broker dealer"), *aff'd*, 208 F.3d 202 (2d Cir. 2000); 1 Collier on Bankruptcy ¶ 12.02 (16th ed. 2011).

59.     Allocating estate property under the Part 190 Regulations is consistent with the statutory duties that the Trustee owes to both customers and creditors.  The Commodity Exchange Act authorizes the CFTC to, notwithstanding the Bankruptcy Code, provide by rule or

regulation, "that certain cash, securities, other property, or commodity contracts are to be
included in or excluded from customer property." 7 U.S.C. § 24(a)(1).[11]  The MFGI Property is
property of the estate that "must be allocated among account classes and between customer
classes" pursuant to the Part 190 Regulations.  17 C.F.R. §190.08(a)(1); *see In re Drexel
Burnham Lambert Group, Inc.*, 120 B.R. 724, 734 (Bankr. S.D.N.Y. 1990).  Customer property
that is "segregated on behalf of a specific account class, or readily traceable on the filing date to
customers of such account class must be allocated to the customer estate of the account class for
which it is segregated or to which it is readily traceable."  17 C.F.R. § 190.08(c)(1).  Though the
MFGI Property was not segregated on behalf of a specific account class, certain property such as
the Guaranty Fund Deposit and the Exchange Memberships can be readily traced to customer
activity and the Exchange Rules contemplate both as a back-stop to provide for customer losses.

60.     In applying the Part 190 Regulations in this context, the Trustee is
cognizant of his duty to the estate as a whole rather than any particular class of creditors.  *See
Kusch v. Mishkin, et al. (In re Adler, Coleman Clearing Corp.)*, Case No. 95-08203 (JLG), Adv.
Proc. No. 95-9248(A), 1998 Bankr. LEXIS 1076, *49 (Bankr. S.D.N.Y. Aug. 24, 1998).  In
agreeing to allocate $130 million of the MFGI Property to customer account classes, the Trustee
drastically increased the overall return of MFGI Property, which will significantly augment the
MFGI estate and increase ultimate customer and creditor recoveries under the applicable laws
and regulations.

---

11. In promulgating the Part 190 Regulations, the CFTC did not seek to supersede or overtake the Bankruptcy Code
in developing a broad definition of "customer property" but merely to follow a statutory mandate.  *See* 48 F.R.
8716 (Mar. 1, 1983) ("notwithstanding the breadth of [the definition of customer property under the Bankruptcy
Code], Congress also specifically authorized the Commission to [define] the scope of customer property.")

**C.** **The Exchange Rules' Requirement That Member Property Be Used To Reimburse Customers Supports Allocation Of The MFGI Property To Customers Under The Part 190 Regulations.**

61.     Under the Exchange Rules, a withdrawing FCM's property cannot be returned to that FCM until its customers are "otherwise provided for."  (Rule 913.B.)  This provision highlights the Exchange Rules' preference that a FCM's property be distributed to its customers.  (*See* CME Joinder ¶ 17-18 (stating that various Exchange Rules require that the MFGI Property be used to satisfy "claims of MFGI customers directly related to futures transactions. . .").)

62.     The MFGI Property can be allocated to MFGI's customers pursuant to the Part 190 Regulations because, while the MFGI Property is property of the estate, it is also subject to the Exchange Rules.  *Seattle Curb Exch. v. Knight*, 59 F.2d 39, 40 (9th Cir. 1932) (exchange membership is estate property over which the bankruptcy court has jurisdiction).  *But see Bd. of Trade v. Johnson*, 264 U.S. 1 (1924) (bankruptcy trustee's right to sell and recover proceeds of exchange membership are subject to rules of the exchange); *In re Gregory*, 174 F. 629, 630 (2d Cir. 1909) (same); *Drexel Burnham*, 120 B.R. at 733; *In re Reinstein*, 165 B.R. 303, 306 (Bankr. S.D. Fla. 1994); *In re Sorkin*, No. 86 B 1905, 1986 Bankr. LEXIS 4901, at *12 (Bankr. N.D. Ill. Nov. 26, 1986), *aff'd*, No. 87 C 2373 (N.D. Ill. 1988).  For example, "the holder of an exchange seat holds that seat subject to the exchange rules, which define and limit his property interest."  *United States v. Broady*, No. 79 Civ. 3291 (JMC), 1989 U.S. Dist. LEXIS 1090, at *9 (S.D.N.Y. 1989); *Reinstein*, 165 B.R. at 306 (claims against member property are "inalienable parts of the membership" which are not subject to avoidance by the trustee).  Accordingly, the MFGI Property — property that an applicable and governing derivatives clearing organization rule contemplates as being available for customer relief — is readily allocable to the customer account classes.

63.     Though the exact value of the shortfall in customer property will only be known as claims are finalized and recoveries completed, the Trustee's conclusion is that there is and will remain a shortfall of customer property.  And that shortfall will need to be bridged by allocation of non-segregated property to customer account classes.  *Ferris, Baker Watts, Inc. v. Stephenson (In re MJK Clearing, Inc.)*, 286 B.R. 109, 129-33 (Bankr. D. Minn. 2002), *aff'd*, 2003 U.S. Dist. LEXIS 5954 (D. Minn. April 7, 2003), *aff'd*, 371 F.3d 397 (8th Cir. 2004) (reallocating non-segregated property to the fund of customer property pursuant to SIPA Section 78*lll*(4)(E) to the extent necessary to make up shortfall in customer property); 17 C.F.R. § 190.08(a)(1)(ii)(J) (providing for the reallocation of non-segregated property to "customer property" subject to allocation and distribution to commodities customer to the extent necessary to make up a shortfall); *But see In re Griffin Trading Co.*, 245 B.R. 291, 308-19 (Bankr. N.D. Ill. 2000), *vacated as mooted sub nom.*, *Inskeep v. MeesPierson N.V. (In re Griffin Trading Co.)*, 270 B.R. 882 (N.D. Ill. 2001) (holding that Section 190.08(a)(1)(ii)(J) of the Part 190 Regulations "exceeds the CFTC's statutory authority to regulate and must be stricken").[12]

**D.     The Trustee's Allocation to Multiple Classes of Customers Is Permitted Under His Discretion and Pursuant the Bankruptcy Rule 9019.**

64.     Though customer property that is not "readily traceable on the filing date" is allocated incrementally to each account class until "the public customer claims of each account class are paid in full" (17 C.F.R. § 190.08(c)(2)), the Trustee's allocation to both the Section 4d Property account class and the Rule 30.7 Property Account Class should be approved.  As an

---

12. Not only was the *Griffin* decision vacated by the U.S. District Court for the Northern District of Illinois shortly after it was issued (*Inskeep v. MeesPierson N.V. (In re Griffin Trading Co.)*, 270 B.R. 882 (N.D. Ill. 2001)), but it was also wrongly decided as it overlooked Section 20(a) of the CEA, which empowers the CFTC to establish such rules and regulations "[n]otwithstanding Title 11 of the United States Code."  7 U.S.C. § 24(a).

initial matter, that division is a term of the Agreement, reached at arms' length and believed in

the Trustee's judgment to be in the best interest of the estate.  As detailed in Section III, if the

Trustee and CME Group did not agree to this allocation, a significant amount of the MFGI

Property would be applied to satisfying customer claims under the Exchange Rules, chipping

away at the amount available for Trustee administration under the Part 190 Regulations.

