# Exhibit 3

1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

-----------------------------------x

In Re: Cae No:

RESIDENTIAL CAPITAL, LLC, et. al,     12-12020(MG)

Debtors.

-----------------------------------x

VIDEOTAPE DEPOSITION OF TIMOTHY DEVINE

New York, New York

November 19, 2012

10:17 a.m.

Reported by:
ERICA L. RUGGIERI, RPR
JOB NO: 27973

3

1

2    A P P E A R A N C E S:

3

4    FOR THE OFFICIAL COMMITTEE

5    OF UNSECURED CREDITORS:

6        KRAMER, LEVIN, NAFTALIS & FRANKEL, LLP

7        1177 Avenue of the Americas

8        New York, New York 10036

9        BY: PHILIP S. KAUFMAN, ESQ.

10           pkaufman@kramerlevin.com

11           MICHAEL MELLIN, ESQ.

12           mmellin@kramerlevin.com

13           SARA GRIBBON

14

15    FOR THE DEBTORS:

16        MORRISON & FOERSTER, LLP

17        1290 Avenue of the Americas

18        New York, NY 10104-0050

19        BY: ANTHONY PRINCI, ESQ.

20           aprinci@mofo.com

21           ARIEL RUIZ, ESQ., (P.m. session)

22           afrl@mofo.com

23

24

25

4

1

2    A P P E A R A N C E S: (Cont'd.)

3

4    FOR THE AD HOC GROUP OF

5    JUNIOR SECURED NOTEHOLDERS:

6        WHITE & CASE, LLP

7        1155 Avenue of the Americas

8        New York, New York 10036

9        BY: HARRISON DENMAN, ESQ.

10           hdenman@whitecase.com

11

12   FOR ALLY FINANCIAL INC.:

13       KIRKLAND & ELLIS, LLP

14       655 Fifteenth Street, N.W.

15       Washington D.C. 20005

16       BY: PATRICK M. BRYAN, ESQ.

17           patrick.bryan@kirkland.com

18

19   FOR WELLS FARGO:

20       ALSTON & BIRD, LLP

21       90 Park Avenue, 12th Floor

22       New York, New York 10016

23       BY: WILLIAM HAO, ESQ.

24           william.hao@alston.com

25

5

1

2      A P P E A R A N C E S: (Cont'd.)

3

4      FOR MBIA:

5           CADWALADER, WICKERSHAM & TAFT, LLP

6           One World Financial Center

7           New York, New York 10281

8           BY: JASON JURGENS, ESQ.

9                jason.jurgens@cwt.com

10               WILLIAM NATBONY, ESQ. (P.m. session)

11               bill.natbony@cwt.com

12

13     FOR THE EXAMINER:

14          CHADBOURNE & PARKE, LLP

15          30 Rockefeller Plaza

16          New York, New York 10112

17          BY: ROBERT KIRBY, ESQ.

18               rkirby@chadbourne.com

19

20     FOR THE LAW DEBENTURE:

21          SEWARD & KISSEL, LLP

22          One Battery Park Plaza

23          New York, New York 10004

24          BY: DANIEL GUZMAN, ESQ.

25               guzman@sewkis.com

6

1

2    A P P E A R A N C E S: (Cont'd.)

3

4    FOR THE U.S. BANK:

5         SEWARD & KISSEL, LLP

6         One Battery Park Plaza

7         New York, New York 10004

8         BY: LAURIE BINDER, ESQ.

9              binder@sewkis.com

10

11    FOR THE POTENTIAL OBJECTOR FGIC:

12         JONES DAY

13         555 South Flower Street, 15th Floor

14         Los Angeles, California 90071

15         BY: RICHARD L. WYNNE, ESQ.

16              rlwynne@jonesday.com

17              HOWARD F. SIDMAN, ESQ. (P.m. session) (New York)

18              hfsidman@jonesday.com

19              MICHAEL DAILEY, ESQ. (New York)

20              mjdailey@jonesday.com

21

22

23

24

25

7

1

2   A P P E A R A N C E S: (Cont'd):

3

4   FOR BANK OF NEW YORK MELLON:

5       DECHERT, LLP

6       1095 Avenue of the Americas

7       New York, New York 10036

8       BY: REBECCA KAHAN, ESQ.

9           rebecca.kahan@dechert.com

10

11  FOR ALLY FINANCIAL:

12      CARTER LEDYARD & MILBURN, LLP

13      2 Wall Street

14      New York, New York 10005

15      BY: AARON CAHN, ESQ.

16          cahn@clm.com

17

18  FOR WILMINGTON TRUST:

19      CLEARY, GOTTLIEB, STEEN & HAMILTON, LLP

20      One Liberty Plaza

21      New York, New York 10006

22      BY: MOIRA HEIGES, ESQ.

23          mheiges@cgsh.com

24

25

8

1

2    A P P E A R A N C E S:

3

4    FOR THE STEERING COMMITTEE INVESTORS:

5        GIBBS & BRUNS, LLP

6        1100 Louisiana, Suite 5300

7        Houston, Texas 77002

8        BY: DAVID SHEEREN, ESQ.

9            dsheeren@gibbsbruns.com

10           KATHY D. PATRICK, ESQ. (P.m. session)

11           kpatrick@gibbsbruns.com

12

13   FOR THE RMBS STEERING COMMITTEE:

14       ROPES & GRAY, LLP

15       1211 Avenue of the Americas

16       New York, New York 10036-8704

17       BY: KEITH WOFFORD, ESQ.

18           keith.wofford@ropesgray.com

19

20

21   PRESENT:

22       TRICIA DENNIS, Ally Financial

23       DEREK WITTE, Talcott Franklin (telephone)

24       CARLOS KING, Videographer

25

16

1                TIMOTHY DEVINE

2                Did you meet that day with

3     Mr. Solomon?

4          A.    I don't remember.

5          Q.    Do you recall discussing with

6     Mr. Solomon on or about October 19th,

7     2011, an approach for dealing with

8     Ms. Patrick?

9          A.    Yes.

10         Q.    Do you recall who else was

11    present besides yourself and Mr. Solomon

12    on that occasion?

13         A.    No.

14         Q.    Do you recall what was

15    discussed?

16         A.    Yes, in general terms.

17         Q.    Please tell me everything you

18    recall about that discussion.

19              MR. BRYAN:  I'm going to object

20         and advise the witness not to answer

21         to the extent that he was advising his

22         client or having discussions with

23         Mr. Solomon that would constitute

24         attorney-client communications.

