Richard M. Cieri
Ray C. Schrock
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

Jeffrey S. Powell
Daniel T. Donovan
Gregory L. Skidmore
KIRKLAND & ELLIS LLP
655 15th Street, N.W., Ste. 1200
Washington, D.C. 20005
Telephone: (202) 879-5000
Facsimile: (202) 879-5200

*Counsel for Ally Financial, Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------------------

| | |
|---|---|
| In re: | Case No. 12-12020 (MG) |
| RESIDENTIAL CAPITAL, LLC, et al., | Chapter 11 |
| Debtors. | Jointly Administered |

--------------------------------------------------------

**DECLARATION OF JONATHAN D. JANOW IN SUPPORT OF ALLY FINANCIAL, INC'S OPPOSITION TO THE MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO PRECLUDE TIMOTHY DEVINE FROM TESTIFYING ABOUT ANY OF THE MATTERS AS TO WHICH DISCOVERY FROM HIM HAS BEEN BLOCKED BASED ON A CLAIM OF PRIVILEGE**

I, JONATHAN D. JANOW, hereby declare, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1.    I am an associate at the law firm of Kirkland & Ellis LLP, counsel to Ally Financial, Inc. ("AFI") in the chapter 11 cases of the above captioned matter. I respectfully submit this declaration in support of AFI's Opposition To The Motion Of The Official Committee Of Unsecured Creditors To Preclude Timothy Devine From Testifying.

2.    Attached to my Declaration as Exhibit A in support of AFI's opposition are excerpts from the deposition testimony of Timothy Devine, dated November 19, 2012.

Dated:  __May 14, 2013____
       Washington, D.C.

                                         ____/s/  Jonathan D. Janow_____
                                         Jonathan D. Janow

# EXHIBIT A

1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

------------------------------------x

In Re: Cae No:

RESIDENTIAL CAPITAL, LLC, et. al,    12-12020(MG)

Debtors.

------------------------------------x


VIDEOTAPE DEPOSITION OF TIMOTHY DEVINE

New York, New York

November 19, 2012

10:17 a.m.


Reported by:
ERICA L. RUGGIERI, RPR
JOB NO: 27973

19

```
 1          TIMOTHY DEVINE

 2          MR. BRYAN:  This is 121?

 3          MR. KAUFMAN:  I believe so.

 4          MR. PRINCI:  Thank you.

 5     Q.    Did you see this letter from

 6   Mr. Solomon on or about its date?

 7     A.    Yes.

 8     Q.    Were you the one who drafted it?

 9     A.    I don't recall.

10     Q.    Wasn't this letter part of the

11   approach that was decided upon at your

12   meeting with Mr. Solomon when you spoke

13   with him about how to deal with

14   Ms. Patrick?

15          MR. BRYAN:  Objection to form.

16          MR. PRINCI:  Objection as to

17     form.

18     A.    Yeah, I'm not sure what was

19   decided at that meeting that I had with

20   Mr. Solomon.

21     Q.    Let me show you the document

22   that has been marked previously as

23   Exhibit 51, which is an e-mail dated

24   October 26, 2011, from Mr. Solomon to a

25   number of people, including yourself.
```

20

<pre>
 1              TIMOTHY DEVINE

 2              Did you -- and there's an

 3    attachment, a letter dated October 25,

 4    2011, from Ms. Patrick to Mr. Solomon.  Do

 5    you have that in front of you?

 6         A.   Yes.

 7         Q.   Did you receive Mr. Solomon's

 8    e-mail with the attachment on or about its

 9    date?

10         A.   Yes.

11         Q.   And did you read Ms. Patrick's

12    response to Mr. Solomon's October 21st

13    letter?

14         A.   I don't have that response in

15    front of me.

16         Q.   I think it's part of the

17    exhibit.

18         A.   Oh, sorry.  Okay.  October 25.

19         Q.   Yes.  You understood that

20    Ms. Patrick's letter was in response to

21    Mr. Devine -- Mr. Solomon's October 21st

22    letter, right?

23         A.   I do remember seeing the letter,

24    yes.

25         Q.   And you recognize that it was
</pre>

21

```
 1              TIMOTHY DEVINE
 2    Ms. Patrick's response to Mr. Solomon's
 3    October 21st letter, correct?
 4         A.    What I recognize is that I did
 5    see this letter from Kathy Patrick to
 6    Mr. Solomon.
 7         Q.    You saw Ms. Patrick's statement
 8    in last paragraph of her letter that her
 9    clients did not accept the contention that
10    AFI didn't bear liability for the PLS and
11    R&W claims they were threatening, correct?
12         A.    I -- I read the letter.
13         Q.    You saw that --
14         A.    I read --
15         Q.    -- part of the letter?
16         A.    That's not what it says.
17         Q.    In the last paragraph of the
18    letter Ms. Patrick said "Our clients do
19    not, however, accept your assertion that
20    Ally Financial, Inc., does not ultimately
21    bear the liability associated with the
22    repurchase and servicing claims described
23    in my October 17th letter.  Ally does."
24              You see that?
25         A.    Yes, I saw that.
```

38

```
 1              TIMOTHY DEVINE
 2       Q.    You have seen these documents
 3  before, haven't you?
 4       A.    As I said, I don't remember in
 5  particular seeing this document.
 6       Q.    Do you know who prepared the
 7  document?
 8       A.    No.
 9            MR. KAUFMAN:  Let's mark as the
10       next exhibit an e-mail chain that runs
11       from December 7, 2011 to December 15,
12       2007.  This one has Bates number Ally
13       PEO 0042503.  So I ask that it not be
14       published on the screen.
15            (9019 Exhibit 124, e-mail chain
16       that runs from December 7, 2011 to
17       December 15, 2007, Bates Ally PEO
18       0042503, marked for identification, as
19       of this date.)
20            MR. BRYAN:  Thank you.
21       Q.    Do you have this document in
22  front of you?
23       A.    Yes.
24       Q.    And did you send the e-mail at
25  the top of the chain on December 15, 2011?
```

39

```
 1              TIMOTHY DEVINE
 2       A.    It looks like I did.
 3       Q.    And did you send that e-mail
 4   after receiving the communication from
 5   Ms. Patrick's firm forwarding draft
 6   confidentiality and tolling agreements?
 7       A.    It looks like I did.  I don't
 8   remember days of the week in December of
 9   2011.
10       Q.    The e-mail -- the e-mails
11   underneath yours reflect that Mr. Sheeren
12   sent draft confidentiality and tolling
13   agreements to Ms. Hamzephour, she
14   forwarded it to you FYI and then you
15   responded, right?
16       A.    Yeah.  I don't see any
17   attachment, unless I'm missing a page, to
18   Exhibit 124.  I just see what appears to
19   be a cover e-mail.
20       Q.    I'm aware.  We -- we looked at
21   that document, those documents before.
22   This is a continuation of the e-mail chain
23   that we looked at earlier.
24            In any event, am I correct,
25   Mr. Devine, that looking at this you
```

40

                    TIMOTHY DEVINE

1

2    received a copy of Mr. Sheeren's e-mail to

3    Ms. Hamzephour who sent it to you FYI?

4        A.    Are you referring back to

5    Exhibit 122?

6        Q.    No.  I'm referring to this

7    exhibit.

8        A.    Oh, well, as I said, there's

9    nothing attached.  So if you are asking me

10   to talk about what is attached, I can only

11   read --

12       Q.    I wasn't.  I wasn't.

13       A.    Okay, sorry.

14       Q.    I didn't ask you anything about

15   what was attached.

16           MR. BRYAN:  Why don't you just

17       rephrase the question or restate it.

18       Q.    In your e-mail, Mr. Devine, you

19   said "Pursuant to our plan I will reach

20   out to Kathy Patrick by e-mail letting her

21   know that Tammy has forwarded me the

22   correspondence and asked me to follow up.

23   First step, requesting confirmation of her

24   representation by clients."

25           You wrote that, correct?

41

1                    TIMOTHY DEVINE

2        A.    Yeah, that looks like I wrote

3   that, yes.

4        Q.    And when you said, "First step

5   requesting confirmation of her

6   representation by clients," what -- what

7   is it that you were referring to?  You

8   want to know the scope of her

9   representation and the identity of her

10  clients?

11       A.    This e-mail looks to me like an

12  e-mail that I would have written to Tammy

13  Hamzephour, who was general counsel at

14  that time for the ResCap entities.  And it

15  appears to include an understanding as to

16  what my role would be in connection with

17  what Tammy asked me to do.  That's what it

18  appears to reflect.

19       Q.    When you said "pursuant to our

20  plan," what plan was that?

21       A.    The -- the discussion there and

22  the plan that's referred to would reflect

23  a plan that the lawyers had advised and

24  recommended to the client and had

25  authority from the client to pursue.  So

62

1            TIMOTHY DEVINE

2            MR. BRYAN:  All right.  Let's

3       take a break.

4            THE VIDEOGRAPHER:  The time is

5       11:29 a.m. and we are off the record.

6            (Whereupon, there is a recess in

7       the proceedings.)

8            THE VIDEOGRAPHER:  The time is

9       11:38 a.m. and we are back on the

10      record.

11      Q.    Looking at Exhibit 130.  These

12  e-mails reflect a number of communications

13  between yourself and Mr. Franklin or his

14  colleagues; is that correct?

15      A.    I don't recognize the name Janet

16  Laughlin or Laughlin but she appears to be

17  related to the Talcott Franklin firm.

18      Q.    Did you send each of the e-mails

19  that show you as the author?

20      A.    I appear to have, sure.

21           MR. KAUFMAN:  Let's mark as the

22      next exhibit a document bearing Bates

23      number Ally 0209505 to 9508.  The

24      first page of which shows it has been

25      redacted.

63

1           TIMOTHY DEVINE

2           (9019 Exhibit 131, series of

3       redacted e-mails, Bates Ally 0209505

4       to 9508, marked for identification, as

5       of this date.)

6       Q.    I'm not sure why the first page

7   was redacted, Mr. Devine.  This is the way

8   it was produced to us.  But if you look at

9   the second and third pages, that's an

10  e-mail that you sent, is it not?

11      A.    You know what, I'm not trying to

12  be difficult, I don't see the heading of

13  that e-mail.

14      Q.    I know.  It was redacted by your

15  counsel.

16      A.    So it's really hard for me to

17  say.  I can see why you ask, it does have

18  at the third page my standard signature

19  block but -- and I'll ask Linda to look

20  for a time on calendars and so on.  But

21  that looks, the second page looks like an

22  e-mail I would have sent but I can't see

23  the signa- -- I can't see the send block.

24  So I don't know who it went to.  It looks

25  like it came from me but you can -- you

64

TIMOTHY DEVINE

1

2     can recognize I'd be hard pressed unless I

3     had that send block.

4         Q.    Do you know who you sent your

5     e-mail to?

6         A.    No.  That's what I'm struggling

7     with.

8         Q.    In the text of the e-mail on the

9     second going over to the top of the third

10    page, you were laying out strategy for

11    dealing with Tal Franklin, weren't you?

12            MR. BRYAN:  Objection to form.

13        A.    Yeah, I can see -- are you

14    referring to the last -- the

15    second-to-last paragraph on that second

16    page.

17        Q.    The whole thing.  You are urging

18    a meeting.  You are saying we can use the

19    meeting to do the following.  You are

20    saying pre- -- you're talking about

21    presetting their expectations, pulling

22    together a conversation to discuss things.

23    All of that is part of laying out a

24    strategy for dealing with Mr. Franklin,

25    wasn't it?

65

1              TIMOTHY DEVINE

2       A.    Yeah.  I can't tell.  It appears

3    to be but, again, without that front page

4    I'm a little bit hamstrung.

5       Q.    In the second page -- sorry,

6    second paragraph of the e-mail which

7    begins on the second page you said we

8    ought to have a meeting with them pointing

9    out that you had pushed them off at the

10   last minute on February 2nd meeting.

11            Do you see that?

12      A.    Yes.

13      Q.    Why had you pushed that

14   February 2 meeting off?

15      A.    I don't remember if that's the

16   one in particular.  But I remember that we

17   did push off one Talcott Franklin meeting

18   when my mother-in-law was dying.

19            MR. KAUFMAN:  Let's mark as the

20       next exhibit an e-mail chain on

21       March 6, 2012, all showing a subject

22       of Tolling Agreement Request.

23            (9019 Exhibit 132, e-mail chain

24       dated March 6, 2012, subject, Tolling

25       Agreement Request, marked for

75

1            TIMOTHY DEVINE

2        Q.    And did you receive the e-mails

3    from Jeff Cancelliere and Patty Zellman

4    above your e-mail?

5        A.    Yes, it looks like I did.

6            MR. KAUFMAN:  Let's mark as the

7        next exhibit another e-mail chain,

8        this one on March 22nd to March 23,

9        2012.

10            (9019 Exhibit 133, e-mail chain

11        dated March 22nd to March 23, 2012,

12        marked for identification, as of this

13        date.)

14            MR. PRINCI:  What exhibit is

15        this?

16            THE COURT REPORTER:  133.

17            MR. PRINCI:  Pardon?

18            MR. KAUFMAN:  133.

19            MR. PRINCI:  Thank you.

20        Q.    Looking at the first e-mail in

21    the chain from David Sheeren to you on

22    March 22, 2012, at 10:09 a.m., did you

23    receive that e-mail from Mr. Sheeren?

24        A.    It looks like I did, yes.

25        Q.    And did you receive -- although

76

```
 1            TIMOTHY DEVINE

 2    it's not attached, did you receive a

 3    template for the RMBS pool data and a

 4    blank sheet for the most frequent --

 5    frequent repurchase reps along with it?

 6        A.    I -- I don't remember.  I assume

 7    I did.  I don't remember though.

 8        Q.    Okay.  Did you send Mr. Sheeren

 9    a response on March 23 at 10:33 a.m.?

10        A.    Yes.

11        Q.    And did you recommend in that

12    e-mail a call to walk through

13    Mr. Sheeren's chart with him?

14        A.    Yes.

15        Q.    And did you also send the e-mail

16    at the top of the exhibit on March 23,

17    2012, the one you sent to Ms. Rosten?

18        A.    Yes.

19        Q.    And in that e-mail you ask

20    Ms. Rosten to work with Mr. Sheeren to set

21    up a regular meeting every other week with

22    him or others at his firm concerning rep

23    and warranty issues, correct?

24        A.    Yes.

25        Q.    Was that done?
```

77

TIMOTHY DEVINE

1

2      A.    Yes, I believe that was done.

3      Q.    Okay.

4      A.    I think if -- if you go back to

5  the bottom of that exhibit, 133, I'm not

6  sure if it was the exact same meeting

7  or -- or whether it was that meeting

8  schedule that Linda Rosten was setting up

9  but I asked to make sure to include John

10  Ruckdaschel.

11          MR. KAUFMAN:  Let's mark as the

12      next exhibit a March 23, 2012 e-mail

13      to Mr. Devine from Ginger Cavanaugh,

14      attached to which is a letter dated

15      March 22, 2012, from Talcott Franklin

16      to Mr. Devine.

17          (9019 Exhibit 134, March 23,

18      2012 e-mail to Mr. Devine from Ginger

19      Cavanaugh, with attached letter dated

20      March 22, 2012 from Talcott Franklin

21      to Mr. Devine, marked for

22      identification, as of this date.)

