Gregory M. Petrick
Ingrid Bagby
Jonathan M. Hoff
Jason Jurgens
Nathan Bull
CADWALADER, WICKERSHAM & TAFT LLP
One World Financial Center
New York, New York 10281
Telephone: (212) 504-6000
Facsimile: (212) 504-6666

-and-

Mark C. Ellenberg
CADWALADER, WICKERSHAM & TAFT LLP
700 Sixth Street, N.W.
Washington, DC 20001
Telephone: (202) 862-2200
Facsimile: (202) 862-2400

*Attorneys for MBIA Insurance Corporation*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------x
                                                                   :
In re:                                                             :          **Chapter 11**
                                                                   :
**RESIDENTIAL CAPITAL, LLC**, *et al.*,                            :          **Case No. 12-12020 (MG)**
                                                                   :
                      **Debtors.**                                 :          **(Jointly Administered)**
                                                                   :
-------------------------------------------------------------------x


**MBIA'S RESPONSE AND OPPOSITION TO THE DEBTORS' *DAUBERT* MOTION TO EXCLUDE TESTIMONY OF MBIA'S EXPERT C.J. BROWN**

## TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ...........................................................................................................

PRELIMINARY STATEMENT .......................................................................................... 1

FACTUAL BACKGROUND ............................................................................................... 7

    A.    Procedural History ....................................................................................... 7

    B.    Mr. Sillman's Purported Valuation Methodology And Analysis ............... 8

    C.    Mr. Brown's Expert Critique And Correction Of Mr. Sillman's Original Analysis ...................................................................................... 10

LEGAL STANDARD ......................................................................................................... 14

ARGUMENT ...................................................................................................................... 15

POINT I    MR. BROWN IS QUALIFIED TO CRITIQUE MR. SILLMAN'S ANALYSIS OF THE DEBTORS' REPURCHASE LIABILITY ........................ 15

POINT II    MR. BROWN'S CRITIQUE AND CORRECTION OF MR. SILLMAN'S ANALYSIS IS ADMISSIBLE EXPERT TESTIMONY ..................................... 18

CONCLUSION ................................................................................................................... 24

# TABLE OF AUTHORITIES

**PAGE(S)**

## CASES:

*Alfa Corp. v. OAO Alfa Bank,*
  475 F. Supp. 2d 357 (S.D.N.Y. 2007)........................................................................21

*Bacardi & Co., Ltd. v. New York Lighter Co., Inc.,*
  No. 97 Civ. 7140, 2000 WL 298915 (E.D.N.Y. Mar. 15, 2000) ...........................19

*In re Blech Secs. Litig.,*
  No. 94 Civ. 7696, 2003 WL 1610775 (S.D.N.Y. March 26, 2003)....................5, 19

*Boucher v. United States Suzuki Motor Corp.,*
  73 F.3d 18 (2d Cir. 1996) .......................................................................................21

*Clarke v. LR Sys.,*
  219 F. Supp. 2d 323 (E.D.N.Y. 2002) ....................................................................14

*Daubert v. Merrell Dow Pharm., Inc.,*
  509 U.S. 579 (1993)................................................................................................14

*Dura Auto. Sys. of Indiana, Inc. v. CTS Corp.,*
  285 F. 3d 609 (7th Cir. 2002) .................................................................................21

*Faryniarz v. Nike, Inc.,*
  No. 00 Civ. 2623, 2002 WL 1968351 (S.D.N.Y. Aug. 23, 2002) ..........................19

*Feinberg v. Katz,*
  No. 01 Civ. 2739, 2007 WL 4562930 (S.D.N.Y. Dec. 21, 2007)......................6, 21

*Floyd v. City of New York,*
  861 F. Supp. 2d 274 (S.D.N.Y. 2012)....................................................................15

*Howard v. Walker,*
  406 F.3d 114 (2d Cir. 2005).............................................................................6, 20

*IBM v. BCG Partners, Inc.,*
  No. 10 Civ. 128, 2013 WL 1775437 (S.D.N.Y. April 25, 2013)......................14, 20

*In re Iridium Operating LLC,*
  373 B.R. 283 (Bankr. S.D.N.Y. 2007)....................................................................23

## TABLE OF AUTHORITIES (cont.)

PAGE(S)

*Johnson & Johnson Vision Care, Inc. v. CIBA Vision Corp.*,
No. 04 Civ. 7369, 2006 WL 2128785 (S.D.N.Y. July 28, 2006) ...........................................15

*Lippe v. Bairnco Corp.*,
288 B.R. 678 (S.D.N.Y. 2003)............................................................................................23

*Malletier v. Dooney & Bourke, Inc.*,
525 F. Supp. 2d 558 (S.D.N.Y. 2007)...................................................................................21

*MBIA Ins. Corp. v. Patriarch Partners VIII, LLC*,
No. 092012 WL 2568972 (S.D.N.Y. July 3, 2012) ........................................................14, 22

*In re Med Diversified, Inc.*,
334 B.R. 89 (Bankr. E.D.N.Y. 2005)...................................................................................17

*Peerless Ins. Co. v. Marley Engineered Prods. LLC*,
No. 05 Civ. 4848, 2008 WL 7440158 (E.D.N.Y. June 12, 2008).........................................20

*Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*,
691 F. Supp. 2d 448 (S.D.N.Y. 2010)...................................................................................15

*Semerdjian v. McDougal Littell*,
641 F. Supp. 2d 233 (S.D.N.Y. 2009)...................................................................................21

*Stroheim & Romann, Inc. v. Allianz Ins. Co.*,
No. 01 Civ. 8236, 2003 WL 21980389 (S.D.N.Y. Aug. 14, 2003) .......................................19

*United States v. Corey*,
207 F.3d 84 (1st Cir. 2000)..................................................................................... 6, 20-21

*United States v. Lumpkin*,
192 F.3d 280 (2d Cir. 1999)................................................................................................14

*United States v. Yevakpor*,
271 Fed. Appx. 19 (2d Cir. 2008) ........................................................................................20

*In re WorldCom, Inc.*,
371 B.R. 33 (Bankr. S.D.N.Y. 2007)....................................................................................17

PAGE(S)

**STATUTES & OTHER AUTHORITIES:**

Fed.R.Evid. 702 Adv. Comm. Notes (2000)....................................................................................15

MBIA Insurance Corporation ("MBIA"), an unsecured creditor of the debtors in the above-captioned chapter 11 cases (the "Debtors") and a member of the Official Committee of Unsecured Creditors, respectfully submits this response and opposition to the Debtors' *Daubert* Motion To Exclude Testimony Of MBIA's Expert C.J. Brown, dated May 6, 2013 (the "Debtors' *Daubert* Motion").

