KRAMER LEVIN NAFTALIS & FRANKEL LLP
Kenneth H. Eckstein
Philip Bentley
David E. Blabey, Jr.
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000

*Counsel for the Official Committee
of Unsecured Creditors*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------ x
| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| Residential Capital, LLC, et al., | : | Case No. 12-12020 (MG) |
| | : | |
| Debtors. | : | Jointly Administered |
| | : | |

------------------------------------------------------------ x

**REPLY IN FURTHER SUPPORT OF MOTION *IN LIMINE* OF THE OFFICIAL
COMMITTEE OF UNSECURED CREDITORS TO PRECLUDE THE EXPERT
TESTIMONY OF JEFFREY A. LIPPS IN CONNECTION WITH THE DEBTORS'
MOTION FOR APPROVAL OF THE RMBS TRUST SETTLEMENT AGREEMENTS**

# TABLE OF CONTENTS

**Page**

Preliminary Statement ........................................................................................................................1

Argument ...........................................................................................................................................1

I.      The Debtors Cannot Overcome the Settled Rule That Expert Testimony on Issues of Law is Inadmissible ................................................................................................1

II.     The Debtors Cannot Establish That Mr. Lipps' Opinion Satisfies *Daubert* ........................3

III.    The Debtors Have Not Adequately Addressed the Problems Posed by Mr. Lipps' Dual Role as Counsel and Expert ........................................................................................6

IV.    The Debtors' Other Arguments Fail as Well ......................................................................8

Conclusion .......................................................................................................................................10

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*CIT Group/Business Credit, Inc. v. Graco Fishing & Rental Tools, Inc.*,
   815 F. Supp. 2d 673 (S.D.N.Y. 2011) ................................................................................... 2

*Davis v. Carroll*,
   No. 09 Civ. 1088, 2013 WL 1285272 (S.D.N.Y. Mar. 29, 2013) ......................................... 5

*Highland Capital Management, L.P. v. Schneider*,
   379 F. Supp. 2d 461 (S.D.N.Y. 2005) ................................................................................... 2

*In re Ambac Fin'l Grp., Inc.*,
   457 B.R. 299 (Bankr. S.D.N.Y. 2011) .................................................................................. 3

*In re Initial Public Offering Securities Litig.*,
   174 F. Supp. 2d 61 (S.D.N.Y. 2001) ..................................................................................... 2

*In re Methyl Tertiary Butyl Ether Products Liability Litigation*,
   MDL No. 1358, 2008 WL 1971538 (S.D.N.Y. May 7, 2008) ........................................ 5, 6

*In re MF Global, Inc.*,
   No. 11-2790, 2012 WL 3242533 (Bankr. S.D.N.Y. Aug. 10, 2012) ................................ 2, 3

*In re Purofied Down Prods. Corp.*,
   150 B.R. 519 (S.D.N.Y. 1993) .............................................................................................. 3

*In re Residential Capital, LLC*,
   No. 12-12020, 2013 WL 1497203 (Bankr. S.D.N.Y. April 12, 2013) ................................. 9

*Kumho Tire Co. v. Carmichael*,
   526 U.S. 137 (1999) ............................................................................................................... 5

*Lippe v. Bairnco*,
   288 B.R. 678 (S.D.N.Y. 2003) .......................................................................................... 7, 8

*Music Sales Corp. v. Morris*,
   73 F. Supp. 2d 364 (S.D.N.Y. 1999) ..................................................................................... 2

*Public Patent Foundation, Inc. v. Glaxosmithkline Consumer Healthcare, LP*,
   801 F. Supp. 2d 249 (S.D.N.Y. 2011) ................................................................................... 2

*United States v. Bilzerian*,
   926 F.2d 1285 (2d Cir. 1991) ................................................................................................ 2

TO THE HONORABLE MARTIN GLENN,
UNITED STATES BANKRUPTCY JUDGE:

The Official Committee of Unsecured Creditors (the "**Committee**") of the above-captioned debtors and debtors-in-possession (collectively, the "**Debtors**") hereby submits this reply (the "**Reply**") in response to the Debtors' opposition (the "**Opposition**") [Dkt. No. 3714] to the Committee's motion *in limine* (the "**Motion**") [Dkt. No. 3612] seeking to preclude the expert testimony of Jeffrey A. Lipps in connection with the Debtors' motion (the "**9019 Motion**") [Dkt. Nos. 320, 1176, 1887] for approval of the RMBS Trust Settlement.[1]

