MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone: (212) 468-8000
Facsimile: (212) 468-7900
Gary S. Lee
Anthony Princi
Darryl P. Rains
Jamie A. Levitt

*Counsel for the Debtors and
Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Case No. 12-12020 (MG) |
| RESIDENTIAL CAPITAL, LLC, et al., | Chapter 11 |
| Debtors. | Jointly Administered |

**DEBTORS' REPLY IN SUPPORT OF *DAUBERT* MOTION
TO EXCLUDE TESTIMONY OF MBIA'S EXPERT C.J. BROWN**

sf-3285010

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................. ii

INTRODUCTION ...............................................................................................................1

ARGUMENT ......................................................................................................................2

I.   MR. SILLMAN'S TESTIMONY WILL ASSIST THE COURT IN
     DETERMINING WHETHER THE ALLOWED CLAIM IS REASONABLE ................2

II.  MR. BROWN IS NOT QUALIFIED TO CRITICIZE THE DATA USED BY
     MR. SILLMAN ..........................................................................................................5

     A.   Mr. Sillman properly used GSE repurchase data ....................................6

     B.   Mr. Sillman properly discounted for the statute of limitations defense .................8

CONCLUSION ................................................................................................................10

## **TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*Dura Auto. Sys. of Indiana, Inc. v. CTS Corp.*,
   285 F.3d 609 (7th Cir. 2002) ...................................................................................................8

*In re Worldcom, Inc.*,
   371 B.R. 33 (Bankr. S.D.N.Y. 2007) ........................................................................................7

*Malletier v. Dooney & Bourke, Inc.*,
   525 F. Supp. 2d 558 (S.D.N.Y. 2007) ......................................................................................8

**OTHER AUTHORITIES**

Fed. R. Evid. 702 .............................................................................................................................7

## INTRODUCTION

The Debtors moved to exclude the testimony of MBIA's paid advisor, C.J. Brown, because he is not qualified and he did not use any reliable methodology.

Brown is not an expert on mortgage-backed securities. *See* Ex. 1, Excerpts from the December 18, 2012 Deposition of C.J. Brown ("Brown Dep."), 18:5-9.[1] He is not an expert on representation and warranty liability. *Id*. at 18:10-13. He is not qualified to offer any opinion about the defects found in ResCap's mortgage-backed securities. *Id*. at 28:25-29:3. And he is not qualified to offer any opinion as to "the proper method to use to determine whether [the proposed $8.7 billion allowed claim] is within a range of reasonableness." *Id*. at 32:14-19. Is it any wonder the Debtors moved to exclude his testimony?

Brown reviewed the work of the Debtors' mortgage-backed securities expert, Frank Sillman, and claims to have discovered two "incorrect inputs." But Brown is not qualified to decide whether those inputs were correct or not. The first "input" concerns whether defect rates should be calculated using data from private-label securities or government-sponsored entities. *Id*. at 39:12-23. But Brown does not know, and lacks the expertise to say, which data set better reveals the defect rates in the Debtors' mortgages. Indeed, he undertook his work without ever asking how many material defects existed in the Debtors' mortgages. *Id*. at 50:16-51:19. He simply replaced one data set with another, without opining on which set is right, and without knowing, or caring, which would yield the more accurate result.

The second "input" concerns a "discount" for the statute of limitations defense. But Brown has no expertise in legal matters and had no opinion on what the proper discount might be. Instead, he simply applied discounts of 25%, 50%, 75%, and 100% as "illustrative," without

---

[1] "Ex. __" refers to the exhibits attached to the Declaration of LaShann M. DeArcy dated May 20, 2013, filed concurrently with this reply brief.

offering any opinion as to whether those discounts, or any other discount, would be reasonable or appropriate. *Id.* at 30:8-31:16. Mr. Brown's rudimentary and arbitrary discounts do nothing to help the Court decide whether the proposed $8.7 billion allowed claim is reasonable in light of the Debtors' available statute of limitations defense.

Mr. Brown's two criticisms of Mr. Sillman's work are not based on any applicable expertise or accepted methodology. His proposed testimony does not comply with *Daubert*'s standards and should be excluded.

