# Exhibit 1

1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------

In re:

RESIDENTIAL CAPITAL, LLC, et al.,

Debtors

------------------------------------------------

Case No. 12-12020 (MG)

Chapter 11

Jointly Administered

------------------------------------------------

DEPOSITION OF CHRISTOPHER JOHN BROWN

DATE: December 18, 2012

HUDSON REPORTING & VIDEO, INC.

124 West 30th Street, 2nd Fl.

New York, New York 10001

Tel: 212-273-9911  Fax: 212-273-9915

TRANSCRIPT of the deposition, said
deposition being conducted pursuant to Rules
Governing Civil Practice in the Superior Court
of New Jersey, by and before MARK IUZZOLINO,
Certified Shorthand Reporter, License No.
X101103, at the offices of Morrison Foerster,
LLP, 1290 6th Avenue, New York, NY, on December
18, 2012, commencing at 9:34 a.m.

1   APPEARANCES:

2

3   MORRISON & FOERSTER LLP

4   1290 Avenue of the Americas

5   New York, New York 10104

6   BY:  DARRYL P. RAINS, ESQUIRE

7   Proposed Counsel for the Debtors and Debtors in

8   Possession

9

10   KRAMER LEVIN NAFTALIS & FRANKEL, LLP

11   1177 Avenue of the Americas

12   New York, New York 10036

13   BY:  PHILIP BENTLEY, ESQUIRE

14   Proposed Counsel for the Official Committee of

15   Unsecured Creditors

16

17   CADWALADER, WICKERSHAM & TAFT, LLP

18   One World Financial Center

19   New York, New York 10281

20   BY:  NATHAN M. BULL, ESQUIRE

21        JASON JURGENS, ESQUIRE

22   Attorneys for MBIA Insurance Corporation

23

24

25

```
 1    APPEARANCES: (Cont'd)

 2

 3    SEWARD & KISSEL, LLP

 4    One Battery Park Plaza

 5    New York, New York 10004

 6    BY:  MARK D. KOTWICK, ESQUIRE

 7         DANIEL GUZMAN, ESQUIRE

 8    Attorneys for U.S. Bank National Association,

 9    in its capacity as Trustee or Indenture Trustee

10

11    GIBBS & BRUNS, LLP

12    1100 Louisiana, Suite 5300

13    Houston, Texas 77002

14    BY:  ROBERT J. MADDEN, ESQUIRE

15    Attorneys for the Steering Committee of

16    Institutional Investors

17

18    ROPES & GRAY, LLP

19    Prudential Tower

20    800 Boylston Street

21    Boston, Massachusetts 02199

22    BY:  ANDREW G. DEVORE, ESQUIRE

23    Attorneys for the Steering Committee of RMBS

24    Investors

25
```

```
 1    APPEARANCES: (Cont'd)

 2

 3    WHITE & CASE, LLP

 4    1155 Avenue of the Americas

 5    New York, New York 10036

 6    BY:  HARRISON DENMAN, ESQUIRE

 7    Attorneys for the Ad Hoc Group of Junior

 8    Secured Noteholders

 9

10    JONES DAY

11    222 East 41st Street

12    New York, New York 10017

13    BY:  PATRICK SMITH, ESQUIRE

14    Attorneys for Financial Guaranty Insurance

15    Company

16

17    MOELIS & COMPANY

18    399 Park Avenue, 5th Floor

19    New York, New York 10022

20    BY:  ALLY GIBLER, ESQUIRE

21    Attorneys for Official Committee of Unsecured

22    Creditors

23

24

25
```

```
 1    APPEARANCES: (Cont'd)

 2

 3    ALSTON & BIRD, LLP

 4    90 Park Avenue

 5    New York, New York 10016

 6    BY:  WILLIAM HAO, ESQUIRE

 7    Attorneys for Wells Fargo Bank, N.A., as

 8    Trustee and Master Servicer

 9

10    MORGAN, LEWIS & BOCKIUS, LLP

11    1701 Market Street

12    Philadelphia, PA 19103

13    BY:  JOHN C. GOODCHILD, III, ESQUIRE

14    Attorneys for Deutsche Bank as Trustee

15

16    DECHERT, LLP

17    1095 Avenues of Americas

18    New York, New York 10036

19    BY:  REBECCA KAHAN, ESQUIRE

20    Attorneys for the Bank of New York Mellon

21

22

23

24

25
```

6

 1   ON THE PHONE:

 2

 3   KIRKLAND & ELLIS LLP

 4   655 Fifteenth Street, N.W.

