UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| In re<br><br>RESIDENTIAL CAPITAL, LLC, *et al.*,<br><br>Debtors. | Case No. 12-12020 (MG)<br><br>Chapter 11<br><br>Jointly Administered |

**SUPPLEMENTAL DECLARATION OF ANTHONY PRINCI IN SUPPORT OF THE
DEBTORS' REPLY AND IN FURTHER SUPPORT OF DEBTORS' MOTION IN
LIMINE TO STRIKE THE OBJECTION AND EXCLUDE THE EVIDENCE OF THE
OFFICIAL COMMITTEE OF UNSECURED CREDITORS IN OPPOSITION TO THE
RMBS TRUST SETTLEMENT**

I, ANTHONY PRINCI, declare:

1.      I am a member of the Bar of the State of New York and admitted to practice
before this Court.  I am an attorney at the law firm Morrison & Foerster LLP, counsel for
Residential Capital, LLC and its affiliated debtors and debtors-in-possession.

2.      I submit this supplemental declaration in support of the Debtors' Reply[1] and in
further support of the Debtors' Motion in Limine to Strike the Objection and Exclude the
Evidence of the Official Committee of Unsecured Creditors in Opposition to the RMBS Trust
Settlement.

3.      Attached hereto as Exhibit 7[2] is a true and correct copy of excerpts from the
Transcript of Hearing, *In re: Residential Capital, LLC, et al.*, No. 12-12020 (MG) (Bankr.
S.D.N.Y.), dated September 19, 2012.

---

[1] Capitalized terms not defined herein will have the same meanings as ascribed to them as in the Reply.

[2] Exhibits 1 through 6 are attached to the *Declaration of Anthony Princi in Support of Debtors' Motion in
Limine to Strike the Objection and Exclude the Evidence of the Official Committee of Unsecured Creditors in
Opposition to the RMBS Trust Settlement* [Docket No. 3615].

4.      Attached hereto as Exhibit 8 is a true and correct copy of excerpts from the

Transcript of Hearing, *In re: Residential Capital, LLC, et al.*, No. 12-12020 (MG) (Bankr.

S.D.N.Y.), dated May 7, 2013.

5.      Attached hereto as Exhibit 9 is a true and correct copy of excerpts from a Pooling

and Servicing Agreement between Residential Asset Securities Corporation, Residential Funding

Corporation, and U.S. Bank N.A., dated as December 1, 2005.

6.      To the best of my knowledge, MBIA, FGIC, and Wilmington each signed

confidentiality agreements with the Debtors which thereby enabled each of them to access all

documents that the Debtors produced in response to the Committee's discovery requests; the

Non-conflicted Members did not.

7.      To the best of my knowledge, MBIA, FGIC, and Wilmington all propounded

separate discovery requests on the Debtor and participated in all the depositions; the Non-

conflicted Members did not.

Dated: New York, NY                        MORRISON & FOERSTER LLP
       May 20, 2013


                                           By:   /s/ Anthony Princi
                                                 Anthony Princi
                                                 1290 Avenue of the Americas
                                                 New York, NY  10104-0050
                                                 212.468.8000

# EXHIBIT 7

1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 12-12020-mg

- - - - - - - - - - - - - - - - - - -x

In the Matter of:


RESIDENTIAL CAPITAL, LLC, et al.,


          Debtors.


- - - - - - - - - - - - - - - - - - -x


          United States Bankruptcy Court

          One Bowling Green

          New York, New York


          September 19, 2012

          10:10 AM




B E F O R E:

HON. MARTIN GLENN

U.S. BANKRUPTCY JUDGE


eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

1    told that the debtor will complete its production by October

2    3rd and have a privilege log by October 10th.  You can't have a

3    cutoff of fact discovery when not all stuff has been produced.

4    Okay?  So the situation is going to require an adjustment to

5    the schedule; which parts of it remain to be seen.

6            MS. PATRICK:  Yes, Your Honor.  And the only other

7    points that I will make with re --

8            THE COURT:  Mr. Princi seemed to be saying that you

9    threatened to pull the plug on the proposed settlement if the

10   hearing doesn't go forward on November 5th.  And your answer to

11   that was, no threat.

12           MS. PATRICK:  No, Your Honor.  My answer to that was,

13   actually, the concession that our trustees made with regard to

14   capping their cure claims and limiting their servicing

15   objections was premised on the notion that the creditors'

16   committee and others would work in good faith to try to achieve

17   that schedule, would work hard, would put us in a position

18   where we would have a hearing.  And what has happened, Your

19   Honor, from the moment that hearing was announced, is that the

20   creditors' committee has been clear that it does not prefer

21   this settlement to be resolved outside of a plan.

22           THE COURT:  Well, I've already told you, that part is

23   a nonstarter, okay?

24           MS. PATRICK:  But the point I was trying to make, Your

25   Honor, is that in that context, if you look at the timing and

1   burdensome to them, in terms of saying they have to have a

2   targeted search of e-mails of a limited universe of people,

3   they identified responsively, Kirkland & Ellis, thirteen

4   people.  I think if they looked at the list of people at the

5   debtors they also get about thirteen people.  Of those thirteen

6   people, nine of them -- all of them -- all the businesspeople,

7   everyone other than a few MoFo lawyers -- they have not

8   searched for a single e-mail yet.

9          THE COURT:  All right; is it --

10         MR. MOLONEY:  Now, maybe they're going to search for

11  all those e-mails and produce them by October 3rd.  If that's

12  their undertaking, terrific, we'll work real hard.  We don't

13  waste time.  We have substantive problems with this.

