MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone: (212) 468-8000
Facsimile: (212) 468-7900
Gary S. Lee
Anthony Princi
Darryl P. Rains

*Counsel for the Debtors and*
*Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Case No. 12-12020 (MG) |
| | ) | |
| RESIDENTIAL CAPITAL, LLC, *et al*., | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

**DEBTORS' REPLY IN SUPPORT OF DEBTORS' MOTION IN LIMINE TO STRIKE THE OBJECTION AND EXCLUDE THE EVIDENCE OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS IN OPPOSITION TO THE RMBS TRUST SETTLEMENT**

The debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors") submit this reply (the "Reply") to the objections[1] of the Committee,[2] FGIC, MBIA, and Wilmington (collectively, the "Objectors") to the *Debtors' Motion in Limine to Strike the Objection and Exclude the Evidence of the Official Committee of Unsecured Creditors in Opposition to the RMBS Trust Settlement* [Docket No. 3613] (the "Motion"). In further support, the Debtors respectfully represent:

## PRELIMINARY STATEMENT

The success of the Debtors' Motion rests on one question of fact and then one question of law. First, did MBIA, FGIC, or Wilmington have a self-interest in or bias in favor of the 9019 Motion being denied when they engaged in the Committee's deliberations and the voting on the 9019 Motion? And second, assuming that one or more of them did have such a conflict, what is the appropriate legal remedy in connection with the evidentiary record in a 9019 motion regarding the Iridium factor concerning creditor support?

As to the factual question, the Committee argues without any evidentiary support that MBIA and FGIC did not pre-judge the Settlement, and that the interest of Wilmington in opposing the Settlement is irrelevant. (Committee Obj. at 6-9.) As to the legal question, the Committee argues that even if MBIA, FGIC, and Wilmington were conflicted, that conflict would not matter because the other three voting members of the Committee also voted to reject

---

[1] *Response of the Official Committee of Unsecured Creditors to Debtors' Motion in Limine to Strike the Objection and Exclude the Evidence of the Official Committee of Unsecured Creditors in Opposition to the RMBS Trust Settlement* [Docket No. 3721] (the "Committee Objection"); *Joinder of Wilmington Trust, N.A. in Support of the Response of the Official Committee of Unsecured Creditors to Debtors' Motion to Strike the Objection and Exclude the Evidence of the Official Committee of Unsecured Creditors in Opposition to the RMBS Trust Settlement* [Docket No. 3728] (the "Wilmington Objection"); *Joinder of Financial Guaranty Insurance Company in Support of the Official Committee of Unsecured Creditors to Debtors' Motion to Strike the Objection and Exclude the Evidence of the Official Committee of Unsecured Creditors in Opposition to the RMBS Trust Settlement* [Docket No. 3722] (the "FGIC Objection"); *MBIA's Response and Opposition to the Debtors' Motion in Limine to Strike the Objection and Exclude the Evidence of the Official Committee of Unsecured Creditors in Opposition to the RMBS Trust Settlement* [Docket No. 3725] (the "MBIA Objection").

[2] Capitalized terms not defined herein shall have the same meanings ascribed to them in the Motion.

1

ny-1091102

the Settlement, which they argue was sufficient under the Committee's by-laws. (Committee Obj. at 4.) In other words, the Committee argues, no harm, no foul. The Committee is wrong on both counts.

The record plainly establishes that MBIA and FGIC had early on determined that apart from the effect on other creditors, it was in their respective, individual self-interests for the 9019 Motion to be denied. For its part, Wilmington does not, because it cannot, deny its intention to seek to subordinate all the RMBS claims and its associated bias arising therefrom. Because 50% of the members of the Committee (including its two co-chairs) who were involved in the deliberation and voting on 9019 Motion had either a self-interest in having the motion denied or a bias in favor of such an outcome, the Committee's process and vote are per se tainted. That the three other Committee members could have deliberated and voted separately against the motion and thereby avoided the influence of the conflicted Committee members, is of no moment -- while that unquestionably would have been the appropriate way for the Committee's deliberations and vote to have proceeded, it didn't. And because it didn't it cannot now be known whether the vote would have been the same in the absence of the influence of the three conflicted Committee members.

