# EXHIBIT 2

1

UNITED STATES BANKRUPTCY COURT

SOURTHERN DISTRICT OF NEW YORK

----------------------------------x

                                      In Re: Case No:

RESIDENTIAL CAPITAL, LLC, et. al,    12-12020(MG)

                Debtors.

----------------------------------x

DEPOSITION OF WILLIAM H. GREENE, Ph.D.

New York, New York

Thursday, January 30, 2013

10:05 a.m.

Reported by:
JOSEPHINE H. FASSETT, RPR
JOB NO: 28735

10

                    (Whereupon, on the record.)

W I L L I A M    H.    G R E E N E, Ph.D., the

          witness, having been duly sworn, was examined

          and testified under oath as follows:

EXAMINATION BY

          MR. BENTLEY:

          Q     Good morning, Dr. Greene.  I'm Philip
Bentley and I represent the Official Creditors
Committee in this case.
          A     Good morning.
          Q     When were you first contacted about
the possibility of representing the RMBS Trustees in
this matter?
          A     Approximately a year ago.
          Q     So early 2012?
          A     Yes.
          Q     In the winter?
          A     I'm sorry?
          Q     In the winter?
          A     Yes.
          Q     Who contacted you?
          A     Charles Parekh.
          Q     Who is Mr. Parekh?
          A     He's -- he's at Duff & Phelps.

11

```
 1                    Greene, Ph.D.
 2       He's -- I don't know what title he has at Duff &
 3       Phelps, but he's one of the people there.
 4            Q    And how do you know Mr. Parekh?
 5            A    At one time he was one of my students.
 6            Q    And have you worked with him since
 7       those days?
 8            A    No.
 9            Q    What did Mr. Parekh say when he
10       contacted you?
11            A    He asked me if I would be interested
12       in working on a case that involves some statistical
13       methods and -- I guess we'll go with that.
14            Q    He told you who the company was?
15            A    Well, he described the case.  The
16       company names didn't have meaning to me.  So he
17       mentioned what the nature of the case was and what
18       kinds of, what kinds of things would be involved.
19            Q    So what did he tell you?
20            A    Well, I can't relate the specific text
21       of the discussion.
22            Q    Understood.
23            A    But he did describe how there were
24       certain sampling issues that they needed some help
25       with.  The essential question was how to find the
```

12

```
 1                     Greene, Ph.D.
 2     characteristics of a very, very large pool of
 3     mortgages when it wasn't possible to examine the
 4     whole pool.  So that was the central theme of the
 5     discussion.
 6           Q     Was it your understanding based on
 7     this discussion that this was in connection with a
 8     settlement or a potential settlement?
 9           A     Yes.
10           Q     Did he tell you who the settlement was
11     potentially between?
12           A     Well, again, the specific names didn't
13     have meaning to me, so we focused on the statistical
14     issues and questions that were going to be asked.
15           Q     How long did this conversation last?
16           A     Well, we had several that lasted
17     collectively a few hours.
18           Q     Over what sort of timeframe?
19           A     I'd say a few weeks.
20           Q     In the winter of 2012?
21           A     Yes.
22           Q     When did you next have any
23     communications about this engagement?
24           A     Well, it was a fairly long gap, but
25     resumed in the fall.
```

Pg 6 of 7

```
                                                              25
 1                       Greene, Ph.D.
 2           the trustees that is work product.
 3                  MR. BENTLEY:  Understood.
 4                  And I don't mean to invade work
 5           product, and I'll let your lawyer help us
 6           draw the lines as we go forward.
 7      BY MR. BENTLEY:
 8           Q      First off, what was your relationship
 9      with Duff & Phelps?  You weren't an employee, were
10      you?
11           A      No.
12           Q      You're a consultant to Duff & Phelps?
13           A      That's correct.
14           Q      Okay.  And through that relationship
15      you were working on the engagement with the
16      trustees?
17           A      That's correct.
18           Q      Okay.  So let's start with:  You've
19      told me about your initial discussions with
20      Mr. Parekh in early 2012 and your understanding
21      about the nature of your potential engagement at
22      that time.  I now want to understand whether your --
23      to talk about whether your understanding of the
24      nature of that engagement evolved over time.
25                  By the time you were engaged, had you
```

450 Seventh Avenue - Ste 500, New York, NY 10123  1.800.642.1099

127

```
 1

 2

 3                      C E R T I F I C A T E

 4

 5              I, JOSEPHINE H. FASSETT, a Registered

 6      Professional Reporter, Certified Court Reporter, and

 7      Notary Public within and for the State of New York,

 8      do hereby certify that the witness, whose deposition

 9      is hereinbefore set forth, was first duly sworn by

10      me on the date indicated, and that the foregoing

11      deposition is a true and accurate record of the

12      testimony given by such witness.

13

14              I FURTHER CERTIFY that I am not employed

15      by nor related to any of the parties to this action

16      by blood or marriage, and that I am in no way

17      interested in the outcome of this matter.

18

19
                        _____
20                      JOSEPHINE H. FASSETT, CCR, RPR
                        CCR License No. 30XI00098400
21                      License No. 32148
                        New York Notary Public
22

23

24

25
```