Hearing Date: June 26, 2013 at 10:00 a.m. (ET)
Objection Deadline: June 19, 2013 at 4:00 p.m. (ET)

MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone:    (212) 468-8000
Facsimile:    (212) 468-7900
Gary S. Lee
Lorenzo Marinuzzi
Jennifer L. Marines
James A. Newton

*Counsel for the Debtors and*
*Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| ------------------------------------------------- ) | | |
| In re: ) | | Case No. 12-12020 (MG) |
| ) | | |
| RESIDENTIAL CAPITAL, LLC, <u>et al.</u>, ) | | Chapter 11 |
| ) | | |
| Debtors. ) | | Jointly Administered |
| ------------------------------------------------- ) | | |

**DEBTORS' MOTION FOR AN ORDER UNDER BANKRUPTCY CODE
SECTIONS 105(A) AND 363(B) AUTHORIZING THE DEBTORS
TO ENTER INTO AND PERFORM UNDER A PLAN SUPPORT
AGREEMENT WITH ALLY FINANCIAL INC., THE CREDITORS'
<u>COMMITTEE, AND CERTAIN CONSENTING CLAIMANTS</u>**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ........................................................................................... 2

JURISDICTION AND VENUE ........................................................................................... 4

BACKGROUND ................................................................................................................. 4

I.      GENERAL BACKGROUND ................................................................................. 5

II.     THE ORIGINAL PLAN SUPPORT AND PLAN SPONSOR AGREEMENTS ............. 5

III.    THE DEBTORS' ASSET SALES ......................................................................... 7

IV.     PLAN NEGOTIATIONS AND THE MEDIATION ................................................ 7

V.      THE TERMS OF THE PLAN SUPPORT AGREEMENT ....................................... 8

RELIEF REQUESTED ...................................................................................................... 15

ANALYSIS ...................................................................................................................... 15

I.      ENTRY INTO THE PLAN SUPPORT AGREEMENT IS A SOUND EXERCISE
        OF THE DEBTORS' BUSINESS JUDGMENT ..................................................... 15

II.     ENTRY INTO THE PLAN SUPPORT AGREEMENT IS IN THE BEST
        INTEREST OF THE DEBTORS' ESTATES AND THEIR CREDITORS ................... 19

III.    THE AGREEMENT DOES NOT IMPLICATE SECTION 1125 OF THE
        BANKRUPTCY CODE ...................................................................................... 20

NOTICE .......................................................................................................................... 22

NO PRIOR REQUEST ...................................................................................................... 22

CONCLUSION ................................................................................................................. 22

ny-1087572

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

In re Aerovox, Inc.,
 269 B.R. 74 (Bankr. D. Del. 2001) ........................................................................... 16

In re Borders Group, Inc.,
 453 B.R. 477 (Bankr. S.D.N.Y. 2011) ...................................................................... 16

In re Century Glove,
 860 F.2d 94 (3d Cir. 1988) .................................................................................20, 21

In re Chemtura Corp.,
 No. 09-11233 (REG) (Bankr. S.D.N.Y. Aug. 9, 2010) [Docket No. 3527] ............ 15

Comm. of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp.
 (In re Johns-Manville Corp.),
 60 B.R. 612 (Bankr. S.D.N.Y. 1986) ....................................................................... 16

In re General Maritime Corp.,
 No. 11-15285 (MG) (Bankr. S.D.N.Y. Apr. 2, 2012) [Docket No. 421] .........15, 21

In re Indianapolis Downs, LLC,
 486 B.R. 286 (Bankr. D. Del. 2013)...................................................................15, 21

In re Metaldyne Corp.,
 409 B.R. 661 (Bankr. S.D.N.Y. 2009) ...................................................................... 16

Official Comm. of Subordinated Bondholders v. Integrated Res., Inc.
 (In re Integrated Res., Inc.),
 147 B.R. 650 (S.D.N.Y. 1992) ................................................................................. 16

Official Comm. of Unsecured Creditors of LTV Aerospace and Def. Co. v. LTV Corp.
 (In re Chateaugay Corp.),
 973 F.2d 141 (2d Cir. 1992) ..................................................................................... 16

Smith v. Van Gorkom,
 488 A.2d 858 (Del. 1985)......................................................................................... 16

Trans World Airlines, Inc. v. Texaco, Inc. (In re Texaco, Inc.),
 81 B.R. 813 (Bankr. S.D.N.Y. 1988) ..................................................................15, 20

STATUTES

11 U.S.C. § 105(a) ............................................................................................................. 17

11 U.S.C. § 363(b)............................................................................................................15

11 U.S.C. § 1125(b)..........................................................................................................20

11 U.S.C. § 1125(b)(1).....................................................................................................15

**OTHER AUTHORITIES**

Transcript of Hearing, <u>In re Owens Corning</u>, No. 00-03837 (Bankr. D. Del. June 23,
2006) [Docket No. 18233]..............................................................................................20

TO THE HONORABLE JUDGE GLENN,
UNITED STATES BANKRUPTCY JUDGE:

Residential Capital, LLC ("**ResCap**") and its affiliated debtors and debtors in possession in the above-captioned cases (each a "**Debtor**" and, collectively, the "**Debtors**") submit this motion (the "**Motion**") pursuant to sections 105(a) and 363(b) of title 11 of the United States Code (the "**Bankruptcy Code**") for entry of an order, substantially in the form attached hereto as Exhibit 1, approving the Debtors' entry into and performance under a plan support agreement (the "**Plan Support Agreement**") among (a) the Debtors, (b) the Debtors' indirect parent, Ally Financial Inc. ("**AFI**", and together with its non-debtor affiliates, "**Ally**"), (c) the Official Committee of Unsecured Creditors of Residential Capital, LLC (the "**Creditors' Committee**") and (d) certain Consenting Claimants[1] (the Consenting Claimants together with Ally, the "**Supporting Parties**"). In support hereof, the Debtors submit the Declaration of Lewis Kruger

