# **EXHIBIT 2**

## **Kruger Declaration**

ny-1087572

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re: | ) | Case No. 12-12020 (MG) |
| | ) | |
| RESIDENTIAL CAPITAL, LLC, et al., | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

**DECLARATION OF LEWIS KRUGER IN SUPPORT OF DEBTORS'
MOTION FOR AN ORDER UNDER BANKRUPTCY CODE SECTIONS
105(A) AND 363(B) AUTHORIZING THE DEBTORS TO ENTER INTO
AND PERFORM UNDER A PLAN SUPPORT AGREEMENT WITH
ALLY FINANCIAL INC., THE CREDITORS' COMMITTEE,
AND CERTAIN CONSENTING CLAIMANTS**

I, Lewis Kruger, being duly sworn, state the following under penalty of perjury:

1. I am the Chief Restructuring Officer ("**CRO**") of the above-captioned debtors and debtors and debtors in possession (collectively, the "**Debtors**"). I am authorized to submit this declaration (the "**Declaration**") in support of the *Debtors' Motion for an Order Under Bankruptcy Code Sections 105(a) and 363(b) Authorizing the Debtors to Enter Into and Perform Under a Plan Support Agreement with Ally Financial Inc. and Certain Consenting Claimants*, (the "**Motion**"), filed contemporaneously herewith.

2. I offer this Declaration to show that the Debtors' decision to enter into the Plan Support Agreement[1] is a sound exercise of business judgment and to show that the negotiation of the Plan Support Agreement was done at arm's length and without undue influence or coercion by any party. Except as otherwise noted, I have personal knowledge of the

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Plan Support Agreement attached to the Motion as Exhibit 3.

ny-1087535                           1

matters set forth herein. If I were called to testify as a witness in this matter, I would testify competently to the facts set forth herein.

## BACKGROUND

3. On February 11, 2013, I was appointed by the Debtors to serve as their Chief Restructuring Officer ("**CRO**") and spearhead the plan process. On the same day, the Debtors filed the *Debtors' Motion Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code for an Order Authorizing the Debtors to Appoint Lewis Kruger as Chief Restructuring Officer* [Docket No. 2887].[2] On March 5, 2013, the Court entered an order approving my appointment. [Docket No. 3103].

4. Prior to my role as CRO, I was a partner and Co-Chair of the Financial Restructuring Group at Stroock & Stroock & Lavan LLP, a law firm that has extensive experience in all aspects of restructuring and insolvency matters. I have over fifty years of restructuring experience. I have played a role in many significant reorganization proceedings in the United States, representing debtors, official and ad hoc creditors' committees, financial institutions and acquirers of assets.

5. In my capacity as CRO, I am generally familiar with the Debtors' businesses and capital structure, the sales of the Debtors' servicing platform and whole loan portfolio for an aggregate purchase price of $4.5 billion during these Chapter 11 cases, the priority and nature of the various claims asserted against the Debtors in these Chapter 11 cases, as well as (i) the terms of the Plan Support Agreement, (ii) Plan Term Sheet and (iii) Supplemental Term Sheet (collectively, the "**Agreement**") that were negotiated between the Debtors, the Creditors' Committee, and the Supporting Parties.

---

[2] The scope of my authority was modified pursuant to Amendment 1 to the Engagement Letter. A copy of Amendment 1 to the Engagement Letter was filed with the Court on March 1, 2013 [Docket No. 3074].

ny-1087535 2

6.     I was privy to, and involved in, the negotiations with the Creditors' Committee and the Supporting Parties, as well as entry into the Plan Support Agreement and Plan Term Sheet, dated as of May 13, 2013 among the Debtors, the Creditors' Committee and the Supporting Parties, as well as the Supplemental Term Sheet dated as of May 23, 2013. Except as otherwise indicated, all statements in this Declaration are based upon my personal knowledge, my discussions and correspondence with the Debtors' employees and professionals, and my review of the Agreement.

## THE ORIGINAL SETTLEMENTS

7.     At the outset of their Chapter 11 cases, the Debtors entered into a settlement and plan support agreement (the "**Original Ally Settlement**") with Ally and certain holders of the 9.625% junior secured notes due 2015 issued by ResCap and guaranteed by GMAC Mortgage and Residential Funding Company, LLC (the "**JSBs**"), as well as settlements and plan support agreements, as amended by both the Debtors' Supplemental Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of RMBS Trust Settlement Agreements [Docket No. 1176] and the Debtors' Second Supplemental Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of RMBS Trust Settlement Agreements [Docket No. 1887], with a large number of investors in securities associated with certain RMBS Trusts (as defined in the Motion) (the "**RMBS Settlement**" and, together with the Original Ally Settlement, the "**Original Settlements**"). I understand that the Debtors' management, in consultation with their advisors and Board of Directors, entered into the Original Settlements believing that they were in the best interests of the Debtors and critical to the success of these cases. The Original Settlements permitted the Debtors to obtain important benefits from the Ally, the JSBs, and the RMBS Trusts.

