UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re: | ) | Case No. 12-12020 (MG) |
| | ) | |
| RESIDENTIAL CAPITAL, LLC, et al., | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

**DECLARATION OF LEWIS KRUGER IN SUPPORT OF DEBTORS' MOTION FOR THE ENTRY OF AN ORDER FURTHER EXTENDING THEIR EXCLUSIVE PERIODS TO FILE A CHAPTER 11 PLAN AND SOLICIT ACCEPTANCES THEREOF**

I, Lewis Kruger, being duly sworn, state the following under penalty of perjury:

1. I am the Chief Restructuring Officer ("CRO") of the above-captioned debtors and debtors and debtors in possession (collectively, the "Debtors"). I submit this declaration (the "Declaration") in support of the *Debtors' Motion for Entry of an Order Further Extending Their Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof* (the "Exclusivity Motion"),[1] filed contemporaneously herewith. Except as otherwise noted, I have personal knowledge of the matters set forth herein.

## BACKGROUND

2. On February 11, 2013, I was appointed by the Debtors to serve as CRO of the Debtors and spearhead the plan process. On the same day, the Debtors filed the *Debtors' Motion Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code for an Order Authorizing the Debtors to Appoint Lewis Kruger as Chief Restructuring Officer* [Docket No.

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Exclusivity Motion or the Plan Support Agreement.

ny-1092932

2887].[2]  On March 5, 2013, the Court entered an order approving my appointment.  [Docket No. 3103].

   3. Prior to my role as CRO, I was a partner and Co-Chair of the Financial Restructuring Group at Stroock & Stroock & Lavan LLP, a law firm that has extensive experience in all aspects of restructuring and insolvency matters.  I have over fifty years of restructuring experience.  I have played a role in many significant reorganization proceedings in the United States, representing debtors, official and ad hoc creditors' committees, financial institutions and acquirers of assets.

   4. I was privy to, and involved in, the plan negotiations among the Debtors and their major stakeholders, as well as entry into the Plan Support Agreement and Term Sheets.  Except as otherwise indicated, all statements in this Declaration are based upon my personal knowledge, my discussions and correspondence with the Debtors' employees and professionals and my review of the Plan Support Agreement and Term Sheets.

## **PLAN PROGRESS**

   5. Since my appointment as CRO, the Debtors have made strides towards a consensual reorganization plan.  Along with the Debtors' advisors, one of my primary focuses since appointment as CRO has been to achieve consensus on the terms of a Chapter 11 plan that has broad creditor support and paves the way for the Debtors' exit from bankruptcy protection, while at the same time maximizing recoveries to creditors.  To this end, I, along with the Debtors' advisors, have participated in regular, concurrent settlement discussions, both in and out of formal mediation, regarding, among other things, several complex intercreditor disputes

---

[2]  The scope of the CRO's authority was modified pursuant to Amendment 1 to the Engagement Letter.  A copy of Amendment 1 to the Engagement Letter as Exhibit 1 was filed with the Court on March 1, 2013 [Docket No. 3074].

2

ny-1092932

that must be resolved in order to move forward with any Chapter 11 plan. I have also participated in discussions over a settlement of both prospective estate claims and direct third party claims against AFI, in exchange for a contribution of cash from AFI.

6. As noted above, I, along with the Debtors' advisors, have met on numerous occasions with each of the Debtors' major creditor constituencies, including AFI and the Creditors' Committee, in an effort to narrow the intercreditor issues that must be resolved prior to the filing of a Chapter 11 plan. Additionally, on April 22 and 23, 2013, I, along with the Debtors' advisors, participated in a mediation "summit" with the Mediator and advisors and/or business level leaders of each of the Debtors' major creditor constituencies (collectively, the "Mediation Participants").

7. After two days of hard-fought, arm's-length negotiations, the Mediation Participants were able to narrow the issues, but were unable to reach a global consensus. However, during the last exclusivity extension, the Debtors and their major stakeholders partook in numerous in-person meetings and conference calls, as well as two additional mediation sessions. As a result, the Debtors, the Creditors' Committee, and the Supporting Parties agreed upon the Plan Support Agreement and Term Sheets, which paves the way for the Debtors expeditious exit from bankruptcy.

8. As set forth in the PSA Approval Motion, the Term Sheets contemplate the incorporation of a settlement with AFI pursuant to which AFI will agree to contribute value in exchange for releases from the Debtors, the Creditors' Committee, and the Supporting Parties, subject to Bankruptcy Court approval as part of the Plan. AFI will contribute an additional (a) $1,950,000,000 in cash on the Effective Date and (b) the first $150,000,000 received by AFI for any Directors and Officers or Errors and Omissions claims it pursues against its insurance

carriers related to the claims released in connection with the Plan to fund the Plan (the "AFI Contribution"). Without the AFI Contribution, the Debtors believe that the global resolution among the Consenting Claimants would not have been possible.

9. I believe that entry into the Plan Support Agreement will enable the Debtors to propose a viable Chapter 11 plan that will, upon confirmation, maximize value for creditors and warrants a further extension of exclusivity. The Plan Support Agreement will ensure that, so long as the Debtors comply with the terms of the Plan Support Agreement, such Plan enjoys the support of AFI, the Creditors' Committee, and the Supporting Parties, which include nearly all of the Debtors' major creditor constituencies. Additionally, the Plan Support Agreement will enable the Debtors to reduce the potentially significant litigation costs that would have otherwise been incurred if the Debtors had continued to pursuant confirmation of a non-consensual plan, as well as the attendant litigation risk of that plan.

10. While tremendous progress has been made on a consensual plan, the Parties need more time to (i) draft and file the Plan and disclosure statement, and (ii) seek approval of the disclosure statement. I believe that the threat of competing plans, as likely or unlikely as that may be, while the Parties are focused on prosecuting the Plan would only distract parties in interest. This could result in delay, and inevitably burden these estates with additional costs and diminish creditor recoveries. It is my opinion that any such plan or plans could not offer a greater return to creditors than that contemplated in the Term Sheets.

11. I believe that the progress made in plan negotiations, culminating in the entry into the Plan Support Agreement warrants a continuation of the Exclusive Plan Period for an additional 70 days. I am confident that a further extension of exclusivity is in the best interests of these estates.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.


Dated:  June 6, 2013                                          /s/ Lewis Kruger                         
       New York, New York                                  Lewis Kruger