**Hearing Date:  June 26, 2013 at 10:00 a.m. (ET) (as approved by the Court)**
**Objection Deadline:  June 19, 2013 at 4:00 p.m. (ET)**

MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone: (212) 468-8000
Facsimile: (212) 468-7900
Gary S. Lee
J. Alexander Lawrence
Kayvan B. Sadeghi
James A. Newton

*Counsel for the Debtors and*
*Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

——————————————————————— )
                                          )
In re:                                    )    Case No. 12-12020 (MG)
                                          )
RESIDENTIAL CAPITAL, LLC, et al.,         )    Chapter 11
                                          )
                         Debtors.         )    Jointly Administered
                                          )
——————————————————————— )

**NOTICE OF HEARING ON DEBTORS' MOTION PURSUANT TO**
**FED. R. BANKR. P. 9019 FOR APPROVAL OF THE SETTLEMENT AGREEMENT**
**AMONG THE DEBTORS, FGIC, THE FGIC TRUSTEES AND CERTAIN**
**INSTITUTIONAL INVESTORS**

        **PLEASE TAKE NOTICE** that, as approved by the Court, the hearing on the *Debtors'*

*Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the Settlement Agreement among the*

*Debtors, FGIC, the FGIC Trustees and Certain Institutional Investors* (the "**Motion**") will be

held on **June 26, 2013 at 10:00 a.m. (ET)** before the Honorable Martin Glenn, United States

Bankruptcy Judge, at the United States Bankruptcy Court for the Southern District of New York,

One Bowling Green, New York, New York 10004.

**PLEASE TAKE FURTHER NOTICE** that the deadline to file and serve a response to

the Motion is **June 19, 2013 at 4:00 p.m. (prevailing Eastern time)**.

Dated: June 7, 2013

/s/ Gary S. Lee
Gary S. Lee
J. Alexander Lawrence
Kayvan B. Sadeghi
James A. Newton
MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone: (212) 468-8000
Facsimile: (212) 468-7900

*Counsel to the Debtors and*
*Debtors in Possession*

**Hearing Date: June 26, 2013 at 10:00 a.m. (ET) (as approved by the Court)**
**Objection Deadline: June 19, 2013 at 4:00 p.m. (ET)**

MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone: (212) 468-8000
Facsimile: (212) 468-7900
Gary S. Lee
J. Alexander Lawrence
Kayvan B. Sadeghi
James A. Newton

*Counsel for the Debtors and*
*Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| ––––––––––––––––––––––––––––––––––––– | ) | |
| In re: | ) | Case No. 12-12020 (MG) |
| | ) | |
| RESIDENTIAL CAPITAL, LLC, et al., | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Jointly Administered |
| ------------------------------------------------------------- | ) | |

**DEBTORS' MOTION PURSUANT TO FED. R. BANKR. P. 9019**
**FOR APPROVAL OF THE SETTLEMENT AGREEMENT**
**AMONG THE DEBTORS, FGIC, THE FGIC TRUSTEES**
**AND CERTAIN INSTITUTIONAL INVESTORS**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................................................ 1

JURISDICTION AND VENUE ................................................................................................. 6

BACKGROUND ......................................................................................................................... 6

    I.    THE DEBTORS' SECURITIZATION BUSINESSES AND THE FGIC
         INSURED TRUSTS ................................................................................................... 6

    II.    PREPETITION LITIGATION AND THE FGIC CLAIMS .................................. 8

    III.    THE FGIC TRUSTEES' CLAIMS ON BEHALF OF THE FGIC
         INSURED TRUSTS ................................................................................................... 9

    IV.    THE TERMS OF THE SETTLEMENT ............................................................... 10

        A.    The Settlement, Discharge and Release of FGIC's Obligations
            Under the Policies .................................................................................... 11

        B.    The FGIC Allowed Claims ..................................................................... 12

        C.    Release of Claims Against the Debtors .................................................. 14

RELIEF REQUESTED ............................................................................................................ 15

ANALYSIS ................................................................................................................................ 15

    I.    THE SETTLEMENT AGREEMENT SATISFIES THE SECOND
         CIRCUIT'S STANDARD UNDER FED. R. BANKR. P. 9019(A) .................. 15

        A.    The Balance Between the Litigation's Possibility of Success and
            the Settlement's Future Benefits ............................................................. 17

        B.    The Likelihood of Complex and Protracted Litigation ........................... 20

        C.    The Paramount Interests of Creditors ..................................................... 22

        D.    The Proposed Settlement Satisfies the Remaining Iridium Factors ......... 23

ADDITIONAL RELIEF REQUESTED .................................................................................. 23

CONCLUSION .......................................................................................................................... 24

NOTICE ..................................................................................................................................... 25

NO PRIOR REQUEST ............................................................................................................ 25

# TABLE OF CONTENTS
## (continued)

Page

EXHIBITS

Exhibit 1: Proposed Order

Exhibit 2: Settlement Agreement (May 23, 2013)

Exhibit 3: Declaration of Lewis Kruger (June 7, 2013)

Exhibit 4: Declaration of Jeffrey Lipps (June 7, 2013)

Exhibit 5: Declaration of Ron D'Vari (June 7, 2013)

Exhibit 6: Claim No. 4870 filed by Financial Guaranty Insurance Company (Nov. 16, 2012)

Exhibit 7: Claim Nos. 6604-6654 filed by Law Debenture Trust Company of New York and Wells Fargo Bank, N.A. as Separate Trustee and Trustee (March 4, 2013)

Exhibit 8: Claim Nos. 6655-6705 filed by U.S. Bank N.A. (March 4, 2013)

Exhibit 9: Claim No. 6758 filed by Bank of New York Mellon Trust Co., N.A. (March 1, 2013)

Exhibit 10: Affirmation of Gary T. Holtzer, Case No. 401265-2012 (Sup. Ct., N.Y. Cnty. May 29, 2013)

# TABLE OF AUTHORITIES

**Page(s)**

CASES

Air Line Pilots Ass'n, Int'l v. Am Nat'l Bank & Trust Co. (In re Ionosphere Clubs, Inc.),
   156 B.R. 414 (S.D.N.Y. 1993)..................................................................................15

Cosoff v. Rodman (In re W.T. Grant Co.),
   699 F.2d 599 (2d Cir. 1983)...............................................................................16, 24

HSBC Bank USA, Nat'l Ass'n v. Fane (In re MF Global Inc.),
   466 B.R. 244 (Bankr. S.D.N.Y. 2012)................................................................16, 17

In re Dewey & LeBoeuf LLP,
   478 B.R. 627 (Bankr. S.D.N.Y. 2012)................................................................15, 16

In re Hibbard Brown & Co.,
   217 B.R. 41 (Bankr. S.D.N.Y. 1998)........................................................................18

In re Lehman Brothers Holdings, Inc.,
   No. 08-13555 (Bankr. S.D.N.Y. Feb. 22, 2012)........................................................18

In re Marco Polo Seatrade B.V.,
   No. 11-13634 (JMP) (Bankr. S.D.N.Y. June 11, 2012)............................................23

Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC),
   478 F.3d 452 (2d Cir. 2007)...............................................................................16, 23

Nellis v. Shugrue,
   165 B.R. 115 (S.D.N.Y. 1994)..................................................................................16

Newman v. Stein,
   464 F.2d 689 (2d Cir. 1972)......................................................................................15

STATUTES AND RULES

28 U.S.C. § 157.................................................................................................................6

28 U.S.C. § 1334...............................................................................................................6

28 U.S.C. § 1408...............................................................................................................6

28 U.S.C. § 1409...............................................................................................................6

Fed. R. Bankr. P. 9019.......................................................................1, 5, 15, 24, 25

Section 1310 of the New York Insurance Law ................................................................9

**TO THE HONORABLE JUDGE GLENN,**
**UNITED STATES BANKRUPTCY JUDGE:**

Residential Capital, LLC ("**ResCap**")[1] and each of its debtor affiliates (collectively, the "**Debtors**") submit this motion (the "**Motion**") pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") for entry of an order substantially in the form annexed hereto as Exhibit 1 (the "**Proposed Order**") approving the Settlement Agreement (the "**Settlement Agreement**"),[2] dated May 23, 2013, among the Debtors, Financial Guaranty Insurance Company ("**FGIC**"), the FGIC Trustees,[3] and the Institutional Investors[4] (collectively, the "**Settlement Parties**") and allowing FGIC's claims in the minimum aggregate amount of $596.5 million (the "**Minimum Allowed Claim Amount**"), subject to FGIC's reservation of its rights to assert certain additional claims and the allowance of FGIC's claims in a larger amount pursuant to the Global Plan Agreement (defined below).  In support of this Motion, the Debtors submit the declarations of Lewis Kruger, Jeffrey Lipps and Ron D'Vari, attached hereto as Exhibits 3-5, and respectfully state as follows:

## INTRODUCTION

1.      The Debtors seek approval of a settlement agreement involving forty-seven (47) separate securitizations with securities insured by FGIC (each a "**FGIC Insured Trust**" and, collectively, the "**FGIC Insured Trusts**").  The Settlement Agreement provides for broad

---

[1] Capitalized terms not otherwise defined herein have the meanings ascribed to them in the Settlement Agreement.

[2] A copy of the Settlement Agreement is attached hereto as Exhibit 2.

[3] The "**FGIC Trustees**" include The Bank of New York Mellon, The Bank of New York Mellon Trust Company, N.A., Law Debenture Trust Company of New York, U.S. Bank National Association and Wells Fargo Bank, N.A., each solely in their respective capacities as trustees, indenture trustees or separate trustees for certain FGIC Insured Trusts.

[4] The "**Institutional Investors**" include certain members of the Steering Committee Consenting Claimants and the Talcott Franklin Consenting Claimants (each as defined in the Plan Support Agreement (defined below)).

1

releases of claims asserted by both FGIC and the FGIC Trustees in connection with the FGIC Insured Trusts.

2.      First, the Settlement Agreement resolves three proofs of claim filed by FGIC (the "**FGIC Claims**"), totaling $5.55 billion in the aggregate.[5]  Under the Settlement Agreement, the Debtors will allow the FGIC Claims in the Minimum Allowed Claim Amount, which amount will be allocated among ResCap, RFC, and GMAC Mortgage on a pro rata basis as set forth in the Settlement Agreement.  This Minimum Allowed Claim Amount is subject to FGIC's reservation of its rights to assert a claim up to a cap of $596.5 million against each of these three Debtors and FGIC's claims being allowed in a larger amount pursuant to the Global Plan Agreement (defined below).

3.      Second, the Settlement Agreement resolves the majority of the general unsecured claims of the FGIC Trustees related to the FGIC Insured Trusts.  Separate and distinct from the FGIC Claims, the FGIC Trustees filed 120 proofs of claim (the "**FGIC Trustees' Claims**") against fifty-one (51) of the Debtors related to the FGIC Insured Trusts.  The Trustees contend that such claims could be equal to the aggregate estimated lifetime reductions in the value of the collateral pools underlying these trusts—*i.e.* the estimated lifetime collateral losses of the FGIC Insured Trusts.  In the aggregate such claims could total approximately $5.41 billion.  Of that $5.41 billion, the Settlement Agreement releases the FGIC Trustees' Claims in varying amounts of up to $5.0 billion against each of the fifty-one (51) Debtors.[6]

---

[5] The FGIC Claims, numbered 4868, 4870 and 4871 assert claims of $1.85 billion against Debtors RFC, ResCap and GMAC Mortgage, respectively, for a total of $5.55 billion in claims.  Claim number 4870, filed against ResCap, is referred to herein as the "**ResCap Claim**."  A copy of the ResCap Claim is attached hereto as Exhibit 6.

[6] Based on Dr. D'Vari's calculations, the FGIC Trustees have released claims potentially amounting to $5.0 billion against each of eighteen (18) of the Debtors and $1.45 billion against each of the other thirty-three (33) other Debtors, for total cumulative estimated contingent claims against all of the Debtors of $137.8 billion.  *See* Claim Nos. 6758-6767 and 6772-6779 filed by Bank of New York Mellon Trust Co., N.A or Bank of New York Mellon, against nine debtor entities; Claim Nos. 6604-6654 filed by Law Debenture Trust Company of New York and Wells Fargo Bank, N.A. as Separate Trustee and Trustee, respectively, against fifty-one debtor entities; and Claim Nos.

4.      Thus, accounting for both the FGIC Claims and the FGIC Trustees' Claims, the Debtors will receive the releases in varying amounts against each Debtor of up to approximately $6.85 billion less the maximum claim FGIC is permitted to assert against that Debtor.

5.      Following the Court's appointment as mediator of United States Bankruptcy Judge James M. Peck[7] and months of arm's-length negotiations, the Debtors' and most of their claimant constituencies reached a broad settlement consisting of a Plan Support Agreement (the "**Plan Support Agreement**") and Plan Term Sheet (the "**Plan Term Sheet**"), each dated May 13, 2013, and the Supplemental Term Sheet (the "**Supplemental Term Sheet**"), dated May 23, 2013, for which the Debtors separately seek Court approval (collectively, the "**Global Plan Agreement**").[8]  The Settlement Agreement, while a stand-alone agreement, represents a critical component of the Global Plan Agreement, and is intrinsically linked to FGIC's rehabilitation in the Supreme Court of the State of New York (the "**Rehabilitation Court**") as it requires approval by the Rehabilitation Court.  Obtaining the Rehabilitation Court's approval of the Settlement Agreement by August 19, 2013 is a specific milestone in the Plan Term Sheet, and failure to achieve any milestone is a termination event under the Plan Support Agreement.  As a result, absent approval of the Court of this Motion, that milestone will in all likelihood not be reached, thereby triggering a termination event with respect to the Global Plan Agreement, which the Debtors and most of their claimant constituencies painstakingly negotiated with Judge Peck's assistance.

---

6655-6705 filed by U.S. Bank N.A, against fifty-one debtor entities (collectively, the "**FGIC Trustees' Claims**"). Copies of representative samples of the FGIC Trustees' Claims are attached hereto as <u>Exhibits 7-9</u>.

