# Exhibit 3

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Case No. 12-12020 (MG) |
| | ) | |
| RESIDENTIAL CAPITAL, LLC, et al., | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

**DECLARATION OF LEWIS KRUGER IN SUPPORT OF DEBTORS'
MOTION PURSUANT TO FED. R. BANKR. P. 9019 FOR APPROVAL
OF THE SETTLEMENT AGREEMENT AMONG THE DEBTORS, FGIC,
THE FGIC TRUSTEES AND CERTAIN INSTITUTIONAL INVESTORS**

I, Lewis Kruger, under penalty of perjury, declare as follows:

1.  I am the Chief Restructuring Officer ("**CRO**") of the above-captioned debtors and debtors in possession (collectively, the "**Debtors**"). I am authorized to submit this declaration (the "**Declaration**") in support of the *Debtors' Motion Pursuant to Fed. R. Bank. P. 9019 for Approval of the Settlement Agreement Among the Debtors, Financial Guaranty Insurance Company, the FGIC Trustees and Certain Institutional Investors* (the "**Motion**"), filed contemporaneously herewith.

2.  I offer this Declaration to show that the Settlement Agreement, dated May 23, 2013 (the "**Settlement Agreement**"), represents a fair and reasonable compromise in connection with certain claims held by Financial Guaranty Insurance Company ("**FGIC**") and the FGIC Trustees[1] and to attest that the Debtors negotiated the Settlement Agreement at arm's-length and without undue influence or coercion by any party. Except as otherwise noted, I have personal

---

[1] The "**FGIC Trustees**" include The Bank of New York Mellon, The Bank of New York Mellon Trust Company, N.A., Law Debenture Trust Company of New York, U.S. Bank National Association and Wells Fargo Bank, N.A., each solely in their respective capacities as trustees, indenture trustees or separate trustees for certain FGIC Insured Trusts (as defined below).

ny-1092361                                                      1

knowledge of the matters set forth herein.  If I were called to testify as a witness in this matter, I would testify competently to the facts set forth herein.

## BACKGROUND

3.      On February 11, 2013, I was appointed by the Debtors to serve as CRO and spearhead the plan formulation process.  On the same day, the Debtors filed the *Debtors' Motion Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code for an Order Authorizing the Debtors to Appoint Lewis Kruger as Chief Restructuring Officer* [Docket No. 2887].[2]  My appointment contemplated that I would "make decisions on behalf of each Debtor with respect to chapter 11 plan negotiations and formulation, in such a manner as is consistent with the business judgment rule, the provisions of applicable law, taking into account the respective fiduciary duties of the CRO to each Debtor's respective estate."  *See* Amendment 1.  On March 5, 2013, the Court entered an order approving my appointment in accordance with the terms of Amendment 1.  [Docket No. 3103].

4.      Prior to my appointment as CRO, I was a partner and Co-Chair of the Financial Restructuring Group at Stroock & Stroock & Lavan LLP, a law firm that has extensive experience in all aspects of restructuring and insolvency matters.  I have over fifty years of restructuring experience.  I have played a role in many significant reorganization proceedings in the United States, representing debtors, official and ad hoc creditors' committees, financial institutions and acquirers of assets.

5.      In my capacity as CRO, I am generally familiar with the parties' respective positions regarding the priority and nature of the various claims asserted against the Debtors in these chapter 11 cases (including the claims asserted by FGIC, the other monoline insurers and

---

[2] The scope of my authority was modified pursuant to Amendment 1 to the Engagement Letter.  A copy of Amendment 1 to the Engagement Letter was filed with the Court on March 1, 2013 [Docket No. 3074].

ny-1092361                                            2

the FGIC Trustees), as well as the terms of the Settlement Agreement negotiated between the Debtors, FGIC, the FGIC Trustees and certain Institutional Investors[3] (collectively, the "**Settlement Parties**").

