# Exhibit 4

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------------------------------

|  |  |  |
|---|---|---|
| In re: | ) | Case No. 12-12020 (MG) |
|  | ) |  |
| RESIDENTIAL CAPITAL, LLC, et al., | ) | Chapter 11 |
|  | ) |  |
| Debtors. | ) | Jointly Administered |
|  | ) |  |

--------------------------------------------------------------------

### DECLARATION OF JEFFREY A. LIPPS IN SUPPORT OF DEBTORS' MOTION PURSUANT TO FED. R. BANKR. P. 9019 FOR APPROVAL OF THE SETTLEMENT AGREEMENT AMONG THE DEBTORS, FGIC, THE FGIC TRUSTEES, AND CERTAIN INSTITUTIONAL INVESTORS

I, Jeffrey A. Lipps, under penalty of perjury, declare as follows:

1.     I am an expert in the litigation of complex commercial disputes, with specific subject matter expertise in the body of law that has developed in disputes regarding the sale of residential mortgage-backed securities ("RMBS").

2.     I am a partner with Carpenter Lipps & Leland LLP, which, since 2010, has been the primary counsel representing certain of the Debtors in RMBS litigation, including litigation brought by monoline insurers.

3.     I submit this Declaration at the request of the Debtors.

### SUMMARY OF TESTIMONY

4.     I have formed the following opinions concerning the Debtors' motion for approval of the Settlement Agreement, entered into May 23, 2013 between Residential Capital LLC and certain of its direct and indirect subsidiaries (collectively, the "Debtors"), Financial Guaranty Insurance Company ("FGIC"), certain institutional investors (the "Investors") and The Bank of New York Mellon, The Bank of New York Mellon Trust Company, N.A., Law Debenture Trust Company of New York, U.S. Bank National Association and Wells Fargo Bank

N.A. (the "FGIC Trustees") for 47 separate securitizations with securities insured by FGIC (each

a "FGIC Insured Trust" and collectively, the "FGIC Insured Trusts") (the "FGIC Settlement

Agreement"):

- *Legal Uncertainty*:  The liabilities to be released under the settlement relate to claims
  that pose unique legal and evidentiary challenges, many of which have not fully
  developed in a definitive way in the case law to date, and none of which has been
  litigated to resolution with respect to the Debtors specifically, such that there is
  considerable uncertainty and risk in the outcome.

- *Expense of Resolution*:  In addition to the uncertainty in the outcome, resolving the
  claims and liabilities covered by the FGIC Settlement Agreement would be
  enormously expensive.  I was personally involved in years of prepetition litigation
  concerning the Debtors' securitizations, which showed that simply completing the
  discovery that would be required to resolve these claims would require substantial
  time and resources.  A trial to resolve these claims would also be enormously
  expensive and complex.

## SUMMARY OF QUALIFICATIONS

5.      I am a partner with Carpenter Lipps & Leland LLP, 280 Plaza, Suite 1300, 280

North High Street, Columbus, Ohio 43215 (the "Firm").

6.      I have over thirty years' experience as a trial lawyer representing and counseling

clients in complex commercial litigation matters, including commercial disputes, class action

litigation, securities litigation, procurement matters, and bankruptcy litigation.  I have handled

cases in state and federal courts in over a dozen states.  I was a partner at Jones Day before

becoming a founding partner in the Firm, which is a litigation boutique with a national practice.

7.      I currently represent or have represented over the past several years a number of

the debtor entities, including Residential Capital LLC ("ResCap"), Residential Funding Co.,

LLC ("RFC"), and GMAC Mortgage, LLC ("GMACM"), four non-debtor affiliated entities, and

several individual former directors and officers of debtor entities in over a dozen separate

lawsuits involving certain debtor entities' issuance of RMBS.  I have been representing various

defendants in these matters since the spring of 2010.

8.      Among the suits in which I represented the Debtors in prepetition litigation were

the twelve cases brought by FGIC against various debtors and affiliated entities (involving

twenty securitizations, and coordinated before Judge Crotty under the lead case *Financial*

*Guaranty Insurance Co. v. GMAC Mortgage, LLC*, No. 11-CV-09729-PAC (S.D.N.Y.)).  I had

also represented the Debtors in *MBIA Insurance Corp. v. Residential Funding Co., LLC*, No.

603552/2008 (Sup. Ct., N.Y. Cnty.) (involving five securitizations), and *MBIA Insurance Corp.*

*v. GMAC Mortgage, LLC*, No. 600837/2010 (Sup. Ct., N.Y. Cnty.) (involving three

securitizations).  Each of these cases involved claims of breaches of representations and

warranties, and related claims of alleged failure to repurchase loans pursuant to the terms of the

applicable contracts.  Our Firm was counsel of record in all of these cases.

9.      In addition, prepetition the Debtors frequently called upon me and my Firm to

evaluate various issues relating to repurchase demands or alleged breaches of representations and

warranties that were not yet in litigation.

10.     My Firm has also been retained as special litigation counsel in these bankruptcy

cases.  Among the litigation matters for which we were retained was to litigate monoline proofs

of claim.  In connection with those matters, we analyzed the proofs of claim filed by FGIC and

the other monolines and actively participated in developing the strategy to litigate monoline

proofs of claim.  We collaborated with Morrison & Foerster LLP ("Morrison & Foerster") in

making initial document requests to FGIC and responding to FGIC's initial document requests to

the Debtors.  In connection with the court appointed examiner's investigation of the Debtors, my

firm was also asked by Morrison & Foerster to assist in responding to the examiner's questions

3

regarding the Debtors' securitization processes, and his request for submissions regarding the

validity of various third-party claims.  These included claims that were or would have been

asserted by the monolines, trustees, and various investors.

11.     I was also proffered by the Debtors as an expert witness in the planned hearing on

the Debtors' motion under Bankruptcy Rule 9019 to approve two settlements regarding the

Debtors' contractual liabilities to securitization trusts formed between 2004 and 2007, which

involved potential liabilities substantially identical to those at issue here.

12.     As part of our Firm's representation of the Debtors in these matters, I have

conducted extensive factual and legal analysis of the claims and defenses in these types of

"representation and warranty" cases, monitored the development of the law around the country in

this area of the law, and assessed the Debtors' exposure in these types of cases.  This analysis has

included close review of the publicly available papers relating to settlements of representation

and warranty claims involving monoline insurers, as well as the Bank of America and Lehman

Brothers settlements of representation and warranty claims brought by trustees.  Over the last

three years of representing the Debtors in RMBS litigation, I have obtained substantial subject

matter expertise in the highly specific legal jurisprudence that has developed around disputes

regarding the sale of RMBS.

13.     I am also deeply familiar with the Debtors' history and practices with respect to

RMBS securitizations.  In the two MBIA Insurance Corp. ("MBIA") cases, which are directly

analogous to the FGIC claims settled here, the parties engaged in extensive fact discovery

involving the exchange and analysis of millions of pages of discovery material and the

completion of dozens of depositions as of the petition date, and had begun expert discovery with

an exchange of initial expert reports in the *MBIA Insurance Corp. v. Residential Funding Co.*

case.  In addition, we had evaluated and made initial letter submissions in the FGIC group of

cases relating to motion to dismiss arguments, and FGIC, likewise, had submitted a letter

outlining a proposed early summary judgment motion.

14.     I make this Declaration based on my experience representing the Debtors and

others in RMBS-related litigation described above.  As set forth below, based on my review of

the settlement terms, my extensive knowledge of the types of claims and defenses at issue and

the strengths and weaknesses in the applicable law, and my familiarity with the strengths and

potential weaknesses in the Debtors' defense of the claims, it is my opinion that the settlement of

claims and liabilities released by the FGIC Settlement Agreement would remove a significant

risk of an unfavorable legal outcome and the necessity of incurring the significant expense of

litigating these claims to final resolution.

## OVERVIEW OF POTENTIAL CLAIMS

15.     Claims for breaches of loan-level representations and warranties, such as those to

be resolved by the FGIC Settlement Agreement, generally arise out of the applicable Pooling and

Servicing Agreement, Assignment and Assumption Agreement, or another applicable sale

agreement (the "Sale Agreements") between the appropriate debtor entity and the trust to whom

the debtor entity is selling the loans.

16.     FGIC, as the "Credit Enhancer," would have typically been granted rights as a

third-party beneficiary to the Sale Agreements for any deals it insured.  Moreover, the same

representations and warranties outlined in the Sale Agreements were generally incorporated by

reference into the applicable Insurance & Indemnity Agreements between the Debtors and FGIC,

which governed FGIC's issuance of financial guaranty insurance policies.

17.     The Sale Agreements typically contain or incorporate by reference a list of fairly

standard representations and warranties about the loans in the collateral pool underlying the

securitization.  These may be representations about the pool of loans generally—for example, "97.5% of the loans in this securitization are actuarial mortgage loans, on which 30 days of interest is owed each month irrespective of the day on which the payment is received" or "no more than 25.0% of the loans are secured by Mortgaged Properties located in California", or they may be representations that apply to each and every loan in the pool, such as "All of the loans in the pool were originated in compliance with applicable state and federal law."

18.    As discussed in greater detail below, additional insight regarding the interpretation of certain representations and warranties may be found in other, related transaction documents, such as the prospectus and prospectus supplement.

19.    The representations and warranties most commonly claimed to have been breached in the various lawsuits that have been filed, both against the Debtors and against others, include:

a.    Representations relating to compliance with Underwriting Guidelines;

b.    Representations relating to compliance with state and federal law;

c.    Representations relating to the accuracy of Loan-to-Value ("LTV") or Combined Loan-to-Value ("CLTV") information;

d.    Representations relating to appraisals or the qualifications of appraisers;

e.    Representations relating to the accuracy of Owner/Occupancy information;

f.    Representations relating to the completeness of Loan Files; and

g.    Representations relating to the accuracy of loan information on the Mortgage Loan Schedule or loan tapes provided in connection with the securitization.

20.    In addition to these claims for breach of the applicable representations and warranties, plaintiffs in representation and warranty litigation have often engaged in a pre-litigation negotiation process, pursuant to the repurchase process outlined in the applicable contract documents.

6

21.     Specifically, the Sale Agreements provide that, "upon discovery" of a breach of a representation or warranty, the Seller (here, the debtor entity selling the loans to the trust for each securitization) is obligated to repurchase or substitute Mortgage Loans sold to a trust that breach the stated representations and warranties and "materially and adversely" affect the Certificateholders' interest in those Loans.  The substitution and cure remedies are limited; leaving repurchase of the loan as the primary remedy once the securitization has been in the market for some period of time.

22.     Under the Sale Agreements, the trustee for each trust is the party authorized to pursue claims for breaches of representations and warranties.  FGIC was also granted certain contractual rights as a third-party beneficiary to enforce breaches of representations and warranties regarding the mortgage loans.[1]

23.     Although the right to request repurchase belongs in the first instance to FGIC and the FGIC Trustees, the Sale Agreements provide that investors with substantial holdings in a given class of certificates—typically, 25%—have the ability (subject to certain rights of FGIC) to direct the FGIC Trustees to take action with respect to such repurchase demands.  Such action includes, if necessary, pursuing litigation against the Debtors for alleged breaches of either the representations and warranties themselves, or the obligation to repurchase a loan "upon discovery" that it does not comply with the representations and warranties.[2]

---

[1] Under the transaction documents, FGIC was given certain control rights with respect to the conduct of litigation against the Debtors.  *See, e.g.,* GMACM 2005-HE1 Indenture § 5.11 ("The Enhancer (so long as no Enhancer Default exists) or the Noteholders of a majority of the aggregate Note Balance of notes with the consent of the Enhancer, shall have the right to direct the time, method and place of conducting any Proceeding for any remedy available to the Indenture Trustee with respect to the notes . . .").  While FGIC's payment default would contractually be considered an "Enhancer Default" (*see* 2005-HE1 Indenture Definitions Appendix at 8), FGIC has asserted that relief granted in its rehabilitation proceeding allows it to continue to control the litigation.

[2] The investors themselves are likely barred from pursuing a direct action against the Debtors by contractual "no action" clauses that require them to work through the FGIC Trustees, at least in the first instance.  *See, e.g., Nomura Asset Acceptance Corp. Alt. Loan Trust, Series 2005-S4 v. Nomura Credit & Capital, Inc.*, No. 652341/2011 at 9

## ELEMENTS OF CAUSE OF ACTION

24.    In its prepetition litigation and proofs of claim, FGIC has asserted various claims

against the Debtors.    The principal claims are for breach of contract.[3]    There are two basic

contract causes of action that may be asserted either by FGIC or by the Investors acting through

the FGIC Trustees:    one for breaches of the representations and warranties made in the Sale

Agreements themselves, and one for breach of the obligation to repurchase defective loans that is

triggered by the discovery of a breach of representation or warranty.[4]    Although distinct causes

<hr>

(Sup. Ct., N.Y. Cnty. May 10, 2013); *Walnut Place LLC v. Countrywide Home Loans, Inc.*, No. 650497/2011, 2012 N.Y. Misc. LEXIS 1537 (Sup. Ct., N.Y. Cnty. March 28, 2012), *aff'd* 948 N.Y.S.2d 580 (1st Dep't 2012).

[3] FGIC, the Investors, and/or  the FGIC Trustees also asserted various tort claims, such as negligent misrepresentation and fraudulent inducement claims.  *See* Claim Nos. 4868, 4870 and 4871 by FGIC against three debtor entities; Claim Nos. 6758-6767 and 6772-6779 filed by Bank of New York Mellon Trust Co., N.A or Bank of New York Mellon, against nine debtor entities; Claim Nos. 6604-6654 filed by Law Debenture Trust Company of New York and Wells Fargo Bank, N.A. as Separate Trustee and Trustee, respectively, against fifty-one debtor entities; and Claim Nos. 6655-6705 filed by U.S. Bank N.A, against fifty-one debtor entities.

