MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone:   (212) 468-8000
Facsimile:   (212) 468-7900
Gary S. Lee
Todd M. Goren
Samantha Martin

*Counsel for the Debtors and
Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------------------------------

|                                         |   |                          |
|-----------------------------------------|---|--------------------------|
| In re:                                  | ) | Case No. 12-12020 (MG)   |
|                                         | ) |                          |
| RESIDENTIAL CAPITAL, LLC, et al.,       | ) | Chapter 11               |
|                                         | ) |                          |
|                            Debtors.     | ) | Jointly Administered     |
|                                         | ) |                          |

----------------------------------------------------------------

**DEBTORS' REPLY TO OBJECTION OF BERKSHIRE HATHAWAY, INC. TO
DEBTORS' AMENDED MOTION FOR ENTRY OF AN ORDER UNDER
11 U.S.C. §§ 105 AND 363 AUTHORIZING THE DEBTORS TO
SATISFY CERTAIN SECURED CLAIMS**

TO THE HONORABLE MARTIN GLENN
UNITED STATES BANKRUPTCY JUDGE:

The debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors") submit this reply (the "Reply") to the *Objection of Berkshire Hathaway, Inc.* ("Berkshire") *to Debtors' Amended Motion for Entry of an Order Under 11 U.S.C. §§ 105 and 363 Authorizing the Debtors to Satisfy Certain Secured Claims* [Docket No. 3893] (the "Objection").[1]  In further support, the Debtors respectfully represent:

---

[1] Capitalized terms used but not defined herein shall have the meaning ascribed to them in the *Amended Motion for Entry of an Order Under 11 U.S.C. §§ 105 and 363 Authorizing the Debtors to Satisfy Certain Secured Claims* [Docket No. 3872] (the "Amended Motion").

ny-1094163

**PRELIMINARY STATEMENT**

1. The Debtors believe that making the Proposed Payments to AFI and the Junior Secured Noteholders is in the best interests of their estates and creditors, notwithstanding the pendency of the PSA and any alleged potential credit risks presented by AFI with respect to potential subsequent disgorgement of the Proposed Payments.

**REPLY**

**A. THE DEBTORS' CURRENT PAYMENTS TO AFI AND THE JUNIOR SECURED NOTEHOLDERS WILL NOT PREJUDICE THE CASE CONSTITUENTS**

2. As explained below and in the Amended Motion, the Debtors have carefully considered whether and when to make the Proposed Payments in consultation with the Committee, the advisors to the ad hoc group of Junior Secured Noteholders (the "Ad Hoc Group"),[2] AFI and the consenting claimants in connection with the plan support agreement (the "PSA"), and it is their sound business judgment that making the Proposed Payments now is without question in the best interests of the estates. As explained below, failure or delay to make the Proposed Payments will cost the estates millions of dollars and only hurt the Debtors' estates.

3. The Debtors currently pay approximately $2.9 million in interest payments to AFI each month on account of the AFI LOC and the AFI Senior Secured Credit Facility. Further, to the extent the Junior Secured Noteholders are oversecured—a proposition that is subject to two pending adversary proceedings— the Debtors currently would be incurring an additional estimated liability of approximately $20 million per month in postpetition interest on the JSN Secured Claims. Each of these interest obligations will continue to accrue if the Court does not grant the relief requested in the Amended Motion. Even being forced to wait an additional 2

---

[2] Based on the Ad Hoc Group's recent Rule 2019 Statement, the Ad Hoc Group currently holds approximately 50% of the Junior Secured Notes. See *Supplement to Amended Verified Statement of White & Case LLP and Milbank, Tweed, Hadley & McCloy LLP Pursuant to Federal Rule of Bankruptcy Procedure 2019* [Docket No. 3770].

weeks (until the PSA is set for approval) to make the Proposed Payments could cost the Debtors close to $5 million in interest payments for AFI and the Junior Secured Noteholders (if the Junior Secured Notes currently are accruing interest).

