Richard M. Cieri
Ray C. Schrock
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York  10022
Telephone:     (212) 446-4800
Facsimile:      (212) 446-4900

*Counsel for Ally Financial Inc. and Ally Bank*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| RESIDENTIAL CAPITAL, LLC, <u>et al</u>. | ) Case No. 12-12020 (MG) |
| | ) |
| Debtors. | ) Jointly Administered |
| | ) |

**ALLY FINANCIAL INC.'S STATEMENT IN SUPPORT**
**OF DEBTORS' AMENDED MOTION UNDER 11 U.S.C. §§ 105 AND**
**363 AUTHORIZING THE DEBTORS TO SATISFY CERTAIN SECURED CLAIMS**

TO THE HONORABLE MARTIN GLENN
UNITED STATES BANKRUPTCY JUDGE:

Ally Financial Inc. on behalf of itself and its non-debtor subsidiaries, including Ally

Bank, (collectively, "***Ally***") submits this statement in support of the *Debtors' Amended Motion*

*Under 11 U.S.C. §§ 105 and 363 Authorizing the Debtors to Satisfy Certain Secured Claims*

[ECF No. 3872] (together with the proposed order attached thereto, the "***Motion***") and in

response to the *Objection of Berkshire Hathaway Inc. to Debtors' Amended Motion Under*

*11 U.S.C. §§ 105 and 363 Authorizing the Debtors to Satisfy Certain Secured Claims* [ECF

No. 3893] (the "***Objection***").[1]

---

[1]    Capitalized terms used but not defined herein have the meanings ascribed to such terms in the Motion.

## STATEMENT

1.    Ally supports the Motion, which has garnered substantial consensus among the Debtors' major stakeholders, including the Committee and the numerous sophisticated creditors that are most directly affected by the relief sought in the Motion.  The Debtors have exercised sound business judgment[2] in seeking to pay down the AFI Claims and JSN Secured Claims (the "***Paydown***") to enhance creditor recoveries in these cases.  Further, Berkshire Hathaway Inc.'s ("***Berkshire***") Objection is without merit, ignores the millions of dollars that continue to be spent by the Debtors' estates and should be overruled.

2.    *First*, for the record, it was not a request from Ally that gave rise to the Motion. Instead, Ally has steadfastly insisted, consistent with its legal rights and applicable law, that the terms of that certain intercreditor agreement, dated as of June 6, 2008 (as amended) (the "***Intercreditor Agreement***")[3] be respected by the parties that signed that contract or are bound by its terms and informed the Debtors that it will take all appropriate action to enforce its intercreditor rights in this Court.  The Debtors filed the Original Motion to pay the Junior Secured Noteholders after extensive negotiations with the advisors to the ad hoc group of Junior Secured Noteholders (the "***Ad Hoc Group***").  The Motion, as amended, is the product of extensive, good-faith negotiations among the Debtors, the Committee, Ally, and — contrary to Berkshire's claim that the Junior Secured Noteholders have not "agreed to support the proposed billion dollar payment to Ally"[4] and notwithstanding that Junior Secured Noteholder consent is not required — the advisors to the Ad Hoc Group.  Additionally, the relief sought is consistent

---

[2]    *See* Motion, ¶ 38.

[3]    *See generally*, Intercreditor Agreement, dated as of June 6, 2008 (as amended) [Exhibit A to ECF No. 1866].

[4]    Objection, ¶ 2.

with the plan support agreement (the "**PSA**") that the Debtors, the Creditors' Committee, Ally, and the Debtors' key creditors recently executed — which resulted from the Court's mediation process and substantial involvement of the Court-appointed mediator, the Honorable James Peck.

3.        *Second,* the Paydown is in the best interests of the Debtors' creditors.  Paying down the JSN Secured Claims avoids the Debtors potentially incurring approximately $20 million in post-petition interest per month.[5]  The Paydown also alleviates payment of approximately $3 million a month to Ally on account of postpetition interest on the AFI Claims. The funds the Debtors will use to make the Paydown presently are earning an immaterial return.[6] Thus, the Paydown is accretive to the Debtors' estates and creditors, including Berkshire.

4.        *Third*, contrary to Berkshire's assertion otherwise,[7] the Motion has been filed in the proper sequence and at the appropriate time in these cases.  Not a moment should be lost to stop the substantial continued administrative costs in these cases.  The benefits to the Debtors' estates through the Motion are tangible and quantifiable.  Moreover, as a large holder of Junior Secured Notes, sophisticated participant in Ally's capital structure at numerous points in time and which bought the Junior Secured Notes with full knowledge of the Intercreditor Agreement's terms, Berkshire does not dispute that the Motion is consistent with the contract to which it is bound.[8]

---

[5]    *See Objection of Ad Hoc Group of Junior Secured Noteholders to Debtors' Motion for Entry of an Order to Permit the Debtors to Continue Using Cash Collateral*, 1 at n.1 (May 6, 2013) [ECF No. 3625]; *see also* Motion, ¶ 5.

[6]    Motion, ¶ 31.

[7]    *See* Objection, ¶ 1.

[8]    *See* Intercreditor Agreement, § 3 (as amended). *See also, In re Ion Media Networks*, 419 B.R. 585, 595 (Bankr. S.D.N.Y. 2009) (enforcing an intercreditor agreement and holding "plainly worded contracts establishing priorities and limiting obstructionist, destabilizing and wasteful behavior should be enforced and creditor expectations should be appropriately fulfilled.").

5.      *Fourth*, Berkshire argues that Ally's credit worthiness is reason alone for the Court to deny the Paydown.  This allegation is specious and the conclusion that Ally may not be credit worthy simply is untrue.  Ally respectfully submits that its public Securities Exchange Commission filings,[9] which demonstrate the substantial financial wherewithal of Ally, one of the largest financial institutions in the United States and a United States Bank Hold Company with more than $166 billion in assets as of March 31, 2013,[10] as well as the support of the Creditors' Committee and the largest unsecured creditors of these estates (which are some of the largest and most sophisticated financial institutions in the country) and the other reasons espoused by the Debtors are more than sufficient to justify the Debtors' business judgment and overrule the Objection.

[*Remainder of page intentionally left blank.*]

---

[9]    *See* Ally Financial Inc., Quarterly Report (Form 10-Q) (May 1, 2013), attached hereto as **Exhibit 1** (the "***Quarterly Report***"); *see also* Ally Financial Inc., Annual Report (Form 10-K) (Jan. 31, 2013), attached hereto as **Exhibit 2**.

[10]    *See* Quarterly Report, 5.

4

6.    For the foregoing reasons, Ally supports the Motion.  The Court should overrule

the Objection and approve the Motion.

New York, New York                         */s/  Ray C. Schrock*
Dated: June 10, 2012                        Richard M. Cieri
                                            Ray C. Schrock
                                            KIRKLAND & ELLIS LLP
                                            601 Lexington Avenue
                                            New York, New York  10022
                                            Telephone:    (212) 446-4800
                                            Facsimile:    (212) 446-4900

                                            *Counsel for Ally Financial Inc. and Ally Bank*

**<u>EXHIBIT 1</u>**

**Ally Financial Inc., Quarterly Report (Form 10-Q) (May 1, 2013)**

Table of Contents

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

# FORM 10-Q

☑        **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d)
OF THE SECURITIES EXCHANGE ACT OF 1934**

       **For the quarterly period ended March 31, 2013, or**

☐        **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d)
OF THE SECURITIES EXCHANGE ACT OF 1934**

       **For the transition period from _____ to _____**

**Commission file number: 1-3754**

# ALLY FINANCIAL INC.
### *(Exact name of registrant as specified in its charter)*

| | |
|---|---|
| **Delaware** | **38-0572512** |
| *(State or other jurisdiction of* | *(I.R.S. Employer* |
| *incorporation or organization)* | *Identification No.)* |

### 200 Renaissance Center
### P.O. Box 200, Detroit, Michigan
### 48265-2000
*(Address of principal executive offices)*
*(Zip Code)*

### (866) 710-4623
*(Registrant's telephone number, including area code)*

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months, and (2) has been subject to such filing for the past 90 days.

Yes ☑          No ☐

Indicate by checkmark whether the registrant has submitted electronically and posted on its corporate Web site, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for a shorter period that the registrant was required to submit and post such files).

Yes ☑          No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a nonaccelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer," and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer ☐        Accelerated filer ☐        Non-accelerated filer ☑        Smaller reporting company ☐
(Do not check if a smaller reporting company)

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).

Yes ☐          No ☑

At April 30, 2013, the number of shares outstanding of the Registrant's common stock was 1,330,970 shares.

Table of Contents

# INDEX

Ally Financial Inc. ☐ Form 10-Q

|  |  | Page |
|---|---|---|
| **Part I — Financial Information** |  |  |
| Item 1. | Financial Statements |  |
|  | Condensed Consolidated Statement of Comprehensive Income (unaudited) | 3 |
|  | for the Three Months Ended March 31, 2013 and 2012 | 3 |
|  | Condensed Consolidated Balance Sheet (unaudited) at March 31, 2013 and December 31, 2012 | 5 |
|  | Condensed Consolidated Statement of Changes in Equity (unaudited) |  |
|  | for the Three Months Ended March 31, 2013 and 2012 | 7 |
|  | Condensed Consolidated Statement of Cash Flows (unaudited) |  |
|  | for the Three Months Ended March 31, 2013 and 2012 | 8 |
|  | Notes to Condensed Consolidated Financial Statements (unaudited) | 10 |
| Item 2. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 72 |
| Item 3. | Quantitative and Qualitative Disclosures About Market Risk | 114 |
| Item 4. | Controls and Procedures | 115 |
| **Part II — Other Information** |  | 116 |
| Item 1. | Legal Proceedings | 116 |
| Item 1A. | Risk Factors | 116 |
| Item 2. | Unregistered Sales of Equity Securities and Use of Proceeds | 117 |
| Item 3. | Defaults Upon Senior Securities | 117 |
| Item 4. | Mine Safety Disclosures | 117 |
| Item 5. | Other Information | 117 |
| Item 6. | Exhibits | 117 |
| **Signatures** |  | 118 |
| **Index of Exhibits** |  | 119 |

Table of Contents

## PART I — FINANCIAL INFORMATION

Item 1. Financial Statements

# Condensed Consolidated Statement of Comprehensive Income (unaudited)

Ally Financial Inc. • Form 10-Q

| ($ in millions) | | Three months ended March 31, | |
|---|---|---:|---:|
| | | **2013** | 2012 |
| **Financing revenue and other interest income** | | | |
| Interest and fees on finance receivables and loans | $ | **1,135** | $ 1,093 |
| Interest on loans held-for-sale | | **16** | 31 |
| Interest on trading assets | | **—** | 9 |
| Interest and dividends on available-for-sale investment securities | | **68** | 74 |
| Interest-bearing cash | | **3** | 2 |
| Operating leases | | **734** | 507 |
| Total financing revenue and other interest income | | **1,956** | 1,716 |
| **Interest expense** | | | |
| Interest on deposits | | **164** | 163 |
| Interest on short-term borrowings | | **16** | 17 |
| Interest on long-term debt | | **701** | 880 |
| Total interest expense | | **881** | 1,060 |
| Depreciation expense on operating lease assets | | **435** | 305 |
| Net financing revenue | | **640** | 351 |
| **Other revenue** | | | |
| Servicing fees | | **82** | 122 |
| Servicing asset valuation and hedge activities, net | | **(201)** | (106) |
| Total servicing income, net | | **(119)** | 16 |
| Insurance premiums and service revenue earned | | **259** | 270 |
| Gain on mortgage and automotive loans, net | | **38** | 20 |
| Other gain on investments, net | | **51** | 89 |
| Other income, net of losses | | **157** | 210 |
| Total other revenue | | **386** | 605 |
| **Total net revenue** | | **1,026** | 956 |
| **Provision for loan losses** | | **131** | 98 |
| **Noninterest expense** | | | |
| Compensation and benefits expense | | **285** | 303 |
| Insurance losses and loss adjustment expenses | | **115** | 98 |
| Other operating expenses | | **558** | 454 |
| Total noninterest expense | | **958** | 855 |
| **(Loss) income from continuing operations before income tax expense** | | **(63)** | 3 |
| Income tax (benefit) expense from continuing operations | | **(123)** | 1 |
| **Net income from continuing operations** | | **60** | 2 |
| Income from discontinued operations, net of tax | | **1,033** | 308 |
| **Net income** | | **1,093** | 310 |
| Other comprehensive (loss) income, net of tax | | **(317)** | 187 |
| **Comprehensive income** | $ | **776** | $ 497 |

Statement continues on the next page.

The Notes to the Condensed Consolidated Financial Statements (unaudited) are an integral part of these statements.

3

Table of Contents

## Condensed Consolidated Statement of Comprehensive Income (unaudited)

Ally Financial Inc. • Form 10-Q

| | Three months ended March 31, | |
|---|---|---|
| *($ in millions except per share data)* | **2013** | 2012 |
| **Net income attributable to common shareholders** | | |
| Net income from continuing operations | $ **60** | $ 2 |
| Preferred stock dividends — U.S. Department of Treasury | **(133)** | (134) |
| Preferred stock dividends | **(67)** | (67) |
| **Net loss from continuing operations attributable to common shareholders** | **(140)** | (199) |
| Income from discontinued operations, net of tax | **1,033** | 308 |
| **Net income attributable to common shareholders** | $ **893** | $ 109 |
| **Basic weighted-average common shares outstanding** | **1,330,970** | 1,330,970 |
| **Diluted weighted-average common shares outstanding (a)** | **1,330,970** | 1,330,970 |
| **Basic earnings per common share** | | |
| Net loss from continuing operations | $ **(105)** | $ (149) |
| Income from discontinued operations, net of tax | **776** | 231 |
| Net income | $ **671** | $ 82 |
| **Diluted earnings per common share (a)** | | |
| Net loss from continuing operations | $ **(105)** | $ (149) |
| Income from discontinued operations, net of tax | **776** | 231 |
| Net income | $ **671** | $ 82 |

(a)   Due to the antidilutive effect of converting the Fixed Rate Cumulative Mandatorily Convertible Preferred Stock into common shares and the net loss from continuing operations attributable to common shareholders for the  three months ended  March 31, 2013 and 2012, loss from continuing operations attributable to common shareholders and basic weighted-average common shares outstanding were used to calculate basic and diluted earnings per share.

The Notes to the Condensed Consolidated Financial Statements (unaudited) are an integral part of these statements.

4

Table of Contents

# Condensed Consolidated Balance Sheet (unaudited)

Ally Financial Inc. • Form 10-Q

| ($ in millions) | | March 31, 2013 | | December 31, 2012 |
|---|---|---|---|---|
| **Assets** | | | | |
| Cash and cash equivalents | | | | |
| Noninterest-bearing | $ | **1,043** | $ | 1,073 |
| Interest-bearing | | **6,394** | | 6,440 |
| Total cash and cash equivalents | | **7,437** | | 7,513 |
| Investment securities | | **15,752** | | 14,178 |
| Loans held-for-sale, net ($701 and $2,490 fair value-elected) | | **718** | | 2,576 |
| Finance receivables and loans, net | | | | |
| Finance receivables and loans, net | | **99,123** | | 99,055 |
| Allowance for loan losses | | **(1,197)** | | (1,170) |
| Total finance receivables and loans, net | | **97,926** | | 97,885 |
| Investment in operating leases, net | | **14,828** | | 13,550 |
| Mortgage servicing rights | | **917** | | 952 |
| Premiums receivable and other insurance assets | | **1,608** | | 1,609 |
| Other assets | | **7,950** | | 11,908 |
| Assets of operations held-for-sale | | **19,063** | | 32,176 |
| Total assets | $ | **166,199** | $ | 182,347 |
| **Liabilities** | | | | |
| Deposit liabilities | | | | |
| Noninterest-bearing | $ | **844** | $ | 1,977 |
| Interest-bearing | | **49,482** | | 45,938 |
| Total deposit liabilities | | **50,326** | | 47,915 |
| Short-term borrowings | | **7,618** | | 7,461 |
| Long-term debt | | **67,621** | | 74,561 |
| Interest payable | | **972** | | 932 |
| Unearned insurance premiums and service revenue | | **2,286** | | 2,296 |
| Accrued expenses and other liabilities | | **3,669** | | 6,585 |
| Liabilities of operations held-for-sale | | **13,233** | | 22,699 |
| Total liabilities | | **145,725** | | 162,449 |
| **Equity** | | | | |
| Common stock and paid-in capital | | **19,668** | | 19,668 |
| Mandatorily convertible preferred stock held by U.S. Department of Treasury | | **5,685** | | 5,685 |
| Preferred stock | | **1,255** | | 1,255 |
| Accumulated deficit | | **(6,128)** | | (7,021) |
| Accumulated other comprehensive (loss) income | | **(6)** | | 311 |
| Total equity | | **20,474** | | 19,898 |
| Total liabilities and equity | $ | **166,199** | $ | 182,347 |

The Notes to the Condensed Consolidated Financial Statements (unaudited) are an integral part of these statements.

Table of Contents

# Condensed Consolidated Balance Sheet (unaudited)

Ally Financial Inc. • Form 10-Q

The assets of consolidated variable interest entities, presented based upon the legal transfer of the underlying assets in order to reflect legal ownership, that can be used only to settle obligations of the consolidated variable interest entities and the liabilities of these entities for which creditors (or beneficial interest holders) do not have recourse to our general credit were as follows.

| ($ in millions) | | March 31, 2013 | | December 31, 2012 |
|---|---|---|---|---|
| **Assets** | | | | |
| Finance receivables and loans, net | | | | |
| Finance receivables and loans, net | $ | **30,181** | $ | 31,510 |
| Allowance for loan losses | | **(152)** | | (144) |
| Total finance receivables and loans, net | | **30,029** | | 31,366 |
| Investment in operating leases, net | | **5,276** | | 6,060 |
| Other assets | | **2,211** | | 2,868 |
| Assets of operations held-for-sale | | **7,835** | | 12,139 |
| Total assets | $ | **45,351** | $ | 52,433 |
| **Liabilities** | | | | |
| Short-term borrowings | $ | **400** | $ | 400 |
| Long-term debt | | **25,757** | | 26,461 |
| Interest payable | | **—** | | 1 |
| Accrued expenses and other liabilities | | **21** | | 16 |
| Liabilities of operations held-for-sale | | **5,762** | | 9,686 |
| Total liabilities | $ | **31,940** | $ | 36,564 |

The Notes to the Condensed Consolidated Financial Statements (unaudited) are an integral part of these statements.

6

Table of Contents

# Condensed Consolidated Statement of Changes in Equity (unaudited)

Ally Financial Inc. • Form 10-Q

| ($ in millions) | Common stock and paid-in capital | | Mandatorily convertible preferred stock held by U.S. Department of Treasury | | Preferred stock | | Accumulated deficit | | Accumulated other comprehensive income (loss) | | Total equity | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Balance at January 1, 2012 | $ | 19,668 | $ | 5,685 | $ | 1,255 | $ | (7,415) | $ | 87 | $ | 19,280 |
| Net income | | | | | | | | 310 | | | | 310 |
| Preferred stock dividends — U.S. Department of Treasury | | | | | | | | (134) | | | | (134) |
| Preferred stock dividends | | | | | | | | (67) | | | | (67) |
| Other comprehensive income | | | | | | | | | | 187 | | 187 |
| Balance at March, 2012 | $ | 19,668 | $ | 5,685 | $ | 1,255 | $ | (7,306) | $ | 274 | $ | 19,576 |
| Balance at January 1, 2013 | $ | **19,668** | $ | **5,685** | $ | **1,255** | $ | **(7,021)** | $ | **311** | $ | **19,898** |
| Net income | | | | | | | | **1,093** | | | | **1,093** |
| Preferred stock dividends — U.S. Department of Treasury | | | | | | | | **(133)** | | | | **(133)** |
| Preferred stock dividends | | | | | | | | **(67)** | | | | **(67)** |
| Other comprehensive loss | | | | | | | | | | **(317)** | | **(317)** |
| **Balance at March 31, 2013** | **$** | **19,668** | **$** | **5,685** | **$** | **1,255** | **$** | **(6,128)** | **$** | **(6)** | **$** | **20,474** |

The Notes to the Condensed Consolidated Financial Statements (unaudited) are an integral part of these statements.

7

Table of Contents

# Condensed Consolidated Statement of Cash Flows (unaudited)

Ally Financial Inc. • Form 10-Q

| Three months ended March 31, ($ in millions) | | 2013 | | 2012 |
|---|---|---:|---|---:|
| **Operating activities** | | | | |
| Net income | $ | **1,093** | $ | 310 |
| Reconciliation of net income to net cash provided by operating activities | | | | |
| Depreciation and amortization | | **657** | | 568 |
| Changes in fair value of mortgage servicing rights | | **90** | | (1) |
| Provision for loan losses | | **158** | | 140 |
| Gain on sale of loans, net | | **(38)** | | (131) |
| Net gain on investment securities | | **(53)** | | (96) |
| Originations and purchases of loans held-for-sale | | **(5,759)** | | (9,626) |
| Proceeds from sales and repayments of loans held-for-sale | | **7,481** | | 11,111 |
| Gain on sale of subsidiaries, net | | **(888)** | | — |
| Net change in | | | | |
| Trading assets | | **—** | | (268) |
| Deferred income taxes | | **(116)** | | (31) |
| Interest payable | | **44** | | 86 |
| Other assets | | **1,329** | | 755 |
| Other liabilities | | **(1,259)** | | (865) |
| Other, net | | **(485)** | | 190 |
| Net cash provided by operating activities | | **2,254** | | 2,142 |
| **Investing activities** | | | | |
| Purchases of available-for-sale securities | | **(4,626)** | | (3,172) |
| Proceeds from sales of available-for-sale securities | | **1,543** | | 2,940 |
| Proceeds from maturities and repayment of available-for-sale securities | | **1,604** | | 1,222 |
| Net increase in finance receivables and loans | | **(42)** | | (4,409) |
| Purchases of operating lease assets | | **(2,352)** | | (1,468) |
| Disposals of operating lease assets | | **641** | | 465 |
| Proceeds from sale of business units, net (a) | | **2,829** | | 29 |
| Net change in restricted cash | | **1,067** | | 280 |
| Other, net | | **41** | | 43 |
| Net cash provided by (used in) investing activities | | **705** | | (4,070) |

Statement continues on the next page.

The Notes to the Condensed Consolidated Financial Statements (unaudited) are an integral part of these statements.

Table of Contents

# Condensed Consolidated Statement of Cash Flows (unaudited)

Ally Financial Inc. • Form 10-Q

| Three months ended March 31, *($ in millions)* | | 2013 | | 2012 |
|---|---|---|---|---|
| **Financing activities** | | | | |
| Net change in short-term borrowings | | **518** | | (546) |
| Net increase in deposits | | **2,360** | | 2,089 |
| Proceeds from issuance of long-term debt | | **4,253** | | 10,749 |
| Repayments of long-term debt | | **(11,445)** | | (10,024) |
| Dividends paid | | **(200)** | | (200) |
| Net cash (used in) provided by financing activities | | **(4,514)** | | 2,068 |
| Effect of exchange-rate changes on cash and cash equivalents | | **67** | | (141) |
| Net decrease in cash and cash equivalents | | **(1,488)** | | (1) |
| Adjustment for change in cash and cash equivalents of operations held-for-sale (a) (b) | | **1,412** | | 45 |
| Cash and cash equivalents at beginning of year | | **7,513** | | 13,035 |
| Cash and cash equivalents at March 31, | $ | **7,437** | $ | 13,079 |
| **Supplemental disclosures** | | | | |
| Cash paid for | | | | |
| Interest | $ | **1,026** | $ | 1,218 |
| Income taxes | | **37** | | 178 |
| Other disclosures | | | | |
| Proceeds from sales and repayments of mortgage loans held-for-investment originally designated as held-for-sale | | **10** | | 63 |

(a)   The amounts are net of cash and cash equivalents of $905 million at March 31, 2013 and $64 million at March 31, 2012 of business units at the time of disposition.

(b)   Cash flows of discontinued operations are reflected within operating, investing, and financing activities in the  Condensed Consolidated Statement of Cash Flows . The cash balance of these operations is reported as assets of operations held-for-sale on the  Condensed Consolidated Balance Sheet .

The Notes to the Condensed Consolidated Financial Statements (unaudited) are an integral part of these statements.

Table of Contents

# Notes to Condensed Consolidated Financial Statements (unaudited)

Ally Financial Inc. • Form 10-Q

## 1.   Description of Business, Basis of Presentation, and Changes in Significant Accounting Policies

Ally Financial Inc. (formerly GMAC Inc. and referred to herein as Ally, we, our, or us) is a leading, independent, diversified, financial services firm. Founded in 1919, we are a leading automotive financial services company with over 90 years experience providing a broad array of financial products and services to automotive dealers and their customers. We became a bank holding company on December 24, 2008, under the Bank Holding Company Act of 1956, as amended. Our banking subsidiary, Ally Bank, is an indirect wholly owned subsidiary of Ally Financial Inc. and a leading franchise in the growing direct (internet, telephone, mobile, and mail) banking market.

Our accounting and reporting policies conform to accounting principles generally accepted in the United States of America (GAAP). Additionally, where applicable, the policies conform to the accounting and reporting guidelines prescribed by bank regulatory authorities. The preparation of financial statements in conformity with GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities at the date of the financial statements and that affect income and expenses during the reporting period. In developing the estimates and assumptions, management uses all available evidence; however, actual results could differ because of uncertainties associated with estimating the amounts, timing, and likelihood of possible outcomes.

The Condensed Consolidated Financial Statements at March 31, 2013, and for the three months ended March 31, 2013, and 2012, are unaudited but reflect all adjustments that are, in management's opinion, necessary for the fair presentation of the results for the interim periods presented. All such adjustments are of a normal recurring nature. These unaudited Condensed Consolidated Financial Statements should be read in conjunction with the audited Consolidated Financial Statements (and the related notes) included in our Annual Report on Form 10-K for the year ended December 31, 2012, as filed on March 1, 2013, with the U.S. Securities and Exchange Commission (SEC).

### Residential Capital, LLC

On May 14, 2012 (the Petition Date), Residential Capital, LLC (ResCap) and certain of its wholly owned direct and indirect subsidiaries (collectively, the Debtors) filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (the Bankruptcy Court). In connection with the filings, Ally Financial Inc. and its direct and indirect subsidiaries and affiliates (excluding the Debtors) (collectively, AFI) had reached an agreement with the Debtors and certain creditor constituencies on a prearranged Chapter 11 plan (the Plan). The Plan included a proposed settlement (the Settlement) between AFI and the Debtors, which included, among other things, an obligation of AFI to make a $750 million cash contribution to the Debtor's estate, and a release of all existing or potential causes of action between AFI and the Debtors, as well as a release of all existing or potential ResCap-related causes of action against AFI held by third parties.

The Settlement contemplated certain milestone requirements that the Debtors failed to satisfy, including the Bankruptcy Court's confirmation of the Plan on or before October 31, 2012. While the failure to meet this October 31 milestone would have resulted in the Settlement's automatic termination, AFI and the Debtors agreed to monthly temporary waivers of this automatic termination through February 28, 2013. This waiver was not extended beyond this date, and therefore the Settlement has terminated.

On November 21, 2012, the Bankruptcy Court entered orders approving the sale of the Debtors' (i) mortgage servicing platform (the Platform Sale) to Ocwen Loan Servicing, LLC and Walter Investment Management Corp. and (ii) "whole-loan" portfolio (the Whole-Loan Sale) to Berkshire Hathaway Inc. under section 363 of the Bankruptcy Code, and not as part of the Plan as originally contemplated. The Whole-Loan Sale closed on February 5, 2013, and the Platform Sale closed on February 15, 2013.

As of the Petition Date, two separate groups of institutional investors in residential mortgage-backed securities (RMBS Investors) issued by ResCap's affiliates and holding more than 25 percent of at least one class in each of 290 securitizations agreed to settle alleged representation and warranty claims against the Debtors' estates in exchange for a total $8.7 billion allowed claim in the Debtors' bankruptcy cases, subject to the applicable securitization trustees' acceptance of the terms of the settlements (the RMBS Settlements). The RMBS Investors also signed separate plan support agreements (PSAs) with the Debtors and AFI in support of the Plan at the time of entering into the RMBS Settlements. To date, RMBS Investors holding more than 25 percent of at least one class in each of 336 securitizations have agreed to the RMBS Settlements. These 336 securitizations have an aggregate original principal balance of approximately $189 billion (out of a total of 392 outstanding securitizations with an original principal balance of $221 billion). The RMBS Settlements are subject to Bankruptcy Court approval, and the Bankruptcy Court has scheduled a hearing to consider such approval beginning on May 28, 2013. The PSAs are not part of this scheduled Bankruptcy Court hearing. A number of creditors have raised objections to the RMBS Settlements, but the trustees representing the 336 securitization trusts and AFI have filed statements in support of the Debtors' motion to approve the RMBS Settlements. Separately, the Debtors have failed to meet several Plan milestones in their bankruptcy cases, each of which has given the RMBS Investors the right to terminate the PSAs upon three business days advance written notice to the Debtors and AFI. On April 18, 2013, one of the two groups of RMBS Investors represented by Talcott Franklin P.C. sent the Debtors and AFI a notice of termination of its PSA. The other group of RMBS Investors represented by Gibbs and Bruns LLP has not given the Debtors and AFI such a notice to date, but have the right to do so at any time. If the RMBS Settlements are not approved or the RMBS Investors were to decide not to support any proposed plan, it could adversely impact the likelihood that any plan is approved by the Bankruptcy Court. AFI continues to support the RMBS Settlements at this time.

On June 4, 2012, Berkshire Hathaway Inc. filed a motion in the Bankruptcy Court for the appointment of an independent examiner to investigate, among other things, certain of the Debtors' transactions with AFI occurring prior to the Petition Date, any claims the Debtors may hold against AFI's officers and directors, and any claims the Debtors proposed to release under the Plan. On June 20, 2012, the Bankruptcy Court approved the appointment of an examiner and, subsequently, the United States Trustee for the Southern District of New York appointed

Table of Contents

# Notes to Condensed Consolidated Financial Statements (unaudited)

Ally Financial Inc. • Form 10-Q

former bankruptcy judge Arthur J. Gonzalez, Esq. as the examiner (the Examiner). On July 27, 2012, the Bankruptcy Court entered an order approving the scope of the Examiner's investigation. The investigation includes, among other things: (a) all material pre-petition transactions between or among the Debtors and AFI, Cerberus Capital Management, L.P. and its subsidiaries and affiliates, and/or Ally Bank; (b) certain post-petition negotiations and transactions with the Debtors, including with respect to plan sponsor, plan support, and settlement agreements, the debtor-in-possession financing with AFI, the stalking horse asset purchase agreement with AFI, and the servicing agreement with Ally Bank; (c) all state and federal law claims or causes of action the Debtors proposed to release as part of the Plan; and (d) the release of all existing or potential ResCap-related causes of action against AFI held by third parties. In the Examiner's original work plan, the Examiner estimated that his investigation and related report would be completed six months from approximately August 6, 2012. However, on February 7, 2013 the Examiner informed the Bankruptcy Court in the third supplement to the work plan that the investigation and related report will not be completed until early May 2013.

On December 26, 2012, the Bankruptcy Court, in an effort to facilitate plan negotiations, entered an order appointing bankruptcy judge James M. Peck, Esq. as mediator (the Mediator) through and until February 28, 2013, to assist the parties in resolving certain issues relating to the formulation and confirmation of the Plan. On March 5, 2013, the Bankruptcy Court entered an order extending the Mediator's term to and including May 31, 2013, unless the Mediator declares in a written order on an earlier date that the mediation is at an impasse and should be terminated. AFI, the Debtors, the official committee of unsecured creditors appointed in the Debtors' bankruptcy cases (the Creditors' Committee) and certain other creditor constituencies are engaging in ongoing mediation sessions under a Bankruptcy Court order of confidentiality. Given the inherent uncertainty of the bankruptcy process, it is reasonably possible that a settlement could be reached that results in a payment substantially higher than the current $750 million estimate, or that no settlement is reached at all. The ultimate outcome of these settlement discussions will be affected by various factors, including, among others, the highly complex nature of the bankruptcy process, competing interests of various parties, disparate creditor priorities, the uncertainty of obtaining certain non-financial terms being sought, competing jurisdictional claims, uncertain residual estate property value, and the timing and unknown conclusions of the independent examiner's investigation.

On February 26, 2013, the Debtors and the Creditors' Committee entered into an agreement, the terms of which provided that, among other things, the Creditors' Committee would support extending the Debtors' exclusive period to file a Chapter 11 plan through and until April 30, 2013, the Debtors would consent to any motion filed by the Creditors' Committee after April 30, 2013 seeking standing to bring estate causes of action against AFI and the Debtors would allow the Settlement to automatically expire on February 28, 2013.

Thereafter, on March 5, 2013, the Bankruptcy Court entered an order extending the Debtors' exclusive period to file a Chapter 11 plan through and until April 30, 2013. On April 15, 2013, the Bankruptcy court entered an order further extending the Debtors' exclusive period to file a Chapter 11 plan through and until May 7, 2013.

On April 11, 2013, the Creditors' Committee filed a motion seeking standing to assert claims against AFI on behalf of the Debtors' estates. In its motion, the Creditors' Committee alleged, among other things, that AFI stripped the Debtors of valuable assets and exercised domination, control and abuse of the Debtors. The Creditors' Committee's claims against AFI include veil-piercing, fraudulent conveyance, indemnification, preferential transfer, and equitable subordination. The Creditors' Committee asserted that AFI may be liable for billions of dollars on account of these claims. AFI believes that these claims have no merit and is fully prepared to litigate these claims to final resolution. The Bankruptcy Court has scheduled a hearing for May 7, 2013 to consider the Creditors' Committee's motion for standing.

On February 27, 2013, the Debtors filed a motion with the Bankruptcy Court seeking, for purposes of any proposed Chapter 11 plan, that GMAC Mortgage's obligation to conduct and pay for independent file review regarding certain residential foreclosure actions and foreclosure sales prosecuted by GMAC Mortgage and its subsidiaries, as required under the Consent Order, be classified as a general unsecured claim in an amount to be determined, and that the automatic stay under the Bankruptcy Code be applied to prevent the FRB, the FDIC, and other governmental entities from taking any action to enforce the obligation against the Debtors (the Foreclosure Review Motion). The Bankruptcy Court is expected to issue a written opinion on the relief sought in the Foreclosure Review Motion in the near future. If the Bankruptcy Court approves the Foreclosure Review Motion, such governmental entities are likely to seek to enforce the obligation against AFI, and any such obligations ultimately borne by AFI could be material.

We are currently named as defendants in various lawsuits relating to ResCap mortgage-backed securities and certain other mortgage-related matters (the Mortgage Cases), which are described in more detail in Note 26. We had previously disclosed that several of the Mortgage Cases were subject to orders entered by the Bankruptcy Court staying the matters through April 30, 2013 in connection with the Debtors bankruptcy. On May 1, 2013, all stay orders applicable to the Ally non-Debtor defendants with respect to the Mortgage Cases expired. As a result, all of the Mortgage Cases are proceeding against us.

As a result of the termination of the Settlement, AFI is no longer obligated to make the $750 million cash contribution and neither party is bound by the Settlement. Further, AFI is not entitled to receive any releases from either the Debtors or any third party claimants, as was contemplated under the Plan and Settlement. However, AFI has not withdrawn its offer to provide a $750 million cash contribution to the Debtors' estate if an acceptable settlement can be reached. As a result of the termination of the Settlement, substantial claims could be brought against us, which could have a material adverse impact on our results of operations, financial position or cash flows. We would have strong legal and factual defenses with respect to any such claims, and would vigorously defend them.

As a result of the bankruptcy filing, effective May 14, 2012, we deconsolidated ResCap from our financial statements. During the first quarter of 2013, we discontinued performing certain mortgage activities, which were required as part of the bankruptcy process until the sale

12-12020-mg    Doc 3934    Filed 06/10/13    Entered 06/10/13 11:58:24    Main Document
Pg 18 of 653

Table of Contents

# Notes to Condensed Consolidated Financial Statements (unaudited)

Ally Financial Inc. • Form 10-Q

of certain assets occurred. As a result of us discontinuing these certain mortgage activities, the operations of ResCap were classified as discontinued.

Based on our assessment of the effect of the deconsolidation of ResCap, obligations under the Plan, and other impacts related to the Chapter 11 filing, we recorded a charge of $1.2 billion during 2012, within our (loss) income from discontinued operations, net of tax. This charge primarily consists of the impairment of Ally's $442 million equity investment in ResCap and the $750 million cash contribution to be made by us to the Debtors' estate described above. As of March 31, 2013, we have $1.1 billion of financing due from ResCap, which is classified as Finance Receivables and Loans, net on our Condensed Consolidated Balance Sheet. We maintain no allowance or impairment against these receivables because management considers them to be fully collectible. At March 31, 2013, our hedging arrangements with ResCap were fully collateralized. Because of the uncertain nature of the bankruptcy proceedings, we cannot predict the ultimate financial impact to Ally. Refer to Note 26 for additional information regarding these bankruptcy proceedings.

## Significant Accounting Policies

### Income Taxes

In calculating the provision for interim income taxes, in accordance with Accounting Standards Codification 740, *Income Taxes*, we apply an estimated annual effective tax rate to year-to-date ordinary income. At the end of each interim period, we estimate the effective tax rate expected to be applicable for the full fiscal year. We exclude and record discretely the tax effect of unusual or infrequently occurring items, including, for example, changes in judgment about valuation allowances and effects of changes in tax law or rates. The provision for income taxes in tax jurisdictions with a projected full year or year-to-date loss for which a tax benefit cannot be realized is estimated using tax rates specific to that jurisdiction.

Refer to Note 1 to the Consolidated Financial Statements in our 2012 Annual Report on Form 10-K regarding additional significant accounting policies.

## Recently Adopted Accounting Standards

### Balance Sheet - Disclosures about Offsetting Assets and Liabilities (ASU 2011-11 and ASU 2013-01)

As of January 1, 2013, we adopted Accounting Standards Update (ASU) 2011-11, which amends ASC 210, *Balance Sheet*. This ASU contains new disclosure requirements regarding the nature of an entity's rights of offset and related arrangements associated with its financial instruments and derivative instruments. In addition, we adopted ASU 2013-01, which simply clarified the scope of ASU 2011-11. The new disclosures will give financial statement users information about both gross and net exposures. ASU 2011-11 and ASU 2013-01 were required to be applied retrospectively. Since the guidance relates only to disclosure of information, the adoption did not have an impact to our consolidated financial condition or results of operations.

### Comprehensive Income - Reporting of Amounts Reclassified Out of Accumulated Other Comprehensive Income (ASU 2013-02)

As of January 1, 2013, we adopted ASU 2013-02, which amends ASC 220, *Comprehensive Income*. The ASU contains new requirements related to the presentation and disclosure of items that are reclassified out of accumulated other comprehensive income. The new requirements provide financial statement users a more comprehensive view of items that are reclassified out of accumulated other comprehensive income. ASU 2013-02 was required to be applied prospectively. Since the guidance relates only to presentation and disclosure of information, the adoption did not have an impact to our consolidated financial condition or results of operations.

## Recently Issued Accounting Standards

### Liabilities - Obligations Resulting from Joint and Several Liability Arrangements for Which the Total Amount of the Obligation Is Fixed at the Reporting Date (ASU 2013-04)

In February 2013, the Financial Accounting Standards Board issued ASU 2013-04. This ASU requires an entity to measure obligations resulting from joint and several liability arrangements for which the total amount of the obligation within the scope of this guidance is fixed at the reporting date, as the sum of the following: (a) The amount the reporting entity agreed to pay on the basis of its arrangement among its co-obligors and (b) any additional amount the reporting entity expects to pay on behalf of its co-obligors. It further requires an entity to disclose the nature and amount of the obligation as well as other information about those obligations. ASU 2013-04 will be effective for us on January 1, 2014, with retrospective application required. The adoption of this guidance is not expected to have a material effect on our consolidated financial condition or results of operations.

### Foreign Currency Matters - Parent's Accounting for the Cumulative Translation Adjustment upon Derecognition of Certain Subsidiaries or Groups of Assets within a Foreign Entity or of an Investment in a Foreign Entity (ASU 2013-05)

In March 2013, the Financial Accounting Standards Board issued ASU 2013-05. This ASU requires a reporting entity that ceases to have a controlling financial interest, in a subsidiary or group of assets or a business, within a foreign entity to release any related Cumulative Translation Adjustment (CTA) into net income. The CTA should be released into net income only if the sale or transfer results in the complete or substantially complete liquidation of the foreign entity. For an equity method investment that is a foreign entity, a pro rata portion of the CTA should be released into net income upon a partial sale of such an investment. This ASU clarifies that the sale of an investment in a foreign entity includes both events that result in the loss of a controlling financial interest in a foreign entity, irrespective of any retained investment, and events that result in step acquisition under which an acquirer obtains control of an acquiree in which it held an equity interest

12

Table of Contents

# Notes to Condensed Consolidated Financial Statements (unaudited)

Ally Financial Inc. • Form 10-Q

immediately before the acquisition date. Under these circumstances, the CTA should be released into net income upon their occurrence. ASU 2013-04 will be effective for us prospectively on January 1, 2014. Management is currently assessing the potential impact of the application of this guidance. However, since the guidance is prospective and we are in the process of exiting most of our international operations, it is not expected to have a material effect on our consolidated financial condition or results of operations.

## 2.     Discontinued and Held-for-sale Operations

### Discontinued Operations

We classify operations as discontinued when operations and cash flows will be eliminated from our ongoing operations and we do not expect to retain any significant continuing involvement in their operations after the respective sale transactions. For all periods presented, all of the operating results for these discontinued operations have been removed from continuing operations and presented separately as discontinued operations, net of tax, in the  Condensed Consolidated Statement of Comprehensive Income . The Notes to the Condensed Consolidated Financial Statements  have been adjusted to exclude discontinued operations unless otherwise noted.

### Select Mortgage Operations

During the first quarter of 2013, the operations of ResCap were classified as discontinued. During the second quarter of 2012, we sold the Canadian mortgage operations of ResMor Trust.

### Select Insurance Operations

During the first quarter of 2013, we committed to sell our Mexican insurance business, ABA Seguros, to the ACE Group. We expect to complete the ABA Seguros sale during the second quarter of 2013. During the first quarter of 2013, we sold our U.K.-based operations to a wholly owned subsidiary of AmTrust Financial Services, Inc.

### Select Automotive Finance Operations

During the fourth quarter of 2012, we committed to sell our automotive finance operations in Europe and Latin America to General Motors Financial Company, Inc. (GM Financial). On the same date, we entered into an agreement with GM Financial to acquire our  40% interest in a motor vehicle finance joint venture in China. On April 1, 2013, we completed the sale of the majority of our operations in Europe and Latin America to GM Financial. The transaction included European operations in Germany, the United Kingdom, Italy, Sweden, Switzerland, Austria, Belgium and the Netherlands, and Latin American operations in Mexico, Chile and Colombia. Refer to  Note 27 for further detail. We expect to complete the sale of the remaining operations during 2013 and possibly 2014.

During the first quarter of 2013, we sold our Canadian automotive finance operations, Ally Credit Canada Limited, and ResMor Trust to Royal Bank of Canada. During the first quarter of 2012, we completed the sale of our Venezuela operations.

### Select Corporate and Other Operations

During the fourth quarter of 2012, we ceased operations at our Commercial Finance Group's European division and classified it as discontinued.

13

Table of Contents

# Notes to Condensed Consolidated Financial Statements (unaudited)

Ally Financial Inc. • Form 10-Q

## Select Financial Information

Select financial information of discontinued operations is summarized below. The pretax income or loss, including direct costs to transact a sale, includes any impairment recognized to present the operations at the lower-of-cost or fair value. Fair value was based on the estimated sales price, which could differ from the ultimate sales price due to price volatility, changing interest rates, changing foreign-currency rates, and future economic conditions.

| ($ in millions) | | Three months ended March 31, | | |
|---|---|---|---|---|
| | | 2013 | | 2012 |
| **Select Mortgage operations** | | | | |
| Total net revenue | $ | — | $ | 403 |
| Pretax (loss) income including direct costs to transact a sale (a) | | **(20)** | | 133 |
| Tax expense (b) | | **16** | | 16 |
| **Select Insurance operations** | | | | |
| Total net revenue | $ | **148** | $ | 156 |
| Pretax income including direct costs to transact a sale | | **28** | | 38 |
| Tax expense | | **1** | | 9 |
| **Select Automotive Finance operations** | | | | |
| Total net revenue | $ | **286** | $ | 387 |
| Pretax income including direct costs to transact a sale (a) | | **1,042** | **(c)** | 196 |
| Tax (benefit) expense (b) | | **(1)** | | 39 |
| **Select Corporate and Other operations** | | | | |
| Total net revenue | $ | **—** | $ | 2 |
| Pretax (loss) income | | **(1)** | | 6 |
| Tax expense | | **—** | | 1 |

(a)    Includes certain treasury and other corporate activity recognized by Corporate and Other.
(b)    Includes certain income tax activity recognized by Corporate and Other.
(c)    Includes recognized pretax gain of $888 million in connection with the sale of our Canadian automotive finance operations, Ally Credit Canada Limited, and ResMor Trust.

14

Table of Contents

# Notes to Condensed Consolidated Financial Statements (unaudited)

Ally Financial Inc. • Form 10-Q

## Held-for-sale Operations

The assets and liabilities of operations held-for-sale are summarized below.

| March 31, 2013 ($ in millions) | Select Insurance operations (a) | | Select Automotive Finance operations (b) | | Total held-for-sale operations | |
|---|---:|---|---:|---|---:|---|
| **Assets** | | | | | | |
| Cash and cash equivalents | | | | | | |
| Noninterest-bearing | $ | 4 | $ | 150 | $ | 154 |
| Interest-bearing | | 66 | | 514 | | 580 |
| Total cash and cash equivalents | | 70 | | 664 | | 734 |
| Investment securities | | 418 | | 3 | | 421 |
| Finance receivables and loans, net | | | | | | |
| Finance receivables and loans, net | | — | | 15,175 | | 15,175 |
| Allowance for loan losses | | — | | (177) | | (177) |
| Total finance receivables and loans, net | | — | | 14,998 | | 14,998 |
| Investment in operating leases, net | | — | | 128 | | 128 |
| Premiums receivable and other insurance assets | | 257 | | — | | 257 |
| Other assets | | 70 | | 2,455 | | 2,525 |
| Total assets | $ | 815 | $ | 18,248 | $ | 19,063 |
| **Liabilities** | | | | | | |
| Interest-bearing deposit liabilities | $ | — | $ | 17 | $ | 17 |
| Short-term borrowings | | — | | 3,059 | | 3,059 |
| Long-term debt | | — | | 8,092 | | 8,092 |
| Interest payable | | — | | 155 | | 155 |
| Unearned insurance premiums and service revenue | | 417 | | — | | 417 |
| Accrued expenses and other liabilities | | 221 | | 1,272 | | 1,493 |
| Total liabilities | $ | 638 | $ | 12,595 | $ | 13,233 |

(a)  Includes ABA Seguros.
(b)  Includes our international entities being sold to GM Financial.

15

Table of Contents

# Notes to Condensed Consolidated Financial Statements (unaudited)

Ally Financial Inc. • Form 10-Q

| December 31, 2012 *($ in millions)* | | Select Insurance operations (a) | | Select Automotive Finance operations (b) | | Total held-for-sale operations |
|---|---|---|---|---|---|---|
| **Assets** | | | | | | |
| Cash and cash equivalents | | | | | | |
|    Noninterest-bearing | $ | 8 | $ | 100 | $ | 108 |
|    Interest-bearing | | 119 | | 1,918 | | 2,037 |
|    Total cash and cash equivalents | | 127 | | 2,018 | | 2,145 |
| Investment securities | | 576 | | 424 | | 1,000 |
| Finance receivables and loans, net | | | | | | |
|    Finance receivables and loans, net | | — | | 25,835 | | 25,835 |
|    Allowance for loan losses | | — | | (208) | | (208) |
|    Total finance receivables and loans, net | | — | | 25,627 | | 25,627 |
| Investment in operating leases, net | | — | | 144 | | 144 |
| Premiums receivable and other insurance assets | | 277 | | — | | 277 |
| Other assets | | 94 | | 2,942 | | 3,036 |
| Impairment on assets of held-for-sale operations | | (53) | | — | | (53) |
| Total assets | $ | 1,021 | $ | 31,155 | $ | 32,176 |
| **Liabilities** | | | | | | |
| Interest-bearing deposit liabilities | $ | — | $ | 3,907 | $ | 3,907 |
| Short-term borrowings | | — | | 2,800 | | 2,800 |
| Long-term debt | | — | | 13,514 | | 13,514 |
| Interest payable | | — | | 177 | | 177 |
| Unearned insurance premiums and service revenue | | 506 | | — | | 506 |
| Accrued expenses and other liabilities | | 297 | | 1,498 | | 1,795 |
| Total liabilities | $ | 803 | $ | 21,896 | $ | 22,699 |

(a)   Includes our U.K.-based operations and ABA Seguros.
(b)   Includes our Canadian operations sold to Royal Bank of Canada and international entities being sold to GM Financial.

16

Table of Contents

# Notes to Condensed Consolidated Financial Statements (unaudited)

Ally Financial Inc. • Form 10-Q

### Recurring Fair Value

The following table displays the assets and liabilities of our held-for-sale operations measured at fair value on a recurring basis. Refer to  Note 22 for descriptions of valuation methodologies used to measure material assets at fair value and details of the valuation models, key inputs to these models, and significant assumptions used.

| ($ in millions) | | Level 1 | | Level 2 | | Level 3 | | Total |
|---|---|---|---|---|---|---|---|---|
| **March 31, 2013** | | | | | | | | |
| **Assets** | | | | | | | | |
| Investment securities | | | | | | | | |
| Available-for-sale securities | | | | | | | | |
| Debt securities | | | | | | | | |
| Foreign government | $ | 328 | $ | — | $ | — | $ | 328 |
| Corporate debt | | — | | 93 | | — | | 93 |
| Other assets | | | | | | | | |
| Derivative assets: | | | | | | | | |
| Interest rate contracts | | — | | — | | 7 | | 7 |
| Foreign currency contracts | | — | | 17 | | — | | 17 |
| Total assets | $ | 328 | $ | 110 | $ | 7 | $ | 445 |
| **Liabilities** | | | | | | | | |
| Accrued expenses and other liabilities: | | | | | | | | |
| Derivative liabilities | | | | | | | | |
| Interest rate contracts | $ | — | $ | 11 | $ | 8 | $ | 19 |
| Total liabilities | $ | — | $ | 11 | $ | 8 | $ | 19 |
| **December 31, 2012** | | | | | | | | |
| **Assets** | | | | | | | | |
| Investment securities | | | | | | | | |
| Available-for-sale securities | | | | | | | | |
| Debt securities | | | | | | | | |
| Foreign government | $ | 555 | $ | 42 | $ | — | $ | 597 |
| Corporate debt | | — | | 76 | | — | | 76 |
| Other | | — | | 327 | | — | | 327 |
| Other assets | | | | | | | | |
| Derivative assets: | | | | | | | | |
| Interest rate contracts | | — | | 22 | | 9 | | 31 |
| Total assets | $ | 555 | $ | 467 | $ | 9 | $ | 1,031 |
| **Liabilities** | | | | | | | | |
| Accrued expenses and other liabilities: | | | | | | | | |
| Derivative liabilities | | | | | | | | |
| Interest rate contracts | $ | — | $ | 24 | $ | 11 | $ | 35 |
| Foreign currency contracts | | — | | 1 | | 18 | | 19 |
| Total liabilities | $ | — | $ | 25 | $ | 29 | $ | 54 |

The column group header spanning Level 1 through Total reads: **Recurring fair value measurements**

17

Table of Contents

# Notes to Condensed Consolidated Financial Statements (unaudited)

Ally Financial Inc. • Form 10-Q

## 3.    Other Income, Net of Losses

Details of other income, net of losses, were as follows.

| ($ in millions) | | Three months ended March 31, | | |
|---|---|---|---|---|
| | | 2013 | | 2012 |
| Mortgage processing fees and other mortgage income | $ | 79 | $ | 122 |
| Late charges and other administrative fees | | 23 | | 21 |
| Remarketing fees | | 20 | | 17 |
| Fair value adjustment on derivatives (a) | | — | | 12 |
| Other, net | | 35 | | 38 |
| Total other income, net of losses | $ | 157 | $ | 210 |

(a)    Refer to Note 20 for a description of derivative instruments and hedging activities.

## 4.    Other Operating Expenses

Details of other operating expenses were as follows.

| ($ in millions) | | Three months ended March 31, | | |
|---|---|---|---|---|
| | | 2013 | | 2012 |
| Insurance commissions | $ | 92 | $ | 99 |
| Mortgage representation and warranty obligation, net (a) | | 83 | | — |
| Lease and loan administration | | 81 | | 54 |
| Technology and communications | | 71 | | 89 |
| Professional services | | 48 | | 38 |
| Advertising and marketing | | 35 | | 35 |
| Regulatory and licensing fees | | 33 | | 33 |
| Premises and equipment depreciation | | 20 | | 17 |
| Vehicle remarketing and repossession | | 14 | | 16 |
| Occupancy | | 11 | | 14 |
| State and local non-income taxes | | 10 | | 9 |
| Other | | 60 | | 50 |
| Total other operating expenses | $ | 558 | $ | 454 |

(a)    Refer to Note 26 for further details on representation and warranty obligation.

18

Table of Contents

# Notes to Condensed Consolidated Financial Statements (unaudited)

Ally Financial Inc. • Form 10-Q

## 5.    Investment Securities

Our portfolio of securities includes bonds, equity securities, asset- and mortgage-backed securities, interests in securitization trusts, and other investments. The cost, fair value, and gross unrealized gains and losses on available-for-sale securities were as follows.

| ($ in millions) | | March 31, 2013 | | | | | | December 31, 2012 | | | | | |
| | | Amortized cost | | Gross unrealized | | Fair value | | Amortized cost | | Gross unrealized | | Fair value |
| | | | | gains | losses | | | | | gains | losses | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Available-for-sale securities** | | | | | | | | | | | | | |
| Debt securities | | | | | | | | | | | | | |
| U.S. Treasury and federal agencies | $ | **2,097** | $ | **3** | $ | **(1)** | $ | **2,099** | $ | 2,212 | $ | 3 | $ | (1) | $ | 2,214 |
| Foreign government | | **297** | | **9** | | **—** | | **306** | | 295 | | 8 | | — | | 303 |
| Mortgage-backed residential (a) | | **8,722** | | **111** | | **(18)** | | **8,815** | | 6,779 | | 130 | | (3) | | 6,906 |
| Asset-backed | | **2,191** | | **31** | | **(1)** | | **2,221** | | 2,309 | | 32 | | (1) | | 2,340 |
| Corporate debt | | **1,272** | | **56** | | **(2)** | | **1,326** | | 1,209 | | 57 | | (3) | | 1,263 |
| Total debt securities | | **14,579** | | **210** | | **(22)** | | **14,767** | | 12,804 | | 230 | | (8) | | 13,026 |
| Equity securities | | **986** | | **48** | | **(49)** | | **985** | | 1,193 | | 32 | | (73) | | 1,152 |
| Total available-for-sale securities (b) | $ | **15,565** | $ | **258** | $ | **(71)** | $ | **15,752** | $ | 13,997 | $ | 262 | $ | (81) | $ | 14,178 |

(a)    Residential mortgage-backed securities include agency-backed bonds totaling  $6,217 million and $4,983 million at March 31, 2013, and December 31, 2012, respectively.

(b)    Certain entities related to our Insurance operations are required to deposit securities with state regulatory authorities. These deposited securities totaled  $15 million and $15 million at March 31, 2013, and December 31, 2012, respectively.

Table of Contents

# Notes to Condensed Consolidated Financial Statements (unaudited)

Ally Financial Inc. • Form 10-Q

The maturity distribution of available-for-sale debt securities outstanding is summarized in the following tables. Prepayments may cause actual maturities to differ from scheduled maturities.

| ($ in millions) | Total | | Due in one year or less | | Due after one year through five years | | Due after five years through ten years | | Due after ten years (a) | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Amount | Yield | Amount | Yield | Amount | Yield | Amount | Yield | Amount | Yield |
| **March 31, 2013** | | | | | | | | | | |
| Fair value of available-for-sale debt securities (b) | | | | | | | | | | |
| U.S. Treasury and federal agencies | $ 2,099 | 0.9% | $ 584 | 0.1% | $ 538 | 1.0% | $ 977 | 1.4% | $ — | —% |
| Foreign government | 306 | 3.2 | 3 | 4.3 | 139 | 3.0 | 164 | 3.3 | — | — |
| Mortgage-backed residential | 8,815 | 2.4 | — | — | — | — | 140 | 2.3 | 8,675 | 2.4 |
| Asset-backed | 2,221 | 2.0 | 7 | 2.0 | 1,595 | 2.0 | 511 | 1.8 | 108 | 2.6 |
| Corporate debt | 1,326 | 5.1 | 4 | 5.8 | 627 | 4.1 | 604 | 6.0 | 91 | 6.0 |
| Total available-for-sale debt securities | $ 14,767 | 2.4 | $ 598 | 0.1 | $ 2,899 | 2.2 | $ 2,396 | 2.6 | $ 8,874 | 2.5 |
| Amortized cost of available-for-sale debt securities | $ 14,579 | | $ 598 | | $ 2,852 | | $ 2,352 | | $ 8,777 | |
| **December 31, 2012** | | | | | | | | | | |
| Fair value of available-for-sale debt securities (b) | | | | | | | | | | |
| U.S. Treasury and federal agencies | $ 2,214 | 0.9% | $ 422 | —% | $ 682 | 0.7% | $ 1,110 | 1.4% | $ — | —% |
| Foreign government | 303 | 2.5 | 1 | 2.2 | 136 | 1.8 | 166 | 3.0 | — | — |
| Mortgage-backed residential | 6,906 | 2.7 | — | — | — | — | 35 | 4.3 | 6,871 | 2.7 |
| Asset-backed | 2,340 | 2.1 | — | — | 1,543 | 2.0 | 510 | 1.7 | 287 | 3.3 |
| Corporate debt | 1,263 | 5.1 | 9 | 3.2 | 560 | 4.0 | 596 | 6.0 | 98 | 5.8 |
| Total available-for-sale debt securities | $ 13,026 | 2.4 | $ 432 | 0.1 | $ 2,921 | 2.0 | $ 2,417 | 2.6 | $ 7,256 | 2.6 |
| Amortized cost of available-for-sale debt securities | $ 12,804 | | $ 431 | | $ 2,880 | | $ 2,369 | | $ 7,124 | |

(a)   Investments with no stated maturities are included as contractual maturities of greater than 10 years. Actual maturities may differ due to call or prepayment options.

(b)   Yields on tax-exempt obligations are computed on a tax-equivalent basis.

The balances of cash equivalents were $2.7 billion and $3.4 billion at March 31, 2013, and December 31, 2012, respectively, and were composed primarily of money market accounts and short-term securities, including U.S. Treasury bills.

The following table presents gross gains and losses realized upon the sales of available-for-sale securities and other-than-temporary impairment.

| | Three months ended March 31, | |
|---|---|---|
| ($ in millions) | 2013 | 2012 |
| Gross realized gains | $ 70 | $ 97 |
| Gross realized losses | (11) | (8) |
| Other-than-temporary impairment | (8) | — |
| Net realized gains | $ 51 | $ 89 |

20

Table of Contents

# Notes to Condensed Consolidated Financial Statements (unaudited)

Ally Financial Inc. • Form 10-Q

The following table presents interest and dividends on available-for-sale securities.

| ($ in millions) | Three months ended March 31, | |
| --- | --- | --- |
| | **2013** | 2012 |
| Taxable interest | $ **63** | $ 69 |
| Taxable dividends | **5** | 5 |
| Interest and dividends on available-for-sale securities | $ **68** | $ 74 |

Certain available-for-sale securities were sold at a loss in 2013 as a result of market conditions within these respective periods. The table below summarizes available-for-sale securities in an unrealized loss position in accumulated other comprehensive income. Based on the methodology described below that was applied to these securities, we believe that the unrealized losses relate to factors other than credit losses in the current market environment. As of March 31, 2013, we did not have the intent to sell the debt securities with an unrealized loss position in accumulated other comprehensive income, and it is not more likely than not that we will be required to sell these securities before recovery of their amortized cost basis. As of March 31, 2013, we had the ability and intent to hold equity securities with an unrealized loss position in accumulated other comprehensive income. As a result, we believe that the securities with an unrealized loss position in accumulated other comprehensive income are not considered to be other-than-temporarily impaired at March 31, 2013. Refer to Note 1 to the Consolidated Financial Statements in our 2012 Annual Report on Form 10-K for additional information related to investment securities and our methodology for evaluating potential other-than-temporary impairments.

| | March 31, 2013 | | | | December 31, 2012 | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Less than 12 months | | 12 months or longer | | Less than 12 months | | 12 months or longer | |
| ($ in millions) | **Fair value** | **Unrealized loss** | **Fair value** | **Unrealized loss** | Fair value | Unrealized loss | Fair value | Unrealized loss |
| **Available-for-sale securities** | | | | | | | | |
| Debt securities | | | | | | | | |
| U.S. Treasury and federal agencies | $ **724** | $ **(1)** | $ **—** | $ — | $ 244 | $ (1) | $ — | $ — |
| Foreign government | **—** | **—** | **—** | **—** | 11 | — | — | — |
| Mortgage-backed residential | **2,360** | **(18)** | **11** | **—** | 493 | (2) | 23 | (1) |
| Asset-backed | **163** | **(1)** | **1** | **—** | 143 | (1) | 1 | — |
| Corporate debt | **110** | **(2)** | **6** | **—** | 120 | (2) | 15 | (1) |
| Total temporarily impaired debt securities | **3,357** | **(22)** | **18** | **—** | 1,011 | (6) | 39 | (2) |
| Temporarily impaired equity securities | **217** | **(27)** | **156** | **(22)** | 380 | (39) | 218 | (34) |
| Total temporarily impaired available-for-sale securities | $ **3,574** | $ **(49)** | $ **174** | $ **(22)** | $ 1,391 | $ (45) | $ 257 | $ (36) |

## 6.  Loans Held-for-Sale, Net

The composition of loans held-for-sale, net, was as follows.

| ($ in millions) | **March 31, 2013** | December 31, 2012 |
| --- | --- | --- |
| Consumer mortgage | | |
| 1st Mortgage | $ **701** | $ 2,490 |
| Total consumer mortgage (a) | **701** | 2,490 |
| Commercial and industrial | | |
| Other | **17** | 86 |
| Total loans held-for-sale (b) | $ **718** | $ 2,576 |

(a)   Fair value option-elected domestic consumer mortgages were $701 million and $2.5 billion at March 31, 2013, and December 31, 2012, respectively. Refer to Note 22 for additional information.

(b)   Totals are net of unamortized premiums and discounts and deferred fees and costs. Included in the totals are net unamortized discounts of $34 million at March 31, 2013, and net unamortized premiums of $26 million at December 31, 2012.

Table of Contents

# Notes to Condensed Consolidated Financial Statements (unaudited)

Ally Financial Inc. • Form 10-Q

The following table summarizes held-for-sale mortgage loans reported at carrying value by higher-risk loan type.

| ($ in millions) | March 31, 2013 | December 31, 2012 |
|---|---|---|
| High original loan-to-value (greater than 100%) mortgage loans | $ 74 | $ 378 |
| Interest-only mortgage loans | 3 | 10 |
| Total higher-risk mortgage loans held-for-sale | $ 77 | $ 388 |

## 7.  Finance Receivables and Loans, Net

The composition of finance receivables and loans, net, reported at carrying value before allowance for loan losses was as follows.

| ($ in millions) | March 31, 2013 | December 31, 2012 |
|---|---|---|
| Consumer automobile | $ 55,014 | $ 53,715 |
| Consumer mortgage | | |
| 1st Mortgage | 7,095 | 7,173 |
| Home equity | 2,577 | 2,648 |
| Total consumer mortgage | 9,672 | 9,821 |
| Commercial | | |
| Commercial and industrial | | |
| Automobile | 29,255 | 30,270 |
| Mortgage | — | — |
| Other | 2,562 | 2,697 |
| Commercial real estate | | |
| Automobile | 2,620 | 2,552 |
| Mortgage | — | — |
| Total commercial | 34,437 | 35,519 |
| Total finance receivables and loans (a) (b) | $ 99,123 | $ 99,055 |

(a) Totals are net of unearned income, unamortized premiums and discounts, and deferred fees and costs of $842 million and $895 million at March 31, 2013, and December 31, 2012, respectively.

(b) Includes $1 million and $2 million of foreign consumer automobile loans, and $15 million and $18 million of foreign commercial other loans at March 31, 2013, and December 31, 2012, respectively.

The following tables present an analysis of the activity in the allowance for loan losses on finance receivables and loans.

| Three months ended March 31, 2013 ($ in millions) | Consumer automobile | Consumer mortgage | Commercial | Total |
|---|---|---|---|---|
| Allowance at January 1, 2013 | $ 575 | $ 452 | $ 143 | $ 1,170 |
| Charge-offs | (142) | (24) | (1) | (167) |
| Recoveries | 49 | 3 | 1 | 53 |
| Net charge-offs | (93) | (21) | — | (114) |
| Provision for loan losses | 107 | 20 | 4 | 131 |
| Other | 10 | — | — | 10 |
| Allowance at March 31, 2013 | $ 599 | $ 451 | $ 147 | $ 1,197 |
| Allowance for loan losses | | | | |
| Individually evaluated for impairment | $ 22 | $ 209 | $ 28 | $ 259 |
| Collectively evaluated for impairment | 575 | 242 | 119 | 936 |
| Loans acquired with deteriorated credit quality | 2 | — | — | 2 |
| Finance receivables and loans at historical cost | | | | |
| Ending balance | 55,014 | 9,672 | 34,437 | 99,123 |
| Individually evaluated for impairment | 270 | 933 | 1,397 | 2,600 |
| Collectively evaluated for impairment | 54,722 | 8,739 | 33,040 | 96,501 |
| Loans acquired with deteriorated credit quality | 22 | — | — | 22 |

Table of Contents

# Notes to Condensed Consolidated Financial Statements (unaudited)

Ally Financial Inc. • Form 10-Q

| Three months ended March 31, 2012 ($ in millions) | Consumer automobile | | Consumer mortgage | | Commercial | | Total | |
|---|---|---|---|---|---|---|---|---|
| Allowance at January 1, 2012 | $ | 766 | $ | 516 | $ | 221 | $ | 1,503 |
| Charge-offs (a) | | (136) | | (45) | | (2) | | (183) |
| Recoveries (b) | | 62 | | 2 | | 12 | | 76 |
| Net charge-offs | | (74) | | (43) | | 10 | | (107) |
| Provision for loan losses | | 83 | | 27 | | (12) | | 98 |
| Other (c) | | 57 | | 1 | | (6) | | 52 |
| Allowance at March 31, 2012 | $ | 832 | $ | 501 | $ | 213 | $ | 1,546 |
| Allowance for loan losses | | | | | | | | |
| Individually evaluated for impairment | $ | 8 | $ | 168 | $ | 47 | $ | 223 |
| Collectively evaluated for impairment | | 816 | | 333 | | 166 | | 1,315 |
| Loans acquired with deteriorated credit quality | | 8 | | — | | — | | 8 |
| Finance receivables and loans at historical cost | | | | | | | | |
| Ending balance | | 67,214 | | 9,958 | | 41,814 | | 118,986 |
| Individually evaluated for impairment | | 88 | | 619 | | 367 | | 1,074 |
| Collectively evaluated for impairment | | 67,055 | | 9,339 | | 41,447 | | 117,841 |
| Loans acquired with deteriorated credit quality | | 71 | | — | | — | | 71 |

(a)    Includes foreign consumer automobile charge-offs of $36 million.
(b)    Includes foreign consumer automobile and foreign commercial recoveries of $16 million and $5 million, respectively.
(c)    Includes provision for loan losses relating to discontinued operations of $42 million.

The following table presents information about significant sales of finance receivables and loans recorded at historical cost and transfers of finance receivables and loans from held-for-investment to held-for-sale.

| ($ in millions) | Three months ended March 31, | | | |
|---|---|---|---|---|
| | **2013** | | 2012 | |
| Consumer mortgage | $ | **—** | $ | 40 |
| Commercial | | **18** | | — |
| Total sales and transfers | $ | **18** | $ | 40 |

23

Table of Contents

# Notes to Condensed Consolidated Financial Statements (unaudited)

Ally Financial Inc. • Form 10-Q

The following table presents an analysis of our past due finance receivables and loans, net, recorded at historical cost reported at carrying value before allowance for loan losses.

| ($ in millions) | 30-59 days past due | | 60-89 days past due | | 90 days or more past due | | Total past due | | Current | | Total finance receivables and loans |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **March 31, 2013** | | | | | | | | | | | |
| Consumer automobile | $ | 743 | $ | 152 | $ | 133 | $ | 1,028 | $ | 53,986 | $ | 55,014 |
| Consumer mortgage | | | | | | | | | | | |
| 1st Mortgage | | 76 | | 32 | | 147 | | 255 | | 6,840 | | 7,095 |
| Home equity | | 16 | | 6 | | 15 | | 37 | | 2,540 | | 2,577 |
| Total consumer mortgage | | 92 | | 38 | | 162 | | 292 | | 9,380 | | 9,672 |
| Commercial | | | | | | | | | | | |
| Commercial and industrial | | | | | | | | | | | |
| Automobile | | 26 | | — | | 24 | | 50 | | 29,205 | | 29,255 |
| Mortgage | | — | | — | | — | | — | | — | | — |
| Other | | — | | — | | — | | — | | 2,562 | | 2,562 |
| Commercial real estate | | | | | | | | | | | |
| Automobile | | 1 | | — | | 15 | | 16 | | 2,604 | | 2,620 |
| Mortgage | | — | | — | | — | | — | | — | | — |
| Total commercial | | 27 | | — | | 39 | | 66 | | 34,371 | | 34,437 |
| Total consumer and commercial | $ | 862 | $ | 190 | $ | 334 | $ | 1,386 | $ | 97,737 | $ | 99,123 |
| **December 31, 2012** | | | | | | | | | | | |
| Consumer automobile | $ | 920 | $ | 213 | $ | 138 | $ | 1,271 | $ | 52,444 | $ | 53,715 |
| Consumer mortgage | | | | | | | | | | | |
| 1st Mortgage | | 66 | | 37 | | 156 | | 259 | | 6,914 | | 7,173 |
| Home equity | | 15 | | 6 | | 18 | | 39 | | 2,609 | | 2,648 |
| Total consumer mortgage | | 81 | | 43 | | 174 | | 298 | | 9,523 | | 9,821 |
| Commercial | | | | | | | | | | | |
| Commercial and industrial | | | | | | | | | | | |
| Automobile | | — | | — | | 16 | | 16 | | 30,254 | | 30,270 |
| Mortgage | | — | | — | | — | | — | | — | | — |
| Other | | — | | — | | 1 | | 1 | | 2,696 | | 2,697 |
| Commercial real estate | | | | | | | | | | | |
| Automobile | | — | | — | | 8 | | 8 | | 2,544 | | 2,552 |
| Mortgage | | — | | — | | — | | — | | — | | — |
| Total commercial | | — | | — | | 25 | | 25 | | 35,494 | | 35,519 |
| Total consumer and commercial | $ | 1,001 | $ | 256 | $ | 337 | $ | 1,594 | $ | 97,461 | $ | 99,055 |

24

Table of Contents

# Notes to Condensed Consolidated Financial Statements (unaudited)

Ally Financial Inc. • Form 10-Q

The following table presents the carrying value before allowance for loan losses of our finance receivables and loans recorded at historical cost on nonaccrual status.

| ($ in millions) | | March 31, 2013 | | December 31, 2012 |
|---|---|---|---|---|
| Consumer automobile | $ | 266 | $ | 260 |
| Consumer mortgage | | | | |
| 1st Mortgage | | 372 | | 342 |
| Home equity | | 30 | | 40 |
| Total consumer mortgage | | 402 | | 382 |
| Commercial | | | | |
| Commercial and industrial | | | | |
| Automobile | | 168 | | 146 |
| Mortgage | | — | | — |
| Other | | 63 | | 33 |
| Commercial real estate | | | | |
| Automobile | | 39 | | 37 |
| Mortgage | | — | | — |
| Total commercial | | 270 | | 216 |
| Total consumer and commercial finance receivables and loans | $ | 938 | $ | 858 |

Management performs a quarterly analysis of the consumer automobile, consumer mortgage, and commercial portfolios using a range of credit quality indicators to assess the adequacy of the allowance based on historical and current trends. The tables below present the population of loans by quality indicators for our consumer automobile, consumer mortgage, and commercial portfolios.

The following table presents performing and nonperforming credit quality indicators in accordance with our internal accounting policies  for our consumer finance receivables and loans recorded at historical cost reported at carrying value before allowance for loan losses. Nonperforming loans include finance receivables and loans on nonaccrual status when the principal or interest has been delinquent for 90 days or when full collection is determined not to be probable. Refer to  Note 1 to the Consolidated Financial Statements in our 2012 Annual Report on Form 10-K for additional information.

| | March 31, 2013 | | | | | December 31, 2012 | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| ($ in millions) | Performing | | Nonperforming | | Total | | Performing | | Nonperforming | Total |
| Consumer automobile | $ 54,748 | $ | 266 | $ | 55,014 | $ | 53,455 | $ 260 | $ | 53,715 |
| Consumer mortgage | | | | | | | | | | |
| 1st Mortgage | 6,723 | | 372 | | 7,095 | | 6,831 | 342 | | 7,173 |
| Home equity | 2,547 | | 30 | | 2,577 | | 2,608 | 40 | | 2,648 |
| Total consumer mortgage | $ 9,270 | $ | 402 | $ | 9,672 | $ | 9,439 | $ 382 | $ | 9,821 |

25

Table of Contents

# Notes to Condensed Consolidated Financial Statements (unaudited)

Ally Financial Inc. • Form 10-Q

The following table presents pass and criticized credit quality indicators based on regulatory definitions for our commercial finance receivables and loans recorded at historical cost reported at carrying value before allowance for loan losses.

| | March 31, 2013 | | | December 31, 2012 | | |
|---|---|---|---|---|---|---|
| ($ in millions) | Pass | Criticized (a) | Total | Pass | Criticized (a) | Total |
| Commercial | | | | | | |
| Commercial and industrial | | | | | | |
| Automobile | $ 27,905 | $ 1,350 | $ 29,255 | $ 28,978 | $ 1,292 | $ 30,270 |
| Mortgage | — | — | — | — | — | — |
| Other | 2,296 | 266 | 2,562 | 2,417 | 280 | 2,697 |
| Commercial real estate | | | | | | |
| Automobile | 2,502 | 118 | 2,620 | 2,440 | 112 | 2,552 |
| Mortgage | — | — | — | — | — | — |
| Total commercial | $ 32,703 | $ 1,734 | $ 34,437 | $ 33,835 | $ 1,684 | $ 35,519 |

(a)    Includes loans classified as special mention, substandard, or doubtful. These classifications are based on regulatory definitions and generally represent loans within our portfolio that have a higher default risk or have already defaulted.

## Impaired Loans and Troubled Debt Restructurings

### Impaired Loans

Loans are considered impaired when we determine it is probable that we will be unable to collect all amounts due according to the terms of the loan agreement. For more information on our impaired finance receivables and loans, refer to  Note 1 to the Consolidated Financial Statements  in our 2012 Annual Report on Form 10-K for additional information.

26

Table of Contents

# Notes to Condensed Consolidated Financial Statements (unaudited)

Ally Financial Inc. • Form 10-Q

The following table presents information about our impaired finance receivables and loans recorded at historical cost.

| ($ in millions) | Unpaid principal balance | Carrying value before allowance | Impaired with no allowance | Impaired with an allowance | Allowance for impaired loans |
|---|---|---|---|---|---|
| **March 31, 2013** | | | | | |
| Consumer automobile | $ 270 | $ 270 | $ — | $ 270 | $ 22 |
| Consumer mortgage | | | | | |
| 1st Mortgage | **790** | **784** | **125** | **659** | **149** |
| Home equity | **148** | **149** | **2** | **147** | **60** |
| Total consumer mortgage | **938** | **933** | **127** | **806** | **209** |
| Commercial | | | | | |
| Commercial and industrial | | | | | |
| Automobile | **168** | **168** | **54** | **114** | **10** |
| Mortgage | **—** | **—** | **—** | **—** | **—** |
| Other | **63** | **63** | **10** | **53** | **7** |
| Commercial real estate | | | | | |
| Automobile | **39** | **39** | **12** | **27** | **11** |
| Mortgage | **—** | **—** | **—** | **—** | **—** |
| Total commercial | **270** | **270** | **76** | **194** | **28** |
| Total consumer and commercial finance receivables and loans | $ **1,478** | $ **1,473** | $ **203** | $ **1,270** | $ **259** |
| **December 31, 2012** | | | | | |
| Consumer automobile | $ 260 | $ 260 | $ 90 | $ 170 | $ 16 |
| Consumer mortgage | | | | | |
| 1st Mortgage | 811 | 725 | 123 | 602 | 137 |
| Home equity | 147 | 148 | 1 | 147 | 49 |
| Total consumer mortgage | 958 | 873 | 124 | 749 | 186 |
| Commercial | | | | | |
| Commercial and industrial | | | | | |
| Automobile | 146 | 146 | 54 | 92 | 7 |
| Mortgage | — | — | — | — | — |
| Other | 33 | 33 | 9 | 24 | 7 |
| Commercial real estate | | | | | |
| Automobile | 37 | 37 | 9 | 28 | 12 |
| Mortgage | — | — | — | — | — |
| Total commercial | 216 | 216 | 72 | 144 | 26 |
| Total consumer and commercial finance receivables and loans | $ 1,434 | $ 1,349 | $ 286 | $ 1,063 | $ 228 |

Table of Contents

# Notes to Condensed Consolidated Financial Statements (unaudited)

Ally Financial Inc. • Form 10-Q

The following tables present average balance and interest income for our impaired finance receivables and loans.

| Three months ended March 31, ($ in millions) | 2013 Average balance | 2013 Interest income | 2012 Average balance | 2012 Interest income |
|---|---|---|---|---|
| Consumer automobile | $ 272 | $ 4 | $ 83 | $ 2 |
| Consumer mortgage | | | | |
| 1st Mortgage | 744 | 7 | 512 | 4 |
| Home equity | 135 | 1 | 100 | 1 |
| Total consumer mortgage | 879 | 8 | 612 | 5 |
| Commercial | | | | |
| Commercial and industrial | | | | |
| Automobile | 157 | 2 | 196 | 2 |
| Mortgage | — | — | 7 | — |
| Other | 57 | — | 34 | — |
| Commercial real estate | | | | |
| Automobile | 38 | — | 63 | — |
| Mortgage | — | — | 15 | — |
| Total commercial | 252 | 2 | 315 | 2 |
| Total consumer and commercial finance receivables and loans | $ 1,403 | $ 14 | $ 1,010 | $ 9 |

## Troubled Debt Restructurings (TDRs)

TDRs are loan modifications where concessions were granted to borrowers experiencing financial difficulties. Numerous initiatives are in place to provide support to our mortgage customers in financial distress, including principal forgiveness, maturity extensions, delinquent interest capitalization, and changes to contractual interest rates. Additionally for automobile loans, we offer several types of assistance to aid our customers including extension of the maturity date and rewriting the loan terms. Total TDRs recorded at historical cost and reported at carrying value before allowance for loan losses were $1.3 billion and $1.2 billion at March 31, 2013, and December 31, 2012, respectively. Refer to Note 1 to the Consolidated Financial Statements in our 2012 Annual Report on Form 10-K for additional information.

Table of Contents

# Notes to Condensed Consolidated Financial Statements (unaudited)

Ally Financial Inc. • Form 10-Q

The following table presents information related to finance receivables and loans recorded at historical cost modified in connection with a troubled debt restructuring during the period.

| Three months ended March 31, ($ in millions) | 2013 (a) | | | 2012 | | |
|---|---|---|---|---|---|---|
| | Number of loans | Pre-modification carrying value before allowance | Post-modification carrying value before allowance | Number of loans | Pre-modification carrying value before allowance | Post-modification carrying value before allowance |
| Consumer automobile | 5,285 | $ 79 | $ 68 | 2,792 | $ 33 | $ 33 |
| Consumer mortgage | | | | | | |
| 1st Mortgage | 474 | 165 | 130 | 77 | 28 | 27 |
| Home equity | 71 | 4 | 4 | 173 | 10 | 9 |
| Total consumer mortgage | 545 | 169 | 134 | 250 | 38 | 36 |
| Commercial | | | | | | |
| Commercial and industrial | | | | | | |
| Automobile | 4 | 25 | 25 | 3 | 3 | 3 |
| Mortgage | — | — | — | — | — | — |
| Other | 1 | 33 | 31 | — | — | — |
| Commercial real estate | | | | | | |
| Automobile | 3 | 11 | 11 | 1 | 2 | 2 |
| Mortgage | — | — | — | — | — | — |
| Total commercial | 8 | 69 | 67 | 4 | 5 | 5 |
| Total consumer and commercial finance receivables and loans | 5,838 | $ 317 | $ 269 | 3,046 | $ 76 | $ 74 |

(a) Due to recent industry practice, bankruptcy loans that have not been reaffirmed have been included within our TDR population beginning in the fourth quarter of 2012.

The following table presents information about finance receivables and loans recorded at historical cost that have redefaulted during the reporting period and were within 12 months or less of being modified as a troubled debt restructuring. Redefault is when finance receivables and loans meet the requirements for evaluation under our charge-off policy (Refer to Note 1 to the Consolidated Financial Statements in our 2012 Annual Report on Form 10-K for additional information) except for commercial finance receivables and loans where redefault is defined as 90 days past due.

| Three months ended March 31, ($ in millions) | 2013 (a) | | | 2012 | | |
|---|---|---|---|---|---|---|
| | Number of loans | Carrying value before allowance | Charge-off amount | Number of loans | Carrying value before allowance | Charge-off amount |
| Consumer automobile | 1,333 | $ 16 | $ 8 | 208 | $ 2 | $ 1 |
| Consumer mortgage | | | | | | |
| 1st Mortgage | 8 | 2 | — | 5 | 1 | — |
| Home equity | 2 | — | — | 4 | 1 | 1 |
| Total consumer mortgage | 10 | 2 | — | 9 | 2 | 1 |
| Commercial | | | | | | |
| Commercial and industrial | | | | | | |
| Automobile | — | — | — | 2 | 2 | — |
| Commercial real estate | | | | | | |
| Automobile | — | — | — | — | — | — |
| Total commercial | — | — | — | 2 | 2 | — |
| Total consumer and commercial finance receivables and loans | 1,343 | $ 18 | $ 8 | 219 | $ 6 | $ 2 |

(a) Due to recent industry practice, bankruptcy loans that have not been reaffirmed have been included within our TDR population beginning in the fourth quarter of 2012.

29

Table of Contents

# Notes to Condensed Consolidated Financial Statements (unaudited)

Ally Financial Inc. • Form 10-Q

At March 31, 2013, and December 31, 2012, commercial commitments to lend additional funds to debtors owing receivables whose terms had been modified in a troubled debt restructuring were $13 million and $25 million, respectively.

## Higher-Risk Mortgage Concentration Risk

The following table summarizes held-for-investment mortgage finance receivables and loans recorded at historical cost and reported at carrying value before allowance for loan losses by higher-risk loan type.

| ($ in millions) | March 31, 2013 | | December 31, 2012 |
|---|---|---|---|
| Interest-only mortgage loans (a) | $ | 1,853 | $ 2,063 |
| Below-market rate (teaser) mortgages | | 185 | 192 |
| Total higher-risk mortgage finance receivables and loans | $ | 2,038 | $ 2,255 |

(a)    The majority of the interest-only mortgage loans are expected to start principal amortization in 2015 or beyond.

## 8.    Investment in Operating Leases, Net

Investments in operating leases were as follows.

| ($ in millions) | March 31, 2013 | | December 31, 2012 |
|---|---|---|---|
| Vehicles and other equipment | $ | 17,524 | $ 16,009 |
| Accumulated depreciation | | (2,696) | (2,459) |
| Investment in operating leases, net | $ | 14,828 | $ 13,550 |

Depreciation expense on operating lease assets includes remarketing gains and losses recognized on the sale of operating lease assets. The following summarizes the components of depreciation expense on operating lease assets.

| ($ in millions) | Three months ended March 31, | | |
|---|---|---|---|
| | 2013 | | 2012 |
| Depreciation expense on operating lease assets (excluding remarketing gains) | $ | 499 | $ 328 |
| Remarketing gains | | (64) | (23) |
| Depreciation expense on operating lease assets | $ | 435 | $ 305 |

## 9.    Securitizations and Variable Interest Entities

### Overview

We are involved in several types of securitization and financing transactions that utilize special-purpose entities (SPEs). A SPE is an entity that is designed to fulfill a specified limited need of the sponsor. Our principal use of SPEs is to obtain liquidity and favorable capital treatment by securitizing certain of our financial assets.

The SPEs involved in securitization and other financing transactions are generally considered variable interest entities (VIEs). VIEs are entities that have either a total equity investment that is insufficient to permit the entity to finance its activities without additional subordinated financial support or whose equity investors lack the ability to control the entity's activities. Due to the deconsolidation of ResCap, our mortgage securitization activity and involvement with certain mortgage-related VIEs has substantially changed. Refer to Note 1 for additional information related to ResCap.

### Securitizations

We provide a wide range of consumer and commercial automobile loans, operating leases, other commercial loans, and mortgage loan products to a diverse customer base. We often securitize these loans and leases (which we collectively describe as loans or financial assets) through the use of securitization entities, which may or may not be consolidated on our Condensed Consolidated Balance Sheet. We securitize consumer and commercial automobile loans, operating leases, and other commercial loans through private-label securitizations. We securitize consumer mortgage loans through transactions involving the Federal National Mortgage Association (Fannie Mae) and the Federal Home Loan Mortgage Corporation (Freddie Mac). We previously securitized consumer mortgage loans through private-label mortgage securitizations and through transactions involving the Government National Mortgage Association (Ginnie Mae). We refer to Fannie Mae, Freddie Mac, and Ginnie Mae collectively as the Government-Sponsored Enterprises or GSEs. During the three months ended March 31, 2013 and 2012, our consumer mortgage loans were primarily securitized through the GSEs.

In executing a securitization transaction, we typically sell pools of financial assets to a wholly owned, bankruptcy-remote SPE, which then transfers the financial assets to a separate, transaction-specific securitization entity for cash, servicing rights, and in some transactions, other retained interests. The securitization entity is funded through the issuance of beneficial interests in the securitized financial assets. The

30

Table of Contents

# Notes to Condensed Consolidated Financial Statements (unaudited)

Ally Financial Inc. • Form 10-Q

beneficial interests take the form of either notes or trust certificates, which are sold to investors and/or retained by us. These beneficial interests are collateralized by the transferred loans and entitle the investors to specified cash flows generated from the securitized loans. In addition to providing a source of liquidity and cost-efficient funding, securitizing these financial assets also reduces our credit exposure to the borrowers beyond any economic interest we may retain.

Each securitization is governed by various legal documents that limit and specify the activities of the securitization entity. The securitization entity is generally allowed to acquire the loans, to issue beneficial interests to investors to fund the acquisition of the loans, and to enter into derivatives or other yield maintenance contracts to hedge or mitigate certain risks related to the financial assets or beneficial interests of the entity. A servicer, who is generally us, is appointed pursuant to the underlying legal documents to service the assets the securitization entity holds and the beneficial interests it issues. Servicing functions include, but are not limited to, making certain payments of property taxes and insurance premiums, default and property maintenance payments, as well as advancing principal and interest payments before collecting them from individual borrowers. Our servicing responsibilities, which constitute continued involvement in the transferred financial assets, consist of primary servicing (i.e., servicing the underlying transferred financial assets) and previously master servicing (i.e., servicing the beneficial interests that result from the securitization transactions). Certain securitization entities also require the servicer to advance scheduled principal and interest payments due on the beneficial interests issued by the entity regardless of whether cash payments are received on the underlying transferred financial assets. Accordingly, we are required to provide these servicing advances when applicable. Refer to  Note 10 for additional information regarding our servicing rights.

The GSEs provide a guarantee of the payment of principal and interest on the beneficial interests issued in securitizations through the GSEs. In private-label securitizations, cash flows from the assets initially transferred into the securitization entity represent the sole source for payment of distributions on the beneficial interests issued by the securitization entity and for payments to the parties that perform services for the securitization entity, such as the servicer or the trustee. In certain private-label securitization transactions, a liquidity facility may exist to provide temporary liquidity to the entity. The liquidity provider generally is reimbursed prior to other parties in subsequent distribution periods. In previous certain private-label securitizations, monoline insurance may have existed to cover certain shortfalls to certain investors in the beneficial interests issued by the securitization entity. As noted above, in certain private-label securitizations, the servicer is required to advance scheduled principal and interest payments due on the beneficial interests regardless of whether cash payments are received on the underlying transferred financial assets. The servicer is allowed to reimburse itself for these servicing advances. Additionally, certain private-label securitization transactions may have previously allowed for the acquisition of additional loans subsequent to the initial loan transfer. Principal collections on other loans and/or the issuance of new beneficial interests, such as variable funding notes, generally funded those loans; we were often contractually required to invest in these new interests.

We may have retained beneficial interests in our private-label securitizations, which may have represented a form of significant continuing economic interest. These retained interests included, but were not limited to, senior or subordinate asset-backed securities and residuals, and previously included senior or subordinate mortgage-backed securities, interest-only strips, and principal-only strips. Certain of these retained interests provided credit enhancement to the trust as they may have absorbed credit losses or other cash shortfalls. Additionally, the securitization agreements may have required cash flows to be directed away from certain of our retained interests due to specific over-collateralization requirements, which may or may not have been performance-driven.

We generally hold certain conditional repurchase options specific to private label securitizations that allow us to repurchase assets from the securitization entity. The majority of the securitizations provide us, as servicer, with a call option that allows us to repurchase the remaining transferred financial assets or outstanding beneficial interests at our discretion once the asset pool reaches a predefined level, which represents the point where servicing becomes burdensome (a clean-up call option). The repurchase price is typically the par amount of the loans plus accrued interest. Additionally, we may hold other conditional repurchase options that allow us to repurchase a transferred financial asset if certain events outside our control occur. The typical conditional repurchase option is a delinquent loan repurchase option that gives us the option to purchase the loan or contract if it exceeds a certain prespecified delinquency level. We generally have complete discretion regarding when or if we will exercise these options, but we would do so only when it is in our best interest.

Other than our customary representation and warranty provisions, these securitizations are nonrecourse to us, thereby transferring the risk of future credit losses to the extent the beneficial interests in the securitization entities are held by third parties. Representation and warranty provisions generally require us to repurchase loans or indemnify the investor or other party for incurred losses to the extent it is determined that the loans were ineligible or were otherwise defective at the time of sale. Refer to   Note 26 for detail on representation and warranty provisions. We did not provide any noncontractual financial support to any of these entities during the  three months ended March 31, 2013 or 2012.

## Other Variable Interest Entities

We have involvements with various other on-balance sheet, immaterial VIEs. Most of these VIEs are used for additional liquidity whereby we sell certain financial assets into the VIE and issue beneficial interests to third parties for cash.

We also provide long-term guarantee contracts to investors in certain nonconsolidated affordable housing entities and have extended a line of credit to provide liquidity and minimize our exposure under these contracts. Since we do not have control over the entities or the power to make decisions, we do not consolidate the entities and our involvement is limited to the guarantee and the line of credit.

Table of Contents

# Notes to Condensed Consolidated Financial Statements (unaudited)

Ally Financial Inc. • Form 10-Q

## Involvement with Variable Interest Entities

The determination of whether financial assets transferred by us to these VIEs (and related liabilities) are consolidated on our balance sheet (also referred to as on-balance sheet) or not consolidated on our balance sheet (also referred to as off-balance sheet) depends on the terms of the related transaction and our continuing involvement (if any) with the VIE. We are deemed the primary beneficiary and therefore consolidate VIEs for which we have both (a) the power, through voting rights or similar rights, to direct the activities that most significantly impact the VIE's economic performance, and (b) a variable interest (or variable interests) that (i) obligates us to absorb losses that could potentially be significant to the VIE and/or (ii) provides us the right to receive residual returns of the VIE that could potentially be significant to the VIE. We determine whether we hold a significant variable interest in a VIE based on a consideration of both qualitative and quantitative factors regarding the nature, size, and form of our involvement with the VIE. We assess whether we are the primary beneficiary of a VIE on an ongoing basis.

Our involvement with consolidated and nonconsolidated VIEs in which we hold variable interests is presented below.

| ($ in millions) | Consolidated involvement with VIEs (a) | | Assets of nonconsolidated VIEs (a) | | Maximum exposure to loss in nonconsolidated VIEs | |
|---|---|---|---|---|---|---|
| **March 31, 2013** | | | | | | |
| On-balance sheet variable interest entities | | | | | | |
| Consumer automobile | $ | **25,048** | | | | |
| Commercial automobile | | **19,576** | | | | |
| Commercial other | | **727** | | | | |
| Off-balance sheet variable interest entities | | | | | | |
| Consumer automobile | | — | $ | **1,336** | $ | **1,336** (b) |
| Consumer mortgage — other | | | | — (c) | | **10** (d) |
| Commercial other | | **(27)** (e) | | — (c) | | **73** |
| Total | $ | **45,324** | $ | **1,336** | $ | **1,419** |
| **December 31, 2012** | | | | | | |
| On-balance sheet variable interest entities | | | | | | |
| Consumer automobile | $ | 28,566 | | | | |
| Commercial automobile | | 23,139 | | | | |
| Commercial other | | 728 | | | | |
| Off-balance sheet variable interest entities | | | | | | |
| Consumer automobile | | — | $ | 1,495 | $ | 1,495 (b) |
| Consumer mortgage — other | | — | | — (c) | | 12 (d) |
| Commercial other | | (28) (e) | | — (c) | | 85 |
| Total | $ | 52,405 | $ | 1,495 | $ | 1,592 |

(a)  Asset values represent the current unpaid principal balance of outstanding consumer and commercial finance receivables and loans within the VIEs.
(b)  Maximum exposure to loss represents the current unpaid principal balance of outstanding loans based on our customary representation and warranty provisions. This measure is based on the unlikely event that all of the loans have underwriting defects or other defects that trigger a representation and warranty provision and the collateral supporting the loans are worthless. This required disclosure is not an indication of our expected loss.
(c)  Includes a VIE for which we have no management oversight and therefore we are not able to provide the total assets of the VIE.
(d)  Our maximum exposure to loss in this VIE is a component of servicer advances made that are allocated to the trust. The maximum exposure to loss presented represents the unlikely event that every loan underlying the excess servicing rights sold defaults, and we, as servicer, are required to advance the entire excess service fee to the trust for the contractually established period. This required disclosure is not an indication of our expected loss.
(e)  Amounts classified as accrued expenses and other liabilities.

## On-balance Sheet Variable Interest Entities

We engage in securitization and other financing transactions that do not qualify for off-balance sheet treatment. In these situations, we hold beneficial interests or other interests in the VIE, which represent a form of significant continuing economic interest. These retained interests include, but are not limited to, senior or subordinate asset-backed securities and residuals, and previously included senior or subordinate mortgage-backed securities, interest-only strips, and principal-only strips. Certain of these retained interests provide credit enhancement to the securitization entity as they may absorb credit losses or other cash shortfalls. Certain of these retained interests may cause cash flows to be directed away from certain of our retained interests due to specific over-collateralization requirements, which may or may not be performance-driven. Because these securitization entities are consolidated, these retained interests and servicing rights are not recognized as separate assets on our  Condensed Consolidated Balance Sheet .

We consolidated certain of these entities because we had a controlling financial interest in the VIE, primarily due to our servicing activities, and because we hold a significant variable interest in the VIE. We are generally the primary beneficiary of automobile securitization

Table of Contents

# Notes to Condensed Consolidated Financial Statements (unaudited)

Ally Financial Inc. • Form 10-Q

entities for which we perform servicing activities and have retained a significant variable interest in the form of a beneficial interest. We were previously the primary beneficiary of certain mortgage private-label securitization entities.

The consolidated VIEs included in the Condensed Consolidated Balance Sheet represent separate entities with which we are involved. The third-party investors in the obligations of consolidated VIEs have legal recourse only to the assets of the VIEs and do not have such recourse to us, except for the customary representation and warranty provisions or when we are the counterparty to certain derivative transactions involving the VIE. In addition, the cash flows from the assets are restricted only to pay such liabilities. Thus, our economic exposure to loss from outstanding third-party financing related to consolidated VIEs is significantly less than the carrying value of the consolidated VIE assets. All assets of consolidated VIEs, presented below based upon the legal transfer of the underlying assets in order to reflect legal ownership, are restricted for the benefit of the beneficial interest holders. Refer to Note 22 for discussion of the assets and liabilities for which the fair value option has been elected.

## Off-balance Sheet Variable Interest Entities

The nature, purpose, and activities of nonconsolidated securitization entities are similar to those of our consolidated securitization entities with the primary difference being the nature and extent of our continuing involvement. The cash flows from the assets of nonconsolidated securitization entities generally are the sole source of payment on the securitization entities' liabilities. The creditors of these securitization entities have no recourse to us with the exception of market customary representation and warranty provisions as described in Note 26.

Nonconsolidated VIEs include entities for which we either do not hold potentially significant variable interests or do not provide servicing or asset management functions for the financial assets held by the securitization entity. Additionally, to qualify for off-balance sheet treatment, transfers of financial assets must meet the sale accounting conditions in ASC 860, *Transfers and Servicing*. Previously, our residential mortgage loan securitizations consisted of Ginnie Mae and private-label securitizations. We are not the primary beneficiary of any GSE loan securitization transaction because we do not have the power to direct the significant activities of such entities. Previously, we did not consolidate certain private-label mortgage securitizations because we did not have a variable interest that could potentially have been significant or we did not have power to direct the activities that most significantly impacted the performance of the VIE.

For nonconsolidated securitization entities, the transferred financial assets are removed from our balance sheet provided the conditions for sale accounting are met. The financial assets obtained from the securitization are primarily reported as cash, servicing rights, or retained interests (if applicable). Typically, we conclude that the fee we are paid for servicing consumer automobile finance receivables represents adequate compensation, and consequently, we do not recognize a servicing asset or liability. As an accounting policy election, we elected fair value treatment for our mortgage servicing rights (MSRs) portfolio. Liabilities incurred as part of these securitization transactions, such as representation and warranty provisions, are recorded at fair value at the time of sale and are reported as accrued expenses and other liabilities on our Condensed Consolidated Balance Sheet. Upon the sale of the loans, we recognize a gain or loss on sale for the difference between the assets recognized, the assets derecognized, and the liabilities recognized as part of the transaction.

The pretax gains recognized on financial assets sold into nonconsolidated securitization and similar asset-backed financing entities for consumer mortgage — GSEs were $93 million and $28 million at March 31, 2013 and March 31, 2012, respectively.

The following table summarizes cash flows received from and paid related to securitization entities, asset-backed financings, or other similar transfers of financial assets where the transfer is accounted for as a sale and we have a continuing involvement with the transferred assets (e.g., servicing) that were outstanding during the three months ended March 31, 2013 and 2012. Additionally, this table contains information regarding cash flows received from and paid to nonconsolidated securitization entities that existed during each period.

| Three months ended March 31, ( $ in millions) | Consumer automobile | | Consumer mortgage GSEs | | Consumer mortgage private-label | |
|---|---|---|---|---|---|---|
| **2013** | | | | | | |
| Cash proceeds from transfers completed during the period | $ | — | $ | 7,580 | $ | — |
| Servicing fees | | 4 | | 119 | | — |
| Representations and warranties obligations | | — | | (23) | | — |
| Other cash flows | | — | | 3 | | — |
| **2012** | | | | | | |
| Cash proceeds from transfers completed during the period | $ | — | $ | 10,645 | $ | — |
| Cash flows received on retained interests in securitization entities | | — | | — | | 14 |
| Servicing fees | | — | | 249 | | 48 |
| Purchases of previously transferred financial assets | | — | | (580) | | (8) |
| Representations and warranties obligations | | — | | (19) | | (4) |
| Other cash flows | | — | | 10 | | 23 |

33

Table of Contents

# Notes to Condensed Consolidated Financial Statements (unaudited)

Ally Financial Inc. • Form 10-Q

The following tables represent on-balance sheet loans held-for-sale and finance receivables and loans, off-balance sheet securitizations, and whole-loan sales where we have continuing involvement. The table presents quantitative information about delinquencies and net credit losses. Refer to Note 10 for further detail on total serviced assets.

| ($ in millions) | Total Amount | | Amount 60 days or more past due | |
|---|---|---|---|---|
| | March 31, 2013 | December 31, 2012 | March 31, 2013 | December 31, 2012 |
| On-balance sheet loans | | | | |
| Consumer automobile | $ 55,014 | $ 53,715 | $ 285 | $ 351 |
| Consumer mortgage | 10,373 | 12,311 | 226 | 241 |
| Commercial automobile | 31,875 | 32,822 | 39 | 24 |
| Commercial mortgage | — | — | — | — |
| Commercial other | 2,579 | 2,783 | — | 1 |
| Total on-balance sheet loans | 99,841 | 101,631 | 550 | 617 |
| Off-balance sheet securitization entities | | | | |
| Consumer automobile | 1,336 | 1,495 | 3 | 4 |
| Consumer mortgage - GSEs | 117,342 | 119,384 | 1,835 | 1,892 |
| Total off-balance sheet securitization entities | 118,678 | 120,879 | 1,838 | 1,896 |
| Whole-loan transactions (a) | 5,558 | 6,756 | 103 | 129 |
| Total | $ 224,077 | $ 229,266 | $ 2,491 | $ 2,642 |

(a)    Whole-loan transactions are not part of a securitization transaction, but represent consumer automobile and consumer mortgage pools of loans sold to third-party investors.

| ($ in millions) | Net credit losses | |
|---|---|---|
| | Three months ended March 31, | |
| | 2013 | 2012 |
| On-balance sheet loans | | |
| Consumer automobile | $ 93 | $ 74 |
| Consumer mortgage | 21 | 18 |
| Commercial automobile | 1 | — |
| Commercial mortgage | n/m | (1) |
| Commercial other | (1) | (8) |
| Total on-balance sheet loans | 114 | 83 |
| Off-balance sheet securitization entities | | |
| Consumer automobile | 1 | n/m |
| Consumer mortgage - GSEs (a) | n/m | n/m |
| Total off-balance sheet securitization entities | 1 | — |
| Whole-loan transactions | n/m | 8 |
| Total | $ 115 | $ 91 |

n/m = not meaningful

(a)    Anticipated credit losses are not meaningful due to the GSE guarantees.

Table of Contents

# Notes to Condensed Consolidated Financial Statements (unaudited)

Ally Financial Inc. • Form 10-Q

## 10.    Servicing Activities
### Mortgage Servicing Rights

The following table summarizes activity related to MSRs, which are carried at fair value. Management estimates fair value using our transaction data and other market data or, in periods when there are limited MSRs market transactions that are directly observable, internally developed discounted cash flow models (an income approach) are used to estimate the fair value. These internal valuation models estimate net cash flows based on internal operating assumptions that we believe would be used by market participants in orderly transactions combined with market-based assumptions for loan prepayment rates, interest rates, and discount rates that we believe approximate yields required by investors in this asset.

| Three months ended March 31, ($ in millions) | | 2013 (a)(b) | | 2012 (c) |
|---|---|---|---|---|
| Estimated fair value at January 1, | $ | 952 | $ | 2,519 |
| Additions recognized on sale of mortgage loans | | 54 | | 75 |
| Changes in fair value | | | | |
| Due to changes in valuation inputs or assumptions used in the valuation model | | (28) | | 163 |
| Other changes in fair value | | (61) | | (162) |
| Estimated fair value at March 31, | $ | 917 | $ | 2,595 |

(a)    The remaining balance is at Ally Bank, due to the deconsolidation of ResCap.
(b)    In April 2013, we sold our agency MSRs portfolio. Refer to  Note 27 for further details.
(c)    Includes activities of our discontinued operations.

Changes in fair value due to changes in valuation inputs or assumptions used in the valuation model include all changes due to a revaluation by a model or by a benchmarking exercise. Other changes in fair value primarily include the accretion of the present value of the discount related to forecasted cash flows and the economic runoff of the portfolio.  Refer to Note 1 to the Consolidated Financial Statements in our 2012 Annual Report on Form 10-K for additional information regarding our significant assumptions and valuation techniques used in the valuation of mortgage servicing rights.

The key economic assumptions and sensitivity of the fair value of MSRs to immediate 10% and 20% adverse changes in those assumptions were as follows.

| ($ in millions) | | March 31, 2013 | | December 31, 2012 |
|---|---|---|---|---|
| Weighted average life (in years) | | 5.4 | | 4.6 |
| Weighted average prepayment speed | | 10.3% | | 13.5% |
| Impact on fair value of 10% adverse change | $ | (64) | $ | (77) |
| Impact on fair value of 20% adverse change | | (122) | | (144) |
| Weighted average discount rate | | 9.3% | | 7.7% |
| Impact on fair value of 10% adverse change | $ | (42) | $ | (10) |
| Impact on fair value of 20% adverse change | | (80) | | (19) |

These sensitivities are hypothetical and should be considered with caution. Changes in fair value based on a 10% and 20% variation in assumptions generally cannot be extrapolated because the relationship of the change in assumptions to the change in fair value may not be linear. Also, the effect of a variation in a particular assumption on the fair value is calculated without changing any other assumption. In reality, changes in one factor may result in changes in another (e.g., increased market interest rates may result in lower prepayments and increased credit losses) that could magnify or counteract the sensitivities. Further, these sensitivities show only the change in the asset balances and do not show any expected change in the fair value of the instruments used to manage the interest rates and prepayment risks associated with these assets.

### Risk Mitigation Activities

The primary risk of our servicing rights is interest rate risk and the resulting impact on prepayments. A significant decline in interest rates could lead to higher-than-expected prepayments that could reduce the value of the MSRs. We economically hedge the impact of these risks with both derivative and nonderivative financial instruments. Refer to Note 20 for additional information regarding the derivative financial instruments used to economically hedge MSRs.

Table of Contents

# Notes to Condensed Consolidated Financial Statements (unaudited)

Ally Financial Inc. • Form 10-Q

The components of servicing valuation and hedge activities, net, were as follows.

| ($ in millions) | Three months ended March 31, | | | |
|---|---|---|---|---|
| | 2013 | | 2012 | |
| Change in estimated fair value of mortgage servicing rights | $ | (89) | $ | (10) |
| Change in fair value of derivative financial instruments | | (112) | | (96) |
| Servicing asset valuation and hedge activities, net | $ | (201) | $ | (106) |

## Mortgage Servicing Fees

The components of mortgage servicing fees were as follows.

| ($ in millions) | Three months ended March 31, | | | |
|---|---|---|---|---|
| | 2013 | | 2012 | |
| Contractual servicing fees, net of guarantee fees and including subservicing | $ | 58 | $ | 86 |
| Late fees | | 1 | | 2 |
| Ancillary fees | | 4 | | 4 |
| Total mortgage servicing fees | $ | 63 | $ | 92 |

## Mortgage Servicing Advances

In connection with our primary mortgage servicing activities (i.e., servicing of mortgage loans), we make certain payments for property taxes and insurance premiums, default and property maintenance payments, as well as advances of principal and interest payments before collecting them from individual borrowers. Servicing advances, including contractual interest, are priority cash flows in the event of a loan principal reduction or foreclosure and ultimate liquidation of the real estate-owned property. These servicing advances are included in other assets on the Condensed Consolidated Balance Sheet and totaled $78 million and $82 million at March 31, 2013 and December 31, 2012, respectively. We maintained an allowance for uncollected primary servicing advances of $1 million and $1 million at March 31, 2013 and December 31, 2012, respectively. Our potential obligation is influenced by the loan's performance and credit quality.

## Mortgage Serviced Assets

Total serviced mortgage assets consist of primary servicing activities. These include loans owned by Ally Bank, where Ally Bank is the primary servicer, and loans sold to third-party investors, where Ally Bank has retained primary servicing. Loans owned by Ally Bank are categorized as loans held-for-sale or finance receivables and loans, which are discussed in further detail in Note 6 and Note 7, respectively. The loans sold to third-party investors were sold through off-balance sheet GSE securitization transactions.

The unpaid principal balance of our serviced mortgage assets were as follows.

| ($ in millions) | March 31, 2013 | | December 31, 2012 | |
|---|---|---|---|---|
| On-balance sheet mortgage loans | | | | |
| Held-for-sale and investment | $ | 9,208 | $ | 10,938 |
| Off-balance sheet mortgage loans | | | | |
| Loans sold to third-party investors | | | | |
| GSEs | | 117,675 | | 119,384 |
| Whole-loan | | 2 | | 2 |
| Total primary serviced mortgage loans (a) | $ | 126,885 | $ | 130,324 |

(a)    In April 2013, we sold our agency MSRs portfolio, refer to Note 27 for further details.

Ally Bank is subject to certain net worth requirements associated with its servicing agreements with Fannie Mae and Freddie Mac. The majority of Ally Bank's serviced mortgage assets are subserviced by GMAC Mortgage, LLC, a subsidiary of ResCap, pursuant to a servicing agreement. At March 31, 2013, Ally Bank was in compliance with the requirements of the servicing agreements.

## Automobile Finance Servicing Activities

We service consumer automobile contracts. Historically, we have sold a portion of our consumer automobile contracts. With respect to contracts we sell, we retain the right to service and earn a servicing fee for our servicing function. Typically, we conclude that the fee we are paid for servicing consumer automobile finance receivables represents adequate compensation, and consequently, we do not recognize a servicing asset or liability. We recognized automobile servicing fees of $ 19 million and $30 million, during the three months ended March 31, 2013 and 2012, respectively.

36

Table of Contents

# Notes to Condensed Consolidated Financial Statements (unaudited)

Ally Financial Inc. • Form 10-Q

## Automobile Finance Serviced Assets

The total serviced automobile finance loans outstanding were as follows.

| ($ in millions) | | March 31, 2013 | | December 31, 2012 |
|---|---|---|---|---|
| On-balance sheet automobile finance loans and leases | | | | |
| Consumer automobile | $ | 55,014 | $ | 53,715 |
| Commercial automobile | | 31,875 | | 32,822 |
| Operating leases | | 14,828 | | 13,550 |
| Operations held-for-sale | | 15,304 | | 25,979 |
| Other | | 45 | | 41 |
| Off-balance sheet automobile finance loans | | | | |
| Loans sold to third-party investors | | | | |
| Securitizations | | 1,317 | | 1,474 |
| Whole-loan | | 5,374 | | 6,541 |
| Other (a) | | 9,060 | | — |
| Total serviced automobile finance loans and leases | $ | 132,817 | $ | 134,122 |

(a)   Consists of serviced assets sold in conjunction with the divestiture of our Canadian automotive finance operations.

## 11.   Other Assets

The components of other assets were as follows.

| ($ in millions) | | March 31, 2013 | | December 31, 2012 |
|---|---|---|---|---|
| Property and equipment at cost | $ | 696 | $ | 693 |
| Accumulated depreciation | | (428) | | (411) |
| Net property and equipment | | 268 | | 282 |
| Restricted cash collections for securitization trusts (a) | | 2,159 | | 2,983 |
| Deferred tax asset | | 1,309 | | 1,190 |
| Fair value of derivative contracts in receivable position | | 668 | | 2,298 |
| Restricted cash and cash equivalents | | 531 | | 889 |
| Collateral placed with counterparties | | 447 | | 1,290 |
| Other accounts receivable | | 445 | | 525 |
| Cash reserve deposits held-for-securitization trusts (b) | | 429 | | 442 |
| Unamortized debt issuance costs | | 418 | | 425 |
| Nonmarketable equity securities | | 283 | | 303 |
| Other assets | | 993 | | 1,281 |
| Total other assets | $ | 7,950 | $ | 11,908 |

(a)   Represents cash collections from customer payments on securitized receivables. These funds are distributed as payments on the related secured debt.
(b)   Represents credit enhancement in the form of cash reserves for various securitization transactions.

Table of Contents

# Notes to Condensed Consolidated Financial Statements (unaudited)

Ally Financial Inc. • Form 10-Q

## 12.    Deposit Liabilities

Deposit liabilities consisted of the following.

| ($ in millions) | March 31, 2013 | | December 31, 2012 |
|---|---|---|---|
| Deposits | | | |
| Noninterest-bearing deposits | $ | 844 | $ 1,977 |
| Interest-bearing deposits | | | |
| Savings and money market checking accounts | | 17,512 | 13,871 |
| Certificates of deposit | | 31,135 | 31,084 |
| Dealer deposits | | 835 | 983 |
| Total deposit liabilities | $ | 50,326 | $ 47,915 |

Noninterest-bearing deposits primarily represent third-party escrows associated with our mortgage loan-servicing portfolio. The escrow deposits are not subject to an executed agreement and can be withdrawn without penalty at any time. At March 31, 2013, and December 31, 2012, certificates of deposit included $12.3 billion and $12.0 billion, respectively, of certificates of deposit in denominations of $100 thousand or more.

## 13.    Short-term Borrowings

The following table presents the composition of our short-term borrowings portfolio.

| ($ in millions) | March 31, 2013 | | | | December 31, 2012 | | |
|---|---|---|---|---|---|---|---|
| | Unsecured | Secured (a) | Total | | Unsecured | Secured (a) | Total |
| Demand notes | $ 3,229 | $ — | $ 3,229 | $ | 3,094 | $ — | $ 3,094 |
| Bank loans and overdrafts | 7 | — | 7 | | 167 | — | 167 |
| Federal Home Loan Bank | — | 3,500 | 3,500 | | — | 3,800 | 3,800 |
| Securities sold under agreements to repurchase | — | 482 | 482 | | — | — | — |
| Other (b) | — | 400 | 400 | | — | 400 | 400 |
| Total short-term borrowings | $ 3,236 | $ 4,382 | $ 7,618 | $ | 3,261 | $ 4,200 | $ 7,461 |

(a)    Refer to Note 14 for further details on assets restricted as collateral for payment of the related debt.
(b)    Other relates to secured borrowings at our Commercial Finance Group at March 31, 2013 and December 31, 2012.

## 14.    Long-term Debt

The following tables present the composition of our long-term debt portfolio.

| ($ in millions) | March 31, 2013 | | | | December 31, 2012 | | |
|---|---|---|---|---|---|---|---|
| | Unsecured | Secured | Total | | Unsecured | Secured | Total |
| Long-term debt | | | | | | | |
| Due within one year | $ 3,809 | $ 10,964 | $ 14,773 | $ | 1,070 | $ 11,503 | $ 12,573 |
| Due after one year (a) | 28,448 | 23,444 | 51,892 | | 31,486 | 29,408 | 60,894 |
| Fair value adjustment | 956 | — | 956 | | 1,094 | — | 1,094 |
| Total long-term debt | $ 33,213 | $ 34,408 | $ 67,621 | $ | 33,650 | $ 40,911 | $ 74,561 |

(a)    Includes $2.6 billion and $2.6 billion of trust preferred securities at both March 31, 2013 and December 31, 2012, respectively.

38

Table of Contents

# Notes to Condensed Consolidated Financial Statements (unaudited)

Ally Financial Inc. • Form 10-Q

The following table presents the scheduled remaining maturity of long-term debt, assuming no early redemptions will occur. The actual payment of secured debt may vary based on the payment activity of the related pledged assets.

| Year ended December 31, ($ in millions) | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 and thereafter | Fair value adjustment | Total |
|---|---|---|---|---|---|---|---|---|
| Unsecured | | | | | | | | |
| Long-term debt | $ 1,008 | $ 5,588 | $ 5,092 | $ 1,970 | $ 3,681 | $ 16,698 | $ 956 | $ 34,993 |
| Original issue discount | (201) | (188) | (56) | (63) | (75) | (1,197) | — | (1,780) |
| Total unsecured | 807 | 5,400 | 5,036 | 1,907 | 3,606 | 15,501 | 956 | 33,213 |
| Secured | | | | | | | | |
| Long-term debt | 7,109 | 12,005 | 8,137 | 3,574 | 2,722 | 861 | — | 34,408 |
| Total long-term debt | $ 7,916 | $ 17,405 | $ 13,173 | $ 5,481 | $ 6,328 | $ 16,362 | $ 956 | $ 67,621 |

The following summarizes assets restricted as collateral for the payment of the related debt obligation primarily arising from securitization transactions accounted for as secured borrowings and repurchase agreements.

| ($ in millions) | March 31, 2013 | | December 31, 2012 | |
|---|---|---|---|---|
| | Total | Ally Bank (a) | Total | Ally Bank (a) |
| Investment securities | $ 500 | $ 500 | $ 1,911 | $ 1,911 |
| Mortgage assets held-for-investment and lending receivables | 9,715 | 9,715 | 9,866 | 9,866 |
| Consumer automobile finance receivables | 23,953 | 12,673 | 29,557 | 14,833 |
| Commercial automobile finance receivables | 18,574 | 18,574 | 19,606 | 19,606 |
| Investment in operating leases, net | 6,872 | 2,966 | 6,058 | 1,691 |
| Other assets | 973 | 252 | 999 | 272 |
| Total assets restricted as collateral (b) | $ 60,587 | $ 44,680 | $ 67,997 | $ 48,179 |
| Secured debt (c) | $ 38,790 | $ 25,864 | $ 45,111 | $ 29,162 |

(a) Ally Bank is a component of the total column.

(b) Ally Bank has an advance agreement with the Federal Home Loan Bank of Pittsburgh (FHLB) and had assets pledged to secure borrowings that were restricted as collateral to the FHLB totaling $12.5 billion and $12.6 billion at March 31, 2013, and December 31, 2012, respectively. These assets were composed primarily of consumer and commercial mortgage finance receivables and loans, net. Ally Bank has access to the Federal Reserve Bank Discount Window. Ally Bank had assets pledged and restricted as collateral to the Federal Reserve Bank totaling $3.1 billion and $1.9 billion at March 31, 2013, and December 31, 2012, respectively. These assets were composed of consumer mortgage finance receivables and loans, net; consumer automobile finance receivables and loans, net; and investment securities. Availability under these programs is only for the operations of Ally Bank and cannot be used to fund the operations or liabilities of Ally or its subsidiaries.

(c) Includes $4.4 billion and $4.2 billion of short-term borrowings at March 31, 2013, and December 31, 2012, respectively.

## Trust Preferred Securities

On December 30, 2009, we entered into a Securities Purchase and Exchange Agreement with U.S. Department of Treasury (Treasury) and GMAC Capital Trust I, a Delaware statutory trust (the Trust), which is a finance subsidiary that is wholly owned by Ally. As part of the agreement, the Trust sold to Treasury 2,540,000 trust preferred securities (TRUPS) issued by the Trust with an aggregate liquidation preference of $2.5 billion. Additionally, we issued and sold to Treasury a ten-year warrant to purchase up to 127,000 additional TRUPS with an aggregate liquidation preference of $127 million, at an initial exercise price of $0.01 per security, which Treasury immediately exercised in full.

On March 1, 2011, the Declaration of Trust and certain other documents related to the TRUPS were amended and all the outstanding TRUPS held by Treasury were designated 8.125% Fixed Rate / Floating Rate Trust Preferred Securities, Series (Series 2 TRUPS). On March 7, 2011, Treasury sold 100% of the Series 2 TRUPS in an offering registered with the SEC. Ally did not receive any proceeds from the sale.

Each Series 2 TRUPS security has a liquidation amount of $25. Distributions are cumulative and are payable until redemption at the applicable coupon rate. Distributions are payable at an annual rate of 8.125% payable quarterly in arrears, beginning August 15, 2011, to but excluding February 15, 2016. From and including February 15, 2016, to but excluding February 15, 2040, distributions will be payable at an annual rate equal to three-month London interbank offer rate plus 5.785% payable quarterly in arrears, beginning May 15, 2016. Ally has the right to defer payments of interest for a period not exceeding 20 consecutive quarters. The Series 2 TRUPS have no stated maturity date, but must be redeemed upon the redemption or maturity of the related debentures (Debentures), which mature on February 15, 2040. The Series 2 TRUPS are generally nonvoting, other than with respect to certain limited matters. During any period in which any Series 2 TRUPS remain outstanding but in which distributions on the Series 2 TRUPS have not been fully paid, none of Ally or its subsidiaries will be permitted to (i) declare or pay dividends on, make any distributions with respect to, or redeem, purchase, acquire or otherwise make a liquidation payment with respect to, any of Ally's capital stock or make any guarantee payment with respect thereto; or (ii) make any payments of principal,

Table of Contents

# Notes to Condensed Consolidated Financial Statements (unaudited)

Ally Financial Inc. • Form 10-Q

interest, or premium on, or repay, repurchase or redeem, any debt securities or guarantees that rank on a parity with or junior in interest to the Debentures with certain specified exceptions in each case.

## Covenants and Other Requirements

In secured funding transactions, there are trigger events that could cause the debt to be prepaid at an accelerated rate or could cause our usage of the credit facility to be discontinued. The triggers are generally based on the financial health and performance of the servicer as well as performance criteria for the pool of receivables, such as delinquency ratios, loss ratios, commercial payment rates. During 2012, there were no trigger events that resulted in the repayment of debt at an accelerated rate or impacted the usage of our credit facilities.

When we issue debt securities in private offerings, we may be subject to registration rights agreements. Under these agreements, we generally agree to use reasonable efforts to cause the consummation of a registered exchange offer or to file a shelf registration statement within a prescribed period. In the event that we fail to meet these obligations, we may be required to pay additional penalty interest with respect to the covered debt during the period in which we fail to meet our contractual obligations.

## Funding Facilities

We utilize both committed and uncommitted credit facilities. The financial institutions providing the uncommitted facilities are not contractually obligated to advance funds under them. The amounts outstanding under our various funding facilities are included on our Condensed Consolidated Balance Sheet.

As of March 31, 2013, Ally Bank had exclusive access to $3.5 billion of funding capacity from committed credit facilities. Ally Bank also has access to a $4.1 billion committed facility that is shared with the parent company. Funding programs supported by the Federal Reserve and the FHLB, together with repurchase agreements, complement Ally Bank's private committed facilities.

The total capacity in our committed funding facilities is provided by banks and other financial institutions through private transactions. The committed secured funding facilities can be revolving in nature and allow for additional funding during the commitment period, or they can be amortizing and not allow for any further funding after the closing date. At March 31, 2013, $26.1 billion of our $33.4 billion of committed capacity was revolving. Our revolving facilities generally have an original tenor ranging from 364 days to two years. As of March 31, 2013, we had $16.9 billion of committed funding capacity from revolving facilities with a remaining tenor greater than 364 days.

### Committed Funding Facilities

| ($ in billions) | Outstanding | | Unused Capacity (a) | | Total Capacity | |
|---|---|---|---|---|---|---|
| | March 31, 2013 | December 31, 2012 | March 31, 2013 | December 31, 2012 | March 31, 2013 | December 31, 2012 |
| Bank funding | | | | | | |
| Secured | $ 1.7 | $ 3.8 | $ 1.8 | $ 4.7 | $ 3.5 | $ 8.5 |
| Nonbank funding | | | | | | |
| Unsecured (b) | 0.1 | 0.1 | — | — | 0.1 | 0.1 |
| Secured (c) (d) (e) | 13.9 | 22.5 | 11.8 | 7.8 | 25.7 | 30.3 |
| Total nonbank funding | 14.0 | 22.6 | 11.8 | 7.8 | 25.8 | 30.4 |
| Shared capacity (f) (g) | 1.1 | 1.1 | 3.0 | 3.0 | 4.1 | 4.1 |
| Total committed facilities | $ 16.8 | $ 27.5 | $ 16.6 | $ 15.5 | $ 33.4 | $ 43.0 |

(a)  Funding from committed secured facilities is available on request in the event excess collateral resides in certain facilities or is available to the extent incremental collateral is available and contributed to the facilities.

(b)  Total unsecured nonbank funding capacity represents committed funding for our discontinued international automobile financing business.

(c)  Total secured nonbank funding capacity includes committed funding for our discontinued international automobile financing business of $6.9 billion and $12.0 billion as of March 31, 2013 and December 31, 2012, respectively, with outstanding debt of $5.1 billion and $9.6 billion, respectively.

(d)  Total unused capacity includes $2.1 billion and $2.2 billion as of March 31, 2013 and December 31, 2012, respectively, from certain committed funding arrangements that are generally reliant upon the origination of future automotive receivables and that are available in 2013.

(e)  Includes the secured facilities of our Commercial Finance Group.

(f)  Funding is generally available for assets originated by Ally Bank or the parent company, Ally Financial Inc.

(g)  Total shared bank facilities includes committed funding for our discontinued international automobile financing business of $0.1 billion and $0.1 billion as of March 31, 2013 and December 31, 2012, respectively with outstanding debt of $0.1 billion, respectively.

Table of Contents

# Notes to Condensed Consolidated Financial Statements (unaudited)

Ally Financial Inc. • Form 10-Q

### Uncommitted Funding Facilities

| ($ in billions) | Outstanding | | Unused Capacity (a) | | Total Capacity | |
|---|---|---|---|---|---|---|
| | March 31, 2013 | December 31, 2012 | March 31, 2013 | December 31, 2012 | March 31, 2013 | December 31, 2012 |
| Bank funding | | | | | | |
| Secured | | | | | | |
| Federal Reserve funding programs | $ — | $ — | $ 1.8 | $ 1.8 | $ 1.8 | $ 1.8 |
| FHLB advances | 4.5 | 4.8 | 0.8 | 0.4 | 5.3 | 5.2 |
| Repurchase agreements | 0.5 | — | — | — | 0.5 | — |
| Total bank funding | 5.0 | 4.8 | 2.6 | 2.2 | 7.6 | 7.0 |
| Nonbank funding | | | | | | |
| Unsecured | 2.2 | 2.1 | 0.4 | 0.4 | 2.6 | 2.5 |
| Secured | — | 0.1 | 0.1 | 0.1 | 0.1 | 0.2 |
| Total nonbank funding (a) | 2.2 | 2.2 | 0.5 | 0.5 | 2.7 | 2.7 |
| Total uncommitted facilities | $ 7.2 | $ 7.0 | $ 3.1 | $ 2.7 | $ 10.3 | $ 9.7 |

(a)   Total nonbank funding capacity represents uncommitted funding for our discontinued international automobile financing business.

## 15.   Accrued Expenses and Other Liabilities

The components of accrued expenses and other liabilities were as follows.

| ($ in millions) | March 31, 2013 | December 31, 2012 |
|---|---|---|
| Accrual related to ResCap Bankruptcy (a) | $ 750 | $ 750 |
| Collateral received from counterparties | 565 | 941 |
| Accounts payable | 475 | 565 |
| Fair value of derivative contracts in payable position | 406 | 2,468 |
| Employee compensation and benefits | 364 | 494 |
| Reserves for insurance losses and loss adjustment expenses | 342 | 341 |
| Reserve for mortgage representation and warranty obligation | 170 | 105 |
| Deferred revenue | 102 | 97 |
| Other liabilities | 495 | 824 |
| Total accrued expenses and other liabilities | $ 3,669 | $ 6,585 |

(a)   Refer to Note 1 for more information regarding the Debtors' bankruptcy, deconsolidation, and this accrual.

41

Table of Contents

# Notes to Condensed Consolidated Financial Statements (unaudited)

Ally Financial Inc. • Form 10-Q

## 16.  Equity

The following table summarizes information about our Series F-2, Series A, and Series G preferred stock.

| | March 31, 2013 | December 31, 2012 |
|---|---|---|
| **Mandatorily convertible preferred stock held by U.S. Department of Treasury** | | |
| **Series F-2 preferred stock (a)** | | |
| Carrying value *($ in millions)* | $ 5,685 | $ 5,685 |
| Par value *(per share)* | 0.01 | 0.01 |
| Liquidation preference *(per share)* | 50 | 50 |
| Number of shares authorized | 228,750,000 | 228,750,000 |
| Number of shares issued and outstanding | 118,750,000 | 118,750,000 |
| Dividend/coupon | 9% | 9% |
| Redemption/call feature | Perpetual (b) | Perpetual (b) |
| **Preferred stock** | | |
| **Series A preferred stock** | | |
| Carrying value *($ in millions)* | $ 1,021 | $ 1,021 |
| Par value *(per share)* | 0.01 | 0.01 |
| Liquidation preference *(per share)* | 25 | 25 |
| Number of shares authorized | 160,870,560 | 160,870,560 |
| Number of shares issued and outstanding | 40,870,560 | 40,870,560 |
| Dividend/coupon | | |
| Prior to May 15, 2016 | 8.5% | 8.5% |
| On and after May 15, 2016 | three month LIBOR + 6.243% | three month LIBOR + 6.243% |
| Redemption/call feature | Perpetual (c) | Perpetual (c) |
| **Series G preferred stock (d)** | | |
| Carrying value *($ in millions)* | $ 234 | $ 234 |
| Par value *(per share)* | 0.01 | 0.01 |
| Liquidation preference *(per share)* | 1,000 | 1,000 |
| Number of shares authorized | 2,576,601 | 2,576,601 |
| Number of shares issued and outstanding | 2,576,601 | 2,576,601 |
| Dividend/coupon | 7% | 7% |
| Redemption/call feature | Perpetual (e) | Perpetual (e) |

(a) Mandatorily convertible to common equity on December 30, 2016.
(b) Convertible prior to mandatory conversion date either with consent of Treasury or in the event the Federal Reserve compels a conversion.
(c) Nonredeemable prior to May 15, 2016.
(d) Pursuant to a registration rights agreement, we are required to maintain an effective shelf registration statement. In the event we fail to meet this obligation, we may be required to pay additional interest to the holders of the Series G Preferred Stock.
(e) Redeemable beginning at December 31, 2011.

## 17.  Accumulated Other Comprehensive Income (Loss)

The following table presents changes, net of tax, in each component of accumulated other comprehensive income (loss).

| ($ in millions) | Unrealized gains on investment securities | Translation adjustments and net investment hedges | Cash flow hedges | Defined benefit pension plans | Accumulated other comprehensive income (loss) |
|---|---|---|---|---|---|
| Balance at December 31, 2012 | $ 76 | $ 368 | $ 2 | $ (135) | $ 311 |
| **2013 net change** | 12 | (350) | 4 | 17 | (317) |
| **Balance at March 31, 2013** | $ 88 | $ 18 | $ 6 | $ (118) | $ (6) |

Table of Contents

# Notes to Condensed Consolidated Financial Statements (unaudited)

Ally Financial Inc. • Form 10-Q

The following table presents the before- and after-tax changes in each component of accumulated other comprehensive income (loss).

| March 31, ($ in millions) | Before Tax | | Tax Effect | | After Tax | |
|---|---|---|---|---|---|---|
| **2013** | | | | | | |
| Unrealized gains on investment securities | | | | | | |
| Net unrealized gains arising during the period | $ | 69 | $ | (1) | $ | 68 |
| Less: Net realized gains reclassified to net income | | 51 | (a) | (2) | (b) | 49 |
| Less: Net realized gains reclassified to income from discontinued operations, net of tax | | 8 | | (1) | | 7 |
| Net change | | 10 | | 2 | | 12 |
| Translation adjustments | | | | | | |
| Net unrealized losses arising during the period | | (49) | | 2 | | (47) |
| Less: Net realized gains reclassified to income from discontinued operations, net of tax | | 432 | | 3 | | 435 |
| Net change | | (481) | | (1) | | (482) |
| Net investment hedges | | | | | | |
| Net unrealized gains arising during the period | | 20 | | (8) | | 12 |
| Less: Net realized losses reclassified to income from discontinued operations, net of tax | | (149) | | 29 | | (120) |
| Net change | | 169 | | (37) | | 132 |
| Cash flow hedges | | | | | | |
| Less: Net realized losses reclassified to net income | | (7) | (c) | 3 | (b) | (4) |
| Defined benefit pension plans | | | | | | |
| Less: Net losses, prior service costs, and transition obligations reclassified to net income | | (2) | (d) | — | (b) | (2) |
| Less: Net losses, prior service costs, and transition obligations reclassified to income from discontinued operations, net of tax | | (17) | | 2 | | (15) |
| Net change | | 19 | | (2) | | 17 |
| Other comprehensive income | $ | (276) | $ | (41) | $ | (317) |

(a)  Includes gains reclassified to other gain on investments, net in our  Condensed Consolidated Statement of Comprehensive Income .
(b)  Includes amounts reclassified to income tax (benefit) expense from continuing operations in our  Condensed Consolidated Statement of Comprehensive Income .
(c)  Includes losses reclassified to interest on long-term debt in our  Condensed Consolidated Statement of Comprehensive Income .
(d)  Includes losses reclassified to compensation and benefits expense in our  Condensed Consolidated Statement of Comprehensive Income .

43

Table of Contents

# Notes to Condensed Consolidated Financial Statements (unaudited)

Ally Financial Inc. • Form 10-Q

## 18.   Earnings per Common Share

The following table presents the calculation of basic and diluted earnings per common share.

| | Three months ended March 31, | | | |
|---|---|---|---|---|
| (*$ in millions except per share data*) | **2013** | | 2012 | |
| Net income from continuing operations | $ | **60** | $ | 2 |
| Preferred stock dividends — U.S. Department of Treasury | | **(133)** | | (134) |
| Preferred stock dividends | | **(67)** | | (67) |
| **Net loss from continuing operations attributable to common shareholders** | | **(140)** | | (199) |
| Income from discontinued operations, net of tax | | **1,033** | | 308 |
| **Net income attributable to common shareholders** | $ | **893** | $ | 109 |
| **Basic weighted-average common shares outstanding** | | **1,330,970** | | 1,330,970 |
| **Diluted weighted-average common shares outstanding (a)** | | **1,330,970** | | 1,330,970 |
| **Basic earnings per common share** | | | | |
| Net loss from continuing operations | $ | **(105)** | $ | (149) |
| Income from discontinued operations, net of tax | | **776** | | 231 |
| **Net income** | $ | **671** | $ | 82 |
| **Diluted earnings per common share (a)** | | | | |
| Net loss from continuing operations | $ | **(105)** | $ | (149) |
| Income from discontinued operations, net of tax | | **776** | | 231 |
| **Net income** | $ | **671** | $ | 82 |

(a)   Due to the antidilutive effect of converting the Fixed Rate Cumulative Mandatorily Convertible Preferred Stock into common shares and the net loss from continuing operations attributable to common shareholders for the  three months ended  March 31, 2013 and 2012, loss from continuing operations attributable to common shareholders and basic weighted-average common shares outstanding were used to calculate basic and diluted earnings per share.

The effects of converting the outstanding Fixed Rate Cumulative Mandatorily Convertible Preferred Stock into common shares are not included in the diluted earnings per share calculation for the three months ended March 31, 2013 and 2012, as the effects would be antidilutive for those periods. As such,  574 thousand of potential common shares were excluded from the diluted earnings per share calculation for the  three months ended  March 31, 2013 and 2012, respectively.

## 19.   Regulatory Capital and Other Regulatory Matters

As a bank holding company, we and our wholly owned state-chartered banking subsidiary, Ally Bank, are subject to risk-based capital and leverage guidelines issued by federal and state banking regulators that require that our capital-to-assets ratios meet certain minimum standards. Failure to meet minimum capital requirements can initiate certain mandatory and possibly additional discretionary action by regulators that, if undertaken, could have a direct material effect on the consolidated financial statements or the results of operations and financial condition of Ally and Ally Bank. Under capital adequacy guidelines and the regulatory framework for prompt corrective action, we must meet specific capital guidelines that involve quantitative measures of our assets and certain off-balance sheet items. Our capital amounts and classifications are also subject to qualitative judgments by the regulators about components, risk-weightings, and other factors.

The risk-based capital ratios are determined by allocating assets and specified off-balance sheet financial instruments into several broad risk categories with higher levels of capital being required for the categories that present greater risk. Under the guidelines, total capital is divided into two tiers: Tier 1 capital and Tier 2 capital. Tier 1 capital generally consists of common equity, minority interests, qualifying noncumulative preferred stock, and the fixed rate cumulative preferred stock sold to Treasury under the Troubled Asset Relief Program (TARP), less goodwill and other adjustments. Tier 2 capital generally consists of perpetual preferred stock not qualifying as Tier 1 capital, limited amounts of subordinated debt and the allowance for loan losses, and other adjustments. The amount of Tier 2 capital may not exceed the amount of Tier 1 capital.

Total risk-based capital is the sum of Tier 1 and Tier 2 capital. Under the guidelines, banking organizations are required to maintain a minimum Total risk-based capital ratio (Total capital to risk-weighted assets) of 8% and a Tier 1 risk-based capital ratio (Tier 1 capital to risk-weighted assets) of 4%.

The federal banking regulators also have established minimum leverage ratio guidelines. The leverage ratio is defined as Tier 1 capital divided by adjusted quarterly average total assets (which reflect adjustments for disallowed goodwill and certain intangible assets). The minimum Tier 1 leverage ratio is  3% or 4% depending on factors specified in the regulations.

A banking institution meets the regulatory definition of "well-capitalized" when its Total risk-based capital ratio equals or exceeds  10% and its Tier 1 risk-based capital ratio equals or exceeds 6%; and for insured depository institutions, when its leverage ratio equals or exceeds  5%, unless subject to a regulatory directive to maintain higher capital levels.

44

Table of Contents

# Notes to Condensed Consolidated Financial Statements (unaudited)

Ally Financial Inc. • Form 10-Q

The banking regulators have also developed a measure of capital called "Tier 1 common" defined as Tier 1 capital less noncommon elements, including qualifying perpetual preferred stock, minority interest in subsidiaries, trust preferred securities, and mandatory convertible preferred securities. Tier 1 common is used by banking regulators, investors and analysts to assess and compare the quality and composition of Ally's capital with the capital of other financial services companies. Also, bank holding companies with assets of $50 billion or more, such as Ally, must develop and maintain a capital plan annually, and among other elements, the capital plan must include a discussion of how we will maintain a pro forma Tier 1 common ratio (Tier 1 common to risk-weighted assets) above 5% under expected conditions and certain stressed scenarios.

On October 29, 2010, Ally, IB Finance Holding Company, LLC, Ally Bank, and the FDIC entered into a Capital and Liquidity Maintenance Agreement (CLMA). The CLMA requires capital at Ally Bank to be maintained at a level such that Ally Bank's leverage ratio is at least 15%. For this purpose, the leverage ratio is determined in accordance with the FDIC's regulations related to capital maintenance.

The following table summarizes our capital ratios.

| ($ in millions) | | March 31, 2013 | | December 31, 2012 | | Required minimum | Well-capitalized minimum |
|---|---|---|---|---|---|---|---|
| | | Amount | Ratio | Amount | Ratio | | |
| Risk-based capital | | | | | | | |
| Tier 1 (to risk-weighted assets) | | | | | | | |
| Ally Financial Inc. | $ | 20,663 | 14.59% | $  20,232 | 13.13% | 4.00% | 6.00% |
| Ally Bank | | 14,380 | 16.68 | 14,136 | 16.26 | 4.00 | 6.00 |
| Total (to risk-weighted assets) | | | | | | | |
| Ally Financial Inc. | $ | 22,084 | 15.59% | $  21,669 | 14.07% | 8.00% | 10.00% |
| Ally Bank | | 15,073 | 17.48 | 14,827 | 17.06 | 8.00 | 10.00 |
| Tier 1 leverage (to adjusted quarterly average assets) (a) | | | | | | | |
| Ally Financial Inc. | $ | 20,663 | 12.01% | $  20,232 | 11.16% | 3.00–4.00% | (b) |
| Ally Bank | | 14,380 | 15.59 | 14,136 | 15.30 | 15.00  (c) | 5.00% |
| Tier 1 common (to risk-weighted assets) | | | | | | | |
| Ally Financial Inc. | $ | 11,180 | 7.89% | $  10,749 | 6.98% | n/a | n/a |
| Ally Bank | | n/a | n/a | n/a | n/a | n/a | n/a |

n/a = not applicable

(a)  Federal regulatory reporting guidelines require the calculation of adjusted quarterly average assets using a daily average methodology.

(b)  There is no Tier 1 leverage component in the definition of a well-capitalized bank holding company.

(c)  Ally Bank, in accordance with the CLMA, is required to maintain a Tier 1 leverage ratio of at least 15%.

At March 31, 2013, Ally and Ally Bank were "well-capitalized" and met all capital requirements to which each was subject.

## 20.    Derivative Instruments and Hedging Activities

We enter into interest rate and foreign-currency swaps, futures, forwards, options, and swaptions in connection with our market risk management activities. Derivative instruments are used to manage interest rate risk relating to specific groups of assets and liabilities, including investment securities, MSRs, and debt. In addition, we use foreign exchange contracts to mitigate foreign-currency risk associated with foreign-currency-denominated debt, foreign exchange transactions, and our net investment in foreign subsidiaries. Our primary objective for utilizing derivative financial instruments is to manage market risk volatility associated with interest rate and foreign-currency risks related to the assets and liabilities.

### Interest Rate Risk

We execute interest rate swaps to modify our exposure to interest rate risk by converting certain fixed-rate instruments to a variable-rate and certain variable-rate instruments to a fixed rate. We monitor our mix of fixed- and variable-rate debt in relation to the rate profile of our assets. When it is cost-effective to do so, we may enter into interest rate swaps to achieve our desired mix of fixed- and variable-rate debt. Derivatives qualifying for hedge accounting consist of fixed-rate debt obligations in which receive-fixed swaps are designated as hedges of specific fixed-rate debt obligations. Other derivatives qualifying for hedge accounting consist of an existing variable-rate liability in which pay-fixed swaps are designated as hedges of the expected future cash flows in the form of interest payments on certain outstanding borrowings associated with Ally Bank's secured debt.

We enter into economic hedges to mitigate exposure for the following categories:

• *MSRs* — Our MSRs are generally subject to loss in value when mortgage rates decline. Declining mortgage rates generally result in an increase in refinancing activity that increases prepayments and results in a decline in the value of MSRs. To mitigate the impact of this risk, we maintain a portfolio of financial instruments, primarily derivative instruments that increase in value when interest

Table of Contents

# Notes to Condensed Consolidated Financial Statements (unaudited)

Ally Financial Inc. • Form 10-Q

rates decline. The primary objective is to minimize the overall risk of loss in the value of MSRs due to the change in fair value caused by interest rate changes.

A multitude of derivative instruments have been used to manage the interest rate risk related to MSRs. They include, but are not limited to, interest rate futures contracts, call or put options on U.S. Treasuries, swaptions, forward sales of mortgage-backed securities (MBS), futures, interest rate swaps, interest rate floors, and interest rate caps.

•   ***Mortgage loan commitments and mortgage loans held-for-sale*** — We are exposed to interest rate risk from the time an interest rate lock commitment (IRLC) is made until the time the mortgage loan is sold. Changes in interest rates impact the market price for our loans; as market interest rates decline, the value of existing IRLCs and loans held-for-sale increase and vice versa. Our primary objective in risk management activities related to IRLCs and mortgage loans held-for-sale is to eliminate or greatly reduce any interest rate risk associated with these items.

The primary derivative instrument we use to accomplish the risk management objective for mortgage loans and IRLCs is forward sales of MBS, primarily Fannie Mae or Freddie Mac to-be-announced securities. These instruments typically are entered into at the time the IRLC is made. The value of the forward sales contracts moves in the opposite direction of the value of our IRLCs and mortgage loans held-for-sale.

•   ***Debt*** — With the exception of a portion of our fixed-rate debt and a portion of our outstanding floating-rate borrowings associated with Ally Bank's secured credit facilities, we do not apply hedge accounting to our derivative portfolio held to mitigate interest rate risk associated with our debt portfolio. Typically, the significant terms of the interest rate swaps match the significant terms of the underlying debt resulting in an effective conversion of the rate of the related debt.

•   ***Other*** — We enter into futures, options, and swaptions to economically hedge our net fixed versus variable interest rate exposure. We also enter into equity options to economically hedge our exposure to the equity markets.

## Foreign Exchange Risk

We enter into derivative financial instrument contracts to mitigate the risk associated with variability in cash flows related to foreign-currency financial instruments. Currency forwards are used to economically hedge foreign exchange exposure on foreign-currency-denominated debt by converting the funding currency to the same currency of the assets being financed. Similar to our interest rate derivatives, the derivatives are generally entered into or traded concurrent with the debt issuance with the terms of the derivative matching the terms of the underlying debt.

We also enter into foreign-currency forwards and option-based contracts with external counterparties to hedge foreign exchange exposure on our net investments in foreign subsidiaries. Our foreign subsidiaries maintain both assets and liabilities in local currencies; these local currencies are generally the subsidiaries' functional currencies for accounting purposes. Foreign-currency exchange-rate gains and losses arise when the assets or liabilities of our subsidiaries are denominated in currencies that differ from this functional currency. In addition, our equity is impacted by the cumulative translation adjustments resulting from the translation of foreign subsidiary results; this impact is reflected in our accumulated other comprehensive income (loss). The hedges are recorded at fair value with the changes recorded to accumulated other comprehensive income (loss) including the spot to forward difference. The net derivative gain or loss remains in accumulated other comprehensive income (loss) until earnings are impacted by the sale or the liquidation of the associated foreign operation.

We also have a centralized-lending program to manage liquidity for all of our subsidiary businesses. Foreign-currency-denominated loan agreements are executed with our foreign subsidiaries in their local currencies. We evaluate our foreign-currency exposure resulting from intercompany lending and manage our currency risk exposure by entering into foreign-currency derivatives with external counterparties. Our foreign-currency derivatives are recorded at fair value with changes recorded as income offsetting the gains and losses on the associated foreign-currency transactions.

Except for our net investment hedges, we generally have not elected to treat any foreign-currency derivatives as hedges for accounting purposes principally because the changes in the fair values of the foreign-currency swaps are substantially offset by the foreign-currency revaluation gains and losses of the underlying assets and liabilities.

## Counterparty Credit Risk

Derivative financial instruments contain an element of credit risk if counterparties are unable to meet the terms of the agreements. Credit risk associated with derivative financial instruments is measured as the net replacement cost should the counterparties that owe us under the contract completely fail to perform under the terms of those contracts, assuming no recoveries of underlying collateral as measured by the market value of the derivative financial instrument.

To mitigate the risk of counterparty default, we maintain collateral agreements with certain counterparties. The agreements require both parties to maintain collateral in the event the fair values of the derivative financial instruments meet established thresholds. In the event that either party defaults on the obligation, the secured party may seize the collateral. Generally, our collateral arrangements are bilateral such that we and the counterparty post collateral for the value of our total obligation to each other. Contractual terms provide for standard and customary exchange of collateral based on changes in the market value of the outstanding derivatives. The securing party posts additional

46

Table of Contents

# Notes to Condensed Consolidated Financial Statements (unaudited)

Ally Financial Inc. • Form 10-Q

collateral when their obligation rises or removes collateral when it falls. We also have unilateral collateral agreements whereby we are the only entity required to post collateral.

Certain derivative instruments contain provisions that require us to either post additional collateral or immediately settle any outstanding liability balances upon the occurrence of a specified credit risk-related event. If a credit risk-related event had been triggered the amount of additional collateral required to be posted by us would have been insignificant.

We placed cash and securities collateral totaling $447 million and $1.3 billion at March 31, 2013 and December 31, 2012, respectively, in accounts maintained by counterparties. We received cash collateral from counterparties totaling $565 million and $941 million at March 31, 2013 and December 31, 2012, respectively. The receivables for collateral placed and the payables for collateral received are included on our Condensed Consolidated Balance Sheet in other assets and accrued expenses and other liabilities, respectively. In certain circumstances, we receive or post securities as collateral with counterparties. We do not record such collateral received on our Condensed Consolidated Balance Sheet unless certain conditions are met. At March 31, 2013 and December 31, 2012, we received noncash collateral of $1 million and $0.3 million, respectively.

## Balance Sheet Presentation

The following table summarizes the fair value amounts of derivative instruments reported on our Condensed Consolidated Balance Sheet. The fair value amounts are presented on a gross basis, are segregated by derivatives that are designated and qualifying as hedging instruments or those that are not, and are further segregated by type of contract within those two categories. At March 31, 2013 and December 31, 2012, $668 million and $2.3 billion, respectively, of the derivative contracts in a receivable position were classified as other assets on the Condensed Consolidated Balance Sheet. At March 31, 2013 and December 31, 2012, $406 million and $2.5 billion of derivative contracts in a liability position were classified as accrued expenses and other liabilities on the Condensed Consolidated Balance Sheet.

| | March 31, 2013 | | | December 31, 2012 | | |
| | Derivative contracts in a | | | Derivative contracts in a | | |
| ($ in millions) | receivable position (a) | payable position (b) | Notional amount | receivable position (a) | payable position (b) | Notional amount |
|---|---|---|---|---|---|---|
| Derivatives qualifying for hedge accounting | | | | | | |
| Interest rate risk | | | | | | |
| Fair value accounting hedges | $ 279 | $ — | $ 6,910 | $ 411 | $ — | $ 7,248 |
| Cash flow accounting hedges | — | 1 | 1,874 | — | 10 | 2,580 |
| Total interest rate risk | 279 | 1 | 8,784 | 411 | 10 | 9,828 |
| Foreign exchange risk | | | | | | |
| Net investment accounting hedges | 21 | 21 | 9,737 | 35 | 53 | 8,693 |
| Total derivatives qualifying for hedge accounting | 300 | 22 | 18,521 | 446 | 63 | 18,521 |
| Economic hedges and trading derivatives | | | | | | |
| Interest rate risk | | | | | | |
| MSRs | 158 | 329 | 7,401 | 1,616 | 2,299 | 146,405 |
| Mortgage loan commitments and mortgage loans held-for-sale | 10 | 5 | 2,238 | 49 | 23 | 9,617 |
| Debt | 28 | 20 | 12,150 | 28 | 29 | 17,716 |
| Other (c) | 141 | 28 | 54,896 | 154 | 27 | 41,514 |
| Total interest rate risk | 337 | 382 | 76,685 | 1,847 | 2,378 | 215,252 |
| Foreign exchange risk | 31 | 2 | 2,629 | 5 | 27 | 2,464 |
| Total economic hedges and trading derivatives | 368 | 384 | 79,314 | 1,852 | 2,405 | 217,716 |
| Total derivatives | $ 668 | $ 406 | $ 97,835 | $ 2,298 | $ 2,468 | $ 236,237 |

(a)    Includes accrued interest of $127 million and $175 million at March 31, 2013 and December 31, 2012, respectively.
(b)    Includes accrued interest of $16 million and $144 million at March 31, 2013 and December 31, 2012, respectively.
(c)    Primarily consists of exchange-traded Eurodollar futures.

Table of Contents

# Notes to Condensed Consolidated Financial Statements (unaudited)

Ally Financial Inc. • Form 10-Q

## Statement of Comprehensive Income Presentation

The following table summarizes the location and amounts of gains and losses on derivative instruments reported in our Condensed Consolidated Statement of Comprehensive Income.

| ($ in millions) | Three months ended March 31, | |
|---|---|---|
| | **2013** | 2012 |
| Derivatives qualifying for hedge accounting | | |
| Loss recognized in earnings on derivatives (a) | | |
| Interest rate contracts | | |
| Interest on long-term debt | **$     (98)** | $     (69) |
| Gain recognized in earnings on hedged items (b) | | |
| Interest rate contracts | | |
| Interest on long-term debt | **101** | 51 |
| Total derivatives qualifying for hedge accounting | **3** | (18) |
| Economic and trading derivatives | | |
| (Loss) gain recognized in earnings on derivatives | | |
| Interest rate contracts | | |
| Servicing asset valuation and hedge activities, net | **(112)** | (96) |
| (Loss) gain on mortgage and automotive loans, net | **(32)** | 83 |
| Other income, net of losses | **(1)** | 18 |
| Total interest rate contracts | **(145)** | 5 |
| Foreign exchange contracts (c) | | |
| Interest on long-term debt | **39** | (9) |
| Other income, net of losses | **28** | (25) |
| Total foreign exchange contracts | **67** | (34) |
| Loss recognized in earnings on derivatives | **$     (75)** | $     (47) |

(a)  Amounts exclude gains related to interest for qualifying accounting hedges of debt, which are primarily offset by the fixed coupon payment on the long-term debt. The gains were $33 million and $26 million for the three months ended March 31, 2013 and 2012, respectively.

(b)  Amounts exclude gains related to amortization of deferred basis adjustments on the hedged items. The gains were $38 million and $60 million for the three months ended March 31, 2013 and 2012, respectively.

(c)  Amounts exclude gains and losses related to the revaluation of the related foreign-denominated debt or receivable. Losses of $65 million and gains of $31 million were recognized for the three months ended March 31, 2013 and 2012, respectively.

48

Table of Contents

# Notes to Condensed Consolidated Financial Statements (unaudited)

Ally Financial Inc. • Form 10-Q

The following table summarizes derivative instruments used in cash flow and net investment hedge accounting relationships.

| ($ in millions) | Three months ended March 31, | | | |
|---|---|---|---|---|
| | 2013 | | 2012 | |
| Cash flow hedges | | | | |
| Interest rate contracts | | | | |
| Loss reclassified from accumulated other comprehensive income to interest on long-term debt (a) | $ | (7) | $ | — |
| Loss recorded directly to interest on long-term debt | | — | | (5) |
| Total interest on long-term debt | $ | (7) | $ | (5) |
| Gain (loss) recognized in other comprehensive income | $ | 7 | $ | (3) |
| Net investment hedges | | | | |
| Foreign exchange contracts | | | | |
| Loss reclassified from accumulated other comprehensive income (loss) to discontinued operations, net | $ | (149) | $ | — |
| Total other income, net of losses | $ | (149) | $ | — |
| Gain (loss) recognized in other comprehensive income (b) | $ | 169 | $ | (203) |

(a)    The amount represents losses reclassified from other comprehensive income (OCI) into earnings as a result of the discontinuance of hedge accounting because it is probable that the forecasted transaction will not occur.

(b)    The amounts represent the effective portion of net investment hedges. There are offsetting amounts recognized in accumulated other comprehensive income related to the revaluation of the related net investment in foreign operations. There were losses of $519 million and gains of $300 million for the three months ended March 31, 2013 and 2012, respectively.

## 21.    Income Taxes

We recognized an income tax benefit from continuing operations of $123 million during the three months ended March 31, 2013, compared to income tax expense of $1 million for the same period in 2012. The income tax benefit resulted primarily from the retroactive reinstatement of the active financing exception by the American Taxpayer Relief Act of 2012 and from the release of valuation allowance related to the measurement of foreign tax credit carryforwards anticipated to be utilized in the future.

As of each reporting date, we consider both positive and negative evidence that could impact our view with regard to future realization of deferred tax assets. We continue to believe it is more likely than not that the benefit for certain state net operating loss, capital loss, and foreign tax credit carryforwards will not be realized. In recognition of this risk, we continue to provide a partial valuation allowance on the deferred tax assets relating to these carryforwards.

The completed sale of our Canadian operations during the quarter generated capital gain income that reduced our $2.2 billion capital loss carryforward that existed as of December 31, 2012. The tax impact of this utilization also resulted in an offsetting tax benefit associated with the reversal of valuation allowance of approximately $230 million. Furthermore, successful completion during 2013 of additional sales of entities currently held-for-sale may result in additional capital gains that would allow us to realize additional capital loss carryforwards. Any related reversal of valuation allowance on these deferred tax assets would also be recognized as an income tax benefit in discontinued operations upon such utilization.

On May 14, 2012, we deconsolidated ResCap for financial reporting purposes. During the first quarter of 2013, the operations of ResCap were classified as discontinued. However, for U.S. federal tax purposes ResCap will continue to be included in our consolidated return filing until ultimate disposition of our ownership in ResCap.

## 22.    Fair Value

### Fair Value Measurements

For purposes of this disclosure, fair value is defined as the exchange price that would be received to sell an asset or paid to transfer a liability (exit price) in the principal or most advantageous market in an orderly transaction between market participants at the measurement date. Fair value is based on the assumptions market participants would use when pricing an asset or liability. Additionally, entities are required to consider all aspects of nonperformance risk, including the entity's own credit standing, when measuring the fair value of a liability.

GAAP specifies a three-level hierarchy that is used when measuring and disclosing fair value. The fair value hierarchy gives the highest priority to quoted prices available in active markets (i.e., observable inputs) and the lowest priority to data lacking transparency (i.e., unobservable inputs). An instrument's categorization within the fair value hierarchy is based on the lowest level of significant input to its valuation. The following is a description of the three hierarchy levels.

Level 1    Inputs are quoted prices in active markets for identical assets or liabilities at the measurement date. Additionally, the entity must have the ability to access the active market, and the quoted prices cannot be adjusted by the entity.

Table of Contents

# Notes to Condensed Consolidated Financial Statements (unaudited)

Ally Financial Inc. • Form 10-Q

| | |
|---|---|
| Level 2 | Inputs are other than quoted prices included in Level 1 that are observable for the asset or liability, either directly or indirectly. Level 2 inputs include quoted prices in active markets for similar assets or liabilities; quoted prices in inactive markets for identical or similar assets or liabilities; or inputs that are observable or can be corroborated by observable market data by correlation or other means for substantially the full term of the assets or liabilities. |
| Level 3 | Unobservable inputs are supported by little or no market activity. The unobservable inputs represent management's best assumptions of how market participants would price the assets or liabilities. Generally, Level 3 assets and liabilities are valued using pricing models, discounted cash flow methodologies, or similar techniques that require significant judgment or estimation. |
| Transfers | Transfers into or out of any hierarchy level are recognized at the end of the reporting period in which the transfer occurred. There were no transfers between any levels during the three months ended March 31, 2013. |

Following are descriptions of the valuation methodologies used to measure material assets and liabilities at fair value and details of the valuation models, key inputs to those models, and significant assumptions utilized.

- ***Available-for-sale securities*** — Available-for-sale securities are carried at fair value based on observable market prices, when available. If observable market prices are not available, our valuations are based on internally developed discounted cash flow models (an income approach) that use a market-based discount rate and consider recent market transactions, experience with similar securities, current business conditions, and analysis of the underlying collateral, as available. To estimate cash flows, we are required to utilize various significant assumptions including market observable inputs (e.g., forward interest rates) and internally developed inputs (including prepayment speeds, delinquency levels, and credit losses).

- ***Mortgage loans held-for-sale, net*** — Our mortgage loans held-for-sale are accounted for at fair value because of fair value option elections. Mortgage loans held-for-sale are typically pooled together and sold into certain exit markets depending on underlying attributes of the loan, such as GSE eligibility, product type, interest rate, and credit quality. Mortgage loans classified as Level 2 are mainly GSE-eligible mortgage loans carried at fair value due to fair value option election, which are valued predominantly using published forward agency prices. It also includes any domestic loans where recently negotiated market prices for the loan pool exist with a counterparty (which approximates fair value) or quoted market prices for similar loans are available.

  Refer to the section within this note titled *Fair Value Option for Financial Assets* for further information about the fair value elections.

- ***MSRs*** — MSRs are classified as Level 3, management estimates fair value using our transaction data and other market data or, in periods when there are limited MSRs market transactions that are directly observable, internally developed discounted cash flow models (an income approach) are used to estimate the fair value. These internal valuation models estimate net cash flows based on internal operating assumptions that we believe would be used by market participants in orderly transactions combined with market-based assumptions for loan prepayment rates, interest rates, and discount rates that we believe approximate yields required by investors in this asset. Cash flows primarily include servicing fees, float income, and late fees in each case less operating costs to service the loans. The estimated cash flows are discounted using an option-adjusted spread-derived discount rate.

- ***Interests retained in financial asset sales*** — The interests retained are in securitization trusts and deferred purchase prices on the sale of whole-loans. Due to inactivity in the market, valuations are based on internally developed discounted cash flow models (an income approach) that use a market-based discount rate; therefore, we classified these assets as Level 3. The valuation considers recent market transactions, experience with similar assets, current business conditions, and analysis of the underlying collateral, as available. To estimate cash flows, we utilize various significant assumptions, including market observable inputs (e.g., forward interest rates) and internally developed inputs (e.g., prepayment speeds, delinquency levels, and credit losses).

- ***Derivative instruments*** — We enter into a variety of derivative financial instruments as part of our risk management strategies. Certain of these derivatives are exchange traded, such as Eurodollar futures. To determine the fair value of these instruments, we utilize the quoted market prices for the particular derivative contracts; therefore, we classified these contracts as Level 1.

  We also execute over-the-counter derivative contracts, such as interest rate swaps, swaptions, forwards, caps, floors, and agency to-be-announced securities. We utilize third-party-developed valuation models that are widely accepted in the market to value these over-the-counter derivative contracts. The specific terms of the contract and market observable inputs (such as interest rate forward curves and interpolated volatility assumptions) are used in the model. We classified these over-the-counter derivative contracts as Level 2 because all significant inputs into these models were market observable.

  We have interest rate lock commitments accounted for as derivative instruments at Ally Bank that are classified as Level 3. We have also historically held certain derivative contracts that are structured specifically to meet a particular hedging objective. These derivative contracts often were utilized to hedge risks inherent within certain on-balance sheet securitizations. To hedge risks on particular bond classes or securitization collateral, the derivative's notional amount was often indexed to the hedged item. As a result, we typically were required to use internally developed prepayment assumptions as an input into the model to forecast future notional amounts on these structured derivative contracts. Accordingly, we classified these derivative contracts as Level 3.

Table of Contents

# Notes to Condensed Consolidated Financial Statements (unaudited)

Ally Financial Inc. • Form 10-Q

However, as of the quarter ended March 31, 2013, we no longer hold such positions within continuing operations due to the sales of our international automotive finance operations.

We are required to consider all aspects of nonperformance risk, including our own credit standing, when measuring fair value of a liability. We reduce credit risk on the majority of our derivatives by entering into legally enforceable agreements that enable the posting and receiving of collateral associated with the fair value of our derivative positions on an ongoing basis. In the event that we do not enter into legally enforceable agreements that enable the posting and receiving of collateral, we will consider our credit risk and the credit risk of our counterparties in the valuation of derivative instruments through a credit valuation adjustment (CVA), if warranted. The CVA calculation utilizes our credit default swap spreads and the spreads of the counterparty.

## Recurring Fair Value

The following tables display the assets and liabilities measured at fair value on a recurring basis including financial instruments elected for the fair value option. We often economically hedge the fair value change of our assets or liabilities with derivatives and other financial instruments. The tables below display the hedges separately from the hedged items; therefore, they do not directly display the impact of our risk management activities.

| March 31, 2013 ($ in millions) | Recurring fair value measurements | | | |
| --- | --- | --- | --- | --- |
| | Level 1 | Level 2 | Level 3 | Total |
| **Assets** | | | | |
| Investment securities | | | | |
| Available-for-sale securities | | | | |
| Debt securities | | | | |
| U.S. Treasury and federal agencies | $ 809 | $ 1,290 | $ — | $ 2,099 |
| Foreign government | 3 | 303 | — | 306 |
| Mortgage-backed residential | — | 8,815 | — | 8,815 |
| Asset-backed | — | 2,221 | — | 2,221 |
| Corporate debt securities | — | 1,326 | — | 1,326 |
| Total debt securities | 812 | 13,955 | — | 14,767 |
| Equity securities (a) | 985 | — | — | 985 |
| Total available-for-sale securities | 1,797 | 13,955 | — | 15,752 |
| Mortgage loans held-for-sale, net (b) | — | 701 | — | 701 |
| Mortgage servicing rights | — | — | 917 | 917 |
| Other assets | | | | |
| Interests retained in financial asset sales | — | — | 139 | 139 |
| Derivative contracts in a receivable position | | | | |
| Interest rate | 31 | 580 | 5 | 616 |
| Foreign currency | — | 52 | — | 52 |
| Total derivative contracts in a receivable position | 31 | 632 | 5 | 668 |
| Collateral placed with counterparties (c) | — | 308 | — | 308 |
| Total assets | $ 1,828 | $ 15,596 | $ 1,061 | $ 18,485 |
| **Liabilities** | | | | |
| Accrued expenses and other liabilities | | | | |
| Derivative contracts in a payable position | | | | |
| Interest rate | $ (14) | $ (369) | $ — | $ (383) |
| Foreign currency | — | (23) | — | (23) |
| Total derivative contracts in a payable position | (14) | (392) | — | (406) |
| Total liabilities | $ (14) | $ (392) | $ — | $ (406) |

(a)   Our investment in any one industry did not exceed 20%.
(b)   Carried at fair value due to fair value option elections.
(c)   Represents collateral in the form of investment securities. Cash collateral was excluded.

51

Table of Contents

# Notes to Condensed Consolidated Financial Statements (unaudited)

Ally Financial Inc. • Form 10-Q

| December 31, 2012 ($ in millions) | Recurring fair value measurements | | | |
| --- | --- | --- | --- | --- |
| | Level 1 | Level 2 | Level 3 | Total |
| **Assets** | | | | |
| Investment securities | | | | |
| Available-for-sale securities | | | | |
| Debt securities | | | | |
| U.S. Treasury and federal agencies | $  697 | $  1,517 | $  — | $  2,214 |
| Foreign government | 3 | 300 | — | 303 |
| Mortgage-backed residential | — | 6,906 | — | 6,906 |
| Asset-backed | — | 2,340 | — | 2,340 |
| Corporate debt securities | — | 1,263 | — | 1,263 |
| Total debt securities | 700 | 12,326 | — | 13,026 |
| Equity securities (a) | 1,152 | — | — | 1,152 |
| Total available-for-sale securities | 1,852 | 12,326 | — | 14,178 |
| Mortgage loans held-for-sale, net (b) | — | 2,490 | — | 2,490 |
| Mortgage servicing rights | — | — | 952 | 952 |
| Other assets | | | | |
| Interests retained in financial asset sales | — | — | 154 | 154 |
| Derivative contracts in a receivable position (c) | | | | |
| Interest rate | 40 | 2,170 | 48 | 2,258 |
| Foreign currency | — | 40 | — | 40 |
| Total derivative contracts in a receivable position | 40 | 2,210 | 48 | 2,298 |
| Collateral placed with counterparties (d) | 103 | 99 | — | 202 |
| Total assets | $  1,995 | $  17,125 | $  1,154 | $  20,274 |
| **Liabilities** | | | | |
| Accrued expenses and other liabilities | | | | |
| Derivative contracts in a payable position (c) | | | | |
| Interest rate | $  (13) | $  (2,374) | $  (1) | $  (2,388) |
| Foreign currency | — | (78) | (2) | (80) |
| Total derivative contracts in a payable position | (13) | (2,452) | (3) | (2,468) |
| Total liabilities | $  (13) | $  (2,452) | $  (3) | $  (2,468) |

(a)   Our investment in any one industry did not exceed 21%.
(b)   Carried at fair value due to fair value option elections.
(c)   Includes derivatives classified as trading.
(d)   Represents collateral in the form of investment securities. Cash collateral was excluded.

The following table presents quantitative information regarding the significant unobservable inputs used in significant Level 3 assets and liabilities measured at fair value on a recurring basis.

| March 31, 2013 ($ in millions) | Level 3 recurring measurements | Valuation technique | Unobservable input | Range |
| --- | --- | --- | --- | --- |
| **Assets** | | | | |
| Mortgage servicing rights | $  917 | (a) | (a) | (a) |
| Other assets | | | | |
| Interests retained in financial asset sales | 139 | Discounted cash flow | Discount rate | 5.4-6.1% |
| | | | Commercial paper rate | 0-0.2% |

(a)   Refer to Note 10 for information related to MSRs valuation assumptions and sensitivities.

Table of Contents

# Notes to Condensed Consolidated Financial Statements (unaudited)

Ally Financial Inc. • Form 10-Q

The following tables present the reconciliation for all Level 3 assets and liabilities measured at fair value on a recurring basis. We often economically hedge the fair value change of our assets or liabilities with derivatives and other financial instruments. The Level 3 items presented below may be hedged by derivatives and other financial instruments that are classified as Level 1 or Level 2. Thus, the following tables do not fully reflect the impact of our risk management activities.

| | | Level 3 recurring fair value measurements | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Net realized/unrealized gains (losses) | | | | | | | | Net unrealized gains (losses) included |
| ($ in millions) | Fair value at Jan. 1, 2013 | included in earnings | included in OCI | Purchases | Sales | Issuances | Settlements | Fair value at Mar. 31, 2013 | in earnings still held at Mar. 31, 2013 | |
| **Assets** | | | | | | | | | | |
| Mortgage servicing rights | $ 952 | $ (89) (a) | $ — | $ — | $ — | $ 54 | $ — | $ 917 | $ (89) (a) | |
| Other assets | | | | | | | | | | |
| Interests retained in financial asset sales | 154 | 2 (b) | — | — | — | — | (17) | 139 | — | |
| Derivative contracts, net (c) | | | | | | | | | | |
| Interest rate | 47 | (46) (d) | — | — | — | — | 4 | 5 | (9) (d) | |
| Foreign currency | (2) | 2 (d) | — | — | — | — | — | — | (1) (d) | |
| Total derivative contracts in a receivable position, net | 45 | (44) | — | — | — | — | 4 | 5 | (10) | |
| Total assets | $ 1,151 | $ (131) | $ — | $ — | $ — | $ 54 | $ (13) | $ 1,061 | (99) | |

(a)   Fair value adjustment was reported as servicing-asset valuation and hedge activities, net, in the Condensed Consolidated Statement of Comprehensive Income .
(b)   Reported as other income, net of losses, in the Condensed Consolidated Statement of Comprehensive Income .
(c)   Includes derivatives classified as trading.
(d)   Refer to Note 20 for information related to the location of the gains and losses on derivative instruments in the Condensed Consolidated Statement of Comprehensive Income .

Table of Contents

# Notes to Condensed Consolidated Financial Statements (unaudited)

Ally Financial Inc. • Form 10-Q

| | | Level 3 recurring fair value measurements | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Net realized/unrealized gains (losses) | | | | | | | Net unrealized gains (losses) included in earnings still held at Mar. 31, 2012 |
| ($ in millions) | Fair value at Jan. 1, 2012 | included in earnings | included in OCI | Purchases | Sales | Issuances | Settlements | Fair value at Mar. 31, 2012 | |
| **Assets** | | | | | | | | | |
| Trading assets (excluding derivatives) | | | | | | | | | |
| Mortgage-backed residential securities | $ 33 | $ 2 (a) | $ — | $ — | $ — | $ — | (3) $ | 32 | $ 4 (a) |
| Investment securities | | | | | | | | | |
| Available-for-sale debt securities | | | | | | | | | |
| Asset-backed | 62 | — | 1 | — | — | — | — | 63 | — |
| Mortgage loans held-for-sale, net (b) | 30 | — | — | 9 | — | — | (9) | 30 | — |
| Consumer mortgage finance receivables and loans, net (b) | 835 | 87 (b) | — | — | — | — | (90) | 832 | 35 (b) |
| Mortgage servicing rights | 2,519 | 1 (c) | — | — | — | 11 | 64 | 2,595 | 1 (c) |
| Other assets | | | | | | | | | |
| Interests retained in financial asset sales | 231 | 5 (d) | — | — | — | — | (42) | 194 | — |
| Derivative contracts, net (e) | | | | | | | | | |
| Interest rate | 71 | (24) (f) | — | — | — | — | (3) | 44 | (28) (f) |
| Foreign currency | 16 | (11) (f) | — | — | — | — | — | 5 | (11) (f) |
| Total derivative contracts in a receivable position, net | 87 | (35) | — | — | — | — | (3) | 49 | (39) |
| Total assets | $ 3,797 | $ 60 | $ 1 | 9 $ | — $ | 11 $ | (83) $ | 3,795 | $ 1 |
| **Liabilities** | | | | | | | | | |
| Long-term debt | | | | | | | | | |
| On-balance sheet securitization debt (b) | $ (830) | $ (83) | $ — | $ — | $ — | $ — | 85 $ | (828) | $ (39) (b) |
| Accrued expenses and other liabilities | | | | | | | | | |
| Loan repurchase liabilities (b) | (29) | — | — | (9) | — | — | 8 | (30) | — |
| Total liabilities | $ (859) | $ (83) | $ — | (9) $ | — $ | — $ | 93 $ | (858) | $ (39) |

(a) The fair value adjustment and the related interest were reported as income from discontinued operations, net of tax, in the Condensed Consolidated Statement of Comprehensive Income.
(b) Carried at fair value due to fair value option elections. Refer to the next section of this note titled *Fair Value Option for Financial Assets and Liabilities* for the location of the gains and losses in the Condensed Consolidated Statement of Comprehensive Income.
(c) Fair value adjustment was reported as servicing-asset valuation and hedge activities, net, and income from discontinued operations, net of tax, in the Condensed Consolidated Statement of Comprehensive Income.
(d) Reported as other income, net of losses, and income from discontinued operations, net of tax, in the Condensed Consolidated Statement of Comprehensive Income.
(e) Includes derivatives classified as trading.
(f) Refer to Note 20 for information related to the location of the gains and losses on derivative instruments in the Condensed Consolidated Statement of Comprehensive Income.

## Nonrecurring Fair Value

We may be required to measure certain assets and liabilities at fair value from time to time. These periodic fair value measures typically result from the application of lower-of-cost or fair value accounting or certain impairment measures. These items would constitute nonrecurring fair value measures.

Table of Contents

# Notes to Condensed Consolidated Financial Statements (unaudited)

Ally Financial Inc. • Form 10-Q

The following tables display the assets and liabilities measured at fair value on a nonrecurring basis.

| March 31, 2013 ($ in millions) | Nonrecurring fair value measurements | | | | Lower-of-cost or fair value or valuation reserve allowance | Total loss included in earnings for the three months ended | |
|---|---|---|---|---|---|---|---|
| | Level 1 | Level 2 | Level 3 | Total | | | |
| **Assets** | | | | | | | |
| Loans held-for-sale | $ — | $ — | $ 18 | $ 18 | $ — | n/m | (a) |
| Commercial finance receivables and loans, net (b) | | | | | | | |
|   Automotive | — | — | 121 | 121 | (21) | n/m | (a) |
|   Other | — | — | 46 | 46 | (7) | n/m | (a) |
| Total commercial finance receivables and loans, net | — | — | 167 | 167 | (28) | n/m | (a) |
| Other assets | | | | | | | |
|   Repossessed and foreclosed assets (c) | — | — | 6 | 6 | (4) | n/m | (a) |
| Total assets | $ — | $ — | $ 191 | $ 191 | $ (32) | n/m | |

n/m = not meaningful

(a) We consider the applicable valuation or loan loss allowance to be the most relevant indicator of the impact on earnings caused by the fair value measurement. Accordingly, the table above excludes total gains and losses included in earnings for these items. The carrying values are inclusive of the respective valuation or loan loss allowance.

(b) Represents the portion of the portfolio specifically impaired during 2013. The related valuation allowance represents the cumulative adjustment to fair value of those specific receivables.

(c) The allowance provided for repossessed and foreclosed assets represents any cumulative valuation adjustment recognized to adjust the assets to fair value.

| March 31, 2012 ($ in millions) | Nonrecurring fair value measurements | | | | Lower-of-cost or fair value or valuation reserve allowance | Total loss included in earnings for the three months ended | |
|---|---|---|---|---|---|---|---|
| | Level 1 | Level 2 | Level 3 | Total | | | |
| **Assets** | | | | | | | |
| Mortgage loans held-for-sale (a) | $ — | $ — | $ 580 | $ 580 | $ (57) | n/m | (b) |
| Commercial finance receivables and loans, net (c) | | | | | | | |
|   Automotive | — | — | 122 | 122 | (25) | n/m | (b) |
|   Mortgage | — | 1 | 15 | 16 | (11) | n/m | (b) |
|   Other | — | — | 20 | 20 | (10) | n/m | (b) |
| Total commercial finance receivables and loans, net | — | 1 | 157 | 158 | (46) | n/m | (b) |
| Other assets | | | | | | | |
|   Repossessed and foreclosed assets (d) | — | 62 | 21 | 83 | (13) | n/m | (b) |
| Total assets | $ — | $ 63 | $ 758 | $ 821 | $ (116) | n/m | |

n/m = not meaningful

(a) Represents loans held-for-sale that are required to be measured at the lower-of-cost or fair value. The table above includes only loans with fair values below cost during 2012. The related valuation allowance represents the cumulative adjustment to fair value of those specific loans.

(b) We consider the applicable valuation or loan loss allowance to be the most relevant indicator of the impact on earnings caused by the fair value measurement. Accordingly, the table above excludes total gains and losses included in earnings for these items. The carrying values are inclusive of the respective valuation or loan loss allowance.

(c) Represents the portion of the portfolio specifically impaired during 2012. The related valuation allowance represents the cumulative adjustment to fair value of those specific receivables.

(d) The allowance provided for repossessed and foreclosed assets represents any cumulative valuation adjustment recognized to adjust the assets to fair value.

Table of Contents

# Notes to Condensed Consolidated Financial Statements (unaudited)

Ally Financial Inc. • Form 10-Q

The following table presents quantitative information regarding the significant unobservable inputs used in significant Level 3 assets measured at fair value on a nonrecurring basis.

| March 31, 2013 ($ in millions) | Level 3 nonrecurring measurements | | Valuation technique | Unobservable input | Range |
|---|---|---|---|---|---|
| **Assets** | | | | | |
| Commercial finance receivables and loans, net | | | | | |
| Automotive | $ | 121 | Fair value of collateral | Adjusted appraisal value | 65.0-95.0% |

## Fair Value Option for Financial Assets

A description of the financial assets elected to be measured at fair value is as follows. Our intent in electing fair value for all these items was to mitigate a divergence between accounting losses and economic exposure for certain assets and liabilities.

• *Conforming and government-insured mortgage loans held-for-sale* — We elected the fair value option for conforming and government-insured mortgage loans held-for-sale funded after July 31, 2009. We elected the fair value option to mitigate earnings volatility by better matching the accounting for the assets with the related hedges.

Excluded from the fair value option were conforming and government-insured loans funded on or prior to July 31, 2009, and those repurchased or rerecognized. The loans funded on or prior to July 31, 2009, were ineligible because the election must be made at the time of funding. Repurchased and rerecognized conforming and government-insured loans were not elected because the election would not mitigate earning volatility. We repurchase or rerecognize loans due to representation and warranty obligations or conditional repurchase options. Typically, we will be unable to resell these assets through regular channels due to characteristics of the assets. Since the fair value of these assets is influenced by factors that cannot be hedged, we did not elect the fair value option.

We carry the fair value-elected conforming and government-insured loans as loans held-for-sale, net, on the Condensed Consolidated Balance Sheet. Our policy is to separately record interest income on the fair value-elected loans (unless they are placed on nonaccrual status); however, the accrued interest was excluded from the fair value presentation. Upfront fees and costs related to the fair value-elected loans were not deferred or capitalized. The fair value adjustment recorded for these loans is classified as gain (loss) on mortgage loans, net, in the Condensed Consolidated Statement of Comprehensive Income. In accordance with GAAP, the fair value option election is irrevocable once the asset is funded even if it is subsequently determined that a particular loan cannot be sold.

The following tables summarize the fair value option elections and information regarding the amounts recorded as earnings for each fair value option-elected item.

| | Changes included in the Condensed Consolidated Statement of Comprehensive Income | | | | | |
|---|---|---|---|---|---|---|
| Three months ended March 31, ($ in millions) | | Interest on loans held-for-sale (a) | | Gain on mortgage loans, net | | Total included in earnings |
| **2013** | | | | | | |
| Assets | | | | | | |
| Mortgage loans held-for-sale, net | $ | 16 | $ | (41) | $ | (25) (b) |
| **2012** | | | | | | |
| Assets | | | | | | |
| Mortgage loans held-for-sale, net | $ | 26 | $ | (59) | $ | (33) (b) |

(a)   Interest income is measured by multiplying the unpaid principal balance on the loans by the coupon rate and the number of days of interest due.

(b)   The credit impact for loans held-for-sale is assumed to be zero because the loans are either suitable for sale or are covered by a government guarantee.

Table of Contents

# Notes to Condensed Consolidated Financial Statements (unaudited)

Ally Financial Inc. • Form 10-Q

The following table provides the aggregate fair value and the aggregate unpaid principal balance for the fair value option-elected loans and long-term debt instruments.

| ($ in millions) | March 31, 2013 | | December 31, 2012 | |
| --- | --- | --- | --- | --- |
| | Unpaid principal balance | Fair value (a) | Unpaid principal balance | Fair value (a) |
| **Assets** | | | | |
| Mortgage loans held-for-sale, net | | | | |
| Total loans | $ 731 | $ 701 | $ 2,416 | $ 2,490 |
| Nonaccrual loans | 50 | 26 | 47 | 25 |
| Loans 90+ days past due (b) | 41 | 21 | 36 | 19 |

(a) Excludes accrued interest receivable.

(b) Loans 90+ days past due are also presented within the nonaccrual loan balance and the total loan balance; however, excludes government-insured loans that are still accruing interest.

## Fair Value of Financial Instruments

The following table presents the carrying and estimated fair value of financial instruments, except for those recorded at fair value on a recurring basis presented in the previous section of this note titled *Recurring Fair Value*. When possible, we use quoted market prices to determine fair value. Where quoted market prices are not available, the fair value is internally derived based on appropriate valuation methodologies with respect to the amount and timing of future cash flows and estimated discount rates. However, considerable judgment is required in interpreting market data to develop estimates of fair value, so the estimates are not necessarily indicative of the amounts that could be realized or would be paid in a current market exchange. The effect of using different market assumptions or estimation methodologies could be material to the estimated fair values. Fair value information presented herein was based on information available at March 31, 2013 and December 31, 2012.

| ($ in millions) | Carrying value | Estimated fair value | | | |
| --- | --- | --- | --- | --- | --- |
| | | Level 1 | Level 2 | Level 3 | Total |
| **March 31, 2013** | | | | | |
| Financial assets | | | | | |
| Loans held-for-sale, net (a) | $ 718 | $ — | $ 701 | $ 18 | $ 719 |
| Finance receivables and loans, net (a) | 97,926 | — | — | 99,039 | 99,039 |
| Nonmarketable equity investments | 283 | — | 252 | 35 | 287 |
| Financial liabilities | | | | | |
| Deposit liabilities | $ 50,326 | $ — | $ — | $ 51,146 | $ 51,146 |
| Short-term borrowings | 7,618 | 5 | — | 7,613 | 7,618 |
| Long-term debt (a)(b) | 67,951 | — | 35,847 | 35,936 | 71,783 |
| **December 31, 2012** | | | | | |
| Financial assets | | | | | |
| Loans held-for-sale, net (a) | $ 2,576 | $ — | $ 2,490 | $ 86 | $ 2,576 |
| Finance receivables and loans, net (a) | 97,885 | — | — | 98,907 | 98,907 |
| Nonmarketable equity investments | 303 | — | 272 | 34 | 306 |
| Financial liabilities | | | | | |
| Deposit liabilities | $ 47,915 | $ — | $ — | $ 48,752 | $ 48,752 |
| Short-term borrowings | 7,461 | 6 | — | 7,454 | 7,460 |
| Long-term debt (a)(b) | 74,882 | — | 36,018 | 42,533 | 78,551 |

(a) Includes financial instruments carried at fair value due to fair value option elections. Refer to the previous section of this note titled *Fair Value Option for Financial Assets and Liabilities* for further information about the fair value elections.

(b) The carrying value includes deferred interest for zero-coupon bonds of $330 million and $321 million at March 31, 2013, and December 31, 2012, respectively.

The following describes the methodologies and assumptions used to determine fair value for the significant classes of financial instruments. In addition to the valuation methods discussed below, we also followed guidelines for determining whether a market was not active and a transaction was not distressed. As such, we assumed the price that would be received in an orderly transaction (including a market-based return) and not in liquidation or distressed sale.

Table of Contents

# Notes to Condensed Consolidated Financial Statements (unaudited)

Ally Financial Inc. • Form 10-Q

- **Loans held-for-sale, net** — Loans held-for-sale classified as Level 2 include all GSE-eligible mortgage loans valued predominantly using published forward agency prices. It also includes any domestic loans and foreign loans where recently negotiated market prices for the loan pool exist with a counterparty (which approximates fair value) or quoted market prices for similar loans are available. Loans held-for-sale classified as Level 3 include all loans valued using internally developed valuation models because observable market prices were not available. The loans are priced on a discounted cash flow basis utilizing cash flow projections from internally developed models that utilize prepayment, default, and discount rate assumptions. To the extent available, we will utilize market observable inputs such as interest rates and market spreads. If market observable inputs are not available, we are required to utilize internal inputs, such as prepayment speeds, credit losses, and discount rates.

- **Finance receivables and loans, net** — With the exception of mortgage loans held-for-investment, the fair value of finance receivables was based on discounted future cash flows using applicable spreads to approximate current rates applicable to each category of finance receivables (an income approach using Level 3 inputs). The carrying value of commercial receivables in certain markets and certain other automotive- and mortgage-lending receivables for which interest rates reset on a short-term basis with applicable market indices are assumed to approximate fair value either because of the short-term nature or because of the interest rate adjustment feature. The fair value of commercial receivables in other markets was based on discounted future cash flows using applicable spreads to approximate current rates applicable to similar assets in those markets.

    For mortgage loans held-for-investment used as collateral for securitization debt, we used a portfolio approach with Level 3 inputs to measure these loans at fair value. The objective in fair valuing these loans (which are legally isolated and beyond the reach of our creditors) and the related collateralized borrowings is to reflect our retained economic position in the securitizations. For mortgage loans held-for-investment that are not securitized, we used valuation methods and assumptions similar to those used for mortgage loans held-for-sale. These valuations consider unique attributes of the loans such as geography, delinquency status, product type, and other factors. Refer to the section above titled *Loans held-for-sale, net*, for a description of methodologies and assumptions used to determine the fair value of mortgage loans held-for-sale.

- **Deposit liabilities** — Deposit liabilities represent certain consumer and brokered bank deposits, mortgage escrow deposits, and dealer deposits. The fair value of deposits at Level 3 were estimated by discounting projected cash flows based on discount factors derived from the forward interest rate swap curve.

- **Debt** — Level 2 debt was valued using quoted market prices, when available, or other means for substantiation with observable inputs. Debt valued using internally derived inputs, such as prepayment speeds and discount rates, was classified as Level 3.

## 23. Offsetting Assets and Liabilities

Our qualifying master netting agreements are written, legally enforceable bilateral agreements that (1) create a single legal obligation for all individual transactions covered by the agreement to the non-defaulting entity upon an event of default of the counterparty, including bankruptcy, insolvency, or similar proceeding, and (2) provide the non-defaulting entity the right to accelerate, terminate, and close-out on a net basis all transactions under the agreement and to liquidate or set off collateral promptly upon an event of default of the counterparty. As it relates to derivative instruments, in certain instances we have the option to report derivatives that are subject to a qualifying master netting agreement on a net basis, we have elected to report these instruments as gross assets and liabilities on the Condensed Consolidated Balance Sheet.

To further mitigate the risk of counterparty default related to derivative instruments, we maintain collateral agreements with certain counterparties. The agreements require both parties to maintain collateral in the event the fair values of the derivative financial instruments meet established thresholds. In the event that either party defaults on the obligation, the secured party may seize the collateral. Generally, our collateral arrangements are bilateral such that we and the counterparty post collateral for the value of our total obligation to each other. Contractual terms provide for standard and customary exchange of collateral based on changes in the market value of the outstanding derivatives. The securing party posts additional collateral when their obligation rises or removes collateral when it falls, such that the net replacement cost of the non-defaulting party is covered in the event of counterparty default.

58

Table of Contents

# Notes to Condensed Consolidated Financial Statements (unaudited)

Ally Financial Inc. • Form 10-Q

The composition of offsetting derivative instruments, financial assets, and financial liabilities was as follows.

| March 31, 2013 ($ in millions) | Gross Amounts of Recognized Assets/(Liabilities) | | Gross Amounts Offset in the Condensed Consolidated Balance Sheet | | Net Amounts of Assets/(Liabilities) Presented in the Condensed Consolidated Balance Sheet | | Gross Amounts Not Offset in the Condensed Consolidated Balance Sheet | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Financial Instruments | | Collateral (a) | | Net Amount | |
| **Assets** | | | | | | | | | | | | |
| Derivative assets in net asset positions | $ | 545 | $ | — | $ | 545 | $ | (34) | $ | (469) | $ | 42 |
| Derivative assets in net liability positions | | 37 | | — | | 37 | | (37) | | — | | — |
| Derivative assets with no offsetting arrangements | | 86 | | — | | 86 | | — | | — | | 86 |
| Total assets | $ | 668 | $ | — | $ | 668 | $ | (71) | $ | (469) | $ | 128 |
| **Liabilities** | | | | | | | | | | | | |
| Derivative liabilities in net liability positions | $ | (362) | $ | — | $ | (362) | $ | 37 | $ | 304 | $ | (21) |
| Derivative liabilities in net asset positions | | (34) | | — | | (34) | | 34 | | — | | — |
| Derivative liabilities with no offsetting arrangements | | (10) | | — | | (10) | | — | | — | | (10) |
| Total liabilities | $ | (406) | $ | — | $ | (406) | $ | 71 | $ | 304 | $ | (31) |

(a)    Financial collateral received/pledged shown as a balance based on the sum of all net asset and liability positions between Ally and each individual derivative counterparty.

| December 31, 2012 ($ in millions) | Gross Amounts of Recognized Assets/(Liabilities) | | Gross Amounts Offset in the Condensed Consolidated Balance Sheet | | Net Amounts of Assets/(Liabilities) Presented in the Condensed Consolidated Balance Sheet | | Gross Amounts Not Offset in the Condensed Consolidated Balance Sheet | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Financial Instruments | | Collateral (a) | | Net Amount | |
| **Assets** | | | | | | | | | | | | |
| Derivative assets in net asset positions | $ | 1,395 | $ | — | $ | 1,395 | $ | (503) | $ | (841) | $ | 51 |
| Derivative assets in net liability positions | | 788 | | — | | 788 | | (788) | | — | | — |
| Derivative assets with no offsetting arrangements | | 115 | | — | | 115 | | — | | — | | 115 |
| Total assets | $ | 2,298 | $ | — | $ | 2,298 | $ | (1,291) | $ | (841) | $ | 166 |
| **Liabilities** | | | | | | | | | | | | |
| Derivative liabilities in net liability positions | $ | (1,929) | $ | — | $ | (1,929) | $ | 788 | $ | 1,092 | $ | (49) |
| Derivative liabilities in net asset positions | | (503) | | — | | (503) | | 503 | | — | | — |
| Derivative liabilities with no offsetting arrangements | | (36) | | — | | (36) | | — | | — | | (36) |
| Total liabilities | $ | (2,468) | $ | — | $ | (2,468) | $ | 1,291 | $ | 1,092 | $ | (85) |

(a)    Financial collateral received/pledged shown as a balance based on the sum of all net asset and liability positions between Ally and each individual derivative counterparty.

5 9

Table of Contents

# Notes to Condensed Consolidated Financial Statements (unaudited)

Ally Financial Inc. • Form 10-Q

## 24.   Segment and Geographic Information

Operating segments are defined as components of an enterprise that engage in business activity from which revenues are earned and expenses incurred for which discrete financial information is available that is evaluated regularly by our chief operating decision maker in deciding how to allocate resources and in assessing performance.

We report our results of operations on a line-of-business basis through three operating segments - Automotive Finance operations, Insurance operations, and Mortgage operations, with the remaining activity reported in Corporate and Other. The operating segments are determined based on the products and services offered, and reflect the manner in which financial information is currently evaluated by management. The following is a description of each of our reportable operating segments.

*Automotive Finance operations* — Provides automotive financing services to consumers and automotive dealers. For consumers, we offer retail automotive financing and leasing for new and used vehicles, and through our commercial automotive financing operations, we fund dealer purchases of new and used vehicles through wholesale or floorplan financing.

*Insurance operations* — Offers both consumer finance and insurance products sold primarily through the automotive dealer channel, and commercial insurance products sold to dealers. As part of our focus on offering dealers a broad range of consumer finance and insurance products, we provide vehicle service contracts, maintenance coverage, and GAP products. We also underwrite selected commercial insurance coverages, which primarily insure dealers' wholesale vehicle inventory in the United States.

*Mortgage operations* — Our ongoing Mortgage operations include the management of our held-for-investment mortgage portfolio. Our Mortgage operations also consist of noncore businesses that are winding down.

Corporate and Other primarily consists of our centralized corporate treasury activities, such as management of the cash and corporate investment securities portfolios, short- and long-term debt, retail and brokered deposit liabilities, derivative instruments, the amortization of the discount associated with new debt issuances and bond exchanges, most notably from the December 2008 bond exchange, and the residual impacts of our corporate funds-transfer pricing (FTP) and treasury asset liability management (ALM) activities. Corporate and Other also includes our Commercial Finance Group, certain equity investments, overhead that was previously allocated to operations that have since been sold or classified as discontinued operations, and reclassifications and eliminations between the reportable operating segments.

We utilize an FTP methodology for the majority of our business operations. The FTP methodology assigns charge rates and credit rates to classes of assets and liabilities based on expected duration and the LIBOR swap curve plus an assumed credit spread. Matching duration allocates interest income and interest expense to these reportable segments so their respective results are insulated from interest rate risk. This methodology is consistent with our ALM practices, which includes managing interest rate risk centrally at a corporate level. The net residual impact of the FTP methodology is included within the results of Corporate and Other.

The information presented in our reportable operating segments and geographic areas tables that follow are based in part on internal allocations, which involve management judgment.

60

Table of Contents

# Notes to Condensed Consolidated Financial Statements (unaudited)

Ally Financial Inc. • Form 10-Q

Financial information for our reportable operating segments is summarized as follows.

| Three months ended March 31, ($ in millions) | Automotive Finance operations | | Insurance operations | | Mortgage operations | | Corporate and Other (a) | | Consolidated (b) | |
|---|---|---|---|---|---|---|---|---|---|---|
| **2013** | | | | | | | | | | |
| Net financing revenue (loss) | $ | 773 | $ | 12 | $ | 34 | $ | (179) | $ | 640 |
| Other revenue (loss) | | 82 | | 308 | | (19) | | 15 | | 386 |
| Total net revenue (loss) | | 855 | | 320 | | 15 | | (164) | | 1,026 |
| Provision for loan losses | | 112 | | — | | 20 | | (1) | | 131 |
| Total noninterest expense | | 400 | | 259 | | 199 | | 100 | | 958 |
| Income (loss) from continuing operations before income tax expense | $ | 343 | $ | 61 | $ | (204) | $ | (263) | $ | (63) |
| Total assets | $ | 118,882 | $ | 8,331 | $ | 11,284 | $ | 27,702 | $ | 166,199 |
| **2012** | | | | | | | | | | |
| Net financing revenue (loss) | $ | 630 | $ | 12 | $ | 37 | $ | (328) | $ | 351 |
| Other revenue | | 77 | | 338 | | 137 | | 53 | | 605 |
| Total net revenue (loss) | | 707 | | 350 | | 174 | | (275) | | 956 |
| Provision for loan losses | | 78 | | — | | 27 | | (7) | | 98 |
| Total noninterest expense | | 388 | | 250 | | 84 | | 133 | | 855 |
| Income (loss) from continuing operations before income tax expense | $ | 241 | $ | 100 | $ | 63 | $ | (401) | $ | 3 |
| Total assets | $ | 119,081 | $ | 8,394 | $ | 30,079 | $ | 28,796 | $ | 186,350 |

(a)  Total assets for the Commercial Finance Group were $1.4 billion and $1.2 billion at March 31, 2013 and 2012, respectively.
(b)  Net financing revenue after the provision for loan losses totaled $0.5 billion and $0.3 billion for the three months ended 2013 and 2012, respectively.

Information concerning principal geographic areas were as follows.

| Three months ended March 31, ($ in millions) | Revenue (a) | | Income (loss) from continuing operations before income tax expense (b) | | Net income (loss) (b)(c) | |
|---|---|---|---|---|---|---|
| **2013** | | | | | | |
| Canada | $ | 49 | $ | 14 | $ | 1,230 |
| Europe (d) | | (10) | | (18) | | 60 |
| Latin America | | — | | (4) | | 80 |
| Asia-Pacific | | 1 | | (2) | | 25 |
| Total foreign | | 40 | | (10) | | 1,395 |
| Total domestic (e) | | 986 | | (53) | | (302) |
| Total | $ | 1,026 | $ | (63) | $ | 1,093 |
| **2012** | | | | | | |
| Canada | $ | 59 | $ | 14 | $ | 83 |
| Europe (d) | | (10) | | (10) | | 26 |
| Latin America | | 1 | | (3) | | 46 |
| Asia-Pacific | | 1 | | — | | 27 |
| Total foreign | | 51 | | 1 | | 182 |
| Total domestic (e) | | 905 | | 2 | | 128 |
| Total | $ | 956 | $ | 3 | $ | 310 |

(a)  Revenue consists of net financing revenue and total other revenue as presented in our Condensed Consolidated Financial Statements.
(b)  The domestic amounts include original discount amortization of $60 million and $111 million or the three months ended March 31, 2013 and 2012, respectively.
(c)  Gain (loss) realized on sale of discontinued operations are allocated to the geographic area in which the business operated.
(d)  Amounts include eliminations between our foreign operations.
(e)  Amounts include eliminations between our domestic and foreign operations.

Table of Contents

# Notes to Condensed Consolidated Financial Statements (unaudited)

Ally Financial Inc. • Form 10-Q

## 25.    Parent and Guarantor Consolidating Financial Statements

Certain of our senior notes are guaranteed by 100% directly owned subsidiaries of Ally (the Guarantors). As of March 31, 2013, the Guarantors included, Ally US LLC, IB Finance Holding Company, LLC (IB Finance), and GMAC Continental Corporation (GMAC Continental). In connection with the purchase and sale agreement with General Motors Financial (GMF) described in Note 2, all of the common stock of GMAC Continental was sold to GMF effective April 1, 2013 and pursuant to the terms of the applicable senior notes, the proceeds from the sale were reinvested in IB Finance. As a result, GMAC Continental ceased to be a subsidiary of Ally and is no longer a Guarantor. As of April 1, 2013, the Guarantors include Ally US LLC and IB Finance, each of which fully and unconditionally guarantee the senior notes on a joint and several basis.

The following financial statements present condensed consolidating financial data for (i) Ally Financial Inc. (on a parent company-only basis), (ii) the Guarantors, (iii) the nonguarantor subsidiaries (all other subsidiaries), and (iv) an elimination column for adjustments to arrive at (v) the information for the parent company, Guarantors, and nonguarantors on a consolidated basis.

Investments in subsidiaries are accounted for by the parent company and the Guarantors using the equity-method for this presentation. Results of operations of subsidiaries are therefore classified in the parent company's and Guarantors' investment in subsidiaries accounts. The elimination entries set forth in the following condensed consolidating financial statements eliminate distributed and undistributed income of subsidiaries, investments in subsidiaries, and intercompany balances and transactions between the parent, Guarantors, and nonguarantors.

62

Table of Contents

# Notes to Condensed Consolidated Financial Statements (unaudited)

Ally Financial Inc. • Form 10-Q

## Condensed Consolidating Statements of Comprehensive Income

| Three months ended March 31, 2013 ($ in millions) | Parent | | Guarantors | | Nonguarantors | | Consolidating adjustments | | Ally consolidated |
|---|---|---|---|---|---|---|---|---|---|
| **Financing revenue and other interest income** | | | | | | | | | |
| Interest and fees on finance receivables and loans | $ | 159 | $ | — | $ | 976 | $ | — | $ | 1,135 |
| Interest and fees on finance receivables and loans — intercompany | | 24 | | — | | 5 | | (29) | | — |
| Interest on loans held-for-sale | | — | | — | | 16 | | — | | 16 |
| Interest and dividends on available-for-sale investment securities | | — | | — | | 68 | | — | | 68 |
| Interest-bearing cash | | 1 | | — | | 2 | | — | | 3 |
| Interest-bearing cash — intercompany | | — | | — | | 2 | | (2) | | — |
| Operating leases | | 96 | | — | | 638 | | — | | 734 |
| Total financing revenue and other interest income | | 280 | | — | | 1,707 | | (31) | | 1,956 |
| **Interest expense** | | | | | | | | | |
| Interest on deposits | | 9 | | — | | 155 | | — | | 164 |
| Interest on short-term borrowings | | 12 | | — | | 4 | | — | | 16 |
| Interest on long-term debt | | 560 | | — | | 146 | | (5) | | 701 |
| Interest on intercompany debt | | (1) | | — | | 26 | | (25) | | — |
| Total interest expense | | 580 | | — | | 331 | | (30) | | 881 |
| Depreciation expense on operating lease assets | | 62 | | — | | 373 | | — | | 435 |
| Net financing (loss) revenue | | (362) | | — | | 1,003 | | (1) | | 640 |
| Dividends from subsidiaries | | | | | | | | | |
| Nonbank subsidiaries | | 3,299 | | 3,254 | | — | | (6,553) | | — |
| **Other revenue** | | | | | | | | | |
| Servicing fees | | 44 | | — | | 38 | | — | | 82 |
| Servicing asset valuation and hedge activities, net | | — | | — | | (201) | | — | | (201) |
| Total servicing income, net | | 44 | | — | | (163) | | — | | (119) |
| Insurance premiums and service revenue earned | | — | | — | | 259 | | — | | 259 |
| Gain on mortgage and automotive loans, net | | — | | — | | 38 | | — | | 38 |
| Other gain on investments, net | | — | | — | | 51 | | — | | 51 |
| Other income, net of losses | | 51 | | — | | 425 | | (319) | | 157 |
| Total other revenue | | 95 | | — | | 610 | | (319) | | 386 |
| **Total net revenue** | | 3,032 | | 3,254 | | 1,613 | | (6,873) | | 1,026 |
| **Provision for loan losses** | | 124 | | — | | 7 | | — | | 131 |
| **Noninterest expense** | | | | | | | | | |
| Compensation and benefits expense | | 192 | | — | | 223 | | (130) | | 285 |
| Insurance losses and loss adjustment expenses | | — | | — | | 115 | | — | | 115 |
| Other operating expenses | | 58 | | — | | 688 | | (188) | | 558 |
| Total noninterest expense | | 250 | | — | | 1,026 | | (318) | | 958 |
| **Income (loss) from continuing operations before income tax (benefit) expense and undistributed income of subsidiaries** | | 2,658 | | 3,254 | | 580 | | (6,555) | | (63) |
| Income tax (benefit) expense from continuing operations | | (329) | | — | | 206 | | — | | (123) |
| **Net income from continuing operations** | | 2,987 | | 3,254 | | 374 | | (6,555) | | 60 |
| (Loss) income from discontinued operations, net of tax | | (265) | | 13 | | 1,284 | | 1 | | 1,033 |
| Undistributed income (loss) of subsidiaries | | | | | | | | | |
| Bank subsidiary | | 226 | | 226 | | — | | (452) | | — |
| Nonbank subsidiaries | | (1,855) | | (2,052) | | — | | 3,907 | | — |
| **Net income** | | 1,093 | | 1,441 | | 1,658 | | (3,099) | | 1,093 |
| Other comprehensive loss, net of tax | | (317) | | (578) | | (601) | | 1,179 | | (317) |
| **Comprehensive income** | $ | 776 | $ | 863 | $ | 1,057 | $ | (1,920) | $ | 776 |

63

Table of Contents

# Notes to Condensed Consolidated Financial Statements (unaudited)

Ally Financial Inc. • Form 10-Q

| Three months ended March 31, 2012 ($ in millions) | Parent | Guarantors | Nonguarantors | Consolidating adjustments | Ally consolidated |
|---|---|---|---|---|---|
| **Financing revenue and other interest income** | | | | | |
| Interest and fees on finance receivables and loans | $ 253 | $ — | $ 844 | $ (4) | $ 1,093 |
| Interest and fees on finance receivables and loans — intercompany | 38 | 1 | 8 | (47) | — |
| Interest on loans held-for-sale | 5 | — | 26 | — | 31 |
| Interest on trading assets | — | — | 9 | — | 9 |
| Interest and dividends on available-for-sale investment securities | — | — | 74 | — | 74 |
| Interest-bearing cash | 1 | — | 1 | — | 2 |
| Operating leases | 52 | — | 455 | — | 507 |
| Total financing revenue and other interest income | 349 | 1 | 1,417 | (51) | 1,716 |
| **Interest expense** | | | | | |
| Interest on deposits | 17 | — | 146 | — | 163 |
| Interest on short-term borrowings | 20 | — | 1 | (4) | 17 |
| Interest on long-term debt | 723 | — | 161 | (4) | 880 |
| Interest on intercompany debt | (5) | 1 | 45 | (41) | — |
| Total interest expense | 755 | 1 | 353 | (49) | 1,060 |
| Depreciation expense on operating lease assets | 13 | — | 292 | — | 305 |
| Net financing (loss) revenue | (419) | — | 772 | (2) | 351 |
| Dividends from subsidiaries | | | | | |
| Nonbank subsidiaries | 141 | — | — | (141) | — |
| **Other revenue** | | | | | |
| Servicing fees | 52 | — | 70 | — | 122 |
| Servicing asset valuation and hedge activities, net | — | — | (106) | — | (106) |
| Total servicing income, net | 52 | — | (36) | — | 16 |
| Insurance premiums and service revenue earned | — | — | 270 | — | 270 |
| (Loss) gain on mortgage and automotive loans, net | (1) | — | 21 | — | 20 |
| Other gain on investments, net | — | — | 89 | — | 89 |
| Other income, net of losses | 35 | 144 | 345 | (314) | 210 |
| Total other revenue | 86 | 144 | 689 | (314) | 605 |
| **Total net (loss) revenue** | (192) | 144 | 1,461 | (457) | 956 |
| **Provision for loan losses** | 78 | — | 20 | — | 98 |
| **Noninterest expense** | | | | | |
| Compensation and benefits expense | 213 | 144 | 90 | (144) | 303 |
| Insurance losses and loss adjustment expenses | — | — | 98 | — | 98 |
| Other operating expenses | 86 | — | 538 | (170) | 454 |
| Total noninterest expense | 299 | 144 | 726 | (314) | 855 |
| **(Loss) income from continuing operations before income tax (benefit) expense and undistributed income of subsidiaries** | (569) | — | 715 | (143) | 3 |
| Income tax (benefit) expense from continuing operations | (268) | — | 269 | — | 1 |
| **Net (loss) income from continuing operations** | (301) | — | 446 | (143) | 2 |
| Income from discontinued operations, net of tax | 10 | 3 | 298 | (3) | 308 |
| Undistributed income of subsidiaries | | | | | |
| Bank subsidiary | 223 | 223 | — | (446) | — |
| Nonbank subsidiaries | 378 | 85 | — | (463) | — |
| **Net income** | 310 | 311 | 744 | (1,055) | 310 |
| Other comprehensive income, net of tax | 187 | 126 | 388 | (514) | 187 |
| **Comprehensive income** | $ 497 | $ 437 | $ 1,132 | $ (1,569) | $ 497 |

Table of Contents

# Notes to Condensed Consolidated Financial Statements (unaudited)

Ally Financial Inc. • Form 10-Q

## Condensed Consolidating Balance Sheet

| March 31, 2013 ($ in millions) | Parent (a) | Guarantors | Nonguarantors (a) | Consolidating adjustments | Ally consolidated |
|---|---|---|---|---|---|
| **Assets** | | | | | |
| Cash and cash equivalents | | | | | |
| Noninterest-bearing | $ 554 | $ — | $ 489 | $ — | $ 1,043 |
| Noninterest-bearing — intercompany | 84 | — | — | (84) | — |
| Interest-bearing | 2,700 | — | 3,694 | — | 6,394 |
| Interest-bearing — intercompany | — | — | 654 | (654) | — |
| Total cash and cash equivalents | 3,338 | — | 4,837 | (738) | 7,437 |
| Investment securities | — | — | 15,752 | — | 15,752 |
| Loans held-for-sale, net | — | — | 718 | — | 718 |
| Finance receivables and loans, net | | | | | |
| Finance receivables and loans, net | 16,495 | — | 82,628 | — | 99,123 |
| Intercompany loans to | | | | | |
| Bank subsidiary | 2,200 | — | — | (2,200) | — |
| Nonbank subsidiaries | 3,285 | — | 109 | (3,394) | — |
| Allowance for loan losses | (253) | — | (944) | — | (1,197) |
| Total finance receivables and loans, net | 21,727 | — | 81,793 | (5,594) | 97,926 |
| Investment in operating leases, net | 2,306 | — | 12,522 | — | 14,828 |
| Intercompany receivables from | | | | | |
| Bank subsidiary | 968 | 2 | — | (970) | — |
| Nonbank subsidiaries | 202 | — | 550 | (752) | — |
| Investment in subsidiaries | | | | | |
| Bank subsidiary | 14,513 | 14,513 | — | (29,026) | — |
| Nonbank subsidiaries | 14,589 | 917 | — | (15,506) | — |
| Mortgage servicing rights | — | — | 917 | — | 917 |
| Premiums receivable and other insurance assets | — | — | 1,617 | (9) | 1,608 |
| Other assets | 2,567 | — | 5,762 | (379) | 7,950 |
| Assets of operations held-for-sale | 900 | 453 | 17,725 | (15) | 19,063 |
| Total assets | $ 61,110 | $ 15,885 | $ 142,193 | $ (52,989) | $ 166,199 |
| **Liabilities** | | | | | |
| Deposit liabilities | | | | | |
| Noninterest-bearing | $ — | $ — | $ 844 | $ — | $ 844 |
| Noninterest-bearing — intercompany | — | — | 84 | (84) | — |
| Interest-bearing | 835 | — | 48,647 | — | 49,482 |
| Total deposit liabilities | 835 | — | 49,575 | (84) | 50,326 |
| Short-term borrowings | 3,229 | — | 4,389 | — | 7,618 |
| Long-term debt | 31,941 | — | 35,680 | — | 67,621 |
| Intercompany debt to | | | | | |
| Nonbank subsidiaries | 691 | — | 5,557 | (6,248) | — |
| Intercompany payables to | | | | | |
| Bank subsidiary | 934 | 2 | — | (936) | — |
| Nonbank subsidiaries | 466 | — | 329 | (795) | — |
| Interest payable | 732 | — | 240 | — | 972 |
| Unearned insurance premiums and service revenue | — | — | 2,286 | — | 2,286 |
| Accrued expenses and other liabilities | 1,775 | 111 | 2,163 | (380) | 3,669 |
| Liabilities of operations held-for-sale | 33 | 425 | 12,775 | — | 13,233 |
| Total liabilities | 40,636 | 538 | 112,994 | (8,443) | 145,725 |
| Total equity | 20,474 | 15,347 | 29,199 | (44,546) | 20,474 |
| Total liabilities and equity | $ 61,110 | $ 15,885 | $ 142,193 | $ (52,989) | $ 166,199 |

(a)    Amounts presented are based upon the legal transfer of the underlying assets to VIEs in order to reflect legal ownership.

Table of Contents

# Notes to Condensed Consolidated Financial Statements (unaudited)

Ally Financial Inc. • Form 10-Q

| December 31, 2012 *($ in millions)* | Parent (a) | | Guarantors | | Nonguarantors (a) | | Consolidating adjustments | | Ally consolidated | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Assets** | | | | | | | | | | |
| Cash and cash equivalents | | | | | | | | | | |
| Noninterest-bearing | $ | 729 | $ | — | $ | 344 | $ | — | $ | 1,073 |
| Noninterest-bearing — intercompany | | 39 | | — | | — | | (39) | | — |
| Interest-bearing | | 3,204 | | — | | 3,236 | | — | | 6,440 |
| Interest-bearing — intercompany | | — | | — | | 452 | | (452) | | — |
| Total cash and cash equivalents | | 3,972 | | — | | 4,032 | | (491) | | 7,513 |
| Investment securities | | — | | — | | 14,178 | | — | | 14,178 |
| Loans held-for-sale, net | | — | | — | | 2,576 | | — | | 2,576 |
| Finance receivables and loans, net | | | | | | | | | | |
| Finance receivables and loans, net | | 12,486 | | — | | 86,569 | | — | | 99,055 |
| Intercompany loans to | | | | | | | | | | |
| Bank subsidiary | | 1,600 | | — | | — | | (1,600) | | — |
| Nonbank subsidiaries | | 3,514 | | — | | 672 | | (4,186) | | — |
| Allowance for loan losses | | (170) | | — | | (1,000) | | — | | (1,170) |
| Total finance receivables and loans, net | | 17,430 | | — | | 86,241 | | (5,786) | | 97,885 |
| Investment in operating leases, net | | 2,003 | | — | | 11,547 | | — | | 13,550 |
| Intercompany receivables from | | | | | | | | | | |
| Bank subsidiary | | 677 | | — | | — | | (677) | | — |
| Nonbank subsidiaries | | 315 | | 334 | | 378 | | (1,027) | | — |
| Investment in subsidiaries | | | | | | | | | | |
| Bank subsidiary | | 14,288 | | 14,288 | | — | | (28,576) | | — |
| Nonbank subsidiaries | | 19,180 | | 3,723 | | — | | (22,903) | | — |
| Mortgage servicing rights | | — | | — | | 952 | | — | | 952 |
| Premiums receivable and other insurance assets | | — | | — | | 1,609 | | — | | 1,609 |
| Other assets | | 2,514 | | — | | 9,968 | | (574) | | 11,908 |
| Assets of operations held-for-sale | | 855 | | 762 | | 30,582 | | (23) | | 32,176 |
| Total assets | $ | 61,234 | $ | 19,107 | $ | 162,063 | $ | (60,057) | $ | 182,347 |
| **Liabilities** | | | | | | | | | | |
| Deposit liabilities | | | | | | | | | | |
| Noninterest-bearing | $ | — | $ | — | $ | 1,977 | $ | — | $ | 1,977 |
| Noninterest-bearing — intercompany | | — | | — | | 39 | | (39) | | — |
| Interest-bearing | | 983 | | — | | 44,955 | | — | | 45,938 |
| Total deposit liabilities | | 983 | | — | | 46,971 | | (39) | | 47,915 |
| Short-term borrowings | | 3,094 | | — | | 4,367 | | — | | 7,461 |
| Long-term debt | | 32,342 | | — | | 42,219 | | — | | 74,561 |
| Intercompany debt to | | | | | | | | | | |
| Nonbank subsidiaries | | 530 | | — | | 5,708 | | (6,238) | | — |
| Intercompany payables to | | | | | | | | | | |
| Bank subsidiary | | 752 | | — | | — | | (752) | | — |
| Nonbank subsidiaries | | 674 | | — | | 278 | | (952) | | — |
| Interest payable | | 748 | | — | | 184 | | — | | 932 |
| Unearned insurance premiums and service revenue | | — | | — | | 2,296 | | — | | 2,296 |
| Accrued expenses and other liabilities | | 2,187 | | 451 | | 4,517 | | (570) | | 6,585 |
| Liabilities of operations held-for-sale | | 26 | | 725 | | 21,948 | | — | | 22,699 |
| Total liabilities | | 41,336 | | 1,176 | | 128,488 | | (8,551) | | 162,449 |
| Total equity | | 19,898 | | 17,931 | | 33,575 | | (51,506) | | 19,898 |
| Total liabilities and equity | $ | 61,234 | $ | 19,107 | $ | 162,063 | $ | (60,057) | $ | 182,347 |

(a)    Amounts presented are based upon the legal transfer of the underlying assets to VIEs in order to reflect legal ownership.

Table of Contents

# Notes to Condensed Consolidated Financial Statements (unaudited)

Ally Financial Inc. • Form 10-Q

## Condensed Consolidating Statement of Cash Flows

| Three months ended March 31, 2013  ($ in millions) | Parent | Guarantors | Nonguarantors | Consolidating adjustments | Ally consolidated |
|---|---|---|---|---|---|
| **Operating activities** | | | | | |
| Net cash provided by operating activities | $ 5,272 | $ 3,109 | $ 426 | $ (6,553) | $ 2,254 |
| **Investing activities** | | | | | |
| Purchases of available-for-sale securities | — | — | (4,626) | — | (4,626) |
| Proceeds from sales of available-for-sale securities | — | — | 1,543 | — | 1,543 |
| Proceeds from maturities and repayments of available-for-sale securities | — | — | 1,604 | — | 1,604 |
| Net (increase) decrease in finance receivables and loans | (5,260) | 80 | 5,138 | — | (42) |
| Net (increase) decrease in loans — intercompany | (369) | 251 | 312 | (194) | — |
| Net increase in operating lease assets | (354) | — | (1,357) | — | (1,711) |
| Capital contributions to subsidiaries | (126) | — | — | 126 | — |
| Returns of contributed capital | 158 | 149 | — | (307) | — |
| Proceeds from sale of business units, net | 409 | — | 2,420 | — | 2,829 |
| Net change in restricted cash | — | (26) | 1,093 | — | 1,067 |
| Other, net | 11 | — | 30 | — | 41 |
| Net cash (used in) provided by investing activities | (5,531) | 454 | 6,157 | (375) | 705 |
| **Financing activities** | | | | | |
| Net change in short-term borrowings — third party | 135 | 35 | 348 | — | 518 |
| Net (decrease) increase in deposits | (148) | — | 2,553 | (45) | 2,360 |
| Proceeds from issuance of long-term debt — third party | 24 | — | 4,229 | — | 4,253 |
| Repayments of long-term debt — third party | (347) | (70) | (11,028) | — | (11,445) |
| Net change in debt — intercompany | 161 | (271) | 118 | (8) | — |
| Dividends paid — third party | (200) | — | — | — | (200) |
| Dividends paid and returns of contributed capital — intercompany | — | (3,254) | (3,606) | 6,860 | — |
| Capital contributions from parent | — | — | 126 | (126) | — |
| Net cash used in financing activities | (375) | (3,560) | (7,260) | 6,681 | (4,514) |
| Effect of exchange-rate changes on cash and cash equivalents | — | — | 67 | — | 67 |
| Net (decrease) increase in cash and cash equivalents | (634) | 3 | (610) | (247) | (1,488) |
| Adjustment for change in cash and cash equivalents of operations held-for-sale | — | (3) | 1,415 | — | 1,412 |
| Cash and cash equivalents at beginning of year | 3,972 | — | 4,032 | (491) | 7,513 |
| Cash and cash equivalents at March 31 | $ 3,338 | $ — | $ 4,837 | $ (738) | $ 7,437 |

67

Table of Contents

# Notes to Condensed Consolidated Financial Statements (unaudited)

Ally Financial Inc. • Form 10-Q

| Three months ended March 31, 2012 ($ in millions) | Parent | Guarantors | Nonguarantors | Consolidating adjustments | Ally consolidated |
|---|---|---|---|---|---|
| **Operating activities** | | | | | |
| Net cash (used in) provided by operating activities | $ (412) | $ 12 | $ 2,688 | $ (146) | $ 2,142 |
| **Investing activities** | | | | | |
| Purchases of available-for-sale securities | — | — | (3,172) | — | (3,172) |
| Proceeds from sales of available-for-sale securities | — | — | 2,940 | — | 2,940 |
| Proceeds from maturities and repayments of available-for-sale securities | — | — | 1,222 | — | 1,222 |
| Net (increase) decrease in finance receivables and loans | (3,691) | 26 | (744) | — | (4,409) |
| Net decrease (increase) in loans — intercompany | 1,649 | (9) | 32 | (1,672) | — |
| Net decrease (increase) in operating lease assets | 216 | — | (1,219) | — | (1,003) |
| Capital contributions to subsidiaries | (44) | — | — | 44 | — |
| Returns of contributed capital | 366 | — | — | (366) | — |
| Proceeds from sale of business units, net | 29 | — | — | — | 29 |
| Net change in restricted cash | — | — | 280 | — | 280 |
| Other, net | (48) | — | 91 | — | 43 |
| Net cash (used in) provided by investing activities | (1,523) | 17 | (570) | (1,994) | (4,070) |
| **Financing activities** | | | | | |
| Net change in short-term borrowings — third party | 231 | 3 | (780) | — | (546) |
| Net increase in deposits | 92 | — | 1,997 | — | 2,089 |
| Proceeds from issuance of long-term debt — third party | 859 | 5 | 9,885 | — | 10,749 |
| Repayments of long-term debt — third party | (574) | — | (9,450) | — | (10,024) |
| Net change in debt — intercompany | 390 | (8) | (1,640) | 1,258 | — |
| Dividends paid — third party | (200) | — | — | — | (200) |
| Dividends paid and returns of contributed capital — intercompany | — | (11) | (501) | 512 | — |
| Capital contributions from parent | — | — | 44 | (44) | — |
| Net cash provided by (used in) by financing activities | 798 | (11) | (445) | 1,726 | 2,068 |
| Effect of exchange-rate changes on cash and cash equivalents | (136) | — | (5) | — | (141) |
| Net (decrease) increase in cash and cash equivalents | (1,273) | 18 | 1,668 | (414) | (1) |
| Adjustment for change in cash and cash equivalents of operations held-for-sale | — | — | 45 | — | 45 |
| Cash and cash equivalents at beginning of year | 6,261 | 14 | 7,276 | (516) | 13,035 |
| Cash and cash equivalents at March 31 | $ 4,988 | $ 32 | $ 8,989 | $ (930) | $ 13,079 |

## 26.   Contingencies and Other Risks

In the normal course of business, we enter into transactions that expose us to varying degrees of risk. For additional information on contingencies and other risks arising from such transactions, refer to Note 29 to the  Consolidated Financial Statements  in our 2012 Annual Report on Form 10-K.

### Mortgage-Related Matters

#### ResCap Bankruptcy Filing

On May 14, 2012, Residential Capital, LLC (ResCap) and certain of its wholly owned direct and indirect subsidiaries (collectively, the Debtors) filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (Bankruptcy Court). In connection with the filings, Ally Financial Inc. and its direct and indirect subsidiaries and affiliates (excluding the Debtors) (collectively, AFI) had reached an agreement with the Debtors and certain creditor constituencies on a prearranged Chapter 11 plan (the Plan). The Plan included a proposed settlement (the Settlement) between AFI and the Debtors, which included, among other things, an obligation of AFI to make a $750 million cash contribution to the Debtors' estate, and a release of all existing or potential causes of action between AFI and the Debtors, as well as a release of all existing or potential ResCap-related causes of action against AFI held by third parties.

The Settlement contemplated certain milestone requirements that the Debtors failed to satisfy, including the Bankruptcy Court's confirmation of the Plan on or before October 31, 2012. While the failure to meet this October 31 milestone would have resulted in the Settlement's automatic termination, AFI and the Debtors agreed to monthly temporary waivers of this automatic termination through February 28, 2013. This waiver was not extended beyond this date, and therefore the Settlement has terminated.

Table of Contents

# Notes to Condensed Consolidated Financial Statements (unaudited)

Ally Financial Inc. • Form 10-Q

As a result of the termination of the Settlement, AFI is no longer obligated to make the $750 million cash contribution and neither party is bound by the Settlement. Further, AFI is not entitled to receive any releases from either the Debtors or any third party claimants, as was contemplated under the Plan and Settlement. However, AFI has not withdrawn its offer to provide a $750 million cash contribution to the Debtors' estate if an acceptable settlement can be reached. As a result of the termination of the Settlement, substantial claims could be brought against us, which could have a material adverse impact on our results of operations, financial position or cash flows. For further information with respect to the bankruptcy, refer to Note 1.

## Mortgage Settlements and Consent Order

On February 9, 2012, we announced that we had reached an agreement with respect to investigations into procedures followed by mortgage servicing companies and banks in connection with mortgage origination and servicing activities and foreclosure home sales and evictions (the Mortgage Settlement). Further, as a result of an examination conducted by the FRB and FDIC, on April 13, 2011, we entered into a consent order (the Consent Order) with the FRB and the FDIC, that required, among other things, GMAC Mortgage, LLC (GMAC Mortgage) to retain independent consultants to conduct a risk assessment related to mortgage servicing activities and, separately, to conduct a review of certain past residential mortgage foreclosure actions (the Foreclosure Review). The Debtors are primarily liable for all remaining obligations under both the Mortgage Settlement and Consent Order. AFI is secondarily liable for the specific performance of required actions, and is jointly and severally liable for certain financial obligations. On September 19, 2012, the official committee of unsecured creditors appointed in the Debtors' bankruptcy cases (the Creditors' Committee) filed an objection to the Debtors' motions to compensate the independent consultants for their Foreclosure Review services. In its objection, the Creditors' Committee alleged, among other things, that AFI should be responsible for the costs of the Foreclosure Review. On October 11, 2012, the Bankruptcy Court entered an interim order allowing the Debtors to continue paying the independent consultants on an interim 90 day basis, while reserving all parties' rights with respect to the allocation of costs between the Debtors and AFI for the Foreclosure Review. The Bankruptcy Court has subsequently issued interim orders authorizing the Debtors to continue paying the independent consultants until May 14, 2013.

On February 27, 2013, the Debtors filed a motion with the Bankruptcy Court seeking, for purposes of any proposed Chapter 11 plan, that GMAC Mortgage's obligation to conduct and pay for independent file review regarding certain residential foreclosure actions and foreclosure sales prosecuted by GMAC Mortgage and its subsidiaries, as required under the Consent Order, be classified as a general unsecured claim in an amount to be determined, and that the automatic stay under the Bankruptcy Code be applied to prevent the FRB, the FDIC, and other governmental entities from taking any action to enforce the obligation against the Debtors (the Foreclosure Review Motion). The Bankruptcy Court is expected to issue a written opinion on the relief sought in the Foreclosure Review Motion in the near future. If the Bankruptcy Court approves the Foreclosure Review Motion, such governmental entities are likely to seek to enforce the obligation against AFI, and any such obligations ultimately borne by AFI could be material.

## Legal Proceedings

We are subject to potential liability under various governmental proceedings, claims, and legal actions that are pending or otherwise asserted against us. We are named as defendants in a number of legal actions, and we are involved in governmental proceedings arising in connection with our respective businesses. Some of the pending actions purport to be class actions, and certain legal actions include claims for substantial compensatory and/or punitive damages or claims for indeterminate amounts of damages. We establish reserves for legal claims when payments associated with the claims become probable and the payments can be reasonably estimated. Given the inherent difficulty of predicting the outcome of litigation and regulatory matters, it is generally very difficult to predict what the eventual outcome will be, and when the matter will be resolved. The actual costs of resolving legal claims may be higher or lower than any amounts reserved for the claims.

### Mortgage-backed Securities Litigation

Ally Financial Inc. and certain of its subsidiaries are named as defendants in various cases relating to ResCap mortgage-backed securities (MBS) and certain other mortgage-related matters, which are described in Note 29 to the Consolidated Financial Statements in our 2012 Annual Report on Form 10-K (collectively, the Mortgage Cases). We had previously disclosed that several of the Mortgage Cases were subject to orders entered by the Bankruptcy Court staying the matters through April 30, 2013 in connection with the Debtors bankruptcy. On May 1, 2013, all stay orders applicable to the Ally non-Debtor defendants with respect to the Mortgage Cases expired. As a result, all of the Mortgage Cases are proceeding against us.

The following supplements the case descriptions provided in Note 29 to the Consolidated Financial Statements in our 2012 Annual Report on Form 10-K.

### *FDIC Litigation*

The Federal Deposit Insurance Corporation filed four complaints against Ally Securities LLC (Ally Securities) between May 2012 and August 2012 alleging violations of federal and state securities laws, in each alleging that Ally Securities made misleading statements in a registration statement. Plaintiff seeks rescission and money damages in all cases including pre- and post-judgment interest, attorney's fees and costs of court. Ally Securities has motions to dismiss pending in two of the four cases. Of the remaining two cases, one case has been remanded to state court in Texas, and the FDIC is challenging the federal court's jurisdiction in the second case.

### *FHLB Litigation*

The claims against Ally Financial Inc. and GMAC Mortgage Group were dismissed in an order dated March 14, 2013. The negligent misrepresentation claim remains against Ally Securities.

Table of Contents

# Notes to Condensed Consolidated Financial Statements (unaudited)

Ally Financial Inc. • Form 10-Q

### New Jersey Carpenters Litigation

A class was certified upon Plaintiffs' request for reconsideration. The defendants' application for leave to appeal the class certification was denied on March 26, 2013.

### Union Central Life Litigation

The defendants filed motion to dismiss on July 27, 2012, which was granted, and the case was dismissed on March 29, 2013. The plaintiffs have until May 28, 2013 to amend their complaint.

## Regulatory Matters

We continue to respond to subpoenas and document requests from the SEC, seeking information covering a wide range of mortgage-related matters, including, among other things, various aspects surrounding securitizations of residential mortgages. We are also responding to subpoenas received from the U.S. Department of Justice, which include broad requests for documentation and other information in connection with its investigation of potential fraud and other potential legal violations related to mortgage backed securities, as well as the origination and/or underwriting of mortgage loans. In addition, the CFPB has recently advised us that they are investigating certain of our retail financing practices. It is possible that this could result in actions against us.

## Loan Repurchases and Obligations Related to Loan Sales

### Representation and Warranty Obligation Reserve Methodology

The representation and warranty reserve was $170 million at March 31, 2013 with respect to our sold and serviced loans. The liability for representation and warranty obligations reflects management's best estimate of probable losses with respect to Ally Bank's mortgage loans sold to Freddie Mac and Fannie Mae. We considered historical and recent demand trends in establishing the reserve. The methodology used to estimate the reserve considers a variety of assumptions including borrower performance (both actual and estimated future defaults), repurchase demand behavior, historical loan defect experience, historical mortgage insurance rescission experience, and historical and estimated future loss experience, which includes projections of future home price changes as well as other qualitative factors including investor behavior. It is difficult to predict and estimate the level and timing of any potential future demands. In cases where we may not be able to reasonably estimate losses, a liability is not recognized. Management monitors the adequacy of the overall reserve and makes adjustments to the level of reserve, as necessary, after consideration of other qualitative factors including ongoing dialogue and experience with counterparties. At the time a loan is sold, an estimate of the fair value of the liability is recorded and classified in accrued expenses and other liabilities on our Condensed Consolidated Balance Sheet  and recorded as a component of gain (loss) on mortgage and automotive loans, net, in our  Condensed Consolidated Statement of Comprehensive Income . We recognize changes in the liability when additional relevant information becomes available. Changes in the estimate are recorded as other operating expenses in our Condensed Consolidated Statement of Comprehensive Income .

On April 16, 2013, we completed the sales of agency MSRs to Ocwen Financial Corporation and Quicken Loans, Inc. The sale to Ocwen Financial Corporation included the transfer of the representation and warranty liabilities associated with the majority of the MSRs sold at a specified price. The repurchase reserve at  March 31, 2013 also reflects losses associated with this contractual obligation. Pursuant to that obligation, we recognized additional provision expense in the period to reflect the terms of the sale of the MSRs asset. Refer to Note 27 to the Condensed Consolidated Financial Statements  for further information related to the MSRs sale.

The following table summarizes the changes in our reserve for representation and warranty obligations.

| Three months ended March 31, ( $ in millions) | | 2013 (a) | | 2012 (b) |
|---|---|---|---|---|
| Balance at January 1, | $ | 105 | $ | 825 |
| Provision for mortgage representation and warranty expenses | | | | |
| Loan sales | | 4 | | 5 |
| Change in estimate — continuing operations | | 83 | | 19 |
| Total additions | | 87 | | 24 |
| Resolved claims (c) | | (23) | | (42) |
| Recoveries | | 1 | | 4 |
| Balance at March 31, | $ | 170 | $ | 811 |

(a)    The liabilities are held by Ally Bank and a majority of the previous liability was eliminated as a result of the deconsolidation of ResCap. Refer to  Note 1 for more information regarding the Debtors' Bankruptcy and the deconsolidation of ResCap.
(b)    Includes activities of our discontinued operations.
(c)    Includes principal losses and accrued interest on repurchased loans, indemnification payments, and settlements with counterparties.

## Other Contingencies

We are subject to potential liability under various other exposures including tax, nonrecourse loans, self-insurance, and other miscellaneous contingencies. We establish reserves for these contingencies when the loss becomes probable and the amount can be reasonably estimated. The actual costs of resolving these items may be substantially higher or lower than the amounts reserved for any one item. Based

Table of Contents

# Notes to Condensed Consolidated Financial Statements (unaudited)

Ally Financial Inc. • Form 10-Q

on information currently available, it is the opinion of management that the eventual outcome of these items will not have a material adverse impact on our results of operations, financial position, or cash flows.

## 27.  Subsequent Events

### Declaration of Quarterly Dividend Payments

On April 11, 2013, the Ally Board of Directors declared quarterly dividend payments on certain outstanding preferred stock. This included a cash dividend of  $1.125 per share, or a total of $134 million, on Fixed Rate Cumulative Mandatorily Convertible Preferred Stock, Series F-2; a cash dividend of  $17.50 per share, or a total of $45 million, on Fixed Rate Cumulative Perpetual Preferred Stock, Series G; and a cash dividend of  $0.53 per share, or a total of $22 million, on Fixed Rate/Floating Rate Perpetual Preferred Stock, Series A. The dividends are payable on  May 15, 2013 .

### Majority of European and Latin American Operations Sale

On April 1, 2013, we completed the sale of the majority of our operations in Europe and Latin America to General Motors Financial Company, Inc. (GM Financial), a wholly-owned subsidiary of General Motors Co. The transaction included European operations in Germany, the United Kingdom, Italy, Sweden, Switzerland, Austria, Belgium, and the Netherlands; and Latin American operations in Mexico, Chile, and Colombia. We received $2.6 billion for the business, which was composed of a  $2.4 billion payment at closing and $190 million of dividends paid by the business to us prior to the closing.

### Mortgage Servicing Rights Sale

On April 16, 2013, we completed the sales of approximately  $115 billion in unpaid principal balance (UPB) of agency MSRs to Ocwen Financial Corp. and Quicken Loans, Inc. In total, we received approximately $850 million in proceeds for the transactions. Final proceeds for the transactions are subject to adjustment based on the actual UPB on the closing dates. Additionally, the sale of our remaining MSRs is under agreement to close in stages over the coming months.

71

Table of Contents

# Management's Discussion and Analysis

Ally Financial Inc. • Form 10-Q

## Item 2.    Management's Discussion and Analysis of Financial Condition and Results of Operations

The following Management's Discussion and Analysis of Financial Condition and Results of Operation (MD&A), as well as other portions of this Form 10-K, may contain certain statements that constitute forward-looking statements within the meaning of the federal securities laws. The words "expect," "anticipate," "estimate," "forecast," "initiative," "objective," "plan," "goal," "project," "outlook," "priorities," "target," "intend," "evaluate," "pursue," "seek," "may," "would," "could," "should," "believe," "potential," "continue," or the negatives of any of these words or similar expressions are intended to identify forward-looking statements. All statements herein, other than statements of historical fact, including without limitation statements about future events and financial performance, are forward-looking statements that involve certain risks and uncertainties. You should not place undue reliance on any forward-looking statement and should consider all uncertainties and risks discussed in this report, including those under Item 1A, Risk Factors, as well as those provided in any subsequent SEC filings. Forward-looking statements apply only as of the date they are made, and Ally undertakes no obligation to update any forward-looking statement to reflect events or circumstances that arise after the date the forward-looking statement is made.

### Selected Financial Data

The selected historical financial information set forth below should be read in conjunction with Management's Discussion and Analysis (MD&A) of Financial Condition and Results of Operations, our Condensed Consolidated Financial Statements , and the Notes to Condensed Consolidated Financial Statements . The historical financial information presented may not be indicative of our future performance.

The following table presents selected statement of income data.

| | | Three months ended March 31, | | |
|---|---|---|---|---|
| ($ in millions) | | 2013 | | 2012 |
| Total financing revenue and other interest income | $ | 1,956 | $ | 1,716 |
| Interest expense | | 881 | | 1,060 |
| Depreciation expense on operating lease assets | | 435 | | 305 |
| Net financing revenue | | 640 | | 351 |
| Total other revenue | | 386 | | 605 |
| Total net revenue | | 1,026 | | 956 |
| Provision for loan losses | | 131 | | 98 |
| Total noninterest expense | | 958 | | 855 |
| (Loss) income from continuing operations before income tax (benefit) expense | | (63) | | 3 |
| Income tax (benefit) expense from continuing operations | | (123) | | 1 |
| Net income from continuing operations | | 60 | | 2 |
| Income from discontinued operations, net of tax | | 1,033 | | 308 |
| Net income | $ | 1,093 | $ | 310 |
| *Basic and diluted earnings per common share:* | | | | |
| Net loss from continuing operations | $ | (105) | $ | (149) |
| Net income | | 671 | | 82 |
| *Non-GAAP financial measures (a):* | | | | |
| Net income | $ | 1,093 | $ | 310 |
| Add: Original issue discount amortization expense (b) | | 57 | | 108 |
| Add: Income tax (benefit) expense from continuing operations | | (123) | | 1 |
| Less: Income from discontinued operations, net of tax | | 1,033 | | 308 |
| Core pretax (loss) income (a) | $ | (6) | $ | 111 |

(a)    Core pretax (loss) income is not a financial measure defined by accounting principles generally accepted in the United States of America (GAAP). We define core pretax income as earnings from continuing operations before income taxes, original issue discount amortization expense primarily associated with our 2008 bond exchange, and the gain on extinguishment of debt related to the 2008 bond exchange. We believe that the presentation of core pretax (loss) income is useful information for the users of our financial statements in understanding the earnings from our core businesses. In addition, core pretax (loss) income is the primary measure that management uses to assess the performance of our operations. We believe that core pretax (loss) income is a useful alternative measure of our ongoing profitability and performance, when viewed in conjunction with GAAP measures. The presentation of this additional information is not a substitute for net income (loss) determined in accordance with GAAP.

(b)    Primarily represents original issue discount amortization expense associated with the 2008 bond exchange that was reported as a loss on extinguishment of debt in the   Condensed Consolidated Statement of Comprehensive Income .

Table of Contents

# Management's Discussion and Analysis

Ally Financial Inc. • Form 10-Q

The following table presents selected balance sheet and ratio data.

| ($ in millions) | At and for the three months ended March 31, | |
|---|---|---|
| | **2013** | 2012 |
| ***Selected period-end balance sheet data:*** | | |
| Total assets | $  **166,199** | $  186,350 |
| Long-term debt | $  **67,621** | $  93,990 |
| Preferred stock/interests | $  **6,940** | $  6,940 |
| Total equity | $  **20,474** | $  19,576 |
| **Financial ratios** | | |
| Efficiency ratio (a) | **93.37 %** | 89.44% |
| Core efficiency ratio (a) | **88.46 %** | 80.36% |
| Return on assets | | |
| Net income from continuing operations | **0.14 %** | —% |
| Net income | **2.54 %** | 0.68% |
| Core pretax (loss) income | **(0.01)%** | 0.24% |
| Return on equity | | |
| Net income from continuing operations | **1.20 %** | 0.04% |
| Net income | **21.98 %** | 6.40% |
| Core pretax (loss) income | **(0.12)%** | 2.29% |
| Equity to assets | **11.57 %** | 10.56% |
| Net interest spread (b) | **1.67 %** | 0.86% |
| Net interest spread excluding original issue discount (b) | **1.89 %** | 1.29% |
| Net yield on interest-earning assets (c) | **1.90 %** | 1.11% |
| Net yield on interest-earning assets excluding original issue discount (c) | **2.07 %** | 1.45% |
| **Regulatory capital ratios** | | |
| Tier 1 capital (to risk-weighted assets) (d) | **14.59 %** | 13.45% |
| Total risk-based capital (to risk-weighted assets) (e) | **15.59 %** | 14.47% |
| Tier 1 leverage (to adjusted quarterly average assets) (f) | **12.01 %** | 11.60% |
| Total equity | $  **20,474** | $  19,576 |
| Goodwill and certain other intangibles | **(489)** | (494) |
| Unrealized gains and other adjustments | **(1,865)** | (317) |
| Trust preferred securities | **2,543** | 2,542 |
| Tier 1 capital (d) | **20,663** | 21,307 |
| Preferred equity | **(6,940)** | (6,940) |
| Trust preferred securities | **(2,543)** | (2,542) |
| Tier 1 common capital (non-GAAP) (g) | $  **11,180** | $  11,825 |
| Risk-weighted assets (h) | $  **141,623** | $  158,468 |
| Tier 1 common (to risk-weighted assets) (g) | **7.89 %** | 7.46% |

(a)  The efficiency ratio equals total other noninterest expense divided by total net revenue. The core efficiency ratio equals total other noninterest expense divided by total net revenue excluding original issue discount amortization expense and gain on extinguishment of debt related to the 2008 bond exchange.

(b)  Net interest spread represents the difference between the rate on total interest-earning assets and the rate on total interest-bearing liabilities, excluding discontinued operations for the periods shown.

(c)  Net yield on interest-earning assets represents net financing revenue as a percentage of total interest-earning assets.

(d)  Tier 1 capital generally consists of common equity, minority interests, qualifying noncumulative preferred stock, and the fixed rate cumulative preferred stock sold to Treasury under TARP, less goodwill and other adjustments.

(e)  Total risk-based capital is the sum of Tier 1 and Tier 2 capital. Tier 2 capital generally consists of preferred stock not qualifying as Tier 1 capital, limited amounts of subordinated debt and the allowance for loan losses, and other adjustments. The amount of Tier 2 capital may not exceed the amount of Tier 1 capital.

(f)  Tier 1 leverage equals Tier 1 capital divided by adjusted quarterly average total assets (which reflects adjustments for disallowed goodwill and certain intangible assets). The minimum Tier 1 leverage ratio is 3% or 4% depending on factors specified in the regulations.

(g)  We define Tier 1 common as Tier 1 capital less noncommon elements, including qualifying perpetual preferred stock, minority interest in subsidiaries, trust preferred securities, and mandatorily convertible preferred securities. Ally considers various measures when evaluating capital utilization and adequacy, including the Tier 1 common equity ratio, in addition to capital ratios defined by banking regulators. This calculation is intended to complement the capital ratios defined by banking regulators for both absolute and comparative purposes. Because GAAP does not include capital ratio measures, Ally believes there are no comparable GAAP financial measures to these ratios. Tier 1 common equity is not formally defined by GAAP or codified in the federal banking regulations and, therefore, is considered to be a non-GAAP financial measure. Ally believes the Tier 1 common equity ratio is important because we believe analysts and banking regulators may assess our capital adequacy using this ratio. Additionally, presentation of this measure allows readers to compare certain aspects of our capital adequacy on the same basis to other companies in the industry.

(h)  Risk-weighted assets are defined by regulation and are determined by allocating assets and specified off-balance sheet financial instruments into several broad risk categories.

Table of Contents

# Management's Discussion and Analysis

Ally Financial Inc. • Form 10-Q

## Overview

Ally Financial Inc. (formerly GMAC Inc.) is a leading, independent, financial services firm. Founded in 1919, we are a leading automotive financial services company with over 90 years experience providing a broad array of financial products and services to automotive dealers and their customers. We became a bank holding company on December 24, 2008, under the Bank Holding Company Act of 1956, as amended. Our banking subsidiary, Ally Bank, is an indirect wholly owned subsidiary of Ally Financial Inc. and a leading franchise in the growing direct (internet, telephone, mobile, and mail) banking market.

## Discontinued Operations

During 2013 and 2012, we committed to dispose of certain operations of our Automotive Finance operations, Insurance operations, Mortgage operations, and Commercial Finance Group, and have classified these operations as discontinued. For all periods presented, all of the operating results for these operations have been removed from continuing operations. Refer to Note 2 to the Condensed Consolidated Financial Statements for more details. The MD&A has been adjusted to exclude discontinued operations unless otherwise noted.

Sales transactions for our Automotive Finance operations are expected to close in stages throughout 2013 and possibly 2014. It is anticipated that there could be significant gains or losses occurring during interim periods as the various stages close. We believe that when all of the various stages are closed, we will realize a cumulative net gain on the sale of our Automotive Finance discontinued operations.

## Primary Lines of Business

Dealer Financial Services, which includes our Automotive Finance and Insurance operations, and Mortgage are our primary lines of business. The following table summarizes the operating results excluding discontinued operations of each line of business. Operating results for each of the lines of business are more fully described in the MD&A sections that follow.

| ($ in millions) | | Three months ended March 31, | | | | Favorable/ (unfavorable) % change |
|---|---|---|---|---|---|---|
| | | 2013 | | 2012 | | |
| Total net revenue (loss) | | | | | | |
| Dealer Financial Services | | | | | | |
| Automotive Finance operations | $ | 855 | $ | 707 | | 21 |
| Insurance operations | | 320 | | 350 | | (9) |
| Mortgage operations | | 15 | | 174 | | (91) |
| Corporate and Other | | (164) | | (275) | | 40 |
| Total | $ | 1,026 | $ | 956 | | 7 |
| Income (loss) from continuing operations before income tax (benefit) expense | | | | | | |
| Dealer Financial Services | | | | | | |
| Automotive Finance operations | $ | 343 | $ | 241 | | 42 |
| Insurance operations | | 61 | | 100 | | (39) |
| Mortgage operations | | (204) | | 63 | | n/m |
| Corporate and Other | | (263) | | (401) | | 34 |
| Total | $ | (63) | $ | 3 | | n/m |

n/m = not meaningful

- Our Dealer Financial Services operations offer a wide range of financial services and products to retail automotive consumers and automotive dealerships. Our Dealer Financial Services consist of two separate reportable segments — Automotive Finance and Insurance operations. Our automotive finance services include providing retail installment sales financing, loans, and leases, offering term loans to dealers, financing dealer floorplans and other lines of credit to dealers, fleet leasing, and vehicle remarketing services.

  Our Insurance operations offer both consumer finance and insurance products sold primarily through the automotive dealer channel, and commercial insurance products sold to dealers. As part of our focus on offering dealers a broad range of consumer finance and insurance products, we provide vehicle service contracts, maintenance coverage, and Guaranteed Automobile Protection (GAP) products. We also underwrite selected commercial insurance coverage, which primarily insures dealers' wholesale vehicle inventory.

- Our ongoing Mortgage operations include the management of our held-for-investment mortgage portfolio. Our Mortgage operations also consist of noncore businesses that are winding down. On October 26, 2012, we announced that we had begun to explore strategic alternatives for our agency mortgage servicing rights (MSRs) portfolio and our business lending operations. On February 28, 2013, we sold our business lending operations to Walter Investment Management Corp. On April 16, 2013, we completed the

Table of Contents

# Management's Discussion and Analysis

Ally Financial Inc. • Form 10-Q

sales of agency MSRs to Ocwen Financial Corp. and Quicken Loans, Inc. Refer to  Note 27 to the Condensed Consolidated Financial Statements for further information. Also on April 17, 2013, we announced a decision to exit the correspondent lending channel and cease production of any new jumbo mortgage loans.

- Corporate and Other primarily consists of our centralized corporate treasury activities, such as management of the cash and corporate investment securities portfolios, short- and long-term debt, retail and brokered deposit liabilities, derivative instruments, the amortization of the discount associated with new debt issuances and bond exchanges, most notably from the December 2008 bond exchange, and the residual impacts of our corporate funds-transfer pricing (FTP) and treasury asset liability management (ALM) activities. Corporate and Other also includes our Commercial Finance Group, certain equity investments, overhead that was previously allocated to operations that have since been sold or classified as discontinued operations, and reclassifications and eliminations between the reportable operating segments. Our Commercial Finance Group provides senior secured commercial-lending products to primarily U.S.-based middle market companies.

75

Table of Contents

# Management's Discussion and Analysis

Ally Financial Inc. • Form 10-Q

## Consolidated Results of Operations

The following table summarizes our consolidated operating results excluding discontinued operations for the periods shown. Refer to the operating segment sections of the MD&A that follows for a more complete discussion of operating results by line of business.

| ($ in millions) | | Three months ended March 31, | | Favorable/ (unfavorable) % change |
|---|---|---|---|---|
| | | **2013** | 2012 | |
| **Net financing revenue** | | | | |
| Total financing revenue and other interest income | $ | **1,956** | $    1,716 | **14** |
| Interest expense | | **881** | 1,060 | **17** |
| Depreciation expense on operating lease assets | | **435** | 305 | **(43)** |
| Net financing revenue | | **640** | 351 | **82** |
| **Other revenue** | | | | |
| Net servicing (loss) income | | **(119)** | 16 | **n/m** |
| Insurance premiums and service revenue earned | | **259** | 270 | **(4)** |
| Gain on mortgage and automotive loans, net | | **38** | 20 | **90** |
| Other gain on investments, net | | **51** | 89 | **(43)** |
| Other income, net of losses | | **157** | 210 | **(25)** |
| Total other revenue | | **386** | 605 | **(36)** |
| **Total net revenue** | | **1,026** | 956 | **7** |
| **Provision for loan losses** | | **131** | 98 | **(34)** |
| **Noninterest expense** | | | | |
| Compensation and benefits expense | | **285** | 303 | **6** |
| Insurance losses and loss adjustment expenses | | **115** | 98 | **(17)** |
| Other operating expenses | | **558** | 454 | **(23)** |
| Total noninterest expense | | **958** | 855 | **(12)** |
| **(Loss) income from continuing operations before income tax (benefit) expense** | | **(63)** | 3 | **n/m** |
| Income tax (benefit) expense from continuing operations | | **(123)** | 1 | **n/m** |
| **Net income from continuing operations** | $ | **60** | $       2 | **n/m** |

n/m = not meaningful

We earned net income from continuing operations of $60 million for the three months ended March 31, 2013, compared to $2 million for the three months ended March 31, 2012. Net income from continuing operations for the three months ended March 31, 2013, was favorably impacted by our Automotive Finance operations, primarily due to an increase in consumer automotive financing revenue related to growth in the retail loan and operating lease portfolios. Additional favorability for the three months ended March 31, 2013 was primarily the result of lower original issue discount (OID) amortization expense related to bond maturities and normal monthly amortization, and lower funding costs. The increase was partially offset by higher depreciation expense related to higher lease asset balances as a result of strong lease origination volume, higher representation and warranty expense driven by the terms of our MSRs portfolio sales agreements, and an increase in the provision for loan losses primarily resulting from the prudent expansion of our underwriting strategy to originate consumer automotive assets across a broader credit spectrum, which was significantly narrowed during the most recent economic recession.

Total financing revenue and other interest income increased $240 million for the three months ended March 31, 2013, compared to the same period in 2012. The increase resulted primarily from an increase in operating lease revenue and consumer financing revenue for our Automotive Finance operations driven primarily by an increase in consumer asset levels as a result of increased used vehicle automotive financing and higher automotive industry sales, as well as limited use of whole-loan sales as a funding source in recent periods. Additionally, we continue to maintain our nonprime origination volume across a broad credit spectrum. This increase was partially offset by lower mortgage loan production as a result of the shutdown of our warehouse lending operations and the wind-down of the consumer held-for-sale portfolio.

Interest expense decreased 17% for the three months ended March 31, 2013, compared to the same periods in 2012, primarily due to lower funding costs and a decrease in OID amortization expense. OID amortization expense decreased $51 million for the three months ended March 31, 2013, compared to the same period in 2012, due to bond maturities and normal monthly amortization.

Table of Contents

# Management's Discussion and Analysis

Ally Financial Inc. • Form 10-Q

Depreciation expense on operating lease assets  increased 43% for the three months ended  March 31, 2013, compared to the same period in 2012, primarily due to higher lease asset balances as a result of strong lease origination volume, partially offset by higher lease remarketing gains.

We incurred a net servicing loss of $119 million for the three months ended  March 31, 2013, compared to net servicing income of $16 million for the same period in 2012. The decrease was primarily due to the valuation of our MSRs portfolio in conjunction with our agreement to sell the portfolio.

Insurance premiums and service revenue earned  decreased 4% for the three months ended  March 31, 2013, compared to the same period in 2012, primarily due to declining U.S. vehicle service contracts written in prior years when the automotive market was depressed.

Gain on mortgage and automotive loans increased  $18 million for the three months ended  March 31, 2013, compared to the same period in 2012. Due to the deconsolidation of ResCap following its bankruptcy filing, we began managing the execution of capital markets transactions, which resulted in us recording gains related to these transactions during the three months ended March 31, 2013.

Other gain on investments, net , was $51 million for the three months ended  March 31, 2013, compared to $89 million for the same period in 2012. The decrease was primarily due to lower realized investment gains and the recognition of  $8 million of other-than-temporary impairment on certain equity securities.

Other income, net of losses , decreased 25% for the three months ended  March 31, 2013, compared to the same period in 2012. The decrease was primarily due to lower fee income and net origination revenue related to decreased consumer mortgage-lending production associated with government-sponsored refinancing programs.

The provision for loan losses was $131 million for the three months ended  March 31, 2013, compared to $98 million for the same period in 2012. The increase was primarily due to the prudent expansion of our underwriting strategy to originate consumer automotive assets across a broader credit spectrum, which was significantly narrowed during the most recent economic recession.

Total noninterest expense increased 12% for the three months ended  March 31, 2013, compared to the same period in 2012. The increase was primarily due to higher representation and warranty expense driven by the terms of our MSRs portfolio sales agreements and unseasonably high early spring hailstorms losses on our dealer inventory insurance products, partially offset by lower compensation and benefits expense primarily related to a decrease in headcount.

We recognized consolidated income tax benefit from continuing operations of $123 million for the three months ended  March 31, 2013, compared to income tax expense of $1 million for the same period in 2012. The increase in income tax benefit was driven by the retroactive reinstatement of the active financing exception by the American Taxpayer Relief Act of 2012, and the release of valuation allowance related to the measurement of foreign tax credit carryforwards anticipated to be utilized in the future.

In calculating the continuing operations provision for income taxes, we apply an estimated annual effective tax rate to year-to-date ordinary income on an interim basis. Refer to *Critical Accounting Estimates* within MD&A and Note 1 to the Condensed Consolidated Financial Statements  for further details.

Table of Contents

# Management's Discussion and Analysis

Ally Financial Inc. • Form 10-Q

## Dealer Financial Services

Results for Dealer Financial Services are presented by reportable segment, which includes our Automotive Finance and Insurance operations.

### Automotive Finance Operations

#### Results of Operations

The following table summarizes the operating results of our Automotive Finance operations excluding discontinued operations for the periods shown. The amounts presented are before the elimination of balances and transactions with our other reportable segments.

| ($ in millions) | Three months ended March 31, | | Favorable/ (unfavorable) % change |
|---|---|---|---|
| | 2013 | 2012 | |
| **Net financing revenue** | | | |
| Consumer | $ 729 | $ 661 | 10 |
| Commercial | 281 | 285 | (1) |
| Loans held-for-sale | — | 5 | (100) |
| Operating leases | 734 | 507 | 45 |
| Other interest income | 7 | 15 | (53) |
| Total financing revenue and other interest income | 1,751 | 1,473 | 19 |
| Interest expense | 543 | 538 | (1) |
| Depreciation expense on operating lease assets | 435 | 305 | (43) |
| Net financing revenue | 773 | 630 | 23 |
| **Other revenue** | | | |
| Servicing fees | 19 | 30 | (37) |
| Other income | 63 | 47 | 34 |
| Total other revenue | 82 | 77 | 6 |
| **Total net revenue** | 855 | 707 | 21 |
| **Provision for loan losses** | 112 | 78 | (44) |
| **Noninterest expense** | | | |
| Compensation and benefits expense | 113 | 108 | (5) |
| Other operating expenses | 287 | 280 | (3) |
| Total noninterest expense | 400 | 388 | (3) |
| **Income from continuing operations before income tax (benefit) expense** | $ 343 | $ 241 | 42 |
| **Total assets** | $ 118,882 | $ 119,081 | — |

Our Automotive Finance operations earned income before income tax expense of $343 million for the three months ended March 31, 2013, compared to $241 million for the three months ended March 31, 2012. Results for the three months ended March 31, 2013 were favorably impacted by higher consumer and operating lease revenues driven by growth in the retail loan and operating lease portfolios. These items were partially offset by higher provision for loan losses driven by the prudent expansion of our underwriting strategy to originate assets across a broader credit spectrum, which was significantly narrowed during the most recent economic recession.

Consumer financing revenue increased 10% for the three months ended March 31, 2013, compared to the same period in 2012, due to an increase in U.S. consumer asset levels driven by growth in the used vehicle portfolio as well as limited use of whole-loan sales as a funding source in recent periods; however, our GM and Chrysler penetration levels for new retail automotive loans were lower than those in 2012. The increase in consumer revenue from volume was partially offset by lower yields as a result of the competitive market environment for automotive financing.

Operating lease revenue increased 45% for the three months ended March 31, 2013, compared to the same period in 2012, primarily due to higher lease asset balances as a result of strong origination volume.

Depreciation expense on operating lease assets increased 43% for the three months ended March 31, 2013, compared to the same period in 2012, primarily due to higher lease asset balances as a result of strong lease origination volume, partially offset by higher lease remarketing gains.

Table of Contents

# Management's Discussion and Analysis

Ally Financial Inc. • Form 10-Q

Servicing fee income decreased 37% for the three months ended March 31, 2013, compared to the same period in 2012, due to lower levels of off-balance sheet retail serviced assets.

Other income increased 34% for the three months ended March 31, 2013, compared to the same period in 2012, primarily due to a one-time fee earned from a vendor that did not occur during the three months ended March 31, 2012.

The provision for loan losses was $112 million for the three months ended March 31, 2013, compared to $78 million for the same period in 2012. The increase was primarily due to the prudent expansion of our underwriting strategy to originate consumer automotive assets across a broader credit spectrum, which was significantly narrowed during the most recent economic recession.

Table of Contents

# Management's Discussion and Analysis

Ally Financial Inc. • Form 10-Q

## Automotive Financing Volume

### Consumer Automotive Financing Volume

The following table summarizes our new and used vehicle consumer financing volume, including lease, and our share of consumer sales in the United States.

| Three months ended March 31, (*units in thousands*) | Consumer automotive financing volume | | % Share of consumer sales | |
|---|---|---|---|---|
| | **2013** | 2012 | **2013** | 2012 |
| GM new vehicles | **151** | 141 | **31** | 31 |
| Chrysler new vehicles | **71** | 77 | **24** | 28 |
| Other non-GM / Chrysler new vehicles | **19** | 20 | | |
| Used vehicles | **126** | 138 | | |
| Total consumer automotive financing volume | **367** | 376 | | |

Consumer automotive financing decreased slightly during the three months ended March 31, 2013, compared to the same period in 2012, primarily due to lower used vehicle origination volume as a result of more competition within the automotive finance market due to the performance of automotive finance assets relative to other asset classes during the 2008 economic downturn. The decrease was partially offset by an increase in GM new vehicle originations resulting from stronger lease volume.

### Manufacturer Marketing Incentives

The following table presents the total U.S. consumer origination dollars and percentage mix by product type.

| Three months ended March 31, ( *$ in millions*) | Consumer automotive financing originations | | % Share of originations | |
|---|---|---|---|---|
| | **2013** | 2012 | **2013** | 2012 |
| GM new vehicles | | | | |
| New retail standard | **$ 1,496** | $ 1,597 | **15** | 16 |
| New retail subvented | **1,291** | 1,746 | **13** | 18 |
| Lease | **1,883** | 1,039 | **19** | 11 |
| Total GM new vehicle originations | **4,670** | 4,382 | | |
| Chrysler new vehicles | | | | |
| New retail standard | **1,046** | 1,078 | **11** | 11 |
| New retail subvented | **231** | 506 | **3** | 5 |
| Lease | **789** | 561 | **8** | 6 |
| Total Chrysler new vehicle originations | **2,066** | 2,145 | | |
| Other new retail vehicles | **508** | 542 | **5** | 5 |
| Other lease | **38** | 20 | **1** | 1 |
| Used vehicles | **2,450** | 2,638 | **25** | 27 |
| Total consumer automotive financing originations | **$ 9,732** | $ 9,727 | | |

During the three months ended March 31, 2013, total new GM vehicle originations increased, compared to the same period in 2012, due to stronger lease volume, partially offset by lower new retail volume. Chrysler new retail contracts decreased primarily as a result of lower retail penetration at Chrysler due to our shift in focus towards non-subvented business. Other lease originations were higher due to the continued strategic focus within the non-GM/non-Chrysler market, and used origination dollars decreased at a lower pace than used vehicle origination volume as a result of strong used vehicle values.

For further discussion of manufacturing marketing incentives, refer to our Annual Report on Form 10-K for the year ended December 31, 2012, Item 7, Management's Discussion and Analysis of Financial Condition and Results of Operations — Automotive Finance Operations.

Table of Contents

# Management's Discussion and Analysis

Ally Financial Inc. • Form 10-Q

### Commercial Wholesale Financing Volume

The following table summarizes the average balances of our commercial wholesale floorplan finance receivables of new and used vehicles and share of dealer inventory in the United States.

| | Average balance | | % Share of dealer inventory | |
| Three months ended March 31, ($ in millions) | 2013 | 2012 | 2013 | 2012 |
|---|---|---|---|---|
| GM new vehicles (a) | $ 16,291 | $ 14,266 | 69 | 72 |
| Chrysler new vehicles (a) | 7,211 | 6,589 | 54 | 62 |
| Other non-GM / Chrysler new vehicles | 2,541 | 2,153 | | |
| Used vehicles | 3,052 | 2,977 | | |
| Total commercial wholesale finance receivables | $ 29,095 | $ 25,985 | | |

(a)   Share of dealer inventory based on a 4 month average of dealer inventory (excludes in-transit units).

Commercial wholesale financing average volume increased during the three months ended March 31, 2013, compared to the same period in 2012, primarily due to growing dealer inventories required to support increasing automobile sales. GM and Chrysler wholesale penetration decreased during the three months ended March 31, 2013, compared to the same period in 2012, as a result of increased competition in the wholesale marketplace.

81

Table of Contents

# Management's Discussion and Analysis

Ally Financial Inc. • Form 10-Q

## Insurance Operations

### Results of Operations

The following table summarizes the operating results of our Insurance operations excluding discontinued operations for the periods shown. The amounts presented are before the elimination of balances and transactions with our other reportable segments.

| ($ in millions) | | Three months ended March 31, | | Favorable/(unfavorable) % change |
|---|---|---|---|---|
| | | 2013 | 2012 | |
| **Insurance premiums and other income** | | | | |
| Insurance premiums and service revenue earned | $ | 259 | $ 270 | (4) |
| Investment income | | 58 | 73 | (21) |
| Other income | | 3 | 7 | (57) |
| Total insurance premiums and other income | | 320 | 350 | (9) |
| **Expense** | | | | |
| Insurance losses and loss adjustment expenses | | 115 | 98 | (17) |
| Acquisition and underwriting expense | | | | |
| Compensation and benefits expense | | 15 | 17 | 12 |
| Insurance commissions expense | | 92 | 99 | 7 |
| Other expenses | | 37 | 36 | (3) |
| Total acquisition and underwriting expense | | 144 | 152 | 5 |
| Total expense | | 259 | 250 | (4) |
| **Income from continuing operations before income tax (benefit) expense** | $ | 61 | $ 100 | (39) |
| **Total assets** | $ | 8,331 | $ 8,394 | (1) |
| **Insurance premiums and service revenue written** | $ | 234 | $ 251 | (7) |
| **Combined ratio (a)** | | 99.7% | 91.4% | |

(a)   Management uses a combined ratio as a primary measure of underwriting profitability with its components measured using accounting principles generally accepted in the United States of America. Underwriting profitability is indicated by a combined ratio under 100% and is calculated as the sum of all incurred losses and expenses (excluding interest and income tax expense) divided by the total of premiums and service revenues earned and other income.

Our Insurance operations earned income from continuing operations before income tax expense of  $61 million for the three months ended March 31, 2013, compared to $100 million for the three months ended  March 31, 2012. The decrease was primarily attributable to unseasonably high early spring hailstorms losses, lower investment income, and lower insurance premiums and service revenue earned from our U.S. vehicle service contracts.

Insurance premiums and service revenue earned  was $259 million for the three months ended March 31, 2013, compared to $270 million for the same period in 2012. The decrease was primarily due to declining U.S. vehicle service contracts written in prior years when the automotive market was depressed.

Investment income totaled $58 million for the three months ended March 31, 2013, compared to $73 million for the same period in 2012. The decrease was primarily due to lower realized investment gains and the recognition of other-than-temporary impairment on certain equity securities of  $8 million.

Insurance losses and loss adjustment expenses  totaled $115 million for the three months ended March 31, 2013, compared to $98 million for the same period in 2012. The increase was driven primarily by unseasonably high early spring hailstorms losses on our dealer inventory insurance products.

Acquisition and underwriting expense  decreased  5% for the three months ended March 31, 2013, compared to the same period in 2012. The decrease was primarily a result of lower commission expense for our U.S. dealership-related products matching our decrease in earned premiums.

The combined ratio increased from 91.4% for the  three months ended March 31, 2012, to 99.7% for the three months ended March 31, 2013, primarily due to an increase in weather-related losses. Excluding the impact of the unseasonably higher weather-related losses, expenses decreased in line with the decline in earned premium as expected.

Table of Contents

# Management's Discussion and Analysis

Ally Financial Inc. • Form 10-Q

The following table shows premium and service revenue written by insurance product.

| ($ in millions) | Three months ended March 31, | | | |
|---|---|---|---|---|
| | **2013** | | 2012 | |
| Vehicle service contracts | | | | |
| New retail | $ | **98** | $ | 94 |
| Used retail | | **125** | | 134 |
| Reinsurance | | **(34)** | | (31) |
| Total vehicle service contracts | | **189** | | 197 |
| Wholesale | | **27** | | 20 |
| Other finance and insurance (a) | | **18** | | 34 |
| Total | $ | **234** | $ | 251 |

(a)   Other finance and insurance includes Guaranteed Automobile Protection (GAP) coverage, excess wear and tear, wind-down of Canadian personal lines, and other ancillary products.

Insurance premiums and service revenue written was $234 million for the three months ended March 31, 2013, compared to $251 million for the same period in 2012. Insurance premiums and service revenue written decreased due to the sale of the Canadian personal lines business, which stopped writing new business on November 1, 2012, and lower written premiums in our used retail vehicle service contract insurance products driven by lower used vehicle sales volume. Vehicle service contract revenue is earned over the life of the service contract on a basis proportionate to the anticipated cost pattern. Accordingly, the majority of earnings from vehicle service contracts written during 2013 will be recognized as income in future periods.

### Cash and Investments

A significant aspect of our Insurance operations is the investment of proceeds from premiums and other revenue sources. We use these investments to satisfy our obligations related to future claims at the time these claims are settled. Our Insurance operations have an Investment Committee, which develops guidelines and strategies for these investments. The guidelines established by this committee reflect our risk tolerance, liquidity requirements, regulatory requirements, and rating agency considerations, among other factors.

The following table summarizes the composition of our Insurance operations cash and investment portfolio at fair value.

| ($ in millions) | March 31, 2013 | | December 31, 2012 | |
|---|---|---|---|---|
| Cash | | | | |
| Noninterest-bearing cash | $ | **163** | $ | 129 |
| Interest-bearing cash | | **664** | | 488 |
| Total cash | | **827** | | 617 |
| Available-for-sale securities | | | | |
| Debt securities | | | | |
| U.S. Treasury and federal agencies | | **1,176** | | 1,090 |
| Foreign government | | **306** | | 303 |
| Mortgage-backed | | **886** | | 714 |
| Asset-backed | | **8** | | 8 |
| Corporate debt | | **1,326** | | 1,264 |
| Total debt securities | | **3,702** | | 3,379 |
| Equity securities | | **981** | | 1,148 |
| Total available-for-sale securities | | **4,683** | | 4,527 |
| Total cash and securities | $ | **5,510** | $ | 5,144 |

Table of Contents

# Management's Discussion and Analysis

Ally Financial Inc. • Form 10-Q

## Mortgage Operations

### Results of Operations

The following table summarizes the operating results for our Mortgage operations excluding discontinued operations for the periods shown. The amounts presented are before the elimination of balances and transactions with our other reportable segments.

| ($ in millions) | | Three months ended March 31, | | Favorable/ (unfavorable) % change |
|---|---|---|---|---|
| | | 2013 | 2012 | |
| **Net financing revenue** | | | | |
| Total financing revenue and other interest income | $ | **122** | $ 166 | **(27)** |
| Interest expense | | **88** | 129 | **32** |
| Net financing revenue | | **34** | 37 | **(8)** |
| Servicing fees | | **63** | 92 | **(32)** |
| Servicing asset valuation and hedge activities, net | | **(201)** | (106) | **(90)** |
| Total servicing income, net | | **(138)** | (14) | **n/m** |
| Gain on mortgage loans, net | | **38** | 25 | **52** |
| Other income, net of losses | | **81** | 126 | **(36)** |
| Total other revenue | | **(19)** | 137 | **(114)** |
| **Total net revenue** | | **15** | 174 | **(91)** |
| **Provision for loan losses** | | **20** | 27 | **26** |
| **Noninterest expense** | | | | |
| Compensation and benefits expense | | **25** | 19 | **(32)** |
| Representation and warranty expense | | **83** | — | **n/m** |
| Other operating expenses | | **91** | 65 | **(40)** |
| Total noninterest expense | | **199** | 84 | **(137)** |
| **(Loss) income from continuing operations before income tax (benefit) expense** | $ | **(204)** | $ 63 | **n/m** |
| **Total assets** | $ | **11,284** | $ 30,079 | **(62)** |

n/m = not meaningful

Our Mortgage operations incurred a loss from continuing operations before income tax expense of $204 million for the three months ended March 31, 2013, compared to income from continuing operations before income tax expense of $63 million for the three months ended March 31, 2012. The decrease was primarily driven by the valuation of our mortgage servicing rights portfolio, the shutdown of our warehouse lending operations, a decrease in consumer mortgage-lending production associated with government-sponsored refinancing programs, and higher representation and warranty expense driven by the terms of our MSRs portfolio sales agreements.

Net financing revenue was $34 million for the three months ended March 31, 2013, compared to $37 million for the same period in 2012. The decrease in net financing revenue was primarily due to lower production as a result of the shutdown of our warehouse lending operations and the wind-down of consumer held-for-sale portfolio.

We incurred a net servicing loss of $138 million for the three months ended March 31, 2013, compared to $14 million for the same period in 2012, primarily resulting from the valuation of our MSRs portfolio in conjunction with our agreement to sell the portfolio.

The net gain on mortgage loans increased 52% for the three months ended March 31, 2013, compared to the same period in 2012. Due to the deconsolidation of ResCap following its bankruptcy filing, we began managing the execution of capital markets transactions, which resulted in us recording gains related to these transactions during the three months ended March 31, 2013.

Other income, net of losses, was $81 million for the three months ended March 31, 2013, compared to $126 million for the same period in 2012. The decrease was primarily due to lower fee income and net origination revenue related to decreased consumer mortgage-lending production associated with government-sponsored refinancing programs.

The provision for loan losses was $20 million for the three months ended March 31, 2013, compared to $27 million for the same period in 2012. The decrease for the three months ended March 31, 2013, was primarily due to lower net charge-offs in 2013 due to the continued runoff of legacy mortgage assets and improvements in home prices.

Total noninterest expense increased $115 million for the three months ended March 31, 2013, compared to the same period in 2012. The increase was primarily due to higher representation and warranty expense driven by the terms of our MSRs portfolio sales agreements, and increased expenses required to establish separate mortgage-related processes as a result of the ResCap separation.

Table of Contents

# Management's Discussion and Analysis

Ally Financial Inc. • Form 10-Q

## Mortgage Loan Production and Servicing

Mortgage loan production was $6.1 billion for the three months ended March 31, 2013, compared to $8.5 billion for the same period in 2012. Loan production decreased $2.4 billion, or 28%, for the three months ended March 31, 2013, compared to the same period in 2012. The decline in loan production was largely driven by our reduced presence in the correspondent lending and direct lending channels. On April 17, 2013, we announced a decision to exit the correspondent lending channel and cease production of any new jumbo mortgage loans.

The following table summarizes U.S. consumer mortgage loan production.

| | 2013 | | 2012 | |
|---|---|---|---|---|
| Three months ended March 31, ($ in millions) | Number of loans | Dollar amount of loans | Number of loans | Dollar amount of loans |
| Production by product type | | | | |
| Prime conforming | 27,872 | $ 5,565 | 30,750 | $ 6,587 |
| Prime nonconforming | 634 | 508 | 578 | 464 |
| Government | 220 | 43 | 6,795 | 1,484 |
| Total U.S. production by product type | 28,726 | $ 6,116 | 38,123 | $ 8,535 |
| U.S. production by channel | | | | |
| Direct lending | 13,344 | $ 2,424 | 17,228 | $ 3,586 |
| Correspondent lender and secondary market purchases | 12,780 | 2,948 | 17,286 | 3,996 |
| Mortgage brokers | 2,602 | 744 | 3,609 | 953 |
| Total U.S. production by channel | 28,726 | $ 6,116 | 38,123 | $ 8,535 |

The majority of our serviced mortgage assets are subserviced by GMAC Mortgage, LLC, a subsidiary of ResCap, pursuant to a servicing agreement. During April 2013, we completed the sale of our portfolio of agency mortgage servicing rights to Ocwen Financial Corporation and Quicken Loans Inc. The sale was completed in two stages - loans guaranteed by Fannie Mae were sold on April 1, 2013, and loans guaranteed by Freddie Mac were sold on April 16, 2013. Refer to  Note 27 to the Condensed Consolidated Financial Statements for further information.

The following table summarizes our primary consumer mortgage loan-servicing portfolio by product category.

| ($ in millions) | March 31, 2013 | December 31, 2012 |
|---|---|---|
| U.S. primary servicing portfolio | | |
| Prime conforming | $ 114,751 | $ 117,544 |
| Prime nonconforming | 11,042 | 11,628 |
| Prime second-lien | 1,082 | 1,136 |
| Government | 10 | 16 |
| Total primary servicing portfolio | $ 126,885 | $ 130,324 |

For more information regarding our serviced mortgage assets, refer to  Note 10 to the Condensed Consolidated Financial Statements .

## Loans Outstanding

Consumer mortgage loans held-for-sale and consumer mortgage loans held-for-investment as of March 31, 2013, represent loans held by Ally Bank.

Consumer mortgage loans held-for-sale were as follows.

| ($ in millions) | March 31, 2013 | December 31, 2012 |
|---|---|---|
| Prime conforming | $ 730 | $ 2,407 |
| Government | 1 | 8 |
| Total | 731 | 2,415 |
| Net (discounts) premiums | (34) | 26 |
| Fair value option election adjustment | 4 | 49 |
| Total, net | $ 701 | $ 2,490 |

Table of Contents

# Management's Discussion and Analysis

Ally Financial Inc. • Form 10-Q

Consumer mortgage loans held-for-investment were as follows.

| ($ in millions) | | March 31, 2013 | | December 31, 2012 |
|---|---|---|---|---|
| Prime conforming | $ | 248 | $ | 245 |
| Prime nonconforming | | 8,225 | | 8,322 |
| Prime second-lien | | 1,083 | | 1,137 |
| Government | | 1 | | — |
| Total | | 9,557 | | 9,704 |
| Net premiums | | 44 | | 43 |
| Allowance for loan losses | | (430) | | (432) |
| Other | | 5 | | 8 |
| Total, net | $ | 9,176 | $ | 9,323 |

86

Table of Contents

# Management's Discussion and Analysis

Ally Financial Inc. • Form 10-Q

## Corporate and Other

The following table summarizes the activities of Corporate and Other excluding discontinued operations for the periods shown. Corporate and Other primarily consists of our centralized corporate treasury activities, such as management of the cash and corporate investment securities portfolios, short- and long-term debt, retail and brokered deposit liabilities, derivative instruments, the amortization of the discount associated with new debt issuances and bond exchanges, most notably from the December 2008 bond exchange, and the residual impacts of our corporate funds-transfer pricing (FTP) and treasury asset liability management (ALM) activities. Corporate and Other also includes our Commercial Finance Group, certain equity investments, overhead that was previously allocated to operations that have since been sold or classified as discontinued operations, and reclassifications and eliminations between the reportable operating segments. Our Commercial Finance Group provides senior secured commercial-lending products to primarily U.S.-based middle market companies.

| ($ in millions) | | Three months ended March 31, | | |
|---|---|---|---|---|
| | | **2013** | 2012 | **Favorable/ (unfavorable) % change** |
| **Net financing loss** | | | | |
| Total financing revenue and other interest income | $ | **53** | $ 44 | **20** |
| Interest expense | | | | |
| Original issue discount amortization | | **60** | 111 | **46** |
| Other interest expense | | **172** | 261 | **34** |
| Total interest expense | | **232** | 372 | **38** |
| Net financing loss (a) | | **(179)** | (328) | **45** |
| **Other revenue** | | | | |
| Other gain on investments, net | | **3** | 24 | **(88)** |
| Other income, net of losses | | **12** | 29 | **(59)** |
| Total other revenue | | **15** | 53 | **(72)** |
| **Total net loss** | | **(164)** | (275) | **40** |
| **Provision for loan losses** | | **(1)** | (7) | **(86)** |
| **Noninterest expense** | | | | |
| Compensation and benefits expense | | **132** | 159 | **17** |
| Other operating expense (b) | | **(32)** | (26) | **23** |
| Total noninterest expense | | **100** | 133 | **25** |
| **Loss from continuing operations before income tax (benefit) expense** | $ | **(263)** | $ (401) | **34** |
| **Total assets** | $ | **27,702** | $ 28,796 | **(4)** |

(a)   Refer to the table that follows for further details on the components of net financing loss.

(b)   Includes a reduction of $193 million for the three months ended March 31, 2013, and $207 million for the three months ended March 31, 2012, related to the allocation of corporate overhead expenses to other segments. The receiving segments record their allocation of corporate overhead expense within other operating expense.

Table of Contents

# Management's Discussion and Analysis

Ally Financial Inc. • Form 10-Q

The following table summarizes the components of net financing losses for Corporate and Other.

| | Three months ended March 31, | |
|---|---|---|
| ($ in millions) | **2013** | 2012 |
| Original issue discount amortization | | |
| 2008 bond exchange amortization | **$ (56)** | $ (103) |
| Other debt issuance discount amortization | **(4)** | (8) |
| Total original issue discount amortization (a) | **(60)** | (111) |
| Net impact of the funds transfer pricing methodology | | |
| Unallocated liquidity costs (b) | **(84)** | (154) |
| Funds-transfer pricing / cost of funds mismatch (c) | **61** | 5 |
| Unassigned equity costs (d) | **(109)** | (86) |
| Total net impact of the funds transfer pricing methodology | **(132)** | (235) |
| Other (including Commercial Finance Group net financing revenue) | **13** | 18 |
| Total net financing losses for Corporate and Other | **$ (179)** | $ (328) |
| Outstanding original issue discount balance | **$ 1,780** | $ 2,093 |

(a)   Amortization is included as interest on long-term debt in the  Condensed Consolidated Statement of Comprehensive Income .
(b)   Represents the unallocated cost of funding our cash and investment portfolio.
(c)   Represents our methodology to assign funding costs to classes of assets and liabilities based on expected duration and the London interbank offer rate (LIBOR) swap curve plus an assumed credit spread. Matching duration allocates interest income and interest expense to the reportable segments so the respective reportable segments results are insulated from interest rate risk. The balance above is the resulting benefit (loss) due to holding interest rate risk at Corporate and Other.
(d)   Primarily represents the unassigned cost of maintaining required capital positions for certain of our regulated entities, primarily Ally Bank and Ally Insurance.

The following table presents the scheduled remaining amortization of original issue discount at  March 31, 2013.

| Year ended December 31, ($ in millions) | 2013 (a) | 2014 | 2015 | 2016 | 2017 | 2018 and thereafter | Total |
|---|---|---|---|---|---|---|---|
| Original issue discount | | | | | | | |
| Outstanding balance | $ 1,579 | $ 1,391 | $ 1,335 | $ 1,272 | $ 1,197 | $— | |
| Total amortization (b) | 201 | 188 | 56 | 63 | 75 | 1,197 | $ 1,780 |
| 2008 bond exchange amortization (c) | 186 | 166 | 43 | 53 | 66 | 1,059 | 1,573 |

(a)   The maximum annual scheduled amortization for any individual year is $158 million in 2030 of which $152 million is related to 2008 bond exchange amortization.
(b)   The amortization is included as interest on long-term debt in the  Condensed Consolidated Statement of Comprehensive Income .
(c)   2008 bond exchange amortization is included in total amortization.

Loss from continuing operations before income tax expense for Corporate and Other was  $263 million for the three months ended March 31, 2013, compared to $401 million for the three months ended  March 31, 2012. Corporate and Other's loss from continuing operations before income tax expense was driven by net financing losses, which primarily represents original issue discount amortization expense and the net impact of our FTP methodology, which includes the unallocated cost of maintaining our liquidity and investment portfolios.

The improvement in the loss from continuing operations before income tax expense for the  three months ended March 31, 2013 was primarily due to decreases in OID amortization expense related to bond maturities and normal monthly amortization, and lower funding costs as a result of the early repayment of certain Federal Home Loan Bank debt during the fourth quarter of 2012, and lower compensation and benefits expense primarily related to a decrease in headcount. The improvement was partially offset by a decrease in other income primarily driven by derivative losses and the sale of servicer advance assets during the first quarter of 2013.

Corporate and Other also includes the results of our Commercial Finance Group. Our Commercial Finance Group earned income from continuing operations before income tax expense of $18 million for the three months ended March 31, 2013, compared to $25 million for the three months ended March 31, 2012. The decrease was primarily related to less favorable provision expense due to higher recoveries on nonperforming exposures in 2012.

Table of Contents

# Management's Discussion and Analysis

Ally Financial Inc. • Form 10-Q

**Cash and Securities**

The following table summarizes the composition of the cash and securities portfolio held at fair value by Corporate and Other.

| ($ in millions) | | March 31, 2013 | | December 31, 2012 |
|---|---|---|---|---|
| **Cash** | | | | |
| Noninterest-bearing cash | $ | 880 | $ | 944 |
| Interest-bearing cash | | 5,720 | | 5,942 |
| Total cash | | 6,600 | | 6,886 |
| **Available-for-sale securities** | | | | |
| Debt securities | | | | |
| U.S. Treasury and federal agencies | | 923 | | 1,124 |
| Mortgage-backed | | 7,930 | | 6,191 |
| Asset-backed | | 2,212 | | 2,332 |
| Total debt securities | | 11,065 | | 9,647 |
| Equity securities | | 4 | | 4 |
| Total available-for-sale securities | | 11,069 | | 9,651 |
| Total cash and securities | $ | 17,669 | $ | 16,537 |

89

Table of Contents

# Management's Discussion and Analysis

Ally Financial Inc. • Form 10-Q

## Risk Management

Managing the risk/reward trade-off is a fundamental component of operating our businesses. Our risk management program is overseen by the Ally Board of Directors (the Board), various risk committees, and the executive leadership team. The Board sets the risk appetite across our company while the risk committees and executive leadership team identify and monitor potential risks and manage the risk to be within our risk appetite. Ally's primary risks include credit, lease residual, market, operational, insurance/underwriting, country, and liquidity. For more information on our risk management process, refer to the Risk Management MD&A section of our 2012 Annual Report on Form 10-K.

### Loan and Lease Exposure

The following table summarizes the exposures from our loan and lease activities.

| ($ in millions) | | March 31, 2013 | | December 31, 2012 |
|---|---|---|---|---|
| Finance receivables and loans | | | | |
| Dealer Financial Services | $ | 86,894 | $ | 86,542 |
| Mortgage operations | | 9,672 | | 9,821 |
| Corporate and Other | | 2,557 | | 2,692 |
| Total finance receivables and loans | | 99,123 | | 99,055 |
| Held-for-sale loans | | | | |
| Dealer Financial Services | | — | | — |
| Mortgage operations | | 701 | | 2,490 |
| Corporate and Other | | 17 | | 86 |
| Total held-for-sale loans | | 718 | | 2,576 |
| Total on-balance sheet loans | $ | 99,841 | $ | 101,631 |
| Off-balance sheet securitized loans | | | | |
| Dealer Financial Services | $ | 1,336 | $ | 1,495 |
| Mortgage operations | | 117,342 | | 119,384 |
| Corporate and Other | | — | | — |
| Total off-balance sheet securitized loans | $ | 118,678 | $ | 120,879 |
| Operating lease assets | | | | |
| Dealer Financial Services | $ | 14,828 | $ | 13,550 |
| Mortgage operations | | — | | — |
| Corporate and Other | | — | | — |
| Total operating lease assets | $ | 14,828 | $ | 13,550 |
| Serviced loans and leases | | | | |
| Dealer Financial Services | $ | 132,817 | $ | 134,122 |
| Mortgage operations | | 126,885 | | 130,324 |
| Corporate and Other | | 1,383 | | 1,344 |
| Total serviced loans and leases | $ | 261,085 | $ | 265,790 |

The risks inherent in our loan and lease exposures are largely driven by changes in the overall economy, used vehicle and housing price levels, unemployment levels, and their impact to our borrowers. The potential financial statement impact of these exposures varies depending on the accounting classification and future expected disposition strategy. We retain the majority of our automobile loans as they complement our core business model, but we do sell loans from time to time on an opportunistic basis. Historically, we primarily originated mortgage loans with the intent to sell and, as such, retained only a small percentage of the loans that we originated or purchased. Mortgage loans that we did not intend to retain were sold to investors, primarily through securitizations guaranteed by GSEs. However, we may have retained an interest or right to service these loans. We ultimately manage the associated risks based on the underlying economics of the exposure. Due to our recent strategic actions, we are exiting the mortgage correspondent lending channel and ceasing origination of any new jumbo loans.

## Credit Risk Management

Credit risk is defined as the potential failure to receive payments when due from a creditor in accordance with contractual obligations. Therefore, credit risk is a major source of potential economic loss to us. Credit risk is monitored by global and line of business committees and the Global Risk Management organization. Together they oversee the credit decisioning and management processes, and monitor credit risk exposures to ensure they are in a safe-and-sound manner and are within our risk appetite. In addition, our Loan Review Group provides

Table of Contents

# Management's Discussion and Analysis

Ally Financial Inc. • Form 10-Q

an independent assessment of the quality of our credit portfolios and credit risk management practices, and directly reports its findings to the Risk and Compliance Committee of the Board on a regular basis.

To mitigate risk we have implemented specific policies and processes across all lines of business, utilizing both qualitative and quantitative analyses, that reflect our commitment to maintaining an independent and ongoing assessment of credit risk and credit quality. Our policies require an objective and timely assessment of the overall quality of the consumer and commercial loan and lease portfolios. This includes the identification of relevant trends that affect the collectability of the portfolios, segments of the portfolios that are potential problem areas, loans and leases with potential credit weaknesses, and assessment of the adequacy of internal credit risk policies and procedures to monitor compliance with relevant laws and regulations. In addition, we maintain limits and underwriting guidelines that reflect our risk appetite.

We manage credit risk based on the risk profile of the borrower, the source of repayment, the underlying collateral, and current market conditions. We monitor the credit risk profile of individual borrowers and the aggregate portfolio of borrowers either within a designated geographic region or a particular product or industry segment. To mitigate risk concentrations, we may take part in loan sales and syndications.

Additionally, we utilize numerous strategies in an effort to mitigate loss and provide ongoing support to customers in financial distress. For automobile loans, we offer several types of assistance to aid our customers. Loss mitigation includes changing the maturity date, extending payments, and rewriting the loan terms. These actions are provided with the intent to provide the borrower with additional options in lieu of repossessing their vehicle. For mortgage loans, as part of our participation in certain governmental programs, we offer mortgage loan modifications to qualified borrowers. Numerous initiatives, such as the Home Affordable Modification Program (HAMP) are in place to provide support to our mortgage customers in financial distress, including principal forgiveness, maturity extensions, delinquent interest capitalization, and changes to contractual interest rates.

Furthermore, we manage our counterparty credit exposure based on the risk profile of the counterparty. Within our policies, we have established minimum standards and requirements for managing counterparty risk exposures in a safe-and-sound manner. Counterparty credit risk is derived from multiple exposure types, including derivatives, securities trading, securities financing transactions, financial futures, cash balances (e.g. due from depository institutions, restricted accounts, and cash equivalents), and investment in debt securities. For more information on Derivative Counterparty Credit Risk, refer to  Note 20 to the Condensed Consolidated Financial Statements .

The U.S. economy accelerated in late 2012, and continued to expand during the  three months ended March 31, 2013. The labor market recovered further during the quarter, with nonfarm payrolls increasing by more than 500,000 and the unemployment rate falling to a four year low of 7.6%. Within the U.S. automotive portfolio, encouraging trends include new light vehicle sales that averaged 15.3 million during the quarter, an 8% increase over the same period in 2012. Nonetheless, we continue to be cautious with the economic outlook due to uneven manufacturing activity, slow global economic growth and uncertainty regarding the effects of the sequester mandated cuts to U.S. federal government spending.

## On-balance Sheet Portfolio

Our on-balance sheet portfolio includes both finance receivables and loans and held-for-sale loans. At  March 31, 2013, this primarily included $86.9 billion of automobile finance receivables and loans and $10.4 billion of mortgage finance receivables and loans.

During 2012 and 2013, we further executed on our strategy of discontinuing and selling or liquidating nonstrategic operations. Refer to  Note 2 to the Condensed Consolidated Financial Statements  for additional information.

91

Table of Contents

# Management's Discussion and Analysis

Ally Financial Inc. • Form 10-Q

The following table presents our total on-balance sheet consumer and commercial finance receivables and loans reported at carrying value before allowance for loan losses.

| ($ in millions) | Outstanding | | Nonperforming (a) | | Accruing past due 90 days or more (b) | |
|---|---|---|---|---|---|---|
| | March 31, 2013 | December 31, 2012 | March 31, 2013 | December 31, 2012 | March 31, 2013 | December 31, 2012 |
| **Consumer** | | | | | | |
| Finance receivables and loans | | | | | | |
| Loans at historical cost | $ 64,686 | $ 63,536 | $ 668 | $ 642 | $ 1 | $ 1 |
| Loans at fair value | — | — | — | — | — | — |
| Total finance receivables and loans | 64,686 | 63,536 | 668 | 642 | 1 | 1 |
| Loans held-for-sale | 701 | 2,490 | 26 | 25 | — | — |
| Total consumer loans | 65,387 | 66,026 | 694 | 667 | 1 | 1 |
| **Commercial** | | | | | | |
| Finance receivables and loans | | | | | | |
| Loans at historical cost | 34,437 | 35,519 | 270 | 216 | — | — |
| Loans at fair value | — | — | — | — | — | — |
| Total finance receivables and loans | 34,437 | 35,519 | 270 | 216 | — | — |
| Loans held-for-sale | 17 | 86 | — | — | — | — |
| Total commercial loans | 34,454 | 35,605 | 270 | 216 | — | — |
| Total on-balance sheet loans | $ 99,841 | $ 101,631 | $ 964 | $ 883 | $ 1 | $ 1 |

(a)  Includes nonaccrual troubled debt restructured loans (TDRs) of $488 million and $419 million at  March 31, 2013, and December 31, 2012, respectively.

(b)  Generally, loans that are 90 days past due and still accruing represent loans with government guarantees. There were no troubled debt restructured loans classified as 90 days past due and still accruing at March 31, 2013 and December 31, 2012.

Total on-balance sheet loans outstanding at March 31, 2013,  decreased $1.8 billion to $99.8 billion from December 31, 2012 reflecting a decrease of $1.2 billion in the commercial portfolio and a decrease of $639 million in the consumer portfolio. The decrease in commercial on-balance sheet loans outstanding was primarily driven by the seasonality of dealer inventories and increased competition across the automotive lending market. The decrease in consumer on-balance sheet loans was primarily driven by the reduction of mortgage originations, partially offset by automobile originations, which outpaced portfolio runoff.

The total TDRs outstanding at March 31, 2013, increased $97 million to $1.3 billion from  December 31, 2012, primarily due to our loss mitigation procedures and continued foreclosure prevention along with our participation in a variety of government-sponsored refinancing programs. Refer to  Note 7 to the Condensed Consolidated Financial Statements for additional information.

Total nonperforming loans at March 31, 2013,  increased $81 million to $964 million from December 31, 2012, reflecting an increase of $54 million of commercial nonperforming loans and an  increase of $27 million of consumer nonperforming loans. The increase in total nonperforming loans from  December 31, 2012, was due in part to the reclassification of a small number of commercial loans to nonperforming status within an overall stable commercial portfolio. Nonperforming loans include finance receivables and loans on nonaccrual status when the principal or interest has been delinquent for 90 days or when full collection is determined not to be probable. Refer to  Note 1 to the Consolidated Financial Statements included in our Annual Report on Form 10-K for the year ended  December 31, 2012 for additional information.

Table of Contents

# Management's Discussion and Analysis

Ally Financial Inc. • Form 10-Q

The following table includes consumer and commercial net charge-offs from finance receivables and loans at historical cost and related ratios reported at carrying value before allowance for loan losses.

| | | Three months ended March 31, | | | |
|---|---|---|---|---|---|
| | | Net charge-offs (recoveries) | | Net charge-off ratios (a) | |
| ($ in millions) | | **2013** | 2012 | **2013** | 2012 |
| Consumer | | | | | |
| Finance receivables and loans at historical cost | $ | **114** | $    117 | **0.7%** | 0.6 % |
| Commercial | | | | | |
| Finance receivables and loans at historical cost | | **—** | (10) | **—** | (0.1) |
| Total finance receivables and loans at historical cost | $ | **114** | $    107 | **0.5** | 0.4 |

(a)    Net charge-off ratios are calculated as net charge-offs divided by average outstanding finance receivables and loans excluding loans measured at fair value and loans held-for-sale during the period for each loan category.

Net charge-offs were $114 million for the three months ended March 31, 2013, compared to $107 million for the three months ended March 31, 2012. The increase was largely due to recoveries in the commercial portfolio in 2012 that did not repeat in 2013. Loans held-for-sale are accounted for at the lower-of-cost or fair value, and therefore we do not record charge-offs.

The *Consumer Credit Portfolio* and *Commercial Credit Portfolio* discussions that follow relate to consumer and commercial finance receivables and loans recorded at historical cost. Finance receivables and loans recorded at historical cost have an associated allowance for loan losses. Finance receivables and loans measured at fair value were excluded from these discussions since those exposures are not accounted for within our allowance for loan losses.

### Consumer Credit Portfolio

During the three months ended March 31, 2013, the credit performance of the consumer portfolio remained strong as our nonperforming and net charge-off rates were relatively stable. For information on our consumer credit risk practices and policies regarding delinquencies, nonperforming status, and charge-offs, refer to Note 1 to the Consolidated Financial Statements included in our Annual Report on Form 10-K for the year ended December 31, 2012.

The following table includes consumer finance receivables and loans recorded at historical cost reported at carrying value before allowance for loan losses.

| | Outstanding | | Nonperforming (a) | | Accruing past due 90 days or more (b) | |
|---|---|---|---|---|---|---|
| ($ in millions) | **March 31, 2013** | December 31, 2012 | **March 31, 2013** | December 31, 2012 | **March 31, 2013** | December 31, 2012 |
| Consumer automobile (c) | $    **55,014** | $    53,715 | $    **266** | $    260 | $    **—** | $    — |
| Consumer mortgage | | | | | | |
| 1st Mortgage | **7,095** | 7,173 | **372** | 342 | **1** | 1 |
| Home equity | **2,577** | 2,648 | **30** | 40 | **—** | — |
| Total consumer finance receivables and loans | $    **64,686** | $    63,536 | $    **668** | $    642 | $    **1** | $    1 |

(a)    Includes nonaccrual troubled debt restructured loans of $403 million and $373 million at March 31, 2013, and December 31, 2012, respectively.
(b)    There were no troubled debt restructured loans classified as 90 days past due and still accruing at March 31, 2013, and December 31, 2012.
(c)    Includes $1 million and $2 million of foreign consumer automobile loans at March 31, 2013, and December 31, 2012, respectively.

Total consumer outstanding finance receivables and loans increased $1.2 billion at March 31, 2013 compared with December 31, 2012. This increase was related to growth in our U.S. automobile consumer loan originations largely due to higher industry sales, which outpaced portfolio runoff. Additionally, we continued to prudently expand our nonprime and used originations as a percent of our total originations.

Total consumer nonperforming finance receivables and loans at March 31, 2013 increased $26 million to $668 million from December 31, 2012, reflecting an increase of $20 million of consumer mortgage nonperforming finance receivables and loans and an increase of $6 million of consumer automobile nonperforming finance receivables and loans. Nonperforming consumer mortgage finance receivables and loans increased primarily due to increased TDRs as we continue foreclosure prevention and loss mitigation procedures along with our participation in a variety of government-sponsored refinancing programs. Refer to Note 7 to the Condensed Consolidated Financial Statements for additional information. Nonperforming consumer finance receivables and loans as a percentage of total outstanding consumer finance receivables and loans remained flat at 1.0% at March 31, 2013 and December 31, 2012.

Consumer automotive loans accruing and past due 30 days or more decreased $215 million to $930 million at March 31, 2013, compared with December 31, 2012. The decrease is primarily related to seasonality.

93

Table of Contents

# Management's Discussion and Analysis

Ally Financial Inc. • Form 10-Q

The following table includes consumer net charge-offs from finance receivables and loans at historical cost and related ratios reported at carrying value before allowance for loan losses.

| ($ in millions) | Net charge-offs | | Net charge-off ratios (a) | |
|---|---|---|---|---|
| | **2013** | 2012 | **2013** | 2012 |
| Consumer automobile (b) | $ **93** | $ 74 | **0.7%** | 0.4% |
| Consumer mortgage | | | | |
| 1st Mortgage | **10** | 23 | **0.6** | 1.4 |
| Home equity | **11** | 20 | **1.6** | 2.6 |
| Total consumer finance receivables and loans | $ **114** | $ 117 | **0.7** | 0.6 |

(Three months ended March 31,)

(a)   Net charge-off ratios are calculated as net charge-offs divided by average outstanding finance receivables and loans excluding loans measured at fair value   and loans held-for-sale during the period for each loan category.

(b)   Includes no foreign consumer automobile net charge-offs for the  three months ended  March 31, 2013 and $20 million for the three months ended March 31, 2012.

Our net charge-offs from total consumer automobile finance receivables and loans were  $93 million for the three months ended March 31, 2013, compared to $74 million for the three months ended March 31, 2012. The $19 million increase was driven primarily by higher U.S. outstandings, change in our U.S. portfolio mix as we prudently expand our nonprime and used originations, and seasoning of the U.S. portfolio. This increase was partially offset by the inclusion of foreign net charge-offs in the three months ended March 31, 2012 prior to the reclassification of the foreign automotive business.

Our net charge-offs from total consumer mortgage receivables and loans were  $21 million for the three months ended March 31, 2013, compared to $43 million for the same period in 2012. The decrease was driven by the improved mix of remaining loans as lower quality legacy loans continued to runoff.

The following table summarizes the unpaid principal balance of total consumer loan originations for the periods shown. Total consumer loan originations include loans classified as finance receivables and loans and loans held-for-sale during the period.

| ($ in millions) | Three months ended March 31, | |
|---|---|---|
| | **2013** | 2012 |
| Consumer automobile (a) | $ **7,022** | $ 10,652 |
| Consumer mortgage | | |
| 1st Mortgage | **6,116** | 8,596 |
| Home equity | **—** | — |
| Total consumer loan originations | $ **13,138** | $ 19,248 |

(a)   Includes no foreign consumer automobile originations at  March 31, 2013 and $2.5 billion at March 31, 2012.

Total automobile-originated loans decreased $3.6 billion for the three months ended March 31, 2013, compared to the same period in 2012. The decrease was primarily due to the reclassification of our foreign automotive business to discontinued operations at the end of 2012 as well as lower new vehicle originations primarily as a result of more competition within the automotive finance market. Total mortgage-originated loans  decreased $2.5 billion for the three months ended  March 31, 2013. The decline in loan production was largely driven by our reduced presence in the correspondent lending and direct lending channels.

Consumer loan originations retained on-balance sheet as held-for-investment were $7.5 billion at  March 31, 2013, compared to $11.1 billion at March 31, 2012. The decrease was primarily due to the reclassification of our foreign automotive business to discontinued operations at the end of 2012 as well as lower new vehicle originations as a result of more competition within the automotive finance market.

94

Table of Contents

# Management's Discussion and Analysis

Ally Financial Inc. • Form 10-Q

The following table shows the percentage of total consumer finance receivables and loans recorded at historical cost reported at carrying value before allowance for loan losses by state and foreign concentration. Total automobile loans were $55.0 billion and $53.7 billion at March 31, 2013, and December 31, 2012, respectively. Total mortgage and home equity loans were $9.7 billion and $9.8 billion at March 31, 2013, and December 31, 2012, respectively.

| | March 31, 2013 (a) | | December 31, 2012 | |
|---|---|---|---|---|
| | Automobile | 1st Mortgage and home equity | Automobile | 1st Mortgage and home equity |
| Texas | 12.9% | 5.8% | 12.9% | 5.8% |
| California | 5.6 | 30.0 | 5.6 | 29.2 |
| Florida | 6.8 | 3.5 | 6.7 | 3.6 |
| Pennsylvania | 5.2 | 1.6 | 5.2 | 1.6 |
| Michigan | 4.8 | 3.9 | 5.0 | 4.1 |
| Illinois | 4.4 | 4.6 | 4.3 | 4.8 |
| New York | 4.5 | 2.0 | 4.6 | 2.0 |
| Ohio | 4.0 | 0.8 | 4.0 | 0.8 |
| Georgia | 3.8 | 2.0 | 3.7 | 1.9 |
| North Carolina | 3.3 | 2.0 | 3.3 | 2.0 |
| Other United States | 44.7 | 43.8 | 44.7 | 44.2 |
| Total consumer loans (b) | 100.0% | 100.0% | 100.0% | 100.0% |

(a)    Presentation is in descending order as a percentage of total consumer finance receivables and loans at March 31, 2013.

(b)    Includes $1 million and $2 million of foreign consumer finance receivables and loans as of March 31, 2013, and December 31, 2012, respectively. These remaining foreign balances are within Finland and the Czech Republic.

We monitor our consumer loan portfolio for concentration risk across the geographies in which we lend. The highest concentrations of loans in the United States are in Texas and California, which represented an aggregate of 21.1% and 21.0% of our total outstanding consumer finance receivables and loans at March 31, 2013, and December 31, 2012, respectively.

Concentrations in our Mortgage operations are closely monitored given the volatility of the housing markets. Our consumer mortgage loan concentrations in California, Florida, and Michigan receive particular attention as the real estate value depreciation in these states has been amongst the most severe.

### Repossessed and Foreclosed Assets

We classify an asset as repossessed or foreclosed (included in Other Assets on the Condensed Consolidated Balance Sheet ) when physical possession of the collateral is taken. We dispose of the acquired collateral in a timely fashion in accordance with regulatory requirements. For more information on repossessed and foreclosed assets, refer to Note 1 to the Consolidated Financial Statements included in our Annual Report on Form 10-K for the year ended December 31, 2012.

Repossessed assets in our Automotive Finance operations at March 31, 2013 remained flat at $62 million from December 31, 2012. Foreclosed mortgage assets at March 31, 2013, increased $1 million to $7 million from December 31, 2012.

### Higher-Risk Mortgage Loans

Since 2009, we primarily focused our origination efforts on prime conforming and government-insured residential mortgages in the United States. However, we continued to hold mortgage loans originated in prior years that have features that expose us to potentially higher credit risk including high original loan-to-value mortgage loans (prime or nonprime), payment-option adjustable-rate mortgage loans (prime nonconforming), interest-only mortgage loans (classified as prime conforming or nonconforming for production and prime nonconforming or nonprime for international production), and below-market rate (teaser) mortgages (prime or nonprime).

In circumstances when a loan has features such that it falls into multiple categories, it is classified to a category only once based on the following hierarchy: (1) high original loan-to-value (LTV) mortgage loans, (2) payment-option adjustable-rate mortgage loans, (3) interest-only mortgage loans, and (4) below-market rate (teaser) mortgages. Given the recent stress within the housing market, we believe this hierarchy provides the most relevant risk assessment of our nontraditional products.

Table of Contents

# Management's Discussion and Analysis

Ally Financial Inc. • Form 10-Q

The following table summarizes mortgage finance receivables and loans by higher-risk loan type. These finance receivables and loans are recorded at historical cost and reported at carrying value before allowance for loan losses.

| ($ in millions) | Outstanding | | Nonperforming | | Accruing past due 90 days or more | |
| --- | --- | --- | --- | --- | --- | --- |
| | March 31, 2013 | December 31, 2012 | March 31, 2013 | December 31, 2012 | March 31, 2013 | December 31, 2012 |
| Interest-only mortgage loans (a) | $ 1,853 | $ 2,063 | $ 111 | $ 125 | $ — | $ — |
| Below-market rate (teaser) mortgages | 185 | 192 | 4 | 3 | — | — |
| Total higher-risk mortgage loans | $ 2,038 | $ 2,255 | $ 115 | $ 128 | $ — | $ — |

(a)　The majority of the interest-only mortgage loans are expected to start principal amortization in 2015 or beyond.

High original LTV mortgage finance receivables and loans at March 31, 2013 remained flat at $1 million from December 31, 2012 and payment-option adjustable-rate mortgage finance receivables and loans at March 31, 2013 decreased $1 million to $2 million from December 31, 2012. There were no high original LTV mortgage loans or payment-option adjustable-rate mortgage loans classified as nonperforming or 90 days past due and still accruing at  March 31, 2013 and December 31, 2012.

The allowance for loan losses was $98 million, or 4.8%, of total higher-risk held-for-investment mortgage loans recorded at historical cost based on carrying value outstanding before allowance for loan losses at  March 31, 2013.

The following table includes our five largest state concentrations based on our higher-risk mortgage finance receivables and loans recorded at historical cost and reported at carrying value before allowance for loan losses.

| ($ in millions) | Interest-only mortgage loans | Below-market rate (teaser) mortgages | Total higher-risk mortgage loans |
| --- | --- | --- | --- |
| **March 31, 2013** | | | |
| California | $ 451 | $ 58 | $ 509 |
| Virginia | 204 | 8 | 212 |
| Maryland | 154 | 5 | 159 |
| Illinois | 94 | 6 | 100 |
| Florida | 79 | 9 | 88 |
| Other United States | 871 | 99 | 970 |
| Total higher-risk mortgage loans | $ 1,853 | $ 185 | $ 2,038 |
| **December 31, 2012** | | | |
| California | $ 500 | $ 60 | $ 560 |
| Virginia | 216 | 9 | 225 |
| Maryland | 166 | 5 | 171 |
| Illinois | 107 | 6 | 113 |
| Florida | 90 | 9 | 99 |
| Other United States | 984 | 103 | 1,087 |
| Total higher-risk mortgage loans | $ 2,063 | $ 192 | $ 2,255 |

## Commercial Credit Portfolio

During the three months ended March 31, 2013, the credit performance of the commercial portfolio remained strong as nonperforming finance receivables and loans and net charge-offs remained relatively stable. For information on our commercial credit risk practices and policies regarding delinquencies, nonperforming status, and charge-offs, refer to Note 1 to the Consolidated Financial Statements included in our Annual Report on Form 10-K for the year ended  December 31, 2012.

Table of Contents

# Management's Discussion and Analysis

Ally Financial Inc. • Form 10-Q

The following table includes total commercial finance receivables and loans reported at carrying value before allowance for loan losses.

| ($ in millions) | Outstanding | | Nonperforming (a) | | Accruing past due 90 days or more (b) | |
|---|---|---|---|---|---|---|
| | March 31, 2013 | December 31, 2012 | March 31, 2013 | December 31, 2012 | March 31, 2013 | December 31, 2012 |
| Commercial and industrial | | | | | | |
| Automobile | $ 29,255 | $ 30,270 | $ 168 | $ 146 | $ — | $ — |
| Mortgage | — | — | — | — | — | — |
| Other (c)(d) | 2,562 | 2,697 | 63 | 33 | — | — |
| Commercial real estate | | | | | | |
| Automobile | 2,620 | 2,552 | 39 | 37 | — | — |
| Mortgage | — | — | — | — | — | — |
| Total commercial finance receivables and loans | $ 34,437 | $ 35,519 | $ 270 | $ 216 | $ — | $ — |

(a)  Includes nonaccrual troubled debt restructured loans of $85 million and $29 million at  March 31, 2013, and  December 31, 2012, respectively.
(b)  There were no troubled debt restructured loans classified as 90 days past due and still accruing at  March 31, 2013 and December 31, 2012.
(c)  Includes foreign commercial and industrial other outstanding loans of $15 million and $18 million and no nonperforming loans at  March 31, 2013,  and December 31, 2012, respectively.
(d)  Other commercial primarily includes senior secured commercial lending.

Total commercial finance receivables and loans outstanding  decreased $1.1 billion to $34.4 billion at March 31, 2013, from December 31, 2012. The commercial and industrial outstandings decreased $1.1 billion primarily due to seasonality of dealer inventories and increased competition across the automotive lending market.

Total commercial nonperforming finance receivables and loans were  $270 million at March 31, 2013, an increase of $54 million compared to  December 31, 2012. The increase was primarily due to the reclassification of a small number of commercial loans to nonperforming status within the overall stable commercial portfolio. Total nonperforming commercial finance receivables and loans as a percentage of outstanding commercial finance receivables and loans increased to  0.8% as of March 31, 2013 from 0.6% as of December 31, 2012.

The following table includes total commercial net charge-offs from finance receivables and loans at historical cost and related ratios reported at carrying value before allowance for loan losses.

| ($ in millions) | Three months ended March 31, | | | |
|---|---|---|---|---|
| | Net charge-offs (recoveries) | | Net charge-off ratios (a) | |
| | 2013 | 2012 | 2013 | 2012 |
| Commercial and industrial | | | | |
| Automobile | $ — | $ — | — % | — % |
| Mortgage | — | — | — | — |
| Other (b) | (1) | (9) | (0.2) | (2.7) |
| Commercial real estate | | | | |
| Automobile | 1 | — | 0.1 | — |
| Mortgage (c) | — | (1) | — | (23.4) |
| Total commercial finance receivables and loans | $ — | $ (10) | — | (0.1) |

(a)  Net charge-off ratios are calculated as net charge-offs divided by average outstanding finance receivables and loans excluding loans measured at fair value and loans held-for-sale during the period for each loan category.
(b)  Includes no foreign net charge-offs for the three months ended March 31, 2013, and $4 million of foreign recoveries for the three months ended March 31, 2012.
(c)  Includes no foreign net charge-offs for the three months ended March 31, 2013, and $1 million of foreign recoveries for the three months ended March 31, 2012.

Our net charge-offs from commercial finance receivables and loans resulted in no net charge-offs for the  three months ended March 31, 2013, compared to recoveries of $10 million for the same period in 2012. The change in net charge-offs was largely driven by strong recoveries in certain wind-down portfolios in three months ended March 31, 2012 that did not repeat for the same period in 2013.

Table of Contents

# Management's Discussion and Analysis

Ally Financial Inc. • Form 10-Q

*Commercial Real Estate*

The commercial real estate portfolio consists of finance receivables and loans issued primarily to automotive dealers. Commercial real estate finance receivables and loans remained flat at $2.6 billion at March 31, 2013 and December 31, 2012.

The following table presents the percentage of total commercial real estate finance receivables and loans by geographic region and property type. These finance receivables and loans are reported at carrying value before allowance for loan losses.

| | March 31, 2013 | December 31, 2012 |
|---|---|---|
| Geographic region | | |
| Florida | 13.6% | 11.7% |
| Michigan | 12.5 | 12.6 |
| Texas | 12.5 | 13.0 |
| California | 9.2 | 9.3 |
| New York | 4.7 | 4.9 |
| North Carolina | 3.9 | 3.9 |
| Virginia | 3.8 | 3.9 |
| Pennsylvania | 3.4 | 3.3 |
| Georgia | 3.1 | 3.0 |
| Louisiana | 2.2 | 2.2 |
| Other United States | 31.1 | 32.2 |
| Total commercial real estate finance receivables and loans | 100.0% | 100.0% |
| Property type | | |
| Automotive dealers | 100.0% | 100.0% |
| Total commercial real estate finance receivables and loans | 100.0% | 100.0% |

*Commercial Criticized Exposure*

Finance receivables and loans classified as special mention, substandard, or doubtful are deemed criticized. These classifications are based on regulatory definitions and generally represent finance receivables and loans within our portfolio that have a higher default risk or have already defaulted. These finance receivables and loans require additional monitoring and review including specific actions to mitigate our potential economic loss.

The following table presents the percentage of total commercial criticized finance receivables and loans by industry concentrations. These finance receivables and loans are reported at carrying value before allowance for loan losses.

| | March 31, 2013 | December 31, 2012 |
|---|---|---|
| Industry | | |
| Automotive | 90.2% | 85.7% |
| Electronics | 3.7 | 1.2 |
| Services | 3.6 | 4.9 |
| Other | 2.5 | 8.2 |
| Total commercial criticized finance receivables and loans | 100.0% | 100.0% |

Total criticized exposures increased $50 million to $1.7 billion at March 31, 2013 from December 31, 2012.

Table of Contents

# Management's Discussion and Analysis

Ally Financial Inc. • Form 10-Q

## Allowance for Loan Losses

The following tables present an analysis of the activity in the allowance for loan losses on finance receivables and loans.

| Three months ended March 31, 2013 ($ in millions) | Consumer automobile | Consumer mortgage | Total consumer | Commercial | Total |
|---|---|---|---|---|---|
| Allowance at January 1, 2013 | $ 575 | $ 452 | $ 1,027 | $ 143 | $ 1,170 |
| Charge-offs | (142) | (24) | (166) | (1) | (167) |
| Recoveries | 49 | 3 | 52 | 1 | 53 |
| Net charge-offs | (93) | (21) | (114) | — | (114) |
| Provision for loan losses | 107 | 20 | 127 | 4 | 131 |
| Other | 10 | — | 10 | — | 10 |
| Allowance at March 31, 2013 | $ 599 | $ 451 | $ 1,050 | $ 147 | $ 1,197 |
| Allowance for loan losses to finance receivables and loans outstanding at March 31, 2013 (a) | 1.1% | 4.7% | 1.6% | 0.4% | 1.2% |
| Net charge-offs to average finance receivables and loans outstanding at March 31, 2013 (a) | 0.7% | 0.9% | 0.7% | —% | 0.5% |
| Allowance for loan losses to total nonperforming finance receivables and loans at March 31, 2013 (a) | 225.1% | 112.2% | 157.1% | 54.5% | 127.6% |
| Ratio of allowance for loan losses to net charge-offs at March 31, 2013 | 1.6 | 5.4 | 2.3 | — | 2.6 |

(a)   Coverage percentages are based on the allowance for loan losses related to finance receivables and loans excluding those loans held at fair value as a percentage of the unpaid principal balance, net of premiums and discounts.

The allowance for consumer loan losses at March 31, 2013, declined $283 million compared to March 31, 2012. The decline was primarily due to the reclassification of our foreign automotive business to discontinued operations at the end of 2012 and run-off of legacy mortgage assets.

The allowance for commercial loan losses declined $66 million at March 31, 2013, compared to March 31, 2012, primarily related to continued wind-down of non-core commercial assets which were partially offset by higher core commercial assets.

| Three months ended March 31, 2012 ($ in millions) | Consumer automobile | Consumer mortgage | Total consumer | Commercial | Total |
|---|---|---|---|---|---|
| Allowance at January 1, 2012 | $ 766 | $ 516 | $ 1,282 | $ 221 | $ 1,503 |
| Charge-offs (a) | (136) | (45) | (181) | (2) | (183) |
| Recoveries (b) | 62 | 2 | 64 | 12 | 76 |
| Net charge-offs | (74) | (43) | (117) | 10 | (107) |
| Provision for loan losses | 83 | 27 | 110 | (12) | 98 |
| Other (c) | 57 | 1 | 58 | (6) | 52 |
| Allowance at March 31, 2012 | $ 832 | $ 501 | $ 1,333 | $ 213 | $ 1,546 |
| Allowance for loan losses to finance receivables and loans outstanding at March 31, 2012 (d) | 1.2% | 5.0% | 1.7% | 0.5 % | 1.3% |
| Net charge-offs to average finance receivables and loans outstanding at March 31, 2012 (d) | 0.5% | 1.7% | 0.6% | (0.1)% | 0.4% |
| Allowance for loan losses to total nonperforming finance receivables and loans at March 31, 2012 (d) | 339.2% | 168.2% | 245.4% | 70.5 % | 182.9% |
| Ratio of allowance for loan losses to net charge-offs at March 31, 2012 | 2.8 | 2.9 | 2.9 | (5.4) | 3.6 |

(a)   Includes foreign consumer automobile charge-offs of $36 million.
(b)   Includes foreign consumer automobile and foreign commercial recoveries of $16 million and $5 million, respectively.
(c)   Includes provision for loan losses relating to discontinued operations of $42 million.
(d)   Coverage percentages are based on the allowance for loan losses related to finance receivables and loans excluding those loans held at fair value as a percentage of the unpaid principal balance, net of premiums and discounts.

Table of Contents

# Management's Discussion and Analysis

Ally Financial Inc. • Form 10-Q

## Allowance for Loan Losses by Type

The following table summarizes the allocation of the allowance for loan losses by product type.

| March 31, ($ in millions) | 2013 | | | 2012 | | |
|---|---|---|---|---|---|---|
| | Allowance for loan losses | Allowance as a % of loans outstanding | Allowance as a % of allowance for loan losses | Allowance for loan losses | Allowance as a % of loans outstanding | Allowance as a % of allowance for loan losses |
| **Consumer** | | | | | | |
| Consumer automobile (a) | $ **599** | **1.1%** | **50.0%** | $ 832 | 1.2% | 53.8% |
| Consumer mortgage | | | | | | |
| 1st Mortgage (b) | **254** | **3.6** | **21.2** | 265 | 3.8 | 17.1 |
| Home equity | **197** | **7.6** | **16.5** | 236 | 7.8 | 15.3 |
| Total consumer loans | **1,050** | **1.6** | **87.7** | 1,333 | 1.7 | 86.2 |
| **Commercial** | | | | | | |
| Commercial and industrial | | | | | | |
| Automobile (c) | **61** | **0.2** | **5.1** | 108 | 0.3 | 7.0 |
| Mortgage (d) | **—** | **—** | **—** | 12 | 0.9 | 0.8 |
| Other (e) | **48** | **1.9** | **4.0** | 50 | 4.0 | 3.2 |
| Commercial real estate | | | | | | |
| Automobile (f) | **38** | **1.5** | **3.2** | 38 | 1.5 | 2.5 |
| Mortgage (g) | **—** | **—** | **—** | 5 | 34.3 | 0.3 |
| Total commercial loans | **147** | **0.4** | **12.3** | 213 | 0.5 | 13.8 |
| Total allowance for loan losses | $ **1,197** | **1.2** | **100.0%** | $ 1,546 | 1.3 | 100.0% |

(a)  Includes no foreign consumer automobile allowance for loan losses and $204 million at  March 31, 2013 and March 31, 2012, respectively.
(b)  Includes no foreign consumer mortgage allowance for loan losses and $3 million at  March 31, 2013 and March 31, 2012, respectively.
(c)  Includes no foreign commercial and industrial automobile allowance for loan losses and $46 million at  March 31, 2013 and March 31, 2012, respectively.
(d)  Includes no foreign commercial and industrial mortgage allowance for loan losses and $11 million at  March 31, 2013 and March 31, 2012, respectively.
(e)  Includes no foreign commercial and industrial other allowance for loan losses and $1 million at  March 31, 2013 and March 31, 2012, respectively.
(f)  Includes no foreign commercial real estate automobile allowance for loan losses and $3 million at  March 31, 2013 and March 31, 2012, respectively.
(g)  Includes no foreign commercial real estate mortgage allowance for loan losses and $5 million at  March 31, 2013 and March 31, 2012, respectively.

Table of Contents

# Management's Discussion and Analysis

Ally Financial Inc. • Form 10-Q

## Provision for Loan Losses

The following table summarizes the provision for loan losses by product type.

| | Three months ended March 31, | |
|---|---|---|
| ($ in millions) | 2013 | 2012 |
| Consumer | | |
| Consumer automobile | $ 107 | $ 83 |
| Consumer mortgage | | |
| 1st Mortgage | 19 | 10 |
| Home equity | 1 | 17 |
| Total consumer loans | 127 | 110 |
| Commercial | | |
| Commercial and industrial | | |
| Automobile | 5 | — |
| Mortgage | — | — |
| Other | (1) | (7) |
| Commercial real estate | | |
| Automobile | — | (5) |
| Mortgage | — | — |
| Total commercial loans | 4 | (12) |
| Total provision for loan losses | $ 131 | $ 98 |

## Market Risk

Our automotive financing, mortgage, and insurance activities give rise to market risk representing the potential loss in the fair value of assets or liabilities and earnings caused by movements in market variables, such as interest rates, foreign-exchange rates, equity prices, market perceptions of credit risk, and other market fluctuations that affect the value of securities, assets held-for-sale, and operating leases. We are exposed to interest rate risk arising from changes in interest rates related to financing, investing, and cash management activities. More specifically, we have entered into contracts to provide financing, to retain mortgage servicing rights, and to retain various assets related to securitization activities all of which are exposed in varying degrees to changes in value due to movements in interest rates. Interest rate risk arises from the mismatch between assets and the related liabilities used for funding. We enter into various financial instruments, including derivatives, to maintain the desired level of exposure to the risk of interest rate and other fluctuations. Refer to Note 20 to the Condensed Consolidated Financial Statements for further information.

We are also exposed to foreign-currency risk arising from the possibility that fluctuations in foreign-exchange rates will affect future earnings or asset and liability values related to our global operations. We enter into hedges to mitigate foreign exchange risk.

We also have exposure to equity price risk, primarily in our Insurance operations, which invests in equity securities that are subject to price risk influenced by capital market movements. We enter into equity options to economically hedge our exposure to the equity markets.

Although the diversity of our activities from our complementary lines of business may partially mitigate market risk, we also actively manage this risk. We maintain risk management control systems to monitor interest rates, foreign-currency exchange rates, equity price risks, and any of their related hedge positions. Positions are monitored using a variety of analytical techniques including market value, sensitivity analysis, and value at risk models.

Refer to our Annual Report on Form 10-K for the year ended December 31, 2012, Item 7, Management's Discussion and Analysis of Financial Condition and Results of Operations, for further discussion on value at risk and sensitivity analysis. Since December 31, 2012, there have been no material changes in these market risks.

Table of Contents

# Management's Discussion and Analysis

Ally Financial Inc. • Form 10-Q

## Liquidity Management, Funding, and Regulatory Capital

### Overview

The purpose of liquidity management is to ensure our ability to meet changes in loan and lease demand, debt maturities, deposit withdrawals, and other cash commitments under both normal operating conditions as well as periods of economic or financial stress. Our primary objective is to maintain cost-effective, stable and diverse sources of funding capable of sustaining the organization throughout all market cycles. Sources of liquidity include both retail and brokered deposits and secured and unsecured market-based funding across various maturity, interest rate, and investor profiles. Further liquidity is available through a pool of unencumbered highly liquid securities, borrowing facilities, repurchase agreements, as well as funding programs supported by the Federal Reserve and the Federal Home Loan Bank of Pittsburgh (FHLB).

We define liquidity risk as the risk that an institution's financial condition or overall safety and soundness is adversely affected by an inability, or perceived inability, to meet its financial obligations, and to withstand unforeseen liquidity stress events. Liquidity risk can arise from a variety of institution specific or market-related events that could have a negative impact on cash flows available to the organization. Effective management of liquidity risk helps ensure an organization's preparedness to meet uncertain cash flow obligations caused by unanticipated events. The ability of financial institutions to manage liquidity needs and contingent funding exposures has proven essential to their solvency.

The Asset-Liability Committee (ALCO) is chaired by the Corporate Treasurer and is responsible for monitoring Ally's liquidity position, funding strategies and plans, contingency funding plans, and counterparty credit exposure arising from financial transactions. Corporate Treasury is responsible for managing the liquidity positions of Ally within prudent operating guidelines and targets approved by ALCO and the Risk and Compliance Committee of the Ally Financial Board of Directors. We manage liquidity risk at the business segment, legal entity, and consolidated levels. Each business segment, along with Ally Bank, prepares periodic forecasts depicting anticipated funding needs and sources of funds with oversight and monitoring by Corporate Treasury. Corporate Treasury manages liquidity under baseline economic projections as well as more severe economic stressed environments. Corporate Treasury, in turn, plans, and executes our funding strategies.

Ally uses multiple measures to frame the level of liquidity risk, manage the liquidity position, or identify related trends as early warning indicators. These measures include coverage ratios that measure the sufficiency of the liquidity portfolio and stability ratios that measure longer-term structural liquidity. In addition, we have established several internal management routines designed to review all aspects of liquidity and funding plans, evaluate the adequacy of liquidity buffers, review stress testing results, and assist senior management in the execution of its structured funding strategy and risk management accountabilities.

We maintain available liquidity in the form of cash, unencumbered highly liquid securities, and available credit facility capacity that, taken together, allows us to operate and to meet our contractual and contingent obligations in the event of market-wide disruptions and enterprise-specific events. We maintain available liquidity at various entities and consider regulatory restrictions and tax implications that may limit our ability to transfer funds across entities. At March 31, 2013, we maintained $19.5 billion of total available parent company liquidity and $10.4 billion of total available liquidity at Ally Bank. Parent company liquidity is defined as our consolidated operations less Ally Bank and the subsidiaries of Ally Insurance's holding company. To optimize cash and secured facility capacity between entities, the parent company lends cash to Ally Bank on occasion under an intercompany loan agreement. At March 31, 2013, $2.2 billion was outstanding under the intercompany loan agreement. Amounts outstanding are repayable to the parent company upon demand, subject to five days notice. As a result, this amount is included in the parent company available liquidity and excluded from the available liquidity at Ally Bank.

### Funding Strategy

Liquidity and ongoing profitability are largely dependent on our timely and cost-effective access to retail deposits and funding in different segments of the capital markets. Our funding strategy largely focuses on the development of diversified funding sources across a global investor base to meet all our liquidity needs throughout different market cycles, including periods of financial distress. These funding sources include unsecured debt capital markets, unsecured retail term notes, public and private asset-backed securitizations, committed and uncommitted credit facilities, brokered certificates of deposits, and retail deposits. We also supplement these sources with a modest amount of short-term borrowings, including Demand Notes, bank loans, and repurchase arrangements. The diversity of our funding sources enhances funding flexibility, limits dependence on any one source, and results in a more cost-effective funding strategy over the long term. We evaluate funding markets on an ongoing basis to achieve an appropriate balance of unsecured and secured funding sources and the maturity profiles of both. In addition, we further distinguish our funding strategy between Ally Bank funding and parent company or nonbank funding.

We diversify Ally Bank's overall funding in order to reduce reliance on any one source of funding and to achieve a well-balanced funding portfolio across a spectrum of risk, duration, and cost of funds characteristics. Over the past few years, we have been focused on diversifying our funding sources, in particular at Ally Bank by growing retail deposits, expanding public and private securitization programs, maintaining the maturity profile of our brokered deposit portfolio while not exceeding a $10.0 billion portfolio, establishing repurchase agreements, and continuing to access funds from the Federal Home Loan Banks.

Since 2009, we have been directing new bank-eligible assets in the United States to Ally Bank in order to reduce and minimize our nonbanking exposures and funding requirements and to utilize our growing consumer deposit-taking capabilities. This has allowed us to use bank funding for a wider array of our automotive finance assets and to provide a sustainable long-term funding channel for the business, while also improving the cost of funds for the enterprise.

102

Table of Contents

# Management's Discussion and Analysis

Ally Financial Inc. • Form 10-Q

## Ally Bank

Ally Bank raises deposits directly from customers through the direct banking channel via the internet and over the telephone. These deposits provide our Automotive Finance and Mortgage operations with a stable and low-cost funding source. At March 31, 2013, Ally Bank had $49.5 billion of total external deposits, including $38.8 billion of retail deposits.

At March 31, 2013, Ally Bank maintained cash liquidity of $3.1 billion and unencumbered highly liquid U.S. federal government and U.S. agency securities of $6.2 billion. In addition, at March 31, 2013, Ally Bank had unused capacity in committed secured funding facilities of $3.3 billion, including an equal allocation of shared unused capacity of $3.0 billion from a facility also available to the parent company. Our ability to access this unused capacity depends on having eligible assets to collateralize the incremental funding and, in some instances, the execution of interest rate hedges. To optimize use of cash and secured facility capacity between entities, Ally Financial lends cash to Ally Bank from time to time under an intercompany agreement. Amounts outstanding on this loan are repayable to Ally Financial at any time. Ally Bank has total available liquidity of $10.4 billion at March 31, 2013, which excludes the intercompany loan of $2.2 billion

Maximizing bank funding continues to be a key part of our long-term liquidity strategy. We have made significant progress in migrating assets to Ally Bank and growing our retail deposit base since becoming a bank holding company in December 2008. Retail deposit growth is key to further reducing our cost of funds and decreasing our reliance on the capital markets. We believe deposits provide a stable, low-cost source of funds that are less sensitive to interest rate changes, market volatility, or changes in our credit ratings when compared to other funding sources. We have continued to expand our deposit gathering efforts through our direct and indirect marketing channels. Current retail product offerings consist of a variety of products including certificates of deposits (CDs), savings accounts, money market accounts, IRA deposit products, as well as an interest checking product. In addition, we utilize brokered deposits, which are obtained through third-party intermediaries. In the first three months of 2013 the deposit base at Ally Bank grew $2.6 billion, ending the quarter at $49.5 billion from $46.9 billion at December 31, 2012. The growth in deposits has been primarily attributable to our retail deposit portfolio, particularly within our savings and money market checking accounts, and our CDs. Strong retention rates continue to materially contribute to our growth in retail deposits. In the first quarter of 2013 we retained 93% of maturing CD balances up for renewal in the same period. In addition to retail and brokered deposits, Ally Bank had access to funding through a variety of other sources including FHLB advances, public securitizations, private secured funding arrangements, and the Federal Reserve's Discount Window. At March 31, 2013, debt outstanding from the FHLB totaled $4.5 billion with no debt outstanding from the Federal Reserve. Also, as part of our liquidity and funding plans, Ally Bank utilizes certain securities as collateral to access funding from repurchase agreements with third parties. Repurchase agreements are generally short-term. At March 31, 2013, Ally Bank had $0.5 billion outstanding under repurchase agreements. Refer to Note 12 to the Condensed Consolidated Financial Statements for a summary of deposit funding by type.

The following table shows Ally Bank's number of accounts and deposit balances by type as of the end of each quarter since 2012.

| ($ in millions) | 1st Quarter 2013 | | 4th Quarter 2012 | | 3rd Quarter 2012 | | 2nd Quarter 2012 | | 1st Quarter 2012 |
|---|---|---|---|---|---|---|---|---|---|
| Number of retail accounts | **1,334,483** | | 1,219,791 | | 1,142,837 | | 1,082,753 | | 1,036,468 |
| Deposits | | | | | | | | | |
| Retail | $ | **38,770** | $ | 35,041 | $ | 32,139 | $ | 30,403 | $ | 29,323 |
| Brokered | | **9,877** | | 9,914 | | 9,882 | | 9,905 | | 9,884 |
| Other (a) | | **844** | | 1,977 | | 2,487 | | 2,411 | | 2,314 |
| Total deposits | $ | **49,491** | $ | 46,932 | $ | 44,508 | $ | 42,719 | $ | 41,521 |

(a)    Other deposits include mortgage escrow and other deposits (excluding intercompany deposits).

In addition to building a larger deposit base, we continue to remain active in the securitization markets to finance our Ally Bank automotive loan portfolios. During the first quarter of 2013, Ally Bank completed one term securitization transaction backed by dealer floorplan loans raising $1.0 billion. Securitization has proven to be a reliable and cost-effective funding source. Additionally, for retail automotive loans and lease notes, the term structure of the transaction locks in funding for a specified pool of loans and leases for the life of the underlying asset creating an effective tool for managing interest rate and liquidity risk. We manage the execution risk arising from secured funding by maintaining a diverse investor base and maintaining capacity in our committed secured facilities. At March 31, 2013, Ally Bank had exclusive access to $3.5 billion from committed credit facilities including a $2.5 billion syndicated facility that can fund automotive retail and dealer floorplan loans, as well as leases. In March 2013, this facility was renewed by a syndicate of nineteen lenders and extended until June 2014. Ally Bank also had access to a $4.1 billion committed facility that is shared with the parent company.

## Nonbank Funding

At March 31, 2013, the parent company maintained liquid cash in the amount of $3.5 billion and unencumbered highly liquid U.S. federal government and U.S. agency securities of $0.9 billion. In addition, at March 31, 2013, the parent company had available liquidity from unused capacity in committed credit facilities of $11.3 billion, including an equal allocation of shared unused capacity of $3.0 billion from a facility also available to Ally Bank. Parent company funding is defined as our consolidated operations less our Insurance operations and Ally Bank. Our ability to access unused capacity in secured facilities depends on the availability of eligible assets to collateralize the incremental funding and, in some instances, the funding also relies on the execution of interest rate hedges. Funding sources at the parent company generally consist of longer-term unsecured debt, unsecured retail term notes, committed credit facilities, asset-backed

Table of Contents

# Management's Discussion and Analysis

Ally Financial Inc. • Form 10-Q

securitizations, and a modest amount of short-term borrowings. To optimize use of cash and secured facility capacity between entities, Ally Financial lends cash to Ally Bank from time to time under an intercompany agreement. Amounts outstanding on this loan are repayable to Ally Financial at any time. The parent company has total available liquidity of $19.5 billion at March 31, 2013, which includes the intercompany loan of $2.2 billion. The total available liquidity amount at March 31, 2013 also includes $1.6 billion of availability that is sourced from certain committed funding arrangements generally reliant upon the origination of future automotive receivables over the next nine months.

We will access the unsecured debt capital markets on an opportunistic basis to help pre-fund upcoming debt maturities. In addition, we have short-term and long-term unsecured debt outstanding from a legacy retail term note program known as SmartNotes. This program generally consisted of fixed-rate instruments with fixed-maturity dates ranging from 9 months to 30 years that were issued through a network of participating broker-dealers. During 2012, we launched a new retail term note program known as Ally Term Notes. There were $7.6 billion and $7.9 billion of combined retail term notes outstanding at March 31, 2013, and December 31, 2012, respectively.

We also obtain unsecured funding from the sale of floating-rate demand notes under our Demand Notes program. The holder has the option to require us to redeem these notes at any time without restriction. Demand Notes outstanding were $3.2 billion at March 31, 2013, compared to $3.1 billion at December 31, 2012. Refer to Note 13 and Note 14 to the Condensed Consolidated Financial Statements for additional information about our outstanding short-term borrowings and long-term unsecured debt, respectively.

Secured funding continues to be a significant source of financing at the parent company. In January 2013 Ally Financial completed a non-prime retail public securitization using the Capital Auto Receivables Asset Trust (CARAT) platform, our first since 2008, raising more than $1.5 billion. We continue to maintain significant funding capacity at the parent company to fund automotive-related assets, including a $8.5 billion syndicated facility that can fund automotive retail and dealer floorplan loans, as well as leases. In March 2013, this facility was renewed by a syndicate of nineteen lenders and extended until March 2015. At March 31, 2013, the parent company had $15.6 billion of exclusive commitments in the U.S. in various facilities secured by automotive and commercial finance assets. The parent company also had access to a $4.1 billion committed facility that is shared with Ally Bank.

## Recent Funding Developments

During the first three months of 2013, we completed U.S. funding transactions totaling almost $2.6 billion and renewed key existing funding facilities as we realized access to both the public and private markets. Key funding highlights from 2013 to date were as follows:

- In March 2013, $11.0 billion in credit facilities were renewed at both the parent company and Ally Bank with a syndicate of nineteen lenders. The $11.0 billion capacity is secured by retail, lease and dealer floorplan automotive assets and is allocated to two separate facilities, one is a $8.5 billion facility maturing in March 2015, which is available to the parent company while the other is a $2.5 billion facility available to Ally Bank maturing in June 2014.

- In January 2013, Ally Financial issued a non-prime retail public securitization, the first since 2008 using its existing CARAT platform. This transaction raised more than $1.5 billion.

- In February 2013, Ally Bank issued a public dealer floorplan securitization. This transaction raised $1.0 billion.

- In April 2013, Ally Bank issued a public retail securitization. This transaction raised over $900 million.

- In April 2013, Ally Bank issued a public dealer floorplan securitization. This transaction raised approximately $550 million.

Table of Contents

# Management's Discussion and Analysis

Ally Financial Inc. • Form 10-Q

## Funding Sources

The following table summarizes debt and other sources of funding and the amount outstanding under each category for the periods shown.

As a result of our funding strategy to maximize funding sources at Ally Bank and grow our retail deposit base, the percentage of funding sources from Ally Bank has increased in 2013 from 2012 levels. In addition, deposits represent a larger portion of the overall funding mix.

| ($ in millions) | Bank | Nonbank | Total | % |
|---|---|---|---|---|
| **March 31, 2013** | | | | |
| Secured financings | $ 25,864 | $ 12,926 | $ 38,790 | 31 |
| Institutional term debt | — | 22,212 | 22,212 | 18 |
| Retail debt programs (a) | — | 13,274 | 13,274 | 11 |
| Bank loans and other | 2 | 5 | 7 | — |
| Total debt (b) | 25,866 | 48,417 | 74,283 | 60 |
| Deposits (c) | 49,491 | 835 | 50,326 | 40 |
| Total on-balance sheet funding | $ 75,357 | $ 49,252 | $ 124,609 | 100 |
| **December 31, 2012** | | | | |
| Secured financings | $ 29,161 | $ 15,950 | $ 45,111 | 35 |
| Institutional term debt | — | 22,200 | 22,200 | 17 |
| Retail debt programs (a) | — | 13,451 | 13,451 | 10 |
| Bank loans and other | 2 | 164 | 166 | — |
| Total debt (b) | 29,163 | 51,765 | 80,928 | 62 |
| Deposits (c) | 46,932 | 983 | 47,915 | 38 |
| Total on-balance sheet funding | $ 76,095 | $ 52,748 | $ 128,843 | 100 |

(a)    Primarily includes $7.6 billion and $7.9 billion of Retail Term Notes at March 31, 2013 and December 31, 2012, respectively.
(b)    Excludes fair value adjustment as described in Note 22 to the Condensed Consolidated Financial Statements.
(c)    Bank deposits include retail, brokered, mortgage escrow, and other deposits. Nonbank deposits include dealer deposits. Intercompany deposits are not included.

Refer to Note 14 to the Condensed Consolidated Financial Statements for a summary of the scheduled maturity of long-term debt at March 31, 2013.

## Funding Facilities

We utilize both committed and uncommitted credit facilities. The financial institutions providing the uncommitted facilities are not contractually obligated to advance funds under them. The amounts outstanding under our various funding facilities are included on our Condensed Consolidated Balance Sheet.

The total capacity in our committed funding facilities is provided by banks and other financial institutions through private transactions. The committed secured funding facilities can be revolving in nature and allow for additional funding during the commitment period, or they can be amortizing and not allow for any further funding after the closing date. At March 31, 2013, $26.1 billion of our $33.4 billion of committed capacity was revolving. Our revolving facilities generally have an original tenor ranging from 364 days to two years. As of March 31, 2013, we had $16.9 billion of committed funding capacity from revolving facilities with a remaining tenor greater than 364 days.

Table of Contents

# Management's Discussion and Analysis

Ally Financial Inc. • Form 10-Q

## Committed Funding Facilities

| ($ in billions) | Outstanding March 31, 2013 | Outstanding December 31, 2012 | Unused Capacity (a) March 31, 2013 | Unused Capacity (a) December 31, 2012 | Total Capacity March 31, 2013 | Total Capacity December 31, 2012 |
|---|---|---|---|---|---|---|
| Bank funding | | | | | | |
| Secured | $ 1.7 | $ 3.8 | $ 1.8 | $ 4.7 | $ 3.5 | $ 8.5 |
| Nonbank funding | | | | | | |
| Unsecured (b) | 0.1 | 0.1 | — | — | 0.1 | 0.1 |
| Secured (c) (d) (e) | 13.9 | 22.5 | 11.8 | 7.8 | 25.7 | 30.3 |
| Total nonbank funding | 14.0 | 22.6 | 11.8 | 7.8 | 25.8 | 30.4 |
| Shared capacity (f) (g) | 1.1 | 1.1 | 3.0 | 3.0 | 4.1 | 4.1 |
| Total committed facilities | $ 16.8 | $ 27.5 | $ 16.6 | $ 15.5 | $ 33.4 | $ 43.0 |

(a) Funding from committed secured facilities is available on request in the event excess collateral resides in certain facilities or is available to the extent incremental collateral is available and contributed to the facilities.
(b) Total unsecured nonbank funding capacity represents committed funding for our discontinued international automobile financing business.
(c) Total secured nonbank funding capacity includes committed funding for our discontinued international automobile financing business of $6.9 billion and $12.0 billion as of March 31, 2013 and December 31, 2012, respectively, with outstanding debt of $5.1 billion and $9.6 billion, respectively.
(d) Total unused capacity includes $2.1 billion and $2.2 billion as of March 31, 2013 and December 31, 2012, respectively, from certain committed funding arrangements that are generally reliant upon the origination of future automotive receivables and that are available in 2013.
(e) Includes the secured facilities of our Commercial Finance Group.
(f) Funding is generally available for assets originated by Ally Bank or the parent company, Ally Financial Inc.
(g) Total shared bank facilities includes committed funding for our discontinued international automobile financing business of $0.1 billion and $0.1 billion as of March 31, 2013 and December 31, 2012, respectively with outstanding debt of $0.1 billion and $0.1 billion, respectively.

## Uncommitted Funding Facilities

| ($ in billions) | Outstanding March 31, 2013 | Outstanding December 31, 2012 | Unused Capacity (a) March 31, 2013 | Unused Capacity (a) December 31, 2012 | Total Capacity March 31, 2013 | Total Capacity December 31, 2012 |
|---|---|---|---|---|---|---|
| Bank funding | | | | | | |
| Secured | | | | | | |
| Federal Reserve funding programs | $ — | $ — | $ 1.8 | $ 1.8 | $ 1.8 | $ 1.8 |
| FHLB advances | 4.5 | 4.8 | 0.8 | 0.4 | 5.3 | 5.2 |
| Repurchase agreements | 0.5 | — | — | — | 0.5 | — |
| Total bank funding | 5.0 | 4.8 | 2.6 | 2.2 | 7.6 | 7.0 |
| Nonbank funding | | | | | | |
| Unsecured | 2.2 | 2.1 | 0.4 | 0.4 | 2.6 | 2.5 |
| Secured | — | 0.1 | 0.1 | 0.1 | 0.1 | 0.2 |
| Total nonbank funding (a) | 2.2 | 2.2 | 0.5 | 0.5 | 2.7 | 2.7 |
| Total uncommitted facilities | $ 7.2 | $ 7.0 | $ 3.1 | $ 2.7 | $ 10.3 | $ 9.7 |

(a) Total nonbank funding capacity represents uncommitted funding for our discontinued international automobile financing business.

### Ally Bank Funding Facilities
*Facilities for Automotive Finance Operations — Secured*

At March 31, 2013, Ally Bank had exclusive access to $3.5 billion from committed credit facilities. Ally Bank's largest facility is a $2.5 billion revolving syndicated credit facility secured by automotive receivables. In March 2013, we reduced and renewed this facility until June 2014. At March 31, 2013, the amount outstanding under this facility was $1.7 billion. Ally Bank also had access to a $4.1 billion committed facility that is shared with the parent company. In the event these facilities are not renewed in the future, the outstanding debt will be repaid over time as the underlying collateral amortizes.

### Nonbank Funding Facilities
*Facilities for Automotive Finance Operations — Secured*

The parent company's largest facility is a $8.5 billion revolving syndicated credit facility secured by automotive receivables. In March 2013, we increased and renewed this facility until March 2015. In the event this facility is not renewed at maturity, the outstanding debt will be repaid over time as the underlying collateral amortizes. At March 31, 2013, there was $3.8 billion outstanding under this facility.

106

Table of Contents

# Management's Discussion and Analysis

Ally Financial Inc. • Form 10-Q

In addition to our syndicated revolving credit facility, we also maintain various bilateral and multilateral secured credit facilities that fund our Automotive Finance operations. These are primarily private securitization facilities that fund a specific pool of automotive assets. Many of the facilities have revolving commitments and allow for the funding of additional assets during the commitment period. At March 31, 2013, the parent company maintained exclusive access to $18.8 billion of committed secured credit facilities and forward purchase commitments to fund automotive assets, and also had access to a $4.1 billion committed facility that is shared with Ally Bank.

## Cash Flows

Net cash provided by operating activities was $2.3 billion for the three months ended March 31, 2013, compared to $2.1 billion for the same period in 2012. During the three months ended March 31, 2013, the net cash inflow from sales and repayment of mortgage and automotive loans held-for-sale exceeded cash outflow from new originations and purchases of such loans by $1.7 billion. During the three months ended March 31, 2012, this activity resulted in a net cash inflow of $1.5 billion.

Net cash provided by investing activities was $0.7 billion for the three months ended March 31, 2013, compared to a net cash outflow from investing activities of $4.1 billion for the same period in 2012. The increase in net cash provided from investing activities was primarily attributable to $2.8 billion of net cash proceeds resulting from the sale of international businesses in the first quarter of 2013 and a $4.4 billion decrease in net cash outflow from finance receivables and loans for the three months ended March 31, 2013, compared to 2012. Cash used to purchase available-for-sale securities, net of proceeds from sales, maturities, and repayments, increased $2.5 billion during the three months ended March 31, 2013, compared to 2012. The cash outflow to purchase operating lease assets exceeded cash inflows from disposals of such assets by $1.7 billion for the three months ended March 31, 2013, compared to a net cash outflow of $1.0 billion for the three months ended March 31, 2012. The increase in net cash outflows associated with leasing activities compared to the prior year was primarily due to an increase in cash used to acquire leased assets.

Net cash used in financing activities for the three months ended March 31, 2013, totaled $4.5 billion, compared to net cash provided by financing of $2.1 billion in the same period in 2012. Cash used to repay long-term debt exceeded cash generated from long-term debt issuances by $7.2 billion for the three months ended March 31, 2013. In three months ended March 31, 2012, cash from issuances of long-term debt exceed repayments by $0.7 billion. Cash provided by short-term debt increased $1.1 billion in the three months ended March 31, 2013, compared to 2012, while cash provided by deposits increased by $0.2 billion.

## Capital Planning and Stress Tests

As a bank holding company with $50 billion or more of consolidated assets, Ally is required to conduct periodic stress tests and submit a proposed capital action plan to the FRB every January, which the FRB must take action on by the following March. The proposed capital action plan must include a description of all planned capital actions over a nine-quarter planning horizon, including any issuance of a debt or equity capital instrument, any capital distribution, and any similar action that the FRB determines could have an impact on Ally's consolidated capital. The proposed capital action plan must also include a discussion of how Ally will maintain capital above the minimum regulatory capital ratios and above a Tier 1 common equity-to-total risk-weighted assets ratio of 5 percent, and serve as a source of strength to Ally Bank. The FRB must approve Ally's proposed capital action plan before Ally may take any proposed capital action covered by the new regime.

Ally submitted the required 2013 capital plan in January 2013. In March 2013, the FRB objected to our capital plan both on quantitative and qualitative grounds. In their published results, the FRB estimated our stressed tier 1 common ratio with adjusted planned capital actions to be 1.52 for the nine-quarter planning period. Also, the FRB estimated our stressed tier 1 capital ratio to be 11.02 and our tier 1 leverage ratio to be 9.42. The FRB noted that the post-stress capital ratios assumed that Ally remains subject to contingent liabilities associated with ResCap. In connection with its reviews, the FRB continues to provide their approval for dividend and interest payments on preferred equity and debt instruments included in regulatory capital, including preferred stock, trust preferred securities, and subordinated debt that were outstanding as of December 31, 2012. We continue to have active, frequent and constructive dialogue with the FRB related to our capital plan.

## Regulatory Capital

Refer to Note 19 to the Condensed Consolidated Financial Statements .

## Credit Ratings

The cost and availability of unsecured financing are influenced by credit ratings, which are intended to be an indicator of the creditworthiness of a particular company, security, or obligation. Lower ratings result in higher borrowing costs and reduced access to capital markets. This is particularly true for certain institutional investors whose investment guidelines require investment-grade ratings on term debt and the two highest rating categories for short-term debt (particularly money market investors).

Table of Contents

# Management's Discussion and Analysis

Ally Financial Inc. • Form 10-Q

Nationally recognized statistical rating organizations rate substantially all our debt. The following table summarizes our current ratings and outlook by the respective nationally recognized rating agencies.

| Rating agency | Short-term | Senior debt | Outlook | Date of last action |
|---|---|---|---|---|
| Fitch | B | BB- | Rating Watch Negative | April 18, 2012 (a) |
| Moody's | Not-Prime | B1 | Positive | February 25, 2013 (b) |
| S&P | C | B+ | Positive | May 17, 2012 (c) |
| DBRS | R-4 | BB-Low | Review - Developing | May 15, 2012 (d) |

(a) Fitch placed our senior debt on Rating Watch Negative and affirmed the short-term rating of B on April 18, 2012.
(b) Moody's confirmed our senior debt rating of B1 and changed the outlook to Positive on February 25, 2013.
(c) Standard & Poor's affirmed our senior debt rating of B+ and the short-term rating of C, and changed the outlook to Positive on May 17, 2012.
(d) DBRS placed our ratings Under Review - Developing on May 15, 2012.

## Off-balance Sheet Arrangements

Refer to Note 9 to the Condensed Consolidated Financial Statements.

## Purchase Obligations

Certain of the structures related to whole-loan sales, securitization transactions, and other off-balance sheet activities contain provisions that are standard in the whole-loan and securitization markets where we may (or, in certain limited circumstances, are obligated to) purchase specific assets from entities. Our obligations are as follows.

### Loan Repurchases and Obligations Related to Loan Sales

#### ResCap Bankruptcy Filing

As described in Note 1 and Note 26 to the Condensed Consolidated Financial Statements, on May 14, 2012, Residential Capital, LLC and certain of its wholly owned direct and indirect subsidiaries filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York. As a result of the deconsolidation of ResCap, a significant portion of our representation and warranty reserve was eliminated. Our representation and warranty reserve was $170 million at March 31, 2013 with respect to Ally Bank's sold and serviced loans. Further, on April 16, 2013, we completed the sale of a portfolio of agency MSRs to Ocwen Financial Corporation and the sale included the transfer of the representation and warranty liabilities associated with the majority of the loans sold. Refer to  Note 27 to the Condensed Consolidated Financial Statements  for further information related to the MSRs sale.

#### Overview

Ally Bank, within our Mortgage operations, sells loans that take the form of securitizations guaranteed by Fannie Mae and Freddie Mac. In connection with securitizations and loan sales, the trustee, for the benefit of the related security holders, is provided various representations and warranties related to the loans sold. The specific representations and warranties typically relate to, among other things, the ownership of the loan, the validity of the lien securing the loan, the loan's compliance with the criteria for inclusion in the transaction, including compliance with underwriting standards or loan criteria established by the buyer, the ability to deliver required documentation and compliance with applicable laws. In general, the representations and warranties described above may be enforced against Ally Bank at any time unless a sunset provision is in place. Upon discovery of a breach of a representation or warranty, the breach is corrected in a manner conforming to the provisions of the sale agreement. This may require Ally Bank to repurchase the loan, indemnify the investor for incurred losses, or otherwise make the investor whole. See  Repurchase Process  below.

#### Originations

Representation and warranty risk-mitigation strategies include, but are not limited to, pursuing settlements with investors where economically beneficial in order to resolve a pipeline of demands in lieu of loan-by-loan assessments that could result in repurchasing loans, aggressively contesting claims we do not consider valid (rescinding claims), or seeking recourse against correspondent lenders from whom we purchased loans wherever appropriate.

The following table summarizes domestic mortgage loans sold by ResCap where Ally Bank maintained the mortgage servicing rights; and following the deconsolidation of ResCap, the loans that were sold by Ally Bank. The following table presents domestic mortgage loans sold categorized by GSE (original unpaid principal balance).

| ($ in billions) | Three months ended March 31, 2013 | Year ended December 31, | | | | | |
| | | 2012 | 2011 | 2010 | 2009 | 2008 | 2007 |
|---|---|---|---|---|---|---|---|
| Fannie Mae | $ 5.4 | $ 21.5 | $ 33.8 | $ 35.2 | $ 21.1 | $ 17.7 | $ 6.7 |
| Freddie Mac | 1.8 | 6.9 | 15.8 | 15.7 | 8.5 | 8.6 | 2.3 |
| Total sales (a) | $ 7.2 | $ 28.4 | $ 49.6 | $ 50.9 | $ 29.6 | $ 26.3 | $ 9.0 |

(a) Representation and warranty obligations vary by loan and may not apply to all loans sold by Ally Bank.

Table of Contents

# Management's Discussion and Analysis

Ally Financial Inc. • Form 10-Q

### *Representation and Warranty Obligation Reserve Methodology*

The liability for representation and warranty obligations reflects management's best estimate of probable losses with respect to Ally Bank's mortgage loans sold to Freddie Mac and Fannie Mae. We considered historical and recent demand trends in establishing the reserve. The methodology used to estimate the reserve considers a variety of assumptions including borrower performance (both actual and estimated future defaults), repurchase demand behavior, historical loan defect experience, historical mortgage insurance rescission experience, and historical and estimated future loss experience, which includes projections of future home price changes as well as other qualitative factors including investor behavior. It is difficult to predict and estimate the level and timing of any potential future demands. In cases where we may not be able to reasonably estimate losses, a liability is not recognized. Management monitors the adequacy of the overall reserve and makes adjustments to the level of reserve, as necessary, after consideration of other qualitative factors including ongoing dialogue and experience with counterparties.  At the time a loan is sold, an estimate of the fair value of the liability is recorded and classified in accrued expenses and other liabilities on our  Condensed Consolidated Balance Sheet  and recorded as a component of gain (loss) on mortgage and automotive loans, net, in our Condensed Consolidated Statement of Comprehensive Income .  We recognize changes in the liability when additional relevant information becomes available. Changes in the estimate are recorded as other operating expenses in our  Condensed Consolidated Statement of Comprehensive Income .

On April 16, 2013, we completed the sales of agency MSRs to Ocwen Financial Corporation and Quicken Loans, Inc. The sale to Ocwen Financial Corporation included the transfer of the representation and warranty liabilities associated with the majority of the MSRs sold at a specified price. The repurchase reserve at  March 31, 2013 also reflects losses associated with this contractual obligation. Pursuant to that obligation, we recognized additional provision expense in the period to reflect the terms of the sale of the MSRs asset. Refer to Note 27 to the Condensed Consolidated Financial Statements  for further information related to the MSRs sale.  Ally Bank experienced a decrease in new claims for the three months ended March 31, 2013 compared to the same period in 2012. The decrease in repurchase claims was driven by significantly fewer new claims during the first quarter of 2013. The following table presents Ally Bank's new claims by GSEs (original unpaid principal balance).

| Three months ended March 31, (*$ in millions*) | | **2013** | | 2012 |
|---|---|---|---|---|
| Fannie Mae | $ | **54** | $ | 45 |
| Freddie Mac | | **16** | | 42 |
| Total claims | $ | **70** | $ | 87 |

The following table presents the total number and original unpaid principal balance (UPB) of loans related to unresolved representation and warranty demands (indemnification claims or repurchase demands). The table includes demands that we have requested be rescinded but have not been agreed to by the investor. Total unresolved representation and warranty demands where Ally Bank has requested the investor to rescind decreased to $4 million or 9% of outstanding claims at  March 31, 2013, compared to $23 million or 40% of outstanding claims at  December 31, 2012.

| (*$ in millions*) | **March 31, 2013** | | December 31, 2012 | |
|---|---|---|---|---|
| | **Number of Loans** | **Original UPB of Loans** | Number of Loans | Original UPB of Loans |
| Fannie Mae | **148** | **$    37** | 187 | $    41 |
| Freddie Mac | **47** | **10** | 72 | 17 |
| Total number of loans and unpaid principal balance | **195** | **$    47** | 259 | $    58 |

### *Repurchase Process*

After receiving a claim under representation and warranty obligations, Ally Bank will review the claim to determine the appropriate response (e.g., appeal and provide or request additional information) and take appropriate action (rescind, repurchase the loan, or remit indemnification payment). Historically, repurchase demands were generally related to loans that became delinquent within the first few years following origination. As a result of market developments over the past several years, investor repurchase demand behavior has changed significantly. GSEs are more likely to submit claims for loans at any point in the loan's life cycle, including requests for loans that become delinquent or loans that incur a loss. Representation and warranty claims are generally reviewed on a loan-by-loan basis to validate if there has been a breach requiring a potential repurchase or indemnification payment. Ally Bank actively contests claims to the extent they are not considered valid. Ally Bank is not required to repurchase a loan or provide an indemnification payment where claims are not valid.

The risk of repurchase or indemnification and the associated credit exposure is managed through underwriting and quality assurance practices and by servicing mortgage loans to meet investor standards. Ally Bank believes that, in general, the longer a loan performs prior to default, the less likely it is that an alleged breach of representation and warranty will be found to have a material and adverse impact on the loan's performance. When loans are repurchased, Ally Bank bears the related credit loss on the loans. Repurchased loans are classified as held-for-sale and initially recorded at fair value.

Table of Contents

# Management's Discussion and Analysis

Ally Financial Inc. • Form 10-Q

The following table presents Ally Bank's new claims by vintage (original unpaid principal balance).

| | Three months ended March 31, | |
|---|---|---|
| ($ in millions) | **2013** | 2012 |
| Pre 2008 | $ **12** | $ 15 |
| 2008 | **38** | 38 |
| Post 2008 | **20** | 34 |
| Total claims | $ **70** | $ 87 |

## Critical Accounting Estimates

We identified critical accounting estimates that, as a result of judgments, uncertainties, uniqueness, and complexities of the underlying accounting standards and operations involved could result in material changes to our financial condition, results of operations, or cash flows under different conditions or using different assumptions.

Our most critical accounting estimates are as follows.

- Fair value measurements

- Allowance for loan losses

- Valuation of automobile lease assets and residuals

- Valuation of mortgage servicing rights

- Goodwill

- Legal and regulatory reserves

- Loan repurchase and obligations related to loan sales

- Determination of provision for income taxes

As part of our quarterly assessment of critical accounting estimates, we concluded that in accordance with Accounting Standards Codification 740, *Income Taxes*, there was a change in the methodologies and processes used in developing the provision for income taxes from what was described in our 2012 Annual Report on Form 10-K. Refer to Note 1 to the Condensed Consolidated Financial Statements for further discussion regarding the methodology and process used in the determination of provision for income taxes. There have been no other significant changes in the methodologies and processes used in developing these estimates from what was described in our 2012 Annual Report on Form 10-K.

### Fair Value of Financial Instruments

We use fair value measurements to record fair value adjustments to certain instruments and to determine fair value disclosures. Refer to Note 22 to the Condensed Consolidated Financial Statements for description of valuation methodologies used to measure material assets and liabilities at fair value and details of the valuation models, key inputs to those models, and significant assumptions utilized. We follow the fair value hierarchy set forth in Note 22 to the Condensed Consolidated Financial Statements in order to prioritize the inputs utilized to measure fair value. We review and modify, as necessary, our fair value hierarchy classifications on a quarterly basis. As such, there may be reclassifications between hierarchy levels.

110

Table of Contents

# Management's Discussion and Analysis

Ally Financial Inc. • Form 10-Q

The following table summarizes assets and liabilities measured at fair value and the amounts measured using Level 3 inputs. The table includes recurring and nonrecurring measurements.

| ($ in millions) | March 31, 2013 | December 31, 2012 |
|---|---|---|
| Assets at fair value | $ 18,676 | $ 20,408 |
| As a percentage of total assets | 11% | 11% |
| Liabilities at fair value | $ 406 | $ 2,468 |
| As a percentage of total liabilities | n/m | 2% |
| Assets at fair value using Level 3 inputs | $ 1,252 | $ 1,288 |
| As a percentage of assets at fair value | 7% | 6% |
| Liabilities at fair value using Level 3 inputs | $ — | $ 3 |
| As a percentage of liabilities at fair value | n/m | n/m |

n/m = not meaningful

We have numerous internal controls in place to ensure the appropriateness of fair value measurements. Significant fair value measures are subject to detailed analytics and management review and approval. We have an established model validation policy and program in place that covers all models used to generate fair value measurements. This model validation program ensures a controlled environment is used for the development, implementation, and use of the models and change procedures. Further, this program uses a risk-based approach to select models to be reviewed and validated by an independent internal risk group to ensure the models are consistent with their intended use, the logic within the models is reliable, and the inputs and outputs from these models are appropriate. Additionally, a wide array of operational controls are in place to ensure the fair value measurements are reasonable, including controls over the inputs into and the outputs from the fair value measurement models. For example, we backtest the internal assumptions used within models against actual performance. We also monitor the market for recent trades, market surveys, or other market information that may be used to benchmark model inputs or outputs. Certain valuations will also be benchmarked to market indices when appropriate and available. We have scheduled model and/or input recalibrations that occur on a periodic basis but will recalibrate earlier if significant variances are observed as part of the backtesting or benchmarking noted above.

Considerable judgment is used in forming conclusions from market observable data used to estimate our Level 2 fair value measurements and in estimating inputs to our internal valuation models used to estimate our Level 3 fair value measurements. Level 3 inputs such as interest rate movements, prepayment speeds, credit losses, and discount rates are inherently difficult to estimate. Changes to these inputs can have a significant effect on fair value measurements. Accordingly, our estimates of fair value are not necessarily indicative of the amounts that could be realized or would be paid in a current market exchange.

Table of Contents

# Management's Discussion and Analysis

Ally Financial Inc. • Form 10-Q

## Statistical Table

The accompanying supplemental information should be read in conjunction with the more detailed information, including our  Condensed Consolidated Financial Statements and the notes thereto, which appears elsewhere in this Quarterly Report.

## Net Interest Margin Table

The following table presents an analysis of net interest margin excluding discontinued operations for the periods shown.

| Three months ended March 31, ($ in millions) | 2013 Average balance (b) | 2013 Interest income/ interest expense | 2013 Yield/ rate | 2012 Average balance (b) | 2012 Interest income/ interest expense | 2012 Yield/ rate | Increase (decrease) due to (a) Volume | Increase (decrease) due to (a) Yield/rate | Increase (decrease) due to (a) Total |
|---|---|---|---|---|---|---|---|---|---|
| **Assets** | | | | | | | | | |
| Interest-bearing cash and cash equivalents | $ 6,565 | $ 3 | 0.19% | $ 8,724 | $ 2 | 0.09% | $ (1) | $ 2 | $ 1 |
| Trading assets | — | — | — | 958 | 9 | 3.78 | (9) | — | (9) |
| Investment securities (c) | 13,921 | 63 | 1.84 | 12,633 | 69 | 2.20 | 8 | (14) | (6) |
| Loans held-for-sale, net | 2,027 | 16 | 3.20 | 3,463 | 31 | 3.60 | (12) | (3) | (15) |
| Finance receivables and loans, net (d) (e) | 98,595 | 1,135 | 4.67 | 90,445 | 1,093 | 4.86 | 95 | (53) | 42 |
| Investment in operating leases, net (f) | 14,205 | 299 | 8.54 | 9,345 | 202 | 8.69 | 102 | (5) | 97 |
| Total interest-earning assets | 135,313 | 1,516 | 4.54 | 125,568 | 1,406 | 4.50 | 183 | (73) | 110 |
| Noninterest-bearing cash and cash equivalents | 1,967 | | | 1,682 | | | | | |
| Other assets (g) | 38,257 | | | 58,516 | | | | | |
| Allowance for loan losses | (1,172) | | | (1,274) | | | | | |
| Total assets | $ 174,365 | | | $ 184,492 | | | | | |
| **Liabilities** | | | | | | | | | |
| Interest-bearing deposit liabilities | $ 47,985 | $ 164 | 1.39% | $ 41,128 | $ 163 | 1.59% | $ 25 | $ (24) | $ 1 |
| Short-term borrowings | 4,585 | 16 | 1.42 | 3,436 | 17 | 1.99 | 5 | (6) | (1) |
| Long-term debt (h) (j) (j) | 71,957 | 701 | 3.95 | 72,719 | 880 | 4.87 | (9) | (170) | (179) |
| Total interest-bearing liabilities (h) (j) (k) | 124,527 | 881 | 2.87 | 117,283 | 1,060 | 3.64 | 21 | (200) | (179) |
| Noninterest-bearing deposit liabilities | 1,579 | | | 2,141 | | | | | |
| Total funding sources (i) (l) | 126,106 | 881 | 2.83 | 119,424 | 1,060 | 3.57 | | | |
| Other liabilities (m) | 28,087 | | | 45,588 | | | | | |
| Total liabilities | 154,193 | | | 165,012 | | | | | |
| Total equity | 20,172 | | | 19,480 | | | | | |
| Total liabilities and equity | $ 174,365 | | | $ 184,492 | | | | | |
| Net financing revenue | | $ 635 | | | $ 346 | | 162 | $ 127 | $ 289 |
| Net interest spread (n) | | | 1.67% | | | 0.86% | | | |
| Net interest spread excluding original issue discount (n) | | | 1.89% | | | 1.29% | | | |
| Net interest spread excluding original issue discount and including noninterest-bearing deposit liabilities (n) | | | 1.93% | | | 1.35% | | | |
| Net yield on interest-earning assets (o) | | | 1.90% | | | 1.11% | | | |
| Net yield on interest-earning assets excluding original issue discount (o) | | | 2.07% | | | 1.45% | | | |

(a)  Changes in interest not solely due to volume or yield/rate are allocated in proportion to the absolute dollar amount of change in volume and yield/rate.
(b)  Average balances are calculated using a combination of monthly and daily average methodologies.
(c)  Excludes income on equity investments of $5 million during the three months ended March 31, 2013 and 2012, respectively. Yields on available-for-sale debt securities are based on fair value as opposed to historical cost.
(d)  Nonperforming finance receivables and loans are included in the average balances. For information on our accounting policies regarding nonperforming status, refer to   Note 1 to the Consolidated Financial Statements in our 2012 Annual Report on Form 10-K.
(e)  Includes other interest income of $2 million during the three months ended March 31, 2012.
(f)  Includes gains on sale of $64 million and $23 million during the three months ended March 31, 2013 and 2012, respectively. Excluding these gains on sale, the annualized yield would be  6.72% and 7.70% at March 31, 2013 and 2012, respectively.
(g)  Average balances include average balances of assets of discontinued operations.
(h)  Includes the effects of derivative financial instruments designated as hedges.
(i)  Average balance includes $1,753 million and $2,062 million related to original issue discount at March 31, 2013 and 2012, respectively. Interest expense includes original issue discount amortization of $57 million and $108 million during the three months ended March 31, 2013 and 2012, respectively.
(j)  Excluding original issue discount the rate on long-term debt was  3.54% and 4.15% at March 31, 2013 and 2012, respectively.
(k)  Excluding original issue discount the rate on total interest-bearing liabilities was  2.65% and 3.21% at March 31, 2013 and 2012, respectively.
(l)  Excluding original issue discount the rate on total funding sources was  2.61% and 3.15% at March 31, 2013 and 2012, respectively.
(m)  Includes average balances of liabilities of discontinued operations.
(n)  Net interest spread represents the difference between the rate on total interest-earning assets and the rate on total interest-bearing liabilities.
(o)  Net yield on interest-earning assets represents net financing revenue as a percentage of total interest-earning assets.

Table of Contents

# Management's Discussion and Analysis

Ally Financial Inc. • Form 10-Q

## Recently Issued Accounting Standards

Refer to Note 1 to the Condensed Consolidated Financial Statements .

## Forward-looking Statements

The foregoing Management's Discussion and Analysis of Financial Condition and Results of Operations and other portions of this Form 10-Q contain various forward-looking statements within the meaning of applicable federal securities laws, including the Private Securities Litigation Reform Act of 1995, that are based upon our current expectations and assumptions concerning future events that are subject to a number of risks and uncertainties that could cause actual results to differ materially from those anticipated.

The words "expect," "anticipate," "estimate," "forecast," "initiative," "objective," "plan," "goal," "project," "outlook," "priorities," "target," "intend," "evaluate," "pursue," "seek," "may," "would," "could," "should," "believe," "potential," "continue," or the negative of any of these words or similar expressions is intended to identify forward-looking statements. All statements herein, other than statements of historical fact, including without limitation statements about future events and financial performance, are forward-looking statements that involve certain risks and uncertainties.

While these statements represent our current judgment on what the future may hold and we believe these judgments are reasonable, these statements are not guarantees of any events or financial results, and Ally's actual results may differ materially due to numerous important factors that are described in the most recent reports on Forms 10-K and 10-Q for Ally, each of which may be revised or supplemented in subsequent reports on Forms 10-Q and 8-K. Such factors include, among others, the following: maintaining the mutually beneficial relationship between Ally and General Motors ("GM"), and Ally and Chrysler Group LLC ("Chrysler"); the profitability and financial condition of GM and Chrysler; resolution of the bankruptcy filings by Residential Capital, LLC and certain of its subsidiaries; our ability to realize the anticipated benefits associated with being a bank holding company, and the increased regulation and restrictions that we are now subject to; the potential for deterioration in the residual value of off-lease vehicles; disruptions in the market in which we fund our operations, with resulting negative impact on our liquidity; changes in our accounting assumptions that may require or that result from changes in the accounting rules or their application, which could result in an impact on earnings; changes in the credit ratings of Ally, Chrysler, or GM; changes in economic conditions, currency exchange rates or political stability in the markets in which we operate; and changes in the existing or the adoption of new laws, regulations, policies or other activities of governments, agencies and similar organizations (including as a result of the Dodd-Frank Act and Basel III).

Use of the term "loans" describes products associated with direct and indirect lending activities of Ally's global operations. The specific products include retail installment sales contracts, loans, lines of credit, leases or other financing products. The term "originate" refers to Ally's purchase, acquisition, or direct origination of various "loan" products.

113

Table of Contents

# Quantitative and Qualitative Disclosures about Market Risk

Ally Financial Inc. • Form 10-Q

**Item 3.    Quantitative and Qualitative Disclosures about Market Risk**

Refer to the Market Risk sections of Item 2, Management's Discussion and Analysis.

Table of Contents

# Controls and Procedures

Ally Financial Inc. • Form 10-Q

## Item 4.    Controls and Procedures

We maintain disclosure controls and procedures, as defined in Rule 13a-15(e) under the Securities Exchange Act of 1934, as amended (the Exchange Act), designed to ensure that information required to be disclosed in reports filed under the Exchange Act is recorded, processed, summarized, and reported within the specified time periods. Our disclosure controls and procedures are also designed to ensure that information required to be disclosed in the reports we file and submit under the Exchange Act is accumulated and communicated to management, including our Chief Executive Officer (Principal Executive Officer) and Senior Executive Vice President of Finance and Corporate Planning (Principal Financial Officer), to allow timely decisions regarding required disclosure.

As of the end of the period covered by this report, our Principal Executive Officer and Principal Financial Officer evaluated, with the participation of our management, the effectiveness of our disclosure controls and procedures and concluded that our disclosure controls and procedures were effective.

There were no changes in our internal controls over financial reporting (as defined in Rule 13a-15(f) of the Exchange Act) that occurred during our most recent fiscal quarter that materially affected, or were reasonably likely to materially affect, our internal controls over financial reporting.

Our management, including our Principal Executive Officer and Principal Financial Officer, does not expect that our disclosure controls or our internal controls will prevent or detect all errors and all fraud. A control system, no matter how well designed and operated, can provide only reasonable, not absolute, assurance that the control system's objectives will be met. Further, the design of a control system must reflect the fact that there are resource constraints, and the benefits of controls must be considered relative to their costs. Because of the inherent limitations in all control systems, no evaluation of controls can provide absolute assurance that all control issues and instances of fraud, if any, within Ally have been detected. These inherent limitations include the realities that judgments in decision-making can be faulty and that breakdowns can occur because of simple error or mistake. Controls can also be circumvented by the individual acts of some persons, by collusion of two or more people, or by management override of the controls. The design of any system of controls is based in part on certain assumptions about the likelihood of future events, and there can be no assurance that any design will succeed in achieving its stated goals under all potential future conditions. Over time, controls may become inadequate because of changes in conditions or deterioration in the degree of compliance with associated policies or procedures. Because of the inherent limitations in a cost-effective control system, misstatements due to error or fraud may occur and not be detected.

Table of Contents

# PART II — OTHER INFORMATION
### Ally Financial Inc. • Form 10-Q

## Item 1.   Legal Proceedings

Refer to Note 26 to the Condensed Consolidated Financial Statements  (incorporated herein by reference) for a discussion related to our legal proceedings, which supplements the discussion of legal proceedings set forth in Note 29 to our  2012 Annual Report on Form 10-K.

## Item 1A.   Risk Factors

Other than with respect to the risk factor provided below, there have been no material changes to the Risk Factors described in our  2012 Annual Report on Form 10-K.

### Risks Related to Our Business

*The previously contemplated settlement related to the ResCap bankruptcy has been allowed to lapse by ResCap and, as a result, there is substantial uncertainty related to resolution of the bankruptcy and substantial claims could be brought against us.*

On May 14, 2012 (the Petition Date), Residential Capital, LLC (ResCap) and certain of its wholly owned direct and indirect subsidiaries (collectively, the Debtors) filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (the Bankruptcy Court). In connection with the filings, Ally Financial Inc. and its direct and indirect subsidiaries and affiliates (excluding the Debtors) (collectively, AFI) had reached an agreement with the Debtors and certain creditor constituencies on a prearranged Chapter 11 plan (the Plan). The Plan included a proposed settlement (the Settlement) between AFI and the Debtors, which included, among other things, an obligation of AFI to make a $750 million cash contribution to the Debtor's estate, and a release of all existing or potential causes of action between AFI and the Debtors, as well as a release of all existing or potential ResCap-related causes of action against AFI held by third parties.

The Settlement contemplated certain milestone requirements that the Debtors failed to satisfy, including the Bankruptcy Court's confirmation of the Plan on or before October 31, 2012. While the failure to meet this October 31 milestone would have resulted in the Settlement's automatic termination, AFI and the Debtors agreed to monthly temporary waivers of this automatic termination through February 28, 2013. This waiver was not extended beyond this date, and therefore the Settlement has terminated.

As of the Petition Date, two separate groups of institutional investors in residential mortgage-backed securities (RMBS Investors) issued by ResCap's affiliates and holding more than 25 percent of at least one class in each of 290 securitizations agreed to settle alleged representation and warranty claims against the Debtors' estates in exchange for a total $8.7 billion allowed claim in the Debtors' bankruptcy cases, subject to the applicable securitization trustees' acceptance of the terms of the settlements (the RMBS Settlements). The RMBS Investors also signed separate plan support agreements (PSAs) with the Debtors and AFI in support of the Plan at the time of entering into the RMBS Settlements. To date, RMBS Investors holding more than 25 percent of at least one class in each of 336 securitizations have agreed to the RMBS Settlements. These 336 securitizations have an aggregate original principal balance of approximately $189 billion (out of a total of 392 outstanding securitizations with an original principal balance of $221 billion). The RMBS Settlements are subject to Bankruptcy Court approval, and the Bankruptcy Court has scheduled a hearing to consider such approval beginning on May 28, 2013. The PSAs are not part of this scheduled Bankruptcy Court hearing. A number of creditors have raised objections to the RMBS Settlements, but the trustees representing the 336 securitization trusts and AFI have filed statements in support of the Debtors' motion to approve the RMBS Settlements. Separately, the Debtors have failed to meet several Plan milestones in their bankruptcy cases, each of which has given the RMBS Investors the right to terminate the PSAs upon three business days advance written notice to the Debtors and AFI. On April 18, 2013, one of the two groups of RMBS Investors represented by Talcott Franklin P.C. sent the Debtors and AFI a notice of termination of its PSA. The other group of RMBS Investors represented by Gibbs and Bruns LLP has not given the Debtors and AFI such a notice to date, but have the right to do so at any time. If the RMBS Settlements were not approved or the RMBS Investors were to decide not to support any proposed plan, it could adversely impact the likelihood that any plan is approved by the Bankruptcy Court. AFI continues to support the RMBS Settlements at this time.

On June 4, 2012, Berkshire Hathaway Inc. filed a motion in the Bankruptcy Court for the appointment of an independent examiner to investigate, among other things, certain of the Debtors' transactions with AFI occurring prior to the Petition Date, any claims the Debtors may hold against AFI's officers and directors, and any claims the Debtors proposed to release under the Plan. On June 20, 2012, the Bankruptcy Court approved the appointment of an examiner and, subsequently, the United States Trustee for the Southern District of New York appointed former bankruptcy judge Arthur J. Gonzalez, Esq. as the examiner (the Examiner). On July 27, 2012, the Bankruptcy Court entered an order approving the scope of the Examiner's investigation. The investigation includes, among other things: (a) all material pre-petition transactions between or among the Debtors and AFI, Cerberus Capital Management, L.P. and its subsidiaries and affiliates, and/or Ally Bank; (b) certain post-petition negotiations and transactions with the Debtors, including with respect to plan sponsor, plan support, and settlement agreements, the debtor-in-possession financing with AFI, the stalking horse asset purchase agreement with AFI, and the servicing agreement with Ally Bank; (c) all state and federal law claims or causes of action the Debtors proposed to release as part of the Plan; and (d) the release of all existing or potential ResCap-related causes of action against AFI held by third parties. In the Examiner's original work plan, the Examiner estimated that his investigation and related report would be completed six months from approximately August 6, 2012. However, on February 7, 2013 the Examiner informed the Bankruptcy Court in the third supplement to the work plan that the investigation and related report will not be completed until early May 2013.

On December 26, 2012, the Bankruptcy Court, in an effort to facilitate plan negotiations, entered an order appointing bankruptcy judge James M. Peck, Esq. as mediator (the Mediator) through and until February 28, 2013, to assist the parties in resolving certain issues relating to

Table of Contents

Ally Financial Inc. • Form 10-Q

the formulation and confirmation of the Plan. On March 5, 2013, the Bankruptcy Court entered an order extending the Mediator's term to and including May 31, 2013, unless the Mediator declares in a written order on an earlier date that the mediation is at an impasse and should be terminated. AFI, the Debtors, the official committee of unsecured creditors appointed in the Debtors' bankruptcy cases (the Creditors' Committee) and certain other creditor constituencies are engaging in ongoing mediation sessions under a Bankruptcy Court order of confidentiality. Given the inherent uncertainty of the bankruptcy process, it is reasonably possible that a settlement could be reached that results in a payment substantially higher than the current $750 million estimate, or that no settlement is reached at all. The ultimate outcome of these settlement discussions will be affected by various factors, including, among others, the highly complex nature of the bankruptcy process, competing interests of various parties, disparate creditor priorities, the uncertainty of obtaining certain non-financial terms being sought, competing jurisdictional claims, uncertain residual estate property value, and the timing and unknown conclusions of the independent examiner's investigation.

On February 26, 2013, the Debtors and the Creditors' Committee entered into an agreement, the terms of which provided that, among other things, the Creditors' Committee would support extending the Debtors' exclusive period to file a Chapter 11 plan through and until April 30, 2013, the Debtors would consent to any motion filed by the Creditors' Committee after April 30, 2013 seeking standing to bring estate causes of action against AFI and the Debtors would allow the Settlement to automatically expire on February 28, 2013.

Thereafter, on March 5, 2013, the Bankruptcy Court entered an order extending the Debtors' exclusive period to file a Chapter 11 plan through and until April 30, 2013. On April 15, 2013, the Bankruptcy court entered an order further extending the Debtors' exclusive period to file a Chapter 11 plan through and until May 7, 2013.

On April 11, 2013, the Creditors' Committee filed a motion seeking standing to assert claims against AFI on behalf of the Debtors' estates. In its motion, the Creditors' Committee alleged, among other things, that AFI stripped the Debtors of valuable assets and exercised domination, control and abuse of the Debtors. The Creditors' Committee's claims against AFI include veil-piercing, fraudulent conveyance, indemnification, preferential transfer, and equitable subordination. The Creditors' Committee asserted that AFI may be liable for billions of dollars on account of these claims. AFI believes that these claims have no merit and is fully prepared to litigate these claims to final resolution. The Bankruptcy Court has scheduled a hearing for May 7, 2013 to consider the Creditors' Committee's motion for standing.

On February 27, 2013, the Debtors filed a motion with the Bankruptcy Court seeking, for purposes of any proposed Chapter 11 plan, that GMAC Mortgage's obligation to conduct and pay for independent file review regarding certain residential foreclosure actions and foreclosure sales prosecuted by GMAC Mortgage and its subsidiaries, as required under the Consent Order, be classified as a general unsecured claim in an amount to be determined, and that the automatic stay under the Bankruptcy Code be applied to prevent the FRB, the FDIC, and other governmental entities from taking any action to enforce the obligation against the Debtors (the Foreclosure Review Motion). The Bankruptcy Court is expected to issue a written opinion on relief sought in the Foreclosure Review Motion in the near future. If the Bankruptcy Court approves the Foreclosure Review Motion, such governmental entities are likely to seek to enforce the obligation against AFI, and any such obligations ultimately borne by AFI could be material.

We are currently named as defendants in various lawsuits relating to ResCap mortgage-backed securities and certain other mortgage-related matters (the Mortgage Cases), which are described in more detail in Note 26 to the Condensed Consolidated Financial Statements . We had previously disclosed that several of the Mortgage Cases were subject to orders entered by the Bankruptcy Court staying the matters through April 30, 2013 in connection with the Debtors bankruptcy. On May 1, 2013, all stay orders applicable to the Ally non-Debtor defendants with respect to the Mortgage Cases expired. As a result, all of the Mortgage Cases are proceeding against us.

As a result of the termination of the Settlement, AFI is no longer obligated to make the $750 million cash contribution and neither party is bound by the Settlement. Further, AFI is not entitled to receive any releases from either the Debtors or any third party claimants, as was contemplated under the Plan and Settlement. However, AFI has not withdrawn its offer to provide a $750 million cash contribution to the Debtors' estate if an acceptable settlement can be reached. As a result of the termination of the Settlement, substantial claims could be brought against us, which could have a material adverse impact on our results of operations, financial position or cash flows.

## Item 2.    Unregistered Sales of Equity Securities and Use of Proceeds

None.

## Item 3.    Defaults upon Senior Securities

None.

## Item 4.    Mine Safety Disclosures

Not applicable.

## Item 5.    Other Information

None.

## Item 6.    Exhibits

The exhibits listed on the accompanying Index of Exhibits are filed as a part of this report. This Index is incorporated herein by reference.

117

Table of Contents

# Signatures

Ally Financial Inc. • Form 10-Q

   Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized, this 1st day of May, 2013.

<div style="text-align: right">

Ally Financial Inc.
(Registrant)

/s/   JEFFREY J. BROWN
</div>

Jeffrey J. Brown
*Senior Executive Vice President of*
*Finance and Corporate Planning*

<div style="text-align: right">

/s/   DAVID J. DEBRUNNER
</div>

David J. DeBrunner
*Vice President, Chief Accounting Officer, and*
*Corporate Controller*

Table of Contents

Ally Financial Inc. • Form 10-Q

# INDEX OF EXHIBITS

| Exhibit | Description | Method of Filing |
|---------|-------------|------------------|
| 12 | Computation of Ratio of Earnings to Fixed Charges | Filed herewith. |
| 31.1 | Certification of Principal Executive Officer pursuant to Rule 13a-14(a)/15d-14(a) | Filed herewith. |
| 31.2 | Certification of Principal Financial Officer pursuant to Rule 13a-14(a)/15d-14(a) | Filed herewith. |
| 32 | Certification of Principal Executive Officer and Principal Financial Officer pursuant to 18 U.S.C. Section 1350 | Filed herewith. |
| 101 | Interactive Data File | Filed herewith. |

119

# Exhibit 12

Ally Financial Inc.

**Ratio of Earnings to Fixed Charges**

| ($ in millions) | Three months ended March 31, 2013 (a) | 2012 (a) | 2011 (a) | 2010 (a) | 2009 (a) | 2008 (a) |
|---|---|---|---|---|---|---|
| | | Year ended December (in millions), | | | | |
| **Earnings** | | | | | | |
| Consolidated net income (loss) from continuing operations | $ 60 | $ 1,370 | $ (219) | $ (334) | $ (3,370) | $ 5,535 |
| Income tax (benefit) expense from continuing operations | (123) | (856) | 42 | 97 | 12 | (87) |
| Equity-method investee (earnings) losses | (3) | (6) | (7) | (8) | 6 | 515 |
| Minority interest expense | — | 1 | 1 | 1 | 1 | 1 |
| Consolidated (loss) income from continuing operations before income taxes, minority interest, and income or loss from equity investees | (66) | 509 | (183) | (244) | (3,351) | 5,964 |
| Fixed charges | 889 | 4,031 | 4,668 | 4,880 | 4,786 | 5,724 |
| Earnings available for fixed charges | $ 823 | $ 4,540 | $ 4,485 | $ 4,636 | $ 1,435 | $ 11,688 |
| **Fixed charges** | | | | | | |
| Interest, discount, and issuance expense on debt | $ 885 | $ 4,014 | $ 4,652 | $ 4,862 | $ 4,768 | $ 5,704 |
| Portion of rentals representative of the interest factor | 4 | 17 | 16 | 18 | 18 | 20 |
| Total fixed charges | 889 | 4,031 | 4,668 | 4,880 | 4,786 | 5,724 |
| Preferred dividend requirements (b) | 200 | 801 | 763 | 1,860 | 1,224 | — |
| Total fixed charges and preferred dividend requirements | $ 1,089 | $ 4,832 | $ 5,431 | $ 6,740 | $ 6,010 | $ 5,724 |
| Ratio of earnings to fixed charges (c) | 0.93 | 1.13 | 0.96 | 0.95 | 0.30 | 2.04 |
| Ratio of earnings to fixed charges and preferred dividend requirements (d) | 0.76 | 0.94 | 0.83 | 0.69 | 0.24 | 2.04 |

(a)  During 2013, 2012, 2011, 2010, and 2009, we committed to dispose certain operations of our Automotive Finance operations, Insurance operations, Mortgage operations, and Commercial Finance Group. We report these businesses separately as discontinued operations in the  Condensed Consolidated Financial Statements . Refer to Note 2 to the Condensed Consolidated Financial Statements  for further discussion of our discontinued operations. All reported periods of the calculation of the ratio of earnings to fixed charges exclude discontinued operations.

(b)  Amount for 2010 includes a $616 million reduction to retained earnings (accumulated deficit) related to a conversion of preferred stock and related amendment that occurred on December 30, 2010.

(c)  The ratio indicates a less than one-to-one coverage for the three months ended March 31, 2013, and the years ended December 31, 2011, 2010 and 2009. Earnings for the three months ended March 31, 2013, and the years ended December 31, 2011, 2010, and 2009 were inadequate to cover fixed charges. The deficient amounts for the ratio were  $66 million for the three months ended March 31, 2013, and  $183 million,  $244 million and $3,351 million for the years ended December 31, 2011, 2010, and 2009, respectively.

(d)  The ratio indicates a less than one-to-one coverage for the three months ended March 31, 2013, and the years ended December 31, 2012, 2011, 2010, and 2009. Earnings for the three months ended March 31, 2013, and the years ended December 31, 2012, 2011, 2010, and 2009 were inadequate to cover total fixed charges and preferred dividend requirements. The deficient amounts for the ratio were  $266 million, for the three months ended March 31, 2013, and  $292 million,  $946 million,  $2,104 million, and $4,575 million for the years ended December 31, 2012, 2011, 2010, and 2009, respectively.

# Exhibit 31.1

Ally Financial Inc.

I, Michael A. Carpenter, certify that:

1.  I have reviewed this report on Form 10-Q of Ally Financial Inc.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations, and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a–15(e) and 15d–15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a–15(f) and 15d–15(f)) for the registrant and have:

    a)  designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b)  designed such internal control over financial reporting or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c)  evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d)  disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent function):

    a)  all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize, and report financial information; and

    b)  any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: May 1, 2013

/S/ MICHAEL A. CARPENTER
_____

Michael A. Carpenter
*Chief Executive Officer*

# Exhibit 31.2

Ally Financial Inc.

I, Jeffrey J. Brown, certify that:

1. I have reviewed this report on Form 10-Q of Ally Financial Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations, and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a–15(e) and 15d–15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a–15(f) and 15d–15(f)) for the registrant and have:

   a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b) designed such internal control over financial reporting or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d) disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent function):

   a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize, and report financial information; and

   b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: May 1, 2013

/S/ JEFFREY J. BROWN
_____

Jeffrey J. Brown
*Senior Executive Vice President of*
*Finance and Corporate Planning*

# Exhibit 32

Ally Financial Inc.

**Certification of Principal Executive Officer and Principal Financial Officer Pursuant to 18 U.S.C. Section 1350**

In connection with the Annual Report of Ally Financial Inc. (the Company) on Form 10-Q for the period ending  March 31, 2013, as filed with the Securities and Exchange Commission on the date hereof (the Report), each of the undersigned officers of the Company, certify, pursuant to 18 U.S.C. §1350, as adopted pursuant to §906 of the Sarbanes-Oxley Act of 2002, that to the best of their knowledge:

1. The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2. The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

/s/ MICHAEL A. CARPENTER

Michael A. Carpenter
*Chief Executive Officer*
May 1, 2013


/S/ JEFFREY J. BROWN

Jeffrey J. Brown
*Senior Executive Vice President of
Finance and Corporate Planning*
May 1, 2013


*A signed original of this written statement required by Section 906, or other document authenticating, acknowledging, or otherwise adopting the signature that appears in typed form within the electronic version of this written statement required by Section 906, has been provided to Ally Financial Inc. and will be furnished to the Securities and Exchange Commission or its staff upon request.*

**<u>EXHIBIT 2</u>**

**Ally Financial Inc., Annual Report (Form 10-K) (Jan. 31, 2013)**

Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION

Washington, D.C. 20549

# Form 10-K

☑ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

   **For the fiscal year ended December 31, 2012 or**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

   **For the transition period from              to**

Commission file number: 1-3754

# ALLY FINANCIAL INC.

**(Exact name of registrant as specified in its charter)**

| | |
|---|---|
| **Delaware** | **38-0572512** |
| (State or other jurisdiction of | (I.R.S. Employer |
| incorporation or organization) | Identification No.) |

**200 Renaissance Center**
**P.O. Box 200 Detroit, Michigan**
**48265-2000**
(Address of principal executive offices)
(Zip Code)

**(866) 710-4623**
(Registrant's telephone number, including area code)

Securities registered pursuant to Section 12(b) of the Act (all listed on the New York Stock Exchange):

**Title of each class**

| | |
|---|---|
| 10.30% Deferred Interest Debentures due June 15, 2015 | 7.375% Notes due December 16, 2044 |
| 7.30% Public Income Notes (PINES) due March 9, 2031 | Fixed Rate/Floating Rate Perpetual Preferred Stock, Series A |
| 7.35% Notes due August 8, 2032 | 8.125% Fixed Rate/Floating Rate Trust Preferred Securities, Series 2 of GMAC Capital Trust I |
| 7.25% Notes due February 7, 2033 | |

Securities registered pursuant to Section 12(g) of the Act: None

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☑ No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐ No ☑

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months and (2) has been subject to such filing requirements for the past 90 days. Yes ☑ No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes ☑    No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulations S-K (§ 229.405 of this chapter) is not contained herein and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.  ☑

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer," and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer ☐        Accelerated filer ☐        Non-accelerated filer ☑        Smaller reporting company ☐

(Do not check if a smaller reporting)

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act). Yes ☐ No ☑

Aggregate market value of voting and nonvoting common equity held by nonaffiliates: Ally Financial Inc. common equity is not registered with the Securities and Exchange Commission and there is no ascertainable market value for such common equity.

At February 28, 2013, the number of shares outstanding of the Registrant's common stock was  1,330,970 shares.

Documents incorporated by reference. None.

Table of Contents

# INDEX

Ally Financial Inc. ⬛ Form 10-K

| | | **Page** |
|---|---|---|
| Part I | | |
| Item 1. | Business | 1 |
| Item 1A. | Risk Factors | 10 |
| Item 1B. | Unresolved Staff Comments | 22 |
| Item 2. | Properties | 22 |
| Item 3. | Legal Proceedings | 23 |
| Item 4. | Mine Safety Disclosures | 23 |
| Part II | | |
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 24 |
| Item 6. | Selected Financial Data | 25 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 27 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 99 |
| Item 8. | Financial Statements and Supplementary Data | 100 |
| | Management's Report on Internal Control over Financial Reporting | 100 |
| | Reports of Independent Registered Public Accounting Firm | 101 |
| | Consolidated Statement of Income | 103 |
| | Consolidated Statement of Comprehensive Income | 105 |
| | Consolidated Balance Sheet | 106 |
| | Consolidated Statement of Changes in Equity | 108 |
| | Consolidated Statement of Cash Flows | 109 |
| | Notes to Consolidated Financial Statements | 111 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 209 |
| Item 9A. | Controls and Procedures | 209 |
| Item 9B. | Other Information | 209 |
| Part III | | |
| Item 10. | Directors, Executive Officers, and Corporate Governance | 210 |
| Item 11. | Executive Compensation | 214 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 226 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 226 |
| Item 14. | Principal Accountant Fees and Services | 227 |
| Part IV | | |
| Item 15. | Exhibits, Financial Statement Schedule | 229 |
| **Signatures** | | 232 |

Table of Contents

# Part I

Ally Financial Inc. • Form 10-K

## Item 1.   Business
### General

Ally Financial Inc. (formerly GMAC Inc.) is a leading, independent, financial services firm with $182.3 billion in assets. Founded in 1919, we are a leading automotive financial services company with over 90 years of experience providing a broad array of financial products and services to automotive dealers and their customers. We became a bank holding company on December 24, 2008, under the Bank Holding Company Act of 1956, as amended (the BHC Act). Our banking subsidiary, Ally Bank, is an indirect wholly owned subsidiary of Ally Financial Inc. and a leading franchise in the growing direct (internet, telephone, mobile, and mail) banking market, with $46.9 billion of deposits at December 31, 2012. The terms "Ally," "the Company," "we," "our," and "us" refer to Ally Financial Inc. and its subsidiaries as a consolidated entity, except where it is clear that the terms means only Ally Financial Inc.

## Our Business

Dealer Financial Services, which includes our Automotive Finance and Insurance operations, and Mortgage are our primary lines of business. Our Dealer Financial Services business is centered on our strong and longstanding relationships with automotive dealers and supports manufacturers with which we have marketing relationships and their marketing programs. Our Dealer Financial Services business serves the financial needs of almost 15,000 dealers with a wide range of financial services and insurance products. We believe our dealer-focused business model makes us the preferred automotive finance company for thousands of our automotive dealer customers. We have developed particularly strong relationships with thousands of dealers resulting from our longstanding relationship with General Motors Company (GM) and our relationship with Chrysler Group LLC (Chrysler), providing us with an extensive understanding of the operating needs of these dealers relative to other automotive finance companies. In addition, we have established specialized incentive programs that are designed to encourage dealers to direct more of their business to us.

Ally Bank, our direct banking platform, provides us with a stable and diversified low-cost funding source. Our focus is on building a stable deposit base driven by our compelling brand and strong value proposition. Ally Bank raises deposits directly from customers through the direct banking channel via the internet, over the telephone, and through mobile applications. Ally Bank offers a full spectrum of deposit product offerings including certificates of deposit, savings accounts, money market accounts, IRA (individual retirement account) deposit products, as well as an online checking product. We continue to expand the product offerings in our banking platform in order to meet customer needs. Ally Bank's assets and operating results are divided between our Automotive Finance operations and Mortgage operations based on its underlying business activities.

Our strategy is to extend our leading position in automotive finance in the United States by continuing to provide automotive dealers and their retail customers with premium service, a comprehensive product suite, consistent funding and competitive pricing, reflecting our commitment to the automotive industry. We are focused on expanding profitable dealer relationships, prudent earning asset growth, and higher risk-adjusted returns. Our growth strategy continues to focus on diversifying the franchise by expanding into different products as well as broadening our network of dealer relationships. During 2012, we continued to focus on the used vehicle market, which resulted in strong growth in used vehicle financing volume. We also seek to broaden and deepen the Ally Bank franchise, prudently growing stable, quality deposits while extending our foundation of products and providing a high level of customer service.

### Strategic Actions
#### *Subsidiaries' Bankruptcy Filings*

On May 14, 2012, Residential Capital, LLC (ResCap) and certain of its wholly owned direct and indirect subsidiaries (collectively, the Debtors) filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York. In connection with the filings, Ally Financial Inc. and its direct and indirect subsidiaries and affiliates (excluding the Debtors) reached an agreement with the Debtors and certain creditor constituencies on a prearranged Chapter 11 plan, which is subject to bankruptcy court approval and certain other conditions. As a result of the bankruptcy filing, effective May 14, 2012 the Debtors were deconsolidated from our financial statements. For further details with respect to the bankruptcy and the deconsolidation, refer to Item 1A. Risk Factors and Note 1 to the Consolidated Financial Statements.

#### *Sale of International Businesses*

During 2012, we committed to sell substantially all of our remaining international businesses, which included automotive finance, insurance, and banking and deposit operations. On February 1, 2013, we completed the sale of our Canadian automotive finance operation to Royal Bank of Canada, and we expect the sales of our remaining international operations in Europe and Latin America, as well as our share in a joint venture in China, to close in stages throughout 2013. As a result of the sales, for all periods presented, the operating results for these operations have been removed from continuing operations. Refer to Note 2 and Note 31 to the Consolidated Financial Statements for more details.

### Dealer Financial Services

Dealer Financial Services includes our Automotive Finance operations and Insurance operations. Our primary customers are automotive dealers, which are independently owned businesses. As part of the process of selling a vehicle, automotive dealers typically originate loans and leases to their retail customers. Dealers then select Ally or another automotive finance provider to which they sell loans and leases. References to consumer automobile loans in this document include installment sales financing unless the context suggests otherwise.

1

Table of Contents

Ally Financial Inc. • Form 10-K

Our Dealer Financial Services operations offer a wide range of financial services and insurance products to almost 15,000 automotive dealerships and approximately 4 million of their retail customers. We have deep dealer relationships that have been built over our greater-than 90-year history. Our dealer-focused business model encourages dealers to use our broad range of products through incentive programs like our Ally Dealer Rewards program, which rewards individual dealers based on the depth and breadth of our relationship. During 2012, 73% of our U.S. automotive dealer customers received benefits under the Ally Dealer Rewards program, which was initiated in 2009. Our automotive finance services include providing retail installment sales contracts, loans, and leases, offering term loans to dealers, financing dealer floorplans and other lines of credit to dealers, fleet leasing, and vehicle remarketing services. We also offer retail vehicle service contracts and commercial insurance primarily covering dealers' wholesale vehicle inventories. We are a leading provider of vehicle service contracts and maintenance coverage.

Dealer Financial Services is supported by approximately 4,400 employees in the United States. A significant portion of our Dealer Financial Services business is conducted with or through GM- and Chrysler-franchised dealers and their customers.

### *Automotive Finance*

Our Automotive Finance operations consist of automotive finance business generated primarily in the United States. At  December 31, 2012, our Automotive Finance operations had $128.4 billion of assets and generated $3.1 billion of total net revenue in 2012. According to Experian Automotive, we were the largest independent provider of new retail automotive loans to franchised dealers in the United States during  2012. We have approximately 1,600 automotive finance and 600 insurance employees across the United States focused on serving the needs of our dealer customers with finance and insurance products, expanding the number of overall dealer and automotive manufacturer relationships, and supporting our dealer lending and underwriting functions. In addition, we have over 1,600 employees that support our servicing operations. We manage commercial account servicing for approximately 5,000 dealers that utilize our floorplan inventory lending or other commercial loans. We provide consumer asset servicing for a $75.3 billion portfolio at December 31, 2012. The extensive infrastructure and experience of our servicing operations are important to our ability to minimize our loan losses and enable us to deliver favorable customer experience to both our dealers and their retail customers.

Our success as an automotive finance provider is driven by the consistent and broad range of products and services we offer to dealers who originate loans and leases to their retail customers who are acquiring new and used automobiles. Ally and other automotive finance providers purchase these loans and leases from automotive dealers. Automotive dealers are independently owned businesses and are our primary customers. Our growth strategy continues to focus on diversifying the franchise by expanding into different products as well as broadening our network of dealer relationships. During  2012, we continued to focus on the used vehicle segment primarily through franchised dealers, which resulted in strong growth in used vehicle financing volume. The fragmented used vehicle financing market provides an attractive opportunity that we believe will further expand and support our dealer relationships and increase our volume of retail loan originations.

Automotive dealers desire a full range of financial products, including new and used vehicle inventory financing, inventory insurance, working capital and capital improvement loans, and vehicle remarketing services to conduct their respective businesses as well as service contracts and guaranteed asset protection (GAP) products to offer their customers. We have consistently provided this full suite of products to dealers.

For consumers, we provide retail automotive financing for new and used vehicles and leasing for new vehicles. In the United States, retail financing for the purchase of vehicles takes the form of installment sales financing. During  2012, we originated a total of 1.5 million automotive loans and leases totaling approximately  $38.7 billion.

Our consumer automotive financing operations generate revenue through finance charges or lease payments and fees paid by customers on the retail contracts and leases. We also recognize a gain or loss on the remarketing of the vehicles financed through lease contracts at the end of the lease. When the lease contract is originated, we estimate the residual value of the leased vehicle at lease termination. Periodically we revise the projected value of the leased vehicle at lease termination. Our actual sales proceeds from remarketing the vehicle may be higher or lower than the estimated residual value.

Automotive manufacturers may elect as a marketing incentive to sponsor special financing programs for retail sales of their respective vehicles. The manufacturer can lower the financing rate paid by the customer on either a retail contract or a lease by paying us the present value of the difference between the customer rate and our standard market rates at contract inception. These marketing incentives are referred to as rate support or subvention. GM may also from time to time offer lease pull-ahead programs, which encourage consumers to terminate existing leases early if they acquire a new GM vehicle. As part of these programs, we waive all or a portion of the customer's remaining payment obligation. In most cases, GM compensates us for a portion of the foregone revenue from those waived payments after consideration of the extent that our remarketing sale proceeds are higher than otherwise would be realized if the vehicle had been remarketed at lease contract maturity. Manufacturers may also elect to lower a customer's lease payments through residual support incentive programs. In these instances, we agree to increase the projected value of the vehicle at the time the lease contract was signed in exchange for a payment from the manufacturer.

Our commercial automotive financing operations primarily fund dealer inventory purchases of new and used vehicles, commonly referred to as wholesale or floorplan financing. This represents the largest portion of our commercial automotive financing business. We also extend lines of credit to individual dealers. In general, each wholesale credit line is secured by all the vehicles financed and, in some instances, by other assets owned by the dealer or by a personal guarantee. The amount we advance to dealers is equal to 100% of the

Table of Contents

Ally Financial Inc. • Form 10-K

wholesale invoice price of new vehicles. Interest on wholesale automotive financing is generally payable monthly and is usually indexed to a floating rate benchmark. The rate for a particular dealer is based on the dealer's creditworthiness and eligibility for various incentive programs, among other factors. During  2012, we financed an average of $27.2 billion of dealer vehicle inventory through wholesale or floorplan financings. We provide comprehensive automotive remarketing services, including the use of SmartAuction, our online auction platform, which efficiently supports dealer-to-dealer and other commercial wholesale car transactions. In  2012, we and others including dealers, fleet rental companies, financial institutions, and GM, utilized SmartAuction to sell 221,000 vehicles to dealers and other commercial customers. SmartAuction served as the remarketing channel for 35% of Ally's off-lease vehicles.

### Manufacturer Agreements

We are currently party to an agreement with GM pursuant to which GM initially agreed to offer all vehicle financing incentives to customers through Ally. However, the agreement, which was originally entered into in November 2006, provides for annual reductions in the percentage of retail financing subvention programs that GM is required to provide through Ally, and currently applies to a limited percentage. The agreement expires on December 31, 2013.

We are also party to an agreement to make available automotive financing products and services to Chrysler dealers and customers. We provide dealer financing and services and retail financing to qualified Chrysler dealers and customers as we deem appropriate according to our credit policies and in our sole discretion, and Chrysler is obligated to use Ally for a designated minimum threshold percentage of Chrysler retail financing subvention programs. On April 25, 2012, Chrysler provided us with notification of nonrenewal related to this agreement and as a result, the agreement will expire on April 30, 2013.

The agreements with GM and Chrysler described above do not provide us with any benefits relating to standard rate financing or lease products. As a result, since the inception of these agreements, we have successfully competed at the dealer-level for standard consumer retail financing and leasing originations for GM and Chrysler automobiles based on our strong dealer relationships, competitive pricing, full suite of products, and comprehensive service. We have further diversified our customer base by establishing agreements to become the preferred financing provider for vehicles manufactured by Thor Industries, Maserati, The Vehicle Production Group LLC, Forest River, and Mitsubishi Motors.

### Insurance

Our Insurance operations offer both consumer finance protection and insurance products sold primarily through the automotive dealer channel, and commercial insurance products sold directly to dealers. As part of our focus on offering dealers a broad range of consumer finance and insurance products, we provide vehicle service contracts, maintenance coverage, and GAP products. We also underwrite selected commercial insurance coverages, which primarily insure dealers' wholesale vehicle inventory in the United States. Our Insurance operations had  $8.4 billion of assets at December 31, 2012, and generated $1.2 billion of total net revenue in 2012.

Our vehicle service contracts for retail customers offer owners and lessees mechanical repair protection and roadside assistance for new and used vehicles beyond the manufacturer's new vehicle warranty. These vehicle service contracts are marketed to the public through automotive dealerships and on a direct response basis. The vehicle service contracts cover virtually all vehicle makes and models. We also offer GAP products, which allow the recovery of a specified economic loss beyond the covered vehicle's value in the event the vehicle is damaged and declared a total loss.

Wholesale vehicle inventory insurance for dealers provides physical damage protection for dealers' floorplan vehicles. Dealers are generally required to maintain this insurance by their floorplan finance provider. We sell these insurance products to approximately 4,000 dealers. Among U.S. GM franchised dealers to whom we provide wholesale financing, our wholesale insurance product penetration rate is approximately 80%. Dealers who receive wholesale financing from Ally are eligible for wholesale insurance incentives, such as automatic eligibility in our preferred insurance programs and increased financial benefits.

A significant aspect of our Insurance operations is the investment of proceeds from premiums and other revenue sources. We use these investments to satisfy our obligations related to future claims at the time these claims are settled. Our Insurance operations have an Investment Committee, which develops investment guidelines and strategies. The guidelines established by this committee reflect our risk tolerance, liquidity requirements, regulatory requirements, and rating agency considerations, among other factors.

### Mortgage

Our ongoing Mortgage operations are conducted through Ally Bank. We intend to continue to originate a modest level of jumbo and conventional conforming residential mortgages for our own portfolio through a select group of correspondent lenders. Our Mortgage operations also consist of noncore business activities including portfolios in runoff. Additionally, on October 26, 2012, we announced that Ally Bank had begun to explore strategic alternatives for its agency mortgage servicing rights portfolio and its business lending operations. On February 28, 2013, we sold our business lending operations to Walter Investment Management Corp.  Our Mortgage operations had  $14.7 billion of assets at December 31, 2012, and generated $1.8 billion of total net revenue in 2012.

During 2012, we originated or purchased residential mortgage loans totaling  $32.5 billion in the United States. Conforming and government-insured residential mortgage loans comprised 93.2% of our 2012 originations, which, in the ordinary course of business, are sold to the Federal National Mortgage Association (Fannie Mae), Federal Home Loan Mortgage Corporation (Freddie Mac), or Government National Mortgage Association (Ginnie Mae) (collectively, the Government-sponsored Enterprises, or GSEs). Since the onset of the housing

3

Table of Contents

Ally Financial Inc. • Form 10-K

crisis, we have reduced our overall mortgage assets from $135.1 billion in 2006 to $14.7 billion at December 31, 2012, primarily through the run-off and divestiture of noncore businesses and assets, and the deconsolidation of ResCap.

## Corporate and Other

Corporate and Other primarily consists of our centralized corporate treasury activities, such as management of the cash and corporate investment securities portfolios, short- and long-term debt, retail and brokered deposit liabilities, derivative instruments, the amortization of the discount associated with new debt issuances and bond exchanges, most notably from the December 2008 bond exchange, and the residual impacts of our corporate funds-transfer pricing (FTP) and treasury asset liability management (ALM) activities. Corporate and Other also includes our Commercial Finance Group, certain equity investments, reclassifications and eliminations between the reportable operating segments, and overhead that was previously allocated to operations that have since been sold or classified as discontinued operations. Our Commercial Finance Group provides senior secured commercial-lending products to primarily U.S.-based middle market companies.

## Ally Bank

Ally Bank raises deposits directly from customers through direct banking via the internet, telephone, mobile, and mail channels. Ally Bank has established a strong and growing retail banking franchise that is based on a promise of being straightforward, easy to use, and offering high-quality customer service. Ally Bank's products and services are designed to develop long-term customer relationships and capitalize on the shift in consumer preference away from branch banking in favor of direct banking.

Ally Bank provides us with a stable and diversified low-cost funding source. At December 31, 2012, we had $46.9 billion of deposits including $35.0 billion of retail deposits sourced by Ally Bank. The focus on retail deposits and growth in our deposit base from $19.2 billion at the end of 2008 to $46.9 billion at the end of 2012, combined with improving capital markets and a lower interest rate environment have contributed to a reduction in our cost of funds of approximately 95 basis points since the first quarter of 2011. We expect to continue to lower our cost of funds and diversify our overall funding as our deposit base grows.

We believe Ally Bank is well-positioned to continue to benefit from the consumer driven-shift from branch banking to direct banking. According to a 2012 American Bankers Association survey, the percentage of customers who prefer to do their banking via direct channels (internet, mail, phone, and mobile) increased from 21% to 62% between 2007 and 2012, while those who prefer branch banking declined from 39% to 18% over the same period. Ally Bank has received a positive response to innovative savings and other deposit products. Ally Bank's products include savings and money market accounts, certificates of deposit, interest-bearing checking accounts, and individual retirement accounts. Ally Bank's competitive direct banking features include online and mobile banking, electronic bill pay, remote deposit, electronic funds transfer, and no-fee debit cards.

## Industry and Competition

The markets for automotive and mortgage financing, banking, and insurance are highly competitive. The market for automotive financing has grown more competitive as more consumers are financing their vehicle purchases and as more competitors continue to enter this market as a result of how well automotive finance assets generally performed relative to other asset classes through the economic cycle during the past several years. More recently, competition for automotive financing has further intensified as a growing number of banks have become increasingly interested in automotive-finance assets. In addition, Ally Bank faces significant competition from commercial banks, savings institutions, and other financial institutions. Our insurance business also faces significant competition from automotive manufacturers, insurance carriers, third-party administrators, brokers, and other insurance-related companies. Many of our competitors have substantial positions nationally or in the markets in which they operate. Some of our competitors have lower cost structures, substantially lower costs of capital, and are much less reliant on securitization activities, unsecured debt, and other public markets. We face significant competition in most areas, including product offerings, rates, pricing and fees, and customer service. Further, there has been significant consolidation among companies in the financial services industry, which is expected to continue.

The markets for automotive securitizations and whole-loan sales are also competitive, and other issuers and originators could increase the amount of their issuances and sales. In addition, lenders and other investors within those markets often establish limits on their credit exposure to particular issuers, originators, and asset classes, or they may require higher returns to increase the amount of their exposure. Increased issuance by other participants in the market or decisions by investors to limit their credit exposure to (or to require a higher yield for) us or to automotive securitizations or whole-loan sales could negatively affect our ability and that of our subsidiaries to price our securitizations and whole-loan sales at attractive rates. The result would be lower proceeds from these activities and lower profits for our subsidiaries and us.

## Certain Regulatory Matters

We are subject to various regulatory, financial, and other requirements of the jurisdictions in which our businesses operate. In light of recent conditions in the global financial markets, regulators have increased their focus on the regulation of the financial services industry. As a result, proposals for legislation or regulations that could increase the scope and nature of regulation of the financial services industry are possible. The following is a description of some of the laws and regulations that currently affect our business.

### Bank Holding Company Status

Ally Financial Inc. (Ally) and IB Finance Holding Company, LLC (IB Finance) are currently both bank holding companies under the BHC Act. IB Finance is the direct holding company for Ally's FDIC-insured depository institution, Ally Bank. As a bank holding company, Ally is subject to supervision, examination and regulation by the Board of Governors of the Federal Reserve System (FRB). Ally must also

Table of Contents

Ally Financial Inc. • Form 10-K

comply with regulatory risk-based capital and leverage requirements, as well as various safety and soundness standards imposed by the FRB, and is subject to certain statutory restrictions concerning the types of assets or securities it may own and the activities in which it may engage. Ally Bank, our banking subsidiary, is currently not a member of the Federal Reserve System and is subject to supervision, examination and regulation by the Federal Deposit Insurance Corporation (FDIC) and the Utah Department of Financial Institutions (UDFI). This regulatory oversight focuses on the protection of depositors, the FDIC's Deposit Insurance Fund, and the banking system as a whole, not security holders, and in some instances may be contrary to their interests.

- **Permitted Activities** — As a bank holding company, subject to certain exceptions, Ally may not, directly or indirectly, acquire more than 5% of any class of voting shares of any nonaffiliated bank or bank holding company, or, directly or indirectly, acquire control of any other company (including by acquisition of 25% or more of a class of voting shares), without first obtaining FRB approval. Furthermore, Ally's activities must be generally limited to banking or managing or controlling banks, or to other activities deemed closely related to banking or otherwise permissible under the BHC Act. As a result, most of our insurance activities and our SmartAuction vehicle remarketing services for third parties are deemed impermissible under the BHC Act. In addition, Ally generally may not hold more than 5% of any class of voting shares of any company unless that company's activities conform with these requirements. Upon our bank holding company approval on December 24, 2008, we were permitted an initial two-year grace period to bring our activities and investments into conformity with these restrictions. This grace period expired in December 2010. The FRB then granted two one-year extensions that expired in December 2012, and recently granted a third one-year extension that expires in December 2013. We will not be permitted to apply to the FRB for any further extensions. Ally's existing activities and investments deemed impermissible under the BHC Act will need to be terminated or disposed of by December 2013. While some of these activities may be continued if Ally is able to convert to a financial holding company under the BHC Act, Ally may be unable to satisfy the requirements to enable it to convert to a financial holding company prior to that time. For further information, refer to Item 1A. Risk Factors.

- **Gramm-Leach-Bliley Act** — The enactment of the Gramm-Leach-Bliley Act of 1999 (GLB Act) eliminated large parts of a regulatory framework that had its origins in the Depression era of the 1930s. Effective with its enactment, new opportunities became available for banks, other depository institutions, insurance companies, and securities firms to enter into combinations that permit a single financial services organization to offer customers a more comprehensive array of financial products and services. To further this goal, the GLB Act amended the BHC Act by providing a new regulatory framework applicable to "financial holding companies," which are bank holding companies that meet certain qualifications and elect financial holding company status. The FRB supervises, examines, and regulates financial holding companies, as it does all bank holding companies. However, insurance and securities activities conducted by a financial holding company or its nonbank subsidiaries are regulated primarily by functional regulators. As a bank holding company, we would be eligible to elect financial holding company status upon satisfaction of certain regulatory requirements applicable to us and to Ally Bank (and any depository institution subsidiary that we may acquire in the future). We do not currently satisfy these requirements, however, we expect to apply for financial holding company status once we do. As a financial holding company, Ally would then be permitted to engage in a broader range of financial and related activities than those that are permissible for bank holding companies, in particular, securities, insurance, and merchant banking activities.

- **Dodd-Frank Wall Street Reform and Consumer Protection Act** — On July 21, 2010, the President of the United States signed into law the Dodd-Frank Wall Street Reform and Consumer Protection Act (Dodd-Frank Act). The Dodd-Frank Act represents a significant overhaul of many aspects of the regulation of the financial services industry, addressing, among other things, systemic risk, capital adequacy, deposit insurance assessments, consumer financial protection, derivatives, lending limits, and mortgage-lending practices. When fully implemented, the Dodd-Frank Act will have material implications for Ally and the entire financial services industry. Among other things, it will or potentially could:

  - result in Ally being subject to enhanced oversight and scrutiny as a result of being a bank holding company with $50 billion or more in total consolidated assets;

  - increase the levels of capital and liquidity with which Ally must operate and affect how it plans capital and liquidity levels;

  - subject Ally to new and/or higher fees paid to various regulatory entities, including but not limited to deposit insurance fees paid by Ally Bank to the FDIC;

  - impact a number of Ally's business and risk management strategies;

  - restrict the revenue that Ally generates from certain businesses;

  - require Ally to provide to the FRB and FDIC an annual plan for its rapid and orderly resolution in the event of material financial distress; and

  - subject Ally to regulation by the Consumer Financial Protection Bureau (CFPB), which has very broad rule-making, examination, and enforcement authorities.

  Many provisions of the Dodd-Frank Act will only become effective at a later date or after a rulemaking process is completed.

Table of Contents

Ally Financial Inc. • Form 10-K

In addition, under the Dodd-Frank Act, financial holding companies, including bank holding companies such as Ally, can be subjected to a new orderly liquidation authority. The orderly liquidation authority became effective in July 2010, with implementing regulations adopted thereafter in stages, with some rulemakings still to come. Under the orderly liquidation authority, the FDIC would be appointed as receiver upon an insolvency of Ally, giving the FDIC considerable rights and powers that it must exercise with the goal of liquidating and winding up Ally, including the ability to assign assets and liabilities without the need for creditor consent or prior court review and the ability of FDIC to differentiate and determine priority among creditors.

In December 2011, the FRB proposed rules to implement some provisions of the systemic risk regime. If adopted as proposed, among other provisions, the rules would require Ally to maintain a sufficient quantity of highly liquid assets to survive a projected 30-day liquidity stress event and implement various liquidity-related corporate governance measures; limit Ally's aggregate exposure to any unaffiliated counterparty to 25% of Ally's capital and surplus; and potentially subject Ally to an early remediation regime that could limit the ability of Ally to pay dividends or expand its business if the FRB identified Ally as suffering from financial or managerial weaknesses.

The CFPB has proposed various rules to implement consumer financial protection provisions of the Dodd-Frank Act and related requirements. Many of these proposed rules, when finalized, will impose new requirements on Ally and its business operations. In addition, as an insured depository institution with total assets of more than $10 billion, Ally Bank may be required in the future to submit periodic reports to the CFPB, and is subject to examination by the CFPB.

- *Capital Adequacy Requirements* — Ally and Ally Bank are subject to various guidelines as established under FRB and FDIC regulations. Refer to  Note 21 to the Consolidated Financial Statements for additional information. See also "Basel Capital Accord" below.

- *Capital Planning and Stress Tests* — In December 2011, U.S. banking regulators imposed capital planning and stress test requirements on bank holding companies with $50 billion or more of consolidated assets. The capital planning regime requires Ally to submit a proposed capital plan to the FRB every January, which the FRB must take action on by the following March. The proposed capital plan must include a description of all planned capital actions over a nine-quarter planning horizon, including any issuance of a debt or equity capital instrument, any capital distribution, and any similar action that the FRB determines could have an impact on Ally's consolidated capital. The proposed action plan must also include a discussion of how Ally will maintain capital above the minimum regulatory capital ratios and above a Tier 1 common equity-to-total risk-weighted assets ratio of 5 percent, and serve as a source of strength to Ally Bank. The FRB's capital plan rule requires that Ally receive no objection from the FRB before making a capital distribution. If the FRB objects to the capital plan, or if certain material events occur after approval of a plan, Ally must submit a revised capital plan within 30 days. In addition, even with an approved capital plan, Ally must seek the approval of the FRB before making a capital distribution if, among other factors, Ally would not meet its regulatory capital requirements after making the proposed capital distribution. Ally submitted its initial capital plan in January 2012, and then submitted a revised capital plan in June 2012. In connection with its reviews, the FRB provided notice of non-objection to Ally's planned preferred dividends and interest on the trust preferred securities and subordinated debt.

In October 2012, U.S. banking regulators issued final rules on stress testing. The FRB final rule requires Ally to conduct semi-annual (annual and mid-cycle) stress tests under baseline, adverse, and severely adverse economic scenarios over a planning horizon that spans nine quarters. The FDIC final rule requires Ally Bank to conduct an annual stress test under baseline, adverse, and severely adverse economic scenarios over a planning horizon that spans nine quarters. Under these rules, Ally and Ally Bank are required to submit the results of these stress tests to regulators and publicly disclose the results of the stress tests under the severely adverse economic scenario. Per the rule, the regulators will also publish, by March 31 of each calendar year, a summary of the supervisory stress test results of each company.

Stress tests are intended to provide supervisors with forward-looking information to help identify downside risk and the potential effect of adverse conditions on capital adequacy. Stress tests required under the FRB's stress test final rule are integrated into the capital planning process under the FRB's capital plans rule. On January 7, 2013, Ally and Ally Bank submitted the required 2013 capital plan and stress tests as required by these regulations.

- *Limitations on Bank Holding Company Dividends and Capital Distributions* —Utah law (and, in certain instances, federal law) places restrictions and limitations on dividends or other distributions payable by our banking subsidiary, Ally Bank, to Ally. With respect to dividends payable by Ally to its shareholders, FRB regulations require bank holding companies with $50 billion or more in total consolidated assets, such as Ally, to submit annual capital plans for FRB non-objection. In the absence of a non-objection regarding the capital plan, the new regulation prohibits bank holding companies from paying dividends or making certain other capital distributions without specific FRB non-objection for such action. Even if a bank holding company receives a non-objection to its capital plan, it may not pay a dividend or make certain other capital distributions without FRB approval under certain circumstances (e.g., after giving effect to the dividend or distribution, the bank holding company would not meet a minimum regulatory capital ratio or a Tier 1 common ratio of at least 5%). In addition, FRB supervisory guidance requires bank holding companies such as Ally to consult with the FRB prior to increasing dividends, implementing common stock repurchase programs or redeeming or repurchasing capital instruments. Such guidance provides for a supervisory capital assessment program that outlines FRB expectations concerning the processes that bank holding companies have in place to ensure they hold adequate capital under adverse conditions to maintain ready access to funding. The federal bank regulatory agencies are also authorized to prohibit a

6

Table of Contents

Ally Financial Inc. • Form 10-K

banking subsidiary or bank holding company from engaging in unsafe or unsound banking practices and, depending upon the circumstances, could find that paying a dividend or making a capital distribution would constitute an unsafe or unsound banking practice.

• **Transactions with Affiliates** — Certain transactions between Ally Bank and any of its nonbank "affiliates," including but not limited to Ally, are subject to federal statutory and regulatory restrictions. Pursuant to these restrictions, unless otherwise exempted, "covered transactions" including Ally Bank's extensions of credit to and asset purchases from its nonbank affiliates, generally (1) are limited to 10% of Ally Bank's capital stock and surplus with respect to transactions with any individual affiliate, with an aggregate limit of 20% of Ally Bank's capital stock and surplus for all affiliates and all such transactions; (2) in the case of certain credit transactions, are subject to stringent collateralization requirements; (3) in the case of asset purchases by Ally Bank, may not involve the purchase of any asset deemed to be a "low quality asset" under federal banking guidelines; and (4) must be conducted in accordance with safe-and-sound banking practices (collectively, the Affiliate Transaction Restrictions). In addition, transactions between Ally Bank and a nonbank affiliate generally must be on market terms and conditions.

   Under the Dodd-Frank Act, among other changes to the Affiliate Transaction Restrictions, credit exposures resulting from derivatives transactions, securities lending and borrowing transactions, and acceptance of affiliate-issued debt obligations (other than securities) as collateral for a loan or extension of credit will be treated as "covered transactions." The Dodd-Frank Act also expands the scope of covered transactions required to be collateralized, requires that collateral be maintained at all times for covered transactions required to be collateralized, and places limits on acceptable collateral.

   Furthermore, there is an "attribution rule" that provides that a transaction between Ally Bank and a third party must be treated as a transaction between Ally Bank and a nonbank affiliate to the extent that the proceeds of the transaction are used for the benefit of or transferred to a nonbank affiliate of Ally Bank. For example, because Ally controls Ally Bank, Ally is an affiliate of Ally Bank for purposes of the Affiliate Transaction Restrictions. Thus, retail financing transactions by Ally Bank involving vehicles for which Ally provided floorplan financing are subject to the Affiliate Transaction Restrictions because the proceeds of the retail financings are deemed to benefit, and are ultimately transferred to, Ally.

   Historically, the FRB was authorized to exempt, in its discretion, transactions or relationships from the requirements of these rules if it found such exemptions to be in the public interest and consistent with the purposes of the rules. As a result of the Dodd-Frank Act, exemptions now may be granted by the FDIC if the FDIC and FRB jointly find that the exemption is in the public interest and consistent with the purposes of the rules, and the FDIC finds that the exemption does not present an unacceptable risk to the Deposit Insurance Fund. The FRB granted several such exemptions to Ally Bank in the past. However, the existing exemptions are subject to various conditions and, particularly in light of the statutory changes made by the Dodd-Frank Act, any requests for future exemptions might not be granted. Moreover, these limited exemptions generally do not encompass consumer leasing or used vehicle financing. Since there is no assurance that Ally Bank will be able to obtain future exemptions or waivers with respect to these restrictions, the ability to grow Ally Bank's business will be affected by the Affiliate Transaction Restrictions and the conditions set forth in the existing exemption letters.

• **Source of Strength** — Pursuant to the Federal Deposit Insurance Act, FRB policy and regulations and the Parent Company Agreement and the Capital and Liquidity Maintenance Agreement described in Note 21 to the Consolidated Financial Statements, Ally is required to act as a source of financial and managerial strength to Ally Bank and is required to commit necessary capital and liquidity to support Ally Bank. This support may be required at inopportune times for Ally.

• **Enforcement Authority** — The FDIC and FRB have broad authority to issue orders to banks and bank holding companies to cease and desist from unsafe or unsound banking practices and from violations of laws, rules, regulations, or conditions imposed in writing by the banking agencies. The FDIC and FRB also are empowered to require affirmative actions to correct any violation or practice; issue administrative orders that can be judicially enforced; direct increases in capital; limit dividends and distributions; restrict growth; assess civil money penalties against institutions or individuals who violate any laws, regulations, orders, or written agreements with the banking agencies; order termination of certain activities of bank holding companies or their subsidiaries; remove officers and directors; order divestiture of ownership or control of a nonbanking subsidiary by a bank holding company (in the case of the FRB); terminate deposit insurance (in the case of the FDIC); and/or place a bank into receivership (in the case of the FDIC).

## Basel Capital Accord

   The minimum risk-based capital requirements adopted by the federal banking agencies follow the Capital Accord (Capital Accord or Basel I) of the Bank for International Settlements' Basel Committee on Banking Supervision (Basel Committee). The Capital Accord was published in 1988 and generally applies to depository institutions and their holding companies in the United States. In 2004, the Basel Committee published a revision to the Capital Accord (Basel II). The goal of the Basel II capital rules is to provide more risk-sensitive regulatory capital calculations and promote enhanced risk management practices among large, internationally active banking organizations. U.S. banking regulators published final Basel II rules in December 2007. Ally is currently required to comply with the Basel II rules as implemented by the U.S. banking regulators. Prior to full implementation of the Basel II rules, Ally is required to complete a qualification period of four consecutive quarters during which it needs to demonstrate that it meets the requirements of the rules to the satisfaction of its primary U.S. banking regulator. Pursuant to an extension that was granted to Ally, this qualification period, or parallel run, is required to begin

Table of Contents

Ally Financial Inc. • Form 10-K

no later than October 1, 2013. During this period, capital is calculated using both Basel I and Basel II methodologies. Upon completion of this parallel run and with the approval of the primary U.S. banking regulator, Ally will begin to use Basel II to calculate regulatory capital. Basel II contemplated a three-year transition period during which a bank holding company or bank could gradually lower its capital level below the levels required by Basel I. However, under a final capital rule that implements a provision of the Dodd-Frank Act, Ally and Ally Bank must continue to calculate their risk-based capital requirements under Basel I, and the capital requirements that each computes under Basel I will serve as a floor for its risk-based capital requirement computed under Basel II.

In addition to Basel II, in December 2010, the Basel Committee adopted new capital, leverage, and liquidity guidelines under the Capital Accord (Basel III) that when implemented in the United States may have the effect of raising capital requirements beyond those required by current law and the Dodd-Frank Act. Basel III calls for an increase of the minimum Tier 1 common equity ratio to 4.5%, net of regulatory deductions, and introduces a capital conservation buffer of an additional 2.5% of common equity to risk-weighted assets raising the target minimum common equity ratio to 7.0%. Basel III increases the minimum Tier 1 capital ratio to 8.5% inclusive of the capital conservation buffer, increases the minimum total capital ratio to 10.5% inclusive of the capital buffer, and introduces a countercyclical capital buffer of up to 2.5% of common equity or other fully loss absorbing capital for periods of excess credit growth. Basel III also introduces a nonrisk adjusted Tier 1 leverage ratio of 3%, based on a measure of the total exposure rather than total assets, and new liquidity standards. The Basel III capital, leverage, and liquidity standards will be phased in over a multiyear period. The Basel III rules also call for a 15% cap on the amount of Tier 1 capital that can be met, in the aggregate, through significant investments in the common shares of unconsolidated financial subsidiaries, mortgage servicing rights (MSRs), and deferred tax assets through timing differences. In addition, under Basel III rules, after a ten-year phase-out period beginning in January 2013, trust preferred and other "hybrid" securities will no longer qualify as Tier 1 capital. However, under the Dodd-Frank Act, subject to certain exceptions (e.g., for debt or equity issued to the U.S. government under the Emergency Economic Stabilization Act), trust preferred and other "hybrid" securities are phased out from Tier 1 capital over a three-year period starting January 2013.

In June 2012, the U.S. banking regulators proposed rules to implement many aspects of Basel III (the U.S. Basel III proposals). The U.S. Basel III proposals contain new capital standards that raise the quality of capital and strengthen counterparty credit risk capital requirements and introduce a leverage ratio as a supplemental measure to the risk-based ratio. The proposals include a new capital conservation buffer, which imposes a common equity requirement above the new minimum that can be depleted under stress, and could result in restrictions on capital distributions and discretionary bonuses under certain circumstances. The U.S. Basel III proposals also provide for a potential countercyclical buffer that regulators can activate during periods of excessive credit growth in their jurisdiction. Furthermore, the U.S. Basel III proposals would replace the current Basel I-based "capital floor" (discussed above) with a standardized approach that, among other things, modifies the existing risk weights for certain types of asset classes. If adopted, this standardized approach would serve as the new minimum "capital floor" for Ally. The U.S. Basel III proposals contemplate that the new capital requirements would be phased in over several years, beginning in 2013. In November 2012, the U.S. banking regulators announced that the U.S. Basel III proposals would not become effective on January 1, 2013. The announcement did not specify new implementation or phase in dates for the U.S. Basel III proposals.

We continue to monitor developments with respect to Basel III and, pending the adoption of final capital rules and subsequent regulatory interpretation by the U.S. regulators, there remains a degree of uncertainty on the full impact of Basel III.

## Troubled Asset Relief Program

As part of the Automotive Industry Financing Program created under the Troubled Asset Relief Program (TARP) established by the U.S. Department of Treasury (Treasury) under the Emergency Economic Stabilization Act of 2008 (the EESA), Ally has entered into agreements pursuant to which Treasury has made investments in Ally. As a result of these investments, subject to certain exceptions, Ally and its subsidiaries are generally prohibited from paying certain dividends or distributions on, or redeeming, repurchasing, or acquiring any common stock without the consent of Treasury. Ally has further agreed that until Treasury ceases to hold Ally preferred stock, Ally will comply with certain restrictions on executive perquisites and compensation. Ally must also take all necessary action to ensure that its corporate governance and benefit plans with respect to its senior executive officers comply with Section 111(b) of the EESA as implemented by any guidance or regulation under the EESA, as amended by the American Recovery and Reinvestment Act of 2009, as implemented by the Interim Final Rule issued by Treasury on June 15, 2009. For further details regarding these restrictions on compensation as a result of TARP investments, refer to the Compensation Discussion and Analysis in Item 11.

## Depository Institutions

Ally Bank's deposits are insured by the FDIC, and Ally Bank is required to file periodic reports with the FDIC concerning its financial condition. Total assets of Ally Bank were $94.8 billion and $85.3 billion at December 31, 2012 and 2011, respectively. As a commercial nonmember bank chartered by the State of Utah, Ally Bank is subject to various regulatory capital adequacy requirements administered by state and federal banking agencies. The Federal Deposit Insurance Corporation Improvement Act of 1991 (FDICIA), among other things, identifies five capital categories for insured depository institutions ("well-capitalized," "adequately capitalized," "undercapitalized," "significantly undercapitalized," and "critically undercapitalized") and requires the respective federal regulatory agencies to implement systems for "prompt corrective action" for insured depository institutions that do not meet minimum capital requirements within such categories. Depending on the category in which an institution is classified, FDICIA imposes progressively more restrictive constraints on operations, management, and capital distributions.

Failure to meet minimum capital requirements can initiate certain mandatory and discretionary actions by regulators that, if undertaken, could have a direct material effect on Ally Bank's results of operations and financial condition. FDICIA generally prohibits a depository

8

Table of Contents

Ally Financial Inc. • Form 10-K

institution from making any capital distribution, including payment of a cash dividend or paying any management fee to its holding company, if the depository institution would become under-capitalized after such payment. Under-capitalized institutions are also subject to growth limitations and are required by the appropriate federal banking agency to submit a capital restoration plan. If any depository institution subsidiary of a holding company is required to submit a capital restoration plan, the holding company would be required to provide a limited guarantee regarding compliance with the plan as a condition of approval of such plan. Failure to meet the capital guidelines could also subject a banking institution to capital raising requirements.

At December 31, 2012, we were in compliance with our regulatory capital requirements. For an additional discussion of capital adequacy requirements, refer to  Note 21 to the Consolidated Financial Statements.

## U.S. Mortgage Business

Our U.S. mortgage business is subject to extensive federal, state, and local laws, rules, and regulations in addition to judicial and administrative decisions that impose requirements and restrictions on this business. As a Federal Housing Administration-approved lender, certain of our U.S. mortgage subsidiaries are required to submit audited financial statements to the Department of Housing and Urban Development on an annual basis. The U.S. mortgage business is also subject to examination by the Federal Housing Commissioner to assure compliance with Federal Housing Administration regulations, policies, and procedures. The federal, state, and local laws, rules, and regulations to which our U.S. mortgage business is subject, among other things, impose licensing obligations and financial requirements; limit the interest rates, finance charges, and other fees that can be charged; regulate the use of credit reports and the reporting of credit information; impose underwriting requirements; regulate marketing techniques and practices; require the safeguarding of nonpublic information about customers; and regulate servicing practices, including the assessment, collection, foreclosure, claims handling, and investment and interest payments on escrow accounts. In addition, proposals have been enacted in the U.S. Congress and are under consideration by various regulatory authorities that would affect the manner in which the GSEs conduct their business and there is some possibility that Fannie Mae and Freddie Mac will be subject to winding down.

## Insurance Companies

Our Insurance operations are subject to certain minimum aggregate capital requirements, net asset and dividend restrictions under applicable state and foreign insurance law, and the rules and regulations promulgated by various U.S. and foreign regulatory agencies. Under various state and foreign insurance regulations, dividend distributions may be made only from statutory unassigned surplus with approvals required from the regulatory authorities for dividends in excess of certain statutory limitations. Our insurance operations are also subject to applicable state laws generally governing insurance companies, as well as laws and regulations for products that are not regulated as insurance, such as vehicle service contracts and guarantees asset protection waivers.

## Investments in Ally

Because Ally Bank is an FDIC-insured bank and Ally and IB Finance are bank holding companies, acquisitions of our voting stock above certain thresholds may be subject to regulatory approval or notice under federal or state law. Investors are responsible for ensuring that they do not, directly or indirectly, acquire shares of our stock in excess of the amount that may be acquired without regulatory approval under the Change in Bank Control Act, the BHC Act, and Utah state law.

## International Banks, Finance Companies, and Other Non-U.S. Operations

Certain of our foreign subsidiaries, which we have classified as discontinued operations, operate in local markets as either banks or regulated finance companies and are subject to regulatory restrictions. These regulatory restrictions, among other things, require that our subsidiaries meet certain minimum capital requirements and may restrict dividend distributions and ownership of certain assets. Total assets of the regulated international banks and finance companies were approximately  $15.3 billion and $13.6 billion at December 31, 2012 and 2011, respectively. Many of our other operations are also heavily regulated in many jurisdictions outside the United States.

## Other Regulations

Some of the more significant regulations that we are subject to include:

- *Privacy* — The GLB Act imposes additional obligations on us to safeguard the information we maintain on our customers, requires us to provide notice of our privacy practices, and permits customers to "opt-out" of information sharing with unaffiliated parties. The federal banking agencies and the Federal Trade Commission have issued regulations that establish obligations to safeguard information. In addition, several states have enacted even more stringent privacy and safeguarding legislation. If a variety of inconsistent state privacy rules or requirements are enacted, our compliance costs could increase substantially.

- *Fair Credit Reporting Act* — The Fair Credit Reporting Act regulates the use of credit reports and the reporting of information to credit reporting agencies, and also provides a national legal standard for lenders to share information with affiliates and certain third parties and to provide firm offers of credit to consumers. In late 2003, the Fair and Accurate Credit Transactions Act was enacted, making this preemption of conflicting state and local law permanent. The Fair Credit Reporting Act was also amended to place further restrictions on the use of information shared between affiliates, to provide new disclosures to consumers when risk-based pricing is used in the credit decision, and to help protect consumers from identity theft. All of these provisions impose additional regulatory and compliance costs on us and reduce the effectiveness of our marketing programs.

9

Table of Contents

Ally Financial Inc. • Form 10-K

- **Truth in Lending Act** — The Truth in Lending Act (TILA), as amended, and Regulation Z, which implements TILA, requires lenders to provide borrowers with uniform, understandable information concerning terms and conditions in certain credit transactions. These rules apply to Ally and its subsidiaries in transactions in which they extend credit to consumers and require, in the case of certain mortgage and automotive financing transactions, conspicuous disclosure of the finance charge and annual percentage rate, if any. In addition, if an advertisement for credit states specific credit terms, Regulation Z requires that such advertisement state only those terms that actually are or will be arranged or offered by the creditor. The Consumer Financial Protection Bureau has recently issued substantial amendments to the mortgage requirements under TILA, and additional changes are likely in the future. Failure to comply with TILA can result in liability for damages as well as criminal and civil penalties.

- **Sarbanes-Oxley Act** — The Sarbanes-Oxley Act of 2002 implemented a broad range of corporate governance and accounting measures designed to promote honesty and transparency in corporate America. The principal provisions of the act include, among other things, (1) the creation of an independent accounting oversight board; (2) auditor independence provisions that restrict non-audit services that accountants may provide to their audit clients; (3) additional corporate governance and responsibility measures including the requirement that the principal executive and financial officers certify financial statements; (4) the potential forfeiture of bonuses or other incentive-based compensation and profits from the sale of an issuer's securities by directors and senior officers in the twelve-month period following initial publication of any financial statements that later require restatement; (5) an increase in the oversight of and enhancement of certain requirements relating to audit committees and how they interact with the independent auditors; (6) requirements that audit committee members must be independent and are barred from accepting consulting, advisory, or other compensatory fees from the issuer; (7) requirements that companies disclose whether at least one member of the audit committee is a "financial expert" (as defined by the SEC) and, if not, why the audit committee does not have a financial expert; (8) a prohibition on personal loans to directors and officers, except certain loans made by insured financial institutions, on nonpreferential terms and in compliance with other bank regulatory requirements; (9) disclosure of a code of ethics; (10) requirements that management assess the effectiveness of internal control over financial reporting and that the Independent Registered Public Accounting firm attest to the assessment; and (11) a range of enhanced penalties for fraud and other violations.

- **USA PATRIOT Act/Anti-Money-Laundering Requirements** — In 2001, the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act (USA PATRIOT Act) was signed into law. Title III of the USA PATRIOT Act amends the Bank Secrecy Act and contains provisions designed to detect and prevent the use of the U.S. financial system for money laundering and terrorist financing activities. The Bank Secrecy Act, as amended by the USA PATRIOT Act, requires bank holding companies, banks, and certain other financial companies to undertake activities including maintaining an anti-money-laundering program, verifying the identity of clients, monitoring for and reporting on suspicious transactions, reporting on cash transactions exceeding specified thresholds, and responding to requests for information by regulatory authorities and law enforcement agencies. We have implemented internal practices, procedures, and controls designed to comply with these anti-money-laundering requirements.

- **Community Reinvestment Act** — Under the Community Reinvestment Act (CRA), a bank has a continuing and affirmative obligation, consistent with the safe-and-sound operation of the institution, to help meet the credit needs of its entire community, including low- and moderate-income persons and neighborhoods. The CRA does not establish specific lending requirements or programs for financial institutions. However, institutions are rated on their performance in meeting the needs of their communities. Failure by Ally Bank to maintain a satisfactory or better rating under the CRA may adversely affect Ally's ability to make acquisitions, engage in new activities, and become a financial holding company.

- **Other** — Our U.S. mortgage business has subsidiaries that are required to maintain regulatory capital requirements under agreements with the GSEs and the Department of Housing and Urban Development.

## Employees

We had approximately 10,600 and 14,800 employees at December 31, 2012 and 2011, respectively. Employees of operations held-for-sale are included within our employee count at December 31, 2012, and 2011. Employees of operations that were deconsolidated during 2012 are included only within our employee count at December 31, 2011.

## Additional Information

The results of operations for each of our reportable operating segments and the products and services offered are contained in the individual business operations sections of Management's Discussion and Analysis of Financial Condition and Results of Operations. Financial information related to reportable operating segments and geographic areas is provided in Note 26 to the Consolidated Financial Statements.

Our Annual Report on Form 10-K, Quarterly Reports on Form 10-Q, and Current Reports on Form 8-K (and amendments to these reports) are available on our internet website, free of charge, as soon as reasonably practicable after the reports are electronically filed with or furnished to the SEC. These reports are available at www.ally.com. Choose Investor Relations, Financial Information, and then SEC Filings (under About Ally). These reports can also be found on the SEC website at www.sec.gov.

## Item 1A.    Risk Factors

Our businesses face many risks and uncertainties, any of which could result in a material adverse effect on our results of operations or financial condition. We believe that the most significant of the risks and uncertainties we face are described below. This Form 10-K is qualified in its entirety by these risk factors.

10

Table of Contents

Ally Financial Inc. • Form 10-K

## Risks Related to Regulation

*Our business, financial condition, and results of operations could be adversely affected by regulations to which we are subject as a result of our bank holding company status.*

We are a bank holding company under the Bank Holding Company Act of 1956 (BHC Act). Many of the regulatory requirements to which we are subject as a bank holding company were not applicable to us prior to December 2008 and have and will continue to require significant expense and devotion of resources to fully implement necessary policies and procedures to ensure continued compliance. Compliance with such laws and regulations involves substantial costs and may adversely affect our ability to operate profitably. Recent events, particularly in the financial and real estate markets, have resulted in bank regulatory agencies placing increased focus and scrutiny on participants in the financial services industry, including us. For a description of our regulatory requirements, see "Business—Certain Regulatory Matters."

Ally is subject to ongoing supervision, examination and regulation by the FRB, and Ally Bank by the FDIC and the Utah DFI, in each case, through regular examinations and other means that allow the regulators to gauge management's ability to identify, assess, and control risk in all areas of operations in a safe-and-sound manner and to ensure compliance with laws and regulations.

Ally is currently required by its banking supervisors to make improvements in areas such as board and senior management oversight, risk management, regulatory reporting, internal audit planning, capital adequacy process, stress testing, and Bank Secrecy Act / anti-money-laundering compliance, and to continue to reduce problem assets. Separately, Ally Bank is currently required by its banking supervisors to make improvements in areas such as compliance management and training, consumer protection monitoring, consumer complaint resolution, internal audit program and residential mortgage loan pricing, and fee monitoring. These requirements are judicially enforceable, and if we are unable to implement and maintain these required actions, plans, policies and procedures in a timely and effective manner and otherwise comply with the requirements outlined above, we could become subject to formal supervisory actions which could subject us to significant restrictions on our existing business or on our ability to develop any new business. Such forms of supervisory action could include, without limitation, written agreements, cease and desist orders, and consent orders and may, among other things, result in restrictions on our ability to pay dividends, requirements to increase capital, restrictions on our activities, the imposition of civil monetary penalties, and enforcement of such action through injunctions or restraining orders. We could also be required to dispose of certain assets and liabilities within a prescribed period. The terms of any such supervisory action could have a material adverse effect on our business, operating flexibility, financial condition, and results of operations.

*Our ability to engage in certain activities may be adversely affected by our status as a bank holding company.*

As a bank holding company, Ally's activities are generally limited to banking or to managing or controlling banks or to other activities deemed closely related to banking or otherwise permissible under the BHC Act and related regulations. Likewise, subject to certain exceptions, Ally is not permitted to acquire more than 5% of any class of voting shares of any nonaffiliated bank or bank holding company, directly or indirectly, or to acquire control of any other company, directly or indirectly (including by acquisition of 25% or more of a class of voting shares). Upon our bank holding company approval, we were permitted an initial two-year grace period to bring our activities and investments into conformity with these restrictions. This grace period expired in December 2010. The FRB then granted two one-year extensions that expired in December 2012, and recently granted a third and final one-year extension that expires in December 2013. We will not be permitted to apply to the FRB for any further extensions. Certain of Ally's existing activities and investments are deemed impermissible under the BHC Act and must be terminated or disposed of by the expiration of this extension, the most significant of which includes most of our insurance activities and our SmartAuction vehicle remarketing services for third parties. While these activities may be continued if Ally is able to convert to a financial holding company under the BHC Act, Ally may be unable to satisfy the requirements to enable it to convert to a financial holding company prior to that time, and activities, businesses, or investments that would be permissible for a financial holding company will need to be terminated or disposed of. This could have a material adverse effect on our business, results of operations, and financial position.

As a bank holding company, our ability to expand into new business activities would require us to obtain the prior approval of the relevant banking supervisors. There can be no assurance that any required approval will be obtained or that we will be able to execute on any such plans in a timely manner or at all. If we are unable to obtain approval to expand into new business activities, our business, results of operations, and financial position may be materially adversely affected.

*Our ability to execute our business strategy may be affected by regulatory considerations.*

Our business strategy for Ally Bank, which is primarily focused on automotive lending and growth of our direct-channel deposit business, is subject to regulatory oversight from a safety and soundness perspective. If our banking supervisors raise concerns regarding any aspect of our business strategy for Ally Bank, we may be obliged to alter our strategy, which could include moving certain activities, such as certain types of lending, outside of Ally Bank to one of our nonbanking affiliates. Alternative funding sources outside of Ally Bank, such as asset securitization or financings in the capital markets, could be more expensive than funding through Ally Bank and could adversely affect our business prospects, results of operations and financial position.

*We are subject to new capital planning and systemic risk regimes, which impose significant restrictions and requirements.*

As a bank holding company with $50 billion or more of consolidated assets, Ally is required to conduct periodic stress tests and submit a proposed capital action plan to the FRB every January, which the FRB must take action on by the following March. The proposed capital

11

Table of Contents

Ally Financial Inc. • Form 10-K

action plan must include a description of all planned capital actions over a nine-quarter planning horizon, including any issuance of a debt or equity capital instrument, any capital distribution, and any similar action that the FRB determines could have an impact on Ally's consolidated capital. The proposed capital action plan must also include a discussion of how Ally will maintain capital above the minimum regulatory capital ratios and above a Tier 1 common equity-to-total risk-weighted assets ratio of 5 percent, and serve as a source of strength to Ally Bank. The FRB's capital plan rule requires that Ally receive no objection from the FRB prior to making a capital distribution. Ally submitted its capital plan in January 2013. Failure to obtain no objection to this plan could limit our ability to pay dividends, redeem or repurchase securities, or take other capital actions in the future.

In addition, in December 2011, the FRB proposed rules to implement certain provisions of the systemic risk regime under the Dodd-Frank Wall Street Reform and Consumer Protection Act (Dodd-Frank Act). If adopted as proposed, among other provisions, the rules would require Ally to maintain a sufficient quantity of highly liquid assets to survive a projected 30-day liquidity stress event and implement various liquidity-related corporate governance measures; limit Ally's aggregate exposure to any unaffiliated counterparty to 25% of Ally's capital and surplus; and potentially subject Ally to an early remediation regime that could limit the ability of Ally to pay dividends or expand its business if the FRB identified Ally as suffering from financial or management weaknesses. The systemic risk provisions, when implemented, could adversely affect our business prospects, results of operations, and financial condition.

*Our ability to rely on deposits as a part of our funding strategy may be limited.*

Ally Bank continues to be a key part of our funding strategy, and we have increased our reliance on deposits as an alternative source of funding through Ally Bank. Ally Bank does not have a retail branch network, and it obtains its deposits through direct banking and brokered deposits which, at December 31, 2012, included $9.4 billion of brokered certificates of deposit that may be more price sensitive than other types of deposits and may become less available if alternative investments offer higher interest rates. At December 31, 2012, brokered deposits represented 20% of Ally Bank total deposits. Our ability to maintain our current level of deposits or grow our deposit base could be affected by regulatory restrictions including the possible imposition of prior approval requirements, restrictions on deposit growth, or restrictions on our rates offered. In addition, perceptions of our financial strength, rates offered by third parties, and other competitive factors beyond our control, including returns on alternative investments, will also impact our ability to grow our deposit base. Even if we are able to grow the deposit base of Ally Bank, our regulators may impose restrictions on our ability to use Ally Bank deposits as a source of funding for certain business activities potentially raising the cost of funding those activities without the use of Ally Bank deposits.

*The regulatory environment in which we operate could have a material adverse effect on our business and earnings.*

Our domestic operations are subject to various laws and judicial and administrative decisions imposing various requirements and restrictions relating to supervision and regulation by state and federal authorities. Such regulation and supervision are primarily for the benefit and protection of our customers, not for the benefit of investors in our securities, and could limit our discretion in operating our business. Noncompliance with applicable statutes, regulations, rules, or policies could result in the suspension or revocation of any license or registration at issue as well as the imposition of civil fines and criminal penalties.

Ally, Ally Bank, and many of our nonbank subsidiaries are heavily regulated by bank and other regulatory agencies at the federal and state levels. This regulatory oversight is established to protect depositors, the FDIC's Deposit Insurance Fund, and the banking system as a whole, not security holders. Changes to statutes, regulations, rules, or policies including the interpretation or implementation of statutes, regulations, rules, or policies could affect us in substantial and unpredictable ways including limiting the types of financial services and products we may offer, limiting our ability to pursue acquisitions and increasing the ability of third parties to offer competing financial services and products.

Our operations are also heavily regulated in many jurisdictions outside the United States. For example, certain of our foreign subsidiaries operate either as a bank or a regulated finance company, and our insurance operations are subject to various requirements in the foreign markets in which we operate. The varying requirements of these jurisdictions may be inconsistent with U.S. rules and may materially adversely affect our business or limit necessary regulatory approvals, or if approvals are obtained, we may not be able to continue to comply with the terms of the approvals or applicable regulations. In addition, in many countries, the regulations applicable to the financial services industry are uncertain and evolving.

Our inability to remain in compliance with regulatory requirements in a particular jurisdiction could have a material adverse effect on our operations in that market with regard to the affected product and on our reputation generally. No assurance can be given that applicable laws or regulations will not be amended or construed differently, that new laws and regulations will not be adopted, or that we will not be prohibited by local laws or regulators from raising interest rates above certain desired levels, any of which could materially adversely affect our business, operating flexibility, financial condition, or results of operations.

*Financial services legislative and regulatory reforms may have a significant impact on our business and results of operations.*

The Dodd-Frank Act, which became law in July 2010, has and will continue to substantially change the legal and regulatory framework under which we operate. Certain portions of the Dodd-Frank Act were effective immediately, and others have become effective since enactment, while others are subject to further rulemaking and discretion of various regulatory bodies. The Dodd-Frank Act, when fully implemented, will have material implications for Ally and the entire financial services industry. Among other things, it will or potentially could:

12

Table of Contents

Ally Financial Inc. • Form 10-K

- result in Ally being subject to enhanced oversight and scrutiny as a result of being a bank holding company with $50 billion or more in consolidated assets;

- affect the levels of capital and liquidity with which Ally must operate and how it plans capital and liquidity levels;

- subject Ally to new and/or higher fees paid to various regulatory entities, including but not limited to deposit insurance fees to the FDIC;

- impact a number of Ally's business and risk management strategies;

- restrict the revenue that Ally generates from certain businesses;

- require Ally to provide to the Federal Reserve and FDIC an annual plan for its rapid and orderly resolution in the event of material financial distress; and

- subject Ally to a new Consumer Financial Protection Bureau (CFPB), which has very broad rule-making, examination, and enforcement authorities.

In light of the further study and rulemaking required to fully implement the Dodd-Frank Act, as well as the discretion afforded to federal regulators, the full impact of this legislation on Ally, its business strategies, and financial performance cannot be known at this time and may not be known for a number of years. In addition, regulations may impact us differently in comparison to other more established financial institutions. However, these impacts are expected to be substantial and some of them are likely to adversely affect Ally and its financial performance. The extent to which Ally can adjust its strategies to offset such adverse impacts also is not knowable at this time.

*Our business may be adversely affected upon our implementation of the revised capital requirements under the Basel III capital rules.*

In December 2010, the Bank for International Settlements' Basel Committee on Banking Supervision adopted new capital, leverage, and liquidity guidelines under the Basel Accord (Basel III), which when implemented in the United States, may have the effect of raising capital requirements beyond those required by current law and the Dodd-Frank Act. In June 2012, the U.S. banking regulators proposed rules to implement many aspects of Basel III (the U.S. Basel III proposals). The U.S. Basel III proposals contain new capital standards that raise the quality of capital and strengthen counterparty credit risk capital requirements and introduce a leverage ratio as a supplemental measure to the risk-based ratio. The proposals include a new capital conservation buffer, which imposes a common equity requirement above the new minimum that can be depleted under stress, and could result in restrictions on capital distributions and discretionary bonuses under certain circumstances. The U.S. Basel III proposals also provide for a potential countercyclical buffer that regulators can activate during periods of excessive credit growth in their jurisdiction. The U.S. Basel III proposals contemplate that the new capital requirements would be phased in over several years, beginning in 2013. In November 2012, the U.S. banking regulators announced that the U.S. Basel III proposals would not become effective on January 1, 2013. The announcement did not specify new implementation or phase-in dates for the U.S. Basel III proposals.

The Basel III rules and the Dodd-Frank Act, when implemented, will over time impose limits on Ally's ability to meet its regulatory capital requirements through the use of mortgage servicing rights (MSRs), trust preferred securities, or other "hybrid" securities, if applicable. At December 31, 2012, Ally had $857 million of MSRs and $2.5 billion of trust preferred securities, which were included as Tier 1 capital. Ally currently has no other "hybrid" securities outstanding. Pending final U.S. implementation of rules for Basel III and subsequent regulatory interpretation, there remains a degree of uncertainty on the full impact of Basel III.

If we or Ally Bank fail to satisfy regulatory capital requirements, we or Ally Bank may be subject to serious regulatory sanctions ranging in severity from being precluded from making acquisitions or engaging in new activities to becoming subject to informal or formal supervisory actions by the FRB and/or FDIC and, potentially, FDIC receivership of Ally Bank. If any of these were to occur, such actions could prevent us from successfully executing our business plan and have a material adverse effect on our business, results of operations, and financial position.

*Our business, financial condition, and results of operations could be adversely affected by governmental fiscal and monetary policies.*

The actions of the FRB and international central banking authorities directly impact our cost of funds for lending, capital raising, and investment activities and may impact the value of financial instruments we hold. In addition, such changes in monetary policy may affect the credit quality of our customers. Changes in domestic and international monetary policy are beyond our control and difficult to predict.

In addition, our business and earnings are significantly affected by the fiscal and monetary policies of the U.S. government and its agencies. We are particularly affected by the policies of the FRB, which regulates the supply of money and credit in the United States. The FRB's policies influence the new and used vehicle financing market, which significantly affects the earnings of our businesses. The FRB's policies also influence the yield on our interest earning assets and the cost of our interest-bearing liabilities. Changes in those policies are beyond our control and difficult to predict and could adversely affect our revenues, profitability, and financial condition.

13

Table of Contents

Ally Financial Inc. • Form 10-K

*Future consumer legislation could harm our competitive position.*

In addition to the enactment of the Dodd-Frank Act, various legislative bodies have also recently been considering altering the existing framework concerning creditors' rights, including legislation that would result in or allow loan modifications of various sorts. Such legislation may change banking statutes and the operating environment in substantial and unpredictable ways. If enacted, such legislation could increase or decrease the cost of doing business; limit or expand permissible activities; or affect the competitive balance among banks, savings associations, credit unions, and other financial institutions. We cannot predict whether new legislation will be enacted, and if enacted, the effect that it or any regulations would have on our activities, financial condition, or results of operations.

*Ally and its subsidiaries are involved in investigations, and proceedings by government and self-regulatory agencies, which may lead to material adverse consequences.*

Ally and its subsidiaries, including Ally Bank, are and may become involved from time to time in reviews, investigations, and proceedings (both formal and informal), and information-gathering requests, by government and self-regulatory agencies, including the FRB, FDIC, Utah DFI, CFPB, SEC, and the Federal Trade Commission regarding their respective operations. Such requests include subpoenas from each of the SEC and the U.S. Department of Justice. We continue to respond to subpoenas and document requests from the SEC, seeking information covering a wide range of mortgage-related matters, including, among other things, various aspects surrounding securitizations of residential mortgages. The subpoenas received from the U.S. Department of Justice include a broad request for documentation and other information in connection with its investigation of potential fraud and other potential legal violations related to mortgage backed securities, as well as the origination and/or underwriting of mortgage loans. In addition, the CFPB has recently advised us that they are investigating certain of our retail financing practices. These matters, or any other investigation or information-gathering request, may result in material adverse consequences including without limitation, adverse judgments, settlements, fines, penalties, injunctions, or other actions.

*Our business, financial position, and results of operations could be adversely affected by the impact of affiliate transaction restrictions imposed in connection with certain financing transactions.*

Certain transactions between Ally Bank and any of its nonbank "affiliates," including but not limited to Ally Financial Inc. are subject to federal statutory and regulatory restrictions. Pursuant to these restrictions, unless otherwise exempted, "covered transactions," including Ally Bank's extensions of credit to and asset purchases from its nonbank affiliates, generally (1) are limited to 10% of Ally Bank's capital stock and surplus with respect to transactions with any individual affiliate, with an aggregate limit of 20% of Ally Bank's capital stock and surplus for all affiliates and all such transactions; (2) in the case of certain credit transactions, are subject to stringent collateralization requirements; (3) in the case of asset purchases by Ally Bank, may not involve the purchase of any asset deemed to be a "low quality asset" under federal banking guidelines; and (4) must be conducted in accordance with safe-and-sound banking practices (collectively, the Affiliate Transaction Restrictions). Furthermore, there is an "attribution rule" that provides that a transaction between Ally Bank and a third party must be treated as a transaction between Ally Bank and a nonbank affiliate to the extent that the proceeds of the transaction are used for the benefit of, or transferred to, a nonbank affiliate of Ally Bank. Retail financing transactions by Ally Bank involving vehicles for which Ally provided floorplan financing are subject to the Affiliate Transaction Restrictions because the proceeds of the retail financings are deemed to benefit, and are ultimately transferred to, Ally.

Under the Dodd-Frank Act, among other changes to Sections 23A and 23B of the Federal Reserve Act, credit exposures resulting from derivatives transactions, securities lending and borrowing transactions, and acceptance of affiliate-issued debt obligations (other than securities) as collateral for a loan or extension of credit will be treated as "covered transactions." The Dodd-Frank Act also expands the scope of covered transactions required to be collateralized and places limits on acceptable collateral.

Historically, the FRB was authorized to exempt, in its discretion, transactions or relationships with affiliates from the requirements of these rules if it found such exemptions to be in the public interest and consistent with the purposes of the rules. As a result of the Dodd-Frank Act, exemptions now may be granted by the FDIC if the FDIC and FRB jointly find that the exemption is in the public interest and consistent with the purposes of the rules, and the FDIC finds that the exemption does not present an unacceptable risk to the Deposit Insurance Fund. The FRB granted several such exemptions to Ally Bank in the past. However, the existing exemptions are subject to various conditions and, particularly in light of the statutory changes made by the Dodd-Frank Act, any requests for future exemptions may not be granted. Moreover, these limited exemptions generally do not encompass consumer leasing or used vehicle financing. Since there is no assurance that Ally Bank will be able to obtain future exemptions or waivers with respect to these restrictions, the ability to grow Ally Bank's business will be affected by the Affiliate Transaction Restrictions.

*Ally Financial Inc. may require distributions in the future from its subsidiaries.*

We currently fund Ally Financial Inc.'s obligations, including dividend payments to our preferred shareholders, and payments of interest and principal on our indebtedness, from cash generated by Ally Financial Inc. In the future, Ally Financial Inc. may not generate sufficient funds at the parent company level to fund its obligations. As such, it may require dividends, distributions, or other payments from its subsidiaries to fund its obligations. However, regulatory and other legal restrictions may limit the ability of Ally Financial Inc.'s subsidiaries to transfer funds freely to Ally Financial Inc. In particular, many of Ally Financial Inc.'s subsidiaries are subject to laws, regulations, and rules that authorize regulatory bodies to block or reduce the flow of funds to it or that prohibit such transfers entirely in certain circumstances. These laws, regulations, and rules may hinder Ally Financial Inc.'s ability to access funds that it may need to make payments on its obligations in the future. Furthermore, as a bank holding company, Ally Financial Inc. may become subject to a prohibition or to limitations

14

Table of Contents

Ally Financial Inc. • Form 10-K

on its ability to pay dividends. The bank regulators have the authority and, under certain circumstances, the duty to prohibit or to limit payment of dividends by the banking organizations they supervise, including Ally Financial Inc. and its subsidiaries.

*Current and future increases in FDIC insurance premiums, including the FDIC special assessment imposed on all FDIC-insured institutions, could decrease our earnings.*

Beginning in 2008 and continuing through 2012, higher levels of bank failures have dramatically increased resolution costs of the FDIC and depleted the Deposit Insurance Fund (the DIF). In May 2009, the FDIC announced that it had voted to levy a special assessment on insured institutions in order to facilitate the rebuilding of the DIF. In September 2009, the FDIC voted to adopt an increase in the risk-based assessment rate effective beginning January 1, 2011, by three basis points. Further, the Dodd-Frank Act alters the calculation of an insured institution's deposit base for purposes of deposit insurance assessments and removes the upper limit for the reserve ratio designated by the FDIC each year. On February 7, 2011, the FDIC approved a final rule implementing these changes, which took effect on April 1, 2011. The FDIC will continue to assess the changes to the assessment rates at least annually. Future deposit premiums paid by Ally Bank depend on the level of the DIF and the magnitude and cost of future bank failures. Any increases in deposit insurance assessments could decrease our earnings.

## Risks Related to Our Business

*The profitability and financial condition of our operations are heavily dependent upon the performance, operations, and prospects of GM and Chrysler.*

GM and Chrysler dealers and their retail customers compose a significant portion of our customer base, and our Dealer Financial Services operations are highly dependent on GM and Chrysler production and sales volume. In 2012, 63% of our U.S. new vehicle dealer inventory financing and 59% of our U.S. new vehicle consumer automotive financing volume were for GM franchised dealers and customers, and 28% of our U.S. new vehicle dealer inventory financing and 32% of our U.S. new vehicle consumer automotive financing volume were for Chrysler dealers and customers.

We are currently party to agreements with each of GM and Chrysler that provide for certain exclusivity privileges related to subvention programs offered by each of them. On April 25, 2012, Chrysler provided us with notification of nonrenewal for the existing agreement, and as a result our agreement with Chrysler will expire in April 2013. Further, Chrysler has recently announced that it has entered into a ten-year agreement with Santander Consumer USA Inc. (Santander), pursuant to which Santander will provide a full range of wholesale and retail financing services to Chrysler dealers and consumers, beginning in May 2013. In addition, our agreement with GM will expire in December 2013. These agreements provided Ally with certain preferred provider benefits, including limiting the use of other financing providers by GM and Chrysler in their incentive programs. We cannot predict the ultimate impact that the expiration of these agreements will have on our operations. However, the expiration of these agreements will likely increase competitive pressure on Ally, as some competitors have or could have exclusive agreements with GM and/or Chrysler.

On October 1, 2010, GM acquired AmeriCredit Corp. (which GM subsequently renamed General Motors Financial Company, Inc. (GMF)), an independent automotive finance company that focuses on providing leasing and subprime financing options. Further, and as previously announced, we have entered into an agreement with GMF pursuant to which GMF will purchase our automotive finance operations in Europe and Latin America, as well as our interest in a joint venture in China. As GMF continues to grow, and as GM directs additional business to GMF, it could reduce GM's reliance on our services over time, which could have a material adverse effect on our profitability and financial condition. In addition, it is possible that GM or other automotive manufacturers could utilize other existing companies to support their financing needs including offering products or terms that we would not or could not offer, which could have a material adverse impact on our business and operations. Furthermore, other automotive manufacturers could expand or establish or acquire captive finance companies to support their financing needs thus reducing their need for our services.

A significant adverse change in GM's or Chrysler's business, including the production or sale of GM or Chrysler vehicles; the quality or resale value of GM or Chrysler vehicles; the use of GM or Chrysler marketing incentives; GM's or Chrysler's relationships with its key suppliers; or GM's or Chrysler's relationship with the United Auto Workers and other labor unions and other factors impacting GM or Chrysler or their respective employees, or significant adverse changes in their respective liquidity position and access to the capital markets; could have a material adverse effect on our profitability and financial condition.

There is no assurance that the global automotive market or GM's and Chrysler's respective share of that market will not suffer downturns in the future, and any negative impact could in turn have a material adverse effect on our business, results of operations, and financial condition.

*Our business requires substantial capital and liquidity, and disruption in our funding sources and access to the capital markets would have a material adverse effect on our liquidity, capital positions, and financial condition.*

Our liquidity and the long-term viability of Ally depend on many factors, including our ability to successfully raise capital and secure appropriate bank financing. We are currently required to maintain a Tier 1 leverage ratio of 15% at Ally Bank, which will require that Ally maintain substantial equity funds in Ally Bank and inject substantial additional equity funds into Ally Bank as Ally Bank's assets increase over time.

15

Table of Contents

Ally Financial Inc. • Form 10-K

We have significant maturities of unsecured debt each year. While we have reduced our reliance on unsecured funding, it continues to remain a critical component of our capital structure and financing plans. At December 31, 2012, approximately $1.3 billion in principal amount of total outstanding consolidated unsecured debt is scheduled to mature in 2013, and approximately $5.6 billion and $5.1 billion in principal amount of consolidated unsecured debt is scheduled to mature in 2014 and 2015, respectively. We also obtain short-term funding from the sale of floating rate demand notes, all of which the holders may elect to have redeemed at any time without restriction. At December 31, 2012, a total of $3.1 billion in principal amount of Demand Notes were outstanding. We also rely on secured funding. At December 31, 2012, approximately $11.5 billion of outstanding consolidated secured debt is scheduled to mature in 2013, approximately $13.6 billion is scheduled to mature in 2014, and approximately $8.6 billion is scheduled to mature in 2015. Furthermore, at December 31, 2012, approximately $15.7 billion in certificates of deposit at Ally Bank are scheduled to mature in 2013, which is not included in the 2013 unsecured maturities provided above. Additional financing will be required to fund a material portion of the debt maturities over these periods. The capital markets continue to be volatile, and Ally's access to the debt markets may be significantly reduced during periods of market stress. In addition, we will continue to have significant original issue discount amortization expenses (OID expense) in the near future, which will adversely affect our net income and resulting capital position. OID expense was $349 million in 2012, and the remaining scheduled amortization of OID is $261 million, $188 million, and $56 million in 2013, 2014, and 2015, respectively.

As a result of the volatility in the markets and our current unsecured debt ratings, we have increased our reliance on various secured debt markets. Although market conditions have improved, there can be no assurances that this will continue. In addition, we continue to rely on our ability to borrow from other financial institutions, and many of our primary bank facilities are up for renewal on a yearly basis. Any weakness in market conditions and a tightening of credit availability could have a negative effect on our ability to refinance these facilities and increase the costs of bank funding. Ally and Ally Bank also continue to access the securitization markets. While markets have continued to stabilize following the 2008 liquidity crisis, there can be no assurances these sources of liquidity will remain available to us.

*Our indebtedness and other obligations are significant and could materially and adversely affect our business.*

We have a significant amount of indebtedness. At December 31, 2012, we had approximately $82.8 billion in principal amount of indebtedness outstanding (including $45.1 billion in secured indebtedness). Interest expense on our indebtedness constituted approximately 48% of our total financing revenue and other interest income for the year ended December 31, 2012. In addition, during the twelve months ending December 31, 2012, we declared and paid preferred stock dividends of $802 million in the aggregate.

We have the ability to create additional unsecured indebtedness. If our debt service obligations increase, whether due to the increased cost of existing indebtedness or the incurrence of additional indebtedness, we may be required to dedicate a significant portion of our cash flow from operations to the payment of principal of, and interest on, our indebtedness, which would reduce the funds available for other purposes. Our indebtedness also could limit our ability to withstand competitive pressures and reduce our flexibility in responding to changing business and economic conditions.

*The worldwide financial services industry is highly competitive. If we are unable to compete successfully or if there is increased competition in the automotive financing and/or insurance markets or generally in the markets for securitizations or asset sales, our business could be negatively affected.*

The markets for automotive financing, banking, and insurance are highly competitive. The market for automotive financing has grown more competitive as more consumers are financing their vehicle purchases and as more competitors continue to enter this market as a result of how well automotive finance assets generally performed relative to other asset classes during the 2008 economic downturn. More recently, competition for automotive financing has further intensified as a growing number of banks have become increasingly interested in automotive-finance assets, which has resulted in pressure on our net interest margins. For example, on April 1, 2011, TD Bank Group announced the closing of its acquisition of Chrysler Financial, which could enhance Chrysler Financial's ability to expand its product offerings and may result in increased competition. Ally Bank faces significant competition from commercial banks, savings institutions, mortgage companies, and other financial institutions. Our insurance business faces significant competition from insurance carriers, reinsurers, third-party administrators, brokers, and other insurance-related companies. Many of our competitors have substantial positions nationally or in the markets in which they operate. Some of our competitors have lower cost structures, substantially lower costs of capital, and are much less reliant on securitization activities, unsecured debt, and public markets. Our competitors may be subject to different, and in some cases, less stringent, legislative and regulatory regimes than we are, thus putting us at a competitive disadvantage to these competitors. We face significant competition in most areas including product offerings, rates, pricing and fees, and customer service. If we are unable to compete effectively in the markets in which we operate, our profitability and financial condition could be negatively affected.

The markets for asset securitizations and whole-loan sales are competitive, and other issuers and originators could increase the amount of their issuances and sales. In addition, lenders and other investors within those markets often establish limits on their credit exposure to particular issuers, originators, and asset classes, or they may require higher returns to increase the amount of their exposure. Increased issuance by other participants in the market or decisions by investors to limit their credit exposure to (or to require a higher yield for) us or to automotive securitizations or whole-loans could negatively affect our ability and that of our subsidiaries to price our securitizations and whole-loan sales at attractive rates. The result would be lower proceeds from these activities and lower profits for our subsidiaries and us.

16

Table of Contents

Ally Financial Inc. • Form 10-K

*Our allowance for loan losses may not be adequate to cover actual losses, and we may be required to materially increase our allowance, which may adversely affect our capital, financial condition, and results of operations.*

We maintain an allowance for loan losses, which is a reserve established through a provision for loan losses charged to expenses, which represents management's best estimate of probable credit losses that have been incurred within the existing portfolio of loans, all as described in  Note 1 to the Consolidated Financial Statements. The allowance, in the judgment of management, is established to reserve for estimated loan losses and risks inherent in the loan portfolio. The determination of the appropriate level of the allowance for loan losses inherently involves a high degree of subjectivity and requires us to make significant estimates of current credit risks using existing qualitative and quantitative information, all of which may undergo material changes. Changes in economic conditions affecting borrowers, accounting rules and related guidance, new information regarding existing loans, identification of additional problem loans, and other factors, both within and outside of our control, may require an increase in the allowance for loan losses.

Bank regulatory agencies periodically review our allowance for loan losses, as well as our methodology for calculating our allowance for loan losses and may require an increase in the provision for loan losses or the recognition of additional loan charge-offs, based on judgments different than those of management. An increase in the allowance for loan losses results in a decrease in net income and capital and may have a material adverse effect on our capital, financial condition and results of operations.

*The previously contemplated plan and settlement related to the ResCap bankruptcy has been allowed to lapse by ResCap, and as a result, there is substantial uncertainty related to resolution of the bankruptcy and substantial claims could be brought against us.*

On May 14, 2012 (the Petition Date), Residential Capital, LLC (ResCap) and certain of its wholly owned direct and indirect subsidiaries (collectively, the Debtors) filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (the Bankruptcy Court). In connection with the filings in May, Ally Financial Inc. and its direct and indirect subsidiaries and affiliates (excluding the Debtors) (collectively, AFI) had reached an agreement with the Debtors and certain creditor constituencies on a prearranged Chapter 11 plan (the Plan). The Plan included a proposed settlement (the Settlement) between AFI and the Debtors, which included, among other things, an obligation of AFI to make a $750 million cash contribution to the Debtor's estate, and a release of all existing or potential causes of action between AFI and the Debtors, as well as a release of all existing or potential ResCap-related causes of action against AFI held by third parties.

The Settlement contemplated certain milestone requirements that the Debtors failed to satisfy, including the Bankruptcy Court's confirmation of the Plan on or before October 31, 2012. While the failure to meet this October 31 milestone would have resulted in the Settlement's automatic termination, AFI and the Debtors agreed to monthly temporary waivers of this automatic termination through February 28, 2013. This waiver was not extended beyond this date, and therefore the Settlement has terminated.

As of the Petition Date, institutional investors in residential mortgage-backed securities (RMBS Investors) issued by ResCap's affiliates and holding more than 25 percent of at least one class in each of 290 securitizations agreed to settle alleged representation and warranty claims against the Debtors' estates in exchange for a total $8.7 billion allowed claim in the Debtors' bankruptcy cases, subject to the applicable securitization trustees' acceptance of the terms of the settlements (the RMBS Settlements). The RMBS Investors also signed separate plan support agreements (PSAs) with the Debtors and AFI in support of the Plan at the time of entering into the RMBS Settlements. To date, RMBS Investors holding more than 25 percent of at least one class in each of 336 securitizations have agreed to the RMBS Settlements. These 336 securitizations have an aggregate original principal balance of approximately $189 billion (out of a total of 392 outstanding securitizations with an original principal balance of $221 billion). The RMBS Settlements are subject to Bankruptcy Court approval, and the Bankruptcy Court has scheduled a hearing to consider such approval in late May 2013. The PSAs are not part of this scheduled Bankruptcy Court hearing. A number of creditors have raised objections to the RMBS Settlements, but the trustees representing the 336 securitization trusts and AFI have filed statements in support of the Debtors' motion to approve the RMBS Settlements. Separately, the Debtors have failed to meet several Plan milestones in their bankruptcy cases, each of which has given the RMBS Investors the right to terminate the PSAs upon three business days advance written notice to the Debtors and AFI. The RMBS Investors have not given the Debtors and AFI such a notice to date, but have the right to do so at any time. If the RMBS Settlements were not approved or the RMBS Investors were to decide not to support any proposed plan, it could adversely impact the likelihood that any plan is approved by the Bankruptcy Court. AFI continues to support the RMBS Settlements at this time.

On June 4, 2012, Berkshire Hathaway Inc. filed a motion in the Bankruptcy Court for the appointment of an independent examiner to investigate, among other things, certain of the Debtors' transactions with AFI occurring prior to the Petition Date, any claims the Debtors may hold against AFI's officers and directors, and any claims the Debtors proposed to release under the Plan. On June 20, 2012, the Bankruptcy Court approved the appointment of an examiner and, subsequently, the United States Trustee for the Southern District of New York appointed former bankruptcy judge Arthur J. Gonzalez, Esq. as the examiner (the Examiner). On July 27, 2012, the Bankruptcy Court entered an order approving the scope of the Examiner's investigation. The investigation includes, among other things: (a) all material pre-petition transactions between or among the Debtors and AFI, Cerberus Capital Management, L.P. and its subsidiaries and affiliates, and/or Ally Bank; (b) certain post-petition negotiations and transactions with the Debtors, including with respect to plan sponsor, plan support, and settlement agreements, the debtor-in-possession financing with AFI, the stalking horse asset purchase agreement with AFI, and the servicing agreement with Ally Bank; (c) all state and federal law claims or causes of action the Debtors proposed to release as part of the Plan; and (d) the release of all existing or potential ResCap-related causes of action against AFI held by third parties. In the Examiner's original work plan, the Examiner estimated that his investigation and related report would be completed six months from approximately August 6, 2012. However, on February

17

Table of Contents

Ally Financial Inc. • Form 10-K

7, 2013 the Examiner informed the Bankruptcy Court in the third supplement to the work plan that the investigation and related report will not be completed until early May 2013.

On December 26, 2012, the Bankruptcy Court, in an effort to facilitate plan negotiations, entered an order appointing bankruptcy judge James M. Peck, Esq. as mediator to assist the parties in resolving certain issues relating to the formulation and confirmation of the Plan. There can be no assurance that the mediation process will continue or will ultimately lead to a successful agreement among the parties.

On February 26, 2013, the official committee of unsecured creditors appointed in the Debtors' bankruptcy cases (the Creditors' Committee) filed with the Bankruptcy Court a response to the Debtors' motions for appointment of a chief restructuring officer and to extend their exclusive period to file a chapter 11 plan, which, among other things, states that the Creditors' Committee supports such extension through and including April 30, 2013, and during such time the Creditors' Committee will agree not to bring any claims against AFI. The response further states that the Debtors consent to the Creditors' Committee seeking standing in the Bankruptcy Court to prosecute and/or settle the Debtors' alleged claims against AFI and agree to settle claims against AFI only with Creditors' Committee consent.

On February 27, 2013, the Debtors filed a motion with the Bankruptcy Court seeking, for purposes of any proposed chapter 11 plan, that GMAC Mortgage's obligation to conduct and pay for independent file review regarding certain residential foreclosure actions and foreclosure sales prosecuted by GMAC Mortgage and its subsidiaries, as required under the Consent Order, be classified as a general unsecured claim in an amount to be determined, and that the automatic stay under the Bankruptcy Code be applied to prevent the FRB, the FDIC, and other governmental entities from taking any action to enforce the obligation against the Debtors. If the Bankruptcy Court approves the motion, such governmental entities are likely to seek to enforce the obligation against AFI, and any such obligations ultimately borne by AFI could be material. The Debtors have requested that the motion be heard at a hearing on March 21, 2013.

We are currently named as defendants in various lawsuits relating to ResCap mortgage-backed securities and certain other mortgage-related matters, which are described in more detail in Note 29 to the Consolidated Financial Statements. The majority of these matters are currently subject to orders entered by the Bankruptcy Court staying the matters through either March 31, 2012 or April 30, 2013. Unless the Debtors seek and obtain Bankruptcy Court approval to extend these stay orders, these matters are expected to proceed against us once the applicable stay orders expire.

As a result of the termination of the Settlement, AFI is no longer obligated to make the $750 million cash contribution and neither party is bound by the Settlement. Further, AFI is not entitled to receive any releases from either the Debtors or any third party claimants, as was contemplated under the Plan and Settlement. However, AFI has not withdrawn its offer to provide a $750 million cash contribution to the Debtors' estate if an acceptable settlement can be reached. As a result of the termination of the Settlement, substantial claims could be brought against us, which could have a material adverse impact on our results of operations, financial position or cash flows.

*We are exposed to consumer credit risk, which could adversely affect our profitability and financial condition.*

We are subject to credit risk resulting from defaults in payment or performance by customers for our contracts and loans, as well as contracts and loans that are securitized and in which we retain a residual interest. Furthermore, a weak economic environment and high unemployment rates could exert pressure on our consumer automotive finance customers resulting in higher delinquencies, repossessions, and losses. There can be no assurances that our monitoring of our credit risk as it affects the value of these assets and our efforts to mitigate credit risk through our risk-based pricing, appropriate underwriting policies, and loss-mitigation strategies are, or will be, sufficient to prevent a further adverse effect on our profitability and financial condition. We have begun to increase our nonprime automobile lending. We define nonprime consumer automobile loans as those loans with a FICO score (or an equivalent score) at origination of less than 620. In addition, we have increased our used automobile financing. Borrowers that finance used vehicles tend to have lower FICO scores as compared to new vehicle borrowers, and defaults resulting from vehicle breakdowns are more likely to occur with used vehicles as compared to new vehicles that are financed. At December 31, 2012, the carrying value of our Automotive Finance operations nonprime consumer automobile loans before allowance for loan losses was $5.1 billion, or approximately 9.4% of our total consumer automobile loans. Of these loans, $62 million were considered nonperforming as they had been placed on nonaccrual status in accordance with internal loan policies. Refer to the Nonaccrual Loans section of Note 1 to the Consolidated Financial Statements for additional information. As we grow our nonprime automobile financing loans over time, our credit risk may increase. As part of the underwriting process, we rely heavily upon information supplied by third parties. If any of this information is intentionally or negligently misrepresented and the misrepresentation is not detected before completing the transaction, the credit risk associated with the transaction may be increased.

*General business and economic conditions may significantly and adversely affect our revenues, profitability, and financial condition.*

Our business and earnings are sensitive to general business and economic conditions in the United States. A downturn in economic conditions resulting in increased short and long term interest rates, inflation, fluctuations in the debt capital markets, unemployment rates, consumer and commercial bankruptcy filings, or a decline in the strength of national and local economies and other factors that negatively affect household incomes could decrease demand for our financing products and increase financing delinquency and losses on our customer and dealer financing operations. We have been negatively affected due to the significant stress in the residential real estate and related capital markets and, in particular, the lack of home price appreciation in many markets in which we lend. Further, a significant and sustained increase in fuel prices could lead to diminished new and used vehicle purchases and negatively affect our automotive finance business.

If the rate of inflation were to increase, or if the debt capital markets or the economies of the United States were to weaken, or if home prices or new and used vehicle purchases experience declines, we could be significantly and adversely affected, and it could become more

18

Table of Contents

Ally Financial Inc. • Form 10-K

expensive for us to conduct our business. For example, business and economic conditions that negatively affect household incomes, housing prices, and consumer behavior related to our businesses could decrease (1) the demand for our new and used vehicle financing and (2) the value of the collateral underlying our portfolio of held-for-investment assets and new and used vehicle loans and interests that continue to be held by us, thus further increasing the number of consumers who become delinquent or default on their loans. In addition, the rate of delinquencies, foreclosures, and losses on our loans could be higher during more severe economic slowdowns.

Any sustained period of increased delinquencies, foreclosures, or losses could further harm our ability to sell our new and used vehicle loans, the prices we receive for our new and used vehicle loans, or the value of our portfolio of mortgage and new and used vehicle loans held-for-investment or interests from our securitizations, which could harm our revenues, profitability, and financial condition. Continued adverse business and economic conditions could affect demand for new and used vehicles, housing, the cost of construction, and other related factors that could harm the revenues and profitability of our business.

*The current debt crisis in Europe, the risk that certain countries may default on their sovereign debt, and recent rating agency actions with respect to European countries and the United States and the resulting impact on the financial markets, could have a material adverse impact on our business, results of operations and financial position.*

The current crisis in Europe has created uncertainty with respect to the ability of certain European Union countries to continue to service their sovereign debt obligations. In the past several years, rating agencies have lowered their ratings on several euro-zone countries. The continuation of the European debt crisis has adversely impacted financial markets and has created substantial volatility and uncertainty, and will likely continue to do so. Risks related to this have had, and are likely to continue to have, a negative impact on global economic activity and the financial markets. The effects of the European debt crisis could be even more significant if a Eurozone country determines to depart the European Monetary Union, which would lead to redenomination of obligations of obligors in that country and cause foreign exchange, operational, and settlement disruptions. In addition, on August 5, 2011, Standard & Poor's Ratings Services lowered its long-term sovereign credit rating on the United States of America to 'AA+' from 'AAA', and the outlook on its long-term rating is negative. The U.S. downgrade, any future downgrades, as well as the perceived creditworthiness of U.S. government-related obligations, including uncertainty surrounding the U.S. federal deficit and debt ceiling debate, could impact our ability to obtain, and the pricing with respect to, funding that is collateralized by affected instruments and obtained through the secured and unsecured markets. As these conditions persist, our business, results of operation, and financial position could be materially adversely affected.

*Acts or threats of terrorism and political or military actions taken by the United States or other governments could adversely affect general economic or industry conditions.*

Geopolitical conditions may affect our earnings. Acts or threats of terrorism and political or military actions taken by the United States or other governments in response to terrorism, or similar activity, could adversely affect general economic or industry conditions.

*The U.S. Department of Treasury (Treasury) holds a majority of the outstanding common stock.*

At February 28, 2013, Treasury held 981,971 shares of common stock, which represents approximately 74% of the voting power of the holders of common stock outstanding for matters requiring a vote of the holders of common stock. In addition, as of the date hereof, Treasury holds 118,750,000 shares of Series F-2 Preferred Stock (which are convertible into shares of common stock in accordance with Ally's certificate of incorporation), with an aggregate liquidation preference of approximately $5.9 billion.

Pursuant to the Amended and Restated Governance Agreement dated May 21, 2009, as of the date hereof, Treasury also has the right to appoint six of the eleven members to our board of directors. As a result of this stock ownership interest and Treasury's right to appoint six directors to our board of directors, Treasury has the ability to exert control, through its power to vote for the election of our directors, over various matters. To the extent Treasury elects to exert such control over us, its interests (as a government entity) may differ from those of our other stockholders and it may influence, through its ability to vote for the election of our directors, matters including:

- the selection, tenure and compensation of our management;

- our business strategy and product offerings;

- our relationship with our employees and other constituencies; and

- our financing activities, including the issuance of debt and equity securities.

In particular, Treasury may have a greater interest in promoting U.S. economic growth and jobs than our other stockholders. In the future we may also become subject to new and additional laws and government regulations regarding various aspects of our business as a result of participation in the TARP program and the U.S. government's ownership in our business. These regulations and actions by directors could make it more difficult for us to compete with other companies that are not subject to similar regulations.

19

Table of Contents

Ally Financial Inc. • Form 10-K

*The limitations on compensation imposed on us due to our participation in TARP, including the restrictions placed on our compensation by the Special Master for TARP Executive Compensation, may adversely affect our ability to retain and motivate our executives and employees.*

Our performance is largely dependent on the talent and efforts of our management team and employees. As a result of our participation in TARP, the compensation of certain members of our management team and employees is subject to extensive restrictions under the Emergency Economic Stabilization Act of 2008, as amended by the American Recovery and Reinvestment Act of 2009 (the ARRA), which was signed into law on February 17, 2009, as implemented by the Interim Final Rule issued by Treasury on June 15, 2009 (the IFR). In addition, due to our level of participation in TARP, pursuant to ARRA and the IFR, the Office of the Special Master for TARP Executive Compensation has the authority to further regulate our compensation arrangements with certain of our executives and employees. In addition, we may become subject to further restrictions under any other future legislation or regulation limiting executive compensation. Many of the restrictions are not limited to our senior executives and affect other employees whose contributions to revenue and performance may be significant. These limitations may leave us unable to create a compensation structure that permits us to retain and motivate certain of our executives and employees or to attract new executives or employees, especially if we are competing against institutions that are not subject to the same restrictions. Any such inability could have a material and adverse effect on our business, financial condition, and results of operations.

*Our borrowing costs and access to the unsecured debt capital markets depend significantly on our credit ratings.*

The cost and availability of unsecured financing are materially affected by our short- and long-term credit ratings. Each of Standard & Poor's Rating Services; Moody's Investors Service, Inc.; Fitch, Inc.; and Dominion Bond Rating Service rates our debt. Our current ratings as assigned by each of the respective rating agencies are below investment grade, which negatively impacts our access to liquidity and increases our borrowing costs in the unsecured market. Ratings reflect the rating agencies' opinions of our financial strength, operating performance, strategic position, and ability to meet our obligations. On February 2, 2012, Fitch downgraded our senior debt to BB- from BB and changed the outlook to negative. Future downgrades of our credit ratings would increase borrowing costs and further constrain our access to the unsecured debt markets and, as a result, would negatively affect our business. In addition, downgrades of our credit ratings could increase the possibility of additional terms and conditions being added to any new or replacement financing arrangements as well as impact elements of certain existing secured borrowing arrangements.

Agency ratings are not a recommendation to buy, sell, or hold any security and may be revised or withdrawn at any time by the issuing organization. Each agency's rating should be evaluated independently of any other agency's rating.

*Our profitability and financial condition could be materially and adversely affected if the residual value of off-lease vehicles decrease in the future.*

Our expectation of the residual value of a vehicle subject to an automotive lease contract is a critical element used to determine the amount of the lease payments under the contract at the time the customer enters into it. As a result, to the extent the actual residual value of the vehicle, as reflected in the sales proceeds received upon remarketing at lease termination, is less than the expected residual value for the vehicle at lease inception, we incur additional depreciation expense and/or a loss on the lease transaction. General economic conditions, the supply of off-lease and other vehicles to be sold, new vehicle market prices, perceived vehicle quality, overall price and volatility of gasoline or diesel fuel, among other factors, heavily influence used vehicle prices and thus the actual residual value of off-lease vehicles. Consumer confidence levels and the strength of automotive manufacturers and dealers can also influence the used vehicle market. For example, during 2008, sharp declines in demand and used vehicle sale prices adversely affected our remarketing proceeds and financial results.

Vehicle brand images, consumer preference, and vehicle manufacturer marketing programs that influence new and used vehicle markets also influence lease residual values. In addition, our ability to efficiently process and effectively market off-lease vehicles affects the disposal costs and proceeds realized from the vehicle sales. While manufacturers, at times, may provide support for lease residual values including through residual support programs, this support does not in all cases entitle us to full reimbursement for the difference between the remarketing sales proceeds for off-lease vehicles and the residual value specified in the lease contract. Differences between the actual residual values realized on leased vehicles and our expectations of such values at contract inception could have a negative impact on our profitability and financial condition.

*Significant indemnification payments or contract, lease, or loan repurchase activity of retail contracts or leases could harm our profitability and financial condition.*

We have repurchase obligations in our capacity as servicer in securitizations and whole-loan sales. If a servicer breaches a representation, warranty, or servicing covenant with respect to an automotive receivable, the servicer may be required by the servicing provisions to repurchase that asset from the purchaser or otherwise compensate one or more classes of investors for losses caused by the breach. If the frequency at which repurchases of assets or other payments occurs increases substantially from its present rate, the result could be a material adverse effect on our financial condition, liquidity, and results of operations.

20

Table of Contents

Ally Financial Inc. • Form 10-K

*A loss of contractual servicing rights could have a material adverse effect on our financial condition, liquidity, and results of operations.*

We are the servicer for all of the receivables we have acquired or originated and transferred to other parties in securitizations and whole-loan sales of automotive receivables. We are paid a fee for these services, which fees in the aggregate constitute a substantial revenue stream for us. In each case, we are subject to the risk of termination under the circumstances specified in the applicable servicing provisions.

In most securitizations and whole-loan sales, the owner of the receivables will be entitled to declare a servicer default and terminate the servicer upon the occurrence of specified events. These events typically include a bankruptcy of the servicer, a material failure by the servicer to perform its obligations, and a failure by the servicer to turn over funds on the required basis. The termination of these servicing rights, were it to occur, could have a material adverse effect on our financial condition, liquidity, and results of operations.

*Our earnings may decrease because of decreases or increases in interest rates.*

We are subject to risks from decreasing interest rates, particularly given the Federal Reserve's recent steps to keep interest rates low in an attempt to improve economic growth. A low interest rate environment or a flat or inverted yield curve may adversely affect certain of our businesses by compressing net interest margins or reducing the amounts we earn on our investment securities portfolio, thereby reducing our net interest income and other revenues.

Rising interest rates could also have an adverse impact on our business as well. For example, rising interest rates:

- will increase our cost of funds;

- may reduce our consumer automotive financing volume by influencing customers to pay cash for, as opposed to financing, vehicle purchases or not to buy new vehicles;

- may negatively impact our ability to remarket off-lease vehicles; and

- will generally reduce the value of automotive financing loans and contracts and retained interests and fixed income securities held in our investment portfolio.

Throughout 2009 and 2010 the credit risk embedded in the balance sheet was reduced as a result of asset sales, asset markdowns, and a change in the mix of our loan assets as the legacy portfolios were replaced with assets underwritten to tighter credit standards. This reduction in risk has resulted in a mix of assets outstanding on the balance sheet as of December 31, 2012, with a lower yielding profile than the prior year. During this same period of time we experienced a significant decline in our consumer automotive operating lease portfolio that was realizing higher yields from remarketing gains due to historically high used vehicle prices. The combination of the above factors resulted in a decline in asset yields more than the decline in liability rates, and therefore the decline in the net interest spread on the balance sheet throughout 2010 and into 2011.

*Our hedging strategies may not be successful in mitigating our risks associated with changes in interest rates and could affect our profitability and financial condition as could our failure to comply with hedge accounting principles and interpretations.*

We employ various economic hedging strategies to mitigate the interest rate and prepayment risk inherent in many of our assets and liabilities. Our hedging strategies rely on assumptions and projections regarding our assets, liabilities, and general market factors. If these assumptions and projections prove to be incorrect or our hedges do not adequately mitigate the impact of changes in interest rates or prepayment speeds, we may experience volatility in our earnings that could adversely affect our profitability and financial condition. In addition, we may not be able to find market participants that are willing to act as our hedging counterparties, which could have an adverse effect on the success of our hedging strategies.

In addition, hedge accounting in accordance with accounting principles generally accepted in the United States of America (GAAP) requires the application of significant subjective judgments to a body of accounting concepts that is complex.

*A failure of or interruption in, as well as, security risks of the communications and information systems on which we rely to conduct our business could adversely affect our revenues and profitability.*

We rely heavily upon communications and information systems to conduct our business. Any failure or interruption of our information systems or the third-party information systems on which we rely as a result of inadequate or failed processes or systems, human errors, employee misconduct, catastrophic events, or other external events could cause underwriting or other delays and could result in fewer applications being received, slower processing of applications, and reduced efficiency in servicing. In addition, our communication and information systems may present security risks, and could be susceptible to hacking or identity theft. For example, similar to other large financial institutions, Ally's website, ally.com, was recently the subject of cyber attacks that resulted in slow performance and unavailability of the website for some customers. The occurrence of any of these events could have a material adverse effect on our business.

*We use estimates and assumptions in determining the fair value of certain of our assets. If our estimates or assumptions prove to be incorrect, our cash flow, profitability, financial condition, and business prospects could be materially and adversely affected.*

We use estimates and various assumptions in determining the fair value of many of our assets, including certain held-for-investment and held-for-sale loans for which we elected fair value accounting, retained interests from securitizations of loans and contracts, MSRs, and other

21

Table of Contents

Ally Financial Inc. • Form 10-K

investments, which do not have an established market value or are not publicly traded. We also use estimates and assumptions in determining the residual values of leased vehicles. In addition, we use estimates and assumptions in determining our reserves for legal matters, insurance losses and loss adjustment expenses which represent the accumulation of estimates for both reported losses and those incurred, but not reported, including claims adjustment expenses relating to direct insurance and assumed reinsurance agreements. For further discussion related to estimates and assumptions, see "Management's Discussion and Analysis of Financial Condition and Results of Operations — Critical Accounting Estimates." Our actual experience may differ materially from these estimates and assumptions. A material difference between our estimates and assumptions and our actual experience may adversely affect our cash flow, profitability, financial condition, and business prospects.

*Fluctuations in valuation of investment securities or significant fluctuations in investment market prices could negatively affect revenues.*

Investment market prices in general are subject to fluctuation. Consequently, the amount realized in the subsequent sale of an investment may significantly differ from the reported market value and could negatively affect our revenues. Additionally, negative fluctuations in the value of available-for-sale investment securities could result in unrealized losses recorded in equity. Fluctuation in the market price of a security may result from perceived changes in the underlying economic characteristics of the investee, the relative price of alternative investments, national and international events, and general market conditions.

*Changes in accounting standards issued by the Financial Accounting Standards Board (FASB) could adversely affect our reported revenues, profitability, and financial condition.*

Our financial statements are subject to the application of GAAP, which are periodically revised and/or expanded. The application of accounting principles is also subject to varying interpretations over time. Accordingly, we are required to adopt new or revised accounting standards or comply with revised interpretations that are issued from time to time by various parties, including accounting standard setters and those who interpret the standards, such as the FASB and the SEC, banking regulators, and our independent registered public accounting firm. Those changes could adversely affect our reported revenues, profitability, or financial condition.

Recently, the FASB has proposed new financial accounting standards, and has many active projects underway, that could materially affect our reported revenues, profitability, or financial condition. These proposed standards or projects include the potential for significant changes in the accounting for financial instruments (including loans, deposits, allowance for loan losses, and debt) and the accounting for leases, among others. It is possible that any changes, if enacted, could adversely affect our reported revenues, profitability, or financial condition.

*The soundness of other financial institutions could adversely affect us.*

Financial services institutions are interrelated as a result of trading, clearing, counterparty, or other relationships. We have exposure to different counterparties, and we routinely execute transactions with counterparties in the financial services industry, including brokers and dealers, commercial banks, investment banks, and other institutions. Many of these transactions expose us to credit risk in the event of default of our counterparty.

*Our inability to maintain relationships with dealers could have an adverse effect on our business, results of operations, and financial condition.*

Our business depends on the continuation of our relationships with our customers, particularly the automotive dealers with whom we do business. If we are not able to maintain existing relationships with key automotive dealers or if we are not able to develop new relationships for any reason, including if we are not able to provide services on a timely basis or offer products that meet the needs of the dealers, our business, results of operations, and financial condition could be adversely affected.

*Adverse economic conditions or changes in laws in states in which we have customer concentrations may negatively affect our operating results and financial condition.*

We are exposed to consumer loan portfolio concentration in certain states, including California, Texas, and Florida. Factors adversely affecting the economies and applicable laws in these and other states could have an adverse effect on our business, results of operations and financial position.

## Item 1B.    Unresolved Staff Comments

None.

## Item 2.    Properties

Our principal corporate offices are located in Detroit, Michigan; New York, New York; and Charlotte, North Carolina. In Detroit, we lease approximately 247,000 square feet from GM pursuant to a lease agreement expiring in November 2016. In New York, we lease approximately 35,000 square feet of office space under a lease that expires in July 2015. In Charlotte, we lease approximately 133,000 square feet of office space under a lease expiring in December 2015.

The primary offices for Dealer Financial Services operations are located in Detroit, Michigan, and Southfield, Michigan. The primary office for our Automotive Finance operations is located in Detroit, Michigan, and is included in the totals referenced above. The primary

22

Table of Contents

Ally Financial Inc. • Form 10-K

office for our Insurance operations is located in Southfield, Michigan, where we lease approximately 71,000 square feet of office space under leases expiring in April 2016.

The primary offices for our Mortgage operations are located in Fort Washington, Pennsylvania. In Fort Washington, we lease approximately 450,000 square feet of office space pursuant to a lease that expires in November 2019.

In addition to the properties described above, we lease additional space to conduct our operations. We believe our facilities are adequate for us to conduct our present business activities.

## Item 3.    Legal Proceedings

Refer to Note 29 to the Consolidated Financial Statements for a discussion related to our legal proceedings.

## Item 4.    Mine Safety Disclosures

Not applicable.

Table of Contents

# Part II

Ally Financial Inc. • Form 10-K

## Item 5.    Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities

### Common Stock

We currently have a total of 2,021,384 shares of common stock authorized for issuance, and at  February 28, 2013, a total of 1,330,970 shares of common stock were issued and outstanding. Further, we have reserved 690,272 of the remaining authorized but unissued shares of common stock for issuance in connection with any future conversion of Ally's Fixed Rate Cumulative Mandatorily Convertible Preferred Stock, Series F-2 (Series F-2 Preferred Stock). Our common stock is not registered with the Securities and Exchange Commission, and there is no established trading market for the shares. At  February 28, 2013, there were 153 holders of common stock reflected on our stock register.

Subject to certain exceptions, for so long as any shares of the Series F-2 Preferred Stock are outstanding and owned by the U.S. Department of Treasury (Treasury), Ally and its subsidiaries are generally prohibited from paying certain dividends or distributions on, or redeeming, repurchasing or acquiring, any common stock without the consent of Treasury. Ally is also generally prohibited from making any dividends or distributions on, or redeeming, repurchasing, or acquiring, its common stock unless all accrued and unpaid dividends for all past dividend periods on the Series F-2 Preferred Stock are paid. In addition, pursuant to the terms of Ally's Fixed Rate Cumulative Perpetual Preferred Stock, Series G, Ally is not permitted to make any Restricted Payments on or prior to January 1, 2014, and may only make Restricted Payments after January 1, 2014, if certain conditions are satisfied. For this purpose, Restricted Payments include dividends or distribution of assets on any share of common stock and any redemption, purchase, or other acquisition of any shares of common stock, subject to certain exceptions.

### Preferred Stock

For a discussion of preferred stock currently outstanding, refer to  Note 18 to the Consolidated Financial Statements.

### Unregistered Sales of Equity Securities

Ally did not have any unregistered sales of its equity securities in fiscal year  2012, except as previously disclosed on Form 8-K.

24

Table of Contents

Ally Financial Inc. • Form 10-K

## Item 6.    Selected Financial Data

The selected historical financial information set forth below should be read in conjunction with Management's Discussion and Analysis (MD&A) of Financial Condition and Results of Operations, our Consolidated Financial Statements, and the Notes to Consolidated Financial Statements. The historical financial information presented may not be indicative of our future performance.

The following table presents selected statement of income data.

| Year ended December 31, ($ in millions) | 2012 | | 2011 | | 2010 | | 2009 | | 2008 |
|---|---|---|---|---|---|---|---|---|---|
| Total financing revenue and other interest income | $ | 7,468 | $ | 7,061 | $ | 8,017 | $ | 8,887 | $ 12,143 |
| Interest expense | | 4,200 | | 5,039 | | 5,460 | | 5,502 | 7,548 |
| Depreciation expense on operating lease assets | | 1,399 | | 941 | | 1,251 | | 2,256 | 3,159 |
| Impairment of investment in operating leases | | — | | — | | — | | — | 1,082 |
| Net financing revenue | | 1,869 | | 1,081 | | 1,306 | | 1,129 | 354 |
| Total other revenue (a) | | 3,029 | | 2,897 | | 4,416 | | 3,432 | 14,212 |
| Total net revenue | | 4,898 | | 3,978 | | 5,722 | | 4,561 | 14,566 |
| Provision for loan losses | | 329 | | 188 | | 357 | | 5,174 | 2,857 |
| Total noninterest expense | | 5,324 | | 4,741 | | 4,973 | | 6,425 | 6,789 |
| (Loss) income from continuing operations before income tax (benefit) expense | | (755) | | (951) | | 392 | | (7,038) | 4,920 |
| Income tax (benefit) expense from continuing operations (b) | | (1,284) | | 51 | | 104 | | 29 | (108) |
| Net income (loss) from continuing operations | | 529 | | (1,002) | | 288 | | (7,067) | 5,028 |
| Income (loss) from discontinued operations, net of tax | | 667 | | 845 | | 741 | | (3,276) | (3,160) |
| Net income (loss) | $ | 1,196 | $ | (157) | $ | 1,029 | $ | (10,343) | $ 1,868 |
| **Basic and diluted earnings per common share:** | | | | | | | | | |
| Net (loss) income from continuing operations | $ | (205) | $ | (1,326) | $ | (1,965) | $ | (15,662) | $ 46,172 |
| Net income (loss) | | 296 | | (691) | | (1,039) | | (21,850) | 17,152 |
| **Non-GAAP financial measures (c):** | | | | | | | | | |
| Net income (loss) | $ | 1,196 | $ | (157) | $ | 1,029 | $ | (10,343) | $ 1,868 |
| Add: Original issue discount amortization expense (d) | | 336 | | 962 | | 1,300 | | 1,143 | 70 |
| Add: Income tax (benefit) expense from continuing operations | | (1,284) | | 51 | | 104 | | 29 | (108) |
| Less: Gain on extinguishment of debt related to the 2008 bond exchange | | — | | — | | — | | — | 11,460 |
| Less: Income (loss) from discontinued operations, net of tax | | 667 | | 845 | | 741 | | (3,276) | (3,160) |
| Core pretax (loss) income (c) | $ | (419) | $ | 11 | $ | 1,692 | $ | (5,895) | $ (6,470) |

(a)   Total other revenue for 2008 includes $12.6 billion of gains on the extinguishment of debt, primarily related to private exchange and cash tender offers settled during the fourth quarter.

(b)   Effective June 30, 2009, we converted from a limited liability company into a corporation and, as a result, became subject to corporate U.S. federal, state, and local taxes. Our conversion to a corporation resulted in a change in tax status and a net deferred tax liability of $1.2 billion was established through income tax expense.

(c)   Core pretax (loss) income is not a financial measure defined by accounting principles generally accepted in the United States of America (GAAP). We define core pretax income as earnings from continuing operations before income taxes, original issue discount amortization expense primarily associated with our 2008 bond exchange, and the gain on extinguishment of debt related to the 2008 bond exchange. We believe that the presentation of core pretax (loss) income is useful information for the users of our financial statements in understanding the earnings from our core businesses. In addition, core pretax (loss) income is the primary measure that management uses to assess the performance of our operations. We believe that core pretax (loss) income is a useful alternative measure of our ongoing profitability and performance, when viewed in conjunction with GAAP measures. The presentation of this additional information is not a substitute for net income (loss) determined in accordance with GAAP.

(d)   Primarily represents original issue discount amortization expense associated with the 2008 bond exchange that was reported as a loss on extinguishment of debt in the Consolidated Statement of Income.

25

Ally Financial Inc. • Form 10-K

The following table presents selected balance sheet and ratio data.

| Year ended December 31, ($ in millions) | | 2012 | | 2011 | | 2010 | | 2009 | | 2008 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Selected period-end balance sheet data:** | | | | | | | | | | |
| Total assets | $ | 182,347 | $ | 184,059 | $ | 172,008 | $ | 172,306 | $ | 189,476 |
| Long-term debt | $ | 74,561 | $ | 92,885 | $ | 86,703 | $ | 88,066 | $ | 115,935 |
| Preferred stock/interests (a) | $ | 6,940 | $ | 6,940 | $ | 6,972 | $ | 12,180 | $ | 6,287 |
| Total equity | $ | 19,898 | $ | 19,280 | $ | 20,398 | $ | 20,794 | $ | 21,854 |
| **Financial ratios** | | | | | | | | | | |
| Efficiency ratio (b) | | 108.70 % | | 119.18 % | | 86.91% | | 140.87 % | | 46.61 % |
| Core efficiency ratio (b) | | 101.72 % | | 95.97 % | | 70.82% | | 112.64 % | | 213.76 % |
| Return on assets (c) | | | | | | | | | | |
|    Net income (loss) from continuing operations | | 0.29 % | | (0.55)% | | 0.16% | | (3.97)% | | 2.65 % |
|    Net income (loss) | | 0.65 % | | (0.09)% | | 0.58% | | (5.81)% | | 0.99 % |
|    Core pretax (loss) income | | (0.23)% | | 0.01 % | | 0.96% | | (3.31)% | | (3.41)% |
| Return on equity (c) | | | | | | | | | | |
|    Net income (loss) from continuing operations | | 2.80 % | | (4.99)% | | 1.39% | | (29.14)% | | 23.01 % |
|    Net income (loss) | | 6.32 % | | (0.78)% | | 4.98% | | (42.65)% | | 8.55 % |
|    Core pretax (loss) income | | (2.21)% | | 0.05 % | | 8.19% | | (24.31)% | | (29.61)% |
| Equity to assets (c) | | 10.30 % | | 11.10 % | | 11.69% | | 13.63 % | | 11.53 % |
| Net interest spread (c)(d) | | 1.14 % | | 0.59 % | | 0.97% | | 0.45 % | | (e) |
| Net interest spread excluding original issue discount (c)(d) | | 1.46 % | | 1.43 % | | 2.21% | | 1.84 % | | (e) |
| Net yield on interest-earning assets (c)(f) | | 1.37 % | | 0.84 % | | 1.15% | | 1.03 % | | (e) |
| Net yield on interest-earning assets excluding original issue discount (c)(f) | | 1.62 % | | 1.56 % | | 2.22% | | 2.08 % | | (e) |
| **Regulatory capital ratios** | | | | | | | | | | |
| Tier 1 capital (to risk-weighted assets) (g) | | 13.13 % | | 13.65 % | | 14.93% | | 14.12 % | | (e) |
| Total risk-based capital (to risk-weighted assets) (h) | | 14.07 % | | 14.69 % | | 16.30% | | 15.52 % | | (e) |
| Tier 1 leverage (to adjusted quarterly average assets) (i) | | 11.16 % | | 11.45 % | | 12.99% | | 12.68 % | | (e) |
| Total equity | $ | 19,898 | $ | 19,280 | $ | 20,398 | $ | 20,794 | | (e) |
| Goodwill and certain other intangibles | | (494) | | (493) | | (532) | | (534) | | (e) |
| Unrealized gains and other adjustments | | (1,715) | | (262) | | (309) | | (447) | | (e) |
| Trust preferred securities | | 2,543 | | 2,542 | | 2,541 | | 2,540 | | (e) |
| Tier 1 capital (g) | | 20,232 | | 21,067 | | 22,098 | | 22,353 | | (e) |
| Preferred equity | | (6,940) | | (6,940) | | (6,972) | | (12,180) | | (e) |
| Trust preferred securities | | (2,543) | | (2,542) | | (2,541) | | (2,540) | | (e) |
| Tier 1 common capital (non-GAAP) (j) | $ | 10,749 | $ | 11,585 | $ | 12,585 | $ | 7,633 | | (e) |
| Risk-weighted assets (k) | | 154,038 | | 154,319 | | 147,979 | | 158,326 | | (e) |
| Tier 1 common (to risk-weighted assets) (j) | | 6.98 % | | 7.51 % | | 8.50% | | 4.82 % | | (e) |

(a) Effective June 30, 2009, we converted from a Delaware limited liability company into a Delaware corporation. Each unit of each class of common membership interest issued and outstanding immediately prior to the conversion was converted into an equivalent number of shares of common stock with substantially the same rights and preferences as the common membership interests. Upon conversion, holders of our preferred membership interests also received an equivalent number of shares of preferred stock with substantially the same rights and preferences as the former preferred membership interests.

(b) The efficiency ratio equals total other noninterest expense divided by total net revenue. The core efficiency ratio equals total other noninterest expense divided by total net revenue excluding original issue discount amortization expense and gain on extinguishment of debt related to the 2008 bond exchange.

(c) The 2012, 2011, 2010, and 2009 ratios were computed based on average assets and average equity using a combination of monthly and daily average methodologies. The 2008  ratios have been computed based on period-end total assets and period-end total equity at December 31, 2008.

(d) Net interest spread represents the difference between the rate on total interest-earning assets and the rate on total interest-bearing liabilities, excluding discontinued operations for the periods shown.

(e) Not applicable at December 31, 2008 as we did not become a bank holding company until December 24, 2008.

(f) Net yield on interest-earning assets represents net financing revenue as a percentage of total interest-earning assets.

(g) Tier 1 capital generally consists of common equity, minority interests, qualifying noncumulative preferred stock, and the fixed rate cumulative preferred stock sold to Treasury under TARP, less goodwill and other adjustments.

(h) Total risk-based capital is the sum of Tier 1 and Tier 2 capital. Tier 2 capital generally consists of preferred stock not qualifying as Tier 1 capital, limited amounts of subordinated debt and the allowance for loan losses, and other adjustments. The amount of Tier 2 capital may not exceed the amount of Tier 1 capital.

(i) Tier 1 leverage equals Tier 1 capital divided by adjusted quarterly average total assets (which reflects adjustments for disallowed goodwill and certain intangible assets). The minimum Tier 1 leverage ratio is 3% or 4% depending on factors specified in the regulations.

(j) We define Tier 1 common as Tier 1 capital less noncommon elements, including qualifying perpetual preferred stock, minority interest in subsidiaries, trust preferred securities, and mandatorily convertible preferred securities. Ally considers various measures when evaluating capital utilization and adequacy, including the Tier 1 common equity ratio, in addition to capital ratios defined by banking regulators. This calculation is intended to complement the capital ratios defined by banking regulators for both absolute and comparative purposes. Because GAAP does not include capital ratio measures, Ally believes there are no comparable GAAP financial measures to these ratios. Tier 1 common equity is not formally defined by GAAP or codified in the federal banking regulations and, therefore, is considered to be a non-GAAP financial measure. Ally believes the Tier 1 common equity ratio is important because we believe analysts and banking regulators may assess our capital adequacy using this ratio. Additionally, presentation of this measure allows readers to compare certain aspects of our capital adequacy on the same basis to other companies in the industry.

(k) Risk-weighted assets are defined by regulation and are determined by allocating assets and specified off-balance sheet financial instruments into several broad risk categories.

Table of Contents

# Management's Discussion and Analysis

Ally Financial Inc. • Form 10-K

## Item 7.   Management's Discussion and Analysis of Financial Condition and Results of Operations

The following Management's Discussion and Analysis of Financial Condition and Results of Operation (MD&A), as well as other portions of this Form 10-K, may contain certain statements that constitute forward-looking statements within the meaning of the federal securities laws. The words "expect," "anticipate," "estimate," "forecast," "initiative," "objective," "plan," "goal," "project," "outlook," "priorities," "target," "intend," "evaluate," "pursue," "seek," "may," "would," "could," "should," "believe," "potential," "continue," or the negatives of any of these words or similar expressions are intended to identify forward-looking statements. All statements herein, other than statements of historical fact, including without limitation statements about future events and financial expectations, are forward-looking statements that involve certain risks and uncertainties. You should not place undue reliance on any forward-looking statement and should consider all uncertainties and risks discussed in this report, including those under Item 1A, Risk Factors, as well as those provided in any subsequent SEC filings. Forward-looking statements apply only as of the date they are made, and Ally undertakes no obligation to update any forward-looking statement to reflect events or circumstances that arise after the date the forward-looking statement are made.

## Overview

Ally Financial Inc. (formerly GMAC Inc.) is a leading, independent, financial services firm. Founded in 1919, we are a leading automotive financial services company with over 90 years experience providing a broad array of financial products and services to automotive dealers and their customers. We became a bank holding company on December 24, 2008, under the Bank Holding Company Act of 1956, as amended. Our banking subsidiary, Ally Bank, is an indirect wholly owned subsidiary of Ally Financial Inc. and a leading franchise in the growing direct (internet, telephone, mobile, and mail) banking market.

## Our Business

### Dealer Financial Services

Our Dealer Financial Services operations offer a wide range of financial services and insurance products to almost 15,000 automotive dealerships and approximately 4 million of their retail customers. We have deep dealer relationships that have been built over our greater-than 90-year history and our dealer-focused business model makes us a preferred automotive finance company for many automotive dealers. Our broad set of product offerings and customer-focused marketing programs differentiate Ally in the marketplace and help drive higher product penetration in our dealer relationships. Our ability to generate attractive automotive assets is driven by our platform and scale, strong relationships with automotive dealers, a full suite of dealer financial products, automotive loan-servicing capabilities, dealer-based incentive programs, and superior customer service.

Our automotive financial services include providing retail installment sales financing, loans, and leases, offering term loans to dealers, financing dealer floorplans and other lines of credit to dealers, fleet leasing, and vehicle remarketing services. We also offer vehicle service contracts and commercial insurance, primarily covering dealers' wholesale vehicle inventories. We are a leading provider of vehicle service contracts, and maintenance coverages.

We have a longstanding relationship with General Motors Company (GM) and have developed strong relationships directly with GM-franchised dealers. We are a preferred financing provider to GM and Chrysler Group LLC (Chrysler) (including Fiat) for incentivized retail loans. Our agreements with GM and Chrysler expire on December 31, 2013 and April 30, 2013, respectively. Ally currently competes in the marketplace for all other parts of the business with GM and Chrysler dealers including wholesale financing, standard rate consumer financing, and leasing. Ally expects to continue to play a significant role with GM and Chrysler dealers in the future as the dealer is Ally's direct customer for the majority of business that is conducted.

We have further diversified our customer base by establishing agreements to become preferred financing providers with other vehicle manufacturers including, Thor Industries, Maserati, The Vehicle Production Group LLC, Forest River, and Mitsubishi Motors. During 2010 our primary emphasis was on originating loans of higher credit tier borrowers. For this reason, our current operating results continue to reflect higher credit quality, lower yielding loans with lower credit loss experience. Ally however seeks to be a meaningful lender to a wide spectrum of borrowers. In 2010 we enhanced our risk management practices and efforts on risk-based pricing. We have gradually increased volumes in lower credit tiers in 2011 and 2012. We plan to continue to increase the proportion of our non-GM and Chrysler business, as we focus on maintaining and growing our dealer-customer base through our full suite of products, our dealer relationships, the scale of our platform, and our dealer-based incentive programs.

Our Insurance operations offer both consumer finance and insurance products sold primarily through the automotive dealer channel, and commercial insurance products sold to dealers. As part of our focus on offering dealers a broad range of consumer finance and insurance products, we provide vehicle service contracts, maintenance coverage, and Guaranteed Automobile Protection (GAP) products. We also underwrite selected commercial insurance coverage, which primarily insures dealers' wholesale vehicle inventory in the United States.

### *Change in Reportable Segments*

During the fourth quarter of 2012, we announced that we had reached agreements to sell substantially all of our International operations. As a result, beginning in the fourth quarter of 2012, we are presenting our continuing Automotive Finance activities under one reportable operating segment, Automotive Finance operations. Previously our Automotive Finance operations were presented as two reportable operating segments, North American Automotive Finance operations and International Automotive Finance operations.

27

Table of Contents

# Management's Discussion and Analysis

Ally Financial Inc. • Form 10-K

## Mortgage

The principal ongoing Mortgage operations are conducted through Ally Bank. We intend to continue to originate a modest level of jumbo and conventional conforming residential mortgages for our own portfolio through a select group of correspondent lenders. Our Mortgage operations also consist of noncore business activities including portfolios in run-off.

On October 26, 2012, we announced that Ally Bank had begun to explore strategic alternatives for its agency mortgage servicing rights portfolio and its business lending operations. On February 28, 2013, we sold our business lending operations to Walter Investment Management Corp.  The majority of Ally Bank's serviced mortgage assets are subserviced by GMAC Mortgage, LLC (GMACM), a subsidiary of ResCap, pursuant to a servicing agreement. Additionally, in July 2012, we announced our intention to shut down our U.S. Automotive Lending business and, as of December 31, 2012, we successfully managed receivables down to $0 with no commitments outstanding. Our intent is to significantly reduce or eliminate our mortgage-related activities with respect to the origination of conforming mortgage loans with the intent to sell into securitizations sponsored by the Federal National Mortgage Association (Fannie Mae), Federal Home Loan Mortgage Corporation (Freddie Mac), or Government National Mortgage Association (Ginnie Mae) (collectively, the Government-sponsored Enterprises, or GSEs), the retention of mortgage servicing rights, and the extension of credit to third-party mortgage originators (warehouse lending).

Residential Capital, LLC (ResCap) and certain of its wholly-owned subsidiaries (collectively, the Debtors), filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York on May 14, 2012. Refer to  Note 1 to the Consolidated Financial Statements for further information regarding the Debtors' Bankruptcy and the deconsolidation of ResCap.

Subsequent to the bankruptcy filing, ResCap announced the sale of certain assets to third parties. Upon the closing of those sales, we do not expect ResCap to continue to broker loans to us. This will primarily impact the production of loans within the Direct Lending channel, which are currently sourced exclusively from ResCap.

As the actions discussed continue to progress, we expect the level of loan production and mortgage-related assets (with the exception of mortgage loans held for investment), as well as the income before income tax expense from Mortgage operations, to decline.

### Change in Reportable Segments

On May 14, 2012, the Debtors filed for relief under Chapter 11 of the Bankruptcy Code in the United States. As a result of the bankruptcy filing, ResCap was deconsolidated from our financial statements; and beginning in the second quarter of 2012, we began presenting our mortgage business activities under one reportable operating segment, Mortgage operations. Previously our Mortgage operations had been presented as two reportable operating segments, Origination and Servicing operations and Legacy Portfolio and Other operations. The new presentation is consistent with the organizational alignment of the business and management's current view of the mortgage business.

## Corporate and Other

Corporate and Other primarily consists of our centralized corporate treasury activities, such as management of the cash and corporate investment securities portfolios, short- and long-term debt, retail and brokered deposit liabilities, derivative instruments, the amortization of the discount associated with new debt issuances and bond exchanges, most notably from the December 2008 bond exchange, and the residual impacts of our corporate funds-transfer pricing (FTP) and treasury asset liability management (ALM) activities. Corporate and Other also includes our Commercial Finance Group, certain equity investments, reclassifications and eliminations between the reportable operating segments, and overhead that was previously allocated to operations that have since been sold or classified as discontinued operations. Our Commercial Finance Group provides senior secured commercial-lending products to primarily U.S.-based middle market companies.

The net financing revenue of our Automotive Finance and Mortgage operations includes the results of an FTP process that insulates these operations from interest rate volatility by matching assets and liabilities with similar interest rate sensitivity and maturity characteristics. The FTP process assigns charge rates to the assets and credit rates to the liabilities within our Automotive Finance and Mortgage operations, respectively, based on anticipated maturity and a benchmark index plus an assumed credit spread. The assumed credit spread represents the cost of funds for each asset class based on a blend of funding channels available to the enterprise, including unsecured and secured capital markets, private funding facilities, and deposits. In addition, a risk-based methodology, which incorporates each operations credit, market, and operational risk components is used to allocate equity to these operations.

### Change in Reportable Segments

During the fourth quarter of 2012, we began to allocate expenses associated with certain deposit gathering activities and other additional costs of holding liquidity to our Automotive Finance and Mortgage operations. These expenses were previously included within our Corporate and Other activities. Additionally, we began to include overhead that was previously allocated to operations that have since been sold or moved into discontinued operations within our Corporate and Other activities.

## Ally Bank

Ally Bank, our direct banking platform,  provides us with a stable and diversified low-cost funding source.  Our focus is on building a stable deposit base driven by our compelling brand and strong value proposition. Ally Bank raises deposits directly from customers through direct banking via the internet, telephone, mobile, and mail channels. Ally Bank has established a strong and growing retail banking franchise

28

Table of Contents

# Management's Discussion and Analysis

Ally Financial Inc. • Form 10-K

which is based on a promise of being straightforward, easy to use, and offering high-quality customer service. Ally Bank's products and services are designed to develop long-term customer relationships and capitalize on the shift in consumer preference for direct banking.

Ally Bank offers a full spectrum of deposit product offerings, such as checking, savings, and certificates of deposit (CDs), as well as 48-month raise your rate CDs, IRA deposit products, Popmoney person-to-person transfer service, eCheck remote deposit capture, Ally Perks debit rewards program, and Mobile Banking. In addition, brokered deposits are obtained through third-party intermediaries. At December 31, 2012, Ally Bank had $46.9 billion of deposits, including $35.0 billion of retail deposits. The growth of our retail base from $7.2 billion at the end of 2008 to $35.0 billion at December 31, 2012, has enabled us to reduce our cost of funds during that period. The growth in deposits is primarily attributable to our retail deposits while our brokered deposits have remained at historical levels. Strong retention rates, reflecting the strength of the franchise, have materially contributed to our growth in retail deposits.

## Funding and Liquidity

Our funding strategy largely focuses on the development of diversified funding sources which we manage across products, programs, markets, and investor groups. We fund our assets primarily with a mix of retail and brokered deposits, public and private asset-backed securitizations, asset sales, committed and uncommitted credit facilities and public unsecured debt.

The diversity of our funding sources enhances funding flexibility, limits dependence on any one source and results in a more cost-effective funding strategy over the long term. Throughout 2008 and 2009, the global credit markets experienced extraordinary levels of volatility and stress. As a result, access by market participants, including Ally, to the capital markets was significantly constrained and borrowing costs increased. In response, numerous government programs were established aimed at improving the liquidity position of U.S. financial services firms. After converting to a bank holding company in late 2008, we participated in several of the programs, including Temporary Liquidity Guaranty Program (TLGP), Term Auction Facility, and Term Asset-Backed Securities Loan Facility. Our diversification strategy and participation in these programs helped us to maintain sufficient liquidity during this period of financial distress to meet all maturing unsecured debt obligations and to continue our lending and operating activities. During 2012, we repaid the TLGP debt and the other programs were discontinued prior to 2012.

As part of our overall transformation from an independent financial services company to a bank holding company, we took actions to further diversify and develop more stable funding sources and, in particular, embarked upon initiatives to grow our consumer deposit-taking capabilities within Ally Bank. In addition, we began distinguishing our liquidity management strategies between bank funding and nonbank funding.

Maximizing bank funding continues to be the cornerstone of our long-term liquidity strategy. We have made significant progress in migrating assets to Ally Bank and growing our retail deposit base since becoming a bank holding company. Retail deposits provide a low-cost source of funds that are less sensitive to interest rate changes, market volatility or changes in our credit ratings than other funding sources. At December 31, 2012, deposit liabilities totaled $47.9 billion, which constituted 37% of our total funding. This compares to just 14% at December 31, 2008.

In addition to building a larger deposit base, we continue to remain active in the securitization markets to finance Ally Bank's automotive loan portfolios. During 2012, we issued $11.8 billion in secured funding backed by retail automotive loans and leases as well as dealer floorplan automotive loans of Ally Bank. Continued structural efficiencies in securitizations combined with improving capital market conditions have resulted in a reduction in the cost of funds achieved through secured funding transactions, making them a very attractive source of funding. Additionally, for retail loans and leases, the term structure of the transaction locks in funding for a specified pool of loans and leases for the life of the underlying asset. Once a pool of retail automobile loans are selected and placed into a securitization, the underlying assets and corresponding debt amortize simultaneously resulting in committed and matched funding for the life of the asset. We manage the execution risk arising from secured funding by maintaining a diverse investor base and maintaining committed secured facilities.

As we have shifted our focus to migrating assets to Ally Bank and growing our bank funding capabilities, our reliance on parent company liquidity has consequently been reduced. Funding sources at the parent company generally consist of longer-term unsecured debt, private credit facilities, and asset-backed securitizations. In 2012, we issued over $3.6 billion of unsecured debt globally through several issuances. At December 31, 2012, we had $1.3 billion and $5.6 billion of outstanding unsecured long-term debt with maturities in 2013 and 2014, respectively. To fund these maturities, we expect to use existing pre-issued liquidity combined with maintaining an opportunistic approach to new issuance.

The strategies outlined above have allowed us to build and maintain a conservative liquidity position. Total available liquidity at the parent company was $15.6 billion and Ally Bank had $13.2 billion of available liquidity at December 31, 2012. Parent company liquidity is defined as our consolidated operations less Ally Bank and the subsidiaries of Ally Insurance's holding company. At the same time, these strategies have also resulted in a cost of funds improvement of approximately 95 basis points since the first quarter of 2011. Looking forward, given our enhanced liquidity and capital position and generally improved credit ratings, we expect that our cost of funds will continue to improve over time.

## Credit Strategy

We are a full spectrum automotive finance lender with most of our automotive loan originations underwritten within the prime-lending markets as we continue to prudently expand in nonprime markets. During 2012, we continued to recognize improvement in our credit risk profile as a result of proactive credit risk initiatives that were taken in 2009 and 2010 and modest improvement in the overall economic

Table of Contents

# Management's Discussion and Analysis

Ally Financial Inc. • Form 10-K

environment. Additionally, we discontinued certain nonstrategic operations, mainly in our international businesses. Within our Automotive Finance operations, we exited certain underperforming dealer relationships. Within our Mortgage operations, we have taken action with the intent to significantly reduce or eliminate our mortgage-related activities with respect to the origination of conforming mortgage loans with the intent to sell into GSE-sponsored securitizations, the retention of mortgage servicing rights, and the extension of credit to third-party mortgage originators (warehouse lending). We intend to continue to originate a modest level of high-quality non-conforming mortgages that exceed GSE limits (jumbo mortgages) for retention as mortgage loans held for investment.

During the year ended December 31, 2012, the credit performance of our portfolios remained strong overall as our asset quality trends within our automotive and mortgage portfolios were stable. Nonperforming loans continued to decline, benefiting from the deconsolidation of ResCap. Charge-offs also declined primarily due to recoveries in the commercial portfolio. Our provision for loan losses increased to $329 million in 2012 from $188 million in 2011 due to higher asset levels in the consumer and commercial automotive portfolios and our prudent expansion of underwriting strategy to originate volumes across a broader credit spectrum, which was significantly narrowed during the recession.

We continue to see signs of economic stabilization in the housing and vehicle markets, although our total credit portfolio will continue to be affected by sustained levels of high unemployment and continued uncertainty in the housing market.

## Bank Holding Company and Treasury's Investments

During 2008, and continuing into 2009, the credit, capital, and mortgage markets became increasingly disrupted. This disruption led to severe reductions in liquidity and adversely affected our capital position. As a result, Ally sought approval to become a bank holding company to obtain access to capital at a lower cost to remain competitive in our markets. On December 24, 2008, Ally and IB Finance Holding Company, LLC, the holding company of Ally Bank, were each approved as bank holding companies under the Bank Holding Company Act of 1956. At the same time, Ally Bank converted from a Utah-chartered industrial bank into a Utah-chartered commercial nonmember bank. Ally Bank as an FDIC-insured depository institution, is subject to the supervision and examination of the Federal Deposit Insurance Corporation (FDIC) and the Utah Department of Financial Institutions (UDFI). Ally Financial Inc. is subject to the supervision and examination of the Board of Governors of the Federal Reserve System (FRB). We are required to comply with regulatory risk-based and leverage capital requirements, as well as various safety and soundness standards established by the FRB, and are subject to certain statutory restrictions concerning the types of assets or securities that we may own and the activities in which we may engage.

As one of the conditions to becoming a bank holding company, the FRB required several actions of Ally, including meeting a minimum amount of regulatory capital. In order to meet this requirement, Ally took several actions, the most significant of which were the execution of private debt exchanges and cash tender offers to purchase and/or exchange certain of our and our subsidiaries outstanding notes held by eligible holders for a combination of cash, newly issued notes of Ally, and in the case of certain of the offers, preferred stock. The transactions resulted in an extinguishment of all notes tendered or exchanged into the offers and the new notes and stock were recorded at fair value on the issue date. This resulted in a pretax gain on extinguishment of debt of $11.5 billion in 2008 and a corresponding increase to our capital levels. The gain included a $5.4 billion original issue discount representing the difference between the face value of the new notes and is being amortized as interest expense over the term of the new notes. In addition, the U.S. Department of Treasury (Treasury) made an initial investment in Ally on December 29, 2008, pursuant to the Troubled Asset Relief Program (TARP) with a $5.0 billion purchase of Ally perpetual preferred stock with a total liquidation preference of $5.25 billion (Perpetual Preferred Stock).

On May 21, 2009, Treasury made a second investment of $7.5 billion in exchange for Ally's mandatorily convertible preferred stock with a total liquidation preference of approximately $7.9 billion (Old MCP), which included a $4 billion investment to support our agreement with Chrysler to provide automotive financing to Chrysler dealers and customers and a $3.5 billion investment related to the FRB's Supervisory Capital Assessment Program requirements. Shortly after this second investment, on May 29, 2009, Treasury acquired 35.36% of Ally common stock when it exercised its right to acquire 190,921 shares of Ally common stock from GM as repayment for an $884 million loan that Treasury had previously provided to GM.

On December 30, 2009, we entered into another series of transactions with Treasury under TARP, pursuant to which Treasury (i) converted 60 million shares of Old MCP (with a total liquidation preference of $3.0 billion) into 259,200 shares of additional Ally common stock; (ii) invested $1.25 billion in new Ally mandatorily convertible preferred stock with a total liquidation preference of approximately $1.3 billion (the New MCP); and (iii) invested $2.54 billion in new trust preferred securities with a total liquidation preference of approximately $2.7 billion (Trust Preferred Securities). At this time, Treasury also exchanged all of its Perpetual Preferred Stock and remaining Old MCP (following the conversion of Old MCP described above) into additional New MCP.

On December 30, 2010, Treasury converted 110 million shares of New MCP (with a total liquidation preference of approximately $5.5 billion) into 531,850 shares of additional Ally common stock. The conversion reduces dividends by approximately $500 million per year, assists with capital preservation, and is expected to improve profitability with a lower cost of funds.

On March 1, 2011, the Declaration of Trust and certain other documents related to the Trust Preferred Securities were amended, and all of the outstanding Trust Preferred Securities held by Treasury were designated 8.125% Fixed Rate/Floating Rate Trust Preferred Securities, Series 2. On March 7, 2011, Treasury sold 100% of the Series 2 Trust Preferred Securities in an offering registered with the SEC. Ally did not receive any proceeds from the sale.

Table of Contents

# Management's Discussion and Analysis

Ally Financial Inc. • Form 10-K

Following the transactions described above, Treasury currently holds 73.78% of Ally common stock and approximately $5.9 billion in New MCP. As a result of its current common stock investment, Treasury is entitled to appoint six of the eleven total members of the Ally Board of Directors.

The following table summarizes the investments in Ally made by Treasury in 2008 and 2009.

| ($ in millions) | Investment type | Date | Cash investment | | Warrants | | Total | |
|---|---|---|---|---|---|---|---|---|
| TARP | Preferred equity | December 29, 2008 | $ | 5,000 | $ | 250 | $ | 5,250 |
| GM Loan Conversion (a) | Common equity | May 21, 2009 | | 884 | | — | | 884 |
| SCAP 1 | Preferred equity (MCP) | May 21, 2009 | | 7,500 | | 375 | | 7,875 |
| SCAP 2 | Preferred equity (MCP) | December 30, 2009 | | 1,250 | | 63 | | 1,313 |
| SCAP 2 | Trust preferred securities | December 30, 2009 | | 2,540 | | 127 | | 2,667 |
| Total cash investments | | | $ | 17,174 | $ | 815 | $ | 17,989 |

(a)    In January 2009, Treasury loaned $884 million to General Motors. In connection with that loan, Treasury acquired rights to exchange that loan for 190,921 shares. In May 2009, Treasury exercised that right.

The following table summarizes Treasury's investment in Ally at December 31, 2012.

| December 31, 2012 *($ in millions)* | Book Value | | Face Value | |
|---|---|---|---|---|
| MCP (a) | $ | 5,685 | $ | 5,938 |
| Common equity (b) | | | | 73.78% |

(a)    Reflects the exchange of face value of $5.25 billion of Perpetual Preferred Stock to MCP in December 2009 and the conversion of face value of $3.0 billion and $5.5 billion of MCP to common equity in December 2009 and December 2010, respectively.

(b)    Represents the current common equity ownership position by Treasury.

## Discontinued Operations

During 2012, 2011, and 2010, we committed to dispose certain operations of our Automotive Finance operations, Insurance operations, Mortgage operations, and Commercial Finance Group, and have classified these operations as discontinued. For all periods presented, all of the operating results for these operations have been removed from continuing operations. Refer to Note 2 to the Consolidated Financial Statements for more details. The MD&A has been adjusted to exclude discontinued operations unless otherwise noted.

Sales transactions for our Automotive Finance operations are expected to close in stages throughout 2013. It is anticipated that there could be significant gains or losses occurring during interim periods of 2013 as the various stages close. We believe that when all of the various stages are closed, we will realize a gain on the sale of our Automotive Finance discontinued operations.

31

Table of Contents

# Management's Discussion and Analysis

Ally Financial Inc. • Form 10-K

## Primary Lines of Business

Dealer Financial Services, which includes our Automotive Finance and Insurance operations, and Mortgage are our primary lines of business. The following table summarizes the operating results excluding discontinued operations of each line of business. Operating results for each of the lines of business are more fully described in the MD&A sections that follow.

| Year ended December 31, ($ in millions) | | 2012 | | 2011 | | 2010 | Favorable/ (unfavorable) 2012-2011 % change | Favorable/ (unfavorable) 2011-2010 % change |
|---|---|---|---|---|---|---|---|---|
| **Total net revenue (loss)** | | | | | | | | |
| Dealer Financial Services | | | | | | | | |
| Automotive Finance operations | $ | **3,149** | $ | 2,952 | $ | 3,421 | **7** | (14) |
| Insurance operations | | **1,214** | | 1,398 | | 1,801 | **(13)** | (22) |
| Mortgage operations | | **1,768** | | 1,171 | | 2,587 | **51** | (55) |
| Corporate and Other | | **(1,233)** | | (1,543) | | (2,087) | **20** | 26 |
| Total | $ | **4,898** | $ | 3,978 | $ | 5,722 | **23** | (30) |
| Income (loss) from continuing operations before income tax (benefit) expense | | | | | | | | |
| Dealer Financial Services | | | | | | | | |
| Automotive Finance operations | $ | **1,389** | $ | 1,333 | $ | 1,757 | **4** | (24) |
| Insurance operations | | **160** | | 316 | | 557 | **(49)** | (43) |
| Mortgage operations | | **689** | | (622) | | 772 | **n/m** | (181) |
| Corporate and Other | | **(2,993)** | | (1,978) | | (2,694) | **(51)** | 27 |
| Total | $ | **(755)** | $ | (951) | $ | 392 | **21** | n/m |

n/m = not meaningful

32

Table of Contents

# Management's Discussion and Analysis

Ally Financial Inc. • Form 10-K

## Consolidated Results of Operations

The following table summarizes our consolidated operating results excluding discontinued operations for the periods shown. Refer to the operating segment sections of the MD&A that follows for a more complete discussion of operating results by line of business.

| Year ended December 31, ($ in millions) | 2012 | 2011 | 2010 | Favorable/ (unfavorable) 2012-2011 % change | Favorable/ (unfavorable) 2011-2010 % change |
|---|---|---|---|---|---|
| **Net financing revenue** | | | | | |
| Total financing revenue and other interest income | $ 7,468 | $ 7,061 | $ 8,017 | 6 | (12) |
| Interest expense | 4,200 | 5,039 | 5,460 | 17 | 8 |
| Depreciation expense on operating lease assets | 1,399 | 941 | 1,251 | (49) | 25 |
| Net financing revenue | 1,869 | 1,081 | 1,306 | 73 | (17) |
| **Other revenue** | | | | | |
| Net servicing income | 693 | 569 | 1,094 | 22 | (48) |
| Insurance premiums and service revenue earned | 1,059 | 1,170 | 1,371 | (9) | (15) |
| Gain on mortgage and automotive loans, net | 532 | 470 | 1,239 | 13 | (62) |
| Loss on extinguishment of debt | (148) | (64) | (124) | (131) | 48 |
| Other gain on investments, net | 146 | 259 | 502 | (44) | (48) |
| Other income, net of losses | 747 | 493 | 334 | 52 | 48 |
| Total other revenue | 3,029 | 2,897 | 4,416 | 5 | (34) |
| **Total net revenue** | 4,898 | 3,978 | 5,722 | 23 | (30) |
| **Provision for loan losses** | 329 | 188 | 357 | (75) | 47 |
| **Noninterest expense** | | | | | |
| Compensation and benefits expense | 1,365 | 1,322 | 1,348 | (3) | 2 |
| Insurance losses and loss adjustment expenses | 461 | 483 | 547 | 5 | 12 |
| Other operating expenses | 3,498 | 2,936 | 3,078 | (19) | 5 |
| Total noninterest expense | 5,324 | 4,741 | 4,973 | (12) | 5 |
| **(Loss) income from continuing operations before income tax (benefit) expense** | (755) | (951) | 392 | 21 | n/m |
| Income tax (benefit) expense from continuing operations | (1,284) | 51 | 104 | n/m | 51 |
| **Net income (loss) from continuing operations** | $ 529 | $ (1,002) | $ 288 | 153 | n/m |

n/m = not meaningful

## 2012 Compared to 2011

We earned net income from continuing operations of $529 million for the year ended December 31, 2012, compared to a net loss from continuing operations of $1.0 billion for the year ended December 31, 2011. Net income from continuing operations for the year ended December 31, 2012, was favorably impacted by our Automotive Finance operations, primarily due to an increase in consumer automotive financing revenue related to growth in the retail loan and operating lease portfolios. Additional favorability for the year ended December 31, 2012 was primarily the result of a more favorable servicing asset valuation, net of hedge, compared to the same period in 2011, higher fee income and net origination revenue related to increased consumer mortgage-lending production associated with government-sponsored refinancing programs, higher net gains on the sale of mortgage loans, and lower original issue discount (OID) amortization expense related to bond maturities and normal monthly amortization. The increase was partially offset by a $1.2 billion charge related to the Debtors' Chapter 11 filing, higher provision for loan losses, and lower investment income due to impairment related to certain investment securities that we do not plan on holding to recovery.

Total financing revenue and other interest income increased $407 million for the year ended December 31, 2012, compared to 2011. The increase resulted primarily from an increase in operating lease revenue and consumer financing revenue at our Automotive Finance operations driven primarily by an increase in consumer asset levels as a result of increased used vehicle automotive financing and higher automotive industry sales, as well as limited use of whole-loan sales as a funding source in recent periods. Additionally, we continue to prudently expand our nonprime origination volume. The increase was partially offset by the deconsolidation of ResCap effective May 14, 2012, which primarily impacted our Mortgage operations, as well as a lower average yield mix as higher rate Ally Bank mortgage loans run off.

Interest expense decreased 17% for the year ended December 31, 2012, compared to 2011. OID amortization expense decreased $576 million for the year ended December 31, 2012, compared to 2011, due to bond maturities and normal monthly amortization. Additionally, interest expense decreased at our Mortgage operations due to the deconsolidation of ResCap and lower funding costs.

Table of Contents

# Management's Discussion and Analysis

Ally Financial Inc. • Form 10-K

Depreciation expense on operating lease assets increased 49% for the year ended December 31, 2012, compared to 2011, primarily due to higher lease asset balances as a result of strong lease origination volume and lower lease remarketing gains primarily due to lower lease remarketing volume. During the latter half of 2009, we re-entered the U.S. leasing market with targeted lease product offerings and have continued to expand lease volume since that time.

Net servicing income was $693 million for the year ended December 31, 2012, compared to $569 million in 2011. The increase was primarily due to the performance of the derivative servicing hedge as compared to a less favorable hedge performance in 2011, partially offset by lower servicing fees due to the deconsolidation of ResCap.

Insurance premiums and service revenue earned decreased 9% for the year ended December 31, 2012, compared to 2011, primarily due to declining U.S. vehicle service contracts written between 2007 and 2009 as a result of lower domestic vehicle sales volume.

Gain on mortgage and automotive loans increased 13% for the year ended December 31, 2012, compared to 2011. Though we deconsolidated ResCap during the second quarter of 2012, the increase was primarily due to higher consumer mortgage-lending production through our direct lending channel and margins associated with government-sponsored refinancing programs, higher margins on warehouse and correspondent lending due to decreased competition and more selective originations from these channels, and improved gains on specified pooled mortgage loans.

Loss on extinguishment of debt increased $84 million for the year ended December 31, 2012, compared to the same period in 2011, primarily due to fees incurred related to the early termination of FHLB debt as a result of replacing our higher-cost long-term debt structure in favor of a lower-cost short-term FHLB debt structure.

Other gain on investments, net, was $146 million for the year ended December 31, 2012, compared to $259 million in 2011. The decrease was primarily due to the recognition of $61 million other-than-temporary impairment on certain equity securities in 2012 and lower realized investment gains.

Other income, net of losses, increased 52% for the year ended December 31, 2012, compared to 2011. The increase was primarily due to higher fee income and net origination revenue related to increased consumer mortgage-lending production associated with government-sponsored refinancing programs and a decrease in fair value option election valuation losses related to the deconsolidation of ResCap, partially offset by lower remarketing fee income from our Automotive Finance operations driven by lower remarketing volumes through our proprietary SmartAuction platform.

The provision for loan losses was $329 million for the year ended December 31, 2012, compared to $188 million in 2011. The increase was driven primarily by higher asset levels in the consumer automotive portfolio and our prudent expansion of underwriting strategy to originate volumes across a broader credit spectrum, which was significantly narrowed during the recession.

Other operating expenses increased 19% for the year ended December 31, 2012, compared to 2011. The increase was primarily due to a $1.2 billion charge related to ResCap's Chapter 11 filing (refer to Note 1 for more information regarding the Debtors' bankruptcy, deconsolidation, and this charge ), a $90 million expense related to penalties imposed by certain regulators and other governmental agencies in connection with mortgage foreclosure-related matters during the second quarter of 2012, and higher professional services expense, partially offset by lower mortgage representation and warranty expense related to the deconsolidation of ResCap.

We recognized consolidated income tax benefit from continuing operations of $1.3 billion for the year ended December 31, 2012, compared to income tax expense of $51 million in 2011. In 2011, we had a full valuation allowance against our domestic net deferred tax assets and certain international net deferred tax assets. For the year ended December 31, 2012, our results from operations benefited $1.3 billion from the release of U.S. federal and state valuation allowances and related effects on the basis of management's reassessment of the amount of its deferred tax assets that are more likely than not to be realized. Refer to Note 23 to the Consolidated Financial Statements for further information.

## 2011 Compared to 2010

We incurred a net loss from continuing operations of $1.0 billion for the year ended December 31, 2011, compared to net income from continuing operations of $288 million for the year ended December 31, 2010. Continuing operations for the year ended December 31, 2011, were unfavorably impacted by a decrease in net servicing income due to a drop in interest rates and increased market volatility, lower gains on the sale of loans, and a $230 million expense related to penalties imposed by certain regulators and other governmental agencies in connection with mortgage foreclosure-related matters. Partially offsetting these decreases were lower representation and warranty expense and provision for loan losses.

Total financing revenue and other interest income decreased by 12% for the year ended December 31, 2011, compared to 2010. Operating lease revenue and the related depreciation expense at our Automotive Finance operations declined due to a lower average operating lease portfolio balance as a result of our decision in late 2008 to significantly curtail leasing. Depreciation expense was also impacted by lower lease remarketing gains resulting from lower lease termination volumes. The decrease in our Mortgage operations resulted from a decline in average asset levels due to loan sales, the deconsolidation of previously on-balance sheet securitizations, and portfolio runoff. Partially offsetting the decrease was an increase in consumer financing revenue at our Automotive Finance operations driven primarily by an increase in consumer asset levels related to strong loan origination volume during 2010 and 2011 resulting primarily from higher automotive industry sales, increased used vehicle financing volume, and higher on-balance sheet retention.

34

Table of Contents

# Management's Discussion and Analysis

Ally Financial Inc. • Form 10-K

Interest expense decreased 8% for the year ended December 31, 2011, compared to 2010, primarily as a result of a change in our funding mix with an increased amount of funding coming from deposit liabilities as well as favorable trends in the securitization markets.

Net servicing income was $569 million for the year ended December 31, 2011, compared to $1.1 billion in 2010. The decrease was primarily due to a decrease in interest rates and increased market volatility compared to favorable valuation adjustments in 2010. Additionally, 2011 includes a valuation adjustment that estimates the impact of higher servicing costs related to enhanced foreclosure procedures, establishment of single point of contact, and other processes to comply with a consent order (the Consent Order) with the FRB and the FDIC entered into on April 13, 2011.

Insurance premiums and service revenue earned decreased 15% for the year ended December 31, 2011, compared to 2010. The decrease was primarily driven by the sale of certain international insurance operations during the fourth quarter of 2010 and lower earnings from our U.S. vehicle service contracts written between 2007 and 2009 due to lower domestic vehicle sales volume.

Gain on mortgage and automotive loans decreased 62% for the year ended December 31, 2011, compared to 2010. The decrease was primarily due to lower margins on mortgage loan sales, a decrease in mortgage loan production, lower whole-loan mortgage sales and mortgage loan resolutions in 2011, the absence of the 2010 gain on the deconsolidation of an on-balance sheet securitization, and the expiration of our automotive forward flow agreements during the fourth quarter of 2010.

We incurred a loss on extinguishment of debt of $64 million for the year ended December 31, 2011, compared to a loss of $124 million for the year ended December 31, 2010. The activity in all periods related to the extinguishment of certain Ally debt, which included $50 million of accelerated amortization of original issue discount for 2011, compared to $101 million in 2010.

Other gain on investments was $259 million for the year ended December 31, 2011, compared to $502 million in 2010. The decrease was primarily due to lower realized investment gains on our Insurance operations investment portfolio.

Other income, net of losses, increased 48% for the year ended December 31, 2011, compared to 2010. The increase during 2011 was primarily due to the positive impact of a $121 million gain on the early settlement of a loss holdback provision related to certain historical automotive whole-loan forward flow agreements and a favorable change in the fair value option election adjustment.

The provision for loan losses was $188 million for the year ended December 31, 2011, compared to $357 million in 2010. The decrease during 2011 reflected improved credit quality of the overall portfolio as a result of the decision to curtail nonprime lending in 2009 and the continued runoff and improved loss performance of our Nuvell nonprime automotive financing portfolio.

Insurance losses and loss adjustment expenses decreased 12% for the year ended December 31, 2011, compared to 2010. The decrease was primarily due to lower frequency and severity experienced in our U.S. vehicle service contract business and the sale of certain international insurance operations during the fourth quarter of 2010, which was partially offset by higher weather-related losses in the United States on our dealer inventory insurance products.

Other operating expenses decreased 5% for the year ended December 31, 2011, compared to 2010. The decrease was primarily related to a decrease of $346 million in mortgage representation and warranty reserve expense, lower insurance commissions expense, and lower vehicle remarketing and repossession expense. The decrease was partially offset by a $230 million expense related to penalties imposed by certain regulators and other governmental agencies in connection with mortgage foreclosure-related matters.

We recognized consolidated income tax expense of $51 million for the year ended December 31, 2011, compared to $104 million in 2010. For those respective periods, we had a full valuation allowance against our domestic net deferred tax assets and certain international net deferred tax assets. Accordingly, tax expense was driven by U.S. state income taxes in states where profitable subsidiaries are required to file separately from other loss companies in the group or where the use of prior losses is restricted, and foreign income taxes on pretax profits within foreign jurisdictions. The decrease in income tax expense for 2011, compared to 2010, was driven by increased foreign pretax losses.

Table of Contents

# Management's Discussion and Analysis

Ally Financial Inc. • Form 10-K

## Dealer Financial Services

Results for Dealer Financial Services are presented by reportable segment, which includes our Automotive Finance and Insurance operations.

### Automotive Finance Operations
### Results of Operations

The following table summarizes the operating results of our Automotive Finance operations excluding discontinued operations for the periods shown. Automotive Finance operations include the automotive activities of Ally Bank. The amounts presented are before the elimination of balances and transactions with our other reportable segments.

| Year ended December 31, ($ in millions) | 2012 | | 2011 | | 2010 | Favorable/ (unfavorable) 2012-2011 % change | Favorable/(unfavorable) 2011-2010 % change |
|---|---|---|---|---|---|---|---|
| **Net financing revenue** | | | | | | | |
| Consumer | $ | **2,827** | $ | 2,411 | $ | 1,953 | **17** | 23 |
| Commercial | | **1,152** | | 1,134 | | 1,210 | **2** | (6) |
| Loans held-for-sale | | **15** | | 5 | | 112 | **n/m** | (96) |
| Operating leases | | **2,379** | | 1,929 | | 2,579 | **23** | (25) |
| Other interest income | | **52** | | 92 | | 109 | **(43)** | (16) |
| Total financing revenue and other interest income | | **6,425** | | 5,571 | | 5,963 | **15** | (7) |
| Interest expense | | **2,199** | | 2,100 | | 2,011 | **(5)** | (4) |
| Depreciation expense on operating lease assets | | **1,399** | | 941 | | 1,255 | **(49)** | 25 |
| Net financing revenue | | **2,827** | | 2,530 | | 2,697 | **12** | (6) |
| **Other revenue** | | | | | | | |
| Servicing fees | | **109** | | 161 | | 227 | **(32)** | (29) |
| Gain on automotive loans, net | | **41** | | 48 | | 248 | **(15)** | (81) |
| Other income | | **172** | | 213 | | 249 | **(19)** | (14) |
| Total other revenue | | **322** | | 422 | | 724 | **(24)** | (42) |
| **Total net revenue** | | **3,149** | | 2,952 | | 3,421 | **7** | (14) |
| **Provision for loan losses** | | **253** | | 89 | | 260 | **(184)** | 66 |
| **Noninterest expense** | | | | | | | |
| Compensation and benefits expense | | **416** | | 395 | | 352 | **(5)** | (12) |
| Other operating expenses | | **1,091** | | 1,135 | | 1,052 | **4** | (8) |
| Total noninterest expense | | **1,507** | | 1,530 | | 1,404 | **2** | (9) |
| **Income before income tax expense** | $ | **1,389** | $ | 1,333 | $ | 1,757 | **4** | (24) |
| **Total assets** | $ | **128,411** | $ | 112,591 | $ | 97,961 | **14** | 15 |

n/m = not meaningful

### 2012 compared to 2011

Our Automotive Finance operations earned income before income tax expense of $1.4 billion for the year ended December 31, 2012, compared to $1.3 billion for the year ended December 31, 2011. Results for the year ended December 31, 2012 were favorably impacted by higher consumer and operating lease revenues driven by growth in the retail loan and operating lease portfolios. These items were partially offset by higher provision for loan losses, lower operating lease remarketing gains due primarily to lower remarketing volume, lower servicing fees, and lower income generated from lease remarketing.

Consumer financing revenue increased 17% for the year ended December 31, 2012, compared to 2011, due to an increase in consumer asset levels driven by limited use of whole-loan sales as a funding source in recent periods, increased volumes of used vehicle automotive financing, and higher automotive industry sales; however, our GM and Chrysler penetration levels for new retail automotive loans were lower than those in 2011. Additionally, we continue to prudently expand our nonprime origination volume. The increase in consumer revenue from volume was partially offset by lower yields as a result of the competitive market environment for automotive financing.

Commercial financing revenue increased $18 million for the year ended December 31, 2012, compared to 2011. The increase was primarily driven by higher commercial loan balances due to growth in our wholesale dealer floorplan lending and dealer loan portfolio, partially offset by lower yields as a result of competitive markets for automotive commercial financing.

Table of Contents

# Management's Discussion and Analysis

Ally Financial Inc. • Form 10-K

Operating lease revenue increased 23% for the year ended December 31, 2012, compared to 2011, primarily due to higher lease asset balances as a result of strong origination volume.

Interest expense increased $99 million for the year ended December 31, 2012, compared to 2011. The increase was primarily due to higher levels of earning assets, primarily as a result of growth in the retail loan and lease portfolios.

Depreciation expense on operating lease assets increased 49% for the year ended December 31, 2012, compared to 2011, primarily due to higher lease asset balances as a result of strong lease origination volume and lower lease remarketing gains primarily due to lower lease remarketing volume.

Servicing fee income decreased 32% for the year ended December 31, 2012, compared to 2011, due to lower levels of off-balance sheet retail serviced assets.

Gains on the sale of automotive loans were $41 million for the year ended December 31, 2012, compared to $48 million for 2011. We sold approximately $2.5 billion of retail automotive loans during 2012 compared to approximately $2.8 billion during 2011. While we continue to opportunistically utilize whole-loan sales as a source of funding, we have primarily focused on securitization and deposit-based funding sources.

Other income decreased 19% for the year ended December 31, 2012, compared to 2011, primarily due to lower remarketing fee income driven by lower remarketing volumes through our proprietary SmartAuction platform.

The provision for loan losses was $253 million for the year ended December 31, 2012, compared to $89 million in 2011. The increase was primarily due to continued growth in the consumer portfolio and our prudent expansion of underwriting strategy to originate volumes across a broader credit spectrum, which was significantly narrowed during the recession.

## 2011 Compared to 2010

Our Automotive Finance operations earned income before income tax expense of $1.3 billion for the year ended December 31, 2011, compared to $1.8 billion for the year ended December 31, 2010. Results for the year ended December 31, 2011, were primarily driven by less favorable remarketing results in our operating lease portfolio due primarily to lower lease terminations and the absence of gains on the sale of automotive loans due to the expiration of our forward flow agreements during the fourth quarter of 2010. These declines were partially offset by increased consumer financing revenue driven by strong loan origination volume related primarily to improvement in automotive industry sales, the growth in used vehicle financing volume, and a lower loan loss provision due to an improved credit mix and improved consumer credit performance.

Consumer financing revenue increased 23% for the year ended December 31, 2011, compared to 2010, due to an increase in consumer asset levels primarily related to strong loan origination volume during 2010 and 2011 resulting primarily from higher automotive industry sales, increased used vehicle financing volume, and higher on-balance sheet retention. Additionally, we continue to prudently expand our nonprime origination volume and introduce innovative finance products to the marketplace. The increase in consumer revenue was partially offset by lower yields as a result of an increasingly competitive market environment and a change in the consumer asset mix, including the runoff of the higher-yielding Nuvell nonprime automotive financing portfolio.

Loans held-for-sale financing revenue decreased $107 million for the year ended December 31, 2011, compared to 2010, due to the expiration of whole-loan forward flow agreements during the fourth quarter of 2010. Subsequent to the expiration of these agreements, consumer loan originations have largely been retained on-balance sheet utilizing deposit funding from Ally Bank and on-balance sheet securitization transactions.

Operating lease revenue decreased 25% for the year ended December 31, 2011, compared to 2010. Operating lease revenue and depreciation expense declined due to a lower average operating lease portfolio balance. Depreciation expense was also impacted by lower remarketing gains due primarily to a decline in lease termination volume. In 2008 and 2009, we significantly curtailed our lease product offerings in the United States. During the latter half of 2009, we re-entered the U.S. leasing market with targeted lease product offerings and have continued to expand lease volume since that time.

Servicing fee income decreased $66 million for the year ended December 31, 2011, compared to 2010, due to lower levels of off-balance sheet retail serviced assets driven by a reduction of new whole-loan sales subsequent to the expiration of our forward flow agreements in the fourth quarter of 2010.

Net gain on automotive loans decreased $200 million for the year ended December 31, 2011, compared to 2010, primarily due to the expiration of whole-loan forward flow agreements during the fourth quarter of 2010.

The provision for loan losses was $89 million for the year ended December 31, 2011, compared to $260 million in 2010. The decrease was primarily due to improved credit quality that drove improved loss performance in the consumer loan portfolio and continued strength in the used vehicle market, partially offset by continued growth in the consumer loan portfolio.

37

Table of Contents

# Management's Discussion and Analysis

Ally Financial Inc. • Form 10-K

## Automotive Finance Operations

Our Automotive Finance operations provide automotive financing services to consumers and automotive dealers. For consumers, we provide retail financing and leasing for new and used vehicles, and through our commercial automotive financing operations, we fund dealer purchases of new and used vehicles through wholesale or floorplan financing.

### *Consumer Automotive Financing*

Historically, we have provided two basic types of financing for new and used vehicles: retail installment sale contracts (retail contracts) and lease contracts. In most cases, we purchase retail contracts and leases for new and used vehicles from dealers when the vehicles are purchased or leased by consumers. Our consumer automotive financing operations generate revenue through finance charges or lease payments and fees paid by customers on the retail contracts and leases. In connection with lease contracts, we also recognize a gain or loss on the remarketing of the vehicle at the end of the lease.

The amount we pay a dealer for a retail contract is based on the negotiated purchase price of the vehicle and any other products, such as service contracts, less any vehicle trade-in value and any down payment from the consumer. Under the retail contract, the consumer is obligated to make payments in an amount equal to the purchase price of the vehicle (less any trade-in or down payment) plus finance charges at a rate negotiated between the consumer and the dealer. In addition, the consumer is also responsible for charges related to past-due payments. When we purchase the contract, it is normal business practice for the dealer to retain some portion of the finance charge as income for the dealership. Our agreements with dealers place a limit on the amount of the finance charges they are entitled to retain. Although we do not own the vehicles we finance through retail contracts, we hold a perfected security interest in those vehicles.

With respect to consumer leasing, we purchase leases (and the associated vehicles) from dealerships. The purchase price of consumer leases is based on the negotiated price for the vehicle less any vehicle trade-in and any down payment from the consumer. Under the lease, the consumer is obligated to make payments in amounts equal to the amount by which the negotiated purchase price of the vehicle (less any trade-in value or down payment) exceeds the contract residual value (including residual support) of the vehicle at lease termination, plus lease charges. The consumer is also generally responsible for charges related to past due payments, excess mileage, excessive wear and tear, and certain disposal fees where applicable. When the lease contract is entered into, we estimate the residual value of the leased vehicle at lease termination. At contract inception, we generally determine the projected residual values based on independent data, including independent guides of vehicle residual values, and analysis. These projected values may be upwardly adjusted as a marketing incentive if the manufacturer considers above-market residual support necessary to encourage consumers to lease vehicles. To the extent the actual residual value of the vehicle, as reflected in the sales proceeds received upon remarketing at lease termination, is less than the expected residual value for the vehicle at lease inception, we incur additional depreciation expense and/or a loss on the lease transaction.

Our standard U.S. leasing plan, SmartLease, requires a monthly payment by the consumer. We also offer an alternative leasing plan, SmartLease Plus, that requires one up-front payment of all lease amounts at the time the consumer takes possession of the vehicle.

During 2011, we introduced the Ally Buyer's Choice product on new GM and Chrysler vehicles to select states in the United States. The Ally Buyer's Choice financing product allows customers to own their vehicle with a fixed rate and payment with the option to sell it to us at a pre-determined point during the contract term and at a pre-determined price.

Consumer leases are operating leases; therefore, credit losses on the operating lease portfolio are not as significant as losses on retail contracts because lease credit losses are primarily limited to payments and assessed fees. Since some of these fees are not assessed until the vehicle is returned, these losses on the lease portfolio are correlated with lease termination volume. U.S. operating lease accounts past due over 30 days represented 0.73% and 0.66% of the total portfolio at December 31, 2012 and 2011, respectively.

With respect to all financed vehicles, whether subject to a retail contract or a lease contract, we require that property damage insurance be obtained by the consumer. In addition, for lease contracts, we require that bodily injury, collision, and comprehensive insurance be obtained by the consumer.

Total consumer financing revenue of our Automotive Finance operations was  $2.8 billion, $2.4 billion, and $2.0 billion in 2012, 2011, and 2010, respectively.

38

Table of Contents

# Management's Discussion and Analysis

Ally Financial Inc. • Form 10-K

## Consumer Automotive Financing Volume

The following table summarizes our new and used vehicle consumer financing volume, including lease, and our share of consumer sales in the United States.

| Year ended December 31, (*units in thousands*) | Consumer automotive financing volume | | | % Share of consumer sales | | |
|---|---|---|---|---|---|---|
| | **2012** | 2011 | 2010 | **2012** | 2011 | 2010 |
| GM new vehicles | **579** | 707 | 596 | **30** | 38 | 38 |
| Chrysler new vehicles | **315** | 304 | 302 | **26** | 32 | 45 |
| Other non-GM / Chrysler new vehicles | **81** | 68 | 33 | | | |
| Used vehicles | **485** | 466 | 255 | | | |
| Total consumer automotive financing volume | **1,460** | 1,545 | 1,186 | | | |

The decline in consumer automotive financing volume in 2012, compared to 2011, was primarily driven by lower retail penetration at both GM and Chrysler in the United States. Additionally, both used and non-GM/Chrysler originations were higher due to the continued strategic focus within these markets. We continue to increase our focus on used vehicle financing, primarily through franchised dealers. The decrease in GM and Chrysler penetration during the year ended December 31, 2012 was primarily due to the market for automotive financing growing more competitive as more consumers are financing their vehicle purchases and as more competitors continue to enter this market as a result of how well automotive finance assets generally performed relative to other asset classes during the 2008 economic downturn.

## Manufacturer Marketing Incentives

Automotive manufacturers may elect to sponsor incentive programs (on both retail contracts and leases) by supporting finance rates below the standard market rates at which we purchase retail contracts. These marketing incentives are also referred to as rate support or subvention. When automotive manufacturers utilize these marketing incentives, we are compensated at contract inception for the present value of the difference between the customer rate and our standard rates. For retail loans, we defer and recognize this amount as a yield adjustment over the life of the contract. For lease contracts, this payment reduces our cost basis in the underlying lease asset.

Automotive manufacturers may also provide incentives on leased vehicles by supporting an above-market residual value, referred to as residual support, to encourage consumers to lease vehicles. Residual support results in a lower monthly lease payment for the consumer. While we are compensated by the manufacturer at the time of lease origination to raise the contract residual, we may bear the risk of loss to the extent the value of the leased vehicle upon remarketing is below the contract residual value of the vehicle at the time the lease contract is signed. Under certain residual support programs, the automotive manufacturer may reimburse us to the extent remarketing sales proceeds are less than the residual value set forth in the lease contract and no greater than our standard residual rates that would have otherwise been applied. To the extent remarketing sales proceeds are more than the contract residual at termination, we may reimburse the automotive manufacturer for a portion of the higher residual value.

Under what we refer to as pull-ahead programs, consumers may be encouraged by the manufacturer to terminate leases early in conjunction with the acquisition of a new vehicle. As part of these programs, we waive all or a portion of the customer's remaining payment obligation. Under most programs, the automotive manufacturer compensates us for a portion of the foregone revenue from the waived payments that are offset partially to the extent that our remarketing sales proceeds are higher than otherwise would be realized if the vehicle had been remarketed at lease contract maturity.

We are currently party to an agreement with GM pursuant to which GM initially agreed to offer all vehicle financing incentives to customers through Ally. However, the agreement, which was originally entered into in November 2006, provides for annual reductions in the percentage of financing subvention programs that GM is required to provide through Ally, and currently applies to a limited percentage. The agreement expires on December 31, 2013.

We are also party to an agreement to make available automotive financing products and services to Chrysler dealers and customers. We provide dealer financing and services and retail financing to qualified Chrysler dealers and customers as we deem appropriate according to our credit policies and in our sole discretion, and Chrysler is obligated to use Ally for a designated minimum threshold percentage of Chrysler retail financing subvention programs. On April 25, 2012, Chrysler provided us with notification of nonrenewal related to this agreement and as a result, the agreement will expire on April 30, 2013.

Table of Contents

# Management's Discussion and Analysis

Ally Financial Inc. • Form 10-K

The following table presents the total U.S. consumer origination dollars and percentage mix by product type.

| Year ended December 31, ($ in billions) | Consumer automotive financing originations | | | % Share of consumer sales | | |
|---|---|---|---|---|---|---|
| | **2012** | 2011 | 2010 | **2012** | 2011 | 2010 |
| GM new vehicles | | | | | | |
| New retail standard | $ **6,230** | $ 9,009 | $ 8,460 | **16** | 23 | 27 |
| New retail subvented | **5,960** | 6,734 | 6,532 | **15** | 17 | 21 |
| Lease | **5,919** | 5,075 | 2,954 | **15** | 13 | 9 |
| Total GM new vehicle originations | **18,109** | 20,818 | 17,946 | | | |
| Chrysler new vehicles | | | | | | |
| New retail standard | **4,431** | 4,062 | 3,324 | **12** | 10 | 11 |
| New retail subvented | **1,971** | 2,454 | 3,893 | **5** | 6 | 12 |
| Lease | **2,380** | 2,165 | 891 | **6** | 5 | 3 |
| Total Chrysler new vehicle originations | **8,782** | 8,681 | 8,108 | | | |
| Other new retail vehicles | **2,178** | 1,684 | 736 | **6** | 4 | 2 |
| Other lease | **93** | 76 | 43 | — | — | — |
| Used vehicles | **9,581** | 8,990 | 4,736 | **25** | 22 | 15 |
| Total consumer automotive financing originations | $ **38,743** | $ 40,249 | $ 31,569 | | | |

At December 31, 2012, the percentage of U.S. new retail contracts acquired that included rate subvention from GM and Chrysler decreased as a percentage of total U.S. new retail contracts compared to 2011, primarily driven by lower retail penetration at both GM and Chrysler in the United States as a result of the continued evolution of our business model. Additionally, both used and non-GM/Chrysler originations were higher due to the continued strategic focus within these markets. We continue to increase our focus on used vehicle financing, primarily through franchised dealers. The fragmented used vehicle financing market provides an attractive opportunity that we believe will further expand and support our dealer relationships and increase our volume of retail loan originations.

*Servicing*

We have historically serviced all retail contracts and leases we retained on-balance sheet. We historically sold a portion of the retail contracts we originated and retained the right to service and earn a servicing fee for our servicing functions. Ally Servicing LLC, a wholly owned subsidiary, performs most servicing activities for U.S. retail contracts and consumer automobile leases.

Servicing activities consist largely of collecting and processing customer payments, responding to customer inquiries such as requests for payoff quotes, processing customer requests for account revisions (such as payment extensions and rewrites), maintaining a perfected security interest in the financed vehicle, monitoring vehicle insurance coverage, and disposing of off-lease vehicles. Servicing activities are generally consistent for our Automotive Finance operations; however, certain practices may be influenced by local laws and regulations.

Our U.S. customers have the option to receive monthly billing statements to remit payment by mail or through electronic fund transfers, or to establish online web-based account administration through the Ally Account Center. Customer payments are processed by regional third-party processing centers that electronically transfer payment data to customers' accounts.

Servicing activities also include initiating contact with customers who fail to comply with the terms of the retail contract or lease, typically via telephone or sending a reminder notice, when an account becomes 3 to 15 days past due. Accounts that become 30 to 45 days past due are transferred to special collection teams that track accounts more closely. The nature and timing of these activities depend on the repayment risk of the account.

During the collection process, we may offer a payment extension to a customer experiencing temporary financial difficulty. A payment extension enables the customer to delay monthly payments for 30, 60, or 90 days, thereby deferring the maturity date of the contract by the period of delay. Extensions granted to a customer typically do not exceed 90 days in the aggregate during any 12-month period or 180 days in aggregate over the life of the contract. During the deferral period, we continue to accrue and collect interest on the contract as part of the deferral agreement. If the customer's financial difficulty is not temporary and management believes the customer could continue to make payments at a lower payment amount, we may offer to rewrite the remaining obligation, extending the term and lowering the monthly payment obligation. In those cases, the principal balance generally remains unchanged while the interest rate charged to the customer generally increases. Extension and rewrite collection techniques help mitigate financial loss in those cases where management believes the customer will recover from financial difficulty and resume regularly scheduled payments or can fulfill the obligation with lower payments over a longer period. Before offering an extension or rewrite, collection personnel evaluate and take into account the capacity of the customer to meet the revised payment terms. Generally, we do not consider extensions that fall within our policy guidelines to represent more than an insignificant delay in payment and, therefore, they are not considered Troubled Debt Restructurings (TDRs). Although the granting of an extension could delay the eventual charge-off of an account, typically we are able to repossess and sell the related collateral, thereby

Table of Contents

# Management's Discussion and Analysis

Ally Financial Inc. • Form 10-K

mitigating the loss. As an indication of the effectiveness of our consumer credit practices, of the total amount outstanding in the U. S. traditional retail portfolio at December 31, 2009, only 7.5% of the extended or rewritten balances were subsequently charged off through December 31, 2012. A three-year period was utilized for this analysis as this approximates the weighted average remaining term of the portfolio. At December 31, 2012, 7.6% of the total amount outstanding in the servicing portfolio had been granted an extension or was rewritten.

Subject to legal considerations, in the United States we normally begin repossession activity once an account becomes greater than 60-days past due. Repossession may occur earlier if management determines the customer is unwilling to pay, the vehicle is in danger of being damaged or hidden, or the customer voluntarily surrenders the vehicle. Approved third-party repossession firms handle repossessions. Normally the customer is given a period of time to redeem the vehicle by paying off the account or bringing the account current. If the vehicle is not redeemed, it is sold at auction. If the proceeds do not cover the unpaid balance, including unpaid earned finance charges and allowable expenses, the resulting deficiency is charged off. Asset recovery centers pursue collections on accounts that have been charged off, including those accounts where the vehicle was repossessed, and skip accounts where the vehicle cannot be located.

At December 31, 2012 and 2011, our total consumer automotive serviced portfolio was $75.3 billion and $85.5 billion, respectively, compared to our consumer automotive on-balance sheet portfolio of $67.3 billion and $73.2 billion at December 31, 2012 and 2011, respectively. Refer to Note 11 to the Consolidated Financial Statements for further information regarding servicing activities.

### Remarking and Sales of Leased Vehicles

When we acquire a consumer lease, we assume ownership of the vehicle from the dealer. Neither the consumer nor the dealer is responsible for the value of the vehicle at the time of lease termination. When vehicles are not purchased by customers or the receiving dealer at scheduled lease termination, the vehicle is returned to us for remarketing through an auction. We generally bear the risk of loss to the extent the value of a leased vehicle upon remarketing is below the contract residual value determined at the time the lease contract is signed. Automotive manufacturers may share this risk with us for certain leased vehicles, as described previously under *Manufacturer Marketing Incentives*. Our methods of vehicle sales in the United States at lease termination primarily include the following:

- *Sale to dealer* — After the lessee declines an option to purchase the off-lease vehicle, the dealer who accepts the returned off-lease vehicle has the opportunity to purchase the vehicle directly from us at a price we define.

- *Internet auctions* — Once the lessee and dealer decline their options to purchase, we offer off-lease vehicles to dealers and certain other third parties in the United States through our proprietary internet site (SmartAuction). This internet sales program maximizes the net sales proceeds from off-lease vehicles by reducing the time between vehicle return and ultimate disposition, reducing holding costs, and broadening the number of prospective buyers. We maintain the internet auction site, set the pricing floors on vehicles, and administer the auction process. We earn a service fee for every vehicle sold through SmartAuction, which, in 2012, was 221,000 vehicles.

- *Physical auctions* — We dispose of our off-lease vehicles not purchased at termination by the lease consumer or dealer or sold on an internet auction through traditional official manufacturer-sponsored auctions. We are responsible for handling decisions at the auction including arranging for inspections, authorizing repairs and reconditioning, and determining whether bids received at auction should be accepted.

### Commercial Automotive Financing

#### Automotive Wholesale Dealer Financing

One of the most important aspects of our dealer relationships is supporting the sale of vehicles through wholesale or floorplan financing. We primarily support automotive finance purchases by dealers of new and used vehicles manufactured or distributed before sale or lease to the retail customer. Wholesale automotive financing represents the largest portion of our commercial financing business and is the primary source of funding for dealers' purchases of new and used vehicles. During 2012, we financed an average commercial wholesale floorplan receivables balance of $15.3 billion of new GM vehicles, representing a 71% share of GM's U.S. dealer inventory. We also financed an average of $6.7 billion of new Chrysler vehicles representing a 58% share of Chrysler's U.S. dealer inventory. In addition, we financed an average of $2.2 billion of new non-GM/Chrysler vehicles and $3.0 billion of used vehicles.

Wholesale credit is arranged through lines of credit extended to individual dealers. In general, each wholesale credit line is secured by all vehicles and typically by other assets owned by the dealer or the operator's or owner's personal guarantee. As part of our floorplan financing arrangement, we typically require repurchase agreements with the automotive manufacturer to repurchase new vehicle inventory under certain circumstances. The amount we advance to dealers is equal to 100% of the wholesale invoice price of new vehicles, which includes destination and other miscellaneous charges, and a price rebate, known as a holdback, from the manufacturer to the dealer in varying amounts stated as a percentage of the invoice price. Interest on wholesale automotive financing is generally payable monthly. Most wholesale automotive financing is structured to yield interest at a floating rate indexed to the Prime Rate. The rate for a particular dealer is based on, among other things, competitive factors, the amount and status of the dealer's creditworthiness, and various incentive programs.

Under the terms of the credit agreement with the dealer, we may demand payment of interest and principal on wholesale credit lines at any time; however, unless we terminate the credit line or the dealer defaults or the risk and exposure warrant, we generally require payment of the principal amount financed for a vehicle upon its sale or lease by the dealer to the customer.

Table of Contents

# Management's Discussion and Analysis

Ally Financial Inc. • Form 10-K

Total commercial wholesale revenue of our Automotive Finance operations was $999 million, $976 million, and $909 million in 2012, 2011, and 2010, respectively.

### Commercial Wholesale Financing Volume

The following table summarizes the average balances of our commercial wholesale floorplan finance receivables of new and used vehicles and share of dealer inventory in the United States.

| | Average balance | | | % Share of dealer inventory | | |
|---|---|---|---|---|---|---|
| Year ended December 31, ($ in millions) | **2012** | 2011 | 2010 | **2012** | 2011 | 2010 |
| GM new vehicles (a) | $ **15,331** | $ 13,407 | $ 10,941 | **71** | 78 | 82 |
| Chrysler new vehicles (a) | **6,693** | 6,228 | 4,665 | **58** | 67 | 72 |
| Other non-GM / Chrysler new vehicles | **2,230** | 1,844 | 1,704 | | | |
| Used vehicles | **2,985** | 2,920 | 2,727 | | | |
| Total commercial wholesale finance receivables | $ **27,239** | $ 24,399 | $ 20,037 | | | |

(a)    Share of dealer inventory based on a 13 month average of dealer inventory (excludes in-transit units).

Commercial wholesale financing average volume increased during 2012, compared to 2011, primarily due to growing dealer inventories required to support increasing automobile sales. GM and Chrysler wholesale penetration decreased during 2012, compared to 2011, as a result of increased competition in the wholesale marketplace.

### Other Commercial Automotive Financing

We also provide other forms of commercial financing for the automotive industry including automotive dealer term loans and automotive fleet financing. Automotive dealer term loans are loans that we make to dealers to finance other aspects of the dealership business. These loans are typically secured by real estate, other dealership assets, and are personally guaranteed by the individual owners of the dealership. Automotive fleet financing may be obtained by dealers, their affiliates, and other companies and be used to purchase vehicles, which they lease or rent to others.

### Servicing and Monitoring

We service all of the wholesale credit lines in our portfolio and the wholesale automotive finance receivables that we have securitized. A statement setting forth billing and account information is distributed on a monthly basis to each dealer. Interest and other nonprincipal charges are billed in arrears and are required to be paid immediately upon receipt of the monthly billing statement. Generally, dealers remit payments to us through wire transfer transactions initiated by the dealer through a secure web application.

Dealers are assigned a risk rating based on various factors, including capital sufficiency, operating performance, financial outlook, and credit and payment history. The risk rating affects the amount of the line of credit, the determination of further advances, and the management of the account. We monitor the level of borrowing under each dealer's account daily. When a dealer's balance exceeds the credit line, we may temporarily suspend the granting of additional credit or increase the dealer's credit line or take other actions following evaluation and analysis of the dealer's financial condition and the cause of the excess.

We periodically inspect and verify the existence of dealer vehicle inventories. The timing of the verifications varies, and ordinarily no advance notice is given to the dealer. Among other things, verifications are intended to determine dealer compliance with the financing agreement and confirm the status of our collateral.

Table of Contents

# Management's Discussion and Analysis

Ally Financial Inc. • Form 10-K

### Insurance Operations
*Results of Operations*

The following table summarizes the operating results of our Insurance operations excluding discontinued operations for the periods shown. The amounts presented are before the elimination of balances and transactions with our other reportable segments.

| Year ended December 31, ($ in millions) | 2012 | | 2011 | | 2010 | Favorable/ (unfavorable) 2012-2011 % change | Favorable/ (unfavorable) 2011-2010 % change |
|---|---|---|---|---|---|---|---|
| **Insurance premiums and other income** | | | | | | | |
| Insurance premiums and service revenue earned | $ | **1,055** | $ | 1,153 | $ | 1,342 | **(8)** | (14) |
| Investment income | | **124** | | 220 | | 418 | **(44)** | (47) |
| Other income | | **35** | | 25 | | 41 | **40** | (39) |
| Total insurance premiums and other income | | **1,214** | | 1,398 | | 1,801 | **(13)** | (22) |
| **Expense** | | | | | | | |
| Insurance losses and loss adjustment expenses | | **454** | | 452 | | 511 | **—** | 12 |
| Acquisition and underwriting expense | | | | | | | |
| Compensation and benefits expense | | **61** | | 61 | | 64 | **—** | 5 |
| Insurance commissions expense | | **382** | | 431 | | 510 | **11** | 15 |
| Other expenses | | **157** | | 138 | | 159 | **(14)** | 13 |
| Total acquisition and underwriting expense | | **600** | | 630 | | 733 | **5** | 14 |
| Total expense | | **1,054** | | 1,082 | | 1,244 | **3** | 13 |
| **Income from continuing operations before income tax expense** | $ | **160** | $ | 316 | $ | 557 | **(49)** | (43) |
| **Total assets** | $ | **8,439** | $ | 8,036 | $ | 8,789 | **5** | (9) |
| **Insurance premiums and service revenue written** | $ | **1,061** | $ | 1,039 | $ | 1,029 | **2** | 1 |
| **Combined ratio (a)** | | **98.3%** | | 93.1% | | 90.6% | | |

(a)    Management uses a combined ratio as a primary measure of underwriting profitability with its components measured using accounting principles generally accepted in the United States of America. Underwriting profitability is indicated by a combined ratio under 100% and is calculated as the sum of all incurred losses and expenses (excluding interest and income tax expense) divided by the total of premiums and service revenues earned and other income.

*2012 Compared to 2011*

Our Insurance operations earned income from continuing operations before income tax expense of $160 million for the year ended December 31, 2012, compared to $316 million for the year ended December 31, 2011. The decrease was primarily attributable to lower investment income, lower insurance premiums and service revenue earned from our U.S. vehicle service contracts, and higher weather-related losses, including the effects of Storm Sandy.

Insurance premiums and service revenue earned was $1.1 billion for the year ended December 31, 2012, compared to $1.2 billion in 2011. The decrease was primarily due to declining U.S. vehicle service contracts written between 2007 and 2009 as a result of lower domestic vehicle sales volume.

Investment income totaled $124 million for the year ended December 31, 2012, compared to $220 million in 2011. The decrease was primarily due to the recognition of other-than-temporary impairment on certain equity securities of $61 million and lower realized investment gains.

Other income totaled $35 million for the year ended December 31, 2012, compared to $25 million in 2011. The increase was primarily due to a gain of $8 million on the sale of our Canadian personal lines business during the second quarter of 2012.

Insurance losses and loss adjustment expenses totaled $454 million for the year ended December 31, 2012, compared to $452 million for the year ended December 31, 2011. The slight increase was driven primarily by higher weather-related losses in the United States on our dealer inventory insurance products, including the effects of Storm Sandy, mostly offset by lower frequency experienced in our vehicle service contract business and lower losses matching our decrease in earned premium. Despite the decrease in insurance premiums and service revenue earned, insurance losses and loss adjustment expenses increased primarily due to the impacts of Storm Sandy, which further impacted the increase in the combined ratio.

Acquisition and underwriting expense decreased 5% for the year ended December 31, 2012, compared to 2011. The decrease was primarily a result of lower commission expense in our U.S. dealership-related products matching our decrease in earned premiums, partially offset by increased technology expense.

43

Table of Contents

# Management's Discussion and Analysis

Ally Financial Inc. • Form 10-K

### 2011 Compared to 2010

Our Insurance operations earned income from continuing operations before income tax expense of $316 million for the year ended December 31, 2011, compared to $557 million for the year ended December 31, 2010. The decrease was primarily attributable to lower insurance premiums and service contract revenue earned from our U.S. vehicle service contracts and lower realized investment gains.

Insurance premiums and service revenue earned was $1.2 billion for the year ended December 31, 2011, compared to $1.3 billion in 2010. The decrease was primarily due to the sale of certain international insurance operations during the fourth quarter of 2010 and lower earnings from our U.S. vehicle service contracts written between 2007 and 2009 due to lower domestic vehicle sales volume.

Investment income totaled $220 million for the year ended December 31, 2011, compared to $418 million in 2010. The decrease was primarily due to lower realized investment gains.

Insurance losses and loss adjustment expenses totaled $452 million for the year ended December 31, 2011, compared to $511 million in 2010. The decrease was primarily due to lower frequency and severity experienced in our U.S. vehicle service contract business and the sale of certain international insurance operations during the fourth quarter of 2010, which was partially offset by higher weather-related losses in the United States on our dealer inventory insurance products.

Acquisition and underwriting expense decreased 14% for the year ended December 31, 2011, compared to 2010. The decrease was primarily due to the sale of certain international insurance operations during the fourth quarter of 2010 and lower commission expense in our U.S. dealership-related products matching our decrease in earned premiums.

### Premium and Service Revenue Written

The following table shows premium and service revenue written by insurance product.

| Year ended December 31, ($ in millions) | | **2012** | | 2011 | | 2010 |
|---|---|---|---|---|---|---|
| Vehicle service contracts | | | | | | |
| New retail | $ | **406** | $ | 376 | $ | 315 |
| Used retail | | **509** | | 514 | | 517 |
| Reinsurance | | **(119)** | | (103) | | (91) |
| Total vehicle service contracts | | **796** | | 787 | | 741 |
| Wholesale | | **132** | | 115 | | 103 |
| Other finance and insurance (a) | | **129** | | 133 | | 113 |
| North American operations | | **1,057** | | 1,035 | | 957 |
| International and Corporate (b) | | **4** | | 4 | | 72 |
| Total | $ | **1,061** | $ | 1,039 | $ | 1,029 |

(a)  Other finance and insurance includes Guaranteed Automobile Protection (GAP) coverage, excess wear and tear, wind-down of Canadian personal lines, and other ancillary products.
(b)  International and Corporate includes certain international operations that were sold during the fourth quarter of 2010 and other run-off products.

Insurance premiums and service revenue written was $1.1 billion for the year ended December 31, 2012, compared to $1.0 billion in 2011 and 2010. Insurance premiums and service revenue written increased slightly due to higher written premiums in our new retail vehicle service contract and dealer inventory insurance products. Vehicle service contract revenue is earned over the life of the service contract on a basis proportionate to the anticipated cost pattern. Accordingly, the majority of earnings from vehicle service contracts written during 2012 will be recognized as income in future periods.

### Cash and Investments

A significant aspect of our Insurance operations is the investment of proceeds from premiums and other revenue sources. We use these investments to satisfy our obligations related to future claims at the time these claims are settled. Our Insurance operations have an Investment Committee, which develops guidelines and strategies for these investments. The guidelines established by this committee reflect our risk tolerance, liquidity requirements, regulatory requirements, and rating agency considerations, among other factors.

Table of Contents

# Management's Discussion and Analysis

Ally Financial Inc. • Form 10-K

The following table summarizes the composition of our Insurance operations cash and investment portfolio at fair value.

| December 31, ($ in millions) | | 2012 | | 2011 |
|---|---|---|---|---|
| Cash | | | | |
| Noninterest-bearing cash | $ | 129 | $ | 211 |
| Interest-bearing cash | | 488 | | 629 |
| Total cash | | 617 | | 840 |
| Available-for-sale securities | | | | |
| Debt securities | | | | |
| U.S. Treasury and federal agencies | | 1,090 | | 496 |
| Foreign government | | 303 | | 678 |
| Mortgage-backed | | 714 | | 590 |
| Asset-backed | | 8 | | 95 |
| Corporate debt | | 1,264 | | 1,491 |
| Other debt | | — | | 23 |
| Total debt securities | | 3,379 | | 3,373 |
| Equity securities | | 1,148 | | 1,054 |
| Total available-for-sale securities | | 4,527 | | 4,427 |
| Total cash and securities | $ | 5,144 | $ | 5,267 |

45

Table of Contents

# Management's Discussion and Analysis

Ally Financial Inc. • Form 10-K

## Mortgage Operations

### Results of Operations

The following table summarizes the operating results for our Mortgage operations excluding discontinued operations for the periods shown. Our Mortgage operations include the ResCap legal entity (prior to its deconsolidation from Ally Financial as of May 14, 2012) and the mortgage operations of Ally Bank. Refer to Note 1 to the Consolidated Financial Statements for further details on ResCap. The amounts presented are before the elimination of balances and transactions with our other reportable segments.

| Year ended December 31, ($ in millions) | | 2012 | | 2011 | | 2010 | Favorable/ (unfavorable) 2012-2011 % change | Favorable/ (unfavorable) 2011-2010 % change |
|---|---|---|---|---|---|---|---|---|
| **Net financing revenue** | | | | | | | | |
| Total financing revenue and other interest income | $ | **743** | $ | 1,147 | $ | 1,711 | **(35)** | (33) |
| Interest expense | | **592** | | 937 | | 1,122 | **37** | 16 |
| Net financing revenue | | **151** | | 210 | | 589 | **(28)** | (64) |
| Servicing fees | | **592** | | 1,198 | | 1,261 | **(51)** | (5) |
| Servicing asset valuation and hedge activities, net | | **(8)** | | (789) | | (394) | **99** | (100) |
| Total servicing income, net | | **584** | | 409 | | 867 | **43** | (53) |
| Gain on mortgage loans, net | | **529** | | 395 | | 990 | **34** | (60) |
| Other income, net of losses | | **504** | | 157 | | 141 | **n/m** | 11 |
| Total other revenue | | **1,617** | | 961 | | 1,998 | **68** | (52) |
| **Total net revenue** | | **1,768** | | 1,171 | | 2,587 | **51** | (55) |
| **Provision for loan losses** | | **86** | | 150 | | 144 | **43** | (4) |
| **Noninterest expense** | | | | | | | | |
| Compensation and benefits expense | | **252** | | 394 | | 322 | **36** | (22) |
| Representation and warranty expense | | **67** | | 324 | | 670 | **79** | 52 |
| Other operating expenses | | **674** | | 925 | | 679 | **27** | (36) |
| Total noninterest expense | | **993** | | 1,643 | | 1,671 | **40** | 2 |
| **Income (loss) from continuing operations before income tax expense** | $ | **689** | $ | (622) | $ | 772 | **n/m** | (181) |
| **Total assets** | $ | **14,744** | $ | 33,906 | $ | 36,786 | **(57)** | (8) |

n/m = not meaningful

### 2012 Compared to 2011

Our Mortgage operations earned income from continuing operations before income tax expense of $689 million for the year ended December 31, 2012, compared to losses from continuing operations before income tax expense of $622 million for the year ended December 31, 2011. During 2011, we experienced an unfavorable servicing asset valuation, net of hedge, that did not recur in 2012. Additionally, during 2012, we earned higher fee income and net origination revenue related to increased consumer mortgage-lending production associated with government-sponsored refinancing programs, and higher net gains on the sale of mortgage loans. We incurred lower representation and warranty expense and operating expenses resulting from the deconsolidation of ResCap during the second quarter of 2012. Refer to Note 1 to the Consolidated Financial Statements for further information regarding ResCap.

Net financing revenue was $151 million for the year ended December 31, 2012, compared to $210 million in 2011. The decrease in net financing revenue was primarily due to the deconsolidation of ResCap during the second quarter of 2012. Additionally, total financing revenue and other interest income decreased in 2012 due to lower average yield mix as higher-rate Ally Bank mortgage loans continued to run off. Partially offsetting the decrease was lower interest expense related to lower funding costs.

Total servicing income, net was $584 million for the year ended December 31, 2012, compared to $409 million in 2011. The increase was primarily due to the performance of the derivative servicing hedge as compared to a less favorable hedge performance in 2011. The increase was partially offset by lower servicing fees due to the deconsolidation of ResCap.

The net gain on mortgage loans increased 34% for the year ended December 31, 2012, compared to 2011. Though we deconsolidated ResCap during the second quarter of 2012, the increase was primarily due to higher consumer mortgage-lending production through our direct lending channel and margins associated with government-sponsored refinancing programs, higher margins on warehouse and correspondent lending due to decreased competition and more selective originations from these channels, and improved market gains on specified pooled loans.

46

Table of Contents
# Management's Discussion and Analysis

Ally Financial Inc. • Form 10-K

Other income, net of losses, was $504 million for the year ended December 31, 2012, compared to $157 million in 2011. The increase was primarily due to higher fee income and net origination revenue related to increased consumer mortgage-lending production associated with government-sponsored refinancing programs and a decrease in fair value option election valuation losses resulting from the deconsolidation of ResCap.

The provision for loan losses was $86 million for the year ended December 31, 2012, compared to $150 million in 2011. The decrease for the year ended December 31, 2012, was primarily due to lower net charge-offs in 2012 due to the continued runoff of legacy mortgage assets and improvements in home prices.

Total noninterest expense decreased 40% for the year ended December 31, 2012, compared to 2011. The decrease was primarily driven by lower representation and warranty expense and compensation and benefits expense resulting from the deconsolidation of ResCap. The decrease was partially offset by a $90 million expense related to penalties imposed by certain regulators and other governmental agencies in connection with mortgage foreclosure-related matters during the second quarter of 2012.

## 2011 Compared to 2010

Our Mortgage operations incurred a loss before income tax expense of $622 million for the year ended December 31, 2011, compared to income before income tax expense of $772 million for the year ended December 31, 2010. The decrease was primarily driven by lower net gains on the sale of mortgage loans, unfavorable servicing asset valuation, net of hedge, lower financing revenue related to a decrease in asset levels, and a $230 million expense related to penalties imposed by certain regulators and other governmental agencies in connection with mortgage foreclosure-related matters. The decrease was partially offset by lower representation and warranty expense.

Net financing revenue was $210 million for the year ended December 31, 2011, compared to $589 million in 2010. The decrease was driven by lower financing revenue and other interest income due primarily to a decline in average asset levels related to loan sales, the deconsolidation of previously on-balance sheet securitizations, and portfolio runoff. The decrease was partially offset by lower interest expense related to a reduction in average borrowings commensurate with a smaller asset base.

Total servicing income, net was $409 million for the year ended December 31, 2011, compared to $867 million in 2010. The decrease was primarily due to a drop in interest rates and increased market volatility compared to favorable valuation adjustments in 2010. Additionally, 2011 includes a valuation adjustment that estimates the impact of higher servicing costs related to enhanced foreclosure procedures, establishment of single point of contact, and other processes to comply with the Consent Order.

The net gain on mortgage loans was $395 million for the year ended December 31, 2011, compared to $990 million in 2010. The decrease during 2011 was primarily due to lower margins and production, lower whole-loan sales, lower gains on mortgage loan resolutions, and the absence of the 2010 gain on the deconsolidation of an on-balance sheet securitization. Refer to Note 10 to the Consolidated Financial Statements for information on the deconsolidation.

Total noninterest expense decreased 2% for the year ended December 31, 2011, compared to 2010. The decrease was primarily driven by lower representation and warranty expense in 2011 as 2010 included a significant increase in expense to cover anticipated repurchase requests and settlements with key counterparties. The decrease was partially offset by a $230 million expense related to penalties imposed by certain regulators and other governmental agencies in connection with mortgage foreclosure-related matters, higher loan processing and underwriting fees, and an increase in compensation and benefits expense due to an increase in headcount related to expansion activities in our broker, retail, and servicing operations.

## Loan Production

### U.S. Mortgage Loan Production Channels

Ally Bank continues to perform certain mortgage activities as a result of the ResCap bankruptcy process. Subsequent to the bankruptcy filing, ResCap announced the sale of certain assets to third parties. Upon the closing of those sales, we do not expect ResCap to continue to broker loans to us. This will primarily impact the production of loans within the direct lending channel, which are currently sourced exclusively from ResCap. We expect the level of loan production to continue to decline.

We have three primary channels for residential mortgage loan production: the purchase of loans in the secondary market (primarily from Ally Bank correspondent lenders), the origination of loans through our direct-lending network, and the origination of loans through our mortgage brokerage network.

- *Correspondent lender and secondary market purchases* — Loans purchased from correspondent lenders are originated or purchased by the correspondent lenders and subsequently sold to us. All of the purchases from correspondent lenders are conducted through Ally Bank. We qualify and approve any correspondent lenders who participate in the loan purchase programs. We intend to continue to originate a modest level of jumbo and conventional conforming residential mortgages for our own portfolio through a select group of correspondent lenders.

- *Direct-lending network* — Our direct-lending network consists of internet and telephone-based call center operations as well as our retail network. Virtually all of the residential mortgage loans of this channel are brokered to Ally Bank.

47

Table of Contents

# Management's Discussion and Analysis

Ally Financial Inc. • Form 10-K

- *Mortgage brokerage network* — Residential mortgage loans originated through mortgage brokers. We review and underwrite the application submitted by the mortgage broker, approve or deny the application, set the interest rate and other terms of the loan, and, upon acceptance by the borrower and the satisfaction of all conditions required by us, fund the loan through Ally Bank. We qualify and approve all mortgage brokers who generate mortgage loans and continually monitor their performance.

The following table summarizes U.S. consumer mortgage loan production by channel.

| | 2012 | | 2011 | | 2010 | |
|---|---|---|---|---|---|---|
| Year ended December 31, ($ in millions) | Number of loans | Dollar amount of loans | Number of loans | Dollar amount of loans | Number of loans | Dollar amount of loans |
| Correspondent lender and secondary market purchases | 58,766 | $ 14,224 | 196,964 | $ 45,349 | 263,963 | $ 61,465 |
| Direct lending | 75,096 | 14,640 | 37,743 | 7,414 | 36,064 | 7,586 |
| Mortgage brokers | 12,996 | 3,601 | 12,018 | 3,495 | 2,035 | 491 |
| Total U.S. production | 146,858 | $ 32,465 | 246,725 | $ 56,258 | 302,062 | $ 69,542 |

The following table summarizes the composition of our U.S. consumer mortgage loan production. ResCap was deconsolidated from Ally as of May 14, 2012. Refer to Note 1 to the Consolidated Financial Statements for further details on ResCap.

| | 2012 | | 2011 | | 2010 | |
|---|---|---|---|---|---|---|
| Year ended December 31, ($ in millions) | Number of loans | Dollar amount of loans | Number of loans | Dollar amount of loans | Number of loans | Dollar amount of loans |
| Ally Bank | 146,074 | $ 32,324 | 245,849 | $ 56,130 | 300,738 | $ 69,320 |
| ResCap | 784 | 141 | 876 | 128 | 1,324 | 222 |
| Total U.S. production | 146,858 | $ 32,465 | 246,725 | $ 56,258 | 302,062 | $ 69,542 |

## Mortgage Loan Production by Type

We intend to continue to originate a modest level of jumbo and conventional conforming residential mortgages for our held-for-investment portfolio through a select group of correspondent lenders. During 2012, 2011, and 2010, we primarily originated prime conforming and government-insured residential mortgage loans. We define prime as mortgage loans with a FICO score of 660 and above. Our mortgage loans are categorized as follows.

- *Prime conforming mortgage loans* — Prime credit quality first-lien mortgage loans secured by 1-4 family residential properties that meet or conform to the underwriting standards established by the GSEs for inclusion in their guaranteed mortgage securities programs.

- *Prime nonconforming mortgage loans* — Prime credit quality first-lien mortgage loans secured by 1-4 family residential properties that either (1) do not conform to the underwriting standards established by the GSEs because they had original principal amounts exceeding GSE limits, which are commonly referred to as jumbo mortgage loans, or (2) have alternative documentation requirements and property or credit-related features (e.g., higher loan-to-value or debt-to-income ratios) but are otherwise considered prime credit quality due to other compensating factors.

- *Prime second-lien mortgage loans* — Open- and closed-end mortgage loans secured by a second or more junior-lien on single-family residences, which include home equity mortgage loans and lines of credit. We ceased originating prime second-lien mortgage loans during 2008.

- *Government mortgage loans* — First-lien mortgage loans secured by 1-4 family residential properties that are insured by the Federal Housing Administration or guaranteed by the Veterans Administration.

- *Nonprime mortgage loans* — First-lien and certain junior-lien mortgage loans secured by single-family residences made to individuals with credit profiles that do not qualify for a prime loan, have credit-related features that fall outside the parameters of traditional prime mortgage products, or that otherwise exposes us to comparatively higher risk of loss. Nonprime includes mortgage loans the industry characterizes as "subprime," as well as high combined loan-to-value second-lien loans that fell out of our standard loan programs due to noncompliance with one or more criteria. We ceased originating nonprime mortgage loans during 2007.

48

Table of Contents

# Management's Discussion and Analysis

Ally Financial Inc. • Form 10-K

The following table summarizes our U.S. consumer mortgage loan production by type.

| Year ended December 31, ($ in millions) | 2012 | | 2011 | | 2010 | |
|---|---|---|---|---|---|---|
| | Number of loans | Dollar amount of loans | Number of loans | Dollar amount of loans | Number of loans | Dollar amount of loans |
| Prime conforming | 133,359 | $ 27,920 | 209,031 | $ 47,511 | 228,936 | $ 53,721 |
| Prime nonconforming | 2,706 | 2,211 | 2,008 | 1,679 | 1,837 | 1,548 |
| Government | 10,793 | 2,334 | 35,686 | 7,068 | 71,289 | 14,273 |
| Total U.S. production | 146,858 | $ 32,465 | 246,725 | $ 56,258 | 302,062 | $ 69,542 |

## U.S. Warehouse Lending

Historically, we provided warehouse-lending facilities to correspondent lenders and other mortgage originators in the United States. These facilities enabled lenders and originators to finance residential mortgage loans until they were sold in the secondary mortgage loan market. In July 2012, we announced our intention to shut down this business and, as of December 31, 2012, we successfully managed receivables down to $0 with no commitments outstanding. At December 31, 2011, we had total warehouse line of credit commitments of $2.8 billion, against which we had $1.9 billion of advances outstanding.

## Loans Outstanding

Consumer mortgage loans held-for-sale and consumer mortgage loans held-for-investment as of December 31, 2012, represent loans held by Ally Bank. ResCap was deconsolidated from Ally Financial as of May 14, 2012. Refer to Note 1 to the Consolidated Financial Statements for further details on ResCap.

Consumer mortgage loans held-for-sale were as follows.

| December 31, ($ in millions) | 2012 | 2011 |
|---|---|---|
| Prime conforming | $ 2,407 | $ 3,345 |
| Prime nonconforming | — | 571 |
| Prime second-lien | — | 545 |
| Government (a) | 8 | 3,294 |
| Nonprime | — | 561 |
| International | — | 17 |
| Total (b) | 2,415 | 8,333 |
| Net premiums (discounts) | 26 | (221) |
| Fair value option election adjustment | 49 | 60 |
| Lower-of-cost or fair value adjustment | — | (60) |
| Total, net (c) | $ 2,490 | $ 8,112 |

(a) Includes loans subject to conditional repurchase options of $0 million and $2.3 billion sold to Ginnie Mae-guaranteed securitizations at December 31, 2012, and December 31, 2011, respectively. The corresponding liability is recorded in accrued expenses and other liabilities on the Consolidated Balance Sheet.

(b) Includes unpaid principal write-down of $0 million and $1.5 billion at December 31, 2012, and December 31, 2011, respectively. The amounts are write-downs taken upon the transfer of mortgage loans from held-for-investment to held-for-sale during the fourth quarter of 2009 and charge-offs taken in accordance with our charge-off policy.

(c) Includes loans subject to conditional repurchase options of $0 million and $106 million sold to off-balance sheet private-label securitizations at December 31, 2012, and December 31, 2011, respectively. The corresponding liability is recorded in accrued expenses and other liabilities on the Consolidated Balance Sheet.

Table of Contents

# Management's Discussion and Analysis

Ally Financial Inc. • Form 10-K

Consumer mortgage loans held-for-investment were as follows.

| December 31, ($ in millions) | 2012 | | 2011 |
|---|---|---|---|
| Prime conforming | $ 245 | $ | 278 |
| Prime nonconforming | 8,322 | | 8,069 |
| Prime second-lien | 1,137 | | 2,200 |
| Government | — | | — |
| Nonprime | — | | 1,349 |
| International | — | | 422 |
| Total | 9,704 | | 12,318 |
| Net premiums | 43 | | 38 |
| Fair value option election adjustment | — | | (1,601) |
| Allowance for loan losses | (432) | | (495) |
| Other | 8 | | — |
| Total, net (a) | $ 9,323 | $ | 10,260 |

(a) At December 31, 2012, and December 31, 2011, the carrying value of mortgage loans held-for-investment relating to securitization transactions accounted for as on-balance sheet securitizations and pledged as collateral totaled $0 million and $837 million, respectively. The investors in these on-balance sheet securitizations have no recourse to our other assets beyond the loans pledged as collateral other than market customary representation and warranty provisions.

## Mortgage Loan Servicing

Our retained mortgage servicing rights consist of primary servicing rights. When we act as primary servicer, we collect and remit mortgage loan payments, respond to borrower inquiries, account for principal and interest, hold custodial and escrow funds for payment of property taxes and insurance premiums, counsel or otherwise work with delinquent borrowers, supervise foreclosures and property dispositions, and generally administer the loans. The majority of our serviced mortgage assets are subserviced by GMAC Mortgage, LLC, a subsidiary of ResCap, pursuant to a servicing agreement. Historically, we acted as a master servicer. When we acted as master servicer, we collected mortgage loan payments from primary servicers and distributed those funds to investors in mortgage-backed and mortgage-related asset-backed securities and whole-loan packages. Key services in this regard include loan accounting, claims administration, oversight of primary servicers, loss mitigation, bond administration, cash flow waterfall calculations, investor reporting, and tax-reporting compliance. In return for performing these functions, we receive servicing fees equal to a specified percentage of the outstanding principal balance of the loans being serviced and may also be entitled to other forms of servicing compensation, such as late payment fees or prepayment penalties. Servicing compensation also includes interest income or the float earned on collections that are deposited in various custodial accounts between their receipt and the scheduled/contractual distribution of the funds to investors. Refer to Note 11 to the Consolidated Financial Statements for additional information.

The value of mortgage servicing rights is sensitive to changes in interest rates and other factors. We have developed and implemented an economic hedge program to, among other things, mitigate the overall risk of loss due to a change in the fair value of our mortgage servicing rights. Accordingly, we hedge the change in the total fair value of our mortgage servicing rights. The effectiveness of this economic hedging program may have a material effect on the results of operations. Refer to the Critical Accounting Estimates section of this MD&A and Note 22 to the Consolidated Financial Statements for further discussion. On October 26, 2012, we announced that Ally Bank began to explore strategic alternatives for its agency mortgage servicing rights portfolio, including a potential sale of the asset. A sale alternative would require GSE approval.

The following table summarizes our primary consumer mortgage loan-servicing portfolio by product category.

| December 31, ($ in millions) | 2012 | | 2011 |
|---|---|---|---|
| U.S. primary servicing portfolio | | | |
| Prime conforming | $ 117,544 | $ | 226,239 |
| Prime nonconforming | 11,628 | | 47,767 |
| Prime second-lien | 1,136 | | 6,871 |
| Government | 16 | | 49,027 |
| Nonprime | — | | 20,753 |
| International primary servicing portfolio | — | | 5,773 |
| Total primary servicing portfolio (a) | $ 130,324 | $ | 356,430 |

(a) Excludes loans for which we acted as a subservicer. Subserviced loans totaled $0 billion and $26.4 billion at December 31, 2012 and 2011, respectively.

Table of Contents

# Management's Discussion and Analysis

Ally Financial Inc. • Form 10-K

## Corporate and Other

The following table summarizes the activities of Corporate and Other excluding discontinued operations for the periods shown. Corporate and Other primarily consists of our centralized corporate treasury activities, such as management of the cash and corporate investment securities portfolios, short- and long-term debt, retail and brokered deposit liabilities, derivative instruments, the amortization of the discount associated with new debt issuances and bond exchanges, most notably from the December 2008 bond exchange, and the residual impacts of our corporate funds-transfer pricing (FTP) and treasury asset liability management (ALM) activities. Corporate and Other also includes our Commercial Finance Group, certain equity investments, overhead that was previously allocated to operations that have since been sold or classified as discontinued operations, and reclassifications and eliminations between the reportable operating segments. Our Commercial Finance Group provides senior secured commercial-lending products to primarily U.S.-based middle market companies.

| Year ended December 31, ($ in millions) | 2012 | | 2011 | | 2010 | | Favorable/ (unfavorable) 2012-2011 % change | Favorable/ (unfavorable) 2011-2010 % change |
|---|---|---|---|---|---|---|---|---|
| **Net financing loss** | | | | | | | | |
| Total financing revenue and other interest income | $ | **157** | $ | 196 | $ | 206 | **(20)** | (5) |
| Interest expense | | | | | | | | |
| Original issue discount amortization | | **349** | | 925 | | 1,204 | **62** | 23 |
| Other interest expense | | **981** | | 992 | | 1,055 | **1** | 6 |
| Total interest expense | | **1,330** | | 1,917 | | 2,259 | **31** | 15 |
| Net financing loss (a) | | **(1,173)** | | (1,721) | | (2,053) | **32** | 16 |
| **Other (expense) revenue** | | | | | | | | |
| Loss on extinguishment of debt | | **(148)** | | (64) | | (124) | **(131)** | 48 |
| Other gain on investments, net | | **69** | | 84 | | 146 | **(18)** | (42) |
| Other income, net of losses | | **19** | | 158 | | (56) | **(88)** | n/m |
| Total other (expense) revenue | | **(60)** | | 178 | | (34) | **(134)** | n/m |
| **Total net loss** | | **(1,233)** | | (1,543) | | (2,087) | **20** | 26 |
| **Provision for loan losses** | | **(10)** | | (51) | | (47) | **(80)** | 9 |
| **Noninterest expense** | | | | | | | | |
| Compensation and benefits expense | | **636** | | 472 | | 610 | **(35)** | 23 |
| Other operating expense (b) | | | | | | | | |
| Accrual related to ResCap Bankruptcy and deconsolidation (c) | | **750** | | — | | — | **n/m** | — |
| Impairment of investment in ResCap (c) | | **442** | | — | | — | **n/m** | — |
| Other | | **(58)** | | 14 | | 44 | **n/m** | 68 |
| Total other operating expense | | **1,134** | | 14 | | 44 | **n/m** | 68 |
| Total noninterest expense | | **1,770** | | 486 | | 654 | **n/m** | 26 |
| **Loss from continuing operations before income tax expense** | $ | **(2,993)** | $ | (1,978) | $ | (2,694) | **(51)** | 27 |
| **Total assets** | $ | **30,753** | $ | 29,526 | $ | 28,472 | **4** | 4 |

n/m = not meaningful

(a)    Refer to the table that follows for further details on the components of net financing loss.

(b)    Includes a reduction of $814 million for the year ended December 31, 2012, and $757 million for each of the years ended December 31, 2011, and 2010, related to the allocation of corporate overhead expenses to other segments. The receiving segments record their allocation of corporate overhead expense within other operating expense.

(c)    Refer to Note 1 to the Consolidated Financial Statements for further information regarding the deconsolidation of ResCap.

Table of Contents

# Management's Discussion and Analysis

Ally Financial Inc. • Form 10-K

The following table summarizes the components of net financing losses for Corporate and Other.

| At and for the year ended December 31, ($ in millions) | | 2012 | | 2011 | | 2010 |
|---|---|---|---|---|---|---|
| Original issue discount amortization | | | | | | |
| 2008 bond exchange amortization | $ | (320) | $ | (886) | $ | (1,158) |
| Other debt issuance discount amortization | | (29) | | (39) | | (46) |
| Total original issue discount amortization (a) | | (349) | | (925) | | (1,204) |
| Net impact of the funds transfer pricing methodology | | | | | | |
| Unallocated liquidity costs (b) | | (586) | | (564) | | (495) |
| Funds-transfer pricing / cost of funds mismatch (c) | | 170 | | 42 | | (364) |
| Unassigned equity costs (d) | | (467) | | (364) | | (77) |
| Total net impact of the funds transfer pricing methodology | | (883) | | (886) | | (936) |
| Other (including Commercial Finance Group net financing revenue) | | 59 | | 90 | | 87 |
| Total net financing losses for Corporate and Other | $ | (1,173) | $ | (1,721) | $ | (2,053) |
| Outstanding original issue discount balance | $ | 1,840 | $ | 2,194 | $ | 3,169 |

(a)  Amortization is included as interest on long-term debt in the Consolidated Statement of Comprehensive Income.
(b)  Represents the unallocated cost of funding our cash and investment portfolio.
(c)  Represents our methodology to assign funding costs to classes of assets and liabilities based on expected duration and the London interbank offer rate (LIBOR) swap curve plus an assumed credit spread. Matching duration allocates interest income and interest expense to the reportable segments so the respective reportable segments results are insulated from interest rate risk. The balance above is the resulting benefit (loss) due to holding interest rate risk at Corporate and Other.
(d)  Primarily represents the unassigned cost of maintaining required capital positions for certain of our regulated entities, primarily Ally Bank and Ally Insurance.

The following table presents the scheduled remaining amortization of the original issue discount at December 31, 2012.

| Year ended December 31, ($ in millions) | | 2013 | | 2014 | | 2015 | | 2016 | | 2017 | 2018 and thereafter (a) | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Original issue discount | | | | | | | | | | | | | |
| Outstanding balance | $ | 1,579 | $ | 1,391 | $ | 1,335 | $ | 1,272 | $ | 1,197 | $— | | |
| Total amortization (b) | | 261 | | 188 | | 56 | | 63 | | 75 | 1,197 | $ | 1,840 |
| 2008 bond exchange amortization (c) | | 241 | | 166 | | 43 | | 53 | | 66 | 1,059 | | 1,628 |

(a)  The maximum annual scheduled amortization for any individual year is $158 million in 2030 of which $152 million is related to 2008 bond exchange amortization.
(b)  The amortization is included as interest on long-term debt on the Consolidated Statement of Comprehensive Income.
(c)  2008 bond exchange amortization is included in total amortization.

## 2012 Compared to 2011

Loss from continuing operations before income tax expense for Corporate and Other was $3.0 billion for the year ended December 31, 2012, compared to $2.0 billion for the year ended December 31, 2011. Corporate and Other's loss from continuing operations before income tax expense was driven by net financing losses, which primarily represents original issue discount amortization expense and the net impact of our FTP methodology, which includes the unallocated cost of maintaining our liquidity and investment portfolios.

The higher loss from continuing operations before income tax expense for the year ended December 31, 2012 was primarily due to a $1.2 billion charge related to ResCap's filing for relief under Chapter 11 of the bankruptcy code in the United States. Refer to Note 1 to the Consolidated Financial Statements for additional information related to ResCap. Additionally, higher losses for the year ended December 31, 2012 were impacted by the early prepayment of certain Federal Home Loan Bank debt to further reduce funding costs, the absence of a $121 million gain on the early settlement of a loss holdback provision related to certain historical automotive whole-loan forward flow agreements recognized during 2011, and an increase in compensation and benefits expense as a result of increased incentive compensation and pension-related expenses. The pension-related expenses resulted from our decision to de-risk our long-term pension liability through lump-sum buyouts and annuity placements for former subsidiaries. Refer to Note 24 to the Consolidated Financial Statements for further detail on these certain pension actions. Partially offsetting the higher losses for the year ended December 31, 2012 were decreases in OID amortization expense related to bond maturities and normal monthly amortization. Additionally, we incurred no accelerated amortization of OID for the year ended December 31, 2012, compared to $50 million for the year ended December 31, 2011.

Corporate and Other also includes the results of our Commercial Finance Group. Our Commercial Finance Group earned income from continuing operations before income tax expense of $48 million for the year ended December 31, 2012, compared to $141 million for the year ended December 31, 2011. The decrease was primarily related to lower net revenue resulting from a decline in income from servicer advance collections, lower accelerated fee income due to fewer early loan payoffs during 2012, compared to 2011. Additionally, provision

52

Table of Contents

# Management's Discussion and Analysis

Ally Financial Inc. • Form 10-K

expense was less favorable in 2012 due to a greater decline in portfolio-level reserves in 2011 associated with higher recoveries on nonperforming exposures, combined with the runoff of the majority of our higher-risk non-core portfolio.

**2011 Compared to 2010**

Loss from continuing operations before income tax expense for Corporate and Other was $2.0 billion for the year ended December 31, 2011, compared to $2.7 billion for the year ended December 31, 2010. Corporate and Other's loss from continuing operations before income tax expense for both periods was driven by net financing losses, which primarily represents original issue discount amortization expense and the net impact of our FTP methodology, which includes the unallocated cost of maintaining our liquidity and investment portfolios.

The improvement in the loss from continuing operations before income tax expense for the year ended December 31, 2011, was primarily due to a decrease in original issue discount amortization expense related to bond maturities and normal monthly amortization and favorable net impact of the FTP methodology. The net FTP methodology improvement was primarily the result of favorable unallocated interest costs due to lower non-earning assets and unamortized original issue discount balance. Additionally, 2011 was favorably impacted by a $121 million gain on the early settlement of a loss holdback provision related to certain historical automotive whole-loan forward flow agreements, a reduction in debt fees driven by the restructuring of our secured facilities and the termination of our automotive forward flow agreements, and by a lower loss on the extinguishment of certain Ally debt (which included accelerated amortization of original issue discount of $50 million for the year ended December 31, 2011, compared to $101 million in 2010).

Corporate and Other also includes the results of our Commercial Finance Group. Our Commercial Finance Group earned income from continuing operations before income tax expense of $141 million for the year ended December 31, 2011, compared to $182 million for the year ended December 31, 2010. The decrease was primarily due to lower asset levels partially offset by lower expenses and favorable loss provisions.

**Cash and Securities**

The following table summarizes the composition of the cash and securities portfolio held at fair value by Corporate and Other.

| December 31, ($ in millions) | | 2012 | | 2011 |
|---|---|---|---|---|
| Cash | | | | |
| Noninterest-bearing cash | $ | 944 | $ | 1,768 |
| Interest-bearing cash | | 5,942 | | 9,781 |
| Total cash | | 6,886 | | 11,549 |
| Trading securities | | | | |
| Mortgage-backed | | — | | 589 |
| Total trading securities | | — | | 589 |
| Available-for-sale securities | | | | |
| Debt securities | | | | |
| U.S. Treasury and federal agencies | | 1,124 | | 1,051 |
| U.S. states and political subdivisions | | — | | 1 |
| Foreign government | | — | | 106 |
| Mortgage-backed | | 6,191 | | 6,722 |
| Asset-backed | | 2,332 | | 2,520 |
| Other debt (a) | | — | | 305 |
| Total debt securities | | 9,647 | | 10,705 |
| Equity securities | | 4 | | 4 |
| Total available-for-sale securities | | 9,651 | | 10,709 |
| Total cash and securities | $ | 16,537 | $ | 22,847 |

(a)   Includes intersegment eliminations.

53

Table of Contents

# Management's Discussion and Analysis

Ally Financial Inc. • Form 10-K

## Risk Management

Managing the risk/reward trade-off is a fundamental component of operating our businesses. Our risk management program is overseen by the Ally Board of Directors (the Board), various risk committees, and the executive leadership team. The Board sets the risk appetite across our company while the risk committees and executive leadership team identify and monitor potential risks and manage the risk to be within our risk appetite. Ally's primary risks include credit, lease residual, market, operational, insurance/underwriting, country, and liquidity.

- ***Credit risk*** — The risk of loss arising from a creditor not meeting its financial obligations to our firm.

- ***Lease Residual risk*** — The risk of loss arising from the possibility that the actual proceeds realized upon the sale of returned vehicles will be lower than the projection of the values used in establishing the pricing at lease inception.

- ***Market risk*** — The risk of loss arising from changes in the fair value of our assets or liabilities (including derivatives) caused by movements in market variables, such as interest rates, foreign-exchange rates, and equity and commodity prices.

- ***Operational risk*** — The risk of loss arising from inadequate or failed processes or systems, human factors, or external events.

- ***Insurance/Underwriting risk*** — The risk of loss associated with either (i) fortuitous occurrences (e.g., fires, hurricanes, tortuous conduct) and/or (ii) the failure to consider the frequency of losses, severity of losses or the correlation of losses with multiple events.

- ***Country risk*** — The risk that economic, social and political conditions, and events in foreign countries will adversely affect our financial interests.

- ***Liquidity risk*** — The risk that our financial condition or overall safety and soundness is adversely affected by an inability, or perceived inability, to meet our financial obligations, and to withstand unforeseen liquidity stress events (see Liquidity Management, Funding, and Regulatory Capital discussion within this MD&A).

While risk oversight is ultimately the responsibility of the Board, our governance structure starts within each line of business, including committees established to oversee risk in their respective areas. The lines of business are responsible for executing on risk strategies, policies, and controls that are fundamentally sound and compliant with global risk management policies and with applicable laws and regulations. The line of business risk committees, which report up to the Risk and Compliance Committee of the Board, monitor the performance within each portfolio and determine whether to amend any risk practices based upon portfolio trends.

In addition, the Global Risk Management and Compliance organizations are accountable for independently monitoring, measuring, and reporting on our various risks. They are also responsible for monitoring that our risks remain within the tolerances established by the Board, developing and maintaining policies, and implementing risk management methodologies.

All lines of business and global functions are subject to full and unrestricted audits by Audit Services. Audit Services reports to the Audit Committee of the Board, and is primarily responsible for assisting the Audit Committee in fulfilling its governance and oversight responsibilities. Audit Services is granted free and unrestricted access to any and all of our records, physical properties, technologies, management, and employees.

In addition, our Global Loan Review Group provides an independent assessment of the quality of Ally's credit risk portfolios and credit risk management practices. This group reports its findings directly to the Risk and Compliance Committee. The findings of this group help to strengthen our risk management practices and processes throughout the organization.

Table of Contents

# Management's Discussion and Analysis

Ally Financial Inc. • Form 10-K

## Loan and Lease Exposure

The following table summarizes the exposures from our loan and lease activities.

| December 31, ($ in millions) | 2012 | 2011 |
|---|---|---|
| **Finance receivables and loans** | | |
| Dealer Financial Services | $ **86,542** | $ 100,734 |
| Mortgage operations | **9,821** | 12,753 |
| Corporate and Other | **2,692** | 1,268 |
| Total finance receivables and loans | **99,055** | 114,755 |
| Held-for-sale loans | | |
| Dealer Financial Services | **—** | 425 |
| Mortgage operations | **2,490** | 8,112 |
| Corporate and Other | **86** | 20 |
| Total held-for-sale loans | **2,576** | 8,557 |
| Total on-balance sheet loans | $ **101,631** | $ 123,312 |
| Off-balance sheet securitized loans | | |
| Dealer Financial Services | $ **1,495** | $ — |
| Mortgage operations | **119,384** | 326,975 |
| Corporate and Other | **—** | — |
| Total off-balance sheet securitized loans | $ **120,879** | $ 326,975 |
| Operating lease assets | | |
| Dealer Financial Services | $ **13,550** | $ 9,275 |
| Mortgage operations | **—** | — |
| Corporate and Other | **—** | — |
| Total operating lease assets | $ **13,550** | $ 9,275 |
| Serviced loans and leases | | |
| Dealer Financial Services | $ **134,122** | $ 122,881 |
| Mortgage operations (a) | **130,324** | 356,430 |
| Corporate and Other | **1,344** | 1,762 |
| Total serviced loans and leases | $ **265,790** | $ 481,073 |

(a) Includes primary mortgage loan-servicing portfolio only.

The risks inherent in our loan and lease exposures are largely driven by changes in the overall economy, used vehicle and housing price levels, unemployment levels, and their impact to our borrowers. The potential financial statement impact of these exposures varies depending on the accounting classification and future expected disposition strategy. We retain the majority of our automobile loans as they complement our core business model, but we do sell loans from time to time on an opportunistic basis. We primarily originate mortgage loans with the intent to sell them and, as such, retain only a small percentage of the loans that we originate or purchase. Mortgage loans that we do not intend to retain are sold to investors, primarily through securitizations guaranteed by GSEs. However, we may retain an interest or right to service these loans. We ultimately manage the associated risks based on the underlying economics of the exposure. Given our recent strategic actions, we intend to continue to originate a modest level of jumbo and conventional conforming residential mortgages through a select group of correspondent lenders with the intent to retain within our held-for-investment portfolio.

- **Finance receivables and loans** — Loans that we have the intent and ability to hold for the foreseeable future or until maturity or loans associated with an on-balance sheet securitization classified as secured financing. These loans are recorded at the principal amount outstanding, net of unearned income and premiums and discounts. Probable credit-related losses inherent in our finance receivables and loans carried at historical cost are reflected in our allowance for loan losses and recognized in current period earnings. We manage the economic risks of these exposures, including credit risk, by adjusting underwriting standards and risk limits, augmenting our servicing and collection activities (including loan modifications and restructurings), and optimizing our product and geographic concentrations. Additionally, we had historically elected to carry certain mortgage loans of ResCap at fair value. Changes in the fair value of these loans are recognized in a valuation allowance separate from the allowance for loan losses and were reflected in current period earnings. We used market-based instruments, such as derivatives, to hedge changes in the fair value of these loans. Refer to the Critical Accounting Estimates discussion within this MD&A and Note 1 to the Consolidated Financial Statements for further information.

Table of Contents
# Management's Discussion and Analysis

Ally Financial Inc. • Form 10-K

- ***Held-for-sale loans*** — Loans that we have the intent to sell. These loans are recorded on our balance sheet at the lower of cost or estimated fair value and are evaluated by portfolio and product type. Changes in the recorded value are recognized in a valuation allowance and reflected in current period earnings. We manage the economic risks of these exposures, including market and credit risks, in various ways including the use of market-based instruments such as derivatives. Refer to the Critical Accounting Estimates discussion within this MD&A and Note 1 to the Consolidated Financial Statements for further information.

- ***Off-balance sheet securitized loans*** — Loans that we transfer off-balance sheet to nonconsolidated variable interest entities. We primarily report this exposure as cash, servicing rights, or retained interests (if applicable). Similar to finance receivables and loans, we manage the economic risks of these exposures, including credit risk, through activities including servicing and collections. Refer to the Critical Accounting Estimates discussion within this MD&A and Note 1 to the Consolidated Financial Statements for further information.

- ***Operating lease assets*** — The net book value of the automobile assets we lease are based on the expected residual values upon remarketing the vehicles at the end of the lease. We are exposed to fluctuations in the expected residual value upon remarketing the vehicle at the end of the lease, and as such at contract inception, we generally determine the projected residual values based on independent data, including independent guides of vehicle residual values, and analysis. A valuation allowance related to lease credit losses is recorded directly against the lease rent receivable balance which is a component of Other Assets. An impairment to the carrying value of the assets may be deemed necessary if there is an unfavorable and unrecoverable change in the value of the recorded asset. Refer to the Critical Accounting Estimates discussion within this MD&A and Note 1 to the Consolidated Financial Statements for further information.

- ***Serviced loans and leases*** — Loans that we service on behalf of our customers or another financial institution. As such, these loans can be on or off our balance sheet. For our mortgage servicing rights, we record an asset or liability (at fair value) based on whether the expected servicing benefits will exceed the expected servicing costs. Changes in the fair value of the mortgage servicing rights are recognized in current period earnings. We also service consumer automobile loans. We do not record servicing rights assets or liabilities for these loans because we receive a fee that adequately compensates us for the servicing costs. We manage the economic risks of these exposures, including market and credit risks, in part through market-based instruments such as derivatives and securities. Refer to the Critical Accounting Estimates discussion within this MD&A and Note 1 to the Consolidated Financial Statements for further information.

## Credit Risk Management

Credit risk is defined as the potential failure to receive payments when due from a creditor in accordance with contractual obligations. Therefore, credit risk is a major source of potential economic loss to us. To mitigate the risk, we have implemented specific processes across all lines of business utilizing both qualitative and quantitative analyses. Credit risk is monitored by global and line of business committees and the Global Risk Management organization. Together they oversee the credit decisioning and management processes and monitor that credit risk exposures are managed in a safe-and-sound manner and are within our risk appetite. In addition, our Global Loan Review Group provides an independent assessment of the quality of our credit portfolios and credit risk management practices, and directly reports its findings to the Risk and Compliance Committee on a regular basis.

We have policies and practices that reflect our commitment to maintain an independent and ongoing assessment of credit risk and credit quality. Our policies require an objective and timely assessment of the overall quality of the consumer and commercial loan and lease portfolios. This includes the identification of relevant trends that affect the collectability of the portfolios, segments of the portfolios that are potential problem areas, loans and leases with potential credit weaknesses, and assessment of the adequacy of internal credit risk policies and procedures to monitor compliance with relevant laws and regulations. In addition, we maintain limits and underwriting guidelines that reflect our risk appetite.

We manage credit risk based on the risk profile of the borrower, the source of repayment, the underlying collateral, and current market conditions. We monitor the credit risk profile of individual borrowers and the aggregate portfolio of borrowers either within a designated geographic region or a particular product or industry segment. To mitigate risk concentrations, we may take part in loan sales and syndications.

Additionally, we have implemented numerous initiatives in an effort to mitigate loss and provide ongoing support to customers in financial distress. For automobile loans, we offer several types of assistance to aid our customers. Loss mitigation includes changing the maturity date, extending payments, and rewriting the loan terms. We have implemented these actions with the intent to provide the borrower with additional options in lieu of repossessing their vehicle. For mortgage loans, as part of our participation in certain governmental programs, we offer mortgage loan modifications to qualified borrowers. Numerous initiatives, such as the Home Affordable Modification Program (HAMP) are in place to provide support to our mortgage customers in financial distress, including principal forgiveness, maturity extensions, delinquent interest capitalization, and changes to contractual interest rates.

Furthermore, we manage our counterparty credit exposure based on the risk profile of the counterparty. Within our policies, we have established minimum standards and requirements for managing counterparty risk exposures in a safe-and-sound manner. Counterparty credit risk is derived from multiple exposure types, including derivatives, securities trading, securities financing transactions, financial futures, cash balances (e.g. due from depository institutions, restricted accounts and cash equivalents), and investment in debt securities. For more information on Derivative Counterparty Credit Risk, refer to Note 22 to the Consolidated Financial Statements.

Table of Contents

# Management's Discussion and Analysis

Ally Financial Inc. • Form 10-K

During 2012, the U.S. economy continued to expand and the labor market recovered further. Within the U.S. automotive portfolio, encouraging trends include higher automotive industry sales when compared to the previous year. Additionally, the housing market continued to recover with strong home price appreciation in late 2012 and existing home sales registered their highest annual level since 2007. We continue to be cautious with the outlook due to weak manufacturing activity, slow global economic growth and pending budgets cuts to the U.S. federal government.

## On-balance Sheet Portfolio

Our on-balance sheet portfolio includes both finance receivables and loans and held-for-sale loans. At  December 31, 2012, this primarily included $86.5 billion of automobile finance receivables and loans and $12.3 billion of mortgage finance receivables and loans. Within our on-balance sheet portfolio, we had historically elected to account for certain mortgage loans of ResCap at fair value. The valuation allowance recorded on fair value-elected loans is separate from the allowance for loan losses. Changes in the fair value of loans are classified as gain on mortgage and automotive loans, net, in the  Consolidated Statement of Comprehensive Income .

During 2012, we further executed on our strategy of discontinuing and selling or liquidating nonstrategic operations. Refer to  Note 2 to the Consolidated Financial Statements for additional information.

The following table presents our total on-balance sheet consumer and commercial finance receivables and loans reported at carrying value before allowance for loan losses.

| December 31, ($ in millions) | Outstanding | | Nonperforming (a) | | Accruing past due 90 days or more (b) | |
|---|---|---|---|---|---|---|
| | **2012** | 2011 | **2012** | 2011 | **2012** | 2011 |
| Consumer | | | | | | |
| Finance receivables and loans | | | | | | |
| Loans at historical cost | $ **63,536** | $  73,452 | $ **642** | $  567 | $ **1** | $  4 |
| Loans at fair value | **—** | 835 | **—** | 210 | **—** | — |
| Total finance receivables and loans | **63,536** | 74,287 | **642** | 777 | **1** | 4 |
| Loans held-for-sale | **2,490** | 8,537 | **25** | 2,820 | **—** | 73 |
| Total consumer loans | **66,026** | 82,824 | **667** | 3,597 | **1** | 77 |
| Commercial | | | | | | |
| Finance receivables and loans | | | | | | |
| Loans at historical cost | **35,519** | 40,468 | **216** | 339 | **—** | — |
| Loans at fair value | **—** | — | **—** | — | **—** | — |
| Total finance receivables and loans | **35,519** | 40,468 | **216** | 339 | **—** | — |
| Loans held-for-sale | **86** | 20 | **—** | — | **—** | — |
| Total commercial loans | **35,605** | 40,488 | **216** | 339 | **—** | — |
| Total on-balance sheet loans | $ **101,631** | $  123,312 | $ **883** | $  3,936 | $ **1** | $  77 |

(a)  Includes nonaccrual troubled debt restructured loans of $419 million and $934 million at  December 31, 2012, and December 31, 2011, respectively.

(b)  Generally, loans that are 90 days past due and still accruing represent loans with government guarantees. This includes no troubled debt restructured loans classified as 90 days past due and still accruing at  December 31, 2012, and $42 million at December 31, 2011.

Total on-balance sheet loans outstanding at December 31, 2012,  decreased $21.7 billion to $101.6 billion from December 31, 2011 reflecting a decrease of $16.8 billion in the consumer portfolio and a decrease of $4.9 billion in the commercial portfolio. The decrease in total on-balance sheet loans outstanding was primarily driven by the reclassification of foreign Automotive Finance operations to discontinued operations and the deconsolidation of ResCap, partially offset by domestic automobile originations which outpaced portfolio runoff. Refer to  Note 1 and Note 2 to the Consolidated Financial Statements for additional information related to ResCap and discontinued operations, respectively.

The total TDRs outstanding at December 31, 2012, decreased $744 million to $1.2 billion from  December 31, 2011, due to the deconsolidation of ResCap.

During the third quarter of 2012, the Office of the Comptroller of the Currency (OCC) advised the banks for which they serve as the primary bank regulatory agency that certain loans that are current, have been discharged in a Chapter 7 Bankruptcy and have not been reaffirmed by the borrower should be accounted for as TDRs and written down to collateral value regardless of their current payment history and expected continued performance. The OCC is not our primary regulator, and our primary regulator has not provided definitive guidance. It is expected that all of the banking regulators will be evaluating this issue in the first quarter of 2013; however, due to industry practice, we have determined that these loans should be accounted for as TDRs on a prospective basis. The write down based on the discounted expected cash flows of these assets has already been considered in our allowance for loan and lease losses recorded at  December 31, 2012. The impact of any change will not be material.

Table of Contents

# Management's Discussion and Analysis

Ally Financial Inc. • Form 10-K

Total nonperforming loans at December 31, 2012, decreased $3.1 billion to $883 million from December 31, 2011, reflecting a decrease of $2.9 billion of consumer nonperforming loans and a decrease of $123 million of commercial nonperforming loans. The decrease in total nonperforming loans from December 31, 2011, was primarily due to the deconsolidation of ResCap. Nonperforming loans include finance receivables and loans on nonaccrual status when the principal or interest has been delinquent for 90 days or when full collection is determined not to be probable. Refer to Note 1 to the Consolidated Financial Statements for additional information.

The following table includes consumer and commercial net charge-offs from finance receivables and loans at historical cost and related ratios reported at carrying value before allowance for loan losses.

| Year ended December 31, ($ in millions) | Net charge-offs (recoveries) | | | | Net charge-off ratios (a) | |
| | 2012 | | 2011 | | 2012 | 2011 |
| --- | --- | --- | --- | --- | --- | --- |
| Consumer | | | | | | |
| Finance receivables and loans at historical cost | $ | **507** | $ | 514 | **0.7 %** | 0.7% |
| Commercial | | | | | | |
| Finance receivables and loans at historical cost | | **(33)** | | 39 | **(0.1)** | 0.1 |
| Total finance receivables and loans at historical cost | $ | **474** | $ | 553 | **0.4** | 0.5 |

(a) Net charge-off ratios are calculated as net charge-offs divided by average outstanding finance receivables and loans excluding loans measured at fair value and loans held-for-sale during the year for each loan category.

Net charge-offs were $474 million for the year ended December 31, 2012, compared to $553 million for the year ended December 31, 2011. The decrease in net charge-offs for the year ended December 31, 2012, was largely due to recoveries in the commercial portfolio. Loans held-for-sale are accounted for at the lower-of-cost or fair value, and therefore we do not record charge-offs.

The *Consumer Credit Portfolio* and *Commercial Credit Portfolio* discussions that follow relate to consumer and commercial finance receivables and loans recorded at historical cost. Finance receivables and loans recorded at historical cost have an associated allowance for loan losses. Finance receivables and loans measured at fair value were excluded from these discussions since those exposures are not accounted for within our allowance for loan losses.

## Consumer Credit Portfolio

Our consumer portfolio primarily consists of automobile loans, first mortgages, and home equity loans (we ceased originating home equity loans in 2009). Loan losses in our consumer portfolio are influenced by general business and economic conditions including unemployment rates, bankruptcy filings, and home and used vehicle prices. Additionally, our consumer credit exposure is significantly concentrated in automobile lending (largely through GM and Chrysler dealerships). Due to our subvention relationships, we are able to mitigate some interest income exposure to certain consumer defaults by receiving a rate support payment directly from the automotive manufacturers at origination.

Credit risk management for the consumer portfolio begins with the initial underwriting and continues throughout a borrower's credit cycle. We manage consumer credit risk through our loan origination and underwriting policies, credit approval process, and servicing capabilities. We use proprietary credit-scoring models to differentiate the expected default rates of credit applicants enabling us to better evaluate credit applications for approval and to tailor the pricing and financing structure according to this assessment of credit risk. We regularly review the performance of the credit scoring models and update them for historical information and current trends. These and other actions mitigate but do not eliminate credit risk. Improper evaluations of a borrower's creditworthiness, fraud, and/or changes in the applicant's financial condition after approval could negatively affect the quality of our receivables portfolio, resulting in loan losses.

Our servicing activities are another key factor in managing consumer credit risk. Servicing activities consist largely of collecting and processing customer payments, responding to customer inquiries such as requests for payoff quotes, and processing customer requests for account revisions (such as payment extensions and refinancings). Servicing activities are generally consistent across our operations; however, certain practices may be influenced by local laws and regulations.

During the year ended December 31, 2012, the credit performance of the consumer portfolio remained strong as our charge-off rate was relatively stable. For information on our consumer credit risk practices and policies regarding delinquencies, nonperforming status, and charge-offs, refer to Note 1 to the Consolidated Financial Statements.

58

Table of Contents

# Management's Discussion and Analysis

Ally Financial Inc. • Form 10-K

The following table includes consumer finance receivables and loans recorded at historical cost reported at carrying value before allowance for loan losses.

| December 31, ($ in millions) | Outstanding 2012 | Outstanding 2011 | Nonperforming (a) 2012 | Nonperforming (a) 2011 | Accruing past due 90 days or more (b) 2012 | Accruing past due 90 days or more (b) 2011 |
|---|---|---|---|---|---|---|
| **Domestic** | | | | | | |
| Consumer automobile | $ **53,713** | $ 46,576 | $ **260** | $ 139 | $ — | $ — |
| Consumer mortgage | | | | | | |
| 1st Mortgage | **7,173** | 6,867 | **342** | 258 | **1** | 1 |
| Home equity | **2,648** | 3,102 | **40** | 58 | — | — |
| Total domestic | **63,534** | 56,545 | **642** | 455 | **1** | 1 |
| **Foreign** | | | | | | |
| Consumer automobile | **2** | 16,883 | — | 89 | — | 3 |
| Consumer mortgage | | | | | | |
| 1st Mortgage | — | 24 | — | 23 | — | — |
| Home equity | — | — | — | — | — | — |
| Total foreign | **2** | 16,907 | — | 112 | — | 3 |
| Total consumer finance receivables and loans | $ **63,536** | $ 73,452 | $ **642** | $ 567 | $ **1** | $ 4 |

(a)   Includes nonaccrual troubled debt restructured loans of $373 million and $180 million at December 31, 2012, and December 31, 2011, respectively.

(b)   There were no troubled debt restructured loans classified as 90 days past due and still accruing at December 31, 2012, and December 31, 2011.

Total consumer outstanding finance receivables and loans decreased $9.9 billion at December 31, 2012 compared with December 31, 2011. This decrease was related to the reclassification of foreign Automotive Finance operations to discontinued operations. This was partially offset by an increase in our core domestic business driven by automobile consumer loan originations, which outpaced portfolio runoff, primarily due to increased industry sales and growth in used and non-GM/Chrysler originations. Additionally, we continued to prudently expand our nonprime originations.

Total consumer nonperforming finance receivables and loans at December 31, 2012, increased $75 million to $642 million from December 31, 2011, reflecting an increase of $32 million of consumer automobile nonperforming finance receivables and loans and an increase of $43 million of consumer mortgage nonperforming finance receivables and loans. Nonperforming consumer domestic automotive finance receivables and loans increased due in part to seasoning of the domestic portfolio as well as increased TDRs as we continue to provide additional options in lieu of repossessing vehicles. Nonperforming consumer domestic mortgage finance receivables and loans increased primarily due to increased TDRs as we continue foreclosure prevention and loss mitigation procedures along with our participation in a variety of government-sponsored refinancing programs. Refer to Note 8 to the Consolidated Financial Statements for additional information. Nonperforming consumer finance receivables and loans as a percentage of total outstanding consumer finance receivables and loans were 1.0% and 0.8% at December 31, 2012 and December 31, 2011, respectively.

Consumer domestic automotive loans accruing and past due 30 days or more increased $290 million to $1.1 billion at December 31, 2012, compared with December 31, 2011. The increase is primarily due to asset growth, prudent expansion of underwriting strategy, which was significantly narrowed during the recession, and seasoning of the portfolio.

Table of Contents

# Management's Discussion and Analysis

Ally Financial Inc. • Form 10-K

The following table includes consumer net charge-offs from finance receivables and loans at historical cost and related ratios reported at carrying value before allowance for loan losses.

| Year ended December 31, ($ in millions) | Net charge-offs | | Net charge-off ratios (a) | |
|---|---|---|---|---|
| | **2012** | 2011 | **2012** | 2011 |
| Domestic | | | | |
| Consumer automobile | $ **267** | $ 249 | **0.5%** | 0.6% |
| Consumer mortgage | | | | |
| 1st Mortgage | **82** | 115 | **1.2** | 1.7 |
| Home equity | **56** | 74 | **2.0** | 2.3 |
| Total domestic | **405** | 438 | **0.7** | 0.8 |
| Foreign | | | | |
| Consumer automobile | **102** | 72 | **0.6** | 0.4 |
| Consumer mortgage | | | | |
| 1st Mortgage | **—** | 4 | **4.4** | 1.2 |
| Home equity | **—** | — | **—** | — |
| Total foreign | **102** | 76 | **0.6** | 0.4 |
| Total consumer finance receivables and loans | $ **507** | $ 514 | **0.7** | 0.7 |

(a)    Net charge-off ratios are calculated as net charge-offs divided by average outstanding finance receivables and loans excluding loans measured at fair value and loans held-for-sale during the year for each loan category.

Our net charge-offs from total consumer automobile finance receivables and loans were $369 million for the year ended December 31, 2012, compared to $321 million for the year ended December 31, 2011. The $18 million increase in net charge-offs from the domestic automobile finance receivables and loans for the year ended  December 31, 2012, was driven primarily by higher outstandings as the net charge-off rate improved.

Our net charge-offs from total consumer mortgage receivables and loans were  $138 million for the year ended December 31, 2012, compared to $193 million in 2011. The decrease was driven by the improved mix of remaining loans as the lower quality legacy loans continued to runoff.

The following table summarizes the unpaid principal balance of total consumer loan originations for the periods shown. Total consumer loan originations include loans classified as finance receivables and loans and loans held-for-sale during the period.

| Year ended December 31, ($ in millions) | 2012 | 2011 |
|---|---|---|
| Domestic | | |
| Consumer automobile | $ **30,351** | $ 32,933 |
| Consumer mortgage | | |
| 1st Mortgage | **32,465** | 56,258 |
| Home equity | **—** | — |
| Total domestic | **62,816** | 89,191 |
| Foreign | | |
| Consumer automobile | **9,653** | 9,983 |
| Consumer mortgage | | |
| 1st Mortgage | **—** | 1,403 |
| Home equity | **—** | — |
| Total foreign | **9,653** | 11,386 |
| Total consumer loan originations | $ **72,469** | $ 100,577 |

Total automobile-originated loans decreased $2.9 billion for the year ended December 31, 2012, compared to 2011. The decrease was primarily due to lower retail penetration at both GM and Chrysler. Total mortgage-originated loans decreased $25.2 billion for the year ended December 31, 2012. The decline in loan production was primarily driven by the reduction in correspondent lending.

Consumer loan originations retained on-balance sheet as held-for-investment were $42.2 billion at  December 31, 2012, compared to $44.6 billion at December 31, 2011. The decrease was primarily due to lower retail penetration at both GM and Chrysler.

Table of Contents

# Management's Discussion and Analysis

Ally Financial Inc. • Form 10-K

The following table shows the percentage of total consumer finance receivables and loans recorded at historical cost reported at carrying value before allowance for loan losses by state and foreign concentration. Total automobile loans were $53.7 billion and $63.5 billion at December 31, 2012, and December 31, 2011, respectively. Total mortgage and home equity loans were $9.8 billion and $10.0 billion at December 31, 2012, and December 31, 2011, respectively.

| December 31, | 2012 (a) | | 2011 | |
| --- | --- | --- | --- | --- |
| | Automobile | 1st Mortgage and home equity | Automobile | 1st Mortgage and home equity |
| Texas | 12.9% | 5.8% | 9.5% | 5.5% |
| California | 5.6 | 29.2 | 4.6 | 25.7 |
| Florida | 6.7 | 3.6 | 4.8 | 4.0 |
| Michigan | 5.0 | 4.1 | 4.0 | 4.8 |
| Pennsylvania | 5.2 | 1.6 | 3.6 | 1.6 |
| Illinois | 4.3 | 4.8 | 3.1 | 5.0 |
| New York | 4.6 | 2.0 | 3.5 | 2.3 |
| Ohio | 4.0 | 0.8 | 2.9 | 1.0 |
| Georgia | 3.7 | 1.9 | 2.5 | 1.8 |
| North Carolina | 3.3 | 2.0 | 2.2 | 2.1 |
| Other United States | 44.7 | 44.2 | 32.9 | 45.9 |
| Foreign (b) | — | — | 26.4 | 0.3 |
| Total consumer loans | 100.0% | 100.0% | 100.0% | 100.0% |

(a)    Presentation is in descending order as a percentage of total consumer finance receivables and loans at December 31, 2012.

(b)    Foreign consumer finance receivables and loans as of December 31, 2012, was $2 million. These remaining foreign balances are within Finland and the Czech Republic.

We monitor our consumer loan portfolio for concentration risk across the geographies in which we lend. The highest concentrations of loans in the United States are in Texas and California, which represented an aggregate of 21.0% and 16.4% of our total outstanding consumer finance receivables and loans at December 31, 2012, and December 31, 2011, respectively.

Concentrations in our Mortgage operations are closely monitored given the volatility of the housing markets. Our consumer mortgage loan concentrations in California, Florida, and Michigan receive particular attention as the real estate value depreciation in these states has been amongst the most severe.

*Repossessed and Foreclosed Assets*

We classify an asset as repossessed or foreclosed (included in other assets on the Consolidated Balance Sheet) when physical possession of the collateral is taken. We dispose of the acquired collateral in a timely fashion in accordance with regulatory requirements. For more information on repossessed and foreclosed assets, refer to Note 1 to the Consolidated Financial Statements.

Repossessed assets in our Automotive Finance operations at December 31, 2012, increased $6 million to $62 million from December 31, 2011. Foreclosed mortgage assets at December 31, 2012, decreased $71 million to $6 million from December 31, 2011, primarily due to the deconsolidation of ResCap.

*Higher-Risk Mortgage Loans*

Since 2009, we primarily focused our origination efforts on prime conforming and government-insured residential mortgages in the United States. However, we continued to hold mortgage loans originated in prior years that have features that expose us to potentially higher credit risk including high original loan-to-value mortgage loans (prime or nonprime), payment-option adjustable-rate mortgage loans (prime nonconforming), interest-only mortgage loans (classified as prime conforming or nonconforming for domestic production and prime nonconforming or nonprime for international production), and below-market rate (teaser) mortgages (prime or nonprime).

In circumstances when a loan has features such that it falls into multiple categories, it is classified to a category only once based on the following hierarchy: (1) high original loan-to-value (LTV) mortgage loans, (2) payment-option adjustable-rate mortgage loans, (3) interest-only mortgage loans, and (4) below-market rate (teaser) mortgages. Given the continued stress within the housing market, we believe this hierarchy provides the most relevant risk assessment of our nontraditional products.

- ***High loan-to-value mortgages*** — Defined as first-lien loans with original loan-to-value ratios equal to or in excess of 100% or second-lien loans that when combined with the underlying first-lien mortgage loan result in an original loan-to-value ratio equal to or in excess of 100%. We ceased originating these loans with the intent to retain during 2009.

Table of Contents

# Management's Discussion and Analysis

Ally Financial Inc. • Form 10-K

- **_Payment-option adjustable-rate mortgages_** — Permit a variety of repayment options. The repayment options include minimum, interest-only, fully amortizing 30-year, and fully amortizing 15-year payments. The minimum payment option generally sets the monthly payment at the initial interest rate for the first year of the loan. The interest rate resets after the first year, but the borrower can continue to make the minimum payment. The interest-only option sets the monthly payment at the amount of interest due on the loan. If the interest-only option payment would be less than the minimum payment, the interest-only option is not available to the borrower. Under the fully amortizing 30- and 15-year payment options, the borrower's monthly payment is set based on the interest rate, loan balance, and remaining loan term. We ceased originating these loans during 2008.

- **_Interest-only mortgages_** — Allow interest-only payments for a fixed time. At the end of the interest-only period, the loan payment includes principal payments and can increase significantly. The borrower's new payment, once the loan becomes amortizing (i.e., includes principal payments), will be greater than if the borrower had been making principal payments since the origination of the loan. We ceased originating these loans with the intent to retain during 2010.

- **_Below-market rate (teaser) mortgages_** — Contain contractual features that limit the initial interest rate to a below-market interest rate for a specified time period with an increase to a market interest rate in a future period. The increase to the market interest rate could result in a significant increase in the borrower's monthly payment amount. We ceased originating these loans with the intent to retain during 2008.

The following table summarizes mortgage finance receivables and loans by higher-risk loan type. These finance receivables and loans are recorded at historical cost and reported at carrying value before allowance for loan losses.

| | **2012** | | | 2011 | | |
|---|---|---|---|---|---|---|
| December 31, ($ in millions) | **Outstanding** | **Nonperforming** | **Accruing past due 90 days or more** | Outstanding | Nonperforming | Accruing past due 90 days or more |
| Interest-only mortgage loans (a) | $  2,063 | $  125 | $  — | $  2,947 | $  147 | $  — |
| Below-market rate (teaser) mortgages | 192 | 3 | — | 248 | 6 | — |
| Total higher-risk mortgage loans | $  2,255 | $  128 | $  — | $  3,195 | $  153 | $  — |

(a)   The majority of the interest-only mortgage loans are expected to start principal amortization in 2015 or beyond.

High original LTV mortgage finance receivables and loans and payment-option adjustable-rate mortgage finance receivables and loans remained flat at $1 million and $3 million, respectively, at December 31, 2012 and December 31, 2011. There were no high original LTV mortgage loans or payment-option adjustable-rate mortgage loans classified as nonperforming or 90 days past due and still accruing at  December 31, 2012 and December 31, 2011.

The allowance for loan losses was $104 million, or 4.6%, of total higher-risk held-for-investment mortgage loans recorded at historical cost based on carrying value outstanding before allowance for loans losses at  December 31, 2012.

Table of Contents

# Management's Discussion and Analysis

Ally Financial Inc. • Form 10-K

The following table includes our five largest state concentrations based on our higher-risk mortgage finance receivables and loans recorded at historical cost and reported at carrying value before allowance for loan losses.

| December 31, ($ in millions) | Interest-only mortgage loans | | Below-market rate (teaser) mortgages | | Total higher-risk mortgage loans | |
|---|---|---|---|---|---|---|
| **2012** | | | | | | |
| California | $ | 500 | $ | 60 | $ | 560 |
| Virginia | | 216 | | 9 | | 225 |
| Maryland | | 166 | | 5 | | 171 |
| Illinois | | 107 | | 6 | | 113 |
| Michigan | | 106 | | 5 | | 111 |
| Other United States | | 968 | | 107 | | 1,075 |
| Total higher-risk mortgage loans | $ | 2,063 | $ | 192 | $ | 2,255 |
| **2011** | | | | | | |
| California | $ | 748 | $ | 78 | $ | 826 |
| Virginia | | 274 | | 10 | | 284 |
| Maryland | | 217 | | 6 | | 223 |
| Illinois | | 153 | | 8 | | 161 |
| Michigan | | 199 | | 9 | | 208 |
| Other United States | | 1,356 | | 137 | | 1,493 |
| Total higher-risk mortgage loans | $ | 2,947 | $ | 248 | $ | 3,195 |

## *Commercial Credit Portfolio*

Our commercial portfolio consists primarily of automotive loans (wholesale floorplan, dealer term loans including real estate loans, and automotive fleet financing), and some commercial finance loans. In general, the credit risk of our commercial portfolio is impacted by overall economic conditions in the countries in which we operate and the financial health of the automotive manufacturers that provide the inventory we floorplan. As part of our floorplan financing arrangements, we typically require repurchase agreements with the automotive manufacturer to repurchase new vehicle inventory under certain circumstances.

Our credit risk on the commercial portfolio is markedly different from that of our consumer portfolio. Whereas the consumer portfolio represents smaller-balance homogeneous loans that exhibit fairly predictable and stable loss patterns, the commercial portfolio exposures can be less predictable. We utilize an internal credit risk rating system that is fundamental to managing credit risk exposure consistently across various types of commercial borrowers and captures critical risk factors for each borrower. The ratings are used for many areas of credit risk management, such as loan origination, portfolio risk monitoring, management reporting, and loan loss reserves analyses. Therefore, the rating system is critical to an effective and consistent credit risk management framework.

During the year ended December 31, 2012, the credit performance of the commercial portfolio remained strong as nonperforming finance receivables and loans and net charge-offs declined. For information on our commercial credit risk practices and policies regarding delinquencies, nonperforming status, and charge-offs, refer to  Note 1 to the Consolidated Financial Statements .

63

Table of Contents

# Management's Discussion and Analysis

Ally Financial Inc. • Form 10-K

The following table includes total commercial finance receivables and loans reported at carrying value before allowance for loan losses.

| December 31, ($ in millions) | Outstanding | | Nonperforming (a) | | Accruing past due 90 days or more (b) | |
|---|---|---|---|---|---|---|
| | **2012** | 2011 | **2012** | 2011 | **2012** | 2011 |
| Domestic | | | | | | |
| Commercial and industrial | | | | | | |
| Automobile | $ **30,270** | $ 26,552 | $ **146** | $ 105 | $ **—** | $ — |
| Mortgage | **—** | 1,887 | **—** | — | **—** | — |
| Other (c) | **2,679** | 1,178 | **33** | 22 | **—** | — |
| Commercial real estate | | | | | | |
| Automobile | **2,552** | 2,331 | **37** | 56 | **—** | — |
| Mortgage | **—** | — | **—** | — | **—** | — |
| Total domestic | **35,501** | 31,948 | **216** | 183 | **—** | — |
| Foreign | | | | | | |
| Commercial and industrial | | | | | | |
| Automobile | **—** | 8,265 | **—** | 118 | **—** | — |
| Mortgage | **—** | 24 | **—** | — | **—** | — |
| Other (c) | **18** | 63 | **—** | 15 | **—** | — |
| Commercial real estate | | | | | | |
| Automobile | **—** | 154 | **—** | 11 | **—** | — |
| Mortgage | **—** | 14 | **—** | 12 | **—** | — |
| Total foreign | **18** | 8,520 | **—** | 156 | **—** | — |
| Total commercial finance receivables and loans | $ **35,519** | $ 40,468 | $ **216** | $ 339 | $ **—** | $ — |

(a)    Includes nonaccrual troubled debt restructured loans of $29 million and $21 million at  December 31, 2012, and December 31, 2011, respectively.
(b)    There were no troubled debt restructured loans classified as 90 days past due and still accruing at  December 31, 2012 and December 31, 2011.
(c)    Other commercial primarily includes senior secured commercial lending.

Total commercial finance receivables and loans outstanding  decreased $4.9 billion to $35.5 billion at December 31, 2012, from December 31, 2011. The domestic commercial and industrial outstandings increased $3.3 billion primarily due to increased automotive industry sales and corresponding rise in inventories as well as ResCap's debtor-in-possession financing, partially offset by the wind-down of the mortgage warehouse lending's portfolio. The foreign commercial and industrial outstandings decreased $8.3 billion primarily due to the reclassification of foreign Automotive Finance operations to discontinued operations.

Total domestic commercial nonperforming finance receivables and loans were  $216 million at December 31, 2012, an increase of $33 million compared to  December 31, 2011. However, portfolio performance was stable during 2012, and total nonperforming commercial finance receivables and loans as a percentage of outstanding commercial finance receivables and loans declined from  0.8% as of December 31, 2011 to 0.6% as of December 31, 2012.

Table of Contents

# Management's Discussion and Analysis

Ally Financial Inc. • Form 10-K

The following table includes total commercial net charge-offs from finance receivables and loans at historical cost and related ratios reported at carrying value before allowance for loan losses.

| Year ended December 31, ($ in millions) | Net charge-offs (recoveries) | | Net charge-off ratios (a) | |
| --- | --- | --- | --- | --- |
| | **2012** | 2011 | **2012** | 2011 |
| **Domestic** | | | | |
| Commercial and industrial | | | | |
| Automobile | $ **2** | $ 7 | **— %** | — % |
| Mortgage | **(1)** | (3) | **(0.1)** | (0.3) |
| Other | **(3)** | (7) | **(0.2)** | (0.5) |
| Commercial real estate | | | | |
| Automobile | **(1)** | 6 | **—** | 0.3 |
| Mortgage | **—** | (1) | **—** | n/m |
| Total domestic | **(3)** | 2 | **—** | — |
| Foreign | | | | |
| Commercial and industrial | | | | |
| Automobile | **(2)** | (1) | **—** | — |
| Mortgage | **—** | 8 | **2.2** | 25.0 |
| Other | **(28)** | 2 | **(75.3)** | 0.8 |
| Commercial real estate | | | | |
| Automobile | **—** | 1 | **0.3** | 0.3 |
| Mortgage | **—** | 27 | **(7.1)** | 60.9 |
| Total foreign | **(30)** | 37 | **(0.4)** | 0.4 |
| Total commercial finance receivables and loans | $ **(33)** | $ 39 | **(0.1)** | 0.1 |

n/m = not meaningful

(a)   Net charge-off ratios are calculated as net charge-offs divided by average outstanding finance receivables and loans excluding loans measured at fair value and loans held-for-sale during the year for each loan category.

Our net charge-offs from commercial finance receivables and loans resulted in recoveries of $33 million for the year ended December 31, 2012, compared to net charge-offs of $39 million in 2011. The decrease in net charge-offs during 2012 was largely driven by strong recoveries in certain wind-down portfolios and an improved mix of loans in the existing portfolios.

*Commercial Real Estate*

The commercial real estate portfolio consists of finance receivables and loans issued primarily to automotive dealers. Commercial real estate finance receivables and loans were $2.6 billion and $2.5 billion at December 31, 2012, and December 31, 2011, respectively.

Table of Contents

# Management's Discussion and Analysis

Ally Financial Inc. • Form 10-K

The following table presents the percentage of total commercial real estate finance receivables and loans by geographic region and property type. These finance receivables and loans are reported at carrying value before allowance for loan losses.

| December 31, | 2012 | 2011 |
|---|---|---|
| Geographic region | | |
| Texas | 13.0% | 12.4% |
| Michigan | 12.6 | 14.1 |
| Florida | 11.7 | 12.4 |
| California | 9.3 | 9.3 |
| New York | 4.9 | 3.5 |
| Virginia | 3.9 | 4.1 |
| North Carolina | 3.9 | 2.1 |
| Pennsylvania | 3.3 | 2.9 |
| Georgia | 3.0 | 2.5 |
| Tennessee | 2.3 | 1.8 |
| Other United States | 32.1 | 28.3 |
| Foreign | — | 6.6 |
| Total commercial real estate finance receivables and loans | 100.0% | 100.0% |
| Property type | | |
| Automotive dealers | 100.0% | 99.4% |
| Other | — | 0.6 |
| Total commercial real estate finance receivables and loans | 100.0% | 100.0% |

### Commercial Criticized Exposure

Finance receivables and loans classified as special mention, substandard, or doubtful are deemed criticized. These classifications are based on regulatory definitions and generally represent finance receivables and loans within our portfolio that have a higher default risk or have already defaulted. These finance receivables and loans require additional monitoring and review including specific actions to mitigate our potential economic loss.

The following table presents the percentage of total commercial criticized finance receivables and loans by industry concentrations. These finance receivables and loans are reported at carrying value before allowance for loan losses.

| December 31, | 2012 | 2011 |
|---|---|---|
| Industry | | |
| Automotive | 85.7% | 82.9% |
| Manufacturing | 5.5 | 1.8 |
| Services | 4.9 | 1.9 |
| Other | 3.9 | 13.4 |
| Total commercial criticized finance receivables and loans | 100.0% | 100.0% |

Total criticized exposures declined $1.4 billion to $1.7 billion at December 31, 2012 from December 31, 2011, primarily due to the reclassification of foreign Automotive Finance operations to discontinued operations as well as improvements in dealer financial condition within the domestic automotive industry. The increase in our automotive criticized concentration rate was driven primarily by the decrease in overall criticized outstandings.

Table of Contents

# Management's Discussion and Analysis

Ally Financial Inc. • Form 10-K

*Selected Loan Maturity and Sensitivity Data*

The table below shows the commercial finance receivables and loans portfolio and the distribution between fixed and floating interest rates based on the stated terms of the commercial loan agreements. This portfolio is reported at carrying value before allowance for loan losses.

| December 31, 2012 (*$ in millions*) | Within 1 year (a) | | 1-5 years | | After 5 years | | Total (b) | |
|---|---|---|---|---|---|---|---|---|
| Commercial and industrial | $ | 31,107 | $ | 1,798 | $ | 44 | $ | 32,949 |
| Commercial real estate | | 131 | | 2,004 | | 417 | | 2,552 |
| Total domestic | | 31,238 | | 3,802 | | 461 | | 35,501 |
| Foreign | | 3 | | 15 | | — | | 18 |
| Total commercial finance receivables and loans | $ | 31,241 | $ | 3,817 | $ | 461 | $ | 35,519 |
| Loans at fixed interest rates | | | $ | 1,809 | $ | 381 | | |
| Loans at variable interest rates | | | | 2,008 | | 80 | | |
| Total commercial finance receivables and loans | | | $ | 3,817 | $ | 461 | | |

(a)    Includes loans (e.g., floorplan) with revolving terms.
(b)    Loan maturities are based on the remaining maturities under contractual terms.

## Allowance for Loan Losses

The following tables present an analysis of the activity in the allowance for loan losses on finance receivables and loans.

| (*$ in millions*) | Consumer automobile | | Consumer mortgage | | Total consumer | | Commercial | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|
| Allowance at January 1, 2012 | $ | 766 | $ | 516 | $ | 1,282 | $ | 221 | $ | 1,503 |
| Charge-offs | | | | | | | | | | |
| Domestic | | (438) | | (149) | | (587) | | (8) | | (595) |
| Foreign | | (178) | | — | | (178) | | (3) | | (181) |
| Total charge-offs | | (616) | | (149) | | (765) | | (11) | | (776) |
| Recoveries | | | | | | | | | | |
| Domestic | | 171 | | 11 | | 182 | | 11 | | 193 |
| Foreign | | 76 | | — | | 76 | | 33 | | 109 |
| Total recoveries | | 247 | | 11 | | 258 | | 44 | | 302 |
| Net charge-offs | | (369) | | (138) | | (507) | | 33 | | (474) |
| Provision for loan losses | | 257 | | 86 | | 343 | | (14) | | 329 |
| Foreign provision for loan losses | | 115 | | — | | 115 | | (50) | | 65 |
| Deconsolidation of ResCap | | — | | (9) | | (9) | | — | | (9) |
| Other (a) | | (194) | | (3) | | (197) | | (47) | | (244) |
| Allowance at December 31, 2012 | $ | 575 | $ | 452 | $ | 1,027 | $ | 143 | $ | 1,170 |
| Allowance for loan losses to finance receivables and loans outstanding at December 31, 2012 (b) | | 1.1% | | 4.6% | | 1.6% | | 0.4 % | | 1.2% |
| Net charge-offs to average finance receivables and loans outstanding at December 31, 2012 (b) | | 0.5% | | 1.4% | | 0.7% | | (0.1) % | | 0.4% |
| Allowance for loan losses to total nonperforming finance receivables and loans at December 31, 2012 (b) | | 221.3% | | 118.0% | | 159.8% | | 66.4 % | | 136.3% |
| Ratio of allowance for loan losses to net charge-offs at December 31, 2012 | | 1.6 | | 3.3 | | 2.0 | | (4.3) | | 2.5 |

(a)    Other includes the allowance of foreign Automotive Finance operations finance receivables and loans that were reclassified as discontinued operations.
(b)    Coverage percentages are based on the allowance for loan losses related to finance receivables and loans excluding those loans held at fair value as a percentage of the unpaid principal balance, net of premiums and discounts.

The allowance for consumer loan losses at December 31, 2012, declined $255 million compared to December 31, 2011. The decline reflects the reclassification of the foreign Automotive Finance operations to discontinued operations and the runoff of legacy portfolios, which was partially offset by an increase in loans outstanding.

Table of Contents

# Management's Discussion and Analysis

Ally Financial Inc. • Form 10-K

The allowance for commercial loan losses declined $78 million at December 31, 2012, compared to December 31, 2011, primarily related to the ongoing strength in dealer performance, the reclassification of foreign Automotive Finance operations to discontinued operations, and general overall improvement in the Commercial Finance Group's portfolio.

| ($ in millions) | Consumer automobile | | Consumer mortgage | | Total consumer | | Commercial | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|
| Allowance at January 1, 2011 | $ | 970 | $ | 580 | $ | 1,550 | $ | 323 | $ | 1,873 |
| Charge-offs | | | | | | | | | | |
| Domestic | | (435) | | (205) | | (640) | | (27) | | (667) |
| Foreign | | (145) | | (5) | | (150) | | (63) | | (213) |
| Total charge-offs | | (580) | | (210) | | (790) | | (90) | | (880) |
| Recoveries | | | | | | | | | | |
| Domestic | | 186 | | 16 | | 202 | | 25 | | 227 |
| Foreign | | 73 | | 1 | | 74 | | 26 | | 100 |
| Total recoveries | | 259 | | 17 | | 276 | | 51 | | 327 |
| Net charge-offs | | (321) | | (193) | | (514) | | (39) | | (553) |
| Provision for loan losses | | 102 | | 129 | | 231 | | (43) | | 188 |
| Foreign provision for loan losses | | 52 | | — | | 52 | | (21) | | 31 |
| Other | | (37) | | — | | (37) | | 1 | | (36) |
| Allowance at December 31, 2011 | $ | 766 | $ | 516 | $ | 1,282 | $ | 221 | $ | 1,503 |
| Allowance for loan losses to finance receivables and loans outstanding at December 31, 2011 (a) | | 1.2% | | 5.2% | | 1.7% | | 0.5% | | 1.3% |
| Net charge-offs to average finance receivables and loans outstanding at December 31, 2011 (a) | | 0.5% | | 1.9% | | 0.7% | | 0.1% | | 0.5% |
| Allowance for loan losses to total nonperforming finance receivables and loans at December 31, 2011 (a) | | 335.8% | | 152.1% | | 226.0% | | 65.3% | | 165.9% |
| Ratio of allowance for loans losses to net charge-offs at December 31, 2011 | | 2.4 | | 2.7 | | 2.5 | | 5.7 | | 2.7 |

(a)    Coverage percentages are based on the allowance for loan losses related to finance receivables and loans excluding those loans held at fair value as a percentage of the unpaid principal balance, net of premiums and discounts.

The allowance for consumer loan losses was $1.3 billion at December 31, 2011, compared to $1.6 billion at December 31, 2010. The decline reflected overall improved credit quality of newer vintages reflecting tightened underwriting standards which was partially offset by an increase in loans outstanding.

The allowance for commercial loan losses was $221 million at December 31, 2011, compared to $323 million at December 31, 2010. The decline was primarily related to improvement in dealer performance and continued wind-down of non-core commercial assets.

Table of Contents

# Management's Discussion and Analysis

Ally Financial Inc. • Form 10-K

## Allowance for Loan Losses by Type

The following table summarizes the allocation of the allowance for loan losses by product type.

| | 2012 | | | 2011 | | |
|---|---|---|---|---|---|---|
| December 31, ($ in millions) | Allowance for loan losses | Allowance as a % of loans outstanding | Allowance as a % of allowance for loan losses | Allowance for loan losses | Allowance as a % of loans outstanding | Allowance as a % of allowance for loan losses |
| Consumer | | | | | | |
| Domestic | | | | | | |
| Consumer automobile | $    575 | 1.1% | 49.2% | $    600 | 1.3% | 39.9% |
| Consumer mortgage | | | | | | |
| 1st Mortgage | 245 | 3.4 | 20.9 | 275 | 4.0 | 18.3 |
| Home equity | 207 | 7.8 | 17.7 | 237 | 7.7 | 15.8 |
| Total domestic | 1,027 | 1.6 | 87.8 | 1,112 | 2.0 | 74.0 |
| Foreign | | | | | | |
| Consumer automobile | — | — | — | 166 | 1.0 | 11.1 |
| Consumer mortgage | | | | | | |
| 1st Mortgage | — | — | — | 4 | 14.5 | 0.2 |
| Home equity | — | — | — | — | — | — |
| Total foreign | — | — | — | 170 | 1.0 | 11.3 |
| Total consumer loans | 1,027 | 1.6 | 87.8 | 1,282 | 1.7 | 85.3 |
| Commercial | | | | | | |
| Domestic | | | | | | |
| Commercial and industrial | | | | | | |
| Automobile | 55 | 0.2 | 4.7 | 62 | 0.2 | 4.0 |
| Mortgage | — | — | — | 1 | — | 0.1 |
| Other | 48 | 1.8 | 4.1 | 52 | 4.4 | 3.5 |
| Commercial real estate | | | | | | |
| Automobile | 40 | 1.6 | 3.4 | 39 | 1.7 | 2.6 |
| Mortgage | — | — | — | — | — | — |
| Total domestic | 143 | 0.4 | 12.2 | 154 | 0.5 | 10.2 |
| Foreign | | | | | | |
| Commercial and industrial | | | | | | |
| Automobile | — | — | — | 48 | 0.6 | 3.2 |
| Mortgage | — | — | — | 10 | 43.1 | 0.7 |
| Other | — | — | — | 1 | 1.9 | 0.1 |
| Commercial real estate | | | | | | |
| Automobile | — | — | — | 3 | 1.7 | 0.2 |
| Mortgage | — | — | — | 5 | 33.2 | 0.3 |
| Total foreign | — | — | — | 67 | 0.8 | 4.5 |
| Total commercial loans | 143 | 0.4 | 12.2 | 221 | 0.5 | 14.7 |
| Total allowance for loan losses | $    1,170 | 1.2 | 100.0% | $    1,503 | 1.3 | 100.0% |

Table of Contents

# Management's Discussion and Analysis

Ally Financial Inc. • Form 10-K

**Provision for Loan Losses**

The following table summarizes the provision for loan losses by product type.

| Year ended December 31, ($ in millions) | 2012 | | 2011 | | 2010 |
|---|---|---|---|---|---|
| **Consumer** | | | | | |
| Domestic | | | | | |
| Consumer automobile | $ | **257** | $ | 102 | $ 228 |
| Consumer mortgage | | | | | |
| 1st Mortgage | | **52** | | 68 | 72 |
| Home equity | | **34** | | 55 | 90 |
| Total domestic | | **343** | | 225 | 390 |
| Foreign | | | | | |
| Consumer automobile | | **—** | | — | (2) |
| Consumer mortgage | | | | | |
| 1st Mortgage | | **—** | | 6 | 2 |
| Home equity | | **—** | | — | — |
| Total foreign | | **—** | | 6 | — |
| Total consumer loans | | **343** | | 231 | 390 |
| **Commercial** | | | | | |
| Domestic | | | | | |
| Commercial and industrial | | | | | |
| Automobile | | **(3)** | | (3) | 2 |
| Mortgage | | **(1)** | | (3) | (13) |
| Other | | **(10)** | | (51) | (47) |
| Commercial real estate | | | | | |
| Automobile | | **—** | | (10) | 34 |
| Mortgage | | **—** | | (1) | (10) |
| Total domestic | | **(14)** | | (68) | (34) |
| Foreign | | | | | |
| Commercial and industrial | | | | | |
| Automobile | | **—** | | — | (2) |
| Mortgage | | **—** | | 5 | (5) |
| Other | | **—** | | — | — |
| Commercial real estate | | | | | |
| Automobile | | **—** | | — | — |
| Mortgage | | **—** | | 20 | 8 |
| Total foreign | | **—** | | 25 | 1 |
| Total commercial loans | | **(14)** | | (43) | (33) |
| Total provision for loan losses | $ | **329** | $ | 188 | $ 357 |

**Lease Residual Risk Management**

We are exposed to residual risk on vehicles in the consumer lease portfolio. This lease residual risk represents the possibility that the actual proceeds realized upon the sale of returned vehicles will be lower than the projection of these values used in establishing the pricing at lease inception. The following factors most significantly influence lease residual risk. For additional information on our valuation of automobile lease assets and residuals, refer to the Critical Accounting Estimates — Valuation of Automobile Lease Assets and Residuals section within this MD&A.

- *Used vehicle market* — We have exposure to changes in used vehicle prices. General economic conditions, used vehicle supply and demand, and new vehicle market prices heavily influence used vehicle prices.

- *Residual value projections* — We establish risk adjusted residual values at lease inception by consulting independently published guides and proprietary statistical models. The residual values are consistently monitored during the lease term. These values are

Table of Contents

# Management's Discussion and Analysis

Ally Financial Inc. • Form 10-K

projections of expected values in the future (typically between two and four years) based on current assumptions for the respective make and model. Actual realized values often differ.

- ***Remarketing abilities*** — Our ability to efficiently process and effectively market off-lease vehicles affects the disposal costs and the proceeds realized from vehicle sales.

- ***Manufacturer vehicle and marketing programs*** — Automotive manufacturers influence lease residual results in the following ways:
  - ◦ The brand image of automotive manufacturers and consumer demand for their products affect residual risk.
  - ◦ Automotive manufacturer marketing programs may influence the used vehicle market for those vehicles through programs such as incentives on new vehicles, programs designed to encourage lessees to terminate their leases early in conjunction with the acquisition of a new vehicle (referred to as pull-ahead programs), and special rate used vehicle programs.
  - ◦ Automotive manufacturers may provide support to us for certain residual deficiencies.

The following table summarizes the volume of our serviced lease terminations in the United States over recent periods. It also summarizes the average sales proceeds on 24-, 36-, and 48-month scheduled lease terminations for those same periods. The mix of terminated vehicles in 2012 was used to normalize results over previous periods to more clearly demonstrate market pricing trends.

| Year ended December 31, | | **2012** | 2011 | | 2010 |
|---|---|---|---|---|---|
| Off-lease vehicles remarketed (*in units*) | | **63,315** | 248,624 | | 376,203 |
| Average sales proceeds on scheduled lease terminations ($ per unit) | | | | | |
| 24-month (a) | $ | **22,586** | n/m | $ | 22,400 |
| 36-month (b) | | **n/m** | n/m | | n/m |
| 48-month | | **18,124** | 16,134 | | 14,289 |

n/m = not meaningful

(a)   During 2011, 24-month lease terminations were not materially sufficient to create a historical comparison due to our temporary curtailment of leasing in 2009.

(b)   The 36-month lease terminations were not materially sufficient to create a historical multi-year comparison from that term due to our temporary curtailment of leasing in 2009.

The number of off-lease vehicles remarketed in 2012 reached a historic low, declining 75% from 2011. The significant decrease was due to our temporary curtailment of leasing in late 2008 through 2009. Sales proceeds have strengthened since 2009 due primarily to the lower supply of attractive used vehicles, which can be largely attributed to the significant drop in new vehicle sales and leasing activity during the last economic downturn. For information on our Investment in Operating Leases, refer to   Note 9 to the Consolidated Financial Statements.

## Market Risk

Our automotive financing, mortgage, and insurance activities give rise to market risk representing the potential loss in the fair value of assets or liabilities and earnings caused by movements in market variables, such as interest rates, foreign-exchange rates, equity prices, market perceptions of credit risk, and other market fluctuations that affect the value of securities, assets held-for-sale, and operating leases. We are exposed to interest rate risk arising from changes in interest rates related to financing, investing, and cash management activities. More specifically, we have entered into contracts to provide financing, to retain mortgage servicing rights, and to retain various assets related to securitization activities all of which are exposed in varying degrees to changes in value due to movements in interest rates. Interest rate risk arises from the mismatch between assets and the related liabilities used for funding. We enter into various financial instruments, including derivatives, to maintain the desired level of exposure to the risk of interest rate and other fluctuations. Refer to  Note 22 to the Consolidated Financial Statements  for further information.

We are also exposed to foreign-currency risk arising from the possibility that fluctuations in foreign-exchange rates will affect future earnings or asset and liability values related to our global operations. We enter into hedges to mitigate foreign exchange risk.

We also have exposure to equity price risk, primarily in our Insurance operations, which invests in equity securities that are subject to price risk influenced by capital market movements. We enter into equity options to economically hedge our exposure to the equity markets.

Although the diversity of our activities from our complementary lines of business may partially mitigate market risk, we also actively manage this risk. We maintain risk management control systems to monitor interest rates, foreign-currency exchange rates, equity price risks, and any of their related hedge positions. Positions are monitored using a variety of analytical techniques including market value, sensitivity analysis, and value at risk models.

Table of Contents

# Management's Discussion and Analysis

Ally Financial Inc. • Form 10-K

## Fair Value Sensitivity Analysis

The following table and subsequent discussion presents a fair value sensitivity analysis of our assets and liabilities using isolated hypothetical movements in specific market rates. The analysis assumes adverse instantaneous, parallel shifts in market-exchange rates, interest rate yield curves, and equity prices. Additionally, since only adverse fair value impacts are included, the natural offset between asset and liability rate sensitivities that arise within a diversified balance sheet, such as ours, is not considered.

| December 31, ($ in millions) | 2012 Nontrading | | 2012 Trading | | 2011 Nontrading | | 2011 Trading | |
|---|---|---|---|---|---|---|---|---|
| Financial instruments exposed to changes in: | | | | | | | | |
| Interest rates | | | | | | | | |
| Estimated fair value | (a) | $ | — | | (a) | $ | 549 | |
| Effect of 10% adverse change in rates | (a) | | — | | (a) | | (2) | |
| Foreign-currency exchange rates | | | | | | | | |
| Estimated fair value | $ | 2,791 | $ | — | $ | 6,724 | $ | — |
| Effect of 10% adverse change in rates | | (279) | | — | | (672) | | — |
| Equity prices | | | | | | | | |
| Estimated fair value | $ | 1,152 | $ | — | $ | 1,059 | $ | — |
| Effect of 10% decrease in prices | | (115) | | — | | (106) | | — |

(a) Refer to the next section titled *Net Interest Income Sensitivity Analysis* for information on the interest rate sensitivity of our nontrading financial instruments.

The fair value of our foreign-currency exchange-rate sensitive financial instruments decreased during the year ended December 31, 2012, compared to 2011, due to decreases in finance receivables and loans that were reclassified to discontinued operations partially offset by a decrease in foreign-denominated short-term borrowings and foreign-denominated long-term debt that were also reclassified to discontinued operations. The net decrease consequently drove the decrease in the fair value estimate and associated adverse 10% change in rates impact. The increase in the fair value of our equity sensitive financial instruments was due to a slightly higher equity investment balance compared to prior year. This change in equity exposure drove our increased sensitivity to a 10% decrease in equity prices.

## Net Interest Income Sensitivity Analysis

We use net interest income sensitivity analysis as our primary metric to measure and manage the interest rate sensitivities of our nontrading financial instruments. Interest rate risk represents the most significant market risk to the nontrading exposures. We actively monitor the level of exposure so that movements in interest rates do not adversely affect future earnings.

We prepare forward-looking forecasts of net interest income, which take into consideration anticipated future business growth, asset/liability positioning, and interest rates based on the implied forward curve. Simulations are used to assess changes in net interest income in multiple interest rates scenarios relative to the baseline forecast. The changes in net interest income relative to the baseline are defined as the sensitivity. The net interest income sensitivity tests measure the potential change in our pretax net interest income over the following twelve months. A number of alternative rate scenarios are tested including immediate parallel shocks to the forward yield curve, nonparallel shocks to the forward yield curve, and stresses to certain term points on the yield curve in isolation to capture and monitor a number of risk types.

Included in our forward-looking forecast is the planned sale of our international and Canadian operations. These instruments were moved to discontinued operations at year end 2012 based on their expected sale in 2013. Consequently, the interest income and expense from these instruments is not included in net interest income and their interest sensitivity is managed using a fair value approach. Therefore, we no longer include the interest sensitivity of these financial instruments in our net interest income simulations.

Our twelve-month pretax net interest income sensitivity based on the forward-curve was as follows.

| Year ended December 31, ($ in millions) | 2012 | | 2011 | |
|---|---|---|---|---|
| Parallel rate shifts | | | | |
| -100 basis points | $ | (7) | $ | 73 |
| +100 basis points | | (46) | | (84) |
| +200 basis points | | 48 | | 88 |

The adverse change in net interest income in the -100 basis point scenario in the 2012 analysis is mainly due to the low interest rate environment as further declines in deposit and short funding rates are limited. The positive change in net interest income in the +200 basis point scenario is mainly due to income on certain commercial loans that have rate index floors. Interest income on these loans increases significantly as interest rates and the related rate index rises above the level of the floor.

72

Table of Contents

# Management's Discussion and Analysis

Ally Financial Inc. • Form 10-K

The change in net interest income sensitivity from the prior year was due to the lower and flatter yield curve and to a lesser extent the planned sale of our international operations.

## Operational Risk

We define operational risk as the risk of loss resulting from inadequate or failed processes or systems, human factors, or external events. Operational risk is an inherent risk element in each of our businesses and related support activities. Such risk can manifest in various ways, including errors, business interruptions, and inappropriate behavior of employees, and can potentially result in financial losses and other damage to us. Examples of operational risk include legal/compliance, vendor management, model, reputational, and representation and warranty obligation risks (See the Purchase Obligations discussion within this MD&A).

To monitor and control such risk, we maintain a system of policies and a control framework designed to provide a sound and well-controlled operational environment. This framework employs practices and tools designed to maintain risk governance, risk and control assessment and testing, risk monitoring, and transparency through risk reporting mechanisms. The goal is to maintain operational risk at appropriate levels in view of our financial strength, the characteristics of the businesses and the markets in which we operate, and the related competitive and regulatory environment.

Notwithstanding these risk and control initiatives, we may incur losses attributable to operational risks from time to time, and there can be no assurance these losses will not be incurred in the future.

## Insurance / Underwriting Risk

In underwriting our vehicle service contracts and insurance policies, we assess the particular risk involved, including losses and loss adjustment expenses, and determine the acceptability of the risk as well as the categorization of the risk for appropriate pricing. We base our determination of the risk on various assumptions tailored to the respective insurance product. With respect to vehicle service contracts, assumptions include the quality of the vehicles produced, the price of replacement parts, repair labor rates in the future, and new model introductions. Insurance risk also includes event risk, which is synonymous with pure risk, hazard risk, or insurance risk, and presents no chance of gain, only of loss.

In some instances, reinsurance is used to reduce the risk associated with volatile businesses, such as catastrophe risk in U.S. dealer vehicle inventory insurance. Our commercial products business is covered by traditional catastrophe protection, aggregate stop loss protection, and an extension of catastrophe coverage for hurricane events. In addition, loss control techniques, such as hail nets or storm path monitoring to assist dealers in preparing for severe weather, help to mitigate loss potential.

We mitigate losses by the active management of claim settlement activities using experienced claims personnel and the evaluation of current period reported claims. Losses for these events may be compared to prior claims experience, expected claims, or loss expenses from similar incidents to assess the reasonableness of incurred losses.

In accordance with industry and accounting practices and applicable insurance laws and regulatory requirements, we maintain reserves for reported losses, losses incurred but not reported, and loss adjustment expenses. The estimated values of our prior reported loss reserves and changes to the estimated values are routinely monitored by credentialed actuaries. Our reserve estimates are regularly reviewed by management; however, since the reserves are based on estimates and numerous assumptions, the ultimate liability may differ from the amount estimated.

## Country Risk

We have exposures to obligors domiciled in foreign countries; and therefore, our portfolio is subject to country risk. Country risk is the risk that conditions in a foreign country will impair the value of our assets, restrict our ability to repatriate equity or profits, or adversely impact the ability of the guarantor to uphold their obligations to us. Country risk includes risks arising from the economic, political, and social conditions prevalent in a country, as well as the strengths and weaknesses in the legal and regulatory framework. These conditions may have potentially favorable or unfavorable consequences for our investments in a particular country.

Country risk is measured by determining our cross-border outstandings in accordance with Federal Financial Institutions Examination Council guidelines. Cross-border outstandings are reported as assets within the country of which the obligor or guarantor resides. Furthermore, outstandings backed by tangible collateral are reflected under the country in which the collateral is held. For securities received as collateral, cross-border outstandings are assigned to the domicile of the issuer of the securities. Resale agreements are presented based on the domicile of the counterparty.

Table of Contents

# Management's Discussion and Analysis

Ally Financial Inc. • Form 10-K

The following table lists all countries in which cross-border outstandings exceed 1.0% of consolidated assets.

| ($ in millions) | Banks | | Sovereign | | Other | | Net local country assets | | Derivatives | | Total cross-border outstandings (a) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **2012 (b)** | | | | | | | | | | | |
| Canada | $ | **396** | $ | **305** | $ | **190** | $ | **2,953** | $ | **6** | $ | **3,850** |
| Germany | | **10** | | **30** | | **3** | | **3,340** | | **450** | | **3,833** |
| United Kingdom | | **265** | | **—** | | **16** | | **2,348** | | **237** | | **2,866** |
| **2011 (b)** | | | | | | | | | | | |
| Canada | $ | 343 | $ | 250 | $ | 451 | $ | 3,746 | $ | 20 | $ | 4,810 |
| Germany | | 47 | | 32 | | 5 | | 3,219 | | 576 | | 3,879 |
| United Kingdom | | 311 | | 6 | | 13 | | 962 | | 1,356 | | 2,648 |

(a)    As we continue to execute on our strategy of selling or liquidating our nonstrategic operations, our total cross-border outstandings will significantly decline upon the completion of the transactions.

(b)    Our total cross-border exposure to Portugal, Ireland, Italy, Greece, and Spain was $649 million and $327 million as of December 31, 2012, and 2011, respectively, most of which was nonsovereign exposure.

Table of Contents

# Management's Discussion and Analysis

Ally Financial Inc. • Form 10-K

## Liquidity Management, Funding, and Regulatory Capital

### Overview

The purpose of liquidity management is to ensure our ability to meet changes in loan and lease demand, debt maturities, deposit withdrawals, and other cash commitments under both normal operating conditions as well as periods of economic or financial stress. Our primary objective is to maintain cost-effective, stable and diverse sources of funding capable of sustaining the organization throughout all market cycles. Sources of liquidity include both retail and brokered deposits and secured and unsecured market-based funding across various maturity, interest rate, currency, and investor profiles. Further liquidity is available through a pool of unencumbered highly liquid securities, borrowing facilities, repurchase agreements, as well as funding programs supported by the Federal Reserve and the Federal Home Loan Bank of Pittsburgh (FHLB).

We define liquidity risk as the risk that an institution's financial condition or overall safety and soundness is adversely affected by an inability, or perceived inability, to meet its financial obligations, and to withstand unforeseen liquidity stress events. Liquidity risk can arise from a variety of institution specific or market-related events that could have a negative impact on cash flows available to the organization. Effective management of liquidity risk helps ensure an organization's  preparedness to meet uncertain cash flow obligations caused by unanticipated events. The ability of financial institutions to manage liquidity needs and contingent funding exposures has proven essential to their solvency.

The Asset-Liability Committee (ALCO) is chaired by the Corporate Treasurer and is responsible for monitoring Ally's liquidity position, funding strategies and plans, contingency funding plans, and counterparty credit exposure arising from financial transactions. Corporate Treasury is responsible for managing the liquidity positions of Ally within prudent operating guidelines and targets approved by ALCO and the Risk and Compliance Committee of the Ally Financial Board of Directors. We manage liquidity risk at the business segment, legal entity, and consolidated levels. Each business segment, along with Ally Bank, prepares periodic forecasts depicting anticipated funding needs and sources of funds with oversight and monitoring by Corporate Treasury. Corporate Treasury manages liquidity under baseline economic projections as well as more severe economic stressed environments. Corporate Treasury, in turn, plans, and executes our funding strategies.

Ally uses multiple measures to frame the level of liquidity risk, manage the liquidity position, or identify related trends as early warning indicators. These measures include coverage ratios that measure the sufficiency of the liquidity portfolio and stability ratios that measure longer-term structural liquidity. In addition, we have established several internal management routines designed to review all aspects of liquidity and funding plans, evaluate the adequacy of liquidity buffers, review stress testing results, and assist senior management in the execution of its structured funding strategy and risk management accountabilities.

We maintain available liquidity in the form of cash, unencumbered highly liquid securities, and available credit facility capacity that, taken together, allows us to operate and to meet our contractual and contingent obligations in the event of market-wide disruptions and enterprise-specific events. We maintain available liquidity at various entities and consider regulatory restrictions and tax implications that may limit our ability to transfer funds across entities. At  December 31, 2012, we maintained $15.6 billion of total available parent company liquidity and $13.2 billion of total available liquidity at Ally Bank. Parent company liquidity is defined as our consolidated operations less Ally Bank and the subsidiaries of Ally Insurance's holding company. To optimize cash and secured facility capacity between entities, the parent company lends cash to Ally Bank on occasion under an intercompany loan agreement. At December 31, 2012, $1.6 billion was outstanding under the intercompany loan agreement. Amounts outstanding are repayable to the parent company upon demand, subject to five days notice. As a result, this amount is included in the parent company available liquidity and excluded from the available liquidity at Ally Bank.

In December 2010, the Basel Committee on Banking Supervision issued "Basel III: International framework for liquidity risk measurement, standards and monitoring", which includes two minimum liquidity risk standards. The first standard is the Liquidity Coverage Ratio (LCR). The LCR measures the ratio of unencumbered, high-quality liquid assets to liquidity needs for a 30-calendar-day time horizon under a severe liquidity stress scenario specified by supervisors. The second standard is the Net Stable Funding Ratio (NSFR). The NSFR is structured to ensure that long term assets are funded with at least a minimum amount of stable liabilities in relation to their liquidity risk profiles. It aims to encourage better assessment of liquidity risk across all on- and off-balance sheet items. In January 2013, the Group of Governors and Heads of Supervision (GHOS), the oversight body of the Basel Committee on Banking Supervision unanimously endorsed amendments to the Liquidity Coverage Ratio announced in December 2010. A summary of changes include: a phased-in implementation with minimum ratio of 60% in 2015, growing by 10% per year to reach 100% by 2019; an expanded definition of high quality liquid assets; and adjustments to net cash outflows. The GHOS indicated that the NSFR will be a priority for the Basel Committee over the next two years and the scheduled implementation date remains unchanged at January 2018. We continue to monitor the potential impacts of these developments and expect to be able to meet the final requirements.

### Funding Strategy

Liquidity and ongoing profitability are largely dependent on our timely and cost-effective access to retail deposits and funding in different segments of the capital markets. We continue to be focused on maintaining and enhancing our liquidity. Our funding strategy largely focuses on the development of diversified funding sources across a global investor base to meet all our liquidity needs throughout different market cycles, including periods of financial distress. These funding sources include unsecured debt capital markets, unsecured retail term notes, public and private asset-backed securitizations, committed and uncommitted credit facilities, brokered certificates of deposits, and retail deposits. We also supplement these sources with a modest amount of short-term borrowings, including Demand Notes, unsecured retail loans, and repurchase arrangements. The diversity of our funding sources enhances funding flexibility, limits dependence on any one source, and

75

Table of Contents

# Management's Discussion and Analysis

Ally Financial Inc. • Form 10-K

results in a more cost-effective funding strategy over the long term. We evaluate funding markets on an ongoing basis to achieve an appropriate balance of unsecured and secured funding sources and the maturity profiles of both. In addition, we further distinguish our funding strategy between Ally Bank funding and parent company or nonbank funding.

We diversify Ally Bank's overall funding in order to reduce reliance on any one source of funding and to achieve a well-balanced funding portfolio across a spectrum of risk, duration, and cost of funds characteristics. Over the past few years, we have been focused on diversifying our funding sources, in particular at Ally Bank by growing retail deposits, expanding public and private securitization programs, maintaining the maturity profile of our brokered deposit portfolio while not exceeding a $10.0 billion portfolio, establishing repurchase agreements, and continuing to access funds from the Federal Home Loan Banks.

Since 2009, we have been directing new bank-eligible assets in the United States to Ally Bank in order to reduce and minimize our nonbanking exposures and funding requirements and utilize our growing consumer deposit-taking capabilities. This has allowed us to use bank funding for a wider array of our automotive finance assets and to provide a sustainable long-term funding channel for the business, while also improving the cost of funds for the enterprise.

## Ally Bank

Ally Bank raises deposits directly from customers through the direct banking channel via the internet and over the telephone. These deposits provide our Automotive Finance and Mortgage operations with a stable and low-cost funding source. At December 31, 2012, Ally Bank had $46.9 billion of total external deposits, including $35.0 billion of retail deposits.

At December 31, 2012, Ally Bank maintained cash liquidity of $2.7 billion and unencumbered highly liquid U.S. federal government and U.S. agency securities of $5.9 billion. In addition, at December 31, 2012, Ally Bank had unused capacity in committed secured funding facilities of $6.2 billion, including an equal allocation of shared unused capacity of $3.0 billion from a facility also available to the parent company. Our ability to access this unused capacity depends on having eligible assets to collateralize the incremental funding and, in some instances, the execution of interest rate hedges. To optimize use of cash and secured facility capacity between entities, Ally Financial lends cash to Ally Bank from time to time under an intercompany agreement. Amounts outstanding on this loan are repayable to Ally Financial at any time. Ally Bank has total available liquidity of $13.2 billion at December 31, 2012, which excludes the intercompany loan of $1.6 billion.

Maximizing bank funding continues to be a key part of our long-term liquidity strategy. We have made significant progress in migrating assets to Ally Bank and growing our retail deposit base since becoming a bank holding company in December 2008. Retail deposit growth is key to further reducing our cost of funds and decreasing our reliance on the capital markets. We believe deposits provide a stable, low-cost source of funds that are less sensitive to interest rate changes, market volatility, or changes in our credit ratings when compared to other funding sources. We have continued to expand our deposit gathering efforts through our direct and indirect marketing channels. Current retail product offerings consist of a variety of products including certificates of deposits (CDs), savings accounts, money market accounts, IRA deposit products, as well as an interest checking product. In addition, we utilize brokered deposits, which are obtained through third-party intermediaries. During 2012, the deposit base at Ally Bank grew $7.3 billion, ending the year at $46.9 billion from $39.6 billion at December 31, 2011. The growth in deposits has been primarily attributable to our retail deposit portfolio, particularly within our savings and money market checking accounts, and our CDs. Strong retention rates continue to materially contribute to our growth in retail deposits. In the fourth quarter of 2012 we retained 93% of maturing CD balances up for renewal in the same period. In addition to retail and brokered deposits, Ally Bank had access to funding through a variety of other sources including FHLB advances, public securitizations, private secured funding arrangements, and the Federal Reserve's Discount Window. At December 31, 2012, debt outstanding from the FHLB totaled $4.8 billion with no debt outstanding from the Federal Reserve. Also, as part of our liquidity and funding plans, Ally Bank utilizes certain securities as collateral to access funding from repurchase agreements with third parties. Repurchase agreements are generally short-term. At December 31, 2012, Ally Bank had no debt outstanding under repurchase agreements. Refer to Note 14 to the Consolidated Financial Statements for a summary of deposit funding by type.

The following table shows Ally Bank's number of accounts and deposit balances by type as of the end of each quarter since 2011.

| ($ in millions) | 4th Quarter 2012 | | 3rd Quarter 2012 | | 2nd Quarter 2012 | | 1st Quarter 2012 | | 4th Quarter 2011 | | 3rd Quarter 2011 | | 2nd Quarter 2011 | | 1st Quarter 2011 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Number of retail accounts | 1,219,791 | | 1,142,837 | | 1,082,753 | | 1,036,468 | | 976,877 | | 919,670 | | 851,991 | | 798,622 |
| Deposits | | | | | | | | | | | | | | | |
| Retail | $ | 35,041 | $ | 32,139 | $ | 30,403 | $ | 29,323 | $ | 27,685 | $ | 26,254 | $ | 24,562 | $ | 23,469 |
| Brokered | | 9,914 | | 9,882 | | 9,905 | | 9,884 | | 9,890 | | 9,911 | | 9,903 | | 9,836 |
| Other (a) | | 1,977 | | 2,487 | | 2,411 | | 2,314 | | 2,029 | | 2,704 | | 2,405 | | 2,064 |
| Total deposits | $ | 46,932 | $ | 44,508 | $ | 42,719 | $ | 41,521 | $ | 39,604 | $ | 38,869 | $ | 36,870 | $ | 35,369 |

(a)   Other deposits include mortgage escrow and other deposits (excluding intercompany deposits).

In addition to building a larger deposit base, we continue to remain active in the securitization markets to finance our Ally Bank automotive loan portfolios. During 2012, Ally Bank completed eleven term securitization transactions backed by retail and dealer floorplan automotive loans and lease notes raising $11.8 billion. Securitization has proven to be a reliable and cost-effective funding source. Additionally, for retail automotive loans and lease notes, the term structure of the transaction locks in funding for a specified pool of loans

Table of Contents

# Management's Discussion and Analysis

Ally Financial Inc. • Form 10-K

and leases for the life of the underlying asset creating an effective tool for managing interest rate and liquidity risk. We manage the execution risk arising from secured funding by maintaining a diverse investor base and maintaining capacity in our committed secured facilities. At December 31, 2012, Ally Bank had exclusive access to $8.5 billion from committed credit facilities. Ally Bank also had access to a $4.1 billion committed facility that is shared with the parent company.

### Nonbank Funding

At December 31, 2012, the parent company maintained liquid cash in the amount of $4.2 billion and unencumbered highly liquid U.S. federal government and U.S. agency securities of $0.9 billion. In addition, at December 31, 2012, the parent company had available liquidity from unused capacity in committed credit facilities of $7.2 billion, including an equal allocation of shared unused capacity of $3.0 billion from a facility also available to Ally Bank. Parent company funding is defined as our consolidated operations less our Insurance operations and Ally Bank. Our ability to access unused capacity in secured facilities depends on the availability of eligible assets to collateralize the incremental funding and, in some instances, the funding also relies on the execution of interest rate hedges. Funding sources at the parent company generally consist of longer-term unsecured debt, unsecured retail term notes, committed credit facilities, asset-backed securitizations, and a modest amount of short-term borrowings. To optimize use of cash and secured facility capacity between entities, Ally Financial lends cash to Ally Bank from time to time under an intercompany agreement. Amounts outstanding on this loan are repayable to Ally Financial at any time. The parent company has total available liquidity of $15.6 billion at December 31, 2012, which includes the intercompany loan of $1.6 billion. The total available liquidity amount at December 31, 2012 also includes $1.7 billion of availability that is sourced from certain committed funding arrangements generally reliant upon the origination of future automotive receivables over the next twelve months.

During 2012, we completed five transactions totaling $3.6 billion in funding through the U.S. debt capital markets. We will continue to access the unsecured debt capital markets on an opportunistic basis to help pre-fund upcoming debt maturities. In addition, we have short-term and long-term unsecured debt outstanding from a legacy retail term note program known as SmartNotes. This program generally consisted of fixed-rate instruments with fixed-maturity dates ranging from 9 months to 30 years that were issued through a network of participating broker-dealers. During 2012, we launched a new retail term note program known as Ally Term Notes. There were $7.9 billion and $9.0 billion of combined retail term notes outstanding at December 31, 2012, and December 31, 2011, respectively.

We also obtain unsecured funding from the sale of floating-rate demand notes under our Demand Notes program. The holder has the option to require us to redeem these notes at any time without restriction. Demand Notes outstanding were $3.1 billion at December 31, 2012, compared to $2.8 billion at December 31, 2011. Unsecured short-term bank loans also provide short-term funding. At December 31, 2012, we had $167 million in short-term bank loans, a decrease of $1.4 billion from December 31, 2011. Refer to Note 15 and Note 16 to the Consolidated Financial Statements for additional information about our outstanding short-term borrowings and long-term unsecured debt, respectively.

Secured funding continues to be a significant source of financing at the parent company. During 2012, the parent company completed automotive-related transactions that included the renewal and extension of $22.3 billion of committed secured funding capacity, the creation of incremental private secured funding capacity totaling $7.1 billion, and $2.4 billion in public term securitizations in Europe and Canada. In January 2013 we completed a public retail securitization using the Capital Auto Receivables Asset Trust (CARAT) platform, our first since 2008, raising more than $1.5 billion. We continue to maintain significant funding capacity at the parent company to fund automotive-related assets, including a $7.5 billion syndicated facility that can fund automotive retail and commercial loans, as well as leases. In March 2012, this facility was renewed by a syndicate of nineteen lenders and extended such that half of the capacity will mature in March 2013 and the other half will mature in March 2014. In addition to this facility, there are a variety of others that provide funding in various countries. At December 31, 2012, the parent company had $30.3 billion of exclusive commitments globally in various facilities secured by automotive assets. The parent company also had access to a $4.1 billion committed facility that is shared with Ally Bank.

### Recent Funding Developments

In summary, during 2012, we completed funding transactions totaling more than $28.0 billion and renewed key existing funding facilities as we realized access to both the public and private markets. Key funding highlights from 2012 and 2013 to date were as follows:

- We accessed the unsecured debt capital markets in February, June, August, and December of 2012 and raised $3.6 billion.

- In 2012, we have continued to access the public asset-backed securitization markets completing eleven U.S. transactions that raised $11.8 billion. Included within the total amount is Ally Bank's inaugural term lease transaction in the U.S. totaling $1.3 billion in funding. Additionally, we completed European and Canadian (retail and dealer floorplan) transactions that raised $1.9 billion and $516 million, respectively.

- We created $7.1 billion of new private capacity to fund automotive assets.

- We renewed and extended more than $22.0 billion of key automotive funding facilities. The automotive facility renewal amount includes the March 2012 refinancing of $15.0 billion in credit facilities at both the parent company and Ally Bank with a syndicate of nineteen lenders. The $15.0 billion capacity is secured by retail, lease and dealer floorplan automotive assets and is allocated to two separate $7.5 billion facilities, one of which is available to the parent company and a Canadian subsidiary while the other is available to Ally Bank. Half of the capacity matures in March 2013 and the other half matures in March 2014. We are currently working on the renewal of the $15.0 billion facility and expect to reduce the total capacity.

Table of Contents

# Management's Discussion and Analysis

Ally Financial Inc. • Form 10-K

- In January 2013, Ally Financial issued its first public securitization since 2008 using its existing CARAT platform. This transaction raised more than $1.5 billion in funding.

- In February 2013, Ally Bank issued a public dealer floorplan securitization. This deal raised $1.0 billion in funding.

In October and December of 2012, we repaid $2.9 billion and $4.5 billion in debt issued under the FDIC's Temporary Liquidity Guarantee Program, respectively. As of December 31, 2012, there is no outstanding TLGP debt.

## Funding Sources

The following table summarizes debt and other sources of funding and the amount outstanding under each category for the periods shown.

As a result of our funding strategy to maximize funding sources at Ally Bank and grow our retail deposit base, the percentage of funding sources from Ally Bank has increased in 2012 from 2011 levels. In addition, deposits represent a larger portion of the overall funding mix.

| December 31, ($ in millions) | | Bank | | Nonbank | | Total | % |
|---|---|---|---|---|---|---|---|
| **2012** | | | | | | | |
| Secured financings | $ | **29,161** | $ | **15,950** | $ | **45,111** | **35** |
| Institutional term debt | | **—** | | **22,200** | | **22,200** | **17** |
| Retail debt programs (a) | | **—** | | **13,451** | | **13,451** | **10** |
| Bank loans and other | | **2** | | **164** | | **166** | **—** |
| Total debt (b) | | **29,163** | | **51,765** | | **80,928** | **62** |
| Deposits (c) | | **46,932** | | **983** | | **47,915** | **38** |
| Total on-balance sheet funding | $ | **76,095** | $ | **52,748** | $ | **128,843** | **100** |
| **2011** | | | | | | | |
| Secured financings | $ | 25,533 | $ | 27,432 | $ | 52,965 | 37 |
| Institutional term debt | | — | | 22,456 | | 22,456 | 15 |
| Retail debt programs (a) | | — | | 14,148 | | 14,148 | 10 |
| Temporary Liquidity Guarantee Program (d) | | — | | 7,400 | | 7,400 | 5 |
| Bank loans and other | | 1 | | 2,446 | | 2,447 | 2 |
| Total debt (b) | | 25,534 | | 73,882 | | 99,416 | 69 |
| Deposits (c) | | 39,604 | | 5,446 | | 45,050 | 31 |
| Total on-balance sheet funding | $ | 65,138 | $ | 79,328 | $ | 144,466 | 100 |
| Off-balance sheet securitizations | | | | | | | |
| Mortgage loans | $ | — | $ | 60,630 | $ | 60,630 | |
| Total off-balance sheet securitizations | $ | — | $ | 60,630 | $ | 60,630 | |

(a) Primarily includes $7.9 billion and $9.0 billion of Retail Term Notes at December 31, 2012 and December 31, 2011, respectively.
(b) Excludes fair value adjustment as described in Note 25 to the Consolidated Financial Statements.
(c) Bank deposits include retail, brokered, mortgage escrow, and other deposits. Nonbank deposits include dealer deposits. Intercompany deposits are not included.
(d) The $7.4 billion of TLGP matured and was repaid in the fourth quarter of 2012.

Refer to Note 16 to the Consolidated Financial Statements for a summary of the scheduled maturity of long-term debt at December 31, 2012.

## Funding Facilities

We utilize both committed and uncommitted credit facilities. The financial institutions providing the uncommitted facilities are not contractually obligated to advance funds under them. The amounts outstanding under our various funding facilities are included on our Consolidated Balance Sheet.

The total capacity in our committed funding facilities is provided by banks and other financial institutions through private transactions. The committed secured funding facilities can be revolving in nature and allow for additional funding during the commitment period, or they can be amortizing and not allow for any further funding after the closing date. At December 31, 2012, $34.3 billion of our $43.0 billion of committed capacity was revolving. Our revolving facilities generally have an original tenor ranging from 364 days to two years. As of December 31, 2012, we had $13.9 billion of committed funding capacity from revolving facilities with a remaining tenor greater than 364 days.

Table of Contents

# Management's Discussion and Analysis

Ally Financial Inc. • Form 10-K

### Committed Funding Facilities

| December 31, ($ in billions) | Outstanding | | Unused capacity (a) | | Total capacity | |
|---|---|---|---|---|---|---|
| | **2012** | 2011 | **2012** | 2011 | **2012** | 2011 |
| Bank funding | | | | | | |
| Secured - U.S. | $ **3.8** | $ 5.8 | $ **4.7** | $ 3.7 | $ **8.5** | $ 9.5 |
| Nonbank funding | | | | | | |
| Unsecured | | | | | | |
| Automotive Finance — U.S. | **—** | — | **—** | 0.5 | **—** | 0.5 |
| Automotive Finance — International | **0.1** | 0.3 | **—** | — | **0.1** | 0.3 |
| Secured | | | | | | |
| Automotive Finance — U.S. (b) (c) | **12.9** | 4.2 | **5.4** | 10.2 | **18.3** | 14.4 |
| Automotive Finance — International (b) | **9.6** | 10.1 | **2.4** | 3.0 | **12.0** | 13.1 |
| Mortgage operations | **—** | 0.7 | **—** | 0.5 | **—** | 1.2 |
| Total nonbank funding | **22.6** | 15.3 | **7.8** | 14.2 | **30.4** | 29.5 |
| Shared capacity (d) | | | | | | |
| U.S. | **1.0** | 1.5 | **3.0** | 2.5 | **4.0** | 4.0 |
| International | **0.1** | 0.1 | **—** | — | **0.1** | 0.1 |
| Total committed facilities | $ **27.5** | $ 22.7 | $ **15.5** | $ 20.4 | $ **43.0** | $ 43.1 |

(a) Funding from committed secured facilities is available on request in the event excess collateral resides in certain facilities or is available to the extent incremental collateral is available and contributed to the facilities.

(b) Total unused capacity includes $2.2 billion as of December 31, 2012, and $4.9 billion as of December 31, 2011, from certain committed funding arrangements that are generally reliant upon the origination of future automotive receivables and that are available in 2013.

(c) Includes the secured facilities of our Commercial Finance Group.

(d) Funding is generally available for assets originated by Ally Bank or the parent company, Ally Financial Inc.

### Uncommitted Funding Facilities

| December 31, ($ in billions) | Outstanding | | Unused capacity | | Total capacity | |
|---|---|---|---|---|---|---|
| | **2012** | 2011 | **2012** | 2011 | **2012** | 2011 |
| Bank funding | | | | | | |
| Secured — U.S. | | | | | | |
| Federal Reserve funding programs | $ **—** | $ — | $ **1.8** | $ 3.2 | $ **1.8** | $ 3.2 |
| FHLB advances | **4.8** | 5.4 | **0.4** | — | **5.2** | 5.4 |
| Total bank funding | **4.8** | 5.4 | **2.2** | 3.2 | **7.0** | 8.6 |
| Nonbank funding | | | | | | |
| Unsecured | | | | | | |
| Automotive Finance — International | **2.1** | 1.9 | **0.4** | 0.5 | **2.5** | 2.4 |
| Secured | | | | | | |
| Automotive Finance — International | **0.1** | 0.1 | **0.1** | 0.1 | **0.2** | 0.2 |
| Mortgage operations | **—** | — | **—** | 0.1 | **—** | 0.1 |
| Total nonbank funding | **2.2** | 2.0 | **0.5** | 0.7 | **2.7** | 2.7 |
| Total uncommitted facilities | $ **7.0** | $ 7.4 | $ **2.7** | $ 3.9 | $ **9.7** | $ 11.3 |

### Ally Bank Funding Facilities

*Facilities for Automotive Finance Operations — Secured*

At December 31, 2012, Ally Bank had exclusive access to $8.5 billion from committed credit facilities. Ally Bank's largest facility is a $7.5 billion revolving syndicated credit facility secured by automotive receivables. During the first quarter of 2012, we renewed this facility with half of this facility maturing in March 2013, and the remainder maturing in March 2014. At December 31, 2012, the amount outstanding under this facility was $3.8 billion. Ally Bank also had access to a $4.1 billion committed facility that is shared with the parent company. In the event these facilities are not renewed in the future, the outstanding debt will be repaid over time as the underlying collateral amortizes.

Table of Contents

# Management's Discussion and Analysis

Ally Financial Inc. • Form 10-K

### *Nonbank Funding Facilities*

*Facilities for Automotive Finance Operations — Unsecured*

We maintain $144 million in revolving committed unsecured bank facilities in our international operations, most of which mature in March 2013.

*Facilities for Automotive Finance Operations — Secured*

The parent company's largest facility is a $7.5 billion revolving syndicated credit facility secured by automotive receivables. During the first quarter of 2012, we renewed this facility with half of this facility maturing in March 2013, and the remainder maturing in March 2014. In the event this facility is not renewed at maturity, the outstanding debt will be repaid over time as the underlying collateral amortizes. At December 31, 2012, there was $7.5 billion outstanding under this facility.

In addition to our syndicated revolving credit facility, we also maintain various bilateral and multilateral secured credit facilities in multiple countries that fund our Automotive Finance operations. These are primarily private securitization facilities that fund a specific pool of automotive assets. Many of the facilities have revolving commitments and allow for the funding of additional assets during the commitment period. At December 31, 2012, the parent company maintained exclusive access to $30.3 billion of committed secured credit facilities and forward purchase commitments to fund automotive assets, and also had access to a $4.1 billion committed facility that is shared with Ally Bank.

## Cash Flows

Net cash provided by operating activities was $5.0 billion for the year ended December 31, 2012, compared to $5.5 billion for the same period in 2011. During the year ended December 31, 2012, the net cash inflow from sales and repayment of mortgage and automotive loans held-for-sale exceeded cash outflow from new originations and purchases of such loans by $1.0 billion. During the year ended December 31, 2011, this activity resulted in a net cash inflow of $0.9 billion.

Net cash used in investing activities was $16.6 billion for the year ended December 31, 2012, compared to $14.1 billion for the same period in 2011. The net cash outflow from finance receivables and loans decreased $4.5 billion for the year ended December 31, 2012, compared to 2011. The cash outflow to purchase operating lease assets exceeded cash inflows from disposals of such assets by $5.7 billion for the year ended December 31, 2012, compared to a net cash outflow of $1.0 billion for the year ended December 31, 2011. The increase in net cash outflows associated with leasing activities compared to the prior year was primarily due to a decrease in cash received on lease dispositions. Cash received from sales, maturities, and repayments of available-for-sale investment securities, net of purchases, increased $0.7 billion during the year ended December 31, 2012, compared to 2011.

Net cash provided by financing activities for the year ended December 31, 2012, totaled $8.0 billion, compared to $10.1 billion in the same period in 2011. Cash provided by short-term debt increased $2.2 billion in the year ended December 31, 2012, compared to 2011, while cash provided by bank deposits increased $1.7 billion. Cash used to repay long-term debt exceeded cash generated from long-term debt issuances by $0.5 billion for the year ended December 31, 2012. In 2011, cash from issuances of long-term debt exceed repayments by $4.3 billion.

## Capital Planning and Stress Tests

As a bank holding company with $50 billion or more of consolidated assets, Ally is required to conduct periodic stress tests and submit a proposed capital action plan to the FRB every January, which the FRB must take action on by the following March. The proposed capital action plan must include a description of all planned capital actions over a nine-quarter planning horizon, including any issuance of a debt or equity capital instrument, any capital distribution, and any similar action that the FRB determines could have an impact on Ally's consolidated capital. The proposed capital action plan must also include a discussion of how Ally will maintain capital above the minimum regulatory capital ratios and above a Tier 1 common equity-to-total risk-weighted assets ratio of 5 percent, and serve as a source of strength to Ally Bank. The FRB must approve Ally's proposed capital action plan before Ally may take any proposed capital action covered by the new regime. Ally submitted its annual capital plan in January 2012, and then submitted a revised capital plan in June of 2012. In connection with its reviews, the FRB provided notice of non-objection to Ally's planned preferred dividends and interest on the trust preferred securities and subordinated debt. We continue to have active, frequent and constructive dialogue with the FRB, and have submitted the required 2013 capital plan on January 7, 2013.

### Regulatory Capital

Refer to Note 21 to the Consolidated Financial Statements.

### Credit Ratings

The cost and availability of unsecured financing are influenced by credit ratings, which are intended to be an indicator of the creditworthiness of a particular company, security, or obligation. Lower ratings result in higher borrowing costs and reduced access to capital markets. This is particularly true for certain institutional investors whose investment guidelines require investment-grade ratings on term debt and the two highest rating categories for short-term debt (particularly money market investors).

Table of Contents

# Management's Discussion and Analysis

Ally Financial Inc. • Form 10-K

Nationally recognized statistical rating organizations rate substantially all our debt. The following table summarizes our current ratings and outlook by the respective nationally recognized rating agencies.

| Rating agency | Short-term | Senior debt | Outlook | Date of last action |
|---|---|---|---|---|
| Fitch | B | BB- | Rating Watch Negative | April 18, 2012 (a) |
| Moody's | Not-Prime | B1 | Positive | February 25, 2013 (b) |
| S&P | C | B+ | Positive | May 17, 2012 (c) |
| DBRS | R-4 | BB-Low | Review - Developing | May 15, 2012 (d) |

(a)  Fitch placed our senior debt on Rating Watch Negative and affirmed the short-term rating of B on April 18, 2012.
(b)  Moody's confirmed our senior debt rating of B1 and changed the outlook to Positive on February 25, 2013.
(c)  Standard & Poor's affirmed our senior debt rating of B+ and the short-term rating of C, and changed the outlook to Positive on May 17, 2012.
(d)  DBRS placed our ratings Under Review - Developing on May 15, 2012.

**Insurance Financial Strength Ratings**

Substantially all of our Insurance operations have a Financial Strength Rating (FSR) and an Issuer Credit Rating (ICR) from the A.M. Best Company. The FSR is intended to be an indicator of the ability of the insurance company to meet its senior most obligations to policyholders. Lower ratings generally result in fewer opportunities to write business as insureds, particularly large commercial insureds, and insurance companies purchasing reinsurance have guidelines requiring high FSR ratings. On February 14, 2013, A.M. Best affirmed the FSR of B++ (good) and the ICR of BBB.

**Off-balance Sheet Arrangements**

Refer to Note 10 to the Consolidated Financial Statements.

***Securitization***

Securitization of assets allows us to diversify funding sources by enabling us to convert assets into cash earlier than what would have occurred in the normal course of business. Information regarding our securitization activities is further described in Note 10 to the Consolidated Financial Statements. As part of these activities, assets are generally sold to securitization entities. These securitization entities are separate legal entities that assume the risk and reward of ownership of the receivables. Neither we nor those subsidiaries are responsible for the other entities' debts, and the assets of the subsidiaries are not available to satisfy our claim or those of our creditors. In turn, the securitization entities establish separate trusts to which they transfer the assets in exchange for the proceeds from the sale of asset- or ¬mortgage-backed securities issued by the trust. The trusts' activities are generally limited to acquiring the assets, issuing asset- or ¬mortgage-backed securities, making payments on the securities, and periodically reporting to the investors. We may account for the transfer of assets as a sale if we either do not hold a significant variable interest or do not provide servicing or asset management functions for the financial assets held by the securitization entity.

Certain of our securitization transactions, while similar in legal structure to the transaction described in the foregoing do not meet the required criteria to be accounted for as off-balance sheet arrangements; therefore, they are accounted for as secured financings. As secured financings, the underlying automobile finance retail contracts, wholesale loans, automobile leases, commercial loans, or mortgage loans remain on our Consolidated Balance Sheet with the corresponding obligation (consisting of the beneficial interests issued by the securitization entity) reflected as debt. We recognize interest income on the finance receivables, automobile leases and loans, and interest expense on the beneficial interests issued by the securitization entity; and we provide for loan losses on the finance receivables and loans as incurred or adjust to fair value for fair value-elected loans. At December 31, 2012 and 2011, $68.0 billion and $78.5 billion of our total assets, respectively, were related to secured financings. Refer to Note 16 to the Consolidated Financial Statements for further discussion.

As part of our securitization activities, we typically agree to service the transferred assets for a fee, and we may earn other related ongoing income. The amount of the fees earned is disclosed in Note 11 to the Consolidated Financial Statements. We may also retain a portion of senior and subordinated interests issued by the trusts; these interests are reported as investment securities, or other assets on our Consolidated Balance Sheet and are disclosed in Note 6 and Note 13 to the Consolidated Financial Statements. For secured financings, retained interests are not recognized as a separate asset on our Consolidated Balance Sheet. Subordinate interests typically provide credit support to the more highly rated senior interest in a securitization transaction and may be subject to all or a portion of the first loss position related to the sold assets.

The FDIC, which regulates Ally Bank, promulgated safe harbor regulation for securitizations by banks. Compliance with this regulation requires the sponsoring bank to retain either five percent of each class of beneficial interests issued in the securitization or a representative sample of similar financial assets equal to five percent of the securitized financial assets to comply with the regulation. The retained interests or assets must be held for the life of the securitization and may not be sold, pledged or hedged, except that interest rate and currency hedging is permitted. This risk retention requirement adversely affects the efficiency of securitizations, because it reduces the amount of funds that can be raised against a given pool of financial assets.

We sometimes use derivative financial instruments to facilitate securitization activities, as further described in Note 22 to the Consolidated Financial Statements.

81

Table of Contents

# Management's Discussion and Analysis

Ally Financial Inc. • Form 10-K

Our economic exposure related to the securitization trusts is generally limited to cash reserves, our other interests retained in financial asset sales, and our customary representation and warranty provisions described in the Consolidated Financial Statements. The trusts have a limited life and generally terminate upon final distribution of amounts owed to investors or upon exercise by us, as servicer of a cleanup call option, when the servicing of the sold contracts becomes burdensome. In addition, the trusts do not invest in our equity or in the equity of any of our affiliates.

## Purchase Obligations

Certain of the structures related to whole-loan sales, securitization transactions, and other off-balance sheet activities contain provisions that are standard in the whole-loan sale and securitization markets where we may (or, in certain limited circumstances, are obligated to) purchase specific assets from entities. Our obligations are as follows.

### Loan Repurchases and Obligations Related to Loan Sales
#### *ResCap Bankruptcy Filing*

As described in Note 1 and Note 29 to the Consolidated Financial Statements, on May 14, 2012, Residential Capital, LLC (ResCap) and certain of its wholly owned direct and indirect subsidiaries (collectively, the Debtors) filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York. As a result of the deconsolidation of ResCap, a significant portion of our representation and warranty reserve was eliminated. Representation and warranty reserve was $105 million at December 31, 2012 with respect to Ally Bank's sold and serviced loans.

#### *Overview*

Ally Bank, within our Mortgage operations, sells loans that take the form of securitizations guaranteed by Fannie Mae and Freddie Mac. In connection with securitizations and loan sales, the trustee, for the benefit of the related security holders, is provided various representations and warranties related to the loans sold. The specific representations and warranties typically relate to, among other things, the ownership of the loan, the validity of the lien securing the loan, the loan's compliance with the criteria for inclusion in the transaction, including compliance with underwriting standards or loan criteria established by the buyer, the ability to deliver required documentation and compliance with applicable laws. In general, the representations and warranties described above may be enforced against Ally Bank at any time unless a sunset provision is in place. Upon discovery of a breach of a representation or warranty, the breach is corrected in a manner conforming to the provisions of the sale agreement. This may require Ally Bank to repurchase the loan, indemnify the investor for incurred losses, or otherwise make the investor whole. See *Repurchase Process* below.

#### *Originations*

Representation and warranty risk-mitigation strategies include, but are not limited to, pursuing settlements with investors where economically beneficial in order to resolve a pipeline of demands in lieu of loan-by-loan assessments that could result in repurchasing loans, aggressively contesting claims we do not consider valid (rescinding claims), or seeking recourse against correspondent lenders from whom we purchased loans wherever appropriate.

The following table summarizes domestic mortgage loans sold by ResCap where Ally Bank maintained the mortgage servicing rights; and following the deconsolidation of ResCap, the loans that were sold by Ally Bank. The following table presents domestic mortgage loans sold categorized by GSE (original unpaid principal balance).

| Year ended December 31, ($ in billions) | **2012** | | 2011 | | 2010 | | 2009 | | 2008 | | 2007 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Fannie Mae | $ | **21.5** | $ | 33.8 | $ | 35.2 | $ | 21.1 | $ | 17.7 | $ | 6.7 |
| Freddie Mac | | **6.9** | | 15.8 | | 15.7 | | 8.5 | | 8.6 | | 2.3 |
| Total sales (a) | $ | **28.4** | $ | 49.6 | $ | 50.9 | $ | 29.6 | $ | 26.3 | $ | 9.0 |

(a)    Representation and warranty obligations vary by loan and may not apply to all loans sold by Ally Bank.

#### *Representation and Warranty Obligation Reserve Methodology*

The liability for representation and warranty obligations reflects management's best estimate of probable lifetime losses at Ally Bank. We consider historical and recent demand trends in establishing the reserve. The methodology used to estimate the reserve considers a variety of assumptions including borrower performance (both actual and estimated future defaults), repurchase demand behavior, historical loan defect experience, historical mortgage insurance rescission experience, and historical and estimated future loss experience, which includes projections of future home price changes as well as other qualitative factors including investor behavior. In cases where we may not be able to reasonably estimate losses, a liability is not recognized. Management monitors the adequacy of the overall reserve and makes adjustments to the level of reserve, as necessary, after consideration of other qualitative factors including ongoing dialogue and experience with counterparties.

At the time a loan is sold, an estimate of the fair value of the liability is recorded and classified in accrued expenses and other liabilities on our Consolidated Balance Sheet and recorded as a component of gain (loss) on mortgage and automotive loans, net, in our Consolidated Statement of Comprehensive Income. We recognize changes in the liability when additional relevant information becomes available. Changes in the estimate are recorded as other operating expenses in our Consolidated Statement of Comprehensive Income. The repurchase reserve at December 31, 2012, relates exclusively to GSE exposure. Ally Bank experienced a decrease in new claims for the year ended December 31,

Table of Contents

# Management's Discussion and Analysis

Ally Financial Inc. • Form 10-K

2012 compared to 2011. The decrease in repurchase claims was driven by significantly fewer new claims during the fourth quarter of 2012. The following table presents Ally Bank's new claims by GSEs (original unpaid principal balance).

| Year ended December 31, ($ in millions) | | 2012 | | 2011 |
|---|---|---|---|---|
| Fannie Mae | $ | 255 | $ | 210 |
| Freddie Mac | | 108 | | 160 |
| Total claims | $ | 363 | $ | 370 |

The following table presents the total number and original unpaid principal balance (UPB) of loans related to unresolved representation and warranty demands (indemnification claims or repurchase demands). The table includes demands that we have requested be rescinded but have not been agreed to by the investor. Total unresolved representation and warranty demands where Ally Bank has requested the investor to rescind increased to $23 million or 40% of outstanding claims at December 31, 2012, compared to $11 million or 24% of outstanding claims at December 31, 2011.

| | 2012 | | 2011 | |
|---|---|---|---|---|
| December 31, ($ in millions) | Number of Loans | Original UPB of Loans | Number of Loans | Original UPB of Loans |
| Fannie Mae | 187 $ | 41 | 72 $ | 15 |
| Freddie Mac | 72 | 17 | 138 | 31 |
| Total number of loans and unpaid principal balance | 259 $ | 58 | 210 $ | 46 |

### Repurchase Process

After receiving a claim under representation and warranty obligations, Ally Bank will review the claim to determine the appropriate response (e.g., appeal and provide or request additional information) and take appropriate action (rescind, repurchase the loan, or remit indemnification payment). Historically, repurchase demands were generally related to loans that became delinquent within the first few years following origination. As a result of market developments over the past several years, investor repurchase demand behavior has changed significantly. GSEs are more likely to submit claims for loans at any point in the loan's life cycle, including requests for loans that become delinquent or loans that incur a loss. Representation and warranty claims are generally reviewed on a loan-by-loan basis to validate if there has been a breach requiring a potential repurchase or indemnification payment. Ally Bank actively contests claims to the extent they are not considered valid. Ally Bank is not required to repurchase a loan or provide an indemnification payment where claims are not valid.

The risk of repurchase or indemnification and the associated credit exposure is managed through underwriting and quality assurance practices and by servicing mortgage loans to meet investor standards. Ally Bank believes that, in general, the longer a loan performs prior to default, the less likely it is that an alleged breach of representation and warranty will be found to have a material and adverse impact on the loan's performance. When loans are repurchased, Ally Bank bears the related credit loss on the loans. Repurchased loans are classified as held-for-sale and initially recorded at fair value.

The following table presents Ally Bank's new claims by vintage (original unpaid principal balance).

| Year ended December 31, ($ in millions) | | 2012 | | 2011 |
|---|---|---|---|---|
| Pre 2008 | $ | 73 | $ | 42 |
| 2008 | | 181 | | 149 |
| Post 2008 | | 109 | | 179 |
| Total claims | $ | 363 | $ | 370 |

### Private Mortgage Insurance

Mortgage insurance is required for certain consumer mortgage loans sold to the GSEs and certain securitization trusts. Mortgage insurance is typically required for first-lien consumer mortgage loans having a loan-to-value ratio at origination of greater than 80 percent. Mortgage insurers are, in certain circumstances, permitted to rescind existing mortgage insurance that covers consumer loans if they demonstrate certain loan underwriting requirements have not been met. Upon receipt of a rescission notice, Ally Bank will assess the notice and, if appropriate, refute the notice, or if the notice cannot be refuted, Ally Bank attempts to remedy the defect. In the event the mortgage insurance cannot be reinstated, Ally Bank may be obligated to repurchase the loan or provide an indemnification payment in the event of a loss, subject to contractual limitations. While Ally Bank makes every effort to reinstate the mortgage insurance, it has had limited success and as a result, most of these requests result in rescission of the mortgage insurance. At December 31, 2012, Ally Bank has approximately $9 million in original unpaid principal balance of outstanding mortgage insurance rescission notices where it has not received a repurchase demand. However, this unpaid principal amount is not representative of expected future losses.

### Guarantees

Guarantees are defined as contracts or indemnification agreements that contingently require us to make payments to third parties based on changes in an underlying agreement that is related to a guaranteed party. Our guarantees include standby letters of credit and certain

Table of Contents

# Management's Discussion and Analysis

Ally Financial Inc. • Form 10-K

contract provisions regarding securitizations and sales. Refer to Note 28 to the Consolidated Financial Statements for more information regarding our outstanding guarantees to third parties.

## Aggregate Contractual Obligations

The following table provides aggregated information about our outstanding contractual obligations disclosed elsewhere in our Consolidated Financial Statements.

| December 31, 2012 *($ in millions)* | Total | | Payments due by period | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Less than 1 year | | 1-3 years | | 3-5 years | | More than 5 years | |
| Description of obligation | | | | | | | | | | |
| Long-term debt | | | | | | | | | | |
| Total (a) | $ | 75,307 | $ | 12,834 | $ | 32,881 | $ | 11,797 | $ | 17,795 |
| Scheduled interest payments for fixed-rate long-term debt | | 23,123 | | 2,473 | | 4,410 | | 3,004 | | 13,236 |
| Estimated interest payments for variable-rate long-term debt (b) | | 1,053 | | 437 | | 516 | | 94 | | 6 |
| Estimated net payments under interest rate swap agreements (b) | | 68 | | — | | — | | — | | 68 |
| Originate/purchase mortgages or securities | | 4,249 | | 4,249 | | — | | — | | — |
| Commitments to provide capital to investees | | 86 | | 80 | | 2 | | 3 | | 1 |
| Home equity lines of credit | | 411 | | — | | 4 | | 38 | | 369 |
| Lending commitments | | 768 | | 184 | | 176 | | 380 | | 28 |
| Lease commitments | | 252 | | 70 | | 112 | | 47 | | 23 |
| Purchase obligations | | 511 | | 253 | | 159 | | 74 | | 25 |
| Bank certificates of deposit | | 31,084 | | 15,688 | | 10,469 | | 4,927 | | — |
| Total | $ | 136,912 | $ | 36,268 | $ | 48,729 | $ | 20,364 | $ | 31,551 |

(a)  Total amount reflects the remaining principal obligation and excludes original issue discount of $1.8 billion and fair value adjustments of $1.1 billion related to fixed-rate debt designated as a hedged item.

(b)  Estimate utilized a forecasted variable interest model, when available, or the applicable variable interest rate as of the most recent reset date prior to December 31, 2012.

The foregoing table does not include our reserves for insurance losses and loss adjustment expenses, which total $341 million at December 31, 2012. While payments due on insurance losses are considered contractual obligations because they related to insurance policies issued by us, the ultimate amount to be paid and the timing of payment for an insurance loss is an estimate subject to significant uncertainty. Furthermore, the timing on payment is also uncertain; however, the majority of the balance is expected to be paid out in less than five years. Similarly, due to uncertainty in the timing of future cash flows related to our unrecognized tax benefits, the contractual obligations detailed above do not include $102 million in unrecognized tax benefits.

The following provides a description of the items summarized in the preceding table of contractual obligations.

### Long-term Debt

Amounts represent the scheduled maturity of long-term debt at December 31, 2012, assuming that no early redemptions occur. The maturity of secured debt may vary based on the payment activity of the related secured assets. The amounts presented are before the effect of any unamortized discount or fair value adjustment. Refer to Note 15 and Note 16 to the Consolidated Financial Statements for additional information on our debt obligations.

### Originate/Purchase Mortgages or Securities

As part of our Mortgage operations, we enter into commitments to originate and purchase mortgages and MBS. Refer to Note 28 to the Consolidated Financial Statements for additional information.

### Commitments to Provide Capital to Investees

As part of arrangements with specific private equity funds, we are obligated to provide capital to investees. Refer to Note 28 to the Consolidated Financial Statements for additional information.

### Home Equity Lines of Credit

We are committed to fund the future remaining balance on unused lines of credit on mortgage loans. The funding is subject to customary lending conditions, such as a satisfactory credit rating, delinquency status, and adequate home equity value. Refer to Note 28 to the Consolidated Financial Statements for additional information.

Table of Contents

# Management's Discussion and Analysis

Ally Financial Inc. • Form 10-K

### Lending Commitments

Our Automotive Finance operations and Commercial Finance Group have outstanding revolving lending commitments with customers. The amounts presented represent the unused portion of those commitments at December 31, 2012. Refer to Note 28 to the Consolidated Financial Statements for additional information.

### Lease Commitments

We have obligations under various operating lease arrangements (primarily for real property) with noncancelable lease terms that expire after December 31, 2012. Refer to Note 28 to the Consolidated Financial Statements for additional information.

### Purchase Obligations

We enter into multiple contractual arrangements for various services. The arrangements represent fixed payment obligations under our most significant contracts and primarily relate to contracts with information technology providers. Refer to Note 28 to the Consolidated Financial Statements for additional information.

### Bank Certificates of Deposit

Refer to Note 14 to the Consolidated Financial Statements for additional information.

## Critical Accounting Estimates

Accounting policies are integral to understanding our Management's Discussion and Analysis of Financial Condition and Results of Operations. The preparation of financial statements in accordance with accounting principles generally accepted in the United States of America (GAAP) requires management to make certain judgments and assumptions, on the basis of information available at the time of the financial statements, in determining accounting estimates used in the preparation of these statements. Our significant accounting policies are described in Note 1 to the Consolidated Financial Statements; critical accounting estimates are described in this section. An accounting estimate is considered critical if the estimate requires management to make assumptions about matters that were highly uncertain at the time the accounting estimate was made. If actual results differ from our judgments and assumptions, then it may have an adverse impact on the results of operations and cash flows. Our management has discussed the development, selection, and disclosure of these critical accounting estimates with the Audit Committee of the Board, and the Audit Committee has reviewed our disclosure relating to these estimates.

### Fair Value of Financial Instruments

We use fair value measurements to record fair value adjustments to certain instruments and to determine fair value disclosures. Refer to Note 25 to the Consolidated Financial Statements for description of valuation methodologies used to measure material assets and liabilities at fair value and details of the valuation models, key inputs to those models, and significant assumptions utilized. We follow the fair value hierarchy set forth in Note 25 to the Consolidated Financial Statements in order to prioritize the inputs utilized to measure fair value. We review and modify, as necessary, our fair value hierarchy classifications on a quarterly basis. As such, there may be reclassifications between hierarchy levels.

The following table summarizes assets and liabilities measured at fair value and the amounts measured using Level 3 inputs. The table includes recurring and nonrecurring measurements.

| Year ended December 31, ($ in millions) | | 2012 | | 2011 |
|---|---|---|---|---|
| Assets at fair value | $ | 20,408 | $ | 30,172 |
| As a percentage of total assets | | 11% | | 16% |
| Liabilities at fair value | $ | 2,468 | $ | 6,299 |
| As a percentage of total liabilities | | 2% | | 4% |
| Assets at fair value using Level 3 inputs | $ | 1,288 | $ | 4,666 |
| As a percentage of assets at fair value | | 6% | | 15% |
| Liabilities at fair value using Level 3 inputs | $ | 3 | $ | 878 |
| As a percentage of liabilities at fair value | | n/m | | 14% |

n/m = not meaningful

Level 3 assets declined 72% or $3.4 billion primarily due to the deconsolidation of ResCap during the year ended December 31, 2012, which resulted in a significant decline in mortgage servicing rights, mortgage loans held-for-sale, net, and consumer mortgage finance receivables and loans, net. Refer to Note 1 to the Consolidated Financial Statements for further information on the deconsolidation of ResCap. As the value of the consumer mortgage finance receivables and loans, net, declined, the value of the related on-balance sheet securitization debt also declined, which was the primary reason Level 3 liabilities declined by 99.9% or $875 million.

We have numerous internal controls in place to ensure the appropriateness of fair value measurements. Significant fair value measures are subject to detailed analytics and management review and approval. We have an established model validation policy and program in place that covers all models used to generate fair value measurements. This model validation program ensures a controlled environment is used for the development, implementation, and use of the models and change procedures. Further, this program uses a risk-based approach to select

Table of Contents
# Management's Discussion and Analysis

Ally Financial Inc. • Form 10-K

models to be reviewed and validated by an independent internal risk group to ensure the models are consistent with their intended use, the logic within the models is reliable, and the inputs and outputs from those models are appropriate. Additionally, a wide array of operational controls are in place to ensure the fair value measurements are reasonable, including controls over the inputs into and the outputs from the fair value measurement models. For example, we backtest the internal assumptions used within models against actual performance. We also monitor the market for recent trades, market surveys, or other market information that may be used to benchmark model inputs or outputs. Certain valuations will also be benchmarked to market indices when appropriate and available. We have scheduled model and/or input recalibrations that occur on a periodic basis but will recalibrate earlier if significant variances are observed as part of the backtesting or benchmarking noted above.

Considerable judgment is used in forming conclusions from market observable data used to estimate our Level 2 fair value measurements and in estimating inputs to our internal valuation models used to estimate our Level 3 fair value measurements. Level 3 inputs such as interest rate movements, prepayment speeds, credit losses, and discount rates are inherently difficult to estimate. Changes to these inputs can have a significant effect on fair value measurements. Accordingly, our estimates of fair value are not necessarily indicative of the amounts that could be realized or would be paid in a current market exchange.

## Allowance for Loan Losses

We maintain an allowance for loan losses (the allowance) to absorb probable loan credit losses inherent in the held-for-investment portfolio, excluding those loans measured at fair value in accordance with applicable accounting standards. The allowance is maintained at a level that management considers to be adequate based upon ongoing quarterly assessments and evaluations of collectability and historical loss experience in our lending portfolio. The allowance is management's estimate of incurred losses in our lending portfolio and involves significant judgment. Management performs quarterly analysis of these portfolios to determine if impairment has occurred and to assess the adequacy of the allowance based on historical and current trends and other factors affecting credit losses. Additions to the allowance are charged to current period earnings through the provision for loan losses; amounts determined to be uncollectible are charged directly against the allowance, while amounts recovered on previously charged-off accounts increase the allowance. Determining the appropriateness of the allowance requires management to exercise significant judgment about matters that are inherently uncertain, including the timing, frequency, and severity of credit losses that could materially affect the provision for loan losses and, therefore, net income. The methodology for determining the amount of the allowance differs between the consumer automobile, consumer mortgage, and commercial portfolio segments. For additional information regarding our portfolio segments and classes, refer to Note 8 to the Consolidated Financial Statements. While we attribute portions of the allowance across our lending portfolios, the entire allowance is available to absorb probable loan losses inherent in our total lending portfolio.

The consumer portfolio segments consist of smaller-balance, homogeneous loans. Excluding certain loans that are identified as individually impaired, the allowance for each consumer portfolio segment (automobile and mortgage) is evaluated collectively. The allowance is based on aggregated portfolio segment evaluations that begin with estimates of incurred losses in each portfolio segment based on various statistical analyses. We leverage proprietary statistical models, including vintage and migration analyses, based on recent loss trends, to develop a systematic incurred loss reserve. These statistical loss forecasting models are utilized to estimate incurred losses and consider several credit quality indicators including, but not limited to, historical loss experience, estimated foreclosures or defaults based on observable trends, delinquencies, and general economic and business trends. Management believes these factors are relevant to estimate incurred losses and are updated on a quarterly basis in order to incorporate information reflective of the current economic environment, as changes in these assumptions could have a significant impact. In order to develop our best estimate of probable incurred losses inherent in the loan portfolio, management reviews and analyzes the output from the models and may adjust the reserves to take into consideration environmental, qualitative and other factors that may not be captured in the models. These adjustments are documented and reviewed through our risk management processes. Management reviews, updates, and validates its systematic process and loss assumptions on a periodic basis. This process involves an analysis of loss information, such as a review of loss and credit trends, a retrospective evaluation of actual loss information to loss forecasts, and other analyses.

The commercial loan portfolio segment is primarily composed of larger-balance, nonhomogeneous exposures within our Automotive Finance operations, Commercial Finance Group, and Mortgage operations. As of December 31, 2012, we no longer have any commercial loans within our mortgage operations. These loans are primarily evaluated individually and are risk-rated based on borrower, collateral, and industry-specific information that management believes is relevant in determining the occurrence of a loss event and measuring impairment. A loan is considered impaired when it is probable that we will be unable to collect all amounts due according to the contractual terms of the loan agreement based on current information and events. Management establishes specific allowances for commercial loans determined to be individually impaired based on the present value of expected future cash flows, discounted at the loans' effective interest rate, observable market price or the fair value of collateral, whichever is determined to be the most appropriate. Estimated costs to sell or realize the value of the collateral on a discounted basis are included in the impairment measurement, when appropriate. In addition to the specific allowances for impaired loans, loans that are not identified as individually impaired are grouped into pools based on similar risk characteristics and collectively evaluated. These allowances are based on historical loss experience, concentrations, current economic conditions, and performance trends within specific geographic locations. The commercial historical loss experience is updated quarterly to incorporate the most recent data reflective of the current economic environment.

The determination of the allowance is influenced by numerous assumptions and many factors that may materially affect estimates of loss, including volatility of loss given default, probability of default, and rating migration. The critical assumptions underlying the allowance include: (1) segmentation of each portfolio based on common risk characteristics; (2) identification and estimation of portfolio indicators and other factors that management believes are key to estimating incurred credit losses; and (3) evaluation by management of borrower, collateral,

Table of Contents

# Management's Discussion and Analysis

Ally Financial Inc. • Form 10-K

and geographic information. Management monitors the adequacy of the allowance and makes adjustments as the assumptions in the underlying analyses change to reflect an estimate of incurred loan losses at the reporting date, based on the best information available at that time. In addition, the allowance related to the commercial portfolio segment is influenced by estimated recoveries from automotive manufacturers relative to guarantees or agreements with them to repurchase vehicles used as collateral to secure the loans. If an automotive manufacturer is unable to fully honor its obligations, our ultimate loan losses could be higher. To the extent that actual outcomes differ from our estimates, additional provision for credit losses may be required that would reduce earnings.

## Valuation of Automobile Lease Assets and Residuals

We have significant investments in vehicles in our operating lease portfolio. In accounting for operating leases, management must make a determination at the beginning of the lease contract of the estimated realizable value (i.e., residual value) of the vehicle at the end of the lease. Residual value represents an estimate of the market value of the vehicle at the end of the lease term, which typically ranges from two to four years. At contract inception, we generally determine the projected residual values based on independent data, including independent guides of vehicle residual values, and analysis. Risk adjustments are determined at lease inception and are based on current auction results adjusted for key variables that historically have shown an impact on auction values (as further described in the Lease Residual Risk discussion in the Risk Management section of this MD&A). The customer is obligated to make payments during the term of the lease for the difference between the purchase price and the contract residual value plus a finance charge. However, since the customer is not obligated to purchase the vehicle at the end of the contract, we are exposed to a risk of loss to the extent the value of the vehicle is below the residual value estimated at contract inception. Management periodically performs a detailed review of the estimated realizable value of leased vehicles to assess the appropriateness of the carrying value of lease assets.

To account for residual risk, we depreciate automobile operating lease assets to estimated realizable value on a straight-line basis over the lease term. The estimated realizable value is initially based on the residual value established at contract inception. Over the life of the lease, management evaluates the adequacy of the estimate of the realizable value and may make adjustments to the extent the expected value of the vehicle at lease termination changes. Any adjustments would result in a change in the depreciation rate of the lease asset, thereby affecting the carrying value of the operating lease asset.

In addition to estimating the residual value at lease termination, we must also evaluate the current value of the operating lease assets and test for impairment to the extent necessary in accordance with applicable accounting standards. Impairment is determined to exist if the undiscounted expected future cash flows (including the expected residual value) are lower than the carrying value of the asset. There were no such impairment charges in 2012, 2011, or 2010.

Our depreciation methodology on operating lease assets considers management's expectation of the value of the vehicles upon lease termination, which is based on numerous assumptions and factors influencing used vehicle values. The critical assumptions underlying the estimated carrying value of automobile lease assets include: (1) estimated market value information obtained and used by management in estimating residual values, (2) proper identification and estimation of business conditions, (3) our remarketing abilities, and (4) automotive manufacturer vehicle and marketing programs. Changes in these assumptions could have a significant impact on the value of the lease residuals. Expected residual values include estimates of payments from automotive manufacturers related to residual support and risk-sharing agreements. To the extent an automotive manufacturer is not able to fully honor its obligation relative to these agreements, our depreciation expense would be negatively impacted.

## Valuation of Mortgage Servicing Rights

Mortgage servicing rights represent the capitalized value of the right to receive future cash flows from the servicing of mortgage loans for others. Mortgage servicing rights are a significant source of value derived from the sale or securitization of mortgage loans. Because residential mortgage loans typically contain a prepayment option, borrowers may often elect to prepay their mortgage loans by refinancing at lower rates during declining interest rate environments. The borrower's ability to prepay is at times impacted by other factors in the current environment that may limit their eligibility to refinance (e.g. a high loan-to-value ratio). When this occurs, the stream of cash flows generated from servicing the original mortgage loan is terminated. As such, the market value of mortgage servicing rights has historically been very sensitive to changes in interest rates and tends to decline as market interest rates decline and increase as interest rates rise.

We capitalize mortgage servicing rights on residential mortgage loans that we have originated and purchased based on the fair market value of the servicing rights associated with the underlying mortgage loans at the time the loans are sold or securitized. GAAP requires that the value of mortgage servicing rights be determined based on market transactions for comparable servicing assets, if available. In the absence of representative market trade information, valuations should be based on other available market evidence and modeled market expectations of the present value of future estimated net cash flows that market participants would expect from servicing. When observable prices are not available, management uses internally developed discounted cash flow models to estimate the fair value. These internal valuation models estimate net cash flows based on internal operating assumptions that we believe would be used by market participants, combined with market-based assumptions for loan prepayment rates, interest rates, default rates and discount rates that management believes approximate yields required by investors for these assets. Servicing cash flows primarily include servicing fees, escrow account income, ancillary income and late fees, less operating costs to service the loans. The estimated cash flows are discounted using an option-adjusted spread-derived discount rate. Management considers the best available information and exercises significant judgment in estimating and assuming values for key variables in the modeling and discounting process. All of our mortgage servicing rights are carried at estimated fair value.

Table of Contents

# Management's Discussion and Analysis

Ally Financial Inc. • Form 10-K

We use the following key assumptions in our valuation approach.

- **Prepayment** — The most significant drivers of mortgage servicing rights value are actual and forecasted portfolio prepayment behavior. Prepayment speeds represent the rate at which borrowers repay their mortgage loans prior to scheduled maturity. Prepayment speeds are influenced by a number of factors such as the value of collateral, competitive market factors, government programs or incentives, or levels of foreclosure activity. However, the most significant factor influencing prepayment speeds is generally the interest rate environment. As interest rates rise, prepayment speeds generally slow, and as interest rates decline, prepayment speeds generally accelerate. When mortgage loans are paid or expected to be paid earlier than originally estimated, the expected future cash flows associated with servicing such loans are reduced. We primarily use third-party models to project residential mortgage loan payoffs. In other cases, we estimate prepayment speeds based on historical and expected future prepayment rates. We measure model performance by comparing prepayment predictions against actual results at both the portfolio and product level.

- **Discount rate** — The cash flows of our mortgage servicing rights are discounted at prevailing market rates, which include an appropriate risk-adjusted spread, which management believes approximates yields required by investors for these assets.

- **Base mortgage rate** — The base mortgage rate represents the current market interest rate for newly originated mortgage loans. This rate is a key component in estimating prepayment speeds of our portfolio because the difference between the current base mortgage rate and the interest rates on existing loans in our portfolio is an indication of the borrower's likelihood to refinance.

- **Cost to service** — In general, servicing cost assumptions are based on internally projected actual expenses directly related to servicing. These servicing cost assumptions are compared to market-servicing costs when market information is available. Our servicing cost assumptions include expenses associated with our activities related to loans in default.

- **Volatility** — Volatility represents the expected rate of change of interest rates. The volatility assumption used in our valuation methodology is intended to estimate the range of expected outcomes of future interest rates. We use implied volatility assumptions in connection with the valuation of our mortgage servicing rights. Implied volatility is defined as the expected rate of change in interest rates derived from the prices at which options on interest rate swaps, or swaptions, are trading. We update our volatility assumptions for the change in implied swaptions volatility during the period, adjusted by the ratio of historical mortgage to swaption volatility.

We also periodically perform a series of reasonableness tests as we deem appropriate, including the following.

- **Review and compare data provided by an independent third-party broker.** We evaluate and compare our fair value price, multiples, and underlying assumptions to data provided by independent third-party broker, including prepayment speeds, discount rates, cost to service, and fair value multiples.

- **Review and compare pricing of publicly traded interest-only securities.** We evaluate and compare our fair value to publicly traded interest-only stripped MBS by age and coupon for reasonableness.

- **Review and compare fair value price and multiples.** We evaluate and compare our fair value price and multiples to market fair value price and multiples in external surveys produced by third parties.

- **Compare actual monthly cash flows to projections.** We reconcile actual monthly cash flows to those projected in the mortgage servicing rights valuation. Based on the results of this reconciliation, we assess the need to modify the individual assumptions used in the valuation. This process ensures the model is calibrated to actual servicing cash flow results.

- **Review and compare recent bulk mortgage servicing right acquisition activity.** We evaluate market trades for reliability and relevancy and then consider, as appropriate, our estimate of fair value of each significant transaction to the traded price. Currently, there are limited market transactions that are directly observable, which are the best indicators of fair value. However, we continue to monitor and track market activity on an ongoing basis.

We generally expect our valuation to be within a reasonable range of that implied by these tests. Changes in these assumptions could have a significant impact on the determination of fair market value. In order to develop our best estimate of fair value, management reviews and analyzes the output from the models and may adjust the assumptions to take into consideration other factors that may not be captured. If we determine our valuation has exceeded the reasonable range, we may adjust it accordingly. At December 31, 2012, based on the market information obtained, we determined that our mortgage servicing rights valuations and assumptions used to value those servicing rights were reasonable and consistent with what an independent market participant would use to value the asset.

The assumptions used in modeling expected future cash flows of mortgage servicing rights have a significant impact on the fair value of mortgage servicing rights and potentially a corresponding impact to earnings. Refer to Note 11 to the Consolidated Financial Statements for sensitivity analysis.

Table of Contents

# Management's Discussion and Analysis

Ally Financial Inc. • Form 10-K

## Goodwill

The accounting for goodwill is discussed in Note 1 to the Consolidated Financial Statements. Goodwill is reviewed for potential impairment at the reporting unit level on an annual basis, as of August 31, or in interim periods if events or circumstances indicate a potential impairment. Goodwill is allocated to the reporting units at the date the goodwill is initially recorded. Once goodwill has been allocated to the reporting units, it generally no longer retains its identification with a particular acquisition, but instead becomes identified with the reporting unit as a whole. As a result, all of the fair value of each reporting unit is available to support the value of goodwill allocated to the unit. Goodwill impairment testing is performed at the reporting unit level, one level below the business segment. For more information on our segments, refer to Note 26 to the Consolidated Financial Statements.

Goodwill impairment testing involves management's judgment, requiring an assessment of whether the carrying value of the reporting unit can be supported by the fair value of the individual reporting unit using widely accepted valuation techniques, such as the market approach (earnings, transaction, pricing multiples and/or other market intelligence that would indicate what a market participant would pay) and the income approach (discounted cash flow methods). In applying these methodologies we utilize a number of factors, including actual operating results, future business plans, economic projections, and market data. A combination of methodologies is used and weighted appropriately for each reporting unit. If actual results differ from these estimates, it may have an adverse impact on the valuation of goodwill that could result in a reduction of the excess over carrying value and possible impairment of goodwill. At December 31, 2012, we did not have material goodwill at our reporting units that is at risk of failing Step 1 of the goodwill impairment test.

## Legal and Regulatory Reserves

Our legal and regulatory reserves reflect management's best estimate of probable losses on legal and regulatory matters. As a legal or regulatory matter develops, management, in conjunction with internal and external counsel handling the matter, evaluates on an ongoing basis whether such matter presents a loss contingency that is both probable and estimable. If, at the time of evaluation, the loss contingency related to a legal or regulatory matter is not both probable and estimable, the matter will continue to be monitored for further developments that would make such loss contingency both probable and estimable. When the loss contingency related to a legal or regulatory matter is deemed to be both probable and estimable, we will establish a liability with respect to such loss contingency and record a corresponding amount to other operating expenses. To estimate the probable loss, we evaluate the individual facts and circumstances of the case including information learned through the discovery process, rulings on dispositive motions, settlement discussions, our prior history with similar matters and other rulings by courts, arbitrators or others. The reserves are continuously monitored and updated to reflect the most recent information related to each matter.

Additionally, in matters for which a loss event is not deemed probable, but rather reasonably possible to occur, we would attempt to estimate a loss or range of loss related to that event, if possible. For these matters, we do not record a liability. However, if we are able to estimate a loss or range of loss, we would disclose this loss, if it is material to our financial statements. To estimate a range of probable or reasonably possible loss, we evaluate each individual case in the manner described above. We do not accrue for matters for which a loss event is deemed remote.

For details regarding the nature of all material contingencies, refer to Note 29 to the Consolidated Financial Statements.

## Loan Repurchase and Obligations Related to Loan Sales

The liability for representation and warranty obligations reflects management's best estimate of probable lifetime losses. We consider historical and recent demand trends in establishing the reserve. The methodology used to estimate the reserve considers a variety of assumptions including borrower performance (both actual and estimated future defaults), repurchase demand behavior, historical loan defect experience, historical mortgage insurance rescission experience, and historical and estimated future loss experience, which includes projections of future home price changes as well as other qualitative factors including investor behavior. In cases where we may not be able to reasonably estimate losses, a liability is not recognized. Management monitors the adequacy of the overall reserve and makes adjustments to the level of reserve, as necessary, after consideration of other qualitative factors including ongoing dialogue and experience with counterparties.

## Determination of Provision for Income Taxes

Our income tax expense, deferred tax assets and liabilities, and reserves for unrecognized tax benefits reflect management's best assessment of estimated current and future taxes to be paid. We are subject to income taxes in both the United States and numerous foreign jurisdictions. Significant judgments and estimates are required in determining the consolidated income tax expense.

Deferred income taxes arise from temporary differences between the tax and financial statement recognition of revenue and expense. In evaluating our ability to recover our deferred tax assets within the jurisdiction from which they arise, we consider all available positive and negative evidence, including scheduled reversals of deferred tax liabilities, projected future taxable income, tax planning strategies, and results of recent operations. In projecting future taxable income, we begin with historical results adjusted for the results of discontinued and deconsolidated operations and incorporate assumptions about the amount of future state, federal and foreign pretax operating income. These assumptions about future taxable income require significant judgment and are consistent with the plans and estimates we are using to manage the underlying businesses. In evaluating the objective evidence that historical results provide, we consider three years of cumulative operating income (loss).

89

Table of Contents

# Management's Discussion and Analysis

Ally Financial Inc. • Form 10-K

A valuation allowance of $1.6 billion and $2.1 billion was recorded against the net U.S. deferred tax asset balance as of  December 31, 2012, and December 31, 2011, respectively. For the year ended December 31, 2012, our results from operations benefited $1.3 billion from the release of U.S. federal and state valuation allowances and related effects on the basis of management's reassessment of the amount of its deferred tax assets that are more likely than not to be realized.

As of each reporting date, we consider existing evidence, both positive and negative, that could impact our view with regard to future realization of deferred tax assets. As of December 31, 2012, we determined that positive evidence existed to conclude that it is more likely than not that ordinary-in-character deferred tax assets are realizable, and therefore, we reduced the valuation allowance accordingly. Positive evidence in this assessment consisted of forecasts of future taxable income that are sufficient to realize net operating loss carryforwards before their expiration, coupled with our emergence from a cumulative three-year U.S. pretax loss (after removing the effects of non-recurring charges and discontinued operations). Certain U.S. deferred tax assets remain offset with a valuation allowance as discussed below.

We believe it is more likely than not that the benefit for certain U.S. net operating loss, capital loss, and foreign tax credit carryforwards will not be realized. In recognition of this risk, we have provided a valuation allowance of $1.6 billion on the deferred tax assets relating to these carryforwards. In particular, the deferred tax assets and liabilities as of December 31, 2012, reflect the U.S. income tax effects of the anticipated sale of entities held-for-sale at net book value. In concluding to maintain a valuation allowance against our capital loss carryforwards, we considered the positive evidence that we have entered into agreements to sell our held-for-sale entities for amounts in excess of book value. We also considered and ultimately weighted more heavily the negative evidence that we have historically had difficulty generating significant capital gains; capital loss carryforwards have a relatively short carryforward period; the timing of disposal of the held-for-sale entities is uncertain; and the disposal of the held-for-sale entities are subject to various levels of regulatory approval in numerous countries. Successful completion during 2013 of the sales of entities currently held-for-sale may result in capital gains that would allow us to realize capital loss carryforwards. A related reversal of valuation allowance on these deferred tax assets would be recognized as an income tax benefit upon such utilization.

For additional information regarding our provision for income taxes, refer to Note 23 to the Consolidated Financial Statements.

**Recently Issued Accounting Standards**

Refer to Note 1 to the Consolidated Financial Statements for further information related to recently adopted and recently issued accounting standards.

Table of Contents

# Management's Discussion and Analysis

Ally Financial Inc. • Form 10-K

## Statistical Table

The accompanying supplemental information should be read in conjunction with the more detailed information, including our Consolidated Financial Statements and the notes thereto, which appears elsewhere in this Annual Report.

### Net Interest Margin Table

The following table presents an analysis of net interest margin excluding discontinued operations for the periods shown.

| | 2012 | | | 2011 | | | 2010 | | |
|---|---|---|---|---|---|---|---|---|---|
| Year ended December 31, ($ in millions) | Average balance (a) | Interest income/ interest expense | Yield/ rate | Average balance (a) | Interest income/ interest expense | Yield/ rate | Average balance (a) | Interest income/ interest expense | Yield/ rate |
| **Assets** | | | | | | | | | |
| Interest-bearing cash and cash equivalents | $ 10,731 | $ 26 | 0.24% | $ 10,939 | $ 21 | 0.19% | $ 12,634 | $ 34 | 0.27% |
| Trading assets | 273 | 13 | 4.76 | 359 | 19 | 5.29 | 163 | 15 | 9.20 |
| Investment securities (b) | 12,336 | 262 | 2.12 | 13,100 | 326 | 2.49 | 10,200 | 306 | 3.00 |
| Loans held-for-sale, net | 4,406 | 155 | 3.52 | 9,062 | 332 | 3.66 | 13,165 | 587 | 4.46 |
| Finance receivables and loans, net (c) (d) | 95,715 | 4,603 | 4.81 | 84,392 | 4,409 | 5.22 | 67,296 | 4,475 | 6.65 |
| Investment in operating leases, net (e) | 11,185 | 980 | 8.76 | 7,968 | 988 | 12.40 | 8,827 | 1,332 | 15.09 |
| Total interest-earning assets | 134,646 | 6,039 | 4.49 | 125,820 | 6,095 | 4.84 | 112,285 | 6,749 | 6.01 |
| Noninterest-bearing cash and cash equivalents | 1,917 | | | 1,180 | | | 427 | | |
| Other assets | 17,500 | | | 22,274 | | | 30,492 | | |
| Allowance for loan losses | (1,246) | | | (1,543) | | | (2,113) | | |
| Assets of discontinued operations (f) | 30,924 | | | 33,106 | | | 35,594 | | |
| Total assets | $ 183,741 | | | $ 180,837 | | | $ 176,685 | | |
| **Liabilities** | | | | | | | | | |
| Interest-bearing deposit liabilities | $ 42,440 | $ 644 | 1.52% | $ 37,423 | $ 614 | 1.64% | $ 30,456 | $ 579 | 1.90% |
| Short-term borrowings | 3,945 | 90 | 2.28 | 4,345 | 116 | 2.67 | 5,309 | 141 | 2.66 |
| Long-term debt (g) (h) (i) | 79,044 | 3,466 | 4.38 | 76,780 | 4,309 | 5.61 | 72,526 | 4,740 | 6.54 |
| Total interest-bearing liabilities (g) (h) (j) | 125,429 | 4,200 | 3.35 | 118,548 | 5,039 | 4.25 | 108,291 | 5,460 | 5.04 |
| Noninterest-bearing deposit liabilities | 2,261 | | | 2,237 | | | 2,070 | | |
| Total funding sources (h) (k) | 127,690 | 4,200 | 3.29 | 120,785 | 5,039 | 4.17 | 110,361 | 5,460 | 4.95 |
| Other liabilities | 6,207 | | | 6,877 | | | 10,068 | | |
| Liabilities of discontinued operations (f) | 30,924 | | | 33,106 | | | 35,594 | | |
| Total liabilities | 164,821 | | | 160,768 | | | 156,023 | | |
| Total equity | 18,920 | | | 20,069 | | | 20,662 | | |
| Total liabilities and equity | $ 183,741 | | | $ 180,837 | | | $ 176,685 | | |
| Net financing revenue | | $ 1,839 | | | $ 1,056 | | | $ 1,289 | |
| Net interest spread (l) | | | 1.14% | | | 0.59% | | | 0.97% |
| Net interest spread excluding original issue discount (l) | | | 1.46% | | | 1.43% | | | 2.21% |
| Net interest spread excluding original issue discount and including noninterest-bearing deposit liabilities (l) | | | 1.51% | | | 1.49% | | | 2.28% |
| Net yield on interest-earning assets (m) | | | 1.37% | | | 0.84% | | | 1.15% |
| Net yield on interest-earning assets excluding original issue discount (m) | | | 1.62% | | | 1.56% | | | 2.22% |

(a)  Average balances are calculated using a combination of monthly and daily average methodologies.
(b)  Excludes income on equity investments of $30 million, $25 million, and $17 million at December 31, 2012, 2011, and 2010, respectively. Yields on available-for-sale debt securities are based on fair value as opposed to historical cost.
(c)  Nonperforming finance receivables and loans are included in the average balances. For information on our accounting policies regarding nonperforming status, refer to  Note 1 to the Consolidated Financial Statements.
(d)  Includes other interest income of $5 million, $5 million, and $3 million at December 31, 2012, 2011, and 2010, respectively.
(e)  Includes gains on sale of $116 million, $217 million, and $555 million at December 31, 2012, 2011, and 2010, respectively. Excluding these gains on sale, the annualized yield would be  7.72%, 9.68%, and 8.80% at December 31, 2012, 2011, and 2010, respectively.
(f)  Average balances and rates are impacted by allocations made to match assets of discontinued operations with liabilities of discontinued operations.
(g)  Includes the effects of derivative financial instruments designated as hedges.
(h)  Average balance includes $1,927 million, $2,552 million, and $3,710 million related to original issue discount at  December 31, 2012, 2011, and 2010, respectively. Interest expense includes original issue discount amortization of $336 million, $912 million, and $1,204 million during the year ended December 31, 2012, 2011, and 2010, respectively.
(i)  Excluding original issue discount the rate on long-term debt was  3.87%, 4.28%, and 4.64% at December 31, 2012, 2011, and 2010, respectively.
(j)  Excluding original issue discount the rate on total interest-bearing liabilities was  3.03%, 3.41%, and 3.80% at December 31, 2012, 2011, and 2010, respectively.
(k)  Excluding original issue discount the rate on total funding sources was  2.98%, 3.35%, and 3.73% at December 31, 2012, 2011, and 2010, respectively.
(l)  Net interest spread represents the difference between the rate on total interest-earning assets and the rate on total interest-bearing liabilities.
(m)  Net yield on interest-earning assets represents net financing revenue as a percentage of total interest-earning assets.

Table of Contents

# Management's Discussion and Analysis

Ally Financial Inc. • Form 10-K

The following table presents an analysis of the changes in net interest income, volume and rate.

| Year ended December 31, ($ in millions) | 2012 vs 2011 Increase (decrease) due to (a) | | | 2011 vs 2010 Increase (decrease) due to (a) | | |
|---|---|---|---|---|---|---|
| | Volume | Yield/rate | Total | Volume | Yield/rate | Total |
| **Assets** | | | | | | |
| Interest-bearing cash and cash equivalents | $ — | $ 5 | $ 5 | $ (4) | $ (9) | $ (13) |
| Trading assets | (4) | (2) | (6) | 12 | (8) | 4 |
| Investment securities | (18) | (46) | (64) | 78 | (58) | 20 |
| Loans held-for-sale, net | (164) | (13) | (177) | (162) | (93) | (255) |
| Finance receivables and loans, net | 562 | (368) | 194 | 1,005 | (1,071) | (66) |
| Investment in operating leases, net | 331 | (339) | (8) | (121) | (223) | (344) |
| Total interest-earning assets | $ 707 | $ (763) | $ (56) | $ 808 | $ (1,462) | $ (654) |
| **Liabilities** | | | | | | |
| Interest-bearing deposit liabilities | $ 78 | $ (48) | $ 30 | $ 121 | $ (86) | $ 35 |
| Short-term borrowings | (10) | (16) | (26) | (26) | 1 | (25) |
| Long-term debt | 124 | (967) | (843) | 267 | (698) | (431) |
| Total interest-bearing liabilities | $ 192 | $ (1,031) | $ (839) | $ 362 | $ (783) | $ (421) |
| **Net financing revenue** | $ 515 | $ 268 | $ 783 | $ 446 | $ (679) | $ (233) |

(a)    Changes in interest not solely due to volume or yield/rate are allocated in proportion to the absolute dollar amount of change in volume and yield/rate.

92

Table of Contents

# Management's Discussion and Analysis

Ally Financial Inc. • Form 10-K

### Outstanding Finance Receivables and Loans

The following table presents the composition of our on-balance sheet finance receivables and loans.

| December 31, ($ in millions) | 2012 | 2011 | 2010 | 2009 | 2008 |
|---|---|---|---|---|---|
| **Consumer** | | | | | |
| Domestic | | | | | |
| Consumer automobile | $ 53,713 | $ 46,576 | $ 34,604 | $ 12,514 | $ 16,281 |
| Consumer mortgage | | | | | |
| 1st Mortgage | 7,173 | 6,997 | 7,057 | 7,960 | 13,542 |
| Home equity | 2,648 | 3,575 | 3,964 | 4,238 | 7,777 |
| Total domestic | 63,534 | 57,148 | 45,625 | 24,712 | 37,600 |
| Foreign | | | | | |
| Consumer automobile | 2 | 16,883 | 16,650 | 17,731 | 21,705 |
| Consumer mortgage | | | | | |
| 1st Mortgage | — | 256 | 742 | 405 | 4,604 |
| Home equity | — | — | — | 1 | 54 |
| Total foreign | 2 | 17,139 | 17,392 | 18,137 | 26,363 |
| Total consumer loans | 63,536 | 74,287 | 63,017 | 42,849 | 63,963 |
| **Commercial** | | | | | |
| Domestic | | | | | |
| Commercial and industrial | | | | | |
| Automobile (a) | 30,270 | 26,552 | 24,944 | 19,604 | 16,913 |
| Mortgage | — | 1,887 | 1,540 | 1,572 | 1,627 |
| Other | 2,679 | 1,178 | 1,795 | 2,688 | 3,257 |
| Commercial real estate | | | | | |
| Automobile | 2,552 | 2,331 | 2,071 | 2,008 | 1,941 |
| Mortgage | — | — | 1 | 121 | 1,696 |
| Total domestic | 35,501 | 31,948 | 30,351 | 25,993 | 25,434 |
| Foreign | | | | | |
| Commercial and industrial | | | | | |
| Automobile (b) | — | 8,265 | 8,398 | 7,943 | 10,749 |
| Mortgage | — | 24 | 41 | 96 | 195 |
| Other | 18 | 63 | 312 | 437 | 960 |
| Commercial real estate | | | | | |
| Automobile | — | 154 | 216 | 221 | 167 |
| Mortgage | — | 14 | 78 | 162 | 260 |
| Total foreign | 18 | 8,520 | 9,045 | 8,859 | 12,331 |
| Total commercial loans | 35,519 | 40,468 | 39,396 | 34,852 | 37,765 |
| Total finance receivables and loans (c) | $ 99,055 | $ 114,755 | $ 102,413 | $ 77,701 | $ 101,728 |
| Loans held-for-sale | $ 2,576 | $ 8,557 | $ 11,411 | $ 20,625 | $ 7,919 |

(a) Amount includes Notes Receivable from General Motors of $3 million at December 31, 2009.
(b) Amounts include no Notes Receivable from General Motors at December 31, 2012 and $529 million, $484 million, $908 million, and $1.7 billion at December 31, 2011, 2010, 2009, and 2008, respectively.
(c) Includes historical cost, fair value, and repurchased loans.

Table of Contents

# Management's Discussion and Analysis

Ally Financial Inc. • Form 10-K

## Nonperforming Assets

The following table summarizes the nonperforming assets in our on-balance sheet portfolio.

| December 31, ($ in millions) | 2012 | 2011 | 2010 | 2009 | 2008 |
|---|---|---|---|---|---|
| Consumer | | | | | |
| Domestic | | | | | |
| Consumer automobile | $ 260 | $ 139 | $ 129 | $ 267 | $ 294 |
| Consumer mortgage | | | | | |
| 1st Mortgage | 342 | 316 | 452 | 782 | 2,547 |
| Home equity | 40 | 91 | 108 | 114 | 540 |
| Total domestic | 642 | 546 | 689 | 1,163 | 3,381 |
| Foreign | | | | | |
| Consumer automobile | — | 89 | 78 | 119 | 125 |
| Consumer mortgage | | | | | |
| 1st Mortgage | — | 142 | 261 | 33 | 1,034 |
| Home equity | — | — | — | — | — |
| Total foreign | — | 231 | 339 | 152 | 1,159 |
| Total consumer (a) | 642 | 777 | 1,028 | 1,315 | 4,540 |
| Commercial | | | | | |
| Domestic | | | | | |
| Commercial and industrial | | | | | |
| Automobile | 146 | 105 | 261 | 281 | 1,448 |
| Mortgage | — | — | — | 37 | 140 |
| Other | 33 | 22 | 37 | 856 | 64 |
| Commercial real estate | | | | | |
| Automobile | 37 | 56 | 193 | 256 | 153 |
| Mortgage | — | — | 1 | 56 | 1,070 |
| Total domestic | 216 | 183 | 492 | 1,486 | 2,875 |
| Foreign | | | | | |
| Commercial and industrial | | | | | |
| Automobile | — | 118 | 35 | 66 | 7 |
| Mortgage | — | — | 40 | 35 | — |
| Other | — | 15 | 97 | 131 | 19 |
| Commercial real estate | | | | | |
| Automobile | — | 11 | 6 | 24 | 2 |
| Mortgage | — | 12 | 70 | 141 | 143 |
| Total foreign | — | 156 | 248 | 397 | 171 |
| Total commercial (b) | 216 | 339 | 740 | 1,883 | 3,046 |
| Total nonperforming finance receivables and loans | 858 | 1,116 | 1,768 | 3,198 | 7,586 |
| Foreclosed properties | 8 | 82 | 150 | 255 | 787 |
| Repossessed assets (c) | 62 | 56 | 47 | 58 | 95 |
| Total nonperforming assets | $ 928 | $ 1,254 | $ 1,965 | $ 3,511 | $ 8,468 |
| Loans held-for-sale | $ 25 | $ 2,820 | $ 3,273 | $ 3,390 | $ 731 |

(a)   Interest revenue that would have been accrued on total consumer finance receivables and loans at original contractual rates was $54 million during the year ended December 31, 2012. Interest income recorded for these loans was $23 million during the year ended December 31, 2012.

(b)   Interest revenue that would have been accrued on total commercial finance receivables and loans at original contractual rates was $21 million during the year ended December 31, 2012. Interest income recorded for these loans was $15 million during the year ended December 31, 2012.

(c)   Repossessed assets exclude $3 million, $3 million, $14 million, $23 million, and $34 million of repossessed operating lease assets at December 31, 2012, 2011, 2010, 2009, and 2008, respectively.

Table of Contents

# Management's Discussion and Analysis

Ally Financial Inc. • Form 10-K

**Accruing Finance Receivables and Loans Past Due 90 Days or More**

The following table presents our on-balance sheet accruing loans past due 90 days or more as to principal and interest.

| December 31, ($ in millions) | 2012 | 2011 | 2010 | 2009 | 2008 |
|---|---|---|---|---|---|
| **Consumer** | | | | | |
| Domestic | | | | | |
| Consumer automobile | $ — | $ — | $ — | $ — | $ 19 |
| Consumer mortgage | | | | | |
| 1st Mortgage | 1 | 1 | 1 | 1 | 33 |
| Home equity | — | — | — | — | — |
| Total domestic | 1 | 1 | 1 | 1 | 52 |
| Foreign | | | | | |
| Consumer automobile | — | 3 | 5 | 5 | 40 |
| Consumer mortgage | | | | | |
| 1st Mortgage | — | — | — | 1 | — |
| Home equity | — | — | — | — | — |
| Total foreign | — | 3 | 5 | 6 | 40 |
| Total consumer | 1 | 4 | 6 | 7 | 92 |
| **Commercial** | | | | | |
| Domestic | | | | | |
| Commercial and industrial | | | | | |
| Automobile | — | — | — | — | — |
| Mortgage | — | — | — | — | — |
| Other | — | — | — | — | — |
| Commercial real estate | | | | | |
| Automobile | — | — | — | — | — |
| Mortgage | — | — | — | — | — |
| Total domestic | — | — | — | — | — |
| Foreign | | | | | |
| Commercial and industrial | | | | | |
| Automobile | — | — | — | — | — |
| Mortgage | — | — | — | — | — |
| Other | — | — | — | 3 | — |
| Commercial real estate | | | | | |
| Automobile | — | — | — | — | — |
| Mortgage | — | — | — | — | — |
| Total foreign | — | — | — | 3 | — |
| Total commercial | — | — | — | 3 | — |
| Total accruing finance receivables and loans past due 90 days or more | $ 1 | $ 4 | $ 6 | $ 10 | $ 92 |
| Loans held-for-sale | $ — | $ 73 | $ 25 | $ 33 | $ 7 |

Table of Contents

# Management's Discussion and Analysis

Ally Financial Inc. • Form 10-K

## Allowance for Loan Losses

The following table presents an analysis of the activity in the allowance for loan losses on finance receivables and loans.

| ($ in millions) | 2012 | 2011 | 2010 | 2009 | 2008 |
|---|---|---|---|---|---|
| Balance at January 1, | $  1,503 | $  1,873 | $  2,445 | $  3,433 | $  2,755 |
| Cumulative effect of change in accounting principles (a) | — | — | 222 | — | (616) |
| Charge-offs | | | | | |
| Domestic | (595) | (667) | (1,297) | (3,380) | (2,192) |
| Foreign | (181) | (213) | (349) | (633) | (347) |
| Write-downs related to transfers to held-for-sale | — | — | — | (3,438) | — |
| Total charge-offs | (776) | (880) | (1,646) | (7,451) | (2,539) |
| Recoveries | | | | | |
| Domestic | 193 | 227 | 363 | 276 | 219 |
| Foreign | 109 | 100 | 85 | 76 | 71 |
| Total recoveries | 302 | 327 | 448 | 352 | 290 |
| Net charge-offs | (474) | (553) | (1,198) | (7,099) | (2,249) |
| Provision for loan losses | 329 | 188 | 357 | 5,174 | 2,857 |
| Foreign provision for loan losses | 65 | 31 | 81 | 996 | 553 |
| Deconsolidation of ResCap | (9) | — | — | — | — |
| Other | (244) | (36) | (34) | (59) | 133 |
| Balance at December 31, | $  1,170 | $  1,503 | $  1,873 | $  2,445 | $  3,433 |

(a)    Effect of change in accounting principle due to adoption of ASU 2009-17,  *Improvements to Financial Reporting by Enterprises Involved with Variable Interest Entities* .

96

Table of Contents

# Management's Discussion and Analysis

Ally Financial Inc. • Form 10-K

### Allowance for Loan Losses by Type

The following table summarizes the allocation of the allowance for loan losses by product type.

| December 31, ($ in millions) | 2012 Amount | 2012 % of total | 2011 Amount | 2011 % of total | 2010 Amount | 2010 % of total | 2009 Amount | 2009 % of total | 2008 Amount | 2008 % of total |
|---|---|---|---|---|---|---|---|---|---|---|
| Consumer | | | | | | | | | | |
| Domestic | | | | | | | | | | |
| Consumer automobile | $ 575 | 49.2 | $ 600 | 39.9 | $ 769 | 41.0 | $ 772 | 31.6 | $ 1,115 | 32.5 |
| Consumer mortgage | | | | | | | | | | |
| 1st Mortgage | 245 | 20.9 | 275 | 18.3 | 322 | 17.2 | 387 | 15.8 | 525 | 15.3 |
| Home equity | 207 | 17.7 | 237 | 15.8 | 256 | 13.7 | 251 | 10.3 | 177 | 5.2 |
| Total domestic | 1,027 | 87.8 | 1,112 | 74.0 | 1,347 | 71.9 | 1,410 | 57.7 | 1,817 | 53.0 |
| Foreign | | | | | | | | | | |
| Consumer automobile | — | — | 166 | 11.1 | 201 | 10.7 | 252 | 10.2 | 279 | 8.1 |
| Consumer mortgage | | | | | | | | | | |
| 1st Mortgage | — | — | 4 | 0.2 | 2 | 0.1 | 2 | 0.1 | 409 | 11.9 |
| Home equity | — | — | — | — | — | — | — | — | 31 | 0.9 |
| Total foreign | — | — | 170 | 11.3 | 203 | 10.8 | 254 | 10.3 | 719 | 20.9 |
| Total consumer loans | 1,027 | 87.8 | 1,282 | 85.3 | 1,550 | 82.7 | 1,664 | 68.0 | 2,536 | 73.9 |
| Commercial | | | | | | | | | | |
| Domestic | | | | | | | | | | |
| Commercial and industrial | | | | | | | | | | |
| Automobile | 55 | 4.7 | 62 | 4.0 | 73 | 3.9 | 157 | 6.4 | 178 | 5.2 |
| Mortgage | — | — | 1 | 0.1 | — | — | 10 | 0.4 | 93 | 2.7 |
| Other | 48 | 4.1 | 52 | 3.5 | 97 | 5.2 | 322 | 13.2 | 65 | 1.9 |
| Commercial real estate | | | | | | | | | | |
| Automobile | 40 | 3.4 | 39 | 2.6 | 54 | 2.9 | — | — | — | — |
| Mortgage | — | — | — | — | — | — | 54 | 2.2 | 458 | 13.3 |
| Total domestic | 143 | 12.2 | 154 | 10.2 | 224 | 12.0 | 543 | 22.2 | 794 | 23.1 |
| Foreign | | | | | | | | | | |
| Commercial and industrial | | | | | | | | | | |
| Automobile | — | — | 48 | 3.2 | 33 | 1.7 | 54 | 2.2 | 45 | 1.3 |
| Mortgage | — | — | 10 | 0.7 | 12 | 0.7 | 20 | 0.8 | 3 | 0.1 |
| Other | — | — | 1 | 0.1 | 39 | 2.1 | 111 | 4.6 | 9 | 0.3 |
| Commercial real estate | | | | | | | | | | |
| Automobile | — | — | 3 | 0.2 | 2 | 0.1 | — | — | — | — |
| Mortgage | — | — | 5 | 0.3 | 13 | 0.7 | 53 | 2.2 | 46 | 1.3 |
| Total foreign | — | — | 67 | 4.5 | 99 | 5.3 | 238 | 9.8 | 103 | 3.0 |
| Total commercial loans | 143 | 12.2 | 221 | 14.7 | 323 | 17.3 | 781 | 32.0 | 897 | 26.1 |
| Total allowance for loan losses | $ 1,170 | 100.0 | $ 1,503 | 100.0 | $ 1,873 | 100.0 | $ 2,445 | 100.0 | $ 3,433 | 100.0 |

Table of Contents

# Management's Discussion and Analysis

Ally Financial Inc. • Form 10-K

## Deposit Liabilities

The following table presents the average balances and interest rates paid for types of domestic deposits.

| Year ended December 31, ($ in millions) | 2012 | | 2011 | | 2010 | |
|---|---|---|---|---|---|---|
| | Average balance (a) | Average deposit rate | Average balance (a) | Average deposit rate | Average balance (a) | Average deposit rate |
| Domestic deposits | | | | | | |
| Noninterest-bearing deposits | $ 2,262 | —% | $ 2,237 | —% | $ 2,071 | —% |
| Interest-bearing deposits | | | | | | |
| Savings and money market checking accounts | 10,953 | 0.88 | 9,696 | 0.88 | 8,015 | 1.21 |
| Certificates of deposit | 29,972 | 1.64 | 26,109 | 1.77 | 21,153 | 2.04 |
| Dealer deposits | 1,515 | 3.81 | 1,685 | 3.87 | 1,288 | 4.00 |
| Total domestic deposit liabilities | $ 44,702 | 1.44% | $ 39,727 | 1.55% | $ 32,527 | 1.78% |

(a)   Average balances are calculated using a combination of monthly and daily average methodologies.

The following table presents the amount of domestic certificates of deposit in denominations of $100 thousand or more segregated by time remaining until maturity.

| December 31, 2012 ($ in millions) | Three months or less | Over three months through six months | Over six months through twelve months | Over twelve months | Total |
|---|---|---|---|---|---|
| Domestic certificates of deposit ($100,000 or more) | $ 1,735 | $ 1,793 | $ 2,779 | $ 5,666 | $ 11,973 |

98

Table of Contents

# Quantitative and Qualitative Disclosures about Market Risk

Ally Financial Inc. • Form 10-k

**Item 7A.    Quantitative and Qualitative Disclosures about Market Risk**

Refer to the Market Risk and the Operational Risk sections of Item 7, Management's Discussion and Analysis.

Table of Contents

# Management's Report on Internal Control over Financial Reporting

Ally Financial Inc. • Form 10-K

## Item 8.   Financial Statements and Supplementary Data

Ally management is responsible for establishing and maintaining effective internal control over financial reporting. The Company's internal control over financial reporting is a process designed under the supervision of the Company's Chief Executive Officer and Senior Executive Vice President of Finance and Corporate Planning to provide reasonable assurance regarding the reliability of financial reporting and the preparation of published financial statements in accordance with generally accepted accounting principles.

The Company's internal control over financial reporting includes policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the Company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of the Consolidated Financial Statements in conformity with generally accepted accounting principles, and that receipts and expenditures of the Company are being made only in accordance with authorizations of management and directors of the Company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the Company's assets that could have a material effect on the Consolidated Financial Statements.

Because of its inherent limitations, internal control over financial reporting can provide only reasonable assurance and may not prevent or detect misstatements. Further, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions or that the degree of compliance with the policies or procedures may deteriorate.

Management conducted, under the supervision of the Company's Chief Executive Officer and Senior Executive Vice President of Finance and Corporate Planning, an evaluation of the effectiveness of the Company's internal control over financial reporting based on the framework in  *Internal Control — Integrated Framework*  issued by the Committee of Sponsoring Organizations of the Treadway Commission, commonly referred to as the "COSO" criteria.

Based on the assessment performed, management concluded that at  December 31, 2012, Ally's internal control over financial reporting was effective based on the COSO criteria.

The independent registered public accounting firm, Deloitte & Touche LLP, has audited the Consolidated Financial Statements of Ally and has issued an attestation report on our internal control over financial reporting at  December 31, 2012, as stated in its report, which is included herein.

/S/ MICHAEL A. CARPENTER

Michael A. Carpenter
*Chief Executive Officer*
March 1, 2013

/S/ JEFFREY J. BROWN

Jeffrey J. Brown
*Senior Executive Vice President of Finance and Corporate Planning*
March 1, 2013

100

Table of Contents

# Report of Independent Registered Public Accounting Firm

To the Board of Directors and Shareholders of Ally Financial Inc.:

We have audited the accompanying Consolidated Balance Sheet of Ally Financial Inc. and subsidiaries (the "Company") as of  December 31, 2012 and 2011, and the related Consolidated Statements of Income, Comprehensive Income, Changes in Equity, and Cash Flows for each of the three years in the period ended  December 31, 2012. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, such consolidated financial statements present fairly, in all material respects, the financial position of the Company at  December 31, 2012 and 2011, and the results of its operations and its cash flows for each of the three years in the period ended  December 31, 2012, in conformity with accounting principles generally accepted in the United States of America.

We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the Company's internal control over financial reporting as of December 31, 2012, based on the criteria established in *Internal Control — Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission and our report dated  March 1, 2013, expressed an unqualified opinion on the Company's internal control over financial reporting.

/s/ DELOITTE & TOUCHE LLP
_____

Deloitte & Touche LLP

Detroit, Michigan

March 1, 2013

101

Table of Contents

# Report of Independent Registered Public Accounting Firm

To the Board of Directors and Shareholders of Ally Financial Inc.:

We have audited the internal control over financial reporting of Ally Financial Inc. and subsidiaries (the "Company") as of  December 31, 2012, based on the criteria established in *Internal Control — Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission. The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, as stated in the accompanying *Management's Report on Internal Control over Financial Reporting* . Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

A company's internal control over financial reporting is a process designed by, or under the supervision of, the company's principal executive and principal financial officers, or persons performing similar functions, and effected by the company's board of directors, management, and other personnel to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of the inherent limitations of internal control over financial reporting, including the possibility of collusion or improper management override of controls, material misstatements due to error or fraud may not be prevented or detected on a timely basis. Also, projections of any evaluation of the effectiveness of the internal control over financial reporting to future periods are subject to the risk that the controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

In our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of  December 31, 2012, based on the criteria established in *Internal Control — Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission.

We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated financial statements as of and for the year ended December 31, 2012, of the Company and our report dated March 1, 2013, expressed an unqualified opinion on those consolidated financial statements.

/s/ DELOITTE & TOUCHE LLP

Deloitte & Touche LLP

Detroit, Michigan

March 1, 2013

102

Table of Contents

# Consolidated Statement of Income

Ally Financial Inc. • Form 10-K

| Year ended December 31, ($ in millions) | | 2012 | | 2011 | | 2010 |
|---|---|---|---|---|---|---|
| **Financing revenue and other interest income** | | | | | | |
| Interest and fees on finance receivables and loans | $ | **4,603** | $ | 4,409 | $ | 4,475 |
| Interest on loans held-for-sale | | **155** | | 332 | | 587 |
| Interest on trading assets | | **13** | | 19 | | 15 |
| Interest and dividends on available-for-sale investment securities | | **292** | | 351 | | 323 |
| Interest-bearing cash | | **26** | | 21 | | 34 |
| Operating leases | | **2,379** | | 1,929 | | 2,583 |
| Total financing revenue and other interest income | | **7,468** | | 7,061 | | 8,017 |
| **Interest expense** | | | | | | |
| Interest on deposits | | **644** | | 614 | | 579 |
| Interest on short-term borrowings | | **90** | | 116 | | 141 |
| Interest on long-term debt | | **3,466** | | 4,309 | | 4,740 |
| Total interest expense | | **4,200** | | 5,039 | | 5,460 |
| Depreciation expense on operating lease assets | | **1,399** | | 941 | | 1,251 |
| Net financing revenue | | **1,869** | | 1,081 | | 1,306 |
| **Other revenue** | | | | | | |
| Servicing fees | | **701** | | 1,358 | | 1,488 |
| Servicing asset valuation and hedge activities, net | | **(8)** | | (789) | | (394) |
| Total servicing income, net | | **693** | | 569 | | 1,094 |
| Insurance premiums and service revenue earned | | **1,059** | | 1,170 | | 1,371 |
| Gain on mortgage and automotive loans, net | | **532** | | 470 | | 1,239 |
| Loss on extinguishment of debt | | **(148)** | | (64) | | (124) |
| Other gain on investments, net | | **146** | | 259 | | 502 |
| Other income, net of losses | | **747** | | 493 | | 334 |
| Total other revenue | | **3,029** | | 2,897 | | 4,416 |
| **Total net revenue** | | **4,898** | | 3,978 | | 5,722 |
| **Provision for loan losses** | | **329** | | 188 | | 357 |
| **Noninterest expense** | | | | | | |
| Compensation and benefits expense | | **1,365** | | 1,322 | | 1,348 |
| Insurance losses and loss adjustment expenses | | **461** | | 483 | | 547 |
| Other operating expenses | | **3,498** | | 2,936 | | 3,078 |
| Total noninterest expense | | **5,324** | | 4,741 | | 4,973 |
| **(Loss) income from continuing operations before income tax expense** | | **(755)** | | (951) | | 392 |
| Income tax (benefit) expense from continuing operations | | **(1,284)** | | 51 | | 104 |
| **Net income (loss) from continuing operations** | | **529** | | (1,002) | | 288 |
| Income from discontinued operations, net of tax | | **667** | | 845 | | 741 |
| **Net income (loss)** | $ | **1,196** | $ | (157) | $ | 1,029 |

Statement continues on the next page.

The Notes to the Consolidated Financial Statements are an integral part of these statements.

103

Table of Contents

# Consolidated Statement of Income

Ally Financial Inc. • Form 10-K

| Year ended December 31, ($ in millions except per share data) | | 2012 | | 2011 | | 2010 |
|---|---|---|---|---|---|---|
| **Net income (loss) attributable to common shareholders** | | | | | | |
| Net income (loss) from continuing operations | $ | **529** | $ | (1,002) | $ | 288 |
| Preferred stock dividends — U.S. Department of Treasury | | **(535)** | | (534) | | (963) |
| Preferred stock dividends | | **(267)** | | (260) | | (282) |
| Impact of preferred stock conversion or amendment (a) | | **—** | | 32 | | (616) |
| **Net loss from continuing operations attributable to common shareholders (b)** | | **(273)** | | (1,764) | | (1,573) |
| Income from discontinued operations, net of tax | | **667** | | 845 | | 741 |
| **Net income (loss) attributable to common shareholders** | $ | **394** | $ | (919) | $ | (832) |
| **Basic weighted-average common shares outstanding** | | **1,330,970** | | 1,330,970 | | 800,597 |
| **Diluted weighted-average common shares outstanding (b)** | | **1,330,970** | | 1,330,970 | | 800,597 |
| **Basic earnings per common share** | | | | | | |
| Net loss from continuing operations | $ | **(205)** | $ | (1,326) | $ | (1,965) |
| Income from discontinued operations, net of tax | | **501** | | 635 | | 926 |
| Net income (loss) | $ | **296** | $ | (691) | $ | (1,039) |
| **Diluted earnings per common share (b)** | | | | | | |
| Net loss from continuing operations | $ | **(205)** | $ | (1,326) | $ | (1,965) |
| Income from discontinued operations, net of tax | | **501** | | 635 | | 926 |
| Net income (loss) | $ | **296** | $ | (691) | $ | (1,039) |

(a)   Refer to Note 18 to the Consolidated Financial Statements for further detail.

(b)   Due to the antidilutive effect of converting the Fixed Rate Cumulative Mandatorily Convertible Preferred Stock into common shares and the net loss from continuing operations attributable to common shareholders for 2012, 2011, and 2010, respectively, loss from continuing operations attributable to common shareholders and basic weighted-average common shares outstanding were used to calculate basic and diluted earnings per share.

The Notes to the Consolidated Financial Statements are an integral part of these statements.

104

Table of Contents

# Consolidated Statement of Comprehensive Income

Ally Financial Inc. • Form 10-K

| Year ended December 31, *($ in millions)* | 2012 | 2011 | 2010 |
|---|---|---|---|
| **Net income (loss)** | $ **1,196** | $ (157) | $ 1,029 |
| **Other comprehensive income (loss), net of tax** | | | |
| Unrealized gains (losses) on investment securities | | | |
| Net unrealized gains arising during the period | **331** | 196 | 320 |
| Less: Net realized gains reclassified to net income | **141** | 284 | 497 |
| Net change | **190** | (88) | (177) |
| Translation adjustments and net investment hedges | | | |
| Translation adjustments | **184** | (237) | 165 |
| Hedges | **(168)** | 173 | (182) |
| Net change | **16** | (64) | (17) |
| Cash flow hedges | | | |
| Net unrealized (losses) gains arising during the period | **(4)** | — | 33 |
| Defined benefit pension plans | | | |
| Net losses, prior service costs, and transition obligations arising during the period | **(36)** | (27) | (59) |
| Less: Net losses, prior service costs, and transition obligations reclassified to net income | **(58)** | (7) | (19) |
| Net change | **22** | (20) | (40) |
| **Other comprehensive income (loss), net of tax** | **224** | (172) | (201) |
| Cumulative effect of change in accounting principle (a) | **—** | — | (4) |
| **Comprehensive income (loss)** | $ **1,420** | $ (329) | $ 824 |

(a)    Relates to the adoption of ASU 2009-17, *Improvements to Financial Reporting by Enterprises Involved with Variable Interest Entities* .

The Notes to the Consolidated Financial Statements are an integral part of these statements.

Table of Contents

# Consolidated Balance Sheet

Ally Financial Inc. • Form 10-K

| December 31, ($ in millions) | | 2012 | | 2011 |
|---|---|---|---|---|
| **Assets** | | | | |
| Cash and cash equivalents | | | | |
| Noninterest-bearing | $ | **1,073** | $ | 2,475 |
| Interest-bearing | | **6,440** | | 10,560 |
| Total cash and cash equivalents | | **7,513** | | 13,035 |
| Trading assets | | **—** | | 622 |
| Investment securities | | **14,178** | | 15,135 |
| Loans held-for-sale, net ($2,490 and $3,919 fair value-elected) | | **2,576** | | 8,557 |
| Finance receivables and loans, net | | | | |
| Finance receivables and loans, net ($— and $835 fair value-elected) | | **99,055** | | 114,755 |
| Allowance for loan losses | | **(1,170)** | | (1,503) |
| Total finance receivables and loans, net | | **97,885** | | 113,252 |
| Investment in operating leases, net | | **13,550** | | 9,275 |
| Mortgage servicing rights | | **952** | | 2,519 |
| Premiums receivable and other insurance assets | | **1,609** | | 1,853 |
| Other assets | | **11,908** | | 18,741 |
| Assets of operations held-for-sale | | **32,176** | | 1,070 |
| Total assets | $ | **182,347** | $ | 184,059 |
| **Liabilities** | | | | |
| Deposit liabilities | | | | |
| Noninterest-bearing | $ | **1,977** | $ | 2,029 |
| Interest-bearing | | **45,938** | | 43,021 |
| Total deposit liabilities | | **47,915** | | 45,050 |
| Short-term borrowings | | **7,461** | | 7,680 |
| Long-term debt ($— and $830 fair value-elected) | | **74,561** | | 92,885 |
| Interest payable | | **932** | | 1,587 |
| Unearned insurance premiums and service revenue | | **2,296** | | 2,576 |
| Accrued expenses and other liabilities ($— and $29 fair value-elected) | | **6,585** | | 14,664 |
| Liabilities of operations held-for-sale | | **22,699** | | 337 |
| Total liabilities | | **162,449** | | 164,779 |
| **Equity** | | | | |
| Common stock and paid-in capital | | **19,668** | | 19,668 |
| Mandatorily convertible preferred stock held by U.S. Department of Treasury | | **5,685** | | 5,685 |
| Preferred stock | | **1,255** | | 1,255 |
| Accumulated deficit | | **(7,021)** | | (7,415) |
| Accumulated other comprehensive income | | **311** | | 87 |
| Total equity | | **19,898** | | 19,280 |
| Total liabilities and equity | $ | **182,347** | $ | 184,059 |

The Notes to the Consolidated Financial Statements are an integral part of these statements.

Table of Contents

# Consolidated Balance Sheet

Ally Financial Inc. • Form 10-K

The assets of consolidated variable interest entities, presented based upon the legal transfer of the underlying assets in order to reflect legal ownership, that can be used only to settle obligations of the consolidated variable interest entities and the liabilities of these entities for which creditors (or beneficial interest holders) do not have recourse to our general credit were as follows.

| December 31, *($ in millions)* | | **2012** | | 2011 |
|---|---|---|---|---|
| **Assets** | | | | |
| Loans held-for-sale, net | $ | — | $ | 9 |
| Finance receivables and loans, net | | | | |
| Finance receivables and loans, net ($— and $835 fair value-elected) | | 31,510 | | 40,935 |
| Allowance for loan losses | | (144) | | (210) |
| Total finance receivables and loans, net | | 31,366 | | 40,725 |
| Investment in operating leases, net | | 6,060 | | 4,389 |
| Other assets | | 2,868 | | 3,029 |
| Assets of operations held-for-sale | | 12,139 | | — |
| Total assets | $ | 52,433 | $ | 48,152 |
| **Liabilities** | | | | |
| Short-term borrowings | $ | 400 | $ | 795 |
| Long-term debt ($— and $830 fair value-elected) | | 26,461 | | 33,143 |
| Interest payable | | 1 | | 14 |
| Accrued expenses and other liabilities | | 16 | | 405 |
| Liabilities of operations held-for-sale | | 9,686 | | — |
| Total liabilities | $ | 36,564 | $ | 34,357 |

The Notes to the Consolidated Financial Statements are an integral part of these statements.

107

Table of Contents

# Consolidated Statement of Changes in Equity

Ally Financial Inc. • Form 10-K

| ($ in millions) | Common stock and paid-in capital | | Mandatorily convertible preferred stock held by U.S. Department of Treasury | | Preferred stock | | Accumulated deficit | | Accumulated other comprehensive income | | Total equity | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Balance at January 1, 2010 (a) | $ | 13,829 | $ | 10,893 | $ | 1,287 | $ | (5,732) | $ | 464 | $ | 20,741 |
| Capital contributions | | 15 | | | | | | | | | | 15 |
| Net income | | | | | | | | 1,029 | | | | 1,029 |
| Preferred stock dividends - U.S. Department of Treasury | | | | | | | | (963) | | | | (963) |
| Preferred stock dividends | | | | | | | | (282) | | | | (282) |
| Dividends to shareholders | | | | | | | | (11) | | | | (11) |
| Conversion of preferred stock and related amendment (b) | | 5,824 | | (5,208) | | | | (616) | | | | — |
| Other comprehensive loss | | | | | | | | | | (205) | | (205) |
| Other (c) | | | | | | | | 74 | | | | 74 |
| Balance at December 31, 2010 (a) | $ | 19,668 | $ | 5,685 | $ | 1,287 | $ | (6,501) | $ | 259 | $ | 20,398 |
| Net loss | | | | | | | | (157) | | | | (157) |
| Preferred stock dividends — U.S. Department of Treasury | | | | | | | | (534) | | | | (534) |
| Preferred stock dividends | | | | | | | | (260) | | | | (260) |
| Series A preferred stock amendment (b) | | | | | | (32) | | 32 | | | | — |
| Other comprehensive loss | | | | | | | | | | (172) | | (172) |
| Other (c) | | | | | | | | 5 | | | | 5 |
| Balance at December 31, 2011 | $ | 19,668 | $ | 5,685 | $ | 1,255 | $ | (7,415) | $ | 87 | $ | 19,280 |
| Net income | | | | | | | | **1,196** | | | | **1,196** |
| Preferred stock dividends — U.S. Department of Treasury | | | | | | | | **(535)** | | | | **(535)** |
| Preferred stock dividends | | | | | | | | **(267)** | | | | **(267)** |
| Other comprehensive income | | | | | | | | | | **224** | | **224** |
| Balance at December 31, 2012 | $ | **19,668** | $ | **5,685** | $ | **1,255** | $ | **(7,021)** | $ | **311** | $ | **19,898** |

(a)    Includes decreases of $46 million and $45 million, respectively, for the years ended December 31, 2010 and 2009, from previously reported balances for the correction of immaterial errors. Refer to Note 1 for further detail.

(b)    Refer to Note 18 to the Consolidated Financial Statements for further detail.

(c)    Represents a reduction of the estimated payment accrued for tax distributions as a result of the completion of the GMAC LLC U.S. Return of Partnership Income for the tax period January 1, 2009, through June 30, 2009.

The Notes to the Consolidated Financial Statements are an integral part of these statements.

Table of Contents

# Consolidated Statement of Cash Flows

Ally Financial Inc. • Form 10-K

| Year ended December 31, ($ in millions) | 2012 | 2011 | 2010 |
|---|---|---|---|
| **Operating activities** | | | |
| Net income (loss) | $ 1,196 | $ (157) | $ 1,029 |
| Reconciliation of net income (loss) to net cash provided by operating activities | | | |
| Depreciation and amortization | 2,381 | 2,713 | 4,146 |
| Other impairment | 19 | 40 | 170 |
| Changes in fair value of mortgage servicing rights | 677 | 1,606 | 872 |
| Provision for loan losses | 405 | 217 | 469 |
| Gain on sale of loans, net | (527) | (459) | (1,014) |
| Net gain on investment securities | (177) | (294) | (520) |
| Loss on extinguishment of debt | 148 | 64 | 123 |
| Originations and purchases of loans held-for-sale | (33,075) | (60,270) | (73,823) |
| Proceeds from sales and repayments of loans held-for-sale | 34,073 | 61,187 | 80,093 |
| Impairment and accruals related to Residential Capital, LLC deconsolidation | 1,192 | — | — |
| Net change in | | | |
|     Trading securities | 595 | (483) | (39) |
|     Deferred income taxes | (1,491) | (198) | (272) |
|     Interest payable | (311) | (98) | 177 |
|     Other assets | 802 | (311) | 1,240 |
|     Other liabilities | (595) | 1,390 | (504) |
|     Other, net | (263) | 546 | (540) |
| Net cash provided by operating activities | 5,049 | 5,493 | 11,607 |
| **Investing activities** | | | |
| Purchases of available-for-sale securities | (12,816) | (19,377) | (24,116) |
| Proceeds from sales of available-for-sale securities | 7,662 | 14,232 | 17,872 |
| Proceeds from maturities and repayment of available-for-sale securities | 5,673 | 4,965 | 4,527 |
| Net increase in finance receivables and loans | (11,943) | (16,998) | (17,344) |
| Proceeds from sales of finance receivables and loans | 2,332 | 2,868 | 3,138 |
| Purchases of operating lease assets | (7,444) | (6,528) | (3,551) |
| Disposals of operating lease assets | 1,745 | 5,517 | 8,627 |
| Proceeds from sale of business units, net (a) | 516 | 50 | 161 |
| Net cash effect from deconsolidation of Residential Capital, LLC | (539) | — | — |
| Other, net | (1,741) | 1,143 | 3,119 |
| Net cash used in investing activities | (16,555) | (14,128) | (7,567) |

Statement continues on the next page.

The Notes to the Consolidated Financial Statements are an integral part of these statements.

Table of Contents

# Consolidated Statement of Cash Flows

Ally Financial Inc. • Form 10-K

| Year ended December 31, ($ in millions) | 2012 | 2011 | 2010 |
|---|---|---|---|
| **Financing activities** | | | |
| Net change in short-term borrowings | 2,694 | 514 | (3,629) |
| Net increase in bank deposits | 7,580 | 5,840 | 6,556 |
| Proceeds from issuance of long-term debt | 39,401 | 44,754 | 39,002 |
| Repayments of long-term debt | (39,909) | (40,473) | (49,530) |
| Dividends paid | (802) | (819) | (1,253) |
| Other, net | (927) | 234 | 869 |
| Net cash provided by (used in) financing activities | 8,037 | 10,050 | (7,985) |
| Effect of exchange-rate changes on cash and cash equivalents | (58) | 49 | 102 |
| Net (decrease) increase in cash and cash equivalents | (3,527) | 1,464 | (3,843) |
| Adjustment for change in cash and cash equivalents of operations held-for-sale (a) (b) | (1,995) | (99) | 725 |
| Cash and cash equivalents at beginning of year | 13,035 | 11,670 | 14,788 |
| Cash and cash equivalents at end of year | $ 7,513 | $ 13,035 | $ 11,670 |
| **Supplemental disclosures** | | | |
| Cash paid for | | | |
|     Interest | $ 5,311 | $ 5,630 | $ 5,531 |
|     Income taxes | 404 | 507 | 517 |
| Noncash items | | | |
|     Increase in finance receivables and loans due to a change in accounting principle (c) | — | — | 17,990 |
|     Increase in long-term debt due to a change in accounting principle (c) | — | — | 17,054 |
|     Transfer of mortgage servicing rights into trading securities through certification | — | 266 | — |
| Conversion of preferred stock to common equity | — | — | 5,208 |
| Other disclosures | | | |
|     Proceeds from sales and repayments of mortgage loans held-for-investment originally designated as held-for-sale | 127 | 241 | 1,324 |
|     Consolidation of loans, net | — | — | 137 |
|     Consolidation of variable interest entity debt | — | — | 78 |
|     Deconsolidation of loans, net | — | — | 1,969 |
|     Deconsolidation of variable interest entity debt | — | — | 1,903 |

(a)    The amounts are net of cash and cash equivalents of $147 million at December 31, 2012, $88 million at December 31, 2011, and $1.2 billion at December 31, 2010 of business units at the time of disposition.

(b)    Cash flows of discontinued operations are reflected within operating, investing, and financing activities in the Consolidated Statement of Cash Flows. The cash balance of these operations is reported as assets of operations held-for-sale on the Consolidated Balance Sheet.

(c)    Relates to the adoption of ASU 2009-17, *Improvements to Financial Reporting by Enterprises Involved with Variable Interest Entities.*

The Notes to the Consolidated Financial Statements are an integral part of these statements.

110

Table of Contents

# Notes to Consolidated Financial Statements

Ally Financial Inc. • Form 10-K

## 1.   Description of Business, Basis of Presentation, and Changes in Significant Accounting Policies

Ally Financial Inc. (formerly GMAC Inc. and referred to herein as Ally, we, our, or us) is a leading, independent, diversified, financial services firm. Founded in 1919, we are a leading automotive financial services company with over 90 years experience providing a broad array of financial products and services to automotive dealers and their customers. We became a bank holding company on December 24, 2008, under the Bank Holding Company Act of 1956, as amended. Our banking subsidiary, Ally Bank, is an indirect wholly owned subsidiary of Ally Financial Inc. and a leading franchise in the growing direct (online and telephonic) banking market.

### Residential Capital, LLC

On May 14, 2012 (the Petition Date), Residential Capital, LLC (ResCap) and certain of its wholly owned direct and indirect subsidiaries (collectively, the Debtors) filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (the Bankruptcy Court). In connection with the filings in May, Ally Financial Inc. and its direct and indirect subsidiaries and affiliates (excluding the Debtors) (collectively, AFI) had reached an agreement with the Debtors and certain creditor constituencies on a prearranged Chapter 11 plan (the Plan). The Plan included a proposed settlement (the Settlement) between AFI and the Debtors, which included, among other things, an obligation of AFI to make a $750 million cash contribution to the Debtors' estate, and a release of all existing or potential causes of action between AFI and the Debtors, as well as a release of all existing or potential ResCap-related causes of action against AFI held by third parties.

The Settlement contemplated certain milestone requirements that the Debtors failed to satisfy, including the Bankruptcy Court's confirmation of the Plan on or before October 31, 2012. While the failure to meet this October 31 milestone would have resulted in the Settlement's automatic termination, AFI and the Debtors agreed to monthly temporary waivers of this automatic termination through February 28, 2013. This waiver was not extended beyond this date, and therefore the Settlement has terminated.

On November 21, 2012, the Bankruptcy Court entered orders approving the sale of the Debtors' (i) mortgage servicing platform (the Platform Sale) to Ocwen Loan Servicing, LLC and Walter Investment Management Corp. and (ii) "whole-loan" portfolio (the Whole-Loan Sale) to Berkshire Hathaway Inc. under section 363 of the Bankruptcy Code, and not as part of the Plan as originally contemplated. The Whole-Loan Sale closed on February 5, 2013, and the Platform Sale closed on February 15, 2013.

As of the Petition Date, institutional investors in residential mortgage-backed securities (RMBS Investors) issued by ResCap's affiliates and holding more than  25 percent of at least one class in each of 290 securitizations agreed to settle alleged representation and warranty claims against the Debtors' estates in exchange for a total  $8.7 billion allowed claim in the Debtors' bankruptcy cases, subject to the applicable securitization trustees' acceptance of the terms of the settlements (the RMBS Settlements). The RMBS Investors also signed separate plan support agreements (PSAs) with the Debtors and AFI in support of the Plan at the time of entering into the RMBS Settlements. To date, RMBS Investors holding more than 25 percent of at least one class in each of 336 securitizations have agreed to the RMBS Settlements. These  336 securitizations have an aggregate original principal balance of approximately $189 billion (out of a total of 392 outstanding securitizations with an original principal balance of  $221 billion). The RMBS Settlements are subject to Bankruptcy Court approval, and the Bankruptcy Court has scheduled a hearing to consider such approval in late May 2013. The PSAs are not part of this scheduled Bankruptcy Court hearing. A number of creditors have raised objections to the RMBS Settlements, and the trustees representing the securitization trusts and AFI have filed statements in support of the Debtors' motion to approve the RMBS Settlements. Separately, the Debtors have failed to meet several Plan milestones in their bankruptcy cases, each of which has given the RMBS Investors the right to terminate the PSAs upon three business days advance written notice to the Debtors and AFI. The RMBS Investors have not given the Debtors and AFI such a notice to date, but have the right to do so at any time. If the RMBS Settlements were not approved or the RMBS Investors were to decide not to support any proposed plan, it could adversely impact the likelihood that any such proposed plan is approved by the Bankruptcy Court. AFI continues to support the RMBS Settlements at this time.

On June 4, 2012, Berkshire Hathaway Inc. filed a motion in the Bankruptcy Court for the appointment of an independent examiner to investigate, among other things, certain of the Debtors' transactions with AFI occurring prior to the Petition Date, any claims the Debtors may hold against AFI's officers and directors, and any claims the Debtors proposed to release under the Plan. On June 20, 2012, the Bankruptcy Court approved the appointment of an examiner and, subsequently, the United States Trustee for the Southern District of New York appointed former bankruptcy judge Arthur J. Gonzalez, Esq. as the examiner (the Examiner). On July 27, 2012, the Bankruptcy Court entered an order approving the scope of the Examiner's investigation. The investigation includes, among other things: (a) all material pre-petition transactions between or among the Debtors and AFI, Cerberus Capital Management, L.P. and its subsidiaries and affiliates, and other related parties; (b) certain post-petition negotiations and transactions with the Debtors, including with respect to plan sponsor, plan support, and settlement agreements, the debtor-in-possession financing with AFI, the stalking horse asset purchase agreement with AFI, and the servicing agreement with Ally Bank; (c) all state and federal law claims or causes of action the Debtors proposed to release as part of the Plan; and (d) the release of all existing or potential ResCap-related causes of action against AFI held by third parties. In the Examiner's original work plan, the Examiner estimated that his investigation and related report would be completed six months from approximately August 6, 2012. However, on February 7, 2013 the Examiner informed the Bankruptcy Court in the third supplement to the work plan that the investigation and related report will not be completed until early May 2013.

On December 26, 2012, the Bankruptcy Court, in an effort to facilitate plan negotiations, entered an order appointing bankruptcy judge James M. Peck, Esq. as mediator to assist the parties in resolving certain issues relating to the formulation and confirmation of the Plan. There can be no assurance that the mediation process will continue or will ultimately lead to a successful agreement among the parties.

Table of Contents

# Notes to Consolidated Financial Statements

Ally Financial Inc. • Form 10-K

On February 26, 2013, the official committee of unsecured creditors appointed in the Debtors' bankruptcy cases (the Creditors' Committee) filed with the Bankruptcy Court a response to the Debtors' motions for appointment of a chief restructuring officer and to extend their exclusive period to file a chapter 11 plan, which, among other things, states that the Creditors' Committee supports such extension through and including April 30, 2013, and during such time the Creditors' Committee will agree not to bring any claims against AFI. The response further states that the Debtors consent to the Creditors' Committee seeking standing in the Bankruptcy Court to prosecute and/or settle the Debtors' alleged claims against AFI and agree to settle claims against AFI only with Creditors' Committee consent.

On February 27, 2013, the Debtors filed a motion with the Bankruptcy Court seeking, for purposes of any proposed chapter 11 plan, that GMAC Mortgage's obligation to conduct and pay for independent file review regarding certain residential foreclosure actions and foreclosure sales prosecuted by GMAC Mortgage and its subsidiaries, as required under the Consent Order, be classified as a general unsecured claim in an amount to be determined, and that the automatic stay under the Bankruptcy Code be applied to prevent the FRB, the FDIC, and other governmental entities from taking any action to enforce the obligation against the Debtors. If the Bankruptcy Court approves the motion, such governmental entities are likely to seek to enforce the obligation against AFI, and any such obligations ultimately borne by AFI could be material. The Debtors have requested that the motion be heard at a hearing on March 21, 2013.

We are currently named as defendants in various lawsuits relating to ResCap mortgage-backed securities and certain other mortgage-related matters, which are described in more detail in Note 29. Substantially all of these matters are currently subject to orders entered by the Bankruptcy Court staying the matters through either March 31, 2012 or April 30, 2013. Unless the Debtors seek and obtain Bankruptcy Court approval to extend these stay orders, these matters are expected to proceed against us once the applicable stay orders expire.

As a result of the termination of the Settlement, AFI is no longer obligated to make the $750 million cash contribution and neither party is bound by the Settlement. Further, AFI is not entitled to receive any releases from either the Debtors or any third party claimants, as was contemplated under the Plan and Settlement. However, AFI has not withdrawn its offer to provide a $750 million cash contribution to the Debtors' estate if an acceptable settlement can be reached. As a result of the termination of the Settlement, substantial claims could be brought against us, which could have a material adverse impact on our results of operations, financial position or cash flows. We would have strong legal and factual defenses with respect to any such claims, and would vigorously defend them.

As a result of the bankruptcy filing, effective May 14, 2012, we have deconsolidated ResCap from our financial statements and ResCap is prospectively accounted for using the cost method. Furthermore, circumstances indicated to us that as of May 14, 2012, our investment in ResCap would not be recoverable, and accordingly we recorded a full impairment of such investment. ResCap's results of operations have been removed from our Consolidated Financial Statements since May 14, 2012. As of December 31, 2012, due to Ally Bank performing certain mortgage activities during the bankruptcy process and the related uncertainty associated with the timing of resolution of the ResCap bankruptcy, we did not classify ResCap as a discontinued operation. Accordingly, ResCap's results are presented as continuing operations within our Consolidated Statement of Income for periods prior to May 14, 2012. Our Consolidated Statement of Income includes the following for ResCap's results of operations (amounts presented are before the elimination of balances and transactions with Ally).

| Year ended December 31, ($ in millions) | | 2012 | | 2011 | | 2010 |
|---|---|---|---|---|---|---|
| Total net revenue | $ | 476 | $ | 632 | $ | 2,051 |
| Provision for loan losses | | — | | 24 | | (7) |
| Total noninterest expense | | 437 | | 1,438 | | 1,526 |
| Income (loss) from continuing operations before income tax expense | | 39 | | (830) | | 532 |
| Income tax expense from continuing operations | | 7 | | 15 | | 7 |
| Net income (loss) from continuing operations | $ | 32 | $ | (845) | $ | 525 |

Based on our assessment of the effect of the deconsolidation of ResCap, obligations under the Plan, and other impacts related to the Chapter 11 filing, we recorded a charge of $1.2 billion during 2012, within our other operating expenses. This charge primarily consists of the impairment of Ally's $442 million equity investment in ResCap and the $750 million cash contribution to be made by us to the Debtors' estate described above. As of December 31, 2012, we have $1.3 billion of financing due from ResCap, which is classified as Finance Receivables and Loans, net on our Consolidated Balance Sheet. We maintain no allowance or impairment against these receivables because management considers them to be fully collectible. At December 31, 2012, our hedging arrangements with ResCap were fully collateralized. Additionally, under a shared services agreement (SSA), each entity agreed to provide services to the other for a period of one year. The SSA will automatically renew each year unless either entity provides written notice of nonrenewal to the other party at least three months prior to the expiration. The SSA fees received by Ally and the expenses paid to ResCap will be reflected within the Consolidated Statement of Income as a reduction or increase of noninterest expense. Because of the uncertain nature of the bankruptcy proceedings, we cannot predict the ultimate financial impact to Ally. Refer to Note 29 for additional information regarding these bankruptcy proceedings.

## Consolidation and Basis of Presentation

The Consolidated Financial Statements include our accounts and accounts of our majority-owned subsidiaries after eliminating all significant intercompany balances and transactions and include all variable interest entities (VIEs) in which we are the primary beneficiary. Refer to Note 10 for further details on our VIEs. Our accounting and reporting policies conform to accounting principles generally accepted in

Table of Contents

# Notes to Consolidated Financial Statements

Ally Financial Inc. • Form 10-K

the United States of America (GAAP). Additionally, where applicable, the policies conform to the accounting and reporting guidelines prescribed by bank regulatory authorities.

We operate our international subsidiaries in a similar manner as we operate in the United States of America (U.S. or United States), subject to local laws or other circumstances that may cause us to modify our procedures accordingly. The financial statements of subsidiaries that operate outside of the United States generally are measured using the local currency as the functional currency. All assets and liabilities of foreign subsidiaries are translated into U.S. dollars at year-end exchange rates. The resulting translation adjustments are recorded in accumulated other comprehensive income. Income and expense items are translated at average exchange rates prevailing during the reporting period.

## Correction of Immaterial Error

We have revised our consolidated financial statements for the years ended December 31, 2010 and 2009, for the correction of an immaterial error related to the accounting for a fair value derivative hedge associated with a specific bond affected by our 2008 bond exchange. The correction of the error resulted in an increase in long-term debt and an associated increase in interest on long-term debt that reduced previously reported net income by $46 million and $45 million for the years ended December 31, 2010 and 2009, respectively. Total equity at December 31, 2010 has also been reduced by $91 million compared to amounts previously reported. We concluded based on our quantitative and qualitative analysis that these related amounts are not material to our results of operations or financial condition.

## Use of Estimates and Assumptions

The preparation of financial statements in conformity with GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities at the date of the financial statements and that affect income and expenses during the reporting period and related disclosures. In developing the estimates and assumptions, management uses all available evidence; however, actual results could differ because of uncertainties associated with estimating the amounts, timing, and likelihood of possible outcomes.

## Significant Accounting Policies

### Cash and Cash Equivalents

Cash and cash equivalents include cash on hand and certain highly liquid investment securities with maturities of three months or less from the date of purchase. Cash and cash equivalents that have restrictions on our ability to withdraw the funds are included in other assets on our Consolidated Balance Sheet. The book value of cash equivalents approximates fair value because of the short maturities of these instruments. Certain securities with original maturities less than 90 days that are held as a portion of longer-term investment portfolios, primarily held by our Insurance operations, are classified as investment securities.

### Securities

Our portfolio of securities includes government securities, corporate bonds, asset- and mortgage-backed securities (MBS), interests in securitization trusts, equity securities, and other investments. Securities are classified based on management's intent. Our trading assets primarily consisted of MBS and retained and purchased interests in certain securitizations. The trading assets are carried at fair value with changes in fair value recorded in current period earnings. All other securities are classified as available-for-sale and carried at fair value with unrealized gains and losses included in accumulated other comprehensive income or loss, on an after-tax basis. Premiums and discounts on debt securities are amortized as an adjustment to investment yield generally over the stated maturity of the security. We employ a systematic methodology that considers available evidence in evaluating potential other-than-temporary impairment of our investments classified as available-for-sale. If the cost of an investment exceeds its fair value, we evaluate, among other factors, the magnitude and duration of the decline in fair value. We also evaluate the financial health of and business outlook for the issuer, the performance of the underlying assets for interests in securitized assets, and our intent and ability to hold the investment.

Once a decline in fair value of an equity security is determined to be other-than-temporary, an impairment charge for the credit component is recorded to other gain (loss) on investments, net, in our Consolidated Statement of Income, and a new cost basis in the investment is established. Noncredit component losses of a debt security are recorded in other comprehensive income (loss) when we do not intend to sell the security or it is not more likely than not that we will have to sell the security prior to the security's anticipated recovery. Noncredit component losses are amortized over the remaining life of the debt security by offsetting the recorded value of the asset.

Realized gains and losses on investment securities are reported in other gain (loss) on investments, net, and are determined using the specific identification method.

For information on investment securities refer to Note 6.

### Loans Held-for-sale

Loans held-for-sale may include consumer automobile, consumer mortgage, and commercial receivables and loans. Loans held-for-sale are carried at either fair value because of the fair value option election or lower of cost or estimated fair value. Loan origination fees, as well as discount points and incremental direct origination costs, are initially recorded as an adjustment of the cost basis of the loan and are reflected in the gain or loss on sale of loans when sold. Fair value is determined by type of loan and is generally based on contractually established commitments from investors, current investor yield requirements, current secondary market pricing, or cash flow models using

113

Table of Contents

# Notes to Consolidated Financial Statements

Ally Financial Inc. • Form 10-K

market-based yield requirements. Our fair value option election loans primarily consist of conforming and government-insured mortgage loans. Refer to  Note 7 for information on loans held-for-sale and Note 25 for information on fair value measurement.

## Finance Receivables and Loans

Finance receivables and loans are reported at the principal amount outstanding, net of unearned income, premiums and discounts, and allowances. Unearned income, which includes unearned rate support received from an automotive manufacturer on certain automotive loans and deferred origination fees reduced by origination costs, is amortized over the contractual life of the related finance receivable or loan using the effective interest method. We make incentive payments for consumer auto loan originations to automotive dealers under our Ally Dealer Rewards Program and account for these payments as direct loan origination costs. Loan commitment fees are generally deferred and amortized over the commitment period. For information on finance receivables and loans, refer to  Note 8.

We classify finance receivables and loans between loans held-for-sale and loans held-for-investment based on management's assessment of our intent and ability to hold loans for the foreseeable future or until maturity. Management's intent and ability with respect to certain loans may change from time to time depending on a number of factors including economic, liquidity, and capital conditions. Management's view of the foreseeable future is based on the longest reasonably reliable net income, liquidity, and capital forecast period.

Our portfolio segments are based on the level at which we develop and document our methodology for determining the allowance for loan losses. Additionally, the classes of finance receivables are based on several factors including the method for monitoring and assessing credit risk, the method of measuring carrying value, and the risk characteristics of the finance receivable. Based on an evaluation of our process for developing the allowance for loan losses including the nature and extent of exposure to credit risk arising from finance receivables, we have determined our portfolio segments to be consumer automobile, consumer mortgage, and commercial.

- *Consumer automobile* — Consists of retail automobile financing for new and used vehicles.

- *Consumer mortgage* — Consists of the following classes of finance receivables.

    - *1st Mortgage* — Consists of residential mortgage loans that are secured in a first-lien position and have priority over all other liens or claims on the respective collateral.

    - *Home equity* — Consists of residential home equity loans or mortgages with a subordinate-lien position.

- *Commercial* — Consists of the following classes of finance receivables.

    - *Commercial and Industrial*

        - *Automobile* — Consists of financing operations to fund dealer purchases of new and used vehicle through wholesale or floorplan financing. Additional commercial offerings include automotive dealer term loans, revolving lines of credit, and dealer fleet financing.

        - *Mortgage* — Consists primarily of warehouse lending.

        - *Other* — Consists of senior secured commercial lending.

    - *Commercial Real Estate*

        - *Automobile* — Consists of term loans to finance dealership land and buildings.

        - *Mortgage* — Related primarily to activities within our business capital group, which provides financing to residential land developers and homebuilders. These activities are in wind-down and do not represent a material component of our business.

### Nonaccrual Loans

Revenue recognition is suspended when any finance receivables and loans are placed on nonaccrual status. Generally, all classes of finance receivables and loans are placed on nonaccrual status when principal or interest has been delinquent for 90 days or when full collection is determined not to be probable. Exceptions include commercial real estate loans that are placed on nonaccrual status when delinquent for 60 days. These loans are reported as nonperforming loans in  Note 8. Revenue accrued, but not collected, at the date finance receivables and loans are placed on nonaccrual status is reversed and subsequently recognized only to the extent it is received in cash or until it qualifies for return to accrual status. However, where there is doubt regarding the ultimate collectability of loan principal, all cash received is applied to reduce the carrying value of such loans. Finance receivables and loans are restored to accrual status only when contractually current and the collection of future payments is reasonably assured.

Generally, we recognize all classes of loans as past due when they are 30 days delinquent on making a contractually required payment.

Table of Contents

# Notes to Consolidated Financial Statements

Ally Financial Inc. • Form 10-K

### Impaired Loans

All classes of loans are considered impaired when we determine it is probable that we will be unable to collect all amounts due (both principal and interest) according to the terms of the loan agreement.

For all classes of consumer loans, impaired loans are loans that have been modified in troubled debt restructurings.

All classes of commercial loans are considered impaired on an individual basis and reported as impaired when we determine it is probable that we will be unable to collect all amounts due according to the terms of the loan agreement.

For all classes of impaired loans, income recognition is consistent with that of nonaccrual loans discussed above. For collateral dependent loans, if the recorded investment in impaired loans exceeds the fair value of the collateral, a charge-off is recorded consistent with the TDR discussion below.

### Troubled Debt Restructurings (TDRs)

When the terms of finance receivables or loans are modified, consideration must be given as to whether or not the modification results in a TDR. A modification is considered to be a TDR when both a) the borrower is experiencing financial difficulty and b) we grant a concession to the borrower. These considerations require significant judgment and vary by portfolio segment. In all cases, the cumulative impacts of all modifications are considered at the time of the most recent modification.

For all classes of consumer loans, various qualitative factors are utilized for assessing the financial difficulty of the borrower. These include, but are not limited to, the borrowers default status on any of its debts, bankruptcy and recent changes in financial circumstances (loss of job, etc.). A concession has been granted when as a result of the modification we do not expect to collect all amounts due, including interest accrued at the original contract rate. Types of modifications that may be considered concessions include but are not limited to extensions of terms at a rate that does not constitute a market rate, a reduction, deferral or forgiveness of principal or interest owed and loans that have been discharged in a Chapter 7 Bankruptcy and have not been reaffirmed by the borrower.

In addition to the modifications noted above, in our consumer automobile class of loans we also provide extensions or deferrals of payments to borrowers who we deem to be experiencing only temporary financial difficulty. In these cases, there are limits within our operational policies to minimize the number of times a loan can be extended, as well as limits to the length of each extension, including a cumulative cap over the life of the loan. Before offering an extension or deferral, we evaluate the capacity of the customer to make the scheduled payments after the deferral period. During the deferral period, we continue to accrue and collect interest on the loan as part of the deferral agreement. We grant these extensions or deferrals when we expect to collect all amounts due including interest accrued at the original contract rate.

A restructuring that results in only a delay in payment that is deemed to be insignificant is not a concession and such modification is not considered to be a TDR. In order to assess whether a restructuring that results in a delay in payment is insignificant, we consider the amount of the restructured payments subject to delay in conjunction with the unpaid principal balance or the collateral value of the loan, whether or not the delay is significant with respect to the frequency of payments under the original contract, or the loan's original expected duration. In the cases where payment extensions on our automobile loan portfolio cumulatively extend beyond 90 days and are more than 10% of the original contractual term or any cumulative extension beyond 180 days, we deem the delay in payment to be more than insignificant, and as such, classify these types of modifications as TDRs. Otherwise, we believe that the modifications do not represent a concessionary modification and accordingly, they are not classified as TDRs.

For all classes of commercial loans, similar qualitative factors are considered when assessing the financial difficulty of the borrower. In addition to the factors noted above, consideration is also given to the borrower's forecasted ability to service the debt in accordance with the contractual terms, possible regulatory actions and other potential business disruptions (e.g. the loss of a significant customer or other revenue stream). Consideration of a concession is also similar for commercial loans. In addition to the factors noted above, consideration is also given to whether additional guarantees or collateral have been provided.

For all loans, TDR classification typically results from our loss mitigation activities. For loans held-for-investment that are not carried at fair value and are TDRs, impairment is typically measured based on the differences between the net carrying value of the loan and the present value of the expected future cash flows of the loan. The loan may also be measured for impairment based on the fair value of the underlying collateral less costs to sell for loans that are collateral dependent. We recognize impairment by either establishing a valuation allowance or recording a charge-off.

The financial impacts of modifications that meet the definition of a TDR are reported in the period in which they are identified as TDRs. Additionally, if a loan that is classified as a TDR redefaults within twelve months of the modification, we are required to disclose such instances of redefault. For the purpose of this disclosure, we have determined that a loan is considered to have redefaulted when the loan meets the requirements for evaluation under our charge-off policy except for commercial loans where redefault is defined as 90 days past due.

Our policy is to generally place all TDRs on nonaccrual status until the loan has been brought fully current, the collection of contractual principal and interest is reasonably assured, and six consecutive months of repayment performance is achieved. In certain cases, if a borrower has been current up to the time of the modification and repayment of the debt subsequent to the modification is reasonably assured, we may choose to continue to accrue interest on the loan.

Table of Contents

# Notes to Consolidated Financial Statements

Ally Financial Inc. • Form 10-K

### *Charge-offs*

As a general rule, consumer automobile loans are written down to estimated collateral value, less costs to sell, once a loan becomes 120 days past due. Consumer first-lien mortgage loans, which consists of our entire 1st mortgage class and a subset of our home equity class that are secured by real estate in a first-lien position are written down to the estimated fair value of the collateral, less costs to sell, once a mortgage loan becomes 180 days past due. Second-lien consumer mortgage loans within our home equity class are charged off at 180 days past due. Second-lien consumer mortgage loans in bankruptcy that are 60 days past due are fully charged off within 60 days of receipt of notification of filing from the bankruptcy court. Consumer automobile and first-lien consumer mortgage loans in bankruptcy that are 60 days past due are written down to the estimated fair value of the collateral, less costs to sell, within 60 days of receipt of notification of discharge from the bankruptcy court. Regardless of other timelines noted within this policy, loans are considered collateral dependent at the time foreclosure or repossession proceedings begin and are charged off to the estimated fair value of the underlying collateral, less costs to sell at that time.

Commercial loans are individually evaluated and where collectability of the recorded balance is in doubt are written down to the estimated fair value of the collateral less costs to sell. Generally, all commercial loans are charged off when it becomes unlikely that the borrower is willing or able to repay the remaining balance of the loan and any underlying collateral is not sufficient to recover the outstanding principal. Collateral dependent loans are charged-off to the fair market value of collateral less costs to sell and non-collateral dependent loans are fully written-off.

### Allowance for Loan Losses

The allowance for loan losses (the allowance) is management's estimate of incurred losses in the lending portfolios. We determine the amount of the allowance required for each of our portfolio segments based on its relative risk characteristics. The evaluation of these factors for both consumer and commercial finance receivables and loans involves complex, subjective judgments. Additions to the allowance are charged to current period earnings through the provision for loan losses; amounts determined to be uncollectible are charged directly against the allowance, net of amounts recovered on previously charged-off accounts.

The allowance is comprised of two components: specific reserves established for individual loans evaluated as impaired and portfolio-level reserves established for large groups of typically smaller balance homogeneous loans that are collectively evaluated for impairment. We evaluate the adequacy of the allowance based on the combined total of these two components. Determining the appropriateness of the allowance is complex and requires judgment by management about the effect of matters that are inherently uncertain. It is possible that others, given the same information, may at any point in time reach different reasonable conclusions.

Measurement of impairment for specific reserves is generally determined on a loan-by-loan basis. Loans determined to be specifically impaired are measured based on the present value of expected future cash flows discounted at the loan's effective interest rate, an observable market price, or the estimated fair value of the collateral less estimated costs to sell, whichever is determined to be the most appropriate. When these measurement values are lower than the carrying value of that loan, impairment is recognized. Loans that are not identified as individually impaired are pooled with other loans with similar risk characteristics for evaluation of impairment for the portfolio-level allowance.

For the purpose of calculating portfolio-level reserves, we have grouped our loans into three portfolio segments:  consumer automobile, consumer mortgage, and commercial. The allowance consists of the combination of a quantitative assessment component based on statistical models, a retrospective evaluation of actual loss information to loss forecasts, and includes a qualitative component based on management judgment. Management takes into consideration relevant qualitative factors, including external and internal trends such as the impacts of changes in underwriting standards, collections and account management effectiveness, geographic concentrations, and economic events, among other factors, that have occurred but are not yet reflected in the quantitative assessment component. All qualitative adjustments are adequately documented, reviewed, and approved through our established risk governance processes. Refer to  Note 8 for information on the allowance for loan losses.

### *Consumer Loans*

Our consumer automobile and consumer mortgage portfolio segments are reviewed for impairment based on an analysis of loans that are grouped into common risk categories (i.e., past due status, loan or lease type, collateral type, borrower, industry or geographic concentrations). We perform periodic and systematic detailed reviews of our lending portfolios to identify inherent risks and to assess the overall collectability of those portfolios. Loss models are utilized for these portfolios, which consider a variety of credit quality indicators including, but not limited to, historical loss experience, current economic conditions, anticipated repossessions or foreclosures based on portfolio trends, delinquencies and credit scores, and expected loss factors by loan type.

### *Consumer Automobile Portfolio Segment*

The allowance for loan losses within the consumer automobile portfolio segment is calculated using proprietary statistical models and other risk indicators applied to pools of loans with similar risk characteristics, including credit bureau score and loan-to-value ratios to arrive at an estimate of incurred losses in the portfolio. These statistical loss forecasting models are utilized to estimate incurred losses and consider a variety of factors including, but not limited to, historical loss experience, estimated defaults based on portfolio trends, delinquencies, and general economic and business trends. These statistical models predict forecasted losses inherent in the portfolio based on both vintage and migration analyses.

Table of Contents

# Notes to Consolidated Financial Statements

Ally Financial Inc. • Form 10-K

The forecasted losses consider historical factors such as frequency (the number of contracts that we expect to default) and loss severity (the expected loss on a per vehicle basis). The loss severity within the consumer automobile portfolio segment is impacted by the market values of vehicles that are repossessed. Vehicle market values are affected by numerous factors including vehicles supply, the condition of the vehicle upon repossession, the overall price and volatility of gasoline or diesel fuel, consumer preference related to specific vehicle segments, and other factors. The historical loss experience is updated quarterly to incorporate the most recent data reflective of the current economic environment.

The quantitative assessment component may be supplemented with qualitative reserves based on management's determination that such adjustments provide a better estimate of credit losses. This qualitative assessment takes into consideration relevant internal and external factors that have occurred but are not yet reflected in the forecasted losses and may affect the performance of the portfolio.

Our methodology and policies with respect to the allowance for loan losses for our consumer automobile portfolio segment did not change during  2012.

## Consumer Mortgage Portfolio Segment

The allowance for loan losses within the consumer mortgage portfolio segment is calculated by using proprietary statistical models based on pools of loans with similar risk characteristics, including credit score, loan-to-value, loan age, documentation type, product type, and loan purpose, to arrive at an estimate of incurred losses in the portfolio. These statistical loss forecasting models are utilized to estimate incurred losses and consider a variety of factors including, but not limited to, historical loss experience, estimated foreclosures or defaults based on portfolio trends, delinquencies, and general economic and business trends.

The forecasted losses are statistically derived based on a suite of behavioral based transition models. This transition framework predicts various stages of delinquency, default, and voluntary prepayment over the course of the life of the loan. The transition probability is a function of the loan and borrower characteristics and economic variables and considers historical factors such as frequency (the number of contracts that we expect to default) and loss severity (the expected loss on a per loan basis). When a default event is predicted, a severity model is applied to estimate future loan losses. Loss severity within the consumer mortgage portfolio segment is impacted by the market values of foreclosed properties, which is affected by numerous factors, including geographic considerations and the condition of the foreclosed property. The historical loss experience is updated quarterly to incorporate the most recent data reflective of the current economic environment.

The quantitative assessment component is supplemented with qualitative reserves based on management's determination that such adjustments provide a better estimate of credit losses. This qualitative assessment takes into consideration relevant internal and external factors that have occurred but are not yet reflected in the forecasted losses and may affect the credit quality of the portfolio.

Our methodology and policies with respect to the allowance for loan losses for our consumer mortgage portfolio segment did not change during  2012.

## Commercial

The allowance for loan losses within the commercial portfolio is comprised of reserves established for specific loans evaluated as impaired and portfolio-level reserves based on nonimpaired loans grouped into pools based on similar risk characteristics and collectively evaluated.

A commercial loan is considered impaired when it is probable that we will be unable to collect all amounts due according to the contractual terms of the loan agreement based on current information and events. These loans are primarily evaluated individually and are risk-rated based on borrower, collateral, and industry-specific information that management believes is relevant in determining the occurrence of a loss event and measuring impairment. Management establishes specific allowances for commercial loans determined to be individually impaired based on the present value of expected future cash flows, discounted at the loan's effective interest rate, observable market price or the fair value of collateral, whichever is determined to be the most appropriate. Estimated costs to sell or realize the value of the collateral on a discounted basis are included in the impairment measurement, when appropriate.

Loans not identified as impaired are grouped into pools based on similar risk characteristics and collectively evaluated. Our risk rating models use historical loss experience, concentrations, current economic conditions, and performance trends. The commercial historical loss experience is updated quarterly to incorporate the most recent data reflective of the current economic environment. The determination of the allowance is influenced by numerous assumptions and many factors that may materially affect estimates of loss, including volatility of loss given default, probability of default, and rating migration. In assessing the risk rating of a particular loan, several factors are considered including an evaluation of historical and current information involving subjective assessments and interpretations. In addition, the allowance related to the commercial portfolio segment is influenced by estimated recoveries from automotive manufacturers relative to guarantees or agreements with them to repurchase vehicles used as collateral to secure the loans.

The quantitative assessment component may be supplemented with qualitative reserves based on management's determination that such adjustments provide a better estimate of credit losses. This qualitative assessment takes into consideration relevant internal and external factors that have occurred and may affect the credit quality of the portfolio.

Our methodology and policies with respect to the allowance for loan losses for our commercial portfolio segment did not change during  2012.

117

Table of Contents

# Notes to Consolidated Financial Statements

Ally Financial Inc. • Form 10-K

## Securitizations and Variable Interest Entities

We securitize, sell, and service consumer automobile loans, operating leases, wholesale loans, and consumer mortgage loans. Securitization transactions typically involve the use of variable interest entities and are accounted for either as sales or secured financings. We may retain economic interests in the securitized and sold assets, which are generally retained in the form of senior or subordinated interests, interest- or principal-only strips, cash reserve accounts, residual interests, and servicing rights.

In order to conclude whether or not a variable interest entity is required to be consolidated, careful consideration and judgment must be given to our continuing involvement with the variable interest entity. In circumstances where we have both the power to direct the activities of the entity that most significantly impact the entity's performance and the obligation to absorb losses or the right to receive benefits of the entity that could be significant, we would conclude that we would consolidate the entity, which would also preclude us from recording an accounting sale on the transaction. In the case of a consolidated variable interest entity, the accounting is consistent with a secured financing, i.e., we continue to carry the loans and we record the related securitized debt on our balance sheet. Unrecorded economic interests in consolidated variable interest entities can be determined as the difference between the recognized assets and recognized liabilities.

In transactions where either one or both of the power or economic criteria mentioned above are not met, we then must determine whether or not we achieve a sale for accounting purposes. In order to achieve a sale for accounting purposes, the assets being transferred must be legally isolated, not be constrained by restrictions from further transfer, and be deemed to be beyond our control. If we were to fail any of the three criteria for sale accounting, the accounting would be consistent with the preceding paragraph (i.e., a secured borrowing). Refer to Note 10 for discussion on variable interest entities.

Gains or losses on off-balance sheet securitizations take into consideration the fair value of the retained interests including the value of certain servicing assets or liabilities, if any, which are initially recorded at fair value at the date of sale. The estimate of the fair value of the retained interests and servicing requires us to exercise significant judgment about the timing and amount of future cash flows from the interests. Refer to Note 25 for a discussion of fair value estimates.

Gains or losses on off-balance sheet securitizations and sales are reported in gain (loss) on mortgage and automotive loans, net, in our Consolidated Statement of Income for consumer automobile loans, wholesale loans, and consumer mortgage loans. Declines in the fair value of retained interests, other than servicing, below the carrying amount are reflected in other comprehensive income, or as other (loss) gain on investments, net, in our Consolidated Statement of Income if such declines are determined to be other-than-temporary or if the interests are classified as trading. Retained interests, as well as any purchased securities, are generally included in available-for-sale investment securities, trading investment securities, or other assets. Designation as available-for-sale or trading depends on management's intent. Securities that are noncertificated and cash reserve accounts related to securitizations are included in other assets on our Consolidated Balance Sheet.

We retain servicing responsibilities for all of our consumer automobile loan, operating lease, and wholesale loan securitizations and for the majority of our consumer mortgage loan securitizations. We may receive servicing fees based on the securitized loan balances and certain ancillary fees, all of which are reported in servicing fees in the Consolidated Statement of Income. We also retain the right to service the consumer mortgage loans sold in securitization transactions involving the Federal National Mortgage Association (Fannie Mae), the Federal Home Loan Mortgage Corporation (Freddie Mac), and the Government National Mortgage Association (Ginnie Mae) (collectively the Government-sponsored Enterprises or GSEs) and private investors. We also serve as the collateral manager in the securitizations of commercial investment securities.

Whether on- or off-balance sheet, the investors in the securitization trusts generally have no recourse to our assets outside of customary market representation and warranty repurchase provisions.

## Mortgage Servicing Rights

Primary servicing rights represent our right to service consumer residential mortgages securitized by us or through the GSEs and third-party whole-loan sales. Primary servicing involves the collection of payments from individual borrowers and the distribution of these payments to the investors or master servicer. Master-servicing rights represented our right to service mortgage- and asset-backed securities and whole-loan packages issued for investors. Master-servicing involved the collection of borrower payments from primary servicers and the distribution of those funds to investors in mortgage- and asset-backed securities and whole-loans packages. We also purchased and sold primary and master-servicing rights through transactions with other market participants.

We capitalize the value expected to be realized from performing specified mortgage servicing activities for others as mortgage servicing rights (MSRs) when the expected future cash flows from servicing are projected to be more than adequate compensation for such activities. These capitalized servicing rights are purchased or retained upon sale or securitization of mortgage loans. MSRs are not recorded on securitizations accounted for as secured financings.

We measure all mortgage servicing assets and liabilities at fair value. We define our servicing rights based on both the availability of market inputs and the manner in which we manage the risks of our servicing assets and liabilities. We leverage all available relevant market data to determine the fair value of our recognized servicing assets and liabilities.

Since quoted market prices for MSRs are not readily available, we estimate the fair value of MSRs by determining the present value of future expected cash flows using modeling techniques that incorporate management's best estimates of key variables including expected cash flows, prepayment speeds, and return requirements commensurate with the risks involved. Cash flow assumptions are modeled using our

118

Table of Contents
# Notes to Consolidated Financial Statements
Ally Financial Inc. • Form 10-K

internally forecasted revenue and expenses, and where possible, the reasonableness of assumptions is periodically validated through comparisons to market data. Prepayment speed estimates are determined from historical prepayment rates on similar assets or obtained from third-party data. Return requirement assumptions are determined using data obtained from market participants, where available, or based on current relevant interest rates plus a risk-adjusted spread. We also consider other factors that can impact the value of the MSRs, such as surety provider termination clauses and servicer terminations that could result if we failed to materially comply with the covenants or conditions of our servicing agreements and did not remedy the failure. Since many factors can affect the estimate of the fair value of MSRs, we regularly evaluate the major assumptions and modeling techniques used in our estimate and review these assumptions against market comparables, if available. We monitor the actual performance of our MSRs by regularly comparing actual cash flow, credit, and prepayment experience to modeled estimates. Refer to  Note 11 for further discussion of our servicing activities.

## Repossessed and Foreclosed Assets

Assets are classified as repossessed and foreclosed and included in other assets when physical possession of the collateral is taken regardless of whether foreclosure proceedings have taken place. Repossessed and foreclosed assets are carried at the lower of the outstanding balance at the time of repossession or foreclosure or the fair value of the asset less estimated costs to sell. Losses on the revaluation of repossessed and foreclosed assets are charged to the allowance for loan losses at the time of repossession. Declines in value after repossession are charged to other operating expenses for loans and depreciation expense for operating lease assets as incurred.

## Goodwill and Other Intangibles

Goodwill and other intangible assets, net of accumulated amortization, are reported in other assets. In accordance with applicable accounting standards, goodwill represents the excess of the cost of an acquisition over the fair value of net assets acquired, including identifiable intangibles. Goodwill is reviewed for impairment utilizing a two-step process. The first step of the impairment test requires us to define the reporting units and compare the fair value of each of these reporting units to the respective carrying value. The fair value of the reporting units in our impairment test is determined based on various analyses including discounted cash flow projections using assumptions a market participant would use. If the carrying value is less than the fair value, no impairment exists, and the second step does not need to be completed. If the carrying value is higher than the fair value or there is an indication that impairment may exist, a second step must be performed to compute the amount of the impairment, if any. Applicable accounting standards require goodwill to be tested for impairment annually at the same time every year and whenever an event occurs or circumstances change that would more likely than not reduce the fair value of a reporting unit below its carrying amount. Our annual goodwill impairment assessment is performed as of August 31 of each year. Refer to  Note 13 for further discussion on goodwill.

## Investment in Operating Leases

Investment in operating leases represents the automobiles that are underlying the leases and is reported at cost, less accumulated depreciation and net of impairment charges and origination fees or costs. Depreciation of vehicles is generally provided on a straight-line basis to an estimated residual value over the lease term. Manufacturer support payments that we receive are treated as a reduction to the cost-basis in the underlying lease asset and are recognized over the life of the contract as a reduction to depreciation expense. We periodically evaluate our depreciation rate for leased vehicles based on projected residual values. Income from operating lease assets that includes lease origination fees, net of lease origination costs, is recognized as operating lease revenue on a straight-line basis over the scheduled lease term.

We have significant investments in the residual values of assets in our operating lease portfolio. The residual values represent an estimate of the values of the assets at the end of the lease contracts. At contract inception, we generally determine the projected residual values based on independent data, including independent guides of vehicle residual values, and analysis. Realization of the residual values is dependent on our future ability to market the vehicles under the prevailing market conditions. Over the life of the lease, we evaluate the adequacy of our estimate of the residual value and may make adjustments to the depreciation rates to the extent the expected value of the vehicle (including any residual support payments) at lease termination changes. In addition to estimating the residual value at lease termination, we also evaluate the current value of the operating lease asset and test for impairment to the extent necessary based on market considerations and portfolio characteristics. Impairment is determined to exist if the undiscounted expected future cash flows are lower than the carrying value of the asset. If our operating lease assets are considered to be impaired, the impairment is measured as the amount by which the carrying amount of the assets exceeds the fair value as estimated by discounted cash flows. The accrual of revenue on operating leases is generally discontinued at the time an account is determined to be uncollectible, at the earliest of time of repossession, within 60 days of bankruptcy notification and greater than 60 days past due, or greater than 120 days past due.

When a lease vehicle is returned to us, the asset is reclassified from investment in operating leases, net, to other assets and recorded at the lower-of-cost or estimated fair value, less costs to sell, on our Consolidated Balance Sheet.

## Impairment of Long-lived Assets

The carrying value of long-lived assets (including property and equipment) are evaluated for impairment whenever events or changes in circumstances indicate that their carrying values may not be recoverable from the estimated undiscounted future cash flows expected to result from their use and eventual disposition. Recoverability of assets to be held and used is measured by a comparison of their carrying amount to future net undiscounted cash flows expected to be generated by the assets. If these assets are considered to be impaired, the impairment is measured as the amount by which the carrying amount of the assets exceeds the fair value as estimated by discounted cash flows. No material impairment was recognized in 2012,  2011, or 2010.

Table of Contents

# Notes to Consolidated Financial Statements

Ally Financial Inc. • Form 10-K

An impairment test on an asset group to be sold or otherwise disposed of is performed upon occurrence of a triggering event or when certain criteria are met (e.g., the asset is planned to be disposed of within twelve months, appropriate levels of authority have approved the sale, there is an active program to locate a buyer, etc), which cause the disposal group to be classified as held-for-sale. Long-lived assets held-for-sale are recorded at the lower of their carrying amount or estimated fair value less cost to sell. If the carrying value of the assets held-for-sale exceeds the fair value less cost to sell, we recognize an impairment loss based on the excess of the carrying amount over the fair value of the assets less cost to sell. During 2012, 2011, and 2010, impairment losses were recognized on asset groups that were classified as held-for-sale or disposed of by sale. Refer to Note 2 for a discussion of discontinued and held-for-sale operations.

## Property and Equipment

Property and equipment stated at cost, net of accumulated depreciation and amortization, are reported in other assets on our Consolidated Balance Sheet. Included in property and equipment are certain buildings, furniture and fixtures, leasehold improvements, company vehicles, IT hardware and software, and capitalized software costs. Depreciation is computed on the straight-line basis over the estimated useful lives of the assets, which generally ranges from three to thirty years. Capitalized software is generally amortized on a straight-line basis over its useful life, which generally ranges from three to five years. Capitalized software that is not expected to provide substantive potential or for which development costs significantly exceed the amount originally expected is considered impaired and written down to fair value. Software expenditures that are considered general, administrative, or of a maintenance nature are expensed as incurred.

## Unearned Insurance Premiums and Service Revenue

Insurance premiums, net of premiums ceded to reinsurers, and service revenue are earned over the terms of the policies. The portion of premiums and service revenue written applicable to the unexpired terms of the policies is recorded as unearned insurance premiums or unearned service revenue. For extended service and maintenance contracts, premiums and service revenues are earned on a basis proportionate to the anticipated cost emergence. For other short duration contracts, premiums and unearned service revenue are earned on a pro rata basis. For further information, refer to Note 3.

## Deferred Policy Acquisition Costs

Commissions, including compensation paid to sellers of vehicle service contracts and other costs of acquiring insurance that are primarily related to and vary with the production of business, are deferred and recorded in other assets. Deferred policy acquisition costs are amortized over the terms of the related policies and service contracts on the same basis as premiums and revenue are earned except for direct response advertising costs, which are amortized over their expected future benefit. We group costs incurred for acquiring like contracts and consider anticipated investment income in determining the recoverability of these costs.

## Reserves for Insurance Losses and Loss Adjustment Expenses

Reserves for insurance losses and loss adjustment expenses are reported in accrued expenses and other liabilities. They are established for the unpaid cost of insured events that have occurred as of a point in time. More specifically, the reserves for insurance losses and loss adjustment expenses represent the accumulation of estimates for both reported losses and those incurred, but not reported, including claims adjustment expenses relating to direct insurance and assumed reinsurance agreements. Estimates for salvage and subrogation recoverable are recognized at the time losses are incurred and netted against provision for insurance losses and loss adjustment expenses. Reserves are established for each business at the lowest meaningful level of homogeneous data. Since the reserves are based on estimates, the ultimate liability may vary from such estimates. The estimates are regularly reviewed and adjustments, which can potentially be significant, are included in earnings in the period in which they are deemed necessary.

## Legal and Regulatory Reserves

Reserves for legal and regulatory matters are established when those matters present loss contingencies that are both probable and estimable, with a corresponding amount recorded to other noninterest expense. In cases where we have an accrual for losses, it is our policy to include an estimate for probable and estimable legal expenses related to the case. If, at the time of evaluation, the loss contingency related to a litigation or regulatory matter is not both probable and estimable, we do not establish an accrued liability. We continue to monitor legal and regulatory matters for further developments that could affect the requirement to establish a liability or that may impact the amount of a previously established liability. There may be exposure to loss in excess of any amounts recognized. For certain other matters where the risk of loss is determined to be reasonably possible, estimable, and material to the financial statements, disclosure regarding details of the matter and an estimated range of loss is required. The estimated range of possible loss does not represent our maximum loss exposure. Financial statement disclosure is also required for matters that are deemed probable or reasonably possible, material to the financial statements, but for which an estimated range of loss is not possible to determine. While we believe our reserves are adequate, the outcome of legal and regulatory proceedings is extremely difficult to predict and we may settle claims or be subject to judgments for amounts that differ from our estimates. For information regarding the nature of all material contingencies, refer to Note 29.

## Loan Repurchase and Obligations Related to Loan Sales

Our Mortgage operations sell loans that take the form of securitizations guaranteed by the GSEs or by whole-loan purchasers. In addition, we infrequently sell securities to investors through private-label securitizations. In connection with these activities we provide to the GSEs, investors, whole-loan purchasers, and financial guarantors (monolines) various representations and warranties related to the loans sold. These representations and warranties generally relate to, among other things, the ownership of the loan, the validity of the lien securing the loan, the loan's compliance with the criteria for inclusion in the transaction, including compliance with underwriting standards or loan criteria established by the buyer, ability to deliver required documentation and compliance with applicable laws. Generally, the representations and

120

Table of Contents

# Notes to Consolidated Financial Statements

Ally Financial Inc. • Form 10-K

warranties described in Note 29 may be enforced at any time over the life of the loan. Historically, ResCap assumed all of the customary representation and warranty obligations for loans purchased from Ally Bank and subsequently sold into the secondary market. A significant portion of our representation and warranty obligations were eliminated as a result of the deconsolidation of ResCap. As a result of the deconsolidation of ResCap, we recorded a representation and warranty reserve to Ally Bank. See Note 29 for additional information.

Upon a breach of a representation, we correct the breach in a manner conforming to the provisions of the sale agreement. This may require us either to repurchase the loan or to indemnify (make-whole) a party for incurred losses or provide other recourse to a GSE or investor. Repurchase demands and claims for indemnification payments are reviewed on a loan-by-loan basis to validate if there has been a breach requiring repurchase or a make-whole payment. We actively contest claims to the extent we do not consider them valid. In cases where we repurchase loans, we bear the credit loss on the loans. Repurchased loans are classified as held-for-sale and initially recorded at fair value and subsequently at the lower of cost or market. We seek to manage the risk of repurchase and associated credit exposure through our underwriting and quality assurance practices and by servicing mortgage loans to meet investor standards.

The reserve for representation and warranty obligations reflects management's best estimate of probable lifetime loss. We consider historical and recent demand trends in establishing the reserve. The methodology used to estimate the reserve considers a variety of assumptions including borrower performance (both actual and estimated future defaults), repurchase demand behavior, historical loan defect experience, historical and estimated future loss experience, which includes projections of future home price changes as well as other qualitative factors including investor behavior. In cases where we may not be able to reasonably estimate losses, a liability is not recognized. Management monitors the adequacy of the overall reserve and makes adjustments to the level of reserve, as necessary, after consideration of other qualitative factors including ongoing dialogue with counterparties.

At the time a loan is sold, an estimate of the fair value of the liability is recorded and classified in other liabilities on our Consolidated Balance Sheet, and recorded as a component of gain (loss) on mortgage and automotive loans, net, in our Consolidated Statement of Income. We recognize changes in the reserve when additional relevant information becomes available. Changes in the liability are recorded as other operating expenses in our Consolidated Statement of Income.

**Earnings per Common Share**

We compute basic earnings (loss) per common share by dividing net income (loss) from continuing operations attributable to common shareholders after deducting dividends on preferred stock by the weighted-average number of common shares outstanding during the period. We compute diluted earnings (loss) per common share by dividing net income (loss) from continuing operations after deducting dividends on preferred stock by the weighted-average number of common shares outstanding during the period plus the dilution resulting from the conversion of convertible preferred stock, if applicable.

**Derivative Instruments and Hedging Activities**

We primarily use derivative instruments for risk management purposes. Derivatives that were held for trading purposes were limited to those entered into by our broker-dealer. Some of our derivative instruments are designated in qualifying hedge accounting relationships; other derivative instruments do not qualify for hedge accounting or are not elected to be designated in a qualifying hedging relationship. In accordance with applicable accounting standards, all derivative financial instruments, whether designated for hedge accounting or not, are required to be recorded on the balance sheet as assets or liabilities and measured at fair value. Additionally, we report derivative financial instruments on the Consolidated Balance Sheet primarily on a gross basis. For additional information on derivative instruments and hedging activities, refer to Note 22.

At inception of a hedge accounting relationship, we designate each qualifying derivative financial instrument as a hedge of the fair value of a specifically identified asset or liability (fair value hedge); as a hedge of the variability of cash flows to be received or paid related to a recognized asset or liability (cash flow hedge); or as a hedge of the foreign-currency exposure of a net investment in a foreign operation. We formally document all relationships between hedging instruments and hedged items and risk management objectives for undertaking various hedge transactions. Both at the hedge's inception and on an ongoing basis, we formally assess whether the derivatives that are used in hedging relationships are highly effective in offsetting changes in fair values or cash flows of hedged items.

Changes in the fair value of derivative financial instruments that are designated and qualify as fair value hedges along with the gain or loss on the hedged asset or liability attributable to the hedged risk, are recorded in the current period earnings. For qualifying cash flow hedges, the effective portion of the change in the fair value of the derivative financial instruments is recorded in accumulated other comprehensive income, and recognized in the income statement when the hedged cash flows affect earnings. For a derivative designated as hedging the foreign-currency exposure of a net investment in a foreign operation, the gain or loss is reported in accumulated other comprehensive income as part of the cumulative translation adjustment. The ineffective portions of fair value, cash flow, and net investment hedges are immediately recognized in earnings, along with the portion of the change in fair value that is excluded from the assessment of hedge effectiveness, if any.

The hedge accounting treatment described herein is no longer applied if a derivative financial instrument is terminated or the hedge designation is removed or is assessed to be no longer highly effective. For these terminated fair value hedges, any changes to the hedged asset or liability remain as part of the basis of the asset or liability and are recognized into income over the remaining life of the asset or liability. For terminated cash flow hedges, unless it is probable that the forecasted cash flows will not occur within a specified period, any changes in fair value of the derivative financial instrument previously recognized remain in accumulated other comprehensive income, and are reclassified into earnings in the same period that the hedged cash flows affect earnings. The previously recognized net derivative gain or loss

121

Table of Contents

# Notes to Consolidated Financial Statements

Ally Financial Inc. • Form 10-K

for a net investment hedge continues to remain in accumulated other comprehensive income until earnings are impacted by sale or liquidation of the associated foreign operation. In all instances, after hedge accounting is no longer applied, any subsequent changes in fair value of the derivative instrument will be recorded into earnings.

Changes in the fair value of derivative financial instruments held for risk management purposes that are not designated for hedge accounting under GAAP and changes in the fair value of derivative financial instruments held for trading purposes are reported in current period earnings.

## Loan Commitments

We enter into commitments to purchase and make loans whereby the interest rate on the loans is set prior to funding (i.e., interest rate lock commitments). Interest rate lock commitments for mortgage loans to be originated for sale and all purchase commitments are derivative financial instruments carried at fair value in accordance with applicable accounting standards with changes in fair value included within current period earnings. The fair value of purchase and interest rate lock commitments include expected net future cash flows related to the associated servicing of the loan. Servicing assets are recognized as distinct assets once they are contractually separated from the underlying loan by sale or securitization. Day-one gains or losses on derivative interest rate lock commitments are recognized when applicable.

## Income Taxes

Our income tax expense, deferred tax assets and liabilities, and reserves for unrecognized tax benefits reflect management's best assessment of estimated future taxes to be paid. We are subject to income taxes in the United States and numerous foreign jurisdictions. Significant judgments and estimates are required in determining the consolidated income tax expense.

Deferred income taxes arise from temporary differences between the tax and financial statement recognition of revenue and expense. In evaluating our ability to recover our deferred tax assets within the jurisdiction from which they arise we consider all available positive and negative evidence including scheduled reversals of deferred tax liabilities, projected future taxable income, tax planning strategies and recent financial operations. In projecting future taxable income, we begin with historical results adjusted for the results of discontinued operations and changes in accounting policies and incorporate assumptions including the amount of future state, federal and foreign pretax operating income, the reversal of temporary differences, and the implementation of feasible and prudent tax planning strategies. For additional information regarding our provision for income taxes, refer to Note 23.

We recognize the financial statement effects of uncertain income tax positions when it is more likely than not, based on the technical merits, that the position will be sustained upon examination. Also, we recognize accrued interest and penalties related to uncertain income tax positions in interest expense and other operating expenses, respectively.

## Share-based Compensation

Under accounting guidance for share-based compensation, compensation cost recognized includes cost for share-based awards. For certain share-based awards compensation cost is ratably charged to expense over the applicable service periods. For other share-based awards, the awards require liability treatment and are remeasured quarterly at fair value until they are paid, with changes in fair value charged to compensation expense in the period in which the change occurs. Refer to Note 24 for a discussion of our share-based compensation plans.

## Foreign Exchange

Foreign-denominated assets and liabilities resulting from foreign-currency transactions are valued using period-end foreign-exchange rates and the results of operations and cash flows are determined using approximate weighted average exchange rates for the period. Translation adjustments are related to foreign subsidiaries using local currency as their functional currency and are reported as a separate component of accumulated other comprehensive income. We may elect to enter into foreign-currency derivatives to mitigate our exposure to changes in foreign-exchange rates. Refer to Derivative Instruments and Hedging Activities above for a discussion of our hedging activities of the foreign-currency exposure of a net investment in a foreign operation.

## Recently Adopted Accounting Standards

### Financial Services - Insurance - Accounting for Costs Associated with Acquiring or Renewing Insurance Contracts (ASU 2010-26)

As of January 1, 2012, we adopted Accounting Standards Update (ASU) 2010-26, which amends ASC 944, *Financial Services - Insurance*. The amendments in this ASU specify which costs incurred in the acquisition of new and renewal insurance contracts should be capitalized. All other acquisition-related costs should be expensed as incurred. If the initial application of the amendments in this ASU results in the capitalization of acquisition costs that had not been previously capitalized, an entity may elect not to capitalize those types of costs. Both retrospective and early adoption was permitted. We elected prospective application and did not early adopt the ASU. The adoption did not have a material impact to our consolidated financial condition or results of operations.

### Fair Value Measurement - Amendments to Achieve Common Fair Value Measurement and Disclosure Requirements in U.S. GAAP and IFRSs (ASU 2011-04)

As of January 1, 2012, we adopted ASU 2011-04, which amends ASC 820, *Fair Value Measurements*. The amendments in this ASU clarify how to measure fair value and it contains new disclosure requirements to provide more transparency into Level 3 fair value measurements. It is intended to improve the comparability of fair value measurements presented and disclosed in financial statements

Table of Contents

# Notes to Consolidated Financial Statements

Ally Financial Inc. • Form 10-K

prepared in accordance with U.S. GAAP and International Financial Reporting Standards (IFRS). The ASU must be applied prospectively. The adoption did not have a material impact to our consolidated financial condition or results of operations.

### Intangibles-Goodwill and Other - Testing Goodwill for Impairment (ASU 2011-08)

As of January 1, 2012, we adopted ASU 2011-08, which amends ASC 350, *Intangibles-Goodwill and Other*. This ASU permits the option of performing a qualitative assessment before calculating the fair value of a reporting unit in step 1 of the goodwill impairment test. If it is determined, on the basis of qualitative factors, that the fair value of a reporting unit is more likely than not more than the carrying amount, the two-step impairment test would not be required. Otherwise, further evaluation under the existing two-step framework would be required. The adoption did not have a material impact to our consolidated financial condition or results of operations.

## Recently Issued Accounting Standards

### Balance Sheet - Disclosures about Offsetting Assets and Liabilities (ASU 2011-11 and ASU 2013-01)

In December 2011, the Financial Accounting Standards Board (FASB) issued ASU 2011-11, which amends ASC 210, *Balance Sheet*. This ASU contains new disclosure requirements regarding the nature of an entity's rights of setoff and related arrangements associated with its financial instruments and derivative instruments. In addition, in January 2013, the FASB issued ASU 2013-01, which simply clarified the scope of ASU 2011-11. The new disclosures will give financial statement users information about both gross and net exposures. ASU 2011-11 and ASU 2013-01 are effective for us on January 1, 2013, and retrospective application is required. Since the guidance relates only to disclosures, adoption is not expected to have a material effect on our consolidated financial condition or results of operations.

### Comprehensive Income - Reporting of Amounts Reclassified Out of Accumulated Other Comprehensive Income (ASU 2013-02)

In February, 2013 the FASB issued ASU 2013-02, which amends ASC 220, *Comprehensive Income*. The ASU contains new requirements related to the presentation and disclosure of items that are reclassified out of other comprehensive income. The new requirements will give financial statement users a more comprehensive view of items that are reclassified out of other comprehensive income. ASU 2013-02 is effective for us on January 1, 2013, and is to be applied prospectively. Since the guidance relates only to presentation and disclosure of information, adoption is not expected to have a material effect on our consolidated financial condition or results of operations.

## 2.    Discontinued and Held-for-sale Operations

### Discontinued Operations

We classify operations as discontinued when operations and cash flows will be eliminated from our ongoing operations and we do not expect to retain any significant continuing involvement in their operations after the respective sale transactions. For all periods presented, all of the operating results for these discontinued operations have been removed from continuing operations and presented separately as discontinued operations, net of tax, in the *Consolidated Statement of Income*. The Notes to the Consolidated Financial Statements have been adjusted to exclude discontinued operations unless otherwise noted.

## Select Mortgage Operations

During the second quarter of 2012, we sold the Canadian mortgage operations of ResMor Trust. During 2010, we sold certain international operations. These operations included residential mortgage loan origination, acquisition, servicing, asset management, sale, and securitizations in the United Kingdom and continental Europe.

## Select Insurance Operations

During the fourth quarter of 2011, we committed to sell our U.K.-based operations that provide vehicle service contracts and insurance products in Europe and Latin America. On February 28, 2013, we sold our U.K.-based operations to a wholly owned subsidiary of AmTrust Financial Services, Inc. Additionally, during the fourth quarter of 2012, we committed to sell our Mexican insurance business, ABA Seguros, to the ACE Group. In connection with the classification of these Insurance operations as held-for-sale we recognized a pretax loss of $55 million during the year ended December 31, 2012. The loss represents the impairment recognized to present the operations at the lower-of-cost or fair value. The fair value was determined using sales agreements with third-party purchasers (a Level 2 fair value input). We expect to complete the ABA Seguros sale during the first half of 2013.

During the second quarter of 2011, we completed the sale of our U.K. consumer property and casualty insurance business. During 2010, we completed the sale of our U.S. consumer property and casualty insurance business.

## Select Automotive Finance Operations

During the fourth quarter of 2012, we committed to sell our Canadian automotive finance operations, Ally Credit Canada Limited, and ResMor Trust (Ally Canada) to Royal Bank of Canada. On February 1, 2013, we completed the sale of Ally Canada. Refer to Note 31 for more information regarding the sale. Additionally, during the fourth quarter of 2012, we committed to sell our automotive finance operations in Europe and Latin America to General Motors Financial Company, Inc. (GM Financial). On the same date, we entered into an agreement with GM Financial to acquire our 40% interest in a motor vehicle finance joint venture in China. No impairment was recognized to present the operations at the lower-of-cost or fair value. We expect to complete the sales by region during 2013.

123

Table of Contents

# Notes to Consolidated Financial Statements

Ally Financial Inc. • Form 10-K

During the first quarter of 2012, we completed the sale of our Venezuela operations. During the first quarter of 2011, we completed the sale of our Ecuador operations. During 2010, we completed the sale of our Argentina and Poland operations and our full-service leasing operations in Australia, Belgium, France, Poland, and the United Kingdom. We also ceased operations in Australia and Russia and classified them as discontinued during 2010.

## Select Corporate and Other Operations

During the fourth quarter of 2012, we ceased operations at our Commercial Finance operations' European division and classified it as discontinued.

## Select Financial Information

Select financial information of discontinued operations is summarized below. The pretax income or loss, including direct costs to transact, includes any impairment recognized to present the operations at the lower-of-cost or fair value. Fair value was based on the estimated sales price, which could differ from the ultimate sales price due to price volatility, changing interest rates, changing foreign-currency rates, and future economic conditions.

| Year ended December 31, ($ in millions) | 2012 | | 2011 | | 2010 |
|---|---|---|---|---|---|
| **Select Mortgage operations** | | | | | |
| Total net revenue (loss) | $ | 7 | $ (4) | $ | 94 |
| Pretax (loss) income including direct costs to transact a sale | | (13) | (38) | | 49 |
| Tax (benefit) expense | | (15) | (8) | | 7 |
| **Select Insurance operations** | | | | | |
| Total net revenue | $ | 625 | $ 710 | $ | 976 |
| Pretax income including direct costs to transact a sale (a) | | 86 | 145 | | 31 |
| Tax expense (b) | | 53 | 39 | | 19 |
| **Select Automotive Finance operations** | | | | | |
| Total net revenue | $ | 1,503 | $ 1,690 | $ | 1,646 |
| Pretax income including direct costs to transact a sale (a) | | 786 | 820 | | 698 |
| Tax expense (b) | | 235 | 92 | | 17 |
| **Select Corporate and Other operations** | | | | | |
| Total net revenue | $ | 11 | $ 7 | $ | 22 |
| Pretax income | | 83 | 44 | | 3 |
| Tax expense (benefit) | | 2 | 3 | | (3) |

(a)    Includes certain treasury and other corporate activity recognized by Corporate and Other.
(b)    Includes certain income tax activity recognized by Corporate and Other.

124

Table of Contents

# Notes to Consolidated Financial Statements

Ally Financial Inc. • Form 10-K

## Held-for-sale Operations

The assets and liabilities of operations held-for-sale are summarized below.

| December 31, 2012 ($ in millions) | Select Insurance operations (a) | | Select Automotive Finance operations (b) | | Total held-for-sale operations | |
|---|---|---|---|---|---|---|
| **Assets** | | | | | | |
| Cash and cash equivalents | | | | | | |
| Noninterest-bearing | $ | 8 | $ | 100 | $ | 108 |
| Interest-bearing | | 119 | | 1,918 | | 2,037 |
| Total cash and cash equivalents | | 127 | | 2,018 | | 2,145 |
| Investment securities | | 576 | | 424 | | 1,000 |
| Finance receivables and loans, net | | | | | | |
| Finance receivables and loans, net | | — | | 25,835 | | 25,835 |
| Allowance for loan losses | | — | | (208) | | (208) |
| Total finance receivables and loans, net | | — | | 25,627 | | 25,627 |
| Investment in operating leases, net | | — | | 144 | | 144 |
| Premiums receivable and other insurance assets | | 277 | | — | | 277 |
| Other assets | | 94 | | 2,942 | | 3,036 |
| Impairment on assets of held-for-sale operations | | (53) | | — | | (53) |
| Total assets | $ | 1,021 | $ | 31,155 | $ | 32,176 |
| **Liabilities** | | | | | | |
| Interest-bearing deposit liabilities | $ | — | $ | 3,907 | $ | 3,907 |
| Short-term borrowings | | — | | 2,800 | | 2,800 |
| Long-term debt | | — | | 13,514 | | 13,514 |
| Interest payable | | — | | 177 | | 177 |
| Unearned insurance premiums and service revenue | | 506 | | — | | 506 |
| Accrued expenses and other liabilities | | 297 | | 1,498 | | 1,795 |
| Total liabilities | $ | 803 | $ | 21,896 | $ | 22,699 |

(a)    Includes our U.K.-based operations that provide vehicle service contracts and insurance products, and ABA Seguros.
(b)    Includes our Canadian and Other International entities (including full-service leasing operations and other automotive finance operations).

125

Table of Contents

# Notes to Consolidated Financial Statements

Ally Financial Inc. • Form 10-K

| December 31, 2011 *($ in millions)* | Select Mortgage operations (a) | | Select Insurance operations (b) | | Select Automotive Finance operations (c) | | Total held-for-sale operations | |
|---|---|---|---|---|---|---|---|---|
| **Assets** | | | | | | | | |
| Cash and cash equivalents | | | | | | | | |
| Noninterest-bearing | $ | — | $ | 4 | $ | 55 | $ | 59 |
| Interest-bearing | | — | | 54 | | 38 | | 92 |
| Total cash and cash equivalents | | — | | 58 | | 93 | | 151 |
| Investment securities | | — | | 186 | | — | | 186 |
| Loans held-for-sale, net | | 260 | | — | | — | | 260 |
| Finance receivables and loans, net | | | | | | | | |
| Finance receivables and loans, net | | 285 | | — | | 11 | | 296 |
| Allowance for loan losses | | — | | — | | (1) | | (1) |
| Total finance receivables and loans, net | | 285 | | — | | 10 | | 295 |
| Investment in operating leases, net | | — | | — | | 91 | | 91 |
| Premiums receivable and other insurance assets | | — | | 77 | | — | | 77 |
| Other assets | | 140 | | 14 | | 30 | | 184 |
| Impairment on assets of held-for-sale operations | | — | | — | | (174) | | (174) |
| Total assets | $ | 685 | $ | 335 | $ | 50 | $ | 1,070 |
| **Liabilities** | | | | | | | | |
| Unearned insurance premiums and service revenue | $ | — | $ | 130 | $ | — | $ | 130 |
| Accrued expenses and other liabilities | | 80 | | 99 | | 28 | | 207 |
| Total liabilities | $ | 80 | $ | 229 | $ | 28 | $ | 337 |

(a)  Includes the Canadian mortgage operations of ResMor Trust.

(b)  Includes our U.K.-based operations that provide vehicle service contracts and insurance products.

(c)  Includes the operations of Venezuela and our full-service leasing operations.

126

Table of Contents

# Notes to Consolidated Financial Statements

Ally Financial Inc. • Form 10-K

## Recurring Fair Value

The following table displays the assets and liabilities of our held-for-sale operations measured at fair value on a recurring basis. Refer to  Note 25 for descriptions of valuation methodologies used to measure material assets at fair value and details of the valuation models, key inputs to these models, and significant assumptions used.

| ($ in millions) | | Recurring fair value measurements | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | Level 1 | | Level 2 | | Level 3 | | Total | |
| **December 31, 2012** | | | | | | | | | |
| **Assets** | | | | | | | | | |
| Investment securities | | | | | | | | | |
| Available-for-sale securities | | | | | | | | | |
| Debt securities | | | | | | | | | |
| Foreign government | $ | 555 | $ | 42 | $ | — | $ | 597 | |
| Corporate debt | | — | | 76 | | — | | 76 | |
| Other | | — | | 327 | | — | | 327 | |
| Other assets | | | | | | | | | |
| Derivative assets: | | | | | | | | | |
| Interest rate contracts | | — | | 22 | | 9 | | 31 | |
| Total assets | $ | 555 | $ | 467 | $ | 9 | $ | 1,031 | |
| **Liabilities** | | | | | | | | | |
| Accrued expenses and other liabilities: | | | | | | | | | |
| Derivative liabilities | | | | | | | | | |
| Interest rate contracts | $ | — | $ | 24 | $ | 11 | $ | 35 | |
| Foreign currency contracts | | — | | 1 | | 18 | | 19 | |
| Total liabilities | $ | — | $ | 25 | $ | 29 | $ | 54 | |
| **December 31, 2011** | | | | | | | | | |
| **Assets** | | | | | | | | | |
| Investment securities | | | | | | | | | |
| Available-for-sale securities | | | | | | | | | |
| Debt securities | | | | | | | | | |
| Foreign government | $ | 171 | $ | 15 | $ | — | $ | 186 | |
| Other assets | | | | | | | | | |
| Interest retained in financial asset sales | | — | | — | | 66 | | 66 | |
| Total assets | $ | 171 | $ | 15 | $ | 66 | $ | 252 | |

## 3.   Insurance Premiums and Service Revenue Earned

The following table is a summary of insurance premiums and service revenue written and earned.

| Year ended December 31, ($ in millions) | | 2012 | | | 2011 | | 2010 | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | Written | Earned | | Written | Earned | Written | Earned |
| Insurance premiums | | | | | | | | |
| Direct | $ | 337 | $ 339 | $ | 359 | $ 326 | $ 359 | $ 337 |
| Assumed | | 44 | 49 | | 38 | 76 | 210 | 281 |
| Gross insurance premiums | | 381 | 388 | | 397 | 402 | 569 | 618 |
| Ceded | | (141) | (109) | | (129) | (126) | (229) | (228) |
| Net insurance premiums | | 240 | 279 | | 268 | 276 | 340 | 390 |
| Service revenue | | 826 | 780 | | 788 | 894 | 718 | 981 |
| Insurance premiums and service revenue written and earned | $ | 1,066 | $ 1,059 | $ | 1,056 | $ 1,170 | $ 1,058 | $ 1,371 |

Table of Contents

# Notes to Consolidated Financial Statements

Ally Financial Inc. • Form 10-K

## 4.    Other Income, Net of Losses

Details of other income, net of losses, were as follows.

| Year ended December 31, ($ in millions) | | 2012 | | 2011 | | 2010 |
|---|---|---|---|---|---|---|
| Mortgage processing fees and other mortgage income | $ | 481 | $ | 231 | $ | 234 |
| Late charges and other administrative fees | | 83 | | 82 | | 92 |
| Remarketing fees | | 63 | | 96 | | 126 |
| Securitization income | | 45 | | 194 | | 20 |
| Fair value adjustment on derivatives (a) | | (30) | | (137) | | (189) |
| Change due to fair value option elections (b) | | (19) | | (101) | | (217) |
| Other, net | | 124 | | 128 | | 268 |
| Total other income, net of losses | $ | 747 | $ | 493 | $ | 334 |

(a)    Refer to Note 22 for a description of derivative instruments and hedging activities.
(b)    Refer to Note 25 for a description of fair value option elections.

## 5.    Other Operating Expenses

Details of other operating expenses were as follows.

| Year ended December 31, ($ in millions) | | 2012 | | 2011 | | 2010 |
|---|---|---|---|---|---|---|
| Impairment and accruals related to ResCap Bankruptcy and deconsolidation (a) | $ | 1,192 | $ | — | $ | — |
| Insurance commissions | | 382 | | 432 | | 511 |
| Technology and communications | | 347 | | 418 | | 431 |
| Lease and loan administration | | 315 | | 168 | | 143 |
| Professional services | | 281 | | 294 | | 241 |
| Advertising and marketing | | 150 | | 168 | | 137 |
| Regulatory and licensing fees | | 119 | | 127 | | 115 |
| Fines and penalties | | 90 | | 222 | | — |
| Premises and equipment depreciation | | 83 | | 81 | | 70 |
| Mortgage representation and warranty obligation, net | | 67 | | 324 | | 670 |
| Occupancy | | 58 | | 72 | | 72 |
| Vehicle remarketing and repossession | | 52 | | 84 | | 123 |
| State and local non-income taxes | | 15 | | 49 | | 42 |
| Other | | 347 | | 497 | | 523 |
| Total other operating expenses | $ | 3,498 | $ | 2,936 | $ | 3,078 |

(a)    This charge consists of the $442 million total impairment of our investment in ResCap and a $750 million accrual of a cash settlement offer to the Debtors' estate. Refer to Note 1 for more information regarding the Debtors' bankruptcy, deconsolidation, and this charge.

128

Table of Contents

# Notes to Consolidated Financial Statements

Ally Financial Inc. • Form 10-K

## 6.    Investment Securities

Our portfolio of securities includes bonds, equity securities, asset- and mortgage-backed securities, interests in securitization trusts, and other investments. The cost, fair value, and gross unrealized gains and losses on available-for-sale securities were as follows.

| | 2012 | | | | 2011 | | | |
|---|---|---|---|---|---|---|---|---|
| | | Gross unrealized | | Fair | | Gross unrealized | | Fair |
| December 31, *($ in millions)* | Amortized cost | gains | losses | value | Amortized cost | gains | losses | value |
| **Available-for-sale securities** | | | | | | | | |
| Debt securities | | | | | | | | |
| U.S. Treasury and federal agencies | $ **2,212** | $ **3** | $ **(1)** | $ **2,214** | $ 1,535 | $ 13 | $ (2) | $ 1,546 |
| U.S. states and political subdivisions | **—** | **—** | **—** | **—** | 1 | — | — | 1 |
| Foreign government | **295** | **8** | **—** | **303** | 765 | 20 | (1) | 784 |
| Mortgage-backed residential (a) | **6,779** | **130** | **(3)** | **6,906** | 7,266 | 87 | (41) | 7,312 |
| Asset-backed | **2,309** | **32** | **(1)** | **2,340** | 2,600 | 28 | (13) | 2,615 |
| Corporate debt | **1,209** | **57** | **(3)** | **1,263** | 1,486 | 23 | (18) | 1,491 |
| Other | **—** | **—** | **—** | **—** | 326 | 1 | — | 327 |
| Total debt securities | **12,804** | **230** | **(8)** | **13,026** | 13,979 | 172 | (75) | 14,076 |
| Equity securities | **1,193** | **32** | **(73)** | **1,152** | 1,188 | 25 | (154) | 1,059 |
| Total available-for-sale securities (b) | $ **13,997** | $ **262** | $ **(81)** | $ **14,178** | $ 15,167 | $ 197 | $ (229) | $ 15,135 |

(a)    Residential mortgage-backed securities include agency-backed bonds totaling  $4,983 million and $6,114 million at December 31, 2012, and December 31, 2011, respectively.

(b)    Certain entities related to our Insurance operations are required to deposit securities with state regulatory authorities. These deposited securities totaled  $15 million and $16 million at December 31, 2012, and December 31, 2011, respectively.

Table of Contents

# Notes to Consolidated Financial Statements

Ally Financial Inc. • Form 10-K

The maturity distribution of available-for-sale debt securities outstanding is summarized in the following tables. Prepayments may cause actual maturities to differ from scheduled maturities.

| ($ in millions) | Total | | Due in one year or less | | Due after one year through five years | | Due after five years through ten years | | Due after ten years (a) | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Amount | Yield | Amount | Yield | Amount | Yield | Amount | Yield | Amount | Yield |
| **December 31, 2012** | | | | | | | | | | |
| Fair value of available-for-sale debt securities (b) | | | | | | | | | | |
| U.S. Treasury and federal agencies | $ 2,214 | 0.9% | $ 422 | —% | $ 682 | 0.7% | $ 1,110 | 1.4% | $ — | —% |
| Foreign government | 303 | 2.5 | 1 | 2.2 | 136 | 1.8 | 166 | 3.0 | — | — |
| Mortgage-backed residential | 6,906 | 2.7 | — | — | — | — | 35 | 4.3 | 6,871 | 2.7 |
| Asset-backed | 2,340 | 2.1 | — | — | 1,543 | 2.0 | 510 | 1.7 | 287 | 3.3 |
| Corporate debt | 1,263 | 5.1 | 9 | 3.2 | 560 | 4.0 | 596 | 6.0 | 98 | 5.8 |
| Total available-for-sale debt securities | $ 13,026 | 2.4 | $ 432 | 0.1 | $ 2,921 | 2.0 | $ 2,417 | 2.6 | $ 7,256 | 2.6 |
| Amortized cost of available-for-sale debt securities | $ 12,804 | | $ 431 | | $ 2,880 | | $ 2,369 | | $ 7,124 | |
| **December 31, 2011** | | | | | | | | | | |
| Fair value of available-for-sale debt securities (b) | | | | | | | | | | |
| U.S. Treasury and federal agencies | $ 1,546 | 0.9% | $ 231 | —% | $ 1,202 | 0.9% | $ 113 | 2.2% | $ — | —% |
| U.S. states and political subdivisions | 1 | 5.4 | — | — | — | — | — | — | 1 | 5.4 |
| Foreign government | 784 | 4.4 | 77 | 7.7 | 506 | 4.3 | 201 | 3.3 | — | — |
| Mortgage-backed residential | 7,312 | 2.5 | 3 | 4.8 | 2 | 6.3 | 189 | 2.6 | 7,118 | 2.5 |
| Asset-backed | 2,615 | 2.1 | — | — | 1,599 | 1.9 | 574 | 1.9 | 442 | 3.2 |
| Corporate debt | 1,491 | 4.9 | 19 | 4.9 | 741 | 4.4 | 606 | 5.6 | 125 | 4.7 |
| Other | 327 | 1.4 | 316 | 1.3 | — | — | 11 | 4.6 | — | — |
| Total available-for-sale debt securities | $ 14,076 | 2.6 | $ 646 | 1.7 | $ 4,050 | 2.4 | $ 1,694 | 3.5 | $ 7,686 | 2.6 |
| Amortized cost of available-for-sale debt securities | $ 13,979 | | $ 644 | | $ 4,026 | | $ 1,678 | | $ 7,631 | |

(a)   Investments with no stated maturities are included as contractual maturities of greater than 10 years. Actual maturities may differ due to call or prepayment options.

(b)   Yields on tax-exempt obligations are computed on a tax-equivalent basis.

The balances of cash equivalents were $3.4 billion and $5.6 billion at December 31, 2012, and December 31, 2011, respectively, and were composed primarily of money market accounts and short-term securities, including U.S. Treasury bills.

The following table presents gross gains and losses realized upon the sales of available-for-sale securities and other-than-temporary impairment.

| Year ended December 31, ($ in millions) | | 2012 | | 2011 | | 2010 |
|---|---|---|---|---|---|---|
| Gross realized gains | $ | 241 | $ | 298 | $ | 537 |
| Gross realized losses | | (34) | | (28) | | (34) |
| Other-than-temporary impairment | | (61) | | (11) | | (1) |
| Net realized gains | $ | 146 | $ | 259 | $ | 502 |

130

Table of Contents

# Notes to Consolidated Financial Statements

Ally Financial Inc. • Form 10-K

The following table presents interest and dividends on available-for-sale securities.

| Year ended December 31, ($ in millions) | 2012 | 2011 | 2010 |
|---|---|---|---|
| Taxable interest | $ 262 | $ 327 | $ 296 |
| Taxable dividends | 30 | 24 | 17 |
| Interest and dividends exempt from U.S. federal income tax | — | — | 10 |
| Interest and dividends on available-for-sale securities | $ 292 | $ 351 | $ 323 |

Certain available-for-sale securities were sold at a loss in 2012, 2011, and 2010 as a result of market conditions within these respective periods (e.g., a downgrade in the rating of a debt security). The table below summarizes available-for-sale securities in an unrealized loss position in accumulated other comprehensive income. Based on the methodology described below that was applied to these securities, we believe that the unrealized losses relate to factors other than credit losses in the current market environment. As of December 31, 2012, we did not have the intent to sell the debt securities with an unrealized loss position in accumulated other comprehensive income, and it is not more likely than not that we will be required to sell these securities before recovery of their amortized cost basis. As of December 31, 2012, we had the ability and intent to hold equity securities with an unrealized loss position in accumulated other comprehensive income. As a result, we believe that the securities with an unrealized loss position in accumulated other comprehensive income are not considered to be other-than-temporarily impaired at December 31, 2012. Refer to Note 1 for additional information related to investment securities and our methodology for evaluating potential other-than-temporary impairments.

| | 2012 | | | | 2011 | | | |
|---|---|---|---|---|---|---|---|---|
| | Less than 12 months | | 12 months or longer | | Less than 12 months | | 12 months or longer | |
| December 31, ($ in millions) | Fair value | Unrealized loss | Fair value | Unrealized loss | Fair value | Unrealized loss | Fair value | Unrealized loss |
| **Available-for-sale securities** | | | | | | | | |
| Debt securities | | | | | | | | |
| U.S. Treasury and federal agencies | $ 244 | $ (1) | $ — | $ — | $ 179 | $ (2) | $ — | $ — |
| Foreign government | 11 | — | — | — | 197 | (1) | — | — |
| Mortgage-backed residential | 493 | (2) | 23 | (1) | 2,302 | (39) | 45 | (2) |
| Asset-backed | 143 | (1) | 1 | — | 994 | (13) | 1 | — |
| Corporate debt | 120 | (2) | 15 | (1) | 444 | (16) | 30 | (2) |
| Total temporarily impaired debt securities | 1,011 | (6) | 39 | (2) | 4,116 | (71) | 76 | (4) |
| Temporarily impaired equity securities | 380 | (39) | 218 | (34) | 770 | (148) | 18 | (6) |
| Total temporarily impaired available-for-sale securities | $ 1,391 | $ (45) | $ 257 | $ (36) | $ 4,886 | $ (219) | $ 94 | $ (10) |

## 7.  Loans Held-for-Sale, Net

The composition of loans held-for-sale, net, was as follows.

| | 2012 | | | 2011 | | |
|---|---|---|---|---|---|---|
| December 31, ($ in millions) | Domestic | Foreign | Total | Domestic | Foreign | Total |
| Consumer automobile | $ — | $ — | $ — | $ 425 | $ — | $ 425 |
| Consumer mortgage | | | | | | |
| 1st Mortgage | 2,490 | — | 2,490 | 7,360 | 12 | 7,372 |
| Home equity | — | — | — | 740 | — | 740 |
| Total consumer mortgage (a) | 2,490 | — | 2,490 | 8,100 | 12 | 8,112 |
| Commercial and industrial | | | | | | |
| Other | 86 | — | 86 | 20 | — | 20 |
| Total loans held-for-sale (b) | $ 2,576 | $ — | $ 2,576 | $ 8,545 | $ 12 | $ 8,557 |

(a)  Fair value option-elected domestic consumer mortgages were $2.5 billion and $3.9 billion at December 31, 2012, and December 31, 2011, respectively. Refer to Note 25 for additional information.

(b)  Totals are net of unamortized premiums and discounts and deferred fees and costs. Included in the totals are net unamortized premiums of $26 million at December 31, 2012, and net unamortized discounts of $221 million at December 31, 2011.

Table of Contents

# Notes to Consolidated Financial Statements

Ally Financial Inc. • Form 10-K

The following table summarizes held-for-sale mortgage loans reported at carrying value by higher-risk loan type.

| December 31, ($ in millions) | 2012 | | 2011 | |
|---|---|---|---|---|
| High original loan-to-value (greater than 100%) mortgage loans | $ | 378 | $ | 423 |
| Payment-option adjustable-rate mortgage loans | | — | | 12 |
| Interest-only mortgage loans | | 10 | | 298 |
| Below-market rate (teaser) mortgages | | — | | 169 |
| Total higher-risk mortgage loans held-for-sale | $ | 388 | $ | 902 |

## 8.    Finance Receivables and Loans, Net

The composition of finance receivables and loans, net, reported at carrying value before allowance for loan losses was as follows.

| December 31, ($ in millions) | 2012 | | | | | | 2011 | | | | | |
| | Domestic | | Foreign | | Total | | Domestic | | Foreign | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Consumer automobile | $ | 53,713 | $ | 2 | $ | 53,715 | $ | 46,576 | $ | 16,883 | $ | 63,459 |
| Consumer mortgage | | | | | | | | | | | | |
|   1st Mortgage | | 7,173 | | — | | 7,173 | | 6,867 | | 24 | | 6,891 |
|   Home equity | | 2,648 | | — | | 2,648 | | 3,102 | | — | | 3,102 |
| Total consumer mortgage | | 9,821 | | — | | 9,821 | | 9,969 | | 24 | | 9,993 |
| Commercial | | | | | | | | | | | | |
|   Commercial and industrial | | | | | | | | | | | | |
|     Automobile | | 30,270 | | — | | 30,270 | | 26,552 | | 8,265 | | 34,817 |
|     Mortgage | | — | | — | | — | | 1,887 | | 24 | | 1,911 |
|     Other | | 2,679 | | 18 | | 2,697 | | 1,178 | | 63 | | 1,241 |
|   Commercial real estate | | | | | | | | | | | | |
|     Automobile | | 2,552 | | — | | 2,552 | | 2,331 | | 154 | | 2,485 |
|     Mortgage | | — | | — | | — | | — | | 14 | | 14 |
| Total commercial | | 35,501 | | 18 | | 35,519 | | 31,948 | | 8,520 | | 40,468 |
| Loans at fair value (a) | | — | | — | | — | | 603 | | 232 | | 835 |
| Total finance receivables and loans (b) | $ | 99,035 | $ | 20 | $ | 99,055 | $ | 89,096 | $ | 25,659 | $ | 114,755 |

(a)    Includes domestic consumer mortgages at fair value as a result of fair value option election. Refer to  Note 25 for additional information.

(b)    Totals are net of unearned income, unamortized premiums and discounts, and deferred fees and costs of  $895 million and $2.9 billion at December 31, 2012, and December 31, 2011, respectively.

Table of Contents

# Notes to Consolidated Financial Statements

Ally Financial Inc. • Form 10-K

The following tables present an analysis of the activity in the allowance for loan losses on finance receivables and loans.

| ($ in millions) | Consumer automobile | Consumer mortgage | Commercial | Total |
|---|---|---|---|---|
| Allowance at January 1, 2012 | $ 766 | $ 516 | $ 221 | $ 1,503 |
| Charge-offs | | | | |
|   Domestic | (438) | (149) | (8) | (595) |
|   Foreign | (178) | — | (3) | (181) |
| Total charge-offs | (616) | (149) | (11) | (776) |
| Recoveries | | | | |
|   Domestic | 171 | 11 | 11 | 193 |
|   Foreign | 76 | — | 33 | 109 |
| Total recoveries | 247 | 11 | 44 | 302 |
| Net charge-offs | (369) | (138) | 33 | (474) |
| Provision for loan losses | 257 | 86 | (14) | 329 |
| Foreign provision for loan losses | 115 | — | (50) | 65 |
| Deconsolidation of ResCap | — | (9) | — | (9) |
| Other (a) | (194) | (3) | (47) | (244) |
| Allowance at December 31, 2012 | $ 575 | $ 452 | $ 143 | $ 1,170 |
| Allowance for loan losses | | | | |
|   Individually evaluated for impairment | $ 16 | $ 186 | $ 26 | $ 228 |
|   Collectively evaluated for impairment | 556 | 266 | 117 | 939 |
|   Loans acquired with deteriorated credit quality | 3 | — | — | 3 |
| Finance receivables and loans at historical cost | | | | |
|   Ending balance | 53,715 | 9,821 | 35,519 | 99,055 |
|   Individually evaluated for impairment | 260 | 873 | 1,538 | 2,671 |
|   Collectively evaluated for impairment | 53,425 | 8,948 | 33,981 | 96,354 |
|   Loans acquired with deteriorated credit quality | 30 | — | — | 30 |

(a)   Other includes the allowance of foreign Automotive Finance operations finance receivables and loans that were reclassified as discontinued operations.

| ($ in millions) | Consumer automobile | Consumer mortgage | Commercial | Total |
|---|---|---|---|---|
| Allowance at January 1, 2011 | $ 970 | $ 580 | $ 323 | $ 1,873 |
| Charge-offs | | | | |
|   Domestic | (435) | (205) | (27) | (667) |
|   Foreign | (145) | (5) | (63) | (213) |
| Total charge-offs | (580) | (210) | (90) | (880) |
| Recoveries | | | | |
|   Domestic | 186 | 16 | 25 | 227 |
|   Foreign | 73 | 1 | 26 | 100 |
| Total recoveries | 259 | 17 | 51 | 327 |
| Net charge-offs | (321) | (193) | (39) | (553) |
| Provision for loan losses | 102 | 129 | (43) | 188 |
| Foreign provision for loan losses | 52 | — | (21) | 31 |
| Other | (37) | — | 1 | (36) |
| Allowance at December 31, 2011 | $ 766 | $ 516 | $ 221 | $ 1,503 |
| Allowance for loan losses | | | | |
|   Individually evaluated for impairment | $ 7 | $ 172 | $ 61 | $ 240 |
|   Collectively evaluated for impairment | 749 | 344 | 160 | 1,253 |
|   Loans acquired with deteriorated credit quality | 10 | — | — | 10 |
| Finance receivables and loans at historical cost | | | | |
|   Ending balance | 63,459 | 9,993 | 40,468 | 113,920 |
|   Individually evaluated for impairment | 69 | 606 | 464 | 1,139 |
|   Collectively evaluated for impairment | 63,302 | 9,387 | 40,004 | 112,693 |

| Loans acquired with deteriorated credit quality | 88 | — | — | 88 |

133

Table of Contents

# Notes to Consolidated Financial Statements

Ally Financial Inc. • Form 10-K

The following table presents information about significant sales of finance receivables and loans recorded at historical cost and transfers of finance receivables and loans from held-for-investment to held-for-sale.

| December 31, ($ in millions) | | 2012 | | 2011 |
|---|---|---|---|---|
| Consumer automobile | $ | 1,960 | $ | 3,279 |
| Consumer mortgage | | 40 | | 107 |
| Commercial | | 96 | | 34 |
| Total sales and transfers | $ | 2,096 | $ | 3,420 |

The following table presents an analysis of our past due finance receivables and loans, net, recorded at historical cost reported at carrying value before allowance for loan losses.

| December 31, ($ in millions) | | 30-59 days past due | | 60-89 days past due | | 90 days or more past due | | Total past due | | Current | | Total finance receivables and loans |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **2012** | | | | | | | | | | | | |
| Consumer automobile | $ | 920 | $ | 213 | $ | 138 | $ | 1,271 | $ | 52,444 | $ | 53,715 |
| Consumer mortgage | | | | | | | | | | | | |
| 1st Mortgage | | 66 | | 37 | | 156 | | 259 | | 6,914 | | 7,173 |
| Home equity | | 15 | | 6 | | 18 | | 39 | | 2,609 | | 2,648 |
| Total consumer mortgage | | 81 | | 43 | | 174 | | 298 | | 9,523 | | 9,821 |
| Commercial | | | | | | | | | | | | |
| Commercial and industrial | | | | | | | | | | | | |
| Automobile | | — | | — | | 16 | | 16 | | 30,254 | | 30,270 |
| Mortgage | | — | | — | | — | | — | | — | | — |
| Other | | — | | — | | 1 | | 1 | | 2,696 | | 2,697 |
| Commercial real estate | | | | | | | | | | | | |
| Automobile | | — | | — | | 8 | | 8 | | 2,544 | | 2,552 |
| Mortgage | | — | | — | | — | | — | | — | | — |
| Total commercial | | — | | — | | 25 | | 25 | | 35,494 | | 35,519 |
| Total consumer and commercial | $ | 1,001 | $ | 256 | $ | 337 | $ | 1,594 | $ | 97,461 | $ | 99,055 |
| **2011** | | | | | | | | | | | | |
| Consumer automobile | $ | 802 | $ | 162 | $ | 179 | $ | 1,143 | $ | 62,316 | $ | 63,459 |
| Consumer mortgage | | | | | | | | | | | | |
| 1st Mortgage | | 91 | | 35 | | 162 | | 288 | | 6,603 | | 6,891 |
| Home equity | | 21 | | 11 | | 18 | | 50 | | 3,052 | | 3,102 |
| Total consumer mortgage | | 112 | | 46 | | 180 | | 338 | | 9,655 | | 9,993 |
| Commercial | | | | | | | | | | | | |
| Commercial and industrial | | | | | | | | | | | | |
| Automobile | | — | | 1 | | 126 | | 127 | | 34,690 | | 34,817 |
| Mortgage | | — | | — | | — | | — | | 1,911 | | 1,911 |
| Other | | — | | — | | 1 | | 1 | | 1,240 | | 1,241 |
| Commercial real estate | | | | | | | | | | | | |
| Automobile | | 2 | | 1 | | 34 | | 37 | | 2,448 | | 2,485 |
| Mortgage | | — | | 2 | | 12 | | 14 | | — | | 14 |
| Total commercial | | 2 | | 4 | | 173 | | 179 | | 40,289 | | 40,468 |
| Total consumer and commercial | $ | 916 | $ | 212 | $ | 532 | $ | 1,660 | $ | 112,260 | $ | 113,920 |

Table of Contents

# Notes to Consolidated Financial Statements

Ally Financial Inc. • Form 10-K

The following table presents the carrying value before allowance for loan losses of our finance receivables and loans recorded at historical cost on nonaccrual status.

| December 31, ($ in millions) | | 2012 | | 2011 |
|---|---|---|---|---|
| Consumer automobile | $ | 260 | $ | 228 |
| Consumer mortgage | | | | |
| 1st Mortgage | | 342 | | 281 |
| Home equity | | 40 | | 58 |
| Total consumer mortgage | | 382 | | 339 |
| Commercial | | | | |
| Commercial and industrial | | | | |
| Automobile | | 146 | | 223 |
| Mortgage | | — | | — |
| Other | | 33 | | 37 |
| Commercial real estate | | | | |
| Automobile | | 37 | | 67 |
| Mortgage | | — | | 12 |
| Total commercial | | 216 | | 339 |
| Total consumer and commercial finance receivables and loans | $ | 858 | $ | 906 |

Management performs a quarterly analysis of the consumer automobile, consumer mortgage, and commercial portfolios using a range of credit quality indicators to assess the adequacy of the allowance based on historical and current trends. The tables below present the population of loans by quality indicators for our consumer automobile, consumer mortgage, and commercial portfolios.

The following table presents performing and nonperforming credit quality indicators in accordance with our internal accounting policies for our consumer finance receivables and loans recorded at historical cost reported at carrying value before allowance for loan losses. Nonperforming loans include finance receivables and loans on nonaccrual status when the principal or interest has been delinquent for 90 days or when full collection is determined not to be probable. Refer to Note 1 for additional information.

| | 2012 | | | | | | 2011 | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| December 31, ($ in millions) | Performing | | Nonperforming | | Total | | Performing | | Nonperforming | | Total | |
| Consumer automobile | $ | 53,455 | $ | 260 | $ | 53,715 | $ | 63,231 | $ | 228 | $ | 63,459 |
| Consumer mortgage | | | | | | | | | | | | |
| 1st Mortgage | | 6,831 | | 342 | | 7,173 | | 6,610 | | 281 | | 6,891 |
| Home equity | | 2,608 | | 40 | | 2,648 | | 3,044 | | 58 | | 3,102 |
| Total consumer mortgage | $ | 9,439 | $ | 382 | $ | 9,821 | $ | 9,654 | $ | 339 | $ | 9,993 |

The following table presents pass and criticized credit quality indicators based on regulatory definitions for our commercial finance receivables and loans recorded at historical cost reported at carrying value before allowance for loan losses.

| | 2012 | | | | | | 2011 | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| December 31, ($ in millions) | Pass | | Criticized (a) | | Total | | Pass | | Criticized (a) | | Total | |
| Commercial | | | | | | | | | | | | |
| Commercial and industrial | | | | | | | | | | | | |
| Automobile | $ | 28,978 | $ | 1,292 | $ | 30,270 | $ | 32,464 | $ | 2,353 | $ | 34,817 |
| Mortgage | | — | | — | | — | | 1,760 | | 151 | | 1,911 |
| Other | | 2,417 | | 280 | | 2,697 | | 883 | | 358 | | 1,241 |
| Commercial real estate | | | | | | | | | | | | |
| Automobile | | 2,440 | | 112 | | 2,552 | | 2,305 | | 180 | | 2,485 |
| Mortgage | | — | | — | | — | | — | | 14 | | 14 |
| Total commercial | $ | 33,835 | $ | 1,684 | $ | 35,519 | $ | 37,412 | $ | 3,056 | $ | 40,468 |

(a)  Includes loans classified as special mention, substandard, or doubtful. These classifications are based on regulatory definitions and generally represent loans within our portfolio that have a higher default risk or have already defaulted.

Table of Contents

# Notes to Consolidated Financial Statements

Ally Financial Inc. • Form 10-K

## Impaired Loans and Troubled Debt Restructurings

### Impaired Loans

Loans are considered impaired when we determine it is probable that we will be unable to collect all amounts due according to the terms of the loan agreement. For more information on our impaired finance receivables and loans, refer to Note 1.

The following table presents information about our impaired finance receivables and loans recorded at historical cost.

| December 31, ($ in millions) | Unpaid principal balance | Carrying value before allowance | Impaired with no allowance | Impaired with an allowance | Allowance for impaired loans |
|---|---|---|---|---|---|
| **2012** | | | | | |
| Consumer automobile | $    260 | $    260 | $    90 | $    170 | $    16 |
| Consumer mortgage | | | | | |
| 1st Mortgage | 811 | 725 | 123 | 602 | 137 |
| Home equity | 147 | 148 | 1 | 147 | 49 |
| Total consumer mortgage | 958 | 873 | 124 | 749 | 186 |
| Commercial | | | | | |
| Commercial and industrial | | | | | |
| Automobile | 146 | 146 | 54 | 92 | 7 |
| Mortgage | — | — | — | — | — |
| Other | 33 | 33 | 9 | 24 | 7 |
| Commercial real estate | | | | | |
| Automobile | 37 | 37 | 9 | 28 | 12 |
| Mortgage | — | — | — | — | — |
| Total commercial | 216 | 216 | 72 | 144 | 26 |
| Total consumer and commercial finance receivables and loans | $  1,434 | $  1,349 | $  286 | $  1,063 | $  228 |
| **2011** | | | | | |
| Consumer automobile | $    69 | $    69 | $    — | $    69 | 7 |
| Consumer mortgage | | | | | |
| 1st Mortgage | 516 | 508 | 83 | 425 | 126 |
| Home equity | 97 | 98 | — | 98 | 46 |
| Total consumer mortgage | 613 | 606 | 83 | 523 | 172 |
| Commercial | | | | | |
| Commercial and industrial | | | | | |
| Automobile | 222 | 222 | 64 | 158 | 22 |
| Mortgage | — | — | — | — | — |
| Other | 37 | 37 | 25 | 12 | 5 |
| Commercial real estate | | | | | |
| Automobile | 68 | 68 | 32 | 36 | 18 |
| Mortgage | 12 | 12 | 1 | 11 | 5 |
| Total commercial | 339 | 339 | 122 | 217 | 50 |
| Total consumer and commercial finance receivables and loans | $  1,021 | $  1,014 | $  205 | $  809 | $  229 |

136

Table of Contents

# Notes to Consolidated Financial Statements

Ally Financial Inc. • Form 10-K

The following tables present average balance and interest income for our impaired finance receivables and loans.

| Year ended December 31, ($ in millions) | 2012 Average balance | 2012 Interest income | 2011 Average balance | 2011 Interest income | 2010 Average balance | 2010 Interest income |
|---|---|---|---|---|---|---|
| Consumer automobile | $ 131 | $ 12 | $ 35 | $ 2 | $ — | $ — |
| Consumer mortgage | | | | | | |
|   1st Mortgage | 598 | 24 | 463 | 18 | 405 | 15 |
|   Home equity | 95 | 4 | 90 | 4 | 79 | 4 |
| Total consumer mortgage | 693 | 28 | 553 | 22 | 484 | 19 |
| Commercial | | | | | | |
|   Commercial and industrial | | | | | | |
|     Automobile | 178 | 8 | 303 | 19 | 335 | 13 |
|     Mortgage | 5 | — | 19 | 6 | 53 | 2 |
|     Other | 32 | 6 | 84 | 1 | 650 | 6 |
|   Commercial real estate | | | | | | |
|     Automobile | 64 | 1 | 126 | 7 | 275 | 3 |
|     Mortgage | 6 | — | 40 | 1 | 137 | 6 |
| Total commercial | 285 | 15 | 572 | 34 | 1,450 | 30 |
| Total consumer and commercial finance receivables and loans | $ 1,109 | $ 55 | $ 1,160 | $ 58 | $ 1,934 | $ 49 |

## Troubled Debt Restructurings

TDRs are loan modifications where concessions were granted to borrowers experiencing financial difficulties. Numerous initiatives, such as the Home Affordable Modification Program (HAMP) are in place to provide support to our mortgage customers in financial distress, including principal forgiveness, maturity extensions, delinquent interest capitalization, and changes to contractual interest rates. Additionally for automobile loans, we offer several types of assistance to aid our customers including changing the maturity date and rewriting the loan terms. Total TDRs recorded at historical cost and reported at carrying value before allowance for loan losses were  $1.2 billion at December 31, 2012, reflecting an increase of $441 million from December 31, 2011. Refer to Note 1 for additional information.

137

Table of Contents

# Notes to Consolidated Financial Statements

Ally Financial Inc. • Form 10-K

The following table presents information related to finance receivables and loans recorded at historical cost modified in connection with a troubled debt restructuring during the period.

| Year ended December 31, ($ in millions) | 2012 (a) | | | 2011 | | |
| | Number of loans | Pre-modification carrying value before allowance | Post-modification carrying value before allowance | Number of loans | Pre-modification carrying value before allowance | Post-modification carrying value before allowance |
|---|---|---|---|---|---|---|
| Consumer automobile | 36,285 | $ 407 | $ 295 | 6,411 | $ 85 | $ 85 |
| Consumer mortgage | | | | | | |
| 1st Mortgage | 1,664 | 412 | 327 | 375 | 133 | 132 |
| Home equity | 1,305 | 24 | 23 | 888 | 51 | 47 |
| Total consumer mortgage | 2,969 | 436 | 350 | 1,263 | 184 | 179 |
| Commercial | | | | | | |
| Commercial and industrial | | | | | | |
| Automobile | 9 | 15 | 15 | 2 | 5 | 5 |
| Mortgage | — | — | — | 1 | 38 | 28 |
| Other | — | — | — | 2 | 11 | 10 |
| Commercial real estate | | | | | | |
| Automobile | 8 | 14 | 13 | 5 | 12 | 11 |
| Mortgage | — | — | — | 2 | 4 | 3 |
| Total commercial | 17 | 29 | 28 | 12 | 70 | 57 |
| Total consumer and commercial finance receivables and loans | 39,271 | $ 872 | $ 673 | 7,686 | $ 339 | $ 321 |

(a)    Due to recent industry practice, bankruptcy loans that have not been reaffirmed have been included within our TDR population beginning in the fourth quarter of 2012.

The following table presents information about finance receivables and loans recorded at historical cost that have redefaulted during the reporting period and were within 12 months or less of being modified as a troubled debt restructuring. Redefault is when finance receivables and loans meet the requirements for evaluation under our charge-off policy (Refer to Note 1 for additional information) except for commercial finance receivables and loans where redefault is defined as 90 days past due.

| Year ended December 31, ($ in millions) | 2012 (a) | | | 2011 | | |
| | Number of loans | Carrying value before allowance | Charge-off amount | Number of loans | Carrying value before allowance | Charge-off amount |
|---|---|---|---|---|---|---|
| Consumer automobile | 2,290 | $ 26 | $ 12 | 420 | $ 4 | $ 2 |
| Consumer mortgage | | | | | | |
| 1st Mortgage | 112 | 16 | 1 | 11 | 2 | — |
| Home equity | 41 | 3 | 2 | 28 | 2 | 1 |
| Total consumer mortgage | 153 | 19 | 3 | 39 | 4 | 1 |
| Commercial | | | | | | |
| Commercial and industrial | | | | | | |
| Automobile | 4 | 3 | — | 1 | 3 | |
| Commercial real estate | | | | | | |
| Automobile | 3 | 3 | — | — | — | |
| Total commercial | 7 | 6 | — | 1 | 3 | — |
| Total consumer and commercial finance receivables and loans | 2,450 | $ 51 | $ 15 | 460 | $ 11 | $ 3 |

(a)    Due to recent industry practice, bankruptcy loans that have not been reaffirmed have been included within our TDR population beginning in the fourth quarter of 2012.

At December 31, 2012, and December 31, 2011, commercial commitments to lend additional funds to debtors owing receivables whose terms had been modified in a troubled debt restructuring were $25 million and $45 million, respectively.

138

Table of Contents

# Notes to Consolidated Financial Statements

Ally Financial Inc. • Form 10-K

## Concentration Risk

### Consumer

We monitor our consumer loan portfolio for concentration risk across the geographies in which we lend. The highest concentrations of loans in the United States are in Texas and California, which represent an aggregate of 21.0% of our total outstanding consumer loans at December 31, 2012.

Concentrations in our mortgage portfolio are closely monitored given the volatility of the housing markets. Our consumer mortgage loan concentrations in California, Florida, and Michigan receive particular attention as the real estate value depreciation in these states has been the most severe.

The following table shows the percentage of total consumer finance receivables and loans recorded at historical cost reported at carrying value before allowance for loan losses by state and foreign concentration.

| December 31, | 2012 (a) | | 2011 | |
| --- | --- | --- | --- | --- |
| | Automobile | 1st Mortgage and home equity | Automobile | 1st Mortgage and home equity |
| Texas | 12.9% | 5.8% | 9.5% | 5.5% |
| California | 5.6 | 29.2 | 4.6 | 25.7 |
| Florida | 6.7 | 3.6 | 4.8 | 4.0 |
| Michigan | 5.0 | 4.1 | 4.0 | 4.8 |
| Pennsylvania | 5.2 | 1.6 | 3.6 | 1.6 |
| Illinois | 4.3 | 4.8 | 3.1 | 5.0 |
| New York | 4.6 | 2.0 | 3.5 | 2.3 |
| Ohio | 4.0 | 0.8 | 2.9 | 1.0 |
| Georgia | 3.7 | 1.9 | 2.5 | 1.8 |
| North Carolina | 3.3 | 2.0 | 2.2 | 2.1 |
| Other United States | 44.7 | 44.2 | 32.9 | 45.9 |
| Foreign (b) | — | — | 26.4 | 0.3 |
| Total consumer loans | 100.0% | 100.0% | 100.0% | 100.0% |

(a)    Presentation is in descending order as a percentage of total consumer finance receivables and loans at December 31, 2012.
(b)    Foreign consumer finance receivables and loans as of December 31, 2012, was $2 million. These remaining foreign balances are within Finland and the Czech Republic.

### Consumer Higher-Risk Mortgage

The following table summarizes held-for-investment mortgage finance receivables and loans recorded at historical cost and reported at carrying value before allowance for loan losses by higher-risk loan type.

| December 31, ($ in millions) | | 2012 | | 2011 |
| --- | --- | --- | --- | --- |
| Interest-only mortgage loans (a) | $ | 2,063 | $ | 2,947 |
| Below-market rate (teaser) mortgages | | 192 | | 248 |
| Total higher-risk mortgage finance receivables and loans | $ | 2,255 | $ | 3,195 |

(a)    The majority of the interest-only mortgage loans are expected to start principal amortization in 2015 or beyond.

139

Table of Contents

# Notes to Consolidated Financial Statements

Ally Financial Inc. • Form 10-K

The following table presents our five largest state concentrations within our held-for-investment mortgage finance receivables and loans recorded at historical cost and reported at carrying value before allowance for loan losses by higher-risk loan type.

| December 31, ($ in millions) | Interest-only mortgage loans | | Below-market rate (teaser) mortgages | | Total higher-risk mortgage loans | |
|---|---|---|---|---|---|---|
| **2012** | | | | | | |
| California | $ | **500** | $ | **60** | $ | **560** |
| Virginia | | **216** | | **9** | | **225** |
| Maryland | | **166** | | **5** | | **171** |
| Illinois | | **107** | | **6** | | **113** |
| Michigan | | **106** | | **5** | | **111** |
| Other United States | | **968** | | **107** | | **1,075** |
| Total higher-risk mortgage loans | $ | **2,063** | $ | **192** | $ | **2,255** |
| **2011** | | | | | | |
| California | $ | 748 | $ | 78 | $ | 826 |
| Virginia | | 274 | | 10 | | 284 |
| Maryland | | 217 | | 6 | | 223 |
| Illinois | | 153 | | 8 | | 161 |
| Michigan | | 199 | | 9 | | 208 |
| Other United States | | 1,356 | | 137 | | 1,493 |
| Total higher-risk mortgage loans | $ | 2,947 | $ | 248 | $ | 3,195 |

## Commercial Real Estate

The commercial real estate portfolio consists of loans issued primarily to automotive dealers. The following table shows the percentage of total commercial real estate finance receivables and loans reported at carrying value before allowance for loan losses by geographic region and property type.

| December 31, | 2012 | 2011 |
|---|---|---|
| Geographic region | | |
| Texas | **13.0%** | 12.4% |
| Michigan | **12.6** | 14.1 |
| Florida | **11.7** | 12.4 |
| California | **9.3** | 9.3 |
| New York | **4.9** | 3.5 |
| Virginia | **3.9** | 4.1 |
| North Carolina | **3.9** | 2.1 |
| Pennsylvania | **3.3** | 2.9 |
| Georgia | **3.0** | 2.5 |
| Tennessee | **2.3** | 1.8 |
| Other United States | **32.1** | 28.3 |
| Foreign | **—** | 6.6 |
| Total commercial real estate finance receivables and loans | **100.0%** | 100.0% |
| Property type | | |
| Automotive dealers | **100.0%** | 99.4% |
| Other | **—** | 0.6 |
| Total commercial real estate finance receivables and loans | **100.0%** | 100.0% |

140

Table of Contents

# Notes to Consolidated Financial Statements

Ally Financial Inc. • Form 10-K

**Commercial Criticized Exposure**

Finance receivables and loans classified as special mention, substandard, or doubtful are deemed as criticized. These classifications are based on regulatory definitions and generally represent finance receivables and loans within our portfolio that have a higher default risk or have already defaulted. The following table presents the percentage of total commercial criticized finance receivables and loans reported at carrying value before allowance for loan losses by industry concentrations.

| December 31, | 2012 | 2011 |
|---|---|---|
| Industry | | |
| Automotive | 85.7% | 82.9% |
| Manufacturing | 5.5 | 1.8 |
| Services | 4.9 | 1.9 |
| Other | 3.9 | 13.4 |
| Total commercial criticized finance receivables and loans | 100.0% | 100.0% |

## 9.  Investment in Operating Leases, Net

Investments in operating leases were as follows.

| December 31, ($ in millions) | | 2012 | | 2011 |
|---|---|---|---|---|
| Vehicles and other equipment | $ | 16,009 | $ | 11,160 |
| Accumulated depreciation | | (2,459) | | (1,885) |
| Investment in operating leases, net | $ | 13,550 | $ | 9,275 |

Depreciation expense on operating lease assets includes remarketing gains and losses recognized on the sale of operating lease assets. The following summarizes the components of depreciation expense on operating lease assets.

| Year ended December 31, ($ in millions) | | 2012 | | 2011 | | 2010 |
|---|---|---|---|---|---|---|
| Depreciation expense on operating lease assets (excluding remarketing gains) | $ | 1,515 | $ | 1,158 | $ | 1,806 |
| Remarketing gains | | (116) | | (217) | | (555) |
| Depreciation expense on operating lease assets | $ | 1,399 | $ | 941 | $ | 1,251 |

The following table presents the future lease nonresidual rental payments due from customers for equipment on operating leases.

| Year ended December 31, ($ in millions) | | |
|---|---|---|
| 2013 | $ | 2,573 |
| 2014 | | 1,705 |
| 2015 | | 618 |
| 2016 | | 27 |
| 2017 and after | | — |
| Total | $ | 4,923 |

## 10.  Securitizations and Variable Interest Entities

### Overview

We are involved in several types of securitization and financing transactions that utilize special-purpose entities (SPEs). A SPE is an entity that is designed to fulfill a specified limited need of the sponsor. Our principal use of SPEs is to obtain liquidity and favorable capital treatment by securitizing certain of our financial assets.

The SPEs involved in securitization and other financing transactions are generally considered variable interest entities (VIEs). VIEs are entities that have either a total equity investment that is insufficient to permit the entity to finance its activities without additional subordinated financial support or whose equity investors lack the ability to control the entity's activities. Due to the deconsolidation of ResCap, our mortgage securitization activity and involvement with certain mortgage-related VIEs has substantially changed. Refer to Note 1 for additional information related to ResCap.

### Securitizations

We provide a wide range of consumer and commercial automobile loans, operating leases, other commercial loans, and mortgage loan products to a diverse customer base. We often securitize these loans and leases (which we collectively describe as loans or financial assets) through the use of securitization entities, which may or may not be consolidated on our Consolidated Balance Sheet. We securitize consumer

Table of Contents

# Notes to Consolidated Financial Statements

Ally Financial Inc. • Form 10-K

and commercial automobile loans, operating leases, and other commercial loans through private-label securitizations. We securitize consumer mortgage loans through transactions involving the Federal National Mortgage Association (Fannie Mae) and the Federal Home Loan Mortgage Corporation (Freddie Mac). We previously securitized consumer mortgage loans through private-label mortgage securitizations and through transactions involving the Government National Mortgage Association (Ginnie Mae). We refer to Fannie Mae, Freddie Mac, and Ginnie Mae collectively as the Government-Sponsored Enterprises or GSEs. During  2012 and 2011, our consumer mortgage loans were primarily securitized through the GSEs.

In executing a securitization transaction, we typically sell pools of financial assets to a wholly owned, bankruptcy-remote SPE, which then transfers the financial assets to a separate, transaction-specific securitization entity for cash, servicing rights, and in some transactions, other retained interests. The securitization entity is funded through the issuance of beneficial interests in the securitized financial assets. The beneficial interests take the form of either notes or trust certificates which are sold to investors and/or retained by us. These beneficial interests are collateralized by the transferred loans and entitle the investors to specified cash flows generated from the securitized loans. In addition to providing a source of liquidity and cost-efficient funding, securitizing these financial assets also reduces our credit exposure to the borrowers beyond any economic interest we may retain.

Each securitization is governed by various legal documents that limit and specify the activities of the securitization entity. The securitization entity is generally allowed to acquire the loans, to issue beneficial interests to investors to fund the acquisition of the loans, and to enter into derivatives or other yield maintenance contracts to hedge or mitigate certain risks related to the financial assets or beneficial interests of the entity. A servicer, who is generally us, is appointed pursuant to the underlying legal documents to service the assets the securitization entity holds and the beneficial interests it issues. Servicing functions include, but are not limited to, making certain payments of property taxes and insurance premiums, default and property maintenance payments, as well as advancing principal and interest payments before collecting them from individual borrowers. Our servicing responsibilities, which constitute continued involvement in the transferred financial assets, consist of primary servicing (i.e., servicing the underlying transferred financial assets) and previously master servicing (i.e., servicing the beneficial interests that result from the securitization transactions). Certain securitization entities also require the servicer to advance scheduled principal and interest payments due on the beneficial interests issued by the entity regardless of whether cash payments are received on the underlying transferred financial assets. Accordingly, we are required to provide these servicing advances when applicable. Refer to  Note 11 for additional information regarding our servicing rights.

The GSEs provide a guarantee of the payment of principal and interest on the beneficial interests issued in securitizations. In private-label securitizations, cash flows from the assets initially transferred into the securitization entity represent the sole source for payment of distributions on the beneficial interests issued by the securitization entity and for payments to the parties that perform services for the securitization entity, such as the servicer or the trustee. In certain private-label securitization transactions, a liquidity facility may exist to provide temporary liquidity to the entity. The liquidity provider generally is reimbursed prior to other parties in subsequent distribution periods. In previous certain private-label securitizations, monoline insurance may have existed to cover certain shortfalls to certain investors in the beneficial interests issued by the securitization entity. As noted above, in certain private-label securitizations, the servicer is required to advance scheduled principal and interest payments due on the beneficial interests regardless of whether cash payments are received on the underlying transferred financial assets. The servicer is allowed to reimburse itself for these servicing advances. Additionally, certain private-label securitization transactions may have previously allowed for the acquisition of additional loans subsequent to the initial loan transfer. Principal collections on other loans and/or the issuance of new beneficial interests, such as variable funding notes, generally funded those loans; we were often contractually required to invest in these new interests.

We may have retained beneficial interests in our private-label securitizations, which may have represented a form of significant continuing economic interest. These retained interests included, but are not limited to, senior or subordinate asset-backed securities and residuals, and previously included senior or subordinate mortgage-backed securities, interest-only strips, and principal-only strips. Certain of these retained interests provided credit enhancement to the trust as they may have absorbed credit losses or other cash shortfalls. Additionally, the securitization agreements may have required cash flows to be directed away from certain of our retained interests due to specific over-collateralization requirements, which may or may not have been performance-driven.

We generally hold certain conditional repurchase options specific to private label securitizations that allow us to repurchase assets from the securitization entity. The majority of the securitizations provide us, as servicer, with a call option that allows us to repurchase the remaining transferred financial assets or outstanding beneficial interests at our discretion once the asset pool reaches a predefined level, which represents the point where servicing becomes burdensome (a clean-up call option). The repurchase price is typically the par amount of the loans plus accrued interest. Additionally, we may hold other conditional repurchase options that allow us to repurchase a transferred financial asset if certain events outside our control are met. The typical conditional repurchase option is a delinquent loan repurchase option that gives us the option to purchase the loan or contract if it exceeds a certain prespecified delinquency level. We generally have complete discretion regarding when or if we will exercise these options, but we would do so only when it is in our best interest.

Other than our customary representation and warranty provisions, these securitizations are nonrecourse to us, thereby transferring the risk of future credit losses to the extent the beneficial interests in the securitization entities are held by third parties. Representation and warranty provisions generally require us to repurchase loans or indemnify the investor or other party for incurred losses to the extent it is determined that the loans were ineligible or were otherwise defective at the time of sale. Refer to  Note 29 for detail on representation and warranty provisions. We did not provide any noncontractual financial support to any of these entities during  2012 or 2011.

Table of Contents

# Notes to Consolidated Financial Statements

Ally Financial Inc. • Form 10-K

## Other Variable Interest Entities

### Servicer Advance Funding Entity

We previously assisted in the financing of our servicer advance receivables; we formed a VIE that issued variable funding notes to third-party investors that were collateralized by servicer advance receivables. These servicer advance receivables were transferred to the VIE and consisted of delinquent principal and interest advances we made as servicer to various investors; property taxes and insurance premiums advanced to taxing authorities and insurance companies on behalf of borrowers; and amounts advanced for mortgages in foreclosure. The VIE funded the purchase of the receivables through financing obtained from the third-party investors and subordinated loans or an equity contribution from our mortgage activities. This VIE was not consolidated on our balance sheet at December 31, 2012 as a result of the deconsolidation of ResCap, but was consolidated on our balance sheet at December 31, 2011. The beneficial interest holder of this VIE does not have legal recourse to our general credit. We do not have a contractual obligation to provide any type of financial support in the future, nor have we provided noncontractual financial support to the entity during 2012 or 2011.

### Other

We had involvements with various other on-balance sheet, immaterial VIEs. Most of these VIEs were used for additional liquidity whereby we sold certain financial assets into the VIE and issued beneficial interests to third parties for cash.

We also provide long-term guarantee contracts to investors in certain nonconsolidated affordable housing entities and have extended a line of credit to provide liquidity and minimize our exposure under these contracts. Since we do not have control over the entities or the power to make decisions, we do not consolidate the entities and our involvement is limited to the guarantee and the line of credit.

## Involvement with Variable Interest Entities

The determination of whether financial assets transferred by us to these VIEs (and related liabilities) are consolidated on our balance sheet (also referred to as on-balance sheet) or not consolidated on our balance sheet (also referred to as off-balance sheet) depends on the terms of the related transaction and our continuing involvement (if any) with the VIE. We are deemed the primary beneficiary and therefore consolidate VIEs for which we have both (a) the power, through voting rights or similar rights, to direct the activities that most significantly impact the VIE's economic performance, and (b) a variable interest (or variable interests) that (i) obligates us to absorb losses that could potentially be significant to the VIE and/or (ii) provides us the right to receive residual returns of the VIE that could potentially be significant to the VIE. We determine whether we hold a significant variable interest in a VIE based on a consideration of both qualitative and quantitative factors regarding the nature, size, and form of our involvement with the VIE. We assess whether we are the primary beneficiary of a VIE on an ongoing basis.

Table of Contents

# Notes to Consolidated Financial Statements

Ally Financial Inc. • Form 10-K

Our involvement with consolidated and nonconsolidated VIEs in which we hold variable interests is presented below.

| December 31, ($ in millions) | Consolidated involvement with VIEs (a) | | Assets of nonconsolidated VIEs (a) | | Maximum exposure to loss in nonconsolidated VIEs | |
|---|---|---|---|---|---|---|
| **2012** | | | | | | |
| On-balance sheet variable interest entities | | | | | | |
| Consumer automobile | $ | **28,566** | | | | |
| Commercial automobile | | **23,139** | | | | |
| Commercial other | | **728** | | | | |
| Off-balance sheet variable interest entities | | | | | | |
| Consumer automobile | | **—** | $ | **1,495** | $ | **1,495** (b) |
| Consumer mortgage — other | | **—** | | **—** (c) | | **12** (d) |
| Commercial other | | **(28)** (e) | | **—** (f) | | **85** |
| Total | $ | **52,405** | $ | **1,495** | $ | **1,592** |
| **2011** | | | | | | |
| On-balance sheet variable interest entities | | | | | | |
| Consumer automobile | $ | 26,504 | | | | |
| Consumer mortgage — private-label | | 1,098 | | | | |
| Commercial automobile | | 19,594 | | | | |
| Other | | 956 | | | | |
| Off-balance sheet variable interest entities | | | | | | |
| Consumer mortgage — Ginnie Mae | | 2,652 (g) | $ | 44,127 | $ | 44,127 (b) |
| Consumer mortgage — CMHC | | 66 (g) | | 3,222 | | 66 (h) |
| Consumer mortgage — private-label | | 141 (g) | | 4,408 | | 4,408 (b) |
| Consumer mortgage — other | | — | | — (c) | | 17 (d) |
| Commercial other | | 83 (e) | | — (f) | | 242 |
| Total | $ | 51,094 | $ | 51,757 | $ | 48,860 |

(a)  Asset values represent the current unpaid principal balance of outstanding consumer finance receivables and loans within the VIEs.

(b)  Maximum exposure to loss represents the current unpaid principal balance of outstanding loans based on our customary representation and warranty provisions. This measure is based on the unlikely event that all of the loans have underwriting defects or other defects that trigger a representation and warranty provision and the collateral supporting the loans are worthless. This required disclosure is not an indication of our expected loss.

(c)  Includes a VIE for which we have no management oversight and therefore we are not able to provide the total assets of the VIE. However, in March 2011 we sold excess servicing rights valued at $266 million to the VIE.

(d)  Our maximum exposure to loss in this VIE is a component of servicer advances made that are allocated to the trust. The maximum exposure to loss presented represents the unlikely event that every loan underlying the excess servicing rights sold defaults, and we, as servicer, are required to advance the entire excess service fee to the trust for the contractually established period. This required disclosure is not an indication of our expected loss.

(e)  Includes $0 million and $100 million classified as finance receivables and loans, net, and $0 million and $20 million classified as other assets, offset by $28 million and $37 million classified as accrued expenses and other liabilities at December 31, 2012, and December 31, 2011, respectively.

(f)  Includes VIEs for which we have no management oversight and therefore we are not able to provide the total assets of the VIEs.

(g)  Includes $0 billion and $2.4 billion classified as mortgage loans held-for-sale, $0 million and $92 million classified as trading securities or other assets, and $0 million and $386 million classified as mortgage servicing rights at December 31, 2012, and December 31, 2011, respectively. CMHC is the Canada Mortgage and Housing Corporation.

(h)  Due to combination of the credit loss insurance on the mortgages and the guarantee by CMHC on the issued securities, the maximum exposure to loss would be limited to the amount of the retained interests. Additionally, the maximum loss would occur only in the event that CMHC dismisses us as servicer of the loans due to servicer performance or insolvency.

## On-balance Sheet Variable Interest Entities

We engage in securitization and other financing transactions that do not qualify for off-balance sheet treatment. In these situations, we hold beneficial interests or other interests in the VIE, which represent a form of significant continuing economic interest. These retained interests include, but are not limited to, senior or subordinate asset-backed securities and residuals, and previously included senior or subordinate mortgage-backed securities, interest-only strips, and principal-only strips. Certain of these retained interests provide credit enhancement to the securitization entity as they may absorb credit losses or other cash shortfalls. Additionally, the securitization documents may require cash flows to be directed away from certain of our retained interests due to specific over-collateralization requirements, which may or may not be performance-driven. Because these securitization entities are consolidated, these retained interests and servicing rights are not recognized as separate assets on our Consolidated Balance Sheet.

Table of Contents

# Notes to Consolidated Financial Statements

Ally Financial Inc. • Form 10-K

We consolidated certain of these entities because we had a controlling financial interest in the VIE, primarily due to our servicing activities, and because we hold a significant variable interest in the VIE. We are generally the primary beneficiary of automobile securitization entities for which we perform servicing activities and have retained a significant variable interest in the form of a beneficial interest. We were previously the primary beneficiary of certain mortgage private-label securitization entities.

The consolidated VIEs included in the Consolidated Balance Sheet represent separate entities with which we are involved. The third-party investors in the obligations of consolidated VIEs have legal recourse only to the assets of the VIEs and do not have recourse to us, except for the customary representation and warranty provisions or when we are the counterparty to certain derivative transactions involving the VIE. In addition, the cash flows from the assets are restricted only to pay such liabilities. Thus, our economic exposure to loss from outstanding third-party financing related to consolidated VIEs is significantly less than the carrying value of the consolidated VIE assets. All assets of consolidated VIEs, presented below based upon the legal transfer of the underlying assets in order to reflect legal ownership, are restricted for the benefit of the beneficial interest holders. Refer to Note 25 for discussion of the assets and liabilities for which the fair value option has been elected.

| December 31, ($ in millions) | | 2012 | | 2011 |
|---|---|---|---|---|
| **Assets** | | | | |
| Loans held-for-sale, net | $ | — | $ | 9 |
| Finance receivables and loans, net | | | | |
| Consumer | | **13,671** | | 21,622 |
| Commercial | | **17,839** | | 19,313 |
| Allowance for loan losses | | **(144)** | | (210) |
| Total finance receivables and loans, net | | **31,366** | | 40,725 |
| Investment in operating leases, net | | **6,060** | | 4,389 |
| Other assets | | **2,868** | | 3,029 |
| Assets of operations held-for-sale | | **12,139** | | — |
| **Total assets** | $ | **52,433** | $ | 48,152 |
| **Liabilities** | | | | |
| Short-term borrowings | $ | **400** | $ | 795 |
| Long-term debt | | **26,461** | | 33,143 |
| Interest payable | | **1** | | 14 |
| Accrued expenses and other liabilities | | **16** | | 405 |
| Liabilities of operations held-for-sale | | **9,686** | | — |
| **Total liabilities** | $ | **36,564** | $ | 34,357 |

## Off-balance Sheet Variable Interest Entities

The nature, purpose, and activities of nonconsolidated securitization entities are similar to those of our consolidated securitization entities with the primary difference being the nature and extent of our continuing involvement. The cash flows from the assets of nonconsolidated securitization entities generally are the sole source of payment on the securitization entities' liabilities. The creditors of these securitization entities have no recourse to us with the exception of market customary representation and warranty provisions as described in Note 29.

Nonconsolidated VIEs include entities for which we either do not hold potentially significant variable interests or do not provide servicing or asset management functions for the financial assets held by the securitization entity. Additionally, to qualify for off-balance sheet treatment, transfers of financial assets must meet the sale accounting conditions in ASC 860, *Transfers and Servicing*. Previously, our residential mortgage loan securitizations consisted of Ginnie Mae and private-label securitizations. We are not the primary beneficiary of any GSE loan securitization transaction because we do not have the power to direct the significant activities of such entities. Previously, we did not consolidate certain private-label mortgage securitizations because we did not have a variable interest that could potentially have been significant or we did not have power to direct the activities that most significantly impacted the performance of the VIE.

For nonconsolidated securitization entities, the transferred financial assets are removed from our balance sheet provided the conditions for sale accounting are met. The financial assets obtained from the securitization are primarily reported as cash, servicing rights, or retained interests (if applicable). Typically, we conclude that the fee we are paid for servicing consumer automobile finance receivables represents adequate compensation, and consequently, we do not recognize a servicing asset or liability. As an accounting policy election, we elected fair value treatment for our mortgage servicing rights (MSR) portfolio. Liabilities incurred as part of these securitization transactions, such as representation and warranty provisions, are recorded at fair value at the time of sale and are reported as accrued expenses and other liabilities on our Consolidated Balance Sheet. Upon the sale of the loans, we recognize a gain or loss on sale for the difference between the assets recognized, the assets derecognized, and the liabilities recognized as part of the transaction.

145

Table of Contents

# Notes to Consolidated Financial Statements

Ally Financial Inc. • Form 10-K

The following summarizes all pretax gains and losses recognized on financial assets sold into nonconsolidated securitization and similar asset-backed financing entities.

| Year ended December 31, *($ in millions)* | 2012 | | 2011 | | 2010 |
|---|---|---|---|---|---|
| Consumer automobile | $ 6 | $ | — | $ | — |
| Consumer mortgage — GSEs | 942 | | 818 | | 1,065 |
| Consumer mortgage — private-label | — | | — | | 17 |
| Total pretax gain | $ 948 | $ | 818 | $ | 1,082 |

The following table summarizes cash flows received from and paid related to securitization entities, asset-backed financings, or other similar transfers of financial assets where the transfer is accounted for as a sale and we have a continuing involvement with the transferred assets (e.g., servicing) that were outstanding in 2012, 2011, and 2010. Additionally, this table contains information regarding cash flows received from and paid to nonconsolidated securitization entities that existed during each period.

| Year ended December 31, *($ in millions)* | Consumer automobile | Consumer mortgage GSEs | Consumer mortgage private-label |
|---|---|---|---|
| **2012** | | | |
| Cash proceeds from transfers completed during the period | $ 1,979 | $ 32,796 | $ 5 |
| Cash flows received on retained interests in securitization entities | — | — | 71 |
| Servicing fees | 12 | 693 | 63 |
| Purchases of previously transferred financial assets | — | (876) | (12) |
| Representations and warranties obligations | — | (108) | (7) |
| Other cash flows | — | (96) | 255 |
| **2011** | | | |
| Cash proceeds from transfers completed during the period | $ — | $ 59,815 | $ 722 |
| Cash flows received on retained interests in securitization entities | — | — | 68 |
| Servicing fees | — | 999 | 201 |
| Purchases of previously transferred financial assets | — | (2,537) | (222) |
| Representations and warranties obligations | — | (143) | (38) |
| Other cash flows | — | (13) | 187 |
| **2010** | | | |
| Cash proceeds from transfers completed during the period | $ — | $ 68,822 | $ 1,090 |
| Cash flows received on retained interests in securitization entities | — | — | 81 |
| Servicing fees | 1 | 1,081 | 209 |
| Purchases of previously transferred financial assets | — | (1,865) | (282) |
| Representations and warranties obligations | — | (389) | (18) |
| Other cash flows | (6) | (39) | (22) |

Table of Contents

# Notes to Consolidated Financial Statements

Ally Financial Inc. • Form 10-K

The following tables represent on-balance sheet loans held-for-sale and finance receivable and loans, off-balance sheet securitizations, and whole-loan sales where we have continuing involvement. The table presents quantitative information about delinquencies and net credit losses. Refer to  Note 11 for further detail on total serviced assets.

| December 31, ($ in millions) | Total Amount | | Amount 60 days or more past due | | Net credit losses | |
|---|---|---|---|---|---|---|
| | **2012** | 2011 | **2012** | 2011 | **2012** | 2011 |
| On-balance sheet loans | | | | | | |
| Consumer automobile | $ **53,715** | $ 63,884 | $ **351** | $ 341 | $ **369** | $ 321 |
| Consumer mortgage (a) | **12,311** | 18,940 | **241** | 3,242 | **16** | 181 |
| Commercial automobile | **32,822** | 37,302 | **24** | 162 | **(1)** | 13 |
| Commercial mortgage | **—** | 1,925 | **—** | 14 | **(1)** | 31 |
| Commercial other | **2,783** | 1,261 | **1** | 1 | **(31)** | (5) |
| Total on-balance sheet loans | **101,631** | 123,312 | **617** | 3,760 | **352** | 541 |
| Off-balance sheet securitization entities | | | | | | |
| Consumer automobile | **1,495** | — | **4** | — | **2** | — |
| Consumer mortgage - GSEs (b) | **119,384** | 262,984 | **1,892** | 9,456 | **n/m** | n/m |
| Consumer mortgage-private-label | **—** | 63,991 | **—** | 11,301 | **1,234** | 3,982 |
| Total off-balance sheet securitization entities | **120,879** | 326,975 | **1,896** | 20,757 | **1,236** | 3,982 |
| Whole-loan transactions (c) | **6,756** | 33,961 | **129** | 2,901 | **243** | 782 |
| Total | $ **229,266** | $ 484,248 | $ **2,642** | $ 27,418 | $ **1,831** | $ 5,305 |

(a)   Includes loans subject to conditional repurchase options of  $0 billion and $2.3 billion guaranteed by the GSEs, and  $0 million and $132 million sold to certain private-label mortgage securitization entities at  December 31, 2012,  and 2011, respectively.
(b)   Anticipated credit losses are not meaningful due to the GSE guarantees.
(c)   Whole-loan transactions are not part of a securitization transaction, but represent consumer automobile and consumer mortgage pools of loans sold to third-party investors.

## 11.    Servicing Activities
## Mortgage Servicing Rights

The following table summarizes activity related to MSRs, which are carried at fair value. As there are limited MSR market transactions that are directly observable, management estimates fair value using internally developed discounted cash flow models (an income approach) to estimate the fair value. These internal valuation models estimate net cash flows based on internal operating assumptions that we believe would be used by market participants in orderly transactions combined with market-based assumptions for loan prepayment rates, interest rates, and discount rates that we believe approximate yields required by investors in this asset.

| Year ended December 31, ($ in millions) | 2012 (a) | 2011 |
|---|---|---|
| Estimated fair value at January 1, | $ **2,519** | $ 3,738 |
| Additions recognized on sale of mortgage loans | **240** | 622 |
| Additions from purchases of servicing rights | **—** | 31 |
| Subtractions from sales of servicing assets | **—** | (266) |
| Changes in fair value | | |
| Due to changes in valuation inputs or assumptions used in the valuation model | **(282)** | (1,041) |
| Other changes in fair value | **(395)** | (565) |
| Deconsolidation of ResCap | **(1,130)** | — |
| Estimated fair value at December 31, | $ **952** | $ 2,519 |

(a)   The remaining balance is at Ally Bank, due to the deconsolidation of ResCap. Ally Bank announced that it has begun to explore strategic alternatives for its agency MSR portfolio.

Changes in fair value due to changes in valuation inputs or assumptions used in the valuation model include all changes due to a revaluation by a model or by a benchmarking exercise. Other changes in fair value primarily include the accretion of the present value of the discount related to forecasted cash flows and the economic runoff of the portfolio.

Table of Contents

# Notes to Consolidated Financial Statements

Ally Financial Inc. • Form 10-K

The key economic assumptions and sensitivity of the fair value of MSRs to immediate 10% and 20% adverse changes in those assumptions were as follows.

| December 31, ($ in millions) | | 2012 | | 2011 |
|---|---|---|---|---|
| Weighted average life (in years) | | 4.6 | | 4.7 |
| Weighted average prepayment speed | | 13.5% | | 15.7% |
| Impact on fair value of 10% adverse change | $ | (77) | $ | (135) |
| Impact on fair value of 20% adverse change | | (144) | | (257) |
| Weighted average discount rate | | 7.7% | | 10.2% |
| Impact on fair value of 10% adverse change | $ | (10) | $ | (59) |
| Impact on fair value of 20% adverse change | | (19) | | (114) |

These sensitivities are hypothetical and should be considered with caution. Changes in fair value based on a 10% and 20% variation in assumptions generally cannot be extrapolated because the relationship of the change in assumptions to the change in fair value may not be linear. Also, the effect of a variation in a particular assumption on the fair value is calculated without changing any other assumption. In reality, changes in one factor may result in changes in another (e.g., increased market interest rates may result in lower prepayments and increased credit losses) that could magnify or counteract the sensitivities. Further, these sensitivities show only the change in the asset balances and do not show any expected change in the fair value of the instruments used to manage the interest rates and prepayment risks associated with these assets.

## Risk Mitigation Activities

The primary risk of our servicing rights is interest rate risk and the resulting impact on prepayments. A significant decline in interest rates could lead to higher-than-expected prepayments that could reduce the value of the MSRs. We economically hedge the impact of these risks with both derivative and nonderivative financial instruments. Refer to Note 22 for additional information regarding the derivative financial instruments used to economically hedge MSRs.

The components of servicing valuation and hedge activities, net, were as follows.

| Year ended December 31, ($ in millions) | | 2012 | | 2011 | | 2010 |
|---|---|---|---|---|---|---|
| Change in estimated fair value of mortgage servicing rights | $ | (677) | $ | (1,606) | $ | (872) |
| Change in fair value of derivative financial instruments | | 669 | | 817 | | 478 |
| Servicing asset valuation and hedge activities, net | $ | (8) | $ | (789) | $ | (394) |

## Mortgage Servicing Fees

The components of mortgage servicing fees were as follows.

| Year ended December 31, ($ in millions) | | 2012 | | 2011 | | 2010 |
|---|---|---|---|---|---|---|
| Contractual servicing fees, net of guarantee fees and including subservicing | $ | 504 | $ | 977 | $ | 998 |
| Late fees | | 29 | | 65 | | 77 |
| Ancillary fees | | 59 | | 156 | | 187 |
| Total mortgage servicing fees | $ | 592 | $ | 1,198 | $ | 1,262 |

## Mortgage Servicing Advances

In connection with our primary Mortgage servicing activities (i.e., servicing of mortgage loans), we make certain payments for property taxes and insurance premiums, default and property maintenance payments, as well as advances of principal and interest payments before collecting them from individual borrowers. Servicing advances including contractual interest, are priority cash flows in the event of a loan principal reduction or foreclosure and ultimate liquidation of the real estate-owned property. These servicing advances are included in other assets on the  Consolidated Balance Sheet and totaled $82 million and $1.9 billion at December 31, 2012 and 2011, respectively. We maintain an allowance for uncollected primary servicing advances of  $1 million and $43 million at December 31, 2012 and 2011, respectively. Our potential obligation is influenced by the loan's performance and credit quality. Additionally, we have a fiduciary responsibility for mortgage escrow and custodial funds that totaled  $0 billion and $4.4 billion at December 31, 2012 and 2011, respectively. A portion of these balances are included in deposit liabilities on our Consolidated Balance Sheet. Refer to  Note 14 for additional information.

Due to the deconsolidation of ResCap on May 14, 2012, we no longer act as a subservicer or master servicer of mortgage loans. Refer to  Note 1 for more information regarding the deconsolidation. When we acted as a subservicer of mortgage loans we performed the responsibilities of a primary servicer but did not own the corresponding primary servicing rights. We received a fee from the primary servicer for such services. As the subservicer, we had the same responsibilities of a primary servicer in that we made certain payments of property

148

Table of Contents

# Notes to Consolidated Financial Statements

Ally Financial Inc. • Form 10-K

taxes and insurance premiums, default and property maintenance, as well as advances of principal and interest payments before collecting them from individual borrowers. At December 31, 2011, outstanding servicer advances related to subserviced loans were $125 million and we had a reserve for uncollected subservicer advances $1 million.

At December 31, 2011, we were the master servicer (i.e., servicer of beneficial interests issued by mortgage securitization entities) for 467,722 loans, having an aggregate unpaid principal balance of $61.4 billion. In many cases, where we acted as master servicer, we also acted as primary servicer. In connection with our master-servicing activities, we serviced the mortgage-backed and mortgage-related asset-backed securities and whole-loan packages sold to investors. As the master servicer, we collected mortgage loan payments from primary servicers and distributed those funds to investors in the mortgage-backed and mortgage-related asset-backed securities and whole-loan packages. As the master servicer, we were required to advance scheduled payments to the securitization trust or whole-loan investors. To the extent the primary servicer does not advance the payments, we were responsible for advancing the payment to the trust or whole-loan investors. Master-servicing advances, including contractual interest, are priority cash flows in the event of a default, thus making their collection reasonably assured. In most cases, we were required to advance these payments to the point of liquidation of the loan or reimbursement of the trust or whole-loan investors. At December 31, 2011, outstanding master-servicing advances were $158 million and we had no reserve for uncollected master-servicing advances.

## Mortgage Serviced Assets

Total serviced mortgage assets consist of primary servicing activities. These include loans owned by Ally Bank, where Ally Bank is the primary servicer, and loans sold to third-party investors, where Ally Bank has retained primary servicing. Loans owned by Ally Bank are categorized as loans held-for-sale or finance receivables and loans which are discussed in further detail in Note 7 and Note 8, respectively. The loans sold to third-party investors were sold through off-balance sheet GSE securitization transactions.

The unpaid principal balance of our serviced mortgage assets were as follows.

| December 31, ($ in millions) | 2012 (a) | | 2011 |
|---|---|---|---|
| On-balance sheet mortgage loans | | | |
| Held-for-sale and investment | $ | 10,938 | $ 18,871 |
| Operations held-for-sale | | — | 541 |
| Off-balance sheet mortgage loans | | | |
| Loans sold to third-party investors | | | |
| Private-label | | — | 50,886 |
| GSEs | | 119,384 | 262,868 |
| Whole-loan | | 2 | 15,105 |
| Purchased servicing rights | | — | 3,247 |
| Operations held-for-sale | | — | 4,912 |
| Total primary serviced mortgage loans | | 130,324 | 356,430 |
| Subserviced mortgage loans | | — | 26,358 |
| Subserviced operations held-for-sale | | — | 4 |
| Total subserviced mortgage loans | | — | 26,362 |
| Master-servicing-only mortgage loans | | — | 8,557 |
| Total serviced mortgage loans | $ | 130,324 | $ 391,349 |

(a)   The remaining balances were serviced by Ally Bank, due to the deconsolidation of ResCap. Ally Bank announced that it has begun to explore strategic alternatives for its agency MSR portfolio.

Ally Bank is subject to certain net worth requirements associated with its servicing agreements with Fannie Mae and Freddie Mac. The majority of Ally Bank's serviced mortgage assets are subserviced by GMAC Mortgage, LLC, a subsidiary of ResCap, pursuant to a servicing agreement. At December 31, 2012, Ally Bank was in compliance with the requirements of the servicing agreements.

## Automobile Finance Servicing Activities

We service consumer automobile contracts. Historically, we have sold a portion of our consumer automobile contracts. With respect to contracts we sell, we retain the right to service and earn a servicing fee for our servicing function. Typically, we conclude that the fee we are paid for servicing consumer automobile finance receivables represents adequate compensation, and consequently, we do not recognize a servicing asset or liability. We recognized automobile servicing fee income of $109 million, $160 million, and $227 million during the years ended December 31, 2012, 2011, and 2010, respectively.

Table of Contents

# Notes to Consolidated Financial Statements

Ally Financial Inc. • Form 10-K

## Automobile Finance Serviced Assets

The total serviced automobile finance loans outstanding were as follows.

| December 31, ($ in millions) | | 2012 | | 2011 |
|---|---|---|---|---|
| On-balance sheet automobile finance loans and leases | | | | |
| Consumer automobile | $ | 53,715 | $ | 63,884 |
| Commercial automobile | | 32,822 | | 37,302 |
| Operating leases | | 13,550 | | 9,275 |
| Operations held-for-sale | | 25,979 | | 102 |
| Other | | 41 | | — |
| Off-balance sheet automobile finance loans | | | | |
| Loans sold to third-party investors | | | | |
| Securitizations | | 1,474 | | — |
| Whole-loan | | 6,541 | | 12,318 |
| Total serviced automobile finance loans and leases | $ | 134,122 | $ | 122,881 |

## 12.   Premiums Receivable and Other Insurance Assets

Premiums receivable and other insurance assets consisted of the following.

| December 31, ($ in millions) | | 2012 | | 2011 |
|---|---|---|---|---|
| Prepaid reinsurance premiums | $ | 236 | $ | 218 |
| Reinsurance recoverable on unpaid losses | | 234 | | 321 |
| Reinsurance recoverable on paid losses | | 40 | | 54 |
| Premiums receivable | | 108 | | 288 |
| Deferred policy acquisition costs | | 991 | | 972 |
| Total premiums receivable and other insurance assets | $ | 1,609 | $ | 1,853 |

Table of Contents

# Notes to Consolidated Financial Statements

Ally Financial Inc. • Form 10-K

## 13.    Other Assets

The components of other assets were as follows.

| December 31, ($ in millions) | 2012 | 2011 |
|---|---|---|
| Property and equipment at cost | $ 693 | $ 1,152 |
| Accumulated depreciation | (411) | (787) |
| Net property and equipment | 282 | 365 |
| Restricted cash collections for securitization trusts (a) | 2,983 | 1,596 |
| Fair value of derivative contracts in receivable position | 2,298 | 5,687 |
| Collateral placed with counterparties | 1,290 | 1,448 |
| Deferred tax asset (b) | 1,190 | 238 |
| Restricted cash and cash equivalents | 889 | 1,381 |
| Other accounts receivable | 525 | 1,110 |
| Cash reserve deposits held-for-securitization trusts (c) | 442 | 838 |
| Unamortized debt issuance costs | 425 | 612 |
| Nonmarketable equity securities | 303 | 419 |
| Interests retained in financial asset sales | 154 | 231 |
| Accrued interest and rent receivable | 147 | 232 |
| Real estate and other investments | 98 | 385 |
| Servicer advances | 92 | 2,142 |
| Prepaid expenses and deposits | 60 | 568 |
| Goodwill | 27 | 518 |
| Other assets | 703 | 971 |
| Total other assets | $ 11,908 | $ 18,741 |

(a)    Represents cash collection from customer payments on securitized receivables. These funds are distributed to investors as payments on the related secured debt.
(b)    The increase in the deferred tax asset represents the release of a material portion of our U.S. valuation allowance. Refer to  Note 23 for more information.
(c)    Represents credit enhancement in the form of cash reserves for various securitization transactions.

The changes in the carrying amounts of goodwill for the periods shown were as follows.

| ($ in millions) | Automotive Finance operations | Insurance operations | Total |
|---|---|---|---|
| Goodwill at January 1, 2010 | $ 469 | $ 57 | $ 526 |
| Transfer of assets of discontinued operations held-for-sale | (1) | (1) | (2) |
| Foreign-currency translation | — | 1 | 1 |
| Goodwill at December 31, 2010 | $ 468 | $ 57 | $ 525 |
| Transfer of assets of discontinued operations held-for-sale | — | (4) | (4) |
| Foreign-currency translation | — | (3) | (3) |
| Goodwill at December 31, 2011 | $ 468 | $ 50 | $ 518 |
| Transfer of assets of discontinued operations held-for-sale | (468) | (23) | (491) |
| Goodwill at December 31, 2012 | $ — | $ 27 | $ 27 |

Table of Contents

# Notes to Consolidated Financial Statements

Ally Financial Inc. • Form 10-K

## 14.    Deposit Liabilities

Deposit liabilities consisted of the following.

| December 31, ($ in millions) | | 2012 | | 2011 |
|---|---|---|---|---|
| Domestic deposits | | | | |
| Noninterest-bearing deposits | $ | 1,977 | $ | 2,029 |
| Interest-bearing deposits | | | | |
| Savings and money market checking accounts | | 13,871 | | 9,035 |
| Certificates of deposit | | 31,084 | | 28,540 |
| Dealer deposits | | 983 | | 1,769 |
| Total domestic deposit liabilities | | 47,915 | | 41,373 |
| Foreign deposits | | | | |
| Interest-bearing deposits | | | | |
| Savings and money market checking accounts | | — | | 1,408 |
| Certificates of deposit | | — | | 1,958 |
| Dealer deposits | | — | | 311 |
| Total foreign deposit liabilities | | — | | 3,677 |
| Total deposit liabilities | $ | 47,915 | $ | 45,050 |

Noninterest-bearing deposits primarily represent third-party escrows associated with our mortgage loan-servicing portfolio. The escrow deposits are not subject to an executed agreement and can be withdrawn without penalty at any time. At December 31, 2012, and December 31, 2011, certificates of deposit included $12.0 billion and $10.0 billion, respectively, of domestic certificates of deposit in denominations of $100 thousand or more.

The following table presents the scheduled maturity of total certificates of deposit.

| Year ended December 31, ($ in millions) | | |
|---|---|---|
| 2013 | $ | 15,688 |
| 2014 | | 6,133 |
| 2015 | | 4,336 |
| 2016 | | 3,545 |
| 2017 | | 1,382 |
| Total certificates of deposit | $ | 31,084 |

## 15.    Short-term Borrowings

The following table presents the composition of our short-term borrowings portfolio.

| December 31, ($ in millions) | | 2012 | | | | | 2011 | | | | |
| | | Unsecured | | Secured (a) | | Total | | Unsecured | | Secured (a) | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Demand notes | $ | 3,094 | $ | — | $ | 3,094 | $ | 2,756 | $ | — | $ | 2,756 |
| Bank loans and overdrafts | | 167 | | — | | 167 | | 1,613 | | — | | 1,613 |
| Federal Home Loan Bank | | — | | 3,800 | | 3,800 | | — | | 1,400 | | 1,400 |
| Other (b) | | — | | 400 | | 400 | | 146 | | 1,765 | | 1,911 |
| Total short-term borrowings | $ | 3,261 | $ | 4,200 | $ | 7,461 | $ | 4,515 | $ | 3,165 | $ | 7,680 |
| Weighted average interest rate (c) | | | | | | 1.0% | | | | | | 3.6% |

(a)    Refer to Note 16 for further details on assets restricted as collateral for payment of the related debt.

(b)    Other primarily includes nonbank secured borrowings at our Commercial Finance Group at December 31, 2012 and Automotive Finance operations at December 31, 2011.

(c)    Based on the debt outstanding and the interest rate at December 31 of each year.

152

Table of Contents

# Notes to Consolidated Financial Statements

Ally Financial Inc. • Form 10-K

## 16.  Long-term Debt

The following tables present the composition of our long-term debt portfolio.

| December 31, ($ in millions) | Amount | Interest rate | Weighted average interest rate (a) | Due date range |
|---|---|---|---|---|
| **2012** | | | | |
| Senior debt | | | | |
| Fixed rate (b) | $ 28,336 | | | |
| Variable rate | 2,345 | | | |
| Total senior debt (c) | 30,681 | 0.38 - 10.29% | 6.69% | 2013 - 2049 |
| Subordinated debt | | | | |
| Fixed rate | 251 | | | |
| Variable rate (d) | 13,451 | | | |
| Total subordinated debt (e) | 13,702 | 0.65 - 8.00% | 0.92% | 2013 - 2018 |
| VIE secured debt | | | | |
| Fixed rate | 19,077 | | | |
| Variable rate | 7,384 | | | |
| Total VIE secured debt | 26,461 | 0.25 - 8.30% | 1.36% | 2013 - 2017 |
| Trust preferred securities | | | | |
| Fixed rate | 2,623 | 8.13% | 8.13% | 2040 |
| Fair value adjustment (f) | 1,094 | | | |
| Total long-term debt (g) | $ 74,561 | | | |
| **2011** | | | | |
| Senior debt | | | | |
| Fixed rate (b) | $ 39,657 | | | |
| Variable rate | 3,393 | | | |
| Total senior debt (c) | 43,050 | 0.00 - 16.68% | 6.15% | 2012 - 2049 |
| Subordinated debt | | | | |
| Fixed rate | 4,675 | | | |
| Variable rate (d) | 8,246 | | | |
| Total subordinated debt (e) | 12,921 | 0.76 - 17.05% | 4.62% | 2012 - 2031 |
| VIE secured debt | | | | |
| Fixed rate | 16,538 | | | |
| Variable rate | 16,605 | | | |
| Total VIE secured debt | 33,143 | 0.32 - 8.30% | 1.96% | 2012 - 2040 |
| Trust preferred securities | | | | |
| Fixed rate | 2,622 | 8.13% | 8.13% | 2040 |
| Fair value adjustment (f) | 1,149 | | | |
| Total long-term debt (g) | $ 92,885 | | | |

(a)  Based on the debt outstanding and the interest rate at December 31 of each year.
(b)  Includes $0.0 billion at December 31, 2012 and $7.4 billion at December 31, 2011, guaranteed by the Federal Deposit Insurance Corporation (FDIC) under the Temporary Liquidity Guarantee Program.
(c)  Includes secured long-term debt of $0.0 billion at December 31, 2012 and $4.0 billion at December 31, 2011.
(d)  Includes $13.5 billion and $8.2 billion of debt outstanding from the Automotive secured revolving credit facilities at December 31, 2012 and 2011, respectively.
(e)  Includes secured long-term debt of $13.5 billion and $12.7 billion at December 31, 2012 and 2011, respectively.
(f)  Amount represents the hedge accounting adjustment of fixed-rate debt.
(g)  Includes fair value option-elected secured long-term debt of $0 million and $830 million at December 31, 2012 and 2011, respectively. Refer to Note 25 for additional information.

Table of Contents

# Notes to Consolidated Financial Statements

Ally Financial Inc. • Form 10-K

| December 31, ($ in millions) | 2012 | | | 2011 | | |
|---|---|---|---|---|---|---|
| | Unsecured | Secured | Total | Unsecured | Secured | Total |
| Long-term debt | | | | | | |
| Due within one year | $ 1,070 | $ 11,503 | $ 12,573 | $ 11,664 | $ 14,521 | $ 26,185 |
| Due after one year | 31,486 | 29,408 | 60,894 | 30,272 | 35,279 | 65,551 |
| Fair value adjustment | 1,094 | — | 1,094 | 1,149 | — | 1,149 |
| Total long-term debt | $ 33,650 | $ 40,911 | $ 74,561 | $ 43,085 | $ 49,800 | $ 92,885 |

The following table presents the scheduled remaining maturity of long-term debt, assuming no early redemptions will occur. The actual payment of secured debt may vary based on the payment activity of the related pledged assets.

| Year ended December 31, ($ in millions) | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 and thereafter | Fair value adjustment | Total |
|---|---|---|---|---|---|---|---|---|
| Unsecured | | | | | | | | |
| Long-term debt | $ 1,331 | $ 5,603 | $ 5,115 | $ 1,971 | $ 3,671 | $ 16,705 | $ 1,094 | $ 35,490 |
| Original issue discount | (261) | (188) | (56) | (63) | (75) | (1,197) | — | (1,840) |
| Total unsecured | 1,070 | 5,415 | 5,059 | 1,908 | 3,596 | 15,508 | 1,094 | 33,650 |
| Secured | | | | | | | | |
| Long-term debt | 11,503 | 13,596 | 8,567 | 3,123 | 3,032 | 1,090 | — | 40,911 |
| Total long-term debt | $ 12,573 | $ 19,011 | $ 13,626 | $ 5,031 | $ 6,628 | $ 16,598 | $ 1,094 | $ 74,561 |

To achieve the desired balance between fixed- and variable-rate debt, we utilize interest rate swap agreements. The use of these derivative financial instruments had the effect of synthetically converting $10.2 billion of our fixed-rate debt into variable-rate obligations and $14.5 billion of our variable-rate debt into fixed-rate obligations at December 31, 2012.

The following summarizes assets restricted as collateral for the payment of the related debt obligation primarily arising from securitization transactions accounted for as secured borrowings and repurchase agreements.

| December 31, ($ in millions) | 2012 | | 2011 | |
|---|---|---|---|---|
| | Total | Ally Bank (a) | Total | Ally Bank (a) |
| Trading assets | $ — | $ — | $ 27 | $ — |
| Investment securities | 1,911 | 1,911 | 780 | 780 |
| Loans held-for-sale | — | — | 805 | — |
| Mortgage assets held-for-investment and lending receivables | 9,866 | 9,866 | 12,197 | 11,188 |
| Consumer automobile finance receivables | 29,557 | 14,833 | 33,888 | 17,320 |
| Commercial automobile finance receivables | 19,606 | 19,606 | 20,355 | 14,881 |
| Investment in operating leases, net | 6,058 | 1,691 | 4,555 | 431 |
| Mortgage servicing rights | — | — | 1,920 | 1,286 |
| Other assets | 999 | 272 | 3,973 | 1,816 |
| Total assets restricted as collateral (b) | $ 67,997 | $ 48,179 | $ 78,500 | $ 47,702 |
| Secured debt (c) | $ 45,111 | $ 29,162 | $ 52,965 | $ 25,533 |

(a) Ally Bank is a component of the total column.
(b) Ally Bank has an advance agreement with the Federal Home Loan Bank of Pittsburgh (FHLB) and had assets pledged to secure borrowings that were restricted as collateral to the FHLB totaling $12.6 billion and $10.9 billion at December 31, 2012, and 2011, respectively. These assets were composed primarily of consumer and commercial mortgage finance receivables and loans, net. Ally Bank has access to the Federal Reserve Bank Discount Window. Ally Bank had assets pledged and restricted as collateral to the Federal Reserve Bank totaling $1.9 billion and $4.3 billion at December 31, 2012, and 2011, respectively. These assets were composed of consumer mortgage finance receivables and loans, net; consumer automobile finance receivables and loans, net; and investment securities. Availability under these programs is only for the operations of Ally Bank and cannot be used to fund the operations or liabilities of Ally or its subsidiaries.
(c) Includes $4.2 billion and $3.2 billion of short-term borrowings at December 31, 2012, and 2011, respectively.

## Trust Preferred Securities

On December 30, 2009, we entered into a Securities Purchase and Exchange Agreement with U.S. Department of Treasury (Treasury) and GMAC Capital Trust I, a Delaware statutory trust (the Trust), which is a finance subsidiary that is wholly owned by Ally. As part of the agreement, the Trust sold to Treasury 2,540,000 trust preferred securities (TRUPS) issued by the Trust with an aggregate liquidation

Table of Contents

# Notes to Consolidated Financial Statements

Ally Financial Inc. • Form 10-K

preference of $2.5 billion. Additionally, we issued and sold to Treasury a ten-year warrant to purchase up to  127,000 additional TRUPS with an aggregate liquidation preference of $127 million, at an initial exercise price of $0.01 per security, which Treasury immediately exercised in full.

On March 1, 2011, the Declaration of Trust and certain other documents related to the TRUPS were amended and all the outstanding TRUPS held by Treasury were designated 8.125% Fixed Rate / Floating Rate Trust Preferred Securities, Series (Series 2 TRUPS). On March 7, 2011, Treasury sold  100% of the Series 2 TRUPS in an offering registered with the SEC. Ally did not receive any proceeds from the sale.

Each Series 2 TRUPS security has a liquidation amount of  $25. Distributions are cumulative and are payable until redemption at the applicable coupon rate. Distributions are payable at an annual rate of 8.125% payable quarterly in arrears, beginning August 15, 2011, to but excluding February 15, 2016. From and including February 15, 2016, to but excluding February 15, 2040, distributions will be payable at an annual rate equal to  three-month London interbank offer rate plus 5.785% payable quarterly in arrears, beginning May 15, 2016. Ally has the right to defer payments of interest for a period not exceeding 20 consecutive quarters. The Series 2 TRUPS have no stated maturity date, but must be redeemed upon the redemption or maturity of the related debentures (Debentures), which mature on February 15, 2040. The Series 2 TRUPS are generally nonvoting, other than with respect to certain limited matters. During any period in which any Series 2 TRUPS remain outstanding but in which distributions on the Series 2 TRUPS have not been fully paid, none of Ally or its subsidiaries will be permitted to (i) declare or pay dividends on, make any distributions with respect to, or redeem, purchase, acquire or otherwise make a liquidation payment with respect to, any of Ally's capital stock or make any guarantee payment with respect thereto; or (ii) make any payments of principal, interest, or premium on, or repay, repurchase or redeem, any debt securities or guarantees that rank on a parity with or junior in interest to the Debentures with certain specified exceptions in each case.

## Covenants and Other Requirements

In secured funding transactions, there are trigger events that could cause the debt to be prepaid at an accelerated rate or could cause our usage of the credit facility to be discontinued. The triggers are generally based on the financial health and performance of the servicer as well as performance criteria for the pool of receivables, such as delinquency ratios, loss ratios, commercial payment rates. During 2012, there were no trigger events that resulted in the repayment of debt at an accelerated rate or impacted the usage of our credit facilities.

When we issue debt securities in private offerings, we may be subject to registration rights agreements. Under these agreements, we generally agree to use reasonable efforts to cause the consummation of a registered exchange offer or to file a shelf registration statement within a prescribed period. In the event that we fail to meet these obligations, we may be required to pay additional penalty interest with respect to the covered debt during the period in which we fail to meet our contractual obligations.

## Funding Facilities

We utilize both committed and uncommitted credit facilities. The financial institutions providing the uncommitted facilities are not contractually obligated to advance funds under them. The amounts outstanding under our various funding facilities are included on our Consolidated Balance Sheet.

As of December 31, 2012, Ally Bank had exclusive access to  $8.5 billion of funding capacity from committed credit facilities. Ally Bank also has access to a  $4.1 billion committed facility that is shared with the parent company. Funding programs supported by the Federal Reserve and the FHLB, together with repurchase agreements, complement Ally Bank's private committed facilities.

The total capacity in our committed funding facilities is provided by banks and other financial institutions through private transactions. The committed secured funding facilities can be revolving in nature and allow for additional funding during the commitment period, or they can be amortizing and do not allow for any further funding after the closing date. At December 31, 2012, $34.3 billion of our $43.0 billion of committed capacity was revolving. Our revolving facilities generally have an original tenor ranging from 364 days to two years. As of December 31, 2012, we had $13.9 billion of committed funding capacity from revolving facilities with a remaining tenor greater than 364 days.

Table of Contents

# Notes to Consolidated Financial Statements

Ally Financial Inc. • Form 10-K

**Committed Funding Facilities**

| December 31, ($ in billions) | Outstanding | | | | Unused capacity (a) | | | | Total capacity | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **2012** | | 2011 | | **2012** | | 2011 | | **2012** | | 2011 | |
| Bank funding | | | | | | | | | | | | |
| Secured - U.S. | $ | **3.8** | $ | 5.8 | $ | **4.7** | $ | 3.7 | $ | **8.5** | $ | 9.5 |
| Nonbank funding | | | | | | | | | | | | |
| Unsecured | | | | | | | | | | | | |
| Automotive Finance — U.S. | | **—** | | — | | **—** | | 0.5 | | **—** | | 0.5 |
| Automotive Finance — International | | **0.1** | | 0.3 | | **—** | | — | | **0.1** | | 0.3 |
| Secured | | | | | | | | | | | | |
| Automotive Finance — U.S. (b) (c) | | **12.9** | | 4.2 | | **5.4** | | 10.2 | | **18.3** | | 14.4 |
| Automotive Finance — International (b) | | **9.6** | | 10.1 | | **2.4** | | 3.0 | | **12.0** | | 13.1 |
| Mortgage operations | | **—** | | 0.7 | | **—** | | 0.5 | | **—** | | 1.2 |
| Total nonbank funding | | **22.6** | | 15.3 | | **7.8** | | 14.2 | | **30.4** | | 29.5 |
| Shared capacity (d) | | | | | | | | | | | | |
| U.S. | | **1.0** | | 1.5 | | **3.0** | | 2.5 | | **4.0** | | 4.0 |
| International | | **0.1** | | 0.1 | | **—** | | — | | **0.1** | | 0.1 |
| Total committed facilities | $ | **27.5** | $ | 22.7 | $ | **15.5** | $ | 20.4 | $ | **43.0** | $ | 43.1 |

(a)  Funding from committed secured facilities is available on request in the event excess collateral resides in certain facilities or is available to the extent incremental collateral is available and contributed to the facilities.

(b)  Total unused capacity includes $2.2 billion as of December 31, 2012, and $4.9 billion as of December 31, 2011, from certain committed funding arrangements that are generally reliant upon the origination of future automotive receivables and that are available in 2013.

(c)  Includes the secured facilities of our Commercial Finance Group.

(d)  Funding is generally available for assets originated by Ally Bank or the parent company, Ally Financial Inc.

**Uncommitted Funding Facilities**

| December 31, ($ in billions) | Outstanding | | | | Unused capacity | | | | Total capacity | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **2012** | | 2011 | | **2012** | | 2011 | | **2012** | | 2011 | |
| Bank funding | | | | | | | | | | | | |
| Secured — U.S. | | | | | | | | | | | | |
| Federal Reserve funding programs | $ | **—** | $ | — | $ | **1.8** | $ | 3.2 | $ | **1.8** | $ | 3.2 |
| FHLB advances | | **4.8** | | 5.4 | | **0.4** | | — | | **5.2** | | 5.4 |
| Total bank funding | | **4.8** | | 5.4 | | **2.2** | | 3.2 | | **7.0** | | 8.6 |
| Nonbank funding | | | | | | | | | | | | |
| Unsecured | | | | | | | | | | | | |
| Automotive Finance — International | | **2.1** | | 1.9 | | **0.4** | | 0.5 | | **2.5** | | 2.4 |
| Secured | | | | | | | | | | | | |
| Automotive Finance — International | | **0.1** | | 0.1 | | **0.1** | | 0.1 | | **0.2** | | 0.2 |
| Mortgage operations | | **—** | | — | | **—** | | 0.1 | | **—** | | 0.1 |
| Total nonbank funding | | **2.2** | | 2.0 | | **0.5** | | 0.7 | | **2.7** | | 2.7 |
| Total uncommitted facilities | $ | **7.0** | $ | 7.4 | $ | **2.7** | $ | 3.9 | $ | **9.7** | $ | 11.3 |

Table of Contents

# Notes to Consolidated Financial Statements

Ally Financial Inc. • Form 10-K

## 17.   Accrued Expenses and Other Liabilities

The components of accrued expenses and other liabilities were as follows.

| December 31, ($ in millions) | | 2012 | | 2011 |
|---|---|---|---|---|
| Fair value of derivative contracts in payable position | $ | 2,468 | $ | 5,367 |
| Collateral received from counterparties | | 941 | | 1,410 |
| Accrual related to ResCap Bankruptcy and deconsolidation (a) | | 750 | | — |
| Accounts payable | | 565 | | 1,178 |
| Employee compensation and benefits | | 494 | | 649 |
| Reserves for insurance losses and loss adjustment expenses | | 341 | | 580 |
| Reserve for mortgage representation and warranty obligation | | 105 | | 825 |
| Deferred revenue | | 97 | | 86 |
| Non-income tax payable | | 15 | | 296 |
| Deferred income tax liability | | 6 | | 111 |
| GM payable, net | | 1 | | 228 |
| Current income tax payable | | 1 | | 200 |
| Loan repurchases liabilities | | — | | 2,387 |
| Other liabilities | | 801 | | 1,347 |
| Total accrued expenses and other liabilities | $ | 6,585 | $ | 14,664 |

(a)   Refer to Note 1 for more information regarding the Debtors' bankruptcy, deconsolidation, and this accrual.

## 18.   Equity

### Common Stock

Our common stock has a par value of $0.01 and there are 2,021,384 shares authorized for issuance. Our common stock is not registered with the Securities and Exchange Commission, and there is no established trading market for the shares. Treasury holds 73.78% of Ally common stock. The following table presents changes in the number of shares issued and outstanding.

| (in shares) | 2012 | 2011 | 2010 |
|---|---|---|---|
| Common stock | | | |
| January 1, | 1,330,970 | 1,330,970 | 799,120 |
| New issuances | | | |
|   Conversion of Series F-2 Preferred Stock (a) | — | — | 531,850 |
| December 31, | 1,330,970 | 1,330,970 | 1,330,970 |

(a)   On December 30, 2010, 110,000,000 shares of Series F-2 Preferred Stock owned by Treasury were converted into 531,850 shares of Ally common stock.

### Preferred Stock

#### Series F-2 Mandatorily Convertible Preferred Stock held by U.S. Department of Treasury

On December 30, 2009, Ally entered into a Securities Purchase and Exchange Agreement (the Purchase Agreement) with Treasury, pursuant to which a series of transactions occurred resulting in Treasury acquiring 228,750,000 shares of Ally's newly issued Fixed Rate Cumulative Mandatorily Convertible Preferred Stock, Series F-2 (the New MCP), with a total liquidation preference of $11.4 billion. On December 30, 2010, Treasury converted 110,000,000 shares of the New MCP into 531,850 shares of Ally common stock. The conversion occurred at an agreed upon rate that exceeded the initial conversion rate as defined in Exhibit H to the Ally Certificate of Incorporation. The fair value of the additional shares was approximately $586 million and represented an inducement. The fair value of the additional common shares issued to Treasury was determined using a combination of valuation techniques consistent with the market approach (Level 3 fair value inputs). The market approach we used to estimate the fair value of our common stock incorporated a combination of the tangible equity and earnings multiples from comparable publicly traded companies deemed similar to Ally (and its operating segments) and by observing comparable transactions in the marketplace. We also considered the implied valuation of our common stock based on the December 30, 2010, conversion with Treasury.

In connection with the conversion, the New MCP Certificate of Designation was amended to require us to deliver additional shares to the New MCP holders upon occurrence of certain specified events. The fair value associated with this provision was $30 million and was reflected in the New MCP balance at December 31, 2010. The fair value of the provision was determined utilizing an option pricing model using inputs and assumptions that management believes a willing market participant would use in estimating fair value (a Level 3 fair value input).

Table of Contents

# Notes to Consolidated Financial Statements

Ally Financial Inc. • Form 10-K

As a result, Treasury now holds 118,750,000 shares of the New MCP, with a total liquidation preference of $5.9 billion. Dividends of the New MCP accrue at 9% per annum. Dividends are payable quarterly, in arrears, only if and when declared by Ally's Board of Directors. The New MCP generally is nonvoting, other than class-voting on certain matters under certain circumstances, including generally, the authorization of senior preferred stock, the adverse amendment of the New MCP, and any exchange or reclassification involving the New MCP or merger or consolidation of Ally. Upon conversion of the New MCP into Ally common stock, the holder would have the voting rights associated with the common stock.

The shares of the New MCP are convertible into common stock at the applicable conversion rate (as provided in the Certificate of Designation) either: (i) at Ally's option, at any time or from time to time, with the prior approval of the Federal Reserve provided that Ally is not permitted to convert any shares of the New MCP held by Treasury except (a) with the prior written consent of Treasury (which consent may be granted in the sole discretion of Treasury with respect to each conversion considering such factors as it deems appropriate at such time, which may include seeking to condition the terms on which it may provide such consent, which may include seeking an alteration of the conversion rate) or (b) pursuant to an order of the Federal Reserve compelling such a conversion; or (ii) at the option of the holder, upon the occurrence of certain specified transactions. All shares of the New MCP that remain outstanding on December 30, 2016, will automatically convert into common stock at a conversion rate of 0.00432 common shares per share of the New MCP. Under any conversion of the New MCP, settlement will always occur by issuance of our common stock.

Subject to the approval of the Federal Reserve and the restrictions imposed by the terms of our other preferred stock, we may opt to redeem, in whole or in part, from time to time, the New MCP then outstanding at any time. The New MCP may be redeemed at the greater of the liquidation preference, plus any accrued and unpaid dividends or the as-converted value, as defined in the Certificate of Designation.

Subject to certain exceptions, for so long as any shares of the New MCP are outstanding and owned by Treasury, Ally is generally prohibited from paying certain dividends or distributions on, or redeeming, repurchasing, or acquiring its capital stock or other equity securities without the consent of Treasury. Additionally, Ally is generally prohibited from making any dividends or distributions on, or redeeming, repurchasing, or acquiring its capital stock or other equity securities unless all accrued and unpaid dividends for all past dividend periods on the New MCP are fully paid.

## Series A Preferred Stock

On March 1, 2011, pursuant to a registration rights agreement between Ally and GM, GM notified Ally of its intent to sell shares of Ally's existing Fixed Rate Perpetual Preferred Stock, Series A (Existing Series A Preferred Stock), held by a subsidiary of GM. On March 25, 2011, Ally filed a Certificate of Amendment of Amended and Restated Certificate of Incorporation (the Amendment) with the Secretary of State of the State of Delaware. Pursuant to the Amendment, Ally's Certificate of Incorporation, which included the terms of the Existing Series A Preferred Stock, was amended to modify certain terms of the Existing Series A Preferred Stock. As part of the Amendment, the Existing Series A Preferred Stock was redesignated as Ally's Fixed Rate / Floating Rate Perpetual Preferred Stock, Series A (the Amended Series A Preferred Stock) and the liquidation amount was reduced from $1,000 per share to $25 per share. The Amendment, and a corresponding amendment to Ally's bylaws, also increased the authorized number of shares of Amended Series A Preferred Stock to 160,870,560 shares, which was adjusted to account for the decreased liquidation amount per share. The total number of shares outstanding following the Amendment is 40,870,560 shares.

Immediately following the Amendment, the subsidiary of GM that held all of the outstanding Amended Series A Preferred Stock sold 100% of such stock in an offering registered with the SEC. Ally did not receive any proceeds from the sale.

Holders of the Amended Series A Preferred Stock are entitled to receive, when, and if declared by Ally, noncumulative cash dividends. Beginning March 25, 2011, to but excluding May 15, 2016, dividends accrue at a fixed rate of 8.5% per annum. Beginning on May 15, 2016, dividends will accrue at a rate equal to three-month London interbank offer rate (LIBOR) plus 6.243%, commencing on August 15, 2016, in each case on the 15th day of February, May, August, and November. Dividends will be payable to holders of record at the close of business on the preceding February 1, May 1, August 1, or November 1, as the case may be, or on such other date, not more than seventy calendar days prior to the dividend payment date, as will be fixed by the Ally Board of Directors. In the event that dividends with respect to a dividend period have not been paid in full on the dividend payment date, we will be prohibited, subject to certain specified exceptions, from (i) redeeming, purchasing or otherwise acquiring, any stock that ranks on a parity basis with, or junior in interest to, the Amended Series A Preferred Stock; (ii) paying any dividends or making any distributions with respect to any stock that ranks junior in interest to the Amended Series A Preferred Stock, until such time as Ally has paid the dividends payable on shares of the Amended Series A Preferred Stock with respect to a subsequent dividend period; and (iii) declaring or paying any dividend on any stock ranking on a parity basis with the Amended Series A Preferred Stock, subject to certain exceptions.

The holders of the Amended Series A Preferred Stock do not have voting rights other than those set forth in the certificate of designations for the Amended Series A Preferred Stock included in Ally's Certificate of Incorporation. Ally may not redeem the Amended Series A Preferred Stock before May 15, 2016, and after such time the Amended Series A Preferred Stock may be redeemed in certain circumstances. In the event of any liquidation, dissolution or winding up of the affairs of Ally, holders of the Amended Series A Preferred Stock will be entitled to receive the liquidation amount per share of Amended Series A Preferred Stock and an amount equal to all declared, but unpaid dividends declared prior to the date of payment out of assets available for distribution, before any distribution is made for holders of stock that ranks junior in interest to the Amended Series A Preferred Stock, subject to the rights of Ally's creditors.

158

Table of Contents

# Notes to Consolidated Financial Statements

Ally Financial Inc. • Form 10-K

The changes to the terms of the Existing Series A Preferred Stock pursuant to the terms of the Amendment were deemed substantive, and as a result, the transaction was accounted for as a redemption of the Existing Series A Preferred Stock and the issuance of the Amended Series A Preferred Stock. The Existing Series A Preferred Stock was removed at its carrying value, the Amended Series A Preferred Stock was recognized at its fair value, and the difference of $ 32 million was recorded as an increase to retained earnings, which impacted the income available to common stockholders used for the earnings per common share calculation.

## Series G Preferred Stock

Effective June 30, 2009, we converted (the Conversion) from a Delaware limited liability company into a Delaware corporation in accordance with applicable law. In connection with the Conversion, the 7% Cumulative Perpetual Preferred Stock (the Blocker Preferred) of Preferred Blocker Inc. (PBI), a wholly owned subsidiary, was required to be converted into or exchanged for preferred stock. For this purpose, we had previously authorized for issuance its 7% Fixed Rate Cumulative Perpetual Preferred Stock, Series G (the Series G Preferred Stock). Pursuant to the terms of a Certificate of Merger, effective October 15, 2009, PBI merged with and into Ally with Ally continuing as the surviving entity. At that time, each share of the Blocker Preferred issued and outstanding immediately prior to the effective time of the merger was converted into the right to receive an equal number of newly issued shares of Series G Preferred Stock. In the aggregate, 2,576,601 shares of Series G Preferred Stock were issued to holders of the Blocker Preferred in connection with the merger. The Series G Preferred Stock ranks equally in right of payment with each of our outstanding series of preferred stock in accordance with the terms thereof.

The Series G Preferred Stock accrues dividends at a rate of 7% per annum. Dividends are payable quarterly, in arrears, only if and when declared by Ally's Board of Directors. Subject to any other restrictions contained in the terms of any other series of stock or other agreements that Ally is or may become subject to, at Ally's option and subject to Ally having obtained any required regulatory approvals, Ally may, subject to certain conditions, redeem the Series G Preferred Stock, in whole or in part, at any time or from time to time, upon proper notice given, at a redemption price equal to the liquidation amount plus the amount of any accrued and unpaid dividends thereon through the date of redemption. The Series G Preferred Stock generally is nonvoting other than class-voting on certain matters under certain circumstances including generally, the authorization of senior capital stock or amendments that adversely impact the Series G Preferred Stock. Ally is generally prohibited from making any Restricted Payments on or prior to January 1, 2014, and may only make Restricted Payments after January 1, 2014, if certain conditions are satisfied. For this purpose, Restricted Payments include, subject to certain exceptions, any dividend payment or distribution of assets on any common stock or any redemption, purchase, or other acquisition of any shares of common stock.

159

Table of Contents

# Notes to Consolidated Financial Statements

Ally Financial Inc. • Form 10-K

The following table summarizes information about our Series F-2, Series A, and Series G preferred stock.

| December 31, | | 2012 | | 2011 |
|---|---|---|---|---|
| **Mandatorily convertible preferred stock held by U.S. Department of Treasury** | | | | |
| **Series F-2 preferred stock (a)** | | | | |
| Carrying value (*$ in millions*) | $ | **5,685** | $ | 5,685 |
| Par value (*per share*) | | **0.01** | | 0.01 |
| Liquidation preference (*per share*) | | **50** | | 50 |
| Number of shares authorized | | **228,750,000** | | 228,750,000 |
| Number of shares issued and outstanding | | **118,750,000** | | 118,750,000 |
| Dividend/coupon | | **9%** | | 9% |
| Redemption/call feature | | **Perpetual (b)** | | Perpetual (b) |
| **Preferred stock** | | | | |
| **Series A preferred stock** | | | | |
| Carrying value (*$ in millions*) | $ | **1,021** | $ | 1,021 |
| Par value (*per share*) | | **0.01** | | 0.01 |
| Liquidation preference (*per share*) | | **25** | | 25 |
| Number of shares authorized | | **160,870,560** | | 160,870,560 |
| Number of shares issued and outstanding | | **40,870,560** | | 40,870,560 |
| Dividend/coupon | | | | |
| Prior to May 15, 2016 | | **8.5%** | | 8.5% |
| On and after May 15, 2016 | | **three month LIBOR + 6.243%** | | three month LIBOR + 6.243% |
| Redemption/call feature | | **Perpetual (c)** | | Perpetual (c) |
| **Series G preferred stock (d)** | | | | |
| Carrying value (*$ in millions*) | $ | **234** | $ | 234 |
| Par value (*per share*) | | **0.01** | | 0.01 |
| Liquidation preference (*per share*) | | **1,000** | | 1,000 |
| Number of shares authorized | | **2,576,601** | | 2,576,601 |
| Number of shares issued and outstanding | | **2,576,601** | | 2,576,601 |
| Dividend/coupon | | **7%** | | 7% |
| Redemption/call feature | | **Perpetual (e)** | | Perpetual (e) |

(a)    Mandatorily convertible to common equity on December 30, 2016.

(b)    Convertible prior to mandatory conversion date with consent of Treasury.

(c)    Nonredeemable prior to May 15, 2016.

(d)    Pursuant to a registration rights agreement, we are required to maintain an effective shelf registration statement. In the event we fail to meet this obligation, we may be required to pay additional interest to the holders of the Series G Preferred Stock.

(e)    Redeemable beginning at December 31, 2011.

Table of Contents

# Notes to Consolidated Financial Statements

Ally Financial Inc. • Form 10-K

## 19.   Accumulated Other Comprehensive Income (Loss)

The following table presents changes, net of tax, in each component of accumulated other comprehensive income (loss).

| ($ in millions) | Unrealized gains (losses) on investment securities (a) | | Translation adjustments and net investment hedges | | Cash flow hedges | | Defined benefit pension plans | | Accumulated other comprehensive income (loss) | |
|---|---|---|---|---|---|---|---|---|---|---|
| Balance at January 1, 2010 | $ | 151 | $ | 433 | $ | (27) | $ | (97) | $ | 460 |
| 2010 net change | | (177) | | (17) | | 33 | | (40) | | (201) |
| Balance at December 31, 2010 | | (26) | | 416 | | 6 | | (137) | | 259 |
| 2011 net change | | (88) | | (64) | | — | | (20) | | (172) |
| Balance at December 31, 2011 | | (114) | | 352 | | 6 | | (157) | | 87 |
| **2012 net change** | | **190** | | **16** | | **(4)** | | **22** | | **224** |
| **Balance at December 31, 2012** | $ | **76** | $ | **368** | $ | **2** | $ | **(135)** | $ | **311** |

(a)    Represents the after-tax difference between the fair value and amortized cost of our available-for-sale securities portfolio.

161

Table of Contents

# Notes to Consolidated Financial Statements

Ally Financial Inc. • Form 10-K

The following table presents the before- and after-tax changes in each component of accumulated other comprehensive income (loss).

| December 31, ($ in millions) | Before Tax | | Tax Effect | | After Tax | |
|---|---|---|---|---|---|---|
| **2012** | | | | | | |
| Unrealized gains (losses) on investment securities | | | | | | |
| Net unrealized gains arising during the period | $ | 377 | $ | (46) | $ | 331 |
| Less: Net realized gains reclassified to net income (a) | | 174 | | (33) | | 141 |
| Net change | | 203 | | (13) | | 190 |
| Translation adjustments and net investment hedges | | | | | | |
| Translation adjustments | | 182 | | 2 | | 184 |
| Hedges | | (270) | | 102 | | (168) |
| Net change | | (88) | | 104 | | 16 |
| Cash flow hedges | | | | | | |
| Net unrealized losses arising during the period | | (7) | | 3 | | (4) |
| Defined benefit pension plans | | | | | | |
| Net losses, prior service costs, and transition obligation arising during the period | | (55) | | 19 | | (36) |
| Less: Net losses, prior service costs, and transition obligations reclassified to net income | | (95) | | 37 | | (58) |
| Net change | | 40 | | (18) | | 22 |
| Other comprehensive income | $ | 148 | $ | 76 | $ | 224 |
| **2011** | | | | | | |
| Unrealized gains (losses) on investment securities | | | | | | |
| Net unrealized gains arising during the period | $ | 213 | $ | (17) | $ | 196 |
| Less: Net realized gains reclassified to net income (b) | | 296 | | (12) | | 284 |
| Net change | | (83) | | (5) | | (88) |
| Translation adjustments and net investment hedges | | | | | | |
| Translation adjustments | | (238) | | 1 | | (237) |
| Hedges | | 173 | | — | | 173 |
| Net change | | (65) | | 1 | | (64) |
| Defined benefit pension plans | | | | | | |
| Net losses, prior service costs, and transition obligation arising during the period | | (25) | | (2) | | (27) |
| Less: Net losses, prior service costs, and transition obligations reclassified to net income | | (12) | | 5 | | (7) |
| Net change | | (13) | | (7) | | (20) |
| Other comprehensive loss | $ | (161) | $ | (11) | $ | (172) |
| **2010** | | | | | | |
| Unrealized gains on investment securities | | | | | | |
| Net unrealized gains arising during the period | $ | 317 | $ | 3 | $ | 320 |
| Less: Net realized gains reclassified to net income | | 506 | | (9) | | 497 |
| Net change | | (189) | | 12 | | (177) |
| Translation adjustments and net investment hedges | | | | | | |
| Translation adjustments | | 178 | | (13) | | 165 |
| Hedges | | (182) | | — | | (182) |
| Net change | | (4) | | (13) | | (17) |
| Cash flow hedges | | | | | | |
| Net unrealized gains arising during the period | | 35 | | (2) | | 33 |
| Defined benefit pension plans | | | | | | |
| Net losses, prior service costs, and transition obligation arising during the period | | (45) | | (14) | | (59) |
| Less: Net losses, prior service costs, and transition obligations reclassified to net income | | (14) | | (5) | | (19) |
| Net change | | (31) | | (9) | | (40) |
| Other comprehensive loss | $ | (189) | $ | (12) | $ | (201) |

(a)  Includes gains of $28 million at December 31, 2012, classified as income (loss) from discontinued operations, net of tax, in our Consolidated Statement of Income.

(b)  Includes gains of $2 million at December 31, 2011, classified as income (loss) from discontinued operations, net of tax, in our Consolidated Statement of Income.

Table of Contents

# Notes to Consolidated Financial Statements

Ally Financial Inc. • Form 10-K

## 20. Earnings per Common Share

The following table presents the calculation of basic and diluted earnings per common share.

| Year ended December 31, (*$ in millions except per share data*) | | 2012 | | 2011 | | 2010 |
|---|---|---|---|---|---|---|
| Net income (loss) from continuing operations | $ | **529** | $ | (1,002) | $ | 288 |
| Preferred stock dividends — U.S. Department of Treasury | | **(535)** | | (534) | | (963) |
| Preferred stock dividends | | **(267)** | | (260) | | (282) |
| Impact of preferred stock conversion or amendment (a) | | **—** | | 32 | | (616) |
| **Net loss from continuing operations attributable to common shareholders (b)** | | **(273)** | | (1,764) | | (1,573) |
| Income from discontinued operations, net of tax | | **667** | | 845 | | 741 |
| **Net income (loss) attributable to common shareholders** | $ | **394** | $ | (919) | $ | (832) |
| **Basic weighted-average common shares outstanding** | | **1,330,970** | | 1,330,970 | | 800,597 |
| **Diluted weighted-average common shares outstanding (b)** | | **1,330,970** | | 1,330,970 | | 800,597 |
| **Basic earnings per common share** | | | | | | |
| Net loss from continuing operations | $ | **(205)** | $ | (1,326) | $ | (1,965) |
| Income from discontinued operations, net of tax | | **501** | | 635 | | 926 |
| **Net income (loss)** | $ | **296** | $ | (691) | $ | (1,039) |
| **Diluted earnings per common share (b)** | | | | | | |
| Net loss from continuing operations | $ | **(205)** | $ | (1,326) | $ | (1,965) |
| Income from discontinued operations, net of tax | | **501** | | 635 | | 926 |
| **Net income (loss)** | $ | **296** | $ | (691) | $ | (1,039) |

(a) Refer to Note 18 for further detail.
(b) Due to the antidilutive effect of converting the Fixed Rate Cumulative Mandatorily Convertible Preferred Stock into common shares and the net loss from continuing operations attributable to common shareholders for 2012, 2011, and 2010, respectively, loss from continuing operations attributable to common shareholders and basic weighted-average common shares outstanding were used to calculate basic and diluted earnings per share.

The effects of converting the outstanding Fixed Rate Cumulative Mandatorily Convertible Preferred Stock into common shares are not included in the diluted earnings per share calculation for the years ended December 31, 2012, 2011, and 2010, respectively, as the effects would be antidilutive for those periods. As such, 574 thousand of potential common shares were excluded from the diluted earnings per share calculation for the years ended December 31, 2012 and 2011, respectively, and 987 thousand of potential common shares were excluded from the diluted earnings per share calculation for the year ended December 31, 2010.

## 21. Regulatory Capital and Other Regulatory Matters

As a bank holding company, we and our wholly owned state-chartered banking subsidiary, Ally Bank, are subject to risk-based capital and leverage guidelines issued by federal and state banking regulators that require that our capital-to-assets ratios meet certain minimum standards. Failure to meet minimum capital requirements can initiate certain mandatory and possibly additional discretionary action by regulators that, if undertaken, could have a direct material effect on the consolidated financial statements or the results of operations and financial condition of Ally and Ally Bank. Under capital adequacy guidelines and the regulatory framework for prompt corrective action, we must meet specific capital guidelines that involve quantitative measures of our assets and certain off-balance sheet items. Our capital amounts and classifications are also subject to qualitative judgments by the regulators about components, risk-weightings, and other factors.

The risk-based capital ratios are determined by allocating assets and specified off-balance sheet financial instruments into several broad risk categories with higher levels of capital being required for the categories that present greater risk. Under the guidelines, total capital is divided into two tiers: Tier 1 capital and Tier 2 capital. Tier 1 capital generally consists of common equity, minority interests, qualifying noncumulative preferred stock, and the fixed rate cumulative preferred stock sold to Treasury under the Troubled Asset Relief Program (TARP), less goodwill and other adjustments. Tier 2 capital generally consists of perpetual preferred stock not qualifying as Tier 1 capital, limited amounts of subordinated debt and the allowance for loan losses, and other adjustments. The amount of Tier 2 capital may not exceed the amount of Tier 1 capital.

Total risk-based capital is the sum of Tier 1 and Tier 2 capital. Under the guidelines, banking organizations are required to maintain a minimum Total risk-based capital ratio (Total capital to risk-weighted assets) of 8% and a Tier 1 risk-based capital ratio (Tier 1 capital to risk-weighted assets) of 4%.

The federal banking regulators also have established minimum leverage ratio guidelines. The leverage ratio is defined as Tier 1 capital divided by adjusted quarterly average total assets (which reflect adjustments for disallowed goodwill and certain intangible assets). The minimum Tier 1 leverage ratio is 3% or 4% depending on factors specified in the regulations.

Table of Contents

# Notes to Consolidated Financial Statements

Ally Financial Inc. • Form 10-K

A banking institution meets the regulatory definition of "well-capitalized" when its Total risk-based capital ratio equals or exceeds 10% and its Tier 1 risk-based capital ratio equals or exceeds 6%; and for insured depository institutions, when its leverage ratio equals or exceeds 5%, unless subject to a regulatory directive to maintain higher capital levels.

The banking regulators have also developed a measure of capital called "Tier 1 common" defined as Tier 1 capital less noncommon elements, including qualifying perpetual preferred stock, minority interest in subsidiaries, trust preferred securities, and mandatory convertible preferred securities. Tier 1 common is used by banking regulators, investors and analysts to assess and compare the quality and composition of Ally's capital with that of other financial services companies. Also, bank holding companies with assets of $50 billion or more, such as Ally, must develop and maintain a capital plan annually, and among other elements, the capital plan must include a discussion of how we will maintain a pro forma Tier 1 common ratio (Tier 1 common to risk-weighted assets) above 5% under expected conditions and certain stressed scenarios.

On October 29, 2010, Ally, IB Finance Holding Company, LLC, Ally Bank, and the FDIC entered into a Capital and Liquidity Maintenance Agreement (CLMA). The CLMA requires capital at Ally Bank to be maintained at a level such that Ally Bank's leverage ratio is at least 15%. For this purpose, the leverage ratio is determined in accordance with the FDIC's regulations related to capital maintenance.

The following table summarizes our capital ratios.

| December 31, ($ in millions) | 2012 | | 2011 | | Required minimum | Well-capitalized minimum |
|---|---|---|---|---|---|---|
| | Amount | Ratio | Amount | Ratio | | |
| Risk-based capital | | | | | | |
| Tier 1 (to risk-weighted assets) | | | | | | |
| Ally Financial Inc. | $  20,232 | 13.13% | $  21,067 | 13.65% | 4.00% | 6.00% |
| Ally Bank | 14,136 | 16.26 | 12,953 | 17.42 | 4.00 | 6.00 |
| Total (to risk-weighted assets) | | | | | | |
| Ally Financial Inc. | $  21,669 | 14.07% | $  22,664 | 14.69% | 8.00% | 10.00% |
| Ally Bank | 14,827 | 17.06 | 13,675 | 18.40 | 8.00 | 10.00 |
| Tier 1 leverage (to adjusted quarterly average assets) (a) | | | | | | |
| Ally Financial Inc. | $  20,232 | 11.16% | $  21,067 | 11.45% | 3.00–4.00% | (b) |
| Ally Bank | 14,136 | 15.30 | 12,953 | 15.50 | 15.00 (c) | 5.00% |
| Tier 1 common (to risk-weighted assets) | | | | | | |
| Ally Financial Inc. | $  10,749 | 6.98% | $  11,585 | 7.51% | n/a | n/a |
| Ally Bank | n/a | n/a | n/a | n/a | n/a | n/a |

n/a = not applicable

(a)  Federal regulatory reporting guidelines require the calculation of adjusted quarterly average assets using a daily average methodology.
(b)  There is no Tier 1 leverage component in the definition of a well-capitalized bank holding company.
(c)  Ally Bank, in accordance with the CLMA, is required to maintain a Tier 1 leverage ratio of at least 15%.

At December 31, 2012, Ally and Ally Bank were "well-capitalized" and met all capital requirements to which each was subject.

## Basel Capital Accord and Other Regulatory Matters

In June 2012, the U.S. federal banking agencies released three notices of proposed rulemaking (NPRs) and a Market Risk Final Rule (effective January 1, 2013). The three NPRs represent substantial revisions to the regulatory capital rules for banking organizations. If adopted, as proposed, these NPRs would incorporate the international Basel III capital framework, as well as implement certain provisions of the Dodd-Frank Wall Street Reform and Consumer Protection Act (Dodd-Frank Act). On August 8, 2012, the federal banking agencies extended the public comment period on the NPRs to October 22, 2012.

Highlights of the NPRs include a revised definition of capital in order to implement the Basel III reforms as well as higher minimum capital ratios that will apply to most banking organizations and would be phased in between 2013 and 2019 consistent with the Basel Committee's international implementation time line. The NPRs remove the use of credit ratings from both the standardized and advanced approaches, as required by the Dodd-Frank Act. In addition, the standards in the existing Basel I risk-based capital rules, which the NPRs refer to as the "general risk-based capital requirements," would be revised, effective January 1, 2015, to include a more risk-sensitive risk-weighting approach. On November 9, 2012, the federal banking agencies announced that the Basel III proposals would not become effective on January 31, 2013.

The Market Risk Final Rule, which amends the calculation of market risk capital, only applies to banking organizations with significant trading assets and liabilities. We do not currently meet the minimum requirements for application of the Market Risk Rule; accordingly, this rule is not currently applicable to us.

Table of Contents

# Notes to Consolidated Financial Statements

Ally Financial Inc. • Form 10-K

Compliance with evolving capital requirements is a strategic priority for Ally. We expect to be in compliance with all applicable requirements within the established timeframes.

## International Banks, Finance Companies, and Other Foreign Operations

Certain of our foreign subsidiaries operate in local markets as either banks or regulated finance companies and are subject to regulatory restrictions. These regulatory restrictions, among other things, require that our subsidiaries meet certain minimum capital requirements and may restrict dividend distributions and ownership of certain assets. Total assets of our regulated international banks and finance companies were approximately $15.3 billion and $13.6 billion at December 31, 2012 and 2011, respectively. In addition, the Bank Holding Company Act of 1956 imposes restrictions on Ally's ability to invest equity abroad without FRB approval. Many of our other operations are also heavily regulated in many jurisdictions outside the United States.

## Depository Institutions

Ally Bank is a state nonmember bank, chartered by the State of Utah, and subject to the supervision of the FDIC and the Utah Department of Financial Institutions. Ally Bank's deposits are insured by the FDIC, and Ally Bank is required to file periodic reports with the FDIC concerning its financial condition. Total assets of Ally Bank were $94.8 billion and $85.3 billion at December 31, 2012 and 2011, respectively. Ally Bank is subject to Utah law (and, in certain instances, federal law) that places restrictions and limitations on the amount of dividends or other distributions. Ally Bank did not make any dividend or other distributions to Ally in 2012 or 2011.

The FRB requires banks to maintain minimum average reserve balances. The amount of the required reserve balance for Ally Bank was $214 million and $205 million at December 31, 2012 and 2011, respectively.

## U.S. Mortgage Business

Our U.S. mortgage business is subject to extensive federal, state, and local laws, rules, and regulations, in addition to judicial and administrative decisions that impose requirements and restrictions on this business. As a Federal Housing Administration-approved lender, certain of our U.S. mortgage subsidiaries are required to submit audited financial statements to the Department of Housing and Urban Development on an annual basis. The U.S. mortgage business is also subject to examination by the Federal Housing Commissioner to assure compliance with Federal Housing Administration regulations, policies, and procedures. The federal, state, and local laws, rules, and regulations to which our U.S. mortgage business is subject, among other things, impose licensing obligations and financial requirements; limit the interest rates, finance charges, and other fees that can be charged; regulate the use of credit reports and the reporting of credit information; impose underwriting requirements; regulate marketing techniques and practices; require the safeguarding of nonpublic information about customers; and regulate servicing practices, including the assessment, collection, foreclosure, claims handling, and investment and interest payments on escrow accounts.

Certain of our mortgage subsidiaries are required to satisfy regulatory net worth requirements. Failure to meet minimum capital requirements can initiate certain mandatory actions by federal, state, and foreign agencies that could have a material effect on our results of operations and financial condition. These entities were in compliance with these requirements at December 31, 2012.

## Insurance Companies

Our Insurance operations are subject to certain minimum aggregate capital requirements, net asset and dividend restrictions under applicable state and foreign insurance law, and the rules and regulations promulgated by various U.S. and foreign regulatory agencies. Under various state and foreign insurance regulations, dividend distributions may be made only from statutory unassigned surplus, with approvals required from the regulatory authorities for dividends in excess of certain statutory limitations. At December 31, 2012, the maximum dividend that could be paid by the U.S. insurance subsidiaries over the next twelve months without prior statutory approval was $118 million.

## 22.    Derivative Instruments and Hedging Activities

We enter into interest rate and foreign-currency swaps, futures, forwards, options, and swaptions in connection with our market risk management activities. Derivative instruments are used to manage interest rate risk relating to specific groups of assets and liabilities, including investment securities, MSRs, and debt. In addition, we use foreign exchange contracts to mitigate foreign-currency risk associated with foreign-currency-denominated investment securities, foreign-currency-denominated debt, foreign exchange transactions, and our net investment in foreign subsidiaries. Our primary objective for utilizing derivative financial instruments is to manage market risk volatility associated with interest rate and foreign-currency risks related to the assets and liabilities.

## Interest Rate Risk

We execute interest rate swaps to modify our exposure to interest rate risk by converting certain fixed-rate instruments to a variable-rate and certain variable-rate instruments to a fixed rate. We monitor our mix of fixed- and variable-rate debt in relation to the rate profile of our assets. When it is cost-effective to do so, we may enter into interest rate swaps to achieve our desired mix of fixed- and variable-rate debt. Derivatives qualifying for hedge accounting consist of fixed-rate debt obligations in which receive-fixed swaps are designated as hedges of specific fixed-rate debt obligations. Other derivatives qualifying for hedge accounting consist of an existing variable-rate liability in which pay-fixed swaps are designated as hedges of the expected future cash flows in the form of interest payments on the outstanding borrowing associated with Ally Bank's secured floating-rate credit facility.

165

Table of Contents

# Notes to Consolidated Financial Statements

Ally Financial Inc. • Form 10-K

We enter into economic hedges to mitigate exposure for the following categories.

- ***MSRs*** — Our MSRs are generally subject to loss in value when mortgage rates decline. Declining mortgage rates generally result in an increase in refinancing activity that increases prepayments and results in a decline in the value of MSRs. To mitigate the impact of this risk, we maintain a portfolio of financial instruments, primarily derivative instruments that increase in value when interest rates decline. The primary objective is to minimize the overall risk of loss in the value of MSRs due to the change in fair value caused by interest rate changes.

  We may use a multitude of derivative instruments to manage the interest rate risk related to MSRs. They include, but are not limited to, interest rate futures contracts, call or put options on U.S. Treasuries, swaptions, forward sales of MBS, futures, interest rate swaps, interest rate floors, and interest rate caps. We monitor and actively manage our risk on a daily basis.

- ***Mortgage loan commitments and mortgage and automobile loans held-for-sale*** — We are exposed to interest rate risk from the time an interest rate lock commitment (IRLC) is made until the time the mortgage loan is sold. Changes in interest rates impact the market price for our loans; as market interest rates decline, the value of existing IRLCs and loans held-for-sale increase and vice versa. Our primary objective in risk management activities related to IRLCs and mortgage loans held-for-sale is to eliminate or greatly reduce any interest rate risk associated with these items.

  The primary derivative instrument we use to accomplish the risk management objective for mortgage loans and IRLCs is forward sales of MBS, primarily Fannie Mae or Freddie Mac to-be-announced securities. These instruments typically are entered into at the time the IRLC is made. The value of the forward sales contracts moves in the opposite direction of the value of our IRLCs and mortgage loans held-for-sale. We also use other derivatives, such as interest rate swaps, options, and futures, to economically hedge automobile loans held-for-sale and certain portions of the mortgage portfolio. Nonderivative instruments, such as short positions of U.S. Treasuries, may also be periodically used to economically hedge the mortgage portfolio.

- ***Debt*** — With the exception of a portion of our fixed-rate debt and a portion of our outstanding floating-rate borrowing associated with Ally Bank's secured floating-rate credit facility, we do not apply hedge accounting to our derivative portfolio held to mitigate interest rate risk associated with our debt portfolio. Typically, the significant terms of the interest rate swaps match the significant terms of the underlying debt resulting in an effective conversion of the rate of the related debt.

- ***Other*** — We enter into futures, options, and swaptions to economically hedge our net fixed versus variable interest rate exposure. We also enter into equity options to economically hedge our exposure to the equity markets.

## Foreign Currency Risk

We enter into derivative financial instrument contracts to mitigate the risk associated with variability in cash flows related to foreign-currency financial instruments. Currency forwards are used to economically hedge foreign exchange exposure on foreign-currency-denominated debt by converting the funding currency to the same currency of the assets being financed. Similar to our interest rate derivatives, the derivatives are generally entered into or traded concurrent with the debt issuance with the terms of the derivative matching the terms of the underlying debt.

Our foreign subsidiaries maintain both assets and liabilities in local currencies; these local currencies are generally the subsidiaries' functional currencies for accounting purposes. Foreign-currency exchange-rate gains and losses arise when the assets or liabilities of our subsidiaries are denominated in currencies that differ from its functional currency. In addition, our equity is impacted by the cumulative translation adjustments resulting from the translation of foreign subsidiary results; this impact is reflected in our accumulated other comprehensive income (loss). We enter into foreign-currency forwards and option-based contracts with external counterparties to hedge foreign exchange exposure on our net investments in foreign subsidiaries. In March 2011, we elected to desdesignate all of our existing net investment hedge relationships and changed our method of measuring hedge effectiveness from the spot method to the forward method for new hedge relationships entered into prospectively. For the net investment hedges that were designated under the spot method up until dedesignation date, the hedges were recorded at fair value with changes recorded to accumulated other comprehensive income (loss) with the exception of the spot to forward difference that was recorded to earnings. For current net investment hedges designated under the forward method, the hedges are recorded at fair value with the changes recorded to accumulated other comprehensive income (loss) including the spot to forward difference. The net derivative gain or loss remains in accumulated other comprehensive income (loss) until earnings are impacted by the sale or the liquidation of the associated foreign operation.

We also have a centralized-lending program to manage liquidity for all of our subsidiary businesses. Foreign-currency-denominated loan agreements are executed with our foreign subsidiaries in their local currencies. We evaluate our foreign-currency exposure resulting from intercompany lending and manage our currency risk exposure by entering into foreign-currency derivatives with external counterparties. Our foreign-currency derivatives are recorded at fair value with changes recorded as income offsetting the gains and losses on the associated foreign-currency transactions.

We also periodically purchase nonfunctional currency denominated investment securities and enter into foreign-currency forward contracts with external counterparties to hedge against changes in the fair value of the securities, through maturity, due to changes in the related foreign-currency exchange rate. The foreign-currency forward contracts are recorded at fair value with changes recorded to earnings. The changes in value of the securities due to changes in foreign-currency exchange rates are also recorded to earnings. In the case of

166

Table of Contents

# Notes to Consolidated Financial Statements

Ally Financial Inc. • Form 10-K

securities classified as available-for-sale, any changes in fair value due to unhedged risks are recorded to accumulated other comprehensive income.

Except for our net investment hedges and fair value foreign-currency hedges of available-for-sale securities, we generally have not elected to treat any foreign-currency derivatives as hedges for accounting purposes principally because the changes in the fair values of the foreign-currency swaps are substantially offset by the foreign-currency revaluation gains and losses of the underlying assets and liabilities.

## Counterparty Credit Risk

Derivative financial instruments contain an element of credit risk if counterparties are unable to meet the terms of the agreements. Credit risk associated with derivative financial instruments is measured as the net replacement cost should the counterparties that owe us under the contract completely fail to perform under the terms of those contracts, assuming no recoveries of underlying collateral as measured by the market value of the derivative financial instrument.

To mitigate the risk of counterparty default, we maintain collateral agreements with certain counterparties. The agreements require both parties to maintain collateral in the event the fair values of the derivative financial instruments meet established thresholds. In the event that either party defaults on the obligation, the secured party may seize the collateral. Generally, our collateral arrangements are bilateral such that we and the counterparty post collateral for the value of our total obligation to each other. Contractual terms provide for standard and customary exchange of collateral based on changes in the market value of the outstanding derivatives. The securing party posts additional collateral when their obligation rises or removes collateral when it falls. We also have unilateral collateral agreements whereby we are the only entity required to post collateral.

Certain derivative instruments contain provisions that require us to either post additional collateral or immediately settle any outstanding liability balances upon the occurrence of a specified credit risk-related event. If a credit risk-related event had been triggered the amount of additional collateral required to be posted by us would have been insignificant.

We placed cash and securities collateral totaling $1.3 billion and $1.4 billion at December 31, 2012 and 2011, respectively, in accounts maintained by counterparties. We received cash collateral from counterparties totaling $941 million and $1.4 billion at December 31, 2012 and 2011, respectively. The receivables for collateral placed and the payables for collateral received are included on our Consolidated Balance Sheet in other assets and accrued expenses and other liabilities, respectively. In certain circumstances, we receive or post securities as collateral with counterparties. We do not record such collateral received on our Consolidated Balance Sheet unless certain conditions are met. At December 31, 2012 and 2011, we received noncash collateral of $0.3 million and $43 million, respectively.

167

Table of Contents

# Notes to Consolidated Financial Statements

Ally Financial Inc. • Form 10-K

## Balance Sheet Presentation

The following table summarizes the fair value amounts of derivative instruments reported on our Consolidated Balance Sheet. The fair value amounts are presented on a gross basis, are segregated by derivatives that are designated and qualifying as hedging instruments or those that are not, and are further segregated by type of contract within those two categories. At December 31, 2012, $2.3 billion of the derivative contracts in a receivable position were classified as other assets on the Consolidated Balance Sheet. At December 31, 2011, $5.7 billion and $14 million of the derivative contracts in a receivable position were classified as other assets and trading assets, respectively, on the Consolidated Balance Sheet. At December 31, 2012, $2.5 billion of derivative contracts in a liability position were classified as accrued expenses and other liabilities on the Consolidated Balance Sheet. At December 31, 2011, $5.4 billion of derivative contracts in a liability position and $12 million of trading derivatives were both classified as accrued expenses and other liabilities on the Consolidated Balance Sheet.

| | 2012 | | | 2011 | | |
|---|---|---|---|---|---|---|
| | Derivative contracts in a | | | Derivative contracts in a | | |
| December 31, ($ in millions) | receivable position (a) | payable position (b) | Notional amount | receivable position (a) | payable position (b) | Notional amount |
| Derivatives qualifying for hedge accounting | | | | | | |
| Interest rate risk | | | | | | |
| Fair value accounting hedges | $ 411 | $ — | $ 7,248 | $ 289 | $ 4 | $ 8,398 |
| Cash flow accounting hedges | — | 10 | 2,580 | 4 | — | 3,000 |
| Total interest rate risk | 411 | 10 | 9,828 | 293 | 4 | 11,398 |
| Foreign exchange risk | | | | | | |
| Net investment accounting hedges | 35 | 53 | 8,693 | 123 | 54 | 8,208 |
| Total derivatives qualifying for hedge accounting | 446 | 63 | 18,521 | 416 | 58 | 19,606 |
| Economic hedges and trading derivatives | | | | | | |
| Interest rate risk | | | | | | |
| MSRs | 1,616 | 2,299 | 146,405 | 4,812 | 5,012 | 523,037 |
| Mortgage loan commitments and mortgage loans held-for-sale | 49 | 23 | 9,617 | 95 | 107 | 24,950 |
| Debt | 28 | 29 | 17,716 | 81 | 54 | 25,934 |
| Other | 154 | 27 | 41,514 | 160 | 101 | 42,142 |
| Total interest rate risk | 1,847 | 2,378 | 215,252 | 5,148 | 5,274 | 616,063 |
| Foreign exchange risk | 5 | 27 | 2,464 | 137 | 47 | 7,569 |
| Total economic hedges and trading derivatives | 1,852 | 2,405 | 217,716 | 5,285 | 5,321 | 623,632 |
| Total derivatives | $ 2,298 | $ 2,468 | $ 236,237 | $ 5,701 | $ 5,379 | $ 643,238 |

(a)    Includes accrued interest of $175 million and $459 million at December 31, 2012 and 2011, respectively.
(b)    Includes accrued interest of $144 million and $458 million at December 31, 2012 and 2011, respectively.

Table of Contents

# Notes to Consolidated Financial Statements

Ally Financial Inc. • Form 10-K

## Comprehensive Income Presentation

The following table summarizes the location and amounts of gains and losses on derivative instruments reported in our  Consolidated Statement of Comprehensive Income .

| Year ended December 31, ($ in millions) | 2012 | | 2011 | | 2010 |
|---|---|---|---|---|---|
| Derivatives qualifying for hedge accounting | | | | | |
| Gain recognized in earnings on derivatives (a) | | | | | |
| Interest rate contracts | | | | | |
| Interest on long-term debt | $ | **164** | $ | 892 | $ | 161 |
| Foreign exchange contracts | | | | | |
| Other income, net of losses | | — | | 35 | | — |
| Loss recognized in earnings on hedged items (b) | | | | | |
| Interest rate contracts | | | | | |
| Interest on long-term debt | | **(193)** | | (848) | | (119) |
| Foreign exchange contracts | | | | | |
| Other income, net of losses | | — | | (35) | | — |
| Total derivatives qualifying for hedge accounting | | **(29)** | | 44 | | 42 |
| Economic and trading derivatives | | | | | |
| (Loss) gain recognized in earnings on derivatives | | | | | |
| Interest rate contracts | | | | | |
| Interest on long-term debt | | **(3)** | | (3) | | — |
| Servicing asset valuation and hedge activities, net | | **669** | | 817 | | 478 |
| Loss on mortgage and automotive loans, net | | **(125)** | | (727) | | (332) |
| Other income, net of losses | | **(18)** | | (70) | | (102) |
| Other operating expenses | | — | | — | | (9) |
| Total interest rate contracts | | **523** | | 17 | | 35 |
| Foreign exchange contracts (c) | | | | | |
| Interest on long-term debt | | **(39)** | | 61 | | (127) |
| Other income, net of losses | | **(48)** | | 17 | | 158 |
| Other operating expenses | | **2** | | (21) | | — |
| Total foreign exchange contracts | | **(85)** | | 57 | | 31 |
| Gain recognized in earnings on derivatives | $ | **409** | $ | 118 | $ | 108 |

(a)  Amounts exclude gains related to interest for qualifying accounting hedges of debt, which are primarily offset by the fixed coupon payment on the long-term debt. The gains were  $123 million,  $257 million, and  $322 million for the years ended December 31, 2012,  2011, and 2010, respectively.

(b)  Amounts exclude gains related to amortization of deferred basis adjustments on the hedged items. The gains were  $231 million, $229 million, and $164 million for the years ended December 31, 2012,  2011, and 2010, respectively.

(c)  Amounts exclude gains and losses related to the revaluation of the related foreign-denominated debt or receivable. Gains of  $75 million, and losses of $77 million and $53 million, were recognized for the years ended December 31, 2012,  2011, and 2010, respectively.

Table of Contents

# Notes to Consolidated Financial Statements

Ally Financial Inc. • Form 10-K

The following table summarizes derivative instruments used in cash flow and net investment hedge accounting relationships.

| Year ended December 31, ($ in millions) | | 2012 | | 2011 | | 2010 |
|---|---|---|---|---|---|---|
| Cash flow hedges | | | | | | |
| Interest rate contracts | | | | | | |
| Gain reclassified from accumulated other comprehensive income to interest on long-term debt | $ | **1** | $ | — | $ | — |
| (Loss) gain recorded directly to interest on long-term debt | | **(7)** | | 5 | | — |
| Total interest on long-term debt | $ | **(6)** | $ | 5 | $ | — |
| (Loss) gain recognized in other comprehensive income | $ | **(7)** | $ | (1) | $ | 4 |
| Net investment hedges | | | | | | |
| Foreign exchange contracts | | | | | | |
| (Loss) gain reclassified from accumulated other comprehensive income to other income, net of losses | $ | **(1)** | $ | (8) | $ | 12 |
| Loss recorded directly to other income, net of losses (a) | | **—** | | (3) | | (18) |
| Total other income, net of losses | $ | **(1)** | $ | (11) | $ | (6) |
| (Loss) gain recognized in other comprehensive income (b) | $ | **(270)** | $ | 173 | $ | (183) |

(a) The amounts represent the forward points excluded from the assessment of hedge effectiveness.
(b) The amounts represent the effective portion of net investment hedges. There are offsetting amounts recognized in accumulated other comprehensive income related to the revaluation of the related net investment in foreign operations. There were gains of $285 million, losses of $237 million, and gains of $187 million for the years ended December 31, 2012, 2011, and 2010, respectively.

## 23.    Income Taxes

The following table summarizes income (loss) from continuing operations before income tax expense.

| Year ended December 31, ($ in millions) | | 2012 | | 2011 | | 2010 |
|---|---|---|---|---|---|---|
| U.S. (loss) income | $ | **(773)** | $ | (834) | $ | 443 |
| Non-U.S. income (loss) | | **18** | | (117) | | (51) |
| (Loss) income from continuing operations before income tax expense | $ | **(755)** | $ | (951) | $ | 392 |

The significant components of income tax expense from continuing operations were as follows.

| Year ended December 31, ($ in millions) | | 2012 | | 2011 | | 2010 |
|---|---|---|---|---|---|---|
| Current income tax (benefit) expense | | | | | | |
| U.S. federal | $ | **—** | $ | 18 | $ | 23 |
| Foreign | | **(24)** | | 26 | | 36 |
| State and local | | **10** | | 12 | | 58 |
| Total current (benefit) expense | | **(14)** | | 56 | | 117 |
| Deferred income tax (benefit) expense | | | | | | |
| U.S. federal | | **(1,058)** | | — | | (6) |
| Foreign | | **25** | | (5) | | — |
| State and local | | **(237)** | | — | | (7) |
| Total deferred benefit | | **(1,270)** | | (5) | | (13) |
| Total income tax (benefit) expense from continuing operations | $ | **(1,284)** | $ | 51 | $ | 104 |

170

Table of Contents

# Notes to Consolidated Financial Statements

Ally Financial Inc. • Form 10-K

A reconciliation of the (benefit) provision for income taxes with the amounts at the statutory U.S. federal income tax rate is shown in the following table.

| Year ended December 31, ($ in millions) | | 2012 | | 2011 | | 2010 |
|---|---|---|---|---|---|---|
| Statutory U.S. federal tax (benefit) expense | $ | (264) | $ | (333) | $ | 137 |
| Change in tax resulting from | | | | | | |
| Effect of valuation allowance change | | (984) | | 339 | | (124) |
| State and local income taxes, net of federal income tax benefit | | (71) | | 7 | | 2 |
| Tax Credits | | (45) | | (3) | | — |
| Changes in unrecognized tax benefits | | (7) | | (5) | | 54 |
| Foreign tax differential | | 2 | | 31 | | (20) |
| Non-deductible expenses | | 64 | | 8 | | 4 |
| Other, net | | 21 | | 7 | | 51 |
| Tax (benefit) expense | $ | (1,284) | $ | 51 | $ | 104 |

As discussed in Note 1, on May 14, 2012, we deconsolidated ResCap for financial reporting purposes. For U.S. federal tax purposes, however, ResCap will continue to be included in our consolidated return filing until ultimate disposition of our ownership in ResCap. Given that the Debtors are disregarded entities for U.S. tax purposes, there should not be a reduction to our net deferred tax assets as a result of the Bankruptcy filing.

Our income tax (benefit) expense from continuing operations has not naturally corresponded with our (loss) income from continuing operations before income tax for the years ended December 31, 2012, 2011, and 2010, given we had U.S. and foreign valuation allowance movements during those years. For 2012, consolidated income tax benefit from continuing operations of $1.3 billion is largely driven by a release of a portion of our U.S. valuation allowance.

As of each reporting date, we consider existing evidence, both positive and negative, that could impact our view with regard to future realization of deferred tax assets. As of December 31, 2012, we determined that positive evidence existed to conclude that it is more likely than not that ordinary-in-character deferred tax assets are realizable, and therefore, we reduced the valuation allowance accordingly. Positive evidence in this assessment consisted of forecasts of future taxable income that are sufficient to realize net operating loss carryforwards before their expiration, coupled with our emergence from a cumulative three-year U.S. pretax loss (after removing the effects of non-recurring charges and discontinued operations). Certain U.S. deferred tax assets remain offset with a valuation allowance as discussed below.

We believe it is more likely than not that the benefit for certain U.S. net operating loss, capital loss, and foreign tax credit carryforwards will not be realized. In recognition of this risk, we have provided a valuation allowance of $1.6 billion on the deferred tax assets relating to these carryforwards. In particular, the deferred tax assets and liabilities as of December 31, 2012, reflect the U.S. income tax effects of the anticipated sale of entities held-for-sale at net book value. In concluding to maintain a valuation allowance against our capital loss carryforwards, we considered the positive evidence that we have entered into agreements to sell our held-for-sale entities for amounts in excess of book value. We also considered and ultimately weighted more heavily the negative evidence that we have historically had difficulty generating significant capital gains; capital loss carryforwards have a relatively short carryforward period; the timing of disposal of the held-for-sale entities is uncertain; and the disposal of the held-for-sale entities are subject to various levels of regulatory approval in numerous countries. Successful completion during 2013 of the sales of entities currently held-for-sale may result in capital gains that would allow us to realize capital loss carryforwards. A related reversal of valuation allowance on these deferred tax assets would be recognized as an income tax benefit upon such utilization.

Table of Contents

# Notes to Consolidated Financial Statements

Ally Financial Inc. • Form 10-K

The significant components of deferred tax assets and liabilities are reflected in the following table.

| December 31, ($ in millions) | 2012 | 2011 |
|---|---:|---:|
| **Deferred tax assets** | | |
| Tax credit carryforwards | $ 1,631 | $ 161 |
| Tax loss carryforwards | 1,025 | 1,976 |
| Mark-to-market on consumer finance receivables and loans | 880 | 695 |
| Equity investment in ResCap | 486 | — |
| Provision for loan losses | 306 | 775 |
| Hedging transactions | 267 | 280 |
| State and local taxes | 263 | 186 |
| ResCap settlement accrual | 262 | — |
| Sales of finance receivables and loans | 206 | 182 |
| Unearned insurance premiums | 142 | 158 |
| Contingency reserves | 19 | 169 |
| Other | 247 | 568 |
| Gross deferred tax assets | 5,734 | 5,150 |
| Valuation allowance | (1,653) | (2,274) |
| Net deferred tax assets | 4,081 | 2,876 |
| **Deferred tax liabilities** | | |
| Lease transactions | 1,756 | 2,052 |
| Basis difference in subsidiaries | 454 | — |
| Deferred acquisition costs | 333 | 328 |
| Debt transactions | 226 | 32 |
| Unrealized gains on securities | 16 | 180 |
| Other | 112 | 157 |
| Gross deferred tax liabilities | 2,897 | 2,749 |
| Net deferred tax assets | $ 1,184 | $ 127 |

At December 31, 2012, we had U.S. federal and state net operating loss carryforwards and capital loss carryforwards. The federal net operating loss carryforwards of $668 million expire in the years 2025–2031. The federal capital loss carryforwards of $2.2 billion expire in the years 2014–2017. The corresponding expiration periods for the state net operating loss carryforwards of $1.7 billion and capital loss carryforwards of $3.1 billion are 2014–2032 and 2014–2017, respectively. Additionally, U.S. foreign tax credit carryforwards of $1.6 billion are available as of December 31, 2012, and expire in the years 2013–2022.

Foreign pretax income is subject to U.S. taxation when effectively repatriated. Before the third quarter of 2012, we fully provided for federal income taxes on the undistributed earnings of foreign subsidiaries except to the extent those earnings were indefinitely reinvested outside the United States. As of December 31, 2012, however, we no longer assert that any foreign earnings are indefinitely reinvested outside of the United States. This change in assertion is primarily due to the fact that agreements to sell our international operations were signed during the fourth quarter of 2012. These sales will be taxable in the United States in future periods and will result in the effective repatriation of foreign earnings. As a result of this change in assertion, all deferred tax liabilities for incremental U.S. tax that stem from temporary differences related to investments in foreign subsidiaries or foreign corporate joint ventures have been recognized as of December 31, 2012.

Table of Contents

# Notes to Consolidated Financial Statements

Ally Financial Inc. • Form 10-K

The following table provides a reconciliation of the beginning and ending amount of unrecognized tax benefits.

| ($ in millions) | | 2012 | | 2011 | | 2010 |
|---|---|---|---|---|---|---|
| Balance at January 1, | $ | 198 | $ | 214 | $ | 172 |
| Additions based on tax positions related to the current year | | 14 | | 11 | | 69 |
| Additions for tax positions of prior years | | 2 | | 20 | | 3 |
| Reductions for tax positions of prior years | | (4) | | (3) | | (23) |
| Settlements | | (17) | | (35) | | (9) |
| Expiration of statute of limitations | | (4) | | — | | (2) |
| Foreign-currency translation adjustments | | (5) | | (9) | | 4 |
| Deconsolidation of ResCap and discontinued operations | | (82) | | — | | — |
| Balance at December 31, | $ | 102 | $ | 198 | $ | 214 |

Included in the unrecognized tax benefits balances are some items, the recognition of which would not affect the effective tax rate, such as the tax effect of certain temporary differences and the portion of gross state unrecognized tax benefits that would be offset by the tax benefit of the associated federal deduction. At December 31, 2012, 2011, and 2010, the balance of unrecognized tax benefits that, if recognized, would affect our effective tax rate is $84 million, $179 million, and $199 million, respectively.

We recognize accrued interest and penalties related to uncertain income tax positions in interest expense and other operating expenses, respectively. For the years ended December 31, 2012, 2011, and 2010, $1 million, $1 million, and $1 million, respectively, were accrued for interest and penalties with the cumulative accrued balance totaling $7 million at December 31, 2012, $178 million at December 31, 2011, and $201 million at December 31, 2010.

We anticipate the examination of various U.S. income tax returns along with the examinations by various foreign, state, and local jurisdictions will be completed within the next twelve months. As such, it is reasonably possible that certain tax positions may be settled and the unrecognized tax benefits would decrease by $22 million, which includes interest and penalties.

We file tax returns in the U.S. federal jurisdiction and various states and foreign jurisdictions. Our most significant operations remaining following our commitment to sell various international operations are the United States and Canada. The oldest tax years that remain subject to examination for those jurisdictions are 2009 and 2004, respectively.

## 24.    Employee Benefit and Compensation Plans

### Defined Contribution Plan

A significant number of our employees are covered by defined contribution plans. Employer contributions vary based on criteria specific to each individual plan and amounted to $56 million, $66 million, and $58 million in 2012, 2011, and 2010, respectively. These costs were recorded as compensation and benefits expense in our Consolidated Statement of Income. We expect contributions for 2013 to be similar to contributions made in 2012.

### Defined Benefit Pension Plan

Certain of our employees are eligible to participate in separate retirement plans that provide for pension payments upon retirement based on factors such as length of service and salary. In recent years, we have transferred, frozen, or terminated a significant number of our other defined benefit plans. All income and expense noted for pension accounting was recorded as compensation and benefits expense in our Consolidated Statement of Income.

The following summarizes information related to our pension plans.

| Year ended December 31, ($ in millions) | | 2012 | | 2011 |
|---|---|---|---|---|
| Projected benefit obligation | $ | 355 | $ | 528 |
| Fair value of plan assets | | 214 | | 398 |
| Underfunded status | $ | (141) | $ | (130) |

The underfunded position is recognized on the Consolidated Balance Sheet and the change in the underfunded position was recorded in other comprehensive income (loss).

### Defined Benefit Pension Plan Actions

GMAC Mortgage Group LLC, our wholly owned subsidiary, sponsors a defined benefit pension plan (the GMACM Pension Plan) for which the accrual of additional benefits were previously frozen. The GMACM Pension Plan primarily covers former employees of certain discontinued or non-core businesses of our Mortgage and Insurance operations. In October 2012, we entered into an agreement under which the GMACM Pension Plan purchased a group annuity contract from a third-party insurance company that requires the insurance company to

173

Table of Contents

# Notes to Consolidated Financial Statements

Ally Financial Inc. • Form 10-K

pay and administer all future annuity payments to the current retiree population of the GMACM Pension Plan (retired as of September 1, 2012) beginning on January 1, 2013. Additionally, during the fourth quarter the GMACM Pension Plan completed a program whereby we offered voluntary lump-sum distributions to terminated employees with vested benefits. In connection with these combined actions we recorded a settlement loss of $95 million.

## Other Postretirement Benefits

Certain of our subsidiaries participated in various postretirement medical, dental, vision, and life insurance plans. We have provided for certain amounts associated with estimated future postretirement benefits other than pensions and characterized such amounts as other postretirement benefits. Other postretirement benefits expense (income), which is recorded in compensation and benefits expense in our Consolidated Statement of Income, was minimal in 2012, 2011, and 2010. We expect our other postretirement benefit expense to continue to be minimal in future years.

## Share-based Compensation Plans

Based on our transactions with Treasury during 2009, we are required to comply with the limitations on executive pay as determined by the Special Master of TARP Compensation (Special Master). We have established Deferred Stock Units (DSUs) and Incentive Restricted Stock Units (IRSUs) as forms of compensation to our senior executives, which have been approved by the Special Master. We also grant Restricted Stock Units (RSUs) to executives under the Long-Term Equity Compensation Incentive Plan (LTIP). Each of our approved compensation plans and awards were designed to provide our executives with an opportunity to share in the future growth in value of Ally, which is necessary to attract and retain key executives.

Pursuant to the terms of the LTIP plan, the Ally Board of Directors determines a share price valuation for share-based compensation awards not less than annually. The Ally Board of Directors thus determined a share price of $8,500 per share for purposes of the LTIP plan as of December 31, 2011. A share price valuation of $9,000 per share was determined as of March 31, 2012. The valuation remained unchanged at $9,000 per share as of December 31, 2012. The changes in award valuation resulted in an increase to compensation expense for RSU, DSU, and IRSU awards of $5 million, $8 million, and $2 million, respectively, recognized in 2012. The impact was recorded as compensation and benefits expense in our Consolidated Statement of Income.

RSU awards are incentive awards granted to executives as phantom shares of Ally. The majority of awards granted in 2008 and 2009 vest ratably on an annual basis based on continued service on December 31, 2012 with the final tranche vesting on December 31, 2012. Participants had the option at grant date to defer the valuation and payout for awards granted in 2008 and 2009. A majority of the participants who received awards granted in 2010, 2011, and 2012 vest ratably over a three-year period starting on the date the award was issued with the majority of the awards fully vesting in February 2013, February 2014, and February 2015, respectively. The awards require liability treatment and are remeasured quarterly at fair value until they are paid. The compensation costs related to these awards are ratably charged to expense over the applicable service period. Changes in fair value related to the portion of the awards that have vested and have not been paid are recognized in earnings in the period in which the changes occur. At December 31, 2012 there were a total of 17,057 RSU award shares outstanding, composed of 189 shares awarded during 2008, 844 shares awarded during 2009, 2,648 shares awarded during 2010, 5,956 shares awarded during 2011, and 7,420 shares awarded during 2012. At December 31, 2011 there were a total of 26,707 RSU award shares outstanding, composed of 3,806 shares awarded during 2008, 5,199 shares awarded during 2009, 9,281 shares awarded during 2010, and 8,421 shares awarded during 2011. We recognized compensation expense related to RSU awards of $92 million, $56 million and $63 million for the years ended December 31, 2012, 2011 and 2010, respectively. These costs were recorded as compensation and benefits expense in our Consolidated Statement of Income.

DSU awards are granted to senior executives as phantom shares of Ally and are included as part of their base salary. DSUs are generally granted ratably each pay period throughout the year, vest immediately upon grant, and are paid in cash. DSUs awarded in 2012 will generally be redeemable in three equal installments: the first on the final payroll date of 2012, the second ratably over 2013 and the third ratably over 2014. DSUs awarded in 2011 are generally redeemable in three equal annual installments beginning on the first anniversary of grant. The DSU awards require liability treatment and are remeasured quarterly at fair value until they are paid, with each change in value fully charged to compensation expense in the period in which the change occurs. At December 31, 2012 and 2011 there were a total of 13,190 and 13,743 DSU award shares outstanding, respectively. We recognized compensation expense related to DSU awards of $65 million, $25 million and $75 million for the years ended December 31, 2012, 2011 and 2010, respectively, for the outstanding awards. These costs were recorded as compensation and benefits expense in our Consolidated Statement of Income.

IRSU awards are incentive awards granted to senior executives as phantom shares of Ally. There were no IRSUs granted to senior executives in 2012. IRSU awards from 2009, 2010 and 2011 generally vest in full after two years from the date of grant based on continued service with Ally. After the vesting requirement is met, IRSU payouts will be made only as we repay our TARP obligations. Payouts will be made in 25% increments based on the percentage of TARP obligations that have been repaid, as determined in accordance with the established guidelines for determining "repayment".

As of December 31, 2012, Ally had repaid more than 25%, but less than 50%, of its TARP obligations. Payouts are based on the fair value of the phantom shares at the time of the payout. The awards require liability treatment and are remeasured quarterly at fair value until they are paid. The compensation costs related to these awards are ratably charged to expense over the requisite service period. Changes in fair value relating to the portion of the awards that have vested and have not been paid are recognized in earnings in the period in which the changes occur. At December 31, 2012 and 2011 there were a total of 6,475 and 7,975 IRSU award shares outstanding, respectively. We

Table of Contents

# Notes to Consolidated Financial Statements

Ally Financial Inc. • Form 10-K

recognized compensation expense related to IRSU awards of $30 million, $14 million and $10 million for the years ended December 31, 2012, 2011 and 2010, respectively, for the outstanding awards. These costs were recorded as compensation and benefits expense in our Consolidated Statement of Income.

## 25.  Fair Value

## Fair Value Measurements

For purposes of this disclosure, fair value is defined as the exchange price that would be received to sell an asset or paid to transfer a liability (exit price) in the principal or most advantageous market in an orderly transaction between market participants at the measurement date. Fair value is based on the assumptions market participants would use when pricing an asset or liability. Additionally, entities are required to consider all aspects of nonperformance risk, including the entity's own credit standing, when measuring the fair value of a liability.

GAAP specifies a three-level hierarchy that is used when measuring and disclosing fair value. The fair value hierarchy gives the highest priority to quoted prices available in active markets (i.e., observable inputs) and the lowest priority to data lacking transparency (i.e., unobservable inputs). An instrument's categorization within the fair value hierarchy is based on the lowest level of significant input to its valuation. The following is a description of the three hierarchy levels.

| | |
|---|---|
| Level 1 | Inputs are quoted prices in active markets for identical assets or liabilities at the measurement date. Additionally, the entity must have the ability to access the active market, and the quoted prices cannot be adjusted by the entity. |
| Level 2 | Inputs are other than quoted prices included in Level 1 that are observable for the asset or liability, either directly or indirectly. Level 2 inputs include quoted prices in active markets for similar assets or liabilities; quoted prices in inactive markets for identical or similar assets or liabilities; or inputs that are observable or can be corroborated by observable market data by correlation or other means for substantially the full term of the assets or liabilities. |
| Level 3 | Unobservable inputs are supported by little or no market activity. The unobservable inputs represent management's best assumptions of how market participants would price the assets or liabilities. Generally, Level 3 assets and liabilities are valued using pricing models, discounted cash flow methodologies, or similar techniques that require significant judgment or estimation. |
| Transfers | Transfers into or out of any hierarchy level are recognized at the end of the reporting period in which the transfer occurred. There were no transfers between any levels during the year ended December 31, 2012. |

Following are descriptions of the valuation methodologies used to measure material assets and liabilities at fair value and details of the valuation models, key inputs to those models, and significant assumptions utilized.

- ***Trading assets (excluding derivatives)*** — Trading assets were recorded at fair value. Our portfolio included MBS (including senior and subordinated interests) that were either investment-grade, noninvestment grade, or unrated securities. Valuations were primarily based on internally developed discounted cash flow models (an income approach) that used assumptions consistent with current market conditions. The valuation considered recent market transactions, experience with similar securities, current business conditions, and analysis of the underlying collateral, as available. To estimate cash flows, we utilized various significant assumptions including market observable inputs (e.g., forward interest rates) and internally developed inputs (e.g., prepayment speeds, delinquency levels, and credit losses).

- ***Available-for-sale securities*** — Available-for-sale securities are carried at fair value based on observable market prices, when available. If observable market prices are not available, our valuations are based on internally developed discounted cash flow models (an income approach) that use a market-based discount rate and consider recent market transactions, experience with similar securities, current business conditions, and analysis of the underlying collateral, as available. To estimate cash flows, we are required to utilize various significant assumptions including market observable inputs (e.g., forward interest rates) and internally developed inputs (including prepayment speeds, delinquency levels, and credit losses).

- ***Mortgage loans held-for-sale, net*** — Our mortgage loans held-for-sale are accounted for at either fair value because of fair value option elections or they were accounted for at the lower-of-cost or fair value. Mortgage loans held-for-sale are typically pooled together and sold into certain exit markets depending on underlying attributes of the loan, such as GSE eligibility, product type, interest rate, and credit quality. Two valuation methodologies are used to determine the fair value of mortgage loans held-for-sale. The methodology used depends on the exit market as described below.

    *Level 2 mortgage loans* — This includes all GSE-eligible mortgage loans carried at fair value due to fair value option election, which are valued predominantly using published forward agency prices. It also includes any domestic loans and foreign loans where recently negotiated market prices for the loan pool exist with a counterparty (which approximates fair value) or quoted market prices for similar loans are available.

    *Level 3 mortgage loans* — This included all conditional repurchase option loans carried at fair value due to the fair value option election and all GSE-ineligible residential mortgage loans that were accounted for at the lower-of-cost or fair value.  The fair value of these residential mortgage loans were determined using internally developed valuation models because observable market prices were not available.  The loans were priced on a discounted cash flow basis utilizing cash flow projections from

175

Table of Contents

# Notes to Consolidated Financial Statements

Ally Financial Inc. • Form 10-K

internally developed models that utilized prepayment, default, and discount rate assumptions. To the extent available, we utilized market observable inputs such as interest rates and market spreads. If market observable inputs were not available, we were required to utilize internal inputs, such as prepayment speeds, credit losses, and discount rates.

Refer to the section within this note titled *Fair Value Option for Financial Assets and Financial Liabilities* for further information about the fair value elections.

- *Consumer mortgage finance receivables and loans, net* — We elected the fair value option for certain consumer mortgage finance receivables and loans. The elected mortgage loans collateralized on-balance sheet securitization debt in which we estimated credit reserves pertaining to securitized assets that could have exceeded or already had exceeded our economic exposure. We also elected the fair value option for all mortgage securitization trusts required to be consolidated. The elected mortgage loans represented a portion of the consumer finance receivables and loans. The balance for which the fair value option was not elected was reported on the balance sheet at the principal amount outstanding, net of charge-offs, allowance for loan losses, and premiums or discounts.

  The loans were measured at fair value using a portfolio approach. The objective in fair valuing the loans and related securitization debt was to account properly for our retained economic interest in the securitizations. As a result of reduced liquidity in capital markets, values of both these loans and the securitized bonds were expected to be volatile. Since this approach involved the use of significant unobservable inputs, we classified all the mortgage loans elected under the fair value option as Level 3. Refer to the section within this note titled *Fair Value Option of Financial Assets and Financial Liabilities* for additional information.

- *MSRs* — MSRs are classified as Level 3 because there are limited MSR market transactions that are directly observable; therefore, we use internally developed discounted cash flow models (an income approach) to estimate the fair value. These internal valuation models estimate net cash flows based on internal operating assumptions that we believe would be used by market participants in orderly transactions combined with market-based assumptions for loan prepayment rates, interest rates, and discount rates that we believe approximate yields required by investors in this asset. Cash flows primarily include servicing fees, float income, and late fees in each case less operating costs to service the loans. The estimated cash flows are discounted using an option-adjusted spread-derived discount rate.

- *Interests retained in financial asset sales* — The interests retained are in securitization trusts and deferred purchase prices on the sale of whole-loans. Due to inactivity in the market, valuations are based on internally developed discounted cash flow models (an income approach) that use a market-based discount rate; therefore, we classified these assets as Level 3. The valuation considers recent market transactions, experience with similar assets, current business conditions, and analysis of the underlying collateral, as available. To estimate cash flows, we utilize various significant assumptions, including market observable inputs (e.g., forward interest rates) and internally developed inputs (e.g., prepayment speeds, delinquency levels, and credit losses).

- *Derivative instruments* — We enter into a variety of derivative financial instruments as part of our risk management strategies. Certain of these derivatives are exchange traded, such as Eurodollar futures. To determine the fair value of these instruments, we utilize the quoted market prices for the particular derivative contracts; therefore, we classified these contracts as Level 1.

  We also execute over-the-counter derivative contracts, such as interest rate swaps, swaptions, forwards, caps, floors, and agency to-be-announced securities. We utilize third-party-developed valuation models that are widely accepted in the market to value these over-the-counter derivative contracts. The specific terms of the contract and market observable inputs (such as interest rate forward curves and interpolated volatility assumptions) are used in the model. We classified these over-the-counter derivative contracts as Level 2 because all significant inputs into these models were market observable.

  We also hold certain derivative contracts that are structured specifically to meet a particular hedging objective. These derivative contracts often are utilized to hedge risks inherent within certain on-balance sheet securitizations. To hedge risks on particular bond classes or securitization collateral, the derivative's notional amount is often indexed to the hedged item. As a result, we typically are required to use internally developed prepayment assumptions as an input into the model to forecast future notional amounts on these structured derivative contracts. Accordingly, we classified these derivative contracts as Level 3.

  We are required to consider all aspects of nonperformance risk, including our own credit standing, when measuring fair value of a liability. We reduce credit risk on the majority of our derivatives by entering into legally enforceable agreements that enable the posting and receiving of collateral associated with the fair value of our derivative positions on an ongoing basis. In the event that we do not enter into legally enforceable agreements that enable the posting and receiving of collateral, we will consider our credit risk and the credit risk of our counterparties in the valuation of derivative instruments through a credit valuation adjustment (CVA), if warranted. The CVA calculation utilizes our credit default swap spreads and the spreads of the counterparty.

- *On-balance sheet securitization debt* — We elected the fair value option for certain mortgage loans held-for-investment and the related on-balance sheet securitization debt. We valued securitization debt that was elected pursuant to the fair value option and any economically retained positions using market observable prices whenever possible. The securitization debt was principally in the form of asset- and MBS collateralized by the underlying mortgage loans held-for-investment. Due to the attributes of the underlying collateral and current market conditions, observable prices for these instruments were typically not available. In these situations, we considered observed transactions as Level 2 inputs in our discounted cash flow models. Additionally, the discounted cash flow models utilized other market observable inputs, such as interest rates, and internally derived inputs including prepayment speeds,

176

Table of Contents

# Notes to Consolidated Financial Statements

Ally Financial Inc. • Form 10-K

credit losses, and discount rates. Fair value option-elected financing securitization debt was classified as Level 3 as a result of the reliance on significant assumptions and estimates for model inputs. Refer to the section within this note titled *Fair Value Option for Financial Assets and Financial Liabilities* for further information about the election. The debt that was not elected under the fair value option is reported on the balance sheet at cost, net of premiums or discounts and issuance costs.

**Recurring Fair Value**

The following tables display the assets and liabilities measured at fair value on a recurring basis including financial instruments elected for the fair value option. We often economically hedge the fair value change of our assets or liabilities with derivatives and other financial instruments. The tables below display the hedges separately from the hedged items; therefore, they do not directly display the impact of our risk management activities.

| December 31, 2012 ($ in millions) | Level 1 | | Level 2 | | Level 3 | | Total | |
|---|---|---|---|---|---|---|---|---|
| **Assets** | | | | | | | | |
| Investment securities | | | | | | | | |
| Available-for-sale securities | | | | | | | | |
| Debt securities | | | | | | | | |
| U.S. Treasury and federal agencies | $ | 697 | $ | 1,517 | $ | — | $ | 2,214 |
| Foreign government | | 3 | | 300 | | — | | 303 |
| Mortgage-backed residential | | — | | 6,906 | | — | | 6,906 |
| Asset-backed | | — | | 2,340 | | — | | 2,340 |
| Corporate debt securities | | — | | 1,263 | | — | | 1,263 |
| Total debt securities | | 700 | | 12,326 | | — | | 13,026 |
| Equity securities (a) | | 1,152 | | — | | — | | 1,152 |
| Total available-for-sale securities | | 1,852 | | 12,326 | | — | | 14,178 |
| Mortgage loans held-for-sale, net (b) | | — | | 2,490 | | — | | 2,490 |
| Mortgage servicing rights | | — | | — | | 952 | | 952 |
| Other assets | | | | | | | | |
| Interests retained in financial asset sales | | — | | — | | 154 | | 154 |
| Derivative contracts in a receivable position | | | | | | | | |
| Interest rate | | 40 | | 2,170 | | 48 | | 2,258 |
| Foreign currency | | — | | 40 | | — | | 40 |
| Total derivative contracts in a receivable position | | 40 | | 2,210 | | 48 | | 2,298 |
| Collateral placed with counterparties (c) | | 103 | | 99 | | — | | 202 |
| Total assets | $ | 1,995 | $ | 17,125 | $ | 1,154 | $ | 20,274 |
| **Liabilities** | | | | | | | | |
| Accrued expenses and other liabilities | | | | | | | | |
| Derivative contracts in a payable position | | | | | | | | |
| Interest rate | $ | (13) | $ | (2,374) | $ | (1) | $ | (2,388) |
| Foreign currency | | — | | (78) | | (2) | | (80) |
| Total derivative contracts in a payable position | | (13) | | (2,452) | | (3) | | (2,468) |
| Total liabilities | $ | (13) | $ | (2,452) | $ | (3) | $ | (2,468) |

(a) Our investment in any one industry did not exceed 21%.
(b) Carried at fair value due to fair value option elections.
(c) Represents collateral in the form of investment securities. Cash collateral was excluded.

177

Table of Contents

# Notes to Consolidated Financial Statements

Ally Financial Inc. • Form 10-K

| December 31, 2011 ($ in millions) | Recurring fair value measurements | | | |
|---|---|---|---|---|
| | Level 1 | Level 2 | Level 3 | Total |
| **Assets** | | | | |
| Trading assets (excluding derivatives) | | | | |
| Mortgage-backed residential securities | $          — | $      575 | $       33 | $      608 |
| Total trading assets | — | 575 | 33 | 608 |
| Investment securities | | | | |
| Available-for-sale securities | | | | |
| Debt securities | | | | |
| U.S. Treasury and federal agencies | 903 | 643 | — | 1,546 |
| States and political subdivisions | — | 1 | — | 1 |
| Foreign government | 427 | 357 | — | 784 |
| Mortgage-backed residential | — | 7,312 | — | 7,312 |
| Asset-backed | — | 2,553 | 62 | 2,615 |
| Corporate debt securities | — | 1,491 | — | 1,491 |
| Other debt securities | — | 327 | — | 327 |
| Total debt securities | 1,330 | 12,684 | 62 | 14,076 |
| Equity securities (a) | 1,059 | — | — | 1,059 |
| Total available-for-sale securities | 2,389 | 12,684 | 62 | 15,135 |
| Mortgage loans held-for-sale, net (b) | — | 3,889 | 30 | 3,919 |
| Consumer mortgage finance receivables and loans, net (b) | — | — | 835 | 835 |
| Mortgage servicing rights | — | — | 2,519 | 2,519 |
| Other assets | | | | |
| Interests retained in financial asset sales | — | — | 231 | 231 |
| Derivative contracts in a receivable position (c) | | | | |
| Interest rate | 79 | 5,274 | 88 | 5,441 |
| Foreign currency | — | 242 | 18 | 260 |
| Total derivative contracts in a receivable position | 79 | 5,516 | 106 | 5,701 |
| Collateral placed with counterparties (d) | 328 | — | — | 328 |
| Total assets | $   2,796 | $  22,664 | $  3,816 | $  29,276 |
| **Liabilities** | | | | |
| Long-term debt | | | | |
| On-balance sheet securitization debt (b) | $          — | $          — | $    (830) | $    (830) |
| Accrued expenses and other liabilities | | | | |
| Derivative contracts in a payable position (c) | | | | |
| Interest rate | (32) | (5,229) | (17) | (5,278) |
| Foreign currency | — | (99) | (2) | (101) |
| Total derivative contracts in a payable position | (32) | (5,328) | (19) | (5,379) |
| Loan repurchase liabilities (b) | — | — | (29) | (29) |
| Trading liabilities (excluding derivatives) | (61) | — | — | (61) |
| Total liabilities | $      (93) | $  (5,328) | $    (878) | $  (6,299) |

(a)   Our investment in any one industry did not exceed 18%.
(b)   Carried at fair value due to fair value option elections.
(c)   Includes derivatives classified as trading.
(d)   Represents collateral in the form of investment securities. Cash collateral was excluded.

Table of Contents

# Notes to Consolidated Financial Statements

Ally Financial Inc. • Form 10-K

The following table presents quantitative information regarding the significant unobservable inputs used in significant Level 3 assets and liabilities measured at fair value on a recurring basis.

| December 31, 2012 *($ in millions)* | Level 3 recurring measurements | | Valuation technique | Unobservable input | Range |
|---|---|---|---|---|---|
| **Assets** | | | | | |
| Mortgage servicing rights | $ | **952** | **(a)** | **(a)** | **(a)** |
| Other assets | | | | | |
| Interests retained in financial asset sales | | 154 | Discounted cash flow | Discount rate | 5.4-6.1% |
| | | | | Commercial paper rate | 0-0.1% |

(a)    Refer to Note 11 for information related to MSR valuation assumptions and sensitivities.

Table of Contents

# Notes to Consolidated Financial Statements

Ally Financial Inc. • Form 10-K

The following tables present the reconciliation for all Level 3 assets and liabilities measured at fair value on a recurring basis. We often economically hedge the fair value change of our assets or liabilities with derivatives and other financial instruments. The Level 3 items presented below may be hedged by derivatives and other financial instruments that are classified as Level 1 or Level 2. Thus, the following tables do not fully reflect the impact of our risk management activities.

| | | Level 3 recurring fair value measurements | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Net realized/unrealized gains (losses) | | | | | | | | |
| ($ in millions) | Fair value at Jan. 1, 2012 | included in earnings | included in OCI | Purchases | Sales | Issuances | Settlements | Transfers out due to deconsolidation or discontinued operations (a) | Fair value at Dec. 31, 2012 | Net unrealized gains (losses) included in earnings still held at Dec. 31, 2012 |
| **Assets** | | | | | | | | | | |
| Trading assets (excluding derivatives) | | | | | | | | | | |
| Mortgage-backed residential securities | $ 33 | $ 2 (b) | $ — | $ — | $ — | $ — | $ (4) | $ (31) | $ — | $ 4 (b) |
| Investment securities | | | | | | | | | | |
| Available-for-sale debt securities | | | | | | | | | | |
| Asset-backed | 62 | 19 | (12) | — | (69) | — | — | — | — | — |
| Mortgage loans held-for-sale, net (c) | 30 | — | — | 12 | — | — | (11) | (31) | — | — |
| Consumer mortgage finance receivables and loans, net (c) | 835 | 121 (c) | — | — | (245) (d) | — | (124) | (587) | — | 51 (c) |
| Mortgage servicing rights | 2,519 | (677) (e) | — | — | — | 240 | — | (1,130) | 952 | (677) (e) |
| Other assets | | | | | | | | | | |
| Interests retained in financial asset sales | 231 | 46 (f) | — | — | — | — | (123) | — | 154 | — |
| Derivative contracts, net (g) | | | | | | | | | | |
| Interest rate | 71 | (78) (h) | — | — | — | — | 53 | 1 | 47 | 1 (h) |
| Foreign currency | 16 | (32) (h) | — | — | — | — | — | 14 | (2) | (50) (h) |
| Total derivative contracts in a receivable position, net | 87 | (110) | — | — | — | — | 53 | 15 | 45 | (49) |
| Total assets | $ 3,797 | $ (599) | $ (12) | $ 12 | $ (314) | $ 240 | $ (209) | $ (1,764) | $ 1,151 | $ (671) |
| **Liabilities** | | | | | | | | | | |
| Long-term debt | | | | | | | | | | |
| On-balance sheet securitization debt (c) | $ (830) | $ (115) (c) | $ — | $ — | $ — | $ — | $ 389 | $ 556 | $ — | $ (62) (c) |
| Accrued expenses and other liabilities | | | | | | | | | | |
| Loan repurchase liabilities (c) | (29) | — | — | (11) | — | — | 10 | 30 | — | — |
| Total liabilities | $ (859) | $ (115) | $ — | $ (11) | $ — | $ — | $ 399 | $ 586 | $ — | $ (62) |

(a)   Represents the amounts transferred out of Level 3 due to the deconsolidation of ResCap or discontinued operations. Refer to Note 1 for additional information related to ResCap. Refer to Note 2 for additional information related to discontinued operations.

(b)   The fair value adjustment was reported as other income, net of losses, and the related interest was reported as interest on trading assets in the Consolidated Statement of Income.

(c)   Carried at fair value due to fair value option elections. Refer to the next section of this note titled *Fair Value Option for Financial Assets and Liabilities* for the location of the gains and losses in the Consolidated Statement of Income.

(d)   Represents the sale of consumer mortgage finance receivable and loans sold as part of the sale of a business line during 2012.

(e)   Fair value adjustment was reported as servicing-asset valuation and hedge activities, net, in the Consolidated Statement of Income.

(f)   Reported as other income, net of losses, in the Consolidated Statement of Income.

(g)   Includes derivatives classified as trading.

(h)   Refer to Note 22 for information related to the location of the gains and losses on derivative instruments in the Consolidated Statement of Income.

180

Table of Contents

# Notes to Consolidated Financial Statements

Ally Financial Inc. • Form 10-K

| ($ in millions) | Fair value at Jan. 1, 2011 | Net realized/unrealized gains (losses) included in earnings | Net realized/unrealized gains (losses) included in OCI | Purchases | Sales | Issuances | Settlements | Transfers out of level 3 | Fair value at Dec. 31, 2011 | Net unrealized gains (losses) included in earnings still held at Dec. 31, 2011 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Assets** | | | | | | | | | | |
| Trading assets (excluding derivatives) | | | | | | | | | | |
| Mortgage-backed residential securities | $ 44 | $ 5 (a) | $ — | $ — | $ — | $ — | $ (16) | $ — | $ 33 | $ 14 (a) |
| Asset-backed securities | 94 | — | — | — | (94) | — | — | — | — | — |
| Total trading assets | 138 | 5 | — | — | (94) | — | (16) | — | 33 | 14 |
| Investment securities | | | | | | | | | | |
| Available-for-sale debt securities | | | | | | | | | | |
| Mortgage-backed residential | 1 | — | — | — | (1) | — | — | — | — | — |
| Asset-backed | — | 18 (b) | 14 | 94 | (64) | — | — | — | 62 | — |
| Total debt securities | 1 | 18 | 14 | 94 | (65) | — | — | — | 62 | — |
| Mortgage loans held-for-sale, net (c) | 4 | (1) (c) | — | 46 | (1) | — | (18) | — | 30 | (2) (c) |
| Consumer mortgage finance receivables and loans, net (c) | 1,015 | 352 (c) | 1 | — | — | — | (533) | — | 835 | 136 (c) |
| Mortgage servicing rights | 3,738 | (1,606) (d) | — | 31 | (266) (e) | 622 | — | — | 2,519 | (1,605) (d) |
| Other assets | | | | | | | | | | |
| Interests retained in financial asset sales | 568 | 180 (f) | — | — | — | 3 | (520) | — | 231 | (15) (f) |
| Derivative contracts, net (g) | | | | | | | | | | |
| Interest rate | (13) | 148 (h) | — | — | — | — | (41) | (23) (i) | 71 | 145 (h) |
| Foreign currency | — | 16 (h) | — | — | — | — | — | — | 16 | 16 (h) |
| Total derivative contracts in a (payable) receivable position, net | (13) | 164 | — | — | — | — | (41) | (23) | 87 | 161 |
| Total assets | $ 5,451 | $ (888) | $ 15 | $ 171 | $ (426) | $ 625 | $ (1,128) | $ (23) | $ 3,797 | $ (1,311) |
| **Liabilities** | | | | | | | | | | |
| Long-term debt | | | | | | | | | | |
| On-balance sheet securitization debt (c) | $ (972) | $ (371) (c) | $ 1 | $ — | $ — | $ — | $ 512 | $ — | $ (830) | $ (184) (c) |
| Accrued expenses and other liabilities | | | | | | | | | | |
| Loan repurchase liabilities (c) | — | 2 (c) | — | (46) | — | — | 15 | — | (29) | 2 (c) |
| Total liabilities | $ (972) | $ (369) | $ 1 | $ (46) | $ — | $ — | $ 527 | $ — | $ (859) | $ (182) |

(a) The fair value adjustment was reported as other income, net of losses, and the related interest was reported as interest on trading assets in the Consolidated Statement of Income.
(b) The fair value adjustment was reported as other income, net of losses, and the related interest was reported as interest and dividends on available-for-sale investment securities in the Consolidated Statement of Income.
(c) Carried at fair value due to fair value option elections. Refer to the next section of this note titled *Fair Value Option for Financial Assets and Liabilities* for the location of the gains and losses in the Consolidated Statement of Income.
(d) Fair value adjustment was reported as servicing-asset valuation and hedge activities, net, in the Consolidated Statement of Income.
(e) Represents excess mortgage servicing rights transferred to an agency-controlled trust in exchange for trading securities. These securities were then sold instantaneously to third-party investors for $266 million.
(f) Reported as other income, net of losses, in the Consolidated Statement of Income.
(g) Includes derivatives classified as trading.
(h) Refer to Note 22 for information related to the location of the gains and losses on derivative instruments in the Consolidated Statement of Income.
(i) The in-house valuations of some derivative contracts classified as Level 3 was replaced with third-party-developed valuation models that are widely accepted in the market to value these over-the-counter derivative contracts. The specific terms of the contract and market observable inputs are entered into the model. We reclassified these over-the-counter derivative contracts as Level 2 because all significant inputs into these models were market observable.

181

Table of Contents

# Notes to Consolidated Financial Statements

Ally Financial Inc. • Form 10-K

## Nonrecurring Fair Value

We may be required to measure certain assets and liabilities at fair value from time to time. These periodic fair value measures typically result from the application of lower-of-cost or fair value accounting or certain impairment measures. These items would constitute nonrecurring fair value measures.

The following tables display the assets and liabilities measured at fair value on a nonrecurring basis.

| December 31, 2012 ($ in millions) | Level 1 | Level 2 | Level 3 | Total | Lower-of-cost or fair value or valuation reserve allowance | Total loss included in earnings for the year ended | |
|---|---|---|---|---|---|---|---|
| **Assets** | | | | | | | |
| Commercial finance receivables and loans, net (a) | | | | | | | |
| Automotive | $ — | $ — | $ 108 | $ 108 | $ (19) | n/m | (b) |
| Other | — | — | 23 | 23 | (7) | n/m | (b) |
| Total commercial finance receivables and loans, net | — | — | 131 | 131 | (26) | n/m | (b) |
| Other assets | | | | | | | |
| Repossessed and foreclosed assets (c) | — | — | 3 | 3 | (2) | n/m | (b) |
| Cost basis investment in ResCap (d) | — | — | — | — | — | (442) | |
| Total assets | $ — | $ — | $ 134 | $ 134 | $ (28) | $ (442) | |

n/m = not meaningful

(a)     Represents the portion of the portfolio specifically impaired during  2012. The related valuation allowance represents the cumulative adjustment to fair value of those specific receivables.

(b)     We consider the applicable valuation or loan loss allowance to be the most relevant indicator of the impact on earnings caused by the fair value measurement. Accordingly, the table above excludes total gains and losses included in earnings for these items. The carrying values are inclusive of the respective valuation or loan loss allowance.

(c)     The allowance provided for repossessed and foreclosed assets represents any cumulative valuation adjustment recognized to adjust the assets to fair value.

(d)     Represents the impairment of our investment in ResCap during 2012. Refer to  Note 1 for additional information related to ResCap.

182

Table of Contents

# Notes to Consolidated Financial Statements

Ally Financial Inc. • Form 10-K

| December 31, 2011 ($ in millions) | Nonrecurring fair value measurements | | | | Lower-of-cost or fair value or valuation reserve allowance | Total loss included in earnings for the year ended | |
|---|---|---|---|---|---|---|---|
| | Level 1 | Level 2 | Level 3 | Total | | | |
| **Assets** | | | | | | | |
| Mortgage loans held-for-sale (a) | $    — | $    — | $   479 | $   479 | $    (60) | n/m | (b) |
| Commercial finance receivables and loans, net (c) | | | | | | | |
|    Automotive | — | — | 310 | 310 | (30) | n/m | (b) |
|    Mortgage | — | 1 | 14 | 15 | (10) | n/m | (b) |
|    Other | — | — | 20 | 20 | (10) | n/m | (b) |
| Total commercial finance receivables and loans, net | — | 1 | 344 | 345 | (50) | n/m | (b) |
| Other assets | | | | | | | |
|    Property and equipment | — | 13 | — | 13 | n/m (d) | $    (8) | |
|    Repossessed and foreclosed assets (e) | — | 32 | 27 | 59 | (15) | n/m | (b) |
| Total assets | $    — | $    46 | $   850 | $   896 | $    (125) | $    (8) | |

n/m = not meaningful

(a)   Represents loans held-for-sale that are required to be measured at the lower-of-cost or fair value. The table above includes only loans with fair values below cost during  2011. The related valuation allowance represents the cumulative adjustment to fair value of those specific assets.

(b)   We consider the applicable valuation or loan loss allowance to be the most relevant indicator of the impact on earnings caused by the fair value measurement. Accordingly, the table above excludes total gains and losses included in earnings for these items. The carrying values are inclusive of the respective valuation or loan loss allowance.

(c)   Represents the portion of the portfolio specifically impaired during  2011. The related valuation allowance represents the cumulative adjustment to fair value of those specific receivables.

(d)   The total gain (loss) included in earnings is the most relevant indicator of the impact on earnings.

(e)   The allowance provided for repossessed and foreclosed assets represents any cumulative valuation adjustment recognized to adjust the assets to fair value.

The following table presents quantitative information regarding the significant unobservable inputs used in significant Level 3 assets measured at fair value on a nonrecurring basis.

| December 31, 2012 ($ in millions) | Level 3 nonrecurring measurements | Valuation technique | Unobservable input | Range |
|---|---|---|---|---|
| **Assets** | | | | |
| Commercial finance receivables and loans, net | | | | |
|    Automotive | $    108 | **Fair value of collateral** | **Adjusted appraisal value** | **65.0-95.0%** |

## Fair Value Option for Financial Assets and Financial Liabilities

A description of the financial assets and liabilities elected to be measured at fair value is as follows. Our intent in electing fair value for all these items was to mitigate a divergence between accounting losses and economic exposure for certain assets and liabilities.

•   ***On-balance sheet mortgage securitizations***  — We elected to measure at fair value certain domestic consumer mortgage finance receivables and loans and the related debt held in on-balance sheet mortgage securitization structures. The fair value-elected loans were classified as finance receivable and loans, net, on the Consolidated Balance Sheet. Our policy is to separately record interest income on the fair value-elected loans (unless the loans are placed on nonaccrual status); however, the accrued interest was excluded from the fair value presentation. We classified the fair value adjustment recorded for the loans as other income, net of losses, in the Consolidated Statement of Income .

We continued to record the fair value-elected debt balances as long-term debt on the Consolidated Balance Sheet. Our policy is to separately record interest expense on the fair value-elected debt, which continues to be classified as interest on long-term debt in the  Consolidated Statement of Income . We classified the fair value adjustment recorded for this fair value-elected debt as other income, net of losses, in the  Consolidated Statement of Income .

•   ***Conforming and government-insured mortgage loans held-for-sale***  — We elected the fair value option for conforming and government-insured mortgage loans held-for-sale funded after July 31, 2009. We elected the fair value option to mitigate earnings volatility by better matching the accounting for the assets with the related hedges.

Table of Contents

# Notes to Consolidated Financial Statements

Ally Financial Inc. • Form 10-K

Excluded from the fair value option were conforming and government-insured loans funded on or prior to July 31, 2009, and those repurchased or rerecognized. The loans funded on or prior to July 31, 2009, were ineligible because the election must be made at the time of funding. Repurchased and rerecognized conforming and government-insured loans were not elected because the election would not mitigate earning volatility. We repurchase or rerecognize loans due to representation and warranty obligations or conditional repurchase options. Typically, we will be unable to resell these assets through regular channels due to characteristics of the assets. Since the fair value of these assets is influenced by factors that cannot be hedged, we did not elect the fair value option.

We carry the fair value-elected conforming and government-insured loans as loans held-for-sale, net, on the Consolidated Balance Sheet. Our policy is to separately record interest income on the fair value-elected loans (unless they are placed on nonaccrual status); however, the accrued interest was excluded from the fair value presentation. Upfront fees and costs related to the fair value-elected loans were not deferred or capitalized. The fair value adjustment recorded for these loans is classified as gain (loss) on mortgage loans, net, in the Consolidated Statement of Income. In accordance with GAAP, the fair value option election is irrevocable once the asset is funded even if it is subsequently determined that a particular loan cannot be sold.

- ***Nongovernment-eligible mortgage loans held-for-sale subject to conditional repurchase options*** — We elected the fair value option for both nongovernment-eligible mortgage loans held-for-sale subject to conditional repurchase options and the related liability. These conditional repurchase options within our private label securitizations allowed us to repurchase a transferred financial asset if certain events outside our control were met. The typical conditional repurchase option was a delinquent loan repurchase option that gave us the option to purchase the loan if it exceeded a certain prespecified delinquency level. We had complete discretion regarding when or if we would exercise these options, but generally we would do so only when it is in our best interest. We recorded the asset and the corresponding liability on our balance sheet when the option becomes exercisable. The fair value option election must be made at initial recording. As such, the conditional repurchase option assets and liabilities recorded prior to January 1, 2011, were ineligible for the fair value election.

We carried these fair value-elected optional repurchase loan balance as loans held-for-sale, net, on the Consolidated Balance Sheet. The fair value adjustment recorded for these loans was classified as other income, net of losses, in the Consolidated Statement of Income. We carried the fair value-elected corresponding liability as accrued expenses and other liabilities on the Consolidated Balance Sheet. The fair value adjustment recorded for these liabilities were classified as other income, net of losses, in the Consolidated Statement of Income.

Table of Contents

# Notes to Consolidated Financial Statements

Ally Financial Inc. • Form 10-K

The following tables summarize the fair value option elections and information regarding the amounts recorded as earnings for each fair value option-elected item.

| Year ended December 31, ($ in millions) | Interest and fees on finance receivables and loans (a) | Interest on loans held-for-sale (a) | Interest on long-term debt (b) | Gain on mortgage loans, net | Other income, net of losses | Total included in earnings | Change in fair value due to credit risk (c) | |
|---|---|---|---|---|---|---|---|---|
| **2012** | | | | | | | | |
| Assets | | | | | | | | |
| Mortgage loans held-for-sale, net | $ — | $ 82 | $ — | $ 262 | $ — | $ 344 | $ — | (d) |
| Consumer mortgage finance receivables and loans, net | 59 | — | — | — | 62 | 121 | (24) | (e) |
| Liabilities | | | | | | | | |
| Long-term debt | | | | | | | | |
| On-balance sheet securitization debt | — | — | (34) | — | (81) | (115) | (8) | (f) |
| Total | | | | | | $ 350 | | |
| **2011** | | | | | | | | |
| Assets | | | | | | | | |
| Mortgage loans held-for-sale, net | $ — | $ 176 | $ — | $ 908 | $ — | $ 1,084 | $ — | (d) |
| Consumer mortgage finance receivables and loans, net | 200 | — | — | — | 153 | 353 | (119) | (e) |
| Liabilities | | | | | | | | |
| Long-term debt | | | | | | | | |
| On-balance sheet securitization debt | — | — | (116) | — | (256) | (372) | (20) | (f) |
| Accrued expenses and other liabilities | | | | | | | | |
| Loan repurchase liabilities | — | — | — | — | 2 | 2 | — | |
| Total | | | | | | $ 1,067 | | |

(a)  Interest income is measured by multiplying the unpaid principal balance on the loans by the coupon rate and the number of days of interest due.

(b)  Interest expense is measured by multiplying bond principal by the coupon rate and the number of days of interest due to the investor.

(c)  Factors other than credit quality that impact fair value include changes in market interest rates and the illiquidity or marketability in the current marketplace. Lower levels of observable data points in illiquid markets generally result in wide bid/offer spreads.

(d)  The credit impact for loans held-for-sale is assumed to be zero because the loans are either suitable for sale or are covered by a government guarantee.

(e)  The credit impact for consumer mortgage finance receivables and loans was quantified by applying internal credit loss assumptions to cash flow models.

(f)  The credit impact for on-balance sheet securitization debt is assumed to be zero until our economic interests in a particular securitization is reduced to zero, at which point the losses on the underlying collateral will be expected to be passed through to third-party bondholders. Losses allocated to third-party bondholders, including changes in the amount of losses allocated, will result in fair value changes due to credit. We also monitor credit ratings and will make credit adjustments to the extent any bond classes are downgraded by rating agencies.

Table of Contents

# Notes to Consolidated Financial Statements

Ally Financial Inc. • Form 10-K

The following table provides the aggregate fair value and the aggregate unpaid principal balance for the fair value option-elected loans and long-term debt instruments.

| | 2012 | | 2011 | |
|---|---|---|---|---|
| December 31, ($ in millions) | Unpaid principal balance | Fair value (a) | Unpaid principal balance | Fair value (a) |
| **Assets** | | | | |
| Mortgage loans held-for-sale, net | | | | |
| Total loans | $ 2,416 | $ 2,490 | $ 3,766 | $ 3,919 |
| Nonaccrual loans | 47 | 25 | 54 | 27 |
| Loans 90+ days past due (b) | 36 | 19 | 53 | 27 |
| Consumer mortgage finance receivables and loans, net | | | | |
| Total loans | — | — | 2,436 | 835 |
| Nonaccrual loans (c) | — | — | 506 | 209 |
| Loans 90+ days past due (b) (c) | — | — | 362 | 163 |
| **Liabilities** | | | | |
| Long-term debt | | | | |
| On-balance sheet securitization debt | $ — | $ — | $ (2,559) | $ (830) |
| Accrued expenses and other liabilities | | | | |
| Loan repurchase liabilities | — | — | (57) | (29) |

(a)   Excludes accrued interest receivable.
(b)   Loans 90+ days past due are also presented within the nonaccrual loan balance and the total loan balance; however, excludes government-insured loans that are still accruing interest.
(c)   The fair value of consumer mortgage finance receivables and loans is calculated on a pooled basis; therefore, we allocated the fair value of nonaccrual loans and loans 90+ days past due to individual loans based on the unpaid principal balances. For further discussion regarding the pooled basis, refer to the previous section of this note titled   *Consumer mortgage finance receivables and loans, net.*

## Fair Value of Financial Instruments

The following table presents the carrying and estimated fair value of financial instruments, except for those recorded at fair value on a recurring basis presented in the previous section of this note titled *Recurring Fair Value*. When possible, we use quoted market prices to determine fair value. Where quoted market prices are not available, the fair value is internally derived based on appropriate valuation methodologies with respect to the amount and timing of future cash flows and estimated discount rates. However, considerable judgment is required in interpreting market data to develop estimates of fair value, so the estimates are not necessarily indicative of the amounts that could be realized or would be paid in a current market exchange. The effect of using different market assumptions or estimation methodologies could be material to the estimated fair values. Fair value information presented herein was based on information available at  December 31, 2012 and 2011.

| | 2012 | | | | | 2011 | |
|---|---|---|---|---|---|---|---|
| | Carrying value | Estimated fair value | | | | Carrying value | Estimated fair value |
| December 31, ($ in millions) | | Level 1 | Level 2 | Level 3 | Total | | |
| Financial assets | | | | | | | |
| Loans held-for-sale, net (a) | $ 2,576 | $ — | $ 2,490 | $ 86 | $ 2,576 | $ 8,557 | $ 8,674 |
| Finance receivables and loans, net (a) | 97,885 | — | — | 98,907 | 98,907 | 113,252 | 113,576 |
| Nonmarketable equity investments | 303 | — | 272 | 34 | 306 | 419 | 423 |
| Financial liabilities | | | | | | | |
| Deposit liabilities | $ 47,915 | $ — | $ — | $ 48,752 | $ 48,752 | $ 45,050 | $ 45,696 |
| Short-term borrowings | 7,461 | 6 | — | 7,454 | 7,460 | 7,680 | 7,622 |
| Long-term debt (a)(b) | 74,882 | — | 36,018 | 42,533 | 78,551 | 93,525 | 92,142 |

(a)   Includes financial instruments carried at fair value due to fair value option elections. Refer to the previous section of this note titled   *Fair Value Option for Financial Assets and Liabilities*  for further information about the fair value elections.
(b)   The carrying value includes deferred interest for zero-coupon bonds of  $321 million and $640 million at December 31, 2012, and 2011, respectively.

The following describes the methodologies and assumptions used to determine fair value for the significant classes of financial instruments. In addition to the valuation methods discussed below, we also followed guidelines for determining whether a market was not

Table of Contents

# Notes to Consolidated Financial Statements

Ally Financial Inc. • Form 10-K

active and a transaction was not distressed. As such, we assumed the price that would be received in an orderly transaction (including a market-based return) and not in forced liquidation or distressed sale.

- *Loans held-for-sale, net* — Loans held-for-sale classified as Level 2 include all GSE-eligible mortgage loans valued predominantly using published forward agency prices. It also includes any domestic loans and foreign loans where recently negotiated market prices for the loan pool exist with a counterparty (which approximates fair value) or quoted market prices for similar loans are available. Loans held-for-sale classified as Level 3 include all loans valued using internally developed valuation models because observable market prices were not available. The loans are priced on a discounted cash flow basis utilizing cash flow projections from internally developed models that utilize prepayment, default, and discount rate assumptions. To the extent available, we will utilize market observable inputs such as interest rates and market spreads. If market observable inputs are not available, we are required to utilize internal inputs, such as prepayment speeds, credit losses, and discount rates.

- *Finance receivables and loans, net* — With the exception of mortgage loans held-for-investment, the fair value of finance receivables was based on discounted future cash flows using applicable spreads to approximate current rates applicable to each category of finance receivables (an income approach using Level 3 inputs). The carrying value of commercial receivables in certain markets and certain other automotive- and mortgage-lending receivables for which interest rates reset on a short-term basis with applicable market indices are assumed to approximate fair value either because of the short-term nature or because of the interest rate adjustment feature. The fair value of commercial receivables in other markets was based on discounted future cash flows using applicable spreads to approximate current rates applicable to similar assets in those markets.

    For mortgage loans held-for-investment used as collateral for securitization debt, we used a portfolio approach with Level 3 inputs to measure these loans at fair value. The objective in fair valuing these loans (which are legally isolated and beyond the reach of our creditors) and the related collateralized borrowings is to reflect our retained economic position in the securitizations. For mortgage loans held-for-investment that are not securitized, we used valuation methods and assumptions similar to those used for mortgage loans held-for-sale. These valuations consider unique attributes of the loans such as geography, delinquency status, product type, and other factors. Refer to the section above titled *Loans held-for-sale, net*, for a description of methodologies and assumptions used to determine the fair value of mortgage loans held-for-sale.

- *Deposit liabilities* — Deposit liabilities represent certain consumer and brokered bank deposits, mortgage escrow deposits, and dealer deposits. The fair value of deposits at Level 3 were estimated by discounting projected cash flows based on discount factors derived from the forward interest rate swap curve.

- *Debt* — Level 2 debt was valued using quoted market prices in inactive markets. Debt valued using internally derived inputs, such as prepayment speeds and discount rates, was classified as Level 3.

## 26. Segment and Geographic Information

Operating segments are defined as components of an enterprise that engage in business activity from which revenues are earned and expenses incurred for which discrete financial information is available that is evaluated regularly by our chief operating decision maker in deciding how to allocate resources and in assessing performance.

We report our results of operations on a line-of-business basis through three operating segments - Automotive Finance operations, Insurance operations, and Mortgage operations, with the remaining activity reported in Corporate and Other. The operating segments are determined based on the products and services offered, and reflect the manner in which financial information is currently evaluated by management. The following is a description of each of our reportable operating segments.

*Automotive Finance operations* — Provides automotive financing services to consumers and automotive dealers and includes the automotive activities of Ally Bank. For consumers, we offer retail automotive financing and leasing for new and used vehicles, and through our commercial automotive financing operations, we fund dealer purchases of new and used vehicles through wholesale or floorplan financing.

*Insurance operations* — Offers both consumer finance and insurance products sold primarily through the automotive dealer channel, and commercial insurance products sold to dealers. As part of our focus on offering dealers a broad range of consumer finance and insurance products, we provide vehicle service contracts, maintenance coverage, and GAP products. We also underwrite selected commercial insurance coverages, which primarily insure dealers' wholesale vehicle inventory in the United States.

*Mortgage operations* — Our ongoing Mortgage operations are conducted through Ally Bank. We intend to continue to  originate a modest level of jumbo and conventional conforming residential mortgages for our own portfolio through a select group of correspondent lenders.  Our Mortgage operations also include noncore business activities that are winding down or were business activities of ResCap, which was deconsolidated on May 14, 2012, including, among other things: portfolios in runoff; and our mortgage reinsurance business.

Corporate and Other primarily consists of our centralized corporate treasury activities, such as management of the cash and corporate investment securities portfolios, short-and long-term debt, retail and brokered deposit liabilities, derivative instruments, the amortization of the discount associated with new debt issuances and bond exchanges, most notably from the December 2008 bond exchange, and the residual impacts of our corporate funds-transfer pricing (FTP) and treasury asset liability management (ALM) activities. Corporate and Other also

Table of Contents

# Notes to Consolidated Financial Statements

Ally Financial Inc. • Form 10-K

includes our Commercial Finance Group, certain equity investments, overhead that was previously allocated to operations that have since been sold or classified as discontinued operations, and reclassifications and eliminations between the reportable operating segments.

We utilize an FTP methodology for the majority of our business operations. The FTP methodology assigns charge rates and credit rates to classes of assets and liabilities based on expected duration and the LIBOR swap curve plus an assumed credit spread. Matching duration allocates interest income and interest expense to these reportable segments so their respective results are insulated from interest rate risk. This methodology is consistent with our ALM practices, which includes managing interest rate risk centrally at a corporate level. The net residual impact of the FTP methodology is included within the results of Corporate and Other.

The information presented in our reportable operating segments and geographic areas tables that follow are based in part on internal allocations, which involve management judgment.

## Change in Reportable Segment Information

As a result of a change in management's view of our operations, we have changed the presentation of our reportable operating segments during the year ended December 31, 2012. These changes include the following:

- During the fourth quarter of 2012, we announced that we had reached agreements to sell substantially all of our International operations. As a result, beginning in the fourth quarter of 2012, we are presenting our continuing Automotive Finance activities under one reportable operating segment, Automotive Finance operations. Previously our Automotive Finance operations were presented as two reportable operating segments, North American Automotive Finance operations and International Automotive Finance operations.

- During the fourth quarter of 2012, we began to allocate certain expenses associated with deposit gathering activities and other additional costs of holding liquidity to our Automotive Finance and Mortgage operations. These expenses were previously included within our Corporate and Other activities. Additionally, we began to include overhead that was previously allocated to operations that have since been sold or moved into discontinued operations within our Corporate and Other activities.

- On May 14, 2012, the Debtors filed for relief under Chapter 11 of the Bankruptcy Code in the United States. As a result of the bankruptcy filing, ResCap was deconsolidated from our financial statements; and beginning in the second quarter of 2012, we began presenting our mortgage business activities under one reportable operating segment, Mortgage operations. Previously our Mortgage operations had been presented as two reportable operating segments, Origination and Servicing operations and Legacy Portfolio and Other operations. The new presentation is consistent with the organizational alignment of the business and management's current view of the mortgage business.

188

Table of Contents

# Notes to Consolidated Financial Statements

Ally Financial Inc. • Form 10-K

Financial information for our reportable operating segments is summarized as follows.

| Year ended December 31, ($ in millions) | Automotive Finance operations | | Insurance operations | | Mortgage operations (a) | | Corporate and Other (b) | | Consolidated (c) | |
|---|---|---|---|---|---|---|---|---|---|---|
| **2012** | | | | | | | | | | |
| Net financing revenue (loss) | $ | 2,827 | $ | 64 | $ | 151 | $ | (1,173) | $ | 1,869 |
| Other revenue (loss) | | 322 | | 1,150 | | 1,617 | | (60) | | 3,029 |
| Total net revenue (loss) | | 3,149 | | 1,214 | | 1,768 | | (1,233) | | 4,898 |
| Provision for loan losses | | 253 | | — | | 86 | | (10) | | 329 |
| Total noninterest expense | | 1,507 | | 1,054 | | 993 | | 1,770 | | 5,324 |
| Income (loss) from continuing operations before income tax expense | $ | 1,389 | $ | 160 | $ | 689 | $ | (2,993) | $ | (755) |
| Total assets | $ | 128,411 | $ | 8,439 | $ | 14,744 | $ | 30,753 | $ | 182,347 |
| **2011** | | | | | | | | | | |
| Net financing revenue (loss) | $ | 2,530 | $ | 62 | $ | 210 | $ | (1,721) | $ | 1,081 |
| Other revenue | | 422 | | 1,336 | | 961 | | 178 | | 2,897 |
| Total net revenue (loss) | | 2,952 | | 1,398 | | 1,171 | | (1,543) | | 3,978 |
| Provision for loan losses | | 89 | | — | | 150 | | (51) | | 188 |
| Total noninterest expense | | 1,530 | | 1,082 | | 1,643 | | 486 | | 4,741 |
| Income (loss) from continuing operations before income tax expense | $ | 1,333 | $ | 316 | $ | (622) | $ | (1,978) | $ | (951) |
| Total assets | $ | 112,591 | $ | 8,036 | $ | 33,906 | $ | 29,526 | $ | 184,059 |
| **2010** | | | | | | | | | | |
| Net financing revenue (loss) | $ | 2,697 | $ | 73 | $ | 589 | $ | (2,053) | $ | 1,306 |
| Other revenue (loss) | | 724 | | 1,728 | | 1,998 | | (34) | | 4,416 |
| Total net revenue (loss) | | 3,421 | | 1,801 | | 2,587 | | (2,087) | | 5,722 |
| Provision for loan losses | | 260 | | — | | 144 | | (47) | | 357 |
| Total noninterest expense | | 1,404 | | 1,244 | | 1,671 | | 654 | | 4,973 |
| Income (loss) from continuing operations before income tax expense | $ | 1,757 | $ | 557 | $ | 772 | $ | (2,694) | $ | 392 |
| Total assets | $ | 97,961 | $ | 8,789 | $ | 36,786 | $ | 28,472 | $ | 172,008 |

(a)   Represents the ResCap legal entity (prior to its deconsolidation from Ally as of May 14, 2012) and the mortgage activities of Ally Bank.
(b)   Total assets for the Commercial Finance Group were $1.5 billion, $1.2 billion, and $1.6 billion at December 31, 2012, 2011 and 2010, respectively.
(c)   Net financing revenue after the provision for loan losses totaled $1.5 billion, $0.9 billion, and $0.9 billion in 2012, 2011 and 2010, respectively.

Table of Contents

# Notes to Consolidated Financial Statements

Ally Financial Inc. • Form 10-K

Information concerning principal geographic areas were as follows.

| Year ended December 31, ($ in millions) | Revenue (a) | | Income (loss) from continuing operations before income tax expense (b) | | Net income (loss) (b) | | Identifiable assets (c) | | Long-lived assets (d) | |
|---|---|---|---|---|---|---|---|---|---|---|
| **2012** | | | | | | | | | | |
| Canada | $ | 236 | $ | 51 | $ | 295 | $ | 13,362 | $ | 1 |
| Europe (e) | | 21 | | 33 | | 183 | | 10,971 | | 16 |
| Latin America | | 2 | | (19) | | 219 | | 8,050 | | 33 |
| Asia-Pacific | | 4 | | 3 | | 99 | | 395 | | — |
| Total foreign | | 263 | | 68 | | 796 | | 32,778 | | 50 |
| Total domestic (f) | | 4,635 | | (823) | | 400 | | 149,542 | | 13,831 |
| Total | $ | 4,898 | $ | (755) | $ | 1,196 | $ | 182,320 | $ | 13,881 |
| **2011** | | | | | | | | | | |
| Canada | $ | 175 | $ | (16) | $ | 436 | $ | 15,156 | $ | 282 |
| Europe (e) | | (44) | | (11) | | 175 | | 9,976 | | 92 |
| Latin America | | (50) | | (105) | | 104 | | 7,647 | | 30 |
| Asia-Pacific | | 2 | | — | | 69 | | 292 | | — |
| Total foreign | | 83 | | (132) | | 784 | | 33,071 | | 404 |
| Total domestic (f) | | 3,895 | | (819) | | (941) | | 150,470 | | 9,236 |
| Total | $ | 3,978 | $ | (951) | $ | (157) | $ | 183,541 | $ | 9,640 |
| **2010** | | | | | | | | | | |
| Canada | $ | 164 | $ | (35) | $ | 402 | $ | 17,321 | $ | 1,522 |
| Europe (e) | | (58) | | (60) | | 278 | | 11,321 | | 406 |
| Latin America | | 9 | | (14) | | 164 | | 6,917 | | 35 |
| Asia-Pacific | | 4 | | 6 | | 7 | | 202 | | — |
| Total foreign | | 119 | | (103) | | 851 | | 35,761 | | 1,963 |
| Total domestic (f) | | 5,603 | | 495 | | 178 | | 135,722 | | 7,541 |
| Total | $ | 5,722 | $ | 392 | $ | 1,029 | $ | 171,483 | $ | 9,504 |

(a)   Revenue consists of net financing revenue and total other revenue as presented in our  Consolidated Statement of Income .
(b)   The domestic amounts include original discount amortization of $349 million, $925 million, and $1.2 billion for the year ended December 31, 2012,  2011, and 2010, respectively.
(c)   Identifiable assets consist of total assets excluding goodwill.
(d)   Long-lived assets consist of investment in operating leases, net, and net property and equipment.
(e)   Amounts include eliminations between our foreign operations.
(f)   Amounts include eliminations between our domestic and foreign operations.

## 27.    Parent and Guarantor Consolidating Financial Statements

Certain of our senior notes are guaranteed by a group of subsidiaries (the Guarantors). The Guarantors, each of which is a 100% directly owned subsidiary of Ally Financial Inc., are Ally US LLC, IB Finance Holding Company, LLC (IB Finance), and GMAC Continental Corporation (GMAC Continental). The Guarantors fully and unconditionally guarantee the senior notes on a joint and several basis. In connection with the purchase and sale agreement with General Motors Financial (GMF) described in  Note 2, all of the common stock of GMAC Continental will be sold to GMF. Following the closing of this equity sale transaction, GMAC Continental will cease to be a Guarantor, and the proceeds from the sale of GMAC Continental will be reinvested in IB Finance or a subsidiary of IB Finance. Following the completion of this transaction, IB Finance and Ally US LLC will remain note Guarantors.

The following financial statements present condensed consolidating financial data for (i) Ally Financial Inc. (on a parent company-only basis), (ii) the Guarantors, (iii) the nonguarantor subsidiaries (all other subsidiaries), and (iv) an elimination column for adjustments to arrive at (v) the information for the parent company, Guarantors, and nonguarantors on a consolidated basis.

Investments in subsidiaries are accounted for by the parent company and the Guarantors using the equity-method for this presentation. Results of operations of subsidiaries are therefore classified in the parent company's and Guarantors' investment in subsidiaries accounts. The elimination entries set forth in the following condensed consolidating financial statements eliminate distributed and undistributed income of subsidiaries, investments in subsidiaries, and intercompany balances and transactions between the parent, Guarantors, and nonguarantors.

Table of Contents

# Notes to Consolidated Financial Statements

Ally Financial Inc. • Form 10-K

## Condensed Consolidating Statements of Income and Comprehensive Income

| Year ended December 31, 2012 ($ in millions) | Parent | Guarantors | Nonguarantors | Consolidating adjustments | Ally consolidated |
|---|---|---|---|---|---|
| **Financing revenue and other interest income** | | | | | |
| Interest and fees on finance receivables and loans | $ 852 | $ — | $ 3,751 | $ — | $ 4,603 |
| Interest and fees on finance receivables and loans — intercompany | 116 | — | 22 | (138) | — |
| Interest on loans held-for-sale | 15 | — | 140 | — | 155 |
| Interest on trading assets | — | — | 13 | — | 13 |
| Interest and dividends on available-for-sale investment securities | — | — | 292 | — | 292 |
| Interest-bearing cash | 16 | — | 10 | — | 26 |
| Interest-bearing cash — intercompany | — | — | 16 | (16) | — |
| Operating leases | 232 | — | 2,147 | — | 2,379 |
| Total financing revenue and other interest income | 1,231 | — | 6,391 | (154) | 7,468 |
| **Interest expense** | | | | | |
| Interest on deposits | 58 | — | 586 | — | 644 |
| Interest on short-term borrowings | 60 | — | 30 | — | 90 |
| Interest on long-term debt | 2,688 | — | 795 | (17) | 3,466 |
| Interest on intercompany debt | (1) | 1 | 132 | (132) | — |
| Total interest expense | 2,805 | 1 | 1,543 | (149) | 4,200 |
| Depreciation expense on operating lease assets | 113 | — | 1,286 | — | 1,399 |
| Net financing (loss) revenue | (1,687) | (1) | 3,562 | (5) | 1,869 |
| Dividends from subsidiaries | | | | | |
| Nonbank subsidiaries | 1,074 | 448 | — | (1,522) | — |
| **Other revenue** | | | | | |
| Servicing fees | 191 | — | 510 | — | 701 |
| Servicing asset valuation and hedge activities, net | — | — | (8) | — | (8) |
| Total servicing income, net | 191 | — | 502 | — | 693 |
| Insurance premiums and service revenue earned | — | — | 1,059 | — | 1,059 |
| (Loss) gain on mortgage and automotive loans, net | (2) | — | 534 | — | 532 |
| Loss on extinguishment of debt | — | — | (148) | — | (148) |
| Other gain on investments, net | — | — | 146 | — | 146 |
| Other income, net of losses | 173 | 474 | 1,290 | (1,190) | 747 |
| Total other revenue | 362 | 474 | 3,383 | (1,190) | 3,029 |
| **Total net (loss) revenue** | (251) | 921 | 6,945 | (2,717) | 4,898 |
| **Provision for loan losses** | 81 | — | 248 | — | 329 |
| **Noninterest expense** | | | | | |
| Compensation and benefits expense | 760 | 473 | 608 | (476) | 1,365 |
| Insurance losses and loss adjustment expenses | — | — | 461 | — | 461 |
| Other operating expenses | 1,128 | 1 | 3,083 | (714) | 3,498 |
| Total noninterest expense | 1,888 | 474 | 4,152 | (1,190) | 5,324 |
| **(Loss) income from continuing operations before income tax benefit and undistributed income of subsidiaries** | (2,220) | 447 | 2,545 | (1,527) | (755) |
| Income tax benefit from continuing operations | (172) | — | (1,112) | — | (1,284) |
| **Net (loss) income from continuing operations** | (2,048) | 447 | 3,657 | (1,527) | 529 |
| Income (loss) from discontinued operations, net of tax | 119 | (93) | 641 | — | 667 |
| Undistributed income of subsidiaries | | | | | |
| Bank subsidiary | 859 | 859 | — | (1,718) | — |
| Nonbank subsidiaries | 2,266 | (105) | — | (2,161) | — |
| **Net income** | $ 1,196 | $ 1,108 | $ 4,298 | $ (5,406) | $ 1,196 |

Table of Contents

# Notes to Consolidated Financial Statements

Ally Financial Inc. • Form 10-K

| Year ended December 31, 2012 *($ in millions)* | Parent | | Guarantors | | Nonguarantors | | Consolidating adjustments | | Ally consolidated | |
|---|---|---|---|---|---|---|---|---|---|---|
| Net income | $ | 1,196 | $ | 1,108 | $ | 4,298 | $ | (5,406) | $ | 1,196 |
| **Other comprehensive (loss) income, net of tax** | | | | | | | | | | |
| Unrealized gains on investment securities | | | | | | | | | | |
| Net unrealized gains arising during the period | | 190 | | 39 | | 329 | | (227) | | 331 |
| Less: Net realized gains (losses) reclassified to net income | | — | | — | | 141 | | — | | 141 |
| Net change | | 190 | | 39 | | 188 | | (227) | | 190 |
| Translation adjustments and net investment hedges | | | | | | | | | | |
| Translation adjustments | | 184 | | 114 | | 205 | | (319) | | 184 |
| Hedges | | (168) | | — | | — | | — | | (168) |
| Net change | | 16 | | 114 | | 205 | | (319) | | 16 |
| Cash flow hedges | | | | | | | | | | |
| Net unrealized gains arising during the period | | (4) | | (4) | | (4) | | 8 | | (4) |
| Defined benefit pension plans | | | | | | | | | | |
| Net gains (losses), prior service costs, and transition obligations arising during the period | | 22 | | — | | (36) | | (22) | | (36) |
| Less: Net losses, prior service costs, and transition obligations reclassified to net income | | — | | — | | (58) | | — | | (58) |
| Net change | | 22 | | — | | 22 | | (22) | | 22 |
| Other comprehensive (loss) income, net of tax | | 224 | | 149 | | 411 | | (560) | | 224 |
| Comprehensive (loss) income | $ | 1,420 | $ | 1,257 | $ | 4,709 | $ | (5,966) | $ | 1,420 |

Table of Contents

# Notes to Consolidated Financial Statements

Ally Financial Inc. • Form 10-K

| Year ended December 31, 2011 ($ in millions) | Parent | Guarantors | Nonguarantors | Consolidating adjustments | Ally consolidated |
|---|---|---|---|---|---|
| **Financing revenue and other interest income** | | | | | |
| Interest and fees on finance receivables and loans | $ 1,071 | $ — | $ 3,348 | $ (10) | $ 4,409 |
| Interest and fees on finance receivables and loans — intercompany | 213 | — | 26 | (239) | — |
| Interest on loans held-for-sale | 5 | — | 327 | — | 332 |
| Interest on trading assets | — | — | 19 | — | 19 |
| Interest and dividends on available-for-sale investment securities | 4 | — | 347 | — | 351 |
| Interest-bearing cash | 5 | — | 16 | — | 21 |
| Operating leases | 713 | — | 1,216 | — | 1,929 |
| Total financing revenue and other interest income | 2,011 | — | 5,299 | (249) | 7,061 |
| **Interest expense** | | | | | |
| Interest on deposits | 65 | — | 549 | | 614 |
| Interest on short-term borrowings | 56 | — | 60 | — | 116 |
| Interest on long-term debt | 3,405 | (1) | 926 | (21) | 4,309 |
| Interest on intercompany debt | (13) | 2 | 236 | (225) | — |
| Total interest expense | 3,513 | 1 | 1,771 | (246) | 5,039 |
| Depreciation expense on operating lease assets | 250 | — | 691 | — | 941 |
| Net financing (loss) revenue | (1,752) | (1) | 2,837 | (3) | 1,081 |
| Dividends from subsidiaries | | | | | |
| Nonbank subsidiaries | 1,383 | — | — | (1,383) | — |
| **Other revenue** | | | | | |
| Servicing fees | 270 | — | 1,089 | (1) | 1,358 |
| Servicing asset valuation and hedge activities, net | — | — | (789) | — | (789) |
| Total servicing income, net | 270 | — | 300 | (1) | 569 |
| Insurance premiums and service revenue earned | — | — | 1,170 | — | 1,170 |
| Gain on mortgage and automotive loans, net | 22 | — | 448 | — | 470 |
| Loss on extinguishment of debt | (64) | — | — | — | (64) |
| Other gain on investments, net | 10 | — | 249 | — | 259 |
| Other income, net of losses | (167) | 37 | 1,287 | (664) | 493 |
| Total other revenue | 71 | 37 | 3,454 | (665) | 2,897 |
| **Total net (loss) revenue** | (298) | 36 | 6,291 | (2,051) | 3,978 |
| **Provision for loan losses** | 58 | — | 130 | — | 188 |
| **Noninterest expense** | | | | | |
| Compensation and benefits expense | 694 | 37 | 628 | (37) | 1,322 |
| Insurance losses and loss adjustment expenses | — | — | 483 | — | 483 |
| Other operating expenses | 546 | 1 | 3,017 | (628) | 2,936 |
| Total noninterest expense | 1,240 | 38 | 4,128 | (665) | 4,741 |
| **(Loss) income from continuing operations before income tax (benefit) expense and undistributed income (loss) of subsidiaries** | (1,596) | (2) | 2,033 | (1,386) | (951) |
| Income tax (benefit) expense from continuing operations | (616) | (1) | 668 | — | 51 |
| **Net (loss) income from continuing operations** | (980) | (1) | 1,365 | (1,386) | (1,002) |
| Income (loss) from discontinued operations, net of tax | 24 | (8) | 826 | 3 | 845 |
| Undistributed income (loss) of subsidiaries | | | | | |
| Bank subsidiary | 1,254 | 1,254 | — | (2,508) | — |
| Nonbank subsidiaries | (455) | 477 | — | (22) | — |
| **Net (loss) income** | $ (157) | $ 1,722 | $ 2,191 | $ (3,913) | $ (157) |

Table of Contents

# Notes to Consolidated Financial Statements

Ally Financial Inc. • Form 10-K

| Year ended December 31, 2011 ($ in millions) | Parent | Guarantors | Nonguarantors | Consolidating adjustments | Ally consolidated |
|---|---|---|---|---|---|
| **Net (loss) income** | $ (157) | $ 1,722 | $ 2,191 | $ (3,913) | $ (157) |
| **Other comprehensive (loss) income, net of tax** | | | | | |
| Unrealized (losses) gains on investment securities | | | | | |
| Net unrealized (losses) gains arising during the period | (82) | 50 | 171 | 57 | 196 |
| Less: Net realized gains reclassified to net income | 6 | — | 278 | — | 284 |
| Net change | (88) | 50 | (107) | 57 | (88) |
| Translation adjustments and net investment hedges | | | | | |
| Translation adjustments | (237) | (114) | (219) | 333 | (237) |
| Hedges | 173 | — | — | — | 173 |
| Net change | (64) | (114) | (219) | 333 | (64) |
| Defined benefit pension plans | | | | | |
| Net (losses) gains, prior service costs, and transition obligations arising during the period | (20) | 1 | (27) | 19 | (27) |
| Less: Net losses, prior service costs, and transition obligations reclassified to net income | — | — | (7) | — | (7) |
| Net change | (20) | 1 | (20) | 19 | (20) |
| **Other comprehensive (loss) income, net of tax** | (172) | (63) | (346) | 409 | (172) |
| **Comprehensive (loss) income** | $ (329) | $ 1,659 | $ 1,845 | $ (3,504) | $ (329) |

194

Table of Contents

# Notes to Consolidated Financial Statements

Ally Financial Inc. • Form 10-K

| Year ended December 31, 2010 ($ in millions) | Parent | Guarantors | Nonguarantors | Consolidating adjustments | Ally consolidated |
|---|---|---|---|---|---|
| **Financing revenue and other interest income** | | | | | |
| Interest and fees on finance receivables and loans | $ 938 | $ — | $ 3,538 | $ (1) | $ 4,475 |
| Interest and fees on finance receivables and loans — intercompany | 411 | — | 4 | (415) | — |
| Interest on loans held-for-sale | 75 | — | 512 | — | 587 |
| Interest on trading assets | — | — | 15 | — | 15 |
| Interest and dividends on available-for-sale investment securities | 4 | — | 321 | (2) | 323 |
| Interest and dividends on available-for-sale investment securities — intercompany | 112 | — | 9 | (121) | — |
| Interest-bearing cash | 13 | — | 21 | — | 34 |
| Operating leases | 1,063 | — | 1,520 | — | 2,583 |
| Total financing revenue and other interest income | 2,616 | — | 5,940 | (539) | 8,017 |
| **Interest expense** | | | | | |
| Interest on deposits | 52 | — | 527 | — | 579 |
| Interest on short-term borrowings | 43 | — | 98 | — | 141 |
| Interest on long-term debt | 3,735 | (1) | 1,026 | (20) | 4,740 |
| Interest on intercompany debt | (21) | 2 | 417 | (398) | — |
| Total interest expense | 3,809 | 1 | 2,068 | (418) | 5,460 |
| Depreciation expense on operating lease assets | 435 | — | 816 | — | 1,251 |
| Net financing (loss) revenue | (1,628) | (1) | 3,056 | (121) | 1,306 |
| Dividends from subsidiaries | | | | | |
| Nonbank subsidiaries | 182 | 1 | — | (183) | — |
| **Other revenue** | | | | | |
| Servicing fees | 434 | — | 1,055 | (1) | 1,488 |
| Servicing asset valuation and hedge activities, net | — | — | (394) | — | (394) |
| Total servicing income, net | 434 | — | 661 | (1) | 1,094 |
| Insurance premiums and service revenue earned | — | — | 1,371 | — | 1,371 |
| Gain on mortgage and automotive loans, net | 31 | — | 1,208 | — | 1,239 |
| Loss on extinguishment of debt | (127) | — | (9) | 12 | (124) |
| Other gain on investments, net | 6 | — | 502 | (6) | 502 |
| Other income, net of losses | (151) | — | 1,046 | (561) | 334 |
| Total other revenue | 193 | — | 4,779 | (556) | 4,416 |
| **Total net (loss) revenue** | (1,253) | — | 7,835 | (860) | 5,722 |
| **Provision for loan losses** | (200) | — | 557 | — | 357 |
| **Noninterest expense** | | | | | |
| Compensation and benefits expense | 785 | — | 563 | — | 1,348 |
| Insurance losses and loss adjustment expenses | — | — | 547 | — | 547 |
| Other operating expenses | 744 | — | 2,930 | (596) | 3,078 |
| Total noninterest expense | 1,529 | — | 4,040 | (596) | 4,973 |
| **(Loss) income from continuing operations before income tax (benefit) expense and undistributed income of subsidiaries** | (2,582) | — | 3,238 | (264) | 392 |
| Income tax (benefit) expense from continuing operations | (574) | — | 678 | — | 104 |
| **Net (loss) income from continuing operations** | (2,008) | — | 2,560 | (264) | 288 |
| Income from discontinued operations, net of tax | 150 | 3 | 592 | (4) | 741 |
| Undistributed income of subsidiaries | | | | | |
| Bank subsidiary | 902 | 902 | — | (1,804) | — |
| Nonbank subsidiaries | 1,985 | 259 | — | (2,244) | — |
| **Net income** | $ 1,029 | $ 1,164 | $ 3,152 | $ (4,316) | $ 1,029 |

195

Table of Contents

# Notes to Consolidated Financial Statements

Ally Financial Inc. • Form 10-K

| Year ended December 31, 2010 ($ in millions) | Parent | Guarantors | Nonguarantors | Consolidating adjustments | Ally consolidated |
|---|---|---|---|---|---|
| **Net income** | $ 1,029 | $ 1,164 | $ 3,152 | $ (4,316) | $ 1,029 |
| **Other comprehensive (loss) income, net of tax** | | | | | |
| Unrealized (losses) gains on investment securities | | | | | |
| Net unrealized (losses) gains arising during the period | (174) | (85) | 649 | (70) | 320 |
| Less: Net realized gains reclassified to net income | 3 | — | 499 | (5) | 497 |
| Net change | (177) | (85) | 150 | (65) | (177) |
| Translation adjustments and net investment hedges | | | | | |
| Translation adjustments | 165 | 442 | 630 | (1,072) | 165 |
| Hedges | (182) | — | — | — | (182) |
| Net change | (17) | 442 | 630 | (1,072) | (17) |
| Cash flow hedges | | | | | |
| Net unrealized gains arising during the period | 33 | — | — | — | 33 |
| Defined benefit pension plans | | | | | |
| Net losses, prior service costs, and transition obligations arising during the period | (40) | — | (81) | 62 | (59) |
| Less: Net losses, prior service costs, and transition obligations reclassified to net income | — | — | (19) | — | (19) |
| Net change | (40) | — | (62) | 62 | (40) |
| **Other comprehensive (loss) income, net of tax** | (201) | 357 | 718 | (1,075) | (201) |
| Cumulative effect of change in accounting principle (a) | (4) | — | (4) | 4 | (4) |
| **Comprehensive income** | $ 824 | $ 1,521 | $ 3,866 | $ (5,387) | $ 824 |

(a) Relates to the adoption of ASU 2009-17, *Improvements to Financial Reporting by Enterprises Involved with Variable Interest Entities.*

196

Table of Contents

# Notes to Consolidated Financial Statements

Ally Financial Inc. • Form 10-K

## Condensed Consolidating Balance Sheet

| December 31, 2012 ($ in millions) | Parent (a) | Guarantors | Nonguarantors (a) | Consolidating adjustments | Ally consolidated |
|---|---|---|---|---|---|
| **Assets** | | | | | |
| Cash and cash equivalents | | | | | |
| Noninterest-bearing | $ 729 | $ — | $ 344 | $ — | $ 1,073 |
| Noninterest-bearing — intercompany | 39 | — | — | (39) | — |
| Interest-bearing | 3,204 | — | 3,236 | — | 6,440 |
| Interest-bearing — intercompany | — | — | 452 | (452) | — |
| Total cash and cash equivalents | 3,972 | — | 4,032 | (491) | 7,513 |
| Investment securities | — | — | 14,178 | — | 14,178 |
| Loans held-for-sale, net | — | — | 2,576 | — | 2,576 |
| Finance receivables and loans, net | | | | | |
| Finance receivables and loans, net | 12,486 | — | 86,569 | — | 99,055 |
| Intercompany loans to | | | | | |
| Bank subsidiary | 1,600 | — | — | (1,600) | — |
| Nonbank subsidiaries | 3,514 | — | 672 | (4,186) | — |
| Allowance for loan losses | (170) | — | (1,000) | — | (1,170) |
| Total finance receivables and loans, net | 17,430 | — | 86,241 | (5,786) | 97,885 |
| Investment in operating leases, net | 2,003 | — | 11,547 | — | 13,550 |
| Intercompany receivables from | | | | | |
| Bank subsidiary | 677 | — | — | (677) | — |
| Nonbank subsidiaries | 315 | 334 | 378 | (1,027) | — |
| Investment in subsidiaries | | | | | |
| Bank subsidiary | 14,288 | 14,288 | — | (28,576) | — |
| Nonbank subsidiaries | 19,180 | 3,723 | — | (22,903) | — |
| Mortgage servicing rights | — | — | 952 | — | 952 |
| Premiums receivable and other insurance assets | — | — | 1,609 | — | 1,609 |
| Other assets | 2,514 | — | 9,968 | (574) | 11,908 |
| Assets of operations held-for-sale | 855 | 762 | 30,582 | (23) | 32,176 |
| Total assets | $ 61,234 | $ 19,107 | $ 162,063 | $ (60,057) | $ 182,347 |
| **Liabilities** | | | | | |
| Deposit liabilities | | | | | |
| Noninterest-bearing | $ — | $ — | $ 1,977 | $ — | $ 1,977 |
| Noninterest-bearing — intercompany | — | — | 39 | (39) | — |
| Interest-bearing | 983 | — | 44,955 | — | 45,938 |
| Total deposit liabilities | 983 | — | 46,971 | (39) | 47,915 |
| Short-term borrowings | 3,094 | — | 4,367 | — | 7,461 |
| Long-term debt | 32,342 | — | 42,219 | — | 74,561 |
| Intercompany debt to | | | | | |
| Nonbank subsidiaries | 530 | — | 5,708 | (6,238) | — |
| Intercompany payables to | | | | | |
| Bank subsidiary | 752 | — | — | (752) | — |
| Nonbank subsidiaries | 674 | — | 278 | (952) | — |
| Interest payable | 748 | — | 184 | — | 932 |
| Unearned insurance premiums and service revenue | — | — | 2,296 | — | 2,296 |
| Accrued expenses and other liabilities | 2,187 | 451 | 4,517 | (570) | 6,585 |
| Liabilities of operations held-for-sale | 26 | 725 | 21,948 | — | 22,699 |
| Total liabilities | 41,336 | 1,176 | 128,488 | (8,551) | 162,449 |
| Total equity | 19,898 | 17,931 | 33,575 | (51,506) | 19,898 |
| Total liabilities and equity | $ 61,234 | $ 19,107 | $ 162,063 | $ (60,057) | $ 182,347 |

(a)   Amounts presented are based upon the legal transfer of the underlying assets to VIEs in order to reflect legal ownership .

Table of Contents

# Notes to Consolidated Financial Statements

Ally Financial Inc. • Form 10-K

| December 31, 2011 ($ in millions) | | Parent (a) | | Guarantors | | Nonguarantors (a) | | Consolidating adjustments | | Ally consolidated |
|---|---|---|---|---|---|---|---|---|---|---|
| **Assets** | | | | | | | | | | |
| Cash and cash equivalents | | | | | | | | | | |
| Noninterest-bearing | $ | 1,413 | $ | — | $ | 1,062 | $ | — | $ | 2,475 |
| Interest-bearing | | 4,848 | | 14 | | 5,698 | | — | | 10,560 |
| Interest-bearing — intercompany | | — | | — | | 516 | | (516) | | — |
| Total cash and cash equivalents | | 6,261 | | 14 | | 7,276 | | (516) | | 13,035 |
| Trading assets | | — | | — | | 622 | | — | | 622 |
| Investment securities | | — | | — | | 15,135 | | — | | 15,135 |
| Loans held-for-sale, net | | 425 | | — | | 8,132 | | — | | 8,557 |
| Finance receivables and loans, net | | | | | | | | | | |
| Finance receivables and loans, net | | 15,151 | | 476 | | 99,128 | | — | | 114,755 |
| Intercompany loans to | | | | | | | | | | |
| Bank subsidiary | | 4,920 | | — | | — | | (4,920) | | — |
| Nonbank subsidiaries | | 5,397 | | 356 | | 550 | | (6,303) | | — |
| Allowance for loan losses | | (245) | | (2) | | (1,256) | | — | | (1,503) |
| Total finance receivables and loans, net | | 25,223 | | 830 | | 98,422 | | (11,223) | | 113,252 |
| Investment in operating leases, net | | 928 | | — | | 8,347 | | — | | 9,275 |
| Intercompany receivables from | | | | | | | | | | |
| Bank subsidiary | | 82 | | — | | — | | (82) | | — |
| Nonbank subsidiaries | | 1,070 | | 327 | | 577 | | (1,974) | | — |
| Investment in subsidiaries | | | | | | | | | | |
| Bank subsidiary | | 13,094 | | 13,094 | | — | | (26,188) | | — |
| Nonbank subsidiaries | | 17,433 | | 3,809 | | — | | (21,242) | | — |
| Mortgage servicing rights | | — | | — | | 2,519 | | — | | 2,519 |
| Premiums receivable and other insurance assets | | — | | — | | 1,853 | | — | | 1,853 |
| Other assets | | 2,664 | | 2 | | 16,713 | | (638) | | 18,741 |
| Assets of operations held-for-sale | | (174) | | — | | 1,244 | | — | | 1,070 |
| Total assets | $ | 67,006 | $ | 18,076 | $ | 160,840 | $ | (61,863) | $ | 184,059 |
| **Liabilities** | | | | | | | | | | |
| Deposit liabilities | | | | | | | | | | |
| Noninterest-bearing | $ | — | $ | — | $ | 2,029 | $ | — | $ | 2,029 |
| Interest-bearing | | 1,768 | | — | | 41,253 | | — | | 43,021 |
| Total deposit liabilities | | 1,768 | | — | | 43,282 | | — | | 45,050 |
| Short-term borrowings | | 2,756 | | 136 | | 4,788 | | — | | 7,680 |
| Long-term debt | | 39,615 | | 214 | | 53,056 | | — | | 92,885 |
| Intercompany debt to | | | | | | | | | | |
| Nonbank subsidiaries | | 574 | | 492 | | 10,673 | | (11,739) | | — |
| Intercompany payables to | | | | | | | | | | |
| Bank subsidiary | | 39 | | — | | — | | (39) | | — |
| Nonbank subsidiaries | | 1,266 | | 1 | | 750 | | (2,017) | | — |
| Interest payable | | 1,167 | | 3 | | 417 | | — | | 1,587 |
| Unearned insurance premiums and service revenue | | — | | — | | 2,576 | | — | | 2,576 |
| Accrued expenses and other liabilities | | 541 | | 323 | | 14,438 | | (638) | | 14,664 |
| Liabilities of operations held-for-sale | | — | | — | | 337 | | — | | 337 |
| Total liabilities | | 47,726 | | 1,169 | | 130,317 | | (14,433) | | 164,779 |
| Total equity | | 19,280 | | 16,907 | | 30,523 | | (47,430) | | 19,280 |
| Total liabilities and equity | $ | 67,006 | $ | 18,076 | $ | 160,840 | $ | (61,863) | $ | 184,059 |

(a)    Amounts presented are based upon the legal transfer of the underlying assets to VIEs in order to reflect legal ownership .

198

Table of Contents

# Notes to Consolidated Financial Statements

Ally Financial Inc. • Form 10-K

## Condensed Consolidating Statement of Cash Flows

| Year ended December 31, 2012 ($ in millions) | Parent | Guarantors | Nonguarantors | Consolidating adjustments | Ally consolidated |
|---|---|---|---|---|---|
| **Operating activities** | | | | | |
| Net cash provided by (used in) operating activities | $ 102 | $ 306 | $ 5,862 | $ (1,221) | $ 5,049 |
| **Investing activities** | | | | | |
| Purchases of available-for-sale securities | — | — | (12,816) | — | (12,816) |
| Proceeds from sales of available-for-sale securities | — | — | 7,662 | — | 7,662 |
| Proceeds from maturities and repayments of available-for-sale securities | — | — | 5,673 | — | 5,673 |
| Net decrease (increase) in finance receivables and loans | 3,027 | 2 | (14,972) | — | (11,943) |
| Proceeds from sales of finance receivables and loans | 352 | — | 1,980 | — | 2,332 |
| Net decrease in loans — intercompany | 3,879 | 105 | 129 | (4,113) | — |
| Net increase in operating lease assets | (2,268) | — | (3,431) | — | (5,699) |
| Capital contributions to subsidiaries | (261) | — | — | 261 | — |
| Returns of contributed capital | 2,079 | — | — | (2,079) | — |
| Net cash effect from deconsolidation of ResCap | — | — | (539) | — | (539) |
| Proceeds from sale of business units, net | 29 | — | 487 | — | 516 |
| Other, net | (247) | (13) | (1,481) | — | (1,741) |
| Net cash provided by (used in) investing activities | 6,590 | 94 | (17,308) | (5,931) | (16,555) |
| **Financing activities** | | | | | |
| Net change in short-term borrowings — third party | 338 | 25 | 2,331 | — | 2,694 |
| Net increase in bank deposits | — | — | 7,619 | (39) | 7,580 |
| Proceeds from issuance of long-term debt — third party | 3,613 | 70 | 35,718 | — | 39,401 |
| Repayments of long-term debt — third party | (11,238) | (73) | (28,598) | — | (39,909) |
| Net change in debt — intercompany | (44) | (149) | (3,984) | 4,177 | — |
| Dividends paid — third party | (802) | — | — | — | (802) |
| Dividends paid and returns of contributed capital — intercompany | — | (457) | (2,843) | 3,300 | — |
| Capital contributions from parent | — | 169 | 92 | (261) | — |
| Other, net | (785) | 1 | (143) | — | (927) |
| Net cash (used in) provided by financing activities | (8,918) | (414) | 10,192 | 7,177 | 8,037 |
| Effect of exchange-rate changes on cash and cash equivalents | (63) | — | 5 | — | (58) |
| Net decrease in cash and cash equivalents | (2,289) | (14) | (1,249) | 25 | (3,527) |
| Adjustment for change in cash and cash equivalents of operations held-for-sale | — | — | (1,995) | — | (1,995) |
| Cash and cash equivalents at beginning of year | 6,261 | 14 | 7,276 | (516) | 13,035 |
| Cash and cash equivalents at end of year | $ 3,972 | $ — | $ 4,032 | $ (491) | $ 7,513 |

199

Table of Contents

# Notes to Consolidated Financial Statements

Ally Financial Inc. • Form 10-K

| Year ended December 31, 2011 ($ in millions) | Parent | Guarantors | Nonguarantors | Consolidating adjustments | Ally consolidated |
|---|---|---|---|---|---|
| **Operating activities** | | | | | |
| Net cash provided by operating activities | $ 2,695 | $ 209 | $ 3,973 | $ (1,384) | $ 5,493 |
| **Investing activities** | | | | | |
| Purchases of available-for-sale securities | — | — | (19,377) | — | (19,377) |
| Proceeds from sales of available-for-sale securities | 1,494 | — | 12,738 | — | 14,232 |
| Proceeds from maturities and repayments of available-for-sale securities | 1 | — | 4,964 | — | 4,965 |
| Net increase in finance receivables and loans | (2,933) | (51) | (14,014) | — | (16,998) |
| Proceeds from sales of finance receivables and loans | 1,346 | — | 1,522 | — | 2,868 |
| Net decrease (increase) in loans — intercompany | 2,743 | 11 | (88) | (2,666) | — |
| Net decrease (increase) in operating lease assets | 2,890 | — | (3,901) | — | (1,011) |
| Capital contributions to subsidiaries | (1,634) | (855) | — | 2,489 | — |
| Returns of contributed capital | 1,255 | — | — | (1,255) | — |
| Proceeds from sale of business units, net | — | — | 50 | — | 50 |
| Other, net | 124 | (1) | 1,020 | — | 1,143 |
| Net cash provided by (used in) investing activities | 5,286 | (896) | (17,086) | (1,432) | (14,128) |
| **Financing activities** | | | | | |
| Net change in short-term borrowings — third party | 237 | 47 | 230 | — | 514 |
| Net increase in bank deposits | — | — | 5,840 | — | 5,840 |
| Proceeds from issuance of long-term debt — third party | 3,201 | 200 | 41,353 | — | 44,754 |
| Repayments of long-term debt — third party | (9,414) | (226) | (30,833) | — | (40,473) |
| Net change in debt — intercompany | 71 | 30 | (2,755) | 2,654 | — |
| Dividends paid — third party | (819) | — | — | — | (819) |
| Dividends paid and returns of contributed capital — intercompany | — | (207) | (2,431) | 2,638 | — |
| Capital contributions from parent | — | 855 | 1,634 | (2,489) | — |
| Other, net | 308 | — | (74) | — | 234 |
| Net cash (used in) provided by financing activities | (6,416) | 699 | 12,964 | 2,803 | 10,050 |
| Effect of exchange-rate changes on cash and cash equivalents | 31 | — | 18 | — | 49 |
| Net increase (decrease) in cash and cash equivalents | 1,596 | 12 | (131) | (13) | 1,464 |
| Adjustment for change in cash and cash equivalents of operations held-for-sale | — | — | (99) | — | (99) |
| Cash and cash equivalents at beginning of year | 4,665 | 2 | 7,506 | (503) | 11,670 |
| Cash and cash equivalents at end of year | $ 6,261 | $ 14 | $ 7,276 | $ (516) | $ 13,035 |

Table of Contents

# Notes to Consolidated Financial Statements

Ally Financial Inc. • Form 10-K

| Year ended December 31, 2010 ($ in millions) | Parent | Guarantors | Nonguarantors | Consolidating adjustments | Ally consolidated |
|---|---|---|---|---|---|
| **Operating activities** | | | | | |
| Net cash provided by operating activities | $ 4,552 | $ 13 | $ 7,230 | $ (188) | $ 11,607 |
| **Investing activities** | | | | | |
| Purchases of available-for-sale securities | (1,485) | — | (22,631) | — | (24,116) |
| Proceeds from sales of available-for-sale securities | 41 | — | 17,872 | (41) | 17,872 |
| Proceeds from maturities and repayments of available-for-sale securities | — | — | 4,527 | — | 4,527 |
| Net decrease in investment securities — intercompany | 323 | — | 260 | (583) | — |
| Net (increase) decrease in finance receivables and loans | (5,177) | 96 | (12,263) | — | (17,344) |
| Proceeds from sales of finance receivables and loans | 6 | — | 3,132 | — | 3,138 |
| Net decrease (increase) in loans — intercompany | 7,736 | (283) | (302) | (7,151) | — |
| Net (increase) decrease in operating lease assets | (2,770) | — | 7,846 | — | 5,076 |
| Capital contributions to subsidiaries | (2,036) | (1,737) | — | 3,773 | — |
| Returns of contributed capital | 880 | — | — | (880) | — |
| Proceeds from sale of business unit, net | 59 | — | 102 | — | 161 |
| Other, net | 104 | (1) | 3,016 | — | 3,119 |
| Net cash (used in) provided by investing activities | (2,319) | (1,925) | 1,559 | (4,882) | (7,567) |
| **Financing activities** | | | | | |
| Net change in short-term borrowings — third party | 735 | 50 | (4,414) | — | (3,629) |
| Net increase in bank deposits | — | — | 6,556 | — | 6,556 |
| Proceeds from issuance of long-term debt — third party | 5,824 | 90 | 33,047 | 41 | 39,002 |
| Repayments of long-term debt — third party | (4,292) | (256) | (44,982) | — | (49,530) |
| Net change in debt — intercompany | 243 | 300 | (7,774) | 7,231 | — |
| Dividends paid — third party | (1,253) | — | — | — | (1,253) |
| Dividends paid and returns of contributed capital — intercompany | — | — | (1,068) | 1,068 | — |
| Capital contributions from parent | — | 1,725 | 2,048 | (3,773) | — |
| Other, net | 418 | — | 451 | — | 869 |
| Net cash provided by (used in) financing activities | 1,675 | 1,909 | (16,136) | 4,567 | (7,985) |
| Effect of exchange-rate changes on cash and cash equivalents | — | — | 102 | — | 102 |
| Net increase (decrease) in cash and cash equivalents | 3,908 | (3) | (7,245) | (503) | (3,843) |
| Adjustment for change in cash and cash equivalents of operations held-for-sale | — | — | 725 | — | 725 |
| Cash and cash equivalents at beginning of year | 757 | 5 | 14,026 | — | 14,788 |
| Cash and cash equivalents at end of year | $ 4,665 | $ 2 | $ 7,506 | $ (503) | $ 11,670 |

## 28.  Guarantees and Commitments

### Guarantees

Guarantees are defined as contracts or indemnification agreements that contingently require us to make payments to third parties based on changes in the underlying agreements with the guaranteed parties. The following summarizes our outstanding guarantees, including those of our discontinued operations, made to third parties on our Consolidated Balance Sheet, for the periods shown.

| | 2012 | | 2011 | |
|---|---|---|---|---|
| December 31, ($ in millions) | Maximum liability | Carrying value of liability | Maximum liability | Carrying value of liability |
| Default automotive repurchases | $ 1,897 | $ — | $ 1,600 | $ — |
| Standby letters of credit and other guarantees | 274 | 44 | 333 | 88 |

### Default Automotive Repurchases

Certain of our discontinued international automotive financing businesses provide certain investors in our on-balance sheet arrangements (securitizations) and whole-loan transactions with repurchase commitments for loans that become contractually delinquent within a specified

Table of Contents

# Notes to Consolidated Financial Statements

Ally Financial Inc. • Form 10-K

time from their date of origination or purchase. The maximum obligation represents the principal balance for loans sold that are covered by these stipulations. Refer to  Note 10 for further information regarding our securitization trusts.

**Standby Letters of Credit**

Our Commercial Finance Group issues standby letters of credit to customers that represent irrevocable guarantees of payment of specified financial obligations. Third-party beneficiaries primarily utilize standby letters of credit as insurance in the event of nonperformance by our customers. Assets of the customers (e.g., trade receivables, inventory, and cash deposits) generally collateralize letters of credit. Expiration dates on letters of credit range from certain ongoing commitments that will expire during the upcoming year to terms of several years for certain letters of credit.

If nonperformance by a customer occurs for letters of credit, we can be liable for payment of the letter of credit to the beneficiary with our likely recourse being a charge back to the customer or liquidation of the collateral. The majority of customers with whom we have letter of credit exposure fall into the "acceptable" risk-rating category of our Commercial Finance Group's internal risk-rating system. This category is essentially at the midpoint of our risk rating classifications.

## Commitments

### Financing Commitments

The contractual commitments were as follows.

| December 31, ($ in millions) | | **2012** | | 2011 |
|---|---|---|---|---|
| Commitments to | | | | |
| Sell mortgages or securities (a) | $ | **6,282** | $ | 12,632 |
| Originate/purchase mortgages or securities (a) | | **4,249** | | 6,741 |
| Provide capital to investees (b) | | **86** | | 56 |
| Provide retail automotive receivables to third-parties (c) | | **425** | | 1,779 |
| Warehouse and construction-lending commitments (d) | | **100** | | 1,018 |
| Home equity lines of credit (e) | | **411** | | 2,234 |
| Unused revolving credit line commitments (f) | | **668** | | 1,304 |

(a)  Amounts primarily include commitments accounted for as derivatives.
(b)  We are committed to contribute capital to certain private equity funds. The fair value of these commitments is considered in the overall valuation of the underlying assets with which they are associated.
(c)  Certain of our discontinued international automotive financing businesses are committed to provide retail automotive receivables to third-party banks in exchange for secured debt. The transaction does not meet the definition of a sale.
(d)  The fair value of these commitments is considered in the overall valuation of the related assets.
(e)  We are committed to fund the remaining unused balances on home equity lines of credit for certain home equity loans sold into securitization structures (both on- and off-balance sheet structures) if certain deal-specific triggers are met. At  December 31, 2012, the commitments to fund home equity lines of credit in off-balance sheet securitizations represented $0 million of the total unfunded commitments.
(f)  The unused portion of revolving lines of credit reset at prevailing market rates and, as such, approximate market value.

The mortgage-lending and revolving credit line commitments contain an element of credit risk. Management reduces its credit risk for unused mortgage-lending and unused revolving credit line commitments by applying the same credit policies in making commitments as it does for extending loans. We typically require collateral as these commitments are drawn.

## Lease Commitments

Future minimum rental payments required under operating leases, primarily for real property, with noncancelable lease terms expiring after  December 31, 2012, are as follows.

| Year ended December 31, ($ in millions) | | |
|---|---|---|
| 2013 | $ | 70 |
| 2014 | | 62 |
| 2015 | | 50 |
| 2016 | | 29 |
| 2017 | | 18 |
| 2018 and thereafter | | 23 |
| Total minimum payment required | $ | 252 |

Certain of the leases contain escalation clauses and renewal or purchase options. Rental expenses under operating leases were  $63 million,  $79 million, and $84 million in 2012,  2011, and 2010, respectively.

Table of Contents

# Notes to Consolidated Financial Statements

Ally Financial Inc. • Form 10-K

**Contractual Commitments**

We have entered into multiple agreements for information technology, marketing and advertising, and voice and communication technology and maintenance. Many of the agreements are subject to variable price provisions, fixed or minimum price provisions, and termination or renewal provisions.

Year ended December 31, *($ in millions)*

| | | |
|---|---|---:|
| 2013 | $ | 253 |
| 2014 and 2015 | | 159 |
| 2016 and 2017 | | 74 |
| 2018 and thereafter | | 25 |
| Total future payment obligations | $ | 511 |

## 29.    Contingencies and Other Risks

In the normal course of business, we enter into transactions that expose us to varying degrees of risk.

### Concentration with GM and Chrysler

The profitability and financial condition of our operations are heavily dependent upon the performance, operations, and prospects of GM, Chrysler, and their dealers. We have preferred provider agreements that provide for limited exclusivity privileges with respect to subvention programs offered by GM and Chrysler. These agreements do not provide us with any benefits relating to standard rate financing or lease products. Our preferred provider agreements with GM and Chrysler terminate on December 31, 2013, and April 30, 2014, respectively.

### Mortgage-Related Matters
#### ResCap Bankruptcy Filing

On May 14, 2012, Residential Capital, LLC (ResCap) and certain of its wholly owned direct and indirect subsidiaries (collectively, the Debtors) filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (Bankruptcy Court). In connection with the filings, Ally Financial Inc. and its direct and indirect subsidiaries and affiliates (excluding the Debtors) (collectively, AFI) had reached an agreement with the Debtors and certain creditor constituencies on a prearranged Chapter 11 plan (the Plan). The Plan included a proposed settlement (the Settlement) between AFI and the Debtors, which included, among other things, an obligation of AFI to make a $750 million cash contribution to the Debtors' estate, and a release of all existing or potential causes of action between AFI and the Debtors, as well as a release of all existing or potential ResCap-related causes of action against AFI held by third parties.

The Settlement contemplated certain milestone requirements that the Debtors failed to satisfy, including the Bankruptcy Court's confirmation of the Plan on or before October 31, 2012. While the failure to meet this October 31 milestone would have resulted in the Settlement's automatic termination, AFI and the Debtors agreed to monthly temporary waivers of this automatic termination through February 28, 2013. This waiver was not extended beyond this date, and therefore the Settlement has terminated.

As a result of the termination of the Settlement, AFI is no longer obligated to make the $750 million cash contribution and neither party is bound by the Settlement. Further, AFI is not entitled to receive any releases from either the Debtors or any third party claimants, as was contemplated under the Plan and Settlement. However, AFI has not withdrawn its offer to provide a $750 million cash contribution to the Debtors' estate if an acceptable settlement can be reached. As a result of the termination of the Settlement, substantial claims could be brought against us, which could have a material adverse impact on our results of operations, financial position or cash flows. For further information with respect to the bankruptcy, refer to Note 1.

Based on our assessment of the effect of the deconsolidation of ResCap, potential obligations as a result of the ResCap bankruptcy, and other impacts related to the bankruptcy filing, we recorded a charge of $1.2 billion during the year ended December 31, 2012. This charge primarily consisted of the impairment of Ally's $442 million equity investment in ResCap and an additional $750 million, which is the amount AFI has offered to contribute to the Debtors' estate. Given the inherent uncertainty of the bankruptcy process, it is possible that the $750 million estimate could be increased or decreased in the future, but we are unable to estimate the amount of any potential modification.

#### Mortgage Settlements and Consent Order

On February 9, 2012, we announced that we had reached an agreement with respect to investigations into procedures followed by mortgage servicing companies and banks in connection with mortgage origination and servicing activities and foreclosure home sales and evictions (the Mortgage Settlement). Further, as a result of an examination conducted by the FRB and FDIC, on April 13, 2011, we entered into a consent order (the Consent Order) with the FRB and the FDIC, that required, among other things, GMAC Mortgage, LLC to retain independent consultants to conduct a risk assessment related to mortgage servicing activities and, separately, to conduct a review of certain past residential mortgage foreclosure actions (the Foreclosure Review). The Debtors are primarily liable for all remaining obligations under both the Mortgage Settlement and Consent Order. AFI is secondarily liable for the specific performance of required actions, and is jointly and severally liable for certain financial obligations. On September 19, 2012, the official committee of unsecured creditors appointed in the Debtors' bankruptcy cases (the Creditors' Committee) filed an objection to the Debtors' motions to compensate the independent consultants

Table of Contents

# Notes to Consolidated Financial Statements

Ally Financial Inc. • Form 10-K

for their Foreclosure Review services. In its objection, the Creditors' Committee alleged, among other things, that AFI should be responsible for the costs of the Foreclosure Review. On October 11, 2012, the Bankruptcy Court entered an interim order allowing the Debtors to continue paying the independent consultants on an interim 90 day basis, while reserving all parties' rights with respect to the allocation of costs between the Debtors and AFI for the Foreclosure Review. On January 14, 2013, the bankruptcy court entered an interim order authorizing the Debtors to continue paying the independent consultants for their Foreclosure Review services until February 28, 2013, and then on February 28, 2013, the bankruptcy court entered an interim order authorizing the Debtors to continue paying the independent consultants until March 21, 2013, reserving all parties' rights until that time. On February 27, 2013, the Debtors filed a motion with the Bankruptcy Court seeking, for purposes of any proposed chapter 11 plan, that GMAC Mortgage's obligation to conduct and pay for independent file review regarding certain residential foreclosure actions and foreclosure sales prosecuted by GMAC Mortgage and its subsidiaries, as required under the Consent Order, be classified as a general unsecured claim in an amount to be determined, and that the automatic stay under the Bankruptcy Code be applied to prevent the FRB, the FDIC, and other governmental entities from taking any action to enforce the obligation against the Debtors. If the Bankruptcy Court approves the motion, such governmental entities are likely to seek to enforce the obligation against AFI, and any such obligations ultimately borne by AFI could be material. The Debtors have requested that the motion be heard at a hearing on March 21, 2013.

## Legal Proceedings

We are subject to potential liability under various governmental proceedings, claims, and legal actions that are pending or otherwise asserted against us. We are named as defendants in a number of legal actions, and we are involved in governmental proceedings arising in connection with our respective businesses. Some of the pending actions purport to be class actions, and certain legal actions include claims for substantial compensatory and/or punitive damages or claims for indeterminate amounts of damages. We establish reserves for legal claims when payments associated with the claims become probable and the payments can be reasonably estimated. Given the inherent difficulty of predicting the outcome of litigation and regulatory matters, it is generally very difficult to predict what the eventual outcome will be, and when the matter will be resolved. The actual costs of resolving legal claims may be higher or lower than any amounts reserved for the claims.

### Mortgage-backed Securities Litigation

We have previously disclosed various litigation matters where the Debtors (as defined above) were named as defendants in cases relating to mortgage-backed securities and certain other mortgage-related matters. As a result of the bankruptcy filings, all litigation against the Debtors has been automatically stayed and will be resolved in the bankruptcy litigation out of the assets of the estate. Ally believes that it has no potential future liability with respect to any litigation claims pending solely against the Debtors.

Ally Financial Inc. and certain of its subsidiaries (excluding the Debtors) (collectively, the AFI Entities) are named as defendants in various cases relating to ResCap mortgage-backed securities (MBS) and certain other mortgage-related matters, which are described in more detail below (collectively, the Mortgage Cases). In the private-label securities litigation, the plaintiffs generally allege that misstatements and omissions occurred in registration statements, prospectuses, prospectus supplements, and other documents related to MBS offerings. The alleged misstatements and omissions typically concern underwriting standards. The plaintiffs generally claim that such misstatements and omissions constitute violations of state and/or federal securities law and common law including negligent misrepresentation and fraud. Plaintiffs seek monetary damages and rescission. In these cases, the claims against Ally Financial Inc. are all indirect or vicarious in nature, which generally requires proof of direct liability against the underlying Debtor entities before the litigants can seek to hold Ally Financial Inc. responsible for such underlying conduct. With respect to the private-label monoline bond insurer claims, certain monoline bond insurers generally allege breach of contract and fraud, as described more specifically below.

As described earlier, the proposed bankruptcy Plan, which provided for a release of all existing and potential causes of action against the AFI Entities held by ResCap (including the Mortgage Cases), has been terminated. As a result, the Mortgage Cases are expected to proceed against us. We intend to vigorously defend these cases.

Other than the Cambridge Place I and II, New Jersey Carpenters, FHFA and FDIC matters, all of the private-label securities matters are currently subject to orders entered by the Bankruptcy Court staying the matter through April 30, 2013 in connection with the Debtors bankruptcy. The Cambridge Place I and II and New Jersey Carpenters matters are currently subject to stay orders through March 31, 2013, and the FHFA and FDIC matters are currently proceeding against the applicable Ally defendants. Other than the MBIA matter, all of the private-label monoline bond insurer claims are currently subject to orders entered by the Bankruptcy Court staying the matter through April 30, 2013 in connection with the Debtors bankruptcy. The MBIA matter is currently proceeding against the applicable Ally defendants. All of the stay orders permit motion to dismiss practice and limited discovery to proceed for and against the non-Debtor Ally defendants.

Set forth below are descriptions of these proceedings.

### *Private-label Securities Litigation*

#### *Allstate Litigation*

On February 14, 2011, the Allstate Insurance Company and various of its subsidiaries and affiliates (collectively, Allstate) filed a complaint in Hennepin County District Court, Minnesota, against Ally Securities LLC (Ally Securities) and a number of ResCap entities. The complaint alleges that the defendants misrepresented in the offering materials the riskiness and credit quality of, and omitted material information related to, residential mortgage-backed securities (MBS) Allstate purchased. The complaint asserts claims for fraud and negligent misrepresentation and seeks money damages and costs, including attorneys' fees. A motion to dismiss the amended complaint was granted in part and denied in part on November 28, 2011, pursuant to which the court dismissed the negligent misrepresentation claim and allowed the fraud and Consumer Fraud Act claims to proceed.

204

Table of Contents

# Notes to Consolidated Financial Statements

Ally Financial Inc. • Form 10-K

### Cambridge Place I and II Litigation

On February 11, 2011, Cambridge Place Investments filed two complaints against Ally Securities and a number of ResCap entities alleging violations of state securities laws and seeks, in both cases, recovery of money damages, together with statutory interest from the date of payment, costs, and attorneys' fees. Plaintiff dismissed the Debtor entities in March 2012 and the case remains pending against Ally Securities only.

### FDIC Litigation

The Federal Deposit Insurance Corporation filed four complaints against Ally Securities between May 2012 and August 2012 alleging violations of federal and state securities laws, in each alleging that Ally Securities made misleading statements in a registration statement. Plaintiff seeks rescission and money damages in all cases including pre- and post-judgment interest, attorney's fees and costs of court. Ally Securities has filed motions to dismiss in three of the four cases, and expects to file a motion to dismiss in the fourth case as well.

### FHFA Litigation

FHFA, as conservator for Freddie Mac, filed a complaint on September 2, 2011, against Ally Financial Inc., Ally Securities, GMAC Mortgage Group (GMACMG), and a number of ResCap entities, in New York County Supreme Court. The case was removed to Federal District Court, Southern District of New York. Subsequent to the ResCap bankruptcy filing, the FHFA amended its complaint to remove all Debtor entities. The complaint alleges that Ally Financial Inc., GMACMG and Ally Securities violated federal and state securities laws and engaged in aiding and abetting a fraud, asserts control person liability against Ally Financial. The plaintiff seeks rescission and recovery of money damages, with interest, as well as consequential and punitive damages, attorney's fees and costs and judgment interest. Motions to dismiss were filed by defendants on July 13, 2012, and were granted in part and denied in part on December 19, 2012. The dismissed portions of the complaint did not substantially alter the original allegations, entities involved, or securities offerings at issue in the case.

### FHLB Litigation

Federal Home Loan Bank (FHLB) of Indianapolis filed an Amended Complaint in Marion County Superior Court for rescission and damages on July 14, 2011, asserting claims for common law negligence and violations of state and federal securities laws, and names Ally Securities, and GMACMG, and a number of ResCap entities. The complaint alleges that the offering documents for the securities underwritten and issued by the defendants contained material misrepresentations of fact, evidenced by high default and foreclosure rates, and seeks damages or statutory recovery upon tender, plus interest, attorneys' fees, and costs, including expert witness fees and an order voiding the transactions at issue. The defendants filed a motion to dismiss, which was granted in part and denied in part. The negligent misrepresentation claim remains against Ally Securities only.

FHLB of Boston filed a complaint on April 20, 2011, in Suffolk County Superior Court, naming numerous defendants including Ally Financial Inc.; GMACMG, and a number of ResCap entities. The complaint alleges that the defendants collectively packaged, marketed, offered, and sold private-label MBS, and FHLB of Boston purchased such securities in reliance upon misstatements and omissions of material facts in the offering documents. The complaint alleges negligent misrepresentation and violations of the Massachusetts Uniform Securities Act. Plaintiffs seek damages, plus interest, attorneys' fees, and costs, including expert witness fees. The defendants removed this case to federal court. The AFI Entities filed a Motion to Dismiss on October 11, 2012.

FHLB of Chicago filed a Corrected Amended Complaint for Rescission and Damages on October 15, 2011, in Cook County Circuit Court, which names, among other defendants, Ally Financial Inc., Ally Securities, GMACMG, and a number of ResCap entities. The complaint alleges that the offering documents for the securities underwritten and issued by defendants contained material misrepresentations of fact and asserts claims for violations of state securities law and negligent misrepresentation. The complaint seeks rescission of the transactions at issue, money damages, and attorney's fees and costs, including expert witness fees. The defendants' motion to dismiss was denied September 12, 2012.

### John Hancock Litigation

John Hancock Life Insurance Company filed a complaint in Hennepin County, Minnesota on July 27, 2012 against Ally Financial Inc., Ally Bank, Ally Securities, GMACMG and a number of ResCap individual directors and officers. The complaint alleges fraud, aiding and abetting fraud, negligent misrepresentation, and violations of federal and state securities laws. The plaintiff seeks rescission and money damages, including costs, reasonable attorneys' fees and expert fees, and prejudgment interest relating to forty-nine securities offerings.

### Huntington Bancshares Litigation

Huntington Bancshares, Inc. (Huntington), commenced a lawsuit on October 11, 2011, against Ally Financial Inc., Ally Securities, and a number of ResCap entities and individual directors and officers. The complaint alleges that the defendants made misrepresentations and omissions of material facts related to the originator's loan underwriting guidelines in the offering materials for five residential mortgage-backed securities. The complaint asserts claims for fraud, aiding and abetting fraud, negligent misrepresentation, and violation of the Minnesota Securities Act and seeks rescission, money damages, and certain costs. The defendants' motion to dismiss was granted and all parties and claims were dismissed with prejudice on December 11, 2012. The plaintiff filed a timely notice of appeal on February 8, 2013. No appeal dates have been set.

Table of Contents

# Notes to Consolidated Financial Statements

Ally Financial Inc. • Form 10-K

*Massachusetts Mutual Life Insurance Company Litigation*

On February 9, 2011, the Massachusetts Mutual Life Insurance Company (MassMutual) filed a complaint in the United States District Court for the District of Massachusetts against numerous defendants, including Ally Securities and a former director of ResCap. The complaint alleges that the defendants' public filings and offering documents associated with MBS that MassMutual purchased contained false statements and omissions of material facts. MassMutual asserts claims for violations of the Massachusetts Uniform Securities Act and seeks both compensatory and statutory damages. The defendants' motion to dismiss was granted in part and denied in part in February 2012, although claims against Ally Securities remain.

*New Jersey Carpenters Litigation*

On January 3, 2011, New Jersey Carpenters Health Fund, New Jersey Carpenters Vacation Fund, and Boilermaker Blacksmith National Pension Trust, on behalf of themselves and a putative class (collectively, New Jersey Carpenters), filed a Consolidated Second Amended Securities Class Action Complaint against numerous defendants including Ally Securities, and a number of ResCap entities and individual directors and officers. The complaint alleges that the plaintiffs and the class purchased MBS between June 28, 2006, and May 30, 2007, and asserts that the offering documents associated with these transactions contained misrepresentations and omitted material information in violation of the federal securities laws. The complaint seeks compensatory damages, rescission or a rescissory measure of damages, and attorneys' fees and costs, among other relief. New Jersey Carpenters moved for class certification. The court denied the plaintiffs' motion for class certification, and the Plaintiffs appealed and 2 nd Circuit affirmed the District Court's ruling. Plaintiffs were then allowed limited discovery to re-attempt class certification and the District Court certified a modified class and allowed claims to be reinstated by certain intervenors. The defendants have filed a motion for reconsideration of class certification.

*Stichting Pensioenfonds Litigation*

On October 11, 2011 Stichting filed a complaint in District Court of Minnesota against Ally Financial Inc., Ally Securities, and a number of ResCap entities and individual directors and officers. The complaint alleges fraud, aiding and abetting fraud, negligent misrepresentation and violation of state securities laws and seeks money damages, including attorney's fees, court costs and expert fees, and judgment interest. The Defendants filed a motion to dismiss on July 30, 2012. The plaintiffs subsequently were granted leave to amend their complaint which added Ally Bank, IB Finance Holding Co., and two securities offerings. The Defendants anticipate filing a motion to dismiss.

*Union Central Life Litigation*

Union Central filed a complaint on April 28, 2011 against Ally Financial Inc., Ally Securities and a number of ResCap entities and a former ResCap director alleging violation of the federal securities laws, state common law fraud, negligent misrepresentation and unjust enrichment. The plaintiff seeks compensatory and statutory damages, and attorneys fees and costs, including expert witness fees. A motion to dismiss was filed on July 27, 2012.

*Western & Southern Litigation*

Western & Southern filed a complaint on June 30, 2011 in Hamilton County, Ohio against Ally Securities and a number of ResCap entities alleging violation of state securities laws and negligent misrepresentation and seeks rescission and money damages, including compensatory and punitive damages, interest, and attorney's fees and costs. A motion to dismiss was granted for all parties except Ally Securities.

## *Private-label Monoline Bond Insurer Claims*

*Assured Guaranty Litigation*

Assured Guaranty filed a complaint on May 11, 2012 in Federal District Court, the Southern District of New York, against Ally Financial, Ally Bank and a number of ResCap entities alleging claims for breach of contract, reimbursement and indemnification under New York law and seeks monetary damages in connection with 2004 and 2006 mortgage securitizations.

*MBIA Litigation*

MBIA Insurance Corporation (MBIA) filed complaints on December 4, 2008, and April 1, 2010, in the New York County Supreme Court against GMAC Mortgage and RFC. The complaints allege that defendants breached their contractual representations and warranties relating to the characteristics of mortgage loans contained in certain insured MBS offerings and includes claims for fraud, improper servicing and failure to notify the insurer of the alleged breach. Both cases were automatically stayed on May 14, 2012 in connection with the Debtors' bankruptcy filings. MBIA subsequently filed a complaint on September 17, 2012 against Ally Financial Inc., IB Finance Holding Company LLC, Ally Bank, Ally Securities, and GMACMG, alleging aiding and abetting common law fraud, and against Ally Bank, breach of contract relating to the characteristics of the mortgage loans contained in certain insured offerings and seeks damages relating to all claims. The Defendants filed a motion to dismiss on February 15, 2013.

*FGIC Litigation*

FGIC filed twelve complaints in New York state court against Ally Financial Inc. (ten of the twelve), Ally Bank (four of the twelve) and a number of ResCap entities between November 29, 2011 and March 13, 2012, alleging that the Debtor defendants breached their contractual representations and warranties relating to the characteristics of mortgage loans contained in certain insured MBS offerings. FGIC also alleges that Ally Financial Inc. is liable under alter ego and fraudulent inducement theories and that Ally Bank aided and abetted such fraudulent inducement and seeks damages relating to all claims. All of the FGIC cases were removed to the U.S. District Court for the Southern District of New York, and the defendants have asked the Court for leave to file motions to dismiss each case.

Table of Contents

# Notes to Consolidated Financial Statements

Ally Financial Inc. • Form 10-K

## Regulatory Matters

We continue to respond to subpoenas and document requests from the SEC, seeking information covering a wide range of mortgage-related matters, including, among other things, various aspects surrounding securitizations of residential mortgages. We are also responding to subpoenas received from the U.S. Department of Justice, which include broad requests for documentation and other information in connection with its investigation of potential fraud and other potential legal violations related to mortgage backed securities, as well as the origination and/or underwriting of mortgage loans. In addition, the CFPB has recently advised us that they are investigating certain of our retail financing practices. It is possible that this could result in actions against us.

## Loan Repurchases and Obligations Related to Loan Sales
### Representation and Warranty Obligation Reserve Methodology

A significant portion of our representation and warranty obligations were eliminated as a result of the deconsolidation of ResCap. Representation and warranty reserve was $105 million at December 31, 2012 with respect to Ally Bank's sold and serviced loans. The current liability for representation and warranty obligations reflects management's best estimate of probable losses with respect to Ally Bank's mortgage loans sold to Freddie Mac and Fannie Mae. We considered historical and recent demand trends in establishing the reserve. The methodology used to estimate the reserve considers a variety of assumptions including borrower performance (both actual and estimated future defaults), repurchase demand behavior, historical loan defect experience, historical mortgage insurance rescission experience, and historical and estimated future loss experience, which includes projections of future home price changes as well as other qualitative factors including investor behavior. It is difficult to predict and estimate the level and timing of any potential future demands. In cases where we may not be able to reasonably estimate losses, a liability is not recognized. Management monitors the adequacy of the overall reserve and makes adjustments to the level of reserve, as necessary, after consideration of other qualitative factors including ongoing dialogue and experience with counterparties.

At the time a loan is sold, an estimate of the fair value of the liability is recorded and classified in accrued expenses and other liabilities on our  Consolidated Balance Sheet and recorded as a component of gain (loss) on mortgage and automotive loans, net, in our  Consolidated Statement of Comprehensive Income . We recognize changes in the liability when additional relevant information becomes available. Changes in the estimate are recorded as other operating expenses in our  Consolidated Statement of Comprehensive Income.  The repurchase reserve at  December 31, 2012,  relates exclusively to GSE exposure.

The following table summarizes the changes in our reserve for representation and warranty obligations.

| Year ended December 31, ($ in millions) | | 2012 (a) | | 2011 |
|---|---|---|---|---|
| Balance at January 1, | $ | 825 | $ | 830 |
| Provision for mortgage representation and warranty expenses | | | | |
| Loan sales | | 16 | | 19 |
| Change in estimate — continuing operations | | 67 | | 324 |
| Total additions | | 83 | | 343 |
| Resolved claims (b) | | (146) | | (360) |
| Recoveries | | 8 | | 12 |
| Deconsolidation of ResCap | | (665) | | — |
| Balance at December 31, | $ | 105 | $ | 825 |

(a) The remaining balance is at Ally Bank as a result of the deconsolidation of ResCap. Refer to  Note 1 for more information regarding the Debtors' Bankruptcy and the deconsolidation of ResCap.

(b) Includes principal losses and accrued interest on repurchased loans, indemnification payments, and settlements with counterparties.

## Other Contingencies

We are subject to potential liability under various other exposures including tax, nonrecourse loans, self-insurance, and other miscellaneous contingencies. We establish reserves for these contingencies when the loss becomes probable and the amount can be reasonably estimated. The actual costs of resolving these items may be substantially higher or lower than the amounts reserved for any one item. Based on information currently available, it is the opinion of management that the eventual outcome of these items will not have a material adverse impact on our results of operations, financial position, or cash flows.

Table of Contents

# Notes to Consolidated Financial Statements

Ally Financial Inc. • Form 10-K

## 30.  Quarterly Financial Statements (unaudited)

| 2012 ($ in millions) | First quarter | | Second quarter | | Third quarter | | Fourth quarter | |
|---|---|---|---|---|---|---|---|---|
| Net financing revenue | $ | 342 | $ | 443 | $ | 473 | $ | 611 |
| Other revenue | | 1,012 | | 762 | | 774 | | 481 |
| Total net revenue | | 1,354 | | 1,205 | | 1,247 | | 1,092 |
| Provision for loan losses | | 98 | | 34 | | 105 | | 92 |
| Total noninterest expense | | 1,120 | | 2,290 | | 877 | | 1,037 |
| Income (loss) from continuing operations before income tax expense (benefit) | | 136 | | (1,119) | | 265 | | (37) |
| Income tax expense (benefit) from continuing operations | | 18 | | (8) | | 43 | | (1,337) |
| Net income (loss) from continuing operations | | 118 | | (1,111) | | 222 | | 1,300 |
| Income from discontinued operations, net of tax | | 192 | | 213 | | 162 | | 100 |
| Net income (loss) | $ | 310 | $ | (898) | $ | 384 | $ | 1,400 |
| Basic earnings per common share | | | | | | | | |
| Net (loss) income from continuing operations | $ | (62) | $ | (985) | $ | 16 | $ | 825 |
| Net income (loss) | | 82 | | (825) | | 137 | | 901 |
| Diluted earnings per common share | | | | | | | | |
| Net (loss) income from continuing operations | | (62) | | (985) | | 16 | | 647 |
| Net income (loss) | | 82 | | (825) | | 137 | | 700 |
| 2011 | | | | | | | | |
| Net financing revenue | $ | 207 | $ | 341 | $ | 247 | $ | 286 |
| Other revenue | | 827 | | 873 | | 385 | | 812 |
| Total net revenue | | 1,034 | | 1,214 | | 632 | | 1,098 |
| Provision for loan losses | | 85 | | 59 | | 57 | | (13) |
| Total noninterest expense | | 1,061 | | 1,277 | | 983 | | 1,420 |
| (Loss) from continuing operations before income tax expense (benefit) | | (112) | | (122) | | (408) | | (309) |
| Income tax expense from continuing operations | | 19 | | 9 | | 13 | | 10 |
| Net loss from continuing operations | | (131) | | (131) | | (421) | | (319) |
| Income from discontinued operations, net of tax | | 277 | | 244 | | 211 | | 113 |
| Net income (loss) | $ | 146 | $ | 113 | $ | (210) | $ | (206) |
| Basic and diluted earnings per common share | | | | | | | | |
| Net loss from continuing operations | $ | (227) | $ | (242) | $ | (467) | $ | (390) |
| Net loss | | (19) | | (58) | | (308) | | (305) |

## 31.  Subsequent Events

### Declaration of Quarterly Dividend Payments

On January 3, 2013, the Ally Board of Directors declared quarterly dividend payments on certain outstanding preferred stock. This included a cash dividend of $1.125 per share, or a total of $134 million, on Fixed Rate Cumulative Mandatorily Convertible Preferred Stock, Series F-2; a cash dividend of $17.50 per share, or a total of $45 million, on Fixed Rate Cumulative Perpetual Preferred Stock, Series G; and a cash dividend of $0.53 per share, or a total of $22 million, on Fixed Rate/Floating Rate Perpetual Preferred Stock, Series A. The dividends were paid on February 15, 2013.

### Canadian Automotive Finance Operation Sale

On February 1, 2013, we completed the sale of our Canadian automotive finance operation, Ally Credit Canada Limited, and ResMor Trust (Ally Canada) to Royal Bank of Canada. Ally received $4.1 billion USD for the business in the form of a $3.7 billion payment at closing and $400 million of dividends from Ally Canada following the announcement of the transaction.

Table of Contents

Ally Financial Inc. • Form 10-K

## Item 9.   Changes in and Disagreements with Accountants on Accounting and Financial Disclosure

None.

## Item 9A.   Controls and Procedures

We maintain disclosure controls and procedures, as defined in Rule 13a-15(e) under the Securities Exchange Act of 1934, as amended (the Exchange Act), designed to ensure that information required to be disclosed in reports filed under the Exchange Act is recorded, processed, summarized, and reported within the specified time periods. Our disclosure controls and procedures are also designed to ensure that information required to be disclosed in the reports we file and submit under the Exchange Act is accumulated and communicated to management, including our Chief Executive Officer (Principal Executive Officer) and Senior Executive Vice President of Finance and Corporate Planning (Principal Financial Officer), to allow timely decisions regarding required disclosure.

As of the end of the period covered by this report, our Principal Executive Officer and Principal Financial Officer evaluated, with the participation of our management, the effectiveness of our disclosure controls and procedures and concluded that our disclosure controls and procedures were effective.

There were no changes in our internal controls over financial reporting (as defined in Rule 13a-15(f) of the Exchange Act) that occurred during our most recent fiscal quarter that materially affected, or were reasonably likely to materially affect, our internal controls over financial reporting.

Our management, including our Principal Executive Officer and Principal Financial Officer, does not expect that our disclosure controls or our internal controls will prevent or detect all errors and all fraud. A control system, no matter how well designed and operated, can provide only reasonable, not absolute, assurance that the control system's objectives will be met. Further, the design of a control system must reflect the fact that there are resource constraints, and the benefits of controls must be considered relative to their costs. Because of the inherent limitations in all control systems, no evaluation of controls can provide absolute assurance that all control issues and instances of fraud, if any, within Ally have been detected. These inherent limitations include the realities that judgments in decision-making can be faulty and that breakdowns can occur because of simple error or mistake. Controls can also be circumvented by the individual acts of some persons, by collusion of two or more people, or by management override of the controls. The design of any system of controls is based in part on certain assumptions about the likelihood of future events, and there can be no assurance that any design will succeed in achieving its stated goals under all potential future conditions. Over time, controls may become inadequate because of changes in conditions or deterioration in the degree of compliance with associated policies or procedures. Because of the inherent limitations in a cost-effective control system, misstatements due to error or fraud may occur and not be detected.

Refer to Item 8 for Management's Report on Internal Control over Financial Reporting.

## Item 9B.   Other Information

None.

209

Table of Contents

# Part III

Ally Financial Inc. • Form 10-K

## Item 10.   Directors, Executive Officers, and Corporate Governance

The following table presents information regarding directors, executive officers, and other significant employees of Ally.

| Name | Age | Position |
| --- | --- | --- |
| Franklin W. Hobbs | 65 | Director (Chairman of the Board) |
| Robert T. Blakely | 71 | Director (Chairman of Audit Committee) |
| Mayree C. Clark | 55 | Director (Member of Audit Committee) |
| John D. Durrett | 64 | Director (Member of Audit Committee) |
| Stephen A. Feinberg | 52 | Director |
| Kim S. Fennebresque | 62 | Director |
| Gerald Greenwald | 77 | Director |
| Marjorie Magner | 63 | Director (Member of Audit Committee) |
| Henry S. Miller | 67 | Director |
| John J. Stack | 66 | Director (Member of Audit Committee) |
| Michael A. Carpenter | 65 | Director and Chief Executive Officer |
| Jeffrey J. Brown | 39 | Senior Executive Vice President of Finance and Corporate Planning |
| James G. Mackey | 45 | Chief Financial Officer |
| Barbara Yastine | 53 | Chief Executive Officer and President of Ally Bank |
| William F. Muir | 58 | President |
| David J. DeBrunner | 46 | Vice President, Chief Accounting Officer, and Corporate Controller |
| Brian Gunn | 40 | Chief Risk Officer |

## Directors, Executive Officers, and Other Significant Employees

*Franklin W. Hobbs* — Director of Ally since May 2009. He currently serves as Chairman of the board. Since 2004, he has been an advisor to One Equity Partners LLC, which manages investments and commitments for JPMorgan Chase & Co. in direct private equity transactions. He was previously the CEO of Houlihan Lokey Howard & Zukin. In that role, he oversaw all operations, which included advisory services for mid-market companies involved in mergers and acquisitions and corporate restructurings. He previously was Chairman of UBS AG's Warburg Dillon, Read & Co. Inc. unit. Prior to that, he was President and CEO of Dillon, Read & Co. Inc. Hobbs earned his bachelor's degree from Harvard College and master's degree in business administration from Harvard Business School. He serves as a director on the Boards of the Lord Abbett & Company, Molson Coors Brewing Company, and UNICEF.

*Robert T. Blakely* — Director of Ally since May 2009. He currently serves as Chairman of the Audit Committee. Previously, he was a trustee of the Financial Accounting Foundation, the oversight board for the Financial Accounting Standards Board. Blakely is the former executive vice president and chief financial officer of Fannie Mae. In this role, he led the financial restatement and implementation of Sarbanes-Oxley controls. He was previously the chief financial officer of WorldCom/MCI, Lyondell Chemical, Tenneco, and US Synthetic Fuels Corporation where he gained valuable experience dealing with accounting principles and financial reporting rules and regulations, evaluating financial results, and generally overseeing the financial reporting processes of large corporations. Blakely received his PhD from Massachusetts Institute of Technology and his master's and bachelor's degrees from Cornell University.

*Mayree C. Clark* — Director of Ally since May 2009. She currently serves as Chairman and member of the Ally Risk Management and Compliance Committee and the Audit Committee. She serves on the board of the Stanford Management Company, which manages the University's endowment. Clark is the founding partner of Eachwin Capital, an asset management firm that has created an investment strategy which keys off the quality of corporate management for the equity securities in which it invests. Clark is a former partner and member of the executive committee at AEA Holdings. Previously, Clark held a variety of executive positions at Morgan Stanley over a span of nearly 25 years, serving as Global Research Director, Director of Global Private Wealth Management, and deputy to the chairman, president and CEO. Clark began her career as an economic associate in antitrust litigation at National Economic Research Associates, Inc. Clark earned a bachelor's degree from the University of Southern California and a master's degree in business administration from Stanford University Graduate School of Business.

*John D. Durrett* — Director of Ally since February 2011. He currently serves as a member of the Audit Committee and Compliance Committee. He serves as a strategic adviser to Serent Capital, a San Francisco-based private equity firm, and sits on the boards of two of Serent's portfolio companies. Durrett is a director emeritus of McKinsey & Co.,Inc., and completed his 27-year career with the firm in 2007. He served in numerous senior leadership positions during his tenure at McKinsey and also served as a member of the firm's Shareholder's Council and chaired its Finance and Infrastructure Committee. Durrett was also a long-time member of McKinsey's Compensation Committee and the Director's and Principal's Review Committees. Durrett received a bachelor's degree from Millsaps College, a juris doctorate from Emory University and a master's degree in business administration from the Wharton School of the University of Pennsylvania.

Table of Contents

Ally Financial Inc. • Form 10-K

*Stephen A. Feinberg* — Director of Ally since March 2009. He co-founded Cerberus Capital Management in November 1992. Feinberg began his career at Drexel Burnham Lambert where he was actively involved in trading large pools of firm capital. From 1985 to 1992, after leaving Drexel Burnham Lambert, he managed money in separate accounts, most of which was firm capital of Gruntal & Co., Inc. Feinberg has over 25 years of experience in distressed investing, including investments in the financial services industry, and he has served as a control party in connection with investments in numerous financial institutions, including various lending institutions. Feinberg is a 1982 graduate of Princeton University.

*Kim S. Fennebresque* — Director of Ally since May 2009. Fennebresque served as chairman and chief executive officer of Dahlman Rose & Co. and is a senior advisor at Cowen Group, Inc. He also served as its chairman, president, and chief executive officer where he oversaw all aspects of the management and operations of the company. Fennebresque has extensive business experience and has served as an investment banker for over three decades. He has demonstrated leadership capability and has extensive knowledge of the management of a publicly traded company. The depth and breadth of his exposure to areas of compensation, legal, accounting, and regulatory issues make him a skilled advisor. Prior to joining Cowen Group, Fennebresque served as head of the Corporate Finance and Mergers & Acquisitions departments at UBS. He also was a general partner and co-head of Investment Banking at Lazard Frères & Co. and held various positions at The First Boston Corporation. Fennebresque is a graduate of Trinity College and Vanderbilt Law School. He is currently on the boards of TEAK Fellowship, and Fountain House.

*Gerald Greenwald* — Appointed to the Ally board of directors in August 2012. Greenwald is a founder of Greenbriar Equity Group, a private equity firm focused on the global transportation sector. Previously, Greenwald was the chairman and chief executive officer of United Airlines from 1994 to 1999. Greenwald began his career in the automotive industry at Ford Motor Company where he worked in several positions including controller, director of operations in Europe and president of Ford of Venezuela. He later joined Chrysler, where he worked in various positions including corporate controller and chief financial officer before being promoted to vice chairman. Greenwald received a bachelor's degree from Princeton University and a master's degree from Wayne State University. He serves on the boards of Align Aerospace Holdings, Inc., GENCO Distribution System, Inc., Ryan Herco Flow Solutions, Western Peterbilt, Inc. and The Aspen Institute, and Chairman of a RAND Corporation Advisory Council.

*Marjorie Magner* — Director of Ally since May 2010. She also serves on the Audit Committee and Risk and Compliance Committee. Magner is a founding member and partner of Brysam Global Partners, a specialized private equity firm that invests in financial services. Previously, she served as chairman and chief executive officer of the Global Consumer Group at Citigroup. In this position, she was responsible for the company's operations serving consumers through retail banking, credit cards, and consumer finance. She earned a bachelor's degree in psychology from Brooklyn College and a master's degree from Krannert School of Management, Purdue University. Magner also serves on the boards of Accenture Ltd., Gannett Company, Inc., and the Brooklyn College Foundation. She is a member of the dean's advisory council for the Krannert School of Management.

*Henry S. Miller* — Appointed to the Ally board of directors in August 2012. Miller has served as chairman of Marblegate Asset Management, LLC since its formation in 2009. Miller was also co-founder, chairman and managing director of Miller Buckfire & Co., LLC. Prior to founding Miller Buckfire, he was vice chairman and managing director at Dresdner Kleinwort Wasserstein. He also served as managing director and head of both the restructuring and transportation industry group of Salomon Brothers. He also previously held senior leadership roles at Prudential Securities and Lehman Brothers. Miller received his bachelor's degree from Fordham University and a master's degree in business administration from from Columbia Business School. He is a trustee of Save the Children, the Washington Institute for Near East Policy, and Fordham University, as well as a member of the board of directors of AIG and a member of the board of overseers of Columbia Business School.

*John J. Stack* — Director of Ally since April 2010. He also serves on the Audit Committee and Risk and Compliance Committee. Stack served as chairman and chief executive officer of Ceska Sporitelna, a.s., the largest bank in the Czech Republic, from 2000 to 2007. Prior to that, he spent 22 years in retail banking in various roles at Chemical Bank and then later at Chase Bank. Stack began his career in government working in staff roles in the New York City Mayor's Office and then the New York City Courts System. He earned a bachelor's degree from Iona College and a master's degree from Harvard Graduate School of Business Administration. He also serves on the boards of Erste Bank Group and Mutual of America.

*Michael A. Carpenter* — Chief Executive Officer of Ally since November 2009 and a member of the Ally Board of Directors since May 2009. He oversees all Ally strategy and operations to focus on strengthening the core businesses, while positioning the company for long-term growth. Carpenter has broad and deep experience in banking, capital markets, turnarounds, and corporate strategy. Most recently, he founded Southgate Alternative Investments in 2007. From 2002 to 2006, he was chairman and chief executive officer of Citigroup Alternative Investments overseeing $60 billion of proprietary capital and customer funds globally in various alternative investment vehicles. From 1998 to 2002, Carpenter was chairman and chief executive officer of Citigroup's Global Corporate & Investment Bank with responsibility for Salomon Smith Barney Inc. and Citibank's corporate banking activities globally. Carpenter was named chairman and CEO of Salomon Smith Barney in 1998, shortly after the merger that created Citigroup, and led the first ever successful integration of a commercial and investment bank. Prior to Citigroup, he was chairman and CEO of Travelers Life & Annuity and vice chairman of Travelers Group Inc. responsible for strategy and business development. From 1989 to 1994, he was chairman of the board, president, and CEO of Kidder Peabody Group Inc., a wholly owned subsidiary of General Electric Company. From 1986 to 1989, Carpenter was executive vice president of GE Capital Corporation. He first joined GE in 1983 as vice president of Corporate Business Development and Planning and was responsible for strategic planning and development as well as mergers and acquisitions. Earlier in his career, Carpenter spent nine years as vice president and director of the Boston Consulting Group consulting to major companies on corporate strategy and three years with Imperial Chemical Industries of the

211

Table of Contents

Ally Financial Inc. • Form 10-K

United Kingdom. Carpenter received a bachelor of science degree from the University of Nottingham, England, and an MBA from the Harvard Business School where he was a Baker Scholar. He also holds an honorary degree of Doctor of Laws from the University of Nottingham. He serves on the boards of Autobytel Inc., U.S. Retirement Partners and the New York City Investment Fund and has been a board member of the New York Stock Exchange, General Signal, Loews Cineplex, and various other private and public companies.

*Jeffrey J. Brown* — Appointed Senior Executive Vice President of Finance and Corporate Planning in June 2011. In this role, Brown oversees the finance, treasury and corporate strategy activities of the company. Brown joined Ally in March 2009 as corporate treasurer with responsibility for global treasury activities, including funding and balance sheet management. Prior to joining Ally, Brown was the corporate treasurer for Bank of America where he had responsibility for the core treasury functions including funding and managing interest rate risk. Brown was at Bank of America for 10 years, beginning his career in finance and later joining the balance sheet management division. Brown previously served as the bank's deputy treasurer and oversaw balance sheet management and the company's corporate funding division. He was also a member of the company's Asset/Liability Management Committee. He received a bachelor's degree in economics from Clemson University and an executive master's degree in business from Queens University in Charlotte. He serves on the Trevillian Cabinet of the College of Business and Behavioral Sciences at Clemson University and on the advisory board of McColl School of Business at Queen's University in Charlotte.

*James G. Mackey* — Chief Financial Officer of Ally since June 2011, after serving as interim Chief Financial Officer since April 2010. In this role, he is responsible for the oversight of the company's financial analysis, controls and reporting, accounting, business planning, and investor relations. Mackey joined the company in 2009 as group vice president and senior finance executive responsible for financial planning and analysis, investor relations, corporate treasury finance, and banking subsidiary financial departments. Previously, Mackey served as chief financial officer for the corporate investments, corporate treasury, and private equity divisions at Bank of America. Earlier in his tenure at Bank of America, he served as managing director within the global structured products group. Prior to Bank of America, Mackey served in the financial institutions practice group at PricewaterhouseCoopers LLP, specializing in capital markets accounting and consulting. He holds a bachelor's degree in business administration and a master's degree in accounting from the University of North Carolina at Chapel Hill. He is also a registered certified public accountant in North Carolina.

*Barbara A. Yastine* —Chief Executive Officer and President of Ally Bank since May 2012. She also continues as chair of the bank, a position she assumed when she joined Ally in 2010. Yastine is a seasoned executive with diverse experience at financial services companies. Prior to joining Ally, she served as a principal of Southgate Investment Partners, LLC. Before that, she was chief financial officer for Credit Suisse First Boston from 2002 to 2004 and had responsibility for controllership, treasury, risk management, strategy, mergers and acquisitions, and tax. She was with Citigroup and its predecessors for 15 years with her last position being as chief financial officer of Citigroup's global corporate and investment bank. During her time at Citigroup, she also served as chief auditor, chief administrative officer of the global consumer group, and as executive vice president of what is now CitiFinancial. Yastine began her career at Citigroup predecessor Primerica as the head of investor relations. Yastine serves on the boards of directors of Primerica Corporation and privately held Symphony Services Corp., as well as nonprofit Phoenix House. Yastine is a former trustee of the Financial Accounting Foundation. She holds a bachelor's degree in journalism and a master's degree in finance, both from New York University.

*William F. Muir* — President of Ally since 2004, and head of its Global Automotive Services business. He oversees the company's automotive finance, insurance, vehicle remarketing and servicing operations. Muir is also a member of the Ally Bank board of directors. Chairman of Ally Insurance Group since June 1999, and a Member of the Ally Commercial Finance and Ally Bank Boards of Directors since February 2002 and March 2004, respectively. Prior to that time, Muir served as executive vice president and chief financial officer from February 1998 to 2004. From 1996 to 1998, Muir served as executive-in-charge of operations and then executive director of planning at Delphi Automotive Systems, a former subsidiary of GM. Prior to serving at Delphi Automotive Systems, Muir served in various executive capacities with Ally since first joining Ally in 1992. He also served in a number of capacities with GM since joining the company in 1983. Muir received a bachelor's degree in industrial engineering and operations research from Cornell University in 1977. He earned a master's of business administration degree from Harvard University in 1983.

*David J. DeBrunner* — Vice President, Chief Accounting Officer, and Controller of Ally since September 2007. DeBrunner joined Ally from Fifth Third Bancorp (Fifth Third) where he was senior vice president, corporate controller, and chief accounting officer from January 2002 to August 2007. Prior to that position, he served as the chief financial officer for the commercial division of Fifth Third beginning in December 1999. DeBrunner joined Fifth Third in 1992 and held various financial leadership positions throughout the company. Prior to his time at Fifth Third, he held positions at Deloitte and Touche LLP in the Chicago and Cincinnati offices. DeBrunner holds a bachelor's of science in accounting from Indiana University and is a member of the American Institute of Certified Public Accountants and the Ohio Society of Certified Public Accountants.

*Brian Gunn* — Chief Risk Officer of Ally since November 2011. In this role, Gunn has overall responsibility for achieving an appropriate balance between risk and return, mitigating unnecessary risk and protecting the company's financial returns. Gunn joined Ally in 2008 as chief risk officer for the Global Automotive Services business where he was responsible for overseeing disciplined risk processes, governance and analytics in support of Ally's efforts to diversify and grow its automotive product lines. In this role, Gunn established a global automotive risk management framework for all product lines across North America, Latin America, Europe and China. Prior to joining Ally, Gunn served in a number of senior leadership positions with GE Money of Stamford, Conn., most recently as chief risk officer for GE Money Canada. In this role, he was responsible for all areas of risk management and collections across various product lines. Gunn received a master's degree in Banking and Finance from Hofstra University in Hempstead, N.Y., and a bachelor's degree in Finance from Providence College in Providence, R.I.

212

Table of Contents

Ally Financial Inc. • Form 10-K

## Ally Code of Ethics

Ally has published on its website the Ally Code of Conduct and Ethics (the Code) that is applicable to all employees. The Code further includes certain provisions that apply specifically to Ally "financial professionals" (as that term is defined in the Code). The Code has been posted on Ally's internet website at www.ally.com, under "About Ally," and "Policies & Charters." Any amendment to, or waiver from, a provision of the Code that applies to our principal executive officer, principal financial officer, principal accounting officer or controller or persons performing similar functions will be posted at this same internet website location as required by applicable law.

## Certain Corporate Governance Matters

*Election of Directors* — Our current directors were elected pursuant to the terms of the Amended and Restated Governance Agreement dated May 21, 2009 (the Governance Agreement), which we have entered into with certain of our shareholders (see Exhibit 10.2 to our Form 8-K filed on May 22, 2009). Based on the current ownership of our common stock, the Governance Agreement provides that the Ally Board of Directors (Board) is to be comprised of the following: (1) one director designated by affiliates of Cerberus Capital Management, L.P., (2) six directors designated by the U.S. Department of Treasury (Treasury), (3) the chief executive officer of Ally and (4) three independent directors chosen by the members described in (1) through (3) above. Currently, the Board consists of the Cerberus appointed director, the chief executive officer of Ally, six directors appointed by Treasury, and three independent directors.

*Audit Committee* — We have established a separately designated standing Audit Committee. Members currently include Chairman Robert T. Blakely, Mayree C. Clark, John D. Durrett Jr., Marjorie Magner, and John J. Stack. Each member is "independent" as required by Rule 10A-3 of the Exchange Act and under rules of the New York Stock Exchange, and the Board has determined that all members are also qualified as "audit committee financial experts," as defined by the SEC.

*Other Board Committees* — We have also established a Risk and Compliance Committee (Risk Committee) and a Compensation, Nominating, and Governance Committee (CNG Committee). Members of the Risk Committee currently include Mayree C. Clark (Committee Chairwoman), Franklin W. Hobbs, Marjorie Magner, Henry S. Miller, and John J. Stack. Members of the CNG Committee currently include Kim S. Fennebresque (Committee Chairman), Robert T. Blakely, and Franklin W. Hobbs.

*Director Independence* — Our common stock is not registered with the SEC or listed on any stock exchange. As such, we are not required by law to have a majority of our Board consist of independent directors. However, the Governance Agreement provides that, based on the current common stock ownership structure, the Ally Board is to consist of eleven members with three of such members being independent. For this purpose, "independent" is determined in accordance with the rules and regulations promulgated by the SEC and the New York Stock Exchange, each as in effect from time to time. Independent directors are appointed by a majority vote of Treasury Designated Managers, the Cerberus Designated Managers, and the Management Designated Managers (as those terms are defined in the Governance Agreement) which majority must include at least one designee of Treasury. The Board has independently and affirmatively determined that all Board members, except for Mr. Carpenter, meet all the requirements for independence. Pursuant to Ally's Bylaws, any Board member that qualifies as "independent" under the applicable standards may perform any independent director function (e.g., serve on an audit committee of the Board). Members of the Ally Audit Committee include Chairman Robert T. Blakely, Mayree C. Clark, John D. Durrett Jr., Marjorie Magner, and John J. Stack. New York Stock Exchange rules require members of our audit committee to meet the SEC's definition of "independence" as provided by Rule 10A-3 of the Exchange Act. The Ally Board has determined that each member of our audit committee meets this independence requirement.

213

Table of Contents

Ally Financial Inc. • Form 10-K

## Item 11.    Executive Compensation
## Corporate Governance and Related Disclosures
### The Compensation, Nominating and Governance Committee

The Ally Compensation, Nominating and Governance Committee (the Committee) is a committee of the Ally Board of Directors (Board) consisting of three non-employee independent directors, including Kim S. Fennebresque (Committee Chairman), Robert T. Blakely, and Franklin W. Hobbs.

The Committee, pursuant to its Charter, is, among other things, responsible for the following:

- Discharging the Board's responsibilities with respect to the establishment, maintenance and administration of Ally's compensation plans, including determining the total compensation of the Chief Executive Officer and executive officers plus other senior executives designated by the Committee as under its purview;

- Overseeing Ally's leadership development and succession planning programs;

- Identifying qualified individuals for membership on the Board (consistent with criteria approved by the Board) and to recommend to the Board the director nominees;

- Reviewing and recommending to the Board the director compensation for service on the Board;

- Leading the Board and its committees in their annual self-evaluation and the annual review of the Board's performance;

- Developing and recommending to the Board a corporate governance policy for the Board, and overseeing Ally's corporate governance procedures and practices related to the Board; and

- Performing any and all duties required of it under applicable laws, rules, regulations, regulatory guidance, or other legal authority.

### Compensation, Nominating and Governance Committee Process

Ally's executive compensation programs are administered by the Committee. During 2012, the Committee met 14 times.

The Committee determines the compensation of senior executives under its purview, including the compensation of our named executive officers (NEOs, who are also our Senior Executive Officers (SEOs) for purposes of the Troubled Asset Relief Program (TARP) requirements). In making its determination for senior executives other than the Chief Executive Officer (CEO) and Residential Capital, LLC (ResCap) executives, and in making changes to our executive compensation program, the Committee considers the recommendations of the CEO. The Committee determines the compensation of the CEO without recommendations from the CEO or other management. The Committee considers the recommendations of the ResCap Board of Directors and the ResCap CEO in making changes to compensation for ResCap executives under its purview. The Committee has delegated to the CEO the authority to determine cash and equity compensation for executives other than for the approximately 25 highest-compensated employees (Top 25), ResCap executives, and other select senior executives as determined by the Committee. The Committee also meets periodically in executive session without the presence of any members of management. The Committee seeks the input of Ally's Risk Management functions, and in its deliberations on compensation related issues it also consults with the chairperson of the Board's Risk and Compliance Committee and Audit Committee.

Frederic W. Cook & Co. (Cook) served as an independent advisor during 2012. Cook reports directly to the Committee and provides ongoing advice with respect to the plans and programs covering the executives, including our NEOs and non-employee directors, for which the Committee is responsible. Cook reviews all materials developed by management in advance of Committee meetings, provides advice and recommendations concerning changes to our plans and programs, as well as information on market practices and trends, and attends meetings of the Committee. Cook undertakes no separate work for Ally.

Ally management engaged Pearl Meyer & Partners (Pearl Meyer) to provide consulting assistance on matters pertaining to executive compensation, including a competitive assessment of the compensation paid to Ally's CEO, a price differential analysis for purposes of assisting in the Company's valuation to determine restricted stock unit awards, an analysis of total direct compensation for top executives and an updated competitive assessment of the compensation for Ally's 25 highest-compensated executives requested by the Special Master for TARP related to executive compensation (the Special Master). Ally management also engaged McLagan Partners (McLagan), an Aon Hewitt Company, to provide consulting assistance on certain matters pertaining to executive compensation, including compensation benchmarking.

### Compensation, Nominating and Governance Committee Report

The Committee has reviewed and discussed with Ally management the Compensation Discussion and Analysis and, based on that discussion, recommended it to the Ally Board of Directors for inclusion in this Form 10-K.

The Committee, with the assistance of Ally's Risk Management and Human Resource functions, conducts assessments of the risks associated with Ally's compensation policies and practices every six months as required by TARP. To complete such assessments, in 2012 the Committee followed a process that consisted of the following: (1) ranking plans in a tiered system based on each plan's potential to encourage risk taking as determined by the size of the potential payout and the nature of the activities engaged in by participants; (2) identifying risk

214

Table of Contents

Ally Financial Inc. • Form 10-K

mitigators built into each plan such as caps, clawback features, and mandatory deferrals; and (3) implementing as necessary additional risk mitigators or controls in plans.

Based on the risk assessments conducted during 2012, the Committee concluded that (1) the SEO compensation programs do not encourage excessive and unnecessary risk taking that could threaten the value of Ally; (2) other employee compensation plans do not encourage unnecessary or excessive risk taking that could threaten the value of the Company, or reward short-term results to the detriment of long-term value creation; and (3) Ally's compensation programs do not encourage the manipulation of reported earnings.

The Committee, with the assistance of the Company's senior risk officers, will continue to assess the risks associated with Ally's compensation plans every six months and take necessary steps to identify and eliminate any features that may unnecessarily expose Ally to risks or encourage manipulation of reported earnings.

The Compensation, Nominating and Governance Committee certifies that:

- It has reviewed with senior risk officers the SEO compensation plans and has identified and limited features to ensure that these plans do not encourage SEOs to take unnecessary and excessive risks that threaten the value of Ally.

- It has reviewed with senior risk officers the employee compensation plans and has identified and limited features as it deemed necessary to ensure that Ally is not exposed to unnecessary risks.

- It has reviewed the employee compensation plans to eliminate any features in these plans that would encourage the manipulation of reported earnings of Ally to enhance the compensation of any employee.

THE COMPENSATION, NOMINATING AND GOVERNANCE COMMITTEE

Kim S. Fennebresque (Committee Chairman)

Robert T. Blakely

Franklin W. Hobbs

## Executive Compensation Discussion and Analysis

### Introduction

For the full year 2012, Ally reported net income of $1.2 billion. Ally's industry-leading U.S. automotive finance franchise remained well-positioned, despite significant competition. Ally grew U.S. net financing revenue 39 percent from the prior year, and also showed significant growth in U.S. automotive earning assets, increasing 18 percent year-over-year, and the Ally Bank franchise continued to build its deposit base and maintained strong customer loyalty with a unique consumer value proposition. Ally made significant strides in the fourth quarter on its key strategic actions aimed at strengthening the company's longer term financial profile and accelerating repayment of the U.S. Department of Treasury's investment.

### Executive Compensation Limitations

In connection with our participation in TARP, certain determinations of the Office of the Special Master for TARP Executive Compensation (Special Master), and other laws and regulations, Ally is subject to certain limitations on executive compensation, the most significant of which are:

- Cash salaries are limited based on the determination of the Special Master;

- The majority of an SEO's compensation paid in equity that must be held long-term;

- Any incentive compensation granted must be in the form of long-term restricted equity that is contingent on performance and paid out after incremental TARP repayments;

- Perquisites and "other" compensation capped at $25,000, with limited exceptions;

- Suspension of the accrual of benefits to supplemental executive retirement plans;

- Prohibition on incentives for SEOs that could cause them to take unnecessary or excessive risks;

- Clawback of any bonus or incentive compensation paid to an SEO based on statements of earnings, revenues, gains, or other performance criteria that are later found to be materially inaccurate, is based on erroneous data that resulted in an accounting restatement due to material noncompliance with any financial reporting requirement under the securities laws within the three years prior to payment, or is found to require repayment under the provisions of any other Federal law or regulation that may govern the Company's executive compensation; and

- Prohibition on any severance payable to the SEOs and the next five most highly compensated employees.

Table of Contents

Ally Financial Inc. • Form 10-K

**Ally Compensation Program Overview and Philosophy**

Working within the limitations imposed on our executive compensation by TARP, Ally's compensation philosophy has been, and continues to be, that there should be a strong linkage between compensation and performance. We believe compensation should:

• Align with long-term value creation for our shareholders;

• Provide appropriate incentives based on individual, business, and Company performance;

• Encourage prudent, but not excessive risk taking;

• Provide a total compensation opportunity competitive with market practice; and

• Be internally equitable for the relative value of the employee's position at Ally.

In addition, our compensation plans are intended to achieve performance enabling us to complete the repayment to the U.S. taxpayers as quickly as practicable.

Ally supports the compensation principles underlying the TARP compensation rules, and we believe our compensation philosophy is consistent with the TARP compensation principles. The Special Master has required that the majority of compensation for NEOs and the next 20 highest-compensated employees be in the form of long-term stock or stock units, that such stock or stock units should be held for specified minimum periods of time, and that any incentive payments should be subject to recoupment if paid based on information that is subsequently found to be materially inaccurate. The Company and the Committee fully support and have implemented these principles for our NEOs and the next 20 highest-compensated employees.

Refer to the *Long-term Equity-based Incentives* section for a discussion of the long-term stock awards that are granted to our NEOs.

**The Pay Process for 2012**

For 2012, the total compensation opportunity for the NEOs was determined by the Special Master, following review and approval of recommended total direct compensation levels for each of the NEOs by the Committee.

On May 14, 2012, our indirect mortgage subsidiary Residential Capital, LLC (ResCap), and certain of its wholly owned direct and indirect subsidiaries, filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (Bankruptcy Court). Further, and also on May 14, 2012, we announced that we were launching a process to explore strategic alternatives with respect to our international operations. The Committee determined that the existing compensation structures in place for Ally did not adequately address issues raised by these developments. As a result, the Committee sought and obtained the Special Master's approval of certain modifications to the compensation structures for the NEOs and other senior executives of the company. The purpose of the modifications was to better ensure that existing senior management was retained and remained fully focused on implementing the announced steps as well as operating the ongoing businesses.

Effective with the bankruptcy filing of Residential Capital, LLC, compensation for all employees of Residential Capital, LLC, including Thomas Marano, were under the purview of the Bankruptcy Court and not directly determined by Ally. Following the bankruptcy filing, Ally and ResCap reached an agreement, memorialized by a Bankruptcy Court order, that clarified that Ally was financially responsible for compensation issued to ResCap employees prior to May 14, 2012, and ResCap was financially responsible for compensation issued to ResCap employees on or after May 14, 2012. Additionally, following the bankruptcy filing, at the request of the ResCap Board of Directors, the Committee sought and obtained the Special Master's approval of a modified compensation structure for Mr. Marano and other employees of ResCap whose compensation was restricted by TARP. The Special Master's Supplemental Determination Letter of November 30, 2012, provides that no compensation awarded after May 14, 2012 to covered employees of ResCap should be in the form of Ally equity and all that such compensation should be awarded in either cash or deferred cash. These modifications were also disclosed, as required, to the Bankruptcy Court. All compensation paid to employees of ResCap after the deconsolidation of ResCap following the bankruptcy filing on May 14, 2012, including Thomas Marano, is the responsibility of ResCap, and was therefore not reflected as compensation expense by Ally in its financial statements for 2012.

**Assessing Ally Compensation Competitiveness**

We compare our total direct compensation against a peer group of other comparably sized financial services companies with whom we compete for business and senior executive talent. We use publicly available reported pay data from a peer group of companies approved by the Committee to conduct the competitive assessment for the CEO and principal financial officer positions. For the other NEO and senior executive positions, we use market survey data from several survey sources to conduct the competitive assessments. Wherever practical, the market surveys include companies that are part of the peer group approved by the Committee.

216

Table of Contents

Ally Financial Inc. • Form 10-K

During 2011, the Committee approved revisions to the peer group to increase the focus on bank holding companies. No changes were made to the peer group during 2012, which consists of the ten financial services companies listed below:

| | | |
|---|---|---|
| • BB&T | • KeyCorp | • U.S. Bancorp |
| • Capital One Financial | • PNC Financial | • Wells Fargo |
| • Discover | • Regions Financial | |
| • Fifth Third Bancorp | • SunTrust Banks | |

For 2012, survey data used for the remaining NEOs and other senior executives came from one or more survey sources, including the Hewitt Total Compensation Measurement™ (TCM™) database, Towers Watson Executive Financial Services survey, McLagan Investment Management survey, and McLagan Fixed Income Sales and Trading survey. Because multiple survey sources are used and not all survey participants provide data for each of the remaining NEOs, it is not possible to list the survey participants included in our competitive data analyzed for positions other than the CEO and the principal financial officer.

For executives below the Top 25 whose pay is not determined by the Special Master, our compensation philosophy is to set base salaries and employee benefits at median competitive levels and to set annual incentive compensation to deliver total annual cash and equity compensation up to or exceeding the 75th percentile when warranted by achievement of aggressive performance goals and top quartile competitive performance. If annual performance goals are not achieved, annual incentive compensation is reduced or eliminated, and total annual cash and equity compensation falls to below the market median. The size of long-term equity-based incentive awards relative to total compensation is set annually to ensure senior management maintains an appropriate level of long-term balance in their total compensation and to achieve individual differentiation of total compensation based on performance considerations and retention needs.

Due to the pay restrictions applicable to the NEOs under TARP, including limitations on incentive compensation, total direct compensation rather than individual elements of pay (i.e., base salary, annual incentives, and long-term incentives) is set to be competitive.

The Committee sets proposed total direct compensation levels for each of the NEOs based on his or her job responsibilities. Once the Committee determines and approves the proposed compensation packages for the NEOs, they are submitted to the Special Master for approval. The Special Master then reviews the proposed packages to determine if they are aligned with TARP requirements and set at appropriate market levels. The Special Master subsequently issues a Determination Letter, specifying the final design and allocation of total pay approved for the NEOs. At the end of the year, the Committee reviews the performance of the NEOs relative to their individual goals and objectives. For 2012, there was no incentive compensation (i.e., the long-term incentive restricted stock units (IRSUs)) eligible to be awarded to any NEO under the Supplemental Determination Letters issued by the Special Master.

### Role of Management in Compensation Decisions

Compensation recommendations for the NEOs other than the CEO and Thomas Marano are presented to and discussed with the Committee by the CEO. The Committee then determines and approves the proposed compensation for the NEOs, which is submitted to the Special Master for final approval.

The Committee determines and approves the compensation of the CEO without the recommendation of management. The Committee exercises its responsibilities with respect to the determination of the compensation of Thomas Marano based on the recommendation of the ResCap Board of Directors and, subsequent to May 14, 2012, upon Bankruptcy Court approval.

### Components of Ally Compensation Program

Due to the TARP restrictions on cash compensation and limitations on incentive compensation, base salary is delivered in a combination of cash and equity. All NEOs were ineligible to receive any incentives for 2012. We also offer limited perquisites and other benefits in order to enhance the effectiveness of our NEOs in focusing their time and energy on performing their duties and responsibilities and to enable us to offer a competitive compensation package to attract and retain senior executive talent.

### *Base Salary*

Under our compensation philosophy, base salary is intended to provide a predictable level of compensation that is competitive in the marketplace for the position responsibilities and individual skills, knowledge, and experience of each executive. However, the pay restrictions under TARP significantly limit the form and amount of base salary paid in 2012. As a result, a significant portion of total direct compensation is delivered in the form of equity-based salary for alignment with shareholders' interests.

217

Table of Contents

Ally Financial Inc. • Form 10-K

The following table shows base salaries paid to the NEOs in 2012.

| NEO | 2012 Base salary | | | |
| | Cash ($) | Deferred Cash ($) (a) | Equity (Deferred stock units) ($) | Total ($) |
| --- | --- | --- | --- | --- |
| Michael A. Carpenter | — | — | 9,500,000 | 9,500,000 |
| Jeffrey J. Brown | 600,000 | — | 3,797,892 | 4,397,892 |
| Barbara Yastine | 600,000 | — | 4,587,357 | 5,187,357 |
| William Muir | 600,000 | — | 3,400,000 | 4,000,000 |
| James G. Mackey | 550,000 | — | 2,450,000 | 3,000,000 |
| Thomas Marano | 600,000 | 5,582,052 | 1,821,397 | 8,003,449 |

(a)    Deferred cash awarded to Mr. Marano was granted after May 14, 2012 in lieu of DSUs pursuant to the request of the ResCap Board of Directors and the Special Master's November 30, 2012 Supplemental Determination Letter.

Equity salary is delivered in the form of deferred stock units (DSUs), which are immediately vested, but are subject to restrictions on the timing of payout. Except for the CEO, DSUs and deferred cash earned in 2012 will be payable in three equal installments: the first on the final payroll date of 2012, the second ratably over 2013 and the third ratably over 2014. DSUs earned by the CEO in 2012 are payable only in three equal, annual installments beginning on the first anniversary of grant.

### Annual Cash Incentives

All NEOs were ineligible to receive annual cash incentives in 2012 due to restrictions under TARP and will continue to be ineligible for as long as the TARP restrictions are in place.

### Long-term Equity-based Incentives

Prior to 2012, we provided long-term equity-based incentives in the form of IRSUs to have an incentive compensation component in the total direct compensation opportunity for our NEOs, and to provide retention and alignment with shareholder interests. Due to the restrictions under TARP, grants of long-term IRSUs are the only incentive compensation permitted for the NEOs and the next 20 highest-compensated employees.

NEOs and the balance of the Top 25 were not eligible for IRSUs in 2012. The long-term IRSU awards granted prior to 2012 to the Top 25 vest after two years from the day they are granted. The long-term IRSU award granted to our CEO in 2011 vests two-thirds after two years from the date they were granted and in full three years from the date they were granted. Earlier IRSU awards made to our CEO vest three years from the date they were granted. After the vesting requirement is met, the NEOs will receive payouts as the Company repays its TARP obligations. Payouts will be made in 25% increments based on the percentage of TARP obligations that have been repaid, as determined in accordance with the established guidelines for determining "repayment". As of December 31, 2012, Ally had repaid more than 25%, but less than 50%, of its TARP obligations, as determined in accordance with the established guidelines. Therefore, 25% of IRSUs granted will be immediately payable to recipients upon the vesting date(s).

### Special Master's 2012 Supplemental Determination Letters and Modified Compensation Structures

On May 14, 2012, our indirect mortgage subsidiary Residential Capital, LLC, and certain of its wholly owned direct and indirect subsidiaries, filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York. Further, and also on May 14, 2012, we announced that we were launching a process to explore strategic alternatives with respect to our international operations. The Committee determined that the existing compensation structures in place for Ally did not adequately address issues raised by these developments. As a result, the Committee sought and obtained the Special Master's approval of certain modifications to the compensation structures for the NEOs and other senior executives of the company. The purpose of the modifications was to better ensure that existing senior management was retained and remained fully focused on implementing the announced steps as well as operating the ongoing businesses.

The modifications to the compensation structures for the NEOs and other senior executives, which were approved by the Special Master in 2012 and then adopted by the Committee, specified as follows:

• No increase in total direct compensation for any Top 25 employee.

• No increase in cash salary for any Top 25 employee.

• The portion of each Top 25 employee's total direct compensation for 2012 that would have been payable in the form of long-term IRSUs would instead be paid in additional salary in the form of DSUs. As a result, no incentive compensation of any kind would be payable for 2012 for any Top 25 employee.

• Except for the CEO, DSUs earned in 2012 will be payable in three equal installments: the first on the final payroll date of 2012, the second ratably over 2013 and the third ratably over 2014. DSUs earned by the CEO in 2012 are payable only in three equal, annual installments beginning on the first anniversary of grant.

218

Table of Contents

Ally Financial Inc. • Form 10-K

- Except for the CEO, DSUs earned in 2009 and 2010 and not yet paid will be payable in equal installments over the period ending on the third anniversary of the grant.

- Except for the CEO, long-term IRSUs previously awarded for prior services will vest after two years of service. Even if vested, as required by the Interim Final Rule, all IRSU awards may be paid only in 25% installments as Ally repays its TARP obligations in 25% increments, and will otherwise be forfeited.

### *Benefits and Perquisites*

We provide our NEOs with health and welfare benefits under the broad-based program generally available to all of our employees. This allows them to receive certain benefits that are not readily available to individuals except through an employer and to receive certain benefits on a pretax basis. Our benefit program includes the Ally Retirement Savings Plan. We provide the savings plan in lieu of higher current cash compensation to ensure that employees have a source of retirement income and because these plans enjoy more favorable tax treatment than current compensation. Under this plan, employee contributions of up to 6% of salary were matched 100% by Ally. The plan also provided a 2% nonmatching contribution on both salary and annual cash incentives, which fully vests after being employed for three years, and a 2% nonmatching discretionary contribution on salary in light of the Company's 2012 performance.

Ally suspended nonqualified contributions to its Retirement Savings Plan in 2009 and did not make any additional nonqualified contributions in 2012. Therefore, employer contributions for 2012 were made only under the qualified portion of the plan only which limits contributions to pay up to $250,000.

In addition to broad-based benefits, the NEOs are provided with limited supplemental benefits and perquisites to remain competitive in attracting and retaining executive talent. For 2012, in accordance with the TARP restrictions, the total value of these perquisites and supplemental benefits was capped at $25,000.

### Long-term Compensation Structure

Based on the compensation structure for 2012, long-term equity-based compensation, represented by DSUs, comprises a significant portion of each NEOs total compensation. The long-term equity-based portion of total compensation for each NEO and its associated percentage of total compensation for 2012 are as follows.

| Name | Total compensation ($) | Long-term equity-based compensation | |
| --- | --- | --- | --- |
| | | Dollar amount awarded ($) | Percent of total compensation (%) |
| Michael A. Carpenter | 9,557,119 | 9,500,000 | 99.4% |
| Jeffrey J. Brown | 4,428,059 | 3,797,892 | 85.8% |
| Barbara Yastine | 5,215,956 | 4,587,357 | 88.0% |
| William Muir | 4,031,723 | 3,400,000 | 84.3% |
| James G. Mackey | 3,030,904 | 2,450,000 | 80.8% |
| Thomas Marano | 8,030,548 | 1,821,397 | 22.7% |

### Employment Agreements and Severance

Ally currently has no employment agreement with any of the NEOs.

As a condition to participating in TARP, Ally's NEOs and the next five most highly compensated employees are not eligible for any severance in the event of termination of employment. These restrictions apply until Ally repays its TARP obligations.

### Clawback Provisions

In connection with the risk assessment Ally conducted in 2012, the Company has reviewed all of its incentive compensation programs to ensure they include language allowing the Company to recoup incentive payments made to recipients in the event those payments were based on financial statements that are later found to be materially inaccurate. Incentive plans that did not include such language were revised to allow for incentive payments to be recovered. A recipient who fails to promptly repay Ally under such circumstances is subject to termination of employment.

Table of Contents

Ally Financial Inc. • Form 10-K

## Summary Compensation Table

The following table shows compensation for any person serving as principal executive officer or principal financial officer during 2012, as well as Ally's next three most highly compensated executive officers.

| Name and principal position | Year | Salary ($) (a) (b) | Stock awards ($) (c) (d) (e) | All other compensation ($) (f) | Total ($) |
|---|---|---|---|---|---|
| Michael A. Carpenter | 2012 | — | 9,500,000 | 57,119 | 9,557,119 |
| Chief Executive Officer | 2011 | — | 9,500,000 | 43,077 | 9,543,077 |
| | 2010 | 186,346 | 9,708,750 | 29,958 | 9,925,054 |
| Jeffrey J. Brown | 2012 | 600,000 | 3,797,892 | 30,167 | 4,428,059 |
| Senior Executive Vice President of Finance and Corporate | 2011 | 600,000 | 3,743,678 | 29,609 | 4,373,287 |
| Planning | 2010 | 500,000 | 3,750,000 | 38,908 | 4,288,908 |
| Barbara Yastine | 2012 | 600,000 | 4,587,357 | 28,599 | 5,215,956 |
| Chief Executive Officer and President, Ally Bank | 2011 | 600,000 | 4,587,357 | 27,950 | 5,215,307 |
| William Muir | 2012 | 600,000 | 3,400,000 | 31,723 | 4,031,723 |
| President | 2011 | 509,000 | 3,147,280 | 30,595 | 3,686,875 |
| James G. Mackey | 2012 | 550,000 | 2,450,000 | 30,904 | 3,030,904 |
| Chief Financial Officer | 2011 | 550,000 | 2,305,738 | 29,653 | 2,885,391 |
| | 2010 | 475,068 | 1,922,951 | 21,604 | 2,419,623 |
| Thomas Marano | 2012 | 6,182,052 | 1,821,397 | 27,099 | 8,030,548 |
| Chief Executive Officer, ResCap | 2011 | 600,000 | 7,403,449 | 31,450 | 8,034,899 |
| | 2010 | 500,000 | 6,906,250 | 26,785 | 7,433,035 |

(a)  The amounts shown as salary represent the cash portion of base salary and do not include the DSU award values that are part of the executive's base salary and are shown as stock awards in this table. Amounts for Mr. Marano for 2012 include $5,582,052 deferred cash paid in lieu of DSUs granted after May 14, 2012 pursuant to the request of the ResCap Board of Directors, the Special Master's November 30, 2012 Supplemental Determination Letter, and disclosure to the Bankruptcy Court. Deferred cash is payable in three equal installments: the first on the final payroll date of 2012, the second ratably over 2013 and the third ratably over 2014. At the request of the ResCap Board of Directors, effective January 1, 2013, the annual salary to be paid to Mr. Marano was reduced to $2,000,000 per year. Of this amount, $600,000 will be paid in cash and the balance will be paid in deferred cash, subject to the approval of the Special Master. Mr. Marano also served as Chief Capital Markets Officer through May 14, 2012.

(b)  For 2010, represents the amount of Mr. Carpenter's compensation that was paid in cash prior to March 23, 2010, when his compensation structure changed to be fully based on long-term equity of the Company. The 2012 total represents the grant date fair value of the Ally DSU awards granted in 2012 and is not necessarily the cash payment received. The amounts for each NEO for 2012 are displayed in the following table. For Mr. Marano, Stock Awards for 2012 of $1,821,397 were granted prior to May 14, 2012. Amounts granted after May 14, 2012 were granted as deferred cash as explained in footnote (a) above. For further information related to compensation paid to ResCap employees, including Mr. Marano, refer to *The Pay Process for 2012*.

| Name | DSU ($) | IRSU ($) | Total ($) |
|---|---|---|---|
| Michael A. Carpenter | 9,500,000 | — | 9,500,000 |
| Jeffrey J. Brown | 3,797,892 | | 3,797,892 |
| Barbara Yastine | 4,587,357 | — | 4,587,357 |
| William Muir | 3,400,000 | | 3,400,000 |
| James G. Mackey | 2,450,000 | | 2,450,000 |
| Thomas Marano | 1,821,397 | — | 1,821,397 |

(d)  The 2011 total represents the grant date fair value of the Ally DSU and IRSU awards granted in 2011 and is not necessarily the cash payment received. The amounts for each NEO for 2011 are displayed in the following table.

| Name | DSU ($) | IRSU ($) | Total ($) |
|---|---|---|---|
| Michael A. Carpenter | 8,000,000 | 1,500,000 | 9,500,000 |
| Jeffrey J. Brown | 2,350,000 | 1,393,678 | 3,743,678 |
| Barbara Yastine | 2,858,238 | 1,729,119 | 4,587,357 |
| William Muir | 1,931,520 | 1,215,760 | 3,147,280 |
| James G. Mackey | 1,353,825 | 951,913 | 2,305,738 |
| Thomas Marano | 4,735,633 | 2,667,816 | 7,403,449 |

(e)  The 2010 total represents the grant date fair value of the Ally DSU and IRSU awards granted in 2010 and is not necessarily the cash payment received. The amount for Mr. Carpenter includes $395,096 of IRSU awards that were granted in January 2010 for performance in 2009, as per the SEC rules. The amounts for each NEO for 2010 are displayed in the following table.

| Name | DSU ($) | IRSU ($) | Total ($) |
|---|---|---|---|
| Michael Carpenter | 7,813,654 | 1,895,096 | 9,708,750 |
| Jeffrey J. Brown | 2,350,000 | 1,400,000 | 3,750,000 |
| James G. Mackey | 1,119,964 | 802,987 | 1,922,951 |
| Thomas Marano | 4,437,500 | 2,468,750 | 6,906,250 |

(f)  Refer to the *All Other Compensation in 2012* section for further details.

Ally Financial Inc. • Form 10-K

**All Other Compensation in 2012**

| | Michael A. Carpenter | Jeffrey J. Brown | Barbara Yastine | William Muir | James G. Mackey | Thomas Marano |
|---|---|---|---|---|---|---|
| Financial counseling (a) | $ 3,500 | $ 3,500 | $ — | $ — | $ 3,439 | $ 3,500 |
| Liability insurance (b) | 425 | 425 | 425 | 825 | 425 | 425 |
| Wellness credit (c) | — | — | — | — | 150 | — |
| Total perquisites | 3,925 | 3,925 | 425 | 825 | 4,014 | 3,925 |
| Life insurance (d) | 28,194 | 1,242 | 3,174 | 5,898 | 1,890 | 3,174 |
| 401(k) matching contribution (e) | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 20,000 |
| Total all other compensation | $ 57,119 | $ 30,167 | $ 28,599 | $ 31,723 | $ 30,904 | $ 27,099 |

(a)    We provide a taxable allowance to certain senior executives for financial counseling and estate planning services with one of several approved providers. The NEOs are provided an enhanced financial and estate planning service. Costs associated with this benefit are reflected in the table above, based on the actual charge for the services received. Any taxes assessed on the imputed income for the value of this service are the responsibility of the executive.

(b)    Represents the total cost of liability insurance for 2012.

(c)    Represents a $150 wellness credit for participating in and completing various wellness initiatives as part of a company-wide wellness program.

(d)    Represents the total cost of life insurance for 2012.

(e)    Represents the employer contribution, Company match contribution, and discretionary contribution made to the employees' 401(k) fund.

**Grants of Plan-based Awards in 2012 — Estimated Future Payments under Equity Incentive Plan Awards**

The following table represents Ally DSU awards, which are stated in phantom shares.

| Name | Awards made: January 1, 2012 - May 31, 2012 (a) | Awards made: June 1, 2012 - December 31, 2012 (a) | Total 2012 ($) (a) |
|---|---|---|---|
| Michael A. Carpenter | 463.3 | 609.0 | 9,500,000 |
| Jeffrey J. Brown | 114.6 | 311.5 | 3,797,892 |
| Barbara Yastine | 139.4 | 375.3 | 4,587,357 |
| William Muir | 101.0 | 280.4 | 3,400,000 |
| James G. Mackey | 70.7 | 204.1 | 2,450,000 |
| Thomas Marano | 210.7 | — | 1,821,397 |

(a)    For all NEOs, DSU awards were granted ratably during the respective periods.

| Name | Award | All other stock awards: number of shares or unit of stock (b) (c) | Grant date fair value of stock or unit awards ($)(d) |
|---|---|---|---|
| Michael A. Carpenter | DSU | 1,072.3 | 9,500,000 |
| Jeffrey J. Brown | DSU | 426.1 | 3,797,892 |
| Barbara Yastine | DSU | 514.7 | 4,587,357 |
| William Muir | DSU | 381.4 | 3,400,000 |
| James G. Mackey | DSU | 274.8 | 2,450,000 |
| Thomas Marano | DSU | 210.7 | 1,821,397 |

(b)    For Mr. Marano, all 210.7 shares were granted prior to May 14, 2012. Amounts exclude deferred cash granted in lieu of DSUs after May 14, 2012 pursuant to the request of the ResCap Board of Directors, the Special Master's November 30, 2012 Supplemental Determination Letter, and disclosure to the Bankruptcy Court.

(c)    The award grants are expressed as phantom shares of Ally.

(d)    The grant date fair value amounts shown do not reflect realized cash compensation by the NEOs, which is described in the Stock Awards Vested Table for the awards. The value shown represents the computed fair value at the date of grant of each award, which was $8,500 per share for each award from January 1, 2012 through March 31, 2012. The grant date fair value for awards granted between April 1, 2012 through December 31, 2012 was $9,000 per share. For a further discussion of the valuation of equity awards, see footnote (a) in the *Outstanding Equity Awards at 2012 Fiscal Year End - Stock Awards* section below and Note 24 to our Consolidated Financial Statements.

221

Table of Contents

Ally Financial Inc. • Form 10-K

## Outstanding Equity Awards at 2012 Fiscal Year End — Stock Awards

The following table provides information for the named executive officers regarding the Ally IRSU awards outstanding at December 31, 2012.

| Name | Grant date | Number of shares or units of stock that have not vested (#) (a) (b) | Market value of shares or units of stock that have not vested ($) (a) |
|---|---|---|---|
| Michael A. Carpenter | 1/28/2010 | 50.6 | 455,151 |
| | 12/16/2010 | 192.0 | 1,728,001 |
| | 12/19/2012 | 187.5 | 1,687,500 |
| Jeffrey J. Brown | 12/19/2011 | 174.2 | 1,567,888 |
| Barbara Yastine | 12/19/2011 | 216.1 | 1,945,259 |
| William Muir | 12/19/2011 | 152.0 | 1,367,730 |
| James G. Mackey | 12/19/2011 | 119.0 | 1,070,903 |
| Thomas Marano | 12/19/2011 | 333.5 | 3,001,293 |

(a)  Amounts shown represent Ally IRSU awards granted to named executives that have not vested. Each award represents one phantom share of Ally. The fair market value for the phantom shares is determined by the Board at least annually, as required by the Ally Financial Long-Term Equity Compensation Incentive Plan. The fair market value for each phantom share at December 31, 2012 was determined to be $9,000. During 2012, Sandler O'Neill & Partners, L.P. (Sandler O'Neill), an independent investment banking firm, was engaged to provide certain valuation analyses and to prepare an annual report regarding the fair market value of the Company's common equity securities, and to provide other services related thereto. The valuation measures as of March 31, 2012 and December 31, 2012 were determined based on the analyses provided by Sandler O'Neill.

(b)  Vesting terms of IRSUs granted to NEOs (with the exception of Mr. Carpenter) were modified in 2012 as a result of the Special Master's Supplemental Determination Letter dated June 8, 2012. For these NEOs, 2011 awards will vest after two years of service. Even if vested, as required by the Interim Final Rule, IRSU awards may be paid only in 25% installments as Ally repays its TARP obligations in 25% increments, and will otherwise be forfeited. No modifications were made to Mr. Carpenter's awards. Mr. Carpenter's grants vest as follows: grant dated January 28, 2010 vests January 28, 2013, grant dated December 16, 2010 vests December 16, 2013 and grant dated December 19, 2011 vests December 19, 2014.

## Options Exercised and Shares Vested in 2012

During 2012, no stock options were held by the named executive officers.

The following table reflects the Ally IRSU and RSU awards that vested in 2012. A substantial portion of the value cannot be paid until Ally further repays its TARP obligations.

| Name | Number of shares acquired on vesting (#) (a) (b) | Value realized on vesting ($) (b) (c) |
|---|---|---|
| Michael A. Carpenter | — | — |
| Jeffrey J. Brown | 336.8 | 3,030,934 |
| Barbara Yastine | 64.0 | 576,000 |
| William Muir | 281.4 | 2,532,831 |
| James G. Mackey | 172.9 | 1,526,579 |
| Thomas Marano | 559.0 | 5,030,628 |

(a)  Amounts shown represent the 2012 vesting of the continued service portion of Mr. Brown's, Mr. Muir's, Mr. Mackey's and Mr. Marano's 2009 IRSU grants and 2010 IRSU grants. Also for Mr. Muir, the amount shown represents the 2008 RSU which vested and paid December 31, 2012. Ms. Yastine's amount shown represents the 2012 vesting of the continued service portion of her 2010 IRSU. The 2009 IRSU and 2010 IRSU vesting was modified in 2012 as a result of the Special Master Supplemental letter dated June 8, 2012. Except for Mr. Carpenter, these awards vested after two years of service from the grant date. Even if vested, as required by the Interim Final Rule, these awards may be paid only in 25% installments as Ally repays its TARP obligations in 25% increments, and will otherwise be forfeited.

(b)  Mr. Muir's final tranche of his 2008 RSU award vested and paid on December 31, 2012.

(c)  The value realized for the vested shares is their fair market value as determined at least annually by the Board, as required by the Ally Long-Term Equity Compensation Incentive Plan. The amounts paid in 2012 represent the first 25% installment based on the partial repayment of TARP obligations and were as follows: $757,734 for Mr. Brown, $144,000 for Ms. Yastine, $603,361 for Mr. Muir, $381,645 for Mr. Mackey, and $1,257,657 for Mr. Marano.

Ally Financial Inc. • Form 10-K

## Nonqualified Deferred Compensation in 2012

The table below reflects year-end balances, Company distributions, and all earnings associated primarily with the Ally nonqualified equalization plan. This plan allows Company contributions to this plan to continue after the IRS maximum limits under our 401(k) plan have been reached.

| Name | Plan name | Executive contributions in last FY ($) | Registrant contributions in last FY ($) | Aggregate earnings in last FY ($) | Aggregate withdrawals/ distributions ($) | Aggregate balance at last FYE ($) |
|---|---|---|---|---|---|---|
| | | Nonqualified deferred compensation | | | | |
| Michael A. Carpenter | DSUs (a) (b) | — | 9,500,000 | 904,553 | 4,488,084 | 19,859,733 |
| Jeffrey J. Brown | Nonqualified Benefit Equalization Plan (c) | — | — | 2,650 | — | 27,413 |
| | DSUs (a) (b) | — | 3,797,892 | 254,624 | 2,947,646 | 5,121,993 |
| Barbara Yastine | DSUs (a) (b) | — | 4,587,357 | 297,361 | 3,293,894 | 6,107,921 |
| William Muir | Nonqualified Benefit Equalization Plan (c) | — | — | 23,020 | — | 213,996 |
| | DSUs (a) (b) | — | 3,400,000 | 254,810 | 3,532,010 | 4,241,966 |
| James G. Mackey | DSUs (a) (b) | — | 2,450,000 | 137,038 | 1,695,288 | 3,006,041 |
| Thomas Marano | Nonqualified Benefit Equalization Plan (c) | — | — | 5,733 | — | 50,986 |
| | DSUs (a) (b) | — | 1,821,397 | 518,350 | 4,230,388 | 6,364,448 |
| | Deferred Cash (d) | — | 5,582,052 | — | 1,943,035 | 3,639,017 |

(a)  In 2009, we included DSU awards, which vested at grant date, within the Options Exercised and Shares Vested in 2009 table. Starting in 2010 and continuing in 2012, we have included the DSU award information in the *Nonqualified Deferred Compensation in 2012* table to more accurately reflect the form of the awards.

(b)  The NEOs had outstanding DSU award values at December 31, 2011, of $13,943,264 for Mr. Carpenter, $4,017,124 for Mr. Brown, $4,517,096 for Ms. Yastine, $4,119,166 for Mr. Muir, $2,114,292 for Mr. Mackey, and $8,255,088 for Mr. Marano.

(c)  Ally maintains a nonqualified benefit equalization plan for highly-compensated employees, including the NEOs. This plan is a nonqualified savings plan designed to allow for the equalization of benefits for highly compensated employees under the Ally 401(k) Program when such employees' contribution and benefit levels exceed the maximum limitations on contributions and benefits imposed by Section 2004 of the Employee Retirement Income Security Act of 1974, as amended, and Section 401(a)(17) and 415 of the Internal Revenue Code of 1986, as amended. This plan is maintained as an unfunded plan and all expenses for administration of the plan and payment of amounts to participants are borne by Ally. Each participant is credited with earnings based on a set of investment options selected by the participant similar to 401(k) investment option to all employees. Pursuant to the Special Master's Determination Letter dated October 22, 2009, contributions to this plan were suspended. Therefore, the amounts shown reflect contributions made by the Company prior to receipt of the Determination Letter.

(d)  Mr. Marano received deferred cash after May 14, 2012 in lieu of DSUs pursuant to the request of the ResCap Board of Directors, the Special Master's November 30, 2012 Supplemental Determination Letter, and disclosure to the Bankruptcy Court. Deferred cash is payable in three equal installments: the first on the final payroll date of 2012, the second ratably over 2013 and the third ratably over 2014.

## Executive Compensation — Post-employment and Termination Benefits

As a condition to participating in TARP, Ally's NEOs and next five highest paid employees waived any right to severance in the event of their termination of employment. These waivers apply until Ally repays its TARP obligations to the U.S. Department of Treasury.

## Director Compensation

Employee directors do not receive any separate compensation for their Board activities. Non-employee directors receive the compensation described below.

Effective April 1, 2012, the annual retainer paid to non-employee directors was increased from $180,000 to $200,000 and was paid entirely in cash. DSUs had been included in the program for $110,000 of the $180,000 annual retainer in 2011, and were also awarded for a portion of the annual retainer paid for the first quarter of 2012, as part of planning for a potential initial public offering. An additional retainer is paid to non-employee directors who serve as a chair of a standing committee, which was also increased during 2012 from $30,000 to $50,000 each. All non-employee directors who serve as members of committees, including chairs of a committee, are paid additional retainers of $20,000 each. The Chair of the Board receives an additional retainer of $250,000. For the first quarter of 2012, this additional retainer was paid half in cash and half in DSUs, and was changed to all cash effective April 1, 2012, the same as the Board retainer. Meeting fees of $2,000 for each in-person meeting and telephonic meeting lasting more than one hour are payable when the Board or any committee meets more than eight times per year.

Non-employee directors are reimbursed for travel expenses incurred in conjunction with their duties as directors. Furthermore, Ally will provide the broadest form of indemnification permitted under Delaware law in connection with liabilities that may arise as a result of their role on the Board, provided that the director satisfies the statutory standard of care.

223

Table of Contents

Beginning January 1, 2012, Ally pays additional director compensation to John J. Stack for his service as a director of Ally Bank in an annual amount equal to $165,000, representing the equivalent of a Board retainer of $115,000 and an additional retainer of $50,000 for service on committees in lieu of meeting fees.

The following table provides compensation for non-employee directors who served during fiscal 2012.

**2012 Director Compensation Table**

| Director name | Fees earned or paid in cash ($) (a) (b) | Stock awards ($) (a) (c) (d) | Total ($) (a) |
|---|---|---|---|
| Robert T. Blakely | 281,500 | 27,500 | 309,000 |
| Mayree C. Clark | 277,250 | 27,500 | 304,750 |
| John D. Durrett | 230,250 | 27,500 | 257,750 |
| Kim S. Fennebresque | 248,500 | 27,500 | 276,000 |
| Franklin W. Hobbs | 446,250 | 58,750 | 505,000 |
| Marjorie Magner | 246,750 | 27,500 | 274,250 |
| John J. Stack | 462,250 | 27,500 | 489,750 |
| Henry S. Miller | 85,001 | — | 85,001 |
| Gerald Greenwald | 85,850 | — | 85,850 |

(a)    The retainer and fees for our non-employee directors were prorated based on when each director served on the Board and their respective committees.

(b)    As noted above, the non-employee directors' cash retainer and fees consist of the following components:

| Director Name | Annual cash retainer ($) | Committee chair or member/chair of Board fees ($) | Ally Bank Board Fees ($) | Additional meeting fees ($) |
|---|---|---|---|---|
| Robert T. Blakely | 167,500 | 85,000 | — | 29,000 |
| Mayree C. Clark | 167,500 | 85,000 | — | 24,750 |
| John D. Durrett | 167,500 | 40,000 | — | 22,750 |
| Kim S. Fennebresque | 167,500 | 65,000 | — | 16,000 |
| Franklin W. Hobbs | 167,500 | 258,750 | — | 20,000 |
| Marjorie Magner | 167,500 | 60,000 | — | 19,250 |
| John J. Stack | 167,500 | 105,000 | 165,000 | 24,750 |
| Henry S. Miller | 75,754 | 7,247 | — | 2,000 |
| Gerald Greenwald | 75,754 | 6,096 | — | 4,000 |

Table of Contents

Ally Financial Inc. • Form 10-K

(c)  As noted above, stock awards granted to the non-employee directors are in the form of DSUs. Amounts in this column represent the aggregate grant date fair value of the DSU awards granted to the directors in 2012 and 2011. The grant date fair value of each DSU award granted to the directors in 2012 and 2011 are as follows:

| Director name | Award | Grant Date | Grant date fair value of stock or unit awards ($) |
|---|---|---|---|
| Robert T. Blakely | DSU | 3/31/2011 | 27,500 |
| | DSU | 6/30/2011 | 27,500 |
| | DSU | 10/1/2011 | 27,500 |
| | DSU | 12/31/2011 | 27,500 |
| | DSU | 3/31/2012 | 27,500 |
| Mayree C. Clark | DSU | 3/31/2011 | 27,500 |
| | DSU | 6/30/2011 | 27,500 |
| | DSU | 10/1/2011 | 27,500 |
| | DSU | 12/31/2011 | 27,500 |
| | DSU | 3/31/2012 | 27,500 |
| John D. Durrett | DSU | 3/31/2011 | 2,411 |
| | DSU | 6/30/2011 | 27,500 |
| | DSU | 10/1/2011 | 27,500 |
| | DSU | 12/31/2011 | 27,500 |
| | DSU | 3/31/2012 | 27,500 |
| Kim S. Fennebresque | DSU | 3/31/2011 | 27,500 |
| | DSU | 6/30/2011 | 27,500 |
| | DSU | 10/1/2011 | 27,500 |
| | DSU | 12/31/2011 | 27,500 |
| | DSU | 3/31/2012 | 27,500 |
| Franklin W. Hobbs | DSU | 3/31/2011 | 58,750 |
| | DSU | 6/30/2011 | 58,750 |
| | DSU | 10/1/2011 | 58,750 |
| | DSU | 12/31/2011 | 58,750 |
| | DSU | 3/31/2012 | 58,750 |
| Marjorie Magner | DSU | 3/31/2011 | 27,500 |
| | DSU | 6/30/2011 | 27,500 |
| | DSU | 10/1/2011 | 27,500 |
| | DSU | 12/31/2011 | 27,500 |
| | DSU | 3/31/2012 | 27,500 |
| John J. Stack | DSU | 3/31/2011 | 27,500 |
| | DSU | 6/30/2011 | 27,500 |
| | DSU | 10/1/2011 | 27,500 |
| | DSU | 12/31/2011 | 27,500 |
| | DSU | 3/31/2012 | 27,500 |

(d)  The following table sets forth the aggregate number of DSUs held by each non-employee director at December 31, 2012. Each DSU represents one phantom share of Ally.

| Name | Number of DSUs (#) |
|---|---|
| Robert T. Blakely | 15.0 |
| Mayree C. Clark | 15.0 |
| John D. Durrett | 12.6 |
| Kim S. Fennebresque | 15.0 |
| Franklin W. Hobbs | 32.1 |
| Marjorie Magner | 15.0 |
| John J. Stack | 15.0 |

Table of Contents

Ally Financial Inc. • Form 10-K

## Item 12.   Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters

The following table sets forth information with respect to beneficial ownership of Ally common stock by each person known by us to be the beneficial owner of more than five percent of our outstanding common stock. The number of shares reported below are as reflected in our stock register at February 28, 2013, and the percentages provided are based on 1,330,970 shares of common stock outstanding at February 28, 2013.

| Name and address of beneficial owner | Amount and nature of beneficial ownership (a) | Percent of class |
|---|---|---|
| U.S. Department of Treasury 1500 Pennsylvania Avenue Washington, D.C. 20220 | 981,971 | 73.78% |
| GMAC Common Equity Trust I c/o Hillel Bennett Stroock & Stroock & Lavan 180 Maiden Lane New York, New York 10038-4982 | 132,280 | 9.94% |
| Persons affiliated with Cerberus Capital Management, L.P. c/o Cerberus Capital Management, L.P. 299 Park Avenue, 22nd Floor New York, New York 10171 | 115,434 | 8.67% |

(a)   All ownership is direct.

For details with respect to equity incentive plans, refer to Item 11, Executive Compensation.

## Item 13.   Certain Relationships and Related Transactions, and Director Independence

Certain relationships and related transactions are described below.

### Relationship with General Motors
#### Products and Services Provided to GM

We provide various products and services to GM on terms comparable to those we provide to third parties. Except as described below, we currently expect to continue to provide these services to GM on an ongoing basis. These products and services include the following:

- We provide wholesale and term-loan financing to dealerships that are either wholly owned by GM or in which GM has a controlling interest. The majority of these dealerships are located in the United States. At December 31, 2012, finance receivables and loans to dealerships owned or majority-owned by GM totaled $260 million.

- We provide operating leases to GM-affiliated entities for buildings with a net book value of $61 million at December 31, 2012. The income statement effect of lease revenues was $8 million during the year ended December 31, 2012.

- The income statement effect for interest on notes receivable from GM was $7 million during the year ended December 31, 2012.

- We have other lease arrangements whereby we lease facilities to GM whereby we have advanced $3 million. The income statement effect for leasing revenues under these arrangements was $1 million for the year ended December 31, 2012.

- In certain states, we provide insurance to GM for vehicle service contracts and for which we have recognized insurance premiums of $101 million for the year ended December 31, 2012.

- GM may elect to sponsor financing incentive programs for wholesale dealer financing, which is known as wholesale subvention. The income statement effect of wholesale subvention and service fees was $177 million for the year ended December 31, 2012.

#### Support Services Provided by GM

GM historically has provided a variety of support services for our business, and we reimburse GM for the costs of providing these services to us. In addition, GM supports us by reimbursing us for certain programs it has with its customers or for expenses we may experience due to their business operations. The services GM provides us, including reimbursement arrangements, include:

- GM may elect to sponsor incentive programs (on both retail contracts and leases) by supporting financing rates below standard rates at which we purchase retail contracts. In addition, under residual support programs, GM may upwardly adjust residual values above the standard lease rates. The subvention related receivables were $172 million at December 31, 2012.

- GM provides lease residual value support as a marketing incentive to encourage consumers to lease vehicles. For certain specific contracts at termination of the lease, GM reimburses us to the extent the remarketing sales proceeds are less than the residual value

226

Table of Contents

Ally Financial Inc. • Form 10-K

set forth in the contract and no greater than our standard residual rates. To the extent remarketing sales proceeds are more than the contract residual at termination, we reimburse GM for its portion of the higher residual value. The income from GM for residual support was $5 million for the year ended  December 31, 2012.

- GM provides financing rates below standard rates at which we purchase contracts (rate support). The revenue from GM for rate support was $629 million for the year ended December 31, 2012.

- GM reimburses us for certain selling expenses we may incur on certain vehicles sold by us at auction. The income statement effect for the reimbursements was $1 million for the year ended December 31, 2012.

- GM occasionally provides payment guarantees on certain commercial and dealer loans and receivables Ally has outstanding. The amount of commercial and dealer loans and receivables covered by a GM guarantee was $127 million at  December 31, 2012.

- GM provides us certain other services and facilities services for which we reimburse them. The income statement effect for these services was $86 million for the year ended December 31, 2012.

- GM provides us certain marketing services for which we reimburse them. The income statement effect for the marketing services was $5 million for the year ended December 31, 2012.

- We have accounts payable to GM that include wholesale settlement payments to GM and notes payable. The balance outstanding for accounts payable was $563 million for the year ended December 31, 2012.

### Credit Arrangements and Other Amounts Due from or Owed to GM

- We provide wholesale financing to GM for vehicles in which GM retains title while the vehicles are consigned to Ally or dealers in Italy. The financing to GM remains outstanding until title is transferred to the dealers. The amount of financing provided to GM by Ally under this arrangement varies based on inventory levels. At December 31, 2012, the amount of this financing outstanding was $11 million.

- In various countries in Europe, we were party to a Rental Fleet Agreement in which we agreed to buy from the rental companies, on agreed terms reflecting fair value, all vehicles sold by GM to rental car companies that GM had become obligated to repurchase. The Rental Fleet Agreement provided for a true-up mechanism whereby GM was required to reimburse us to the extent the revenues we earned from the resale of the vehicles were less than the amount we paid the rental companies to purchase such vehicles. At December 31, 2012, we had a receivable in the amount of $18 million for providing this service.

### Capital Contributions Received from GM

During 2012, we did not receive any capital contributions from GM.

## Related Party Transaction Procedures

Pursuant to the Ally Financial Inc. Bylaws dated December 30, 2009 (the Bylaws), Ally and its subsidiaries must, subject to certain limited exceptions, conduct all transactions with its affiliates, stockholders and their affiliates, current or former officers or directors, or any of their respective family members on terms that are fair and reasonable and no less favorable to Ally than it would obtain in a comparable arm's-length transaction with an independent third party.

In addition, the Bylaws further provide for procedures and approval requirements for certain transactions with related persons. Specifically, without prior approval of the holders of a majority of Ally common stock (which must include a minimum of two common stockholders) and at least a majority of the Ally independent directors, we are not permitted to enter into any transaction with any affiliate, stockholder (other than governmental entities, except for the U.S. Department of Treasury in its capacity as a stockholder) or any of their affiliates, or any senior executive officer (other than agreements entered into in connection with a person's employment) if the value of the consideration provided exceeds $5 million or, if there is no monetary consideration paid or quantifiable value exchanged, if the agreement is otherwise determined to be material. Notwithstanding the foregoing, no stockholder approval is required if at least a majority of Ally independent directors determine that such transaction is entered into in the ordinary course of Ally's business and is on terms no less favorable to Ally than those that would have been obtained in a comparable transaction with an independent third party.

## Director Independence

For a discussion of the independence of members of the Ally Board of Directors and certain other corporate governance matters, refer to Certain Corporate Governance Matters in Item 10.

## Item 14.   Principal Accountant Fees and Services

We retained Deloitte & Touche LLP, the member firms of Deloitte Touche Tohmatsu Limited, and their respective affiliates (collectively, Deloitte & Touche) to audit our consolidated financial statements for the year ended  December 31, 2012. We also retained Deloitte & Touche, as well as other accounting and consulting firms, to provide various other services in 2012.

227

Table of Contents

Ally Financial Inc. • Form 10-K

The aggregate fees billed to us for professional services performed by Deloitte & Touche were as follows.

| December 31, *($ in millions)* | | 2012 | | 2011 |
|---|---|---|---|---|
| Audit fees (a) | $ | **20** | $ | 20 |
| Audit-related fees (b) | | **5** | | 6 |
| Tax fees (c) | | **—** | | 1 |
| Total principal accountant fees | $ | **25** | $ | 27 |

(a)  Audit fees include fees for the integrated audit of our annual  Consolidated Financial Statements , reviews of interim financial statements included in our Quarterly Reports on Form 10-Q, and audit services in connection with statutory and regulatory filings. In addition, this category includes approximately $1 million in both  2012 and 2011, pertaining to services such as comfort letters for securities issuances and consents to the incorporation of audit reports in filings with SEC.

(b)  Audit-related fees include fees for assurance and related services that are traditionally performed by the principal accountant, including attest services related to servicing and compliance, agreed-upon procedures relating to securitizations and financial asset sales, internal control reviews, consultation concerning financial accounting and reporting standards, audits in connection with acquisitions and divestitures, employee benefit plan audits, and audits of actuarial estimates.

(c)  Tax fees include fees for services performed for tax compliance, tax planning, and tax advice, including preparation of tax returns and claims for refund, and tax payment-planning services. Tax planning and advice also include assistance with tax audits and appeals and tax advice related to specific transactions.

The services performed by Deloitte & Touche in 2012 were preapproved in accordance with the Independent Auditor Services and Preapproval Policy of the Ally Audit Committee. This policy requires the independent registered public accounting firm to present the proposed audit services and related fees to the Ally Audit Committee for approval prior to the commencement of the services. Amounts exceeding the initially approved audit fees, or audit services not initially contemplated or considered during the initial approval, must be separately approved by the Committee.

The Ally Audit Committee must also preapprove all audit-related services, tax services, and all other services that are proposed to be provided by the independent registered public accounting firm. Similar to audit services, management and the independent registered public accounting firm annually present the proposed services and related fees to the Ally Audit Committee for approval prior to the commencement of services. The Committee's approval of the services and fees form the basis for an annual limit on such fees. The Committee periodically reviews the spending against these limits. Services that were not initially contemplated or considered during the initial approval must be separately approved by the Committee.

The Ally Audit Committee determined that all services provided by Deloitte & Touche during  2012 were compatible with maintaining their independence as principal accountants.

228

Table of Contents

# Part IV

Ally Financial Inc. • Form 10-K

## Item 15.   Exhibits, Financial Statement Schedules

The exhibits listed on the accompanying Index of Exhibits are filed or incorporated by reference as a part of this report. This Index is incorporated herein by reference. Certain financial statements schedules have been omitted because prescribed information has been incorporated into our Consolidated Financial Statements or notes thereto.

| Exhibit | Description | Method of Filing |
|---|---|---|
| 3.1 | Amended and Restated Certificate of Incorporation of Ally Financial Inc., dated as of March 25, 2011 | Filed as Exhibit 3.1 to the Company's Current Report on Form 8-K dated as of March 25, 2011 (File No. 1-3754), incorporated herein by reference. |
| 3.2 | Bylaws of Ally Financial Inc., dated as of March 25, 2011 | Filed as Exhibit 3.2 to the Company's Current Report on Form 8-K dated as of March 25, 2011, (File No. 1-3754), incorporated herein by reference. |
| 4.1 | Form of Indenture dated as of July 1, 1982, between the Company and Bank of New York (Successor Trustee to Morgan Guaranty Trust Company of New York), relating to Debt Securities | Filed as Exhibit 4(a) to the Company's Registration Statement No. 2-75115, incorporated herein by reference. |
| 4.1.1 | Form of First Supplemental Indenture dated as of April 1, 1986, supplementing the Indenture designated as Exhibit 4.1 | Filed as Exhibit 4(g) to the Company's Registration Statement No. 33-4653, incorporated herein by reference. |
| 4.1.2 | Form of Second Supplemental Indenture dated as of June 15, 1987, supplementing the Indenture designated as Exhibit 4.1 | Filed as Exhibit 4(h) to the Company's Registration Statement No. 33-15236, incorporated herein by reference. |
| 4.1.3 | Form of Third Supplemental Indenture dated as of September 30, 1996, supplementing the Indenture designated as Exhibit 4.1 | Filed as Exhibit 4(i) to the Company's Registration Statement No. 333-33183, incorporated herein by reference. |
| 4.1.4 | Form of Fourth Supplemental Indenture dated as of January 1, 1998, supplementing the Indenture designated as Exhibit 4.1 | Filed as Exhibit 4(j) to the Company's Registration Statement No. 333-48705, incorporated herein by reference. |
| 4.1.5 | Form of Fifth Supplemental Indenture dated as of September 30, 1998, supplementing the Indenture designated as Exhibit 4.1 | Filed as Exhibit 4(k) to the Company's Registration Statement No. 333-75463, incorporated herein by reference. |
| 4.2 | Form of Indenture dated as of September 24, 1996, between the Company and The Chase Manhattan Bank, Trustee, relating to SmartNotes | Filed as Exhibit 4 to the Company's Registration Statement No. 333-12023, incorporated herein by reference. |
| 4.2.1 | Form of First Supplemental Indenture dated as of January 1, 1998, supplementing the Indenture designated as Exhibit 4.2 | Filed as Exhibit 4(a)(1) to the Company's Registration Statement No. 333-48207, incorporated herein by reference. |
| 4.2.2 | Form of Second Supplemental Indenture dated as of June 20, 2006, supplementing the Indenture designated as Exhibit 4.2 | Filed as Exhibit 4(a)(2) to the Company's Registration Statement No. 33-136021, incorporated herein by reference. |
| 4.3 | Form of Indenture dated as of October 15, 1985, between the Company and U.S. Bank Trust (Successor Trustee to Comerica Bank), relating to Demand Notes | Filed as Exhibit 4 to the Company's Registration Statement No. 2-99057, incorporated herein by reference. |
| 4.3.1 | Form of First Supplemental Indenture dated as of April 1, 1986, supplementing the Indenture designated as Exhibit 4.3 | Filed as Exhibit 4(a) to the Company's Registration Statement No. 33-4661, incorporated herein by reference. |
| 4.3.2 | Form of Second Supplemental Indenture dated as of June 24, 1986, supplementing the Indenture designated as Exhibit 4.3 | Filed as Exhibit 4(b) to the Company's Registration Statement No. 33-6717, incorporated herein by reference. |
| 4.3.3 | Form of Third Supplemental Indenture dated as of February 15, 1987, supplementing the Indenture designated as Exhibit 4.3 | Filed as Exhibit 4(c) to the Company's Registration Statement No. 33-12059, incorporated herein by reference. |
| 4.3.4 | Form of Fourth Supplemental Indenture dated as of December 1, 1988, supplementing the Indenture designated as Exhibit 4.3 | Filed as Exhibit 4(d) to the Company's Registration Statement No. 33-26057, incorporated herein by reference. |
| 4.3.5 | Form of Fifth Supplemental Indenture dated as of October 2, 1989, supplementing the Indenture designated as Exhibit 4.3 | Filed as Exhibit 4(e) to the Company's Registration Statement No. 33-31596, incorporated herein by reference. |
| 4.3.6 | Form of Sixth Supplemental Indenture dated as of January 1, 1998, supplementing the Indenture designated as Exhibit 4.3 | Filed as Exhibit 4(f) to the Company's Registration Statement No. 333-56431, incorporated herein by reference. |

Table of Contents

Ally Financial Inc. • Form 10-K

| Exhibit | Description | Method of Filing |
|---|---|---|
| 4.3.7 | Form of Seventh Supplemental Indenture dated as of June 15, 1998, supplementing the Indenture designated as Exhibit 4.3 | Filed as Exhibit 4(g) to the Company's Registration Statement No. 333-56431, incorporated herein by reference. |
| 4.4 | Form of Indenture dated as of December 1, 1993, between the Company and Citibank, N.A., Trustee, relating to Medium Term Notes | Filed as Exhibit 4 to the Company's Registration Statement No. 33-51381, incorporated herein by reference. |
| 4.4.1 | Form of First Supplemental Indenture dated as of January 1, 1998, supplementing the Indenture designated as Exhibit 4.4 | Filed as Exhibit 4(a)(1) to the Company's Registration Statement No. 333-59551, incorporated herein by reference. |
| 4.5 | Indenture, dated as of December 31, 2008, between the Company and The Bank of New York Mellon, Trustee | Filed as Exhibit 4.2 to the Company's Current Report on Form 8-K dated as of January 2, 2009, (File No. 1-3754), incorporated herein by reference. |
| 4.6 | Amended and Restated Indenture, dated March 1, 2011, between the Company and The Bank of New York Mellon, Trustee | Filed as Exhibit 4.2 to the Company's Current Report on Form 8-K dated as of March 4, 2011 (File No. 1-3754), incorporated herein by reference. |
| 4.7 | Form of Guarantee Agreement related to Ally Financial Inc. Senior Unsecured Guaranteed Notes | Filed as Exhibit 4.7 to the Company's Annual Report for the period ended December 31, 2010, on Form 10-K (File No. 1-3754), incorporated herein by reference. |
| 4.8 | Second Amended and Restated Declaration of Trust by and between the trustees of each series of GMAC Capital Trust I, Ally Financial Inc., as Sponsor, and by the holders, from time to time, of undivided beneficial interests in the relevant series of GMAC Capital Trust I, dated as of March 1, 2011 | Filed as Exhibit 4.1 to the Company's Current Report on Form 8-K dated as of March 4, 2011 (File No. 1-3754), incorporated herein by reference. |
| 4.9 | Series 2 Trust Preferred Securities Guarantee Agreement between Ally Financial Inc. and The Bank of New York Mellon, dated as of March 1, 2011 | Filed as Exhibit 4.3 to the Company's Current Report on Form 8-K dated as of March 4, 2011 (File No. 1-3754), incorporated herein by reference. |
| 10 | Amended and Restated Governance Agreement, dated as of May 21, 2009, by and between GMAC Inc., FIM Holdings LLC, GM Finance Co. Holdings LLC and the United States Department of the Treasury | Filed as Exhibit 10.2 to the Company's Current Report on Form 8-K dated as of May 22, 2009 (File No. 1-3754), incorporated herein by reference. |
| 10.1 | Letter Agreement, dated as of May 21, 2009, between GMAC Inc. and the United States Department of the Treasury (which includes the Securities Purchase Agreement — Standard Terms attached thereto, with respect to the issuance and sale of the Convertible Preferred Membership Interests and the Warrant) | Filed as Exhibit 10.1 to the Company's Current Report on Form 8-K dated as of May 22, 2009 (File No. 1-3754), incorporated herein by reference. |
| 10.2 | Securities Purchase and Exchange Agreement, dated as of December 30, 2009, between GMAC Inc. and the United States Department of the Treasury* | Filed as Exhibit 10.1 to the Company's Current Report on Form 8-K dated as of December 30, 2009, (File No. 1-3754), incorporated herein by reference. |
| 10.3 | Master Transaction Agreement, dated May 21, 2009, between GMAC Inc., Chrysler LLC, U.S. Dealer Automotive Receivables Transition LLC and the United States Department of the Treasury | Filed as Exhibit 10.3 to the Company's Quarterly Report for the period ended June 30, 2009, on Form 10-Q (File No. 1-3754), incorporated herein by reference. |
| 10.4 | Amended and Restated United States Consumer Financing Services Agreement, dated May 22, 2009, between GMAC Inc. and General Motors Corporation* | Filed as Exhibit 10.4 to the Company's Quarterly Report for the period ended June 30, 2009, on Form 10-Q/A (File No. 1-3754), incorporated herein by reference. |
| 10.5 | Amended and Restated Master Services Agreement, dated May 22, 2009, between GMAC Inc. and General Motors Corporation* | Filed as Exhibit 10.5 to the Company's Quarterly Report for the period ended June 30, 2009, on Form 10-Q/A (File No. 1-3754), incorporated herein by reference. |
| 10.6 | Auto Finance Operating Agreement, entered into on August 6, 2010, between Ally Financial Inc. and Chrysler Group LLC* | Filed as Exhibit 10.1 to the Company's Quarterly Report for the period ended September 30, 2010, on Form 10-Q/A (File No. 1-3754), incorporated herein by reference. |
| 10.7 | Intellectual Property License Agreement, dated November 30, 2006, by and between General Motors Corporation and GMAC LLC | Filed as Exhibit 10.1 to the Company's Quarterly Report for the period ended March 31, 2007, on Form 10-Q (File No. 1-3754), incorporated herein by reference. |
| 10.8 | Capital and Liquidity Maintenance Agreement, entered into on October 29, 2010, between Ally Financial Inc., IB Finance Holding Company, LLC, Ally Bank and the Federal Deposit Insurance Corporation | Filed as Exhibit 10.2 to the Company's Quarterly Report for the period ended September 30, 2010, on Form 10-Q (File No. 1-3754), incorporated herein by reference. |

[Table of Contents](#)

Ally Financial Inc. • Form 10-K

| Exhibit | Description | Method of Filing |
|---|---|---|
| 10.9 | Settlement agreement, dated December 23, 2010, by and between GMAC Mortgage, LLC, Residential Capital, LLC, Residential Funding Securities, LLC, Residential Asset Mortgage Products, Inc., Residential Funding Company LLC, Residential Funding Mortgage Securities I, Inc., Residential Accredit Loans, Inc., Homecomings Financial LLC, and the Federal National Mortgage Association* | Filed as Exhibit 10.9 to the Company's Annual Report for the period ended December 31, 2010, on Form 10-K/A (File No. 1-3754), incorporated herein by reference. |
| 10.10 | Ally Financial Inc. Long-Term Equity Compensation Incentive Plan, as amended | Filed herewith. |
| 10.11 | Ally Financial Inc. Severance Plan, Plan Document and Summary Plan Description, as amended | Filed herewith. |
| 10.12 | Form of Award Agreement related to the issuance of Deferred Stock Units | Filed herewith. |
| 10.13 | Deferred Stock Unit Award Agreement for Michael A. Carpenter, dated April 12, 2012 | Filed herewith. |
| 10.14 | Deferred Stock Unit Award Agreement for Jeffrey J. Brown, dated April 12, 2012 | Filed herewith. |
| 10.15 | Deferred Stock Unit Award Agreement for Barbara A. Yastine, dated April 12, 2012 | Filed herewith. |
| 10.16 | Deferred Stock Unit Award Agreement for William F. Muir, dated April 12, 2012 | Filed herewith. |
| 10.17 | Deferred Stock Unit Award Agreement for James G. Mackey, dated April 12, 2012 | Filed herewith. |
| 10.18 | Deferred Stock Unit Award Agreement for Thomas F. Marano, dated April 12, 2012 | Filed herewith. |
| 10.19 | Partial Release of Liability Agreement, dated March 17, 2010, by and among Federal Home Loan Mortgage Corporation, GMAC Mortgage, LLC and Residential Funding Company, LLC | Filed as Exhibit 10.26 to the Company's Annual Report for the period ended December 31, 2011, on Form 10-K (File No. 1-3754), incorporated herein by reference. |
| 10.2 | Purchase and Sale Agreement, by and between Ally Financial Inc. and Royal Bank of Canada, dated October 23, 2012 | Filed herewith. |
| 10.21 | Amended and Restated Purchase and Sale Agreement, by and among Ally Financial Inc., General Motors Financial Company, Inc., and General Motors Company, dated November 21, 2012, as amended and restated as of February 22, 2013 | Filed herewith. |
| 10.22 | Share Transfer Agreement, by and between Ally Financial Inc. and General Motors Financial Company, Inc., dated November 21, 2012 | Filed herewith. |
| 10.23 | Consent Judgment, dated March 12, 2012 | Filed as Exhibit 10.1 to the Company's Current Report on Form 8-K dated as of March 12, 2012 (File No. 1-3754), incorporated herein by reference. |
| 12 | Computation of Ratio of Earnings to Fixed Charges | Filed herewith. |
| 21 | Ally Financial Inc. Subsidiaries as of December 31, 2012 | Filed herewith. |
| 23.1 | Consent of Independent Registered Public Accounting Firm | Filed herewith. |
| 31.1 | Certification of Principal Executive Officer pursuant to Rule 13a-14(a)/15d-14(a) | Filed herewith. |
| 31.2 | Certification of Principal Financial Officer pursuant to Rule 13a-14(a)/15d-14(a) | Filed herewith. |
| 32 | Certification of Principal Executive Officer and Principal Financial Officer pursuant to 18 U.S.C. Section 1350 | Filed herewith. |
| 99 | Certification of Principal Executive Officer and Principal Financial Officer, as required pursuant to the TARP Standards for Compensation and Corporate Governance; 31 CFR Part 30, Section 30.15 | Filed herewith. |
| 101 | Interactive Data File | Filed herewith. |

\*    Certain confidential portions have been omitted pursuant to a confidential treatment request which has been separately filed with the Securities and Exchange Commission.

231

Table of Contents

# Signatures

*Ally Financial Inc. • Form 10-K*

Pursuant to the requirements of Section 133 or 15(d) of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized, this 1st day of March, 2013.

<div align="center">

**Ally Financial Inc.**

**(Registrant)**

</div>

/S/ MICHAEL A. CARPENTER
_____

Michael A. Carpenter

*Chief Executive Officer*

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the Registrant and in the capacities indicated, this 1st day of March, 2013.

| /S/ MICHAEL A. CARPENTER | /S/ JEFFREY J. BROWN |
|---|---|
| Michael A. Carpenter | Jeffrey J. Brown |
| *Chief Executive Officer* | *Senior Executive Vice President of Finance and Corporate Planning* |

/S/ DAVID J. DEBRUNNER
_____

David J. DeBrunner

*Vice President, Chief Accounting Officer, and
Corporate Controller*

<div align="center">232</div>

Table of Contents

# Signatures

Ally Financial Inc. • Form 10-K

---

/S/ FRANKLIN W. HOBBS

Franklin W. Hobbs
*Ally Chairman*

---

/S/ ROBERT T. BLAKELY

Robert T. Blakely
*Director*

---

/S/ MICHAEL A. CARPENTER

Michael A. Carpenter
*Chief Executive Officer and Director*

---

/S/ MAYREE C. CLARK

Mayree C. Clark
*Director*

---

/S/ JOHN D. DURRETT

John D. Durrett
*Director*

---

/S/ STEPHEN A. FEINBERG

Stephen A. Feinberg
*Director*

---

/S/ KIM S. FENNEBRESQUE

Kim S. Fennebresque
*Director*

---

/S/ GERALD GREENWALD

Gerald Greenwald
*Director*

---

/S/ MARJORIE MAGNER

Marjorie Magner
*Director*

---

/S/ HENRY S. MILLER

Henry S. Miller
*Director*

---

/S/ JOHN J. STACK

John J. Stack
*Director*

233

ALLY FINANCIAL INC.
LONG-TERM EQUITY COMPENSATION INCENTIVE PLAN

ALLY FINANCIAL INC.
LONG-TERM EQUITY COMPENSATION INCENTIVE PLAN
Table of Contents

Section 1 Definitions
Section 2 Purpose of Plan
Section 3 Term of Plan; Amendment and Termination of Plan
Section 4 Administration
Section 5 Eligibility and Participation
Section 6 Units Available under Plan; Common Stock Value
Section 7 Grants of Awards
Section 8 Vesting and Payment of Award
Section 9 Restrictive Covenants
Section 10 Termination of Employment; Other Payments
Section 11 Claims
Section 12 Taxes
Section 13 Miscellaneous

ALLY FINANCIAL INC.
LONG-TERM EQUITY COMPENSATION INCENTIVE PLAN

1.0 DEFINITIONS

The following terms shall have the following meanings unless the context indicates otherwise:

1.1 "Ally Financial Inc." shall mean Ally Financial Inc., a Delaware corporation.

1.2 "Award" shall mean a compensatory award that is granted in accordance with Section 7 below and that Vests and is paid in accordance with Section 9 or 11 below.

1.3 "Award Letter" shall mean a written agreement between Ally Financial Inc. and the Participant that establishes the terms, conditions, restrictions and/or limitations applicable to an Award in addition to those established by the Plan and by the Committee's exercise of its administrative powers.

1.4 "Beneficiary" shall mean a beneficiary designated in writing by a Participant to receive a Payment in the event of a Participant's death prior to a date of Payment. If no Beneficiary is designated by the Participant, then the Participant's estate shall be deemed to be the Participant's Beneficiary.

1.5 "Board" shall mean the Board of Directors of the Company.

1.6 "bps" shall mean a hypothetical ownership interest of the Company Awarded prior to October 1, 2010 and as subsequently adjusted by the Committee in accordance with the Plan (based on basis points, where, for example (i) an Award subject to 1.5 bps would equal an Award relating to a 0.015% hypothetical ownership interest of the Company and (ii) an Award subject to 3.25 bps would equal an Award relating to a 0.0325% hypothetical ownership interest of the Company).

1.7 "Business Unit" shall mean a single business or product line or related group of businesses or product lines of the Company that, in the ordinary course of the Company's business, managerial and financial reporting are considered and managed as a division, including, but not limited to, the Company's North American Auto Finance, International Operations, Mortgage Operations, Insurance and Commercial Finance divisions, and which consist of a group of legal entities rolling up to a holding company that is a wholly-owned subsidiary of the Company.

1.8 "Cause" shall mean any one of the following:

(a) felony indictment or misdemeanor conviction; or

(b) failure to perform any material responsibility of the leadership position; or

(c) a course of conduct which would tend to hold the Company or any of its affiliates in disrepute or scandal, as determined by the Board in its sole discretion; or

(d) failure to follow lawful directions of the Board; or

(e) any material breach of fiduciary duty to the Company; or

(f) gross negligence; or

(g) willful misconduct; or

(h) failure to comply with a material Company policy; or

(i) any act of fraud, theft, or dishonesty; or

(j) breach of any restrictive covenants, including the duty of confidentiality with respect to Company information.

(k) failure to promptly repay any Award payment that is determined to be owed to the Company pursuant to 8.6 below.

1.9 "Change in Control" shall mean both:

(a) a change in the ownership of the Company in accordance with Treasury Regulation Section 1.409A-3(i)(5)(v); or

(b) a change in effective control of the Company in accordance with Treasury Regulation Section 1.409A-3(i)(5)(vi); or

(c) a change in the ownership of a substantial portion of the Company's assets in accordance with Treasury Regulation Section 1.409A-3(i)(5)(vii);

1.10 "Change-in-Control Date" shall mean the date a Change in Control occurs.

1.11 "Code" shall mean the Internal Revenue Code of 1986, as amended from time to time, including applicable regulations promulgated thereunder.

1.12 "Committee" shall mean the Board's Compensation, Nominating and Governance Committee.

1.13 "Common Stock" shall mean common stock, par value $0.01 per share, of the Company.

1.14 "Common Stock Value" shall mean the fair market value of a share of the Common Stock as determined in good faith by the Board.

1.15 "Company" shall mean Ally Financial Inc.

1.16 "Competitive Activity" shall mean an activity in which the Participant engages directly or indirectly (whether as a principal, agent, partner, member, employee, investor, owner, consultant, board member or otherwise) that is in direct competition with the Company or any of its Subsidiaries or affiliates in any of the States within the United States, or countries within the world, in which the Company or any of its Subsidiaries or affiliates conducts business with respect to a business in which the Company or any of its subsidiaries or affiliates engaged or was preparing to engage during employment and on the date of the termination of employment; provided, however, that an ownership interest of 1% or less in any publicly held company shall not constitute a Competitive Activity; and further provided, however, that the Participant may be employed by or otherwise associated with a business or entity of which a subsidiary, division, segment, unit, etc. is in direct competition with the Company or any Subsidiary or affiliate but as to which such subsidiary, division, segment, unit, etc. the Participant has no direct or indirect responsibilities or involvement so long as the Participant does not breach the covenant of confidentiality contained in Section 9.3 below.

1.17 "Deferral Payment Date" shall mean March 15, 2013, or any other date specified in an Award Letter.

1.18 "Disability" or "Disabled" shall mean a "disability" as defined under Code Section 409A(a)(2)(C).

1.19 "Dividend Equivalent" shall mean an amount equal to the amount of a dividend with respect to Ally Financial Inc. equity that is paid to Ally Financial Inc. equity holders on or after an IPO.

1.20 "Effective Date" shall mean July 16, 2008, the date approved by the Board.

1.21 "ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended from time to time, including applicable regulations promulgated thereunder.

1.22 "Exchange Act" shall mean the Securities Exchange Act of 1934, as amended from time to time, including applicable regulations thereunder.

1.23 "Fair Market Value" shall mean the fair market value of the Company as determined in good faith by the Board and in accordance with Section 6 below.

1.24 "IPO" shall mean an underwritten sale to the public of the Company's equity securities pursuant to an effective registration statement filed with the Securities and Exchange Commission on Form S-1 and after which the Company's equity securities are listed on the New York Stock Exchange or the American Stock Exchange or on the NASDAQ Stock Market; provided, however, that an IPO shall not include any issuance of the Company's equity securities in any merger or other business combination, and shall not include any registration of the issuance of such equity securities to exiting

security holders or employees of the Company on Form S-4 or Form S-8.

1.25 "Participant" shall mean any employee of the Company or any Subsidiary to whom an Award has been granted by the Committee under the Plan and who is employed by the Company or any Subsidiary as of the date the Award Vests in accordance with Section 8 or 10 below.

1.26 "Payment" or "Paid" prior to an IPO shall mean a cash payment and subsequent to an IPO shall mean a cash payment or a distribution of Common Stock (to the extent Shareholders have made shares available for employee incentives), as determined by the Committee in its sole discretion, made to a Participant having an aggregate Common Stock Value equal to:

(a) if with respect to an RSU, the product of (x) the Common Stock Value times (y) the number of Units underlying the RSU subject to the Payment, plus any Dividend Equivalents, if applicable; or

(b) if with respect to an SAR, the product of (x) the Common Stock Value less the Strike Price times (y) the number of Units underlying the SAR subject to the Payment; and

1.27 "Plan" shall mean the Ally Financial Inc. Long-Term Equity Compensation Incentive Plan.

1.28 "RSU" shall mean an Award designated as a full-value compensatory vehicle where compensation attributable to such Award will be measured by the Fair Market Value or Common Stock Value, as the case may be, as of the Payment Date, and which shall be subject to restrictions and limitations imposed by the Committee on the date of grant.

1.29 "Sale of a Business Unit" shall mean whether effected directly or indirectly, or in one transaction or a series of transactions:

(a) any merger, consolidation, reorganization or other business combination pursuant to which a Business Unit and an acquirer and/or all or a substantial portion of their respective business operations are combined in a manner that results in a "change of control" of the Business Unit (utilizing the criteria described in the Section 1.9 Change in Control definition but substituting Business Unit for Company); or

(b) the sale, transfer or other disposition of all or substantially all of the capital stock or assets of the subsidiaries of the Company included in the Business Unit by way of negotiated purchase, tender or exchange offer, option, leveraged buyout, joint venture over which Ally does not exercise voting control or otherwise.

1.30 "SAR" shall mean an Award designated as an appreciation-only compensatory vehicle where compensation attributable to such Award will be measured by the excess, if any, of the Common Stock Value of the Award as of the Payment Date less the Strike Price, and which shall be subject to restrictions and limitations imposed by the

Committee on the date of grant.

1.31 Shareholder" shall mean a holder of Common Stock.

1.32 "Strike Price" shall mean the strike price of an SAR as determined by the Committee.

1.33 "Subsidiary" shall mean a corporation of which the Company directly or indirectly owns more than 50 percent of the Voting Stock or any other business entity in which the Company directly or indirectly has an ownership interest of more than 50 percent.

1.34 "Treasury Regulation" shall mean the regulations promulgated under the Code by the United States Department of the Treasury, as amended from time to time.

1.35 "Unforeseeable Emergency" shall mean an "unforeseeable emergency" as defined under Code Section 409A(a)(2)(B)(ii)(I).

1.36 "Unit" shall mean a phantom share of Common Stock.

1.37 "Unvested Award'" shall mean the portion of an Award that has not yet Vested.

1.38 "Vest" shall mean that the Participant has an unrestricted right, title and interest to receive the compensation attributable to the Award (or a portion of such Award) or to otherwise enjoy the benefits underlying such Award without a "substantial risk of forfeiture" (as such term is defined and used in Code Section 409A).

1.39 "Vesting Date" shall mean the date on which an Award Vests as specified in the Award Letter.

1.40 "Voting Stock" shall mean the capital stock of any class or classes having general voting power under ordinary circumstances, in the absence of contingencies, to elect the directors of a corporation.

2.0 PURPOSE OF PLAN

2.1 Purpose. The purpose of the Plan is to motivate certain employees of the Company and its Subsidiaries to put forth maximum efforts toward the growth, profitability, and success of the Company and its Subsidiaries by providing incentives to such employees through payments that are based on Common Stock Value. In addition, the Plan is intended to provide incentives that will attract and retain highly qualified individuals as employees of the Company and its Subsidiaries, and to assist in aligning the interests of such employees with the interests of the Company's Shareholders.

2.2 ERISA. The Plan is intended to be an unfunded "employee benefit plan" (as such term is defined and used under ERISA) which is maintained primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees for purposes of Title I of ERISA, and thus the Plan is intended to

be treated as and subject to the "top-hat" plan requirements under ERISA.

2.3 Code Section 409A. The Plan is intended to be a "nonqualified deferred compensation plan" as such term is defined and used under Code Section 409A, and thus the Plan is intended to be fully subject to and fully compliant with Code Section 409A.

2.4 TARP Compliance. The Plan is intended to fully comply with the Emergency Economic Stabilization Act of 2008, the American Recovery and Reinvestment Act of 2009, the rules and regulations of the Troubled Asset Relief Program, and any other Federal law or regulation that may govern executive compensation for so long as the Company shall remain subject to such laws and regulations.

3.0 TERM OF PLAN; AMENDMENT AND TERMINATION OF PLAN

3.1 Term. The Plan shall be effective as of the Effective Date and shall terminate on the earlier of (i) the date that all Awards granted under the Plan are Paid or (ii) the 10th anniversary of the Effective Date, unless sooner terminated by the Board in accordance with Section 3.2 below.

3.2 Termination of Plan. The Board may suspend or terminate the Plan at any time with or without prior notice; provided, however, that no action authorized by this Section 3.2 shall reduce the amount of any outstanding Award or otherwise adversely change the terms and conditions thereof without the Participant's prior written consent.

3.3 Amendment of Plan. The Board may amend the Plan at any time with or without prior notice; provided, however, that no action authorized by this Section 3.3 shall reduce the amount of any outstanding Award or otherwise adversely change the terms and conditions thereof without the Participant's prior written consent, except as provided in Section 3.5.

3.4 Amendment or Cancellation of Award Letters. The Committee may amend or modify any Award Letter at any time; provided, however, that except as provided in Section 3.5, if the amendment or modification adversely affects the Participant, such amendment or modification shall be by mutual agreement between the Committee and the Participant or such other persons as may then have an interest therein.

3.5 Compliance Amendments. Notwithstanding anything contained in this Section 3 or in the Plan to the contrary, the Plan and/or any Award Letter may be unilaterally amended by the Board or the Committee, as the case may be, – even if such amendment reduces the amount of any outstanding Award or otherwise adversely changes the terms and conditions thereof without the Participant's prior written consent – if such amendment is required to comply with (i) any Federal law or regulation that may govern executive compensation, including but not limited to Title VII of the American Recovery and Reinvestment Act of 2009 and the Troubled Asset Relief program and the regulations thereunder or (ii) Code Section 409A. In addition, any such amendment to the Plan or to any Award Letter that would cause compensation payable under the Plan to be subject to the penalty tax imposed by Code Section 409A shall be null and void and of no effect as

if the Plan had never been amended.

4.0 ADMINISTRATION

4.1 Responsibility. The Committee shall have the responsibility, in its sole discretion, to control, operate, manage and administer the Plan in accordance with its terms.

4.2 Award Letter. Each Award granted under the Plan shall be evidenced by an Award Letter, which shall be signed by an authorized agent or officer of Ally Financial Inc. and the Participant; provided, however, that in the event of any conflict between a provision of the Plan and any provision of an Award Letter, the provision of the Plan shall control and prevail.

4.3 Authority of the Committee. The Committee shall have all the discretionary authority that may be necessary or helpful to enable it to discharge its responsibilities with respect to the Plan, including but not limited to the following:

(a) to determine eligibility for participation in the Plan;

(b) to determine the size of an Award granted under the Plan;

(c) to set vesting schedules for each Award;

(d) to set the Strike Prices for SARs under the Plan;

(e) to grant Awards to, and to enter into Award Letters with, Participants;

(f) to equitably convert outstanding Awards from bps to Units;

(g) to supply any omission, correct any defect, or reconcile any inconsistency in the Plan in such manner and to such extent as it shall deem appropriate in its sole discretion to carry the same into effect;

(h) to issue administrative guidelines as an aid to administer the Plan and make changes in such guidelines as it from time to time deems proper;

(i) to make rules for carrying out and administering the Plan and make changes in such rules as it from time to time deems proper;

(j) to the extent permitted under the Plan, grant waivers of Plan terms, conditions, restrictions, and limitations;

(k) to maintain the Plan's full compliance with Code Section 409A;

(l) to maintain the Plan's full compliance with any Federal law or regulation that may govern executive compensation and that applies to the Company, including but not limited to Title VII of the American Recovery and Reinvestment Act of 2009 and the

Troubled Asset Relief Program and the regulations thereunder;

(m) to recommend the Common Stock Value to the Board for purposes of the Plan;

(n) to take any and all other actions it deems necessary or advisable for the proper operation or administration of the Plan.

4.4 Action by the Committee. The Committee may act only by a majority of its members. Any determination of the Committee may be made, without a meeting, by a writing or writings signed by all of the members of the Committee. In addition, the Committee may authorize any one or more of its members to execute and deliver documents on behalf of the Committee.

4.5 Delegation of Authority. The Committee may delegate to one or more of its members, or to one or more agents, such administrative duties as it may deem advisable; provided, however, that any such delegation shall be in writing. In addition, the Committee, or any person to whom it has delegated duties under this Section 4.5, may employ one or more persons to render advice with respect to any responsibility the Committee or such person may have under the Plan. The Committee may employ such legal or other counsel, consultants and agents as it may deem desirable for the administration of the Plan and may rely upon any opinion or computation received from any such counsel, consultant or agent. Expenses incurred by the Committee in the engagement of such counsel, consultant or agent shall be paid by the Company or the Subsidiary whose employees have benefited from the Plan, as determined by the Committee.

4.6 Determinations and Interpretations by the Committee. All determinations and interpretations made by the Committee shall be binding and conclusive on all Participants and their heirs, successors, and legal representatives.

4.7 Liability. No member of the Committee and no employee of the Company shall be liable for any act or failure to act hereunder, except in circumstances involving his or her bad faith, gross negligence or willful misconduct, and no member of the Committee or employee of the Company shall be liable for any act or failure to act hereunder by any other member or employee or by any agent to whom duties in connection with the administration of the Plan have been delegated.

4.8 Indemnification. The Company shall indemnify members of the Committee and any agent of the Committee against any and all liabilities or expenses to which they may be subjected by reason of any act or failure to act with respect to their duties on behalf of the Plan, except in circumstances involving such person's bad faith, gross negligence or willful misconduct.

5.0 ELIGIBILITY AND PARTICIPATION

5.1 Eligibility. All employees of the Company and its Subsidiaries shall be eligible to participate in the Plan and to receive Awards.

5.2 Participation. The Committee in its sole discretion shall designate who shall be a Participant and receive Awards under the Plan. Designation of a Participant in any year shall not require the Committee to designate such person to receive an Award in any other year or, once designated, to receive the same Award as granted to the Participant in any other year. The Committee shall consider such factors as it deems pertinent in selecting Participants and in determining the bps or Units subject to each Award.

6.0 UNITS AVAILABLE UNDER PLAN; COMMON STOCK VALUE

6.1 Available Units for Grant. The aggregate number of Units that may be granted under all Awards during the term of the Plan shall not exceed 79,910. The aggregate number of Units that may be granted under all RSU Awards during the term of the Plan shall not exceed 47,946. The aggregate number of Units that may be granted under all SAR Awards during the term of the Plan shall not exceed 31,964. Awards that are cancelled or forfeited may be regranted.

6.2 Adjustment to Units. As to Awards denominated with reference to Units, if there is any change to the Common Stock, through merger, consolidation, reorganization, recapitalization, dividend, split, reverse split, split-up, split-off, spin-off, combination of Common Stock, exchange of Common Stock, dividend in kind or other like change in capital structure or distribution (other than normal cash dividends) to Shareholders, an adjustment shall be made to each such Award either granted or available for grant under the Plan so that after such adjustment each such Award reflects such change to the Common Stock. In addition, for the purpose of preventing any dilution or enlargement of Participants' rights under the Plan, the Committee shall have the authority to adjust, in an equitable manner, the Units available for grant or granted under the Plan, as well as the Strike Price of outstanding SARs, the Common Stock Value or any other affected term.

6.3 Common Stock Value. The Board shall determine the Common Stock Value (i) at least once a year and (ii) as of a Change-in-Control Date. The Board may in its sole discretion determine a Common Stock Value at any other time. The Common Stock Value shall take into account the valuation rules under Treasury Regulation Section 1.409A-1(b)(5)(iv) if compliance with such valuation rules are necessary for compliance with Code Section 409A.

7.0 GRANTS OF AWARDS

7.1 Grants. The Committee in its sole discretion and at any time may grant Awards to Participants. Each grant of an Award shall be designated by a fixed number of Units underlying the Award.

7.2 Types of Grants. The Committee in its sole discretion may grant either RSUs, SARs, or a combination of both.

7.3 Award Letter. Each Award shall be evidenced by an Award Letter, stating:

(a) the Units underlying the Award;

(b) if the Award is a SAR, then the Strike Price;

(c) the Vesting schedule for each Award;

(d) if the Award is an RSU, whether the Award is subject to a Deferral Payment Date; and

(e) any other term, condition, restriction and/or limitation with respect to the Award.

7.4 Deferral. To the extent permitted by the Committee, a Participant may elect to defer compensation attributable to an RSU Award to the Deferral Payment Date, provided that such deferral fully complies with Code Section 409A.

7.5 Dividend Equivalents. On or after an IPO, Participants who hold RSUs shall be entitled to receive Dividend Equivalents to the same extent and in the same manner as equity holders of the Common Stock, if and when such holders receive dividends under such Common Stock. The Dividend Equivalent shall be deemed to be invested in additional RSUs, based on the Common Share Value on the dividend payment date and such additional RSUs shall be subject to the same Vesting schedule, forfeiture rules, and other terms applicable to the related RSU Award.

8.0 VESTING AND PAYMENT OF AWARDS

8.1 Vesting. Each Award shall Vest in accordance with the Vesting schedule contained in each Award Letter, as determined by the Committee in its sole discretion, unless Vesting is accelerated in accordance with Section 8.2 or 10 below or unless Vesting is required to be modified in order to comply with any Federal law or regulation that may govern executive compensation, including but not limited to Title VII of the American Recovery and Reinvestment Act of 2009 and the Troubled Asset Relief Program and the regulations thereunder.

8.2 Vesting Due to a Change in Control. Except as prohibited by any Federal law or regulation that may govern executive compensation, including but not limited to Title VII of the American Recovery and Reinvestment Act of 2009 and the Troubled Asset Relief Program and the regulations thereunder, during the one-year period immediately following the Change-in-Control Date, a Participant's unvested Awards shall 100% immediately Vest as of the date of an involuntary termination of the Participant's employment by the Company without Cause and shall be paid within 75 days of Vesting.

8.3 Payment of RSU Awards. Except as prohibited by any Federal law or regulation that may govern executive compensation, including but not limited to Title VII of the American Recovery and Reinvestment Act of 2009 and the Troubled Asset Relief Program and the regulations thereunder, and except as provided in Sections 8.2 or 10.3, RSUs that Vest shall be Paid to the Participant at the later of within 75 days after a Vesting Date or on a date specified in an individual Award Letter, based on the most

recent Common Stock Value, provided that if all or a portion of the RSUs are subject to a valid deferral in accordance with Section 7.4 above, then such RSUs shall be Paid in accordance with such Deferral Payment Date based on the most recent Common Stock Value prior to the Deferral Payment Date.

8.4 Payment of SAR Awards. Except as prohibited by any Federal law or regulation that may govern the Company's executive compensation, including but not limited to Title VII of the American Recovery and Reinvestment Act of 2009 and the Troubled Asset Relief Program and the regulations thereunder, SARs that Vest shall be paid to the Participant by March 15 immediately following the December 31, 2012 final Vesting Date, but not later than 75 days after a Vesting Date based on (i) if the Participant's employment has not been terminated prior to the date of Payment, then the most recent Common Stock Value or (ii) if the Participant's employment has been terminated (including termination due to death) prior to the date of Payment, then the most recent Common Stock Value preceding the date of the termination of the Participant's employment (including a termination due to death).

8.5 Payment of Dividend Equivalents. Except as prohibited by any Federal law or regulation that may govern the Company's executive compensation, including but not limited to Title VII of the American Recovery and Reinvestment Act of 2009 and the Troubled Asset Relief Program and the regulations thereunder, Dividend Equivalents (if any) shall be Paid when the related RSU Award is paid to the Participant in accordance with Section 8.3 above.

8.6 Repayment of Certain Award Payments. If any Award payment to a Participant who (i) is or was an executive officer (as defined in Rule 3b-7 of the Securities Exchange Act of 1934); or (ii) is a named executive officer (as determined pursuant to Instruction 1 to Item 402(a)(3) of Regulation S-K under the Federal Securities Laws); or (iii) is among the next twenty most highly compensated employees of the Company, is determined to have been based on statements of earnings, revenues, gains, or other performance criteria that are later found to be materially inaccurate, is based on erroneous data that resulted in an accounting restatement due to material noncompliance with any financial reporting requirement under the securities laws within the three years prior to payment, or is found to require repayment under the provisions of any other Federal law or regulation that may govern the Company's executive compensation, such payment shall, upon notice to the Participant, become immediately due and payable in full to the Company. The Committee may, in its discretion, also demand repayment from other Participants based on the same determination. Failure to promptly repay the Company upon demand will constitute Cause for termination of employment.

## 9.0 RESTRICTIVE COVENANTS

9.1 Non-Competition. While the Participant who is awarded SARs, or who participates or participated in the GMAC Management LLC Class C Membership Interests Plan, is employed by the Company or a Subsidiary, and during the 1-year period immediately following the date of any termination of the Participant's employment with the Company

or a Subsidiary, such Participant shall not without the prior written consent of the Committee, at any time, directly or indirectly, whether on behalf of himself or herself or any other person or entity, engage in a Competitive Activity. The restrictions in this Section 9.1 do not apply to a Participant who is not awarded SARs, or who does not or did not participate in the GMAC Management LLC Class C Membership Interests Plan unless the restrictions in this Section 9.1 are specified in the Participant's Award Letter.

9.2 Non-Solicitation of Customers/Clients and Employees. While the Participant is employed by the Company or a Subsidiary, and during the 2-year period immediately following the date of any termination of the Participant's employment with the Company or a Subsidiary, such Participant shall not at any time, directly or indirectly, whether on behalf of himself or herself or any other person or entity (i) solicit any client and/or customer of the Company or any Subsidiary with respect to a Competitive Activity or (ii) solicit or employ any employee of the Company or any Subsidiary, or any person who was an employee of the Company or any subsidiary during the 60-day period immediately prior to the Participant's termination, for the purpose of causing such employee to terminate his or her employment with the Company or such Subsidiary.

9.3 Confidentiality. While the Participant is employed by the Company or a Subsidiary, and at all times thereafter, a Participant shall not disclose to anyone or make use of any trade secret or proprietary or confidential information of the Company, including such trade secret or proprietary or confidential information of any customer or client or other entity to which the Company owes an obligation not to disclose such information, which he or she acquires during his or her employment with the Company, including but not limited to records kept in the ordinary course of business, except:

(a) as such disclosure or use may be required or appropriate in connection with his or her work as an employee of the Company; or

(b) when required to do so by a court of law, by any governmental agency having supervisory authority over the business of the Company or by any administrative or legislative body (including a committee thereof) with apparent jurisdiction to order him or her to divulge, disclose or make accessible such information; or

(c) as to such confidential information that becomes generally known to the public or trade without his or her violation of this Section 9.3; or

(d) to the Participant's spouse, attorney, and/or his or her personal tax and financial advisors as reasonably necessary or appropriate to advance the Participant's tax, financial and other personal planning (each an "Exempt Person"), provided, however, that any disclosure or use of any trade secret or proprietary or confidential information of the Company by an Exempt Person shall be deemed to be a breach of this Section 9.3 by the Participant.

9.4 Non-Disparagement. While the Participant is employed by the Company or a Subsidiary, and at all times thereafter, a Participant shall not make any statements or

express any views that disparage the business reputation or goodwill of the Company and/or any of its Subsidiaries, affiliates, investors, Shareholders, officers, or employees.

9.5 Enforcement of Section 9. If a Participant materially violates any provision of this Section 9, he or she shall immediately forfeit any right, title and interest to any Award that has not yet been paid. In addition, such Participant shall be required to repay to Ally Financial Inc. a cash amount equal to the value of all Payments made during the 24-month period ending on the date the Company initiates an enforcement action under this Section 9 and shall reimburse the Company for its legal fees and costs associated with recovery of these amounts.

9.6 Enforcement of Non-Competition, Non-Solicitation and Confidentiality Covenants. If a Participant violates or threatens to violate any provisions of this Section 9, the Company shall not have an adequate remedy at law. Accordingly, the Company shall be entitled to such equitable and injunctive relief, without the posting of a bond, as may be available to restrain the Participant and any business, firm, partnership, individual, corporation or entity participating in the breach or threatened breach from the violation of the provisions of this Section 9. Nothing in the Plan shall be construed as prohibiting the Company from pursuing any other remedies available at law or in equity for breach or threatened breach of this Section 9, including the recovery of damages. If the Company is successful in enforcing its rights under this provision, the affected Participant shall reimburse the Company for its legal fees and costs associated with such enforcement action.

## 10.0 TERMINATION OF EMPLOYMENT; OTHER DISTRIBUTIONS

10.1 Death. Except as prohibited by any Federal law or regulation that may govern executive compensation, including but not limited to Title VII of the American Recovery and Reinvestment Act of 2009 and the Troubled Asset Relief Program and the regulations thereunder, if a Participant dies prior to a Payment, then the Participant's Unvested Awards shall Vest (if at all) as of the date of death of such Participant in accordance with the Award Letter.

10.2 Termination of Employment Due to Disability. Except as prohibited by any Federal law or regulation that may govern the Company's executive compensation, including but not limited to Title VII of the American Recovery and Reinvestment Act of 2009 and the Troubled Asset Relief Program and the regulations thereunder, if a Participant's employment is terminated due to Disability prior to a Payment, then the Participant's Unvested Awards shall Vest (if at all) as of the date of such termination of employment in accordance with the Award Letter.

10.3 Termination of Employment Due to Sale of a Business Unit. Except as prohibited by any Federal law or regulation that may govern the Company's executive compensation, including but not limited to Title VII of the American Recovery and Reinvestment Act of 2009 and the Troubled Asset Relief Program and the regulations thereunder, if a Participant's employment is terminated, other than for Cause, due to and during the

twelve months following a Sale of a Business Unit, then the Participant's Unvested Awards shall 100% Vest as of the date of such termination of employment. Payment will be made as if vesting was not accelerated by this Section 10.3 and in accordance with any valid deferral election.

10.4 Termination for Cause. If a Participant's employment is terminated by the Company or a Subsidiary for Cause prior to a Payment, then the Participant's Vested and Unvested Awards shall be immediately forfeited as of the date of such termination of employment.

10.5 Termination without Cause. Except as prohibited by any Federal law or regulation that may govern the Company's executive compensation, including but not limited to Title VII of the American Recovery and Reinvestment Act of 2009 and the Troubled Asset Relief Program and the regulations thereunder, if a Participant's employment is terminated by the Company or a Subsidiary without Cause, including a Qualified Termination under the Ally Financial Inc. Senior Leadership Severance Plan effective as of June 1, 2008, prior to a Payment, then unless the termination is otherwise a Termination Due to the Sale of a Business Unit under Section 10.3:

(a) the Participant's Unvested Award shall Vest (if at all) in accordance with the Award Letter; and

(b) all other of the Participant's Unvested Awards shall be immediately forfeited as of the date of such termination of employment.

10.6 Termination by Participant. Except as provided in Section 10.7, if a Participant's employment is terminated by the Participant prior to a Payment, then the Participant's Unvested Awards shall be immediately forfeited as of the date of such termination of employment.

10.7 Retirement. Except as prohibited by any Federal law or regulation that may govern the Company's executive compensation, including but not limited to Title VII of the American Recovery and Reinvestment Act of 2009 and the Troubled Asset Relief Program and the regulations thereunder, if a Participant reaches age 65, or reaches age 55 and has a combination of age and service to the Company and its Subsidiaries totaling 70 or more, and the Participant's employment terminates, other than for Cause or pursuant to Section 8.2 or Section 10.3, the Participant's Unvested Awards shall continue to vest as if the Participant had not terminated employment, provided that such vesting shall not accelerate or change the Payment of any award; and that such continued Vesting and Payment fully complies with Code Section 409A.

10.8 Disability. The Committee, in its sole discretion, may provide in the Award Letter or take such unilateral action so that Awards will be Paid if a Participant is Disabled (even if the Participant's employment with the Company or a Subsidiary is not terminated), provided that such Payment fully complies with Code Section 409A and any Federal law or regulation that may govern the Company's executive compensation, including but not limited to Title VII of the American Recovery and Reinvestment Act of 2009 and the

Troubled Asset Relief Program and the regulations thereunder.

10.9 Unforeseeable Emergency. The Committee, in its sole discretion, may provide in the Award Letter or take such unilateral action so that all or a portion of the Awards will be Paid if a Participant has an Unforeseeable Emergency, provided that such Payment fully complies with Code Section 409A and any Federal law or regulation that may govern the Company's executive compensation, including but not limited to Title VII of the American Recovery and Reinvestment Act of 2009 and the Troubled Asset Relief Program and the regulations thereunder.

10.10 Section 409A Mandatory 6-Month Delay. Notwithstanding anything contained in the Plan to the contrary, if the Committee determines that the Participant is a "specified employee" as such term is defined and used under Code Section 409A(a)(2)(B)(i) and Treasury Regulation Section 1.409A-3(i)(2), then all Payments based on a termination of employment shall be subject to a mandatory delay and Paid on the first day of the 7th month following the date that would have been the date of Payment if the Participant had not been determined by the Committee to be a "specified employee" and based on the most recent Common Stock Value as of the date that would have been the date of Payment had the Participant not been determined by the Committee to be a specified employee.

11.0 CLAIMS

11.1 Claims Procedure. If any Participant or Beneficiary, or his or her legal representative, has a claim for benefits under the Plan which is not being paid, such claimant may file a written claim with the Committee setting forth the amount and nature of the claim, supporting facts, and the claimant's address. Written notice of the disposition of a claim by the Committee shall be furnished to the claimant within 90 days after the claim is filed. In the event of special circumstances, the Committee may extend the period for determination for up to an additional 90 days, in which case it shall so advise the claimant. If the claim is denied, the reasons for the denial shall be specifically set forth in writing, pertinent pro-visions of the Plan shall be cited, including an explanation of the Plan's claim review procedure, and, if the claim is perfectible, an explanation as to how the claimant can perfect the claim shall be provided.

11.2 Claims Review Procedure. If a claimant whose claim has been denied wishes further consideration of his or her claim, he or she may request the Committee to review his or her claim in a written statement of the claimant's position filed with the Committee no later than 60 days after receipt of the written notification provided for in Section 11.1 above. The Committee shall fully and fairly review the matter and shall promptly advise the claimant, in writing, of its decision within the next 60 days. Due to special circumstances, the Committee may extend the period for determination for up to an additional 60 days, in which case it shall so advise the claimant.

12.0 TAXES

12.1 Withholding Taxes. The Company shall be entitled to withhold from any and all payments made to a Participant under the Plan all federal, state, local and/or other taxes or imposts which the Company determines are required to be so withheld from such payments or by reason of any other payments made to or on behalf of the Participant or for his or her benefit hereunder.

12.2 Golden Parachute Excise Tax Reduction. This 12.2 shall apply if a Participant would be entitled to amounts under the Plan which, together with any other payments or benefits to such Participant, would constitute a "parachute payment" as defined in Section 280G of the Code. Notwithstanding any provision of this Plan or any Award Agreement, payments in respect of any Award will be reduced (after giving effect to reductions of other entitlements with a view to maximizing the value to be retained by the Participant) if and to the extent that such reduction would result in a greater "Net After-Tax Amount", as hereinafter defined, than such Participant would be entitled to in the absence of such reduction. For purposes hereof, "Net After-Tax Amount" shall mean the net amount of all amounts to which such Participant is entitled that would or could constitute a "parachute payment", after giving effect to all taxes applicable to such payments, including without limitation, any tax under Section 4999 of the Code. The determination of whether and how any such payment reduction shall be effected shall be made by a nationally recognized accounting firm acceptable to the Participant and the Company.

12.3 Code Section 409A. The Plan is subject to Code Section 409A. Notwithstanding anything contained in the Plan to the contrary, the Committee shall have full authority to operate the Plan and to override or amend any provision in the Plan or any Award Letter in order for the Plan to be fully compliant – both in form and in operation – with Code Section 409A.

12.4 No Guarantee of Tax Consequences. No person connected with the Plan in any capacity, including, but not limited to, the Company and any Subsidiary and their directors, officers, agents and employees, makes any representation, commitment, or guarantee that any tax treatment, including, but not limited to, federal, state and local income, estate and gift tax treatment, will be applicable with respect to amounts payable or provided under the Plan, or paid to or for the benefit of a Participant under the Plan, or that such tax treatment will apply to or be available to a Participant on account of participation in the Plan.

13.0 MISCELLANEOUS

13.1 Listing of Awards and Related Matters. If at any time the Committee shall determine that the listing, registration or qualification of Awards with respect to any Award on any securities exchange or under any applicable law, or the consent or approval of any governmental regulatory authority, is necessary or desirable as a condition of, or in connection with, the granting of an Award, such Award may not be exercised, distributed or paid out, as the case may be, in whole or in part, unless such listing, registration, qualification, consent or approval shall have been effected or obtained free of any conditions not acceptable to the Committee.

13.2 No Right, Title, or Interest in Company Assets. Participants shall have no right, title, or interest whatsoever in or to any investments which the Company may make to aid it in meeting its obligations under the Plan. Nothing contained in the Plan, and no action taken pursuant to its provisions, shall create or be construed to create a trust of any kind, or a fiduciary relationship between the Company and any Participant, beneficiary, legal representative or any other person. To the extent that any person acquires a right to receive payments from the Company under the Plan, such right shall be no greater than the right of an unsecured general creditor of the Company. All payments to be made hereunder shall be paid from the general funds of the Company and no special or separate fund shall be established and no segregation of assets shall be made to assure payment of such amounts except as expressly set forth in the Plan.

13.3 Nontransferability. Awards granted under the Plan, and any rights and privileges pertaining thereto, may not be transferred, assigned, pledged, or hypothecated in any manner, by operation of law or otherwise, other than by will or by the laws of descent and distribution.

13.4 Voting and Distribution Rights. A Participant shall not be entitled to any voting rights, distributions or any other rights or privileges of an equity holder as a result of the grant of an Award.

13.5 No Right to Continued Employment or Service or to Grants. The Participant's rights, if any, to continue to serve the Company or any Subsidiary as an officer, employee, or otherwise, shall not be enlarged or otherwise affected by his or her designation as a Participant under the Plan, and the Company or the applicable Subsidiary reserves the right to terminate the employment of any Employee at any time. The adoption of the Plan shall not be deemed to give any Employee or any other individual any right to be selected as a Participant or to be granted an Award.

13.6 Awards Subject to Foreign Laws. The Committee may grant Awards to individual Participants who are subject to the tax and/or other laws of nations other than the United States, and such Awards may have terms and conditions as determined by the Committee as necessary to comply with applicable foreign laws. The Committee may take any action that it deems advisable to obtain approval of such Awards by the appropriate foreign governmental entity; provided, however, that no such Awards may be granted pursuant to this Section 13.4 and no action may be taken which would result in a violation of the Exchange Act or any other applicable law.

13.7 Governing Law. The Plan, all Awards granted hereunder, and all actions taken in connection herewith shall be governed by and construed in accordance with the laws of the State of Michigan without reference to principles of conflict of laws, except as superseded by applicable federal law.

**ALLY FINANCIAL INC. SEVERANCE PLAN**

**PLAN DOCUMENT**

**AND**

**SUMMARY PLAN DESCRIPTION**

**As Amended March 8, 2012**

**ALLY FINANCIAL INC. SEVERANCE PLAN**

**TABLE OF CONTENTS**

|       |                                                  | Page |
|-------|--------------------------------------------------|------|
| I.    | Purpose of the Plan                              | 4    |
| II.   | Eligibility and Participation                    | 4    |
| III.  | Qualified Terminations of Employment             | 5    |
| IV.   | Plan Benefits                                    | 6    |
| V.    | Participant's Obligations                        | 7    |
| VI.   | Tax Matters                                      | 9    |
| VII.  | Administration, Amendment and Termination        | 10   |
| VIII. | Claims Procedure                                 | 10   |
| IX.   | Other Information                                | 10   |
| X.    | Statement of ERISA Rights                        | 11   |
| XL.   | Questions Regarding The Plan                     | 12   |
| XIL.  | Miscellaneous                                    | 12   |

Appendix:    Claims Procedure

**ALLY FINANCIAL INC. SEVERANCE PLAN**

**DEFINITIONS**

|  | **Page** |
|---|---|
| **Claimant** | **16** |
| **Claims Procedure** | **10** |
| **Code** | **9** |
| **Committee** | **4** |
| **Company** | **4** |
| **ERISA** | **4** |
| **Exempt Person** | **8** |
| **General Release Document(s)** | **6** |
| **Level I Participant** | **4** |
| **Level II Participant** | **4** |
| **LTECIP** | **4** |
| **Non-Solicitation Period** | **7** |
| **Other Severance Plans** | **4** |
| **Participant** | **4** |
| **Plan** | **4** |
| **Qualified Termination of Employment** | **5** |
| **Severance Pay** | **6** |
| **SPD** | **4** |

**ALLY FINANCIAL INC. SEVERANCE PLAN**
**PLAN DOCUMENT AND SUMMARY PLAN DESCRIPTION**

This is the Summary Plan Description ("SPD") for the Ally Financial Inc. Severance Plan (the "Plan").  The Compensation and Leadership Committee of the Board of Directors (the "Committee") of Ally Financial Inc., formerly GMAC Inc. and GMAC LLC, (the "Company") adopted the Plan with an effective date of January 1, 2009, which has since been amended by the Company's Employee Benefits Committee.  The Plan is intended to be an employee welfare-benefit plan under and subject to the Employee Retirement Income Security Act of 1974, as amended, and the applicable regulations promulgated thereunder ("ERISA").  As a SPD, its purpose is to explain the Plan for you and provide you with additional information regarding the Plan.  You should read it carefully. This document also serves as the "plan document" for the Plan.

## I.        PURPOSE OF THE PLAN

The Plan is intended to provide financial and other benefits in the event of a termination of employment.  Severance payments are not to be viewed as automatic and are not compensation for past services, but instead are intended only as prospective payments that will be offered under certain circumstances. This Plan replaces and supersedes all other plans, programs, policies, agreements and arrangements of the Company (other than individual employment agreements) in which any employee has been eligible or entitled to participate ("Other Severance Plans"), and all such Other Severance Plans are hereby discontinued as of January 1, 2009.

## II.       ELIGIBILITY AND PARTICIPATION

A.        With the exception of any GMAC Mortgage Group LLC company, all United States employees of the Company will participate in the Plan ("Participants").  However, the level of participation in the Plan is determined by a Participant's level of responsibility within the Company as described below.

B.        Employees who do not participate in the Company's Long-Term Equity Compensation Incentive Plan ("LTECIP") or Band 2 and Band 3 Employees whose LTECIP participation is the result of an RSU award issued after December 31, 2011 will participate in this Plan at Benefit Level I described herein and be referred to as Level I Participants .

C.        Band 2 Employees who participate in the LTECIP by virtue of an RSU award issued prior to January 1, 2012 or who were hired with eligibility for Ally Supplemental Benefits prior to January 1, 2012, and all Band 1 Employees, will participate in this Plan at Benefit Level II described herein and be referred to as Level II

Participants; <u>provided, however,</u> that persons who participate in the LTECIP solely as the result of receiving Key Contributor Share Units ("KCSU") are not Level II Participants.  KCSU recipients will participate in the Plan at Benefit Level I described herein and remain Level I Participants.

        D.        Employees of any GMAC Mortgage Group LLC company are not eligible for any benefits under this plan.

## III.    QUALIFIED TERMINATIONS OF EMPLOYMENT

        A.        Plan benefits are payable only upon a "Qualified Termination of Employment," which means a termination of employment with the Company as a result of any of the following:

        1.      Elimination of current position or reduction in the total number of employees in the same department performing the same or similar job.

        2.      Substantial change in current duties for which the employee no longer qualifies.

        3.      Substantial change in current duties which results in a twenty percent (20%) or more reduction in salary.

        4.      Declining a geographic transfer to a new position offered to employee upon the elimination of current position as an alternative to termination, provided that the expenses associated with the transfer would qualify for receipt of benefits under the Relocation Program.

        B.        Accordingly, Plan benefits are not payable for an "unqualified" termination of employment as a result of any of the following:

        1.      Loss of temporary employment

        2.      Termination of employment where an employment or other written agreement provides for severance

        3.      Death

        4.      Disability

5.    Involuntary termination for cause as determined by the Company in its sole discretion

6.    Resignation

7.    Retirement

8.    An approved Leave of Absence or failure to return from an approved Leave of Absence

9.    Transfers from the Company to a Company affiliate.

10.    The majority of the Company's assets are sold via an asset purchase agreement or the Company ceases an operation and the same is assumed by another employer, and continued employment is offered with a comparable salary and target incentive or equity compensation opportunity (greater than 80% of current compensation and incentive package).

11.    A termination of employment for which a Participant has executed a severance and release document or has received benefits pursuant to the terms of any other severance plan.

C.    Plan benefits will not be paid unless and until the Participant signs and does not revoke a General Release Document(s) in a form(s) that is satisfactory to, approved by, and provided by the Company.  These documents may be changed from time to time.

## IV.    PLAN BENEFITS

A.    Level I Participants are eligible for the following Severance Pay (meaning  base salary only):

| Band 3 and Band 4 | | Band 2 | |
|---|---|---|---|
| Full Years of Unbroken Service | Weeks of Pay | Full Years of Unbroken Service | Weeks of Pay |
| Less than 1 | 4 | Less than 1 | 8 |
| 1 | 4 | 1 | 8 |
| 2 | 4 | 2 | 8 |
| 3 | 5 | 3 | 8 |
| 4 | 6 | 4 | 8 |
| 5 | 9 | 5 | 9 |
| 6 | 10 | 6 | 10 |
| 7 | 11 | 7 | 11 |
| 8 | 12 | 8 | 12 |
| 9 | 13 | 9 | 13 |
| 10 | 16 | 10 | 16 |
| 11 | 17 | 11 | 17 |
| 12 | 18 | 12 | 18 |
| 13 | 19 | 13 | 19 |
| 14 | 20 | 14 | 20 |
| 15 | 23 | 15 | 23 |
| 16 | 24 | 16 | 24 |
| 17 | 25 | 17 | 25 |
| 18 | 26 | 18 | 26 |
| 19 | 27 | 19 | 27 |
| 20 and more | 35 | 20 and more | 35 |

B.      Level II Participants are eligible for the following Severance Pay:

- 0-4 full years of unbroken service: 26 weeks of pay

- 5-14 full years of unbroken service: 39 weeks of pay

- 15 and above full years of unbroken service: 52 weeks of pay

C.      Base salary for the purpose of determining commission-eligible employees' Severance Pay is deemed to be $50,000 annually.

D.      Any debts or monies Participant owes to the Company or its subsidiaries or affiliates will be deducted from the Severance Pay amounts described in A & B above.

E.      Outplacement. Each Participant shall be eligible to receive outplacement benefits following a Qualified Termination of Employment through an approved vendor, provided that the scope, level, amount, timing, and all other terms and conditions of such outplacement benefits shall be determined by the Company in its sole discretion and on

an individual-by-individual or a group-by-group basis. In addition, outplacement benefits will be tiered based on employee's level in the organization, market conditions, and/or geographic area .

## V.    PARTICIPANT'S OBLIGATIONS

A.    <u>Non-Solicitation</u>. At all times prior to and following a Level II Participant's termination of employment for any reason, including voluntary termination, then during the subsequent twenty-four months ("Non-Solicitation Period") a Level II Participant shall not at any time, directly or indirectly, whether on behalf of himself or herself or any other person or entity (i) solicit any client and/or customer of the Company or any subsidiary with respect to a Competitive Activity or (ii) solicit or employ any employee of the Company or any subsidiary, or any person who was an employee of the Company or any subsidiary during the 60-day period immediately prior to the Level II Participant's termination,  for the purpose of causing such employee to terminate his or her employment with the Company or such subsidiary .

B.    <u>Confidentiality</u>. At all times prior to and following the termination date, a Participant shall not disclose to anyone or make use of any trade secret or proprietary or confidential information of the Company, including such trade secret or proprietary or confidential information of any customer or client or other entity to which the Company owes an obligation not to disclose such informa-tion, which he or she acquires during his or her employment with the Company, including but not limited to records kept in the ordinary course of business, except :

1.    as such disclosure or use may be required or appropriate in connection with his or her work as an employee of the Company; or

2.    when required to do so by a court of law, by any governmental agency having supervisory authority over the business of the Company or by any administrative or legislative body (including a committee thereof) with apparent jurisdiction to order him or her to divulge, disclose or make accessible such information; or

3.    as to such confidential information that becomes generally known to the public or trade without his or her violation of this Section V-B; or

4.    to the Participant's spouse, attorney, and/or his or her personal tax and financial advisors as reasonably necessary or appropriate to advance the Participant's tax, financial and other personal planning (each an "Exempt Person"), *provided, however*, that any disclosure or use of any trade secret or proprietary or confidential information of the Company by an Exempt Person shall be deemed to be a breach

of this Section V-B by the Participant.

        C.      <u>Non-Disparagement.</u> At all times prior to and following the termination date, a Participant shall not make any statements or express any views that disparage the business reputation or goodwill of the Company and/or any of its subsidiaries, affiliates, investors, members, officers, or employees.

        D.      <u>Return of Company Property</u>. Immediately following the termination date, a Participant will immediately return all Company property in his or her possession, including but not limited to all computer equipment (hardware and software), telephones, facsimile machines, electronic communication devices, credit cards, office keys, security access cards, badges, identification cards and all copies (including drafts) of any documentation or information (however stored) relating to the business of the Company, its customers and clients or its prospective customers and clients.

        E.      <u>Cooperation</u>. Following the termination date, a Participant will cooperate willingly, as the Company may reasonably request, including his or her attendance and truthful testimony where deemed appropriate by the Company, with respect to any investigation or the Company's defense or prosecution of any existing or future claims or litigations or other proceeding relating to matters in which he or she was involved or potentially had knowledge by virtue of his or her employment with the Company.

        F.      <u>Enforcement of Section V.</u> If a Participant materially violates any provision of this Section V, he or she shall immediately forfeit any right, title and interest to any Severance Pay that has not yet been paid or provided and shall be required to repay to the Company a cash amount equal to the value of the Severance Pay that he or she has already received and shall reimburse the Company for its legal fees and costs associated with recovery of these amounts.

        G.      <u>Enforcement of Non-Solicitation and Confidentiality Covenants.</u> If a Participant violates or threatens to violate any provisions of Section V, the Company shall not have an adequate remedy at law. Accordingly, the Company shall be entitled to such equitable and injunctive relief, without posting a bond, as may be available to restrain the Participant and any business, firm, partnership, individual, corporation or entity participating in the breach or threatened breach from the violation of the provisions of Section V. Nothing in the Plan shall be construed as prohibiting the Company from pursuing any other remedies available at law or in equity for breach or threatened breach of Section V, including the recovery of damages. If Company is successful in enforcing its rights under this provision, the affected Participant will reimburse the Company for its legal fees and costs associated with such enforcement action.

## VI.   TAX MATTERS

A.    <u>Withholding Taxes</u>. The Company shall be entitled to withhold from any and all payments made under the Plan all federal, state, local and/or other taxes or imposts which the Company determines are required to be so withheld from such payment .

B.    <u>Code Section 409A</u>. The Plan is not intended to be subject to Code Section 409A.  Notwithstanding anything contained in the Plan to the contrary, the Committee shall have full authority to operate the Plan and to override or amend any provision in the Plan and any Participation Agreement in order for the Plan to be fully compliant - both in form and in operation - with Code Section 409A.

C.    <u>No Guarantee of Tax Consequences</u>. No person connected with the Plan in any capacity, including, but not limited to, the Company and any subsidiary and their directors, officers, agents and employees makes any representation, commitment, or guarantee that any tax treatment, including, but not limited to, federal, state and local income, estate and gift tax treatment, will be applicable with respect to amounts payable or provided under the Plan, or paid to or for the benefit of a Participant under the Plan, or that such tax treatment will apply to or be available to a Participant on account of participation in the Plan .

## VII.    ADMINISTRATION, AMENDMENT AND TERMINATION

The Company has and retains the right to interpret, amend, revise, cancel or terminate the Plan at any time and without prior notice, provided any amendment, revision, cancellation or termination of the Plan will not reduce a Participant's benefits to which he or she has become entitled due to a Qualified Termination of Employment that has already occurred or is about to occur.  No representations by anyone may extend the Plan to provide severance packages or benefits not covered by the Plan.

The Company, and such other person(s) or entity(ies) to whom such authority has been delegated as a fiduciary of the Plan, shall in its sole discretion determine each employee's eligibility under the Plan and the amount of Severance Pay or other benefits under the Plan, and in connection therewith in such fiduciary capacity and in its sole discretion shall make factual determinations.   Such determinations shall be made under the Claims Procedure (explained below) when the Claims Procedure is applicable.

The Company, and such other person(s) or entity(ies) to whom such authority has been delegated as a fiduciary of the Plan, acting under the Claims Procedure or otherwise, shall have the authority and responsibility, in its sole discretion, to interpret or construe the terms and provisions of the Plan.

## VIII.    CLAIMS PROCEDURE

If you believe that you are entitled to severance benefits, you must make a claim

for benefits by following the Claims Procedure set forth in the Appendix to this document.

## IX.        OTHER INFORMATION

**Official Plan Name:** Ally Financial Inc. Severance Plan

**Name and Address of Employer that Maintains the Plan:**
Ally Financial Inc., 200 Renaissance Center, M/C482-B09-C24, Detroit, MI. 48265.

**Employer Identification Number of Employer that Maintains the Plan:**  38-0572512

**Plan Number:** 535

**Type of Plan:** Welfare - Severance

**Type of Administration:** Self-administered by Ally Financial Inc.

**Funding:** The Plan is unfunded and uninsured.

**Sources of Contributions:** The employer, Ally Financial Inc., makes contributions in the amount necessary to pay benefits.

**Agent for Service of Legal Process on the Plan and Address at which Process May Be Served:**  Ally Financial Inc., 200 Renaissance Center, M/C482-B09-C24, Detroit, MI. 48265.

**Date of the End of the Year for Purposes of Maintaining the Plan's Fiscal Records (that is, the plan year end):** December 31.

## X.        STATEMENT OF ERISA RIGHTS

As a participant in the Ally Financial Inc. Severance Plan, you are entitled to certain rights and protections under ERISA. ERISA provides that all Plan participants shall be entitled to:

Receive Information about Your Plan and Benefits

• Examine, without charge, at the plan administrator's office and at other

specified locations, such as worksites, all documents governing the Plan, and a copy of the latest annual report (Form 5500 Series), if any, filed by the plan with the U.S. Department of Labor, and available at the Public Disclosure Room of the Employee Benefits Security Administration.

- Obtain upon written request to the plan administrator copies of documents governing the operation of the Plan and copies of the latest annual report (Form 5500 Series), if any, and updated summary plan description. The plan administrator may make a reasonable charge for the copies.

- Receive a summary of the Plan's annual financial report. The plan administrator is required by law to furnish each participant with a copy of this summary annual report.

Prudent Actions by Plan Fiduciaries

In addition to creating rights for Plan participants ERISA imposes duties upon the people who are responsible for the operation of the Plan. The people who operate your Plan, called "fiduciaries" of the Plan, have a duty to do so prudently and in the interest of you and other Plan participants and beneficiaries. No one, including your employer or any other person, may fire you or otherwise discriminate against you in any way to prevent you from obtaining a benefit under the Plan or exercising your rights under ERISA.

Enforce Your Rights

If your claim for a Plan benefit is denied or ignored, in whole or in part, you have a right to know why this was done, to obtain copies of documents relating to the decision without charge, and to appeal any denial, all within certain time schedules.

Under ERISA, there are steps you can take to enforce the above rights. For instance, if you request a copy of the plan documents or latest annual report from the Plan and do not receive them within 30 days, you may file suit in a Federal court. In such a case, the court may require the plan administrator to provide the materials and pay you up to $110 a day until you receive the materials, unless the materials were not sent because of reasons beyond the control of the administrator. If you have a claim for benefits which is denied or ignored, in whole or in part, you may file suit in a state or Federal court. If it should happen that plan fiduciaries misuse the plan's money, or if you are discriminated against for asserting your rights, you may seek assistance from the U.S. Department of Labor, or you may file a suit in a Federal court. The court will decide who should pay court costs and legal fees. If you are successful, the court may order the person you have sued to pay these costs and fees. If you lose, the court may order you to pay these costs and fees, for example, if it finds your claim is frivolous.

If you have any questions about your Plan, you should contact the plan administrator (see below).  If you have any questions about this statement or about your rights under ERISA, or if you need assistance in obtaining documents from the plan administrator, you should contact the nearest office of the Employee Benefits Security Administration, U.S. Department of Labor, listed in your telephone directory, or the Division of Technical Assistance and Inquiries, Employee Benefits Security Administration, U.S. Department of Labor, 200 Constitution Avenue, N.W., Washington, D.C. 20210. You may also obtain certain publications about your rights and responsibilities under ERISA by calling the publications hotline of the Employee Benefits Security Administration .

## XI.    QUESTIONS REGARDING THE PLAN

Questions regarding the Plan may be directed to: the Vice President of Total Rewards, Ally Financial Inc.,  1177 Avenue of the Americas, New York, NY 10036.

## XII.    MISCELLANEOUS

A.    <u>No Mitigation.</u> A Participant shall be under no obliga-tion to seek other employment following the termination date and there will be no offset against amounts due to the Participant under the Plan on account of any compensation attributable to any subsequent employment.

B.    <u>Offset.</u> Any benefits paid under the Plan will be reduced by any payment or benefit made or provided by the Company or any subsidiary to the Participant pursuant to (i) any severance plan, program, policy or arrangement of the Company or any subsidiary not otherwise referred to in the Plan, (ii) the termination-of-employment provisions of any employment agreement between the Company or any subsidiary and the Participant, and (iii) any federal, state or local statute, rule, regulation or ordinance .

C.    <u>No Right, Title, or Interest in Company Assets.</u> Participants shall have no right, title, or interest whatsoever in or to any assets of the Company or any investments which the Company may make to aid it in meeting its obligations under the Plan.   Nothing contained in the Plan, and no action taken pursuant to its provisions, shall create or be construed to create a trust of any kind, or a fiduciary relationship between the Company and any Participant, or his or her beneficiary, legal representative or any other person.   To the extent that any person acquires a right to receive payments from the Company under the Plan, such right shall be no greater than the right of an unsecured general creditor of the Company.  Subject to this Section XII-C, all payments to be made hereunder shall be paid from the general funds of the Company and no special or separate fund shall be established and no segregation of assets shall be made to assure payment of such amounts

D.    <u>No Right to Continued Employment.</u> A Participant's rights, if any, to

continue to serve the Company as an employee shall not be enlarged or otherwise affected by his or her designation as a participant under the Plan, and the Company or the applicable subsidiary reserves the right to terminate the employment of any employee at any time. The adoption of the Plan shall not be deemed to give any employee, or any other individual any right to be selected as a participant or to continued employment with the Company or any subsidiary.

E.    <u>Other Rights.</u> The Plan shall not affect or impair the rights or obligations of the Company or a Participant under any other written plan, contract, arrangement, or pension, profit sharing or other compensation plan, provided however, that if any provision of any agreement, plan, program policy, arrangement or other written document between or relating to the Company and the Participant conflicts with any provision of the Plan, the provision of the Plan shall control and prevail.

F.    <u>Governing Law.</u> The Plan shall be governed by and construed in accordance with the laws of the State of Michigan without reference to principles of conflict of laws, except as superseded by ERISA and other applicable federal law.

G.    <u>Severability.</u> If any term or condition of the Plan shall be invalid or unenforceable to any extent or in any application, then the remainder of the Plan, with the exception of such invalid or unenforceable provision, shall not be affected thereby and shall continue in effect and application to its fullest extent.

H.    <u>Executive Compensation Requirements.</u>  It is intended that the Plan will fully comply with the Emergency Economic Stabilization Act of 2008 ("EESA"), the American Recovery and Reinvestment Act of 2009 ("ARRA"), any and all regulations promulgated under EESA and ARRA, and any and all other federal and state rules, regulations, and policies regulating executive compensation (collectively "Executive Compensation Requirements").  The Company may unilaterally take whatever actions, or refrain from taking any action, that it considers in its sole discretion is necessary to comply with the Executive Compensation Requirements.  Such actions include, but are not limited to, requiring repayment of any Plan benefits determined to have been based on statements of earnings, revenues, gains, or other criteria that are later found to be materially inaccurate.  The Committee may, in its discretion, demand repayment from other Plan benefit recipients based on the same determination.

* * * * *

**APPENDIX**

**CLAIMS PROCEDURE**

1.      A participant ("claimant") with an interest in the Ally Financial Inc. Severance Plan (the "Plan") shall have the right to file a claim for benefits under the Plan and to appeal any denial of a claim for benefits.  Any request for a Plan benefit or to clarify the claimant's rights to future benefits under the terms of the Plan shall be considered to be a claim.  (However, this claims procedure does not govern casual inquiries about benefits or the circumstances under which benefits might be paid under the terms of the Plan, nor does it govern a request for a determination regarding eligibility for coverage except such a determination as is requested or necessary in connection with a claim for benefits.)  An authorized representative of the claimant may act on behalf of the claimant in pursuing a benefit claim or appeal of an adverse benefit determination.  The individual or individuals responsible for deciding the benefit claim or appeal, as applicable, may require the representative to provide reasonable written proof that the representative has in fact been authorized to act on behalf of the claimant.  The Plan requires no fee or other cost for the making of a claim or appealing an adverse benefit determination.

2.      A claim for benefits will be considered as having been made when submitted in writing by the claimant to the plan administrator, in care of:

            Vice President Total Rewards
            Ally Financial Inc.
            1177 Avenue of the Americas
            New York, NY 10036

        Your claim should include the following:

            Your name, address, telephone number, and employee identity number.

            Your dates of employment with the Company.

            Your job title and position with the Company.

            The reasons for your termination of employment; and

                A statement of the reasons why you are entitled to severance pay under the Plan

3.      A claim for benefits will be considered as having been made when submitted in writing by the claimant to the plan administrator, in care of: The Vice President of Total Rewards of the Company, acting on behalf of the plan administrator, will determine whether, or to what extent, the claim may be allowed or denied under the terms of the Plan.  If the claim is wholly or partially denied, the plan administrator shall notify the claimant of the Plan's adverse benefit determination

within a reasonable period of time, but not later than 90 days after the Plan receives the claim, unless the plan administrator determines that special circumstances require an extension of time for processing the claim. If such an extension of time for processing is required, written notice of the extension shall be furnished to the claimant prior to the termination of the initial 90-day period. Such extension may not exceed an additional 90 days from the end of the initial 90-day period.  The extension notice shall indicate the special circumstances requiring an extension of time and the date by which the Plan expects to render the final decision. For the purposes of this paragraph 3, the period of time within which a benefit determination is required to be made shall begin at the time a claim is filed in accordance with the Plan's filing requirements, without regard to whether all the information necessary to make a benefit determination accompanies the filing.

4.     The plan administrator shall provide a claimant with written or electronic notification of any adverse benefit determination.  Any electronic notification shall comply with the standards imposed by 29 CFR § 2520.104b-1(c)(i), (iii) and (iv).  The notification shall set forth, in a manner calculated to be understood by the claimant:

   (1)     The specific reason(s) for the adverse determination;

   (2)     Reference to the specific Plan provisions on which the determination is based;

   (3)     A description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary; and

   (4)     A description of the Plan's appeal (review) procedures and the time limits applicable to such procedures, including a statement of the claimant's right to bring a civil action under ERISA § 502(a) following an adverse benefit determination on appeal.

4.     The claimant may appeal an adverse benefit determination to the Vice President of Total Rewards acting on behalf of the plan administrator. The Vice President of Total Rewards shall conduct a full and fair review of each appealed claim and its denial.  The claimant shall have at least 60 days following receipt of a notification of an adverse benefit determination within which to appeal the determination.

5.     The claimant may appeal an adverse benefit determination to the Vice President of Total Rewards acting on behalf of the plan administrator. The Vice President of Total Rewards shall conduct a full and fair review of each appealed claim and

its denial. The claimant shall have at least 60 days following receipt of a notification of an adverse benefit determination within which to appeal the determination.

6.

1.    The appeal of an adverse benefit determination must be made in writing. In connection with making such request, the claimant may submit written comments, documents, records, and other information relating to the claim for benefits. The claimant shall be provided, free of charge upon written request, reasonable access to, and copies of, all documents, records and other information relevant (as defined in paragraph (k) below) to the claimant's claim for benefits. In considering the appeal the Vice President of Total Rewards shall take into account all comments, documents, records, and other information submitted by the claimant relating to the claim, without regard to whether such information was submitted or considered in connection with the initial benefit determination.

*General procedure.* The plan administrator shall notify a claimant of the Plan's benefit determination upon appeal within a reasonable period of time, but not later than 60 days after receipt of the claimant's appeal. However, the plan administrator may determine that special circumstances (such as the need to hold a hearing) require an extension of time for processing the claim. If the plan administrator determines that an extension of time, not to exceed 60 days, for processing is required, written notice of the extension shall be furnished to the claimant prior to the termination of the initial 60-day period. The extension notice shall indicate the special circumstances requiring an extension of time and the date by which the Plan expects to render the determination on appeal.

*Calculating time periods.* For the purposes of this paragraph (f), the period of time within which a benefit determination on appeal is required to be made shall begin at the time an appeal is filed in accordance with the Plan's appeal filing requirements, without regard to whether all the information necessary to make a benefit determination on appeal accompanies the filing. In the event that a period of time is extended as provided above for the determination of a claim on appeal due to a claimant's failure to submit information necessary to decide an appeal of an adverse benefit determination, the period for making the benefit determination on appeal shall be tolled from the date on which the notification of the extension is sent to the claimant until the date on which the claimant responds to the request for additional information.

*Furnishing documents.* In the case of an adverse determination on appeal, the plan administrator shall provide such access to, and copies of, documents, records, and other information described in subparagraphs (g)

(3) and (4) below as is appropriate.

7.      The plan administrator shall provide a claimant with written or electronic notification of the Plan's benefit determination on appeal. Any electronic notification shall comply with the standards imposed by 29 CFR § 2520.104b-1(c)(i), (iii) and (iv).  In the case of an adverse benefit determination on appeal, the notification shall set forth, in a manner calculated to be understood by the claimant:

    (1)      The specific reason(s) for the adverse determination;

    (2)      Reference to the specific Plan provisions on which the benefit determination is based;

    (3)      A statement that the claimant is entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant (as defined in paragraph (k) below) to the claimant's claim for benefits; and

    (4)      A statement of the claimant's right to bring a civil action under ERISA § 502(a).

8.      The claimant must exhaust his or her rights to file a claim and to appeal an adverse benefit determination before bringing any civil action to recover benefits due to him under the terms of the Plan, to enforce his or her rights under the terms of the Plan, or to clarify his or her rights to future benefits under the terms of the Plan.

9.      The Vice President of Total Rewards shall exercise his or her responsibilities and authority under this claims procedure as a fiduciary and, in such capacity, shall have the discretionary authority and responsibility (1) to interpret and construe the Plan and any rules or regulations under the Plan, (2) to determine the eligibility of employees to participate in the Plan, and the rights of participants and former participants and any other claimants to receive benefits under the Plan, and (3) to make factual determinations in connection with any of the foregoing.  The Vice President of Total Rewards may, in his or her discretion, determine to hold a hearing or hearings in carrying out his or her responsibilities and authority under this claims procedure.

10.    Benefit claim determinations and decisions on appeals shall be made in accordance with governing Plan documents.  The Plan's provisions shall be applied consistently with respect to similarly situated claimants.  The Vice President of Total Rewards shall maintain complete records of his or her proceedings in deciding claims and appeals.

11.    Definitions. For the purposes of this Claims Procedure the following definitions apply:

"*Adverse benefit determination*" means any of the following: a denial, reduction, or termination of, or a failure to provide or make payment (in whole or in part) for, a benefit, including any such denial, reduction, termination, or failure to provide or make payment that is based on a determination of a participant's eligibility to participate in the Plan.

A document, record, or other information shall be considered " *relevant*" to a claimant's claim if such document, record, or other information (i) was relied upon in making the benefit determination, (ii) was submitted, considered, or generated in the course of making the benefit determination, without regard to whether such document, record, or other information was relied upon in making the benefit determination, or (iii) demonstrates compliance with the administrative processes and safeguards required pursuant to paragraph (j) above in making the benefit determination.



[Date]


**[Name]**

Re: ***Ally Deferred Stock Units***


Dear [Name]:

Consistent with the recent determination from the Office of the Special Master for TARP Executive Compensation, effective January 1, 2012 (the "Investment Date"), a portion of your annualized 2012 base compensation, $_____ will be deferred and invested in Deferred Stock Units (DSUs) as described below.

This form of compensation remains subject to revision at any time in order to comply with any Federal law or regulation that may govern executive compensation, including but not limited to Title VII of the American Recovery and Reinvestment Act of 2009, the Interim final Rules issued pursuant to this law, and the Troubled Asset Relief Program (collectively the "TARP Rules"). Additionally, the components of your total compensation, as well as the allocation of your total compensation among the various components may be prospectively adjusted at any time at Ally's sole discretion.

Investment in any DSUs for 2012 will occur at the end of each 2012 payroll cycle (the "Investment Date"), retroactive to the first 2012 payroll. The value of a DSU on the Investment Date will be based on the value of a Restricted Stock Unit on the Investment Date (as defined in the Long Term Equity Compensation Incentive Plan or "LTECIP"). The value at the time of any payment ("Settlement Date") will be the value of a Restricted Stock Unit as defined in and determined pursuant to the LTECIP. The value of a DSU may change from the Investment Date to the Settlement Date due to increases or decreases in Ally's value, as well as adjustments for recapitalization, merger, etc. as outlined in Section 6.2 of the LTECIP.

Unless otherwise specified in any plan document, DSUs will not determine any potential severance you may become eligible for. Rather, severance under any applicable plan will be determined based only upon your direct cash compensation in effect prior to becoming one of Ally's 25 highest compensated employees or otherwise restricted by the TARP Rules.

Subject to requirements of any Federal laws or regulations that may govern executive compensation, including but not limited to the TARP Rules, settlement of your DSUs will be made as follows with each occurrence constituting a "Settlement Date":

- For 1/3 of each investment, on the first payroll following a date 12 months from Investment Date
- For 1/3 of each investment, on the first payroll following a date 24 months from Investment Date
- For 1/3 of each investment, on the first payroll following a date 36 months from Investment Date

These payments are not subject to forfeiture and will be made pursuant to this Settlement schedule, regardless of your employment status.

By signing below, you acknowledge and agree to this settlement schedule for any 2012 DSUs. You also acknowledge your understanding that your DSUs are subject to the rules under Code Section 409A, and you agree and accept all risks (including increased taxes and penalties) resulting from Code Section

409A. In order to receive these DSUs, your signature is required no later than  **[Date]**. Please return the signed copy to _____.

Sincerely yours,


James J. Duffy
Ally Group VP and Chief HR Officer
[Date]


_____        _____
**Signature**                                                        **Date**



*200 Renaissance Center, M/C482-B14-D46, Detroit, MI. 48265*

April 12, 2012

**Michael Carpenter**

**Re: *Ally Deferred Stock Units***

Dear Michael:

Consistent with the recent determination from the Office of the Special Master for TARP Executive Compensation, effective January 1, 2012 (the "Investment Date"), a portion of your annualized 2012 base compensation, $8,000,000 will be deferred and invested in Deferred Stock Units (DSUs) as described below.

This form of compensation remains subject to revision at any time in order to comply with any Federal law or regulation that may govern executive compensation, including but not limited to Title VII of the American Recovery and Reinvestment Act of 2009, the Interim final Rules issued pursuant to this law, and the Troubled Asset Relief Program (collectively the "TARP Rules"). Additionally, the components of your total compensation, as well as the allocation of your total compensation among the various components may be prospectively adjusted at any time at Ally's sole discretion.

Investment in any DSUs for 2012 will occur at the end of each 2012 payroll cycle (the "Investment Date"), retroactive to the first 2012 payroll. The value of a DSU on the Investment Date will be based on the value of a Restricted Stock Unit on the Investment Date (as defined in the Long Term Equity Compensation Incentive Plan or "LTECIP"). The value at the time of any payment ("Settlement Date") will be the value of a Restricted Stock Unit as defined in and determined pursuant to the LTECIP. The value of a DSU may change from the Investment Date to the Settlement Date due to increases or decreases in Ally's value, as well as adjustments for recapitalization, merger, etc. as outlined in Section 6.2 of the LTECIP.

Unless otherwise specified in any plan document, DSUs will not determine any potential severance you may become eligible for. Rather, severance under any applicable plan will be determined based only upon your direct cash compensation in effect prior to becoming one of Ally's 25 highest compensated employees or otherwise restricted by the TARP Rules.

Subject to requirements of any Federal laws or regulations that may govern executive compensation, including but not limited to the TARP Rules, settlement of your DSUs will be made as follows with each occurrence constituting a "Settlement Date":

•    For 1/3 of each investment, on the first payroll following a date 12 months from Investment Date
•    For 1/3 of each investment, on the first payroll following a date 24 months from Investment Date
•    For 1/3 of each investment, on the first payroll following a date 36 months from Investment Date

These payments are not subject to forfeiture and will be made pursuant to this Settlement schedule, regardless of your employment status. By signing below, you acknowledge and agree to this settlement schedule for any 2012 DSUs. You also acknowledge your understanding that your DSUs are subject to the rules under Code Section 409A, and

you agree and accept all risks (including increased taxes and penalties) resulting from Code Section 409A.  In order to receive these DSUs, your signature is required no later than **May 18, 2012**. Please return the signed copy to Thelma Socia; thelmasocia@ally.com, Phone (313) 656-6156.


Sincerely yours,


James J. Duffy
Ally Group VP and Chief HR Officer
April 12, 2012


**/s/ Michael A. Carpenter**                                              **May 14, 2012**
**Signature**                                                                        **Date**



*200 Renaissance Center, M/C482-B14-D46, Detroit, MI. 48265*

April 12, 2012


**Jeffrey Brown**

**Re: *Ally Deferred Stock Units***


Dear Jeffrey:

Consistent with the recent determination from the Office of the Special Master for TARP Executive Compensation, effective January 1, 2012 (the "Investment Date"), a portion of your annualized 2012 base compensation, $2,350,000 will be deferred and invested in Deferred Stock Units (DSUs) as described below.

This form of compensation remains subject to revision at any time in order to comply with any Federal law or regulation that may govern executive compensation, including but not limited to Title VII of the American Recovery and Reinvestment Act of 2009, the Interim final Rules issued pursuant to this law, and the Troubled Asset Relief Program (collectively the "TARP Rules"). Additionally, the components of your total compensation, as well as the allocation of your total compensation among the various components may be prospectively adjusted at any time at Ally's sole discretion.

Investment in any DSUs for 2012 will occur at the end of each 2012 payroll cycle (the "Investment Date"), retroactive to the first 2012 payroll. The value of a DSU on the Investment Date will be based on the value of a Restricted Stock Unit on the Investment Date (as defined in the Long Term Equity Compensation Incentive Plan or "LTECIP"). The value at the time of any payment ("Settlement Date") will be the value of a Restricted Stock Unit as defined in and determined pursuant to the LTECIP. The value of a DSU may change from the Investment Date to the Settlement Date due to increases or decreases in Ally's value, as well as adjustments for recapitalization, merger, etc. as outlined in Section 6.2 of the LTECIP.

Unless otherwise specified in any plan document, DSUs will not determine any potential severance you may become eligible for. Rather, severance under any applicable plan will be determined based only upon your direct cash compensation in effect prior to becoming one of Ally's 25 highest compensated employees or otherwise restricted by the TARP Rules.

Subject to requirements of any Federal laws or regulations that may govern executive compensation, including but not limited to the TARP Rules, settlement of your DSUs will be made as follows with each occurrence constituting a "Settlement Date":

- For 1/3 of each investment, on the first payroll following a date 12 months from Investment Date
- For 1/3 of each investment, on the first payroll following a date 24 months from Investment Date
- For 1/3 of each investment, on the first payroll following a date 36 months from Investment Date

These payments are not subject to forfeiture and will be made pursuant to this Settlement schedule, regardless of your employment status.

By signing below, you acknowledge and agree to this settlement schedule for any 2012 DSUs.  You also acknowledge your understanding that your DSUs are subject to the rules under Code Section 409A, and you agree and accept all risks (including increased taxes and penalties) resulting from Code Section 409A.  In order to receive these DSUs, your signature is required no later than **May 18, 2012**. Please return the signed copy to Thelma Socia; thelmasocia@ally.com, Phone (313) 656-6156.

Sincerely yours,

James J. Duffy
Ally Group VP and Chief HR Officer
April 12, 20112

**/s/ Jeffrey J. Brown**                                                          **May 15, 2012**
**Signature**                                                                         **Date**



*200 Renaissance Center, M/C482-B14-D46, Detroit, MI. 48265*

April 12, 2012


**Barbara Yastine**

**Re: *Ally Deferred Stock Units***


Dear Barbara:

Consistent with the recent determination from the Office of the Special Master for TARP Executive Compensation, effective January 1, 2012 (the "Investment Date"), a portion of your annualized 2012 base compensation, $2,858,238 will be deferred and invested in Deferred Stock Units (DSUs) as described below.

This form of compensation remains subject to revision at any time in order to comply with any Federal law or regulation that may govern executive compensation, including but not limited to Title VII of the American Recovery and Reinvestment Act of 2009, the Interim final Rules issued pursuant to this law, and the Troubled Asset Relief Program (collectively the "TARP Rules"). Additionally, the components of your total compensation, as well as the allocation of your total compensation among the various components may be prospectively adjusted at any time at Ally's sole discretion.

Investment in any DSUs for 2012 will occur at the end of each 2012 payroll cycle (the "Investment Date"), retroactive to the first 2012 payroll. The value of a DSU on the Investment Date will be based on the value of a Restricted Stock Unit on the Investment Date (as defined in the Long Term Equity Compensation Incentive Plan or "LTECIP"). The value at the time of any payment ("Settlement Date") will be the value of a Restricted Stock Unit as defined in and determined pursuant to the LTECIP. The value of a DSU may change from the Investment Date to the Settlement Date due to increases or decreases in Ally's value, as well as adjustments for recapitalization, merger, etc. as outlined in Section 6.2 of the LTECIP.

Unless otherwise specified in any plan document, DSUs will not determine any potential severance you may become eligible for. Rather, severance under any applicable plan will be determined based only upon your direct cash compensation in effect prior to becoming one of Ally's 25 highest compensated employees or otherwise restricted by the TARP Rules.

Subject to requirements of any Federal laws or regulations that may govern executive compensation, including but not limited to the TARP Rules, settlement of your DSUs will be made as follows with each occurrence constituting a "Settlement Date":

•    For 1/3 of each investment, on the first payroll following a date 12 months from Investment Date
•    For 1/3 of each investment, on the first payroll following a date 24 months from Investment Date
•    For 1/3 of each investment, on the first payroll following a date 36 months from Investment Date

These payments are not subject to forfeiture and will be made pursuant to this Settlement schedule, regardless of your employment status.

---

By signing below, you acknowledge and agree to this settlement schedule for any 2012 DSUs.  You also acknowledge your understanding that your DSUs are subject to the rules under Code Section 409A, and you agree and accept all risks (including increased taxes and penalties) resulting from Code Section 409A.  In order to receive these DSUs, your signature is required no later than **May 18, 2012**. Please return the signed copy to Thelma Socia; thelmasocia@ally.com, Phone (313) 656-6156.

Sincerely yours,

James J. Duffy
Ally Group VP and Chief HR Officer
April 12, 2012

**/s/ Barbara A. Yastine**                                **May 15, 2012**

**Signature**                                                       **Date**



*200 Renaissance Center, M/C482-B14-D46, Detroit, MI. 48265*

April 12, 2012

**William Muir**

**Re: *Ally Deferred Stock Units***

Dear William:

Consistent with the recent determination from the Office of the Special Master for TARP Executive Compensation, effective January 1, 2012 (the "Investment Date"), a portion of your annualized 2012 base compensation, $2,071,000 will be deferred and invested in Deferred Stock Units (DSUs) as described below.

This form of compensation remains subject to revision at any time in order to comply with any Federal law or regulation that may govern executive compensation, including but not limited to Title VII of the American Recovery and Reinvestment Act of 2009, the Interim final Rules issued pursuant to this law, and the Troubled Asset Relief Program (collectively the "TARP Rules"). Additionally, the components of your total compensation, as well as the allocation of your total compensation among the various components may be prospectively adjusted at any time at Ally's sole discretion.

Investment in any DSUs for 2012 will occur at the end of each 2012 payroll cycle (the "Investment Date"), retroactive to the first 2012 payroll. The value of a DSU on the Investment Date will be based on the value of a Restricted Stock Unit on the Investment Date (as defined in the Long Term Equity Compensation Incentive Plan or "LTECIP"). The value at the time of any payment ("Settlement Date") will be the value of a Restricted Stock Unit as defined in and determined pursuant to the LTECIP. The value of a DSU may change from the Investment Date to the Settlement Date due to increases or decreases in Ally's value, as well as adjustments for recapitalization, merger, etc. as outlined in Section 6.2 of the LTECIP.

Unless otherwise specified in any plan document, DSUs will not determine any potential severance you may become eligible for.  Rather, severance under any applicable plan will be determined based only upon your direct cash compensation in effect prior to becoming one of Ally's 25 highest compensated employees or otherwise restricted by the TARP Rules.

Subject to requirements of any Federal laws or regulations that may govern executive compensation, including but not limited to the TARP Rules, settlement of your DSUs will be made as follows with each occurrence constituting a "Settlement Date":

- For 1/3 of each investment, on the first payroll following a date 12 months from Investment Date
- For 1/3 of each investment, on the first payroll following a date 24 months from Investment Date
- For 1/3 of each investment, on the first payroll following a date 36 months from Investment Date

These payments are not subject to forfeiture and will be made pursuant to this Settlement schedule, regardless of your employment status.

By signing below, you acknowledge and agree to this settlement schedule for any 2012 DSUs.  You also acknowledge your understanding that your DSUs are subject to the rules under Code Section 409A, and you agree and accept all risks (including increased taxes and penalties) resulting from Code Section 409A.  In order to receive these DSUs, your signature is required no later than  **May 18, 2012**. Please return the signed copy to Thelma Socia; thelmasocia@ally.com, Phone (313) 656-6156.

Sincerely yours,

James J. Duffy
Ally Group VP and Chief HR Officer
April 12, 2012

**/s/ William F. Muir**                                               **April 17, 2012**
**Signature**                                                        **Date**



*200 Renaissance Center, M/C482-B14-D46, Detroit, MI. 48265*

April 12, 2012

**James Mackey**

**Re:** *Ally Deferred Stock Units*

Dear James:

Consistent with the recent determination from the Office of the Special Master for TARP Executive Compensation, effective January 1, 2012 (the "Investment Date"), a portion of your annualized 2012 base compensation, $1,450,000 will be deferred and invested in Deferred Stock Units (DSUs) as described below.

This form of compensation remains subject to revision at any time in order to comply with any Federal law or regulation that may govern executive compensation, including but not limited to Title VII of the American Recovery and Reinvestment Act of 2009, the Interim final Rules issued pursuant to this law, and the Troubled Asset Relief Program (collectively the "TARP Rules"). Additionally, the components of your total compensation, as well as the allocation of your total compensation among the various components may be prospectively adjusted at any time at Ally's sole discretion.

Investment in any DSUs for 2012 will occur at the end of each 2012 payroll cycle (the "Investment Date"), retroactive to the first 2012 payroll. The value of a DSU on the Investment Date will be based on the value of a Restricted Stock Unit on the Investment Date (as defined in the Long Term Equity Compensation Incentive Plan or "LTECIP"). The value at the time of any payment ("Settlement Date") will be the value of a Restricted Stock Unit as defined in and determined pursuant to the LTECIP. The value of a DSU may change from the Investment Date to the Settlement Date due to increases or decreases in Ally's value, as well as adjustments for recapitalization, merger, etc. as outlined in Section 6.2 of the LTECIP.

Unless otherwise specified in any plan document, DSUs will not determine any potential severance you may become eligible for. Rather, severance under any applicable plan will be determined based only upon your direct cash compensation in effect prior to becoming one of Ally's 25 highest compensated employees or otherwise restricted by the TARP Rules.

Subject to requirements of any Federal laws or regulations that may govern executive compensation, including but not limited to the TARP Rules, settlement of your DSUs will be made as follows with each occurrence constituting a "Settlement Date":

•   For 1/3 of each investment, on the first payroll following a date 12 months from Investment Date
•   For 1/3 of each investment, on the first payroll following a date 24 months from Investment Date
•   For 1/3 of each investment, on the first payroll following a date 36 months from Investment Date

These payments are not subject to forfeiture and will be made pursuant to this Settlement schedule, regardless of your employment status.

By signing below, you acknowledge and agree to this settlement schedule for any 2012 DSUs. You also acknowledge your understanding that your DSUs are subject to the rules under Code Section 409A, and you agree and accept all risks (including increased taxes and penalties) resulting from Code Section 409A. In order to receive these DSUs, your signature is required no later than **May 18, 2012**. Please return the signed copy to Thelma Socia; thelmasocia@ally.com, Phone (313) 656-6156.

Sincerely yours,

James J. Duffy
Ally Group VP and Chief HR Officer
April 12, 2012

**/s/ James G. Mackey**                                                              **April 16, 2012**
**Signature**                                                                        **Date**



*200 Renaissance Center, M/C482-B14-D46, Detroit, MI. 48265*

April 12, 2012

**Thomas Marano**

**Re: *Ally Deferred Stock Units***

Dear Thomas:

Consistent with the recent determination from the Office of the Special Master for TARP Executive Compensation, effective January 1, 2012 (the "Investment Date"), a portion of your annualized 2012 base compensation, $4,735,633 will be deferred and invested in Deferred Stock Units (DSUs) as described below.

This form of compensation remains subject to revision at any time in order to comply with any Federal law or regulation that may govern executive compensation, including but not limited to Title VII of the American Recovery and Reinvestment Act of 2009, the Interim final Rules issued pursuant to this law, and the Troubled Asset Relief Program (collectively the "TARP Rules"). Additionally, the components of your total compensation, as well as the allocation of your total compensation among the various components may be prospectively adjusted at any time at Ally's sole discretion.

Investment in any DSUs for 2012 will occur at the end of each 2012 payroll cycle (the "Investment Date"), retroactive to the first 2012 payroll. The value of a DSU on the Investment Date will be based on the value of a Restricted Stock Unit on the Investment Date (as defined in the Long Term Equity Compensation Incentive Plan or "LTECIP"). The value at the time of any payment ("Settlement Date") will be the value of a Restricted Stock Unit as defined in and determined pursuant to the LTECIP. The value of a DSU may change from the Investment Date to the Settlement Date due to increases or decreases in Ally's value, as well as adjustments for recapitalization, merger, etc. as outlined in Section 6.2 of the LTECIP.

Unless otherwise specified in any plan document, DSUs will not determine any potential severance you may become eligible for. Rather, severance under any applicable plan will be determined based only upon your direct cash compensation in effect prior to becoming one of Ally's 25 highest compensated employees or otherwise restricted by the TARP Rules.

Subject to requirements of any Federal laws or regulations that may govern executive compensation, including but not limited to the TARP Rules, settlement of your DSUs will be made as follows with each occurrence constituting a "Settlement Date":

• For 1/3 of each investment, on the first payroll following a date 12 months from Investment Date
• For 1/3 of each investment, on the first payroll following a date 24 months from Investment Date
• For 1/3 of each investment, on the first payroll following a date 36 months from Investment Date

These payments are not subject to forfeiture and will be made pursuant to this Settlement schedule, regardless of your employment status.

By signing below, you acknowledge and agree to this settlement schedule for any 2012 DSUs. You also acknowledge your understanding that your DSUs are subject to the rules under Code Section 409A, and you agree and accept all risks (including increased taxes and penalties) resulting from Code Section 409A. In order to receive these DSUs, your signature is required no later than **May 18, 2012**. Please return the signed copy to Thelma Socia; thelmasocia@ally.com, Phone (313) 656-6156.

Sincerely yours,

James J. Duffy
Ally Group VP and Chief HR Officer
April 12, 2012

**/s/ Thomas F. Marano**                                           **April 17, 2012**
**Signature**                                                            **Date**

EXECUTION VERSION

PURCHASE AND SALE AGREEMENT

by and between

ALLY FINANCIAL INC.

and

ROYAL BANK OF CANADA

Dated as of October 23, 2012

# TABLE OF CONTENTS

## ARTICLE I
## DEFINITIONS AND TERMS

| | | |
|---|---|---|
| Section 1.1 | Certain Definitions | 1 |
| Section 1.2 | Interpretation | 13 |

## ARTICLE II
## SALE AND PURCHASE OF THE TARGET EQUITY INTERESTS

| | | |
|---|---|---|
| Section 2.1 | Sale and Purchase of the Target Equity Interests | 15 |
| Section 2.2 | Purchase Price | 15 |
| Section 2.3 | Purchase Price Adjustment | 15 |
| Section 2.4 | Purchase Price Allocation | 17 |
| Section 2.5 | Closing | 17 |
| Section 2.6 | Closing Deliverables | 17 |
| Section 2.7 | Tax Withholding | 18 |

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF PARENT

| | | |
|---|---|---|
| Section 3.1 | Organization, Authorization, Enforceability, Non-Contravention | 19 |
| Section 3.2 | Equity Interests of the Target Companies | 20 |
| Section 3.3 | Target Company Financial Information | 21 |
| Section 3.4 | No Undisclosed Liabilities | 22 |
| Section 3.5 | Absence of Changes | 22 |
| Section 3.6 | No Litigation | 22 |
| Section 3.7 | Approvals | 22 |
| Section 3.8 | Taxes | 23 |
| Section 3.9 | Employee Benefit Plans | 25 |
| Section 3.10 | Labor Matters | 27 |
| Section 3.11 | No Violation of Law; Required Licenses and Permits | 27 |
| Section 3.12 | Real Property | 28 |
| Section 3.13 | Environmental Matters | 28 |
| Section 3.14 | Intellectual Property | 29 |
| Section 3.15 | Specified Contracts | 30 |
| Section 3.16 | Title to Assets | 32 |
| Section 3.17 | Insurance | 32 |
| Section 3.18 | Transactions with Affiliates | 32 |
| Section 3.19 | Securitizations | 32 |
| Section 3.20 | Finder's Fees | 33 |
| Section 3.21 | Books and Records | 33 |
| Section 3.22 | Sufficiency of Assets | 34 |
| Section 3.23 | Parent Guarantees | 34 |
| Section 3.24 | Deposits | 34 |
| Section 3.25 | Extensions of Credit | 34 |
| Section 3.26 | Mortgage Business | 34 |
| Section 3.27 | Derivative Transactions | 34 |
| Section 3.28 | Certain Other Business | 35 |
| Section 3.29 | No Other Representations or Warranties | 35 |

SC1:3314648.6

TABLE OF CONTENTS

(*continued*)

ARTICLE IV
REPRESENTATIONS AND WARRANTIES OF PURCHASER

| | | |
|---|---|---|
| Section 4.1 | Organization, Authorization, Enforceability, Non-Contravention | 35 |
| Section 4.2 | Financing | 36 |
| Section 4.3 | Approvals | 36 |
| Section 4.4 | Finder's Fees | 37 |
| Section 4.5 | No Litigation | 37 |
| Section 4.6 | Securities Law Compliance | 37 |
| Section 4.7 | Due Diligence by Purchaser | 37 |
| Section 4.8 | Solvency | 38 |
| Section 4.9 | Foreign Investment Review | 38 |
| Section 4.10 | No Other Representations or Warranties | 38 |

ARTICLE V
COVENANTS

| | | |
|---|---|---|
| Section 5.1 | Conduct of the Target Business | 38 |
| Section 5.2 | Sale of Target Equity Interests | 42 |
| Section 5.3 | Cooperation | 42 |
| Section 5.4 | Pre-Closing Restructuring | 44 |
| Section 5.5 | Access and Information | 44 |
| Section 5.6 | Confidentiality | 45 |
| Section 5.7 | Announcements | 46 |
| Section 5.8 | Insurance | 46 |
| Section 5.9 | Interest in Intellectual Property | 47 |
| Section 5.10 | Cooperation Regarding Transition Arrangements | 48 |
| Section 5.11 | Employee Matters | 49 |
| Section 5.12 | Termination of Certain Affiliate Arrangements; Replacement of Guarantees and Transferred Derivatives; Certain Releases | 52 |
| Section 5.13 | Notices and Consents | 53 |
| Section 5.14 | Non-Compete; Non-Solicit | 53 |
| Section 5.15 | Capital Distribution | 57 |
| Section 5.16 | Other Transaction Documents | 57 |
| Section 5.17 | Further Assurances | 57 |

ARTICLE VI
CONDITIONS TO CLOSING

| | | |
|---|---|---|
| Section 6.1 | Conditions to Each Party's Obligations | 58 |
| Section 6.2 | Conditions to Obligations of Purchaser | 58 |
| Section 6.3 | Conditions to Obligations of Parent | 59 |

**TABLE OF CONTENTS**

(*continued*)

ARTICLE VII
TAX MATTERS

| | | |
|---|---|---|
| Section 7.1 | Seller Returns and Reports | 59 |
| Section 7.2 | Purchaser Returns and Reports | 60 |
| Section 7.3 | Amendments | 61 |
| Section 7.4 | Contest Provisions | 61 |
| Section 7.5 | Transfer and Sales Taxes | 62 |
| Section 7.6 | Cooperation; Access to Records | 63 |
| Section 7.7 | No Tax Election | 63 |
| Section 7.8 | Tax Sharing | 63 |
| Section 7.9 | Income Tax Purchase Price Allocation | 63 |
| Section 7.10 | Refund of Tax Benefits | 64 |

ARTICLE VIII
SURVIVAL; INDEMNIFICATION; CERTAIN REMEDIES

| | | |
|---|---|---|
| Section 8.1 | Survival | 64 |
| Section 8.2 | Indemnification by Parent | 65 |
| Section 8.3 | Indemnification by Purchaser | 66 |
| Section 8.4 | Claims Procedure | 67 |
| Section 8.5 | Payment | 70 |
| Section 8.6 | Treatment of Indemnification Payments | 70 |
| Section 8.7 | Provisions | 71 |
| Section 8.8 | Exclusive Remedies | 71 |
| Section 8.9 | Damages | 71 |
| Section 8.10 | Net Tax Benefit | 72 |
| Section 8.11 | Contingent Liabilities | 72 |
| Section 8.12 | Right to Recover | 72 |
| Section 8.13 | Double Claims | 72 |
| Section 8.14 | Mitigation of Losses | 73 |

ARTICLE IX
TERMINATION

| | | |
|---|---|---|
| Section 9.1 | Termination | 73 |
| Section 9.2 | Notice of Termination | 74 |
| Section 9.3 | Effect of Termination | 74 |
| Section 9.4 | Additional Rights and Remedies | 74 |

SC1:3314648.6

**TABLE OF CONTENTS**

(*continued*)


ARTICLE X
MISCELLANEOUS

| | | |
|---|---|---|
| Section 10.1 | Notices | 74 |
| Section 10.2 | Assignment | 76 |
| Section 10.3 | No Third-Party Beneficiaries | 76 |
| Section 10.4 | Whole Agreement; Conflict with Other Transaction Documents | 76 |
| Section 10.5 | Costs | 77 |
| Section 10.6 | Governing Law; Consent to Jurisdiction; Specific Performance | 77 |
| Section 10.7 | Counterparts | 78 |
| Section 10.8 | Severability | 78 |
| Section 10.9 | Amendments; Waiver | 79 |
| Section 10.10 | Payments | 79 |

**Schedules and Exhibits**

Schedule A          Target Companies
Schedule B          Jurisdiction-Specific Closing Deliverables
Schedule C          Reference Closing Statement

Exhibit 1          Form of Transition Services Agreement
Exhibit 2          Form of Transitional Trademark License Agreement

**Disclosure Letters**

Parent's Disclosure Letter
Purchaser's Disclosure Letter

-iv-

SC1:3314648.6

**PURCHASE AND SALE AGREEMENT** , dated as of October 23, 2012 (the "<u>Agreement</u>"), by and between Ally Financial Inc., a corporation organized under the laws of the state of Delaware (" <u>Parent</u>"), and Royal Bank of Canada, a Schedule I bank existing under the Bank Act ("<u>Purchaser</u>").

<div align="center">RECITALS</div>

WHEREAS, Parent, directly or indirectly through the other Sellers (as defined below), owns all of the Target Equity Interests (as defined below) issued by the Target Companies (as defined below); and

WHEREAS, on the terms and conditions set forth herein, Sellers desire to sell to Purchaser, and Purchaser desires to purchase from each Seller, all of each Seller's rights in the Target Equity Interests.

NOW, THEREFORE, in consideration of the premises and the mutual representations, warranties, covenants and undertakings contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, agree as follows:

<div align="center">Article I<br>DEFINITIONS AND TERMS</div>

<u>Section 1.1</u>    <u>Certain Definitions</u>. As used in this Agreement, the following terms have the meanings set forth below:

"<u>Accounting Expert</u>" has the meaning set forth in <u>Section 2.3(c)</u>.

"<u>Action</u>" means any civil, criminal or administrative action, suit, demand, claim, case, litigation, arbitration, opposition, objection, cancellation, inquiry, hearing, dispute, investigation or other proceeding.

"<u>Adjustment Amount</u>" means an amount equal to the absolute value of (i) the Estimated Net Asset Value *minus* (ii) the Final Net Asset Value.

"<u>Affiliate</u>" means, with respect to any specified Person, any other Person directly or indirectly Controlling, Controlled by or under common Control with such specified Person; <u>provided</u> that neither the U.S. Treasury nor any Person under common Control with Parent as a result of the ownership of Equity Interests in Parent by the U.S. Treasury shall constitute an Affiliate of Parent.

"<u>Agreement</u>" has the meaning set forth in the <u>Preamble</u>.

"<u>ARC</u>" means an advance ruling certificate pursuant to section 102 of the Competition Act.

"<u>Bank Act</u>" means the *Bank Act* (Canada).

"Business Combination" has the meaning set forth in Section 5.14(b)(vii).

"Business Day" means any day other than a Saturday, Sunday or a day on which banks located in New York, New York, Toronto, Ontario or, to the extent relating to the transfer of Target Equity Interests in any of the jurisdictions listed on Schedule B, such jurisdiction, are authorized or required by Law to be closed.

"Canadian Target Companies" means all Target Companies that are resident in Canada for purposes of the Tax Act.

"Cap" has the meaning set forth in Section 8.2(b).

"Closing" has the meaning set forth in Section 2.5.

"Closing Date" means the date on which the Closing occurs.

"Closing Payment" means an amount equal to the sum of (i) the Premium and (ii) the Estimated Net Asset Value.

"Code" means the Internal Revenue Code of 1986.

"Commissioner" means the Commissioner of Competition, appointed pursuant to the Competition Act, or her or his designated representative.

"Company Material Adverse Effect" means any change, effect, event or occurrence that, either individually or in the aggregate with any other change, effect, event or occurrence, (i) has or is reasonably likely to have a material and adverse effect on the business, assets, condition (financial or otherwise) or the results of operations of the Target Companies, taken as a whole, or (ii) would be reasonably likely to prevent or materially impair the ability of Parent or any of its Affiliates to perform their respective obligations under the Transaction Documents or to consummate the transactions contemplated thereby in a timely manner;  provided that, in the case of clause (i) only, none of the following (or the results thereof), either alone or in combination with any other changes, effects, events or occurrences, shall constitute or contribute to a Company Material Adverse Effect: (a) any change in applicable accounting principles or any adoption, proposal, implementation or change in Law (including any Law in respect of Taxes) or any interpretation thereof by any Government Authority; (b) any change in global, national or regional political conditions (including protests, strikes, riots, acts of terrorism or war) or in general global, national or regional economic, business, regulatory, political or market conditions or in national or global financial or capital markets (including any such conditions or markets in Canada or the United States); (c) any change generally affecting the industries or market sectors in the geographic regions in which one or more of the Target Companies operate; (d) any change resulting from or arising out of hurricanes, earthquakes, floods, or other natural disasters; (e) the negotiation, execution, announcement or performance of the Transaction Documents or consummation of the transactions contemplated thereby; (f) the failure of one or more of the Target Companies to meet any internal or public projections, forecasts or estimates of performance, revenues or earnings (it being understood that

-2-

SC1:3314648.6

the facts and circumstances contributing to such failure may constitute or contribute to a Company Material Adverse Effect); (g) any actions (or the effects of any action) taken (or omitted to be taken) upon the written request or instruction of, or with the written consent of, Purchaser, consistent with the terms hereof, to consummate the transactions contemplated hereby; or (h) any action (or the effects of any action) taken (or omitted to be taken) by the Target Companies as required pursuant to this Agreement; except in the cases of clauses (a), (b), (c) and (d) to the extent such change (or any results thereof) has a materially disproportionate effect on the Target Companies, taken as a whole, compared with other Persons operating in the industries and jurisdictions in which the Target Companies operate.

"Company Trademarks" means those trademarks listed on Section 1.01(a) of Parent's Disclosure Letter.

"Competing Person" has the meaning set forth in Section 5.14(b)(v).

"Competition Act" means the *Competition Act* (Canada) and the regulations promulgated thereunder, as amended from time to time.

"Competition Act Approval" means (a) the issuance of an ARC by the Commissioner with respect to the transactions contemplated by this Agreement and such ARC has not been withdrawn or (b) that (i) the applicable waiting period under section 123 of the Competition Act shall have expired, waived or been terminated, or the Commissioner shall have waived the obligation to notify and supply information under section 113(c) of the Competition Act because substantially similar information was previously supplied in relation to a request for an ARC; and (ii) unless waived by Purchaser, Purchaser shall have been advised in writing by the Commissioner that the Commissioner does not at that time intend to make an application for an order under section 92 of the Competition Act in respect of the transactions contemplated by this Agreement, and any terms and conditions attached to any such advice shall be acceptable to Purchaser acting reasonably, and such advice has not been withdrawn.

"Confidential Information" means, with respect to either Party or any of its respective Affiliates, any information disclosed to such Party by the other Party or any of the other Party's respective Affiliates that relates to (i) the provisions of any Transaction Document or any agreement entered into pursuant to any Transaction Document, (ii) the negotiations relating to any Transaction Document (or any such other agreement), (iii) any information relating to the business, financial or other affairs (including future plans, financial targets, trade secrets and know-how) of such other Party or such other Party's Affiliates, or (iv) any information of the other Party or such other Party's Affiliates provided in a manner which reasonably indicates the confidential or proprietary nature of such information. With respect to Purchaser and its Affiliates, Confidential Information includes all Evaluation Material (as such term is defined in the Confidentiality Agreement).

"Confidentiality Agreement" means the letter agreement, dated as of July 10, 2012, between Parent and Purchaser.

-3-

"Constituent Documents" means, with respect to any corporation, its charter, articles and by-laws; with respect to any partnership, its certificate of partnership and partnership agreement; with respect to any limited liability company, its certificate of formation and limited liability company or operating agreement; with respect to each other Person, its comparable constitutional instruments or documents (and, in each case, such similar instruments or documents as applicable under a relevant jurisdiction).

"Continuing Employees" has the meaning set forth in Section 5.11(a).

"Contract" means any written contract, agreement, undertaking, indenture, lease or other written instrument of any kind to which any Target Company is a party or by which it or any of its assets or properties is bound but shall exclude any Target Company Benefit Plan.

"Control" means, with respect to any specified Person, the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise. The terms "Controlling" and "Controlled" have meanings correlative to the foregoing.

"Corresponding Derivative" means, with respect to any Transferred Derivative, the Derivative Transaction set forth in Item 32 of Section 3.18 of Parent's Disclosure Letter that has the same Ally internal Swap ID as such Transferred Derivative.

"Deductible" has the meaning set forth in Section 8.2(b).

"Derivative Transaction" means any swap transaction, option, warrant, forward purchase or sale transaction, futures transaction, cap transaction, floor transaction or collar transaction relating to one or more currencies, commodities, bonds, equity securities, loans, interest rates, catastrophe events, weather-related events, credit-related events or conditions or any indices, or any other similar transaction (including any option with respect to any of these transactions) or combination of any of these transactions, including collateralized mortgage obligations or other similar instruments or any debt or equity instruments evidencing or embedding any such types of transactions, and any related credit support, collateral or other similar arrangements related to such transactions.

"Disclosing Party" has the meaning set forth in Section 5.6(b).

"Disclosure Letter" means, with respect to either Party, a letter delivered by such Party to the other Party contemporaneously with the execution and delivery of this Agreement setting forth, among other things, items the disclosure of which is necessary or appropriate either in response to an express disclosure requirement contained in a provision hereof or as an exception to one or more representations, warranties or covenants of such Party contained in this Agreement; provided that the mere inclusion of an item in a Disclosure Letter as an exception to a representation, warranty or covenant shall not be deemed an admission by the disclosing Party that such item (or any non-disclosed item or information of comparable or greater significance) represents a material exception or fact, event or circumstance or that such item has had or is reasonably likely or expected to result in a Company Material Adverse Effect or a Purchaser Material Adverse Effect, as applicable;

provided,  further, that a disclosure in any section of such Party's Disclosure Letter shall be deemed to be a disclosure for all other sections of such Party's Disclosure Letter in respect of which it is reasonably apparent that such disclosure is applicable, whether or not repeated or cross-referenced in such other section.

"Distribution" has the meaning set forth in Section 5.15.

"Encumbrance" means any mortgage, deed of trust, easement, pledge, hypothecation, assignment, security interest, restriction, option, equity interest, preference, participation interest, claim, lien, or encumbrance;  provided,  however, that no Encumbrance shall be deemed to be created by this Agreement or any other Transaction Document.

"Environmental Law" means all Laws concerning the protection of the environment, or the use, handling, release or disposal of any hazardous substance.

"Equity Interest" means, with respect to any Person, any type of equity ownership in such Person, including partnership interests in a general partnership or limited partnership, membership interests in a limited liability company, shares of capital stock of a corporation or any other interest entitling the holder thereof to participate in distributions, including of the income or profits of such Person, to vote for the governing body of such Person or otherwise granting any similar ownership interest in such Person.

"Estimated Closing Statement" means a statement prepared in accordance with IFRS consistently applied and using the same methodology used to prepare the Reference Closing Statement, setting forth Parent's good faith estimate of the Net Asset Value as of the Closing Date.

"Estimated Net Asset Value" means the estimated Net Asset Value as of the Closing Date as shown on the Estimated Closing Statement.

"Excess Tax Receivables" means the amount, if any, by which the excess Taxes that were paid by the Target Companies prior to the Closing that are expected to be refunded by the relevant Government Authority post-Closing exceed the Tax Receivables.

"Excluded Employees" means all employees employed by Motors Insurance Corporation immediately prior to the Closing Date who participate in Target Company Benefit Plans.

"Excluded Employees Benefit Plans" has the meaning set forth in Section 5.11(f).

"Excluded Employees Benefit Transition Date" has the meaning set forth in Section 5.11(f).

"Extensions of Credit" has the meaning set forth in Section 3.25(a).

"Final Closing Statement" means a statement prepared in accordance with IFRS consistently applied and using the same methodology used to prepare the Estimated Closing Statement and the Reference Closing Statement, setting forth the Net Asset Value as of the Closing Date.

-5-

"Final Net Asset Value" means the Net Asset Value as of the Closing Date as shown on the Final Closing Statement.

"Final Net Asset Value Adjustment" means an amount (which may be negative) equal to (i) the Final Net Asset Value *minus* (ii) the Estimated Net Asset Value.

"Government Authority" means any foreign or domestic, federal, provincial, state, county, city or local legislative, administrative or regulatory authority, agency, bureau, court, tribunal, body or other governmental or quasi-governmental entity with competent jurisdiction, including any supranational body and any self-regulatory authority or organization.

"Government Order" means any order, writ, judgment, injunction, approval, decree, declaration, stipulation, determination, agreement or award entered by or with any Government Authority.

"IFRS" means International Financial Reporting Standards, as promulgated by the International Accounting Standards Board.

"Indebtedness" of any Person means: (a) all liabilities of such Person for borrowed money, whether current or funded, fixed or contingent, secured or unsecured, all obligations evidenced by bonds, debentures, notes or similar instruments, and all liabilities in respect of mandatorily redeemable or purchasable share capital or securities convertible into share capital; (b) all liabilities of such Person for the deferred purchase price of property or services, which are, and to the extent, required to be classified and accounted for under IFRS as liabilities; (c) all liabilities of such Person in respect of any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which are, and to the extent, required to be classified and accounted for under IFRS as capital leases; and (d) all liabilities of such Person as obligor or guarantor of, or for the reimbursement of any obligor on any letter of credit or similar credit transaction securing, obligations of a type described in clause (a), (b) or (c) above to the extent of the obligation secured.

"Indemnified Person" has the meaning set forth in Section 8.4(a).

"Indemnifying Person" has the meaning set forth in Section 8.4(a).

"Insurance Policies" has the meaning set forth in Section 3.17.

"Intellectual Property" means, in any and all jurisdictions throughout the world, any (i) trademarks, service marks, Internet domain names, trade dress and trade names, registrations and applications for registration of the foregoing, and the goodwill associated therewith and symbolized thereby, (ii) patents and patent applications, (iii) confidential and proprietary information, including trade secrets and know-how and (iv) copyrights (including copyrights in computer software and Internet websites) and registrations and applications for registration of the foregoing.

"IP User" has the meaning set forth in Section 5.9(c).

-6-

SC1:3314648.6

"IT Assets" means computers, computer software, firmware, middleware, servers, workstations, routers, hubs, switches, data, data communications lines, and other information technology equipment, and associated documentation.

"Knowledge" means, (i) with respect to Parent, the actual knowledge, after reasonable inquiry, of any of the officers listed in Section 1.01(b) of Parent's Disclosure Letter, and (ii) with respect to Purchaser, the actual knowledge, after reasonable inquiry, of any of the officers listed in Section 1.01(b) of Purchaser's Disclosure Letter.

"Law" means any domestic or foreign law (including common law), statute, ordinance, rule, regulation, code, order, judgment, injunction, decree, directive, policy, guideline, ruling, approval, decree or other requirement or rule of law enacted, issued, promulgated, enforced or entered by a Government Authority.

"Liabilities" means any debt, liability or obligation, whether asserted or unasserted, determined or determinable, absolute or contingent, accrued or unaccrued and whether due or to become due.

"Losses" means any damages, losses, claims, demands, actions, suits, proceedings, payments, liabilities, charges, interest, fines, judgments, penalties, Taxes and out-of-pocket costs and expenses (including reasonable outside legal fees).

"Mortgage Sale Agreements" has the meaning set forth in Section 3.26.

"Net Asset Value" means, as of any given date, the aggregate amount (in Dollars) of the assets and property of the Target Companies *minus* the aggregate amount of the Liabilities of the Target Companies, in each case that are required to be set forth on a balance sheet of each respective Target Company prepared in accordance with IFRS, and *minus* the amount of the Excess Tax Receivables. Notwithstanding the foregoing, Net Asset Value shall not give effect to purchase accounting or any other adjustments relating to the sale of the Target Equity Interests contemplated by this Agreement or the conduct by Purchaser following Closing of the business operated by the Target Companies.

"New Holdco" means the newly formed, wholly owned Subsidiary of GMAC DDA B.V. that is either (i) a limited partnership organized under the Laws of Ontario (together with a general partner that is also a wholly owned Subsidiary of GMAC DDA B.V. and is a limited liability company organized under the Laws of Delaware), (ii) a limited liability company organized under the Laws of Delaware or (iii) such other entity as may be agreed to by the Parties in writing prior to the Closing, and to which all of GMAC DDA B.V.'s Equity Interests in Ally Credit Canada Limited are contributed.

"Non-Compete Term" has the meaning set forth in Section 5.14(a).

"Notice" has the meaning set forth in Section 10.1(a).

"Old Plans" has the meaning set forth in Section 5.11(b).

-7-

SC1:3314648.6

"OSFI" means the Office of the Superintendent of Financial Institutions Canada.

"Outside Date" means July 23, 2013.

"Outstanding" means, with respect to Equity Interests of a Person, those Equity Interests that are issued and outstanding at a particular time.

"Parent" has the meaning set forth in the Preamble.

"Parent Fundamental Representations" means Section 3.1(a) (*Organization*), Section 3.1(b) (*Corporate Authorization*), Section 3.1(c) (*Binding Effect*), Section 3.2 (*Equity Interests of the Target Companies*) and Section 3.20 (*Finder's Fees*).

"Parent Guarantees" has the meaning set forth in Section 5.12(b).

"Parent Plans" has the meaning set forth in Section 3.9(a).

"Parent Required Governmental Approvals" has the meaning set forth in Section 3.7.

"Parent Trademarks" means those trademarks listed on Section 1.01(c) of Parent's Disclosure Letter.

"Parties" means Parent and Purchaser.

"Pension Plan" has the meaning set forth in Section 5.11(d).

"Permits" means licenses, permits, certificates, registrations and other authorizations and approvals that are issued by or obtained from any Government Authority.

"Permitted Encumbrances" means (i) Encumbrances for Taxes, assessments or governmental charges or levies not yet due and payable, or which although delinquent can be paid without penalty, or are being contested in good faith by appropriate proceedings, (ii) Encumbrances resulting from a precautionary filing by a lessor with respect to a lease, (iii) Encumbrances imposed by Law, such as carriers', warehousemen's and mechanics' liens and other similar liens arising in the ordinary course which secure payment of obligations not more than 60 days past due or which are being contested in good faith by appropriate proceedings, (iv) purchase money security interests for the purchase or leasing of office equipment, computers, vehicles and other items of tangible personal property, (v) in the case of real property, zoning, building, subdivision, environmental, entitlement or other land use regulations, (vi) in the case of real property, easements, quasi-easements, encumbrances, licenses, covenants, rights-of-way, rights of re-entry or other restrictions and similar agreements, conditions or restrictions or Encumbrances that would be shown by a current title report or other similar report or listing or by a current survey or physical inspection and which do not materially interfere with, or materially impair the use of, the property or assets subject thereto, and (vii) any other Encumbrances which do not impede the ownership, operation or value of the Target Companies, taken as a whole, in any material respect.

-8-

"<u>Person</u>" means any individual, bank, corporation, general or limited partnership, association, limited liability company, business trust, unincorporated organization or similar organization, whether domestic or foreign, or any Government Authority.

"<u>Pre-Closing Period</u>" means each taxable period that ends as of or before the Closing and, in the case of a taxable period beginning on or before and ending after the Closing, the portion of such period through the end of the Closing.

"<u>Pre-Closing Returns</u>" has the meaning set forth in <u>Section 7.1</u>.

"<u>Premium</u>" means $614,000,000.

"<u>Previous Canadian GAAP</u>" means Canadian generally accepted accounting principles in effect as of dates, and for periods ended, prior to January 1, 2011.

"<u>Process Agent</u>" has the meaning set forth in <u>Section 10.6(c)</u>.

"<u>Purchase Price</u>" has the meaning set forth in <u>Section 2.2(a)</u>.

"<u>Purchaser</u>" has the meaning set forth in the <u>Preamble</u>.

"<u>Purchaser Benefit Plans</u>" has the meaning set forth in <u>Section 5.11(a)</u>.

"<u>Purchaser Fundamental Representations</u>" means <u>Section 4.1(a)</u> (*Organization*), <u>Section 4.1(b)</u> (*Corporate Authorization*), <u>Section 4.1(c)</u> (*Binding Effect*), <u>Section 4.4</u> (*Finder's Fees*) and <u>Section 4.6</u> (*Securities Law Compliance*).

"<u>Purchaser Material Adverse Effect</u>" means, as of any particular date, any change, effect, event or occurrence that, individually or when considered in the aggregate with any other change, effect, event or occurrence, materially and adversely impairs the ability of Purchaser or any of Purchaser's Affiliates to perform its obligations under any of the Transaction Documents or to consummate the transactions contemplated thereby in a timely manner.

"<u>Purchaser Required Governmental Approvals</u>" has the meaning set forth in <u>Section 4.3</u>.

"<u>Receipt Date</u>" has the meaning set forth in <u>Section 8.4(f)</u>.

"<u>Receiving Party</u>" has the meaning set forth in <u>Section 5.6(b)</u>.

"<u>Reference Closing Statement</u>" means the statement attached as <u>Schedule C</u>.

"<u>Registered</u>" means issued by, registered or filed with, renewed by or the subject of a pending application before any Government Authority or Internet domain name registrar.

"<u>Related Party</u>" has the meaning set forth in <u>Section 3.18</u>.

"<u>Related Party Contract</u>" has the meaning set forth in <u>Section 3.18</u>.

-9-

"<u>Replacement Pension Plan</u>" has the meaning set forth in <u>Section 5.11(f)</u>.

"<u>Representatives</u>" means, with respect to any Person, such Person's Affiliates, directors, managers, officers, employees, legal or financial advisors, agents or other representatives, or anyone acting on behalf of them or such Person.

"<u>Required Governmental Approvals</u>" means the Purchaser Required Governmental Approvals and the Parent Required Governmental Approvals.

"<u>Restricted Activity</u>" has the meaning set forth in <u>Section 5.14(a)</u>.

"<u>Restricted Persons</u>" has the meaning set forth in <u>Section 5.14(a)</u>.

"<u>Restricted Territory</u>" has the meaning set forth in <u>Section 5.14(a)</u>.

"<u>Restructuring</u>" means the transactions described in <u>Section 1.01(d)</u> of Parent's Disclosure Letter.

"<u>Retention Agreements</u>" has the meaning set forth in <u>Section 3.9(c)</u>.

"<u>Review Period</u>" has the meaning set forth in <u>Section 2.3(a)</u>.

"<u>Rights</u>" means, with respect to any Person, securities or obligations, directly or indirectly, convertible into or exercisable or exchangeable for, or giving any other person any right, directly or indirectly, to subscribe for or acquire, or any options, puts, calls or commitments relating, directly or indirectly, to, or any share appreciation right or other instrument the value of which is determined in whole or in part by reference to the market price, book or other value of, Equity Interests of such Person, or by which such Person or any of its Subsidiaries is or may become obligated to offer, issue, sell, purchase, return or redeem, or cause to be offered, issued, sold, purchased, returned or redeemed, any Equity Interests of such Person or any of its Subsidiaries, whether pursuant to any security, obligation, right, instrument, agreement, contract, commitment, option, undertaking or other arrangement or understanding (including, for the avoidance of doubt, upon exercise of any options, warrants or convertible loans or securities), whether fixed or contingent and whether or not in writing.

"<u>Scheduled Intellectual Property</u>" has the meaning set forth in <u>Section 3.14(a)</u>.

"<u>Securities Act</u>" means the Securities Act of 1933.

"<u>Securitization Instruments</u>" has the meaning set forth in <u>Section 3.19(a)</u>.

"<u>Securitization Issuing Entity</u>" means the issuing entity in any Securitization Transaction.

"<u>Securitization Servicer</u>" has the meaning set forth in <u>Section 3.19(a)</u>.

-10-

"Securitization Transaction" means each of the transactions set forth in Section 1.01 of Parent's Disclosure Letter and any other transaction sponsored by any of the Target Companies similar to such transactions.

"Sellers" means, with respect to any Target Equity Interests, those Persons listed in Part 2 of Schedule A as a "Seller" of such Target Equity Interests.

"Sold Mortgage Business" has the meaning set forth in Section 3.26.

"Solvent" has the meaning set forth in Section 4.8.

"Specified Contracts" has the meaning set forth in Section 3.15(a).

"Specified Person" has the meaning set forth in Section 5.11(e).

"Specified Properties" has the meaning set forth in Section 3.12.

"Specified Tax Liability" means any Liability for Taxes of any of the Target Companies for any Pre-Closing Period that is not shown as a Liability or reserve on the Final Closing Statement (and if such Taxes arise in a Straddle Period, as allocated pursuant to Section 7.2(c)) or resulting from the Restructuring, in each case, to the extent that Parent has not paid Purchaser any amounts with respect to such Liability for Taxes under Section 8.2(a)(iii).

"Specified Tax Receivables" has the meaning set forth in Section 8.4(f).

"Statement of Objections" has the meaning set forth in Section 2.3(b).

"Straddle Period" has the meaning set forth in Section 7.2(a).

"Straddle Period Return" has the meaning set forth in Section 7.2(a).

"Sub-Deductible" has the meaning set forth in Section 8.2(b).

"Subsidiary" means, for any Person, any other Person of which such first Person owns (either directly or through one or more other Subsidiaries) a majority of the outstanding Equity Interests or securities carrying a majority of the voting power in the election of the board of directors or other governing body of such other Person, and with respect to which entity such first Person is not otherwise prohibited contractually or by other legally binding authority from exercising control.

"Surviving Provisions" means Article I (*Definitions and Terms*), Section 5.6 (*Confidentiality*), Section 8.8 (*Exclusive Remedies*), Article IX (*Termination*) and Article X (*Miscellaneous*).

"Target Business" means the business conducted by the Target Companies as of the date hereof.

-11-

SC1:3314648.6

"<u>Target Companies</u>" means those Persons listed in Part 1 of <u>Schedule A</u> as a "Target Company."

"<u>Target Company Benefit Plans</u>" has the meaning set forth in <u>Section 3.9(a)</u>.

"<u>Target Company Financial Information</u>" has the meaning set forth in <u>Section 3.3(b)</u>.

"<u>Target Company Non-Pension Plans</u>" has the meaning set forth in <u>Section 5.11(f)</u>.

"<u>Target Equity Interests</u>" means all of the Equity Interests listed in Part 2 of <u>Schedule A</u> as "Target Equity Interests."

"<u>Target Holding Companies</u>" means (a) New Holdco, (b) 1020491 Alberta Ltd., and (c) ResMor Capital Corporation.

"<u>Tax</u>" and "<u>Taxes</u>" means any taxes, duties, fees, premiums, assessments, imposts, levies and other charges of a similar nature imposed by any Government Authority, including all interest, penalties, fines, additions to tax or other additional amounts imposed by any Government Authority in respect thereof, and including those levied on, or measured by, or referred to as, income, gross receipts, profits, capital, transfer, land transfer, sales, goods and services, harmonized sales, use, value-added, excise, stamp, withholding, business, franchising, property, development, occupancy, employer health, payroll, employment, health, social services, education and social security taxes, all surtaxes, all customs duties and import and export taxes, countervail and anti-dumping, all licence, franchise and registration fees and all employment insurance, health insurance and Canada, Québec and other government pension plan premiums or contributions.

"<u>Tax Act</u>" means the *Income Tax Act* (Canada).

"<u>Tax Claim</u>" has the meaning set forth in <u>Section 7.4(a)</u>.

"<u>Tax Notice</u>" has the meaning set forth in <u>Section 7.4(a)</u>.

"<u>Tax Receivables</u>" means certain excess Taxes that were paid by Ally Credit Canada Limited and GMAC Leaseco Corporation prior to Closing in an amount equal to $318,503,727, as more particularly set out in <u>Section 1.01(e)</u> of Parent's Disclosure Letter, that are expected to be refunded by the relevant Government Authority post-Closing.  The Tax Receivables are comprised of the following three tranches: (i) Tax Receivables – Tranche 1, in the amount of $48,058,014 in respect of taxation years ending December 31, 2008 or earlier; (ii) Tax Receivables – Tranche 2, in the amount of $88,540,994 in respect of the taxation years ending January 15, 2009 and December 31, 2009; and (iii) Tax Receivables – Tranche 3, in the amount of $181,904,719 in respect of the taxation year ending December 31, 2010.  Notwithstanding the foregoing, if any portion of the Tax Receivables is refunded prior to the Closing by the relevant Government Authority then the amount of Tax Receivables, and the relevant tranche of Tax Receivables, shall be correspondingly reduced by the amount refunded.

"<u>Tax Receivables Materials</u>" has the meaning set forth in <u>Section 7.1</u>.

-12-

"Tax Receivables Receipt Date" means (i) with respect to Tax Receivables – Tranche 1, December 31, 2013; (ii) with respect to Tax Receivables – Tranche 2, December 31, 2014; and (iii) with respect to Tax Receivables – Tranche 3, December 31, 2015.

"Tax Returns" means any return, notice, filing, form, statement, report, election, declaration, disclosure, schedule, estimate, claim for refund, information return and other documents (whether in tangible, electronic or other form) and including any amendments, schedules, attachments, supplements, appendices and exhibits thereto, made, prepared, filed or required to be made, prepared or filed by Law with respect to any Taxes.

"Third-Party Claim" has the meaning set forth in Section 8.4(a).

"TLCA" means the *Trust and Loan Companies Act* (Canada).

"Transaction Documents" means this Agreement, the Transition Services Agreement and the Transitional Trademark License Agreement.

"Transferred Derivative" means any Derivative Transaction set forth on Section 1.01(f) of Parent's Disclosure Letter.

"Transition Employee" has the meaning set forth in Section 5.14(f).

"Transition Services Agreement" means a Transition Services Agreement substantially in the form attached as Exhibit 1, together with such changes and other terms as the Parties may mutually agree.

"Transitional Trademark License Agreement" means a Transitional Trademark License Agreement substantially in the form attached as Exhibit 2, together with such changes and other terms as the Parties may mutually agree.

"Virtual Data Room" means the virtual electronic data room established for "Project Chicago" at https://services.intralinks.com containing documents and information relating to, among other things, the Target Companies, the Target Business and the Target Equity Interests made available by Parent in electronic form to Purchaser and its Representatives.

Section 1.2    Interpretation.

(a)    Unless the context otherwise specifically requires:

(i)    the words "hereof," "herein," "hereby" and "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular provision of this Agreement;

(ii)    all terms defined in the singular have a comparable meaning when used in the plural, and vice versa;

-13-

SC1:3314648.6

(iii)    the terms "Dollars" and "$" mean Canadian Dollars;

(iv)    references to words of inclusion herein shall not be construed as terms of limitation, and thus references to "included" matters or items shall be regarded as non-exclusive, non-characterizing illustrations;

(v)    references herein to either gender include the other gender;

(vi)    references to this Agreement shall include Parent's Disclosure Letter, Purchaser's Disclosure Letter, the Preamble and any Recitals, Schedules and Exhibits to this Agreement;

(vii)    references herein to the Preamble or to any Recital, Article, Section, Subsection, Exhibit or Schedule shall refer, respectively, to the Preamble or to a Recital, Article, Section, Subsection, Exhibit or Schedule to this Agreement;

(viii)    references to any statute, rule or regulation are to the statute, rule or regulation as amended, modified, supplemented or replaced from time to time (and, in the case of statutes, include any rules and regulations promulgated under the statute) and all references to any section of any statute, rule or regulation include any successor to the section;

(ix)    references to any Government Authority include any successor to such Government Authority;

(x)    references to any agreement or other document are to such agreement or document as amended, modified, supplemented or replaced from time to time;

(xi)    references to books, records or other information mean books, records or other information in any form including paper, electronically stored data, magnetic media, film and microfilm;

(xii)    references to a time of day are, unless otherwise specified, references to New York City time;

(xiii)    references to "made available" (or words of similar import) in respect of information made available (or words of similar import) by Parent mean any information made available to Purchaser in the Virtual Data Room as of the time of the execution and delivery of this Agreement;

(xiv)    references herein to Parent making available, or having made available, a "complete" copy of any document shall mean that Parent makes available, or has made available, a copy of the entire text of such document;

(xv)    references herein to Ally Credit Canada Limited shall mean Ally Credit Canada Limited or, after its conversion to a Nova Scotia unlimited liability company, Ally Credit Canada Company, including any successor entity;

-14-

(xvi)    references to writing shall include any mode of reproducing words in a legible and non-transitory form; and

(xvii)    the rule known as the *ejusdem generis* rule shall not apply and accordingly general words introduced by the word "other" shall not be given a restrictive meaning by reason of the fact that they are preceded by words indicating a particular class of acts, matters or things.

(b)    The table of contents and headings contained in this Agreement are for reference purposes only and do not limit or otherwise affect any of the provisions of this Agreement.

(c)    No rule of construction against the draftsperson shall be applied in connection with the interpretation or enforcement of this Agreement, as this Agreement is the product of negotiation between sophisticated parties advised by counsel.

(d)    Whenever a provision of this Agreement provides that an action is to be effected as of, on or by a certain date, and such date is not a Business Day, this Agreement shall be read so that such action is required to be effected as of, on or by (as applicable) the next succeeding Business Day.

ARTICLE II
SALE AND PURCHASE OF THE TARGET EQUITY INTERESTS

Section 2.1    Sale and Purchase of the Target Equity Interests. On the terms and subject to the conditions set forth herein, at the Closing, Parent shall cause each Seller to sell, transfer and deliver to Purchaser, free and clear of any Encumbrances other than any restrictions arising under applicable Law, and Purchaser shall purchase and receive from each Seller, all of such Seller's right, title and interest in and to the Target Equity Interests owned by such Seller.

Section 2.2    Purchase Price.

(a)    The aggregate purchase price for the Target Equity Interests (the "Purchase Price") shall be an amount in cash equal to the sum of (i) the Closing Payment and (ii) the Final Net Asset Value Adjustment. The Purchase Price shall be payable and subject to adjustment as provided herein.

(b)    No later than three Business Days prior to the Closing Date, Parent shall deliver to Purchaser the Estimated Closing Statement. Purchaser shall have an opportunity to review the Estimated Closing Statement and shall be provided reasonable access to the books, records and other relevant information of Parent and its Representatives to the extent reasonably necessary to review the Estimated Closing Statement.

Section 2.3    Purchase Price Adjustment.

(a)    As soon as reasonably practicable, but in no event later than 60 days following the Closing Date, Purchaser shall prepare and deliver to Parent the Final Closing Statement.  During

-15-

the 60-day period immediately following Parent's receipt of the Final Closing Statement (the " Review Period"), Parent and its Representatives shall be provided reasonable access to the books, records and other relevant information of Purchaser and its Representatives to the extent reasonably necessary to review the Final Closing Statement.  During the Review Period, Purchaser shall make reasonably available personnel of Purchaser and its Affiliates (including the Target Companies) directly responsible for and knowledgeable about the information used in, and the preparation of, the Final Closing Statement in order to respond to reasonable inquiries made by Parent and its Representatives.

(b)    On or prior to the last day of the Review Period, and provided that the aggregate amount at issue is greater than or equal to $50,000, Parent may object to the Final Closing Statement by delivering to Purchaser a written statement setting forth the basis for Parent's objections thereto (the "Statement of Objections"). If Parent fails to deliver the Statement of Objections within the Review Period, the Final Closing Statement shall be deemed to have been accepted by Parent and shall be used in calculating the Adjustment Amount. If Parent delivers the Statement of Objections within the Review Period, the Parties shall negotiate in good faith to resolve such objections, and, if the same are so resolved, the Final Closing Statement with such changes that may have been previously agreed in writing by the Parties shall be final and binding and shall be used in calculating the Adjustment Amount.

(c)    If the Parties shall fail to reach an agreement with respect to any of the matters set forth in the Statement of Objections, then such unresolved matters shall, not later than 15 days after one of the Parties affirmatively terminates discussions in writing with respect to the Statement of Objections, be submitted for resolution to Ernst & Young LLP (or, if such firm shall decline or is unable to act or is not, at the time of such submission, independent of both Parent and Purchaser, to another independent accounting firm of international reputation mutually acceptable to Parent and Purchaser (either Ernst & Young LLP or such other accounting firm, the "Accounting Expert")). The Accounting Expert shall, limiting its review to matters properly included in the Statement of Objections and acting as an expert and not as an arbitrator, resolve the disputes set forth in the Statement of Objections and make any corresponding adjustments to the Final Closing Statement. Subject to, and to the extent permitted by, any applicable Laws, the Parties shall each make readily available to the Accounting Expert all relevant books, records and other information relating to the Target Companies.  Each Party shall concurrently provide the other Party with copies of all such materials and information provided by such Party to the Accounting Expert. The Parties shall jointly instruct the Accounting Expert to make a determination as soon as practicable within 30 days (or such other time as the Parties shall agree in writing) after its engagement and to select, with respect to each item in dispute, an amount between or equal to Purchaser's position on the Final Closing Statement and Parent's position in the Estimated Closing Statement. The Accounting Expert's resolution of the disputes set forth in the Statement of Objections and the Final Closing Statement, with any such adjustments made by the Accounting Expert, shall be final and binding and shall be used in determining the Adjustment Amount, absent manifest error. The fees of the Accounting Expert shall be divided between Purchaser, on the one hand, and Parent, on behalf of the Sellers, on the other hand, in proportion to the aggregate Dollar amount unsuccessfully disputed by such Party *divided by* the aggregate Dollar amount of items submitted to the Accounting Expert.

-16-

(d)    Within two Business Days of the later of (1) Parent's acceptance of the Final Closing Statement or (2) the resolution of all Parent's objections to the Final Closing Statement, to the extent that the Estimated Net Asset Value is not equal to the Final Net Asset Value:

(i)    if the Estimated Net Asset Value is greater than the Final Net Asset Value, Parent shall cause the Sellers to pay to Purchaser an amount equal to the Adjustment Amount by wire transfer of immediately available funds to one or more accounts designated by Purchaser; and

(ii)    if the Estimated Net Asset Value is less than the Final Net Asset Value, Purchaser shall pay to the Sellers an amount equal to the Adjustment Amount by wire transfer of immediately available funds to one or more accounts designated by Parent.

The Parties agree that any such payment pursuant to this  Section 2.3(d) shall be treated as an adjustment to the purchase price for the Target Equity Interests for Tax purposes.

Section 2.4    Purchase Price Allocation. To the fullest extent permitted under applicable Law, Purchaser and Parent shall (and shall cause their respective Affiliates to) allocate the Purchase Price among the Target Equity Interests as set forth in Part 2 of  Schedule A. Each of Purchaser and Parent shall (and shall cause their respective Affiliates to) report the purchase and sale of the Target Equity Interests consistent with such allocation for Canadian and U.S. federal income Tax purposes except to the extent the relevant jurisdiction requires a different treatment.

Section 2.5    Closing. The sale and purchase of the Target Equity Interests will take place at a closing (the "Closing") to be held at the offices of Sullivan & Cromwell LLP, 125 Broad St., New York, New York, at 10:00 a.m., New York City time, on the first Business Day of the month following the calendar month in which the last of the conditions set forth in  Article VI has been satisfied or waived (other than those conditions that, by their terms, are to be satisfied on the Closing Date, but subject to the satisfaction of those conditions), or on such other date or at such other time and place as the Parties may mutually agree.  The Closing shall be deemed to be effective as of 12:00 a.m., New York City time, on the first calendar day of the month in which the Closing occurs.

Section 2.6    Closing Deliverables.

(a)    At the Closing, Purchaser shall deliver, or cause to be delivered, to Sellers the following:

(iii)    an amount in Dollars equal to the Closing Payment, by wire transfer in immediately available funds, to one or more accounts that have been designated by Parent at least two Business Days prior to the Closing Date;

(iv)    those deliverables listed on  Schedule B  for which Purchaser or any of its Affiliates is responsible;

(v)    duly executed counterparts to each of the Transaction Documents (other than this Agreement) to which Purchaser or any of its Affiliates is a party;

-17-

(vi)    the certificate referred to in <u>Section 6.3(c)</u>;

(vii)    evidence that all Purchaser Required Governmental Approvals have been obtained; and

(viii)    such other customary instruments of transfer or assumption, in each case in form and substance reasonably satisfactory to Parent, as may be reasonably required to give effect to the Transaction Documents.

(b)    At the Closing, Parent shall deliver, or cause to be delivered, to Purchaser the following:

(i)    those deliverables listed on <u>Schedule B</u> for which Parent or any of its Affiliates is responsible;

(ii)    duly executed counterparts to each of the Transaction Documents (other than this Agreement) to which Parent or any of its Affiliates is a party;

(iii)    the certificate referred to in <u>Section 6.2(c)</u>;

(iv)    evidence that all Parent Required Governmental Approvals have been obtained;

(v)    subject to applicable law, the resignations, effective as of the Closing, of all directors and officers of the Target Companies, except for such individuals who are Continuing Employees; and

(vi)    such other customary instruments of transfer or assumption, in each case in form and substance reasonably satisfactory to Purchaser, as may be reasonably required to give effect to the Transaction Documents.

<u>Section 2.7    Tax Withholding</u>. Notwithstanding anything in this Agreement to the contrary, Purchaser shall deduct and withhold, or cause to be deducted and withheld, from any amount otherwise payable pursuant to this Agreement to any Person such amounts as it is required to deduct and withhold with respect to the making of such payment under any applicable tax Law.   To the extent that amounts are so withheld, or caused to be withheld, such withheld amounts shall be treated for all purposes of this Agreement as having been paid to such Person in respect of which such deduction and withholding was made, provided that such withheld amounts are actually remitted to the appropriate Government Authority within the time required and in accordance with applicable tax Law.   Parent and Purchaser confirm that, pursuant to (i) applicable Laws enacted prior to the date hereof and in force on the date hereof, (ii) any proposed amendments to such Laws publicly announced in writing by the relevant Government Authorities prior to the date hereof and proposed to be effective in respect of payments made on or after the date hereof and (iii) the accuracy of the representations in <u>Section 3.8(j)</u> and <u>Section 3.8(k)</u>, no Tax is required to be withheld from the payment of the Purchase Price by the Purchaser, and unless there is a change in applicable Law

-18-

prior to Closing, the Purchaser shall not withhold any amount from the payment of the Purchase Price.

<div align="center">

ARTICLE III

REPRESENTATIONS AND WARRANTIES OF PARENT

</div>

Except as set forth in Parent's Disclosure Letter, Parent represents and warrants to Purchaser, as of the date hereof and as of the Closing Date (or in the case of representations and warranties that speak of a specified date, as of such specified date), as follows:

Section 3.1    Organization, Authorization, Enforceability, Non-Contravention.

(c)    *Organization.* Parent is a corporation duly incorporated, validly existing and in good standing under the laws of the state of Delaware. Each other Seller is a corporation or other organization duly organized, validly existing and in good standing (or the equivalent, if any, in the applicable jurisdiction) under the laws of its respective jurisdiction of incorporation or organization. Each Target Company is a corporation or other organization duly organized, validly existing and in good standing (or the equivalent, if any, in the applicable jurisdiction) under the laws of its respective jurisdiction of incorporation or organization and has the requisite corporate or other organizational power to own, operate or lease the properties and assets owned, operated or leased by it and to conduct its business as presently conducted, except, in each case, where the failure to be so qualified or in good standing would not have a Company Material Adverse Effect.

(d)    *Corporate Authorization.* Parent and each of its Affiliates that is a party to any of the Transaction Documents has full corporate or other organizational power and authority to execute and deliver each of the Transaction Documents to which it is a party and to perform its obligations under, and consummate the transactions contemplated by, each such Transaction Document. The execution, delivery and performance of this Agreement by Parent has been duly and validly authorized by all necessary corporate action on the part of Parent. The execution, delivery and performance of each of the Transaction Documents (other than this Agreement) to which Parent or any of its Affiliates is a party have been, or prior to Closing will have been, duly and validly authorized by all necessary corporate or other action on the part of such Person.

(e)    *Binding Effect.* This Agreement has been, and the other Transaction Documents will be at the Closing, duly executed and delivered by Parent or those of its Affiliates that are (or are contemplated to be) party thereto. This Agreement is a legal, valid and binding obligation of Parent enforceable in accordance with its terms, subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar laws of general applicability relating to or affecting creditors' rights and to general equity principles. Each of the Transaction Documents other than this Agreement to which Parent or any of its Affiliates is or will be a party, when executed and delivered by such Person, will be legal, valid and binding obligations of such Person enforceable in accordance with their terms, subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar laws of general applicability relating to or affecting creditors' rights and to general equity principles.

<div align="center">-19-</div>

SC1:3314648.6

(f)    *Non-Contravention.* The execution, delivery and performance of each of the Transaction Documents to which Parent or any of its Affiliates is a party by such Person, and the consummation by such Person of the transactions contemplated by the Transaction Documents, will not (i) violate or conflict with any provision of the Constituent Documents of such Person or any Target Company, (ii) subject to the receipt of all Parent Required Governmental Approvals, and the expiration of any related waiting periods, violate or conflict with any Law or Permit applicable to such Person or any Target Company, other than immaterial violations of Law or any Permit, or (iii) constitute a breach (or event which, with the giving of notice or the lapse of time, would constitute a breach) under, or give any third party any rights of termination, acceleration or cancellation of, or result in the creation of any Encumbrance (other than Permitted Encumbrances) on any of the Equity Interests of any of the Target Companies or any of the  material assets or properties of the Target Companies pursuant to any Specified Contract, Permit or Government Order to which any Target Company is a party.

Section 3.2    Equity Interests of the Target Companies.

(e)    Schedule A sets forth a complete list of each of the Target Companies and sets forth the designation and par value, if applicable, and the number of authorized, issued and outstanding Equity Interests of each of the Target Companies, and the percentage ownership interest of any Seller or other Target Company in each Target Company. There are no other Outstanding Equity Interests in any of the Target Companies and there are no Outstanding Rights in respect of any Equity Interests in any of the Target Companies. Each Seller legally or beneficially owns, directly or indirectly, all of the respective Equity Interests set forth opposite its name in Part 2 of Schedule A free and clear of any Encumbrances, except for restrictions on transfer arising under applicable securities Laws.   Each Target Company legally or beneficially owns, directly or indirectly, all of the respective Equity Interests in the other Target Companies set forth opposite its name in Part 1 of Schedule A free and clear of any Encumbrances, except for restrictions arising under applicable securities Laws.

(f)    All the Equity Interests in the Target Companies (other than New Holdco) have been duly authorized and validly issued and are fully paid and were not issued in violation of any preemptive or other similar right.  From and after its date of formation, all of the Equity Interests in New Holdco shall been have been duly authorized and validly issued, not issued in violation of any preemptive or other similar right, and shall be fully paid.

(g)    No Target Company owns, beneficially, directly or indirectly, any Equity Interests of any Person other than another of the Target Companies.

(h)    No Indebtedness having the right to vote on any matters on which the holders of Equity Interests in the Target Companies referenced in Section 3.3(a) may vote are Outstanding.

(i)    Each Target Holding Company (i) does not own or have, and, since December 31, 2007 has not owned or had, any interest in any assets (tangible or intangible), real property or Equity Interests other than the Equity Interests of any Target Company; (ii) does not engage, and, since December 31, 2007 has not engaged, in any business or operations of any kind, and its only activity

-20-

is, and, since December 31, 2007 has been, the holding of the Equity Interests in the capital of the other Target Companies; and (iii) is not, and, since December 31, 2007 has not been, liable for or subject to any Liability.

Section 3.3    Target Company Financial Information.

(a)    Subject to such exceptions and qualifications as may be reflected in such financial information:

(i)    The audited consolidated financial statements as of and for the year ended December 31, 2010 of Ally Credit Canada Limited and ResMor Trust Company present fairly, in all material respects, in accordance with Previous Canadian GAAP, consistently applied, the consolidated financial position, results of operations and cash flows of Ally Credit Canada Limited and ResMor Trust Company, respectively, for the periods and as of the dates indicated therein.

(ii)    The audited consolidated financial statements as of and for the year ended December 31, 2011 of Ally Credit Canada Limited and ResMor Trust Company present fairly, in all material respects, in accordance with IFRS, consistently applied, the consolidated financial position, results of operations and cash flows of Ally Credit Canada Limited and ResMor Trust Company, respectively, for the periods and as of the dates indicated therein.

(iii)    The unaudited consolidated financial statements as of and for the six-month period ended June 30, 2012 of Ally Credit Canada Limited and ResMor Trust Company present fairly, in all material respects, in accordance with IFRS, consistently applied, the consolidated financial position, results of operations and cash flows of Ally Credit Canada Limited and ResMor Trust Company, respectively, for the periods and as of the dates indicated therein.

(iv)    To the Knowledge of Parent, (i) the draft summary balance sheet for Ally Credit Canada Limited set forth in Section 3.3(a)(iv) of Parent's Disclosure Letter presents fairly, in all material respects, in accordance with IFRS, consistently applied, the condensed consolidated financial position of Ally Credit Canada Limited as of September 30, 2012, and (ii) the draft summary balance sheet for ResMor Trust Company set forth in Section 3.3(a)(iv) of Parent's Disclosure Letter presents fairly, in all material respects, in accordance with IFRS, consistently applied, the financial position of ResMor Trust Company as of September 30, 2012.

(b)    Set forth on Section 3.3(b) of Parent's Disclosure Letter are complete copies of all financial statements referred to in Section 3.3(a) (collectively, the "Target Company Financial Information"). The Target Company Financial Information has been derived from the books of account (including the financial records) of the Target Companies, and such books of account

-21-

(including the financial records) of each Target Company have been maintained in accordance with commercially reasonable business practices in all material respects.

Section 3.4    No Undisclosed Liabilities.  Except (i) as set forth in the Target Company Financial Information and (ii) for Liabilities incurred by the Target Companies since December 31, 2011 in the ordinary course of their respective businesses, consistent with past practice, there are no material Liabilities of the Target Companies.  Section 3.4 of Parent's Disclosure Letter sets forth a true and correct listing of all outstanding indebtedness for borrowed money of each Target Company, other than any such indebtedness arising in the ordinary course of such Target Company's business consistent with past practice.

Section 3.5    Absence of Changes.  Since December 31, 2011, (i) except as contemplated by the Transaction Documents and except for any action taken in connection with any effort to sell the Target Companies or the Target Business, the Target Companies have operated their respective businesses in the ordinary course, consistent with past practice, (ii) there has not been any change, effect, event or occurrence that has had or would have a Company Material Adverse Effect, and (iii) other than actions taken with the prior written consent of Purchaser, neither Parent nor any of the Target Companies has taken any action that would require Purchaser's consent if taken after the date hereof through the Closing Date pursuant to  Section 5.1(a)(i), (ii), (iii), (iv), (viii), (xi) or (xiv).

Section 3.6    No Litigation.  There is no Action by any Person pending or, to Parent's Knowledge, threatened against Parent or the Target Companies that would be reasonably likely to result in monetary damages, injunctive action or the taking of any other action that would be reasonably likely to be materially adverse to the Target Companies, taken as a whole or would prevent or materially impair or materially delay the ability of Parent or any of its Affiliates to consummate the transactions contemplated by the Transaction Documents. There are no Government Orders that are unsatisfied or outstanding or, to Parent's Knowledge, threatened against the Sellers or any of the Target Companies in relation to the Target Business or against any of the properties or businesses of the Target Companies that would have a Company Material Adverse Effect.

Section 3.7    Approvals.  Other than the authorizations, waivers, consents, approvals, filings, registrations and notices as set forth in Section 3.7 of Parent's Disclosure Letter (collectively, the "Parent Required Governmental Approvals"), neither Parent nor any of its Affiliates is required to (i) obtain any authorization, waiver, consent or approval of, (ii) make any filing or registration with, or (iii) give any notice to, any Government Authority in connection with or as a condition to the execution, delivery and performance of any of the Transaction Documents or the consummation of the transactions contemplated thereby, other than (1) any authorization, waiver, consent, approval, filing, registration or notice the failure of which to obtain, make or give would not be, individually or in the aggregate, materially adverse to the Target Companies, taken as a whole, and would not prevent or materially impair or materially delay the ability of Parent or any of its Affiliates to consummate the transactions contemplated by the Transaction Documents, or (2) as would be required solely as a result of the identity or regulatory status of Purchaser or its Affiliates. To Parent's Knowledge, as of the date hereof, no event has occurred nor has any circumstance arisen that would reasonably be likely to result in the failure of any Parent Required Governmental Approvals or any

SC1:3314648.6

other authorizations to be received in a timely manner in order to permit the consummation of the transactions contemplated by this Agreement.

Section 3.8    Taxes.

(a)    All material Tax Returns that are required to be filed under applicable Laws on or before the Closing (taking into account any extensions of time in which to file) by any of the Target Companies have been or will be timely filed on or before the Closing, and all such Tax Returns are or will be true, correct and complete in all material respects.

(b)    Each of the Target Companies has duly and timely paid all material Taxes shown on any Tax Return of the Target Companies required to be filed on or before the Closing for any Pre-Closing Period except for those amounts that are being contested in good faith. Provision has been made in the accounts and financial statements of each Target Company for amounts at least equal to the amount of all Taxes owing by such Target Company, including Taxes, that are not yet due and payable.

(c)    None of the Target Companies is a party to any audit, examination, investigation, action or proceeding for assessment or collection of Taxes, nor has such an event been threatened against any Target Company and there are no matters under discussion, audit or appeal with any Government Authority in respect of Taxes.

(d)    There is no agreement, election, designation, consent or waiver of any statute of limitations or extension of time with respect to Taxes of any Target Company, including any Tax assessment or deficiency, in effect or that will have effect for any period ending after the Closing Date.

(e)    As of the time of Closing, (i) Ally Credit Canada Limited will have become a Nova Scotia Unlimited Liability Company and (ii) Ally Credit Canada Limited and New Holdco will each be treated as a "disregarded entity" within the meaning of U.S. Treasury Reg. § 301.7701-3(b)(2)(i)(C) for U.S. federal income tax purposes.

(f)    For purposes of the Tax Act or any other applicable Tax Law, since January 1, 2006, no Person or group of Persons has ever acquired or had the right to acquire control of any of the Target Companies.

(g)    None of sections 78, 80, 80.01, 80.02, 80.03 or 80.04 of the Tax Act, or any equivalent provision of the Tax legislation of any province or any other jurisdiction, have applied or will apply to the Target Companies at any time up to and including the Closing Date.

(h)    None of the Target Companies has acquired property from a Person not dealing at arm's length (for purposes of the Tax Act) with it in circumstances that would result in such Target Company becoming liable to pay any amount of Taxes of such Person under subsection 160(1) of the Tax Act or any corresponding provincial provision.

-23-

(i)    Each of the Canadian Target Companies is duly registered under subdivision (d) of Division V of Part IX of the *Excise Tax Act* (Canada) with respect to the goods and services and harmonized sales tax and under Division I of Chapter VIII of Title I of the *Quebec Sales Tax Act* with respect to Quebec sales tax.

(j)    The Target Equity Interests and the shares of Ally Credit Canada Limited are not "taxable Canadian property" for purposes of section 116, and within the meaning of, the Tax Act.

(k)    GMAC DDA B.V. is a resident of the Netherlands for purposes of, and fully entitled to claim the benefits afforded by, the Canada-Netherlands Income Tax Convention.

(l)    Each of the Target Companies (i) has withheld from each payment made to any Person, including any of its present or former employees, officers and directors and all Persons who are or are deemed to be nonresidents of Canada for purposes of the Tax Act, all amounts required by applicable Law to be withheld, and has timely remitted such withheld amounts within the prescribed periods to the appropriate Government Authority and (ii) has timely remitted all Canada Pension Plan contributions, provincial pension plan contributions, employment insurance premiums, employer health taxes and other Taxes payable or required to be withheld and remitted by it in respect of its employees to the appropriate Government Authority within the time required under applicable Law.

(m)    Each of the Target Companies has charged, collected and remitted on a timely basis all Taxes as required under applicable Law (including goods and services, harmonized sales and provincial, territorial and local sales Taxes) on any sale, supply or delivery whatsoever, made by it.

(n)    Each of the Target Companies has maintained and continues to maintain at its place of business in Canada all records and books of account required to be maintained under the Tax Act, the *Excise Tax Act* (Canada) and any corresponding provincial provision, except as would not result in any violation of applicable Law.

(o)    None of the Target Companies is party to or bound by any tax sharing agreement, tax indemnity obligation in favor of any Person or similar agreement in favor of any Person with respect to Taxes (including any advance pricing agreement or other similar agreement relating to Taxes with any Government Authority) other than any such agreements among the Target Companies.

(p)    Ally Credit Canada Limited is entitled to receive the Tax Receivables from the relevant Government Authority.

(q)    Each Securitization Issuing Entity in which a Target Company has an Equity Interest (i) has timely filed all Tax Returns that are required to be filed by it under applicable Laws, (ii) has timely paid all Taxes due and payable by it, and (iii) is not a party to any audit examination, investigation, action or proceeding for assessment or collection of Taxes, nor has any audit examination, investigation, action or proceeding for assessment or collection of Taxes been

-24-

threatened against it and there are no matters under discussion, audit or appeal with any Government Authority in respect of Taxes.

(r)    The paid-up capital of Ally Credit Canada Limited for purposes of the Tax Act as of the date hereof is not less than $900,000,000.

Section 3.9    Employee Benefit Plans.

(a)    All material written benefit and compensation plans, contracts, policies, agreements or arrangements (other than any contracts, policies, arrangements or agreements operated by a Government Authority) that are maintained and sponsored by the Target Companies for the benefit of current or former employees, current or former directors, or consultants of the Target Companies, including plans providing benefits on retirement, death, termination of employment (whether voluntary or not), or during periods of sickness or disablement, or any deferred or incentive compensation, welfare, healthcare, medical, stock or stock-related award plans (the "Target Company Benefit Plans") are listed in Section 3.9(a)(i) of Parent's Disclosure Letter. To avoid doubt, no compensation, retirement or other employee benefit plans established, maintained or sponsored by Parent (" Parent Plans") shall be considered a Target Company Benefit Plan for any purpose under this Agreement. All Parent Plans which cover Target Company employees or in respect of which the Target Companies have any Liabilities are listed in Section 3.9(a)(ii) of Parent's Disclosure Letter. Other than with respect to the Target Company Benefit Plans listed in Section 3.9(a)(i) of Parent's Disclosure Letter and the Parent Plans listed in Section 3.9(a)(ii) of Parent's Disclosure Letter, the Target Companies have no Liabilities with respect to any benefit and compensation plans, contracts, policies, agreements or arrangements (other than any contracts, policies, arrangements or agreements operated by a Government Authority). Notwithstanding the foregoing, with respect to each Target Company Benefit Plan that is documented on a standard form or template, only such standard form or template, along with any material variations from such standard form or template, shall be listed in Section 3.9(a)(iii) of Parent's Disclosure Letter. Parent has made available to Purchaser complete copies of all Parent Plans listed in Section 3.9(a)(ii) of Parent's Disclosure Letter and the Target Company Benefit Plans, as amended, together with, if applicable, all related actuarial reports, and all other related documentation, including funding agreements, trust agreements, funding and financial information.

(b)    Each Target Company Benefit Plan has been administered in accordance with its terms and is in compliance with applicable Laws, except for any failures to so administer or be in compliance that would not, individually or in the aggregate be reasonably likely to result in a material Liability to the Target Companies, taken as a whole.  No Target Company Benefit Plan is (i) maintained in the United States or (ii) primarily for the benefit of employees working in the United States.

(c)    Parent has made available to Purchaser a list of all agreements in respect of the employees of the Target Companies under which any Target Company has any payment obligation which will arise as a result of or is conditional upon the transactions contemplated by this Agreement (the "Retention Agreements").

-25-

SC1:3314648.6

(d)    To Parent's Knowledge, no fact, condition or circumstance exists that would affect in any material respect the information contained in the documents made available pursuant to this <u>Section 3.9</u> and, in particular, no promises or commitments have been made by the Target Companies to amend any Target Company Benefit Plan.

(e)    Each Target Company Benefit Plan is duly registered where required by applicable Law (including registration with the relevant Tax authorities where such registration is required to qualify for Tax exemption or other beneficial Tax status).

(f)    All employer and employee obligations in respect of the Target Company Benefit Plans, including payments, contributions and premiums required under applicable Law and their terms, have been satisfied in all material respects and, to the Parent's Knowledge, there are no outstanding material defaults or material violations in respect thereof.

(g)    No Target Company Benefit Plan is a "pension plan" as defined under applicable pension standards laws or a "registered pension plan" or a "retirement compensation arrangement" as defined in the Tax Act.

(h)    There are no Actions pending or, to Parent's Knowledge, threatened, with respect to the Target Company Benefit Plans against the Target Companies or the funds of such Target Company Benefit Plans, other than claims for benefits in the ordinary course or Actions that would not, individually, or in the aggregate, be reasonably likely to result in a material Liability to the Target Companies, taken as a whole.

(i)    No order has been made or notice given by a Government Authority pursuant to any applicable Law requiring (or proposing to require) the Target Companies to take (or refrain from taking) any action in respect of any Target Company Benefit Plan and, to Parent's Knowledge, no event has occurred and no condition or circumstance exists that has resulted, or would be reasonably likely to result in, any Target Company Benefit Plan (A) being ordered or required to be terminated or wound up in whole or in part, (B) having its registration under any applicable Law refused or revoked, (C) being placed under the administration of any trustee or any regulatory authority or (D) being required to pay any material Taxes under applicable Law.

(j)    The Target Company Benefit Plans are fully funded in accordance with their terms and all applicable Laws; and none of the Target Company Benefit Plans provide benefits beyond retirement or other termination of employment or service.

(k)    The Target Companies have no obligation or Liabilities in respect of any multi-employer pension plans or multi-employer benefit plans.

(l)    Except as provided in the Retention Agreements, neither the execution, delivery or performance of this Agreement, nor the consummation of any of the other transactions contemplated by this Agreement, will result in any bonus, golden parachute, severance or other payment or obligation to any current or former employee or director of the Target Companies (whether or not under any Target Company Benefit Plan), materially increase the benefits payable or provided under

-26-

any Target Company Benefit Plan, result in any acceleration of the time of payment or vesting of any such benefit, or increase or accelerate employer contributions thereunder.

(m)   All material data necessary to administer each Target Company Benefit Plan is in the possession of the Target Companies and is in a form which is sufficient for the proper administration of such plan(s) in accordance with its terms and all Laws and such data is complete and correct in all material respects.

(n)   Other than the Excluded Employees, only current and former employees of the Target Companies participate in the Target Company Benefit Plans.

Section 3.10   Labor Matters.

(a)   None of the Target Companies is a party to or bound by any labor agreements, works council agreements, union contracts or collective bargaining agreements.

(b)   No trade union, council of trade unions, employee bargaining agency or affiliated bargaining agent (A) holds bargaining rights with respect to any Target Company employees by way of certification, interim certification, voluntary recognition, designation or successor rights; (B) to Parent's Knowledge, has applied to be certified as the bargaining agent of any Target Company employees; or (C) to Parent's Knowledge has applied to have any Target Company declared a related employer or successor employer pursuant to applicable labor Laws.  Since January 1, 2011, to Parent's Knowledge, there has been no material activity involving any employees seeking to certify a collective bargaining unit or engaging in any organizing activity.

(c)   The Target Companies are in compliance, in all material respects, with all applicable labor and employment Laws, including those pertaining to occupational health and safety, pay equity, employment equity and employment standards, and there are no pending or, to Parent's Knowledge, threatened, Actions thereunder against any of the Target Companies..

(d)   There is no pending or, to Parent's Knowledge, threatened, strike, walkout, picketing, hand-billings or other work stoppage or any union organizing effort by any of the employees of any Target Company.

(e)   Parent has made available to Purchaser a true and complete list of employees of the Target Companies as of the date thereof setting out the length of service, job title, salary and compensation details.

Section 3.11   No Violation of Law; Required Licenses and Permits.

(a)   Except as would not have a Company Material Adverse Effect, (i) since January 1, 2010, each Target Company has conducted its business in compliance with applicable Law and no Target Company has been a party or subject to any Government Order with any Government Authority which is charged with regulating or supervising any Target Company which imposes any restrictions on or otherwise affects the Target Business and (ii) each Target Company has all Permits necessary for the conduct of the Target Business, all such Permits are in full force and effect, to

-27-

Parent's Knowledge no suspension or cancellation of any of them is threatened and the business of each Target Company is being conducted in compliance with all such Permits.

(b)    Since January 1, 2010, the Target Companies have filed all material reports and documents required to be filed with any applicable Government Authority and have paid all material fees and assessments due and payable in connection therewith.  Each of such material reports and documents complied in all material respects with applicable Law when filed or as amended or supplemented.

(c)    ResMor Trust Company is a member institution in good standing within the meaning of the *Canada Deposit Insurance Corporation Act* (Canada).

(d)    ResMor Trust Company is a member institution in good standing of the Canadian Payments Association.

Section 3.12    Real Property. Section 3.12 of Parent's Disclosure Letter sets out a list of all real property that is owned, or leased or subleased from any other Person, by any of the Target Companies (such real property, the "Specified Properties"), and identifies the instruments under which such real property is leased or subleased.  Each Target Company (i) has good and valid title to all real property owned by it, free and clear of all Encumbrances other than Permitted Encumbrances, and (ii) has a good and valid leasehold interest in all real property that is leased or subleased from any other Person by such Target Company, free and clear of all Encumbrances other than Permitted Encumbrances.

Section 3.13    Environmental Matters.

(a)    Except as would not have a Company Material Adverse Effect, each of the Target Companies:

(i)    is in compliance with all applicable Environmental Laws with respect to its occupation of all applicable Specified Properties;

(ii)    possesses all Permits required under applicable Environmental Laws for the operation of the Target Business;

(iii)    has not within the prior three years received any written claim, notice of violation or citation concerning any violation or alleged violation of any applicable Environmental Law with respect to its occupation of all applicable Specified Properties or any alleged liability pursuant to any Environmental Law with respect to its occupation of all applicable Specified Properties; and

(iv)    is not the subject of any Action alleging or addressing any violation or alleged violation of any applicable Environmental Law with respect to its occupation of any of the applicable Specified Properties or any alleged liability pursuant to any Environmental Law with respect to its occupation of any of the applicable Specified Properties.

-28-

SC1:3314648.6

(b)    Notwithstanding any other provision of this <u>Article III</u>, the representations and warranties contained in this <u>Section 3.13</u> constitute the sole representations and warranties of Parent with respect to any Environmental Law.

<u>Section 3.14</u>    <u>Intellectual Property</u>.

(a)    <u>Section 3.14(a)</u> of Parent's Disclosure Letter sets forth a true and complete list of all material Registered Intellectual Property owned by the Target Companies indicating for each item of such Registered Intellectual Property, the registration or application number, and the applicable filing jurisdiction (collectively, the "<u>Scheduled Intellectual Property</u>").

(b)    To Parent's Knowledge and except as would not have a Company Material Adverse Effect:

(i)    the Intellectual Property owned by the Target Companies (including the Company Trademarks) is owned free and clear of all Encumbrances, other than Permitted Encumbrances and non-exclusive and exclusive licenses granted by the applicable Target Company in the ordinary course of business;

(ii)    the operation of the businesses of the Target Companies as currently conducted does not infringe or misappropriate the Intellectual Property of any third party, no Person has asserted in a writing received by Parent or any of the Target Companies that any of the Target Companies have infringed or misappropriated the Intellectual Property of any third party and no third party has infringed or misappropriated any Intellectual Property owned by the Target Companies;

(iii)    the Target Companies have taken reasonable measures to protect the confidential nature of the trade secrets and Confidential Information that they own or, to the extent contractually required, use; and

(iv)    the IT Assets used by the Target Companies operate and perform as required by the Target Companies in connection with their respective businesses and have not materially malfunctioned or failed within the past eighteen months; the Target Companies have implemented reasonable backup, security and disaster recovery technology and procedures consistent with historical practices; and the Target Companies are compliant with their own privacy policies and commitments to their respective customers, consumers and employees, concerning data protection and the privacy and security of personal data and the nonpublic personal information of their respective customers, consumers and employees.

(c)    To Parent's Knowledge (which qualifier shall not apply with respect to any customer lists included within any Intellectual Property), except for (i) the rights, services, assets and properties provided, to be provided or that may be provided pursuant to the Transaction Documents, (ii) any third party consent or approval of any Government Authority referred to in Section 2.7 of the Transition Services Agreement, and (iii) the rights, services, assets and properties provided or

-29-

to be provided by Purchaser immediately following the Closing, the Target Companies will own, or otherwise have the right to use, all of the material Intellectual Property and material IT Assets necessary to conduct the Target Business in all material respects as it is conducted immediately prior to the date of this Agreement.  For the avoidance of doubt, the representation and warranty set forth in this Section 3.14(c) shall not be construed or interpreted as, or deemed to be, a representation or warranty regarding the infringement of Intellectual Property rights.

(d)    Notwithstanding anything to the contrary set forth herein, this  Section 3.14 and Section 3.15 contain all of the representations and warranties provided by Parent with respect to matters related to Intellectual Property and IT Assets.

Section 3.15    Specified Contracts.

(a)    Section 3.15(a) of Parent's Disclosure Letter lists, as of the date hereof, each of the following Contracts to which any Target Company is a party or is otherwise bound (collectively, the "Specified Contracts"):

(v)    *Future Payment Obligations*.  Any Contract involving the payment by or to such Target Company of more than $1,000,000 in any twelve-month period or $3,000,000 in the aggregate, and which by its terms does not terminate or is not terminable without penalty by such Target Company upon 90 days or less prior notice;

(vi)    *Restrictive Covenants*.  Any Contract (A) containing covenants limiting in any material respect the freedom of any Target Company (or following the Closing, the Purchaser or any of its Affiliates) to compete or operate in any line of business or with any Person or that involves any restriction with respect to the geographic area in which, or the method by which, any Target Company (or following the Closing, Purchaser or its Affiliates) may carry on its business (other than as may be required by Law or any Government Authority); (B) that requires any Target Company (or following the Closing, Purchaser or its Affiliates) to deal exclusively or on a "sole source" basis with another party to such Contract with respect to the subject matter of such Contract; or (C) that requires referrals of business;

(vii)    *Required Loans*.  Any Contract containing a covenant by any Target Company to make, directly or indirectly, any advance, loan, extension of credit or capital contribution to, or other investments in, any Person in excess of $100,000, in each case other than as made in the ordinary course of such Target Company's business consistent with past practice;

(viii)    *Indebtedness*.  Any Contract relating to any indebtedness for borrowed money which creates payment obligations of, or from, any party to any Target Company in excess of $100,000, other than in the ordinary course of such Target Company's business consistent in all material respects with past practice;

-30-

(ix)    *Capital Expenditures*. Any Contract containing covenants requiring capital expenditures by a Target Company in excess of $500,000 individually or $2,000,000 in the aggregate;

(x)    *Acquisition Agreements*. Any Contract for the acquisition, sale or lease of any material properties or assets of a Target Company (by merger, purchase or sale of assets or otherwise), in each case under which any Target Company has any material executory indemnification or other continuing obligations;

(xi)    *Guarantees*. Any Contract under which a Target Company has directly or indirectly guaranteed or otherwise agreed to be responsible for indebtedness for borrowed money or other Liabilities of any Person (other than another Target Company) in excess of $50,000;

(xii)    *Joint Ventures*. Any partnership, joint venture or other similar agreement;

(xiii)    *Material Outsourcing*. Any Contract which is a "material outsourcing arrangement" of the ResMor Trust Company pursuant to Guideline B-10 (Outsourcing of Business Activities, Functions and Processes) of the Office of the Superintendent of Financial Institutions (Canada);

(xiv)    *Right of First Refusal*. Any Contract that grants any right of first refusal or right of first offer or similar right that limits the ability of any Target Company to own, operate, sell, transfer, pledge or otherwise dispose of its material assets or businesses, or any Contract that contains a "most favoured nation" clause or other similar term providing preferential treatment to a party that is material to any Target Company, other than, in each case, any Securitization Instrument;

(xv)    *Lease*. Any lease pursuant to which the annualized base rent for the lease year that includes December 31, 2011, or the consideration paid during the calendar year ended December 31, 2011, as applicable, was in excess of $1,000,000; and

(xvi)    *Government Authority*. Any Contract with a Government Authority, other than any Contract evidencing an Extension of Credit entered into by any Target Company in the ordinary course of business consistent with past practice.

(b)    Parent has made available to Purchaser a complete copy of each Specified Contract. Each Specified Contract is a valid and binding obligation of, and is an enforceable obligation against, the relevant Target Company that is a party thereto and, to Parent's Knowledge, the counterparty or counterparties thereto (subject in each case to the effect of any applicable bankruptcy, reorganization, insolvency, moratorium, rehabilitation, liquidation, fraudulent conveyance, preferential transfer or similar Laws now or hereafter in effect relating to or affecting creditors' rights and remedies generally and subject, as to enforceability, to the effect of general equitable principles (regardless of whether enforcement is sought in a proceeding in equity or law)), except for such failures to be valid, binding or enforceable as would not have a Company Material Adverse

-31-

Effect. None of the Target Companies or, to Parent's Knowledge, any other party to a Specified Contract is in breach (with or without the giving of notice, the lapse of time or both) of a Specified Contract, except for any such breaches that would not have a Company Material Adverse Effect.

Section 3.16    Title to Assets. Each of the Target Companies has good title to all material properties and assets, other than real property, owned or stated to be owned by it, free and clear of all Encumbrances other than Permitted Encumbrances.

Section 3.17    Insurance. Section 3.17 of Parent's Disclosure Letter contains a list of policies of casualty and liability insurance directly, or indirectly through Parent and its Affiliates, maintained by the Target Companies (collectively, the "Insurance Policies"). All of the Insurance Policies are in full force and effect and all insurance premiums due thereon have been paid in full when due, except, in each case, as would not be material to the Target Companies, taken as a whole. Since January 1, 2012, the Target Companies have not received in writing any notice of cancellation or termination or denial of coverage with respect to any such policy, except to the extent such policy has expired and been replaced in the ordinary course of business consistent with past practice. As of the date hereof, there are no material outstanding claims related to the Target Business under any Insurance Policy or default with respect to the provisions in any Insurance Policy.

Section 3.18    Transactions with Affiliates. Section 3.18 of Parent's Disclosure Letter contains a true and correct list of all loans, leases and other Contracts between Parent, its Affiliates (other than the Target Companies) or the directors, officers or employees of the Target Companies (each of the foregoing, a "Related Party"), on the one hand, and any of the Target Companies, on the other hand (each of the foregoing, a "Related Party Contract"), involving payments in excess of $50,000 annually or any indemnity obligation of any Target Company in favor of a Related Party.

Section 3.19    Securitizations.

(a)    Each of the Target Companies, to the extent that it is a servicer of any Securitization Transaction (in such a capacity, a "Securitization Servicer"), is in compliance in all material respects with all contracts to which it is bound under such Securitization Transaction (collectively referred to as the "Securitization Instruments"). Each of the Target Companies, to the extent that it is a Securitization Issuing Entity, has performed in all material respects all of its respective obligations under the Securitization Instruments. Each of the Target Companies has performed in all material respects all of its respective obligations under the Securitization Instruments.

(b)    Parent has made available to Purchaser complete copies of each Securitization Instrument.

(c)    There are no pending or, to Parent's Knowledge, threatened, Actions as of the date hereof in which it is alleged that any prospectus, or any amendments or supplements thereto contained, as of the date on which it was issued in any Securitization Transaction, any untrue statement of a material fact or omitted to state any material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made,

-32-

SC1:3314648.6

not misleading. No securities were issued or sold by any of the Target Companies in violation in any material respect of applicable Law in any Securitization Transaction.

(d)    No event of default, early amortization event, servicer default or similar event currently exists under any Securitization Instrument or any Derivative Transaction relating to a Securitization Transaction, and no cash trapping trigger event or other event requiring the increase of credit enhancement for any Securitization Transaction currently exists, except any cash trapping trigger or other event requiring the increase of credit enhancement for any Securitization Transaction that occurred as a result of the performance of the related pool of assets.

(e)    None of the Target Companies has acted in the capacity of guarantor or credit enhancer in any Securitization Transaction, nor have any of the Target Companies provided any type of guaranty in any Securitization Transaction with respect to any payments of principal or interest in connection with any issued securities;  provided, however, that for the purposes of this representation, no Target Company shall be deemed a "guarantor" or "credit enhancer" solely by reason of owning or holding any right to receive a deferred purchase price, co-ownership interest, credit residual, subordinate interest, credit reserve account or similar instrument or account related to any Securitization Transaction.

(f)    Except as would not have a Company Material Adverse Effect, none of the execution, delivery or performance of any of the Transaction Documents, nor the completion of the transactions contemplated by any of the Transaction Documents, will (i) constitute an event of default, early amortization event, servicer default or any other similar event under any Securitization Instruments, or (ii) give any third party any rights of termination, acceleration, declaring early amortization or cancellation under any Securitization Instruments.

Section 3.20    Finder's Fees. Except for Citigroup Global Markets Inc. and Evercore Group LLC, whose fees will be paid by Parent or one of its Affiliates (other than any of the Target Companies), there is no other investment banker, broker, finder or other intermediary that has been retained by or is authorized to act on behalf of Parent or its Affiliates who would be entitled to any fee or commission in connection with the transactions contemplated by this Agreement.

Section 3.21    Books and Records.

(a)    Since January 1, 2010, the books and records of the Target Companies have been (i) maintained in all material respects in accordance with Previous Canadian GAAP  or IFRS, as applicable, and (ii) in compliance with all Laws applicable thereto.

(b)    The Target Companies have established and maintain a system of internal accounting controls sufficient to provide reasonable assurances that transactions are recorded in accordance with Previous Canadian GAAP  or IFRS, as applicable, consistently applied and applicable Law. Since December 31, 2011, none of Parent, the Target Companies nor, to Parent's Knowledge, any director or senior executive officer of any Target Company has received written notice of any material weakness regarding the accounting or auditing practices, procedures or methods of any

-33-

SC1:3314648.6

Target Company or their respective internal accounting controls, other than material weaknesses that have been remedied prior to the date of this Agreement.

Section 3.22    Sufficiency of Assets. Except for the rights, services, assets and properties provided or to be provided pursuant to the Transaction Documents, immediately following the Closing, the Target Companies will own, or otherwise have the right to use pursuant to written Contracts, all of the assets, properties and rights necessary to conduct the Target Business in all material respects as it is conducted immediately prior to the date of this Agreement.

Section 3.23    Parent Guarantees. Section 3.23 of the Parent's Disclosure Letter lists all Parent Guarantees.  Parent has made available to Purchaser complete copies of the Parent Guarantees.

Section 3.24    Deposits. Each deposit accepted by ResMor Trust Company complies in all material respects with the applicable deposit agreement with ResMor Trust Company and has been originated and maintained in compliance in all material respects with applicable Law and the policies and procedures of ResMor Trust Company.

(a)    Each loan, revolving credit facility, letter of credit or other extension of credit or commitment to extend credit (collectively, "Extensions of Credit") made, entered into or held by any of the Target Companies referenced in  Section 3.3(a)(i) is evidenced by written evidences of Indebtedness and (ii) to the extent secured, has been secured by a valid and perfected Encumbrance, except for such failures to be evidenced in writing, valid or perfected as would not have a Company Material Adverse Effect.

(b)    Each outstanding Extension of Credit has been originated and, during the period of time, if any, in which such Extension of Credit was administered and serviced by one or more of the Target Companies referenced in  Section 3.3(a), was administered and serviced, in all material respects, in accordance with such Target Companies' loan administration standards.

Section 3.25    Mortgage Business. None of the Target Companies engage in the business of originating residential mortgages. Section 3.26 of the Parent's Disclosure Letter lists all the contracts (the "Mortgage Sale Agreements") entered into (and not terminated) by Parent or any of its Affiliates in respect of the sale of the mortgage business to MCAP Commercial LP (the " Sold Mortgage Business") of the Target Companies pursuant to which any Target Company has any material ongoing obligation.

Section 3.26    Derivative Transactions.  Except as would not have a Company Material Adverse Effect, all Derivative Transactions, whether entered into for the account of any Target Company or for the account of a customer of a Target Company were entered into in accordance with applicable Law. None of the Target Companies nor, to Parent's Knowledge, any other party thereto is in breach in any material respect of any of its obligations under any Derivative Transaction.

Section 3.27    Certain Other Business. None of the Target Companies has engaged in the business of issuing or servicing credit cards since January 1, 2008.

-34-

Section 3.28    No Other Representations or Warranties. Except for the representations and warranties contained in this  Article III (as qualified by the applicable items disclosed in Parent's Disclosure Letter), neither Parent nor any other Person makes any express or implied representation or warranty on behalf of Parent or any of its Affiliates, and Parent disclaims any other representations or warranties. To avoid doubt, Parent does not give or make any warranty or representation as to (and shall have no indemnification obligation or, in the absence of fraud, other liabilities in respect of) the accuracy or reasonableness of any forecasts, estimates, projections, statements of intent or statements of opinion provided to Purchaser, any of its Affiliates, or any of their respective Representatives on or prior to the date of this Agreement, including in the "Confidential Information Memorandum" relating to the Target Business, any management presentations and any other information made available in the Virtual Data Room.  Purchaser acknowledges and agrees that, except for the representations and warranties contained in this  Article III (as qualified by the applicable items disclosed in Parent's Disclosure Letter), neither Parent nor any of its Affiliates is making any representation or warranty regarding any documents, projections, forecasts, statement or other information made, communicated or furnished (orally, in writing, in the Virtual Data Room, in management presentations (including any questions posed and answers given and any related discussions, whether formal or informal) or otherwise) to Purchaser, any of its Affiliates, or any of their respective Representatives (including any opinion, information, projection or advice that may have been or may be provided to such Person by any Representatives of Parent or any of its Affiliates). No Person makes any representations or warranties to Purchaser regarding the probable success or profitability of the Target Companies.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Except as set forth in Purchaser's Disclosure Letter, Purchaser represents and warrants to Parent, as of the date hereof and as of the Closing Date (or in the case of representations and warranties that speak of a specified date, as of such specified date), as follows:

Section 4.1    Organization, Authorization, Enforceability, Non-Contravention .

(a)    *Organization*. Purchaser is a Schedule I bank existing under the Bank Act.

(b)    *Corporate Authorization*. Purchaser and each of its Affiliates that is a party to any of the Transaction Documents has full corporate or other organizational power and authority to execute and deliver the Transaction Documents to which it is a party and to perform its obligations under, and consummate the transactions contemplated by, each such Transaction Document.  The execution, delivery and performance of this Agreement by Purchaser has been duly and validly authorized by all necessary corporate action on the part of Purchaser. The execution, delivery and performance of each of the Transaction Documents (other than this Agreement) to which Purchaser or any of its Affiliates is a party have been, or prior to Closing will have been, duly and validly authorized by all necessary corporate or other action on the part of such Person.

(c)    *Binding Effect*. This Agreement has been, and the other Transaction Documents will at the Closing be, duly executed and delivered by Purchaser or those of its Affiliates that are (or are

-35-

SC1:3314648.6

contemplated to be) party thereto. This Agreement is a legal, valid and binding obligation of Purchaser enforceable in accordance with its terms, subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar laws of general applicability relating to or affecting creditors' rights and to general equity principles. Each of the Transaction Documents (other than this Agreement) to which Purchaser or any of its Affiliates is a party, when executed and delivered by such Person, will be legal, valid and binding obligations of such Person enforceable in accordance with their terms, subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar laws of general applicability relating to or affecting creditors' rights and to general equity principles.

(d)  *Non-Contravention*. The execution, delivery and performance of each of the Transaction Documents to which Purchaser or any of its Affiliates is a party by such Person, and the consummation by such Person of the transactions contemplated by the Transaction Documents, will not (i) violate or conflict with any provision of the Constituent Documents of such Person, (ii) subject to the receipt of all Purchaser Required Governmental Approvals, and the expiration of any related waiting periods, violate or conflict with any Law or Permit applicable to such Person, other than immaterial violations of Law or any Permit, or (iii) constitute a breach (or event which, with the giving of notice or the lapse of time, would constitute a breach) under, or give any third party any rights of termination, acceleration or cancellation of, or result in the creation of any Encumbrance (other than Permitted Encumbrances) on any of the material assets, properties or capital stock of such Person, pursuant to any Contract, Permit or Government Order to which such Person is a party.

Section 4.2   Financing. As of the Closing, Purchaser will have available sufficient cash, available lines of credit, committed debt or equity financing, or other sources of immediately available funds to enable it to consummate the transactions contemplated by this Agreement and perform its obligations hereunder. Purchaser's obligations hereunder are not subject to any condition regarding Purchaser's ability to obtain financing for the consummation of the transactions contemplated hereunder.

Section 4.3   Approvals. Other than the authorizations, waivers, consents, approvals, filings, registrations and notices set forth in Section 4.3 of Purchaser's Disclosure Letter (collectively, the "Purchaser Required Governmental Approvals"), neither Purchaser nor any of its Affiliates is required to (i) obtain any authorization, waiver, consent or approval of, (ii) make any filing or registration with, or (iii) give any notice to, any Government Authority in connection with or as a condition to the execution, delivery and performance of any of the Transaction Documents or the consummation of the transactions contemplated thereby, other than any authorization, waiver, consent, approval, filing, registration or notice the failure of which to obtain, make or give would not have a Purchaser Material Adverse Effect. To Purchaser's Knowledge, where the Purchaser Required Governmental Approvals require that Purchaser meet certain qualifications, Purchaser meets such qualifications. To Purchaser's Knowledge, as of the date hereof, no event has occurred nor has any circumstance arisen that would reasonably be likely to result in the failure of any Purchaser Required Governmental Approvals or any other authorizations to be received in a timely manner in order to permit the consummation of the transactions contemplated by this Agreement.

-36-

SC1:3314648.6

Section 4.4    Finder's Fees.  Except for RBC Dominion Securities, Inc., whose fees will be paid by Purchaser or one of its Affiliates, there is no other investment banker, broker, finder or other intermediary that has been retained by or is authorized to act on behalf of Purchaser who would be entitled to any fee or commission in connection with the transactions contemplated by this Agreement.

Section 4.5    No Litigation.  To Purchaser's Knowledge, there is no Action by any Person pending or threatened against Purchaser that would be reasonably likely to result in monetary damages, injunctive relief or the taking of any other action that would be reasonably likely to (in any of the foregoing cases) result in a Purchaser Material Adverse Effect.  There are no unsatisfied or outstanding Government Orders against Purchaser or any of the properties or business of the Purchaser that would be reasonably expected to have a Purchaser Material Adverse Effect.

Section 4.6    Securities Law Compliance. Purchaser is financially sophisticated and understands that the Target Equity Interests have not been registered under the securities laws of any jurisdiction, including the Securities Act, and may only be transferred pursuant to registration or an applicable exemption under all applicable Laws.  Purchaser is acquiring the Target Equity Interests for its own account, for the purpose of investment only and not with a view to, or for sale in connection with, any distribution thereof in violation of applicable Law. Purchaser has not, directly or indirectly, offered the Target Equity Interests to anyone or solicited any offer to buy the Target Equity Interests from anyone, so as to bring to such offer and sale of the Target Equity Interests by Purchaser within the registration requirements of the Securities Act or the securities Laws of any other jurisdiction.

Section 4.7    Due Diligence by Purchaser.  Purchaser acknowledges that it has conducted to its satisfaction an independent investigation of the Target Business and the operations, assets, Liabilities and financial condition of the Target Companies in making the determination to proceed with the transactions contemplated by the Transaction Documents and has relied solely on the results of its own independent investigation and the representations and warranties in  Article III in connection with the Target Companies and the subject matter of this Agreement. The representations and warranties of Parent in  Article III constitute the sole and exclusive representations and warranties of Parent to Purchaser in connection with the transactions contemplated by this Agreement, and Purchaser understands, acknowledges and agrees that, except as set forth in  Article III, all other representations and warranties of any kind or nature express or implied (including any relating to the future or historical financial condition, results of operations, assets or Liabilities of the Target Companies or the quality, quantity or condition of the assets of the Target Companies) are specifically disclaimed by Parent, and, to the extent applicable, waived by Purchaser.

Section 4.8    Solvency.  After giving effect to the payment of all amounts required to be paid in connection with the consummation of the transactions contemplated by this Agreement, and payment of all related fees and expenses, Purchaser will be Solvent as of and immediately following the Closing.  For purposes of this Agreement, the term "Solvent," when used with respect to any Person, means that, as of any date of determination, (a) the amount of the "fair saleable value" of the assets of such Person will, as of such date, exceed (i) the value of all "liabilities of such person, including contingent and other liabilities," as of such date, as such quoted terms are generally

-37-

determined in accordance with applicable Laws governing determinations of the insolvency of debtors, and (ii) the amount that will be required to pay the probable Liabilities of such Person as such debts become absolute and mature, (b) such Person will not have, as of such date, an unreasonably small amount of capital for the operation of the businesses in which it is engaged or proposed to be engaged following such date, and (c) such Person will be able to pay its Liabilities as they mature.

Section 4.9    Foreign Investment Review.  Purchaser is not a non-Canadian for the purposes of the Investment Canada Act (Canada).

Section 4.10    No Other Representations or Warranties. Except for the representations and warranties contained in this Article IV, neither Purchaser nor any other Person makes any other express or implied representation or warranty on behalf of Purchaser or any of its Affiliates, and Purchaser disclaims any other representations or warranties.

ARTICLE V
COVENANTS

Section 5.1    Conduct of the Target Business.

(a)    Parent undertakes to procure that, between the date hereof and the Closing, the Target Companies (except in each case as referred to in Section 5.1(b) or as may be approved by Purchaser (such approval not to be unreasonably withheld, conditioned or delayed)) shall (1) carry on the Target Business in the ordinary course, consistent with past practice, (2) use their respective commercially reasonable efforts to maintain and preserve their respective business organizations and material relationships with regulators, auto dealers, customers, suppliers, licensors and licensees and (3) without limiting the generality of the foregoing, not:

(ii)    amend in any respect or in any manner adverse to Purchaser any provision of the Constituent Documents of any Target Company, or any term of any outstanding Equity Interest issued by any Target Company;

(iii)    sell, pledge, transfer, dispose of, encumber (other than Permitted Encumbrances), create, allot or issue, or grant an option to subscribe for, any Equity Interest in any Target Company;

(iv)    acquire or agree to acquire any Equity Interest in any Person (other than another of the Target Companies), other than in connection with investment activities conducted in the ordinary course of business consistent with past practice;

(v)    merge or consolidate any Target Company with any Person, or adopt a plan of complete or partial liquidation, dissolution, restructuring, recapitalization or other reorganization of any Target Company;

(vi)    other than in the ordinary course of business consistent with past practice, (A) make any loans, advances or capital contributions to, any other Person, except another

-38-

SC1:3314648.6

Target Company, or (B) incur, issue, assume, modify the material terms of or increase by way of modification any indebtedness for borrowed money or guarantee any such liabilities;

(vii)   (A) grant any salary or wage increase to any employee or consultant of any Target Company from those existing on the date of this Agreement, except in any case (1) as may be required by applicable Law, (2) to satisfy contractual obligations existing as of the date of this Agreement, (3) in the ordinary course of business consistent with past practice, including the timing thereof, but in any event, not to exceed 2% per year in the aggregate or (4) for recently promoted employees in accordance with past practice (it being understood that the establishment of a salary or wage rate for newly hired employees shall not be considered a salary or wage increase for purposes of this  Section 5.1(a)(vii)), or (B) enter into or amend or renew any employment, consulting, severance, retention, change in control or similar agreements or arrangements with any director, officer, employee or consultant of any Target Company, or (C) hire any new employees or engage new sub-contractors (other than any short term or temporary employees or contractors that can, in each case, be terminated on the greater of (1) two weeks' notice (or less) or (2) notice required under applicable employment standards legislation);

(viii)   (A) enter into, amend or renew any contracts, agreements, policies or arrangements relating to the funding of or provisions of benefits under a Target Company Benefit Plan (other than any such contracts, agreements or policies that (1) can be terminated by the Target Company, without penalty, on less than three months' notice, or (2) do not provide for a year over year increase in premiums exceeding 5%, or (B) enter into, establish, adopt or amend any pension, retirement, stock option, stock purchase, profit sharing, deferred compensation, bonus, severance, group insurance or other employee benefit, incentive or welfare contract, plan or arrangement, or any similar arrangement, in respect of any director, officer, employee or consultant of any Target Company, take any action to accelerate the vesting of compensation or benefits payable thereunder, or make any discretionary contributions or payments to any trust or other funding vehicle for a Target Company Benefit Plan, except in any case (x) as may be required by applicable Law, (y) to satisfy contractual obligations existing as of the date of this Agreement, or (z) as required by the terms of any applicable agreement or benefit plan in existence on the date of this Agreement;  provided, however, that notwithstanding the foregoing, any recently promoted employee shall be eligible to receive any benefits or compensation payable under any pension, retirement, stock option, stock purchase, profit sharing, deferred compensation, bonus, severance, group insurance or other employee benefit, incentive or welfare contract, plan or arrangement, or any similar arrangement that is in effect as of the date of this Agreement;

(ix)   make any change in accounting methods, principles, practices or policies used by any Target Company as may be materially affecting their assets or Liabilities, except insofar as may be required by Law or applicable accounting principles;

(x)   unless reasonably necessary to effectuate the Tax treatment specified in  Section 3.8(e), make or change any election not in the ordinary course of business consistent with past practice, change an annual accounting period, adopt or change any accounting

-39-

method, file any amended Tax Return, enter into any closing agreement, settle any claim for Taxes or assessments relating to it, surrender any right to claim a refund of Taxes, consent to any extension or waiver of limitation period applicable to any claim for Taxes or assessments relating to it, if such election, adoption, change, amendment, agreement, settlement, surrender or consent would increase the liability of Purchaser for Taxes that are not otherwise borne by the Sellers under  Section 8.2 or is in respect of the Tax Receivables;

(xi)   other than the settlement of collection Actions in the ordinary course of business, (A) settle any Action (1) with a value greater than $250,000 individually or $1,000,000 in the aggregate and for which a reserve has not been established by the applicable Target Company, (2) for an amount more than 15% above the amount of any reserve established for such Action by the applicable Target Company, or (3) that would create an adverse precedent for an Action that, in the reasonable judgment of Parent, after consultation with Purchaser, is reasonably likely to be material to the Target Companies, taken as a whole, or (B) waive or release any rights or claims material to the Target Companies, taken as a whole, or agree or consent to the issuance of any Government Order restricting the Target Business in any material respect or that would be reasonably likely to adversely affect the Target Business in any material respect;

(xii)   other than any transfers to another Target Company or in the ordinary course of business consistent with past practice, sell, lease, license or otherwise dispose of, grant an Encumbrance on or permit an Encumbrance to exist on, or agree to sell, lease, license, or otherwise dispose of, or grant or permit an Encumbrance on, any material properties or assets of the Target Companies with a value greater than $1,000,000 in the aggregate, in each case, other than any Permitted Encumbrances;

(xiii)   other than in the ordinary course of business consistent with past practice, acquire a substantial portion of the assets or business of any Person or any division or line of business thereof, or otherwise acquire any material assets, in each case, in any transaction with a value greater than $1,000,000 in the aggregate, or enter into any new line of business;

(xiv)   make any distribution (whether in cash, stock, equity rights or property) or declare or pay any dividend to any Person other than a Target Company, effect a reduction of the capital, or enter into any contractual commitment to effect any of the foregoing, other than the Distribution;

(xv)   commence any proceeding or file any petition in any court relating to the bankruptcy, reorganization, insolvency, dissolution, liquidation or relief from debtors, in any case, in respect of any Target Company;

(xvi)   (A) enter into any new Specified Contract, (B) renew or terminate any existing Specified Contract, except renewals of existing Specified Contracts on terms that are, in the aggregate, at least as favorable to the applicable Target Company as the terms thereof on the date of this Agreement or (C) amend or modify any material right or obligation under any existing Specified Contract;

-40-

(xvii)    make any capital expenditure other than in the ordinary course of business consistent with past practice and, in any event, not in excess of $500,000 individually or $2,000,000 in the aggregate;

(xviii)    other than in the ordinary course of business, consistent with past practice or in connection with any Securitization Transaction, and except as required by applicable Law, IFRS or any internal policies and procedures, make any material change to (A) their investment securities portfolios, derivatives portfolios or interest rate exposure, through purchases, sales or otherwise, or (B) the manner in which such portfolios are classified or reported, in any material respect; or

(xix)    affirmatively authorize or commit to do any of the actions prohibited by this  Section 5.1(a).

(b)    Notwithstanding anything to the contrary in  Section 5.1(a), neither Parent nor any of its Affiliates shall be prevented from undertaking, be required to obtain Purchaser's consent in relation to, or incur any Liability as a result of effecting any of the following:

(i)    any matter required by Law or any Government Authority;

(ii)    the performance of any obligation, or the taking of any action permitted or required by any Transaction Document;

(iii)    any action expressly disclosed in  Section 5.1(b) of Parent's Disclosure Letter to be taken by Parent or any of its Affiliates (including the Target Companies) on or prior to the Closing Date;

(iv)    the performance of an obligation under any Specified Contract existing as at the date hereof;

(v)    the contribution of any funding to any Target Company at the request or direction of any Government Authority, provided that (x) Parent shall have promptly provided Purchaser, and in any event within three Business Days of Parent's receipt (either directly or through an Affiliate), a copy of any such request or direction of a Government Authority, and (y) Parent shall have promptly provided Purchaser reasonably satisfactory evidence as to the making of such contribution and the reasons therefor as soon as practicable, and in any event within three Business Days, after such contribution has been made;

(vi)    the release or discharge of any Liability owed by a Target Company to Parent or any of its Affiliates, or owed by Parent or any of its Affiliates to a Target Company pursuant to  Section 5.12; or

(vii)    any action taken in connection with disaster recovery or related emergency response efforts with the intention of minimizing any adverse effect resulting from such efforts ( provided that Parent shall promptly notify Purchaser of any such efforts).

-41-

Section 5.2    Sale of Target Equity Interests. Between the date hereof and the Closing, Parent shall not, and shall cause each of the Sellers not to (except as may be approved by Purchaser (such approval not to be unreasonably withheld, conditioned or delayed)), issue, sell, transfer, dispose of or encumber any Equity Interests of the Target Companies or Rights in respect thereof, or admit any new partner or member with respect to any Target Company, except as may be disclosed in Parent's Disclosure Letter.

Section 5.3    Cooperation.

(a)    The Parties shall, and shall cause their respective Affiliates to, cooperate with each other and use their respective reasonable best efforts to take or cause to be taken all actions, and do or cause to be done all things, reasonably necessary, proper or advisable on their respective parts under this Agreement and applicable Laws to satisfy the conditions set forth in  Article VI and to consummate and make effective the transactions contemplated by the Transaction Documents with the intent of effecting the Closing as promptly as practicable, including preparing and filing all documentation to effect all necessary notices, reports and other filings and to obtain as promptly as practicable all consents, registrations, approvals, waivers, orders, interpretive guidance, exemptions, Permits and authorizations necessary to be obtained from any Government Authority (including the Required Governmental Approvals) in order to consummate the transactions; provided, however, that each Party agrees to, and to cause its respective Affiliates to, reasonably consult with each other in advance of any filing, and agrees to consider and reasonably take into account the views of the other Party in connection with each such filing.  Without limiting the generality of the foregoing, each Party shall, and shall cause its respective Affiliates to, make timely and as promptly as practicable (and in no event later than 30 calendar days after the date hereof) all filings and submissions required under any applicable Law in connection with the Transaction Documents and the transactions contemplated thereby, and file promptly any additional information requested under any applicable Law in connection therewith, after receipt of the request therefor.

(b)    Without limiting the generality of this Section 5.3, the Parties shall reasonably cooperate with each other and shall each furnish to the other all information reasonably necessary or desirable in connection with making any application or other filing required to be made pursuant to any applicable Law, and in connection with resolving any investigation or other inquiry by any Government Authority under any applicable Laws, in each case, with respect to the transactions contemplated by the Transaction Documents.  Each Party shall as promptly as reasonably practicable inform the other of any communication with or from, and any proposed understanding, undertaking or agreement with, any Government Authority regarding such applications and filings.  Neither Party nor any of their respective Representatives shall agree to participate in any substantive meeting or discussion with any Government Authority in respect of any filing, investigation or inquiry concerning the transactions contemplated by this Agreement unless it consults with the other Party in advance and, to the extent permitted by such Government Authority, gives the other Party the opportunity to attend;  provided, however, that Purchaser shall not be required to provide Parent or its counsel with an opportunity to attend and/or participate in any meetings, conference calls or other communications that may be held with OSFI in connection with approvals required under the Bank Act or the TLCA; provided, further, that Purchaser shall, as promptly as practicable, provide

-42-

reports on such meetings, conference calls or other communications to Parent or its counsel, which reports shall include a comprehensive summary of the subject matter of such meetings, calls and communications, including any issues, questions or concerns raised in connection with the transactions contemplated hereby.  The Parties shall consult and reasonably cooperate with one another in connection with any analyses, appearances, presentations, memoranda, briefs, arguments, opinions and proposals made or submitted by or on behalf of either Party in connection with all meetings, actions and proceedings under or relating to any applicable Laws in connection with the transactions contemplated by this Agreement (including, with respect to making a particular filing, by providing copies of all such documents to the non-filing Party prior to filing, giving due consideration to all reasonable additions, deletions or changes suggested in connection therewith); provided, however, that in respect of the approvals required under the Bank Act or the TLCA, any confidential information shall be redacted and provided only to legal counsel to the Parent.  Any such provision of information by one Party to the other may be made on a counsel-only basis to the extent required under applicable Law, and any such materials may be redacted (i) to remove references concerning the valuation of the Target Companies, (ii) as necessary to comply with contractual arrangements, (iii) as necessary to address reasonable attorney-client or other privilege or confidentiality concerns or (iv) as otherwise necessary to comply with applicable Law.

(c)    Without limiting the generality of this Section 5.3, Purchaser agrees to use its reasonable best efforts (1) to obtain any and all consents, registrations, approvals, waivers, orders, interpretive guidance, exemptions, Permits and authorizations necessary to be obtained from any Government Authority (including the Required Governmental Approvals) to cause the transactions contemplated by this Agreement to occur prior to the Outside Date and (2) to avoid or eliminate each and every impediment to obtaining any and all consents, registrations, approvals, waivers, orders, interpretive guidance, exemptions, Permits and authorizations necessary to be obtained from any Government Authority (including the Required Governmental Approvals) to cause the transactions contemplated by this Agreement to occur prior to the Outside Date.

(d)    The Parties shall keep each other apprised of the status of matters relating to completion of the transactions contemplated by this Agreement, including promptly furnishing the other with copies of any material notices or other communications received by either Party or its Affiliates (as the case may be) or, to its Knowledge, its Representatives from any Government Authority with respect to the transactions contemplated by this Agreement, in each case to the extent permitted by applicable Law.  The Parties shall give prompt notice to each other of any development or combination of developments that, individually or in the aggregate, is reasonably likely to prevent, materially delay or materially impair its respective ability to consummate the transactions contemplated by this Agreement, including the failure to satisfy a condition to the Closing set forth in Article VI; provided, however, that no such notification shall affect the representations, warranties, covenants or obligations of the Parties or the conditions to the obligations of the Parties under this Agreement.

Section 5.4    Pre-Closing Restructuring. Between the date hereof and the Closing Date, the Parties shall cooperate in good faith to effect the Restructuring in a manner that is reasonably satisfactory to each Party.  Parent agrees to keep Purchaser reasonably informed regarding the timing

-43-

SC1:3314648.6

and actions made in connection with the Restructuring.  Notwithstanding the foregoing, Parent's obligation pursuant to this Section 5.4 shall be subject to the filing of all documentation to effect all necessary notices, reports and other filings with and obtaining all consents, registrations, approvals, waivers, orders, interpretive guidance, exemptions, Permits and authorizations from all applicable Government Authorities with respect to the Restructuring.  No actions undertaken by Parent or any of its Affiliates (including the Target Companies) in connection with the Restructuring (nor the effects resulting from any such actions) shall (i) serve as the basis for a breach of any representation or warranty contained in <u>Article III</u> (including for purposes of determining whether an indemnifiable claim for Losses exists under <u>Article VIII</u>) or (ii) be prohibited by <u>Section 5.1(a)</u> or <u>Section 5.2</u>. Parent or one or more of its Affiliates (other than the Target Companies) shall bear all out-of-pocket costs and expenses (including any fees and Taxes) incurred in connection with the Restructuring.

Section 5.5    <u>Access and Information</u>.

(a)    From the date hereof until the Closing, subject to any applicable Law, Parent, in its reasonable discretion and to the extent not disruptive to the employees of the Target Companies, Target Business and the senior management of the Target Companies, shall, and shall cause its Affiliates to, afford Purchaser and its Affiliates, subject to any contractual restrictions, reasonable access during normal business hours upon reasonable advance notice to the books and records of the Target Business and senior management of the Target Companies and their respective agents and auditors, in each case, to the extent reasonably required by Purchaser to ensure an orderly and efficient transition of the Target Business to Purchaser (including meetings in connection with talent identification and interviews with key employees), to prepare for the Closing and to facilitate the satisfaction of the conditions to the Closing under <u>Article VI</u>; <u>provided</u>, <u>however</u>, that in no event shall Purchaser have access to any information (i) that relates solely to any portion of the business of Parent or its Affiliates that is not being transferred pursuant to this Agreement or (ii)  in Parent's reasonable determination, the disclosure of which would violate applicable Law, or could result in the waiver of any legal privilege.  In the event that disclosing information would violate any obligation of Parent or any of its Affiliates with respect to confidentiality, the Parties shall reasonably cooperate so the information might be made available in a redacted format, or, if such redaction would result in pertinent information being omitted, Parent shall make such information available if Purchaser delivers confidentiality, and if reasonably required, indemnity, undertakings reasonably satisfactory to Parent.

(b)    Following the Closing, to the extent permitted by applicable Law, Purchaser agrees to provide (or cause its Affiliates to provide) Parent with all necessary access to all books and records and other documents that it acquires pursuant to this Agreement and to its assets, properties and Representatives, in each case, to the extent that such access is reasonably required by Parent or any of its Affiliates, (i) to prepare financial statements, Tax filings or regulatory filings of Parent in respect of periods ending on or prior to the Closing Date, (ii) to comply with the terms of any Transaction Document, any applicable Law or request of any Government Authority, (iii) to defend or prosecute any judicial, arbitral or regulatory proceeding to which Parent or any of its Affiliates is a party relating to the business and affairs of the Target Companies prior to the Closing, or (iv)

-44-

in connection with any claim for indemnity made under or pursuant to this Agreement, in each case, subject in the case of any Confidential Information of Purchaser or any of its Affiliates to Parent and its Representatives agreeing to maintain the confidentiality of such information; provided, however, that in no event shall Parent have access to any information the disclosure of which, based on advice of Purchaser's counsel, or in Purchaser's reasonable determination, would violate applicable Law or could result in the waiver of any legal privilege. In the event that disclosing information would violate any obligation of Purchaser or any of its Affiliates with respect to confidentiality, the Parties shall reasonably cooperate so the information might be made available in a redacted format, or, if such redaction would result in pertinent information being omitted, Purchaser shall make such information available if Parent delivers confidentiality, and if reasonably required, indemnity, undertakings reasonably satisfactory to Purchaser. Purchaser agrees to (or to cause its Affiliates to) retain and preserve all books and records and all other documents that it and its Affiliates acquire pursuant to this Agreement for at least eight years following the Closing Date (or longer if required by applicable Law).

Section 5.6    Confidentiality.

(s)    Sections 3, 4, 5 and 11 of the Confidentiality Agreement shall cease to have any force or effect as of the Closing Date.

(t)    Subject to Section 5.7 and Section 5.6(c), from and after the Closing Date, (i) each Party that receives or obtains Confidential Information of Purchaser or any of its Affiliates to Parent and its Representatives agreeing to maintain the confidentiality of Information, or whose Affiliates receive or obtain Confidential Information (collectively, the " Receiving Party"), from the other Party or any of its Affiliates (collectively, the "Disclosing Party") as a result of entering into this Agreement (or any agreement entered into pursuant to this Agreement) shall treat such Confidential Information as confidential and shall not disclose or use any such Confidential Information except as provided herein.

(u)    Section 5.6(b) shall not prohibit disclosure or use of any Confidential Information if and to the extent: (i) the disclosure or use is required by Law, any Government Authority or any recognized stock exchange on which the Equity Interests of the Receiving Party or its Affiliates are listed (provided that, to the extent permitted by applicable Law, prior to such disclosure or use the Receiving Party shall (A) promptly notify the Disclosing Party of such requirement and provide the Disclosing Party with a list of Confidential Information to be disclosed and (B) reasonably cooperate in obtaining a protective order covering, or confidential treatment for, such Confidential Information), (ii) the disclosure is to any Government Authority having jurisdiction over the Receiving Party or any of its Affiliates in connection with ordinary course discussions with, and examinations by, such Government Authority, (iii) disclosed to any Government Authority with jurisdiction over the Receiving Party or its Affiliates (provided that, to the extent permitted by applicable Law, prior to such disclosure the Receiving Party shall (A) promptly notify the Disclosing Party of such requirement and provide the Disclosing Party with a list of Confidential Information to be disclosed and (B) reasonably cooperate in obtaining a protective order covering, or confidential treatment for, such Confidential Information), (iv) the disclosure or use is required for the purpose of any judicial proceedings arising out of this Agreement or any other agreement entered into under or pursuant to this Agreement or the disclosure is made in connection with the Tax affairs of the

-45-

Disclosing Party, (v) the disclosure is made to the Receiving Party's Representatives on a need-to-know basis (with the understanding that the Receiving Party shall be responsible for any breach by its Representatives of this  Section 5.6), (vi) the Confidential Information is or becomes generally available to the public (other than as a result of a disclosure, directly or indirectly, by the Receiving Party or its Representatives), (vii) the Confidential Information is already in the Receiving Party's possession ( provided that such Confidential Information is not known by the Receiving Party to be subject to another confidentiality obligation), (viii) the Confidential Information is or becomes available to the Receiving Party on a non-confidential basis from a source other than the Disclosing Party ( provided that such sources are not known by the Receiving Party to be subject to another confidentiality obligation), (ix) in the case of disclosure or use by Purchaser and its Affiliates, the Confidential Information relates exclusively to the Target Companies and is independently developed after the Closing, or (x) the disclosure or use of such Confidential Information is made with the Disclosing Party's prior written approval.

Section 5.7    Announcements. Neither Party shall, and they shall cause their respective Affiliates not to, issue any press release or make any general employee communication or public announcement relating to the subject matter of this Agreement until the Closing Date without the prior review and written approval of the other Party (which approval shall not be unreasonably withheld, conditioned or delayed); provided, however, that the foregoing shall not prohibit such disclosure if required by Law, any Government Authority or any recognized stock exchange on which the Equity Interests of either Party or any of their respective Affiliates are listed (in which case the applicable Party will use its commercially reasonable efforts to consult with the other Party before making the disclosure and to allow such other Party to review the text of the disclosure before it is made). Without limiting the reach of the preceding sentence, the Parties shall cooperate to develop all public announcement materials and general employee communications and make appropriate management available at presentations related to the transactions contemplated by this Agreement as reasonably requested by the other Party.

Section 5.8    Insurance.

(f)    With respect to the Target Businesses, Parent shall (i) keep, or cause to be kept, all Insurance Policies or suitable replacements therefor (with terms, conditions, retentions and limits of liability that are substantially similar in all material respects to the existing policies or otherwise consistent with the market practice of businesses of a similar size and type), in full force and effect through the close of business on the Closing Date, and (ii) use commercially reasonable efforts to protect the rights of the insured Persons under such insurance policies or replacements in all material respects, including by causing said insured Persons to (A) pay or otherwise satisfy or have satisfied any unpaid premiums when due with respect to any period ending at or prior to the Closing, (B) provide any reasonably required notices (including renewal notices or, if applicable, other documentation reasonably required to continue in full force and effect the Insurance Policies) to the issuers thereof, and (C) act reasonably in respect of any decision whether to submit and pursue claims on a timely basis under the Insurance Policies.

(g)    Purchaser and its Affiliates (including, after the Closing, the Target Companies) will not have access to, and shall not be permitted to make any claims under, any of Parent's or any of

-46-

its Affiliate's insurance policies and programs with respect to any events or circumstances, including events or circumstances relating to the Target Business that occurred or existed prior to the Closing.

Section 5.9    Interest in Intellectual Property.

(e)    Except as specifically provided in this Section 5.9 or the Transitional Trademark License Agreement, Purchaser acknowledges and agrees that none of Purchaser or its Affiliates (including, after the Closing, the Target Companies) is purchasing, acquiring, receiving a license to or otherwise obtaining any right, title or interest in, to or under any Intellectual Property owned or licensed by Parent or any of its Affiliates (other than the Target Companies), including the Parent Trademarks, but excluding the Company Trademarks.

(f)    Except as expressly permitted in the Transitional Trademark License Agreement, (i) Purchaser shall, and shall cause its Affiliates (which, as of and after the Closing, shall include the Target Companies) to, cease and discontinue all uses of the Parent Trademarks, and (ii) Parent shall, and shall cause its Affiliates to, cease and discontinue all uses of the Company Trademarks.  Purchaser, for itself and its Affiliates (which, as of and after the Closing, shall include the Target Companies), agrees that the rights of the Target Companies to the Parent Trademarks pursuant to the terms of any trademark agreements between Parent and its Affiliates, on the one hand, and the Target Companies, on the other hand, shall terminate as of the Closing and be replaced by such rights as are provided by the Transitional Trademark License Agreement. Parent, for itself and its Affiliates, agrees that any of their respective rights to the Company Trademarks pursuant to the terms of any trademark agreements between Parent and its Affiliates, on the one hand, and the Target Companies, on the other hand, shall terminate as of the Closing and be replaced by such rights as are provided by the Transitional Trademark License Agreement.

(g)    Purchaser hereby irrevocably and unconditionally covenants, and will cause its Affiliates (which, as of and after the Closing, shall include the Target Companies) and its and their respective successors and assigns to covenant, not to, after the Closing, assert, initiate, file, or otherwise commence anywhere in the world any Action, or participate in or provide support for any such Action, against Parent or its Affiliates, or their respective successors or assigns or their respective officers, directors, employees, agents, direct or indirect customers, users, licensees, direct or indirect suppliers, service providers, distributors, resellers or contractors (each, an " IP User") for infringement, misappropriation, or other violation of any Intellectual Property rights in or arising from any Intellectual Property owned by any of the Target Companies as of the date of this Agreement, provided (i) that the use, and the manner of use, of any such Intellectual Property by the applicable IP User is consistent with the use, and the manner of use, of any such Intellectual Property as of the date of this Agreement, and (ii) any such use of any such Intellectual Property does not otherwise breach  Section 5.14.

Section 5.10    Cooperation Regarding Transition Arrangements.

(a)    Subject to applicable Law, between the date of this Agreement and the earlier of the Closing Date and the termination of this Agreement, each Party shall reasonably cooperate with the other Party to reasonably assist each other in planning and implementing necessary and appropriate

-47-

policies, procedures and other arrangements in connection with the transition of ownership of the Target Companies, including the services to be provided pursuant to the Transition Services Agreement.  As necessary in connection therewith, each Party shall designate certain of their respective employees as "Transition Coordinators" to coordinate planning and implementation contemplated by this Section 5.10(a).

(b)    The Parties shall, and shall cause their respective Affiliates to, use their respective commercially reasonable efforts to obtain any consents and approvals and make any other notifications that may be required in connection with the provision of services and access to certain facilities as of the Closing Date pursuant to the Transition Services Agreement.  The Parties agree that any costs and expenses payable to third parties (other than the respective Representatives of each of the Parties) in connection with the procurement of any such consents or waivers of third parties necessary or advisable for the provision of such services and access to such facilities shall be borne by equally by Parent and Purchaser, provided that the Parties shall cooperate to minimize such costs and expenses.  If the Parties are unable to obtain any such consent or approval prior to the Closing, the Parties shall use commercially reasonable efforts to obtain, as of the Closing Date, a commercially reasonable alternative to the services and access to the facilities to which such consent or approval and the costs and expenses payable to obtain such alternative (but not the costs and expenses for the ongoing receipt of such alternative services and access to the facilities) shall be borne equally by Parent and Purchaser, provided that the Parties shall cooperate to minimize such costs and expenses.

(c)    From and after the date hereof, subject to applicable Law and the reimbursement of costs as provided in this Section 5.10(c), Parent shall, and shall cause the Target Companies to, in Parent's reasonable discretion and to the extent not disruptive to the employees of the Target Companies, reasonably cooperate in sending communications to and to arranging meetings between Purchaser and the Target Companies, on the one hand, and the Target Companies' auto dealers or auto manufacturers, on the other hand, in each case as reasonably requested by Purchaser.  The content of any such communications shall be mutually agreed upon by the Parties.  All reasonable out-of-pocket costs relating to any communications sent by the Target Companies at the request of Purchaser shall be borne by Purchaser, provided Parent shall obtain Purchaser's prior written approval before any such costs in excess of $15,000 are incurred.  Subject to applicable Law, between the date of this Agreement and the Closing Date, Parent shall keep Purchaser informed and cooperate with Purchaser in connection with the efforts of the Target Companies to retain their auto dealers and auto manufacturers.

Section 5.11    Employee Matters.

(c)    Effective as of and from the Closing, each employee who is employed by any of the Target Companies as of immediately prior to the Closing (the "Continuing Employees") shall continue in employment with Purchaser or an Affiliate thereof.  Subject to Section 5.11(g), for the one-year period immediately following the Closing Date, or, if longer, for the period of time required by applicable law, Purchaser shall, or shall cause its Affiliates to, provide to each Continuing Employee (i) base compensation and incentive compensation (including equity compensation) opportunities and welfare and retirement benefits and perquisites that, in the aggregate, are

-48-

substantially similar to the base compensation and incentive compensation (including equity compensation) opportunities and welfare and retirement benefits and perquisites provided by Parent and the Target Companies as in effect for each such Continuing Employee as of immediately prior to the Closing, except with respect to pension benefits (for those Continuing Employees currently participating in a defined benefit plan) and retiree benefits (healthcare and life insurance), and (ii) severance benefits that are substantially similar to the severance benefits provided by the Target Companies to each such Continuing Employee immediately prior to the Closing.   Effective immediately upon the Closing, Purchaser may designate certain Continuing Employees to be eligible to participate in the benefit and compensation plans, contracts, policies and arrangements of Purchaser or its applicable Affiliates (including any benefit and compensation plans, contracts, policies and arrangements of the Target Companies maintained by Purchaser or its Affiliates after the Closing) (the "Purchaser Benefit Plans").

(d)    For purposes of vesting, benefit accrual, eligibility for benefits, vacation and sick time credit and eligibility to participate under the Purchaser Benefit Plans (but not for purposes of benefit accrual under any Purchaser Benefit Plan that is not a Target Company Benefit Plan that continues to be maintained by Purchaser or its Affiliates after Closing), each Continuing Employee shall be credited with his or her years of service with the Target Companies and their respective predecessors before the Closing, to the same extent as such Continuing Employee was entitled, before the Closing, to credit for such service under any similar Target Company Benefit Plan in which such Continuing Employee participated or was eligible to participate immediately prior to the Closing;  provided that the foregoing shall not apply to the extent that its application would result in a duplication of benefits, including duplication of any severance payment, with respect to the same period of service.  In addition, and without limiting the generality of the foregoing, Purchaser shall cause or shall cause its applicable Affiliates to cause (i) each Continuing Employee to be immediately eligible to participate, without any waiting time, in any and all Purchaser Benefit Plans to the extent coverage under any such Purchaser Benefit Plan is replacing comparable coverage under a Target Company Benefit Plan in which such Continuing Employee participated immediately before the Closing (such plans, collectively, the "Old Plans"), and (ii) for purposes of each Purchaser Benefit Plan providing medical, dental, pharmaceutical and/or vision benefits to any Continuing Employee, any evidence of insurability requirements, all pre-existing condition exclusions and actively-at-work requirements of such Purchaser Benefit Plan to be waived for such Continuing Employee and his or her covered dependents.  Purchaser shall cause any eligible expenses incurred by any Continuing Employee and his or her covered dependents during the portion of the plan year of the Old Plan ending on the date such Continuing Employee's participation in the corresponding Purchaser Benefit Plan begins to be taken into account under such Purchaser Benefit Plan for purposes of satisfying all deductible, coinsurance and maximum out-of-pocket requirements applicable to such Continuing Employee and his or her covered dependents for the applicable plan year.

(e)    Parent shall be responsible for all payment obligations, and shall reimburse Target Companies for any payments made by the Target Companies on or after the Closing Date under the Retention Agreements except to the extent that such payment obligations are accrued or reserved for in the Final Closing Statement.

-49-

(f)    To avoid doubt, effective as of the Closing, the applicable Target Company and its Affiliates shall retain responsibility for the registered pension plan listed in Section 5.11(d) of Parent's Disclosure Letter (the "Pension Plan") and, subject to Section 5.11(f), shall be solely responsible for all Liabilities with respect to such Pension Plan, and shall hold harmless Parent and its Affiliates in respect of such Pension Plan.

(g)    Within 30 days of the date of this Agreement, Parent shall provide to Purchaser in writing a list of all employees of the Target Companies, including information regarding each such employee's participation in Target Company Benefit Plans and in Parent Plans. Not less than two (2) weeks prior to the Closing Date, Parent shall provide to the Purchaser in writing (i) a list of all Continuing Employees including each such employee's length of service, job title, salary and compensation details and information regarding participation in Target Company Benefit Plans and in Parent Plans, and (ii) a list of the sales personnel, sales support staff, credit relationship managers, dealer relationship managers and contract processing managers of the Target Companies (other than administrative personnel) (each, a "Specified Person"), together with any other employee data reasonably requested by Purchaser; provided, however, that such other employee data reasonably requested is requested in writing not less than four (4) weeks prior to the Closing Date.

(h)    Effective as of February 1, 2013, or effective on the Closing Date if earlier (in either event the " Excluded Employees Benefit Transition Date") the Excluded Employees shall cease to accrue further benefits under and participate in any of the Target Company Benefit Plans including the Pension Plan.  As soon as practicable following the date hereof, Parent shall take steps to establish and register or cause to be established and registered with the relevant pension Government Authority a registered pension plan to be effective as of the Excluded Employees Benefit Transition Date to provide pension benefits for the Excluded Employees who participated in the Pension Plan immediately prior to such date (the " Replacement Pension Plan").  As soon as the Replacement Pension Plan has been filed for registration with the relevant Government Authority, Parent shall notify the Purchaser and provide Purchaser with a copy of the Replacement Pension Plan.  As soon as practicable thereafter and if possible (and if permitted by Law) prior to the Excluded Employees Benefit Transition Date, the Target Company which is the administrator of the Pension Plan shall prepare and file with the relevant Government Authority an application for approval to transfer the defined contribution account balances of the Excluded Employees from the Pension Plan to the Replacement Pension Plan (for greater certainty, the asset transfer is to include the Excluded Employees' entire account balances, including amounts contributed up to the Excluded Employees Benefit Transition Date as well as interest and earnings following such date up to the date of the asset transfer, less any benefits or expenses paid therefrom).  If the Government Authority declines to approve the asset transfer, then the account balances shall remain in the Pension Plan to be dealt with in the normal course in accordance with its terms and applicable Law.  From and after the Closing, Parent shall indemnify the Target Companies and the Purchaser and its Affiliates for any costs incurred by them on and after the Closing Date in respect of such asset transfer. Parent shall also establish and cause to be established, to be effective on and after the Excluded Employees Benefit Transition Date, non-pension benefit plans (the "Excluded Employees Benefit Plans") for the Excluded Employees who participated in the Target Company Benefit Plans (other than the Pension Plan – the " Target Company Non-Pension Plans") immediately prior to such date.  From and after

-50-

the Closing, Parent shall indemnify and hold harmless Purchaser and its Affiliates, and the Target Companies, from and against any and all claims made by any of the Excluded Employees in respect of benefits under the Target Company Benefit Plans, unless such claims are paid from a Target Company Benefit Plan. Any claims incurred by the Excluded Employees prior to the Excluded Employees Benefit Transition Date and not paid prior to such date shall be covered by the Target Company Non-Pension Plans if the relevant plan is provided pursuant to insurance and not on an administrative-services only basis and the claim is covered by the relevant insurance policy; any other claims incurred by the Excluded Employees either before or on and after such date shall be covered by the Excluded Employees Benefit Plan. "Incurred" means, in relation to such claims, the date on which the event giving rise to such claim occurred and, in particular: (i) with respect to a death or dismemberment claim, shall be the date of the death or dismemberment; (ii) with respect to a short-term or long-term disability claim, shall be the date that the period of short-term or long-term disability commenced; (iii) with respect to an extended health care claim, including, without limitation, dental and medical treatments, shall be the date of the treatment; and (iv) with respect to a prescription drug or vision care claim, the date that the prescription was filled. Notwithstanding the foregoing, Parent shall make commercially reasonable efforts to establish or cause to be established the Replacement Pension Plan and the Excluded Employees Benefit Plans effective January 1, 2013 (or the Closing Date if earlier); if Parent succeeds in doing so, then this Section 5.11(f) shall be read such that the Excluded Employees Benefit Transition Date is January 1, 2013 (or the Closing Date if earlier) for all purposes.

(i)    Purchaser and Parent acknowledge and agree that all provisions contained in this Section 5.11 are included for the sole benefit of Purchaser and Parent and nothing contained herein shall (i) be construed as an amendment to any employee benefit plan or program, (ii) create any third-party beneficiary or other rights in any other Person, including any Continuing Employee or former employee of any of Purchaser, Parent, the Target Companies or any of their respective Affiliates, or any dependent or beneficiary thereof, (iii) limit the right of the Purchaser or its Affiliates to, at any time after the Closing, terminate the employment of any Continuing Employee or amend or terminate (in whole or in part) any Purchaser Benefit Plans, (iv) require any Purchaser Benefit Plans to replicate any particular benefit(s) provided under the Target Company Benefit Plans prior to the Closing or (v) require or otherwise obligate Purchaser or Parent or any of their respective Affiliates to maintain any particular employee benefit plan (including any severance policy or practice) or retain the employment of any Continuing Employee following the Closing Date.

Section 5.12    Termination of Certain Affiliate Arrangements; Replacement of Guarantees and Transferred Derivatives; Certain Releases.

(e)    Subject to applicable law, on or prior to the Closing Date, all Related Party Contracts (other than those set forth in Section 5.12(a) of Parent's Disclosure Letter) shall be terminated as between Parent or any of its Affiliates (other than the Target Companies), on the one hand, and any of the Target Companies, on the other hand, and all payables and receivables under any Related Party Contracts so terminated shall have been settled and shall be reflected on the Estimated Closing Statement and Final Closing Statement.

-51-

SC1:3314648.6

(f)    Subject to applicable Law, at or prior to the Closing, Purchaser shall (i) arrange for substitute letters of credit, guarantees and other obligations or commitments to replace (A) any letters of credit, guarantees (including any guarantees in connection with any Securitization Transaction), surety bonds, performance bonds, capital maintenance agreements or commitments, and other contractual obligations or commitments entered into by or on behalf of Parent or any of its Affiliates (other than solely by any of the Target Companies) in connection with the Target Business (together, the "Parent Guarantees") outstanding as of the date hereof and (B) any Parent Guarantees entered into in the ordinary course of business, consistent with past practice, on or after the date hereof and prior to the Closing, (ii) assume all obligations under each Parent Guarantee or Transferred Derivative, obtaining from the creditor or other counterparty a full release (in a form satisfactory to Parent) of all parties liable, directly or indirectly, for reimbursement to the creditor or counterparty, as the case may be, or fulfillment of other obligations to a counterparty in connection with amounts drawn under the Parent Guarantees or due under the Transferred Derivatives, (iii) obtain from the creditor or other counterparty a waiver, release and discharge of any Parent Guarantee (in a form reasonably satisfactory to Parent) and (iv) obtain from the counterparty to any Transferred Derivative a novation of such Transferred Derivative to Purchaser or any of its Affiliates (in a form reasonably satisfactory to Parent). Purchaser shall make, or cause to be made, any required filings before any applicable Government Authority in connection with the foregoing. Purchaser further agrees that to the extent (1) the beneficiary or counterparty under any Parent Guarantee does not accept any such substitute letter of credit, guarantee or other obligation or commitment proffered by Purchaser, (2) Purchaser is unable to obtain from the beneficiary or counterparty under any Parent Guarantee a full release (in a form satisfactory to Parent) as contemplated by Section 5.12(b)(ii) Purchaser shall indemnify, defend and hold harmless Parent and its Affiliates against, and reimburse Parent and its Affiliates for, any and all amounts paid, including costs or expenses in connection with such Parent Guarantees, including Parent's and its Affiliates' expenses in maintaining such Parent Guarantees, whether or not any such Parent Guarantee is drawn upon or required to be performed, and shall in any event promptly (and in any event within three Business Days) reimburse Parent and its Affiliates to the extent any Parent Guarantee is called upon, and Parent or its Affiliates make any payment or are obligated to reimburse the party issuing the Parent Guarantee or (3) Purchaser is unable to obtain from the counterparty to any Transferred Derivative a novation (in a form satisfactory to Parent) as contemplated by Section 5.12(b)(iv), Purchaser shall enter into a back-to-back Derivative Transaction with Parent (or its designated Affiliate) with the same terms as such Transferred Derivative. At the request of Parent, Purchaser shall provide Parent and its Affiliates, as applicable, with letters of credit in an amount equal to Parent's and its Affiliates' entire potential liability pursuant to the immediately preceding sentence. Any such letters of credit shall be in such forms and from such counterparties as are satisfactory to Parent. Any costs or expenses in respect of the novation or assumption of any Transferred Derivative pursuant to this Section 5.12(b) shall be borne by Purchaser. Any novation of a Transferred Derivative shall be made effective as of the Closing Date or such other date as the Parties may agree; the termination of a Corresponding Derivative shall be made effective as of such date; and the payment (excluding any costs or expenses) to or from, as the case may be, Ally Investment Management LLC in respect of the novation to Purchaser of such Transferred Derivative shall be equal to the payment from or to, as the case may be, Ally Investment Management to Ally Credit Canada Limited in respect of the termination of the related Corresponding Derivative such that Ally Investment Management LLC shall not incur

-52-

any net costs associated with the termination and novation of the Transferred Derivative and the related Corresponding Derivative

(g)    Subject to <u>Section 5.12(a)</u>, and without prejudice to the Parties' respective indemnification obligations under <u>Article VIII</u>, at or prior to the Closing, (i) the Target Companies shall execute releases acquitting, releasing and discharging Parent and its Affiliates (other than the Target Companies) from any and all Liabilities to the Target Companies that exist as of the Closing Date or that arise in the future from events or occurrences taking place prior to or as of the Closing Date, other than in respect of the Contracts disclosed in <u>Section 5.12(c)(i)</u> of Parent's Disclosure Letter, and (ii) Parent and its Affiliates (other than the Target Companies) shall execute releases acquitting, releasing and discharging the Target Companies from any and all Liabilities to Parent or any of its Affiliates (other than the Target Companies) that exist as of the Closing Date or that arise in the future from events or occurrences taking place prior to or as of the Closing Date, other than in respect of the Contracts disclosed in <u>Section 5.12(c)(ii)</u> of Parent's Disclosure Letter.

Section 5.13    <u>Notices and Consents</u>. Prior to Closing, the Parties will take all commercially reasonable steps necessary, and proceed diligently and in good faith, as promptly as practicable, to cause the relevant Target Companies to give such notices to third parties and obtain such third-party consents as Purchaser (acting reasonably) deems necessary or desirable in connection with the transactions contemplated by this Agreement; <u>provided</u> that Parent and Purchaser shall share on an equal basis any out-of-pocket expenses or any payments required to be made to any third party in connection with providing any such assistance, provided further that the Parties shall cooperate to minimize such expenses and payments. The Parties agree that, in the event that any such consent necessary or desirable to preserve for the Target Business or any of the Target Companies any right or benefit under any Contract to which a Target Company is a party is not obtained prior to the Closing, Parent will, subsequent to the Closing, reasonably cooperate (for a period not to exceed four months from the Closing Date) with Purchaser and the relevant Target Company in attempting to obtain such consent as promptly thereafter as practicable; <u>provided</u> that Parent shall not be required to incur any out-of-pocket expenses or make any payment to any third party in connection with providing any such assistance.

Section 5.14    <u>Non-Compete; Non-Solicit</u>.

(a)    During the period beginning on the Closing Date and ending on the third anniversary thereof (the "<u>Non-Compete Term</u>"), Parent and its Subsidiaries (the "<u>Restricted Persons</u>") shall not directly or indirectly, anywhere in Canada (the "<u>Restricted Territory</u>"), originate or service consumer and commercial automobile loans and leases or conduct a deposit-taking business or directly or indirectly own an interest in, manage, operate or Control any Person that engages in the foregoing activities in the Restricted Territory (collectively, the "<u>Restricted Activity</u>").

(b)    Notwithstanding the foregoing, nothing in this Agreement shall prohibit or in any way limit or apply to:

(i)    any Person other than the Restricted Persons from conducting any Restricted Activity;

-53-

(ii)    any Restricted Person from performing any act or conducting any business required by this Agreement or any other Transaction Document;

(iii)    any Restricted Person from (A) acquiring, owning or holding up to 4.99% of the outstanding securities of an entity whose securities are listed and traded on a nationally recognized securities exchange or market, whether or not in the United States of America (provided that no Restricted Person may otherwise Control the business or affairs of such entity), (B) holding or exercising rights of ownership with respect to a security in a fiduciary, custodial or agency capacity or otherwise for the benefit of or on behalf of customers or other un-Affiliated beneficiaries or (C) continuing any existing relationship with a credit aggregation system known as RouteOne Canada provided that, and for so long as, no Restricted Person owns a majority of the Equity Interests in, or exercises operational control of, RouteOne Canada Corp;

(iv)    any Restricted Person from making passive investments for general insurance accounts or investment management activities in the ordinary course of its business;

(v)    subject to compliance with Section 5.14(h), the ownership of, any affiliation with, or the conduct of any other activity with respect to, a Person that conducts, either directly or indirectly, a Restricted Activity (any such Person, together with all of its Affiliates, a "Competing Person") that is the result of (1) a merger, consolidation, share exchange, sale or purchase of assets, scheme of arrangement or similar business combination involving any Restricted Person with any Competing Person or (2) the acquisition of any Competing Person or any Equity Interests in any Competing Person by any Restricted Person, if, in the case of either (1) or (2), at least 66 2/3% of the total consolidated revenues of such Competing Person in the Restricted Territory in which it operates in the calendar year prior to such ownership or affiliation does not relate to a Restricted Activity;

(vi)    subject to compliance with Section 5.14(h), any Restricted Person from acquiring a Competing Person or more than 4.99% of the Equity Interests in any Competing Person that derived in excess of 33 1/3% of its total consolidated revenues in its most recent fiscal year from activities that constitute Restricted Activities; provided, however, that such Restricted Person may proceed with any such acquisition only if such Restricted Person uses commercially reasonable efforts (which efforts shall include conducting a bona fide sale process) to divest, as soon as reasonably practicable following the acquisition but in any event within one year of its acquisition, that portion of such Competing Person that constitutes Restricted Activities;

(vii)    subject to compliance with Section 5.14(h), (A) any Person not Affiliated with Parent that acquires Parent or any of its Affiliates or their respective successors or substantially all of their respective assets or business, or any of such Person's Affiliates (other than Parent and its Affiliates prior to such acquisition) if such Person or any of its Affiliates engaged in a Restricted Activity in the Restricted Territory immediately before such acquisition or (B) any Person resulting from any merger, consolidation, share exchange, sale or purchase of assets, scheme of arrangement or similar business combination (a

-54-

SC1:3314648.6

"Business Combination") of Parent or any of its successors with or into any other Person not Affiliated with Parent, or any of such Person's Affiliates, if (1) the directors of Parent immediately prior to such transaction do not serve as a majority of the directors of the surviving Person or direct or indirect parent of the surviving Person following such Business Combination, (2) the equity holders of Parent or any successor immediately before such Business Combination own, immediately following such transaction no more than 50% of the outstanding capital stock of the surviving Person (if the surviving Person is a publicly held company following the transaction) or the direct or indirect parent of the surviving Person (if the parent is a publicly held company following such Business Combination), and (3) such other Person or any of its Affiliates engaged in a Restricted Activity immediately before such Business Combination;

(viii)    any Restricted Person from foreclosing on collateral of or acquiring any of the outstanding Equity Interests in any Person that has outstanding Indebtedness to any Restricted Person, or engaging in any activities otherwise prohibited by this Section 5.14 in connection with any such Person as a result of the acquisition of such Equity Interests, in connection with a debt previously contracted in a distressed or troubled situation, provided, in each case, that any such Indebtedness was originated by the Restricted Person outside the Restricted Territory;

(ix)    any Restricted Person from continuing any businesses or operations in wind-down or liquidation that are not being acquired by Purchaser pursuant to this Agreement;

(x)    any Restricted Person from undertaking general advertising or marketing campaigns not targeting customers, clients or other third party beneficiaries of the Target Companies; provided that such advertising or marketing campaigns are not designed to solicit recipients for any services constituting any Restricted Activity in the Restricted Territory; or

(xi)    Parent and its Affiliates with respect to wholesale remarketing of vehicles to dealers within the Restricted Territory which vehicles were generated from Parent and its Affiliates' business in the United States.

(c)    Notwithstanding anything to the contrary contained in this Agreement, the parties acknowledge and agree that (i) subject to compliance with Section 5.14(h), no current or future Affiliate of Parent (or any of such Affiliate's direct or indirect Subsidiaries) shall be subject to any of the restrictions or requirements set forth in this Section 5.14 at any time following the date on which Parent, directly or indirectly no longer Controls such Person and (ii) no current or future Affiliates of Parent (or any of such Affiliate's direct or indirect Subsidiaries) shall be subject to any of the restrictions or requirements set forth in this Section 5.14 at any time for conducting a Restricted Activity outside of any Restricted Territory for the benefit of customers, clients or other third party beneficiaries who also may reside or otherwise have a presence within a Restricted Territory, other than, in the case of clause (ii), such portions of the business and operations of any auto dealer or auto manufacturer known to such Affiliates to be conducted in the Restricted Territory; provided that any funds lent by a Restricted Person to any auto dealer or auto manufacturer outside the

-55-

Restricted Territory where such dealer or manufacturer utilizes, without the knowledge of such Affiliates, such funds for the benefit of its business and operations in the Restricted Territory will not be deemed a breach of  Section 5.14(a).

(d)    During the period beginning on the Closing Date and ending on the third anniversary thereof, Parent and its Subsidiaries shall not, directly or indirectly, knowingly and proactively induce, solicit or attempt to induce or solicit in the Restricted Territory any auto dealer or auto manufacturer that is a customer of one or more Target Companies as of the Closing Date to cease conducting business therewith.

(e)    For a period of 540 days from and after the Closing Date, Parent shall not, and shall cause each of its Subsidiaries not to, directly or indirectly, hire or solicit for employment any Specified Person; provided that nothing herein shall be construed to prevent or prohibit any Restricted Person from hiring or soliciting for employment any Specified Person (i) through the use of, or who responds to, general mass solicitations for employment (including advertisements) or a third-party recruiter (in each case, not specifically directed toward employees of the Target Companies), (ii) who was terminated by Purchaser or any of its Affiliates or (iii) who has not been an employee of any Target Company or Purchaser for at least 90 days prior to any direct or indirect solicitation or encouragement from any Restricted Person (other than solicitations or encouragements not otherwise in violation of this  Section 5.14(d)).

(f)    For a period of 540 days from the expiry of the transition period under the Transition Services Agreement, Purchaser shall not, and shall cause each of its Subsidiaries not to, directly or indirectly, hire or solicit for employment any individual who is an employee of Parent or any of its Affiliates and who provided any transition services under the Transition Services Agreement (each a "Transition Employee"); provided that nothing herein shall be construed to prevent or prohibit Purchaser or any of its Affiliates from hiring or soliciting for employment any Transition Employee (i) through the use of, or who responds to, general mass solicitations for employment (including advertisements) or a third-party recruiter (in each case, not specifically directed toward any Transition Employees), (ii) who was terminated by Parent or any of its Affiliates or (iii) who has not been an employee of Parent or any of its Affiliates for at least 90 days prior to any direct or indirect solicitation or encouragement from Purchaser or any of its Affiliates (other than solicitations or encouragements not otherwise in violation of this Section 5.14(f)).

(g)    Parent acknowledges that the covenants in this  Section 5.14 are necessary in order to induce Purchaser to enter into and consummate the transactions contemplated by this Agreement, are required by Purchaser in connection with the transactions contemplated by this Agreement, and that Purchaser would not enter into and consummate the transactions contemplated by this Agreement without the agreement of Parent to the covenants contained in this  Section 5.14. In the event that any of the provisions of this  Section 5.14 should ever be adjudicated to exceed the time, scope, geographic, or other limitations permitted by applicable Law in any jurisdiction, then such provisions shall be deemed reformed in such jurisdiction to the maximum time, scope, geographic or other limitations enforceable under applicable Law.

-56-

(h)    During the Non-Compete Term, Parent and its Affiliates shall not, directly or indirectly, knowingly use, or knowingly licence any third party to use, any Parent Trademark to conduct any Restricted Activity in the Restricted Territory (subject to the provisions of Section 5.14(b)(i), (ii), (iii), (iv), (viii), (ix), (x) and (xi)).

(i)    Parent and Purchaser confirm (i) that no portion of the Purchase Price is or shall be attributable to any non-compete and non-solicitation covenants for Canadian Tax purposes and such non-compete and non-solicitation covenants set forth herein have been granted to maintain or preserve the fair market value of the Target Equity Interests and (ii) that such non-compete and non-solicitation covenants meet the requirements of proposed subsection 56.4(8) of the Tax Act and section 333.10 of the Quebec Tax Act.

Section 5.15    Capital Distribution.  Subject to applicable Law, prior to the Closing, Parent shall cause Ally Credit Canada Limited to make a capital distribution, in the form of cash or securities, in an amount of at least $250,000,000 up to the paid-up capital of Ally Credit Canada Limited (the "Distribution").  Prior to the Closing, Parent shall seek in good faith to increase the amount of the Distribution to an amount that is greater than $250,000,000 but no greater than $900,000,000;  provided that the Parties have mutually agreed upon a plan, satisfactory to each Party, to effect such increased Distribution (with each Party acting reasonably).  Purchaser shall cooperate with Parent in planning and structuring the manner in which Ally Credit Canada Limited effects the Distribution, and Parent shall consult with Purchaser in connection with any proposed distribution of securities as part of the Distribution.

Section 5.16    Other Transaction Documents.  At the Closing, each Party shall, and shall cause its respective Affiliates to, execute each Transaction Document (other than this Agreement) to which it is contemplated to be a party.

Section 5.17    Further Assurances.  The Parties agree that, from time to time, whether before, on or after the Closing Date, each of them shall execute and deliver such further instruments of conveyance and transfer and take such other action as may be reasonably requested by the other Party to carry out the purposes and intents of this Agreement.

ARTICLE VI
CONDITIONS TO CLOSING

Section 6.1    Conditions to Each Party's Obligations.  The obligations of the Parties to effect the Closing are subject to the satisfaction (or written waiver by each Party) on or prior to the Closing of each of the following conditions:

(a)    *Government Approvals*.  All Required Governmental Approvals shall have been obtained, and any applicable waiting periods relating thereto shall have expired, been waived or been terminated early.

-57-

(b)    *No Prohibition*. There shall be no Law in effect enjoining or otherwise prohibiting the Closing and no pending lawsuits, actions or proceedings to enjoin or otherwise prohibit the Closing shall have been commenced by any Government Authority or other Person.

Section 6.2    Conditions to Obligations of Purchaser. The obligation of Purchaser to effect the Closing is also subject to the satisfaction (or written waiver by Purchaser) on or prior to the Closing of the following conditions:

(e)    *Representations and Warranties.* Each of the representations and warranties of Parent contained in Article III shall be true and correct as of the date hereof and as of the Closing Date except (i) for such representations and warranties that are made only as of a specific date, which shall be true and correct as of such date, and (ii) where the failures of such representations and warranties to be true and correct have not had and would not have a Company Material Adverse Effect (disregarding for purposes of this clause (ii) any limitations as to materiality or Company Material Adverse Effect set forth therein); provided that the Parent Fundamental Representations (other than the representations and warranties contained in Section 3.2(a)) shall be true and correct in all material respects as written as of the date hereof and as of the Closing Date, and the representations and warranties contained in Section 3.2(a) and Section 3.5(ii) shall be true and correct in all respects (other than, in the case of Section 3.2(a), for such failures to be true and correct that are de minimis).

(f)    *Covenants*. The covenants and agreements of Parent set forth in this Agreement to be performed at or prior to the Closing shall have been duly performed in all material respects.

(g)    *Officer's Certificate.* There shall have been delivered to Purchaser a certificate, dated the Closing Date and signed by a duly authorized officer of Parent, certifying the satisfaction of the conditions in Section 6.2(a) and Section 6.2(b).

(h)    *Transaction Documents*. Parent and its Affiliates, as applicable, shall have duly executed and delivered the Transaction Documents (other than this Agreement) to which they are a party.

(i)    *Third Party Consents*. All material third party consents or approvals of Government Authorities required by Parent or its Affiliates to provide any services under the Transition Services Agreement shall have been obtained, or Parent shall have satisfied Purchaser, acting reasonably, of Parent's ability to provide such services without such consents or approvals at no additional material incremental cost to Purchaser.

Section 6.3    Conditions to Obligations of Parent. The obligation of Parent to effect the Closing is also subject to the satisfaction (or written waiver by Parent) on or prior to the Closing of the following conditions:

(a)    *Representations and Warranties.* Each of the representations and warranties of Purchaser contained in Article IV shall be true and correct as of the date hereof and as of the Closing Date except (i) for such representations and warranties that are made only as of a specific date,

-58-

which shall be true and correct as of such date, and (ii) where the failures of such representations and warranties to be true and correct have not had and would not have a Purchaser Material Adverse Effect (disregarding for purposes of this clause (ii) any limitations as to materiality or Purchaser Material Adverse Effect set forth therein); <u>provided</u> that the Purchaser Fundamental Representations shall be true and correct in all material respects as written as of the date hereof and as of the Closing Date.

(b)    *Covenants*. The covenants and agreements of the Purchasers set forth in this Agreement to be performed at or prior to the Closing shall have been duly performed in all material respects.

(c)    *Officer's Certificate.* There shall have been delivered to Parent a certificate, dated the Closing Date and signed by a duly authorized officer of Purchaser, certifying the satisfaction of the conditions in  <u>Section 6.3(a)</u> and <u>Section 6.3(b)</u>.

(d)    *Transaction Documents*. Purchaser and its Affiliates, as applicable, shall have duly executed and delivered the Transaction Documents (other than this Agreement) to which they are a party.

(e)    *Restructuring*. The Restructuring shall have been successfully completed by Parent.

ARTICLE VII
<u>TAX MATTERS</u>

Section 7.1    Seller Returns and Reports. Seller shall prepare or cause to be prepared, and timely file, or cause to be filed, when due all Tax Returns that are required to be filed by or with respect to the Target Companies before the Closing Date (" <u>Pre-Closing Returns</u>") and shall timely pay, or cause to be paid, any Taxes shown due on such Tax Returns, other than in respect of the Taxes disclosed in Section 3.8(b) of Parent's Disclosure Letter.  All such Pre-Closing Returns shall be prepared in a manner consistent with past practice, except as otherwise required by Law.  Sellers shall (i) promptly prepare (or cause to be prepared) all reasonably necessary documents or other correspondence in respect of the Tax Receivables that has not previously been provided to the relevant Government Authority (the "<u>Tax Receivables Materials</u>"), (ii) provide Purchaser with a reasonable opportunity to review and comment on the Tax Receivables Materials, (iii) consider in good faith all comments of Purchaser with respect to the Tax Receivables Materials, and (iv) submit (or cause to be submitted) the Tax Receivables Materials to the relevant Government Authority as promptly as possible.  Seller shall promptly provide Purchaser with copies of all written correspondence with any Government Authority relating to the Tax Receivables and reasonable notice of any material discussions with any Government Authority relating to the Tax Receivables.

Section 7.2    Purchaser Returns and Reports.

(f)    Purchaser shall prepare, or cause to be prepared, and file, or cause to be filed, when due all Tax Returns that are required to be filed by or with respect to the Target Companies after the Closing Date.  For any Taxes that are in respect of a taxable period beginning on or before and

-59-

ending after the Closing (such period, a "<u>Straddle Period</u>" and each Tax Return for any Straddle Period, a "<u>Straddle Period Return</u>"), Purchaser shall prepare, or cause to be prepared, each Straddle Period Return on a basis consistent with (i) applicable Law, (ii) the Final Closing Statement, and (iii) to the extent not inconsistent with applicable Law, the past practices and procedures of the Target Companies. Purchaser shall provide to Parent for its review a draft of each Straddle Period Return no later than 60 days in the case of an income Tax Return, and 30 days in the case of any other Tax Return, prior to the due date for filing such Tax Return with the appropriate Government Authorities. Parent shall notify Purchaser in writing within 15 days in the case of an income Tax Return, and five days in the case of any other Tax Return, after delivery of a Straddle Period Return of any reasonable comments with respect to items set forth in such Straddle Period Return. Purchaser shall consider in good faith all such comments. Purchaser shall provide a final copy of each Straddle Period Return to Parent not less than two days before the deadline to file such Straddle Period Return and Purchaser shall ensure that such Straddle Period Return is duly filed.

(g)    Parent shall pay to Purchaser all Specified Tax Liabilities by wire transfer of immediately available funds within five (5) Business Days after the date of receiving notice from Purchaser that such Taxes are due. Parent shall be entitled to recover from Purchaser any amounts paid to Purchaser pursuant to this  <u>Section 7.2(b)</u> to the extent that any final decision, judgment or award shall have been rendered by a Government Authority of competent jurisdiction finding that such Taxes were not payable by the Target Companies.

(h)    In the case of a Straddle Period, the Taxes allocable to the portion of such period that is a Pre-Closing Period shall be:

(v)    In the case of Taxes imposed on a periodic basis (such as real or personal property Taxes), the amount of such Taxes for the entire period (or, in the case of such Taxes determined on an arrears basis, the amount of such Taxes for the immediately preceding period) multiplied by a fraction, the numerator of which is the number of calendar days in the Pre-Closing Period and the denominator of which is the number of calendar days in the relevant Straddle Period;

(vi)    In the case of Taxes not described in (i) above (such as franchise Taxes, Taxes that are based upon or related to income or receipts, or Taxes that are based upon occupancy or imposed in connection with any sale or other transfer or assignment of property), the amount of any such Taxes shall be determined as if such taxable period ended at the close of the Closing Date; and

(vii)    In the case of Canadian Taxes imposed in respect of income of a partnership, the amount of any such Taxes shall be determined as if the taxable year of the partnership ended at the end of the Closing Date.

(i)    The Purchaser may cause the Canadian Target Companies to make the election referred to in subsection 256(9) of the Tax Act, and comparable provisions of applicable provincial or territorial legislation, and to file such election(s) for such Canadian Target Companies' taxation year(s) ending immediately before the Closing Date.

SC1:3314648.6

    Section 7.3    Amendments. Purchaser shall not permit any amendment, or any similar action, with respect to any Tax Return filed by the Sellers with respect to any Pre-Closing Period (if Sellers would be liable for any Losses arising from such amended returns) without the prior written consent of the Sellers, which consent shall not be unreasonably withheld or delayed;  provided that the foregoing shall not apply to any amended Tax Return that may be required following resolution of a tax audit or other inquiry from a taxing authority conducted in accordance with the contest provisions of  Section 7.4.

    Section 7.4    Contest Provisions.

    (v)    If a claim shall be made by any Government Authority, that, if successful, might result in a payment on behalf of Sellers to Purchaser under Section 8.2 or Section 8.4(f) (a "Tax Claim"), Purchaser shall promptly (and in any case no later than 15 days after Purchaser becomes aware of a Tax Claim) notify the Sellers with such potential liability in writing and in reasonable detail to apprise Sellers of the nature of the Tax Claim taking into account the facts and circumstances with respect to such Tax Claim (a " Tax Notice"). If a Tax Notice is not given to Sellers within such time period, such failure shall not preclude Purchaser from obtaining such indemnification but its right to indemnification shall be reduced to the extent that such delay prejudiced Sellers' position or defense of the Tax Claim or increased the amount of liability or cost of defense.

    (w)    Subject to Section 7.4(d), with respect to any Tax Claim or claim related to the Excess Tax Receivables, Sellers shall have the right, at their own sole expense, to control and conduct all proceedings and negotiations in connection with such Tax claim (including selection of counsel), and may, in their sole discretion, either pay the Tax claimed and sue for a refund where applicable Law permits such refund suits or contest the Tax Claim in any permissible manner. Purchaser or its designee shall have the right to participate in such proceedings and negotiations (including with counsel of its choice), at its sole expense, and Sellers shall reasonably cooperate with Purchaser and its accountants and other Representatives in connection with such participation.  If Sellers elect, in their sole discretion, not to control and conduct the proceedings and negotiations in connection with a Tax Claim or a claim related to the Excess Tax Receivables, Sellers shall, within 20 days of receipt of a Tax Notice with respect to such claim, notify Purchaser in writing of their intention not to control and conduct the proceedings and negotiations in connection with such claim.  In such event, Purchaser may control, or cause its designee to control, and conduct such proceedings and negotiations in such manner as it may deem appropriate, and Sellers shall have the right to participate in such proceedings and negotiations (including, without limitation, with counsel of their choice), at their sole expense, and Purchaser shall reasonably cooperate with Sellers and their accountants and other representatives in connection with such participation; provided that Purchaser shall not settle any Tax Claim or a claim related to the Excess Tax Receivables without Sellers' consent (such consent not to be unreasonably withheld, conditioned or delayed).

    (x)    Notwithstanding the foregoing, Sellers with potential liability under  Section 8.2 with respect to a Tax Claim shall not be entitled to settle such Tax Claim in the event such settlement relates to any Taxes for which such Sellers are not liable unless such Sellers notify Purchaser in writing of their intention to settle such Tax Claim at least 20 days prior to the date of such proposed settlement. If Purchaser rejects the proposed settlement, Purchaser may control, or cause its designee

-61-

to control, and conduct such proceedings and negotiations regarding such Tax Claim in such manner as it may deem appropriate at its sole expense, and Sellers shall have the right to participate in such proceedings and negotiations at their sole expense, and Purchaser and Sellers shall reasonably cooperate with each other and with their respective accountants and other representatives in connection with such participation. In such case, any amount payable by Sellers under Section 8.2 shall be no greater than the amount of the proposed settlement rejected by Purchaser, if the amount of such proposed settlement is acceptable to the relevant Government Authority and the proposed settlement is otherwise acceptable to the Government Authority in all material respects.

(y)    With respect to any Tax Claim relating to the Tax Receivables, Parent shall have the right to control and conduct all proceedings and negotiations in connection with such Tax Claim (including selection of counsel).  Purchaser or its designee shall have the right to participate in such proceedings and negotiations (including with counsel of its choice) and Parent shall reasonably cooperate with Purchaser and its accountants and other Representatives in connection with such participation.  Parent agrees that it shall dispute any Tax Claim relating to the Tax Receivables as expeditiously as possible.  If Parent elects, in its sole discretion, not to control and conduct the proceedings and negotiations in connection with a Tax Claim relating to the Tax Receivables, Parent shall, within 20 days of receipt of a Tax Notice with respect to such Tax Claim, notify Purchaser in writing of its intention not to control and conduct the proceedings and negotiations in connection with such Tax Claim.  In such event, Purchaser may control, or cause its designee to control, and conduct such proceedings and negotiations in such manner as it may deem appropriate, and Parent shall have the right to participate in such proceedings and negotiations (including, without limitation, with counsel of its choice), at its sole expense, and Purchaser shall reasonably cooperate with Parent and its accountants and other representatives in connection with such participation.

Section 7.5    Transfer and Sales Taxes.  Purchaser will, at its own expense, file all necessary Tax Returns and other documentation with respect to any transfer, documentary, stamp or other related Taxes and any recording or filing fees, including interest or penalties thereon, in each case arising from the purchase and sale of the Target Equity Interests, and will pay all such Taxes in full. If required by applicable law, Sellers will, and will cause its affiliates to, join in the execution of any such Tax Returns and other documentation.

Section 7.6    Cooperation; Access to Records.  After the Closing, Sellers and Purchaser shall cooperate fully in preparing for and conducting any audits of, or disputes with Tax authorities regarding, any Tax Returns, and shall provide such information as reasonably necessary for such audits, disputes or for the filing of all Tax Returns, subject to the provisions of  Section 7.4. Parent shall, and shall cause each other Seller to, after the Closing, consistent with current practices of the Target Companies, retain such records, documents, accounting data and other information as are necessary for the preparation, filing and examination of Tax Returns with respect to Taxes of the Target Companies and shall make available to the other parties and to any Government Authority as reasonably requested all records, documents, accounting data and other information relating to Taxes of the Target Companies until the expiration of the statute of limitations (and, to the extent notified by Purchaser or the Target Companies, any extensions thereof) and shall give Purchaser reasonable written notice prior to transferring, destroying, or discarding any such books and records

-62-

and, if Purchaser so requests, Sellers shall allow Purchaser to take possession of such books and records.

Section 7.7    No Tax Election.

(h)    Purchaser shall not make, and agrees to prevent the Target Companies from making, any tax election for U.S. income tax purposes that might adversely affect the Sellers without the prior written consent of the Sellers, which shall not be unreasonably withheld, taking into account any compensation provided by Purchaser to Sellers.

(i)    Other than a tax election that is made in respect of any taxable period (including portions thereof as allocated pursuant to Section 7.2(c)) beginning after Closing or a tax election made pursuant to Section 7.2(d), Purchaser agrees to prevent the Target Companies from making, any tax election for Canadian income tax purposes that might result in an increased payment by Sellers under Article VIII without the prior written consent of the Sellers, which shall not be unreasonably conditioned, withheld or delayed, taking into account any compensation provided by Purchaser to Sellers.

Section 7.8    Tax Sharing. Prior to the Closing Date, Sellers shall terminate any tax-sharing allocation, and indemnification agreements and arrangements of the Target Companies, and such agreements shall have no further effect for any taxable year or period (whether a past, present or future year or period), and no additional payments shall be made thereunder on or after the Closing Date with respect to any period.

Section 7.9    Income Tax Purchase Price Allocation. For U.S. federal income tax purposes (and for purposes of any state tax that is based upon similar principles), Purchaser and Parent shall (and shall cause their respective Affiliates to) allocate the Purchase Price, as determined for U.S. federal income tax purposes, among the Target Companies, or if a Target Company is treated as a "disregarded entity" within the meaning of U.S. Treasury Reg. § 301.7701-3(b)(2)(i)(C), to the assets of such Target Company, as reasonably specified by the Parent in writing in a final Purchase Price allocation statement delivered to the Purchaser no later than 15 days after the later of (1) Parent's acceptance of the Final Closing Statement or (2) the resolution of all Parent's objections to the Final Closing Statement pursuant to Section 2.3(d). Parent shall deliver to Purchaser no later than 15 days after the later of (1) Parent's acceptance of the Final Closing Statement or (2) the resolution of all Parent's objections to the Final Closing Statement pursuant to Section 2.3(d), a draft statement setting forth its calculation of the Purchase Price, for U.S. federal income tax purposes (including a schedule setting forth any assumed liabilities constituting part of such Purchase Price), and its proposed allocation of such Purchase Price among the Target Companies and/or their assets, which calculation and allocation shall be prepared in a manner consistent with all applicable requirements of the Code and the U.S. Treasury Regulations thereunder. If Purchaser disagrees either with the Parent's determination or allocation of the Purchase Price set forth on such statement, Purchaser may deliver to Parent its proposed changes to such statement within 15 days of receipt thereof. Parent shall consider any such proposed changes reasonably and in good faith, accept any changes that are required by applicable Law and incorporate any such changes (and any other changes that it has agreed with Purchaser to make) in the final Purchase Price allocation statement

-63-

to be delivered as provided in the first sentence of this  Section 7.9. Without limiting the generality of the foregoing, Purchaser and Parent shall (and shall cause their respective Affiliates to) file all Tax Returns for U.S. federal income Tax purposes (and for purposes of any state tax that is based upon similar principles) in a manner consistent with the final Purchase Price allocation statement, taking into account any required adjustments to the Purchase Price and the allocation thereof that arise because of events that occur after the final Purchase Price allocation statement has been delivered.

Section 7.10    Refund of Tax Benefits. Purchaser shall pay to Parent, within 15 days, the amount of any refunds of Tax (other than in respect of the Tax Receivables which shall be dealt with in accordance with  Section 8.4(f)) that are received by the Purchaser or the Target Companies, or any amounts credited against Tax to which Purchaser or the Target Companies become entitled, including, for certainty, any refund or amounts credited in respect of an Excess Tax Receivable, which refunds or amounts credited relate to Tax periods (or portions thereof) ending on or before the Closing Date (except to the extent shown as an asset on a balance sheet of a Target Company for purposes of, or otherwise taken into account in, calculating the Final Net Asset Value). Purchaser shall not be required to apply any Tax attributes arising in any taxable period (including portions thereof as allocated pursuant to  Section 7.2(c)) beginning after Closing to any Pre-Closing Period in order to increase the amount of any Tax refund or any amounts credited against Tax which relate to Tax periods (or portions thereof) ending on or before the Closing Date.

<div align="center">ARTICLE VIII<br>SURVIVAL; INDEMNIFICATION; CERTAIN REMEDIES</div>

Section 8.1    Survival. The representations, warranties, covenants and obligations of the Parties contained in or made pursuant to this Agreement shall survive in full force and effect until the date that is 540 days after the Closing Date, at which time they shall terminate (and no claims shall be made for indemnification under  Section 8.2  or  Section 8.3 thereafter), except (a) the Parent Fundamental Representations and the Purchaser Fundamental Representations shall each survive until the end of the applicable statute of limitations and (b) the representations and warranties set forth in  Section 3.8 shall survive until the date that is 60 days after the relevant Government Authorities shall no longer be entitled to assess or reassess liability for Taxes against the Target Companies for the particular period to which the representation or warranty relates, having regard, without limitation, to any waivers given by the Target Companies in respect of any taxation year or taxation period,  provided that if such waivers are given after the Closing Date, Parent shall have given its prior consent in writing, not to be unreasonably withheld, conditioned or delayed, to such waivers;  provided, further, that any obligations to indemnify and hold harmless shall not terminate with respect to any Losses as to which the Person to be indemnified shall have given notice (stating the basis of the claim for indemnification) to the Indemnifying Person in accordance with  Section 8.4 before the termination of such applicable survival period. The covenants and obligations that by their terms apply or are to be performed in whole or in part after the Closing shall survive for the period provided in such covenants and obligations, or until fully performed, and the covenants and obligations that by their terms apply or are to be performed in their entirety on or prior to the

<div align="center">-64-</div>

Closing shall terminate at the earlier of (x) the time at which they are performed and (y) immediately following the Closing.

Section 8.2    Indemnification by Parent.

(c)    After the Closing and subject to this Article VIII, Parent, on behalf of the Sellers, shall indemnify, defend and hold harmless Purchaser against, and reimburse Purchaser for, all Losses that Purchaser may at any time suffer or incur, or become subject to:

(i)    as a result of or in connection with the breach of any of the representations and warranties of Parent contained in Article III (it being understood that, for purposes of determining whether any breach has occurred or calculating the amount of any Losses under this Section 8.2(a)(i), all materiality and Company Material Adverse Effect qualifications and exceptions, including the words or phrases "material", "immaterial", "in all material respects" or words or phrases of similar import, (except for such qualifications and exceptions (A) used to qualify a list of items rather than to qualify a statement or (B) contained in Section 3.5(ii)) contained in such representations and warranties shall be disregarded);

(ii)    as a result of or in connection with any breach by Parent of any of its covenants or obligations contained in this Agreement;

(iii)    (A) that constitute a Liability for Taxes of any of the Target Companies (except as shown as a Liability or reserve on the Final Closing Statement for purposes of, or otherwise taken into account in, calculating the Final Net Asset Value) for any Pre-Closing Period (and, if such Taxes arise in a Straddle Period, as allocated pursuant to Section 7.2(c)), (B) resulting from Ally Credit Canada Limited receiving less than the full amount of the Tax Receivables from the relevant Government Authority (it being understood that any amounts applied by a Government Authority to reduce any Specified Tax Liability shall not be considered to be credited to Ally Credit Canada Limited for purposes of this Section 8.2(a)(iii)), and (C) relating to any reasonable third-party costs incurred by Purchaser or its Affiliates in connection with any matters relating to Taxes in the foregoing clauses (A) and (B), provided however, that such third-party costs shall not include professional fees incurred in connection with the dispute of any item herein with Parent or its Affiliates; or

(iv)    as a result of or in connection with the Sold Mortgage Business or under any Mortgage Sale Agreement, except for any Losses suffered by Purchaser as a result of or in connection with any breach or purported breach, by Purchaser or any of its Affiliates from and after the Closing Date, of any covenants or obligations contained in any Mortgage Sale Agreement (including pursuant to any waiver of any provision thereof obtained in connection with the transactions contemplated hereby); or

(v)    resulting from the Restructuring.

(d)    Notwithstanding anything to the contrary contained herein, Parent shall not be required to indemnify, defend or hold harmless Purchaser against, or reimburse, or otherwise have

-65-

any liability under this Agreement to, Purchaser for any Losses pursuant to  Section 8.2(a)(i) (other than Losses in connection with any Parent Fundamental Representations) until the aggregate amount of Purchaser's Losses for which Purchaser is finally determined to be otherwise entitled to indemnification under  Section 8.2(a)(i) exceeds $22,500,000 (the "Deductible"), after which Parent, on behalf of the Sellers, shall be obligated for all Purchaser's Losses for which Purchaser is finally determined to be otherwise entitled to indemnification under  Section 8.2(a)(i) that are in excess of the Deductible;  provided that, once the aggregate amount of Purchaser's Losses for which Purchaser is finally determined to be entitled to indemnification under  Section 8.2(a)(i) exceeds $15,000,000 (the "Sub-Deductible"), then Parent, on behalf of the Sellers, shall be obligated for all Purchaser's Losses for which Purchaser is finally determined to be entitled to indemnification under  Section 8.2(a)(i) for Losses in connection with the representations and warranties in  Section 3.8; provided that, to avoid doubt, any amounts actually paid for Losses hereunder (including under  Section 8.2(a)(iii)) shall not be applied against the Deductible or the Sub-Deductible.  Notwithstanding anything to the contrary contained herein, Parent shall not be required to indemnify, defend or hold harmless Purchaser against, or reimburse, or otherwise have any liability under this Agreement to, Purchaser for any Losses (1) pursuant to  Section 8.2(a)(i) (other than Losses in connection with any Parent Fundamental Representation) in a cumulative aggregate amount exceeding $400,000,000 (the "Cap") and (2) pursuant to  Section 8.2(a)(ii),  Section 8.2(a)(iv) and Section 8.2(a)(i) (only in respect of Losses in connection with the Parent Fundamental Representations) in a cumulative aggregate amount exceeding the Purchase Price.

(e)    Solely for purposes of this  Article VIII, the term "Purchaser" includes Purchaser and its Affiliates (including, after the Closing Date, the Target Companies) and their respective successors (if any).

Section 8.3    Indemnification by Purchaser.

(z)    After the Closing and subject to this  Article VIII, Purchaser shall indemnify, defend and hold harmless Parent, on behalf of itself and the Sellers, against, and reimburse Parent for, all Losses that Parent may at any time suffer or incur, or become subject to:

(i)    as a result of or in connection with the breach of any of the representations and warranties of Purchaser contained in  Article IV (it being understood that for purposes of determining whether any breach has occurred or calculating the amount of any Losses under this  Section 8.3(a)(i), all materiality and Purchaser Material Adverse Effect qualifications and exceptions, including the words or phrases "material", "immaterial", "in all material respects" or words or phrases of similar import, contained in such representations and warranties shall be disregarded);

(ii)    as a result of or in connection with any breach by Purchaser of any of its covenants or obligations contained in this Agreement; or

(iii)    that constitute a Liability for Taxes of any of the Target Companies for any taxable periods (including portions thereof as allocated pursuant to  Section 7.2(c)) beginning after the Closing.

-66-

(aa)    Notwithstanding anything to the contrary contained herein, Purchaser shall not be required to indemnify, defend or hold harmless Parent against, or reimburse, or otherwise have any liability under this Agreement to, Parent for any Losses pursuant to Section 8.3(a)(i) (other than Losses in connection with any Purchaser Fundamental Representations) with respect to any claim until the aggregate amount of Losses for which Parent is finally determined to be otherwise entitled to indemnification under  Section 8.3(a)(i) exceeds the Deductible, after which Purchaser shall be obligated for all the Losses for which Parent is finally determined to be otherwise entitled to indemnification under Section 8.3(a)(i) that are in excess of the Deductible.  Notwithstanding anything to the contrary contained herein, Purchaser shall not be required to indemnify, defend or hold harmless Parent against, or reimburse, or otherwise have any liability under this Agreement to, Parent for any Losses (1) pursuant to Section 8.3(a)(i) (other than Losses in connection with any Purchaser Fundamental Representation) in a cumulative aggregate amount exceeding the Cap and (2) pursuant to Section 8.3(a)(ii) and Section 8.3(a)(i) (only in respect of Losses in connection with the Purchaser Fundamental Representations) in a cumulative aggregate amount exceeding the Purchase Price.

(bb)    Solely for purposes of this Article VIII, the term "Parent" includes Parent and its Affiliates and their respective successors (if any).

Section 8.4    Claims Procedure.

(o)    *Notification by the Indemnified Person*. If any Person claiming indemnification under this Article VIII (the "Indemnified Person") becomes aware of any fact, matter or circumstance that may give rise to a claim for indemnification under this  Article VIII, the Indemnified Person shall (at its own expense) promptly notify the Person from whom indemnification is sought (the " Indemnifying Person") in writing of such claim, including any pending or threatened claim or demand by a third party that the Indemnified Person has determined has given or could reasonably give rise to a right of indemnification under this Agreement (including a pending or threatened claim or demand asserted in writing by a third party against the Indemnified Person) (each, a " Third-Party Claim"), setting out the provisions under this Agreement on which such claim is based, and such other information (to the extent available) as is reasonably necessary to enable the Indemnifying Person to assess the merits of the potential claim, to make such provisions as it may consider necessary (including details of the legal and factual basis of the claim and the evidence on which the party relies (including where the claim is the result of a Third-Party Claim, evidence of the Third-Party Claim)) and setting out its estimate of the amount of Losses to the extent ascertainable which are, or are to be, the subject of the claim; provided, however, that the failure to provide such notice shall not release the Indemnifying Person from any of its obligations under this  Article VIII except to the extent that the Indemnifying Person is prejudiced by such failure.  The Parties agree that (i) in this Article VIII they intend to shorten, in the case of the limited survival periods specified in Section 8.1, the applicable statute of limitations period with respect to certain claims; (ii) notices for claims in respect of a breach of a representation, warranty, covenant or obligation must be delivered prior to the expiration of the applicable survival period specified in Section 8.1 for such representation, warranty, covenant or obligation; and (iii) any claims for indemnification for which notice is not timely delivered in accordance with this  Section 8.4(a) shall be expressly barred and

-67-

are hereby waived; provided, further, that if, prior to such applicable date, a Party shall have notified the other Party in accordance with the requirements of this Section 8.4(a) of a claim for indemnification under this Article VIII (whether or not formal legal action shall have been commenced based upon such claim), such claim shall continue to be subject to indemnification in accordance with this Article VIII notwithstanding the passing of such applicable date.

(p)    *Cooperation by the Indemnified Person.*    The Indemnified Person shall reasonably cooperate with and assist the Indemnifying Person in determining the validity of any claim for indemnity by the Indemnified Person and in defending against a Third-Party Claim. In connection with any fact, matter, event or circumstance that may give rise to a claim against any Indemnifying Person under this Agreement, the Indemnified Person shall ensure that the Indemnified Person and its Affiliates, as applicable: (i) shall preserve all material evidence relevant to the claim, (ii) shall allow the Indemnifying Person and its advisers to investigate the fact, matter, event or circumstance alleged to give rise to such claim and whether and to what extent any amount is payable in respect of such claim, and (iii) shall (at its own expense) disclose to the Indemnifying Person and its Representatives all material of which it is aware which relates to the claim and provide, and procure that its Affiliates provide (at their own expense), all such information and assistance, including access to premises and personnel, and the right to examine and copy or photograph any assets, accounts, documents and records, as the Indemnifying Person or its Representatives may reasonably request, subject to the Indemnifying Person and its advisers agreeing in such form as the Indemnified Person may reasonably require to keep all such information confidential and to use it only for the purpose of investigating and defending the claim in question.

(q)    *Assumption of Defense of a Third-Party Claim*.

(i)    Upon receipt of a notice of a claim for indemnity from an Indemnified Person pursuant to Section 8.4(a) in respect of a Third-Party Claim, the Indemnifying Person may, by notice to the Indemnified Person delivered within 30 Business Days of the receipt of notice of such Third-Party Claim, assume the defense and control of any Third-Party Claim, with its own counsel and at its own expense, but shall allow the Indemnified Person a reasonable opportunity to participate in the defense of such Third-Party Claim with its own counsel and at its own expense (which shall not constitute a Loss); provided, however, that the Indemnifying Person shall pay the reasonable fees and expenses of separate outside counsel to the Indemnified Person if (i) so requested by the Indemnifying Person to participate, (ii) the named parties to any such Action (including any impleaded parties) include both the Indemnified Person and the Indemnifying Person and the Indemnified Person shall have been advised in writing by its outside counsel that there may be one or more legal defenses available to the Indemnified Person that are different from, or in addition to, those available to the Indemnifying Person or (iii) outside counsel to the Indemnified Person shall have advised the Indemnified Person in writing that a conflict or potential conflict exists between the Indemnified Person and the Indemnifying Person that would make joint representation inappropriate; provided, further, that the Indemnifying Person shall not be required to pay for more than one such counsel (plus local counsel, if and to the extent applicable) for all Indemnified Persons in connection with any Third-Party Claim.

-68-

(ii)    The Indemnifying Person shall not, without the prior written consent of the Indemnified Person (which shall not be unreasonably withheld, conditioned or delayed), consent to a settlement, compromise or discharge of, or the entry of any judgment arising from, any Third-Party Claim, unless such settlement, compromise, discharge or entry of any judgment does not involve any finding or admission of any violation of Law or admission of any wrongdoing by the Indemnified Person, and the Indemnifying Person shall obtain, as a condition of any settlement, compromise, discharge, entry of judgment (if applicable), or other resolution, a complete and unconditional release of each Indemnified Person from any and all Liabilities in respect of such Third-Party Claim. If the Indemnifying Person does not assume the defense and control of any such Third-Party Claim, the Indemnified Person, subject to Section 8.4(d), may defend the same in such manner as it may deem appropriate.

(iii)    If the Indemnifying Person elects not to assume the defense and control of any Third-Party Claim or fails to notify the Indemnified Person of its election as herein provided, the Indemnified Person may defend against, negotiate, settle or otherwise deal with such Third-Party Claim in accordance with the other provisions of this Article VIII; provided, that the Indemnified Person shall keep the Indemnifying Person reasonably apprised of the status of such Third-Party Claim and use reasonable efforts to allow the Indemnifying Person to participate therein at its own expense; provided, further, that the Indemnified Person shall not settle, compromise or consent to the entry of any judgment with respect to any such Third-Party Claim, or admit to any liability with respect to such Third-Party Claim, without the prior written consent of the Indemnifying Person, such consent not to be unreasonably withheld, conditioned or delayed.

(r)    *Settlement of Claims*. The Indemnified Person shall not settle, compromise or consent to the entry of any judgment with respect to any claim or demand for which it is seeking indemnification from the Indemnifying Person or admit to any liability with respect to such claim or demand without the prior written consent of the Indemnifying Person. Notwithstanding anything to the contrary contained in this Article VIII, no Indemnifying Person shall have any liability under this Article VIII for any Losses arising out of or in connection with any Third-Party Claim that is settled or compromised by an Indemnified Person without the consent of such Indemnifying Person.

(s)    *Response to Claims Not Involving Third-Party Claims*. In the event any Indemnifying Person receives a notice of a claim for indemnity from an Indemnified Person pursuant to Section 8.4(a) that does not involve a Third-Party Claim, the Indemnifying Person shall notify the Indemnified Person within 30 Business Days following its receipt of such notice whether the Indemnifying Person disputes its liability to the Indemnified Person under this Article VIII.

(t)    *Claim by Purchaser under Section 8.2(a)(iii)(B)*. Notwithstanding anything herein to the contrary, on the earlier of (i) the date on which Parent elects not to exercise its rights under Section 7.4(d) with respect to the control and conduct of all proceedings and negotiations in respect of any Tax Claim in respect of any Tax Receivables ("Specified Tax Receivables"), and (ii) the Tax Receivables Receipt Date for that tranche, Purchaser shall be entitled to make a claim under Section 8.2(a)(iii)(B) in respect of any portion of that tranche of the Tax Receivables that has not been

-69-

received by or credited to Ally Credit Canada Limited (other than as applied to reduce any Specified Tax Liability) as of such date (or, in case of clause (i), in respect of the Specified Tax Receivables) and shall be entitled to recover from Parent under such claim within five Business Days of making such claim.  If, after payment of the full amount of all claims by Parent to Purchaser under this  Section 8.4(f), Ally Credit Canada Limited receives (i) all or any portion of the Tax Receivables from the relevant Government Authority or (ii) notice from a Government Authority that all or any portion of the Tax Receivables will be applied to reduce any Tax liability of Ally Credit Canada Limited other than any Specified Tax Liability, Purchaser shall, within five Business Days of the receipt or application (the "Receipt Date"), pay to Parent an amount equal to (A) the aggregate amount of Tax Receivables received by Ally Credit Canada Limited (including any interest received from the Government Authority applicable to any portion of such Tax Receivables that relates to the period after which Parent paid the amounts owing to Purchaser under this  Section 8.4(f) in respect of such portion of the Tax Receivables) or applied to reduce Ally Credit Canada Limited's Tax liability (other than any portion of the Tax Receivables applied to reduce any Specified Tax Liability) on or prior to such Receipt Date,  *minus*  (B) all amounts previously paid to Parent by Purchaser under this Section 8.4(f) in respect of the Tax Receivables plus all reasonable out-of-pocket costs incurred by Purchaser or its Affiliates in connection with the collection of such Tax Receivables (it being understood that if the difference between (A) and (B) is a negative number, no amount shall be payable to Parent).

Section 8.5    Payment.  In the event a claim for indemnification under this  Article VIII has been finally determined, the amount of such final determination shall be paid by the Indemnifying Person to the Indemnified Person within two Business Days of the request therefor in immediately available funds.  Any Action by or before any Government Authority or arbitral body, and the liability for and amount of damages therefor, shall be deemed to be "finally determined" for purposes of this  Article VIII when the parties hereto have so determined by mutual agreement or, if disputed, when a final non-appealable Government Order has been entered into with respect to such Action.

Section 8.6    Treatment of Indemnification Payments .  To the fullest extent permitted under applicable Law, for all purposes (including Tax purposes), the Parties shall treat any payment made under  Section 8.2 or Section 8.3 as an adjustment to the Purchase Price.

Section 8.7    Provisions.  No Indemnifying Person shall be liable under this  Article VIII in respect of any Loss to the extent of the amount of the Loss accrued or reserved for in the Final Closing Statement.

Section 8.8    Exclusive Remedies .  Each Party acknowledges and agrees that (a) prior to the Closing, other than in the case of actual fraud by Parent, the sole and exclusive remedy of Purchaser for any breach of any of the representations and warranties of Parent contained in  Article III shall be, in the event that each of the conditions set forth in  Article VI has not been satisfied or waived, refusal to close the purchase and sale of the Target Equity Interests hereunder; (b) following the Closing, (i) the indemnification provisions of this Article VIII shall be the sole and exclusive remedies of the Parties for any breach of the representations or warranties contained in this Agreement except in the case of fraud or willful breach and (ii) notwithstanding anything to the contrary contained herein, no breach of any representation, warranty, covenant or obligation

-70-

SC1:3314648.6

contained herein shall give rise to any right on the part of either Party to rescind this Agreement or any of the transactions contemplated hereby; and (c) following the Closing, the indemnification provisions of this Article VIII shall be the sole and exclusive monetary remedies of the Parties for any breach or non-fulfillment of any covenant (other than those covenants set forth under Section 5.6 for the enforcement of which a Party may also seek specific performance).

Section 8.9    Damages. The Parties agree that with respect to each indemnification obligation set forth in this Article VIII, any Transaction Document or any other document executed or delivered in connection with the Closing, in no event shall an Indemnifying Person have any liability to an Indemnified Person for any consequential, indirect, incidental, exemplary, punitive or special damages, internal costs or lost profits, except for any such damages actually paid by the Indemnified Person to any third party in respect of any Third-Party Claim. The Parties agree that, notwithstanding the terms of this Section 8.9 but subject to the other terms of this Article VIII, this Section 8.9 shall not preclude Purchaser and its Affiliates from claiming Losses under this Article VIII in connection with damages actually paid by them to the third party (or any of its Affiliates) set forth in Section 8.9 of Purchaser's Disclosure Letter relating to any sale of some or all of the assets of the Target Companies to such third party, provided (i) that the facts, events and circumstances giving rise to such damages give rise to a breach under this Agreement for which indemnification would be available to Purchaser and its Affiliates had they sustained the damages directly as a Loss (and such breach is demonstrable), and (ii) the amount of such damages indemnifiable hereunder shall be the lesser of (x) the damages actually paid by them to the third party as a result of the breach and (y) the amount that Purchaser and its Affiliates would have been entitled hereunder had the Purchaser and its Affiliates continued to own such assets sold to the third party .

Section 8.10    Net Tax Benefit. Any amount of any Loss for which reimbursement or indemnification is provided under this Article VIII shall be (i) decreased by any Tax benefit actually realized as a decrease in Taxes payable by the Indemnified Person (or any Affiliate thereof) as a result of the incurrence or payment of any such Loss (including as a result of the facts, matters, events or circumstances giving rise to such Losses), and (ii) increased by any Tax cost actually incurred as an increase in Taxes payable by the Indemnified Person (or any Affiliate thereof) as a result of the receipt or accrual of the indemnification payment.

Section 8.11    Contingent Liabilities. No Indemnifying Person shall be liable under this Article VIII in respect of any Loss which is contingent unless and until such contingent Loss becomes an actual liability and is due and payable. To avoid doubt, any Loss in respect of Taxes for which an assessment or reassessment has been issued by a Government Authority shall not be considered a contingent Loss.

Section 8.12    Right to Recover.

(a)    If any Indemnifying Person is liable to pay an amount in discharge of any claim under this Agreement and any Indemnified Person recovers or is entitled to recover (whether by payment, discount, credit, relief, insurance or otherwise) from a third party a sum which indemnifies or compensates the Indemnified Person (in whole or in part) in respect of the Loss which is the

-71-

subject matter of the claim, Parent or Purchaser, as applicable, shall procure that, before steps are taken to enforce a claim against any Indemnifying Person under this Agreement, all reasonable steps are taken to enforce recovery against the third party and any actual recovery (less any reasonable costs and expenses incurred in obtaining such recovery) shall reduce or satisfy, as the case may be, such claim to the extent of such recovery. Notwithstanding the foregoing, neither Party shall be required to act or forbear to act under this Section 8.12 if such act or forbearance, as applicable, could prejudice such Person's ability to prosecute a claim against an Indemnifying Person or any right hereunder in the reasonable judgment of Parent or Purchaser, as applicable.

(b)    If any Indemnifying Person has paid an amount in discharge of any claim under this Agreement and any Indemnified Person recovers or is entitled to recover (whether by payment, discount, credit, relief, insurance or otherwise) from a third party a sum which indemnifies or compensates any Indemnified Person (in whole or in part) in respect of the Loss which is the subject matter of the claim, Parent or Purchaser, as applicable, shall procure that all steps are taken as may reasonably be required to enforce such recovery and shall, or shall procure that the relevant Indemnified Person shall, pay to Parent or Purchaser, as applicable, as soon as practicable after receipt an amount equal to (i) any sum recovered from the third party less any reasonable costs and expenses incurred in obtaining such recovery or (ii) if less, the amount previously paid by the relevant Indemnifying Person to the relevant Indemnified Person. Double Claims

Section 8.13    Mitigation of Losses. Any Indemnified Person that becomes aware of Losses for which it seeks, or may seek, indemnification under this Article VIII shall use commercially reasonable efforts to mitigate such Losses, which in the absence of mitigation might give rise to or increase such Loss in respect of any claim under this Article VIII, including, to avoid doubt, re-filing any Tax Return for any period that is not closed by virtue of any statute of limitations to make claims for any amounts available in such period that arise from the Losses being mitigated (including as a result of the facts, matters, events or circumstances giving rise to such Losses) including claims for increased available capital cost allowance but only to the extent such amounts arose in a Pre-Closing Period and were not taken into account in calculating the Final Net Asset Value. In the event an Indemnified Person fails to so mitigate such an indemnifiable Loss, the Indemnifying Person shall have no liability for any portion of such Loss that is attributable to the Indemnified Person's failure to use such commercially reasonable efforts.

ARTICLE IX
TERMINATION

Section 9.1    Termination. This Agreement may be terminated prior to the Closing:

(f)    Consent. By the mutual written consent of Parent and Purchaser;

(g)    Delay. By either Parent or Purchaser if no Closing has occurred on or before the Outside Date as it may be extended; provided, however, that the right to terminate this Agreement under this Section 9.1(b) shall not be available to any Party whose failure to take any action required to fulfill any of such Party's obligations under this Agreement has caused or resulted in the failure of the Closing to occur prior to the Outside Date;

-72-

(h)    *Breach.*  By either Parent or Purchaser, upon written notice to the other, in the event of a material breach of any representation, warranty, covenant or agreement contained in this Agreement on the part of Purchaser (in the case of Parent) or Parent (in case of Purchaser), which breach would, individually or in the aggregate, result in, if occurring or continuing on the Closing Date, the failure of any condition to the terminating Party's obligations set forth in  Article VI  to be satisfied, and which cannot be or has not been cured within 45 days after the giving of written notice to the breaching Party of such breach (or by the Outside Date, if earlier); provided, however, that the right to terminate this Agreement under this  Section 9.1(c)  shall not be available to any Party if the would-be terminating Party is then in material breach of its representations, warranties, agreements and covenants hereunder; and

(i)    *Denial of Regulatory Approval.* By Parent or Purchaser on or after the 60th day following the issuance of a written denial of any Required Governmental Approval by action of the relevant Government Authority and all avenues of appeal, if any, have been exhausted; provided, however, that the right to terminate this Agreement under this  Section 9.1(d)  shall not be available to any Party if such Party is in material breach of its representations, warranties, agreements and covenants hereunder at the time it seeks to terminate this Agreement under this  Section 9.1(d).

Section 9.2    Notice of Termination. If Parent or Purchaser desires to terminate this Agreement pursuant to  Section 9.1, it shall give written notice of such termination to (in the case of termination by Parent) Purchaser and to (in the case of termination by Purchaser) Parent.

Section 9.3    Effect of Termination. Upon a termination of this Agreement in accordance with  Section 9.1, each Party's further rights and obligations hereunder, other than the Surviving Provisions, shall terminate, but termination shall not affect any rights or obligations of a party which may have accrued prior to such termination and shall not relieve any Party from liability for any willful and material breach prior to such termination.

Section 9.4    Additional Rights and Remedies. The Parties acknowledge and agree that nothing in this  Article IX  shall prejudice or limit any rights or remedies which may otherwise be available to Parent or Purchaser under this Agreement or pursuant to applicable Law, including the right to claim damages or seek specific performance.

<div align="center">

ARTICLE X
MISCELLANEOUS

</div>

Section 10.1    Notices.

(cc)    Any notice, request, claim, demand or other communication in connection with this Agreement (each, a " Notice") shall be:

(i)    in writing in English; and

(ii)    delivered by hand, fax, registered mail or by courier using an internationally recognized courier company, or transmitted by email.

<div align="center">

-73-

</div>

(dd)   A Notice to any Party shall be sent to such party at the following address, or such other Person or address as such Party may designate by delivery of notice in writing to the other Party.

(i)    If to Parent or any Seller, to:

Ally Financial Inc.
200 Renaissance Center
Mail Code 482-B09-B11
Detroit, MI 48265-2000
Attention: William B. Solomon, General Counsel
Facsimile: (313) 656-6124
Email: William.b.Solomon@ally.com

and

Sullivan & Cromwell LLP
135 Broad Street
New York, New York 10004
Attention: Jay Clayton
C. Andrew Gerlach
Facsimile: (212) 558-3588
Email: ClaytonWJ@sullcrom.com,
gerlacha@sullcrom.com

and

Torys LLP
79 Wellington Street West, Suite 3000
B70, TD Centre
Toronto, Ontario M5K 1N2
Attention: Jim S. Hong
Facsimile: (416) 865-7380
Email: jhong@Torys.com

(ii)   If to Purchaser, to:

Royal Bank of Canada
200 Bay St. 8th Floor, South
Toronto, Ontario M5J 2J5
Attention: General Counsel
Facsimile: (416) 974-9241

-74-

With a copy to (which shall not constitute a Notice):

> Osler, Hoskin & Harcourt LLP
> Box 50, 1 First Canadian Place
> Toronto, Ontario M5X 1B8
> Attention: Douglas Marshall
> Facsimile: (416) 862-6666
> Email: dmarshall@osler.com

(ee)   A Notice shall be effective upon receipt and shall be deemed to have been received:

(i)   at the time of delivery, if delivered by hand, registered post or courier; or

(ii)   upon confirmation by telephone or electronic correspondence of receipt thereof, if sent by fax or email, excluding, however, any answer or confirmation automatically generated by electronic means (such as out-of-office replies).

Section 10.2   Assignment. Except as otherwise expressly provided in this Agreement, no Party may without the prior written consent of the other Party, assign, grant any security interest over, hold on trust or otherwise transfer the benefit of the whole or any part of this Agreement; provided that (a) Parent may, following notice in writing to Purchaser no later than three Business Days prior to the effective date of the assignment, assign any or all of its rights, benefits and obligations under this Agreement to one or more of its direct or indirect, wholly-owned Subsidiaries (other than any Target Company) or Affiliates; provided, further, that any such assignment shall not (i) result in any delay in the consummation of the transactions contemplated hereby or (ii) relieve Parent of its obligations hereunder; and (b) Purchaser may, following notice in writing to Parent no later than three Business Days prior to the effective date of the assignment, assign, pledge or otherwise transfer any or all of its rights, benefits and obligations under this Agreement to one or more of its direct or indirect, wholly-owned Subsidiaries or Affiliates that are resident in Canada for purposes of the Tax Act; provided that any such assignment shall not (i) result in any delay in the consummation of the transactions contemplated hereby or (ii) relieve Purchaser of its obligations hereunder.  Any attempted assignment in violation of this  Section 10.2  shall be null and void. This Agreement shall be binding upon, shall inure to the benefit of, and shall be enforceable by, the Parties and their successors and permitted assigns.

Section 10.3   No Third-Party Beneficiaries. Except as provided in Article VIII or otherwise expressly provided herein, this Agreement is for the sole benefit of the Parties and their permitted assigns, and nothing herein expressed or implied shall give or be construed to give to any Person, other than the Parties and such assigns, any legal or equitable rights hereunder.

Section 10.4   Whole Agreement; Conflict with Other Transaction Documents .

(j)   This Agreement, the other Transaction Documents and the Confidentiality Agreement contain the whole agreement between the Parties relating to the subject matter of this

-75-

Agreement to the exclusion of any terms implied by Law which may be excluded by contract and supersede any previous written or oral agreement between the Parties in relation to the matters dealt with herein and therein.

(k)   Purchaser acknowledges that it has not been induced to enter into this Agreement by any representation, warranty assurance, commitment, statement or undertaking not expressly incorporated into it and agrees that it will not contend to the contrary.

(l)   So far as is permitted by Law, Purchaser agrees and acknowledges that its only right and remedy in relation to any provision of this Agreement shall be for breach of the terms of this Agreement to the exclusion of all other rights and remedies (including those in tort or arising under statute), including any right to rescind this Agreement.

(m)   If there is any inconsistency between the terms of this Agreement and any other Transaction Document, this Agreement shall prevail (as between the Parties and as between any of Parent's Affiliates and any of Purchaser's Affiliates) to the extent of the inconsistency, unless otherwise expressly agreed.

Section 10.5   Costs. Except as otherwise provided herein, each Party shall bear all costs incurred by it in connection with the preparation, negotiation and execution of this Agreement, the other Transaction Documents and the transactions contemplated hereby and thereby. Purchaser shall bear the costs incurred for local notaries for the preparation of the deeds and other documents necessary to effect the Closing.

Section 10.6   Governing Law; Consent to Jurisdiction; Specific Performance .

(j)   **THIS AGREEMENT AND ANY NON-CONTRACTUAL OBLIGATIONS ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK (WITHOUT REGARD TO ANY PRINCIPLES OF CONFLICTS OF LAW OR CHOICE OF LAW THAT WOULD HAVE THE EFFECT OF GIVING EFFECT TO THE LAWS OF ANOTHER JURISDICTION).**

(k)   Each Party hereby irrevocably and unconditionally consents to submit to the exclusive jurisdiction and venue of the United States District Court for the Southern District of New York and in the courts hearing appeals therefrom unless no basis for federal jurisdiction exists, in which event each Party irrevocably consents to the exclusive jurisdiction and venue of the Supreme Court of the State of New York, New York County, and the courts hearing appeals therefrom, for any Action arising out of or relating to this Agreement and the transactions contemplated hereby. Each Party hereby irrevocably and unconditionally waives, and agrees not to assert, by way of motion, as a defense, counterclaim or otherwise, in any such Action, any claim that it is not personally subject to the jurisdiction of the aforesaid courts for any reason, other than the failure to serve process in accordance with this  Section 10.6, that it or its property is exempt or immune from jurisdiction of any such court or from any legal process commenced in such courts (whether through service of notice, attachment prior to judgment, attachment in aid of execution of judgment,

-76-

execution of judgment or otherwise), and to the fullest extent permitted by applicable Law, that the Action in any such court is brought in an inconvenient forum, that the venue of such Action is improper, or that this Agreement, or the subject matter hereof, may not be enforced in or by such courts and further irrevocably waives, to the fullest extent permitted by applicable Law, the benefit of any defense that would hinder, fetter or delay the levy, execution or collection of any amount to which the party is entitled pursuant to the final judgment of any court having jurisdiction. **EACH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY AND ALL RIGHTS TO TRIAL BY JURY IN CONNECTION WITH ANY ACTION ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.**

(l)    Purchaser hereby irrevocably designates Chief Counsel, US Regulatory and Corp., located at Royal Bank of Canada, 3 World Financial Centre, 200 Vesey St – 14th Floor, New York, NY 10281-8098, United States (in such capacity, the "Process Agent") its designee, appointee and agent to receive, for and on its behalf, service of process in such jurisdiction in any Action arising out of or relating to this Agreement and such service shall be deemed complete upon delivery thereof to the Process Agent; provided that in the case of any such service upon the Process Agent, the Party effecting such service shall also deliver a copy thereof to Purchaser in the manner provided in Section 10.1. Each Party further irrevocably consents to the service of process out of any of the aforementioned courts in any such Action by the mailing of copies thereof by registered mail, postage prepaid, to such party at its address specified pursuant to Section 10.1, such service of process to be effective upon acknowledgment of receipt of such registered mail.

(m)    Each Party expressly acknowledges that the foregoing waivers are intended to be irrevocable under the laws of the State of New York and of the United States of America; provided that consent by Purchaser to jurisdiction and service contained in this Section 10.6 is solely for the purpose referred to in this Section 10.6 and shall not be deemed to be a general submission to said courts or in the State of New York other than for such purpose.

(n)    Each Party acknowledges that, other than as provided in Section 8.8, it would be impossible to determine the amount of damages that would result from any breach of any of the provisions of this Agreement and that, in view of the uniqueness of the subject matter of this Agreement, the remedy at law for any breach, or threatened breach, of any of such provisions would be inadequate and, accordingly, agrees that, other than as provided in Section 8.8, the other Party, in addition to any other rights or remedies which it may have, shall be entitled to specific performance of this Agreement and any of the terms of this Agreement (including the respective obligations of Purchaser and Parent under Section 5.1, Section 5.6 and Section 5.14) and such other equitable and injunctive relief available to the Parties from any arbitral tribunal of competent jurisdiction to compel specific performance of, or restrain any Party from violating, any of such provisions. In connection with any action or proceeding for equitable and injunctive relief permitted hereunder, other than as provided in Section 8.8, each Party hereby waives any claim or defense that a remedy at law alone is adequate and, to the maximum extent permitted by Law, agrees to have each provision of this Agreement (including the respective obligations of Purchaser and Parent under Section 5.1, Section 5.6 and Section 5.14) specifically enforced against it, without the necessity of posting bond or other

-77-

security against it, and consents to the entry of equitable and injunctive relief against it enjoining or restraining any breach or threatened breach of any provision of this Agreement.

Section 10.7    Counterparts. This Agreement may be executed in any number of counterparts, each of which shall be deemed to constitute an original and all of which shall together constitute one and the same instrument.  This Agreement shall become binding when any number of counterparts, individually or taken together, shall bear the signatures of both Parties.  This Agreement may be executed and delivered by facsimile or any other electronic means, including ".pdf" or ".tiff" files, and any facsimile or electronic signature shall constitute an original for all purposes.

Section 10.8    Severability. The provisions of this Agreement shall be deemed severable and the invalidity or unenforceability of any provision shall not affect the validity or enforceability of the other provisions hereof.  If any provision of this Agreement, or the application thereof to any Person or any circumstance, is invalid or unenforceable, (a) a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision and (b) the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected by such invalidity or unenforceability, nor shall such invalidity or unenforceability affect the validity or enforceability of such provision, or the application thereof, in any other jurisdiction.

Section 10.9    Amendments; Waiver. Any provision of this Agreement may be amended if, and only if, such amendment is in writing and signed by and on behalf of Parent and Purchaser.  Any provision of this Agreement may be waived if such waiver is in writing and signed by and on behalf of the Party against whom such waiver is to be enforced.  No waiver of any breach of this Agreement will be implied from any forbearance or failure of a Party to take action thereon.

Section 10.10    Payments. Except to the extent otherwise expressly provided in this Agreement, all payments to be made under this Agreement shall be made in full, without any set-off or deduction for or on account of any counterclaim.  Any payment to be made under this Agreement shall be effected by crediting for same day value the account specified by the Party entitled to the payment on or before the due date for payment.

*[Signature Page Follows]*

-78-

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first written above.

ALLY FINANCIAL INC.


By:  /s/ Michael A. Carpenter
     Name:  Michael A. Carpenter
     Title:   Chief Executive Officer


ROYAL BANK OF CANADA


By:  /s/ Shauneen Bruder
     Name:  Shauneen Bruder
     Title:   EVP, Operations


By:  /s/ Michael Dobbins
     Name:  Michael Dobbins
     Title:   EVP, Personal Financing Products Canada and US Banking


[Signature Page - Purchase and Sale Agreement]

CONFIDENTIAL

AMENDED AND RESTATED PURCHASE AND SALE AGREEMENT

by and among

ALLY FINANCIAL INC.,
as Parent

GENERAL MOTORS FINANCIAL COMPANY, INC.

as Purchaser

and, solely for purposes of Section 5.3, Section 5.6, Section 5.14(b) and Article X,

GENERAL MOTORS COMPANY,

as Purchaser Topco

Dated as of November 21, 2012

Amendment and Restatement Dated as of February 22, 2013

SC1:3347968.1D

-2-

SC1:3347968.1D

# TABLE OF CONTENTS

| | | | |
|---|---|---|---|
| Article I | DEFINITIONS AND TERMS | | 1 |
| | Section 1.1 | Certain Details | 1 |
| | Section 1.2 | Interpretation | 18 |
| Article II | SALE AND PURCHASE OF THE TARGET EQUITY INTERESTS | | 20 |
| | Section 2.1 | Sale and Purchase of the Target Equity Interests | 20 |
| | Section 2.2 | Purchase Price | 20 |
| | Section 2.3 | Purchase Price Adjustment | 20 |
| | Section 2.4 | Holdbacks | 22 |
| | Section 2.5 | Closing | 22 |
| | Section 2.6 | Closing Deliverables | 23 |
| | Section 2.7 | Purchase Price Allocation | 24 |
| | Section 2.8 | Withholding | 24 |
| | Section 2.9 | Deferred Closings | 25 |
| Article III | REPRESENTATIONS AND WARRANTIES OF PARENT | | 27 |
| | Section 3.1 | Organization, Authorization, Enforceability, Non-Contravention | 27 |
| | Section 3.2 | Equity Interests of the Target Companies | 28 |
| | Section 3.3 | Target Company Financial Information | 29 |
| | Section 3.4 | No Undisclosed Liabilities | 30 |
| | Section 3.5 | Absence of Changes | 30 |
| | Section 3.6 | No Litigation | 30 |
| | Section 3.7 | Approvals | 30 |
| | Section 3.8 | Taxes | 31 |
| | Section 3.9 | Employee Benefit Plans | 34 |
| | Section 3.10 | Labor Matters | 36 |
| | Section 3.11 | No Violation of Law; Required Licenses and Permits | 37 |
| | Section 3.12 | Real Property | 38 |
| | Section 3.13 | Environmental Matters | 38 |
| | Section 3.14 | Intellectual Property | 39 |
| | Section 3.15 | Contracts | 40 |
| | Section 3.16 | Title to Assets | 43 |
| | Section 3.17 | Insurance | 43 |
| | Section 3.18 | Transactions with Affiliates | 43 |
| | Section 3.19 | Securitizations | 43 |
| | Section 3.20 | Intercompany Loans | 45 |
| | Section 3.21 | Finder's Fees | 45 |
| | Section 3.22 | Foreign Asset Control | 45 |
| | Section 3.23 | Anti-Money Laundering | 45 |
| | Section 3.24 | Anti-Corruption; No Unlawful Payments; Prohibited Practices | 45 |
| | Section 3.25 | Export Controls | 46 |
| | Section 3.26 | Consumer Financial Protection | 47 |
| | Section 3.27 | Financing Contracts | 47 |
| | Section 3.28 | No Amendments to Transferred Derivatives or Corresponding Derivatives | 48 |
| | Section 3.29 | No Other Representation or Warranties | 48 |

# TABLE OF CONTENTS

| Article IV | REPRESENTATIONS AND WARRANTIES OF PURCHASER | 49 |
|---|---|---|
| Section 4.1 | Organization, Authorization, Enforceability, Non-Contravention | 49 |
| Section 4.2 | Financing | 50 |
| Section 4.3 | Approvals | 50 |
| Section 4.4 | Finder's Fees | 51 |
| Section 4.5 | No Litigation | 51 |
| Section 4.6 | Securities Law Compliance | 51 |
| Section 4.7 | Due Diligence by Purchaser | 51 |
| Section 4.8 | Solvency | 52 |
| Section 4.9 | No Other Representations or Warranties | 52 |
| Article V | COVENANTS | 52 |
| Section 5.1 | Conduct of the Target Business | 52 |
| Section 5.2 | Sale of the Target Equity Interests | 57 |
| Section 5.3 | Cooperation | 57 |
| Section 5.4 | Pre-Closing Restructuring | 59 |
| Section 5.5 | Access and Information | 59 |
| Section 5.6 | Confidentiality | 61 |
| Section 5.7 | Announcements | 62 |
| Section 5.8 | Insurance | 63 |
| Section 5.9 | Interest in Intellectual Property | 64 |
| Section 5.10 | Cooperation Regarding Transition Arrangements | 66 |
| Section 5.11 | Employee Matters | 66 |
| Section 5.12 | Termination of Certain Affiliate Arrangements; Replacement of Guarantees and Transferred Derivatives; Certain Releases | 71 |
| Section 5.13 | Notices and Consents | 72 |
| Section 5.14 | Financing | 73 |
| Section 5.15 | Non-Compete; Non-Solicit | 74 |
| Section 5.16 | Other Transaction Documents | 78 |
| Section 5.17 | Intercompany Loans | 78 |
| Section 5.18 | Further Assurances | 79 |
| Section 5.19 | Delivery of Audited Financial Statements | 79 |
| Section 5.20 | VAT Provisions | 80 |
| Section 5.21 | No Shop | 81 |
| Section 5.22 | Powers of Attorney | 82 |
| Section 5.23 | Derivative Treatment | 82 |
| Article VI | CONDITIONS TO CLOSING | 52 |
| Section 6.1 | Conditions to Each Party's Obligations | 83 |
| Section 6.2 | Conditions to Obligations of Purchaser | 83 |
| Section 6.3 | Conditions to Obligations of Parent | 84 |
| Article VII | TAX MATTERS | 85 |
| Section 7.1 | Seller Returns and Reports | 85 |
| Section 7.2 | Purchaser Returns and Reports | 85 |
| Section 7.3 | Amendments | 85 |
| Section 7.4 | Contest Provisions | 86 |

SC1:3347968.1D

TABLE OF CONTENTS

| Section 7.5 | Transfer Taxes | 87 |
| Section 7.6 | Cooperation; Access to Records | 88 |
| Section 7.7 | No Tax Elections | 88 |
| Section 7.8 | No Dividends | 88 |
| Section 7.9 | Tax Sharing | 88 |
| Section 7.10 | IRS Forms 5471 | 88 |
| Section 7.11 | Staddle Period Tax Allocation | 89 |
| Section 7.12 | Disputes | 89 |
| Section 7.13 | Refunds | 89 |
| Section 7.14 | Exclusivity | 90 |
| Article VIII | SURVIVAL; INDEMNIFICATION; CERTAIN REMEDIES | 90 |
| Section 8.1 | Survival | 90 |
| Section 8.2 | Indemnification by Parent | 91 |
| Section 8.3 | Indemnification by Purchaser | 93 |
| Section 8.4 | Claims Procedure | 95 |
| Section 8.5 | Payment | 96 |
| Section 8.6 | Treatment of Indemnification Payments | 97 |
| Section 8.7 | Provisions | 97 |
| Section 8.8 | Exclusive Remedies | 97 |
| Section 8.9 | Damages | 97 |
| Section 8.10 | Net Financial Benefit | 98 |
| Section 8.11 | Contingent Liabilities | 98 |
| Section 8.12 | Right to Recovery | 98 |
| Section 8.13 | Double Claims | 99 |
| Section 8.14 | Mitigation of Losses | 99 |
| Article IX | TERMINATION | 99 |
| Section 9.1 | Termination | 99 |
| Section 9.2 | Notice of Termination | 100 |
| Section 9.3 | Effect of Termination | 100 |
| Section 9.4 | Additional Rights and Remedies | 101 |
| Article X | MISCELLANEOUS | 101 |
| Section 10.1 | Notices | 101 |
| Section 10.2 | Assignment | 102 |
| Section 10.3 | No Third-Party Beneficiaries | 103 |
| Section 10.4 | Whole Agreement; Conflict with Other Transaction Documents | 103 |
| Section 10.5 | Costs | 103 |
| Section 10.6 | Governing Law; Consent to Jurisdiction; Specific Performance | 103 |
| Section 10.7 | Counterparts | 105 |
| Section 10.8 | Severability | 105 |
| Section 10.9 | Amendments; Waiver | 105 |
| Section 10.10 | Payments; Currency Conversion | 105 |

-iii-

SC1:3347968.1D

**Schedules and Exhibits**

Schedule A                      Target Companies
Schedule B                      Jurisdiction-Specific Closing Deliverables
Schedule C                      Agreed Accounting Principles
Schedule D                      Reference Closing Statement
Schedule 1.1(a)                 Agreed Derivative Valuation Principles
Schedule 1.1(b)                 Brazilian Target Companies
Schedule 1.1(c)                 Dutch Target Companies
Schedule 1.1(d)                 European Target Companies
Schedule 1.1(e)                 French Target Company
Schedule 1.1(f)                 German Target Companies
Schedule 1.1(g)                 MCC Target Companies
Schedule 1.1(h)                 Restricted Region
Schedule 1.1(i)                 UK Target Companies
Schedule 2.8                    Fiscal Residence of Purchasing Entity
Schedule 3.8(q)                 Net Deferred Tax Asset
Schedule 3.8(u)                 U.K. Tax Representations
Schedule 3.8(v)                 French Tax Representations
Schedule 3.8(w)                 German Tax Representations
Schedule 3.8(x)                 Dutch Tax Representations
Schedule 5.17                   European Intercompany Loans
Schedule 6.2(d)                 Brazilian Withholding Tax Calculations

Exhibit 1                        Form of Transition Services Agreement
Exhibit 2                       Form of Transitional Trademark License Agreement (Mexico)
Exhibit 3                       Form of Transitional Trademark License Agreement (Other than Mexico)
Exhibit 4                       Trademark License Agreement Amendment
Exhibit 5                       Global Services Agreement

**Disclosure Letters**

Parent's Disclosure Letter
Purchaser's Disclosure Letter

SC1:3347968.1D

106

**AMENDED AND RESTATED PURCHASE AND SALE AGREEMENT**, dated as of November 21, 2012, and amended and restated as of February [•], 2013 (as amended and restated, the "Agreement"), by and among Ally Financial Inc., a corporation organized under the laws of the state of Delaware ("Parent"), and General Motors Financial Company, Inc., a corporation organized under the laws of the state of Texas ("Purchaser") and, solely with respect to Section 5.3, Section 5.6, Section 5.14(b) and Article X, General Motors Company, a corporation organized under the laws of the state of Delaware ("Purchaser Topco").

<div align="center">RECITALS</div>

WHEREAS, Parent, directly or indirectly through the other Sellers (as defined below), owns all of the Target Equity Interests (as defined below) issued by the Brazilian Target Companies (as defined below), the European Target Companies (as defined below), and the MCC Target Companies (as defined below), (each of the foregoing groups of Target Companies, a "Target Business Segment"); and

WHEREAS, on the terms and conditions set forth herein, the Sellers desire to sell to Purchaser (or to one or more assignees of Purchaser pursuant to an assignment made in accordance with Section 10.2), and Purchaser desires to purchase from (or to cause one or more assignees of Purchaser pursuant to an assignment made in accordance with Section 10.2 to purchase from) each Seller, either directly or through one or more Subsidiaries, all of each Seller's rights in the Target Equity Interests.

NOW, THEREFORE, in consideration of the premises and the mutual representations, warranties, covenants and undertakings contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto, intending to be legally bound, agree as follows:

SC1:3347968.1D

Article I
DEFINITIONS AND TERMS

Section 1.1    Certain Definitions. As used in this Agreement, the following terms have the meanings set forth below:

"2006 Agreement" means the Purchase and Sale Agreement by and among General Motors Corporation, General Motors Acceptance Corporation, GM Finance Co. Holdings Inc. and FIM Holdings LLC, dated as of April 2, 2006, and all agreements, undertakings or other written instruments entered into in connection therewith or with respect thereto, including the letter agreement, dated as of March 13, 2007, by and among GMAC LLC, GM Finance Co. Holdings Inc. and FIM Holdings LLC and the November 5, 2008 e-mail from Purchaser's Executive Director – Tax Counsel to Parent's Director of Tax Operations and Analysis regarding the income tax effects of non-income tax refunds.

"Accounting Expert" has the meaning set forth in Section 2.3(a).

"Action" means any civil, criminal or administrative action, suit, demand, claim (including any counterclaim), case, litigation, mediation, arbitration, opposition, objection, cancellation, inquiry, hearing, dispute, investigation or other proceeding.

"Adjustment Amount" means an amount (which may be negative) equal to (i) the Final Net Asset Value *minus* (ii) the Estimated Net Asset Value.

"Affiliate" means, with respect to any specified Person, any other Person directly or indirectly Controlling, Controlled by or under common Control with such specified Person; provided, that (i) neither the U.S. Department of the Treasury nor any Person under common Control with Parent (other than Parent's Controlled Affiliates) as a result of the ownership of Equity Interests in Parent by the U.S. Department of the Treasury shall constitute an Affiliate of Parent, and (ii) neither of the U.S. Department of the Treasury nor any Person under common Control with Purchaser Topco or Purchaser (other than Purchaser Topco's Controlled Affiliates) as a result of the ownership of Equity Interests in Purchaser Topco by the U.S. Department of the Treasury shall constitute an Affiliate of Purchaser Topco or Purchaser, respectively.

"Agreed Accounting Principles" means the principles set forth on Schedule C.

"Agreed Derivative Valuation Principles" means the principles set forth on Schedule 1.1(a).

"Agreement" has the meaning set forth in the Preamble.

"AIM" means Ally Investment Management LLC.

"AIM Derivative" means (i) any Derivative Transaction set forth on Section 1.1(g) of Parent's Disclosure Letter and (ii) any Derivative Transaction primarily related to a Target Company entered into on or after the date hereof, to which AIM is a party, except for BG Derivatives, Corresponding Derivatives and foreign exchange swaps.

2

"Allocation Schedule" has the meaning set forth in Section 2.7.

"BG Derivative" means (i) any Derivative Transaction set forth on Section 1.1(h) of Parent's Disclosure Letter and (ii) any balance guarantee Derivative Transaction primarily related to a Target Company entered into on or after the date hereof, to which AIM is a party, except for Corresponding Derivatives and foreign exchange swaps.

"Brazilian Target Companies" means the Target Companies set forth on Schedule 1.1(b).

"Brazilian Withholding Taxes Calculation" has the meaning set forth in Section 6.2(d).

"Business Combination" has the meaning set forth in Section 5.15(b)(vii).

"Business Day" means any day other than a Saturday, Sunday or a day on which banks located in New York, New York, Detroit, Michigan or Fort Worth, Texas or, to the extent relating to the transfer of Target Equity Interests in any of the jurisdictions listed on Schedule B, such jurisdiction, are authorized or required by Law to be closed.

"Business Employees" means the individuals set forth in Section 5.11(b) of Parent's Disclosure Letter, it being understood that such list may be updated from time to time to add or subtract individuals, subject, in each case, to the mutual agreement of Purchaser and Parent.

"Cap" has the meaning set forth in Section 8.2(b).

"Claim Notice" has the meaning set forth in Section 8.4(a).

"Class Action Deductible" has the meaning set forth in Section 8.2(b).

"Closing" has the meaning set forth in Section 2.5.

"Closing Company Material Adverse Effect" shall have the same meaning as Company Material Adverse Effect, except that (i) each reference to "Target Companies" set forth in such definition shall be replaced with a reference to "Subject Companies," and (ii) in clause (ii) thereof, the phrase "to perform their obligations under any of the Transaction Documents or to consummate the transactions contemplated thereby in a timely manner" shall be replaced with "to perform their obligations under any of the Transaction Documents or to consummate the transactions contemplated thereby in a timely manner, in each case to the extent they relate, or are contemplated to be consummated, at the applicable Closing".

"Closing Date" means, with respect to any Closing, the date on which such Closing occurs.

"Closing Payment" means, as of any Closing, the sum of the following in respect of each Target Business Segment to be purchased and sold at such Closing: (a) the Estimated Net Asset Value of such Target Business Segment, and (b) the Premium applicable to such Target Business Segment; provided, however, that at the Closing in respect of the European Target Companies, the Closing Payment shall be reduced by an amount, if any, equal to the Holdback Amount in respect

3

of each other Target Business Segment if the Closing for such other Target Business Segment has not occurred concurrently with or prior to such Closing.

"Closing Purchaser Material Adverse Effect" shall have the same meaning as Purchaser Material Adverse Effect, except that the phrase "to perform its obligations under any of the Transaction Documents or to consummate the transactions contemplated thereby in a timely manner" shall be replaced with "to perform its obligations under any of the Transaction Documents or to consummate such Closing contemplated thereby in a timely manner, in each case to the extent they relate, or are contemplated to be consummated, at the applicable Closing".

"Code" means the Internal Revenue Code of 1986.

"Company In-Process Marks" means the trademarks listed in Section 1.1(a) of Parent's Disclosure Letter which will be assigned to one of the Target Companies on the applicable Closing Date.

"Company Material Adverse Effect" means any change, effect, event or occurrence that, either individually or in the aggregate with any other change, effect, event or occurrence, (i) has or is reasonably likely to have a material and adverse effect on the business, operations, assets, liabilities, condition (financial or otherwise) or the results of operations of the Target Companies, taken as a whole, or (ii) would be reasonably likely to prevent or materially impair the ability of Parent or any of its Affiliates to perform their respective obligations under the Transaction Documents or to consummate the transactions contemplated thereby in a timely manner; provided that, in the case of clause (i) only, none of the following (or the results thereof), either alone or in combination with any other changes, effects, events or occurrences, shall constitute or contribute to a Company Material Adverse Effect: (a) any change in applicable accounting principles or any adoption, proposal, implementation or change in Law (including any Law in respect of Taxes) or any interpretation thereof by any Government Authority; (b) any change in global, national or regional political conditions (including protests, strikes, riots, acts of terrorism or war) or in general global, national or regional economic, business, regulatory, political or market conditions or in national or global financial or capital markets (including any such conditions or markets in the United States or any of the countries in which any Target Company is incorporated or organized); (c) any change generally affecting the industries or market sectors in the geographic regions in which one or more of the Target Companies operate; (d) any change resulting from or arising out of hurricanes, earthquakes, floods, or other natural disasters; (e) the negotiation, execution, announcement or performance of the Transaction Documents or consummation of the transactions contemplated thereby; (f) the failure of one or more of the Target Companies to meet any internal or public projections, forecasts or estimates of performance, revenues or earnings (it being understood that the facts and circumstances contributing to such failure may constitute or contribute to a Company Material Adverse Effect); (g) any actions (or the effects of any action) taken (or omitted to be taken) upon the written request or instruction of, or with the written consent of, Purchaser, consistent with the terms hereof, to consummate the transactions contemplated hereby; (h) any action (or the effects of any action) taken (or omitted to be taken) by the Target Companies as required pursuant to this Agreement or (i) any change, effect, event or circumstance primarily caused by, occurring at, affecting or relating to Purchaser Topco, Purchaser or any of their Affiliates

4

(including any bankruptcy, work stoppage or other adverse change at Purchaser Topco, Purchaser or any of their Affiliates); except in the cases of clauses (a), (b) and (c) to the extent such change (or any results thereof) has a disproportionate effect on the Target Companies, taken as a whole, compared with other Persons operating in the industries and jurisdictions in which the Target Companies operate.

"Company Trademarks" means those trademarks listed on Section 1.1(b) of Parent's Disclosure Letter.

"Competing Person" has the meaning set forth in Section 5.15(b)(v).

"Confidential Information" means, with respect to either Party or any of its respective Affiliates, any information disclosed to such Party by the other Party or any of the other Party's respective Affiliates that relates to (i) the provisions of this Agreement or any agreement entered into pursuant to this Agreement, (ii) the negotiations relating to this Agreement (or any such other agreement), (iii) any information relating to the business, financial or other affairs (including future plans, financial targets, trade secrets and know-how) of such other Party or such other Party's Affiliates, or (iv) any information of the other Party or such other Party's Affiliates provided in a manner which reasonably indicates the confidential or proprietary nature of such information.  With respect to Purchaser and its Affiliates, Confidential Information includes all Evaluation Material (as such term is defined in the Confidentiality Agreement).

"Confidentiality Agreement" means the letter agreement, dated as of April 10, 2012, as amended, between Parent and Purchaser Topco.

"Constituent Documents" means, with respect to any corporation, its charter or articles of incorporation or association and by-laws; with respect to any partnership, its certificate of partnership and partnership agreement; with respect to any limited liability company, its certificate of formation and limited liability company or operating agreement; with respect to each other Person, its comparable constitutional instruments or documents (and, in each case, such similar instruments or documents as applicable under a relevant jurisdiction).

"Consumer Financial Protection Law" means (i) all Laws concerning the protection of consumers in credit, credit sale and leasing transactions, including Laws addressing usury, credit terms, disclosure, collection and repossession practices, and limitations on creditor's rights; and (ii) Data Protection Laws.

"Continuing Employees" has the meaning set forth in Section 5.11(c).

"Contract" means any written contract, agreement, undertaking, indenture, lease or other written instrument of any kind to which any Target Company, any Securitization Originator, any Securitization Depositor or any Securitization Issuing Entity is a party or by which it or any of its assets or properties is bound but shall exclude any Target Company Benefit Plan.

"Control" means, with respect to any specified Person, the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities,

5

by contract or otherwise.  The terms "Controlling" and "Controlled" have meanings correlative to the foregoing.

"Corresponding Derivative" means (i) any Derivative Transaction set forth under "Swap Transactions Between Ally Investment Management LLC and a Target Company" in Section 3.18 of Parent's Disclosure Letter and (ii) any Derivative Transaction entered into on or after the date hereof between Ally Investment Management LLC, on the one hand, and a Target Company, on the other hand.

"Credit Enhancement" means any security deposit or unapplied advance payment, investment certificate, certificate of deposit, authorization to hold funds, hypothecation of account or like instrument, letter of credit, agreement of indemnity guarantee, recourse agreement, security agreement or property, in each case pledged, assigned, mortgaged, made, delivered or transferred as security for the performance of any obligation under or with respect to any Financing Contract.

"Criminal Liability" means any liability, fine, censure or other sanction resulting from the violation of any criminal Law, other than immaterial violations that have not and could not result in (a) any financial liability that is material to any Target Business Segment taken as a whole, or (b) incarceration of any director or employee of any Target Company.

"Data Protection Laws" means all Laws covering the protection of Personal Data in any Target Jurisdiction, including if and to the extent applicable the Data Protection Directive 95/46/EC.

"De Minimis Target Companies" means (i) with respect to the European Target Companies, one or more European Target Companies, that both (a) are not organized in the United Kingdom or Germany and (b) the asset value of which does not exceed 20% of the aggregate asset value of all of the European Target Companies, in each case, as at September 30, 2012, and (ii) with respect to the MCC Target Companies, either (a) GMAC Automotriz Limitada and/or Comerical Automotriz Chile S.A., or (b) GMAC Financiera de Colombia S.A. Compañía de Financiamiento, GMAC Servicios S.A.S., a Colombia *sociedad de acciones simplificada* and/or GMAC Colombia S.A. LLC, a Delaware limited liability company; provided that any group of MCC Target Companies that includes one or more MCC Target Companies identified in each of (a) and (b) shall not constitute "De Minimis Target Companies".

"Deductible" has the meaning set forth in Section 8.2(b).

"Deferred Closing" has the meaning set forth in Section 2.9(a).

"Deferred Closing Date" has the meaning set forth in Section 2.9(a).

"Deferred Premium" means, in the event one or more MCC Target Companies is a Deferred Target Company, the amount equal to the Premium applicable to the MCC Target Companies multiplied by the pro rata portion of the estimated book value that the Deferred Target Company and its Sibling Companies (if any) represent relative to the estimated book value of the MCC Target Companies as a whole, estimated as of the applicable Closing.

6

"Deferred Target Company" has the meaning set forth in Section 2.9(a).

"Derivative Transaction" means any swap transaction, option, warrant, forward purchase or sale transaction, futures transaction, cap transaction, floor transaction or collar transaction relating to one or more currencies, commodities, bonds, equity securities, loans, interest rates, catastrophe events, weather-related events, credit-related events or conditions or any indices, or any other similar transaction (including any option with respect to any of these transactions) or combination of any of these transactions, including collateralized mortgage obligations or other similar instruments or any debt or equity instruments evidencing or embedding any such types of transactions, and any related credit support, collateral or other similar arrangements related to such transactions.

"Disclosing Party" has the meaning set forth in Section 5.6(b).

"Disclosure Letter" means, with respect to either Party, a letter delivered by such Party to the other Party contemporaneously with the execution and delivery of this Agreement setting forth, among other things, items the disclosure of which is necessary or appropriate either in response to an express disclosure requirement contained in a provision hereof or as an exception to one or more representations, warranties or covenants of such Party contained in this Agreement; provided that the mere inclusion of an item in a Disclosure Letter as an exception to a representation, warranty or covenant shall not be deemed an admission by the disclosing Party that such item (or any non-disclosed item or information of comparable or greater significance) represents a material exception, fact, event or circumstance or that such item has had or is reasonably likely or expected to result in a Company Material Adverse Effect or a Purchaser Material Adverse Effect, as applicable; provided, further, that a disclosure in any section of such Party's Disclosure Letter shall be deemed to be a disclosure for all other sections of such Party's Disclosure Letter in respect of which it is reasonably apparent on the face of such disclosure that such disclosure is applicable, whether or not repeated or cross-referenced in such other section; provided that although Parent's Disclosure Letter has been divided into two segments labeled "Europe" and "Latin America", each section and subsection in each segment shall be read in concert so that each disclosure under an applicable section or subsection in either segment of Parent's Disclosure Letter shall be considered to be disclosed in a single unified section or subsection of Parent's Disclosure Letter, and the fact that an item has been disclosed in one segment shall not be construed to mean that such disclosure is limited to such segment.

"Dutch Target Companies" means the Target Companies listed on Schedule 1.1(c).

"Effective Hire Date" has the meaning set forth in Section 5.11(a).

"Employee Representative Body" has the meaning set forth in Section 3.10(g).

"Encumbrance" means any mortgage, deed of trust, easement, pledge, hypothecation, assignment, security interest, restriction, option, equity interest, preference, participation interest, claim, lien, or encumbrance; provided, however, that no Encumbrance shall be deemed to be created by this Agreement or any other Transaction Document.

7

"<u>Environmental Law</u>" means all Laws concerning the protection of the environment or  natural resources, or the use, handling, release, disposal of, or exposure to any pollutants, contaminants or toxic or hazardous materials, substance or wastes.

"<u>Equity Interest</u>" means, with respect to any Person, any share of capital stock of, or any general, limited or other partnership interest, membership interest or similar ownership interest in, such Person.

"<u>Estimated Closing Statement</u>" means, for any Closing, a statement setting forth the unaudited combined balance sheet of the Subject Companies as of the close of business on the last day of the month ended two months immediately prior to the month in which such Closing occurs, prepared in accordance with the Agreed Accounting Principles and using the same methodology used to prepare the Reference Closing Statement, including Parent's good faith calculation of the Estimated Net Asset Value.

"<u>Estimated Net Asset Value</u>" means, for any Closing, a calculation of the Net Asset Value of each Target Business Segment (excluding any Deferred Target Companies) as of the close of business on the last day of the month ended two months immediately prior to the month in which such Closing occurs, as set forth on the Estimated Closing Statement.

"<u>European Intercompany Loan</u>" has the meaning set forth in <u>Section 5.17(a)(iii)</u>.

"<u>European Target Companies</u>" means the Target Companies listed on <u>Schedule 1.1(d)</u>.

"<u>Exchange Act</u>" means the Securities Exchange Act of 1934.

"<u>Excluded Target Company Benefit Plans</u>" has the meaning set forth in <u>Section 3.9(a)</u>.

"<u>Final Closing</u>" means the Closing at which, upon the consummation of the purchase and sale of the Subject Companies, all Target Companies will have been purchased by and sold to Purchaser.

"<u>Final Closing Statement</u>" means, for any Closing, the audited combined balance sheet of the Subject Companies as of the close of business on the day immediately preceding the applicable Closing Date, prepared in accordance with the Agreed Accounting Principles, including a calculation of the Net Asset Value of each Target Business Segment (excluding any Deferred Target Companies) as of the close of business on the day immediately preceding such Closing Date.

"<u>Final Net Asset Value</u>" means the Net Asset Value of a Target Business Segment (excluding any Deferred Target Companies) as of the close of business on the day immediately preceding the relevant Closing Date as shown on the applicable Final Closing Statement.

"<u>Financing Contract</u>" means any executory Contract in the form of a lease of or rental agreement with respect to motor vehicles or secured or unsecured financing of motor vehicles with respect to which (i) any Target Company, any Securitization Originator, any Securitization Depositor or any Securitization Issuing Entity is the lessor, seller, lender, secured party or obligee

8

(whether initially or as an assignee), or (ii) is between an obligor, on the one hand, and a lessor, seller, obligee, secured party or assignee of any of the foregoing, on the other hand.

"French Target Company" means the Target Company listed on Schedule 1.1(e) and identified as such thereon.

"GAAP" means U.S. generally accepted accounting principles.

"German Target Companies" means the Target Companies listed on Schedule 1.1(f) and identified as such thereon.

"GMAC IF" means GMAC International Finance B.V.

"GMAC-SAIC" means GMAC-SAIC Automotive Finance Co. Ltd.

"Government Authority" means any foreign or domestic, federal, state, provincial, county, city or local legislative, administrative or regulatory authority, agency, court, tribunal, body or other governmental or quasi-governmental entity with competent jurisdiction, including any supranational body and any self-regulatory authority or organization.

"Government Order" means any order, writ, judgment, injunction, approval, decree, declaration, stipulation, determination, agreement or award entered by or with any Government Authority.

"Historical Financial Statements" has the meaning set forth in Section 5.19.

"Holdback Amount" means (i) with respect to the Brazilian Target Companies, $65,000,000, and (ii) with respect to the MCC Target Companies, $100,000,000.

"Indemnifiable Tax Representations" means the representations and warranties set forth in Section 3.8(i) through and including (l) (other than clause (iv) thereof), (m), (o), (p), (s), clause (c) on Schedule 3.8(v) (France), clauses (a)(i) through (a)(iii) on Schedule 3.8(x) (Netherlands), and clauses (a) through (e) on Schedule 3.8(w) (Germany).

"Indemnified Person" has the meaning set forth in Section 8.4(a).

"Indemnifying Person" has the meaning set forth in Section 8.4(a).

"Initial Terms and Conditions of Employment" has the meaning set forth in Section 5.11(a).

"Insurance Policies" has the meaning set forth in Section 3.17.

"Intellectual Property" means, in any and all jurisdictions throughout the world, any (i) trademarks, service marks, Internet domain names, trade dress and trade names, registrations and applications for registration of the foregoing, and the goodwill associated therewith and symbolized thereby ("Trademarks"), (ii) patents and patent applications (including any provisional, continuation, continuation-in-part, divisional and reissue) and any term extensions, (iii) confidential

9

and proprietary information, including trade secrets, know-how and invention disclosures, and (iv) copyrights (including copyrights in computer software, Internet websites and databases) and registrations and applications for registration of the foregoing.

"Intercompany Loan" has the meaning set forth in Section 3.20.

"IRS" means the U.S. Internal Revenue Service.

"ISDA Agreement" means an International Swaps and Derivatives Association Master Agreement.

"IT Assets" means computers, computer software (whether in source or object code), firmware, middleware, servers, workstations, routers, hubs, switches, data, data communications lines, and other information technology equipment, and associated documentation.

"Key Person" has the meaning set forth in Section 5.15(f)(i).

"Knowledge" means (i) with respect to Parent, the actual knowledge after reasonable inquiry of any of the officers listed in Section 1.1(c) of Parent's Disclosure Letter and (ii) with respect to Purchaser, the actual knowledge after reasonable inquiry of any of the officers listed in Section 1.1(c) of Purchaser's Disclosure Letter. "Knowledge" does not require Parent to conduct, have conducted, obtain or have obtained any non-infringement, inventorship, invalidity, freedom-to-operate or any other opinions of counsel of any nature, formal or informal, or any searches regarding Intellectual Property, including any subject matter, ownership, competitive intelligence or other searches, and no knowledge of any third-party Intellectual Property rights that would have been revealed by such inquiries, opinions or searches will be imputed to Parent; provided, however, that Parent shall be deemed to have actual knowledge of any such opinions of counsel conducted or obtained directly by Parent.

"Law" means any law, statute, ordinance, rule, regulation, code, order, judgment, injunction, decree, directive, policy, guideline, ruling, approval or other requirement or rule of law enacted, issued, promulgated, enforced or entered by a Government Authority.

"Leased Properties" has the meaning set forth in Section 3.12(a).

"Leases" has the meaning set forth in Section 3.12(a).

"Liabilities" means any/or all (as applicable from the context) debt, liability or obligation of any kind whatsoever, whether known or unknown, asserted or unasserted, determined or determinable, absolute or contingent, liquidated or unliquidated, accrued or unaccrued and whether due or to become due.

"Losses" means any damages, losses, claims, demands, actions, suits, proceedings, payments, liabilities, charges, interest, fines, judgments, penalties and out-of-pocket costs and expenses (including reasonable fees and out-of-pocket expenses of outside legal counsel), whether or not involving a Third-Party Claim.

10

"Material Indebtedness" has the meaning set forth in Section 3.4.

"MCC Target Companies" means the Target Companies listed on Schedule 1.1(g).

"Net Asset Value" means, as of and for any Closing, the aggregate amount (in U.S. Dollars) of the assets and property of the Subject Companies (which, for the avoidance of doubt, shall not include any asset attributable to a right to receive refunds in respect of Taxes or VAT to which Purchaser or any of its Affiliates is entitled pursuant to the 2006 Agreements)*minus* the aggregate amount of the Liabilities of the Subject Companies, in each case that are required to be set forth on a balance sheet of each respective Subject Company prepared in accordance with the Agreed Accounting Principles. Notwithstanding the foregoing, Net Asset Value shall not give effect to purchase accounting or any other adjustments relating to the sale of the Target Equity Interests contemplated by this Agreement or the conduct by Purchaser following a Closing of the business operated by the Subject Companies.

"Net Deferred Tax Asset" shall mean the aggregate of the deferred tax assets and deferred tax liabilities (which aggregate shall not be reduced by the amount of any reserve for contingent tax liabilities maintained under FAS 5, FIN 48 or any successor or similar accounting principle) (net of any valuation allowance) of the Target Companies taken into account in calculating Net Asset Value based on the more recent of (i) the September 30 Financials, (ii) the Estimated Closing Statements, and (iii) the Final Closing Statements of the Target Business Segments.

"Net Derivative Value" means, with respect to any Closing, the sum (which may be positive or negative) of (i) the positive or negative aggregate value (including the value of any deferred cost associated therewith) of each outstanding Subject Trust Derivative plus (ii) the positive or negative aggregate value (including the value of any deferred cost associated therewith) of each outstanding Subject Transferred Derivative plus (iii) the Purchaser Derivative Termination Obligations incurred in connection with such Closing;  it being understood that the values calculated pursuant to clauses (i) and (ii) shall be calculated pursuant to the Agreed Derivative Valuation Principles.

"Non-Approved Company" has the meaning set forth in Section 2.9(a).

"Non-Compete Term" has the meaning set forth in Section 5.15(a).

"Non-Indemnifiable Tax Representations" means the representations and warranties set forth in Section 3.8(a) through and including (h), (n), (q), (r), (t), (u), clause (iv) of Section 3.8(l), clauses (a) and (b) on Schedule 3.8(v) (France) and clause (f) on Schedule 3.8(w) (Germany).

"Notice" has the meaning set forth in Section 10.1(a).

"OFAC" means the Office of Foreign Assets Control, within the U.S. Department of Treasury.

"Old Plans" has the meaning set forth in Section 5.11(d).

"Outside Date" has the meaning set forth in Section 9.1(b).

"Owned Properties" has the meaning set forth in Section 3.12(a).

"Paid Purchase Price" means, as of any date, the cumulative amount of each Target Business Segment Purchase Price paid to Parent on or before such date.

"Parent" has the meaning set forth in the Preamble.

"Parent Benefit Plans" has the meaning set forth in Section 3.9(a).

"Parent Fundamental Representations" means Section 3.1(a) (*Organization*), Section 3.1(b) (*Authorization*), Section 3.1(c) (*Binding Effect*), Section 3.2 (other than clause (d) thereof) (*Equity Interests of the Target Companies*) and Section 3.21 (*Finder's Fees*).

"Parent Guarantees" has the meaning set forth in Section 5.12(b).

"Parent In-Process Marks" means the trademarks listed in Section 1.1(d) of Parent's Disclosure Letter which will be assigned to Parent on or prior to the applicable Closing Date.

"Parent Indemnified Persons" has the meaning set forth in Section 8.3(a).

"Parent Required Governmental Approvals" has the meaning set forth in Section 3.7.

"Parent Trademarks" means those trademarks listed on Section 1.1(e) of Parent's Disclosure Letter.

"Parties" means Parent, Purchaser and, solely for purposes of Section 5.3, Section 5.6, Section 5.14(b) and Article X, Purchaser Topco.

"Pension Plan" has the meaning set forth in Section 5.11(h).

"Permits" means licenses, permits, certificates, notifications, registrations and other authorizations and approvals that are issued by or obtained from any Government Authority.

"Permitted Encumbrances" means (i) Encumbrances for Taxes, assessments or governmental charges or levies not yet due and payable, or which although delinquent can be paid without penalty or interest, or are being contested in good faith by appropriate proceedings, and for which appropriate reserves have been established therefor in the Target Company Financial Information in accordance with GAAP, (ii) Encumbrances resulting from a precautionary filing by a lessor with respect to a lease, (iii) Encumbrances imposed by Law, such as carriers', warehousemen's and mechanics' liens and other similar liens arising in the ordinary course which secure payment of obligations not more than 60 days past due or which are being contested in good faith by appropriate proceedings, (iv) purchase money security interests for the purchase or leasing of office equipment, computers, vehicles and other items of tangible personal property arising in the ordinary course of business consistent with past practice, (v) in the case of the Specified Properties, zoning, building, subdivision, environmental, entitlement or other land use regulations (including requirements for geo-referencing of rural properties' metes and bounds according to Brazilian Federal Law No. 10,267/2001 and the restrictions for acquisition of rural properties by

12

foreign entities or Brazilian entities controlled by foreign Persons according to Brazilian Federal Law No. 5,709/71), (vi) in the case of the real property, easements, quasi-easements, encumbrances, licenses, covenants, rights-of-way, rights of re-entry or other restrictions and similar agreements, conditions or restrictions or Encumbrances that would be shown by a current title report or other similar report or listing or by a current survey or physical inspection, (vii) Encumbrances incurred in accordance with the terms of Securitization Transactions and (viii) any other Encumbrances that do not impair in any material respect, in each case, the ownership, operation, current use or value of the Target Companies, any Specified Property or any material asset of a Target Company.

"<u>Person</u>" means any individual, bank, corporation, general or limited partnership, association, limited liability company, business trust, branch, unincorporated organization or similar organization, whether domestic or foreign, or any Government Authority.

"<u>Personal Data</u>" means information or data relating to an identifiable individual.

"<u>Post-Closing Period</u>" means, with respect to a Target Company, each taxable period of the Target Company that begins after the applicable Closing Date and, in the case of a taxable period beginning on or before and ending after the applicable Closing Date, the portion of such period beginning after the applicable Closing Date.

"<u>Pre-Closing Period</u>" means, with respect to a Target Company, each taxable period of the Target Company that ends on or before the applicable Closing Date and, in the case of a taxable period beginning on or before and ending after the applicable Closing, the portion of such period through the end of the applicable Closing Date.

"<u>Premium</u>" means, with respect to (i) the Brazil Target Companies, $53,000,000, (ii) with respect to the MCC Target Companies, the remainder of $80,000,000 <u>less</u> the amount of any Deferred Premium, and (iii) with respect to the European Target Companies, $0.

"<u>Prohibited Person</u>" means (i) any Person identified on OFAC's list of Specially Designated Nationals and Blocked Persons or targeted by an OFAC Sanctions Program; (ii) the government, including any political subdivision, agency, instrumentality, or national thereof, of any country against which the United States or any Target Jurisdiction targets through economic sanctions or embargoes; (iii) any Person acting, directly or indirectly, on behalf of, or an entity that is owned or controlled by, a Specially Designated National and Blocked Person or by a government or Person identified in clause (ii) above, or (iii)  a Person on any other similar export control, terrorism, money laundering or drug trafficking related list administered by any Government Authority either within or outside the U.S. with whom it is illegal to conduct business pursuant to applicable Law.

"<u>Purchaser</u>" has the meaning set forth in the <u>Preamble</u>.

"<u>Purchaser Benefit Plans</u>" has the meaning set forth in <u>Section 5.11(d)</u>.

"<u>Purchaser Derivative Termination Obligations</u>" means, with respect to any Closing, 50% of the out-of-pocket expenses incurred by Parent in connection with its efforts to terminate any Subject Rejected Derivative, and the non-realization of any deferred cost associated therewith;

13

<u>provided</u> that in no event shall the aggregate amount of Derivative Termination Expenses payable at all Closings exceed $10,000,000.

"<u>Purchaser Fundamental Representations</u>" means <u>Section 4.1(a)</u> (*Organization*), <u>Section 4.1(b)</u> (*Authorization*), <u>Section 4.1(c)</u> (*Binding Effect*), <u>Section 4.4</u> (*Finder's Fees*) and <u>Section 4.6</u> (*Securities Law Compliance*).

"<u>Purchaser Indemnified Persons</u>" has the meaning set forth in <u>Section 8.2(a)</u>.

"<u>Purchaser Material Adverse Effect</u>" means, as of any particular date, any change, effect, event or occurrence that, individually or when considered in the aggregate with any other change, effect, event or occurrence, would be reasonably likely to materially and adversely impair the ability of Purchaser or any of Purchaser's Affiliates to perform its respective obligations under any of the Transaction Documents or to consummate the transactions contemplated thereby in a timely manner.

"<u>Purchaser Required Governmental Approvals</u>" has the meaning set forth in <u>Section 4.3</u>.

"<u>Purchaser Topco</u>" has the meaning set forth in the <u>Preamble</u>.

"<u>Receiving Party</u>" has the meaning set forth in <u>Section 5.6(b)</u>.

"<u>Reference Closing Statement</u>" means the statement attached as <u>Schedule D</u>.

"<u>Rejected Derivative</u>" means each AIM Derivative not identified by Purchaser in accordance with <u>Section 5.23(a)</u>.

"<u>Related Party</u>" has the meaning set forth in <u>Section 3.18</u>.

"<u>Related Party Contract</u>" has the meaning set forth in <u>Section 3.18</u>.

"<u>Relevant Transfer</u>" has the meaning set forth in <u>Section 3.10(f)</u>.

"<u>Remaining Target Business Segments</u>" means, as of any date, each Target Business Segment that has not been purchased and sold pursuant to an applicable Closing on or prior to such date.

"<u>Representatives</u>" means, with respect to any Person, such Person's Affiliates, directors, managers, officers, employees, legal or financial advisors, agents or other representatives, or anyone acting on behalf of them or such Person.

"<u>Required Governmental Approvals</u>" means the Purchaser Required Governmental Approvals and the Parent Required Governmental Approvals.

"<u>Restricted Activity</u>" has the meaning set forth in <u>Section 5.15(a)</u>.

"<u>Restricted Persons</u>" has the meaning set forth in <u>Section 5.15(a)</u>.

"<u>Restricted Region</u>" means, for any Target Business Segment, the jurisdictions identified in respect of such region on <u>Schedule 1.1(h)</u>.

14

"Restricted Territory" has the meaning set forth in Section 5.15(a).

"Restructuring" means the transactions described in Section 1.1(f) of Parent's Disclosure Letter.

"Retention Agreements" has the meaning set forth in Section 5.11(e).

"Revised Statements" has the meaning set forth in Section 2.7.

"Run-Off Insurance" has the meaning set forth in Section 5.8(c).

"Sanctions Program" means an OFAC-administered economic sanctions program that targets threats to the U.S. national security, foreign policy or economy and pursuant to which targets are identified through legislation, by Executive Order and/or in the Foreign Assets Control Regulations, 31 CFR, Subtitle B, Chapter V.

"Scheduled Intellectual Property" has the meaning set forth in Section 3.14(a).

"Securities Act" means the Securities Act of 1933.

"Securitization Depositor" means the depositor, assignor, trustor, settlor, receivables trustee, seller or any similar role in any Securitization Transaction.

"Securitization Instruments" has the meaning set forth in Section 3.19(a).

"Securitization Issuing Entity" means any issuing entity in any Securitization Transaction.

"Securitization Originator" means, with respect to a Securitization Transaction, the entity that originated or otherwise acquired the assets securitized in such Securitization Transaction and directly or indirectly sold them to the related Securitization Depositor or Securitization Issuing Entity.

"Securitization Servicer" has the meaning set forth in Section 3.19(a).

"Securitization Transaction" means any transaction sponsored by any of the Target Companies under which any of the Target Companies have sold or pledged receivables in a securitization in which securities backed by, or other interest in, such receivables were sold and any of such securities or other interests remain outstanding.

"Sellers" means, with respect to any Target Equity Interests, those Persons listed in Part 2 of Schedule A as a "Seller" of such Target Equity Interests.

"Sibling Target Company" means any Target Company incorporated or organized in the same jurisdiction as a Non-Approved Company.

"Solvent" has the meaning set forth in Section 4.8.

"Specified Closing Date" has the meaning set forth in Section 2.5.

15

"Specified Contracts" has the meaning set forth in Section 3.15(a).

"Specified Jurisdiction" means Brazil, Germany, Mexico and the United Kingdom.

"Specified Jurisdiction Cap" means, with respect to any Specified Jurisdiction, an amount equal to 20% of the aggregate revenue for the year ended December 31, 2012 generated by the Target Companies, taken as a whole, located in such Specified Jurisdiction.

"Specified Properties" has the meaning set forth in Section 3.12(a).

"Straddle Period" has the meaning set forth in Section 7.11.

"Subject BG Derivative" means, with respect to any Closing, a BG Derivative entered into primarily relating to one or more Subject Companies.

"Subject Companies" means, with respect to any Closing, the Target Companies to be purchased and sold at such Closing.

"Subject Rejected Derivative" means, with respect to any Closing, a Rejected Derivative primarily relating to one or more Subject Companies.

"Subject Transferred Derivative" means, with respect to any Closing, a Transferred Derivative primarily relating to one or more Subject Companies.

"Subject Trust Derivative" means, with respect to any Closing, a Trust Derivative to which a Securitization Issuer primarily relating to one or more Subject Companies is a party.

"Subsidiary" means, for any Person, any other Person of which such first Person owns (either directly or through one or more other Subsidiaries) a majority of the outstanding Equity Interests or securities carrying a majority of the voting power in the election of the board of directors or other governing body of such other Person, and with respect to which entity such first Person is not otherwise prohibited contractually or by other legally binding authority from exercising control.

"Surviving Provisions" means Article I (*Definitions and Terms*), Section 5.6 (*Confidentiality*), Section 5.7 (*Announcements*), Section 8.8 (*Exclusive Remedies*), Article IX (*Termination*), and Article X (*Miscellaneous*).

"Target Business" means the business conducted by the Target Companies as of the date hereof.

"Target Business Segment" has the meaning set forth in the Recitals.

"Target Business Segment Purchase Price" has the meaning set forth in Section 2.2(a).

"Target Companies" means those Persons listed in Part 1 of Schedule A as a "Target Company."

16

"<u>Target Company Benefit Plans</u>" has the meaning set forth in <u>Section 3.9(a)</u>.

"<u>Target Company Financial Information</u>" has the meaning set forth in <u>Section 3.3(a)</u>.

"<u>Target Equity Interests</u>" means all of the Equity Interests listed in Part 2 of <u>Schedule A</u> as "<u>Target Equity Interests</u>."

"<u>Target Guarantee</u>" has the meaning set forth in <u>Section 3.15(d)</u>.

"<u>Target Jurisdiction</u>" means any jurisdiction in which any Target Company is operating, located or incorporated or organized.

"<u>Target Permits</u>" has the meaning set forth in <u>Section 3.11(b)</u>.

"<u>Tax</u>" and "<u>Taxes</u>" means (i) all federal, state, local, municipal or foreign taxes, customs duties and governmental levies of any kind whatsoever imposed by a Government Authority, including all income, gross receipts, capital, sales, services, use, financial transaction, insurance, ad valorem, VAT, business flat tax, transfer, franchise, profits, inventory, capital stock, license, withholding, payroll, employment, contributions to public or governmental funds, investment grants or subsidies, social security contributions (including employer and employee national insurance contributions and contributions to *Instituto Mexicano del Seguro Social*), housing and retirement quotas or contributions (including *Instituto del Fondo Nacional de la Vivienda para los Trabajadores*), contributions to retirement savings funds (including *Sistema de Ahorro para el Retiro*), compulsory profit sharing with employees for (including *Participación de los Trabajadores en las Utilidades*), and unemployment, excise, severance, stamp, occupation, property and estimated taxes that are taxes, customs duties or levies imposed by a Government Authority, whether payable on the basis of a tax assessment or by direct payment, withholding, deduction or liability to account, (ii)  any interest, additions, penalties or other incidental payments or ancillary charges with respect thereto and (iii) any liability in respect of any items described in clauses (i) or (ii) payable by reason of Contract, assumption, transferee or successor liability, operation of Law, Treasury Regulations Section 1.1502-6(a) (or any predecessor or successor thereof of any analogous or similar provision under Law) or otherwise. " <u>Tax Attribute</u>" shall mean the net operating loss, foreign tax credit, tax basis in an asset or any similar tax characteristic or attribute of any of the Target Companies prior to the applicable Closing.

"<u>Tax Claim</u>" has the meaning set forth in <u>Section 7.4(a)</u>.

"<u>Tax Notice</u>" has the meaning set forth in <u>Section 7.4(a)</u>.

"<u>Tax Returns</u>" means any return, amended return or other report or notice (including elections, declarations, disclosures, schedules, estimates, claims for refund, tax audit reports (including *dictámenes fiscales*) and information returns and any amendments thereto) filed or required to be filed with a Taxing Authority by Law with respect to any Tax and including, where permitted or required, combined, consolidated or unitary returns for any group of entities that includes any Target Company and its Affiliates.

17

"Taxing Authority" means any Government Authority or other fiscal, revenue, customs and excise authority, body or official having jurisdiction over the assessment, determination, collection or imposition of any Tax.

"Third-Party Claim" has the meaning set forth in Section 8.4(a).

"Threshold" has the meaning set forth in Section 8.2(b).

"Title Corrections" has the meaning set forth in Section 5.9(e).

"Trademark License Agreement Amendment" means an amendment substantially in the form attached as Exhibit 4 to the Trademark License Agreement, together with such changes and other terms as the Parties may mutually agree.

"Transaction Documents" means this Agreement, the Transition Services Agreement, and the Transitional Trademark License Agreements, the Trademark License Agreement Amendment and the deliverables listed on Schedule B.

"Transfer In-Process Marks" means the Company In-Process Marks and the Parent In-Process Marks.

"Transfer Taxes" has the meaning set forth in Section 7.5.

"Transferred Derivatives" mean (i) all BG Derivative Transactions, and (ii) each AIM Derivative, if any, selected by Purchaser in accordance with Section 5.23(a).

"Transferred Employees" has the meaning set forth in Section 5.11(a).

"Transition Services Agreement" means a Transition Services Agreement substantially in the form attached as Exhibit 1, together with such changes and other terms as the Parties may mutually agree.

"Transitional Trademark License Agreements" means collectively, the Transitional Trademark License Agreements substantially in the form attached as Exhibit 2 with respect to Mexico and Exhibit 3 for each of the other countries in which a Target Company is sold, together with such changes and other terms as the Parties may mutually agree.

"Treasury Regulations" means the regulations prescribed under the Code.

"Trust Derivative" means any Derivative Transaction to which a Securitization Issuing Entity is a party.

"UK Target Companies" means the Target Companies listed on Schedule 1.1(i).

"VAT" means value added tax as provided for in Council Directive 2006/112/EC (or as implemented by any member state of the European Union) and any other tax of a similar nature, irrespective of the jurisdiction in which it is imposed.

18

"<u>VATA</u>" means the Value Added Tax Act 1994 of the United Kingdom.

"<u>Virtual Data Room</u>" means the virtual data room containing documents and information relating to, among other things, the Target Companies, the Target Business and the Target Equity Interests made available by Parent in electronic form to Purchaser and its Representatives.

<u>Section 1.2</u>    <u>Interpretation</u>.

(a)    Unless the context otherwise specifically requires:

(i)    the words "hereof," "herein," "hereby" and "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular provision of this Agreement;

(ii)    all terms defined in the singular have a comparable meaning when used in the plural, and vice versa;

(iii)    the terms "Dollars" and "$" mean United States Dollars;

(iv)    references to words of inclusion herein shall not be construed as terms of limitation, and thus references to "included" matters or items shall be regarded as non-exclusive, non-characterizing illustrations;

(v)    the words "or" and "nor" shall not be exclusive;

(vi)    references herein to either gender shall include the other gender;

(vii)    references to this Agreement shall include Parent's Disclosure Letter, Purchaser's Disclosure Letter, the Preamble and any Recitals, Schedules and Exhibits to this Agreement;

(viii)    references herein to the Preamble or to any Recital, Article, Section, Subsection, Exhibit or Schedule shall refer, respectively, to the Preamble or to a Recital, Article, Section, Subsection, Exhibit or Schedule to this Agreement;

(ix)    references to any statute, rule or regulation are to the statute, rule or regulation as amended, modified, supplemented or replaced from time to time (and, in the case of statutes, include any rules and regulations promulgated under the statute) and all references to any section of any statute, rule or regulation include any successor to the section;

(x)    references to any Government Authority include any successor to such Government Authority;

(xi)    references to any agreement or other document are to such agreement or document as amended, modified, supplemented or replaced in accordance with its terms from time to time;

19

(xii)   references to books, records or other information mean books, records or other information in any form including paper, electronically stored data, magnetic media, film and microfilm;

(xiii)   references to a time of day are, unless otherwise specified, references to New York City time;

(xiv)   references to "made available" (or words of similar import) in respect of information made available (or words of similar import) by Parent mean any information made available to Purchaser (including any information made available prior to the date hereof in the Virtual Data Room);

(xv)   references herein to Parent making available, or having made available, a "complete" copy of any document shall mean that Parent makes available, or has made available, a copy of the entire text of such document, including any material amendments or modifications thereto or thereof;

(xvi)   references to writing shall include any mode of reproducing words in a legible and non-transitory form; and

(xvii)   references to the "date hereof" and the "date of this Agreement" (or any words of similar import) shall mean November 21, 2012.

(b)   The table of contents and headings contained in this Agreement are for reference purposes only and do not limit or otherwise affect any of the provisions of this Agreement.

(c)   No rule of construction against the draftsperson shall be applied in connection with the interpretation or enforcement of this Agreement, as this Agreement is the product of negotiation between sophisticated parties advised by counsel.

(d)   Whenever a provision of this Agreement provides that an action is to be effected as of, on or by a certain date, and such date is not a Business Day, this Agreement shall be read so that such action is required to be effected as of, on or by (as applicable) the next succeeding Business Day.

<div align="center">

ARTICLE II
SALE AND PURCHASE OF THE TARGET EQUITY INTERESTS

</div>

Section 2.1   Sale and Purchase of the Target Equity Interests. On the terms and subject to the conditions set forth herein, at each Closing, Parent shall cause each applicable Seller to sell, transfer and deliver to Purchaser, free and clear of any Encumbrances other than any restrictions arising under applicable Law and the Constituent Documents of the Target Companies, and Purchaser shall purchase and receive from each applicable Seller, all of such Seller's right, title and interest in and to the Target Equity Interests in each Subject Company owned by such Seller.

<div align="center">20</div>

Section 2.2    Purchase Price.

(a)    The aggregate purchase price for each Target Business Segment (each, a "Target Business Segment Purchase Price") shall be an amount in respect of such Target Business Segment equal to (i) the Closing Payment in respect of such Target Business Segment, plus (ii) the Adjustment Amount in respect of such Target Business Segment, plus (iii) in the case of the European Target Companies, any Holdback Amount actually paid. Each Target Business Segment Purchase Price shall be payable and subject to adjustment as provided herein. The Purchase Price shall be inclusive of any applicable VAT (howsoever arising), and neither Parent nor any Seller (on the one hand) nor Purchaser nor any Affiliate of Purchaser (on the other hand) shall exercise any option or right available to it under applicable Law to voluntarily qualify any of the transactions contemplated hereunder as a taxable transaction for VAT purposes.

(b)    No later than seven Business Days prior to each Closing Date, Parent shall deliver to Purchaser an Estimated Closing Statement relating to the Target Business Segment(s) that will be the subject of such Closing Date. Purchaser shall have an opportunity to review each Estimated Closing Statement and shall be provided reasonable access to the books, records and other relevant information of Parent and its Representatives to the extent reasonably necessary to review such Estimated Closing Statement.

Section 2.3    Purchase Price Adjustment.

(a)    As soon as reasonably practicable, following each Closing Date, Purchaser shall prepare, or shall cause to be prepared, a Final Closing Statement for each Target Business Segment that is the subject of such Closing and a certificate of the chief financial officer directly overseeing the Target Companies comprising such Target Business Segment certifying that the Final Closing Statement was prepared in accordance with the Agreed Accounting Principles and engage Deloitte and Touche LLP (or such other registered public accounting firm of international reputation which is mutually acceptable to Parent and Purchaser) (the "Accounting Expert") to (i) audit the Final Closing Statement and issue a report thereon, and (ii) certify in writing to Parent and Purchaser that such audit was conducted in accordance with the terms hereof, and Purchaser shall cause such report and such certificate to be produced no later than 120 days following each Closing Date. The Accounting Expert shall be provided reasonable access to the books, records and other relevant information of the Target Companies, Purchaser, Parent and their respective Representatives, to the extent necessary to complete its audit of the Final Closing Statement, and Purchaser and Parent shall, and shall cause their Representatives (including the Subject Companies) to, make reasonably available their respective personnel directly responsible for and knowledgeable about the information to be used in, and reasonably necessary for the preparation of, such Final Closing Statement and in order to respond to inquiries made by the Accounting Expert, and Purchaser shall cause the Subject Companies to prepare and deliver customary management representation letters as may be requested by the Accounting Expert. Parent shall be provided reasonable access to the books, records and other relevant information of the Target Companies, Purchaser, and their respective Representatives (including the working papers of Parent and the Accounting Expert in connection with the preparation and audit of the applicable Final Closing Statement), and Purchaser and Parent shall, and shall cause their Representatives (including the Subject Companies) to, make reasonably available their respective personnel

21

directly responsible for and knowledgeable about the information to be used in the Final Closing Statement in order to respond to inquiries made by Parent. The Final Closing Statement shall be final and binding and shall be used in determining the Adjustment Amount, absent manifest error. The fees and expenses of the Accounting Expert shall be borne by Parent.

(b)    Within five Business Days of the delivery of the report on any Final Closing Statement in respect of any Target Business Segment by the Accounting Expert, to the extent that the applicable Estimated Net Asset Value is not equal to the applicable Final Net Asset Value:

(i)    if the applicable Estimated Net Asset Value is greater than the applicable Final Net Asset Value, Parent shall cause the Sellers to pay promptly to Purchaser an amount equal to the absolute value of the Adjustment Amount, by wire transfer of immediately available funds to one or more accounts designated by Purchaser; and

(ii)    if the Estimated Net Asset Value is less than the Final Net Asset Value, Purchaser shall pay promptly to the Sellers an amount equal to the absolute value of the Adjustment Amount, by wire transfer of immediately available funds to one or more accounts designated by Parent.

(c)    The Parties agree that any such payment pursuant to this  Section 2.3  shall be treated as an adjustment to the applicable Target Business Segment Purchase Price for the applicable Target Equity Interests for Tax purposes.

(d)    One Business Day prior to any Closing, or such other time and date as the Parties may agree, Parent shall deliver to Purchaser a statement setting forth the Net Derivative Value in respect of such Closing.  The Net Derivative Value calculation delivered by Parent to Purchaser shall be final and binding, absent manifest error.

Section 2.4    Holdbacks . In the event that the Closing Payment at the Closing in respect of any European Target Company is reduced by any Holdback Amount, then, as deferred purchase price payments in respect of the European Target Companies, at each subsequent Closing (if any), an amount in Dollars equal to the Holdback Amount in respect of the Target Business Segment(s) that is the subject of such subsequent Closing shall be payable by wire transfer in immediately available funds to one or more accounts designated by Parent.

Section 2.5    Closing . The sale and purchase of the Target Equity Interests in each Target Business Segment will take place at a closing (each, a "Closing ") to be held at the offices of Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York, a 10:00 a.m., New York City time, on (a) in the case of the European Target Companies and the MCC Target Companies the first Business Day of the calendar month following the calendar month in which the last of the conditions set forth in  Article VI  has been satisfied or waived (other than those conditions that, by their terms, are to be satisfied on such Closing Date, but subject to the satisfaction of those conditions) with respect to such Target Business Segment; provided , however , that in the event that the last of the conditions set forth in Article VI  has been satisfied or waived (other than those conditions that, by their terms, are to be satisfied on such Closing Date, but subject to the satisfaction of those conditions) with respect to any Target Business Segment composed of the European Target Companies or the

22

MCC Target Companies in the month of February, May, August or November of any year, then the Closing in respect of such Target Business Segment shall occur on the first Business Day of the second calendar month following such calendar month; (b) in the case of the Brazilian Target Companies, the first Business Day of the next fiscal quarter following the fiscal quarter in which the last of the conditions set forth in Article VI has been satisfied or waived (other than those conditions that, by their terms, are to be satisfied on the Closing Date, but subject to the satisfaction of those conditions) with respect to the Brazilian Target Companies; or (c) on such other date or at such other time and place as the Parties may mutually agree (any such date contemplated by (a), (b) or (c), a " Specified Closing Date"); provided, further, however, that in the event that, at any Closing, one or more Deferred Target Companies would be excluded from such Closing, Parent shall have the right, in its sole discretion, to postpone the Closing in respect of any Target Business Segment by delivering written notice to Purchaser informing Purchaser of its decision to postpone the Closing in respect of such Target Business Segment until the earliest to occur of (x) the first Specified Closing Date at which none of the Target Companies in such Target Business Segment would be Deferred Target Companies, (y) the last Specified Closing Date that is 120 or fewer days after the date that the last of the conditions set forth in Article VI has been satisfied or waived (other than those conditions that, by their terms, are to be satisfied on such Closing Date, but subject to the satisfaction of those conditions) with respect to such Target Business Segment and (z) any other Specified Closing Date identified by Parent in a subsequent written notice delivered to Purchaser.  In no case shall the Closing in respect of any Target Business Segment occur prior to April 1, 2013.  For the avoidance of doubt, the Closings associated with the three Target Business Segments may occur on three separate dates.  Each Closing shall be deemed to be effective as of 12:01 a.m., New York City time, on the first calendar day of the calendar month in which such Closing occurs.

Section 2.6    Closing Deliverables.

(a)    At each Closing, Purchaser shall deliver, or cause to be delivered, to Parent the following:

(i)    an amount in Dollars equal to the sum of (A) the applicable Closing Payment  plus (B) the applicable Net Derivative Value, by wire transfer in immediately available funds, to one or more accounts that have been designated by Parent at least two Business Days prior to the applicable Closing Date;

(ii)    if the Closing in respect of the European Target Companies has previously occurred, an amount in Dollars equal to the applicable portion of the Holdback Amount payable, by wire transfer in immediately available funds, to one or more accounts that have been designated by Parent at least two Business Days prior to the applicable Closing Date;

(iii)    to the extent applicable, funds in an amount and of a type sufficient to satisfy Purchaser's obligations with respect to the repayment of Intercompany Loans set forth in  Section 5.17;

(iv)    the deliverables listed on Schedule B for which Purchaser or any of its Affiliates is responsible to the extent they relate to the Subject Companies;

23

(v)    reasonable evidence that all Purchaser Required Governmental Approvals have been obtained;

(vi)    the certificate referred to in <u>Section 6.3(c)</u>; and

(vii)    such other customary instruments of transfer or assumption, in each case in form and substance reasonably satisfactory to Parent, as may be reasonably required to give effect to the Transaction Documents to the extent they relate to such Closing.

(b)    At each Closing, Parent shall deliver, or cause to be delivered, to Purchaser the following:

(i)    the deliverables listed on <u>Schedule B</u> for which Parent or any of its Affiliates is responsible, to the extent they relate to the Subject Companies;

(ii)    the certificate referred to in <u>Section 6.2(c)</u>:

(iii)    the certificates referred to in <u>Section 6.2(d)</u>, to the extent they relate to the Subject Companies;

(iv)    reasonable evidence that all Parent Required Governmental Approvals have been obtained;

(v)    subject to applicable Law, the resignations, effective as of such Closing, of all directors and officers of the Subject Companies, except for such individuals who are Continuing Employees;

(vi)    executed assignments of Parent's right, title and interest in and to the Company In-Process Marks applicable to the Target Companies involved in such Closing; and

(vii)    such other customary instruments of transfer or assumption, in each case in form and substance reasonably satisfactory to Purchaser, as may be reasonably required to give effect to the Transaction Documents to the extent they relate to such Closing.

(c)    At the first Closing to occur, Parent and Purchaser shall deliver, or cause to be delivered, to the other duly executed counterparts to each of the Transaction Documents (other than this Agreement) to which it or any of its Affiliates is a party.

<u>Section 2.7</u>    <u>Purchase Price Allocation</u>. Within 120 days following each Closing Date, Purchaser shall prepare (or cause to be prepared) and deliver to Parent a schedule (the "<u>Allocation Schedule</u>") allocating the applicable Target Business Segment Purchase Price and other amounts payable and liabilities assumed pursuant to this Agreement or otherwise treated as consideration for U.S. federal income tax purposes among the Target Companies that comprise the Target Business Segment, and (ii) the amounts allocated to each Target Company included in such Target Business Segment and listed on <u>Section 3.8(i)</u> of Parent's Disclosure Letter that is treated as a "partnership" or "disregarded entity" for U.S. federal income tax purposes among the assets of such Target

24

Company. Thereafter, Purchaser shall provide Parent from time to time revised copies of the Allocation Schedule (the " Revised Statements") so as to report any matter on the Allocation Schedule that needs updating (including adjustments to any Target Business Segment Purchase Price, if any).  The Allocation Schedule and the Revised Statements shall be prepared in accordance with Section 1060 of the Code and the Treasury Regulations thereunder.  If a change proposed by Parent is disputed by Purchaser, then Purchaser and Parent shall negotiate in good faith to resolve such dispute.  If Purchaser and Parent are unable to resolve any dispute, then Purchaser and Parent may allocate the Target Business Segment Purchase Price with respect to the disputed item as each sees fit.

Section 2.8    Withholding. Notwithstanding any other provision of this Agreement, and for the avoidance of doubt, (a) each payment made by Purchaser or any Affiliate of Purchaser pursuant to this Agreement shall be made net of any Taxes required by applicable Law to be deducted or withheld from such payment (and any Taxes arising in connection with the remittance of such withheld amounts to the appropriate Government Authority) and (b) any amounts deducted or withheld from any such payment shall be remitted to the applicable Taxing Authority and shall be treated for all purposes of this Agreement as having been paid to the Person in respect of which such withholding was required, provided that Purchaser shall provide within 60 days of such payment by Purchaser or its Affiliate under this Agreement the original as a certified copy of a receipt issued by the Governmental Authority evidencing the payment of such Taxes, a copy of the return reporting the payment of such Taxes, or other evidence of such payment reasonably satisfactory to Parent; provided, however, that if Purchaser causes a Target Company to be acquired at an applicable Closing by a Person organized or having a fiscal residence in a jurisdiction other than one of the jurisdictions set forth opposite the jurisdiction of such Target Company on Schedule 2.8, or if Purchaser causes a Target Company to be acquired at an applicable Closing by a branch or permanent establishment located in a jurisdiction other than  one of the jurisdictions set forth opposite the jurisdiction of such Target Company on Schedule 2.8, in each case, then Purchaser shall be responsible for any withholding tax arising as a result of such acquisition that exceeds the withholding tax that would have been imposed had such acquisition been effected by a Person organized and having a fiscal residence in one of the jurisdictions set forth opposite the jurisdiction of such Target company on  Schedule 2.8. The Parties hereby acknowledge and agree that Purchaser and the Brazilian Target Companies shall (a) be entitled to rely on the Brazilian Withholding Taxes Calculations and (b) provide, if and to the extent required by Brazilian Law, information regarding the capital gain taxes to the Brazilian Government Authority (as calculated and described in the Brazilian Withholding Taxes Calculations).

Section 2.9    Deferred Closings.

(a)    Subject to the second proviso set forth in  Section 2.5, if, at any time and from time to time, all of the conditions to a Closing with respect to a Target Business Segment specified in Article VI other than Section 6.1(a) are satisfied or have been waived (other than those which, by their nature, are to be satisfied at the Closing) and at such time  Section 6.1(a) has not been satisfied solely as a result of the absence of Required Governmental Approvals relating to one or more Target Companies (each such Target Company, a "Non-Approved Company") in such Target Business Segment that together with any other Non-Approved Companies and any Sibling Target Companies

25

constitute De Minimis Target Companies ("Deferred Target Companies"), then (subject to the remaining provisions of this Section 2.9), an initial Closing shall occur with respect to all Target Companies in such Target Business Segment for which Section 6.1(a) has been satisfied (assuming at such time that all other conditions to Closing specified in Article VI in fact are satisfied or waived). The closing of the transactions contemplated hereby (a "Deferred Closing") with respect to each Deferred Target Company shall be deferred until the first Specified Closing Date on which all of the conditions described in Section 2.9(c) and Section 2.9(d) are satisfied or waived (a "Deferred Closing Date") with respect to such Deferred Target Company.

(b)    The obligation of Purchaser to consummate any Deferred Closing shall be subject to the fulfillment, at or prior to the date of the applicable Deferred Closing, of each of the following conditions:

(i)    all Required Governmental Approvals relating to such Deferred Target Company shall have been made or obtained, and any applicable waiting periods relating thereto shall have expired or been terminated early;

(ii)    there shall be no Law in effect enjoining or otherwise prohibiting such Deferred Closing and no pending lawsuits, actions or proceedings to enjoin or otherwise prohibit such Closing shall have been commenced by any Government Authority or other Person;

(iii)    the covenants and agreements of Parent set forth in this Agreement to be performed at or prior to such Deferred Closing shall have been duly performed in all material respects to the extent that they relate to such Deferred Target Company; and

(iv)    the closing condition set forth in Section 6.2(a) shall have been satisfied or waived with respect to such Deferred Target Companies that are the subject of such Deferred Closing, except that each reference in Section 6.2(a) to "Target Business Segment" shall refer to the group of Deferred Target Companies that are the subject of such Deferred Closing.

(c)    The obligation of Parent to consummate any Deferred Closing shall be subject to the fulfillment, at or prior to the date of the applicable Deferred Closing, of each of the following conditions:

(i)    all Required Governmental Approvals relating to such Deferred Target Company shall have been made or obtained, and any applicable waiting periods relating thereto shall have expired or been terminated early;

(ii)    there shall be no Law in effect enjoining or otherwise prohibiting such Deferred Closing and no pending lawsuits, actions or proceedings to enjoin or otherwise prohibit such Closing shall have been commenced by any Government Authority or other Person;

26

(iii)   the covenants and agreements of Purchaser set forth in this Agreement to be performed at or prior to such Deferred Closing shall have been duly performed in all material respects to the extent that they relate to such Deferred Target Company; and

(iv)   the closing condition set forth in <u>Section 6.3(a)</u> shall have been satisfied or waived with respect to such Deferred Target Companies that are the subject of such Deferred Closing, except that each reference in <u>Section 6.3(a)</u> to "Target Business Segment" shall refer to the group of Deferred Target Companies that are the subject of such Deferred Closing.

(d)   No later than three Business Days prior to each Deferred Closing Date, Parent shall deliver to Purchaser an Estimated Closing Statement relating to the Deferred Target Companies that will be the subject of such Deferred Closing Date. Purchaser shall have an opportunity to review each Estimated Closing Statement and shall be provided reasonable access to the books, records and other relevant information of Parent and its Representatives to the extent reasonably necessary to review such Estimated Closing Statement.

(e)   At each Deferred Closing, if any, (i) Purchaser shall deliver to Parent any of the documents or other deliverables required to be delivered by Parent pursuant to Section 2.6 to the extent related to the Deferred Target Company and not previously delivered to Parent at an earlier Closing (including any amounts payable pursuant to <u>Section 2.6(a)(i)</u>) and (ii) Parent shall deliver to Purchaser any of the documents or other deliverables required to be delivered by Parent pursuant to <u>Section 2.6</u> to the extent related to the Deferred Target Company and not previously delivered to Purchaser at a previous Closing.

(f)   Unless the context otherwise clearly requires, references in this Agreement (i) to "Closing", "Closing Date", "Subject Company" and "Target Business Segment" shall, with respect to any Deferred Target Company, be deemed to refer to the applicable Deferred Closing, Deferred Closing Date, Deferred Target Company or Deferred Target Companies, respectively and (ii) "Closing Payment" shall, with respect to any Deferred Target Company, be deemed to refer to the sum of (A) the Estimated Net Asset Value in respect of such Deferred Target Company and (B) the Deferred Premium in respect of such Deferred Target Company.

(g)   Following each Deferred Closing Date, each Party shall take all actions contemplated to be taken by it in connection with a Closing Date pursuant to <u>Section 2.3</u>.

(h)   In respect of each Deferred Target Company, Parent and the Purchaser shall continue to comply, to the extent reasonably practicable, through the applicable Deferred Closing Date, with all covenants and agreements contained in this Agreement that are required by their terms to be performed prior to the Closing relating to the extent related to such Deferred Target Company.

<div align="center">ARTICLE III
<u>REPRESENTATIONS AND WARRANTIES OF PARENT</u></div>

Except as set forth in Parent's Disclosure Letter, Parent represents and warrants to Purchaser, as of the date hereof and as of each Closing Date (with respect to the Subject Companies at such Closing Date) (or in the case of representations and warranties that speak of a specified date, as of

<div align="center">27</div>

such specified date), as follows (it being understood that the following representations and warranties are made assuming that the Restructuring has been completed in full):

Section 3.1    Organization, Authorization, Enforceability, Non-Contravention.

(c)    *Authorization*.  Parent and each of its Affiliates that is a party to any of the Transaction Documents has the requisite corporate or other organizational power and authority to execute and deliver each of the Transaction Documents to which it is a party and to perform its obligations under, and consummate the transactions contemplated by, each such Transaction Document.  The execution, delivery and performance of this Agreement by Parent has been duly and validly authorized by all necessary corporate action on the part of Parent. The execution, delivery and performance of each of the Transaction Documents (other than this Agreement) to which Parent or any of its Affiliates is (or is contemplated to be) a party have been, or prior to the Closing at which such Transaction Document is to be executed will have been, duly and validly authorized by all necessary corporate or other action on the part of such Person.

(d)    *Binding Effect*.  This Agreement has been, and each other Transaction Document will be at the Closing at which such Transaction Document is to be executed, duly executed and delivered by Parent or those of its Affiliates that are (or are contemplated to be) party thereto.  This Agreement is a legal, valid and binding obligation of Parent enforceable in accordance with its terms, subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar laws of general applicability relating to or affecting creditors' rights and to general equity principles.  Each of the Transaction Documents other than this Agreement to which Parent or any of its Affiliates is or will be a party, when executed and delivered by such Person, will be legal, valid and binding obligations of such Person enforceable in accordance with their terms, subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar laws of general applicability relating to or affecting creditors' rights and to general equity principles.

(e)    *Non-Contravention*.  Assuming the receipt of all Required Governmental Approvals, and the expiration of any related waiting periods, the execution, delivery and performance of each of the Transaction Documents to which Parent or any of its Affiliates is a party by such Person, and the consummation by such Person of the transactions contemplated by the Transaction Documents, will not (i) violate or conflict with any provision of the Constituent Documents of such Person, (ii) violate or conflict with any Law or Permit applicable to such Person, other than violations of Law or any Permit that would not materially impair the ability of the Target Companies, taken as a whole, to conduct the Target Business in substantially the manner it is conducted as of the date hereof, or (iii) constitute a breach or default (or event which, with the giving of notice or the lapse of time, would constitute a breach or default) under, or give any third party (with or without the giving of notice, the passage of time or otherwise) any rights of termination, acceleration, prepayment, redemption or cancellation of, or give rise to any loss of a material benefit or obligation to make a payment under, or result in the creation of any Encumbrance (other than Permitted Encumbrances) on any of the assets, properties or Equity Interests of any of the Target Companies pursuant to, any Contract to which any Target Company is a party or by which any Target Company's properties or assets may be bound (other than any Contract to which any Affiliate of Purchaser Topco or Purchaser is a party), any Government Order to which any Target Company is a party or any Securitization Instrument, except in case

28

of clause (iii), for any such breaches, terminations, accelerations, cancellations, losses or Encumbrances that would not have a Company Material Adverse Effect (solely for purposes of this Section 3.1(d), disregarding clause (e) in the proviso set forth in the definition of Company Material Adverse Effect).

Section 3.2    Equity Interests of the Target Companies.

(e)    Schedule A sets forth a complete list of each of the Target Companies and sets forth the designation and par value, if applicable, and the number of authorized, issued and outstanding Equity Interests of each of the Target Companies, and the percentage ownership interest of any Seller or other Target Company in each Target Company. Each Seller legally or beneficially owns, directly or indirectly, all of the respective Equity Interests set forth opposite its name in Part 2 of Schedule A free and clear of any Encumbrances, except for transfer restrictions arising under applicable securities Laws. Each Target Company legally or beneficially owns, directly or indirectly, all of the respective Equity Interests in the other Target Companies set forth opposite its name in Part 1 of Schedule A free and clear of any Encumbrances, except for restrictions arising under applicable securities Laws.

(f)    All the Target Equity Interests have been duly authorized and validly issued and are fully paid and were not issued in violation of any preemptive or other similar right. There are no outstanding options, warrants, rights of conversion, exchange or purchase or any similar rights in respect of any Equity Interests in any of the Target Companies. There are no agreements or understandings outstanding with respect to the issuance, voting, sale or transfer of any Equity Interests in any of the Target Companies (except for this Agreement).

(g)    No Target Company owns, beneficially, directly or indirectly, any Equity Interests of any Person other than another of the Target Companies. None of the Target Companies has any registered branches (*Niederlassungen*) or non-registered offices (*Geschäftsräume*), except as set forth in Section 3.2(c) of the Parent's Disclosure Letter.

(h)    As of the date hereof, to Parent's Knowledge, no Government Authority owns, directly or indirectly, any Equity Interest of any Target Company

Section 3.3    Target Company Financial Information.

(a)    The Target Company Financial Information has been derived from the books of account (including the financial records) of the Target Companies and Parent. Such books of account (including the financial records) (i) of each Target Company have been maintained in accordance with the Agreed Accounting Principles in all material respects and (ii) of Parent, to the extent used to derive the Target Company Financial Information, have been maintained in accordance with Parent's accounting policies in all material respects.

(b)    Each of the Target Companies is subject to Parent's system of internal control over financial reporting (as such term is defined in Rule 13a-15(f) under the Exchange Act). No significant deficiencies or material weaknesses in the design or operation of Parent's system of internal control over financial reporting were identified in Parent's most recent assessment that

29

would be reasonably likely to adversely affect the Target Companies' ability to record, process, summarize and report financial information and such recent assessment did not identify any instances of fraud, whether or not material, that involves management or other employees who have a significant role in the Target Companies' internal control over financial reporting.

    (c)   Each of the Target Companies is Solvent, and none of them has been declared bankrupt.

    Section 3.4   No Undisclosed Liabilities. Except (i) as set forth in the Target Company Financial Information, (ii) for Liabilities incurred by the Target Companies since September 30, 2012 in the ordinary course of their respective businesses, consistent with past practice, (iii) for Liabilities for Taxes and (iv) for Liabilities that are not material to (A) the Target Companies, taken as a whole, or (B) any Target Business Segment, taken as a whole, there are no Liabilities of the Target Companies. Section 3.4 of Parent's Disclosure Letter sets forth a true and correct listing of all material outstanding indebtedness for borrowed money as of October 31, 2012 ( "Material Indebtedness") of each Target Company.

    Section 3.5   Absence of Changes. Except as contemplated by the Transaction Documents, since December 31, 2011, (a) except for the redirection of effort by executives, employees and agents of the Parent and its Affiliates in connection with the sale processes for the Target Companies and the other international operations of Parent and its Affiliates, the consummation of transactions resulting from said sale processes and the incurrence of expenses and obligations under transaction agreements and in matters related thereto, the Target Companies have operated their respective businesses in the ordinary course, consistent with past practice, (b) there has not been any change, effect, event or occurrence that has had or would, individually or in the aggregate, have a Company Material Adverse Effect and (c) none of the Target Companies has taken any action that would have been prohibited by Section 5.1(a)(i), (ii), (iii), (iv), (v), (vi), (ix), (x), (xiii), (xiv), (xix) or (xx) if taken after the date of this Agreement.

    Section 3.6   No Litigation. There is no Action by any Person pending or, to Parent's Knowledge, threatened against the Sellers or the Target Companies that, in any of the foregoing cases, would be reasonably likely to result in (a) monetary damages, injunctive action or the taking of any other action that would, individually or in the aggregate, be reasonably likely to be material to (i) the Target Companies, taken as a whole, or (ii) any Target Business Segment, taken as a whole, or (b) criminal liability or sanctions. There are no unsatisfied or outstanding Government Orders against the Sellers in relation to the Target Business or any of the Target Companies or against any of the properties or businesses of the Target Companies that would, individually or in the aggregate, be reasonably likely to be material to (i) the Target Companies, taken as a whole, or (ii) any Target Business Segment, taken as a whole.

    Section 3.7   Approvals. Other than the authorizations, waivers, consents, approvals, filings, registrations and notices as set forth in Section 3.7 of Parent's Disclosure Letter (collectively, the "Parent Required Governmental Approvals"), neither Parent nor any of its Affiliates is required to (i) obtain any authorization, waiver, consent or approval of, (ii) make any filing or registration with, or (iii) give any notice to, any Government Authority in connection with or as a condition to the execution, delivery and performance of any of the Transaction Documents or the consummation

30

of the transactions contemplated thereby, other than (1) any authorization, waiver, consent, approval, filing, registration or notice the failure of which to obtain, make or give would not be reasonably likely to materially impair the ability of (x) the Target Companies, taken as a whole, or (y) any Target Business Segment, taken as a whole, in each case, to conduct their business in the manner it is conducted as of the date hereof, or (2) as would be required solely as a result of the identity or regulatory status of Purchaser or its Affiliates. To Parent's Knowledge, as of the date hereof, no event has occurred nor has any circumstance arisen that would reasonably be likely to result in the failure of any Parent Required Governmental Approvals to be received in a timely manner in order to permit the consummation of the transactions contemplated by this Agreement.

Section 3.8   Taxes.

(a)   Since November 30, 2006, all material amounts of Taxes payable by or on behalf of each Target Company (including, for the avoidance of doubt, all deficiencies asserted or assessments made as a result of any examinations by any Taxing Authority) have been duly and timely paid, whether or not shown on a Tax Return.

(b)   With respect to any period for which Tax Returns have not yet been filed or for which Taxes are not yet due or owing, each Target Company has made due and sufficient accruals for such Taxes in its financial statements in accordance with GAAP.

(c)   Since November 30, 2006, all required estimated Tax payments sufficient to avoid any underpayment penalties or interest have been made by or on behalf of each Target Company.

(d)   There are no Encumbrances as a result of any unpaid Taxes upon any of the assets of the Target Companies, other than Permitted Encumbrances.

(e)   None of the Target Companies is a party to any audit, review, examination, investigation, Action, or proceeding for assessment or collection of an amount of Taxes that could exceed $500,000.00, nor, since November 30, 2006, has such an event been threatened or announced, in each case in a written document delivered to any Target Company from a Taxing Authority. Since November 30, 2006, no material issue has been raised by a Taxing Authority in any prior audit, review, examination, investigation, action, dispute or proceeding for assessment or collection of Taxes of any Target Company which has resulted in a proposed deficiency that has been communicated to a Target Company in writing.

(f)   No agreements, suspensions, consents or waivers of any statute of limitations or extension of time with respect to a Tax assessment or deficiency is in effect or has been requested in writing with respect to any Tax that reasonably could be expected to amount to $500,000.00 or more in Taxes of any Target Company.

(g)   Since November 30, 2006, each Target Company has complied in all material respects with all applicable Laws relating to the payment and withholding of Taxes and has timely withheld and paid to the appropriate Government Authority all material amounts of Taxes required to have been withheld and paid, including in connection with amounts paid or owing to any employee, creditor, independent contractor, consultant, shareholder, supplier or other third party.

31

(h)    Section 3.8(i) of Parent's Disclosure Letter sets forth a complete list of each of the Target Companies and the proper classification for U.S. federal income tax purposes of each such Target Companies.  Since the latter of November 30, 2006 and the dates of their respective formations, (i) each of the Target Companies has been and is treated for U.S. federal income tax purposes as indicated on Section 3.8(i) of Parent's Disclosure Letter, (ii) no Seller (or any of its Affiliates) has taken a position on any Tax Return contrary to such treatment or inconsistent therewith and (iii) no Taxing Authority has questioned such treatment in writing.

(i)    Since November 30, 2006, no written claim has been made to Parent or its Affiliates by a Taxing Authority in a jurisdiction where any Target Company does not file Tax Returns that such Target Company is or may be subject to taxation by that jurisdiction.

(j)    Since November 30, 2006, none of the Target Companies or any other Person with authority acting on their behalf (i) has agreed to or is required to make any adjustments pursuant to Section 481(a) of the Code or any similar provision of Law, has any Knowledge that any Taxing Authority has proposed any such adjustment, or has any application pending with any Taxing Authority requesting permission for any changes in accounting methods that relate to the Target Companies, (ii) has executed or entered into a closing agreement pursuant to Section 7121 of the Code or any similar provision of Law with respect to any Target Company, or (iii) has granted to any Person any power of attorney that is currently in force with respect to any Tax matter.

(k)    None of the Target Companies (i) is a party to any Tax sharing, allocation, indemnity or similar agreement or arrangement pursuant to which it will have any obligation to make any payments after the applicable Closing (other than any Tax sharing, allocation or indemnity within a Target Business Segment), (ii) is subject to any private letter ruling of the IRS or comparable rulings of or clearances issued by any other Taxing Authority, or has applied for any other Tax rulings or clearances within the past three years (iii) is or has, since November 30, 2006, ever been a member of any consolidated, combined, affiliated, unitary or similar group of corporations for any Tax purposes other than a VAT group or a group where Parent or an Affiliate was the common parent or (iv) is or could be liable for Tax which is primarily or directly chargeable against or attributable to a person other than the relevant Target Company, or which is charged by reference to the income or gains of another person (other than Taxes chargeable against or attributable, or which is charged by reference to the income or gain of, another Target Company within the same Target Business Segment that is being acquired in the applicable Closing).  To Parent's Knowledge, there are or have been no facts or other circumstances which have led or may lead to an invalidity, cancellation or removal of a binding Tax ruling or a similar clearance of any Taxing Authority granted to any of the Target Companies.

(l)    None of the Target Companies will be required to include any item of income in, or exclude any item of deduction from, taxable income for any taxable period (or portion thereof) ending after the applicable Closing Date with respect to income that was realized (and reflects economic income arising) prior to the applicable Closing Date, but after November 30, 2006, including as a result of (i) an installment sale or open transaction disposition made on or prior to the applicable Closing Date, (ii) any prepaid amount received or deferred revenue recognized on or prior to the applicable Closing Date.

32

(m)    Sellers have made available to Purchaser complete copies of (i) all filed Tax Returns of the Target Companies relating to the taxable periods beginning in or subsequent to 2009 and (ii) any audit report, examination report or interim finding in respect of a pending audit issued within the last three years relating to any Taxes due from or with respect to the Target Companies, in each case that list at least $500,000.00 of Tax as due.

(n)    No Target Company is treated for any Tax purposes as resident in a country other than the country of its incorporation, and no Target Company has a branch, agency or permanent establishment in a country other than the country of its incorporation.

(o)    Each of the Target Companies listed on Section 3.8(p) of Parent's Disclosure Letter (i) is registered for the purposes of VAT, and (ii) since November 30, 2006, has been so registered at all times that it has been required to be registered by VAT legislation, and such registration is not subject to any conditions imposed by or agreed with the relevant Taxing Authority.

(p)    The amount of the Net Deferred Tax Asset prepared in accordance with GAAP as of September 30, 2012 is $374,125,972. The components of the Net Deferred Tax Asset are set forth on Schedule 3.8(q) by company and type of asset, including offsetting valuation allowances. With respect to each applicable Closing, Parent's Disclosure Letter shall be updated to reflect the amounts shown with respect to each deferred tax asset and deferred tax liability (net of any valuation allowance) taken into account in calculating Net Asset Value based on the applicable Final Closing Statement.

(q)    To Parent's Knowledge, all material documents by virtue of which any Target Company has any right which are required to be stamped have been properly stamped and all duty, interest and penalties on those documents have been paid.

(r)    To Parent's Knowledge, all material transactions in respect of which any clearance or consent was required from any Taxing Authority have been entered into by each Target Company after such consent or clearance has been properly obtained.  To Parent's Knowledge, any application for such clearance or consent has been made on the basis of full and accurate disclosure of all the relevant material facts and considerations and, to Parent's Knowledge, all such transactions have been carried into effect only in accordance with the terms of the relevant clearance or consent.

(s)    To Parent's Knowledge, the Target Companies possess the relevant exemption certificates or other administrative decisions or authorizations issued by the relevant Tax authorities, which are necessary in order to effect all material amounts of payments made within a year of the date hereof free of any withholding taxes (including withholding taxes on dividends, interest or license payments) or Tax deductions (including withholding by a third party, such as a paying agent), if and to the extent such payments were made free of withholding taxes or Tax deductions.

(t)    The representations and warranties set forth on Schedule 3.8(u) are true and correct in all respects as to the UK Target Companies.

33

(u)    The representations and warranties set forth on Schedule 3.8(v) are true and correct in all respects as to the French Target Company.

(v)    The representations and warranties set forth on Schedule 3.8(w) are true and correct in all respects as to the German Target Companies.

(w)    The representations and warranties set forth on Schedule 3.8(x) are true and correct in all respects as to the Dutch Target Companies.

(x)    For purposes of this Section 3.8, Article VII, Section 8.2(a)(vii), and Section 8.2(a)(viii), any reference to a Target Company shall be deemed to refer to (i) any entity that shall have merged with or liquidated or converted into such Target Company prior to the applicable Closing and (ii) any Subsidiary of a Target Company.

(y)    Notwithstanding any other provision of this Article III, except for the representation contained in Section 3.5, the representations and warranties contained in this Section 3.8 and Section 3.9 constitute the sole representations and warranties of Parent with respect to Taxes, or Actions or Liabilities that relate to Taxes.

Section 3.9    Employee Benefit Plans.

(a)    Each Target Company Benefit Plan has been administered in accordance with its terms and is in compliance with applicable Laws (including any requirements as to registration), except for any failures to so administer or be in compliance that would not, individually or in the aggregate, be reasonably likely to be material to (A) the Target Companies, taken as a whole or (B) any Target Business Segment, taken as a whole. No Target Company Benefit Plan is (i) maintained in the United States or (ii) primarily for the benefit of employees working in the United States. As of the date hereof, there is no pending, outstanding, or, to Parent's Knowledge, threatened litigation relating to any Target Company Benefit Plans (other than claims for benefits in the ordinary course) which would, if adversely determined, result, individually or in the aggregate, in any material Liability to (A) the Target Companies, taken as a whole or (B) any Target Business Segment, taken as a whole. All material contributions that any Target Company is required to make to any Target Company Benefit Plan have been fully and timely paid when due. Each Target Company Benefit Plan that is intended to qualify for tax-favored status under applicable Law does so qualify, except for any failures to so qualify that would not, individually or in the aggregate, be reasonably likely to be material to (A) the Target Companies, taken as a whole or (B) any Target Business Segment, taken as a whole. Except as set forth in Section 3.9(b) of Parent's Disclosure Letter, the transactions contemplated by this Agreement shall not result in (x) the payment, any increase in any payment, or any acceleration of payment, vesting or funding of any compensation or benefit under any Target Company Benefit Plan or Parent Benefit Plan or to any Business Employee or any current or former employee or director of any of the Target Companies, or (y) payment of any compensation or benefit that could not be deductible by any of the Target Companies under Code Section 280G.

34

(b)    Neither Parent nor any Target Company has in the six years prior to the date of this Agreement participated in or had any actual or contingent Liability or obligation towards a defined benefit pension scheme which is subject to the provisions of the UK Pensions Act 2004.

Section 3.10    Labor Matters.

(a)    The Target Companies are, and since January 1, 2010 have been, in compliance with all applicable Laws relating to employment or terms and conditions of employment, and are not and have not engaged in any unfair labor practices or similar prohibited practices, except for any failures to comply or engagement in such practices that would not, individually or in the aggregate, be reasonably likely to be material to (a) the Target Companies, taken as a whole or (B) any Target Business Segment, taken as a whole.

(b)    There is no pending or, to Parent's Knowledge, threatened, strike, walkout or other work stoppage, material labor dispute or any union organizing effort by any of the employees of any Target Company. There has not been since January 1, 2010, any material strike, walkout, work stoppage, material labor dispute, or to Parent's Knowledge, any union organizing efforts.

(c)    There is no material unfair labor practice charge or complaint against any of the Target Companies pending or, to Parent's Knowledge, threatened, before any Government Authority which would, if adversely determined, result in any material Liability to (A) the Target Companies, taken as a whole and (B) any Target Business Segment, taken as a whole.

(d)    Except as set forth in Section 3.10(e) of Parent's Disclosure Letter, all individual independent contractors and individual consultants can be terminated immediately without incurring any Liabilities on the part of the Target Companies provided that notice of such termination is provided to such individual independent contractor or individual consultant either three months' prior to such termination or such longer notice period as required by applicable Law.

(e)    (i) No Target Company has, during the three year period prior to the date hereof, been party to any relevant transfer as defined in the UK Transfer of Undertakings (Protection of Employment) Regulations 2006 or similar local legislation in Europe applicable to any Target Company (a "Relevant Transfer"), and (ii) no employee has transferred to any Target Company at any time pursuant to a Relevant Transfer who remains employed by any Target Company.

(f)    No Target Company has, during the three year period prior to the date hereof, failed to provide information to and/or to consult with any employees or workers of any Target Company and/or their representatives and/or any employee representative bodies (including without limitation any works councils, trade unions or other staff representative bodies) (each a " Employee Representative Body") whether such information and/or consultation is required under (i) any legislation applicable to any Target Company affecting relations between employers and their employees or workers, or (ii) any agreement with any Employee Representative Body, and there is no obligation to inform and/or consult any employees or workers of any Target Company and/or any Employee Representative Body in respect of the transactions contemplated or effected by this Agreement, except, in each case, in which the failure to do so would not, individually or in

35

the aggregate, be reasonably likely to be material to (A) the Target Companies, taken as a whole or (B) any Target Business Segment, taken as a whole.

(g)    None of the Target Companies (i) has received a claim in writing from any Person to the effect that any Target Company has improperly classified as an independent contractor or consultant any Person that provides services to any of the Target Companies or (ii) is liable for any labor or social security matters in connection with such Persons except, in each case, in which the failure to do so would not, individually or in the aggregate, be reasonably likely to be material to (A) the Target Companies, taken as a whole, or (B) any Target Business Segment, taken as a whole.

Section 3.11    No Violation of Law; Required Licenses and Permits. (a) No Target Company has, since December 31, 2007, violated any applicable Law, and no Target Company is a party or subject to any Government Order with any Government Authority which is charged with regulating or supervising any Target Company which imposes any restrictions or fines on the business of any Target Company or the Target Business, in each case, except as would not, individually or in the aggregate, be reasonably likely to (i) be material to (A) the Target Companies, taken as a whole, or (B) any Target Business Segment, taken as a whole, or (ii) result in any Criminal Liability. To the Knowledge of Parent, none of the Target Companies is under investigation with respect to the violation of any Laws, other than routine examinations by Government Authorities.

(a)    Each Target Company has all Permits necessary for the conduct of the Target Business as presently conducted (all such Permits for all of the Target Companies, collectively, the "Target Permits"), and the business of each Target Company and the Target Business have, since January 1, 2010, been conducted in compliance with all such Permits, in each case, except as would not, individually or in the aggregate, be reasonably likely to (i) be material to (A) the Target Companies, taken as a whole, or (B) any Target Business Segment, taken as a whole, or (ii) result in any Criminal Liability.  There are no Actions pending, or to the Knowledge of Parent, threatened or reasonably expected to be asserted, relating to the suspension, revocation or modification of any Target Permit, in each case, except as would not, individually or in the aggregate, be reasonably likely to be material to (A) the Target Companies, taken as a whole, or (B) any Target Business Segment, taken as a whole, or (ii) result in any Criminal Liability.

Section 3.12    Real Property.

(a)    Section 3.12 of Parent's Disclosure Letter sets out a list of all real property that is (i) owned in fee by any of the Target Companies (the "Owned Properties"), or (ii) leased or subleased from any other Person, by any of the Target Companies (the "Leased Properties", and together with the Owned Properties, the "Specified Properties"), and identifies the instruments under which such real property is leased or subleased (the "Leases"). Each Target Company (i) has good and valid title to all of the Owned Properties owned by it, free and clear of all Encumbrances other than Permitted Encumbrances, and (ii) has a good and valid leasehold interest in all of the Leased Properties that is leased or subleased from any other Person by such Target Company.

36

(a)    As of the date hereof, none of the Target Companies or, to Parent's Knowledge, any other party to a Lease is in breach of a Lease, except for any such breaches that would not, individually or in the aggregate, be material to (i) the Target Companies, taken as a whole, or (ii) any Target Business Segment, taken as a whole.

Section 3.13    Environmental Matters.

(a)    Except as would not have a Company Material Adverse Effect, each of the Target Companies:

(i)    is and has within the prior five years been in compliance with all applicable Environmental Laws;

(ii)    possesses, maintains and is in compliance with all Permits required under applicable Environmental Laws for the operation of the Target Business as presently conducted;

(iii)    has not within the prior five years received any written claim, notice of violation or citation, and is not party to any Government Order, concerning any violation or alleged violation of any applicable Environmental Law or any alleged liability pursuant to any Environmental Law;

(iv)    is not the subject of any pending or, to Parent's Knowledge, threatened Action alleging or addressing any violation or alleged violation of any applicable Environmental Law or any alleged liability pursuant to any Environmental Law; and

(v)    to Parent's Knowledge, there are no pollutants, contaminants or toxic or hazardous materials, substance or wastes present at, on, or under any Specified Property except in compliance with Environmental Law.

(b)    Notwithstanding any other provision of this Article III, the representations and warranties contained in this Section 3.13 constitute the sole representations and warranties of Parent with respect to any Environmental Law.

Section 3.14    Intellectual Property.

(a)    Section 3.14(a) of Parent's Disclosure Letter contains a list of all registered Intellectual Property and applications for registration of Intellectual Property owned or purportedly owned by the Target Companies (other than the Parent In-Process Marks and Internet domain names), indicating for each item of such registered or applied for Intellectual Property the registration or application number, the applicable Target Company that is the purported owner and the applicable filing jurisdiction (collectively, the "Scheduled Intellectual Property", except for the Scheduled Intellectual Property provided pursuant to Section 5.5(e)(iv)). To the Parent's Knowledge, all Scheduled Intellectual Property that is or has been registered is subsisting, valid and enforceable. All material Intellectual Property owned by a Target Company is owned free and clear of any Encumbrance other than Permitted Encumbrances and all necessary registration, maintenance, renewal and other relevant filing fees due through the date hereof in connection

37

therewith have been timely paid and all necessary documents and certificates in connection therewith have been timely filed with the relevant patent, copyright, trademark or other authorities in the United States or foreign jurisdictions, as the case may be, for the purposes of maintaining such registered Intellectual Property in full force and effect.

(b)    To Parent's Knowledge, (i) the operation of the businesses of the Target Companies as currently conducted does not infringe or misappropriate the Intellectual Property of any third party, and (ii) no third party has infringed or misappropriated, or is infringing or misappropriating, any material Intellectual Property owned by the Target Companies.

(c)    To Parent's Knowledge, no Person has asserted in a writing received by Parent or any Target Company in the two-year period prior to the date of this Agreement that any of the Target Companies have infringed or misappropriated, or are infringing and misappropriating, the Intellectual Property of any third party, nor has any Person asserted such a claim prior to that period of which discussions are ongoing.

(d)    The Target Companies have taken reasonable measures to protect the confidential nature of the trade secrets and confidential information that they own or use.  To Parent's Knowledge, no trade secret or other confidential information owned by the Target Companies that is material to their businesses as currently conducted has been disclosed or authorized to be disclosed by the Target Companies to any of their employees or consultants, contractors or other third parties other than pursuant to a written agreement containing confidentiality or nondisclosure obligations, except where such obligations are imposed by applicable Law. To Parent's Knowledge, no employee, consultant or independent contractor of the Target Companies is in default or breach of any material term of any such non-disclosure or confidentiality agreement, covenant or obligation.

(e)    The Target Companies' respective IT Assets (A) are, to the Parent's Knowledge, adequate for the businesses of the Target Companies as currently conducted, (B) operate and perform as required by the Target Companies in connection with their respective businesses as currently conducted and (C) are functioning and in good order and have not materially malfunctioned or failed within the past two years. The Target Companies have implemented reasonable backup, security and disaster recovery technology and procedures consistent with historical practices.  To Parent's Knowledge, the Target Companies are compliant in all material respects with their respective privacy policies and contractual commitments to their respective customers, consumers and employees, concerning data protection.

(f)    Neither the execution of this Agreement or any Transaction Documents (except as expressly set forth herein or therein), nor the conduct of the business and operations of the Target Companies as presently conducted, will result in the Target Companies granting to any third Person any right to any material Intellectual Property owned by, or licensed to, the Target Companies. Immediately following the applicable Closing, the applicable Target Companies will have the right to exercise all of their current rights under the Specified Contracts set forth in  Section 3.15(a)(viii) of Parent's Disclosure Letter (subject to obtaining any required consent from the applicable counterparty thereto) granting rights to the applicable Target Companies with respect to Intellectual Property or IT Assets of a third party to the same extent and in the same

38

manner they would have been able to had the transaction contemplated by the Transaction Documents not occurred, except as would not, individually or in the aggregate, have a Company Material Adverse Effect.

(g)    The IT Assets on which Personal Data is processed enable the Target Companies to: (i) determine the scope of lawful use of the Personal Data; and (ii) comply with data subject access requests (as such requests are provided for under applicable Data Protection Laws) within the relevant time limits specified by applicable Data Protection Laws.

(h)    Notwithstanding any other provision of this Article III, the representations and warranties contained in Section 3.1(d), Section 3.11, this Section 3.14 and Section 3.15 constitute the sole representations and warranties of Parent with respect to any Intellectual Property and IT Assets.

Section 3.15    Contracts.

(a)    Section 3.15(a) of Parent's Disclosure Letter lists, as of the date hereof, each of the following Contracts to which any Target Company is a party or is otherwise bound (collectively, the "Specified Contracts"):

(i)    *Future Payment Obligations*. Any Contract (other than any Contract (A) containing a covenant by any Target Company to make, directly or indirectly, any advance, loan, extension of credit or capital contribution to, or other investments in, any Person, (B) relating to indebtedness for borrowed money, or (C) between any Target Company, on the one hand, and any customer or dealer, on the other hand, in each case, entered into in the ordinary course consistent with past practice, or any Contract between any Target Company, on the one hand, and any manufacturer or distributor of automobiles, sport utility vehicles, light duty trucks or vans) involving the payment by such Target Company of more than $1,000,000 in any 12-month period or $7,500,000 in the aggregate during the term thereof, and which by its terms does not terminate or is not terminable without penalty by such Target Company upon 90 days' or less prior notice;

(ii)    *Non-Compete*. Any Contract containing covenants limiting in any material respect the freedom of the Target Companies (or that would apply after the applicable Closing to an Affiliate of the Target Companies) to compete or operate in any line of business or geographical area or to compete with any Person;

(iii)    *Required Loans*. Any Contract containing a covenant by any Target Company to make, directly or indirectly, any advance, loan, extension of credit or capital contribution to, or other investments in, any Person in excess of $1,000,000, in each case other than as made in the ordinary course of such Target Company's business consistent with past practice;

(iv)    *Indebtedness*. Any Contract relating to any indebtedness for borrowed money, in each case, which creates payment obligations of, or from, any party to any Target Company, other than indebtedness for borrowed money in the ordinary course of such Target Company's business consistent with past practice;

39

(v)  *Capital Expenditures*. Any Contract containing covenants requiring capital expenditures by a Target Company in excess of $1,000,000;

(vi)  *Acquisition Agreements*.  Other than in connection with any Securitization Transaction, any Contract for the acquisition, sale or lease of any material properties, operating business or assets of or by a Target Company (by merger, purchase or sale of assets or otherwise), in each case under which any Target Company has any material indemnification or other continuing obligations;

(vii)  *Joint Ventures*. Any partnership, joint venture agreement, strategic alliance or profit sharing agreement (other than any Contract with any manufacturer or distributor of automobiles, sport utility vehicles, light duty trucks or vans);

(viii)  *Intellectual Property and IT Assets*. (A) Any grant or license by the Target Companies to another Person of any right to or under material Intellectual Property or material IT Assets that are owned by the Target Companies, excluding any confidentiality agreements or other agreements the main purpose of which is not to grant or license Intellectual Property; and (B) any grant or license by another Person to any of the Target Companies of any right to or under any third Person's Intellectual Property or IT Assets that are material to the conduct of the Target Companies' business, excluding any Contract with an annual license fee of less than $1,000,000;

(ix)  *Labor Agreements*. Any Contract with any labor union or association representing any employee of any Target Company, including any collective bargaining agreements;

(x)  *Financing Contracts*. Any Contract (A) providing for the collection, servicing or administration of leases, loans, conditional sales agreements or financial instruments of a similar type, by any Target Company on behalf of any other Person, or (B) providing for the administration by any Person of any part of the loans or financial instruments of a similar type of any Target Company, in each case, involving the payment by or to such Target Company of more than $5,000,000 during the term thereof;

(xi)  *OEM Contracts*. Any Contract with any manufacturer or distributor of automobiles, sport utility vehicles, light duty trucks or vans (other than Purchaser or any of its Affiliates) that was previously made available to Purchaser;  provided that Parent shall have no obligation to make available to Purchaser any such Contract that was not previously made available prior to the date hereof and that is subject to confidentiality or similar provisions prohibiting its disclosure; or

(xii)  *Outsourcing Agreements*. Any Contract for the outsourcing of financial or other services to an Affiliate or a third-party the entry into which requires the submission of written notice to a competent Government Authority pursuant to applicable Law.

(b)  A complete copy of each Specified Contract has been made available to Purchaser.  As of the date hereof, each Specified Contract is a valid and binding obligation of, and is an

40

enforceable obligation against, the relevant Target Company that is a party thereto, and, to Parent's Knowledge, the party or counterparties thereto (subject in each case to the effect of any applicable bankruptcy, reorganization, insolvency, moratorium, rehabilitation, liquidation, fraudulent conveyance, preferential transfer or similar Laws now or hereafter in effect relating to or affecting creditors' rights and remedies generally and subject, as to enforceability, to the effect of general equitable principles (regardless of whether enforcement is sought in a proceeding in equity or law)), except for such failures to be valid, binding or enforceable as would not, individually or in the aggregate, be materially adverse to (i) the Target Companies, taken as a whole, or (ii) any Target Business Segment, taken as a whole. As of the date hereof, none of the Target Companies or, to Parent's Knowledge, any other party to a Specified Contract is in breach of a Specified Contract, except for any such breaches that would not be materially adverse to (i) the Target Companies, taken as a whole, or (ii) any Target Business Segment, taken as a whole.

(c)    Section 3.15(c) of Parent's Disclosure Letter lists, as of the date hereof, each Contract under which any Person has directly or indirectly guaranteed or agreed to guarantee or otherwise to be responsible for borrowed money or other Liabilities of any Target Company, Securitization Servicer, Securitization Depositor, Securitization Issuing Entity or Securitization Originator. As of the date hereof, to the Knowledge of Parent, no such Person is in breach of such a Contract, except for any such breaches that would not, individually or in the aggregate, be reasonably likely to be material to (i) the Target Companies, taken as a whole, or (ii) any Target Business Segment, taken as a whole.

(d)    None of the Target Companies or their subsidiaries are parties to or otherwise bound by any Contract under which such Target Company has directly or indirectly guaranteed or agreed to guarantee or otherwise to be responsible for indebtedness for borrowed money or other Liabilities of any Person other than another Target Company or its subsidiaries (any such Contract, other than as set forth in Section 3.15(d) of the Parent Disclosure Letter, a "Target Guarantee").

Section 3.16    Title to Assets. Each of the Target Companies has good and valid title to all properties and assets, other than the Specified Properties, any Intellectual Property and any IT Assets, material to the conduct of such Target Company's business and owned or stated to be owned by it, free and clear of all Encumbrances other than Permitted Encumbrances.

Section 3.17    Insurance. Section 3.17 of Parent's Disclosure Letter contains a list of all policies of casualty and liability and other insurance directly, or indirectly through Parent and its Affiliates, maintained by the Target Companies (collectively, and together with any other policies provided pursuant to Section 5.5(e)(iii), the "Insurance Policies"), other than policies that are to be provided pursuant to Section 5.5(e)(iii). All of the Insurance Policies are in full force and effect and all insurance premiums due thereon have been paid in full when due, except, in each case, as would not, individually or in the aggregate, be reasonably likely to be material to (i) the Target Companies, taken as a whole or (ii) any Target Business Segment, taken as a whole.  Between January 1, 2012 and the date of this Agreement, the Target Companies have not received in writing any notice of cancellation or termination or denial of coverage with respect to any such policy, except to the extent such policy has expired and been replaced in the ordinary course of business consistent with past practice. As of the date hereof, there is no (i) outstanding claim related to the Target Business under any Insurance Policy for an amount either currently, or reasonably expected

41

to be, in excess of $500,000 or (ii) outstanding material default with respect to the provisions in any Insurance Policy.

Section 3.18    Transactions with Affiliates. Section 3.18 of Parent's Disclosure Letter contains a list of loans, leases and other Contracts between Parent, its Affiliates (other than the Target Companies) or the directors, officers or employees of the Target Companies (each of the foregoing, a "Related Party"), on the one hand, and any of the Target Companies, on the other hand (each of the foregoing, a "Related Party Contract"), involving payments in excess of $120,000 annually with the Target Business.

Section 3.19    Securitizations.

(a)    Each of the Target Companies, in each case, to the extent that it is a servicer of any Securitization Transaction (in such a capacity, a "Securitization Servicer") or otherwise a party to a Securitization Transaction, is in compliance in all material respects with all Contracts to which it is bound under such Securitization Transaction (collectively referred to as the "Securitization Instruments"). Each of the Target Companies, to the extent that it is a Securitization Issuing Entity or Securitization Servicer, has performed in all material respects all of its respective obligations under the Securitization Instruments. Each of the Target Companies, in each case, to the extent that it is a Securitization Depositor or Securitization Originator, has performed in all material respects all of its respective obligations under the Securitization Instruments. To Parent's Knowledge, each other party to a Securitization Transaction is in compliance in all material respects with and has performed in all material respects all of its respective obligations under the Securitization Instruments.

(b)    Since January 1, 2009, each Target Company, each Securitization Depositor, each Securitization Issuing Entity has made or caused to be made all material filings required to be made by it with any Government Authority under applicable Law in connection with any Securitization Transaction, and each such filing complied in all material respects with the requirements of applicable Law. There are no pending or, to Parent's Knowledge, threatened, lawsuits, actions, proceedings or claims in which it is alleged that any registration statement, prospectus, private placement memorandum or other offering document, or any amendments or supplements thereto contained, as of the date on which it was issued in any Securitization Transaction, any untrue statement of a material fact or omitted to state any material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading. No securities were issued or sold by any of the Target Companies or any Securitization Issuing Entity in violation in any material respect of applicable Law in any Securitization Transaction.

(c)    No event of default, servicer default, termination event, amortization event, event triggering a debtor notification obligation in relation to the perfection of security or title or other similar event currently exists under any Securitization Instrument and no cash trapping trigger event (including interest premium or fee increase) or other event requiring the increase of credit enhancement for any Securitization Transaction currently exists, except, in each case, for any cash trapping trigger or other event requiring the increase of credit enhancement for any Securitization Transaction that occurred as a result of the performance of the related pool of assets,

42

and no event has occurred that, with the giving of notice, the passage of time, or both would constitute any such event.

(d)   None of the Target Companies has acted in the capacity of guarantor or credit enhancer in any Securitization Transaction, nor has any of the Target Companies provided any type of guaranty in any Securitization Transaction with respect to any payments of principal or interest in connection with any issued securities;  provided, however, that for the purposes of this representation, none of the Target Companies shall be deemed a "guarantor" or "credit enhancer" solely by reason of owning or holding any credit residual, subordinate interest, credit reserve account or similar instrument or account related to any Securitization Transaction.

(e)   Section 3.19(e) of Parent's Disclosure Letter lists all of the Securitization Transactions as of the date of this Agreement. With respect to each Securitization Transaction, a complete copy of all material documents, agreements, reports and instruments relating to such Securitization Transaction has been made available to Purchaser.

(f)   Each Securitization Issuing Entity is not a party to any agreement, contract or commitment other than the relevant Securitization Instruments to which it is a party.

(g)   As of the date hereof, (i) no material claim has been made since January 1, 2009 pursuant to an indemnification obligation, and (ii) no event has occurred and is continuing that (with or without notice or lapse of time) would be reasonably likely to result in any material indemnification obligation, in either case, of any Target Company, any Securitization Originator, Securitization Servicer or Securitization Depositor to any Securitization Issuing Entity or to any securitization trustee, investor, lender, guarantor, surety provider, swap provider, or other counterparty or participant in any Securitization Transaction.

(h)   As of the date hereof, to Parent's Knowledge, no party to a Securitization Transaction has validly exercised a right to cause a repurchase, buyback or replacement of a securitized asset  pursuant to such Securitization Transaction other than a repurchase, buyback or replacement obligation (i) exercised for administrative purposes in the ordinary course of business or (ii) pursuant to the terms and conditions of a Securitization Instrument with respect to delinquencies and defaulted Contracts.

(i)   Parent has made available to Purchaser a complete copy of all material credit, underwriting or collection policies of each Securitization Originator and Securitization Servicer.

Section 3.20   Intercompany Loans. Section 3.20 of Parent's Disclosure Letter sets forth a complete listing of all intercompany loans outstanding as of the date hereof made by (a) GMAC IF or any Affiliate of Parent other than a Target Company, on the one hand, to any Target Company, on the other hand, (each, an "Intercompany Loan") and (b) any Target Company, on the one hand, to GMAC IF or any Affiliate of Parent, on the other hand, and, in each case, as of October 31, 2012, the outstanding principal amount.

Section 3.21   Finder's Fees. Except for Citigroup Global Markets Inc. and Evercore Group LLC, whose fees will be paid by Parent or one of its Affiliates (other than any of the Target

43

Companies), there is no other investment banker, broker, finder or other intermediary that has been retained by or is authorized to act on behalf of Parent or its Affiliates who would be entitled to any fee or commission in connection with the transactions contemplated by this Agreement.

Section 3.22    Foreign Asset Control. Parent, each Seller and each Target Company maintains a risk-based system of controls which reasonably assures, as applicable, the monitoring, prevention, detection, and reporting of transactions involving OFAC Specially Designated Nationals and Blocked Persons as required by applicable Law.

Section 3.23    Anti-Money Laundering. Parent, each Seller and each Target Company maintains a risk-based system of controls which reasonably assures the monitoring, prevention, detection, and reporting of transactions violating any applicable anti-money laundering Law, including the Proceeds of Crime Act 2003, the Money Laundering Regulations 2007, the Bank Secrecy Act of 1970, the U.S.A. Patriot Act of the United States, and the rules and guidance of the Financial Services Authority and Office of Fair Trading.

Section 3.24    Anti-Corruption; No Unlawful Payments; Prohibited Practices .

(a)    To the extent required by applicable Law, each Target Company maintains systems of internal accounting controls sufficient to provide reasonable assurances that (i) transactions are executed in accordance with management's general or specific authorization; (ii) transactions are recorded as necessary to maintain accountability for assets; (iii) access to assets is permitted only in accordance with management's general or specific authorization; and (iv) the recorded accountability for assets is compared with the actual levels at reasonable intervals and appropriate action is taken with respect to any differences.

(b)    Each Target Company maintains a risk-based system of controls which reasonably assures, as applicable, the monitoring, prevention, detection, and reporting of transactions violating any applicable Laws relating to anti-corruption, including the U.S. Foreign Corrupt Practices Act of 1977 and the U.K. Bribery Act of 2011.

(c)    Since December 31, 2007, none of the Target Companies or, to Parent's Knowledge, any Representative of any Target Company has paid, offered or promised to pay, or authorized or ratified the payment directly or indirectly, of any monies or anything of value to any official or employee of any Government Authority or any political party or candidate for political office for the purpose of influencing any act or decision of such official or of the Government Authority to obtain or retain business, direct business to any person or secure any other improper benefit or advantage, in each case in violation of any applicable Law.

(d)    Since December 31, 2007, none of the Target Companies or, to Parent's Knowledge, any Representative of any Target Company has committed or engaged in any Prohibited Practices.

(e)    For purposes of this Section 3.24, an "official or employee" includes any official or employee of any entity owned or controlled by a Government Authority (or family members thereof), members of royal families, any officer or employee of a public international organization, as well as any person acting in an official capacity for or on behalf of any of the foregoing.

44

Section 3.25    Export Controls.

(a)    None of Parent, any Seller, Target Company, or any of their respective directors or senior officials are Prohibited Persons.

(b)    Since December 31, 2007, none of Parent, any Seller or Target Company is a party to any contract or bid with, and has not conducted business with any Prohibited Persons in violation of any applicable Law.

(c)    Since December 31, 2007, none of Parent, any Seller or Target Company is a party to any contract or bid with, and has not conducted any business directly or indirectly involving Cuba, Iran, Myanmar (Burma), North Korea, Sudan or Syria in violation of any applicable Law.

(d)    There is no pending or, to the Knowledge of Parent, threatened Action against, or, to the Knowledge of Parent, investigation by any Government Authority of, any Target Company, nor is there any injunction, order, judgment, ruling or decree imposed (or, to the Knowledge of Parent, threatened to be imposed) upon any Target Company or any asset of any Target Company by or before any Government Authority, or pending voluntary disclosure to any Government Authority, in each case, in connection with an alleged violation of any applicable Law relating to the export of data, goods or services to any foreign person or jurisdiction against which the United States maintains sanctions or export controls, including applicable regulations of the U.S. Department of Commerce, the U.S. Department of State, U.S. Department of Energy and OFAC, as well as any applicable requirements or restrictions imposed by any other non-U.S. jurisdiction.

(e)    Since December 31, 2007, each of the Target Companies has complied with all applicable U.S. and non-U.S. export control requirements, including regulations controlling the export of certain products, services, and technologies and anti-boycott requirements as set forth in the Export Administration Regulations (EAR), 15 CFR Parts 730-774, as amended, and Section 999 of the Code and similar non-US requirements.

Section 3.26    Consumer Financial Protection. Except as would not, individually or in the aggregate, be reasonably likely to (i) be material to (A) the Target Companies, taken as a whole, or (B) any Target Business Segment, taken as a whole, or (ii) result in Criminal Liability, each Target Company:

(a)    is compliant with its own current and in-force privacy policies and express commitments to its respective customers, consumers and employees concerning the privacy and security of their Personal Data;

(b)    is compliant with its obligations under applicable Consumer Financial Protection Law in respect of the use of electronic communications (including e-mail, text messaging, fax machines, automated calling systems and non-automated telephone calls) for direct marketing purposes; and

(c)    each of the Target Companies:

45

(i)    may, subject to the requirements of applicable Consumer Financial Protection Law, exploit all Personal Data forming the subject matter of any executory Contract entered into in by such Target Company as part of the operation of the Target Business in accordance with applicable Consumer Financial Protection Law;

(ii)    either (1) holds all Personal Data used by such Target Company on its IT Assets, or (2) such Personal Data is held (a) by a third party under a Contract allowing reasonable access by the Target Company to the Personal Data, or (b) is otherwise held in such a manner as to allow reasonable access by the Target Company to the Personal Data; and

(iii)    has, since December 31, 2007, processed Personal Data in accordance with applicable Consumer Financial Protection Law.

Section 3.27    Financing Contracts. Except as would not have a Company Material Adverse Effect:

(a)    Each Financing Contract and each related Credit Enhancement is valid, binding and enforceable, by the applicable Target Company, Securitization Depositor or Securitization Issuing Entity, as the case may be, against the obligor or borrower thereunder in accordance with its respective written terms, subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and other laws of general applicability relating to or affecting creditors' rights and to general equity principles.

(b)    (i) Each Financing Contract and each related Credit Enhancement is, in full force and effect, free and clear of Encumbrances other than Permitted Encumbrances and Encumbrances arising in connection with any Securitization Transaction or under any Securitization Instrument; (ii) each Target Company or Securitization Issuing Entity, as the case may be, has in its possession or control the notes and other documentation comprising each Financing Contract and each related Credit Enhancement reasonably necessary to enforce the rights of such Target Company or Securitization Issuing Entity, as the case may be, with respect to such Financing Contract, subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and other laws of general applicability relating to or affecting creditors' rights and to general equity principles; and (iii) all payments by the obligor or borrower under each Financing Contract are made to or for the benefit of a Target Company or Securitization Issuing Entity, as the case may be.

(c)    With respect to each Financing Contract, the applicable Target Company or Securitization Issuing Entity, as the case may be, has a valid and enforceable security interest in any collateral subject thereto, subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and other laws of general applicability relating to or affecting creditors' rights and to general equity principles, as and to the extent required by such Target Company's or the applicable Securitization Originator's respective credit or investment approval with respect to such Financing Contract.

Section 3.28    No Amendments to Transferred Derivatives or Corresponding Derivatives .

46

(a)    <u>Section 1.1(g)</u> of the Parent's Disclosure Letter lists all of the AIM Derivatives as of the date of this Agreement and <u>Section 3.18</u> of the Parent's Disclosure Letter lists all of the Corresponding Derivatives as of the date of this Agreement.  With respect of each such Transferred Derivative, Parent has made available to Purchaser a complete copy of the transaction confirmations relating to such Transferred Derivative.

(b)    The termination of any AIM Derivative pursuant to <u>Section 5.23</u> shall not trigger a default, termination event or requirement to post collateral (or event which, with the giving of notice or the lapse of time, would constitute a breach or default, termination event or requirement to post collateral) in any Contract.

<u>Section 3.29</u>    <u>No Other Representations or Warranties</u>.  Except for the representations and warranties contained in this <u>Article III</u> (as qualified by the applicable items disclosed in Parent's Disclosure Letter), neither Parent nor any other Person makes any express or implied representation or warranty on behalf of Parent or any of its Affiliates, and Parent disclaims any other representations or warranties. To avoid doubt, Parent does not give or make any warranty or representation as to (and shall have no indemnification obligation or, in the absence of fraud, other liabilities in respect of) the accuracy or reasonableness of any forecasts, estimates, projections, statements of intent or statements of opinion provided to Purchaser, any of its Affiliates, or any of their respective Representatives on or prior to the date of this Agreement, including in the "<u>Confidential Information Memorandum</u>" relating to the Target Business, any management presentations and any other information made available in the Virtual Data Room.  Purchaser acknowledges and agrees that, except for the representations and warranties contained in this <u>Article III</u> (as qualified by the applicable items disclosed in Parent's Disclosure Letter), neither Parent nor any of its Affiliates is making any representation or warranty regarding any documents, projections, forecasts, statement or other information made, communicated or furnished (orally, in writing, in the Virtual Data Room, in management presentations (including any questions posed and answers given and any related discussions, whether formal or informal) or otherwise) to Purchaser, any of its Affiliates, or any of their respective Representatives (including any opinion, information, projection or advice that may have been or may be provided to such Person by any Representatives of Parent or any of its Affiliates). No Person makes any representations or warranties to Purchaser regarding the probable success or profitability of the Target Companies.

<div align="center">

ARTICLE IV
<u>REPRESENTATIONS AND WARRANTIES OF PURCHASER</u>

</div>

Except as set forth on Purchaser's Disclosure Letter, the Purchaser represents and warrants to Parent, as of the date hereof and as of each Closing Date (or in the case of representations and warranties that speak of a specified date, as of such specified date), as follows (it being understood that the following representations and warranties are made assuming that the Restructuring has been completed in full):

<div align="center">

47

</div>

Section 4.1    Organization, Authorization, Enforceability, Non-Contravention.

(a)    *Organization*. Purchaser is a corporation duly incorporated, validly existing and in good standing under the laws of the state of Texas. Purchaser Topco is a corporation duly incorporated, validly existing and in good standing under the laws of the state of Delaware.

(b)    *Authorization*.  Purchaser Topco, Purchaser and each of their Affiliates that is a party to any of the Transaction Documents has full corporate or other organizational power and authority to execute and deliver the Transaction Documents to which it is a party and to perform its obligations under, and consummate the transactions contemplated by, each such Transaction Document. The execution, delivery and performance of this Agreement by Purchaser has been duly and validly authorized by all necessary corporate action on the part of Purchaser. The execution, delivery and performance of this Agreement by Purchaser Topco has been duly and validly authorized by all necessary corporate action on the part of Purchaser Topco. The execution, delivery and performance of each of the Transaction Documents (other than this Agreement) to which Purchaser Topco, Purchaser or any of their Affiliates is (or is contemplated to be) a party have been, or prior to the Closing at which such Transaction Document is to be executed will have been, duly and validly authorized by all necessary corporate or other action on the part of such Person.

(c)    *Binding Effect*. This Agreement has been, and each other Transaction Document will at the Closing at which such Transaction Document is to be executed be, duly executed and delivered by Purchaser Topco, Purchaser or those of their Affiliates that are (or are contemplated to be) party thereto.  This Agreement is a legal, valid and binding obligation of each of Purchaser Topco and Purchaser enforceable in accordance with its terms, subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar laws of general applicability relating to or affecting creditors' rights and to general equity principles.  Each of the Transaction Documents (other than this Agreement) to which Purchaser Topco, Purchaser or any of their Affiliates is a party, when executed and delivered by such Person, will be legal, valid and binding obligations of such Person enforceable in accordance with their terms, subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar laws of general applicability relating to or affecting creditors' rights and to general equity principles.

(d)    *Non-Contravention*. Assuming the receipt of all Parent Required Governmental Approvals and Purchaser Required Governmental Approvals, and the expiration of any related waiting periods, the execution, delivery and performance of each of the Transaction Documents to which Purchaser Topco and Purchaser or any of their Affiliates is a party by such Person, and the consummation by such Person of the transactions contemplated by the Transaction Documents, will not (i) violate or conflict with any provision of the Constituent Documents of such Person, (ii) violate or conflict with any Law or Permit applicable to such Person, other than immaterial violations of Law or any Permit or (iii) constitute a breach or default (or event which, with the giving of notice or the lapse of time, would constitute a breach or default) under, or give any third party (with or without the giving of notice, the passage of time or otherwise) any rights of termination, acceleration, prepayment, redemption or cancellation of, or give rise to any loss of a material benefit or obligation to make a payment under, or result in the creation of any

48

Encumbrance (other than Permitted Encumbrances) on any of the assets, properties or Equity Interests of Purchaser Topco, Purchaser or any of their Affiliates pursuant to any Contract to which any such Person is a party or by which any such Person's properties or assets may be bound, except in case of clause (iii), for any such breaches, terminations, accelerations, cancellations, losses or Encumbrances that would not have a Purchaser Material Adverse Effect.

Section 4.2    Financing. As of each Closing, Purchaser will have available sufficient cash, available lines of credit, committed debt or equity financing or other sources of immediately available funds to enable it to consummate the transactions contemplated by this Agreement and perform its obligations hereunder.  Purchaser's obligations hereunder are not subject to any condition regarding Purchaser's ability to obtain financing for the consummation of the transactions contemplated hereunder.

Section 4.3    Approvals. Other than the authorizations, waivers, consents, approvals, filings, registrations and notices set forth in Section 4.3 of Purchaser's Disclosure Letter (collectively, the "Purchaser Required Governmental Approvals"), none of Purchaser Topco, Purchaser nor any of their Affiliates is required to (i) obtain any authorization, waiver, consent or approval of, (ii) make any filing or registration with, or (iii) give any notice to, any Government Authority in connection with or as a condition to the execution, delivery and performance of any of the Transaction Documents or the consummation of the transactions contemplated thereby, other than any authorization, waiver, consent, approval, filing, registration or notice the failure of which to obtain, make or give would not have a Purchaser Material Adverse Effect. To Purchaser's Knowledge, where Purchaser Required Governmental Approvals require that Purchaser meet certain qualifications, Purchaser meets such qualifications.  To Purchaser's Knowledge, as of the date hereof, no event has occurred nor has any circumstance arisen that would reasonably be likely to result in the failure of any Purchaser Required Governmental Approvals to be received in a timely manner in order to permit the consummation of the transactions contemplated by this Agreement.

Section 4.4    Finder's Fees. Except for Merrill Lynch, Pierce, Fenner & Smith Inc., Barclays Capital, Inc., UBS Securities LLC and Banco Bradesco BBI S.A., whose fees will be paid by Purchaser or one of its Affiliates, there is no other investment banker, broker, finder or other intermediary that has been retained by or is authorized to act on behalf of Purchaser who would be entitled to any fee or commission in connection with the transactions contemplated by this Agreement.

Section 4.5    No Litigation.  To Purchaser's Knowledge, there is no Action by any Person pending or threatened against Purchaser Topco, Purchaser or any of their Affiliates that would be reasonably likely to result in monetary damages, injunctive relief or the taking of any other action that would (in any of the foregoing cases) result in a Purchaser Material Adverse Effect.  There are no unsatisfied or outstanding Government Orders against Purchaser Topco, Purchaser or any of their Affiliates or any of the properties or business of Purchaser Topco, Purchaser or any of their Affiliates that would have a Purchaser Material Adverse Effect.

Section 4.6    Securities Law Compliance. Purchaser is financially sophisticated and understands that the Target Equity Interests have not been registered under the securities laws of any jurisdiction, including the Securities Act, and may only be transferred pursuant to registration

49

or an applicable exemption under all applicable Laws.  Purchaser is acquiring the Target Equity Interests for its own account, for the purpose of investment only and not with a view to, or for sale in connection with, any distribution thereof in violation of applicable Law. Purchaser has not, directly or indirectly, offered the Target Equity Interests to anyone or solicited any offer to buy the Target Equity Interests from anyone, so as to bring such offer and sale of the Target Equity Interests by Purchaser within the registration requirements of the Securities Act or the securities Laws of any other jurisdiction.

Section 4.7    Due Diligence by Purchaser.  Purchaser acknowledges that it has conducted to its satisfaction an independent investigation of the Target Business and the operations, assets, Liabilities and financial condition of the Target Companies in making the determination to proceed with the transactions contemplated by the Transaction Documents and has relied solely on the results of its own independent investigation and the representations and warranties in  Article III  in connection with the Target Companies and the subject matter of this Agreement. Purchaser has, among other things, had full access to the Virtual Data Room and received Parent's Disclosure Letter. Purchaser has also received certain projections and other forecasts, including projected financial statements, cash flow items, capital expenditure budgets and certain business plan information, and acknowledges that (i) there are uncertainties inherent in attempting to make such projections and forecasts and, accordingly, it is not relying on them, (ii) Purchaser is familiar with such uncertainties and is taking full responsibility for making its own evaluation of the adequacy and accuracy of all such projections and forecasts, (iii) Purchaser has no claim under this Agreement against anyone with respect to the accuracy of such projections and forecasts and (iv) Parent has made no representation or warranty with respect to such projections and forecasts.  The representations and warranties of Parent in Article III constitute the sole and exclusive representations and warranties of Parent to Purchaser in connection with the transactions contemplated by this Agreement, and Purchaser understands, acknowledges and agrees that, except as set forth in Article III, all other representations and warranties of any kind or nature express or implied (including any relating to the future or historical financial condition, results of operations, assets or Liabilities of the Target Companies or the quality, quantity or condition of the assets of the Target Companies) are specifically disclaimed by Parent. Purchaser hereby waives any other warranty or representation, in each case, express or implied, as to the quality, merchantability, fitness for a particular purpose or condition of the Target Companies or any part thereof.

Section 4.8    Solvency.  After giving effect to the payment of all amounts required to be paid in connection with the consummation of the transactions contemplated by this Agreement, and payment of all related fees and expenses, Purchaser will be Solvent as of and immediately following each Closing.  For purposes of this Agreement, the term "Solvent," when used with respect to any Person, means that, as of any date of determination, (a) the amount of the "fair saleable value" of the assets of such Person will, as of such date, exceed (i) the value of all "liabilities of such person, including contingent and other liabilities," as of such date, as such quoted terms are generally determined in accordance with applicable Laws governing determinations of the insolvency of debtors, and (ii) the amount that will be required to pay the probable Liabilities of such Person as such debts become absolute and mature, (b) such Person will not have, as of such date, an unreasonably small amount of capital for the operation of the businesses in which it is engaged or proposed to be engaged following such date, and (c) such Person will be able to pay its Liabilities

50

as they mature.

Section 4.9   No Other Representations or Warranties. Except for the representations and warranties contained in this  Article IV, neither Purchaser nor any other Person makes any other express or implied representation or warranty on behalf of Purchaser or any of its Affiliates, and Purchaser disclaims any other representations or warranties.

ARTICLE V
COVENANTS

Section 5.1   Conduct of the Target Business.

(a)   Parent undertakes to procure that, between the date hereof and the Closing at which any Subject Companies are purchased and sold, such Subject Companies (except in each case as referred to in  Section 5.1(b) or as may be approved by Purchaser (such approval not to be unreasonably withheld, conditioned or delayed)) (1) shall carry on the business of such Subject Companies and, to the extent applicable to any such Subject Company, the Securitization Transactions, in the ordinary course, consistent in all material respects with past practice (including by continuing the business of such Subject Companies in each market in which it is currently conducted), (2) shall use their respective commercially reasonable efforts to preserve intact in all material respects their respective business organizations and preserve their relationships with customers, key employees and other Persons with whom they have material business dealings, and (3) shall not:

(iii)   amend any provision of the Constituent Documents of any Subject Company, or any term of any outstanding Equity Interest issued by any Subject Company;

(iv)   effect any recapitalization, reclassification, stock split, combination or like change in the capitalization of any Subject Company;

(v)   sell, pledge, transfer, dispose of, encumber (other than Permitted Encumbrances) create, allot or issue, or grant an option to subscribe for, any Equity Interest in any Subject Company;

(vi)   acquire or agree to acquire any Equity Interest in any Person (other than another of the Subject Companies), other than in connection with investment activities conducted in the ordinary course of business consistent with past practice;

(vii)   merge or consolidate any Subject Company with any Person, or adopt a plan of complete or partial liquidation, dissolution, restructuring, recapitalization or other reorganization of any Subject Company;

(viii)   other than in the ordinary course of business consistent with past practice, (A) make any loans, advances or capital contributions to, any other Person, except another Subject Company, or (B) incur, issue, assume, increase or modify the material terms of any indebtedness for borrowed money or guarantee any such Liabilities;

51

(ix)    (A) grant any salary or wage increase to any director, employee or individual consultant of any Target Company or to any Business Employee from those existing on the date of this Agreement, except in any case (1) as may be required by applicable Law, (2) to satisfy contractual obligations existing as of the date of this Agreement (including pursuant to any collective bargaining agreement), (3) pursuant to national trade agreements; (4) in the ordinary course of business consistent with past practice, including increases that are consistent with past increases, with respect to any employee and such increase for any such employee does not exceed the total budgeted amount for compensation, or (5) for newly hired or recently promoted employees (other than any employee replacing a Key Person or Business Employee) to fill a vacant position as of the date hereof or to replace an employee who terminated employment after the date hereof on terms that are in the ordinary course of business consistent with past practice for the applicable position; provided however, that any once-per-year salary increase for any Business Employee that is employed in the US shall not exceed 3% of such Business Employee's then-current annual salary; or (B) enter into, amend or renew any employment, individual consulting, severance, retention, change in control or similar agreements or arrangements with any Business Employee or Key Person, except for any such agreement or arrangements for which Purchaser and its Affiliates would not have any obligation or Liability; (C) enter into, amend or renew any employment, individual consulting, severance, retention, change in control or similar agreements or arrangements with any director, officer, employee or individual consultant of any Target Company except (other than for a Key Person) on terms that are in the ordinary course of business consistent with past practice, including increases that are consistent with past increases, for the applicable position (it being understood that any such employment agreement may provide for severance in the ordinary course of business consistent with past practices);

(x)    (A) enter into, establish, adopt or amend any Target Company Benefit Plan or other pension, retirement, stock option, stock purchase, profit sharing, deferred compensation, bonus, severance, group insurance, employee benefit, incentive or welfare contract, plan or arrangement in respect of any director, officer, employee or individual consultant of any Target Company, or take any action to accelerate the vesting of compensation or benefits payable thereunder (other than in respect of Parent Benefit Plans), except (other than in respect of any employment, individual consulting, severance, retention, change in control or similar agreements or arrangements of Key Persons for which Purchaser and its Affiliates would have any obligation or Liability): (1) as may be required by applicable Law, (2) to satisfy contractual obligations under this Agreement or existing as of the date of this Agreement, (3) pursuant to national trade agreements; (4) to comply with any judicial or administrative order from any Government Authority, (5) as part of an annual renewal process consistent with past practice, including increases that are consistent with past increases, or (6) in the ordinary course of business consistent with past practice, including increases that are consistent with past increases, provided, however, that notwithstanding the foregoing, any newly hired or recently promoted employee (other than any employee replacing a Key Person) shall be eligible to participate in any existing contract, plan or arrangement on terms that are in the ordinary course of business consistent with past practice for the applicable position;  further provided, that the amount of cumulative, aggregate costs

52

of all changes under this subsection (A) shall not exceed the total budgeted amount for any such contract, plan or arrangement, or (B) enter into, establish, adopt or amend any pension, retirement, stock option, stock purchase, profit sharing, deferred compensation, bonus, severance, group insurance, employee benefit, incentive or welfare contract, plan or arrangement in respect of any Business Employee, except (other than in respect of any employment, individual consulting, severance, retention, change in control or similar agreements or arrangements of Business Employees for which Purchaser and its Affiliates would have any obligation or Liability) in any manner such that the resulting terms or increases in amounts applicable to any Business Employee is not disproportionately favorable to such Business Employee relative to the resulting terms or increases in amounts applicable to similarly situated non-Business Employees;

(xi)    make any change, in any material respect, in accounting methods, principles, practices or policies used by any Subject Company or in the manner of application of such methods, principles, practices or policies, except insofar as may be required by Law or applicable accounting principles;

(xii)    make, change or revoke any Tax election (including any entity classification election), change an annual accounting period, change any taxable year, adopt or change any accounting method, file any amended Tax Return, enter into any closing agreement with respect to Taxes, settle any claim for Taxes or assessments relating to it, surrender any right to claim a refund of Taxes, consent to any extension or waiver of any limitation period applicable to any claim for Taxes or assessments relating to it;

(xiii)    other than the settlement of collection Actions in the ordinary course of business consistent with past practice, settle any pending or threatened Action (A) with a value greater than $1,750,000 individually or $7,500,000, in the aggregate, and for which a reserve has not been established by the applicable Subject Company or (B) for an amount more than 15% above the amount of any reserve established for such Action by the applicable Subject Company;

(xiv)    other than in the ordinary course of business consistent with past practice, sell, lease, license or otherwise dispose of, grant an Encumbrance on or permit an Encumbrance to exist on, or agree to sell, lease, license, or otherwise dispose of, or grant or permit an Encumbrance on, any properties or assets of the Subject Companies with a value greater than $2,500,000, in each case, other than any Permitted Encumbrances;

(xv)    acquire a substantial portion of the assets or business of any Person or any division or line of business thereof, or otherwise acquire any assets or properties, in each case, whether in a single transaction or a series of related transactions, with a value greater than $2,500,000, or enter into any new line of business;

(xvi)    make any distribution (whether in cash, stock, equity rights or property), declare or pay any dividend, effect a reduction of the capital, or enter into any contractual commitment to effect any of the foregoing;

53

(xvii)    commence any proceeding or file any petition in any court relating to the bankruptcy, reorganization, insolvency, dissolution, liquidation or relief from debtors, in any case, in respect of any Subject Company;

(xviii)    enter into any new Contract that, if existing on the date hereof, would be a Specified Contract (other than a Specified Contract described in  Section 3.15(a)(i),  Section 3.15(a)(iv),  or  Section 3.15(a)(v),  to the extent entered into in the ordinary course of business consistent with past practice, or  Section 3.15(a)(x)  or  Section 3.15(a)(xi)),  or amend, modify, waive, renew or terminate, in each case, in any material respect, any material right under any existing Specified Contract except renewals, extensions or replacements of existing Specified Contracts on terms that are, in the aggregate, at least as favorable in all material respects to the Target Company as the terms thereof on the date of this Agreement or fail to comply with any material obligation of the relevant Subject Company under any Specified Contract;

(xix)    other than in the ordinary course of business consistent with past practice, sell, lease, license or otherwise dispose of, grant an Encumbrance on or permit an Encumbrance to exist on, or agree to sell, lease, license, or otherwise dispose of, or grant or permit an Encumbrance on, any Intellectual Property or IT Assets owned or used by the Subject Companies;

(xx)    fail to maintain any Scheduled Intellectual Property or fail to use reasonable measures to protect the confidential nature of the material trade secrets of the Target Companies;

(xxi)    make or commit to make capital expenditures in excess of $2,000,000 individually and $5,000,000 in the aggregate;

(xxii)    enter into, modify or terminate any labor or collective bargaining agreement of any Target Company or, through negotiation or otherwise, make any commitment to incur any Liability to any labor organization with respect to any Target Company except pursuant to national trade agreements;

(xxiii)    other than actions taken in the ordinary course of business consistent with past practice, take or permit any of its Affiliates to take any action that would result in any Securitization Servicer, Securitization Originator, Securitization Depositor or Securitization Issuing Entity failing to comply in any material respect with its obligations under any applicable Securitization Instrument;

(xxiv)    other than in the ordinary course of business, consistent with past practice, and except as required by Law, applicable accounting standards updating requirements of internal policies and procedures in place as of the date hereof, changes to policies and procedures applicable to Parent and its Affiliates and not targeted at the Target Companies or the Securitization Instruments, modify, replace or supersede the any credit, underwriting or collection practices of any Target Company in any material respect;

54

(xxv)    transfer the employment of any Business Employee to a position outside of the Target Business; or

(xxvi)    affirmatively authorize or commit to do any of the actions prohibited by this  Section 5.1(a).

(b)    Notwithstanding anything to the contrary in  Section 5.1(a), or any other provision of this Agreement or any other Transaction Document, neither Parent nor any of its Affiliates shall be prevented from undertaking, be required to obtain Purchaser's consent in relation to, or incur any Liability as a result of effecting any of the following:

(i)    any matter required by Law or any Government Authority;

(ii)    the implementation of any transaction or the taking of any action expressly contemplated to be taken in any Transaction Document, including any action that arises as a result of the fact that more than one Closing may occur;

(iii)    any matter disclosed in Section 5.1(b) of Parent's Disclosure Letter;

(iv)    the performance of an obligation under any Contract existing as at the date hereof;

(v)    the contribution of any funding to any Subject Company in the ordinary course of business consistent with past practice;

(vi)    the release or discharge of any Liability owed by a Subject Company to Parent or any of its Affiliates, or owed by Parent or any of its Affiliates to a Subject Company;

(vii)    the amendment, modification or revision of the terms of any European Intercompany Loan pursuant to  Section 5.17;

(viii)    any action taken in connection with disaster recovery or related emergency response efforts with the intention of minimizing any adverse effect resulting from such efforts (provided that Parent shall promptly notify Purchaser of any such efforts); or

(ix)    the assignment of any Transfer In-Process Marks to Parent.

Section 5.2    Sale of Target Equity Interests. Except in connection with the Restructuring or the transactions contemplated hereby, between the date hereof and the Final Closing, Parent shall not, and shall cause each of the Sellers not to (except as may be approved by Purchaser (such approval not to be unreasonably withheld, conditioned or delayed)), issue, sell, transfer, dispose of or encumber any Target Equity Interests or rights in respect thereof, or admit any new partner or member with respect to any Target Company.

55

Section 5.3   Cooperation.

(a)   Each of Parent, Purchaser Topco and Purchaser shall, and shall cause their respective Affiliates to, cooperate with each other and use their respective reasonable best efforts to take or cause to be taken all actions, and do or cause to be done all things, reasonably necessary, proper or advisable on their respective parts under this Agreement and applicable Laws to satisfy the conditions set forth in Article VI and to consummate and make effective the transactions contemplated by the Transaction Documents with the intent of effecting each Closing as promptly as practicable, including preparing and filing all documentation to effect all necessary notices, reports and other filings and to obtain as promptly as practicable all consents, registrations, approvals, waivers, orders, interpretive guidance, exemptions, Permits and authorizations necessary to be obtained from any Government Authority (including the Required Governmental Approvals) in order to consummate the transactions contemplated hereby;  provided, however, that each Party agrees to, and to cause its respective Affiliates to, reasonably consult with each other in advance of any filing, and agrees to consider and reasonably take into account the views of the other Party in connection with each such filing.  Without limiting the generality of the foregoing, each Party shall, and shall cause its respective Affiliates to, make timely and as promptly as practicable (and in no event later than 30 calendar days after the date hereof or within such further period acceptable to both Parties) all filings and submissions required under any applicable Law in connection with the Transaction Documents and the transactions contemplated thereby, and file promptly any additional information requested under any applicable Law in connection therewith, after receipt of the request therefor.

(b)   Without limiting the generality of this Section 5.3, the Parties shall reasonably cooperate with each other and shall each furnish to the other all information reasonably necessary or desirable in connection with making any application or other filing required to be made pursuant to any applicable Law, and in connection with resolving any investigation or other inquiry by any Government Authority under any applicable Laws, in each case, with respect to the transactions contemplated by the Transaction Documents.  Each Party shall as promptly as reasonably practicable inform the other of any communication (including promptly furnishing copies of any written communication) with or from, and any proposed understanding, undertaking or agreement with, any Government Authority regarding such applications and filings. Neither Party nor any of their respective Representatives shall agree to participate in any substantive meeting or discussion with any Government Authority in respect of any filing, investigation or inquiry concerning the transactions contemplated by this Agreement unless it consults with the other Party in advance and, to the extent permitted by such Government Authority, gives the other Party the opportunity to attend.  The Parties shall consult and reasonably cooperate with one another in connection with any analyses, appearances, presentations, memoranda, briefs, arguments, opinions and proposals made or submitted by or on behalf of either Party in connection with all meetings, actions and proceedings under or relating to any applicable Laws in connection with the transactions contemplated by this Agreement (including, with respect to making a particular filing, by providing copies of all such documents to the non-filing Party prior to filing, giving due consideration to all reasonable additions, deletions or changes suggested in connection therewith).  Any such provision of information by one Party to the other may be made on a counsel-only basis to the extent required under applicable Law (including any anti-gun jumping Laws), and any such

56

materials may be redacted (i) to remove references concerning the valuation of the Target Companies, (ii) as necessary to comply with contractual arrangements, (iii) as necessary to address reasonable attorney-client or other privilege or confidentiality concerns or (iv) as otherwise necessary to comply with applicable Law.

(c)    Without limiting the generality of this Section 5.3, each of Parent, Purchaser Topco and Purchaser agrees to use its reasonable best efforts to take or cause to be taken all actions necessary (i) to obtain any and all consents, registrations, approvals, waivers, orders, interpretive guidance, exemptions, Permits and authorizations necessary to be obtained from any Government Authority (including the Required Governmental Approvals) to cause the transactions contemplated by this Agreement to occur prior to the Outside Date and (ii) to avoid or eliminate each and every impediment to obtaining any and all consents, registrations, approvals, waivers, orders, interpretive guidance, exemptions, Permits and authorizations necessary to be obtained from any Government Authority (including the Required Governmental Approvals) to cause the transactions contemplated by this Agreement to occur prior to the Outside Date; provided, however, that in respect of each Closing, nothing contained herein will require Purchaser Topco, Purchaser or any of their Affiliates (which for purposes of this proviso shall include the Target Companies) to (x) agree to sell, divest, dispose of or hold separate any assets or businesses, (y) take or commit to take any action that limits its freedom of action with respect to, or its ability to retain, one or more of its businesses, product lines or assets, except in the case of Purchaser and its Controlled Affiliates only, in a manner that would not be materially burdensome to the applicable Target Business Segment, or (z) litigate, pursue or defend against any administrative or judicial action or proceeding (including any temporary restraining order or preliminary injunction) challenging any of the transactions contemplated hereby.

(d)    The Parties shall keep each other apprised of the status of matters relating to completion of the transactions contemplated by this Agreement, including promptly furnishing the other with copies of any material notices or other communications received by either Party or its Affiliates (as the case may be) or, to its Knowledge, its Representatives from any Government Authority with respect to the transactions contemplated by this Agreement, in each case to the extent permitted by applicable Law.  The Parties shall give prompt notice to each other of any development or combination of developments that, individually or in the aggregate, is reasonably likely to prevent, materially delay or materially impair its respective ability to consummate the transactions contemplated by this Agreement, including the failure to satisfy a condition to the Closing set forth in Article VI; provided, however, that no such notification shall affect the representations, warranties, covenants or obligations of the Parties or the conditions to the obligations of the Parties under this Agreement.

Section 5.4    Pre-Closing Restructuring. Between the date hereof and the Final Closing, Parent shall effect the Restructuring. Notwithstanding the foregoing, Parent's obligation pursuant to this Section 5.4 shall be subject to the filing of all documentation to effect all necessary notices, reports and other filings with and obtaining all consents, registrations, approvals, waivers, orders, interpretive guidance, exemptions, Permits and authorizations from all applicable Government Authorities with respect to the Restructuring.  Parent or one or more of its Affiliates (other than the Target Companies) shall bear all out-of-pocket costs and expenses (including any fees and Taxes)

57

incurred in connection with the Restructuring. Parent agrees to keep Purchaser reasonably informed on a timely basis regarding the timing and actions taken (as described in <u>Section 1.1(f)</u> of Parent's Disclosure Letter) in connection with the Restructuring.

<u>Section 5.5</u>   <u>Access and Information</u>.

(a)   With respect to each Subject Company, from the date hereof until the Closing at which such Subject Company is sold, subject to any applicable Law, Parent, to the extent not unreasonably disruptive to the business and employees of such Subject Company, shall, and shall cause its Affiliates to, (i) afford Purchaser and its Affiliates, subject to any confidentiality restrictions, reasonable access during normal business hours upon reasonable advance notice to the books and records and other documents of the Subject Company and assets, properties and senior management and personnel of such Subject Company and its Affiliates, agents and auditors, and (ii) promptly furnish, or cause to be furnished, to Purchaser such technical, financial and operating data and other information (or copies thereof) with respect to such Subject Company, as may from time to time be reasonably requested by Purchaser, in each case, to the extent reasonably required by Purchaser to ensure an orderly and efficient transition of (including for the purposes of retaining personnel (including Key Personnel) of or related to) such Subject Company to Purchaser, to prepare for the Closing relating to such Subject Company or any financing contemplated by <u>Section 5.14</u> and to facilitate the satisfaction of the conditions to the Closing relating to such Subject Company under <u>Article VI</u>; <u>provided</u>, <u>however</u>, that in no event shall Purchaser have access to any information (i) that relates solely to any portion of the business of Parent or its Affiliates that is not being transferred pursuant to this Agreement or (ii) in Parent's reasonable determination, the disclosure of which would violate applicable Law, or could affect any legal privilege. In the event that disclosing information would violate any obligation of Parent or any of its Affiliates with respect to confidentiality, the Parties shall reasonably cooperate so the information might be made available in a redacted format, or, if such redaction would result in pertinent information being omitted, Parent shall make such information available if Purchaser delivers confidentiality, and if reasonably required, indemnity, undertakings reasonably satisfactory to Parent. No information provided to or obtained by Purchaser pursuant to this <u>Section 5.5(a)</u> or otherwise obtained after the execution of this Agreement shall limit or otherwise affect the remedies available hereunder to Purchaser (including Purchaser's right to seek indemnification pursuant to <u>Section 8.2</u>), or the representations or warranties of, or the conditions to the obligations of, the Parties hereto.

(b)   Following the first Closing hereunder until the sixth (6th) anniversary of such Closing, to the extent permitted by applicable Law, Purchaser agrees to provide (or cause its Affiliates to provide) Parent with all necessary access to all books and records and other documents that Purchaser has acquired pursuant to this Agreement and to its Representatives to the extent that such access is reasonably required by Parent or any of its Affiliates and is not unreasonably disruptive to the business and employees of Purchaser and its Affiliates, (i) to prepare any required financial statements, Tax filings or regulatory filings of Parent in respect of periods ending on or prior to any Closing, (ii) to comply with the terms of any Transaction Document, any applicable Law or request of any Government Authority, (iii) to defend or prosecute any judicial, arbitral or regulatory proceeding to which Parent or any of its Affiliates is a party relating to the business

58

and affairs of any Subject Company prior to any Closing or (iv) in connection with any claim for indemnity made under or pursuant to this Agreement, in each case, subject in the case of any Confidential Information of Purchaser or any of its Affiliates to Parent and its Representatives agreeing to maintain the confidentiality of such information; provided, however, that in no event shall Parent have access to any information the disclosure of which, based on advice of Purchaser's counsel, or in Purchaser's reasonable determination, would violate applicable Law or could destroy any legal privilege.  All such information made available to Parent under this Section 5.5(b) shall be deemed Confidential Information and shall be subject to  Section 5.6 (including Section 5.6(c)).  In the event that disclosing information would violate any obligation of Purchaser or any of its Affiliates with respect to confidentiality, the Parties shall reasonably cooperate so the information might be made available in a redacted format.  Purchaser agrees to (or to cause its Affiliates to) retain and preserve all books and records and all other documents that it and its Affiliates acquire pursuant to this Agreement in accordance with Purchaser's internal document retention policies.

(c)    Following the first Closing hereunder until the sixth (6th) anniversary of such Closing, to the extent permitted by applicable Law, Parent agrees to provide (or cause its Affiliates to provide) Purchaser with all necessary access to all books and records and other documents of Parent and to its Representatives to the extent that such access is reasonably required by Purchaser or any of its Affiliates and is not unreasonably disruptive to the business and employees of Parent and its Affiliates, (i) to prepare any required financial statements, reports (including servicer or investor reports), Tax filings or regulatory filings of Purchaser, including with respect to any Securitization Transaction, in respect of periods ending on or prior to any Closing, (ii) to comply with the terms of any Transaction Document, any applicable Law or request of any Government Authority, (iii) to defend or prosecute any judicial, arbitral or regulatory proceeding to which Purchaser or any of its Affiliates (which, as of and after a Closing, shall include any Subject Company transferred at such Closing) is a party relating to the business and affairs of the applicable Target Business Segment prior to such Closing or (iv) in connection with any claim for indemnity made under or pursuant to this Agreement, in each case, subject in the case of any Confidential Information of Parent or any of its Affiliates to Purchaser and its Representatives agreeing to maintain the confidentiality of such information; provided, however, that in no event shall Purchaser have access to any information the disclosure of which, based on advice of Parent's counsel, or in Parent's reasonable determination, would violate applicable Law or could destroy any legal privilege. All such information made available to Purchaser under this  Section 5.5(c) shall be deemed Confidential Information and shall be subject to  Section 5.6 (including Section 5.6(c)). In the event that disclosing information would violate any obligation of Parent or any of its Affiliates with respect to confidentiality, the Parties shall reasonably cooperate so the information might be made available in a redacted format. Parent agrees to (or to cause its Affiliates to) retain and preserve all books and records and all other documents that it and its Affiliates transfer to Purchaser pursuant to this Agreement in accordance with Parent's internal document retention policies.

(d)    From the date hereof until the applicable Closing, Parent shall provide to Purchaser copies of all servicer and security holder reports required to be delivered by any Subject Company,

59

or any of its Affiliates, under each Securitization Transaction, within five Business Days following the date such report is required to be delivered under the applicable Securitization Instruments.

(e)    Within thirty (30) days of the date hereof, Parent shall make available to Purchaser complete copies of (i) all material Contracts related to Material Indebtedness, (ii) any Contract for employment of any individual or firm on a full-time, part-time or consulting or other basis providing annual compensation in excess of $300,000, to the extent such Contract is in the possession of Parent, (iii) a list of each Insurance Policy not set forth on Section 3.17 of Parent's Disclosure Letter and (iv) a list of all Scheduled Intellectual Property not listed on Section 3.14(a) of Parent's Disclosure Letter.

Section 5.6    Confidentiality.

(a)    The first (other than the first two sentences thereof), third, fourth and fifth paragraphs of the Confidentiality Agreement shall cease to have any force or effect as of the Final Closing.  Paragraph six of the Confidentiality Agreement is hereby amended as of the Final Closing to extend the term thereof until the third anniversary of the Final Closing and to apply only to employees of Parent and its Affiliates (other than the Target Companies).

(b)    Subject to Section 5.6(c) and Section 5.7, from and after the Final Closing, (i) each Party that receives or obtains Confidential Information, or whose Affiliates receive or obtain Confidential Information (collectively, the " Receiving Party"), from the other Party or any of its Affiliates (collectively, the "Disclosing Party") as a result of entering into this Agreement (or any agreement entered into pursuant to this Agreement) shall treat, and shall cause its Representatives to treat, such Confidential Information as confidential and shall not disclose or use any such Confidential Information except as provided herein.

(c)    Section 5.6(b) shall not prohibit disclosure or use of any Confidential Information if and to the extent: (i) the disclosure or use is required by Law, any Government Authority or any recognized stock exchange on which the Equity Interests of the Receiving Party or its Affiliates are listed (provided that, to the extent permitted by applicable Law, prior to such disclosure or use the Receiving Party shall (A) promptly notify the Disclosing Party of such requirement and provide the Disclosing Party with a list of Confidential Information to be disclosed and (B) reasonably cooperate (at the Disclosing Party's cost) in obtaining a protective order covering, or confidential treatment for, such Confidential Information), (ii) the disclosure is to any Government Authority having jurisdiction over the Receiving Party or any of its Affiliates in connection with ordinary course discussions with, and examinations by, such Government Authority; (iii) disclosed to any Government Authority with jurisdiction over the Receiving Party or its Affiliates (provided that, to the extent permitted by applicable Law, prior to such disclosure the Receiving Party shall (A) promptly notify the Disclosing Party of such requirement and provide the Disclosing Party with a list of Confidential Information to be disclosed and (B) reasonably cooperate (at the Disclosing Party's sole cost) in obtaining a protective order covering, or confidential treatment for, such Confidential Information), (iv) the disclosure or use is required for the purpose of any judicial proceedings arising out of this Agreement or any other agreement entered into under or pursuant to this Agreement or the disclosure is made in connection with the Tax affairs of the Disclosing Party, (v) the disclosure is made to the Receiving Party's Representatives on a need-

60

to-know basis (with the understanding that the Receiving Party shall be responsible for any breach by its Representatives of this Section 5.6), (vi) the Confidential Information is or becomes generally available to the public (other than as a result of a disclosure, directly or indirectly, in contravention of this Section 5.6 or the Confidentiality Agreement by the Receiving Party or its Representatives), (vii) the Confidential Information is already in the Receiving Party's possession ( provided that such Confidential Information is not known by the Receiving Party to be subject to another confidentiality obligation to the Disclosing Party), (viii) the Confidential Information is or becomes available to the Receiving Party on a non-confidential basis from a source other than the Disclosing Party (provided that such sources are not known by the Receiving Party to be subject to another confidentiality obligation to the Disclosing Party), (ix) in the case of disclosure or use by Purchaser and its Affiliates, the Confidential Information relates exclusively to the Target Companies and is independently developed after the Final Closing, or (x) the disclosure or use of such Confidential Information is made with the Disclosing Party's prior written approval.

Section 5.7    Announcements. Neither Party shall, and they shall cause their respective Affiliates not to, issue any press release or make any written public announcement relating to the subject matter of this Agreement until the Final Closing without the prior review and written approval of the other Party (which approval shall not be unreasonably withheld, conditioned or delayed); provided, however, the foregoing shall not prohibit such disclosure if required by Law, any Government Authority or any recognized stock exchange on which the Equity Interests of either Party or any of their respective Affiliates are listed (in which case the applicable Party will use its reasonable best efforts to consult with the other Party before making the disclosure and to allow such other Party to review the text of the disclosure before it is made).

Section 5.8    Insurance.

(a)    With respect to each Target Business Segment, Parent shall (i) keep, or cause to be kept, all Insurance Policies or suitable replacements therefor (with terms, conditions, retentions and limits of liability that are substantially similar in all material respects to the existing policies or otherwise consistent with the market practice of businesses of a similar size and type), in full force and effect through the close of business on the Closing Date relating to such Target Business Segment, and (ii) use commercially reasonable efforts to protect the rights of the insured Persons under such insurance policies or replacements in all material respects, including by causing said insured Persons to (A) pay or otherwise satisfy or have satisfied any unpaid premiums when due with respect to any period ending at or prior to the Closing relating to such Target Business Segment, (B) provide any reasonably required notices (including renewal notices or, if applicable, other documentation reasonably required to continue in full force and effect the Insurance Policies) to the issuers thereof, and (C) act reasonably in respect of any decision whether to submit and pursue Target Company claims on a timely basis under the Insurance Policies, and (iii) notify Purchaser of any Target Company claims made pursuant to such insurance policies on or after the date hereof, in excess of $500,000 in respect of any individual claim.

(b)    Purchaser and its Affiliates (which, as of and after any Closing, shall include the Subject Companies) will not have access to, and shall not be permitted to make any claims under, any of Parent's or any of its Affiliate's insurance policies and programs with respect to any events

61

or circumstances, including events or circumstances relating to a Subject Company that occurred or existed prior to the Closing relating to such Subject Company; provided that nothing in this Section 5.8 shall preclude Purchaser Indemnified Persons from making any claim for indemnification pursuant to Article VIII; provided, further, however, that Parent (i) shall use commercially reasonable efforts to pursue and collect claims arising prior to the applicable Closing for coverage for Losses involving the assets, properties and liabilities of the Subject Companies or the operation (or interruption) of business conducted by the Subject Companies, if and to the extent Parent would pursue such claims pursuant to its internal policies and procedures had such Closing not occurred, (ii) shall keep Purchaser reasonably apprised of developments concerning such claims, and (iii) shall promptly pay any amounts collected in respect of any such claim, net of any external expenses incurred by Parent in connection with its actions pursuant to this proviso, after the applicable Closing Date to Purchaser for the benefit of the Subject Companies.

(c)    Parent shall obtain and prepay an extended reporting period of six years under each of the D&O Insurance Policies (the "Run-Off Insurance"); Parent shall use commercially reasonable efforts to obtain such Run-Off Insurance prior to the First Closing, and in the event Parent is unable to acquire Run-Off Insurance prior to the First Closing, Parent shall obtain it as promptly as practicable thereafter, and such Run-Off Insurance shall have a commencement date of the First Closing Date.  Such Run-Off Insurance shall be obtained on terms and conditions substantially similar to the terms and conditions in the current D&O Insurance Policies.

Section 5.9    Interest in Intellectual Property.

(a)    Except as specifically provided in this Section 5.9 or the Transitional Trademark License Agreement, Purchaser acknowledges and agrees that none of Purchaser or its Affiliates (including, after any Closing, the Subject Companies transferred at such Closing) is purchasing, acquiring, receiving a license to or otherwise obtaining any right, title or interest in, to or under any Intellectual Property owned or licensed by Parent or any of its Affiliates (other than the Target Companies to the extent they are purchased and sold hereunder), including the Parent Trademarks.

(b)    Except as expressly permitted in the Transitional Trademark License Agreement, (i) Purchaser shall, and shall cause its Affiliates (which, as of and after any Closing, shall include the Target Business Segment transferred at such Closing) to, cease and discontinue all uses of the Parent Trademarks, and (ii) Parent shall, and shall cause its Affiliates to, cease and discontinue all uses of the Company Trademarks. Purchaser, for itself and its Affiliates (which, as of and after any Closing, shall include the Subject Companies transferred at such Closing), agrees that the rights of the Target Companies to the Parent Trademarks pursuant to the terms of any trademark agreements between Parent and its Affiliates, on the one hand, and such Target Companies, on the other hand, shall terminate as of the Closing relating to such Target Company and be replaced by such rights as are provided by the Transitional Trademark License Agreement. Parent, for itself and its Affiliates, agrees that any of their respective rights to the Company Trademarks pursuant to the terms of any trademark agreements between Parent and its Affiliates, on the one hand, and any Target Company, on the other hand, shall terminate as of the Closing relating to such Target Company and be replaced by such rights as are provided by the Transitional Trademark License Agreement.

62

(c)    Purchaser hereby irrevocably and unconditionally covenants, and will cause its Affiliates (which, as of and after any Closing, shall include the Subject Companies transferred at such Closing) and its and their respective successors and assigns to covenant, not to, after any Closing, assert, initiate, file, or otherwise commence anywhere in the world any Action, or participate in or provide support for any such Action, against Parent or its Affiliates, or their respective successors or assigns or their respective officers, directors, employees, agents, direct or indirect customers, users, licensees, direct or indirect suppliers, service providers, distributors, resellers or contractors for infringement, misappropriation, or other violation of any patents, copyrights or trade secrets (in each case, other than with respect to software) owned by any of the Subject Companies transferred at such Closing and used in the ordinary course of business at that time by Parent or its Affiliates other than the Target Companies.

(d)    Parent and other Sellers each hereby grant to Purchaser and its Affiliates (including the Target Companies) a worldwide, perpetual and irrevocable license under their respective owned Intellectual Property that is in existence and used in each Target Business Segment on each Closing Date (other than Trademarks), for use in the Target Business solely in the manner used in the Target Business as of the applicable Closing Date, it being understood that with respect to any Intellectual Property associated with any website, website content, marketing collateral or any similar materials in Mexico, such materials may be used in their current form as permitted under the Transitional Trademark License Agreement for Mexico.

(e)    Prior to the first Closing, Parent shall, and shall cause its Affiliates to, use commercially reasonable efforts to ensure that: (i) all Scheduled Intellectual Property is properly filed in the current name of one of the Target Companies in the applicable jurisdiction; (ii) sole and exclusive title to all software (x) owned by Parent or its Subsidiaries and used exclusively by or for the Target Companies and/or (y) identified as having ownership by "GMAC" under the "IP Ownership" column in  Section 5.9(e) of the Parent Disclosure Letter, is transferred to a Target Company; (iii) all ownership interest Parent and any applicable Affiliate has in the software identified under the heading "HP Software" of Section 5.9(e) of the Parent Disclosure Letter is transferred to a Target Company; (iv) all licenses to software (x) used by or for the Target Companies and not used by Parent itself or for its other Subsidiaries or (y) identified as "Licensed" under the "IP Ownership" column in Section 5.9(e) of the Parent Disclosure Letter, are transferred to a Target Company, subject to any transfer or assignment restrictions set forth in such licenses; and (v) it works with Purchaser in good faith to determine if any Trademarks owned by Parent or its Affiliates and used exclusively by the Target Companies other than the Scheduled Intellectual Property, the Parent In-Process Marks and the Company In-Process Marks should be transferred to a Target Company; with the Parties in each case to equally share all costs related thereto (collectively, the " Title Corrections"); with the Parties in each case to equally share all costs related thereto, except for fees associated with any consent obtained under (vi) above which shall be borne solely by Purchaser. If, as of any Closing, any Title Correction has not been completed that is applicable to the Target Companies involved in such Closing, Purchaser shall take all actions necessary to complete such Title Correction after such Closing. After such Closing, Parent shall cooperate in good faith with Purchaser in effectuating Title Corrections, including, but not limited to, the timely execution and delivery of necessary documentation to Purchaser.

63

(f)    Within 14 days after the date hereof, Parent shall deliver to Purchaser a list of known deviations from the Ally Global Information Security Policy and any associated mitigating measures taken.

(g)    Within 30 days after the date hereof, Parent shall deliver to Purchaser a list of all registered Internet domain names owned by the Target Companies or owned by Parent or its Affiliates and used by the Target Companies. For such domain names that contain a Target Company Trademark but not a Parent Trademark, Parent shall transfer ownership to a Target Company to the extent not already owned by a Target Company; for such domain names that contain a Parent Trademark but not a Target Company Trademark, Target Company shall transfer ownership to the Parent or its Affiliates to the extent not currently owned by the Parent or its Affiliates and Parent or its Affiliates shall license such domain names to the relevant Target Company(ies) pursuant to the relevant Transitional Trademark License Agreement (by adding it to the list of Licensed Trademarks). For all other such domain names, the parties shall negotiate in good faith on ownership and usage rights thereto, provided that neither party shall be forced to abandon use of a domain name without a reasonable transitional period. For purposes of this provision, the terms "Target Company Trademark" and "Parent Trademark" shall include misspellings thereof.

Section 5.10    Cooperation Regarding Transition Arrangements.

(b)    Subject to applicable Law, with respect to each Subject Company, between the date of this Agreement and the earlier of the Closing for such Subject Company and the termination of this Agreement, each Party shall reasonably cooperate with the other Party to assist each other in planning and implementing necessary and appropriate policies, procedures and other arrangements in connection with the transition of ownership of such Subject Company, including the services to be provided pursuant to the Transition Services Agreement. As necessary in connection therewith, each Party shall designate certain of their respective employees as "Transition Coordinators" to coordinate planning and implementation contemplated by this Section 5.10(a).

(c)    The Parties shall, and shall cause their respective Affiliates to, use their respective reasonable best efforts to obtain any consents and approvals and make any other notifications that may be required in connection with the provision of services and access to certain facilities following any Closing pursuant to the Transition Services Agreement. The Parties agree that any costs and expenses payable to third parties (other than the respective Representatives of each of the Parties) in connection with the procurement of any such consents or waivers of third parties necessary or advisable for the provision of such services and access to such facilities shall be borne by the Party who (or whose Affiliates) will receive such services or access pursuant to the Transition Services Agreement. If the Parties are unable to obtain any such consent or approval prior to the applicable Closing, the Parties shall use reasonable best efforts to obtain, as of such Closing, a commercially reasonable alternative to such services and access to the facilities and the costs and expenses payable to obtain such alternative (but not the costs and expenses for the ongoing receipt of such alternative services and access to the facilities) shall be borne by the Party who (or whose Affiliates) will receive such services or access pursuant to the Transition Services Agreement.

64

Section 5.11    Employee Matters.

(c)    Effective as of and from the applicable Closing, each Continuing Employee (as defined below) as of immediately prior to the applicable Closing shall continue in employment as of the applicable Closing Date with the applicable Target Company.  To the extent that the Purchaser and any of its Affiliates requires the services of any Key Person prior to the applicable Closing Date on which such Key Person becomes either a Transferred Employee or a Continuing Employee, the parties agree to enter into a transition services agreement covering the provision of such services having terms substantially similar to those contained in the Global Services Agreement between the parties as of the date hereof; and to the extent that the Purchaser and its Affiliates require the services of any employees or consultants of a Target Company other than a Key Person prior to the applicable Closing Date, the parties agree to mutually and reasonably agree on such other employees or consultants selected to provide services pursuant to such transition services agreement. For a period of one year following the applicable Closing Date, neither the Purchaser nor any of its Affiliates shall transfer the employment of any employee employed by a Target Company located in France immediately prior to the applicable Closing Date to a different entity to the extent that such transfer could create Liability for Parent or any of its Affiliates.  For the avoidance of doubt, any reference under this Section 5.11 and Section 5.11(a) of Parent's Disclosure Letter to the "applicable Closing" or "applicable Closing Date" in respect of any Business Employee providing services to GMAC-SAIC Automotive Finance Company Limited shall be the Completion Date (as defined in the Share Transfer Agreement, dated as of the date hereof, between Parent and Purchaser with respect to the sale and transfer of Parent's 40% equity interest in GMAC-SAIC).

(d)    By the later of 60 days following the date hereof or the 21st day before the Effective Hire Date, Purchaser shall or shall cause an Affiliate thereof to make an offer of employment in writing to each Business Employee set forth on  Section 5.11(a) of Parent's Disclosure Letter; provided that such Business Employee is still employed by Parent or an Affiliate thereof as of such date, and, provided further, that Parent and its Affiliates have complied with all of its obligations under the terms of this Agreement in respect of the Business Employees as of the date of such offer of employment.  The Purchaser shall provide a draft of its form of employment offer to Parent for review over a reasonable period of time and shall reasonably consider in good faith any comments provided by Parent prior to delivery of any written employment offer to any Business Employee.  Each such offer of employment shall be in compliance with applicable Law, with such employment to take effect under the terms stated herein upon the applicable Business Employee's Effective Hire Date. Subject to the requirements of applicable Law, each such offer to a Business Employee shall be for employment (A) in a position comparable to such Business Employee's position as of the time such offer is made, (B) with base compensation and target incentive compensation opportunities substantially comparable to the aggregate amount of such Business Employee's base compensation and target incentive compensation opportunities (including the value of equity compensation opportunities, it being understood that such portion of the Business Employee's compensation does not need to be in the form of equity based compensation but excluding change in control or retention bonuses) immediately preceding the Effective Hire Date; provided, however, that with respect to cash annual incentive compensation opportunities, the relevant comparison shall be to the amount of such cash annual incentive

65

compensation opportunities as in effect as of the date hereof, (C) at a work location within 35 miles of such Business Employee's current work location and (D) with employee welfare and retirement benefits that are substantially comparable in the aggregate to the welfare and retirement benefits provided to such Business Employee in the aggregate immediately preceding the Effective Hire Date (collectively, the "Initial Terms and Conditions of Employment"). Business Employees who commence employment with Purchaser or its Affiliates shall be referred to herein as "Transferred Employees." Transferred Employees shall be provided with the Initial Terms and Conditions of Employment during their employment through the first anniversary of the applicable Effective Hire Date. Parent shall provide Purchaser with information that Purchaser reasonably requests to comply with Purchaser's obligations under this Section 5.11(b), including with respect to each Business Employee, to update his or her current base compensation,  date of hire, position and work location, and to provide correct summaries of all benefit and compensation plans, contracts, policies, agreements or arrangements in which Business Employees participate.  Purchaser shall provide Parent with information that Parent reasonably requests (A) to verify that such offers of employment are in compliance with this  Section 5.11(a) and (B) regarding Business Employees' acceptances and rejections of such offers of employment.  Business Employees' commencement of employment with Purchaser shall not be conditioned upon such employees satisfactorily completing a background investigation, drug test or other employment screening process except to the extent that any such process is required as a matter of such employees' professional certification or qualification or Purchaser's and any of its Affiliates' obtaining or maintaining a license, permit or authorization to conduct business, if any, and shall not include a probationary period.  Purchaser and its Affiliates shall be responsible to provide each Business Employee who does not receive an employment offer that complies with this  Section 5.11(b) or is terminated by Purchaser and its Affiliates within one year following the Effective Hire Date with severance payments and benefits that are on substantially similar terms and in the same amount as the severance payments and benefits that would have been provided by Parent and its Affiliates to such Business Employee, had such termination occurred immediately prior to the Effective Hire Date, under the terms of the written severance benefit plan or arrangement applicable to each such Business Employee (a correct copy of which has been made available to Purchaser). Effective as of the Effective Hire Date, the Transferred Employees shall cease to actively participate in and to accrue benefits under the employee benefit plans and programs of Parent and its Affiliates.  The "Effective Hire Date" shall mean, with respect to each Business Employee, the date set forth for each such Business Employee in  Section 5.11(a) of Parent's Disclosure Letter.

(e)    Purchaser shall, or shall cause its Affiliates to treat each non-union employee of a Target Company who continues in employment with the Target Companies as of or after the applicable Closing Date as a "Continuing Employee". Subject to compliance with applicable Law, Continuing Employees, during their employment with the Purchaser or any Affiliate thereof after the applicable Closing Date shall receive during the one-year period commencing on the applicable Closing Date or such longer period as required by applicable Law, (i) base compensation and target-incentive compensation opportunities that, in the aggregate, are substantially comparable to the aggregate amount of base compensation and target incentive compensation opportunities (including the value of equity compensation opportunities, it being understood that such portion of the Continuing Employee's compensation does not need to be in the form of equity

66

based compensation but excluding change in control, retention or similar compensation) as in effect for each such Continuing Employee as of immediately prior to the applicable Closing, provided, however, that with respect to cash annual incentive compensation opportunities, the relevant comparison shall be to the amount of such cash annual incentive compensation opportunities as in effect as of the date hereof, (ii) employee welfare and retirement benefits, that, in the aggregate, are substantially comparable to those in effect for each such Continuing Employee immediately prior to the applicable Closing, and (iii) severance benefits that are on substantially similar terms to and in the same amount as severance benefits provided by the applicable Target Companies to each such Continuing Employee immediately prior to the applicable Closing under the terms of the applicable, written severance benefit plan or arrangement (a complete copy of which has been made available to Purchaser) or as required under applicable Law;  provided, however, that the foregoing shall not apply to any employee of any Target Company who is a member of a union (regardless of whether they are covered by a collective bargaining agreement or a labor agreement), and the parties intend that, following the applicable Closing, such union employees shall continue to be provided with compensation and employee benefits consistent with the terms of the applicable collective bargaining agreement or applicable labor agreement, each such union employee's employment contract (if applicable), and applicable Law.

(f)    For purposes of vesting, benefit accrual, vacation and sick time credit and eligibility to participate under the Purchaser Benefit Plans, each Transferred Employee and Continuing Employee shall be credited with his or her years of service with the Parent, Target Companies and any Affiliates thereof, and their respective predecessors before the applicable Closing, to the same extent as such Transferred Employee or Continuing Employee was entitled, before the applicable Closing, to credit for such service under any similar Target Company Benefit Plan or similar benefit plan of Parent in which such Transferred Employee or Continuing Employee participated or was eligible to participate immediately prior to the applicable Closing;  provided that the foregoing shall not apply to the extent that its application would result in a duplication of benefits with respect to the same period of service.  In addition, and without limiting the generality of the foregoing, Purchaser shall cause or shall cause its applicable Affiliates (other than Purchaser Topco, General Motors Holdings LLC or General Motors LLC) to cause (i) each Transferred Employee and Continuing Employee to be immediately eligible to participate, without any waiting time, in any and all benefit and compensation plans, contracts, policies and arrangements of Purchaser or its applicable Affiliates (the "Purchaser Benefit Plans") to the extent coverage under any such Purchaser Benefit Plan is replacing comparable coverage under a Target Company Benefit Plan or similar benefit plan of Parent or its Affiliates in which such Transferred Employee or Continuing Employee participated immediately before the Closing (such plans, collectively, the "Old Plans"), and (ii) for purposes of each Purchaser Benefit Plan providing medical, dental, pharmaceutical and/or vision benefits to any Transferred Employee or Continuing Employee, any evidence of insurability requirements, all pre-existing condition exclusions and actively-at-work requirements of such Purchaser Benefit Plan to be waived for such Transferred Employee or Continuing Employee and his or her covered dependents.  Parent shall cause any eligible expenses incurred by any Transferred Employee or Continuing Employee and his or her covered dependents during the portion of the plan year of the Old Plan ending on the date such Transferred Employee or Continuing Employee's participation in the corresponding Purchaser Benefit Plan begins to be taken into account under such Purchaser Benefit Plan for purposes of

67

satisfying all deductible, coinsurance and maximum out-of-pocket requirements applicable to such Transferred Employee or Continuing Employee and his or her covered dependents for the applicable plan year.  For the avoidance of doubt, no Business Employee, Continuing Employee or any other Target Company employee shall have the right to participate in or to any new benefit accrual in any benefit and compensation plan, contract, policy or arrangement sponsored or maintained by Purchaser Topco, General Motors Holdings LLC, or General Motors LLC; however, each Continuing Employee or Transferred Employee who was a participant in the General Motors Retirement Program for Salaried Employees (" SRP") at the time of terminating employment with General Motors Corporation or any of its Affiliates in connection with the divestiture of GMAC LLC and its subsidiaries and was granted the right to continue to accrue vesting and eligibility service under the SRP pursuant to the terms of the Revised Memorandum of Understanding between General Motors Corporation and GMAC LLC, dated as of November 29, 2006 (" SRP MOU"), shall continue to be eligible to accrue such vesting and eligibility service credits on the same basis as prior to his or her Effective Hire Date or the applicable Closing Date with respect to his or her employment with Purchaser and its Affiliates (including the Target Companies) to determine vesting and retirement eligibility with respect to the SRP pursuant to the terms of the SRP and the relevant provision of the SRP MOU, as set forth in Section 5.11(d) of Parent's Disclosure Letter. For the avoidance of doubt, nothing herein shall restrict Purchaser and its Affiliates (including the Target Companies) from, at any time, amending, modifying or terminating, as applicable, the SRP, any Purchaser Benefit Plan, any Old Plan, any Target Company Benefit Plan or any other plan sponsored or maintained by Purchaser or its Affiliates (including the Target Companies).

(g)    Parent and its Affiliates shall, or shall cause the applicable Target Company to pay any amounts that are payable in respect of the Retention Agreements with Target Company employees set forth on Section 5.11(e) of the Parent's Disclosure Letter (the "Retention Agreements"), as earned in respect of the applicable Continuing Employee's employment with Parent and its Affiliates on or prior to, and in no event later than as soon as commercially practicable following, the applicable Closing Date.  Parent and its Affiliates shall be solely responsible for the payment of any and all retention, change in control or other similar compensation or benefit payments which are or may become payable to any Transferred Employee with the consummation of the transactions contemplated hereby or under Parent Benefit Plans, in each case in accordance with and subject to the terms of the relevant plan, agreement or program, as applicable.

(h)    Parent and its Affiliates shall pay any and all compensation payable to any current or former employee, director or individual independent contractor or individual consultant of any Target Company under the Parent Benefit Plans, including under the Ally Financial, Inc. Long-Term Equity Compensation Incentive Plan and the Ally Financial, Inc. Annual Incentive Plans, in accordance with and subject to the terms of any such plans or arrangements, except to the extent that such payments are accrued on the audited combined balance sheet of the Target Companies for purposes of the Final Closing Statement.  With respect to 2013 bonuses for Transferred Employees, Parent and its applicable Affiliates shall accrue for such bonuses for each Transferred Employee for each month from the beginning of the 2013 calendar year through the Effective Hire Date the monthly pro rata amount of such Transferred Employee's actual 2012 bonus amount, subject to adjustments for reasons that are consistent with past practice, and shall pay a cash

68

amount to Purchaser and its Affiliates equal to the aggregate amount of such accrual for each Transferred Employee promptly following such Effective Hire Date, and the Purchaser shall, or shall cause its Affiliates to, pay each such Transferred Employee a cash incentive bonus in respect of 2013 at least equal to the amount of the aggregate amount of bonus accrual paid by Parent and its Affiliates to Purchaser and its Affiliates in respect of such Transferred Employee.

(i)    For the avoidance of doubt, except to the extent that such payments are accrued on the audited combined balance sheet of the Target Companies for purposes of the Final Closing Statement, Parent and its Affiliates (other than the Target Companies) shall reimburse Purchaser and its Affiliates to the extent that Purchaser and its Affiliates (including the Target Companies) pay any incentive compensation, retention, change in control or other similar compensation or benefit payments relating to any periods prior to the applicable Closing Date (for the avoidance of doubt, including without limitation under the Ally Financial, Inc. Long-Term Equity Compensation Incentive Plan, the Ally Financial, Inc. Annual Incentive Plans, and pursuant to the Retention Agreements) to any current or former employee, director or individual independent contractor or individual consultant of any Target Company or any Business Employee.

(j)    To avoid doubt, effective as of the applicable Closing, Purchaser and its Affiliates shall assume or, as applicable, continue to maintain, the applicable Pension Plan(s) listed in Section 5.11(h) of Parent's Disclosure Letter (each, a "Pension Plan" and collectively, the "Pension Plans") and shall be solely responsible for all Liabilities with respect to such Pension Plans and shall hold harmless Parent and its Affiliates in respect of such Pension Plans.

(k)    Purchaser and Parent each shall, and shall each cause its respective Affiliates to, timely comply with all applicable labor or employment Laws of the applicable jurisdictions and any collective bargaining agreements or similar agreements applicable to the employees of the Target Companies to inform and/or consult with the relevant local unions and works councils, in each case in connection with the transactions contemplated hereby. Purchaser and Parent shall reasonably cooperate with each other with respect to the provision of information required or desirable to be provided to any unions or works councils in respect of the transactions contemplated hereby.

(l)    Purchaser and Parent acknowledge and agree that all provisions contained in this Section 5.11 are included for the sole benefit of Purchaser and Parent and nothing contained herein shall (i) be construed as an amendment to any employee benefit plan or program, (ii) create any third-party beneficiary or other rights in any other Person, including any employee or former employee of any of Purchaser, Parent, the Target Companies or any of their respective Affiliates, or any dependent or beneficiary thereof, or (iii) otherwise obligate Purchaser or Parent or any of their respective Affiliates to maintain any particular employee benefit plan or retain the employment of any particular employee following the applicable Closing Date.

Section 5.12    Termination of Certain Affiliate Arrangements; Replacement of Guarantees and Transferred Derivatives; Certain Releases.

(i)    Subject to applicable Law, on or prior to any Closing (i) all Related Party Contracts (other than (i) those set forth in Section 5.12(a) of Parent's Disclosure Letter (subject to the

69

conditions described therein) and (ii) all Intercompany Loans, which shall be treated as described in  Section 5.17) shall be terminated as between Parent or any of its Affiliates (other than any Subject Company), on the one hand, and any of the Subject Companies, on the other hand, and all payables and receivables under any Related Party Contracts so terminated shall have been settled, and (ii) with respect to the Related Party Contracts terminated on or prior to such Closing Date pursuant to  Section 5.12(a)(i), Parent shall deliver mutual releases executed by Parent or such Affiliates that are party to such Related Party Contracts, on the one hand, and such Subject Companies that are party to such Related Party Contracts, on the other hand, providing that no further payments are due, or may become due, under or in respect of such terminated Related Party Contracts, by either Parent or such Affiliates, on the one hand, and by such Subject Companies, on the other; provided that, while all amounts outstanding under such Related Party Contracts shall be paid in connection with such termination, in no event shall Parent or any of its Affiliates, or any Subject Company, pay any termination fee or other financial penalty in connection with any such termination or release.

(j)    Subject to applicable Law, at or prior to any Closing, Purchaser shall, with respect to the Subject Companies and any portion of the Target Business to be purchased and sold at such Closing, (i) arrange for substitute letters of credit, guarantees and other obligations or commitments to replace (A) any letters of credit, guarantees (including any guarantees in connection with any Securitization Transaction), surety bonds, performance bonds, capital maintenance agreements or commitments, and other contractual obligations or commitments entered into by or on behalf of Parent or any of its Affiliates (other than solely by any of the Subject Companies) in connection with the Subject Companies and their businesses (together, the " Parent Guarantees") listed on Section 5.12(b)(i) of Parent's Disclosure Letter outstanding as of the date hereof and (B) any Parent Guarantees entered into in the ordinary course of business, consistent with past practice and in compliance with the provisions hereof, on or after the date hereof and prior to such Closing, (ii) assume all obligations under each Parent Guarantee relating to such Subject Companies and their businesses, obtaining from the creditor or other counterparty a full release (in a form reasonably satisfactory to Parent) of all parties liable, directly or indirectly, for reimbursement to the creditor or counterparty, as the case may be, or fulfillment of other obligations to a counterparty in connection with amounts drawn under the Parent Guarantees or due under such Transferred Derivatives, or (iii) obtain from the creditor or other counterparty a waiver, release and discharge of any such Parent Guarantee (in a form reasonably satisfactory to Parent). Purchaser and its Affiliates shall make, or cause to be made, any required filings before any applicable Government Authority in connection with the foregoing. Purchaser further agrees that to the extent (1) the beneficiary or counterparty under any Parent Guarantee does not accept any such substitute letter of credit, guarantee or other obligation or commitment proffered by Purchaser, or (2) Purchaser is unable to obtain from the beneficiary or counterparty under any Parent Guarantee a full release (in a form reasonably satisfactory to Parent) as contemplated by  Section 5.12(b)(ii) or Section 5.12(b)(iii), Purchaser shall indemnify, defend and hold harmless Parent and its Affiliates against, and reimburse Parent and its Affiliates for, any and all amounts paid, including costs or expenses in connection with such Parent Guarantees, including Parent's and its Affiliates' expenses in maintaining such Parent Guarantees, whether or not any such Parent Guarantee is drawn upon or required to be performed, and shall in any event promptly (and in any event within three Business Days) reimburse Parent and its Affiliates to the extent any Parent Guarantee is called upon, and

70

Parent or its Affiliates make any payment or are obligated to reimburse the party issuing the Parent Guarantee.

(k)    Subject to Section 5.12(a) and Section 5.20, and without prejudice to the Parties' respective indemnification obligations under Article VIII, at or prior to any Closing, (i) the Subject Companies shall execute releases acquitting, releasing and discharging Parent and its Affiliates (other than such Subject Companies) from any and all Liabilities to such Subject Companies that exist as of such Closing Date or that arise in the future from events or occurrences taking place prior to or as of such Closing Date, other than in respect of the Contracts disclosed in Section 5.12(a)(i) of Parent's Disclosure Letter, and (ii) Parent and its Affiliates (other than such Subject Companies) shall execute releases acquitting, releasing and discharging such Subject Companies from any and all Liabilities to Parent or any of its Affiliates (other than such Subject Companies) that exist as of such Closing Date or that arise in the future from events or occurrences taking place prior to or as of such Closing Date, other than in respect of the Contracts disclosed in Section 5.12(a)(i) of Parent's Disclosure Letter.

Section 5.13    Notices and Consents.

(e)    Prior to each Closing, the Parties will take all commercially reasonable steps necessary, and proceed diligently and in good faith, as promptly as practicable, to cause the relevant Subject Companies to give such notices to third parties and obtain such third-party consents as Purchaser (acting reasonably) deems necessary or desirable in connection with the transactions contemplated by this Agreement; provided that Parent shall not be required to incur any out-of-pocket expenses or make any payment to any third party in connection with providing any such assistance, other than the payment of its attorneys' fees and expenses.  The Parties agree that, in the event that any such consent necessary or desirable to preserve for the Target Business or any of the Subject Companies any right or benefit under any Contract to which a Subject Company is a party is not obtained prior to the applicable Closing, Parent will, subsequent to such Closing, reasonably cooperate (for a period not to exceed six months from the Closing Date relating to Subject Company) with Purchaser and the relevant Subject Company in attempting to obtain such consent as promptly thereafter as practicable; provided that Parent shall not be required to incur any out-of-pocket expenses or make any payment to any third party in connection with providing any such assistance.

(f)    Without limiting the generality of this Section 5.13, prior to the applicable Closing, Parent shall, and shall cause the relevant Subject Companies to use all commercially reasonable efforts necessary and proceed diligently and in good faith, as promptly as practicable, to obtain the third-party consents required under the outstanding indebtedness for borrowed money set forth on Section 5.13 of Parent's Disclosure Letter and any Securitization Transaction.

Section 5.14    Financing.

(a)    Until the Final Closing, Parent shall use its reasonable efforts to provide, at Purchaser's sole cost and expense, such reasonable cooperation and assistance as may be reasonably requested by Purchaser in connection with the preparation for and execution of any financing by Purchaser related to the transactions contemplated by this Agreement, including to

71

(i) cause appropriate officers and employees to be available at their offices and on reasonable notice to meet with ratings agencies, prospective lenders, underwriters and investors, as applicable, in presentations, meetings, road shows and due diligence sessions, (ii) provide reasonable assistance with the preparation of any ratings presentations, registration statements, prospectuses, offering memoranda or other disclosure materials in connection therewith, including the preparation of appropriate discussions of business, financial statements, pro-forma financial statements and management discussion for inclusion in any of the above, (iii) provide any reasonably expected sources for any such financing with reasonable access to the properties, books and records of the Target Companies (provided that they have entered into confidentiality arrangements that are reasonably satisfactory to Parent), and (iv) direct its independent accountants to provide reasonable assistance to Purchaser, including in connection with providing customary consents and comfort letters consistent with professional standards and industry practice;  provided that (A) nothing in this Section 5.14 shall require any cooperation to the extent that it would unreasonably interfere with the business or operations of Parent or its Affiliates and (B) none of Parent or its Affiliates shall be required to pay any commitment or other similar fee for which it has not been advanced funds or incur any other liability or provide any covenant or undertaking in connection with any such financing.  Purchaser shall promptly, upon request by Parent, reimburse Parent for all reasonable and documented out-of-pocket costs and expenses (including attorneys' fees) incurred by Parent and its Affiliates in connection with the cooperation and assistance contemplated by this Section 5.14(a).  Notwithstanding anything to the contrary contained in this Agreement, Parent shall not be deemed to be in breach of this Section 5.14(a) so long as Parent has acted in good faith to cooperate and assist Purchaser as set forth in this  Section 5.14(a).

(b)    Until the Final Closing, in order to enable it or Purchaser to consummate the transactions contemplated by the Transaction Documents and perform its obligations thereunder, Purchaser Topco shall take all actions necessary to (i) ensure Purchaser has access to $4,000,000,000 in revolving credit facility capacity and (ii) provide financial support in the form of capital contributions to Purchaser to the extent necessary to achieve on a pro forma basis immediately following any Closing a ratio of Purchaser's tangible equity to Purchaser's assets of no less than 10% (it being understood that Purchaser Topco has no obligation to maintain thereafter such ratio).

(c)    Prior to the Closing in respect of the European Target Companies, Parent and Purchaser shall use their commercially reasonable efforts to take all actions necessary, including obtaining any regulatory or similar approvals or Permits, to substitute GMAC PEARL B.V. (or, subject to consultation with and consent of Purchaser, another Target Company) for GMAC IF with respect to any outstanding Intercompany Loan (subject to Section 5.17) or other Related Party Contracts between GMAC IF, on the one hand, and any Target Company, on the other hand, with respect to funding for such Target Company. Parent shall, and shall cause its Affiliates to, consult with Purchaser in advance of any such substitution; provided that this  Section 5.14(c) shall not require Parent and its Affiliates to take any corporate action, to execute any document or other instrument, or to incur any Liability that would (A) be effective prior to the Closing in respect of the European Target Companies or (B) be a Liability of any Person other than a European Target Company (and, for the avoidance of doubt, in no event shall Parent or any of its Affiliates

72

be required to enter into any Parent Guarantee in connection with this <u>Section 5.14(c)</u>). Purchaser shall consider in good faith any alternative proposal Parent may develop in respect of the treatment of the Intercompany Loans described in the previous sentence.

Section 5.15   Non-Compete; Non-Solicit.

(a)   With respect to each Target Business Segment, during the period beginning on the Closing Date relating to such Target Business Segment and ending on the third anniversary of such Closing Date (any such period, a "<u>Non-Compete Term</u>"), Parent and its Controlled Affiliates (the "<u>Restricted Persons</u>") shall not, directly or indirectly, anywhere in each of the jurisdictions set forth on <u>Section 5.15(a)</u> of Parent's Disclosure Letter in the subsection relating to such Target Business Segment (the "<u>Restricted Territory</u>"), originate or service consumer, wholesale or commercial motor vehicle loans and leases, or directly or indirectly own an interest in, manage, operate, finance or Control any Person that provides any such products or services in the Restricted Territory (collectively, the "<u>Restricted Activity</u>").

(b)   Notwithstanding the foregoing, nothing in this Agreement shall prohibit or in any way limit:

(i)   any Person other than the Restricted Persons from conducting any Restricted Activity;

(ii)   any Restricted Person from performing any act or conducting any business expressly required by this Agreement or any other Transaction Document;

(iii)   any Restricted Person from acquiring, owning or holding up to 4.99% of the outstanding securities of an entity whose securities are listed and traded on a nationally recognized securities exchange or market, whether or not in the United States of America (<u>provided</u> that no Restricted Person may otherwise Control the business or affairs of such entity) or holding or exercising rights of ownership with respect to a security in a fiduciary, custodial or agency capacity or otherwise for the benefit of or on behalf of customers or other un-Affiliated beneficiaries;

(iv)   any Restricted Person from making passive investments for general insurance accounts or investment management activities in the ordinary course of its business;

(v)   the ownership of, any affiliation with, or the conduct of any other activity with respect to, a Person that conducts, either directly or indirectly, a Restricted Activity (any such Person, together with all of its Affiliates, a "<u>Competing Person</u>") that is the result of (1) a merger, consolidation, share exchange, sale or purchase of assets, scheme of arrangement or similar business combination involving any Restricted Person with any Competing Person or (2) the acquisition of any Competing Person or any Equity Interests in any Competing Person by any Restricted Person, if, in the case of either (1) or (2):

(A)   no more than 20% of such Competing Person's total consolidated revenues in its most recent fiscal year (excluding any revenues of

73

any Restricted Person) in each Restricted Region in which it operated in the calendar year prior to such ownership or affiliation change from activities that constitute Restricted Activities; and

(B)    such Competing Person did not generate total consolidated revenues in its most recent fiscal year (excluding any revenues of such Restricted Person) in any Specified Jurisdiction in which it operated in the calendar year prior to such ownership or affiliation change from activities that constitute Restricted Activities in an amount that would exceed the applicable Specified Jurisdiction Cap;

(vi)    any Restricted Person from acquiring a Competing Person or more than 4.99% of the outstanding Equity Interests in any Competing Person that generated total consolidated revenues in its most recently completed fiscal year prior to such acquisition from activities that constitute Restricted Activities in excess of the thresholds set forth in  Section 5.15(b)(v); provided, however, that such Restricted Person shall use its reasonable best efforts to (i) divest, within one year of its acquisition a sufficient portion of such Competing Person necessary to satisfy such thresholds and (ii) after such divestiture has occurred, not exceed such thresholds for the duration of the remaining Non-Compete Term.

(vii)    (A) any Person not Affiliated with Parent that acquires Parent or any of its Affiliates or their respective successors or substantially all of their respective assets or business, or any of such Person's Affiliates or (B) any Person resulting from any merger, consolidation, share exchange, sale or purchase of assets, scheme of arrangement or similar business combination (a "Business Combination") of Parent or any of its successors with or into any other Person not Affiliated with Parent, or any of such Person's Affiliates, if (1) the directors of Parent immediately prior to such transaction do not serve as a majority of the directors of the surviving Person or direct or indirect parent of the surviving Person following such Business Combination, and (2) the equity holders of Parent or any successor immediately before such Business Combination own, immediately following such transaction no more than 50% of the outstanding capital stock of the surviving Person or the direct or indirect parent of the surviving Person;

(viii)    any Restricted Person from foreclosing on collateral of or acquiring any of the outstanding Equity Interests in any Person that has outstanding indebtedness to any Restricted Person, or engaging in any activities otherwise prohibited by this Section 5.15 in connection with any such Person as a result of the acquisition of such Equity Interests, in connection with a debt previously contracted in a distressed or troubled situation;

(ix)    any Restricted Person from continuing any businesses or operations in wind-down or liquidation that are not being acquired by Purchaser pursuant to this Agreement; provided, however, that such Restricted Person shall not conduct any Restricted Activity not already conducted prior to such Closing;

(x)    any Restricted Person from providing transition or separation services to any Person in connection with Parent's publicly announced strategy to sell its Mexican insurance

74

operations, its Canadian motor vehicle finance operations and deposit taking operations and the warranty insurance business conducted under the CarCare Plan brand;

(xi)    any Restricted Person from undertaking general advertising or marketing campaigns not targeting customers, clients or other third-party beneficiaries of the Target Companies; or

(xii)   any Restricted Person from owning and servicing the assets described in  Section 5.21  of Parent's Disclosure Letter.

(c)    Nothing in this Agreement shall require any Restricted Person to terminate any instruments or Contracts of or with any customers, clients or other third-party beneficiaries in effect as of the date hereof, or prohibit or otherwise limit any of them from performing their respective binding obligations in effect as of the Closing at which such instruments, Contracts or performance first become a Restricted Activity pursuant to this  Section 5.15.

(d)    Notwithstanding anything to the contrary contained in this Agreement, the parties acknowledge and agree that (i) no current or future Affiliate of Parent (or any of such Affiliate's direct or indirect Subsidiaries) shall be subject to any of the restrictions or requirements set forth in this  Section 5.15  at any time following the date on which Parent, directly or indirectly, no longer Controls such Person; (ii) no current or future Affiliates of Parent (or any of such Affiliate's direct or indirect Subsidiaries) shall be subject to any of the restrictions or requirements set forth in this  Section 5.15  at any time for conducting a Restricted Activity outside of any Restricted Territory for the benefit of customers, clients or other third-party beneficiaries who also may reside or otherwise have a presence within a Restricted Territory; and (iii) neither GMAC-SAIC, nor any successor joint venture, shall constitute an " Affiliate" of Parent for purposes of this  Section 5.15.

(e)    Parent acknowledges that the covenants in this  Section 5.15  are necessary in order to induce Purchaser to enter into and consummate the transactions contemplated by this Agreement, are required by Purchaser in connection with the transactions contemplated by this Agreement, and that Purchaser would not enter into and consummate the transactions contemplated by this Agreement without the agreement of Parent to the covenants contained in this  Section 5.15. In the event that any of the provisions of this  Section 5.15  should ever be finally adjudicated to exceed the time, scope, geographic or other limitations permitted by applicable Law in any jurisdiction, then such provisions shall be deemed reformed in such jurisdiction to the maximum time, scope, geographic or other limitations enforceable under applicable Law.

(f)    For three years following the date on which any of the following individuals become employees, directly or indirectly, of Purchaser and its Affiliates (including any Subject Companies) as a result of any Closing hereunder, the Restricted Persons shall not, directly or indirectly engage in any of the following activities:

(i)    with respect to any of the individuals set forth on  Section 5.15(f)(i)  of Parent's Disclosure Letter (each, a " Key Person"), cause, solicit, induce or encourage any such individual to leave such employment or hire, employ or otherwise engage any such individual;

75

(ii)    with respect to any of the individuals set forth on Section 5.15(f)(ii) of Parent's Disclosure Letter, cause, solicit, induce or encourage any such individual to leave such employment or hire, employ or otherwise engage any such individual; or

(iii)    with respect to any individual who was an employee at or above the management level set forth on Section 5.15(f)(iii) of Parent's Disclosure Letter of the international operations of Parent immediately prior to the applicable Closing, cause, solicit, induce or encourage any such individual to leave such employment;

provided that nothing herein shall be construed to prevent or prohibit any Restricted Person (A) in the case of clauses (ii) and (iii) above, from hiring or soliciting for employment any individual (1) who has not been an employee of any Target Company or Purchaser for at least three months prior to any direct or indirect solicitation or encouragement from any Restricted Person (other than solicitations or encouragements not otherwise in violation of this Section 5.15(f)), or (2) was involuntarily terminated by Purchaser or the Subject Companies, as applicable and (B) from, in the case of clause (iii) only, hiring, and in the case of clauses (i) through (iii), soliciting for employment, any individual (1) through the use of, or who responds to, general mass solicitations for employment (including advertisements) or a third-party recruiter (in each case, not specifically directed toward employees of the Subject Companies), or (2) who contacts any Restricted Person on his or her own initiative without any prior direct or indirect solicitation or encouragement from any Restricted Person in violation of this Section 5.15(f).

Section 5.16    Other Transaction Documents. At each Closing, each Party shall, and shall cause its respective Affiliates to, execute each Transaction Document (other than this Agreement) to which it is contemplated to be a party and which is to be executed and delivered in connection with such Closing hereunder.

Section 5.17    Intercompany Loans.

(j)    At:

(iv)    the Closing relating to the Brazilian Target Companies, Purchaser shall repay, or cause each applicable Brazilian Target Company to repay, an amount equal to the then-outstanding principal amount and accrued but unpaid interest under each Intercompany Loan to which such Brazilian Target Company is a party in accordance with the terms and conditions of such Intercompany Loan;

(v)    the Closing relating to the MCC Target Companies, Purchaser shall repay, or cause each applicable MCC Target Company to repay, an amount equal to the then-outstanding principal amount and accrued but unpaid interest under each Intercompany Loan to which such MCC Target Company is a party in accordance with the terms and conditions of such Intercompany Loan; and

(vi)    the Closing relating to the European Target Companies, Purchaser shall repay, or cause each applicable European Target Company to repay, an amount equal to the then-

76

outstanding principal amount and accrued but unpaid interest under each Intercompany Loan to which such European Target Company is a party in accordance with the terms and conditions of such Intercompany Loan (each, a " European Intercompany Loan"); provided, however, that Purchaser may, by delivery of written notice to Parent at least 45 days prior to the estimated date of such Closing, defer the repayment of any then-outstanding principal amount of European Intercompany Loans up to $2,000,000,000 until the Final Closing if (i) the terms of such European Intercompany Loans are amended prior to such Closing to reflect terms substantially similar to those set forth in  Schedule 5.17 and reflecting market conditions at the time of such Closing, and (ii) Parent and Purchaser are able to agree to definitive documentation relating to such amendment before the fifth Business Day prior to such Closing.  Parent and Purchaser will use their commercially reasonable efforts to negotiate and agree upon such terms and definitive documentation as promptly as possible after the delivery of written notice to Parent of Purchaser's election to defer repayment of such European Intercompany Loans  pursuant to this paragraph (a)(iii).

(k)    Notwithstanding Section 5.17(a), Purchaser may, by delivery of written notice to Parent at least 45 days prior to the estimated date of the Final Closing, defer the repayment of any then-outstanding principal amount of European Intercompany Loans in excess of $2,000,000,000 until the first anniversary of the Final Closing if (i) the terms of such European Intercompany Loans are amended prior to the Final Closing to reflect terms substantially similar to those set forth in  Schedule 5.17 and reflecting market conditions at the time of such Final Closing, and (ii) Parent and Purchaser are able to agree to definitive documentation relating to such amendment before the fifth Business Day prior to such Final Closing.  Parent and Purchaser will use their commercially reasonable efforts to negotiate and agree upon such terms and definitive documentation as promptly as possible after the delivery of written notice to Parent of Purchaser's election to defer repayment of such European Intercompany Loans  pursuant to this paragraph (b).

(l)    In lieu of Purchaser paying or causing the repayment of European Intercompany Loans pursuant to this  Section 5.17 at the Final Closing, Purchaser may, by delivery of written notice to Parent at least 45 days prior to the estimated date of the Final Closing, elect to purchase one or more European Intercompany Loans (in whole and not in part) from Parent or its Affiliates for a purchase price equal to the then-outstanding principal amount of such European Intercompany Loans plus all accrued but unpaid interest under such European Intercompany Loans and otherwise on such terms and conditions as Parent and Purchaser shall mutually agree (with each acting reasonably) no later than five Business Days prior to the Final Closing.  The then-outstanding principal amount of any such European Intercompany Loans so purchased shall be counted in the calculation of amounts repaid for purposes of the $2,000,000,000 threshold referred to in  Section 5.17(b).

(m)    At the Final Closing, Purchaser and Parent shall each execute or cause to be executed any instrument, in form reasonably satisfactory to each of Purchaser and Parent, reasonably requested by either such Party to facilitate the transactions contemplated by this Section 5.17.

Section 5.18    Further Assurances. The Parties agree that, from time to time, whether before, on or after any Closing Date, each of them shall execute and deliver such further instruments of conveyance and transfer and take such other action as may be reasonably requested by the other

77

Party to carry out the purposes and intents of this Agreement.

Section 5.19    Delivery of Audited Financial Statements. As soon as practicable, but in no event later than 10 Business Days before the first Closing, Parent shall deliver to Purchaser audited combined financial statements of the Target Companies as at December 31, 2010, 2011 and 2012 and related statements of income, stockholders' equity and cash flows for fiscal years then ended of the Target Companies, prepared in accordance with GAAP to the extent required pursuant to Rule 3-05 of Regulation S-X, (the "Historical Financial Statements") and such other financial statements as may be required in order for Purchaser to meet its regulatory external financial reporting obligations under United States securities Laws. All costs and expenses associated with the audit and preparation of the Historical Financial Statements, the audit report and any comfort letters in connection therewith, shall be borne equally by Parent, on the one hand, and Purchaser, on the other hand. Purchaser and its Affiliates shall cooperate with Parent and take all such actions as Parent or its auditor may reasonably request in connection with the preparation of the Historical Financial Statements.

Section 5.20    VAT Provisions

(a)    With respect to any jurisdiction in which a Target Company is a member of a VAT group with a Seller or another Affiliate of Parent, at Purchaser's request:

(iv)    Parent shall, and shall cause Sellers to, cooperate reasonably with Purchaser with respect to the preservation of such a VAT group, if possible; and

(v)    (A) Parent shall, on or before the applicable Closing, give notice to the relevant Taxing Authority (copying the notice to Purchaser) that the relevant Target Companies will cease to be under Parent's control with effect from the applicable Closing and will use its best efforts to procure that the date on which each Target Company ceases to be a member of such Seller's or Affiliate's VAT group falls on the applicable Closing;

(A)    Parent (on behalf of the relevant Sellers) shall pay, or shall procure that there is paid, to each Target Company an amount equivalent to such proportion of any repayment of VAT or any amounts relating to VAT that it or an Affiliate of the Sellers received on behalf of the VAT group from any Taxing Authority or of any credit obtained by reference to an excess of deductible input tax over output tax which is attributable to supplies made or deemed to be made by the relevant Target Company while a member of such Seller's or Affiliate's VAT group to the extent that the repayment is received or credit obtained after the relevant Closing within ten (10) Business Days of Parent's receipt on behalf of the VAT group; and

(B)    Parent (on behalf of the relevant Sellers) shall pay, or shall procure that there is paid, to the relevant Target Company an amount equal to any VAT on actual or deemed supplies, self-supplies, importations or acquisitions made for VAT purposes (after taking account of any deductible input tax attributable to such supplies, importations or acquisitions) by other members of the relevant Seller's or Affiliate's VAT group (not being any of the Target Companies or their subsidiaries), which the relevant Target Company is liable to

78

account for, in addition to any costs and expenses incurred in investigating, assessing or contesting such liability, before Target Company ceased to be a member of the same VAT group as the non Target Company; provided that to the extent able to do so the Target Company provides to Parent a copy of the final and binding assessment notice letter (or similar communication) issued by the relevant Taxing Authority holding the Target Company accountable for such VAT.If such Target Company could not provide Parent a copy of a final and binding assessment notice letter, the amount of VAT that Parent shall pay shall be determined in Parent's reasonable discretion.

(b)    Subject to <u>Section 5.20(d)</u>, with respect to any jurisdiction in which a Target Company is a member of a VAT group with a Seller or another Affiliate of Parent, at Parent's request:

(i)    Purchaser (on behalf of the relevant Purchasers) shall pay, or shall procure that there is paid, to a non Target Company an amount equivalent to such proportion of any repayment of VAT or any amounts relating to VAT received by the representative member from any Taxing Authority (calculated before any set-off asserted by the Taxing Authority against tax due in respect of a Target Company) or of any credit obtained by reference to an excess of deductible input tax over output tax which is attributable to supplies made or deemed to be made by the relevant non Target Company while a member of such Seller's or Affiliate's VAT group within ten (10) Business Days of receipt by the representative member; and

(ii)    Purchaser (on behalf of the relevant Purchasers) shall pay, or shall procure that there is paid, to each non Target Company an amount equal to any VAT on actual or deemed supplies, self-supplies, importations or acquisitions made for VAT purposes (after taking account of any deductible input tax attributable to such supplies, importations or acquisitions) by members of the relevant Seller's or Affiliate's VAT group (being Target Companies or their subsidiaries), which the non Target Company is liable to account for, in addition to any costs and expenses incurred in investigating, assessing or contesting such liability, before non Target Company ceased to be a member of Seller's or Affiliate's VAT group; provided that to the extent able to do so the non Target Company provides to Purchaser a copy of the final and binding assessment notice letter (or similar communication) issued by the relevant Taxing Authority holding the non Target Company accountable for such VAT. If such non Target Company could not provide Purchaser a copy of a final and binding assessment notice letter, the amount of VAT that Purchaser shall pay shall be determined in Purchaser's reasonable discretion.

(c)    The deeming provisions of Section 43(1) of VATA (and any corresponding or similar provision of any non-U.K. Laws) will be disregarded in determining what supplies have been made or are deemed to have been made by or to any person.

(d)    <u>Section 5.20(b)</u> shall not require the Purchaser (or any Target Company) to make any payments to Parent or any other Seller (or any other party) in respect of repayments, refunds or payments to which Purchaser or any of its Affiliates is entitled pursuant to the 2006 Agreement.

79

(e)    Parent shall (or shall cause the applicable Seller to), prior to Closing, make all the necessary applications to Her Majesty's Revenue & Customs (including (where appropriate) forms VAT1, VAT50 and VAT51) to ensure that GMAC Holdings UK Limited and GMAC UK Plc are members of the same UK VAT group.

(f)    On or immediately after the Closing Date, Parent shall submit to the Purchaser a list showing all assets of the German Target Companies for which (i) the potential input VAT adjustment periods have not already been expired as of the Closing Date and (ii) the relevant Target Company has claimed an input VAT deduction in an amount exceeding the equivalent to $10,000 on an individual asset basis.

Section 5.21    No Shop. During the period commencing on the date hereof and ending on the earlier of  the termination of this Agreement pursuant to Section 9.1, and the Final Closing Date, Parent will not, directly or indirectly (i) knowingly solicit, initiate or encourage the submission of any proposal or offer from any Person (other than Purchaser and its Affiliates) relating to the acquisition of any Target Equity Interests or all or substantially all of the assets of any Target Company (including any acquisition structured as a merger, consolidation or share exchange), or (ii) knowingly assist, participate in or facilitate (including providing any confidential information for the purpose of encouraging), any effort or attempt by any Person (other than Purchaser and its Affiliates) to make any proposal or offer to effect any transaction referred to in clause (i) above.

Section 5.22    Powers of Attorney . Except as otherwise agreed by Parent and Purchaser, prior to any Closing Parent shall, or shall cause the applicable Subject Companies to, terminate any powers of attorney executed by or on behalf of any Subject Company except for those powers of attorney executed by or on behalf of any Transferred Employee, any Continuing Employee or any union employee of a Target Company who continues in employment with the Target Companies as of or after the applicable Closing Date.

Section 5.23    Derivative Treatment.

(f)    On or before December 31, 2012, Purchaser shall deliver written notice to Parent informing Parent which, if any, AIM Derivatives they select as Transferred Derivatives pursuant to clause (ii) of the definition thereof.

(g)    Prior to the First Closing, Purchaser shall use reasonable best efforts to enter into an ISDA Agreement with each counterparty to a Transferred Derivative in a form that shall permit the novation of the Transferred Derivatives, and Parent shall cause margin accounts with each such counterparty to be funded at each Closing in an amount sufficient to permit the novation of each Subject Transferred Derivative at each applicable Closing.

(h)    At or prior to each Closing, Purchaser shall use reasonable best efforts to obtain from the counterparty to each Subject Transferred Derivative a novation of such Subject Transferred Derivative in a form reasonably satisfactory to Parent;  provided that if Purchaser is unable to obtain such a novation in a form reasonably satisfactory to Parent, then (i) Purchaser shall use its reasonable best efforts to enter into a back-to-back Derivative Transaction with the same terms as such Subject Transferred Derivative with a financial institution reasonably acceptable to Parent

80

with whom Parent is a counterparty to an ISDA Agreement and who agrees to permit Parent to enter into a Derivative Transaction with equivalent offsetting terms to such Subject Transferred Derivative, and (ii) if Purchaser is unable to enter into the back-to-back Derivative Transaction contemplated by clause (i), Purchaser shall (which obligation may not be assigned pursuant to Section 10.2 or otherwise without the prior written consent of Parent) enter into a back-to-back Derivative Transaction with Parent (or its designated Affiliate) that provides Parent (or its Affiliate) with equivalent offsetting terms to such Subject Transferred Derivative;  provided, further, that the sole amount payable in connection with any such novation or the entry into any of the foregoing transactions shall be the payment of the applicable Net Derivative Value.

(i)    At or prior to each Closing, Parent shall use reasonable best efforts to cause each Subject Rejected Derivative and each Corresponding Derivative to be terminated or to expire in accordance with its terms at or prior to the Closing Date applicable to the Target Company that is party to such Subject Rejected Derivative or Corresponding Derivative.

ARTICLE VI
CONDITIONS TO CLOSING

Section 6.1    Conditions to Each Party's Obligations. The obligations of the Parties to effect any Closing relating to any Target Business Segment are subject to the satisfaction (or written waiver by each of Parent and Purchaser) on or prior to such Closing of each of the following conditions:

(a)    *Government Approvals*. All Required Governmental Approvals relating to the Subject Companies shall have been made or obtained, and any applicable waiting periods relating thereto shall have expired or been terminated early.

(b)    *No Prohibition*. There shall be no Law in effect enjoining or otherwise prohibiting such Closing and no pending lawsuits, actions or proceedings to enjoin or otherwise prohibit such Closing shall have been commenced by any Government Authority or other Person.

(c)    *Restructuring*. The Restructuring shall have been completed by Parent.

Section 6.2    Conditions to Obligations of Purchaser. The obligation of Purchaser to effect any Closing relating to any Target Business Segment is also subject to the satisfaction (or written waiver by Purchaser) on or prior to such Closing of the following conditions:

(e)    *Representations and Warranties*. Each of the representations and warranties of Parent contained in  Article III that relate to such Target Business Segment shall be true and correct to the extent relating to such Target Business Segment as of the date hereof and as of the Closing Date relating to such Target Business Segment as though made at and as of such Closing Date, except (i) for such representations and warranties that are made only as of a specific date, which shall be true and correct as of such date, and (ii) where the failures of such representations and warranties to be true and correct have not had and would not have, (A) with respect to the accuracy of the representations and warranties at and as of the date hereof, a Company Material Adverse Effect, and (B) with respect to the accuracy of the representations and warranties at and as of such

81

Closing Date, a Closing Company Material Adverse Effect (disregarding for purposes of this clause (ii) any limitations as to materiality or Company Material Adverse Effect set forth in such representations and warranties); provided that (x) each reference to "Target Companies" in Article III shall be replaced with a reference to "Subject Companies" and (y) the Parent Fundamental Representations shall be true and correct with respect to such Target Business Segment in all material respects as written as of the date hereof and as of the Closing Date associated with such Target Business Segment, and (z) the representations and warranties contained in Section 3.5(b) shall be true and correct in all respects (replacing the reference to "Company Material Adverse Effect" in Section 3.5(b) with "Closing Company Material Adverse Effect" for purposes of this clause (z)).

(f)    *Covenants*. The covenants, obligations and agreements of Parent set forth in this Agreement to be performed at or prior to such Closing shall have been duly performed in all material respects to the extent they relate to such Target Business Segment.

(g)    *Officer's Certificate.* There shall have been delivered to Purchaser a certificate, dated as of such Closing Date and signed by a duly authorized officer of Parent, certifying the satisfaction of the conditions in Section 6.2(a) and Section 6.2(b).

(h)    *Brazilian Withholding Taxes Calculations.* Solely with respect to the Closing associated with the Brazil Target Companies, Parent shall have delivered to Purchaser a certificate that sets forth the calculation of the capital gain or loss with respect to the Target Companies listed in Schedule 6.2(d) and the amount of the Brazilian capital gain tax due.

(i)    *Audited Financial Statements.* Solely in connection with the first Closing hereunder, the Historical Financial Statements shall have been delivered to Purchaser pursuant to Section 5.19.

(j)    *Closing Deliverables*. There shall have been delivered to Purchaser the items specified in Section 2.6(b) and, to the extent applicable, Section 2.6(c).

Section 6.3    Conditions to Obligations of Parent. The obligation of Parent to effect the Closing relating to any Target Business Segment is also subject to the satisfaction (or written waiver by Parent) on or prior to such Closing of the following conditions:

(a)    *Representations and Warranties.* Each of the representations and warranties of Purchaser contained in Article IV shall be true and correct as of the date hereof and as of the Closing Date associated with such Target Business Segment as though made at and as of such Closing Date except (i) for such representations and warranties that are made only as of a specific date, which shall be true and correct as of such date, and (ii) where the failures of such representations and warranties to be true and correct have not had and would not have, with respect to the accuracy of the representations and warranties at and as of the date hereof, a Purchaser Material Adverse Effect, and with respect to the accuracy of the representations and warranties at and as of the applicable Closing Date, a Closing Purchaser Material Adverse Effect (disregarding for purposes of this clause (ii) any limitations as to materiality or Purchaser Material Adverse Effect set forth in such representations and warranties); provided that the Purchaser Fundamental

82

Representations shall be true and correct in all material respects as written as of the date hereof and as of the Closing Date associated with such Closing.

(b)    *Covenants*. The covenants and agreements of the Purchaser set forth in this Agreement to be performed at or prior to such Closing shall have been duly performed in all material respects to the extent that they relate to such Target Business Segment.

(c)    *Officer's Certificate.* There shall have been delivered to Parent a certificate, dated as of such Closing Date and signed by a duly authorized officer of Purchaser, certifying the satisfaction of the conditions in  Section 6.3(a) and Section 6.3(b).

(d)    *Closing Deliverables*. There shall have been delivered to Parent the items specified in  Section 2.6(a) and, to the extent applicable, Section 2.6(c).

<div align="center">

ARTICLE VII
TAX MATTERS

</div>

Section 7.1    Seller Returns and Reports. Parent shall file, or shall cause the Target Companies to file, when due all Tax Returns that are required to be filed by or with respect to the Target Companies on or before the applicable Closing Date (taking into account all valid extensions of time to file) and shall pay all Taxes shown due on such Tax Returns. All such Tax Returns shall be prepared in a manner consistent with prior practice unless otherwise required by applicable Law.  Parent shall, or shall cause the Sellers to, provide Purchaser with copies of such completed Tax Returns (including annual VAT returns, but excluding all monthly or quarterly VAT returns) at least 30 days prior to the due date for filing thereof, along with supporting workpapers, for Purchaser's review and approval (such approval not to be unreasonably withheld, conditioned or delayed).  Parent and Purchaser shall attempt in good faith to resolve any disagreements regarding such Tax Returns prior to the due date for filing.  In the event that Parent and Purchaser are unable to resolve any dispute with respect to such Tax Return at least five days prior to the due date for filing, such dispute shall be resolved pursuant to Section 7.12, which resolution shall be binding on the Parties.

Section 7.2    Purchaser Returns and Reports. Purchaser shall file or cause to be filed when due all Tax Returns that are required to be filed by or with respect to each Target Company after the applicable Closing Date with respect to Pre-Closing Periods and, subject to the rights to payment from Parent only to the extent provided in  Section 8.2(a)(vi), shall pay all Taxes shown due on such Tax Returns. All such Tax Returns shall be prepared in a manner consistent with prior practice unless otherwise required by applicable Law. Purchaser shall provide Parent with copies of such completed Tax Returns (including annual VAT returns, but excluding all monthly or quarterly VAT returns) at least 30 days prior to the due date for filing thereof, along with supporting workpapers, for Parent's review and approval (such approval not to be unreasonably withheld, conditioned or delayed).  Parent and Purchaser shall attempt in good faith to resolve any disagreements regarding such Tax Returns prior to the due date for filing.  In the event that Parent and Purchaser are unable to resolve any dispute with respect to such Tax Return at least five days prior to the due date for filing, such dispute shall be resolved pursuant to Section 7.12, which resolution shall be binding on the Parties.  Not later than 10 days prior to the due date for the payment of Taxes on any Tax Returns which Purchaser has the responsibility to cause to be filed pursuant to this  Section 7.2,

<div align="center">83</div>

Parent shall pay (or cause to be paid) to Purchaser the amount of Taxes owed by Parent pursuant to the provisions of  Section 8.2(a). No payment pursuant to this Section 7.2 shall excuse Parent from its indemnification obligations pursuant to (and to the extent of) Section 8.2(a)(vii) if the amount of Taxes as ultimately determined (on audit or otherwise) for the periods covered by such Tax Returns exceeds the amount of Parent's payment under this Section 7.2.

Section 7.3    Amendments.  Unless required by applicable Law, Purchaser shall not amend, and after the Closing shall not permit the Target Companies to amend, any Tax Return filed by Parent, the other Sellers, the Target Companies with respect to any Pre-Closing Period of any Target Company (if Parent or another Seller would be liable for any Losses arising from such amendment and if such amendment is reasonably likely to have a material adverse effect on Parent or such Seller) without the prior written consent of Parent, which consent shall not be unreasonably withheld, conditioned or delayed;  provided that the foregoing shall not apply to any amendment that may be required to be filed following resolution of a Tax audit or other inquiry from a Taxing Authority conducted in accordance with the contest provisions of Section 7.4.

Section 7.4    Contest Provisions.

(d)    If a claim shall be made by any Taxing or Government Authority, that, if successful, might result in a payment on behalf of Parent to Purchaser under Section 8.2 Purchaser shall promptly notify Parent with such potential liability in writing (a " Tax Notice") of such claim (a "Tax Claim") provided that Purchaser's failure to deliver such Tax Notice to Parent shall not limit Purchaser's rights under Section 8.2 except to the extent Parent's position or defense is actually and materially prejudiced by such failure. Such Tax Notice shall provide reasonable detail to apprise Parent of the nature of the Tax Claim, taking into account the facts and circumstances with respect to such Tax Claim.

(e)    With respect to a Tax Claim or proceeding arising therefrom relating exclusively to a Pre-Closing Period, Purchaser shall have the right, at Parent's sole expense (but subject to the same limitation on expenses as provided in  Section 8.2(a)(vii)(G)), to represent the interests of the Target Companies with respect to such a Tax Claim or proceeding; provided, that:

(i)    Purchaser shall provide Parent with copies of all correspondence, notices and other written materials received from any Taxing Authorities and shall otherwise keep Parent and its tax advisors advised of significant developments in the audit or dispute and of significant communications involving representatives of the Taxing Authorities;

(ii)    Parent shall have the right to consent to the selection of outside counsel or other advisors in connection with such Tax Claim or proceeding (which consent shall not be unreasonably withheld);

(iii)    Purchaser shall keep Parent reasonably informed and consult seriously and in good faith with Parent and its tax advisors with respect to any issue relating to such audit or dispute;

84

(iv)    Parent may request that Purchaser take a position in respect of such audit or proceeding, and Purchaser shall do so provided that (X) there exists a reasonable basis in fact and law for such position and (Y) the adoption of such position would not reasonably be expected to adversely affect the Tax liability of any of the Target Companies for any post-Closing period or portion thereof (unless Parent agrees to indemnify and hold harmless such Target Companies from such adverse effect);

(v)    Purchaser shall provide Parent with a copy of any material written submission to be sent to a Taxing Authority prior to the submission thereof and shall give serious and good faith consideration to any comments or suggested revisions that Parent or its tax advisors may have with respect thereto;

(vi)    Parent shall have the right to have a representative attend any portion of a meeting between Purchaser or any Target Company, on the one hand, and a Taxing Authority, on the other, in which any Tax for which Parent may be liable pursuant to Section 8.2(a)(vii) is discussed, provided that Purchaser shall have the right to set the agenda and strategy for such meeting; and

(vii)    there will be no settlement, resolution, or closing or other agreement with respect thereto without the consent of Parent, which consent will not be unreasonably withheld, conditioned or delayed.  For the avoidance of doubt, Parent may reasonably withhold its consent to any settlement, resolution or closing or other agreement with respect to any Tax Claim or proceeding arising therefrom if Parent can supply Purchaser with an opinion of nationally recognized tax counsel in the relevant jurisdiction that there is a reasonable basis in law and fact for Parent to achieve a more favorable result than the settlement, resolution, closing or other agreement, in which case Purchaser will continue to pursue the relevant tax audit or proceeding.

(f)    With respect to a Tax Claim or proceeding arising therefrom relating to a Straddle Period, Purchaser shall have the right, at its sole expense (but subject to indemnity pursuant to  Section 8.2(a)(vii), reasonably allocated taking into account the portion of the total Tax Claim that related to a Pre-Closing Period), to represent the interests of the Target Companies with respect to such a Tax Claim or proceeding; provided, that:

(vi)    Parent shall have the right, at its sole expense, to have a representative attend any proceedings and negotiations and to review any written materials sent to or received from the Taxing Authority;

(vii)    Purchaser shall reasonably cooperate with Parent in connection with such attendance;

(viii)    Purchaser shall not settle any Tax Claim or proceeding arising therefrom without Parent's consent (such consent not to be unreasonably withheld, conditioned or delayed).

85

Section 7.5    Transfer Taxes. Purchaser and Parent shall each be liable for and shall pay within any time period prescribed by Law or Taxing Authority (and shall indemnify and hold harmless Parent Indemnified Persons against) 50% of any transfer, documentary, filing, recording, stamp, sales, use, registration and other such taxes or fees or governmental charges, including interest or penalties thereon, in each case arising out of or in connection with the transactions effected pursuant to this Agreement (but, for the avoidance of doubt, excluding any taxes computed by reference to net income or capital gain of the Sellers, which shall be the responsibility of Parent) ("Transfer Taxes"). Purchaser shall, at its own expense, file (or cause to be filed) all necessary Tax Returns and other documentation with respect to any such Transfer Taxes, in each case arising from the purchase and sale of the Target Equity Interests.  If required by applicable Law, Parent shall, and shall cause its Affiliates to, join in the execution of any such Tax Returns and other documentation; provided that any dispute with respect thereto shall be resolved pursuant to Section 7.12, which resolution shall be binding on the Parties. Parent and Purchaser shall, and shall cause their respective Affiliates to, use commercially reasonable efforts to minimize the amount of Transfer Taxes payable by reason of the consummation of the transactions contemplated hereunder.

Section 7.6    Cooperation; Access to Records. After each Closing of each Target Business Segment, Parent and Purchaser shall cooperate fully in preparing for and conducting any audits of, or disputes with any Taxing Authorities regarding, any Tax Returns, and shall provide such information as reasonably necessary for such audits, disputes or for the filing of all Tax Returns, subject to the provisions of Section 7.4, of each Target Company in the Target Business Segment. Parent shall, and shall cause the other Sellers to, after the applicable Closing, consistent with current practices of the Target Companies, retain such records, documents, accounting data and other information as are necessary for the preparation, filing and examination of Tax Returns with respect to Taxes of each Target Company and shall make available to the other Parties and to any Government Authority as reasonably requested all records, documents, accounting data and other information relating to Taxes of each Target Company until sixty (60) days after the expiration of the statute of limitations (and, to the extent Parent is notified by Purchaser or the Target Companies, any extensions thereof) and shall give Purchaser reasonable written notice prior to transferring, destroying, or discarding any such books and records and, if Purchaser so requests, Parent, or the other Sellers, shall allow Purchaser to take possession of such books and records.

Section 7.7    No Tax Elections. Purchaser shall not make, and agrees to prevent the Target Companies from making, any election pursuant to Section 338(g) of the Code or any similar provision of Law with respect to any Target Company.

Section 7.8    No Dividends. With respect to each Target Company, prior to January 1 of the calendar year following the year in which the applicable Closing occurs, Purchaser agrees that such Target Company shall not pay any distributions or dividends to its shareholders.

Section 7.9    Tax Sharing. Prior to the applicable Closing Date, Parent shall, and shall cause the other Sellers to, terminate any Tax sharing, Tax allocation, and Tax indemnification agreements and arrangements of each of the Target Companies (other than any Tax sharing, allocation or Tax indemnification agreement solely between Target Companies in the same Target Business Segment), and such agreements shall have no further effect for any taxable year or period (whether a past, present or future year or period), and no additional payments shall be made

86

thereunder on or after the applicable Closing Date with respect to any period.

Section 7.10    IRS Forms 5471.  Purchaser shall cause a Form 5471, Information Return of U.S. Persons with Respect to Certain Foreign Corporations, to be timely and accurately filed for each Target Company (other than a Target Company that is treated as a "disregarded entity" within the meaning of Treasury Regulations Section 301.7701-3(b)(2)(i)(C)) that is not a U.S. Person for such Target Company's tax year in which Purchaser acquired such company. Each such Form 5471 shall be filed as a joint information return in respect of Purchaser (or its applicable Affiliate) and Parent (or its applicable Affiliates).  In connection with the filing of each such Form 5471, Parent agrees to furnish or cause to be furnished to Purchaser, upon request, as promptly as practicable, such information (including Forms 5471 for each applicable Target Company for the taxable years ended December 31, 2011 and 2012 filed by Parent or its Affiliates) and assistance that is reasonably required to properly complete such Form 5471.  Purchaser shall provide copies of the Forms 5471 to Parent no later than ten Business Days prior to the due date for filing such Forms 5471 for Parent's review and approval.

Section 7.11    Straddle Period Tax Allocation. If a Target Company does not close its taxable year on the applicable Closing Date or in any case in which a Tax is assessed with respect to a taxable period which includes the applicable Closing Date but does not begin or end on that day (a "Straddle Period"), the Taxes, if any, attributable to a Straddle Period shall be allocated (i) to the Pre-Closing Period for the period up to and including the applicable Closing, and (ii) to the period beginning after the applicable Closing for the period subsequent to the applicable Closing. Any allocation of income or deductions required to determine any Taxes attributable to a Straddle Period shall be made by means of a closing of the books and records of the Target Company as of the applicable Closing (but taking into account any Tax consequences of the Closing), provided that (x) real and personal property Taxes and any other *ad valorem* Taxes shall be apportioned on a per diem basis and (y)  exemptions, allowances or deductions that are calculated on an annual basis (including depreciation and amortization deductions) shall be allocated between the period ending on the applicable Closing and the period after the applicable Closing in proportion to the number of days in each such period.

Section 7.12    Disputes. Any dispute as to any matter covered in this Article VII shall be resolved by a nationally recognized tax expert in the jurisdiction to which the dispute relates that is mutually agreed by Parent and Purchaser or, if Parent and Purchaser do not agree on the selection of such expert, KPMG. The fees and expenses of such expert shall be borne 50% by Parent, on the one hand, and 50% by Purchaser on the other. If any dispute with respect to a Tax Return is not resolved prior to the due date of such Tax Return, such Tax Return shall be filed in the manner which the party responsible for preparing such Tax Return deems correct, the filing of which shall not prejudice or otherwise control the dispute in respect of such Tax Return.

Section 7.13    Refunds. If Purchaser or any Target Company receives (i) a Tax refund of any Tax, (ii) a credit against Taxes otherwise payable in lieu of a refund, or (iii) the release of excess Tax reserves (which were taken into account in the calculation of Final Net Asset Value) upon a final, binding and nonappealable determination with respect to contingencies forming the basis of such reserves, which Tax refund, credit or release relate to Taxes previously paid in or provided for in respect of a Pre-Closing Period (except to the extent that such refund or credit (i) is shown as an

87

asset on the Final Closing Statement for purposes of calculating, or otherwise taken into account as an increase to, the applicable Final Net Asset Value, (ii) results from the carryback of a Tax attribute arising from a taxable period (or portion thereof) beginning on or after Closing, or (iii) is one to which Purchaser or any of its Affiliates is entitled pursuant to the 2006 Agreements), Purchaser shall pay to the applicable Seller, within fifteen (15) Business Days following the actual receipt of such refund (or the application of such credit or release of such reserve), an amount equal to such refund (or credit or release) less (x) any expenses incurred by Purchaser, any of its Affiliates or any Target Company in connection with obtaining such refund (or credit or release) and (y) any Taxes incurred by Purchaser, any of its Affiliates or any Target Company in connection with the receipt or accrual of any such refund (or application of such credit or release).  All other Tax refunds (or credits) and excess Tax reserves shall belong to Purchaser or to the applicable Target Company. Nothing in this Agreement is intended to alter the rights and obligations of the parties to the 2006 Agreement; provided, however, that to the extent that Parent is obligated pursuant to the 2006 Agreement to make a payment to Purchaser or an Affiliate of Purchaser by reason of the receipt by a Target Company of a Tax refund, Parent shall not be obligated to make such payment with respect to a Tax refund received by such Target Company after the applicable Closing Date.

Section 7.14    Exclusivity. In the event of any inconsistency between the provisions of this  Article VII, on the one hand, and the provisions of Article VIII, on the other hand, the provisions of this  Article VII shall control as to Tax matters.

ARTICLE VIII
SURVIVAL; INDEMNIFICATION; CERTAIN REMEDIES

Section 8.1    Survival. The representations, warranties, covenants and obligations of the Parties with respect to each Target Business Segment contained in or made pursuant to this Agreement shall survive in full force and effect until 5:00 p.m. New York City time on the date that is 540 days after the Closing Date for such Target Business Segment, at which time they shall terminate (and no claims shall be made for indemnification under  Section 8.2 or Section 8.3 thereafter), except:

(e)    the Parent Fundamental Representations and Purchaser Fundamental Representations shall survive until 5:00 p.m. New York City time on the date that is the later of (i) 60 days after the expiration of any applicable statute of limitations and (ii) the tenth anniversary of the Closing Date for such Target Business Segment;

(f)    (i) the covenants and obligations that by their terms apply or to the extent they are to be performed in whole or in part after a Closing shall survive for the period provided in such covenants and obligations, or until fully performed and (ii) the covenants and obligations that by their terms apply or to the extent that they are to be performed in their entirety on or prior to a Closing shall survive until 5:00 p.m. New York City time on the date that is 270 days after such Closing;

(g)    The Non-Indemnifiable Tax Representations shall terminate upon Closing;

88

(h)    The Indemnifiable Tax Representations, Parent's and Purchaser's obligations pursuant to <u>Article VII</u> and claims for indemnification under <u>Section 8.2(a)(vii)</u>, <u>Section 8.2(a)(viii)</u> and <u>Section 8.3(a)(iii)</u> shall survive until the date that is the later of (i) 5:00 p.m., New York City time, on the date that is 60 days after the expiration of any applicable statute of limitations (including any extensions and suspension thereof) and (ii) 5:00 p.m., New York City time, on the date that is 60 days after the date that the respective tax assessment has become final, binding and nonappealable;

(i)    claims for indemnification under <u>Section 8.2(a)(iii)</u> shall survive in full force and effect until 5:00 p.m., New York City time, on the date that is the sixth anniversary of the Closing relating to the Brazilian Target Companies;

(j)    claims for indemnification under <u>Section 8.2(a)(iv)</u> shall survive in full force and effect until 5:00 p.m., New York City time, on the date that is the sixth anniversary of the Closing relating to the Target Business Segment that is the source of the greatest amount of Losses arising out of such claim for indemnification;

(k)    claims for indemnification under <u>Section 8.2(a)(v)</u> shall survive in full force and effect indefinitely; and

(l)    claims for indemnification under <u>Section 8.2(a)(vi)</u> shall survive in full force and effect until 5:00 p.m., New York City time, on the date that is the tenth anniversary of the Closing relating to the Target Business Segment that is the source of the greatest amount of Losses arising out of such claim for indemnification.

<u>Section 8.2</u>    <u>Indemnification by Parent</u>.

(f)    After each Closing and subject to this <u>Article VIII</u>, Parent, on behalf of the Sellers, shall indemnify, defend and hold harmless Purchaser and its Affiliates (which, as of and after any Closing, shall include the Subject Companies transferred at such Closing) (the "<u>Purchaser Indemnified Persons</u>"), against, and reimburse the Purchaser Indemnified Persons for, without duplication, all Losses that the Purchaser Indemnified Persons may at any time suffer or incur, or become subject to:

(viii)    as a result of or in connection with the breach of any of the representations and warranties of Parent contained in <u>Article III</u> to the extent relating to a Closing that has occurred or a Target Company that has been purchased by and sold to Purchaser (other than the Non-Indemnifiable Tax Representations) (<u>it</u> <u>being</u> <u>understood</u> that, for purposes of determining whether any breach has occurred or calculating the amount of any Losses under this <u>Section 8.2(a)(i)</u>, all materiality and Company Material Adverse Effect qualifications and exceptions (except for such qualifications and exceptions (A) used in <u>Section 3.15(a)(ii)</u>, <u>Section 3.15(a)(vi)</u>, <u>Section 3.15(a)(viii)</u>, <u>Section 3.19(e)</u>, <u>Section 3.19(i)</u> and <u>Section 3.28(a)</u> to qualify a list of items or a set of materials made available rather than to qualify a statement or (B) contained in <u>Section 3.5(b)</u>) contained in such representations and warranties shall be disregarded);

89

(ix)    as a result of or in connection with any breach by Parent of any of its covenants, agreements or obligations contained in this Agreement to the extent relating to a Closing that has occurred or a Target Company that has been purchased by and sold to Purchaser;

(x)    as a result of the matters set forth in Section 8.2(a)(iii) of Parent's Disclosure Letter;

(xi)    as a result of any action taken by Parent or any of its Affiliates to effect the Restructuring (to the extent resulting from the Restructuring and affecting a Target Company that has been purchased by and sold to Purchaser);

(xii)    as a result of (A) Parent's ownership of Residential Capital LLC, or (B) any Target Guarantee;

(xiii)    as a result of or in connection with (A) GMAC Continental Corporation's operation of any business (other than the Target Business) or acquisition, ownership or sale of any assets (other than any Equity Interests in any of the Target Companies) prior to Closing, or (B) any Liability of GMAC Continental Corporation that is not related to, and does not arise from, its operation of the Target Business or its ownership of any Equity Interest in any of the Target Companies; or

(xiv)    that constitute (A) Taxes of the Target Companies (or any predecessor thereof) for any Pre-Closing Period (as allocated under Section 7.11), including any Taxes of the Target Company in respect of (1) income realized on the applicable Closing Date to the extent resulting from actions taken by the Target Company at the direction of Parent or any Seller (or any Affiliate of Parent or any Seller) that are outside the ordinary course of business or (2) any transactions in connection with the consummation of the Restructuring, (B) Taxes imposed on any Target Company as a result of the transactions effected pursuant to this Agreement, (C) Taxes imposed on the Target Companies pursuant to Treasury Regulations Section 1.1502-6(a) (or any predecessor or successor thereof or any analogous or similar provision under state, local or foreign Law), (D) Tax liability of any Target Company (including, without limitation, any U.K. income tax (whether collected through PAYE or otherwise) or employee or employer's National Insurance Contributions) together with any interest or penalties arising therefrom, as a result of any share options, restricted stock units, stock appreciation rights or other such similar awards, which have been granted and/or awarded to any U.K. employees of a Target Company prior to Closing, pursuant to the Ally Financial, Inc. Long-Term Equity Incentive Plan, (E) any Transfer Taxes required to be borne by Parent pursuant to Section 7.5, (F) all withholding Taxes and Taxes in respect of non-resident gains arising as a result of or in connection with the transactions contemplated by this Agreement and (G) reasonable out-of-pocket costs and expenses (including reasonable fees and out-of-pocket expenses of outside legal counsel and other advisors) incurred by Purchaser Indemnified Persons relating to any indemnified Tax matter (including an examination relating thereto or a claim for Taxes) in this Section 8.2(a)(vii) or Section 8.2(a)(viii); or

90

(xv)    as a result of a final binding and non-appealable determination that changes a Tax Attribute (including by reason of the application of any Tax Attribute to offset or reduce any Tax liability described in Section 8.2(a)(vii), but excluding by reason of (i) any retroactive change in Law enacted after the Closing, (ii) the sale of the Target Companies or (iii) any change of control or change of business conduct effected on or after the Closing), which, if given effect as of the applicable Closing Date (and not taking into account any change of Law since the Closing Date), would have caused a reduction in the Net Deferred Tax Asset calculated in accordance with GAAP, in which case the Loss subject to indemnification by Parent in this Section 8.2(a)(viii) shall be equal to the amount such reduction, payable at such time and to the extent that the changed Tax Attribute that causes a reduction in the Net Deferred Tax Asset would otherwise have been used to reduce the amount of Tax paid by Purchaser a Target Company or its Affiliates.

(g)    Notwithstanding anything to the contrary contained herein, Parent shall not be required to indemnify, defend or hold harmless the Purchaser Indemnified Persons against, or reimburse, or otherwise have any liability under this Agreement to, the Purchaser Indemnified Persons for (i) any Losses pursuant to Section 8.2(a)(i) (other than Losses in connection with any Parent Fundamental Representations or the Indemnifiable Tax Representations) with respect to any claim (A) unless such claim (or related claims arising out of the same facts, events or circumstances) involves Losses in excess of $125,000 (the "Threshold") (nor shall any such claim that does not meet such Threshold be applied to or considered for purposes of calculating the aggregate amount of Losses of the Purchaser Indemnified Persons for which Parent has responsibility under clause (B) of this Section 8.2(b) below), and (B) until the aggregate amount of the Losses of the Purchaser Indemnified Persons for which the Purchaser Indemnified Persons are finally determined to be otherwise entitled to indemnification under Section 8.2(a)(i) exceeds 2.00% of the Paid Purchase Price at the time the Claim Notice in respect of a claim for such Losses (or related claims arising out of the same facts, events or circumstances) is delivered (as may be increased pursuant to the last sentence of this Section 8.2(b), the "Deductible"), after which Parent, on behalf of the Sellers, shall be obligated for all Purchaser's Losses for which Purchaser is finally determined to be otherwise entitled to indemnification under Section 8.2(a)(i) that are in excess of the Deductible, but only if such excess Losses arise with respect to any claim (or related claims arising out of the same facts, events or circumstances) involving Losses in excess of the Threshold, (ii) any Losses pursuant to Section 8.2(a)(iii) with respect to any claim until the aggregate amount of the Losses of the Purchaser Indemnified Persons for which the Purchaser Indemnified Persons are finally determined to be otherwise entitled to indemnification under Section 8.2(a)(iii) exceeds $5,000,000 at the time the Claim Notice in respect of a claim for such Losses (or related claims arising out of the same facts, events or circumstances) is delivered (the "Class Action Deductible"), after which Parent, on behalf of the Sellers, shall be obligated for all Purchaser's Losses for which Purchaser is finally determined to be otherwise entitled to indemnification under Section 8.2(a)(iii) that are in excess of the Class Action Deductible, but only if such excess Losses arise with respect to any claim (or related claims arising out of the same facts, events or circumstances) involving Losses in excess of the Threshold.  Notwithstanding anything to the contrary contained herein, Parent shall not be required to indemnify, defend or hold harmless the Purchaser Indemnified Persons against, or reimburse, or otherwise have any liability under this Agreement to, the Purchaser Indemnified Persons for any Losses (1) pursuant to Section 8.2(a)(i) (other than

91

Losses in connection with any Parent Fundamental Representation or the Indemnifiable Tax Representations) in a cumulative aggregate amount exceeding 15% of the Paid Purchase Price at the time the Claim Notice in respect of a claim for such Losses (or related claims arising out of the same facts, events or circumstances) is delivered (as may be increased pursuant to the last sentence of this Section 8.2(b), the "Cap"), and (2) pursuant to Section 8.2(a)(i) in connection with the Parent Fundamental Representations or the Indemnifiable Tax Representations, Section 8.2(a)(ii), Section 8.2(a)(iv), Section 8.2(a)(vi), Section 8.2(a)(vii) and Section 8.2(a)(viii) in a cumulative aggregate amount exceeding the Paid Purchase Price at the time the Claim Notice in respect of a claim for such Losses (or related claims arising out of the same facts, events or circumstances) is delivered.  Notwithstanding anything herein to the contrary, the Deductible and the Cap in respect of any claim (or related claims arising out of the same facts, events or circumstances) shall increase as the Paid Purchase Price increases after the occurrence of any subsequent Closings.

Section 8.3    Indemnification by Purchaser.

(g)    After each Closing and subject to this Article VIII, Purchaser shall indemnify, defend and hold harmless Parent, the Sellers, and its and their respective Affiliates and Representatives (the "Parent Indemnified Persons"), against, and reimburse Parent Indemnified Persons for, without duplication, all Losses that Parent Indemnified Persons may at any time suffer or incur, or become subject to:

(i)    as a result of or in connection with the breach of any of the representations and warranties of Purchaser contained in Article IV (it being understood that, for purposes of determining whether any breach has occurred or calculating the amount of any Losses under this Section 8.3(a)(i), all materiality and Purchaser Material Adverse Effect qualifications and exceptions contained in such representations and warranties shall be disregarded);

(ii)    as a result of or in connection with any breach by any Purchaser or Purchaser Topco of any of their covenants, agreements or obligations contained in this Agreement or in any Transaction Document; or

(iii)    that constitute (A) any Transfer Taxes required to be borne by such Purchaser pursuant to Section 7.5; (B) any withholding Tax for which Purchaser is responsible pursuant to Section 2.8; and (C) reasonable out-of-pocket costs and expenses (including reasonable fees and out-of-pocket expenses of outside legal counsel and other advisors) incurred by Parent Indemnified Persons relating to any indemnified Tax matter (including an examination relating thereto or a claim for Taxes) in this Section 8.3(a)(iii).

(h)    Notwithstanding anything to the contrary contained herein, Purchaser shall not be required to indemnify, defend or hold harmless the Parent Indemnified Persons against, or reimburse, or otherwise have any liability under this Agreement to, the Parent Indemnified Persons for any Losses pursuant to Section 8.3(a)(i) (other than Losses in connection with any Purchaser Fundamental Representations) with respect to any claim (i) unless such claim (or related claims arising out of the same facts, events or circumstances) involves Losses in excess of the Deductible

92

(nor shall any such claim that does not meet such Threshold be applied to or considered for purposes of calculating the aggregate amount of Parent's Losses for which Purchaser has responsibility under clause (ii) of this  Section 8.3(b) below), (ii) until the aggregate amount of Losses for which the Parent Indemnified Persons are finally determined to be otherwise entitled to indemnification under  Section 8.3(a)(i) exceeds the Deductible, after which Purchaser shall be obligated for all the Losses for which the Parent Indemnified Persons are finally determined to be otherwise entitled to indemnification under  Section 8.3(a)(i) that are in excess of the Deductible, but only if such excess Losses arise with respect to any claim (or related claims arising out of the same facts, events or circumstances) involving Losses in excess of the Deductible.  Notwithstanding anything to the contrary contained herein, Purchaser shall not be required to indemnify, defend or hold harmless the Parent Indemnified Persons against, or reimburse, or otherwise have any liability under this Agreement to, the Parent Indemnified Persons for any Losses (1) pursuant to  Section 8.3(a)(i) (other than Losses in connection with any Purchaser Fundamental Representation) in a cumulative aggregate amount exceeding the Cap, and (2) pursuant to  Section 8.3(a)(i) in connection with the Purchaser Fundamental Representations and  Section 8.3(a)(iii) in a cumulative aggregate amount exceeding the Paid Purchase Price at the time the Claim Notice in respect of a claim for such Losses (or related claims arising out of the same facts, events or circumstances) is delivered, irrespective of the occurrence of any subsequent Closings.

Section 8.4    Claims Procedure.

(a)    *Notification by the Indemnified Person*.  If any Person claiming indemnification under this  Article VIII (the "Indemnified Person") becomes aware of any fact, matter or circumstance that may give rise to a claim for indemnification under this  Article VIII, the Indemnified Person shall (at its own expense) promptly notify in reasonable detail the Person from whom indemnification is sought (the "Indemnifying Person") in writing of such claim ("Claim Notice"), including any pending or threatened claim or demand by a third party that the Indemnified Person has determined has given or could reasonably give rise to a right of indemnification under this Agreement (including a pending or threatened claim or demand asserted in writing by a third party against the Indemnified Person) (each, a "Third-Party Claim"), setting out the provisions under this Agreement upon which such claim is based, and such other information (to the extent known) as is reasonably necessary to enable the Indemnifying Person to assess the merits of the potential claim, to make such provisions as it may consider necessary (including details of the legal and factual basis of the claim and the evidence on which the party relies (including where the claim is a result of a Third-Party Claim, evidence of the Third-Party Claim)) and setting out its estimate of the amount of Losses to the extent ascertainable which are, or are to be, the subject of the claim; provided,  however, that the failure to provide such notice shall not release the Indemnifying Person from any of its obligations under this  Article VIII except to the extent that the Indemnifying Person is materially prejudiced by such failure.  The Parties agree that (i) notices for claims in respect of a breach of a representation, warranty, covenant or obligation must be delivered prior to the expiration of the applicable survival period specified in  Section 8.1 for such representation, warranty, covenant or obligation and (ii) any claims for indemnification for which notice is not timely delivered in accordance with this  Section 8.4(a) shall be expressly barred and are hereby waived;  provided,  further, that if, prior to such applicable

93

date, a Party shall have notified the other Party in accordance with the requirements of this  Section 8.4(a) of a claim for indemnification (including for a contingent Loss) under this  Article VIII  (whether or not formal legal action shall have been commenced based upon such claim), such claim shall continue to be subject to indemnification in accordance with this  Article VIII notwithstanding the passing of such applicable date (and, in the case of a claim for indemnification for a contingent Loss, notwithstanding that such contingent Loss may not become an actual liability until the passing of such applicable date).

(b)    *Cooperation by the Indemnified Person*.  The Indemnified Person shall reasonably cooperate with and assist the Indemnifying Person in determining the validity of any claim for indemnity by the Indemnified Person and in defending against a Third-Party Claim.  In connection with any fact, matter, event or circumstance that may give rise to a claim against any Indemnifying Person under this Agreement, the Indemnified Person shall ensure that the Indemnified Person and its Affiliates, as applicable: (i) shall preserve all material evidence relevant to the claim, (ii) shall allow the Indemnifying Person and its advisers to investigate the fact, matter, event or circumstance alleged to give rise to such claim and whether and to what extent any amount is payable in respect of such claim, and (iii) shall provide the Indemnifying Person and its Representatives reasonable access to such documents and information as may be reasonably requested in connection with such Third-Party Claims, subject to the Indemnifying Person and its advisers agreeing in such form as the Indemnified Person may reasonably require to keep all such information confidential and to use it only for the purpose of investigating and defending the claim in question.

(c)    *Assumption of Defense of a Third-Party Claim*.  Upon receipt of a notice of a claim for indemnity from an Indemnified Person pursuant to Section 8.4(a) in respect of a Third-Party Claim (other than a Tax Claim or proceeding arising therefrom, which shall be governed by the provisions of Article VII) the Indemnifying Person may, by notice to the Indemnified Person delivered within 30 Business Days of the receipt of notice of such Third-Party Claim, assume the defense and control of any Third-Party Claim, with its own counsel and at its own expense, but shall allow the Indemnified Person a reasonable opportunity to participate in the defense of such Third-Party Claim with its own counsel and at its own expense.  The Indemnifying Person shall not, without the prior written consent of the Indemnified Person (which shall not be unreasonably withheld, conditioned or delayed), consent to a settlement, compromise or discharge of, or the entry of any judgment arising from, any Third-Party Claim, unless such settlement, compromise, discharge or entry of any judgment does not involve any finding or admission of any violation of Law or admission of any wrongdoing by the Indemnified Person, and the Indemnifying Person shall obtain, as a condition of any settlement, compromise, discharge, entry of judgment (if applicable), or other resolution, a complete and unconditional release of each Indemnified Person from any and all Liabilities in respect of such Third-Party Claim.  If the Indemnifying Person does not assume the defense and control of any such Third-Party Claim, the Indemnified Person, subject to  Section 8.4(d), may defend the same in such manner as it may deem appropriate.  This Section 8.4(c) and Section 8.4(d) do not apply to Third-Party Claims relating to Tax Claims or proceedings arising therefrom, which shall be governed by the provisions of  Article VII.

94

(d)    *Settlement of Claims*.  The Indemnified Person shall not settle, compromise or consent to the entry of any judgment with respect to any claim or demand for which it is seeking indemnification from the Indemnifying Person or admit to any liability with respect to such claim or demand without the prior written consent of the Indemnifying Person (which consent shall not be unreasonably withheld, conditioned or delayed).  Notwithstanding anything to the contrary contained in this <u>Article VIII</u>, no Indemnifying Person shall have any liability under this <u>Article VIII</u> for any Losses arising out of or in connection with any Third-Party Claim that is settled or compromised by an Indemnified Person without the consent of such Indemnifying Person.

(e)    *Response to Claims Not Involving Third-Party Claims*.  In the event any Indemnifying Person receives a notice of a claim for indemnity from an Indemnified Person pursuant to <u>Section 8.4(a)</u> that does not involve a Third-Party Claim, the Indemnifying Person shall notify the Indemnified Person within 30 Business Days following its receipt of such notice whether the Indemnifying Person disputes its liability to the Indemnified Person under this <u>Article VIII</u>.

Section 8.5    <u>Payment</u>.  In the event a claim for indemnification under this <u>Article VIII</u> has been finally determined, the amount of such final determination shall be paid by the Indemnifying Person to the Indemnified Person within two Business Days of the request therefor in immediately available funds.  Any Action by or before any Government Authority or arbitral body, and the liability for and amount of damages therefor, shall be deemed to be "<u>finally determined</u>" for purposes of this <u>Article VIII</u> when the Parties hereto have so determined by mutual agreement or, if disputed, when a final non-appealable Government Order has been entered into with respect to such Action.

Section 8.6    <u>Treatment of Indemnification Payments</u>.  To the fullest extent permitted under applicable Law, for all purposes (including Tax purposes), the Parties shall treat any payment made under <u>Section 8.2</u> or <u>Section 8.3</u> as an adjustment to the Target Business Segment Purchase Price for the Target Business Segment to which such payment relates.

Section 8.7    <u>Provisions</u>.  To the extent that any claim for indemnification relates to a Tax or Loss for which a reserve, accrual or provision is demonstrably and identifiably reflected in the Final Closing Statement, the amount of such Tax or Loss with respect to such claim for which such reserve, accrual or provision is reflected shall be reduced to take into account the amount of such reserve, accrual or provision. The amount of any Tax or Loss for which indemnification is provided under this <u>Article VIII</u> shall be net of any amounts actually recovered by the Indemnified Person under insurance policies with respect to such Loss.

Section 8.8    <u>Exclusive Remedies</u>.  Each Party acknowledges and agrees that (a) prior to the Closing relating to any Target Business Segment, other than in the case of actual fraud by Parent, the sole and exclusive remedies of the Purchaser Parties for any breach of any of the representations and warranties of Parent contained in <u>Article III</u> relating to such Target Business Segment or the transfer thereof shall be, (i) in the event that each of the conditions set forth in <u>Article VI</u> has not been satisfied or waived, refusal to close the purchase and sale of the Target Equity Interests relating to such Target Business Segment hereunder and (ii) the right to terminate this Agreement pursuant to <u>Section 9.1(c)</u> subject to the terms set forth therein; (b) following the Closing relating to any Target Business Segment, the indemnification provisions of this <u>Article VIII</u> shall be the sole and

9 5

exclusive remedies of the Parties for any breach of the representations or warranties contained in this Agreement relating to such Target Business Segment or the transfer thereof except in the case of fraud or willful breach and (ii) notwithstanding anything to the contrary contained herein, no breach of any representation, warranty, covenant or obligation contained herein shall give rise to any right on the part of either Party to rescind this Agreement or any of the transactions contemplated hereby, including any Closing that has already occurred; and (c) following the Closing relating to any Target Business Segment, the indemnification provisions of this Article VIII shall be the sole and exclusive monetary remedies of the Parties for any breach or non-fulfillment of any covenant to the extent such covenant relates to such Target Business Segment (other than those covenants set forth under Section 5.5(b), Section 5.5(c), Section 5.6, Section 5.9(e), Section 5.15 and Section 5.18 for the enforcement of which a Party may also seek specific performance or injunctive relief).

Section 8.9    Damages. The Parties agree that with respect to each indemnification obligation set forth in this Article VIII, any Transaction Document or any other document executed or delivered in connection with any Closing, in no event shall an Indemnifying Person have any liability to an Indemnified Person for any consequential, indirect, incidental, exemplary, punitive or special damages, internal costs or lost profits, other than any such damages, costs or lost profits required to be paid by an Indemnified Person or any of its Affiliates to any third party arising out of an Action by such third party or its Affiliates.

Section 8.10    Net Financial Benefit.

(g)    No Indemnifying Person shall be liable under this Article VIII in respect of any Losses suffered by any Indemnified Person to the extent there are any offsetting savings by or quantifiable net financial benefits to such Indemnified Person arising from such Losses or the facts, matters, events or circumstances giving rise to such Losses.  This Section 8.10(a) shall not apply to any Loss relating to Taxes.

(h)    Any amount of any Loss or Tax for which indemnification is provided under Section 8.2 shall be (i) increased by the amount of any Tax cost actually incurred as an increase in Taxes payable by the Indemnified Person (or any Affiliate thereof) as a result of the receipt or accrual of the indemnification payment, (ii) net of any Tax benefit actually realized as a decrease in cash Taxes payable by the Indemnified Person (or any Affiliate thereof) prior to the date of such indemnification payment as a result of the incurrence or payment of any such Loss or Tax (including as a result of the facts, matters, events or circumstances giving rise to such Losses or Taxes).

(i)    If, following an indemnification payment pursuant to Section 8.2, an Indemnified Person (or any Affiliate thereof) actually realizes as a decrease in cash Taxes payable by the Indemnified Person (or any Affiliate thereof) a Tax benefit as a result of the incurrence or payment of a Loss or Tax that would have reduced the amount of such indemnification payment pursuant to Section 8.10(b) had such Tax benefit been actually realized prior to the date of such indemnification payment, then within ten (10) Business Days following the realization of the Tax benefit, Purchaser shall refund to Parent the amount of such Tax benefit.

Section 8.11    Contingent Liabilities.  No Indemnifying Person shall be liable under this Article VIII in respect of any Loss which is contingent unless and until such contingent Loss becomes

96

an actual liability and is due and payable.

Section 8.12    Right to Recovery. (g) If any Indemnifying Person is liable to pay an amount in discharge of any claim under this Agreement and any Indemnified Person recovers or is entitled to recover (whether by payment, discount, credit, relief, insurance or otherwise) from a third party a sum which indemnifies or compensates the Indemnified Person (in whole or in part) in respect of the Loss which is the subject matter of the claim, Parent or Purchaser, as applicable, shall procure that all commercially reasonable steps are taken to enforce recovery against the third party and any actual recovery (less any reasonable costs and expenses incurred in obtaining such recovery) shall reduce or satisfy, as the case may be, such claim to the extent of such recovery.  Notwithstanding the foregoing, neither Party shall be required to act or forebear to act under this  Section 8.12 if such act or forbearance, as applicable, could prejudice such Person's ability to prosecute a claim against an Indemnifying Person or any right hereunder in the reasonable judgment of Parent or Purchaser, as applicable.

(h)    If any Indemnifying Person has paid an amount in discharge of any claim under this Agreement and any Indemnified Person recovers or is entitled to recover (whether by payment, discount, credit, relief, insurance or otherwise) from a third party a sum which indemnifies or compensates any Indemnified Person (in whole or in part) in respect of the Loss which is the subject matter of the claim, Parent or Purchaser, as applicable, shall procure that all commercially reasonable steps are taken as may be required to enforce such recovery and shall, or shall procure that the relevant Indemnified Person shall, pay to Parent or Purchaser, as applicable, as soon as practicable after receipt an amount equal to (i) any sum recovered from the third party less any reasonable costs and expenses incurred in obtaining such recovery or (ii) if less, the amount previously paid by the relevant Indemnifying Person to the relevant Indemnified Person. Double Claims

Section 8.13    Mitigation of Losses.

(a)    The Indemnified Persons shall cause that all commercially reasonable steps are taken and all commercially reasonable assistance is provided to avoid or mitigate any Losses, which in the absence of mitigation might give rise to or increase the Loss in respect of any claim under this  Article VIII. This Section 8.14(a) shall not apply to Taxes.

(b)    Subject to and in accordance with the provisions of this  Section 8.14(b), if any liability of the Parent under  Section 8.2(a) in respect of Tax can be reduced or eliminated by the surrender of Group Relief (as defined in  Schedule 3.8(u)) to the relevant Target Company by any company other than Purchaser, an Affiliate of Purchaser or any other Target Company (including by way of electing that any gain on the disposal or notional disposal of an asset be treated as accruing not to the Target Company but to an Affiliate of Parent), Parent may make or procure the making of such surrender or election and Purchaser shall procure that the Target Company shall cooperate with Parent in relation to such surrender or election and make all necessary returns, claims, consents and notifications required to be made in respect of such surrender or election.  The Target Company shall not be liable to give any consideration in respect of any surrender of or election in relation to Group Relief pursuant to this  Section 8.14(b).

97

(c)    In the event that (x) the taxable income or Tax of a Target Company is increased for a Pre-Closing Period in a manner that results in an indemnification payment under  Section 8.2(a), and (y) the result of such increase is the allowance of an additional deduction in computing the taxable income, an additional credit or a correlative adjustment reducing Taxes of such Target Company or its Affiliates in a taxable period beginning after the applicable Closing Date, the Purchaser shall use commercially reasonable efforts to claim such deduction, credit or correlative adjustment in the earliest taxable period for which such deduction, credit or correlative adjustment is allowable.

<div align="center">

ARTICLE IX
TERMINATION

</div>

Section 9.1    Termination. This Agreement may be terminated at any time prior to the Final Closing:

(h)    *Consent*. By the mutual written consent of Parent and Purchaser;

(i)    *Delay*.  By either Parent or Purchaser if the Final Closing has not occurred on or before July 1, 2014 (the " Outside Date"); provided, however, the right to terminate this Agreement under this  Section 9.1(b) shall not be available to any Party whose failure to take any action required to fulfill any of such Party's obligations under this Agreement has caused or resulted in the failure of any Closing to occur prior to the Outside Date, and any such termination shall not affect the obligations of the Parties to complete the purchase and sale of any Target Business Segment with respect to which the last of the conditions set forth in  Article VI has been satisfied or waived (other than those conditions that, by their terms, are to be satisfied on such Closing Date), but the Closing in respect of such Target Business Segment has not yet occurred (which, for purposes of this  Article IX, shall be deemed to be completed prior to July 1, 2014).

(j)    *Breach*.  By either Parent or Purchaser, upon written notice to the other, in the event of a material breach of any representation, warranty, covenant or agreement contained in this Agreement on the part of Purchaser Topco or Purchaser (in the case of Parent) or Parent (in case of Purchaser), which breach would, individually or in the aggregate, result in, if occurring or continuing on every Closing Date applicable to each Target Business Segment not transferred prior to such date, the failure of any condition to the terminating Party's obligations set forth in Article VI in respect of every Closing relating to every Remaining Target Business Segment, and which cannot be or has not been cured within 45 days after the giving of written notice to the breaching Party of such breach (or by the Outside Date, if earlier); provided, however, that the right to terminate this Agreement under this  Section 9.1(c) shall not be available to Purchaser or Parent if the would-be terminating Party (including, in the case of Purchaser, Purchaser Topco) is then in material breach of its representations, warranties, agreements and covenants hereunder; and

(k)    *Denial of Regulatory Approval.*  By Parent or Purchaser on or after the date that at least one Required Governmental Approval in respect of each Remaining Target Business Segment has been subject to a written denial by action of each relevant Government Authority at least 60 days prior to such date and all avenues of appeal, if any, for each such Required Governmental

<div align="center">98</div>

Approval have been exhausted; provided, however, that the right to terminate this Agreement under this  Section 9.1(d) shall not be available to any Party if such Party is in material breach of its representations, warranties, agreements and covenants hereunder at the time it seeks to terminate this Agreement under this  Section 9.1(d).

Section 9.2    Notice of Termination. If Parent or Purchaser desires to terminate this Agreement pursuant to  Section 9.1, it shall give written notice of such termination to (in the case of termination by Parent) Purchaser and to (in the case of termination by Purchaser) Parent.

Section 9.3    Effect of Termination. Upon a termination of this Agreement in accordance with  Section 9.1, each Party's further rights and obligations hereunder, other than the Surviving Provisions, shall terminate, but termination shall not affect any rights or obligations of a party which may have accrued prior to such termination and shall not relieve any Party from liability for any willful and material breach prior to such termination.  Notwithstanding the foregoing (but subject to clause (ii) of the proviso in  Section 9.1(b)), any termination of this Agreement shall only have effect with respect to any Remaining Target Business Segment as of the date of such termination (and, for the avoidance of doubt, any holdback payment that has not been paid theretofore pursuant to  Section 2.4 shall be forfeited by Parent).

Section 9.4    Additional Rights and Remedies. The Parties acknowledge and agree that nothing in this  Article IX shall prejudice or limit any rights or remedies which may otherwise be available to Parent under this Agreement or pursuant to applicable Law, including the right to claim damages or seek specific performance.

<div align="center">

ARTICLE X
MISCELLANEOUS

</div>

Section 10.1    Notices.

(i)    Any notice, request, claim, demand or other communication in connection with this Agreement (each, a " Notice") shall be:

(i)    in writing in English; and

(ii)    delivered by hand, fax, registered mail or by courier using an internationally recognized courier company, or transmitted by email.

(j)    A Notice to any Party shall be sent to such party at the following address, or such other Person or address as such Party may designate by delivery of notice in writing to the other Party.

<div align="center">

99

</div>

(i)   If to Parent, to:

        Ally Financial Inc.
        200 Renaissance Center
        Mail Code 482-B09-B11
        Detroit, MI 48265-2000
        Attention: Peter Greene,
        William B. Solomon, General Counsel
        Facsimile: (877) 263-4044
        (313) 656-6124
        Email: Peter.Greene@ally.com,
        William.B.Solomon@ally.com

        With a copy to (which shall not constitute a Notice):

        Sullivan & Cromwell LLP
        135 Broad Street
        New York, New York 10004
        Attention: Jay Clayton
        C. Andrew Gerlach
        Facsimile: (212) 558-3588
        Email: ClaytonWJ@sullcrom.com,
        gerlacha@sullcrom.com

(ii)   If to Purchaser or Purchaser Topco, to:

        General Motors Financial Company, Inc.
        801 Cherry Street, Suite 3500
        Fort Worth, Texas 76102
        Attention: Chief Financial Officer
        Facsimile: (817) 302-7915
        chris.choate@gmfinancial.com

        With a copy to (which shall not constitute a Notice):
        Weil, Gotshal & Manges LLP
        767 Fifth Avenue
        New York, New York 10153
        Attention: Frederick S. Green, Daniele D. Do
        Facsimile: (212) 310-8007
        Email: frederick.green@weil.com,
        danielle.do@weil.com

(k)    A Notice shall be effective upon receipt and shall be deemed to have been received:

(xiii)    at the time of delivery, if delivered by hand, registered post or courier; or

(xiv)    upon confirmation by telephone or electronic correspondence of receipt thereof, if sent by fax or email, excluding, however, any answer or confirmation automatically generated by electronic means (such as out-of-office replies).

Section 10.2    Assignment. Except as otherwise expressly provided in this Agreement, no Party may without the prior written consent of the other Party, assign, grant any security interest over, hold on trust or otherwise transfer the benefit of the whole or any part of this Agreement; provided that (a) Parent may, following notice in writing to Purchaser no later than three Business Days prior to the effective date of the assignment, assign any or all of its rights, benefits and obligations under this Agreement to one or more of its direct or indirect, wholly owned Subsidiaries (other than any Target Company) or Affiliates; provided, further, that any such assignment shall not relieve Parent of its obligations hereunder; and (b) Purchaser may, following notice in writing to Parent no later than three Business Days prior to the effective date of the assignment, assign, pledge or otherwise transfer any or all of its rights, benefits and obligations under this Agreement to one or more of its direct or indirect, wholly owned Subsidiaries or Affiliates; provided that any such assignment shall not (i) result in any delay in the consummation of the transactions contemplated hereby or (ii) relieve Purchaser of its obligations hereunder. Any attempted assignment in violation of this Section 10.2 shall be null and void. This Agreement shall be binding upon, shall inure to the benefit of, and shall be enforceable by, the Parties and their successors and permitted assigns.

Section 10.3    No Third-Party Beneficiaries. Except as provided in Article VIII or otherwise expressly provided herein, this Agreement is for the sole benefit of the Parties and their permitted assigns, and nothing herein expressed or implied shall give or be construed to give to any Person, other than the Parties and such assigns, any legal or equitable rights hereunder.

Section 10.4    Whole Agreement; Conflict with Other Transaction Documents.

(h)    This Agreement, the other Transaction Documents and the Confidentiality Agreement contain the whole agreement between the Parties relating to the subject matter of this Agreement to the exclusion of any terms implied by Law which may be excluded by contract and supersede any previous written or oral agreement between the Parties in relation to the matters dealt with herein and therein.

(i)    Purchaser acknowledges that it has not been induced to enter this Agreement by any representation, warranty assurance, commitment, statement or undertaking not expressly incorporated into it and agrees that it will not contend to the contrary.

(j)    So far as is permitted by Law, Purchaser agrees and acknowledges that its only right and remedy in relation to any provision of this Agreement shall be for breach of the terms of this Agreement to the exclusion of all other rights and remedies (including those in tort or arising under statute), including any right to rescind this Agreement.

101

(k)     If there is any inconsistency between the terms of this Agreement and any other Transaction Document, this Agreement shall prevail (as between the Parties and as between any of Parent's Affiliates and any of Purchaser's Affiliates) to the extent of the inconsistency, unless otherwise expressly agreed.

Section 10.5    Costs. Except as otherwise provided herein, each Party shall bear all costs incurred by it in connection with the preparation, negotiation and execution of this Agreement, the other Transaction Documents and the transactions contemplated hereby and thereby, it being understood that in no event shall any Subject Companies bear any out-of-pocket costs and expenses of Parent or any of the Sellers unless such costs and expenses are reflected in the Final Net Asset Value with respect to such Subject Companies. Purchaser shall bear the costs incurred for local notaries for the preparation of the deeds and other documents necessary to effect each Closing as well as the costs incurred for the German notary contemplated by Section 10.7.

Section 10.6    Governing Law; Consent to Jurisdiction; Specific Performance.

(m)     **THIS AGREEMENT AND ANY NON-CONTRACTUAL OBLIGATIONS ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK (WITHOUT REGARD TO ANY PRINCIPLES OF CONFLICTS OF LAW OR CHOICE OF LAW THAT WOULD HAVE THE EFFECT OF GIVING EFFECT TO THE LAWS OF ANOTHER JURISDICTION)**.

(n)     Each Party hereby irrevocably and unconditionally consents to submit to the exclusive jurisdiction and venue of the United States District Court for the Southern District of New York and in the courts hearing appeals therefrom unless no basis for federal jurisdiction exists, in which event each Party irrevocably consents to the exclusive jurisdiction and venue of the Supreme Court of the State of New York, New York County, and the courts hearing appeals therefrom, for any Action arising out of or relating to this Agreement and the transactions contemplated hereby. Each Party hereby irrevocably and unconditionally waives, and agrees not to assert, by way of motion, as a defense, counterclaim or otherwise, in any such Action, any claim that it is not personally subject to the jurisdiction of the aforesaid courts for any reason, other than the failure to serve process in accordance with this Section 10.6, that it or its property is exempt or immune from jurisdiction of any such court or from any legal process commenced in such courts (whether through service of notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment or otherwise), and to the fullest extent permitted by applicable Law, that the Action in any such court is brought in an inconvenient forum, that the venue of such Action is improper, or that this Agreement, or the subject matter hereof, may not be enforced in or by such courts and further irrevocably waives, to the fullest extent permitted by applicable Law, the benefit of any defense that would hinder, fetter or delay the levy, execution or collection of any amount to which the party is entitled pursuant to the final judgment of any court having jurisdiction. **EACH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY AND ALL RIGHTS TO TRIAL BY JURY IN CONNECTION WITH ANY ACTION ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.**

102

(o)    Each Party irrevocably consents to the service of process out of any of the aforementioned courts in any such Action by the mailing of copies thereof by registered mail, postage prepaid, to such party at its address specified pursuant to  Section 10.1, such service of process to be effective upon acknowledgment of receipt of such registered mail.

(p)    Each Party expressly acknowledges that the foregoing waivers are intended to be irrevocable under the laws of the State of New York and of the United States of America; provided that consent by Purchaser to jurisdiction and service contained in this Section 10.6 is solely for the purpose referred to in this  Section 10.6 and shall not be deemed to be a general submission to said courts or in the State of New York other than for such purpose.

(q)    Each Party acknowledges that, other than as provided in  Section 8.8, it would be impossible to determine the amount of damages that would result from any breach of any of the provisions of this Agreement and that, in view of the uniqueness of the subject matter of this Agreement, the remedy at law for any breach, or threatened breach, of any of such provisions would be inadequate and, accordingly, agrees that, other than as provided in  Section 8.8, the other Party, in addition to any other rights or remedies which it may have, shall be entitled to specific performance of this Agreement and any of the terms of this Agreement (including the respective obligations of Purchaser and Parent under  Section 5.5(b),  Section 5.5(c),  Section 5.6,  Section 5.9(e),  Section 5.15 and  Section 5.18) and such other equitable and injunctive relief available to the Parties from any arbitral tribunal of competent jurisdiction to compel specific performance of, or restrain any party from violating, any of such provisions.   In connection with any action or proceeding for equitable and injunctive relief permitted hereunder, other than as provided in  Section 8.8, each Party hereby waives any claim or defense that a remedy at law alone is adequate and, to the maximum extent permitted by Law, agrees to have each provision of this Agreement (including the respective obligations of Purchaser and Parent under  Section 5.5(b),  Section 5.5(c),  Section 5.6,  Section 5.9(e),  Section 5.15 and  Section 5.18) specifically enforced against it, without the necessity of posting bond or other security against it, and consents to the entry of equitable and injunctive relief against it enjoining or restraining any breach or threatened breach of any provision of this Agreement.

Section 10.7    Counterparts. The Parties agree to have this Agreement executed and notarized by a notary in Germany after execution of this Agreement by the parties hereto in New York. This Agreement may be executed in any number of counterparts, each of which shall be deemed to constitute an original and all of which shall together constitute one and the same instrument.   Subject to the first sentence of this  Section 10.7, this Agreement shall become binding when any number of counterparts, individually or taken together, shall bear the signatures of both Parties. Subject to the first sentence of this  Section 10.7, this Agreement may be executed and delivered by facsimile or any other electronic means, including " .pdf" or ".tiff" files, and any facsimile or electronic signature shall constitute an original for all purposes.

Section 10.8    Severability. The provisions of this Agreement shall be deemed severable and the invalidity or unenforceability of any provision shall not affect the validity or enforceability of the other provisions hereof.  If any provision of this Agreement, or the application thereof to any Person or any circumstance, is invalid or unenforceable, (a) a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and

103

purpose of such invalid or unenforceable provision and (b) the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected by such invalidity or unenforceability, nor shall such invalidity or unenforceability affect the validity or enforceability of such provision, or the application thereof, in any other jurisdiction.

Section 10.9    Amendments; Waiver. Any provision of this Agreement may be amended if, and only if, such amendment is in writing and signed by and on behalf of each Party hereto.  Any provision of this Agreement may be waived if such waiver is in writing and signed by and on behalf of the Party against whom such waiver is to be enforced.  No waiver of any breach of this Agreement will be implied from any forbearance or failure of a Party to take action thereon.

Section 10.10    Payments; Currency Conversion.

(i)    Except to the extent otherwise expressly provided in this Agreement, all payments to be made under this Agreement shall be made in full, without any set off or deduction for or on account of any counterclaim.  Any payment to be made under this Agreement shall be effected by crediting for same day value the account specified by the Party entitled to the payment on or before the due date for payment.

(j)    The conversion of any amount determined initially by reference to a foreign currency into Dollars for purposes of testing such amount against the thresholds contained in Section 3.15 (*Contracts*) or Section 5.1 (*Conduct of the Target Business*) shall be made based on the currency conversion rate published in the applicable Bloomberg page at 4:00 p.m., New York City Time, on, (i) with respect the thresholds contained in Section 3.15 (*Contracts*), the date hereof, and (ii) with respect to the thresholds contained in Section 5.1 (*Conduct of the Target Business*), the date the relevant action necessitating such testing against such thresholds is taken.

*[Signature Page Follows]*

IN WITNESS WHEREOF, Parent, Purchaser and Purchaser Topco have executed this Agreement as of the date first written above.

ALLY FINANCIAL INC.

By:  /s/ Michael A. Carpenter
        Name:  Michael A. Carpenter
        Title:   Chief Executive Officer

104

GENERAL MOTORS FINANCIAL COMPANY, INC.


By:  /s/ Chris A. Choate
     Name:  Chris A. Choate
     Title:   Executive Vice President, Chief Financial Officer and Treasurer



Solely for purposes of Section 5.3, Section 5.6, Section 5.14(b) and Article X:



GENERAL MOTORS COMPANY



By:  /s/ James A. Davlin, V
     Name:  James A. Davlin, V
     Title:   Vice President, Finance and Treasurer

SC1:3347968.1D

**Share Transfer Agreement**

by and between

**Ally Financial Inc.**

(as "Seller")

and

**General Motors Financial Company, Inc.**

(as "Purchaser")

in

respect of a transfer of registered capital of

**GMAC-SAIC Automotive Finance Company Limited**

**Table of Contents**

| **Article** | **Heading** |
|---|---|
| Article 1 | Definitions and Interpretation |
| Article 2 | Transfer of Registered Capital |
| Article 3 | Purchase Price and Completion |
| Article 4 | Conditions Precedent |
| Article 5 | Representations and Warranties in respect of the Seller and the Purchaser |
| Article 6 | Obligation of Secrecy |
| Article 7 | Further Covenants |
| Article 8 | Effectiveness and Termination of the Agreement |
| Article 9 | Breach of Representations, Warranties or Covenants and Indemnifications |
| Article 10 | Governing Law |
| Article 11 | Settlement of Disputes |
| Article 12 | Miscellaneous |
| | |
| Schedule A | Reference Closing Statement |

**Share Transfer Agreement**

entered into on November 21, 2012, by and between:

**Ally Financial Inc.** (formerly known as GMAC LLC), a corporation organized and existing under the laws of the State of Delaware, United States of America, with its principal executive offices located at 1209 Orange Street, Wilmington, Delaware  19801, USA; and

• hereinafter referred to as the "Seller"

**General Motors Financial Company, Inc.**, a corporation duly organized and existing under the laws of the State of Texas, United States of America, with its principal executive offices located at 801 Cherry Street, Suite 3500, Fort Worth, Texas 76102, USA.

- hereinafter referred to as the "Purchaser"

The Seller and the Purchaser may be hereinafter referred to collectively as the "Parties" or individually as a "Party".

**Preamble**

**Whereas**, GMAC-SAIC Automotive Finance Company Limited (the "Company") is a Sino-foreign equity joint venture enterprise duly organized and validly existing under the laws of the People's Republic of China ("PRC"), with its legal address at Fortune Plaza, Building F, 160 Pu Ming Road, Pudong, Shanghai, 200120, China;

**Whereas**, the Seller owns a 40% equity interest in the Company; and

**Whereas**, in accordance with the terms and subject to the conditions of this Share Transfer Agreement (this "Agreement"), the Purchaser wishes to acquire from the Seller and the Seller wishes to transfer to the Purchaser, all the equity interest in the Company owned by the Seller.

**Accordingly**, in consideration of the mutual covenants and premises contained in this Agreement and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties, intending to be legally bound, hereby agree as follows:

**Article 1**
**Definitions and Interpretation**

1.1    Unless the terms or context of this Agreement otherwise provide, the following terms shall have the meanings as set out below:

2006 Agreement  shall mean the Purchase and Sale Agreement by and among General Motors Corporation, General Motors Acceptance Corporation, GM Finance Co. Holdings Inc. and FIM Holdings LLC, dated as of April 2, 2006, and all agreements, undertakings or other written instruments entered into in connection therewith or with respect thereto, including the letter agreement, dated as of March 13, 2007, by and among GMAC LLC, GM Finance Co. Holdings

Inc. and FIM Holdings LLC and the November 5, 2008 e-mail from Purchaser's Executive Director – Tax Counsel to the Seller's Director of Tax Operations and Analysis regarding the income tax effects of non-income tax refunds.

Action shall mean any civil, criminal or administrative action, suit, demand, claim (including any counterclaim), case, litigation, mediation, arbitration, opposition, objection, cancellation, inquiry, hearing, dispute, internal or external investigation or other proceeding.

Adjustment Amount shall mean an amount (which may be negative) equal to 40% of the difference between (i) the Final Net Asset Value and (ii) the Estimated Net Asset Value.

Affiliate shall mean, with respect to any specified Person, any other Person directly or indirectly Controlling, Controlled by or under common Control with such specified Person; provided that (i) neither the U.S. Department of the Treasury nor any Person under common Control with the Seller (other than the Seller's Controlled Affiliates) as a result of the ownership of equity interests in the Seller by the U.S. Department of the Treasury shall constitute an Affiliate of the Seller, and (ii) neither the U.S. Department of the Treasury nor any Person under common Control with the Purchaser (other than the Purchaser's Controlled Affiliates and the General Motors Company) as a result of the ownership of equity interests in the General Motors Company by the U.S. Department of the Treasury shall constitute an Affiliate of the Purchaser.

Anti-trust Clearance shall mean the approval or conditional approval of the Anti-Monopoly Bureau of the Ministry of Commerce of the PRC that may be required for the Parties to complete the Transaction.

Approval Authorities shall mean any Government Authority whose approval will be required in order to complete the Transaction.

Business Day shall mean any day of the year, other than Saturday and Sunday, on which banking institutions in China, the City of London and the City of New York are generally open to the public for conducting business and are not required or authorized to close.

CBRC Approval shall mean the approval of the Transaction to be granted by the China Banking Regulatory Commission.

Company Material Adverse Effect shall mean any change, effect, event or occurrence that, either individually or in the aggregate with any other change, effect, event or occurrence, (i) has or is reasonably likely to have a material and adverse effect on the business, operations, assets, liabilities, condition (financial or otherwise) or the results of operations of the Company, or (ii) would be reasonably likely to prevent or materially impair the ability of the Seller or any of its Affiliates to perform their respective obligations under the Transaction Documents or to consummate the transactions contemplated thereby in a timely manner; provided that, in the case of clause (i) only, none of the following (or the results thereof), either alone or in combination with any other changes, effects, events or occurrences, shall constitute or contribute to a Company Material Adverse Effect: (a) any change in applicable accounting principles or any adoption, proposal, implementation or change in Law (including any Law in respect of Taxes) or any interpretation thereof by any Government Authority; (b) any change in global, national or regional political conditions (including protests, strikes, riots, acts of terrorism or war) or in general global, national or regional economic, business, regulatory, political or market conditions or in national or global financial or capital markets (including any such conditions or markets in the United States or the PRC); (c) any change

generally affecting the industries or market sectors in the geographic regions in which the Company operates; (d) any change resulting from or arising out of hurricanes, earthquakes, floods, or other natural disasters; (e) the negotiation, execution, announcement or performance of the Transaction Documents or consummation of the transactions contemplated thereby; (f) the failure of the Company to meet any internal or public projections, forecasts or estimates of performance, revenues or earnings (it being understood that the facts and circumstances contributing to such failure may constitute or contribute to a Company Material Adverse Effect); (g) any actions (or the effects of any action) taken (or omitted to be taken) upon the written request or instruction of, or with the written consent of, the Purchaser, consistent with the terms hereof, to consummate the transactions contemplated hereby; (h) any action (or the effects of any action) taken (or omitted to be taken) by the Company as required pursuant to this Agreement or (i) any change, effect, event or circumstance primarily caused by, occurring at, affecting or relating to the Purchaser or any of its Affiliates (including any bankruptcy, work stoppage or other adverse change at the Purchaser or any of its Affiliates); except in the cases of clauses (a), (b) and (c) to the extent such change (or any results thereof) has a disproportionate effect on the Company compared with other Persons operating in the industries and jurisdictions in which the Company operates.

Completion shall mean completion of the sale and purchase of the Transferred Shares in accordance with Article 3.3.

Completion Date shall mean the date of Completion under this Agreement.

Completion Payment shall mean an amount equal to the sum of (i) an amount equal to 40% of the Estimated Net Asset Value  plus (ii) $415,000,000.

Completion Statement shall mean the unaudited balance sheet of the Company as of the close of business on the day immediately preceding the Completion Date, prepared in accordance with U.S. generally accepted accounting principles, including a calculation of the Net Asset Value of the Company as of the close of business on the day immediately preceding the Completion Date.

Conditions Precedent shall mean the conditions precedent set forth in Article 4.1.

Control shall mean, with respect to any specified Person, the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise.  The terms Controlling and Controlled shall have meanings correlative to the foregoing.

Constituent Documents shall mean, with respect to any corporation, its charter or articles of incorporation or association and by-laws; with respect to any partnership, its certificate of partnership and partnership agreement; with respect to any limited liability company, its certificate of formation and limited liability company or operating agreement; with respect to each other person or entity, its comparable constitutional instruments or documents (and, in each case, such similar instruments or documents as applicable under a relevant jurisdiction).

Criminal Liability shall mean any liability, fine, censure or other sanction resulting from the violation of any criminal Law, other than immaterial violations that have not and could not result in (a) any financial liability that is material to the Company, or (b) incarceration of any director or employee of the Company.

Effective Date shall mean the date on which this Agreement becomes valid and effective in accordance with Article 8.

Encumbrance shall mean any mortgage, deed of trust, easement, pledge, hypothecation, assignment, security interest, restriction, option, equity interest, preference, participation interest (including but not limited to any right of first refusal or right of last refusal), claim, lien, or other encumbrance; provided, however, that for the purposes of this Agreement, no Encumbrance shall be deemed to be created by this Agreement, the New JV Contract or the New Articles of Association.

Equity Interest shall mean, with respect to any Person, any share of capital stock of, or any general, limited or other partnership interest, membership interest or similar ownership interest in, such Person.

Estimated Closing Statement shall mean a statement setting forth the unaudited balance sheet of the Company as of the close of business on the last day of the month ended two months immediately prior to the month in which the Completion occurs, prepared in accordance with U.S. generally accepted accounting principles and using the same methodology used to prepare the Reference Closing Statement, including the Seller's good faith calculation of the Estimated Net Asset Value.

Estimated Net Asset Value shall mean a calculation of the Net Asset Value of the Company as of the close of business on the last day of the month ended two months immediately prior to the month in which the Completion occurs, as set forth on the Estimated Closing Statement.

Final Net Asset Value shall mean the Net Asset Value of the Company as of the close of business on the day immediately preceding the Completion Date as shown on the Completion Statement.

Government Authority shall mean any foreign or domestic, federal, state, provincial, county, city or local legislative, administrative or regulatory authority, agency, court, tribunal, body or other governmental or quasi-governmental entity with competent jurisdiction, including any supranational body and any self-regulatory authority or organization.

Government Order shall mean any order, writ, judgment, injunction, approval, decree, declaration, stipulation, determination, agreement or award entered by or with any Government Authority.

Key Person shall mean Frederick Livingood.

Knowledge shall mean with respect to the Seller, the actual knowledge after reasonable inquiry of any of the following individuals: Mark Bole and Michael Kanarios.

Law shall mean any law, statute, ordinance, rule, regulation, code, order, judgment, injunction, decree, directive, policy, guideline, ruling, approval or other requirement or rule of law enacted, issued, promulgated, enforced or entered by a Government Authority.

Liabilities means any/or all (as applicable from the context) debt, liability or obligation of any kind whatsoever, whether known or unknown, asserted or unasserted, determined or determinable, absolute or contingent, liquidated or unliquidated, accrued or unaccrued and whether due or to become due.

MOFCOM Approval shall mean the approval of the Transaction to be granted by the Ministry of Commerce of China.

Net Asset Value shall mean the aggregate amount (in U.S. Dollars) of the assets and property of the Company (which, for the avoidance of doubt, shall not include any asset attributable to a right to receive refunds in respect of Taxes or VAT to which Purchaser or any of its Affiliates is entitled pursuant to the 2006 Agreement) minus the aggregate amount of the Liabilities of the Company, in each case that are required to be set forth on a balance sheet of the Company prepared in accordance with U.S. generally accepted accounting principles.  Notwithstanding the foregoing, Net Asset Value shall not give effect to purchase accounting or any other adjustments relating to the sale of the Transferred Shares contemplated by this Agreement or the conduct following Completion of the business operated by the Company.

New Articles of Association shall mean (a) the amended and restated Articles of Association of the Company, or (b) the Original Articles of Association as amended by an amendment thereto, reflecting the change in ownership of the Transferred Shares as contemplated by this Agreement and other changes as may be agreed among the Purchaser and the Ongoing Members.

New JV Contract shall mean (a) the amended and restated joint venture contract of the Company, or (b) the Original JV Contract as amended by an amendment thereto, reflecting the change in ownership of the Transferred Shares as contemplated by this Agreement and other changes as may be agreed among the Purchaser and the Ongoing Members.

Ongoing Members shall mean Shanghai Automotive Group Finance Company Ltd., a company duly organized and validly existing under the laws of China with its legal address located at 1199 Kang Ding Road, Shanghai, and Shanghai General Motors Corporation Limited, a company duly organized and validly existing under the laws of China with its legal address located at 1500 Shen Jiang Road, Pudong, Shanghai.

Original Articles of Association shall mean the Articles of Association of the Company executed by the Seller and the Ongoing Members and approved by the Approval Authority, dated May 30, 2008.

Original JV Contract shall mean the Amended and Restated Joint Venture Contract, dated May 30, 2008, between the Seller, Shanghai Automotive Group Finance Company Ltd and Shanghai General Motors Corporation Limited.

Outside Date shall mean July 1, 2014 (or such later date as the Seller and the Purchaser may agree in writing).

Permits shall mean licenses, permits, certificates, notifications, registrations and other authorizations and approvals that are issued by or obtained from any Government Authority.

Person shall mean any individual, bank, corporation, general or limited partnership, joint venture, association, limited liability company, business trust, branch, unincorporated organization or similar organization, whether domestic or foreign, or any Government Authority.

Purchaser Material Adverse Effect shall mean, as of any particular date, any change, effect, event or occurrence that, individually or when considered in the aggregate with any other change, effect, event or occurrence, would be reasonably likely to materially and adversely impair the ability of the Purchaser or any of the Purchaser's Affiliates to perform its respective obligations under any

of the Transaction Documents or to consummate the transactions contemplated thereby in a timely manner.

Purchaser Fundamental Representations means Article 5.2(a) (*Incorporation and Standing*), Article 5.2(b) (*Power and Authority*), Article 5.2(c) (*Binding Effect*) and Article 5.2(e) (*Solvency*).

Reference Closing Statement shall mean the statement attached as Schedule A.

Registration Authority shall mean the State Administration of Industry and Commerce or its authorised local authority.

Representatives shall mean, with respect to any Person, such Person's Affiliates, directors, managers, officers, employees, legal or financial advisors, agents or other representatives, or anyone acting on behalf of them or such Person.

Requisite Approvals shall mean any approval/clearance to be obtained by an Approval Authority in accordance with the provisions hereof.

Revised Approval Certificate shall mean the revised approval certificate of the Company to be issued by the Approval Authority evidencing the approval of the transfer of Transferred Shares contemplated by this Agreement.

Revised Business License shall mean the revised business license of the Company to be issued by the Registration Authority, evidencing registration of the transfer of Transferred Shares contemplated by this Agreement.

Seller Fundamental Representations means Article 5.1(a) (*Incorporation and Standing*), Article 5.1(b) (*Power and Authority*), Article 5.1(c) (*Binding Effect*) and Article 5.1(g) (*Good Title*).

Tax or Taxes shall mean any national, provincial, municipal, or local taxes, charges, fees, levies, or other assessments, including all net income (including foreign investment enterprise income tax and individual income withholding tax), sales, use, transfer, turnover (including value-added tax, business tax, and consumption tax), resource, special purpose, documentation (including stamp duty and deed tax), filing, recording, social insurance (including pension, medical, unemployment, housing, and other social insurance withholding), tariffs (including import duty), and estimated taxes, charges, fees, levies, or other assessments levied by any Government Authority of any kind whatsoever and any interest, penalties or additions in connection therewith.

Transaction shall mean the transfer of the Transferred Shares by the Seller to the Purchaser to be completed in accordance with the provisions hereof, and the effecting of the New JV Contract and the New Articles of Association.

Transaction Documents shall mean this Agreement, the New JV Contract and the New Articles of Association and any other documents entered into by the Parties in relation to the Transaction.

1.2    Articles and headings are inserted for the purpose of convenience and reference only and shall not affect the interpretation or construction of this Agreement. Words denoting the singular shall, where applicable, include plural and vice versa.  Reference to the masculine gender shall, where applicable, include the feminine gender and vice versa.  Except as otherwise indicated, all references in this

Agreement to "Articles" or "Schedule A" are intended to refer to Articles of, or Schedule A to, this Agreement.

## Article 2
## Transfer of Registered Capital

2.1    The Seller hereby sells and transfers to the Purchaser, and the Purchaser hereby purchases and acquires from the Seller, the entire equity interest in the Company owned by the Seller, which represents 40% of the registered capital of the Company ("Transferred Shares"), in exchange for the Purchase Price.

2.2    Unless otherwise prescribed under PRC Law, all obligations (other than those which the Seller may actually or potentially have under Article 19.3 of the Original JV Contract) and rights in respect of the Transferred Shares, including but not limited to profits and dividends accruing after the Completion Date, shall pass from the Seller to the Purchaser immediately, free of any Encumbrances, upon full payment of the Completion Payment being made pursuant to Article 3.

2.3    Upon the Effective Date, the Seller shall no longer be the shareholder of the Company. The Company will continue to be a Sino-foreign equity joint venture with the Purchaser holding 40% of the registered capital thereof.

2.4    Upon the Effective Date, the Original JV Contract and the Original Articles of Association shall be terminated and replaced by the New JV Contract and the New Articles of Association respectively. It is hereby agreed by both Parties that the Original JV Contract and the Original Articles of Association shall be deemed to be terminated automatically as of the Effective Date, and the terms and conditions of the Original JV Contract and the Original Articles of Association shall cease to be binding on the Seller (except to the extent provided under Article 19.3 of the Original JV Contract).

## Article 3
## Purchase Price and Completion

3.1    The aggregate purchase price for the Transferred Shares (the "Purchase Price") shall be an amount equal to (i) the Completion Payment,   plus (ii) the Adjustment Amount. The Purchase Price shall be payable and subject to adjustment as provided herein.

3.2    The Completion Payment shall be paid by the Purchaser to the Seller upon Completion.

3.3    Completion shall take place on the first Business Day of the calendar month following the satisfaction or waiver of the Conditions Precedent, at the offices of King & Wood Mallesons, 17th Floor, One ICC, Shanghai ICC, 999 Huai Hai Road (M), Shanghai 200031, P.R. China  at 10:00 a.m., Shanghai time, on the Completion Date (or on any other date, time or place as may be agreed in writing by the Seller and the Purchaser).

On the Completion Date, the Purchaser shall transfer an amount equal to the Completion Payment in full without any right to set off to such bank account as the Seller may notify the Purchaser in writing not later than five Business Days prior to Completion and provide to the Seller the document evidencing the payment has been remitted.

3.4  No later than seven Business Days prior to the Completion Date, the Seller shall deliver to the Purchaser the Estimated Closing Statement.  The Purchaser shall have an opportunity to review the Estimated Closing Statement and shall be provided reasonable access to the books, records and other relevant information of the Seller and its Representatives to the extent reasonably necessary to review such Estimated Closing Statement.

3.5(a)  As soon as reasonably practicable, but in no event later than 60 days following the Completion Date, the Purchaser shall prepare and deliver to the Seller the Completion Statement.  During the 60-day period immediately following the Seller's receipt of the Completion Statement (the "Review Period"), the Seller and its Representatives shall be provided reasonable access, to the extent the Purchaser has the contractual or legal ability to provide such access, to the books, records and other relevant information of the Company, the Purchaser and its Representatives to the extent reasonably necessary to review such Completion Statement; provided that prior to obtaining such access, the Seller shall have executed a non-disclosure agreement on reasonable and customary terms.  During the Review Period, the Purchaser shall make reasonably available personnel of the Purchaser and its Affiliates (including the Company) directly responsible for and knowledgeable about the information used in, and the preparation of, such Completion Statement in order to respond to reasonable inquiries made by the Seller and its Representatives.  On or prior to the last day of the Review Period, the Seller may object to the Completion Statement relating to such Review Period by delivering to the Purchaser a written statement setting forth the basis for the Seller's objections thereto (the "Statement of Objections").  If the Seller fails to deliver such Statement of Objections within the Review Period, the Completion Statement shall be deemed to have been accepted by the Seller and shall be used in calculating the Adjustment Amount.  If the Seller delivers such Statement of Objections within the Review Period, the Parties shall negotiate in good faith to resolve such objections, and, if the same are so resolved, the Completion Statement with such changes that may have been previously agreed in writing by the Parties shall be final and binding and shall be used in calculating the Adjustment Amount. If, within 30 days after the expiry of the Review Period, the Parties shall fail to reach an agreement with respect to any of the matters set forth in the Statement of Objections, then such unresolved matters shall be submitted for resolution to Deloitte and Touche LLP (or such other registered public accounting firm of international reputation which is mutually acceptable to the Seller and the Purchaser) (the "Accounting Expert").  The Accounting Expert shall, limiting its review to matters properly included in the Statement of Objections and acting as an expert and not as an arbitrator, resolve the disputes set forth in the Statement of Objections and make any corresponding adjustments to the Completion Statement.  Subject to, and to the extent permitted by, any applicable Laws, the Parties shall each make readily available, to the extent the Parties have the contractual or legal ability to make available, to the Accounting Expert all relevant books, records and other information relating to the Company.  Each Party shall concurrently provide the other Party with copies of all such materials and information provided by such Party to the Accounting Expert.  The Parties shall jointly instruct the Accounting Expert to make a determination in accordance with U.S. generally accepted accounting principles as soon as practicable within 30 days (or such other time as the Parties shall agree in writing) after its engagement and to select, with respect to each item in dispute, an amount between or equal to the Purchaser's position on the Completion Statement and the Seller's position in the Estimated Closing Statement.  The Accounting Expert's resolution of the disputes set forth in the applicable Statement of Objections and the Completion Statement, with any such adjustments made by the Accounting Expert, shall be final and binding and shall be used in determining the Adjustment Amount, absent manifest error. The fees of the Accounting Expert shall be divided between the Purchaser, on the one hand, and the Seller, on the other hand, in proportion to the aggregate dollar amount unsuccessfully disputed by such Party in connection with the Completion,  divided by the

aggregate Dollar amount of disputed items submitted to the Accounting Expert in connection with the Completion.

(b)    Within five Business Days of the later of (1) the Seller's acceptance of    a Completion Statement or (2) the resolution of all the Seller's objections to a Completion Statement, to the extent that the    Estimated Net Asset Value is not equal to the Final Net Asset Value:

(i)    if the Estimated Net Asset Value is greater than the Final Net    Asset Value, the Seller shall pay promptly to the Purchaser an amount equal to the absolute value of the Adjustment Amount,    by wire transfer of immediately available funds to one or more accounts designated by the Purchaser; and

(ii)    if the Estimated Net Asset Value is less than the Final Net    Asset Value, the Purchaser shall pay promptly to the Seller an    amount equal to the absolute value of the Adjustment Amount,    by wire transfer of immediately available funds to the account    set forth in Article 3.3 or such other accounts as may be    designated by the Seller.

(c)    The Parties agree that any such payment pursuant to this Article 3.5    shall be treated as an adjustment to the Purchase Price for tax purposes.

3.6  If the Purchaser fails to make any payment when due hereunder, without prejudice to any other rights or remedies of the Seller, including, without limitation, damages, the Seller shall have the right to seek specific performance of the Purchaser's obligation to make such payment hereunder.

**Article 4**
**Conditions Precedent**

4.1    (A) The obligation of the Seller to consummate the transfer of the Transferred Shares as contemplated by this Agreement is subject to the fulfillment of each of the conditions set forth in paragraphs (a) through (e), (h) and (i) below, and (B) the obligation of the Purchaser to consummate the transfer of the Transferred Shares as contemplated by this Agreement is subject to the fulfillment of each of the conditions set forth in paragraphs (a) through (g) and (j) below:

(a)    the Board of Directors of the Company having passed a unanimous resolution approving the transfer of the Transferred Shares contemplated hereunder, the New JV Contract and the New Articles of Association;

(b)    the New JV Contract and the New Articles of Association having been executed by all parties thereto;

(c)    the Company having obtained the MOFCOM Approval, the Anti-trust Clearance (if required), the CBRC Approval and all other Requisite Approvals from the relevant Approval Authorities approving this Agreement, the transfer of the Transferred Shares, the New JV Contract and the New Articles of Association; provided that such approvals shall not alter the terms of this Agreement, the New JV Contract and the New Articles of Association in any way that relates to the material rights and obligations of a Party;

(d)    the Company having obtained the Revised Business License reflecting the Purchaser as the new shareholder of the Company;

(e)     the Company having obtained such waivers and consents signed by the Ongoing Members as the Purchaser may reasonably request to enable the Purchaser to be registered as holder of the Transferred Shares;

(f)     each of the representations and warranties of the Seller contained in Article 5 shall be true and correct as of the date hereof and as of the Completion Date as though made at and as of the Completion Date, except (i) for such representations and warranties that are made only as of a specific date, which shall be true and correct as of such date, and (ii) where the failures of such representations and warranties to be true and correct have not had and would not have a Company Material Adverse Effect (disregarding for purposes of this clause (ii) any limitations as to materiality or Company Material Adverse Effect set forth in such representations and warranties);  provided  that the Seller Fundamental Representations shall be true and correct in all material respects as written as of the date hereof and as of the Completion Date;

(g)     the covenants and agreements of the Seller set forth in this Agreement to be performed at or prior to the Completion shall have been duly performed in all material respects;

(h)     each of the representations and warranties of the Purchaser contained in Article 5 shall be true and correct as of the date hereof and as of the Completion Date except (i) for such representations and warranties that are made only as of a specific date, which shall be true and correct as of such date, and (ii) where the failures of such representations and warranties to be true and correct have not had and would not have Purchaser Material Adverse Effect (disregarding for purposes of this clause (ii) any limitations as to materiality or Purchaser Material Adverse Effect set forth in such representations and warranties);  provided  that the Purchaser Fundamental Representations shall be true and correct in all material respects as written as of the date hereof and as of the Completion Date;

(i)     the covenants and agreements of the Purchaser set forth in this Agreement to be performed at or prior to the Completion shall have been duly performed in all material respects; and

(j)     the Seller shall have completed the Tax filing and settled the Taxes for the capital gain Taxes imposed on the Seller in respect of the Purchase Price set forth in this Agreement, and the Seller shall have received the certificate issued by the PRC tax authority as a proof of the completion of such obligations and delivered a copy of such certificate to Purchaser.

4.2     Notwithstanding Article 4.1, to the extent permitted by applicable Law, (a) the Seller may at any time unilaterally waive in whole or in part and conditionally or unconditionally any of the Conditions Precedent set forth in Article 4.1(h) and (i) by notice in writing to the Purchaser, and (b) the Purchaser may at any time unilaterally waive in whole or in part and conditionally or unconditionally any of the Conditions Precedent set forth in Article 4.1(f), (g) and (j) by notice in writing to the Seller.

4.3     The Seller shall use all commercially reasonable efforts to cause the satisfaction of each of the Conditions Precedent (other than Article 4.1(b), (h) and (i)), and the obtaining of all consents and approvals reasonably necessary or appropriate in connection with the Transaction (including but not limited to those mentioned in Article 4.1).  The Purchaser shall use all commercially reasonable efforts to (1) cause the satisfaction of each of the Conditions Precedent in Article 4.1(b), (h) and (i) and (2) cooperate with the Seller and the Company and execute documents and perform acts as requested by the Approval Authorities in relation to Article 4.1(c) and (d).

4.4     The Seller shall, as promptly as practicable upon becoming aware thereof, give notice to the Purchaser of the obtaining or effecting of the relevant Requisite Approvals by the Approval Authorities.

4.5     The Parties agree that all requests and enquiries from any Approval Authority with respect to any Requisite Approval and/or transfer registration shall be addressed by the Parties in consultation with each other, and the Parties shall promptly cooperate with and provide all necessary information and assistance reasonably required by any Approval Authority upon being requested to do so by the other Party;  provided that nothing herein shall obligate either Party or its Affiliates to breach any confidentiality obligations owed to any Person.

In the event that any Approval Authority (i) refuses to grant its approval, or (ii) requests that substantive amendments or supplements be made to this Agreement, the New JV Contract or the New Articles of Association that are material and adverse to any Party or (iii) imposes additional obligations on the Seller, the Purchaser or their respective Affiliates that are material and adverse to such Persons, either Party may, after seeking opinion from the other Party, reasonably determine whether to withdraw the application for such approval and terminate this Agreement in accordance with its terms, or amend this Agreement and/or the applicable document in a mutually agreeable manner as between the parties hereto and thereto in which case such amended agreement or other document shall be re-submitted to such Approval Authority for approval as soon as practicable.

In the event that any Approval Authority requests that non-substantive amendments or supplements be made to this Agreement which would not adversely impact any of the Parties' or their respective Affiliates' interests under this Agreement and/or any other documents submitted, the Parties shall negotiate in good faith any such necessary amendments to this Agreement and re-submit this Agreement to such Approval Authority for approval as soon as practicable.

4.6     Neither the Purchaser nor the Seller may rely on the failure of any condition set forth in Article 4.1 if such failure resulted from such Party's failure to comply with any provision of this Agreement.

4.7     The Seller shall cause its directors appointed to the board of the Company to adopt a resolution approving the transfer of the Transferred Shares contemplated hereunder.

**Article 5**
**Representations and Warranties in respect of the Seller and the Purchaser**

5.1.     The Seller hereby represents and warrants to the Purchaser that, as of the date hereof and as of the Effective Date and the Completion Date:

a)    Incorporation and Standing. The Seller is duly incorporated, validly existing and in good standing under its laws of incorporation;

b)    Power and Authority. The Seller has the requisite power and authority to duly and validly conclude this Agreement and perform its duties and obligations hereunder;

c)    Binding Effect. Subject to Article 8.1, this Agreement is a valid and effective agreement, and constitutes the Seller's binding and enforceable obligations in accordance with its terms, subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar Laws of general applicability relating to or affecting creditors' rights and to general equity principles;

d)   <u>No Conflicts; Consents</u>.  None of the execution of this Agreement by the Seller, the performance of its obligations hereunder or the transfer of the Transferred Shares provided herein does or will:

  (i)    conflict with or violate any of its Constituent Documents;

  (ii)   violate or result in the breach of any permit or authorization granted by any Government Authority to it, in each case, except as would not, individually or in the aggregate, be reasonably likely to be (A) material to the Company or (B) result in any Criminal Liability;

  (iii)  constitute a violation of any Laws, except as would not, individually or in the aggregate, be reasonably likely to be (A) material to the Company or (B) result in any Criminal Liability; or

  (iv)   require any authorizations and filings of any Government Authority or any consents or approvals from any other Person that is not a Government Authority, except in connection, or in compliance, with the Laws of the PRC relating to the Transferred Shares;

e)   <u>Solvency</u>.

  (i)    No petition has been presented or order made and no meeting convened or resolution passed for the winding up or administration of the Seller or for a liquidator or bankruptcy administrator to be appointed in respect of the Seller;

  (ii)   No distress, execution or other process has been levied on any of the assets of the Seller and no liquidator or bankruptcy administrator has been appointed and there is no reason to believe that such a person might be appointed;

  (iii)  The Seller is not insolvent, or unable to pay its debts as they fall due, and has not stopped paying its debts as they fall due; and

  (iv)   No event analogous to any of the foregoing has occurred in respect of the Seller in or outside the PRC;

f)   <u>No Action or Government Orders</u> .  There are no Actions pending, or to the Seller's Knowledge, threatened, against the Seller relating to this Agreement or the Transaction. There are no outstanding Government Orders which are binding on it that would prevent, hinder or delay any part of the Transaction;

g)   <u>Good Title</u>.  The Seller has good and marketable title to the Transferred Shares, and the Transferred Shares are free and clear of any Encumbrance (other than Encumbrances arising under applicable securities laws); and

h)   <u>Financial Information</u>.  To the Knowledge of the Seller:

  (i)    Subject to such exceptions and qualifications as may be reflected in such financial information, the unaudited financial statements as of and for the years

ended December 31, 2010 and 2011 and the nine-month period ended September 30, 2012 of the Company (collectively, the "Company Financial Information") were prepared in accordance with PRC generally accepted accounting principles consistently applied and present fairly, in all material respects, the financial position and results of operations and cash flows of the Company for the periods and as of the dates indicated therein.

(ii)    Except (A) as set forth in the Company Financial Information, (B) for Liabilities incurred by the Company since September 30, 2012 in the ordinary course of the Company's business, consistent with past practice, and (C) for Liabilities that are not material to the Company, there are no Liabilities of the Company.

5.2.    The Purchaser hereby represents and warrants to the Seller that, as of the date hereof and as of the Effective Date and the Completion Date:

a)    <u>Incorporation and Standing</u>.  The Purchaser is duly incorporated, validly existing and in good standing under its laws of incorporation;

b)    <u>Power and Authority</u>.  The Purchaser has the requisite power and authority to duly and validly conclude this Agreement and perform its duties and obligations hereunder;

c)    <u>Binding Obligations</u>.  Subject to Article 8.1, this Agreement is a valid and effective agreement, and constitutes the Purchaser's binding and enforceable obligations in accordance with its terms, subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar Laws of general applicability relating to or affecting creditors' rights and to general equity principles;

d)    <u>No Conflict; Consents</u>.  None of the execution of this Agreement by the Purchaser, the performance of its obligations hereunder or the consummation of the transfer of the Transferred Shares provided herein does or will:

(i)    conflict with or violate any of its Constituent Documents;

(ii)    violate or result in the breach of any permit or authorization granted by any Government Authority to it, other than immaterial violations or breaches of any such permit or authorization;

(iii)    constitute a violation of any Laws, other than immaterial violations of any such Laws; or

(iv)    require any authorizations and filings of any Government Authority or any consents or approvals from any other Person that is not a Government Authority, except in connection, or in compliance, with the Laws of the PRC relating to the Transferred Shares;

e)    <u>Solvency</u>.

      (i)      No petition has been presented or order made and no meeting convened or resolution passed for the winding up or administration of the Purchaser or for a liquidator or bankruptcy administrator to be appointed in respect of the Purchaser;

      (ii)     No distress, execution or other process has been levied on any of the assets of the Purchaser and no liquidator or bankruptcy administrator has been appointed and there is no reason to believe that such a person might be appointed;

      (iii)    The Purchaser is not insolvent, or unable to pay its debts as they fall due, and has not stopped paying its debts as they fall due;

      (iv)    No event analogous to any of the foregoing has occurred in respect of the Purchaser in or outside the PRC; and

      (v)     The Purchaser will have sufficient immediately available funds prior to or upon Completion to pay the Purchase Price in accordance with Article 3.3; and

    f)    <u>No Action or Government Orders</u>. There are no Actions pending or, to the Purchaser's knowledge, threatened, against the Purchaser relating to this Agreement or the Transaction. There are no outstanding Government Orders which are binding on it that would prevent, hinder or delay any part of the Transaction.

### Article 6
### Obligation of Secrecy

6.1    The Seller and the Purchaser shall undertake to keep confidential all information in whatever form, whether technical or commercial, of a confidential nature pertaining to the business of the Company and/or of any of the Parties (hereinafter "Confidential Information"), and to only use such Confidential Information to the extent necessary for the due performance of this Agreement.

6.2    For the purpose of this Agreement, "Confidential Information" shall mean the information referred to in Article 6.1 but shall not include any document, material or other information that:

    (a)    was lawfully in the possession of the receiving Party prior to its disclosure by the disclosing Party;

    (b)    is or becomes generally known to the public (other than by breach of this Agreement or any other obligation of confidentiality owed between any of the Parties);

    (c)    is or becomes available to the relevant Party other than as a result of a disclosure by a Person bound by an obligation of confidentiality to the other Party; or

    (d)    is independently developed by the relevant Party without reference to the Confidential Information.

6.3    Articles 6.1 and 6.2 shall not prohibit disclosure of any information if and to the extent that:

    (a)    the disclosure of such information is required by Laws or required or requested by any securities exchange or Government Authority having jurisdiction over it; <u>provided</u> that the Party required to disclose shall provide prior notification of such impending disclosure to the

other Party and use all reasonable efforts to preserve the confidentiality of the Confidential Information in complying with such required disclosure, including but not limited to obtaining a protective order to the extent reasonably possible;

(b)    the disclosure is made to the Affiliates of the Purchaser, the Company or the Seller, or to the officers, employees, agents and professional and other advisers (or any of them) of the Purchaser, the Company, the Seller or the Affiliates of the Purchaser, the Company or the Seller, where such Person has a business-related need to have access to the Confidential Information provided that such person undertakes to comply with the provisions hereof in respect of such information as if such person were a party to this Agreement and the Purchaser, the Company, the Seller (as the case may be) shall be liable for any breach of this Article 6 by such Person; or

(c)    the other Party has given its prior written approval to the disclosure.

6.4    Unless required by any Government Authority, Laws or the rules of any securities exchange, no press release or public announcement regarding the Transaction shall be made by any of the Parties without the prior written consent of the other Party. The Parties shall consult with each other prior to consenting to or making any required press releases or public announcements in accordance with any Government Authority or pursuant to any Laws or rules of any securities exchange with respect to the Transaction.

6.5    The obligation of secrecy set out in this Article 6 shall survive any termination of this Agreement for a period of three (3) years and remain in force accordingly.

**Article 7**
**Further Covenants**

7.1    Except as otherwise contemplated in this Agreement, from the date of this Agreement until Completion   or the termination of this Agreement pursuant to Article 8 (whichever is earlier):

(a)    Each Party shall notify the other Party as soon as practicable after it becomes aware of any fact or circumstance which constitutes or which would or might constitute a breach of any of its representations or warranties in Article 5 or which would or might cause a representation or warranty given by it under Article 5 to be untrue, inaccurate or misleading if given in respect of the facts or circumstances as at the latter date.

(b)    The Seller shall not sell, transfer, dispose of or create any Encumbrance over any Transferred Shares or rights in respect thereof, or, to the extent that it has the contractual or legal ability to do so, not admit or agree to admit any new shareholder in respect to the Company.

(c)    The Seller shall use its commercially reasonable efforts to maintain its or its Affiliate's employment relationship with the Key Person and the Key Person's secondment to the Company and shall not cause the Key Person to leave his employment with the Seller except for cause (and only after notice to, and consultation with, the Purchaser); provided, however, that Seller shall not be deemed to be in breach of this covenant in the case where the Key Person voluntarily and without any direct or indirect inducement from the Seller or its Affiliates resigns from his employment or the secondment of the Key Person to the Company is terminated by the Company due to reasons not attributed to the Seller.

(d)    The Seller shall ensure, to the extent that it has the contractual or legal ability to do so, that the Board of the Company does not make any distribution (whether in cash, stock, equity rights or property), declare or pay any dividend, effect a reduction of the capital, or enter into any contractual commitment to effect any of the foregoing.

7.2    As soon as practicable following the date hereof, and in the case of clause (a), in any event prior to Completion, the Seller shall procure, to the extent that it has the contractual or legal ability to do so, that the Company:

(a)    complies with any and all of the Company's obligations to provide any notifications or obtain any consents or waivers in respect of the Transaction, the New JV Contract and the New Articles of Association, under any binding agreement, arrangement, commitment, indemnity, lease, license or understanding entered into by the Company; and

(b)    provides all necessary notifications to, and effects all necessary registrations and filings with, all applicable Government Authorities to reflect the current name of the Seller as the shareholder of record of the Company.

(c)    delivers to the Purchaser (i) audited financial statements of the Company as at December 31, 2010, 2011 and 2012 and related statements of income and shareholders' equity for the fiscal years then ended of the Company, prepared in accordance with PRC generally accepted accounting principles, (ii) an audited reconciliation to U.S. generally accepted accounting principles at December 31, 2010, 2011 and 2012 to the extent required pursuant to Rule 3-05 of Regulation S-X and (iii) such other financial statements as may be required in order for the Purchaser to meet its reporting obligations under United States securities Laws (collectively, the "Historical Financial Statements").  The Seller and the Purchaser shall bear all costs and expenses associated with the audit and preparation of the Historical Financial Statements equally, along with the audit report and any comfort letters in connection therewith.  The Purchaser and its Affiliates shall cooperate with the Seller and take all such actions as the Seller or its auditor may reasonably request in connection with the preparation of the Historical Financial Statements; and

(d)    provides to the Purchaser reasonable access to the books, records and other relevant information (including any work with respect to the reconciliation of PRC generally accepted accounting principles with U.S. generally accepted accounting principles) of the Company to the extent reasonably necessary to prepare any required financial statements, Tax filings or regulatory filings of the Purchaser.

7.3    Non-Compete.

(a)    During the period beginning on the Completion Date and ending on the third anniversary of the Completion Date (any such period, a "Non-Compete Term"), the Seller and its Controlled Affiliates (the "Restricted Persons") shall not, directly or indirectly, anywhere in China (the "Restricted Territory"), originate or service consumer, wholesale or commercial motor vehicle loans and leases, or directly or indirectly own an interest in, manage, operate, finance or Control any Person that provides any such products or services in the Restricted Territory (collectively, the "Restricted Activity").

(b)    Notwithstanding the foregoing, nothing in this Agreement shall prohibit or in any way limit:

(i)     any Person other than the Restricted Persons from conducting any Restricted Activity;

(ii)    any Restricted Person from performing any act or conducting any business expressly required by this Agreement or any other Transaction Document;

(iii)   any Restricted Person from acquiring, owning or holding up to 4.99% of the outstanding securities of an entity whose securities are listed and traded on a nationally recognized securities exchange or market, whether or not in the United States of America ( provided that no Restricted Person may otherwise Control the business or affairs of such entity) or holding or exercising rights of ownership with respect to a security in a fiduciary, custodial or agency capacity or otherwise for the benefit of or on behalf of customers or other un-Affiliated beneficiaries;

(iv)    any Restricted Person from making passive investments for general insurance accounts or investment management activities in the ordinary course of its business;

(v)     the ownership of, any affiliation with, or the conduct of any other activity with respect to, a Person that conducts, either directly or indirectly, a Restricted Activity (any such Person, together with all of its Affiliates, a "Competing Person") that is the result of (1) a merger, consolidation, share exchange, sale or purchase of assets, scheme of arrangement or similar business combination involving any Restricted Person with any Competing Person or (2) the acquisition of any Competing Person or any Equity Interests in any Competing Person by any Restricted Person, if, in the case of either (1) or (2):

> (A) no more than 20% of such Competing Person's total consolidated revenues in its most recent fiscal year (excluding any revenues of any Restricted Person) in the Restricted Territory in which it operated in the calendar year prior to such ownership or affiliation change from activities that constitute Restricted Activities; and

> (B) such Competing Person did not generate total consolidated revenues in its most recent fiscal year (excluding any revenues of such Restricted Person) in China in the calendar year prior to such ownership or affiliation change from activities that constitute Restricted Activities in an amount that would exceed 20% of the aggregate revenue for the year ended December 31, 2012 generated by the Company;

(vi)    any Restricted Person from acquiring a Competing Person or more than 4.99% of the outstanding Equity Interests in any Competing Person that generated total consolidated revenues in its most recently completed fiscal year prior to such acquisition from activities that constitute Restricted Activities in excess of the thresholds set forth in Article 7.3(b)(v); provided, however, that such Restricted Person shall use its reasonable best efforts to (i) divest, within one year of its acquisition a sufficient portion of such Competing Person necessary to satisfy such thresholds and (ii) after such divestiture has occurred, not exceed such thresholds for the duration of the remaining Non-Compete Term;

(vii) (A) any Person not Affiliated with the Seller that acquires the Seller or any of its Affiliates or their respective successors or substantially all of their respective assets

or business, or any of such Person's Affiliates or (B) any Person resulting from any merger, consolidation, share exchange, sale or purchase of assets, scheme of arrangement or similar business combination (a "Business Combination") of the Seller or any of its successors with or into any other Person not Affiliated with the Seller, or any of such Person's Affiliates, if (1) the directors of the Seller immediately prior to such transaction do not serve as a majority of the directors of the surviving Person or direct or indirect parent of the surviving Person following such Business Combination, and (2) the equity holders of the Seller or any successor immediately before such Business Combination own, immediately following such transaction no more than 50% of the outstanding capital stock of the surviving Person or the direct or indirect parent of the surviving Person;

(viii)    any Restricted Person from foreclosing on collateral of or acquiring any of the outstanding Equity Interests in any Person that has outstanding indebtedness to any Restricted Person, or engaging in any activities otherwise prohibited by Article 7.3 in connection with any such Person as a result of the acquisition of such Equity Interests, in connection with a debt previously contracted in a distressed or troubled situation;

(ix)    any Restricted Person from continuing any businesses or operations in wind-down or liquidation that are not being acquired by the Purchaser pursuant to this Agreement; provided, however, that such Restricted Person shall not conduct any Restricted Activity not already conducted prior to such Closing;

(x)    any Restricted Person from providing transition or separation services to any Person in connection with the Seller's publicly announced strategy to sell its Mexican insurance operations, its Canadian motor vehicle finance operations and deposit taking operations and the warranty insurance business conducted under the CarCare Plan brand; or

(xi)    any Restricted Person from undertaking general advertising or marketing campaigns not targeting customers, clients or other third party beneficiaries of the Company.

(b)    Nothing in this Agreement shall require any Restricted Person to terminate any instruments or contracts of or with any customers, clients or other third party beneficiaries in effect as of the date hereof, or prohibit or otherwise limit any of them from performing their respective binding obligations in effect as of Completion at which such instruments, contracts or performance first become a Restricted Activity pursuant to this Article 7.3.

(c)    Notwithstanding anything to the contrary contained in this Agreement, the parties acknowledge and agree that (i) no current or future Affiliate of the Seller (or any of such Affiliate's direct or indirect Subsidiaries) shall be subject to any of the restrictions or requirements set forth in this Article 7.3 at any time following the date on which the Seller, directly or indirectly, no longer Controls such Person; and (ii) no current or future Affiliates of the Seller (or any of such Affiliate's direct or indirect Subsidiaries) shall be subject to any of the restrictions or requirements set forth in this Article 7.3 at any time for conducting a Restricted Activity outside of any Restricted Territory for the benefit of customers, clients or other third party beneficiaries who also may reside or otherwise have a presence within a Restricted Territory.

(d)    The Seller acknowledges that the covenants in this Article 7.3 are necessary in order to induce the Purchaser to enter into and consummate the transactions contemplated by this Agreement, are required by the Purchaser in connection with the transactions contemplated by this Agreement, and that the Purchaser would not enter into and consummate the transactions contemplated by this Agreement without the agreement of the Seller to the covenants contained in this Article 7.3.  In the event that any of the provisions of this Article 7.3 should ever be finally adjudicated to exceed the time, scope, geographic or other limitations permitted by applicable Law in any jurisdiction, then such provisions shall be deemed reformed in such jurisdiction to the maximum time, scope, geographic or other limitations enforceable under applicable Law.

7.4    <u>Transition Arrangements</u>.

(a)    Subject to applicable Law, between the date of this Agreement and the earlier of Completion and the termination of this Agreement, each Party shall reasonably cooperate with the other Party to assist each other in planning and implementing necessary and appropriate policies, procedures and other arrangements in connection with the termination or transition of any services, technology or other support which the Seller has agreed to provide to the Company under each of the agreements attached to the Original JV Contract.

(b)    The Parties shall use their commercially reasonable efforts to obtain any consents and approvals and make any other notifications that may be required in connection with paragraph (a) above.

7.5    <u>Further Assurances</u>.

(a)    Each Party shall use its commercially reasonable efforts to do and perform, or cause to be done and performed, all such further acts and things and shall execute and deliver all such other agreements, certificates, instruments and documents as may be necessary or desirable to assure fully to the Purchaser, all of the Transferred Shares and all rights, title, interest, remedies, powers and privileges in respect thereof and to otherwise give effect to the terms and intent of this Agreement.

(b)    Each Party shall execute and perform its respective obligations under this Agreement in compliance with applicable Laws in all material respects.

**Article 8**
**Effectiveness and Termination of the Agreement**

8.1    This Agreement shall come into effect as of the date hereof ( <u>provided</u> that any portion of this Agreement that requires the approval of any Government Authority shall not come into effect until such approval has been obtained) and the transfer of Transferred Shares contemplated under this Agreement shall become effective when the Revised Approval Certificate has been issued.

8.2    This Agreement may be terminated as follows:

(a)    At the election of the Seller or the Purchaser, if all Requisite Approvals shall not have been obtained or effectuated on or prior to the Outside Date, <u>provided</u> that (i) the terminating Party is not in material default of any of its obligations hereunder and (ii) the right to terminate this Agreement pursuant to this Article 8 shall not be available to any Party whose breach of any

provision of this Agreement has been the cause of, or resulted, directly or indirectly, in, the failure to obtain or effectuate the Requisite Approvals;

(b)    By mutual written consent of the Seller and the Purchaser to terminate this Agreement;

(c)    At the election of the Seller, if the Purchaser does not comply with its obligations under Article 3.2;

(d)    At the election of the Seller or the Purchaser, in the event of a material breach of any representation, warranty, covenant or agreement contained in this Agreement on the part of the other Party, which breach would, individually or in the aggregate, result in, if occurring or continuing on the Completion Date, the failure of any condition to the terminating Party's obligations set forth in Article 7 to be satisfied, and which cannot be or has not been cured within 45 days after the giving of written notice to the breaching Party of such breach (or by the Outside Date, if earlier); provided, however, that the right to terminate this Agreement under this Section 8.2(d) shall not be available to any Party if the would-be terminating Party is then in material breach of its representations, warranties, agreements and covenants hereunder; or

(e)    at the election of the applicable Party pursuant to the second paragraph of Article 4.5.

If the Revised Approval Certificate and/or the Revised Business License has, at the time of such termination, already been obtained, the Parties shall take all necessary steps, as soon as reasonably practicable, to procure the cancellation of Revised Approval Certificate and/or the Revised Business License and the reinstatement of the Seller as the registered owner of the Transferred Shares.

8.3    In the event of termination by the Purchaser or the Seller pursuant to Article 8.2, written notice shall be immediately given to the other Party and the transfer of Transferred Shares shall be abandoned, without further actions by the Purchaser or the Seller. In such event, each Party shall be relieved of its duties and obligations as of the date of termination and such termination shall be without liability for either Party, provided that no such termination shall relieve any Party from liability for any breach of this Agreement committed prior to the date of termination.

8.4    Except as set forth in Article 8.2, neither Party shall have right to terminate this Agreement.

### Article 9
### Breach of Representations, Warranties or Covenants and Indemnifications

9.1    Subject to the limitations of liability set out in Article 9.2 and without prejudice to any other rights of the non-breaching Party including, without limitation, the right to terminate this Agreement as set out hereunder, the breaching Party agree to indemnify and hold harmless the non-breaching Party and its Affiliates from and against all losses, liabilities, costs, damages, and all claims of whichever kind and nature, asserted by any third party or Government Authority against or incurred by the non-breaching Party and its Affiliates and resulting from the breach by the breaching Party of any of the breaching Party's representations, warranties, covenants or any other obligation of the breaching Party under this Agreement or in relation to responsibilities and liabilities that according to this Agreement ("Losses") shall remain and/or rest with the breaching Party. In any such case the breaching Party shall put the non-breaching Party and its Affiliates in a position as it would financially be in, if the breaching Party had not breached any of its representations, warranties, covenants or obligations hereunder.

9.2     Limitations.

    (a)    The representations, warranties, covenants and obligations of the Parties contained in this Agreement shall survive in full force and effect until 5:00 p.m. Shanghai time on the date that is 540 days after the Completion Date, at which time they shall terminate (and no claims shall be made for indemnification under Article 9.1 thereafter), except:

        (i)    the Seller Fundamental Representations and Purchaser Fundamental Representations shall survive until 5:00 p.m. Shanghai time on the date that is the later of (i) 60 days after the expiration of any applicable statute of limitations and (ii) the tenth anniversary of the Completion Date; and

        (ii)    (a) the covenants and obligations that by their terms apply or to the extent they are to be performed in whole or in part after Completion shall survive for the period provided in such covenants and obligations, or until fully performed and (b) the covenants and obligations that by their terms apply or to the extent that they are to be performed in their entirety on or prior to Completion shall survive until 5:00 p.m. Shanghai time on the date that is 270 days after Completion.

    (b)    The maximum aggregate liability of the Seller in respect of (a) a breach of (i) any Seller Fundamental Representation or (ii) any covenant or other obligation contained in this Agreement shall not exceed the Purchase Price, and (b) a breach of any other representation or warranty under this Agreement shall not exceed 15% of the Purchase Price;  provided,  however, that in respect of clauses (a)(ii) and (b) only, (A) no liability shall attach to the Seller in respect of any claim unless the aggregate amount of Losses suffered by the Purchaser and its Affiliates exceeds US$125,000 (or the equivalent thereof in other currencies), and (B) the Seller shall only be liable for Losses in excess of 2% of the Purchase Price.

    (c)    Purchaser shall not be entitled to recover from Seller under this Article 9 or under any Transaction Document more than once in respect of the same Loss (notwithstanding that such Loss may result from breaches of multiple provisions of this Agreement).

    (d)    The amount of any Loss for which indemnification is provided under this Article 9 shall be net of any amounts (i) actually recovered by the Purchaser under insurance policies with respect to such Loss, (ii) for which a reserve, provision or accrual is reflected in the Completion Statement, (iii) resulting from any Tax benefit actually realized or (iv) actually recovered by the Company for the benefit of the Purchaser (in an amount proportionate to the Purchaser's equity interest in the Company).  If the Seller is liable to pay, or has paid, an amount in discharge of any claim under this Agreement and the Purchaser directly or indirectly recovers or is entitled to recover (whether by payment, discount, credit, relief, insurance or otherwise) from a third party a sum which indemnifies or compensates the Purchaser (in whole or in part) in respect of the Loss which is the subject matter of the claim, then (A) in the case of amounts Seller is liable to pay, the Purchaser shall procure that all commercially reasonable steps are taken to enforce recovery against the third party and any actual recovery (less any reasonable costs and expenses incurred in obtaining such recovery) shall reduce or satisfy, as the case may be, such claim to the extent of such recovery, and (B) in the case of amounts the Seller has paid, pay to the Seller as soon as practicable after receipt an amount equal to (i) any sum recovered from the third party less any reasonable costs and expenses incurred in obtaining such recovery or (ii) if less, the amount previously paid by the Seller to the Purchaser. The Purchaser shall cause

that all commercially reasonable steps are taken and all commercially reasonable assistance is given to avoid or mitigate any Losses, which in the absence of mitigation might give rise to or increase a Loss in respect of any claim under this Article 9.

(e)     Each Party acknowledges and agrees that (a) prior to the Completion, other than in the case of actual fraud by the Seller, the sole and exclusive remedies of the Purchaser for any breach of any of the representations and warranties of the Seller contained in this Agreement shall be, (i) in the event that each of the Conditions Precedent has not been satisfied or waived, refusal to close the Transaction and (ii) the right to terminate this Agreement pursuant to Article 8.2 subject to the terms set forth therein; (b) following the Completion, the indemnification provisions of this Article 9 shall be the sole and exclusive remedies of the Parties for any breach of the representations or warranties contained in this Agreement except in the case of fraud or willful breach and (ii) notwithstanding anything to the contrary contained herein, no breach of any representation, warranty, covenant or obligation contained herein shall give rise to any right on the part of either Party to rescind this Agreement or the Transaction; and (c) following Completion, the indemnification provisions of this Article 9 shall be the sole and exclusive monetary remedies of the Parties for any breach or non-fulfillment of any covenant.

9.3     Notwithstanding any provision of this Agreement, neither Party shall be liable for any indirect or consequential damages or punitive liability in connection with any claim under this Agreement.

9.4     The Parties agree that irreparable harm would occur if any of the provisions of Article 6 ( *Obligation of Secrecy*) and Article 7.3 (*Non-Compete*) were not performed in accordance with the terms thereof or if the Seller fails to effect the Transaction in accordance with the terms of this Agreement, and that the Party which is affected by such failure to perform shall be entitled to seek an injunction or injunctions (or similar remedy(ies)) to prevent breaches of this Agreement to enforce specifically the performance of the terms and provisions hereof in any court or courts having jurisdiction over the Party against whom any injunction (or similar remedy) is being sought.

9.5     No information provided to or obtained by the Purchaser after the execution of this Agreement shall limit or otherwise affect the remedies available hereunder to the Purchaser (including Purchaser's right to seek indemnification pursuant to this Article 9), or the representations or warranties of, or the conditions to the obligations of, the Parties.

### Article 10
### Governing Law

This Agreement shall be governed by and construed in accordance with the Laws of the People's Republic of China.

### Article 11
### Settlement of Disputes

11.1     In the event any dispute arises between the Parties out of or in relation to this Agreement, including but not limited to any dispute regarding its breach, termination or validity, the Parties shall attempt in the first instance to resolve such dispute through friendly consultations.

11.2     Any dispute arising from, out of or in connection with this Contract shall be settled through friendly consultations between the Parties.   Such consultations shall begin immediately after one Party has delivered to the other Party a written request for such consultation.   If within ninety (90) days following

the date on which such notice is given, the dispute cannot be settled through mutual consultations, the dispute shall be submitted to arbitration in Singapore in accordance with the Arbitration Rules of the Singapore International Arbitration Centre ("SIAC Rule") for the time being in force.

There shall be three (3) arbitrators. Each Party shall select one (1) arbitrator within thirty (30) days after giving or receiving the demand for arbitration. Such arbitrators shall be freely selected, and the Parties shall not be limited in their selection to any prescribed list.  Such selected arbitrators shall select the third arbitrator, who shall be the chairman of the arbitration tribunal.  If a Party does not appoint an arbitrator, or if the Party-selected arbitrators fail to select the third arbitrator within thirty (30) days after the selection of the second (2nd) Party-selected arbitrator, the relevant appointment(s) shall be made by the chairman of the Singapore International Arbitration Centre.  The language of the arbitration shall be English.

**Article 12**
**Miscellaneous**

12.1    No failure to exercise and delay in exercising any right, power or remedy under this Agreement will be deemed as a waiver. Nor will any single or partial exercise of any right, power or remedy preclude any further exercise of such right, power or remedy.  No waiver of any of the provisions of this Agreement will constitute a waiver of any of the rights or remedies of the Party entitled to the benefit of such provisions unless made in writing and executed by such Party.

12.2    Should any provision of this Agreement be or become invalid or unenforceable, the validity of the remaining provisions of this Agreement shall not be affected thereby. The Parties shall endeavor to agree on a replacement which is closest to the business intention of the Parties at the time of signing this Agreement.

12.3    Each Party shall be responsible for its own taxes, costs and expenses incurred by it in connection with the Transaction and the preparation, negotiation and execution of this Agreement in accordance with Law. For the avoidance of doubt, the Seller shall be responsible for, and the Purchaser shall not withhold on account of, any tax determined by reference to the net gains of the Seller that is imposed as a result of the Transaction.

12.4    No amendment or variation of this Agreement shall be effective unless made in writing and signed by and on behalf of each of the Parties and approved by the relevant Approval Authorities.

12.5    None of the Parties shall be entitled to assign or transfer any rights and benefits it is entitled to hereunder without the prior written consent of the other Party.

12.6    This Agreement constitutes the entire agreement of the Parties and supersedes all prior agreements and undertakings, both written and oral, between the Parties with respect to the subject matter hereof.

12.7    (a)    Any notice, request, claim, demand or other communication in connection with this Agreement (each, a "Notice") shall be:

(i)    in writing in English; and

(ii)    delivered by hand, fax, registered mail or by courier using an internationally recognized courier company, or transmitted by email.

(b)    A Notice to any Party shall be sent to such party at the following address, or such other Person or address as such Party may designate by delivery of notice in writing to the other Party.

    (i)    If to the Seller, to:

Ally Financial Inc.
1177 Avenue of the Americas, 15th Floor
New York, New York 10036
Attention:   Peter Greene
Facsimile:   (877) 263-4044
Email:   Peter.Greene@ally.com

And to:

Ally Financial Inc.
200 Renaissance Center
Mail Code: 482-B09-B11
Detroit, MI 48265-2000
Attention:   William B. Solomon, General Counsel
Facsimile:   (313) 656-6124
Email:   William.B.Solomon@ally.com

With a copy to (which shall not constitute a Notice):

Sullivan & Cromwell LLP
125 Broad Street
New York, New York 10004
Attention:W. Jay Clayton, C. Andrew Gerlach
Facsimile:(212) 558-3588
Email:   claytonw@sullcrom.com, gerlacha@sullcrom.com

With an additional copy to (which shall not constitute a Notice):

King & Wood Mallesons
17th Floor, One ICC, Shanghai ICC
999 Huai Hai Road (M)
Shanghai 200031, P.R. China
Attention:Mark Schaub
Facsimile:+86 21 2412 6250
Email:   schaub@cn.kwm.com

    (ii)    If to Purchaser, to:

General Motors Financial Company, Inc.
801 Cherry Street, Suite 3500
Fort Worth, Texas 76102
Attention:Chief Financial Officer
Facsimile:(817) 302-7915
Email:   chris.choate@gmfinancial.com

With a copy to (which shall not constitute a Notice):

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Attention: Frederick S. Green, Danielle D. Do
Facsimile: (212) 310-8007
Email:    frederick.green@weil.com, danielle.do@weil.com

(c)    A Notice shall be effective upon receipt and shall be deemed to have been received:

(i)    at the time of delivery, if delivered by hand, registered post or courier; or

(ii)    upon confirmation by telephone or electronic correspondence of receipt thereof, if sent by fax or email, excluding, however, any answer or confirmation automatically generated by electronic means (such as out-of-office replies).

12.8    This Agreement is made out in Chinese and English and it is acknowledged by the Parties that both versions are equally authentic.  In the event of any inconsistency between the English version and any other language version, the arbitration tribunal if appointed pursuant to Article 11.2 above shall decide which version more accurately reflects the true intention of the Parties.

12.9    This Agreement shall be signed in English and Chinese in eight (8) originals, each party shall hold one original in each language and the others shall be for approval and registration with the relevant Approval Authorities, Registration Authority and any other relevant Government Authority.

*[The rest of this page is intentionally left blank]*

IN WITNESS WHEREOF, both Parties hereto have caused this Agreement to be executed by their authorized representatives as of date first written above.

**SIGNED** for and on behalf of
**Ally Financial Inc.**


/s/ Michael A. Carpenter
_____
Name: Michael A. Carpenter
Title: Chief Executive Officer
Nationality: United States
**EXECUTED** in New York City, New York, United States


**SIGNED** for and on behalf of
**General Motors Financial Company, Inc.**


/s/ Chris A. Choate
_____
Name: Chris A. Choate
Title: Executive Vice President, Chief Financial Officer and Treasurer
Nationality: United States
**EXECUTED** in Fort Worth, Texas, United States

# Exhibit 12

Ally Financial Inc.

**Ratio of Earnings to Fixed Charges**

| Year ended December 31, ($ in millions) | | 2012 (a) | | 2011 (a) | | 2010 (a) | | 2009 (a) | | 2008 (a) |
|---|---|---|---|---|---|---|---|---|---|---|
| **Earnings** | | | | | | | | | | |
| Consolidated net income (loss) from continuing operations | $ | **529** | $ | (1,002) | $ | 288 | $ | (7,067) | $ | 5,028 |
| Income tax (benefit) expense from continuing operations | | **(1,284)** | | 51 | | 104 | | 29 | | (108) |
| Equity-method investee distribution | | **—** | | — | | — | | — | | 111 |
| Equity-method investee (earnings) losses | | **(1)** | | (7) | | (7) | | 12 | | 552 |
| Minority interest expense | | **1** | | 1 | | 1 | | 1 | | 1 |
| Consolidated (loss) income from continuing operations before income taxes, minority interest, and income or loss from equity investees | | **(755)** | | (957) | | 386 | | (7,025) | | 5,584 |
| Fixed charges | | **4,180** | | 5,106 | | 5,535 | | 5,422 | | 7,437 |
| Earnings available for fixed charges | $ | **3,425** | $ | 4,149 | $ | 5,921 | $ | (1,603) | $ | 13,021 |
| **Fixed charges** | | | | | | | | | | |
| Interest, discount, and issuance expense on debt | $ | **4,160** | $ | 5,082 | $ | 5,511 | $ | 5,395 | $ | 7,393 |
| Portion of rentals representative of the interest factor | | **20** | | 24 | | 24 | | 27 | | 44 |
| Total fixed charges | | **4,180** | | 5,106 | | 5,535 | | 5,422 | | 7,437 |
| Preferred dividend requirements (b) | | **801** | | 763 | | 2,537 | | 1,224 | | — |
| Total fixed charges and preferred dividend requirements | $ | **4,981** | $ | 5,869 | $ | 8,072 | $ | 6,646 | $ | 7,437 |
| Ratio of earnings to fixed charges (c) | | **0.82** | | 0.81 | | 1.07 | | (0.30) | | 1.75 |
| Ratio of earnings to fixed charges and preferred dividend requirements (d) | | **0.69** | | 0.71 | | 0.73 | | (0.24) | | 1.75 |

(a)    During 2012, 2011, 2010, and 2009, we committed to sell certain operations of our Automotive Finance operations, Insurance operations, Mortgage operations, and Commercial Finance Group. We report these businesses separately as discontinued operations in the Consolidated Financial Statements. Refer to  Note 2 to the Consolidated Financial Statements for further discussion of our discontinued operations. All reported periods of the calculation of the ratio of earnings to fixed charges exclude discontinued operations.

(b)    Amount for 2010 includes a $616 million reduction to retained earnings (accumulated deficit) related to a conversion of preferred stock and related amendment that occurred on December 30, 2010.

(c)    The ratio indicates a less than one-to-one coverage for the years ended December 31, 2012, 2011 and 2009. Earnings available to for fixed charges for the years ended December 31, 2012, 2011, and 2009 were inadequate to cover fixed charges. The deficient amounts for the ratio were  $755 million,  $957 million, and $7,025 million, for the years ended December 31, 2012, 2011, and 2009, respectively.

(d)    The ratio indicates a less than one-to-one coverage for the years ended December 31, 2012, 2011, 2010, and 2009. Earnings available for fixed charges  and preferred dividend requirements for the years ended December 31, 2012, 2011, 2010, and 2009 were inadequate to cover total fixed charges and preferred dividend requirements. The deficient amounts for the ratio were $1,556 million,  $1,720 million,  $2,151 million, and $8,249 million for the years ended December 31, 2012, 2011, 2010, and 2009, respectively.

# Exhibit 21

Ally Financial Inc.

**Ally Financial Inc. Subsidiaries as of December 31, 2012**

| Name of subsidiary | State or sovereign power of incorporation |
| --- | --- |
| Ally Financial Inc. | Delaware |
| Ally Auto Assets LLC | Delaware |
| Ally Insurance Holdings Inc. | Delaware |
| Aba Seguros, S.A. de C.V. | Mexico |
| Motors Insurance Corporation | Michigan |
| Ally Wholesale Enterprises LLC | Delaware |
| Basic Credit Holding Company, L.L.C. | Delaware |
| Capital Auto Receivables LLC | Delaware |
| Central Originating Lease, LLC | Delaware |
| GMAC International Holdings BV | Netherlands |
| Ally Credit Canada Limited | Canada |
| GMAC Mortgage Group LLC | Delaware |
| IB Finance Holding Company, LLC | Delaware |
| Ally Bank | Utah |
| Ally Credit, S.A. de C.V. Sociedad Financiera de Objeto Multiple, Entidad No Regulada | Mexico |
| All Investment Management, LLC | Delaware |
| Ally Mexico Holdings LLC | Delaware |
| Ally Securities, LLC | Delaware |
| Ally Servicing, LLC | Delaware |
| GMAC International Holdings Cooperatief U.A. | Netherlands |

# Exhibit 23.1

Ally Financial Inc.

## CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

We consent to the incorporation by reference of our reports dated March 1, 2013, relating to the consolidated financial statements of Ally Financial Inc. and the effectiveness of Ally Financial Inc.'s internal control over financial reporting, appearing in this Annual Report on Form 10 -K of Ally Financial Inc. for the year ended December 31, 2012, in the following registration statements on Form S -3:

| Registration Statement No. | Description |
| --- | --- |
| 333-168622 | Ally Financial Inc. Perpetual Preferred Stock, Series G |
| 333-171519 | Ally Financial Inc. Senior Guaranteed Notes |
| 333-178919 | Ally Financial Inc. Demand Notes |
| 333-183535 | Ally Financial Inc. Term Notes |

/s/ Deloitte & Touche LLP

Deloitte & Touche LLP
Detroit, Michigan
March 1, 2013

# Exhibit 31.1

Ally Financial Inc.

I, Michael A. Carpenter, certify that:

1.   I have reviewed this report on Form 10-K of Ally Financial Inc.;

2.   Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.   Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations, and cash flows of the registrant as of, and for, the periods presented in this report;

4.   The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a–15(e) and 15d–15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a–15(f) and 15d–15(f)) for the registrant and have:

   a)   designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b)   designed such internal control over financial reporting or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c)   evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d)   disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect the registrant's internal control over financial reporting; and

5.   The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent function):

   a)   all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize, and report financial information; and

   b)   any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: March 1, 2013

/S/ MICHAEL A. CARPENTER

Michael A. Carpenter
*Chief Executive Officer*

# Exhibit 31.2

Ally Financial Inc.

I, Jeffrey J. Brown, certify that:

1. I have reviewed this report on Form 10-K of Ally Financial Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations, and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a–15(e) and 15d–15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a–15(f) and 15d–15(f)) for the registrant and have:

    a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b) designed such internal control over financial reporting or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d) disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent function):

    a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize, and report financial information; and

    b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: March 1, 2013

/S/ JEFFREY J. BROWN

Jeffrey J. Brown
*Senior Executive Vice President of
Finance and Corporate Planning*

# Exhibit 32

Ally Financial Inc.

**Certification of Principal Executive Officer and Principal Financial Officer Pursuant to 18 U.S.C. Section 1350**

In connection with the Annual Report of Ally Financial Inc. (the Company) on Form 10-K for the period ending  December 31, 2012, as filed with the Securities and Exchange Commission on the date hereof (the Report), each of the undersigned officers of the Company, certify, pursuant to 18 U.S.C. §1350, as adopted pursuant to §906 of the Sarbanes-Oxley Act of 2002, that to the best of their knowledge:

1.  The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2.  The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

/s/ MICHAEL A. CARPENTER
_____

Michael A. Carpenter
*Chief Executive Officer*
March 1, 2013


/S/ JEFFREY J. BROWN
_____

Jeffrey J. Brown
*Senior Executive Vice President of*
*Finance and Corporate Planning*
March 1, 2013


*A signed original of this written statement required by Section 906, or other document authenticating, acknowledging, or otherwise adopting the signature that appears in typed form within the electronic version of this written statement required by Section 906, has been provided to Ally Financial Inc. and will be furnished to the Securities and Exchange Commission or its staff upon request.*



Ally Financial Inc. (UST# AIF0008), formerly GMAC Inc.,
Section 30.15 Certifications for 2012

In compliance with the Interim Final Rule, TARP Standards for Compensation and Corporate Governance, 31 CFR Part 30, Section 30.15:

(i) The Compensation, Nominating and Governance Committee of the Board of Directors of Ally Financial Inc. (Committee) has discussed, reviewed, and evaluated with senior risk officers at least every six months during any part of the most recently completed fiscal year that was a TARP period, senior executive officer (SEO) compensation plans and employee compensation plans and the risks these plans pose to Ally Financial Inc.;

(ii) The Committee has identified and limited during any part of the most recently completed fiscal year that was a TARP period any features of the SEO compensation plans that could lead SEOs to take unnecessary and excessive risks that could threaten the value of Ally Financial Inc. and has identified any features of the employee compensation plans that pose risks to Ally Financial Inc. and has limited those features to ensure that Ally Financial Inc. is not unnecessarily exposed to risks;

(iii) The Committee has reviewed, at least every six months during any part of the most recently completed fiscal year that was a TARP period, the terms of each employee compensation plan and identified any features of the plan that could encourage the manipulation of reported earnings of Ally Financial Inc. to enhance the compensation of an employee, and has limited any such features;

(iv) The Committee will certify to the reviews of the SEO compensation plans and employee compensation plans required under (i) and (iii) above;

(v) The Committee will provide a narrative description of how it limited during any part of the most recently completed fiscal year that was a TARP period the features in
    (A) SEO compensation plans that could lead SEOs to take unnecessary and excessive risks that could threaten the value of Ally Financial Inc.;
    (B) Employee compensation plans that unnecessarily expose Ally Financial Inc. to risks; and
    (C) Employee compensation plans that could encourage the manipulation of reported earnings of Ally Financial Inc. to enhance the compensation of an employee;

(vi) Ally Financial Inc. has required that bonus payments to SEOs or any of the next twenty most highly compensated employees, as defined in the regulations and guidance established under section 111 of the Emergency Economic Stabilization Act of 2008/EESA (bonus payments), be subject to a recovery or "clawback" provision during any part of the most recently completed fiscal year that was a TARP period if the bonus payments were based on materially inaccurate financial statements or any other materially inaccurate performance metric criteria;

(vii) Ally Financial Inc. has prohibited any golden parachute payment, as defined in the regulations and guidance established under section 111 of EESA, to an SEO or any of the next five most highly compensated employees during any part of the most recently completed fiscal year that was a TARP period;

(viii) Ally Financial Inc. has limited bonus payments to its applicable employees in accordance with section 111 of EESA and the regulations and guidance established thereunder during any part of the most recently completed fiscal year that was a TARP period and has received or is in the process of receiving approvals from the Office of the Special Master for TARP Executive Compensation for compensation payments and structures as required under the regulations and guidance established under section 111 of EESA, and has not made any payment inconsistent with those approved payments and structures;

(ix) Ally Financial Inc., its direct and indirect subsidiaries and their employees have complied with the excessive or luxury expenditures policy, as defined in the regulations and guidance established under section 111 of EESA, during any part of the most recently completed fiscal year that was a TARP period; and any expenses that, pursuant to the policy, required approval of the Board of Directors of Ally Financial Inc., a committee of the Board of Directors, an SEO, or an executive officer with a similar level of responsibility were properly approved;

(x) The requirement of permitting a non-binding shareholder resolution in compliance with any applicable federal securities rules and regulations on the disclosures provided under the federal securities laws related to SEO compensation paid or accrued during any part of the most recently completed fiscal year that was a TARP period is not applicable to Ally Financial Inc;

(xi) Ally Financial Inc. will disclose the amount, nature, and justification for the offering, during any part of the most recently completed fiscal year that was a TARP period, of any perquisites, as defined in the regulations and guidance established under section 111 of EESA, whose total value exceeds $25,000 for any employee who is subject to the bonus payment limitations identified in paragraph (viii);

(xii) Ally Financial Inc. will disclose whether Ally Financial Inc., the Board of Directors of Ally Financial Inc., or the Committee has engaged during any part of the most recently completed fiscal year that was a TARP period a compensation consultant; and the services the compensation consultant or any affiliate of the compensation consultant provided during this period;

(xiii) Ally Financial Inc. has prohibited the payment of any gross-ups, as defined in the regulations and guidance established under section 111 of EESA, to the SEOs and the next twenty most highly compensated employees during any part of the most recently completed fiscal year that was a TARP period;

(xiv) Ally Financial Inc. has substantially complied with all other requirements related to employee compensation that are provided in the agreement between Ally Financial Inc. and Treasury, including any amendments; and

(xv) Ally Financial Inc. has submitted to Treasury a complete and accurate list of the SEOs and the twenty next most highly compensated employees for the current fiscal year, with the non-SEOs ranked in descending order of level of annual compensation, and with the name, title, and employer of each SEO and most highly compensated employee identified.

Based on his knowledge, each of the undersigned certifies the foregoing statements, understanding that a knowing and willful false or fraudulent statement made in connection with this certification may be punishable by fine, imprisonment, or both (see, for example, 18 USC 1001),


  /s/ Michael A. Carpenter_____

Michael A. Carpenter
Chief Executive Officer
Ally Financial Inc.
[Principal Executive Officer]
Date: January 31, 2013


   /s/ Jeffrey J. Brown_____

Jeffrey J. Brown
Senior Executive Vice President of Finance and Corporate Planning
Ally Financial Inc.
[Principal Financial Officer]
Date: January 31, 2013