# Exhibit D

**SEWARD & KISSEL LLP**
Dale C. Christensen, Jr.
Thomas Ross Hooper
Benay L. Josselson
One Battery Park Plaza
New York, New York 10004
Telephone: (212) 574-1200
Facsimile: (212) 480-8421

*Counsel to Law Debenture Trust Company of*
*New York, as Separate Trustee of Certain*
*Residential Mortgage Backed Securities Trusts*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | ) |
| | ) **Case No. 12-12020 (MG)** |
| **RESIDENTIAL CAPITAL, LLC,** *et al.,* | ) |
| | ) **Chapter 11** |
| Debtors. | ) |
| | ) **Jointly Administered** |

## <u>DECLARATION OF THOMAS MUSARRA</u>

TO THE HONORABLE MARTIN GLENN
UNITED STATES BANKRUPTCY JUDGE

  I, Thomas Musarra, hereby declare, pursuant to 28 U.S.C. § 1746, that the following is

true and correct to the best of my knowledge, information and belief:

  1.  I am Senior Vice-President of Corporate Trust at Law Debenture Trust Company

of New York ("**<u>Law Debenture</u>**"). I have personal knowledge of the facts set forth herein,

except as to certain matters that I believe to be true based on (a) information provided by Duff &

Phelps, LLC ("**<u>Duff & Phelps</u>**"), (b) information about positions of parties in these Chapter 11

Cases contained in pleadings that I reviewed, or reported to me by counsel, or learned during my

participation in the Plan Mediation (defined below); and (c) my review of business records of Law Debenture.

2.        In my capacity as Senior Vice-President of Corporate Trust, my responsibilities include, among other things, managing and overseeing matters relating to Law Debenture's role as "Separate Trustee" to various residential mortgage-backed securities trusts, on behalf of which Law Debenture pursues repurchase claims resulting from breaches of representations and warranties made by sellers and other transaction parties related to mortgage loans within the portfolios of the trusts.

3.        This Declaration is submitted in support of the (a) *Joinder of Certain RMBS Trustees to Debtors' Motion for an Order Under Bankruptcy Code Sections 105(a) and 363(b) Authorizing the Debtors to Enter Into and Perform Under a Plan Support Agreement with Ally Financial Inc., the Creditors Committee and Certain Consenting Claimants* filed contemporaneously herewith (the "**Joinder**") and (b) *Debtors' Motion for an Order Under Bankruptcy Code Sections 105(a) and 363(b) Authorizing the Debtors to Enter Into and Perform Under a Plan Support Agreement with Ally Financial Inc., the Creditors' Committee, and Certain Consenting Claimants* [ECF No. 3814] (the "**Plan Support Agreement Motion**"), filed on May 23, 2013.[1]

4.        On May 13, 2013, the Debtors, Ally Financial Inc. ("**AFI**"), the Official Committee of Unsecured Creditors (the "**Committee**"), and the Consenting Claimants,[2] entered

---

[1]        On May 14, 2012, Residential Capital, LLC, and certain of its direct and indirect subsidiaries (collectively, "**ResCap**" or the "**Debtors**") filed voluntary petitions under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (the "**Court**") (collectively, the "**Chapter 11 Cases**"). The Chapter 11 Cases are being jointly administered under the caption In re Residential Capital, LLC, Case No. 12-12020 (MG).

[2]        The "**Consenting Claimants**" include AIG Asset Management (U.S.) LLC, as investment advisor for certain affiliated entities that have filed proofs of claim in the Debtors' chapter 11 cases; Allstate Insurance Company and its subsidiaries and affiliates; Deutsche Bank National Trust Company and Deutsche Bank Trust Company Americas, each solely in its capacity as trustee, indenture trustee, securities administrator, co-

into the Plan Support Agreement[3] [ECF No. 3814, Ex. 3], pursuant to which they agreed to the terms of a proposed consensual Chapter 11 plan of reorganization (the "**Plan**") and resolution of all claims and disputes between them as set forth in the Plan Term Sheet (the "**Plan Term Sheet**") and the Supplemental Term Sheet (the "**Supplemental Term Sheet**," together with the Plan Term Sheet, the "**Term Sheets**") attached respectively as Exhibits A and B to the Plan Support Agreement.

5.      Among the claims and disputes resolved in the proposed Plan is a settlement (the "**RMBS Settlement**") that provides for the allowance, priority, allocation and treatment of the claims of residential mortgage backed securitization trusts (the "**RMBS Trusts**") against the Debtors, including claims arising from Origination-Related Provisions[4] (the "**Repurchase Claims**") and claims unrelated to Origination-Related Provisions (the "**Servicing Claims,**" together with the Repurchase claims, the "**RMBS Trust Claims**").

---

administrator, paying agent, grantor trustee, custodian and/or similar agency capacities in respect of certain of the RMBS Trusts (together, "**Deutsche Bank**"); Financial Guaranty Insurance Corporation ("**FGIC**"); HSBC Bank USA, N.A., solely in its capacity as trustee in respect of certain of the RMBS Trusts ("**HSBC**"); the Kessler Class Claimants; Law Debenture, solely in its capacity as Separate Trustee of certain of the RMBS Trusts; Massachusetts Mutual Life Insurance Company and its subsidiaries and affiliates; MBIA Insurance Corporation and its subsidiaries and affiliates ("**MBIA**"); certain funds and accounts managed by Paulson & Co. Inc.; Prudential Insurance Company of America and its subsidiaries and affiliates; the Steering Committee Consenting Claimants; certain holders of the Senior Unsecured Notes issued by ResCap; The Bank of New York Mellon and The Bank of New York Mellon Trust Company, N.A., each solely in its capacity as trustee, indenture trustee, securities administrator, co-administrator, paying agent, grantor trustee, master servicer, custodian and/or similar agency capacities in respect of certain of the RMBS Trusts (together, "**BNY Mellon**"); the Talcott Franklin Consenting Claimants; U.S. Bank National Association, solely in its capacity as trustee, indenture trustee, securities administrator, co-administrator, paying agent, grantor trustee, custodian and/or similar agency capacities in respect of certain of the RMBS Trusts ("**U.S. Bank**"); Wells Fargo Bank, N.A., solely in its capacity as trustee, indenture trustee, master servicer, securities administrator, co-administrator, paying agent, grantor trustee, custodian and/or similar agency capacities in respect of certain of the RMBS Trusts ("**Wells Fargo**"); and Wilmington Trust, National Association, not individually, but solely in its capacity as Indenture Trustee for the Senior Unsecured Notes issued by ResCap.

[3]      Capitalized terms, if not otherwise defined herein, shall have the meanings assigned thereto in the Plan Support Agreement Motion or the Plan Support Agreement, as applicable.

[4]      "**Origination-Related Provisions**" shall have the meaning ascribed in the *Revised Joint Omnibus Scheduling Order and Provisions for Other Relief Regarding (I) Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of RMBS Trust Agreements, (II) The RMBS Trustees' Limited Objection to the Sale Motion* [ECF No. 945].

A.      **The Separate Trustee**

6.      Law Debenture serves as separate trustee (in such capacity, the "**Separate Trustee**") in respect of certain RMBS Trusts which are identified in schedules attached to the Proofs of Claim described below (collectively, the "**Law Debenture RMBS Trusts**").  As used herein, the term "Law Debenture" refers to Law Debenture solely in its capacity as Separate Trustee, and this Declaration is made solely with respect to Law Debenture's role as Separate Trustee of the Law Debenture RMBS Trusts.

7.      The Law Debenture RMBS Trusts are governed by one or more pooling and servicing agreements, indentures, highly integrated set of "servicing agreements," mortgage loan purchase agreements, deposit trust agreements, trust agreements, asset sale agreements, depositor sale agreements, administration agreements, yield maintenance agreements and other ancillary transaction documents (collectively, the "**Transaction Documents**").

8.      Pursuant to the Transaction Documents, one or more of the Debtors has obligations in various capacities, including as originator, seller, sponsor, depositor and similar capacities (together, "**Seller**"), and/or as servicer, subservicer, master servicer, back-up servicer, HELOC servicer, administrator, co-administrator, and similar capacities (collectively, "**Servicer**").

9.      On or about October 4, 2012, Wells Fargo, as trustee and/or indenture trustee to the Law Debenture RMBS Trusts, filed several verified petitions for instructions in the administration of the Law Debenture RMBS Trusts pursuant to Minn. Stat. § 501B.16.  In each of those petitions, Wells Fargo sought the entry of an order authorizing Law Debenture, as Separate Trustee, to take actions against entities who, directly or indirectly, sold, transferred or assigned residential mortgage loans (the "**Mortgage Loans**") to such Law Debenture RMBS Trusts, or who may be liable for breaches of representations or warranties related to the

4

Mortgage Loans (collectively, the "**Potentially Responsible Parties**"). Specifically, each verified petition sought an order that, among other things, authorized the Separate Trustee:

> to take actions to enforce claims against the Potentially Responsible Parties, including but not limited to (i) demanding production of files and other information relating to the Mortgage Loans (the 'Loan Files') by the Potentially Responsible Parties or servicers of the Mortgage Loans ('Servicers'), (ii) commencing litigation or asserting claims to compel the Potentially Responsible Parties or Servicers to turn over Loan Files, (iii) making demands on the Potentially Responsible Parties to repurchase Mortgage Loans, (iv) commencing litigation to compel Potentially Responsible Parties to repurchase Mortgage Loans, and (v) taking any other actions authorized by the Indentures to enforce a Potentially Responsible Party's obligation to repurchase Mortgage Loans (collectively, the 'Repurchase Claims'), to the extent of the powers of the Trustee, and to withdraw, compromise or settle the Repurchase Claims.

