UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - -x

In the Matter of:

Case No. 12-12020-mg

RESIDENTIAL CAPITAL, LLC, et al.,

Debtors.

- - - - - - - - - - - - - - - - - - - - -x

JENKINS ET AL.,

Plaintiffs,

-against- Adv. Proc. No. 12-01935-mg

RESIDENTIAL FUNDING COMPANY, LLC ET AL.,

Defendants.

- - - - - - - - - - - - - - - - - - - - -x

SOLANO,

Plaintiff,

-against- Adv. Proc. No. 13-01255-mg

GMAC MORTGAGE LLC, ET AL.,

Defendants.

- - - - - - - - - - - - - - - - - - - - -x

- - - - - - - - - - - - - - - - - - - - -x

HAWTHORNE,

Plaintiff,

-against- Adv. Proc. No. 12-02050-mg

GMAC MORTGAGE LLC,

Defendant.

- - - - - - - - - - - - - - - - - - - - -x

United States Bankruptcy Court

One Bowling Green

New York, New York

June 12, 2013

10:07 AM

B E F O R E:

HON. MARTIN GLENN

U.S. BANKRUPTCY JUDGE

Doc# 2511, (CC: Doc no. 3343) Status Conference Re: Motion to Approve Motion By Ally Financial Inc. and Ally Bank for an Order Enforcing the Automatic Stay Pursuant to 11 U.S.C. 362 (a)(3) By (1) Enjoining Prosecution of Alter Ego and Veil Piercing Claims in the Class Action Entitled Landon Rothstein, Et Al. v GMAC Mortgage, LLC Et Al., and (2) Declaring Such Claims Void Ab Initio

(CC: Doc# 3374, 3375) Status Conference RE: Debtors Motion for Entry of an Order to Permit the Debtors to Continue Using Cash Collateral.

(CC: Doc no. 3911, 3912) Debtors' Motion for Entry of an Order Further Extending Their Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof filed by Gary S. Lee on behalf of Residential Capital, LLC.

Doc# 3733 Motion for Relief from Stay

Doc# 3829 Debtors Application Under Bankruptcy Code Sections 327(a) and 328(a) for Entry of an Order Approving Fourth Addendum to Engagement Agreement with FTI Consulting, Inc. as Financial Advisor to the Debtors, Authorizing Provision of Litigation Support Services Nunc Pro Tunc to March 1, 2013

Doc# 3626, 3872 Debtors' Amended Motion for Entry of an Order Under 11 U.S.C. 105 and 363 Authorizing the Debtors to Partially Satisfy Certain Secured Claims.

(CC: Doc# 3830) Debtors' Motion Pursuant to Section 362(a) of the Bankruptcy Code for Enforcement of the Automatic Stay.

(CC: Doc# 2604) Motion for Relief from Stay

(CC: Doc no. 2935) Adj. Hearing RE: Motion to Extend Time For Julio Solano To File Proof Of Claim (related document(s)2934) filed by Richard Sax on behalf of Julio Solano.

(Doc no. 3315) Hearing RE: Letter to the Honorable Judge Glenn re: acceptance of tardy claim filed by Donna Chinloy.

(CC: Doc# 3187) First Application for Interim Professional Compensation (First Interim Application of Pepper Hamilton LLP as Special Foreclosure Review Counsel for Bankruptcy Issues for the Debtors for Compensation and Reimbursement of Expenses Incurred for the Period May 15, 2012 through December 31, 2012) for Pepper Hamilton LLP, Special Counsel, period: 5/15/2012 to 12/31/2012, fee:$2,226,584.25, expenses: $87,327.73.

12-12019-mg Residential Funding Company, LLC Ch. 11

Adversary proceeding: 12-01935-mg Jenkins et al v. Residential Funding Company, LLC et al. (CC: Doc no. 1) Adjourned Case Management Conference.

Adversary proceeding: 12-02050-mg Hawthorne v. GMAC MORTGAGE, LLC (CC: Doc no. 1) Adj. Pretrial Conference

Adversary proceeding: 13-01255-mg Solano v. GMAC Mortgage LLC et al. Status Conference

Transcribed by: Sharona Shapiro
eScribers, LLC
700 West 192nd Street, Suite #607
New York, NY 10040
(973)406-2250
operations@escribers.net

A P P E A R A N C E S :

MORRISON & FOERSTER LLP

Attorneys for Debtors

1290 Avenue of the Americas

New York, NY 10104

BY: LORENZO MARINUZZI, ESQ.

ERICA J. RICHARDS, ESQ.

SAMANTHA MARTIN, ESQ.

JAMES A. NEWTON, ESQ.

NORMAN S. ROSENBAUM, ESQ.

TODD M. GOREN, ESQ.

PEPPER HAMILTON LLP

Special Foreclosure Review Counsel for Debtors

Suite 1800

4000 Town Center

Southfield, MI 48075

BY: DEBORAH KOVSKY-APAP, ESQ. (TELEPHONICALLY)

KRAMER, LEVIN, NAFTALIS & FRANKEL, LLP

Attorneys for Official Creditors' Committee

1177 Avenue of the Americas

New York, NY 10036

BY: DOUGLAS MANNAL, ESQ.

STEPHEN D. ZIDE, ESQ.

WILMER CUTLER PICKERING HALE AND DORR LLP

Attorneys for Official Creditors' Committee

1873 Pennsylvania Avenue, NW

Washington, DC 20006

BY: WILLIAM J. PERLSTEIN, ESQ. (TELEPHONICALLY)

SILVERMAN ACAMPORA LLP

Special counsel to committee for borrower issues

100 Jericho Quadrangle

Suite 300

Jericho, NY 11753

BY: JUSTIN S. KRELL, ESQ.

WHITE & CASE LLP

Attorneys for Ad Hoc Group Of Junior Secured Noteholders

1155 Avenue of the Americas

New York, NY 10036

BY: HARRISON DENMAN, ESQ.

MILBANK, TWEED, HADLEY & MCCLOY LLP

Attorneys for Ad Hoc Group of Junior Secured Notes

One Chase Manhattan Plaza

New York, NY 10005

BY: GERARD UZZI, ESQ.

KIRKLAND & ELLIS LLP

Attorneys for Ally Financial, Inc. and Ally Bank

601 Lexington Avenue

New York, NY 10022

BY: RAY C. SCHROCK, ESQ.

KIRBY MCINERNEY LLP

Attorneys for Rothstein Plaintiffs

825 Third Avenue

New York, NY 10022

BY: MARK A. STRAUSS, ESQ.

BIFFERATO GENTILOTTI LLC

Attorneys for Rothstein Plaintiffs

1013 Centre Road

Suite 102

Wilmington, DE 19805

BY: GARVAN F. MCDANIEL, ESQ.

COLE, SCHOTZ, MEISEL, FORMAN & LEONARD, P.A.

Court Plaza North, 25 Main Street

Hackensack, NJ 07601

BY: JOHN H. DRUCKER, ESQ.

HOGAN LOVELLS US LLP

Attorneys for U.S. Bank as trustee and America'

Servicing Company

875 Third Avenue

New York, NY 10022

BY: BRIAN J. GRIECO, ESQ.

SEWARD & KISSEL LLP

Attorneys for US Bank N.A. as RMBS Trustee

One Battery Park Plaza

New York, NY 10004

BY: MARK D. KOTWICK, ESQ.

CHADBOURNE & PARKE LLP

Attorneys for the Examiner

30 Rockefeller Plaza

New York, NY 10112

BY: MICHAEL G. DISTEFANO, ESQ.

CLEARY GOTTLIEB STEEN & HAMILTON LLP

Attorneys for Wilmington Trust

One Liberty Plaza

New York, NY 10006

BY: SEAN A. O'NEAL, ESQ.

MARK A. LIGHTNER, ESQ.

MUNGER, TOLLES & OLSON LLP

Attorneys for Berkshire Hathaway

355 South Grand Avenue

35th Floor

Los Angeles, CA 90071

BY: THOMAS B. WALPER, ESQ.

LAW OFFICES OF RICHARD SAX

Attorneys for Creditor, Julio Solano

448 Sebastopol Avenue

Santa Rosa, CA 95401

BY: RICHARD SAX, ESQ. (TELEPHONICALLY)

BRADLEY, ARANT, BOULT & CUMMINGS, LLP

Attorneys for Defendant Judy Faber

One Federal Place

1819 Fifth Avenue North

Birmingham, AL 35203

BY: GLENN E. GLOVER, ESQ. (TELEPHONICALLY)

JAMES P. WATKINS, ESQ. (TELEPHONICALLY)

LAW OFFICES OF LA LEY CON JOHN H. RUIZ, PA.

Attorneys for Marcia Navarro

5040 N.W. 7th Street

Suite 750

Miami, FL 33126

BY: JOHN H. RUIZ, ESQ. (TELEPHONICALLY)

R. APONTE & ASSOCIATES, PLLC

Attorneys for Marcia Navarro

BY: ROSY APONTE, ESQ. (TELEPHONICALLY)

UNITED STATES DEPARTMENT OF JUSTICE

Office of the United States Trustee

33 Whitehall Street

21st Floor

New York, NY 10004

BY: BRIAN S. MASUMOTO, ESQ.

ALSO PRESENT:

SHARON JENKINS, In Pro Per/Pro Se

P R O C E E D I N G S

THE COURT: Please be seated. All right. We're here in Residential Capital, number 12-12020.

Mr. Marinuzzi?

MR. MARINUZZI: Good morning, Your Honor. Lorenzo Marinuzzi, Morrison & Foerster, on behalf of the debtors.

We have, Your Honor, a fairly lengthy agenda this morning, but the first matter that's up for this morning is found on page 13 of the agenda. It's a status conference with respect to the motion by AFI and Ally Bank to enforce the automatic stay with respect to an action we refer to as the Rothstein action.

The motion was filed on December 21st by AFI. They filed the motion after consulting with the debtors about the nature of the complaint that was asserted, that was filed originally against GMAC and then amended to drop GMAC as a defendant. The committee filed papers with respect to the motion, hasn't taken an official position on it yet. The debtors have actually joined in AFI's motion. And so far the parties have not scheduled a hearing date on this.

As we continue to negotiate, we think the appropriate way to deal with the issue, because the issue that's central to this is whether the claims asserted by the plaintiffs in the action against Ally Bank and AFI are really estate causes of action that belong to the estate, or whether they're

independent parties, and so we're trying to figure out the right approach to deal with the legal and factual issues with the backdrop of the PSA and the contemplated plan.

THE COURT: Where's the case pending?

MR. MARINUZZI: The case is pending in the Southern District of New York.

THE COURT: Before whom?

MR. MARINUZZI: Before Judge Nathan. We've spoken with counsel for AFI, with the committee, and with the plaintiffs. I think all of us have various positions on this that we'd like to share with the Court. I'll defer to Mr. Schrock, who's sitting behind me, who actually filed a motion on behalf of AFI.

MR. SCHROCK: Good morning, Your Honor.

THE COURT: Good morning.

MR. SCHROCK: Ray Schrock, Kirkland & Ellis, on behalf of AFI and Ally Bank.

Your Honor, we did file this motion because we feel it raises very fundamental issues to the case and the law of the case that are subject to the exclusive jurisdiction of this court, that is, specifically what is an estate claim. We saw various parties, including the Rothstein parties, that we believe were framing up estate claims under a different name. We didn't want those rights being affected for a lot of reasons.

Since that time, we've worked with the debtors and the committee. And I think, Your Honor, in light of the PSA, the debtors and the committee are effectively going to take over prosecution of the motion. And the committee asked me, about a week and a half ago, could we put this off for some time and give them time to put some further briefing into it and also look at the issues. And I think that really these are confirmation issues, at the end of the day.

THE COURT: What's the status of the Rothstein action?

MR. SCHROCK: It is stayed, Your Honor, pending -- and there's no date certain for it to be reinstated, pending this Court's determination as to whether or not the causes of action are estate claims.

THE COURT: Have you had a conference before Judge Nathan?

MR. SCHROCK: Your Honor, I believe that -- I've not appeared in the case, but I believe so.

THE COURT: Okay.

MR. SCHROCK: So Your Honor, I'm happy to answer any questions, but we believe that these matters are properly heard in conjunction with the confirmation of a plan.

THE COURT: All right. Anybody else want to be heard with respect to this Rothstein action?

MR. MANNAL: Your Honor, Doug Mannal, on behalf of the creditors' committee.

Your Honor, in light of the plan support agreement and the proposed plan that will be filed with the disclosure statement on July 3rd, we thought this was better suited to be heard in connection with confirmation of the plan. We were somewhat confused by the motion when it was made. We think it really is a core issue to the case, but again, better heard as part of the confirmation hearing. That's why we had asked for further adjournment. And in light of the filing of the PSA and the global settlement, it's our intent to likely put in additional briefing on this motion.

THE COURT: Thank you.

Counsel, come on up.

MR. STRAUSS: Good morning, Your Honor. Mark Strauss from Kirby McInerney. We're counsel to the plaintiffs in the Rothstein action, which is a punitive class action in the Southern District of New York before Judge Nathan.

Judge, just to make a couple of corrections for the record. The case is not stayed. The case is proceeding against other defendants. There are defendants affiliated with an insurance company called Balboa that ac --

THE COURT: Is this a force-placed insurance case?

MR. STRAUSS: Yes, it is. Those claims are proceeding. There's a fully-briefed motion to dismiss before Judge Nathan. The claims as to Ally Bank and Ally Financial are not stayed either. Those parties' time to respond to the

complaint is adjourned until resolution of these bankruptcy issues that were raised in the motion.

THE COURT: Is it exclusive a force-placed insurance case?

MR. STRAUSS: Yes, it is exclu -- exactly. There are no issues as to foreclosure or anything else.

What we are seeking is a hearing and a ruling on a very discrete issue, legal issue that was raised by the initial papers, and other counsel adverted to it, and that is an issue of what claims are estate claims.

We are focused on the claims that we have against Ally Bank. We do not believe those claims --

THE COURT: Ally Bank, as opposed to AFI?

MR. STRAUSS: Correct. We believe that the Ally Bank claims that we've asserted are not estate claims by any stretch. Those claims are not alter ego or veil piercing claims. They are based upon breach of contract and respondeat superior.

THE COURT: Tell me who's the putative plaintiffs. It's a class action, right?

MR. STRAUSS: Yes, the putative plaintiffs are borrowers. They're servicing -- they're borrowers whose mortgage loans were serviced by GMAC Mortgage, LLC.

The claims as to Ally Bank have no allegations of domination or control.

THE COURT: What are the claims against Ally Bank based on?

MR. STRAUSS: The claims against Ally Bank are based upon breach of contract and respondeat superior. As for the breach of contract claims --

THE COURT: Was Ally Bank a mortgagee on specific loans? Is that --

MR. STRAUSS: Yes. Ally Bank owns the loans and/or owns the servicing rights of the loans, and we allege that they stand in the shoes of the original lenders and are obligated on the mortgage loan contracts and are obligated for their breach.

THE COURT: Was GMAC a subservicer for Ally Bank or --

MR. STRAUSS: Yes.

THE COURT: -- servicer for Ally Bank?

MR. STRAUSS: Yes. And we also allege that Ally Bank appointed GMAC Mortgage as its agent, as its servicer, and that it's responsible, under respondeat superior, under ordinary agency principles, for the torts committed by GMAC Mortgage.

In addition, there was a subservicer by the name of Newport Management Company, which doesn't have anything to do with the debtors. And we allege that the subservicer also committed torts against --

THE COURT: Subservicer for whom?

MR. STRAUSS: For --

THE COURT: Under contract with whom?

MR. STRAUSS: They contracted with GMAC Mortgage on the consent of Ally Bank, so they're a subagent. And the principal, Ally Bank, we allege, is responsible for the torts of the subagent as well, under this respondeat superior theory.

THE COURT: I didn't look at the docket sheet in the district court, so I'm not familiar with what's transpired. When is -- you say Balboa's made a motion to dismiss. When is that going to be heard?

MR. STRAUSS: There hasn't been a date set.

THE COURT: Is it fully briefed?

MR. STRAUSS: Fully briefed, yes.

So the parties that have moved, in their papers, they try to conflate the claims that we've pled against Ally Financial and Ally Bank. But there really are distinct claims and distinct pleadings as to each one, and the claims against Ally Bank are not derivative, by any stretch.

So this is a threshold issue for us going into confirmation. If the Court rules that the claims are derivative, then we have nothing more to do. If the Court rules that the claims belong to us, then we have to consider the third-party releases and whether to object. And I would submit that a hearing and a ruling on this discrete narrow issue would help all the parties, would narrow the issues for all the parties going forward.

THE COURT: Is the motion before me fully briefed?

MR. STRAUSS: From our point of you, yes. And we don't think there's any discovery required for this issue. This is simply a matter of what's pled in the complaint and what the law is.

THE COURT: All right. Let me hear -- anybody else want to be heard on this?

MR. STRAUSS: Thank you, Your Honor.

THE COURT: Thank you.

MR. MANNAL: Your Honor, Doug Mannal, on behalf of the creditors' committee again.

Your Honor, we did not address in our papers the issue as to whether or not these are direct claims. To the extent we're going to have a hearing on whether or not the claims against Ally Bank are direct claims under an agency theory, we'd ask to be able to put in additional briefing on that.

THE COURT: Here's what I'd like done. The parties who want to be heard on this motion, I want them to confer, to agree on a schedule that -- because what I'm hearing from counsel today, this issue of whether they're direct or derivative claims is perhaps not ultimately determinative of the outcome, but may well be. Certainly, even if they're direct claims, meaning that they are claims that don't belong to the estate but belong to the plaintiffs, the Court has authority to stay prosecution of those claims against the

nondebtor parent in connection with other pending actions around the country, including some in the Southern District of New York.

The Court had previously entered a preliminary injunction. Most of those were resolved with consent orders. One required a decision by the Court. So the Court would have authority to stay the actions. That doesn't mean that that's the most appropriate result at this point. But obviously, if the claims are derivative claims, they do belong to the estate and they couldn't be prosecuted by the plaintiffs. And the decision of whether they're derivative and therefore property of the estate, is clearly a matter for the bankruptcy court to decide.

So what I'd like is for parties to confer, agree on a schedule. I'll permit one more round of briefs that just address that. And I don't remember what omnibus dates we have in July or August, but work with Mr. Strauss about coming up with an agreed schedule that would have this motion heard in July or August.

It may well be that the decision of the Court would be, whether they're direct or derivative, is to put a stay in place with respect to Ally Financial. I've done that -- that's happened before, as I've referenced. And then it may well be a confirmation issue. If the plaintiffs object to confirmation on the grounds of the scope of the third-party nondebtor

release, I mean, that's -- we'll have to deal with that. But I think, in the first instance, let's get the rest of the briefing done and get the matter on the calendar for a ResCap omnibus day.

Okay, Mr. Marinuzzi?

MR. MARINUZZI: We'll do that, Your Honor.

THE COURT: All right. Mr. Strauss, you'll work with other counsel in trying to work out a schedule on that?

MR. STRAUSS: Yes, Your Honor.

THE COURT: One other question, Mr. Strauss. I don't know what Judge Nathan's practice is in terms of scheduling motions, so I don't know whether you expect to hear from her that a date's going to be set or -- do you know?

MR. STRAUSS: I don't know, Judge.

THE COURT: Okay. So certainly -- are there any conferences -- case management conferences scheduled with Judge Nathan at this point?

MR. STRAUSS: No.

THE COURT: All right. Mr. Schrock, is Judge Nathan -- did you file something in the district court referencing what you believe the issues are as to whether these are derivative claims? You know, I think Judge Nathan has

had -- she's had a couple of appeals from decisions of mine, and I'm not sure whether they've been in ResCap. There have been so many appeals that are just spread all over the district court; I just don't know whether she's had one or not.

MR. SCHROCK: Yes, Your Honor, there is a stipulation, I believe, entered in -- I'll have to take a look at the docket sheet, but I believe it was last -- in March, letting the court know that this issue was --

THE COURT: Okay.

MR. SCHROCK: -- before the court.

THE COURT: Okay. If you would send a copy of that. That's filed in the district court, I take it?

MR. SCHROCK: Yes, Your Honor.

THE COURT: If you would send a copy to me, copy to other counsel on the case in the district court, so they see what you've sent me, okay? All right. Thank you very much.

MR. SCHROCK: Thank you.

MR. MARINUZZI: Your Honor, the next item on the agenda is the status conference with respect to debtors' cash collateral motion. I'll cede the podium to Todd Goren.

THE COURT: Thank you.

MR. GOREN: Thank you, Your Honor. Todd Goren, Morrison & Foerster on behalf of the debtors.

We had hoped to have this resolved by the time we got here today. I think we are close. We sent the junior secured

bonds a stipulation last week that would have resolved this. We're still waiting for some comments back to that. In the meantime, I think what we'd like to do at this point is just adjourn the hearing to the 26th and we'll work -- we're working with the junior secured bonds either to finalize the stipulation resolving this, or a stipulation extending use of cash collateral through that date. But in the meantime, all parties' rights are reserved on all issues.

THE COURT: All right. Anybody want to be heard for the junior secured notes?

Mr. Uzzi, come on up.

MR. UZZI: For the record, Gerard Uzzi of Milbank, Tweed, Hadley & McCloy, for the ad hoc committee of junior secured notes.

Just simply to confirm what Mr. Goren said, Your Honor, we agree that the parties' rights are preserved, pending coming back before your court.

THE COURT: Okay. The only thing I would say to both of you is that I'm hopeful you'll work this out by stipulation. I don't want to find out on June 25th that I'm having a contested hearing on June 26th because use of cash collateral is about to expire. So I don't want -- okay, no bad surprise -- if there's a bad surprise, make sure you tell me well in advance. Okay?

MR. UZZI: That's fine, Your Honor. I mean, I think

we can say the anticipation actually is that we're going to agree -- have an agreed termination --

THE COURT: Okay.

MR. UZZI: -- of the use of cash collateral. So I think we'll get there, Your Honor.

THE COURT: All right. Thanks very much.

All right. Thanks, Mr. Goren.

Mr. Marinuzzi?

MR. MARINUZZI: Your Honor, you just mentioned bad surprises; I think we have a good surprise here. Under the heading "uncontested motions" is the debtors' motion to further extend their exclusive plan filing and solicitation periods. The request is supported by the UCC.

Your Honor entered a bridge order last week that continued exclusivity through today. The motion seeks a further continuation for August 21st for filing and October 21st for solicitation. In support of the request, the debtors submitted the declaration of Lewis Kruger, who's seated behind me, the CRO. We've negotiated a PSA; it's up for hearing on the 26th.

I think the debtors have made tremendous progress working side by side with the committee and with the creditors in the case to push the case forward, and unless the Court has any questions, we'd ask that the extension be granted.

THE COURT: Anybody else wish to be heard?

Mr. Mannal?

MR. MANNAL: Your Honor, Doug Mannal, Kramer Levin, on behalf of the creditors' committee.

Your Honor, I echo Mr. Marinuzzi's comments. I believe we have made substantial progress towards a largely consensual Chapter 11 plan. The limited relief on the extension of exclusivity is to allow the parties time to file the plan support agreement -- or approve the plan support agreement and file the plan and disclosure statement on the 3rd of July, and have a hearing on the disclosure statement. And that's what's intended to be accomplished in this next period of exclusivity extension.

THE COURT: Thank you. Anybody else wish to be heard?

All right. The motion is granted.

MR. MARINUZZI: Thank you, Your Honor. That brings us to the motion of the City of Evansdale, Iowa for entry of an order modifying the automatic stay to allow condemnation. Samantha Martin, seated behind me, is in the process of negotiating a stipulation that hopefully resolves it, Your Honor. I don't know if Your Honor has any questions regarding the motion, but I'm happy to have Samantha Martin address them.

THE COURT: I don't. So what -- are you going to adjourn this till --

MR. MARINUZZI: Till July 10th.

THE COURT: -- July 10th.

MR. MARINUZZI: I'm sorry; June 26th --

THE COURT: June 26th.

MR. MARINUZZI: -- right.

THE COURT: That's fine.

MR. MARINUZZI: Okay. And Your Honor, that brings us to contested matters on page 18.

THE COURT: Okay.

MR. MARINUZZI: Actually, there's an interim order. Okay.

THE COURT: I'm sorry?

MR. MARINUZZI: Okay. Your Honor, Erica Richards tells me that I missed the application to retain FTI, which is at the top of page 18, and I apologize for that. I'm going to cede the podium to Erica who will present the application.

THE COURT: Thank you.

MS. RICHARDS: Good morning, Your Honor.

THE COURT: Good morning.

MS. RICHARDS: Erica Richards of Morrison & Foerster, appearing on behalf of the debtors.

As my colleague, Mr. Lorenzo (sic), indicated --

THE COURT: Mr. Marinuzzi.

MS. RICHARDS: Mr. Marinuzzi. Thank you, Your Honor.

THE COURT: Can I introduce the two of you?

MS. RICHARDS: We're on a first-name basis.

The next matter is the debtors' application seeking

approval of a fourth addendum to the retention of FTI Consulting, INc., the debtors' financial advisor. That application essentially seeks approval of certain litigation support services that were excluded from FTI's original application. I think the notable point is that it seeks nunc pro tunc relief to March 1st for services FTI provided in connection with the debtors' subordination complaint that was filed in February. Fees for those services run approximately 150,000 dollars to date.

After filing the application, the debtors and FTI consulted with counsel to the committee and agreed to modify the language in the order to clarify that the services being sought now relate solely to the subordination complaint. And to the extent the debtors and FTI are seeking --

THE COURT: I assume the work is stopped for now.

MS. RICHARDS: Yes, correct. That work has already been done, but it was done. And to the extent FTI is asked to perform other of these litigation support services, they'll file a declaration on seven days' notice with the Court. It will hopefully eliminate the need for us to keep coming back seeking additional applications.

THE COURT: All right. Anybody else wish to be heard with respect to this application to expand the scope of the FTI engagement?

All right. It's granted.

MS. RICHARDS: Thank you, Your Honor.

THE COURT: Thank you.

MR. MARINUZZI: Your Honor, this brings us to the three foreclosure-review related applications to retain and pay PWC, Hudson Cook, and Pepper Hamilton. We submitted to chambers a further interim order extending the final hearing date to July 10th. We're still negotiating with the Fed. We expect to come back to the Court soon. So we'd ask that the orders be continued on an interim basis through July 10th.

THE COURT: Anybody else wish to be heard with respect to -- so just so it's clear, it's PWC --

MR. MARINUZZI: Correct, it's PWC --

THE COURT: Pepper Hamilton.

MR. MARINUZZI: -- and Hudson Cook.

THE COURT: Hudson Cook.

MR. MARINUZZI: Correct.

THE COURT: Anybody wish to be heard with respect to those applications?

All right. Granted. I hope to hear from you soon, Mr. Marinuzzi.

MR. MARINUZZI: I hope so, Your Honor. And that takes us, Your Honor, to page 24 of the agenda, and the debtors' motion to pay down certain secured claims. I'll cede the podium to Todd Goren again.

THE COURT: Okay.

MR. GOREN: Thank you, Your Honor. Todd Goren, Morrison & Foerster on behalf of the debtors.

Before you is the amended motion of the debtors seeking authority to pay down approximately 1.1 billion dollars to Ally Financial, subject to a reservation of rights, in the event that the settlement embodied in the plan support agreement and a plan is not ultimately approved, and to pay down 800 million of junior secured bond debt.

Paydown saves the estate approximately three million dollars a month in interest that we're currently paying to AFI. And if it turns out that the junior secured bonds are, in fact, oversecured and accruing interest, there would be another seven million dollars in savings per month as a result of the 800 million dollar paydown.

The motion has the support of the creditors' committee, each of its members, plus the other parties to the plan support agreement, including AFI. And importantly, AFI did compromise on certain issues in reaching agreement here, giving up what it believed were certain rights it had under the intercreditor agreement and allowing the junior secured bonds to be indefeasibly paid on this 800 million dollars.

Absent that concession by AFI, we probably would have had to have been before you, something akin to what we were looking for in the original motion, having a fight about what the rights of the parties were under the intercreditor

agreement. Paying AFI saves that fight, and because we have the reservation of rights, we believe all parties' rights are reserved in the event the settlement is not ultimately approved.

THE COURT: So when this was first raised, you were proposing to escrow AFI's money, and now you've changed it to paying it, which really goes to the objection from -- the limited objection from Berkshire Hathaway. So what's the -- why should the funds be paid as opposed to escrowed?

MR. GOREN: Well, first of all, actually paying the money saves us the interest expense. If the funds were escrowed, we probably would have con -- I mean, at a minimum, we would had to have continued to pay money into the escrow, continue to preserve --

THE COURT: How much would the interest, between now and June 26th, be with respect to the AFI amount, as opposed to -- put the JSNs aside.

MR. GOREN: AFI would be about a million and a half dollars between now and June 26th. I mean, as you noted, the only objector to the motion is Berkshire Hathaway. They argue it's premature. It wasn't clear to me from their objection whether they were simply asking that it be deferred till the 26th or whether they were asking that it be deferred until confirmation. I think I read it more as the latter. That would be a fifteen-million-dollar cost to the estate just in

AFI's --

THE COURT: Just AFI --

MR. GOREN: -- AFI's interest. But even deferring the two weeks costs the estate a million and a half dollars.

And I think it's important to note that under the proposed plan, Berkshire Hathaway, who's a holder of junior secured bonds, is being paid in full in cash on all of its pre-petition claims, which means all interest that gets paid to AFI ultimately comes out of the money that's available for unsecured creditors.

THE COURT: They probably would like that money, I suspect. They just, you know -- but I'll hear about that.

MR. GOREN: I'm sure they would. So because this ultimately, we believe, is going to be a cost that's borne by unsecured creditors, we think --

THE COURT: Yeah.

MR. GOREN: -- you know, we should really defer to the --

THE COURT: So what's the standard that the court's supposed to apply in determining whether to approve the motion?

MR. GOREN: I believe it's a business judgment standard, Your Honor, and I believe we've more than adequately met that. We submitted the declaration of Mark Puntas in support of the motion, which details the business judgment reasons for making the motion.

THE COURT: So let me ask you this. If the PSA is not approved or the plan is not confirmed, what would -- and an assertion that AFI's loan should be subordinated or somehow otherwise recharacterized or some other form of relief, what would the debtor have to do to recover the payment from AFI?

MR. GOREN: I mean, obviously -- I'm not sure I follow the question.

THE COURT: Well, would you have to file an adversary complaint to recover the billion plus that you're about to pay to AFI, as opposed to you have an agreement from AFI that in the event that either the plan support agreement is not approved or the case is not confirmed, that they will deposit the funds in escrow pending further order of the Court?

I mean, I just -- my question is what would -- if those things happened, because I don't have -- the PSA is on for approval in a couple of weeks, so that's why I asked how much would it cost the debtors on interest between now and then. It's obviously an important step, not the final step, but if the PSA is approved, it's an important step. Okay.

MR. GOREN: The --

THE COURT: I'd certainly have a higher comfort level about authorizing the payment to AFI if the PSA is approved, but I have the motion today, not in two weeks.

MR. GOREN: And the parties thought about that, they gave it a lot of thought, about whether we wanted to go forward

today or on the 26th. Ultimately, the parties -- you know, both the debtors and the committee concluded --

THE COURT: Well --

MR. GOREN: -- we were --

THE COURT: -- you say that, but the parties concluded, on very short notice, to amend the motion that was before the Court. It's not like it was a well thought out plan in advance, you filed the motion and it was clear to the Court from the start what the relief that was being sought, namely, pay the JSNs now escrow funds to AFI. So I mean, I think -- I'll hear the objector on this, but I don't think they're prejudiced by the fact that there was very short notice of the amended motion. But it's not as if this was a clearly thought out in advance -- it was kind of at the last minute you amended.

MR. GOREN: Well, I mean, it took some time to finalize the amendments, but from the time we signed the PSA, the contemplation was this was going to be the path forward. And we did give thought as to whether it should go forward before the PSA is approved, recognizing that obviously there's some risk in the PSA being approved, but ultimately that whatever risk exists needs to be counterbalanced against actual cash that has to go out the door. And the parties assessed that risk --

THE COURT: So let me come back to my question. Let's

assume the PSA is not approved and the debtor or the committee decided that Ally shouldn't have that money, what would have to occur? They'd have to bring an adversary proceeding against Ally to cause the disgorgement of the payment or the deposit in escrow of the payment?

