**GIBSON, DUNN & CRUTCHER LLP**
David M. Feldman (DF-8070)
Joshua P. Weisser (JW-0185)
200 Park Avenue
New York, New York 10166-0193
Telephone: (212) 351-4000
Facsimile: (212) 351-4035

Attorneys for Amherst Advisory & Management, LLC

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------
In re:

RESIDENTIAL CAPITAL, LLC, et al.,

                                  Debtors.
---------------------------------------------------------------

Case No. 12-12020 (MG)

Chapter 11

Jointly Administered

**LIMITED OBJECTION TO DEBTORS' MOTION FOR AN ORDER
UNDER BANKRUPTCY CODE SECTIONS 105(a) AND 363(b)
AUTHORIZING THE DEBTORS TO ENTER INTO AND PERFORM UNDER
A PLAN SUPPORT AGREEMENT WITH ALLY FINANCIAL INC., THE
CREDITORS' COMMITTEE AND CERTAIN CONSENTING CLAIMANTS**

Amherst Advisory & Management, LLC ("***AAM***"), acting in its capacity as investment manager for holder(s) of trust certificates issued by RALI Series 2006-QO7 Trust (the "***RALI 2006-QO7***"), hereby submits this limited objection (the "***Objection***") to the *Debtors' Motion for an Order under Bankruptcy Code Sections 105(a) and 363(b) Authorizing the Debtors To Enter into and Perform under a Plan Support Agreement with Ally Financial Inc., the Creditors'*

- 1 -

*Committee, and Certain Consenting Creditors* (the "**Motion**")[1] [Docket No. 3814] and, in support of this Objection, respectfully represents as follows:

## BACKGROUND

1.  AAM serves as investment manager for one or more RMBS investors that hold, in the aggregate, approximately 50% of a class of residential mortgage-backed securities ("**RMBS**") issued by RALI 2006-QO7, a securitization trust (a "**RMBS Trust**") that originally issued over $1.5 billion of RMBS. Previously in the cases, AAM objected [Dkt. No. 2297] (the "**Settlement Objection**") to the Debtors' attempted settlement of RMBS claims ("**RMBS Claims**") under Bankruptcy Rule 9019 [Dkt. No. 320] (as supplemented, the "**Settlement Motion**"). Grounds for the objection included the Debtors' failure to provide RMBS investors with material input on the proposed allocation between the RMBS Trusts of an aggregate RMBS Claim of up to $8.7 billion. RMBS claim allocation under the Settlement Motion was subject to the unfettered discretion of an outside professional (an "**Outside Professional**") retained to estimate the trusts' relative losses. To participate in the settlement, investors were obligated to opt in prior to any release of the Outside Professional's relative loss estimates and without any ability to appeal. No hearing has been held with respect to the Settlement Motion.

2.  The plan structure reflected in the current Motion, the proposed support agreement (the "**Plan Support Agreement**") and the plan term sheet ("**Plan Term Sheet**") and supplemental plan term sheet (the "**Supplemental Term Sheet**" and together with the Plan Term Sheet, "**Term Sheets**") annexed thereto fails to adequately address the failures of the RMBS Settlement cited in the preceding paragraph. In an effort to create a global solution and avoid

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion, as supplemented.

what the Debtors term "nuclear war", the Debtors continue to advocate guesswork over actual analysis.  Considerable attention is paid to value allocation between various partially consolidated debtor groups.  No attention is paid to value allocation among the RMBS Trusts.  The agreed-upon formulation, as set forth in Schedule A to Annex III to the Supplemental Term Sheet (the "**Proposed Allocation**"), continues to be retaining an Outside Professional with unfettered discretion to allocate value among the trusts.  RMBS investors, therefore, are left with a coercive choice:  either opt into the Plan Support Agreement and the RMBS Settlement and thereby waive any right to challenge the ultimate calculation of their trusts' relative claim amounts or opt out of the settlement and wait to resolve their claims until a date uncertain.  The Committee's consent right with respect to the claims administration process further complicates this decision.

