Hearing Date: June 26, 2013 at 10:00 a.m. (E.T.)
Objection Deadline: June 19, 2013 at 4:00 p.m. (E.T.)

**Zuckerman Spaeder LLP**
Laura E. Neish
1185 Avenue of the Americas, 31st Floor
New York, NY 10036-2603
(212) 704-9600

**Zuckerman Spaeder LLP**
Nelson C. Cohen (*pro hac vice*)
Graeme Bush (*pro hac vice*)
1800 M Street, NW
Washington, DC 20036
(202) 778-1800

*Attorneys for National Credit Union Administration Board
as Liquidating Agent for Western Corp. Federal Credit Union
and U.S. Central Federal Credit Union*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Case No. 12-12020 (MG) |
| RESIDENTIAL CAPITAL, LLC, et al., | Chapter 11 |
| **Debtors.** | Jointly Administered |

**OBJECTION AND RESERVATION OF RIGHTS OF NATIONAL CREDIT UNION
ADMINISTRATION BOARD TO DEBTORS' MOTION FOR AN ORDER UNDER
BANKRUPTCY CODE SECTION 105(A) AND 363(B) AUTHORIZING THE DEBTORS
TO ENTER INTO AND PERFORM UNDER A PLAN SUPPORT AGREEMENT WITH
ALLY FINANCIAL INC., THE CREDITORS' COMMITTEE,
AND CERTAIN CONSENTING CLAIMANTS**

The National Credit Union Administration Board, as Liquidating Agent for Western

Corp. Federal Credit Union and U.S. Central Federal Credit Union ("NCUAB"), hereby submits

this objection (the "Objection") to the Debtors' Motion for an Order Under Bankruptcy Code

Section 105(a) and 363(b) Authorizing the Debtors to Enter into and Perform Under a Plan

Support Agreement with Ally Financial Inc. ("Ally"), the Creditors' Committee and Certain Consenting Claimants (the "PSA Motion"). NCUAB has two principal objections to the PSA Motion.

First, the PSA Motion asks the Court to give its preliminary blessing to a proposed settlement that its proponents interpret very differently from the plain language of the settlement documents they have presented to the Court. Under the agreement, parties with Private Securities Claims are the sole beneficiaries of the $225.7 million Private Securities Claimants Trust (the "PSC Trust"). The Supplemental Term Sheet defines Private Securities Claims as "those securities litigation claims against the Debtors, including claims against the Debtors and Ally, arising from the purchase or sale of RMBS." Supp. Term Sheet at 8 n.10. NCUAB (i) has asserted securities litigation claims against the Debtors, which claims underlie its eleven proofs of claim totaling $293 million; and (ii) has securities litigation claims against Ally and a non-debtor affiliate that are not time-barred. NCUAB's claims fit squarely in the definition of Private Securities Claims.

However, contrary to the language in the Supplemental Term Sheet, the PSA supporters interpret the definition of Private Securities Claims to *exclude* parties that have timely securities claims against the Debtors, unless they have also filed a complaint asserting securities claims against Ally or have a tolling agreement with Ally. The Supplemental Term Sheet lists the parties that the PSA proponents contend are the "only holders" of Private Securities Claims.

Even if it were not contrary to the plain language of the agreement, the distinction between the identified holders of Private Securities Claims and NCUAB makes no sense because it treats like-situated parties – parties with unexpired claims against Ally – differently, allocating a larger share of the Debtors' assets to those parties with unexpired claims against Ally solely on

2

the basis that they have filed claims against Ally or have received a tolling agreement from Ally. Prior to the filing of the term sheet, NCUAB informed parties involved in the mediation that it had unexpired claims against Ally. NCUAB has drafted a complaint against Ally that it is prepared to file. The PSA proponents have not articulated any principle to justify the exclusion of NCUAB from the scope of the Private Securities Claim class.

