Hearing Date and Time:  June 26, 2013 at 10 a.m.

WHITE & CASE LLP
1155 Avenue of the Americas
New York, New York 10036-2787
Telephone: (212) 819-8200
Facsimile:  (212) 354-8113
J. Christopher Shore (JCS – 6031)
Harrison L. Denman (HD – 1945)

     - and -

MILBANK, TWEED, HADLEY & MCCLOY LLP
1 Chase Manhattan Plaza
New York, New York 10005
Telephone:  (212) 530-5000
Facsimile:  (212) 530-5219
Gerard Uzzi (GU – 2297)

Attorneys for the Ad Hoc Group
of Junior Secured Noteholders

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | ) )  Chapter 11 |
| RESIDENTIAL CAPITAL, LLC, <u>et</u> <u>al.</u>, | )  Case No. 12-12020 (MG) |
| Debtors. | )  (Jointly Administered) |

**OBJECTION OF THE AD HOC GROUP OF JUNIOR SECURED
NOTEHOLDERS TO THE DEBTORS' MOTION PURSUANT TO FED. R.
BANKR. P. 9019 FOR APPROVAL OF THE SETTLEMENT AGREEMENT
AMONG THE DEBTORS, FGIC, THE FGIC TRUSTEES AND CERTAIN
<u>INSTITUTIONAL INVESTORS</u>**

TO THE HONORABLE MARTIN GLENN,
UNITED STATES BANKRUPTCY JUDGE:

The Ad Hoc Group of Junior Secured Noteholders (the "Ad Hoc Group"),[1] by and

through its undersigned counsel, hereby files this objection (the "Objection") to the FGIC

Motion[2] submitted by the above-captioned debtors (the "Debtors") in these chapter 11 cases (the

"Cases") pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy

Rules") for entry of an order approving the Settlement Agreement (the "Settlement Agreement"),

dated May 23, 2013, among the Debtors, Financial Guaranty Insurance Company ("FGIC"), the

FGIC Trustees, and the Institutional Investors and allowing FGIC's claims in the minimum

aggregate amount of not less than $596.5 million.  In support of its Objection, the Ad Hoc Group

respectfully states as follows:

## PRELIMINARY STATEMENT

1.      In many respects, the FGIC Motion is a fitting example of just what is wrong with

the Debtors' ends-oriented approach in these Cases and, more particularly, with their proposed

claims allowances in connection with the "Global Plan Agreement" that is the subject of the

pending motion to approve the Plan Support Agreement (the "PSA").

2.      As set forth herein, the FGIC Motion and the Settlement Agreement contemplate

two possible outcomes in these Cases – (1) that the Global Plan Agreement will ultimately fail to

produce a confirmable plan of reorganization in these Cases, or (2) that the Global Plan

---

[1] The Ad Hoc Group is comprised of certain entities (the "Junior Secured Noteholders") that hold or manage holders of 9.625% Junior Secured Guaranteed Notes due 2015 issued under that certain Indenture dated as of June 6, 2008 (the "Junior Secured Notes").  Following the Debtors' $800 million paydown, the outstanding amount of principal and pre-petition interest on the Junior Secured Noteholders' claim now equals $1.422 billion and the outstanding amount of post-petition interest accrued through June 14, 2013 equals approximately $264 million.  The aggregate amount outstanding continues to increase by virtue of the ongoing accrual of post-petition interest at the rate of approximately $183 million per year.

[2] Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the Settlement Agreement Among the Debtors, FGIC, the FGIC Trustees and Certain Institutional Investors [Docket No. 3929] (June 7, 2013) (the "FGIC Motion").  Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the FGIC Motion.

Agreement will lead to a successful, comprehensive plan of reorganization confirmed for all of the Debtors.  The Debtors' handling of both scenarios in the Settlement Agreement is significantly flawed.

3.      With respect to the failed plan scenario, the settlement with FGIC is best described as a lopsided claims collar favoring the third-party claimant.  As explained in Section I, infra, to the extent that the plan contemplated in the Global Plan Agreement is not consummated, the Debtors have apparently conceded that FGIC can assert general unsecured claims against Residential Funding Company, LLC ("RFC") and GMAC Mortgage, LLC ("GMACM") at a guaranteed floor of approximately 32% of the total claims filed by FGIC against those Debtors and can assert, subject to defense by the Debtors, up to an additional 65% of the total claims filed by FGIC against RFC, GMACM and Residential Capital, LLC ("ResCap").  The FGIC Motion is, however, silent as to why these three Debtors believe that a locked-in 3% discount to a maximum filed claim merits a settlement, particularly where they have set the claim floor so high relative to the ceiling.  Equally troubling is the lack of any explanation as to how these Debtors are planning to apportion the allowed claims among their respective estates or why all Debtors are, pursuant to Section 3.03 of the Settlement Agreement, locking themselves into particular plan structures as they relate to the FGIC Claims even in the event the Global Plan Agreement fails.  As explained below, individual Debtors are simply not free to agree to allow non-meritorious claims against their estates to facilitate a settlement at other affiliated estates or to lock in plan treatments in a 9019 settlement.  At a minimum, the Debtors need to make clear how and at which estates the FGIC Claims will be allowed and be free to treat such claims as the law provides in the event that the Global Plan Agreement fails.

4.      To be clear, though, the FGIC Motion is not about the prospect of a failed plan, and is clearly focused on the second potential scenario – that the Global Plan Agreement will lead to a successful plan of reorganization in the near term.  It is this second scenario that highlights the Debtors' and Committee's apparent willingness to do whatever it might take to advance their attempts to buy peace, including abandoning notions of legal rights and entitlements in favor of patently and unjustifiably preferring creditors who agree to support the Debtors' plan.  For, if one were to focus solely on the law, as this Court must, there is little to recommend the Court's granting the FGIC Motion at this time and allowing the FGIC Claims on the terms set forth in the Settlement Agreement.  Indeed, it is clear from the settlement structure embodied in that agreement that the FGIC Motion is just one more example of the Debtors' and Committee's "Cookie Jar" plan construct in which settling parties are meted out a specific portion of the Ally Contribution – their "cookie" – in exchange for plan support.

