# Exhibit 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------- x

FINANCIAL GUARANTY INSURANCE      )
COMPANY,                          )
                                  )
        Plaintiff,                )
                                  )
        -against-                 )
                                  )
ALLY FINANCIAL, INC. F/K/A GMAC,  )
LLC; RESIDENTIAL CAPITAL, LLC     )
F/K/A RESIDENTIAL CAPITAL         )
CORPORATION; ALLY BANK F/K/A      )
GMAC BANK; GMAC MORTGAGE,         )
LLC F/K/A GMAC MORTGAGE           )
CORPORATION                       )
                                  )
        Defendants.               )

-------------------------------------------------------- x

No._____ 12 CIV 0780

**COMPLAINT**

RECEIVED
JAN 31 2012
U.S.D.C.S.D.N.Y.
CASHIERS

Plaintiff Financial Guaranty Insurance Company ("FGIC"), by and through its attorneys,

Jones Day, for its Complaint against defendants, Ally Financial, Inc., formerly known as GMAC,

LLC ("Ally Financial"), Residential Capital, LLC, formerly known as Residential Capital

Corporation ("ResCap"), Ally Bank, formerly known as GMAC Bank ("Ally Bank"), and

GMAC Mortgage, LLC, formerly known as GMAC Mortgage Corporation ("GMACM"),

alleges as follows:

## NATURE OF THE ACTION

1.      This breach of contract action arises in connection with a financial guaranty

insurance policy (the "Policy") issued by FGIC in relation to a GMACM-sponsored transaction

(the "2005-HE1 Transaction" or the "Transaction"), in which GMACM Home Equity Loan Trust

2005-HE1 (the "2005-HE1 Trust" or the "Trust") issued and sold to investors over $991 million

aggregate principal amount of insured residential mortgage-backed securities (the "2005-HE1

Notes"). As the sponsor of the 2005-HE1 Transaction, GMACM procured the Policy from FGIC

in order to enhance the ratings and marketability of the 2005-HE1 Notes by, among other things,

providing FGIC with certain material representations, warranties and affirmative covenants. In

reliance on those representations, warranties and affirmative covenants FGIC issued the Policy,

thereby enabling the 2005-HE1 Notes to receive a triple-A rating from the rating agencies. This,

in turn, made the 2005-HE1 Transaction viable and enabled GMACM and its affiliates to earn

millions of dollars in transaction fees. GMACM, however, has failed to honor its contractual

obligations by materially breaching the essential terms of its agreement with FGIC and the

essential terms of the other operative documents incorporated therein.

       2.      The breaches committed by GMACM, as detailed more fully below, were

directed by Ally Financial, acting directly or indirectly through its wholly-owned subsidiary,

ResCap. Ally Financial is the ultimate parent of ResCap, which owns GMACM. Ally Financial,

as the ultimate parent of ResCap and GMACM, has the practical ability, which it has repeatedly

exercised, to direct and control the activities of these (and other) subsidiaries. In many

instances—including in this Transaction—Ally Financial's direction and control was effected by

using ResCap as an intermediary instrument to achieve its goals.

       3.      The 2005-HE1 Transaction is a mortgage loan securitization: a complex

arrangement comprising multiple interdependent agreements among GMACM and several other

parties, pursuant to which the Trust acquired a pool of home equity lines of credit ("HELOCs" or

"Mortgage Loans") and issued securities, including the 2005-HE1 Notes, which were intended to

be repaid out of the cash flow from those HELOCs. The Transaction was sponsored by

GMACM. To facilitate the Transaction, GMACM pooled together over eighteen thousand

Mortgage Loans to provide collateral for the 2005-HE1 Notes. All of the Mortgage Loans were either originated or acquired by GMACM or Ally Bank, another Ally Financial subsidiary.

4.       After pooling the Mortgage Loans originated or acquired by GMACM and Ally Bank, GMACM transferred the Mortgage Loans directly or indirectly to another Ally Financial subsidiary, Residential Asset Mortgage Products, Inc. ("RAMP"). RAMP then deposited the Mortgage Loans it received from GMACM into the 2005-HE1 Trust. The 2005-HE1 Trust, in turn, issued the 2005-HE1 Notes to investors. Thereafter, the 2005-HE1 Trust used the periodic payments made by the borrowers under the Mortgage Loans to pay, among other things, principal and interest due on the 2005-HE1 Notes and the fees and expenses of GMACM and other participants in the Transaction.

5.       The 2005-HE1 Trust was a legal entity created by GMACM solely for the purposes of the 2005-HE1 Transaction to hold the Mortgage Loans and to issue the 2005-HE1 Notes to investors in a registered public offering. Wells Fargo Bank, N.A. ("Wells Fargo") agreed to act as indenture trustee of the 2005-HE1 Trust (the "Indenture Trustee").

6.       As well as being the Sponsor, GMACM also acts as servicer of the 2005-HE1 Transaction (the "Servicer"). As Servicer, GMACM supervises the collection of borrower payments and performs other servicing duties related to the Mortgage Loans. As discussed in more detail below, all of GMACM's servicing operations have since been integrated into ResCap.

7.       GMACM, directed and controlled by Ally Financial, is, therefore, the hub of the 2005-HE1 Transaction: it is the sponsor of the securitization, the originator of most of the Mortgage Loans, the seller of the Mortgage Loans directly or indirectly to the 2005-HE1 Trust, and the servicer of the Mortgage Loans. The primary victim of the 2005-HE1 Transaction is

FGIC, which has already paid out tens of millions of dollars in losses under the Policy, with further material losses still to come.

8.    In addition to originating some of the Mortgage Loans used in the 2005-HE1 Transaction, Ally Bank also entered into its own separate contractual agreement with FGIC regarding its duties as custodian of the Transaction. As custodian, Ally Bank (then doing business as GMAC Bank) was one of the critical parties to the Transaction, charged with certain oversight and maintenance duties with respect to the 2005-HE1 Trust for which it collected substantial fees. Like GMACM, however, Ally Bank has materially breached the terms of its agreements with FGIC, in particular by failing to ensure that essential documents were included in the loan file, such as the loan agreements.

9.    Yet another Ally Financial subsidiary, Ally Securities, LLC ("Ally Securities" f/k/a GMAC RFC Securities), was an underwriter for the 2005-HE1 Transaction.

