| Month | Subsequent Transfer Amount ($) |
|---|---|
| February 2006 | 83,499,906 |
| March 2006 | 35,799,998 |
| April 2006 | 34,799,950 |
| May 2006 | 45,499,830 |
| June 2006 | 40,299,989 |
| July 2006 | 41,299,967 |
| August 2006 | 39,000,000 |
| September 2006 | 35,999,999 |
| October 2006 | 41,244,620 |
| **Total** | 397,444,259 |

100.    In short, Subsequent Mortgage Loans improperly transferred to the 2005-HE1

Trust despite the fact that an Early Amortization Event had already triggered the termination of

the Revolving Period.  GMACM had no authority to execute such transfers.  As such, under the

express terms of the Operative Documents, the subsequently transferred loans were not properly

transferred to the 2005-HE1 Trust in accordance with the terms of the 2005-HE1 Transaction.

Accordingly, GMACM breached the I&I Agreement by failing to comply with the Operative

Documents.

        e.    **Improper Transfer Following Natural Expiration of Revolving
           Period**

101.    As described above, the Revolving Period terminated, at the latest, on the

Payment Date occurring in September 2006, even if there had been no Early Amortization Event.

Nevertheless, GMACM improperly transferred approximately $41,244,620 in Subsequent

Mortgage Loans into the 2005-HE1 Trust in October 2006.  Therefore, in the alternative, even if

an Early Amortization Event had not occurred no later than January 2006 and the Revolving

Period had not then ended (which it did), GMACM improperly transferred Subsequent Mortgage

Loans beyond the scheduled close of the Revolving Period in September 2006, which is a

separate breach of the I&I Agreement. *See* I&I Agreement § 2.02(a).

> **f.    GMACM Failed to Obtain FGIC's Consent or Furnish
> Required Data and Documents In Transferring Subsequent
> Mortgage Loans**

102.    Separately and independently from its obligation to refrain from transferring

Subsequent Mortgage Loans following an Early Amortization Event, GMACM must execute a

Subsequent Transfer Agreement on or prior to each Subsequent Transfer of Subsequent

Mortgage Loans. *See* MLPA § 2.2(b)(ii); MLPA Exhibit 2.  In each Subsequent Transfer

Agreement, GMACM must restate therein all applicable representations and warranties

regarding the Mortgage Loans and certify that it is complying with the requirements of the

Operative Documents, including that its actions are not in contravention of any of those

agreements. *See* MLPA §§ 2.2(b)(ii), (iv); MLPA Exhibit 2.  GMACM must also certify that it

had satisfied each condition precedent to effecting a Subsequent Transfer. *See* MLPA §

2.2(b)(ii); MLPA Exhibit 2.  As explained further below, GMACM has failed to provide either

FGIC or the Indenture Trustee with any Subsequent Transfer Agreement in respect of the

Subsequent Transfers.

103.    In addition, pursuant to the MLPA, before it can transfer any Subsequent

Mortgage Loan into the 2005-HE1 Trust, GMACM must:  (i) deliver to FGIC a timely "Addition

Notice" no later than seven Business Days prior to the Subsequent Transfer Date, (ii) deliver to

FGIC an executed copy of the related Subsequent Transfer Agreement together with a Mortgage

Loan Schedule listing the related Subsequent Mortgage Loans, and (iii) obtain the approval of

FGIC for the sale of the related Subsequent Mortgage Loans within five Business Days of

FGIC's receipt of an updated loan tape containing information on the Subsequent Mortgage

Loans. *See* MLPA § 2.2(b). GMACM failed to deliver such Addition Notices, Subsequent

Transfer Agreements, and Mortgage Loan Schedules, or to obtain such approvals.

104.    On November 2, 2011, FGIC sent a notice to GMACM stating that it may have

transferred approximately $851,740,479 in Subsequent Mortgage Loans to the 2005-HE1 Trust

without satisfying all of the conditions described above. FGIC advised it had no evidence that

GMACM provided FGIC with the required notices, electronic tapes and other information, or

had obtained FGIC's consent prior to the transfer. Specifically, FGIC had no record of receiving

any Addition Notice, Subsequent Transfer Agreement, related Mortgage Loan Schedule, or

electronic tape with respect to any Subsequent Mortgage Loan transferred. Nor did FGIC have

any record of its approval for the sale of any Subsequent Mortgage Loan. Further, FGIC advised

that it had made inquiries with the Indenture Trustee, and determined that the Indenture Trustee

did not have any record of receiving any Addition Notice or copies of Subsequent Transfer

Agreements in respect of the Subsequent Mortgage Loans.

105.    To date, GMACM has failed to respond to this notice. FGIC has no records of the

required notices, tapes, information, or approvals in respect of the Subsequent Mortgage Loans.

### g.    GMACM Selected Subsequent Mortgage Loans in a Manner Adverse to the Interests of FGIC by Reselling Loans to the Trust that GMACM Had Been Required to Repurchase

106.    Separately and independently from its obligation to refrain from transferring

Subsequent Mortgage Loans following an Early Amortization Event, or to provide the required

notices, tapes, information, and approvals prior to the Subsequent Transfers, GMACM may not

adversely select Subsequent Mortgage Loans to transfer into the 2005-HE1 Trust.

107.    As discussed above, during the Revolving Period and subject to certain conditions,

GMACM, as Seller, may purchase Subsequent Mortgage Loans and transfer them into the 2005-

HE1 Trust. MLPA § 2.2(a). Among the conditions GMACM must satisfy in order to transfer

Subsequent Mortgage Loans to the 2005-HE1 Trust, GMACM must not "select[] such Subsequent Mortgage Loans in a manner that it reasonably believes is adverse to the interests of [FGIC] . . . ." MLPA § 2.2(b).

108.    In its role as Servicer, GMACM also has the discretion to increase the credit limit on a given Mortgage Loan, subject to certain limitations, if such an increase is requested by the mortgagor.  In order to maintain the integrity of the overall loan pool, however, GMACM is also required to repurchase, and thereby remove, any such Mortgage Loan from the 2005-HE1 Trust if GMACM agrees to such an increase.  Specifically, pursuant to the Servicing Agreement, "[GMACM] shall repurchase any Mortgage Loan . . . [if] at the request of the Mortgagor, [GMACM] at its option and in its sole discretion agrees to an increase in the Credit Limit above the Credit Limit of such Mortgage Loan as of the related Cut-Off Date . . . ." Servicing Agreement § 3.15(b).

109.    During the Revolving Period, GMACM increased the credit limits on certain Mortgage Loans held by the 2005-HE1 Trust.  As a result, GMACM repurchased and removed some or all of these Mortgage Loans from the 2005-HE1 Trust (the "Repurchased Mortgage Loans").

110.    Nevertheless, GMACM then resold those very same Repurchased Mortgage Loans back into the 2005-HE1 Trust, even though it knew that it had been required to remove (and had previously removed) the Repurchased Mortgage Loans from the 2005-HE1 Trust pursuant to the Servicing Agreement.  In fact, in a June 9, 2008 e-mail to FGIC, GMACM conceded that it had resold the Repurchased Mortgage Loans back to the 2005-HE1 Trust.  By selecting the Repurchased Mortgage Loans for resale back to the 2005-HE1 Trust—Mortgage Loans that GMACM knew it was required to remove from the Trust—GMACM not only

circumvented the intended operation of the Servicing Agreement, but also breached the MLPA
by selecting "such Mortgage Loans in a manner . . . adverse to the interests of [FGIC]." MLPA
§ 2.2(b).

