**Hearing Date: June 26, 2013 at 10:00 a.m. (EST)**

Wollmuth Maher & Deutsch LLP
500 Fifth Avenue
New York, New York 10110
(212) 382-3300
Paul R. DeFilippo
Randall R. Rainer

*Attorneys for Syncora Guarantee Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Case No: 12-12020-MG |
| RESIDENTIAL CAPITAL, LLC, *et al.*, | Chapter 11 |
| Debtors. | Jointly Administered |

**OBJECTION OF SYNCORA GUARANTEE INC. TO DEBTORS' MOTION**
**FOR AN ORDER UNDER BANKRUPTCY CODE SECTIONS 105(A) AND 363(B)**
**AUTHORIZING THE DEBTORS TO ENTER INTO AND PERFORM UNDER A PLAN**
**SUPPORT AGREEMENT WITH ALLY FINANCIAL INC., THE CREDITORS'**
<u>**COMMITTEE AND CERTAIN CONSENTING CLAIMANTS**</u>

**TO:    THE HONORABLE MARTIN GLENN**
          **UNITED STATES BANKRUPTCY JUDGE**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .......................................................................................... ii

PRELIMINARY STATEMENT ...................................................................................1

BACKGROUND .........................................................................................................1

I.      Syncora Issued Financial Guaranty Insurance Policies Covering $2 Billion
        of RMBS Trust Certificates Issued by RMBS Settlement Trusts
        For Which Debtor GMACM is the Servicer..........................................................2

II.     Debtor GMACM's Duties and Obligations as Servicer .........................................2

III.    Syncora Is Entitled to Indemnity Against Losses from GMACM's Servicing Failures......4

IV.     The PSA Contains Several Terms that Impact (or At Least Appear to Impact)
        Syncora and the Trusts to Which it Issued Financial Guaranty Insurance Policies............4

V.      In An Attempt to Understand the Terms of the PSA and Their Purported Rationale,
        Syncora Sought Information and Clarification from the Debtor and the Relevant
        Consenting Claimants, Only To Be Further Perplexed or Simply Stonewalled.................7

ARGUMENT...............................................................................................................9

I.      THE PSA FAILS TO SATISFY THE "HEIGHTENED SCRUTINY"
        STANDARD OR THE BUSINESS JUDGMENT TEST ...................................................9

II.     THE COURT LACKS JURISDICTION TO ENTER AN ORDER
        EXTINGUISHING OR OTHERWISE IMPAIRING THIRD-PARTY CLAIMS
        AGAINST RMBS TRUSTEES ........................................................................11

III.    THE PROPOSED PLAN CONTEMPLATED BY THE PLAN
        SUPPORT GREEMENT IS NOT CONFIRMABLE BASED ON
        THE RECORD BEFORE THE COURT........................................................................14

# TABLE OF AUTHORITIES

**Cases**                                                                                                  **Page(s)**

*AG Capital Funding Partners, L.P. v. State St. Bank and Trust Co.*,
    11 N.Y.3d 146 (N.Y. 2008) ............................................................................17

*Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*,
    837 F. Supp. 2d 162 (S.D.N.Y. 2011).................................................................9

*Fasso v. Doerr*,
    903 N.E.2d 1167 (N.Y. 2009)..........................................................................17

*In re 18 RVC, LLC*,
    485 B.R. 492 (Bankr. E.D.N.Y. 2012)........................................................14, 15

*In re AOV Industries, Inc.*,
    792 F.2d 1140 (D.C. Cir. 1986) .......................................................................14

*In re House of Wines, Inc*.,
    2007 WL 1455849 (Bankr.D.D.C. May 15, 2007) ...........................................17

*In re Innkeepers USA Trust*,
    442 B.R. 227 (Bankr. S.D.N.Y. 2010)....................................................9, 10, 16

*In re Metromedia Fiber Network, Inc.*,
    416 F.3d 136 (2d Cir. 2005).............................................................................13

*In re Modern Textile, Inc.*,
    900 F.2d 1184 (8th Cir. 1990) .........................................................................14

*In re Quigley Co., Inc.*,
    437 B.R. 102 (Bankr. S.D.N.Y. 2010).............................................................15

*In re Saunders*,
    440 B.R. 336 (Bankr. E.D. Pa. 2006) ..............................................................14

*In re Schuler*,
    354 B.R. 37 (Bankr. W.D.N.Y. 2006) ..............................................................17

*In re VF Brands, Inc.*,
    282 B.R. 134 (Bankr. D. Del. 2002) ................................................................14

*In re XO Commun., Inc.*,
    330 B.R. 394 (Bankr. S.D.N.Y. 2005).............................................................12

*Johns-Manville Corp. v. Chubb Indemnity Ins. Co. (In re Johns-Manville Corp.)*,
   600 F.3d 135 (2d Cir. N.Y. 2010) ........................................................................................12

*Matter of Corland Corp.*,
   967 F.2d 1069 (5th Cir. 1992) ............................................................................................17