Accordingly, the Court has adequate grounds under Bankruptcy Rule 9019 to approve the

allocation to both account classes.  And although it remains too early in the SIPA Proceeding to

determine exactly what allocations to make among account classes under Rule 190.08(c)(2), the

Agreement's allocations are a step toward the final allocation.  The gap between what is owed to

customers and what has been recovered for each account class will need to be bridged by

allocations of property more substantial that those requested by this Motion.  Accordingly, under

the Trustee's discretion, he seeks approval of a 50-50 split of the allocated amount to the two

classes of Segregated Property.

        65.     Allocation of the MFGI Property to customers is in the best interest of the

MFGI estate, is an exercise of the Trustee's sound business judgment, and provides the Trustee

with $130 million in immediate available funds.  Accordingly, the allocation should be

authorized and approved by the Court.

## NOTICE

        66.     Notice of this Motion has been provided pursuant to the Order Pursuant to

Section 105(a) of the Bankruptcy Code and Bankruptcy Rules 1015(c) and 9007 Implementing

Certain Notice and Case Management Procedures and Related Relief (ECF No. 418).  In

addition, notice of this Motion has been published on the website of the Trustee

(www.mfglobaltrustee.com).  The Trustee submits that no other or further notice need be given.

## NO PRIOR REQUEST

67.     No prior request for the relief sought in this Motion has been made to this

or any other court.

## CONCLUSION

WHEREFORE, the Trustee respectfully requests that this Court enter an Order, in

the form substantially similar to that attached as Exhibit A hereto, approving the Agreement,

authorizing any actions to by taken by the Parties thereunder, and granting the Trustee such other

and further relief as is just and proper.


Dated: New York, New York
       June 14, 2012


                                        HUGHES HUBBARD & REED LLP

                                        By:  /s/ James B. Kobak, Jr.
                                             James B. Kobak, Jr.
                                             Christopher K. Kiplok
                                             Anson B. Frelinghuysen
                                             Eleni D. Theodosiou-Pisanelli
                                        One Battery Park Plaza
                                        New York, New York 10004
                                        Telephone:  (212) 837-6000
                                        Facsimile:  (212) 422-4726
                                        Email:  kobak@hugheshubbard.com


                                        Attorneys for James W. Giddens, Trustee for
                                        the SIPA Liquidation of MF Global Inc.

12-12020-mg    Doc 3715-3    Filed 05/14/13    Entered 05/14/13 16:09:49    Exhibit 3
Pg 3 of 76

# EXHIBIT A

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In re

MF GLOBAL INC.,                                  Case No. 11-2790 (MG) SIPA

                                    Debtor.

## [PROPOSED] ORDER GRANTING TRUSTEE'S MOTION FOR APPROVAL OF AN AGREEMENT PROVIDING FOR THE RETURN OF MFGI PROPERTY, EXTINGUISHMENT OF DUPLICATE CLAIMS FILED WITH CME GROUP INC., AND ALLOCATION OF THE MFGI PROPERTY TO CUSTOMERS OF THE MFGI ESTATE

Upon the Motion[1] dated June 14, 2012, of James W. Giddens (the "Trustee"), as

Trustee for the liquidation of the business of MF Global Inc. ("MFGI" or the "Debtor"), pursuant

to the Securities Investor Protection Act ("SIPA"), for entry of an order (this "Order") approving

the Limited Agreement and Reservation of Rights between the Trustee and CME Group Inc.

("CMEG"), on its own behalf and on behalf of each and all of its exchange subsidiaries,[2] and

GFX Corporation ("GFX") (collectively, "CME Group") (together with the Trustee, the

"Parties"); and the Court having jurisdiction to consider the Motion and the relief requested

therein in accordance with SIPA § 78eee(b)(4); and venue being proper before this Court

pursuant to SIPA § 78eee(a)(3) and 15 U.S.C. § 78aa; and it appearing that the relief requested

by the Motion is necessary and in the best interests of the estate, its customers, its creditors, and

all parties in interest; and it and it appearing that due and proper notice of the Motion and the

relief requested therein having been given in accordance with this Court's Order Pursuant to

---

1.  Capitalized terms not otherwise defined herein shall have the meanings given to them in the Motion.

2.  Chicago Mercantile Exchange Inc. ("CME"), Board of Trade of the City of Chicago, Inc. ("CBOT"), New York Mercantile Exchange, Inc. ("NYMEX"), and Commodity Exchange, Inc. ("COMEX") (together, the "Exchanges").

section 105(a) of the Bankruptcy Code and Bankruptcy Rules 1015(c) and 9007 Implementing

Certain Notice and Case Management Procedures and Related Relief (ECF No. 418), and no

other or further notice is necessary; and it appearing that due and proper notice of the Motion and

Agreement has been provided by CME Group to all parties making claims against the MFGI

Property, and that no other or further notice is necessary; and the Court having determined that

the legal and factual bases set forth in the Motion establish just cause for the relief granted

herein, it is hereby

      **ORDERED** that the Motion is granted in all respects; and it is further

      **ORDERED** that the Agreement dated as of June 7, 2012 between the Trustee and

CME Group is authorized and approved pursuant to Bankruptcy Rule 9019, and that the failure

to specifically include any particular provision of the Agreement in this Order shall not diminish

or impair the effectiveness of such provision, it being the intent of the Court that the Parties'

implementation of the actions contemplated in the Agreement be approved in their entirety; and

it is further

      **ORDERED** that the Parties are authorized to execute, deliver, implement and

fully perform any and all obligations, instruments, documents and papers and to take any and all

actions reasonably necessary to consummate the Agreement and perform any and all obligations

contemplated therein; and it is further

      **ORDERED** that all parties asserting claims under the Exchange Rules have been

afforded satisfactory notice and a full and fair opportunity to be heard concerning the terms of

the Agreement, and shall be barred from making claims relating to the MFGI Property against

CME Group or MFGI Property at CME Group other than in accordance with the terms of the Agreement; and it is further

**ORDERED** that all parties permitted by the Agreement to receive payment on claims asserted under the Exchange Rules have been afforded satisfactory notice and a full and fair opportunity to be heard concerning the terms of such payment and shall receive payment from CME Group or the Trustee on such claims only in accordance with the terms of the Agreement; and it is further

**ORDERED** that to the extent applicable, the automatic stay imposed by section 362(a) of the Bankruptcy Code is hereby modified solely to the extent necessary to allow CME Group to determine claims asserted under the Exchange Rules and pay allowed Fee Rebate Claims and Non-Customer Claims as detailed in the Agreement; and it is further

**ORDERED** that the Trustee is authorized to allocate the MFGI Property as specified in the Agreement; and it is further

**ORDERED** that the Trustee is authorized to sell or otherwise dispose of the MFGI Property as specified in the Agreement and Motion; and it is further

**ORDERED** that this Court shall retain jurisdiction with respect to all matters relating to the interpretation, implementation, or enforcement of the Agreement and this Order.