25              MR. KAUFMAN:  Are you

17

```
 1          TIMOTHY DEVINE

 2      instructing him not to answer?

 3          MR. BRYAN:  As your -- your

 4      question is now formed, yes.

 5      Q.   What was discussed at the

 6  meeting you had?

 7          MR. BRYAN:  Same objection.  You

 8      are asking him to disclose his advice

 9      to, and conversations, with

10      Mr. Solomon.

11          MR. KAUFMAN:  So you are just

12      instructing him not to answer?  I just

13      want that clear.

14          MR. BRYAN:  Yes.  I'm

15      instructing him not to answer.

16          MR. KAUFMAN:  Fine.  I don't

17      agree with it but we will move on.

18      Q.   As a result of the meeting was

19  an approach formulated for how to respond

20  to Ms. Patrick?

21      A.   I don't recall.

22      Q.   Whatever approach may or may not

23  have been formulated were you given any

24  responsibility in connection with dealing

25  with Ms. Patrick?
```

31

1                    TIMOTHY DEVINE

2        A.    I don't remember.

3        Q.    Finally, you said you would

4    share step-by-step plan for interacting

5    with her.  Did you do that?

6              MR. PRINCI:  Objection as to

7         form.

8        A.    I don't remember having written

9    the e-mail.  So...

10       Q.    Whether or not you remember

11   writing the e-mail, Mr. Devine, following

12   December 7, did you share with those to

13   whom -- those who were shown as having

14   been the recipients of your e-mail the

15   step-by-step plan for interacting with

16   Ms. Patrick?

17             MR. BRYAN:  Objection to form.

18       A.    I may have.

19       Q.    What was your plan at that

20   point?

21             MR. BRYAN:  Objection and I

22        would instruct the witness not to

23        reveal any advice or counsel given to

24        his client on the subject.

25       A.    I'm not going to share with you

32

1           TIMOTHY DEVINE

2    what advice I gave to my client.

3           MR. KAUFMAN:  Let's mark as the

4       next exhibit what appears to be a

5       notice of a meeting, the subject of

6       which is R&W and PLS expectations for

7       CCAR 2012.  Attached to which is a

8       multipage document dated January 4,

9       2011.  The Bates numbers extend from

10      Ally PEO 0028776 to 81.

11          (9019 Exhibit 123, notice of a

12      meeting with attached multipage

13      document dated January 4, 2011, Bates

14      Ally PEO 0028776 to 81, marked for

15      identification, as of this date.)

16          MR. BRYAN:  Phil, I don't object

17      to your use of the exhibit but I ask

18      that it not be published.  There are

19      parties in this room that have not

20      agreed to the protective order,

21      therefore they are not entitled to PEO

22      information.  So you can use it with

23      the witness but please do not publish

24      it on the screen.

25          MR. KAUFMAN:  Okay.  We are not

38

1           TIMOTHY DEVINE

2      Q.    You have seen these documents

3 before, haven't you?

4      A.    As I said, I don't remember in

5 particular seeing this document.

6      Q.    Do you know who prepared the

7 document?

8      A.    No.

9           MR. KAUFMAN:  Let's mark as the

10      next exhibit an e-mail chain that runs

11      from December 7, 2011 to December 15,

12      2007.  This one has Bates number Ally

13      PEO 0042503.  So I ask that it not be

14      published on the screen.

15           (9019 Exhibit 124, e-mail chain

16      that runs from December 7, 2011 to

17      December 15, 2007, Bates Ally PEO

18      0042503, marked for identification, as

19      of this date.)

20           MR. BRYAN:  Thank you.

21      Q.    Do you have this document in

22 front of you?

23      A.    Yes.

24      Q.    And did you send the e-mail at

25 the top of the chain on December 15, 2011?

39

1              TIMOTHY DEVINE

2       A.    It looks like I did.

3       Q.    And did you send that e-mail

4  after receiving the communication from

5  Ms. Patrick's firm forwarding draft

6  confidentiality and tolling agreements?

7       A.    It looks like I did.  I don't

8  remember days of the week in December of

9  2011.

10      Q.    The e-mail -- the e-mails

11 underneath yours reflect that Mr. Sheeren

12 sent draft confidentiality and tolling

13 agreements to Ms. Hamzephour, she

14 forwarded it to you FYI and then you

15 responded, right?

16      A.    Yeah.  I don't see any

17 attachment, unless I'm missing a page, to

18 Exhibit 124.  I just see what appears to

19 be a cover e-mail.

20      Q.    I'm aware.  We -- we looked at

21 that document, those documents before.

22 This is a continuation of the e-mail chain

23 that we looked at earlier.

24           In any event, am I correct,

25 Mr. Devine, that looking at this you

40

1                 TIMOTHY DEVINE

2     received a copy of Mr. Sheeren's e-mail to

3     Ms. Hamzephour who sent it to you FYI?

4         A.    Are you referring back to

5     Exhibit 122?

6         Q.    No.  I'm referring to this

7     exhibit.

8         A.    Oh, well, as I said, there's

9     nothing attached.  So if you are asking me

10    to talk about what is attached, I can only

11    read --

12        Q.    I wasn't.  I wasn't.

13        A.    Okay, sorry.

14        Q.    I didn't ask you anything about

15    what was attached.

16            MR. BRYAN:  Why don't you just

17        rephrase the question or restate it.

18        Q.    In your e-mail, Mr. Devine, you

19    said "Pursuant to our plan I will reach

20    out to Kathy Patrick by e-mail letting her

21    know that Tammy has forwarded me the

22    correspondence and asked me to follow up.

23    First step, requesting confirmation of her

24    representation by clients."

25            You wrote that, correct?

41

1              TIMOTHY DEVINE

2        A.    Yeah, that looks like I wrote

3    that, yes.

4        Q.    And when you said, "First step

5    requesting confirmation of her

6    representation by clients," what -- what

7    is it that you were referring to?  You

8    want to know the scope of her

9    representation and the identity of her

10   clients?

11       A.    This e-mail looks to me like an

12   e-mail that I would have written to Tammy

13   Hamzephour, who was general counsel at

14   that time for the ResCap entities.  And it

15   appears to include an understanding as to

16   what my role would be in connection with

17   what Tammy asked me to do.  That's what it

18   appears to reflect.

19       Q.    When you said "pursuant to our

20   plan," what plan was that?

21       A.    The -- the discussion there and

22   the plan that's referred to would reflect

23   a plan that the lawyers had advised and

24   recommended to the client and had

25   authority from the client to pursue.  So

42

1              TIMOTHY DEVINE

2    I'm not going to talk about what the

3    contents of the plan are.

4        Q.    Whatever the contents were, it's

5    part of the same plan that was agreed upon

6    back in October between you and

7    Mr. Solomon, isn't it?

8            MR. BRYAN:  Objection to form.

9        Also instruct the witness not to

10       answer to the extent he would disclose

11       communications with Mr. Solomon.