23      A.    Thank you.

24      Q.    Looking at what we just marked,

25  did you receive this e-mail and attachment

78

```
 1              TIMOTHY DEVINE

 2    on March 23, 2012?

 3         A.    It looks like it, yeah.

 4         Q.    Looking at the letter from

 5    Mr. Franklin that's attached, Mr. Franklin

 6    expressed frustration about the progress

 7    of negotiations with him; is that correct?

 8              MR. PRINCI:  Objection as to

 9         form.

10         Q.    That is the substance of his

11    letter?

12         A.    Just a moment.  I --

13         Q.    Sure.  Take your time.

14         A.    Okay.  I have completed reading

15    the letter.  Thanks.

16         Q.    And in substance, Mr. Franklin

17    expressed -- expressed frustration about

18    the progress of negotiations with him; is

19    that right?

20              MR. BRYAN:  Object to form.

21              MR. PRINCI:  Objection to form.

22         A.    I -- I think the letter speaks

23    for itself.  I'd -- I'd be hard pressed to

24    characterize it in summary fashion.

25         Q.    You would?
```

79

1          TIMOTHY DEVINE

2     A.    Yes.

3     Q.    Mr. Franklin complained

4   specifically in the third paragraph of his

5   letter that meetings had been delayed and

6   that Ally had failed to provide responses

7   to offers of compromise or to move

8   negotiations forward, right?

9     A.    That's what it says.

10    Q.    And you understood when you

11  received his letter that he was

12  essentially threatening that if things

13  didn't move forward to his satisfaction,

14  that would be some consequences?

15    A.    If you are asking me how I

16  responded to him, I can answer that

17  question.  If you are asking me what I

18  thought and what my mental impressions

19  were against this potential adversary, I'm

20  not going to answer it.

21    Q.    I'm only -- you -- you are

22  saying you won't tell me whether you

23  understood upon receiving the letter that

24  Mr. Franklin was threatening you if things

25  didn't move forward to his satisfaction?

80

1              TIMOTHY DEVINE

2              MR. BRYAN:  I think the letter

3         speaks for itself.  If you are asking

4         him what did -- if you want him to

5         paraphrase the letter, if that's what

6         the goal of the question is --

7         Q.   I did neither.  I want to know

8    whether you understood when you received

9    the letter that to be the case?

10             MR. BRYAN:  Understood what to

11        be the case?

12             MR. KAUFMAN:  That Mr. Franklin

13        was threatening that if things didn't

14        move forward to his satisfaction,

15        there would be consequences.

16             MR. BRYAN:  Objection to the

17        form.

18        A.   I can see reading the letter

19   here now that he was apparently frustrated

20   but you'd probably be better to ask him

21   exactly what he intended to communicate by

22   the letter.

23        Q.   I know what he wrote.  I was

24   only asking what your understanding of

25   what he was saying was when you got it.

81

```
 1              TIMOTHY DEVINE

 2      Are you telling me you are not going to

 3      answer that question?

 4          A.    What my mental impressions were

 5      of this potential adversary in litigation?

 6          Q.    Yes.

 7          A.    Yes, I'm not going to answer

 8      that.

 9          Q.    Okay.

10              MR. KAUFMAN:  Let's mark as the

11          next exhibit an e-mail chain between

12          Mr. Devine and Kathy Patrick on

13          April 5, 2012.

14              (9019 Exhibit 135, e-mail chain

15          between Mr. Devine and Kathy Patrick

16          on April 5, 2011, marked for

17          identification, as of this date.)

18          Q.    Looking at what we have just

19      marked, is this an exchange of e-mails you

20      had with Ms. Patrick on April 5, 2012?

21          A.    Yes, that's what it looks like.

22      Yes.

23              MR. KAUFMAN:  Let's mark as the

24          next exhibit an e-mail from Mr. Devine

25          to Ms. Patrick on April 16, 2012.
```

82

```
 1              TIMOTHY DEVINE

 2       Attached to which is a draft

 3       confidentiality agreement.

 4              MR. PRINCI:  Is this Exhibit

 5       136?

 6              THE COURT REPORTER:  Yes.

 7              (9019 Exhibit 136, e-mail from

 8       Mr. Devine to Ms. Patrick dated

 9       April 16, 2012, with attached draft

10       confidentiality agreement, marked for

11       identification, as of this date.)

12       A.     Thank you.

13       Q.     Looking at the document we just

14    marked, did you send this e-mail to

15    Ms. Patrick with the attached draft on

16    April 16, 2012?

17       A.     Yes.  It looks like that's

18    exactly what I did.

19       Q.     Let me show you the document

20    that has been marked previously as

21    Exhibit 76, which is an e-mail chain on

22    April 17, 2012.  And let me direct your

23    attention to the e-mail at the top of the

24    first page, the one from you to Gary Lee

25    and Tammy Hamzephour at 9:57 a.m.
```

83

1                    TIMOTHY DEVINE

2              Do you see that?

3       A.    Sorry.  Say that again, please.

4       Q.    The e-mail at the top of the

5    first page of the exhibit from you to

6    Mr. Lee and Ms. Hamzephour at 9:57 a.m.

7    Do you see that?

8       A.    From me -- at the top of the

9    first page?

10      Q.    Correct.

11      A.    Yes.

12      Q.    Did you send that e-mail?

13      A.    It looks like I do.

14      Q.    And your e-mail reported on a

15   conversation you had with Mr. Lee the day

16   before, was that correct?

17      A.    Yes.

18      Q.    And one of the things you had

19   talked about with Mr. Lee was whether to

20   include a dollar figure or dollar figures

21   for a potential contribution from AFI in a

22   presentation to Ms. Patrick; is that

23   correct?

24      A.    Yes.

25      Q.    And you said that you didn't

84

```
 1            TIMOTHY DEVINE
 2    think a potential dollar range should be
 3    shared with Kathy Patrick at that point;
 4    is that correct?
 5        A.    Yes.
 6        Q.    Why not?  Why did you think that
 7    a dollar figure should not be shared with
 8    her?
 9        A.    Are you asking me what I thought
10    or what I said to Gary and Tammy about
11    what I thought?  Because if you want to
12    know my answer, I can answer the second
13    one.
14        Q.    Answer the second one.
15        A.    Okay.  What I said to Gary and
16    Tammy was that the business hasn't gotten
17    to an Ally Financial, Inc. number yet.
18    Meaning AFI and ResCap have not come to an
19    understanding as to the amount that the
20    parent AFI and the debtors would agree to
21    in their separate negotiations.
22        Q.    Are you finished?
23        A.    Yeah.
24        Q.    You also said "Can always share
25    with her at next round of discussion."
```

85

```
 1              TIMOTHY DEVINE
 2   What made you think that at the next round
 3   of discussion you'd have such a figure to
 4   share with her?
 5        A.   I don't remember in particular
 6   but as I understood it, those negotiations
 7   were going on and if they had arrived at a
 8   number and an agreement at a number, then
 9   we would have been able to share it with
10   Kathy Patrick.
11        Q.   Let me show you the document
12   that's been marked previously as
13   Exhibit 79, which are e-mails between
14   yourself and Ms. Hamzephour.
15             Did you send the e-mail at the
16   bottom of this exhibit to Ms. Hamzephour
17   on April 23, 2012?
18        A.   That's what it looks like, yes.
19        Q.   And am I correct that this
20   e-mail was in preparation for an upcoming
21   meeting with Kathy Patrick?
22        A.   Just one moment.  Let me refresh
23   my memory.  Yes, I think that's right in
24   the timeline.
25        Q.   And specifically this was about
```

86

```
 1              TIMOTHY DEVINE
 2    what information should be presented to
 3    Ms. Patrick in a waterfall presentation;
 4    is that correct?
 5         A.    It -- it regards certain
 6    information that should be presented in a
 7    waterfall for Kathy Patrick.
 8         Q.    And -- and among those things
 9    you recommended using 3 billion, 4 billion
10    and 6 billion as the low, medium, high
11    valuations of PLS and R&W exposure; is
12    that correct?
13              MR. BRYAN:  Objection.
14         Q.    Isn't that what you are
15    referring to in the first sentence to
16    Ms. Hamzephour?
17              MR. BRYAN:  Objection to the
18         form.
19         A.    No, that's not what I was
20    referring to.
21         Q.    You say "would like to recommend
22    3, 4, 6 rather than -- rather than 4, 5, 6
23    as low, medium, high."  Weren't you
24    recommending -- let me ask you this first.
25    The 3, 4, 6, that -- that referred to
```

87

1            TIMOTHY DEVINE

2    billions, correct?

3        A.    Yes.

4        Q.    And you were recommending using

5    3 billion, 4 billion and 6 billion as the

6    low, medium and high valuations to be

7    included in a waterfall presentation to

8    Ms. Patrick, correct?

9            MR. BRYAN:  Objection to form.

10       A.    I don't know what you mean by

11   valuations in that question.

12       Q.    What did the 3, 4, 6 refer to?

13       A.    That referred to, as I sit here

14   today and recollect, three potential

15   hypothetical scenarios involving what I

16   understood at the time to be ResCap's

17   presentation to the Kathy Patrick team

18   regarding potential allowed claims for the

19   class of claimants of which the Kathy

20   Patrick clients represented one part.

21       Q.    Okay.  And you said to

22   Ms. Hamzephour that you would provide

23   analytics to support those values,

24   correct?

25       A.    I said I will provide analytics

88

1                    TIMOTHY DEVINE

2      to demonstrate how one could get to 3 or 4

3      or 6 billion.

4           Q.    Okay.  And did you have those

5      analytics?

6           A.    I don't recall whether I had

7      them as of April 23 or not.

8           Q.    Okay.  You also recommended

9      using $750 million rather than $1 billion

10     as a potential AFI contribution; is that

11     correct?

12          A.    Yes, that is correct.

13          Q.    And as to that you said, "I

14     don't have basis to say it should be a

15     billion and it would be better to leave

16     some room for negotiation."

17                Do you see that?

18          A.    I see that.

19          Q.    Okay.  Then you went on to say,

20     "If we want to use a billion we will need

21     clearance from AFI and I haven't spoken to

22     Mike."  Were you referring to

23     Mr. Carpenter there?

24          A.    Yes.

25          Q.    What made you choose 750 million

89

1              TIMOTHY DEVINE

2    as the potential AFI contribution to show

3    Ms. Patrick at this point?

4         A.    Sitting here today, my best

5    memory is that I must have heard

6    discussion in the separate conversation

7    over an AFI and ResCap settlement that

8    used the term -- the -- the figure 750.

9         Q.    Okay.

10        A.    But even as I sit here today, I

11   recognized that that conversation was

12   ongoing.  And the only reason that a

13   figure was being used in these ResCap

14   waterfalls at all was so that ResCap could

15   at least put a placeholder out in front of

16   these potential claimants.

17        Q.    Okay.

18        A.    It wasn't a final figure, in

19   other words.

20        Q.    When you say you must have heard

21   discussion.  Discussion between whom?

22        A.    Well, it would have come from

23   folks who were aware of the status of the

24   other conversation -- the other

25   negotiation.

90

1          TIMOTHY DEVINE

2      Q.   Who was that?

3      A.   It could have been lawyers.  It

4  could have been business people who

5  were -- who had heard that figure.

6      Q.   Who reported it to you?

7      A.   I don't remember.

8      Q.   Did you have clearance to

9  include a 750 dollar -- 50 million dollar

10 number in a waterfall presentation to

11 Ms. Patrick at this point?

12          MR. PRINCI:  Objection as to

13     form.

14     A.   Well, first of all, it wasn't --

15 it wasn't an Ally waterfall.  And I was

16 simply recommending -- I had been

17 presented a draft waterfall to which I was

18 responding in this e-mail to Tammy

19 Hamzephour.  And reading backward in time

20 it appears that the draft I saw had a

21 $1 billion figure as a potential AFI

22 contribution.  And my recommendation to

23 Tammy was that she not include 1 billion,

24 as I felt it would have been misleading

25 given the status of the separate

91

1                    TIMOTHY DEVINE

2    negotiation as I understood it to -- to

3    stand that day.

4        Q.    By saying that using

5    $750 million would leave some room for

6    negotiation, you had reason to believe,

7    didn't you, that AFI's contribution could

8    go higher?

9             MR. BRYAN:   Objection to form.

10       A.    If I remember correctly, the

11   draft that I saw started with what I think

12   they were calling at that time a base

13   case, which was a $0 contribution of AFI

14   to the estates.   And then I think that

15   they went to 250, 500 and 750.   So I had

16   reason to believe that it could be as low

17   as 0 and as I indicate here, up to 750.

18       Q.    No, Mr. Devine, you said that

19   using 750 million would leave some room

20   for negotiation.   Are you telling me you

21   had no reason to believe that AFI's

22   contribution could go higher than that?

23            MR. BRYAN:   Objection to form.

24            MR. PRINCI:   Objection as to

25        form.

92

1              TIMOTHY DEVINE

2        A.    All I can say is that I had no

3    reason to believe that using a billion

4    would be an appropriate number for ResCap

5    to use at that time.

6        Q.    Okay.  Well, you were

7    recommending that 750 million be put on

8    the table for a waterfall presen- --

9    withdrawn -- that 750 million be used in a

10   waterfall presentation as the high end

11   contribution from AFI at that point,

12   right?

13       A.    Right.  Rather than a billion.

14       Q.    Okay.  And --

15       A.    Because there was no basis for a

16   billion at that time.

17       Q.    Mr. Devine, you are an

18   experienced negotiator, aren't you?

19            MR. PRINCI:  Objection to form.

20       A.    I -- I have negotiated

21   settlements before.

22       Q.    You wouldn't have put your

23   absolute top dollar on the table to start

24   a negotiation with Ms. Patrick, would you

25   have?

93

1              TIMOTHY DEVINE

2              MR. BRYAN:  Objection to form.

3         A.    If you are asking me what I

4    would or would have done (sic) on behalf

5    of the client at that time, that would

6    require me to speculate.  If you are re-

7    -- if you are asking me why I said to

8    Tammy Hamzephour it would be better to

9    leave some room for negotiation, I can

10   answer.  And the answer would be I was

11   mistaken.  I mistakenly assumed that -- I

12   was mis -- I was badly informed and I

13   overspoke with regard to the status of the

14   communications at that point.

15              I regret having put that in

16   there because I really had no knowledge

17   and it was foolish of me to put that

18   statement in there.

19        Q.    Were you chastised by anyone for

20   doing that?

21        A.    No.  I just feel bad about it

22   because it -- it was inaccurate.  It was

23   an inaccurate statement of the status of

24   the communication.

25        Q.    And you don't remember from what

94

1        TIMOTHY DEVINE

2   source you received that communication?

3        A.    No.

4        Q.    Okay.  Whatever contribution AFI

5   was going to make towards this proposed

6   settlement with Ms. Patrick, it was going

7   to require releases from both the PLS, R&W

8   claimants and ResCap, correct?

9           MR. BRYAN:  Objection to form.

10       A.    Sorry, that -- sorry.  I want to

11  make sure I understood your question.

12  Will you please repeat it.

13       Q.    Whatever contribution AFI was

14  going to make towards this proposed

15  settlement with Ms. Patrick, it was going

16  to require releases from both the PLS, R&W

17  claimants and ResCap; is that correct?

18           MR. PRINCI:  Objection as to

19      form.

20           MR. BRYAN:  Same objection.

21       A.    So it sounds now I better

22  understand your question like you are

23  asking me to speculate as to what possible

24  outcomes could have occurred at that point

25  in the negotiation.

95

1           TIMOTHY DEVINE

2        Q.    I'm not asking you to speculate.

3    I'm asking you to tell me at the time that

4    you were preparing to provide this

5    waterfall presentation to Ms. Patrick in

6    connection with proposed settlement with

7    her, wasn't it your understanding that AFI

8    in return for whatever contribution it

9    would be making to that settlement was

10   going to require releases from both the

11   PLS claimants as well as ResCap?

12       A.    Couple -- couple points in

13   response.  One, I wasn't preparing the

14   waterfall.