## PRELIMINARY STATEMENT

Counsel to MBIA retained C.J. Brown as an expert witness in connection with MBIA's objection to the Debtors' Motions Pursuant to Fed. R. Bankr. P. 9019 for Approval of the RMBS Trust Settlement Agreements [Docket Nos. 320, 1176 and 1887] (the "Debtors' Rule 9019 Motion").[1]  Mr. Brown was asked to review and assess the expert opinions and testimony proffered by Frank Sillman, a purported expert "in mortgage-backed securitizations and in the review and analysis of repurchase risks and liabilities."  The Debtors retained Mr. Sillman in connection with their Rule 9019 Motion.  Mr. Brown is an expert in finance, valuation, restructuring and capital-raising transactions and has previously been qualified as an expert in valuation and restructuring in connection with Ambac Financial Group's Chapter 11 proceeding in the United States Bankruptcy Court for the Southern District of New York.  Mr. Brown is a Managing Director in the Blackstone Group's Restructuring & Reorganization Group and previously worked as an investment banker at Bear, Stearns & Co. Inc.  He is more than qualified to provide an expert opinion with respect to valuation methodologies and to critique and correct the determination and application of inputs and assumptions.

---

[1]    Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the RMBS Trust Settlement Agreements.

Through use of a formula that he created out of whole cloth, Mr. Sillman purported to estimate the value of the Debtors' aggregate repurchase liability to the Settlement Trusts, and opined as to the reasonableness of the Total Allowed Claim proposed by the Settlement Agreements. Mr. Sillman estimated the Debtors' aggregate repurchase liability through the application of a supposed valuation formula he created involving (i) his determination of estimated lifetime losses for all of the Settlement Trusts and (ii) the portion of those losses that Mr. Sillman speculated the Debtors would be willing to "share" by agreeing to resolve or make whole repurchase demands made in connection with the Settlement Trusts.

Mr. Brown addressed Mr. Sillman's analysis. Mr. Brown concluded that Mr. Sillman used incorrect data when Mr. Sillman applied his formula to estimate the Debtors' aggregate repurchase liability for all of the Settlement Trusts. Mr. Brown, utilizing Mr. Sillman's own methodology, but correcting for errors, concluded that Mr. Sillman significantly overstated the Debtors' aggregate repurchase liability in connection with the Settlement Trusts. Mr. Brown limited his opinion to a critique and correction of Mr. Sillman's defective application of Mr. Sillman's own methodology. The Debtors' attack on Mr. Brown's opinions as "not based on sound methodology," therefore, is effectively an attack on the implausible and arbitrary methodology and opinion of their own expert, Mr. Sillman. Debtors' *Daubert* Motion at 3.

Among other things, Mr. Brown opined that Mr. Sillman's work was defective and unreliable for the following reasons:

- Mr. Sillman used a variable in his formula that he called the "Agree Rate." Mr. Sillman defined his Agree Rate as: "the percentage of Demands issued by the Trustee that the Seller agrees to repurchase or make whole." Declaration of Frank Sillman, dated June 11, 2012 (the "Sillman I Declaration"), at ¶ 59. Mr. Sillman had prepared a summary of the Debtors' repurchase experience in connection with the Settlement Trusts (the "Sillman Repurchase Demand Summary") that reflected an Agree

Rate, using Mr. Sillman's definition of only 14%.   Mr. Sillman, however, disregarded this information and arbitrarily selected a much higher Agree Rate of 41% to 47%. Mr. Brown opined that this error caused Mr. Sillman to significantly overstate his estimations of the Debtors' aggregate repurchase liability.

- Mr. Sillman treated each of the Settlement Trusts as if they had identical claims and were subject to identical defenses and did not consider the facts and circumstances of each Settlement Trust.  In particular, Mr. Sillman failed to properly consider the relative litigation risk faced by each of the Settlement Trusts arising out of a defense based on the statute of limitations (the "Statute of Limitations Defense").   According to Mr. Brown, Mr. Sillman's disregard for the significant risk presented by the Statute of Limitations Defense to nearly 65% of the Settlement Trusts caused Mr. Sillman to substantially overstate the estimated valuation of the Debtors' aggregate repurchase liability for the Settlement Trusts.

As MBIA made clear in its Objection, there are many more fundamental problems with Mr. Sillman's analysis in addition to those expressed by Mr. Brown, including that (i) Mr. Sillman's original analysis made no attempt to actually estimate the Debtors' repurchase liability through re-underwriting loan files on the basis of the Debtors' breaches of the representations and warranties made by the Debtors to each of the Settlement Trusts (the only legal basis for the Debtors' obligation to repurchase loans), (ii) Mr. Sillman's analysis is entirely arbitrary, largely based on his undocumented and limited "experience" working as a consultant to the Debtors, and is neither scientific nor replicable, and (iii) Mr. Sillman tautologically relied on the fact that the Debtors agreed to the Total Allowed Claim as a basis for his opinion that the Total Allowed Claim was reasonable.  MBIA's Objection at 21-22.  MBIA intends to address the credibility of Mr. Sillman's opinions at the hearing through cross-examination.   The Debtors by contrast have decided to burden the Court with unnecessary and baseless motion practice designed to distract attention from Mr. Sillman's fatally flawed analysis.  The Debtors seek to preclude Mr. Brown from offering his expert critique and correction of Mr. Sillman's analysis of the Debtors'

3

aggregate repurchase liability to the Settlement Trusts.[2]    The Debtors' *Daubert* Motion is premised on four arguments, all of which are unavailing.