**Preliminary Statement**

The Opposition does nothing to undermine the arguments for preclusion set forth in the Motion. The Debtors dodge key cases, invent new exceptions to well settled law, and ignore inconvenient facts. Despite these attempts at obfuscation, it remains clear that the testimony of Mr. Lipps must be excluded for the reasons set forth in the Motion: because he offers expert testimony on issues of law in violation of controlling Second Circuit authority; because his opinion is based on no reliable methodology but only his own unsupported *ipse dixit*; and because (as the Debtors now acknowledge) he has been playing a dual role as expert and counsel in this matter.

**Argument**

**I.    The Debtors Cannot Overcome the Settled Rule That Expert Testimony on Issues of Law is Inadmissible**

The Motion sets forth, at length, the abundant Second Circuit authority supporting the well-settled proposition that an expert's testimony on issues of law is inadmissible. *See* Motion at 5-7. The Debtors simply ignore this controlling authority, dismissing these cases –

---

[1] The RMBS Trustees that serve on the Committee have not participated in Committee deliberations concerning the Motion or Reply.

- 1 -

without even citing them – as having been decided "outside the bankruptcy context." Opposition at 3. This is a distinction without a difference.

Rather than confront the Committee's arguments, the Debtors set up a straw man, arguing that "Mr. Lipps's opinion does not address the ultimate legal issues." Opposition at 2. But the Committee has not sought to exclude Mr. Lipps' testimony on this ground. Rather, the Committee seeks to exclude Mr. Lipps' self-described "legal analysis" (January 15 Declaration ¶ 28) on the ground that it contravenes the "general rule" that "an expert's testimony on issues of law is inadmissible." *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991). *See* Motion at 5-9. His testimony, in this regard, is no different than the expert legal analyses that were excluded in the cases cited by the Committee at pages 5-9 of the Motion. *See, e.g., Highland Capital Management, L.P. v. Schneider*, 379 F. Supp. 2d 461 (S.D.N.Y. 2005); *In re Initial Public Offering Securities Litig.*, 174 F. Supp. 2d 61 (S.D.N.Y. 2001); *Music Sales Corp. v. Morris*, 73 F. Supp. 2d 364 (S.D.N.Y. 1999).[2]

The Debtors misleadingly cite several cases in which bankruptcy courts, in connection with Rule 9019 settlement motions, considered *non-expert* attorney declarations that provided relevant *factual* information – e.g., discussions of case and settlement background, costs and burdens, and the debtor's or trustee's position with respect to the settlement. *See* Opposition at 2-3. In none of these three cases did the attorney offer an expert declaration or opine on issues of law, as Mr. Lipps does here. *See In re MF Global, Inc.*, No. 11-2790, 2012 WL 3242533, *6-7 (Bankr. S.D.N.Y. Aug. 10, 2012) (citing attorney declaration for proposition that litigation would be time consuming and expensive, SIPA Trustee had determined that

---

[2] This rule has been uniformly applied in bench trials as well as in jury trials. *See, e.g.*, *CIT Group/Business Credit, Inc. v. Graco Fishing & Rental Tools, Inc.*, 815 F. Supp. 2d 673, 678 (S.D.N.Y. 2011) (cited by the Committee at page 12 of the Motion); *Public Patent Foundation, Inc. v. Glaxosmithkline Consumer Healthcare, LP*, 801 F. Supp. 2d 249, 254 (S.D.N.Y. 2011).

- 2 -

resolving the dispute was beneficial to the estate, settlement resolved esoteric issues, and negotiations had been arm's length); *In re Ambac Fin'l Grp., Inc.*, 457 B.R. 299, 304-06 (Bankr. S.D.N.Y. 2011) (citing attorney declaration and testimony in support of factual conclusions regarding debtor's "extensive systems, policies, and controls," "plausible explanation for the timing of the stock sales," and "significant legal costs" avoided); *In re Purofied Down Prods. Corp.*, 150 B.R. 519, 521 (S.D.N.Y. 1993) (citing trustee assertions in motion for approval of settlement that trustee had "expended significant time, expense and effort in connection with the [] litigation," "substantial additional expense and effort would be incurred, with no certainty of a favorable result, if the litigation was not settled," and it was trustee's "opinion that, considering the claims and defenses of the parties, the settlement was in the best interests of the estate").