## ARGUMENT

### I.  MR. SILLMAN'S TESTIMONY WILL ASSIST THE COURT IN DETERMINING WHETHER THE ALLOWED CLAIM IS REASONABLE.

The Debtors' expert, Frank Sillman, has a quarter-century of experience in the mortgage-backed securities industry, including years of experience with repurchase demands based on alleged representation and warranty liability. Mr. Sillman's expertise makes him particularly well-suited to assist the Court in assessing the Debtors' potential repurchase exposure.

Mr. Brown, by contrast, has no experience with mortgage-backed securities. He is not qualified to decide how to assess Debtors' litigation exposure or criticize Mr. Sillman's analysis.

Mr. Sillman is the managing partner of Fortace, LLC, an advisory and consulting firm to banks, mortgage companies, insurance companies, trustees of mortgage-backed securities, and investors in mortgage-backed securities. *See* June 11, 2012 Declaration of Frank Sillman ("June 2012 Sillman Decl."), ¶¶ 1-4. He has twenty-five years of experience in the mortgage banking industry and has held senior positions responsible for mortgage-backed securities activities at a number of financial institutions. He is an expert in the origination and securitization of mortgage-backed securities, the determination of loan loss reserves, the review and analysis of repurchase risks and liabilities, and the dispositions of repurchase demands for mortgage loans.

A major part of Mr. Sillman's work at Fortace LLC is determining the reasonableness of repurchase demands based on alleged breaches of representations and warranties. He has worked with insurers and lenders to assert repurchase demands by developing loan audit selection criteria, reviewing contractual representations and warranties, reviewing related contractual obligations, and performing loan audits. He has also assisted issuers and sellers of mortgage-backed securities in responding to repurchase demands by reviewing contractual representations and warranties, reviewing related contractual obligations, and advising on whether to accept or reject loan repurchase requests. *Id*. at ¶ 2.

Mr. Sillman used his expertise to make an independent determination of whether the proposed $8.7 billion allowed claim falls within the range of reasonableness. He did so using two of the most widely-accepted and commonly-used methods for determining an issuer's liability for material defects or breaches of contractual representations and warranties.[2] Both methods independently produced similar results, showing that between 36 percent and 44 percent of the loans underlying the Debtors' mortgage-backed securities have material defects in breach of the Debtors' representations and warranties.

The first method involved using the Debtors' own historical loan repurchase experience to estimate the percentage of loans in the 392 settlement trusts the Debtors would be required to repurchase due to material underwriting defects. The Debtors have, over the years, received and responded to requests for the repurchase of thousands of loans based on alleged breaches of representations or warranties. The Debtors analyzed the merits of each of these requests, and also evaluated all their defenses to the requests. Thus, the Debtors' historical experience in

---

[2] Mr. Sillman also employed financial analysis and publicly-available data to determine the aggregate losses that have been, and will be, incurred by owners of the Debtors' mortgage-backed securities. He determined that investors will lose between $43 and $45 billion, in the aggregate, on their investments. Mr. Brown does not address or criticize this finding. *See* Brown Dep. at 37:5-8.

evaluating, and either agreeing to or rejecting, repurchase demands afforded Mr. Sillman a robust and objective source of data regarding material defects in the Debtors' loan population.

The second method involved performing a forensic re-underwriting of 1,500 loans randomly-selected from the 392 trusts in the settlement. Mr. Sillman led a team of 42 underwriters and 3 underwriting managers in conducting a detailed review of all 1,500 loan files. *See* January 15, 2013 Reply Declaration of Frank Sillman ("January 2013 Sillman Decl."), ¶ 9. Mr. Sillman and his team: familiarized themselves with the applicable underwriting guidelines and automated underwriting system (*id*. at ¶ 10); recalculated and recorded numerous underwriting metrics (including debt-to-income ratio, loan-to-value ratio, and combined loan-to-value ratio) (*id*. at ¶¶ 11-12); and used various industry-accepted third-party verification tools to help validate origination information. *Id*. at ¶ 13. Mr. Sillman himself made an independent assessment of each loan file and made the ultimate determination on whether a loan was materially defective. *Id*. at ¶¶ 16-19. Based on this intensive and detailed review, Mr. Sillman concluded that 43.5 percent of the sample loans had material underwriting defects. *Id*. at ¶ 22.