 5   Washington, D.C. 20005-5793

 6   BY:  PATRICK M. BRYAN, ESQUIRE

 7   Attorneys for Ally Financial, Inc.

 8

 9   PROSKAUER ROSE

10   Eleven Times Square

11   Eighth Avenue & 41st Street

12   New York, New York 10036-8299

13   BY:  IRENA M. GOLDSTEIN, ESQUIRE

14   Attorneys for Assured Guarantee

15

16   MORGAN, LEWIS & BOCKIUS, LLP

17   1111 Pennsylvania Ave, N.W.

18   Washington, D.C. 20004

19   BY:  TONYA OLIVER, ESQUIRE

20   Attorneys for Deutsche Bank as Trustee

21

22

23

24

25

```
 1          I N D E X   T O   W I T N E S S E S

 2

 3   WITNESS            EXAMINED BY                    PAGE

 4   CHRISTOPHER JOHN BROWN

 5                      Mr. Rains                        8

 6

 7

 8

 9

10          I N D E X   T O   E X H I B I T S

11

12   NUMBER            DESCRIPTION                    PAGE

13

14   Brown 1     Copy of expert report of              10

15               Christopher John Brown

16               with attached resume

17   Brown 2     Document, XLS No. 45459               46

18   Brown 3     Document, XLS No. 56670               46

19

20

21

22

23

24

25
```

1       Q.    What are you an expert in?

2       A.    I'm an expert in valuation and, I

3   would say, valuing assets and liabilities and

4   restructuring matters.

5       Q.    Are you an expert in mortgage-backed

6   securities?

7       A.    I wouldn't say narrowly defined -- I

8   wouldn't say narrowly defined as an expert in

9   mortgage-backed securities, no.

10      Q.    Are you an expert in what we call

11  "rep and warranty liability"?

12      A.    As it relates to potential legal

13  matters regarding rep and warranty matters, no.

14      Q.    Well, specifically rep and warranty

15  litigation or rep and warranty liability in the

16  mortgage-backed security arena.

17      A.    Much of the work that I did in

18  connection with Ambac was involving rep and

19  warranty matters, so I'm very familiar with

20  them, yeah.

21      Q.    Are you an expert in that area?

22      A.    I would say I'm very familiar with

23  the topics.

24      Q.    Are you a statistician?  Are you an

25  expert in statistics?

1    to page 9.

2         A.    Okay.

3         Q.    And I direct your attention to

4    footnote 6 at the bottom of the page.  I want

5    to make sure, sir, that I understand first what

6    you are not doing in this matter.

7              You've read Mr. Sillman's report?

8         A.    I have.

9         Q.    You know that he calculates or

10   assumes a number of different rates in his

11   report?

12        A.    Yes.

13        Q.    You criticize one of them, his agree

14   rate.  Correct?

15             MR. JURGENS:   Objection to form.

16        A.    Correct.

17        Q.    You are not offering any opinion

18   about the audit rate that Mr. Sillman used in

19   his report, are you?

20        A.    I am not.

21        Q.    Are you offering any opinion about

22   the demand rate that forms part of his

23   calculations in his report?

24        A.    I am not.

25        Q.    Are you offering any opinion about

1    the breach rate that he used in his report?

2            MR. JURGENS:  Objection to form.

3        A.   I am not.

4        Q.   You're not going to offer any opinion

5    as to the reasonableness of any of the

6    assumptions he used in his report.  Correct?

7            MR. JURGENS:  Objection to form.

8        A.   That's correct.

9        Q.   Are you going to offer an opinion

10    about the overall methodology by which he chose

11    to calculate risk exposure here?