14         THE COURT:  Since I didn't pick up on the significance

15  of footnote 13 in a document I don't have a copy of sitting in

16  front of me, just tell me again, Mr. Moloney, what is the gist

17  of that?  What did you take away from the footnote?

18         MR. MOLONEY:  What I took away from the footnote is

19  that the RMBS creditors were concerned that their PSA waterfall

20  might be upset as a result of the examiner's reports, as a

21  result of claims that we might argue against AFI on behalf of

22  the note holders and that either some of that 750 which they

23  had hoped to go to them, or money beyond that 750, would go to

24  us and not to them.  And so they asked the debtor to change the

25  deal.

1   I think the debtor was concerned that they had a PSA

2   agreement with Kathy and not with our group, and that,

3   therefore, if they accommodated that request, they would create

4   a voting block at the parent-company level that would support

5   their plan.  So I think, putting it another way, it's

6   collusion; putting it another way, we want to put some sunshine

7   on something that doesn't look good, doesn't smell right, and

8   it's hard to explain.

9            THE COURT:  Okay.  Make it really simple for me.  What

10  is it that you're seeking in discovery that you believe you

11  have not received so far?

12           MR. MOLONEY:  We would like them to produce discovery

13  related to the HoldCo election, how it was arrived at and why

14  it was changed, and why it's changed again, including the names

15  of the people who were involved in the most recent change, who

16  approved it and who negotiated it.  We would like discovery as

17  to the basis for the claim which they are now preserving and

18  which they have now set an amount of at 8.7 billion dollars.

19  And we would like to be sure that the e-mail productions they

20  produce include the e-mails of all the people who they've

21  identified in these interrogatories as having been involved in

22  negotiation or approval of this deal, which is about thirteen.

23           THE COURT:  Okay; thank you, Mr. Moloney.

24           MR. MOLONEY:  Thank you.

25           THE COURT:  Who else wants to be heard?

**RESIDENTIAL CAPITAL, LLC, ET AL.**                125

1   there's a communication between a ResCap attorney and the

2   institutional investors' lawyer with respect to what we are

3   doing about the HoldCo election, whether that's privileged or

4   not.  I don't think it is.  I think if the lawyers are

5   negotiating it, it should be produced.  They're going to do

6   what they're going to do with respect to that.

7          They're going to schedule it in a privileged log, and

8   I guess we're going to come back to Your Honor later to say

9   that -- for Your Honor to determine if the -- if there was a

10  statement yeah, but without the HoldCo election, we're pulling

11  our PSA, whether that's a privileged communication or not.

12  Okay, I get we're not going to do it today, but what we need to

13  establish today is that we're not going to be told none of that

14  discovery is relevant for the purposes of this motion.

15         THE COURT:  All right.  Anybody else want to be heard?

16  Let -- hold on a second.  Go ahead.

17         MR. ELLENBERG:  If the Court please, Mark Ellenberg,

18  Cadwalader, Wickersham & Taft, on behalf of MBIA.

19         Your Honor, I rise just to make two points.  First,

20  MBIA has not --

21         THE COURT:  You didn't really mean it when you said

22  never, under no circumstances should you ever approve this

23  settlement?

24         MR. ELLENBERG:  It's not what we said, Your Honor.

25         THE COURT:  It's pretty close.

RESIDENTIAL CAPITAL, LLC, ET AL.                                   126

1          MR. ELLENBERG:  It's not, Your Honor.  And you were

2    provided with the entire letter.

3          THE COURT:  Okay.

4          MR. ELLENBERG:  What we said was --

5          THE COURT:  Looked like the entire letter.

6          MR. ELLENBERG:  -- what we said was -- and we've

7    clarified with the trustee since, what we said was do not

8    charge our trusts expenses for your consideration of the

9    settlement.  And the reason that's what we said, Your Honor,

10   was because we are the real party-in-interest in those trusts.

11         Ms. Patrick's clients and Mr. Talcott's clients have

12   not absorbed a single penny of damage --

13         THE COURT:  Tell me, Mr. Ellenberg, the letter that

14   the debtors attached to their status report, which is a one-

15   page letter; you're saying that's not a complete letter?

16         MR. ELLENBERG:  I'm sorry.  It -- I didn't realize

17   they attached the letter --

18         THE COURT:  Well, they did.

19         MR. ELLENBERG:  -- Your Honor.  I read it on my iPad.

20   I only saw the --

21         THE COURT:  They did.  They --

22         MR. ELLENBERG:  -- quote.

23         THE COURT:  -- attached --

24         MR. ELLENBERG:  Okay.

25         THE COURT:  It's a one-page letter.  It bears a

1  signature of -- for David --

2          MR. ELLENBERG:  David Glehan --

3          THE COURT:  -- Glehan.

4          MR. ELLENBERG:  -- Your Honor.  Yes.  And the --

5          THE COURT:  And you're saying that's not a complete

6  document?

7          MR. ELLENBERG:  It is a complete document, Your Honor.

8  And read in its entirety, what it says is --

9          THE COURT:  I did it read it.  It's only two

10 paragraphs long.

11          MR. ELLENBERG:  Okay.  It doesn't say we're

12 opting out.  It says we will make the decision, not you.  And

13 that's because we have the right to make that decision --

14          THE COURT:  When it says "We hereby instruct you not

15 to consider or accept any settlement or compromise offers

16 relating to any claims that may belong to the above referenced

17 trust" and it goes on from there.

18          MR. ELLENBERG:  It does go on, Your Honor.

19          THE COURT:  That looks like pretty clear language.

20          MR. ELLENBERG:  But, Your Honor, it goes on.  All

21 right, the point is we will give them an instruction at the

22 appropriate time.