Moreover, the Committee cites to no legal authority nor to any sound legal or equitable basis, to advance its "no harm, no foul" theory of how a tainted Committee deliberation and voting process should be treated in these circumstances. The Debtor submits that because of the importance to the estate and its stakeholders of any position taken by an official creditors' committee, a creditors' committee's decision-making on any matter should always be clear from even the appearance of a conflict. Furthermore, the need for the avoidance of any such possibility is particularly necessary in connection with 9019 motions and the corresponding

2

ny-1091102

<u>Iridium</u> factor that requires an examination of creditor support. Accordingly, the Debtor submits that the proper equitable remedy for the tainted process that produced the Committee's position on the 9019 Motion is to strike its product -- the Committee's Objection -- from the record.

## UNDISPUTED FACTS

The following facts, which are either conceded or not contested by the Objectors, form the factual predicate for, and support the grant of, the Debtors' Motion:

- On June 11, 2012, the Debtors filed the 9019 Motion.

- Prior to the filing of the 9019 Motion, FGIC unqualifiedly informed the trustees associated with the trusts it had wrapped that the Settlement was materially adverse to FGIC's interests.

- FGIC did not provide the trustees with an indemnification, so its direction to the trustees was not contractually binding.

- Approximately six weeks after the filing of the 9019 Motion, on July 23, 2012, MBIA unqualifiedly directed the trustee not to consider or accept the Settlement.

- MBIA did not provide the trustees with an indemnification, so its direction to the trustees was not contractually binding.

- Wilmington seeks to subordinate the claims of all the trusts, regardless of the amount of the claims.

- At hearings on September 19, 2012 and October 10, 2012, counsel for the Committee represented that the Committee had not reached a decision on the Settlement.

- The Committee concedes that the proper exercise of its fiduciary duty requires it to first fully investigate the merits of the Settlement before objecting to it. (Comm. Obj. at 11.)

- Pursuant to the releases provided for in the Settlement, the Settlement extinguishes any claims against the Debtors of the FGIC/MBIA wrapped trusts.

- The Committee concedes that the RMBS Trustees that serve on the Committee "properly determined" to exclude themselves from deliberations concerning the Committee's vote on the 9019 Motion. (Comm. Obj. at 3.)

- FGIC, MBIA and Wilmington all participated in the Committee's deliberations concerning the Settlement, and those deliberations included only three other Committee members: AIG Asset Management LLC, Allstate Life Insurance Company and an individual, Rowena L. Drennon (collectively, the "Non-conflicted Members"). (Comm. Obj. at 3.)

- MBIA, FGIC and Wilmington each signed confidentiality agreements with the Debtors which thereby enabled each of them to access all documents that the Debtors produced in response to the Committee's discovery requests; the Non-conflicted Members did not.

- MBIA, FGIC and Wilmington all propounded separate discovery requests on the Debtor and participated in all the depositions; the Non-conflicted Members did not.

## BACKGROUND AND PROCEDURAL STATUS

After the Committee filed the 9019 Motion, the Committee, MBIA and FGIC on more than one occasion asserted that the 9019 Motion should not go forward on a stand-alone basis,

arguing instead that the resolution of the amount of the allowed claims held by the RMBS Trusts should be rolled into plan discussions that involved the resolution of other disputed claims – including, importantly for them, the disputed claims of MBIA and FGIC. [CITE]  MBIA and FGIC obviously believed that they would have greater leverage with respect to the negotiation of the amount, if any, of their disputed claims if they could continue to try to stop the largest creditor group in these cases from having their claims fixed.  The Court ultimately made clear to the Committee, MBIA and FGIC that it was not going to so delay the adjudication of the amount of the allowed claims for the RMBS Trusts.