---

[1] The "**Consenting Claimants**" include American International Group, as investment advisor for certain affiliated entities that have filed proofs of claim in the Debtors' chapter 11 cases; Allstate Insurance Company and its subsidiaries and affiliates; Deutsche Bank National Trust Company and Deutsche Bank Trust Company Americas, each solely in its capacity as trustee, indenture trustee, securities administrator, co-administrator, paying agent, grantor trustee, custodian and/or similar agency capacities in respect of certain of the RMBS Trusts (as defined below) (collectively, "**Deutsche**"); Financial Guaranty Insurance Corporation ("**FGIC**"); HSBC Bank USA, N.A., solely in its capacity as trustee in respect of certain of the RMBS Trusts ("**HSBC**"); the Kessler Class Claimants (as defined in the Plan Support Agreement); Law Debenture Trust Company of New York, solely in its capacity as separate trustee in respect of certain of the RMBS Trusts ("**Law Debenture**"); Massachusetts Mutual Life Insurance Company and its subsidiaries and affiliates; MBIA Insurance Corporation and its subsidiaries and affiliates (collectively, "**MBIA**," and together with FGIC, the "**Supporting Monolines**"); certain funds and accounts managed by Paulson & Co. Inc., holders of Senior Unsecured Notes issued by ResCap ("**Paulson**"); Prudential Insurance Company of America and its subsidiaries and affiliates; the Steering Committee Consenting Claimants (as defined in the Plan Support Agreement); certain holders of the Senior Unsecured Notes issued by ResCap (the "**Supporting Senior Unsecured Noteholders**"), The Bank of New York Mellon and The Bank of New York Mellon Trust Company, N.A., each solely in its capacity as trustee, indenture trustee, securities administrator, co-administrator, paying agent, grantor trustee, master servicer, custodian and/or similar agency capacities in respect of certain of the RMBS Trusts (collectively, "**BNY Mellon**"); the Talcott Franklin Consenting Claimants (as defined in the Plan Support Agreement and, together with the Steering Committee Consenting Claimants, the "**Institutional Investors**"); U.S. Bank National Association, solely in its capacity as trustee, indenture trustee, securities administrator, co-administrator, paying agent, grantor trustee, custodian and/or similar agency capacities in respect of certain of the RMBS Trusts ("**U.S. Bank**"); and Wells Fargo Bank, N.A., solely in its capacity as trustee, indenture trustee, securities administrator, co-administrator, paying agent, grantor trustee, custodian and/or similar agency capacities in respect of certain of the RMBS Trusts ("**Wells Fargo**" and together with BNY Mellon, Deutsche, HSBC, Law Debenture, and U.S. Bank, the "**RMBS Trustees**"); and Wilmington Trust, National Association, not individually, but solely in its capacity as Indenture Trustee for the Senior Unsecured Notes issued by ResCap ("**Wilmington Trust**").

(the "**Kruger Declaration**"), attached hereto as <u>Exhibit 2</u>, and respectfully state as follows:[2]

## PRELIMINARY STATEMENT

1.      As the Court is aware, the Debtors' management and its Chief Restructuring Officer, Lewis Kruger, in consultation with its advisors and Board of Directors, as well as the Creditors' Committee along with its individual constituents have focused much of their attention on developing a consensual plan of reorganization supported by the Debtors' major constituencies in an effort to maximize value and recoveries to creditors in these Chapter 11 cases.  Fostering consensus has been no easy task, particularly in light of the numerous complex legal issues that had to be resolved, including the validity and priority of claims of securities holders and the monoline insurers, the amount of the claims held by the RMBS Trustees, and the extent of the estates' claims against Ally.  As a result, after months of negotiations, the Debtors sought to further facilitate a consensual resolution through the appointment of the Honorable James M. Peck, as Plan Mediator (the "**Plan Mediator**"), and the appointment of Mr. Kruger as the Debtors' Chief Restructuring Officer.  These engagements represented critical steps toward overcoming a difficult impasse between and among the Debtors, their creditors, and Ally.

2.      After months of intensive negotiations following completion of the Debtors' major asset sales in November 2012, a series of all-day mediation sessions led by the Plan Mediator and attended by the Debtors, their major claimant constituencies, and their professionals, and after several more weeks of nearly round-the-clock negotiations, the Debtors have reached consensus on the terms of a plan that has the support of Ally and is endorsed by a substantial majority of the Debtors' largest claimant constituencies.  Under the terms of the

---

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Plan Support Agreement.

contemplated plan, Ally, as part of a comprehensive settlement, will increase its contribution to the Debtors' estates by $1.35 billion over the amount to which it had agreed in its prepetition plan support agreement with the Debtors, to a total of $2.1 billion, comprised of a contribution of (a) $1,950,000,000 in cash on the Effective Date of the Plan and (b) $150,000,000, anticipated to come from a settlement between Ally and its insurers, but in any event to be paid by Ally no later than September 30, 2014 (collectively (a) and (b), the "**Ally Contribution**"). The Agreement, which was facilitated in large part by the efforts of the Plan Mediator, Mr. Kruger, and counsel for the Creditors' Committee, represents a remarkable achievement given the complexity of the Debtors' capital structure, and the complexity and breadth of the disputed issues posed in these cases, and signals an end to the litigation, infighting, and potential "nuclear war" in these cases.