ny-1087535                                3

8.      For example, in connection with the Original Ally Settlement, Ally agreed to and (i) provided debtor in possession financing, (ii) permitted the Debtors to continue subservicing mortgage loans, (iii) supported the Debtors' continued origination of mortgages, (iv) continued providing the Debtors with use of their back-office shared services, such as centralized payroll and risk management services, among others, (v) cooperated with the Debtors to separate the shared services resources and permit the smooth transition of the Debtors' businesses to a purchaser, and (vi) served as a stalking horse bidder for the Debtors' Whole Loan Sale (as defined in the Motion). But for these contributions, the Debtors probably would have been unable to operate in Chapter 11, and would have been unable to sell their key assets in value maximizing transactions. Additionally, as a result of the Ally Settlement, the Debtors were able to obtain from Ally and the JSBs consent to use of their cash collateral.

9.      Similarly, the RMBS Settlement permitted the Debtors to (i) proceed with the sales of the estates' assets on a smooth and expeditious basis and (ii) resolve objections regarding the severability of the Debtors' pooling and servicing agreements and the appropriate priority of the RMBS Trusts' alleged origination-based claims to a future date or, potentially, to avoid the dispute altogether.

## NEGOTIATION AND MEDIATION PROCESS

10.     Along with the Debtors' advisors, one of my primary focuses since appointment as CRO has been to achieve consensus on the terms of a Chapter 11 plan that has broad creditor support and paves the way for the Debtors' exit from bankruptcy protection, while at the same time maximizing recoveries to creditors. To this end, I, along with the Debtors' advisors, have participated in regular, concurrent settlement discussions, both in and out of formal mediation, regarding, among other things, several complex intercreditor disputes that must be resolved in order to move forward with any Chapter 11 plan. I have also participated in

ny-1087535                                              4

discussions over a settlement of both prospective estate claims and direct third party claims against Ally, in exchange for a contribution of cash from Ally. Aided by the invaluable efforts of the Honorable James M. Peck (the "**Plan Mediator**"), appointed as plan mediator in these Chapter 11 cases, the Debtors' advisors and I identified each Party's position and moved expeditiously toward constructing a restructuring plan satisfactory to the overwhelming majority of the Debtors' creditors.

11. As noted above, I, along with the Debtors' advisors, have met on numerous occasions with each of the Debtors' major creditor constituents, including Ally and the Creditors' Committee, in an effort to narrow the intercreditor issues that must be resolved prior to the filing of a Chapter 11 plan. Additionally, on April 22 and 23, 2013, I, along with the Debtors' advisors, participated in a mediation "summit" with the Plan Mediator and advisors and/or business level leaders of each of the Debtors' major creditor constituencies (collectively, the "**Mediation Participants**"), including, but not limited to the following parties:

(a) AIG;

(b) Allstate;

(c) Ally;

(d) the Creditors' Committee;

(e) FGIC;

(f) FHFA;

(g) the Kessler Class Claimants;

(h) representatives of the JSBs;

(i) MassMutual;

(j) MBIA;

(k) Prudential;

(l) the RMBS Trustees;

(m) the Steering Committee Consenting Claimants;

(n) counsel to certain holders of the Senior Unsecured Notes;

(o) Syncora;

(p) the Talcott Franklin Consenting Claimants; and

(q) Wilmington Trust.[3]

12. Though the exact conversations during the mediation sessions that continued through and including today are subject to confidentiality restrictions contained in this Court's *Order Appointing Mediator* [Docket No. 2519], the Mediation Participants exchanged several different proposals for a form of Chapter 11 plan and various scenarios for distribution of available cash to fund the wind down of the Debtors' estates. Each Mediation Participant was given an opportunity to share its views on what it believed to be an appropriate plan construct and distribution on account of its claim against the Debtors. After two days of hard-fought, arm's-length negotiations with the Mediation Participants, the Parties were able to narrow the issues, but were unable to reach a global consensus. However, after numerous follow-up in-person meetings and conference calls over the following weeks, as well as two additional mediation sessions on May 9 and 10, 2013, the Debtors, the Creditors' Committee, and the Supporting Parties agreed, on May 13, 2013, upon a Plan Support Agreement and Plan Term Sheet, described in more detail in the Motion, which paves the way for the Debtors expeditious exit from bankruptcy. On May 23, 2013, the Parties further agreed to the terms of a Supplemental Term Sheet setting forth certain terms regarding the plan mechanics and waterfall.