[7] <u>See</u> *Order Appointing Mediator*, dated December 26, 2012 [Docket No. 2519].

[8] Copies of the Plan Support Agreement, the Plan Term Sheet, and the Supplemental Term Sheet are contained in Exhibit 3 to *Debtors' Motion for an Order Under Bankruptcy Code Sections 105(a) and 363 (b) Authorizing the Debtors to Enter Into and Perform Under a Plan Support Agreement with Ally Financial Inc., the Creditors' Committee, and Certain Consenting Claimants* [Docket No. 3814] (the "**Plan Support Agreement Motion**").  The Plan Support Agreement Motion is scheduled to be heard on the same day as this Motion.

6.      Thus, while the Debtors seek approval of the Settlement Agreement based on its merits as a stand-alone and separate agreement, it is important to place the Agreement and its significant benefits to the estate into its proper context.  The Settlement Agreement represents a significant component of the global plan mediation.  The Debtors receive a substantial reduction of the FGIC Claims.  Based on a cash payment by FGIC to the FGIC Trustees, the Debtors also receive a release from the vast majority of the FGIC Trustees' Claims.  The settlement allows for a greater share of the estate proceeds, and any litigation recovery or settlement, to be allocated to other creditors.

7.      Two essential elements of the proposed settlement are (i) FGIC's agreement to make a substantial cash payment to the FGIC Trustees in resolution of past and future claims under the Policies (defined below) FGIC issued in connection with the FGIC Insured Trusts and (ii) allowance of the FGIC Claims in at least the Minimum Allowed Claim Amount. Specifically, as part of the Settlement Agreement, subject to the Rehabilitation Court's approval, FGIC has agreed to make a cash payment of $253.3 million to the FGIC Trustees.  In addition, the Settlement Agreement provides that, subject to this Court's approval, the FGIC Claims will be allowed in the Minimum Allowed Claim Amount, subject to FGIC's reservation of its rights to assert certain additional claims and the FGIC Claims being allowed in a larger amount pursuant to the Global Plan Agreement.  Accordingly, effectiveness of the Settlement Agreement is conditioned on the approval of both the Rehabilitation Court and this Court.  Thus, the Debtors agreed to seek the Court's approval of the Settlement Agreement, which is incorporated into the broader settlement set forth in the Global Plan Agreement, in advance of the rest of the plan confirmation process, but only in exchange for the substantial releases of approximately $1.85 billion in claims from FGIC against each of ResCap, GMAC Mortgage and RFC, less the

maximum claim FGIC is permitted to assert against that Debtor, and from the FGIC Trustees in varying amounts up to $5.0 billion against each of the Debtors.

8.      If the Court ultimately approves the Global Plan Agreement and the plan contemplated thereby becomes effective, FGIC's allowed claim amount and recovery will be dictated by the terms of the Supplemental Term Sheet.  Thus, any objections to FGIC's recovery under the Global Plan Agreement can be evaluated alongside the proposed recoveries of other claimants and addressed through the plan confirmation process.

9.      If, however, the Court does not approve the Global Plan Agreement or the plan contemplated thereby does not become effective, the Debtors still receive substantial benefits under the Settlement Agreement.  First, rather than claims for $1.85 billion against each of ResCap, GMAC Mortgage, and RFC, FGIC will be limited to seeking claims of $596.5 million against each of ResCap, GMAC Mortgage, and RFC, and the Debtors can continue to contest or seek to subordinate such claims to the extent they exceed the Minimum Allowed Claim Amount floor set by the Settlement Agreement.  In other words, regardless of whether the Court approves the Plan Support Agreement or the plan becomes effective, the Settlement Agreement caps the FGIC Claims at a fraction of the amounts asserted in FGIC's proofs of claim.  Second, the Debtors still receive the releases described above from the FGIC Insured Trusts.

10.      Moreover, the Debtors would no longer need to litigate the validity, priority and amount of the FGIC Claims or the vast majority of the FGIC Trustees' claims in connection with the origination of the FGIC Insured Trusts.  Approval of the Settlement Agreement would thereby provide the added benefit of eliminating the uncertainty, delay, and costs associated with litigating those claims.[9]  Given the extraordinary complexity of the legal and factual issues

---

[9] As described below, litigation regarding a portion of FGIC's and the FGIC Trustees' Claims in connection with the FGIC Insured Trusts could be required if the Plan Support Agreement terminates or the chapter 11 plan

involved in litigating these claims, the Debtors would likely incur substantial professional fees in any litigation of these claims, and the litigation could drag on for years.  Moreover, if the Debtors were required to litigate the validity, priority and amount of the released claims, the resulting delay and the need to maintain adequate reserves under any chapter 11 plan would necessarily reduce the present value of all of creditors' potential recoveries.

11.     Based on all of the facts and circumstances involved, the Debtors have determined, in the reasonable exercise of their business judgment, that approval of the Settlement Agreement would confer an immediate and tangible benefit to the Debtors' estates, and that the terms of the Settlement Agreement are in the best interest of all creditors.  In the Debtors' judgment, the Court should approve the Settlement Agreement, regardless of whether the Court ultimately approves the Plan Support Agreement or confirms the plan contemplated thereby.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

## I.    THE DEBTORS' SECURITIZATION BUSINESSES AND THE FGIC INSURED TRUSTS

13.     Prior to the closing of their Court-approved asset sales, the Debtors were a leading residential real estate finance company indirectly owned by Ally Financial Inc. ("**AFI**"), which is

---

contemplated thereby does not become effective, but the amounts in dispute would be substantially reduced as a result of releases contained in the Settlement Agreement.  With the Settlement Agreement, the Debtors receive a release as to securities with an initial par value that represents over 96% of the original balance of the FGIC Insured Trusts, and over 93% of the value of all interests in the Trusts after factoring in the expected value of interest-only certificates and residual interests.

not a Debtor.  The Debtors and their non-debtor affiliates operated the fifth-largest mortgage

servicing business and the tenth-largest mortgage origination business in the United States.[10]

14.    As part of the Debtors' mortgage servicing and origination businesses, Debtors

GMAC Mortgage, LLC ("**GMAC Mortgage**") and Residential Funding Company, LLC

("**RFC**") acted as Sponsor, Depositor, Master Servicer, Primary Servicer, or Subservicer in

connection with transactions (the "**RMBS Transactions**") involving the securitization of

residential mortgages through securitization trusts.  Kruger Decl. ¶ 8.  In conjunction with their

various roles in the RMBS Transactions, certain of the Debtors were parties to the various

agreements governing the creation and operation of the FGIC Insured Trusts (the "**Governing**

**Agreements**").[11] Id.

15.    FGIC, a monoline financial guaranty insurance company, issued irrevocable

insurance policies (the "**Policies**") for certain securities (the "**Securities**") issued by the FGIC

Insured Trusts.  By "wrapping" Securities issued by the FGIC Insured Trusts, FGIC guaranteed

the payment of principal and interest due on the Securities.  See Kruger Decl. ¶ 9.  Additionally,

FGIC entered into an Insurance and Indemnity Agreement with one or more of the Debtors in

connection with each of the FGIC Insured Trusts (the "**Insurance Agreements**").  Id.  Pursuant

to the Insurance Agreements, the Debtor party agreed, among other things, to reimburse FGIC

for certain payments FGIC made under the Policies that resulted from the applicable Debtor's

failure to repurchase or substitute mortgage loans that breached one or more representations or

warranties contained in the applicable Governing Agreements.  See Kruger Decl. ¶ 9.