6.    Because the monoline insurers represent one of the largest creditor groups in the Debtors' bankruptcy cases, resolution of the monoline claims has been a critical factor in formulation of a chapter 11 plan and a central focus of my work as CRO.  In connection with working to formulate a chapter 11 plan, I participated in analyzing the validity, priority and amount of any claims asserted by the monoline insurers, including FGIC, as well as the implications of the Bankruptcy Code on the treatment of monoline insurers' claims.  I have also been involved in the process of (i) seeking discovery in connection with claims filed by FGIC and MBIA Insurance Corp. ("**MBIA**"), (ii) preparing objections to the claims filed by certain monoline insurers and (iii) planning for anticipated litigation regarding the monolines' claims.

7.    I was also involved in the plan negotiations with the Creditors' Committee and many of the Debtors' major creditor constituencies, as well as entry into the Plan Support Agreement (the "**Plan Support Agreement**") and Plan Term Sheet (the "**Plan Term Sheet**"), dated as of May 13, 2013, among the Debtors, the Creditors' Committee and the Supporting Parties (as defined in the Plan Support Agreement), and the Supplemental Term Sheet dated as of May 23, 2013 (the "**Supplemental Term Sheet**" and, together with the Plan Support Agreement and the Plan Term Sheet, the "**Global Plan Agreement**").

---

[3] The "**Institutional Investors**" include the Steering Committee Consenting Claimants and the Talcott Franklin Consenting Claimants (each as defined below).  Counsel for the Talcott Franklin Consenting Claimants agreed to use Best Efforts (as defined in the Plan Support Agreement (as defined below)) to obtain consent to the Settlement Agreement from the investors he represents.

ny-1092361                                      3

## THE FGIC CLAIMS

8.  As part of the Debtors' mortgage servicing and origination businesses, Debtors GMAC Mortgage, LLC ("**GMAC Mortgage**") and Residential Funding Company, LLC ("**RFC**") acted as Sponsor, Depositor, Master Servicer, Primary Servicer, or Subservicer in connection with transactions (the "**RMBS Transactions**") involving the securitization of residential mortgages through securitization trusts. In conjunction with their various roles in the RMBS Transactions, certain of the Debtors were parties to the applicable Pooling and Servicing Agreements, Assignment and Assumption Agreements, Indentures, Mortgage Loan Purchase Agreements and/or other agreements governing the creation and operation of the FGIC Insured Trusts (as defined below) (the "**Governing Agreements**").

9.  FGIC, a monoline financial guaranty insurance company, issued irrevocable insurance policies (the "**Policies**") for certain Securities (as defined in the Settlement Agreement) issued in connection with certain of the securitization trusts (the "**FGIC Insured Trusts**") associated with the RMBS Transactions. By issuing the Policies, FGIC guaranteed the payment of principal and interest due on the insured Securities. Additionally, FGIC entered into an Insurance and Indemnity Agreement with one or more of the Debtors in connection with each of the FGIC Insured Trusts (the "**Insurance Agreements**"). Pursuant to the Insurance Agreements, the Debtor party agreed, among other things, to reimburse FGIC for certain payments FGIC made under the Policies that resulted from the applicable Debtor's failure to repurchase or substitute mortgage loans that breached one or more representations or warranties contained in the applicable Governing Agreements.

10. Beginning on November 29, 2011 and prior to the Petition Date, FGIC initiated a total of twelve civil suits asserting a variety of claims against ResCap, GMAC Mortgage, and RFC in connection with twenty (20) of the FGIC Insured Trusts. The actions are currently

pending in the United States District Court for the Southern District of New York, and each action has been stayed as against the Debtors as of the Petition Date. As of the Petition Date, the Debtors had not yet filed responsive pleadings or commenced discovery in any of the FGIC actions.