As to negligent misrepresentation, New York law requires a showing of a "special relationship of trust" between the parties that would warrant the FGIC Trustees relying on the Debtors' statements without question.  Courts have regularly rejected such claims as to the monoline credit enhancers, which are similarly situated to the FGIC Trustees in terms of the arm's length contractual relationship to the Debtors and the information provided to them by the Debtors.  *See, e.g., MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*, 928 N.Y.S.2d 229, 235-36 (1st Dep't 2011) (upholding dismissal of negligent misrepresentation claim because no special relationship of trust or uniquely superior knowledge was established); *MBIA Ins. Corp. v. Residential Funding Co., LLC*, No. 603552/2008, 2009 N.Y. Misc. LEXIS 3523 (Sup. Ct., N.Y. Cnty. Dec. 22, 2009) (same).

As to the fraud claims, similarly, the Investors and/or FGIC Trustees (and perhaps FGIC) would need to establish the additional elements of scienter and justifiable reliance.  *See HSH Nordbank AG v. UBS AG*, 941 N.Y.S.2d 59, 65 (1st Dep't 2012) (collecting cases holding no justifiable reliance as to fraud claims arising from sale or agreement to provide insurance for securities where plaintiff was sophisticated, understood and accepted the risks, and could conduct its own independent investigation into the accuracy of defendant's representations before agreeing to purchase or provide insurance).  It is not entirely clear if a monoline insurer has to show justifiable reliance. *Compare CIFG Assur. N. Am., Inc. v. Goldman, Sachs & Co.*, No. 652286/2011, 2013 N.Y. App. Div. LEXIS 3184 (N.Y. App. Div. 1st Dep't May 7, 2013) ("Under the circumstances, there is a question of fact as to whether plaintiff reasonably relied on defendants' representations.  It was not required, as a matter of law, to audit or sample the underlying loan files.") *with MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*, No. 602825/2008, 2013 N.Y. Misc. LEXIS 1774, at *83 (Sup. Ct., N.Y. Cnty. Apr. 29, 2013) (holding "even if MBIA were required to demonstrate justifiable reliance, taking all inferences in its favor as the non-movant, there are sufficient facts in dispute as to preclude Countrywide's motion for summary judgment.").  Nonetheless, the FGIC Trustees' and Investors' burden of proof (and probably FGIC's) would be greater than it is for breach of contract claims.  Moreover, the Debtors would argue that any tort claims relating to the representations and warranties are duplicative of breach of contract claims.  Accordingly, I have focused my analysis on the riskiest claims for the Debtors, which are the breach of contract claims.

[4] FGIC also asserted breach of contract claims for servicing, denial of access to information and claims based  on the alleged improper addition of loans post-closing to the GMACM 2005-HE1 and 2006-HE1 securitizations.  The liabilities arising from these allegations are comparatively small and, in any event, duplicative in many respects of

of action, both types of claims turn on the question of whether a given loan breached one or more

contractual representations or warranties.

25.    If FGIC, the Investors, and/or the FGIC Trustees were to pursue litigation of the

claims, the elements they would need to prove include that (1) an agreement existed, (2) the

agreement was breached, (3) the breach was material, (4) the breach caused harm to the plaintiff,

and (5) the plaintiff suffered damages as a result.

26.    Because of the complex structure of the RMBS offerings, each of these elements

poses unique legal and evidentiary challenges, many of which have not fully developed in a

definitive way in the case law to date, and none of which has been litigated to resolution with

respect to the Debtors specifically.  I evaluate each element in more detail below, and explain

why I have concluded that there is sufficient uncertainty and risk in the outcome of the claims

and liabilities released by the FGIC Settlement Agreement and significant expense in litigating

these claims and liabilities to support the Debtors' conclusion that the proposed settlement is

reasonable.

### Scope of Representations and Warranties

27.    Although the representations and warranties for each securitization are spelled out

in a clearly identifiable section of the Sale Agreements, there remains ambiguity and dispute

about the scope of some of the representations.  Accordingly, the fundamental question of

whether the Debtors had even made an actionable representation may be disputed, and subject to

uncertainty as to how a court might rule.

---

the liabilities arising from the main breach of contract claims.  Because the likely claims based on those theories are
smaller and the lack of case law on these theories, this declaration focuses on the breach of representation and
warranty claims.

28.    Some of the representations and warranties that pose potential interpretive issues

with respect to the Debtors' Sale Agreements for FGIC Insured Trusts deals include (for

example):

a.    "The appraisal was made by an appraiser who meets the minimum qualifications for appraisers as specified in the Program Guide."  2007-EMX1 Assignment and Assumption Agreement, § 4(xi);

b.    "The information set forth on the Mortgage Loan Schedule with respect to each Mortgage Loan is true and correct in all material respects as of the date or dates which such information is furnished."  *Id.* at § 4(xv);

c.    "The weighted average Loan-to-Value Ratio with respect to the Group I Loans, and the Group II Loans, in each case by outstanding principal balance at origination, are 84.1% and 83.8%, respectively."  *Id.* at § 4(xviii);

d.    "Approximately 91.8% and 93.8% of the Mortgaged Properties related to the Group I Loans and Group II Loans, respectively are secured by the owner's primary residence.  Approximately 3.4% and 1.7% of the Mortgaged Properties related to the Group I Loans and the Group II Loans, respectively, are secured by the owner's second or vacation residence.  Approximately 4.9% and 4.5% of the Mortgaged Properties related to the Group I Loans and the Group II Loans, respectively, are secured by a non-owner occupied residence."  *Id.* at § 4(xxiii);

e.    "[T]here is no default, breach, violation or event of acceleration existing under any Mortgage Note or Mortgage and no event which, with notice and expiration of any grace or cure period, would constitute a default, breach, violation or event of acceleration . . . ."  *Id.* at § 4(xxviii);

f.    "Each Mortgage Loan as of the time of its origination complied in all material respects with all applicable local, state and federal laws, including, but not limited to, all applicable predatory lending laws."  *Id.* at § 4(xliii);

g.    "The originator of [the relevant Loans] offered the related borrower mortgage loan products for which the borrower qualified and we are not aware that the originator encouraged or required the borrower to select a mortgage loan product that is a higher cost product designed for less creditworthy borrowers."  *Id.* at § 4(lii);

h.    "The originator of [the relevant Loans] adequately considered the borrower's ability to make payments by employing underwriting techniques that considered a variety of factors, such as:  the borrower's income, assets and liabilities, and not solely the collateral value, in deciding to extend the credit at the time of origination."  *Id.* at § 4(liii);

i.  "No borrower . . . was charged 'points and fees' in an amount greater than (a)
$1,000 or (b) 5% of the principal amount of such Mortgage Loan, whichever is
greater."  *Id.* at § 4(liv);

j.  "No fraud or misrepresentation has taken place in connection with the origination
of any Mortgage Loan."  *Id.* at § 4(lx);

k.  "There is no right of rescission, valid offset, defense, claim or counterclaim of any
obligor under any Mortgage Note or Mortgage . . . ."  2006-HSA2 Home Equity
Loan Purchase Agreement, § 3.1(b)(iii);

l.  "For each [relevant] Loan, the related Mortgage File contains or will contain each
of the documents and instruments specified to be included therein."  *Id.* at
§ 3.1(b)(vii);

m.  "All of the [relevant] Loans have been underwritten in substantial compliance
with the criteria set forth in the Program Guide." *Id.* at § 3.1(b)(xxxvii); and

n.  "Each Subservicer meets all applicable requirements under the Servicing
Agreement, is properly qualified to service the [Loans] and has been servicing the
[Loans] . . . in accordance with the terms of the respective Subservicing
Agreement."  *Id.* at § 3.1(b)(xxxvi).

29.    The representations and warranties cited above are just a sampling of the variety

of loan-level representations and warranties that may be at issue, and they vary from trust to

trust, requiring that any issues as to their scope be litigated differently for different trusts.  But

the examples above all present interpretive (not to mention evidentiary) issues:

- How will the qualifications of an appraiser be evaluated?

- If some number of the appraisals are deemed flawed because of unqualified
appraisers (or for other reasons), how does that impact the weighted average
Loan-to-Value Ratio for the collateral pool?

- Did the Debtors warrant the accuracy of the underlying appraisal, or merely the
accuracy of the loan-to-value calculation based on it?

- What constitutes "awareness" as to whether an originator may be "encourag[ing]"
a borrower to choose one loan product over another?

- What does it mean for an originator to "adequately consider" a borrower's ability
to pay, and what are the Debtors actually warranting in that regard?

- What does "substantial compliance" with the underwriting guidelines mean?

- If granting exceptions to the requirements of published underwriting guidelines is common across the industry, should loans with exceptions be considered in "substantial compliance"?

- Will those originators be considered to have "adequately considered" the borrower's ability to pay?

- Is there a threshold number of exceptions that renders the loan not substantially compliant, or demonstrates a failure to adequately consider the borrower's ability to pay?

- Or could a single exception, if the variance is large enough (say, 40 or more points on a FICO score, or 10 or more percentage points for a DTI or LTV), be sufficient to render a given loan out of substantial compliance?

- Do such deviations constitute *prima facie* evidence that an originator has not adequately considered a borrower's ability to pay?

30. Further complicating the issues, other materials in the package of transaction documents relating to each trust shed additional light on how potentially ambiguous representations and warranties should be interpreted, including the extensive risk disclosures included in the prospectus and prospectus supplement for each securitization. For example, the risk disclosures explain:

a. "Generally, the [Loans] have been originated using underwriting standards that are less stringent than the underwriting standards applied by certain other [similar] loan purchase programs." 2006-HSA2 Pro. Supp. at S-17. *See also* 2007-EMX1 Pro. Supp. at S-19 ("The mortgage loans have been originated using underwriting standards that are less restrictive than the underwriting requirements used as standards for other first lien and junior lien mortgage loan purchase programs, including other programs of Residential Funding Company, LLC and the programs of Fannie Mae and Freddie Mac.")

b. "Applying less stringent underwriting standards creates additional risks that losses on the [loans] will be allocated to noteholders. For example, the . . . loan pool includes . . . loans made to borrowers whose income is not required to be disclosed or verified." 2006-HSA2 Pro. Supp. at S-17. *See also* 2007-EMX1 Pro. Supp. at S-19 ("Applying less restrictive underwriting standards creates additional risks that losses on the mortgage loans will be allocated to certificateholders.")

c. "[M]ortgage loans made to borrowers whose income is not verified, including borrowers who may not be required to state their income . . . may increase the risk

12

that the borrowers' income is less than that represented."  2007-EMX1 Pro. Supp.
at S-19.

d.   "The basis for any statement that a given percentage of the mortgage loans is
secured by mortgaged properties that are owner-occupied will be one or more of
the following:

- the making of a representation by the mortgagor at the origination of a
mortgage loan that the mortgagor intends to use the mortgaged property as a
primary residence;

- a representation by the originator of the mortgage loan, which may be based
solely on the above clause; or

- the fact that the mailing address for the mortgagor is the same as the address
of the mortgaged property.

Any representation and warranty in the related pooling and servicing agreement
regarding owner-occupancy may be based solely on that information."  2007-
EMX1 Prospectus at 9.

e.   "In some cases, in lieu of an appraisal, a valuation of the mortgaged property will
be obtained from a service that provides an automated valuation."  *Id.* at 10.

f.   "Appraisers may be either staff appraisers employed by the originator or
independent appraisers selected in accordance with pre-established guidelines
established by or acceptable to the originator."  *Id.* at 11.

g.   "Appraised values may be determined by either:

- a statistical analysis;

- a broker's price opinion; or

- an automated valuation, drive-by appraisal, or other certification of value."
*Id.* at 10.

h.   "If specified in the accompanying prospectus supplement, a mortgage pool may
include mortgage loans that have been underwritten pursuant to a streamlined
documentation refinancing program.  Such program permits some mortgage loans
to be refinanced with only limited verification or updating of the underwriting
information that was obtained at the time that the original mortgage loan was
originated."  *Id.* at 11.

i.   "[S]ome mortgage loans may have been originated under 'limited
documentation,' 'stated documentation,' or 'no documentation' programs that
require less documentation and verification than do traditional 'full
documentation' programs.  Under [these programs], minimal investigation into

the mortgagor's credit history and income profile is undertaken by the originator . . . ." *Id*.

j.   "The level of review by Residential Funding Company, LLC, if any, will vary . . . [RFC] typically will review a sample of the mortgage loans purchased . . . for conformity with the applicable underwriting standards." *Id*. at 12.

k.   "[A] mortgage loan will be considered to be originated in accordance with a given set of underwriting standards if, based on an overall qualitative evaluation, the loan is in substantial compliance with the underwriting standards." *Id*.

l.   "[A] mortgage loan may be considered to comply with a set of underwriting standards, even if one or more specific criteria included in the underwriting standards were not satisfied, if other factors compensated for the criteria that were not satisfied or if the mortgage loan is considered to be in substantial compliance with the underwriting standards." *Id*.

m.   "In the case of a Designated Seller Transaction" —such as the EMX transactions —"the applicable underwriting standards will be those of the seller or of the originator of the mortgage loans . . . ." *Id*.

n.   "In addition, the depositor purchases loans that do not conform to the underwriting standards contained in the Guide." 2006-HSA2 Prospectus at 18.

o.   "The underwriting standards used in negotiated transactions and master commitments and the underwriting standards applicable to loans underlying private securities may vary substantially from the underwriting standards contained in the Guide." *Id*.

p.   "Due to the variety of underwriting standards and review procedures that may be applicable to the loans included in any pool, the accompanying prospectus supplement, in most cases, will not distinguish among the various underwriting standards applicable to the loans nor describe any review for compliance with applicable underwriting standards performed by the depositor or Residential Funding Corporation." *Id*.

q.   "Because an automated underwriting system will only consider the information that it is programmed to review, which may be more limited than the information that could be considered in the course of a manual review, some mortgage loans may be approved by an automated system that would have been rejected through a manual review." *Id*. at 19.

r.   "[T]here could be programming inconsistencies between an automated underwriting system and the underwriting criteria set forth in Residential Funding Corporation's Seller Guide, which could in turn be applied to numerous mortgage loans that the system reviews." *Id*.