4.  Further, the proposal to pay AFI in cash in full prior to making any payments to the Junior Secured Noteholders obviates potential issues that would otherwise arise under the Intercreditor Agreement[3] (pursuant to which AFI has certain rights as senior creditor) if the Debtors were to make a payment only to the Junior Secured Noteholders, as contemplated by the Original Motion.  Additionally, the PSA (subject to the Court's approval) provides that the Debtors may make the JSN Partial Payment if, and only if, the Debtors first pay the AFI Revolver Claims.  For these reasons, the Debtors filed the Amended Motion to allow this Court to consider the issues of the paydown separately from the other issues involved in the PSA.

5.  In addition, Berkshire's statement that the Junior Secured Noteholders are "a significant constituency that has not agreed to support the proposed billion dollar payment to Ally" (Objection at ¶ 2) is incorrect.  While Berkshire has not yet executed any confidentiality agreements to permit it to engage in such discussions, the Debtors have been in frequent discussions with the advisors to the Ad Hoc Group and the JSN Trustee since the filing of the Original Motion concerning these issues, including the Proposed Payments to AFI on account of the AFI Claims.  Indeed, the Debtors shared drafts of the order seeking approval of the Amended Motion with counsel for the Committee, AFI, the Ad Hoc Group, and the JSN Trustee prior to filing, and each of the parties consented to the terms thereof.

6.  Finally, the Amended Motion provides that, in the event the Plan, as defined in the PSA, is not confirmed, the Proposed Payments to AFI will be without prejudice to the rights of any party to seek to recharacterize or equitably subordinate the AFI Claims as if the Proposed

---

[3] See Intercreditor Agreement, dated as of June 6, 2008, § 2 (as amended) [Exhibit A to ECF No. 1866].

3

ny-1094163

Payments had not been made, and for the Court to fashion any remedy in connection therewith. Further, if the Proposed Payments are not made, the interest accrues directly and adversely affects distributions to unsecured creditors of the Debtors' estates.

7.  The estates' fiduciaries, the Debtors and the Committee, both believe that this reservation protects the Debtors' potential claims against AFI in the event that the PSA and/or Plan are not approved. Accordingly, there is no reason to delay the Proposed Payments to AFI. Under the structure of the proposed Plan, it is only unsecured creditors that would suffer as a result of the payment of the ongoing interest expense, while Junior Secured Noteholders, such as a Berkshire, will not be required to bear such expense and will be paid their claims on the effective date of the Plan regardless.

### B. AFI DOES NOT PRESENT A MEANINGFUL CREDIT RISK

8.  In the Objection, Berkshire argues that the ability to disgorge funds from AFI in the event the AFI Claims are recharacterized or equitably subordinated is insufficient because the Amended Motion does not address the alleged potential credit risk posed by AFI in the event the Plan is not approved and the claims against AFI must be pursued. The Debtors have evaluated this argument and believe that the Court should approve the Potential Payments, notwithstanding the risks associated with the potential termination of the PSA and any alleged hypothetical credit risk presented by AFI. Moreover, Berkshire has not and cannot present any evidence in support of its claims.[4]

9.  AFI's recent securities filings indicate a relatively strong liquidity position for each of AFI and Ally Bank. See Form 10-Q for the quarterly period ended March 31, 2013 ("We

---

[4] Certain three-month-old media articles and blog entries do not substantiate Berkshire's allegations. Indeed, although it is not clear whether Berkshire intends to proffer into evidence Exhibit 1 to its Objection, the Debtors are highly skeptical that such a proffer could be sustained over a hearsay objection. See generally Fed. R. Evid. 801 et seq.

maintain available liquidity in the form of cash, unencumbered highly liquid securities, and available credit facility capacity that, taken together, allows us to operate and to meet our contractual and contingent obligations in the event of market-wide disruptions and enterprise-specific events. We maintain available liquidity at various entities and consider regulatory restrictions and tax implications that may limit our ability to transfer funds across entities. At March 31, 2013, we maintained $19.5 billion of total available parent company liquidity and $10.4 billion of total available liquidity at Ally Bank.").[5]  In sum, AFI is one of the largest financial institutions in the United States.  It has well in excess of $100 billion in assets, accesses the credit markets regularly, issues unsecured debt and is a United States Bank Holding Company.  The Debtors have determined in their business judgment, and in consultation with nearly all of their largest creditor constituents, that AFI does not pose a credit risk to the estates.