10.    On or about November 7 and November 8, 2012, the Minnesota Court granted the verified petitions. Promptly thereafter, Law Debenture accepted its responsibilities as Separate Trustee under the Instruments of Appointment and Acceptance (each, an "**IAA**") attached to such verified petitions. The IAAs provided, among other things, that:

> [T]he Separate Trustee shall ... have full power, right and authority to: i) pursue requests for mortgage loan files and related files/information; ii) commence litigation to compel servicers (or other applicable parties) to turnover mortgage loan files and related files/information; iii) demand repurchase or substitution of mortgage loans by mortgage loan sellers (or other applicable parties) and engage in settlement if applicable; iv) commence litigation to enforce Repurchase Claims and engage in settlement; and v) take such additional actions on behalf of the Certificateholders necessary or appropriate to give effect to (i) through (iv) above.

11.    Law Debenture, in its capacity as Separate Trustee, and Wells Fargo, in its capacity as trustee and/or indenture trustee, of the Law Debenture RMBS Trusts, have the authority to assert claims against the Debtors on behalf of the Law Debenture RMBS Trusts to the extent of their respective obligations under the IAAs.

12.     The claims of the Law Debenture RMBS Trusts fall into two broad categories: (a) Repurchase Claims, which arise from the conduct of the Debtors as Sellers, and which include, but are not limited to, claims arising from the right to demand the repurchase of loans based on breaches of representations and warranties under the Transaction Documents with respect to such loans; and (b) Servicing Claims, which arise from the conduct of the Debtors as Servicer under the applicable pooling and servicing agreement (or similar agreement).

**B.      The Proofs of Claim and Notice of Cure Claims**

13.     On or about March 1, 2013, Law Debenture, as Separate Trustee, and Wells Fargo, as trustee and/or indenture trustee, jointly filed Proof of Claim Nos. 6604 through 6654 (the "**Proofs of Claim**") with respect to the Law Debenture RMBS Trusts,[5] which proof of claims asserted (among other things) (a) the Repurchase Claims and claims for breaches of other representations and warranties; (b) the Servicing Claims; (c) claims for indemnification under the Transaction Documents; and (d) claims for fraud and/or negligent misrepresentation arising from the conduct of the Debtors acting as Seller under the Transaction Documents.[6]

14.     On or about April 16, 2013, Wells Fargo, as trustee and/or indenture trustee for the Law Debenture RMBS Trusts, filed a Notice of Cure Claim [ECF No. 3454], arising from the conduct of the Debtors acting as Servicer under the Transaction Documents, giving notice of, among other things: (a) claims arising from failure to perform as Servicer under the Transaction

---

[5]     Wells Fargo and Law Debenture jointly filed such proofs of claim to the extent of their respective obligations as Trustee or Separate Trustee under the IAAs.

[6]     Pursuant to the *Stipulation and Order Permitting Law Debenture Trust Company of New York to File Proofs of Claim after the Bar Date*, dated November 16, 2012 [ECF No. 2194] (the "**Law Debenture Claims Stipulation**"), the Debtors and Law Debenture agreed that all claims of Law Debenture on behalf of itself and on behalf of the applicable Law Debenture RMBS Trusts and/or their beneficiaries could be asserted in a single proof of claim.  Pursuant to the Law Debenture Claims Stipulation, Law Debenture's single proof of claim would constitute the filing of proofs of claim in each of the applicable Debtors' cases so long as each proof of claim set forth against each specific Debtor, on a trust-by-trust basis, the amount of such claim (and/or whether the claim is contingent and/or unliquidated), and the capacity in which Law Debenture was acting in asserting the claim (*i.e.*, as Separate Trustee).  The Law Debenture Claims Stipulation further provided that no documentation in support of each proof of claim need to be filed, and set March 1, 2013 as the deadline to file each such proof of claim.

Documents, including but not limited to misapplication of payments, wrongful foreclosure, improper loss mitigation practices, and unreasonably long foreclosure timing caused by improper servicing practices; (b) claims arising from failure to give notice of, and enforce, breaches of representations and warranties; (c) claims arising from severance of origination-related provisions; (d) claims for indemnification and payment of expenses; (e) claims arising from borrower complaints; and (f) claims arising from litigation.

## C.    **The RMBS 9019 Motion**

15.    On June 11, 2012, the Debtors filed a motion, which was later amended (as amended, the "**RMBS 9019 Motion**"), seeking approval of the Debtors' settlement agreements with two groups of institutional investors (as amended, collectively, the "**Original Settlement Agreement**"[7]).  The Original Settlement Agreement relates to the Repurchase Claims of 392 RMBS Trusts (the "**Original Settling Trusts**").[8]

16.    The Original Settlement Agreement had been negotiated by, among others, three law firms, Gibbs & Bruns, P.C., Ropes & Gray LLP and Talcott Franklin P.C.  Those three firms represented the two groups of institutional investors (clients of Gibbs & Bruns and Ropes & Gray, the "**Steering Committee Claimants**", and clients of Talcott Franklin, the "**Talcott Franklin Consenting Claimants**," together with the Steering Committee Claimants, the "**Institutional Investors**") who collectively held, or were authorized investment managers for

---

[7]    The Third Amended and Restated RMBS Trust Settlement Agreements can be found at Exhibits 1 and 2 of the *Declaration of LaShann M. DeArcy in Further Support of Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the RMBS Settlement Agreements* [ECF No. 3222].

[8]    *See Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of RMBS Trust Settlement Agreements* [ECF No. 320], as amended and supplemented by the *Debtors' Supplemental Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of RMBS Trust Settlement Agreements* [ECF No. 1176] and the *Debtors' Second Supplemental Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of RMBS Trust Settlement Agreements* [ECF No. 1887].

holders of, 25% or more of one or more classes (or tranches) of certificates of various of the Original Settling Trusts.[9]

17.    Under the Original Settlement Agreement, the Original Settling Trusts would have been granted an allowed aggregate claim of up to $8.7 billion (as further described herein, the "**Allowed Claim**") against those Debtors that acted as Seller, to be allocated in accordance with certain formulas set forth in Exhibit B to the Original Settlement Agreement.[10]  In support of the RMBS 9019 Motion, the Debtors submitted an expert report that calculated the Original Settling Trusts' Repurchase Claims at between $6.7 billion and $10.3 billion.[11]

18.    I understand that Holders in all 392 Original Settling Trusts were notified of the RMBS 9019 Motion, and all such Holders, and all other parties in interest in these Chapter 11 Cases, had the opportunity to object to the RMBS 9019 Motion.  Certain of the objections are discussed below.

### D.    The RMBS Trustees' Retention of Duff & Phelps

19.    I understand that in or about July 2012, Deutsche Bank, BNY Mellon, US Bank and Wells Fargo jointly decided to employ Duff & Phelps as an expert to assist the RMBS Trustees in the Chapter 11 Cases in light of the then-pending RMBS 9019 Motion, including in the identification, quantification, litigation, and/or resolution of the RMBS Trust Claims.  Law Debenture later joined in the retention of Duff & Phelps after its appointment as Separate Trustee to assist it in the Chapter 11 Cases in light of the RMBS 9019 Motion.

---

[9]     Holders of certificates of the RMBS Trusts are referred to herein as "**Holders**".

[10]     The RMBS 9019 Motion provided that "[w]hile the [Original Settlement Agreement] was negotiated by the Institutional Investors, the Trustees of each of the [Original Settling] Trusts will also evaluate the reasonableness of the settlement and can accept or reject the proposed compromise on behalf of each Trust."  *See* ECF No. 320 at ¶4.

[11]     *Declaration of Frank Sillman in Support of Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the RMBS Trust Settlement Agreements*, ECF No. 320-8, at ¶¶ 68 and 69.