MR. GOREN: I mean, if the PSA falls apart or the plan falls apart at any point, the committee, or whoever is authorized to bring those claims, will bring whatever claims exist against Ally; this court or some appellate court will rule about what Ally owes or doesn't owe. The order specifically makes clear that any equitable subordination and recharacterization arguments are not prejudiced by the fact we've paid down, so if the Court ultimately --

THE COURT: It's just who has the money in the meantime.

MR. GOREN: Yeah, so Ally's holding the money in the meantime. We're not paying interest on it in the meantime, if it turns out we're wrong. And if it turns out we're right, that there is some claims Ally owes us for, they'll pay us whatever is owed as determined by a court. So --

THE COURT: And in the debtor exercising its business judgment, did it consider the credit risk?

MR. GOREN: It did, Your Honor, and as we set forth in our reply, I mean, we -- you know, obviously, we're very familiar with Ally and its credit position. We don't believe

there's any real credit risk of Ally. They've got over 100 million dollars in assets, approximately twenty billion dollars in liquidity of -- you know, we're giving them another billion dollars as a result of the paydown. We don't believe there's any real credit risk. And any hypothetical risk that may exist, we think is counterbalanced by real cash going out the door.

THE COURT: All right. Let me hear from anyone else in support of the motion, before I hear the objection.

MR. ZIDE: Stephen Zide from Kramer Levin, on behalf of the committee.

Your Honor, we also took a very hard look at this, and we ultimately came to the position that we support the full paydown of AFI prior to the PSA. I think you've hit the nail on the head; this is just a view of cost/benefits.

THE COURT: Hang on. Whoever's on the phone, you need to put your phone on mute. We're picking up background noise. So if you don't want to be cut off from the phone, please mute your phone.

Go ahead, Mr. Zide.

MR. ZIDE: There clearly is a credit risk; I don't know how real it is. The debtors -- you know, we've talked to the debtors about it. They're feeling very comfortable. We got very comfortable, ultimately, that the credit risk is not very high, that it's a very low credit risk. But as Todd said,

there are very strong tangible benefits to paying down AFI right now. It saves us three million dollars a month. In addition, it avoided a fight with AFI on the paydown of the JSNs. In addition, right now the PSA provides that we're not going to pay down the JSNs if we don't pay AFI. So it's not just a 1.5 million to AFI over the next two weeks, but it's also deferring the JSN paydown, which is approximately six million dollars a month savings, so it's another three million as well. And also we insisted on a reservation of rights in the order which preserved all rights of the committee or the debtors to bring causes of action against AFI in the court to implement an appropriate remedy. And the way we view this is that there is no automatic trigger if the PSA is terminated or the plan doesn't go effective. They've been paid down. We're not paying them post-petition interest, but we could sue them and nothing in that lawsuit is prejudiced by this payment. And we support the motion.

THE COURT: Thank you. Anyone else wish to speak in support?

MR. UZZI: Very briefly, Your Honor. Gerard Uzzi, again, of Milbank Tweed, Hadley & McCloy, for the ad hoc committee.

Your Honor, I just want to get a couple of things on the record regarding our position. The debtors indicated that we participated in negotiating the order that was filed with

the amended motion, and we did, Your Honor, and as a consequence, we support the motion.

The two provisions that were important to us that's different from the original motion and the order is that the provision -- and it's reflected in the last proviso of paragraph 3 of the order -- that the payments in order to stop the accrual of interest on the junior secured notes, are paid in indefeasibly, and the debtors have agreed.

The other thing that was important to us, Your Honor, and it's reflected in paragraph 8 of the order, is that our rights under the cash collateral order continue. Why that's important, Your Honor, is that the debtors are paying down the LOC -- the revolver is what's senior to us. The LOC is side by side. We have some disputed liens on that; that's not the issue that I'm concerned about. The issue is that the LOC collateral is the collateral that our adequate protection liens attach to. So that's mostly cash today; our adequate protection liens attach to it, so that still is our cash collateral. We want to make sure that our rights with respect to the LOC cash collateral is preserved.

With those changes in the order, we've decided to support the motion. Very briefly, Your Honor, Berkshire is an important constituent in this case. We've coordinated with them on many things, and we will continue to coordinate with them. On this sole issue, Your Honor, we have advocated in the

past, and I think you're going to hear from us in the future as well, de-risking the process. On balance, we think this de-risks the process, and therefore, we're comfortable with the order.

THE COURT: So address the issue of the credit risk of paying the money to AFI, because obviously if the money is paid to AFI, there's that much less money available to satisfy you or your constituency or any other constituency in the case.

MR. UZZI: Your Honor, look, it's a very fair point. And again, we had to balance a lot of things coming in here. I'm probably more concerned about the credit risk of ResCap than I am of Ally right now, and particularly with respect to some of the positions they've taken as to what they can do with cash. So yes, I agree there's a credit risk of Ally.

THE COURT: Well, that isn't a concern about credit risk. They just disagree with you about what they can do with the cash that's available.

MR. UZZI: Well, if they spend the cash, it's gone -- Ally spends the cash --

THE COURT: I don't want to get off on that.

MR. UZZI: Yeah.

THE COURT: I'm sorry. I just --

MR. UZZI: So look, we had to make a choice, Your Honor. It wasn't an easy choice for us, but on balance, again, somewhat thematically, in de-risking the overall process, we've

advocated it for --

THE COURT: Just so that --

MR. UZZI: -- the past --

THE COURT: Why don't you -- I think I understand what you mean, but just so the record's clear, when you talk about de-risking the process, explain what you mean.

MR. UZZI: We have a dispute over our post-petition interests, Your Honor. One way to minimize the dispute, and so therefore to minimize the risk, is to stop the accrual of post-petition interest. One way to do that is just to pay our principal. So we think that -- you know, the thing that we've been concerned of for a -- well, it's really since the beginning of the case, is that on day one we had no dispute because there was no accrued post-petition interest. Every day that goes by, the dispute increases and makes it harder to litigate and makes it harder to settle. So based upon that, and that issue only, Your Honor, is what's driving our determination on this motion.

THE COURT: Thank you.

MR. UZZI: Thanks.

THE COURT: All right. Anybody else want to speak in support?

All right. Mr. Walper, do you want to be heard?

MR. WALPER: Thank you, Your Honor. Thomas Walper, Munger, Tolles & Olson, on behalf of Berkshire Hathaway.

Your Honor, we passed in the hall and you asked if I would come in for a status conference yesterday, and the answer is I probably would not, but I would come in for this. Berkshire Hathaway takes this payment very, very seriously. I think that the Court --

THE COURT: I can't imagine that you don't want your share of the 800 million dollars.

MR. WALPER: Well, I appreciate the point. Berkshire Hathaway has a lot of investments in --

THE COURT: I guess they don't care about their --

MR. WALPER: That --

THE COURT: You know, you own about what percentage of the JSN?

MR. WALPER: Over forty percent, Your Honor.

THE COURT: Yeah. So somewhere like 350 million dollars of this money would come to Berkshire Hathaway and --

MR. WALPER: That is the case --

THE COURT: -- they're indifferent to it right now.

MR. WALPER: That is the case, Your Honor. And it's not on principal, because there's a lot more than 300-plus million dollars that Berkshire Hathaway expects to recover here.

Focusing in on what appears to be, sort of, the principal area of tension -- and by the way, Your Honor, what we would like is a continuance of this matter as to either both

or as to AFI --

THE COURT: Well, it isn't coming out of the JSN's pocket if this is continued for two weeks, for example or I don't -- first, let me ask you -- and I guess I had understood that you wanted it adjourned until the PSA hearing. Mr. Goren, I think, suggested -- wasn't sure whether it was through the PSA hearing or confirmation.

MR. WALPER: This is what I was trying to clarify, Your Honor.

THE COURT: Okay.

MR. WALPER: We would ask that the matter be adjourned, either both or as to AFI, for --

THE COURT: Well, the motion is to pay both; it's not to pay only you or, you know --

MR. WALPER: Right, and so I'm trying to avoid the conflict of that by saying them both, Your Honor -- till such time as there is a hearing with respect to the plan support agreement, but also, because the examiner's report will be disclosed after that hearing, a brief time after that, say a week or so, so we have had an opportunity, as well, to digest that report before coming back to Your Honor. That's -- surprise, surprise; we've been asking for that report for some time, and we totally appreciate, Your Honor, that it's been --

THE COURT: You may not appreciate it, but we're having a hearing on your motion on June 26th.

MR. WALPER: No, and I appreciate that it's been sealed, Your Honor, and it has had important effects on this case, and we acknowledge that.

THE COURT: You filed your motion before the PSA -- before an agreement on the PSA, am I right about that?

MR. WALPER: We filed the motion --

THE COURT: The motion to unseal the examiner report.

MR. WALPER: We filed it before we knew what it said, yeah.

THE COURT: Okay.

MR. WALPER: Yes, Your Honor. But, first clarifying what we're seeking with respect to the continuance as opposed to confirmation as Mr. Marinuzzi had referred to.

Let's look for a second on what I think and Berkshire thinks is one of the key issues here. And that is credit risk. Now, Ally has given us its 10Q in a file --

THE COURT: May I ask you this?

MR. WALPER: Um-hum.

THE COURT: Is that the focus of your concern is the credit risk if the money is paid to Ally new (sic)? That's what I read your papers, essentially, as saying.

MR. WALPER: Yeah. And I think that that is correct, Your Honor. And --

THE COURT: So let me ask you another question, then; excuse me. Is the standard in my considering this motion

whether the debtor has satisfied the business judgment test?

MR. WALPER: Well, if you'll allow me to say I'm not sure and then give an analogy.

THE COURT: Go ahead, sure.

MR. WALPER: Thank you. To me, something stands a bit Kafkaesque and that is if Alley has agreed to pay 2.1 billion dollars to the estate, why is before they pay their 2.1, we, the estate, needs to pay them 1.1? To me that 1.1 that this motion seeks to pay them is a bit like the debtors' assets. These are the debtors' assets -- the debtor should be investing its assets in high-, high-, high-grade credit.

THE COURT: Well, the debtor under, the U.S. Trustee guidelines, is very, very restricted in what it can do with its cash.

MR. WALPER: Exactly.

THE COURT: And the interest rate on the Ally debt overwhelms the amount of interest the debtor would receive in investing in qualified investments the money that it's holding in the estate. You agree with that, I assume?

MR. WALPER: Well, yeah, I do. And when you say swamp, I mean, it's a matter of --

THE COURT: It's coming out of their -- I'm pointing at the unsecured creditors committee council -- it's coming out of their hides, not yours.

MR. WALPER: Right, well, but they have alleged that

we are -- that the junior secured bonds are woefully undersecured. And if that is the case, then we are unsecured creditors, too, of course. But that being the case, this is a brief period of time. There is a delta with respect to the interest but it's not like the JSN delta; it's a far smaller delta. But if you read the 10Q on page 108, it refers to Ally as being a C credit for short-term, C credit, as it's being on a watch list. This is not a U.S. Trustee-approved investment, and this is very much like an investment --

THE COURT: But this isn't a loan that the debtor is making to Ally, at least -- unless --

MR. WALPER: It may be.

THE COURT: -- unless and until they have recorded subject-to-challenge perfected security interest. You agree with that, right?

MR. WALPER: I haven't read the examiner's report; I have not reviewed -- I don't know if there's any infirmity with respect to this.

THE COURT: I mean, you certainly have, I'm sure that you or your colleagues have examined the underlying documentation to make -- given the large stake that your client has -- to determine whether Ally on the face of it appears to have a perfected security interest for the amount of its claim.

MR. WALPER: Well, this Court has entered an order approving the use of cash collateral and the like which does

endorse those, that is correct.

THE COURT: Well, and -- but it was -- it may have bound the debtor as to the validity perfection of the lien. It didn't bind the committee. So the committee is still free to challenge validity perfection amount of the AFI lien but at least on -- I mean, the debtor reached its stipulation. I don't believe there as a challenge to it when that came on.

Let me come back to the question that I asked, and I don't think you've really answered my question.

MR. WALPER: Okay.

THE COURT: Okay? The only -- and I'll put it this way -- the only standard I know that I'm supposed to apply in determining whether to approve this motion is the business judgment standard. The issue to me is has the debtor appropriately exercised its business judgment in the relief that it's seeking? Namely, payment to the JSNs, for which over 300 million will come to your client; and the payment, subject to all the reservations of rights to AFI. So is the standard in your view different than the business judgment standard?

And if so, what is it and where is your authori -- because your -- mercifully, your limited objection was fairly short. I got the point; I understand your concerns.

MR. WALPER: Okay.

THE COURT: But you didn't cite any authority for what the standard is the Court's supposed to apply in deciding

whether to approve the pending motion.

MR. WALPER: Well, and that is correct. And there was really only two days' notice and the like. But, that's fine.

THE COURT: Well, but, come on. But -- are you telling me you didn't have a -- if -- I'm very sensitive to the notion of it was changed -- the form of the relief they were seeking was changed at the last minute. I mean, are you saying you haven't had enough time to consider the motion?

MR. WALPER: No, I'm not saying that, Your Honor,

THE COURT: Okay. I --

MR. WALPER: Absolutely not. And I'm not trying to deflect your question at all, Your Honor.

THE COURT: Okay.

MR. WALPER: It's a very --

THE COURT: Well --

MR. WALPER: -- it's an appropriate --

THE COURT: That's okay.

MR. WALPER: It's an appropriate question. But I have no authority or experience that would say that a decision such as this would be anything other than the debtors' business judgment. But that being the case, this is an important use of the debtors' assets. And it is -- what it's doing here is, yes, paying back a secured claim to a party who has allegedly dominated and controlled it, who against which it has significant fraudulent conveyance claims and other claims, and

to which party has already agreed to pay 2.1 billion dollars pursuant to a PSA to be approved back to ResCap. And that to me, I think, raises some issues perhaps with respect to business judgment, prudence or whatever.

THE COURT: Can I ask this? Do you wish to cross-examine any of the debtors' witnesses with respect to their decision to exercise their business judgment in this fashion? I mean, one of the things -- and I looked at the pay and I realize you all only had a short time to respond. You did, you filed your limited objection. If you tell me you think you're -- you want to cross-examine, we'll get a witness.

MR. WALPER: Well, Your Honor --

THE COURT: You didn't really raise -- I mean, I understand your concern. You raised the issue principally with respect to the credit risk they're paying this money back now. And the response said yeah, but we're paying a lot of interest which is coming out of the hide of the unsecured creditors in the meantime. And that may be your client, as well.

MR. WALPER: Right. And -- but I would submit there is sufficient evidence in the record. I'm not saying that cross-examine might not -- wouldn't be appropriate, but there is evidence in the record. And that is that counsel has not indicated that this is subject to disgorgement; it just says there's a reservation of rights. And as the court appropriately questioned, does this mean you'd have to file an

adversary proceeding to get back the money when they owe you money? And the answer was yes, I believe.

THE COURT: I never got a real answer, but that's --

MR. WALPER: I think the answer is yes and that is one of the concerns. One of the concerns is there may be significant regulatory hurdles for Ally to pay this money back. Maybe they have to get regulatory approval to pay it back even with Court order. They may appeal any ruling of this Court with respect to disgorgement. You could conceive of this costing millions and millions and millions of dollars. It would be worth that investment because it's 1.1 --

THE COURT: Let me just try -- I want to -- do you wish to cross-examine a witness or are we resting on the papers that I have in front of me?

MR. WALPER: If I could have a brief recess, I'd be delighted to cross-examine Mr. Puntus.

THE COURT: Who do you wish to examine? I mean, I'm just -- look, you filed your limited objection. It didn't seem to me that there really are disputed factual issues. You dispute the conclusion that the debtor reached, namely that this was an exercise of business judgment in seeking that relief. But that's why I want to know, are you requesting the opportunity to cross-examine a witness from the debtor on the issue? Which seems to me the only issue that would be pertinent to it is the exercise of business judgment.

MR. WALPER: I apologize for the pause, Your Honor. I do believe that there is sufficient record in light of the fact that what we're seeking, really, here is a brief continuance, so other factual developments can be understood.

THE COURT: That's not what you asked for. The factual development you asked -- you wanted the Court to at least wait until the PSA hearing and the examiner report --

MR. WALPER: that's correct.

THE COURT: -- being done. The examiner report is hearsay no matter what.

MR. WALPER: Okay.

THE COURT: The last I looked at --

MR. WALPER: I would agree, Your Honor, yes.

THE COURT: -- an issue like that, it would be hearsay. Important, no doubt, important. Do you wish to cross-examine a witness of the debtor on the exercise of business judgment in their motion to pay this money?

MR. WALPER: Yes, Your Honor.

THE COURT: Okay. We will -- let's finish this agenda. We'll see what time we finish and the debtor can call a witness and we'll do it right now.

MR. WALPER: Thank you very much.

THE COURT: Okay.

MR. WALPER: I appreciate it.

THE COURT: Anybody else wish to be heard with respect

to the pending motion?

Go ahead, Mr. Goren.

MR. GOREN: Your Honor, we have Mr. Puntus here. I only rise -- and he's available, happy to -- we'll speak with him. But I just rose now to just clarify one thing which is that there actually was no stipulations in the original cash collateral order as to AFI. We stipulated only to the junior --

THE COURT: All right. Thank you very much for clarifying that.

MR. GOREN: Just wanted to clarify.

THE COURT: Okay. Mr. Schrock?

MR. SCHROCK: Good morning, Your Honor; Ray Schrock of Kirkland & Ellis on behalf of AFI and Ally Bank.

Your Honor, I'm going to reserve -- may I reserve comments until after cross? But I would like to address some of the points that counsel raised at the podium.

THE COURT: Well, no, I want to hear from you now. I mean, you can speak again --

MR. SCHROCK: Okay.

THE COURT: -- after cross-examination.

MR. SCHROCK: Okay.

Your Honor, Berkshire Hathaway has raised an alleged issue: credit risk. They have not submitted any evidence in support of their objection. They want the estate and unsecured

creditors to take on a further cost when there's been a largely very-consensual Chapter 11 plan and global settlement reached. The debtors --

THE COURT: Not yet approved by the Court.

MR. SCHROCK: Not yet approved by the Court, Your Honor, but nevertheless, Your Honor, there is an intercreditor agreement that's in place with -- that governs Berkshire Hathaway's debt. Our insistence all along has been that the terms of that intercreditor must be honored. And we certainly very much insist on that.

THE COURT: Yeah, I'm not deciding the issue at the moment, but it certainly appears to me with respect to this motion that unless I heard a lot more argument, evidence and briefed authority, that I can't approve the repayment to the JSNs without the payment to AFI. Somebody would have to make a showing that hasn't been made to me so far so that if the JSNs want their money now, the cost of it is the repayment to AFI. At least on the present set of papers in front of me, that's the relief that's being sought; not pay just the JSNs, don't pay AFI. That doesn't mean that the Court should grant the motion. Just that's what I understand.

So, I mean, I don't know that you have to -- I understand your position. It's consistent with at least the relief that's being sought by the debtor at this time.

MR. SCHROCK: Okay, very good, Your Honor. We just

wanted to make sure that was clear.

THE COURT: Okay.

MR. SCHROCK: Also, Your Honor, we don't think there's any question, and we think the further evidence and cross of the witness will support that the debtor has satisfied business judgment standards. We do take serious issue with somebody saying that Ally is a credit risk. Ally has access to the capital markets; Ally has well ov -- in excess of a hundred billion dollars in assets; Ally has access to several -- in excess of twenty billion in liquidity; it has an access to capital markets as recently as just a couple months ago; it has access to capital markets during the case. Berkshire Hathaway has found it appropriate to invest in Ally through depositions.

So, Your Honor, we think it's a real cost-savings issue for the estate. Parties are trying to save money so that their -- we can start pushing money out of the estate, hopefully, in connection with the confirmed plan that's before the Court. But this type of relief, to pay off secured creditors, to de-risk the case, it's meaningful. This is real money, real recoveries.

THE COURT: I'm very mindful of that. It's --

MR. SCHROCK: Okay. That's all I have, Your Honor.

THE COURT: Thank you, Mr. Schrock.

Does anybody else wish to be heard?

All right, let's move on with the agenda and then

somebody from the debtor ought to be -- I don't know if you want to excuse yourself to go prepare your witness, go ahead and do that because my thought is we're going to move forward promptly with that. Okay?

MR. GOREN: We'll be ready, Your Honor.

THE COURT: Okay.

MS. RICHARDS: Your Honor, for the record again, Erica Richards of Morrison & Foerster appearing on behalf of the debtors.

That takes us, I think, to a much more straightforward matter for the Court's consideration. It begins on the top of page 25 of the agenda. That's the debtors' motion seeking to enforce the stay against Marcia Navarro and her counsel at docket number 3830.

THE COURT: Okay. Is anybody here for the Navarros?

MS. APONTE: Yes; Rosy Aponte on behalf of Navarro.

THE COURT: All right. May I -- just tell me your name again.

MS. APONTE: Rosy Aponte.

THE COURT: Okay. All right, Ms. Richards, go ahead and argue your motion and I'll give them a chance to respond.

MS. RICHARDS: Your Honor, I would also note that Glen Glover from Bradley Arant Boult Cummings who is GMAC Mortgages' co-counsel in the underlying state matter is also present telephonically.

Your Honor, we think this matter is a straightforward stay violation.

THE COURT: Well, I don't.

MS. RICHARDS: Okay.

THE COURT: So let me just ask you some questions, okay? First off, is GMAC seeking to vacate the Florida judgment? Doing anything to vacate the Florida judgment? I mean, somebody was asleep at the switch. Somebody shows up at a hearing after the bankruptcy's filing, doesn't tell the state court judge in Florida that there's been a bankruptcy and they go ahead and enter a judgment for attorneys' fees.

MS. RICHARDS: That's true, Your Honor. And by way of explanation, if you look at the record in the court pleadings, the foreclosure matter was dismissed in April 2011. The week after, Navarro's counsel filed the motion for attorneys' fees and did nothing with it for over a year. In the intervening period, GMAC Mortgage ceased using the counsel who'd been handling the underlying foreclosure matter. So the file was dormant. By the time the application was filed and they retained additional counsel, I agree, there was a gap --

THE COURT: Is the debtor doing anything in Florida state court to seek to vacate the judgment for attorneys' fees? It's 25,870 dollars.

MS. RICHARDS: They are, Your Honor. They filed --

THE COURT: And what's the status?

MS. RICHARDS: -- a motion to vacate. There is a hearing scheduled tomorrow before the state court. I understand --

THE COURT: The trial court that entered the judgment?

MS. RICHARDS: Correct. I think the Miami-Dade Circuit Court in Florida.

THE COURT: Okay.

MS. RICHARDS: I think GMAC Mortgage -- and Mr. Glover can correct me if I'm wrong -- GMAC Mortgage is seeking to vacate those fees. In addition, the Navarros have filed a motion for sanctions against GMAC Mortgage and their counsel on the grounds that the bankruptcy state was inapplicable and the notice was improperly filed. That's also scheduled for hearing tomorrow.

THE COURT: So look -- and I had this vague recollection and I asked one of my law clerks to look at it and it didn't -- I'll tell you what we found. In a prior matter in this case involving the Donaghys, D-O-N-A-G-H-Y, Michael and Stephanie Donaghy; on January 8th, 2013, I granted the Donaghys' motion for relief from the automatic stay and the order which is ECF docket number 2579 in paragraph 2, "To the extent applicable, the automatic stay of Bankruptcy Code Section 362 is limited for the limited purpose of permitting the Donaghys to pursue in the New Jersey Bankruptcy Court sanctions against GMAC Mortgage for conduct occurring on or

after the petition date of May 14th, 2012 by or on behalf of GMAC Mortgage in connection with the Donaghys' loan or their pending Chapter 13 bankruptcy case."

So the gist of that was, I think it was Judge Wizmur in the Bankruptcy Court -- there was a real question about the conduct of GMAC in connection with the Donaghys' bankruptcy case. It's a little different than this but somebody's asleep at the switch. They don't tell the Court in Florida that there's a bankruptcy filed. The Navarros, at least, claim they didn't have notice of it, either, at the time. Whether they did or not, I don't know, okay. The questions that I have are, is it implicit in the supplemental servicing order that if a debtor is unsuccessful in a state foreclosure action, that the state court may order payment of fees if state law so provides?

So the thing about the Donaghy case -- that I have to go back to look at a transcript but I remember raising this subject during the argument -- was, fine, you got a supplemental servicing order, it allows for you to go forward with foreclosure proceedings. And then when you do something that leads a court not to enter a damage award because there's a wrongful foreclosure, but because there's something you did in the foreclosure proceeding that leads a court to say wither the prevailing party under state law recovers attorneys' fees or they're entitled to sanctions against you, for you to come and tell me that no, Judge, the automatic stay applies, the

Donaghys can incur 25,000 dollars in legal fees for wrongful -- and I'm not saying this is -- hypothetically -- that for wrongful foreclosure, and the state court is powerless -- Judge, you said they could go ahead with the foreclosure, but the state court is powerless to enforce sanctions, attorneys' fees. That's what's bothering me, okay?

Look, the court entered a judgment after the automatic stay. It is not crystal clear from the supplemental servicing order -- I don't know whether -- was the supplemental servicing order entered on the date that the judgment for attorneys' fees was entered?

MS. RICHARDS: I think --

MS. APONTE: Yes.

MS. RICHARDS: The final supplemental servicing order had been entered, I think, as of that date.

THE COURT: But it's not, I have to tell you, it's not -- it's certainly not explicit in there that the state court could award attorneys' fees. But just as the Donaghy matter came before me, I wasn't about to say that I'm going to decide this issue. The judge that has the case should decide the issue. So here's what I'm going to -- I'll hear from the Navarro's counsel -- the motion to vacate is being heard tomorrow?

MS. RICHARDS: I have to defer to Ms. Aponte --

MS. APONTE: No, Your Honor. The motion to enforce

the stay is being heard tomorrow. There is no motion to vacate judgment; it's a motion to enforce the stay.

THE COURT: Okay.

MR. GLOVER: Your Honor, this is Glenn Glover from Bradley Arant. It's actually -- there is not motion to enforce the stay that's been filed by GMAC. There was a motion for sanctions, motion to strike misleading, frivolous and disparaging filing a motion for sanctions that was filed by GMAC. It's my understanding that that is not on the docket tomorrow.

What is on the docket, as evidenced by a notice of hearing, is Ms. Navarro's amended motion for sanctions and to hold GMAC, an individual attorney from the Albertelli law firm and the law firm itself, in contempt for filing -- for simply filing an inapplicable notice of bankruptcy stay which was filed, I believe, in mid-March of 2013. And just to clarify that for the record. That's, according to my understanding, that's the only thing, the only motion, that is set for hearing tomorrow in the state court.

THE COURT: Mr. Glover, tell us --

MS. APONTE: Well, we also filed --

THE COURT: Stop --

MS. APONTE: -- Your Honor, a motion to stay the proceedings until you clarified this order. We didn't -- only filed that motion. We didn't realize that the hearing was

going to be held before this June 13 hearing. I had set that hearing before this one. SO it's also a motion to stay the proceedings until Your Honor clarifies the interim relief and whether the state does apply or not.

THE COURT: All right.

MR. GLOVER: Your Honor --

THE COURT: Mr. Glover, stop --

MR. GLOVER: -- Glenn Glover again. It's my understanding that that is -- I'm not sure this makes much of a difference -- but that is that they did not file a motion seeking that relief, but they actually submitted an ame -- a proposed order.

THE COURT: Mr. Glover.

MR. GLOVER: And that proposed order did state that they would --

THE COURT: This is why I don't like telephone hearings.

MR. GLOVER: -- I think it was in the last paragraph, paragraph 8 of that proposed order, that they would stand down against GMAC and GMAC only --

THE COURT: Okay, Mr. --

MR. GLOVER: -- with respect to any further proceedings until the Bankruptcy Court ruled.

THE COURT: All right. Mr. Glover, don't say another word until I tell you to. I've been trying to cut in and ask a

question. It's the problem with telephone hearings; I'm not faulting you for it, but I don't want to hear from either counsel on the phone until I finish what I have to say.

Okay, I'm going to ask Mr. Glover some questions and I'd like some answers.

Mr. Glover, has GMAC filed a motion in state court to vacate the judgment for attorneys' fees that was entered? Could you answer that for me?

MR. GLOVER: Your Honor, I can. If you give me one second, I've got the docket in front of me.

MS. RICHARDS: Your Honor, the motion to vacate was Exhibit --

MR. GLOVER: Yeah, I --

MS. RICHARDS: -- 4H to our motion; excuse me.

THE COURT: Ms. Martin, go ahead -- Ms. Richards; I'm sorry. I apologize.

MS. RICHARDS: No problem. The debtors did file a motion to vacate. It was attached as Exhibit 4H to our motion.

THE COURT: When is that going to be heard?

MS. RICHARDS: It has not been scheduled for a hearing yet.

THE COURT: Okay. What I would like to do -- let me -- does Navarro's counsel want to be heard? Go ahead.

MS. APONTE: Yes, Your Honor. It's our position that in your order filed July 13th, 2012, docket entry 774, the

final supplemental order, it states that there's an exception to the stay. And it clearly states that that exception is "except when a monetary claim of must be pled in order for an interested party to assert a claim to defend against or otherwise enjoin or preclude a foreclosure, each a mandatory monetary claim."

I also cited in my motion, Your Honor, case law that's right on point, which says that -- it's my position that in this case the debtor's trying to use the interim relief as a sword and a shield. They ask to be granted the leave to go ahead with these foreclosure actions, and that's part of the interim relief. And now, they're saying well, if we prosecute and we win, we're entitled to attorneys' fees. But if we lose for wrongful foreclosure or otherwise, then they're not entitled to fees. And they cannot have it both ways, Your Honor.

If It's either -- if they're going to pursue these prosec -- prosecuted prosecuting these foreclosure claims, then the prevailing party is entitled to attorneys' fees. Another issue is that under 57105 of Florida law these attorneys' fees, half of them are -- the attorneys are responsible for it. So the 25,000 and plus judgment, half of it would be the debtor, and the other half would be the attorneys that are responsible for paying that claim.

And the attorneys are not part of this bankruptcy, so

their portion is not -- should not be stayed in the proceedings even if Your Honor were to decide that it is. Again -- and there's -- in your order, you stated that any direct claims or counterclaims are part of the automatic stay. But this was not a direct claim or a counterclaim. It was a defense to a foreclosure, where GMAC is the one prosecuting the claim, which is they asked and received relief for. And now, they're saying well, you granted us to leave to prosecute the foreclosure claim. But if they prevail, then they shouldn't be entitled to fees. And I don't think that that -- that they should be able to use the interim relief order as a sword and a shield.

And there's case law on point. There's In re Ilazra (ph.), which was a case decided by the Ninth Circuit in 2005, which says "Even if a cause of action arose pre-petition, the discharged shield cannot be used as a sword that enables a debtor to undertake risk free litigation at others' expense." It says, "In light of the foregoing discussion, we reaffirm that claims for attorneys' fees and costs incurred pre or post-petition, the debtor voluntarily commences litigation or otherwise voluntarily returns to the fray of the stayed action, then they're exposing themselves to having to pay attorneys'" --

THE COURT: All right.

MS. APONTE: -- "fees if they lose."

THE COURT: All right, stop. I don't want to hear

anymore. All right. Here's the Court's determination.

MS. RICHARDS: Your Honor, I would like the opportunity to respond to your questions in a few --

THE COURT: Go ahead, quickly.

MS. RICHARDS: -- points. The purpose of the supplemental servicing order was to allow the debtors to continue servicing post-petition. The foreclosure action was dismissed more than a year before the debtors filed. Both Navarro and her counsel received notice of the bar date order and didn't file a proof of claim. We are not seeking to forbid people from getting attorneys' fees when the debtors wrongfully foreclose.

Here -- everything here happened pre-petition, and the Navarro's counselor are now seeking to get paid ahead of every similarly situated creditor.

THE COURT: Okay. I -- I don't want to hear anymore argument. The Court's determination is the following.

The supplemental servicing order lifts the automatic stay with respect to the debtors' prosecution of state foreclosure actions. And in doing so, the debtor also subjects itself to sanctions or attorneys' fees when available and awarded under applicable state law. Therefore, the automatic stay did not apply and bar or prevent the entry of the judgment ordering an award of attorneys' fees in the amount of 25,870 dollars. However, because the attorneys' fees were based on

pre-petition conduct, the judgment is a pre-petition general unsecured claim. It's unclear to me whether the debtor was given proper notice of the filing of the case when the debtors' lawyer showed up in the bankruptcy court -- showed up in the state court after judgment -- after the bankruptcy was filed, didn't even disclose that fact to the state court judge.