3. Prior to the commencement of these cases, AAM retained a third party forensic review firm to analyze a large subset of the RALI 2006-Q07 loan files for breach of the applicable representations and warranties and accordingly, is best suited to calculate that RMBS Trust's claim amounts.  Any settlement of the RMBS Claims should permit informed holders, like those represented by AAM, to compare their estimates as to claims based on representations and warranties with the Outside Professional's Claim Share calculations before deciding to opt in or out.

4. Other proposed plan provisions incorporated into the Term Sheets are equally troubling, would unjustifiably reduce RMBS investor recoveries and may render any chapter 11 plan patently unconfirmable.  No rationale is presented by the Debtors for allocating case costs of approximately $1.27 billion to the GMACM Debtors and the RFC Debtors, and $0 to the ResCap Debtors.  Further, AAM objects to the proposed payment of the professional fees of a

select group of RMBS investors (the Gibbs & Bruns and Ropes & Gray fees) out of the recovery of all investors. As proposed, this approximately $47 million surcharge would even apply to RMBS investors and RMBS Trusts which opt out of the Plan Support Agreement and the RMBS Settlement.

5.   AAM acknowledges the value in resolving these cases through a negotiated settlement, particularly as it relates to claims against Ally. A consensual deal, however, does not alleviate the Debtors of their obligation to justify their commitment for supporting this flawed Plan Support Agreement and chapter 11 plan structure. This is particularly true when one considers how extraordinary terms outlined in the Plan Term Sheet threaten to direct substantial value away from the Debtors' largest creditor constituency. Accordingly, AAM hereby objects to the Motion and reserves rights of the holders for which it acts as investment manager to opt out of the Plan Support Agreement and the RMBS Settlement and to continue to prosecute the objections described herein at any confirmation hearing relating to a chapter 11 plan consistent with the Term Sheets.

## LIMITED OBJECTION

**A.     The Proposed Allocation Unfairly Denies RMBS Investors Adequate Information regarding Material Terms of the RMBS Settlement**

6.   AAM hereby restates it objection to the claim allocation process, as set forth in AAM's original Settlement Objection. The proposed settlement of RMBS Claims continues to rely on a flawed method of value allocation incorporated into the Term Sheets. The actual facts regarding a particular loan portfolio's R&W Claims should not be ignored.

7.   There are two primary flaws to the Proposed Allocation. The first concerns the authority of the Outside Professional to direct claim allocation without input from the RMBS investors. The second flaw concerns the chosen method of calculation. Providing the Outside

Professional with unchecked power to guesstimate projected losses and claim shares denies RMBS investors adequate information as to expected value allocation and unfairly prohibits investors from introducing actual facts into the process. To participate in the settlement, RMBS investors must blindly compromise their claims.

8.   Ideally, a complete analysis of all RMBS Trusts' Claim Share allocations would be made available prior to the proposed deadline for trustees to opt into or out of the settlement. If the Debtors intend to go forward with the current settlement process, however, the Proposed Allocation should be modified to permit RMBS investors to challenge the Outside Professional's estimates (based on, among other things, actual loan file reviews) or to opt out of the settlement based on the investors' proposed allocation of Claims Shares. Investors should only be forced to fully commit to a RMBS settlement once they have adequate information as to its economics. This is particularly true in the case of the RMBS investor(s) managed by AAM. AAM has caused considerable work to be performed in analyzing the applicable RALI 2006-QO7 loan files in respect of breaches of representations and warranties and is in a significantly better position to calculate RALI 2006-QO7's representation and warranty related claims than the Outside Professional. Where it believes the Outside Professional has erred with respect to its assumptions and estimates in this regard, AAM should not be denied the opportunity to challenge the professional's calculations with actual analysis.

9.   The Outside Professional's flawed method of analysis highlights the need for RMBS investor input on the process. Calculation of the Exception Rate under the Proposed Allocation is based not on identification of actual breaches of representations and warranties under the underlying transaction documentation (which breaches would trigger repurchase obligations) but instead an analysis of deviations from underwriting guidelines (and other

requirements in the representations and warranties, although it is not clear that the Outside Professional intends to actually review any loans for breaches of representations or warranties). Settlement Term Sheet, Annex II, Schedule A, ¶ 1(b)(ii).  Yet, the Committee's own expert has acknowledged that analysis of underwriting guidelines (and marketing prospectuses) is "not equivalent" to identifying breaches of representations and warranties under the actual governing documents.  *The Official Committee of Unsecured Creditors' Federal Rule of Civil Procedure 26(A)(2) Expert Disclosures*, Exhibit A, ¶ 31.  "R&W breaches (e.g. flawed appraisals that lead to misstated home values) might successfully be argued by the Trusts to constitute material R&W breaches yet would not be included as 'materially defective' underwriting as determined by the re-underwriting process." *Id* at FN 19.