Second, the PSA Motion asks the Court to issue an order that makes a number of findings in support of the proposed settlement, including that it is in the best interests of creditors and the investors in each RMBS Trust and that the parties to the PSA "acted reasonably, in good faith and in the best interests of their respective constituencies in entering into the Agreement." The PSA Motion does not provide the Court, or any of the creditors who were not part of the mediation that yielded the settlement, sufficient evidence to support the findings.[1]

NCUAB in further support of the Objection, respectfully submits as follows:

## BACKGROUND

**The NCUAB Claims**

1. NCUAB has filed eleven (11) proofs of claim (the "NCUAB Claims") against Debtors Residential Accredit Loans Inc. [Claim Nos. 2626, 2627, 2628, 2629, 2630, 2631, 2632, 2633, 2634, and 2636] and Residential Funding Mortgage Securities II, Inc. [Claim No. 2635]. Declaration of Nelson C. Cohen at ¶ 4 (attached hereto as Exhibit A). The NCUAB Claims total approximately $293 Million and arise out of violations of the Securities Act of 1933, the

---

[1] On June 19, 2013, the deadline date for filing objections to the PSA Motion, the Debtors submitted a revised proposed order with language that the findings proposed in the Form of Order will not "be deemed to constitute any finding of fact or conclusion of law in connection with the approval or confirmation of, as applicable, any disclosure statement, chapter 11 plan or other motion . . . that seeks to effectuate the terms of the Agreement." [Docket No. 4006]

California Corporate Securities Law of 1968 and the Kansas Uniform Securities Act.[2]  Cohen Decl. ¶ 5.

2. NCUAB also has claims against non-debtors Ally and Ally Securities LLC ("Ally Securities") that are not time-barred and that it is prepared to assert.  Those claims arise out of violations of Sections 11 and 15 of the Securities Act of 1933.  Cohen Decl. ¶ 6.  The value of the NCUAB's Section 15 claims against Ally Financial is over $390 million, and the value of the Section 11 claims against Ally Securities is about $200 million.  Cohen Decl. ¶ 7.

3. On November 27, 2012, AIG Management (U.S.), and affiliated entities, Allstate Insurance Company and affiliated entities, Massachusetts Mutual Life Insurance Company, and Prudential Insurance Company of America and affiliated entities (collectively, the "AIG Movants") filed the *Motion of AIG Asset Management (U.S.), LLC, the Allstate Entities, Massachusetts Mutual Life Insurance Company, and the Prudential Entities for an Order Under Bankruptcy Rule 2012 (i) Classifying RMBS Fraud Claims in the Same Class as the Securitization Trusts' Claims for Purposes of any Chapter 11 Plan for the Debtors and (ii) Directing That Misrepresentation Claims Cannot Be Placed in a Plan Class That Will Be Subordinated Under Bankruptcy Code Section 510(b)* (the "3013 Motion") [Case No. 12-12020, Docket No. 2284].  As the holder of the NCUAB Claims, NCUAB joined in the 3013 Motion [Docket NO. 2555].

4. By the 3013 Motion, the AIG Movants sought entry of an order determining, for purposes of any chapter 11 plan with respect to the Debtors, that (a) claims against the Debtors for violations of federal and state securities laws, common-law fraud, and other similar theories (collectively, "Misrepresentation Claims") arising out of the Debtors' misrepresentations and

---

[2]   The claims largely arise out of residential mortgage-backed securities ("RMBS"), which are investments derived from pools of mortgage loans that are packaged for securitization through bankruptcy-remote trusts.

conduct in connection with the purchases by investors (such as NCUAB) of RMBS issued by certain trusts (the "Trusts") should be classified as general unsecured claims, together with any claims of the trustees of the Trusts (the "Trustees") against the Debtors for breaches of representations and warranties by the Debtors ("R&W Claims") and (b) Misrepresentation Claims are not subject to subordination under section 510 of the Bankruptcy Code. *See* 3013 Motion at 1–4.