5.      The Global Plan Agreement scenario embodied in the Settlement Agreement is as follows:  In exchange for a release of an identical $1.85 billion claim filed against RFC, GMACM and ResCap, and a continuing agreement to support the Debtors' contemplated plan, the three Debtors have agreed to allow specific general unsecured claims by FGIC  in the aggregate amount of $934 million, apportioned as follows:  $415 million to RFC, $182 million to GMACM, and (unlike the failed plan scenario) a fixed claim of $337 million against ResCap. These claim allowances are completely unjustifiable in three material respects.

6.      First, the Motion lacks any evidence as to why the Debtors find it appropriate to concede an increase in the aggregate potential quantum of allowed FGIC Claims in a settlement scenario versus that of a failed plan.  Simply why should FGIC get a guaranteed, aggregate $596.5 million claim if the plan fails, but a guaranteed $934 million claim if FGIC supports a

successful plan?  FGIC's claims are what they are – the fact that the Debtors' claims against Ally are being compromised in exchange for the Ally Contribution as part of the Global Plan Agreement should have no demonstrable impact on the amount of FGIC's allowed claims against the Debtors.  The PSA merely contemplates that an asset which exists today – the Debtors' unliquidated claims and causes of action against Ally – shall be monetized for $2.1 billion at confirmation.  There is no legitimate basis for giving FGIC a larger share of that asset depending on when and how it is monetized.  What seems to be going on here is that the Debtors are agreeing to give FGIC its plan support "cookie" – a guaranteed dollar recovery – without regard to the facts and law, all for the sake of advancing their agenda embodied in the Global Plan Agreement.

7.     Second, the fact that ResCap, the holding company parent, would agree to a $337 million claim against it under the circumstances amply demonstrates that the concepts of law and entitlement are becoming more attenuated as the prospect of near-term peace takes hold in these Cases.  As set forth in Section II, infra, ResCap is not in privity with FGIC on any of its claims, and FGIC's only asserted basis for a claim against the parent entity is on alter ego, veil piercing and substantive consolidation theories.  In other words, ResCap, which is agreeing to a $337 million claim, (1) is at most liable for the unpaid debts of its two subsidiaries, RFC and GMACM, which FGIC agrees are fixed at approximately $600 million, and (2) is only liable for that amount if FGIC were able to assert (and prevail) on claims for derivative liability belonging to RFC and GMACM, not FGIC.[3]  Implicit in those claims amounts is the Debtors' assumption, without any relevant supporting facts or law, that the alter ego liability claims against ResCap

---

[3] The FGIC Motion lacks any evidence of the expected distributions on the allowed claims against RFC and GMACM, making it impossible to tell whether ResCap is agreeing to claims beyond its maximum derivative liability.  Moreover, the FGIC Motion is silent as to what claims ResCap might have against its subsidiaries to the extent it satisfies their debts as part of the Settlement Agreement.

have a greater than 50% chance of success.  Leaving aside that fact, the Global Plan Agreement

is premised on the fact that the estates of ResCap, GMACM and RFC will <u>not</u> be consolidated

and directly contradicts the Debtors' oft-repeated phrase that the possibility of piercing or

substantive consolidation in these Cases is illusory.  While peace has its virtues, the Court should

not permit the Debtors to straddle two alternate factual and legal universes and claim on the one

hand that the merging of Debtor estates is unfounded and, on the other, grant hundreds of

millions of dollars of claims to FGIC – a single creditor -- premised on exactly the opposite

proposition.

8.      <u>Third</u>, both scenarios in the proposed Settlement Agreement share a common

deficiency in that they purport to fix the *pari passu* priority of at least some amount of FGIC

Claims.  The Settlement Agreement thus appears to disregard the fact that all FGIC Claims arise

in connection with the purchase and sale of the Debtors' securities and are subject to mandatory

subordination under section 510(b) of the Code.  Thus, as set forth in Section III, <u>infra</u>, to the

extent it is inclined to grant the FGIC Motion, the Court should expressly preserve the rights of

all parties in interest to seek to subordinate, by adversary proceeding, any FGIC Claims that are

allowed.  Simply stated, a creditor cannot avoid the legal deficiencies of its claims merely

because it is willing to support a plan, nor may a debtor blithely look the other way and give a

creditor more than the law allows.

9.      For these reasons, and others expressed herein, the Ad Hoc Group respectfully

requests that the court deny the FGIC Motion.

## **THE FGIC CLAIMS**

10.     Prior to the Petition Date, FGIC initiated twelve civil suits against ResCap,

GMACM and RFC in connection with twenty of the FGIC Insured Trusts.  FGIC Motion ¶ 16;

see, e.g., Complaint, Fin. Guar. Ins. Co. v. Ally Fin., Inc., No. 12 Civ 0780 (S.D.N.Y. Jan. 31,

2012), a copy of which is attached hereto as Exhibit 1 for illustrative purposes (the "FGIC

Complaint").  The twelve actions are currently pending in the United States District Court for the

Southern District of New York and have been stayed as against the Debtors since the Petition

Date.  Id.

       11.     Relying on the allegations asserted in its pre-petition complaints, FGIC filed three

proofs of claim (the "FGIC Claims")[4] against Debtors RFC, GMACM and ResCap.  FGIC

Motion ¶¶ 2; 17.  Each substantively identical proof of claim asserts claims of $1.85 billion

against each respective Debtor.[5]  FGIC Motion ¶ 2, n. 5.  The FGIC Claims asserted against

GMACM and RFC include the following breach of contract claims:  "(i) breach of both

transaction-level and loan-level representations, warranties, and affirmative covenants; (ii)

breach of the applicable Sponsor's duty to repurchase, cure, or substitute defective Mortgage

Loans; (iii) breach of the applicable Sponsor's duties regarding the servicing of the Mortgage

Loans; and (iv) breach of the applicable Sponsor's duty to provide FGIC with access to

information regarding the Mortgage Loans."  ResCap Claim ¶ 13; see also FGIC Motion ¶ 17.

FGIC also seeks to recover from GMACM and RFC certain amounts FGIC has been requested to

pay under its insurance policies pursuant to indemnification provisions contained in the

Insurance Agreements (together with (i) through (iv) above, the "Breach of Contract Claims").