10.   FGIC, a monoline financial guaranty insurance company, was in the business of writing financial guaranty insurance policies with respect to asset-backed and debt securities, including residential mortgage-backed notes ("RMBS Notes"). At the time of the 2005-HE1 Transaction, FGIC's financial strength was rated triple-A by Moody's Investors Services, Inc. ("Moody's"), Standard and Poor's Ratings Services (a division of The McGraw-Hill Companies, Inc.) ("S&P"), and Fitch, Inc., which enabled securities that were insured by FGIC to be rated triple-A as well. FGIC's financial guaranty insurance policies for RMBS Notes typically guaranteed the timely payment of the principal and interest due on the insured securities, including the amount, if any, of principal losses allocated to the RMBS Notes. FGIC's insurance policies thus enhanced the credit quality, and marketability, of the insured securities.

11.   At GMACM's request, FGIC agreed pursuant to the Insurance and Indemnity

Agreement, dated as of March 29, 2005 (the "I&I Agreement"), among FGIC, GMACM and the

Trust (among others), to issue an insurance policy to insure the repayment of the 2005-HE1

Notes.  On March 29, 2005, FGIC issued the Policy to Wells Fargo, as Indenture Trustee under

the Indenture, dated as of March 29, 2005 (the "Indenture"), between the Trust and the Indenture

Trustee, with respect to the insured securities.  The Policy thus enhanced the credit quality, and

marketability, of the 2005-HE1 Notes.

12.   As explained more fully in this Complaint, the 2005-HE1 Trust was permitted to

execute subsequent transfers of new collateral (in the form of additional Mortgage Loans) into

the loan pool, in exchange for a portion of the payments made by borrowers under the Mortgage

Loans, provided, however, that certain conditions precedent had been met—including, among

other things, GMACM providing FGIC with proper notice, and an "Early Amortization Event"

not having occurred (as this would close the period during which new mortgage loans could be

added (the "Revolving Period")).

13.   Following the closing of the 2005-HE1 Transaction, GMACM failed to recognize

and give effect to the occurrence of an Early Amortization Event as defined by the plain

language of the transaction documents.  Such failure was a breach of its contractual obligations

under the transaction documents.

14.   In all, GMACM added approximately $851 million in additional Mortgage Loans

(the "Subsequent Mortgage Loans") to the 2005-HE1 Trust through subsequent transfers that it

was not permitted to make because, among other reasons, the Revolving Period had closed.  As a

result, FGIC is being asked to pay significant losses incurred on a substantial number of loans

that should never have been added to the 2005-HE1 Trust under the express terms of the

transaction documents.  GMACM also failed to give notice to FGIC of the occurrence of an Early Amortization Event or of the many occasions on which it executed subsequent transfers. This also resulted in the improper funding of certain 2005-HE1 Notes, which also increased FGIC's exposure under the Policy.

15.     Accordingly, GMACM has committed multiple breaches of the contractual provisions governing transfers of Subsequent Mortgage Loans to the 2005-HE1 Trust.

16.     Faced with substantial claims under the Policy, FGIC requested copies of the Mortgage Loan files and servicing notes for the Mortgage Loans.  GMACM is obligated under its agreements with FGIC to provide these documents to FGIC.  Notwithstanding its contractual obligations, GMACM has refused to provide FGIC with all of the requested documentation, which, on information and belief, will provide further evidence of GMACM's material breaches of representations and warranties.  This refusal to provide information is itself a material breach of GMACM's contractual obligations to FGIC.

17.     Through this Complaint, FGIC seeks relief against GMACM, Ally Bank, ResCap, and Ally Financial for GMACM's material breaches of the I&I Agreement and other contractual obligations owed to FGIC in connection with the 2005-HE1 Transaction.

18.     Further, FGIC seeks relief against Ally Bank for its material breaches of its contractual obligations to FGIC.

19.     FGIC also seeks a declaration from the Court that Ally Financial, ResCap, and GMACM were, and continue to be, alter egos of one another.

## THE PARTIES

20.     Plaintiff FGIC is a New York stock insurance corporation with its principal place of business at 125 Park Avenue, New York, New York 10017.

21.     Defendant Ally Financial is a Delaware corporation with its principal place of business in Detroit, Michigan. Ally Financial is the parent company of ResCap, GMACM, and all GMACM-affiliated entities relevant to this action.

22.     Defendant GMACM is a Delaware limited liability company with its principal place of business in Fort Washington, Pennsylvania. In the period relevant to this action, GMACM originated, acquired, and serviced residential mortgage loans, and sponsored securitizations of mortgage loans.

23.     Since 2005, GMACM has been an indirect wholly-owned subsidiary of ResCap; prior to that time, GMACM was an indirect, wholly-owned subsidiary of Ally Financial.

24.     Defendant ResCap is a Delaware limited liability corporation and an indirect wholly owned subsidiary of Ally Financial. ResCap is the indirect corporate parent of GMACM and its business includes originating, acquiring, selling, and servicing mortgage loans.

25.     Ally Bank (f/k/a GMAC Bank) is an indirect, wholly-owned subsidiary of Ally Financial, and was at all times relevant to this Complaint a loan originator. To facilitate the 2005-HE1 Transaction, Ally Bank sold to GMACM many of the Mortgage Loans, which it had originated or acquired to be securitized in the Transaction. GMAC Bank was renamed Ally Bank in May 2009. Ally Bank is an online bank chartered under Utah law.

## JURISDICTION AND VENUE

26.     This Court has subject matter jurisdiction over this suit pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

27.     Venue is proper in this district under 28 U.S.C. § 1391 because a substantial part of the events giving rise to this claim occurred within this judicial district. Moreover, GMACM,

a party to this action, has agreed to submit to the jurisdiction of this Court, and has agreed not to
challenge venue in this Court.

## RELEVANT NON-PARTIES

28.     RAMP, a special purpose vehicle, is an indirect, wholly owned subsidiary of Ally
Financial and a Delaware corporation with its principal place of business in Minnesota.  To
facilitate the 2005-HE1 Transaction, RAMP purchased mortgage loans from GMACM and
Walnut Grove Mortgage Loan Trust 2003-A ("Walnut Grove") and deposited those loans into
the 2005-HE1 Trust.  The Trust then issued the 2005-HE1 Notes to the underwriters, including
Ally Securities (then doing business as GMAC RFC Securities), to be sold to investors.