111. Accordingly, because it has failed to comply with conditions precedent before
transferring the Subsequent Mortgage Loans, GMACM has breached and continues to breach
Section 2.2(b) of the MLPA and Section 2.02(a) of the I&I Agreement.

### h.    Subsequent Transfers Damaged FGIC

112. Further, the Subsequent Mortgage Loans transferred into the 2005-HE1 Trust
have performed much worse than the initial Mortgage Loans. As of January 1, 2012,
approximately 16% of the balance of the over $397 million in improperly transferred Subsequent
Mortgage Loans added in or after January 2006 has been charged-off, defaulted, or was severely
delinquent, as compared to approximately 3% of the balance of the initial Mortgage Loans and
other loans added during the Prefunding Period.

### (2)    GMACM Caused Funding of Variable Pay Revolving Notes Following the Early Amortization Event in Contravention of the Contracts

113. The 2005-HE1 Transaction was structured using what is known as a "soft-bullet"
structure, whereby the principal balances of the Class A-1 Notes, Class A-2 Notes, and Class A-3
Notes (collectively, the "Term Notes") were to be satisfied and retired sequentially with a single,
"bullet" payment to each class on a specified payment date (the "Targeted Final Payment Date").
In order to fund this bullet payment, the Indenture Trustee was to request advances from existing
holders of associated VPRNs and/or the Issuer was to issue and sell additional associated VPRNs
in the amount of the principal balance of the Term Note that was scheduled to be retired (*i.e.*,
Class A-1 VPRNs were to be funded to retire Class A-1 Notes, Class A-2 VPRNs were to be

funded to retire the Class A-2 Notes, Class A-3 VPRNs were to be funded to retire the Class A-3

Notes). The associated class of VPRNs would then be amortized over a specified term.

114.    The Targeted Final Payment Date for the Term Notes was September 25, 2006 for

the Class A-1 Notes. *See* Indenture, Appendix A. On or about this date, the Class A-1 VPRNs

were funded and the Class A-1 Notes were retired.

115.    Under the Operative Documents, "[u]pon [GMACM's] becoming aware of any

Early Amortization Event, [GMACM] shall forward to the Indenture Trustee a statement to such

effect, including the nature of such Early Amortization Event." Servicing Agreement § 4.01(a).

Furthermore, "if an Early Amortization Event has occurred . . . the Indenture Trustee will not

request an Advance and the Issuer will not issue any additional Variable Pay Revolving Notes."

Indenture § 2.03.

116.    An Early Amortization Event occurred no later than January 2006. As such,

under the express terms of the Operative Documents, GMACM should have notified the

Indenture Trustee of the Early Amortization Event. Notwithstanding this obligation, GMACM

failed to notify the Indenture Trustee that the Early Amortization Event had occurred, thereby

causing the Indenture Trustee to fund the Class A-1 VPRNs—with an aggregate principal

amount of $423,800,000—on or about the Targeted Final Payment Date of September 25, 2006.

The issuance of such Class A-1 VPRNs after the Early Amortization Event occurred constituted

a breach of the Operative Documents.

117.    The funding of Class A-1 VPRNs caused an improper outflow of funds from the

2005-HE1 Trust to the holders of the VPRNs, because the interest rate on the improperly issued

Class A-1 VPRNs was higher than the interest rate of the Class A-1 Notes that were improperly

retired. The funds applied to cover the higher interest rate on the Class A-1 VPRNs would have

otherwise been used to cover other liabilities of the Trust, including payment shortfalls on the remaining 2005-HE1 Notes. The failure to cover these shortfalls because of the higher interest rate of the Class A-1 VPRNs has resulted in additional claims on the Policy to the detriment of FGIC.

118.    Accordingly, because it failed to notify the Trustee of the occurrence of an Early Amortization Event, and caused the Trust to issue Class A-1 VPRNs after the occurrence of such Early Amortization Event, GMACM has breached and continues to breach Section 4.01(a) of the Servicing Agreement and Section 2.02(a) of the I&I Agreement.

### (3)    GMACM's Denial of Loan File Requests

119.    As the 2005-HE1 Transaction continued to perform poorly, on December 9, 2010, FGIC wrote to GMACM via e-mail demanding that GMACM provide additional Mortgage Loan files to FGIC, including origination files, servicing notes, and custodian files, for a random sample of 350 2005-HE1 loans. Having received no response from GMACM to its earlier requests, FGIC sent a follow-up e-mail on February 3, 2011, regarding the status of its December 9, 2010 request for files. FGIC's demands for information were received by ResCap, which informed FGIC that ResCap could not respond to the requests until the matter was discussed internally at ResCap and a response was authorized by those with decision-making authority. On information and belief, ResCap's response required authorization from officers at Ally Financial, and GMACM/ResCap's response was directed by officers at Ally Financial.

120.    On February 14, 2011, and again on April 26, 2011, FGIC sent further follow-up letters requesting loan files.

121.    In finally responding to FGIC's request for information, GMACM refused to provide any loan files or other information relating to current or pre-paid loans ("Performing

Loans"). Instead, it only provided FGIC with only some of the requested loan files, consisting

largely of non-performing loans, and chose to conceal the Performing Loan files from FGIC.

122.    Pursuant to the Servicing Agreement and the I&I Agreement, FGIC is entitled to

reasonable access to the documentation regarding all of the Mortgage Loans.  Section 2.02(p) of

the I&I Agreement provides that "FGIC shall have the right, so long as any of the [2005-HE1]

Notes remains outstanding, to conduct an ongoing review of GMACM's practices as Servicer

through reviews of the Mortgage Loans . . . ."  Notably, there is no limitation in the I&I

Agreement as to the nature of the Mortgage Loans files that are subject to review.  Further,

Section 2.02(c)(v) of the I&I Agreement states that "[p]romptly upon request," GMACM must

provide to FGIC "such other data as [FGIC] may reasonably request. . . ."

123.    On April 26, 2011, having still received none of the remaining performing

Mortgage Loan files it requested, FGIC sent a further letter requesting the remaining loan files.

To date, GMACM has not responded.

124.    By producing only non-performing Mortgage Loan files, in contravention of the

I&I Agreement, GMACM has arbitrarily and unreasonably imposed limitations on FGIC's

contractual right to reasonable access to Mortgage Loan files in contravention of the Operative

Documents.

125.    As a result of the failure of GMACM to fulfill this contractually-sanctioned

request, despite its obligation to do so, FGIC is unable to evaluate the full extent of potential

breaches of the representations and warranties of GMACM, and in that regard reserves its rights

to bring further claims.  Moreover, on information and belief, GMACM is and has been aware

that a substantial number of the Mortgage Loans, whether acquired at the closing or thereafter,

were nonconforming and, thus, in breach of its own representations and warranties.  Despite this

knowledge, GMACM has failed to repurchase the nonconforming loans or replace them with conforming loans, as is required under the Operative Documents.

### (4)   GMACM's Denial of Servicing Notes

126.   On December 9, 2010, FGIC demanded, pursuant to Section 2.02(c)(v) of the I&I Agreement, that GMACM furnish the servicing notes for the Mortgage Loans.