*Taylor v. Sturgell*,
   553 US 880, 128 S Ct 2161(2008) ......................................................................................12

## **Other Authorities**

11 U.S.C. § 509 ......................................................................................................................17

11 U.S.C. § 1129 ....................................................................................................................15

17 C.F.R. 229.1122 ..................................................................................................................2

Streit Act, N.Y. Real Prop. Law § 124 ....................................................................................16

Syncora Guarantee Inc. ("Syncora"), as monoline insurer to certain of the RMBS Trusts[1] at issue in these cases, hereby files this objection to the Debtors' Motion for an Order under Bankruptcy Code Sections 105(a) and 363(b) Authorizing the Debtors to Enter into and Perform under a Plan Support Agreement ("PSA") with Ally Financial Inc., the Creditors' Committee and Certain Consenting Claimants (the "Motion"), along with the supporting Declaration of Randall R. Rainer and the exhibits thereto ("Rainer Dec.").  In support of its Objection, Syncora respectfully states as follows:

## PRELIMINARY STATEMENT

Notwithstanding the efforts that the Debtors, Creditors' Committee and Supporting Parties have made to craft the proposed PSA and its terms and any momentum those parties may have generated to have the Motion granted, the proposed PSA Order entered and the PSA be fully executed, the Court respectfully should stop this runaway train in its tracks and address fundamental defects in what amounts to a pre-approved plan of reorganization that violates basic tenets of law and is unconfirmable.  Among other things, the proposed PSA Order contains exculpatory findings of fact in favor of non-debtor RMBS Trustees, that while interlocutory and non-binding (and thus unnecessary here at all), are not clearly stated as such.  Moreover, the opaque terms of the proposed PSA cannot pass the required heightened scrutiny standard, much less the business judgment standard.  Indeed, Plan supporters themselves have offered varying and inconsistent interpretations of what appear to be critically important terms that pose a significant impact upon Syncora and others in extinguishing or impairing claims.  As such, the proffered Plan needs to go back to the drawing board in certain fundamental respects.

---

[1] Capitalized terms not otherwise defined herein shall have that meaning ascribed to them in the Motion.

**BACKGROUND**

I.    **Syncora Issued Financial Guaranty Insurance Policies Covering
$2 Billion of RMBS Trust Certificates Issued by RMBS Settlement
Trusts For Which Debtor GMACM is the Servicer**

Pursuant to several financial guaranty insurance policies, Syncora insured the payment of

interest and principal on more than $2 billion of RMBS pass-through certificates issued by

RMBS Trusts for which the Debtor GMAC Mortgage, LLC ("GMACM" or "Debtor") has acted

as Servicer or Master Servicer (*e.g.*, for SunTrust Acquisition Closed-End Seconds Trust, Series

2007-1 ("STACS 2007-1")) (collectively, the "Syncora Transactions").  Rainer Dec. ¶ 5.

Syncora is a third-party beneficiary of the Trustee's obligations under the Operative Documents

in each transaction, and Debtor GMACM has separately covenanted with Syncora in each

transaction to perform its specified servicing obligations, agreeing to indemnify Syncora directly

for any losses caused by GMACM's negligence or servicing failures that were not undertaken in

good faith.

II.    **Debtor GMACM's Duties and Obligations as Servicer**

The operational transaction documents for each of the Syncora Transactions impose upon

Debtor GMACM, as Servicer, express contractual obligations for the benefit of Syncora as

insurer, as well as affirmative duties to act prudently to safeguard the mortgage loan collateral.

More specifically, for example, the STACS 2007-1 Pooling and Servicing Agreement (Rainer

Dec. Exh. A) imposes upon GMACM the obligation to service the mortgage loans prudently, as

if the loans were its own and in a manner that maximizes a timely and complete recovery.

Section 3.01 of the Agreement states:

> From and after the Closing Date, the Servicer [GMACM] . . . shall service and
> administer the Mortgage Loans on behalf of the Trust Fund and in the best
> interests of and for the benefit of the Certificateholders (as determined by the
> Servicer in its reasonable judgment) in accordance with the terms of this

Agreement and the Mortgage Loans and all applicable law and regulations and, to the extent consistent with such terms, <u>in the same manner in which it services and administers similar mortgage loans for its own portfolio, giving due consideration to customary and usual standards of practice of prudent mortgage lenders and loan servicers</u> administering similar mortgage loans but without regard to [conflicting interests of the Servicer's affiliates]. To the extent consistent with the foregoing, the Servicer shall also seek to <u>maximize the timely and complete recovery of</u> principal and interest on the related Mortgage Notes . . . .

STACS 2007-1 Pooling and Servicing Agreement § 3.01 (emphasis added). The Agreement further requires that GMACM "service and administer the related Mortgage Loans in accordance with applicable state and federal law." *Id*. In that vein, GMACM also is required to certify annually its compliance with the servicing criteria required by Item 1122 of SEC Regulation AB, 17 C.F.R. 229.1122, which includes certifying that the mortgage loans in the collateral pool and the requisite loan documentation have been "safeguarded" by GMACM. *Id*. § 3.18(a) & Exhibit E thereto (listing such Relevant Servicing Criteria).