Dated:   New York, New York
_____ __, 2012

_____
Honorable Martin Glenn
United States Bankruptcy Judge

12-12020-mg    Doc 3715-3    Filed 05/14/13    Entered 05/14/13 16:09:49    Exhibit 3
Pg 41 of 77

# EXHIBIT B

EXECUTION VERSION

## LIMITED AGREEMENT AND RESERVATION OF RIGHTS
## BETWEEN CME GROUP INC. AND JAMES W. GIDDENS, AS
## TRUSTEE FOR THE SIPA LIQUIDATION OF MF GLOBAL INC.

This Limited Agreement and Reservation of Rights (the "Agreement"), dated as of

June 7, 2012, among James W. Giddens (the "Trustee"), as Trustee for the liquidation of MF

Global Inc. ("MFGI") pursuant to the Securities Investor Protection Act of 1970, as amended

("SIPA"), and CME Group Inc. ("CMEG"), on its own behalf and on behalf of each and all of its

exchange subsidiaries[1] and GFX Corporation ("GFX") (collectively, "CME Group"), is entered

into in connection with the disposition of MFGI property at, or controlled by, CME Group.  For

convenience, and as the context may require, the Trustee and CME Group may each be referred

to individually as a "Party" and collectively as the "Parties."

## RECITALS

A.    On October 31, 2011 (the "Filing Date"), James W. Giddens was appointed as

Trustee in the liquidation of MFGI pursuant to SIPA by the Honorable Paul A. Engelmayer,

United States District Court for the Southern District of New York, as set forth in the Order

commencing liquidation ("MFGI Liquidation Order").

B.    The MFGI Liquidation Order, *inter alia*: (i) appointed James W. Giddens as

Trustee for the liquidation of the business of MFGI pursuant to 15 U.S.C. § 78eee(b)(3); and (ii)

removed for all purposes the case to the United States Bankruptcy Court for the Southern District

---

1.    Chicago Mercantile Exchange Inc. ("CME"), Board of Trade of the City of Chicago, Inc. ("CBOT"), New York
      Mercantile Exchange, Inc. ("NYMEX"), and Commodity Exchange, Inc. ("COMEX") (together, the
      "Exchanges").

of New York (the "Court"), as required for SIPA cases by 15 U.S.C. § 78eee(b)(4) (Case No. 11-2790, such proceeding, the "SIPA Proceeding").  (MFGI Liquidation Order ¶¶ II, IX.)

C.      Immediately upon his appointment and over the course of subsequent weeks, the Trustee and his professionals, working closely with CME Group, other derivatives clearing organizations ("DCOs"), and regulators from the Commodity Futures Trading Commission, transferred funds and positions associated with the commodity futures accounts of MFGI's former customers whose futures and options transactions were undertaken through U.S. exchanges.  Positions and property associated with MFGI accounts were transferred to other futures commission merchants ("FCMs") pursuant to Court orders obtained by the Trustee in accordance with the commodity broker liquidation provisions of chapter 7 of title 11 of the United States Code[2] (11 U.S.C. §§ 761–767, the "Commodity Broker Liquidation Provisions"), and 17 C.F.R. §§ 190.01–190.10 (the "Part 190 Regulations," and such transfers, the "FCM Account Transfers").[3]

D.      On November 23, 2011, the Court entered an Order Granting Trustee's Expedited Application Establishing Parallel Customer Claims Processes and Related Relief ("Claims Process Order").  The Claims Process Order approved and implemented a claims process in accordance with SIPA and, *inter alia*, approved the forms and procedures for filing, determining, and adjudicating claims against the MFGI estate.

---

2.   Title 11 of the United States Code shall be referred to as the "Bankruptcy Code."

3.   The relevant orders are:  Order Approving Trustee's Emergency Motion ("Position Transfer Order"); Order Approving Cash Only Account Transfers ("Cash-Only Order"); Order Approving Third Account Transfer ("Third Account Transfer Order"); and the 363 Purchase Order (collectively, the "Account Transfer Orders").  On January 31, 2012, CME Group filed a contingent omnibus claim related to the November 30, 2011 guarantee from CME Group to the Trustee, which was assigned claim number 100003918 (the "CME Omnibus Customer Claim").

E.    The Trustee has identified four classes of FCM property as existing in the liquidation of MFGI:  (i) property related to commodity futures and options trading by former MFGI customers on domestic exchanges ("<u>Section 4d Property</u>"); (ii) property related to commodity futures and options trading by former MFGI customers on non-domestic exchanges ("<u>Rule 30.7 Property</u>" and together with Section 4d Property, "<u>Segregated Property</u>"); (iii) property related to warehouse receipts, precious metal certificates, shipping certificates, and other certificates of title for commodities held by MFGI for its customers ("<u>Delivery Property</u>"); and (iv) all other property of the MFGI estate, including property that is or was proprietary to MFGI's FCM business ("<u>Non-Segregated Property</u>").

F.    Rules promulgated by the Exchanges (the "<u>Exchange Rules</u>") provide, *inter alia*, as follows:

(i)    CME Rule 913.B ("<u>Rule 913.B</u>") directs the satisfaction of specified obligations from the MFGI Guaranty Fund and other property of MFGI. The rule provides, in pertinent part:

> When a clearing member withdraws from clearing membership (whether voluntarily or involuntarily), its guaranty fund deposit, the proceeds from the sale of its memberships assigned for clearing qualification or any other deposits required by the Clearing House, and any remaining assets available to the Exchange including, but not limited to, memberships will be released when Exchange staff determines that the following has occurred: (1) all contracts and obligations with the Exchange have been settled and paid, (2) all sums owing to the Exchange have been paid, (3) all obligations to other members and customers arising out of claims directly related to futures transactions cleared on the Exchange have been paid or otherwise provided for . . . .

*EXECUTION VERSION*

(ii)    CME Rule 110, CBOT Rule 110 and NYMEX Rule 110 (collectively,

"Rule 110") direct the satisfaction of certain member and non-member

obligations from the proceeds of the sale of memberships on the

Exchanges.  CME Rule 110[4] provides, in pertinent part:

> All claims against the seller's membership or its
> proceeds shall be submitted in writing to the
> [Membership] Department within 20 days of the
> posting of notice of the sale of said membership.  At
> the conclusion of the 20-day claim filing period, the
> Market Regulation Department and the Department
> shall conduct an investigation of all claims properly
> filed against the seller's membership or its
> proceeds.  This investigation shall be completed
> within 20 days unless the investigation cannot be
> resolved within that period.
>
> The total proceeds of the sale, or in the case of a
> transfer, the value at the mid-point of the bid-offer
> spread as of the date of the transfer, of the
> membership shall be applied to the following
> purposes and in the following order of priority:
>
>     a. Payment of all dues, fines, contributions,
> charges and other indebtedness due to the
> Exchange, the CME Guaranty Fund or GFX
> Corporation;
>
> . . .
>
>     c.  Payment of amounts due to other clearing
> members on claims filed which the Exchange staff
> determines to have arisen directly out of
> transactions on the Exchange;
>
>     d.  Payment of amounts due to members and
> member firms on claims filed which the Exchange

---

4.    CME, CBOT, NYMEX and COMEX each have their own rules.  Although there are some differences among
the rules, for purposes of this agreement CME Rule 110, CBOT Rule 110 and NYMEX Rule 110 are
substantially identical.