12           MR. KAUFMAN:  I wasn't asking

13       for -- for the contents.  I just

14       wanted to know whether it's part of

15       the same plan.

16       A.    I'm not going to tell you about

17   the contents of what plan or plans the

18   client or clients may have been pursuing

19   at my advice.

20       Q.    So although this document was

21   produced to us and I'm asking you about

22   something that you wrote in it, namely

23   pursuant to our plan, you are telling me

24   you are not going to explain what plan you

25   were referring to there?

43

1          TIMOTHY DEVINE

2          MR. BRYAN:  You know that

3     production of a document has nothing

4     to do with where to draw the line on

5     attorney-client communications.

6     Mr. Devine is not going to disclose

7     his communications with his clients

8     and the legal advice he provided.

9          MR. KAUFMAN:  Okay.

10          Q.    In any event, you said the first

11    step was to get confirmation of

12    Ms. Patrick's representation, right?

13          A.    That's what the e-mail reflects.

14          Q.    And you were the one who was

15    coordinating that effort; is that correct?

16          MR. BRYAN:  Objection to form.

17          A.    I had been asked to interface

18    with Kathy Patrick.

19          Q.    And did you follow up and

20    request that information from Ms. Patrick?

21          A.    I don't remember doing so but I

22    presume that I did.  It looks here that

23    Tammy asked me to do that and I was doing

24    that.

25          Q.    Do you have some specific

44

1              TIMOTHY DEVINE

2    recollection of Ms. Hamzephour asking you

3    to do that, Mr. Devine, or are you just

4    assuming that as you sit here today?

5              MR. BRYAN:  Objection to form.

6         A.   Yeah, the trouble with answering

7    that question is we are going to get into

8    conversations that we had amongst counsel

9    on behalf of the client.  So I'm not going

10   to answer it.

11             MR. KAUFMAN:  I'd like to go off

12        the record.

13             THE VIDEOGRAPHER:  The time is

14        11:02 a.m. and we are off the record.

15             (Whereupon, there is a recess in

16        the proceedings.)

17             THE VIDEOGRAPHER:  The time is

18        11:07 a.m. and we are back on the

19        record.

20        Q.   Do you have a specific

21   recollection of Ms. Hamzephour asking you

22   to reach out to Ms. Patrick by e-mail,

23   letting her know that you had received the

24   correspondence that Mr. Sheeren had

25   forwarded?

45

1           TIMOTHY DEVINE

2       A.   I don't have that specific

3   recollection.

4           MR. KAUFMAN:  Let's mark as the

5       next exhibit a December 19, 2011,

6       e-mail from Linda Rosten to Kathy

7       Patrick showing a copy to you.  And

8       attached to that is a letter dated

9       December 19, 2011 from Mr. Devine to

10      Ms. Patrick.

11          (9019 Exhibit 125, December 19,

12      2011 e-mail from Linda Rosten to Kathy

13      Patrick with attached letter dated

14      December 19, 2011 from Mr. Devine to

15      Ms. Patrick, marked for

16      identification, as of this date.)

17          MR. BRYAN:  This is 125?

18          THE WITNESS:  Thank you.

19          THE COURT REPORTER:  Yes.

20      Q.   Looking at the second page of

21   the exhibit, Mr. Devine, did you write

22   that letter to Ms. Patrick?

23      A.   It looks like I did, yeah.

24      Q.   And this was your request for

25   confirmation of her firm's representation

82

1            TIMOTHY DEVINE

2        Attached to which is a draft

3        confidentiality agreement.

4            MR. PRINCI:  Is this Exhibit

5        136?

6            THE COURT REPORTER:  Yes.

7            (9019 Exhibit 136, e-mail from

8        Mr. Devine to Ms. Patrick dated

9        April 16, 2012, with attached draft

10       confidentiality agreement, marked for

11       identification, as of this date.)

12       A.    Thank you.

13       Q.    Looking at the document we just

14    marked, did you send this e-mail to

15    Ms. Patrick with the attached draft on

16    April 16, 2012?

17       A.    Yes.  It looks like that's

18    exactly what I did.

19       Q.    Let me show you the document

20    that has been marked previously as

21    Exhibit 76, which is an e-mail chain on

22    April 17, 2012.  And let me direct your

23    attention to the e-mail at the top of the

24    first page, the one from you to Gary Lee

25    and Tammy Hamzephour at 9:57 a.m.

83

1          TIMOTHY DEVINE

2          Do you see that?

3     A.    Sorry.  Say that again, please.

4     Q.    The e-mail at the top of the

5  first page of the exhibit from you to

6  Mr. Lee and Ms. Hamzephour at 9:57 a.m.

7  Do you see that?

8     A.    From me -- at the top of the

9  first page?

10    Q.    Correct.

11    A.    Yes.

12    Q.    Did you send that e-mail?

13    A.    It looks like I do.

14    Q.    And your e-mail reported on a

15 conversation you had with Mr. Lee the day

16 before, was that correct?

17    A.    Yes.

18    Q.    And one of the things you had

19 talked about with Mr. Lee was whether to

20 include a dollar figure or dollar figures

21 for a potential contribution from AFI in a

22 presentation to Ms. Patrick; is that

23 correct?

24    A.    Yes.

25    Q.    And you said that you didn't

84

1                    TIMOTHY DEVINE

2     think a potential dollar range should be

3     shared with Kathy Patrick at that point;

4     is that correct?

5          A.    Yes.

6          Q.    Why not?  Why did you think that

7     a dollar figure should not be shared with

8     her?

9          A.    Are you asking me what I thought

10    or what I said to Gary and Tammy about

11    what I thought?  Because if you want to

12    know my answer, I can answer the second

13    one.

14         Q.    Answer the second one.

15         A.    Okay.  What I said to Gary and

16    Tammy was that the business hasn't gotten

17    to an Ally Financial, Inc. number yet.

18    Meaning AFI and ResCap have not come to an

19    understanding as to the amount that the

20    parent AFI and the debtors would agree to

21    in their separate negotiations.

22         Q.    Are you finished?

23         A.    Yeah.

24         Q.    You also said "Can always share

25    with her at next round of discussion."

85

1                 TIMOTHY DEVINE

2    What made you think that at the next round

3    of discussion you'd have such a figure to

4    share with her?

5         A.    I don't remember in particular

6    but as I understood it, those negotiations

7    were going on and if they had arrived at a

8    number and an agreement at a number, then

9    we would have been able to share it with

10   Kathy Patrick.

11        Q.    Let me show you the document

12   that's been marked previously as

13   Exhibit 79, which are e-mails between

14   yourself and Ms. Hamzephour.