15            Two, we were not negotiating,

16   Kathy Patrick and me -- Kathy Patrick and

17   I with regard to whether or not the 750

18   would be consideration for anything that

19   the debtor received in connection with the

20   resolution of a debtor and Kathy Patrick

21   settlement agreement.

22       Q.    Weren't those things all being

23   negotiated together, Mr. Devine?

24       A.    The 750 was not being negotiated

25   with Kathy Patrick.

96

1          TIMOTHY DEVINE

2       Q.    I understand that.  But in order

3    to make a settlement with her there had to

4    be some contribution from AFI, right?

5          MR. PRINCI:  Object to form.

6       A.    You'd have to ask Kathy Patrick

7    what she was looking for in that regard.

8       Q.    What was the point of including

9    a $750 million number as a contribution

10   from AFI in a waterfall presentation to

11   Ms. Patrick if it wasn't understood that

12   in order to make any settlement there was

13   going to have to be a contribution from

14   AFI?

15          MR. BRYAN:  Objection to form.

16          MR. PRINCI:  Objection as to

17      form.

18      A.    Now I understand your question.

19   So as I understand it at the time the

20   waterfalls, and I'm trying to remember

21   this, I don't -- there's no attachment to

22   the exhibit, but I think that the

23   waterfalls included 0 contribution from

24   Ally up to 750 million contribution from

25   Ally.  And if you are asking me what was

97

TIMOTHY DEVINE

1

2      ResCap trying to get done at that time, I

3      understood from Tammy Hamzephour and Gary

4      Lee that ResCap was trying to give Kathy

5      Patrick a hypothetical fully sort of

6      caveated vision of some possible scenarios

7      in the event that they struck a deal, that

8      is, ResCap and Kathy Patrick, in

9      connection with a ResCap filing and an

10     allowed claim and so on.  And without --

11     without -- Kathy Patrick at that time had

12     been duly informed that there was a

13     potential for an Ally and ResCap

14     settlement which would have or could have

15     included some contribution by Ally into

16     the estate.  And so she was trying to

17     understand what potential such a

18     contribution, either from 0 up to 750,

19     would mean for her clients as she

20     evaluated for her part the -- the

21     settlement that was being negotiated

22     between ResCap and Kathy Patrick.

23          Q.    And you understood, didn't you,

24     that if AFI were to make a contribution

25     towards that settlement it was going to

98

1          TIMOTHY DEVINE

2    require releases both from the R&W

3    claimants as well as from ResCap?

4          MR. BRYAN:  Object to form.

5       A.    So if -- if I understand your

6    question, what I communicated to Kathy

7    Patrick was that in connection with the

8    settlement agreement she was trying to

9    reach with the debtor, for which she

10   sought Ally's support and assurance that

11   Ally wouldn't object to it, Ally would

12   seek a release -- Ally would seek the

13   support of her clients of the plan that

14   was being negotiated between ResCap and

15   Ally at the time.

16      Q.    And that plan would include

17   releases both from third-party claimants

18   such as her clients and ResCap, right?

19      A.    The plan being negotiated

20   between ResCap and Ally?

21      Q.    Yes.

22      A.    The plan being negotiated

23   between ResCap and Ally would include a

24   debtor release as well as a provision for

25   third-party nonconsensual releases, that's

99

1              TIMOTHY DEVINE

2   correct.

3        Q.    Okay.

4        MR. KAUFMAN:  Let's mark as the

5   next exhibit an e-mail on April 24,

6   2012, from Mr. Devine.

7            (9019 Exhibit 137, WITHDRAWN,

8   marked for identification, as of this

9   date.)

10       Q.    Looking at the document we've

11  just marked, Mr. Devine, did you send this

12  e-mail on April 24th?

13       MR. BRYAN:  Again, Phil, can you

14  represent that this was not on our

15  clawback list?

16       MR. KAUFMAN:  I don't have your

17  list in front of me, Patrick.

18       MR. BRYAN:  I believe this one

19  plainly is.

20       MR. KAUFMAN:  I don't -- you

21  believe this is on your clawback list?

22       MR. BRYAN:  I do.

23       MR. KAUFMAN:  Do you have a copy

24  of your list?

25       MR. BRYAN:  We can take a break

121

1          TIMOTHY DEVINE

2      Q.    Focusing on the e-mail that

3   starts on the bottom of the first page and

4   continues over to the second.  That's an

5   e-mail you sent to Mr. Solomon and others

6   on April 27th, correct?

7      A.    Just a moment, please.

8          Okay.  Sorry, I'm ready to

9   answer your question.

10      Q.    Is that an e-mail you sent to

11   Mr. Solomon and others on April 27th?

12      A.    Yes.

13      Q.    And you reported in your e-mail

14   a conversation you had just had with

15   Ms. Patrick, correct?

16      A.    Yes.

17      Q.    And was that an accurate summary

18   of your conversation with Ms. Patrick?

19      A.    I assume it was.

20      Q.    The next e-mail up is from

21   Mr. Solomon at 8:48 p.m.  Did you receive

22   that e-mail?

23      A.    Yes, it looks like I did.

24      Q.    And then you responded to

25   Mr. Solomon at 8:50 p.m., correct?

1                  TIMOTHY DEVINE

2        A.    Yes.

3        Q.    And the last line of your

4    response you said "Lots to do and have to

5    manage all client expectations since KP's

6    clients will take several hacks at us."

7              To what clients were you

8    referring?

9        A.    I assume I was referring to the

10   clients that KP had identified.

11       Q.    Okay.  When you said "have to

12   manage all client expectations," which

13   client or clients were you talking about

14   there?

15       A.    I was probably referring to the

16   ResCap client as well as the Ally client.

17       Q.    And how did you believe those

18   expectations had to be managed?

19             MR. BRYAN:  Objection to form.

20             MR. KAUFMAN:  Let me withdraw

21       it.

22       Q.    What expectations of those

23   clients did you believe had to be managed?

24       A.    I'm trying to put myself back in

25   time.  It wasn't clear to me that Kathy

123

TIMOTHY DEVINE

1

2    Patrick and her clients were going to --

3    it wasn't clear to me at that time that a

4    deal was going to get done.  And I assume

5    that's what I meant by having to manage

6    client expectations with regard to whether

7    a deal was going to get done or not.

8         Q.    Okay.  And how did you believe

9    those expectations concerning whether a

10   deal could get done needed to be managed?

11         MR. BRYAN:  Objection to form.

12         A.    I'm going to try and understand

13   your question better but would you please

14   clarify.

15         Q.    You said "have to manage all

16   client expectations."  And you explained

17   that those expectations had to do with

18   whether or not a deal with Ms. Patrick's

19   clients could get done, right?

20         A.    That's my best memory of what I

21   was talking about.  I confess I don't

22   remember exactly what I was talking about.

23         Q.    How did you propose to manage

24   those expectations?

25         A.    How in terms of who I'd speak

124

TIMOTHY DEVINE

1

2        with or how in terms of what actions would

3        be taken?

4             Q.    Both.

5             A.    I don't remember.

6             Q.    Who was going to do the

7        managing, you?

8                  MR. BRYAN:  Object to form.

9             A.    I -- I think the client

10       expectations, you can see who is on the

11       e-mail here.  You've got Gary Lee and

12       you've got Tammy Hamzephour.  So I assume

13       that they would be managing whatever

14       expectations the ResCap client had.  And

15       we have got Bill Solomon, Rick Cieri and

16       Ray Schrock who together would be managing

17       client expectations at Ally.

18            Q.    What client were you on?

19                 MR. BRYAN:  Objection to form.

20            Q.    Were you the lawyer for the

21       situation or were you on the Ally side?

22                 MR. PRINCI:  Objection as to

23            form.

24                 MR. BRYAN:  Objection to form.

25            A.    With regard to the April 27 --

125

1                    TIMOTHY DEVINE

2      with regard to finalizing the deal with

3      Kathy Patrick in the role of reporting

4      back here in the e-mail Friday, April 27

5      it looks like 8:00 at night, I was

6      reporting back to Ally and ResCap teams

7      with regard to the conversation with Kathy

8      Patrick.  It could be that Gary Lee was

9      having conversations at the same time, I

10     don't know.  But what I reported was that

11     I had spoken with her and it looked like

12     essentially a pretty positive and upbeat

13     status report at that time.

14          Q.    Okay.

15          A.    So --

16          Q.    I was referring to your

17     statement that, "have to manage all client

18     expectations."  I'm trying to figure out

19     which client or clients were you managing?

20          A.    I wasn't managing --

21               MR. BRYAN:  Asked and answered.

22          A.    -- any client.

23          Q.    So everyone else that you

24     e-mail -- sent your e-mail to was doing

25     some managing but you weren't doing any,

126

1                TIMOTHY DEVINE

2    is that what you're saying?

3              MR. BRYAN:  Objection to form.

4              MR. PRINCI:  Objection as to

5        form.

6        A.    I'm saying I wasn't managing any

7    client.  If you're talking about managing

8    expectations --

9        Q.    I'm talking managing

10   expectations.

11       A.    Oh, that's different.

12       Q.    Whose cli- -- which client

13   expectations were you managing?

14       A.    I was --

15             MR. BRYAN:  Objection to form.

16       A.    I was providing information to

17   Tammy and Gary for their advice to the

18   ResCap clients and I was providing

19   information to Rick and Ray and Bill with

20   regard to the Ally client.  But clearly by

21   that point I would have been participating

22   in attorney-client discussions with the

23   Ally client with regard to the Kathy

24   Patrick discussions.

25             MR. KAUFMAN:  Let's mark as the

137

1                TIMOTHY DEVINE

2       investor/securities litigation."  And

3       there's a $400 million number next to

4       that.  Wasn't that some estimate of the

5       possible or reasonably possible range of

6       loss for securities litigation?

7                MR. BRYAN:  Object to form.

8          A.    Yeah.  Well, there's a lot of

9       detail behind that line.  And as I sit

10      here today, I just can't remember the

11      detail.  But as I recall, that would have

12      been a number subject to a variety of

13      stresses that were imposed on the process

14      from outside of this sort of legal

15      advisory function.

16         Q.    Right.  Okay.

17         A.    That's the more complete answer.

18         Q.    Let me show you what's been

19      marked previously as Exhibit 83.

20         A.    Thank you.

21         Q.    Which is an e-mail chain on May

22      4, 2012.  There are two e-mails in this

23      exhibit.  Did you receive the one from

24      Mr. Lee on May 4?

25         A.    Yeah, it looks like I did.  Yes.

138

TIMOTHY DEVINE

1

2      Q.    And is the e-mail above that

3   your response to Mr. Lee?

4      A.    Yes.  That's what it looks like.

5      Q.    Mr. Lee referred to a call or

6   meeting with Ms. Patrick that day.  And

7   you said our notes match.  Were you and

8   Mr. Lee both on a call with Mr. Patrick --

9   sorry -- with Ms. Patrick on May 4th?

10     A.    I -- I don't remember.  What --

11   what I do remember is that Gary Lee was

12   having a variety of conversations with

13   Kathy Patrick during that period, some of

14   which I would have been included on and

15   some of which I wouldn't have been

16   included on.

17     Q.    Well, he was summarizing in an

18   e-mail what Ms. Patrick had proposed that

19   day.  And you said, "Our notes match."  So

20   you must have been on that call, right?

21          MR. PRINCI:  Objection as to

22      form.

23     A.    Yeah, might.  The reason I

24   clarified my answer is that it could be

25   that he was summarizing calls or meetings

139

1                    TIMOTHY DEVINE

2      that took place outside of my presence.

3           Q.    You said our notes match --

4           A.    So --

5           Q.    Didn't that indicate your

6      agreement with the summary he provided to

7      you?

8                MR. BRYAN:  Object to form.

9           A.    Yeah.  So as I recall during

10     those days, as I said, there were times

11     when I was talking with Kathy Patrick and

12     there were times when Gary Lee was talking

13     to Kathy Patrick.  So it's just as

14     reasonable in the misty fog of my memory

15     right now to understand our notes match to

16     describe a separate conversation that I

17     had with Kathy Patrick with the agreement

18     as Gary Lee describes it here.

19               It's possible that we were in

20     the same meeting and that that's what that

21     e-mail means.  It's also possible that we

22     were in separate meetings and we were

23     comparing notes as to our understanding of

24     what KP was proposing.

25          Q.    Okay.  In any event, your

140

TIMOTHY DEVINE

1

2 understanding of the conversations with

3 Ms. Patrick matched the summary that

4 Mr. Lee provided in the e-mail to you; is

5 that correct?

6     A.    That's correct.

7     Q.    Okay.  The five points listed by

8 Mr. Lee were the essential terms of the

9 deal you were discussing with Ms. Patrick

10 at that time; is that correct?

11     A.    No.

12     Q.    No.  No?

13     A.    No.

14     Q.    Oh, okay.  In point 4 of his

15 e-mail, Mr. Lee wrote, "The KP group will

16 enter into a plan support agreement which

17 would support the DIP, sale, sale process,

18 servicing, shared services and plan

19 releases provide that Ally contributes no

20 less than X dollars in cash."

21     Do you see that?

22     A.    I see that, yes.

23     Q.    And the plan releases that you

24 understood Mr. Lee was referring to there

25 were third-party releases to AFI and a

141

```
 1              TIMOTHY DEVINE
 2    release from ResCap to AFI; is that
 3    correct?
 4         A.    Are you referring to number 4
 5    only --
 6         Q.    That is what I'm referring to.
 7         A.    -- in isolation?  Out of
 8    context, number 4?
 9         Q.    When you received Mr. Lee's
10    e-mail --
11         A.    Yeah.
12         Q.    -- and responded to him that
13    your notes matched his, I'm asking you
14    whether you understood he was referring
15    there in number 4 to the plan releases
16    that would be received by Ally from both
17    ResCap and third-party claimants?
18         A.    I would say, as I sit here
19    today, plan releases would refer to, at a
20    minimum, the plan.  The debtor release and
21    the third-party nonconsensual release.
22         Q.    Okay.  Now, the minimum
23    contribution from AFI in return for those
24    releases is set -- is set forth in
25    Mr. Lee's e-mail as X dollars in cash.  Do
```

142

1              TIMOTHY DEVINE

2    you see that?

3        A.    I see that.

4        Q.    He just has an X.

5        A.    Yes.  I see that that number 4

6    refers to X dollars in cash.

7        Q.    As of May 4 was the amount of

8    AFI's contribution still open with respect

9    to Ms. Patrick?

10       A.    I don't -- I don't remember.

11       Q.    As of May 4 how much was

12   Ms. Patrick demanding from AFI to enter

13   into a plan support agreement as part of

14   her settlement?

15            MR. PRINCI:  Objection as to

16       form.

17            MR. BRYAN:  Objection to form.

18       A.    Kathy Patrick wasn't demanding a

19   certain amount of money from AFI into the

20   estate.

21       Q.    Had she indicated to you that

22   the amount of AFI's contribution was

23   unimportant to her?

24       A.    Had she indicated that it was

25   unimportant what AFI put in the estate?

143

TIMOTHY DEVINE

1

2      Q.    Yes.

3      A.    No, she did not indicate that to

4  me.

5      Q.    Did she indicate that it was

6  important?

7      A.    Yes.

8      Q.    Okay.  What did she say about

9  that?