*First*, the Debtors argue that Mr. Brown is not qualified to provide an expert opinion critiquing and correcting Mr. Sillman's analysis because, they claim, "there is no 'nexus' between his credentials on 'valuation, restructuring, and capital-raising transactions' and his opinions on Mr. Sillman's work." Debtors' *Daubert* Motion at 3. The Debtors are confused about the subject matter of Mr. Brown's testimony, seemingly because they are confused about the subject matter of the testimony of their own expert, Mr. Sillman. The Debtors contend that Mr. Sillman's work "involves, in part, (1) an analysis of liability for representations and warranties contained in agreements pertaining to (2) mortgage backed securities." Debtors' *Daubert* Motion at 2. But, in connection with the Sillman I Declaration that Mr. Sillman submitted in support of the Debtors' Rule 9019 motion, Mr. Sillman conceded that he did not perform an analysis of liability based upon whether the Debtors' breached representations and warranties that were made in connection with the Securitizations. Sillman I Decl. at ¶ 5. In particular, Mr. Sillman did not perform any re-underwriting of loan files to determine whether there was evidence of any breach of representations and warranties for the 392 Settlement Trusts. *Id*. Rather, Mr. Sillman offered a formulaic hypothesis of the Debtors' repurchase liability in

---

[2]    The Debtors' *Daubert* Motion is solely predicated on the opinions expressed by Mr. Brown with respect to Mr. Sillman's analysis given in the Sillman I Declaration, and his deposition testimony ("Sillman Tr."). In Mr. Brown's direct testimony, which will be submitted on May 14, 2013 in accordance with the Fifth Revised Joint Omnibus Scheduling Order and Provisions For Other Relief Regarding Debtors' Motion Pursuant To Fed. R. Bankr. P. 9019 For Approval Of RMBS Trust Settlement Agreements [Docket No. 3306], dated March 25, 2013, Mr. Brown also will critique and correct a second analysis proffered by Mr. Sillman for the first time in his Reply Declaration, dated January 15, 2013 (the "Sillman II Declaration"). According to Mr. Brown, Mr. Sillman's analysis in the Sillman II Declaration, like Mr. Sillman's analysis in the Sillman I Declaration, fails to factor in the risks faced by certain Settlement Trusts with respect to the Statute of Limitations Defense. As a result, Mr. Sillman's analysis in the Sillman II Declaration also significantly overstates the Debtors' aggregate repurchase liability.

connection with the Settlement Trusts.    He then performed an extrapolation, without any expertise in statistical or probability analysis, and opined as to the reasonableness of the Total Allowed Claim.  Sillman I Decl. at ¶5.  In short, Mr. Sillman's original analysis, which is what Mr. Brown critiqued and corrected, was a valuation exercise and nothing else.

Mr. Brown is a finance and valuation expert.  Mr. Brown has more than ten years of experience as a finance and restructuring professional valuing assets and liabilities.  Brown Decl., Appendix BBB.  Mr. Brown also has been previously qualified as an expert in valuation and restructuring in the United States Bankruptcy Court for the Southern District of New York. Brown Tr. at 12-15.  Plainly, Mr. Brown is qualified to critique and correct Mr. Sillman's application of the methodology Mr. Sillman devised to value the Debtors' aggregate repurchase liability.  Ironically, it is Mr. Sillman who is not qualified to provide an expert opinion with respect to a valuation methodology, as he has no experience in asset valuation or statistics.

*Second,* the Debtors argue that the Court should exclude Mr. Brown's testimony because he purportedly did not perform an "independent analysis" and because he has "no opinion on the proper method for determining whether a claim size is within a range of reasonableness, what the range should be, or whether the proposed $8.7 billion allowed claim is within that range."  Debtors' *Daubert* Motion at 1, 3 n. 3.  This argument is meritless.  Mr. Brown's critique and correction of Mr. Sillman's defective application of Mr. Sillman's own purported valuation methodology is permissible expert testimony.  *See, e.g., In re Blech Secs. Litig.*, No. 94 Civ. 7696, 2003 WL 1610775 at *20 (S.D.N.Y. March 26, 2003) ("Courts have often allowed expert testimony for the sole purpose of critiquing and thereby helping to explain the work of an expert witness retained by another party.").

*Third*, the Debtors argue that Mr. Brown should not be allowed to give expert testimony because, as part of his analysis and investigation, he had a conversation with Chris Connelly, an expert in representation and warranties analysis and repurchase demand resolution. In particular, the Debtors argue that all of Mr. Brown's testimony should be precluded because it is based, in small part, on the opinion of Mr. Connelly, who is not offered as an expert in this proceeding. The Debtors are wrong on this contention, too. Mr. Brown did not serve as a "mouthpiece" for Connelly's expert opinion with respect to representations and warranties, as the Debtors suggest. Rather, Mr. Connelly merely corroborated certain specific understandings and assumptions *made by Mr. Sillman*. In any event, as a matter of law, there is nothing improper with Mr. Brown relying on Mr. Connelly. *See, e.g., Howard v. Walker*, 406 F.3d 114, 127 (2d Cir. 2005) ("Experts are generally permitted to rely on otherwise inadmissible evidence in formulating an expert opinion."); *United States v. Corey*, 207 F. 3d 84, 88 (1st Cir. 2000).

*Fourth*, the Debtors argue that Mr. Brown's expert testimony should be excluded because he relied, in part, on an assumption provided by counsel that the Sillman Repurchase Demand Summary – a summary prepared by Mr. Sillman of the Debtors' response to 16,000 repurchase requests in connection with the Settlement Trusts – represented "sufficiently robust data" from which to draw conclusions. The Debtors are wrong. The use of assumptions provided by counsel in the formation of an expert opinion is neither unusual nor impermissible. *See, e.g.*, *Feinberg v. Katz*, No. 01 Civ. 2739, 2007 WL 4562930, at *4 (S.D.N.Y. Dec. 21, 2007) ("Counsel routinely ask their expert witness to 'assume' various facts as the basis for his opinion").

For these reasons, the Debtors' meritless effort to exclude Mr. Brown's expert testimony should be denied.

## FACTUAL BACKGROUND

### A.    Procedural History

On or about May 13, 2012, the Debtors entered into the RMBS Trust Settlement Agreements with the Steering Committee Group of Institutional Investors and the Talcott Franklin Group of Institutional Investors.  On or about May 14, 2012, the Debtors filed petitions for voluntary relief under chapter 11 of title 11 of the United States Code.  On or about June 11, 2012, the Debtors filed the Rule 9019 Motion.  In support of the Rule 9019 Motion, the Debtors submitted the Sillman I Declaration.

On or about July 31, 2012, fact discovery in connection with the Debtors' Rule 9019 Motion commenced pursuant to the Revised Joint Omnibus Scheduling Order entered by this Court.  On or about August 15, 2012, the Debtors filed their Supplemental Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the RMBS Trust Settlement Agreements.  On or about September 28, 2012, the Debtors filed Mr. Sillman's Supplemental Declaration (the "First Supplemental Sillman Declaration").  On or about October 19, 2012, the Debtors filed their Second Supplemental Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the RMBS Trust Settlement Agreements.

On November 20, 2012, the deposition of Mr. Sillman was taken.  On or about December 3, 2012, MBIA served its Objection to the Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the RMBS Trust Settlement Agreements, and submitted the expert report of Mr. Brown.  On December 18, 2012, the Debtors deposed Mr. Brown.

On January 15, 2013, the Debtors filed the Sillman II Declaration.