The Debtors make much of this Court's decision in *MF Global* – but the attorney declaration there (attached as **Exhibit A** hereto) was a simple four-page declaration that contained no discussion of legal issues. Instead, it merely: affirmed that the facts and representations set forth in the accompanying motion were accurate (¶ 3); noted that litigation of the settled issues would have been a "case of first impression potentially subject to a drawn-out appellate process" and would be "time consuming and expensive" (¶ 5); described the negotiations that led to the settlement and represented that they were at arms-length and in good faith (¶¶ 6-8); stated the Trustee's belief that "entry into the Agreement is a sound exercise of his business judgment and in the best interest of [] customers and creditors" (¶ 6); and set forth the benefits of the settlement (¶ 9). The *MF Global* fact declaration could not be more different than the lengthy "expert" legal analyses Mr. Lipps has submitted.

## II. The Debtors Cannot Establish That Mr. Lipps' Opinion Satisfies *Daubert*

In the Motion, the Committee explained that the ultimate opinion expressed in Mr. Lipps' September 28 expert report – that the proposed Settlement is reasonable in amount –

- 3 -

was premised only on his impermissible legal analysis, such that if the Court were to preclude Mr. Lipps from testifying as to legal matters, his opinion would have no basis at all. Motion at 10. The Debtors have not contested this point. Thus, if the Court strikes Mr. Lipps' testimony as to legal matters, his ultimate opinion must be stricken as well, and the Court need go no further.

But even if the Court were to permit Mr. Lipps' testimony as to legal issues, his ultimate opinion must still be excluded as lacking support. Mr. Lipps' September 28 expert report provides no support for his opinion that a settlement of $8.7 billion – as opposed to some other number – is reasonable, because his analysis is devoid of any quantitative component. Motion at 10-12. And even if the Court were to consider the improper supplementation contained in his January 15 reply report, Mr. Lipps' cursory consideration of these few additional data points would not come close to meeting *Daubert* standards. *Id*. at 12-14.

The Debtors' contention that non-quantitative expert testimony is admissible in *some* cases (Opposition at 4-5) is true, but it is a red herring. In *this* case, Mr. Lipps is offering an opinion that is quantitative in nature – namely, that $8.7 billion is a reasonable amount for which to settle the Trusts' hundreds of thousands of potential put-back claims. This conclusion cannot be rationally supported without considering a number of quantitative issues, including the number of loans that qualify for put-back and the amount of damages awardable for each defective loan. Yet Mr. Lipps has made no serious attempt to quantify any of these matters. Moreover, his passing observation (September 28 Declaration at ¶ 120) that "the overwhelming majority of the loans in each collateral pool did not breach any representations and warranties" would seem to support a settlement more in the range of $2-3 billion than $8.7 billion.[3]

---

[3] The Debtors make much of the Committee's prior characterization of Mr. Lipps' legal analysis as "detailed and sophisticated." *See, e.g*., Opposition at 5 (quoting Committee's Objection to the 9019 Motion). What the Debtors fail to note is that providing a sound legal analysis, as Mr. Lipps does with respect to some of the governing legal issues, is only one of several necessary steps in a valuation of the Trusts' put-back claims. Unless the legal analysis

Judge Oetken's recent decision in *Davis v. Carroll*, No. 09 Civ. 1088, 2013 WL 1285272 (S.D.N.Y. Mar. 29, 2013), is closely on point. In that suit over an unauthorized sale of artwork, the defendant purchaser sought to buttress his buyer-in-the-ordinary-course defense by introducing expert testimony that the purchase price was reasonable. *Id*. at *18. The court struck the expert's testimony for reasons squarely applicable here. The court began by acknowledging that (as the Debtors argue here) an expert's testimony need not always rest on "traditional scientific methods," but may sometimes be based on "practical experience." *Id.* at *19. But, the court ruled, proponents of expert testimony "must still reckon with the rule that 'the basic requirements of reliability – as they are now articulated in Rule 702 – apply across the board to all expert testimony.'" *Id*. at *20 (citation omitted). Although the buyer's expert was qualified to offer expert testimony on art appraisal, the court nevertheless excluded his testimony as unreliable, noting:

> Rosenberg's ROP appraisal, which selectively mixes aspects of standard appraisal practice with a speculative assessment of how the parties to a substantial transaction might have viewed each work, does not survive scrutiny. At no point in his report, deposition, or declaration does Rosenberg clarify the full set of factors that play a role in this analysis, nor does Rosenberg explain how these factors interact or how much weight each factor is assigned in his calculus. . . . Under *Kumho Tire*, Rosenberg has failed to link his personal knowledge and experience to the issue in a non-speculative and non-conjectural manner.