Mr. Sillman then considered all legal and factual defenses to repurchase demands and estimated the likely damages that the trusts could recover. Based on the Debtors' own historical repurchase experience in agreeing to or disputing repurchase demands, industry-wide repurchase data, and his own extensive experience with loan repurchase demands, Mr. Sillman applied a substantial litigation defense discount of from 41 to 47 percent.

Mr. Brown did not do any of this. Indeed, he is not qualified to do it, as he has no experience with mortgage-backed securities. Brown concedes he is not an expert in "potential legal matters regarding rep and warranty liability," (Brown Dep. at 18:10-13), and admits he is not "an expert in mortgage-backed securities, no." *Id*. at 18:5-9. Brown did not perform or rely

4

on statistical analysis for his opinions because he "didn't view it as something that was going to be that relevant to the analysis." *Id*. at 68:16-17.  Brown has no opinion on whether to apply discounts for legal defenses such as loss causation, materiality and standing (*id*. at 34:3-20) and has no opinion on the merits of any statute of limitations defense.  *Id*. at 76:14-17.  Nor does Brown offer an opinion about a proper methodology "to calculate risk exposure."  *Id*. at 29:9-12.

Because Mr. Brown is not qualified to assess liability for breaches of representations and warranties, and is not qualified to re-underwrite loan files, he did not attempt to offer any opinion about the Debtors' potential liability in this matter.  Nor did he offer any "opinion as to the reasonableness of Mr. Sillman's overall methodology," or challenge Mr. Sillman's approaches to calculating the Debtors' exposure to liability for defective loans.  *See* December 3, 2012 Declaration of C.J. Brown ("Brown Decl.") ¶ 22, n.6; *see also* Brown Dep. at 29:9-12.  Indeed, Mr. Brown offers no opinion on the reasonableness of *any* of the assumptions in Mr. Sillman's work.  *Id*. at 29:4-8.  Most importantly, Mr. Brown offers no opinion as to whether the proposed $8.7 billion allowed claim is, or is not, within the range of reasonableness – for the simple reason that Mr. Brown has no idea what the range of reasonableness is or should be.  *Id*. at 33:16-19.

Mr. Brown's proposed testimony is outside his field of expertise and is not based on any methodology accepted by experts in the field.  It should not be allowed at trial.

## II.    MR. BROWN IS NOT QUALIFIED TO CRITICIZE THE DATA USED BY MR. SILLMAN.

Mr. Brown says his only purpose is to correct two "flaws" in Mr. Sillman's analysis.  *See* Brown Dep. at 33:1-4.  Mr. Brown, however, is not qualified to decide whether there are any flaws or to correct any supposed "flaws."  In fact, Mr. Brown didn't really identify the "flaws" or correct them.  Instead, MBIA's counsel decided it disagreed with two aspects of Mr. Sillman's work, and it identified those aspects to Mr. Brown.  Then MBIA's counsel obtained different

5

sf-3285010

data and discounts which it wished to use, and it supplied those to Mr. Brown. Mr. Brown's only function was to perform some calculations based on the decisions and input of MBIA's counsel. *Id*. at 50:16-51:14.

Because Mr. Brown does not opine, and is not qualified to say, whether Mr. Sillman's report actually is flawed or not, and because he is not qualified to say other data or discounts are appropriate, his testimony on those topics should not be allowed.

### A.    Mr. Sillman properly used GSE repurchase data.

Mr. Sillman's first methodology involved determining the level of material defects in the Debtors' loan population based on its historical loan repurchase experience. For this analysis, Mr. Sillman relied on the Debtors' repurchase experience with repurchase demands from government-sponsored entities ("GSEs"). The Debtors have dealt with thousands of repurchase demands from Freddie Mac and Freddie Mae. The Debtors' responses to these demands were based on a complete review of the applicable loan files, payment histories, and other available information, as well as consideration of available legal defenses – such as statute of limitations and loss causation defenses. In addition, the Debtors' historical repurchase demand experience with Fannie Mae and Freddie Mac is publicly reported in those entities' SEC filings and has been summarized in publicly-available publications. The Debtors' historical GSE repurchase demand experience thus provided a multi-year set of robust, verifiable, and objective data from which to estimate material underwriting defect rates in Debtors' loans. *See* June 2012 Sillman Decl., ¶ 8.