12        A.   No.

13        Q.   Do you have an opinion as to whether

14    MBIA or FGIC or other insurers, whether their

15    claims are being excluded or included in the

16    settlement?

17            MR. JURGENS:  Objection to form.

18        A.   I am not.

19            MR. SMITH:  I have the same

20        objection.

21        Q.   Pardon me?

22        A.   I am not.

23        Q.   You offer an opinion about statute of

24    limitations.  But if I understand it correctly,

25    you are not offering an opinion as to whether

1    the statute of limitations actually will or

2    will not bar anyone's claim.  Correct?

3        A.    That's correct.  I'm just saying, in

4    my view, there's a risk -- based on the

5    analysis I've done and things that I've read,

6    there's a risk that some of the trusts would be

7    time barred.

8        Q.    You're not an expert on whether that

9    risk is remote or real or serious, are you?

10        A.    I'm describing that there is some

11    risk.  I'm not offering a view as to the

12    severity of that risk.

13        Q.    And, in fact, all you know about that

14    risk really is that lawyers have told you the

15    risk exists.  Correct?

16        A.    And from things that I've read.

17        Q.    Written by lawyers saying the risk

18    exists.  Correct?

19        A.    Yes.

20        Q.    You apply some discounts to recovery

21    based on a statute-of-limitation risk in your

22    report.  Right?

23        A.    Yes.

24        Q.    Twenty-five, 50, 75 and 100 percent

25    discounts.  Right?

1       A.   Correct.

2       Q.   Those numbers were given to you by

3   counsel.  Is that right?

4       A.   Yes.

5       Q.   You don't have any opinion as to

6   whether those discounts do or do not reflect

7   reality?

8            MR. JURGENS:  Objection to form.

9       A.   That's correct.

10      Q.   They're illustrative only.  Right?

11      A.   That's right.

12      Q.   You won't offer any opinion as to

13  whether those discounts are reasonable.

14  Correct?

15           MR. JURGENS:  Objection to form.

16      A.   That's correct.

17      Q.   You are not going to offer any

18  opinion about the right way or the proper

19  methodology to use to go about deciding whether

20  the proposed settlement here is or is not

21  within the range of reasonableness, are you?

22           MR. JURGENS:  Objection to form.

23      A.   I'm sorry.  Could you repeat the

24  question?

25      Q.   Sure.  Let me break it into pieces.

32

1           Do you understand, sir, what the

2    motion that is before Judge Glenn here is

3    about?

4           A.   Yes.

5           Q.   What is it about?

6           A.   It's about establishing a claim size

7    for the repurchase liability.

8           Q.   Do you understand that one of the

9    things Judge Glenn will need to decide is

10   whether the proposed 8.7 billion-dollar allowed

11   claim is within a range of reasonableness?

12          A.   Yes.

13              MR. JURGENS:   Objection to form.

14          Q.   Are you going to offer any opinion as

15   to the proper method to use to determine

16   whether that claim size is within a range of

17   reasonableness?

18              MR. JURGENS:   Objection to form.

19          A.   I am not.

20          Q.   And you have no opinion as to whether

21   the proposed allowed claim of 8.7 billion is,

22   in fact, within or outside of a range of

23   reasonableness.

24              MR. JURGENS:   Objection to form.

25          Q.   Right?

1       A.    No.  I simply looked at Mr. Sillman's

2    analysis and looked at some flaws and

3    calculated a new range based on correcting

4    those flaws.

5       Q.    If I could be a little more precise,

6    I appreciate that you criticized Mr. Sillman.

7    Right?

8       A.    Yes.

9       Q.    Your conclusion is, his work doesn't

10   support the 8.7 billion-dollar allowed claim?

11      A.    Correct.

12      Q.    You don't go the next step and say,

13   "I have an opinion that that number is outside

14   the range of reasonableness"?

15      A.    That's correct.

16      Q.    You haven't gone and done your own

17   analysis of what the range of reasonableness is

18   or should be?