23          Your Honor, if I may?

24          THE COURT:  Go ahead.

25          MR. ELLENBERG:  No investor has suffered a penny of

# EXHIBIT 8

1

1

2 UNITED STATES BANKRUPTCY COURT

3 SOUTHERN DISTRICT OF NEW YORK

4 Case No. 12-12020-mg

5 - - - - - - - - - - - - - - - - - - - -x

6 In the Matter of:

7

8 RESIDENTIAL CAPITAL, LLC, et al.,

9

10          Debtors.

11

12 - - - - - - - - - - - - - - - - - - - -x

13

14          United States Bankruptcy Court

15          One Bowling Green

16          New York, New York

17

18          May 7, 2013

19          10:04 AM

20

21 B E F O R E:

22 HON. MARTIN GLENN

23 U.S. BANKRUPTCY JUDGE

24

25

1    bringing several billion dollars, that'll be a different story.

2    But part of the reason why we think we are an appropriate

3    representative is that we're not asking the estate to pay our

4    expenses upfront or on an ongoing basis as with other parties.

5    And if that wasn't clear in our papers, that is our position.

6              THE COURT:  All right.

7              MR. MOLONEY:  We'll talk about it next week.

8              MR. MOLONEY:  But I have a -- I had a college

9    professor, Wally Sear (ph.), who said that -- in political

10   science, he said the way you stand depends on where you sit.

11   And it's really profoundly truthful and provides an insight

12   into where we are in this case which is at the holding company

13   level where we are.  The only asset -- the only asset available

14   for unsecured creditors are the claims we've outlined in that

15   detailed complaint which we did file, Your Honor.  That's the

16   only asset.  Then we have a committee structure which is, in my

17   experience, unusual.  It's kind of a hybrid torts

18   committee/creditor committee.  And the only representative on

19   the committee of the holdco company is our client.  And the

20   only representative on the committee with a liquidated claim

21   against anybody is our client.  Everyone else on the committee

22   is basically a tort claimant of one sort or the other.  We have

23   three RMBS trustees who have these R&W claims which you're

24   going to be hearing about.  We have two monoline insurers with

25   their own lawsuits in other states that they're pursuing

RESIDENTIAL CAPITAL, LLC, et al.                          28

1  vigorously which they see as their primary source of recovery.

2  We have two securities plaintiffs who are also pursuing their

3  own lawsuits which they see as their primary source of

4  recovery.  And we have a representative of a putative borrower

5  class action who has his own lawsuit which he's going to try to

6  settle through an insurance company.  So the only people who

7  are really looking at the estate as a source of recovery in

8  this case is us.  So we have the anomaly where we're the only

9  member of this non-person committee and we have the most acute

10 interest in these claims.  We've spent an enormous amount of

11 time in this case actually presenting our issues to the

12 examiner.  So, obviously, Your Honor will be guided by what the

13 examiner finds.  But that's where we've spent our ammunition.

14         THE COURT:  Kramer Levin's obligation as counsel to

15 the creditors' committee is the entire creditors' committee and

16 all of the constituents of it.  And those that have claims --

17 where there are claims against the OpCos for debt because there

18 was debt forgiveness if that was a fraudulent conveyance or

19 whatever other theory, isn't Kramer Levin obligated to pursue

20 the interests of all of the constituents of the creditors'

21 committee.

22         MR. MOLONEY:  I think Kramer Levin's done a fabulous

23 job in this case.  And I think that the only way this committee

24 has been functional is because of --

25         THE COURT:  They're going to put this transcript up on

1   their wall.

2           MR. MOLONEY:  Well, I think it's absolutely true.  The

3   only way this committee has been functional and as successful

4   as we have been is because of the tremendous job they've done.

5   However, we have -- one occasion is highly public that they've

6   talked about.  There are occasions which I will not get into

7   where the other operating creditors, in order to settle their

8   individual lawsuits with AFI have proposed to settle our claims

9   along that for a song.  And if they get a committee vote 8 to 1

10  to do that or 6 to 3 to do that, what is the committee counsel

11  supposed to do at that point in time?

12          Now we may -- they'll be in --

13          THE COURT:  The Court may have to do something.

14          MR. MOLONEY:  -- quite a difficult situation at that

15  point in time.

16          THE COURT:  Yeah.  The Court may have to do something

17  at that point if --

18          MR. MOLONEY:  So we're trying to avoid putting my good

19  friend, Mr. Eckstein, in that position.  He's done a yeoman job

20  protecting us against a number of efforts to do things like

21  this and we're trying to help him out.  At least we have an

22  obligation --

23          THE COURT:  I'm sure he appreciates it greatly.

24          MR. MOLONEY:  Well, we have an obligation to step

25  forward to do that, Your Honor.  And so, our suggestion is that

RESIDENTIAL CAPITAL, LLC, et al.                                    30

1   obviously, we can deal next week with our right to have co-

2   standing to prosecute which I think we certainly -- the OpCo

3   claims which I think would deal with at least one major

4   concern.  And we think we should have a seat at the table if

5   these claims are going to be settled outside of a plan.

6           THE COURT:  Address the issue of -- that's the one

7   issue, and I raised it with Mr. Simon.  It's the issue that's

8   really primarily on my mind is the issue of authority to settle

9   claims.  I mean --

10          MR. MOLONEY:  I think, Your Honor, the problem on that

11  -- and just to preview --

12          THE COURT:  I'm sure I'll hear from you if the

13  committee's counsel proposes to settle claims for an amount

14  that you believe is too low or they don't sufficiently pursue

15  claims against the OpCos, for example.