Thereafter, as this Court is aware, and weeks before the Debtors filed the instant Motion, Judge Peck was appointed as a mediator in these cases.  Since his appointment Judge Peck has conducted a mediation in an attempt to resolve global case issues that would then allow for a consensual plan of reorganization.  These issues include the issues that are the subject of the 9019 Motion, and the Debtors and the Objectors, together with other parties, actively participated in the mediation efforts.  As the Court is further aware, as a result of the mediation all of the parties who participated in the mediation have agreed to a resolution of all major case issues, including those encompassed by the 9019 Motion.  Provided that this agreement is embodied in an executed plan support agreement and an accompanying motion to approve same by 9:00 a.m. on May 23, 2013, the Court has advised that the trial on the 9019 Motion will be adjourned together with this and other in limine motions.  Concurrently with the preparation and filing of this reply brief, the Debtors and the Objectors have been working together to meet the May 23rd deadline.

In the event that the aforementioned deadline is not met and the trial goes forward, contrary to the Committee's argument, the Debtors will prove that the Settlement was negotiated

at arm's length with the Institutional Investors; that the amount of the Settlement falls well within the range of reasonableness for the claims involved; and that the Settlement is unquestionably in the best interests of the estate and its creditors for numerous reasons, including the fact that in the absence of a settlement the estates face cure claims from the RMBS Trusts that could result in there being no distributions to other unsecured creditors and/or an administratively insolvent estate.

## ARGUMENT

In opposing the Motion the Objectors make two primary arguments: (1) they argue that MBIA, FGIC, and Wilmington are not conflicted notwithstanding their clear statements of self-interest and bias against the 9019 Motion, and (2) even if they are conflicted, such conflicts are immaterial because they did not change the Committee's vote.[3]  The Debtors assert the Objectors are wrong on both counts.

### I. FGIC AND MBIA'S SELF-INTEREST IN HAVING THE 9019 MOTION DENIED, AND WILMINGTON'S BIAS AGAINST THE CLAIMS OF THE TRUSTS, TAINTED THE COMMITTEE'S DELIBERATIONS AND VOTE

The Objectors claim that there is no factual support for the Debtors' Motion.  In truth, the Debtors' Motion is supported by facts that undeniably reveal a self-interest and/or bias on the part of MBIA, FGIC and Wilmington that should have led them to recuse themselves from the Committee's deliberations and vote on the 9019 Motion.  See infra at 3-4.  Recognizing that these facts demonstrate that MBIA, FGIC and Wilmington were self-interested and/or biased, the

---

[3] At the outset, the Debtors acknowledge two minor and inadvertent inaccuracies in the Motion.  First, in a parenthetical on page 7 of the Motion, the Debtors attribute the following quote to *In re Drexel Burnham Lambert Group, Inc.,* 138 B.R. 717, 722 (Bankr. S.D.N.Y. 1992): "The Committee and its members owed a fiduciary duty to the class it represented, but not to the individual creditors within the class or to the estate."  That quote is actually from the *In re Rickel & Assocs., Inc.,* 272 B.R. 74, 99 (Bankr. S.D.N.Y. 2002).  *Rickel*, however, cites *Drexel Burnham* in support of the quoted proposition.  *Rickel & Assocs.,* 272 B.R. at 99.  Second, in discussing the equitable powers of the court under section 105 to strike pleadings, the Debtors state that in *In re Zarnel,* 619 F.3d 156 (2d Cir. 2010), the Second Circuit affirmed the decision of the bankruptcy court to strike the debtors' petitions, when in fact the Second Circuit remanded on other grounds.  *Id.* at 172.  In doing so, however, the Second Circuit noted that "striking a petition, might be appropriate in these circumstances."  *Id.*

6

ny-1091102

Objectors simply disavow the truth of the matter. In doing so, none of the Objectors submit any evidence to support their incredulous denial of the truth. Instead MBIA, FGIC and the Committee seek to employ the "what's written doesn't mean what is says" tactic with the hope that they can obfuscate the truth.

With respect to MBIA, the letters sent to the applicable trustees are clear on their face and MBIA's attempts at "backtracking" are unavailing. As set forth in the Motion, just weeks after the filing of the 9019 Motion, MBIA sent a letter to the trustees <u>directing</u> it not to "consider or accept" any settlement or compromise offer. (Ex. 6 at 1). Though MBIA asserts that the letters were only sent as a direction "not to take any action with respect to the proposed settlement that would prejudice MBIA's rights," (MBIA Obj. at ¶ 9) such argument is belied by a plain reading of the letters: the letters make absolutely no mention of the protection of MBIA's rights.