3.      As detailed further below, pursuant to the Plan Support Agreement, each of the Supporting Parties has agreed to support a soon-to-be-filed Chapter 11 plan (the "**Plan**") that encompasses and comports with each of the terms of the Plan Term Sheet and Supplemental Term Sheet attached to the Plan Support Agreement as Exhibits A and B, respectively (collectively, the Plan Support Agreement, the Plan Term Sheet, and Supplemental Term Sheet, the "**Agreement**"). The Plan will provide for, among other things, (i) the Ally Contribution, in exchange for, among other things, Debtor Releases and Third Party Releases (each as defined in the Plan Support Agreement) in favor of Ally, (ii) the allocation of proceeds available for distribution to creditors based on a mediated compromise and settlement of disputed inter-creditor issues as well as disputed issues among Debtors and (iii) the creation of various trusts to provide distributions to creditors and to administer the estates following confirmation of the Plan. The Debtors anticipate that the Plan will expedite creditor recoveries and facilitate

3

substantial cost savings by obviating continued litigation and the expenses associated therewith.[3]

Indeed, absent the Agreement, creditor recoveries will be a small fraction of what they are

projected to be under the Plan contemplated by the Agreement.

4.      The Plan structure contemplated in the Agreement will serve as the

backbone for the distribution of substantial value to creditors and facilitate the Debtors' exit from

bankruptcy.  Absent approval of the Agreement, it will terminate and the substantial value and

structure the Agreement brings to the Debtors' Chapter 11 cases will be lost.  As set forth below

and in the Kruger Declaration, the Debtors believe entering into the Plan Support Agreement is

in the best interests of their estates, and their entry into and performance under the Plan Support

Agreement should be approved.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C.

§§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is proper

in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

**I.      GENERAL BACKGROUND**

6.      On May 14, 2012 (the "**Petition Date**"), each of the Debtors filed a

voluntary petition in this Court for relief under Chapter 11 of Bankruptcy Code.  The Debtors are

managing and operating their businesses as debtors in possession pursuant to Bankruptcy Code

---

[3] By this Motion, the Debtors do not seek to make payments to or otherwise utilize estate assets in satisfaction of the claims held by the Supporting Parties or any other creditor.  Instead, by seeking approval of entry into and performance under the Plan Support Agreement, the Debtors simply seek to build consensus among major constituencies and work in a concerted fashion toward the proposal and confirmation of a Chapter 11 plan. Each of the parties will nevertheless retain the ability to terminate their obligations under the Plan Support Agreement in certain circumstances, and the Supporting Parties are only required to vote in favor of the Plan upon proper solicitation of their respective votes.  Accordingly, as described below, the Debtors' entry into and performance under the Plan Support Agreement does not run afoul of Section 1125 of the Bankruptcy Code.

ny-1087572

sections 1107(a) and 1108.  These cases are being jointly administered pursuant to Rule 1015(b)

of the Federal Rules of Bankruptcy Procedure.  On June 20, 2012, the Court directed that an

examiner be appointed [Docket No. 454], and on July 3, 2012, the Court approved Arthur J.

Gonzalez as the examiner (the "**Examiner**") [Docket No. 674].

7.     On May 16, 2012, the United States Trustee for the Southern District of

New York appointed the nine member Creditors' Committee.

8.     The Debtors were formerly a leading residential real estate finance

company indirectly owned by Ally, which is not a Debtor.  Prior to the closing of the Debtors'

Court-approved asset sales, the Debtors and their non-debtor affiliates operated the fifth largest

mortgage servicing business and the tenth largest mortgage origination business in the United

States.  A more detailed description of the Debtors, including their business operations, their

capital and debt structure, and the events leading to the filing of these bankruptcy cases, is set

forth in the *Affidavit of James Whitlinger, Chief Financial Officer of Residential Capital, LLC, in*

*Support of Chapter 11 Petitions and First Day Pleadings* [Docket No. 6].

## II.    THE ORIGINAL PLAN SUPPORT AND PLAN SPONSOR AGREEMENTS

9.     At the outset of their Chapter 11 cases, the Debtors entered into a

settlement and plan support agreement with Ally, which included an agreement by certain

holders of the JSBs to support an agreed upon plan (the "**Original Ally Settlement**"), as well as

a settlement and plan agreement, as amended by both the Debtors' Supplemental Motion

Pursuant to Fed. R. Bankr. P. 9019 for Approval of RMBS Trust Settlement Agreements [Docket

No. 1176] and the Debtors' Second Supplemental Motion Pursuant to Fed. R. Bankr. P. 9019 for

Approval of RMBS Trust Settlement Agreements [Docket No. 1887], with a large number of

investors in securities associated with certain RMBS Trusts (as defined below) (the "**RMBS**

**Settlement**" and, together with the Original Ally Settlement, the "**Original Settlements**").  The

5

Debtors' management, in consultation with their advisors and Board of Directors, entered into the Original Settlements believing that they were in the best interests of the Debtors' estates and critical to the success of these cases.  Indeed, the Original Settlements proved critical to the survival of the Debtors' mortgage origination and servicing platforms during their Chapter 11 cases and provided substantial benefits from the RMBS Trusts, Ally and the JSBs.  Without the Original Settlements, the Debtors almost certainly would not have been able to continue to originate loans and effectuate sales of their assets, generating approximately $4.5 billion for the benefit of all creditors.

10.     For example, in connection with the Original Ally Settlement, Ally agreed to and (i) provided debtor in possession financing, (ii) permitted the Debtors to continue subservicing mortgage loans, (iii) supported the Debtors' continued origination of mortgages, (iv) continued providing the Debtors with use of their back-office shared services, such as centralized payroll and risk management services, among others, (v) cooperated with the Debtors to separate the shared services resources and permit the smooth transition of the Debtors' businesses to a purchaser and (vi) served as a stalking horse bidder for the Debtors' Whole Loan Sale (as defined below).  See Kruger Decl. ¶ 8.  But for these contributions, the Debtors probably would have been unable to operate in Chapter 11, and would have been unable to sell their key assets in value maximizing transactions.  Additionally, as a result of the Original Ally Settlement, the Debtors were able, to obtain from Ally and the JSBs consensual use of cash collateral.[4]  See Kruger Decl. ¶ 8.