---

[3] Wilmington Trust, National Association, in its capacity as indenture trustee for the Senior Unsecured Notes issued by Debtor Residential Capital, LLC.

ny-1087535                                6

13. Though hard fought and, at times uncertain, I believe that the negotiations between the Debtors and the Parties were a success. In my opinion, the Plan Support Agreement is a remarkable achievement given the complexity of these Chapter 11 cases, is in the best interests of the Debtors' estates, will maximize distributions to creditors, and will avoid a "free-for-all" with significant plan-related litigation that would deplete the limited remaining resources available for distribution to creditors.

14. Each of the creditor groups was required to participate in a give-and-take process through the Mediation. In my opinion, the process of good faith negotiations undertaken by all participants resulted in an Agreement that is in the best interests not only of the Debtors, but also the other Mediation Participants, including the RMBS Trustees and the investors in the RMBS Trusts, and all other creditors of the Debtors' estates. I believe that the Agreement provides the best possible outcome for each of the Debtors' creditor groups under the circumstances.

## THE PLAN SUPPORT AGREEMENT

15. The Plan Support Agreement sets forth the Parties' commitments and obligations with respect to the Plan Term Sheet and Supplemental Term Sheet, attached as exhibits to the Plan Support Agreement. The Plan Support Agreement includes customary conditions for such documents, such as an agreement to support a Plan that is consistent with the terms of the Agreement, to negotiate in good faith to reach definitive documentation, and to not take any action that will delay or impede consummation of the proposed Plan.

16. As set forth in the Motion,[4] the Plan Term Sheet contemplates the incorporation of a settlement with Ally pursuant to which Ally will agree to contribute value to

---

[4] The following summary is qualified in its entirety by the provisions of the Agreement. The Agreement will control in the event of any inconsistency with this Declaration.

the Debtors' estates in exchange for releases from the Debtors, the Creditors' Committee, and the Supporting Parties, subject to Bankruptcy Court approval as part of the Plan. Ally will contribute an additional (a) $1,950,000,000 in cash on the Effective Date and (b) the first $150,000,000 received by Ally for any Directors and Officers or Errors and Omissions claims it pursues against its insurance carriers related to the claims released in connection with the Plan to fund the Plan (the "**Ally Contribution**"). Without the Ally Contribution, the Debtors believe that the global resolution among the Consenting Claimants would not have been possible.

17. In addition to the Ally Contribution, Ally has made several other contributions to the Debtors throughout all phases of the Debtors' Chapter 11 cases. For instance, Ally has agreed to continue to provide the Debtors with certain critical shared services that the Debtors historically obtained from Ally and which the Debtors were unable to provide for themselves. These shared services include, for example, functions related to payroll, information technology, and human resources. Additionally, Ally provided debtor-in-possession financing and consensual use of its cash collateral. Ally also acted as a stalking horse bidder for the Debtors' held for sale portfolio.

18. Based on my discussion with the Debtors' advisors, it is my belief that Ally's financial and non-financial contributions made by Ally to the Debtors' estates are significant. Though parties-in-interest will have the opportunity to raise substantive objections to the Debtors' proposed plan and the Ally Contribution at confirmation, it is my belief that the amount of the Ally Contribution represents the best "deal" that the Debtors could obtain from Ally taking into account the hard-fought, good-faith negotiations wherein the Parties were all represented by experienced professionals and advisors. Further, the Ally Contribution is vital to

the Debtors' ability to file and confirm a Chapter 11 plan because, without the Ally Contribution, the Parties would not have agreed to the terms of the Agreement.

## THE DEBTORS' BUSINESS JUDGMENT

19.     I believe that entry into the Plan Support Agreement is a reasonable exercise of the Debtors' business judgment.  As described, the Plan Support Agreement provides substantial benefits to the Debtors' estates.  First, the Plan Support Agreement, Plan Term Sheet, and Supplemental Term Sheet will enable the Debtors to propose a Chapter 11 plan that will, upon confirmation, maximize value for creditors.  Second, the Plan Support Agreement will ensure that, so long as the Debtors comply with the terms of the Plan Support Agreement, such Plan enjoys the support of Ally, the Creditors' Committee, and the Supporting Parties, which include nearly all of the Debtors' major creditors constituencies.  Third, the Plan Support Agreement will enable the Debtors to reduce the potentially significant litigation costs that would have otherwise been incurred if the Debtors had continued to pursuant confirmation of a non-consensual plan, as well as the attendant litigation risk of that plan.  Fourth, the Plan Support Agreement provides for enhanced recoveries for the Debtors' creditors far in excess of what such creditors would otherwise obtain from the Debtors' estates.