---

[10] A more detailed description of the Debtors, including their business operations, their capital and debt structure, and the events leading to the filing of these bankruptcy cases, is set forth in the affidavit of James Whitlinger, dated May 14, 2012 [Docket No. 6].

[11] The Governing Agreements typically consist of either (i) a Mortgage Loan Purchase Agreement, a Servicing Agreement, an Indenture, and a Custodial Agreement, or (ii) a Pooling and Servicing Agreement and an Assignment and Assumption Agreement.

## II.    PREPETITION LITIGATION AND THE FGIC CLAIMS

16.    Beginning on November 29, 2011, and prior to the Petition Date, FGIC initiated a total of twelve civil suits asserting a variety of claims against ResCap, GMAC Mortgage, and RFC in connection with twenty (20) of the FGIC Insured Trusts.  See Kruger Decl. ¶ 10.  The actions are currently pending in the United States District Court for the Southern District of New York, and each action has been stayed as against the Debtors as of the Petition Date.  Id.  As of the Petition Date, the Debtors had not yet filed responsive pleadings or commenced discovery in any of the FGIC actions.  Id.

17.    Relying on its allegations in the prepetition lawsuits, FGIC filed the FGIC Claims, asserting general unsecured claims against each of the three Debtors.  See Kruger Decl. ¶ 11. The FGIC Claims, all substantially similar in form and nature, allege that: (i) RFC and GMAC Mortgage breached various representations, warranties and/or covenants in the Governing Agreements or the offering documents, (ii) FGIC was fraudulently induced to issue the Policies in connection with most of these FGIC Insured Trusts[12] and (iii) ResCap is liable for the alleged breaches and fraud of GMAC Mortgage and RFC under alter ego liability theory.[13]  Id.  FGIC also asserts claims related to the Debtors' servicing of the mortgage loans in the FGIC Insured Trusts, arguing that it was damaged by (i) the Debtors' failure to properly service the loans, implement loss mitigation efforts and enforce the FGIC Insured Trust sponsors' obligations to repurchase or substitute mortgage loans that breached representations and warranties, and (ii) the Debtors' alleged refusal to provide FGIC access to certain information, "including financial

---

[12] In its prepetition complaints, FGIC did not assert a fraudulent inducement claim in connection with six of the FGIC Insured Trusts.  Thus, it is unclear whether the FGIC Claims include a fraud claim in connection with these six FGIC Insured Trusts.  The FGIC Claims further do not specifically identify which of the FGIC Insured Trusts that were not at issue in the prepetition litigation are nonetheless at issue in the FGIC Claims.

[13] The ResCap Claim asserts that "ResCap is indistinguishable from each of [GMAC Mortgage] and RFC, and is thus jointly and severally liable to FGIC under a theory of alter ego liability for the harms FGIC has suffered from the breaches of contract committed by [GMAC Mortgage] and RFC."  See ResCap Claim ¶ 26.

statements, accounts' reports, and other information." <u>See</u> ResCap Claim ¶¶ 17-18.  Finally, the

FGIC Claims seek to recover certain amounts FGIC has been requested to pay under the Policies

pursuant to indemnification provisions contained in the Insurance Agreements.  <u>See</u> ResCap

Claim ¶ 22.

18.     The FGIC Claims seek "legal, rescissory, equitable, consequential, and/or

punitive damages against the Debtors for GMAC [Mortgage]'s and RFC's material breaches of

the [Governing Agreements] and their fraudulent inducement of FGIC to enter into the

[Insurance] Agreements and issue Policies for the [FGIC Insured Trusts]."  <u>See</u> ResCap Claim ¶

38.  The FGIC Claims assert damages of "not less than $1.85 Billion" against each of RFC,

ResCap, and GMAC Mortgage, for an aggregate claim of $5.55 billion.[14]  <u>See</u> ResCap Claim ¶

38.

## III.    THE FGIC TRUSTEES' CLAIMS ON BEHALF OF THE FGIC INSURED TRUSTS

19.     In addition to and separate from the claims related to the twenty (20) FGIC

Insured Trusts addressed in the FGIC prepetition litigation, the FGIC Trustees' Claims include

claims against the Debtors in connection with an additional twenty-seven (27) of the FGIC

Insured Trusts.  Kruger Decl. ¶ 13.  The Settlement Agreement governs each of these forty-seven

(47) FGIC Insured Trusts.  <u>Id.</u>  In their proofs of claim, the FGIC Trustees assert that the FGIC

Insured Trusts possess, among other things, breach of contract and tort claims arising out of the

representations and warranties contained in the Governing Agreements.  <u>Id.</u>  The FGIC Trustees

---

[14] As of November 2009, pursuant to an order issued by the Superintendent under Section 1310 of the New York Insurance Law, dated November 24, 2009, FGIC ceased making payments on all claims, including claims made under the Policies.  As of that date, FGIC had paid approximately $343.3 million in claims to the insureds under the Policies.  <u>See</u> Affirmation of Gary T. Holtzer at ¶ 5 Case No. 401265-2012 (Sup. Ct., N.Y. Cnty. May 29, 2013), attached hereto as <u>Exhibit 10</u>.  As of March 31, 2013, FGIC had received approximately $789 million in claims under the Policies that it had not yet paid.  <u>Id.</u>  Absent the settlement, release, and discharge of FGIC's obligations under the Policies, FGIC estimates that the present value of losses projected to arise under the Policies in the future exceed $400 million.  <u>Id.</u>

have maintained throughout the case that, in the absence of the proposed RMBS Settlement,[15]

their asserted claims against each of multiple Debtors in connection with the FGIC Insured

Trusts could be equal to the aggregate estimated lifetime reductions in the value of the collateral

pools underlying the these trusts—*i.e.* the estimated lifetime collateral losses of the FGIC

Insured Trusts. Id. Dr. D'Vari, estimates the aggregate of such claims at approximately $5.41

billion. D'Vari Decl. ¶ 31.

## IV.    THE TERMS OF THE SETTLEMENT

20.    In early April 2013, in connection with the mediation process overseen by Judge

Peck, certain of the Settlement Parties outlined the financial terms of a potential settlement

among the Debtors, FGIC and the FGIC Trustees, which would resolve a number of disputes

regarding the validity, amount and priority of the FGIC Claims. See Kruger Decl. ¶ 15. In

addition, the proposed settlement would stem the alleged accrual of the FGIC Claims by

preventing the FGIC Insured Trusts from continuing to present insurance claims to FGIC and,

consequently, increasing the size of the indemnification and rescissory damages claims to which

FGIC asserts it is entitled. Id. The negotiated terms of the proposed settlement were ultimately

incorporated into an agreement among the Debtors and many of their major claimant

constituencies, embodied in the Global Plan Agreement, setting forth the primary terms of a

chapter 11 plan that will have the support of a substantial majority of the Debtors' claimant

constituencies. Id. ¶¶ 15.