11. Relying on its allegations in the prepetition lawsuits, FGIC filed three proofs of claim numbered 4868, 4870 and 4871 against Debtors RFC, ResCap and GMAC Mortgage, respectively (collectively, the "**FGIC Claims**") asserting general unsecured claims against such Debtors. The FGIC Claims, all substantially similar in form and nature, allege that: (i) RFC and GMAC Mortgage breached various representations, warranties and/or covenants in the Governing Agreements or the offering documents, (ii) FGIC was fraudulently induced to issue the Policies in connection with most of these FGIC Insured Trusts and (iii) ResCap is liable for the alleged breaches and fraud of GMAC Mortgage and RFC under alter ego liability theory. FGIC also asserts claims related to the Debtors' allegedly deficient servicing of the mortgage loans in the FGIC Insured Trusts and based on the Debtors' alleged failure to provide FGIC access to certain information in accordance with the Governing Agreements. FGIC further seeks indemnification for "any and all claims, losses, liabilities, demands, damages, costs, or expenses of any nature arising out of or relating to the breach" of the Governing Agreements.

12. In total, the FGIC Claims assert claims of "not less than $1.85 Billion"[4] against each of RFC, ResCap and GMAC Mortgage. It is my understanding that the aggregate amount of each of the FGIC Claims was calculated by FGIC taking its calculation of the total expected

---

[4] It is my understanding that as of November 2009, pursuant to an order issued by the Superintendent of Financial Services of New York under Section 1310 of the New York Insurance Law, dated November 24, 2009, FGIC ceased making payments on all claims, including claims made under the Policies. As of that date, FGIC represents that it had paid approximately $343.3 million in claims to the insureds under the Policies. As of March 31, 2013, FGIC represents that it had received approximately $789 million in claims under the Policies that it had not yet paid. Absent the settlement, discharge and release of FGIC's obligations under the Policies, FGIC estimates that the present value of losses projected to arise under the Policies in the future exceed $400 million.

ny-1092361                                          5

lifetime claims against it under the Policies and adding estimated interest and estimated costs incurred in pursuing the claims.  I further understand that the total expected claims included historical claims received plus the present value of the difference of (i) the projected expected future claims less (ii) expected future premiums.

### THE RMBS TRUSTS' CLAIMS IN CONNECTION WITH THE FGIC TRANSACTIONS

13.    In addition to and separate from the claims related to the twenty (20) FGIC Insured Trusts addressed in the FGIC prepetition litigation, the FGIC Trustee's claims (the "**FGIC Trustees' Claims**") include claims against the Debtors in connection with an additional twenty-seven (27) FGIC Insured Trusts.  The Settlement Agreement governs each of these forty-seven (47) FGIC Insured Trusts.  In their proofs of claim, the FGIC Trustees assert that the FGIC Insured Trusts possess, among other things, breach of contract and tort claims arising out of the representations and warranties contained in the Governing Agreements.  The FGIC Trustees have maintained throughout the case that, in the absence of the proposed RMBS Settlement, their asserted claims against each of multiple Debtors in connection with the FGIC Insured Trusts could be equal to the aggregate estimated lifetime reductions in the value of the collateral pools underlying the these trusts—*i.e.* the estimated lifetime collateral losses of the FGIC Insured Trusts.  I understand that Dr. D'Vari has estimated the aggregate of such claims to be approximately $5.41 billion.

### THE FGIC SETTLEMENT

14.    Following the Court's appointment of United States Bankruptcy Judge James M. Peck as mediator, and months of arm's-length negotiations, the Debtors' and most of their claimant constituencies reached a broad settlement set forth in the Global Plan Agreement.  The Settlement Agreement represents a critical component of the Global Plan Agreement.  In fact,

obtaining approval of the Settlement Agreement by the Supreme Court of the State of New York overseeing FGIC's rehabilitation proceeding by August 19, 2013 is a milestone contained in the Plan Term Sheet, and failure to achieve any milestone is a termination event under the Plan Support Agreement. Absent approval of the Court of this Motion, that milestone will in all likelihood not be reached, thereby triggering a termination event with respect to the Global Plan Agreement, which the Debtors and most of their claimant constituencies negotiated with Judge Peck's assistance.