14

s.  "We cannot assure you that an automated underwriting review will in all cases result in the same determination as a manual review with respect to whether a mortgage loan satisfied Residential Funding Corporation's underwriting criteria." *Id*.

31.    The Debtors would argue that these risk disclosures must be considered when evaluating the scope and/or interpretation of the applicable representations and warranties, and that, where the disclosures clearly state the data provided elsewhere in the transaction documents is less than 100% reliable, the scope and/or interpretation of the corresponding warranties is therefore more limited.[5]  Thus, for example, the Debtors would argue that because the risk disclosures make clear that owner-occupancy data is frequently self-reported by borrowers, and that self-reported data is the basis for the calculations provided by the Debtors, it cannot be a breach of the owner occupancy representations if it turns out some of the self-reporting was inaccurate.

32.    FGIC, the Investors, and/or the FGIC Trustees, however, would likely argue that regardless of their skepticism as to the quality of the underwriting or accuracy of the data supplied, the very purpose of a warranty is that it obviates the need to do additional investigating, including by probing the discrepancies between the warranties and the risk disclosures.[6]

---

[5] *See, e.g., Assured Guar. Mun. Corp. v. Flagstar Bank, FSB*, 11 Civ. 2375 (JSR), 2011 U.S. Dist. LEXIS 102722, at *13 (S.D.N.Y. Sept. 8, 2011), amended Oct. 27, 2011 (Rakoff, J.) ("[I]t is black letter law that the provisions of a contract or a related set of contracts should be read as a whole and every effort should be made to give them consistent meaning in their overall context") (citing *Perreca v. Gluck*, 295 F.3d 215, 224 (2d Cir. 2002) (it is a "cardinal principle of contract construction that a document should be read to give effect to all its provisions and to render them consistent with each other," and, accordingly, "all provisions of a contract [should] be read together as a harmonious whole, if possible.")).

[6] *See CBS, Inc. v. Ziff-Davis Publ'g Co.*, 75 N.Y.2d 496, 504-05 (1990); *see also Metro. Coal Co. v. Howard*, 155 F.2d 780, 784 (2d Cir. 1946) (L. Hand, J.) ("A warranty . . . is intended precisely to relieve the promise of any duty to ascertain the fact for himself."); *MBIA Ins. Corp. v. Credit Suisse Secs. (USA) LLC*, No. 603751/2009, 2011 N.Y. Misc. LEXIS 4787, at *17 (Sup. Ct., N.Y. Cnty. Oct. 7, 2011), *rev'd and remanded on other grounds*, 102 A.D.3d 488 (1st Dep't 2013) ("[W]here a plaintiff has gone to the trouble to insist on a written representation [or warranty] that certain facts are true, it will often be justified in accepting that representation [or warranty] rather than making its own inquiry") (citation and emphasis omitted)).

33.     To illustrate the complexity of the issue, just one of the many key potential
disputes likely to be litigated for a large number of trusts arises with respect to alleged borrower
fraud.  An agreement governing one of the FGIC Insured Trusts contains an express
representation that "[n]o fraud or misrepresentation has taken place in connection with the
origination of any Mortgage Loan."  *See* 2007-EMX1 Assignment and Assumption Agreement,
§ 4(lx).  An agreement governing another FGIC Insured Trust contains a more limited
representation that "[n]o fraud or misrepresentation of a material fact with respect to the
origination of a Mortgage Loan has taken place on the part of GMACM and to the best of
GMACM's knowledge, no fraud or misrepresentation of a material fact with respect to the
origination of a Mortgage Loan has taken place on the part of any third party, including without
limitation the related mortgagor, connected with the origination of a Mortgage Loan."  *See* 2007-
HE2 Loan Purchase Agreement, § 3.01(b)(xxxvii).

34.     The Debtors' other securitizations insured by FGIC at issue in the prepetition
litigation, however, do not contain an express "fraud representation," but contain language in the
representations and warranties that plaintiffs have argued is the equivalent of a fraud
representation.

35.     For example, a number of the Debtors' Sale Agreements include warranties as to
the accuracy of the Mortgage Loan Schedules accompanying the trust documents.  *See, e.g.,*
2005-HE1 Home Equity Loan Purchase Agreement, § 3.1(b)(i) ("The information set forth in the
Mortgage Loan Schedule with respect to each Mortgage Loan or the Mortgage Loans is true and
correct in all material respects as of the date or dates respecting which such information is
initially furnished").

36.     The Mortgage Loan Schedules vary in complexity from one securitization to the next, but the Schedules frequently include information about debt-to-income ratios, loan-to-value ratios, and owner-occupancy status.

37.     In many cases, particularly for securitizations on the Residential Funding Mortgage Securities II, Inc. ("RFMSII") shelf, the "income" data from which the "debt to income" ratio is derived is based on a borrower's stated income, and not on W-2s or pay stubs collected as part of the loan application process.

38.     Stated income loans were clearly permitted under several of the Debtors' loan programs and did not require verification of the borrower's actual income.  The consequence of not requiring income documentation meant that the incomes stated by borrowers could be inaccurate, inflated, or even fraudulent, and the Debtors may not have any express obligation to investigate them for accuracy.  As described above, these facts were disclosed in the prospectuses for securitizations containing stated income loans.

39.     Plaintiffs in representation and warranty litigation, including FGIC, have alleged that, by representing that the Mortgage Loan Schedules were accurate, the Debtors indirectly represented that the underlying income data were truthful and not fraudulent.[7]

40.     For such securitizations, the Debtors would vigorously dispute plaintiffs' interpretation.  On the contrary, the Debtors' position is that they only warranted that the data in the Schedules was consistent with the data in their records, not that it was actually true; and that if the other transaction documents disclosed a potential reason for inaccuracy in the data, such as

---

[7] *See, e.g.,* Complaint, *Fin. Ins. Guar. Corp. v. Residential Funding Co., LLC*, No. 1:11-cv-09736-PAC (S.D.N.Y.), Doc. No. 1-1 at ¶ 81 ("RFC provided information to FGIC concerning Mortgage Loans . . . . This information included schedules that set forth statistics about the loan pool.  The schedules purported to describe key characteristics relevant to the assessment of risk, including weighted averages of FICO scores and DTI and CLTV ratios. . . . In turn, . . . RFC represented that all the information in those schedules 'is true and correct in all material respects as of the date or dates respecting which such information is furnished.'").

the use of stated income underwriting, then there is no basis for interpreting the representation

otherwise.

41.      Although I have been unable to locate any case law squarely addressing the

correct interpretation of this representation, there is at least some risk that a court will accept

plaintiffs' arguments that, by representing the Schedules are "accurate," the Debtors could be

found to have warranted the *truth* of the information contained in them.  In *MBIA Insurance

Corp. v. Countrywide Home Loans, Inc.*, for example, MBIA made this argument, but

Countrywide apparently did not vigorously contest the interpretation, and the court adopted

MBIA's interpretation as a result.[8]  Such a conclusion could find support in general contract

principles applying the "plain meaning" of contractual language, or in extrinsic evidence if the

court deems the contractual language ambiguous.[9]

42.      Likewise, as the various prospectuses and prospectus supplements clearly

disclose, the property value data underlying the calculation of a loan's loan-to-value ratio (as

included on a Mortgage Loan Schedule) may be derived from drive-by appraisals, automated

valuation models, or stated values, depending on the applicable underwriting guidelines for that

loan; and owner-occupancy data is typically based on what the borrower's stated intention is at

the time of loan closing, not what actually occurs (or even what the borrower actually intends).

These other aspects of the Mortgage Loan Schedules may also be subject to attack by FGIC, the

Investors, and/or the FGIC Trustees for alleged breach of the "accuracy" representation,

---

[8] *See MBIA Ins. Corp. v. Countrywide Home Loans, Inc.,* No. 602825/2008, 2013 N.Y. Misc. LEXIS 1774, at *83
(Sup. Ct., N.Y. Cnty. Apr. 29, 2013) (finding because MBIA allege[d] "that the [Mortgage Loan Schedules]
contained materially false and incorrect information regarding at least 1,416 unique mortgage loans" and
"Countrywide ma[de] no argument as to why [those expert] findings as to 1,414 [of the] loans are incorrect . . .
there are no issues of fact for trial as to whether [1,414 of] the loans violate the representation").

[9] *See, e.g., LaSalle Bank Nat'l Ass'n v. Merrill Lynch Mortg. Lending, Inc.*, 04 Civ. 5452 (PKL), 2007 U.S. Dist.
LEXIS 59303, at *21-25 (S.D.N.Y. Aug. 13, 2007).

depending on what re-underwriting of the individual loan files reveals.[10]  Other data on certain

Schedules may be subject to a similar argument.  These issues are starting to be litigated in

different types of RMBS cases around the country, but no consensus has yet emerged from the

courts to review these issues.[11]

43.    As another example, for a number of trusts, the relevant Sale Agreements

included a representation that:

> [T]here is no material default, breach, violation or event of
> acceleration existing under the terms of any Mortgage Note or
> Mortgage and no event which . . . would constitute a material
> default, breach, violation or event of acceleration under the terms
> of any Mortgage Note or Mortgage.

2005-HE1 Assignment and Assumption Agreement, § 4(xxix); *see also* 2006-HSA2 Home

Equity Loan Purchase Agreement, § 3.1(b)(xix).

44.    Plaintiffs in representation and warranty litigation have argued that certain

commonly-used Notes and Loan Application forms contain a promise by the borrower that the

information provided by the borrower in obtaining the loan is true.  Where borrowers make those

representations, their breach is typically described in the loan documents as a "material event of

default" allowing for the acceleration of the indebtedness.  Thus, plaintiffs argue, if a borrower

lied in his or her loan application, that is a "material event of default" and a breach of the related

representation by the issuer (here, one of the Debtors) for which the issuer should be strictly

liable, regardless of whether applicable underwriting guidelines required it to investigate the

---

[10] The Debtors did not re-underwrite substantial numbers of loans in connection with defending the pre-petition
litigation matters because the bankruptcy petition was filed on the eve of that work beginning in earnest in the first
case to reach the expert phase.

[11] *See, e.g., Mass. Mut. Life Ins. Co. v. Countrywide Fin. Corp.*, No. 2:11-ML-02265-MRP (MANx), 2012 U.S. Dist.
LEXIS 121702, at *9-10 (C.D. Cal. Aug. 17, 2012) (Pfaelzer, J.) (holding issuer cannot be liable in investor
litigation for misrepresentations of owner occupancy data where information was furnished by borrowers); *Mass.
Mut. Life Ins. Co. v. Residential Funding Co., LLC*, 843 F. Supp. 2d 191, 204-05 (D. Mass. 2012) (same).

truthfulness of the statements in the loan application and regardless of whether it knew of the

borrower's fraud.

45.     There are a number of counter-arguments the Debtors could mount (and have

mounted) to such an argument, including testimony and expert opinions that such an

interpretation is contrary to the parties' intent and the industry standard interpretation of the

"material event of default" language.  The Debtors could also point to the fact that, in addition to

the standard mortgage note representation, some of their securitizations contained an explicit

representation that no borrower committed fraud or made misrepresentations in connection with

a loan application, indicating that the note representation was not meant to be a representation

that all borrower statements were true.  However, at least some courts have agreed with

plaintiffs' view as to this representation.[12]

46.     In *Love Funding*, the Southern District of New York granted summary judgment

to the trust/plaintiff in a commercial mortgage-backed securities case for breach of a virtually

identical "material event of default" representation, concluding that the seller of the loans was

"strictly liable" for an event of acceleration caused by the borrower's fraud, even if the seller

lacked knowledge of the fraud.[13]

47.     Indeed, when MBIA, in its case against RFC, sought to issue subpoenas to

thousands of borrowers' employers to try to determine whether the borrowers had committed

---

[12] *Trust for the Certificate Holders of the Merrill Lynch Mortg. Pass-Through Certificates Series 1991-C1 v. Love Funding Corp.*, 04 Civ. 9890 (SAS), 2005 U.S. Dist. LEXIS 23522, at *26-30 (S.D.N.Y. Oct. 7, 2005), *rev'd and remanded on other grounds*, 591 F.3d 116 (2d Cir. 2010), *judgment entered on remand*, 736 F. Supp. 2d 716 (S.D.N.Y. 2010).  *See also MBIA Insurance Corp. v. Countrywide Home Loans, Inc.*, No. 602825/2008, 2013 N.Y. Misc. LEXIS 1774, at *72 (Sup. Ct., N.Y. Cnty. Apr. 29, 2013).

[13] *See also Citimortgage v. OCM Bancorp, Inc.*, No. 4:10CV467CDP, 2011 U.S. Dist. LEXIS 45437, at *19 (E.D. Mo. Apr. 27, 2011) (holding that, regardless of whether applicable guidelines require it, underwriters must evaluate the "reasonableness" of a borrower's income in a stated income transaction).

fraud, it successfully relied on this argument to obtain the discovery, notwithstanding the absence of an express fraud representation in the applicable Sale Agreements.[14]

48.      There are some distinguishing features to the *Love Funding* opinion that render it not directly applicable to the claims here: the defendant in that case did not dispute either (1) whether the "material event of default" representation was intended to be limited to non-payment defaults, or (2) the correctness of a prior Louisiana state court determination that the borrower's fraud at origination constituted an "event of default" under the terms of the mortgage. Thus, the arguments the Debtors might advance were not specifically tested in *Love Funding*. However, the court in *Love Funding* did find that "the meaning [of the representation at issue] was unambiguous," despite the fact that the parties "urge[d] different interpretations." *Id.* at *27-28.