10.    Thus, the Debtors and Committee have evaluated the risks associated with the repayment of AFI in the event the PSA is terminated or the Plan is not confirmed and have determined that any such risks are outweighed by the interest payments that will be due and owing to AFI currently in the event the AFI LOC and the AFI Senior Secured Credit Facility remain unpaid and the potential accrual of additional interest to the Junior Secured Noteholders, which costs will be borne directly by the estates' unsecured creditors under the proposed Plan. The parties to the PSA, the largest creditors of these estates, also support the relief requested. With this overwhelming consensus and the avoidance of substantial costs to the estates, the Debtors respectfully submit that making the Proposed Payments is unquestionably in the best interests of the estates and a sound exercise of the Debtors' business judgment.

---

[5] The Form 10-Q is available at:
http://www.sec.gov/Archives/edgar/data/40729/000004072913000009/gjm201333110q.htm.

In addition, the relevant pages of the Form 10-Q are annexed hereto as Exhibit 1.

## CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court overrule the Objection and grant the relief requested in the Amended Motion, and grant such other and further relief as is just and proper.

| | |
|---|---|
| New York, New York<br>Dated: June 10, 2013 | /s/ Gary S. Lee<br>Gary S. Lee<br>Todd M. Goren<br>Samantha Martin<br>MORRISON & FOERSTER LLP<br>1290 Avenue of the Americas<br>New York, New York 10104<br>Telephone: (212) 468-8000<br>Facsimile: (212) 468-7900<br><br>*Counsel to the Debtors and*<br>*Debtors in Possession* |

**Exhibit 1**

ny-1094163

Table of Contents

## UNITED STATES SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

# FORM 10-Q

☑ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the quarterly period ended March 31, 2013, or

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from _____ to _____

Commission file number: 1-3754

## ALLY FINANCIAL INC.
*(Exact name of registrant as specified in its charter)*

| **Delaware** | **38-0572512** |
|---|---|
| *(State or other jurisdiction of incorporation or organization)* | *(I.R.S. Employer Identification No.)* |

**200 Renaissance Center
P.O. Box 200, Detroit, Michigan
48265-2000**
*(Address of principal executive offices)*
*(Zip Code)*

**(866) 710-4623**
*(Registrant's telephone number, including area code)*

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months, and (2) has been subject to such filing for the past 90 days.

Yes ☑     No ☐

Indicate by checkmark whether the registrant has submitted electronically and posted on its corporate Web site, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for a shorter period that the registrant was required to submit and post such files).

Yes ☑     No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a nonaccelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer," and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer ☐     Accelerated filer ☐     Non-accelerated filer ☑     Smaller reporting company ☐
(Do not check if a smaller reporting company)

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).

Yes ☐     No ☑

At April 30, 2013, the number of shares outstanding of the Registrant's common stock was 1,330,970 shares.

# Management's Discussion and Analysis
Ally Financial Inc. • Form 10-Q

## Liquidity Management, Funding, and Regulatory Capital
### Overview

 The purpose of liquidity management is to ensure our ability to meet changes in loan and lease demand, debt maturities, deposit withdrawals, and other cash commitments under both normal operating conditions as well as periods of economic or financial stress. Our primary objective is to maintain cost-effective, stable and diverse sources of funding capable of sustaining the organization throughout all market cycles. Sources of liquidity include both retail and brokered deposits and secured and unsecured market-based funding across various maturity, interest rate, and investor profiles. Further liquidity is available through a pool of unencumbered highly liquid securities, borrowing facilities, repurchase agreements, as well as funding programs supported by the Federal Reserve and the Federal Home Loan Bank of Pittsburgh (FHLB).

 We define liquidity risk as the risk that an institution's financial condition or overall safety and soundness is adversely affected by an inability, or perceived inability, to meet its financial obligations, and to withstand unforeseen liquidity stress events. Liquidity risk can arise from a variety of institution specific or market-related events that could have a negative impact on cash flows available to the organization. Effective management of liquidity risk helps ensure an organization's preparedness to meet uncertain cash flow obligations caused by unanticipated events. The ability of financial institutions to manage liquidity needs and contingent funding exposures has proven essential to their solvency.