20.     Duff & Phelps generally was asked to (a) evaluate the reasonableness of the Original Settlement Agreement as it related to the Repurchase Claims of the Original Settling Trusts, (b) determine, for any other RMBS Trusts for which any of the RMBS Trustees acted as Trustee, or Separate Trustee, or Master Servicer, the appropriate amount of their Repurchase Claims; (c) determine, for all RMBS Trusts for which any of the RMBS Trustees acted as Trustee, or Separate Trustee, or Master Servicer, the amount of their Servicing Claims; and (d) advise the RMBS Trustees regarding any proposed plan of reorganization or liquidation of the Debtors, and distributions thereunder.[12]

**E.      The Reasonable Range of the Allowed Amount of Repurchase Claims of the Original Settling Trusts**

21.     In the course of its engagement, Duff & Phelps conducted a sampling review of more than 6,500 mortgage loan files provided by the Debtors in an effort to identify breaches of representations and warranties, and used statistical methodologies to estimate the incidence of those breaches across the population of mortgage loans in the RMBS Trusts.  Duff & Phelps also used historical information and financial analysis to calculate the total present and projected future losses experienced by the RMBS Trusts.  As a result of the significant work performed by Duff & Phelps, Law Debenture and the other RMBS Trustees gained an understanding that the range of Repurchase Claims for the Original Settling Trusts that could be asserted against the Debtors was between $6.5 billion and $10.2 billion.

22.     In the absence of approval of the RMBS Settlement, the RMBS Trust Claims would need to be asserted and litigated on trust by trust basis.  As described in the *Steering Committee Investors' Statement in Support of Settlement and Response to Settlement Objections*

---

[12]      The nature of the claims varies on a trust by trust basis.  For example, certain RMBS Trusts may have Repurchase Claims but not Servicing Claims (or some subset thereof), others may have Servicing Claims but not Repurchase Claims, and still others may assert claims in each category.

[ECF No. 1739] (the "**Steering Committee Statement**"), litigation of the Repurchase Claims would be an uncertain, expensive and protracted process. Even if such litigation were successful, it likely would deplete the Debtors' estates, and might nonetheless result in diminished recoveries to all creditor constituencies, including the Law Debenture RMBS Trusts. *See* Steering Committee Statement, ¶¶ 8, 28-32.

23.     In light of the conclusion of Duff & Phelps regarding the estimated magnitude of the Repurchase Claims, and considering the substantial risks and defenses associated with litigating those claims in the absence of a consensual resolution, Law Debenture concluded in its good faith judgment that the proposal in the Original Settlement Agreement to allow those claims at up to $8.7 billion in the aggregate was within a reasonable range to settle the Original Settling Trusts' Repurchase Claims.

24.     On or about February 4, 2013, BNY Mellon, Deutsche Bank, US Bank and Law Debenture, in furtherance of the Court's request that they advise the Court of their views of the Original Settlement Agreement in advance of the hearing on the RMBS 9019 Motion, filed the *RMBS Trustees' Statement Regarding Debtors' Motion Pursuant To Fed. R. Bankr. P. 9019 For Approval Of RMBS Trust Settlement Agreements* [ECF No. 2833] (the "**Trustees' Statement**"). The Trustees' Statement provided, among other things, that:

> After careful consideration of relevant factors and analysis, including (a) the results of its review of a statistically significant number of loan files in the [Original] Settling Trusts provided by the Debtors, (b) the estimation of projected total collateral losses and underwriting breach rates in the [Original] Settling Trusts, (c) the estimation of likely agree rates with respect to the [Original] Settling Trusts (which take into account the litigation risk associated with the relative characteristics of the breach), and (d) consideration of causality factors (which take into account the litigation risk associated with a lack of causal relationship between the breach and loss), Duff [& Phelps] advised [BNY Mellon, Deutsche Bank, US Bank and Law Debenture] that the amount of [up to 8.7 billion] is

> within a reasonable range to settle the [Original] Settling Trusts'
> Repurchase Claims ....

Trustees' Statement, at ¶ 10.

25.     The foregoing RMBS Trustees further stated in the Trustees' Statement that:

> Assuming no changes in the facts and controlling law underlying the
> Repurchase Claims, and subject to the RMBS Trustees' determination
> that all provisions of the RMBS Trust Settlement are fair, equitable and
> reasonable to the [Original] Settling Trusts, the RMBS Trustees have
> determined that the Allowed Claim falls within a reasonable range to
> resolve the [Original] Settling Trusts' Repurchase Claims and the
> Debtors' proposed Revised Claim Allocation Methodology for allocating
> the Allowed Claim among the [Original] Settling Trusts is fair and
> equitable to those trusts.

*Id.* at ¶12.

26.     As described in more detail below, Law Debenture concluded that the resolution of the Repurchase Claims of the Original Settling Trusts in the context of the Plan Support Agreement, including the RMBS Settlement, represents a reasonable resolution of those claims.

## F.     The Repurchase Claims of the Non-Settling Trusts

27.     It consistently has been contemplated by Law Debenture and the other RMBS Trustees that the resolution of the RMBS Trust Claims would need to include the Repurchase Claims of all RMBS Trusts for which they acted,[13] and not just the Repurchase Claims of the Original Settling Trusts.  Since these additional RMBS Trusts were not included in the RMBS 9019 Motion, they were usually referred to as the "**Non-Settling Trusts**."

28.     At the request of the RMBS Trustees, Duff & Phelps calculated the Repurchase Claims of the Non-Settling Trusts using the same methodology it employed to estimate the Repurchase Claims of the Original Settling Trusts.  Based on that methodology, as of the date of the Supplemental Term Sheet, Duff & Phelps had preliminarily determined that the amount of

---

[13]     The claims of each RMBS Trusts are based on the applicable Transaction Documents and therefore only certain RMBS Trusts have Repurchase Claims.

the Repurchase Claims of the Non-Settling Trusts was approximately $950 million.  At that date, that amount was known to be subject to further refinement, based on further information that Duff & Phelps needed from one or more of the RMBS Trustees.  In addition, that amount was subject to dispute by the Debtors, certain of the Debtors' other creditors, and the Institutional Investors.

29.    As described below, the Repurchase Claims of the Non-Settling Trusts are included (as "**Additional Settling Trusts**") in the RMBS Settlement, and their claims will receive treatment thereunder that is consistent with the treatment being accorded to the Repurchase Claims of the Original Settling Trusts.  Based on the foregoing, including the analysis performed by Duff & Phelps, and for the reasons described in more detail below, Law Debenture concluded that the resolution of the Repurchase Claims of the Non-Settling Trusts (included in the RMBS Settlement as Additional Settling Trusts) in the context of the Plan Support Agreement, including the RMBS Settlement, represents a reasonable resolution of those claims.

### G.    The Allocation of Repurchase Claims among the RMBS Trusts

30.    Duff & Phelps also evaluated the methodology in the Original Settlement Agreement regarding the allocation to each of the RMBS Trusts of the Allowed Claim.  The proposed allocation methodology in the Original Settlement Agreement allocated the aggregate past claim among the Original Settling Trusts *pro rata* on the basis of aggregate past and projected losses of such trusts.  In response to suggestions by Duff & Phelps and after lengthy discussions with the Steering Committee Claimants, the Debtors and other interested parties, the methodology was modified (the "**Revised Claim Allocation Methodology**") to provide for the Allowed Claim to be allocated *pro rata* based on differences among the RMBS Trusts in the incidence of breaches of representations and warranties, as revealed by additional loan sampling

and other statistical work performed by Duff & Phelps. In light of Duff & Phelps' analysis, Law

Debenture concluded that the Revised Claim Allocation Methodology was reasonable.

31.    Accordingly, the Trustee's Statement also noted that:

> [BNY Mellon, Deutsche Bank, US Bank and Law Debenture], after consulting
> with Duff, asked the Debtors and the Institutional Investors to adjust the Claim
> Allocation Methodology. Though they advised [BNY Mellon, Deutsche Bank,
> US Bank and Law Debenture] of their view that the existing formula was both
> adequate and reasonable, the parties to the RMBS Trust Settlement were
> amenable to the ... requested change, which we [*i.e.*, BNY Mellon, Deutsche
> Bank, US Bank and Law Debenture] understand will be embodied in an
> amendment (the "**Revised Claim Allocation Methodology**").

Trustees' Statement at ¶ 9.

32.    As described below, the Revised Claim Allocation Methodology is set forth in the

Supplemental Term Sheet and is part of the RMBS Settlement. *See* Supplemental Term Sheet,

Schedule A to Annex III. Based on the foregoing, including the analysis performed by Duff &

Phelps, Law Debenture concluded that it was reasonable to use the Revised Claim Allocation

Methodology in the context of the Plan Support Agreement as part of the RMBS Settlement.

**H.    The Servicing Claims of the RMBS Trusts**

33.    In order to assist the RMBS Trustees in quantifying the Servicing Claims, Duff &

Phelps analyzed potential liabilities of the applicable Debtor, as Servicer, for the RMBS Trusts

for which the RMBS Trustees act as Trustee or Separate Trustee or Master Servicer. In

performing this analysis, Duff & Phelps used publicly-available data on industry-specific

litigations and regulatory actions relating to residential mortgage servicing practices; reviewed

the files of a sampling of litigations specific to the Debtors; reviewed rating agency evaluation

reports for the Debtors; accessed and reviewed a sample of the Debtors' records of servicing

complaints for Debtor-serviced loans, and used publicly-available performance data on a sample

of the RMBS Trusts.  Duff & Phelps presented its analysis relating to the quantification of the Servicing Claims both orally and in writing to the RMBS Trustees.