Whether the Navarros -- the stay clearly does apply to any effort by the Navarros to collect on the judgment. And if they wish to seek to collect on that judgment, they're going to have to file a motion for filing of a late claim. And while the standard is a difficult one for filing of a late claim, to me, frankly, the debtor invited this through its failure to disclose to the state court that there was a bankruptcy that was in place.

So for today, what I'm deciding is, is that the automatic stay does not apply, did not apply to the entry of the judgment for attorney's fees awarded in the state court foreclosure action in Florida. It certainly was -- it appears to have been awarded based on a prevailing party rule in Florida. The debtor was unsuccessful; hence the judgment for attorneys' fees was entered. But it was based on pre-petition conduct, and it would be a pre-petition claim. For now, what that judgment does is fix the amount of a potential claim. The Navarros' lawyer is going to have to file a motion for leave to file a late claim, which I will -- if you can't resolve this

matter, Ms. Richards, I will consider the motion when it comes.

So they can -- in -- put it this way, in my view, based on my ruling, there is no basis, as a result of the automatic stay, for the state court judgment to be vacated. If there are independent state court grounds for doing so, I leave that to the court in Florida. I thought I made this clear at the time of the Donaghy matter. You came into this case -- the debtor came into this case saying it wanted to conduct business as usual. And it wanted the ability to continue to bring state court foreclosure actions, and that was fine. And that's what the supplemental servicing order permits.

It doesn't permit borrowers to bring damages actions against the debtor. They'd have to do that through a proof of claim in this court. But when you bring a foreclosure action or continue a foreclosure action and the conduct would subject the debtor to sanctions and/or the award of attorneys' fees under applicable state law, that's the risk the debtor bears in conducting business as usual. That's going to be the Court's ruling.

MS. APONTE: Your Honor?

THE COURT: And an order will be entered denying the motion, which is at ECF 3830, for the reasons stated on the record.

All right. Let's move on, on the agenda.

MS. RICHARDS: Thank you, Your Honor.

THE COURT: Counsel on the phone on the matter, if you want to be excused, you can be, or you're welcome to stay on.

Mr. Newtown --

MS. APONTE: I'll be excused. Thank you, Your Honor.

THE COURT: Okay, thank you.

MR. NEWTON: Good morning, Your Honor. James Newton of Morrison & Foerster, on behalf of the debtors. The next couple of matters relate to motions filed by Julio Solano. The first one is a motion for permission to extend the deadline for Julio Solano to file a proof of claim. It's docket number 2935. And the -- I apologize. I think I got them in the wrong order. There's also a relief from stay motion filed by Mr. Solano.

I'm happy to let the Court know that, I believe, as of this morning, we have reached an agreement with Mr. Solano. His counsel, I believe, Mr. Sax is on the phone. And with your permission, I reflect the agreement, and we'll follow it up --

THE COURT: Let me just confirm --

MR. NEWTON: -- with --

THE COURT: -- Mr. Sax, are you on the phone?

MR. SAX: Yes, I am, Your Honor.

THE COURT: All right. Go ahead, Mr. Newton.

MR. SAX: Can you hear me?

THE COURT: Yes, I can. We'll let the debtors' proceed, and then I'll give you a chance to speak, okay?

MR. SAX: Yes, Your Honor.

THE COURT: All right, thank you. Go ahead.

MR. NEWTON: Mr. Solano has agreed that he will withdraw the motion to file a late proof of claim and also dismiss the adversary proceeding that he has pending seeking a determination of dischargability of any debt that the debtors owe to him. And the debtors will, in turn, stipulate to relief from the automatic stay so that Mr. Solano can pursue the equitable claims that he seeks to pursue in the state court, but not with regards to monetary claims that he is asserting against the debtors.

So that would permit Mr. Solano to pursue his request to unwind the foreclosure sale -- or avoid the foreclosure sale.

THE COURT: What -- the house was sold in foreclosure?

MR. NEWTON: The house was sold --

THE COURT: Was it a private buyer or --

MR. NEWTON: It was purchased by the bank, so it's being held in real estate owned, currently.

THE COURT: All right. Mr. Sax, do you want to be heard?

MR. SAX: I agree that Mr. Newton set forth our agreement, Your Honor.

THE COURT: Okay. So are you going to put it in the form of a stipulation?

MR. NEWTON: We will.

THE COURT: All right. Thank you very much. Thank you, Mr. Sax. Thank you, Mr. Newton.

MR. SAX: Thank you.

MR. NEWTON: I'll turn the podium over to Norm Rosenbaum for the --

THE COURT: Okay.

MR. NEWTON: -- next matter.

MR. ROSENBAUM: Good morning, Your Honor. Norm Rosenbaum, Morrison & Foerster. Your Honor, the next matter on is a motion filed by Donna Chinloy. It's in the form of a letter that was put for hearing to extend the deadline for filing a proof of claim. I don't know if Ms. Chinloy, who I believe is appearing pro se, has made an appearance.

THE COURT: Ms. Chinloy, are you on the phone? Let me just check the -- all right, I've examined the telephone appearance list, and I do not Ms. Chinloy on the list.

I will take the matter under submission and enter a written order.

MR. ROSENBAUM: Thank you, Your Honor.

THE COURT: Thank you, Mr. Rosenbaum.

MR. ROSENBAUM: Your Honor, that brings us to the first interim application of Pepper Hamilton as special counsel for the foreclosure review. I'm advised by the U.S. trustee, Mr. Masumoto, will confirm that they've settled. And I'm not

sure the terms of the settlement, but hopefully from Pepper Hamilton or the U.S. trustee's office can describe it for the Court.

THE COURT: All right. Mr. Masumoto?

MR. MASUMOTO: If I may, Your Honor?

THE COURT: Yes, go ahead.

MR. MASUMOTO: Good morning, Your Honor. Brian Masumoto for the Office of the United States Trustee. I believe counsel for --

THE COURT: Let me ju -- before you -- is somebody for Pepper Hamilton on the phone?

MR. MASUMOTO: I believe --

MS. KOVSKY-APAP: Your Honor, this is Deborah Kovsky-Apap with Pepper Hamilton.

THE COURT: All right, thank you. Go ahead, Mr. Masumoto.

MR. MASUMOTO: Your Honor, the parties have conferred and reached an agreement with respect to the vague time entry objection that the U.S. trustee filed. Based upon the submissions and the consultation with the applicant, we've withdrawn that objection.

With respect to the objections to expenses, the parties have agreed that the applicant will reduce their expenses by 1,500 dollars with respect to meal charges over the 20 dollar limit.

And that resolves all of our issues.

THE COURT: All right. Anybody else wish to be heard with respect to the Pepper Hamilton first interim fee application?

All right. The Court has reviewed the fee application. It also reviewed the records which were submitted in camera for the Court's review. It reviewed the U.S. trustee's objection and now the resolution that the U.S. trustee has reached with Pepper Hamilton. On that basis, the Court approves the first interim app -- fee application to Pepper Hamilton with the adjustment that's been agreed upon with the U.S. trustee.

MR. MASUMOTO: Thank you, Your Honor.

THE COURT: Thank you very much, Mr. Masumoto.

MS. KOVSKY-APAP: Thank you, Your Honor.

THE COURT: You're welcome.

MR. ROSENBAUM: Your Honor, next, we get to cure objections on the agenda. I think, suffice it to say, the debtors are working through the cure objections in an effort to try to resolve them. And we're pretty close to resolving all of them. So the ones that haven't been resolved, we're adjourning to the July 10th hearing. And the ones that are resolved, we're settling within -- in consultation with the committee. Thank you.

THE COURT: All right.

MR. ROSENBAUM: Your Honor, that brings us to the adversary proceedings that begin at the bottom of page 31. I'm going to cede the podium to James Newton.

THE COURT: On the copy of the agenda that I was handed just before the hearing, it's on page 32, but --

MR. NEWTON: That's my agenda as well. Your Honor, James Newton of Morrison & Foerster, again, on behalf of the debtors. The first adversary proceeding matter is the Jenkins v. Residential Funding Company, LLC, et al. adversary. It's number 12-01935.

Your Honor may recall that the Court previously granted the debtors' Rule 12(e) motion for a definite statement. And we were last here on May 14th, shortly before the deadline for plaintiffs to file an amended complaint. Since then, Your Honor, the Jenkins have filed a complaint. It was the -- as far as I could tell, the exact same complaint that was filed previously.

THE COURT: So let me -- if I remember correctly, I think it's this case. What -- is anyone from the Jenkins on the phone?

MS. JENKINS: Yes.

THE COURT: Okay. I --

MS. JENKINS: Can you hear me?

THE COURT: Yes, I can. I think the last time that we had a hearing in the case, you were trying to find counsel.

And I don't --

MS. JENKINS: Yes, sir.

THE COURT: -- remember -- I think someone -- they hadn't appeared yet, but they were on the phone. Am I -- Mr. Newton, am I correct about that?

MR. NEWTON: They weren't on the phone, but we had spoken to someone who was --

THE COURT: Yeah.

MR. NEWTON: -- assisting the Jenkins.

THE COURT: And Mrs. Jenkins, I gather you were unsuccessful in getting counsel?

MS. JENKINS: Yes, sir.

THE COURT: Okay.

MS. JENKINS: May I read a statement, if you -- if it please Your Honor?

THE COURT: Sure, go ahead.

MS. JENKINS: I'll just from the beginning.

THE COURT: Okay.

MS. JENKINS: We would like to make the following statement for the consideration of the Court, and we are not sure that all of this is relevant. But we pray that you will allow it. We have been in contact with attorney Marv Brenner (ph.), and he has agreed to communicate with Silverman Acampora and others on a very limited basis. Attorney Brenner has not agreed to formerly represent us for various reasons. He has

been the only counsel that has agreed to do anything as of this date.

It is very evident that we need legal counsel, and we are still trying to accomplish that. It appears to be a money issue, just point blank, plain and simple, which we thoroughly understand. Lawyers are saying that we need 20,000 dollars upward to retain them, and we are -- and they are either out of district, or we are out of district, or they are not admitted in your district. And we have gone through legal aid in a -- New York and in Atlanta, where we live. We do not want to lose our home, Your Honor, when there are clearly, clearly rules, regulations and errors made by our servicer and others who are processing our mortgage document by our loan and the loan modification.

And we just absolutely had no control over it. We feel they should be held accountable for these inconsistencies and/or errors, which we have identified in our amendment, including our -- the hardship that it has caused us. We have spent many thousands of dollars already on foreclosure attorneys, fighting foreclosure, while actually paying our mortgage at the same time through several different trial payment periods. This has only prolonged and aggravated the issue, which we want to resolve and not prolong issues made by the U.S. Residential Funding, GMAC and others that were accountable.

I just have a little bit more to go, if you will, Your Honor.

THE COURT: Go ahead.

MS. JENKINS: It appears that some of our mortgage documents may be fraudulent, and we would like to find out for sure. The only avenue we have right now is through this complaint in your court. We have had several different owners of our mortgage, doubled in with mortgage lenders and GMAC, who broke -- as we understand it, has filed for bankruptcy. That is why we filed the complaint and also filed as a creditor.

Your Honor, in the grand scheme of things, we are only one very minute speck in this humongous pot. And we want to be heard and justified. We are senior citizens and do not want to be displaced under these circumstances, which, again, were beyond our control. Your Honor, we were paying our mortgage even though our resources were limited.

Will you grant us a motion to allow us to resolve this issue by ordering them, whoever the them are -- we don't even know who the them are anymore -- not to foreclose on us with -- along with any compensation that may be allowed. We are, again, in loan -- in the loan modification process and not in foreclosure at this time. We are thankful and appreciative of the Court's patience and others involved while trying to get these issues resolved.

Please support us, whatever else you can, so we may be

able to resolve our situation and stay in our home, Your Honor.

THE COURT: All right. Thank you, Mrs. Jenkins. Mr. Newton?

MR. NEWTON: Your Honor, I just want to say that the debtors certainly are not trying to prevent the Jenkins from resolving any issues that they have with respect to --

THE COURT: Who owns the loan; do you know?

MR. NEWTON: I don't recall who owns the loan. I believe it's in a securitization trust. The debtors are the master servicer of the loan.

THE COURT: Is Ocwen servicing it now?

MR. NEWTON: No. It's America's Servicing Company, and I believe counsel for America's Servicing Company is in the courtroom as well.

But as we've stated from the beginning, we just -- we don't think this is the correct place for this to be proceeding. We -- as stated at the prior hearing, the -- we've spoken to Mr. Brenner, who Ms. Jenkins referenced. We've provided him with contact information for the primary ser -- the -- sorry, the servicer, America's Servicing Company, as well as foreclosure counsel in Georgia. And we really believe that that's the best time that the Jenkins time could spend is speaking with that foreclosure counsel who will be able to answer the questions and deal with any issues that the Jenkins have related to the foreclosure or if there's a potential for a

loan modification -- for a loan modification.

THE COURT: Counsel for American Ser -- America's Servicing?

MS. JENKINS: Your Honor, may I speak, please?

THE COURT: No, no. I'll give you another chance, Mrs. Jenkins. Counsel for America's --

MS. JENKINS: Yes, sir.

THE COURT: -- Servicing is here. Go ahead. Your name is?

MR. GRIECO: Brian Grieco from Hogan Lovells, for Wells Fargo --

THE COURT: Go ahead.

MR. GRIECO: -- and for the --

THE COURT: Wells --

MR. GRIECO: -- trust, U.S. Bank, as trustee.

THE COURT: Okay.

MR. GRIECO: I have not heard from -- I guess this was a proposed counsel.

THE COURT: Yeah.

MR. GRIECO: And I was told that Mr. Newton had given my contact information. It's my understanding from my contact with the Shapiro Firm (ph.), which was bankruptcy and foreclosure counsel, that there was talk of a modification. But I've had no status report from them since.

THE COURT: Do you know what the status of the

foreclosure action is?

MR. GRIECO: It's my understanding that this was a nonjudicial foreclosure --

THE COURT: Foreclosure.

MR. GRIECO: -- notice, and it was stayed by a bankruptcy, which has now been dismissed.

THE COURT: But the foreclosure hasn't been completed yet?

MR. GRIECO: No, not to my understanding.

THE COURT: All right. Mrs. Jenkins, do you want to say something else? Go ahead.

MS. JENKINS: Yes, sir. I just wanted to say we just want to pay our mortgage and stay in our home. It was never our intention to file an adversary complaint or file as a creditor. But we felt we had no alternative but to do that through all of the options and influences, even when we did file for our bankruptcy in the State of Georgia, the judge, paraphrasing, just basically jumped all over the foreclosing because he saw our documentation, but we were paying our loan. And he saw our documentation, where we went several tracking years (ph.) successfully, yet they still -- they would start foreclosure procedures.

We don't have an avenue in the State of Georgia, as people keep saying.

THE COURT: All right. Let me --

MS. JENKINS: And I did -- sir?

THE COURT: What I was going to say, Mrs. Jenkins, what I have before me is your amended complaint. Bear with me a second. It was filed on May 20th, 2013, and it's ECF docket number 32 in the adversary proceeding in this case. The matter is scheduled today for a case management conference. That's what I'm hearing. The amended complaint, which names numerous defendants -- I have no idea whether it's been served or not -- is all I have before me. I mean, it's on file. There are no motions that have been filed yet with respect to the amended complaint.

Is anyone from Silverman Acampora here? Come on up to the microphone.

MR. KRELL: Good morning, Judge. Justin Krell, Silverman Acampora --

THE COURT: Right.

MR. KRELL: -- special counsel to the committee.

THE COURT: So have you had any communication recently with Mrs. Jenkins?

MR. KRELL: I haven't, Your Honor. Prior to the May hearing, I did speak with Mr. Brenner. Mr. Brenner intimated to me that he was --

THE COURT: This was the lawyer who was considering --

MR. KRELL: Right. He wasn't retained.

THE COURT: -- retention?

MR. KRELL: He was going to try to --

THE COURT: Yes.

MR. KRELL: -- facilitate possibly the loans mods, speak to foreclosure counsel and facilitate that process. But he made it clear he was not going to appear in this court --

THE COURT: Right.

MR. KRELL: -- file any papers on behalf of the Jenkins.

THE COURT: Right.

MR. KRELL: He was contacted prior to the Jenkins' date for the amended pleading to be due. It appears that maybe he did not provide any assistance in the Jenkins filing that amended pleading. I haven't heard from him since that hearing date.

THE COURT: Okay.

MR. KRELL: So I don't know if he's been in contact with the Shapiro Firm and what the status is on the loan --

THE COURT: Let me ask this --

MR. KRELL: -- mod --

THE COURT: -- and -- Ms. Jenkins, the Silverman Acampora firm is special borrowers' counsel to the creditors' committee. They don't represent you, but they've been dealing with borrowers' issues such as would be raised here.

I would ask that you once again reach out to Mrs. Jenkins and perhaps provide some limited guidance about --

maybe some contact phone numbers about -- I -- you know, I don't know who's holding the mortgage. I don't know who -- I guess America's Servicing is the loan servicer. I guess any effort for loan modification would have to be done through America's Servicing. And perhaps, you can provide the -- contact information. Get an address in writing so you can send a letter that includes the contact information so there is a record that you provided it.

There are a number of programs, Mrs. Jenkins, that may or may not be available for loan modifications; the so-called HAMP program, H-A-M-P, Home Affordable Modification Program. There are requirements to qualify for that. I have no idea whether you would qualify. There may be other alternatives also available. It is really important, if your bankruptcy case has been dismissed, and so there's no stay in effect against foreclosure, that if you're going to try and avoid a foreclosure of your home you need to move very quickly.

The only thing before me right now is a complaint, and I -- I'm fairly certain, because it's, if not identical, it's almost identical to the earlier complaint on which the Court granted the motion for a more definite statement on March 28th, 2013; it's at ECF docket number 26. The Court entered its order granting debtors' motion pursuant to Federal Rule of Bankruptcy Procedure 7012 and Federal Rule of Civil Procedure 12(e) for a more definite statement. And I gave an opportunity

to file an amended complaint, and that's what's on the docket. No motion is addressed to that yet.

Again, it does not appear from the docket that the complaint has been served on anybody, nor was the earlier one. But I would at least ask that special borrowers' counsel at least follow up with Mrs. Jenkins and put in writing the contact information you give her. Okay?

MR. KRELL: No problem. We'll --

THE COURT: All right. And I assume, Mr. Newton, in due course, you'll file a motion addressed to this amended complaint.

MR. KRELL: I -- could I ju -- Ms. Jenkins, is -- when's the last time you heard from Mr. Brenner?

THE COURT: Have you spoken to Mr. Brenner, Mrs. Jenkins?

MS. JENKINS: Not since last week, on -- the last time that he talked with you guys.

THE COURT: All right. So do you have Mrs. Jenkins' contact information?

MR. KRELL: Yes, and I have Mr. Brenner's. So I'll -- I --

THE COURT: Why don't you -- if you'd follow up, I would appreciate it. All right. Thank you very much, Mrs. Jenkins. That's all for today on your case, okay?

MS. JENKINS: Okay. So do I know where we stand right

now? Are --

THE COURT: I --

MS. JENKINS: Is our case thrown out, because --

THE COURT: No, it's not thrown out, but it's -- the case -- you filed the amended complaint. If the debtor is going to make a motion and others make a motion to it, in due course, that'll be considered. But there's nothing that -- no order of this Court that prevents the loan servicer from moving forward with foreclosure in Georgia. So you need to -- if you're going to seek a loan modification, you need to move forward very quickly with respect to that. All right? Tha --

MS. JENKINS: Your Honor, we are in the process of a loan modification, and they now have all of our paperwork and updated documents, financial statements, everything.

THE COURT: All right. I'm going to have --

MS. JENKINS: I do --

THE COURT: Mrs. Jenkins, what I'm going to do is I'm going to have Mr. Newton -- in the first instance, maybe he'll get you in touch with counsel for America's Servicing as well. Since you're not represented by counsel, they can go ahead and speak with you. It's -- if you've -- and maybe you can check and find out whether your client has any loan modification papers. If they participate in HAMP , I guess they can't move forward with a foreclosure while there's a loan modifi -- if in fact loan modification papers have been submitted, I believe

that they would have to await further action.

But that's not for me to decide.

MS. JENKINS: Your Hon --

MR. KRELL: And I can look into the status of the --

MS. JENKINS: Your Honor, may I --

THE COURT: Okay. All right. Counsel for the loan serv -- Mrs. Jenkins, I have to end this hearing because I have a lot more to be heard. Counsel is going to -- somebody will be in touch with you further, okay? All right. So this --

MS. JENKINS: Okay.

THE COURT: -- matter's concluded. Let's move on on the calendar. Thank you very much, Mrs. Jenkins.

Mr. Marinuzzi, who's going to go? Mr. Marinuzzi? Ms. Martin?

MS. MARTIN: Good morning, Your Honor. Samantha Martin from Morrison & Foerster, on behalf of the debtor.

Next on the agenda is the adversary proceeding filed by Ms. Gwendolyn Hawthorne, case number 12-02050. Your Honor, Ms. Hawthorne filed a complaint in November of 2012. We initially extended the response deadline with this Court's permission several times to see if the parties would be able to reach a settlement. On April 3rd, 2013, Your Honor entered an order directing the applicability of the borrower adversary proceeding procedures to this matter. And as a result, on also April 3rd, the debtors filed a notice thereof.

The notice required the parties to schedule and conduct the initial conference by May 20th, and the parties did hold the initial conference on May 15th; during which time, the parties discussed the relief sought by Ms. Hawthorne and potential settlement terms. Ms. Hawthorne was not represented by counsel at the meeting, but her brother was present with her and spoke on her behalf. During that conference, plaintiff indicated an interest in a potential settlement involving either a loan modification or a purchase of the note.

However, since the sale -- the servicing was transferred to Ocwen in connection with the sale, I reached out to Ocwen to explain plaintiff's interest and to see if they would consult with plaintiff to pursue the settlement options. We then sent plaintiff a loan modification package and also the name, phone number and e-mail address for an attorney representative at Ocwen. And it's my understanding that they're working through that currently.

We held a second conference on May 21st, where we also decided that the plaintiff would continue seeking this relief. And as a result, we propose to reschedule the status conference for July 10th.

THE COURT: All right, that's fine. Thank you very much for the report.

MS. MARTIN: Thank you.

THE COURT: Okay. I appreciate it. All right. And I

guess the Solano is being withdrawn -- the adversary proceeding's being withdrawn.

MR. NEWTON: That's correct, Your Honor.

THE COURT: Okay. Anything else on the agenda? Mr. Marinuzzi or Ms. Martin?

MS. MARTIN: That concludes the agenda.

THE COURT: All right. So what we're going to do is we're going to take -- Mr. Walper, do you want to proceed with your cross-examination? Is that still your plan?

MR. WALPER: Yes, Your Honor.

THE COURT: Okay. Are -- Mr. Goren, are you prepared to proceed?

MR. GOREN: We're ready to go now, Your Honor.

THE COURT: Let's take a ten-minute recess. And at noon, we'll begin with, hopefully, a short examination of the witness.

All right. So we're in -- take a ten-minute break.

(Recess from 11:48 a.m. until 12:05 p.m.)

THE COURT: All right, please be seated. Back on the record in Residential Capital, number 12-12020.

Mr. Goren?

MR. GOREN: Thank you, Your Honor. This is on the continued -- the paydown motion.

THE COURT: Correct.

MR. GOREN: Debtors would like to call to the stand

Marc Puntus.

THE COURT: Okay. Mr. Puntus.

If you would raise your right hand to be sworn?

(Witness Sworn)

MR. GOREN: May I approach, Your Honor?

THE COURT: Yes, please.

DIRECT EXAMINATION

BY MR. GOREN:

Q. If you could just give your name and experience very briefly for the Court, Mr. Puntus?

A. Sure. My name is Marc Puntus. I am a partner and co-head of the restructuring group at Centerview Partners. We are the investment bankers for ResCap.

Q. And can you please take a look at Exhibit 1 which should be there in front of you?

A. I have it.

Q. Do you recognize that document?

A. I do.

Q. Can you explain what it is?

A. It's my declaration in support of the extend motion.

Q. Okay. And does that declaration represent your views on the case at the time you gave the declaration?

A. It does.

Q. Okay. And if you could briefly describe for the Court what factors the debtors evaluated in determining to make the

paydown motion.

A. As the declaration reflects, both the AFI credit facilities as well as the junior secured notes continue to accrue interest during the case. We've been paying interest under the AFI facilities at approximately three-million dollars a month during the case. By virtue of this motion and the paydown of approximately 1.1 billion dollars in claims under that motion, we will be saving approximately three million dollars a month in interest which savings will inure to the benefit of the unsecured creditors.

From a purely economic perspective, putting aside litigation issues, it makes sense to pay down those claims and we focused on that. With respect to the junior secured notes, there is the dispute as Mr. Uzzi mentioned as to whether junior secured notes are oversecured or not and whether they're entitled to post-petition interest. The purpose of paying them down by approximately -- by 800 million dollars is to de-risk the estate. By virtue of that paydown, to the extent those notes are oversecured, the estate will be saving between six-and-a-half and seven million dollars a month in interest which also will inure to the benefit of the unsecured creditors of the estate.

An important factor, as has been mentioned in the court, in all of this was the resolution or the compromise and settlement we've reached with AFI with respect to the claims

that the estate has against it and the global resolution which will be pending before the court on June 26th. Prior to that resolution, we intended to proceed with paying down the junior secured notes to de-risk the estate. Nobody disputes that they are secured, at the very least, to the tune of 800 million dollars, but we did not propose as a practical matter to pay down AFI. By virtue of the resolution or at least the compromise of those claims, and the fact that substantially all the stakeholders in the case have signed onto it, we determined that saving three million dollars a month in interest was prudent, mindful of the fact that we reserve the right in the order to seek disgorgement of those claims or recharacterization of those loans at a later date.

Q. And even absent approval of this settlement with the reservation of rights, do you have a view as to whether the paydown is appropriate?

A. Yeah. Well, look, we're quite comfortable -- I'm quite comfortable with AFI's financial security and their financial wherewithal. So as a purely business matter, purely as a business matter even absent a resolution of the settlement, as long as we reserve the appropriate rights, we're comfortable that they will have the liquidity to pay, to the extent that they are forced to disgorge those claims or those amounts at a later date.

Q. And do you know how much cash the debtors are currently

holding? It's in paragraph 5 of your declaration, if you don't recall.

A. I know we received approximately 4.1 million in -- 4.1 billion in gross proceeds from the asset sales and I believe we hold approximately 3.5 billion dollars of cash, excluding restricted cash.

Q. And what type of return are the debtors currently earning on that?

A. Unfortunately, as a consequence of the restrictions imposed by the Code and the U.S. Trustee, we're really, as I understand it, earning very little return. In fact, I believe our cash only affords the debtor business credits at this point. I think the debtors have had an opportunity to earn a de minimis return and by de minimis, I would say between twenty-five and fifty basis points. So between a quarter and a half-a-point of interest, but unfortunately have been unable to even earn that return as a consequence of some requirements imposed by the U.S. Trustee which JP Morgan who would be the custodian of the funds was unwilling to agree to.

So effectively, we're earning some business credits, but earning little to no return on the cash in the estate.

Q. And how, with it all, did potential settlement dynamics with the junior secured notes play in determining to make the motion?

A. I think we are in the midst of a negotiation and

potentially a litigation with the junior secured notes and as Mr. Uzzi mentioned, the smaller the amount in dispute, the easier it will be to settle. And so I think we all concluded -- and, frankly, it's been our conclusion -- that we should pay more to the junior secured notes. We should pay down an amount that everybody, the debtors, the creditors' committee, Ally and other stakeholders, believe is uncontestably (sic) secured because it saves the estate, to the extent that they are oversecured and the debtors are wrong, it saves the estate twenty million dollars or more a month. It's simple math and we took that into account in our analysis.

Q. And you mentioned earlier that you have evaluated AFI's credit risk. Can you explain how you assessed that?

A. Sure. We did not do a detailed, you know, due diligence examination. We've taken a look at their 10K's and their 10Q's, their public filings as is reflected in the document that was prepared, you know, by me and my colleagues and has been, I think, admitted as Exhibit 2. We took a look at the balance sheet; we took a look at the income statement; we took a look at the cash on the balance sheet; we took a look at AFI's ability to access the debt capital markets which they've done most recently on April 15th. And based upon that analysis, we concluded that we were, in the context of all the facts, we were comfortable with their financial ability to repay this amount to the extent they need to at some future --

THE COURT: Tell me what Exhibit 2 is?

THE WITNESS: Exhibit 2, really, Your Honor, is a summary of the key financials embedded in AFI's 10K and 10Q. So it summarizes the balance sheet --

THE COURT: Prepared by you or your colleagues?

THE WITNESS: Prepared by me and my team.

Page 1 summarizes the balance sheet. I think the key point is AFI -- and AFI's financials include ResCap. You can't separate out ResCap. But AFI has upwards of 100-billion dollars in assets, 166 billion in the aggregate including ResCap; it has 23 billion dollars in cash; it has net book equity of approximately 20 billion dollars. Those were some important factors with respect to the balance sheet.

As to ability to commit capital or funding, AFI has approximately sixteen billion dollars in committed funding facilities that are undrawn that could be used to satisfy amounts here to the extent these amounts were disgorged. And on page 3, I think the pertinent factor is AFI doesn't -- AFI is a profit-making business in the aggregate. During the last year, it generated approximately 5.2 billion dollars in cash flow; it generated two billion dollars during the first quarter of this year. And most importantly for us, it tapped the unsecured debt markets as recently as April of this year, raising 3.4 billion dollars of debt with coupons ranging from 2.3 percent to 3.2 percent.

So taking into account all those factors and our general knowledge of AFI's business in the aggregate, you know, we're quite comfortable with whatever modest risk might exist. We're quite comfortable that the benefit to the estate far outweighs that modest risk.

MR. GOREN: No further questions, Your Honor.

THE COURT: Are you going to move these into evidence?

MR. GOREN: Yes. I would like to move Exhibits 1 and 2 into evidence.

THE COURT: Any objections?

MR. WALPER: No objection, Your Honor.

THE COURT: All right. Exhibits 1 and 2 are admitted in evidence.

(Marc Puntus' declaration was hereby admitted as Debtors' Exhibit 1, as of this date.)

(Centerview's analysis of AFI's credit risk was hereby admitted as Debtors' Exhibit 2, as of this date.)

THE COURT: Thank you. Cross-examination?

Well, first, anybody who's supporting the motion wish to examine further before we -- all right, Mr. Walper, go ahead. Cross-examination.

MR. WALPER: Thanks, Your Honor.

CROSS-EXAMINATION

BY MR. WALPER:

Q. Good afternoon, Mr. Puntus.

A. Good afternoon, Mr. Walper.
Q. So could -- I've now had a chance to review Exhibits 1 and 2. Exhibit 2 was prepared when?
A. Yesterday.
Q. Okay. And is it my understanding that Clearview (sic) Partners has advised the company with respect to whether or not it's appropriate to make the -- repay AFI with respect to its first priority loan?
A. Centerview Partners has, yes.
Q. Excuse me, Mr. Puntus.
A. It's all right.
Q. Okay. And at the time that your declaration was signed in Connecticut this motion, is it the case that Exhibit 2 had not yet been prepared?
A. The exhibit didn't exist; the information which underlies the exhibit existed and had been reviewed by me and my team.
Q. So is it fair to day that prior to giving your declaration, that you had analyzed the public information with respect to AFI and your recommendation was based upon?
A. Correct -- prio -- my recommendation was principally based upon the savings which will be enjoyed by the estate by virtue of paying down both the AFI facilities and the JSN and, secondarily, by virtue of my knowledge of AFI and Ally's business balance sheet and finances. And, yes, we had reviewed the Q's and the K's and we were quite comfortable with their

financial wherewithal.

Q. And had there been management with Centerview input discussion concerning the credit risk, if you will, of AFI prior to, say, June 10th?

A. There wasn't much discussion; we discussed it briefly. And the reason there wasn't much discussion is that nobody was particularly concerned about the credit risk of AFI.

Q. Did you consider what steps would have to be taken in the event that the payment was made, the plan's support agreement or the ultimate settlement at confirmation with AFI was not approved?

A. It sounds like a legal question, but my assumption would be that to the extent we had repaid them and the PSA was not approved and the plan and disclosure state -- the plan was ultimately not confirmed and we were back in litigation mode, then I -- my assumption would be is that somebody would need to file an adversary proceeding to seek disgorgement of those clai -- those proceeds on whatever legal basis they believed existed.