10.  Taking into account the Outside Professional's review of underwriting guidelines as a "rough proxy" for analysis of actual RMBS Trust claim amounts, informed investors like AAM which can produce more realistic estimates as to claim amounts should not be shut out of the settlement process.

B.  **Cost Allocation under the Plan Support Agreement Unfairly Punishes RMBS Investors**

11.  The Debtors' commitment to the proposed cost allocation under the Plan Support Agreement is equally concerning.  Pursuant to the Plan Support Agreement, the Debtors will propose a chapter 11 plan that allocates 100% of the case administration costs, or $1.27 billion, to the RFC Debtors and the GMACM Debtors and $0 of the case administration costs to the ResCap Debtors.  No justification is given for this split.  It is believed that all Debtors are contractually liable for common professional and other case administration costs.

12.  The one sided cost allocation described in the preceding paragraph would result in a substantial decrease in RMBS investor recoveries.  The approximately $1.27 billion in

projected costs to be borne completely by the RFC Debtors and GMACM Debtors constitutes just under 92% of the combined GMACM Debtors' Unsecured Distribution and the RFC Debtors' Unsecured Distribution.  Notwithstanding the cost, the Debtors fail to describe this proposed cost allocation in the Motion or supporting declaration, much less offer evidentiary support that the Debtors' agreement to this extraordinary provision via the Plan Support Agreement constitutes an act of good business judgment.

13.     Equally problematic is the current application of fees for counsel to the Steering Committee Consulting Claimants and the Talcott Franklin Consenting Claimants (each, as defined in the Plan Support Agreement) (together, the "***Certain Institutional Investors***") against all RMBS Trusts.  See Plan Support Agreement, p. 5 ("The RMBS Settlement, including but not limited to provisions for attorney's fees, shall be incorporated into the Plan and approved by entry of the Confirmation Order.").  Plan Support Agreement and annexed Term Sheet provisions governing payment of the Certain Institutional Investors' legal fees mirror the terms of the proposed RMBS Settlement Agreement.  Counsel to the Certain Institutional Investments will share a contingency fee equal to 5.7% of allowed unsecured and cure claims of <u>all</u> RMBS Claims, reducing RMBS investor recoveries.  Supplemental Term Sheet p. 6.  Based on estimates provided in the Motion, this equates to $416.2 million of allowed unsecured claims and $5.5 million of cure claims.

14.     Provisions of the Plan Support Agreement and Supplemental Term Sheet directing the application of the Certain Institutional Investments' counsel fees against all RMBS Claims are inappropriate and should be stricken.  The Certain Institutional Investments retained counsel to represent their interests on a contingency fee basis, as is their right.  The Certain Institutional Investments' counsel does not purport to represent all RMBS investors' interests.

See *Verified Statement of Gibbs and Brunn LLP pursuant to Federal Rule of Bankruptcy Procedure* (Dkt. No. 1741).  Accordingly, other RMBS investors, should not be forced to bear the significant costs of that retention or be bound to the terms of a professional engagement letter to which they are unrelated third parties.  RMBS investors' rights are represented by the RMBS Trustees, all four of which retained counsel for this matter and whose legal fees are expected to be paid by the estates.  Plan Support Agreement, p. 6.  No available evidence supports any statement that Certain Institutional Investments' counsel furthered all RMBS Trust' interests or the reasonableness of the 5.7% windfall, and no justification exists for compelling all claimants – including *claimants who opt out of the settlement* – to shoulder these contingency fee claims.[2]  The Certain Institutional Investors alone should absorb the cost of their counsel.[3]