5. The Debtors opposed the 3013 Motion and instituted an adversary proceeding seeking entry of an order or a judgment subordinating securities law and related claims asserted against certain of the Debtors arising from the purchase or sale of RMBS for which certain Debtors served as sponsor, depositor or master servicer under section 510(a), (b) or (c) of the Bankruptcy Code (the "Subordination Adversary Proceeding"). The Debtors named NCUAB and the claimants now designated as the holders of Private Securities Claims[3] as defendants in the Subordination Adversary Proceeding.

6. The 3013 Motion and the Subordination Adversary Proceeding were consolidated (the "Consolidated Adversary Proceeding"). The parties to the Consolidated Adversary Proceeding stipulated to facts and filed cross motions for summary judgment seeking a resolution of the issues presented therein. The summary judgment motions have been fully briefed. The Consolidated Subordination Adversary Proceeding is currently stayed as a result of the PSA Motion.

---

[3] Unless separately defined herein, capitalized terms herein will have the meaning ascribed to them in the PSA Motion.

5

**NCUAB's Efforts to Participate in the Mediation Process**

7.      On January 22, 2013, counsel for NCUAB wrote to Judge Peck, requesting an opportunity to participate in the mediation. NCUAB did not receive any response from Judge Peck. Cohen Decl. ¶ 8.

8.      Thereafter, NCUAB contacted Lewis Kruger, the Debtors' Chief Restructuring Officer (the "CRO"), hoping to gain access to the mediation process through him. In early May, NCUAB's calls were returned by the CRO's counsel. After a brief conversation with the CRO's counsel, during which NCUAB conveyed its request to participate in the mediation, NCUAB heard nothing further until it received a copy of the PSA Motion. Cohen Decl. ¶¶ 9-10.

9.      NCUAB attempted to keep abreast of developments in the mediation, including by communications with counsel for other holders of securities claims, to try to ascertain how its claims were being evaluated and treated by the participants. Given the highly confidential nature of the mediation, and the unwillingness to expand the group of participants, NCUAB was not successful, despite its efforts, in obtaining information about its treatment under the settlement until after the public filing of the PSA Motion. Cohen Decl. ¶ 11.

**The Plan Support Agreement**

10.     On May 23, 2013, the Debtors filed the PSA Motion seeking approval of its entry into a Plan Support Agreement (the "PSA") with Ally, the Creditors' Committee and certain Consenting Claimants.[4] Among the terms of the PSA, Ally and/or its non-debtor affiliates will make a contribution to the Debtors' estates in an aggregate amount of $2.1 Billion. In exchange, the Debtors have agreed to file a plan of reorganization consistent with the principal terms set forth in the plan outline attached to the PSA as Exhibits A and B. The plan will include a

---

[4]     The AIG Movants are among the Consenting Claimants. These claimants are also identified as "Settling Private Securities Claimants" and are listed holders of Private Securities Claims in the Supplemental Term Sheet.

provision under which all creditors, regardless of classification, grant a broad release of any claims they may have against Ally and its affiliates, including securities litigation claims. Plan Term Sheet, Exhibit A to PSA, at page 8. This broad release would, if implemented as part of a plan, result in the non-consensual release of NCUAB's securities claims against Ally and its affiliates notwithstanding that NCUAB's claims are being treated differently than other creditors with such claims.

11.     The Supplemental Term Sheet, attached to the PSA as Exhibit B (the "Term Sheet"), sets forth the proposed treatment of the holders of Private Securities Claims. The Term Sheet provides that a trust fund will be established for the benefit of holders of Private Securities Claims.[5] Annex 1 to the Term Sheet provides that the trust for the payment of the Private Securities Claims will be funded with $225.7 Million. General unsecured creditors will receive a pro rata share of $19.2 Million. Annex 1 to Term Sheet. The PSA Motion, supporting pleadings, and exhibits, do not provide information about the estimated pro rata distribution percentage for the members of these two classes.