FGIC Motion ¶ 17 (citing ResCap Claim ¶ 22).  Additionally, the FGIC Claims include claims

---

[4] Only the ResCap Claim is attached to the FGIC Motion as an exhibit, but the FGIC Motion states that the three proofs of claim are "all substantively similar in form and nature."  Motion ¶ 17.

[5] Given that each individual claim for fraud and breach of representation and warranty would logically be limited only to the Debtor entity responsible for that particular RMBS Transaction – i.e., in each instance, either GMACM or RFC – the proofs of claim filed against each of these entities should address only the FGIC Claims against that particular entity.  It appears then that FGIC was less than rigorous in its claim assertions and that $1.85 billion represents the aggregate assertable claim against the Debtors to be allocated as part of the claims reconciliation process.

against GMACM and RFC that "FGIC was fraudulently induced to issue the Policies in connection with most of these FGIC Insured Trusts" (the "Fraud Claims"). FGIC Motion ¶ 17; see also ResCap Claim ¶ 28.  Further, the FGIC Claims include claims against ResCap in connection with the Breach of Contract Claims and the Fraud Claims based solely on a theory of alter ego liability (the "Alter Ego Claims").  FGIC Motion ¶ 17; see also ResCap Claim ¶¶ 24-26; 32.

12.    It is unclear whether the Debtors initiated any discovery in connection with the FGIC Claims, either in any of the twelve pending actions or in this Court, and it is unclear on what evidence and/or advice the three settling Debtors – in this case Mr. Lewis Kruger acting as CRO for each of them – relied upon in making his determination to allow claims against their estates.

## THE SETTLEMENT AGREEMENT

13.    The Settlement Agreement includes three central components:

(i)    the settlement, discharge and release of FGIC's obligations under the Policies in exchange for a bulk, cash payment of $253.3 million from FGIC to the FGIC Trustees;

(ii)    allowance of claims against [three] of the Debtors' estates in the Minimum Allowed Claim Amount (subject to FGIC's reservation of rights to assert additional claims . . . ) or, if a chapter 11 plan contemplated by the Global Plan Agreement becomes effective, in the aggregate and allocated amounts set forth in the Supplemental Term Sheet, as such amounts may be adjusted, amended or revised by agreement of the parties to the Global Plan Agreement . . .; and

(iii)    the release of the remainder of the FGIC Claims against the Debtors' estates and the bulk of the claims asserted by the FGIC Trustees on behalf of the FGIC Insured Trusts.

FGIC Motion ¶ 21.

14.    The first component of the Settlement Agreement is actually a settlement between FGIC and the FGIC Trustees – FGIC provides $253.3 million of cash and, in exchange, the FGIC Trustees agree to discharge and release any claims against FGIC under the Policies.  FGIC

Motion ¶ 22.  The second component of the Settlement Agreement provides for the allowance of

the FGIC Claims as *pari passu* general unsecured claims against ResCap, GMACM and RFC

totaling $934 million if the PSA is approved and the chapter 11 plan contemplated thereunder

goes effective.  If the PSA is not approved by the Court or otherwise terminates in accordance

with its terms or the chapter 11 plan contemplated thereunder does not go effective, FGIC

reserves the right to assert general unsecured claims against each of ResCap (an entity at which it

has no valid claim), GMACM and RFC (entities against which FGIC's claims are clearly subject

to subordination pursuant to section 510(b)) of up to $596.5 million at each entity.  Settlement

Agreement § 3.01.  However, the Debtors retain the right to contest or seek to subordinate any

claim asserted by FGIC in excess of the Minimum Allowed Claim Amount ($596.5 million)

which will be allocated pro rata among ResCap, GMACM and RFC based on the Debtors'

contractual obligations under the relevant governing agreements and not based on any alter ego

or aiding and abetting or similar claims.[6]  FGIC Motion ¶ 25.  The supposed *quid pro quo*, from

the Debtors' perspective, is the third component of the Settlement Agreement, pursuant to which

FGIC agrees (i) to reduce the claims it can assert without any justification as to whether the

reduction is appropriate or should be even greater than it is and (ii) to be locked in opposition to

any plan of reorganization that does not allow and treat as unsubordinated its claims as set forth

in the PSA.  FGIC Motion ¶ 27; Settlement Agreement § 3.03.  As such, approval of the Motion

has the critical consequence of obligating FGIC to support <u>any</u> plan that provides it with its

allowed claim and preventing the Debtors from supporting any plan that does not.  As a

signatory to the PSA, FGIC may terminate its agreement upon the occurrence of various

termination events including among others the prosecution of a plan that does not comport with

---

[6] Neither the Motion nor the Settlement Agreement provides any explanation of how that allocation would be
determined or what the allocated amounts would be on a Debtor-by-Debtor basis.

the various creditor recoveries set out in the Plan Term Sheet.  See PSA § 6.1(h).  Upon approval

of the Settlement Agreement, however, FGIC essentially forfeits its optionality – it must support

any plan, even one that diverges from the Global Plan Agreement, so long as it provides for the

requested treatment of FGIC's claims.

## ARGUMENT

15.     The FGIC Motion should be denied because the Debtors have failed to satisfy

their burden of demonstrating that the Settlement Agreement is fair and equitable and in the best

interests of each of the Debtors' estates.  The Settlement Agreement (i) represents an

inappropriate attempt to entrench certain components of the Global Plan Agreement, even in the

event of termination of that settlement, months in advance of any conclusive determination as to

the merits of that settlement; (ii) in the Global Plan Agreement scenario, overcompensates FGIC

for meritless alter ego claims that it could not assert against ResCap in any event because the

Global Plan Agreement waives substantive consolidation and, as the Debtors admit, alter ego

claims belong to GMACM and RFC not FGIC; and (iii) does not fully preserve the rights of

parties in interest to seek to subordinate the FGIC Claims pursuant to section 510(b).

## APPLICABLE LEGAL STANDARD

16.     Each of ResCap, GMACM and RFC bears the burden of demonstrating to the

Court that the Settlement Agreement is fair and equitable and in the best interests of its estate.