29.     Ally Securities, an entity incorporated in Delaware, is an affiliate of GMACM and
RAMP and a registered broker-dealer under the Securities Exchange Act of 1934, and is
registered to do business in New York.  Prior to 2007, Ally Securities was known as Residential
Funding Securities Corporation, and was doing business as GMAC RFC Securities.  Ally
Securities served as an underwriter of the 2005-HE1 Notes and, on information and belief,
participated in the preparation of certain of the key offering documents for the 2005-HE1
Transaction.

30.     Walnut Grove is a Delaware statutory trust established by an affiliate of GMACM.
Beginning in 2003, GMACM sold to Walnut Grove second-lien mortgage loans that it had
originated or acquired.  To facilitate the 2005-HE1 Transaction, Walnut Grove sold certain of the
Mortgage Loans to RAMP.

## FACTUAL ALLEGATIONS

### A.     Ally Financial and its Subsidiaries

31.     In the period relevant to this action, GMACM originated, acquired, sold, and
serviced residential mortgage loans and, from time to time, arranged for the securitization of

those mortgage loans and the sale of securities collateralized by those mortgage loans to investors, often in the form of RMBS Notes.

32.    The mortgage loans included in securitizations sponsored by GMACM have suffered extremely high rates of delinquencies, defaults and losses, and it is a matter of public knowledge that the business practices of Ally Financial's subsidiaries, including in large part GMACM, Ally Bank, and ResCap, led Ally Financial to seek a bailout by the federal government in 2008.

### (1)    GMACM, GMAC-RFC, and RFC

33.    GMACM is a subsidiary of GMAC-RFC Holding Company, LLC ("GMAC-RFC") which in turn is a subsidiary of ResCap, which in turn is a subsidiary of the ultimate parent, Ally Financial.

34.    Residential Funding Corporation, LLC ("RFC") is also a subsidiary of GMAC-RFC and ResCap.  Like its affiliate GMACM, RFC engaged in the business of originating, acquiring, servicing, and securitizing mortgage loans during the period relevant to this action.

35.    GMAC-RFC companies issued $42.34 billion of non-agency mortgage-backed securities in 2004, $56.93 billion in 2005, $66.19 billion in 2006, and $32.43 billion in 2007, according to Inside Mortgage Finance Publications, Inc.  *See 2011 Mortgage Market Statistical Annual: Volume II* at 38-41.  GMAC-RFC was the fifth largest issuer of non-agency mortgage-backed securities in 2005, the fourth largest in 2006, and the eighth largest in 2007.  *Id.*

36.    GMAC-RFC was the largest issuer of private mortgage-backed securities in 2002, when it issued $11.5 billion of private mortgage-backed securities, according to the *Financial Crisis Inquiry Report, Final Report of the National Commission on the Causes of the Financial and Economic Crisis in the United States* (the "FCIC Report"), published in January 2011.  *See*

FCIC Report at 462. GMAC-RFC was also the fourth largest subprime mortgage lender in 2004,

when it loaned $26 billion to subprime borrowers. *See id.* at 504.

37.     The FCIC Report pointedly notes the widespread failure among the mortgage-

backed security industry generally to adhere to basic standards in loan origination, selection, and

evaluation—a truth FGIC would come to learn specifically in its dealings with GMACM. The

FCIC Report concludes that:

> [F]irms securitizing mortgages failed to perform adequate due
> diligence on the mortgages they purchased and at times knowingly
> waived compliance with underwriting standards. Potential
> investors were not fully informed or were misled about the poor
> quality of the mortgages contained in some mortgage-related
> securities. These problems appear to have been significant.

*Id.* at 187.

38.     The FCIC Report further notes that, in light of Ally Financial and its subsidiaries'

systemic failure to ensure the credit quality of the mortgage loans backing its securitizations,

repurchase demands against GMAC/Ally Financial have mounted. From 2007 to 2010, the

Federal National Mortgage Association ("Fannie Mae") has forced Ally Financial to buy back

approximately $838 million worth of mortgage loans. *Id.* at 225. And in 2009 and 2010, the

Federal Home Loan Mortgage Corporation ("Freddie Mac") forced Ally Financial to buy back

approximately $453 million worth of mortgage loans. *Id.*

**(2)     Ally Financial's Securitization Business**

39.     Ally Financial's business model depended on securitizations, which were

conducted by its business units, including GMACM. Pooling mortgage loans and selling them

into securitizations enabled GMACM to fund its ongoing mortgage loan originations and

acquisitions, earned it significant fees from the resulting transactions, and reduced the credit risk

it retained with respect to those loans.

40.     GMACM, in addition to securitizing mortgage loans originated by itself or other

Ally Financial subsidiaries, also earned fees by securitizing mortgage loans it acquired from third

parties. GMACM would acquire such mortgage loans and then deposit them (usually through an

affiliate), along with mortgage loans it had originated, into a securitization trust. In many

instances, GMACM profited from the difference between the cost GMACM incurred to originate

or acquire mortgage loans, and the price at which it sold them for deposit into the securitizations.

41.     In order to gain additional fees for performing certain administrative duties under

the various transaction agreements, including collecting mortgage payments and determining

whether a mortgage loan is in default based on the transaction documents, GMACM generally

acted as servicer of its own securitizations. GMACM thereby earned servicing fees that

normally amounted to—as it did in the 2005-HE1 Transaction—0.50% per annum of the

aggregate principal balance of the mortgage loans, and also collected substantial fees amounting

to a large percentage of any subsequent recoveries from charged-off or liquidated loans.

42.     GMACM also enriched Ally Financial and its other subsidiaries through its

sponsorship of securitizations. Ally Financial entities typically participated in each of the key

steps in the securitization process, and recorded gains and earned fees at each of those steps. For

example, in the 2005-HE1 Transaction:

- Ally Bank gained fees for originating many of the loans initially comprising the 2005-HE1 Trust, and proceeds from selling those loans to GMACM; Ally Bank also gained fees as custodian of the 2005-HE1 Trust for holding certain documents;

- Walnut Grove received the proceeds from selling certain of the Mortgage Loans to RAMP;

- RAMP received payments for serving as the depositor of the Mortgage Loans to the 2005-HE1 Trust; and

- Ally Securities received fees for underwriting the 2005-HE1 Notes.