127.   GMACM, without justification or explanation, and in breach of its obligations in the I&I Agreement, has failed to respond to requests for servicing notes.

### (5)   GMACM's Denial of FGIC's Access To Books and Records, Servicing Officer, and GMACM's Independent Accountants

128.   On January 20, 2012, in accordance with its express rights under Sections 2.02(e)(i),(ii), (iii) of the I&I Agreement, FGIC requested (i) to inspect the books and records of GMACM; (ii) to discuss the affairs, finances and accounts of GMACM with the Chief Financial Officer of GMACM; and (iii) to discuss the affairs, finances and accounts of GMACM with GMACM's independent accountants.

129.   To date, GMACM has failed to respond to this request, in violation of the I&I Agreement.

### F.   Ally Bank's Breaches of The Custodial Agreement

130.   Under the Custodial Agreement, to which FGIC is an express third party beneficiary, *see* Custodial Agreement § 4.6, and through which Ally Bank received substantial fees, Ally Bank undertook several obligations to FGIC concerning the manner in which Ally Bank would ensure that the Mortgage Loans contained complete and accurate information and that GMACM was in compliance with its representations and warranties regarding the origination, selection, and characteristics of those loans.

131.    Ally Bank agreed that it would "hold the Loan Agreements [for the initial Mortgage Loans] and any Loan Agreement relating to any Subsequent Mortgage Loan," and that it would review the Loan Agreements and deliver to FGIC a certification of "the completeness of the receipt of the Loan Agreements." Custodial Agreement §§ 2.1, 2.2(b).

132.    Ally Bank further agreed to notify FGIC of breaches of the MLPA by GMACM, by providing that: "Upon discovery by the Custodian of a breach of any representation or warranty made by [GMACM] in the Purchase Agreement . . . with respect to a Mortgage Loan . . . the Custodian shall give prompt written notice to [FGIC]." Custodial Agreement § 2.3.

133.    An initial review of a small percentage of defective Mortgage Loans has revealed that in some instances the Mortgage Note or Second Lien Note (*i.e.*, the Loan Agreement) was not included in the loan file. The lack of a Loan Agreement within a particular file constitutes a breach of the representations and warranties given by GMACM in the MLPA. Ally Bank should have been aware of the fact that Loan Agreements were missing from certain Mortgage Loan files, and that this was a breach of the MLPA's representations and warranties. Consequently, it should have notified FGIC of such breaches pursuant to its own obligations under the Custodial Agreement. *See* Custodial Agreement §§ 2.1-2.3. Ally Bank has, however, failed to provide FGIC with any notices regarding defects in any Mortgage Loan file, and has further provided inaccurate and/or incomplete certifications regarding the Mortgage Loans, thereby breaching the Custodial Agreement to which FGIC is an express third party beneficiary.

134.    Moreover, Ally Bank had an obligation to notify FGIC of any breach by GMACM of the MLPA representations and warranties that it discovered, not just those pertaining to the Loan Agreement, and its failure to so notify FGIC was a further breach of the Custodial Agreement.

### G.    GMACM's Breach of Obligations as Servicer

135.    GMACM, as Servicer, failed in numerous material respects to properly perform
its duties to service and administer the Mortgage Loans in accordance with the provisions of the
relevant Operative Documents for the 2005-HE1 Transaction, including, but not limited to, its
obligations to follow proper servicing procedures.

136.    GMACM took responsibility for the servicing of the Mortgage Loans and had
certain related contractual obligations under the I&I Agreement and the Servicing Agreement
with respect to the 2005-HE1 Transaction.  Under the I&I Agreement, GMACM covenanted that
"[a]ll Mortgage Loans will be serviced in all material respects in compliance with the Servicing
Agreement and the Indenture."  I&I Agreement § 2.02(l).  Under the Servicing Agreement,
GMACM is liable to FGIC for the servicing and administration of the Mortgage Loans, and in
doing so is required to "follow such collection procedures as shall be normal and usual in its
general mortgage servicing activities and consistent with the procedures the Servicer employs in
servicing all other Mortgage Loans in the servicing portfolio with characteristics similar to those
of the Mortgage Loans."  Servicing Agreement §§ 3.02(a), 6.01.

137.    During 2007, the servicing operations of GMACM were integrated into ResCap.
Since the time of the integration, on information and belief, GMACM breached these obligations
by, among other things, being deficient in its borrower contact, collections, and loss mitigation
standards, and by failing to honor FGIC's contractual rights to information.  In particular, an
onsite review of the Ally Financial servicing arm's practices, including those of GMACM, on
March 25, 2009 by FGIC and a third party firm, and subsequent analysis, revealed *inter alia*: (i)
inadequate call center staffing—staffing unable to handle increased incoming and outgoing call
volumes; (ii) call center staffing turnovers as high as 40% in a single year; (iii) a calling
campaign that does not attempt to contact borrowers through other means when GMACM does

not have a viable number or the borrower is continuously unresponsive to messages left; (iv) a

lack of effort to hire personnel to visit the mortgaged property to discuss loss mitigation

strategies with borrowers in default; and (v) severely infrequent use of alternative loss mitigation

strategies as compared to the industry.  GMACM, as servicer, also had an obligation to notify

FGIC of any material breaches of representations and warranties, and to cause GMACM, as

seller, to repurchase the affected Mortgage Loans.

138.    On information and belief, GMACM has failed to remedy any of its deficient

servicing practices.

139.    In addition, GMACM disclosed to FGIC for the first time in March 2009 that it

classified loans into one of three categories or "Risk Tiers" under a servicing protocol ("Risk

Protocol").  Such an approach was, upon information and belief, part of the further cost-cutting

measures implemented under the direction of Ally Financial when all of the servicing operations

were integrated.

140.    FGIC was damaged by the use of the Risk Protocol following the Ally-directed

integration.  Under the Risk Protocol, the timing and frequency of calls made with respect to a

loan are determined in accordance with the loan's assigned category or Risk Tier.  GMACM

disclosed to FGIC that all of the mortgage loans in FGIC-insured, GMACM-serviced

transactions (over 90,000 mortgage loans), including all of the Mortgage Loans in the 2005-HE1

Transaction, were placed in the lowest category of risk.  For such mortgage loans, regardless

whether they were (i) first- or second- lien, (ii) underwritten under less stringent guidelines, or

(iii) originated by non-GMAC entities—all of which are factors that require more attentive

servicing—delinquent borrowers were called at a later stage of delinquency and less frequently

than loans in higher risk categories.  As the purchaser of the Mortgage Loans, however,

GMACM clearly knew that such Mortgage Loans, by their very nature, required particularized servicing before the implementation of the Risk Protocol. The Mortgage Loans were therefore knowingly miscategorized and neglected, and intentionally received much less care than if they had been properly categorized and appropriately serviced. Consequently, the failure by GMACM to ensure that the Mortgage Loans were serviced and administered in accordance with "procedures as shall be normal and usual in its general mortgage servicing activities" constitutes a breach of the Servicing Agreement and the I&I Agreement. *See* Servicing Agreement § 3.02(a); I&I Agreement § 2.02(l).

141.     On July 8, 2009, FGIC requested: (1) additional information concerning the various Risk Tiers generally, and (2) documentation in order to assess whether or not FGIC was being harmed as a result of being placed in the lower risk tier. To date, GMACM has failed to provide such information in breach of Section 2.02(c)(v) of the I&I Agreement.