Further to the importance of GMACM's obligations and duties as Servicer, GMACM covenanted directly with Syncora to indemnify Syncora for losses and expenses caused by GMACM's breach or other violation of its servicing obligations. For example, under the Insurance and Indemnity Agreement between and among Syncora, GMACM and others for STACS 2007-1 ("STACS 2007-1 I&I") (Rainer Dec. Exh. B), as Servicer, GMACM "agree[d] to pay, protect, indemnify and save harmless [Syncora] from and against any and all . . . losses, . . . costs or expenses (including reasonable fees and expenses of attorneys, consultants and auditors and reasonable costs of investigations) of any nature . . . arising out of or relating to the transactions contemplated by the Operative Documents by reason of . . . (ii) the misfeasance or malfeasance of, or negligence, bad faith, willful misconduct . . . in connection with any Transaction arising from the Operative Documents; [or] . . . (iv) the breach by . . . GMACM . . . of any covenant under any of the Operative Documents" (STACS I&I § 3.04), unless GMACM

3

acted or refrained from acting "in good faith" or acted or refrained from acting due to an "error in judgment" (STACS 2007-1 Pooling and Servicing Agreement § 7.03).

Therefore, the Insurance and Indemnity Agreements give Syncora an independent, direct right of recovery (indemnification) from Servicer GMACM based upon GMACM's breaches of its servicing obligations.

### III.    Syncora Is Entitled to Indemnity Against Losses from GMACM's Servicing Failures

The Syncora Transactions have performed poorly, with substantial principal losses in the mortgage loan pools that have resulted in insurance claims payments by Syncora on multiple deals pursuant to its financial guaranty insurance policies.  Although Syncora is still investigating the full parameters of its claims against Debtor GMACM with respect to one or more of the Syncora Transactions, it appears  GMACM has breached its above-described duties and obligations as Servicer by failing to act prudently to safeguard mortgage loan collateral and, where loans were delinquent or defaulted, failing to act timely or maximize recovery.  Syncora has paid insurance claims totaling nearly $750 million, including paying $148,914,678 in claims for STACS 2007-1 and $74,816,151 in claims for Residential Accredit Loans Inc. Series 2006-Q04 ("RALI 2006-Q04").  Rainer Dec. ¶ 7.

Accordingly, GMACM has disregarded and breached the servicing obligations described above, as well as other servicing-related obligations, acting with negligence and a lack of good faith, thereby causing Syncora to suffer substantial losses in connection with the transactions.  As a result, Syncora, and the Trust for each Syncora Transaction, have unsecured "servicing claims" against Debtor GMACM.

### IV.    The PSA Contains Several Terms that Impact (or At Least Appear to Impact) Syncora and the Trusts for Which Syncora Insured Certain Classes of Certificates

4

The proposed PSA contains several terms that impact Syncora's servicing claims against GMACM, as well as repurchase and servicer claims held by the RMBS Trusts for which Syncora issued an insurance policy concerning one or more tranches of pass-through certificates.  To be sure, however, the terms of the proposed PSA and its Term Sheet and Supplemental Term Sheet, and the annexes and exhibits thereto, are opaque, inconsistent and at times simply confusing.

*First*, in order to create a single Liquidation Trust from which to make distributions to creditors, the PSA proposes to consolidate all assets of all Debtors for such purpose, identifying such assets as being sourced from one of three groups of Debtors, *i.e.*, the "ResCap Debtors," the "GMACM Debtors" and the "RFC Debtors."  However, the Plan appears to contemplate an undisclosed allocation of value of the Liquidation Trust's assets to each of the three Debtor groups, from which unsecured creditors may recover a distribution.  Several classifications of claims are identified as having a claim against more than one of the three Debtor groups, and a distribution projection is provided (Annex I to the Supplemental Term Sheet), stating, *e.g.*, that all non-MBIA and non-FGIC monoline claims will be satisfied from a $96 million distribution. None of the Plan, Term Sheets nor the Motion, however, explains how such allocations of value are being made, nor the rationale for determining that such claims constitute allowed claims entitled to distribution under the Plan.

*Second*, with respect to the proposed settlement of the RMBS Trust Claims for repurchase and cure (*i.e.*, "cure" claims),[2] RMBS Trusts that do not have monoline insurance for any of its tranches of pass-through certificates will participate in the RMBS Trust settlement and have an unsecured Allowed RMBS Trust Claim.  However, any RMBS Trust wherein certain of the certificateholders benefit from an insurance policy from a monoline insurer (an "Insured

---

[2] Based on the language of the PSA, it is unclear what claims are actually included as "cure" claims that are being settled.