EXECUTION VERSION

staff determines to have arisen directly out of transactions on the Exchange;

e. Payment of amounts due to public customers of the seller based on claims filed by such customers or based on reports of the Market Regulation Department, which claims are determined by the Exchange staff to be based upon misappropriation of customer funds, improperly executed transactions, unpaid credit balances, or other similar matters, directly related to transactions on the Exchange;

No other claims against the proceeds of the sale of a membership shall be recognized and administered by the Exchange, but the creditors of the seller of a membership not falling in the foregoing categories may pursue other legal means of securing payment of their obligations.

(iii)    CME Rule 103 and CME Rule 104 govern the sale of CME exchange memberships.  To sell a membership, the owner or legal representative must sign and file an offer to sell stating the price and including an agreement describing the conditions of the sale. The mechanics of the purchase are detailed in CME Rule 103.  CME Rule 106 provides that CME memberships may be transferred, as opposed to sold, upon approval by the exchange.  Similar CBOT and NYMEX rules govern the sale or disposition of CBOT, NYMEX, and COMEX exchange memberships.

G.    In excess of $175 million of MFGI Guaranty Fund and other property of MFGI continues to be held at CME Group, which property CME asserts is subject to claims submitted under Exchange Rules and the requirements of (among other rules) Rule 110 and Rule 913.B. That property (i.e., the MFGI Property, as defined in Section 1.2 below) includes MFGI's guaranty fund deposit, house origin collateral (margin), 12,000 shares of CME Group Inc. stock,

*EXECUTION VERSION*

and 35 memberships of various classes on the Exchanges, each as described in more detail in

Section 1.1 below.

H.      The following claims already have been asserted against the MFGI Property and

submitted to the Exchanges pursuant to Exchange Rules:

(i)      Customer claims (both member and non-member) arising out of losses

related to Segregated Property ("Customer Claims");

(ii)     Member and non-member claims related to broker commissions, fee

rebates, and other non-Customer Claims, some of which may be allowable

under Rule 913.B and/or Rule 110 ("Non-Customer Claims"); and

(iii)    CME Group claims related to unpaid clearing fees, exchange fees, rent,

indemnification, and other MFGI obligations to CME Group and its

affiliates, as submitted on June 1, 2012 in the SIPA Proceeding and

assigned Claim No. 300000652 (the "CME Claim").

I.      GFX maintained two commodity futures and options customer accounts at MFGI

and posted a $15 million letter of credit with MFGI to margin, guarantee, secure, purchase, or

sell commodities contracts (the "GFX Letter of Credit").  Those accounts had a combined net

liquidating value ("NLV"), including the value of the GFX Letter of Credit, of $14,953,012 as of

the date of the transfer of open account positions to other FCMs.  On June 6, 2012, GFX

transferred $4,663,120 (representing twenty percent (20%) of the accounts' NLV plus

$1,625,530 previously received from the Trustee as part of the FCM Account Transfers plus the

value of the GFX Letter of Credit over and above the accounts' combined net liquidating value)

EXECUTION VERSION

to the Trustee, and the Trustee returned the GFX Letter of Credit to GFX.  Accordingly, GFX received eighty percent (80%) of its accounts' NLV ($11,962,409) as part of the FCM Account Transfers and as an eight percent (8%) advance distribution pursuant to the Order Approving First Interim Distribution for Allowed Commodity Futures Claims (ECF No. 1450).  GFX previously submitted commodity customer claims in the SIPA Proceeding, which were assigned Claim Nos. 900006632 and 900007779 (the "GFX Claims").

    J.    CME Group asserts that under Rules 110 and  913.B, to the extent that Customer Claims arise out of losses related to Segregated Property, some or all of those obligations of MFGI to customers may "directly relate" to futures transactions cleared on the relevant Exchange within the meaning of Rules 110 and 913.B.  The Trustee asserts that the MFGI Property should be administered pursuant to the already ongoing claims process in the SIPA Proceeding rather than through a separate disposition or administration by CME Group under the Exchange Rules.

    K.    The Parties recognize that it is in the interests of all MFGI customers and other parties in interest that MFGI Property be made available for distribution as soon as possible and that any disagreements concerning the administration of MFGI Property be resolved expeditiously and without the delay and expense that would be associated with any litigation.

    **NOW THEREFORE**, in consideration of the promises and mutual covenants, benefits, and detriments contained herein, intending to be legally bound, the Parties do hereby agree as follows:

EXECUTION VERSION

# ARTICLE I
## MFGI PROPERTY AT CME GROUP

**1.1**    CME Group represents and warrants as follows:

**1.1.1**    <u>Section 4d Property</u>.  As of close of business on the Filing Date, CME Group maintained Section 4d Property relating to MFGI's former commodities customers of $2,430,038,750.00.  After taking into account customer trade settlements and similar adjustments, all such property has been transferred to FCMs for the benefit of customers at the Trustee's direction or returned to the Trustee for his administration.  Accordingly, CME Group holds no further MFGI property that was, or should have been, segregated for MFGI's commodity futures and options customers.

**1.1.2**    <u>Guaranty Fund Deposit</u>.  As of close of business on the Filing Date, CME Group held $161,048,885.71 in cash and cash equivalents posted by MFGI as guaranty fund money pursuant to CME Rule 816 (the "<u>Guaranty Fund Deposit</u>"), and continues to hold that amount.

**1.1.3**    <u>House Origin Funds</u>.  As of close of business on the Filing Date, MFGI maintained at CME through its "<u>House Origin Account</u>" certain open commodity futures and options positions as part of its proprietary trading program (such positions, the "<u>MFGI House Positions</u>").  As of the Filing Date, MFGI had posted $32,301,591.18 in cash and cash equivalents with the CME Group as margin associated with the MFGI House Positions, which included $7,548,035.42 of excess margin.  Subsequent to entry of the MFGI Liquidation Order, CME Group organized and effectuated an auction of the MFGI House Positions to a third party, transferring the MFGI House Positions along with $12,500,000.00 in

*EXECUTION VERSION*

collateral (margin) on November 1, 2012. MFGI's House Origin Account now
consists of $13,416,113.97 in cash (the "House Origin Funds").

**1.1.4**    <u>CME Group Shares</u>. On the Filing Date, CME held an interest in 12,000 shares of
CME Group Inc. common stock owned by MFGI. Each CME Group Inc. share
had a close-of-market value of $269.51 as of June 6, 2012 (collectively, the
"CME Group Shares").

**1.1.5**    <u>Exchange Memberships</u>. On the Filing Date, MFGI owned 35 memberships of
various classes on various Exchanges (the "Exchange Memberships," as listed on
Exhibit A hereto).

**1.1.6**    Except for the MFGI Property (as defined in Section 1.2), CME Group does not
control or hold any other property that is or was property belonging to, held for,
or owed to MFGI, or any of its former customers, as of the Filing Date, or which,
subsequent to the Filing Date, came into CME Group's control and is owed to the
MFGI estate or any of its former customers.

**1.2**    As used in this agreement, the term "MFGI Property" consists of the following: (i) the
Guaranty Fund Deposit, (ii) the House Origin Funds, (iii) the CME Group Shares, and
(iv) the Exchange Memberships.

## ARTICLE II
## EXECUTION DATE AND EFFECTIVE DATE

**2.1**    This Agreement shall become effective and binding upon (a) execution by and on behalf
of the Parties, each Party hereto having delivered to the other Parties an executed
counterpart of its signature page to this Agreement (the "Execution Date"); and (b) an

*EXECUTION VERSION*

entry of an Order (in substantially similar form to that attached as Exhibit B hereto) by the Bankruptcy Court approving this Agreement, the effectiveness of which has not been stayed ("Court Approval" and such date, the "Effective Date").