15             Did you send the e-mail at the

16   bottom of this exhibit to Ms. Hamzephour

17   on April 23, 2012?

18        A.    That's what it looks like, yes.

19        Q.    And am I correct that this

20   e-mail was in preparation for an upcoming

21   meeting with Kathy Patrick?

22        A.    Just one moment.  Let me refresh

23   my memory.  Yes, I think that's right in

24   the timeline.

25        Q.    And specifically this was about

95

1                    TIMOTHY DEVINE

2         Q.    I'm not asking you to speculate.

3    I'm asking you to tell me at the time that

4    you were preparing to provide this

5    waterfall presentation to Ms. Patrick in

6    connection with proposed settlement with

7    her, wasn't it your understanding that AFI

8    in return for whatever contribution it

9    would be making to that settlement was

10   going to require releases from both the

11   PLS claimants as well as ResCap?

12        A.    Couple -- couple points in

13   response.  One, I wasn't preparing the

14   waterfall.

15             Two, we were not negotiating,

16   Kathy Patrick and me -- Kathy Patrick and

17   I with regard to whether or not the 750

18   would be consideration for anything that

19   the debtor received in connection with the

20   resolution of a debtor and Kathy Patrick

21   settlement agreement.

22        Q.    Weren't those things all being

23   negotiated together, Mr. Devine?

24        A.    The 750 was not being negotiated

25   with Kathy Patrick.

96

1          TIMOTHY DEVINE

2      Q.    I understand that.  But in order

3  to make a settlement with her there had to

4  be some contribution from AFI, right?

5          MR. PRINCI:  Object to form.

6      A.    You'd have to ask Kathy Patrick

7  what she was looking for in that regard.

8      Q.    What was the point of including

9  a $750 million number as a contribution

10  from AFI in a waterfall presentation to

11  Ms. Patrick if it wasn't understood that

12  in order to make any settlement there was

13  going to have to be a contribution from

14  AFI?

15          MR. BRYAN:  Objection to form.

16          MR. PRINCI:  Objection as to

17      form.

18      A.    Now I understand your question.

19  So as I understand it at the time the

20  waterfalls, and I'm trying to remember

21  this, I don't -- there's no attachment to

22  the exhibit, but I think that the

23  waterfalls included 0 contribution from

24  Ally up to 750 million contribution from

25  Ally.  And if you are asking me what was

97

1                TIMOTHY DEVINE

2    ResCap trying to get done at that time, I

3    understood from Tammy Hamzephour and Gary

4    Lee that ResCap was trying to give Kathy

5    Patrick a hypothetical fully sort of

6    caveated vision of some possible scenarios

7    in the event that they struck a deal, that

8    is, ResCap and Kathy Patrick, in

9    connection with a ResCap filing and an

10    allowed claim and so on.  And without --

11    without -- Kathy Patrick at that time had

12    been duly informed that there was a

13    potential for an Ally and ResCap

14    settlement which would have or could have

15    included some contribution by Ally into

16    the estate.  And so she was trying to

17    understand what potential such a

18    contribution, either from 0 up to 750,

19    would mean for her clients as she

20    evaluated for her part the -- the

21    settlement that was being negotiated

22    between ResCap and Kathy Patrick.

23        Q.    And you understood, didn't you,

24    that if AFI were to make a contribution

25    towards that settlement it was going to

98

1              TIMOTHY DEVINE

2     require releases both from the R&W

3     claimants as well as from ResCap?

4          MR. BRYAN:   Object to form.

5          A.    So if -- if I understand your

6     question, what I communicated to Kathy

7     Patrick was that in connection with the

8     settlement agreement she was trying to

9     reach with the debtor, for which she

10    sought Ally's support and assurance that

11    Ally wouldn't object to it, Ally would

12    seek a release -- Ally would seek the

13    support of her clients of the plan that

14    was being negotiated between ResCap and

15    Ally at the time.

16         Q.    And that plan would include

17    releases both from third-party claimants

18    such as her clients and ResCap, right?

19         A.    The plan being negotiated

20    between ResCap and Ally?

21         Q.    Yes.

22         A.    The plan being negotiated

23    between ResCap and Ally would include a

24    debtor release as well as a provision for

25    third-party nonconsensual releases, that's

99

```
1              TIMOTHY DEVINE
2     correct.
3          Q.    Okay.
4              MR. KAUFMAN:  Let's mark as the
5          next exhibit an e-mail on April 24,
6          2012, from Mr. Devine.
7              (9019 Exhibit 137, WITHDRAWN,
8          marked for identification, as of this
9          date.)
10         Q.    Looking at the document we've
11    just marked, Mr. Devine, did you send this
12    e-mail on April 24th?
13             MR. BRYAN:  Again, Phil, can you
14         represent that this was not on our
15         clawback list?
16             MR. KAUFMAN:  I don't have your
17         list in front of me, Patrick.
18             MR. BRYAN:  I believe this one
19         plainly is.
20             MR. KAUFMAN:  I don't -- you
21         believe this is on your clawback list?
22             MR. BRYAN:  I do.
23             MR. KAUFMAN:  Do you have a copy
24         of your list?
25             MR. BRYAN:  We can take a break
```

120

1              TIMOTHY DEVINE

2    discussion do you recall with

3    Mr. DeBrunner, Mr. Mackey and Mr. Kushman,

4    wasn't there discussion of a $3 billion

5    range as one possible disclosure?

6              MR. BRYAN:  Objection to form.

7         A.   I don't recall that.

8         Q.   You don't recall that.  Okay.

9    What do you recall of the discussion you

10   had with Mr. Mackey, Mr. DeBrunner and

11   Mr. Kushman relating to the language and

12   final pro- -- finalized proposed range

13   that was included in the 10-Q?

14             MR. BRYAN:  Objection.  He's not

15        going to disclose what advice he gave

16        to the client regarding these

17        disclosures.

18             MR. KAUFMAN:  Okay.  Let's mark

19        as the next exhibit an e-mail chain on

20        April 27, 2012 -- I'm sorry.  I see

21        this has already been marked.

22        Q.   Let -- let me show you the

23   document that has previously been marked

24   as Exhibit 44.

25        A.   Thank you.

121

1           TIMOTHY DEVINE

2      Q.    Focusing on the e-mail that

3   starts on the bottom of the first page and

4   continues over to the second.  That's an

5   e-mail you sent to Mr. Solomon and others

6   on April 27th, correct?

7      A.    Just a moment, please.

8            Okay.  Sorry, I'm ready to

9   answer your question.