10      A.    Kathy Patrick understood that

11  the negotiation of a dollar number between

12  AFI and ResCap was going on separately

13  from the discussions over the RMBS

14  settlement.  Notwithstanding that, she

15  understood that she had no direct role

16  or -- or standing to bargain for a number

17  there since the number -- since that

18  agreement was between the estate and Ally.

19  She did care about the number and she told

20  me that she cared about the number for the

21  obvious reason that she wanted to maximize

22  that figure from Ally Financial.

23      Q.    But as of May 4th, had she

24  expressed an amount that she expected from

25  AFI if she were going to proceed with a

144

```
 1              TIMOTHY DEVINE

 2    settlement?

 3         A.    I don't remember as of May 4th.

 4         Q.    Okay.

 5         A.    The days -- it's going to be

 6    very difficult for me to remember the

 7    particular days.  Those conversations were

 8    very concentrated during that time.

 9         Q.    Well, the amount of AFI's

10    contribution towards this settlement was

11    important to AFI, wasn't it?

12         A.    Toward the -- toward the ResCap

13    settlement?

14         Q.    In this settlement.

15         A.    Well, we weren't -- we weren't

16    contributing to this settlement.

17         Q.    Yeah, okay.  I guess technically

18    that may have been true, Mr. Devine, but

19    you certainly understood as both

20    negotiations were proceeding that the

21    money, whatever it might be, that AFI was

22    going to settle with ResCap for was going

23    to wind up in a settlement with

24    Ms. Patrick, right?

25              MR. PRINCI:  Objection as to
```

145

1                TIMOTHY DEVINE

2       form.

3            MR. BRYAN:   Same objection.

4       A.    What -- I certainly understood

5       that Kathy Patrick was negotiating with

6       ResCap for an allowed claim which would

7       govern or -- govern in part or would

8       potentially go toward resolution of the

9       eventual disbursement to her clients and

10      the class that are clients were in in the

11      estate.   And that obviously the quantum of

12      the recovery of the estate, from whatever

13      source, was very interesting to her and

14      her clients.

15      Q.    And the amount that AFI would be

16      paying for the releases from ResCap and

17      third parties was important to AFI, was it

18      not?

19      A.    Yes.

20           MR. BRYAN:   Object to the form.

21      Q.    Okay.

22           MR. KAUFMAN:   Why don't we take

23      a lunch break now.   It's 1:30.

24           MR. BRYAN:   What time do you

25      want to reconvene?

155

1        TIMOTHY DEVINE

2            (9019 Exhibit 142, e-mail chain

3        dated May 6, 2012, marked for

4        identification, as of this date.)

5        Q.    Looking at what we've just

6    marked, the first e-mail in the chain,

7    which starts at the very bottom of the

8    first page and goes over to the second

9    page, is from you to Mr. Renzi and Jeff

10   Cancelliere, correct?

11       A.    Yes.

12       Q.    And you sent that e-mail?

13       A.    Cc'ing Gary Lee at MoFo, yes.

14       Q.    And you wanted to see how

15   waterfalls would look with certain

16   assumptions built into them; is that

17   correct?

18       A.    I was providing them figures it

19   looks from here -- I don't have present

20   recollection of what I was doing but it

21   looks from this distance that I was

22   providing them figures to fill in on a

23   waterfall that was apparently in process.

24   I don't know as I look here, because it's

25   only a two-page exhibit, whether or not I

156

                    TIMOTHY DEVINE

1

2    originated this subject help with

3    waterfall before 8:00 p.m. if possible or

4    if this is part of a longer e-mail

5    communication string.

6        Q.    Whether or not it's part of a

7    longer e-mail communication string,

8    Mr. Devine, in your e-mail to

9    Mr. Cancelliere and Mr. Renzi you asked

10   them to assume certain figures and plug

11   them in to two possible waterfall

12   scenarios, correct?

13       A.    Yes, that's correct.

14       Q.    And in each case you wanted it

15   assumed that Ally's contribution to a

16   settlement would be 750 cash, plus 200 for

17   HFS, plus 100 for originations, right?

18       A.    Yes.

19       Q.    What did 200 for HFS signify?

20       A.    I don't know exactly what it

21   signified.  And the reason I said that is

22   I didn't really understand it at the time.

23   As I sit here today, I believe it

24   represented Ally's commitment to -- to

25   assert some position with regard to the

157

1           TIMOTHY DEVINE

2    stalking horse for the -- for a certain

3    class of assets that were being offered

4    for sale in the estate.  But -- but I

5    confess, I didn't know what it was then

6    and frankly I don't know what it is now.

7           Q.    What did you mean by 100 for

8    originations?

9           A.    Similar answer.  I understood

10   that the teams working on the Ally and

11   ResCap settlement had come up with this

12   sort of shorthand to represent what I was

13   made to understand was the Ally cash

14   contribution to the Ally and ResCap

15   settlement, which is the settlement to

16   which this sentence here refers.  "Assume

17   750 Ally cash plus 200 for HFS plus 100

18   for originations constitute the Ally" cash

19   contribution to the settlement.  That's

20   the Ally ResCap settlement that's being

21   described.  And as I said before, I really

22   did not participate in or have any

23   responsibility in working on that, those

24   settlement discussions.

25           Q.    Who was it that gave you those

158

1            TIMOTHY DEVINE

2    amounts?

3        A.    I don't know.  I -- I don't know

4    who gave me those amounts.  It could have

5    been lawyers working directly on that

6    deal.  It could have been people in a

7    business meeting that were providing an

8    update as to what those numbers were.

9        Q.    As you sit here today, you have

10   no recollection of who was giving you

11   those numbers?

12       A.    Other than the recollection I

13   just gave you?

14       Q.    That it could have been any

15   number of people.

16       A.    That's not what I said.

17            MR. BRYAN:  Object to form.

18       Q.    You said it could have been

19   lawyers working directly on that deal.  It

20   could have been people in business

21   meetings that were providing an update.

22       A.    Yes.

23       Q.    So it could have been any -- any

24   one or more of those groups of people, is

25   that what you are saying?

159

1          TIMOTHY DEVINE

2          MR. BRYAN:  Object to form.

3      A.    It could have been the lawyers

4   working for Ally in connection with trying

5   to get that settlement or it could have

6   been people in a business context working

7   on the -- trying to get that Ally ResCap

8   settlement done.

9      Q.    The first waterfall you wanted

10  to see using those numbers for an Ally

11  contribution was one where there would be

12  no money for any securities fraud

13  plaintiffs but keeping miscellaneous GUC

14  at same assumed level we had been

15  assuming, right?

16     A.    Assuming for the moment no

17  dollars to any securities fraud investor

18  plaintiffs and keeping miscellaneous GUC

19  at same assumed level we have been

20  assuming, yes.

21     Q.    And GUC was general unsecured

22  creditors?

23     A.    Yes.  Put it this way, that was

24  an acronym that was being used by ResCap

25  and its professionals to describe a

160

1              TIMOTHY DEVINE

2    certain class of potential claimants in

3    the estate.  I don't know what they meant

4    by it.  And I don't know who they meant by

5    it.  But it had been kind of a fixture in

6    several of the waterfalls.  And it's that

7    acronym and that fixture in the waterfalls

8    that I'm referring to and not any

9    particular group of plaintiffs -- or

10   claimants.

11       Q.    When you said keeping

12   miscellaneous GUC at same assumed level we

13   had been assuming, what level had been

14   assumed?

15       A.    I would refer you to those

16   various waterfalls for whatever the

17   assumption had been made in connection

18   with that GUC, miscellaneous GUC.  I was

19   not responsible for preparing those

20   waterfalls.  I don't know what they meant

21   by GUC.  And so I don't want to mislead

22   here and suggest that GUC referred to any

23   particular claimants.

24       Q.    Mr. Devine, you were the one who

25   was asking for this waterfall and what I'm

161

```
 1              TIMOTHY DEVINE

 2    trying to find out from you is what it

 3    was -- I'm trying to find out why you

 4    wanted it.  And you are telling me you

 5    didn't understand a thing about what you

 6    were asking for?

 7              MR. BRYAN:  Objection to form.

 8         That's not at all what you asked.

 9         That's an entirely new question.

10         Q.    Are you -- are you telling me

11    today that you have no knowledge of the

12    level at which it had been assumed a

13    waterfall would flow to miscellaneous

14    general unsecured creditors.

15         A.    The purpose of my instruction

16    there was to isolate variables that I

17    didn't understand and didn't want moving

18    around while I was driving variables that

19    I did understand better.  And so that's

20    why as I sit here today I -- I have no

21    idea what Renzi or Cancelliere or any of

22    the professionals for the estate meant at

23    that time by the miscellaneous GUCs or

24    mean today by that class.  I just didn't

25    want them moving other variables around
```

162

1                   TIMOTHY DEVINE

2      when they were plugging in these variables

3      for the places that I was asking them to

4      do it.

5          Q.    Why did you want it assumed that

6      there would be no dollars to any

7      securities fraud investor plaintiffs.

8          A.    I think that Mr. Lee had

9      informed me that ResCap intended not to

10     assign any dollars to any securities

11     plaintiffs.  ResCap had determined not to

12     assign any claim or valuation of any claim

13     to any securities plaintiffs.

14         Q.    What -- what was the -- what was

15     the language there?

16         A.    Securities/fraud investor

17     plaintiffs.  And so again, I was not

18     directing the creation of a waterfall.  I

19     was trying to hold still certain variables

20     over which I had no control it being a

21     ResCap waterfall.

22         Q.    Okay.  Mr. Devine, looking at

23     the -- at the two scenarios you were

24     requesting.  One -- one kept the

25     miscellaneous general unsecured creditors

163

TIMOTHY DEVINE

1

2    at the same assumed level we had been

3    assuming and the other one assumed that

4    the general unsecured creditors ended up

5    at only half the value with being -- had

6    been -- you had been assuming.  Why did

7    you want to see those separate waterfall

8    presentations?

9        A.    Well, first of all, you are

10   assuming that I wanted to see them.

11       Q.    You asked for them?

12       A.    I asked for them.  But you are

13   assuming that I wanted to see them.  And

14   that -- that may not be an accurate

15   assumption.  At this point in the

16   conversation there were many -- there was

17   a lot of work going on at the same time.

18   And I may have been asked by any number of

19   people to please throw some alternative

20   potential waterfalls up against the wall

21   and see what had happened.

22            And my -- my best memory as I

23   sit here today is I wouldn't have come up

24   with the notion of assuming that

25   miscellaneous GUCs end up at only half the

164

1             TIMOTHY DEVINE

2    value we had been assuming because I don't

3    recall understanding the level of GUCs to

4    be of interest to my client at that point.

5    And it's certainly true that I did not

6    understand my client to have any say as to

7    the assignment as amongst the various

8    creditor classes of any particular claim

9    or eventual disbursement in the waterfall.

10        Q.    So if you didn't come up with

11   this, Mr. Devine, who was it that asked

12   you to get these waterfalls from Mr. Renzi

13   and Mr. Cancelliere?

14            MR. PRINCI:  Objection as to

15       form.

16        A.    Well, it would help me to know

17   whether or not I was the originator of

18   this e-mail or whether it was cut off from

19   a larger string, but even so at that point

20   recognize that Renzi didn't work for me

21   and Cancelliere didn't work for me.  So

22   the fact that I'm asking them to do

23   something and cc'ing Gary Lee suggests to

24   me that I'm sort of a communication point

25   in helping to get some waterfall work

165

1                    TIMOTHY DEVINE

2       done -- and then as you can see as you go

3       up the exhibit on page 1 of Exhibit 142,

4       Renzi responds to me, cc's Gary and

5       William Nolan, I don't know who that is.

6       And then I say, "Thanks, Mark," da, da,

7       da, da, "pass some additional stuff on."

8       But I'm sure to include Gary Lee at MoFo

9       as cc and Ruckdaschel for that matter who

10      is ResCap attorney to suggest to me that

11      I'm assisting in the process of running

12      down data again toward what appears to be

13      something of a tight deadline.  It's 644

14      in the e-mail at the top.  And the subject

15      line of the e-mail is --

16          Q.   Is this in response to some

17      question I asked you?

18              MR. PRINCI:  I'll object.  He's

19          not through with his answer.  Don't

20          interrupt the witness.

21              MR. KAUFMAN:  Hey, you know

22          what, I'm taking back the three

23          minutes he just spent talking about

24          something that I didn't even ask

25          about.

166

1          TIMOTHY DEVINE

2          MR. BRYAN:  He was in the middle

3     of an answer.  You do not interrupt

4     the witness.

5          MR. KAUFMAN:  Yeah, okay.  I'm

6     just telling you.

7          MR. BRYAN:  Mr. Devine --

8          MR. KAUFMAN:  I am not going to

9     be cut off by Mr. Devine occupying all

10    of the time he can by -- by saying

11    whatever he feels like on the record.

12         MR. BRYAN:  Well, that's an

13    entirely inaccurate description of

14    what's been happening today.  He's

15    been answering your questions

16    directly.  Now, I would ask that you

17    pause, let Mr. Devine complete his

18    answer and then ask your next

19    question.

20    Q.    Go ahead, Mr. Devine, finish.

21    A.    So I was just saying that it may

22  well be that I was participating with the

23  ResCap team toward trying to get a deal

24  done that both ResCap and Ally were trying

25  to get done and if you look at the e-mails

167

TIMOTHY DEVINE

1    it appears that we were all working

2    against a deadline.  I don't know what the

3    purpose of that or the reason for that

4    deadline was but we were working to try to

5    get something done by 8:00 p.m.

6        Q.    Who asked you to request these

7    waterfalls from Mr. Renzi and

8    Mr. Cancelliere, give me a name?

9            MR. PRINCI:  Objection as to

10       form.  Asked and answered.

11       A.    I -- I don't remember.

12       Q.    But you are sure it wasn't you

13   who came up with the idea to request these

14   waterfalls; is that correct?

15       A.    I'm just looking at the

16   Exhibit 142 --

17       Q.    Just answer me.  Do you -- was

18   it -- are you sure it wasn't you who

19   asked -- who came up with the idea to

20   request these waterfalls?

21           MR. PRINCI:  Objection.

22           MR. BRYAN:  You are doing it

23       again.  Don't interrupt witness.

24           MR. KAUFMAN:  I'm entitled to an

168

```
 1            TIMOTHY DEVINE
 2      answer to my question.
 3           MR. BRYAN:  And he was about to
 4      answer your question before you
 5      interrupted him again.  I'd ask you to
 6      calm down.  Let the witness --
 7           MR. KAUFMAN:  I am calm.
 8           MR. BRYAN:  Well, let the
 9      witness answer your questions.
10           MR. KAUFMAN:  I'm glad this is
11      all on videotape.
12           MR. BRYAN:  Do you recall the
13      question pending?
14           THE WITNESS:  I -- I thought it
15      was to try to find out whether or not
16      I remembered who asked me to run the
17      waterfalls.
18      Q.    No.  Are you sure it wasn't you
19   who came up with the idea to request these
20   waterfalls?
21      A.    No, I'm not sure it wasn't me.
22      Q.    Okay.
23      A.    As I testified, I don't remember
24   who -- where -- where it came from, where
25   the source of that question was.
```

169

```
 1              TIMOTHY DEVINE

 2        Q.    So it could have been you?

 3        A.    Could have been Kathy Patrick.

 4   It could have been Gary Lee.  It could

 5   have been Tammy Hamzephour.  Could have

 6   been John Ruckdaschel.

 7        Q.    And it could have been you?

 8        A.    Could have been me.

 9        Q.    Okay.

10        A.    As I said, that's unlikely.

11        Q.    Did Mr. Renzi and

12   Mr. Cancelliere thereafter provide you

13   with the two waterfalls you requested?

14        A.    I don't remember.

15            MR. KAUFMAN:  Let's mark as the

16        next exhibit an e-mail on May 7, 2012,

17        from Mr. Devine to Ms. Patrick.

18            (9019 Exhibit 143, e-mail dated

19        May 7, 2012 from Mr. Devine to

20        Ms. Patrick, marked for

21        identification, as of this date.)

22            MR. KAUFMAN:  This one shouldn't

23        be put up on the screen.

24            UNIDENTIFIED SPEAKER:  Can I

25        publish this?
```

171

                    TIMOTHY DEVINE

1

2      today to believe that your e-mail that was

3      produced to us by your counsel was altered

4      in some way?