On or about February 19, 2013, the Debtors filed a second Supplemental Sillman Declaration (the "Second Supplemental Sillman Declaration"). On or about May 6, 2013, the Debtors filed the Debtors' *Daubert* Motion.

**B.    Mr. Sillman's Purported Valuation Methodology And Analysis**

In the Sillman I Declaration and the First Supplemental Sillman Declaration, which were the subjects of Mr. Brown's expert report, Mr. Sillman used certain assumptions and variables to create a mathematical formula from which he purported to calculate his estimated value of the Debtors' aggregate repurchase liability to the Settlement Trusts. The first variable that Mr. Sillman included in his formula was defined as the "Estimated Lifetime Losses." Mr. Sillman purported to use that variable to estimate the lifetime losses for the Settlement Trusts. Sillman I Decl. at ¶ 25. Mr. Sillman called the second variable in his formula the "Loss Share Rate." Mr. Sillman purported to use this variable to estimate the portion of the Estimated Lifetime Losses that the Debtors would agree to pay as a result of breaches of representations and warranties. *Id*. at ¶ 44. Mr. Sillman determined the Loss Share Rate by multiplying two additional variables: (1) an "Agree Rate" (defined by Mr. Sillman as "the percentage of Demands issued by the Trustee that the Seller agrees to repurchase or make whole," Sillman I Declaration ¶ 59), and (2) a "Breach Rate," which Mr. Sillman defined as the percentage of loans that Trustees would audit or examine, and then submit to the Debtors for repurchase. *Id*. at ¶¶ 45-63.

In connection with analyzing the Debtors' repurchase history, Mr. Sillman created the Sillman Repurchase Demand Summary, a summary chart showing, among other things, the number of loans submitted to the Debtors for repurchase and the Debtors' decisions with respect to these demands, that is, whether the Debtors agreed to repurchase loans or not from the

Settlement Trusts. Instead of using the Sillman Repurchase Demand Summary to calculate his Agree Rate, Mr. Sillman used repurchase data relating to Fannie Mae and Freddie Mac (the Government Sponsored Enterprises or "GSEs"). Mr. Sillman determined that the Debtors agreed to repurchase 67.56% of repurchase demands made by GSEs. Sillman I Decl. at ¶ 61. Mr. Sillman acknowledged that the repurchase experience with the GSEs was not comparable to the Debtors' repurchase experience with the Settlement Trusts. In particular, Mr. Sillman acknowledged that the Debtors' repurchase experience with the Settlement Trusts and the GSEs amounted to apples and oranges because, in Sillman's words, the Settlement Trusts are subject to "less stringent representations and warranties . . . when compared to the stronger representations and warranties found in the Fannie Mae and Freddie Mac agreements." *Id.* at ¶ 61. Because of this admitted lack of comparability, Mr. Sillman applied a discount to the Debtors' GSE repurchase experience in order to arrive at his Agree Rate of 41% to 47% for the Settlement Trusts. According to Mr. Brown, the discount applied by Mr. Sillman to formulate his Agree Rate was entirely arbitrary. *Id.* at ¶ 62.

Despite Mr. Sillman's acknowledgement of the lack of comparability, he used the Debtors' GSE repurchase experience to estimate the value of the Debtors' aggregate repurchase liability for all the Settlement Trusts and disregard the Debtors' actual repurchase experience of the Settlement Trusts. In so doing, Mr. Sillman estimated the value of the Debtors' repurchase liability to the Settlement Trusts to be between $6.7 billion and $10.3 billion. *Id.* at ¶ 68.[3] Mr. Sillman arrived at this value by extrapolating from his analysis of certain loans in the Settlement

---

[3] In his Supplemental Declarations, Sillman "updated" the Estimated Lifetime Losses but did not recalculate the Debtors' aggregate repurchase liability. Mr. Brown used Mr. Sillman's most recently "updated" Estimated Lifetime Losses to recalculate the Debtors' aggregate repurchase liability, according to Mr. Sillman's formula, to be between $6.3 billion and $9.3 billion.

Trusts.   He performed this extrapolation without any expertise in statistical or probability analysis.

### C.    Mr. Brown's Expert Critique And Correction Of Mr. Sillman's Original Analysis

MBIA retained Mr. Brown to, among other things, evaluate and critique Mr. Sillman's original purported valuation of the Debtors' repurchase liability in connection with the Settlement Trusts.[4]  Mr. Brown analyzed Mr. Sillman's work and determined that Mr. Sillman did not use the data and information that was required by Mr. Sillman's own valuation formula. Mr. Brown concluded that Mr. Sillman's errors in applying his methodology resulted in a substantial overstatement of the Debtors' aggregate repurchase liability to the Settlement Trusts.

*First*, Mr. Sillman did not use the data and information required by his formula's Agree Rate variable as Mr. Sillman, himself, defined it.  Mr. Sillman defined his Agree Rate as: "the percentage of Demands issued by the Trustee that the Seller agrees to repurchase or make whole."   Sillman I Declaration ¶ 59.   Here, the Debtors are the "sellers" referenced in this definition.   Mr. Sillman had at his disposal the Sillman Repurchase Demand Summary – a summary that Mr. Sillman created of the outcomes of the 16,000 repurchase demands received by the Debtors in connection with the Settlement Trusts, that is, a summary of the Debtors' decisions to accept or reject every repurchase demand made in connection with the Settlement

---

[4]    Mr. Brown also was asked by MBIA to review and assess the allocation methodology set forth in the RMBS Trust Settlement Agreements (the "Allocation Method") and the methodology by which the RMBS Trust Settlement Methodology reduces the proposed Total Allowed Claim in the event that a Settlement Trust opts out of the Settlement (the "Total Allowed Claim Reduction Method").  Brown Decl. at ¶ 3.   Mr. Brown opined that the Allocation Method disproportionately and unreasonably benefits certain Settlements that could be subject to the Statute of Limitations Defense at the expense of Trusts that are not subject to that litigation risk.  Id. at ¶¶ 10, 45.  Mr. Brown also opined that the Total Allowed Claim Reduction Method disproportionately and unreasonably penalizes Settlement Trusts that opt out that have a relatively high share of collateral losses but a relatively low share of original principal balance.  *Id.* at ¶¶ 11, 46.  The Debtors do not challenge these opinions.

Trusts.  Thus, Mr. Sillman had the ability to calculate the exact percentage of demands issued by

Settlement Trusts that the Debtors agreed to repurchase or make whole.  Mr. Sillman had the

entire universe of data needed to calculate the Agree Rate variable, as he had defined it.