*Id.* at *24-25 (referencing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999)).[4]

---

is coupled with a quantitative analysis addressing issues such as the defect rate and the amount of resulting losses, it no more supports the reasonableness of an $8.7 billion settlement than a $2 billion or $4 billion settlement.

[4] The multiple cases cited at page 12 of the Motion are to the same effect. The Debtors make no attempt to respond to these cases. Instead, the Debtors cite cases (Opposition at 4-5) for the proposition that experience-based testimony may be admissible – but these cases do not dispense with the requirement of a methodology. Thus, in *In re Methyl Tertiary Butyl Ether Products Liability Litigation*, MDL No. 1358, 2008 WL 1971538 (S.D.N.Y. May 7, 2008), the court was careful to note that, even when an expert applies his experience, "the court must determine that an expert's testimony is 'properly grounded, well-reasoned, and not speculative,' and the expert must 'show *how* his or her experience . . . led to his conclusion.'" *Id.* at *6 (citations omitted; emphasis added). Moreover, the expert in *Methyl* employed a far more quantitative and scientific – and fully articulated – technique than Mr. Lipps, actually

- 5 -

Mr. Lipps' testimony suffers from the very same flaws. While his declarations identify a variety of factors that he supposedly considered in reaching his opinion, they say nothing at all about how, having considered those factors, he reached his conclusion that $8.7 billion is a reasonable settlement sum. His conclusion, therefore, is nothing more than *ipse dixit*. Whether the basis for Mr. Lipps' opinion is his legal analysis alone or his legal analysis as supplemented by the additional data points belatedly set forth in his January 15 Declaration, his testimony must be excluded because there is nothing in his analysis, other than his untestable say-so, to link his consideration of various factors to his conclusory determination that the settlement amount is reasonable. *See* Motion at 12-14.

## III.  The Debtors Have Not Adequately Addressed the Problems Posed by Mr. Lipps' Dual Role as Counsel and Expert

The Debtors acknowledge Mr. Lipps' involvement in seeking approval of the RMBS Trust Settlement, *see* Opposition at 2, 6-7, but they seek to dismiss its relevance by arguing that (i) he was not involved in negotiating the settlement, (ii) his involvement thereafter was minimal, and (iii) his role as counsel is not a basis for exclusion of his testimony, but only for discounting its weight. None of these arguments is persuasive.

First, it is irrelevant that Mr. Lipps may not have been involved in *negotiation* of the Settlement. The matter before the Court concerns the *approval* of the Settlement, and the

---

endeavoring to explain his conclusions by reference to data, calculations, and estimates. *See, e.g., id.* at *4 (expert "compare[d] the technical properties of MTBE and ethanol and discusse[d] the modifications to blending, transportation, terminal and retail technology that would have been necessary to use ethanol more widely in RFG") and *7 (expert explained that he "began with data showing that factoring in tax credits, raw ethanol was often cheaper than MTBE" and "then considered costs related to the chemicals' technical properties such as octane balances and butane back out as well as additional investment for ethanol at the terminal level or for installation of equipment").

Finally, it bears note that the Debtors embrace the correct standard for admission of expert opinion in their own motion to preclude the testimony of Mr. C.J. Brown, in which they state that "*Daubert* requires that Brown 'illustrate the reliability of his methodology and analysis at every step,'" and "[i]f he cannot, the Court should exclude his testimony because of the 'analytical gap between the data and the opinion proffered.'" *See* Dkt. No. 3606 at 3 (citations omitted).

Debtors have acknowledged (and the evidence establishes) Mr. Lipps' role in advocating that cause.