Mr. Sillman decided not to use a different set of data relating to the Debtors' repurchase demands concerning private label securities ("PLS"). He concluded the PLS data was not sufficiently reliable to form the basis of his analysis, primarily because of the small number of fully resolved PLS repurchase demands and the large percentage of unresolved demands. For example, 82% of repurchase demands from private-label trusts were unresolved (largely due to

6

pending litigation), while only 3.1% of Fannie Mae and Freddie Mac were unresolved. *See* June 2012 Sillman Decl., ¶¶ 8, 24. Moreover, Mr. Sillman determined that certain PLS-related information (e.g., trustees' rates of demanding repurchase asserted in PLS repurchase-related litigation) was unsubstantiated and appeared inflated. *Id*. at ¶ 56. The limited PLS data prevented Mr. Sillman from ascertaining meaningful calculations for his analysis. *Id*. at ¶ 8. Finally, although the PLS data was of extremely limited guidance, Mr. Sillman recognized that the Debtors had already made a final decision to agree to repurchase or make whole 14% of all PLS repurchase demands. *See* January 2013 Sillman Decl., ¶¶ 32-33. Mr. Sillman opined that this percentage would undoubtedly rise given the remaining 82% of unresolved demands, and would likely end up similar to the more robust and nearly-fully resolved GSE data. *Id*. at ¶ 34.

Mr. Sillman, of course, recognized that the Debtors' GSE experience was different than it would be for PLS loans. Accordingly, Mr. Sillman applied a discount to the GSE defect rates to account for higher repurchase rates for GSE loans and the more stringent representations and warranties found in GSE syndications. *See, e.g.*, June 2012 Sillman Decl., ¶¶ 61-62.

Mr. Brown, by contrast, says that Mr. Sillman should have used a certain input—the "agree rate"—derived from the Debtors' experience with PLS (instead of GSE) repurchase demands. But Mr. Brown is not qualified by "knowledge, skill, experience, training, or education" to opine on the type of repurchase demand data that Mr. Sillman should have used. Nor is he qualified to determine whether the PLS data was sufficiently robust to allow Mr. Sillman to perform reliable calculations.[3] *See* Fed. R. Evid. 702.

---

[3] As Debtors showed in their opening brief, Brown's purported qualifications as a "valuation" expert do not qualify him to opine on Sillman's analysis of Debtors' potential repurchase demand exposure. *See In re Worldcom, Inc.*, 371 B.R. 33, 41-42 (Bankr. S.D.N.Y. 2007) (requiring a "nexus between [the expert's] credentials and the subject matter of his testimony"). MBIA argues that "Mr. Brown did not need any expertise with repurchase demands to reach his conclusion" because Sillman's work was really the sort of "valuation exercise" that is in Brown's realm of expertise. *See* MBIA Opp'n at 17-18. MBIA's argument stretches the phrase "valuation exercise" beyond recognition, plays fast and loose with *Daubert*'s nexus requirement, and should be rejected.

And his methodology – as he fully admits – amounts to simply assuming the validity of the PLS data set at the direction of MBIA's counsel, confirming this assumption in a single phone call with another supposed expert, and then criticizing Sillman for not using the PLS data set. *See* Brown Decl. ¶ 24. Brown has no independent opinion on the quality of the GSE data or the sufficiency of the PLS data. He says Mr. Sillman should have used PLS data, instead of GSE data, only because that's what MBIA's counsel told him to do.

Acting as the "mouthpiece" of counsel is not a reliable methodology under *Daubert* and Rule 702. *See Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 614 (7th Cir. 2002) (refusing to permit an expert who lacked expertise in the relevant specialty to be a "mouthpiece"). Moreover, however much "comfort" Brown says he drew from the phone call, he "cannot simply be the conduit for the opinion of an unproduced expert." *Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 664 (S.D.N.Y. 2007) (citations omitted). That is especially true here, because Mr. Brown does not "know his background" and was "not familiar with [his] qualifications." *See* Brown Dep. at 71:9-15; 75:13-18.[4] In any event, that call is no substitute for Mr. Brown having his own expertise and reliable methodology.