19      A.    No, I have not.

20      Q.    We talked about statute of

21   limitations.

22            You're aware, aren't you, that there

23   are other potential legal defenses to the

24   claims that would be asserted here by the

25   trusts and their investors?  Right?

```
 1                  MR. JURGENS:  Objection to form.

 2        A.   I am.

 3        Q.   Are you going to offer any opinion as

 4   to discounts that ought to be applied as a

 5   result of those legal defenses?

 6                  MR. JURGENS:  Objection to form.

 7        A.   I have not been asked to do that, no.

 8        Q.   You have no opinion about loss

 9   causation, for example?

10                  MR. JURGENS:  Objection to form.

11        A.   I have not been asked to look at

12   that, no.

13        Q.   No opinion about materiality?

14                  MR. JURGENS:  Objection to form.

15        A.   I have not been asked to look at

16   that.

17        Q.   Do you have any opinion to offer

18   about standing as a legal defense?

19                  MR. JURGENS:  Objection to form.

20        A.   No.

21        Q.   Do you have any opinion to offer us

22   as to whether the settlement is the product of

23   arm's-length bargaining?

24                  MR. JURGENS:  Objection to form.

25        A.   No.
```

1    in performing your work.  Right?

2          A.    Correct.  As a critique of his

3    analysis, I assumed some things about his

4    analysis that may be correct.

5          Q.    In any event, you didn't embark as

6    part of your work on reevaluating or

7    criticizing his aggregate loss calculation?

8          A.    That's correct.

9          Q.    What you did is applied discounts to

10   it based on assumptions you were given by

11   counsel?

12         A.    Correct.

13         Q.    Could I ask you to turn to paragraph

14   6 of Exhibit 1?  This is where you introduce

15   your work.  And the last sentence says,

16   "Mr. Sillman used several incorrect inputs in a

17   formula he used in his analysis."

18              If I read your report correctly,

19   you've identified two incorrect inputs.

20   Correct?

21         A.    Correct.

22         Q.    I mean, you say several, but in

23   paragraph 7 you talk about the agree rate.  In

24   paragraph 8 you talk about statute of

25   limitations.

1    "GSE loans."  Right?

2         A.    Correct.

3         Q.    And then he applied a discount to it.

4    Correct?

5         A.    Correct.

6         Q.    And you think that was the wrong

7    thing to do?

8         A.    I think the discount that he used

9    seemed somewhat arbitrary.

10        Q.    Well, you don't even like the idea

11   that he used GSE data.  Correct?

12        A.    Correct.  I believe he had actual

13   data to use, and I believe he didn't use that

14   actual data.

15        Q.    And the actual data is PLS data or

16   data from the trusts that are at issue here?

17        A.    Correct.

18        Q.    Is that really the nature of the

19   fight, whether he should have used GSE data

20   with a discount or, on the other hand, whether

21   he should have used the PLS data?

22             MR. JURGENS:  Objection to form.

23        A.    Yes.

24        Q.    I'm going to jump into that in a

25   second, but let me first ask you about the

1        A.    I excluded the voluntaries on the

2   view and assumption that those were related to

3   reviews that would come about from the debtor

4   itself as part of their process and wouldn't be

5   applicable for this analysis now, as was also

6   described in the Sillman report.

7        Q.    Why are those not applicable?

8        A.    Those are not applicable because

9   there would be no argument by the debtor about

10  whether or not they would agree or not if it

11  was -- they were brought about from the debtor

12  itself.  It's the debtor who's proposing to put

13  these loans back, one way or the other, as part

14  of their internal QC process, so it doesn't

15  seem as relevant as the nonvoluntaries.

16       Q.    Isn't the point of your work to try

17  to figure out how many material defects there

18  are in the population?

19            MR. JURGENS:  Objection to form.

20       A.    No.  Our analysis was a critique of

21  the methodology used by Mr. Sillman.

22       Q.    When you made that critique, you

23  didn't care about the number of -- or the

24  incidence of material defects in ResCap's

25  loans?