16          MR. MOLONEY:  I think --

17          THE COURT:  You're not shy.  I'll hear from you about

18  it.

19          MR. MOLONEY:  I'm not shy.  But as Your Honor knows,

20  going back to the W.T. Grant case way back when, the Second

21  Circuit announced a very lenient standard for bankruptcy court

22  settlements:  lowest range of reasonableness.  And the premise

23  of that was there was a trustee in that case.  And there was a

24  fiduciary.  And the idea is that a fiduciary settles a

25  bankruptcy case -- be any kind, a debtor fiduciary, some other

# EXHIBIT 9

EXECUTION COPY

# AMENDMENT

RESIDENTIAL ASSET SECURITIES CORPORATION,

Depositor,

RESIDENTIAL FUNDING CORPORATION,

Master Servicer,

and

U.S. BANK NATIONAL ASSOCIATION

Trustee

POOLING AND SERVICING AGREEMENT

Dated as of December 1, 2005

Home Equity Mortgage Asset-Backed Pass-Through Certificates

Series 2005-EMX5

DOCSLA1:512237.4

## ARTICLE VIII

### CONCERNING THE TRUSTEE

Section 8.01.    Duties of Trustee.

(a)    The Trustee, prior to the occurrence of an Event of Default and after the curing of all Events of Default which may have occurred, undertakes to perform such duties and only such duties as are specifically set forth in this Agreement. In case an Event of Default has occurred (which has not been cured or waived), the Trustee shall exercise such of the rights and powers vested in it by this Agreement, and use the same degree of care and skill in their exercise as a prudent investor would exercise or use under the circumstances in the conduct of such investor's own affairs.

(b)    The Trustee, upon receipt of all resolutions, certificates, statements, opinions, reports, documents, orders or other instruments furnished to the Trustee which are specifically required to be furnished pursuant to any provision of this Agreement, shall examine them to determine whether they conform to the requirements of this Agreement. The Trustee shall notify the Certificateholders and the Certificate Insurer of any such documents which do not materially conform to the requirements of this Agreement in the event that the Trustee, after so requesting, does not receive satisfactorily corrected documents. The Trustee shall forward or cause to be forwarded in a timely fashion the notices, reports and statements required to be forwarded by the Trustee pursuant to Sections 4.03, 7.03, and 10.01. The Trustee shall furnish in a timely fashion to the Master Servicer such information as the Master Servicer may reasonably request from time to time for the Master Servicer to fulfill its duties as set forth in this Agreement and the Trustee shall furnish in a timely fashion to the Certificate Insurer such information in its possession as the Certificate Insurer may reasonably request from time to time for the Certificate Insurer to protect its interests and to fulfill its duties under the Certificate Guaranty Insurance Policy. The Trustee covenants and agrees that it shall perform its obligations hereunder in a manner so as to maintain the status of each REMIC created hereunder as a REMIC under the REMIC Provisions and (subject to Section 10.01(f)) to prevent the imposition of any federal, state or local income, prohibited transaction, contribution or other tax on the Trust Fund to the extent that maintaining such status and avoiding such taxes are reasonably within the control of the Trustee and are reasonably within the scope of its duties under this Agreement.

(c)    No provision of this Agreement shall be construed to relieve the Trustee from liability for its own negligent action, its own negligent failure to act or its own willful misconduct; *provided, however,* that:

(i)    Prior to the occurrence of an Event of Default, and after the curing or waiver of all such Events of Default which may have occurred, the duties and obligations of the Trustee shall be determined solely by the express provisions of this Agreement, the Trustee shall not be liable except for the performance of such duties and obligations as are specifically set forth in this Agreement, no implied covenants or obligations shall be read into this Agreement against the Trustee and, in the absence of bad faith on the part of the Trustee, the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon any certificates or opinions furnished to the Trustee by the Depositor or the Master Servicer and which on their face, do not contradict the requirements of this Agreement;

(ii)    The Trustee shall not be personally liable for an error of judgment made in good faith by a Responsible Officer or Responsible Officers of the Trustee, unless it shall be proved that the Trustee was negligent in ascertaining the pertinent facts;

(iii)    The Trustee shall not be personally liable with respect to any action taken, suffered or omitted to be taken by it in good faith in accordance with the direction of the Certificate Insurer or the Certificateholders holding Certificates which evidence, Percentage Interests aggregating not less than 25% of the affected Classes as to the time, method and place of conducting any proceeding for any remedy available to the Trustee, or exercising any trust or power conferred upon the Trustee, under this Agreement;

(iv)    The Trustee shall not be charged with knowledge of any default (other than a default in payment to the Trustee) specified in clauses (i) and (ii) of Section 7.01 or an Event of Default under clauses (iii), (iv) and (v) of Section 7.01 unless a Responsible Officer of the Trustee assigned to and working in the Corporate Trust Office obtains actual knowledge of such failure or event or the Trustee receives written notice of such failure or event at its Corporate Trust Office from the Master Servicer, the Certificate Insurer, the Depositor or any Certificateholder; and

(v)    Except to the extent provided in Section 7.02, no provision in this Agreement shall require the Trustee to expend or risk its own funds (including, without limitation, the making of any Advance) or otherwise incur any personal financial liability in the performance of any of its duties as Trustee hereunder, or in the exercise of any of its rights or powers, if the Trustee shall have reasonable grounds for believing that repayment of funds or adequate indemnity against such risk or liability is not reasonably assured to it.