Indeed, at a hearing on September 19, 2012, the Court — based on a plain reading of the letters — questioned MBIA's assertion that it did not say it would never approve the Settlement:

| | |
|---|---|
| THE COURT: | You didn't really mean it when you said never, under no circumstances should you ever approve this settlement? |
| MR. ELLENBERG: | It's not what we said, Your Honor. |
| THE COURT: | It's pretty close. |
| MR. ELLENBERG: | It's not, Your Honor. And you were provided with the entire letter. |
| | ……………... |
| THE COURT: | I did it read it. It's only two paragraphs long. |
| MR. ELLENBERG: | Okay. It doesn't say we're opting out. It says we will make the decision, not you. And that's because we have the right to make that decision -- |
| THE COURT: | When it says "We hereby instruct you not to consider or accept any settlement or compromise offers relating to any claims that may belong to the above referenced trust" and it goes on from there. |
| MR. ELLENBERG: | It does go on, Your Honor. |
| THE COURT: | That looks like pretty clear language. |

7

ny-1091102

(Ex. 7, H'rg Tr. Sept. 19, 2012 at 125: 21-126:2; 127: 9-19.)  As the Court appeared to have recognized, the only fair reading of the letters is that MBIA determined at the outset of the case that it had a self-interest in the denial of the 9019 Motion.  Furthermore, the fact that MBIA instructed the trustee not to even "consider" the merits of the Settlement, make its position on this Settlement – which as the UCC acknowledges occurred well before there had been a chance for any party to have fairly assessed what was in the best interests of all creditors (Committee Obj. at 10-11) – as final as final can be.  MBIA was certainly within its rights as a creditor to make such a final determination for itself early in the case whether for substantive or tactical reasons.  With such a self-interest, however, MBIA should have recused itself from the Committee's deliberations on the Settlement.[4]

The facts that FGIC attempts to run from are equally if not more damning.  Just eleven days after the Debtors publicly disclosed the RMBS Trust Settlement, and before the Debtors had filed any motion to approve or otherwise justify the Settlement, FGIC had already decided the proposed settlement was not in its interests.  Indeed, on May 25, 2012, FGIC sent a letter to U.S. Bank N.A., as trustee for numerous trusts associated with residential mortgage backed security certificates insured by FGIC, asserting that "[t]he terms of the Settlement Agreement . . . which will increase FGIC's potential claims and losses under the Transactions, are materially adverse to FGIC's interest with respect to the Transactions."  (Ex. 5 at 2.)  In furtherance of these individual interests, FGIC commanded the Trustees, pursuant to its alleged rights to direct the trustees under the agreements governing Trusts, "not to vote in favor of, or opt in to, the Settlement Agreement."  (*Id.*)  FGIC attempts to characterize the letter solely as a direction to

---

[4] Moreover, MBIA's allegations of its rights under the operative trust documents also are at odds with the truth.  MBIA's direction did not also include an indemnification, and hence it was not contractually binding on the trustees. See Ex. 9 to Supp Princi Dec.

8

avoid the trustees taking any "precipitous action." (FGIC Obj. at 4). This contorted effort to rehabilitate the contents of the letter is pure sophistry and is belied by FGIC's unqualified statement to the trustee BEFORE THE 9019 MOTION WAS EVEN FILED that the Settlement is **"materially adverse to FGIC's interest …."** Again, FGIC was entitled to take such a position against the Settlement; having done so, however, it should have recused itself from the Committee's deliberations on it.

Not only are MBIA's and FGIC's arguments patently disingenuous, they are devoid of any evidentiary predicate – if their attempted revisionist history had any truth to it, presumably they would have filed affidavits from competent company representatives to support this. In the absence of such evidence, their counsel's arguments as to what the letters mean are unavailing.