11.     Similarly, the RMBS Settlement permitted the Debtors to (i) proceed with the sales of the estates' assets on a smooth and expeditious basis and (ii) resolve objections

_____

[4] At this juncture it is unclear whether Ally or the JSBs will continue to consent to use of their cash collateral.

6

regarding the severability of the Debtors' pooling and servicing agreements and the priority of

the RMBS Trusts' alleged origination-based claims to a future date or, potentially, to avoid

altogether the dispute over highly complex and significantly value-shifting issues.  See Kruger

Decl. ¶ 9.[5]

12.    The Original Settlements therefore indisputably provided the Debtors with

significant benefits necessary for the Debtors to avoid the fate of every other major mortgage

servicer that has filed for bankruptcy in recent years – i.e., liquidation.

## III.    THE DEBTORS' ASSET SALES

13.    On November 19, 2012, the Court approved the Debtors' sale of (i) their

mortgage servicing businesses (the "**Platform Sale**") and (ii) most of the estates' whole loan

portfolio (the "**Whole Loan Sale**").[6]  The transactions comprising the Debtors' Platform Sale

closed in two parts: a sale to Walter Investment Management Corporation that closed on January

31, 2013, and a sale to Ocwen Loan Servicing, LLC that closed on February 15, 2013.  The

Debtors' Whole Loan Sale to Berkshire Hathaway Inc. closed on February 5, 2013.  In the

aggregate, these asset sales yielded approximately $4.5 billion in gross sale proceeds to the

Debtors' estates.

## IV.    PLAN NEGOTIATIONS AND THE MEDIATION

14.    As described above, since the approval of the Debtors' asset sales, the

Debtors and their professionals, along with the Creditors' Committee and its professionals, have

---

[5] See also *Revised Joint Omnibus Scheduling Order and Provisions for Other Relief Regarding (i) Debtors' Motion Pursuant to Fed. R. Bank. P. 9019 for Approval of RMBS Trust Settlement Agreements, and (ii) the RMBS Trustees' Limited Objection to the Sale Motion* at ¶ 18 [Docket No. 945] (reserving the issue of severability of the pooling and servicing agreements and capping cure claims); *Debtors' Second Supplemental Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of RMBS Trust Settlement Agreements*, Exhibits 2 & 3 at § 7.01[Docket No. 1887] (providing for release of origination-based claims upon acceptance of the RMBS Settlement by a trust).

[6] The estates continue to own whole loans, but the Whole Loan Sale involved a substantial majority of all loans previously held by the Debtors' estates.

focused their efforts on developing a Chapter 11 plan supported by the majority of their claimant

constituencies.  Given the breadth and complexity of the disputed issues that required resolution,

the Debtors enlisted the assistance of the Plan Mediator.  Following many weeks of one-off

mediation meetings and discussions, Mr. Kruger and the Debtors' advisors participated in a

mediation "summit" on April 22 and 23, 2013 with the Plan Mediator and advisors and/or

business level leaders of each of the Debtors' major claimant constituencies (collectively, the

"**Mediation Participants**"), including the Creditors' Committee, the individual members

thereof, Ally, the JSBs, borrower representatives and certain private and governmental securities

holders.  See Kruger Decl. ¶ 10.

15.    After two days of hard-fought, arm's-length negotiations facilitated by the

Plan Mediator, the parties were able to narrow their disagreements.  See Kruger Decl. ¶ 12.

Additional in-person meetings and conference calls ensued over the following weeks, followed

by two additional global mediation sessions that took place on May 9 and 10, 2013.  Finally,

after months of nearly round-the-clock formal and informal negotiations, the Debtors, the

Creditors' Committee, and the Supporting Parties agreed, on May 13, 2013 (one day before the

one year anniversary of the filing of these cases), on the terms of the Plan Support Agreement

and Plan Term Sheet, which pave the way for the Debtors' exit from bankruptcy.  See Kruger

Decl. ¶ 12.

## V.    THE TERMS OF THE PLAN SUPPORT AGREEMENT

16.    The resolution embodied in the Agreement has garnered support from

many of the Debtors' largest claimant constituencies, asserting tens of billions in claims,

including investors in securities associated with residential mortgage backed securitization trusts

for which the Debtors act as sponsor, depositor, servicer, master servicer, or in other similar

capacities (the "**RMBS Trusts**"), the RMBS Trustees, the Supporting Senior Unsecured

8

Noteholders (including Paulson, and Wilmington Trust, as indenture trustee), the Kessler Class

Claimants, the Supporting Monolines (MBIA and FGIC), the Creditors' Committee, and Ally.

In general, under the Plan Support Agreement, the Supporting Parties have agreed to support the

proposal and confirmation of the Plan in accordance with the terms of the Agreement.  The Plan

Support Agreement also contains customary conditions for such documents, such as agreements

to support a plan that is consistent with the Agreement, to negotiate in good faith to reach

definitive documentation and to not take any action that will delay or impede consummation of

the proposed Plan.  See Kruger Decl. ¶ 15; Plan Support Agreement §§ 2(a), 4.1(b), (c) & (e).

17.    The Plan will provide for partial consolidation (for distribution purposes

only) of the Debtors' estates into three groups – the ResCap Debtors,[7] the GMAC Mortgage

Debtors,[8] and the RFC Debtors.[9]  Supplemental Term Sheet at 2.  Plan distributions will be

funded with net proceeds from the Debtors' asset sales and the assets remaining in the Debtors'

estates, which will include the Ally Contribution, with certain securities litigants and borrowers

receiving distributions through three trusts to be established under the Plan for this purpose.  See

Supplemental Term Sheet at 2-3.  The key provisions of the Plan Support Agreement include:

**Overview of Plan Support Agreement[10]**

| Plan Support Agreement Term | Summary |
|---|---|
|  |  |

---

[7] The ResCap Debtors include ResCap, and its two direct subsidiaries, GMAC Residential Holding Company, LLC and GMAC-RFC Holding Company, LLC.