20.     The Agreement is also in the best interests of the Debtors' estates purely based on the number of claims and legal disputes that are resolved and/or avoided.  The Agreement resolves actual disputes, described below, as well as complex potential disputes with Ally, the Creditors' Committee, the RMBS Trustees, the securities litigants and other investors, the Kessler Class Claimants, FGIC, and MBIA as insurers in connection with certain Debtor-sponsored RMBS Trusts, and certain holders of the Senior Unsecured Notes issued by ResCap, including Paulson, as well as their indenture trustee, Wilmington Trust.

21. As the Court is well aware, these cases involve extremely complicated legal and factual issues. Since my appointment as CRO to the Debtors, I, with the assistance of the Debtors' advisors, have been participating in negotiations regarding the complex intercreditor disputes that must be resolved in order to move forward with any Chapter 11 plan. Those issues include: (a) whether the claims asserted by various monoline insurers should be disallowed or subordinated under the Bankruptcy Code (or are not otherwise sustainable as a matter of law) and the related question of whether such monoline insurers control the claims of the RMBS Trusts that they "wrapped"; (b) whether the holders of Junior Secured Guaranteed Notes (the "JSBs") are oversecured and entitled to any postpetition interest; (c) the approval of the proposed RMBS Settlement; and (d) the priority of claims arising under securities laws relating to the Debtors' residential mortgage backed securities. I also led the Debtors in the continuing negotiations concerning the settlement of claims against Ally.

22. Based on the divergent interests of the Parties, as well as the complex issues pervading these cases, I believe that it was in the best interests of the Debtors' estates to find common ground and have nearly all major parties coalesce around the Plan and distribution structure embodied in the Agreement. Absent consensus on these matters, the Debtors' estates would likely be involved in costly and time consuming litigation regarding these issues that could last several years.

23. For example, if the monolines are successful in overcoming arguments that their claims must be subordinated or disallowed pursuant to the Bankruptcy Code, adjudication of the monoline claims would require litigation of issues similar those raised in the monoline mortgage insurer litigation that has been pending in state and federal courts around the country for several years, in many cases without resolution. The litigation of their claims will

require resolution of exceedingly complex legal and factual issue.  Any litigation of these claims by the Debtors could require substantial additional discovery, experts, and, potentially, a loan-by-loan analysis regarding alleged breaches of representations and warranties made by the Debtors in connection with the applicable securitizations, and regarding the remedies available to the monolines for any alleged breaches of representations and warranties.

24.     Similarly, the Agreement, if approved, will almost certainly reduce the significant litigation costs associated with preparing for and prosecuting a 5-day trial over the reasonableness of the RMBS Settlement.  As the Court recognized at the Debtors' March 5 omnibus hearing, the issues underlying any such litigation, while complex in general, they are further complicated by disputes regarding the extent of the monolines' control over the settlement process, their ability to direct of the RMBS Trustees, and, in the case of FGIC, the implications of FGIC's pending rehabilitation proceeding on the rights of all parties to the transactions wrapped by FGIC.  If the Debtors are required to litigate the claims asserted by the RMBS Trustees outside of the context of the RMBS Settlement, the parties may also be forced to engage in a loan-by-loan analysis similar to the one that could be required if the monoline claims are litigated.

25.     Finally, I also believe that the terms of the Agreement relating to milestones contained in the Plan Term Sheet are achievable and do not unnecessarily burden the Debtors' estates with a timeline that is unreasonable.  The Debtors, along with the Creditors' Committee, will work expeditiously to implement the Agreement, and the Debtors are hopeful that a plan can be confirmed within the timeframe contemplated.

26.     For all of the foregoing reasons, after careful consideration, the Debtors determined that entry into the Agreement, including the Plan Support Agreement, was beneficial

to the Debtors, their estates, and their stakeholders, and was appropriate under the circumstances in which this Agreement was made.  The Agreement reflects the heavily-negotiated settlement and compromise of the Parties' respective positions and provides for support for the Plan during a critical phase of the Debtors' Chapter 11 cases.  The Agreement provides the "backbone" for a smooth transition to the disclosure statement and plan confirmation phase of these Chapter 11 cases that the Debtors hope will result in a successful exit from bankruptcy and distribution of assets to creditors.  Additionally, the $2.1 billion Ally Contribution, subject to a determination by this Court regarding the appropriateness of such settlement, provides a means for effectuating the Plan agreed upon by the Debtors, the Creditors' Committee, and the Supporting Parties.

I swear under penalty of perjury that the foregoing is true and correct.

Dated: May 23, 2013

                                            /s/ Lewis Kruger
                                           Lewis Kruger

*Signature Page to Declaration of Lewis Kruger in Support of Debtors' Motion for an Order Under Bankruptcy Code Sections 105(a) and 363(b) Authorizing the Debtors to Enter Into and Perform Under a Plan Support Agreement with Ally Financial Inc. and Certain Consenting Claimants*