21.    Concurrently with the negotiations leading up to the completion of the

Supplemental Term Sheet, the Settlement Parties negotiated the terms of a settlement involving

---

[15] The "**RMBS Settlement**" refers to the Debtors' proposed settlement of representation and warranty claims
asserted by the trustees of 392 securitization trusts for an allowed claim of up to $8.7 billion, as described in the
*Debtors' Second Supplemental Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of RMBS Trust Settlement
Agreements* [Docket No. 1887] (the "**RMBS Settlement Motion**").

FGIC and the FGIC Trustees that was acceptable to all of the Settlement Parties and supported
by many of the Debtors' claimant constituencies, including each of the parties to the Global Plan
Agreement.  Kruger Decl. ¶ 16.  The resulting Settlement Agreement consists of three main
parts: (i) the settlement, discharge and release of FGIC's obligations under the Policies in
exchange for a bulk, cash payment of $253.3 million from FGIC to the FGIC Trustees;
(ii) allowance of claims against certain of the Debtors' estates in the Minimum Allowed Claim
Amount (subject to FGIC's reservation of its rights to assert additional claims, as described
above) or, if a chapter 11 plan contemplated by the Global Plan Agreement becomes effective, in
the aggregate and allocated amounts set forth in the Supplemental Term Sheet, as such amounts
may be adjusted, amended or revised by agreement of the parties to the Global Plan Agreement
(the "**FGIC Allowed Claims**"); and (iii) the release of the remainder of the FGIC Claims against
the Debtors' estates and the bulk of the claims asserted by the FGIC Trustees on behalf of the
FGIC Insured Trusts.  Settlement Agreement §§ 2.01-2.02, 3.01-3.03; Kruger Decl. ¶ 16.

> **A.** **The Settlement, Discharge and Release of FGIC's Obligations Under the
> Policies**

22.    The first element of the Settlement Agreement is a settlement, discharge and
release of FGIC's obligations under the Policies, as approved by the Rehabilitation Court.  In this
regard, FGIC will obtain releases of its obligations under the Policies, in exchange for a bulk,
cash payment from FGIC to the FGIC Trustees in an amount of up to $253.3 million (the
"**Settlement Payment**").  <u>See</u> Settlement Agreement §§ 2.01(a)(i), (b), 2.02; Kruger Decl. ¶ 17.
Upon the effective date of the Settlement Agreement, this settlement, discharge and release will
prevent any further claims against FGIC under the Policies, ending any further accrual of claims
FGIC alleges it holds against the Debtors, particularly the FGIC Claims seeking reimbursement
or indemnity.  Kruger Decl. ¶ 17.

**B.    The FGIC Allowed Claims**

23.    The second element of the Settlement Agreement is the allowance of the FGIC

Claims in an amount significantly less than the total asserted amount of the FGIC Claims.  As

described above, the amount of the FGIC Allowed Claims depends on whether the Plan Support

Agreement is approved and the plan contemplated thereby ultimately becomes effective.

24.    If the Court approves the Plan Support Agreement and the plan contemplated

thereby becomes effective, the amount of the FGIC Allowed Claims will be the aggregate and

allocated amounts set forth in the Supplemental Term Sheet, as such amounts may be adjusted,

amended or revised by agreement of the parties to such agreement.  Settlement Agreement

§ 3.01(B); Kruger Decl. ¶ 19.  The Supplemental Term Sheet currently provides that the FGIC

Claims will be allowed against ResCap in the amount of $337.5 million, GMAC Mortgage in the

amount of $181.5 million and RFC in the amount of $415 million, which is projected to yield a

recovery of approximately $206.5 million (as set forth on Annex I of the Supplemental Term

Sheet).  See Kruger Decl. ¶ 19.  In other words, if the Court approves the Plan Support

Agreement and the plan contemplated thereby becomes effective, the amount of the FGIC

Allowed Claims will be governed by the terms of the Supplemental Term Sheet, as set forth in

the Settlement Agreement.  Settlement Agreement § 3.01(B).  In this way, FGIC's ultimate

recovery under the plan contemplated by the Global Plan Agreement can be evaluated as part of

the plan confirmation process, alongside the projected recoveries of the other claimants under the

plan.

25.    On the other hand, if the Plan Support Agreement is not approved or terminates in

accordance with its terms, or the chapter 11 plan contemplated thereby never becomes effective,

the FGIC Claims will be allowed in the Minimum Allowed Claim Amount, allocated among

ResCap, RFC, and GMAC Mortgage pro rata based on which of the Debtors would be

contractually obligated to reimburse FGIC for such payments under the Governing Agreements, and not based upon FGIC's alter ego or aiding and abetting or similar claims.[16]   Settlement Agreement § 3.01(A); Kruger Decl. ¶ 20.[17]   In this alternative scenario, the Settlement Agreement provides that the Minimum Allowed Claim Amount will be treated *pari passu* with other unsecured claims allowed against ResCap, GMAC Mortgage and RFC.  See Kruger Decl. ¶ 8.  FGIC will further retain its rights to assert a general unsecured claim against each of ResCap, GMAC Mortgage and RFC, however in each case FGIC's asserted claim against each Debtor will be capped at $596.5 million (which cap includes any portion of the Minimum Allowed Claim Amount allocated to such Debtor).  Settlement Agreement § 3.01; Kruger Decl. ¶ 20.  Notably, nothing in the Settlement Agreement precludes the Settlement Parties from objecting to or otherwise seeking subordination of any unsecured claims asserted by FGIC in excess of the Minimum Allowed Claim Amount.  See Kruger Decl. ¶ 20.  In other words, rather than three claims, each in the amount of $1.85 billion, against each of ResCap, GMAC Mortgage, and RFC, FGIC will be limited to asserting three claims, each in the amount of $596.5 million, against each of ResCap, GMAC Mortgage, and RFC, which the Debtors can continue to contest or seek to subordinate, above the Minimum Allowed Claim Amount.

26.     For illustrative purposes, the following chart summarizes the amount of the claims that FGIC could assert, which portion of those will be allowed against the Debtors, and the agreed upon treatment of the claims:

---

[16] In other words, the portion of the FGIC Claims allowed against GMAC Mortgage should be equal to the sum of (i) the amount of the claims previously paid by FGIC to FGIC Insured Trusts under Policies associated with an Insurance Agreement to which GMAC Mortgage is a signatory, and (ii) the amount of the Settlement Payment attributable to such FGIC Insured Trusts.  A similar calculation should apply with respect to the amount of the FGIC Claims allowed against ResCap and RFC.  See Kruger Decl. ¶ 20 n.6.