15.    In early April 2013, in connection with the mediation process overseen by Judge Peck, certain of the Settlement Parties outlined the financial terms of a potential settlement among the Debtors, FGIC and the FGIC Trustees, which would resolve a number of disputes regarding the validity, amount and priority of the FGIC Claims. In addition, the proposed settlement would stem the alleged accrual of the FGIC Claims by preventing the FGIC Insured Trusts from continuing to present insurance claims to FGIC and, consequently, increasing the size of the indemnification and rescissory damages claims to which FGIC asserts it is entitled. The negotiated terms of the proposed settlement were ultimately incorporated into an agreement among the Debtors and a substantial majority of their major claimant constituencies, embodied in the Global Plan Agreement, setting forth the primary terms of a chapter 11 plan that will have the support of the parties to the Global Plan Agreement.

16.    Concurrently with the negotiations leading up to the completion of the Supplemental Term Sheet, the Settlement Parties negotiated the terms of a settlement involving FGIC and the FGIC Trustees that was acceptable to all of the Settlement Parties and supported by many of the Debtors' claimant constituencies, including each of the parties to the Global Plan Agreement. The resulting Settlement Agreement consists of three main parts: (i) the settlement,

ny-1092361                                7

discharge and release of FGIC's obligations under the Policies in exchange for a bulk, cash payment of $253.3 million from FGIC to the FGIC Trustees; (ii) allowance of the FGIC Claims against certain of the Debtors' estates in the minimum aggregate amount of $596.5 million (the "**Minimum Allowed Claim Amount**"),[5] subject to FGIC's reservation of its rights to assert certain additional claims and the allowance of FGIC's claims in a larger amount pursuant to the Global Plan Agreement and (iii) the release against the Debtors' estates of the remainder of the FGIC Claims and the vast majority of the FGIC Trustees' Claims.

    A.    **The Settlement, Discharge and Release of FGIC's Obligations Under the Policies**

17. The first element of the Settlement Agreement is a settlement, discharge and release of FGIC's obligations under the Policies. In this regard, FGIC will obtain releases of its obligations under the Policies, in exchange for a bulk, cash payment from FGIC to the FGIC Trustees in an amount of up to $253.3 million (the "**Settlement Payment**"). Upon the effective date of the Settlement Agreement, this settlement, discharge and release will prevent any further claims against FGIC under the Policies, ending any further accrual of claims FGIC alleges it holds against the Debtors.

    B.    **The FGIC Allowed Claims**

18. The next key component of the Settlement Agreement is the allowance of the FGIC Claims in an amount significantly less than the total asserted amount of the FGIC Claims. Ultimately, the amount of the FGIC Allowed Claims depends on whether the Plan Support Agreement is approved and the plan contemplated thereby ultimately becomes effective.

---

[5] The Settlement Parties calculated this base $596.5 million allowed claim by taking the sum of (i) $343.2 million, the amount of claims FGIC has paid under the Policies that allegedly remains unreimbursed by the Debtors; and (ii) $253.3 million, the amount of the Settlement Payment.

ny-1092361        8

19.     If the Court approves the Plan Support Agreement, and the chapter 11 plan contemplated thereby becomes effective, the amount of the FGIC Allowed Claims will be the aggregate and allocated amounts set forth in the Supplemental Term Sheet, as such amounts may be adjusted, amended or revised by agreement of the parties to such agreement.  The Supplemental Term Sheet currently provides that the FGIC Claims will be allowed against ResCap in the amount of $337.5 million, GMAC Mortgage in the amount of $181.5 million and RFC in the amount of $415 million, which is projected to yield a recovery of approximately $206.5 million (as set forth in Annex I to the Supplemental Term Sheet).

20.     On the other hand if the Plan Support Agreement is not approved or terminates in accordance with its terms, or the chapter 11 plan contemplated thereby does not become effective, the FGIC Claims will be allowed in the Minimum Allowed Claim Amount, allocated among ResCap, RFC, and GMAC Mortgage pro rata based on which of the Debtors would be contractually obligated to reimburse FGIC for such payments under the Governing Agreements, and not based upon FGIC's alter ego or aiding and abetting or similar claims.[6]  Under this scenario, the Minimum Allowed Claim Amount will be treated *pari passu* with other unsecured claims allowed against ResCap, GMAC Mortgage and RFC.  FGIC will further retain its rights to assert a general unsecured claim against each of ResCap, GMAC Mortgage and RFC, however in each case FGIC's asserted claim against each Debtor will be capped at $596.5 million (which cap includes any portion of the Minimum Allowed Claim Amount allocated to such Debtor).  However, nothing in the Settlement Agreement precludes the Settlement Parties from objecting