49.      More recently in *MBIA Insurance Corp. v. Countrywide Home Loans, Inc.*, Countrywide made the argument "that 'default' refers to the payment status of loans," and presented an affidavit with evidence as to the "'commonly understood meaning of [default]'" and "'industry practice'" as to that term.  No. 602825/2008, 2013 N.Y. Misc. LEXIS 1774, at *71 (Sup. Ct., N.Y. Cnty. Apr. 29, 2013) (quoting Countrywide Opp. Br. 21-22).  Nevertheless, the trial court held that the language of the "no default" representation was unambiguous, which consequently prohibited Countrywide from "'introduc[ing] evidence of custom or industry practice to subvert the agreement's plain meaning'" and granted summary judgment to MBIA on the question of whether borrower misrepresentations breached the loan representation.  *Id.* at *72 (citation omitted).

---

[14] *See MBIA Ins. Corp. v. Residential Funding Co., LLC*, No. 603552/2008, MBIA Letter To Court, Doc. 83:6-8 (Sup. Ct., N.Y. Cnty. Feb. 17, 2011); *id.*, Hr'g Tr., Doc. 118 at 34:21-26, 35-38 (Sup. Ct., N.Y. Cnty. Mar. 3, 2011).

50.     Accordingly, there is uncertainty in the developing case law—and certainly with

respect to the Debtors' specific transaction documents—as to the correct interpretation of the

scope of the representations and warranties at issue in the FGIC Settlement Agreement.

### Existence of a Breach

51.     The most common way to determine whether a loan in fact complies with an

underwriting-related representation or warranty—such as those relating to loan-to-value ratios,

debt-to-income ratios, borrower misrepresentations, or compliance with federal or state law, all

of which are commonly alleged to have been breached—is to review and re-underwrite the actual

loan files.  This task is time-consuming, expensive, and fraught with differences in judgment and

opinion, as predicting or assessing a borrower's likely ability to pay in the future is not an

empirical exercise.

52.     In addition to the mortgage and the note, loan files typically contain the

borrower's loan application, supporting income documentation (if required), credit report,

appraisals (if required), Truth In Lending Act disclosure forms, and other documents relating to

the evaluation of the borrower's creditworthiness.

53.     Debtor entities RFC and GMACM, who originated and/or acquired the loans prior

to securitization, each published underwriting guidelines generally governing the process of

evaluating whether a loan met the respective debtor entity's standards.  In addition, RFC

sometimes negotiated specific contracts with third party loan sellers, or negotiated purchase

terms for a specific portfolio of loans, that included additional underwriting parameters.  For

individual loans, RFC or GMACM might also grant an exception to the published guidelines,

depending on the circumstances of the particular loan or borrower.  These underwriting

standards, including the use of exceptions and other variances from the published guidelines, are

described in the prospectus and prospectus supplement for each trust.  *See* Paragraph 30, *infra*

(quoting underwriting disclosures from various prospectuses and prospectus supplements).

There were also references in the RFC Client Guide to the use of negotiated purchase terms and

exceptions.  In addition, RFC and GMACM presentations to investors and credit enhancers also

referenced the use of negotiated criteria and/or exceptions in the underwriting process.

54.    There are frequently ambiguities in how to determine when there has been a

breach of an underwriting-related representation or warranty, and loan underwriting and the

evaluation of a borrower's creditworthiness are often judgment calls.

55.    Thus, litigating the fundamental issue of whether a representation or warranty has

even been breached poses evidentiary challenges and injects a high level of uncertainty into the

outcome.

56.    By way of example, some of the typical underwriting-related disputes that arise in

attempting to prove a breach include the following (some of which have already arisen in pre-

petition litigation against the Debtors):

      a.   **Is the granting of exceptions to underwriting guidelines consistent with
representations that the underwriting "substantially complies" with the
published guidelines?**  *See, e.g.*, First Amended Complaint, *MBIA Ins. Corp. v.
Residential Funding Co., LLC*, No. 603552/2008, Doc. 28 at ¶¶ 58, 61, 63, 68-69,
78 (Sup. Ct., N.Y. Cnty. Mar. 19, 2010); Amended Complaint, *MBIA Ins. Corp. v.
Countrywide Home Loans, Inc.*, No. 602825/2008, Doc. 9 at ¶¶ 78-79 (Sup. Ct.,
N.Y. Cnty. Aug. 24, 2009).

      b.   **Is the purchase of loans in bulk (a practice that is common in the industry)
pursuant to a negotiated set of underwriting criteria consistent with
representations that the underwriting "substantially complies" with the
published guidelines?**  *See, e.g.,* First Amended Complaint, *MBIA Ins. Corp. v.
Residential Funding Co., LLC*, No. 603552/2008, Doc. 28 at ¶¶ 62-63, 69, 78
(Sup. Ct., N.Y. Cnty. Mar. 19, 2010); Amended Complaint, *MBIA Ins. Corp. v.
Countrywide Home Loans, Inc.*, No. 602825/2008, Doc. 9 at ¶¶ 1-4 (Sup. Ct.,
N.Y. Cnty. Aug. 24, 2009).

      c.   **Can defects in appraisals be accurately demonstrated through the use of
retroactive automated valuation tools (essentially, retroactive appraisal
models)?**  *See, e.g.*, Amended Complaint, *Fed. Home Loan Bank of Boston v. Ally
Fin. Inc.*, 1:11-cv-10952-GAO, Doc. 180 at ¶¶ 877-90 (D. Mass. June 29, 2012);
Amended Complaint at ¶¶ 628-35, *Fed. Home Loan Bank of Indianapolis v. Banc*

*of Am. Mortg. Secs. Inc.*, 49D05 10 10 PL 045071 (Marion, Indiana Sup. Ct. July
14, 2011); Corrected Amended Complaint at ¶¶ 619-26, *Fed. Home Loan Bank of
Chicago v. Banc of Am. Funding Corp.*, 10 CH 45033 (Circuit Court of Cook
County, Illinois Apr. 8, 2011).

d. **Do issuers who acquire and then sell stated income loans into securitizations
have a duty to evaluate whether the borrower committed fraud in stating an
inflated income, even where there is no fraud representation in the
securitization documents?** *Compare Citimortgage v. OCM Bancorp, Inc.*, No.
4:10CV467CDP, 2011 U.S. Dist. LEXIS 45437, at *19 (E.D. Mo. Apr. 27, 2011)
(holding that, regardless of whether applicable guidelines require it, underwriters
must evaluate the "reasonableness" of a borrower's income in a stated income
transaction) with *N.J. Carpenters Health Fund v. NovaStar Mortg., Inc.*, 08 Civ.
5310 (DAB), 2012 U.S. Dist. LEXIS 56010, at *18-21 (S.D.N.Y. Mar. 29, 2012)
(finding it unreasonable for an investor to rely on statements about the
underwriting of stated income loans when the same set of transaction documents
contained extensive disclosures about the risks of such loans), rev'd and
remanded 709 F.3d 109 (2d Cir. 2013).

e. **Have issuers who conducted "due diligence" on only a sample of loans
coming through the process breached their representation that loans were
underwritten according to "generally accepted" standards?** *Luminent Mortg.
Capital, Inc. v. Merrill Lynch & Co.*, 652 F. Supp. 2d 576, 580-581 (E.D. Pa.
2009) (in assessing sufficiency of complaint alleging securities fraud arising from
sale of RMBS, stating that the "quality of the issuer's due diligence examination
was a material characteristic of all the Certificates" and that, "[a]s part of its due
diligence, Defendant [] reviewed a large sample of the loan documentation and
conducted a detailed statistical analysis to ensure that the quality of the loans was
consistent with the expected yields").

f. **Where issuers have warned that owner-occupancy data is self-reported, can
they nonetheless be held liable for owner-occupancy data that turns out to be
inaccurate?** *Mass. Mut. Life Ins. Co. v. Countrywide Fin. Corp.*, No. 2:11-ML-
02265-MRP (MANx), 2012 U.S. Dist. LEXIS 121702, at *6-10 (C.D. Cal. Aug.
17, 2012) (Pfaelzer, J.) (holding issuer cannot be liable in investor litigation for
misrepresentations of owner occupancy data where information was furnished by
borrowers); *Mass. Mut. Life Ins. Co. v. Residential Funding Co., LLC*, 843 F.
Supp. 2d 191, 204-05 (D. Mass. 2012) (same).

g. **Were points and fees correctly calculated and disclosed to borrowers (in
order to comply with state and federal requirements)?**

h. **Does the absence of certain documents in a loan file—such as a written
underwriting approval, exception request form, or Patriot Act disclosure
form—constitute a breach of a representation that the loan "substantially
complied" with applicable underwriting guidelines, even if irrelevant to the
borrower's actual creditworthiness?**

57.    From my experience representing the Debtors in RMBS cases over the past several years, I am aware that the Debtors face a number of factual hurdles in answering these questions, and there is great uncertainty in the outcome of any one of these issues.

58.    By way of example, the parties in the pre-petition RMBS cases involving the Debtors have largely disagreed as to which were the applicable underwriting guidelines and whether the use of "exceptions" as disclosed in the prospectus was permissible.

59.    On the one hand, RFC developed evidence, including the deposition testimony of a number of witnesses and the language of the prospectuses, showing that RFC considered loans with exceptions, loans processed through automated underwriting systems, or loans acquired pursuant to negotiated criteria agreements all to be in "substantial compliance" with the applicable guidelines.  The evidence showed that the Debtors' underwriters, quality audit staff, and those managing the securitization process followed consistent processes, gave considerable time and attention to individual underwriting decisions, never intended or knowingly allowed "bad" loans to be securitized, often voluntarily undertook to weed out weak collateral, and made extensive efforts to fully disclose to counterparties and investors any risks present in the collateral pool, including through the creation and expansion of the "Vision" website, a best-in-class tool for tracking historical collateral performance at a loan level for each securitization and shelf.

60.    On the other hand, FGIC, the Investors, and/or the FGIC Trustees may attempt to point to the plain language of the published RFC Client Guide to suggest that deviations from it (including exceptions and negotiated criteria) were not authorized.  They may try to develop evidence that there were either certain controls lacking in the Debtors' underwriting and securitization processes, or failures to document underwriting decision-making, that (they will

likely argue) demonstrate the process was flawed.  Underwriting decisions are frequently a

judgment call, so it is likely FGIC, the Investors, and/or the FGIC Trustees will be able to find

examples where reasonable underwriters may disagree, and point to those as examples of

breaches.

61.    For example, FGIC, the Investors, and/or the FGIC Trustees may look to stated

income loan underwriting practices and try to advance the theory that the Debtors had an

affirmative obligation routinely to evaluate the reasonableness of every stated income loan,

notwithstanding the clear language of the Client Guide and the risk disclosures to the contrary.

They may likewise attempt to mount an attack on the Debtors' use of automated decisioning

tools (which were externally available to loan sellers and allowed for a preliminary assessment of

whether the loan was acceptable to the Debtors), arguing that because the Debtors knew that

automated programs might evaluate a loan application differently than a human underwriter

would (despite that this is clearly disclosed in the prospectus and prospectus supplement), their

use of such tools was problematic.  And, as with any document-intensive complex litigation

matter—particularly where the events in question are several years in the past—FGIC, the

Investors, and/or the FGIC Trustees are likely to attempt to point to the absence of

documentation as evidence that proper processes were allegedly not followed.

62.    Finally, it is typical for plaintiffs to focus on the small handful of self-critical

memos or emails that inevitably exist in any business process of this size and complexity, and

attempt to present those out of context.  I considered the potential impact of these types of

random documents on a fact-finder, regardless of the weight of the evidence otherwise

suggesting a generally robust and disciplined underwriting process.

63.    Thus, the Debtors' ability to meet the various representations and warranties

relating to loan underwriting is an issue for which both the law and the facts are likely to be

disputed.  While the Debtors would hotly contest any allegation that underwriting representations

were breached, there is potential risk for the Debtors of an adverse outcome on each of these

issues if a representation and warranty case were to go to trial.

### Materiality of Breach

64.    Under black-letter contract law, a breach must be "material" to be actionable.

65.    In addition, the applicable contract language for breaches of representations and

warranties in these trusts adds an express materiality component, requiring that the breach be one

that "materially and adversely affects the interests of any Securityholders or the Credit Enhancer

. . . in such [Loan]".  *See, e.g.,* 2006-HSA2 Home Equity Loan Purchase Agreement § 3.1.

66.    Under general contract principles, whether a "material" breach has occurred is

typically a question of fact.  23 Williston on Contracts (4th ed.) § 63.3 (quoted in *Metro. Nat'l

Bank v. Adelphi Acad.*, No. 7389/2008, 2009 N.Y. Misc. LEXIS 1261, at *8 (Sup. Ct., Kings

Cnty. 2009)).  To be "material," a breach must "go to the root of the agreement" and be "so

fundamental to a contract that the failure to perform that obligation defeats the essential purpose

of the contract or makes it impossible for the other party to perform . . . ."  *Id.*

67.    The issue of whether a breach is material or causes a material and adverse effect

has been addressed a handful of times in cases involving contracts for the purchase of loans,

commercial mortgage-backed securities cases, and in RMBS cases brought by monoline credit

enhancers.

68.    Generally, the most significant materiality disputes arise because plaintiffs

(whether credit enhancer, trustee, or investor) seek to restrict the materiality analysis to the

closing date of the securitization.  Under plaintiffs' analysis, the breach of the representation or

warranty has occurred as of the closing date, so, plaintiffs argue, subsequent events are irrelevant

to the evaluation of whether the breach was material.