 The Asset-Liability Committee (ALCO) is chaired by the Corporate Treasurer and is responsible for monitoring Ally's liquidity position, funding strategies and plans, contingency funding plans, and counterparty credit exposure arising from financial transactions. Corporate Treasury is responsible for managing the liquidity positions of Ally within prudent operating guidelines and targets approved by ALCO and the Risk and Compliance Committee of the Ally Financial Board of Directors. We manage liquidity risk at the business segment, legal entity, and consolidated levels. Each business segment, along with Ally Bank, prepares periodic forecasts depicting anticipated funding needs and sources of funds with oversight and monitoring by Corporate Treasury. Corporate Treasury manages liquidity under baseline economic projections as well as more severe economic stressed environments. Corporate Treasury, in turn, plans, and executes our funding strategies.

 Ally uses multiple measures to frame the level of liquidity risk, manage the liquidity position, or identify related trends as early warning indicators. These measures include coverage ratios that measure the sufficiency of the liquidity portfolio and stability ratios that measure longer-term structural liquidity. In addition, we have established several internal management routines designed to review all aspects of liquidity and funding plans, evaluate the adequacy of liquidity buffers, review stress testing results, and assist senior management in the execution of its structured funding strategy and risk management accountabilities.

 We maintain available liquidity in the form of cash, unencumbered highly liquid securities, and available credit facility capacity that, taken together, allows us to operate and to meet our contractual and contingent obligations in the event of market-wide disruptions and enterprise-specific events. We maintain available liquidity at various entities and consider regulatory restrictions and tax implications that may limit our ability to transfer funds across entities. At March 31, 2013, we maintained $19.5 billion of total available parent company liquidity and $10.4 billion of total available liquidity at Ally Bank. Parent company liquidity is defined as our consolidated operations less Ally Bank and the subsidiaries of Ally Insurance's holding company. To optimize cash and secured facility capacity between entities, the parent company lends cash to Ally Bank on occasion under an intercompany loan agreement. At March 31, 2013, $2.2 billion was outstanding under the intercompany loan agreement. Amounts outstanding are repayable to the parent company upon demand, subject to five days notice. As a result, this amount is included in the parent company available liquidity and excluded from the available liquidity at Ally Bank.

### Funding Strategy

 Liquidity and ongoing profitability are largely dependent on our timely and cost-effective access to retail deposits and funding in different segments of the capital markets. Our funding strategy largely focuses on the development of diversified funding sources across a global investor base to meet all our liquidity needs throughout different market cycles, including periods of financial distress. These funding sources include unsecured debt capital markets, unsecured retail term notes, public and private asset-backed securitizations, committed and uncommitted credit facilities, brokered certificates of deposits, and retail deposits. We also supplement these sources with a modest amount of short-term borrowings, including Demand Notes, bank loans, and repurchase arrangements. The diversity of our funding sources enhances funding flexibility, limits dependence on any one source, and results in a more cost-effective funding strategy over the long term. We evaluate funding markets on an ongoing basis to achieve an appropriate balance of unsecured and secured funding sources and the maturity profiles of both. In addition, we further distinguish our funding strategy between Ally Bank funding and parent company or nonbank funding.

 We diversify Ally Bank's overall funding in order to reduce reliance on any one source of funding and to achieve a well-balanced funding portfolio across a spectrum of risk, duration, and cost of funds characteristics. Over the past few years, we have been focused on diversifying our funding sources, in particular at Ally Bank by growing retail deposits, expanding public and private securitization programs, maintaining the maturity profile of our brokered deposit portfolio while not exceeding a $10.0 billion portfolio, establishing repurchase agreements, and continuing to access funds from the Federal Home Loan Banks.

 Since 2009, we have been directing new bank-eligible assets in the United States to Ally Bank in order to reduce and minimize our nonbanking exposures and funding requirements and to utilize our growing consumer deposit-taking capabilities. This has allowed us to use bank funding for a wider array of our automotive finance assets and to provide a sustainable long-term funding channel for the business, while also improving the cost of funds for the enterprise.