34.    Based on the analysis of those data, Duff & Phelps attempted to quantify the Debtors' liability as Servicer related to: (a) misapplied and miscalculated payments; (b) wrongful foreclosure and improper loss mitigation practices; and (c) extended foreclosure timing issues caused by improper or inefficient servicing behavior such as falsified affidavits, improper documentation, and improper collection practices.

35.    Duff & Phelps concluded that the potential liability of the Debtors as Servicer for the three bases analyzed could be asserted in amounts up to as much as $1.1 billion, but that the amount of the claim was subject to uncertainty and material refinement.

36.    Duff & Phelps has advised that the assertion of Servicing Claims against the Debtors involves significant risk and uncertainty.  The RMBS Trustees have been unable to obtain full discovery regarding potential Servicing Claims, in part because the Debtors assert that some of the information requested is not reasonably available.  I understand that the amount of information that would be needed in order to assert the Servicing Claims in a litigated proceeding is likely very large and the analysis of that information and data would likely be expensive, time-consuming, and may ultimately lack sufficient certainty to establish the validity of such claims in a contested proceeding.

37.    Furthermore, I understand that the Debtors may have viable defenses to the assertion and quantification of any Servicing Claims, the resolution of which is uncertain.  For example, certain of the Transaction Documents provide that the Servicer can be held liable only if it can be shown to have acted negligently or grossly negligently.

38.     Under the Plan Support Agreement, the Servicing Claims are allowed in the aggregate amount of $96 million.  Based on the foregoing, including the analysis performed by Duff & Phelps, and in recognition of the material uncertainty relating to the quantification and assertion of such claims in a contested proceeding, Law Debenture has concluded that this represents a reasonable resolution of such claims in the context of the Plan Support Agreement, including the RMBS Settlement.

## I.     Objections to the RMBS 9019 Motion

39.     Notably, no party filed an objection to the RMBS 9019 Motion asserting that the $8.7 billion Allowed Claim in the Original Settlement Agreement was too low.  There were, however, several objections that the $8.7 billion number was too high.

40.     For example, the Committee objected that the Debtors' liability for Repurchase Claims of the RMBS Trusts was approximately $3.8 billion, and if certain legal defenses were considered, might be reduced to a range of $2.7 billion to $3.3 billion.  *See Objection of the Official Committee of Unsecured Creditors to the Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the RMBS Trust Settlement Agreements* [ECF No. 2825], including the supporting Expert Report of Bradford Cornell, Ph.D [ECF No. 2829, Ex. A].

41.     In addition, FGIC objected that the Debtors could not support the reasonableness of an allowed aggregate claim exceeding $4 billion, excluding the value of the claims that monoline insurers (each, a "**Monoline**") have against the Debtors, and that "the $8.7 Billion claim amount is excessive and unreasonable" and "grossly overstates the value of the settled claim."  *See Objection of Financial Guaranty Insurance Company to the Debtors' Second Supplemental Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of RMBS Settlement Agreements* [ECF. No. 2819].

42.    MBIA similarly objected that the Repurchase Claims of the Original Settling Trusts, excluding the claims of the Monolines, were less than $3 billion and that the Original Settlement Agreement provided a "windfall for certain Settling Trusts at the expense of both non-settling and settling creditors." *See Objection of MBIA Insurance Corporation to Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of RMBS Settlement Agreements* [ECF. No. 2810], including the Expert Declaration of C.J. Brown [ECF. No. 2810].

43.    Moreover, only two Holders in the RMBS Trusts objected to the manner in which the aggregate Allowed Claim of $8.7 billion was to be allocated among the Original Settling Trusts in the Original Settlement Agreement. *See Objection to the Debtors' Second Supplemental Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of RMBS Settlement Agreements* [ECF. No. 2308]; *Limited Objection to Debtors' Second Supplemental Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of RMBS Settlement Agreements* [ECF. No. 2297]. The crux of those two objections was that the allocation methodology in the Original Settlement Agreement failed to take into account the unique characteristics of the Original Settling Trusts and inappropriately used net losses as a proxy for viable Repurchase Claims. As described above, Law Debenture believes that the Revised Claim Allocation Methodology, used in the RMBS Settlement, addresses the concerns of these two Holders.

## J.    The Plan Mediation

44.    On December 6, 2012, the Debtors filed a motion seeking the entry of an order appointing a mediator [ECF No. 2357] to assist certain parties in interest in resolving various plan issues in furtherance of reaching a consensual Chapter 11 plan. By order dated December

26, 2012 [ECF No. 2519], the Court appointed U.S. Bankruptcy Judge James M. Peck as Mediator.[14]

45.     The Plan Support Agreement (including the RMBS Settlement) was the result of extensive mediation over the course of some five months overseen by Judge Peck (the "**Plan Mediation**").  The communications and analyses relating to negotiations conducted during the Plan Mediation are privileged and confidential by law and pursuant to agreement, and therefore cannot be disclosed in detail.  In general, however, the integrated, global settlement associated with the Plan Support Agreement must be understood first and foremost as the product of intense, arms-length negotiations conducted among sophisticated parties with differing and conflicting interests, under the close supervision and guidance of a sitting bankruptcy judge.

46.     The Plan Support Agreement (which includes the RMBS Settlement) is part of an integrated, multifaceted agreement among numerous constituencies that was born as the result of a lengthy, highly contentious Plan Mediation.  Prior to entering into the Plan Support Agreement, Law Debenture considered (keeping in mind the respective responsibilities of Law Debenture as Separate Trustee and Wells Fargo as Trustee) the benefits and risks associated with reaching an agreement regarding an overall consensual plan of reorganization, as well as the risks and uncertainties associated with allowance of, and distributions on, the RMBS Trust Claims in the absence of a consensual plan.

47.     The Plan Support Agreement provides for: (a) the allowance of the RMBS Trust Claims and (b) the treatment of those claims in accordance with the proposed Plan.  As set forth herein, relying on the advice of its professional advisors, including the information and conclusions provided by Duff & Phelps, and evaluating the totality of the circumstances,

---

[14]     By orders dated March 5, 2013 [ECF No. 3101] and June 4, 2013 [ECF No. 3877], the Court extended Judge Peck's appointment as Mediator through May 31, 2013 and October 31, 2013, respectively.

including the positions of the parties, Law Debenture assessed whether the allowance of, and

distribution on, those claims (which includes the RMBS Claims of the Law Debenture RMBS

Trusts) under the terms set forth in the Plan Support Agreement would be reasonable.  For the

reasons set forth in this Declaration, and taking into consideration the number and nature of the

objections filed to the RMBS 9019 Motion and the fact that the RMBS Settlement was

negotiated as part of the Plan Mediation, Law Debenture determined in good faith and by relying

on its professional advisors that the treatment of the RMBS Trust Claims as set forth in the Plan

Support Agreement and the proposed Plan are a reasonable compromise of the claims of the Law

Debenture RMBS Trusts.

**K.     The Allowance of, and Distributions on, the RMBS Trust Claims under the Plan Support Agreement**

48.     The Supplemental Term Sheet provides that:

> ... all RMBS Trust Claims of the Original Settling Trusts and the Additional
> Settling Trusts shall be fully and finally allowed as non-subordinated unsecured
> claims in the aggregate amount of $7.051 billion for the Original Settling Trusts
> and in the aggregate amount of $250 million for the Additional Settling Trusts
> (collectively, the "Allowed RMBS Trust Claims") and allocated $209.8 million to
> the GMACM Debtors and $7,091.2 million to the RFC Debtors; *provided,*
> *however*, the allowance and allocation of such claims pursuant to this paragraph
> shall not affect the distributions to be made in accordance with the RMBS Trust
> Allocation Protocol (attached hereto as Annex III).

Supplemental Term Sheet at p. 5, ¶5.

49.     The proviso contained in the above quoted portion of the Supplemental Term

Sheet was necessary because, based on Duff & Phelps work, (a) the Repurchase Claims of both

the Original Settling Trusts and the Non-Settling Trusts are in different amounts than the

amounts stated in the Supplemental Term Sheet for the Original Settling Trusts and the

Additional Settling Trusts (which include the Non-Settling Trusts), and the allocation of those

Repurchase Claims as between the GMACM Debtors and the RFC Debtors is different than the

allocation made by the Debtors; and (b) the allocations of claims made by the Debtors did not include a specific allocation of the Servicing Claims (after an agreed upon allowance at $96 million, as discussed below) as between the GMACM Debtors and the RFC Debtors. While these differences did not diminish the total Distribution Amount for RMBS Trust Claims, they do impact the amount that will be distributed to Class GS-6 and Class RS-6 and the individual RMBS Trusts therein, which could affect the ultimate distributions under the Plan contemplated by the Plan Support Agreement to the RMBS Trusts. Accordingly, the RMBS Trustees requested, and the other parties to the Plan Support Agreement agreed, that the distributions for those claims, whether to the RFC Debtors or the GMACM Debtors, be subject to the RMBS Trust Allocation Protocol, which will allow Duff & Phelps to ensure that the ultimate distributions to any particular RMBS Trust will not be impacted by the foregoing or other factors that were not addressed in the Supplemental Term Sheet.[15]

50. The amounts set forth in the Supplemental Term Sheet reflect the exclusion from the Allowed Claim of approximately $1.6 billion in claims held by the Insured RMBS Trusts (as defined in the Supplemental Term Sheet). The Insured RMBS Trusts (other than the FGIC-Insured Trusts, as further described below) have received, and in the future are assumed to receive, payment of their losses directly from the applicable Monoline, which largely eliminates the need for an allowed claim against the Debtors' estates for the Insured RMBS Trusts.[16] As noted in the Supplemental Term Sheet, a separate aggregate claim of $250 million will be

---

[15]    As noted in the Trust Allocation Protocol, Duff & Phelps determinations are subject to further refinement.