But as I said, we were quite comfortable and still are quite comfortable with AFI's financial wherewithal to pay those monies back as well as their financial wherewithal, by the way, to pay 2.1 billion dollars which they've agreed to pay as part of the overall global settlement.

Q. That was "billion", correct?

A. 2.1 billion.
Q. Yes.
A. Did I say "million"? I apologize.
Q. Just wanted to make sure it was clear.
A. Sure.
Q. And was there any consideration in connection with giving your view to management and making the decision as to how long, in the event that ResCap needed to seek return of those funds, how long that that litigation, the adversary proceeding might take to reach resolution?
A. I -- not from me, no.
Q. Do you think that that's relevant?
A. I suppose it could be relevant in some small fashion.
Q. And what is the small fashion in which you think it might be relevant?
A. If you're asking whether we have projected out AFI's financials two years or three years, so as to come to a similar conclusion as to their financial wherewithal, we haven't done that. Although my strong suspicion or my strong inclination is, is that had we done that, our conclusion would not have changed.
Q. And what do you base that suspicion on?
A. Based upon their financial wherewithal. It's a very strong business. AFI is a very strong and profitable business; they've been, as I said, they've been -- they generated five-

billion dollars in cash flow last year. They continue to dispose of assets on a profitable basis, and the business is a good credit. They have accessed the credit markets, not on a secured basis, but on an unsecured basis at very low rates of interest.

All those things tell me it is a good, strong, profitable business.

Q. Are you familiar with the Fitch Rating for short-term debt of AFI as disclosed in their last 10Q?

A. I am generally familiar with what a Fitch Rating is. I'm not specifically familiar with what their rating is her or what the rating is on their short-term debt.

Q. Would it surprise you to hear that it was C-rated?

A. No.

Q. Um-hum. With respect to Fitch's Rating, are you familiar with that?

THE COURT: I'm sorry; I don't understand your question, Mr. Walper.

Q. With respect to the Fitch Rating of AFI, are you familiar with that rating?

A. I don't understand the question, either. I don't understand it differently from the prior question.

Q. Well, that was S&P.

A. No, I think the prior question was Fitch.

THE COURT: No, you asked him about Fitch.

MR. GOREN: Okay, excuse me.

THE COURT: That's why we're all confused.

MR. GOREN: Maybe the time difference, Your Honor? I apologize.

Q. Let me correct the record and say --

THE COURT: it's 9:30 in the morning for you, Mr. Walper. Come on, you know?

MR. WALPER: Well, I've been up all night.

THE COURT: Preparing for this cross-examination?

MR. WALPER: Apparently.

UNIDENTIFIED SPEAKER: I doubt it, Your Honor.

THE COURT: I'm sorry to tease. Go ahead.

MR. WALPER: No, no, it's completely appropriate, Your Honor.

Q. So the reference to C was an S&P rating and I apologize to the Court and to the witness. But I assume that your answer would be the same as to that?

A. Correct.

Q. Okay. And with respect to Fitch, would it surprise you if the rating were "Watch Negative" with respect to AFI?

A. No.

Q. Okay. Are you familiar with the government's stress testing of AFI with its peers, or in particular, Ally Bank with its peers?

A. I'm familiar generally with the government's stress

testing of banks. Ally Bank, not AFI; Ally Bank.

Q. Um-hum. And do you know how Ally Bank came out in the last stress testing performed?

A. I believe they failed that stress test.

Q. Um-hum. And do you know what the government thought that a passing grade would be of banks of similar size?

A. I don't have that information in front of me, so no.

Q. Okay. Well, it is contained in the 10Q.

A. I'm sorry; your voice trailed off. It's contained where?

Q. In the 10Q.

MR. WALPER: Sorry, Your Honor.

Q. So you, no doubt, have been in the banking community, whether it be on the restructuring side or the non-restructuring side back in 2007 and 2008, is that correct, Mr. Puntus?

A. That is correct.

Q. Okay. So you no doubt experienced the recession that we all experienced, but in particular became acute in the last couple of quarters of 2008, correct?

A. I was around.

Q. Yes. So do you feel like -- are you of the opinion that ResCap would have any difficulty collecting any judgment against Ally or in recovering the 1.1 billion dollars if we happen to experience the same level or even close to the same level of recession, which I think many of us did not predict,

sometime in the near future?

A. I express no opinion whether, if the world ends and we have another housing collapse and the debt capital markets evaporate, whether Ally or anybody else would be able to satisfy their obligations. What I do and have testified to is the fact that based upon the current circumstances, the current financial condition of AFI and Ally, the facts and circumstances associated with the case, most importantly the global resolution which is pending as well as the interest to be saved, potentially twenty-three million dollars aggregating AFI and the junior secured notes, twenty-three million dollars a month for at least five or six more months, that's a substantial amount of money. In that context, to the extent there is any risk -- and there is risk in everything in life -- we believe it's a risk worth taking.

Q. Do you have any reason to believe that we're not going to experience, in a period of time which would reflect the time it would take to recover under an adversary proceeding these funds, that we're not going to experience a recession like we did in 2008?

A. We may experience a recession; we may not. I'm not an economic forecaster so I have no opinion. I think the likelihood we experience something of the sor -- of the magnitude and severity of what we experienced in late -- in 2008, it seems unlikely but not impossible.

Q. All right. But then again, you said that you're not qualified to do that, correct?

THE COURT: He didn't say that.

A. Well, you asked me the question. I said I'm not an economic forecaster. Are you?

THE WITNESS: Sorry, Your Honor.

Q. No, I confused S&P and Fitch.

A. You were up late last night.

THE COURT: He doesn't have to answer your question.

THE WITNESS: That's true.

MR. WALPER: No. I do not, but I'll go under oath.

Q. One last question, Mr. Puntus, and I appreciate you taking the stand.

With respect to the interest you've referred to, in the event that only the Ally portion was not paid and that in this hearing as to the payment of Ally was continued for three weeks, how much interest would accrue?

A. You're asking to the extent we do pay the JSNs, don't pay Ally, and we continue it for three weeks, and then make the paydown? It's a million-and-a-half to two million dollars.

Q. Okay, thank you.

MR. WALPER: No further questions.

THE COURT: Thank you.

Any other cross-examination?

All right. Redirect?

MR. GOREN: Thank you; Todd Goren.

REDIRECT EXAMINATION

BY MR. GOREN:

Q. Mr. Walper mentioned the stress test. And do you have an understanding as to which entity was stress-tested?

A. Yeah, Ally Bank. Not AFI; Ally Bank.

Q. And who is the lender under the Ally facilities?

A. AFI.

MR. GOREN: No further questions, Your Honor.

THE COURT: All right.

Do you wish to argue, Mr. Walper?

MR. WALPER: I do. But I have one --

THE COURT: Go ahead.

MR. WALPER: Thank you.

THE COURT: I'm sorry.

RECROSS-EXAMINATION

BY MR. WALPER:

Q. I think in Exhibit 2, there's a reference to net book value of AFI. How much of that net value is attributable to --

THE COURT: Just point me to the right place in the exhibit.

THE WITNESS: It's page 1, I believe --

MR. WALPER: Yes.

THE WITNESS: -- you're referring to.

MR. WALPER: It's the first bullet in the report.

THE COURT: Okay, go ahead.

Q. How much of that is attributable to Ally Bank?

A. I don't have the breakout. AFI doesn't break out AFI's business from Ally's business or ResCap's business in its financials.

THE COURT: All right. You're excused.

THE WITNESS: Thank you, Your Honor.

THE COURT: Do you want to argue, Mr. Walper?

MR. WALPER: Thank you, Your Honor. We are where we were and while, certainly, Mr. Puntus' testimony would reflect that there was thought around the issue of what would happen in the event that the money needed to come back to the ResCap estate, we firmly believe that a -- since the beginning of the case, they have -- AFI has been unpaid, that a short continuance of this hearing, to give Berkshire comfort that the plan support agreement would be approved and that there was an opportunity to see the examiner's report, is very little when compared to the risks associated with paying them only to find that if the plan is not confirmed or the settlement is not approved, that the estate would have to chase AFI to receive these payments. Whether that risk is associated with long-term litigation which is expensive or whether there's federal regulations that get in between the payment; whether there's a long appeal or, you know, the devastating case -- which none of us could predict before but we're talking about fiduciary funds

here, okay -- that there is some recession --

THE COURT: Well, when you say we're talking about fiduciary funds, whether AFI's security interest can subsequently be challenged or not, meaning whether their claims could be subordinated or not, you don't -- you have not disputed the fact that, as it stands today, AFI has a secured claim against the debtors. That's, on the face, oversecured. Consequently, they continue to be entitled to post-petition interest.

So it's not as if the debtor is proposing to just pay 1.1 billion dollars in the hope of getting it back. The quid pro quo is they're eliminating the secured debt. If -- it may be challenged. It may be overturned, ultimately. But -- so when you say, yeah -- yes, they are a fiduciary, but it's not as if there's -- they're taking funds that are to satisfy some unencumbered claim that --

MR. WALPER: I appreciate that point, but that -- if that was the point that you heard, that was not necessarily the point I --

THE COURT: Okay.

MR. WALPER: -- I was attempting to make, Your Honor. Back to the sleep (ph.). The point I'm making is that these funds are fiduciary funds because you can pay them to AFI, but then AFI has committed to pay 2.1 billion dollars to the estate. So in fact, if we weren't where we were, and we had

the settlement here today, we'd probably be setting off those amounts as opposed to paying them --

THE COURT: I don't know whether you would or not. I -- you know --

MR. WALPER: And -- and so what I'm doing is liking those funds -- comparing them to fiduciary funds that you'd want to protect, you know, against the potential dissipation by investing them in a C rated company, where this is no escrowing of the funds and where there is no clear path to quickly getting them back in the event that the settlement is not confirmed.

THE COURT: Okay.

MR. WALPER: Thank you, Your Honor.

THE COURT: Thank you very much. Mr. Goren?

MR. GOREN: Thank you, Your Honor. I -- Mr. Walper raises some fair points, but the fact is, as you noted, that the standard to approve this motion is the business judgment rule. And as the testimony of Mr. Puntus made clear, the debtors evaluated all of those factors in consultation with the creditors' committee, each of its nine members, all of their advisers, including the individual advisers, and concluded that making the pay-down motion was in the best interest of the estate.

And that, I believe, is clearly a valid exercise of the debtors' business judgment under these circumstances.

THE COURT: All right, thank you. Anybody else wish to be heard?

All right. Pending before the Court is the debtors' motion for entry of an order under 11 U.S.C. Sections 105 and 363, authorizing the debtors to partially satisfy certain secured claims. That motion was filed at ECF 3626, and it sought approval of an 800 million dollar payment to partially satisfy the secured claim filed by the junior secured noteholders of the 9.625 percent of the junior secured guaranteed notes due 2015.

The partial satisfaction of the JSN claim is intended to curb the accrual of post-petition interest in the event the Court determines the JSN's are oversecured. The motion is supported by the declaration of Marc D. Puntus, which is at ECF 3671. The Court has admitted it in evidence as Exhibit 1.

And on June 3rd, 2013, the debtors filed the debtors' amended motion for entry of an order under Section -- under 11 U.S.C. Sections 105 and 363, authorizing the debtors to satisfy certain secured claims. That's at ECF 3872, and it seeks, in addition to the payment to the JSN's, approval of a payment of $1,127,127,553.39 to AFI to satisfy AFI's claim -- claims under a secured loan agreement and secured -- senior secured credit facility. And that amended motion is supported by the additional declaration of Marc D. Puntus. I guess that's actually the declaration that I -- it's actually the additional

declaration that's been admitted into evidence.

MR. GOREN: That's correct, Your Honor.

THE COURT: All right. And as I sa -- okay.

One limited objection to the amended motion was filed by Berkshire Hathaway. That's at ECF 3893, and it objects to the payment to AFI as premature. The debtor, AFI and the committee have all filed replies to the Berkshire objection. Those are at ECF 3933, 3934 and 3935. For the reasons that I'll explain, the Court approves the debtors' amended motion authorizing the payments to AFI and the junior secured noteholders.

I won't go through the entire background with respect to the details about the junior secured notes. I've already mentioned that to the extent that they're oversecured they'd be earning post-petition interest at the rate of 9.625 percent.

With respect to AFI, on December 30th, 2009, the debtors, RFC and GMACM, two of the debtors and certain of the other debtors as borrowers, ResCap as guarantor and AFI as agent and lender, entered into a 1.1 billion dollar amended and restated secured loan agreement in order to consolidate under one agreement, the terms and provisions of two secured credit agreements with AFI entered into on November 30th, 2008 and June 1, 2009, respectively, as well as the loans made those agreements. The outstanding principal amount under the AFI LOC, as of petition date, was approximately 380 million

dollars.

Additionally, on December 30th, 2009, the debtors, RFC and GMACM, as borrowers, and various debtor affiliates as guarantors, entered into a loan agreement with AFI as agent and lender -- I'll refer to that as the AFI senior secured credit facility -- amending and restating in its entirety the original loan agreement entered into on June 4th, 2008. The senior -- the AFI senior secured credit facility was originally a revolving loan facility, with the outstanding amount was converted into a term loan in connection with the amendment and restatement. As of the petition date, the outstanding principal of the AFI senior secured credit facility was approximately 747 million dollars.

And the AFI senior secured credit facility is secured by a first priority lien on the assets that secure the junior secured notes. In pursuant to the original cash collateral order, the debtors have paid interest at the nondefault rate on a current basis throughout the cases.

In connection with the incurrence of the debt that I've referred to, the debtors, ResCap, GMA -- ResCap, GMACM and RFC entered into a certain intercredit agreement dated as of June 6th, 2008. I'll skip the parties to it. It's a long list.

On May 15th, 2010, the senior secured notes were repaid at maturity, and the junior secured notes effectively

stepped into the position of the senior secured notes.

With respect to the debtors' cash position, the debtor -- debtors received approximately 4.1 billion dollars in gross sale proceeds in connection with the sale of its mortgage loan origination and servicing platform to Ocwen and the sale of its Legacy loan portfolio to Berkshire Hathaway. The debtors used this cash, in part, to pay off in full the AFI DIP facility and the Barclays DIP facility, as well as other pre-petition facilities, including the Citibank MSR facility and the FNMA EAF facility. And as of March 31, 2013, the debtors have approximately 3.5 billion dollars in net cash, excluding restricted cash, of which 1.7 billion in cash constitutes proceeds of the collateral securing the AFI senior secured credit facility and the junior secured notes, plus there are substantial other assets remaining to be monetized.

And the debtors' cash is primarily held in multiple accounts with various institutions. And as Mr. Punts' testimony indicated, there -- the debtors' earning practically nothing on the cash that's -- they're holding.

Based on the current budget, the debtors anticipate that even after the proposed payments for the AFI claims and the JSN secured claims, the remaining JSN cash collateral and the other noncash collateral securing the junior secured notes will be sufficient to pay all receipts, expenses and interest allocable to such collateral pursuant to the original cash

collateral order or nonconsensual cash collateral order as applicable.

The debtors' motion details the benefits to the estate if it's authorized to make these payments. I won't go through those in detail. They're set forth in the papers. And I guess the basic point is the very substantial interest savings that will occur if the AFI and JSN's payments are approved by the Court. While the debtors believe that the JSN's are undersecured, the debtors seek to make the payments to limit the risk that the JSN's prevailed in the adversary proceedings that are pending to determine whether they're oversecured or undersecured. And if it turns that the JSN's are oversecured, this will avoid very substantial post-petition interest that would be due.

The debtors amended the motion, in part, to align it with the motion to approve the plan support agreement, which is scheduled to be heard by the Court on June 26th. The debtors, in the motion, would appear to acknowledge that AFI is oversecured and has been making interest payments on a current basis to AFI during the case. The payment to AFI would be subject to a reservation of rights in the event the plan PSA is not approved and a plan is not confirmed. There's no doubt that any effort to recover that money, in all likelihood, would have to be done through a -- an adversary proceeding. I'm not making any determination of that now, but that seems to be the

view of the parties. And I don't underestimate the length or complication of such a proceeding.

Berkshire Hathaway's objection primarily foc -- the -- they really requested the Court delay any ruling on the request, at least until -- to see whether the plan support agreement is approved and also until the examiner's report is released. Based on the motion that's pending before me and based on my knowledge of the credit agreements and intercreditor agreement, it is questionable whether the debtors could pay the 800 million to the JSN's without also paying the 1.1 billion to AFI. I'm not making a decision on that. The motion itself is styled -- requires the payment approval of both payments, not one or the other but both.

The primary issue that Berkshire has raised in its objection in -- and in argument today is the credit risk that would be faced if the debtor or committee or other parties were seeking to recover the payments from AFI.

In addition to the Puntus declaration, which the Court admitted as Exhibit 1, the Court also heard the direct and cross-examination of Mr. Puntus from the witness stand today. And he addressed in large measure the evalua -- the debtors' evaluation of the credit worthiness or credit risk associated with making the payment to AFI.

So the legal standard for the issues before the Court, Section 363(b)(1) provides that the trustee, after notice and

hearing, may use sale or lease other than in the ordinary course of business property of the estate. In approving a transaction conducted pursuant to Section 363(b)(1), the courts consider whether the debtor exercised sound business judgment. See in re Chateaugay Corp, 973 F.2d 141 at 144-45, Second Circuit 1992, (approving sale of assets based on a finding that sound business judgment supported sale because delay in the sale of assets may diminish their value).

See also Committee of Equity Security Holders v. Lionel Corp, in re Lionel Corp. 722 F.2nd 1063 at 1072, Second Circuit 1983 (holding that the sale of assets out of the ordinary course of business must be supported by "some articulated business justification other than the appeasement of major creditors" and that "a judgment determining a Section 363(b) application must expressly find from the evidence presented before him at the hearing a good business reason to grant such an application").

Once the trustee articulates a sound business justification, there is "a presumption that in making a business decision the decision maker acted on an informed basis, in good faith and in the honest belief that the action was in the best interest of the company." Offic -- see Official Committee of Subordinated Bondholders v. Integrated Resources Inc., 147 B.R., 650 at 656, Bankruptcy Court Southern District of New York, 1992. Appeal dismissed 3 F.3d, 49,

Second Circuit 1993.

Applying the business judgment standard that's set forth in the cases that I've discussed and many others that elaborate and support the same legal proposition and considering the facts, both in the Puntus declaration, which is Exhibit 1, the AFI financial overview, which is admitted into evidence as Exhibit 2, and based all -- on all of the -- and the cross -- the exam -- direct examination and cross-examination of Mr. Puntus today, the Court concludes that the debtor has established, by preponderance of the evidence, that the debtor appropriately exercised its business judgment its decision to seek approval to make the payments to AFI and the JSN's.

In exercising its business judgment, the certain -- the standard is certainly not a certainty that -- in here, in the event that the PSA is not approved, the plan is not confirmed that the debtor will be able -- certainty that they'll be able to recover being advanced to AFI. There are no doubt serious claims that can be pressed against AFI. The committee was seeking STN authority to go ahead and prosecute claims against AFI. And while it had not filed a draft complaint, the senior unsecured noteholders, I guess, represented by Mr. Moloney, had also sought STN authority, had in fact filed a complaint.

So there's no doubt that there would be serious claims

that could be asserted against Ally, and I also have no doubt that Ally would vigorously defend against all of them and that the amounts that would be sought in any such litigation would substantially exceed the 1.1 billion dollars, the approximate amount that is -- will be paid to Ally to satisfy their secured claim at this point. In discussion today as to whether there'd be claims to subordinate or recharacterize Ally's secured claims in this case, I'm sure there would be many other theories that would be pursued. And I have no doubt that that would be complicated, major litigation that would tax the resources of the debtor and Ally in defending.

But again, certainty is not the standard that is applied in -- when a Court reviews the exercise of business judgment by a debtor. The Court does not substitute its own business decision for that of the debtor. Under all the circumstances present here, the Court concludes, based on the evidence and the argument, that the debtor has established by preponderance of the evidence that it is exercised appropriate business judgment in determining to make these payments. And therefore, the debtors' motion, as amended, is granted.

The order should reflect that for the reasons stated by the Court the motion is granted. All right. Mr. Goren.

MR. GOREN: Thank you, Your Honor. One last point I wanted to just raise briefly. As Mr. Puntus noted on the stand, we are in discussions with the parties about a potential

increase paid out into the JSN's. I don't believe Mr. Walper's objection even went to that, if he's even supportive of the --

THE COURT: He seems to be happy --

MR. GOREN: -- payout --

THE COURT: -- when they're getting --

MR. GOREN: Yes.

THE COURT: -- their money, but --

MR. GOREN: So I --

THE COURT: I'm -- that doesn't call for a response, Mr. Walper, okay? You're welcome to, but --

MR. WALPER: I'm tired, Your Honor.

THE COURT: You're welcome to. Okay. He wants to pay you more money, Mr. Walper.

MR. GOREN: So I was just rising to ask that if -- assuming we can get all of the committee, the Ally, the junior bonds with an increased paid-out, and then we could just submit a stipulation to the Court authorizing the paid-out and -- rather than having to put out another motion.

THE COURT: What you can do is submit on presentment so that if the U.S. trustee, for example, or any other party-in-interest wishes to object, they can. They'll have the time to object. If there are no objections, I'll deal with it accordingly. But it's going to require more than -- you can do a --

MR. GOREN: Okay.

MR. WALPER: -- you can do a stipulation, but you're going to have to it on presentment so that any other party-in-interest has an opportunity to object.

MR. GOREN: Very good, Your Honor.

THE COURT: Okay? Mr. Walper, you want to be heard? And I didn't mean to tease, Mr. Walper. I --

MR. WALPER: I just wanted to say --

THE COURT: You usually -- you take it in good fashion.

MR. WALPER: I just want to --

THE COURT: I shouldn't assume.

MR. WALPER: I just want to thank the Court for the time.

THE COURT: Okay.

MR. WALPER: I really appreciate it.

THE COURT: Thank you very much. All right.

MR. WALPER: Thank you.

THE COURT: Thank you. We're adjourned.

(Whereupon these proceedings were concluded at 12:52 p.m.)

I N D E X


| WITNESS | EXAMINATION BY | PAGE |
|---|---|---|
| Marc Puntus | Mr. Goren | 88 |
| Marc Puntus | Mr. Walper | 94 |
| Marc Puntus | Mr. Goren | 103 |
| Marc Puntus | Mr. Walper | 103 |


E X H I B I T S


| DEBTORS' | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Marc Puntus' declaration | 94 |
| 2 | Centerview's analysis of AFI's credit risk | 94 |


RULINGS


| | Page | Line |
|---|---|---|
| Debtors' motion to further extend their exclusive plan filing and solicitation periods granted | 27 | 14 |
| Application to expand scope of FTI Consulting, Inc. engagement approved | 29 | 25 |
| Applications to retain and pay PWC, Hudson Cook, and Pepper Hamilton granted | 30 | 19 |

I N D E X (Contd.)

RULINGS (Contd.)


| | Page | Line |
|---|---|---|
| Debtors' Amended Motion for Entry of an Order Under 11 U.S.C. 105 and 363 Authorizing the Debtors to Partially Satisfy Certain Secured Claims Approved | 67 | 27 |
| Debtors' Motion Pursuant to Section 362(a) of The Bankruptcy Code for Enforcement of the Automatic Stay. | 72 | 10 |
| First application for Interim Professional Compensation (First Interim Application of Pepper Hamilton LLP as Special Foreclosure Review Counsel for Bankruptcy Issues for the Debtors for Compensation and Reimbursement Of Expenses Incurred for the Period May 15, 2012 through December 31, 2012) for Pepper Hamilton LLP, Special Counsel Approved as Agreed | 108 | 9 |

C E R T I F I C A T I O N

I, Sharona Shapiro, certify that the foregoing transcript is a true and accurate record of the proceedings.

Sharona Shapiro

______________________________________

SHARONA SHAPIRO

AAERT Certified Electronic Transcriber CET**D-492

eScribers

700 West 192nd Street, Suite #607

New York, NY 10040

Date: June 13, 2013

#

**#607 (1)** 5:22

$

**$1,127,127,553.39 (1)** 107:21
**$87,327.73 (1)** 4:24

A

**a3 (1)** 3:5
**Ab (1)** 3:8
**ability (4)** 67:9;92:21,24;93:14
**able (8)** 21:16;64:10;77:1,23;85:21;101:4;114:17,18
**Absent (3)** 31:22;90:14,20
**Absolutely (2)** 48:11;75:15
**ac (1)** 17:20
**ACAMPORA (5)** 7:19;74:23;80:12,15;81:21
**acceptance (1)** 4:16
**Acceptances (1)** 3:16
**access (5)** 54:7,9,10,12;92:21
**accessed (1)** 98:3
**accomplish (1)** 75:4
**accomplished (1)** 27:11
**according (1)** 60:17
**accordingly (1)** 116:23
**account (2)** 92:11;94:1
**accountable (2)** 75:16,25
**accounts (1)** 110:17
**accrual (3)** 39:7;41:9;107:12
**accrue (2)** 89:4;102:17
**accrued (1)** 41:14
**accruing (1)** 31:12
**acknowledge (2)** 44:3;111:18
**acted (1)** 113:20
**Action (22)** 3:6;14:11,12,24,25;16:9,12,23;17:15,15;18:20;38:11;58:13;64:14,20;65:7;66:18;67:14,15;79:1;85:1;113:21
**actions (6)** 22:1,7;63:11;65:20;67:10,12
**actual (1)** 35:22
**actually (11)** 14:19;15:12;26:1;28:8;32:10;52:6;60:5;61:11;75:20;107:25,25
**acute (1)** 100:18
**Ad (4)** 8:3,11;25:13;38:21
**Addendum (2)** 3:23;29:1
**addition (6)** 19:20;38:3,4;57:10;107:20;112:18
**additional (6)** 17:10;21:16;29:21;56:20;107:24,25
**Additionally (1)** 109:2
**address (7)** 21:12;22:16;27:21;40:5;52:16;82:6;86:15
**addressed (3)** 83:2,10;112:21
**adequate (2)** 39:16,17
**adequately (1)** 33:22
**Adj (2)** 4:11;5:8
**adjourn (2)** 25:4;27:23
**Adjourned (5)** 5:5;18:1;43:5,12;117:18
**adjourning (1)** 72:22
**adjournment (1)** 17:8
**adjustment (1)** 72:11
**admitted (9)** 75:8;92:18;94:12,14,16;107:15;108:1;112:19;114:6
**Adv (1)** 2:5
**advance (3)** 25:24;35:8,14
**advanced (1)** 114:18
**Adversary (20)** 5:3,7,10;34:8;36:3;50:1;69:5;73:2,8,9;79:14;80:5;85:17,23;87:1;96:17;97:9;101:18;111:10,24
**adverted (1)** 18:9
**advised (2)** 70:24;95:6
**advisers (2)** 106:21,21
**Advisor (2)** 3:24;29:2
**advocated (2)** 39:25;41:1
**affected (1)** 15:24
**affiliated (1)** 17:19
**affiliates (1)** 109:3
**Affordable (1)** 82:11
**affords (1)** 91:12
**AFI (99)** 14:10,13,24;15:9,13,17;18:13;31:10,17,17,22;32:1,16,18;33:2,9;34:5,10,10,22;35:10;37:14;38:1,3,5,6,11;40:6,7;43:1,12;47:5,18;52:7,14;53:15,17,20;89:2,5,25;90:7;93:8,9,14,18,18;95:7,19,22,23;96:3,7,10;97:24;98:9,19;99:20,23;100:1;101:7,11;103:6,8,19;104:3,14,20;105:6,23,24;107:21;108:6,6,10,16,18,22,24;109:4,5,8,12,14;110:7,13,21;111:7,18,20,20;112:11,17,23;114:6,12,18,19,21
**AFI's (17)** 14:19;32:6;33:1,3;34:3;90:18;92:12,21;93:3,8;94:2,16;96:21;97:16;104:3;105:3;107:21
**afternoon (2)** 94:25;95:1
**again (18)** 17:6;21:11;30:24;38:21;40:10,24;52:19;55:7,18;61:8;64:2;73:7;76:14,21;81:24;83:3;102:1;115:12
**against (33)** 14:16,24;17:19;18:11;19:1,3,23;20:14,16;21:15,25;35:22;36:3,9;38:11;48:24;55:13;57:11,25;58:24;61:20;63:4;67:13;69:11;82:16;90:1;100:23;105:7;106:7;114:19,21;115:1,2
**against- (1)** 2:5
**agency (2)** 19:19;21:15
**agenda (14)** 14:7,9;24:19;30:22;51:20;54:25;55:12;67:24;72:18;73:4,6;85:17;87:4,6
**agent (3)** 19:17;108:19;109:4
**aggravated (1)** 75:22
**aggregate (3)** 93:10,19;94:2
**aggregating (1)** 101:10
**ago (2)** 16:5;54:11
**agree (11)** 21:19;22:14;25:16;26:2;40:14;45:19;46:14;51:13;56:20;69:22;91:19
**agreed (13)** 22:18;26:2;29:11;39:8;45:6;49:1;69:3;71:23;72:11;74:23,25;75:1;96:23
**Agreement (29)** 3:23;17:1;27:8,9;31:7,17,18,20;32:1;34:10,11;43:18;44:5;53:7;68:15,17;69:23;71:18;96:9;104:16;107:22;108:20,21;109:4,7,21;111:16;112:6,9
**agreements (3)** 108:22,24;112:8
**ahead (27)** 37:20;45:4;52:2;55:2,20;56:11;59:4;62:15,23;63:11;65:4,14;68:22;69:2;71:6,15;74:16;76:3;78:8,12;79:11;84:20;94:21;99:12;103:13;104:1;114:20
**aid (1)** 75:9
**akin (1)** 31:23
**Al (7)** 3:7,7;5:3,4,11;12:6;73:9
**Albertelli (1)** 60:13
**align (1)** 111:15
**allegations (1)** 18:24
**allege (4)** 19:9,16,22;20:4
**alleged (2)** 45:25;52:23
**allegedly (1)** 48:23
**Alley (1)** 45:6
**allocable (1)** 110:25
**allow (6)** 27:7,17;45:2;65:6;74:22;76:17
**allowed (1)** 76:20
**allowing (1)** 31:20
**allows (1)** 58:18
**Ally (71)** 3:3,3;8:19,19;14:10,24;15:17;17:24,24;18:11,13,14,24;19:1,3,6,8,12,15,16;20:3,4,14,15,17;21:15;22:22;31:5;36:2,4,9,10,19,25;37:1;40:12,14,19;44:16,20;45:16;46:6,11,22;50:6;52:14;54:7,7,8,9,13;92:7;99:23;100:1,1,2,23;101:4,7;102:15,16,19;103:6,6,7;104:2;115:1,2,5,11;116:15
**Ally's (4)** 36:16;95:23;104:4;115:7
**almost (1)** 82:20
**along (2)**