### C.    The Proposed Trust Unit Distribution and Reserve Mechanic Is Flawed

15.    Finally, AAM objects to the Motion on the grounds that the mechanics for the issuance and reserve of Trust Units for the benefit of RMBS investors is flawed.  The Supplemental Term Sheet states that the number of Trust Units issued at emergence will be based on distribution amounts in respect of the RMBS Claims (among other claims) and that an estimated portion of the Trust Units will be set aside for other Monoline Claims and General Unsecured Claims. Supplemental Term Sheet, p. 3.  There is no express set aside for disputed RMBS Claims.  The Supplemental Term Sheet assumes all 392 RMBS Trusts elect to participate in the proposed RMBS Settlement.  Yet, the Plan Support Agreement clearly provides RMBS

---

[2]    Notably, other than noting the attendance of representatives of the Certain Institutional Investors at the mediation settlement, Mr. Kruger, the chief restructuring officer, offers no evidence or opinion as to the reasonableness of this multi-million windfall or the appropriateness of its application against all RMBS Claims.

[3]    Alternatively, should the Court find that payment of the Certain Institutional Investments' legal fees is appropriate here, the Debtors should be directed to pay for the fees of other RMBS investors as well (including those of AAM).

Claim holders with the opportunity to direct trustees to opt out of that document and presumably the RMBS Settlement for specific trusts (as is consistent with the terms of the governing trust documentation).  Plan Support Agreement § 5.2(c).  The Debtors should not be permitted to effectively estimate and cap RMBS Claimholder recoveries by failing to set aside Trust Units for disputed RMBS Claims.

### D. All Rights To Direct the Prosecution of RALI 2006-QO7's R&W Claims Are Reserved

16. Consistent with the terms of the Plan Support Agreement, AAM reserves all rights to elect to not participate in the Plan Support Agreement or the RMBS Settlement described therein and to direct the prosecution of any proof of claim filed in respect of the RALI 2006-QO7 R&W Claims to the full extent permissible under the governing RMBS Agreements and applicable law.

17. To facilitate consideration of the chapter 11 plan and the RMBS Settlement, AAM respectfully requests that the Court direct the Debtors to delay the current deadline to opt out of the Plan Support Agreement and establish a post-confirmation deadline for RMBS Trusts to opt in and out of the RMBS Settlement to the extent it is approved.  The current deadline for trustees to opt out of the Plan Support Agreement is entry of an order approving the Motion.  Plan Support Agreement § 5.2(c). RMBS Trustees which are not directed to opt out of the Plan Support Agreement must, on behalf of the RMBS Trust, support approval of the Motion and the Disclosure Statement and confirmation of a plan of reorganization.  Plan Support Agreement § 4.1(b).  If the flaws in the Plan Support Agreement and related Term Sheets are corrected, AAM would consider the Plan Support Agreement.  Likely, however, these failures will not be addressed until the hearing on the present Motion, and AAM will not have sufficient time to carefully consider any resulting changes adopted by the Debtors.  Notably, in connection with

the original RMBS Settlement Agreement, RMBS investors were given 30 days after entry of an order approving the Settlement Motion to decide to opt in or opt out of the RMBS Settlement. *See Fourth Revised Joint Omnibus Scheduling Order and Provisions for Other Relief regarding Debtors' Motion pursuant to Fed. R. Bankr. P. 9019 for Approval of RMBS Trust Settlement Agreements*, ¶ 14 [Docket No. 2528]. No justification is given for changing this practice in the present Motion.

WHEREFORE, AAM respectfully requests that (i) the Motion be denied, unless and until the Plan Support Agreement and related Term Sheets are modified on the terms set forth herein and (ii) the Court grant AAM such other and further relief as it may deem just and proper.

Dated:  New York, New York
        June 19, 2013                    Respectfully submitted,

                                         /s/ David M. Feldman
                                         David M. Feldman (DF-8070)
                                         Joshua Weisser (JW-0185)
                                         **GIBSON, DUNN & CRUTCHER LLP**
                                         200 Park Avenue
                                         New York, New York  10166-0193
                                         Telephone:  (212) 351-4000
                                         Facsimile:  (212) 351-4035

                                         *Attorneys for*
                                         *Amherst Advisory & Management, LLC*