12.     As noted above, the Term Sheet defines the Private Securities Claims as "those securities litigation claims against the Debtors, including claims against the Debtors and Ally, arising from the purchase or sale of RMBS." Term Sheet at p. 8, n. 10. The Term Sheet then lists 21 claimants as the only holders of Private Securities Claims. Though as written, the definition of Private Securities Claims in the Term Sheet includes the claims of NCUAB, NCUAB is not included in the list of holders of Private Securities Claims.

---

[5]     The Debtors have agreed to allow the claims of the four Settling Private Securities Claimants for voting purposes in an aggregate amount of $1.753 Billion for voting purposes while for payment purposes the same claims are allowed in the aggregate amount of $1.022 Billion. Neither the PSA Motion nor the Term Sheet explains the basis for either amount.

13. After receiving the PSA Motion, counsel for NCUAB contacted counsel for the Debtors and the Creditors Committee and requested more detailed information about the PSA terms. Cohen Decl. at ¶ 14.

14. NCUAB received a brief response from the Creditors' Committee in which NCUAB was told that, notwithstanding the definition of Private Securities Claims in the Term Sheet, NCUAB does not hold claims that qualify as Private Securities Claims because NCUAB does not have claims against Ally that are filed or the subject of a tolling agreement. Cohen Decl. at ¶ 17.[6] The Debtor did not reply to NCUAB before the May 29 Status Conference.

15. At the May 29 status conference on the PSA Motion, counsel for the Creditors' Committee advised the Court that securities law claimants not included among those listed in Note 10 would be treated as general unsecured creditors. Cohen Decl. at ¶ 16.

16. Since the Status Conference, the Debtor along with the Creditors' Committee and the Consenting Creditors have conferred with NCUAB about the PSA. During those conversations NCUAB has explained that: (a) its claims are consistent with the definition of Private Securities Claims in the Term Sheet, and (b) even if it is proper to consider claims against non-debtors as additional criteria for inclusion among the Private Securities Claims, NCUAB satisfies that criterion because it has such claims. NCUAB has also sought an explanation for the differential treatment between its claims and others' claims against Ally that also have not been filed but are the subject of a tolling agreement. Cohen Decl. ¶¶ 18-19. The response has been that the distinction exists because that is what the mediation parties agreed to.

---

[6] Since the Status Conference, NCUAB has had some discussions with the Debtors and the Creditors Committee in which NCUAB learned that the entities that comprise the group of Private Securities Claims were identified by Ally. To date, the Debtors have made no effort to communicate the basis for this distinction to the other claimants in this case or definitively determine whether there are any other entities that hold claims against Ally.

8

17. As part of its effort to understand the PSA Motion and Term Sheet, and to communicate its position to the PSA proponents, NCUAB provided Debtors, the Creditors' Committee and the Consenting Creditors with a copy of its draft complaint against Ally based on violations of Section 15 of the Securities Act of 1933. Cohen Decl. at ¶ 20. The draft complaint sets out the legal basis for NCUAB's position that claims of NCUAB are not time-barred. Cohen Decl. at ¶ 21.

## ARGUMENT

### A. Introduction.

Bankruptcy courts have long recognized the value of settlements among various creditor factions as a way of managing the reorganization process. *In re Bradlees Stores, Inc.,* 291 B.R. 307, 311 (Bankr. S.D.N.Y. 2003). Negotiated resolutions that form the basis of a consensual plan may save time and expense for the estate, the creditors and the judicial system. *In re Chemtura Corp.,* 439 B.R. 561, 595 n.149 (Bankr. S.D.N.Y. 2010). This Court remains the final arbiter of whether a resolution that is the product of negotiations between the Debtors and a portion of the creditor body is in fact fair and equitable to the entire creditor body.[7]

Here, the Debtors and the settling parties propose to allocate the vast majority of the assets going to parties with securities claims against both Debtor and non-debtor entities to the relatively few unsecured creditors that have formally asserted claims against, or entered a tolling agreement with, non-debtor Ally. The remaining unsecured claimants will be left with virtually nothing from which they may recover their losses. Since the Debtors and Creditors' Committee have outlined a plan that appears to unfairly discriminate against certain securities litigation claimants (like NCUAB), the PSA should not be approved at this time. At a minimum, the

---

[7] *Cf. In re Am. Capital Equip., LLC,* 688 F.3d 145, 154 (3d Cir. 2012) (discussing the court's inherent power to control its docket and not proceed with time consuming hearings if a plan is patently unconfirmable).