See Fed. R. Bankr. P. 9019; HSBC Bank USA, Nat'l Ass'n v. Fane (In re MF Global Inc.), 466

B.R. 244, 247 (Bankr. S.D.N.Y. 2012) (Glenn, J.) ("[a] court must determine that a settlement

under Bankruptcy Rule 9019 is fair, equitable, and in the best interests of the estate before it may

approve a settlement.").  Such a determination should be based on "the probabilities of ultimate

success should the claim be litigated" and "an educated estimate of the complexity, expense and

likely duration of such litigation, the possible difficulties of collecting on any judgment which

might be obtained, and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise." Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424-25 (1968). In making this determination, the Court should consider the wide range of factors identified in Motorola, Inc. v. Official Committee of Unsecured Creditors (In re Iridium Operating LLC), 478 F.3d 452, 462 (2d Cir. 2007).

17.    Though the Debtors cite only Bankruptcy Rule 9019 as their statutory basis for relief, courts have acknowledged that Bankruptcy Rule 9019 is only "a rule of procedure, [that] cannot, by itself, create a substantive requirement of judicial approval" for a settlement of claims. Northview Motors, Inc. v. Chrysler Motors Corp., 186 F.3d 346, 351 n.4 (3d Cir. 1999). Instead, section 363 of the Bankruptcy Code is the substantive provision that gives the basis for approval of a settlement. See id. ("Section 363 of the Code is the substantive provision requiring court approval."); Myers v. Martin (In re Martin), 91 F.3d 389, 394 n.2 (3d Cir. 1996) (same). Accordingly, the Court can only approve the Settlement Agreement if each of the settling Debtors can satisfy its respective burden under section 363 of the Bankruptcy Code of demonstrating that the Settlement Agreement is the product of proper business judgment of the settling Debtors. See generally In re Dewey & LeBoeuf LLP, 478 B.R. 627, 641 (Bankr. S.D.N.Y. 2012) (Glenn, J.) (recognizing that, under Bankruptcy Rule 9019, a debtor's business judgment is one factor to consider).

**I.    APPROVAL OF THE SETTLEMENT AGREEMENT AT THIS TIME WOULD IMPROPERLY ENTRENCH CERTAIN KEY COMPONENTS OF THE GLOBAL PLAN AGREEMENT EVEN IF SUCH AGREEMENT TERMINATES OR PLAN IS NOT CONFIRMED**

18.    As noted above, the Settlement Agreement toggles FGIC's claims depending on whether the Court confirms the plan contemplated in the PSA. Should the Global Plan Agreement fail to result in a confirmable plan of reorganization, the Settlement Agreement

entitles FGIC to (i) receive the Minimum Allowed Claim Amount of $596.5 million against

GMACM and RFC and (ii) further retain its rights to assert a $596.5 million general unsecured

claim against <u>each</u> of ResCap, GMACM and RFC (which includes the Minimum Allowed Claim

Amount where applicable).  <u>See</u> FGIC Motion ¶ 25.  Thus, the Debtors have apparently agreed

that FGIC can assert general unsecured claims against RFC and GMACM at a guaranteed floor

of approximately 32% of the total claims filed against those Debtors and can assert, subject to

defense by the Debtors, up to an additional 65% of the total amount claimed by FGIC against

RFC, GMACM and ResCap.

19.    Perhaps counter-intuitively, given that it is intended to address a scenario absent

the Global Plan Agreement, a failed plan scenario improperly entrenches certain key components

of that agreement.  For one thing, if the PSA is not approved or terminates in accordance with its

terms or if the plan contemplated thereunder does not become effective, the Debtors are locked

up under the Settlement Agreement to allow the FGIC Claims as *pari passu* general unsecured

claims in the Minimum Allowed Claim Amount.  Settlement Agreement § 3.03.  Fixing the

priority of the FGIC Claims under the Settlement Agreement effectively precludes parties from

subsequently raising subordination arguments, which are discussed <u>infra</u> in Section III.  This

lock up potentially prejudices any subsequent litigation related to the size of the general

unsecured claims pool, including intercompany claims.  (The value of intercompany claims, as to

which the Junior Secured Noteholders assert indisputably valid liens, is dependent in part on the

amount of general unsecured claims at each Debtor.)  Therefore, whether the FGIC Claims are

subordinated under section 510(b) of the Bankruptcy Code or recover *pari passu* with general

unsecured claims, is an issue that is more properly determined in connection with the trial of the

to-be-consolidated adversary proceedings challenging various aspects of the nature and extent of

the Junior Secured Noteholders' liens.  See Residential Capital, LLC et. al. v. UMB Bank, N.A.

et. al., Adv. Case No. 13-01343-mg (Bankr. S.D.N.Y.); Official Committee of Unsecured

Creditors v. UMB Bank, N.A., Adv. Case No. 13-01277-mg (Bankr. S.D.N.Y.) (together, the

"Adversary Proceeding").   To the extent this Court ultimately holds that the Junior Secured

Noteholders are oversecured on any of the bases to be litigated in the Adversary Proceeding, then

the ultimate value of the intercompany claims – and, therefore, the appropriateness of whether to

grant the FGIC Claims *pari passu* general unsecured claims status – will be moot with respect to

the Junior Secured Noteholders.

20.      The Settlement Agreement also seeks to entrench an allowed claim for FGIC now

while preserving FGIC's rights to assert its claims above that amount subject to the cap, and

thereby provides the Debtors with illusory compensation.  The Debtors argue in the FGIC

Motion that the settlement, even outside of the plan scenario, is beneficial because it reduces the

aggregate FGIC Claim from $5.5 billion to the capped amount of $596.5 million against three

Debtors, i.e., $1.79 billion.  But, in so measuring, the Debtors are inaccurately tripling the filed

claim amount to account for the assertion of identical proofs of claims against three Debtors.  In

fact, in its proofs of claim FGIC asserted its full claim amount – $1.85 billion – against each of

ResCap, GMACM and RFC.  Therefore, as noted above, the maximum amount FGIC could ever

recover against all Debtors is $1.85 billion in the aggregate.

21.      Thus, under the failed plan scenario, FGIC essentially retains a "free option" to

recover nearly the full amount of its claims.  The only consideration FGIC concedes in exchange

for the Debtors' allowing the FGIC Claims in this scenario is the $1.79 billion cap on the general

unsecured claim FGIC can assert against ResCap, GMACM and RFC.  This cap, however, is

only approximately $60.5 million less than FGIC's total asserted claims of $1.85 billion (a

3.27% reduction).  FGIC thus fails to provide sufficient consideration in exchange for the

Debtors' allowance of the FGIC Claims.  As a result, the inadequate consideration falls far short

of an appropriate exercise of each Debtor's business judgment.