### (3)    Ally Financial, GMACM, and RFC Face Numerous Investigations and Lawsuits Relating to Their RMBS Securitizations

43.    GMACM is currently being investigated by the U.S. Department of Justice (the "DOJ") for fraud related to the origination and underwriting of mortgage loans.  On June 29, 2011, Ally Financial disclosed that the DOJ had served GMACM with a subpoena in June 2011, which "includes a broad request for documentation and other information in connection with its investigation of potential fraud related to the origination and/or underwriting of mortgage loans." Ally Fin. Inc., Amendment No. 3 to Form S-1 Registration Statement under the Securities Act of 1933 (Form S-1/A), at 23 (June 29, 2011) (emphasis added).

44.    Additionally, on September 2, 2011, the Federal Housing Finance Authority ("FHFA"), as conservator for Freddie Mac, filed suit in the Supreme Court of the State of New York, New York County against Ally Financial and several of its subsidiaries for claims arising in connection with its role in the public filing of offering documents containing false and misleading statements.  These claims arise from Freddie Mac's purchase of over $6 billion in certificates issued through twenty-one transactions similar to the transactions at issue here. Among other claims, FHFA brought suit for common law fraud against various Ally Financial subsidiaries and aiding and abetting fraud against Ally Financial for its intentional and substantial assistance in rendering material misrepresentations to Freddie Mac in connection with the sale of the subject certificates.  The FHFA also alleges violations of state and federal securities laws by Ally Financial and several of its subsidiaries stemming from false and misleading statements contained in publicly filed prospectuses, prospectus supplements, registration statements, and other offering documents.  Additionally, FHFA also alleges aiding and abetting fraud against Ally Financial and certain of its affiliates for their intentional and substantial assistance in rendering material misrepresentations to Freddie Mac in connection with

the sale of the certificates. The FHFA action seeks relief in the form of rescission and recovery of the $6 billion purchase price of the certificates, including lost principal and interest, as well as punitive damages and attorneys' fees and costs.

45.    Ally Financial also disclosed that the U.S. Securities and Exchange Commission (the "SEC") served a subpoena on Ally Financial, requesting documentation regarding certain "bulk settlements" relating to securitized mortgage loans as well as a request for materials provided to investors and prospective investors in mortgage securitization transactions. *Id.*

46.    GMACM and RFC face numerous pending lawsuits brought by RMBS investors and insurers. For example, GMACM is currently facing a lawsuit brought by MBIA Insurance Corporation ("MBIA") in New York Supreme Court in which MBIA alleges that in connection with three transactions similar to the one at issue here, GMACM affirmatively misrepresented the credit quality of tens of thousands of mortgage loans, with a total original principal balance of more than $4 billion, as a means of unfairly shifting to investors and MBIA risks that GMACM should have borne itself. On December 15, 2010, the New York Supreme Court issued a ruling on GMACM's motion to dismiss which allowed both the breach of representations and warranties and fraud claims, among others, to proceed to trial.

47.    Additionally, according to Ally Financial's quarterly report for the third quarter of 2011, as of November 4, 2011, there were twenty-two pending suits against Ally Financial's mortgage-related subsidiaries. The plaintiffs in those suits have alleged, among other things, that Ally Financial's various subsidiaries made misstatements and omissions in registration statements, prospectuses, prospectus supplements, and other documents related to RMBS offerings. The alleged misstatements typically concern underwriting standards. Ally Fin. Inc., Quarterly Report (Form 10-Q), at 159 (Nov. 4, 2011).

48.    Moreover, Ally Financial has disclosed that it expects additional RMBS lawsuits
from monoline insurers like FGIC given that Ally Financial and its subsidiaries sold $42.7
billion of loans into monoline-wrapped securitizations from 2004 to 2007.  In the first nine
months of 2011 alone, Ally Financial and its subsidiaries have received repurchase claims from
monoline insurers for $254 million worth of mortgages related to securitizations it consummated
between 2004 and 2007.  It clearly recognizes its exposure because, according to Ally
Financial's CEO, Michael Carpenter, ResCap has already reserved $829 million for
representations and warranties claims and, according to its own SEC filings, Ally Financial
confirms that "litigation with . . . monolines is likely."  Ally Fin. Inc., Quarterly Report (Form
10-Q), at 88, 159 (Nov. 4, 2011).

49.    According to its most recent quarterly report, Ally Financial believes its
"exposure to mortgage representation and warranty claims is most significant for loans
originated and sold between 2004 through 2008 . . . ."  Ally Fin. Inc., Quarterly Report (Form
10-Q), at 146 (Nov. 4, 2011).  The 2005-HE1 Transaction is, as its name implies, of the 2005
vintage.

**(4)    The Mortgage Loan Servicing Practices of Ally Financial and
GMACM Have Come Under Scrutiny for Deficiencies**

50.    The Board of Governors of the Federal Reserve System (the "Federal Reserve
Board") and the Federal Deposit Insurance Corporation (the "FDIC") has ordered Ally Financial,
GMACM, and several other Ally Financial subsidiaries to adopt new procedures and practices in
relation to mortgage loan servicing.  *See* Consent Order, FRB Docket No. 11020-B-HC (April 13,
2011) (the "Consent Order").

51.    The Consent Order notes that Ally Financial's mortgage servicing subsidiaries,
including GMACM, have been accused, *inter alia*, of (1) failing to properly increase financial,

staffing, and managerial resources in order to meet an increasing number of foreclosures; (2) failing to properly put in place "adequate internal controls, policies and procedures, compliance risk management, internal audit, training, and oversight of the foreclosure process"; (3) filing false affidavits in foreclosure actions; and (4) litigating foreclosure proceedings without "confirming that the promissory note and mortgage document were properly endorsed or assigned." *Id.* at 3-4.

52.     Furthermore, under the Consent Order, Ally Financial must direct GMACM and its other mortgage servicing subsidiaries to take certain remedial action to ensure that they operate in a "safe and sound manner" in the future. *Id.* at 4. Specifically, among other things, the Consent Order requires Ally Financial to take "steps to improve the information and reports that will be regularly reviewed by [Ally Financial's] board of directors. . . [to assess the performance of] residential mortgage loan servicing, Loss Mitigation, and foreclosure activities and operations . . . ." *Id.* at 8.