### H.     Ally Financial's Domination and Control of its Subsidiaries Results in an Integrated, Single Corporate Enterprise

142.     As discussed in greater detail below, Ally Financial is the ultimate parent of all of the other Defendants to this action. Ally Financial owns ResCap, which owns GMACM and RFC. Ally Financial—as the ultimate parent of ResCap, GMACM, Ally Bank, and RFC—has the practical ability, which it has repeatedly and admittedly exercised, to direct and control the actions of its subsidiaries, including ResCap, GMACM, Ally Bank, and RFC.

143.     As also discussed below, Ally Financial has exercised such domination and control over its subsidiaries, including ResCap, GMACM, Ally Bank, and RFC. Ally Financial exercised its direction and control in connection with the 2005-HE1 Transaction. At times, Ally Financial performed such direction and control by using ResCap as an instrument to effect its goals.

144.    As mentioned above, Ally Financial has recently admitted to the Federal Reserve
Board and FDIC that it "indirectly owns and controls . . . numerous direct and indirect nonbank
subsidiaries, including Residential Capital, LLC . . . ('ResCap'), and its direct and indirect
subsidiaries[.]" *See* Consent Order, *In the Matter of Ally Financial Inc., et al.*, FRB Docket No.
11020-B-HC (Apr. 13, 2011) (emphasis added).

145.    As further discussed below, Ally Financial's public statements and actions at or
around the time of the Transaction's close until present, also demonstrate that Ally Financial: (i)
owns a majority of its subsidiaries' stock; (ii) shares resources, management and employees with
its subsidiaries; (iii) considers its mortgage businesses to be "units" of its business; and (iv) has a
business relationship with its subsidiaries designed to benefit itself at the expense of its
subsidiaries.

   **(1)    Evidence of Ally Financial's Domination of GMACM Directly and
           Indirectly Through its Control of ResCap**

146.    From its inception as the ultimate parent company, Ally Financial focused on
controlling the management of its subsidiaries to the point that it treated ResCap as an extension
of itself, rather than a subsidiary whose dealings were at arm's length.

147.    ResCap, for example, did not conduct any operations whatsoever until GMAC
Residential Holding Corp. and GMAC-RFC Holding Corp.—two of Ally Financial's wholly-
owned subsidiaries—were transferred to it in March 2005.  Those two subsidiaries represented
substantially all of Ally Financial's mortgage securitization business.

148.    Ally Financial, at the direction of its board of directors, also provided ResCap
with liquidity and capital.

149.    Further, in Ally Financial's 8-K, filed on June 9, 2005, it disclosed that ResCap
would enter into an operating agreement with Ally Financial, under which Ally Financial would

agree to "indemnify, defend and hold [ResCap] harmless from and against any losses [ResCap]

suffer[s] related to the businesses and liabilities of [Ally Financial] and its subsidiaries."

Proposed Operating Agreement, Ex. 99.1 to Form 8-K, dated June 8, 2005 (hereinafter "2005

Operating Agreement").

150.    On information and belief, Ally Financial's restructuring and financial support of

its subsidiaries was undertaken at the direction of the Ally Financial board of directors in order to

improve and maintain the investment grade rating and profitability of Ally Financial's mortgage

securitization business.  This restructuring then enabled Ally Financial to present itself to its

subsidiaries' securitization transaction partners—including FGIC—as a stable corporate parent

supporting and overseeing the business of its subsidiaries, which in turn made those subsidiaries

more attractive as counterparties to market participants, such as FGIC.

151.    On December 1, 2006, Ally Financial, had its inaugural conference call with

investors, at which time Rick Buxton, the then head of Ally Financial's Investor Relations,

"welcome[d everyone] to the beginning of a new era [of Ally Financial] as an independent global

financial services company."  On the same investor call, Eric Feldstein, Ally Financial's then

CEO, demonstrated how Ally Financial was going to take initial steps to actively control its

subsidiaries.  For instance, Feldstein declared that one of Ally Financial's first acts as controlling

parent was "to integrate certain of GMAC mortgage operations . . . with RFC operations . . . to

drive some cost efficiencies." *Id.*

152.    At all times since Ally Financial caused ResCap to be incorporated, it has owned

100% of ResCap.[1]  Since incorporation, the ownership of ResCap has not changed—Ally

---

[1] GM had created a shell company, GMAC Mortgage Group Inc., which was the direct parent of ResCap.
However, there is no indication that this company conducted any business independent from Ally Financial.  In fact,
Ally Financial's first Annual Report as an independent entity, which was filed with the Securities and Exchange

Financial still "owns 100% of ResCap . . . ." Ally Financial Earnings Call dated Nov. 2011,

statement by Michael Carpenter, Ally Financial's CEO.

153.    Ally Financial has continued to exert its domination and control over ResCap via

shared resources, management and employees.  For example, Ally Financial and ResCap shared

at least three common board members, including two individuals who were active participants

with respect to the intertwined relationship between Ally Financial and ResCap: (1) ResCap's

chairman and Ally Financial's CEO, Eric Feldstein; and (2) Ally Financial's CFO and a director

of ResCap, Sanjiv Khattri.  In fact, the proposed 2005 operating agreement, between ResCap and

Ally Financial, which Ally Financial filed with the SEC, and which upon information and belief

is still currently in effect, "*require[s] that [ResCap's] board of directors include at least two

independent directors, to be selected by GMAC*." 2005 Operating Agreement (emphasis added).

154.    Moreover, on April 26, 2007, "ResCap Investor Relations" announced the release

of Ally Financial's 2007 first quarter financial results to investors in an email bearing the

ResCap logo.  That announcement stated that Ally Financial's financial results were found on

both Ally Financial's and ResCap's websites.

155.    Another example of the many employees who had overlapping responsibilities at

Ally Financial and its subsidiaries, including GMACM and RAMP, is David C. Walker.  Walker

joined Ally Financial in 1985 and has served as Vice President of GMAC Group and CFO of

GMAC Mortgage Group.  In September 2005, around the closing of the 2005-HE1 Transaction,

---

(continued...)

Commission (the "SEC") on March 3, 2007, included a corporate hierarchy chart that evidenced Ally Financial's
corporate structure.  There was a direct line from Ally Financial to ResCap. *See* Ally Fin. Form 10-K, at 2 (March 3,
2007).  In addition, there is no indication that Ally Financial ever discusses ResCap as an "indirect subsidiary."  To
the contrary, as discussed, below, Ally has publicly stated on numerous occasions that it is the owner of ResCap.

Walker was a director at ResCap, GMACM, RFC, and RAMP, among other ResCap

subsidiaries.

156.    Similarly, William F. Muir, Ally Financial's President, has served in that capacity

since at least 2004 (first at GMAC and then at Ally Financial) while also serving as President

and Chairman of the Board of IB Finance Holding Company, LLC—the direct parent of Ally

Bank—and as a director of Ally Bank.