Trust") will <u>not</u> receive an Allowed RMBS Trust Claim. *See* Supplemental Term Sheet at 5, 7. No distinction appears to be made for, on the one hand, RMBS Trusts with insurance for all tranches of issued certificates, and on the other hand, RMBS Trusts with insurance on only certain tranches of issued certificates (*e.g.*, RALI 2007-Q04) (Rainer Dec. ¶ 6). The Supplemental Term Sheet states (at 5) that "Insured RMBS Trusts shall be entitled to distributions to the extent provided in the RMBS Trust Allocation Protocol," but the language of the protocol (Annex III to the Supplemental Term Sheet) and its operation are completely unclear, suggesting that only Insured Trusts that made an insurance claim that remains outstanding will receive an Allowed RMBS Trust Claim only to the extent of such non-payment by the insurer. Nevertheless, it appears that Insured Trusts still would release all of their claims against the Debtors, including repurchase claims and servicer claims, as to which such Trusts are not being allowed a claim in the Plan (*i.e.*, those Trusts, which would include RALI 2006-Q04, would not receive any recovery on such claims from the Debtors).

*Third*, as revealed in the various RMBS Trustees' joinder affidavits filed subsequent to and in support of the Motion, the RMBS Trustees disclosed that they retained the financial advisor Duff & Phelps to (a) develop the RMBS Trust Allocation Protocol and (b) undertake an analysis of each settling RMBS Trust's servicer claims and place a value on each such claim. The joinder affidavits mention Duff & Phelps' data points considered in developing and valuing each Trust's servicer claims (which are said to total $1.1 billion for all RMBS Trusts, discounted to $96 million for purposes of the proposed Plan), but the Trustees did not disclose the methodology that Duff & Phelps employed to value the claims.

*Fourth*, in connection with Ally Financial Inc. ("Ally") committing to contribute $2.1 billion to the Debtors' Estate for use in settling claims as part of a Plan, the PSA states that Ally

6

will receive a general release of all claims that the Debtors may have against Ally.  In defining

the "Ally Release Parties," the PSA Term Sheet (at 6-7 & n. 4) contains sweeping language

extending the non-debtor release to other non-debtor entities (*e.g.*, "non-Debtor affiliates" of

shareholders of Ally would receive a release).  Further, to the extent that the "Ally Release

Parties" also includes "the Debtors' respective successors and assigns," the PSA when read

literally provides a release for claims brought against the Debtors and their successors – *i.e.*, the

Debtors' Liquidating Trust.  *Id.*

      *Fifth*, the PSA Term Sheet states that each of the Trustees for the RMBS Trusts (the so-

called "Settling Parties") and their Representatives are to be exculpated against any liability for

pre- or post-petition conduct related to and leading to the PSA, and the Debtors' Proposed Order

approving the PSA contains the following legal finding: "The RMBS Trustees acted reasonably,

in good faith and in the best interests of the Institutional Investors, the investors in each RMBS

Trust and each such RMBS Trust in agreeing to the [PSA]."

      *Sixth*, the proposed Plan Injunction (PSA Term Sheet at 10) enjoins actions not only as

against Released Claims, but also as to matters "on account of or in connection with or with

respect to any" Released Claim.  The latter appears overly broad.

**V.      In An Attempt to Understand the Terms of the PSA and Their Purported Rationale,
         Syncora Sought Information and Clarification from the Debtors and the Relevant
         <u>RMBS Trustees, Only To Be Further Perplexed or Simply Stonewalled</u>**

      In light of the pervasive lack of clarity in the PSA, the PSA Term Sheet and the

Supplemental Term Sheet, counsel for Syncora promptly convened telephone conference calls

with counsel for the Debtors and counsel for the Trustees and one Master Servicer for Syncora

Transactions.  Rainer Dec. ¶ 8.  During the course of those conversations, it became clear to

Syncora's counsel that neither the Debtors' counsel nor the RMBS Trustees' counsel we spoke to

had a full, or even the same, understanding of certain highly material terms of the PSA, such as

the treatment of Insured Trusts and how the RMBS Trust Protocol operates with respect to

Insured Trusts.  *Id.*  For example, whereas counsel for one Trustee told Syncora's counsel that an

Insured Trust's repurchase claims against a Debtor would be released if the RMBS Trust

Settlement is consummated, counsel for another Trustee told Syncora's counsel that such

repurchase claim would not be released and that the Insurer would become vested to assert the

claim.  In other instances, Trustee counsel stated that Duff & Phelps could provide an

understanding of how the PSA terms operate and were derived, and their rationale to exclude

certain insured trusts from sharing in recoveries.  *Id.* ¶ 9.  Absent complete transparency into

each of the PSA's provisions, it should not be approved.

Accordingly, and in light of the high-level summary description of Duff & Phelps' work

set forth in each of the RMBS Trustees' joinder affidavits filed in connection with this Motion,

Syncora asked the Trustees' counsel to arrange for access to the Duff & Phelps work that (a)

implemented a methodology for assessing the value of RMBS Trust servicer claims against

GMACM, including with respect to the Syncora Transactions, and (b) devised the RMBS Trust

Allocation Protocol, in which Insured Trusts purportedly could participate in some fashion.  *Id.* ¶

10.