## ARTICLE III
## COVENANTS

3.1    Liquidation and Return of MFGI Property.

3.1.1    Guaranty Fund Deposit and House Origin Funds.  Within three (3) days after the Effective Date, CME Group shall transfer the Guaranty Fund Deposit and House Origin Funds, less sixteen and a half million dollars ($16,500,000) (the "Set-Aside Funds"), to the Trustee using the instructions included on Exhibit C hereto (the "Trustee Wire Instructions").

3.1.2    CME Group Shares.  Promptly after the Effective Date, the Trustee will request that the stock registrar/transfer agent transfer the CME Group Shares and any post-Filing Date dividend payments, to the Trustee, and CME Group shall provide the stock registrar/transfer agent with appropriate approvals, confirmations, and/or other documentation as may be required to complete such transfer.  The Trustee shall thereafter liquidate all CME Group Shares and inform CME Group in writing of the net proceeds of such liquidation (together with dividends accrued on the CME Group Shares between the Filing Date and the date of their transfer to the Trustee, the "CME Group Shares Liquidation Amount").

3.1.3    Exchange Memberships.  From time to time after the Effective Date and in an orderly process without the need of further Court approval, the Trustee shall sell

*EXECUTION VERSION*

the Exchange Memberships pursuant to Exchange Rules (the "Exchange Membership Sales").  Promptly after the sale of each Exchange Membership, CME Group shall transfer the sale proceeds to the Trustee using the Trustee Wire Instructions.  Collectively, proceeds of the Exchange Membership Sales shall be the "Exchange Membership Proceeds."

**3.2**   Disposition of Claims Asserted Under Exchange Rules.

**3.2.1**   Customer Claims.  With the exception of Customer Claims relating to exchange fee rebates that have not been credited to MFGI customer accounts ("Fee Rebate Claims"), upon the Effective Date all Customer Claims shall be deemed provided for by CME Group in accordance with the provisions of Sections 3.5, 3.6, and 3.7 of this Agreement.  To the extent further notice must be provided to customers regarding their claims filed with Exchanges, CME Group shall undertake providing such notice and the Trustee shall have no responsibility to do so.

**3.2.2**   Fee Rebate Claims.  Within thirty (30) days of the Effective Date of this Agreement, the Trustee shall provide to CME Group a list of the customer accounts entitled to CME Group fee rebates, including names, addresses and amounts for each account.  Each such customer shall be deemed by CME Group to have filed a claim under Rule 913 and/or Rule 110 without the need to submit a formal claim with CME Group, and CME Group may rely upon the list provided by the Trustee in allowing claims and making distributions on account of customer Fee Rebate Claims.

EXECUTION VERSION

**3.2.3**    <u>Non-Customer Claims</u>.  Within ninety (90) days of the Effective Date, the Exchanges shall review and make initial determinations of all Non-Customer Claims and Fee Rebate Claims pursuant to the Exchange Rules and will provide the Trustee with one or more summaries of the Non-Customer Claims and the Fee Rebate Claims, which summaries shall include, without limitation, the name of the claimant, the amount proposed to be allowed or denied, and a brief explanation of the determination.  In the event an Exchange determines that any Fee Rebate Claim or Non-Customer Claim, or the documentation provided in support thereof, is insufficient, the Exchange may (but shall not be required to) permit a claimant to submit a revised claim or additional documentation supporting the claim.  The Trustee may request, and CME Group will promptly provide to the Trustee, copies of any claims and supporting documents and/or materials to substantiate or understand the Exchange's initial determination. Nothing herein shall constitute a waiver of the Trustee's right to contest such claims or later seek recovery from a claimant of any amounts to which the Trustee asserts such claimant was not entitled.

**3.2.3.1**    CME Group shall pay allowed Fee Rebate Claims and Non-Customer Claims using the Set-Aside Funds.  To the extent the total amount allowed on Non-Customer Claims and Fee Rebate Claims (the <u>Exchange Claim Allowed Amount</u>") exceeds the value of the Set-Aside Funds, each party with an allowed Non-Customer Claim or Fee Rebate Claim shall receive distribution of its claim on a *pro rata* basis, as otherwise provided for in the Exchange Rules.  When making

*EXECUTION VERSION*

distributions on allowed claims in the SIPA Proceeding, the Trustee

shall consider any payments made by CME Group to claimants for

allowed Fee Rebate Claims and Non-Customer Claims.

**3.2.3.2**    To the extent the Set-Aside Funds are greater than the Exchange Claim

Allowed Amount, CME Group shall promptly transfer the excess to

the Trustee using the Trustee Wire Instructions.

**3.2.3.3**    The automatic stay extant to the SIPA Proceeding shall be deemed

modified solely to the extent necessary for CME Group to evaluate,

determine, and pay allowed Fee Rebate Claims and Non-Customer

Claims using the Set-Aside Amount in accordance with the provisions

of this Agreement.

**3.3**    <u>CME Claim</u>.  CME Group waives priority of payment under the Exchange Rules of the

CME Claim, which, without limitation, shall be deemed to include CME Group's claims

pursuant to Rule 110 and Rule 913.B.  Upon the Effective Date, the CME Claim shall, to

the extent allowed, constitute a priority unsecured claim against the MFGI general estate,

approved by order of the Bankruptcy Court, entitled to higher priority than all allowed

unsecured claims under 11 U.S.C. § 726(a)(2) (as made applicable to the SIPA

Proceeding under SIPA §§ 78fff(b) and 78fff-1(a)).

**3.4**    <u>Disposition of the GFX Claim</u>.  GFX waives priority of payment under the Exchange

Rules of the GFX Claims or any other claim it may have against MFGI.  On the Effective

Date, the GFX Claims shall be deemed allowed as a commodity futures customer claim

to Section 4d Property in the aggregate amount of $14,953,012, of which $11,962,409

*EXECUTION VERSION*

shall have been deemed already transferred or distributed to GFX pursuant to the FCM

Account Transfers and the Order Approving First Interim Distribution for Allowed

Commodity Futures Claims.  This Agreement shall constitute the Trustee's determination

of the GFX Claims (the "GFX Determination"), and GFX waives its right to object to the

GFX Determination.  Upon return of the regular form Declaration and Release used by

the Trustee on allowed claims, GFX shall be entitled to distribution of its allowed claim

at the same rate and in the same manner as any other MFGI customer with an allowed

claim to Section 4d Property.

**3.5**     Allocation of the MFGI Property.  Upon receipt of the MFGI Property from CME Group

as set forth in Section 3.1, the Trustee shall allocate such property in accordance with his

rights and duties under the Bankruptcy Code, SIPA, and the Part 190 Regulations as

follows:

**3.5.1**    Not less than sixty-five million dollars ($65,000,000) shall be allocated to the

MFGI Section 4d Property account class; and

**3.5.2**    Not less than sixty-five million dollars ($65,000,000) shall be allocated to the

MFGI Rule 30.7 Property account class.