10     Q.    Is that an e-mail you sent to

11  Mr. Solomon and others on April 27th?

12     A.    Yes.

13     Q.    And you reported in your e-mail

14  a conversation you had just had with

15  Ms. Patrick, correct?

16     A.    Yes.

17     Q.    And was that an accurate summary

18  of your conversation with Ms. Patrick?

19     A.    I assume it was.

20     Q.    The next e-mail up is from

21  Mr. Solomon at 8:48 p.m.  Did you receive

22  that e-mail?

23     A.    Yes, it looks like I did.

24     Q.    And then you responded to

25  Mr. Solomon at 8:50 p.m., correct?

122

TIMOTHY DEVINE

1
2      A.    Yes.

3      Q.    And the last line of your

4   response you said "Lots to do and have to

5   manage all client expectations since KP's

6   clients will take several hacks at us."

7           To what clients were you

8   referring?

9      A.    I assume I was referring to the

10  clients that KP had identified.

11     Q.    Okay.  When you said "have to

12  manage all client expectations," which

13  client or clients were you talking about

14  there?

15     A.    I was probably referring to the

16  ResCap client as well as the Ally client.

17     Q.    And how did you believe those

18  expectations had to be managed?

19          MR. BRYAN:  Objection to form.

20          MR. KAUFMAN:  Let me withdraw

21     it.

22     Q.    What expectations of those

23  clients did you believe had to be managed?

24     A.    I'm trying to put myself back in

25  time.  It wasn't clear to me that Kathy

123

1          TIMOTHY DEVINE

2     Patrick and her clients were going to --

3     it wasn't clear to me at that time that a

4     deal was going to get done.  And I assume

5     that's what I meant by having to manage

6     client expectations with regard to whether

7     a deal was going to get done or not.

8          Q.    Okay.  And how did you believe

9     those expectations concerning whether a

10    deal could get done needed to be managed?

11          MR. BRYAN:  Objection to form.

12          A.    I'm going to try and understand

13    your question better but would you please

14    clarify.

15          Q.    You said "have to manage all

16    client expectations."  And you explained

17    that those expectations had to do with

18    whether or not a deal with Ms. Patrick's

19    clients could get done, right?

20          A.    That's my best memory of what I

21    was talking about.  I confess I don't

22    remember exactly what I was talking about.

23          Q.    How did you propose to manage

24    those expectations?

25          A.    How in terms of who I'd speak

124

1              TIMOTHY DEVINE

2      with or how in terms of what actions would

3      be taken?

4          Q.    Both.

5          A.    I don't remember.

6          Q.    Who was going to do the

7      managing, you?

8              MR. BRYAN:  Object to form.

9          A.    I -- I think the client

10     expectations, you can see who is on the

11     e-mail here.  You've got Gary Lee and

12     you've got Tammy Hamzephour.  So I assume

13     that they would be managing whatever

14     expectations the ResCap client had.  And

15     we have got Bill Solomon, Rick Cieri and

16     Ray Schrock who together would be managing

17     client expectations at Ally.

18         Q.    What client were you on?

19             MR. BRYAN:  Objection to form.

20         Q.    Were you the lawyer for the

21     situation or were you on the Ally side?

22             MR. PRINCI:  Objection as to

23        form.

24             MR. BRYAN:  Objection to form.

25         A.    With regard to the April 27 --

125

1          TIMOTHY DEVINE

2     with regard to finalizing the deal with

3     Kathy Patrick in the role of reporting

4     back here in the e-mail Friday, April 27

5     it looks like 8:00 at night, I was

6     reporting back to Ally and ResCap teams

7     with regard to the conversation with Kathy

8     Patrick.  It could be that Gary Lee was

9     having conversations at the same time, I

10    don't know.  But what I reported was that

11    I had spoken with her and it looked like

12    essentially a pretty positive and upbeat

13    status report at that time.

14         Q.    Okay.

15         A.    So --

16         Q.    I was referring to your

17    statement that, "have to manage all client

18    expectations."  I'm trying to figure out

19    which client or clients were you managing?

20         A.    I wasn't managing --

21              MR. BRYAN:  Asked and answered.

22         A.    -- any client.

23         Q.    So everyone else that you

24    e-mail -- sent your e-mail to was doing

25    some managing but you weren't doing any,

126

```
1              TIMOTHY DEVINE
2      is that what you're saying?
3              MR. BRYAN:  Objection to form.
4              MR. PRINCI:  Objection as to
5         form.
6         A.    I'm saying I wasn't managing any
7      client.  If you're talking about managing
8      expectations --
9         Q.    I'm talking managing
10     expectations.
11        A.    Oh, that's different.
12        Q.    Whose cli- -- which client
13     expectations were you managing?
14        A.    I was --
15             MR. BRYAN:  Objection to form.
16        A.    I was providing information to
17     Tammy and Gary for their advice to the
18     ResCap clients and I was providing
19     information to Rick and Ray and Bill with
20     regard to the Ally client.  But clearly by
21     that point I would have been participating
22     in attorney-client discussions with the
23     Ally client with regard to the Kathy
24     Patrick discussions.
25             MR. KAUFMAN:  Let's mark as the
```

139

1                 TIMOTHY DEVINE

2     that took place outside of my presence.

3         Q.    You said our notes match --

4         A.    So --

5         Q.    Didn't that indicate your

6     agreement with the summary he provided to

7     you?

8              MR. BRYAN:   Object to form.

9         A.    Yeah.  So as I recall during

10    those days, as I said, there were times

11    when I was talking with Kathy Patrick and

12    there were times when Gary Lee was talking

13    to Kathy Patrick.  So it's just as

14    reasonable in the misty fog of my memory

15    right now to understand our notes match to

16    describe a separate conversation that I

17    had with Kathy Patrick with the agreement

18    as Gary Lee describes it here.

19              It's possible that we were in

20    the same meeting and that that's what that

21    e-mail means.  It's also possible that we

22    were in separate meetings and we were

23    comparing notes as to our understanding of

24    what KP was proposing.

25        Q.    Okay.  In any event, your

140

1                    TIMOTHY DEVINE

2    understanding of the conversations with

3    Ms. Patrick matched the summary that

4    Mr. Lee provided in the e-mail to you; is

5    that correct?

6         A.    That's correct.

7         Q.    Okay.  The five points listed by

8    Mr. Lee were the essential terms of the

9    deal you were discussing with Ms. Patrick

10   at that time; is that correct?

11        A.    No.

12        Q.    No.  No?

13        A.    No.

14        Q.    Oh, okay.  In point 4 of his

15   e-mail, Mr. Lee wrote, "The KP group will

16   enter into a plan support agreement which

17   would support the DIP, sale, sale process,

18   servicing, shared services and plan

19   releases provide that Ally contributes no

20   less than X dollars in cash."