5          A.    I just don't remember sending an

6      e-mail at 5:18 in the morning.

7          Q.    Well, obviously you did, right?

8          A.    It seems to indicate that I sent

9      it at 5:18 in the morning.

10         Q.    You told Ms. Patrick that --

11     that the numbers you had shared with her

12     that night, 750 plus 100 plus 200, the

13     waterfalls you had run appear to show that

14     PLS R&W claims across all of the trusts

15     would take at above the $1 billion

16     threshold she had mentioned.

17             Do you see that?

18         A.    Yeah, I -- I read the first

19     paragraph.

20         Q.    Okay.  Can you explain what you

21     were describing to Ms. Patrick in saying

22     that across the entire run of all the

23     trusts would take at above the threshold

24     you had mentioned to me of a billion?

25     What were you talking about?

172

TIMOTHY DEVINE

1

2      A.    So if I remember correctly and

3  just judging too by the e-mail in context,

4  there -- the numbers I shared tonight --

5  I'm not sure whether or not ResCap would

6  have provided waterfalls by this point.  I

7  know they provided some originals.  I

8  don't know whether they provided updated

9  waterfalls or not.  But in any event, it

10  appears that we were both talking about

11  some waterfalls, meaning what ResCap was

12  projecting I guess is the best word with

13  all sorts of assumptions and caveats, et

14  cetera, including lots of unknowns as to

15  how those waterfalls might or might not

16  play out in an eventual ResCap filing.

17          But it appears that we are

18  talking about those sorts of waterfalls

19  and it appears that the waterfalls showed

20  that total rep and warrant on all the PLS,

21  that is, that would have referred in

22  context to all rep and warrant claims of

23  all sorts and all related claims to rep

24  and warrant on all the private label

25  securities, which by that time in the

173

1          TIMOTHY DEVINE

2    conversation would have meant the 392 or

3    whatever the proper number is of

4    securitizations that the ResCap entities

5    offered during the subject years.  Wrapped

6    and nonwrapped referred to whether or not

7    there was or wasn't monoline participation

8    in some or all of the deal, particular

9    deal.

10          "And with claims on all ResCap

11   PLS rep and warrant."  I don't remember

12   what that next part refers to.  "And with

13   claims on all ResCap PLS rep and warrant

14   valued at the figure you mentioned

15   tonight."  I just don't know what that

16   was.  That may have referred to a defect

17   rate and/or a severity rate across the

18   population.

19          But whatever it referred to,

20   that if you assumed whatever that was, the

21   PLS rep and warrant valued at the figure

22   you mentioned tonight -- she must have

23   mentioned a defect rate or some other

24   figure -- appear to show that in light of

25   all those assumptions that the PLS rep and

174

TIMOTHY DEVINE

1   warrant across the entire run of all the

2   trusts, that is the entire class beyond

3   her particular client holdings, would take

4   at above the threshold you, meaning Kathy

5   Patrick, had mentioned to me of a billion.

6       Q.   What was the billion dollar

7   threshold?

8       A.   I don't remember a billion

9   dollar threshold.  Reading this now, the

10  bid that all of the trusts would take

11  referred to sort of a final outcome.

12      Q.   I understand that.  But what was

13  the -- what was the threshold?  What was

14  the billion dollar threshold above which

15  the trust would take?

16      A.   I don't remember.

17      Q.   What was the significance of the

18  trust taking at above that level?

19      A.   Reading this now, it looks like

20  she had communicated to me an outcome

21  figure that I -- that I used the word

22  "threshold" with, that that class of

23  claimants would take -- would -- would end

24  up with over a billion dollars.  I think

175

1                    TIMOTHY DEVINE

2     that's what it means.

3                    In context I was clear from

4     square one never to promise any take to

5     anybody, any outcome.  Because first of

6     all, it wasn't my estate and second I had

7     no idea how the various claimants would

8     end up taking.  And she understood that.

9          Q.    The waterfalls that you

10    described in this e-mail excluded any

11    recovery for securities in common law

12    fraud plaintiffs, correct?

13         A.    It looks here in the second

14    paragraph like there was a waterfall

15    assumption that securities in common law

16    fraud plaintiffs claims would be

17    subordinated.

18         Q.    And you pointed out to

19    Ms. Patrick that you expected those

20    claimants to fight for a seat at the table

21    and that it would be hard to imagine there

22    wouldn't be some flow to them, right?

23         A.    That seems to be what I was

24    saying to her at that time.

25         Q.    Why did you believe it was hard

176

1          TIMOTHY DEVINE

2     to imagine that those claimants wouldn't

3     get at least some recovery?

4          A.    Well, first of all, I have no

5     experience in a bankruptcy anything near

6     this magnitude or complexity.  So I was

7     probably well beyond my comfort zone in

8     making a statement like that.  I did know,

9     though, that there were parties out there

10    who had no rep and warrant claims because

11    they had sold their interests in the

12    various securities and so to my

13    understanding would not participate in a

14    recovery in the rep and warrant structure.

15    And that they would nonetheless seek to --

16    try to recover against the estate on the

17    securities in common law claims.

18         Q.    Yes.  And you also said it was

19    hard to imagine there wouldn't be some

20    flow on those claims.  Why did you believe

21    that?

22         A.    Based on my very general and

23    inexpert understanding of the bankruptcy

24    process where most parties who think they

25    have claims eventually try to assert them.

177

1            TIMOTHY DEVINE

2        Q.    So you are testifying that you

3    were having conversations and e-mail

4    exchanges with Ms. Patrick without knowing

5    what you were talking about?

6            MR. PRINCI:  Objection to form.

7            MR. BRYAN:  Objection as to

8        form.  That's not at all what he said.

9            MR. KAUFMAN:  That is what he

10       said.

11           MR. BRYAN:  The record is

12       perfectly clear, that's not what he

13       said.

14       A.    Kathy Patrick knew that I wasn't

15   providing any -- certainly any advice to

16   her and certainly not speaking on behalf

17   of anyone with regard to what eventual

18   outcomes would take place inside of the

19   bankruptcy.

20       Q.    Let me show you document

21   previously marked as Exhibit 41, which is

22   an e-mail chain on May 7, 2012.

23           I'd like to focus first on the

24   first e-mail in this chain which is from

25   Gary Lee at 9:08 p.m.  It's at the bottom

178

1              TIMOTHY DEVINE

2    of the second page.  Do you see that?

3         A.    Yes.

4         Q.    Okay.  Did you receive that

5    e-mail?

6         A.    It looks like I did.

7         Q.    And Mr. Lee reported that after

8    several calls with Ms. Patrick that

9    evening she had come back at $10 billion

10   all in PLS and R&W with a 22 percent

11   defect rate.

12             Do you see that?

13        A.    I see that.  Although the way

14   you pronounced that isn't the way I would

15   read it in context.

16        Q.    Now, looking at your e-mail at

17   10:14 p.m. that night, which begins on the

18   first page of the exhibit and goes over to

19   the second page.

20             MR. BRYAN:  Phil, I'm sorry to

21        interrupt but this is a document that

22        we had raised with the committee as

23        our clawback that there would be an

24        appropriate redaction made to this

25        e-mail on the second page.  The

179

TIMOTHY DEVINE

1

2      document you just handed the witness

3      does not have that redaction.  So to

4      the extent you want to question the

5      witness about everything but his

6      e-mail that begins Rick and Gary,

7      that's fine.  But I'm not going to let

8      you ask any questions about that

9      paragraph.

10     Q.    About which paragraph, the one

11  that starts Rick and Gary?

12         MR. BRYAN:  Correct.

13         MR. WYNNE:  My understanding is

14     that we didn't agree to that redaction

15     or that clawback.

16         MR. BRYAN:  Well, that

17     notwithstanding on the record we are

18     clawing this document back with an

19     appropriate redaction and I'm not

20     going to let you ask any questions

21     about the second paragraph that begins

22     "Rick and Gary," semicolon, on the

23     second page.

24         MR. WYNNE:  That's not -- that's

25     not my understanding of what was

180

1               TIMOTHY DEVINE

2        discussed or what was agreed to with

3        respect to the court.  Perhaps we

4        should go off the record and discuss

5        this and resolve it.

6               MR. KAUFMAN:  Okay.  Let's go

7        off the record.

8               THE VIDEOGRAPHER:  The time is

9        2:48 p.m. and we are off the record.

10              (Brief recess.)

11              THE VIDEOGRAPHER:  The time is

12       2:51 p.m. and we are back on the

13       record.

14              THE WITNESS:  Thanks.

15       Q.    Please look at the e-mail that

16   you sent at 10:14 p.m. on May 7th which

17   begins at the bottom of the first page of

18   Exhibit 41 and continues over to the

19   second page.  Do you see that?

20       A.    I see that e-mail, yeah.

21       Q.    And did you send that e-mail?

22       A.    Yes.  It looks like I sent that

23   e-mail.

24       Q.    The first part of your e-mail

25   was addressed specifically to Mark Renzi

181

1           TIMOTHY DEVINE

2      and Jeff Cancelliere, right?

3           A.    Yes.

4           Q.    And you said "KP needs defect

5      rate.  If we can persuade her team that

6      they are using wrong severities, etc., and

7      can preserve the defect rate, we can pick

8      away at the $10 billion."

9                Why did you believe Ms. Patrick

10     needed a certain defect rate for her

11     settlement?

12          A.    I believe that she told me that

13     her analysis and assessment of the loans

14     at issue had indicated a certain defect

15     rate.  And notwithstanding the very

16     natural process of negotiation I

17     understood that she was reaching a point

18     where she wasn't going to compromise with

19     regard to what defect rate applied to this

20     loan population based on the analysis of

21     her team.

22          Q.    What did you understand the term

23     "defect rate" to mean?

24          A.    It -- the simplest way to

25     understand it is the rate at which loans

182

TIMOTHY DEVINE

1

2   in a particular pool would fail according

3   to the applicable standards against which

4   they would be adjudged.  And in the

5   context of the private label securities,

6   in particular, the defect rate represented

7   the rate at which loans in the particular

8   pool at issue violated reps and warrants

9   according to the terms of the relevant

10  contract, which included that they must

11  breach the applicable standards, the

12  applicable reps and warrants in a way that

13  materially and adversely impacted the

14  interests of the counterparties.

15      Q.   What was the significance of a

16  certain defect rate to the settlement

17  amount as you understood it?

18      A.   So there were a lot of moving

19  parts and this is entirely out of context.

20  But to answer your question subject to the

21  variety of factors that were, one measure

22  of an appropriate claim from Kathy

23  Patrick's standpoint was again a very

24  rough level and disregarding for the

25  moment all sorts of complexities, the

183

1                TIMOTHY DEVINE

2     defect rate times the severities, times

3     the lifetime loss in a particular pool of

4     loan.

5                So that if you had a defect rate

6     you had a couple different variables

7     getting toward what she would have viewed

8     as an acceptable final low number in the

9     negotiation.  And if the defect rate went

10    too low, the total dollar number of the

11    claim would go low as well.

12        Q.    So did you understand from your

13    discussions with Ms. Patrick that the

14    defect rate was a significant factor in

15    driving the settlement number she was

16    looking for?

17        A.    One among many.

18        Q.    Okay.  The next part of your

19    e-mail addressed to Gary Lee and Rick

20    Cieri, right?

21            MR. BRYAN:  You are talking the

22        second paragraph?

23            MR. KAUFMAN:  Yes.

24        A.    Yes.

25        Q.    And you asked them "What

211

1              TIMOTHY DEVINE

2        spare copy?

3              MR. KAUFMAN:   This is the only

4        one I have got.

5        Q.     Do you have the exhibit in front

6    of you, Mr. Devine?

7        A.     Exhibit 1, marked 145?

8        Q.     That's correct.

9        A.     Yes.

10       Q.     You see that's an e-mail from

11   you to Ms. Patrick on May 8th, 2012, at --

12   at 12:12 a.m. -- sorry -- on May 8th,

13   2012, at 12:12 a.m., correct?

14       A.     If I'm looking at the right

15   exhibit which is, ends in Bates 928, it

16   says from Devine Timothy sent Tuesday, May

17   8th, 2012 4:11 a.m.  Am I looking at the

18   wrong exhibit?

19       Q.     Looking at the top one you

20   sent -- you sent this e-mail to

21   Ms. Patrick at 4:11 a.m.?

22       A.     I don't know.  That sounds

23   strange to me that I would have sent an

24   e-mail out at --

25       Q.     However strange, is that your

212

1                TIMOTHY DEVINE

2    e-mail, Mr. Devine?

3         A.    It looks like my e-mail.

4         Q.    Do you have any reason to doubt

5    it's your e-mail?

6         A.    I don't have reason to doubt

7    it's my e-mail.

8         Q.    You said in that e-mail "I'm

9    getting lots of pressure on valuation

10   now."  Who were you getting pressure from?

11        A.    Well, it looks like from reading

12   the e-mail everything we know about our

13   product, referring to the ResCap

14   securitizations and the collateral

15   underneath them, from origination through

16   pooling through reps and diligence through

17   servicing makes our folks believe we are

18   better, that is lower, than Countrywide by

19   a large margin.  I am being asked to

20   explain how we could agree to a defect

21   rate 150 of Countrywide's.

22             So judging by that context I was

23   probably getting pressure from people on

24   the ResCap side who were saying that a

25   defect rate 150 percent of Countrywide's

218

1              TIMOTHY DEVINE

2              Did you send the e-mail to

3    Mr. Cancelliere at 5:50 a.m. on May 9th?

4         A.    I don't remember what time I

5    sent it but it looks here like an e-mail

6    from me to Jeff Cancelliere.

7         Q.    You sent that e-mail, didn't

8    you?

9         A.    It looks like it.

10        Q.    And you wrote to

11   Mr. Cancelliere, "What is the defect rate

12   at 8.7 billion according to her

13   severities, etc., and according to ours."

14             Do you see that?

15        A.    Yes.

16        Q.    Why did you want that

17   information?

18        A.    Well, let's start with the

19   question which distinguishes her

20   severities and ours.  Because as I

21   mentioned earlier, Kathy Patrick's

22   formulas applied different severities to

23   the collateral in the pools that underlay

24   the various securitizations.  And if you

25   apply a more aggressive severity, meaning

219

1                    TIMOTHY DEVINE

2      that loans are more likely to fail

3      according to whatever macroeconomic or

4      otherwise or other stresses you put

5      against it, your defect rate would be

6      lower if you -- if you isolated two of the

7      more significant variables that arrive at

8      an outcome which -- with regard to total

9      exposure.

10              And so it was important to

11     understand the defect rate at a couple of

12     different severities.

13          Q.    Where did the $8.7 billion

14     number come from in your e-mail to

15     Mr. Cancelliere?

16          A.    Unfortunately, I don't have a

17     timeline in front of me with regard to the

18     various communications with the parties.