The Sillman Repurchase Demand Summary indicated that the Debtors  agreed to

repurchase just 14% of the loans submitted for repurchase. Brown Decl. ¶ 23.[5]  Mr. Sillman,

however, did not use this data and information when applying his formula to value the Debtors'

repurchase liability.   Instead, Mr. Sillman relied on his own supposed, yet unsupported,

"experience," as well as the Debtors' repurchase experience with the GSEs, to create a number

which he plugged into his formula.  He did so notwithstanding the availability of the Sillman

Repurchase Demand Summary and the definition of Agree Rate that he created.  Sillman I Decl.

¶¶ 60-63.  Mr. Sillman used the GSE repurchase experience, with an arbitrary discount, despite

his acknowledgement that the experience was not comparable to the Debtors' repurchase

experience with the Settlement Trusts.  *Id*. at ¶ 62.

Mr. Sillman contended that the "actual data for the Trusts is not available."  He

ignored the Sillman Repurchase Demand Summary because, in his view, "the vast majority of

the Trusts' private label securities ("PLS") repurchase demands received by the Debtors are

unresolved."  Sillman I Decl. at ¶¶ 5, 8; Sillman Tr. at 164.   In particular, Mr. Sillman reasoned

that the 64.76 % of repurchase demands that the Debtors indisputably and expressly rejected

were, as a technical matter, "unresolved."  *Id*.  According to Mr. Sillman, the only repurchase

demands that could be considered "resolved" were (i) repurchase demands that resulted in the

---

[5]    The Sillman Repurchase Demand Summary also reflected that the Debtors disagreed with 64.76% of
loan repurchase demands, convinced the demanding party to rescind 2.33% of the demands, and were still
in the process of reviewing 22.54% of the demands.  Brown Decl. at ¶ 23.  The numbers do not add up to
100% because Mr. Brown, in order to be conservative, excluded the pending demands.  *Id*. at ¶27.

Debtors agreeing to repurchase the subject loan and (ii) the extremely small number of repurchase demands that were formally withdrawn by the parties making the repurchase demands. Sillman Tr. at 181. Mr. Sillman's rationale makes no sense given how Mr. Sillman defined the Agree Rate variable in his formula. Mr. Sillman defined the Agree Rate to be "the percentage of Demands issued by the Trustee that the Seller *agrees* to repurchase or make whole." Sillman I Decl. at ¶59 (emphasis added). The Sillman Repurchase Demand Summary reflects that the Debtors *agreed* to repurchase 14% of the loans subject to repurchase demands in connection with the Settlement Trusts. Mr. Brown concluded that Mr. Sillman provided no basis or evidence to support his conclusion that the repurchase demands that the Debtors rejected were "unresolved," and that any "unresolved" demands might result in a repurchase by the Debtors. Brown Tr. at 65-66.

Mr. Brown corrected for Mr. Sillman's errors by using the data and information that Mr. Sillman had compiled about the Debtors' actual experience with repurchase demands for the Settlement Trusts, in accordance with Mr. Sillman's definition of Agree Rate. Mr. Brown concluded that, by not using the Agree Rate derived from the Debtors' actual repurchase experience with the Settlement Trusts, Mr. Sillman erroneously and significantly overstated the Debtors' repurchase liability by between $5.9 billion and $6.6 billion. Brown Decl. at ¶¶ 42-48. According to Mr. Brown, if Mr. Sillman had properly applied his own formula using the data and information called for by his own definition of the Agree Rate, Mr. Sillman would have estimated the Debtors' repurchase liability at between $2.1 billion and $2.8 billion, far less than the proposed $8.7 billion Total Allowed Claim. *Id*. at ¶ 47.

Mr. Brown discussed Mr. Sillman's use of the GSE data with Chris Connelly, an expert in representations and warranties analysis and repurchase demand resolution. Mr.

Connelly has more than 25 years of experience in residential contract finance for both whole loan and securitized transactions as well as mortgage loan underwriting and loan level due diligence. He is currently the owner of SDI Advisory Services, LLC ("SDI"), a mortgage and real estate consulting firm based in Fairfield, Connecticut. SDI provides services to a variety of companies connected to the distressed residential mortgage and real estate sectors. Mr. Connelly confirmed for Mr. Brown what Mr. Sillman had stated in his report – representations and warranties associated with GSE agreements were generally much stricter than those that existed with respect to the Settlement Trusts, and therefore, the Debtors' repurchase experience with the GSEs was not comparable to the Debtors' repurchase experience with the Settlement Trusts.

*Second*, Mr. Brown found and corrected for another error in Mr. Sillman's analysis. Mr. Sillman, according to Mr. Brown, improperly failed to distinguish between (a) Settlement Trusts whose securitizations closed prior to May 14, 2006, which faced a real risk of having a court find that their repurchase claims were time-barred by the applicable statute of limitations and (b) Settlement Trusts that closed after May 14, 2006, which did not have a risk with respect to the Statute of Limitations Defense. Brown Decl. at ¶ 49. According to Mr. Brown, Mr. Sillman's disregard for the significant risk presented by the Statute of Limitations Defense to certain Settlement Trusts overstated the valuation of the Debtors' repurchase liability. To correct for this error, Mr. Brown identified, and discounted, the claims associated with hundreds of Settlement Trusts that closed prior to May 14, 2006. *Id*. at ¶¶ 37-41. Mr. Brown then recalculated the Debtors' repurchase liability using Mr. Sillman's methodology, but using the correct inputs. *Id*. at ¶¶ 42-44. Mr. Brown opined that Mr. Sillman had overstated the Debtors' repurchase liability by, on average, several billion dollars. *Id*. The Debtors did not

move to exclude Mr. Brown's expert testimony in connection with his statute of limitations analysis.

## **LEGAL STANDARD**

A witness qualified as an expert will be permitted to testify if his or her testimony "will assist the trier of fact to understand the evidence or to determine a fact in issue." *United States v. Lumpkin*, 192 F.3d 280, 289 (2d Cir. 1999) (quoting Rule 702). The Federal Rules of Evidence favor the admissibility of expert testimony and are applied with a "liberal thrust." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 588 (1993). "The Second Circuit's standard for admissibility of expert testimony is 'especially broad.'" *MBIA Ins. Corp. v. Patriarch Partners VIII, LLC*, No. 092012 WL 2568972, at *15 (S.D.N.Y. July 3, 2012) (quoting *Clarke v. LR Sys.*, 219 F. Supp. 2d 323, 332 (E.D.N.Y. 2002)). "Where there is sufficient indicia of reliability to allow admission of expert testimony, vigorous cross examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means to attack the evidence." *Id*. (internal citations and quotations omitted). "The Rules' liberal approach to the admission of expert testimony is particularly appropriate in a bench trial." *Id*. (internal citations and quotations omitted). "Experts may also rely primarily, if not solely, on their experience or years of accumulated learning and insight." *IBM v. BCG Partners, Inc.*, No. 10 Civ. 128, 2013 WL 1775437, at * 16 (S.D.N.Y. April 25, 2013) (internal citations and quotations omitted).