Second, notwithstanding the Debtors' attempts to minimize his participation, Mr. Lipps and his firm have been deeply involved in the prosecution of the 9019 Motion, including drafting briefs for the Debtors on the very issues as to which he proposes to testify. The evidence set forth in the Motion (at 15-19) makes this abundantly clear, and the assertion that the time entries demonstrating this role were "cherry-picked," Opposition at 6, is belied by the fee applications of Carpenter Lipps & Leland LLP. In language cited by the Committee that the Debtors fail to acknowledge, Mr. Lipps' firm touted its role in prosecution of the 9019 Motion, noting, among other things, that it: "collaborated heavily with Morrison & Foerster to help the Debtors address . . . the [RMBS 9019] motion," "assisted in responding to the discovery requests that the Debtors have received related to the RMBS Trust Settlement," and "researched certain issues relevant to the reply briefing and prepared drafts of sections of the brief in close coordination with Morrison & Foerster." *See* Motion at 17 (quoting and citing fee applications). The fact that Mr. Lipps – as lead counsel for this engagement – performed only some of this work himself, and supervised the remaining work that his partners and associates performed, does not diminish the significance of his participation.

Finally, while it would certainly be appropriate for the Court to discount the weight of Mr. Lipps' testimony in light of his clear bias, it is also appropriate to exclude his testimony altogether because of his role as counsel. The Debtors give short shrift to *Lippe v. Bairnco*, 288 B.R. 678 (S.D.N.Y. 2003), but the case could not be more closely on point. There,

as here, an attorney was engaged both as counsel and as an expert,[5] and, in that dual role, helped to develop and explore legal theories, identify the relevant facts and law, formulate arguments and theories, and prepare for responses to defenses. *See Lippe*, 288 B.R. at 684, 688 (described in more detail in the Motion at 16, 19). The court in *Lippe* recognized that "lack of bias is not required for expert testimony to be admissible," but nevertheless excluded the expert testimony in its entirety, determining that "here plaintiffs have gone too far, for they seek to call as a witness someone who has acted as their attorney." *Id.* at 688-89. The same result is warranted here.

## IV.     The Debtors' Other Arguments Fail as Well

The Debtors' remaining arguments also miss the mark. First, in arguing that the May 24 Declaration is relevant, Opposition at 8-9, the Debtors ignore the fact that that declaration addressed the burdens of litigating claims against *non*-debtors *outside* of bankruptcy. They nowhere confront the Committee's argument that this litigation history has at most minimal relevance to the 9019 Motion, since the Debtors are in bankruptcy and any claims will be resolved not through ordinary nonbankruptcy litigation but rather through summary proceedings such as estimation. Because, as Mr. Lipps has admitted, he has no familiarity with the court's estimation powers, *see* Lipps Tr. 38:9-43:12, he has no basis to testify as to the burdens that estimation of the Trusts' claims would entail – and in any event, that is a different topic from those addressed in his May 24 Declaration.

Second, the Debtors' arguments regarding the Court's April 12 Preclusion Order are disingenuous. The Debtors disclaim any intent to rely on Mr. Lipps' testimony in support of

---

[5] The Debtors note that Mr. Lipps has not signed any of the their motions or briefs, Opposition at 8, but that appears to have been true of the attorney expert in *Lippe* as well. *See Lippe*, 288 B.R. at 683 (describing expert as having been engaged by attorneys of record, and not listing expert among counsel in header of opinion).

their decision to enter into the RMBS Trust Settlement.  Opposition at 10.  However, in their reply brief in support of the 9019 Motion, the Debtors suggested the contrary:

> Th[e Debtors' legal] defenses were considered and factored into the settlement . . . . [T]he Debtors' lawyers have significant experience defending RMBS cases, and the Debtors' directors have been keenly interested in the Debtors' representation and warranty litigation since 2008.  The Debtors' directors and lawyers were fully up-to-speed on the strengths and weaknesses of the Debtors' legal defenses.  The Debtors will offer the testimony of Jeffrey Lipps, the Debtors' principal outside counsel for RMBS-related litigation, to explain these strengths and weaknesses.