### B.    Mr. Sillman properly discounted for the statute of limitations defense.

Mr. Sillman's historical repurchase analysis took into account the Debtors' statute of limitations defenses. That is because the Debtors only agreed to repurchase loans when they did not have a valid statute of limitations defense. Thus, the Debtors' historical repurchase experience takes into account a statute of limitations defense whenever it was available. *See* June 2012 Sillman Decl., ¶¶ 61-62. Based on the Debtors' higher than average agree rates, less stringent representations and warranties found in the settlement trusts' governing agreements as

---

[4] MBIA tries to prop up Connelly's qualifications by, for the first time in its brief, asserting his experience in residential contract finance and his position as owner of a consulting firm. *See* MBIA Opp'n at 12-13. These, however, are things that Brown did not put in his report, or even know at the time of his phone call.

compared to the stronger representations and warranties in the GSE agreements, and the consideration of costs, risks and uncertainties should the parties have to resort to litigation, Mr. Sillman discounted for available repurchase defenses by 41 to 47 percent. *Id*. at ¶¶ 61-63; *see also* January 2013 Sillman Decl. ¶¶ 7, 30.

Mr. Brown, however, criticizes Mr. Sillman for not applying another statute of limitations discount. Mr. Brown is not qualified to opine as to whether any additional statute of limitations discount is appropriate or, if it were, what that discount should be. Mr. Brown is not a lawyer and has no ability to opine on the merits of any statute of limitations defense. *See* Brown Dep. at 76:11-17. He has no opinion on when the statute starts to run (*id*. at 76:18-21) and no opinion on the application of equitable tolling (*id*. at 76:22-24). Mr. Brown has no opinion on whether the statute of limitations defense will bar *anyone's* claim—all he knows is what the lawyers told him. *Id*. at 29:23-30:19. And Mr. Brown does not know and did not ask—because he does not care—whether the discounts given to him by counsel were reasonable. *Id*. at 31:12-14. Mr. Brown thus has no basis to say whether, or how much of, a discount is required for a statute of limitations defense or any other legal defense.

What Mr. Brown did is not expert analysis. Instead, here again, all he did is perform a few calculations based entirely on instructions from MBIA's counsel. It was MBIA's counsel that decided an additional statute of limitations discount was appropriate. And it was MBIA's counsel that gave Mr. Brown arbitrary discount amounts for his calcuations. Here's how Mr. Brown's report explains it:

> I was asked by MBIA's counsel to estimate ranges of Litigation Discounts by using scenarios where 25%, 50%, 75% and 100% of the losses associated with affected Settlement Trusts (the "Statute of Limitations Litigation Discount") are removed from the Sillman Estimated Lifetime Losses. By using these scenarios, I am not offering an opinion as to whether the Statute of Limitations Defense may exclude repurchase claims to the extent contemplated under the scenarios.

*See* Brown Decl. ¶ 35 n.11.

Mr. Brown has no basis for saying whether the percentages given to him by counsel have any basis in reality. *See* Brown Dep. at 31:5-16. Mr. Brown concedes the ranges were just given to him by counsel and are "not meant in any way to reflect any opinion by [him] as to what a reasonable discount should be." *See id*. at 79:18-80:1. He made no effort to connect an analysis of the statute of limitations with those percentages – in fact, Mr. Brown did no analysis into the merits of repurchase claims or viability of statute of limitations defenses at all.

## CONCLUSION

The Debtors' underwriting expert, Mr. Sillman, used two distinct, widely-used industry methodologies to estimate the Debtors' potential repurchase exposure and concluded, after these independent and exhaustive analyses, that the $8.7 billion allowed claim is reasonable.

MBIA, in contrast, offers someone who: (1) concedes he has no expertise in mortgage-backed securities or representation and warranty liability; (2) bases his methodology solely on faulty assumptions by counsel (and a phone call with an unproduced expert); and (3) offers nothing to assist the Court in determining whether the allowed claim is reasonable.

MBIA has not satisfied its burden of establishing that Mr. Brown is qualified and used reliable methods to reach his conclusions. The Court should exclude Mr. Brown's testimony.

Dated: May 20, 2013
New York, New York

/s/    Darryl P. Rains
Gary S. Lee
Anthony Princi
Darryl P. Rains
Jamie A. Levitt
MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone: (212) 468-8000
Facsimile: (212) 468-7900

*Counsel for the Debtors and Debtors in Possession*