1           MR. JURGENS:  Objection to form.

2      A.   I don't know if I cared about that.

3  I'm not sure in what sense of the word you mean

4  that.

5      Q.   If you wanted to know how many

6  material defects appeared in the population of

7  ResCap's loans, should you take into account

8  loans that ResCap voluntarily repurchased as a

9  result of material defects?

10          MR. JURGENS:  Objection to form.

11     A.   That's not the analysis that we did.

12     Q.   Why not?

13     A.   Because we were doing a critique of

14  Mr. Sillman's work.

15     Q.   You were doing a critique without

16  asking the larger question:  How many material

17  defects are there in ResCap's loans?

18          MR. JURGENS:  Objection to form.

19     A.   Correct.

20     Q.   Why did you not consider the category

21  "unknown"?

22          MR. JURGENS:  Objection to form.

23     A.   One, because it was a smaller sample

24  size, and it wasn't clear what -- just by

25  virtue of the unknown aspect of these, it was

1   give two grounds in paragraph 24 for your

2   conclusion that the PLS data are sufficiently

3   robust.  Neither of those grounds says anything

4   about work you and your team did.  So it's

5   coming a bit of a surprise to me that you did

6   work on this.

7          MR. JURGENS:  Objection to form.

8          Is there a question?

9      Q.   Yeah, where is the work?

10         MR. JURGENS:  Objection to form.

11     A.   There's no work that went into the

12   report.  There was general background

13   information that I did to get myself

14   comfortable on some of the statements that are

15   being made.  I didn't do any work because I

16   didn't view it as something that was going to

17   be that relevant to the analysis.

18     Q.   If you did the work, why did you have

19   to rely on counsel's instructions to you to

20   assume that it was robust?

21         MR. JURGENS:  Objection to form.

22     A.   I don't understand the question.

23     Q.   When a statistician decides whether a

24   sample is sufficiently robust to predict

25   outcomes, what kind of methods do they use to

1        A.    Mr. Connolly.

2        Q.    Who is he?

3        A.    He is an expert that the company has

4    used in the past.

5        Q.    What's his first name?

6        A.    Chris.

7        Q.    Chris Connolly?

8        A.    Chris Connolly.

9        Q.    Where does he work?

10       A.    I don't have his background handy.  I

11   don't know his background but I know --

12       Q.    Does he work at Blackstone?

13       A.    No, he does not work at Blackstone.

14       Q.    Does he work at MBIA?

15       A.    No, he's a consultant for MBIA.

16       Q.    How would I find this man?

17       A.    I suppose we could put you in touch

18   with him.

19       Q.    Did you meet with him in person?

20       A.    I had a telephone call with him.

21       Q.    Right.  What did you say on the call?

22       A.    We had a conversation about

23   underwriting standards and -- we had a long

24   call.

25       Q.    Did you send him Exhibits 2 or 3 or

1     Q.   Isn't that what you and Mr. Connolly

2  did, you just eyeballed the size of the sample

3  and said that must be big enough?

4        MR. JURGENS:  Objection to form.

5        MR. BENTLEY:  Objection to form.

6     A.   I can't speak for Mr. Connolly.

7     Q.   Isn't that what you did?

8     A.   That is not what I did.  I described

9  earlier that I had discussions with

10  Mr. Connolly and I got comfort that way and I

11  also did some general background reading on

12  sample sizes.

13     Q.   What are Mr. Connolly's

14  qualifications to be an expert on statistics?

15     A.   I'm not familiar with Mr. Connolly's

16  qualifications, though I presume he is well

17  qualified for him to be advising MBIA on these

18  matters.

19        MR. JURGENS:  Just note my objection

20     to the prior question.

21     Q.   What did Mr. Connolly say about the

22  large number of loans in the disagree

23  rescission requested category?

24     A.   I don't recall.

25     Q.   Did you ask Mr. Connolly to provide

1    a -- to provide any work product to you on the

2    robustness of the sample size or the data?

3        A.   No.

4        Q.   Do you understand whether he's been

5    asked to that at trial in this matter?

6        A.   I'm not aware of whether he was or

7    wasn't.