(d)    The Trustee shall timely pay, from its own funds, the amount of any and all federal, state and local taxes imposed on the Trust Fund or its assets or transactions including, without limitation, (A) "prohibited transaction" penalty taxes as defined in Section 860F of the Code, if, when and as the same shall be due and payable, (B) any tax on contributions to a REMIC after the Closing Date imposed by Section 860G(d) of the Code and (C) any tax on "net income from foreclosure property" as defined in Section 860G(c) of the Code, but only if such taxes arise out of a breach by the Trustee of its obligations hereunder, which breach constitutes negligence or willful misconduct of the Trustee.

Section 8.02.    Certain Matters Affecting the Trustee.

(a)    Except as otherwise provided in Section 8.01:

(i)    The Trustee may rely and shall be protected in acting or refraining from acting upon any resolution, Officers' Certificate, certificate of auditors or any other certificate, statement, instrument, opinion, report, notice, request, consent, order, appraisal, bond or other paper or document believed by it to be genuine and to have been signed or presented by the proper party or parties;

(ii)    The Trustee may consult with counsel, and any Opinion of Counsel shall be full and complete authorization and protection in respect of any action taken or suffered or omitted by it hereunder in good faith and in accordance with such Opinion of Counsel;

(iii)    The Trustee shall be under no obligation to exercise any of the trusts or powers vested in it by this Agreement or to institute, conduct or defend any litigation hereunder or in relation hereto at the request, order or direction of the Certificate Insurer or any of the Certificateholders pursuant to the provisions of this Agreement, unless (a) the Certificate Insurer or such Certificateholders, as applicable, shall have offered to the Trustee reasonable security or indemnity against the costs, expenses and liabilities which may be incurred therein or thereby and (b) the Certificate Insurer has given its consent; nothing contained herein shall, however, relieve

the Trustee of the obligation, upon the occurrence of an Event of Default (which has not been cured), to exercise such of the rights and powers vested in it by this Agreement, and to use the same degree of care and skill in their exercise as a prudent investor would exercise or use under the circumstances in the conduct of such investor's own affairs;

(iv)    The Trustee shall not be personally liable for any action taken, suffered or omitted by it in good faith and believed by it to be authorized or within the discretion or rights or powers conferred upon it by this Agreement;

(v)    Prior to the occurrence of an Event of Default hereunder and after the curing of all Events of Default which may have occurred, the Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, approval, bond or other paper or document, unless requested in writing so to do by the Certificate Insurer or the Holders of Certificates of any Class evidencing, as to such Class, Percentage Interests, aggregating not less than 50% with the written consent of the Certificate Insurer; *provided, however,* that if the payment within a reasonable time to the Trustee of the costs, expenses or liabilities likely to be incurred by it in the making of such investigation is, in the opinion of the Trustee, not reasonably assured to the Trustee by the security afforded to it by the terms of this Agreement, the Trustee may require reasonable indemnity against such expense or liability as a condition to so proceeding.  The reasonable expense of every such examination shall be paid by the Master Servicer, if an Event of Default shall have occurred and is continuing, and otherwise by the Certificateholder requesting the investigation (or the Certificate Insurer, if the Certificate requested the investigation);

(vi)    The Trustee may execute any of the trusts or powers hereunder or perform any duties hereunder either directly or by or through agents or attorneys provided that the Trustee shall remain liable for any acts of such agents or attorneys; and

(vii)    To the extent authorized under the Code and the regulations promulgated thereunder, each Holder of a Class R Certificate hereby irrevocably appoints and authorizes the Trustee to be its attorney-in-fact for purposes of signing any Tax Returns required to be filed on behalf of the Trust Fund.  The Trustee shall sign on behalf of the Trust Fund and deliver to the Master Servicer in a timely manner any Tax Returns prepared by or on behalf of the Master Servicer that the Trustee is required to sign as determined by the Master Servicer pursuant to applicable federal, state or local tax laws, *provided* that the Master Servicer shall indemnify the Trustee for signing any such Tax Returns that contain errors or omissions.

(b)    Following the issuance of the Certificates (and except as provided for in Section 2.04), the Trustee shall not accept any contribution of assets to the Trust Fund unless (subject to Section 10.01(f)) it shall have obtained or been furnished with an Opinion of Counsel to the effect that such contribution will not (i) cause any REMIC created hereunder to fail to qualify as a REMIC at any time that any Certificates are outstanding or (ii) cause the Trust Fund to be subject to any federal tax as a result of such contribution (including the imposition of any federal tax on "prohibited transactions" imposed under Section 860F(a) of the Code).

Section 8.03.    <u>Trustee Not Liable for Certificates or Mortgage Loans</u>.

The recitals contained herein and in the Certificates (other than the execution of the Certificates and relating to the acceptance and receipt of the Mortgage Loans) shall be taken as the statements of the Depositor or the Master Servicer as the case may be, and the Trustee assumes no responsibility for their correctness.  The Trustee makes no representations as to the validity or sufficiency of this Agreement or

AMENDMENT

RESIDENTIAL ASSET MORTGAGE PRODUCTS, INC.,

Depositor,

RESIDENTIAL FUNDING CORPORATION,

Master Servicer,

and

AMENDMENT

JPMORGAN CHASE BANK

Trustee

POOLING AND SERVICING AGREEMENT

Dated as of May 1, 2004

Mortgage Asset-Backed Pass-Through Certificates

Series 2004-RS5

ARTICLE VIII

CONCERNING THE TRUSTEE

Section 8.01.   Duties of Trustee.