For its part, the Committee appears to believe that if it can mislabel the positions that MBIA and FGIC took, this will change the facts. It thus resorts to disingenuously referring to the earlier positions taken by MBIA and FGIC variously as mere "preliminary statements regarding the Settlement" (Comm. Obj. at 5), "personal reservations" (Comm. Obj. at 5), "a precautionary measure intended to prevent the Trustees from approving the deal before it could be vetted" (Comm. Obj. at 7), and again only reflecting "preliminary views on the merits of the Settlement" (Comm. Obj. at 8). The Committee's mislabeling does nothing to change the clear facts here.

Notably, the Committee fails to explain why MBIA and FGIC need not have recused themselves from the vote when they admit that it was "proper[]" for the trustees to have recused themselves. (Comm. Obj. at 3.) If the trustees as mere agents of the trusts had a self-interest in the 9019 Motion meriting recusal, it would certainly stand to reason that MBIA and FGIC would have a far greater self-interest as de facto beneficiaries of the trusts who stood in the shoes of the

9

institutional investors. (See, e.g., MBIA Obj. at ¶ 9: "Once MBIA began to pay claims, the trustees for the securitization trusts MBIA insures were required to act for the benefit of MBIA. Moreover, because MBIA had paid claims, any recovery by the eight MBIA-insured securitization trusts under the proposed settlement agreement would pass through to MBIA pursuant to the terms of the relevant transaction documents.") If recusal was appropriate for the trustees, it should have been doubly appropriate for MBIA and FGIC to ensure the integrity of the Committee's deliberations.

The Committee further argues that the fact that MBIA and FGIC hired their own counsel and conducted their own discovery belies the allegation that they influenced the Committee's judgment. (Comm. Obj. at 7 n.7.) Their reasoning is not only mistaken, but, in fact, the tremendous discovery efforts engaged in by MBIA, FGIC and Wilmington, made the need for their recusal in these circumstances all the more necessary.

As the Court is aware, MBIA, FGIC and Wilmington have been the most active unsecured creditors in these cases; on a stand-alone basis, there is nothing improper about their vigorous pursuit of their individual rights. As part of their aggressive prosecution of their respective rights, MBA, FGIC and Wilmington engaged in tremendous discovery efforts for their own purposes in connection with the 9019 Motion. Each of them had separate counsel; each of them executed a confidentiality agreement allowing them access to documents produced to the UCC's counsel for "professional eyes only" that they otherwise would not have had access to; each of them propounded discovery requests on the Debtors separate and apart from the discovery requests propounded by the Committee; each of them attended all of the depositions in these cases, frequently examining the Debtors' witnesses and occasionally taking the lead in the deposition in lieu of the Committee. In contrast, the Non-conflicted Members did none of this.

10

As a result, during the deliberations with the Non-conflicted Members MBIA, FGIC and Wilmington would have had a much deeper and stronger artillery from which to draw in order to advocate their positions. Thus, far from belieing the potential for their having influenced the Committee's deliberations, the significantly greater resources that they brought to bear make it more likely that they were able to influence the Committee's deliberations.

Wilmington, for its part, does not in substance dispute that it has a bias against the claims of the RMBS Trusts. Wilmington does not dispute, as it cannot, that it believes that the trusts' claims – regardless of their amount – should all be subordinated to the claims of the noteholders that Wilmington Trust represents. (*See, e.g.*, Wilmington Trust Objection to RMBS Trust Settlement ¶¶ 35-38.) Wilmington only argues that this interest is insufficient to disqualify it from voting on the Settlement. (Wilmington Obj. at ¶ 3.)[5] The Committee more openly argues that "a desire to see certain claims subordinated is a natural part of the jockeying in a chapter 11 case" and thus should not require Wilmington's recusal (Comm. Obj. at 9.) The Debtors' pointedly disagree. Wilmington was entitled in its capacity as an individual creditor to seek to have the trusts' claims subordinated; Wilmington should not, however, be using the Committee's vote as a way to "jockey" for any such position.