[8] The GMAC Mortgage Debtors include GMAC Mortgage, LLC and its direct and indirect Debtor subsidiaries.

[9] The RFC Debtors include Residential Funding Company, LLC and its direct and indirect Debtor subsidiaries.

[10] The following summary is provided for illustrative purposes only and is qualified in its entirety by reference to the Agreement.  In the event of any inconsistency between this summary and the Agreement, the Agreement shall control in all respects.

ny-1087572

| Debtors' Obligations (§ 3.1) | • The Debtors will seek approval of the Agreement and use the Agreed Efforts[11] to prosecute the terms of the Agreement, including proposing and seeking confirmation of the Plan in accordance with Milestones set forth in the Plan Term Sheet.<br><br>• The Debtors will not enter into any agreements fixing Claims in an amount over $200,000 individually and $25 million in the aggregate prior to entry of the Confirmation Order without the consent of the Creditors' Committee. |
|---|---|
| Plan Proponents' Obligations (§ 3.2) | • The Debtors and the Creditors' Committee (collectively, the "**Plan Proponents**") will file a Plan and Disclosure Statement in accordance with the terms of the Agreement and Term Sheets and use Agreed Efforts to obtain approval of the Disclosure Statement and confirmation of the Plan.<br><br>• The Plan Proponents will not take or encourage any other person or entity to take, any action that would, or would reasonably be expected to, breach or be inconsistent with the Plan Support Agreement or the Plan or delay or take any negative action to interfere with the acceptance of the Plan. |

---

[11] With the exception of FGIC, the "Agreed Efforts" means Best Efforts (as defined in the Plan Support Agreement), but does not include expenditure of out-of-pocket costs other than for fees and expenses of attorneys and existing financial advisors.  Plan Support Agreement § 1.  With respect to FGIC, "Agreed Efforts" means commercially reasonable efforts.  Id.

10

| | |
|---|---|
| Creditors' Committee and Supporting Parties' Obligations (§ 4.1(a)-(b)) | • In addition to a commitment to support approval of the Disclosure Statement and confirmation of the Plan, the Creditors' Committee and Supporting Parties agreed to stay all litigation and discovery in connection with actions against the Debtors or Ally, <u>provided</u> that the Kessler Class Claimants may continue to prosecute their class claims and Bankruptcy Rule 7023 motion [Docket No. 2044]. |
| | • The Creditors' Committee and Supporting Parties will also support a partial paydown of no less than $800 million of the Junior Unsecured Notes' secured claim, provided that Ally is paid prior to any such paydown of the Junior Secured Notes Secured Claim in cash in full in satisfaction of all outstanding amounts owed under the Amended and Restated Credit Agreement, dated as of December 30, 2009, among the GMAC Mortgage, LLC, Residential Funding Company, LLC, Residential Capital, LLC, GMAC Residential Holding Company, LLC, GMAC-RFC Holding Company, LLC, Homecomings Financial, LLC, AFI and Wells Fargo Bank, N.A. (as amended or supplemented); provided further that the terms of any Bankruptcy Court order approving such paydown enforces the terms and conditions of the intercreditor agreement between the Junior Secured Notes and Ally in all respects, provided, further, however, that in the event the Plan does not become effective, any paydown of Ally's secured indebtedness will have no impact on, and be without prejudice to, the rights of any Party to seek to recharacterize or equitably subordinate Ally's secured claims as if the paydown had not been made, and for the Court to fashion any remedy in connection therewith. |
| Supporting Parties' Agreement to Vote for the Plan (§ 4.1(e)) | • Each Supporting Party will, subject to receipt of an approved Disclosure Statement, vote in favor of the Plan all claims held by each such Supporting Party. |
| Releases of Ally (§ 4.2) | • The Debtors, the Creditors' Committee, and each Supporting Party will support the releases in favor of Ally set forth in the Plan Term Sheet, which include both Debtor and Third Party Releases. The proposed releases do not, however, release any claims against Ally held by the Federal Deposit Insurance Corporation, in its capacity as receiver, or the Federal Housing Finance Agency. |

11

| | |
|---|---|
| Transfer Restrictions on Supporting Parties (§ 4.3) | • Each Supporting Party, other than the Institutional Investors, agrees not to transfer any of its claims against the Debtors to any third-party unless such third-party is or becomes subject to the terms of the Agreement, subject to certain exceptions for transfers of RMBS.<br><br>• Subject to limited exceptions, the Institutional Investors will maintain holdings aggregating 25% of the voting rights in one or more classes of Securities of not less than 235 of the RMBS Trusts sponsored by the Debtors between 2004 and 2007. |
| FGIC Approval (§ 5.1) | • FGIC will use Agreed Efforts to obtain the Rehabilitation Court's approval of the Plan Support Agreement and that certain Settlement Agreement to be entered into among the Debtors, FGIC, The Bank of New York Mellon, The Bank of New York Mellon Trust Company, N.A., U.S. Bank National Association and Wells Fargo Bank, N.A., each in its capacity as RMBS Trustee,[12] and the Institutional Investors (as defined therein), dated not later than May 23, 2013, in each case by no later than August 19, 2013. |
| Specific Parties' Obligations in Connection with the RMBS Trustees (§ 5.2)[13] | • The Supporting Monolines and Investors will withdraw all letters previously sent to the RMBS Trustees purporting to direct them to accept or not to accept the RMBS Settlement. |
| Obligations of Wilmington Trust (§ 5.4) | • On or before May 31, 2013, Wilmington Trust will recommend to holders of Senior Unsecured Notes, that they direct Wilmington Trust to enter into the Plan Support Agreement, and obtain such direction by that date. |

---

[12] Although not listed in the Plan Support Agreement, Law Debenture, solely in its capacity as separate trustee, is also a party to the FGIC Settlement Agreement.