[17] The Settlement Parties calculated the Minimum Allowed Claim Amount by taking the sum of (i) $343.2 million, the amount of claims FGIC has paid under the Policies that allegedly remains unreimbursed by the Debtors; and (ii) $253.3 million, the amount of the Settlement Payment.  Settlement Agreement § 3.01(A)(i); Kruger Decl. ¶ 16 n.5.

| Scenario | Status of PSA and Chapter 11 Plan | Maximum FGIC Claims | FGIC Claims Subject to Subordination or Objection |
|---|---|---|---|
| 1 | Plan Support Agreement not approved or contemplated plan does not become effective | FGIC may assert a claim of $596.5 million against each of ResCap, GMAC Mortgage and RFC | Yes, but only in respect of the portion, if any, asserted in excess of the Minimum Allowed Claim Amount |
| 2 | Plan Support Agreement approved and contemplated plan becomes effective | Three allowed claims (as governed by the Global Plan Agreement):<br><br>ResCap ($337.5 million)<br><br>GMAC Mortgage ($181.5 million)<br><br>RFC ($415.0 million) | No |

### C.    Release of Claims Against the Debtors

27.    Pursuant to the terms of the Settlement Agreement, the Debtors will obtain a release of claims against each of the Debtors in varying amounts of up to approximately $6.85 billion less the maximum claim FGIC is permitted to assert against that Debtor.  See D'Vari Decl. ¶ 2 (describing estimated claims being released by FGIC Trustees); ResCap Claim ¶ 38 (describing amount of asserted FGIC Claims); Settlement Agreement § 3.01.  Subject to the terms and conditions of the Settlement Agreement described above, FGIC has agreed to a reduction of its asserted $1.85 billion in claims against each of ResCap, GMAC Mortgage and RFC ($5.55 billion in claims in the aggregate) to the Minimum Allowed Claim Amount or the amounts set forth in the Supplemental Term Sheet.  Kruger Decl. ¶ 21.  Additionally, pursuant to the Settlement Agreement, the FGIC Insured Trusts will release the majority of the claims they have asserted, resulting in the release of up to approximately $5.0 billion in claims in the aggregate asserted by the FGIC Insured Trusts against each of the Debtors.  See D'Vari Decl. ¶ 2.  In sum, the Debtors will obtain releases of claims against each Debtor, in varying amounts

of up to approximately $6.85 billion less the maximum claim FGIC is permitted to assert against

that Debtor, in exchange for allowed claims in favor of FGIC that are substantially lower than

the asserted amount of the FGIC Claims and a cash payment of $253.3 million *from FGIC* to the

FGIC Trustees.

## RELIEF REQUESTED

28.     The Debtors respectfully request that this Court enter an order substantially in the

form of the Proposed Order, approving the Settlement Agreement, including the allowance of the

FGIC Claims, pursuant to Bankruptcy Rule 9019(a), in the amounts set forth in the Settlement

Agreement.

## ANALYSIS

## I.     THE SETTLEMENT AGREEMENT SATISFIES THE SECOND CIRCUIT'S STANDARD UNDER FED. R. BANKR. P. 9019(a)

29.     Rule 9019(a) provides, in part, that "[o]n motion by the [debtor-in-possession]

and after notice and a hearing, the court may approve a compromise or settlement."  Fed. R.

Bankr. P. 9019(a).  This rule empowers bankruptcy courts to approve a settlement agreement

where "it is supported by adequate consideration, is 'fair and equitable,' and is in the best

interests of the estate."  Air Line Pilots Ass'n, Int'l v. Am Nat'l Bank & Trust Co. (In re

Ionosphere Clubs, Inc.), 156 B.R. 414, 426 (S.D.N.Y. 1993); In re Dewey & LeBoeuf LLP, 478

B.R. 627, 640 (Bankr. S.D.N.Y. 2012) (Glenn, J.).  The Court's analysis is not a mechanical

process, but rather contemplates a "range of reasonableness . . . which recognizes the

uncertainties of law and fact in any particular case and the concomitant risks and costs

necessarily inherent in taking any litigation to completion."  Newman v. Stein, 464 F.2d 689, 693

(2d Cir. 1972).

30.     "As a general matter, '[s]ettlements and compromises are favored in bankruptcy

as they minimize costly litigation and further parties' interests in expediting the administration of

the bankruptcy estate.'" In re Dewey & LeBoeuf LLP, 478 B.R. at 640 (quoting In re MF Global

Inc., No. 11–2790, 2012 WL 3242533 at *5 (Bankr. S.D.N.Y. Aug 10, 2012) (Glenn J.)); HSBC

Bank USA, Nat'l Ass'n v. Fane (In re MF Global Inc.), 466 B.R. 244, 247 (Bankr. S.D.N.Y.

2012) (Glenn, J.).  The decision to approve a particular settlement lies within the sound

discretion of the bankruptcy court.  See Nellis v. Shugrue, 165 B.R. 115, 122-23 (S.D.N.Y.

1994); Ionosphere Clubs, Inc., 156 B.R. at 426.  Bankruptcy courts, however, should consider

and factor in the debtor's exercise of its business judgment when reviewing a proposed

settlement and may rely on the opinion of the debtor, parties to the settlement, and professionals.

MF Global Inc., 466 B.R. at 244; Dewey & LeBoeuf LLP, 478 B.R. at 641.

31.     To approve a proposed settlement, courts "need not conduct a mini-trial" or

definitively decide the numerous issues of law and fact raised by the settlement.  Dewey &

LeBoeuf LLP, 478 B.R. at 641 (internal quotations omitted).  Rather, courts should "canvass the

issues and see whether the settlement 'fall[s] below the lowest point in the range of

reasonableness.'"  Cosoff v. Rodman (In re W.T. Grant Co.), 699 F.2d 599, 608 (2d Cir. 1983);

Dewey & LeBoeuf LLP, 478 B.R. at 641 (same).

32.     In deciding whether a particular settlement falls within the "range of

reasonableness," courts consider the following "Iridium" factors: (a) the balance between the

litigation's possibility of success and the settlement's future benefits; (b) the likelihood of

complex and protracted litigation, "with its attendant expense, inconvenience, and delay"; (c) the

paramount interests of creditors; (d) whether other parties in interest support the settlement;

(e) "the nature and breadth of releases to be obtained by officers and directors"; (f) the

16

"competency and experience of counsel" supporting, and "[t]he experience and knowledge of the bankruptcy court judge" reviewing the settlement; and (g) "the extent to which the settlement is the product of arm's-length bargaining." Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC), 478 F.3d 452, 462 (2d Cir. 2007) (internal citations and quotations omitted).

33.    The Debtors respectfully submit that each of the Iridium factors weighs in favor of this Court's approval of the Settlement Agreement.

**A.    The Balance Between the Litigation's Possibility of Success and the Settlement's Future Benefits**

34.    To avoid protracted and complicated litigation over the validity, amount and priority of the FGIC Claims and the FGIC Trustees' Claims being released, the Debtors determined that entering into the Settlement Agreement is in the best interest of the Debtors' estates and their creditors.  The Settlement Agreement resulted from rigorous, arm's-length negotiations between the Settlement Parties, all sophisticated parties who understand and appreciate the complexities involved in RMBS securitization transactions and financial guarantee insurance.  The Settlement Agreement fits within the broader effort to reach a resolution of the claims of the major creditor constituencies overseen and directed by Judge Peck, and was important in facilitating the success of the global mediation efforts.