---

[6] In other words, the portion of the FGIC Claims allowed against GMAC Mortgage should be equal to the sum of (i) the amount of the claims previously paid by FGIC to FGIC Insured Trusts under Policies associated with an Insurance Agreement to which GMAC Mortgage is a signatory, and (ii) the amount of the Settlement Payment attributable to such FGIC Insured Trusts.  A similar calculation should apply with respect to the amount of the FGIC Claims allowed against ResCap and RFC.

ny-1092361                                            9

to or otherwise seeking subordination of any unsecured claims asserted by FGIC in excess of the Minimum Allowed Claim Amount.

### C.  Release of Claims Against the Debtors

21. Subject to the terms and conditions of the Settlement Agreement described above, FGIC has agreed to a reduction of its asserted $5.55 billion in claims ($1.85 billion against each of ResCap, GMAC Mortgage and RFC) to the Minimum Allowed Claim Amount or the claim amount set forth in the Supplemental Term Sheet.  Additionally, pursuant to the Settlement Agreement, the FGIC Insured Trusts will release a portion of their claims, as set forth in more detail in the D'Vari Declaration.  The FGIC Trustees' Claims being released will be equal to the aggregate of all origination-based claims the FGIC Trustees have asserted in connection with the FGIC Insured Trusts, less the amount of any claims under the Governing Agreements for any past or future losses to holders of Securities not insured by the Policies.  In sum, each of the Debtors will obtain a release of claims, in varying amounts of up to approximately $6.85 billion less the maximum claim FGIC is permitted to assert against that Debtor,[7] in exchange for allowed claims in favor of FGIC that are substantially less than the asserted amount of the FGIC Claims and a cash payment of $253.3 million *from FGIC* to the FGIC Trustees.

---

[7] Both the FGIC Trustees and FGIC have asserted claims against each of ResCap, GMAC Mortgage and RFC, with the aggregate of the claims asserted against each of these three entities by FGIC and the FGIC Trustees estimated at $6.85 billion.  Under the Global Plan Agreement, FGIC would retain a claim of $181.5 million against GMAC Mortgage, resulting in a release of claims against GMAC Mortgage of approximately $6.67 billion.  The claims released against each of the other Debtors, including ResCap and RFC, would be less than this amount.  If the Plan Support Agreement is not approved or the plan contemplated by the Global Plan Agreement does not become effective, FGIC would retain the right to assert claims of $596.5 million against each of ResCap, GMAC Mortgage and RFC.  Accordingly, in that scenario, the minimum amount of claims being released against any one Debtor would by approximately $6.25 billion, with a portion of the remaining claim subject to objection and/or subordination.

# THE IRIDIUM FACTORS

A. **The Balance Between the Litigation's Possibility of Success and the Settlement Agreement's Future Benefits**

22. It is my understanding that significant uncertainty exists regarding the outcome of litigation regarding the validity, priority and amount of the FGIC Claims and the FGIC Trustees' Claims through the claims resolution process. In part due to this uncertainty, I, along with the Debtors, believe that the Settlement Agreement provides substantial benefits to the Debtors' creditors and their estates.

23. After reviewing the FGIC Claims, the FGIC Trustees' Claims, the relevant prepetition FGIC complaints and the Governing Agreements for the FGIC Insured Trusts, the Debtors believe that they have strong defenses to those claims. If forced to litigate, the Debtors would mount a vigorous defense. Nonetheless, I understand that the issues that would be involved in litigating the FGIC Claims and/or the FGIC Trustees' Claims are likely to be fact-intensive in nature and the legal issues involved relatively novel. Accordingly, I, along with the Debtors, understand that such litigation would involve litigation risk. In fact, I understand that the results of litigation among other mortgage originators and monoline insurers and/or securitization trustees have resulted in some unfavorable outcomes for mortgage originators. As a result, the Debtors and I believe that they would face substantial litigation uncertainty in connection with litigating these issues.