69.    Defendants argue, in contrast, that certain breaches are not material because they

do not ultimately have a "material and adverse effect" on the plaintiff, and facts subsequent to

the closing date are relevant to that analysis.

70.    For example, some loans may breach a representation or warranty, but if the

borrower continues to pay his or her loan timely, there is no "effect" on the investor.  Similarly,

if the loan is found to breach an underwriting representation related to stated income,

undisclosed debts, property value, etc., but the reason the borrower ultimately stopped paying is

because he passed away, then the breach itself has no "effect" on the investor.

71.    These issues overlap with causation issues, discussed further below.

72.    In the monoline insurance context, Judge Rakoff issued an opinion denying

summary judgment in *Assured Guaranty Municipal Corp. v. Flagstar Bank, FSB,* No. 11 Civ.

2375 (JSR), 2012 U.S Dist. LEXIS 138296 (S.D.N.Y. Sept. 25, 2012), in which he relied on the

"dictionary definitions" of "material" and "adverse" to conclude that plaintiffs in breach of

representation and warranty cases need not prove that the breach "causes . . . actual loss" in order

to satisfy the "material and adverse breach" element.  *Id.* at *8-11.[15]  On the other hand, in *MBIA*

*Insurance Corp. v. Countrywide Home Loans, Inc.,* No. 602825/2008, 2013 N.Y. Misc. LEXIS

1774, at *67 (Sup. Ct., N.Y. Cnty. Apr. 29, 2013), the trial court reiterated the court's prior

finding that the "materially and adversely affected" language was ambiguous and a definition

---

[15] *See Assured Guar. Mun. Corp. v. Flagstar Bank*, FSB, No. 11 Civ. 2375 (JSR), 2013 U.S. Dist. LEXIS 16682, at
**100-101 (S.D.N.Y. Feb. 5, 2013) (quoting its summary judgment decision and stating "the Court determined that
the further requirement that breaches of these representations and warranties be 'material and adverse' means that
'plaintiff must only show that [Flagstar's] breaches [of the representations and warranties] materially increased its
risk of loss' . . . [which] is a function of all the circumstances presented in each unique loan file.").

could not be applied as a matter of law.[16]  The trial court therefore denied summary judgment as

to all five categories of breaches alleged to be indisputable by MBIA, and reserved the issue for

trial.  *Id.* at *63-93.

73.     In two commercial mortgage-backed cases to address the issue, the dispute arose

in the context of motions *in limine* to preclude evidence relating to post-closing performance of

the loans.  *See Wells Fargo Bank, N.A. v. LaSalle Bank Nat'l Ass'n*, No. CIV-08-1125-C, 2011

U.S. Dist. LEXIS 35343 (W.D. Okla. Apr. 1, 2011); *Wells Fargo Bank, N.A. v. LaSalle Bank*

*Nat'l Ass'n*, 2:08-CV-1448 JCM (RJJ), 2011 U.S Dist. LEXIS 145026 (D. Nev. Dec. 15, 2011).

Both cases were brought by trustees seeking to enforce loan repurchase provisions for breaches

of representations and warranties.

74.     The Oklahoma court addressed Wells Fargo's motion *in limine* to exclude

evidence regarding the decline of the economy and mortgage and real estate markets because "as

of the closing date of the securities, the value of the certificateholders' interests and the

underlying mortgages were materially and adversely affected by Defendant's alleged breaches of

warranties."  *Wells Fargo Bank,* 2011 U.S. Dist. LEXIS 35343, at *24.  The court held that

"[e]vidence regarding the post-securitization market meltdown is relevant only if Plaintiff asserts

material and adverse effects occurred after the securitization closing date."  *Id.* at *24.  Similarly,

the Nevada court held that "[i]f plaintiff limits its material and adverse effects claim to evidence

available as of the closing date, evidence or testimony of general post-closing economic

conditions is irrelevant" and must be excluded.  *Wells Fargo Bank,* 2011 U.S Dist. LEXIS

145026, at *4.

---

[16] The trial court quoted its first opinion denying summary judgment in which the court concluded "that the
applicable provisions of the SSA and the PSA are subject to varying interpretations regarding 'interest' and affect on
interest, as well as varying and equally valid interpretations of how the 'aggregate' in SSA § 2.04(d) must be
defined." *MBIA Ins. Corp. v Countrywide Home Loans, Inc.*, 936 N.Y.S.2d 513, 526 (Sup. Ct., N.Y. Cnty. 2012).

75.     Likewise, courts interpreting loan sale agreements have found evidence that a buyer would not have purchased the loan "had they known about the negative information" that was the basis for an alleged breach of representation and warranty sufficient to defeat summary judgment. *Lehman Bros. Holdings, Inc. v. Laureate Realty Servs.*, 1:04-cv-1432-RLY-TAB, 2007 U.S. Dist. LEXIS 76940, at *36-37 (S.D. Ind. Sept. 28, 2007). This again suggests a risk that a court may find it is the falsity of the information available to the buyer at the time of closing that gives rise to the "material and adverse effect," and not the subsequent performance of the loan in question.[17]

76.     Courts interpreting this type of language in the commercial mortgage-backed securities context have also split on the question of whether plaintiffs can be required to meet a "double materiality" standard; that is, whether plaintiff must prove both that the breach was a material breach *and*, as a separate element, that the breach had a "material and adverse" effect on the Investors.[18] Thus, it is unclear what burden of proof a court in a case between FGIC, the Investors, and/or the FGIC Trustees might place on plaintiffs regarding materiality.

77.     In addition to the issues discussed above, other, more mundane disputes as to "materiality" are bound to arise in any litigation with FGIC, the Investors, and/or the FGIC

---

[17] *See also* Material and Adverse Opinion of Professor Barry E. Adler (relating to the action *In the Matter of the Application of The Bank of New York Mellon*, No. 651786/2011 (Sup. Ct., N.Y. Cnty. June 29, 2011) (Kapnick, J.)) (discussing interpretation of similar language in light of *Laureate* and *Wells Fargo* decisions and concluding it "is not possible to conclude with any confidence how a court would interpret" such language), *available at* http://www.cwrmbssettlement.com/docs/Opinion%20Regarding%20Material%20and%20Adverse%20Affect.pdf, at 12 (last visited June 4, 2013).

[18] *Compare Wells Fargo Bank NA v. LaSalle Bank Nat'l Ass'n*, 3:07-cv-00449-MRM, Hr'g Tr., Doc. 366 at 5:11-15 (S.D. Ohio Nov. 13, 2009) ("I agree with Defendant's interpretation of the relevant case law, that Plaintiff must prove as required by New York law that there is a material breach of a representation and warranty . . . .") *with Wells Fargo Bank NA v. LaSalle Nat'l Ass'n*, 2:08-CV-1448 JCM (RJJ), 2011 U.S. Dist. LEXIS 145026, at *11 (D. Nev. Dec. 15, 2011) ("[T]he court does not endorse defendant's contention that the double materiality requirement is well-supported by the relevant case law") and *Wells Fargo Bank, N.A. v. LaSalle Nat'l Ass'n*, No. CIV-08-1125-C, Mem. Op. & Order Doc. 323:41 (W.D. Okla. Dec. 10, 2010) (declining to follow *Wells Fargo* S.D. Ohio decision).
.

Trustees for the FGIC Insured Trusts.  For example, as noted above, it was industry standard during the relevant time period to grant "exceptions" to underwriting guidelines from time to time, based on an overall assessment of the borrower's creditworthiness.  Thus, while published guidelines might require a minimum FICO score of 680 for certain types of loans, an underwriter could approve a borrower with a lower FICO score (say, 640) based on an evaluation of other features of that borrower or loan, such as reserves in excess of the minimum required amount, or a lower debt-to-income ratio than required.  Disputes are bound to arise as to whether a 40-point FICO deviation, in the overall context of that loan, is or is not "material."  With dozens of underwriting parameters to evaluate for thousands of individual loans, any litigation over such issues is certain to be extremely costly and fraught with risk.

## Causation

78.    As noted above, a hotly contested issue in representation and warranty litigation is proximate cause.  There is limited precedent regarding causation in the monoline context and in commercial mortgage-backed cases.

79.    The primary legal dispute, which is intertwined with the materiality issues discussed above, is whether the actual cause of the loan's failure is a defect in the underwriting.

80.    Courts have confirmed that the market collapse can serve as a defense to securities claims under the federal securities laws, as well as common law claims for fraud and negligent misrepresentation.[19]

---

[19] *See, e.g., In re Wash. Mut. Mortg. Backed Secs. Litig.*, NO. C09-37 MJP, 2012 U.S. Dist. LEXIS 102064, at *41-42 (W.D. Wash. July 23, 2012) (denying summary judgment on Securities Act claim where factual issues existed regarding, among other things, whether market collapse caused plaintiffs' losses); *see also Abu Dhabi Commercial Bank v. Morgan Stanley & Co., Inc.*, 08 Civ. 7508 (SAS), 2012 U.S. Dist. LEXIS 119671, at *101-103 (S.D.N.Y. Aug. 17, 2012) (same as to fraud and negligent misrepresentation claims); *but see MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*, 928 N.Y.S.2d 229, 235 (1st Dep't 2011) (declining to rule at motion to dismiss stage that MBIA's losses were caused by the housing and credit crisis).

81.    Furthermore, as a general matter, causation is an element of a contract claim
under New York law.  A plaintiff, for example, must show that the alleged breach of contract
was the "direct and proximate" cause of the injuries.[20]  Accordingly, general contract law allows
defendants to present evidence of the market collapse as the cause of a plaintiff's losses in
RMBS cases.

82.    Only a handful of cases, however, have examined this causation issue in the
specific context of contractual breach of representation and warranty claims (or repurchase
claims).  While some of these cases touch on the market collapse as a defense to plaintiffs'
claims, no court has issued a definitive ruling on the issue.

83.    Causation was addressed in the *MBIA Insurance Corp. v. Countrywide Financial
Corp.* case.  There, the trial court held that MBIA was "not required to establish a direct causal
connection between proven warranty breaches by [defendant] and MBIA's claims payments
made pursuant to the insurance policies at issue" in order to prove that a breach was material.
936 N.Y.S.2d 513, 527 (Sup. Ct., N.Y. Cnty. 2012).  In the same opinion, the trial court
nonetheless held that MBIA must still "prove that it was damaged as a direct result of the
material misrepresentations," and denied MBIA's motion to strike Countrywide's affirmative
defenses based on the intervening or superseding cause of the economic crisis.  *Id.* at 522, 527.[21]

84.    The court's ruling—in addition to providing mixed guidance—was based in
substantial part on applicable insurance statutes.  New York Insurance Law § 3105 provides that

---

[20] *See Freund v. Washington Square Press, Inc.*, 34 N.Y.2d 379, 379 (1974).

[21] On appeal of this decision, the Appellate Division did not disturb that part of the trial court's decision that
"pursuant to Insurance Law §§ 3105 and 3106, plaintiff was not required to establish causation in order to prevail on
its fraud and breach of contract claims," but the Appellate Division also did not disturb the finding that MBIA must
still "prove that it was damaged as a direct result of the material misrepresentations," or the denial of MBIA's
motion to strike Countrywide's defenses based on the intervening or superseding cause of the economic crisis.
*MBIA Ins. Corp. v. Countrywide Home Loans, Inc.,* No. 602825/2008, 2013 N.Y. App. Div. LEXIS 2107 (1st Dep't
Apr. 2, 2013).

an insurance policy can only be avoided for a misrepresentation that is so material that it would have led to the insurer not issuing a policy if it knew the truth regarding a misrepresented fact. *See id.* at 520.  New York Insurance Law § 3106 further limits materiality to breaches which materially increase the risk of loss, damage, or injury of the kind actually suffered.  *See id.*  The insurance analysis, while obviously relevant to an evaluation of FGIC's claims, are not relevant to the Investors' and/or the FGIC Trustees' claims also at issue here. [22]  It is unclear whether any portion of these rulings can be imported into the Investors' and/or the FGIC Trustees' analysis, or to what extent courts will look to the monoline insurance litigation for guidance across the types of claimants involved in this settlement.

85.     The only two cases involving trustee repurchase demands I am aware of are the two *Wells Fargo* evidentiary decisions discussed above, in which the courts excluded *in limine* any evidence of the market collapse so long as the plaintiff trustee limited its evidence to "material and adverse effects as of the closing date."[23]  In both cases, however, the courts did not provide any legal analysis supporting this conclusion.  Accordingly, these decisions appear to have limited persuasive or precedential value.

86.     In another case, *LaSalle Bank Nat'l Assn. v. Citicorp Real Estate, Inc.*, 01 Civ. 4389 (AGS), 2002 U.S. Dist. LEXIS 1730 (S.D.N.Y. Feb. 5, 2002), which is a non-trustee case involving the sale of a loan, the court stated that plaintiffs had properly pleaded a "material and adverse effect" because the alleged breaches could constitute a "partial cause" or may have "contributed" to the loan's eventual default.  *Id.* at *13.  Under this analysis, even a court looking

---

[22] *See also Syncora Guar. Inc. v. EMC Mortg. Corp.*, 874 F. Supp. 2d 328 (S.D.N.Y. 2012); *Assured Guar. Mun. Corp. v. Flagstar Bank, FSB*, No. 11 Civ. 2375 (JSR), 2012 U.S Dist. LEXIS 138296, at *9-11 (S.D.N.Y. Sept. 25, 2012) (also noting that the contractual repurchase language does not tie the repurchase obligation to default of the loan).