[16]    In consideration for these payments, the Monolines in turn will be allowed significant claims against the applicable Debtors, on account of which they are anticipated to receive substantial distributions from such Debtors' estates.

allowed to account for the expansion of the RMBS Settlement to include Repurchase Claims of the Additional Settling Trusts.[17]

51.     Based on the analysis of Duff & Phelps, and in light of the concessions and agreements contained in the RMBS Settlement, and the fact that the Additional Settling Trusts (which include the Non-Settling Trusts) will share in the Distribution Amount together with the Original Settling Trusts based on the same formula pursuant to the RMBS Trust Allocation Protocol, Law Debenture believes it is reasonable to include the Additional Settling Trusts in the RMBS Settlement in the context of the Plan Support Agreement.

52.     The Plan Support Agreement provides for the allocation of the estimated "distributable value" of the Debtors' Estates (including the AFI Contribution, as further described below).  The details of that agreed upon allocation are set forth in Annex I to the Supplemental Term Sheet.

53.     Under the Supplemental Term Sheet, certain RMBS Trust Claims are entitled to receive distributions of cash and liquidating trust interests or such other consideration of equivalent value as will not adversely affect the REMIC status of the RMBS Trusts.

54.     Specifically, Annex I to the Supplemental Term Sheet provides that the "Distribution Amount" allocated for the "RMBS Trust Claims" is $672.3 million.  The Supplemental Term Sheet defines "RMBS Trust Claims" to mean:

(i) all claims of residential mortgage backed securitization trusts (the "RMBS Trusts") against the Debtors arising from the Origination-Related Provisions (the

---

[17]     The Supplemental Term Sheet provides as follows:

The RMBS Settlement will be expanded to permit the inclusion of any RMBS Trust having RMBS Trust Claims, as follows: First, once the Plan Support Agreement is approved, subject to Section 5.2(c) of the Plan Support Agreement, each RMBS Trust for which any RMBS Trustee acts as trustee or separate trustee, will be included in the RMBS Settlement.  Second, the Plan will provide that any other RMBS Trusts will be included in and treated consistently with the RMBS Settlement (all such RMBS Trusts added to the RMBS Settlement are referred to as the "Additional Settling Trusts").

Supplemental Term Sheet at p. 5, ¶ 1.

"RMBS R+W Claims") and (ii) all claims of the RMBS Trusts against the Debtors not arising from the Origination-Related Provisions (the "RMBS Cure Claims"). "Origination-Related Provisions" shall have the meaning ascribed in the *Revised Joint Omnibus Scheduling Order and Provisions for Other Relief Regarding (I) Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of RMBS Trust Settlement Agreements, and (II) The RMBS Trustees' Limited Objection to the Sale Motion*, entered July 31, 2012 [Dkt. No. 945].

Supplemental Term Sheet, at 4 n.8.  In substance, "RMBS Trust Claims" encompasses the Repurchase Claims of the Original Settling Trusts, Repurchase Claims of the Additional Settling Trusts and the Cure Claims.

55.    The amount of cash and other consideration allocable to the Repurchase Claims will be the Distribution Amount of $672.3 million, less (a) fees payable to counsel to the Institutional Investors in a total amount that is estimated to be approximately $38.32 million and (b) the $96 million paid to the RMBS Trusts on account of RMBS Cure Claims – or approximately $537.98 million.  The proposed RMBS Trust Allocation Protocol allocates the assets available for distribution to Repurchase Claims and Servicing Claims between those RMBS Trusts that have claims against the GMACM Debtors and those that have claims against the RFC Debtors.[18]

56.    Pursuant to the RMBS Trust Allocation Protocol, the RMBS Cure Claims will receive payment prior to the payment of the other RMBS Trust Claims; such treatment is consistent with the assertion by the RMBS Trustees that such claims are "cure claims" entitled to administrative priority.[19]

---

[18]    The Distribution Amount (less attorneys fees, described above, and the amount attributable to RMBS Cure Claims) will be shared in accordance with the RMBS Trust Allocation Protocol, which is attached as Annex III to the Supplemental Term Sheet, and the amount to be distributed and allocated is subject to certain adjustments.

[19]    Servicing Claims includes those Servicing Claims which arise under the Transaction Documents that are executory contracts and that were assumed and assigned in connection with the sale of the Debtors' servicing assets "Cure Claims") and those Servicing Claims that arise under Transaction Documents where the Debtors' role thereunder was terminated prior to or during the Chapter 11 Case, or were not assumed and assigned during the Chapter 11 Cases ("Other Servicing Claims").  The total allowed amount of Servicing Claims, including Cure Claims and Other Servicing Claims, is capped at $96 million.  Within that capped amount, the RMBS Trustees

57.    With regard to the Repurchase Claims that are held by RMBS Trusts that are insured by Monolines other than FGIC, as explained above, such claims generally are not allowed against the Debtors' estates, as they are contemplated to receive payments directly by payment from the applicable Monoline.  The rights of Insured RMBS Trusts are reserved in the event that the applicable Monoline does not honor its obligations.

58.    As it relates to RMBS Trusts insured by FGIC, FGIC will pay to the RMBS Trustees, for distribution to holders of certificates of the RMBS Trusts that are insured by insurance policies issued by FGIC (the "**FGIC Policies**"), a lump sum cash payment of $253.3 million (the **"FGIC Payment"**) in settlement of the FGIC-Insured RMBS Trust's claims against FGIC.  The RMBS Trustees of the FGIC-Insured RMBS Trusts (the "**FGIC RMBS Trustees**") will determine, based on the analysis done by Duff & Phelps, the portion of the FGIC Payment that will be allocated to each FGIC-Insured RMBS Trust based on each trust's allocable share of its accrued and unpaid claims and estimated future claims under its FGIC Policies.

## L.    The AFI Contribution

59.    One critical component of the global settlement is the resolution of claims against AFI and the quantification of the contribution by AFI to the Debtors' Estates at $2.1 billion in value (the "**AFI Contribution**").  Under the original RMBS 9019 Motion, AFI was willing to make a contribution limited to $750 million.

60.    Law Debenture considered that the increase in the AFI Contribution, the certainty associated with fixing the AFI Contribution, the added value to the Debtors' Estates, and the avoidance of the delay and expense associated with litigation relating to Ally's liability to the Estates, were all of significant benefit to the Law Debenture RMBS Trusts.

anticipate that to the extent the Other Servicing Claims are general unsecured claims they will be treated *pari passu* with the Repurchase Claims and to the extent that are entitled to administrative priority they will be treated *pari passu* with the Cure Claims.

**M.**       **Litigation Risks**

61.       Another very important consideration for Law Debenture in reaching its decisions
with respect to the Plan was the resolution of disputed issues that otherwise would present risk to
the Law Debenture RMBS Trusts and could result in expensive and prolonged litigation that
could affect the recoveries of the Law Debentures RMBS Trusts.

62.       *First*, the Plan Support Agreement contemplates the resolution of claims that the
RMBS Trustees expect would otherwise be contested in time-consuming and uncertain
proceedings.  Objections to the RMBS 9019 Motion, including those of FGIC, MBIA and the
Committee, will no longer be pressed.  The RMBS 9019 Motion remains outstanding and, in the
absence of the compromises associated with the Plan Support Agreement, will require a lengthy
and expensive hearing.  Upon the conclusion of that hearing, while the Court might authorize the
Debtors to perform the Original Settlement Agreement, it is also possible that the Court might
sustain one or more of the objections filed to the RMBS 9019 Motion.  If the Court declined to
grant the RMBS 9019 Motion, the allowance of Repurchase Claims of the Original Settling
Trusts would be left to the expensive and uncertain process of claims litigation.  The same would
be true for the Repurchase Claims of the Non-Settling Trusts.  Thus, allowance of the RMBS
Trust Claims, as contemplated by the Plan Support Agreement, offers the benefits of allowance
consistent with the RMBS 9019 Motion without the risks attendant to that contested matter.

63.       In addition, the Plan Support Agreement permits the determination of, and
distribution under the proposed Plan on, the Repurchase Claims of the Non-Settling Trusts (as
Additional Settling Trusts), without the expense, delay and uncertainty associated with asserting
and litigating those claims.