53:8;76:20
**Alter (2)** 3:5;18:16
**alternative (1)** 79:15
**alternatives (1)** 82:13
**Although (1)** 97:19
**ame (1)** 61:11
**amend (1)** 35:6
**Amended (23)** 4:2;14:16;31:3;35:13,15;39:1;60:12;73:14;80:3,7,10;81:11,13;83:1,10;84:5;107:17,23;108:4,9,19;111:15;115:20
**amending (1)** 109:6
**amendment (2)** 75:17;109:10
**amendments (1)** 35:17
**America' (1)** 10:3
**American (1)** 78:2
**Americas (2)** 7:4;8:4
**America's (8)** 77:12,13,20;78:2,6;82:3,5;84:19
**amount (13)** 32:16;45:17;46:23;47:5;65:24;66:23;92:2,6,25;101:13;108:24;109:9;115:5
**amounts (5)** 90:23;93:17,17;106:2;115:3
**analogy (1)** 45:3
**analysis (3)** 92:11,23;94:16
**analyzed (1)** 95:18
**and/or (3)** 19:8;67:16;75:17
**and-a-half (1)** 89:20
**Angeles (1)** 11:15
**answered (1)** 47:9
**anticipate (1)** 110:20
**anticipation (1)** 26:1
**anymore (3)** 65:1,16;76:19
**Apap (1)** 71:14
**apart (2)** 36:6,7
**apologize (7)** 28:13;51:1;62:16;68:11;97:3;99:4,15
**APONTE (15)** 12:21,24;55:16,16,19,19;59:13,24,25;60:21,23;62:24;64:24;67:20;68:4
**app (1)** 72:10
**Apparently (1)** 99:10
**appeal (3)** 50:8;104:24;113:25
**appeals (2)** 24:1,3
**appear (3)** 81:5;83:3;111:18
**appearance (2)** 70:14,17
**appeared (2)** 16:17;74:4
**appearing (3)** 28:19;55:8;70:14
**appears (7)** 42:23;46:22;53:12;66:18;75:4;76:4;81:11
**appeasement (1)** 113:13
**appellate (1)** 36:9
**applicability (1)** 85:23
**applicable (4)** 57:22;65:22;67:17;111:2
**applicant (2)** 71:20,23
**Application (17)** 3:21;4:18,19;28:12,14,25;29:3,5,10,23;56:19;70:23;72:4,6,10;113:15,17
**applications (3)** 29:21;30:4,18
**applied (1)** 115:13
**applies (1)** 58:25
**apply (8)** 33:20;47:12,25;61:4;65:23;66:7,16,16
**Applying (1)** 114:2
**appointed (1)** 19:17
**appreciate (10)** 42:8;43:23,24;44:1;51:24;83:23;86:25;102:12;105:17;117:15
**appreciative (1)** 76:22
**approach (2)** 15:2;88:5
**appropriate (12)** 14:21;22:8;38:12;48:16,18;49:21;54:13;90:16,21;95:7;99:13;115:18
**appropriately (3)** 47:15;49:25;114:11
**approval (9)** 29:1,3;34:16;50:7;90:14;107:7,20;112:12;114:12
**Approve (8)** 3:3;27:8;33:20;47:13;48:1;53:14;106:17;111:16
**approved (20)** 31:7;32:4;34:2,12,19,22;35:20,21;36:1;49:2;53:4,5;96:11,14;104:16,20;111:7,22;112:6;114:16
**approves (2)** 72:10;108:9
**Approving (4)** 3:22;46:25;113:2,6
**approximate (1)** 115:4
**approximately (18)** 29:8;31:4,9;37:2;38:7;89:5,7,8,17;91:3,5;93:12,15,20;108:25;109:13;110:3,11
**April (5)** 56:14;85:22,25;92:22;93:23
**ARANT (3)** 12:2;55:23;60:5
**area (1)** 42:24
**argue (4)** 32:20;55:21;103:11;104:8
**argument (5)** 53:13;58:17;65:17;112:15;115:17
**arguments (1)** 36:12
**arose (1)** 64:14
**around (3)** 22:2;100:20;104:11
**articulated (1)** 113:13
**articulates (1)** 113:18
**aside (2)** 32:17;89:11
**asleep (2)** 56:8;58:7
**assert (1)** 63:4
**asserted (4)** 14:15,23;18:15;115:1
**asserting (1)** 69:10
**assertion (1)** 34:3
**assessed (2)** 35:23;92:13
**asset (1)** 91:4
**assets (13)** 37:2;45:9,10,11;48:22;54:9;93:10;98:2;109:15;110:15;113:6,8,11
**assistance (1)** 81:12
**assisting (1)** 74:9
**associated (4)** 101:8;104:18,21;112:22
**ASSOCIATES (1)** 12:21
**assume (6)** 29:15;36:1;45:19;83:9;99:16;117:11
**assuming (1)** 116:15
**assumption (2)** 96:12,16
**Atlanta (1)** 75:10
**attach (2)** 39:17,18
**attached (1)** 62:18
**attempting (1)** 105:21
**attorney (4)** 60:13;74:22,24;86:15
**Attorneys (20)** 7:3,12;8:3,11,19;9:3,11;10:3,12,20;11:3,12,21;12:3,13,22;63:21,23,25;75:20
**attorneys' (19)** 56:11,15,22;58:23;59:5,10,18;62:7;63:13,19,20;64:18,22;65:11,21,24,25;66:21;67:16
**attorney's (1)** 66:17
**attributable (2)** 103:19;104:2
**August (3)** 22:17,19;26:16
**authori (1)** 47:20
**authority (8)** 21:25;22:7;31:4;47:24;48:19;53:14;114:20,23
**authorized (2)** 36:8;111:4
**Authorizing (7)** 3:24;4:3;34:22;107:5,18;108:10;116:17
**Automatic (15)** 3:4;4:7;14:11;27:17;38:13;57:20,22;58:25;59:7;64:4;65:18,22;66:16;67:4;69:8
**available (7)** 33:9;40:7,17;52:4;65:21;82:10,14
**Avenue (11)** 7:4,13;8:4,20;9:4;10:5;11:13,22;12:5;76:6;79:23
**avoid (4)** 43:15;69:13;82:16;111:13
**avoided (1)** 38:3
**await (1)** 85:1
**award (4)** 58:20;59:18;65:24;67:16
**awarded (3)** 65:22;66:17,19

## B

**back (22)** 25:2,17;29:20;30:8;35:25;43:21;47:8;48:23;49:2,15;50:1,6,7;58:16;87:19;96:15,22;100:14;104:12;105:11,22;106:10
**backdrop (1)** 15:3
**background (2)**

37:17;108:12
**bad (3)**
25:22,23;26:9
**balance (9)**
40:2,10,24;92:19, 20;93:4,7,13;95:24
**Balboa (1)**
17:20
**Balboa's (1)**
20:8
**Bank (34)**
3:3;8:19;10:3,12; 14:10,24;15:17; 17:24;18:12,13,14, 24;19:1,3,6,8,12,15, 16;20:3,4,15,17; 21:15;52:14;69:18; 78:15;99:23;100:1,1, 2;103:6,6;104:2
**bankers (1)**
88:13
**banking (1)**
100:12
**Bankruptcy (28)**
2:16,25;3:21;4:7, 20;18:1;22:12; 56:10;57:12,22,24; 58:3,5,6,9;60:15; 61:23;63:25;66:4,5, 13;76:9;78:22;79:6, 17;82:14,24;113:24
**bankruptcy's (1)**
56:9
**banks (2)**
100:1,6
**bar (2)**
65:9,23
**Barclays (1)**
110:8
**base (1)**
97:22
**based (20)**
18:17;19:2,3; 41:16;65:25;66:19, 21;67:3;71:19; 92:22;95:19,20; 97:23;101:6;110:20; 112:7,8;113:6; 114:7;115:16
**basic (1)**
111:6
**basically (1)**
79:18
**basis (13)**
28:24;30:9;67:3; 72:9;74:24;91:15; 96:18;98:2,4,4; 109:18;111:20; 113:21
**Battery (1)**
10:13
**Bear (1)**
80:3
**bears (1)**
67:17
**became (1)**
100:18
**begin (2)**
73:2;87:15
**beginning (4)**
41:13;74:17; 77:15;104:13
**begins (1)**
55:11
**behalf (22)**
3:17;4:13;14:6; 15:13,16;16:24; 21:10;24:23;27:3; 28:19;31:2;37:10; 41:25;52:14;55:8, 16;58:1;68:7;73:7; 81:7;85:16;86:7
**behind (3)**
15:12;26:18;27:18
**belief (1)**
113:21
**belong (5)**
14:25;20:21; 21:23,24;22:9
**benefit (3)**
89:10,21;94:4
**benefits (2)**
38:1;111:3
**Berkshire (20)**
11:12;32:8,20; 33:6;39:22;41:25; 42:4,8,16,21;44:14; 52:23;53:7;54:12; 104:15;108:5,7; 110:6;112:3,14
**best (3)**
77:22;106:22; 113:22
**better (2)**
17:3,6
**beyond (1)**
76:15
**BIFFERATO (1)**
9:10
**billion (31)**
31:4;34:9;37:2,3; 45:6;49:1;54:9,10; 89:7;91:4,5;93:10, 11,12,15,20,21,24; 96:23,25;97:1;98:1; 100:23;105:11,24; 108:19;110:3,11,12; 112:11;115:4
**bind (1)**
47:4
**Birmingham (1)**
12:6
**bit (3)**
45:5,9;76:1
**blank (1)**
75:5
**bond (1)**
31:8
**Bondholders (1)**
113:23
**bonds (7)**
25:1,5;31:11,20; 33:7;46:1;116:16
**book (2)**
93:11;103:18
**borne (1)**
33:14
**borrower (2)**
7:20;85:23
**borrowers (5)**
18:22,22;67:12; 108:18;109:3
**borrowers' (3)**
81:21,23;83:5
**both (13)**
25:18;35:2;42:25; 43:12,13,16;63:15; 65:8;89:2;95:22; 112:13,13;114:5
**bothering (1)**
59:6
**bottom (1)**
73:2
**BOULT (2)**
12:2;55:23
**bound (1)**
47:3
**Bowling (1)**
2:17
**BR (1)**
113:24
**BRADLEY (3)**
12:2;55:23;60:5
**breach (4)**
18:17;19:4,5,11
**break (2)**
87:17;104:3
**breakout (1)**
104:3
**Brenner (7)**
74:22,24;77:18; 80:21,21;83:13,14
**Brenner's (1)**
83:20
**BRIAN (4)**
10:8;13:8;71:7; 78:10
**bridge (1)**
26:14
**brief (4)**
43:19;46:4;50:15; 51:3
**briefed (4)**
20:11,12;21:1; 53:14
**briefing (4)**
16:6;17:10;21:16; 23:3
**briefly (6)**
38:20;39:22; 88:10,24;96:5; 115:24
**briefs (1)**
22:15
**bring (7)**
36:3,8,8;38:11; 67:9,12,14
**brings (5)**
27:15;28:5;30:3; 70:22;73:1
**broke (1)**
76:9
**brother (1)**
86:6
**budget (1)**
110:20
**bullet (1)**
103:25
**business (46)**
33:21,24;36:21; 45:1;47:13,15,19; 48:20;49:4,7;50:21, 25;51:17;54:5;67:8, 18;90:19,20;91:12, 20;93:19;94:2; 95:24;97:24,24;98:2, 7;104:4,4,4;106:17, 25;113:2,4,7,12,13, 16,18,20;114:2,11, 14;115:13,15,19
**buyer (1)**
69:17

**C**

**CA (2)**
11:15,23
**calendar (2)**
23:3;85:12
**call (3)**
51:20;87:25;116:9
**called (1)**
17:20
**came (6)**
37:13;47:7;59:19; 67:7,8;100:2
**camera (1)**
72:7
**can (38)**
26:1;28:23;40:13, 16;45:13;49:5;51:4, 20;52:19;54:16; 57:9;59:1;62:9;67:2; 68:2,23,24;69:8; 71:2;73:23,24; 76:25;82:5,6;84:20, 21;85:4;88:14,19; 92:13;105:3,23; 114:19;116:15,19, 21,23;117:1
**Capital (9)**
3:17;14:3;54:8,11, 12;87:20;92:21; 93:14;101:3
**care (1)**
42:10
**Case (59)**
5:5;8:2;15:4,5,19, 20;16:17;17:6,18,18, 21;18:4;23:16; 24:15;26:23,23; 34:12;39:23;40:8; 41:13;42:17,19; 44:3;46:2,3;48:21; 54:12,19;57:18;58:3, 7,15;59:20;63:7,9; 64:12,13;66:3;67:7, 8;73:19,25;80:5,6; 82:15;83:24;84:3,5; 85:18;88:22;89:4,6; 90:9;95:13;101:8; 104:14,24;111:20; 115:8
**cases (2)**
109:18;114:3
**Cash (39)**
3:11;24:19;25:7, 21;26:4;33:7;35:23; 37:6;39:11,17,18,20; 40:14,17,18,19; 45:14;46:25;52:6; 90:25;91:5,6,12,21; 92:20;93:11,20; 98:1;109:16;110:2,7, 11,12,12,16,19,22, 25;111:1
**cause (2)**
36:4;64:14
**caused (1)**
75:18
**causes (3)**
14:24;16:12;38:11
**CC (9)**
3:2,10,14;4:6,9,11, 18;5:4,8
**ceased (1)**
56:17
**cede (4)**
24:20;28:14; 30:23;73:3
**Centerview (3)**
88:12;95:9;96:2
**Centerview's (1)**
94:16
**central (1)**
14:22
**Centre (1)**
9:12
**Certain (12)**
4:4;16:11;29:3; 30:23;31:18,19; 82:19;107:5,19; 108:17;109:21; 114:14
**Certainly (11)**

21:22;23:15;34:21;46:19;53:9,12;59:17;66:18;77:5;104:10;114:15
**certainty (3)** 114:15,17;115:12
**Ch (1)** 5:2
**CHADBOURNE (1)** 10:19
**challenge (2)** 47:5,7
**challenged (2)** 105:4,13
**chambers (1)** 30:6
**chance (4)** 55:21;68:25;78:5;95:2
**changed (4)** 32:6;48:6,7;97:21
**changes (1)** 39:21
**Chapter (4)** 3:15;27:6;53:2;58:3
**charges (1)** 71:24
**Chase (2)** 8:12;104:20
**Chateaugay (1)** 113:5
**check (2)** 70:16;84:21
**Chinloy (5)** 4:16;70:11,13,15,17
**choice (2)** 40:23,24
**Circuit (5)** 57:6;64:13;113:6,11;114:1
**circumstances (5)** 76:14;101:6,8;106:25;115:16
**cite (1)** 47:24
**cited (1)** 63:7
**Citibank (1)** 110:9
**citizens (1)** 76:13
**City (1)** 27:16
**Civil (1)** 82:24
**clai (1)** 96:18
**Claim (30)** 4:12,16;15:21;46:23;48:23;58:9;63:3,4,6,24;64:5,6,9;65:10;66:2,10,11,22,23,25;67:14;68:10;69:4;70:13;105:7,16;107:8,11,21;115:6
**Claims (64)** 3:6,8;4:4;14:23;15:23;16:13;17:22,24;18:10,10,11,12,15,15,16,17,24;19:1,3,5;20:14,15,16,19,21;21:13,14,15,21,23,23,25;22:9,9;23:22;30:23;33:8;36:8,8,19;48:25,25;63:18;64:3,18;69:9,10;89:7,12,25;90:8,12,23;105:4;107:6,19,21;110:21,22;114:19,21,25;115:7,8
**clarified (1)** 60:24
**clarifies (1)** 61:3
**clarify (5)** 29:12;43:8;52:5,11;60:16
**clarifying (2)** 44:11;52:10
**Class (3)** 3:6;17:15;18:20
**clear (12)** 30:11;32:21;35:8;36:11;41:5;54:1;59:8;67:6;81:5;97:4;106:9,18
**clearly (8)** 22:12;35:13;37:21;63:2;66:7;75:11,11;106:24
**Clearview (1)** 95:5
**CLEARY (1)** 11:2
**clerks (1)** 57:16
**client (4)** 46:21;47:17;49:18;84:22
**close (3)** 24:25;72:20;100:24
**co-counsel (1)** 55:24
**Code (4)** 3:21;4:7;57:22;91:10
**co-head (1)** 88:11
**COLE (1)** 9:19
**collapse (1)** 101:3
**Collateral (19)** 3:12;24:20;25:7,21;26:4;39:11,16,16,19,20;46:25;52:7;109:16;110:13,22,23,25;111:1,1
**colleague (1)** 28:20
**colleagues (3)** 46:20;92:17;93:5
**collect (2)** 66:8,9
**collecting (1)** 100:22
**comfort (2)** 34:21;104:15
**comfortable (12)** 37:23,24;40:3;90:17,18,21;92:24;94:3,4;95:25;96:20,21
**coming (9)** 22:17;25:17;29:20;40:10;43:2,21;45:22,23;49:17
**commences (1)** 64:19
**comments (3)** 25:2;27:4;52:16
**commit (1)** 93:14
**committed (4)** 19:19,23;93:15;105:24
**Committee (35)** 7:3,12,20;14:17;15:9;16:2,3,4,25;21:11;25:13;26:22;27:3;29:11;31:16;35:2;36:1,7;37:11;38:10,22;45:23;47:4,4;72:24;80:17;81:22;92:7;106:20;108:7;112:16;113:9,23;114:20;116:15
**communicate (1)** 74:23
**communication (1)** 80:18
**community (1)** 100:12
**Company (12)** 5:2,4;10:4;17:20;19:21;73:9;77:12,13,20;95:6;106:8;113:22
**compared (1)** 104:18
**comparing (1)** 106:6
**Compensation (3)** 4:19,21;76:20
**complaint (24)** 14:15;18:1;21:4;29:7,13;34:9;73:14,15,16;76:7,10;79:14;80:3,7,11;82:18,20;83:1,4,11;84:5;85:19;114:22,24
**completed (1)** 79:7
**completely (1)** 99:13
**complicated (1)** 115:10
**complication (1)** 112:2
**compromise (3)** 31:18;89:24;90:8
**CON (2)** 12:12;32:12
**conceive (1)** 50:9
**concern (3)** 40:15;44:19;49:14
**concerned (4)** 39:15;40:11;41:12;96:7
**concerning (1)** 96:3
**concerns (3)** 47:22;50:5,5
**concession (1)** 31:22
**concluded (7)** 35:2,6;85:11;92:4,23;106:21;117:19
**concludes (3)** 87:6;114:9;115:16
**conclusion (4)** 50:20;92:4;97:18,20
**condemnation (1)** 27:17
**condition (1)** 101:7
**conduct (7)** 57:25;58:6;66:1,22;67:8,15;86:2
**conducted (1)** 113:3
**conducting (1)** 67:18
**confer (2)** 21:18;22:14
**Conference (15)** 3:2,10;5:5,8,11;14:9;16:14;24:19;42:2;80:6;86:2,3,7,18,20
**conferences (2)** 23:16,16
**conferred (1)** 71:17
**confirm (3)** 25:15;68:18;70:25
**confirmation (11)** 16:8,21;17:4,7;20:19;22:24,24;32:24;43:7;44:13;96:10
**confirmed (8)** 34:2,12;54:17;96:15;104:19;106:11;111:22;114:17
**conflate (1)** 20:14
**conflict (1)** 43:16
**confused (3)** 17:5;99:2;102:7
**conjunction (1)** 16:21
**Connecticut (1)** 95:13
**connection (11)** 17:4;22:1;29:7;54:17;58:2,6;86:11;97:6;109:10,19;110:4
**consensual (1)** 27:6
**consent (2)** 20:3;22:5
**consequence (3)** 39:2;91:9,17
**Consequently (1)** 105:8
**consider (6)** 20:21;36:22;48:8;67:1;96:8;113:4
**consideration (3)** 55:11;74:20;97:6
**considered (1)** 84:7
**considering (3)** 44:25;80:23;114:5
**consistent (1)** 53:23
**consolidate (1)** 108:20
**constituency (2)** 40:8,8
**constituent (1)** 39:23
**constitutes (1)** 110:12
**consult (1)** 86:13
**consultation (3)** 71:20;72:23;106:19
**consulted (1)** 29:11
**Consulting (3)** 3:23;14:14;29:2
**contact (10)**

74:22;77:19;78:21,21;81:16;82:1,6,7;83:7,19
**contacted (1)** 81:10
**contained (2)** 100:8,9
**contemplated (1)** 15:3
**contemplation (1)** 35:18
**contempt (1)** 60:14
**contested (2)** 25:21;28:6
**context (2)** 92:23;101:13
**continuance (4)** 42:25;44:12;51:3;104:15
**continuation (1)** 26:16
**Continue (13)** 3:11;14:21;32:14;39:11,24;65:7;67:9,15;86:19;89:3;98:1;102:19;105:8
**continued (6)** 26:15;30:9;32:13;43:3;87:23;102:16
**contract (4)** 18:17;19:4,5;20:1
**contracted (1)** 20:2
**contracts (1)** 19:11
**control (3)** 18:25;75:15;76:15
**controlled (1)** 48:24
**converted (1)** 109:10
**conveyance (1)** 48:25
**Cook (3)** 30:5,14,15
**coordinate (1)** 39:24
**coordinated (1)** 39:23
**copy (4)** 24:11,14,14;73:4
**core (1)** 17:6
**Corp (3)** 113:5,10,10
**corrections (1)** 17:17
**correctly (1)** 73:18
**cost (5)** 32:25;33:14;34:17;53:1,17
**cost/benefits (1)** 37:15
**costing (1)** 50:10
**costs (2)** 33:4;64:18
**cost-savings (1)** 54:14
**council (1)** 45:23
**Counsel (46)** 4:20,23;7:20;15:9;17:12,14;18:9;21:20;23:8;24:15;29:11;49:22;52:17;55:13;56:15,17,20;57:11;59:22;62:3,23;65:9;68:1,16;70:23;71:9;73:25;74:11;75:1,3;77:13,21,23;78:2,6,18,23;80:17;81:4,21;83:5;84:19,20;85:6,8;86:6
**counselor (1)** 65:14
**counterbalanced (2)** 35:22;37:6
**counterclaim (1)** 64:5
**counterclaims (1)** 64:4
**country (1)** 22:2
**couple (7)** 17:17;24:1;34:16;38:23;54:11;68:8;100:19
**coupons (1)** 93:24
**course (5)** 46:3;83:10;84:7;113:2,12
**Court (388)** 2:16;9:20;14:2;15:4,7,11,15,21;16:9,14,18,22;17:11,21;18:3,13,19;19:1,6,12,15,24;20:1,6,7,11,19,20;21:1,6,9,17,24;22:4,6,6,12,20;23:7,10,15,19,20;24:4,7,9,10,11,12,14,15,21;25:9,17,18;26:3,6,23,25;27:13,22,25;28:2,4,7,10,15,17,21,23;29:15,19,22;30:2,8,10,13,15,17,25;32:5,15;33:2,11,16,19;34:1,8,13,21;35:3,5,7,8,25;36:9,9,13,14,20,21;37:8,16;38:11,18;40:5,15,20,22;41:2,4,19,21;42:5,6,10,12,15,18;43:2,10,13,24;44:4,7,10,17,19,24;45:4,12,16,22;46:10,13,19,24;47:2,11,24;48:4,10,13,15,17;49:5,13,24;50:3,8,8,12,17;51:5,6,9,12,14,19,23,25;52:9,12,18,21;53:4,4,5,11,20;54:2,18,21,23;55:6,15,17,20;56:3,5,10,13,21,22,25;57:2,4,4,6,7,15,24;58:5,8,14,20,22;59:3,5,7,16,18;60:3,19,20,22;61:5,7,13,16,21,23,24;62:6,15,19,22;64:23,25;65:4,16;66:4,5,6,13,17;67:4,5,6,10,14,21;68:1,5,14,18,20,22,24;69:2,9,15,17,20,24;70:2,7,15,21;71:3,4,6,10,15;72:2,5,10,14,16,25;73:4,11,18,22,24;74:3,8,10,13,16,18,20;76:3,7;77:2,7,11;78:2,5,8,12,14,16,19,25;79:4,7,10,25;80:2,16,18,23,25;81:2,5,6,9,15,18,20;82:20,22;83:9,14,18,22;84:2,4,8,15,17;85:6,11;86:22,25;87:4,7,11,14,19,24;88:2,6,10,24;89:23;90:2;93:1,5;94:7,10,12,18;98:17,25;99:2,6,9,12,16;102:3,9,23;103:10,13,15,20;104:1,6,8;105:2,20;106:3,12,14;107:1,3,13,15;108:3,9;111:8,17;112:4,18,19,24;113:24;114:9;115:13,14,16,22;116:3,5,7,9,12,17,19;117:5,8,11,12,14,16,18
**courtroom (1)** 77:14
**courts (1)** 113:3
**Court's (10)** 16:12;33:19;47:25;55:11;65:1,17;67:18;72:7;76:23;85:20
**C-rated (1)** 98:13
**credit (37)** 36:22,25;37:1,5,21,24,25;40:5,11,14,15;44:15,20;45:11;46:7,7;49:15;52:24;54:7;89:2;92:13;94:16;96:3,7;98:3,3;107:22;108:21;109:5,8,12,14;110:14;112:8,15,22,22
**Creditor (4)** 11:21;65:15;76:10;79:15
**creditors (11)** 26:22;33:10,15;45:23;46:3;49:17;53:1;54:19;89:10,21;113:14
**Creditors' (9)** 7:3,12;16:25;21:11;27:3;31:15;81:21;92:6;106:20
**credits (2)** 91:12,20
**CRO (1)** 26:19
**cross (3)** 52:16;54:4;114:8
**cross- (2)** 49:5;114:8
**cross-examination (8)** 52:21;87:9;94:18,21,23;99:9;102:24;112:20
**cross-examine (6)** 49:11,21;50:13,16,23;51:16
**crystal (1)** 59:8
**CUMMINGS (2)** 12:2;55:23
**curb (1)** 107:12
**cure (2)** 72:17,19
**current (5)** 101:6,6;109:18;110:20;111:19
**currently (5)** 31:10;69:19;86:17;90:25;91:7
**custodian (1)** 91:19
**cut (2)** 37:18;61:25
**CUTLER (1)** 7:11

## D

**damage (1)** 58:20
**damages (1)** 67:12
**date (19)** 14:20;16:11;20:10;25:7;29:9;30:7;58:1;59:10,15;65:9;75:2;81:11,14;90:13,24;94:15,17;108:25;109:11
**dated (1)** 109:21
**dates (1)** 22:16
**date's (1)** 23:13
**day (5)** 16:8;23:4;41:13,14;95:17
**days' (2)** 29:19;48:3
**DC (1)** 7:14
**DE (3)** 9:14;91:14,14
**deadline (4)** 68:9;70:12;73:14;85:20
**deal (5)** 14:22;15:2;23:1;77:24;116:22
**dealing (1)** 81:22
**Deborah (1)** 71:13
**debt (12)** 31:8;45:16;53:8;69:6;92:21;93:23,24;98:8,12;101:3;105:12;109:19
**debtor (47)** 34:5;36:1,21;45:1,10,12,17;46:10;47:3,6,14;50:20,23;51:16,20;53:24;54:5;55:1;56:21;58:13;63:22;64:16,19;65:20;66:2,12,20;67:8,13,16,17;84:5;85:16;91:12;105:10;108:6;109:3;110:3;112:16;113:4;114:10,11,17;115:11,14,15,17
**Debtors (70)** 3:10,11,21,24;4:3,21;14:6,14,19;16:1,3;19:22;24:23;26:17,21;28:19;29:10,14;31:2,3;34:17;35:2;37:22,23;38:11,24;39:8,12;53:3;55:9;62:17;65:6,8,11;68:7;69:6,7,11;72:19;73:8;77:5,9;85:25;87:25;88:25;90:25;91:7,

13;92:6,9;105:7;106:19;107:5,16,18;108:17,17,18;109:2,17,20;110:3,7,10,20;111:8,9,15,17;112:9
**Debtors' (32)** 3:14;4:2,6;24:19;26:11;28:25;29:2,7;30:22;45:9,10;48:20,22;49:6;55:12;65:19;66:3;68:24;73:12;82:23;94:14,17;106:25;107:3,16;108:9;110:2,16,18;111:3;112:21;115:20
**debtor's (1)** 63:9
**December (4)** 4:22;14:13;108:16;109:2
**decide (5)** 22:13;59:20,20;64:2;85:2
**decided (4)** 36:2;39:21;64:13;86:19
**deciding (3)** 47:25;53:11;66:15
**decision (11)** 22:6,11,20;48:19;49:7;97:7;112:11;113:20,20;114:12;115:15
**decisions (1)** 24:1
**declaration (17)** 26:18;29:19;33:23;88:20,21,22;89:2;91:1;94:14;95:12,18;107:14,24,25;108:1;112:18;114:5
**Declaring (1)** 3:7
**defend (2)** 63:4;115:2
**Defendant (3)** 2:7;12:3;14:17
**defendants (3)** 17:19,19;80:8
**defending (1)** 115:11
**defense (1)** 64:5
**defer (3)** 15:11;33:17;59:24
**deferred (2)** 32:22,23
**deferring (2)** 33:3;38:7
**definite (3)** 73:12;82:21,25
**deflect (1)** 48:12
**delay (2)** 112:4;113:7
**delighted (1)** 50:16
**delta (3)** 46:4,5,6
**DENMAN (1)** 8:7
**denying (1)** 67:21
**DEPARTMENT (1)** 13:2
**deposit (2)** 34:12;36:4
**depositions (1)** 54:13
**de-risk (3)** 54:19;89:17;90:4
**de-risking (3)** 40:2,25;41:6
**de-risks (1)** 40:3
**derivative (7)** 20:17,20;21:21;22:9,11,21;23:22
**describe (2)** 71:2;88:24
**detail (1)** 111:5
**detailed (1)** 92:14
**details (3)** 33:24;108:13;111:3
**determination (6)** 16:12;41:18;65:1,17;69:6;111:25
**determinative (1)** 21:21
**determine (2)** 46:22;111:11
**determined (2)** 36:20;90:9
**determines (1)** 107:13
**determining (6)** 33:20;47:13;88:25;91:23;113:14;115:19
**devastating (1)** 104:24
**development (1)** 51:6
**developments (1)** 51:4
**difference (2)** 61:10;99:3
**different (6)** 15:23;39:4;47:19;58:7;75:21;76:7
**differently (1)** 98:22
**difficult (1)** 66:11
**difficulty (1)** 100:22
**digest (1)** 43:20
**diligence (1)** 92:14
**diminish (1)** 113:8
**DIP (2)** 110:7,8
**direct (10)** 21:13,15,20,23;22:21;64:3,5;88:7;112:19;114:8
**directing (1)** 85:23
**disagree (1)** 40:16
**dischargability (1)** 69:6
**discharged (1)** 64:15
**disclose (2)** 66:6,13
**disclosed (2)** 43:19;98:9
**disclosure (4)** 17:2;27:9,10;96:14
**discovery (1)** 21:3
**discrete (2)** 18:8;20:23
**discussed (3)** 86:4;96:5;114:3
**discussion (5)** 64:17;96:3,5,6;115:6
**discussions (1)** 115:25
**disgorge (1)** 90:23
**disgorged (1)** 93:17
**disgorgement (5)** 36:4;49:23;50:9;90:12;96:17
**dismiss (3)** 17:23;20:8;69:5
**dismissed (5)** 56:14;65:8;79:6;82:15;113:25
**disparaging (1)** 60:8
**displaced (1)** 76:14
**dispose (1)** 98:2
**dispute (7)** 41:7,8,13,15;50:20;89:14;92:2
**disputed (3)** 39:14;50:19;105:6
**disputes (1)** 90:4
**dissipation (1)** 106:7
**DISTEFANO (1)** 10:24
**distinct (2)** 20:15,16
**District (12)** 15:6;17:16;20:7;22:2;23:20;24:3,12,15;75:8,8,9;113:25
**Doc (6)** 3:2,14;4:11,15;5:4,8
**Doc# (8)** 3:2,10,19,21;4:2,6,9,18
**docket (13)** 20:6;24:6;55:14;57:21;60:9,11;62:10,25;68:10;80:4;82:22;83:1,3
**document (3)** 75:13;88:17;92:16
**documentation (3)** 46:21;79:19,20
**documents (2)** 76:5;84:14
**documents2934 (1)** 4:12
**dollar (4)** 31:14;71:25;107:7;108:19
**dollars (54)** 29:9;31:4,10,13,21;32:19;33:4;37:2,2,4;38:2,8;42:7,16,21;45:7;49:1;50:10;54:9;56:23;59:1;65:25;71:24;75:6,19;89:5,7,9,17,20;90:6,10;91:5;92:10;93:10,11,12,15,20,21,24;96:23;98:1;100:23;101:10,11;102:20;105:11,24;109:1,13;110:3,11;115:4
**dominated (1)** 48:24
**domination (1)** 18:25
**Donaghy (4)** 57:19;58:15;59:18;67:7
**D-O-N-A-G-H-Y (1)** 57:18
**Donaghys (3)** 57:18,24;59:1
**Donaghys' (3)** 57:20;58:2,6
**done (11)** 21:17;22:22;23:3;29:17,17;51:9;82:4;92:22;97:18,20;111:24
**Donna (2)** 4:16;70:11
**door (2)** 35:23;37:7
**dormant (1)** 56:19
**DORR (1)** 7:11
**doubled (1)** 76:8
**doubt (9)** 51:15;99:11;100:12,17;111:22;114:19,25;115:1,9
**Doug (3)** 16:24;21:10;27:2
**DOUGLAS (1)** 7:7
**down (15)** 30:23;31:4,8;36:13;38:1,5,14;39:12;61:19;89:12,17;90:3,7;92:6;95:22
**draft (1)** 114:21
**driving (1)** 41:17
**drop (1)** 14:16
**DRUCKER (1)** 9:23
**due (6)** 81:11;83:10;84:6;92:14;107:10;111:14
**during (9)** 54:12;58:17;86:3,7;89:4,6;93:19,21;111:20
**dynamics (1)** 91:22