Debtors and the Creditors' Committee must share with NCUAB any disclosures they made to the parties defined as Settling Private Securities Claimants and permit NCUAB the opportunity to show that it should be included among the holders of Private Securities Claims.

      **B.    NCUAB's Claims Are Consistent with the Definition of Private Securities Claims in the PSA**.

The Term Sheet defines "Private Securities Claims" as securities litigation "against the Debtors, including claims against the Debtors and Ally, arising from the purchase or sale of RMBS." NCUAB's claims fit easily within this definition, because it has filed securities claims against the Debtors and holds unexpired securities claims against Ally. We are nevertheless informed that, even though it is not written this way, the PSA proponents interpret this provision to limit this group to the holders of securities litigation claims against the Debtors *and* claims against non-debtor Ally entities, and to require that the claims against Ally be either (1) the subject of a pending litigation or (2) the subject of a tolling agreement with Ally.

Nothing in the PSA Motion, the PSA or the Exhibits to the PSA reflects, explains, or justifies this limitation on the defined term Private Securities Claims. For example, the PSA Motion does not provide a basis to distinguish between NCUAB's unfiled, non-time-barred claims against Ally and the claims of a Private Securities Claimant who has unfiled claims against Ally that are not time barred because they are covered by a tolling agreement. Nor does the PSA Motion explain why the latter claims should be classified in a way likely to give them a recovery from assets of the Debtors that is substantially greater than that available to NCUAB's claims.[8]

---

[8]     The PSA and Term Sheet also includes $100 Million to settle the *New Jersey Carpenters Health Fund v. Residential Capital, LLC*, No. 08-8781 (S.D.N.Y.), class action suit. NCUAB is a member of the class certified by the district court in that case, and thus may be eligible for a portion of that settlement. Holders of Private Securities Claims (as the PSA proponents would limit this term) are also members of the *New Jersey Carpenters* class. If

When the Creditors' Committee and the Debtors advised NCUAB of their additional qualification for inclusion in the group of Private Securities Claims, NCUAB provided a copy of a complaint that it had prepared (prior to the PSA being reached) and is ready to file. The draft complaint asserts claims against non-debtor Ally entities arising out of RMBS transactions. In addition, the draft complaint sets forth the factual and legal bases that support NCUAB's position that those claims are timely.[9]

The Debtors and the Creditors' Committee may dispute whether NCUAB's claims against Ally are timely or otherwise meritorious. There is no indication, however, that an assessment of the strength of the securities claims of the listed Private Securities Claimants played any role in determining whether those claims would be included in the classification. Indeed, the Term Sheet provides that such an evaluation will not occur until after confirmation, when the trustee of the PSC Trust assigns the Private Securities Claims into tiers that get different recoveries based on their "nature and status." Term Sheet at 8-9.

NCUAB should be included as a holder of Private Securities Claims because its claims fall within the definition of a Private Securities Claim, both as set forth in the Term Sheet and as interpreted by the PSA proponents.

### C. All Securities Litigation Claims against the Debtors Should Be Placed in a Single Class and Treated Similarly for the Plan.

Classification of claims for the purpose of treatment under a plan of reorganization is governed by section 1122 of the Bankruptcy Code. Under section 1122, claims may be separately classified if they are not substantially similar, if there is a good business reason for

---

Private Securities Claimants who are *New Jersey Carpenters* class members are eligible to recover from the PSC Trust, NCUAB should be as well.