22.     Further, the FGIC Motion or the Settlement Agreement does not explain how,

upon termination of the Global Plan Agreement, the Minimum Allowed Claim Amount would be

allocated among GMACM or RFC.  Nor does the FGIC Motion identity FGIC's recovery from

such Minimum Allowed Claim Amount under such a scenario.  Without such information, it is

impossible to fully evaluate the Settlement Agreement.   And the one specific provided by the

FGIC Motion – that absent the Global Plan Agreement, the Minimum Allowed Claim Amount

would not be assertable against ResCap – raises more questions with respect to the appropriate

nature of the proposed Settlement Agreement than it answers.  FGIC Motion ¶ 25.  As set forth

in more detail in section II, _infra_, the Debtors fail to adequately explain how the allowance of a

$337 million general unsecured claim is in the best interest of ResCap when, absent the Global

Plan Agreement, they contest the allowance of even $1 of such claims against ResCap.

## II.     THE SETTLEMENT AGREEMENT IMPROPERLY GRANTS FGIC A CLAIM AGAINST RESCAP

23.     The proposed Settlement Agreement provides that, if the PSA is approved and the

plan contemplated thereunder does become effective, FGIC shall have an allowed general

unsecured claim against RFC and GMACM in the aggregate amount of $596.5 million, and an

allowed general unsecured claim against ResCap in the amount of $337.5 million.[7]  FGIC

Motion ¶ 24.  As noted above, any allowed FGIC Claim against ResCap would presumably be

---

[7] The Settlement Agreement also provides that, under such circumstances, FGIC shall have an allowed general unsecured claim for $181.5 million against GMACM and $415 million against RFC.  As with FGIC's allowed general unsecured claim against ResCap, these allowed claims against GMACM and RFC are similarly inflated. The Debtors do not sufficiently establish that these inflated claims amounts are reasonable or give any justification for such allowed claim amounts.

predicated solely on FGIC's Alter Ego Claims asserted against ResCap in its prepetition litigation.  See ResCap Claim ¶¶ 24-26; 32-33.  Those Alter Ego Claims allege that ResCap is jointly and severally liable to FGIC under a derivative theory of alter ego liability for harm suffered by FGIC that is the subject of its Breach of Contract Claims and Fraud Claims against GMACM and RFC.  ResCap Claim ¶¶ 26-27 (FGIC claims that (i) Ally exercised dominion and control over its subsidiaries, including ResCap, GMACM and RFC, and (ii) Ally and its subsidiaries failed to observe corporate formalities and distinguish themselves as separate entities).

24.    In allowing FGIC Claims based on derivative liability theory, however, the Settlement Agreement inappropriately engineers an inflated recovery for FGIC from ResCap – which should, by all measures, be valued at zero – in three ways.

25.    First, FGIC cannot satisfy, and the Motion does not address at all, the strict and exacting legal standard for the alter ego liability claims underpinning its allowed claim against ResCap.  See Mobil Oil Corp. v. Linear Films, Inc., 718 F. Supp. 260, 270 (D. Del. 1989) ("Disregard of the corporate entity is appropriate only in exceptional circumstances.").  To prevail in piercing the corporate veil and establishing alter ego liability under Delaware law, a plaintiff must establish "(1) that the parent and subsidiary operated as a single economic entity, and (2) that an overall element of injustice or unfairness is present."  In re BH S&B Holdings LLC, 420 B.R. 112, 133-34 (Bankr. S.D.N.Y. 2009) (citations omitted); Maloney-Rafaie v. Bridge at School, Inc., 958 A.2d 871. 881 (Del. Ch. 2008) (examining factors including the dominance of the parent entity over its subsidiaries); Mobil Oil, 718 F. Supp. at 269 ("[Delaware] law requires fraud or injustice to be found in the defendant's use of the corporate form.").  In its pre-petition complaints, FGIC merely alleges facts indicative of typical parent-

subsidiary relationships and fails to allege any fraud or similar injustice.  See, e.g., Ex. 1 (FGIC

Complaint) at 142-171.  The Debtors previously recognized that FGIC would likely receive, if

anything, a meager recovery on its Alter Ego Claims against ResCap.  See, e.g., Debtors'

Supplemental Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the RMBS Trust

Settlement Agreements [Docket No. 1176] at ¶ 20 ("Debtors…dispute the likelihood of success

on and strength of such potential [alter ego] claims."); Debtors' Reply Brief Re Non-Iridium

Issues in Support of Motion for Approval of RMBS Settlement Agreements [Docket No. 2804]

at 20 ("The Debtors…have consistently maintained that their potential liability for

representations and warranties claims lies primarily with Residential Funding Corporation and

GMACM, the two subsidiaries directly involved in the origination and sale of mortgage-backed

securities."); Debtors' Reply Brief Re Objection of Junior Secured Noteholders to Motion for

Approval of RMBS Settlement Agreements [Docket No. 3221] at 2 ("ResCap, of course, has

little exposure to liability (only on alter ego or corporate veil-piercing theories)…").

        26.    Second, in conceding any validity to FGIC's derivative alter ego claims against

ResCap on account of its subsidiaries' activities, the Debtors essentially recognize – without

support – the validity of substantively consolidating the ResCap estate with each of the GMACM

estate and the RFC estate.  This is because both alter ego liability and substantive consolidation

serve to allow a court to disregard corporate formalities and hold all debtor estates jointly liable

for liabilities of any individual debtor.  See In re Am. Intern. Refinery, 402 B.R. 728, 742 n.5

(Bankr. W.D. La. 2008) (stating that the legal standard for substantive consolidation "is almost

identical to the core elements of an alter ego or veil-piercing claim under state law"); In re