53.     In connection with the enforcement of the Consent Order, as of November 2011, the Federal Reserve Board is permitting mortgage borrowers who were financially harmed by the foreclosure processes of GMACM to request an independent review of their files. *See* Press Release, Federal Reserve Board (November 1, 2011). This independent review will determine whether errors and misrepresentations in GMACM's foreclosure processes indeed caused financial harm to the borrower. *See id.* If the foreclosure process is found to have caused financial injury to the borrower, GMACM will then be required to provide full compensation. *See id.*

54.     Moreover, according to the sworn testimony of an Ally Financial/GMACM employee, Ally Financial's mortgage servicing subsidiaries have routinely filed false affidavits

in thousands of foreclosure actions across the country. *See* Jeffrey Stephan Dep. *Federal*

*National Mortgage Association v. Bradbury*, BRI-RE-09-65 (Me. Dist. Ct., Div Nine, No. Cumb.)

(June 7, 2010). Indeed, according to the FCIC Report:

> [L]enders have relied on "robo-signers" who substituted speed for
> accuracy by signing, and sometimes backdating, hundreds of affidavits
> claiming personal knowledge of facts about mortgages that they did
> not actually know to be true. One such "robosigner," Jeffrey Stephan
> of GMAC, said that he signed 10,000 affidavits in a month—roughly 1
> per minute, in a 40-hour workweek—making it highly unlikely that he
> verified payment histories in each individual case of foreclosure.

FCIC Report at 407.

      55.     Stephan also testified that, when executing summary judgment affidavits to be

used in judicial foreclosure actions, he was acting in accordance with policies and procedures,

and never in fact inspected any of the exhibits to the affidavits or even ensured that the exhibits

were attached, despite swearing that he had done so in the affidavits themselves. Stephan Dep.

Tr. at 54:12-25. Such exhibits would generally include (or at least should have included), among

other things, the mortgage note and documents relating to the assignment of the mortgage. *See*

*id.* at 51:15-23. Stephan further testified that when he signed an affidavit affirming that the

foreclosure was proper, all he knew was the borrower's name and whether he had signing

authority for the GMAC entity foreclosing on the property. *Id.* at 62:23-25, 63:2-6. Stephan

testified that the process he followed in signing summary judgment affidavits was in accordance

with the policies and procedures required by GMACM. *Id.* at 64:8-14.

      56.     The Ohio Attorney General, in October 2010, filed suit against GMACM and

Ally Financial, alleging, *inter alia*, that employees of GMACM had executed thousands of false

affidavits in connection with foreclosures on properties in that state. *See State of Ohio v. GMAC*

*Mortgage LLC*, CI0201006984, Court of Common Pleas, Lucas County, Ohio (Toledo). And in

December 2011, the Massachusetts Attorney General filed a similar suit against GMACM for,

among other things, engaging in unfair and deceptive foreclosure practices. *See Commonwealth
of Massachusetts v. Bank of America NA*, 11-4363, Suffolk County Superior Court (Boston).

57.     Indeed, as recently as January 31, 2012, Ally Financial reported that it was forced
to record a charge of approximately $270 million in the fourth quarter of 2011, as a result of
penalties expected to be imposed against ResCap by regulators and governmental agencies in
connection with ResCap's improper foreclosure processes. *See* Ally Fin. Inc., Form 8-K, at 2
(Jan. 31, 2012).

58.     Days after filing suit, the Massachusetts Attorney General sent a letter to the
United States Senate Committee on Banking, Housing and Urban Affairs, and the United States
House Committee on Financial Services asking that the federal government investigate Ally
Financial and GMACM for allegedly carrying out illegal foreclosures and submitting false
documents related to property seizures. *See* Attorney General Martha Coakley Urges Congress
to Investigate Ally Financial's GMAC Over Foreclosure Practices, Boston Globe, Dec. 6, 2011.
Specifically, the Massachusetts Attorney General's letter to the Senate and House Committees
stated:

> In light of Ally [Financial]'s alleged deceptive and illegal actions
> against homeowners in Massachusetts and across the country, I
> respectfully request that your committees investigate Ally [Financial]'s
> serious misconduct and consider what actions the federal government
> can take to ensure that Ally [Financial] adheres to the law.

### (5)     Significant Possibility of Ally Financial Seeking Bankruptcy Protection for ResCap, GMAC-RFC, and GMACM

59.     Ally Financial is considering filing for bankruptcy protection for ResCap, its
wholly-owned, indirect subsidiary, which has reportedly lost $555 million since 2009, according
to multiple published reports, as of November 9, 2011.  GMACM is a wholly-owned, indirect
subsidiary of ResCap.

- 17 -

60.     Bloomberg News reported that "[d]erivatives traders are betting that Ally

[Financial] will place its Residential Capital LLC [ResCap] mortgage unit into bankruptcy

instead of supporting the business as the bank prepares for an initial public offering," in an

article entitled "*Ally May Put ResCap in Bankruptcy to Ease IPO: Corporate Finance*," dated

November 14, 2011.  According to the article, Ally Financial has the power to decide whether its

"mortgage unit," ResCap, should file for bankruptcy.

61.     Indeed, Ally Financial warned in its 2010 annual report that "[t]here is a

significant risk that ResCap will not be able to meet its debt service obligations and other

funding obligations in the near term."  Ally Fin. Inc., Annual Report (Form 10-K), at 21 (Feb. 25,

2011).  Additionally, on January 31, 2012, Ally Financial disclosed that it "will record a charge

of approximately $270 million in the fourth quarter of 2011 for penalties expected to be imposed

by certain of [its] regulators and other governmental agencies in connection with foreclosure

related Matters . . . [t]he majority of [which] was recorded at Residential Capital, LLC

('ResCap') . . . .  [This] resulted in a covenant breach in certain of ResCap's credit facilities."

Ally Financial, Current Report (Form 8-K) (January 31, 2012).

**B.      GMACM's Securitizations and Financial Guaranty Insurance Generally**

62.     To improve the marketability and ratings of the RMBS Notes issued as part of its

securitizations, GMACM from time to time sought credit enhancement for the RMBS Notes

from FGIC, a financial guaranty insurer, in the form of financial guaranty insurance policies.

Under the terms of a financial guaranty insurance policy like the one FGIC issued here, the

insurer unconditionally and irrevocably guarantees to the trustee for the benefit of the holders of

the insured RMBS Notes that, if there is a shortfall in cash available to make required payments

on the insured securities, the financial guaranty insurer will pay the amount of the shortfall to the

trustee for the benefit of the holders of the insured securities.