157.    The 2005 Operating Agreement also indicates that Ally Financial has expressly

"restrict[ed] ResCap's ability to declare dividends or prepay subordinated indebtedness owed to

[Ally Financial] or its other affiliates." *See id.*

158.    Conversely, Ally Financial has also agreed to directly pay the losses or expenses

of ResCap.  In the same 2005 Operating Agreement, Ally Financial stated that it would stand

behind ResCap and "indemnify, defend and hold [ResCap] harmless from and against any losses

[ResCap] suffer[s] related to the businesses and liabilities of [Ally Financial] and its

subsidiaries." *Id.*

159.    Ally Financial has continued to make additional public statements that further

demonstrate its willingness to support and fund ResCap.  For instance, in May 2007, during an

investor earnings call, Sanjiv Khattri, the Executive Vice President and Chief Financial Officer

of Ally Financial, repeatedly made statements that Ally Financial's board of directors "will take

whatever reasonable efforts that need to be done to maintain [ResCap's] earnings."  Ally

Financial's Q1 2007 Earnings Call at 24 (May 2, 2007).  Khattri pointed to the fact that "the

[Ally Financial] Board . . . and [Ally Financial] did not hesitate to inject a billion dollars of

equity when it was appropriate . . . ."  Ally Financial's Q2 2007 Earnings Call at 9 (July 30,

2007).  Khattri unequivocally stated that "[a]ll I can assure you [is] that if you look at the

strategic plan of [Ally Financial], a strong ResCap with an investment grade rating is a key part

of our plan and a key part of <u>our value creation</u>." *Id.* (emphasis added). Thus, Ally Financial's

senior management assured the market that Ally Financial was supporting ResCap for the

purposes of Ally Financial's own "value creation."

160.    The financial support Ally Financial gave to ResCap began as far back as May

2005 and has persisted over many years. Upon information and belief, Ally Financial continued

to prop up ResCap, an undercapitalized entity, by channeling capital and liquidity into ResCap

even as its condition continued to deteriorate as the housing market crashed. In addition to the

direct financial support Ally Financial contributed to ResCap, it was also instrumental in

obtaining outside investments that flowed directly to its mortgage subsidiaries. In 2008, Ally

Financial announced to the market that it renewed a funding facility with Citi, which provided

"funding of up to $13.8 billion." Ally Fin. Inc., Form 8-K (Sept. 19, 2008). A portion of such

funding was specifically earmarked for "mortgage assets across the [Ally Financial] and

[ResCap] businesses." *Id.*

161.    Moreover, there is substantial evidence that billions of dollars of TARP funds

meant to stabilize Ally Financial were given to ResCap by Ally Financial. *See* TARP Report

dated March 10, 2010, at 41, 44 (hereinafter "TARP Report"). Upon information and belief, the

TARP funds were commingled among a variety of entities within Ally Financial's mortgage

family, including ResCap.

162.    Additionally, as discussed above, Ally Financial recorded a $270 million charge

in the fourth quarter of 2011, the majority of which was recorded at its controlled subsidiary,

ResCap. In the wake of anticipated penalties to be assessed against ResCap by government

regulators, and the fact that ResCap failed to maintain sufficient tangible net worth to comply

with the requirements of the terms of certain credit facilities, Ally Financial propped up its

subsidiary ResCap with a $196.5 million capital contribution in the form of intercompany debt

forgiveness. *See* Ally Fin. Inc., Form 8-K, at 2 (Jan. 31, 2012).

> **(2)** **Ally Financial Has Disregarded Corporate Formalities and Treated
> Its Businesses as a Single Enterprise**

163.     Ally Financial describes its subsidiaries as its own business units rather than

separate and distinct entities.  For example, Ally Financial declares, in a section of its website

specifically intended to inform investors, that GMACM is a "business unit" of Ally Financial,

rather than an indirect subsidiary owned by ResCap. *See* Ally Financial Website, Ally Home >

About Ally > Investor Relations, *available at* http://www.ally.com/about/investor/ (last visited

Jan. 26, 2012).

164.     In line with Ally Financial's current classification of its mortgage businesses as

"units" of Ally Financial, it has consistently been involved in the day-to-day operations of its

subsidiaries.  For example, at least one individual, who was identified at various times as being a

GM and/or Ally Financial employee, was on the working group list for transactions involving

ResCap subsidiaries that FGIC insured, including this Transaction.  He was included on

communications surrounding the deal document drafting processes from commencement to

close.  Such communications sent to him concerned both the negotiation of the various Operative

and Offering Documents, as well as the final executed versions of the Operative and Offering

Documents, including the fraudulent representations, warranties, and affirmative covenants that

are at issue in this action.

165.     In addition to the dominance and control Ally Financial exerted over its mortgage

units, ResCap also viewed GMACM and RFC as part of its own business.  For example, in its

investor presentation from 2007, ResCap declares that GMACM and RFC "are owned and

*operated* by GMAC Residential Capital Company, LLC [ResCap]." It further states that ResCap
"is part of the [Ally Financial] family of companies."

166.   Ally Financial exerted its dominance and control over ResCap. Upon information
and belief, when Ally Financial was not directly controlling GMACM and RFC, it was using
ResCap as an instrument to do so.

167.   Ally Financial is currently using its subsidiaries' resources as its own in order to
earn favorable ratings by credit rating agencies. For instance, a report put out by Moody's in
November 2011 rated Ally Financial as an "above average" originator of mortgage loans. It is
evident from that report that Ally Financial obtained such a rating by providing information
related to its mortgage units, including GMACM and Ally Bank. Ally Financial itself is not
engaged in the origination business. Instead, it is using its mortgage units as instruments to
obtain favorable ratings.

168.   Such disregard for the corporate form has persisted over time. For instance, Fitch
Ratings in 2007 publicly reported that "operations of [Ally Financial]'s residential mortgage
servicing businesses—which include [GMACM, RFC], and HomeComings Financial Network—
have been integrated into" ResCap. Moreover, Moody's reported that in 2007, "ResCap
combined all servicing operations under one servicing entity . . . under common management
[and] common systems . . . ." There is no indication that either RFC or GMACM has ceased
operations or been sold to other entities or investors. Thus, upon information and belief, ResCap
has conflated various businesses that currently have extensive third-party contractual
relationships, such as the one GMACM has with respect to the 2005-HE1 Transaction as
Servicer.

169.    Even the employees of Ally Financial's subsidiaries think of themselves as
employees of Ally Financial rather than separate entities since there appears to be no difference.
For example, Thomas F. Marano, served as an officer of Ally Financial as well as Chairman and
CEO of ResCap.  His responsibilities include overseeing the mortgage lending and servicing in
ResCap.  In testimony before the House Financial Services Subcommittee on November 18,
2011, Marano stated that "Ally [Financial]'s mortgage business is conducted through GMAC
Mortgage."  Upon information and belief, Marano—in his dual role as an officer of Ally
Financial as well as Chairman and CEO of ResCap—directed and controlled the actions of
GMACM and RFC.

170.    In another example, Larry Hipp, a member of ResCap's Risk Analyst/Investor
Repurchase Department, communicated with FGIC regarding rescission requests using an Ally
Financial email address, but in those very same emails, lists his ResCap contact information,
including a ResCap email address.  In addition, Ally Financial/ResCap used to send FGIC secure
communications bearing a "GMAC ResCap" header, but those secure communications now have
an Ally Financial header.