On Friday, June 14, 2013, Syncora was advised by Trustee counsel that the other

Trustees had consented to Syncora speaking with Duff & Phelps to discuss its methodologies and

ask questions about the RMBS Trust Allocation Protocol it developed, and Syncora promptly

spoke with the designated Duff & Phelps executive to schedule an initial call for such purpose.

Then, on Sunday evening June 17, Syncora received an email from the Trustees in which they

performed an abrupt about-face and reneged on their agreement, contending all of a sudden that

such information was not relevant.  As a result of the conduct of the RMBS Trustees – the same

Trustees seeking an exculpatory finding from this Court with respect to their decision to enter

into the PSA – Syncora remains unable to get even a glimpse into the Duff & Phelps

methodology upon which the RMBS Trustees' settlement of RMBS Trust claims is largely

based, or understand the factors the Trustees considered in determining that it purportedly is in

the best interests of each RMBS Trust for the Trustees to enter into the PSA on these terms.  *Id*. ¶

11.

## **ARGUMENT**

### I.    **THE PSA FAILS TO SATISFY THE "HEIGHTENED SCRUTINY" STANDARD OR THE BUSINESS JUDGMENT TEST**

The Debtors assume, without analysis, that the business judgment standard applies to the

Motion to approve the PSA.  However, the PSA is a contract with Ally, an insider, and should

therefore be subject to the "heightened scrutiny" standard applied by Judge Chapman in *In re*

*Innkeepers USA Trust*, 442 B.R. 227, 231 (Bankr. S.D.N.Y. 2010).  In applying heightened

scrutiny, courts are concerned with the integrity and entire fairness of the transaction at issue,

typically examining whether the process and price of a proposed transaction not only appear fair

but are fair and whether fiduciary duties were properly taken into consideration.  *Id*.  There are

several aspects of the proposed agreement that do not square with the fiduciary duties of the

various parties.

The Debtors have a duty to refrain from favoring or appearing to favor one or another of

their estates and its creditors over another.  *Id.* at 235 ("it is 'Bankruptcy 101' that a debtor and

its board of directors owe fiduciary duties to the debtor's creditors to maximize the value of the

estate, and each of the estates in a multi-debtor case").  The Trustees also have a fiduciary duty

to each of the trusts they service, and the investors in those trusts.  *See Ellington Credit Fund,*

*Ltd. v. Select Portfolio Servicing, Inc.*, 837 F. Supp. 2d 162, 191-92 (S.D.N.Y. 2011). The PSA contemplates at least three allocations of assets among either competing estates or creditors, all of which implicate the fiduciary duties of both the Debtors and the RMBS Trustees: the allocation of available assets among three groups of Debtors, a further allocation of recoveries among the creditors of those three groups of Debtors, and finally the RMBS Trust Allocation Protocol for allocation of values among some, but not all, of the trusts themselves. The PSA further contemplates that only uninsured RMBS Trusts may have allowed claims against the Debtors, placing squarely at issue the fiduciary duties of the trustees of the insured trusts who propose to settle their trust's claims without any compensation. In addition, the RMBS Trusteess are settling their right to pursue certain claims on behalf of the trusts without the RMBS Trustees providing the necessary evaluation on the nature or value of such claims.

The PSA is also unclear as to the rights of partially insured trusts, *i.e.*, those that have insurance covering only a portion of the investors' interests in such trust, with the balance uninsured.[3] The PSA and its term sheets are opaque as to how the first two allocations were accomplished by the Debtors, and the Trustees have stonewalled Syncora's request to obtain and examine the Duff & Phelps analysis on which they rely for the alleged reasonableness of their decisions with respect to the division of assets among various trusts.

Finally it is impossible to discern whether a partially insured trust loses its right to an allowed claim or not. This makes it impossible for the Court or the other parties to determine if either the Debtors or the RMBS Trustees have discharged their fiduciary duties. This is fatal to approval of the PSA under either the heightened scrutiny standard, or the business judgment test. *See In re Innkeepers*, 442 B.R. at 233 (rejecting plan support agreement where Debtors failed to

---

[3] For example, Syncora insures only certain of the tranches of mortgage pass-through certificates issued by the RALI 2006-Q04 Trust and, we believe, other tranches of certificates issued by that Trust are uninsured.

"show[] that they acted good faith in (i) making the decision to enter into the PSA and (ii) providing transparency to their creditors").