**3.6**     Satisfaction of Rule 913.B.  Upon completion of the actions contemplated by the Parties

herein, including entry of the Court order contemplated in Section 2.1, the following shall

be deemed to have occurred solely for purposes of Rule 913.B with respect to MFGI:

**3.6.1**    As a result of CME Group's determination to waive its right to payment from

MFGI Property on account of the CME Claim and to subordinate the CME Claim

EXECUTION VERSION

to all MFGI customer net equity claims until they are paid in full, and as a result of GFX's determination to waive its right to payment from MFGI Property on account of its customer claim, all MFGI contracts and obligations with CME Group shall be deemed to have been settled and paid, and all sums owing to CME Group shall been deemed to have been paid; and

**3.6.2** All MFGI obligations to members and customers arising out of claims directly related to futures transactions cleared on the Exchanges shall be deemed to have been "otherwise provided for" within the meaning of Rule 913.B.

**3.7** <u>Satisfaction of Rule 110</u>. Upon completion of the actions contemplated by the Parties herein, including entry of the Court order contemplated in Section 2.1, the following shall be deemed to have occurred with respect to MFGI: solely for purposes of Rule 110, the Exchange Membership Proceeds shall be deemed to have been applied in partial satisfaction of the CME Claim, which constitutes a first priority claim under Rule 110, and CME Group shall be deemed to have contributed those amounts to the Trustee for distribution to MFGI customers in accordance with the other terms of this Agreement. No other claims shall be allowed against the Exchange Membership Proceeds under Exchange Rules (including but not limited to Rule 110), and all claims under the Exchange Rules shall be administered as set forth in Section 3.2 above.

**3.8** <u>Notice to Claimants</u>. CME Group shall be responsible for providing prompt notice of this Agreement and the hearing on the motion seeking to approve this Agreement, and such other notice as it deems appropriate, to all persons who have asserted claims under Exchange Rules.

*EXECUTION VERSION*

## ARTICLE IV
## RELEASES AND RESERVATIONS

**4.1**    Releases of Claims.

**4.1.1**    The Trustee and CME Group (together, the "Releasors") hereby irrevocably release, waive, acquit and forever discharge the Releasees (as defined below) from, in all cases, any and all Claims (as defined below) that the Releasors may have or may hereafter claim to have, or that might have been alleged, against the Releasees (or any of them) arising out of or relating in any way to the MFGI Property.

**4.1.2**    For the purposes of the Agreement and this Release, the term "Releasees" shall mean, collectively (and each or any of them as appropriate), the Trustee Parties and the CME Parties, as such parties are defined below:

**4.1.2.1**    The "Trustee Parties" shall include the Trustee and the Securities Investor Protection Corporation ("SIPC") and their respective agents, employees, professionals, successors and assigns, along with the MFGI estate.

**4.1.2.2**    The "CME Parties" shall include CME Group and its respective affiliates and each of CME Group's, and such affiliates' respective directors, officers, employees, agents, consultants, shareholders, members and partners, past and present, in their capacities as such, and with respect to each of the foregoing, their, its or his successors and assigns, heirs, attorneys and representatives.

*EXECUTION VERSION*

**4.1.3**    For purposes of this Agreement, the term "Claims" shall have the meaning ascribed to such term under section 101 of the Bankruptcy Code and shall include any and all accounts, actions, agreements, bonds, bills, causes of action, claims, contracts, controversies, costs, covenants, damages, disputes, proceedings, duties, penalties, debts, executions, judgments, lawsuits, liabilities, obligations, promises, reckonings, specialties, suits, sums of money, trespasses, variances, of whatever kind, nature, character or description, including, without limitation, claims for monies, damages (whether direct, indirect, liquidated, consequential or incidental), contempt, equitable relief of any kind, costs, expenses, losses and attorneys', accountants' and experts' fees and expenses, and suits of every nature and description whatsoever, from the beginning of time to date of this letter, whether known or unknown, anticipated or unanticipated, suspected or unsuspected, whether asserted or unasserted, accrued or unaccrued, whether based on federal, state, local, foreign, statutory or common law or any other law, statute, code, ordinance, rule or regulation (including, without limitation, the New York Uniform Commercial Code and the common law relating to the rights of pledgors and pledgees with respect to pledged collateral and the rules of any self-regulatory organization) (each of the forgoing "Law"), whether based upon contract, warranty, tort, fraud, negligence, or otherwise, whether at law or in equity, and whether for sums of money, costs, interest, expenses, attorneys' fees, injunctive relief, declaratory relief or other equitable relief.

EXECUTION VERSION

**4.1.4**    The CME Releasors expressly acknowledge and agree that, upon the Effective Date, it and they shall have no further rights with respect to the MFGI Property (other than with respect to the CME Claim and the GFX Claims).

**4.2**    <u>Reservation of Rights</u>.  The Parties hereby reserve all rights with respect to all matters between them (or any of their respective affiliates) not related to this Agreement, which rights shall not be affected by this Agreement, by implication or otherwise.  For the avoidance of doubt and without limiting the generality of the foregoing, this Agreement, any court filing seeking approval of this Agreement filed by the Trustee and CME Group, and any order entered by the Court approving this Agreement, shall not:

**4.2.1**    be deemed to release, waive, acquit or discharge the Releasees from: (x) the Agreement, (y) any Claims arising under the Agreement, or (z) the disposition of property contemplated under the Agreement;

**4.2.2**    bind, be collateral estoppel, res judicata or otherwise prejudice any other matter (other than the matters in this Agreement, and the performance thereof) between the Trustee and the CME Group;

**4.2.3**    impair, modify, or waive the rights and remedies of the Trustee, the MFGI estate, or any other party in respect of any claims that have been asserted, or may be asserted against CME Group (or any affiliates of CME Group), including, for the avoidance of doubt, any claims that are the subject of or related to the FCM Account Transfers (including without limitation the CME Omnibus Customer Claim and/or the November 30, 2011 guarantee described therein) or actions taken by CME Group prior to the Filing Date;  or

*EXECUTION VERSION*

**4.2.4**    impair, modify, or waive the rights and remedies of CME Group (or any affiliate

of CME Group) or any other party in respect of any other claims that have been

asserted, or may be asserted, by CME Group (or any affiliates of CME Group)

against MFGI (or the Trustee as trustee for MFGI), with respect to any matter

other than the CME Claim.

## ARTICLE V
## MISCELLANEOUS

**5.1**    <u>Authorizations</u>.  Each Party represents and warrants to the other Parties that other than

the Court Approval, no authorizations, approvals, consents or waivers by, or notifications

to, a governmental authority, or other person (including but not limited to licenses,

notifications, registrations or declarations) are required for the execution, delivery or

satisfaction by such Party of this Agreement or the satisfaction of any of the obligations

of such Party contemplated hereby, or, if required, all such authorizations have been

obtained.  In the case of CME Group, where action must be taken by one of its

subsidiaries, CME Group represents and warrants that it can and will cause such

subsidiary to act in accordance with the terms of this Agreement.

**5.2**    <u>Entire Agreement</u>.  This Agreement contains the entire agreement between the Parties,

and supersedes any prior understandings, with respect to the subject matter hereof.  This

Agreement may not be amended or otherwise modified except in a writing duly executed

by each of the Parties.