21             Do you see that?

22        A.    I see that, yes.

23        Q.    And the plan releases that you

24   understood Mr. Lee was referring to there

25   were third-party releases to AFI and a

142

1                    TIMOTHY DEVINE

2      you see that?

3          A.    I see that.

4          Q.    He just has an X.

5          A.    Yes.  I see that that number 4

6      refers to X dollars in cash.

7          Q.    As of May 4 was the amount of

8      AFI's contribution still open with respect

9      to Ms. Patrick?

10         A.    I don't -- I don't remember.

11         Q.    As of May 4 how much was

12     Ms. Patrick demanding from AFI to enter

13     into a plan support agreement as part of

14     her settlement?

15              MR. PRINCI:  Objection as to

16         form.

17              MR. BRYAN:  Objection to form.

18         A.    Kathy Patrick wasn't demanding a

19     certain amount of money from AFI into the

20     estate.

21         Q.    Had she indicated to you that

22     the amount of AFI's contribution was

23     unimportant to her?

24         A.    Had she indicated that it was

25     unimportant what AFI put in the estate?

143

1              TIMOTHY DEVINE

2        Q.    Yes.

3        A.    No, she did not indicate that to

4   me.

5        Q.    Did she indicate that it was

6   important?

7        A.    Yes.

8        Q.    Okay.  What did she say about

9   that?

10       A.    Kathy Patrick understood that

11  the negotiation of a dollar number between

12  AFI and ResCap was going on separately

13  from the discussions over the RMBS

14  settlement.  Notwithstanding that, she

15  understood that she had no direct role

16  or -- or standing to bargain for a number

17  there since the number -- since that

18  agreement was between the estate and Ally.

19  She did care about the number and she told

20  me that she cared about the number for the

21  obvious reason that she wanted to maximize

22  that figure from Ally Financial.

23       Q.    But as of May 4th, had she

24  expressed an amount that she expected from

25  AFI if she were going to proceed with a

205

1              TIMOTHY DEVINE

2      the prior appropriate lawful disclosures

3      in the 10-Q.

4          Q.    Yeah.  And whatever risk you

5      thought you might have in that connection,

6      even if you didn't think there was any,

7      you wanted an answer as to what that risk

8      might be in comparison to another risk.

9      And that risk you said was that will blow

10     the chance to get third-party releases.

11     So my question is, isn't what you wanted

12     to know was whether the third-party

13     releases from a risk standpoint were more

14     valuable than taking the risk of whatever

15     might happen vis-à-vis the SEC or the

16     disclosures that had been made in the --

17     in the 10-Q?

18              MR. PRINCI:  Objection to form.

19         Asked and answered.

20              MR. BRYAN:  Objection to form.

21         A.    No.  That's not what I was

22     comparing.  I wasn't comparing the risk

23     because we had already fully, lawfully and

24     appropriately made the disclosures.

25         Q.    Right.

206

1          TIMOTHY DEVINE

2      A.    That had already been

3   undertaken.

4      Q.    You were so confident,

5   Mr. Devine, that you consulted Davis Polk

6   about this very issue, right?

7          MR. BRYAN:  Objection to form.

8      Q.    Didn't you?

9          MR. BRYAN:  You are asking him

10      if he consulted outside attorneys?

11      Q.    You consulted not just outside

12   attorneys, you consulted Davis Polk on

13   this exact issue, didn't you?

14          MR. BRYAN:  I'm going to

15      instruct the witness not to answer

16      what legal advice he sought from

17      Ally's attorneys.

18      Q.    Did you or did you not consult

19   Davis Polk about the risk to AFI of

20   settling -- the risk to AFI in terms of

21   disclosures that were made in the 10-Q by

22   having a settlement of this -- of this

23   magnitude with Ms. Patrick?

24          MR. BRYAN:  I'm going to

25      instruct the witness not to answer to

207

1          TIMOTHY DEVINE

2      the extent you are asking him what

3      legal advice he sought on what topics

4      from an outside attorney for AFI.

5          MR. KAUFMAN:  I just want to

6      know whether -- you are not letting

7      him answer on the topic?

8          MR. BRYAN:  You are asking him a

9      very specific topic.  And I'm

10     instructing the witness not to answer.

11     Q.    Did you or did you not seek

12  advice from Davis Polk on AFI's risk for

13  possible securities violations in

14  connection with the 10-Q?

15         MR. BRYAN:  Mr. Kaufman, we can

16     do this all day.  I'm instructing the

17     witness not to answer.

18         MR. KAUFMAN:  Okay.  Let's mark

19     as the next exhibit an e-mail chain on

20     May 7th and May 8th.  Bates numbers RC

21     9019_000049164 through 66.

22         (9019 Exhibit 144, e-mail chain

23     dated May 7th and May 8th, Bates RC

24     9019_000049164 through 66, marked for

25     identification, as of this date.)

217

1               TIMOTHY DEVINE

2   those are in sequence.

3       Q.    You are saying there's something

4   peculiar about sending an e-mail at 11:00

5   in the morning?

6       A.    No, no.  I'm just -- I just lost

7   confidence in the -- in the time, in the

8   various exhibits that you've sent me.

9   Some of it doesn't make sense to me.

10      Q.    Is there anything about what I

11  have just shown you among the exhibits

12  where -- in this exhibit where Mr. --

13  where you sent an e-mail at 10:46 a.m. on

14  May 8th, got a response from Mr. Lee on

15  the same day at 11:00 a.m. and then you

16  sent a further e-mail at 11:15, anything

17  suspicious about that?

18          MR. BRYAN:  Objection to form.

19      A.    In terms of the timing?

20      Q.    Yes.

21      A.    No, not independently.

22      Q.    Okay.  Let me show you what's

23  been marked previously as Exhibit 117,

24  which are e-mails between you and

25  Mr. Cancelliere on May 9th, 2012.

218

1          TIMOTHY DEVINE

2          Did you send the e-mail to

3   Mr. Cancelliere at 5:50 a.m. on May 9th?

4       A.    I don't remember what time I

5   sent it but it looks here like an e-mail

6   from me to Jeff Cancelliere.

7       Q.    You sent that e-mail, didn't

8   you?

9       A.    It looks like it.

10      Q.    And you wrote to

11  Mr. Cancelliere, "What is the defect rate

12  at 8.7 billion according to her

13  severities, etc., and according to ours."

14          Do you see that?

15      A.    Yes.

16      Q.    Why did you want that

17  information?