19     But at some point it must have been

20     communicated to me by either Gary Lee or

21     Kathy Patrick that they were at least

22     talking about a valuation figure for the

23     allowed claim of this class at

24     $8.7 billion.

25          Q.    And did you want to ascertain

220

1          TIMOTHY DEVINE

2    based on information that you were

3    requesting from Mr. Cancelliere, whether

4    that $8.7 billion number could be

5    supported by a defect rate?

6          MR. BRYAN:  Objection to form.

7      A.    So the question is -- sorry, I

8    didn't get the question.

9      Q.    Did you want to ascertain based

10   on information that you were requesting

11   from Mr. Cancelliere whether that

12   $8.7 billion number could be supported by

13   a defect rate?

14         MR. BRYAN:  Object to form.

15     A.    I don't understand what you mean

16   by whether it could be supported by a

17   defect rate.

18     Q.    You were asking Mr. Cancelliere

19   what is the defect rate at $8.7 billion,

20   right?

21     A.    Correct.

22     Q.    Okay.  What I'm asking you is

23   whether you wanted that defect rate to see

24   whether it could support an $8.7 billion

25   claim, right?

221

```
 1          TIMOTHY DEVINE

 2          MR. PRINCI:  Objection as to

 3     form.

 4          MR. BRYAN:  Objection to form.

 5     A.    I don't understand what you mean

 6   by support.  I think what I was asking him

 7   was very simple, what is the defect rate

 8   at 8.7 billion.  And I think he understood

 9   my question correctly because he gave me

10   an answer.  If you use our 44.1 billion

11   which was apparently our severity on the

12   population, and multiply times a defect

13   rate to get to 8.7, you'd have the figure

14   of 19.7.  If you used Kathy Patrick's

15   severities, which apparently we understood

16   to be 48.7 billion, then the defect rate

17   would be around 17.9.

18     Q.    Okay.  What significance, if

19   any, did you attach to the information

20   Mr. Cancelliere gave to you?

21     A.    I know that just based on the

22   series of e-mails that we looked at

23   preceding this one that parties were

24   looking at the defect rate to compare it

25   to the Bank of America settlement.
```

222

1          TIMOTHY DEVINE

2      Q.    Did the information

3   Mr. Cancelliere gave to you in this e-mail

4   make you comfortable with an allowed claim

5   at $8.7 billion?

6          MR. BRYAN:  Object to form.

7      A.    What do you mean by comfortable?

8      Q.    Willing to go along with it.

9      A.    All right.  So with that

10  understanding in terms -- willing to go

11  along with it in the context of the

12  negotiation of a settlement by ResCap of

13  an allowed claim based on that number?

14     Q.    Yes.

15     A.    I'm not sure as of 5/9/2012 at

16  that time whether I was comfortable with

17  it or not.  Because it was only one term

18  in a very complicated series of

19  transactions.  And it would have been

20  within that much, much larger context as

21  to whether or not I would have advised the

22  client or not that that was a comfortable

23  number.

24     Q.    Were you representing ResCap on

25  May 9th, 2012?

225

1        TIMOTHY DEVINE

2        Q.    Okay.  Did there come a time

3    when you learned who it was, what

4    individuals were negotiating a settlement

5    between ResCap and AFI?

6        A.    Yes.

7        Q.    Okay.  When did you learn that?

8        A.    I don't remember when I learned

9    that.

10        Q.    Did you learn it before or after

11    the ResCap board gave its approval to the

12    settlement with Kathy Patrick?

13        A.    I don't know.

14        Q.    Okay.  What individuals did you

15    come to learn negotiated the settlement

16    between AFI and ResCap?

17        A.    Well, I may or may not be

18    correct but you are asking me for my

19    understanding.  It was Mike Carpenter for

20    AFI with the independents of the ResCap

21    board.

22        Q.    During the course of the

23    negotiations with Ms. Patrick, up until

24    May 9th, weren't you -- weren't you being

25    kept advised about the progress of

226

1              TIMOTHY DEVINE

2     negotiations between AFI and ResCap?

3          A.    For what time period, sorry?

4          Q.    In April and May of -- of 2012,

5     while the negotiations with Kathy Patrick

6     were in the later stages, weren't you kept

7     apprised of the status of negotiations

8     between AFI and ResCap?

9          A.    Periodically.

10         Q.    Who was keeping you apprised?

11         A.    I guess I would have heard from

12    Ally's counsel from time to time.

13         Q.    Meaning who?

14         A.    Or -- meaning Rick Cieri, Ray

15    Schrock.  It could also be that I received

16    an update in connection with a larger

17    discussion with lawyers and clients.

18         Q.    Give me the names of the people

19    you are talking about?

20             MR. BRYAN:  Objection to form.

21    He just -- he did.

22         Q.    Besides Mr. Schrock and

23    Mr. Cieri, who else?

24         A.    The business clients at AFI.

25         Q.    Meaning who?

227

1                TIMOTHY DEVINE

2      A.   Mike Carpenter, Jeff Brown, Bill

3    Solomon.

4      Q.   How closely were you kept

5    advised of the progress of those

6    negotiations between AFI and ResCap during

7    that period?  Last half of April, first

8    couple of weeks in May.

9      A.   As I say, it was periodic.  I

10   was not -- I was not participating in the

11   negotiation of it.  I certainly was not

12   privy to daily developments by any means.

13     Q.   But when you say periodic, what

14   does that mean, every other day, every two

15   days, what?

16          MR. PRINCI:  Objection as to

17      form.

18     A.   Just sitting here today, I just

19   don't recall.  Nobody -- nobody sent out a

20   schedule to keep me abreast of what was

21   going on on that negotiation.

22     Q.   But you were kept abreast,

23   weren't you?

24     A.   Periodically.

25     Q.   Okay.  You did know that if

229

1          TIMOTHY DEVINE

2          MR. KAUFMAN:  Let's mark as the

3     next exhibit an e-mail from Mr. Devine

4     to Mr. Lee on May 9th, 2012.  Bates

5     number RC 9019_00049196.

6          (9019 Exhibit 147, e-mail from

7     Mr. Devine to Mr. Lee on May 9th,

8     2012, Bates RC 9019_00049196, marked

9     for identification, as of this date.)

10     Q.    Let me show you what we just

11   marked as Exhibit 147.

12     A.    Thank you.

13     Q.    Is that an e-mail you sent to

14   Mr. Lee at 9:03 a.m. on May 9th, 2012?

15     A.    Well, it looks like an e-mail

16   that I sent to Gary Lee and cc'd Ray Cieri

17   and Ray Schrock.  As I said, I'm not sure

18   about the time because some of these have

19   been produced with times that don't seem

20   to make sense to me.

21     Q.    Do you have any reason to doubt

22   that this is an e-mail you sent?

23     A.    No.

24     Q.    Okay.  You said to Mr. Lee,

25   "Gary, as I told you on the phone, Ally

230

                    TIMOTHY DEVINE

1

2    will support the $8.7 billion allowed

3    claim.  There is no new Ally money.  Hard

4    stop at 750 plus 200 plus 100.  Thanks,

5    Tim."  Right?

6         A.    Yes.  That's what it says.

7         Q.    At the time you sent this e-mail

8    to Mr. Lee, had the amount of AFI's

9    contribution to a settlement been agreed

10   upon to your knowledge?

11        A.    As I said before, I don't know

12   when that amount was agreed upon.

13        Q.    Had Mr. Lee been pressing you

14   for a larger contribution from AFI?

15        A.    Mr. Lee knew because I told him

16   that I was not going to negotiate that

17   number with him.  That I didn't have

18   authority to negotiate it for him -- with

19   him and that I didn't intend to do so.

20        Q.    But you did make clear to him,

21   did you not, in this e-mail, that there

22   was not going to be more Ally money, isn't

23   that what you say?

24        A.    The e-mail here does not refer

25   to -- it does not constitute an e-mail

231

```
  1            TIMOTHY DEVINE

  2   from me to Gary Lee about the Ally and

  3   ResCap settlement.  It is about Gary and I

  4   concluding what may have been perceived on

  5   his part as an open issue as to the

  6   resolution of the deals that he and I

  7   actually were working on resolving, which

  8   were the ResCap deal with Kathy Patrick

  9   and the PSA that Kathy Patrick and ResCap

 10   and Ally entered.

 11       Q.   Mr. Devine, you said hard stop

 12   at 750 plus 200 plus 100.  Isn't that the

 13   amount that AFI was proposing to

 14   contribute as part of the Kathy Patrick

 15   settlement?

 16            MR. PRINCI:  Objection as to

 17       form.

 18            MR. BRYAN:  Objection to form.

 19       A.   No, it's not.  It's the amount

 20   that Ally and ResCap were negotiating in

 21   their settlement agreement and it became

 22   of interest in the agreements between

 23   ResCap and Kathy Patrick on the one hand

 24   and the tripartite agreement between Kathy

 25   Patrick's clients, ResCap and Ally as a
```

232

TIMOTHY DEVINE

1    term among many in context in the -- in

2    those two agreements.  But it was not a

3    negotiation in connection with those --

4    the resolution of those deals.

5         Q.    So you say, Mr. Devine.  But

6    isn't it a fact that it was more than just

7    of interest to Ms. Patrick what the amount

8    Ally would be contributing as part of what

9    her clients might share in under a plan?

10   It was a key element of what her entire

11   settlement was?  You understood that,

12   didn't you?

13            MR. PRINCI:  Objection as to

14       form.

15            MR. BRYAN:  Objection as to

16       form.  And, Mr. Kaufman, you are

17       entitled to your views but do not try

18       to belittle the witness in your

19       questioning.  That commentary should

20       stop.

21        Q.    You understood that, didn't you?

22            MR. PRINCI:  Objection as to

23       form.

24            MR. BRYAN:  Same objection.

25

233

```
 1              TIMOTHY DEVINE

 2       A.    One of the features of the

 3   settlement agreement that ResCap entered

 4   with Kathy Patrick and then the settlement

 5   agreement or the plan support agreement

 6   between AFI, the ResCap entities and Kathy

 7   Patrick involved the amount of cash that

 8   Ally would put into the estate.  That's

 9   certainly correct.  There's no question

10   about that.

11       Q.    And you said there is no new

12   Ally money.  How did you know that?

13       A.    The question arose as to whether

14   or not Ally intended to put any additional

15   money into the Ally/ResCap settlement.

16   And the answer was no.

17       Q.    Who gave you that information?

18       A.    I don't recall who gave me that

19   information.

20       Q.    So somebody at AFI told you by

21   May 9th at 9:03 a.m. that Ally wasn't

22   going to put anything more into the pot?

23       A.    If by the pot you mean the Ally

24   and ResCap settlement agreement --

25       Q.    Yes.
```

234

1              TIMOTHY DEVINE

2         A.    -- that either was or wasn't

3    finalized by that point, the answer is

4    yes.

5         Q.    Is it fair to say that you were

6    telling Mr. Lee in this e-mail as -- that

7    in effect he could take it or leave it?

8              MR. PRINCI:  Objection as to

9         form.

10        A.    No, that's not correct.  As I

11   told you, I wasn't negotiating that figure

12   with him.  This was more informational

13   than anything else.

14        Q.    You said you -- Gary, as I told

15   you on the phone Ally will support the

16   $8.7 billion allowed claim but there

17   wasn't going to be any more Ally money.

18   So what I'm asking you is, weren't you

19   telling Mr. Lee in effect you can get the

20   support from Ally for the $8.7 billion

21   claim but not for any more money from AFI?

22             MR. BRYAN:  Object to form.

23             MR. PRINCI:  Objection as to

24        form.

25        Q.    Isn't that what you were telling

235

1            TIMOTHY DEVINE

2      him?

3          A.    No.  In fact that's a fallacious

4      question.  It's just not at all

5      characteristic of what kind of

6      conversation we were having.

7          Q.    It's exactly what you said to

8      him?

9              MR. PRINCI:  Objection to form.

10             MR. BRYAN:   Objection to form.

11         A.    No, it's not.

12         Q.    You didn't tell him that AFI

13     would support the $8.7 billion allowed

14     claim?

15             MR. PRINCI:  Objection.

16         Argumentative.

17         A.    I did in this note say, "Gary,

18     as I told you on the phone, Ally will

19     support the $8.7 billion allowed claim."

20     And Ally did.

21         Q.    Okay.  But you also said there

22     is no new Ally money.  Hard stop at 750

23     plus 200 plus 100.  You also said that,

24     correct?

25         A.    Yes, we -- I did say that.

236

1                    TIMOTHY DEVINE

2       You -- you are reading that correctly.

3            Q.    And so the combination of the

4       two things you were telling Gary was Ally

5       will support the settlement at that number

6       but not for any more money?

7                 MR. BRYAN:  Objection to form.

8            Q.    Isn't that what you were saying?

9                 MR. PRINCI:  Objection as to

10           form.

11           A.    No.  I think you are entirely

12      wrong with your understanding of what the

13      negotiation was.  And I have said it three

14      or four times and you continue to try to

15      misconstrue it and it's -- it's

16      frustrating.

17           Q.    Okay.  Did you think there was

18      any risk in saying this to Mr. Lee that

19      the settlement would fall apart as a

20      result?

21                MR. PRINCI:  Objection as to

22           form?

23           A.    Which settlement?

24           Q.    The settlement you were

25      discussing in this e-mail with Mr. Lee.

238

```
 1              TIMOTHY DEVINE

 2      a great contribution from AFI, just yes,

 3      you considered or no, you didn't?

 4              MR. PRINCI:  Objection as to

 5          form.

 6              MR. BRYAN:  Objection to form.

 7          A.   I don't think I probably

 8      considered it in consequence of that

 9      e-mail because I didn't view that

10      communication as a negotiation with Gary

11      Lee.

12          Q.   Okay.

13              MR. KAUFMAN:  Let's take a

14          five-minute break.

15              THE VIDEOGRAPHER:  The time is

16          4:08 p.m. and we are off the record.

17              (Whereupon, there is a recess in

18          the proceedings.)

19              THE VIDEOGRAPHER:  The time is

20          4:23 p.m. and we are back on the

21          record.

22              MR. KAUFMAN:  Let's mark as

23          Exhibit 148 an e-mail chain on

24          May 9th, 2012 Re:  Talcott Franklin.

25              (9019 Exhibit 148, e-mail chain
```

239

1              TIMOTHY DEVINE

2        on May 9th, 2012 Re:  Talcott

3        Franklin, marked for identification,

4        as of this date.)

5        Q.    Directing your attention to the

6    e-mail at the bottom of this exhibit,

7    Mr. Devine, did you send this e-mail on

8    May 9th at 9:04 on two -- at two

9    thousand -- May 9, 2012, at 9:04?

10       A.    That's what the e-mail

11   indicates.

12       Q.    And you reported on a call you

13   had received from Talcott Franklin; is

14   that correct?

15       A.    Just one moment, please.

16             Sorry, what was the question

17   again?  Thanks, I have completed reading

18   the e-mail.

19       Q.    You reported in your e-mail on a

20   call you had received from Mr. Franklin,

21   right?

22       A.    Yes.

23       Q.    And Mr. Franklin had told you he

24   was very favorably inclined to sign onto a

25   settlement an plan support agreement and

240

1                   TIMOTHY DEVINE

2      that he was confident his clients would go

3      along, right?