## ARGUMENT

### POINT I
### MR. BROWN IS QUALIFIED TO CRITIQUE MR. SILLMAN'S ANALYSIS OF THE DEBTORS' REPURCHASE LIABILITY

The Debtors argue that Mr. Brown is not qualified to opine on Mr. Sillman's analysis because, allegedly, "there is no 'nexus' between [Mr. Brown's] credentials on 'valuation, restructuring, and capital-raising transactions' and his opinions on Sillman's work." Debtors' *Daubert* Motion at 3. The Debtors are wrong.

By virtue of his "knowledge, skill, experience, training, or education," in the areas of valuation, restructuring and finance, Mr. Brown is more than qualified to offer his expert opinion in accordance with Fed. R. Evid. 702 critiquing Mr. Sillman's faulty application of the valuation methodology Mr. Sillman created to estimate the Debtors' repurchase liability in connection with the Settlement Trusts. *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 691 F. Supp. 2d 448, 457 (S.D.N.Y. 2010) ("Courts within the Second Circuit have liberally construed expert qualification requirements" and have allowed "an expert to testify as to matters within his general expertise even though he lacked qualifications as to certain technical matters within that field") (internal quotations omitted); *Johnson & Johnson Vision Care, Inc. v. CIBA Vision Corp.*, No. 04 Civ. 7369, 2006 WL 2128785, at *5-6 (S.D.N.Y. July 28, 2006) (rejecting "an overly narrow test of ... qualifications" and allowing testimony of damages expert without industry-specific training or experience); *Floyd v. City of New York*, 861 F. Supp. 2d 274, 287 (S.D.N.Y. 2012) ("Generally the rejection of expert testimony is the exception rather than the rule.") (internal quotations omitted) (quoting Fed.R.Evid. 702 Adv. Comm. Notes (2000)).

The Debtors attempt to obfuscate the subject matter of Mr. Sillman's expert opinion. Mr. Sillman is a purported valuation expert, and probably not even that. Mr. Sillman designed a formulaic – if fundamentally arbitrary and flawed – methodology to value the Debtors' aggregate repurchase liability to the Settlement Trusts. In particular, Mr. Sillman stated that he was asked to "provide an independent assessment of the Total Allowed Claim as defined in the RMBS Trust Settlement Agreements and opine as to its reasonableness." Sillman I Decl. at ¶ 5. In the Sillman I Declaration that the Debtors submitted in support of their Rule 9019 Motion, Mr. Sillman made clear that he "took no position on the ability of any party to prove a breach of representations and warranties under the Governing Agreements." *Id*. Rather, as discussed above, Mr. Sillman estimated the Debtors' aggregate repurchase liability through the application of a valuation formula involving (i) the determination of estimated lifetime losses for the Settlement Trusts and (ii) the portion of those losses that the Debtors historically have been willing to "share" by agreeing to honor repurchase demands. As part of his formula, Mr. Sillman defined certain variables, including a term he defined as the "Agree Rate." Mr. Sillman defined the Agree Rate as "the percentage of Demands issued by the Trustee that the Seller agrees to repurchase or make whole." Sillman I Decl. at ¶59. Mr. Brown's expert opinion offered a critique and correction of Mr. Sillman's application of Mr. Sillman's own methodology.

In short, valuing assets and liabilities is what Mr. Brown does for a living. Mr. Brown is more than qualified (and far more qualified than Mr. Sillman) to opine on finance and valuation issues. Indeed, the Debtors do not challenge Mr. Brown's qualifications to provide an expert opinion with respect to valuation, nor can they. Mr. Brown previously was qualified as an expert in valuation and restructuring in connection with Ambac Financial Group's Chapter 11 proceeding in the United States Bankruptcy Court for the Southern District of New York. Brown

Tr. at 12-15. Mr. Brown has more than ten years of experience as a finance and restructuring professional valuing assets and liabilities. Brown Decl., Appendix BBB. As a Managing Director at the Blackstone Group's Restructuring & Reorganization Group, Mr. Brown has advised on more than two dozen engagements involving billions of dollars with respect to debtors and creditors in out-of-court restructurings, chapter 11 reorganizations, distressed M&A transactions and distressed capital-raising transactions. *Id*. In connection with these engagements, Mr. Brown structured complex transactions and formulated valuations in a variety of areas, including with respect to going-concerns, liquidations, stakeholder recoveries and corporate capital structures, including valuations of debt liabilities and covenant packages. *Id*. Mr. Brown also has led engagements involving asset sales, debtor-in-possession financings and exit financings. *Id*. As an investment banker at Bear, Stearns & Co. Inc., Mr. Brown executed fifteen transactions including M&A deals, equity and debt offerings, and capital commitments. For these reasons, Mr. Brown is eminently qualified to offer an expert opinion with respect to how Mr. Sillman applied his formula (or disregarded it, as the case may be) to value the Debtors' aggregate repurchase liability to the Settlement Trusts.[6]

The Debtors also question Mr. Brown's qualifications on the grounds that he "has never been qualified as an expert to testify in federal court on the subject of representation and warranty liability, repurchase claims, or mortgage-backed securities settlements." Debtors' *Daubert* Motion at 3 n. 2. This argument is a red herring. The Debtors' argument reveals that they do not appreciate that Mr. Sillman's original analysis was a valuation exercise that did not

---

[6]  The Debtors' authorities are inapposite because they concern experts that were precluded from offering testimony in fields in which they had no experience or expertise. *See, e.g., In re WorldCom, Inc.*, 371 B.R. 33, 41-42 (Bankr. S.D.N.Y. 2007) (precluding economist from offering testimony regarding sales practices of prepaid telephone card industry); *In re Med Diversified, Inc.*, 334 B.R. 89, 95-97 (Bankr. E.D.N.Y. 2005) (precluding accountant – who admitted to no experience in preparing valuation reports – from offering testimony regarding business valuation).

require repurchase experience.   And by his errors, Mr. Sillman proved that *he* lacked the

expertise to conduct a proper valuation of the Debtors' repurchase liability.  Mr. Brown did not

need any expertise with repurchase demands to reach his conclusion that Mr. Sillman made

fundamental errors in his application of his own valuation analysis.   Mr. Sillman offered a

formulaic method for valuing the Debtors' repurchase liability.   He defined each variable

himself.  Although Mr. Sillman's methodology is arbitrary and unreliable, Mr. Brown accepted it

for purposes of this analysis. He simply opined that Mr. Sillman did not apply the formula in a

manner consistent with Mr. Sillman's own definitions.