Debtors' Reply Brief re *Iridium* Factors at 43-44 [Dkt. No. 2803].  The implication is clear: the Debtors hope that, by introducing (i) the opinions of Mr. Lipps (the Debtors' lead put-back defense counsel) as to the strengths and weaknesses of R&W defenses, and (ii) evidence that the Debtors' directors were fully up-to-speed on the strengths and weaknesses of the Debtors' legal defenses, the Court will infer that the Board was fully apprised of Mr. Lipps' views.  But this is exactly what the Court's Preclusion Order prohibits.  The Debtors' statement that the Court's Preclusion Order "would only prohibit Mr. Lipps from testifying regarding legal advice he actually gave to the Debtors' officers and board members," Opposition at 10, is in direct conflict with that Order, which explicitly cautioned that evidence of Board members' personal experience with R&W liability "may not be used as a back door to introduce legal advice given by ResCap's attorneys."  *In re Residential Capital, LLC*, No. 12-12020, 2013 WL 1497203, *8 (Bankr. S.D.N.Y. April 12, 2013).

## Conclusion

WHEREFORE, for the reasons set forth herein and in the Motion, the Committee respectfully requests that the Court enter an Order precluding Mr. Lipps from offering expert testimony at the trial of the 9019 Motion.

Dated: New York, New York
May 20, 2013

                                            KRAMER LEVIN NAFTALIS & FRANKEL LLP

                                            /s/ Philip Bentley
                                            Kenneth H. Eckstein
                                            Philip Bentley
                                            David E. Blabey, Jr.
                                            1177 Avenue of the Americas
                                            New York, New York 10036
                                            Telephone: (212) 715-9100
                                            Facsimile: (212) 715-8000

                                            *Counsel for the Official Committee*
                                            *of Unsecured Creditors*

**EXHIBIT A**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

In re

        MF GLOBAL INC.,

                         Debtor.

Case No. 11-2790 (MG) SIPA

**DECLARATION OF ANSON B. FRELINGHUYSEN IN SUPPORT OF
TRUSTEE'S MOTION FOR APPROVAL OF AN AGREEMENT PROVIDING
FOR THE RETURN OF MFGI PROPERTY, EXTINGUISHMENT OF
DUPLICATE CLAIMS FILED WITH CME GROUP INC., AND ALLOCATION
OF THE MFGI PROPERTY TO CUSTOMERS OF THE MFGI ESTATE**

I, ANSON B. FRELINGHUYSEN, declare that the following is true and correct:

        1.        I am an attorney duly admitted to practice in this Court and am associated with the firm of Hughes Hubbard & Reed LLP ("Hughes Hubbard"), attorneys for James W. Giddens (the "Trustee"), as Trustee for the liquidation of the business of MF Global Inc. ("MFGI") under the Securities Investor Protection Act of 1970, as amended ("SIPA").

        2.        I submit this declaration in support of the Limited Agreement and Reservation of Rights (the "Agreement") between the Trustee and CME Group Inc. ("CMEG"), on its own behalf and on behalf of each and all of its exchange subsidiaries,[1] and GFX Corporation ("GFX") (collectively, "CME Group") and the Trustee's Motion for Approval of an Agreement Providing for the Return of MFGI Property, Extinguishment of Duplicate Claims

---

1. Chicago Mercantile Exchange Inc. ("CME"), Board of Trade of the City of Chicago, Inc. ("CBOT"), New York Mercantile Exchange, Inc. ("NYMEX"), and Commodity Exchange, Inc. ("COMEX," and collectively with CME, CBOT, and NYMEX, the "Exchanges").

62024937_1

12-12020-mg    Doc 3784    Filed 05/20/13    Entered 05/20/13 16:15:40    Main Document
                                    Pg 2 of 4
11-02790-mg    Doc 2716    Filed 08/03/12    Entered 08/03/12 16:37:42    Main Document
                                    Pg 16 of 18

2

filed with CME Group Inc., and Allocation of the MFGI Property to Customers of the MFGI Estate (the "Motion," ECF No. 2029).[2]

3.  On behalf of the Trustee, I participated in negotiations and discussions with CME Group that resulted in the Agreement described in the Motion and attached thereto as Exhibit B. I have knowledge of the facts and representations set forth in the Motion regarding the terms of the Agreement, which provide for: (i) disposition of the MFGI Property; (ii) subordination of the CME Claim and the GFX Claims to all customer claims; (iii) liquidation and/or sale of the Exchange Memberships and CME Group Shares; (iv) disposition of claims asserted under the Exchange Rules and modification of the automatic stay in the SIPA Proceeding to the extent necessary; and (v) allocation of a portion of the MFGI Property to MFGI's customer estates. The Motion accurately describes the foregoing.