8        Q.   Let's turn to the statute of

9    limitations.

10       A.   Okay.

11       Q.   I think you've told us you're not a

12   lawyer.  Correct?

13       A.   Correct.

14       Q.   You're not offering an opinion on the

15   merits of any statute of limitations defense.

16   Right?

17       A.   Correct.

18       Q.   You're not going to testify about

19   when the statute starts to run, for example?

20       A.   No, I'm not going to offer an opinion

21   about when the statute may run or not run.

22       Q.   You don't have an opinion about

23   doctrines like equitable tolling?

24       A.   No.

25       Q.   You're not going to offer an opinion

1    number of years between date of origination on

2    the one hand and a tolling agreement or

3    bankruptcy on the other?

4         A.   Well, there's a little more than

5    that, as I described in the report.

6         Q.   That's how you decided, first of

7    all --

8         A.   First of all.

9         Q.   -- whether there was any exposure to

10   a statute of limitations defense.

11        A.   Correct.

12        Q.   Right?

13             And then you applied damages numbers

14   to that.  Right?

15             MR. JURGENS:  Objection to form.

16        A.   I describe what I do in my report.

17   It's not as simple as that.

18        Q.   In any event, as I think you told us,

19   the discounts that you applied, 25, 50, 75, and

20   100 percent, those are given to you by counsel.

21   Right?

22        A.   Yes.

23        Q.   They're not meant in any way to

24   reflect any opinion by you as to what a

25   reasonable discount should be?

80

1       A.    Correct.

2       Q.    You concluded that there could be a

3    discount of as much as 17.6 percent under your

4    analysis.  Is that right?

5            MR. JURGENS:  Objection to form.

6       A.    That's right.  That's right.

7       Q.    That's in paragraph 39?

8       A.    That's correct.

9       Q.    What -- what aggregate loss number

10   did you use to calculate that percentage?

11           MR. JURGENS:  Objection to form.

12      A.    I simply use Mr. Sillman's loss

13   number.

14      Q.    Well, he has many loss numbers.  He

15   has a range.

16      A.    Right, but the 17.6 percent is with

17   reference to the actual trusts and dollar value

18   of the losses within those trusts.

19      Q.    Didn't he give a range as to each

20   trust?

21      A.    He gave an aggregate, an aggregate

22   number.

23      Q.    I guess I'm not understanding why

24   this percentage is not a range, since he

25   provided a range of aggregate losses.

1

2                    C E R T I F I C A T E

3

4

5            I, MARK IUZZOLINO, a Certified Shorthand

6    Reporter and Notary Public of the State of New

7    Jersey certify that the foregoing is a true and

8    accurate transcript of the testimony of the

9    aforementioned first duly sworn by me.

10           I further certify that I am neither

11   attorney or counsel for, nor related to or employed

12   by, any of the parties to the action in which the

13   deposition is taken, and further that I am not a

14   relative or employee of any attorney or counsel

15   employed in this case, nor am I financially

16   interested in the action.

17

18

19           _____

20           CERTIFIED SHORTHAND REPORTER

21           NOTARY PUBLIC OF NEW JERSEY

22           LICENSE NO. X101103

23

24

25

1           December 18, CHRISTOPHER JOHN BROWN

2              I wish to make the following changes for

3    The following reasons:

4    PAGE   LINE

5    ____   ____   CHANGE:_____

6    REASON:_____

7    ____   ____   CHANGE:_____

8    REASON:_____

9    ____   ____   CHANGE:_____

10   REASON:_____

11   ____   ____   CHANGE:_____

12   REASON:_____

13   ____   ____   CHANGE:_____

14   REASON:_____

15   ____   ____   CHANGE:_____

16   REASON:_____

17   ____   ____   CHANGE:_____

18   REASON:_____

19   ____   ____   CHANGE:_____

20   REASON:_____

21   ____   ____   CHANGE:_____

22   REASON:_____

23   ____   ____   CHANGE:_____

24   REASON:_____

25   Hudson Reporting & Video, Inc.    1-800-310-1769