(a)      The Trustee, prior to the occurrence of an Event of Default and after the curing of all Events of Default which may have occurred, undertakes to perform such duties and only such duties as are specifically set forth in this Agreement. In case an Event of Default has occurred (which has not been cured or waived), the Trustee shall exercise such of the rights and powers vested in it by this Agreement, and use the same degree of care and skill in their exercise as a prudent investor would exercise or use under the circumstances in the conduct of such investor's own affairs.

(b)      The Trustee, upon receipt of all resolutions, certificates, statements, opinions, reports, documents, orders or other instruments furnished to the Trustee which are specifically required to be furnished pursuant to any provision of this Agreement, shall examine them to determine whether they conform to the requirements of this Agreement. The Trustee shall notify the Insurer and the Certificateholders of any such documents which do not materially conform to the requirements of this Agreement in the event that the Trustee, after so requesting, does not receive satisfactorily corrected documents in a timely fashion. The Trustee shall forward or cause to be forwarded in a timely fashion the notices, reports and statements required to be forwarded by the Trustee pursuant to Sections 4.03, 7.03, and 10.01. The Trustee shall furnish in a timely fashion to the Master Servicer such information as the Master Servicer may reasonably request from time to time for the Master Servicer to fulfill its duties as set forth in this Agreement and the Trustee shall furnish in a timely fashion to the Insurer such information as the Insurer may reasonably request from time to time for the Insurer to protect its interests and to fulfill its duties under the Policy. The Trustee covenants and agrees that it shall perform its obligations hereunder in a manner so as to maintain the status of each of REMIC I, REMIC II, REMIC III and REMIC IV as a REMIC under the REMIC Provisions and to prevent the imposition of any federal, state or local income, prohibited transaction (except as provided in Section 2.04 herein), contribution or other tax on the Trust Fund to the extent that maintaining such status and avoiding such taxes are reasonably within the control of the Trustee and are reasonably within the scope of its duties under this Agreement.

(c)      No provision of this Agreement shall be construed to relieve the Trustee from liability for its own negligent action, its own negligent failure to act or its own willful misconduct; *provided, however,* that:

(i)      Prior to the occurrence of an Event of Default, and after the curing or waiver of all such Events of Default which may have occurred, the duties and obligations of the Trustee shall be determined solely by the express provisions of this Agreement, the Trustee shall not be liable except for the performance of such duties and obligations as are specifically set forth in this Agreement, no implied covenants or obligations shall be read into this Agreement against the Trustee and, in the absence of bad faith on the part of the Trustee, the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon any certificates or opinions furnished to

the Trustee by the Depositor or the Master Servicer and which on their face, do not contradict the requirements of this Agreement;

(ii)    The Trustee shall not be personally liable for an error of judgment made in good faith by a Responsible Officer or Responsible Officers of the Trustee, unless it shall be proved that the Trustee was negligent in ascertaining the pertinent facts;

(iii)    The Trustee shall not be personally liable with respect to any action taken, suffered or omitted to be taken by it in good faith in accordance with the direction of the Insurer or the Certificateholders holding Certificates which evidence, Percentage Interests aggregating not less than 25% of the affected classes as to the time, method and place of conducting any proceeding for any remedy available to the Trustee, or exercising any trust or power conferred upon the Trustee, under this Agreement;

(iv)    The Trustee shall not be charged with knowledge of any default (other than a default in payment to the Trustee) specified in clauses (i) and (ii) of Section 7.01 or an Event of Default under clauses (iii), (iv) and (v) of Section 7.01 unless a Responsible Officer of the Trustee assigned to and working in the Corporate Trust Office obtains actual knowledge of such failure or event or the Trustee receives written notice of such failure or event at its Corporate Trust Office from the Master Servicer, the Insurer, the Depositor or any Certificateholder; and

(v)    Except to the extent provided in Section 7.02, no provision in this Agreement shall require the Trustee to expend or risk its own funds (including, without limitation, the making of any Advance) or otherwise incur any personal financial liability in the performance of any of its duties as Trustee hereunder, or in the exercise of any of its rights or powers, if the Trustee shall have reasonable grounds for believing that repayment of funds or adequate indemnity against such risk or liability is not reasonably assured to it.

(d)    The Trustee shall timely pay, from its own funds, the amount of any and all federal, state and local taxes imposed on the Trust Fund or its assets or transactions including, without limitation, (A) "prohibited transaction" penalty taxes as defined in Section 860F of the Code, if, when and as the same shall be due and payable, (B) any tax on contributions to a REMIC after the Closing Date imposed by Section 860G(d) of the Code and (C) any tax on "net income from foreclosure property" as defined in Section 860G(c) of the Code, but only if such taxes arise out of a breach by the Trustee of its obligations hereunder, which breach constitutes negligence or willful misconduct of the Trustee.

Section 8.02.    Certain Matters Affecting the Trustee.