The Objectors fundamentally misconstrue the nature of the relief the Debtors are seeking in the Motion in arguing that the Debtors have not pleaded breach of fiduciary duty with sufficient particularity. (Comm. Obj. at 4; MBIA Obj. at ¶ 5). Although true, this is plainly beside the point. Although MBIA, FGIC and Wilmington's bias against the Settlement plainly implicates their fiduciary duties to unsecured creditors, the Debtors are not bringing a complaint

---

[5] Wilmington also disputes the Debtors' characterization (Motion at 6) that Wilmington opposed the 9019 Motion from the outset in Wilmington's report filed on September 18, 2012, Dkt. No. 1479. Even if Wilmington's reading of the report is correct, however, Wilmington plainly expressed its opposition to the Settlement in open court a day later, describing the deal as "collusion" which "doesn't smell right." Ex. 7, Transcript of Hearing at 91:6-7 (Sept. 19, 2012).

11

ny-1091102

against them seeking damages for breach of fiduciary duty. Rather, the Debtors have a brought a motion seeking equitable relief pursuant to section 105 of the Bankruptcy Code, to which no heightened pleading requirements apply.

In short, the Debtors submit that it was not appropriate for FGIC, MBIA, and Wilmington to vote on the Committee's view of Settlement and their having done so tainted the Committee's deliberations.

## II. THE APPROPRIATE REMEDY FOR THE TAINTED DELIBERATIONS IS STRIKING THE COMMITTEE'S OBJECTION

The crux of the Objectors' argument is that because three other members of the Committee voted to oppose the 9019 Motion, any conflict on the part of MBIA, FGIC, and Wilmington was irrelevant as it did not changed the outcome of the vote:

- "[T]he Court need not decide whether MBIA, FGIC, and Wilmington were conflicted, as the Debtors allege, because the three other voting members of the Committee all voted to object to the settlement," (Comm. Obj. at 4.)

In other words, the Objectors argue, any conflicts to the Committee's deliberations should be irrelevant because they would not have changed the end result. In doing so, the Objectors cite to no law or equitable principle to support their proposed standard of conduct for committees. The Debtor submits that this is not – and indeed should not be – the law in Chapter 11 cases. The Debtors have not been able to locate any case as to the appropriate remedy when committee action is the product of a vote where committee members should have recused themselves. But if the Committee were correct in this regard, committee members with a conflict of interest would have no incentive to recuse themselves so long as a minimum number of unbiased committee members would have otherwise been available to vote in favor of the committee's action. Such a result would be patently inconsistent with the integrity of the

12

ny-1091102

bankruptcy process. *See In re Ira Haupt & Co.,* 361 F.2d 164, 168 (2d Cir. 1966) ("The conduct of bankruptcy proceedings not only should be right but must seem right"). Given the critical importance of creditors' committees in the chapter 11 process as an advocate for all unsecured creditors, a standard of unbiased conduct should apply to committees in chapter 11 in determining whether committee members should vote on actions.

The Objectors, however, would seek to have the Debtors prove that the Committee's deliberations were poisoned by the conflicts of FGIC, MBIA, and Wilmington to have the Committee's Opposition to the 9019 Motion stricken: "Because the Debtors presented no evidence that MBIA's, FGIC's or Wilmington's preliminary statements regarding the Settlement in any way impacted or affected the Committee's thorough, five-month evaluation of the Settlement, the Motion to Strike should be denied." (Comm. Obj. at 5.)

That burden should not fairly rest with the Debtors. The Objectors' no harm, no foul argument ignores the fact that the three other Non-conflicted Members who voted on the 9019 Motion did not deliberate on their own. And the Objectors have not contended that the three other members were not influenced by MBIA, Wilmington, or FGIC. It is implausible -- to say the least – to think that the other members (and particularly Ms. Drennan, as an individual) would not have been influenced by the standing of the two committee co-chairs, FGIC and Wilmington, and MBIA, all of whom have experience with the chapter 11 process and all of whose counsel had conducted discovery of the Settlement which the other members had not.