[13] Pursuant to the Supplemental Term Sheet, the Parties agreed that these letters will be deemed withdrawn upon execution of the Supplemental Term Sheet.

ny-1087572

| Termination (§ 6.1) | • Certain or all of the Debtors, the Creditors' Committee, or the Supporting Parties may terminate the Agreement upon the occurrence of the following events, among others:<br><br>o Conversion, dismissal, or appointment of a trustee in the Debtors' Chapter 11 cases;<br><br>o Modification of the releases set forth in the Plan Term Sheet in any manner;<br><br>o The Plan Support Agreement ceases to be binding upon Ally, the Creditors' Committee, or any of the Consenting Claimants;<br><br>o The Examiner's Report is disclosed to any party prior to the Court's entry of an order authorizing the Debtors' entry into and performance under the Plan Support Agreement;<br><br>o The Debtors file with the Bankruptcy Court a proposed disclosure statement, Chapter 11 plan, confirmation order, or other related document that is not an Approved Plan Document;<br><br>o Mutual consent of all Parties; or<br><br>o The Debtors' failure to comply with any of the milestones set forth in the Plan Term Sheet, including:<br><br>  ▪ Approval of the Plan Support Agreement by July 3, 2013<br><br>  ▪ Filing of the Plan and Disclosure Statement by July 3, 2013;<br><br>  ▪ Approval, no later than August 19, 2013, of a settlement among the Debtors, FGIC, and certain of the RMBS Trustees (the "**FGIC Settlement Agreement**"), by the FGIC Rehabilitation Court;<br><br>  ▪ Approval of adequacy of the Disclosure Statement by August 30, 2013; and<br><br>  ▪ Effectiveness of the Plan not later than 30 days following the entry of an order confirming the Plan and, in no event later than December 15, 2013. |
|---|---|

13

| | |
|---|---|
| Recognition of Applicable Fiduciary Duty (§ 7.5) | • The Debtors, Ally, the Creditors' Committee, and the Consenting Claimants represent, warrant, and covenant that they took the existence of the Examiner and the expected Examiner's Report into account when exercising their fiduciary duties and entering into the Agreement and that no Party may terminate the Agreement based in any way upon the Examiner's Report or the information contained therein. |

ny-1087572

**RELIEF REQUESTED**

18.     By this Motion, the Debtors respectfully request an order, under

Bankruptcy Code sections 105(a) and 363(b) authorizing the Debtors to enter into and perform

under the Plan Support Agreement.

**ANALYSIS**

## I.    ENTRY INTO THE PLAN SUPPORT AGREEMENT IS A SOUND EXERCISE OF THE DEBTORS' BUSINESS JUDGMENT

19.     Entry into a plan support agreement does not necessarily require approval

under Bankruptcy Code section 363(b)(1).  See, e.g., Trans World Airlines, Inc. v. Texaco, Inc.

(In re Texaco, Inc.), 81 B.R. 813, 818 (Bankr. S.D.N.Y. 1988).  In this case, the Debtors do not

seek to expend incremental estate resources or otherwise make payments to any of the

Supporting Parties prior to confirmation of the Plan.  Nonetheless, consistent with practice in this

and other districts, the Debtors seek approval of the Plan Support Agreement under Bankruptcy

Code section 363 out of an abundance of caution and in order to ensure that the Debtors obtain

from the Creditors' Committee and Supporting Parties the benefits provided by the Agreement.

See, e.g. In re General Maritime Corp., No. 11-15285 (MG) (Bankr. S.D.N.Y. Apr. 2, 2012)

[Docket No. 421] (granting debtors' motion pursuant to Bankruptcy Code section 363 to enter

into plan support agreement); In re Indianapolis Downs, LLC, 486 B.R. 286, 295-97 (Bankr. D.

Del. 2013) (refusing to designate votes of signatories to restructuring support agreement based

on argument that the agreement violated Bankruptcy Code section 1125); In re Chemtura Corp.,

No. 09-11233 (REG) (Bankr. S.D.N.Y. Aug. 9, 2010) [Docket No. 3527] (same).

20.     Section 363(b)(l) of the Bankruptcy Code authorizes a debtor in

possession to "use, sell or lease, other than in the ordinary course of business, property of the

estate," subject to court approval.  11 U.S.C. § 363(b)(1).  Courts will approve a debtor's use of

property under Bankruptcy Code section 363 if the use is a sound exercise of the debtor's business judgment.  See Official Comm. of Unsecured Creditors of LTV Aerospace and Def. Co. v. LTV Corp. (In re Chateaugay Corp.), 973 F.2d 141, 144-45 (2d Cir. 1992); In re Borders Grp., Inc., 453 B.R. 477, 482 (Bankr. S.D.N.Y. 2011).  Once a debtor articulates a sound business justification, a presumption arises that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company."  Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.), 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985)).

21.      As a result, the debtor's business judgment "should be approved by the court unless it is shown to be 'so manifestly unreasonable that it could not be based upon sound business judgment, but only on bad faith, or whim or caprice."  In re Aerovox, Inc., 269 B.R. 74, 80 (Bankr. D. Del. 2001) (internal quotations omitted); accord Integrated Res., 147 B.R. at 656 ("Courts are loath to interfere with corporate decisions absent a showing of bad faith, self-interest or gross negligence.").  Accordingly, courts will not generally substitute their business judgment for a debtor's.  In re Metaldyne Corp., 409 B.R. 661, 667 (Bankr. S.D.N.Y. 2009) (Glenn, B.J.).  Instead, "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct."  Comm. of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.), 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986).