35.    In summary, FGIC and/or the FGIC Trustees have asserted various claims for breach of contract, including the breach of representations and warranties contained in the Governing Agreements for the FGIC Insured Trusts relating to, among other things, the "characteristics of the Mortgage Loans, and the accuracy and completeness of the information supplied to FGIC." See, e.g., ResCap Claim ¶ 15.  Additionally, FGIC and/or the FGIC Trustees have asserted claims for the refusal by RFC and/or GMAC Mortgage to repurchase, cure or

replace defective loans and failing to act in accordance with an affirmative covenants in the

Governing Agreements.  See, e.g., ResCap Claim ¶¶ 16-18.  Finally, FGIC and/or the FGIC

Trustees assert fact-specific claims for fraud.  See, e.g., ResCap Claim ¶ 28.

36.    After reviewing the FGIC Claims, the FGIC Trustees' Claims, the relevant

prepetition FGIC complaints and the Governing Agreements for the FGIC Insured Trusts, the

Debtors believe that they have defenses to those claims.  If forced to litigate, the Debtors would

mount a vigorous defense.  Nonetheless, given the fact-intensive nature of the claims asserted by

FGIC and the FGIC Trustees and the relatively novel legal issues involved, the ultimate outcome

of any such litigation would be uncertain.  See Lipps Decl. ¶¶ 27-139 (describing the complex

issues and varying outcomes in monoline insurer and trustee litigation).

37.    Although the resolution of disputes through litigation always involves some

measure of uncertainty, that is particularly true in the complex RMBS securitization context.  See

Lipps Decl. ¶ 26.  Such uncertainty of outcome in complex cases is an important consideration in

whether to approve a settlement.  See, e.g., In re Hibbard Brown & Co., 217 B.R. 41, 45 (Bankr.

S.D.N.Y. 1998) (approving settlement after finding that the multiple legal issues presented were

"complex" and carried "no guarantee of success"); In re Lehman Brothers Holdings, Inc., No.

08-13555 (Bankr. S.D.N.Y. Feb. 22, 2012) (approving the establishment of a $5 billion reserve,

pursuant to the terms of the debtors' plan of reorganization, for claims asserted by indenture

trustees arising out of RMBS sold by non-debtor affiliates).  In fact, as this Court has indicated,

"[u]ncertainty is usually what leads to negotiation and resolution."  Hearing Tr. at 30:23-24,

dated Sept. 11, 2012.  [Docket No. 1428].

38.    In negotiating the Settlement Agreement, the Settlement Parties each concluded,

based on their own assessments of the possibility of success of the litigation and the benefits of

the settlement, that allowance of certain portions of the FGIC Claims in connection with

settlement, discharge and release of FGIC's obligations under the Policies and a release of

additional claims against the Debtors by both FGIC and the FGIC Trustees, is in their respective

best interests.  The Debtors believe the Minimum Allowed Claim Amount, regardless of whether

the Global Plan Agreement is approved, is reasonable in light of FGIC and the FGIC Trustees'

releases of claims against each of the fifty-one (51) Debtors in varying amounts of up to

approximately $6.85 billion less the maximum claim FGIC is permitted to assert against that

Debtor.  See Kruger Decl. ¶¶ 24, 29.  Moreover, the Debtors believe that the Settlement

Agreement provides further benefit by stemming the potential accrual of additional FGIC claims,

and limiting the Debtors' down-side risk by capping the total claims that may ultimately be

asserted by FGIC and the FGIC Trustees.  See Kruger Decl. ¶¶ 15, 24.

39.    Meanwhile, to determine through litigation the precise amount of the FGIC

Claims and the FGIC Trustees' Claims being released based on the litany of allegations and

claims asserted would be a difficult task and would likely be the subject of intense and complex

litigation, with attendant litigation risk to all sides.  See Lipps Decl. ¶ 14.  Additionally, litigating

these claims would distract the Debtors from focusing on critical aspects of the restructuring,

including the plan confirmation process and resolving open issues with their other creditors.

Accordingly, the Debtors believe that it would be improvident in light of the circumstances of

these cases and the attempts by the Debtors to confirm a chapter 11 plan to incur the expense,

burden and delay incident to litigation of these claims.  See Kruger Decl. ¶ 24.  In the absence of

a settlement, litigating these claims would require substantial discovery, expert and lay testimony

and could further require a loan-by-loan analysis of whether the Debtors breached any of the

representations and warranties contained in the Governing Agreements.  Lipps Decl. ¶¶ 131,

140-41.

40.     In short, if litigated over the next several years, although the ultimate value of the

FGIC Claims and the FGIC Trustees' Claims being released could be more or less than the

Minimum Allowed Claim Amount, the administrative costs and uncertainty associated with

litigating the claims, as well as the limitation on down-side risk provided by the Settlement

Agreement, and the significant benefits of facilitating a global compromise that could

dramatically shorten the length, complexity and cost of these chapter 11 cases, make a settlement

a more efficient and reasonable way to deal with one of the Debtors' most significant creditors.

### B.     The Likelihood of Complex and Protracted Litigation

41.     If the FGIC Claims and the released FGIC Trustees' Claims are not resolved by

the Settlement Agreement, the Settlement Parties would incur significant time and expense to

litigate the Settlement Parties' claims with the likelihood of no better (and perhaps far worse)

outcome.  Indeed, these claims involve fact-intensive questions that could take years to litigate,

thereby delaying the implementation of a chapter 11 plan, increasing administrative costs and

tying up significant assets which would otherwise be available for distribution to creditors.  See

Lipps Decl. ¶ 4.

42.     RMBS breach of representation and warranty and fraudulent inducement claims

are extremely complex, and litigating these issues would be labor-intensive, costly and time-

consuming.  See Lipps Decl. ¶¶ 4, 26.  The discovery necessary to resolve these claims—along

with the various pleadings and hearings necessary for the Court to decide the allowed amount of

the FGIC Claims and the FGIC Trustees' Claims being released—would be massive, as each of

the forty-seven (47) FGIC Insured Trusts have different Governing Agreements and factual

underpinnings, especially with respect to the fraud claims.  See Kruger Decl. ¶ 27; Lipps Decl. ¶ 141.