24. On the other hand, I, along with the Debtors believe that the Settlement Agreement provides substantial benefits to their estates and their creditors. In particular, the Settlement Agreement provides benefits in the form of (i) a reduction of claims asserted against each of the Debtors' estates in varying amounts up to $6.85 billion less the maximum claim FGIC is permitted to assert against that Debtor (as described above), (ii) increased certainty

regarding the validity, priority and amount of the FGIC Claims and the FGIC Trustees' Claims and (iii) substantial cost savings when compared with the likely costs of professional fees and experts associated with litigation over the FGIC Claims the FGIC Trustees' Claims being released.

      **B.**    **The Likelihood of Complex and Protracted Litigation**

25.    The ongoing disputes in recent years among mortgage originators on the one hand, and monoline insurers and securitization trustees on the other, are well publicized. A number of the lawsuits and other proceedings involving RMBS breach of representation and warranty and fraudulent inducement allegations against mortgage originators have been ongoing for years, in many cases without resolution. Indeed, as of the Petition Date, the Debtors were involved in litigation with MBIA that had been pending since late 2008.

26.    The Debtors litigation with FGIC, on the other hand, commenced shortly before the Petition Date. As of the Petition Date, the Debtors had not yet filed responsive pleadings and discovery had not yet commenced. Similarly, I am not aware of any lawsuits commenced by the FGIC Trustees as of the Petition Date in connection with the breach of representation and warranty claims related to the FGIC Insured Trusts. As a result, absent a settlement, the Debtors are almost certain to become embroiled in lengthy litigation with FGIC and the FGIC Trustees over the validity, amount and possible subordination of their asserted claims.

27.    Given the highly fact intensive nature of RMBS litigation, the litigation is also almost certain to be complex and protracted. As described further in the Lipps Declaration, the Debtors have experienced such litigation first-hand with MBIA, which spanned three and a half years leading up to the Petition Date. The discovery necessary to resolve the FGIC Claims and the FGIC Trustees' Claims—along with the various pleadings and hearings necessary for the Court to decide the allowed amount of the FGIC Claims and the FGIC Trustees' Claims being

ny-1092361                    12

released—would be massive, as each of the forty-seven (47) FGIC Insured Trusts have different Governing Agreements and factual underpinnings, especially with respect to the fraud claims.

28.     In sum, litigation regarding the validity, amount and priority of the FGIC Claims, as well as the FGIC Trustees Claims' being released, would almost certainly be exceedingly complex and could drag on for years, much like other lawsuits of a similar nature that are currently pending in other state and federal courts.  Finally, as with any other complex litigation that extends for years, the expenses associated with any litigation of the FGIC Claims and the FGIC Trustees Claims' being released would almost certainly be high, inconvenient and, given the asserted size of those claims, could result in a delay of distributions to other creditors even in the event of a confirmed chapter 11 plan.

    **C.     The Paramount Interests of Creditors**

29.     As described above, the Settlement Agreement resolves substantial claims against the Debtors' estates—in varying amounts of up to $6.85 billion less the maximum claim FGIC is permitted to assert against that Debtor (as described above), in the aggregate against each of the Debtors.  Obtaining the releases in the Settlement Agreement involves providing consideration to FGIC and the FGIC Trustees as part of a trilateral agreement.  FGIC will receive the Minimum Allowed Claim Amount or the claim amounts set forth in the Supplemental Term Sheet, as described above.  The FGIC Trustees will receive cash compensation *from FGIC*.  The Debtors receive releases from both FGIC and the FGIC Trustees.  As a result, relatively few claims against the Debtors will remain in connection with the FGIC Insured Trusts, including (i) the Minimum Allowed Claim Amount (subject to the reservations of rights described above) or the claim amounts set forth in the Supplemental Term Sheet, (ii) certain servicing claims held by the FGIC Trustees, and (iii) claims attributable to losses by holders of Securities not insured by the

ny-1092361                                     13

Policies. I, along with the Debtors, believe that the Settlement Agreement represents a compromise that is in the paramount interests of creditors.