[23] *See Wells Fargo Bank, N.A. v. LaSalle Bank Nat'l Ass'n*, No. CIV-08-1125-C, 2011 U.S. Dist. LEXIS 35343, at *23-24 (W.D. Okla. April 1, 2011); *Wells Fargo Bank, N.A. v. LaSalle Bank Nat'l Ass'n*, 2:08-CV-1448 JCM (RJJ), 2011 U.S Dist. LEXIS 145026, at *3-4 (D. Nev. Dec. 15, 2011).

to the eventual outcome of the loan may accept a minimal showing of partial causation by

plaintiff as sufficient for plaintiff to meet its burden.

　　　　87.　　Given the relatively undeveloped status of the case law, the outcome of the

causation issues remains highly uncertain.

### Harm and Damages

　　　　88.　　Defendants in representation and warranty litigation, including the Debtors, have

consistently maintained that the sole remedy for breaches of representations and warranties is the

repurchase of the defective loan.  That conclusion is supported by the plain language of the

Debtor's Sale Agreements.  *See, e.g.,* 2006-HSA2 Home Equity Loan Purchase Agreement, § 3.1

("Upon discovery . . . of a breach of any representation and warranty . . . which materially and

adversely affects the interests of any Securityholders or the Credit Enhancer . . . the Seller shall,

within 90 days of its discovery or receipt of notice of such breach, . . . either (i) cure such breach

in all material respects or (ii) . . . either (A) repurchase such [Loan] . . . or (B) substitute one or

more Eligible Substitute Loans . . . ; provided that the seller shall have the option to substitute . .

. only if such substitution occurs within two years following the Closing Date.

　　　　89.　　Monolines have argued that they are entitled to the monetary equivalent of

rescission of their insurance agreements.[24]  In the trustee context, the only precedent I am aware

of regarding damages are the Lehman and Bank of America settlements and a very recent

decision in *ACE Securities Corp. v. DB Structured Products, Inc.* which found, with a very short

analysis, that a trustee was limited to the repurchase price damages established in the  pooling

---

[24] *See, e.g., MBIA Ins. Corp. v. Countrywide Home Loans, Inc.,* No. 602825/2008, 2013 N.Y. App. Div. LEXIS
2107 (1st Dep't Apr. 2, 2013) (holding "rescission is not warranted" because "Plaintiff voluntarily gave up the right
to seek rescission" and "does not actually seek rescission" in the complaint, nor is it "impracticable in any relevant
sense"); *MBIA Ins. Corp. v. Countrywide Home Loans, Inc.,* No. 602825/2008 , 2013 N.Y. Misc. LEXIS 1774, at
*27 (Sup. Ct., N.Y. Cnty. Apr. 29, 2013) (affirming that "[w]hile rescissory damages are unavailing for the reasons
explained by the First Department, nothing in the contract language cited above bars other forms of monetary
damages, such as compensatory relief").

and servicing agreement.  *See ACE Securities Corp. v. DB Structured Products, Inc.,* Case No.

650980/2012, 2013 N.Y. Misc. Lexis 1979 (Sup. Ct. N.Y. Cnty, May 13, 2013).

90.    In addition to the risk of FGIC raising these arguments, in considering the risk to

the Debtors of litigating the claims, I had to take into account the possibility—however remote—

that the Investors and/or the FGIC Trustees would also attempt to import the same concepts of

rescission likely to be pursued by FGIC into their claims here, in order to maximize or increase

their potential recovery.  Such a theory could inflate the claimed damages by attempting to hold

the Debtors responsible for all losses suffered by the trusts, regardless of whether they are

attributable to breaches of representations and warranties and regardless of whether FGIC paid

claims on those tranches or not, based on the argument that the Investors would never have

purchased the certificates had they known of the alleged breaches.

91.    Even if FGIC, the Investors, and/or the FGIC Trustees are not permitted to obtain

a rescission-like recovery, the parties will undoubtedly dispute the extent to which any losses

suffered by the trusts are actually attributable to breaches of representations and warranties.

92.    In addition, the parties will almost certainly dispute whether FGIC, the Investors,

and/or the FGIC Trustees can recover for loans that breach representations and warranties, but

have not defaulted.  This dispute flows directly from the proximate cause issues discussed above.

If FGIC, the Investors, and/or the FGIC Trustees can recover for loans that have not defaulted—

and perhaps even loans that have been fully paid off, as the Supreme Court of New York,

Appellate Division, First Department has held in the *Countrywide* case—then their damages

could theoretically exceed even the actual and estimated losses to the trusts.[25]

---

[25] *See, e.g., MBIA Ins. Corp. v. Countrywide Home Loans, Inc.,* No. 602825/2008, 2013 N.Y. App. Div. LEXIS
2107 (1st Dep't Apr. 2, 2013) (holding "plaintiff is entitled to a finding that the loan need not be in default to trigger
defendants' obligation to repurchase it"); *see also MBIA Ins. Corp. v. Countrywide Home Loans, Inc.,* No.
602825/2008, 2013 N.Y. Misc. LEXIS 1774, at *52 (Sup. Ct., N.Y. Cnty. Apr. 29, 2013) (holding "in the absence of

93.    Conversely, another possible defense that renders a damages analysis inquiry highly uncertain is whether foreclosure cuts off the ability to request repurchase of loans based on the recent decision in *MASTR Asset Backed Securities Trust 2006-HE3 v. WMC Mortgage Corp.,* Case No. 11-CV-02542, 2012 U.S. Dist. LEXIS 142579 (D. Minn. Oct. 1, 2012).  The court in *MASTR Asset* dismissed repurchase claims brought with respect to foreclosed loans.  A recent decision by a New York State Court denied a motion to dismiss based on a similar theory to that considered in *MASTR Asset.  See ACE Securities Corp. v. DB Structured Products, Inc.*, Case No. 650980/2012, 2013 N.Y. Misc. Lexis 1979 (Sup. Ct. N.Y. Cnty, May 13, 2013) (denying motion to dismiss based on theory that foreclosed loans could not be repurchased because the transaction documents in question appeared to contemplate the repurchase of foreclosed loans).  If litigated, FGIC, the Investors, and/or the FGIC Trustees have credible arguments to distinguish the holding in *MASTR Asset* because the repurchase provisions in the Debtors' transaction documents are significantly different than those in *MASTR Asset* and like those in *Ace Securities* appear to contemplate the repurchase of foreclosed loans.  Moreover, there remains substantial uncertainty whether other courts considering representation and warranty claims would agree with the decision in *MASTR Asset*.  Because the law is still developing around this issue, I do not believe it will likely bar most of the claims of FGIC, the FGIC Trustees and/or the Investors.

94.    Finally, as noted above, FGIC, the Investors, and/or the FGIC Trustees are pursuing some tort claims, which could expose the Debtors to a different potential damages calculation and the prospect of having to litigate punitive damages issues.

---

language restricting Countrywide's repurchase obligation to defaulting loans, the Court concludes that MBIA need not show that a Securitization loan is in default in order to be repurchased"); *Assured Guar. Mun. Corp. v. Flagstar Bank*, FSB, No. 11 Civ. 2375 (JSR), 2013 U.S. Dist. LEXIS 16682, at *105 (S.D.N.Y. Feb. 5, 2013) (holding "the 'cure or repurchase' remedy in the Transaction Documents is not limited to defaulted or delinquent loans").

95.    These risks and uncertainties as to the basic methodology for calculating damages

relating to FGIC, the Investors, and/or the FGIC Trustees' claims are an important factor I

considered in reaching my conclusion.

### ADDITIONAL DEFENSES

96.    In addition to the elements of a proposed plaintiff's cause of action for breaches

of representations and warranties or breaches of the repurchase obligation, I reviewed various

potential affirmative defenses available to the Debtors.  The strengths and weaknesses of these

affirmative defenses also were factors in my conclusion.  The three primary affirmative defenses

I evaluated were (1) statute of limitations, (2) plaintiff's knowledge of the risk and/or failure to

conduct appropriate due diligence, and (3) the intervening cause of the housing crisis.

### Statute of Limitations

97.    The statute of limitations for contract claims in New York is six years, and no

discovery rule that would extend the time period is available for contract claims.  N.Y. CPLR

§ 213(2); *Hernandez v. Bank of Nova Scotia,* 908 N.Y.S.2d 45, 46 (1st Dep't 2010).[26]

98.    Most of the trusts included in the FGIC Settlement Agreement were issued

between 2005 and 2007.  Prior to the Debtors filing for bankruptcy, FGIC sued on the 2005-HE1

and 2005-HS1 transaction more than six years after the closing.  The remaining securitizations

FGIC sued on prepetition were filed within six years of closing.  Additionally, the FGIC

---

[26] As previously noted, my analysis focuses on the breach of contract claims because they pose the greatest risk to
the Debtors.  However, I note that the statute of limitations for fraud in New York is either six years, or two years
from the time the plaintiff discovered or should have discovered the fraud.  N.Y. CPLR § 213.  The analysis as to
when the statute was triggered on fraud claims is likely highly factual; however courts have considered the fact of
widely-publicized allegations of underwriting problems as evidence that the plaintiff "should have discovered" the
fraud at that point.  *See, e.g., Stichting Pensioenfonds ABP v. Countrywide Fin. Corp.,* 802 F. Supp. 2d 1125, 1134-
39 (C.D. Cal. 2011); *but see In re Countrywide Fin. Corp. Mortgage-Backed Secs.,* No. 2:11-ML-02265-MRP
(MANx), 2013 U.S. Dist. LEXIS 40726, at *16 (C.D. Cal. Mar. 21, 2013) ("The Court cannot hold, given the
judicially noticeable materials, that a reasonably diligent investor in mortgage-backed securities could have pled a
sufficient complaint as of February 27, 2008").  The analysis above with respect to the timing of repurchase
demands as a trigger will likely apply to tort claims as well.

Settlement Agreement includes some FGIC Insured Trusts that were closed within six years of the petition date, and FGIC's, the Investors, and the FGIC Trustees' claims were timely as to those Trusts.

99.    Accordingly, one argument the Debtors likely would have considered making if the claims were litigated is that claims for breach of representation and warranty arising from the 2005-HE1 and 2005-HS1 transaction are time-barred.  In addition, some of the Trusts included in the FGIC Settlement Agreement, but on which FGIC had not sued prepetition, are also older Trusts that closed more than six years before the bankruptcy petition was filed on May 14, 2012.

100.    An argument that such older claims are time-barred is supported by a number of courts in a variety of breach of warranty contexts.[27]

101.    Nonetheless, at least two courts have held that the breach of the contractual repurchase obligation is a separate claim from that for breach of a representation or warranty.[28] Thus, the cause of action for breach of the repurchase obligation is only complete—and the statute of limitations only begins running—once the Debtors fail to repurchase non-conforming loans upon demand.  FGIC did not begin to request repurchase from the Debtors until 2008. Neither the Investors nor the FGIC Trustees have yet made any repurchase demands as to these Trusts.  Thus FGIC, the Investors, and/or the FGIC Trustees may argue, "where a demand is necessary to entitle a person to commence an action, the time within which the action must be

---

[27] *See, e.g., Structured Mortg. Trust 1997-2 v. Daiwa Fin. Corp.*, 02 Civ. 3232 (SHS), 2003 U.S. Dist. LEXIS 2677, at *5 (S.D.N.Y. Feb. 25, 2003) (breach occurs at the moment of sale because "the facts warranted in the . . . Agreement were not true when made"); *Nomura Asset Acceptance Corp. Alt. Loan Trust, Series 2005-S4 v. Nomura Credit & Capital, Inc.*, No. 652341/2011 at 13 (Sup. Ct., N.Y. Cty. May 10, 2013); *see also Lehman Bros. Holdings, Inc. v. Evergreen Moneysource Mortg. Co.*, 793 F. Supp. 2d 1189, 1194 (W.D. Wash. 2011); *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Holdings LLC*, No. 5140-CS, 2012 Del. Ch. LEXIS 171, at *56 (Del. Ch. Aug. 7, 2012).

[28] *See Lehman Bros. Holdings, Inc. v. Nat'l Bank of Arkansas*, 875 F. Supp. 2d 911, 916-17 (E.D. Ark. 2012); *ACE Sec. Corp. v. DB Structured Prods., Inc.*, No. 650980/2012, 2013 N.Y. Misc. LEXIS 1979 (Sup. Ct., N.Y. Cnty. May 13, 2013).

commenced shall be computed from the time when the right to make the demand is complete."
N.Y. CPLR § 206.[29]

102.    Thus, while the Debtors would have argued that certain of FGIC's claims are
time-barred if this dispute were litigated, I must consider as part of my analysis the risk that a
court hearing the issues would agree with the *National Bank of Arkansas* court and allow a
separate claim for breach of the repurchase obligation to proceed.

103.    FGIC may also raise a similar argument to one that the Investors have advanced
more broadly against the Debtors.  The Investors contend that the Debtors cannot rely on the
statute of limitations defense given the Debtors' dual role as Seller and Master Servicer for the
securitizations because the Debtors, when acting as Master Servicer, were obligated to pursue
repurchase by the Seller of loans that had breached a representation.  According to the Investors,
because the Debtors should have pursued repurchase claims against themselves prior to the
expiration of the statute of limitations, the Debtors cannot rely on the statute of limitations as a
defense.

104.    I am aware of no court that has addressed this argument.  Thus, while the Debtors
would have logical counter-arguments that equitable tolling is inapplicable to trusts' contract
claims against the Debtors, there is no way to predict whether those counter-arguments would
ultimately prevail.