64.       The Plan Support Agreement also provides for the allowance of, and distribution
under the Plan on, the Servicing Claims of the RMBS Trusts.  As set forth above, those claims

were the subject of an analysis by Duff & Phelps and were roughly quantified, but the presentation of those claims would have required further discovery and analysis, likely leading to litigation over both the quantification of the claims and their relative priority.  The treatment of these claims represents a meaningful recovery to the RMBS Trusts possessing such claims, without the expense, delay, and uncertainty associated with analyzing, asserting, and litigating those claims.

65.     *Second*, many of the contentious and complicated inter-creditor issues in these cases are resolved by the Plan Support Agreement, including, among other things, the priority of certain of the claims asserted by the Monolines and by certain securities claimants.  In particular, both the amount of the claims of the Monolines and the relationship between those claims and the RMBS Trust Claims are the subject of disputes, and the resolution of all those disputes through litigation presents both a general risk of delay and expense to all stakeholders as well as a specific risk to the RMBS Trusts of dilution.  Thus, the Plan Support Agreement, which resolves these inter-creditor claims, including the claims of the Monolines, offers significant benefit to the RMBS Trusts.

66.     *Third*, the increasing costs of administration of these Chapter 11 Cases threaten to erode any distribution to unsecured creditors.  The Plan Support Agreement would effectively abate the continued accrual of such costs.

**N.      The FGIC Rehabilitation Proceeding and FGIC Settlement Agreement**

67.     With regard to the RMBS Trusts insured by FGIC, the fact that FGIC is currently involved in a state rehabilitation proceeding was a significant complicating factor in reaching a resolution of claims of the FGIC-Insured RMBS Trusts.

68.     In or about June 2012, the Supreme Court of the State of New York appointed Benjamin M. Lawsky, Superintendent of Financial Services of the State of New York, as

rehabilitator (the "**Rehabilitator**") of FGIC in the rehabilitation proceeding styled *In the Matter of the Rehabilitation of Financial Guaranty Insurance Company*, Index No. 401265/2012 (the "**FGIC Rehabilitation Proceeding**").  As a result of an injunction entered by the court in the FGIC Rehabilitation Proceeding (and other administrative action taken by FGIC's regulator), the FGIC-Insured RMBS Trusts have been obligated to continue to pay premiums under the FGIC Policies, notwithstanding that FGIC was relieved of its obligations to pay claims made by the trusts under those same policies.

69.     In or about June 2013, the Rehabilitator filed a revised First Amended Plan of Rehabilitation for FGIC (the "**Plan of Rehabilitation**") which contemplates, among other things, for certain payments to be made over time to policyholders on account of claims under the FGIC Policies, including to the FGIC-Insured RMBS Trusts on account of the FGIC Policies.  The contemplated payments to the FGIC-Insured RMBS Trusts under the Plan of Rehabilitation would represent only a percentage of the accrued and unpaid claims and the projected future claims made by those RMBS Trusts under the FGIC Policies.

70.     The RMBS Trustees were asked to consider a settlement proposal with FGIC. Under that proposal, among other things, FGIC would pay the FGIC Payment to the FGIC-Insured RMBS Trusts and forgo future premiums with respect to the FGIC Policies (estimated by Duff & Phelps to be approximately $18.3 million).  In exchange, the FGIC RMBS Trustees would release and discharge FGIC from all obligations and liabilities under the FGIC Policies. Those terms formed the basis of a Settlement Agreement, entered into as of May 23, 2013 by and among the Debtors, FGIC, the FGIC RMBS Trustees and the Institutional Investors (the "**FGIC Settlement**") which is a central piece of RMBS Settlement and the Plan Support Agreement.

71.    At the request of the FGIC RMBS Trustees, Duff & Phelps conducted an analysis of the economic terms of the FGIC Settlement, using both publicly-available and non-public information from Lazard, the financial advisor to the Rehabilitator, as to projected future claims and anticipated payouts pursuant to the Plan of Rehabilitation.  Duff & Phelps utilized this information to compare the FGIC Payment under the FGIC Settlement with the discounted value of the stream of payments that the FGIC-Insured RMBS Trusts would be projected to receive under the Plan of Rehabilitation if the FGIC RMBS Trustees declined to enter into the FGIC Settlement.

72.    Based on its analysis of the respective benefits to the FGIC-Insured RMBS Trusts of the FGIC Settlement and those that such trusts would enjoy under the Plan of Rehabilitation, Duff & Phelps advised the FGIC RMBS Trustees that the FGIC Payment and FGIC Settlement represented a reasonable resolution of the accrued and unpaid claims and projected future claims against FGIC under the FGIC Policies.

73.    Based on the foregoing, including Duff & Phelps' analysis and advice, Law Debenture concluded that the treatment of the claims of the FGIC-Insured RMBS Trusts under the Plan Support Agreement was reasonable.

## O.    Support of Other Constituencies

74.    The Institutional Investors, which hold significant, and for some RMBS Trusts controlling, investments in certificates issued by the RMBS Trusts were informed, involved, in regular communication with the RMBS Trustees and supportive of the RMBS Settlement.  The Institutional Investors were active participants in the Plan Mediation and the negotiations that led to the overall settlement associated with the Plan Support Agreement.  The Institutional Investors were aware of all of the compromises that evolved during the Plan Mediation and negotiations

leading to the Plan Support Agreement, and they communicated through their counsel that they fully supported the Plan Support Agreement.

**P.**   **Notices to Holders**

75.   Law Debenture and/or Wells Fargo have, in their respective capacities as Separate Trustee, trustee and indenture trustee, regularly provided notice of matters related to the RMBS 9019 Motion and other significant events in ResCap's Chapter 11 Cases to the holders in the Law Debenture RMBS Trusts.

76.   I further understand that certain of the RMBS Trustees, including Wells Fargo, jointly retained The Garden City Group, Inc. ("**GCG**") to provide certain administrative services in connection with noticing various Holders, including the facilitation of the dissemination of notices to the various Holders at the direction and on behalf of the RMBS Trustees and the creation and maintenance of a website for Holders that provides contact information for the RMBS Trustees, recent developments in the Chapter 11 Cases, links to relevant documents filed in the Chapter 11 Cases, and upcoming Court deadlines and hearing dates (the "**RMBS Trustee Website**").  As described in more detail in the Affidavit of Jose C. Fraga ("**Fraga Affidavit**"), which is attached to the Joinder as Exhibit G, GCG has distributed and posted several notices on behalf of the RMBS Trustees.

77.   On or about May 24, 2013, at or about the time of the PSA Motion, on behalf of the RMBS Trustees, GCG facilitated and published a "Time Sensitive Notice Regarding (a) Plan Support Agreement Among ResCap Debtors and the RMBS Trustees, Among Others, and (b) Settlement Agreement Among the Debtors, Financial Guaranty Insurance Company and Certain of the RMBS Trustees" (the "**Holder PSA Notice**"), a copy of which is attached as Exhibit G to the Fraga Affidavit.  The Holder PSA Notice described the terms of the PSA and

the Term Sheets, as well as the RMBS Settlement and the FGIC Settlement and the process by which Holders could object to them.

78.     Finally, the FGIC RMBS Trustees published a "Time Sensitive Notice Regarding Settlement Agreement Among the ResCap Debtors, Financial Guaranty Insurance Company and the FGIC Trustees" (the "**Holder FGIC Settlement Notice**"), a copy of which is attached hereto as Exhibit A (attachments omitted).  The Holder FGIC Settlement Notice was drafted jointly by the RMBS Trustees of the FGIC-Insured RMBS Trusts and, in the case of the Law Debenture RMBS Trusts that were insured by FGIC was provided by Wells Fargo, as trustee or indenture trustee, to the Holders in those trusts.  The Holder FGIC Settlement Notice provided additional information to the holders in those trusts regarding the FGIC Rehabilitation Proceeding, FGIC Settlement, their rights thereunder, the process for holders to object to the FGIC Settlement in the FGIC Rehabilitation Proceeding and to obtain information on the cash amount FGIC will pay to a particular trust.  The Holder FGIC Settlement Notice and certain pleadings in the FGIC Rehabilitation Proceeding have also been posted on the RMBS Trustee Website.