**E**

**EAF (1)** 110:10
**earlier (3)** 82:20;83:4;92:12
**earn (2)** 91:13,17
**earning (6)** 91:7,11,20,21;108:15;110:18
**easier (1)** 92:3

**easy (1)** 40:24
**ECF (9)** 57:21;67:22;80:4;82:22;107:6,14,19;108:5,8
**echo (1)** 27:4
**economic (3)** 89:11;101:22;102:5
**effect (1)** 82:15
**effective (1)** 38:14
**effectively (3)** 16:3;91:20;109:25
**effects (1)** 44:2
**effort (4)** 66:8;72:19;82:4;111:23
**Ego (2)** 3:5;18:16
**either (11)** 17:25;25:5;34:11;42:25;43:12;58:10;62:2;63:17;75:7;86:9;98:21
**elaborate (1)** 114:4
**eliminate (1)** 29:20
**eliminating (1)** 105:12
**ELLIS (3)** 8:18;15:16;52:14
**else (18)** 16:22;18:6;21:6;26:25;27:13;29:22;30:10;37:8;38:18;41:21;51:25;54:24;72:2;76:25;79:11;87:4;101:4;107:1
**e-mail (1)** 86:15
**embedded (1)** 93:3
**embodied (1)** 31:6
**enables (1)** 64:15
**end (2)** 16:8;85:7
**endorse (1)** 47:1
**ends (1)** 101:2
**enforce (6)** 14:10;55:13;59:5,25;60:2,5
**Enforcement (1)** 4:7
**Enforcing (1)** 3:4
**Engagement (2)** 3:23;29:24
**enjoin (1)** 63:5
**Enjoining (1)** 3:5
**enjoyed (1)** 95:21
**enough (1)** 48:8
**enter (3)** 56:11;58:20;70:18
**entered (19)** 22:4;24:6;26:14;46:24;57:4;59:7,10,11,15;62:7;66:21;67:21;82:22;85:22;108:19,22;109:4,7,21
**entire (1)** 108:12
**entirety (1)** 109:6
**Entitled (8)** 3:6;58:24;63:13,15,19;64:9;89:16;105:8
**entity (1)** 103:5
**Entry (11)** 3:11,14,22;4:2;27:16;62:25;65:23;66:16;71:18;107:4,17
**equitable (2)** 36:11;69:9
**equity (2)** 93:12;113:9
**Erica (4)** 28:11,14,18;55:7
**errors (2)** 75:12,17
**eScribers (1)** 5:21
**escrow (5)** 32:6,13;34:13;35:10;36:5
**escrowed (2)** 32:9,12
**escrowing (1)** 106:8
**ESQ (22)** 7:7,8,16,25;8:7,15,23;9:7,16,23;10:8,16,24;11:7,8,17,25;12:8,9,18,24;13:8
**essentially (2)** 29:3;44:21
**established (2)** 114:10;115:17
**estate (36)** 14:24,25;15:21,23;16:13;18:10,15;21:24;22:9,12;31:9;32:25;33:4;45:7,8,19;52:25;54:15,16;69:19;89:18,19,22;90:1,4;91:21;92:8,10;94:4;95:21;104:13,20;105:25;106:23;111:3;113:2
**Et (6)** 3:7,7;5:3,4,11;73:9
**evalua (1)** 112:21
**evaluated (3)** 88:25;92:12;106:19
**evaluation (1)** 112:22
**Evansdale (1)** 27:16
**evaporate (1)** 101:4
**even (16)** 21:22;33:3;50:7;64:2,14;66:6;76:16,18;79:16;90:14,20;91:17;100:24;110:21;116:2,2
**event (11)** 31:6;32:3;34:11;96:9;97:8;102:15;104:12;106:10;107:12;111:21;114:16
**everybody (1)** 92:6
**evidence (15)** 49:20,22;52:24;53:13;54:4;94:7,9,13;107:15;108:1;113:15;114:7,10;115:17,18
**evidenced (1)** 60:11
**evident (1)** 75:3
**exact (1)** 73:16
**exactly (2)** 18:5;45:15
**exam (1)** 114:8
**examination (6)** 87:15;88:7;92:15;103:2;114:8,9
**examine (3)** 49:6;50:17;94:20
**examined (2)** 46:20;70:16
**Examiner (4)** 10:20;44:7;51:7,9
**examiner's (4)** 43:18;46:16;104:17;112:6
**example (2)** 43:3;116:20
**exceed (1)** 115:4
**except (1)** 63:3
**exception (2)** 63:1,2
**excess (2)** 54:8,10
**exclu (1)** 18:5
**excluded (1)** 29:4
**excluding (2)** 91:5;110:11
**Exclusive (4)** 3:15;15:20;18:3;26:12
**exclusivity (3)** 26:15;27:7,12
**excuse (5)** 44:25;55:2;62:14;95:10;99:1
**excused (3)** 68:2,4;104:6
**exercise (6)** 49:7;50:21,25;51:16;106:24;115:13
**exercised (4)** 47:15;113:4;114:11;115:18
**exercising (2)** 36:21;114:14
**Exhibit (18)** 62:12,18;88:14;92:18;93:1,2;94:15,17;95:3,13,15,16;103:18,21;107:15;112:19;114:6,7
**Exhibits (3)** 94:8,12;95:2
**exist (4)** 36:9;37:6;94:3;95:15
**existed (2)** 95:16;96:19
**exists (1)** 35:22
**expand (1)** 29:23
**expect (2)** 23:12;30:8
**expects (1)** 42:21
**expense (2)** 32:11;64:16
**Expenses (5)** 4:21,24;71:22,24;110:24
**expensive (1)** 104:22
**experience (7)** 48:19;88:9;100:24;101:17,19,21,23
**experienced (3)** 100:17,18;101:24
**expire (1)** 25:22
**explain (5)** 41:6;86:12;88:19;92:13;108:9
**explanation (1)** 56:13
**explicit (1)** 59:17
**exposing (1)** 64:21
**express (1)** 101:2
**expressly (1)** 113:15
**Extend (5)** 4:11;26:12;68:9;70:12;88:20
**extended (1)** 85:20
**Extending (3)** 3:15;25:6;30:6
**extension (3)** 26:24;27:7,12
**extent (13)** 21:13;29:14,17;57:22;89:18;90:22;92:9,25;93:17;96:13;101:13;102:18;108:14

## F

**F2d (1)** 113:5
**F2nd (1)** 113:10
**F3d (1)** 113:25
**Faber (1)** 12:3
**face (2)** 46:22;105:7
**faced (1)** 112:16
**facilitate (2)** 81:3,4
**facilities (6)** 89:3,5;93:16;95:22;103:7;110:9
**facility (11)** 107:23;109:6,8,9,12,14;110:8,8,9,10,14

**fact (14)** 31:11;35:12; 36:12;51:2;66:6; 84:25;90:8,11; 91:11;101:6;105:6, 25;106:16;114:24
**factor (2)** 89:23;93:18
**factors (4)** 88:25;93:13;94:1; 106:19
**facts (3)** 92:24;101:7;114:5
**factual (4)** 15:2;50:19;51:4,6
**failed (1)** 100:4
**failure (1)** 66:12
**fair (3)** 40:9;95:17;106:16
**fairly (3)** 14:7;47:21;82:19
**faith (1)** 113:21
**falls (2)** 36:6,7
**familiar (9)** 20:7;36:25;98:8, 10,11,15,19;99:22, 25
**far (5)** 14:19;46:5;53:16; 73:16;94:4
**Fargo (1)** 78:11
**fashion (4)** 49:7;97:13,14; 117:9
**faulting (1)** 62:2
**February (1)** 29:8
**Fed (1)** 30:7
**Federal (4)** 12:4;82:23,24; 104:22
**fee (3)** 72:3,5,10
**fee$2,226,584.25 (1)** 4:24
**feel (3)** 15:18;75:16; 100:21
**feeling (1)** 37:23
**Fees (26)** 29:8;56:11,15,22; 57:10;58:14,23;59:1, 6,10,18;62:7;63:13, 15,19,20;64:10,18, 24;65:11,21,24,25; 66:17,21;67:16
**felt (1)** 79:15
**few (1)** 65:3
**fiduciary (5)** 104:25;105:3,14, 23;106:6
**fifteen-million-dollar (1)** 32:25
**Fifth (1)** 12:5
**fifty (1)** 91:15
**fight (3)** 31:24;32:1;38:3
**fighting (1)** 75:20
**figure (1)** 15:1
**File (28)** 3:15;4:12;15:18; 23:20;27:7,9;29:19; 34:8;44:16;49:25; 56:18;61:10;62:17; 65:10;66:10,24,25; 68:10;69:4;73:14; 79:14,14,17;80:9; 81:7;83:1,10;96:17
**filed (55)** 3:16;4:13,16; 14:13,14,15,17; 15:12;17:2;24:12; 29:8;35:8;38:25; 44:4,6,8;49:10; 50:18;56:15,19,24; 57:10,13;58:9;60:6, 8,16,21,25;62:6,25; 65:8;66:5;68:8,12; 70:11;71:19;73:15, 17;76:9,10,10;80:4, 10;84:5;85:17,19,25; 107:6,8,16;108:4,7; 114:21,24
**filing (13)** 17:8;26:12,16; 29:10;56:9;60:8,14, 15;66:3,10,11;70:13; 81:12
**filings (1)** 92:16
**final (4)** 30:6;34:18;59:14; 63:1
**finalize (2)** 25:5;35:17
**finances (1)** 95:24
**Financial (19)** 3:3,24;8:19;17:24; 20:15;22:22;29:2; 31:5;84:14;90:18, 18;92:24;96:1,21,22; 97:18,23;101:7; 114:6
**financials (4)** 93:3,8;97:17; 104:5
**find (6)** 25:20;73:25;76:5; 84:22;104:18; 113:15
**finding (1)** 113:6
**fine (6)** 25:25;28:4;48:3; 58:17;67:10;86:22
**finish (3)** 51:19,20;62:3
**firm (5)** 60:13,14;78:22; 81:17,21
**firmly (1)** 104:13
**First (20)** 4:18,19;14:8;23:2; 32:5,10;43:4;44:11; 56:6;68:9;70:23; 72:3,10;73:8;84:18; 93:21;94:19;95:8; 103:25;109:15
**first-name (1)** 28:24
**Fitch (7)** 98:8,10,19,24,25; 99:19;102:7
**Fitch's (1)** 98:15
**five (1)** 101:12
**five- (1)** 97:25
**fix (1)** 66:23
**FL (1)** 12:16
**Floor (2)** 11:14;13:5
**Florida (10)** 56:6,7,10,21;57:6; 58:8;63:20;66:18, 20;67:6
**flow (2)** 93:21;98:1
**FNMA (1)** 110:10
**foc (1)** 112:3
**focus (1)** 44:19
**focused (2)** 18:11;89:13
**Focusing (1)** 42:23
**Foerster (9)** 14:6;24:23;28:18; 31:2;55:8;68:7; 70:10;73:7;85:16
**follow (4)** 34:6;68:17;83:6, 22
**following (2)** 65:17;74:19
**forbid (1)** 65:10
**forced (1)** 90:23
**force-placed (2)** 17:21;18:3
**forecaster (2)** 101:22;102:5
**foreclose (2)** 65:12;76:19
**foreclosing (1)** 79:18
**Foreclosure (43)** 4:20;18:6;56:14, 18;58:13,19,21,22; 59:3,4;63:5,11,14, 18;64:6,8;65:7,20; 66:18;67:10,14,15; 69:13,13,15;70:24; 75:19,20;76:22; 77:21,23,25;78:23; 79:1,3,4,7,22;81:4; 82:16,17;84:9,24
**foreclosure-review (1)** 30:4
**foregoing (1)** 64:17
**form (4)** 34:4;48:6;69:25; 70:11
**FORMAN (1)** 9:19
**formerly (1)** 74:25
**forth (4)** 36:23;69:22; 111:5;114:3
**forty (1)** 42:14
**forward (10)** 20:25;26:23; 34:25;35:18,19; 55:3;58:18;84:9,11, 24
**found (3)** 14:9;54:13;57:17
**Fourth (2)** 3:22;29:1
**framing (1)** 15:23
**FRANKEL (1)** 7:2
**frankly (2)** 66:12;92:4
**fraudulent (2)** 48:25;76:5
**fray (1)** 64:20
**free (2)** 47:4;64:16
**frivolous (1)** 60:7
**front (5)** 50:14;53:18; 62:10;88:15;100:7
**FTI (8)** 3:23;28:12;29:1,6, 10,14,17,23
**FTI's (1)** 29:4
**full (3)** 33:7;37:13;110:7
**fully (3)** 20:11,12;21:1
**fully-briefed (1)** 17:23
**fundamental (1)** 15:19
**Funding (6)** 5:2,4;73:9;75:24; 93:14,15
**funds (15)** 32:9,11;34:13; 35:10;91:19;97:8; 101:19;104:25; 105:3,15,23,23; 106:6,6,9
**Further (16)** 3:15;16:6;17:8; 26:11,16;30:6; 34:13;53:1;54:4; 61:22;85:1,9;94:6, 20;102:22;103:9
**future (3)** 40:1;92:25;101:1

## G

**gap (1)** 56:20
**GARVAN (1)** 9:16
**Gary (1)** 3:16
**gather (1)** 74:10
**gave (3)** 34:25;82:25;88:22
**general (2)** 66:1;94:2
**generally (2)** 98:10;99:25
**generated (3)** 93:20,21;97:25
**GENTILOTTI (1)** 9:10
**Georgia (4)** 77:21;79:17,23; 84:9

**GERARD (3)**
8:15;25:12;38:20
**gets (1)**
33:8
**gist (1)**
58:4
**given (4)**
44:16;46:21;66:3;78:20
**giving (4)**
31:19;37:3;95:17;97:6
**Glen (1)**
55:22
**GLENN (5)**
2:24;4:15;12:8;60:4;61:8
**global (5)**
17:9;53:2;90:1;96:24;101:9
**GLOVER (19)**
12:8;55:23;57:8;60:4,4,20;61:6,7,8,8,13,14,18,22,24;62:4,6,9,13
**GMA (1)**
109:20
**GMAC (29)**
2:6;3:7;5:7,10;14:16,16;18:23;19:12,17,19;20:2;55:23;56:6,17;57:8,9,11,25;58:2,6;60:6,9,13;61:20,20;62:6;64:6;75:24;76:8
**GMACM (3)**
108:17;109:3,20
**goes (2)**
32:7;41:15
**Good (22)**
14:5;15:14,15;17:13;26:10;28:16,17;52:13;53:25;68:6;70:9;71:7;80:14;85:15;94:25;95:1;98:3,6;113:16,21;117:4,8
**Goren (53)**
24:20,22,22;25:15;26:7;30:24;31:1,1;32:10,18;33:3,13,17,21;34:6,20,24;35:4,16;36:6,16,23;43:5;52:2,3,11;55:5;87:11,13,21,22,25;88:5,8;94:6,8;99:1,3;103:1,1,3,9;106:14,15;108:2;115:22,23;116:4,6,8,14,25;117:4
**GOTTLIEB (1)**
11:2
**government (1)**
100:5
**government's (2)**
99:22,25
**governs (1)**
53:7
**grade (1)**
100:6
**Grand (2)**
11:13;76:11
**grant (3)**
53:20;76:17;113:17
**granted (11)**
26:24;27:14;29:25;30:19;57:19;63:10;64:8;73:12;82:21;115:20,22
**granting (1)**
82:23
**Green (1)**
2:17
**GRIECO (10)**
10:8;78:10,10,13,15,17,20;79:2,5,9
**gross (2)**
91:4;110:4
**grounds (3)**
22:25;57:12;67:5
**Group (3)**
8:3,11;88:12
**guaranteed (1)**
107:10
**guarantor (1)**
108:18
**guarantors (1)**
109:4
**guess (10)**
42:10;43:4;78:17;82:3,3;84:23;87:1;107:24;111:5;114:22
**guidance (1)**
81:25
**guidelines (1)**
45:13
**guys (1)**
83:17
**Gwendolyn (1)**
85:18

## H

**Hackensack (1)**
9:21
**HADLEY (3)**
8:10;25:13;38:21
**HALE (1)**
7:11
**half (6)**
16:5;32:18;33:4;63:21,22,23
**half-a-point (1)**
91:16
**hall (1)**
42:1
**Hamilton (12)**
4:19,23;11:2;30:5,13;70:23;71:2,11,14;72:3,9,11
**HAMP (2)**
82:11;84:23
**H-A-M-P (1)**
82:11
**hand (1)**
88:3
**handed (1)**
73:5
**handling (1)**
56:18
**Hang (1)**
37:16
**happen (2)**
100:24;104:11
**happened (3)**
22:23;34:15;65:13
**happy (5)**
16:19;27:21;52:4;68:14;116:3
**hard (1)**
37:12
**harder (2)**
41:15,16
**hardship (1)**
75:18
**HARRISON (1)**
8:7
**Hathaway (13)**
11:12;32:8,20;33:6;41:25;42:4,9,16,21;52:23;54:12;108:5;110:6
**Hathaway's (2)**
53:8;112:3
**HAWTHORNE (6)**
2:3;5:7;85:18,19;86:4,5
**head (1)**
37:15
**heading (1)**
26:11
**hear (16)**
21:6;23:12;30:19;33:12;35:11;37:8,9;40:1;52:18;59:21;62:2;64:25;65:16;68:23;73:23;98:13
**heard (34)**
16:20,22;17:4,6;20:9;21:7,18;22:18;25:9;26:25;27:13;29:22;30:10,17;41:23;51:25;53:13;54:24;59:22;60:1;62:19,23;69:21;72:2;76:13;78:17;81:13;83:13;85:8;105:18;107:2;111:17;112:19;117:5
**Hearing (41)**
4:11,15;14:20;17:7;18:7;20:23;21:14,19;25:4,21;26:19;27:10;30:6;43:5,7,17,19,25;51:7;56:9;57:2,13;60:12,18,25;61:1,2;62:20;70:12;72:22;73:5,25;77:17;80:7,21;81:13;85:7;102:16;104:15;113:1,16
**hearings (2)**
61:17;62:1
**hearsay (2)**
51:10,15
**held (5)**
61:1;69:19;75:16;86:18;110:16
**help (1)**
20:24
**hence (1)**
66:20
**hereby (2)**
94:14,16
**Here's (3)**
21:17;59:21;65:1
**hide (1)**
49:17
**hides (1)**
45:24
**high (1)**
37:25
**high- (2)**
45:11,11
**higher (1)**
34:21
**high-grade (1)**
45:11
**hit (1)**
37:14
**Hoc (4)**
8:3,11;25:13;38:21
**HOGAN (2)**
10:2;78:10
**hold (3)**
60:13;86:3;91:5
**holder (1)**
33:6
**Holders (1)**
113:9
**holding (6)**
36:16;45:18;82:2;91:1;110:19;113:11
**home (5)**
75:11;77:1;79:13;82:11,17
**HON (2)**
2:24;85:3
**honest (1)**
113:21
**Honor (159)**
14:5,7;15:14,18;16:2,10,16,19,24;17:1,13;21:8,10,12;23:6,9;24:5,13,18,22;25:16,25;26:5,9,14;27:2,4,15,20,20;28:5,11,16,22;30:1,3,21,22;31:1;33:22;36:23;37:12;38:20,23;39:1,9,12,22,25;40:9,24;41:8,17,24;42:1,14,19,24;43:9,16,21,23;44:2,11,23;48:9,12;49:12;51:1,13,18;52:3,13,15,23;53:6,6,25;54:3,14,22;55:5,7,22;56:1,12,24;59:25;60:4,23;61:3,6;62:9,11,24;63:7,16;64:2;65:2;67:20,25;68:4,6,21;69:1,23;70:9,10,20,22;71:5,7,13,17;72:13,15,17;73:1,6,11,15;74:15;75:11;76:2,11,15;77:1,4;78:4;80:20;84:12;85:5,15,18,22;87:3,10,13,22;88:5;93:2;94:6,11,22;99:3,11,14;100:11;102:6;103:9;104:7,9;105:21;106:13,15;108:2;115:23;116:11;117:4
**Honorable (1)**
4:15
**honored (1)**
53:9
**hope (3)**
30:19,21;105:11
**hoped (1)**
24:24
**hopeful (1)**
25:19
**hopefully (5)**
27:19;29:20;54:17;71:1;87:15
**house (2)**
69:15,16
**housing (1)**
101:3
**Hudson (3)**
30:5,14,15
**humongous (1)**
76:12
**hundred (1)**
54:8
**hurdles (1)**

50:6
**hypothetical (1)**
37:5
**hypothetically (1)**
59:2

**I**

**idea (2)**
80:8;82:12
**identical (2)**
82:19,20
**identified (1)**
75:17
**Ilazra (1)**
64:12
**imagine (1)**
42:6
**implement (1)**
38:12
**implicit (1)**
58:12
**important (14)**
33:5;34:18,19;39:3,9,12,23;44:2;48:21;51:15,15;82:14;89:23;93:13
**importantly (3)**
31:17;93:22;101:8
**imposed (2)**
91:10,18
**impossible (1)**
101:25
**improperly (1)**
57:13
**inapplicable (2)**
57:12;60:15
**Inc (5)**
3:3,23;8:19;29:2;113:24
**inclination (1)**
97:19
**include (1)**
93:8
**includes (1)**
82:7
**including (7)**
15:22;22:2;31:17;75:18;93:10;106:21;110:9
**income (1)**
92:19
**inconsistencies (1)**
75:16
**increase (1)**
116:1
**increased (1)**
116:16
**increases (1)**
41:15
**incur (1)**
59:1
**Incurred (2)**
4:22;64:18
**incurrence (1)**
109:19
**indefeasibly (2)**
31:21;39:8
**independent (2)**
15:1;67:5
**indicated (5)**
28:20;38:24;49:23;86:8;110:18
**indifferent (1)**
42:18
**individual (2)**
60:13;106:21
**infirmity (1)**
46:17
**influences (1)**
79:16
**information (9)**
77:19;78:21;82:6,7;83:7,19;95:15,18;100:7
**informed (1)**
113:20
**in-interest (1)**
116:21
**initial (3)**
18:8;86:2,3
**initially (1)**
85:20
**Initio (1)**
3:8
**injunction (1)**
22:5
**input (1)**
96:2
**insist (1)**
53:10
**insisted (1)**
38:9
**insistence (1)**
53:8
**instance (2)**
23:2;84:18
**institutions (1)**
110:17
**insurance (3)**
17:20,21;18:3
**Integrated (1)**
113:23
**intended (3)**
27:11;90:3;107:11
**intent (1)**
17:9
**intention (1)**
79:14
**intercredit (1)**
109:21
**intercreditor (5)**
31:20,25;53:6,9;112:9
**interest (43)**
31:10,12;32:11,15;33:3,8;34:17;36:17;38:15;39:7;41:10,14;45:16,17;46:5,14,23;49:16;86:8,12;89:4,4,9,16,20;90:10;91:16;98:5;101:9;102:14,17;105:3,9;106:22;107:12;108:15;109:17;110:24;111:6,13,19;113:22;117:3
**interested (1)**
63:4
**interests (1)**
41:8
**Interim (12)**
4:18,19;28:8;30:6,9;61:3;63:9,12;64:11;70:23;72:3,10
**intervening (1)**
56:16
**intimated (1)**
80:21
**into (20)**
16:6;20:18;32:13;67:7,8;85:4;92:11;94:1,7,9;108:1,19,22;109:4,7,10,21;110:1;114:6;116:1
**introduce (1)**
28:23
**inure (2)**
89:9,21
**invest (1)**
54:13
**investing (3)**
45:10,18;106:8
**investment (4)**
46:8,9;50:11;88:13
**investments (2)**
42:9;45:18
**invited (1)**
66:12
**involved (1)**
76:23
**involving (2)**
57:18;86:8
**Iowa (1)**
27:16
**issue (35)**
14:22,22;17:6;18:8,8,9;20:18,24;21:3,12,20;22:24;24:8;39:15,15,25;40:5;41:17;47:14;49:14;50:24,24;51:14;52:24;53:11;54:6,15;59:20,21;63:20;75:5,23;76:18;104:11;112:14
**Issues (23)**
4:20;7:20;15:2,19;16:7,8;18:2,6;20:24;23:21;25:8;31:18;44:15;49:3;50:19;72:1;75:23;76:24;77:6,24;81:23;89:12;112:24
**item (1)**
24:18

**J**

**JAMES (4)**
12:9;68:6;73:3,7
**January (1)**
57:19
**Jenkins (48)**
5:3;13:13;73:8,15,19,21,23;74:2,9,10,12,14,17,19;76:4;77:2,5,18,22,24;78:4,6,7;79:10,12;80:1,2,19;81:8,12,20,25;82:9;83:6,12,15,16,24,25;84:3,12,16,17;85:3,5,7,10,12
**Jenkins' (2)**
81:10;83:18
**Jericho (2)**
7:21,23
**Jersey (1)**
57:24
**JOHN (3)**
9:23;12:12,18
**joined (1)**
14:19
**JP (1)**
91:18
**JSN (7)**
38:7;42:13;46:5;95:22;107:11;110:22,22
**JSNs (9)**
32:17;35:10;38:4,5;47:16;53:15,16,19;102:18
**JSN's (10)**
43:2;107:13,20;111:7,8,10,12;112:10;114:13;116:1
**ju (2)**
71:10;83:12
**JUDGE (20)**
2:25;4:15;15:8;16:14;17:16,17,24;23:11,14,16,19,22;56:10;58:4,25;59:4,20;66:6;79:17;80:14
**judgment (44)**
33:21,24;36:22;45:1;47:14,15,19;48:21;49:4,7;50:21,25;51:17;54:6;56:7,7,11,22;57:4;59:7,10;60:2;62:7;63:22;65:23;66:1,5,8,9,17,20,23;67:4;100:22;106:17,25;113:4,7,14;114:2,11,14;115:14,19
**Judy (1)**
12:3
**Julio (5)**
4:12,13;11:21;68:8,10
**July (11)**
17:3;22:17,19;27:10,24,25;30:7,9;62:25;72:22;86:21
**jumped (1)**
79:18
**June (16)**
2:20;25:20,21;28:1,2;32:16,19;43:25;61:1;90:2;96:4;107:16;108:23;109:7,22;111:17
**Junior (30)**
8:3,11;24:25;25:5,10,13;31:8,11,20;33:6;39:7;46:1;52:8;89:3,13,14;90:3;91:23;92:1,5;101:11;107:8,9;108:10,13;109:15,25;110:14,23;116:15
**jurisdiction (1)**
15:20
**JUSTICE (1)**
13:2
**justification (2)**
113:13,19
**justified (1)**
76:13
**JUSTIN (2)**
7:25;80:14

**K**

**Kafkaesque (1)**
45:6
**keep (2)**
29:20;79:24
**key (3)**
44:15;93:3,7
**kind (1)**
35:14
**KIRBY (2)**
9:2;17:14
**KIRKLAND (3)**
8:18;15:16;52:14
**KISSEL (1)**
10:11
**knew (1)**

44:8
**knowledge (3)** 94:2;95:23;112:8
**KOTWICK (1)** 10:16
**Kovsky- (1)** 71:13
**KOVSKY-APAP (2)** 71:13;72:15
**KRAMER (3)** 7:2;27:2;37:10
**KRELL (16)** 7:25;80:14,14,17,20,24;81:1,3,7,10,16,19;83:8,12,20;85:4
**Kruger (1)** 26:18
**K's (1)** 95:25

## L

**LA (1)** 12:12
**Landon (1)** 3:6
**language (1)** 29:12
**large (2)** 46:21;112:21
**largely (2)** 27:5;53:1
**last (21)** 24:7;25:1;26:14;35:14;39:5;48:7;51:12;61:18;73:13,24;83:13,16,16;93:19;98:1,9;100:3,18;102:8,12;115:23
**late (6)** 66:10,11,25;69:4;101:24;102:8
**later (2)** 90:13,24
**latter (1)** 32:24
**LAW (14)** 11:20;12:12;15:19;21:5;57:16;58:14,23;60:13,14;63:7,20;64:12;65:22;67:17
**lawsuit (1)** 38:16
**lawyer (3)** 66:4,24;80:23
**Lawyers (1)** 75:6
**leads (2)** 58:20,22
**lease (1)** 113:1
**least (12)** 46:11;47:6;51:7;53:18,23;58:9;83:5,6;90:5,7;101:12;112:5
**leave (4)** 63:10;64:8;66:24;67:5
**Lee (1)** 3:16
**Legacy (1)** 110:6
**legal (9)** 15:2;18:8;59:1;75:3,9;96:12,18;112:24;114:4
**lender (3)** 103:7;108:19;109:5
**lenders (2)** 19:10;76:8
**length (1)** 112:1
**lengthy (1)** 14:7
**LEONARD (1)** 9:19
**less (1)** 40:7
**Letter (3)** 4:15;70:12;82:7
**letting (1)** 24:7
**level (3)** 34:21;100:24,25
**LEVIN (3)** 7:2;27:2;37:10
**Lewis (1)** 26:18
**Lexington (1)** 8:20
**LEY (1)** 12:12
**Liberty (1)** 11:4
**lien (3)** 47:3,5;109:15
**liens (3)** 39:14,16,18
**life (1)** 101:14
**lifts (1)** 65:18
**light (5)** 16:2;17:1,8;51:2;64:17
**LIGHTNER (1)** 11:8
**likelihood (2)** 101:23;111:23
**likely (1)** 17:9
**liking (1)** 106:5
**limit (2)** 71:25;111:9
**limited (11)** 27:6;32:8;47:21;49:10;50:18;57:23,23;74:24;76:16;81:25;108:4
**Lionel (2)** 113:10,10
**liquidity (3)** 37:3;54:10;90:22
**list (4)** 46:8;70:17,17;109:23
**litigate (1)** 41:16
**Litigation (12)** 3:25;29:3,18;64:16,19;89:12;92:1;96:15;97:9;104:22;115:3,10
**little (5)** 58:7;76:1;91:11,21;104:17
**live (1)** 75:10
**LLC (11)** 2:6;3:7,17;5:2,4,8,10,21;9:10;18:23;73:9
**LLP (15)** 4:19,23;7:2,11,19;8:2,10,18;9:2;10:2,11,19;11:2,11;12:2
**loan (36)** 19:11;34:3;46:10;58:2;75:13,13;76:21,21;77:7,8,10;78:1,1;79:19;81:17;82:3,4,10;84:8,10,13,22,24,25;85:6;86:9,14;95:8;107:22;108:20;109:4,7,9,10;110:5,6
**loans (7)** 18:23;19:7,8,9;81:3;90:13;108:23
**LOC (5)** 39:13,13,15,20;108:25
**long (5)** 90:21;97:7,9;104:24;109:22
**long-term (1)** 104:21
**look (21)** 16:7;20:6;24:6;37:12;40:9,23;44:14;50:18;56:13;57:15,16;58:16;59:7;85:4;88:14;90:17;92:15,18,19,20,20
**looked (2)** 49:8;51:12
**looking (1)** 31:24
**Lorenzo (2)** 14:5;28:20
**Los (1)** 11:15
**lose (3)** 63:13;64:24;75:10
**lot (8)** 15:24;34:25;40:10;42:9,20;49:16;53:13;85:8
**LOVELLS (2)** 10:2;78:10
**low (2)** 37:25;98:4