[9]  Most briefly, NCUAB contends that its Section 15 claims against Ally and Section 11 claims against Ally Securities are not time-barred because of the interplay of the so-called "Extender Statute," 12 U.S.C. § 1787(b)(14), applicable to extend the limitations period for actions brought by a conservator or liquidating agent like NCUAB, and *American Pipe & Constr. Co. v. Utah*, 414 U.S. 538 (1974) ("*American Pipe*"), and related cases.

11

doing so, or if the claimants have sufficiently different interests under the plan. *In re Wabash Valley Power Ass'n,* 72 F.3d 1305 (7th Cir. 1995). "Foremost among [the basic principles of classification] is the notion that the focus of classification is the legal character of the claim as it relates to the *assets of the debtor.*" *In re AOV Indus., Inc.,* 792 F.2d 1140, 1150 (D.C. Cir. 1986) (emphasis original). "The fact that some members of the class may also look to third parties for payment, while others in the class do not have the same right, does not mandate separate classification." *In re Quigley Co.,* 377 B.R. 110, 116 (Bankr. S.D.N.Y. 2007) (quoting *In re AOV Indus., Inc.,* 792 F.2d at 1151).

"It is the nature of their claims being satisfied that is significant, not the nature of other claims or interests a creditor might have." *In re AOV Indus., Inc.,* 792 F.2d at 1151 (quoting *In re Martin's Point Limited P'ship,* 12 B.R. 721, 727 (Bankr. N.D. Ga. 1981)). The existence of a third-party guarantor does not change the nature of a claim vis-à-vis the bankrupt estate. *See In re McKenzie,* 4 B.R. 88, 91-92 (Bankr. W.D.N.Y. 1980). Therefore, a determination of whether claims are "substantially similar" for classification purposes cannot be based on whether non-debtors, such as Ally, could also be responsible for the claim. *Id.*

While under section 1122 of the Bankruptcy Code, the Debtors may be able to classify the defined Private Securities Claimants together since they appear to have similar claims, Section 1122 does not permit the Debtors arbitrarily to exclude from the class other parties whose claims are substantively the same as those in the Private Securities Claimants' class.

Pursuant to section 1122 and the express language of the PSA, NCUAB should be offered an opportunity to participate as the holder of a Private Securities Claim in order for its treatment to be fair and equitable. This has not occurred, nor is such a process contemplated by the PSA.

The discrimination against the NCUAB Claims in the PSA Motion is unwarranted, unexplained, and undermines the Debtors' proposed classification of claims.[10]

### D. There Is Insufficient Support in the PSA Motion for the Proposed Findings Requested in the Form of Order .

The PSA proponents have submitted a proposed order ("Form of Order") that asks the Court to make specific findings about the PSA and Term Sheet, the process by which it was developed, and the conduct of the parties that participated in its development. Those requested findings have inadequate support in the record and should not be part of any order entered on the PSA.

The first paragraph of the Form of Order asks the Court to find that (1) the PSA is "in the best interests of Debtors' estates, their creditors, the Institutional Investors, the *investors in each RMBS Trust* and each such RMBS Trust [and] the RMBS Trustees" (emphasis added); and (2) "each of the parties to the Agreement, including the RMBS Trustees have acted reasonably, in good faith and in the best interests of their respective constituencies in entering into the Agreement." The PSA Motion lacks evidence upon which the Court can make these findings. NCUAB would appear to be included at the least as an "investor in . . . [certain] RMBS Trust[s]." Based on the limited information that has been provided to support the disparate treatment of its securities claims, NCUAB strongly disputes that the PSA is in its best interests or that the party or parties to the Agreement charged with representing NCUAB's interests acted reasonably, in good faith, and in NCUAB's best interests. The Debtors' submission of the Kruger declaration is self-serving, and the Court should not rely on it alone to endorse a confidential process that yielded a settlement that appears to favor those who were at the

---

[10] As discussed above, NCUAB does in fact have claims against the non-debtor Ally entities, so the purported distinction on which the classification is apparently based does not exist.