Cooper, 147 B.R. 678, 684 (Bankr. D.N.J. 1993) (observing that "the factors which the

bankruptcy courts consider regarding substantive consolidation include the factors which courts

consider regarding piercing the corporate veil"). The Global Plan Agreement, however,
expressly provides that ResCap, GMACM and RFC will <u>not</u> be substantively consolidated in
these Cases. <u>See</u> Supplemental Term Sheet at 2 ("For the avoidance of doubt, the Plan does not
contemplate the substantive consolidation of any of the Debtors."). It is therefore completely
unjustified and nonsensical that the Debtors would grant FGIC claims against ResCap, solely on
alter ego theories, despite the fact that these claims are based on the same facts and
circumstances as claims for substantive consolidation that the Global Plan Agreement explicitly
waives. In any event, even if valid, it is unclear how the amount of any alter ego claim against
ResCap (asserted at $337.5 million in the Settlement Agreement if the PSA is approved and the
chapter 11 plan contemplated thereunder becomes effective) could represent more than 50% of
the total admitted liability of its two subsidiaries. There is no showing whatsoever in the FGIC
Motion that there is a 50% or more likelihood that ResCap is derivatively liable, and such a
showing would completely undermine a central tenet of the PSA. It is this absence of any
correlation between the allowed claim and the underlying legal theory of liability that should
give this Court pause as to the Debtors' intents here. From the Ad Hoc Group's vantage point,
the Debtors are simply handing out recoveries at various estates and in various amounts to
reverse engineer recoveries that settling creditors are demanding in exchange for plan support.

27.     <u>Third</u>, granting any allowed general unsecured claim against ResCap on account
of FGIC's alleged Alter Ego Claims is inappropriate because GMACM and RFC, not FGIC, are
the proper entities eligible to assert those claims for the benefit of all of their creditors. The
Debtors themselves have repeatedly recognized, in the context of analyzing their relationship
with Ally, any alter ego claims constitute Debtor estate claims, not third party claims eligible to
be asserted by contingent litigation creditors like FGIC. <u>See</u> Debtors' Joinder to Motion by Ally

Financial Inc. and Ally Bank for an Order Enforcing the Automatic Stay Pursuant to 11 U.S.C.

362(a)(3) By (1) Enjoining Prosecution of Alter Ego and Veil Piercing Claims in the Class

Action Entitled Landon Rothstein, et al. v. GMACM, LLC, et al. and (2) Declaring Such Claims

Void Ab Initio [Docket No. 2793] at ¶ 18 ("The veil-piercing allegations … are precisely the

types of claims that courts routinely have held to be 'general' in nature and the exclusive

property of a debtor's estate").  By extension, claims alleging alter ego liability against ResCap

constitute estate claims of GMACM and RFC, not FGIC – meaning that only GMACM and

RFC, respectively, could assert those claims (and be compensated by ResCap for the settlement

of those claims).  Yet, the Global Plan Agreement clearly settles all intercompany claims at zero.

Supplemental Term Sheet at 12-16.  Given these facts, there simply is no justification for

awarding an allowed claim against ResCap to FGIC on account of the Alter Ego Claims.

      28.     Notwithstanding the questionable legal basis for allowing a $337.5 million alter

ego claim against ResCap, the Debtors do not appear to have independently evaluated the

propriety of that allowance from the perspective of ResCap at all.  Rather, a single signatory –

Chief Restructuring Officer Lewis Kruger – entered into the Settlement Agreement on behalf of

each Debtor.  See Settlement Agreement signature page (Mr. Kruger signs the Settlement

Agreement for "Residential Capital LLC for itself and on behalf of its direct and indirect

subsidiaries").   Indeed, the Motion and supporting Kruger Declaration attempt to justify the

Settlement Agreement – including the allowance of the FGIC Claim against ResCap – from the

perspective of the "Debtors" generally, not any one individually.  See, e.g., FGIC Motion ¶11

("approval of the Settlement Agreement would confer an immediate and tangible benefit to the

**Debtors' estates**.") (emphasis added); Kruger Decl. ¶ 22 ("I believe that the Settlement

Agreement provides substantial benefits to the **Debtors' creditors and their estates**") (emphasis

added).  Notably, Mr. Kruger does not even attempt to assert that each component to this

Settlement Agreement resulted from arms-length negotiations by <u>each</u> of the Debtors, most

particularly by ResCap.  Rather, Mr. Kruger generally testifies that it is "the negotiation and

mediation process from which the Agreement and Settlement Agreement resulted" that were

"hard fought" and the product of "arms-length" bargaining.  Kruger Decl. ¶ 34.  Left

conspicuously unsaid in the Motion is whether the allowance of FGIC's claim against ResCap

was the product of any arms-length negotiations with anyone representing ResCap's interests

independent of the other Debtors.

29.     At bottom, the Debtors simply fail to provide an independent defensible basis for

ResCap to grant FGIC any recovery for its Alter Ego Claims.  As such, the allowance of that

claim appears to result from the need to manufacture a set of allowed claims for FGIC and the

other settling constituents sufficient to enable a recovery in the amounts set forth in Annex I of

the Supplemental Term Sheet.  Diverting FGIC's allowed claims to ResCap ostensibly on

account of alter ego liability effectively bolsters FGIC's overall recovery (by reducing the

amount of its Fraud Claims and Breach of Contract Claims, which would be subject to

subordination under section 510(b) for the reasons set forth <u>infra</u> in Section III), while

simultaneously enabling enhanced recoveries for subsidiary claimants.

30.     In short, notwithstanding any plan machinations, granting FGIC a claim against

ResCap without regard to its merits is not in the best interests of ResCap and should not be

approved.  See <u>TMT Trailer</u>, 390 U.S. at 424, 435 (reversing and remanding approval of a

settlement as part of plan of reorganization absent factual findings sufficient for the court to

make an informed, independent decision with regard to the probable outcome of litigation); <u>In re

Final Analysis, Inc.</u>, 417 B.R. 332, 342 (Bankr. D. Md. 2009) (considering the likelihood of

success of asserted claims and other factors bearing on the propriety of the settlement); Cont'l Ill.

Nat. Bank and Trust Co. of Chicago v. Widett, Slater & Goldman, P.C., 47 B.R. 925, 927 (D.

Mass. 1985) ("In approving a settlement compromise, the bankruptcy court must assess the

merits of the claims the debtor is giving up and weigh these against the proposed advantage for

the debtor's estate.").

31.    On the point of evaluating a settlement on an estate-by-estate basis, the Second

Circuit's decision in Augie/Restivo is particularly instructive. Union Savings Bank v.

Augie/Restivo Baking Co., Ltd. (In re Augie/Restivo Baking Co., Ltd.), 860 F.2d 515 (2d Cir.