63.     For a trust that issues RMBS Notes, the primary source of funds is the remittance of payments on the underlying residential mortgage loans.  Delinquencies by borrowers in making their mortgage loan payments will, by definition, reduce cash flows to the trust, which will directly impair the ability of the trust to make required payments on the RMBS Certificates.  Delinquencies, if not cured, will eventually result in losses on the mortgage loans, which reduce the aggregate principal amount of the loan pool held by the trust.  In this manner, high levels of mortgage loan delinquencies and defaults can lead to shortfalls in cash available to pay RMBS investors.  Such shortfalls result in claims on FGIC's policies.

### C.     The GMACM 2005-HE1 Transaction

64.     On March 29, 2005, GMACM pooled together and deposited many thousands of HELOCs into the GMACM Home Equity Loan Trust 2005-HE1.  The 2005-HE1 Trust served as the Issuer of $991,087,000 in aggregate principal amount of 2005-HE1 Notes.  HELOCs are typically adjustable rate revolving credit line loans collateralized by second-lien mortgages, which can be drawn on at any time during an extended period, and repaid at any time, subject to a maximum repayment period.

65.     The initial conveyance to the 2005-HE1 Trust by RAMP (acting as Depositor) contained over 18,100 Mortgage Loans (i.e., HELOCs) with an aggregate outstanding principal balance of approximately $732 million.  Investors in the GMACM-sponsored 2005-HE1 Transaction were issued six classes of securities—Class A-1 Notes, Class A-2 Notes, and Class A-3 Notes, Class A-1 Variable Pay Revolving Notes ("VPRNs"), Class A-2 VPRNs, and Class A-3 VPRNs (collectively, the "2005-HE1 Notes")—which were collateralized by the Mortgage Loans transferred to and held by the 2005-HE1 Trust.  In addition, approximately $243 million was deposited into a pre-funding account at closing, which was used to acquire additional Mortgage Loans in the 90 days following closing (the "Prefunding Period").

66.     To enhance the ratings and marketability of the 2005-HE1 Notes, GMACM

sought a financial guaranty insurance policy from FGIC for the purpose of insuring the

transaction for the benefit of the certificate holders.  On March 29, 2005, GMACM and FGIC

executed the I&I Agreement, under which FGIC agreed to and did issue the Policy (number

05030011) to insure the 2005-HE1 Notes.  The I&I Agreement was signed by FGIC (as the

Insurer), GMACM (as a Seller and Servicer), RAMP (as the Depositor), Walnut Grove (as a

Seller), and Wells Fargo (as the Indenture Trustee).

67.     Also on March 29, 2005, Ally Bank (using its then-current name, GMAC Bank)

entered into the 2005-HE1 Custodial Agreement (the "Custodial Agreement") whereby it agreed,

among other things, to serve as Custodian of the underlying mortgage loan notes on behalf of the

2005-HE1 Trust.  FGIC is an express third party beneficiary of that agreement.  *See* Custodial

Agreement § 4.6.

68.     The I&I Agreement provides, in part, that FGIC is a third-party beneficiary of,

and shall have all of the rights provided for in, the "Operative Documents."  I&I Agreement §

2.02(k).  "Operative Documents" are defined to include, among other documents:  (i) the 2005

HE-1 Notes; (ii) the Mortgage Loan Purchase Agreement dated as of March 29, 2005 among

GMACM, RAMP, Walnut Grove, the 2005-HE1 Trust, and Wells Fargo (the "MLPA"); (iii) the

Servicing Agreement dated as of March 29, 2005 among GMACM, the 2005-HE1 Trust and

Wells Fargo; (iv) the Indenture dated as of March 29, 2005 between the 2005-HE1 Trust and

Wells Fargo; (v) the Custodial Agreement dated as of March 29, 2005 among GMACM, Wells

Fargo, and Ally Bank; and (vi) any Subsequent Transfer Agreement in respect of Subsequent

Mortgage Loans entered between GMACM and the 2005-HE1 Trust.  *See* I&I Agreement § 1.01.

69.    Pursuant to the I&I Agreement, FGIC—termed the "Enhancer" under certain of the Operative Documents—insured the 2005-HE1 Notes. The Policy improved the marketability of the 2005-HE1 Notes by mitigating risk for potential investors and making the 2005-HE1 Notes eligible to receive a credit rating of triple-A by the rating agencies at closing.

70.    GMACM and the Depositor offered the 2005-HE1 Notes for sale pursuant to a prospectus, dated December 22, 2004 (the "2005-HE1 Prospectus"), a prospectus supplement, dated March 23, 2005 (the "2005-HE1 Prospectus Supplement"), and a Private Placement Memorandum for the VPRNs, dated March 29, 2005 (the "2005-HE1 PPM"), which touted the Policy and the "triple-A" initial rating of the 2005-HE1 Notes made possible by the Policy. The 2005-HE1 Prospectus, 2005-HE1 Prospectus Supplement, and 2005-HE1 PPM, together with certain preliminary offering documents, each as further supplemented by any subsequent amendment or supplement thereto and any other offering document that makes reference to the Policy, are referred to collectively as the "2005-HE1 Offering Documents."

71.    On March 29, 2005, an Ally Financial subsidiary, Ally Securities, sold the 2005-HE1 Notes to investors, and FGIC issued the Policy in accordance with the terms of the I&I Agreement.

72.    The 2005-HE1 Transaction was structured in such a way as to permit GMACM to add additional collateral in the form of Subsequent Mortgage Loans to the 2005-HE1 Trust during a specifically defined Revolving Period, which enabled GMACM to continue to shift the credit risk of such loans to investors and to FGIC for a defined period after closing, and to realize immediate gains on the loans it sold to the Trust. GMACM represented and warranted to FGIC that the Subsequent Mortgage Loans would conform to the same contractual representations and

warranties GMACM made about the characteristics and the underwriting procedures of the

Mortgage Loans that were in the pool at closing. *See* MLPA § 3.1(b).

73.    Nevertheless, by express contractual provisions, Subsequent Mortgage Loans

were not permitted to be added to the pool following the occurrence of an Early Amortization

Event. An Early Amortization Event was deemed to occur whenever, for three consecutive

months, the average amount in the Funding Account which has not been used during a month to

purchase Additional Balances or Subsequent Mortgage Loans is greater than 30% of such

amount plus the amount which had been used during that month to purchase Additional Balances

and Subsequent Mortgage Loans. Indenture, Appendix A. The "Funding Account" is an

account held by the 2005-HE1 Trust and used, among other things, to purchase Additional

Balances (*i.e.*, subsequent draws on the Mortgage Loans) and Subsequent Mortgage Loans

during the Revolving Period. *See* Servicing Agreement § 3.16.