171.    A further example is supplied by Jeffrey Stephan, a loan officer of GMACM who
was implicated in the robo-signing issues associated with servicing mortgage loans.  He was
asked the following questions at his deposition:

> Q:    Could you please state your name for the record.
> A:    My name is Jeffrey Stephan.
> Q:    Okay.  And who do you work for?
> A:    GMAC, LLC [Ally Financial].
> Q:    And is there a difference between GMAC, LLC and GMAC
> Mortgage, LLC?
> A:    GMAC, LLC – I'm trying to think of the word to use – the most
> recent name.
> Q:    Okay.
> A:    It's GMCA [sic] Mortgage Corporation.

Q:      Okay.
A:      I'm not sure how you would word that.
Q.      Okay.  So are they -- does GMAC, LLC -- now has that basically
taken over these other entities --
A.      Yes.
Q.      -- that formerly existed?
A.      Yes.
Q.      So these entities no longer currently exist?
A.      Right.
Q.      Okay.  And how long then have you been employed by GMAC,
LLC?
A.      Five years.

Jeffrey Stephan Deposition, *GMAC Mortgage, LLC v. Neu*, 4:25-5:22, Dec. 10, 2009, Case No.

50 2008 CA 040805, (15th Cir. Ct., Palm Beach, Fl.).

### I.      FGIC's Contractual Remedies Under The I&I Agreement

172.    The I&I Agreement provides FGIC with broad remedies for GMACM's breaches

of its representations and warranties.  The breadth of these remedies provided further material

inducement for FGIC to issue the Policy.  Specifically, Section 5.02(b) of the I&I Agreement

provides:

> Unless otherwise expressly provided, no remedy herein conferred
> or reserved is intended to be exclusive of any other available
> remedy, but each remedy shall be cumulative and shall be in
> addition to other remedies given under this Insurance Agreement,
> the Indenture or existing at law or in equity.

173.    Moreover, the I&I Agreement provides that, upon an "Event of Default" – which

is defined to include when "[a]ny representation or warranty" by GMACM in the I&I Agreement

or the Operative Documents is materially untrue or incomplete – FGIC can "take whatever action

at law or in equity as may appear necessary or desirable in its judgment to collect the amounts, if

any, then due under [the I&I Agreement] or any other Operative Document or to enforce

performance and observance of any obligation, agreement or covenant of GMACM."  I&I

Agreement §§ 5.01(a), 5.02(a).

174.   In addition, GMACM agreed in Section 3.04(a) of the I&I Agreement:

> to pay, and to protect, indemnify and save harmless
> [FGIC] . . . from and against, any and all claims, losses, liabilities
> (including penalties), actions, suits, judgments, demands, damages,
> costs or expenses (including reasonable fees and expenses of
> attorneys . . . ) . . . of any nature arising out of or relating to the
> breach by GMACM of any of the representations or warranties
> contained in Section 2.01 [of the I&I Agreement] or arising out of
> or relating to the Transaction contemplated by the Operative
> Documents . . . .

I&I Agreement § 3.04(a).

175.   Moreover, consistent with its obligation to select Mortgage Loans that met its

published criteria, GMACM agreed to repurchase or substitute Mortgage Loans that did not

conform to GMACM's representations and warranties, and to indemnify FGIC for claims and

losses arising from GMACM's breach of any representation or warranty. *See* I&I Agreement §§

3.03(b), 3.04(a).

## FIRST CAUSE OF ACTION

### (As Against Ally Financial, ResCap, GMACM: Material Breach of the I&I Agreement – Declaratory Relief Regarding GMACM's Indemnification Obligation)

176.   FGIC re-alleges and incorporates by reference paragraphs 1 through 175 of this

Complaint.

177.   The I&I Agreement is a valid and binding agreement between the parties.

178.   FGIC has performed its obligations under the I&I Agreement.

179.   GMACM's representations and warranties were material to FGIC's decision to

insure the Notes and to issue the Policy.

180.   GMACM's pervasive and material breaches of its representations and warranties,

from the very inception of the Transaction and in the years since, constitute a material breach of

the I&I Agreement that has deprived FGIC of the purpose of the parties' bargain.

181.    Pursuant to Section 3.04(a) of the I&I Agreement, GMACM must indemnify

FGIC for any and all claims, losses, liabilities, demands, damages, costs or expenses of any

nature arising out of or relating to the breach by GMACM of any of the representations or

warranties contained in Section 2.01 of the I&I Agreement or arising out of or related to the

transactions contemplated by the related Operative Documents by reason of, among other things,

the breach by GMACM of any representation, warranty, or covenant under any of the related

Operative Documents.

182.    As explained above, GMACM has breached numerous representations, warranties,

and covenants in the Offering and Operative Documents, for example, those contained in Section

2.01 of the I&I Agreement.  These breaches have caused FGIC to pay claims and to incur losses,

costs, and expenses; and it will continue to do so.

183.    Ally Financial, acting directly and/or indirectly through ResCap, directed

GMACM's actions as set forth in this cause of action.

184.    FGIC therefore seeks a declaration that Ally Financial, ResCap, and GMACM

must jointly and severally indemnify and reimburse FGIC for all sums arising out of the 2005-

HE1 Transaction for which FGIC has or will become liable, or, alternatively, for all loss

resulting from any breaches of the representations, warranties, and covenants of the I&I

Agreement or any of the related Operative Documents, or, alternatively, in an amount to be

determined at trial, and an order giving effect to such indemnification.

185.    In addition, FGIC seeks a declaration that GMACM must indemnify and

reimburse FGIC for all sums arising out of the 2005-HE1 Transaction for which FGIC has or

will become liable, or, alternatively, for all loss resulting from any breaches of the

representations, warranties, and covenants of the I&I Agreement or any of the related Operative

Documents, or, alternatively, in an amount to be determined at trial, and an order giving effect to such indemnification.

## SECOND CAUSE OF ACTION

**(As Against Ally Financial, ResCap, GMACM: Material Breach of the Operative Documents — Indemnification for Improper Subsequent Transfers, or, Alternatively, Repurchase of Improper Subsequent Transfers, or, Alternatively, Damages for all Losses Sustained from Improper Subsequent Transfers)**

186.    FGIC re-alleges and incorporates by reference paragraphs 1 through 185 of this Complaint.

187.    The I&I Agreement is a valid and binding agreement between the parties.

188.    FGIC has performed its obligations under the I&I Agreement.

189.    GMACM has breached the I&I Agreement, and the provisions of the MLPA and the Operative Documents incorporated therein, by executing improper Subsequent Transfers to the 2005-HE1 Trust despite the occurrence of an Early Amortization Event having terminated the Revolving Period no later than January 2006, and—independently—after the stated date for the termination of the Revolving Period on the September 2006 Payment Date.

190.    Moreover, GMACM has breached the MLPA by failing to provide FGIC with the required agreements, notices, information, and data, and failing to obtain from FGIC the required approvals, prior to transferring the Subsequent Mortgage Loans into the 2005-HE1 Trust.

191.    In addition, GMACM has breached and continues to breach the Servicing Agreement by failing to notify the Indenture Trustee of the occurrence of the Early Amortization Event no later than January 2006.  Further, GMACM has breached and continues to breach the I&I Agreement by failing to promptly notify FGIC of the same, which constitutes a Material Adverse Change.

192.    Ally Financial, acting directly and/or indirectly through ResCap, directed
GMACM's actions as set forth in this cause of action.

193.    FGIC has been damaged in an amount to be proven at trial as a result of the
improper transfer of Mortgage Loans to the 2005-HE1 Trust.