The PSA is vague and inconsistent, and Syncora engaged in discussions with both the Debtors and representatives of the RMBS Trustees in an effort to clarify certain points. Those efforts were unavailing, as none of the parties approached by Syncora in an effort to obtain clarification of certain provisions of the PSA were able to explain many unclear provisions, including (i) how assets were allocated among the Debtors and among the classes of claims against each of the Debtors; (ii) who is included in the proposed third-party release language at page 12, Section 4.2 of the PSA; (iii) how opt-out by a Trust affects treatment of its claims; (iv) the rights of partially insured trusts; (v) the rights of parties, like Syncora, who are subrogated to the claims of investors in insured trusts, if the insured trusts are not permitted to hold allowed claims; (vi) the methodology employed by Duff & Phelps, the RMBS Trustees' advisor, in calculating claims of the Trusts; and (vii) the rationale for determining that "Other Monoline Claims" are entitled to a $96 million distribution, while other claims such as the approximately $800 million MBIA claim, are deemed allowed claims entitled to distribution without any evidence or findings with respect to the validity or amount of such claims. Indeed, since the PSA contemplates a Plan with a common pool of assets available for distribution to all of the Debtors' creditors, any creditor class deemed allowed takes away from the recovery for all other creditor classes, making discovery and related findings on the Plan structure imperative. The PSA should not be approved until there is complete transparency into each of its provisions.

II.    **THE COURT LACKS JURISDICTION TO ENTER AN
       ORDER EXTINGUISHING OR OTHERWISE IMPAIRING
       THIRD-PARTY CLAIMS AGAINST RMBS TRUSTEES**

The findings of the Proposed Order in itself would release claims without any analysis on the identity or value of such claims. Specifically, Sections 3 and 4 of the Proposed Order provide that the PSA are in the "best interests of the Debtors' estates, their creditors, the Institutional Investors, the investors in each RMBS Trust, and the RMBS Trustees" and that the "RMBS Trustees acted reasonably, in good faith and in the best interests of the Institutional Investors, the investors in each RMBS Trust and each such RMBS Trust in agreeing to the Agreement."[4] This language in the Proposed Order would insulate the RMBS Trustees from gross negligence, willful misconduct, breach of fiduciary duty, ordinary negligence, and possibly other claims against the RMBS Trustees, thereby effectively extinguishing or impairing Syncora's claims against any trustee of a Syncora-insured securitization who releases the claims of that trustee for no consideration, in derogation of Syncora's rights in subrogation to the trust's investors' claims.[5]

Moreover, it is unclear whether any order entered by the Court with respect to the PSA may have preclusive effect on the parties and/or non-parties to the proceedings. *See In re XO Commun., Inc.*, 330 B.R. 394, 451-52 (Bankr. S.D.N.Y. 2005). To that end, the Court has

---

[4] The findings in Sections 3 and 4 of the Proposed Order should also be read in conjunction with the extremely broad exculpatory language in the PSA itself, which provides that the "Settling Parties" (*i.e.*, including the RMBS Trustees):

> shall neither have, nor incur, any liability to any entity for any pre-petition or post-petition act or omission taken in connection with, or related to, formulating, negotiating, preparing, disseminating, soliciting, implementing, administering, confirming, or effecting the consummation of any prepetition plan support agreements, the Plan Support Agreement, the Term Sheets, the Plan, the Disclosure Statement, the Ally Settlement Agreement, the RMBS Settlement, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Plan provided, that the foregoing provisions of this exculpation shall have no effect on the liability of any entity that results from any such act that is determined in a final, nonappealable order to have constituted gross negligence or willful misconduct; provided, further, that the Exculpated Parties shall be entitled to rely upon the advice of counsel concerning his, her, or its duties pursuant to, or in connection with, any prepetition plan support agreement, the Plan Support Agreement, the Term Sheets, the Plan, the Disclosure Statement, and the RMBS Settlement.

PSA Term Sheet at 11.

[5] As set forth *supra*, Syncora has paid insurance claims on the Syncora Transactions totaling nearly $750 million, thereby giving Syncora a subrogation claim for such amounts under the Operative Documents.

previously acknowledged that such an order may have preclusive effect in other courts.  *See* June

17, 2013 Transcript, annexed to Rainer Decl. as Ex.C at 18, 25, 37, 39, 49.  Nevertheless, any

language in the Proposed Order which may be interpreted to have preclusive effect should be

stricken.

As the Court of Appeals for the Second Circuit has repeatedly held, however, a

bankruptcy court lacks jurisdiction to enjoin a person's direct claims against a non-debtor based

on the non-debtor's independent wrongdoing.  *Johns-Manville Corp. v. Chubb Indemnity Ins.*

*Co. (In re Johns-Manville Corp.)*, 600 F.3d 135, 151-52 (2d Cir. N.Y. 2010).  That is exactly

what the Proposed Order purports to do.  In the alternative, to the extent that the Order is found

to have *res judicata* effect on Syncora's claims, principles of due process require that Syncora be

entitled to a full and fair opportunity to litigate its claims.  *See Taylor v Sturgell*, 553 US 880,

892-93, 128 S Ct 2161, 2171, 171 L Ed 2d 155 (2008).  However, there is no evidence or other

findings on the record permitting the Court to make such an adjudication.  In addition, the RMBS

Trustees are not making the kind of meaningful financial contribution that is a fundamental

prerequisite to issuance of an order barring third-party claims against non-debtors, under *In re*

*Metromedia Fiber Network, Inc.*, 416 F.3d 136, 142 (2d Cir. 2005).  Accordingly, the Court

lacks jurisdiction, and the evidence necessary in the record, to enter an Order extinguishing or

impairing third-party claims against the RMBS Trustees.