**5.3**    <u>Governing Law</u>.  This Agreement and the rights and duties of the Parties hereunder will

be governed by and construed, enforced, and performed in accordance with the laws of

the State of New York, without giving effect to principles of conflicts of laws that would

require the application of laws of another jurisdiction.

5.4    <u>Jurisdiction; Waiver of Jury Trial</u>.  The Parties hereby:

    (a)    irrevocably and unconditionally submit to the exclusive jurisdiction of the Bankruptcy Court to determine all claims or disputes relating in any way to this Agreement.  If and to the extent that the SIPA Proceeding is closed and a request for relief would otherwise be brought in the Bankruptcy Court if the SIPA Proceeding were not closed or dismissed, the Courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City shall have exclusive jurisdiction over this Agreement and any such claims;

    (b)    irrevocably and unconditionally waive, to the fullest extent permitted by law, any objection to the laying of venue in the aforesaid courts; and

    (c)    waive any right to trial by jury with respect to any action brought against them or relating in any way to this Agreement.

5.5    <u>Counterparts</u>.  This Agreement may be executed in counterparts, by either original

signature or signature transmitted by facsimile transmission or other similar process and

each copy so executed shall be deemed to be an original and all copies so executed shall

constitute one and the same agreement.

5.6    <u>Notices</u>.  All notices, demands, and other communications hereunder shall be in writing

(which may include email) and shall be deemed to have been duly given:  (i) when

personally delivered; (ii) upon actual receipt (as established by confirmation of receipt or

otherwise) during normal business hours, otherwise on the first business day thereafter, if

transmitted by facsimile or telecopier with confirmation of receipt; (iii) three (3) days

after mailed by certified mail, return receipt requested, postage prepaid; (iv) when

actually delivered if sent by overnight courier; or (v) upon confirmation by the addressee

of receipt, by telephone or return email, if transmitted by email; in each case, to the

EXECUTION VERSION

following addresses, or to such other addresses as the Parties may from time to time

specify by notice to the other Parties given pursuant hereto.

       If to the Trustee, to:

          Hughes Hubbard & Reed LLP
          One Battery Park Plaza
          New York, NY 10004
          Attention:  Anson B. Frelinghuysen, Esq.
          frelingh@hugheshubbard.com

       If to CME Group, to:

          Lisa A. Dunsky, Esq.
          Director and General Counsel
          CME Group Inc.
          20 South Wacker Drive
          Chicago, Illinois 60606
          lisa.dunsky@cmegroup.com

          Copy to:   Vincent E. Lazar, Esq.
                    Jenner & Block LLP
                    353 N. Clark Street
                    Chicago, Illinois  60654
                    vlazar@jenner.com

**5.7**   <u>Intended Beneficiaries</u>.  This Agreement shall be binding upon and inure solely to the

benefit of the Parties hereto and their respective successors and permitted assigns and

nothing herein, express or implied, is intended to or shall confer upon any other person

any legal or equitable right, benefit or remedy of any nature whatsoever under or by

reason of this Agreement.

**5.8**   <u>Reliance on Representations</u>.  Each Party hereby expressly warrants and represents to the

others that no promise or agreement that is not expressed herein has been made to him,

her, or it in executing this Agreement, and that none of the Parties is relying upon any

statement or representation of any agent of the Parties.  The Parties agree and stipulate

*EXECUTION VERSION*

that all representations, warranties, agreements, covenants, and obligations herein are material, shall be deemed to have been relied upon by the other Parties, and shall survive the Court Approval (and the consummation of the transactions contemplated hereby).

5.9    <u>Successors and Assigns</u>.  This Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and assigns, including any successor trustee.

5.10    <u>No Admission of Liability</u>.  This Agreement is not an admission of any liability but is a compromise and settlement and neither this Agreement, nor any of the communications or proceedings described in the following sentence, shall be treated as, or claimed to be, or to be evidence of, an admission of any liability or wrongdoing whatsoever, or the truth or untruth, or merit or lack of merit, of any claim or defense of any Party.  Without limitation of the preceding sentence, all communications (whether oral or in writing) between and/or among the Parties, their counsel and/or their respective representatives, and all proceedings, relating to, concerning or in connection with this Agreement, or the matters covered hereby and thereby (whether occurring prior to, on or after the date hereof), shall be governed and protected in accordance with the Federal Rule of Evidence 408 and New York Civil Practice Law and Rules Section 4547 to the fullest extent permitted by law.

5.11    <u>Parties' Acknowledgment</u>.  Each of the Parties acknowledges that it has had access to the data and information it requires and has had answered to its satisfaction any questions it has asked, with regard to the meaning and significance of any of the provisions of this Agreement.

EXECUTION VERSION

**5.12**    Interpretation.  This Agreement has been jointly drafted by the Parties at arms' length and each Party has had ample opportunity to consult with independent legal counsel.  No provision or ambiguity in this Agreement shall be resolved against any Party solely by virtue of its participation in the drafting of this Agreement.

**5.13**    Attorneys' Fees.  Each Party shall be responsible for the payment of its own costs and expenses (including reasonable attorneys' fees) in connection with the drafting, execution, and implementation of this Agreement.  Nevertheless, in any action or proceeding to enforce this Agreement, the prevailing Party shall be entitled to payment of its reasonable costs and expenses (including reasonable attorneys' fees).

**5.14**    Captions.  The captions of this Agreement are for convenience only and are not a part of this Agreement and do not in any way limit or amplify the terms and provisions of this Agreement and shall have no effect on its interpretation.

**5.15**    Confidentiality.  The Parties acknowledge that Exhibit A contains confidential commercial information (the "Confidential Information") and that the Trustee has filed or shall file a motion seeking permission of the Bankruptcy Court to file Exhibit A under seal in the SIPA Proceeding ("Motion to Seal"), which CME Group shall support or at least not oppose, allowing the Trustee to file a Motion for Entry of an Order Approving Agreement without providing Exhibit A to each party receiving notice of such motion.

**5.16**    Admissibility.  Other than with respect to matters addressed in this Agreement, this Agreement is without prejudice to any legal position or argument of, or any claim, demand, action or cause of action of the Parties against one another, and all such legal positions, arguments, claims and disputes, and all rights and defenses in respect thereof,

*EXECUTION VERSION*

are expressly preserved.  Accordingly, neither this Agreement, nor any negotiations or proceedings in connection herewith, may be used in any proceeding against any Party or its affiliates for any purpose, except to seek Court Approval and/or to effectuate or otherwise enforce the terms of this Agreement.

**5.17**    <u>Further Assurances</u>.  Each Party agrees that from time to time it will promptly execute and deliver all further agreements, instruments, documents, and certificates, and shall make or cause to be made such recordings or registrations and take all further action, as may be necessary or reasonably desirable or as may be reasonably requested by a Party hereto to evidence any of the terms and provisions of this Agreement.

**5.18**    <u>Authority to Execute</u>.  Each individual signing this Agreement on behalf of any Party acknowledges and, with respect to his or her own signature below, warrants and represents that he/she is authorized to execute this Agreement in his/her representative capacity, as reflected below and on behalf of the Party or Parties indicated.

**5.19**    <u>Court Approval</u>.  Each of the Parties covenants and agrees to support the other Parties' efforts to obtain Court Approval in all respects and shall take no actions inconsistent therewith.