18      A.    Well, let's start with the

19  question which distinguishes her

20  severities and ours.  Because as I

21  mentioned earlier, Kathy Patrick's

22  formulas applied different severities to

23  the collateral in the pools that underlay

24  the various securitizations.  And if you

25  apply a more aggressive severity, meaning

219

1                      TIMOTHY DEVINE

2      that loans are more likely to fail

3      according to whatever macroeconomic or

4      otherwise or other stresses you put

5      against it, your defect rate would be

6      lower if you -- if you isolated two of the

7      more significant variables that arrive at

8      an outcome which -- with regard to total

9      exposure.

10             And so it was important to

11     understand the defect rate at a couple of

12     different severities.

13       Q.    Where did the $8.7 billion

14     number come from in your e-mail to

15     Mr. Cancelliere?

16       A.    Unfortunately, I don't have a

17     timeline in front of me with regard to the

18     various communications with the parties.

19     But at some point it must have been

20     communicated to me by either Gary Lee or

21     Kathy Patrick that they were at least

22     talking about a valuation figure for the

23     allowed claim of this class at

24     $8.7 billion.

25       Q.    And did you want to ascertain

237

1        TIMOTHY DEVINE

2        MR. PRINCI:  Objection as to

3    form.

4        A.    I don't remember whether I

5    thought that there might be a risk that

6    the settlement would fall apart or not.

7        Q.    Did you consider what you would

8    do for AFI if Mr. Lee bought and insisted

9    on a greater contribution from AFI?

10        MR. PRINCI:  Objection as to

11    form.

12        MR. BRYAN:  Object to form.

13        A.    If you are asking me for my

14    mental impression as to what contingencies

15    might occur in the event that ResCap and

16    Kathy Patrick didn't settle, I'm not going

17    to answer that question as it would

18    reflect attorney-client privileged

19    information.  And probably attorney work

20    product.

21        Q.    Without telling me what it was

22    that you considered just tell me whether

23    you considered what might happen if

24    Mr. Lee balked as a result of what you

25    said to him in this e-mail and insisted on

359

1          TIMOTHY DEVINE

2   describe as the RMBS or put back

3   litigation, and I'd include in that

4   definition both the monoline claims that

5   were in litigation and any put back claims

6   that -- that might have been asserted?

7        A.   The first substantial contact I

8   had within my job duties with the mortgage

9   business was in the summer of 2010 when

10  the FHFA propounded 64 subpoenas across

11  the industry and I was asked to coordinate

12  the response to the subpoenas that were

13  issued to the company.

14       Q.   Did you supervise outside

15  counsel with respect to the monoline

16  litigation either MBIA or FGIC litigation?

17       A.   Have I done that?

18       Q.   Yes.

19       A.   Yes.

20       Q.   When you were representing AFI

21  from the time of the October letter that

22  Ms. Patrick sent to the signing of the

23  settlement agreement, were you solely

24  representing AFI or were you also

25  representing ResCap during that time

360

1          TIMOTHY DEVINE

2    period from October forward?

3        A.    Well, we should probably be

4    careful with regard to what you mean by

5    representing.  The -- as I recall, the

6    first communication from Kathy Patrick

7    came in to Bill Solomon in his capacity as

8    general counsel of Ally Financial, Inc.

9    He responded by indicating to Ms. Patrick

10   that Ally Financial, Inc. did not have

11   exposure of the variety that she wanted to

12   talk about settling.  And referred her to

13   Tammy Hamzephour, general counsel for

14   ResCap.

15          What -- my participation in

16   connection with meeting with Ms. Patrick,

17   I think Mr. Sheeren was there at the first

18   meeting in Minnesota, I don't recall

19   exactly.  But in any event, I was there in

20   my capacity as chief counsel for

21   litigation for ResCap, given that

22   Ms. Patrick purported to represent clients

23   who purported to have rep and warrant

24   essentially contract claims against the

25   contracting parties, all of whom were

361

1                    TIMOTHY DEVINE

2      within the ResCap structure and none of

3      whom were within the Ally structure.

4           Q.    So at that time in that meeting,

5      if I understand, it took place sometime

6      between October, November, December,

7      sometime in 2011, the last quarter?

8           A.    I don't recall when it took

9      place.  I think we have had some testimony

10     on it today.  If there's a document we

11     could refer to it.

12          Q.    I'm going to try to do this

13     without -- without taking the time to go

14     back to the documents.

15          A.    Okay, thank you.

16          Q.    So initially you were

17     representing ResCap in what I will call

18     the Kathy Patrick negotiations with

19     respect to her claims?

20          A.    Well --

21               MR. BRYAN:  Objection to form.

22          A.    I -- I understand that you would

23     call them negotiations.  So I think that

24     term is going to end up being understood

25     in a number of different ways.  What --

362

        TIMOTHY DEVINE

1

2   what went on for some period of time with

3   Kathy Patrick was an exchange of

4   communications designed to understand the

5   nature of her representation, who her

6   clients were, what kind of claims they

7   were purporting to make.  And so to the

8   extent that that is a prelude to or a part

9   of or a type of negotiation, yes.  So for

10   a period of time I was supporting those

11   discussions in my capacity in support of

12   the ResCap entities.

13        Q.    You understood that Ms. Patrick

14   was asserting that ResCap owed her clients

15   a substantial amount of money?

16        A.    Yes.

17        Q.    So you -- did she at some

18   point -- what was the first, her first

19   demand or her first claim that she made

20   against ResCap, do you recall?

21        A.    As I sit here today, I don't

22   recall her first demand.

23        Q.    Did she ask for $10 billion?

24        A.    Now, you are talking about once

25   the discussions started to take place for

363

1              TIMOTHY DEVINE

2    a compromise of those claims within the

3    context of a ResCap filing.

4        Q.    At any point?

5        A.    Yeah.  So I believe that she did

6    at one point in the negotiations but now

7    this was within the context of a potential

8    ResCap filing at which time I was not

9    representing ResCap in connection with a

10   potential resolution of claims against the

11   ResCap estate.

12       Q.    Okay.  So if I understand your

13   testimony correctly, you initially started

14   out representing ResCap and then at some

15   point you were no longer representing

16   ResCap.  Could you explain to me when your

17   role and responsibility changed?

18       A.    I think you've slightly

19   misunderstood but I don't blame you.  At

20   some point -- because it wasn't entirely

21   clear, right.  At some point -- look, when

22   we started the discussions with Kathy

23   Patrick, I was representing the ResCap

24   entities in connection with the assertion

25   that they had -- that Kathy Patrick did

364

1          TIMOTHY DEVINE

2    represent clients who did or did not under

3    the relevant documents have contract

4    claims against ResCap.  And that was

5    natural because I had been dealing with

6    that kind of assertion of claim, although

7    not by investors and trustees but rather

8    by the monolines against the ResCap

9    entities theretofore.