4           A.    As I read here, I'm trying to

5      remember, there were a lot of the deals

6      going on at that time.  He was very

7      favorably inclined to support and

8      participate in what we are doing.  And so

9      at this stage, on Wednesday, May 9th,

10     given the other e-mails we have seen, I

11     very likely would have been fairly blunt

12     and transparent with him with regard to

13     the state of play.  And so the fact that

14     I'm reporting that he's very favorably

15     inclined to support and participate in

16     what we are doing, probably means that he

17     would be inclined to enter an agreement

18     like the one that Kathy Patrick was

19     entering with ResCap and like the one the

20     three parties were entering into in the

21     PSA.

22          Q.    Specifically a settlement

23     agreement and a plan support agreement,

24     right?

25          A.    Yes.

241

1              TIMOTHY DEVINE

2        Q.    In the next to last paragraph of

3   your e-mail you said "I think he would

4   like to sign something prepetition.   I

5   certainly am not the right person to

6   negotiate that with him.  As you recall,

7   we sent him a draft of the settlement

8   agreement and PSA early on."

9              Do you see that?

10       A.    I do see that.

11       Q.    Why did you think you weren't

12   the best person to negotiate those

13   agreements with Mr. Franklin?

14       A.    I think because one of the

15   agreements, the settlement agreement

16   that's come to be called the RMBS

17   Settlement Agreement was an agreement that

18   was between ResCap or the ResCap entities

19   and the RMBS claimants.  And so I would

20   not be in a position to negotiate that

21   with him.  I didn't have the pen, so to

22   speak, nor did I actually have the pen

23   with regard to the PSA even though Ally

24   would be a party to that agreement.

25             And at this point because the

1              TIMOTHY DEVINE

2    conversations were moving on from sort of

3    rep and warrant general conversations to

4    agreements that would take meaning within

5    the concept of a bankruptcy, I was

6    indicating that I am not bankruptcy expert

7    and would not be the right person to

8    negotiate terms of an agreement in that

9    context.

10             I would have thought that given

11   the population of the recipients of this

12   e-mail I sent, that Gary Lee would have

13   picked up the conversation with Talcott

14   Franklin.  And it looks like at the top of

15   this Exhibit 148 that that's exactly what

16   happened.  That Gary Lee responded and

17   said we can send him a revised agreement

18   and PSA when we get next draft from KP.

19             MR. KAUFMAN:  Let's mark as

20        Exhibit 149 an e-mail chain on

21        May 9th, 2012.  Bates numbers RC

22        9019_00049216 and 9217.

23             (9019 Exhibit 149, e-mail chain

24        on May 9th, 2012, Bates RC

25        9019_00049216 and 9217, marked for

249

```
 1              TIMOTHY DEVINE
 2    favorable and fair to all concerned and I
 3    wanted to get the deal done as I
 4    understood we were on a certain timeline.
 5         Q.    Looking at the top e-mail in the
 6    chain from Mr. Lee to yourself, among
 7    others, at 10:54 a.m. on May 9th, did you
 8    receive that e-mail?
 9         A.    It looks like I did, yes.
10         Q.    And Mr. Lee wrote, "We will be
11    seeking ResCap board approval today.  Does
12    Ally's board need to approve as it is
13    signing the PSA and ResCap is agreeing to
14    settle a claim in excess of 25 million,
15    which requires Ally approval under Ally's
16    governance framework.  Please let us
17    know."
18              Did AFI's board need to approve?
19         A.    I don't know.
20         Q.    Did Mr. Lee, to your knowledge,
21    receive a response to his inquiry?
22         A.    I don't know.
23         Q.    Does Mr. Lee's reference to the
24    ResCap board -- his reference to seeking
25    ResCap board approval today, meaning
```

250

1              TIMOTHY DEVINE

2      May 9th, refresh your recollection of the

3      timeline in relation to the e-mails that

4      appear below that e-mail?

5           A.    Yes, it does.

6           Q.    In what way?

7           A.    Well, it looks like that ResCap

8      or at least Gary Lee at that point

9      intended to bring the ResCap board, if I

10     understand correctly what he was referring

11     to, the RMBS -- proposed RMBS settlement

12     agreement and the PSA, on that day.

13              MR. KAUFMAN:  Let's mark as the

14          next exhibit, which is 150 an e-mail

15          chain on May 9th and May 10th, 2012,

16          between Mr. Devine and Ms. Patrick.

17              (9019 Exhibit 150, e-mail chain

18          dated May 9th and May 10th, 2012,

19          marked for identification, as of this

20          date.)

21          A.    Thank you.

22          Q.    Directing your attention to the

23     e-mail at the bottom of the first page of

24     this exhibit, and continuing over to the

25     second page, which is an e-mail from

251

TIMOTHY DEVINE

1

2  Ms. Patrick to you on May 9th at

3  10:52 p.m.  Did you receive that e-mail?

4       A.    It looks like I did.

5       Q.    And Ms. Patrick wrote to you for

6  help regarding an apparent disagreement

7  she was having with Mr. Lee, correct?

8       A.    I have just finished reading the

9  e-mail.  What was the question?  Sorry.

10       Q.    Ms. Patrick wrote to you for

11  help regarding an apparent disagreement

12  she was having with Mr. Lee, correct?

13       A.    I think that's probably a fair

14  summary of the e-mail.

15       Q.    Mr. Lee was saying he thought

16  Ms. Patrick's clients would be released

17  from securities claims as well as PLS and

18  R&W claims and Ms. Patrick was saying the

19  opposite, right?

20       A.    I don't know what you mean by

21  PLS and R&W claims.  How are you using the

22  word PLS there?

23       Q.    Put back claims?

24       A.    As distinct from rep and warrant

25  claims.

252

1            TIMOTHY DEVINE

2        Q.    No.  Put back and rep and

3    warrant claims.  Didn't you understand

4    that Mr. Lee was saying he thought

5    Ms. Patrick's clients would be -- would be

6    releasing those claims as well as

7    securities claims and Ms. Patrick was

8    saying that there was no release of

9    securities claims from her clients, isn't

10   that the disagreement you understood?

11       A.    The disagreement as I can read

12   now and understand from reading the e-mail

13   is that Gary was apparently telling Kathy

14   that the release, and I assume they were

15   talking about the release contained inside

16   of the ResCap and Kathy Patrick RMBS

17   settlement agreement, that that release

18   should include securities claims by those

19   claimants as well as everything else.  And

20   she was saying that no, the release would

21   not include securities claims in its

22   scope.

23       Q.    Right.  And Ms. Patrick was

24   saying that her clients never offered or

25   agreed to release securities claims

253

1          TIMOTHY DEVINE

2    because they didn't own those claims,

3    right?

4        A.    I don't see where it says she

5    didn't -- she claimed they didn't own the

6    claims.

7        Q.    Okay.  Ms. Patrick was saying

8    her clients hadn't offered to release

9    those claims because they weren't in a

10   position to release those claims, right?

11       A.    Who does the they refer to?

12       Q.    Her clients.

13       A.    No, I don't understand her to

14   have said that.

15       Q.    You didn't understand that

16   that's what her point was?

17       A.    No.

18       Q.    Why did you think Ms. Patrick

19   believed that her clients were not going

20   to be releasing securities claims as part

21   of their settlement with ResCap?

22       A.    Because as Kathy Patrick told

23   ResCap from the beginning, her

24   representation of those clients did not

25   extend to issues relating to securities

254

```
 1              TIMOTHY DEVINE
 2    claims.
 3         Q.    Okay.  And you wrote back to
 4    Ms. Patrick at 10:27 p.m. that evening,
 5    correct?
 6         A.    It looks like it.
 7         Q.    Okay.  And you told her that you
 8    would straighten everything out, right?
 9         A.    It says --
10              MR. PRINCI:  Objection as to
11         form.
12         A.    I assume this is -- again, I'm
13    not sure here, but I assume this is an
14    indication that on May 9th, 2012, at
15    10:27 p.m. that I wrote to Kathy Patrick,
16    "I'll try to straighten everything out.  I
17    notice some strange questions coming from
18    Freddie's counsel this evening.  Let me
19    work on it."
20         Q.    Right.  Did you receive
21    Ms. Patrick's response to that at the top
22    of the first page of this exhibit?
23         A.    It looks like I did.
24              MR. KAUFMAN:  Let's mark as the
25         next exhibit an e-mail chain on May
```

255

1              TIMOTHY DEVINE

2         9th to May 10th, 2012, Bates numbers

3         RC 9019_00049486 through 49491.

4              (9019 Exhibit 151, e-mail chain

5         dated May 9th to May 10th, 2012, Bates

6         RC 9019_00049486 through 49491, marked

7         for identification, as of this date.)

8         Q.    Let me show you what we have

9    marked as Exhibit 151.  Let me direct your

10   attention in the first instance to the

11   e-mail from Gary Lee to Ms. Patrick at

12   11:08 p.m. on May 9th which appears on the

13   page of this exhibit ending in 49488.

14   It's the bottom two-thirds of that page.

15            Do you see that?

16        A.    For 9488 from Gary S. Lee to

17   Kathy D. Patrick.

18        Q.    Yes.  You have that?

19        A.    I see that.

20        Q.    While you are not copied on that

21   e-mail, it was forwarded to you a little

22   bit later, was it not?

23        A.    It looks like it was.

24        Q.    Mr. Lee said there seems to be a

25   disagreement on a fundamental point and

256

TIMOTHY DEVINE

1

2    that he was working it -- sorry -- that he

3    was writing it down so it was clear.  Do

4    you see where he said that?

5        A.    I see he says in his e-mail to

6    Kathy Patrick, "There seems to be

7    disagreement based on our call with Ropes

8    on one fundamental point.  So we are clear

9    I'm writing it down so you and I can

10    discuss."  Yep, I see it.

11        Q.    And the disagreement was over

12    whether securities claims were being

13    released as part of the settlement by

14    ResCap with Ms. Patrick, right?

15        A.    That's what it appears to be,

16    yes.

17        Q.    Mr. Lee was saying he believed

18    all securities claims were being released

19    under that settlement as were all other

20    claims for both wrapped and unwrapped

21    deals, right?

22        A.    I guess that's right.

23        Q.    And his reference to Ross was to

24    Ross Martin at Ropes & Gray, right?

25        A.    I assume it was.

257

```
 1              TIMOTHY DEVINE

 2      Q.    In the next to last paragraph of

 3   his e-mail Mr. Lee said, "So when Ross

 4   tells me an unknown amount of securities

 5   claims comes on top of this, I get spooked

 6   because that renders a deal at

 7   $8.7 billion illusory.  And if you ask why

 8   I care, which is what Ross screamed at me

 9   this evening, beyond the fact that this is

10   the deal I sold to our board and thought

11   we had, it, A, gives everyone an incentive

12   to manage attacks by other claimants to

13   get into the class or attempt to get a

14   bigger share and, B, it is consistent with

15   the need to maintain recoveries for other

16   constituents who are key to the success of

17   the plan."

18            Did I read that correctly?

19      A.    You read it correctly.

20      Q.    Were you aware that at the

21   ResCap board meeting earlier that day,

22   May 9th, Mr. Lee had sold the deal with

23   Ms. Patrick as including a full release of

24   all securities claims from Kathy Patrick's

25   clients and others similarly situated?
```

258

1                TIMOTHY DEVINE

2           MR. BRYAN:  Object to form.

3      A.     So if we are talking about the

4      page 3 of Exhibit 151, I think I

5      understand your question to be about a

6      conversation between Gary Lee and Ross

7      Martin recounted in an e-mail from Gary

8      Lee to Kathy Patrick that I wasn't copied

9      on?

10     Q.     No.  No.

11     A.     Okay.

12     Q.     I'm asking you whether you were

13     aware on May 9th that at the ResCap board

14     meeting that day Mr. Lee had sold the deal

15     to the board, had sold the deal with

16     Ms. Patrick, to the board as including a

17     full release of all securities claims?

18           MR. PRINCI:  Objection as to

19      form.

20     Q.     Yes, you were aware of that or

21     no, you weren't?

22           MR. BRYAN:  Objection as to

23      form.

24           MR. PRINCI:  Objection as to

25      form.

259

1          TIMOTHY DEVINE

2      A.    I don't know what Mr. Lee told

3    the board.  I -- I don't know what Mr. Lee

4    told the board.

5      Q.    So is it your testimony that you

6    were not aware that he did that?

7          MR. PRINCI:  Objection as to

8        form.

9          MR. BRYAN:  Asked and answered.

10     A.    I -- number one, in the series

11   of e-mails over those several days I have

12   no idea what I knew at one point or at

13   another.  I'm trying my best to be

14   accurate here.

15          Second, I don't recall Gary Lee

16   ever telling me what he was or wasn't

17   going to tell to the ResCap board.

18          And third, I don't know if I

19   knew at that -- at that moment in time on

20   Wednesday at 8:24, whether or not Gary Lee

21   had sold or not sold or told or not told

22   something to his ResCap board.

23     Q.    But you did receive his e-mail

24   on Wednesday evening at 11:26 p.m.,

25   correct?

281

```
 1            TIMOTHY DEVINE

 2       A.    Well, I sent an e-mail to Gary

 3    Lee, Jamie Levitt, Noah Ornstein and John

 4    Ruckdaschel, cc'd Cieri and Schrock at

 5    4:29.

 6       Q.    Right.  And you sent that e-mail

 7    in response to Mr. Lee's e-mail at 4:26 on

 8    May 12th, didn't you?

 9       A.    Yeah, I'm not sure if it's in

10    response but I did send him an e-mail a

11    couple minutes later.

12       Q.    And you wrote, "Got it.  Had

13    call with KP.  We told her PSA support

14    whole hog is drop dead."  That's what you

15    wrote, right?

16       A.    That's what I wrote.

17       Q.    And is that what you told

18    Ms. Patrick?

19       A.    I don't remember if I told her

20    whole hog but if I read this sitting here

21    now, it looks like I was communicating to

22    that group that I told her that she had to

23    support the PSAs in full.  And that that

24    was a provision that Ally would insist on

25    to the extent Ally could insist on
```

282

1              TIMOTHY DEVINE

2    anything.

3        Q.    And by using the phrase "drop

4    dead" you meant it was nonnegotiable from

5    Ally's perspective, right?

6        A.    I meant that if she wanted our

7    participation in the PSA she needed to

8    support it.

9              MR. KAUFMAN:  Let's mark as the

10        next exhibit an e-mail chain on

11        May 13, 2012 between Mr. Devine and

12        Talcott Franklin.

13             (9019 Exhibit 155, e-mail chain

14        dated May 13, 2012 between Mr. Devine

15        and Talcott Franklin, marked for

16        identification, as of this date.)

17       A.    Okay.

18       Q.    Looking at the first e-mail in

19   this chain which starts at the bottom of

20   the first page, did you send that e-mail

21   to Mr. Franklin at 12:16 p.m. on

22   May 13th -- I'm sorry -- at 1:28 p.m. on

23   May 12th?

24       A.    It looks like I did.  Again, I'm

25   not sure of the timing but it looks like I

283

                    TIMOTHY DEVINE

1

2    did.

3        Q.    And Mr. Franklin responded for

4    you to call him, correct?

5        A.    Yes.  That looks right.

6        Q.    And then you wrote back to

7    Mr. Franklin saying "I can try to call you

8    but on phone now with CEO and making range

9    of final decisions before 1:00 p.m. board

10   meeting.  I can't expose Ally to any

11   claims however remote."

12            That's what you wrote, correct?

13       A.    That's what that e-mail says.

14       Q.    And were you referring to Mike

15   Carpenter when you referred to being on

16   the phone with the CEO?

17       A.    I probably was, yeah.

18       Q.    And were you referring to an AFI

19   board meeting in that e-mail?

20       A.    I don't recall but that would --

21   that would make sense.