**POINT II**
**MR. BROWN'S CRITIQUE AND CORRECTION OF MR.**
**SILLMAN'S   ANALYSIS   IS   ADMISSIBLE   EXPERT**
**TESTIMONY**

The   Debtors   seek   to   exclude   Mr.   Brown's   expert   opinions   regarding   Mr.

Sillman's application of his methodology on the basis that Mr. Brown's critique is "not based on

sound methodology."   Debtors' *Daubert* Motion at 3.   In particular, the Debtors attack Mr.

Brown's opinions for three reasons: (i) Mr. Brown only offered a critique and correction of Mr.

Sillman's   application   of   his   methodology   and   did   not   form   his   own   opinion   as   to   the

reasonableness of the proposed Total Allowed Claim,[7] (ii) Mr. Brown's opinion is based, in part,

on a conversation he had with another expert, Mr. Connelly, who has not been offered as an

expert in this proceeding and (iii) Mr. Brown relied, in part, on an assumption from counsel that

the Sillman Repurchase Demand Summary represented "sufficiently robust data" from which to

---

[7]    The Debtors criticize Mr. Brown for not performing an "independent analysis" and for having "no
opinion on the proper method for determining whether a claim size is within a range of reasonableness,
what the range should be, or whether the proposed $8.7 billion allowed claim is within that range."
Debtors' *Daubert* Motion at 1, 3 n. 3

derive the Agree Rate. Debtors' *Daubert* Motion at 3-6. Each of the Debtors' arguments is meritless as a matter of law.

*First*, whether Mr. Brown has an "independent opinion" as to the reasonableness of the proposed Total Allowed Claim has no bearing on the admissibility of his testimony. Mr. Brown offered a critique and correction of Mr. Sillman's application of Mr. Sillman's methodology of the Debtors' repurchase liability to the Settlement Trusts. Courts routinely allow such expert testimony. *See, e.g.*, *In re Blech*, 2003 WL 1610775 at *20 ("Courts have often allowed expert testimony for the sole purpose of critiquing and thereby helping to explain the work of an expert witness retained by another party."); *Faryniarz v. Nike, Inc*., No. 00 Civ. 2623, 2002 WL 1968351, at *2 (S.D.N.Y. Aug. 23, 2002) (allowing testimony of an expert who critiqued flaws in analysis of opposing expert); *Bacardi & Co., Ltd. v. New York Lighter Co., Inc.*, No. 97 Civ. 7140, 2000 WL 298915, at *6 (E.D.N.Y. Mar. 15, 2000) (admitting testimony of a critiquing expert). Experts are permitted to offer critiques that "go directly to the validity of the underlying premise of Defendant's experts' opinions" because such testimony "will help the trier of fact . . . determine the weight to be accorded Defendant's witness' opinions." *Stroheim & Romann, Inc. v. Allianz Ins. Co.*, No. 01 Civ. 8236, 2003 WL 21980389, at *3 (S.D.N.Y. Aug. 14, 2003) (denying motion to exclude expert testimony that "only serve[s] to criticize the conclusions of Defendant's experts and that [] does not offer any opinions as to the cause of the damages.").

The Debtors' criticism of Mr. Brown's methodology as purportedly "not sound" is ironic, if nothing else. Debtors' *Daubert* Motion at 3. Mr. Brown simply critiqued, corrected and applied *Mr. Sillman's methodology*. If there is an analysis that is unsound, it is Mr. Sillman's analysis, not Mr. Brown's critique of it. Mr. Brown's testimony critiquing and

correcting Mr. Sillman's analysis will help inform the Court as to the weight, if any, to accord Mr. Sillman's opinions in its consideration of the reasonableness of the proposed Total Allowed Claim and its adjudication of whether the Debtors satisfied their burden under Rule 9019.  Mr. Brown criticized Mr. Sillman for disregarding data called for by the variables that Mr. Sillman, himself, defined when he developed his valuation formula.  As a result, as Mr. Brown concluded, Mr. Sillman overstated his valuation of the Debtors' repurchase liability by as much as $6.6 billion.

*Second*, Mr. Brown should not be precluded from giving expert testimony simply because he drew comfort from a conversation with Mr. Connelly, an expert in representations and warranties analysis and repurchase demand resolution.  The United States Court of Appeals for the Second Circuit has "repeatedly rejected the argument [that] . . . a district court errs merely by admitting expert testimony that is based, in part, on otherwise inadmissible evidence." *United States v. Yevakpor,* 271 Fed. Appx. 19, at 3 (2d Cir. 2008).  Indeed, "[e]xperts are generally permitted to rely on otherwise inadmissible evidence in formulating an expert opinion." *Howard*, 406 F. 3d at 127.  For example, experts are entitled to rely on hearsay because, "as an expert, the witness herself is assumed to have the skill to properly evaluate the hearsay, giving it probative force appropriate to the circumstances." *Id*.  "It is well settled that [an expert] is entitled to rely on the opinion of experts in other fields as background material for arriving at [their own] opinion . . . regardless of their admissibility." *IBM*, 2013 WL 1775437, at *17 (citations and quotations omitted); *Peerless Ins. Co. v. Marley Engineered Prods. LLC*, No. 05 Civ. 4848, 2008 WL 7440158, at *6 (E.D.N.Y. June 12, 2008) ("Experts . . . often rely upon the observations of other experts in reaching their conclusions.").  Accordingly, courts often allow testimony that is based on conversations with other experts and professionals.  *See e.g., Corey*,

207 F.3d at 88 (1st Cir. 2000) (admitting expert testimony based in part on telephone call with firearm historian); *Semerdjian v. McDougal Littell*, 641 F. Supp. 2d 233 (S.D.N.Y. 2009) (admitting expert testimony based, in part, on conversations with employees at textbook publisher).

Here, Mr. Brown drew comfort from his conversation with Mr. Connelly that he could rely on *Mr. Sillman's views* and observations about GSE data. Mr. Brown did so out of an abundance of caution, which was prudent given the flaws he found in Mr. Sillman's application of his valuation formula. Mr. Connelly *corroborated Mr. Sillman's opinion* that the Debtors' repurchase experience with the GSEs was not analogous and was irrelevant to the Debtor's repurchase experience with the Settlement Trusts.[8] It is puzzling why the Debtors would criticize Mr. Brown for a conversation with Mr. Connelly in which he essentially corroborated Mr. Sillman's own statements.