4.  As represented by CME Group in the Agreement, subsequent to the Filing Date and pursuant to the FCM Account Transfers, the only MFGI property remaining at or under the control of CME Group is the MFGI Property. CME Group has taken the position that such property must be disposed of in accordance with its various Exchange Rules.

5.  After an in-depth review, the Trustee has taken the position that the MFGI Property should not be subject to any separate administration pursuant to the Exchange Rules but should instead be administered solely by the Trustee and merged into the Court-administered SIPA Proceeding. Litigation between CME Group and the Trustee regarding priority of payment pursuant to the Exchange Rules versus the Part 190 Regulations would not only be a case of first impression potentially subject to a drawn-out appellate process, but would also be time

---

2. Capitalized terms used herein but not defined shall have the meaning ascribed to them in the Motion and the Agreement.

11-02790-mg    Doc 2716    Filed 08/03/12    Entered 08/03/12 16:37:42    Main Document
                                    Pg 3 of 4
12-12020-mg    Doc 3784    Filed 05/20/13    Entered 05/20/13 16:15:10    Main Document
                                    Pg 17 of 18

3

consuming and expensive. Both factors would ultimately be to the detriment of MFGI's former customers and creditors.

6. In an effort to avoid such extensive and costly litigation, and to maximize and accelerate recoveries to customers, the Trustee's and CME Group's respective professionals have engaged in arms-length, good faith negotiations in reaching the Agreement over a period of several months. The professionals exchanged views regarding the legal issue described above. Based on CME Group's continued position regarding the priority of Exchange Rules over the Part 190 Regulations as to the disposition of the MFGI Property, the Trustee believes that entry into the Agreement is a sound exercise of his business judgment and in the best interest of MFGI's customers and creditors for the reasons stated in the Motion and paragraph 9 below. The Agreement obviates the need to engage in expensive and protracted litigation with CME Group regarding this issue.

7. After agreeing to the basic framework of the Agreement, the Trustee's and CME Group's respective professionals spent a significant amount of time and effort, including conducting numerous telephonic and in-person meetings between professionals, to arrive at the final terms of the Agreement.

8. In addition to participating in negotiations with CME Group, I also participated, on behalf of the Trustee, in significant discussions and information exchanges with counsel for Louis J. Freeh, as Chapter 11 Trustee of MF Global Holdings Ltd., et al. (the "Chapter 11 Trustee"), the Statutory Creditors' Committee of MF Global Holdings Ltd., et al. (the "Statutory Creditors' Committee"), and the Ad Hoc Group of MF Global Holdings Ltd., et al. creditors (the "Ad Hoc Group," together with the Chapter 11 Trustee and Statutory Creditors' Committee, the "Chapter 11 Parties") with the purpose of obviating a formal objection to the

62024937_1

12-12020-mg Doc 3784 Filed 05/29/13 Entered 05/29/13 16:15:10 Main Document Pg 18 of 18
11-02790-mg Doc 2716 Filed 08/03/12 Entered 08/03/12 16:37:42 Main Document Pg 4 of 4

4

Motion by the Chapter 11 Parties. These efforts were successful. On June 29, 2012, the Chapter 11 Parties submitted written requests to the Trustee, and, beginning on July 5, 2012, the Trustee and CME Group responded to those requests, producing written explanations and hundreds of pages of documents. Subsequently, all parties engaged in multiple rounds of telephonic and in-person conferences to develop and respond to the various issues presented by the Motion. The ultimate outcome of these substantial efforts was that none of the Chapter 11 Parties objected to the Motion and the Trustee filed the Notice of Revised Proposed Order (ECF No. 2603).

9. The Agreement will result in the liquidation and delivery of over $160 million in MFGI property held or controlled by CME Group to the MFGI estate and the elimination of a duplicate customer claims process under the Exchange Rules. The Agreement will result in the subordination and disposition of the CME Claim and the GFX Claims in the SIPA Proceeding and will cause a substantial portion of MFGI Property to be allocated to MFGI's customer estates. As a whole, the Agreement achieves multiple benefits for MFGI's former customers and creditors. The Agreement resolves a set of highly esoteric issues and avoids costly and uncertain litigation. Accordingly, the terms of the Agreement are fair, reasonable, and in the best interests of MFGI's customers and creditors.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: August 3, 2012
New York, New York

_____
Anson B. Frelinghuysen

62024937_1