(a)    Except as otherwise provided in Section 8.01:

(i)    The Trustee may rely and shall be protected in acting or refraining from acting upon any resolution, Officers' Certificate, certificate of auditors or any other certificate, statement, instrument, opinion, report, notice, request, consent, order, appraisal, bond or

other paper or document believed by it to be genuine and to have been signed or presented by the proper party or parties;

(ii)    The Trustee may consult with counsel and any Opinion of Counsel shall be full and complete authorization and protection in respect of any action taken or suffered or omitted by it hereunder in good faith and in accordance with such Opinion of Counsel;

(iii)    The Trustee shall be under no obligation to exercise any of the trusts or powers vested in it by this Agreement or to institute, conduct or defend any litigation hereunder or in relation hereto at the request, order or direction of any of the Certificateholders or the Insurer, pursuant to the provisions of this Agreement, unless such Certificateholders or the Insurer shall have offered to the Trustee reasonable security or indemnity against the costs, expenses and liabilities which may be incurred therein or thereby and the Insurer has given its consent; nothing contained herein shall, however, relieve the Trustee of the obligation, upon the occurrence of an Event of Default (which has not been cured), to exercise such of the rights and powers vested in it by this Agreement, and to use the same degree of care and skill in their exercise as a prudent investor would exercise or use under the circumstances in the conduct of such investor's own affairs;

(iv)    The Trustee shall not be personally liable for any action taken, suffered or omitted by it in good faith and believed by it to be authorized or within the discretion or rights or powers conferred upon it by this Agreement;

(v)    Prior to the occurrence of an Event of Default hereunder and after the curing of all Events of Default which may have occurred, the Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, approval, bond or other paper or document, unless requested in writing to do by the Insurer or by the Holders of Certificates of any Class evidencing, as to such Class, Percentage Interests, aggregating not less than 50% with the written consent of the Insurer; provided, however, that if the payment within a reasonable time to the Trustee of the costs, expenses or liabilities likely to be incurred by it in the making of such investigation is, in the opinion of the Trustee, not reasonably assured to the Trustee by the security afforded to it by the terms of this Agreement, the Trustee may require reasonable indemnity against such expense or liability as a condition to so proceeding. The reasonable expense of every such examination shall be paid by the Master Servicer, if an Event of Default shall have occurred and is continuing, and otherwise by the Certificateholder or the Insurer requesting the investigation;

(vi)    The Trustee may execute any of the trusts or powers hereunder or perform any duties hereunder either directly or by or through agents or attorneys provided that the Trustee shall remain liable for any acts of such agents or attorneys; and

(vii)    To the extent authorized under the Code and the regulations promulgated thereunder, each Holder of a Class R Certificate hereby irrevocably appoints and authorizes the Trustee to be its attorney-in-fact for purposes of signing any Tax Returns required to be filed on behalf of the Trust Fund. The Trustee shall sign on behalf of the Trust Fund and

deliver to the Master Servicer in a timely manner any Tax Returns prepared by or on behalf of the Master Servicer that the Trustee is required to sign as determined by the Master Servicer pursuant to applicable federal, state or local tax laws, provided that the Master Servicer shall indemnify the Trustee for signing any such Tax Returns that contain errors or omissions.

(b)    Following the issuance of the Certificates (and except as provided for in Section 2.04), the Trustee shall not accept any contribution of assets to the Trust Fund unless it shall have obtained or been furnished with an Opinion of Counsel to the effect that such contribution will not (i) cause any of REMIC I, REMIC II, REMIC III or REMIC IV to fail to qualify as a REMIC at any time that any Certificates are outstanding or (ii) cause the Trust Fund to be subject to any federal tax as a result of such contribution (including the imposition of any federal tax on "prohibited transactions" imposed under Section 860F(a) of the Code).

Section 8.03.    Trustee Not Liable for Certificates or Mortgage Loans.

The recitals contained herein and in the Certificates (other than the execution of the Certificates and relating to the acceptance and receipt of the Mortgage Loans) shall be taken as the statements of the Depositor or the Master Servicer as the case may be, and the Trustee assumes no responsibility for their correctness. The Trustee makes no representations as to the validity or sufficiency of this Agreement or of the Certificates (except that the Certificates shall be duly and validly executed and authenticated by it as Certificate Registrar) or of any Mortgage Loan or related document, or of MERS or the MERS® System. Except as otherwise provided herein, the Trustee shall not be accountable for the use or application by the Depositor or the Master Servicer of any of the Certificates or of the proceeds of such Certificates, or for the use or application of any funds paid to the Depositor or the Master Servicer in respect of the Mortgage Loans or deposited in or withdrawn from the Custodial Account or the Certificate Account by the Depositor or the Master Servicer.

Section 8.04.    Trustee May Own Certificates.

The Trustee in its individual or any other capacity may become the owner or pledgee of Certificates with the same rights it would have if it were not Trustee.

Section 8.05.    Master Servicer to Pay Trustee's Fees and Expenses; Indemnification.

(a)    The Master Servicer covenants and agrees to pay to the Trustee and any co-trustee from time to time, and the Trustee and any co-trustee shall be entitled to, reasonable compensation (which shall not be limited by any provision of law in regard to the compensation of a trustee of an express trust) for all services rendered by each of them in the execution of the trusts hereby created and in the exercise and performance of any of the powers and duties hereunder of the Trustee and any co-trustee, and the Master Servicer will pay or reimburse the Trustee and any co-trustee upon request for all reasonable expenses, disbursements and advances incurred or made by the Trustee or any co-trustee in accordance with any of the provisions of this Agreement (including the reasonable compensation and the expenses and disbursements of its counsel and of all persons not regularly in its employ, and the expenses incurred by the Trustee or any co-trustee in connection with the

**EXECUTION COPY**

HOME EQUITY LOAN TRUST 2006-HSA2

Issuer

AND

JPMORGAN CHASE BANK, NATIONAL ASSOCIATION.

Indenture Trustee

INDENTURE

Dated as of February 24, 2006

---

HOME EQUITY LOAN-BACKED TERM NOTES

HOME EQUITY LOAN-BACKED VARIABLE FUNDING NOTES

---

DOCSNY1:1189950.4

remedy accruing upon any Event of Default shall impair any such right or remedy or constitute a waiver of any such Event of Default or an acquiescence therein. Every right and remedy given by this Article V or by law to the Indenture Trustee or to the Noteholders may be exercised from time to time, and as often as may be deemed expedient, by the Indenture Trustee or by the Noteholders, as the case may be.