Ultimately, however, it cannot be known how the three other committee members would have voted if the two committee co-chairs and Wilmington had not participated in the Committee's deliberations. For this reason, equity should demand a bright line rule for committee members' conduct as fiduciaries: once a conflict has been demonstrated, the action of

13

ny-1091102

the committee should be void or voidable. *Cf. Baker v. Marley,* 8 N.Y.2d 365, 368 170 N.E.2d 900 (1960) (resolutions of board of trustees involving conflicted vote of one trustee held void even though resolutions approved by majority of board without counting conflicted vote); *U.S. v. Rattenni,* 480 F.2d 195, 197 (2d Cir. 1973) (although only one of six jurors who had heard adverse publicity admitted prejudice from it, jury's verdict had to be set aside as tainted, notwithstanding weighty evidence presented against defendant). When the integrity of the voting process has been tainted, the burden should not be placed on the parties objecting to the vote to show actual prejudice resulted from the conflict.

The Committee argues that "Motions of this sort, if taken seriously, would have a chilling impact on the operation of official creditors' committees in complex chapter 11 cases, in which creditor interests always diverge." (Comm. Obj. at 2.) Nonsense. Motions to strike committee action beset by deliberations involving conflicts of interest will not chill the operation of Committees; they will only ensure the integrity of committees' deliberative processes by compelling committee members to recuse themselves when they have a self-interest or bias with respect to a committee decision.[6]

The Committee also makes much of the black letter proposition that a creditor need not be disinterested to qualify for committee membership (Comm. Obj. at 9, citing *In re Barney's, Inc.,* 197 B.R. 431, 442 (Bankr. S.D.N.Y. 1996).) This is plainly beside the point. The Debtors do not argue that Wilmington, FGIC, or MBIA should not serve on the Committee; the Debtors only submit that all three of them should have recused themselves on the Committee's vote in which they had a self-interest or bias. That MBIA, FGIC, and Wilmington need not be

---

[6] Indeed, at the Court's recent hearing on Wilmington's STN motion, Wilmington, co-chair of the Committee, conceded that it, too, had concerns about how this Committee's members might improperly conduct themselves in the face of conflicts. See Ex. 8 Supp. Princi Dec.

14

ny-1091102

disinterested to serve on the Committee does not obviate them from the need to discharge their fiduciary duties as a Committee member in an unbiased and untainted fashion.

The Objectors also argue that the Debtors would seek to have committee members recuse themselves every time their interests are not perfectly aligned with every other creditor. (Wilmington Obj. at 2) (Comm. Obj. at 9.) Again, the Objectors are mistaken. Committee members are permitted to have their own interests as creditors; only when a committee member has a self-interest or bias which is different from the unsecured creditor body would it be appropriate for a recusal.

Finally, the Objectors assert that the Motion seeking to strike the Committee's Objection is "much-too-late": "To the extent that the Debtors had a concern with the Committee's process or its standing, they should have raised that concern in their 96 pages of reply briefing. . ." (Comm. Obj. at 9-10.) In fact, the Debtors did raise this precise concern in their reply briefing on the 9019 Motion. See *Debtors' Reply Brief re:* Iridium *Factors in Support of Motion for Approval of RMBS Settlement Agreements* [Dkt No. 2803] at 61-63. The Debtors waited to move to strike the Committee's Objection to the 9019 Motion until the Court's deadline for *in limine* motions because the Debtors believed it would be improvident to litigate these issues during the mediation; as the Objectors well know the Debtors were trying to foster a settlement in these cases, such an allegation is particularly unfair. The Debtors were fully within their rights to move to strike the Objection when they did; there was no deadline imposed by law or court order for filing the Motion; and the Objectors are certainly in no way prejudiced in responding to the Motion before the trial begins.

15

## **CONCLUSION**

WHEREFORE, the Debtors respectfully request that the Court overrule the Objections to the Motion and grant the relief requested therein, as well as any other such relief as the Court deems just and proper.

| | |
|---|---|
| New York, New York<br>Dated: May 20, 2013 | /s/ Anthony Princi<br>Gary S. Lee<br>Anthony Princi<br>Darryl P. Rains<br>MORRISON & FOERSTER LLP<br>1290 Avenue of the Americas<br>New York, New York 10104<br>Telephone: (212) 468-8000<br>Facsimile: (212) 468-7900<br><br>*Counsel to the Debtors and*<br>*Debtors in Possession* |