22.     Further, section 105(a) of the Bankruptcy Code codifies the bankruptcy court's inherent equitable powers and authorizes it to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

23.     The Debtors have come a long way since the filing of these cases and entry into the Original Settlements.  With this history in mind, as well as the difficult issues and costly litigation that would be faced in the absence of a consensual resolution of these cases, the Debtors have concluded that entry into and performance under the Plan Support Agreement represents a sound exercise of their business judgment.  See Kruger Decl. ¶¶ 19-26.  The consensual Agreement provides a framework for the resolution of these highly litigious and factional Chapter 11 cases and an expeditious emergence from Chapter 11.  See Kruger Decl. ¶ 22-24.  The Plan Support Agreement reflects a heavily negotiated resolution regarding the terms of a Plan supported by a substantial majority of the Debtors' major claimant constituencies, including the Supporting Monolines, the Creditors' Committee, securities litigants, the RMBS Trustees, Ally, the Supporting Senior Unsecured Notes, along with Wilmington Trust, the Kessler Class Claimants, and the Institutional Investor groups.  See Kruger Decl. ¶¶ 10-14, 20.  And the Plan Support Agreement provides for enhanced recoveries for the Debtors' creditors far in excess of what such creditors would otherwise obtain from the Debtors' estates.  See Kruger ¶ 19.  Absent Bankruptcy Court approval of the Plan Support Agreement, the global settlement terminates.

24.     The Debtors have long believed that a global settlement would be required to avoid a drawn out litigation "free-for-all" or "nuclear war" among their major creditor groups.  As described further in the Kruger Declaration, the Debtors' cases are riddled with complex legal and factual disputes that are currently being litigated in state and federal courts across the

country.  See Kruger Decl. ¶¶ 21-24.  Much of this litigation has been ongoing for several years,
in many instances without resolution.  See Kruger Decl. ¶ 23.  The Debtors believe that absent
the Agreement, they would be required to litigate any number of difficult and complex issues, at
significant further expense to their estates, and that their Chapter 11 cases would likely result in
the creation of a litigation trust.  See Kruger Decl. ¶ 20.  Not only would the Debtors be required
to engage in a costly 5-day trial regarding the RMBS Settlement, but they would also be required
to engage in complex, costly litigation over the validity of the monolines' claims, whether those
claims are subject to subordination or disallowance under the Bankruptcy Code, and potentially
conduct a loan-by-loan analysis in connection with alleged breaches of representations and
warranties.  See Kruger Decl. ¶¶ 23-24.  Similarly, absent the Agreement, the Debtors would
likely be required to litigate several other difficult and complex issues, including the priority of
claims arising under securities laws relating to the Debtors' RMBS.  See Kruger Decl. ¶ 21.
Finally, the Agreement facilitates the Debtors' efforts to try to resolve one of the largest putative
class action claims against their estates, thereby potentially obviating the need for extensive
litigation regarding allowance and merits of the claims of the Kessler Class Claimants.  See
Supplemental Term Sheet at 9-11.

        25.    Through the Plan Support Agreement, the Debtors have obtained a critical
mass of support among their creditors, which have agreed to support a Plan designed to
maximize recoveries for all claimant constituencies and avoid the litigation described above.  In
connection with the Plan, Ally has agreed to make a contribution of (a) $1,950,000,000 in cash
on the Effective Date, and (b) the first $150,000,000 received by Ally for any Directors and
Officers or Errors and Omissions claims it pursues against its insurance carriers related to the
claims released in connection with the Plan, significantly expanding the pool of funds currently

18

available for distribution to creditors.  See Plan Term Sheet at 5.  Without the Ally Contribution,

the Debtors believe that the global resolution among the Consenting Claimants would not have

been possible.  See Kruger Declaration ¶ 16.

26.    For each of these reasons and for the reasons stated in the Kruger

Declaration, the Debtors seek the relief requested by this Motion to ensure that they will obtain

the benefits provided in the Agreement.[14]

## II.    ENTRY INTO THE PLAN SUPPORT AGREEMENT IS IN THE BEST INTEREST OF THE DEBTORS' ESTATES AND THEIR CREDITORS[15]

27.    The Plan Support Agreement contemplates that the order approving this

Plan Support Agreement will contain affirmative findings in connection with the RMBS

Trustees' entry into the Plan Support Agreement.  Plan Support Agreement § 5.2(d).

Accordingly, this Motion seeks a finding from the Court that the relief requested herein is in the

best interests of the Debtors' estates and their creditors, and, specifically, that entry into the

Agreement and the transactions contained therein, is in the best interests of the Institutional

Investors, the investors in each RMBS Trust, each such RMBS Trust, and the RMBS Trustees, as

a compromise of each of the RMBS Trust's asserted claims against the Debtors.

28.    Moreover, this Motion seeks a finding from the Court that each of the

parties to the Agreement, including the RMBS Trustees, has acted reasonably, in good faith and

in the best interests of its respective constituencies in entering into the Agreement.  Specifically,

the Motion seeks a finding that the RMBS Trustees acted reasonably, in good faith and in the

---

[14] Importantly, however, the Debtors do not seek approval of any of the settlements embodied in the Agreement. Approval of those settlements will await confirmation, and any and all parties-in-interest that oppose confirmation of the Plan will retain their rights to object to confirmation of the Plan at the appropriate time.

[15] The Debtors understand that the RMBS Trustees intend to provide evidence to support certain findings in the proposed order.

ny-1087572

best interests of the Institutional Investors, the investors in each RMBS Trust and each such

RMBS Trust in agreeing to the Agreement.