43.    The Debtors have substantial pre-petition experience litigating with monoline insurance companies like FGIC regarding claims similar to those asserted in connection with the FGIC Insured Trusts.  ResCap's experience in *MBIA Insurance Corp. v. Residential Funding Company, LLC* illustrates the true enormity and difficulty of such litigation.  See Lipps Decl. ¶ 142.  In contrast to the forty-seven (47) trusts and hundreds of thousands of individual loans at issue here, MBIA's lawsuit against RFC involved just five trusts securitizing approximately 63,000 Alt-A home equity lines of credit or closed-end second mortgages brought to market over the course of less than one year.  Id. ¶ 143.  Yet, over the three and a half years from the filing of that action to the Petition Date, fact discovery had still not been completed.  Id.  By the Petition Date and the stay of that litigation, RFC had produced more than a million pages of documents, including loan files for more than 63,000 mortgage loans.  Id.  RFC had produced nearly one terabyte of data, including a variety of source code, other application data and back-end loan-level data relating to automated systems used in connection with underwriting, pricing, acquiring, pooling, auditing and servicing the mortgage loans.  Id.  Further, MBIA had taken over eighty days of depositions of current or former ResCap entity personnel.  Id. ¶ 144.  In turn RFC had taken fifty days of depositions of current or former MBIA personnel.  Id.  A number of third-party depositions had been taken, and the parties had exchanged ten expert reports without including rebuttal reports.  Id.  Litigation with FGIC and the FGIC Insured Trustees would involve the same issues and complexities but would be even more complicated and prolonged. Id. ¶ 146.

21

44.     At a time when the Debtors are attempting to fix the amount of the claims pool

and obtain confirmation of a chapter 11 plan expected to be supported by the overwhelming

majority of their claimant constituencies, FGIC's agreement to fix its claims and make a

contribution to the FGIC Insured Trusts will further the Debtors' goals without the need for

expensive and potentially drawn-out litigation.

### C.     The Paramount Interests of Creditors

45.     The Settlement Agreement is beneficial to the Debtors' estates and their creditors

because the proposed settlement is well within the range of reasonableness and will resolve a

significant claim against the Debtors' estates.  Settlement of the FGIC Claims and the vast

majority of the FGIC Trustees' Claims will cap the amount of the claims that may be asserted by

FGIC in connection with the FGIC Insured Trusts, cap the aggregate of all origination based

claims that may be asserted in connection with the FGIC Insured Trusts, result in an immediate

cash payment from FGIC to the FGIC Insured Trusts on account of the settlement, discharge and

release of FGIC's obligations under the Policies, and, most importantly, advance the Debtors'

efforts to confirm and effectuate a chapter 11 plan.  Increased certainty regarding the amount of

the FGIC Allowed Claims and a substantial reduction in the amount of the FGIC Trustees'

Claims will avoid the necessity to set aside large reserves to pay these claims, which could delay

(and reduce) recoveries to other stakeholders, including unsecured creditors.

46.     Litigation over these claims would burden the Debtors' estates with significant

legal expense and would almost certainly result in delays in distribution of the estates' assets to

creditors.  See Lipps Decl. ¶¶ 4, 140-41 (similar prepetition litigation indicates that cases could

drag on for years, and discovery burdens will be massive).  The Debtors' focus at this juncture of

the chapter 11 proceedings should be, and in fact is, on receiving approval of a disclosure

statement and confirming a chapter 11 plan.  The litigation over these claims would distract the

Debtors' limited personnel and professionals from more critical tasks, slow the Debtors'

emergence from bankruptcy, and potentially delay the distribution to creditors. For this reason

as well, the Debtors believe approval of the Settlement Agreement is in the best interest of their

creditors.

        **D.**      **The Proposed Settlement Satisfies the Remaining *Iridium* Factors**

      47.      For the reasons stated above, the Debtors believe that the paramount interest of all

parties is best served by approval of the Settlement Agreement. Moreover, the remaining

Iridium factors are also satisfied. The Settlement Agreement is supported by the Creditors'

Committee and each of the other parties to the Global Plan Agreement. Kruger Decl. ¶ 31.

Collectively, these entities hold or represent the holders of the overwhelming majority of claims

asserted in the Debtors' chapter 11 cases. Id. The Settlement Agreement was negotiated by

sophisticated counsel without collusion, in good faith, and from arm's-length bargaining

positions. Additionally, the releases of the Debtors' officers and directors in the Settlement

Agreement are reasonable and consistent with releases in settlement agreements approved in

other cases in this district, providing only for voluntary releases by the non-debtor Settlement

Parties. See, e.g., In re Marco Polo Seatrade B.V., Case No. 11-13634 (JMP) (Bankr. S.D.N.Y.

June 11, 2012) [Docket No. 510]. As noted above, the negotiations over the amount of the FGIC

Allowed Claims, the Settlement Payment and the scope of the releases provided by FGIC and the

FGIC Trustees was the subject of arm's length negotiations by all parties involved and part of the

overall resolution process overseen by Judge Peck.

**ADDITIONAL RELIEF REQUESTED**

      48.      The Settlement Agreement contemplates that the order approving the Agreement

will contain affirmative findings in connection with the FGIC Trustees' entry into the Settlement

23

Agreement.[18]  Settlement Agreement § 1.03.  Accordingly, this Motion also seeks a finding from the Court, *inter alia*, that the relief requested herein is in best interests of the investors in each FGIC Insured Trust, each such FGIC Insured Trust, the FGIC Trustees and all other parties. Moreover, this Motion seeks a finding from the Court that the FGIC Trustees have acted reasonably, in good faith and in the best interests of the investors in each FGIC Insured Trust and that each such FGIC Insured Trust in agreeing to the Agreement.

49.     Finally, this Motion requests a finding from the Court that the notice of the Settlement Agreement, including the FGIC Trustees' notice of the same, is sufficient and effective in satisfaction of federal and state due process requirements and other applicable law to put the parties in interest in these chapter 11 cases and others, including the investors in each FGIC Trust, on notice of the Settlement Agreement.

## CONCLUSION

50.     The Debtors have determined, exercising their business judgment that the terms of the Settlement Agreement are fair, equitable and eminently reasonable to the Debtors' estates and creditors, thereby satisfying the standards of Bankruptcy Rule 9019.  The timely resolution of the FGIC Claims serves the best interests of the Debtors and their creditors.  The Debtors therefore submit that the settlement is fair and well within the range of reasonableness—and certainly not "below the lowest point in the range of reasonableness."  W.T. Grant Co., 699 F.2d at 608.  Accordingly, the Debtors respectfully request that the Court approve the Settlement Agreement pursuant to Bankruptcy Rule 9019.

---

[18] The Debtors understand that the FGIC Trustees intend to provide evidence to support certain findings in the proposed order.

## NOTICE

51.     Notice of this Motion has been provided in accordance with the Case

Management Procedures Order, entered by this Court on May 23, 2012 [Docket No. 141].

## NO PRIOR REQUEST

52.     Except as otherwise noted herein, no prior application for the relief requested

herein has been made to this Court or any other court.

**WHEREFORE**, the Debtors respectfully request the entry of the Proposed Order

granting the relief requested herein and such other and further relief as the Court may deem just

and proper.


Dated: New York, New York
          June 7, 2013

                                        Respectfully submitted,

                                        /s/ Gary S. Lee
                                        Gary S. Lee
                                        J. Alexander Lawrence
                                        Kayvan B. Sadeghi
                                        James A. Newton
                                        MORRISON & FOERSTER LLP
                                        1290 Avenue of the Americas
                                        New York, New York 10104
                                        Telephone: (212) 468-8000
                                        Facsimile: (212) 468-7900

                                        *Counsel for the Debtors
                                        and Debtors in Possession*