### D.  The Remaining Iridium Factors

30. I, along with the Debtors, also believe that the other *Iridium* factors are satisfied.

#### 1.  Support of Other Parties-in-Interest for the Settlement Agreement

31. Each of the Debtors' claimant constituencies that have signed on to the Global Plan Agreement also support the Settlement Agreement, including:

(a) the Creditors' Committee;

(b) Ally Financial Inc., on behalf of itself and its direct and indirect non-debtor subsidiaries;

(c) Allstate Insurance Company and its subsidiaries and affiliates;

(d) American International Group, as investment advisor for certain affiliated entities that have filed proofs of claim in the Debtors' chapter 11 cases;

(e) the Kessler Class Claimants (as defined in the Plan Support Agreement);

(f) Massachusetts Mutual Life Insurance Company and its subsidiaries and affiliates;

(g) MBIA Insurance Corporation and its subsidiaries and affiliates;

(h) Prudential Insurance Company of America and its subsidiaries and affiliates;

(i) certain funds and accounts managed by Paulson & Co. Inc., holders of Senior Unsecured Notes issued by ResCap;

(j) the RMBS Trusts (as defined in the Plan Support Agreement);

(k) certain holders of the Senior Unsecured Notes issued by ResCap;

(l) the Steering Committee Consenting Claimants (as defined in the Plan Support Agreement);

(m) the Talcott Franklin Consenting Claimants (as defined in the Plan Support Agreement); and

(n) Wilmington Trust, National Association, not individually, but solely in its capacity as Indenture Trustee for the Senior Unsecured Notes issued by ResCap.

Collectively, these entities hold or represent the holders of the overwhelming majority of claims asserted in the Debtors' chapter 11 cases.

### 2. Nature and Breadth of Releases To Be Obtained by Officers and Directors

32. In my view, the releases of the Debtors' officers and directors in the Settlement Agreement are reasonable and, based on my understanding, consistent with releases in settlement agreements approved in other cases in this district, providing only for voluntary releases by the non-debtor Settlement Parties.

### 3. Competency and Experience of Counsel

33. All of the Settlement Parties were represented by competent and experienced counsel throughout the negotiation of the FGIC Settlement Agreement. I personally have over fifty years of experience as a practicing attorney in restructuring matters. The Debtors were represented by competent and experienced counsel at Morrison & Foerster LLP. In my view, the Superintendent of Financial Services of New York, as Rehabilitator of FGIC; the Bank of New York Mellon; the Bank of New York Mellon Trust Company, N.A.; Law Debenture Trust Company of New York; U.S. Bank National Association; Wells Fargo Bank, N.A.; the Steering Committee Consenting Claimants and the Talcott Franklin Consenting Claimants were all represented by competent and experienced counsel.

### 4. Arm's-Length Negotiations

34. As indicated above and in my declaration in support of the Plan Support Agreement Motion, the negotiation and mediation process from which the Agreement and the Settlement Agreement resulted were hard-fought. This settlement was part of the overall resolution process overseen by Judge Peck. Each of the parties involved were represented by sophisticated counsel who negotiated vigorously on behalf of their respective constituencies.

Accordingly, I, along with the Debtors, believe that the Settlement Agreement was the result of arm's-length bargaining.

## **CONCLUSION**

35.     Based on all of the factors described above, I conclude that settlement on the terms set forth in the FGIC Settlement Agreement is fair and well within the range of reasonableness and certainly not below the lowest point in the range of reasonableness.

*[signature page follows]*

I declare under penalty of perjury that the foregoing is true and correct.

Executed the 7th day of June, 2013, at New York, New York.

                                              /s/ Lewis Kruger
                                                      Lewis Kruger

*Signature Page to Declaration of Lewis Kruger in Support of Debtors' Motion Pursuant to Fed. R. Bank. P. 9019 for Approval of the Settlement Agreement Among the Debtors, Financial Guaranty Insurance Company, the FGIC Trustees and Certain Institutional Investors*