105.    Under the transaction documents for RFC's securitizations, RFC does serve as
both the Seller and Master Servicer.  *See*, *e.g.*, RASC 2007-EMX1 Assignment and Assumption
Agreement at 1.  Under the transaction documents for GMACM's securitizations, GMACM
serves as both the Seller and the Servicer.  *See, e.g.*, GMACM 2005-HE1 Servicing Agreement

---

[29] *See also Kunstsammlungen Zu Weimar v. Elicofon*, 536 F. Supp. 829, 848-49 (E.D.N.Y. 1981).

at 1.  Under the transaction documents, the Master Servicer (or Servicer) is obligated to request

that the Seller cure or repurchase loans that breach representations:

> **Upon the discovery** by the Depositor, **the Master Servicer**, the
> Certificate Insurer, the Trustee or the Custodian of a breach of any
> of the representations and warranties made in the Assignment
> Agreement in respect of any Mortgage Loan or of any Repurchase
> Event which materially and adversely affects the interests of the
> Certificateholders or the Certificate Insurer in such Mortgage
> Loan, **the party discovering such breach shall give prompt written
> notice to the other parties and the Certificate Insurer** (the
> Custodian being so obligated under a Custodial Agreement).  **The
> Master Servicer shall promptly notify Residential Funding of
> such breach or Repurchase Event and request that Residential
> Funding either** (i) **cure such breach or Repurchase Event** in all
> material respects within 90 days from the date the Master Servicer
> was notified of such breach or Repurchase Event or (ii) **purchase
> such Mortgage Loan** from the Trust Fund at the Purchase Price
> and in the manner set forth in Section 2.02.

RASC 2007-EMX1 Pooling and Servicing Agreement at 63-64 (emphasis added); RFMSII

2006-HSA1 Pooling and Servicing Agreement at 43 (substantially similar); GMACM 2006 HE-1

Servicing Agreement at 4 ("The Servicer, on behalf of and subject to the direction of the

Indenture Trustee, as pledgee of the Mortgage Loans, or the Issuer, shall enforce the

representations and warranties of the Sellers pursuant to the Purchase Agreement.").

106.    Equitable tolling is recognized by courts in New York and is available to extend

the statute of limitations period for certain claims, including claims for breach of contract.[30]

Moreover, as noted by the Investors, equitable tolling has been used to toll the limitations period

for claims "where the one claiming the benefit of the statute of limitations is the one charged in

law with the duty of asserting and enforcing the claim before the statute runs."  *A.F.L. Falck,*

---

[30] *See, e.g., First Am. Title Ins. Co. v. Fiserve Fulfillment Servs.* 06 Civ. 7132, 2008 U.S. Dist. LEXIS 7344, at *12
(S.D.N.Y. Jan. 25, 2008).

*S.p.A. v. E.A. Karay Co.*, 722 F. Supp. 12, 16 (S.D.N.Y. 1989) (quoting *PET, Inc. v. Lustig*, 77

A.D.2d 455, 457 (4th Dep't 1980)).

107.    The Debtors would, however, have several counter-arguments against application

of equitable tolling to FGIC, the Investors' and/or the FGIC Trustees' breach of contract claims

for 2005-HE1 and 2005-HS1.  As an initial matter, the doctrine is only available in "rare and

exceptional circumstances." *Moody v. Morris*, 608 F. Supp. 2d 575, 580 (S.D.N.Y. 2009)

(internal citations, alterations, and quotations omitted).  The cases involving equitable tolling

often involve a defendant that controlled the person or entity capable of timely enforcing the

tolled claim.[31]  In such situations, the claim may be tolled while the defendant is effectively the

sole person or entity capable of enforcing the claim.  *See, e.g.*, *Croce*, 565 F. Supp. at 892.  In the

securitizations covered by the FGIC Settlement Agreement both FGIC and the FGIC Trustees

(both independently and at the request of the Investors) are empowered to demand repurchase of

loans in breach of a representation or warranty.  *See, e.g.* 2005-HE1 Loan Purchase Agreement at

20.

108.    Moreover, even assuming that the Master Servicer has an obligation to pursue a

repurchase claim against the Seller under the transaction documents, the Debtors could argue that

this obligation only arises "upon the discovery" of a "breach" that "materially and adversely

affects the interests of the Securityholders, the Enhancer or the Purchaser …."  *See id.*  Because

the Debtors have not re-underwritten the overwhelming majority of the loans in the trusts, the

Debtors have an argument that, at this time, they are under no obligation to pursue repurchase of

the vast majority of the loans.

---

[31] *See PET, Inc. v. Lustig,* 77 A.D.2d 455, 457 (4th Dep't 1980) (claims of corporation tolled against CEO and
stockholder); *A.F.L. Falck, S.p.A. v. E.A. Karay Co.*, 722 F. Supp. 12, 16 (S.D.N.Y. 1989) (claims of corporation
tolled against president and sole shareholder of corporation); *Croce v. Kurnit*, 565 F. Supp. 884, 892 (S.D.N.Y.
1982) (claims of estate tolled against counsel for the estate).

109.    Further, the Debtors would likely argue that the Master Servicer did not, in fact,

have a legal "duty of asserting and enforcing the claim before the statute runs," *see PET, Inc.*, 77

A.D.2d at 457, but instead only had an obligation to request cure or repurchase by the Seller, *see,*

*id.*

110.    I would expect, however, that FGIC, the Investors, and/or the FGIC Trustees

would vigorously dispute these counter-arguments, and some—in particular, the "upon

discovery" clause argument—are likely to require extensive fact discovery to resolve.

111.    In short, equitable tolling provides another avenue for an aggressive plaintiff to

evade application of the statute of limitations defense.  Because no court has addressed whether a

monoline or trust's claims for breaches of representations and warranties can be equitably tolled

and because reasonable arguments can be advanced for and against application of the doctrine,

equitable tolling injects additional uncertainty into the analysis of the potential outcome of

litigation between the Debtors and FGIC, the Investors, and/or the FGIC Trustees.

### Plaintiffs' Due Diligence

112.    A common inquiry in the monoline credit enhancer litigation context, and under

federal securities law in the investor litigation context, is whether the plaintiff undertook any

diligence before entering the transaction.  For claims arising under the 1933 Securities Act, the

relevant inquiry is whether the investor had knowledge of the risks prior to purchasing the

securities.  For the monoline litigation matters, the question is whether the credit enhancer

justifiably relied on the seller's assurances.

113.    Accordingly, I considered whether any similar analysis might provide a defense in

the context of the kinds of claims resolved by the FGIC Settlement Agreement.  Although courts

have found disputed questions of fact barred defendants' summary judgment requests in other

monoline cases, the due diligence defense could prove dispositive in responding to FGIC's

fraudulent inducement claims.  Nonetheless, I found only limited support for importing these concepts into the pure breach of contract analysis.  On the contrary, the bulk of the case law has supported the general rule that because a warranty "is intended precisely to relieve the promise of any duty to ascertain the fact for himself," it relieves the recipient of any obligation to investigate further.  *Metro. Coal Co. v. Howard*, 155 F.2d 780, 784 (2d Cir. 1946) (L. Hand, J.).[32]

114.    The general rule has a critical exception directly applicable here:  "where the seller has disclosed at the outset facts that would constitute a breach of warranty, that is to say, the inaccuracy of certain warranties, and the buyer closes with full knowledge and acceptance of those inaccuracies, the buyer cannot later be said to believe he was purchasing the seller's promise respecting the truth of the warranties."  *Merrill Lynch & Co. v. Allegheny Energy, Inc.*, 500 F.3d 171, 186 (2d Cir. 2007).  In other words, if the counterparty to the contract "candidly disclosed" that the information supplied (and warranted in the contract to be accurate) was actually inaccurate, the allegedly "relying" party cannot assert a claim for breach of warranty.  *Id.*[33]

115.    However, this exception has been narrowly construed.  Indeed, the court in *Assured Guaranty Municipal Corp. v. Flagstar Bank, FSB* recently rejected a diligence-based argument made by Flagstar on summary judgment, holding that *Ziff-Davis* applied and the *Galli* exception did not, because even though Assured received diligence reports identifying actual

---

[32] *See also CBS, Inc. v. Ziff-Davis Publ'g Co.*, 75 N.Y.2d 496, 503-06 (1990); *MBIA Ins. Corp. v. Credit Suisse Secs. (USA) LLC*, No. 603751/2009, 2011 N.Y. Misc. LEXIS 4787, at *17 (Sup. Ct., N.Y. Cnty. Oct. 7, 2011) , *rev'd and remanded on other grounds*, 102 A.D.3d 488 (1st Dep't 2013) ("[W]here a plaintiff has gone to the trouble to insist on a written representation [or warranty] that certain facts are true, it will often be justified in accepting that representation [or warranty] rather than making its own inquiry") (citation omitted).

[33] *See also Galli v. Metz*, 973 F.2d 145, 151 (2d Cir. 1992) ("Where a buyer closes on a contract in the full knowledge and acceptance of facts *disclosed by the seller* which would constitute a breach of warranty under the terms of the contract, the buyer should be foreclosed from later asserting the breach.  In that situation, unless the buyer expressly preserves his rights under the warranties . . . , we think the buyer has waived the breach.").

examples of problematic loans in the securitization, and had run its own loss models predicting certain losses would occur, that information did not come from the seller/issuer (*i.e.*, Flagstar). *Assured Guar. Mun. Corp. v. Flagstar Bank, FSB,* No. 11 Civ. 2375 (JSR), 2012 U.S Dist. LEXIS 138296, at *18-19 (S.D.N.Y. Sept. 25, 2012). Thus, the court reasoned, "[i]f the buyer 'has been informed of the falsity of the facts by some third party,' he has not waived the representations and warranties." *Id.* at *19 (quoting *Rogath v. Siebenmann,* 129 F.3d 261, 265 (2d Cir. 1997)).[34]

116. The Debtors would argue that their own risk disclosures are so substantial, and so directly warn against reliance on the corresponding statements in the representations and warranties, that the *Galli* exception applies. The Debtors would also argue that the diligence reports and other information provided to FGIC and the Investors trigger the *Galli* exception. However, there is no clear indication that the Debtors would be successful in making such arguments.

### **"Housing Crisis" Defense**

117. There is ample evidence that the true cause of the losses to these trusts was the massive economic downturn beginning in late 2007 and escalating through 2008 and into 2009.

118. As discussed above, the Debtors had developed extensive factual and expert support for this argument.

---

[34] Although it was in the context of justifiable reliance for a fraudulent inducement claim, the court in *MBIA Insurance Corp. v. Countrywide Home Loans, Inc.* similarly concluded in partially denying Countrywide's summary judgment motion that it "cannot find that MBIA's failure to perform the particular type of [individual loan] due diligence that Countrywide suggests makes MBIA's reliance unjustifiable, especially since MBIA did not have a right to access the loan files before closing." No. 602825/2008, 2013 N.Y. Misc. LEXIS 1774, at *15 (Sup. Ct., N.Y. Cnty. Apr. 29, 2013). The court further noted that the type of prospectus supplement "disclaimers identified by Countrywide speak to the future performance of the loans, not the characteristics of the loans at the time the representations were made and the transaction was entered into." *Id.* at *19.

119.    However, in light of some of the court rulings discussed above with respect to materiality and causation, it is possible a court evaluating such claims against the Debtors would preclude the evidence entirely, require the Debtors to prove these facts as an affirmative defense, rather than considering them part of plaintiff's burden to address as part of the "causation" element its claims, or consider the evidence only as a "partial" cause of the loss.

120.    Moreover, FGIC, the Investors, and/or the FGIC Trustees may attempt to argue that the housing crisis itself was propelled in part by the business practices of RMBS issuers like the Debtors.

121.    Accordingly, a key factor to be considered in weighing the potential outcome of the litigating the claims released by the FGIC Settlement Agreement is the possibility that the housing crisis defense may not be permitted or may not be entirely persuasive.

**Other Intervening Causes**

122.    The Debtors also would argue that a number of issues relating to loan attributes and/or non-underwriting events contributed to the Investors' losses.

123.    For example, a number of the trusts involve loans with underwriting characteristics that increase the risk of losses.  These risks are disclosed in the prospectuses and prospectus supplements, and likely contributed to some of the losses experienced by the trusts, reinforcing that breaches of representations and warranties were not the sole cause of losses.  For example, some trusts include loans with adjustable interest rates or "teaser" rate, such that a borrower may be able to afford an introductory or lower interest rate early in the term of the loan, but later encounters difficulty timely paying when the interest rate increases.

124.    In addition, there are a number of causes of delinquencies or defaults that cannot be effectively prevented or controlled through stringent underwriting:  borrowers may become disabled or die; they may unexpectedly lose their jobs; the property may be destroyed due to a

fire or natural disaster and they may be unable to refinance or sell the home as a result.  Some

amount of the losses to the trusts occur as a result of these everyday, non-underwriting-related

events.

125.    This type of "causation" evidence is likely to face similar challenges to the

causation factors described above, because it relates to events occurring after the closing of the

transaction.  I considered the likelihood that these alternative causes actually impacted the trusts'

losses, as well as the possibility that a court might not permit such evidence to be introduced

(either as to causation or damages), in my analysis.

**Evidentiary Issues**

126.    In reaching my conclusions, I also had to consider potential evidentiary issues

and, as a trial lawyer, make an assessment of whether and how the proof on either side of the

case would be admitted.

127.    In general, based on my evaluation of the factual record developed so far, I

believe the Debtors have very strong factual defenses and solid witnesses.  None of the over

sixty witnesses deposed in the *MBIA Insurance Corp. v. Residential Funding Co., LLC*, No.

603552/2008 (Sup. Ct., N.Y. Cnty.) case, for example, testified to anything resembling fraud or

knowing misrepresentation in any of the Debtors' practices.  Many described good attention to

internal controls, and a meaningful effort and genuine desire to be transparent with the Investors

about the risks of the investments.

128.    However, there are some practical challenges to the presentation of evidence,

separate from the legal and factual merits discussed above.