79.     I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

DATED this 10th day of June, 2013

_____
Thomas Musarra

# Exhibit A

TIME SENSITIVE NOTICE
REGARDING SETTLEMENT AGREEMENT AMONG THE RESCAP DEBTORS,
FINANCIAL GUARANTY INSURANCE COMPANY AND THE FGIC TRUSTEES

**NOTICE IS HEREBY GIVEN BY:**

**THE BANK OF NEW YORK MELLON,
THE BANK OF NEW YORK MELLON TRUST COMPANY, N.A.,
U.S. BANK NATIONAL ASSOCIATION,
WELLS FARGO BANK, N.A., AND
LAW DEBENTURE TRUST COMPANY OF NEW YORK**

**IN THEIR SEVERAL CAPACITIES AS TRUSTEES, INDENTURE TRUSTEES
AND/OR SEPARATE TRUSTEES (COLLECTIVELY, THE "FGIC TRUSTEES" AND
EACH, AN "FGIC TRUSTEE"), TO THE HOLDERS (THE
"CERTIFICATEHOLDERS") OF CERTIFICATES, NOTES OR OTHER SECURITIES
(COLLECTIVELY, THE "CERTIFICATES") UNDER THE RESIDENTIAL
MORTGAGE-BACKED SECURITIZATION TRUSTS IDENTIFIED ON SCHEDULE A
TO THIS NOTICE (COLLECTIVELY, THE "FGIC TRUSTS" AND EACH A "FGIC
TRUST").**

**THIS NOTICE CONTAINS IMPORTANT TIME-SENSITIVE INFORMATION FOR
CERTIFICATEHOLDERS AND OTHER PERSONS POTENTIALLY INTERESTED IN
THE FGIC TRUSTS.  ALL DEPOSITORIES, CUSTODIANS AND OTHER
INTERMEDIARIES RECEIVING THIS NOTICE, AS APPLICABLE, ARE
REQUESTED TO EXPEDITE ITS RE-TRANSMITTAL TO CERTIFICATEHOLDERS
IN A TIMELY MANNER.  FAILURE TO ACT PROMPTLY IN COMPLIANCE WITH
THIS PARAGRAPH MAY IMPAIR THE ABILITY OF THE CERTIFICATEHOLDERS
ON WHOSE BEHALF SUCH INTERMEDIARIES ACT TO CONSIDER THE
MATTERS DESCRIBED IN THIS NOTICE IN A TIMELY FASHION.**

Dated:  June 4, 2013

This notice (the "**Notice**") is given to you by the FGIC Trustees under the Pooling and Servicing
Agreements (including Series Supplements and Standard Terms of Pooling and Servicing
Agreements), and Indentures and related Servicing Agreements (collectively, the "**Governing
Agreements**") governing the FGIC Trusts.  This Notice incorporates by reference the notice
given by the RMBS Trustees (as defined therein) regarding (A) the Plan Support Agreement,
dated May 13, 2013 (the "**Plan Support Agreement**"), among the ResCap Debtors and the
RMBS Trustees (including the FGIC Trustees), among others, and (B) the Settlement Agreement
among the Debtors, Financial Guaranty Insurance Company and Certain of the RMBS
Trustees(including the FGIC Trustees), dated May 24, 2013 (the "**May 24 Notice**").  In the event
of any inconsistencies between the May 24 Notice and this Notice, this Notice shall govern.

Capitalized terms used but not defined herein shall have the meanings assigned to them in the Governing Agreements or in the FGIC Settlement Agreement, as defined below.

**THIS NOTICE CONCERNS A PROPOSED SETTLEMENT OF, AMONG OTHER THINGS, THE PRESENT AND FUTURE CLAIMS OF THE FGIC TRUSTS AGAINST FINANCIAL GUARANTY INSURANCE CORPORATION ("FGIC") UNDER THE INSURANCE POLICIES (THE "POLICIES") ISSUED BY FGIC IN RESPECT OF THE TRUSTS.[1]**

**IF THE FGIC SETTLEMENT AGREEMENT IS APPROVED BY THE STATE COURT AND THE BANKRUPTCY COURT, IT WILL BIND EACH APPLICABLE FGIC TRUST AND THE RELATED CERTIFICATEHOLDERS. THE PROPOSED FGIC SETTLEMENT AGREEMENT MATERIALLY AFFECTS THE INTERESTS OF THE CERTIFICATEHOLDERS. THE FGIC TRUSTEES THEREFORE RESPECTFULLY REQUEST THAT ALL CERTIFICATEHOLDERS AND OTHER NOTICE RECIPIENTS READ THIS NOTICE AND RELATED MATERIALS CAREFULLY IN CONSULTATION WITH THEIR LEGAL AND FINANCIAL ADVISORS. CERTIFICATEHOLDERS THAT DO NOT WANT THE FGIC SETTLEMENT AGREEMENT TO BECOME EFFECTIVE SHOULD CONSIDER OBJECTING TO ITS APPROVAL IN THE STATE COURT ON OR BEFORE THE DEADLINE OF JULY 16, 2013 AT 3:00 P.M. (PREVAILING EASTERN TIME) AND/OR IN THE BANKRUPTCY COURT ON OR BEFORE THE DEADLINE THAT WILL BE SET ONCE THE NOTICE OF THE MOTION TO APPROVE THE FGIC SETTLEMENT AGREEMENT IS FILED (SUCH NOTICE IS EXPECTED TO BE FILED ON OR BEFORE JUNE 7, 2013).[2]**

I.     **Background--ResCap Bankruptcy Filing and FGIC Rehabilitation Proceeding.**

On May 14, 2012, Residential Capital, LLC, and certain of its direct and indirect subsidiaries (collectively, "**ResCap**" or the "**Debtors**") filed voluntary petitions under Chapter 11 of the United States Bankruptcy Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") (*In re Residential Capital, LLC*, Case No. 12-12020 (MG) and related cases) (collectively, the "**Chapter 11 Cases**"). To obtain information regarding the Chapter 11 Cases, please see Section VI, below.

Pursuant to an order dated June 28, 2012, the Supreme Court of the State of New York (the "**State Court**") appointed Benjamin M. Lawsky, Superintendent of Financial Services of the State of New York, as rehabilitator (the "**Rehabilitator**") of FGIC in the rehabilitation proceeding styled *In the Matter of the Rehabilitation of Financial Guaranty Insurance Company*, Index No. 401265/2012 (the "**Rehabilitation Proceeding**").

---

[1]  Terms not otherwise defined in these initial summary paragraphs are defined below.

[2]  When the notice of the motion seeking Bankruptcy Court approval of the FGIC Settlement Agreement (the "**FGIC Motion**") is filed with the Bankruptcy Court, it will be available at **http://www.rescaprmbssettlement.com**, or from The Garden City Group ("**GCG**") by contacting GCG in the manner described in Section VI, below, and other means as set forth in Section VI. Any Certificateholder of a FGIC Trust may object to the approval of the FGIC Settlement Agreement in the Bankruptcy Court pursuant to the terms of the FGIC Motion.

SK 03687 0119 1385897 v5

## II.    The FGIC Settlement Agreement.

On May 23, 2013, ResCap, FGIC, and the FGIC Trustees as trustees or separate trustees under the FGIC Trusts, and certain other parties (collectively, the "**FGIC Settlement Parties**") entered into a settlement agreement (the "**FGIC Settlement Agreement**") pursuant to which the FGIC Settlement Parties settled their claims against each other, including the claims of the FGIC Trusts against FGIC for claims under the Policies under which FGIC insured the payment of principal and interest owing on certain of the Certificates.  According to the terms of the FGIC Settlement Agreement, among other things, (a) each FGIC Settlement Party shall release the other FGIC Settlement Parties in respect of the Policies and other Policy Agreements (as defined in the FGIC Settlement Agreement), including the release by the FGIC Trusts of current claims in the amount of at least $789 million, and future claims against FGIC, (b) FGIC will pay to the FGIC Trusts for distribution to Certificateholders holding Certificates insured by the Policies cash in the aggregate amount of $253.3 million in settlement of the FGIC Trusts' claims against FGIC, (c) the FGIC Trustees shall release the Debtors in respect of Origination-Related Provisions (as defined in the FGIC Settlement Agreement), (d) FGIC will not be liable for any further payments under the Policies and other Policy Agreements, and (e) the FGIC Trusts will no longer make premium, reimbursement, or other payments to FGIC.[3]  Copies of the FGIC Settlement may be obtained at **http://www.rescaprmbssettlement.com, at www.fgicrehabilitation.com** or from GCG by contacting GCG in the manner described in Section VI, below.

In accordance with the allocation methodology set forth in Exhibit F to the FGIC Settlement Agreement, the FGIC Trustees, in consultation with their advisors, will have sole and exclusive authority to determine the share of the $253.3 million payable to each FGIC Trust and the allocation of such share among the CUSIPs issued by each such FGIC Trust that are insured by a Policy.  On or before July 3, 2013, the FGIC Trustees will notify FGIC in writing of the cash amount that FGIC shall pay to each FGIC Trust once the FGIC settlement is effective.

**As of July 3, 2013, the FGIC Trustees will make available to any Certificateholders holding Certificates insured by a Policy information as to the cash amount that FGIC will pay to the FGIC Trust(s) that issued such Certificates, _provided_ that any such Certificateholder submits a proper request for such information to the FGIC Trustee(s) for such FGIC Trust(s), and provides appropriate verification of its holdings.**

---

[3]    Pursuant to the FGIC Settlement Agreement, FGIC will receive an allowed claim against certain of the Debtors in the aggregate amount of (i) approximately $934 million, if the chapter 11 plan contemplated by the Plan Support Agreement attached to the FGIC Settlement Agreement as Exhibit C goes effective, or (ii) $596.5 million, if the Plan Support Agreement is terminated in accordance with its terms and the chapter 11 plan contemplated thereby does not go effective, subject to FGIC's right to assert a claim against each of three of the Debtors, in each case up to the amount of $596.5 million.  FGIC has agreed under the Plan Support Agreement to cap its recovery from ResCap under (i), above, to $206.5 million.  For more information on the Plan Support Agreement, please review the May 24 Notice.