## M

**magnitude (1)** 101:24
**Main (1)** 9:20
**major (2)** 113:14;115:10
**maker (1)** 113:20
**makes (5)** 36:11;41:15,16;61:9;89:12
**making (10)** 33:25;46:11;97:7;105:22;106:22;111:19,25;112:11,23;113:19
**Management (6)** 5:5;19:21;23:16;80:6;96:2;97:7
**mandatory (1)** 63:5
**Manhattan (1)** 8:12
**MANNAL (8)** 7:7;16:24,24;21:10,10;27:1,2,2
**many (6)** 24:3;39:24;75:19;100:25;114:3;115:8
**Marc (5)** 88:1,11;94:14;107:14,24
**March (5)** 3:25;24:7;29:6;82:21;110:10
**Marcia (3)** 12:13,22;55:13
**Marinuzzi (29)** 14:4,5,6;15:5,8;23:5,6;24:18;26:8,9;27:15,24;28:1,3,5,8,11,21,22;30:3,12,14,16,20,21;44:13;85:13,13;87:5
**Marinuzzi's (1)** 27:4
**MARK (5)** 9:7;10:16;11:8;17:13;33:23
**markets (7)** 54:8,11,12;92:21;93:23;98:3;101:3
**MARTIN (10)** 2:24;27:18,21;62:15;85:14,15,16;86:24;87:5,6
**Marv (1)** 74:22
**master (1)** 77:10
**MASUMOTO (11)** 13:8;70:25;71:4,5,7,8,12,16,17;72:13,14
**math (1)** 92:11
**matter (28)** 14:8;21:4;22:12;23:3;28:25;42:25;43:11;45:21;51:10;55:11,24;56:1,14,18;57:17;59:19;67:1,7;68:1;70:8,10,18;73:8;80:5;85:24;90:6,19,20
**matters (3)** 16:20;28:6;68:8
**matter's (1)** 85:11
**maturity (1)** 109:25
**May (41)** 4:22;21:22;22:20,23;37:5;43:24;44:17;46:12;47:2;49:18;50:5,8;52:15;55:17;58:1,14;71:5;73:11,13;74:14;76:5,20,25;78:4;80:4,20;82:9,10,13;85:5;86:2,3,18;88:5;101:21,21;105:12,13;109:24;113:1,8
**Maybe (6)** 50:7;81:11;82:1;84:18,21;99:3
**MCCLOY (3)** 8:10;25:13;38:21
**MCDANIEL (1)** 9:16
**MCINERNEY (2)** 9:2;17:14
**meal (1)** 71:24
**mean (27)** 22:7;23:1;25:25;

32:12,19;34:6,14;35:10,16;36:6,24;41:5,6;45:21;46:19;47:6;48:7;49:8,13,25;50:17;52:19;53:20,22;56:8;80:9;117:6
**meaning (2)** 21:23;105:4
**meaningful (1)** 54:19
**means (1)** 33:8
**meantime (6)** 25:3,7;36:15,17,17;49:18
**measure (1)** 112:21
**meeting (1)** 86:6
**MEISEL (1)** 9:19
**members (2)** 31:16;106:20
**mentioned (7)** 26:9;89:14,23;92:2,12;103:4;108:14
**mercifully (1)** 47:21
**met (1)** 33:23
**Miami (1)** 12:16
**Miami-Dade (1)** 57:5
**MICHAEL (2)** 10:24;57:18
**microphone (1)** 80:13
**mid-March (1)** 60:16
**midst (1)** 91:25
**might (4)** 49:21;94:3;97:9,14
**MILBANK (3)** 8:10;25:12;38:21
**million (31)** 31:8,9,13,14,21;32:18;33:4;37:2;38:2,6,8,8;42:7,15,21;47:17;89:8,17,20;90:5,10;91:3;92:10;97:3;101:10,11;102:20;107:7;108:25;109:13;112:10
**million-and-a-half (1)** 102:20
**millions (3)** 50:10,10,10
**mindful (2)** 54:21;90:11
**mine (1)** 24:1
**minimis (2)** 91:14,14
**minimize (2)** 41:8,9
**minimum (1)** 32:12
**minute (3)** 35:14;48:7;76:12
**misleading (1)** 60:7
**missed (1)** 28:12
**mod (1)** 81:19
**mode (1)** 96:15
**modest (2)** 94:3,5
**modifi (1)** 84:24
**modification (13)** 75:14;76:21;78:1,1,23;82:4,11;84:10,13,22,25;86:9,14
**modifications (1)** 82:10
**modify (1)** 29:11
**modifying (1)** 27:17
**mods (1)** 81:3
**Moloney (1)** 114:23
**moment (1)** 53:12
**monetary (3)** 63:3,6;69:10
**monetized (1)** 110:15
**money (29)** 32:6,11,13;33:9,11;36:2,14,16;40:6,6,7;42:16;44:20;45:18;49:15;50:1,2,6;51:17;53:17;54:15,16,20;75:4;101:13;104:12;111:23;116:7,13
**monies (1)** 96:22
**month (10)** 31:10,13;38:2,8;89:6,9,20;90:10;92:10;101:12
**months (2)** 54:11;101:12
**more (18)** 20:20;22:15;32:24;33:22;40:11;42:20;53:13;55:10;65:8;76:1;82:21,25;85:8;92:5,10;101:12;116:13,23
**Morgan (1)** 91:18
**morning (16)** 14:5,8,8;15:14,15;17:13;28:16,17;52:13;68:6,15;70:9;71:7;80:14;85:15;99:6
**Morrison (9)** 14:6;24:23;28:18;31:2;55:8;68:7;70:10;73:7;85:16
**MORTGAGE (25)** 2:6;3:7;5:7,10;18:23,23;19:11,17,19;20:2;56:17;57:8,9,11,25;58:2;75:13,21;76:4,8,8,15;79:13;82:2;110:4
**mortgagee (1)** 19:6
**Mortgages' (1)** 55:23
**Most (5)** 22:5,8;92:22;93:22;101:8
**mostly (1)** 39:17
**Motion (132)** 3:2,3,10,14,19;4:2,6,9,11;14:10,13,14,18,19;15:12,18;16:4;17:5,10,23;18:2;20:8;21:1,18;22:18;24:20;26:11,15;27:14,16,21;30:23;31:3,15,24;32:20;33:20,24,25;34:23;35:6,8,13;37:9;38:17;39:1,2,4,22;41:18;43:13,25;44:4,6,7,25;45:9;47:13;48:1,8;51:17;52:1;53:13,21;55:12,21;56:15;57:1,11,20;59:22,25;60:1,2,5,6,7,8,12,18,23,25;61:2,10;62:6,11,14,18,18;63:7;66:10,24;67:1,22;68:9,12;69:4;70:11;73:12;76:17;82:21,23;83:2,10;84:6,6;87:23;88:20;89:1,6,8;91:24;94:19;95:13;106:17,22;107:4,6,13,17,23;108:4,9;111:3,15,16,18;112:7,12;115:20,22;116:18
**motions (4)** 23:12;26:11;68:8;80:10
**move (9)** 54:25;55:3;67:24;82:17;84:10,23;85:11;94:7,8
**moved (1)** 20:13
**moving (1)** 84:8
**Mrs (15)** 74:10;77:2;78:6;79:10;80:2,19;81:24;82:9;83:6,14,18,23;84:17;85:7,12
**MSR (1)** 110:9
**much (24)** 24:16;26:6;32:15;34:17;40:7;46:9;51:22;52:9;53:10;55:10;61:9;70:2;72:14;83:23;85:12;86:23;90:25;96:5,6;102:17;103:19;104:2;106:14;117:16
**multiple (1)** 110:16
**MUNGER (2)** 11:11;41:25
**must (4)** 53:9;63:3;113:12,15
**mute (2)** 37:17,18

**N**

**NA (1)** 10:12
**NAFTALIS (1)** 7:2
**nail (1)** 37:14
**name (7)** 15:23;19:20;55:18;78:9;86:15;88:9,11
**namely (3)** 35:9;47:16;50:20
**names (1)** 80:7
**narrow (2)** 20:23,24
**Nathan (7)** 15:8;16:15;17:16,24;23:17,20,22
**Nathan's (1)** 23:11
**nature (1)** 14:15
**Navarro (5)** 12:13,22;55:13,16;65:9
**Navarros (5)** 55:15;57:10;58:9;66:7,8
**Navarros' (1)** 66:24
**Navarro's (5)** 56:15;59:22;60:12;62:23;65:14
**near (1)** 101:1
**necessarily (1)** 105:18
**need (9)** 29:20;37:16;75:3,6;82:17;84:9,10;92:25;96:16
**needed (2)** 97:8;104:12
**needs (2)** 35:22;45:8
**Negative (1)** 99:20
**negotiate (1)** 14:21
**negotiated (1)** 26:19
**negotiating (3)** 27:19;30:7;38:25
**negotiation (1)** 91:25
**net (4)** 93:11;103:18,19;110:11
**nevertheless (1)** 53:6
**New (20)** 2:18,18;5:23;7:5;8:5,13,21;9:5;10:6,14,22;11:5;13:6;15:6;17:16;22:3;44:20;57:24;75:10;113:25
**Newport (1)** 19:21
**NEWTON (26)** 68:6,6,19,22;69:3,16,18,22;70:1,3,5,8;73:3,6,7;74:5,6,9;77:3,4,8,12;78:20;83:9;84:18;87:3
**Newtown (1)** 68:3
**next (9)** 24:18;27:11;28:25;38:6;68:7;70:8,10;72:17;85:17
**night (2)** 99:8;102:8
**nine (1)**

106:20
**Ninth (1)**
64:13
**NJ (1)**
9:21
**Nobody (2)**
90:4;96:6
**noise (1)**
37:17
**non- (1)**
100:13
**noncash (1)**
110:23
**nonconsensual (1)**
111:1
**nondebtor (2)**
22:1,25
**nondefault (1)**
109:17
**none (1)**
104:24
**nonjudicial (1)**
79:3
**noon (1)**
87:15
**nor (1)**
83:4
**Norm (2)**
70:5,9
**North (2)**
9:20;12:5
**notable (1)**
29:5
**note (3)**
33:5;55:22;86:9
**noted (3)**
32:19;106:16;
115:24
**Noteholders (4)**
8:3;107:9;108:11;
114:22
**Notes (21)**
8:11;25:10,14;
39:7;89:3,13,15,19;
90:4;91:23;92:1,5;
101:11;107:10;
108:13;109:16,24,
25;110:1,14,23
**notice (14)**
29:19;35:6,12;
48:3;57:13;58:10;
60:11,15;65:9;66:3;
79:5;85:25;86:1;
112:25
**notion (1)**
48:6
**November (2)**
85:19;108:22
**number (11)**
14:3;55:14;57:21;
68:10;73:10;80:5;
82:9,22;85:18;
86:15;87:20
**numbers (1)**
82:1
**numerous (1)**
80:7
**Nunc (2)**
3:25;29:5
**NW (2)**
7:13;12:14
**NY (12)**
5:23;7:5,23;8:5,
13,21;9:5;10:6,14,
22;11:5;13:6

## O

**oath (1)**
102:11
**object (5)**
20:22;22:24;
116:21,22;117:3
**objection (17)**
32:7,8,21;37:9;
47:21;49:10;50:18;
52:25;71:19,21;
72:8;94:11;108:4,7;
112:3,15;116:2
**objections (5)**
71:22;72:18,19;
94:10;116:22
**objector (2)**
32:20;35:11
**objects (1)**
108:5
**obligated (2)**
19:10,11
**obligations (1)**
101:5
**obviously (6)**
22:8;34:6,18;
35:20;36:24;40:6
**occur (2)**
36:3;111:7
**occurring (1)**
57:25
**October (1)**
26:16
**Ocwen (5)**
77:11;86:11,12,
16;110:5
**off (8)**
16:5;37:18;40:20;
54:18;56:6;100:9;
106:1;110:7
**Offic (1)**
113:22
**Office (3)**
13:3;71:2,8
**OFFICES (2)**
11:20;12:12
**Official (4)**
7:3,12;14:18;
113:23
**OLSON (2)**
11:11;41:25
**omnibus (2)**
22:16;23:4
**once (2)**
81:24;113:18
**One (32)**
2:17;8:12;10:13;
11:4;12:4;20:16;
22:6,15;23:10;24:4;
41:8,10,13;44:15;
49:8;50:4,5;52:5;
57:16;61:2;62:9;
64:6;66:11;68:9;
76:12;83:4;102:12;
103:12;108:4,21;
112:13;115:23
**O'NEAL (1)**
11:7
**ones (2)**
72:21,22
**only (23)**
25:18;32:20;
41:17;43:14;47:11,
12;48:3;49:9;50:24;
52:4,7;60:18,18,24;
61:20;75:1,22;76:6,
11;82:18;91:12;
102:15;104:18
**onto (1)**
90:9
**operations@escribersnet (1)**
5:25
**opinion (3)**
100:21;101:2,22
**opportunity (7)**
43:20;50:23;65:3;
82:25;91:13;104:17;
117:3
**opposed (6)**
18:13;32:9,16;
34:10;44:12;106:2
**options (2)**
79:16;86:13
**Order (58)**
3:4,11,14,22;4:2;
26:14;27:17;28:8;
29:12;30:6;34:13;
36:10;38:10,25;39:4,
6,6,10,11,21;40:4;
46:24;50:8;52:7;
57:21;58:12,14,18;
59:9,10,14;60:24;
61:12,14,19;62:25;
63:1,3;64:3,11;65:6,
9,18;67:11,21;68:12;
70:19;82:23;84:8;
85:23;90:12;107:4,
17;108:20;109:17;
111:1,1,1;115:21
**ordering (2)**
65:24;76:18
**orders (2)**
22:5;30:9
**ordinary (3)**
19:18;113:1,12
**original (8)**
19:10;29:4;31:24;
39:4;52:6;109:6,16;
110:25
**originally (2)**
14:16;109:8
**origination (1)**
110:5
**others (6)**
74:24;75:12,24;
76:23;84:6;114:3
**others' (1)**
64:16
**otherwise (4)**
34:4;63:5,14;
64:20
**ought (1)**
55:1
**out (32)**
15:1;23:8;25:19,
20;31:11;33:9;35:7,
14,23;36:18,18;37:6;
43:2;45:22,23;
49:17;54:16;75:7,8;
76:5;81:24;84:3,4,
22;86:11;93:9;
97:16;100:2;104:3;
113:11;116:1,18
**outcome (1)**
21:22
**outstanding (3)**
108:24;109:9,11
**outweighs (1)**
94:5
**ov (1)**
54:8
**over (12)**
16:3;24:3;37:1;
38:6;41:7;42:14;
47:16;56:16;70:5;
71:24;75:15;79:18
**overall (2)**
40:25;96:24
**oversecured (10)**
31:12;89:15,19;
92:9;105:7;107:13;
108:14;111:11,12,19
**overturned (1)**
105:13
**overview (1)**
114:6
**overwhelms (1)**
45:17
**owe (3)**
36:10;50:1;69:7
**owed (1)**
36:20
**owes (2)**
36:10,19
**own (2)**
42:12;115:14
**owned (1)**
69:19
**owners (1)**
76:7
**owns (4)**
19:8,9;77:7,8

## P

**PA (2)**
9:19;12:12
**package (1)**
86:14
**page (11)**
14:9;28:6,13;
30:22;46:6;55:12;
73:2,5;93:7,18;
103:22
**paid (14)**
31:21;32:9;33:7,8;
36:13;38:14;39:7;
40:6;44:20;65:14;
102:15;109:17;
115:5;116:1
**paid-out (2)**
116:16,17
**papers (11)**
14:17;18:9;20:13;
21:12;44:21;50:13;
53:18;81:7;84:23,
25;111:5
**paperwork (1)**
84:13
**paragraph (6)**
39:6,10;57:21;
61:18,19;91:1
**paraphrasing (1)**
79:18
**parent (1)**
22:1
**Park (1)**
10:13
**PARKE (1)**
10:19
**part (7)**
17:7;63:11,25;
64:4;96:23;110:7;
111:15
**partial (1)**
107:11
**Partially (3)**
4:4;107:5,7
**participate (1)**
84:23
**participated (1)**
38:25
**particular (2)**
99:23;100:18
**particularly (2)**
40:12;96:7
**parties (27)**
14:20;15:1,22,22;
20:13,24,25;21:17;

22:14;27:7;31:16, 25;34:24;35:1,5,23; 54:15;71:17,23; 85:21;86:1,2,4; 109:22;112:1,16; 115:25
**parties' (4)** 17:25;25:8,16; 32:2
**partner (1)** 88:11
**Partners (3)** 88:12;95:6,9
**party (6)** 48:23;49:1;58:23; 63:4,19;66:19
**party- (1)** 116:20
**party-in- (1)** 117:2
**passed (1)** 42:1
**passing (1)** 100:6
**past (2)** 40:1;41:3
**path (2)** 35:18;106:9
**patience (1)** 76:23
**pause (1)** 51:1
**pay (44)** 30:4,23;31:4,7; 32:13;34:9;35:10; 36:19;38:5,5;41:10; 43:13,14;45:6,7,8,9; 49:1,8;50:6,7;51:17; 53:19,20;54:18; 64:21;79:13;89:12; 90:6,22;92:5,5; 96:21,23,23;102:18, 18;105:10,23,24; 110:7,24;112:10; 116:12
**Paydown (12)** 31:9,14;37:4,14; 38:3,7;87:23;89:1,7, 18;90:16;102:20
**pay-down (1)** 106:22
**paying (23)** 31:10;32:1,7,10; 36:17;38:1,15; 39:12;40:6;48:23; 49:15,16;63:24; 75:20;76:15;79:19; 89:4,16;90:3;95:22; 104:18;106:2; 112:10
**payment (21)** 34:5,22;36:4,5; 38:16;42:4;47:16, 17;53:15;58:14; 75:22;96:9;102:16; 104:23;107:7,20,20; 108:6;111:20; 112:12,23
**payments (12)** 39:6;104:21; 108:10;110:21; 111:4,7,9,19;112:13, 17;114:12;115:19
**payout (1)** 116:4
**peers (2)** 99:23,24
**pending (16)** 15:4,5;16:10,11; 22:1;25:16;34:13; 48:1;52:1;58:3;69:5; 90:2;101:9;107:3; 111:11;112:7
**Pennsylvania (1)** 7:13
**people (2)** 65:11;79:24
**Pepper (11)** 4:19,23;30:5,13; 70:23;71:1,11,14; 72:3,9,11
**per (1)** 31:13
**Per/Pro (1)** 13:13
**percent (5)** 42:14;93:25,25; 107:9;108:15
**percentage (1)** 42:12
**perfected (2)** 46:14,23
**perfection (2)** 47:3,5
**perform (1)** 29:18
**performed (1)** 100:3
**perhaps (4)** 21:21;49:3;81:25; 82:5
**Period (6)** 4:22,23;27:11; 46:4;56:17;101:17
**Periods (3)** 3:15;26:12;75:22
**PERLSTEIN (1)** 7:16
**permission (3)** 68:9,17;85:21
**Permit (4)** 3:11;22:15;67:12; 69:12
**permits (1)** 67:11
**permitting (1)** 57:23
**perspective (1)** 89:11
**pertinent (2)** 50:25;93:18
**petition (6)** 41:10;58:1;64:19; 108:25;109:11; 110:9
**ph (5)** 64:13;74:23; 78:22;79:21;105:22
**phone (15)** 37:16,17,18,19; 62:3;68:1,16,20; 70:15;71:11;73:20; 74:4,6;82:1;86:15
**PICKERING (1)** 7:11
**picking (1)** 37:17
**Piercing (2)** 3:6;18:16
**Place (6)** 12:4;22:22;53:7; 66:14;77:16;103:20
**plain (1)** 75:5
**Plaintiff (5)** 2:4;86:7,13,14,19
**Plaintiffs (11)** 9:3,11;14:23; 15:10;17:14;18:19, 21;21:24;22:10,24; 73:14
**plaintiff's (1)** 86:12
**Plan (33)** 3:16;15:3;16:21; 17:1,2,4;26:12;27:6, 8,8,9;31:6,7,17;33:6; 34:2,11;35:7;36:6; 38:14;43:17;53:2; 54:17;87:9;96:14, 14;104:16,19; 111:16,21,22;112:5; 114:16
**plan's (1)** 96:9
**platform (1)** 110:5
**play (1)** 91:23
**Plaza (5)** 8:12;9:20;10:13, 21;11:4
**pleading (2)** 81:11,13
**pleadings (2)** 20:16;56:13
**Please (8)** 14:2;37:18;74:15; 76:25;78:4;87:19; 88:6,14
**pled (3)** 20:14;21:4;63:3
**PLLC (1)** 12:21
**plus (4)** 31:16;34:9;63:22; 110:14
**pm (2)** 87:18;117:19
**pocket (1)** 43:3
**podium (6)** 24:20;28:14; 30:24;52:17;70:5; 73:3
**point (22)** 21:2;22:8;23:17; 25:3;29:5;36:7;40:9; 42:8;47:22;63:8; 64:12;75:5;91:13; 93:8;103:20;105:17, 18,19,22;111:6; 115:6,23
**pointing (1)** 45:22
**points (4)** 52:17;65:5;91:15; 106:16
**portfolio (1)** 110:6
**portion (2)** 64:1;102:15
**position (9)** 14:18;36:25; 37:13;38:24;53:23; 62:24;63:8;110:1,2
**positions (2)** 15:10;40:13
**possibly (1)** 81:3
**post- (2)** 41:9;64:18
**post-petition (9)** 38:15;41:7,14; 65:7;89:16;105:8; 107:12;108:15; 111:13
**pot (1)** 76:12
**potential (7)** 66:23;77:25;86:5, 8;91:22;106:7; 115:25
**potentially (2)** 92:1;101:10
**powerless (2)** 59:3,5
**practical (1)** 90:6
**practically (1)** 110:18
**practice (1)** 23:11
**pray (1)** 74:21
**pre (1)** 64:18
**pre- (1)** 110:8
**preclude (1)** 63:5
**predict (2)** 100:25;104:25
**prejudiced (3)** 35:12;36:12;38:16
**preliminary (1)** 22:4
**premature (2)** 32:21;108:6
**prepare (1)** 55:2
**prepared (6)** 87:11;92:17;93:5, 6;95:3,14
**Preparing (1)** 99:9
**pre-petition (7)** 33:8;64:14;65:13; 66:1,1,21,22
**preponderance (2)** 114:10;115:18
**PRESENT (6)** 13:12;28:14; 53:18;55:24;86:6; 115:16
**presented (1)** 113:16
**presentment (2)** 116:19;117:2
**preserve (1)** 32:14
**preserved (3)** 25:16;38:10;39:20
**pressed (1)** 114:19
**presumption (1)** 113:19
**Pretrial (1)** 5:8
**pretty (1)** 72:20
**prevail (1)** 64:9
**prevailed (1)** 111:10
**prevailing (3)** 58:23;63:19;66:19
**prevent (2)** 65:23;77:5
**prevents (1)** 84:8
**previously (3)** 22:4;73:11,17
**primarily (2)** 110:16;112:3

**primary (2)** 77:19;112:14
**principal (6)** 20:4;41:11;42:20, 24;108:24;109:12
**principally (2)** 49:14;95:20
**principles (1)** 19:19
**prio (1)** 95:20
**prior (10)** 37:14;57:17; 77:17;80:20;81:10; 90:2;95:17;96:4; 98:22,24
**priority (2)** 95:8;109:15
**private (1)** 69:17
**Pro (5)** 3:25;13:13;29:6; 70:14;105:12
**probably (6)** 31:22;32:12; 33:11;40:11;42:3; 106:1
**problem (3)** 62:1,17;83:8
**Proc (1)** 2:5
**Procedure (2)** 82:24,24
**procedures (2)** 79:22;85:24
**proceed (4)** 68:25;87:8,12; 90:3
**proceeding (19)** 5:3,7,10;17:18,23; 36:3;50:1;58:22; 69:5;73:8;77:17; 80:5;85:17,24; 96:17;97:9;101:18; 111:24;112:2
**proceedings (8)** 58:19;60:24;61:3, 23;64:1;73:2; 111:10;117:19
**proceeding's (1)** 87:2
**proceeds (4)** 91:4;96:18;110:4, 13
**process (8)** 27:18;40:2,3,25; 41:6;76:21;81:4; 84:12
**processing (1)** 75:13
**Professional (1)** 4:18
**profitable (3)** 97:24;98:2,6
**profit-making (1)** 93:19
**program (2)** 82:11,11
**programs (1)** 82:9
**progress (2)** 26:21;27:5
**projected (1)** 97:16
**prolong (1)** 75:23
**prolonged (1)** 75:22
**promptly (1)** 55:4
**Proof (6)** 4:12;65:10;67:13; 68:10;69:4;70:13
**proper (1)** 66:3
**properly (1)** 16:20
**property (2)** 22:11;113:2
**propose (2)** 86:20;90:6
**proposed (7)** 17:2;33:6;61:12, 14,19;78:18;110:21
**proposing (2)** 32:6;105:10
**proposition (1)** 114:4
**prosec (1)** 63:18
**prosecute (3)** 63:12;64:8;114:20
**prosecuted (2)** 22:10;63:18
**prosecuting (2)** 63:18;64:6
**Prosecution (4)** 3:5;16:4;21:25; 65:19
**protect (1)** 106:7
**protection (2)** 39:16,18
**provide (3)** 81:12,25;82:5
**provided (3)** 29:6;77:19;82:8
**provides (3)** 38:4;58:14;112:25
**Provision (2)** 3:24;39:5
**provisions (2)** 39:3;108:21
**proviso (1)** 39:5
**prudence (1)** 49:4
**prudent (1)** 90:11
**PSA (25)** 15:3;16:2;17:8; 26:19;34:1,15,19,22; 35:17,20,21;36:1,6; 37:14;38:4,13;43:5, 7;44:4,5;49:2;51:7; 96:13;111:21; 114:16
**public (2)** 92:16;95:18
**punitive (1)** 17:15
**Puntas (1)** 33:23
**Punts' (1)** 110:17
**Puntus (18)** 50:16;52:3;88:1,2, 10,11;94:25;95:10; 100:15;102:12; 106:18;107:14,24; 112:18,20;114:5,9; 115:24
**Puntus' (2)** 94:14;104:10
**purchase (1)** 86:9
**purchased (1)** 69:18
**purely (3)** 89:11;90:19,19
**purpose (3)** 57:23;65:5;89:16
**Pursuant (7)** 3:4;4:6;49:2; 82:23;109:16; 110:25;113:3
**pursue (6)** 57:24;63:17;69:8, 9,12;86:13
**pursued (1)** 115:9
**push (1)** 26:23
**pushing (1)** 54:16
**put (13)** 16:5,6;17:9;21:16; 22:21;32:17;37:17; 47:11;67:2;69:24; 70:12;83:6;116:18
**putative (2)** 18:19,21
**putting (1)** 89:11
**PWC (3)** 30:5,11,12

**Q**

**Q's (1)** 95:25
**Quadrangle (1)** 7:21
**qualified (2)** 45:18;102:2
**qualify (2)** 82:12,13
**quarter (2)** 91:15;93:21
**quarters (1)** 100:19
**questionable (1)** 112:9
**quickly (4)** 65:4;82:17;84:11; 106:9
**quid (1)** 105:11
**quite (7)** 90:17,17;94:3,4; 95:25;96:20,21
**quo (1)** 105:12

**R**

**raise (3)** 49:13;88:3;115:24
**raised (8)** 18:2,8;32:5;49:14; 52:17,23;81:23; 112:14
**raises (3)** 15:19;49:3;106:16
**raising (2)** 58:16;93:24
**ranging (1)** 93:24
**rate (3)** 45:16;108:15; 109:17
**rated (1)** 106:8
**rates (1)** 98:4
**rather (1)** 116:18
**Rating (9)** 98:8,10,11,12,15, 19,20;99:15,20
**RAY (3)** 8:23;15:16;52:13
**Re (8)** 3:2,10;4:11,15,16; 64:12;113:5,10
**reach (3)** 81:24;85:22;97:10
**reached (8)** 47:6;50:20;53:2; 68:15;71:18;72:9; 86:11;89:25
**reaching (1)** 31:18
**read (5)** 32:24;44:21;46:6, 16;74:14
**ready (2)** 55:5;87:13
**reaffirm (1)** 64:17
**real (10)** 37:1,5,6,22;50:3; 54:14,19,20;58:5; 69:19
**realize (2)** 49:9;60:25
**really (18)** 14:24;16:7;17:6; 20:15;32:7;33:17; 41:12;47:9;48:3; 49:13;50:19;51:3; 77:21;82:14;91:10; 93:2;112:4;117:15
**reason (3)** 96:6;101:16; 113:16
**reasons (6)** 15:25;33:25; 67:22;74:25;108:8; 115:21
**recall (3)** 73:11;77:8;91:2
**receipts (1)** 110:24
**receive (2)** 45:17;104:20
**received (4)** 64:7;65:9;91:3; 110:3
**recently (4)** 54:11;80:18; 92:22;93:23
**recess (3)** 50:15;87:14,18
**recession (5)** 100:17,25;101:19, 21;105:1
**recharacterization (2)** 36:12;90:13
**recharacterize (1)** 115:7
**recharacterized (1)** 34:4
**recognize (1)** 88:17
**recognizing (1)** 35:20
**recollection (1)** 57:16
**recommendation (2)** 95:19,20
**record (13)** 17:18;25:12; 38:24;49:20,22; 51:2;55:7;56:13;

60:17;67:23;82:8; 87:20;99:5
**recorded (1)** 46:13
**records (1)** 72:6
**record's (1)** 41:5
**recover (7)** 34:5,9;42:21; 101:18;111:23; 112:17;114:18
**recoveries (1)** 54:20
**recovering (1)** 100:23
**recovers (1)** 58:23
**RECROSS-EXAMINATION (1)** 103:16
**Redirect (2)** 102:25;103:2
**reduce (1)** 71:23
**refer (2)** 14:11;109:5
**reference (2)** 99:15;103:18
**referenced (2)** 22:23;77:18
**referencing (1)** 23:21
**referred (3)** 44:13;102:14; 109:20
**referring (1)** 103:24
**refers (1)** 46:6
**reflect (4)** 68:17;101:17; 104:10;115:21
**reflected (3)** 39:5,10;92:16
**reflects (1)** 89:2
**regarding (2)** 27:20;38:24
**regards (1)** 69:10
**regulations (2)** 75:12;104:23
**regulatory (2)** 50:6,7
**Reimbursement (1)** 4:21
**reinstated (1)** 16:11
**relate (2)** 29:13;68:8
**related (3)** 4:12;30:4;77:25
**release (1)** 23:1
**released (1)** 112:7
**releases (1)** 20:22
**relevant (4)** 74:21;97:12,13,15
**Relief (23)** 3:19;4:9;27:6; 29:6;34:4;35:9; 47:15;48:6;50:22; 53:19,24;54:18; 57:20;61:3,11;63:9, 12;64:7,11;68:12; 69:7;86:4,19
**remaining (2)** 110:15,22
**remedy (1)** 38:12
**remember (4)** 22:16;58:16; 73:18;74:3
**repaid (2)** 96:13;109:25
**repay (2)** 92:25;95:7
**repayment (2)** 53:14,17
**replies (1)** 108:7
**reply (1)** 36:24
**report (12)** 43:18,21,22;44:7; 46:16;51:7,9;78:24; 86:23;103:25; 104:17;112:6
**represent (3)** 74:25;81:22;88:21
**representative (1)** 86:16
**represented (3)** 84:20;86:5;114:23
**request (4)** 26:13,17;69:12; 112:5
**requested (1)** 112:4
**requesting (1)** 50:22
**require (1)** 116:23
**required (3)** 21:3;22:6;86:1
**requirements (2)** 82:12;91:17
**requires (1)** 112:12
**ResCap (14)** 23:3;24:2;40:11; 49:2;88:13;93:8,9, 11;97:8;100:22; 104:12;108:18; 109:20,20
**ResCap's (1)** 104:4
**reschedule (1)** 86:20
**reservation (6)** 31:5;32:2;38:9; 49:24;90:15;111:21
**reservations (1)** 47:18
**reserve (4)** 52:15,15;90:11,21
**reserved (2)** 25:8;32:3
**Residential (7)** 3:17;5:2,4;14:3; 73:9;75:24;87:20
**resolution (9)** 18:1;72:8;89:24; 90:1,3,7,20;97:10; 101:9
**resolve (5)** 66:25;72:20; 75:23;76:17;77:1
**resolved (6)** 22:5;24:24;25:1; 72:21,23;76:24
**resolves (2)** 27:19;72:1
**resolving (3)** 25:6;72:20;77:6
**resources (3)** 76:16;113:24; 115:11
**respect (45)** 14:10,11,17; 16:23;22:22;24:19; 29:23;30:10,17; 32:16;39:19;40:12; 43:17;44:12;46:4, 18;49:3,6,15;50:9; 51:25;53:12;61:22; 65:19;71:18,22,24; 72:3;77:6;80:10; 84:11;89:13,25; 93:13;95:6,7,19; 98:15,19;99:19,20; 102:14;108:12,16; 110:2
**respectively (1)** 108:23
**respond (4)** 17:25;49:9;55:21; 65:3
**respondeat (4)** 18:17;19:4,18; 20:5
**response (3)** 49:16;85:20;116:9
**responsible (4)** 19:18;20:4;63:21, 23
**rest (1)** 23:2
**restated (1)** 108:20
**restatement (1)** 109:11
**restating (1)** 109:6
**resting (1)** 50:13
**restricted (3)** 45:13;91:6;110:12
**restrictions (1)** 91:9
**restructuring (3)** 88:12;100:13,14
**result (6)** 22:8;31:13;37:4; 67:3;85:24;86:20
**retain (3)** 28:12;30:4;75:7
**retained (2)** 56:20;80:24
**retention (2)** 29:1;80:25
**return (6)** 91:7,11,14,17,21; 97:8
**returns (1)** 64:20
**Review (4)** 4:20;70:24;72:7; 95:2
**reviewed (6)** 46:17;72:5,6,7; 95:16,24
**reviews (1)** 115:13
**revolver (1)** 39:13
**revolving (1)** 109:9
**RFC (3)** 108:17;109:2,21
**Richard (3)** 4:13;11:20,25
**Richards (30)** 28:11,16,18,18,22, 24;29:16;30:1;55:7, 8,20,22;56:4,12,24; 57:1,5,8;59:12,14, 24;62:11,14,15,17, 20;65:2,5;67:1,25
**right (88)** 14:2;15:2;16:22; 18:20;21:6;23:7,19; 24:16;25:9;26:6,7; 27:14;28:3;29:22, 25;30:19;36:18; 37:8;38:2,4;40:12; 41:21,23;42:18; 43:15;44:5;45:25; 46:15;49:19;51:21; 52:9;54:25;55:17, 20;61:5,24;63:8; 64:23,25;65:1; 67:24;68:22;69:2, 20;70:2,16;71:4,15; 72:2,5,25;76:6;77:2; 79:10,25;80:16,24; 81:6,9;82:18;83:9, 18,23,25;84:11,15; 85:6,9;86:22,25; 87:7,17,19;88:3; 90:11;94:12,20; 95:11;102:1,25; 103:10,20;104:6; 107:1,3;108:3; 115:22;117:16
**rights (18)** 15:24;19:9;25:8, 16;31:5,19,25;32:2, 2;38:9,10;39:11,19; 47:18;49:24;90:15, 21;111:21
**rise (1)** 52:4
**rising (1)** 116:14
**risk (35)** 35:21,22,24; 36:22;37:1,5,5,21, 24,25;40:5,11,14,16; 41:9;44:15,20; 49:15;52:24;54:7; 64:16;67:17;92:13; 94:3,5,16;96:3,7; 101:14,14,15; 104:21;111:10; 112:15,22
**risks (1)** 104:18
**RMBS (1)** 10:12
**Road (1)** 9:12
**Rockefeller (1)** 10:21
**Rosa (1)** 11:23
**rose (1)** 52:5
**Rosenbaum (8)** 70:6,9,10,20,21, 22;72:17;73:1
**ROSY (3)** 12:24;55:16,19
**Rothstein (8)** 3:6;9:3,11;14:12; 15:22;16:9,23;17:15
**round (1)** 22:15
**RUIZ (2)** 12:12,18
**rule (6)** 36:10;66:19; 73:12;82:23,24;