13

negotiating table.[11] There has not been sufficient information disclosed about the treatment of the different classes of securities and other claimants and about the secret mediation process, or the details of the Term Sheet, for the Court to be able to make this finding. The Court should not make the requested findings until the Debtors have disclosed significantly more information that will allow creditors to make an informed judgment and the parties have had the opportunity to test the basis for the requested findings.[12]

For example, in Annex 1 to the Term Sheet, the Debtors disclose that the Private Securities Claims will share $227.5 Million, representing 9.5% of the assets of the estate while the general unsecured claims will share in $19.2 Million, or 0.8% of the estate's assets. However, neither the Motion nor the support documents make any disclosure regarding the amount of the claims in these respective classes or the resulting proportional recoveries on account of those claims. Since any plan proposed in accordance with the terms outlined in the PSA and its supporting documents will be constrained by the findings in this Form of Order, the disclosures made in connection with the PSA Motion should be supplemented prior to the Court making such a finding.

Finally, paragraph 9 in the Form of Order provides that the "discretionary rights granted in the Treatment of Securities Claims Section of the Term Sheet are approved." However, the section of the Term Sheet pertaining to the Treatment of Securities Claims does not describe any "discretionary rights."[13] Without an express description of the nature and extent of the

---

[11] Because the Debtors have not moved pursuant to Rule 9019 for the approval of a compromise in the PSA Motion, NCUAB presumes that it is the Debtors' intention to seek formal approval of the compromise contained in the PSA and the related documents in connection with confirmation of the plan. See *In re Iridium Operating LLC,* 478 F.3d 452 (2d Cir. 2007). Obviously, failure to do so would be fatal to the plan.

[12] NCUAB casts no aspersions on the parties that participated in the mediation that produced the PSA, including Mr. Kruger; however, it is premature to ask the Court to approve the process and its outcome based on the opinion of a single participant employed by the Debtors.

[13] While the Term Sheet fails to describe the discretionary right, it does provide that the funds available to pay Private Securities Claims will be "administer[ed] and distribute[d] … in accordance with the trust agreement."

discretionary rights the Debtors seek, the Court should refuse to enter an order that contains such broad relief. Therefore, there is insufficient basis and explanation for the requested finding in paragraph 9.

## RESERVATION OF RIGHTS

NCUAB reserves all rights with respect to the Debtors' bankruptcy cases, and NCUAB's claims against the Debtors, including but not limited to the rights to oppose (a) any motion or adversary proceeding seeking expungement, disallowance, subordination, or other modification of any claims asserted against the Debtors by NCUAB and (b) confirmation of any chapter 11 plan filed in these cases that proposes to disallow or subordinate such claims.

**WHEREFORE,** NCUAB respectfully requests that the Court enter an order denying approval of the Plan Support Agreement and granting such other relief as may be just and proper.

Dated: June 19, 2013
New York, NY                                       ZUCKERMAN SPAEDER LLP

*/s/ Laura E. Neish*
Laura E. Neish
1185 Avenue of the Americas, 31st Floor
New York, NY 10036-2603
(212) 704-9600
Nelson C. Cohen (admitted *pro hac vice*)
Graeme Bush (admitted *pro hac vice*)
1800 M Street, NW
Washington, DC 20036
(202) 778-1800

*Counsel for the National Credit Union Administration Board as Liquidating Agent for Western Corp. Federal Credit Union and U.S. Central Federal Credit Union*

---

Term Sheet at page 8. The Term Sheet further provides that the terms of the trust agreement, which will control the administration of and distributions to the Private Securities Claims, will be subject to the approval of the Debtors, the Creditors' Committee, Ally and the four of the Settling Private Securities Claimants. Since the Term Sheet expressly provides that the terms of the Private Securities Trust Agreement shall be approved in connection with confirmation of a plan, NCUAB presumes that the discretionary rights cannot have any connection to such Trust.

15