1988).  In that case, the Second Circuit was presented with two chapter 11 estates – one entity

subject to secured claims and another subject to general unsecured claims.  Id. at 517.  To

manufacture a single plan of reorganization capable of "cramming down" the votes of the

secured creditor, the Debtors proposed, and the Bankruptcy Court approved, the substantive

consolidation of the two estates.  The District Court affirmed.  Id.  On appeal, the Second Circuit

reversed, holding substantive consolidation of two chapter 11 estates to be inappropriate when

unwarranted under the circumstances, notwithstanding any purported benefits for the case as a

whole:  "Where, as in the instant case, creditors such as [secured creditor] and [unsecured

creditor] knowingly made loans to separate entities and no irremediable commingling of assets

has occurred, a creditor cannot be made to sacrifice the priority of its claims against its debtor by

fiat based on the bankruptcy court's speculation that it knows the creditor's interests better than

does the creditor itself."  Id. at 520.  The court further stated that it did "not believe that a

proposed reorganization plan alone can justify substantive consolidation."  Id.  As support for

this proposition, the court cited to its earlier decision in Flora Mir, where the court held that the

consummation of a chapter 11 plan providing for substantive consolidation "may indeed be

desirable but not at the cost of sacrificing the rights of [the debtors'] debenture holders." Id. at

520-21 (quoting Flora Mir Candy Corp. v. R.S. Dickson & Co., 432 F.2d 1060, 1063 (2d Cir.

1970)).  While Augie/Restivo spoke to the issue of substantive consolidation, not the allowance

of alter ego claims, it implicates a consideration that characterizes each scenario – that a Court

must consider each Debtor and its respective creditor bodies when analyzing a proposed

settlement involving multiple Debtors.  Here, as in Augie/Restivo, the Court should consider

each Debtor and its respective creditor bodies and decline to approve the Alter Ego Claims

against ResCap, as they are manufactured merely to provide FGIC with a combined recovery

sufficient to garner its support for the Global Plan Agreement.  See also In re Innkeepers USA

Trust, 442 B.R. 227, 235 (Bankr. S.D.N.Y. 2010) ("in a case with multiple debtors, the debtors,

as fiduciaries, have duties to refrain from favoring or appearing to favor one or another of their

estates and its creditors over another.") (citing In re Adelphia Communications Corp., 336 B.R.

610, 669-71 (Bankr. S.D.N.Y. 2006); cf. Official Comm. of Unsecured Creditors of LTV

Aerospace & Defense Co. v. LTV Corp. (In re Chateaugay Corp.), 973 F.2d 141, 143 (2d Cir.

1992) ("The court also held that 'the Debtors [had] advanced good business reasons' for the sale

and that it was 'a reasonable exercise of *each of the Debtors' business judgment* to consummate

a transfer of the Transferred Assets on the terms and conditions set forth in the Agreement.'")

(emphasis added); In re Raytech Corp., 261 B.R. 350, 359-61 (Bankr. D. Conn. 2001) (analyzing

the impact of settlement between jointly administered estates on each of the settling estates).

III.    ANY ORDER GRANTING THE MOTION SHOULD PRESERVE THE ABILITY
OF PARTIES TO SEEK TO SUBORDINATE THE FGIC CLAIMS PURSUANT TO
SECTION 510(b) OF THE BANKRUPTCY CODE

    A.    The Settlement Agreement Cannot Elevate the Priority of FGIC's Claims to
Pari Passu Priority

    32.    As an initial matter, it is inappropriate to allow a claim that is otherwise subject to

section 510(b) subordination to recover *pari passu* with general unsecured creditors, even if such

status is required by a settlement agreement.  See Anchorage Police & Fire Ret. Sys. v. Official

Comm. Of Unsecured Creditors of the Holding Co. Debtors (In re Conseco, Inc.), Case No. 03-

CV-7054, 2004 WL 1459270, at * 3 (N.D. Ill. June 25, 2004) (finding that "[t]here is no rational

explanation why a settlement agreement consummated just months prior to the bankruptcy

should dramatically alter the nature, let alone the treatment, of the underlying claim, particularly

given the plain terms and purpose of §510(b)."); In re Periman Producers Drillers, Inc., 263 B.R.

510, 520 (W.D. Tex. 2000) (holding that a claim for damages arising from the purchase of a

security should have been subordinated under section 510(b) despite being predicated on a

settlement agreement); In re Cincinnati Microwave, Inc., 210 B.R. 130, 132-33 (Bankr. S.D. Oh.

1997) (holding that settlement could not be approved because the debtor "would receive in

consideration for its proposed contribution" to the settlement where settling claimants should

have been subordinated under Section 510(b) and received no recovery as a result).

    B.    Section 510(b) Requires the Subordination of the FGIC Claims

    33.    The Court should preserve the ability of parties in interest to seek to subordinate

FGIC's claims in an adversary proceeding brought pursuant to section 510(b) of the Bankruptcy

Code.  Section 510(b) requires that a court subordinate, among other claims, "a claim arising

from rescission of a purchase or sale of a security of the debtor or of an affiliate of the debtor,

[or] for damages arising from the purchase or sale of such a security . . . ."  11 U.S.C. § 510(b).

The FGIC Claims plainly fall within the ambit of Section 510(b), as they are the direct result of, and intended to compensate for, damages sustained on account of the purchase of the Securities, which are securities of one or more Debtors.  This Objection incorporates by reference the arguments made with respect to section 510(b) in the Objection of the Ad Hoc Group of Junior Secured Noteholders to Debtors' Motion for Approval of the RMBS Trust Settlement Agreements [Docket No. 2824] (Feb. 1, 2013).

### 1.    The Securities are securities "of the Debtor"

34.    Section 510(b) of the Bankruptcy Code subordinates certain claims relating to the purchase or sale of securities "of the debtor or of an affiliate of the debtor."  11 U.S.C. § 510(b). The fact that the FGIC Insured Trusts were interposed between the Sellers and the Security Holders should have no bearing on the application of section 510(b) to the FGIC Claims.  The FGIC Insured Trusts are effectively conduits that enable Sellers to issue the Securities to the Security Holders.  These FGIC Insured Trusts were established by and for the benefit of Debtors and their issuance of the Securities was done effectively on behalf of these entities.