### D.    GMACM's Representations, Warranties and Affirmative Covenants

74.    In connection with the 2005-HE1 Transaction, GMACM, at the direction of Ally

Financial, either directly or indirectly through ResCap, made numerous representations,

warranties and affirmative covenants to FGIC. Among other things, GMACM covenanted that it

would comply with and perform its obligations under the Operative Documents. Moreover,

GMACM promised to service the Mortgage Loans in accordance with the terms of the Operative

Documents, provide timely Mortgage Loan file information, and provide FGIC with a variety of

information, including access to GMACM's books and records and to GMACM's Servicing

Officer and its independent accountants.

75.    Based on the information received by FGIC and the representations and

warranties given by GMACM, FGIC entered into the I&I Agreement and agreed to issue the

Policy to the Indenture Trustee for the benefit of the holders of the 2005-HE1 Notes. In return

for doing so, FGIC received a modest annual premium, based on a small, fixed percentage of the

aggregate principal balance of the 2005-HE1 Notes. Specifically, FGIC received 0.125% per

annum of the aggregate balance of the 2005-HE1 Notes for serving as insurer, a figure

commensurate with the risk that FGIC believed it was accepting, based on the representations,

warranties and affirmative covenants provided by GMACM.

### (1)    Representations, Warranties and Affirmative Covenants Relating to the Operative and Offering Documents

76.    Under Article II of the I&I Agreement, GMACM made the following

representations, warranties, and covenants, among others. *First*, in the I&I Agreement—which

expressly identifies FGIC as a third-party beneficiary with respect to the related Operative

Documents—GMACM specifically covenants that it will "comply in all material respects with

the terms and conditions of and perform its obligations under the Operative Documents to which

it is a party . . . ." I&I Agreement § 2.02(a).

77.    *Second*, in the I&I Agreement, GMACM represented and warranted to FGIC that

"[n]either the Operative Documents to which it is a party nor other information relating to the

Mortgage Loans. . . including the Offering Documents . . . contains any statement of a material

fact which was untrue or misleading in any material respect when made." I&I Agreement §

2.01(j). GMACM further represented and warranted that "[t]he Offering Document does not

contain any untrue statement of a material fact and does not omit to state [any] material fact

necessary to make the statements made therein, in light of the circumstances under which they

were made, not misleading[.]" § 2.01(k).

78.    *Third*, the I&I Agreement incorporated by reference, for the benefit of FGIC, the

representations and warranties contained in the "Operative Documents," as that term was defined

in the I&I Agreement: "[e]ach of the representations and warranties . . . contained in the

applicable Operative Documents . . . is true and correct in all material respects[.]" *See* I&I

Agreement § 2.01(l); *see also id.* § 1.01.  The incorporation by reference of the Operative

Documents into the I&I Agreement was intended to allow FGIC to rely on any representation

and warranty that GMACM made to other entities, such as investors or the Indenture Trustee, in

connection with the 2005-HE1 Transaction.  Indeed, the I&I Agreement expressly identifies

FGIC as a third-party beneficiary with respect to the related Operative Documents.  I&I

Agreement § 2.02(k).

> **(2)    Representations, Warranties, and Affirmative Covenants Regarding
> Access to Information and Servicing**

79.    The I&I Agreement also provides that "[a]ll the Mortgage Loans will be serviced

in all material respects in compliance with the Servicing Agreement and the Indenture[.]" *See*

I&I Agreement § 2.02(l).  In the Servicing Agreement, GMACM covenanted, represented, and

warranted that it would service and administer the Mortgage Loans in the 2005-HE1 Transaction

in a manner consistent with its own servicing guidelines.  *See* Servicing Agreement § 3.01(a).

80.    The I&I Agreement requires, among other things, that GMACM furnish or cause

to be furnished to FGIC "promptly upon receipt thereof, copies of all schedules, financial

statements or other similar reports delivered to or by GMACM . . . [as well as] [p]romptly upon

request such other data as [FGIC] may reasonably request."  I&I Agreement § 2.02(c)(v).

81.    The I&I Agreement further affords FGIC the express right "to conduct an ongoing

review of GMACM's practices as Servicer through reviews of the Mortgage Loans, reappraisals

of Mortgaged Properties and reviews of servicing practices."  I&I Agreement § 2.02(p).  FGIC

also has the express right to "inspect the books and records of GMACM . . . [and to] discuss the

affairs, finances and accounts of GMACM with the Chief Financial Officer of GMACM; and

with GMACM's consent, which consent shall not be unreasonably withheld or delayed, to

discuss the affairs, finances and accounts of GMACM with GMACM's independent

accountants[.]" I&I Agreement § 2.02(e).

### E.   GMACM's Breaches of Its Representations, Warranties and Affirmative Covenants

### (1)   GMACM Improperly Transferred Over $850 Million in Subsequent Mortgage Loans

82.     As discussed below, GMACM improperly and repeatedly transferred Subsequent

Mortgage Loans into the 2005-HE1 Trust long after the Operative Documents forbade it from

doing so.  Moreover, GMACM failed to give FGIC required information and data concerning the

Subsequent Mortgage Loans, and/or to obtain FGIC's consent prior to transferring the

Subsequent Mortgage Loans into the 2005-HE1 Trust.  GMACM transferred loans with an

aggregate principal amount of $851,740,479 to the 2005-HE1 Trust through these improper

subsequent transfers (the "Subsequent Transfers").

### a.   "Revolving Period," "Subsequent Mortgage Loans" And An "Early Amortization Event"

83.     Under the Operative Documents, GMACM, as Servicer of the 2005-HE1 Trust, is

required to establish a Custodial Account in which it must deposit any payments made by

borrowers on the Mortgage Loans (*i.e.*, the principal and interest payments made by mortgagors).

Servicing Agreement § 3.02(b).  Additionally, under the Operative Documents, the Indenture

Trustee is required to establish a segregated trust account known as the Funding Account.

Servicing Agreement § 3.16(a).