194.    FGIC is entitled to indemnification for any claim it has paid or which it may be
required to pay arising from a Subsequent Mortgage Loan that was improperly transferred to the
2005-HE1 Trust.

195.    FGIC therefore seeks a declaration that GMACM must reimburse and indemnify
FGIC for all sums arising out of the 2005-HE1 Transaction for which FGIC has or will become
liable and that FGIC is entitled to immediate reimbursement of all sums it has paid to date under
the Policy and to the payment of all future amounts due or claims that may be presented for
payment by FGIC under the Policy as and when such sums fall due or such claims are presented,
as a result of the improper transfer of Subsequent Mortgage Loans to the 2005-HE1 Trust.

196.    Further, FGIC seeks an order that GMACM must repurchase the Mortgage Loans
that were improperly transferred to the 2005-HE1 Trust.

197.    In the alternative, FGIC has been damaged in an amount to be proven at trial
because it has paid or remains liable for certain claims arising from Subsequent Mortgage Loans
that GMACM was obligated to repurchase as a result of their improper transfer to the 2005-HE1
Trust.

198.    GMACM, ResCap and Ally Financial are jointly and severally liable for such
damages.

199.    Alternatively, GMACM is liable for such damages.

## THIRD CAUSE OF ACTION

### (As Against Ally Financial, ResCap, GMACM: Material Breach of the Operative Documents — Indemnification for Improper Funding of Variable Pay Revolving Notes Following Early Amortization Event, or, Alternatively, Damages for such Improper Funding)

200.    FGIC re-alleges and incorporates by reference paragraphs 1 through 199 of this Complaint.

201.    The I&I Agreement is a valid and binding agreement between the parties.

202.    FGIC has performed its obligations under the I&I Agreement.

203.    GMACM has breached the I&I Agreement, and the provisions of the Indenture and the Operative Documents incorporated therein, by failing to notify the Indenture Trustee that the Early Amortization Event had occurred, thereby causing the Indenture Trustee and Issuer to improperly fund the Class A-I VPRNs following the Early Amortization Event.

204.    FGIC therefore seeks a declaration that GMACM must reimburse and indemnify FGIC for all sums arising out of the 2005-HE1 Transaction for which FGIC has or will become liable and that FGIC is entitled to immediate reimbursement of all sums it has paid to date under the Policy and to the payment of all future amounts due or claims that may be presented for payment by FGIC under the Policy as and when such sums fall due or such claims are presented, as a result of the improper funding of the VPRNs following the Early Amortization Event.

205.    In the alternative, FGIC has been damaged in an amount to be proven at trial because it has paid or remains liable for certain claims as a result of the improper funding of the VPRNs following the Early Amortization Event.

206.    GMACM, ResCap and Ally Financial are jointly and severally liable for such damages.

207.    Alternatively, GMACM is liable for such damages.

## FOURTH CAUSE OF ACTION

**(As Against Ally Financial, ResCap, and GMACM: Breach of Contract – Declaratory
Relief Regarding Access to Information)**

208.    FGIC re-alleges and incorporates by reference paragraphs 1 through 207 of this
Complaint.

209.    The I&I Agreement is a valid and binding agreement between the parties.

210.    FGIC has performed its obligations under the I&I Agreement.

211.    Pursuant to Sections 2.02(e)(i)-(iii) of the I&I Agreement, GMACM agreed to
furnish or cause to be furnished to FGIC financial statements, accountants' reports, and other
information.  Such other information includes, but is not limited to, data relating to the Mortgage
Loans, the servicing of the Mortgage Loans, and the 2005-HE1 Transaction.  FGIC further has
the right to conduct reviews of GMACM's practices as Servicer through reviews of the Mortgage
Loans pursuant to Section 2.02(p) of the I&I Agreement.

212.    As discussed above, pursuant to the I&I Agreement, FGIC made numerous
reasonable written requests that GMACM furnish or cause to be furnished data relating to the
Mortgage Loans, and the servicing of those loans, in order for FGIC to determine the veracity of
representations and warranties made by GMACM, and others, concerning the Mortgage Loans.

213.    GMACM has refused to provide more than a fraction of the data concerning the
Mortgage Loans sought by FGIC.

214.    GMACM has failed to comply with its contractual obligations and breached the
I&I Agreement by failing to provide data relating to the Mortgage Loans after receiving
reasonable requests for such data from FGIC.

215.    Pursuant to Sections 2.02(e)(i)-(iii) of the I&I Agreement, GMACM agreed to
permit FGIC, upon its reasonable request, to (i) inspect the books and records of GMACM; (ii)

discuss the affairs, finances and accounts of GMACM with GMACM's Servicing Officer; and
(iii) discuss the affairs, finances and accounts of GMACM with GMACM's independent
accountants.

216.    On January 20, 2012, FGIC made a reasonable written request that GMACM
permit FGIC or its authorized agent to conduct an inspection of the books and records of
GMACM, as well as permit FGIC to (i) discuss the affairs, finances and accounts of GMACM
with the Chief Financial Officer of GMACM, and (ii) with GMACM's consent, which consent
shall not be unreasonably withheld or delayed, discuss the affairs, finances, and accounts of
GMACM with GMACM's independent accountants.

217.    GMACM has failed to make available such persons or to produce such
information.

218.    GMACM has failed to comply with its contractual obligations and breached the
I&I Agreement by failing to make available the persons requested or to provide the information
requested pursuant to the I&I Agreement, Section 2.02(e)(i)-(iii).

219.    Pursuant to Section 2.02(c)(v) of the I&I Agreement, GMACM agreed to furnish
or cause to furnish to FGIC "all reports provided . . . pursuant to the [Servicing Agreement]."

220.    FGIC made a reasonable request for servicing notes on December 9, 2010.

221.    GMACM has failed to comply with its contractual obligations and breached the
I&I Agreement by failing to cause the Servicing Reports to be delivered to FGIC after receiving
reasonable requests from FGIC.

222.    Ally Financial, acting directly and/or indirectly through ResCap, directed
GMACM's actions as set forth in this cause of action.

223.   Accordingly, FGIC seeks a declaration that GMACM has failed to comply with
Sections 2.02(c)(v), 2.02(e)(i)-(iii), and 2.02(p) of the I&I Agreement, and an order requiring
GMACM to promptly remedy those breaches and therefore comply with FGIC's requests and
notices to GMACM pursuant to the relevant provisions, as detailed above.

## FIFTH CAUSE OF ACTION

### (As Against Ally Financial, ResCap, and GMACM: Breach of Servicer Obligations)

224.   FGIC re-alleges and incorporates by reference paragraphs 1 through 223 of this
Complaint.

225.   The I&I Agreement is a valid and binding agreement between the parties.

226.   FGIC has performed its obligations under the I&I Agreement.

227.   As explained above, GMACM has breached its affirmative covenant under the
I&I Agreement to service all Mortgage Loans in all material respects in compliance with the
Servicing Agreement.

228.   GMACM's breaches of the I&I Agreement have caused substantial harm and
damages to FGIC, in an amount to be proved at trial, but at a minimum including substantially
higher claims on the Policy and other losses and expenses.

229.   Ally Financial, acting directly and/or indirectly through ResCap, directed
GMACM's actions as set forth in this cause of action.

230.   As a result of this breach of contract, FGIC has been damaged and will continue
to be damaged in an amount to be determined at trial.

231.   GMACM, ResCap and Ally Financial are jointly and severally liable for such
damages.

232.   Alternatively, GMACM is liable for such damages.

## SIXTH CAUSE OF ACTION

### (As Against Ally Bank:  Breach of the Custodial Agreement

233.    FGIC re-alleges and incorporates by reference paragraphs 1 through 232 of this

Complaint.

234.    The Custodial Agreement is a valid and binding agreement between the parties

thereto.

235.    FGIC is an express third party beneficiary of the Custodial Agreement.

236.    As explained above, Ally Bank has materially breached its obligations under

Sections 2.1, 2.2, and 2.3 of the Custodial Agreement.

237.    As a result of these breaches of contract, FGIC has been damaged and will

continue to be damaged in an amount to be determined at trial.

238.    Ally Bank is liable for such damages.

## SEVENTH CAUSE OF ACTION

### (As Against Ally Financial, ResCap, and GMACM: Declaratory Relief)

239.    FGIC re-alleges and incorporates by reference paragraphs 1 through 238 of this

Complaint.

240.    As discussed above, Ally Financial, acting directly and/or indirectly through

ResCap, directed GMACM's actions as set forth in this complaint.

241.    For the reasons set forth in paragraphs 142 through 171, among others, Ally

Financial, ResCap, and GMACM were and continue to be alter egos of each other.

242.    FGIC has been damaged as a result of the actions Ally Financial, ResCap, and

GMACM.

243.    FGIC therefore seeks a declaration that Ally Financial, ResCap, and GMACM
were and continue to be alter egos of each other, and therefore are jointly and severely liable for
each other's liabilities.

## EIGHTH CAUSE OF ACTION

### (As Against GMACM: Attorneys' Fees and Costs)

244.    FGIC re-alleges and incorporates by reference paragraphs 1 through 243 of this
Complaint.

245.    The I&I Agreement is a valid and binding agreement between the parties.

246.    FGIC has performed its obligations under the I&I Agreement.

247.    Pursuant to Section 3.03(c) of the I&I Agreement, GMACM agreed to reimburse
FGIC for any and all costs or expenses "including reasonable attorneys' . . . fees and expenses"
in connection with the enforcement, defense or preservation of any rights in respect of any of the
Operative Documents.  Further, pursuant to Section 3.04(a) of the I&I Agreement, GMACM
agreed to pay FGIC any and all costs or expenses "including reasonable fees and expenses of
attorneys" arising out of or relating to the breach by GMACM of any of the representations or
warranties contained in Section 2.01 of the I&I Agreement or arising out of or relating to the
2005-HE1 Transaction.

248.    FGIC has incurred and will continue to incur substantial costs and expenses,
including but not limited to attorneys' fees in filing and prosecuting this lawsuit, arising out of
GMACM's failure to provide Mortgage Loan files, Servicing Reports, and financial information
and its breach of the representations and warranties contained in Section 2.01 of the I&I
Agreement and other representations, warranties, and its covenants within the Operative
Documents, such as Section 2.02 of the I&I Agreement.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff Financial Guaranty Insurance Company demands judgment in

its favor and against defendant GMAC Mortgage Company, LLC, with respect to (1) through (3)

and (5) through (14) below, and in its favor and against Residential Capital, LLC, with respect to

(1) through (3), (5) through (11), (13), and (14), below, and in its favor and against Ally Bank,

with respect to (4), (13), and (14) below, and in its favor and against Ally Financial, Inc., with

respect to (1) through (3), (5) through (11), (13), and (14) below and the following relief:

**(1)**   A declaration that, pursuant to GMACM's obligations under the I&I
Agreements, GMACM must solely and/or Ally Financial, ResCap, and
GMACM must jointly and severally reimburse and indemnify FGIC for all
sums arising out of the 2005-HE1 Transaction for which FGIC has or will
become liable, or, alternatively, for all loss resulting from any breaches of
the representations, warranties, and covenants of the I&I Agreement or
any of the related Operative Documents, or, alternatively, in an amount to
be determined at trial, and an order giving effect to that declaration;

**(2)**   Further or alternatively, an award of all legal, rescissory, and equitable
damages, to be proven at trial for GMACM's material breaches of the I&I
Agreement and the Operative Documents incorporated therein;

**(3)**   Further or alternatively, an award of compensatory, consequential and/or
equitable damages, and any other damages to be proven at trial, for
GMACM's pervasive and material breaches of its representations,
warranties, and affirmative covenants, which constitute material breaches
of the I&I Agreement and frustration of the parties' bargain;

**(4)**   Further or alternatively, an award of compensatory, consequential and/or
equitable damages, and any other damages to be proven at trial, for Ally
Bank's material breaches of its obligations under the Custodial
Agreement;

**(5)**   Further or alternatively, a declaration that GMACM reimburse and
indemnify FGIC for all sums arising out of the 2005-HE1 Transaction for
which FGIC has or will become liable, and that FGIC is entitled to
immediate reimbursement of all sums it has paid to date under the Policy
and to the payment of all future amounts due or claims that may be
presented for payment by FGIC under the Policy as and when such sums
fall due or such claims are presented, as a result of Subsequent Mortgage
Loans that were improperly transferred to the 2005-HE1 Trust, and the

improper funding of the VPRNs, and an order giving effect to that declaration;

**(6)** Further or alternatively, an award of compensatory, consequential and/or equitable damages, and any other damages to be proven at trial, for GMACM's improper transfer of Subsequent Mortgage Loans to the 2005-HE1 Trust and improper funding of the VPRNs;

**(7)** Further or alternatively, a declaration that GMACM must repurchase the Mortgage Loans that were improperly transferred to the 2005-HE1 Trust, and/or must reimburse the 2005-HE1 Trust for monies improperly distributed to the VPRNs, and order giving effect to that declaration;

**(8)** Further or alternatively, a declaration that GMACM must provide full access to all Mortgage Loan files requested or that will be requested by FGIC in the 2005-HE1 Transaction, and an order giving effect to that declaration;

**(9)** Further or alternatively, a declaration that GMACM must allow FGIC to inspect the books and records of GMACM, to discuss the affairs, finances and accounts of GMACM with the Chief Financial Officer of GMACM, and to discuss the affairs, finances and accounts of GMACM with GMACM's independent accountants, and an order giving effect to that declaration;

**(10)** Further or alternatively, a declaration that GMACM must cause servicing notes to be provided for the 2005-HE1 Transaction when requested by FGIC, and an order giving effect to that declaration;

**(11)** Further or alternatively, a declaration that Ally Financial, ResCap, and GMACM are alter egos of each other and are jointly and severally liable for each other's liabilities;

**(12)** An award of FGIC's attorneys' fees, and other costs and expenses incurred in enforcing, defending, or preserving its rights under the I&I Agreement and other Operative Documents, as defined in the I&I Agreement;

**(13)** An award of prejudgment interest at the statutory rate; and

**(14)** Any other and further relief that the Court deems just and proper.

## JURY DEMAND

FGIC demands a trial by jury for all issues so triable as a matter of right.


Dated: January 31, 2012

JONES DAY

_(signature)_

Jayant W. Tambe
Stephen J. Pearson
Howard F. Sidman
Alex P. McBride
222 East 41st Street
New York, New York 10017
(212) 326-3939

*Attorneys for Plaintiff*
*Financial Guaranty Insurance Company*