The Plan proposed by the PSA appears to be eliminating claims without the necessary

findings by the Debtors or RMBS Trustees.[6]  Specifically, there are no details of the factors that

---

[6] Section 4.2 of the PSA provides for a "Third Party Release" as set forth in the Plan Term Sheet.  The PSA Term
Sheet provides that the "Debtor Released Parties are deemed released and discharged by the Debtors, the estates,
and, if applicable, a liquidating trust from any and all Causes of Action whatsoever[.]"  PSA Term Sheet at 6.
"Debtor Released Parties" are defined to include the "Consenting Claimants" which in turn are defined to include
"the RMBS Trustees," among others.  PSA Term Sheet at 7, n.5, PSA § 1 (defining "Consenting Claimants").

the RMBS Trustees assessed in the Duff & Phelps report.  There is also no evidence of the

factors assessed with respect to individual trusts, or if there even was individual assessments

with respect to individual trusts.  The Declarations filed by the RMBS Trustees in Support of the

PSA generally describe the Duff & Phelps method for evaluating claims and provide global

estimates for claims held by all trusts,[7] but the Declarations fail to analyze individual claims held

by specific trusts or the value for such individual trust claims.  Further, when counsel for

Syncora spoke to representatives for the RMBS Trustees to clarify such issues, the RMBS

Trustees could not identify which claims were being settled in respect of the individual trusts, let

alone the valuation method in settling such claims.  The RMBS Trustees did not appear to

consider that the settlement may extinguish certain claims that individual trusts may hold without

even being considered.

        If the Court is going to adjudicate the RMBS Trustees' "good faith" and

"reasonableness" in settling the RMBS Trustees' claims, the record before the Court must permit

such a finding.  There has been inadequate opportunity for discovery or other pre-trial

proceedings in advance of any effort to make an adjudication that would constitute a "full and

fair opportunity" to be heard.  An investigation into the value of the claims being settled would

also be in the best interest of each RMBS Trust to more fully understand its claims that are being

settled.  Accordingly, any exculpatory language in the Proposed Order that could exonerate the

RMBS Trusees from liability should be stricken.

**III.    THE PROPOSED PLAN CONTEMPLATED BY THE
        PLAN SUPPORT AGREEMENT IS NOT CONFIRMABLE
        BASED ON THE RECORD BEFORE THE COURT**

        The PSA which contemplates a non-confirmable Plan should not be authorized by the

Court.   While this Motion is not a substitute for hearings to approve the Plan and Disclosure

---

[7] *See, e.g.,* Declaration of Thomas Musarra in Support of PSA, dated June 10, 2013 [Docket No. 3940-4].

Statement, if the Plan which is eventually proposed contains provisions required by the PSA that render it non-confirmable, there would appear to be no reason to approve the PSA.  *C.f. In re 18 RVC, LLC*, 485 B.R. 492, 495 (Bankr. E.D.N.Y. 2012) ("bankruptcy court should not approve a disclosure statement if the proposed plan which it describes is incapable of confirmation").  The provision denying an Insured Trust the right to an allowed claim (PSA Supplemental Term Sheet at 5, ¶ 8) is of doubtful validity.  The existence of a third-party guarantor for certain certificates issued by the insured securitization does not change the nature of a creditor's claim against a debtor.  *In re AOV Industries, Inc.*, 792 F.2d 1140, 1151 (D.C. Cir. 1986) ("The existence of a third-party guarantor does not change the nature of a claim vis-a-vis the bankrupt estate[.]").  Indeed, it is not uncommon for a creditor to hold both an allowed claim against a debtor, and a guarantee claim against a different party.[8]  This is all the more true here, whee the creditor holding the claim against the Debtor is distinct from the certificateholders who receive the benefit of the monoline insurance.  Accordingly, even though certain of trust certificateholders are insured against losses, Syncora, which is subrogated to their rights, would still hold claims against Debtors for breaches that caused those losses.  Projected future losses to the trusts are not even accounted for in the PSA.  Moreover, denying a partially insured trust a claim has no rational basis.  Likewise, to the extent the Plan would separately classify the claims of insured trusts from uninsured trusts, that is not a legitimate basis for separate classification.  *See In re 18 RVC, LLC*, 485 B.R. 492, 496-97 (Bankr. E.D.N.Y. 2012) (denying classification "solely on the existence of a personal guarantee" for cram down purposes).

---

[8] *In re Modern Textile, Inc.*, 900 F.2d 1184, 1191 (8th Cir. 1990) (holding that landlord whose lease was rejected by trustee holds claim against estate for breach, and claim against third-party guarantor of lease); *In re Saunders*, 440 B.R. 336, 345-46 (Bankr. E.D. Pa. 2006) (ruling that judgment creditor held direct claim, notwithstanding existence of third-party guarantor obligations); *In re VF Brands, Inc.*, 282 B.R. 134, 137 (Bankr. D. Del. 2002) ("[Creditor] is simply seeking a recovery from someone whom it asserts is liable to it, in addition to the [] Debtors. This is no different from a creditor who is free to pursue collection of its claim from a guarantor of that debt . . . .").

The impact of sweeping non-Debtor releases in the PSA must also be assessed in respect of the best interest test of Section 1129(a)(7) of the Bankruptcy Code, especially with respect to insured trusts which have claims but which receive nothing of value under the plan. Each impaired class of creditors that does not accept the plan must "receive under the plan on account of such claim or interest property of a value . . . that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7[.]" 11 U.S.C. § 1129(a)(7). This requires the Court to ascertain whether dissenting creditors will receive more by recovering on their claims against non-debtors if the debtors are liquidated under Chapter 7, than they will receive under a plan that shields the non-debtors from liability to such dissenting creditors. In other words, the Court should reject the PSA to the extent it contemplates a Plan which would release third-party claims without compensation because such claims would be retained by the third-parties in Chapter 7. *See In re Quigley Co., Inc.*, 437 B.R. 102, 145 (Bankr. S.D.N.Y. 2010) (rejecting proposed plan because "dissenting Non–Settling Claimants . . . would 'retain' their right to sue Pfizer if Quigley were liquidated under chapter 7" and plan sought to release such claims).

Syncora has direct claims against the Trustees of its insured trusts that are not based on derivative claims. Rather, Syncora's claims are derived from the operative agreements to which Syncora and the RMBS Trustees are parties, and applicable law, including the Trust Indenture Act and the Streit Act. Among other things, Syncora believes that the RMBS Trustees for its transactions may have:

- Failed to obtain complete mortgage files as required by the transaction documents;

- Failed to timely provide notices of defaults under the transaction documents, even though they were on notice or had knowledge of rampant breaches of representations and warranties with respect to underwriting of defective loans;

16

- Failed to require originators and depositors to repurchase defective mortgage loans even after the trustees became aware of systemic underwriting and other problems; and

- Failed to provide notice of settlement negotiations on behalf of the trustees and the trusts.

The potential claims against the trustees are based on (i) violation of the Trust Indenture Act, for failure to act prudently after default; (ii) violation of the Streit Act (Article 4A of the New York Real Property Law)[9]; (iii) breach of contract, including breach of the Operative Documents to which the trustee is a party (which may be derivative of the rights of the trust that was injured);[10] and (iv) common law negligence, including negligent conduct prior to default. *See AG Capital Funding Partners, L.P. v. State St. Bank and Trust Co.*, 11 N.Y.3d 146, 158 (N.Y. 2008). Syncora may also be vested with additional claims based upon the provision of the PSA whereby the RMBS Trustees propose to release claims held by insured trusts for no value flowing to the insured trust; such a device would eliminate Syncora's contractual subrogation rights for no consideration.[11]

In addition, the PSA explicitly provides that third parties are entitled to their attorneys' fees as a component of their allowed claims under the Plan.[12] There is no rationale even supplied in the PSA for distribution on third-party attorneys' fees, including whether such a provision

---

[9] The Streit Act applies to "mortgage investments" and imposes obligations on trustees similar to the "prudent man" standard. Streit Act, N.Y. Real Prop. Law § 124.

[10] Since Syncora is a third party beneficiary of the Operative Documents, including the Indenture (STACS I&I at 2.02(j)), and is subrogated to the rights of the investors in the trusts it insures (*id.* 3.07), it has standing to bring a derivative claim against the trustee on behalf of the affected trust.

[11] Syncora does not waive, and expressly reserves the right, to add additional information or theories in asserting its claims against the RMBS Trustees and objecting to Plan confirmation.

[12] *See* PSA Supplemental Term Sheet at 6 ¶ 13 ("the Plan and RMBS Settlement shall provide for fees payable to counsel for the Institutional Investors"); PSA Supplemental Term Sheet at 10, ¶ 9 ("If a settlement is reached, the allowance of the Kessler Class Claim, including a provision for attorney's fees (which shall not be in addition to the Kessler Class Claim), shall be approved as part of the Plan confirmation process."); PSA Supplemental Term Sheet at 5, ¶ 2 ("The RMBS Settlement, including but not limited to the provision for attorney's fees, shall be incorporated into the Plan and approved by the entry of the Confirmation Order.").

satisfies the requirements of Section 330 of the Bankruptcy Code.  *Id.*  Because the PSA purports

to release third-party claims without compensation and contemplates a Plan whose provisions

cannot be approved by the Court, the Court should reject the PSA.

**WHEREFORE**, Syncora respectfully requests that the Court deny the Motion and enter

such other and further relief as is just and proper.

Date:   New York, New York
        June 19, 2013

                          WOLLMUTH MAHER & DEUTSCH LLP


                          By:        */s/ Paul R. DeFilippo*
                                     Paul R. DeFilippo
                                     Randall R. Rainer

                          500 Fifth Avenue
                          New York, New York 10110
                          (212) 382-3300

                          *Attorneys for Syncora Guarantee Inc.*