**5.20**    <u>Termination of this Agreement if Effective Date Has Not Occurred</u>.  For the avoidance of doubt, this Agreement shall terminate and be of no further force or effect if the Effective Date has not occurred by October 1, 2012 (or such later date as the Parties may agree in writing), except that Sections 5.1 through 5.20 (other than Section 5.19) shall be effective and shall survive such termination.

EXECUTION VERSION

**5.21**   <u>Calculation of Time</u>.  When calculating the period of time before which, within which, or following which any act is to be done pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded, and if the last day of such period is not a business day, the period shall end on the next succeeding business day, and if the period is for five (5) days or fewer, only business days shall be counted.

[ *Remainder of page intentionally left blank - signature page to follow* ]

*EXECUTION VERSION*

26

IN WITNESS WHEREOF, the Parties hereto have hereby executed this Agreement on the date

indicated in the first paragraph of this Agreement.

**JAMES W. GIDDENS AS
TRUSTEE FOR THE LIQUIDATION
OF MF GLOBAL INC.**
By:  HUGHES HUBBARD & REED LLP

By:
Name: James B. Kobak, Jr.
Title:   Partner

**CME GROUP INC.,** on behalf of itself
and Chicago Mercantile Exchange Inc.,
Board of Trade of the City of Chicago,
Inc., New York Mercantile Exchange, Inc.
and Commodity Exchange, Inc.

By:
Name:
Title:

**GFX CORPORATION**

By:
Name:
Title

*EXECUTION VERSION*

**CME GROUP INC.,** on behalf of itself
and Chicago Mercantile Exchange Inc.,
Board of Trade of the City of Chicago,
Inc., New York Mercantile Exchange, Inc.
and Commodity Exchange, Inc.

By: _____

Name:  Terrence A. Duffy

Title:    Executive Chairman & President

*EXECUTION VERSION*

**GFX CORPORATION**

By: _Michael Dengis_
Name:  Michael Dengis
Title:   Chief Executive Officer

*EXECUTION VERSION*

# EXHIBIT A

**Exchange Memberships**

12-12020-mg    Doc 3715-3    Filed 05/14/13    Entered 05/14/13 16:09:49    Exhibit 3
Pg 72 of 76

**[ TO BE FILED UNDER SEAL ]**

# EXHIBIT B

**Proposed Order**

61921572_10

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | |
| MF GLOBAL INC., | Case No. 11-2790 (MG) SIPA |
| Debtor. | |

**[PROPOSED] ORDER GRANTING TRUSTEE'S MOTION FOR
APPROVAL OF AN AGREEMENT PROVIDING FOR THE DISPOSITION
OF MFGI PROPERTY, ALLOCATION OF THE MFGI PROPERTY
TO CUSTOMERS OF THE MFGI ESTATE, AND EXTINGUISHMENT
OF DUPLICATE CLAIMS FILED WITH CME GROUP INC.**

Upon the Motion[1] dated June __, 2012, of James W. Giddens (the "Trustee"), as

Trustee for the liquidation of the business of MF Global Inc. ("MFGI" or the "Debtor"), pursuant

to the Securities Investor Protection Act ("SIPA"), for entry of an order (this "Order") approving

the Limited Agreement and Reservation of Rights between the Trustee and CME Group Inc.

("CMEG"), on its own behalf and on behalf of each and all of its exchange subsidiaries,[2] and

GFX Corporation ("GFX") (collectively, "CME Group") (together with the Trustee, the

"Parties"); and the Court having jurisdiction to consider the Motion and the relief requested

therein in accordance with SIPA § 78eee(b)(4); and venue being proper before this Court

pursuant to SIPA § 78eee(a)(3) and 15 U.S.C. § 78aa; and it appearing that the relief requested

by the Motion is necessary and in the best interests of the estate, its customers, its creditors, and

all parties in interest; and it and it appearing that due and proper notice of the Motion and the

relief requested therein having been given in accordance with this Court's Order Pursuant to

---

1. Capitalized terms not otherwise defined herein shall have the meanings given to them in the Motion.

2. Chicago Mercantile Exchange Inc. ("CME"), Board of Trade of the City of Chicago, Inc. ("CBOT"), New York Mercantile Exchange, Inc. ("NYMEX"), and Commodity Exchange, Inc. ("COMEX") (together, the "Exchanges").

2

section 105(a) of the Bankruptcy Code and Bankruptcy Rules 1015(c) and 9007 Implementing

Certain Notice and Case Management Procedures and Related Relief (ECF No. 418), and no

other or further notice is necessary; and it appearing that due and proper notice of the Motion and

Agreement has been provided by CME Group to all parties making claims against the MFGI

Property, and that no other or further notice is necessary; and the Court having determined that

the legal and factual bases set forth in the Motion establish just cause for the relief granted

herein, it is hereby

   **ORDERED** that the Motion is granted in all respects; and it is further

   **ORDERED** that the Agreement dated as of June 7, 2012 between the Trustee and

CME Group is authorized and approved pursuant to Bankruptcy Rule 9019, and that the failure

to specifically include any particular provision of the Agreement in this Order shall not diminish

or impair the effectiveness of such provision, it being the intent of the Court that the Parties'

implementation of the actions contemplated in the Agreement be approved in their entirety; and

it is further

   **ORDERED** that the Parties are authorized to execute, deliver, implement and

fully perform any and all obligations, instruments, documents and papers and to take any and all

actions reasonably necessary to consummate the Agreement and perform any and all obligations

contemplated therein; and it is further

   **ORDERED** that all parties asserting claims under the Exchange Rules have been

afforded satisfactory notice and a full and fair opportunity to be heard concerning the terms of

the Agreement, and shall be barred from making claims relating to the MFGI Property against

61936220_3

CME Group or MFGI Property at CME Group other than in accordance with the terms of the

Agreement; and it is further

**ORDERED** that all parties permitted by the Agreement to receive payment on claims

asserted under the Exchange Rules have been afforded satisfactory notice and a full and fair

opportunity to be heard concerning the terms of such payment and shall receive payment from

CME Group or the Trustee on such claims only in accordance with the terms of the Agreement;

and it is further

**ORDERED** that to the extent applicable, the automatic stay imposed by section

362(a) of the Bankruptcy Code is hereby modified solely to the extent necessary to allow CME

Group to determine claims asserted under the Exchange Rules and pay allowed Fee Rebate

Claims and Non-Customer Claims as detailed in the Agreement; and it is further

**ORDERED** that the Trustee is authorized to allocate the MFGI Property as

specified in the Agreement; and it is further

**ORDERED** that the Trustee is authorized to sell or otherwise dispose of the

MFGI Property as specified in the Agreement and Motion; and it is further

**ORDERED** that this Court shall retain jurisdiction with respect to all matters

relating to the interpretation, implementation, or enforcement of the Agreement and this Order.

Dated:    New York, New York
          _____ __, 2012

                                                    _____
                                                    Honorable Martin Glenn
                                                    United States Bankruptcy Judge

## EXHIBIT C

### Trustee Wire Instructions

| | |
|---|---|
| **Bank Name:** | Union Bank, N.A. |
| **ABA Number:** | 122-000-496 |
| **Account Number:** | 37130196431 |
| **Account Name:** | TRUSDG |
| **Beneficiary Name:** | James W. Giddens, Trustee MFG FCM House Funds Account |
| **Beneficiary Account:** | 6711967007 |