10         At some point ResCap began to

11   consider a Chapter 11 restructuring.  I

12   did not represent ResCap at all in

13   connection with this Chapter 11

14   restructuring, unless you consider the

15   nature of our discussions according to the

16   common interest or joint defense privilege

17   in which case that's why I don't blame you

18   for misunderstanding the nature of what I

19   just talked about.  But so, yes, I did

20   represent ResCap in connection with the

21   sort of bilateral claim of Kathy Patrick's

22   clients against the ResCap entities and

23   rep and warrant.  Once the context of the

24   restructuring became a part of that

25   dialogue, ResCap was represented by Gary

365

1          TIMOTHY DEVINE

2    Lee of MoFo.  I never represented ResCap

3    on a bankruptcy related resolution.  At

4    least unless you -- as I say, I did

5    continue to advise ResCap in connection

6    with plain sort of legal analysis on rep

7    and warrant issues but not so much as

8    would be implicated in connection with the

9    filing.

10        Q.    Thank you for that and let me

11   try to make sure I understand correctly.

12   To try to summarize.  In the beginning of

13   from October for some period of time in

14   the initial stages that you've described

15   as essentially information gathering

16   stages, you were representing ResCap.  By

17   the end, by the April and May time period

18   that we have looked at a variety of

19   e-mails by that time period you were no

20   longer representing ResCap, you would have

21   solely been representing AFI, is that

22   correct, am I bracketing the change in

23   role correctly?

24        A.    No.  I think you are missing one

25   part of it.  But it's -- it's

366

1                   TIMOTHY DEVINE

2       directionally correct.  So first of all,

3       the difficulty with the word

4       "representing" given that there were no

5       pleadings in the matter, nobody appeared

6       as counsel of record, et cetera.  So let's

7       for a moment agree that the term

8       "representing" is somewhat subject to a

9       variety of definitions and understandings.

10          Q.    I would use representing as

11      representing in the context of the

12      negotiations.  Representing a client, be

13      it AFI or ResCap, in dealing with

14      Ms. Patrick or the Talcott Franklin group

15      that came in at the end.  If you

16      understand that.

17          A.    Uh-hum.  So there -- there were

18      certainly throughout the relevant period

19      transactions and discussions,

20      communications -- transactions meaning

21      information exchange, et cetera, between

22      the ResCap parties and Kathy Patrick on

23      the one hand or Talcott Franklin on the

24      other, which I assisted and advised ResCap

25      in accomplishing.

367

1          TIMOTHY DEVINE

2          At the same time I was

3     representing -- I was chief counsel to

4     Ally as well so of course I was advising

5     both ResCap and Ally in connection with

6     the -- the claims that Kathy Patrick

7     purported to make on behalf of those

8     clients.

9          Q.    When you were representing

10    ResCap in the initial stages of this

11    discussions and negotiations with

12    Ms. Patrick, who did you report to at

13    ResCap?

14          A.    I certainly included Tammy

15    Hamzephour in any discussions.  She was

16    general counsel to the ResCap entities.  I

17    had conversations with and gave advice to

18    and took input from a variety of business

19    clients.

20          Q.    So in addition to Ms. Hamzephour

21    you spoke to other not -- not in-house

22    counsel but other business representatives

23    at ResCap?

24          A.    Yes.

25          Q.    Do you recall who that would be

368

1              TIMOTHY DEVINE

2    in the initial stages?

3         A.    Sure.  So but in what capacity,

4    as sort of an information source, as a --

5    as a normal business client or in sort of

6    a decision-making --

7         Q.    In any capacity you were

8    representing them in the initial stages of

9    these discussions and negotiations with

10   Ms. Patrick.

11        A.    I had communications with Tom

12   Marano, with Jim Whitlinger, with Jeff

13   Blashco (ph), Jeff Cancelliere.  This was

14   my -- as in-house counsel I had naturally

15   the information and expertise relating to

16   the rep and warrant claims that Kathy

17   Patrick and her clients purport to make.

18   It was all contained within ResCap.  That

19   was my resource base, that was my client

20   base, that's where the decision-making

21   authority with regard to whether or not to

22   engage in real settlement discussions or

23   not.  That's -- that's where all that took

24   place with the ResCap client.

25        Q.    Why was it decided at some point

369

1          TIMOTHY DEVINE

2     that you would no longer represent ResCap

3     and solely be representing AFI?

4          A.    I'm going to answer your

5     question without revealing privileged

6     communications.  At some point it was

7     determined that people performing

8     functions like the one I was performing,

9     which spanned across -- across the Ally,

10    the nondebtor to the debtor line, should

11    reorient so that they were aligned with

12    one or the other.  And that was a process

13    that took place across the various

14    business units and functions to the extent

15    that there was any overlap.

16         Q.    Do you know when that was?

17         A.    With regard to my own role?

18         Q.    Yes.

19         A.    I don't know exactly when it

20    was.  I understand you would think I would

21    have an exact date and hour.  I don't.

22    But because -- the reason I don't is

23    because it's probably accurate to say that

24    in some measure I continued to be a

25    resource for the ResCap client even as

370

1            TIMOTHY DEVINE

2     they retained MoFo to represent them in

3     connection with rep and warrant and in

4     connection with rep and warrant in a

5     bankruptcy context, simply because I had a

6     great deal of experience in connection

7     with the claims that were being asserted

8     against the estate and because, as you

9     know, many of us believed that we had a

10    common interest in joint defense.  And in

11    fact at some point a document was executed

12    to that effect.

13            So it's not a straight line,

14    drop dead date after which I was no longer

15    providing advice to either a client of

16    sorts or a co, sort of a party subject to

17    a common defense or joint defense

18    agreement.

19        Q.    I think I understand.  To your

20    knowledge, when did ResCap become

21    insolvent, and I would define that on a

22    balance sheet basis when its total assets

23    were less than its total liabilities?

24        A.    I don't know.

25            MR. BRYAN:  Objection.

376

1

2                C E R T I F I C A T I O N

3    STATE OF NEW YORK       )

4                            ) ss.:

5    COUNTY OF NEW YORK      )

6

7             I, ERICA L. RUGGIERI, RPR and a

8        Notary Public within and for the State

9        of New York, do hereby certify:

10            That I reported the proceedings

11       in the within-entitled matter, and

12       that the within transcript is a true

13       record of such proceedings.

14            I further certify that I am not

15       related by blood or marriage, to any

16       of the parties in this matter and

17       that I am in no way interested in

18       the outcome of this matter.

19            IN WITNESS WHEREOF, I have

20       hereunto set my hand this 20th day

21       of November, 2012.

22

23

24            ERICA L. RUGGIERI, RPR

25