22       Q.    When you said that you couldn't

23   expose Ally to any claims however remote,

24   what did you mean?

25       A.    I just wanted to note on the

284

1              TIMOTHY DEVINE

2      timing here, I think my testimony was

3      probably incorrect earlier if I testified

4      that my e-mail to Talcott was at 1:28 p.m.

5      That might be an indication of his time

6      zone and not mine.  Because if you see the

7      e-mail up the chain was sent Sunday at

8      12:35 p.m.  I'm just not sure of the

9      timing.  But inside that note, inside my

10     note to Talcott it says I can try to call

11     you but I'm on the phone right now with

12     CEO making range of final decisions before

13     1:00 p.m. board meeting.  So I'm assuming

14     that the 12:35 was my time zone and that

15     the 1:00 p.m. was my time zone.

16         Q.    In any event, Mr. Devine, when

17     you said you couldn't expose Ally to any

18     claims however remote, what did you mean?

19         A.    So basically as I recall, and

20     there were a lot of moving parts at this

21     time, there were a lot of settlements

22     going on, there were a lot of

23     conversations but if I recall correctly,

24     the question was whether or not Talcott

25     Franklin could logistically accomplish

285

                        TIMOTHY DEVINE

1

2     getting authority from his clients to sign

3     the plan support agreement and I was

4     indicating to him in that last sentence, I

5     can't expose Ally to any claims however

6     remote, the importance of including all

7     claims of any type in the plan support

8     agreement.  And the reference to however

9     remote was with regard to the frequent and

10    consistent communication I had -- had had

11    with Talcott Franklin and with Kathy

12    Patrick, for that matter, from the

13    beginning that rep and warrant claims as

14    against Ally are -- were not viable

15    legally or factually.  And that we also

16    did not believe that there was exposure to

17    Ally in the securities claims.

18        Q.   That was your position.  But you

19    needed the same release provisions for

20    Mr. Franklin as you had with Ms. Patrick,

21    right?

22            MR. PRINCI:  Objection as to

23        form.

24        A.   When you say I needed them, what

25    did you mean.

286

1              TIMOTHY DEVINE

2        Q.    That was nonnegotiable.  If Ally

3   was going to support this plan --

4        A.    Which plan?

5        Q.    As you told Ms. Patrick, it was

6   drop dead.  Isn't that what you were

7   telling Mr. Franklin too, that you needed

8   the same release provisions with him as

9   you had with Ms. Patrick, full releases as

10  to Ally?

11            MR. BRYAN:  Object to form.

12       A.    I think you are mixing up the

13  settlement agreements that we have been

14  talking about.

15       Q.    Mr. Devine, isn't what you were

16  telling Mr. Franklin in that e-mail when

17  you said I can't expose Ally to any claims

18  however remote that you needed from him

19  the same release provisions as you had

20  demanded from Ms. Patrick?

21            MR. BRYAN:  Objection to form.

22       A.    So the -- the transaction that

23  is at issue in the e-mail that -- that we

24  are talking about, Exhibit 155, was an

25  agreement by Talcott Franklin on behalf of

287

1          TIMOTHY DEVINE

2    his clients to enter into a settlement

3    agreement with ResCap, releasing

4    essentially the same claims against ResCap

5    as the Kathy Patrick clients had and to

6    sign up to support a plan of

7    reorganization that the estate would file

8    and pursue which included a release by the

9    debtor of claims against Ally and a

10   third-party nonconsensual release.  And

11   that's what we were negotiating there.

12          And I assume that I was

13   explaining to him that as part of Ally's

14   participation in the plan support

15   agreement, including a commitment by Ally

16   not to object to the $8.7 billion allowed

17   claim, that his clients would have to sign

18   up to the plan as enunciated, which

19   included a debtor release and a

20   third-party nonconsensual release.

21          MR. KAUFMAN:  Thank you,

22      Mr. Devine.  I have nothing further.

23          MR. WYNNE:  Why don't we take a

24      brief recess and we'll --

25          THE VIDEOGRAPHER:  The time is

288

                   TIMOTHY DEVINE

1

2        5:30 p.m. and we are off the record.

3            (Whereupon, there is a recess in

4        the proceedings.)

5            THE VIDEOGRAPHER:  The time is

6        5:37 p.m. and we are back on the

7        record.

8    EXAMINATION BY

9    MR. JURGENS:

10       Q.    Good evening now, Mr. Devine.

11   My name is Jason Jurgens from the law firm

12   of Cadwalader, Wickersham & Taft, LLP on

13   behalf of MBIA Insurance Corp.  I'd like

14   to ask you some questions, some of which

15   are going to be MBIA specific and some

16   have to do with your understanding of the

17   scope of the release in the settlement

18   agreement, the RMBS Settlement Agreement.

19            If we can turn back to

20   Exhibit 150, which Mr. Kaufman showed you

21   earlier.  If you look at the chain where

22   the date is May 9, 2012, at 10:41 p.m.,

23   that part of the chain.  Do you see that

24   section?  It's the part Ms. Patrick sent

25   to you or so it appears from the e-mail.

359

1            TIMOTHY DEVINE

2    describe as the RMBS or put back

3    litigation, and I'd include in that

4    definition both the monoline claims that

5    were in litigation and any put back claims

6    that -- that might have been asserted?

7         A.    The first substantial contact I

8    had within my job duties with the mortgage

9    business was in the summer of 2010 when

10   the FHFA propounded 64 subpoenas across

11   the industry and I was asked to coordinate

12   the response to the subpoenas that were

13   issued to the company.

14        Q.    Did you supervise outside

15   counsel with respect to the monoline

16   litigation either MBIA or FGIC litigation?

17        A.    Have I done that?

18        Q.    Yes.

19        A.    Yes.

20        Q.    When you were representing AFI

21   from the time of the October letter that

22   Ms. Patrick sent to the signing of the

23   settlement agreement, were you solely

24   representing AFI or were you also

25   representing ResCap during that time

360

1              TIMOTHY DEVINE

2     period from October forward?

3          A.    Well, we should probably be

4     careful with regard to what you mean by

5     representing.  The -- as I recall, the

6     first communication from Kathy Patrick

7     came in to Bill Solomon in his capacity as

8     general counsel of Ally Financial, Inc.

9     He responded by indicating to Ms. Patrick

10    that Ally Financial, Inc. did not have

11    exposure of the variety that she wanted to

12    talk about settling.  And referred her to

13    Tammy Hamzephour, general counsel for

14    ResCap.

15              What -- my participation in

16    connection with meeting with Ms. Patrick,

17    I think Mr. Sheeren was there at the first

18    meeting in Minnesota, I don't recall

19    exactly.  But in any event, I was there in

20    my capacity as chief counsel for

21    litigation for ResCap, given that

22    Ms. Patrick purported to represent clients

23    who purported to have rep and warrant

24    essentially contract claims against the

25    contracting parties, all of whom were

361

                    TIMOTHY DEVINE

1

2    within the ResCap structure and none of

3    whom were within the Ally structure.

4        Q.    So at that time in that meeting,

5    if I understand, it took place sometime

6    between October, November, December,

7    sometime in 2011, the last quarter?

8        A.    I don't recall when it took

9    place.  I think we have had some testimony

10   on it today.  If there's a document we

11   could refer to it.

12       Q.    I'm going to try to do this

13   without -- without taking the time to go

14   back to the documents.

15       A.    Okay, thank you.

16       Q.    So initially you were

17   representing ResCap in what I will call

18   the Kathy Patrick negotiations with

19   respect to her claims?

20       A.    Well --

21            MR. BRYAN:  Objection to form.

22       A.    I -- I understand that you would

23   call them negotiations.  So I think that

24   term is going to end up being understood

25   in a number of different ways.  What --

362

1          TIMOTHY DEVINE

2    what went on for some period of time with

3    Kathy Patrick was an exchange of

4    communications designed to understand the

5    nature of her representation, who her

6    clients were, what kind of claims they

7    were purporting to make.  And so to the

8    extent that that is a prelude to or a part

9    of or a type of negotiation, yes.  So for

10   a period of time I was supporting those

11   discussions in my capacity in support of

12   the ResCap entities.

13        Q.    You understood that Ms. Patrick

14   was asserting that ResCap owed her clients

15   a substantial amount of money?

16        A.    Yes.

17        Q.    So you -- did she at some

18   point -- what was the first, her first

19   demand or her first claim that she made

20   against ResCap, do you recall?

21        A.    As I sit here today, I don't

22   recall her first demand.

23        Q.    Did she ask for $10 billion?

24        A.    Now, you are talking about once

25   the discussions started to take place for

363

```
 1              TIMOTHY DEVINE
 2    a compromise of those claims within the
 3    context of a ResCap filing.
 4         Q.   At any point?
 5         A.   Yeah.  So I believe that she did
 6    at one point in the negotiations but now
 7    this was within the context of a potential
 8    ResCap filing at which time I was not
 9    representing ResCap in connection with a
10    potential resolution of claims against the
11    ResCap estate.
12         Q.   Okay.  So if I understand your
13    testimony correctly, you initially started
14    out representing ResCap and then at some
15    point you were no longer representing
16    ResCap.  Could you explain to me when your
17    role and responsibility changed?
18         A.   I think you've slightly
19    misunderstood but I don't blame you.  At
20    some point -- because it wasn't entirely
21    clear, right.  At some point -- look, when
22    we started the discussions with Kathy
23    Patrick, I was representing the ResCap
24    entities in connection with the assertion
25    that they had -- that Kathy Patrick did
```

364

1           TIMOTHY DEVINE

2    represent clients who did or did not under

3    the relevant documents have contract

4    claims against ResCap.  And that was

5    natural because I had been dealing with

6    that kind of assertion of claim, although

7    not by investors and trustees but rather

8    by the monolines against the ResCap

9    entities theretofore.

10           At some point ResCap began to

11   consider a Chapter 11 restructuring.  I

12   did not represent ResCap at all in

13   connection with this Chapter 11

14   restructuring, unless you consider the

15   nature of our discussions according to the

16   common interest or joint defense privilege

17   in which case that's why I don't blame you

18   for misunderstanding the nature of what I

19   just talked about.  But so, yes, I did

20   represent ResCap in connection with the

21   sort of bilateral claim of Kathy Patrick's

22   clients against the ResCap entities and

23   rep and warrant.  Once the context of the

24   restructuring became a part of that

25   dialogue, ResCap was represented by Gary

365

1              TIMOTHY DEVINE

2      Lee of MoFo.  I never represented ResCap

3      on a bankruptcy related resolution.  At

4      least unless you -- as I say, I did

5      continue to advise ResCap in connection

6      with plain sort of legal analysis on rep

7      and warrant issues but not so much as

8      would be implicated in connection with the

9      filing.

10         Q.    Thank you for that and let me

11     try to make sure I understand correctly.

12     To try to summarize.  In the beginning of

13     from October for some period of time in

14     the initial stages that you've described

15     as essentially information gathering

16     stages, you were representing ResCap.  By

17     the end, by the April and May time period

18     that we have looked at a variety of

19     e-mails by that time period you were no

20     longer representing ResCap, you would have

21     solely been representing AFI, is that

22     correct, am I bracketing the change in

23     role correctly?

24         A.    No.  I think you are missing one

25     part of it.  But it's -- it's

366

1                    TIMOTHY DEVINE

2      directionally correct.  So first of all,

3      the difficulty with the word

4      "representing" given that there were no

5      pleadings in the matter, nobody appeared

6      as counsel of record, et cetera.  So let's

7      for a moment agree that the term

8      "representing" is somewhat subject to a

9      variety of definitions and understandings.

10         Q.    I would use representing as

11     representing in the context of the

12     negotiations.  Representing a client, be

13     it AFI or ResCap, in dealing with

14     Ms. Patrick or the Talcott Franklin group

15     that came in at the end.  If you

16     understand that.

17         A.     Uh-hum.  So there -- there were

18     certainly throughout the relevant period

19     transactions and discussions,

20     communications -- transactions meaning

21     information exchange, et cetera, between

22     the ResCap parties and Kathy Patrick on

23     the one hand or Talcott Franklin on the

24     other, which I assisted and advised ResCap

25     in accomplishing.

367

1                TIMOTHY DEVINE

2           At the same time I was

3    representing -- I was chief counsel to

4    Ally as well so of course I was advising

5    both ResCap and Ally in connection with

6    the -- the claims that Kathy Patrick

7    purported to make on behalf of those

8    clients.

9        Q.    When you were representing

10   ResCap in the initial stages of this

11   discussions and negotiations with

12   Ms. Patrick, who did you report to at

13   ResCap?

14       A.    I certainly included Tammy

15   Hamzephour in any discussions.  She was

16   general counsel to the ResCap entities.  I

17   had conversations with and gave advice to

18   and took input from a variety of business

19   clients.

20       Q.    So in addition to Ms. Hamzephour

21   you spoke to other not -- not in-house

22   counsel but other business representatives

23   at ResCap?

24       A.    Yes.

25       Q.    Do you recall who that would be

368

1                    TIMOTHY DEVINE

2      in the initial stages?

3          A.    Sure.  So but in what capacity,

4      as sort of an information source, as a --

5      as a normal business client or in sort of

6      a decision-making --

7          Q.    In any capacity you were

8      representing them in the initial stages of

9      these discussions and negotiations with

10     Ms. Patrick.

11         A.    I had communications with Tom

12     Marano, with Jim Whitlinger, with Jeff

13     Blashco (ph), Jeff Cancelliere.  This was

14     my -- as in-house counsel I had naturally

15     the information and expertise relating to

16     the rep and warrant claims that Kathy

17     Patrick and her clients purport to make.

18     It was all contained within ResCap.  That

19     was my resource base, that was my client

20     base, that's where the decision-making

21     authority with regard to whether or not to

22     engage in real settlement discussions or

23     not.  That's -- that's where all that took

24     place with the ResCap client.

25         Q.    Why was it decided at some point

369

1          TIMOTHY DEVINE

2     that you would no longer represent ResCap

3     and solely be representing AFI?

4          A.    I'm going to answer your

5     question without revealing privileged

6     communications.  At some point it was

7     determined that people performing

8     functions like the one I was performing,

9     which spanned across -- across the Ally,

10    the nondebtor to the debtor line, should

11    reorient so that they were aligned with

12    one or the other.  And that was a process

13    that took place across the various

14    business units and functions to the extent

15    that there was any overlap.

16         Q.    Do you know when that was?

17         A.    With regard to my own role?

18         Q.    Yes.

19         A.    I don't know exactly when it

20    was.  I understand you would think I would

21    have an exact date and hour.  I don't.

22    But because -- the reason I don't is

23    because it's probably accurate to say that

24    in some measure I continued to be a

25    resource for the ResCap client even as

370

1                   TIMOTHY DEVINE

2      they retained MoFo to represent them in

3      connection with rep and warrant and in

4      connection with rep and warrant in a

5      bankruptcy context, simply because I had a

6      great deal of experience in connection

7      with the claims that were being asserted

8      against the estate and because, as you

9      know, many of us believed that we had a

10     common interest in joint defense.  And in

11     fact at some point a document was executed

12     to that effect.

13               So it's not a straight line,

14     drop dead date after which I was no longer

15     providing advice to either a client of

16     sorts or a co, sort of a party subject to

17     a common defense or joint defense

18     agreement.

19          Q.    I think I understand.  To your

20     knowledge, when did ResCap become

21     insolvent, and I would define that on a

22     balance sheet basis when its total assets

23     were less than its total liabilities?

24          A.    I don't know.

25               MR. BRYAN:  Objection.