*Third*, Mr. Brown's reliance on an assumption provided by counsel does not render his testimony inadmissible. *See, e.g.*, *Feinberg*, 2007 WL 4562930, at *4 ("Counsel routinely ask their expert witness to 'assume' various facts as the basis for his opinion"); *Alfa Corp. v. OAO Alfa Bank*, 475 F. Supp. 2d 357, 366 (S.D.N.Y. 2007) ("[C]ourts should reject expert opinions only if it . . . relies on assumptions that are so unreasonable and contradictory as to suggest bad faith."); *Boucher v. United States Suzuki Motor Corp.*, 73 F.3d 18 (2d Cir. 1996) ("[C]ontentions that the assumptions are unfounded go to the weight, not the admissibility, of the

---

[8]    The Debtors' authorities are completely inapposite. In *Dura Auto. Sys. of Indiana, Inc. v. CTS Corp.*, 285 F. 3d 609, 612-15 (7th Cir. 2002), the court precluded testimony from a hydrologist who merely reported the results of modeling exercises undertaken by other employees of his consulting firm. Similarly, in *Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 664 (S.D.N.Y. 2007), the court precluded an expert who attempted to proffer a regression analysis that was performed by someone else and that the precluded expert admitted "he essentially had nothing to do with the preparation." *Id*. Here, there is no suggestion by the Debtors that Mr. Connelly performed Mr. Brown's analysis for him, or that Mr. Connelly had anything to do with Mr. Brown's quantitative analysis.

testimony.") (internal citations and quotations omitted); *MBIA Ins. Corp.,* 2012 WL 2568972, at *16.

Not only is it routine for an expert to be asked to take into account certain assumptions in the course of his analysis, *Mr. Sillman himself* relied on various assumptions from counsel, including, critically, an assumption "that the Trusts were capable of proving a breach of representations and warranties under the Governing Agreements in certain claims against the Debtors."  Sillman I Decl. at ¶¶ 5, 67; Sillman Tr. at 194 ("I take no position on the ability of any party to prove a breach of representations and warranties under the governing agreements.  And I assume for the purposes of this declaration that a showing can be made against the debtors.").

The assumption that the Debtors take issue with here – that the Sillman Repurchase Demand Summary represented "sufficiently robust data" from which to derive an Agree Rate, under Mr. Sillman's definition – was neither unreasonable nor unfounded.  The Sillman Repurchase Demand Summary identified the outcome of *all 16,000 repurchase requests* made to the Debtors in connection with the Settlement Trusts before the Debtors filed for bankruptcy protection.  By reference to the Sillman Repurchase Demand Summary, Mr. Brown was able to determine the Agree Rate in exact accordance with Mr. Sillman's definition of the Agree Rate: "the percentage of Demands issued by the Trustee that the Seller agrees to repurchase or make whole."  Sillman I Decl. at ¶ 59.  Far from requiring a so-called "reality check," Mr. Brown's reliance on the data to derive an Agree Rate was reasonable and reliable because the Sillman Repurchase Demand Summary comprised, not even a large sample, but *entire known universe* of the Debtors' repurchase experience in connection with the Settlement Trusts.  In contrast, the Debtors' expert, Mr. Sillman, chose to form his Agree Rate by

22

(i) reference to data relating to GSE repurchase demands that he admitted was not analogous to the Debtors' repurchase experience with Settlement Trusts and (ii) the application of an arbitrary discount that was not supported by any quantitative or qualitative analysis.  Sillman I Decl. ¶ 61; Sillman Tr. at 225-30.

In addition, the Debtors' argument that the Sillman Repurchase Demand Summary is "too limited" is inexplicable given Mr. Sillman's subsequent re-underwriting analysis, and the conclusions and opinions expressed in the Sillman II Declaration.  In particular, Mr. Sillman purported to extrapolate a "material defect rate" applicable to all 1.6 million loans sold to the Settlement Trusts from a re-underwriting review of just 1500 loans (less than 10% of the size of the data set contained in the Sillman Repurchase Demand Summary).  Sillman II Decl. at ¶¶ 5-7.  Equally inexplicable is the Debtors' attack on Mr. Brown for purportedly not relying on "statistical analysis for his opinions."  Debtors' *Daubert* Motion at 4-5.  The Debtors offer no explanation as to why statistical analysis would be necessary to form conclusions from a set of data, like the Sillman Repurchase Demand Summary, that is not a sample, but rather comprises *the entire universe* of available data required to calculate the Agree Rate variable *as defined by Sillman himself*.  Nor do the Debtors explain how their criticism can be reconciled with the fact that Mr. Sillman's own analysis required an extrapolation from a sample of loans, even though Mr. Sillman lacks the expertise to offer opinions as to statistics or probability.[9]

---

[9]    The Debtors' authorities are not only inapposite, they are beneficial to MBIA.  In *In re Iridium Operating LLC*, 373 B.R. 283, 351 (Bankr. S.D.N.Y. 2007), the court precluded testimony because an expert "ignored or wrongly discarded Iridium's projections" and instead "created his own projections for litigation purposes."  *Id.*  Similarly, in *Lippe v. Bairnco Corp.*, 288 B.R. 678, 689 (S.D.N.Y. 2003), the court precluded expert testimony because the experts engaged in "apples and oranges 'comparisons'" and "they do not account for major variables."  *Id.*  Here, it is Mr. Sillman who disregarded relevant data and ignored major litigation risks, like the Statute of Limitations Defense.  Brown Decl. ¶7, 8, 45.

**CONCLUSION**

MBIA respectfully submits that the Debtors' *Daubert* Motion should be denied.


Dated:    New York, New York
          May 14, 2013

                              **CADWALADER, WICKERSHAM & TAFT LLP**


                              By _____/s/ Jonathan M. Hoff _____
                              Gregory M. Petrick
                              Ingrid Bagby
                              Jonathan M. Hoff
                              Jason Jurgens
                              Nathan Bull
                              CADWALADER, WICKERSHAM & TAFT LLP
                              One World Financial Center
                              New York, New York 10281
                              Telephone: (212) 504-6000
                              Facsimile: (212) 504-6666

                              -and-

                              Mark C. Ellenberg
                              CADWALADER, WICKERSHAM & TAFT LLP
                              700 Sixth Street, N.W.
                              Washington, DC 20001
                              Telephone: (202) 862-2200
                              Facsimile: (202) 862-2400

                              *Attorneys for MBIA Insurance Corporation*