Section 5.11.  Control by the Credit Enhancer or Noteholders.  The Holders of a majority of the Security Balances of Notes with the consent of the Credit Enhancer, or the Credit Enhancer (so long as no Credit Enhancer Default exists) shall have the right to direct the time, method and place of conducting any Proceeding for any remedy available to the Indenture Trustee with respect to the Notes or exercising any trust or power conferred on the Indenture Trustee; provided that:

(i)  such direction shall not be in conflict with any rule of law or with this Indenture;

(ii)  subject to the express terms of Section 5.04, any direction to the Indenture Trustee to sell or liquidate the Trust Estate shall be by Holders of Notes representing not less than 100% of the Security Balances of Notes with the consent of the Credit Enhancer, or the Credit Enhancer (so long as no Credit Enhancer Default exists);

(iii)  if the conditions set forth in Section 5.05 have been satisfied and the Indenture Trustee elects to retain the Trust Estate pursuant to such Section, then any direction to the Indenture Trustee by Holders of Notes representing less than 100% of the Security Balances of Notes to sell or liquidate the Trust Estate shall be of no force and effect; and

(iv)  the Indenture Trustee may take any other action deemed proper by the Indenture Trustee that is not inconsistent with such direction.

Notwithstanding the rights of Noteholders set forth in this Section, subject to Section 6.01, the Indenture Trustee need not take any action that it determines might involve it in liability or might materially adversely affect the rights of any Noteholders not consenting to such action unless the Indenture Trustee has received satisfactory indemnity from the Credit Enhancer or the Noteholders.

Section 5.12.  Waiver of Past Default.  Prior to the declaration of the acceleration of the maturity of the Notes as provided in Section 5.02, the Holders of Notes of not less than a majority of the Security Balances of the Notes with the consent of the Credit Enhancer, or the Credit Enhancer (so long as no Credit Enhancer Default exists) may waive any past Event of Default and its consequences except an Event of Default (i) with respect to payment of principal of or interest on any of the Notes or (ii) in respect of a covenant or provision hereof which cannot be modified or amended without the consent of the Holder of each Note. In the case of any such waiver, the Issuer, the Indenture Trustee and the Holders of the Notes shall be restored to their respective former positions and rights hereunder; but no such waiver shall extend to any subsequent or other Event of Default or impair any right consequent thereto.

**EXECUTION COPY**

GMACM HOME EQUITY LOAN TRUST 2006-HE1,

Issuer,

and

JPMORGAN CHASE BANK, NATIONAL ASSOCIATION,

Indenture Trustee

———————————

INDENTURE

———————————

Dated as of March 30, 2006

GMACM HOME EQUITY LOAN-BACKED TERM NOTES

DOCSLA1:519326.5

of Default or an acquiescence therein. Every right and remedy given by this Article V or by law to the Indenture Trustee or to the Noteholders may be exercised from time to time, and as often as may be deemed expedient, by the Indenture Trustee or by the Noteholders, as the case may be.

Section 5.11    Control by Enhancer or Noteholders.    The Enhancer (so long as no Enhancer Default exists) or the Noteholders of a majority of the aggregate Note Balance of Notes with the consent of the Enhancer, shall have the right to direct the time, method and place of conducting any Proceeding for any remedy available to the Indenture Trustee with respect to the Notes or exercising any trust or power conferred on the Indenture Trustee, provided that:

(a) such direction shall not be in conflict with any rule of law or with this Indenture;

(b) subject to the express terms of Section 5.04, any direction to the Indenture Trustee to sell or liquidate the Trust Estate shall be by the Enhancer (so long as no Enhancer Default exists) or by the Noteholders of Notes representing not less than 100% of the aggregate Note Balance of the Notes with the consent of the Enhancer;

(c) if the conditions set forth in Section 5.05 shall have been satisfied and the Indenture Trustee elects to retain the Trust Estate pursuant to such Section, then any direction to the Indenture Trustee by Noteholders of Notes representing less than 100% of the aggregate Note Balance of the Notes to sell or liquidate the Trust Estate shall be of no force and effect; and

(d) the Indenture Trustee may take any other action deemed proper by the Indenture Trustee that is not inconsistent with such direction.

Notwithstanding the rights of Noteholders set forth in this Section, subject to Section 6.01, the Indenture Trustee need not take any action that it determines (in its sole discretion) might involve it in liability or might materially adversely affect the rights of any Noteholders not consenting to such action, unless the Trustee has received satisfactory indemnity from the Enhancer or a Noteholder.

Section 5.12    Waiver of Past Defaults.    Prior to the declaration of the acceleration of the maturity of the Notes as provided in Section 5.02, the Enhancer (so long as no Enhancer Default exists) or the Noteholders of not less than a majority of the aggregate Note Balance of the Notes, with the consent of the Enhancer, may waive any past Event of Default and its consequences, except an Event of Default (a) with respect to payment of principal of or interest on any of the Notes or (b) in respect of a covenant or provision hereof that cannot be modified or amended without the consent of the Noteholder of each Note. In the case of any such waiver, the Issuer, the Indenture Trustee and the Noteholders shall be restored to their respective former positions and rights hereunder; but no such waiver shall extend to any subsequent or other Event of Default or impair any right consequent thereto.

Upon any such waiver, any Event of Default arising therefrom shall be deemed to have been cured and not to have occurred, for every purpose of this Indenture; but no such waiver shall extend to any subsequent or other Event of Default or impair any right consequent thereto.