29.     Finally, this Motion requests a finding from the Court that the RMBS

Trustees' notice of the RMBS Settlement, the FGIC Settlement Agreement, and the Agreement

(the "**RMBS Trustees' Notice**") was sufficient and effective in satisfaction of federal and state

due process requirements and other applicable law to put the parties in interest in these Chapter

11 cases, including the Institutional Investors and the investors in each RMBS Trust, on notice of

the Agreement, RMBS Settlement, and the FGIC Settlement Agreement.

## III.    THE AGREEMENT DOES NOT IMPLICATE SECTION 1125 OF THE BANKRUPTCY CODE

30.     Section 1125(b) of the Bankruptcy Code provides that "[a]n acceptance or

rejection of a plan may not be solicited after the commencement of the case under this title . . .

unless, at the time of or before such solicitation, there is transmitted . . . a written disclosure

statement approved, after notice and a hearing, by the court as containing adequate information."

11 U.S.C. § 1125(b).  Courts have long recognized that the scope of impermissible "solicitation"

under section 1125(b) of the Bankruptcy Code should be read narrowly to avoid interfering with

the negotiations necessary for resolution of nearly any bankruptcy case.  See Century Glove, Inc.

v. First Am. Bank of New York, 860 F.2d 94, 101 (3d Cir. 1988); see also In re Texaco, Inc., 81

B.R. at 814-16; Transcript of Hearing at 14-15, In re Owens Corning, No. 00-03837 (Bankr. D.

Del. June 23, 2006) (Docket No. 18233) ("The Plan Support Agreement is the written

memorialization of the negotiations . . . and that is not the solicitation of a vote.").

31.     Indeed, courts in this district and elsewhere regularly approve postpetition

plan support agreements, concluding that they do not run afoul of Bankruptcy Code section

1125.  See, e.g., In re Indianapolis Downs, LLC, 486 B.R. at 295-97[16]; In re General Maritime

Corp., No. 11-15285 (MG) (Bankr. S.D.N.Y. Apr. 2, 2012) [Docket No. 421] (granting debtors'

motion to enter into plan support agreement); In re Chemtura Corp., No. 09-11233 (REG)

(Bankr. S.D.N.Y. Aug. 9, 2010) [Docket No. 3527] (same).

      32.    In this case, the Plan Support Agreement simply documents the parties'

agreements resulting from vigorous arm's length negotiations.  Neither Ally nor the Consenting

Claimants have agreed to vote in favor of the Plan unless and until the Court approves a

disclosure statement and their votes have been properly solicited pursuant to section 1125 of the

Bankruptcy Code.  Plan Support Agreement § 4.1(e).  Additionally, the Plan Support Agreement

contains termination events that permit the respective parties to withdraw from their promise to

propose or vote in favor of the Plan in the event of a termination of the Agreement or

modification of the terms of the anticipated Plan.  See Plan Support Agreement § 6.1.

Accordingly, the Debtors submit that the Agreement does not constitute an impermissible

"solicitation" under section 1125(b) of the Bankruptcy Code and the Court should authorize the

Debtors to enter into and perform in accordance with the terms of the Plan Support Agreement.

---

[16] In connection with approval of a plan of reorganization in In re Indianapolis Downs, LLC, Judge Shannon affirmed the entry into a post-petition restructuring support agreement and declined to designate the votes of the signatories to the restructuring support agreement under section 1126(e) of the Bankruptcy Code for agreeing to the terms of a plan without approval of a written disclosure statement.  486 B.R. at 293-97.  Citing the Third Circuit's decision in In re Century Glove, 860 F.2d 94 (3d Cir. 1988), the court determined that "a narrow construction of 'solicitation' affords . . . parties the opportunity to memorialize their agreements in a way that allows a Chapter 11 case to move forward." Indianapolis Downs, at 295.  Further, in denying the motion to designate, the court noted that Chapter 11 provides an "invitation to negotiate" and bankruptcy courts must be cautious not to construe the Bankruptcy Code's disclosure requirements in a manner that would "chill . . . or hamstring . . .the negotiation process that is at the heart of Chapter 11." Id. at 297.  ("When a deal is negotiated in good faith between a debtor and sophisticated parties, and that arrangement is memorialized in a written agreement and promptly disclosed, § 1126 will not automatically require designation of the votes of the participants." ).

## NOTICE

33.     Notice of this Motion has been provided in accordance with the Case

Management Procedures Order, approved by this Court on May 23, 2012 [Docket No. 141].

## NO PRIOR REQUEST

34.     Except as otherwise noted herein, no prior application for the relief

requested herein has been made to this or any other court.

## CONCLUSION

35.     The Agreement represents the culmination of hard-fought negotiations

with and among the Debtors' major claimant constituencies.  The Debtors believe that the Plan

Support Agreement represents a fair and reasonable compromise intended to benefit all creditors

and, therefore, have concluded in their sound business judgment that performance under the Plan

Support Agreement is in the best interests of all of their stakeholders.  The Debtors therefore

request that the Court authorize them, pursuant to Bankruptcy Code sections 105(a) and 363(b),

to enter into and perform under the Plan Support Agreement.

22

WHEREFORE, the Debtors respectfully request the entry of an order, substantially in the

form attached hereto as <u>Exhibit 1</u>,  granting the relief requested herein and such other and further

relief as the Court may deem just and proper.

New York, New York                         /s/  Gary S. Lee
Dated: May 23, 2013                        Gary S. Lee
                                           Lorenzo Marinuzzi
                                           Jennifer L. Marines
                                           James A. Newton
                                           MORRISON & FOERSTER LLP
                                           1290 Avenue of the Americas
                                           New York, New York 10104
                                           Telephone: (212) 468-8000
                                           Facsimile: (212) 468-7900

                                           *Counsel to the Debtors and
                                           Debtors in Possession*

23