129.    For one, there has been tremendous attrition among the Debtors' employees since

the key events occurring from 2004 through about 2008.  For example, of the seventy-six

witnesses deposed in the two MBIA cases as of the petition date, many of whom would also be

46

witnesses as to the FGIC Insured Trusts, 80% were former employees. Many who were current employees at the time of their deposition have since left the company, most recently to go to Ocwen or Greentree as a result of the Debtors' recent asset sales. At present, *none* of the key RFC capital markets employees who worked on the securitizations at issue remains a current employee of the Debtors. Most of these former employees reside in Minnesota and Pennsylvania, beyond the reach of a New York court trial subpoena. A few reside as far away as California and Texas. Almost none left the company with any ongoing contractual obligation to cooperate with future litigation.

130.    Moreover, most of the former employee witnesses were involuntarily terminated as part of a series of mass layoffs beginning in 2007. Thus, many have a limited sense of loyalty to the Debtors, and while they may have been willing to appear voluntarily once for a deposition to avoid being served with a deposition subpoena, garnering their cooperation for future depositions, let alone trial testimony in another state, would undoubtedly be challenging. Thus, presenting evidence live at trial—which, from my perspective as a trial lawyer, is almost always more meaningful than reading a dry transcript or even replaying videotaped testimony—would be a challenge.

131.    Another challenge is posed by the nature of these securitizations, each of which contains thousands of individual loans. Indeed, over 185,000 loans are at issue in the FGIC Insured Trusts. As noted above, it has always been the Debtors' position that a repurchase claim requires a loan-by-loan evaluation of *which* loans to repurchase. Plaintiffs in both securitization and representation and warranty cases have argued, with some limited success to date, that a

statistical sampling approach is acceptable.[35]  Regardless of whether statistical sampling can

reliably be used to assess breaches and calculate damages, however, it is clear most judges would

not permit the presentation of evidence on thousands of individual loans one by one.

132.    Thus, the evidentiary challenge for trial becomes *which* loans to present.  While it

is my belief based on the available evidence to date that the overwhelming majority of the loans

in each collateral pool did not breach any representations and warranties, it is easy for a

plaintiff's lawyer to focus in on the relatively few loans that present egregious examples of

underwriting problems—what I call the "low hanging fruit."

133.    Those examples present a risk to the Debtors that a judge or jury will form an

adverse impression based on a small slice of the available evidence, placing the Debtors in the

position of attempting to prove a negative.  It is often impractical and difficult to shake those

kinds of initial impressions effectively.

## OUTCOMES IN OTHER MONOLINE LITIGATIONS

134.    In assessing the potential outcomes of the Debtors' prospective litigation with

FGIC, and with the Investors and/or FGIC Trustees, I have found the outcomes of other

monoline litigations not involving the Debtors particularly relevant.  As indicated above, the

Debtors believe they have many meritorious defenses and would be prepared, if necessary, to

defend these claims vigorously.  However, the only monoline case which has gone to trial

resulted in a sizeable verdict for the monoline.  In addition, within the past thirteen months,

monolines have obtained significant settlements from other defendants.

135.    In *Assured Guaranty Municipal Corp. v. Flagstar Bank, FSB*, after a twelve-day

bench trial, Judge Rakoff awarded Assured Guaranty, another monoline insurer, nearly all

---

[35] *See MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*, No. 602825/2008, 2010 N.Y. Misc. LEXIS 6182, at *8-18
(Sup. Ct., N.Y. Cnty. Dec. 22, 2010) (permitting statistical sampling); *Fed. Hous. Fin. Agency v. JPMorgan Chase
& Co.*, 11 Civ. 6189 (DLC), 2012 U.S. Dist. LEXIS 173768 (S.D.N.Y. Dec. 3, 2012) (same).

damages it sought for breaches of representations and warranties in the underlying agreements.
*See Assured Guaranty Municipal Corp. v. Flagstar Bank, FSB*, 11 Civ. 2375 (JSR), 2013 U.S.
Dist. LEXIS 16682 (S.D.N.Y. Feb. 5, 2013).  The plaintiff met with this success even after Judge
Rakoff had granted a sweeping motion to dismiss limiting the plaintiff's claims in accordance
with a sole-remedy provision in the underlying contracts.  There are significant differences
between the transactional documents in the *Assured* case and the Debtors' Sale Agreements, as
well as differing facts between the cases that I believe provide the Debtors' stronger defenses.  I
have, however, considered that adverse outcome in coming to my opinion that there is a risk of
an unfavorable legal outcome if the claims and liabilities released by the FGIC Settlement
Agreement were litigated.

136.    Several of the monolines have also obtained significant monetary payments in
settlement of pending or unfiled litigation.  For example, *Assured Guaranty Corp. v. DB
Structured Products, Inc.*, 651824/2010 (N.Y. Sup. Ct.), in which Assured initially pled losses of
nearly $60 million in claims it had to pay to certificateholders due to Deutsche Bank's alleged
breach of representations and warranties, was reportedly settled along with other claims that
were not yet in litigation for roughly $165 million in May 2012.  Assured also recently settled its
claims against UBS in *Assured Guaranty Municipal Corp. v. UBS Real Estate Securities Inc.*,
12-cv-01579 (HB) (S.D.N.Y.), reportedly for $358 million, plus additional reimbursement under
a collateralized loss-sharing reinsurance agreement.

137.    In July 2012, shortly after Justice Bransten of the New York Supreme Court ruled
that Syncora Guaranty Inc. only had to prove that Countrywide's alleged breaches of
representations and warranties "increased the risk profile of the issued insurance policies,"[36] the

---

[36] *Syncora Guar. Inc. v Countrywide Home Loans, Inc.*, 36 Misc. 3d 328, 345 (N.Y. Sup. Ct. N.Y. Cnty. 2012).

parties settled for a reported sum of $375 million.  Bank of America later publicly announced

that the settlement resolved roughly $600 million of outstanding put-back claims against

Countrywide.

138.    MBIA's case against Flagstar, *MBIA v. Flagstar ABS, LLC*, 13-cv-00262 (JSR)

(S.D.N.Y.), was reportedly settled in May 2013 for $110 million.  In that case MBIA initially

pled that it had paid more than $165 million in claims arising from Flagstar's alleged breaches of

representations and warranties.  In May 2013, MBIA also settled its case against Countrywide,

*MBIA Ins. Corp. v. Countrywide Home Loans*, 602825/2008 (N.Y. Sup. Ct., NY. Cnty.),

reportedly for $1.6 billion in cash from Bank of America, plus other consideration.  Based on

published reports, I understand that in the latter settlement, Bank of America also released MBIA

from significant claims Bank of America affiliates had against MBIA in connection with credit

default swaps.

139.    There are important distinctions between the terms of the agreements governing

the FGIC Insured Trusts and the agreements at issue in the foregoing cases, as well as the types

of securitizations at issue in these cases and the facts and circumstances surrounding the Debtors'

securitization business.  While I believe these distinctions are generally favorable to the Debtors,

I have considered these settlements as showing that other defendants facing similar allegations

thought they were faced with a significant risk of an adverse outcome if the claims were litigated

on the merits.

## COST OF LITIGATING THE CLAIMS

140.    Finally, any trial to resolve the claims on the securitizations covered by the FGIC

Settlement Agreement, would be lengthy and expensive, involving weeks of evidence and

numerous experts on either side, including experts on the underwriting of the loans, statistical

sampling, the impact of the housing crisis, and damages, to name a few.

141.    The anticipated scope of discovery would likely involve tens of millions of pages of documents and hundreds of days of deposition testimony from current and former employees of the debtor entities.  My opinion is based on the Firm's work preparing to litigate with FGIC (including the initial exchange of document requests between the parties in these bankruptcy proceedings), my experience in litigation with MBIA on similar claims to those being asserted by FGIC, and my knowledge regarding the extensive discovery which has occurred in other cases involving monoline insurers.

142.    The Firm represents debtor entities RFC and GMACM in MBIA's lawsuits against each. *MBIA Insurance Corp. v. Residential Funding Co., LLC*, No. 603552/2008 (Sup. Ct., N.Y. Cnty.) and *MBIA Insurance Corp. v. GMAC Mortgage, LLC*, No. 600837/2010 (Sup. Ct., N.Y. Cnty.)  The enormous fact discovery in MBIA's lawsuits is indicative of the potential discovery burden in litigating these claims.

143.    MBIA's case against RFC was filed in 2008, but discovery was still ongoing on the Petition Date in certain matters.  The case involves just five securitizations made up of loans issued by RFC in less than a year.  Still, RFC has produced more than a million pages of documents, over 63,000 mortgage loan files, and one terabyte of data.

144.    In addition, MBIA has taken over eighty days of depositions of current or former RFC, GMACM, or ResCap personnel.  RFC has taken fifty days of depositions of current or former MBIA personnel.  Ten expert reports have been exchanged, and rebuttal reports were anticipated.

145.    Fact discovery in MBIA's lawsuit against GMACM was also ongoing when the bankruptcy case was filed.  That case involves just three securitizations issued by GMACM. GMACM has already produced more than a million pages of documents and additional

electronic records.  The court previously cited to this discovery as showing the likely burden of

discovery of other cases in deciding to extend the automatic stay to stop the litigation being

pursue pursued by Western & Southern.  *See* July 10, 2012 Transcript in *In re Residential

Capital, LLC*, Adv. Proc. No. 12-0167 at 137 ("The debtors have provided specific samples of

cases that involved a small number of securitizations, but still produced millions of pages in

discovery and upwards of eighty days' worth depositions from the debtors' current and former

employees.")

146.    If anything, litigating FGIC's claims would pose a greater burden than the MBIA

cases.  The FGIC Insured Trusts consist of a larger number of securitizations, and a more diverse

array of securitization and loan types than the MBIA cases involved.  Prior to the entry into the

FGIC Settlement Agreement, the Debtors and FGIC had exchanged initial document requests in

these bankruptcy proceedings.  FGIC served the Debtors with no less than **117 document

requests**, including a request for all loan files in connection with the twenty (20) FGIC Insured

Trusts at issue in the prepetition litigation and six (6) additional FGIC Insured Trusts.  The

Debtors and FGIC had multiple meet and confers regarding the Debtors' document requests to

FGIC and the Debtors had provided FGIC an initial set of document search terms and custodians

for FGIC to use in searching its materials.  While FGIC had not yet provided the Debtors with

search terms or custodians, the Debtors had started to analyze the likely custodians for FGIC's

discovery requests, and preliminarily identified over sixty potential custodians among the parties.

147.    Additional complications would be posed in comparison to the MBIA litigation

because of the fact that the Investors and the FGIC Trustees also have claims against the Debtors

based on FGIC's failure to make payments since November 2009 on its policies, which could

impose additional demands on the Debtors.  It is quite possible if no settlement is reached with

FGIC that the FGIC Trustees and/or the Investors would serve their own unique document requests on the Debtors.  Deposition discovery would also likely be more involved, with more parties actively participating.

148.    As shown in the chart below, considering only the twenty FGIC Insured Trusts at issue in the prepetition litigation rather than all of the forty-seven FGIC Insured Trusts covered by the FGIC Settlement Agreement, FGIC's claims involve more securitizations, more loans, more shelves, a greater timeframe and a far wider variety of mortgage products than were involved in the MBIA cases

| | FGIC Cases Filed Prepetition | Combined MBIA Cases |
|---|---|---|
| **No. of Securitizations** | 20 Securitizations | 8 Securitizations |
| **No. of Loans at Closing[37]** | >185,000 Loans | 120,476 Loans |
| **No. of Shelves** | 4 Shelves (GMACM, RASC, RAMP, and RFMSII) | 2 Shelves (GMACM and RFMSII) |
| **Approximate Time Periods For Offerings** | RFC :       1.5 years<br>            (9/23/05 – 3/30/07)<br>GMACM:  2 years, 3 months<br>            (3/29/05 – 6/28/07) | RFC:       10 months<br>            (7/28/06 – 5/30/07)<br>GMACM:  2 years, 5 months<br>            (10/28/04 – 3/29/07) |
| **Loan Types** | • Adjustable rate home equity revolving credit line loans (HELOCs) and closed-end home equity loans (CESs)<br><br>• Fixed-rate and adjustable-rate first lien and junior lien mortgage loans<br><br>• Loans acquired through AlterNet and Negotiated Conduit Asset programs<br><br>• Fixed-rate second loans acquired through the 125% home equity loan program | • Fixed and adjustable rate home equity revolving credit line loans (HELOCs) and closed-end home equity loans (CESs) |

---

[37] Certain of the GMACM sponsored securitizations insured by FGIC and MBIA permitted additional loans to be added to a securitization post-closing.  As a result, the number of loans that were part of the securitizations at any point would be greater than the number of loans included at closing.

Given the over one hundred document requests already served by FGIC and the larger number of

securitizations, mortgage loans and mortgage products involved, discovery regarding the FGIC

Insured Trusts would likely be even more complicated than discovery in the two MBIA cases.

Many of the relevant document custodians and witnesses for litigating the issues covered by the

FGIC Settlement Agreement were not involved in the MBIA cases.  Some of the relevant

custodians have never had their emails restored as part of any prior litigation involving the

Debtors.  Restoring documents from backup tapes for these custodians would be a time-

consuming and expensive process.  In addition, producing the loan files for this large number of

securitizations would be time-consuming and expensive, particularly given the complications

posed by the sale of the Debtors' servicing platform.

## **CONCLUSION**

149.    Based on all of the factors described above, as well as my general professional

experience, my experience working with the Debtors as my clients, and my experience defending

representation and warranty and other RMBS lawsuits, I conclude that settlement of the claims

and liabilities released by the FGIC Settlement Agreement would remove a significant risk of an

unfavorable legal outcome and the necessity of incurring the significant expense of litigating

these claims to final resolution.  I declare under penalty of perjury that the foregoing is true and

correct.

Executed the 7th day of June, 2013, at Columbus, Ohio.

 /s/ Jeffrey A. Lipps_____
                Jeffrey A. Lipps