SK 03687 0119 1385897 v5

**CERTIFICATEHOLDERS OF A FGIC TRUST ARE URGED TO REVIEW
CAREFULLY THE FGIC SETTLEMENT AGREEMENT AND TO CONSULT WITH
THEIR ADVISORS.**

III.    **The Rehabilitation Proceeding and Related Deadlines.**

On May 29, 2013, an affirmation (the "**Affirmation**") in support of the Rehabilitator's motion
for an order approving the FGIC Settlement Agreement and relevant portions of the Plan Support
Agreement was filed in the State Court.  On May 30, 2013, the State Court entered an order to
show cause (the "Order to Show Cause") setting forth a schedule of deadlines and the date of a
hearing to consider approval of the FGIC Settlement Agreement and relevant portions of the Plan
Support Agreement (the "**State Court Hearing**").  Copies of the Affirmation and the Order to
Show Cause may be obtained at **www.fgicrehabilitation.com**, at
**http://www.rescaprmbssettlement.com** or from GCG by contacting GCG in the manner
described in Section VI, below.  Pursuant to the Order to Show Cause, the State Court Hearing
will take place on August 6, 2013 at 10:00 a.m. at IAS Part 36, Room 428, thereof, at the
Courthouse located at 60 Centre Street, New York, New York.

**Any Certificateholder objecting to any aspect of the FGIC Settlement Agreement must file
an objection with the State Court, and serve a copy of such objection via email upon
gary.holtzer@weil.com and joseph.verdesca@weil.com, attorneys for the Rehabilitator, so
that such objection is received on or before July 16, 2013 at 3:00p.m. (the "State Court
Objection Deadline").**

If no objection is filed on or before the State Court Objection Deadline, pursuant to the Order to
Show Cause, the State Court may approve the FGIC Settlement Agreement without holding the
State Court Hearing.[4]

IV.    **Certificateholders Can Object to the FGIC Settlement Agreement.**

*Any Certificateholder objecting to any aspect of the FGIC Settlement Agreement can file an
objection with the Bankruptcy Court as set forth in footnote 2, above, and/or in the State
Court as set forth in Section III, above.  If a Certificateholder of a FGIC Trust does not file a
timely objection to the FGIC Settlement Agreement in the Bankruptcy Court or Rehabilitation
Proceeding or if such Certificateholder's timely objection(s) are overruled, so long as the
FGIC Settlement Agreement is approved by the Bankruptcy Court and the State Court, such
Certificateholder will be bound by the terms of the FGIC Settlement Agreement.[5]  If approved*

---

[4]  As noted in footnote 2, above, Certificateholders of a FGIC Trust may also object to the FGIC Motion in the
Bankruptcy Court.
[5] Note that Bankruptcy Court approval of a plan of reorganization for the Debtors is *not* a condition to the
effectiveness of the FGIC Settlement Agreement.  By its terms, the FGIC Settlement Agreement will become
effective if and when both the Bankruptcy Court and the Rehabilitation Court have entered final orders approving it.
The May 24 Notice incorrectly stated that the Bankruptcy Court approval of a plan of reorganization for the Debtors
was a condition to the effectiveness of the FGIC Settlement Agreement.

4

*by the Bankruptcy Court and the State Court, all Certificateholders holding Certificates insured by FGIC's Policies, and any other persons or entities who received this Notice, will be bound by the FGIC Settlement Agreement and the settlements, releases and discharges contained therein, regardless of whether any Certificateholder or other person or entity appeared before the Bankruptcy Court and/or at the State Court Hearing or submitted an objection.*

*Certificateholders should review with their advisors the relevant Governing Agreements and any applicable orders that have been entered by the State Court, including the Order of Rehabilitation, dated June 28, 2012, to determine what legal position, if any, they intend to assert.*

### V.       This Notice Is a Summary.

This Notice is not intended as, nor does it provide, a detailed restatement of the FGIC Settlement Agreement, relevant law or relevant legal procedures.  The FGIC Trustees do not intend to send any further notices with respect to the matters addressed herein, and Certificateholders and other potentially interested persons are urged to review carefully the FGIC Settlement Agreement, any related notices, and other related pleadings that have been filed, and that subsequently may be filed, in the Chapter 11 Cases and in the Rehabilitation Proceeding, and to consult with their own legal and financial advisors.

### VI.      Other Sources of Information.

Information relevant to the FGIC Settlement Agreement, the Plan Support Agreement, and any notices thereof will be available at **http://www.rescaprmbssettlement.com,** which will be updated regularly with related material documents filed or orders entered by the Bankruptcy Court and the State Court.  Certificateholders may also access documents filed in the Rehabilitation Proceeding at **www.fgicrehabilitation.com**.  If a Certificateholder has any questions or would like to request copies of any of the relevant documents, Certificateholders may call GCG at (866) 241-7538 in the United States, +1 (202) 470-4565 outside the United States, or send an email to **questions@ rescaprmbssettlement.com**.

Certificateholders may also obtain any documents filed with the Bankruptcy Court in the Chapter 11 Cases by visiting ResCap's claims agent website at **http://www.kccllc.net/rescap,** or by logging on to PACER at **https://www.uscourts.gov** (a small fee is charged for this service). Documents filed in the Chapter 11 Cases may also be viewed during normal business hours at the Clerk's Office of the Bankruptcy Court, located at One Bowling Green, New York, New York 10004.

The Committee appointed in the Chapter 11 Cases has established an official website (the "**Committee Website**"), on which basic information concerning the Chapter 11 Cases has been posted, including, but not limited to, relevant contact information, upcoming dates and deadlines, statements and schedules filed by ResCap and a list of answers to frequently asked questions. The Committee Website can be reached at **http://dm.epiq11.com/RES/Project**.

SK 03687 0119 1385897 v5

Inquiries with respect to any particular FGIC Trust for which The Bank of New York Mellon, The Bank of New York Mellon Trust Company, N.A., U.S. Bank National Association, or Wells Fargo Bank, N.A. serves as FGIC Trustee may be directed to the FGIC Trustee for such FGIC Trust using the "RMBS Trustee Contact Information" for such FGIC Trustee at **http://www.rescaprmbssettlement.com**.  With respect to those FGIC Trusts for which Law Debenture Trust Company of New York serves as separate FGIC Trustee, inquiries may be directed to **nytrustco@lawdeb.com.**  With respect to all other trusts, Certificateholders of those trusts should refer to their respective Governing Agreements for contact information.

### VII.    Other Matters.

Certificateholders and other persons interested in the FGIC Trusts should not rely on the FGIC Trustees, or on counsel or other advisors retained by the FGIC Trustees, as their sole source of information.

Please note that the foregoing is not intended and should not be construed as investment, accounting, financial, legal or tax advice by or on behalf of the FGIC Trustees, or their directors, officers, affiliates, agents, attorneys or employees. Each person or entity receiving this Notice should seek the advice of its own advisers in respect of the matters set forth herein.

Please be further advised that each of the FGIC Trustees reserves all of the rights, powers, claims and remedies available to it under the Governing Agreements and applicable law. No delay or forbearance by an FGIC Trustee to exercise any right or remedy accruing upon the occurrence of a default, or otherwise under the terms of the Governing Agreements, other documentation relating thereto or under applicable law, shall impair any such right or remedy or constitute a waiver thereof or acquiescence therein.

Each of the FGIC Trustees expressly reserves its rights under each applicable Governing Agreement, including without limitation, its right to recover in full its fees and costs (including, without limitation, fees and costs incurred or to be incurred by such FGIC Trustee in performing its duties, indemnities owing or to become owing to such FGIC Trustee, compensation for such FGIC Trustee's time spent and reimbursement for fees and costs of counsel and other agents it employs in performing its duties or to pursue remedies) and its right, prior to exercising any rights or powers in connection with any applicable Governing Agreement at the request or direction of any Certificateholder, to receive security or indemnity satisfactory to it against all costs, expenses and liabilities which might be incurred in compliance therewith, and all rights that may be available to it under applicable law or otherwise.

6

Please be advised that with respect to any particular inquiry from individual Certificateholders, a FGIC Trustee may conclude that a specific response to such inquiry is not consistent with requirements under applicable law and regulation of equal and full dissemination of information to all Certificateholders.

THE BANK OF NEW YORK MELLON, THE BANK OF NEW
YORK MELLON TRUST COMPANY, N.A., U.S. BANK
NATIONAL ASSOCIATION, WELLS FARGO BANK, N.A.,
AND LAW DEBENTURE TRUST COMPANY OF NEW YORK,
severally, as trustees, and/or indenture trustees or separate trustees
of the FGIC Trusts

SK 03687 0119 1385897 v5