106:18
**ruled (1)**
61:23
**rules (3)**
20:19,21;75:11
**ruling (6)**
18:7;20:23;50:8;67:3,19;112:4
**run (1)**
29:8

## S

**S&P (3)**
98:23;99:15;102:7
**sa (1)**
108:3
**sale (12)**
69:13,14;86:10,11;110:4,4,5;113:1,6,7,8,11
**sales (1)**
91:4
**Samantha (3)**
27:18,21;85:15
**same (6)**
73:16;75:21;99:17;100:24,24;114:4
**sanctions (9)**
57:11,25;58:24;59:5;60:7,8,12;65:21;67:16
**Santa (1)**
11:23
**satisfaction (1)**
107:11
**satisfied (2)**
45:1;54:5
**Satisfy (10)**
4:4;40:7;93:16;101:5;105:15;107:5,8,18,21;115:5
**save (1)**
54:15
**saved (1)**
101:10
**saves (6)**
31:9;32:1,11;38:2;92:8,10
**saving (3)**
89:8,19;90:10
**savings (5)**
31:13;38:8;89:9;95:21;111:6
**saw (3)**
15:21;79:19,20
**Sax (12)**
4:13;11:20,25;68:16,20,21,23;69:1,20,22;70:3,4
**saying (12)**
43:16;44:21;48:7,9;49:20;54:7;59:2;63:12;64:7;67:8;75:6;79:24
**schedule (5)**
21:19;22:15,18;23:8;86:1
**scheduled (7)**
14:20;23:16;57:2,13;62:20;80:6;111:17
**scheduling (1)**
23:11
**scheme (1)**
76:11
**SCHOTZ (1)**
9:19
**SCHROCK (23)**
8:23;15:12,14,16,16;16:10,16,19;23:19;24:5,10,13,17;52:12,13,13,20,22;53:5,25;54:3,22,23
**scope (2)**
22:25;29:23
**Se (2)**
13:13;70:14
**sealed (1)**
44:2
**SEAN (1)**
11:7
**seated (4)**
14:2;26:18;27:18;87:19
**Sebastopol (1)**
11:22
**second (7)**
44:14;62:10;80:4;86:18;113:5,10;114:1
**secondarily (1)**
95:23
**Section (6)**
4:6;57:23;107:17;112:25;113:3,14
**Sections (3)**
3:21;107:4,18
**secure (1)**
109:15
**Secured (56)**
4:4;8:3,11;24:25;25:5,10,14;30:23;31:8,11,20;33:7;39:7;46:1;48:23;54:18;89:3,13,15;90:4,5;91:23;92:1,5,8;98:4;101:11;105:6,12;107:6,8,8,9,19,22,22,22;108:10,13,20,21;109:5,8,12,14,14,16,24,25;110:1,13,14,22,23;115:5,7
**securing (2)**
110:13,23
**securitization (1)**
77:9
**security (5)**
46:14,23;90:18;105:3;113:9
**seek (8)**
56:22;66:9;84:10;90:12;96:17;97:8;111:9;114:12
**seeking (20)**
18:7;28:25;29:14,21;31:4;44:12;47:16;48:7;50:21;51:3;55:12;56:6;57:9;61:11;65:10,14;69:5;86:19;112:17;114:20
**seeks (6)**
26:15;29:3,5;45:9;69:9;107:19
**seem (1)**
50:18
**seems (4)**
50:24;101:25;111:25;116:3
**send (3)**
24:11,14;82:6
**senior (12)**
39:13;76:13;107:22;109:5,7,8,12,14,24;110:1,13;114:22
**sense (1)**
89:12
**sensitive (1)**
48:5
**sent (3)**
24:16,25;86:14
**separate (1)**
93:9
**ser (2)**
77:19;78:2
**serious (3)**
54:6;114:19,25
**seriously (1)**
42:4
**serv (1)**
85:7
**served (2)**
80:8;83:4
**serviced (1)**
18:23
**servicer (7)**
19:15,17;75:12;77:10,20;82:3;84:8
**Services (6)**
3:25;29:4,6,8,12,18
**Servicing (23)**
10:4;18:22;19:9;58:12,18;59:8,9,14;65:6,7,18;67:11;77:11,12,13,20;78:3,8;82:3,5;84:19;86:10;110:5
**set (9)**
20:10;23:13;36:23;53:18;60:18;61:1;69:22;111:5;114:2
**setting (1)**
106:1
**settle (2)**
41:16;92:3
**settled (1)**
70:25
**settlement (18)**
17:9;31:6;32:3;53:2;71:1;85:22;86:5,8,13;89:25;90:14,20;91:22;96:10,24;104:19;106:1,10
**settling (1)**
72:23
**seven (3)**
29:19;31:12;89:20
**several (5)**
54:9;75:21;76:7;79:20;85:21
**severity (1)**
101:24
**SEWARD (1)**
10:11
**Shapiro (3)**
5:20;78:22;81:17
**share (2)**
15:11;42:7
**SHARON (1)**
13:13
**Sharona (1)**
5:20
**sheet (8)**
20:6;24:7;92:19,20;93:4,7,13;95:24
**shield (3)**
63:10;64:11,15
**shoes (1)**
19:10
**short (6)**
35:6,12;47:22;49:9;87:15;104:14
**shortly (1)**
73:13
**short-term (3)**
46:7;98:8,12
**showed (2)**
66:4,4
**showing (1)**
53:16
**shows (1)**
56:8
**sic (4)**
28:20;44:20;92:8;95:5
**side (6)**
26:22,22;39:13,14;100:13,14
**signed (3)**
35:17;90:9;95:12
**significant (2)**
48:25;50:6
**SILVERMAN (5)**
7:19;74:23;80:12,15;81:20
**similar (2)**
97:17;100:6
**similarly (1)**
65:15
**simple (2)**
75:5;92:11
**simply (4)**
21:4;25:15;32:22;60:14
**sitting (1)**
15:12
**situated (1)**
65:15
**situation (1)**
77:1
**six (2)**
38:7;101:12
**six- (1)**
89:19
**sixteen (1)**
93:15
**size (1)**
100:6
**skip (1)**
109:22
**sleep (1)**
105:22
**small (2)**
97:13,14
**smaller (2)**
46:5;92:2
**so-called (1)**
82:10
**Solano (12)**
4:12,13;5:10;11:21;68:8,10,13,15;69:3,8,12;87:1
**sold (2)**
69:15,16
**sole (1)**
39:25
**solely (1)**
29:13
**Solicit (1)**
3:16
**solicitation (2)**
26:12,17
**Somebody (8)**
53:15;54:6;55:1;56:8,8;71:10;85:8;96:16
**somebody's (1)**
58:7

**somehow (1)** 34:3
**someone (2)** 74:3,7
**sometime (1)** 101:1
**somewhat (2)** 17:5;40:25
**somewhere (1)** 42:15
**soon (2)** 30:8,19
**sor (1)** 101:23
**sorry (11)** 28:1,10;40:22; 62:16;77:20;98:17; 99:12;100:9,11; 102:6;103:15
**sort (1)** 42:23
**sought (8)** 29:13;35:9;53:19, 24;86:4;107:7; 114:23;115:3
**sound (3)** 113:4,7,18
**sounds (1)** 96:12
**South (1)** 11:13
**Southern (4)** 15:5;17:16;22:2; 113:24
**speak (9)** 38:18;41:21;52:4, 19;68:25;78:4; 80:21;81:4;84:21
**SPEAKER (1)** 99:11
**speaking (1)** 77:23
**Special (7)** 4:20,23;7:20; 70:23;80:17;81:21; 83:5
**specific (1)** 19:6
**specifically (3)** 15:21;36:11;98:11
**speck (1)** 76:12
**spend (2)** 40:18;77:22
**spends (1)** 40:19
**spent (1)** 75:19
**spoke (1)** 86:7
**spoken (4)** 15:8;74:7;77:18; 83:14
**spread (1)** 24:3
**stake (1)** 46:21
**stakeholders (2)** 90:9;92:7
**stand (7)** 19:10;61:19; 83:25;87:25;102:13; 112:20;115:25
**standard (14)** 33:19,22;44:25; 47:12,14,18,19,25; 66:11;106:17; 112:24;114:2,15; 115:12
**standards (1)** 54:6
**stands (2)** 45:5;105:6
**start (3)** 35:9;54:16;79:21
**state (30)** 55:24;56:9,22; 57:2,12;58:13,14,14, 23;59:3,5,17;60:19; 61:4,14;62:6;65:19, 22;66:5,6,13,17; 67:4,5,9,17;69:9; 79:17,23;96:14
**stated (5)** 64:3;67:22;77:15, 17;115:21
**statement (9)** 17:3;27:9,10; 73:13;74:14,20; 82:21,25;92:19
**statements (1)** 84:14
**States (6)** 2:16;13:2,3;63:1, 2;71:8
**Status (13)** 3:2,10;5:11;14:9; 16:9;24:19;42:2; 56:25;78:24,25; 81:17;85:4;86:20
**Stay (34)** 3:4,19;4:7,9; 14:11;21:25;22:7, 21;27:17;55:13; 56:2;57:20,22; 58:25;59:8;60:1,2,6, 15,23;61:2;63:2; 64:4;65:19,23;66:7, 16;67:4;68:2,12; 69:8;77:1;79:13; 82:15
**stayed (6)** 16:10;17:18,25; 64:1,20;79:5
**STEEN (1)** 11:2
**step (3)** 34:18,18,19
**Stephanie (1)** 57:19
**STEPHEN (2)** 7:8;37:10
**stepped (1)** 110:1
**steps (1)** 96:8
**still (8)** 25:2;30:7;39:18; 47:4;75:4;79:21; 87:9;96:20
**stipulate (1)** 69:7
**stipulated (1)** 52:7
**stipulation (10)** 24:5;25:1,6,6,19; 27:19;47:6;69:25; 116:17;117:1
**stipulations (1)** 52:6
**STN (2)** 114:20,23
**stop (5)** 39:6;41:9;60:22; 61:7;64:25
**stopped (1)** 29:15
**straightforward (2)** 55:10;56:1
**STRAUSS (23)** 9:7;17:13,13,22; 18:5,14,21;19:3,8, 14,16,25;20:2,10,12; 21:2,8;22:17;23:7,9, 10,14,18
**Street (4)** 5:22;9:20;12:14; 13:4
**stress (5)** 99:22,25;100:3,4; 103:4
**stress-tested (1)** 103:5
**stretch (2)** 18:16;20:17
**strike (1)** 60:7
**strong (6)** 38:1;97:19,19,24, 24;98:6
**styled (1)** 112:12
**subagent (2)** 20:3,5
**subject (7)** 15:20;31:5;47:17; 49:23;58:17;67:15; 111:21
**subjects (1)** 65:20
**subject-to-challenge (1)** 46:14
**submission (1)** 70:18
**submissions (1)** 71:20
**submit (4)** 20:23;49:19; 116:16,19
**submitted (7)** 26:18;30:5;33:23; 52:24;61:11;72:6; 84:25
**subordinate (1)** 115:7
**subordinated (3)** 34:3;105:5;113:23
**subordination (3)** 29:7,13;36:11
**subsequently (1)** 105:4
**subservicer (4)** 19:12,20,22,24
**substantial (5)** 27:5;101:13; 110:15;111:6,13
**substantially (2)** 90:8;115:4
**substitute (1)** 115:14
**successfully (1)** 79:21
**sue (1)** 38:15
**suffice (1)** 72:18
**sufficient (3)** 49:20;51:2;110:24
**suggested (1)** 43:6
**Suite (4)** 5:22;7:22;9:13; 12:15
**suited (1)** 17:3
**summarizes (2)** 93:4,7
**summary (1)** 93:3
**superior (4)** 18:18;19:4,18; 20:5
**supplemental (9)** 58:12,18;59:8,9, 14;63:1;65:6,18; 67:11
**Support (29)** 3:25;17:1;26:17; 27:8,8;29:4,18;31:6, 15,17;33:24;34:11; 37:9,13;38:17,19; 39:2,22;41:22; 43:17;52:25;54:5; 76:25;88:20;96:9; 104:16;111:16; 112:5;114:4
**supported (5)** 26:13;107:14,23; 113:7,12
**supporting (1)** 94:19
**supportive (1)** 116:2
**suppose (1)** 97:13
**supposed (3)** 33:20;47:12,25
**sure (20)** 24:2;25:23;33:13; 34:6;39:19;43:6; 45:3,4;46:19;54:1; 61:9;71:1;74:16,21; 76:6;88:11;92:14; 97:4,5;115:8
**surprise (7)** 25:23,23;26:10; 43:22,22;98:13; 99:19
**surprises (1)** 26:10
**suspect (1)** 33:12
**suspicion (2)** 97:19,22
**swamp (1)** 45:21
**switch (2)** 56:8;58:8
**sword (3)** 63:10;64:11,15
**sworn (2)** 88:3,4

## T

**talk (2)** 41:5;78:23
**talked (2)** 37:22;83:17
**talking (2)** 104:25;105:2
**tangible (1)** 38:1
**tapped (1)** 93:22
**tardy (1)** 4:16
**tax (1)** 115:10
**team (2)** 93:6;95:16
**tease (2)** 99:12;117:6
**telephone (3)** 61:16;62:1;70:16

**TELEPHONICALLY (7)** 7:16;11:25;12:8,9,18,24;55:25
**telling (1)** 48:5
**tells (1)** 28:12
**ten-minute (2)** 87:14,17
**tension (1)** 42:24
**term (1)** 109:10
**terminated (1)** 38:13
**termination (1)** 26:2
**terms (5)** 23:11;53:9;71:1;86:5;108:21
**test (3)** 45:1;100:4;103:4
**testified (1)** 101:5
**testimony (3)** 104:10;106:18;110:18
**testing (3)** 99:23;100:1,3
**Tha (1)** 84:11
**thankful (1)** 76:22
**Thanks (4)** 26:6,7;41:20;94:22
**that'll (1)** 84:7
**thematically (1)** 40:25
**theories (1)** 115:9
**theory (2)** 20:5;21:15
**there'd (1)** 115:6
**therefore (5)** 22:11;40:3;41:9;65:22;115:20
**Thereof (2)** 3:16;85:25
**Third (2)** 9:4;10:5
**third-party (2)** 20:22;22:25
**THOMAS (2)** 11:17;41:24
**thoroughly (1)** 75:5
**though (1)** 76:16
**thought (10)** 17:3;34:24,25;35:7,13,19;55:3;67:6;100:5;104:11
**thousands (1)** 75:19
**three (9)** 30:4;31:9;38:2,8;89:8;90:10;97:17;102:16,19
**three-million (1)** 89:5
**threshold (1)** 20:18
**throughout (1)** 109:18
**thrown (2)** 84:3,4
**till (4)** 27:23,24;32:22;43:16
**times (1)** 85:21
**tired (1)** 116:11
**today (15)** 21:20;24:25;26:15;34:23;35:1;39:17;66:15;80:6;83:24;105:6;106:1;112:15,20;114:9;115:6
**Todd (6)** 24:20,22;30:24;31:1;37:25;103:1
**told (1)** 78:20
**TOLLES (2)** 11:11;41:25
**tomorrow (6)** 57:2,14;59:23;60:1,10,19
**took (7)** 35:16;37:12;92:11,18,19,19,20
**top (2)** 28:13;55:11
**torts (3)** 19:19,23;20:4
**totally (1)** 43:23
**touch (2)** 84:19;85:9
**towards (1)** 27:5
**tracking (1)** 79:20
**trailed (1)** 100:9
**transaction (1)** 113:3
**Transcribed (1)** 5:20
**transcript (1)** 58:16
**transferred (1)** 86:11
**transpired (1)** 20:7
**tremendous (1)** 26:21
**trial (2)** 57:4;75:21
**trigger (1)** 38:13
**true (2)** 56:12;102:10
**Trust (3)** 11:3;77:9;78:15
**trustee (15)** 10:3,12;13:3;45:12;70:24;71:8,19;72:9,12;78:15;91:10,18;112:25;113:18;116:20
**Trustee-approved (1)** 46:8
**trustee's (2)** 71:2;72:8
**try (5)** 20:14;50:12;72:20;81:1;82:16
**trying (12)** 15:1;23:8;43:8,15;48:11;54:15;61:25;63:9;73:25;75:4;76:23;77:5
**Tunc (2)** 3:25;29:6
**tune (1)** 90:5
**turn (2)** 69:7;70:5
**turns (4)** 31:11;36:18,18;111:12
**TWEED (3)** 8:10;25:13;38:21
**twenty (3)** 37:2;54:10;92:10
**twenty-five (1)** 91:15
**twenty-three (2)** 101:10,11
**two (12)** 28:23;33:4;34:23;38:6;39:3;43:3;48:3;93:21;97:17;102:20;108:17,21
**type (2)** 54:18;91:7

**U**

**UCC (1)** 26:13
**ultimate (1)** 96:10
**ultimately (12)** 21:21;31:7;32:3;33:9,14;35:1,21;36:13;37:13,24;96:15;105:13
**Um-hum (4)** 44:18;98:15;100:2,5
**unable (1)** 91:16
**unclear (1)** 66:2
**uncontestably (1)** 92:8
**uncontested (1)** 26:11
**Under (33)** 3:21;4:3;15:23;19:18,18;20:1,5;21:15;26:10;31:19,25;33:5;39:11;45:12;58:23;63:20;65:22;67:17;70:18;76:14;89:5,7;101:18;102:11;103:7;106:25;107:4,17,17,21;108:20,24;115:15
**underestimate (1)** 112:1
**underlies (1)** 95:15
**underlying (3)** 46:20;55:24;56:18
**undersecured (3)** 46:2;111:9,12
**understood (2)** 43:4;51:4
**undertake (1)** 64:16
**undrawn (1)** 93:16
**unencumbered (1)** 105:16
**Unfortunately (2)** 91:9,16
**UNIDENTIFIED (1)** 99:11
**United (4)** 2:16;13:2,3;71:8
**unless (4)** 26:23;46:11,13;53:13
**unlikely (1)** 101:25
**unpaid (1)** 104:14
**unseal (1)** 44:7
**unsecured (12)** 33:10,15;45:23;46:2;49:17;52:25;66:2;89:10,21;93:23;98:4;114:22
**unsuccessful (3)** 58:13;66:20;74:11
**unwilling (1)** 91:19
**unwind (1)** 69:13
**up (17)** 14:8;15:23;17:12;22:17;25:11;26:19;31:19;37:17;56:8;66:4,4;68:17;80:12;83:6,22;99:8;102:8
**updated (1)** 84:14
**upon (10)** 18:17;19:4;41:16;71:19;72:11;92:22;95:19,21;97:23;101:6
**upward (1)** 75:7
**upwards (1)** 93:9
**USC (4)** 3:4;4:3;107:4,18
**use (8)** 25:6,21;26:4;46:25;48:21;63:9;64:11;113:1
**used (3)** 64:15;93:16;110:7
**Using (2)** 3:11;56:17
**usual (2)** 67:9,18
**usually (1)** 117:8
**UZZI (17)** 8:15;25:11,12,12,25;26:4;38:20,20;40:9,18,21,23;41:3,7,20;89:14;92:2

**V**

**vacate (10)** 56:6,7,22;57:1,10;59:22;60:1;62:7,11,18
**vacated (1)** 67:4
**vague (2)** 57:15;71:18
**valid (1)** 106:24
**validity (2)** 47:3,5
**value (3)** 103:19,19;113:8
**various (5)** 15:10,22;74:25;109:3;110:17

**Veil (2)**
3:5;18:16
**very-consensual (1)**
53:2
**view (7)**
37:15;38:12;47:19;67:2;90:15;97:7;112:1
**views (1)**
88:21
**vigorously (1)**
115:2
**violation (1)**
56:2
**virtue (5)**
89:6,18;90:7;95:21,23
**voice (1)**
100:9
**Void (1)**
3:8
**voluntarily (2)**
64:19,20

**W**

**wait (1)**
51:7
**waiting (1)**
25:2
**WALPER (85)**
11:17;41:23,24,24;42:8,11,14,17,19;43:8,11,15;44:1,6,8,11,18,22;45:2,5,15,20,25;46:12,16,24;47:10,23;48:2,9,11,14,16,18;49:12,19;50:4,15;51:1,8,11,13,18,22,24;87:8,10;94:11,20,22,24;95:1;98:18;99:7,8,10,13;100:11;102:11,22;103:4,11,12,14,17,23,25;104:8,9;105:17,21;106:5,13,15;116:10,11,13;117:1,5,6,7,10,12,15,17
**Walper's (1)**
116:1
**wants (1)**
116:12
**Washington (1)**
7:14
**watch (2)**
46:8;99:20
**WATKINS (1)**
12:9
**way (9)**
14:22;38:12;41:8,10;42:24;47:12;56:12;67:2;96:22
**ways (1)**
63:15
**week (6)**
16:5;25:1;26:14;43:20;56:14;83:16
**weeks (7)**
33:4;34:16,23;38:6;43:3;102:17,19
**welcome (4)**
68:2;72:16;116:10,12
**Wells (2)**
78:11,14
**weren't (2)**
74:6;105:25
**West (1)**
5:22
**What's (11)**
16:9;20:7;21:4;27:11;32:8;33:19;39:13;41:17;56:25;59:6;83:1
**when's (1)**
83:13
**Where's (1)**
15:4
**Whereupon (1)**
117:19
**wherewithal (6)**
90:19;96:1,21,22;97:18,23
**WHITE (1)**
8:2
**Whitehall (1)**
13:4
**who'd (1)**
56:17
**Whoever's (1)**
37:16
**who's (7)**
15:12;18:19;26:18;33:6;82:2;85:13;94:19
**whose (1)**
18:22
**WILLIAM (1)**
7:16
**WILMER (1)**
7:11
**Wilmington (2)**
9:14;11:3
**win (1)**
63:13
**wish (17)**
26:25;27:13;29:22;30:10,17;38:18;49:5;50:13,17;51:15,25;54:24;66:9;72:2;94:19;103:11;107:1
**wishes (1)**
116:21
**withdraw (1)**
69:4
**withdrawn (3)**
71:21;87:1,2
**wither (1)**
58:22
**within (1)**
72:23
**without (2)**
53:15;112:10
**witness (18)**
49:11;50:13,23;51:16,21;54:5;55:2;87:16;88:4;93:2,6;99:16;102:6,10;103:22,24;104:7;112:20
**witnesses (1)**
49:6
**Wizmur (1)**
58:4
**woefully (1)**
46:1
**word (1)**
61:25
**work (7)**
22:17;23:7,8;25:4,19;29:15,16
**worked (1)**
16:1
**working (4)**
25:4;26:22;72:19;86:17
**world (1)**
101:2
**worth (2)**
50:11;101:15
**worthiness (1)**
112:22
**writing (2)**
82:6;83:6
**written (1)**
70:19
**wrong (4)**
36:18;57:9;68:11;92:9
**wrongful (4)**
58:21;59:1,3;63:14
**wrongfully (1)**
65:11

**Y**

**year (6)**
56:16;65:8;93:20,22,23;98:1
**years (3)**
79:21;97:17,17
**yesterday (2)**
42:2;95:4
**York (18)**
2:18,18;5:23;7:5;8:5,13,21;9:5;10:6,14,22;11:5;13:6;15:6;17:16;22:3;75:10;113:25

**Z**

**ZIDE (5)**
7:8;37:10,10,20,21

**0**

**07601 (1)**
9:21

**1**

**1 (15)**
3:5,25;5:4,8;88:14;93:7;94:8,12,15;95:2;103:22;107:15;108:23;112:19;114:6
**1,500 (1)**
71:24
**1.1 (10)**
31:4;45:8,8;50:11;89:7;100:23;105:11;108:19;112:11;115:4
**1.5 (1)**
38:6
**1.7 (1)**
110:12
**10:07 (1)**
2:21
**100 (2)**
7:21;37:1
**10004 (2)**
10:14;13:6
**10005 (1)**
8:13
**10006 (1)**
11:5
**10022 (3)**
8:21;9:5;10:6
**10036 (2)**
7:5;8:5
**10040 (1)**
5:23
**100-billion (1)**
93:9
**10112 (1)**
10:22
**1013 (1)**
9:12
**102 (1)**
9:13
**105 (3)**
4:3;107:4,18
**1063 (1)**
113:10
**1072 (1)**
113:10
**108 (1)**
46:6
**10K (1)**
93:3
**10K's (1)**
92:15
**10Q (6)**
44:16;46:6;93:3;98:9;100:8,10
**10Q's (1)**
92:16
**10th (7)**
27:24,25;30:7,9;72:22;86:21;96:4
**11 (8)**
3:4,15;4:3;5:2;27:6;53:2;107:4,17
**11:48 (1)**
87:18
**1155 (1)**
8:4
**11753 (1)**
7:23
**1177 (1)**
7:4
**12 (1)**
2:20
**12/31/2012 (1)**
4:24
**12:05 (1)**
87:18
**12:52 (1)**
117:19
**12-01935 (1)**
73:10
**12-01935-mg (1)**
5:3
**12-02050 (1)**
85:18
**12-02050-mg (2)**
2:5;5:7
**12-12019-mg (1)**
5:2
**12-12020 (2)**
14:3;87:20
**12e (2)**
73:12;82:25
**13 (3)**
14:9;58:3;61:1
**13-01255-mg (1)**
5:10
**13th (1)**
62:25
**141 (1)**
113:5
**144-45 (1)**
113:5
**147 (1)**
113:24
**14th (2)**
58:1;73:13
**15 (1)**
4:22

**150,000 (1)**
29:9
**15th (3)**
86:3;92:22;109:24
**166 (1)**
93:10
**18 (2)**
28:6,13
**1819 (1)**
12:5
**1873 (1)**
7:13
**192nd (1)**
5:22
**19805 (1)**
9:14
**1983 (1)**
113:11
**1992 (2)**
113:6,25
**1993 (1)**
114:1
**1st (1)**
29:6

## 2

**2 (13)**
3:7;57:21;92:18;93:1,2;94:9,12,17;95:3,3,13;103:18;114:7
**2.1 (6)**
45:6,7;49:1;96:23;97:1;105:24
**2.3 (1)**
93:25
**20 (2)**
71:25;93:12
**20,000 (1)**
75:6
**20006 (1)**
7:14
**2005 (1)**
64:13
**2007 (1)**
100:14
**2008 (7)**
100:14,19;101:20,25;108:22;109:7,22
**2009 (3)**
108:16,23;109:2
**2010 (1)**
109:24
**2011 (1)**
56:14
**2012 (5)**
4:22,22;58:1;62:25;85:19
**2013 (9)**
2:20;3:25;57:19;60:16;80:4;82:22;85:22;107:16;110:10
**2015 (1)**
107:10
**20th (2)**
80:4;86:2
**21st (5)**
13:5;14:13;26:16,17;86:18
**23 (1)**
93:11
**24 (1)**
30:22
**25 (2)**
9:20;55:12
**25,000 (2)**
59:1;63:22
**25,870 (2)**
56:23;65:24
**2511 (1)**
3:2
**2579 (1)**
57:21
**25th (1)**
25:20
**26 (1)**
82:22
**2604 (1)**
4:9
**26th (12)**
25:4,21;26:20;28:1,2;32:16,19,23;35:1;43:25;90:2;111:17
**28th (1)**
82:21
**2935 (2)**
4:11;68:11

## 3

**3 (3)**
39:6;93:18;113:25
**3.2 (1)**
93:25
**3.4 (1)**
93:24
**3.5 (2)**
91:5;110:11
**30 (1)**
10:21
**300 (2)**
7:22;47:17
**300-plus (1)**
42:20
**30th (3)**
108:16,22;109:2
**31 (3)**
4:22;73:2;110:10
**3187 (1)**
4:18
**32 (2)**
73:5;80:5
**327a (1)**
3:22
**328a (1)**
3:22
**33 (1)**
13:4
**33126 (1)**
12:16
**3315 (1)**
4:15
**3343 (1)**
3:2
**3374 (1)**
3:10
**3375 (1)**
3:10
**350 (1)**
42:15
**35203 (1)**
12:6
**355 (1)**
11:13
**35th (1)**
11:14
**362 (2)**
3:4;57:23
**3626 (2)**
4:2;107:6
**362a (1)**
4:6
**363 (3)**
4:3;107:5,18
**363b (1)**
113:15
**363b1 (2)**
112:25;113:3
**3671 (1)**
107:15
**3733 (1)**
3:19
**380 (1)**
108:25
**3829 (1)**
3:21
**3830 (3)**
4:6;55:14;67:22
**3872 (2)**
4:2;107:19
**3893 (1)**
108:5
**3911 (1)**
3:14
**3912 (1)**
3:14
**3933 (1)**
108:8
**3934 (1)**
108:8
**3935 (1)**
108:8
**3rd (5)**
17:3;27:9;85:22,25;107:16

## 4

**4.1 (3)**
91:3,3;110:3
**448 (1)**
11:22
**49 (1)**
113:25
**4H (2)**
62:14,18
**4th (1)**
109:7

## 5

**5 (1)**
91:1
**5.2 (1)**
93:20
**5/15/2012 (1)**
4:23
**5040 (1)**
12:14
**57105 (1)**
63:20

## 6

**601 (1)**
8:20
**650 (1)**
113:24
**656 (1)**
113:24
**6th (1)**
109:22

## 7

**700 (1)**
5:22
**7012 (1)**
82:24
**722 (1)**
113:10
**747 (1)**
109:13
**750 (1)**
12:15
**774 (1)**
62:25
**7th (1)**
12:14

## 8

**8 (2)**
39:10;61:19
**800 (8)**
31:8,13,21;42:7;89:17;90:5;107:7;112:10
**825 (1)**
9:4
**875 (1)**
10:5
**8th (1)**
57:19

## 9

**9.625 (2)**
107:9;108:15
**9:30 (1)**
99:6
**90071 (1)**
11:15
**95401 (1)**
11:23
**973 (1)**
113:5
**973406-2250 (1)**
5:24