### 2.    The plain language of section 510(b) subordinates claims "arising from" all "securities" not just equity investments

35.    Courts interpreting the "securities" prong of section 510(b) have similarly concluded that it plainly applies to claims arising from the purchase and sale of debt securities as well as equity securities.  See, e.g., Levine v. Resolution Trust Corp. (In re Coronet Capital Co.), Nos. 90 B 13646, 94 Civ. 1187, 1995 WL 429494, at *8 (S.D.N.Y. July 20, 1995) (finding that section 510(b) is not restricted to claims of equity security holders because "[s]ection 510(b) refers to 'security', and § 101(49)(A)(i) of the Code defines 'security' to include 'note'."). Therefore, the Securities giving rise to the FGIC Claims indisputably constitute "securities" for purposes of sections 510(b) and 101(49)(A).  See, e.g., Allen v. Geneva Steel Co. (In re Geneva

Steel Co.), 260 B.R. 517, 525-26 (10th Cir. BAP 2001) (affirming a bankruptcy court decision to

subordinate claims arising from the purchase or sale of notes under section 510(b));

NationsBank, N.A. v. Commercial Fin. Servs., Inc. (In re Commercial Fin. Servs., Inc.), 268

B.R. 579, 600 (Bankr. N.D. Okla. 2001) (finding that a note issued by a trust on account of

certificates, which were issued by an asset-backed trust to the trust, constituted a "security" for

purposes of section 510(b)).

> **3.    The FGIC Claims "arise from" the purchase and sale of the Securities**

36.    Subordination is appropriate here because the FGIC Claims arise from Governing

Agreements which were an inextricable part of the purchase or sale of the Securities and an

instrument by which FGIC assumed the same risk of loss as purchasers of the Securities.  FGIC's

agreement to insure loss related to the Securities is akin to the purchase of the Securities.

Indeed, FGIC itself has in these Cases characterized the Governing Agreements as

"securitization transactions" and has described the FGIC Claims as occurring "in the

securitization transactions." See Limited Objection of Financial Guaranty Insurance Company to

the Debtors' Sale Motion and Assumption Notice [Docket No. 1746] ¶ 6 (describing Governing

Agreements, including FGIC insurance policy as forming a "securitization transaction" and

describing occurrence of Breach of Contract Claims "in the securitization transactions").

Further, FGIC has described its insurance policies as being inextricably linked with, and indeed

playing a crucial role in, the sale of the Debtors' Securities.  See id. at ¶ 4 ("FGIC's financial

guaranty insurance policies enhanced the ratings and marketability of the Debtors' RMBS,

which, in turn made the Debtors' securitization transactions viable.")  Finally, and perhaps most

tellingly, FGIC describes its risk of loss in any such securitization transaction as dependent on,

"(i) the credit quality of the underlying mortgage loans and (ii) the servicing of such mortgage

loans," essentially the same risks faced by prospective purchasers of the Securities.  Compare id.

at ¶ 5 with Statement of Stipulated Undisputed Facts and Agreed-to Exhibits, Residential

Capital, LLC v. Allstate Ins. Co., Adv. Case No. 13-01262 (Bankr. S.D.N.Y. 2013) [Adv. Case

Docket No. 23], Exhibit 3 (Prospectus Supplement) at S-16-23.

### 4.    Section 510(b) Requires Subordination of the Breach of Contract Claims

37.    Subordinating the Breach of Contract Claims here is perfectly consistent with, and

in fact mandatory under, section 510(b) of the Bankruptcy Code.  The statutory language of

section 510(b) does not itself limit to subordination to securities fraud or fraud of any kind.

Section 510(b) subordinates, among other things, "a claim arising from rescission of a purchase

or sale of a security of the debtor or of an affiliate of the debtor, [or] for damages arising from

the purchase or sale of such a security . . . ." 11 U.S.C. § 510(b).  The Breach of Contract Claims

easily fall within this language, as they would be the direct result of, and intended to compensate

for, damages sustained on account of having purchased the Securities.

38.    The contractual representations underlying the Breach of Contract Claims

materially overlap with the substance of the Fraud Claims with respect to the subject matter of

the contractual representations, which are the quintessential claims subject to subordination

under section 510(b).  The objective of each Fraud Claims and Breach of Contract Claim is also

identical – each seeks reimbursement for losses suffered by FGIC.  Under sections 11(e),

12(a)(2) or 15 of the Securities Act, a fraudulent description of mortgages in a prospectus would

entitle security holders to recover damages or rescind their investment.  Similarly, a material

breach of the contractual representations would entitle FGIC to rescind its insuring of the

deficient mortgages.  Accordingly, both types of claims seek to restore FGIC to the same

position it would have occupied had the mortgages been represented properly at the time of the

securitization.

39.     Further, subordinating the FGIC Claims would be fully consonant with the purposes of section 510(b).  FGIC is a sophisticated party that elected to insure the Securities notwithstanding the risks of illegality of disclosures made in connection with the Governing Agreements.  Through the FGIC Claims, FGIC is trying to reallocate the "risk of illegality" of their insuring of the Securities by obtaining treatment on par with the settling Debtors' other general unsecured creditors.  The policy underlying section 510(b) requires that the risk of illegality in the insuring of the Securities be borne by parties with a financial interest in the securities, such as FGIC, not by the Debtors' unsecured creditors.

## CONCLUSION

WHEREFORE, for the foregoing reasons, the Ad Hoc Group requests that the Court deny the Motion to the extent requested herein and grant such further relief as it deems just.

Dated: June 19, 2013
        New York, New York

Respectfully submitted,

By: /s/ J. Christopher Shore
J. Christopher Shore

WHITE & CASE LLP
1155 Avenue of the Americas
New York, New York 10036-2787
Telephone: (212) 819-8200
Facsimile:  (212) 354-8113
J. Christopher Shore (JCS – 6031)
Harrison L. Denman (HD – 1945)

    - and -

MILBANK, TWEED, HADLEY & MCCLOY LLP
1 Chase Manhattan Plaza
New York, New York 10005
Telephone:  (212) 530-5000
Facsimile:  (212) 530-5219
Gerard Uzzi (GU – 2297)

Attorneys for the Ad Hoc Group of Junior
Secured Noteholders