84.     As Servicer of the 2005-HE1 Trust, GMACM is required, "[o]n each Payment

Date during the Revolving Period, . . . to withdraw from the Custodial Account and deposit into

the Funding Account . . . the aggregate amount of Principal Collections remaining after the

purchase of all Additional Balances or Subsequent Mortgage Loans on or prior to such Payment

Date." Servicing Agreement § 3.16(a).

85.    A revolving period, in the context of a securitization, is generally the time during

which cash available to the trust may properly be reinvested in new collateral for the pool rather

than being used to pay down the principal balance of the securities. Under the Operative

Documents, the Revolving Period is defined in pertinent part as: "The period beginning on the

Closing Date and ending on the earlier of (i) the Payment Date occurring in September 2006,

[and] (ii) the occurrence of an event described in clause (iv) of the definition of Early

Amortization Event[.]" Indenture, Appendix A.

86.    During the Revolving Period and subject to certain conditions, GMACM, as

Seller, could purchase Subsequent Mortgage Loans and transfer them into the 2005-HE1 Trust.

MLPA § 2.2(a). GMACM could then be reimbursed with funds from the Custodial Account

and/or the Funding Account. *See* MLPA § 2.2(a); Servicing Agreement § 3.16(c)(i)(B).

87.    Even during the period in which GMACM is authorized under the Operative

Documents to execute the purchase and transfer of Subsequent Mortgage Loans, it is required to

seek and obtain FGIC's permission to do so prior to transferring those loans into the 2005-HE1

Trust. *See* MLPA § 2.2(b)(vi); 2005-HE1 Prospectus Supplement at S-43. In addition, the

MLPA also requires GMACM to deliver to FGIC, within five days after the transfer, a copy of

the Mortgage Loan Schedule reflecting the Subsequent Mortgage Loans in electronic format.

*See* MLPA § 2.2(c).

88.    Moreover, GMACM may only transfer Subsequent Mortgage Loans if "the

Revolving Period shall not have terminated." MLPA § 2.2(b)(v). As detailed above, the

Revolving Period ends, *inter alia*, upon "the occurrence of an event described in clause (iv) of

the definition of Early Amortization Event."  Indenture, Appendix A.

89.     An Early Amortization Event, as defined, is "[t]he occurrence of one of the

following events: . . . (iv) if beginning in June 2005 (a) for three consecutive months, the average

amount in the Funding Account which has not been used during a month to purchase Additional

Balances or Subsequent Mortgage Loans is greater than 30% of such amount plus the amount

which had been used during that month to purchase Additional Balances and Subsequent

Mortgage Loans. . . ."  Indenture, Appendix A.

### b.     An Early Amortization Event Occurs no later than January 2006

90.     Under the Operative Documents, an Early Amortization Event occurred no later

than January 2006.  By that date, at the latest, for three consecutive months the average amount

in the Funding Account which had not been used during a month to purchase Additional

Balances or Subsequent Mortgage Loans was greater than 30% of such amount plus the amount

which had been used during that month to purchase Additional Balances and Subsequent

Mortgage Loans.

91.     Because the condition specified in clause (iv) of the definition of "Early

Amortization Event" was satisfied, at the latest, on one or more occasions by January 2006, an

Early Amortization Event occurred by operation of the express terms of the Operative

Documents in January 2006, or earlier.

### c.     GMACM Failed to Notify FGIC of the Occurrence of the Early Amortization Event and the Resulting "Material Adverse Change"

92.     Under the Operative Documents, "[u]pon [GMACM's] becoming aware of any

Early Amortization Event, [GMACM] shall forward to the Indenture Trustee a statement to such

effect, including the nature of such Early Amortization Event." Servicing Agreement § 4.01(a).
In turn, the Indenture Trustee must then deliver by mail such notice to other parties to the
Transaction, including FGIC. *Id.*

93.    GMACM has failed to notify the Indenture Trustee of the occurrence of an Early
Amortization Event, which occurred no later than January 2006, in breach of its obligations
under the Servicing Agreement. Consequently, the Indenture Trustee failed to notify FGIC of
the occurrence of the Early Amortization Event. Accordingly, GMACM has breached, and
continues to breach, its obligations under the Servicing Agreement to provide notice of the
occurrence of the Early Amortization Event.

94.    Moreover, pursuant to the I&I Agreement, GMACM must promptly inform FGIC
of the occurrence of any "Material Adverse Change." I&I Agreement § 2.02(f). A "Material
Adverse Change" is defined in the I&I Agreement as "a material adverse change in the ability of
such Person [*i.e.*, any individual or entity] to perform its obligations under any of the Operative
Documents including any material adverse change in the business, financial condition, results of
operations or properties of such Person on a consolidated basis with its subsidiaries which might
have such effect." *Id.* § 1.01.

95.    The occurrence of the Early Amortization Event resulted in an Event of Default
under the Indenture, which is a Material Adverse Change under the I&I Agreement. *See*
Indenture, Appendix A; I&I Agreement § 1.01. Therefore, GMACM had an obligation to
promptly notify FGIC of this Material Adverse Change.

96.    GMACM has failed to notify FGIC of the occurrence of this Material Adverse
Change. Accordingly, GMACM has breached, and continues to breach, its obligations under the

I&I Agreement to provide prompt notice to FGIC of the occurrence of this Material Adverse
Change.

### d.   Subsequent Transfers in Contravention of the Operative Documents

97.   GMACM was permitted to transfer new loans to the 2005-HE1 Trust only during
the Revolving Period.  Accordingly, under the express provisions in the Operative Documents,
the Revolving Period automatically (and without the need for any action by any party) ended
when the Early Amortization Event occurred no later than January 2006.  As of that point in time,
the Revolving Period ended and GMACM was prohibited from transferring any new loans to the
2005-HE1 Trust.

98.   Notwithstanding the fact that the Revolving Period had ended no later than
January 2006, GMACM continued to improperly transfer Subsequent Mortgage Loans into the
2005-HE1 Trust after that date.  In total, GMACM improperly added to the 2005-HE1 Trust,
through at least nine (9) Subsequent Transfers starting on or after the January 2006 Payment
Date, an aggregate principal amount of $397,444,259 in improper Subsequent Mortgage Loans.

99.   The table below sets forth the aggregate outstanding principal balance of the
Subsequent Mortgage Loans in each of the at least nine (9) improper Subsequent Transfers that
GMACM effected: