# EXHIBIT A

ACE SECURITIES CORP.
Depositor

GMAC MORTGAGE, LLC
Servicer

WELLS FARGO BANK, NATIONAL ASSOCIATION
Master Servicer and Securities Administrator


HSBC BANK USA, NATIONAL ASSOCIATION
Trustee


POOLING AND SERVICING AGREEMENT
Dated as of April 1, 2007



SunTrust Acquisition Closed-End Seconds Trust, Series 2007-1
Asset Backed Pass-Through Certificates

## TABLE OF CONTENTS

ARTICLE I DEFINITIONS ...............................................................................5
SECTION 1.01.    Defined Terms. ....................................................................5
SECTION 1.02.    Allocation of Certain Interest Shortfalls. ...................................71

ARTICLE II CONVEYANCE OF MORTGAGE LOANS; ORIGINAL ISSUANCE OF
CERTIFICATES .................................................................73
SECTION 2.01.    Conveyance of the Mortgage Loans. ........................................73
SECTION 2.02.    Acceptance of REMIC I by Trustee..........................................74
SECTION 2.03.    Repurchase or Substitution of Mortgage Loans..........................74
SECTION 2.04.    Representations and Warranties of the Master Servicer...........................77
SECTION 2.05.    Representations, Warranties and Covenants of the Servicer. ...................79
SECTION 2.06.    Issuance of the REMIC I Regular Interests and the Class R-I
Interest.........................................................................81
SECTION 2.07.    Conveyance of the REMIC I Regular Interests; Acceptance of
REMIC II and REMIC III by the Trustee....................................81
SECTION 2.08.    Issuance of the Residual Certificates. .......................................82
SECTION 2.09.    Establishment of the Trust. ....................................................82
SECTION 2.10.    Purpose and Powers of the Trust..............................................82
SECTION 2.11.    Representations and Warranties of the Trustee. ...........................83

ARTICLE III ADMINISTRATION AND SERVICING OF THE MORTGAGE LOANS;
ACCOUNTS.......................................................................84
SECTION 3.01.    The Servicer to Act as Servicer. ..............................................84
SECTION 3.02.    Sub-Servicing Agreements Between the Servicer and Sub-Servicers.......87
SECTION 3.03.    Successor Sub-Servicers. ......................................................89
SECTION 3.04.    No Contractual Relationship Between Sub-Servicer, Subcontractor,
Trustee or the Certificateholders..............................................89
SECTION 3.05.    Assumption or Termination of Sub-Servicing Agreement by
Successor Servicer. .............................................................89
SECTION 3.06.    Collection of Certain Mortgage Loan Payments. .........................90
SECTION 3.07.    Collection of Taxes, Assessments and Similar Items; Servicing
Accounts. .........................................................................91
SECTION 3.08.    Collection Account and Distribution Account..............................92
SECTION 3.09.    Withdrawals from the Collection Account and Distribution Account.......94
SECTION 3.10.    Investment of Funds in the Investment Accounts...........................96
SECTION 3.11.    Maintenance of Hazard Insurance, Errors and Omissions and
Fidelity Coverage and Primary Mortgage Insurance. ...............................98
SECTION 3.12.    Enforcement of Due-on-Sale Clauses; Assumption Agreements ............100
SECTION 3.13.    Realization Upon Defaulted Mortgage Loans. .......................101
SECTION 3.14.    Trustee to Cooperate; Release of Mortgage Files....................105
SECTION 3.15.    Servicing Compensation. ......................................................106
SECTION 3.16.    Collection Account Statements................................................107
SECTION 3.17.    Annual Statement as to Compliance.........................................107

i

SECTION 3.18.    Assessments of Compliance and Attestation Reports............................108
SECTION 3.19.    [Reserved]..................................................................................109
SECTION 3.20.    Annual Certification; Additional Information. ....................................109
SECTION 3.21.    Access to Certain Documentation.....................................................111
SECTION 3.22.    Title, Management and Disposition of REO Property............................111
SECTION 3.23.    Obligations of the Servicer in Respect of Prepayment Interest
                 Shortfalls; Relief Act Interest Shortfalls..............................................114
SECTION 3.24.    Obligations of the Servicer in Respect of Mortgage Rates and
                 Monthly Payments. ........................................................................114
SECTION 3.25.    Reserve Fund. ..............................................................................115
SECTION 3.26.    Advance Facility. ..........................................................................116
SECTION 3.27.    Indemnification. ...........................................................................118

ARTICLE IV ADMINISTRATION AND MASTER SERVICING OF THE
                 MORTGAGE LOANS BY THE MASTER SERVICER .................................119

SECTION 4.01.    Master Servicer. ...........................................................................119
SECTION 4.02.    REMIC-Related Covenants. ............................................................120
SECTION 4.03.    Monitoring of Servicer...................................................................120
SECTION 4.04.    Fidelity Bond. ..............................................................................121
SECTION 4.05.    Power to Act; Procedures................................................................121
SECTION 4.06.    Due-on-Sale Clauses; Assumption Agreements. ..................................122
SECTION 4.07.    Documents, Records and Funds in Possession of Master Servicer To
                 Be Held for Trustee........................................................................122
SECTION 4.08.    Standard Hazard Insurance and Flood Insurance Policies......................123
SECTION 4.09.    Presentment of Claims and Collection of Proceeds...............................123
SECTION 4.10.    Reserved......................................................................................124
SECTION 4.11.    Trustee to Retain Possession of Certain Insurance Policies and
                 Documents. ..................................................................................124
SECTION 4.12.    Realization Upon Defaulted Mortgage Loans. .....................................124
SECTION 4.13.    Compensation for the Master Servicer. .............................................124
SECTION 4.14.    REO Property...............................................................................124
SECTION 4.15.    Master Servicer Annual Statement of Compliance................................125
SECTION 4.16.    Master Servicer Assessments of Compliance. ......................................126
SECTION 4.17.    Master Servicer Attestation Reports. .................................................127
SECTION 4.18.    Annual Certification.......................................................................128
SECTION 4.19.    Obligation of the Master Servicer in Respect of Prepayment Interest
                 Shortfalls.....................................................................................129
SECTION 4.20.    Prepayment Penalty Verification. .....................................................129

ARTICLE V PAYMENTS TO CERTIFICATEHOLDERS ...................................................131

SECTION 5.01.    Distributions.................................................................................131
SECTION 5.02.    Statements to Certificateholders. .....................................................141
SECTION 5.03.    Servicer Reports; P&I Advances. .....................................................144
SECTION 5.04.    Allocation of Realized Losses. .........................................................146
SECTION 5.05.    Compliance with Withholding Requirements........................................149
SECTION 5.06.    Reports Filed with Securities and Exchange Commission. .....................149

SECTION 5.07.        Supplemental Interest Trust. ................................................................154
SECTION 5.08.        Tax Treatment of Swap Payments and Swap Termination Payments. ....157
SECTION 5.09.        Swap Collateral Account. ......................................................................157
SECTION 5.10.        The Policy. ............................................................................................158

ARTICLE VI THE CERTIFICATES .......................................................................161

SECTION 6.01.        The Certificates. ....................................................................................161
SECTION 6.02.        Registration of Transfer and Exchange of Certificates. .........................163
SECTION 6.03.        Mutilated, Destroyed, Lost or Stolen Certificates. ................................169
SECTION 6.04.        Persons Deemed Owners. .......................................................................169
SECTION 6.05.        Certain Available Information. ................................................................169

ARTICLE VII THE DEPOSITOR, THE SERVICER AND THE MASTER SERVICER ........171

SECTION 7.01.        Liability of the Depositor, the Servicer and the Master Servicer. ...........171
SECTION 7.02.        Merger or Consolidation of the Depositor, the Servicer or the
                     Master Servicer. ....................................................................................171
SECTION 7.03.        Limitation on Liability of the Depositor, the Servicer, the Master
                     Servicer and Others. ..............................................................................171
SECTION 7.04.        Limitation on Resignation of the Servicer. .............................................172
SECTION 7.05.        Limitation on Resignation of the Master Servicer. .................................174
SECTION 7.06.        Assignment of Master Servicing. ...........................................................174
SECTION 7.07.        Rights of the Depositor in Respect of the Servicer and the Master
                     Servicer. ................................................................................................174
SECTION 7.08.        Duties of the Credit Risk Manager. ........................................................175
SECTION 7.09.        Limitation Upon Liability of the Credit Risk Manager. ..........................176
SECTION 7.10.        Removal of the Credit Risk Manager. .....................................................176

ARTICLE VIII DEFAULT........................................................................................177

SECTION 8.01.        Servicer Events of Default. .....................................................................177
SECTION 8.02.        Master Servicer to Act; Appointment of Successor. ...............................182
SECTION 8.03.        Notification to Certificateholders. ..........................................................183
SECTION 8.04.        Waiver of Events of Default. ..................................................................183

ARTICLE IX CONCERNING THE TRUSTEE AND THE SECURITIES
                     ADMINISTRATOR .................................................................................185

SECTION 9.01.        Duties of Trustee and Securities Administrator.......................................185
SECTION 9.02.        Certain Matters Affecting Trustee and Securities Administrator. ............186
SECTION 9.03.        Trustee and Securities Administrator not Liable for Certificates or
                     Mortgage Loans. ...................................................................................189
SECTION 9.04.        Trustee and Securities Administrator May Own Certificates. .................189
SECTION 9.05.        Fees and Expenses of Trustee, Custodian and Securities
                     Administrator. ........................................................................................189
SECTION 9.06.        Eligibility Requirements for Trustee and Securities Administrator. .......190
SECTION 9.07.        Resignation and Removal of Trustee and Securities Administrator.........191
SECTION 9.08.        Successor Trustee or Securities Administrator. .......................................192

SECTION 9.09.      Merger or Consolidation of Trustee or Securities Administrator. ...........193
SECTION 9.10.      Appointment of Co-Trustee or Separate Trustee. ...................................193
SECTION 9.11.      Appointment of Office or Agency. .........................................................194
SECTION 9.12.      Representations and Warranties. ............................................................194

ARTICLE X TERMINATION ................................................................................................196

SECTION 10.01.    Termination Upon Repurchase or Liquidation of All Mortgage
                  Loans. ....................................................................................................196
SECTION 10.02.    Additional Termination Requirements. ..................................................199

ARTICLE XI REMIC PROVISIONS ......................................................................................201

SECTION 11.01.    REMIC Administration..........................................................................201
SECTION 11.02.    Prohibited Transactions and Activities. .................................................203
SECTION 11.03.    Indemnification. ....................................................................................204

ARTICLE XII MISCELLANEOUS PROVISIONS ................................................................205

SECTION 12.01.    Amendment. ..........................................................................................205
SECTION 12.02.    Recordation of Agreement; Counterparts. ..............................................206
SECTION 12.03.    Limitation on Rights of Certificateholders. ...........................................207
SECTION 12.04.    Governing Law. .....................................................................................207
SECTION 12.05.    Notices. .................................................................................................207
SECTION 12.06.    Severability of Provisions. .....................................................................208
SECTION 12.07.    Notice to Rating Agencies. ....................................................................208
SECTION 12.08.    Article and Section References................................................................209
SECTION 12.09.    Grant of Security Interest.......................................................................209
SECTION 12.10.    Survival of Indemnification. ..................................................................210
SECTION 12.11.    Intention of the Parties and Interpretation. ............................................210
SECTION 12.12.    Indemnification. ....................................................................................210
SECTION 12.13.    Swap Provider and Class A Certificate Insurer as Third Party
                  Beneficiaries. ........................................................................................211

Exhibits

| | |
|---|---|
| Exhibit A-1 | Form of Class A Certificate |
| Exhibit A-2 | Form of Class M Certificate |
| Exhibit A-3 | Form of Class CE Certificate |
| Exhibit A-4 | Form of Class P Certificate |
| Exhibit A-5 | Form of Class R Certificate |
| Exhibit B-1 | Form of Transferor Representation Letter and Form of Transferee Representation Letter in Connection with Transfer of the Class P Certificates, Class CE Certificates and Residual Certificates Pursuant to Rule 144A Under the Securities Act |
| Exhibit B-2 | Form of Transferor Representation Letter and Form of Transferee Representation Letter in Connection with Transfer of the Class P Certificates, Class CE Certificates and Residual Certificates Pursuant to Rule 501(a) Under the Securities Act |
| Exhibit B-3 | Form of Transfer Affidavit and Agreement and Form of Transferor Affidavit in Connection with Transfer of Residual Certificates |
| Exhibit C | Form of Back-Up Certification |
| Exhibit D | Form of Power of Attorney |
| Exhibit E | Servicing Criteria |
| Exhibit F-1 | Mortgage Loan Purchase and Sale Agreement |
| Exhibit F-2 | Assignment, Assumption and Recognition Agreement |
| Exhibit G | Form 10-D, Form 8-K and Form 10-K Reporting Responsibility |
| Exhibit H | Additional Disclosure Notification |
| Exhibit I | Swap Agreement |
| Exhibit J | Financial Guaranty Insurance Policy |
| | |
| Schedule 1 | Mortgage Loan Schedule |
| Schedule 2 | Prepayment Charge Schedule |
| Schedule 3 | Servicing Performance Standards |
| Schedule 4 | Standard File Layout - Delinquency Reporting |
| Schedule 5 | Standard File Layout – Master Servicing |
| Schedule 6 | Data Requirements of Servicing Advances Incurred Prior to Cut-off Date |

This Pooling and Servicing Agreement, is dated and effective as of April 1, 2007, among ACE SECURITIES CORP., as Depositor, GMAC MORTGAGE, LLC, as Servicer, WELLS FARGO BANK, NATIONAL ASSOCIATION, as Master Servicer and Securities Administrator and HSBC BANK USA, NATIONAL ASSOCIATION, as Trustee.

PRELIMINARY STATEMENT:

The Depositor intends to sell pass-through certificates to be issued hereunder in multiple classes, which in the aggregate will evidence the entire beneficial ownership interest of the Trust Fund created hereunder. The Trust Fund will consist of a segregated pool of assets comprised of the Mortgage Loans and certain other related assets subject to this Agreement.

REMIC I

As provided herein, the Securities Administrator will elect to treat the segregated pool of assets consisting of the Mortgage Loans and certain other related assets subject to this Agreement (other than the Reserve Fund and, for the avoidance of doubt, the Supplemental Interest Trust and the Swap Agreement) as a REMIC for federal income tax purposes, and such segregated pool of assets will be designated as "REMIC I". The Class R-I Interest will be the sole class of "residual interests" in REMIC I for purposes of the REMIC Provisions (as defined herein). The following table irrevocably sets forth the designation, the REMIC I Remittance Rate, the initial Uncertificated Balance and, for purposes of satisfying Treasury regulation Section 1.860G-1(a)(4)(iii), the "latest possible maturity date" for each of the REMIC I Regular Interests (as defined herein). None of the REMIC I Regular Interests will be certificated.

| Designation | REMIC I Remittance Rate | Initial Uncertificated Balance | Latest Possible Maturity Date[1] |
|---|---|---|---|
| I | Variable[2] | | April 2037 |
| I-1-A | Variable[2] | | April 2037 |
| I-1-B | Variable[2] | | April 2037 |
| I-2-A | Variable[2] | | April 2037 |
| I-2-B | Variable[2] | | April 2037 |
| I-3-A | Variable[2] | | April 2037 |
| I-3-B | Variable[2] | | April 2037 |
| I-4-A | Variable[2] | | April 2037 |
| I-4-B | Variable[2] | | April 2037 |
| I-5-A | Variable[2] | | April 2037 |
| I-5-B | Variable[2] | | April 2037 |
| I-6-A | Variable[2] | | April 2037 |
| I-6-B | Variable[2] | | April 2037 |
| I-7-A | Variable[2] | | April 2037 |
| I-7-B | Variable[2] | | April 2037 |
| I-8-A | Variable[2] | | April 2037 |
| I-8-B | Variable[2] | | April 2037 |
| I-9-A | Variable[2] | | April 2037 |
| I-9-B | Variable[2] | | April 2037 |
| I-10-A | Variable[2] | | April 2037 |
| I-10-B | Variable[2] | | April 2037 |

---

(1)     For purposes of Section 1.860G-1(a)(4)(iii) of the Treasury regulations, the Distribution Date immediately following the maturity date for the Mortgage Loan with the latest maturity date has been designated as the "latest possible maturity date" for each REMIC I Regular Interest.

(2)     Calculated in accordance with the definition of "REMIC I Remittance Rate" herein.

## REMIC II

As provided herein, the Securities Administrator will elect to treat the segregated pool of assets consisting of the REMIC I Regular Interests as a REMIC for federal income tax purposes, and such segregated pool of assets will be designated as "REMIC II." The Class R-II Interest will evidence the sole class of "residual interests" in REMIC II for purposes of the REMIC Provisions. The following table irrevocably sets forth the designation, the REMIC II Remittance Rate, the initial aggregate Uncertificated Balance and, for purposes of satisfying Treasury regulation Section 1.860G-1(a)(4)(iii), the "latest possible maturity date" for each of the REMIC II Regular Interests. None of the REMIC II Regular Interests will be certificated.

| Designation | REMIC II Remittance Rate | Initial Uncertificated Balance | | Latest Possible Maturity Date (1) |
|---|---|---|---|---|
| A | Variable[2] | | | April 2037 |
| M-1 | Variable[2] | | | April 2037 |
| M-2 | Variable[2] | | | April 2037 |
| M-3 | Variable[2] | | | April 2037 |
| M-4 | Variable[2] | | | April 2037 |
| ZZ | Variable[2] | | | April 2037 |
| P | Variable[2][3] | $ | 100.00 | April 2037 |
| IO | Variable[2] | (4) | | April 2037 |
| I-SUB | Variable[2] | | | April 2037 |
| I-GRP | Variable[2] | | | April 2037 |
| II-SUB | Variable[2] | | | April 2037 |
| II-GRP | Variable[2] | | | April 2037 |
| XX | Variable[2] | | | April 2037 |

---

[1] For purposes of Section 1.860G-1(a)(4)(iii) of the Treasury regulations, the Distribution Date immediately following the maturity date for the Mortgage Loan with the latest maturity date has been designated as the "latest possible maturity date" for each REMIC II Regular Interest.

[2] Calculated in accordance with the definition of "REMIC II Remittance Rate" herein.

[3] REMIC II Regular Interest P will be entitled to 100% of the Prepayment Charges.

[4] REMIC II Regular Interest IO will not have an Uncertificated Balance, but will accrue interest on its Notional Amount.

REMIC III

As provided herein, the Securities Administrator will elect to treat the segregated pool of assets consisting of the REMIC II Regular Interests as a REMIC for federal income tax purposes, and such segregated pool of assets will be designated as "REMIC III." The Class R-III Interest will evidence the sole class of "residual interests" in REMIC III for purposes of the REMIC Provisions. The following table irrevocably sets forth the designation, the Pass-Through Rate, the initial aggregate Certificate Principal Balance and, for purposes of satisfying Treasury regulation Section 1.860G-1(a)(4)(iii), the "latest possible maturity date" for the indicated Classes of Certificates.

| Designation | Pass-Through Rate | Initial Aggregate Certificate Principal Balance | Latest Possible Maturity Date [1] |
|---|---|---|---|
| Class A | Variable[2] | | April 2037 |
| Class M-1 | Variable[2] | | April 2037 |
| Class M-2 | Variable[2] | | April 2037 |
| Class M-3 | Variable[2] | | April 2037 |
| Class M-4 | Variable[2] | | April 2037 |
| Class P | N/A[3] | $          100.00 | April 2037 |
| Class CE | (4) | | April 2037 |
| Class IO Interest | (7) | (7) | April 2037 |

---

[1]   For purposes of Section 1.860G-1(a)(4)(iii) of the Treasury regulations, the Distribution Date immediately following the maturity date for the Mortgage Loan with the latest maturity date has been designated as the "latest possible maturity date" for each Class of Certificates.

[2]   Calculated in accordance with the definition of "Pass-Through Rate" herein.

[3]   The Class P Certificates will not accrue interest.

[4]   The Class CE Certificates will accrue interest at their variable Pass-Through Rate on the Notional Amount of the Class CE Certificates outstanding from time to time which shall equal the Uncertificated Balance of the REMIC II Regular Interests (other than REMIC II Regular Interest P). The Class CE Certificates will not accrue interest on their Certificate Principal Balance.

[7]   The Class IO Interest will not have a Pass-Through Rate or a Certificate Principal Balance, but will be entitled to 100% of amounts distributed on REMIC II Regular Interest IO.

The Mortgage Loans had an aggregate Scheduled Principal Balance as of the Cut-off Date, after deducting all Monthly Payments due on or before the Cut-off Date, of $_____.

4

In consideration of the mutual agreements herein contained, the Depositor, the Servicer, the Master Servicer, the Securities Administrator and the Trustee agree as follows:

ARTICLE I

DEFINITIONS

SECTION 1.01.    Defined Terms.

Whenever used in this Agreement, including, without limitation, in the Preliminary Statement hereto, the following words and phrases, unless the context otherwise requires, shall have the meanings specified in this Article. Unless otherwise specified, all calculations described herein shall be made on the basis of a 360-day year consisting of twelve 30-day months.

"Accepted Master Servicing Practices": With respect to any Mortgage Loan, as applicable, either (x) those customary mortgage master servicing practices of prudent mortgage servicing institutions that master service mortgage loans of the same type and quality as such Mortgage Loan in the jurisdiction where the related Mortgaged Property is located, to the extent applicable to the Master Servicer (except in its capacity as successor to the Servicer), or (y) as provided in Section 3.01 hereof, but in no event below the standard set forth in clause (x).

"Accepted Servicing Practices": As defined in Section 3.01.

"Account": The Collection Account and the Distribution Account as the context may require.

"Accrued Certificate Interest": With respect to any Class A Certificate, Mezzanine Certificate, Class CE Certificate and each Distribution Date, interest accrued during the related Interest Accrual Period at the Pass-Through Rate for such Certificate for such Distribution Date on the Certificate Principal Balance, in the case of the Class A Certificates and the Mezzanine Certificates, or on the Notional Amount in the case of the Class CE Certificates, of such Certificate immediately prior to such Distribution Date.  The Class P Certificates are not entitled to distributions in respect of interest and, accordingly, will not accrue interest.  All distributions of interest on the Class A Certificates and the Mezzanine Certificates will be calculated on the basis of a 360-day year and the actual number of days in the applicable Interest Accrual Period.  All distributions of interest on the Class CE Certificates will be based on a 360-day year consisting of twelve 30-day months.  Accrued Certificate Interest with respect to each Distribution Date, as to any Class A Certificate, Mezzanine Certificate or Class CE Certificate shall be reduced by an amount equal to the portion allocable to such Certificate pursuant to Section 1.02 hereof, if any, of the sum of (a) the aggregate Prepayment Interest Shortfall, if any, for such Distribution Date to the extent not covered by payments pursuant to Section 3.23 or Section 4.19 of this Agreement and (b) the aggregate amount of any Relief Act Interest Shortfall, if any, for such Distribution Date. In addition, Accrued Certificate Interest with respect to each Distribution Date, as to any Class CE Certificate, shall be reduced by an amount equal to the portion allocable to such Class CE Certificate of Realized Losses, if any, pursuant to Section 1.02 and Section 5.04 hereof.

5

"<u>Additional Disclosure Notification</u>": Has the meaning set forth in Section 5.06(a).

"<u>Additional Form 10-D Disclosure</u>": Has the meaning set forth in Section 5.06(a) of this Agreement.

"<u>Additional Form 10-K Disclosure</u>": Has the meaning set forth in Section 5.06(d) of this Agreement.

"<u>Additional Servicer</u>": Means each affiliate of the Servicer that Services any of the Mortgage Loans and each Person who is not an affiliate of the Servicer. For clarification purposes, the Master Servicer and the Securities Administrator are Additional Servicers.

"<u>Administration Fees</u>": The sum of (i) the Servicing Fee, (ii) the Master Servicing Fee and (iii) the Credit Risk Management Fee.

"<u>Administration Fee Rate</u>": The sum of (i) the Servicing Fee Rate, (ii) the Master Servicing Fee Rate and (iii) the Credit Risk Management Fee Rate.

"<u>Advance Facility</u>": As defined in Section 3.26(a).

"<u>Advance Financing Person</u>": As defined in Section 3.26(a).

"<u>Advance Reimbursement Amounts</u>":  As defined in Section 3.26(b).

"<u>Affiliate</u>": With respect to any specified Person, any other Person controlling or controlled by or under common control with such specified Person. For the purposes of this definition, "control" when used with respect to any specified Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise, and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"<u>Aggregate Loss Severity Percentage</u>": With respect to any Distribution Date, the percentage equivalent of a fraction, the numerator of which is the aggregate amount of Realized Losses incurred on any Mortgage Loans from the Cut-off Date to the last day of the preceding calendar month and the denominator of which is the aggregate principal balance of such Mortgage Loans immediately prior to the liquidation of such Mortgage Loans.

"<u>Agreement</u>": This Pooling and Servicing Agreement, including all exhibits and schedules hereto and all amendments hereof and supplements hereto.

"<u>Allocated Realized Loss Amount</u>": With respect to any Class of Mezzanine Certificates and any Distribution Date, an amount equal to the sum of any Realized Loss allocated to that Class of Certificates on the Distribution Date and any Allocated Realized Loss Amount for that Class remaining unpaid from the previous Distribution Date.

"<u>Amounts Held for Future Distribution</u>": As to any Distribution Date, the aggregate amount held in the Collection Account at the close of business on the immediately

preceding Determination Date on account of (i) all Monthly Payments or portions thereof received in respect of the Mortgage Loans due after the related Due Period and (ii) Principal Prepayments and Liquidation Proceeds received in respect of such Mortgage Loans after the last day of the related Prepayment Period.

"Ancillary Income":  All income derived from the Mortgage Loans, other than Servicing Fees and Prepayment Charges, including but not limited to, late charges, fees received with respect to checks or bank drafts returned by the related bank for non sufficient funds, assumption fees, optional insurance administrative fees and all other incidental fees and charges.

"Assignment": An assignment of Mortgage, notice of transfer or equivalent instrument, in recordable form, which is sufficient under the laws of the jurisdiction where the related Mortgaged Property is located to reflect of record the sale and assignment of the Mortgage, which assignment, notice of transfer or equivalent instrument may be in the form of one or more blanket assignments covering Mortgages secured by Mortgaged Properties located in the same county, if permitted by law.

"Assignment Agreement": The Assignment, Assumption and Recognition Agreement, dated as of May 15, 2007, among the Interim Seller as assignor, the Depositor as assignee, the Sponsor and the Master Servicer, and acknowledged and agreed to by the Guarantor evidencing the assignment of the Mortgage Loan Purchase Agreement from the Interim Seller to the Depositor, a copy of which is attached hereto as Exhibit F-2.

"Authorized Officers":  A managing director of the whole loan trading desk and a managing director in global markets.

"Available Distribution Amount": With respect to any Distribution Date, an amount equal to (1) the sum of (a) the aggregate of the amounts on deposit in the Collection Account and the Distribution Account as of the close of business on the Servicer Remittance Date, (b) the aggregate of any amounts deposited in the Distribution Account by the Servicer or the Master Servicer in respect of Prepayment Interest Shortfalls for such Distribution Date pursuant to Section 3.23 or Section 4.19 of this Agreement, (c) the aggregate of any P&I Advances for such Distribution Date made by the Servicer pursuant to Section 5.03 of this Agreement and (d) the aggregate of any P&I Advances made by a successor to the Servicer (including the Master Servicer) for such Distribution Date pursuant to Section 8.02 of this Agreement, reduced (to not less than zero) by (2) the portion of the amount described in clause (1)(a) above that represents (i) Amounts Held for Future Distribution, (ii) Principal Prepayments on the Mortgage Loans received after the related Prepayment Period (together with any interest payments received with such Principal Prepayments to the extent they represent the payment of interest accrued on the Mortgage Loans during a period subsequent to the related Prepayment Period), (iii) Liquidation Proceeds, Insurance Proceeds and Subsequent Recoveries received in respect of the Mortgage Loans after the related Prepayment Period, (iv) amounts reimbursable or payable to the Depositor, the Servicer, the Trustee, the Master Servicer, the Securities Administrator or the Custodian pursuant to Section 3.09 or 9.05 of this Agreement or otherwise payable in respect of Extraordinary Trust Fund Expenses, (v) the Credit Risk Management Fee, (vi) amounts deposited in a Collection Account or the Distribution Account in error, (vii) the amount of any Prepayment Charges collected by the Servicer in connection with the Principal

7

Prepayment of any of the Mortgage Loans and (viii) amounts reimbursable to a successor Servicer (including the Master Servicer) pursuant to Section 8.02 of this Agreement.

"Avoided Payment": With respect to the Insured Certificates, any payment of principal or interest previously distributed to a holder of an Insured Certificate by or on behalf of the Trust that is voided as a result of any Insolvency Proceeding and which is returned by a holder of Insured Certificates as required by a final, nonappealable order of a court of competent jurisdiction.

"Balloon Mortgage Loan": A Mortgage Loan that provides for the payment of the unamortized principal balance of such Mortgage Loan in a single payment, that is substantially greater than the preceding monthly payment at the maturity of such Mortgage Loan.

"Balloon Payment": A payment of the unamortized principal balance of a Mortgage Loan in a single payment, that is substantially greater than the preceding Monthly Payment at the maturity of such Mortgage Loan.

"Bankruptcy Code": The Bankruptcy Reform Act of 1978 (Title 11 of the United States Code), as amended.

"Book-Entry Certificates": The Class A Certificates and Mezzanine Certificates for so long as the Certificates of such Class shall be registered in the name of the Depository or its nominee.

"Book-Entry Custodian": The custodian appointed pursuant to Section 6.01.

"Business Day": Any day other than a Saturday, a Sunday or a day on which banking or savings and loan institutions in the States of New York, Maryland, Minnesota, Pennsylvania or in the city in which the Corporate Trust Office of the Trustee is located, are authorized or obligated by law or executive order to be closed.

"Cash-Out Refinancing": A Refinanced Mortgage Loan the proceeds of which are more than a nominal amount in excess of the principal balance of any existing first mortgage plus any subordinate mortgage on the related Mortgaged Property and related closing costs.

"Certificate": Any one of the SunTrust Acquisition Closed-End Seconds Trust, Asset Backed Pass-Through Certificates, Series 2007-1, Class A, Class M-1, Class M-2, Class M-3, Class M-4, Class P, Class CE and Class R Certificates issued under this Agreement.

"Certificate Factor": With respect to any Class of Certificates (other than the Residual Certificates) as of any Distribution Date, a fraction, expressed as a decimal carried to six places, the numerator of which is the aggregate Certificate Principal Balance (or Notional Amount, in the case of the Class CE Certificates) of such Class of Certificates on such Distribution Date (after giving effect to any distributions of principal and allocations of Realized Losses resulting in reduction of the Certificate Principal Balance (or Notional Amount, in the case of the Class CE Certificates) of such Class of Certificates to be made on such Distribution Date), and the denominator of which is the initial aggregate Certificate Principal Balance (or

8

Notional Amount, in the case of the Class CE Certificates) of such Class of Certificates as of the Closing Date.

"Certificate Margin": With respect to the Class A Certificates and, for purposes of the definition of "Marker Rate", REMIC II Regular Interest A, ____% in the case of each Distribution Date through and including the Optional Termination Date and ____% in the case of each Distribution Date thereafter.

With respect to the Class M-1 Certificates and, for purposes of the definition of "Marker Rate", REMIC II Regular Interest M-1, _____% in the case of each Distribution Date through and including the Optional Termination Date and _____% in the case of each Distribution Date thereafter.

With respect to the Class M-2 Certificates and, for purposes of the definition of "Marker Rate", REMIC II Regular Interest M-2, _____% in the case of each Distribution Date through and including the Optional Termination Date and _____% in the case of each Distribution Date thereafter.

With respect to the Class M-3 Certificates and, for purposes of the definition of "Marker Rate", REMIC II Regular Interest M-3, _____% in the case of each Distribution Date through and including the Optional Termination Date and _____% in the case of each Distribution Date thereafter.

With respect to the Class M-4 Certificates and, for purposes of the definition of "Marker Rate", REMIC II Regular Interest M-4, _____% in the case of each Distribution Date through and including the Optional Termination Date and _____% in the case of each Distribution Date thereafter.

"Certificateholder" or "Holder": The Person in whose name a Certificate is registered in the Certificate Register, except that a Disqualified Organization or a Non-United States Person shall not be a Holder of a Residual Certificate for any purposes hereof, and solely for the purposes of giving any consent pursuant to this Agreement, any Certificate registered in the name of or beneficially owned by the Depositor, the Sponsor, the Servicer, the Master Servicer, the Securities Administrator, the Trustee or any Affiliate thereof shall be deemed not to be outstanding and the Voting Rights to which it is entitled shall not be taken into account in determining whether the requisite percentage of Voting Rights necessary to effect any such consent has been obtained, except as otherwise provided in Section 12.01. The Trustee and the Securities Administrator may conclusively rely upon a certificate of the Depositor, the Sponsor, the Master Servicer, the Securities Administrator or the Servicer in determining whether a Certificate is held by an Affiliate thereof. All references herein to "Holders" or "Certificateholders" shall reflect the rights of Certificate Owners as they may indirectly exercise such rights through the Depository and participating members thereof, except as otherwise specified herein; provided, however, that the Trustee and the Securities Administrator shall be required to recognize as a "Holder" or "Certificateholder" only the Person in whose name a Certificate is registered in the Certificate Register.

"Certificate Owner": With respect to a Book-Entry Certificate, the Person who is the beneficial owner of such Certificate as reflected on the books of the Depository or on the books of a Depository Participant or on the books of an indirect participating brokerage firm for which a Depository Participant acts as agent.

"Certificate Principal Balance": With respect to each Class A Certificate, Mezzanine Certificate or Class P Certificate as of any date of determination, the Certificate Principal Balance of such Certificate on the Distribution Date immediately prior to such date of determination plus any Subsequent Recoveries added to the Certificate Principal Balance of such Certificate (other than a Class P Certificate) pursuant to Section 5.04, minus (i) all distributions allocable to principal made thereon and (ii) Realized Losses allocated thereto, if any, on such immediately prior Distribution Date (or, in the case of any date of determination up to and including the first Distribution Date, the initial Certificate Principal Balance of such Certificate, as stated on the face thereof). With respect to each Class CE Certificate as of any date of determination, an amount equal to the Percentage Interest evidenced by such Certificate times the excess, if any, of (A) the then aggregate Uncertificated Balances of the REMIC II Regular Interests over (B) the then aggregate Certificate Principal Balances of the Class A Certificates, the Mezzanine Certificates and the Class P Certificates then outstanding. The aggregate initial Certificate Principal Balance of each Class of Regular Certificates is set forth in the Preliminary Statement hereto.

"Certificate Register": The register maintained pursuant to Section 6.02.

"Certification Parties": Has the meaning set forth in Section 3.20 of this Agreement.

"Certifying Person": Has the meaning set forth in Section 3.20 of this Agreement.

"Charged Off Loan": With respect to any Distribution Date, a defaulted Mortgage Loan that the Servicer is required to charge off once such Mortgage Loan becomes 180 days delinquent pursuant to Section 3.13, provided that such Mortgage Loan is not a Liquidated Mortgage Loan.

"Class": Collectively, all of the Certificates bearing the same class designation.

"Class A Certificate":  Any one of the Class A Certificates executed and authenticated by the Securities Administrator and delivered by the Trustee, substantially in the form annexed hereto as Exhibit A-1 and evidencing (i) a Regular Interest in REMIC III, (ii) the right to receive the related Net WAC Rate Carryover Amount and (iii) the obligation to pay any Class IO Distribution Amount.

"Class A Certificate Insurer":  XL Capital Assurance Inc.

"Class A Principal Distribution Amount": With respect to any Distribution Date on or after the Stepdown Date and on which a Trigger Event is not in effect, the excess of (x) the Certificate Principal Balance of the Class A Certificates immediately prior to such Distribution Date over (y) the lesser of (A) the product of (i) _____% and (ii) the aggregate Stated Principal Balance of the Mortgage Loans as of the last day of the related Due Period (after giving effect to

10

scheduled payments of principal due during the related Due Period, to the extent received or advanced and unscheduled collections of principal received during the related Prepayment Period) and (B) the aggregate Stated Principal Balance of the Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced and unscheduled collections of principal received during the related Prepayment Period) minus the product of (i) 0.50% and (ii) the aggregate principal balance of the Mortgage Loans as of the Cut-off Date.

"Class CE Certificate": Any one of the Class CE Certificates executed and authenticated by the Securities Administrator and delivered by the Trustee, substantially in the form annexed hereto as Exhibit A-3 and evidencing (i) a Regular Interest in REMIC III, (ii) beneficial ownership of the Reserve Fund and (iii) beneficial ownership of the Supplemental Interest Trust.

"Class IO Distribution Amount":  As defined in Section 5.07(f) hereof.  For purposes of clarity, the Class IO Distribution Amount for any Distribution Date shall equal the amount payable to the Supplemental Interest Trust on such Distribution Date in excess of the amount payable on the Class IO Interest on such Distribution Date, all as further provided in Section 5.07(f) hereof.

"Class IO Interest":  An uncertificated interest in the Trust Fund held by the Trustee, evidencing a REMIC Regular Interest in REMIC III for purposes of the REMIC Provisions.

"Class M-1 Certificate": Any one of the Class M-1 Certificates executed and authenticated by the Securities Administrator and delivered by the Trustee, substantially in the form annexed hereto as Exhibit A-2 and evidencing (i) a Regular Interest in REMIC III, (ii) the right to receive the related Net WAC Rate Carryover Amount and (iii) the obligation to pay any Class IO Distribution Amount.

"Class M-1 Principal Distribution Amount": With respect to any Distribution Date on or after the Stepdown Date and on which a Trigger Event is not in effect, the excess of (x) the sum of (i) the Certificate Principal Balance of the Class A Certificates after taking into account the payment of the Class A Principal Distribution Amount on the Distribution Date and (ii) the Certificate Principal Balance of the Class M-1 Certificates immediately prior to the Distribution Date over (y) the lesser of (A) the product of (i) _____% and (ii) the aggregate Stated Principal Balance of the Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period) and (B) the aggregate Stated Principal Balance of the Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period) minus the product of (i) 0.50% and (ii) the aggregate principal balance of the Mortgage Loans as of the Cut-off Date.

"Class M-2 Certificate": Any one of the Class M-2 Certificates executed and authenticated by the Securities Administrator and delivered by the Trustee, substantially in the

form annexed hereto as Exhibit A-2 and evidencing (i) a Regular Interest in REMIC III, (ii) the right to receive the related Net WAC Rate Carryover Amount and (iii) the obligation to pay any Class IO Distribution Amount.

"Class M-2 Principal Distribution Amount": With respect to any Distribution Date on or after the Stepdown Date and on which a Trigger Event is not in effect, the excess of (x) the sum of (i) the Certificate Principal Balance of the Class A Certificates after taking into account the payment of the Class A Principal Distribution Amount on the Distribution Date, (ii) the Certificate Principal Balance of the Class M-1 Certificates after taking into account the payment of the Class M-1 Principal Distribution Amount on the Distribution Date and (iii) the Certificate Principal Balance of the Class M-2 Certificates immediately prior to the Distribution Date over (y) the lesser of (A) the product of (i) _____% and (ii) the aggregate Stated Principal Balance of the Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period) and (B) the aggregate Stated Principal Balance of the Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period) minus the product of (i) 0.50% and (ii) the aggregate principal balance of the Mortgage Loans as of the Cut-off Date.

"Class M-3 Certificate": Any one of the Class M-3 Certificates executed and authenticated by the Securities Administrator and delivered by the Trustee, substantially in the form annexed hereto as Exhibit A-2 and evidencing (i) a Regular Interest in REMIC III, (ii) the right to receive the related Net WAC Rate Carryover Amount and (iii) the obligation to pay any Class IO Distribution Amount.

"Class M-3 Principal Distribution Amount": With respect to any Distribution Date on or after the Stepdown Date and on which a Trigger Event is not in effect, the excess of (x) the sum of (i) the Certificate Principal Balance of the Class A Certificates after taking into account the payment of the Class A Principal Distribution Amount on the Distribution Date, (ii) the Certificate Principal Balance of the Class M-1 Certificates after taking into account the payment of the Class M-1 Principal Distribution Amount on the Distribution Date, (iii) the Certificate Principal Balance of the Class M-2 Certificates after taking into account the payment of the Class M-2 Principal Distribution Amount on the Distribution Date and (iv) the Certificate Principal Balance of the Class M-3 Certificates immediately prior to the Distribution Date over (y) the lesser of (A) the product of (i) _____% and (ii) the aggregate Stated Principal Balance of the Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period) and (B) the aggregate Stated Principal Balance of the Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period) minus the product of (i) 0.50% and (ii) the aggregate principal balance of the Mortgage Loans as of the Cut-off Date.

"Class M-4 Certificate": Any one of the Class M-4 Certificates executed and authenticated by the Securities Administrator and delivered by the Trustee, substantially in the form annexed hereto as Exhibit A-2 and evidencing (i) a Regular Interest in REMIC III, (ii) the right to receive the related Net WAC Rate Carryover Amount and (iii) the obligation to pay any Class IO Distribution Amount.

"Class M-4 Principal Distribution Amount": With respect to any Distribution Date on or after the Stepdown Date and on which a Trigger Event is not in effect, the excess of (x) the sum of (i) the Certificate Principal Balance of the Class A Certificates after taking into account the payment of the Class A Principal Distribution Amount on the Distribution Date, (ii) the Certificate Principal Balance of the Class M-1 Certificates after taking into account the payment of the Class M-1 Principal Distribution Amount on the Distribution Date, (iii) the Certificate Principal Balance of the Class M-2 Certificates after taking into account the payment of the Class M-2 Principal Distribution Amount on the Distribution Date, (iv) the Certificate Principal Balance of the Class M-3 Certificates after taking into account the payment of the Class M-3 Principal Distribution Amount on the Distribution Date and (v) the Certificate Principal Balance of the Class M-4 Certificates immediately prior to the Distribution Date over (y) the lesser of (A) the product of (i) _____% and (ii) the aggregate Stated Principal Balance of the Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period) and (B) the aggregate Stated Principal Balance of the Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period) minus the product of (i) 0.50% and (ii) the aggregate principal balance of the Mortgage Loans as of the Cut-off Date.

"Class P Certificate": Any one of the Class P Certificates executed and authenticated by the Securities Administrator and delivered by the Trustee, substantially in the form annexed hereto as Exhibit A-4 and evidencing a Regular Interest in REMIC III for purposes of the REMIC Provisions.

"Class R Certificates": Any one of the Class R Certificates executed and authenticated by the Securities Administrator and delivered by the Trustee, substantially in the form annexed hereto as Exhibit A-5, and evidencing the Class R-I Interest, the Class R-II Interest and the Class R-III Interest.

"Class R-I Interest": The uncertificated residual interest in REMIC I.

"Class R-II Interest": The uncertificated residual interest in REMIC II.

"Class R-III Interest": The uncertificated residual interest in REMIC III.

"Closing Date": April 15, 2007.

"Code": The Internal Revenue Code of 1986, as amended from time to time.

"Collection Account": The separate account or accounts created and maintained, or caused to be created and maintained, by the Servicer pursuant to Section 3.08(a) of this Agreement for the benefit of the Certificateholders, which shall be entitled "GMAC Mortgage, LLC, as Servicer for HSBC Bank USA, National Association as Trustee, in trust for the registered holders of SunTrust Acquisition Closed-End Seconds Trust, Series 2007-1 , Asset Backed Pass-Through Certificates.  The Collection Account must be an Eligible Account.

"Combined Loan-to-Value Ratio": With respect to any Mortgage Loan and as of any date of determination, the fraction (expressed as a percentage) the numerator of which is the sum of (i) original principal balance of the related Mortgage Loan at such date of determination and (ii) the unpaid principal balance of the related First Mortgage Loan as of the date of origination of that Mortgage Loan and the denominator of which is (a) with respect to a Refinanced Mortgage Loan, the Value of the related Mortgaged Property at origination and (b) with respect to all other Mortgage Loans, the lesser of (i) the Value of the related Mortgage Property at origination and (ii) the purchase price of the related Mortgaged Property.

"Commission": The Securities and Exchange Commission.

"Controlling Person": Means, with respect to any Person, any other Person who "controls" such Person within the meaning of the Securities Act.

"Corporate Trust Office": The principal corporate trust office of the Trustee or the Securities Administrator, as the case may be, at which, at any particular time, its corporate trust business in connection with this Agreement shall be administered, which office at the date of the execution of this instrument is located at (i) with respect to the Trustee, HSBC Bank USA, National Association, 452 Fifth Avenue, New York, New York 10018, Attention: CTLA-Structured Finance/STACS 2007-1, or at such other address as the Trustee may designate from time to time by notice to the Certificateholders, the Depositor, the Master Servicer, the Securities Administrator and the Servicer, or (ii) with respect to the Securities Administrator, (A) for purposes of Certificate transfers and surrender, Wells Fargo Bank, National Association, Sixth Street and Marquette Avenue, Minneapolis, Minnesota 55479, Attention: Corporate Trust (STACS 2007-1), and (B) for all other purposes, Wells Fargo Bank, National Association, P.O. Box 98, Columbia, Maryland 21046, Attention: Corporate Trust (STACS 2007-1) (or for overnight deliveries, at 9062 Old Annapolis Road, Columbia, Maryland 21045, Attention: Corporate Trust (STACS 2007-1)), or at such other address as the Securities Administrator may designate from time to time by notice to the Certificateholders, the Depositor, the Master Servicer, the Servicer and the Trustee.

"Corresponding Certificate": With respect to each REMIC II Regular Interest, as follows:

| REMIC II REGULAR INTEREST | CLASS |
|---|---|
| REMIC II REGULAR INTEREST A | A |
| REMIC II REGULAR INTEREST M-1 | M-1 |
| REMIC II REGULAR INTEREST M-2 | M-2 |
| REMIC II REGULAR INTEREST M-3 | M-3 |
| REMIC II REGULAR INTEREST M-4 | M-4 |

14

| REMIC II REGULAR INTEREST | CLASS |
|---|---|
| REMIC II REGULAR INTEREST P | P |
| REMIC II REGULAR INTEREST CE | CE |

"Credit Enhancement Percentage": For any Distribution Date, the percentage equivalent of a fraction, the numerator of which is the sum of the aggregate Certificate Principal Balances of the Mezzanine Certificates and the Class CE Certificates (which includes the Overcollateralization Amount), and the denominator of which is the aggregate Stated Principal Balance of the Mortgage Loans, calculated after taking into account distributions of principal on the Mortgage Loans and distribution of the Principal Distribution Amount to the Certificates then entitled to distributions of principal on such Distribution Date.

"Credit Risk Management Agreements": The agreements between the Credit Risk Manager and the Servicer and/or Master Servicer, each regarding the loss mitigation and advisory services to be provided by the Credit Risk Manager.

"Credit Risk Management Fee": The amount payable to the Credit Risk Manager on each Distribution Date as compensation for all services rendered by it in the exercise and performance of any and all powers and duties of the Credit Risk Manager under the Credit Risk Management Agreements, which amount shall equal one twelfth of the product of (i) the Credit Risk Management Fee Rate multiplied by (ii) the Stated Principal Balance of the Mortgage Loans and any related REO Properties as of the first day of the related Due Period.

"Credit Risk Management Fee Rate": 0.010% per annum.

"Credit Risk Manager": Clayton Fixed Income Services Inc., a Colorado corporation and its successors and assigns.

"Custodial Agreement":  The Custodial Agreement, dated as of April 1, 2007, among the Trustee, the Custodian and the Servicer, as may be amended or supplemented from time to time, or any other custodial agreement entered into after the date hereof with respect to any Mortgage Loan subject to this Agreement.

"Custodian": Deutsche Bank National Trust Company or any other custodian appointed under any custodial agreement entered into after the date of this Agreement.

"Cut-off Date": With respect to each Mortgage Loan, April 1, 2007. With respect to all Qualified Substitute Mortgage Loans, their respective dates of substitution. References herein to the "Cut-off Date," when used with respect to more than one Mortgage Loan, shall be to the respective Cut-off Dates for such Mortgage Loans.

"DBRS": DBRS, Inc.

"Debt Service Reduction": With respect to any Mortgage Loan, a reduction in the scheduled Monthly Payment for such Mortgage Loan by a court of competent jurisdiction in a proceeding under the Bankruptcy Code, except such a reduction resulting from a Deficient Valuation.

15

"Deficiency Amount": As of any Distribution Date, the sum of the following amounts, in each case after giving effect to distributions made on the Insured Certificates on such Distribution Date from sources other than the Policy:

(i)        the excess, if any, of (A) the Interest Distribution Amount on such class of Insured Certificates (calculated without regard to any step-up of the related Pass-Through Rate following the first distribution date on which the optional clean-up call is exercisable) over (B) the Interest Remittance Amount allocated to pay such Interest Distribution Amount pursuant to the pooling and servicing agreement;

(ii)        if such Distribution Date is not the Final Maturity Date, the amount, if any, by which the Certificate Principal Balance of the Class A Certificates (after giving effect to all distributions to the Class A Certificates on such Distribution Date) exceeds the aggregate principal balance of the Mortgage Loans as of the last day of the related Due Period; and

(iii)        the Certificate Principal Balance of the Insured Certificates on its Final Maturity Date.

"Deficient Valuation": With respect to any Mortgage Loan, a valuation of the related Mortgaged Property by a court of competent jurisdiction in an amount less than the then outstanding principal balance of the Mortgage Loan, which valuation results from a proceeding initiated under the Bankruptcy Code.

"Definitive Certificates": As defined in Section 6.01(b).

"Deleted Mortgage Loan": A Mortgage Loan replaced or to be replaced by a Qualified Substitute Mortgage Loan.

"Delinquency Percentage": As of the last day of the related Due Period, the percentage equivalent of a fraction, the numerator of which is the aggregate Stated Principal Balance of all Mortgage Loans that, using the OTS Method, are sixty (60) or more days delinquent, are in foreclosure, have been converted to REO Properties or have been discharged by reason of bankruptcy (but excluding Charged Off Loans), and the denominator of which is the aggregate Stated Principal Balance of the Mortgage Loans and REO Properties as of the last day of the previous calendar month.

"Depositor": ACE Securities Corp., a Delaware corporation, or its successor in interest.

"Depository": The Depository Trust Company, or any successor Depository hereafter named. The nominee of the initial Depository, for purposes of registering those Certificates that are to be Book-Entry Certificates, is Cede & Co. The Depository shall at all times be a "clearing corporation" as defined in Section 8-102(3) of the Uniform Commercial Code of the State of New York and a "clearing agency" registered pursuant to the provisions of Section 17A of the Exchange Act.

"Depository Institution": Any depository institution or trust company, including the Trustee, that (a) is incorporated under the laws of the United States of America or any State

16

thereof, (b) is subject to supervision and examination by federal or state banking authorities and (c) has outstanding unsecured commercial paper or other short-term unsecured debt obligations (or, in the case of a depository institution that is the principal subsidiary of a holding company, such holding company has unsecured commercial paper or other short-term unsecured debt obligations) that are rated at least A-1+ by S&P, F-1+ by Fitch and P-1 by Moody's (or, if such Rating Agencies are no longer rating the Offered Certificates, comparable ratings by any other nationally recognized statistical rating agency then rating the Offered Certificates).

"Depository Participant": A broker, dealer, bank or other financial institution or other Person for whom from time to time a Depository effects book-entry transfers and pledges of securities deposited with the Depository.

"Determination Date": With respect to each Distribution Date, the 15th day of the calendar month in which such Distribution Date occurs, or if such 15th day is not a Business Day, the Business Day immediately preceding such 15th day.  The Determination Date for purposes of Article X hereof shall mean the 15th day of the month, or if such 15th day is not a Business Day, the first Business Day following such 15th day.

"Directly Operate": With respect to any REO Property, the furnishing or rendering of services to the tenants thereof, the management or operation of such REO Property, the holding of such REO Property primarily for sale to customers, the performance of any construction work thereon or any use of such REO Property in a trade or business conducted by REMIC I other than through an Independent Contractor; provided, however, that the Servicer, on behalf of the Trustee, shall not be considered to Directly Operate an REO Property solely because the Servicer establishes rental terms, chooses tenants, enters into or renews leases, deals with taxes and insurance, or makes decisions as to repairs or capital expenditures with respect to such REO Property.

"Disqualified Organization": Any of the following: (i) the United States, any State or political subdivision thereof, any possession of the United States, or any agency or instrumentality of any of the foregoing (other than an instrumentality which is a corporation if all of its activities are subject to tax and, except for Freddie Mac, a majority of its board of directors is not selected by such governmental unit), (ii) any foreign government, any international organization, or any agency or instrumentality of any of the foregoing, (iii) any organization (other than certain farmers' cooperatives described in Section 521 of the Code) which is exempt from the tax imposed by Chapter 1 of the Code (including the tax imposed by Section 511 of the Code on unrelated business taxable income), (iv) rural electric and telephone cooperatives described in Section 1381(a)(2)(C) of the Code, (v) an "electing large partnership" and (vi) any other Person so designated by the Securities Administrator based upon an Opinion of Counsel that the holding of an Ownership Interest in a Residual Certificate by such Person may cause any Trust REMIC or any Person having an Ownership Interest in any Class of Certificates (other than such Person) to incur a liability for any federal tax imposed under the Code that would not otherwise be imposed but for the Transfer of an Ownership Interest in a Residual Certificate to such Person. The terms "United States," "State" and "international organization" shall have the meanings set forth in Section 7701 of the Code or successor provisions.

17

"Distribution Account": The separate trust account or accounts created and maintained by the Securities Administrator pursuant to Section 3.08(b) in the name of the Securities Administrator for the benefit of the Certificateholders and designated "Wells Fargo Bank, National Association, in trust for registered holders of SunTrust Acquisition Closed-End Seconds Trust, Series 2007-1 ". Funds in the Distribution Account shall be held in trust for the Certificateholders for the uses and purposes set forth in this Agreement. The Distribution Account must be an Eligible Account.

"Distribution Date": The 25th day of any month, or if such 25th day is not a Business Day, the Business Day immediately following such 25th day, commencing in May 2007.

"Due Date": With respect to each Distribution Date, the day of the month on which the Monthly Payment is due on a Mortgage Loan during the related Due Period, exclusive of any days of grace.

"Due Period": With respect to any Distribution Date, the period commencing on the second day of the month immediately preceding the month in which such Distribution Date occurs and ending on the first day of the month in which such Distribution Date occurs.

"Eligible Account": Any of (i) an account or accounts maintained with a Depository Institution, (ii) an account or accounts the deposits in which are fully insured by the FDIC, (iii) a trust account or accounts maintained with a federal depository institution or state chartered depository institution acting in its fiduciary capacity or (iv) an account or accounts acceptable to each Rating Agency as confirmed and approved in writing by each Rating Agency. Eligible Accounts may bear interest.

"ERISA": The Employee Retirement Income Security Act of 1974, as amended from time to time.

"Escrow Account": an account established by the Servicer for Escrow Payments on any Mortgage Loan.

"Escrow Mortgage Loan": Any Mortgage Loan for which the Servicer has established an Escrow Account for items constituting Escrow Payments.

"Escrow Payments": With respect to any Mortgage Loan, the amounts constituting ground rents, taxes, mortgage insurance premiums, fire and hazard insurance premiums, and any other payments required to be escrowed by the Mortgagor with the mortgagee pursuant to the Mortgage, applicable law or any other related document.

"Estate in Real Property": A fee simple estate in a parcel of land.

"Excess Liquidation Proceeds": To the extent that such amount is not required by law to be paid to the related Mortgagor, the amount, if any, by which Liquidation Proceeds with respect to a liquidated Mortgage Loan exceed the sum of (i) the outstanding principal balance of such Mortgage Loan and accrued but unpaid interest at the related Net Mortgage Rate through the last day of the month in which the related Liquidation Event occurs, plus (ii) related

18

liquidation expenses or other amounts to which the Servicer is entitled to be reimbursed from Liquidation Proceeds with respect to such liquidated Mortgage Loan pursuant to Section 3.09 of this Agreement.

"Exchange Act":  The Securities Exchange Act of 1934, as amended, and the rules and regulations thereunder.

"Extraordinary Trust Fund Expense": Any amounts payable or reimbursable to the Trustee, the Master Servicer, the Securities Administrator, the Custodian or any director, officer, employee or agent of any such Person from the Trust Fund pursuant to the terms of this Agreement and any amounts payable from the Distribution Account in respect of taxes pursuant to Section 11.01(g)(v).

"Fannie Mae": Fannie Mae, formerly known as the Federal National Mortgage Association, or any successor thereto.

"FDIC": Federal Deposit Insurance Corporation or any successor thereto.

"Final Maturity Date":  The Distribution Date occurring in April 2037.

"Final Recovery Determination": With respect to any defaulted Mortgage Loan or any REO Property (other than a Mortgage Loan or REO Property purchased by an originator, the Sponsor or the Terminator pursuant to or as contemplated by Section 2.03, 3.13(c) or Section 10.01), a determination made by the Servicer that all Insurance Proceeds, Liquidation Proceeds and other payments or recoveries which the Servicer, in its reasonable good faith judgment, expects to be finally recoverable in respect thereof have been so recovered, which determination shall be evidenced by a certificate of a Servicing Officer of the Servicer delivered to the Master Servicer and maintained in its records.

"First Mortgage Loan":  A mortgage loan that is secured by a first lien on the related Mortgaged Property.

"Fitch": Fitch Ratings or any successor in interest.

"Form 8-K Disclosure Information": Has the meaning set forth in Section 5.06(b) of this Agreement.

"Freddie Mac": Freddie Mac, formerly known as the Federal Home Loan Mortgage Corporation, or any successor thereto.

"Guarantor": SunTrust Bank.

"GMAC": GMAC Mortgage, LLC or any successor thereto appointed hereunder in connection with the servicing and administration of the Mortgage Loans.

"Independent": When used with respect to any accountants, a Person who is "independent" within the meaning of Rule 2-01(B) of the Commission's Regulation S-X.  When used with respect to any specified Person, any such Person who (a) is in fact independent of the

Depositor, the Master Servicer, the Securities Administrator, the Servicer, the Sponsor, any originator and their respective Affiliates, (b) does not have any direct financial interest in or any material indirect financial interest in the Depositor, the Master Servicer, the Securities Administrator, the Servicer, the Sponsor, any originator or any Affiliate thereof, (c) is not connected with the Depositor, the Master Servicer, the Securities Administrator, the Servicer, the Sponsor, any originator or any Affiliate thereof as an officer, employee, promoter, underwriter, trustee, partner, director or Person performing similar functions and (d) is not a member of the immediate family of a Person defined on clause (b) or (c) above.

"Independent Contractor": Either (i) any Person (other than the Servicer) that would be an "independent contractor" with respect to REMIC I within the meaning of Section 856(d)(3) of the Code if REMIC I were a real estate investment trust (except that the ownership tests set forth in that section shall be considered to be met by any Person that owns, directly or indirectly, 35% or more of any Class of Certificates), so long as REMIC I does not receive or derive any income from such Person and provided that the relationship between such Person and REMIC I is at arm's length, all within the meaning of Treasury Regulation Section 1.856-4(b)(5), or (ii) any other Person (including the Servicer) if the Trustee has received an Opinion of Counsel to the effect that the taking of any action in respect of any REO Property by such Person, subject to any conditions therein specified, that is otherwise herein contemplated to be taken by an Independent Contractor will not cause such REO Property to cease to qualify as "foreclosure property" within the meaning of Section 860G(a)(8) of the Code (determined without regard to the exception applicable for purposes of Section 860D(a) of the Code), or cause any income realized in respect of such REO Property to fail to qualify as Rents from Real Property.

"Insolvency Proceeding": The commencement after the Closing Date of any bankruptcy, insolvency, readjustment of debt, reorganization, marshalling of assets and liabilities or similar proceedings by or against any person, the commencement, [after the date hereof,] of any proceedings by or against any person for the winding up or liquidation of its affairs, or the consent, after the date hereof, to the appointment of a trustee, conservator, receiver or liquidator in any bankruptcy, insolvency, readjustment of debt, reorganization, marshalling of assets and liabilities or similar proceedings of or relating to any person.

"Insurance Agreement": The Insurance and Indemnity Agreement dated as of April 15, 2007, among the Class A Certificate Insurer, the Sponsor, the Servicer and the Interim Seller, the Depositor, the Master Servicer and the Securities Administrator.

"Insurance Proceeds": Proceeds of any title policy, hazard policy or other insurance policy, covering a Mortgage Loan or the related Mortgaged Property, to the extent such proceeds are not to be applied to the restoration of the related Mortgaged Property or released to the Mortgagor or a senior lienholder in accordance with Accepted Servicing Practices, subject to the terms and conditions of the related Mortgage Note and Mortgage.

"Insured Amounts": With respect to any Distribution Date and the Insured Certificates, that portion of the Scheduled Payments that shall become due for payment but shall be unpaid by reason of Nonpayment on such Distribution Date (which shall be equal to the amount of any related Deficiency Amount).

"Insured Certificates": The Class A Certificates.

"Insured Payments" means, with respect to any Distribution Date, the aggregate amount actually paid by the Class A Certificate Insurer to the Securities Administrator in respect of Insured Amounts for such Distribution Date.

"Insurer Reimbursement Amount": As of any Distribution Date, the sum of (x)(i) all Insured Payments and Avoided Payments paid by the Class A Certificate Insurer, but for which the Class A Certificate Insurer has not been reimbursed prior to such Distribution Date, plus (ii) interest accrued on such Insured Payments and Avoided Payments not previously paid calculated at the Late Payment Rate, from the date the Class A Certificate Insurer paid the related Insured Payments or Avoided Payments to the Securities Administrator or (in the case of Avoided Payments) other authorized recipient, and (y) without duplication, (i) any amounts then due and owing to the Class A Certificate Insurer under the Insurance Agreement or this Agreement but for which the Class A Certificate Insurer has not been paid or reimbursed prior to such Distribution Date, plus (ii) interest on such amounts at the Late Payment Rate.

"Interest Accrual Period": With respect to any Distribution Date and the Class A Certificates and the Mezzanine Certificates, the period commencing on the Distribution Date of the month immediately preceding the month in which such Distribution Date occurs (or, in the case of the first Distribution Date, commencing on the Closing Date) and ending on the day preceding such Distribution Date. With respect to any Distribution Date and the Class CE Certificates and the REMIC I Regular Interests, the one-month period commencing on the first day of the month prior to the month in which the Distribution Date occurs and ending on the last day of the calendar month immediately preceding the month in which such Distribution Date occurs.

"Interest Carry Forward Amount": With respect to any Distribution Date and any Class A Certificate or Mezzanine Certificate, the sum of (i) the amount, if any, by which (a) the Interest Distribution Amount for such Class as of the immediately preceding Distribution Date exceeded (b) the actual amount distributed on such Class in respect of interest on such immediately preceding Distribution Date and (ii) the amount of any Interest Carry Forward Amount for such Class remaining unpaid from the previous Distribution Date, plus accrued interest on such sum calculated at the related Pass-Through Rate for the most recently ended Interest Accrual Period.

"Interest Determination Date": With respect to the Class A Certificates, the Mezzanine Certificates, REMIC I Regular Interests and REMIC II Regular Interests (other than REMIC II Regular Interest P) and any Interest Accrual Period therefor, the second London Business Day preceding the commencement of such Interest Accrual Period.

"Interest Distribution Amount": With respect to any Distribution Date and any Class A Certificates, any Mezzanine Certificates and any Class CE Certificates, the aggregate Accrued Certificate Interest on the Certificates of such Class for such Distribution Date.

"Interest Remittance Amount": With respect to any Distribution Date, that portion of the Available Distribution Amount for such Distribution Date that represents interest received

or advanced on the Mortgage Loans (net of the Administration Fees and any Prepayment Charges and after taking into account amounts payable or reimbursable to the Trustee, the Custodian, the Securities Administrator, the Master Servicer, the Servicer or the Credit Risk Manager pursuant to this Agreement or the Custodial Agreement).

"Interim Seller": GMAC Mortgage, LLC.

"Last Scheduled Distribution Date": The Distribution Date occurring in April 2037 which is the Distribution Date immediately following the maturity date for the Mortgage Loan with the latest maturity date.

"Late Collections": With respect to any Mortgage Loan and any Due Period, all amounts received subsequent to the Determination Date immediately following such Due Period with respect to such Mortgage Loan, whether as late payments of Monthly Payments or as Insurance Proceeds, Liquidation Proceeds or otherwise, which represent late payments or collections of principal and/or interest due (without regard to any acceleration of payments under the related Mortgage and Mortgage Note) but delinquent for such Due Period and not previously recovered.

"Late Payment Rate": The lesser of (a) the greater of (i) the prime rate as published in the Wall Street Journal (or if no such rate is published thereby, in a publication selected by the Class A Certificate Insurer) (any change in such rate of interest to be effective on the date such change is published) plus 2%, and (ii) the highest rate of interest on any of the Insured Certificates and (b) the maximum rate permissible under applicable usury or similar laws limiting interest rates. The Late Payment Rate shall be computed on the basis of the actual number of days elapsed over a year of 360 days for any Distribution Date.

"Liquidated Mortgage Loan": A Liquidated Mortgage Loan is a Mortgage Loan that was liquidated and for which the Servicer has determined that it has received all amounts it expects to receive in connection with such liquidation, including payments under any related private mortgage insurance policy, hazard insurance policy or any condemnation proceeds and amounts received in connection with the final disposition of the related REO Property.

"Liquidation Event": With respect to any Mortgage Loan, any of the following events: (i) such Mortgage Loan is paid in full; (ii) a Final Recovery Determination is made as to such Mortgage Loan or (iii) such Mortgage Loan is removed from REMIC I by reason of its being purchased, sold or replaced pursuant to or as contemplated by Section 2.03, Section 3.13(c) or Section 10.01 of this Agreement. With respect to any REO Property, either of the following events: (i) a Final Recovery Determination is made as to such REO Property or (ii) such REO Property is removed from REMIC I by reason of its being purchased pursuant to Section 10.01.

"Liquidation Proceeds": The amount (other than Insurance Proceeds, amounts received in respect of the rental of any REO Property prior to REO Disposition, or required to be released to a Mortgagor or a senior lienholder in accordance with applicable law or the terms of the related Mortgage Loan Documents) received by the Servicer in connection with (i) the taking of all or a part of a Mortgaged Property by exercise of the power of eminent domain or

condemnation (other than amounts required to be released to the Mortgagor or a senior lienholder), (ii) the liquidation of a defaulted Mortgage Loan through a trustee's sale, foreclosure sale or otherwise, (iii) the repurchase, substitution or sale of a Mortgage Loan or an REO Property pursuant to or as contemplated by Section 2.03, Section 3.13(c), Section 3.22 or Section 10.01 of this Agreement or (iv) any Subsequent Recoveries.

"Loan-to-Value Ratio": As of any date of determination, the fraction, expressed as a percentage, the numerator of which is the principal balance of the related Mortgage Loan at such date and the denominator of which is the Value of the related Mortgaged Property.

"London Business Day": Any day on which banks in the Cities of London and New York are open and conducting transactions in United States dollars.

"Loss Severity Percentage": With respect to any Distribution Date, the percentage equivalent of a fraction, the numerator of which is the amount of Realized Losses incurred on a Mortgage Loan and the denominator of which is the principal balance of such Mortgage Loan immediately prior to the liquidation of such Mortgage Loan.

"Marker Rate": With respect to the Class CE Certificates and any Distribution Date, a per annum rate equal to two (2) times the weighted average of the REMIC II Remittance Rate for each of REMIC II Regular Interest A, REMIC II Regular Interest M-1, REMIC II Regular Interest M-2, REMIC II Regular Interest M-3, REMIC II Regular Interest M-4 and REMIC II Regular Interest ZZ, with the rate on each such REMIC II Regular Interest (other than REMIC II Regular Interest ZZ) subject to a cap equal to the lesser of (i) the related One-Month LIBOR Pass-Through Rate and (ii) the related Net WAC Pass-Through Rate for the Corresponding Certificate for the purpose of this calculation for such Distribution Date and with the rate on REMIC II Regular Interest ZZ subject to a cap of zero for the purpose of this calculation; provided however, each such cap for each REMIC II Regular Interest (other than REMIC II Regular Interest ZZ) shall be multiplied by a fraction the numerator of which is the actual number of days in the related Interest Accrual Period and the denominator of which is 30.

"Master Servicer":  As of the Closing Date, Wells Fargo Bank, National Association and thereafter, its respective successors in interest who meet the qualifications of this Agreement. The Master Servicer and the Securities Administrator shall at all times be the same Person or an Affiliate.

"Master Servicer Event of Default":  One or more of the events described in Section 8.01(b).

"Master Servicing Fee": With respect to each Mortgage Loan and for any calendar month, an amount equal to one-twelfth of the product of the Master Servicing Fee Rate multiplied by the Scheduled Principal Balance of the Mortgage Loans as of the Due Date in the preceding calendar month.

"Master Servicing Fee Rate": 0.009% per annum.

"Maximum ZZ Uncertificated Interest Deferral Amount": With respect to any Distribution Date, the excess of (i) accrued interest at the REMIC II Remittance Rate applicable

to REMIC II Regular Interest ZZ for such Distribution Date on a balance equal to the Uncertificated Balance of REMIC II Regular Interest ZZ minus the REMIC II Overcollateralization Amount, in each case for such Distribution Date, over (ii) Uncertificated Interest on REMIC II Regular Interest A, REMIC II Regular Interest M-1, REMIC II Regular Interest M-2, REMIC II Regular Interest M-3 and REMIC II Regular Interest M-4 for such Distribution Date, with the rate on each such REMIC II Regular Interest subject to a cap equal to the lesser of (i) the related One-Month LIBOR Pass-Through Rate and (ii) the related Net WAC Pass-Through Rate for the Corresponding Certificate for the purpose of this calculation for such Distribution Date; provided however, each such cap for each REMIC II Regular Interest shall be multiplied by a fraction the numerator of which is the actual number of days in the related Interest Accrual Period and the denominator of which is 30.

"<u>MERS</u>":   Mortgage Electronic Registration Systems, Inc., a corporation organized and existing under the laws of the State of Delaware, or any successor thereto.

"<u>MERS® System</u>":  The system of recording transfers of mortgages electronically maintained by MERS.

"<u>Mezzanine Certificate</u>": Any Class M-1, Class M-2, Class M-3 or Class M-4 Certificate.

"<u>MIN</u>":  The Mortgage Identification Number for Mortgage Loans registered with MERS on the MERS® System.

"<u>MOM Loan</u>":   With respect to any Mortgage Loan, MERS acting as the mortgagee of such Mortgage Loan, solely as nominee for the originator of such Mortgage Loan and its successors and assigns, at the origination thereof.

"<u>Monthly Payment</u>": With respect to any Mortgage Loan, the scheduled monthly payment of principal and interest on such Mortgage Loan which is payable by the related Mortgagor from time to time under the related Mortgage Note, determined: (a) after giving effect to (i) any Deficient Valuation and/or Debt Service Reduction with respect to such Mortgage Loan and (ii) any reduction in the amount of interest collectible from the related Mortgagor pursuant to the Relief Act or similar state or local laws; (b) without giving effect to any extension granted or agreed to by the Servicer pursuant to Section 3.01 of this Agreement; and (c) on the assumption that all other amounts, if any, due under such Mortgage Loan are paid when due.

"<u>Moody's</u>":  Moody's Investors Service, Inc. or any successor in interest.

"<u>Mortgage</u>": The mortgage, deed of trust or other instrument creating a second lien on, or second priority security interest in, a Mortgaged Property securing a Mortgage Note.

"<u>Mortgage File</u>": The Mortgage Loan Documents pertaining to a particular Mortgage Loan.

"<u>Mortgage Loan</u>": Each mortgage loan transferred and assigned to the Trustee and the Mortgage Loan Documents for which have been delivered to the Custodian pursuant to

Section 2.01 of this Agreement and pursuant to the Custodial Agreement, as held from time to time as a part of the Trust Fund, the Mortgage Loans so held being identified in the Mortgage Loan Schedule.

"Mortgage Loan Documents":  The documents evidencing or relating to each Mortgage Loan delivered to the Custodian under the Custodial Agreement on behalf of the Trustee.

"Mortgage Loan Purchase Agreement": Shall mean the Mortgage Loan Purchase and Sale Agreement dated as of May 15, 2007, between the Sponsor as seller and the Interim Seller as purchaser, a copy of which is attached hereto as Exhibit F-1.

"Mortgage Loan Schedule": As of any date, the list of Mortgage Loans included in REMIC I on such date, attached hereto as Schedule 1. The Depositor shall deliver or cause the delivery of the initial Mortgage Loan Schedule to the Servicer, the Master Servicer, the Custodian and the Trustee on the Closing Date. The Mortgage Loan Schedule shall set forth the following information with respect to each Mortgage Loan:

(i)     the Mortgage Loan identifying number;

(ii)    the Mortgagor's first and last name;

(iii)   the street address of the Mortgaged Property including the state and zip code;

(iv)    a code indicating whether the Mortgaged Property is owner-occupied;

(v)     the type of Residential Dwelling constituting the Mortgaged Property;

(vi)    the original months to maturity;

(vii)   the original date of the Mortgage Loan and the remaining months to maturity from the Cut-off Date, based on the original amortization schedule;

(viii)  the Combined Loan-to-Value Ratio at origination;

(ix)    the Mortgage Rate in effect immediately following the Cut-off Date;

(x)     the date on which the first Monthly Payment was due on the Mortgage Loan;

(xi)    the stated maturity date;

(xii)   the amount of the Monthly Payment at origination;

(xiii)  the amount of the Monthly Payment as of the Cut-off Date;

25

(xiv)    the last Due Date on which a Monthly Payment was actually applied to the unpaid Stated Principal Balance;

(xv)    the original principal amount of the Mortgage Loan;

(xvi)    the Stated Principal Balance of the Mortgage Loan as of the close of business on the Cut-off Date;

(xvii)    a code indicating the purpose of the loan (i.e., purchase financing, rate/term refinancing, cash-out refinancing);

(xviii)    the Mortgage Rate at origination;

(xix)    the date on which the first Monthly Payment was due on the Mortgage Loan and, if such date is not consistent with the Due Date currently in effect, such Due Date;

(xx)    a code indicating the documentation style (i.e., full, stated or limited);

(xxi)    a code indicating if the Mortgage Loan is subject to a primary insurance policy or lender paid mortgage insurance policy and the name of the insurer, and if applicable, the rate payable in connection therewith;

(xxii)    the Appraised Value of the Mortgaged Property;

(xxiii)    the sale price of the Mortgaged Property, if applicable;

(xxiv)    a code indicating whether the Mortgage Loan is subject to a Prepayment Charge, the term of such Prepayment Charge and the amount of such Prepayment Charge;

(xxv)    the product type (e.g., 2/28, 15 year fixed, 30 year fixed, 15/30 balloon, etc.);

(xxvi)    the FICO score at origination;

(xxvii)    with respect to each Mortgage Loan registered on MERS, the MIN;

(xxviii)    the Custodian.

The Mortgage Loan Schedule shall set forth the following information with respect to the Mortgage Loans in the aggregate as of the Cut-off Date: (1) the number of Mortgage Loans; (2) the current principal balance of the Mortgage Loans; (3) the weighted average Mortgage Rate of the Mortgage Loans; and (4) the weighted average maturity of the Mortgage Loans. The Mortgage Loan Schedule shall be amended from time to time by the Depositor in accordance with the provisions of this Agreement. With respect to any Qualified

Substitute Mortgage Loan, the Cut-off Date shall refer to the related Cut-off Date for such Mortgage Loan, determined in accordance with the definition of Cut-off Date herein.

"Mortgage Note": The original executed note or other evidence of the indebtedness of a Mortgagor under a Mortgage Loan.

"Mortgage Rate": With respect to each Mortgage Loan, the annual rate at which interest accrues on such Mortgage Loan from time to time in accordance with the provisions of the related Mortgage Note. With respect to each Mortgage Loan that becomes an REO Property, as of any date of determination, the annual rate determined in accordance with the immediately preceding sentence as of the date such Mortgage Loan became an REO Property.

"Mortgaged Property": The underlying property securing a Mortgage Loan, including any REO Property, consisting of an Estate in Real Property improved by a Residential Dwelling.

"Mortgagor": The obligor on a Mortgage Note.

"Net Monthly Excess Cashflow": With respect to any Distribution Date, the sum of (i) any Overcollateralization Reduction Amount for such Distribution Date and (ii) the excess of (x) the Available Distribution Amount for such Distribution Date over (y) the sum for such Distribution Date of (A) the aggregate Senior Interest Distribution Amounts payable to the Holders of the Class A Certificates, (B) the aggregate Interest Distribution Amounts payable to the holders of the Mezzanine Certificates, (C) the Principal Remittance Amount, (D) any Net Swap Payment or Swap Termination Payment (not caused by the occurrence of a Swap Provider Trigger Event) owed to the Swap Provider (to the extent such amount has not been paid by the Securities Administrator from any upfront payment received pursuant to any related replacement interest rate swap agreement that may be entered into by the Trustee on behalf of the Supplemental Interest Trust) and (E) the premium payable to the Class A Certificate Insurer and any reimbursements payable to the Class A Certificate Insurer.

"Net Mortgage Rate": With respect to any Mortgage Loan (or the related REO Property) as of any date of determination, a per annum rate of interest equal to the then applicable Mortgage Rate for such Mortgage Loan minus the Administration Fee Rate.

"Net Swap Payment":  With respect to each Distribution Date, the net payment required to be made pursuant to the terms of the Swap Agreement by either the Swap Provider or Securities Administrator from the Supplemental Interest Trust, which net payment shall not take into account any Swap Termination Payment.

"Net WAC Pass-Through Rate": With respect to the Offered Certificates and any Distribution Date, a rate per annum (adjusted for the actual number of days elapsed in the related Interest Accrual Period) equal to the product of (i) twelve and (ii) a fraction, expressed as a percentage, the numerator of which is the amount of interest which accrued on the Mortgage Loans in the prior calendar month minus the fees payable to the Servicer, the Master Servicer and the Credit Risk Manager for such Distribution Date and any Net Swap Payment payable to the Swap Provider or Swap Termination Payment payable to the Swap Provider which was not caused by the occurrence of a Swap Provider Trigger Event (to the extent such amount has not

27

been paid by the Securities Administrator from any upfront payment received pursuant to any related replacement interest rate swap agreement that may be entered into by the Supplemental Interest Trust Trustee), and, the premium payable to the Class A Certificate Insurer in each case for such Distribution Date and the denominator of which is the aggregate principal balance of the Mortgage Loans as of the last day of the immediately preceding Due Period (or as of the Cut-off Date with respect to the first Distribution Date), after giving effect to principal prepayments received during the related Prepayment Period.  For federal income tax purposes, the economic equivalent of such rate shall be expressed as the weighted average of (adjusted for the actual number of days elapsed in the related Interest Accrual Period) the REMIC II Remittance Rates on the REMIC II Regular Interests (other than REMIC II Regular Interest IO), weighted on the basis of the Uncertificated Balance of such REMIC II Regular Interest.

"Net WAC Rate Carryover Amount": With respect to any Class A Certificate or Mezzanine Certificate and any Distribution Date on which the Pass-Through Rate is limited to the applicable Net WAC Pass-Through Rate, an amount equal to the sum of (i) the excess of (x) the amount of interest such Class would have been entitled to receive on such Distribution Date if the applicable Net WAC Pass-Through Rate would not have been applicable to such Class on such Distribution Date over (y) the amount of interest paid to such Class on such Distribution Date at the applicable Net WAC Pass-Through Rate plus (ii) the related Net WAC Rate Carryover Amount for the previous Distribution Date not previously distributed to such Class together with interest thereon at a rate equal to the Pass-Through Rate for such Class for the most recently ended Interest Accrual Period without taking into account the applicable Net WAC Pass-Through Rate.

"New Lease": Any lease of REO Property entered into on behalf of REMIC I, including any lease renewed or extended on behalf of REMIC I, if REMIC I has the right to renegotiate the terms of such lease.

"Nonpayment": With respect to any Distribution Date, the failure of the Securities Administrator to receive in full, in accordance with the terms of this Agreement, funds legally available to pay all or a portion of the Scheduled Payments that are due for payment on the Insured Certificates with respect to such Distribution Date.

"Nonrecoverable P&I Advance": Any P&I Advance previously made or proposed to be made in respect of a Mortgage Loan or REO Property that, in the good faith business judgment of the Servicer or a successor to the Servicer (including the Master Servicer) will not or, in the case of a proposed P&I Advance, would not be ultimately recoverable from related Late Collections, Insurance Proceeds or Liquidation Proceeds on such Mortgage Loan or REO Property as provided herein.

"Nonrecoverable Servicing Advance": Any Servicing Advance previously made or proposed to be made in respect of a Mortgage Loan or REO Property that, in the good faith business judgment of the Servicer or a successor to the Servicer (including the Master Servicer) will not or, in the case of a proposed Servicing Advance, would not be ultimately recoverable from related Late Collections, Insurance Proceeds or Liquidation Proceeds on such Mortgage Loan or REO Property as provided herein.

"Non-United States Person": Any Person other than a United States Person.

"Notional Amount": With respect to the Class CE Certificates and any Distribution Date, the Uncertificated Balance of the REMIC II Regular Interests (other than REMIC II Regular Interest P) for such Distribution Date.  As of the Closing Date, the Notional Amount of the Class CE Certificates is equal to $_____.

With respect to REMIC II Regular Interest IO and each Distribution Date listed below, the aggregate Uncertificated Balance of the REMIC I Regular Interests ending with the designation "A" listed below:

| Distribution Date | REMIC I Regular Interests |
|---|---|
| 1st through 7th | I-1-A through I-54-A and II-1-A through II-54-A |
| 8 | I-2-A through I-54-A and II-2-A through II-54-A |
| 9 | I-3-A through I-54-A and II-3-A through II-54-A |
| 10 | I-4-A through I-54-A and II-4-A through II-54-A |
| 11 | I-5-A through I-54-A and II-5-A through II-54-A |
| 12 | I-6-A through I-54-A and II-6-A through II-54-A |
| 13 | I-7-A through I-54-A and  II-7-A through II-54-A |
| 14 | I-8-A through I-54-A and  II-8-A through II-54-A |
| 15 | I-9-A through I-54-A and  II-9-A through II-54-A |
| 16 | I-10-A through I-54-A and  II-10-A through II-54-A |
| 17 | I-11-A through I-54-A and  II-11-A through II-54-A |
| 18 | I-12-A through I-54-A and  II-12-A through II-54-A |
| 19 | I-13-A through I-54-A and  II-13-A through II-54-A |
| 20 | I-14-A through I-54-A and  II-14-A through II-54-A |
| 21 | I-15-A through I-54-A and  II-15-A through II-54-A |
| 22 | I-16-A through I-54-A and  II-16-A through II-54-A |
| 23 | I-17-A through I-54-A and  II-17-A through II-54-A |
| 24 | I-18-A through I-54-A and  II-18-A through II-54-A |
| 25 | I-19-A through I-54-A and II-19-A through II-54-A |
| 26 | I-20-A through I-54-A and II-20-A through II-54-A |
| 27 | I-21-A through I-54-A and II-21-A through II-54-A |
| 28 | I-22-A through I-54-A and II-22-A through II-54-A |
| 29 | I-23-A through I-54-A and II-23-A through II-54-A |
| 30 | I-24-A through I-54-A and II-24-A through II-54-A |
| 31 | I-25-A through I-54-A and II-25-A through II-54-A |
| 32 | I-26-A through I-54-A and II-26-A through II-54-A |
| 33 | I-27-A through I-54-A and II-27-A through II-54-A |
| 34 | I-28-A through I-54-A and II-28-A through II-54-A |
| 35 | I-29-A through I-54-A and II-29-A through II-54-A |
| 36 | I-30-A through I-54-A and II-30-A through II-54-A |
| 37 | I-31-A through I-54-A and II-31-A through II-54-A |
| 38 | I-32-A through I-54-A and II-32-A through II-54-A |
| 39 | I-33-A through I-54-A and II-33-A through II-54-A |
| 40 | I-34-A through I-54-A and II-34-A through II-54-A |
| 41 | I-35-A through I-54-A and II-35-A through II-54-A |
| 42 | I-36-A through I-54-A and II-36-A through II-54-A |
| 43 | I-37-A through I-54-A and II-37-A through II-54-A |
| 44 | I-38-A through I-54-A and II-38-A through II-54-A |
| 45 | I-39-A through I-54-A and  II-39-A through II-54-A |
| 46 | I-40-A through I-54-A and  II-40-A through II-54-A |
| 47 | I-41-A through I-54-A and  II-41-A through II-54-A |
| 48 | I-42-A through I-54-A and  II-42-A through II-54-A |
| 49 | I-43-A through I-54-A and  II-43-A through II-54-A |
| 50 | I-44-A through I-54-A and  II-44-A through II-54-A |

| Distribution Date | REMIC I Regular Interests |
|---|---|
| 51 | I-45-A through I-54-A and II-45-A through II-54-A |
| 52 | I-46-A through I-54-A and II-46-A through II-54-A |
| 51 | I-47-A through I-54-A and II-47-A through II-54-A |
| 51 | I-48-A through I-54-A and II-48-A through II-54-A |
| 55 | I-49-A through I-54-A and II-49-A through II-54-A |
| 56 | I-50-A through I-54-A and II-50-A through II-54-A |
| 57 | I-51-A through I-54-A and II-51-A through II-54-A |
| 58 | I-52-A through I-54-A and II-52-A through II-54-A |
| 59 | I-53-A and I-54-A and II-53-A and II-54-A |
| 60 | I-54-A and II-54-A |
| thereafter | $0.00 |

With respect to the Class IO Interest and any Distribution Date, an amount equal to the Notional Amount of the REMIC II Regular Interest IO.]

"Offered Certificates": The Class A Certificates and the Mezzanine Certificates, collectively.

"Officer's Certificate": With respect to any Person, a certificate signed by the Chairman of the Board, the Vice Chairman of the Board, the President or a vice president (however denominated), or by the Treasurer, the Secretary, or one of the assistant treasurers or assistant secretaries of such Person (or, in the case of a Person that is not a corporation, signed by the person or persons having like responsibilities).

"One-Month LIBOR": With respect to the Class A Certificates, the Mezzanine Certificates, REMIC II Regular Interests (other than REMIC II Regular Interest P) and any Interest Accrual Period therefor, the rate determined by the Securities Administrator on the related Interest Determination Date on the basis of the offered rate for one-month U.S. dollar deposits, as such rate appears on Reuters Screen LIBOR01 Page as of 11:00 a.m. (London time) on such Interest Determination Date; provided that if such rate does not appear on Reuters Screen LIBOR01 Page, the rate for such date will be determined on the basis of the offered rates of the Reference Banks for one-month U.S. dollar deposits, as of 11:00 a.m. (London time) on such Interest Determination Date. In such event, the Securities Administrator will request the principal London office of each of the Reference Banks to provide a quotation of its rate. If on such Interest Determination Date, two or more Reference Banks provide such offered quotations, One-Month LIBOR for the related Interest Accrual Period shall be the arithmetic mean of such offered quotations (rounded upwards if necessary to the nearest whole multiple of 1/16). If on such Interest Determination Date, fewer than two Reference Banks provide such offered quotations, One-Month LIBOR for the related Interest Accrual Period shall be the higher of (i) LIBOR as determined on the previous Interest Determination Date and (ii) the Reserve Interest Rate. Notwithstanding the foregoing, if, under the priorities described above, LIBOR for an Interest Determination Date would be based on LIBOR for the previous Interest Determination Date for the third consecutive Interest Determination Date, the Securities Administrator shall select an alternative comparable index (over which the Securities Administrator has no control), used for determining one-month Eurodollar lending rates that is calculated and published (or otherwise made available) by an independent party. The establishment of One-Month LIBOR by the Securities Administrator and the Securities Administrator's subsequent calculation of the

One-Month LIBOR Pass-Through Rates for the relevant Interest Accrual Period, shall, in the absence of manifest error, be final and binding.

"One-Month LIBOR Pass-Through Rate": With respect to the Class A Certificates and, for purposes of the definition of "Marker Rate", REMIC II Regular Interest A, a per annum rate equal to One-Month LIBOR plus the related Certificate Margin.

With respect to the Class M-1 Certificates and, for purposes of the definition of "Marker Rate", REMIC II Regular Interest M-1, a per annum rate equal to One-Month LIBOR plus the related Certificate Margin.

With respect to the Class M-2 Certificates and, for purposes of the definition of "Marker Rate", REMIC II Regular Interest M-2, a per annum rate equal to One-Month LIBOR plus the related Certificate Margin.

With respect to the Class M-3 Certificates and, for purposes of the definition of "Marker Rate", REMIC II Regular Interest M-3, a per annum rate equal to One-Month LIBOR plus the related Certificate Margin.

With respect to the Class M-4 Certificates and, for purposes of the definition of "Marker Rate", REMIC II Regular Interest M-4, a per annum rate equal to One-Month LIBOR plus the related Certificate Margin.

"Opinion of Counsel": A written opinion of counsel, who may, without limitation, be salaried counsel for the Depositor, the Servicer, the Securities Administrator or the Master Servicer, acceptable to the Trustee, except that any opinion of counsel relating to (a) the qualification of any REMIC as a REMIC or (b) compliance with the REMIC Provisions must be an opinion of Independent counsel.

"Optional Termination Date": The first Distribution Date on which the aggregate principal balance of the Mortgage Loans (and properties acquired in respect thereof) remaining in the Trust Fund as of the last day of the related Due Period has been reduced to less than or equal to 10% of the aggregate principal balance of the Mortgage Loans as of the Cut-off Date.

"OTS Method": The Office of Thrift Supervision (OTS) Delinquency Calculation Method, pursuant to which a Mortgage Loan is considered delinquent if a monthly payment has not been received by the close of business on such Mortgage Loan's Due Date in the following month.  By way of example, a Mortgage Loan will be considered 30 days delinquent if the borrower fails to make a scheduled payment due on July 1 by the close of business on August 1. Such loan will be reported as current at the end of July and on the August statement to investors and will not be reported as delinquent until the end of August and on the September statement to investors.

"Overcollateralization Amount": With respect to any Distribution Date, the excess, if any, of (a) the aggregate Stated Principal Balances of the Mortgage Loans and REO Properties immediately following such Distribution Date over (b) the sum of the aggregate Certificate Principal Balances of the Class A Certificates, the Mezzanine Certificates and the

Class P Certificates as of such Distribution Date (after taking into account the payment of the Principal Remittance Amount on such Distribution Date).

"<u>Overcollateralization Increase Amount</u>": With respect to any Distribution Date, the amount by which the Required Overcollateralization Amount for such Distribution Date exceeds the Overcollateralization Amount (calculated for this purpose assuming 100% of the Principal Remittance Amount is distributed to the Class A Certificates and the Mezzanine Certificates on such Distribution Date) for such Distribution Date..

"<u>Overcollateralization Reduction Amount</u>": With respect to any Distribution Date, the lesser of (i) the amount by which the Overcollateralization Amount (calculated for this purpose assuming 100% of the Principal Remittance Amount is distributed to the Class A Certificates and the Mezzanine Certificates on such Distribution Date) exceeds the Required Overcollateralization Amount and (ii) the Principal Remittance Amount for such Distribution Date. The Overcollateralization Reduction Amount is equal to zero when a Trigger Event is in effect.

"<u>Ownership Interest</u>": As to any Certificate, any ownership or security interest in such Certificate, including any interest in such Certificate as the Holder thereof and any other interest therein, whether direct or indirect, legal or beneficial, as owner or as pledgee.

"<u>P&I Advance</u>": As to any Mortgage Loan or REO Property, any advance made by the Servicer in respect of any Determination Date pursuant to Section 5.03 of this Agreement, an Advance Financing Person pursuant to Section 3.26 of this Agreement or in respect of any Distribution Date by a successor Servicer pursuant to Section 8.02 of this Agreement (which advances shall not include principal or interest shortfalls due to bankruptcy proceedings or application of the Relief Act or similar state or local laws.)

"<u>Pass-Through Rate</u>": With respect to the Class A Certificates and the Mezzanine Certificates, and any Distribution Date, a rate per annum equal to the lesser of (i) the related One-Month LIBOR Pass-Through Rate for such Distribution Date and (ii) the related Net WAC Pass-Through Rate for such Distribution Date.

With respect to the Class CE Certificates and any Distribution Date, a rate per annum equal to the percentage equivalent of a fraction, the numerator of which is the sum of the amounts calculated pursuant to clauses (i) through (xv) below, and the denominator of which is the aggregate Uncertificated Balances of REMIC II Regular Interest AA, REMIC II Regular Interest A, REMIC II Regular Interest M-1, REMIC II Regular Interest M-2, REMIC II Regular Interest M-3 and REMIC II Regular Interest ZZ. For purposes of calculating the Pass-Through Rate for the Class CE Certificates, the numerator is equal to the sum of the following components:

(i)    the REMIC II Remittance Rate for REMIC II Regular Interest A minus the Marker Rate, applied to an amount equal to the Uncertificated Balance of REMIC II Regular Interest A;

    (ii)  the REMIC II Remittance Rate for REMIC II Regular Interest M-1 minus the Marker Rate, applied to an amount equal to the Uncertificated Balance of REMIC II Regular Interest M-1;

    (iii)  the REMIC II Remittance Rate for REMIC II Regular Interest M-2 minus the Marker Rate, applied to an amount equal to the Uncertificated Balance of REMIC II Regular Interest M-2;

    (iv)  the REMIC II Remittance Rate for REMIC II Regular Interest M-3 minus the Marker Rate, applied to an amount equal to the Uncertificated Balance of REMIC II Regular Interest M-3;

    (v)  the REMIC II Remittance Rate for REMIC II Regular Interest M-4 minus the Marker Rate, applied to an amount equal to the Uncertificated Balance of REMIC II Regular Interest M-4;

    (vi)  the REMIC II Remittance Rate for REMIC II Regular Interest ZZ minus the Marker Rate, applied to an amount equal to the Uncertificated Balance of REMIC II Regular Interest ZZ; and

    (vii)  100% of the interest on REMIC II Regular Interest P.

    The Class IO Interest shall not have a Pass-Through Rate, but current interest for the Class IO Interest and each Distribution Date shall be an amount equal to 100% of the amounts distributable to REMIC II Regular Interest IO for such Distribution Date.

    "PCAOB":  Means the Public Company Accounting Oversight Board.

    "Percentage Interest": With respect to any Class of Certificates (other than the Residual Certificates), the undivided percentage ownership in such Class evidenced by such Certificate, expressed as a percentage, the numerator of which is the initial Certificate Principal Balance represented by such Certificate and the denominator of which is the aggregate initial Certificate Principal Balance or Notional Amount of all of the Certificates of such Class. The Class A Certificates and the Mezzanine Certificates are issuable only in minimum Percentage Interests corresponding to minimum initial Certificate Principal Balances of $25,000 and integral multiples of $1.00 in excess thereof.  The Class P Certificates are issuable only in Percentage Interests corresponding to initial Certificate Principal Balances of $20 and integral multiples thereof. The Class CE Certificates are issuable only in minimum Percentage Interests corresponding to minimum initial Notional Amounts of $10,000 and integral multiples of $1.00 in excess thereof; provided, however, that a single Certificate of each such Class of Certificates may be issued having a Percentage Interest corresponding to the remainder of the aggregate initial Notional Amount of such Class or to an otherwise authorized denomination for such Class plus such remainder. With respect to any Residual Certificate, the undivided percentage ownership in such Class evidenced by such Certificate, as set forth on the face of such Certificate. The Residual Certificates are issuable in Percentage Interests of 20% and integral multiples of 5% in excess thereof.

"Permitted Investments": Any one or more of the following obligations or securities acquired at a purchase price of not greater than par, regardless of whether issued by the Depositor, the Servicer, the Master Servicer, the Trustee or any of their respective Affiliates:

(i)    direct obligations of, or obligations fully guaranteed as to timely payment of principal and interest by, the United States or any agency or instrumentality thereof, provided such obligations are backed by the full faith and credit of the United States;

(ii)    (A) demand and time deposits in, certificates of deposit of, bankers' acceptances issued by or federal funds sold by any depository institution or trust company (including the Trustee or its agent acting in their respective commercial capacities) incorporated under the laws of the United States of America or any state thereof and subject to supervision and examination by federal and/or state authorities, so long as, at the time of such investment or contractual commitment providing for such investment, such depository institution or trust company (or, if the only Rating Agency is S&P, in the case of the principal depository institution in a depository institution holding company, debt obligations of the depository institution holding company) or its ultimate parent has a short-term uninsured debt rating in the highest available rating category of Moody's and S&P and provided that each such investment has an original maturity of no more than 365 days; and provided further that, if the only Rating Agency is S&P and if the depository or trust company is a principal subsidiary of a bank holding company and the debt obligations of such subsidiary are not separately rated, the applicable rating shall be that of the bank holding company; and, provided further that, if the original maturity of such short-term obligations of a domestic branch of a foreign depository institution or trust company shall exceed 30 days, the short-term rating of such institution shall be A-1+ in the case of S&P if S&P is the Rating Agency; and (B) any other demand or time deposit or deposit which is fully insured by the FDIC;

(iii)    repurchase obligations with a term not to exceed 30 days with respect to any security described in clause (i) above and entered into with a depository institution or trust company (acting as principal) rated A-1+ or higher by S&P, and A2 or higher by Moody's, provided, however, that collateral transferred pursuant to such repurchase obligation must be of the type described in clause (i) above and must (A) be valued daily at current market prices plus accrued interest, (B) pursuant to such valuation, be equal, at all times, to 105% of the cash transferred by a party in exchange for such collateral and (C) be delivered to such party or, if such party is supplying the collateral, an agent for such party, in such a manner as to accomplish perfection of a security interest in the collateral by possession of certificated securities;

(iv)    securities bearing interest or sold at a discount that are issued by any corporation incorporated under the laws of the United States of America or any state thereof and that are rated by each Rating Agency that rates such securities in its highest long-term unsecured rating categories at the time of such investment or contractual commitment providing for such investment;

34

(v)        commercial paper (including both non-interest-bearing discount obligations and interest-bearing obligations payable on demand or on a specified date not more than 30 days after the date of acquisition thereof) that is rated by each Rating Agency that rates such securities in its highest short-term unsecured debt rating available at the time of such investment;

(vi)        units of money market funds that have been rated "AAAm" or "AAAm-G" by S&P or "Aaa" by Moody's including any such money market fund managed or advised by the Master Servicer, the Trustee or any of their Affiliates; and

(vii)        if previously confirmed in writing to the Trustee, any other demand, money market or time deposit, or any other obligation, security or investment, as may be acceptable to the Rating Agencies as a permitted investment of funds backing securities having ratings equivalent to its highest initial rating of the Class A Certificates;

provided, however, that no instrument described hereunder shall evidence either the right to receive (a) only interest with respect to the obligations underlying such instrument or (b) both principal and interest payments derived from obligations underlying such instrument and the interest and principal payments with respect to such instrument provide a yield to maturity at par greater than 120% of the yield to maturity at par of the underlying obligations.

"Permitted Transferee": Any Transferee of a Residual Certificate other than a Disqualified Organization or Non-United States Person.

"Person": Any individual, limited liability company, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated organization or government or any agency or political subdivision thereof.

"Plan": Any employee benefit plan or certain other retirement plans and arrangements, including individual retirement accounts and annuities, Keogh plans and bank collective investment funds and insurance company general or separate accounts in which such plans, accounts or arrangements are invested, that are subject to ERISA or Section 4975 of the Code.

"Policy": The certificate guaranty insurance policy provided by the Class A Insurer with respect to the Class A Certificates.

"Premium": The premium payable to the Class A Certificate Insurer under the Policy on each Distribution Date. The premium will be a per annum rate equal to 0.230% calculated on an actual/360 basis of the Certificate Principal Balance of the Class A Certificates as of such Distribution Date (without giving effect to any distributions thereon on that Distribution Date).

"Prepayment Assumption": A prepayment rate of 100% PPC. The Prepayment Assumption is used solely for determining the accrual of original issue discount on the Certificates for federal income tax purposes. To assume 100% PPC is to assume (i) a per annum prepayment rate of 10% of the then outstanding principal balance of the mortgage loans in the first month of the life of the mortgage loans, (ii) an additional 1.6364% (precisely 18%/11) per

annum in each month thereafter through the eleventh month, (iii) building to a constant prepayment rate of 28% per annum beginning in the twelfth month and remaining constant thereafter.

"Prepayment Charge": With respect to any Principal Prepayment, any prepayment premium, penalty or charge payable by a Mortgagor in connection with any Principal Prepayment on a Mortgage Loan pursuant to the terms of the related Mortgage Note.

"Prepayment Charge Schedule":   As of any date, the list of Mortgage Loans providing for a Prepayment Charge included in the Trust Fund on such date, attached hereto as Schedule 2 (including the prepayment charge summary attached thereto).  The Depositor shall deliver or cause the delivery of the Prepayment Charge Schedule to the Servicer, the Master Servicer and the Trustee on the Closing Date. The Prepayment Charge Schedule shall set forth the following information with respect to each Prepayment Charge:

(i)        the Mortgage Loan identifying number;

(ii)       a code indicating the type of Prepayment Charge;

(iii)      the date on which the first Monthly Payment was due on the related Mortgage Loan;

(iv)      the term of the related Prepayment Charge;

(v)       the original Stated Principal Balance of the related Mortgage Loan; and

(vi)      the Stated Principal Balance of the related Mortgage Loan as of the Cut-off Date.

"Prepayment Interest Shortfall": With respect to any Distribution Date, for each such Mortgage Loan that was the subject of a Principal Prepayment in full or in part during the portion of the related Prepayment Period occurring between the first day of the related Prepayment Period and the last day of the calendar month preceding the month in which such Distribution Date occurs that was applied by the Servicer to reduce the outstanding principal balance of such Mortgage Loan on a date preceding the Due Date in the succeeding Prepayment Period, an amount equal to interest at the applicable Net Mortgage Rate on the amount of such Principal Prepayment for the number of days commencing on the date on which the prepayment is applied and ending on the last day of the calendar month preceding such Distribution Date. The obligations of the Servicer and the Master Servicer in respect of any Prepayment Interest Shortfall are set forth in Section 3.23 and Section 4.19, respectively of this Agreement.

"Prepayment Period":   For any Distribution Date, the calendar month preceding the month in which such Distribution Date occurs.

"Principal Distribution Amount":  With respect to any Distribution Date will be the sum of (i) the principal portion of all Monthly Payments on the Mortgage Loans due during the related Due Period, whether or not received on or prior to the related Determination Date; (ii)

the principal portion of all proceeds received in respect of the repurchase of a Mortgage Loan or, in the case of a substitution, certain amounts representing a principal adjustment, during the related Prepayment Period pursuant to or as contemplated by Section 2.03, Section 3.13(c) and Section 10.01 of this Agreement; (iii) the principal portion of all other unscheduled collections, including Insurance Proceeds, Liquidation Proceeds and all Principal Prepayments in full and in part, received during the related Prepayment Period, to the extent applied as recoveries of principal on the Mortgage Loans, net in each case of payments or reimbursements to the Trustee, the Custodian, the Master Servicer, the Securities Administrator, the Servicer or the Credit Risk Manager and (iv) the amount of any Overcollateralization Increase Amount for such Distribution Date minus (v) the amount of any Overcollateralization Reduction Amount for such Distribution Date.

"Principal Prepayment": Any voluntary payment of principal made by the Mortgagor on a Mortgage Loan which is received in advance of its scheduled Due Date and which is not accompanied by an amount of interest representing the full amount of scheduled interest due on any Due Date in any month or months subsequent to the month of prepayment.

"Principal Remittance Amount": With respect to any Distribution Date, the sum of the amounts described in clauses (i) through (iii) of the definition of Principal Distribution Amount.

"Purchase Price": With respect to any Mortgage Loan or REO Property to be purchased pursuant to or as contemplated by Section 2.03, Section 3.13(c) or Section 10.01 of this Agreement, and as confirmed by a certification of a Servicing Officer to the Trustee, an amount equal to the sum of (i) 100% of the Stated Principal Balance thereof as of the date of purchase (or such other price as provided in Section 10.01), (ii) in the case of (x) a Mortgage Loan, accrued interest on such Stated Principal Balance at the applicable Net Mortgage Rate in effect from time to time from the Due Date as to which interest was last covered by a payment by the Mortgagor or a P&I Advance by the Servicer, which payment or P&I Advance had as of the date of purchase been distributed pursuant to Section 5.01, through the end of the calendar month in which the purchase is to be effected and (y) an REO Property, the sum of (1) accrued interest on such Stated Principal Balance at the applicable Net Mortgage Rate in effect from time to time from the Due Date as to which interest was last covered by a payment by the Mortgagor or a P&I Advance by the Servicer through the end of the calendar month immediately preceding the calendar month in which such REO Property was acquired, plus (2) REO Imputed Interest for such REO Property for each calendar month commencing with the calendar month in which such REO Property was acquired and ending with the calendar month in which such purchase is to be effected, net of the total of all net rental income, Insurance Proceeds, Liquidation Proceeds and P&I Advances that as of the date of purchase had been distributed as or to cover REO Imputed Interest pursuant to Section 5.01, (iii) any unreimbursed Servicing Advances and P&I Advances (including Nonrecoverable P&I Advances and Nonrecoverable Servicing Advances) and any unpaid Servicing Fees allocable to such Mortgage Loan or REO Property and (iv) in the case of a Mortgage Loan required to be purchased pursuant to Section 2.03, expenses reasonably incurred or to be incurred by the Servicer or the Trustee in respect of the breach or defect giving rise to the purchase obligation and any costs and damages incurred by the Trust Fund and the Trustee in connection with any violation by any such Mortgage Loan of any predatory or abusive lending law.

"Qualified Substitute Mortgage Loan": A mortgage loan substituted for a Deleted Mortgage Loan pursuant to the terms of this Agreement which must, on the date of such substitution, (i) have an outstanding principal balance, after application of all scheduled payments of principal and interest due during or prior to the month of substitution, not in excess of the Scheduled Principal Balance of the Deleted Mortgage Loan as of the Due Date in the calendar month during which the substitution occurs, (ii) have a Mortgage Rate not less than (and not more than one percentage point in excess of) the Mortgage Rate of the Deleted Mortgage Loan, (iii) have a remaining term to maturity not greater than (and not more than one year less than) that of the Deleted Mortgage Loan, (iv) have the same Due Date as the Due Date on the Deleted Mortgage Loan, (v) have a Combined Loan-to-Value Ratio as of the date of substitution equal to or lower than the Combined Loan-to-Value Ratio of the Deleted Mortgage Loan as of such date, (vi) be secured by the same lien priority on the related Mortgaged Property as the Deleted Mortgage Loan, (vii) have a credit grade at least equal to the credit grading assigned on the Deleted Mortgage Loan, (viii) be a "qualified mortgage" as defined in the REMIC Provisions and (ix) conform to each representation and warranty set forth in Section 6 of the Mortgage Loan Purchase Agreement applicable to the Deleted Mortgage Loan.  In the event that one or more mortgage loans are substituted for one or more Deleted Mortgage Loans, the amounts described in clause (i) hereof shall be determined on the basis of aggregate principal balances, the Mortgage Rates described in clause (ii) hereof shall be determined on the basis of weighted average Mortgage Rates, the terms described in clause (iii) hereof shall be determined on the basis of weighted average remaining term to maturity, the Combined Loan-to-Value Ratios described in clause (v) hereof shall be satisfied as to each such mortgage loan, the credit grades described in clause (vii) hereof shall be satisfied as to each such mortgage loan and, except to the extent otherwise provided in this sentence, the representations and warranties described in clause (ix) hereof must be satisfied as to each Qualified Substitute Mortgage Loan or in the aggregate, as the case may be.

"Rate/Term Refinancing": A Refinanced Mortgage Loan, the proceeds of which are not more than a nominal amount in excess of the existing first mortgage loan and any subordinate mortgage loan on the related Mortgaged Property and related closing costs, and were used exclusively (except for such nominal amount) to satisfy the then existing first mortgage loan and any subordinate mortgage loan of the Mortgagor on the related Mortgaged Property and to pay related closing costs.

"Rating Agency or Rating Agencies": Moody's, S&P, DBRS or their successors. If such agencies or their successors are no longer in existence, "Rating Agencies" shall be such nationally recognized statistical rating agencies, or other comparable Persons, designated by the Depositor, notice of which designation shall be given to the Trustee and the Servicer.

"Realized Loss": With respect to each Mortgage Loan as to which a Final Recovery Determination has been made, an amount (not less than zero), as reported by the Servicer to the Master Servicer (in substantially the form of Schedule 4 hereto) equal to (i) the unpaid principal balance of such Mortgage Loan as of the commencement of the calendar month in which the Final Recovery Determination was made, plus (ii) accrued interest from the Due Date as to which interest was last paid by the Mortgagor through the end of the calendar month in which such Final Recovery Determination was made, calculated in the case of each calendar month during such period (A) at an annual rate equal to the annual rate at which interest was then

accruing on such Mortgage Loan and (B) on a principal amount equal to the Stated Principal Balance of such Mortgage Loan as of the close of business on the Distribution Date during such calendar month, plus (iii) any amounts previously withdrawn from the Collection Account in respect of such Mortgage Loan pursuant to Section 3.09(a)(ix) and Section 3.13(b) of this Agreement, minus (iv) the proceeds, if any, received in respect of such Mortgage Loan during the calendar month in which such Final Recovery Determination was made, net of amounts that are payable therefrom to the Servicer with respect to such Mortgage Loan pursuant to Section 3.09(a)(iii) of this Agreement. Any Charged Off Loan will give rise to a Realized Loss (calculated as if clause (iv) of the previous sentence is equal to zero) at the time it is charged off, as described in Section 3.13(a)(iii) hereof.

With respect to any REO Property as to which a Final Recovery Determination has been made, an amount (not less than zero) equal to (i) the unpaid principal balance of the related Mortgage Loan as of the date of acquisition of such REO Property on behalf of REMIC I, plus (ii) accrued interest from the Due Date as to which interest was last paid by the Mortgagor in respect of the related Mortgage Loan through the end of the calendar month immediately preceding the calendar month in which such REO Property was acquired, calculated in the case of each calendar month during such period (A) at an annual rate equal to the annual rate at which interest was then accruing on the related Mortgage Loan and (B) on a principal amount equal to the Stated Principal Balance of the related Mortgage Loan as of the close of business on the Distribution Date during such calendar month, plus (iii) REO Imputed Interest for such REO Property for each calendar month commencing with the calendar month in which such REO Property was acquired and ending with the calendar month in which such Final Recovery Determination was made, plus (iv) any amounts previously withdrawn from the Collection Account in respect of the related Mortgage Loan pursuant to Section 3.09(a)(ix) and Section 3.13(b) of this Agreement, minus (v) the aggregate of all P&I Advances and Servicing Advances (in the case of Servicing Advances, without duplication of amounts netted out of the rental income, Insurance Proceeds and Liquidation Proceeds described in clause (vi) below) made by the Servicer in respect of such REO Property or the related Mortgage Loan for which the Servicer has been or, in connection with such Final Recovery Determination, will be reimbursed pursuant to Section 3.22 of this Agreement out of rental income, Insurance Proceeds and Liquidation Proceeds received in respect of such REO Property, minus (vi) the total of all net rental income, Insurance Proceeds and Liquidation Proceeds received in respect of such REO Property that has been, or in connection with such Final Recovery Determination, will be transferred to the Distribution Account pursuant to Section 3.22 of this Agreement.

With respect to each Mortgage Loan which has become the subject of a Deficient Valuation, the difference between the principal balance of the Mortgage Loan outstanding immediately prior to such Deficient Valuation and the principal balance of the Mortgage Loan as reduced by the Deficient Valuation.

With respect to each Mortgage Loan which has become the subject of a Debt Service Reduction, the portion, if any, of the reduction in each affected Monthly Payment attributable to a reduction in the Mortgage Rate imposed by a court of competent jurisdiction. Each such Realized Loss shall be deemed to have been incurred on the Due Date for each affected Monthly Payment.

To the extent the Servicer receives Subsequent Recoveries with respect to any Mortgage Loan, the amount of Realized Loss with respect to that Mortgage Loan will be reduced to the extent such recoveries are applied to reduce the Certificate Principal Balance of any Class of Certificates on any Distribution Date.

"Record Date": With respect to each Distribution Date and the Class A Certificates and the Mezzanine Certificates, the Business Day immediately preceding such Distribution Date for so long as such Certificates are Book-Entry Certificates. With respect to each Distribution Date and any other Class of Certificates, including any Definitive Certificates, the last day of the calendar month immediately preceding the month in which such Distribution Date occurs.

"Recovery Fee(s)": An amount equal to thirty percent (30%) of the net recoveries received in respect of a Charged Off Loan payable to the Servicer.

"Reference Banks": Barclays Bank PLC, The Tokyo Mitsubishi Bank and National Westminster Bank PLC and their successors in interest; provided, however, that if any of the foregoing banks are not suitable to serve as a Reference Bank, then any leading banks selected by the Securities Administrator which are engaged in transactions in Eurodollar deposits in the International Eurocurrency market (i) with an established place of business in London, (ii) not controlling, under the control of or under common control with the Depositor or any Affiliate thereof and (iii) which have been designated as such by the Securities Administrator.

"Refinanced Mortgage Loan": A Mortgage Loan the proceeds of which were not used to purchase the related Mortgaged Property.

"Regular Certificate": Any Class A Certificate, Mezzanine Certificate, Class CE Certificate or Class P Certificate.

"Regular Interest": A "regular interest" in a REMIC within the meaning of Section 860G(a)(1) of the Code.

"Regulation AB": Means Subpart 229.1100 - Asset Backed Securities (Regulation AB), 17 C.F.R. §§229.1100-229.1123, as such may be amended from time to time, and subject to such clarification and interpretation as have been provided by the Commission in the adopting release (Asset-Backed Securities, Securities Act Release No. 33-8518, 70 Fed. Reg. 1,506-1,631 (Jan. 7, 2005)) or by the staff of the Commission, or as may be provided by the Commission or its staff from time to time.

"Released Loan": Any Charged Off Loan that is released by the Servicer to the Class CE Certificateholders pursuant to Section 3.13(a)(iv), generally on the date that is six months after the later of (i) the date on which such Mortgage Loans were charged off and (ii) the date on which any collections are received on such Charged Off Loans. Any Released Loan will no longer be an asset of any Trust REMIC or the Trust Fund.

"Relevant Servicing Criteria": Means the Servicing Criteria applicable to the various parties, as set forth on Exhibit E attached hereto. For clarification purposes, multiple parties can have responsibility for the same Relevant Servicing Criteria. With respect to a

Servicing Function Participant engaged by the Master Servicer, the Securities Administrator, the Trustee or the Servicer, the term "Relevant Servicing Criteria" may refer to a portion of the Relevant Servicing Criteria applicable to such parties.

"Relief Act": The Servicemembers Civil Relief Act, as amended, or similar state or local laws.

"Relief Act Interest Shortfall": With respect to any Distribution Date and any Mortgage Loan, any reduction in the amount of interest collectible on such Mortgage Loan for the most recently ended Due Period as a result of the application of the Relief Act.

"REMIC": A "real estate mortgage investment conduit" within the meaning of Section 860D of the Code.

"REMIC I": The segregated pool of assets subject hereto, constituting the primary trust created hereby and to be administered hereunder, with respect to which a REMIC election is to be made, consisting of: (i) such Mortgage Loans and Prepayment Charges as from time to time are subject to this Agreement, together with the Mortgage Files relating thereto, and together with all collections thereon and proceeds thereof; (ii) any REO Property, together with all collections thereon and proceeds thereof; (iii) the Trustee's rights with respect to the Mortgage Loans under all insurance policies required to be maintained pursuant to this Agreement and any proceeds thereof; (iv) the Depositor's rights under the Mortgage Loan Purchase Agreement (including any security interest created thereby) and any Assignment Agreement; and (v) the Collection Account, the Distribution Account and any REO Account, and such assets that are deposited therein from time to time and any investments thereof, together with any and all income, proceeds and payments with respect thereto. Notwithstanding the foregoing, however, REMIC I specifically excludes (i) all payments and other collections of principal and interest due on the Mortgage Loans on or before the Cut-off Date and all Prepayment Charges payable in connection with Principal Prepayments made before the Cut-off Date; (ii) the Reserve Fund and any amounts on deposit therein from time to time and any proceeds thereof; (iii) the Swap Agreement; and (iv) the Supplemental Interest Trust.

["REMIC I Group I Regular Interests": REMIC I Regular Interest I and REMIC I Regular Interest I-1-A through REMIC I Regular Interest I-54-B as designated in the Preliminary Statement hereto.

"REMIC I Group II Regular Interests": REMIC I Regular Interest II and REMIC I Regular Interest II-1-A through REMIC II Regular Interest II-54-B as designated in the Preliminary Statement hereto.

"REMIC I Regular Interest": Any of the separate non-certificated beneficial ownership interests in REMIC I issued hereunder and designated as a "regular interest" in REMIC I. Each REMIC I Regular Interest shall accrue interest at the related REMIC I Remittance Rate in effect from time to time, and shall be entitled to distributions of principal, subject to the terms and conditions hereof, in an aggregate amount equal to its initial Uncertificated Balance as set forth in the Preliminary Statement hereto.

"REMIC I Remittance Rate": With respect to REMIC I Regular Interest I, a per annum rate equal to the weighted average of the Net Mortgage Rates of the Group I Mortgage Loans. With respect to each REMIC I Group I Regular Interest ending with the designation "A", a per annum rate equal to the weighted average of the Net Mortgage Rates of the Group I Mortgage Loans multiplied by 2, subject to a maximum rate of 10.040%. With respect to each REMIC I Group I Regular Interest ending with the designation "B", the greater of (x) a per annum rate equal to the excess, if any, of (i) 2 multiplied by the weighted average of the Net Mortgage Rates of the Group I Mortgage Loans over (ii) 10.040% and (y) 0.00%.  With respect to REMIC I Regular Interest II, a per annum rate equal to the weighted average of the Net Mortgage Rates of the Group II Mortgage Loans. With respect to each REMIC I Group II Regular Interest ending with the designation "A", a per annum rate equal to the weighted average of the Net Mortgage Rates of the Group II Mortgage Loans multiplied by 2, subject to a maximum rate of 10.040%. With respect to each REMIC I Group II Regular Interest ending with the designation "B", the greater of (x) a per annum rate equal to the excess, if any, of (i) 2 multiplied by the weighted average of the Net Mortgage Rates of the Group II Mortgage Loans over (ii) 10.040% and (y) 0.00%.

"REMIC II": The segregated pool of assets consisting of all of the REMIC I Regular Interests conveyed in trust to the Trustee, for the benefit of the REMIC II Regular Interests pursuant to Section 2.07, and all amounts deposited therein, with respect to which a separate REMIC election is to be made.

"REMIC II Interest Loss Allocation Amount": With respect to any Distribution Date, an amount equal to (a) the product of (i) 50% of the aggregate Stated Principal Balance of the Mortgage Loans and REO Properties then outstanding and (ii) the REMIC II Remittance Rate for REMIC II Regular Interest AA minus the Marker Rate, divided by (b) 12.

"REMIC II Marker Allocation Percentage": 50% of any amount payable or loss attributable from the Mortgage Loans, which shall be allocated to REMIC II Regular Interest AA, REMIC II Regular Interest A, REMIC II Regular Interest M-1, REMIC II Regular Interest M-2, REMIC II Regular Interest M-3, REMIC II Regular Interest ZZ and REMIC II Regular Interest P.

"REMIC II Overcollateralization Amount": With respect to any date of determination, (i) 0.50% of the aggregate Uncertificated Balances of the REMIC II Regular Interests (other than REMIC II Regular Interest P) minus (ii) the aggregate of the Uncertificated Balances of REMIC II Regular Interest A, REMIC II Regular Interest M-1, REMIC II Regular Interest M-2, REMIC II Regular Interest M-3, in each case as of such date of determination.

"REMIC II Principal Loss Allocation Amount": With respect to any Distribution Date, an amount equal to (a) the product of (i) 50% of the aggregate Stated Principal Balance of the Mortgage Loans and REO Properties then outstanding and (ii) 1 minus a fraction, the numerator of which is two times the aggregate of the Uncertificated Balances of REMIC II Regular Interest A, REMIC II Regular Interest M-1, REMIC II Regular Interest M-2, REMIC II Regular Interest M-3 and the denominator of which is the aggregate of the Uncertificated Balances of REMIC II Regular Interest A, REMIC II Regular Interest M-1, REMIC II Regular Interest M-2, REMIC II Regular Interest M-3 and REMIC II Regular Interest ZZ.

"REMIC II Regular Interest": Any of the separate non-certificated beneficial ownership interests in REMIC II issued hereunder and designated as a "regular interest" in REMIC II. Each REMIC II Regular Interest shall accrue interest at the related REMIC II Remittance Rate in effect from time to time, and shall be entitled to distributions of principal, subject to the terms and conditions hereof, in an aggregate amount equal to its initial Uncertificated Balance as set forth in the Preliminary Statement hereto. The designations for the respective REMIC II Regular Interests are set forth in the Preliminary Statement hereto.

"REMIC II Regular Interest AA": One of the separate non-certificated beneficial ownership interests in REMIC II issued hereunder and designated as a Regular Interest in REMIC II.  REMIC II Regular Interest AA shall accrue interest at the related REMIC II Remittance Rate in effect from time to time, and shall be entitled to distributions of principal, subject to the terms and conditions hereof, in an aggregate amount equal to its initial Uncertificated Balance as set forth in the Preliminary Statement hereto.

"REMIC II Regular Interest A": One of the separate non-certificated beneficial ownership interests in REMIC II issued hereunder and designated as a Regular Interest in REMIC II. REMIC II Regular Interest A shall accrue interest at the related REMIC II Remittance Rate in effect from time to time, and shall be entitled to distributions of principal, subject to the terms and conditions hereof, in an aggregate amount equal to its initial Uncertificated Balance as set forth in the Preliminary Statement hereto.

"REMIC II Regular Interest IO": One of the separate non-certificated beneficial ownership interests in REMIC II issued hereunder and designated as a Regular Interest in REMIC II. REMIC II Regular Interest IO shall accrue interest at the related REMIC II Remittance Rate in effect from time to time and shall not be entitled to distributions of principal.

"REMIC II Regular Interest M-1": One of the separate non-certificated beneficial ownership interests in REMIC II issued hereunder and designated as a Regular Interest in REMIC II. REMIC II Regular Interest M-1 shall accrue interest at the related REMIC II Remittance Rate in effect from time to time, and shall be entitled to distributions of principal, subject to the terms and conditions hereof, in an aggregate amount equal to its initial Uncertificated Balance as set forth in the Preliminary Statement hereto.

"REMIC II Regular Interest M-2": One of the separate non-certificated beneficial ownership interests in REMIC II issued hereunder and designated as a Regular Interest in REMIC II. REMIC II Regular Interest M-2 shall accrue interest at the related REMIC II Remittance Rate in effect from time to time, and shall be entitled to distributions of principal, subject to the terms and conditions hereof, in an aggregate amount equal to its initial Uncertificated Balance as set forth in the Preliminary Statement hereto.

"REMIC II Regular Interest M-3": One of the separate non-certificated beneficial ownership interests in REMIC II issued hereunder and designated as a Regular Interest in REMIC II.  REMIC II Regular Interest M-3 shall accrue interest at the related REMIC II Remittance Rate in effect from time to time, and shall be entitled to distributions of principal, subject to the terms and conditions hereof, in an aggregate amount equal to its initial Uncertificated Balance as set forth in the Preliminary Statement hereto.

43

"REMIC II Regular Interest M-4": One of the separate non-certificated beneficial ownership interests in REMIC II issued hereunder and designated as a Regular Interest in REMIC II. REMIC II Regular Interest M-4 shall accrue interest at the related REMIC II Remittance Rate in effect from time to time, and shall be entitled to distributions of principal, subject to the terms and conditions hereof, in an aggregate amount equal to its initial Uncertificated Balance as set forth in the Preliminary Statement hereto.

"REMIC II Regular Interest P": One of the separate non-certificated beneficial ownership interests in REMIC II issued hereunder and designated as a Regular Interest in REMIC II. REMIC II Regular Interest P shall accrue interest at the related REMIC II Remittance Rate in effect from time to time, and shall be entitled to distributions of principal, subject to the terms and conditions hereof, in an aggregate amount equal to its initial Uncertificated Balance as set forth in the Preliminary Statement hereto.

"REMIC II Regular Interest XX": One of the separate non-certificated beneficial ownership interests in REMIC II issued hereunder and designated as a Regular Interest in REMIC II. REMIC II Regular Interest XX shall accrue interest at the related REMIC II Remittance Rate in effect from time to time, and shall be entitled to distributions of principal, subject to the terms and conditions hereof, in an aggregate amount equal to its initial Uncertificated Balance as set forth in the Preliminary Statement hereto.

"REMIC II Regular Interest ZZ": One of the separate non-certificated beneficial ownership interests in REMIC II issued hereunder and designated as a Regular Interest in REMIC II. REMIC II Regular Interest ZZ shall accrue interest at the related REMIC II Remittance Rate in effect from time to time, and shall be entitled to distributions of principal, subject to the terms and conditions hereof, in an aggregate amount equal to its initial Uncertificated Balance as set forth in the Preliminary Statement hereto.

"REMIC II Regular Interest I-SUB": One of the separate non-certificated beneficial ownership interests in REMIC II issued hereunder and designated as a Regular Interest in REMIC II. REMIC II Regular Interest I-SUB shall accrue interest at the related REMIC II Remittance Rate in effect from time to time, and shall be entitled to distributions of principal, subject to the terms and conditions hereof, in an aggregate amount equal to its initial Uncertificated Balance as set forth in the Preliminary Statement hereto.

"REMIC II Regular Interest I-GRP": One of the separate non-certificated beneficial ownership interests in REMIC II issued hereunder and designated as a Regular Interest in REMIC II. REMIC II Regular Interest I-GRP shall accrue interest at the related REMIC II Remittance Rate in effect from time to time, and shall be entitled to distributions of principal, subject to the terms and conditions hereof, in an aggregate amount equal to its initial Uncertificated Balance as set forth in the Preliminary Statement hereto.

"REMIC II Regular Interest II-SUB": One of the separate non-certificated beneficial ownership interests in REMIC II issued hereunder and designated as a Regular Interest in REMIC II. REMIC II Regular Interest II-SUB shall accrue interest at the related REMIC II Remittance Rate in effect from time to time, and shall be entitled to distributions of principal,

subject to the terms and conditions hereof, in an aggregate amount equal to its initial Uncertificated Balance as set forth in the Preliminary Statement hereto.

"REMIC II Regular Interest II-GRP": One of the separate non-certificated beneficial ownership interests in REMIC II issued hereunder and designated as a Regular Interest in REMIC II. REMIC II Regular Interest II-GRP shall accrue interest at the related REMIC II Remittance Rate in effect from time to time, and shall be entitled to distributions of principal, subject to the terms and conditions hereof, in an aggregate amount equal to its initial Uncertificated Balance as set forth in the Preliminary Statement hereto.

"REMIC II Remittance Rate": With respect to REMIC II Regular Interest AA, REMIC II Regular Interest A, REMIC II Regular Interest M-1, REMIC II Regular Interest M-2, REMIC II Regular Interest M-3, REMIC II Regular Interest M-4, REMIC II Regular Interest ZZ, REMIC II Regular Interest P, REMIC II Regular Interest I-SUB, REMIC II Regular Interest II-SUB and REMIC II Regular Interest XX, a per annum rate (but not less than zero) equal to the weighted average of: (w) with respect to REMIC I Regular Interest I and REMIC I Regular Interest II, the REMIC I Remittance Rate for each such REMIC I Regular Interest for each such Distribution Date, (x) with respect to each REMIC I Regular Interest ending with the designation "B", the weighted average of the REMIC I Remittance Rates for such REMIC I Regular Interests, weighted on the basis of the Uncertificated Balances of such REMIC I Regular Interests for each such Distribution Date and (y) with respect to REMIC I Regular Interests ending with the designation "A", for each Distribution Date listed below, the weighted average of the rates listed below for each such REMIC I Regular Interest listed below, weighted on the basis of the Uncertificated Balances of each such REMIC I Regular Interest for each such Distribution Date:

| Distribution Date | REMIC I Regular Interest | Rate |
|---|---|---|
| 1st through 6th | I-1-A through I-54-A | REMIC I Remittance Rate |
| | II-1-A through II-54-A | REMIC I Remittance Rate |
| 7 | I-1-A through I-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | II-1-A through II-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| 8 | I-2-A through I-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | II-2-A through II-54-A | 2 multiplied by Swap LIBOR, subject to a maximum REMIC I Remittance Rate |
| | I-1-A | REMIC I Remittance Rate |
| | II-1-A | REMIC I Remittance Rate |
| 9 | I-3-A through I-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | II-3-A through II-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | I-1-A and I-2-A | REMIC I Remittance Rate |
| | II-1-A and II-2-A | REMIC I Remittance Rate |
| 10 | I-4-A through I-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | II-4-A through II-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | I-1-A through I-3-A | REMIC I Remittance Rate |
| | II-1-A through II-3-A | REMIC I Remittance Rate |
| 11 | I-5-A through I-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | II-5-A through II-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I |

| Distribution Date | REMIC I Regular Interest | Rate |
|---|---|---|
| | | Remittance Rate |
| | I-1-A through I-4-A | REMIC I Remittance Rate |
| | II-1-A through II-4-A | REMIC I Remittance Rate |
| 12 | I-6-A through I-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | II-6-A through II-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | I-1-A through I-5-A | REMIC I Remittance Rate |
| | II-1-A through II-5-A | REMIC I Remittance Rate |
| 13 | I-7-A through I-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | II-7-A through II-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | I-1-A through I-6-A | REMIC I Remittance Rate |
| | II-1-A through II-6-A | REMIC I Remittance Rate |
| 14 | I-8-A through I-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | II-8-A through II-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | I-1-A through I-7-A | REMIC I Remittance Rate |
| | II-1-A through II-7-A | REMIC I Remittance Rate |
| 15 | I-9-A through I-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | II-9-A through II-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | I-1-A through I-8-A | REMIC I Remittance Rate |
| | II-1-A through II-8-A | REMIC I Remittance Rate |
| 16 | I-10-A through I-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | II-10-A through II-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | I-1-A through I-9-A | REMIC I Remittance Rate |
| | II-1-A through II-9-A | REMIC I Remittance Rate |
| 17 | I-11-A through I-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | II-11-A through II-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | I-1-A through I-10-A | REMIC I Remittance Rate |
| | II-1-A through II-10-A | REMIC I Remittance Rate |
| 18 | I-12-A through I-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | II-12-A through II-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | I-1-A through I-11-A | REMIC I Remittance Rate |
| | II-1-A through II-11-A | REMIC I Remittance Rate |
| 19 | I-13-A through I-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | II-13-A through II-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | I-1-A through I-12-A | REMIC I Remittance Rate |
| | II-1-A through II-12-A | REMIC I Remittance Rate |
| 20 | I-14-A through I-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | II-14-A through II-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | I-1-A through I-13-A | REMIC I Remittance Rate |
| | II-1-A through II-13-A | REMIC I Remittance Rate |
| 21 | I-15-A through I-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | II-15-A through II-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | I-1-A through I-14-A | REMIC I Remittance Rate |
| | II-1-A through II-14-A | REMIC I Remittance Rate |
| 22 | I-16-A through I-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |

46

| Distribution Date | REMIC I Regular Interest | Rate |
|---|---|---|
| | II-16-A through II-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | I-1-A through I-15-A | REMIC I Remittance Rate |
| | II-1-A through II-15-A | REMIC I Remittance Rate |
| 23 | I-17-A through I-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | II-17-A through II-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | I-1-A through I-16-A | REMIC I Remittance Rate |
| | II-1-A through II-16-A | REMIC I Remittance Rate |
| 24 | I-18-A through I-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | II-18-A through II-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | I-1-A through I-17-A | REMIC I Remittance Rate |
| | II-1-A through II-17-A | REMIC I Remittance Rate |
| 25 | I-19-A through I-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | II-19-A through II-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | I-1-A through I-18-A | REMIC I Remittance Rate |
| | II-1-A through II-18-A | REMIC I Remittance Rate |
| 26 | I-20-A through I-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | II-20-A through II-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | I-1-A through I-19-A | REMIC I Remittance Rate |
| | II-1-A through II-19-A | REMIC I Remittance Rate |
| 27 | I-21-A through I-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | II-21-A through II-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | I-1-A through I-20-A | REMIC I Remittance Rate |
| | II-1-A through II-20-A | REMIC I Remittance Rate |
| 28 | I-22-A through I-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | II-22-A through II-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | I-1-A through I-21-A | REMIC I Remittance Rate |
| | II-1-A through II-21-A | REMIC I Remittance Rate |
| 29 | I-23-A through I-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | II-23-A through II-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | I-1-A through I-22-A | REMIC I Remittance Rate |
| | II-1-A through II-22-A | REMIC I Remittance Rate |
| 30 | I-24-A through I-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | II-24-A through II-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | I-1-A through I-23-A | REMIC I Remittance Rate |
| | II-1-A through II-23-A | REMIC I Remittance Rate |
| 31 | I-25-A through I-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | II-25-A through II-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | I-1-A through I-24-A | REMIC I Remittance Rate |
| | II-1-A through II-24-A | REMIC I Remittance Rate |
| 32 | I-26-A through I-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | II-26-A through II-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | I-1-A through I-25-A | REMIC I Remittance Rate |
| | II-1-A through II-25-A | REMIC I Remittance Rate |
| 33 | I-27-A through I-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I |

| Distribution Date | REMIC I Regular Interest | Rate |
|---|---|---|
| | II-27-A through II-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| 34 | I-1-A through I-26-A | REMIC I Remittance Rate |
| | II-1-A through II-26-A | REMIC I Remittance Rate |
| | I-28-A through I-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | II-28-A through II-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| 35 | I-1-A through I-27-A | REMIC I Remittance Rate |
| | II-1-A through II-27-A | REMIC I Remittance Rate |
| | I-29-A through I-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | II-29-A through II-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| 36 | I-1-A through I-28-A | REMIC I Remittance Rate |
| | II-1-A through II-28-A | REMIC I Remittance Rate |
| | I-30-A through I-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | II-30-A through II-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| 37 | I-1-A through I-29-A | REMIC I Remittance Rate |
| | II-1-A through II-29-A | REMIC I Remittance Rate |
| | I-31-A through I-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | II-31-A through II-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| 38 | I-1-A through I-30-A | REMIC I Remittance Rate |
| | II-1-A through II-30-A | REMIC I Remittance Rate |
| | I-32-A through I-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | II-32-A through II-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| 39 | I-1-A through I-31-A | REMIC I Remittance Rate |
| | II-1-A through II-31-A | REMIC I Remittance Rate |
| | I-33-A through I-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | II-33-A through II-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| 40 | I-1-A through I-32-A | REMIC I Remittance Rate |
| | II-1-A through II-32-A | REMIC I Remittance Rate |
| | I-34-A through I-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | II-34-A through II-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| 41 | I-1-A through I-33-A | REMIC I Remittance Rate |
| | II-1-A through II-33-A | REMIC I Remittance Rate |
| | I-35-A through I-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | II-35-A through II-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| 42 | I-1-A through I-34-A | REMIC I Remittance Rate |
| | II-1-A through II-34-A | REMIC I Remittance Rate |
| | I-36-A through I-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | II-36-A through II-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| 43 | I-1-A through I-35-A | REMIC I Remittance Rate |
| | II-1-A through II-35-A | REMIC I Remittance Rate |
| | I-37-A through I-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | II-37-A through II-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | I-1-A through I-36-A | REMIC I Remittance Rate |
| | II-1-A through II-36-A | REMIC I Remittance Rate |

| Distribution Date | REMIC I Regular Interest | Rate |
|---|---|---|
| 44 | I-38-A through I-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | II-38-A through II-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | I-1-A through I-37-A | REMIC I Remittance Rate |
| | II-1-A through II-37-A | REMIC I Remittance Rate |
| 45 | I-39-A through I-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | II-39-A through  II-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | I-1-A through I-38-A | REMIC I Remittance Rate |
| | II-1-A through II-38-A | REMIC I Remittance Rate |
| 46 | I-40-A through I-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | II-40-A through II-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | I-1-A through I-39-A | REMIC I Remittance Rate |
| | II-1-A through II-39-A | REMIC I Remittance Rate |
| 47 | I-41-A through I-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | II-41-A through II-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | I-1-A through I-40-A | REMIC I Remittance Rate |
| | II-1-A through II-40-A | REMIC I Remittance Rate |
| 48 | I-42-A through I-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | II-42-A through II-41-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | I-1-A through I-41-A | REMIC I Remittance Rate |
| | II-1-A through II-21-A | REMIC I Remittance Rate |
| 49 | I-43-A through I-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | II-43-A through II-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | I-1-A through I-42-A | REMIC I Remittance Rate |
| | II-1-A through II-42-A | REMIC I Remittance Rate |
| 50 | I-44-A through I-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | II-44-A through II-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | I-1-A through I-43-A | REMIC I Remittance Rate |
| | II-1-A through II-43-A | REMIC I Remittance Rate |
| 51 | I-45-A through I-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | II-45-A through II-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | I-1-A through I-44-A | REMIC I Remittance Rate |
| | II-1-A through II-44-A | REMIC I Remittance Rate |
| 52 | I-46-A through I-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | II-46-A through II-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | I-1-A through I-45-A | REMIC I Remittance Rate |
| | II-1-A through II-45-A | REMIC I Remittance Rate |
| 51 | I-47-A through I-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | II-47-A through II-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | I-1-A through I-46-A | REMIC I Remittance Rate |
| | II-1-A through II-46-A | REMIC I Remittance Rate |
| 51 | I-48-A through I-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | II-48-A through II-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | I-1-A through I-47-A | REMIC I Remittance Rate |

| Distribution Date | REMIC I Regular Interest | Rate |
|---|---|---|
| | II-1-A through II-47-A | REMIC I Remittance Rate |
| 55 | I-49-A through I-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | II-49-A through II-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | I-1-A through I-48-A | REMIC I Remittance Rate |
| | II-1-A through II-48-A | REMIC I Remittance Rate |
| 56 | I-50-A through I-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | II-50-A through II-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | I-1-A through I-49-A | REMIC I Remittance Rate |
| | II-1-A through II-49-A | REMIC I Remittance Rate |
| 57 | I-51-A through I-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | II-51-A through II-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | I-1-A through I-50-A | REMIC I Remittance Rate |
| | II-1-A through II-50-A | REMIC I Remittance Rate |
| 58 | I-52-A through I-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | II-52-A through II-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | I-1-A through I-51-A | REMIC I Remittance Rate |
| | II-1-A through II-51-A | REMIC I Remittance Rate |
| 59 | I-53-A and I-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | II-53-A and II-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | I-1-A through I-52-A | REMIC I Remittance Rate |
| | II-1-A through II-52-A | REMIC I Remittance Rate |
| 60 | I-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | II-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | I-1-A through I-50-A | REMIC I Remittance Rate |
| | II-1-A through II-50-A | REMIC I Remittance Rate |
| thereafter | I-1-A through I-54-A | REMIC I Remittance Rate |
| | II-1-A through II-54-A | REMIC I Remittance Rate |

With respect to REMIC II Regular Interest I-GRP, a per annum rate (but not less than zero) equal to the weighted average of: (w) with respect to REMIC I Regular Interest I, the REMIC I Remittance Rate for such REMIC I Regular Interest for each such Distribution Date, (x) with respect to REMIC I Group I Regular Interests ending with the designation "B", the weighted average of the REMIC I Remittance Rates for such REMIC I Regular Interests, weighted on the basis of the Uncertificated Balances of each such REMIC I Regular Interest for each such Distribution Date and (y) with respect to REMIC I Group I Regular Interests ending with the designation "A", for each Distribution Date listed below, the weighted average of the rates listed below for such REMIC I Regular Interests listed below, weighted on the basis of the Uncertificated Balances of each such REMIC I Regular Interest for each such Distribution Date:

| Distribution Date | REMIC I Regular Interest | Rate |
|---|---|---|
| 1st through 6th | I-1-A through I-54-A | REMIC I Remittance Rate |
| 7 | I-1-A through I-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| 8 | I-2-A through I-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of |

| Distribution Date | REMIC I Regular Interest | Rate |
|---|---|---|
| | | REMIC I Remittance Rate |
| | I-1-A | REMIC I Remittance Rate |
| 9 | I-3-A through I-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | I-1-A and I-2-A | REMIC I Remittance Rate |
| 10 | I-4-A through I-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | I-1-A through I-3-A | REMIC I Remittance Rate |
| 11 | I-5-A through I-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | I-1-A through I-4-A | REMIC I Remittance Rate |
| 12 | I-6-A through I-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | I-1-A through I-5-A | REMIC I Remittance Rate |
| 13 | I-7-A through I-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | I-1-A through I-6-A | REMIC I Remittance Rate |
| 14 | I-8-A through I-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | I-1-A through I-7-A | REMIC I Remittance Rate |
| 15 | I-9-A through I-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | I-1-A through I-8-A | REMIC I Remittance Rate |
| 16 | I-10-A through I-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | I-1-A through I-9-A | REMIC I Remittance Rate |
| 17 | I-11-A through I-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | I-1-A through I-10-A | REMIC I Remittance Rate |
| 18 | I-12-A through I-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | I-1-A through I-11-A | REMIC I Remittance Rate |
| 19 | I-13-A through I-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | I-1-A through I-12-A | REMIC I Remittance Rate |
| 20 | I-14-A through I-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | I-1-A through I-13-A | REMIC I Remittance Rate |
| 21 | I-15-A through I-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | I-1-A through I-14-A | REMIC I Remittance Rate |
| 22 | I-16-A through I-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | I-1-A through I-15-A | REMIC I Remittance Rate |
| 23 | I-17-A through I-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of |

51

| Distribution Date | REMIC I Regular Interest | Rate |
|---|---|---|
| | | REMIC I Remittance Rate |
| | I-1-A through I-16-A | REMIC I Remittance Rate |
| 24 | I-18-A through I-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | I-1-A through I-17-A | REMIC I Remittance Rate |
| 25 | I-19-A through I-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | I-1-A through I-18-A | REMIC I Remittance Rate |
| 26 | I-20-A through I-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | I-1-A through I-19-A | REMIC I Remittance Rate |
| 27 | I-21-A through I-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | I-1-A through I-20-A | REMIC I Remittance Rate |
| 28 | I-22-A through I-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | I-1-A through I-21-A | REMIC I Remittance Rate |
| 29 | I-23-A through I-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | I-1-A through I-22-A | REMIC I Remittance Rate |
| 30 | I-24-A through I-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | I-1-A through I-23-A | REMIC I Remittance Rate |
| 31 | I-25-A through I-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | I-1-A through I-24-A | REMIC I Remittance Rate |
| 32 | I-26-A through I-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | I-1-A through I-25-A | REMIC I Remittance Rate |
| 33 | I-27-A through I-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | I-1-A through I-26-A | REMIC I Remittance Rate |
| 34 | I-28-A through I-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | I-1-A through I-27-A | REMIC I Remittance Rate |
| 35 | I-29-A through I-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | I-1-A through I-28-A | REMIC I Remittance Rate |
| 36 | I-30-A through I-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | I-1-A through I-29-A | REMIC I Remittance Rate |
| 37 | I-31-A through I-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | I-1-A through I-30-A | REMIC I Remittance Rate |
| 38 | I-32-A through I-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of |

52

| Distribution Date | REMIC I Regular Interest | Rate |
|---|---|---|
| | | REMIC I Remittance Rate |
| | I-1-A through I-31-A | REMIC I Remittance Rate |
| 39 | I-33-A through I-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | I-1-A through I-32-A | REMIC I Remittance Rate |
| 40 | I-34-A through I-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | I-1-A through I-33-A | REMIC I Remittance Rate |
| 41 | I-35-A through I-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | I-1-A through I-34-A | REMIC I Remittance Rate |
| 42 | I-36-A through I-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | I-1-A through I-35-A | REMIC I Remittance Rate |
| 43 | I-37-A through I-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | I-1-A through I-36-A | REMIC I Remittance Rate |
| 44 | I-38-A through I-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | I-1-A through I-37-A | REMIC I Remittance Rate |
| 45 | I-39-A through I-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | I-1-A through I-38-A | REMIC I Remittance Rate |
| 46 | I-40-A through I-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | I-1-A through I-39-A | REMIC I Remittance Rate |
| 47 | I-41-A through I-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | I-1-A through I-40-A | REMIC I Remittance Rate |
| 48 | I-42-A through I-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | I-1-A through I-41-A | REMIC I Remittance Rate |
| 59 | I-43-A through I-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | I-1-A through I-42-A | REMIC I Remittance Rate |
| 50 | I-44-A through I-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | I-1-A through I-43-A | REMIC I Remittance Rate |
| 51 | I-45-A through I-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | I-1-A through I-44-A | REMIC I Remittance Rate |
| 52 | I-46-A through I-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | I-1-A through I-45-A | REMIC I Remittance Rate |
| 51 | I-47-A through I-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of |

53

| Distribution Date | REMIC I Regular Interest | Rate |
|---|---|---|
| | | REMIC I Remittance Rate |
| | I-1-A through I-46-A | REMIC I Remittance Rate |
| 51 | I-48-A through I-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | I-1-A through I-47-A | REMIC I Remittance Rate |
| 55 | I-49-A through I-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | I-1-A through I-48-A | REMIC I Remittance Rate |
| 56 | I-50-A through I-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | I-1-A through I-49-A | REMIC I Remittance Rate |
| 57 | I-51-A through I-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | I-1-A through I-50-A | REMIC I Remittance Rate |
| 58 | I-52-A through I-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | I-1-A through I-51-A | REMIC I Remittance Rate |
| 59 | I-53-A and I-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | I-1-A through I-52-A | REMIC I Remittance Rate |
| 60 | I-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | I-1-A through I-50-A | REMIC I Remittance Rate |
| thereafter | I-1-A through I-54-A | REMIC I Remittance Rate |

With respect to REMIC II Regular Interest II-GRP, a per annum rate (but not less than zero) equal to the weighted average of: (w) with respect to REMIC I Regular Interest II, the REMIC I Remittance Rate for such REMIC I Regular Interest for each such Distribution Date, (x) with respect to REMIC I Group II Regular Interests ending with the designation "B", the weighted average of the REMIC I Remittance Rates for such REMIC I Regular Interests, weighted on the basis of the Uncertificated Balances of each such REMIC I Regular Interest for each such Distribution Date and (y) with respect to REMIC I Group II Regular Interests ending with the designation "A", for each Distribution Date listed below, the weighted average of the rates listed below for such REMIC I Regular Interests listed below, weighted on the basis of the Uncertificated Balances of each such REMIC I Regular Interest for each such Distribution Date:

| Distribution Date | REMIC I Regular Interest | Rate |
|---|---|---|
| 1st through 6th | II-1-A through II-54-A | REMIC I Remittance Rate |
| 7 | II-1-A through II-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| 8 | II-2-A through II-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | II-1-A | REMIC I Remittance Rate |
| 9 | II-3-A through II-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | II-1-A and II-2-A | REMIC I Remittance Rate |
| 10 | II-4-A through II-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of |

| Distribution Date | REMIC I Regular Interest | Rate |
|---|---|---|
|  |  | REMIC I Remittance Rate |
|  | II-1-A through II-3-A | REMIC I Remittance Rate |
| 11 | II-5-A through II-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
|  | II-1-A through II-4-A | REMIC I Remittance Rate |
| 12 | II-6-A through II-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
|  | II-1-A through II-5-A | REMIC I Remittance Rate |
| 13 | II-7-A through II-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
|  | II-1-A through II-6-A | REMIC I Remittance Rate |
| 14 | II-8-A through II-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
|  | II-1-A through II-7-A | REMIC I Remittance Rate |
| 15 | II-9-A through II-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
|  | II-1-A through II-8-A | REMIC I Remittance Rate |
| 16 | II-10-A through II-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
|  | II-1-A through II-9-A | REMIC I Remittance Rate |
| 17 | II-11-A through II-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
|  | II-1-A through II-10-A | REMIC I Remittance Rate |
| 18 | II-12-A through II-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
|  | II-1-A through II-11-A | REMIC I Remittance Rate |
| 19 | II-13-A through II-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
|  | II-1-A through II-12-A | REMIC I Remittance Rate |
| 20 | II-14-A through II-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
|  | II-1-A through II-13-A | REMIC I Remittance Rate |
| 21 | II-15-A through II-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
|  | II-1-A through II-14-A | REMIC I Remittance Rate |
| 22 | II-16-A through II-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
|  | II-1-A through II-15-A | REMIC I Remittance Rate |
| 23 | II-17-A through II-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
|  | II-1-A through II-16-A | REMIC I Remittance Rate |
| 24 | II-18-A through II-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
|  | II-1-A through II-17-A | REMIC I Remittance Rate |
| 25 | II-19-A through II-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of |

| Distribution Date | REMIC I Regular Interest | Rate |
|---|---|---|
| | | REMIC I Remittance Rate |
| | II-1-A through II-18-A | REMIC I Remittance Rate |
| 26 | II-20-A through II-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | II-1-A through II-19-A | REMIC I Remittance Rate |
| 27 | II-21-A through II-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | II-1-A through II-20-A | REMIC I Remittance Rate |
| 28 | II-22-A through II-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | II-1-A through II-21-A | REMIC I Remittance Rate |
| 29 | II-23-A through II-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | II-1-A through II-22-A | REMIC I Remittance Rate |
| 30 | II-24-A through II-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | II-1-A through II-23-A | REMIC I Remittance Rate |
| 31 | II-25-A through II-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | II-1-A through II-24-A | REMIC I Remittance Rate |
| 32 | II-26-A through II-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | II-1-A through II-25-A | REMIC I Remittance Rate |
| 33 | II-27-A through II-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | II-1-A through II-26-A | REMIC I Remittance Rate |
| 34 | II-28-A through II-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | II-1-A through II-27-A | REMIC I Remittance Rate |
| 35 | II-29-A through II-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | II-1-A through II-28-A | REMIC I Remittance Rate |
| 36 | II-30-A through II-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | II-1-A through II-29-A | REMIC I Remittance Rate |
| 37 | II-31-A through II-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | II-1-A through II-30-A | REMIC I Remittance Rate |
| 38 | II-32-A through II-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | II-1-A through II-31-A | REMIC I Remittance Rate |
| 39 | II-33-A through II-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | II-1-A through II-32-A | REMIC I Remittance Rate |
| 40 | II-34-A through II-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of |

| Distribution Date | REMIC I Regular Interest | Rate |
|---|---|---|
| | | REMIC I Remittance Rate |
| | II-1-A through II-33-A | REMIC I Remittance Rate |
| 41 | II-35-A through II-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | II-1-A through II-34-A | REMIC I Remittance Rate |
| 42 | II-36-A through II-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | II-1-A through II-35-A | REMIC I Remittance Rate |
| 43 | II-37-A through II-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | II-1-A through II-36-A | REMIC I Remittance Rate |
| 44 | II-38-A through II-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | II-1-A through II-37-A | REMIC I Remittance Rate |
| 45 | II-39-A through II-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | II-1-A through II-38-A | REMIC I Remittance Rate |
| 46 | II-40-A through II-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | II-1-A through II-39-A | REMIC I Remittance Rate |
| 47 | II-41-A through II-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | II-1-A through II-40-A | REMIC I Remittance Rate |
| 48 | II-42-A through II-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | II-1-A through II-41-A | REMIC I Remittance Rate |
| 59 | II-43-A through II-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | II-1-A through II-42-A | REMIC I Remittance Rate |
| 50 | II-44-A through II-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | II-1-A through II-43-A | REMIC I Remittance Rate |
| 51 | II-45-A through II-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | II-1-A through II-44-A | REMIC I Remittance Rate |
| 52 | II-46-A through II-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | II-1-A through II-45-A | REMIC I Remittance Rate |
| 51 | II-47-A through II-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | II-1-A through II-46-A | REMIC I Remittance Rate |
| 51 | II-48-A through II-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | II-1-A through II-47-A | REMIC I Remittance Rate |
| 55 | II-49-A through II-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of |

57

| Distribution Date | REMIC I Regular Interest | Rate |
|---|---|---|
| | | REMIC I Remittance Rate |
| | II-1-A through II-48-A | REMIC I Remittance Rate |
| 56 | II-50-A through II-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | II-1-A through II-49-A | REMIC I Remittance Rate |
| 57 | II-51-A through II-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | II-1-A through II-50-A | REMIC I Remittance Rate |
| 58 | II-52-A through II-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | II-1-A through II-51-A | REMIC I Remittance Rate |
| 59 | II-53-A and II-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | II-1-A through II-52-A | REMIC I Remittance Rate |
| 60 | II-54-A | 2 multiplied by Swap LIBOR, subject to a maximum rate of REMIC I Remittance Rate |
| | II-1-A through II-50-A | REMIC I Remittance Rate |
| thereafter | II-1-A through II-54-A | REMIC I Remittance Rate |

With respect to REMIC II Regular Interest IO, and (i) the 1st Distribution Date through the 6th Distribution Date, the excess of (x) the weighted average of the REMIC I Remittance Rates for REMIC I Regular Interests including the designation "A", over (y) the weighted average of the REMIC I Remittance Rates for REMIC I Regular Interests including the designation "A", (ii) the 7th Distribution Date through the 60th Distribution Date, the excess of (x) the weighted average of the REMIC I Remittance Rates for REMIC I Regular Interests including the designation "A", over (y) 2 multiplied by Swap LIBOR and (iii) thereafter, 0.00%.

"REMIC II Sub WAC Allocation Percentage": 50% of any amount payable or loss attributable from the Mortgage Loans, which shall be allocated to REMIC II Regular Interest I-SUB, REMIC II Regular Interest I-GRP, REMIC II Regular Interest II-SUB, REMIC II Regular Interest II-GRP and REMIC II Regular Interest XX.

"REMIC II Subordinated Balance Ratio": The ratio among the Uncertificated Balances of each REMIC II Regular Interest ending with the designation "SUB,", equal to the ratio between, with respect to each such REMIC II Regular Interest, the excess of (x) the aggregate Stated Principal Balance of the Group I Mortgage Loans or Group II Mortgage Loans, as applicable over (y) the current Certificate Principal Balance of related Class A Certificates.

"REMIC II Required Overcollateralization Amount": 0.50% of the Required Overcollateralization Amount.

"REMIC III": The segregated pool of assets consisting of all of the REMIC II Regular Interests conveyed in trust to the Trustee, for the benefit of the REMIC III Certificateholders pursuant to Section 2.07, and all amounts deposited therein, with respect to which a separate REMIC election is to be made.

"REMIC III Certificate": Any Regular Certificate or Class R Certificate.

"REMIC III Certificateholder": The Holder of any REMIC III Certificate.]

"REMIC Provisions": Provisions of the federal income tax law relating to real estate mortgage investment conduits, which appear at Section 860A through 860G of the Code, and related provisions, and proposed, temporary and final regulations and published rulings, notices and announcements promulgated thereunder, as the foregoing may be in effect from time to time.

"REMIC Regular Interest": Any REMIC I Regular Interest or REMIC II Regular Interest.

"REMIC Remittance Rate": The REMIC I Remittance Rate or the REMIC II Remittance Rate.

"Remittance Report": A report by the Servicer pursuant to Section 5.03(a) of this Agreement.

"Rents from Real Property": With respect to any REO Property, gross income of the character described in Section 856(d) of the Code as being included in the term "rents from real property."

"REO Account": The account or accounts maintained, or caused to be maintained, by the Servicer in respect of an REO Property pursuant to Section 3.22 of this Agreement.

"REO Disposition": The sale or other disposition of an REO Property on behalf of REMIC I.

"REO Imputed Interest": As to any REO Property, for any calendar month during which such REO Property was at any time part of REMIC I, one month's interest at the applicable Net Mortgage Rate on the Stated Principal Balance of such REO Property (or, in the case of the first such calendar month, of the related Mortgage Loan, if appropriate) as of the close of business on the Distribution Date in such calendar month.

"REO Principal Amortization": With respect to any REO Property, for any calendar month, the excess, if any, of (a) the aggregate of all amounts received in respect of such REO Property during such calendar month, whether in the form of rental income, sale proceeds (including, without limitation, that portion of the Termination Price paid in connection with a purchase of all of the Mortgage Loans and REO Properties pursuant to Section 10.01 of this Agreement that is allocable to such REO Property) or otherwise, net of any portion of such amounts (i) payable in respect of the proper operation, management and maintenance of such REO Property or (ii) payable or reimbursable to the Servicer pursuant to Section 3.22(d) of this Agreement for unpaid Servicing Fees in respect of the related Mortgage Loan and unreimbursed Servicing Advances and P&I Advances in respect of such REO Property or the related Mortgage Loan, over (b) the REO Imputed Interest in respect of such REO Property for such calendar month.

"REO Property": A Mortgaged Property acquired by the Servicer or its nominee on behalf of REMIC I through foreclosure or deed-in-lieu of foreclosure, as described in Section 3.22 of this Agreement.

"Reportable Event": Has the meaning set forth in Section 5.06(b) of this Agreement.

"Required Overcollateralization Amount":  With respect to any Distribution Date (i) prior to the Stepdown Date, the product of (A) [_____]% and (B) the aggregate principal balance of the Mortgage Loans as of the Cut-off Date, (ii) on or after the Stepdown Date provided a Trigger Event is not in effect, the greater of (x) [_____]% of the aggregate Stated Principal Balance of the Mortgage Loans as of the last day of the related Due Period and (y) an amount equal to the product of (A) 0.50% and (B) the aggregate principal balance of the Mortgage Loans as of the Cut-off Date, and (iii) on or after the Stepdown Date and a Trigger Event is in effect, the Required Overcollateralization Amount for the immediately preceding Distribution Date.  Notwithstanding the foregoing, on and after any Distribution Date following the reduction of the aggregate Certificate Principal Balance of the Class A Certificates and Mezzanine Certificates to zero, the Required Overcollateralization Amount shall be zero.

"Reserve Fund": A fund created pursuant to Section 3.25 which shall be an asset of the Trust Fund but which shall not be an asset of any Trust REMIC.

"Reserve Interest Rate": With respect to any Interest Determination Date, the rate per annum that the Securities Administrator determines to be either (i) the arithmetic mean (rounded upwards if necessary to the nearest whole multiple of 1/16%) of the one-month U.S. dollar lending rates which New York City banks selected by the Securities Administrator, after consultation with the Depositor, are quoting on the relevant Interest Determination Date to the principal London offices of leading banks in the London interbank market or (ii) in the event that the Securities Administrator can determine no such arithmetic mean, the lowest one-month U.S. dollar lending rate which New York City banks selected by the Securities Administrator are quoting on such Interest Determination Date to leading European banks.

"Residential Dwelling": Any one of the following: (i) a attached, detached or semi-detached one to four-family dwelling, (ii) a one-family dwelling unit in a Fannie Mae eligible condominium project or (iii) a detached one-family dwelling in a planned unit development, none of which is a co-operative or mobile home.

"Residual Certificate":  Any one of the Class R Certificates.

"Residual Interest": The sole class of "residual interests" in a REMIC within the meaning of Section 860G(a)(2) of the Code.

"Responsible Officer": When used with respect to the Trustee, any officer of the Trustee having direct responsibility for the administration of this Agreement and, with respect to a particular matter, to whom such matter is referred because of such officer's knowledge of and familiarity with the particular subject.

"Reuters Screen LIBOR01 Page": The display page currently so designated on the Reuters Monitor Money Rates Service (or such other page as may replace that page on that service for the purpose of displaying comparable rates or prices).

"Rule 144A": Rule 144A under the Securities Act.

"S&P": Standard & Poor's, a division of the McGraw-Hill Companies, Inc.

"Sarbanes-Oxley Act": Means the Sarbanes-Oxley Act of 2002 and the rules and regulations of the Commission promulgated thereunder (including any interpretations thereof by the Commission's staff).

"Sarbanes-Oxley Certification": A written certification signed by an officer of the Master Servicer that complies with (i) the Sarbanes-Oxley Act of 2002, as amended from time to time, and (ii) Exchange Act Rules 13a-14(d) and 15d-14(d), as in effect from time to time; provided that if, after the Closing Date (a) the Sarbanes-Oxley Act of 2002 is amended, (b) the Rules referred to in clause (ii) are modified or superseded by any subsequent statement, rule or regulation of the Commission or any statement of a division thereof, or (c) any future releases, rules and regulations are published by the Commission from time to time pursuant to the Sarbanes-Oxley Act of 2002, which in any such case affects the form or substance of the required certification and results in the required certification being, in the reasonable judgment of the Master Servicer, materially more onerous that then form of the required certification as of the Closing Date, the Sarbanes-Oxley Certification shall be as agreed to by the Master Servicer, the Depositor and the Sponsor following a negotiation in good faith to determine how to comply with any such new requirements.

"Scheduled Payments": With respect to any Distribution Date with respect to the Insured Certificates during the Term of the Policy, (i) the Interest Distribution Amount distributable in respect of such Class on such Distribution Date (calculated without regard to any step-up following an optional termination date) and (ii) for the Final Maturity Date, the Certificate Principal Balance of such Class outstanding on such Distribution Date, in each case, in accordance with the original terms of such Class of the Insured Certificates and this Agreement when the Insured Certificates were issued and without regard to any subsequent amendment or modification of the Insured Certificates or this Agreement that has not been consented to in writing by the Class A Certificate Insurer. Notwithstanding the foregoing, "Scheduled Payments" shall in no event include payments which become due on an accelerated basis as a result of any optional termination, in whole or in part, or any other cause, unless the Class A Certificate Insurer elects, in its sole discretion, to pay such amounts in whole or in part (in which event Scheduled Payments shall include such accelerated payments as, when, and to the extent so elected by the Class A Certificate Insurer). In the event that the Class A Certificate Insurer does not make such election, "Scheduled Payments" shall include payments due in accordance with the original scheduled terms of the Insured Certificates without regard to any acceleration. In addition, "Scheduled Payments" shall not include, nor shall coverage be provided under the Policy in respect of (i) any amounts due in respect of the Insured Certificates attributable to any increase in interest rate, penalty or other sum payable by the Trust by reason of any default or event of default in respect of the Insured Certificates, or by reason of any deterioration of the creditworthiness of the Trust, (ii) any shortfalls in interest arising out of the application of the Relief Act or any similar state or local laws, regulations or ordinances, (iii) Prepayment Interest Shortfalls, (iv) Net WAC Rate Carryover Amounts, or (v) any taxes, withholding or other charge imposed by any governmental authority due in connection with the payment of any Scheduled Payment to any holder or owner of an Insured Certificate.

"Scheduled Principal Balance": With respect to any Mortgage Loan: (a) as of the Cut-off Date, the outstanding principal balance of such Mortgage Loan as of such date, net of the principal portion of all unpaid Monthly Payments, if any, due on or before such date; (b) as of any Due Date subsequent to the Cut-off Date up to and including the Due Date in the calendar month in which a Liquidation Event occurs with respect to such Mortgage Loan, the Scheduled Principal Balance of such Mortgage Loan as of the Cut-off Date, minus the sum of (i) the principal portion of each Monthly Payment due on or before such Due Date but subsequent to the Cut-off Date, whether or not received, (ii) all Principal Prepayments received before such Due Date but after the Cut-off Date, (iii) the principal portion of all Liquidation Proceeds and Insurance Proceeds received before such Due Date but after the Cut-off Date, net of any portion thereof that represents principal due (without regard to any acceleration of payments under the related Mortgage and Mortgage Note) on a Due Date occurring on or before the date on which such proceeds were received and (iv) any Realized Loss incurred with respect thereto as a result of a Deficient Valuation occurring before such Due Date, but only to the extent such Realized Loss represents a reduction in the portion of principal of such Mortgage Loan not yet due (without regard to any acceleration of payments under the related Mortgage and Mortgage Note) as of the date of such Deficient Valuation; and (c) as of any Due Date subsequent to the occurrence of a Liquidation Event with respect to such Mortgage Loan, zero. With respect to any REO Property: (a) as of any Due Date subsequent to the date of its acquisition on behalf of the Trust Fund up to and including the Due Date in the calendar month in which a Liquidation Event occurs with respect to such REO Property, an amount (not less than zero) equal to the Scheduled Principal Balance of the related Mortgage Loan as of the Due Date in the calendar month in which such REO Property was acquired, minus the aggregate amount of REO Principal Amortization, if any, in respect of REO Property for all previously ended calendar months; and (b) as of any Due Date subsequent to the occurrence of a Liquidation Event with respect to such REO Property, zero.

"Securities Act": The Securities Act of 1933, as amended, and the rules and regulations thereunder.

"Securities Administrator": As of the Closing Date, Wells Fargo Bank, National Association and thereafter, its respective successors in interest that meet the qualifications of this Agreement. The Securities Administrator and the Master Servicer shall at all times be the same Person or Affiliates.

"Senior Interest Distribution Amount": With respect to any Distribution Date, an amount equal to the sum of (i) the Interest Distribution Amount for such Distribution Date for the Class A Certificates and (ii) the Interest Carry Forward Amount, if any, for such Distribution Date for the Class A Certificates.

"Servicer": GMAC or any successor thereto appointed hereunder in connection with the servicing and administration of the Mortgage Loans.

"Servicer Event of Default": One or more of the events described in Section 8.01(a).

"Servicer Remittance Date":  With respect to any Distribution Date, by 12:00 p.m. New York time on the 18th day of the month in which such Distribution Date occurs; provided that if such 18th day of a given month is not a Business Day, the Servicer Remittance Date for such month shall be the Business Day immediately preceding such 18th day.

"Servicer Report": A report (substantially in the form of Schedule 5 hereto) or otherwise in form and substance acceptable to the Master Servicer and Securities Administrator on an electronic data file or tape prepared by the Servicer pursuant to Section 5.03(a) of this Agreement, with such additions, deletions and modifications as agreed to by the Master Servicer, the Securities Administrator and the Servicer.

"Service(s)(ing)": Means, in accordance with Regulation AB, the act of servicing and administering the Mortgage Loans or any other assets of the Trust by an entity that meets the definition of "servicer" set forth in Item 1101 of Regulation AB and is subject to the disclosure requirements set forth in Item 1108 of Regulation AB.  For clarification purposes, any uncapitalized occurrence of this term shall have the meaning commonly understood by participants in the residential mortgage-backed securitization market.

"Servicing Advances": The customary and reasonable "out-of-pocket" costs and expenses incurred prior to or on or after the Cut-off Date (the amounts incurred prior to the Cut-off Date shall be identified on the Servicing Advance Schedule by (a) the Servicer with respect to any Mortgage Loans serviced by the Servicer that were transferred to the Servicer prior to the Cut-off Date and/or (b) the Depositor with respect to any Mortgage Loans that were transferred to the Servicer after the Cut-off Date, as applicable) by the Servicer in connection with a default, delinquency or other unanticipated event by the Servicer in the performance of its servicing obligations, including, but not limited to, the cost of (i) the preservation, restoration and protection of a Mortgaged Property, (ii) any enforcement or judicial proceedings, including but not limited to foreclosures, in respect of a particular Mortgage Loan, including any expenses incurred in relation to any such proceedings that result from the Mortgage Loan being registered on the MERS® System, (iii) the management (including reasonable fees in connection therewith) and liquidation of any REO Property, (iv) the performance of its obligations under Section 3.01, Section 3.07, Section 3.11, Section 3.13 and Section 3.22 of this Agreement; (v) refunding to any Mortgagor the portion of any prepaid origination fees or finance charges that are subject to reimbursement upon a principal prepayment of the related Mortgage Loan to the extent such refund is required by applicable law; and (vi) obtaining any legal documentation required to be included in the Mortgage File and/or correcting any outstanding title issues (i.e., any lien or encumbrance on the Mortgaged Property that prevents the effective enforcement of the intended lien position) reasonably necessary for the Servicer to perform its obligations under this Agreement.  Servicing Advances also include any reasonable "out-of-pocket" cost and expenses (including legal fees) incurred by the Servicer in connection with executing and recording instruments of satisfaction, deeds of reconveyance or Assignments to the extent not recovered from the Mortgagor or otherwise payable under this Agreement.  The Servicer shall not be required to make any Nonrecoverable Servicing Advances.

"Servicing Advance Schedule":  With respect to any Servicing Advances incurred prior to the Cut-off Date, the schedule or schedules provided by (a) the Servicer with respect to any Mortgage Loans that were transferred to the Servicer prior to the Cut-off Date and/or (b) the

Depositor with respect to any Mortgage Loans that were transferred to the Servicer after the Cut-off Date, as applicable, to the Master Servicer and, if such schedule is provided by the Depositor, to the Servicer, on the date on which the Servicer seeks reimbursement for a Servicing Advance made by the Servicer, which schedule or schedules shall contain the information set forth on Schedule 6.

"Servicing Criteria": Means the criteria set forth in paragraph (d) of Item 1122 of Regulation AB, as such may be amended from time to time.

"Servicing Fee": With respect to each Mortgage Loan and for any calendar month, an amount equal to one-twelfth of the product of the Servicing Fee Rate multiplied by the Scheduled Principal Balance of the Mortgage Loans as of the Due Date in the preceding calendar month. The Servicing Fee is payable solely from collections of interest on the Mortgage Loans, except as otherwise provided in Section 3.09 of this Agreement.

"Servicing Fee Rate":  0.50% per annum.

"Servicing Function Participant": Means any Sub-Servicer, Subcontractor or any other Person, other than the Servicer, the Master Servicer, the Custodian, the Trustee and the Securities Administrator, that is determined to be "participating in the servicing function" within the meaning of Item 1122 of Regulation AB, without regard to any threshold referenced therein.

"Servicing Officer": Any officer of the Servicer or the Master Servicer involved in, or responsible for, the administration and servicing of Mortgage Loans, whose name and specimen signature appear on a list of Servicing Officers furnished by the Servicer or the Master Servicer, to the Trustee, the Master Servicer (in the case of the Servicer), the Securities Administrator and the Depositor on the Closing Date, as such list may from time to time be amended.

"Servicing Performance Standards": The servicing performance standards applicable to GMAC and set forth on Schedule 3 attached hereto.

"Significant Subsequent Recoveries": With respect to a defaulted Mortgage Loan, a determination by the Servicer that either (A) the potential Subsequent Recoveries are anticipated to be greater than or equal to the sum of (i) the total indebtedness of the senior lien on the related Mortgaged Property and (ii) $10,000 (after anticipated expenses and attorneys' fees) or (B) the related Mortgagor has shown a willingness and ability to pay over the previous six months.

"Single Certificate":  With respect to any Class of Certificates (other than the Residual Certificates), a hypothetical Certificate of such Class evidencing a Percentage Interest for such Class corresponding to an initial Certificate Principal Balance of $1,000. With respect to the Residual Certificates, a hypothetical Certificate of such Class evidencing a 100% Percentage Interest in such Class.

"Special Servicing Practices": With regard to any Charged Off Loans, the servicing of such Charged Off Loans using specialized collection procedures (including foreclosure, if appropriate) to maximize recoveries.

"Sponsor": SunTrust Asset Funding, LLC or its successor in interest, in its capacity as seller under the Mortgage Loan Purchase Agreement.

"Startup Day": With respect to each Trust REMIC, the day designated as such pursuant to Section 11.01(b) hereof.

"Stated Principal Balance": With respect to any Mortgage Loan: (a) as of any date of determination up to but not including the Distribution Date on which the proceeds, if any, of a Liquidation Event with respect to such Mortgage Loan would be distributed, the Scheduled Principal Balance of such Mortgage Loan as of the Cut-off Date, as shown in the Mortgage Loan Schedule, minus the sum of (i) the principal portion of each Monthly Payment due on a Due Date subsequent to the Cut-off Date, to the extent received from the Mortgagor or advanced by the Servicer or a successor to the Servicer and distributed pursuant to Section 5.01 of this Agreement on or before such date of determination, (ii) all Principal Prepayments received after the Cut-off Date, to the extent distributed pursuant to Section 5.01 of this Agreement on or before such date of determination, (iii) all Liquidation Proceeds and Insurance Proceeds applied by the Servicer as recoveries of principal in accordance with the provisions of Section 3.13 of this Agreement, to the extent distributed pursuant to Section 5.01 of this Agreement on or before such date of determination, and (iv) any Realized Loss incurred with respect thereto as a result of a Deficient Valuation made during or prior to the Prepayment Period for the most recent Distribution Date coinciding with or preceding such date of determination; and (b) as of any date of determination coinciding with or subsequent to the Distribution Date on which the proceeds, if any, of a Liquidation Event with respect to such Mortgage Loan would be distributed, zero. With respect to any REO Property: (a) as of any date of determination up to but not including the Distribution Date on which the proceeds, if any, of a Liquidation Event with respect to such REO Property would be distributed, an amount (not less than zero) equal to the Stated Principal Balance of the related Mortgage Loan as of the date on which such REO Property was acquired on behalf of REMIC I, minus the sum of (i) if such REO Property was acquired before the Distribution Date in any calendar month, the principal portion of the Monthly Payment due on the Due Date in the calendar month of acquisition, to the extent advanced by the Servicer or a successor to the Servicer and distributed pursuant to Section 5.01 of this Agreement, on or before such date of determination and (ii) the aggregate amount of REO Principal Amortization in respect of such REO Property for all previously ended calendar months, to the extent distributed pursuant to Section 5.01 of this Agreement on or before such date of determination; and (b) as of any date of determination coinciding with or subsequent to the Distribution Date on which the proceeds, if any, of a Liquidation Event with respect to such REO Property would be distributed, zero.

"Stepdown Date": The earlier to occur of (i) the later to occur of (a) the Distribution Date occurring in May 2010 and (b) the first Distribution Date on which the Credit Enhancement Percentage (calculated for this purpose only after taking into account distributions of principal on the Mortgage Loans, but prior to any distribution of the Principal Distribution Amount to the holders of the Certificates then entitled to distributions of principal on such Distribution Date), is greater than or equal to 29.00% and (ii) the first Distribution Date on which the aggregate Certificate Principal Balance of the Class A Certificates has been reduced to zero.

"Subcontractor": Means any vendor, subcontractor or other Person that is not responsible for the overall servicing of Mortgage Loans but performs one or more discrete

functions identified in Item 1122(d) of Regulation AB (without regard to any threshold percentage specified therein) with respect to Mortgage Loans under the direction or authority of the Servicer (or a Sub-Servicer of the Servicer), the Master Servicer, the Trustee, the Custodian or the Securities Administrator.

"Subordinate Certificates": Collectively, the Mezzanine Certificates and the Class CE Certificates.

"Subsequent Recoveries": As of any Distribution Date, amounts received during the related Prepayment Period by the Servicer specifically related to a defaulted Mortgage Loan or disposition of an REO Property prior to the related Prepayment Period that resulted in a Realized Loss, (i) with respect to a Charged Off Loan, after such Mortgage Loan has been charged off by the Servicer or (ii) with respect to a Liquidated Mortgage Loan, after the liquidation or disposition of such defaulted Mortgage Loan.

"Sub-Servicer": Means any Person that services Mortgage Loans on behalf of any Servicer and is responsible for the performance (whether directly or through sub-servicers or Subcontractors) of a substantial portion of the material servicing functions required to be performed under this Agreement or any related Sub-Servicing Agreement that is identified in Item 1122(d) of Regulation AB.

"Sub-Servicing Agreement": The written contract between the Servicer and a Sub-Servicer relating to servicing and administration of certain Mortgage Loans as provided in Section 3.02 of this Agreement.

"Substitution Shortfall Amount": As defined in Section 2.03.

"Supplemental Interest Trust":  The corpus of a trust created pursuant to Section 5.07 of this Agreement and designated as the "Supplemental Interest Trust," consisting of the Swap Agreement, the Class IO Interest and the right to receive payments in respect of the Class IO Distribution Amount.  For the avoidance of doubt, the Supplemental Interest Trust does not constitute a part of the Trust Fund.

"Supplemental Interest Trust Trustee":  HSBC Bank USA, National Association a national banking association, or its successor in interest, or any successor supplemental interest trust trustee appointed as provided herein or in the Swap Agreement provided.

"Swap Agreement":  The Interest Rate Swap Agreement, dated as of May [___], 2007, between the Supplemental Interest Trust Trustee, and the Swap Provider, including any schedule, confirmations, credit support annex or other credit support document relating thereto, and attached hereto as Exhibit I.

"Swap Credit Support Annex:  The credit support annex, dated as of May [___], 2007, between the Supplemental Interest Trust Trustee and the Swap Provider, which is annexed to and forms part of the Swap Agreement.

"Swap LIBOR":  LIBOR as determined pursuant to the Swap Agreement.

"Swap Notional Amount": For each calculation period as defined in the Swap Agreement, the amount set forth below:

| Distribution Date | Swap Notional Amount ($) |
|---|---|
| May 25, 2007 | 335,803,000.00 |
| June 25, 2007 | 327,818,269.15 |
| July 25, 2007 | 319,139,157.37 |
| August 25, 2007 | 309,802,003.79 |
| September 25, 2007 | 299,848,197.13 |
| October 25, 2007 | 289,323,965.95 |
| November 25, 2007 | 278,280,108.26 |
| December 25, 2007 | 266,771,660.14 |
| January 25, 2008 | 254,858,168.73 |
| February 25, 2008 | 243,446,975.51 |
| March 25, 2008 | 232,545,772.45 |
| April 25, 2008 | 222,131,800.07 |
| May 25, 2008 | 212,183,313.47 |
| June 25, 2008 | 202,679,537.02 |
| July 25, 2008 | 193,600,621.36 |
| August 25, 2008 | 184,927,601.97 |
| September 25, 2008 | 176,642,359.89 |
| October 25, 2008 | 168,727,583.98 |
| November 25, 2008 | 161,166,734.99 |
| December 25, 2008 | 153,944,011.13 |
| January 25, 2009 | 147,044,315.24 |
| February 25, 2009 | 140,453,223.41 |
| March 25, 2009 | 134,156,954.99 |
| April 25, 2009 | 128,142,343.88 |
| May 25, 2009 | 122,396,811.22 |
| June 25, 2009 | 116,908,339.18 |
| July 25, 2009 | 111,665,445.98 |
| August 25, 2009 | 106,657,162.00 |
| September 25, 2009 | 101,873,006.96 |
| October 25, 2009 | 97,302,968.13 |
| November 25, 2009 | 92,937,479.45 |
| December 25, 2009 | 88,767,401.66 |
| January 25, 2010 | 84,784,003.30 |
| February 25, 2010 | 80,978,942.46 |
| March 25, 2010 | 77,344,249.50 |
| April 25, 2010 | 73,872,310.40 |
| May 25, 2010 | 70,555,850.96 |
| June 25, 2010 | 67,387,921.58 |
| July 25, 2010 | 64,361,882.86 |
| August 25, 2010 | 61,471,391.74 |
| September 25, 2010 | 58,710,388.28 |
| October 25, 2010 | 56,073,083.07 |
| November 25, 2010 | 53,553,945.13 |
| December 25, 2010 | 51,147,690.41 |
| January 25, 2011 | 48,849,270.79 |
| February 25, 2011 | 46,653,863.50 |
| March 25, 2011 | 44,556,861.17 |
| April 25, 2011 | 42,553,862.16 |
| May 25, 2011 | 40,640,661.35 |
| June 25, 2011 | 38,813,241.45 |
| July 25, 2011 | 37,067,764.62 |

| Distribution Date | Swap Notional Amount ($) |
|---|---|
| August 25, 2011 | 35,400,564.38 |
| September 25, 2011 | 33,808,138.07 |
| October 25, 2011 and thereafter | 0.00 |

"Swap Provider":  The swap provider under the Swap Agreement.  Initially, the Swap Provider shall be Bear Stearns Financial Products Inc.

"Swap Provider Trigger Event":  A Swap Provider Trigger Event shall have occurred if any of the following has occurred: (i) an Event of Default under the Swap Agreement with respect to which the Swap Provider is a Defaulting Party (as defined in the Swap Agreement), (ii) a Termination Event under the Swap Agreement with respect to which the Swap Provider is the sole Affected Party (as defined in the Swap Agreement) or (iii) an Additional Termination Event under the Swap Agreement with respect to which the Swap Provider is the sole Affected Party.

"Swap Termination Payment":  Upon the designation of an "Early Termination Date" as defined in the Swap Agreement, the payment to be made by the Securities Administrator on behalf of the Supplemental Interest Trust Trustee from the Supplemental Interest Trust to the Swap Provider, or by the Swap Provider to the Supplemental Interest Trust, as applicable, pursuant to the terms of the Swap Agreement.

"Tax Returns": The federal income tax return on Internal Revenue Service Form 1066, U.S. Real Estate Mortgage Investment Conduit Income Tax Return, including Schedule Q thereto, Quarterly Notice to Residual Interest Holders of REMIC Taxable Income or Net Loss Allocation, or any successor forms, to be filed on behalf of the Trust REMICs under the REMIC Provisions, together with any and all other information reports or returns that may be required to be furnished to the Certificateholders or filed with the Internal Revenue Service or any other governmental taxing authority under any applicable provisions of federal, state or local tax laws.

"Termination Price": As defined in Section 10.01.

"Terminator": As defined in Section 10.01.

"Term of the Policy": The period from and including the Closing Date to and including the first date on which (i) all Scheduled Payments have been paid that are required to be paid under this Agreement; (ii) any period during which any Scheduled Payment could have been avoided in whole or in part as a preference payment under applicable bankruptcy, insolvency, receivership or similar law has expired, and (iii) if any proceedings requisite to avoidance as a preference payment have been commenced prior to the occurrence of (i) and (ii) above, a final and nonappealable order in resolution of each such proceeding has been entered; provided, further, that if the holders of Insured Certificates are required to return any Avoided Payment as a result of such Insolvency Proceeding, then the Term of the Policy shall terminate on the date on which the Class A Certificate Insurer has made all payments required to be made under the terms of the Policy in respect of all such Avoided Payments.

"Transfer": Any direct or indirect transfer, sale, pledge, hypothecation, or other form of assignment of any Ownership Interest in a Certificate.

"Transferee": Any Person who is acquiring by Transfer any Ownership Interest in a Certificate.

"Transferor": Any Person who is disposing by Transfer of any Ownership Interest in a Certificate.

"Trigger Event": With respect to any Distribution Date, a Trigger Event is in effect if either (x) the Delinquency Percentage exceeds 4.50% or (y) the aggregate amount of Realized Losses incurred since the Cut-off Date through the last day of the related Due Period divided by the aggregate principal balance of the Mortgage Loans as of the Cut-off exceeds the applicable percentages set forth below with respect to such Distribution Date:

| Distribution Date | Percentages |
| --- | --- |
| May 2010 to April 2011 | 4.25% plus 1/12 of 2.25% for each month thereafter |
| May 2011 to April 2012 | 6.50% plus 1/12 of 0.75% for each month thereafter |
| May 2012 to April 2013 | 7.25% plus 1/12 of 1.00% for each month thereafter |
| May 2013 and thereafter | 8.25% |

"Trust": SunTrust Acquisition Closed-End Seconds Trust, Series 2007-1 , the trust created hereunder.

"Trust Fund": Collectively, all of the assets of REMIC I, REMIC II, REMIC III and the Reserve Fund and any amounts on deposit therein and any proceeds thereof. For avoidance of doubt, the Trust Fund does not include the Supplemental Interest Trust.

"Trust REMIC": REMIC I, REMIC II or REMIC III.

"Trustee": HSBC Bank USA, National Association, a national banking association, or its successor in interest, or any successor trustee appointed as herein provided.

"Uncertificated Balance": The amount of the REMIC Regular Interests outstanding as of any date of determination. As of the Closing Date, the Uncertificated Balance of each REMIC Regular Interest shall equal the amount set forth in the Preliminary Statement hereto as its initial uncertificated balance. On each Distribution Date, the Uncertificated Balance of the REMIC Regular Interest shall be reduced by all distributions of principal made on such REMIC Regular Interest on such Distribution Date pursuant to Section 5.01 and, if and to the extent necessary and appropriate, shall be further reduced on such Distribution Date by Realized Losses as provided in Section 5.04 and the Uncertificated Balance of REMIC II Regular Interest ZZ shall be increased by interest deferrals as provided in Section 5.01. The Uncertificated Balance of each REMIC Regular Interest shall never be less than zero.

"Uncertificated Interest": With respect to any REMIC Regular Interest for any Distribution Date, one month's interest at the related REMIC Remittance Rate applicable to such REMIC Regular Interest for such Distribution Date, accrued on the Uncertificated Balance thereof immediately prior to such Distribution Date. Uncertificated Interest in respect of the

REMIC Regular Interests shall accrue on the basis of a 360-day year consisting of twelve 30-day months. Uncertificated Interest with respect to each Distribution Date, as to any REMIC Regular Interest, shall be reduced by an amount equal to the sum of (a) the aggregate Prepayment Interest Shortfall, if any, for such Distribution Date to the extent not covered by payments pursuant to Section 3.23 or Section 4.19 of this Agreement and (b) the aggregate amount of any Relief Act Interest Shortfall, if any allocated, in each case, to such REMIC Regular Interest or REMIC Regular Interest pursuant to Section 1.02. In addition, Uncertificated Interest with respect to each Distribution Date, as to any REMIC Regular Interest, shall be reduced by Realized Losses, if any, allocated to such REMIC Regular Interest pursuant to Section 1.02 and Section 5.04.

"Uninsured Cause": Any cause of damage to a Mortgaged Property such that the complete restoration of such property is not fully reimbursable by the hazard insurance policies required to be maintained pursuant to Section 3.11.

"United States Person": A citizen or resident of the United States, a corporation, partnership or other entity created or organized in, or under the laws of, the United States or any political subdivision thereof (except, in the case of a partnership, to the extent provided in regulations) provided that, for purposes solely of the restrictions on the transfer of any Class R Certificate, no partnership or other entity treated as a partnership for United States federal income tax purposes shall be treated as a United States Person unless all persons that own an interest in such partnership either directly or through any entity that is not a corporation for United States federal income tax purposes are required to be United States Persons, or an estate whose income is subject to United States federal income tax regardless of its source, or a trust if a court within the United States is able to exercise primary supervision over the administration of the trust and one or more United States persons have the authority to control all substantial decisions of the trust. To the extent prescribed in regulations by the Secretary of the Treasury, a trust which was in existence on August 20, 1996 (other than a trust treated as owned by the grantor under subpart E of part I of subchapter J of chapter I of the Code), and which was treated as a United States person on August 20, 1996 may elect to continue to be treated as a United States person notwithstanding the previous sentence. The term "United States" shall have the meaning set forth in Section 7701 of the Code.

"Value": With respect to any Mortgaged Property, the lesser of (i) the lesser of (a) the value thereof as determined by an appraisal made for the related originator of the Mortgage Loan at the time of origination of the Mortgage Loan by an appraiser who met the minimum requirements of Fannie Mae and Freddie Mac and (b) the value thereof as determined by a review appraisal conducted by the related originator of the Mortgage Loan in accordance with the related originator's underwriting guidelines, and (ii) the purchase price paid for the related Mortgaged Property by the Mortgagor with the proceeds of the Mortgage Loan; provided, however, (A) in the case of a Refinanced Mortgage Loan, such value of the Mortgaged Property is based solely upon the lesser of (1) the value determined by an appraisal made for the related originator of the Mortgage Loan of such Refinanced Mortgage Loan at the time of origination of such Refinanced Mortgage Loan by an appraiser who met the minimum requirements of Fannie Mae and Freddie Mac and (2) the value thereof as determined by a review appraisal conducted by the related originator of the Mortgage Loan in accordance with the related originator's underwriting guidelines, and (B) in the case of a Mortgage Loan originated in connection with a "lease-option purchase," such value of the Mortgaged Property is based on the lower of the value

determined by an appraisal made for the originator of such Mortgage Loan at the time of origination or the sale price of such Mortgaged Property if the "lease option purchase price" was set less than 12 months prior to origination, and is based on the value determined by an appraisal made for the related originator of such Mortgage Loan at the time of origination if the "lease option purchase price" was set 12 months or more prior to origination.

"Verification Report":  As defined in Section 4.20.

"Voting Rights": The portion of the voting rights of all of the Certificates which is allocated to any such Certificate. With respect to any date of determination, 98% of all Voting Rights will be allocated among the holders of the Class A Certificates, the Mezzanine Certificates and the Class CE Certificates in proportion to the then outstanding Certificate Principal Balances of their respective Certificates, 1% of all Voting Rights will be allocated among the holders of the Class P Certificates and 1% of all Voting Rights will be allocated among the holders of the Class R Certificates. The Voting Rights allocated to each Class of Certificate shall be allocated among Holders of each such Class in accordance with their respective Percentage Interests as of the most recent Record Date. Notwithstanding the foregoing, unless a Class A Certificate Insurer default exists under the Insurance Agreement, the Class A Certificate Insurer will be entitled to exercise all voting rights of the holders of the Class A Certificates.

SECTION 1.02.     Allocation of Certain Interest Shortfalls.

For purposes of calculating the amount of Accrued Certificate Interest and the amount of the Interest Distribution Amount for the Class A Certificates, the Mezzanine Certificates and the Class CE Certificates for any Distribution Date, (1) the aggregate amount of any Prepayment Interest Shortfalls (to the extent not covered by payments by the Servicer pursuant to Section 3.23 of this Agreement or by the Master Servicer pursuant to Section 4.19 of this Agreement) and any Relief Act Interest Shortfalls incurred in respect of the Mortgage Loans for any Distribution Date shall be allocated first, to the Class CE Certificates, second, to the Class M-4 Certificates, third, to the Class M-3 Certificates, fourth, to the Class M-2 Certificates, fifth, to the Class M-1 Certificates and sixth, to the Class A Certificates, in each case based on, and to the extent of, one month's interest at the then applicable respective Pass-Through Rate on the respective Certificate Principal Balance or Notional Amount, as applicable, of each such Certificate and (2) the aggregate amount of any Realized Losses allocated to the Mezzanine Certificates and Net WAC Rate Carryover Amounts paid to the Class A Certificates and the Mezzanine Certificates incurred for any Distribution Date shall be allocated to the Class CE Certificates on a *pro rata* basis based on, and to the extent of, one month's interest at the then applicable respective Pass-Through Rate on the respective Certificate Principal Balance or Notional Amount thereof, as applicable.

For purposes of calculating the amount of Uncertificated Interest for the REMIC I Group I Regular Interests for any Distribution Date, the aggregate amount of any Prepayment Interest Shortfalls (to the extent not covered by payments by the Servicer pursuant to Section 3.23 of this Agreement or the Master Servicer pursuant to Section 4.19) and any Relief Act Interest Shortfalls incurred in respect of Group I Mortgage Loans shall be allocated first, to REMIC I Regular Interest I and to the REMIC I Group I Regular Interests ending with the

designation "B", *pro rata* based on, and to the extent of, one month's interest at the then applicable respective REMIC I Remittance Rates on the respective Uncertificated Principal Balances of each such REMIC I Regular Interest, and then, to REMIC I Group I Regular Interests ending with the designation "A", pro rata based on, and to the extent of, one month's interest at the then applicable respective REMIC I Remittance Rates on the respective Uncertificated Balances of each such REMIC I Regular Interest.

For purposes of calculating the amount of Uncertificated Interest for the REMIC I Group II Regular Interests for any Distribution Date, the aggregate amount of any Prepayment Interest Shortfalls (to the extent not covered by payments by the Servicer pursuant to Section 3.23 of this Agreement or the Master Servicer pursuant to Section 4.19) and any Relief Act Interest Shortfalls incurred in respect of Group II Mortgage Loans shall be allocated first, to REMIC I Regular Interest II and to the REMIC I Group II Regular Interests ending with the designation "B", *pro rata* based on, and to the extent of, one month's interest at the then applicable respective REMIC I Remittance Rates on the respective Uncertificated Principal Balances of each such REMIC I Regular Interest , and then, to REMIC I Group II Regular Interests ending with the designation "A", pro rata based on, and to the extent of, one month's interest at the then applicable respective REMIC I Remittance Rates on the respective Uncertificated Balances of each such REMIC I Regular Interest.

For purposes of calculating the amount of Uncertificated Interest for the REMIC II Regular Interests for any Distribution Date:

(A)     The REMIC II Marker Allocation Percentage of the aggregate amount of any Prepayment Interest Shortfalls (to the extent not covered by payments by the Servicer pursuant to Section 3.23 of this Agreement or the Master Servicer pursuant to Section 4.19) and the REMIC II Marker Allocation Percentage of any Relief Act Interest Shortfalls incurred in respect of the Mortgage Loans for any Distribution Date shall be allocated among REMIC II Regular Interest AA, REMIC II Regular Interest A, REMIC II Regular Interest M-1, REMIC II Regular Interest M-2, REMIC II Regular Interest M-3, REMIC II Regular Interest M-4, REMIC II Regular Interest ZZ and REMIC II Regular Interest P *pro rata* based on, and to the extent of, one month's interest at the then applicable respective REMIC II Remittance Rate on the respective Uncertificated Balance of each such REMIC II Regular Interest; and

(B)     The REMIC II Sub WAC Allocation Percentage of the aggregate amount of any Prepayment Interest Shortfalls (to the extent not covered by payments by the Servicer pursuant to Section 3.23 of this Agreement or by the Master Servicer pursuant to Section 4.19 of this Agreement) and the REMIC II Sub WAC Allocation Percentage of any Relief Act Interest Shortfalls incurred in respect of the Mortgage Loans for any Distribution Date shall be allocated first, to Uncertificated Interest payable to REMIC II Regular Interest I-SUB, REMIC II Regular Interest I-GRP, REMIC II Regular Interest II-SUB, REMIC II Regular Interest II-GRP and REMIC II Regular Interest XX, *pro rata* based on, and to the extent of, one month's interest at the then applicable respective REMIC II Remittance Rate on the respective Uncertificated Balance of each such REMIC II Regular Interest.

72

## ARTICLE II

## CONVEYANCE OF MORTGAGE LOANS;
## ORIGINAL ISSUANCE OF CERTIFICATES

SECTION 2.01.    Conveyance of the Mortgage Loans.

The Depositor, concurrently with the execution and delivery hereof, does hereby transfer, assign, set over and otherwise convey to the Trustee, on behalf of the Trust, without recourse, for the benefit of the Certificateholders, all the right, title and interest of the Depositor, including any security interest therein for the benefit of the Depositor, in and to the Mortgage Loans identified on the Mortgage Loan Schedule, the rights of the Depositor under the Mortgage Loan Purchase Agreement and Assignment Agreement (including, but not limited to, the right to enforce the obligations of the other parties thereto (including the Guarantor) thereunder), the right to any Net Swap Payment and any Swap Termination Payment made by the Swap Provider, and all other assets included or to be included in REMIC I. Such assignment includes all interest and principal received by the Depositor and the Servicer on or with respect to the Mortgage Loans (other than payments of principal and interest due on such Mortgage Loans on or before the Cut-off Date).   Copies of the Mortgage Loan Purchase Agreement and the Assignment Agreement are attached hereto as Exhibit F-1 and Exhibit F-2, respectively.

In connection with such transfer and assignment, the Depositor does hereby deliver to, and deposit with the Custodian pursuant to the Custodial Agreement the documents with respect to each Mortgage Loan as described under Section 2 of the Custodial Agreement (the "Mortgage Loan Documents"). In connection with such delivery and as further described in the Custodial Agreement, the Custodian will be required to review such Mortgage Loan Documents and deliver to the Trustee, the Depositor, the Servicer and the Sponsor certifications (in the forms attached to the Custodial Agreement) with respect to such review with exceptions noted thereon.  In addition, under the Custodial Agreement the Depositor will be required to cure certain defects with respect to the Mortgage Loan Documents for the related Mortgage Loans after the delivery thereof by the Depositor to the Custodian as more particularly set forth therein.

Notwithstanding anything to the contrary contained herein, the parties hereto acknowledge that the functions of the Trustee with respect to the custody, acceptance, inspection and release of the Mortgage Files, including, but not limited to certain insurance policies and documents contemplated by Section 4.11, and preparation and delivery of the certifications shall be performed by the Custodian pursuant to the terms and conditions of the Custodial Agreement.

The Depositor shall deliver or cause the Sponsor to deliver to the Servicer copies of all trailing documents required to be included in the Mortgage File at the same time the originals or certified copies thereof are delivered to the Trustee or Custodian, such documents including the mortgagee policy of title insurance and any Mortgage Loan Documents upon return from the recording office.  The Servicer shall not be responsible for any custodian fees or other costs incurred in obtaining such documents and the Depositor shall cause the Servicer to be reimbursed for any such costs the Servicer may incur in connection with performing its obligations under this Agreement.

The Mortgage Loans permitted by the terms of this Agreement to be included in the Trust are limited to (i) Mortgage Loans (which the Depositor acquired pursuant to the Assignment Agreement and the Mortgage Loan Purchase Agreement, which contains, among other representations and warranties, a representation and warranty of the Sponsor that no Mortgage Loan is a "High-Cost Home Loan" as defined in the New Jersey Home Ownership Act effective November 27, 2003 or as defined in the New Mexico Home Loan Protection Act effective January 1, 2004, as defined in the Massachusetts Predatory Home Loan Practices Act, effective November 7, 2004 (Mass. Ann. Laws Ch. 183C) or as defined in the Indiana Home Loan Practices Act, effective January 1, 2005 (Ind. Code Ann. Sections 24-9-1 through 24-9-9) or a "high risk home loan" under the Illinois High Risk Home Loan Act, effective as of January 1, 2004) and (ii) Qualified Substitute Mortgage Loans (which, by definition as set forth herein and referred to in the Mortgage Loan Purchase Agreement, are required to conform to, among other representations and warranties, the representation and warranty of the Sponsor that no Qualified Substitute Mortgage Loan is a "High-Cost Home Loan" as defined in the New Jersey Home Ownership Act effective November 27, 2003 or as defined in the New Mexico Home Loan Protection Act effective January 1, 2004, as defined in the Massachusetts Predatory Home Loan Practices Act, effective November 7, 2004 (Mass. Ann. Laws Ch. 183C) or as defined in the Indiana Home Loan Practices Act, effective January 1, 2005 (Ind. Code Ann. Sections 24-9-1 through 24-9-9) or a "high risk home loan" under the Illinois High Risk Home Loan Act, effective as of January 1, 2004).   The Depositor and the Trustee on behalf of the Trust understand and agree that it is not intended that any Mortgage Loan be included in the Trust that is a "High-Cost Home Loan" as defined in the New Jersey Home Ownership Act effective November 27, 2003, as defined in the New Mexico Home Loan Protection Act effective January 1, 2004, as defined in the Massachusetts Predatory Home Loan Practices Act, effective November 7, 2004 (Mass. Ann. Laws Ch. 183C) or as defined in the Indiana Home Loan Practices Act, effective January 1, 2005 (Ind. Code Ann. Sections 24-9-1 through 24-9-9) or a "high risk home loan" under the Illinois High Risk Home Loan Act, effective as of January 1, 2004.

SECTION 2.02.    Acceptance of REMIC I by Trustee.

The Trustee acknowledges receipt, subject to the provisions of Section 2.01 hereof and Section 2 of the Custodial Agreement, of the Mortgage Loan Documents and all other assets included in the definition of "REMIC I" under clauses (i), (iii), (iv) and (v) (to the extent of amounts deposited into the Distribution Account) and declares that it holds (or the Custodian on its behalf holds) and will hold such documents and the other documents delivered to it constituting a Mortgage Loan Document, and that it holds (or the Custodian on its behalf holds) or will hold all such assets and such other assets included in the definition of "REMIC I" in trust for the exclusive use and benefit of all present and future Certificateholders.

SECTION 2.03.    Repurchase or Substitution of Mortgage Loans.

(a)    Upon discovery or receipt of notice of any materially defective document in, or that a document is missing from, a Mortgage File or of a breach by the Sponsor of any representation, warranty or covenant under the Mortgage Loan Purchase Agreement in respect of any Mortgage Loan that materially and adversely affects the value of such Mortgage Loan or the interest therein of the Certificateholders or the Class A Certificate Insurer, the Trustee shall

74

promptly notify the Sponsor, the Class A Certificate Insurer and the Servicer of such defect, missing document or breach and request that the Sponsor deliver such missing document, cure such defect or breach within ninety (90) days from the date the Sponsor was notified of such missing document, defect or breach, and if the Sponsor does not deliver such missing document or cure such defect or breach in all material respects during such period, the Trustee shall enforce the obligations of the Sponsor under the Mortgage Loan Purchase Agreement to repurchase such Mortgage Loan from REMIC I at the Purchase Price within ninety (90) days after the date on which the Sponsor was notified of such missing document, defect or breach, if and to the extent that the Sponsor is obligated to do so under the Mortgage Loan Purchase Agreement. Pursuant to the terms of the Mortgage Loan Purchase Agreement, if the Sponsor fails to perform its repurchase obligations thereunder, the Guarantor shall repurchase such Mortgage Loan at the Purchase Price. The Purchase Price for the repurchased Mortgage Loan shall be remitted to the Servicer for deposit in the Collection Account and the Trustee, upon receipt of written certification from the Servicer of such deposit, shall release or cause the Custodian (upon receipt of a request for release in the form attached to the Custodial Agreement) to release to the Sponsor the related Mortgage File and the Trustee shall execute and deliver such instruments of transfer or assignment, in each case without recourse, representation or warranty, as the Sponsor shall furnish to it and as shall be necessary to vest in the Sponsor any Mortgage Loan released pursuant hereto, and the Trustee shall not have any further responsibility with regard to such Mortgage File. In lieu of repurchasing any such Mortgage Loan as provided above, if so provided in the Mortgage Loan Purchase Agreement, the Sponsor may cause such Mortgage Loan to be removed from REMIC I (in which case it shall become a Deleted Mortgage Loan) and substitute one or more Qualified Substitute Mortgage Loans in the manner and subject to the limitations set forth in Section 2.03(b). It is understood and agreed that the obligation of the Sponsor to cure or to repurchase (or to substitute for) any Mortgage Loan as to which a document is missing, a material defect in a constituent document exists or as to which such a breach has occurred and is continuing shall constitute the sole remedy respecting such omission, defect or breach available to the Trustee and the Certificateholders.

In addition, promptly upon the earlier of discovery by the Servicer or receipt of notice by the Servicer of the breach of the representation or covenant of the Sponsor set forth in Section (qq) of Exhibit G of the Mortgage Loan Purchase Agreement which materially and adversely affects the interests of the Holders of the Class P Certificates in any Prepayment Charge, the Servicer shall promptly notify the Sponsor and the Trustee of such breach. The Trustee shall enforce the obligations of the Sponsor under the Mortgage Loan Purchase Agreement to remedy such breach to the extent and in the manner set forth in the Mortgage Loan Purchase Agreement.

(b)    Any substitution of Qualified Substitute Mortgage Loans for Deleted Mortgage Loans made pursuant to Section 2.03(a) must be effected prior to the date which is two years after the Startup Day for REMIC I.

As to any Deleted Mortgage Loan for which the Sponsor substitutes a Qualified Substitute Mortgage Loan or Loans, such substitution shall be effected by the Sponsor delivering to the Trustee or the Custodian on behalf of the Trustee, for such Qualified Substitute Mortgage Loan or Loans, the Mortgage Note, the Mortgage, the Assignment to the Trustee, and such other documents and agreements, with all necessary endorsements thereon, as are required by Section

2 of the Custodial Agreement, as applicable, together with an Officers' Certificate providing that each such Qualified Substitute Mortgage Loan satisfies the definition thereof and specifying the Substitution Shortfall Amount (as described below), if any, in connection with such substitution. The Custodian on behalf of the Trustee shall acknowledge receipt of such Qualified Substitute Mortgage Loan or Loans and, within ten (10) Business Days thereafter, review such documents and deliver to the Depositor, the Trustee and the Servicer, with respect to such Qualified Substitute Mortgage Loan or Loans, an initial certification pursuant to the Custodial Agreement, with any applicable exceptions noted thereon. Within one year of the date of substitution, the Custodian on behalf of the Trustee shall deliver to the Depositor, the Trustee and the Servicer a final certification pursuant to the Custodial Agreement with respect to such Qualified Substitute Mortgage Loan or Loans, with any applicable exceptions noted thereon. Monthly Payments due with respect to Qualified Substitute Mortgage Loans in the month of substitution are not part of REMIC I and will be retained by the Sponsor.  For the month of substitution, distributions to Certificateholders will reflect the Monthly Payment due on such Deleted Mortgage Loan on or before the Due Date in the month of substitution, and the Sponsor shall thereafter be entitled to retain all amounts subsequently received in respect of such Deleted Mortgage Loan. The Depositor shall give or cause to be given written notice to the Certificateholders that such substitution has taken place, shall amend the Mortgage Loan Schedule to reflect the removal of such Deleted Mortgage Loan from the terms of this Agreement and the substitution of the Qualified Substitute Mortgage Loan or Loans and shall deliver a copy of such amended Mortgage Loan Schedule to the Trustee and the Servicer. Upon such substitution, such Qualified Substitute Mortgage Loan or Loans shall constitute part of the Trust Fund and shall be subject in all respects to the terms of this Agreement and the Mortgage Loan Purchase Agreement, including all applicable representations and warranties thereof included herein or in the Mortgage Loan Purchase Agreement.

For any month in which the Sponsor substitutes one or more Qualified Substitute Mortgage Loans for one or more Deleted Mortgage Loans, the Servicer will determine the amount (the "Substitution Shortfall Amount"), if any, by which the aggregate Purchase Price of all such Deleted Mortgage Loans exceeds the aggregate of, as to each such Qualified Substitute Mortgage Loan, the Scheduled Principal Balance thereof as of the date of substitution, together with one month's interest on such Scheduled Principal Balance at the applicable Net Mortgage Rate, plus all outstanding P&I Advances and Servicing Advances (including Nonrecoverable P&I Advances and Nonrecoverable Servicing Advances) related thereto. On the date of such substitution, the Sponsor will deliver or cause to be delivered to the Servicer for deposit in the Collection Account an amount equal to the Substitution Shortfall Amount, if any, and the Trustee or the Custodian on behalf of the Trustee, upon receipt of the related Qualified Substitute Mortgage Loan or Loans, upon receipt of a request for release in the form attached to the Custodial Agreement and certification by the Servicer of such deposit, shall release to the Sponsor the related Mortgage File or Files and the Trustee shall execute and deliver such instruments of transfer or assignment, in each case without recourse, representation or warranty, as the Sponsor shall deliver to it and as shall be necessary to vest therein any Deleted Mortgage Loan released pursuant hereto.

In addition, the Sponsor shall obtain at its own expense and deliver to the Trustee an Opinion of Counsel to the effect that such substitution will not cause (a) any federal tax to be imposed on any Trust REMIC, including without limitation, any federal tax imposed on

"prohibited transactions" under Section 860F(a)(1) of the Code or on "contributions after the startup date" under Section 860G(d)(1) of the Code, or (b) any Trust REMIC to fail to qualify as a REMIC at any time that any Certificate is outstanding.

(c)     Upon discovery by the Depositor, the Sponsor, the Servicer or the Trustee that any Mortgage Loan does not constitute a "qualified mortgage" within the meaning of Section 860G(a)(3) of the Code, the party discovering such fact shall within two (2) Business Days give written notice thereof to the other parties. In connection therewith, the Sponsor shall repurchase or substitute one or more Qualified Substitute Mortgage Loans for the affected Mortgage Loan within ninety (90) days of the earlier of discovery or receipt of such notice with respect to such affected Mortgage Loan. Such repurchase or substitution shall be made by (i) the Sponsor if the affected Mortgage Loan's status as a non-qualified mortgage is or results from a breach of any representation, warranty or covenant made by the Sponsor under the Mortgage Loan Purchase Agreement or (ii) the Depositor, if the affected Mortgage Loan's status as a non-qualified mortgage does not result from a breach of a representation or warranty. Any such repurchase or substitution shall be made in the same manner as set forth in Section 2.03(a). The Trustee shall reconvey to the Sponsor the Mortgage Loan to be released pursuant hereto in the same manner, and on the same terms and conditions, as it would a Mortgage Loan repurchased for breach of a representation or warranty.

(d)     [With respect to a breach of the representations made pursuant to Section 5(xii) of the Mortgage Loan Purchase Agreement that materially and adversely affects the value of such Mortgage Loan or the interest therein of the Certificateholders, the Sponsor shall be required to take the actions set forth in this Section 2.03.]

(e)     Within ninety (90) days of the earlier of discovery by the Servicer or receipt of notice by the Servicer of the breach of any representation, warranty or covenant of the Servicer set forth in Section 2.05 which materially and adversely affects the interests of the Certificateholders in any Mortgage Loan or Prepayment Charge, the Servicer shall cure such breach in all material respects.

SECTION 2.04.     Representations and Warranties of the Master Servicer.

The Master Servicer hereby represents, warrants and covenants to the Servicer, the Depositor and the Trustee, for the benefit of each of the Trustee and the Certificateholders, that as of the Closing Date or as of such date specifically provided herein:

(i)     The Master Servicer is a national banking association duly formed, validly existing and in good standing under the laws of the United States of America and is duly authorized and qualified to transact any and all business contemplated by this Agreement to be conducted by the Master Servicer;

(ii)     The Master Servicer has the full power and authority to conduct its business as presently conducted by it and to execute, deliver and perform, and to enter into and consummate, all transactions contemplated by this Agreement. The Master Servicer has duly authorized the execution, delivery and performance of this Agreement, has duly executed and delivered this Agreement, and this Agreement, assuming due

authorization, execution and delivery by the other parties hereto, constitutes a legal, valid and binding obligation of the Master Servicer, enforceable against it in accordance with its terms except as the enforceability thereof may be limited by bankruptcy, insolvency, reorganization or similar laws affecting the enforcement of creditors' rights generally and by general principles of equity;

(iii)    The execution and delivery of this Agreement by the Master Servicer, the consummation by the Master Servicer of any other of the transactions herein contemplated, and the fulfillment of or compliance with the terms hereof are in the ordinary course of business of the Master Servicer and will not (A) result in a breach of any term or provision of the charter and by-laws of the Master Servicer or (B) conflict with, result in a breach, violation or acceleration of, or result in a default under, the terms of any other material agreement or instrument to which the Master Servicer is a party or by which it may be bound, or any statute, order or regulation applicable to the Master Servicer of any court, regulatory body, administrative agency or governmental body having jurisdiction over the Master Servicer; and the Master Servicer is not a party to, bound by, or in breach or violation of any indenture or other agreement or instrument, or subject to or in violation of any statute, order or regulation of any court, regulatory body, administrative agency or governmental body having jurisdiction over it, which materially and adversely affects or, to the Master Servicer's knowledge, would in the future materially and adversely affect, (x) the ability of the Master Servicer to perform its obligations under this Agreement or (y) the business, operations, financial condition, properties or assets of the Master Servicer taken as a whole;

(iv)    The Master Servicer does not believe, nor does it have any reason or cause to believe, that it cannot perform each and every covenant made by it and contained in this Agreement;

(v)    No litigation is pending against the Master Servicer that would materially and adversely affect the execution, delivery or enforceability of this Agreement or the ability of the Master Servicer to perform any of its other obligations hereunder in accordance with the terms hereof;

(vi)    There are no actions or proceedings against, or investigations known to it of, the Master Servicer before any court, administrative or other tribunal (A) that might prohibit its entering into this Agreement, (B) seeking to prevent the consummation of the transactions contemplated by this Agreement or (C) that might prohibit or materially and adversely affect the performance by the Master Servicer of its obligations under, or validity or enforceability of, this Agreement;

(vii)    No consent, approval, authorization or order of any court or governmental agency or body is required for the execution, delivery and performance by the Master Servicer of, or compliance by the Master Servicer with, this Agreement or the consummation by it of the transactions contemplated by this Agreement, except for such consents, approvals, authorizations or orders, if any, that have been obtained prior to the Closing Date; and

(viii)    There are no affiliations, relationships or transactions relating to the Master Servicer of a type that are described under Item 1119 of Regulation AB with the Custodian, the Depositor, the Sponsor, the Servicer, the Credit Risk Manager, the Swap Provider, American Home Mortgage Corp., the Class A Certificate Insurer or the Trustee.

It is understood and agreed that the representations, warranties and covenants set forth in this Section 2.04 shall survive the resignation or termination of the parties hereto and the termination of this Agreement and shall inure to the benefit of the Trustee, the Depositor and the Certificateholders.

SECTION 2.05.    Representations, Warranties and Covenants of the Servicer.

(a)    The Servicer hereby represents, warrants and covenants to the Master Servicer, the Securities Administrator, the Depositor and the Trustee, for the benefit of each of such Persons and the Certificateholders that as of the Closing Date or as of such date specifically provided herein:

(i)    The Servicer is a limited liability company duly organized and validly existing under the laws of the jurisdiction of its formation, and is duly authorized and qualified to transact any and all business contemplated by this Agreement to be conducted by the Servicer in any state in which a Mortgaged Property is located or is otherwise not required under applicable law to effect such qualification and, in any event, is in compliance with the doing business laws of any such State, to the extent necessary to ensure its ability to enforce each Mortgage Loan and to service the Mortgage Loans in accordance with the terms of this Agreement;

(ii)    the Servicer has the full power and authority to conduct its business as presently conducted by it and to execute, deliver and perform, and to enter into and consummate, all transactions contemplated by this Agreement.  the Servicer has duly authorized the execution, delivery and performance of this Agreement, has duly executed and delivered this Agreement, and this Agreement, assuming due authorization, execution and delivery by the other parties hereto, constitutes a legal, valid and binding obligation of the Servicer, enforceable against it in accordance with its terms, except as the enforceability thereof may be limited by bankruptcy, insolvency, reorganization or similar laws affecting the enforcement of creditors' rights generally and by general principles of equity;

(iii)    The execution and delivery of this Agreement by the Servicer, the servicing of the Mortgage Loans by the Servicer hereunder, the consummation by the Servicer of any other of the transactions herein contemplated, and the fulfillment of or compliance with the terms hereof are in the ordinary course of business of the Servicer and will not (A) result in a breach of any term or provision of the Servicer's formation documents or (B) conflict with, result in a breach, violation or acceleration of, or result in a default under, the terms of any other material agreement or instrument to which the Servicer is a party or by which it may be bound, or any statute, order or regulation applicable to the Servicer of any court, regulatory body, administrative agency or

79

governmental body having jurisdiction over the Servicer; and the Servicer is not a party to, bound by, or in breach or violation of any indenture or other agreement or instrument, or subject to or in violation of any statute, order or regulation of any court, regulatory body, administrative agency or governmental body having jurisdiction over it, which materially and adversely affects or, to the Servicer's knowledge, would in the future materially and adversely affect, (x) the ability of the Servicer to perform its obligations under this Agreement, (y) the business, operations, financial condition, properties or assets of the Servicer taken as a whole or (z) the legality, validity or enforceability of this Agreement;

(iv)    the Servicer does not believe, nor does it have any reason or cause to believe, that it cannot perform each and every covenant made by it and contained in this Agreement;

(v)    No litigation is pending against the Servicer that would materially and adversely affect the execution, delivery or enforceability of this Agreement or the ability of the Servicer to service the Mortgage Loans or to perform any of its other obligations hereunder in accordance with the terms hereof;

(vi)    There are no actions or proceedings against, or investigations known to it of, the Servicer before any court, administrative or other tribunal (A) that might prohibit its entering into this Agreement, (B) seeking to prevent the consummation of the transactions contemplated by this Agreement or (C) that might prohibit or materially and adversely affect the performance by the Servicer of its obligations under, or the validity or enforceability of, this Agreement;

(vii)    No consent, approval, authorization or order of any court or governmental agency or body is required for the execution, delivery and performance by the Servicer of, or compliance by the Servicer with, this Agreement or the consummation by it of the transactions contemplated by this Agreement, except for such consents, approvals, authorizations or orders, if any, that have been obtained prior to the Closing Date;

(viii)    the Servicer has fully furnished and will continue to fully furnish, in accordance with the Fair Credit Reporting Act and its implementing regulations, accurate and complete information (e.g., favorable and unfavorable) on its borrower credit files to Equifax, Experian and Trans Union Credit Information Company or their successors on a monthly basis;

(ix)    the Servicer is a member of MERS in good standing, and will comply in all material respects with the rules and procedures of MERS in connection with the servicing of the Mortgage Loans that are registered with MERS; and

(x)    the Servicer will not waive any Prepayment Charge other than in accordance with the standard set forth in Section 3.01.

(b)    Notwithstanding anything to the contrary contained in this Agreement, if the covenant of the Servicer set forth in Section 2.05(a)(x) above is breached, the Servicer will

80

pay the amount of such waived Prepayment Charge, from its own funds without any right of reimbursement, for the benefit of the Holders of the Class P Certificates, by depositing such amount into the Collection Account within 90 days of the earlier of discovery by the Servicer or receipt of notice by the Servicer of such breach; provided, however, the Servicer shall not have any obligation to pay the amount of any uncollected Prepayment Charge under this Section 2.05 if the Servicer did not have a copy of the related Mortgage Note, the Servicer requested a copy of the same from the Custodian in accordance with the terms of the Custodial Agreement and the Custodian failed to provide such copy within the time frame set forth in the Custodial Agreement. Furthermore, notwithstanding any other provisions of this Agreement, any payments made by the Servicer in respect of any waived Prepayment Charges pursuant to this paragraph shall be deemed to be paid outside of the Trust Fund.

(c)     It is understood and agreed that the representations, warranties and covenants set forth in this Section 2.05 shall survive the resignation or termination of the parties hereto, the termination of this Agreement and the delivery of the Mortgage Files to the Custodian and shall inure to the benefit of the Trustee, the Master Servicer, the Securities Administrator, the Servicer, the Depositor, the Certificateholders. Upon discovery by any such Person or the Servicer of a breach of any of the foregoing representations, warranties and covenants which materially and adversely affects the value of any Mortgage Loan, Prepayment Charge or the interests therein of the Certificateholders, the party discovering such breach shall give prompt written notice (but in no event later than two (2) Business Days following such discovery) to the Trustee.  Subject to Section 8.01, unless such breach shall not be susceptible of cure within ninety (90) days, the obligation of the Servicer set forth in Section 2.03(e) to cure breaches shall constitute the sole remedy against the Servicer available to the Certificateholders, the Depositor or the Trustee on behalf of the Certificateholders respecting a breach of the representations, warranties and covenants contained in this Section 2.05.

SECTION 2.06.     Issuance of the REMIC I Regular Interests and the Class R-I Interest.

The Trustee acknowledges the assignment to it of the Mortgage Loans and the delivery to the Custodian on its behalf of the Mortgage Loan Documents, subject to the provisions of Section 2.01 and Section 2.02 hereof and Section 2 of the Custodial Agreement, together with the assignment to it of all other assets included in REMIC I, the receipt of which is hereby acknowledged. The interests evidenced by the Class R-I Interest, together with the REMIC I Regular Interests, constitute the entire beneficial ownership interest in REMIC I. The rights of the Holders of the Class R-I Interest and REMIC I (as holder of the REMIC I Regular Interests) to receive distributions from the proceeds of REMIC I in respect of the Class R-I Interest and the REMIC I Regular Interests, respectively, and all ownership interests evidenced or constituted by the Class R-I Interest and the REMIC I Regular Interests, shall be as set forth in this Agreement.

SECTION 2.07.     Conveyance of the REMIC I Regular Interests; Acceptance of REMIC II and REMIC III by the Trustee.

The Depositor, concurrently with the execution and delivery hereof, does hereby transfer, assign, set over and otherwise convey to the Trustee, without recourse all the right, title

and interest of the Depositor in and to the REMIC I Regular Interests for the benefit of the Class R-II Interest and REMIC II (as holder of the REMIC I Regular Interests). The Trustee acknowledges receipt of the REMIC I Regular Interests and declares that it holds and will hold the same in trust for the exclusive use and benefit of all present and future Holders of the Class R-II Interest and REMIC II (as holder of the REMIC I Regular Interests). The rights of the Holder of the Class R-II Interest and REMIC II (as holder of the REMIC I Regular Interests) to receive distributions from the proceeds of REMIC II in respect of the Class R-II Interest and the REMIC II Regular Interests, respectively, and all ownership interests evidenced or constituted by the Class R-II Interest and the REMIC II Regular Interests, shall be as set forth in this Agreement. The Class R-II Interest and the REMIC II Regular Interests shall constitute the entire beneficial ownership interest in REMIC II.  The Trustee acknowledges receipt of the REMIC II Regular Interests and declares that it holds and will hold the same in trust for the exclusive use and benefit of all present and future Holders of the Class R-III Interest and REMIC III (as holder of the REMIC II Regular Interests). The rights of the Holder of the Class R-III Interest and REMIC III (as holder of the REMIC II Regular Interests) to receive distributions from the proceeds of REMIC III in respect of the Class R-III Interest and the Regular Certificates, respectively, and all ownership interests evidenced or constituted by the Class R-III Interest and the Regular Certificates, shall be as set forth in this Agreement. The Class R-III Interest and the Regular Certificates shall constitute the entire beneficial ownership interest in REMIC III.

SECTION 2.08.    Issuance of the Residual Certificates.

The Trustee acknowledges the assignment to it of the REMIC I Regular Interests and, concurrently therewith and in exchange therefor, pursuant to the written request of the Depositor executed by an officer of the Depositor, the Securities Administrator has executed and authenticated and the Trustee has delivered to or upon the order of the Depositor, the Class R Certificates in authorized denominations. The Class R Certificates evidence ownership in the Class R-I Interest, the Class R-II Interest and the Class R-III Interest.

SECTION 2.09.    Establishment of the Trust.

The Depositor does hereby establish, pursuant to the further provisions of this Agreement and the laws of the State of New York, an express trust to be known, for convenience, as "SunTrust Acquisition Closed-End Seconds Trust, Series 2007-1 " and does hereby appoint HSBC Bank USA, National Association as Trustee in accordance with the provisions of this Agreement.

SECTION 2.10.    Purpose and Powers of the Trust.

The purpose of the common law trust, as created hereunder, is to engage in the following activities:

(a)    acquire and hold the Mortgage Loans and the other assets of the Trust Fund and the proceeds therefrom;

(b)    to issue the Certificates sold to the Depositor in exchange for the Mortgage Loans;

(c)    to make payments on the Certificates;

(d)    to engage in those activities that are necessary, suitable or convenient to accomplish the foregoing or are incidental thereto or connected therewith; and

(e)    subject to compliance with this Agreement, to engage in such other activities as may be required in connection with conservation of the Trust Fund and the making of distributions to the Certificateholders.

The trust is hereby authorized to engage in the foregoing activities.  The Trustee shall not cause the trust to engage in any activity other than in connection with the foregoing or other than as required or authorized by the terms of this Agreement (or those ancillary thereto) while any Certificate is outstanding, and this Section 2.10 may not be amended, without the consent of the Certificateholders evidencing 51% or more of the aggregate voting rights of the Certificates.

SECTION 2.11.    Representations and Warranties of the Trustee.

The Trustee hereby represents and warrants to the Sponsor and the Depositor, for the benefit of each of the Certificateholders, that as of the Closing Date:

(a)    There are no affiliations relating to the Trustee of a type that are described under Item 1119(a) of Regulation AB; and

(b)    There are no legal proceedings pending or contemplated, including legal proceedings pending or contemplated by governmental authorities, against the Trustee that could be material to the Certificateholders.

ARTICLE III

ADMINISTRATION AND SERVICING
OF THE MORTGAGE LOANS; ACCOUNTS

SECTION 3.01.        The Servicer to Act as Servicer.

From and after the Closing Date, the Servicer shall service and administer the Mortgage Loans on behalf of the Trust Fund and in the best interests of and for the benefit of the Certificateholders (as determined by the Servicer in its reasonable judgment) in accordance with the terms of this Agreement and the Mortgage Loans and all applicable law and regulations and, to the extent consistent with such terms, in the same manner in which it services and administers similar mortgage loans for its own portfolio, giving due consideration to customary and usual standards of practice of prudent mortgage lenders and loan servicers administering similar mortgage loans but without regard to:

(i)        any relationship that the Servicer or any Affiliate of the Servicer may have with the related Mortgagor;

(ii)        the ownership of any Certificate by the Servicer or any Affiliate of the Servicer;

(iii)        the Servicer's obligation to make P&I Advances or Servicing Advances; or

(iv)        the Servicer's right to receive compensation for its services hereunder.

To the extent consistent with the foregoing, the Servicer shall also seek to maximize the timely and complete recovery of principal and interest on the related Mortgage Notes and shall waive (or permit a Sub-Servicer to waive) a Prepayment Charge only under the following circumstances: (i) such waiver is standard and customary in servicing similar Mortgage Loans and such waiver is related to a default or reasonably foreseeable default and would, in the reasonable judgment of the Servicer, maximize recovery of total proceeds taking into account the value of such Prepayment Charge and the related Mortgage Loan and, if such waiver is made in connection with a refinancing of the related Mortgage Loan, such refinancing is related to a default or a reasonably foreseeable default, (ii) such Prepayment Charge is unenforceable in accordance with applicable law or the collection of such related Prepayment Charge would otherwise violate applicable law or (iii) the collection of such Prepayment Charge would be considered "predatory" pursuant to written guidance published or issued by any applicable federal, state or local regulatory authority acting in its official capacity and having jurisdiction over such matters.  In addition, the Servicer shall not impose a Prepayment Charge in any instance when the related Mortgage Loan is accelerated or where the Mortgagor has made a Principal Prepayment in full in connection with the workout of a delinquent Mortgage Loan or due to a default by the Mortgagor.  Notwithstanding any provision in this Agreement to the contrary, in the event the Prepayment Charge payable under the terms of the Mortgage Note is less than the amount of the Prepayment Charge set forth in the Prepayment Charge Schedule or

other information provided to the Servicer, neither the Servicer nor the Master Servicer shall have any liability or obligation with respect to such difference (including any obligation to recalculate any Prepayment Charges), and in addition shall not have any liability or obligation to pay the amount of any uncollected Prepayment Charge if the failure to collect such amount is the direct result of inaccurate or incomplete information on the Prepayment Charge Schedule.

In the event any Servicer waives a Prepayment Charge in connection with clauses (ii) or (iii) of the preceding paragraph, the Servicer shall provide a written explanation of the Servicer's determination to the Master Servicer, and the Master Servicer shall provide a copy of such writing to the Sponsor and the Depositor.

Subject only to the above-described servicing standards (the "Accepted Servicing Practices") and the terms of this Agreement and of the related Mortgage Loans, the Servicer shall have full power and authority, to do or cause to be done any and all things in connection with such servicing and administration which it may deem necessary or desirable with the goal of maximizing proceeds of the related Mortgage Loan.  Without limiting the generality of the foregoing, the Servicer in its own name is hereby authorized and empowered by the Trustee when the Servicer believes it appropriate in its best judgment, to execute and deliver, on behalf of the Trust Fund, the Certificateholders and the Trustee or any of them, and upon written notice to the Trustee, any and all instruments of satisfaction or cancellation, or of partial or full release or discharge or subordination, and all other comparable instruments, with respect to the related Mortgage Loans and the related Mortgaged Properties and to institute foreclosure proceedings or obtain a deed-in-lieu of foreclosure so as to convert the ownership of such properties, and to hold or cause to be held title to such properties, on behalf of the Trustee, for the benefit of the Trust Fund and the Certificateholders. The Servicer shall service and administer the related Mortgage Loans in accordance with applicable state and federal law and shall provide to the Mortgagors any reports required to be provided to them thereby. The Servicer shall also comply in the performance of this Agreement with all reasonable rules and requirements of each insurer under any standard hazard insurance policy. Subject to Section 3.14, the Trustee shall execute, at the written request of any Servicer, and furnish to the Servicer a power of attorney in the form of Exhibit D hereto and other documents necessary or appropriate to enable the Servicer to carry out its servicing and administrative duties hereunder and furnished to the Trustee by the Servicer, and the Trustee shall not be liable for the actions of the Servicer under such powers of attorney and shall be indemnified by the Servicer for any cost, liability or expense incurred by the Trustee in connection with the Servicer's use or misuse of any such power of attorney.

The Servicer is hereby authorized and empowered in its own name or in the name of the Sub-Servicer, when the Servicer or the Sub-Servicer, as the case may be, believes it is appropriate in its best judgment to register any Mortgage Loan on the MERS® System, or cause the removal from the registration of any Mortgage Loan on the MERS® System, to execute and deliver, on behalf of the Trustee and the Certificateholders or any of them, any and all instruments of assignment and other comparable instruments with respect to such assignment or re-recording of a Mortgage in the name of MERS, solely as nominee for the Trustee and its successors and assigns. Any reasonable expenses incurred in connection with the actions described in the preceding sentence or as a result of MERS discontinuing or becoming unable to continue operations in connection with the MERS® System, shall be reimbursable by the Trust Fund to the Servicer.

In accordance with Accepted Servicing Practices, the Servicer shall make or cause to be made Servicing Advances as necessary for the purpose of effecting the payment of taxes and assessments on the related Mortgaged Properties (to the extent the Servicer has been notified that such taxes or assessments have not been paid by the related Mortgagor, owner or servicer of the related First Mortgage Loan), which Servicing Advances shall be reimbursable in the first instance from related collections from the related Mortgagors pursuant to Section 3.07, and further as provided in Section 3.09; provided, however, the Servicer shall only make such Servicing Advance if the related Mortgagor has not made such payment and if the failure to make such Servicing Advance would result in the loss of the related Mortgaged Property due to a tax sale or foreclosure as result of a tax lien; provided, however, that the Servicer shall be required to make such Servicing Advances only to the extent that such Servicing Advances, in the good faith judgment of the Servicer, will be recoverable by the Servicer out of Insurance Proceeds, Liquidation Proceeds, or otherwise out of the proceeds of the related Mortgage Loan. Any cost incurred by the Servicer in effecting the payment of taxes and assessments on a Mortgaged Property shall not, for the purpose of calculating the Stated Principal Balance of such Mortgage Loan or distributions to Certificateholders, be added to the unpaid principal balance of the related Mortgage Loan, notwithstanding that the terms of such Mortgage Loan so permit. The parties to this Agreement acknowledge that Servicing Advances shall be reimbursable pursuant to Section 3.09 of this Agreement, and agree that no Servicing Advance shall be rejected or disallowed by any party unless it has been shown that such Servicing Advance was not made in accordance with the terms of this Agreement. Notwithstanding the foregoing, the parties understand and agree that, with respect to any Mortgage Loan (1) the Master Servicer shall not approve the reimbursement of any Servicing Advance made with respect to such Mortgage Loan prior to the Cut-off Date (each, a "Pre-Cut-off Date Advance") unless and until it has received a Servicing Advance Schedule listing the amount of Pre-Cut-off Date Advances made in respect of such Mortgage Loan from (a) the Servicer with respect to any Mortgage Loans that were transferred to the Servicer prior to the Cut-off Date and/or (b) the Depositor with respect to any Mortgage Loans that were transferred to the Servicer after the Cut-off Date, as applicable, (2) the aggregate Pre-Cut-off Date Advances reimbursable hereunder with respect to such Mortgage Loan shall not exceed the amount of Pre-Cut-off Date Advances for such Mortgage Loan shown on the Servicing Advance Schedule delivered to the Master Servicer, (3) the Depositor shall be deemed to have agreed with and approved the Pre-Cut-off Date Advances shown on any Servicing Advance Schedule furnished to the Master Servicer, and (4) the Master Servicer will have no liability to the Depositor, the Servicer or any other Person, including any Certificateholder, for approving reimbursement of related Pre-Cut-off Date Advances so long as the aggregate amount of such advances reimbursed hereunder does not exceed of the amount of Pre-Cut-off Date Advances for such Mortgage Loan shown on the Servicing Advance Schedule.

The Servicer, in such capacity, may consent to the refinancing of a First Mortgage Loan on a Mortgaged Property, provided that the following requirements are met:

(i)    the resulting Combined Loan-to-Value Ratio of such Mortgage Loan is no higher than the Combined Loan-to-Value Ratio prior to such refinancing;

(ii)    the interest rate for the loan evidencing the refinanced First Mortgage Loan is no more than 2.0% higher than the interest rate on the loan

evidencing the existing First Mortgage Loan immediately prior to the date of such refinancing; and

(iii)      the mortgage loan evidencing the refinanced First Mortgage Loan is not subject to negative amortization.

The Servicer shall inspect the Mortgaged Properties related to Mortgage Loans serviced by the Servicer as often as deemed necessary by the Servicer in the Servicer's sole discretion, to assure itself that the value of such Mortgaged Property is being preserved. In addition, if any Mortgage Loan is more than 60 days delinquent, the Servicer shall conduct subsequent inspections in accordance with Accepted Servicing Practices. The Servicer shall keep a written or electronic report of each such inspection.

Notwithstanding anything in this Agreement to the contrary, the Servicer may not make any future advances with respect to a Mortgage Loan and the Servicer shall not permit any modification with respect to any related Mortgage Loan that would change the Mortgage Rate, reduce or increase the principal balance (except for reductions resulting from actual payments of principal) or change the final maturity date on such related Mortgage Loan (unless, as provided in Section 3.06, the related Mortgagor is in default with respect to the related Mortgage Loan or such default is, in the judgment of the Servicer, reasonably foreseeable) or any modification, waiver or amendment of any term of any related Mortgage Loan that would both (A) effect an exchange or reissuance of such Mortgage Loan under Section 1001 of the Code (or final, temporary or proposed Treasury regulations promulgated thereunder) and (B) cause any Trust REMIC created hereunder to fail to qualify as a REMIC under the Code or the imposition of any tax on "prohibited transactions" or "contributions after the startup date" under the REMIC Provisions.

In the event that the Mortgage Loan Documents relating to a Mortgage Loan contain provisions requiring the related Mortgagor to arbitrate disputes (at the option of the Trustee, on behalf of the Trust), the Trustee hereby authorizes the Servicer to waive the Trustee's right or option to arbitrate disputes and to send written notice of such waiver to the Mortgagor, although the Mortgagor may still require arbitration at its option.

From and after the Closing Date, the Servicer will fully furnish, in accordance with the Fair Credit Reporting Act and its implementing regulations, accurate and complete information (e.g., favorable and unfavorable) on its borrower credit files to Equifax, Experian and Trans Union Credit Information Company or their successors on a monthly basis.

SECTION 3.02.      Sub-Servicing Agreements Between the Servicer and Sub-Servicers.

(a)      The Servicer may arrange for the subservicing of any Mortgage Loan by a Sub-Servicer pursuant to a Sub-Servicing Agreement; provided that such sub-servicing arrangement and the terms of the related Sub-Servicing Agreement must provide for the servicing of such Mortgage Loans in a manner consistent with the servicing arrangements contemplated hereunder and the Servicer shall cause any Sub-Servicer to comply with the provisions of this Agreement (including, without limitation, to provide the information required

87

to be delivered under Sections 3.17, 3.18 and 3.20 hereof), to the same extent as if such Sub-Servicer were the Servicer.  The Servicer shall be responsible for obtaining from each Sub-Servicer and delivering to the Master Servicer any annual statement of compliance, assessment of compliance, attestation report and Sarbanes Oxley related certification as and when required to be delivered.  Each Sub-Servicer shall be (i) authorized to transact business in the state or states where the related Mortgaged Properties it is to service are situated, if and to the extent required by applicable law to enable the Sub-Servicer to perform its obligations hereunder and under the Sub-Servicing Agreement and (ii) a Freddie Mac or Fannie Mae approved mortgage servicer. Notwithstanding the provisions of any Sub-Servicing Agreement, any of the provisions of this Agreement relating to agreements or arrangements between any Servicer or a Sub-Servicer or reference to actions taken through the Servicer or otherwise, the Servicer shall remain obligated and liable to the Depositor, the Trustee and the Certificateholders for the servicing and administration of the related Mortgage Loans in accordance with the provisions of this Agreement without diminution of such obligation or liability by virtue of such Sub-Servicing Agreements or arrangements or by virtue of indemnification from the Sub-Servicer and to the same extent and under the same terms and conditions as if the Servicer alone were servicing and administering the related Mortgage Loans. Every Sub-Servicing Agreement entered into by the Servicer shall contain a provision giving the successor servicer the option to terminate such agreement in the event a successor servicer is appointed.  All actions of each Sub-Servicer performed pursuant to the related Sub-Servicing Agreement shall be performed as an agent of the Servicer with the same force and effect as if performed directly by the Servicer.

(b)   Notwithstanding the foregoing, the Servicer shall be entitled to outsource one or more separate servicing functions to a Subcontractor that does not meet the eligibility requirements for a Sub-Servicer, so long as such outsourcing does not constitute the delegation of the Servicer's obligation to perform all or substantially all of the servicing of the related Mortgage Loans to such Subcontractor.  The Servicer shall promptly, upon request, provide to the Master Servicer, the Trustee and the Depositor a written description (in form and substance satisfactory to the Master Servicer, the Trustee and the Depositor) of the role and function of each Subcontractor utilized by the Servicer, specifying (i) the identity of each such Subcontractor "participating in the servicing function" within the meaning of Item 1122 of Regulation AB, and (ii) which elements of the Servicing Criteria will be addressed in assessments of compliance provided by each Subcontractor identified pursuant to clause (i) of this subsection; provided, however, that the Servicer shall not be required to provide the information in clauses (i) or (ii) of this subsection until such time that the applicable assessment of compliance is due pursuant to Section 3.18 of this Agreement.  The use by the Servicer of any such Subcontractor shall not release the Servicer from any of its obligations hereunder and the Servicer shall remain responsible hereunder for all acts and omissions of such Subcontractor as fully as if such acts and omissions were those of the Servicer, and the Servicer shall pay all fees and expenses of the Subcontractor from the Servicer's own funds.

(c)   As a condition to the utilization of any Subcontractor determined to be "participating in the servicing function" within the meaning of Item 1122 of Regulation AB, the Servicer shall cause any such Subcontractor used by the Servicer for the benefit of the Master Servicer, the Trustee and the Depositor to comply with the provisions of Sections 3.18 and 3.20 of this Agreement to the same extent as if such Subcontractor were the Servicer. The Servicer shall be responsible for obtaining from each such Subcontractor and delivering to the Master

Servicer and any Depositor any assessment of compliance, attestation report and Sarbanes-Oxley related certification required to be delivered by such Subcontractor under Sections 3.18 and 3.20, in each case as and when required to be delivered.

(d)    For purposes of this Agreement, the Servicer shall be deemed to have received any collections, recoveries or payments with respect to the related Mortgage Loans that are received by a Sub-Servicer regardless of whether such payments are remitted by the Sub-Servicer to the Servicer.

SECTION 3.03.    Successor Sub-Servicers.

Any Sub-Servicing Agreement shall provide that the Servicer shall be entitled to terminate any Sub-Servicing Agreement and to either itself directly service the related Mortgage Loans or enter into a Sub-Servicing Agreement with a successor Sub-Servicer which qualifies under Section 3.02.    Any Sub-Servicing Agreement shall include the provision that such agreement may be immediately terminated as soon as is reasonably possible by any successor to the Servicer without fee in accordance with the terms of this Agreement, in the event that the Servicer (or any successor to the Servicer) shall, for any reason, no longer be the Servicer of the related Mortgage Loans (including termination due to a Servicer Event of Default).  The Servicer shall be entitled to enter into an agreement with its Sub-Servicer and Subcontractor for indemnification of the Servicer or Subcontractor, as applicable, by such Sub-Servicer and nothing contained in this Agreement shall be deemed to limit or modify such indemnification.

SECTION 3.04.    No Contractual Relationship Between Sub-Servicer, Subcontractor, Trustee or the Certificateholders.

Any Sub-Servicing Agreement and any other transactions or services relating to the Mortgage Loans involving a Sub-Servicer or the Subcontractor, as applicable, shall be deemed to be between the Sub-Servicer or Subcontractor, as applicable, and the Servicer alone and the Master Servicer, Trustee and the Certificateholders shall not be deemed parties thereto and shall have no claims, rights, obligations, duties or liabilities with respect to any Sub-Servicer or the Subcontractor except as set forth in Section 3.05.

SECTION 3.05.    Assumption or Termination of Sub-Servicing Agreement by Successor Servicer.

In connection with the assumption of the responsibilities, duties and liabilities and of the authority, power and rights of the Servicer hereunder by a successor servicer pursuant to Section 8.02, it is understood and agreed that the Servicer's rights and obligations under any Sub-Servicing Agreement then in force between the Servicer and a Sub-Servicer shall be assumed simultaneously by such successor servicer without act or deed on the part of such successor servicer; provided, however, that any successor servicer may terminate the Sub-Servicer.

The Servicer shall, upon the reasonable request of the Master Servicer, but at its own expense, deliver to the assuming party documents and records relating to each Sub-Servicing Agreement and an accounting of amounts collected and held by it and otherwise use its

best efforts to effect the orderly and efficient transfer of the Sub-Servicing Agreements to the assuming party.

The Servicing Fee payable to any such successor servicer shall be payable from payments received on the Mortgage Loans in the amount and in the manner set forth in this Agreement.

SECTION 3.06.    Collection of Certain Mortgage Loan Payments.

The Servicer shall make reasonable efforts to collect all payments called for under the terms and provisions of the Mortgage Loans, and shall, to the extent such procedures shall be consistent with this Agreement, Accepted Servicing Practices and the Servicing Performance Standards, follow such collection procedures as it would follow with respect to mortgage loans comparable to the Mortgage Loans and held for its own account. Consistent with the foregoing, the Servicer may in its discretion (i) waive any late payment charge or, if applicable, penalty interest or (ii) extend the due dates for the Monthly Payments due on a Mortgage Note related to a Mortgage Loan for a period of not greater than 180 days; provided that any extension pursuant to this clause shall not affect the amortization schedule of any Mortgage Loan for purposes of any computation hereunder and provided, further, that any such waiver, modification, postponement or indulgence granted to a Mortgagor by the Servicer in connection with its servicing of the related First Mortgage Loan shall not be considered relevant to a determination of whether the Servicer has acted consistently with the terms and standards of this Agreement, so long as in the Servicer's determination such action is not materially adverse to the interests of the Certificateholders. Notwithstanding the foregoing, in the event that any Mortgage Loan is in default or, in the judgment of the Servicer, such default is reasonably foreseeable, the Servicer, consistent with Accepted Servicing Practices may waive, modify or vary any term of such Mortgage Loan (including, but not limited to, modifications that change the Mortgage Rate, forgive the payment of principal or interest or extend the final maturity date of such Mortgage Loan), accept payment from the related Mortgagor of an amount less than the Stated Principal Balance in final satisfaction of such Mortgage Loan, or consent to the postponement of strict compliance with any such term or otherwise grant indulgence to any Mortgagor if in the Servicer's determination such waiver, modification, postponement or indulgence is not materially adverse to the interests of the Certificateholders or the Class A Certificate Insurer (taking into account any estimated Realized Loss that might result absent such action); provided, however, that if the aggregate principal balance of the Mortgage Loans subject to modification is greater than 5% of the initial aggregate principal balance of the Mortgage Loans, such modification shall only be permitted with the prior written consent of the Class A Certificate Insurer, so long as a default by the Class A Certificate Insurer has not occurred and is not continuing, rather than proceeding with foreclosure. The Servicer shall not be required to institute or join in litigation with respect to collection of any payment (whether under a Mortgage, Mortgage Note or otherwise or against any public or governmental authority with respect to a taking or condemnation) if it reasonably believes that enforcing the provision of the Mortgage or other instrument pursuant to which such payment is required is prohibited by applicable law.

SECTION 3.07.    Collection of Taxes, Assessments and Similar Items; Servicing Accounts.

In connection with an Escrow Mortgage Loan or a Mortgage Loan that in accordance with Accepted Servicing Practices becomes an Escrow Mortgage Loan, the Servicer shall establish and maintain one or more accounts (the "Servicing Accounts"), into which all collections from the Mortgagors (or related advances from Sub-Servicers) for the payment of taxes, assessments, fire, flood, and hazard insurance premiums, and comparable items for the account of the Mortgagors ("Escrow Payments") shall be deposited and retained. Servicing Accounts shall be Eligible Accounts.  The Servicer shall deposit in the clearing account in which it customarily deposits payments and collections on mortgage loans in connection with its mortgage loan servicing activities on a daily basis, and in no event more than one Business Day after the Servicer's receipt thereof, all Escrow Payments collected on account of the related Mortgage Loans and shall thereafter deposit such Escrow Payments in the Servicing Accounts, in no event later than the second Business Day after the deposit of good funds into the clearing account, and retain therein, all Escrow Payments collected on account of the Mortgage Loans, for the purpose of effecting the timely payment of any such items as required under the terms of this Agreement. Withdrawals of amounts from a Servicing Account may be made by the Servicer only to (i) effect timely payment of taxes, assessments, fire, flood, and hazard insurance premiums, and comparable items; (ii) reimburse itself out of related collections for any Servicing Advances made pursuant to Section 3.01 (with respect to taxes and assessments) and Section 3.11 (with respect to fire, flood and hazard insurance); (iii) refund to Mortgagors any sums as may be determined to be overages; (iv) for application to restore or repair the related Mortgaged Property in accordance with Section 3.11; (v) pay interest, if required and as described below, to Mortgagors on balances in the Servicing Account; or, only to the extent not required to be paid to the related Mortgagors, to pay itself interest on balances in the Servicing Account; or (vi) clear and terminate the Servicing Account at the termination of the Servicer's obligations and responsibilities in respect of the related Mortgage Loans under this Agreement in accordance with Article X. As part of its servicing duties, the Servicer shall pay to the Mortgagors interest on funds in Servicing Accounts, to the extent required by law and, to the extent that interest earned on funds in the Servicing Accounts is insufficient, to pay such interest from its own funds, without any reimbursement therefor. Notwithstanding the foregoing, the Servicer shall not be obligated to collect Escrow Payments if the related Mortgage Loan does not require such payments but the Servicer shall nevertheless be obligated to make Servicing Advances as provided in Section 3.01 and Section 3.11. In the event the Servicer shall deposit in the Servicing Accounts any amount not required to be deposited therein, it may at any time withdraw such amount from the Servicing Accounts, any provision to the contrary notwithstanding.

With respect to Escrow Mortgage Loans, the Servicer shall ascertain and estimate Escrow Payments and all other charges that will become due and payable with respect to the related Mortgage Loans and the Mortgaged Properties, to the end that the installments payable by the Mortgagors will be sufficient to pay such charges as and when they become due and payable.  To the extent that a Mortgage does not provide for Escrow Payments, the Servicer (i) shall determine whether any such payments are made by the Mortgagor in a manner and at a time that is necessary to avoid the loss of the Mortgaged Property due to a tax sale or the foreclosure as a result of a tax lien and (ii) shall ensure that all insurance required to be maintained on the Mortgaged Property pursuant to this Agreement is maintained.  If any such payment has not been

made and the Servicer receives notice of a tax lien with respect to the Mortgage Loan being imposed, the Servicer shall, promptly and to the extent required to avoid loss of the Mortgaged Property, advance or cause to be advanced funds necessary to discharge such lien on the Mortgaged Property unless the Servicer determines the advance to be nonrecoverable. The Servicer assumes full responsibility for the payment of all such bills and shall effect payments of all such bills irrespective of the Mortgagor's faithful performance in the payment of same or the making of the Escrow Payments and shall make Servicing Advances to effect such payments subject to its determination of recoverability.

SECTION 3.08.        Collection Account and Distribution Account.

(a)        On behalf of the Trust Fund, the Servicer shall establish and maintain one or more "Collection Accounts", held in trust for the benefit of the Trustee and the Certificateholders and the Class A Certificate Insurer. On behalf of the Trust Fund, the Servicer shall deposit or cause to be deposited in the clearing account in which it customarily deposits payments and collections on mortgage loans in connection with its mortgage loan servicing activities on a daily basis, and in no event more than one Business Day after the Servicer's receipt thereof, and shall thereafter deposit in the Collection Account, in no event later than two Business Days after the deposit of good funds into the clearing account, as and when received or as otherwise required hereunder, the following payments and collections received or made by it on or subsequent to the Cut-off Date other than amounts attributable to a Due Date on or prior to the Cut-off Date:

(i)        all payments on account of principal, including Principal Prepayments, on the Mortgage Loans;

(ii)        all payments on account of interest (net of the Servicing Fee) on each Mortgage Loan;

(iii)        all Insurance Proceeds and Liquidation Proceeds (other than proceeds collected in respect of any particular REO Property) and all Subsequent Recoveries with respect to the Mortgage Loans;

(iv)        any amounts required to be deposited by the Servicer pursuant to Section 3.10 in connection with any losses realized on Permitted Investments with respect to funds held in the Collection Account;

(v)        any amounts required to be deposited by the Servicer pursuant to the second paragraph of Section 3.11(a) in respect of any blanket policy deductibles;

(vi)        any Purchase Price or Substitution Shortfall Amount delivered to the Servicer and all proceeds (net of amounts payable or reimbursable to the Servicer, the Master Servicer, the Trustee, the Custodian or the Securities Administrator) of Mortgage Loans purchased in accordance with Section 2.03, Section 3.13 or Section 10.01; and

(vii)        any Prepayment Charges collected by the Servicer in connection with the Principal Prepayment of any of the Mortgage Loans or amounts required to be

deposited by the Servicer in connection with a breach of its obligations under Section 2.05.

The foregoing requirements for deposit in the Collection Account shall be exclusive, it being understood and agreed that, without limiting the generality of the foregoing, Ancillary Income and payments in the nature of late payment charges, assumption fees or other similar fees need not be deposited by the Servicer in the Collection Account and may be retained by the Servicer as additional servicing compensation. In the event the Servicer shall deposit in the Collection Account any amount not required to be deposited therein, it may at any time withdraw such amount from the Collection Account, any provision herein to the contrary notwithstanding.

(b)    On behalf of the Trust Fund, the Securities Administrator shall establish and maintain one or more accounts (such account or accounts, the "Distribution Account"), held in trust for the benefit of the Trustee, the Trust Fund and the Certificateholders and the Class A Certificate Insurer. On behalf of the Trust Fund, the Servicer shall deliver to the Securities Administrator in immediately available funds for deposit in the Distribution Account on or before 12:00 noon New York time on the Servicer Remittance Date, that portion of the Available Distribution Amount (calculated without regard to the references in clause (2) of the definition thereof to amounts that may be withdrawn from the Distribution Account) for the related Distribution Date then on deposit in the Collection Account and the amount of all Prepayment Charges collected by the Servicer in connection with the Principal Prepayment of any of the Mortgage Loans then on deposit in the Collection Account and the amount of any funds reimbursable to an Advance Financing Person pursuant to Section 3.26. If the balance on deposit in a Collection Account exceeds $100,000 as of the commencement of business on any Business Day and the Collection Account constitutes an Eligible Account solely pursuant to clause (ii) of the definition of "Eligible Account," the Servicer shall, on or before 5:00 p.m. New York time on such Business Day, withdraw from the Collection Account any and all amounts payable or reimbursable to the Depositor, the Servicer, the Trustee, the Master Servicer, the Securities Administrator or the Sponsor pursuant to Section 3.09 and shall pay such amounts to the Persons entitled thereto or shall establish a separate Collection Account (which shall also be an Eligible Account) and withdraw from the existing Collection Account the amount on deposit therein in excess of $100,000 and deposit such excess in the newly created Collection Account.

With respect to any remittance received by the Securities Administrator after the Servicer Remittance Date on which such payment was due, the Securities Administrator shall send written notice thereof to the Servicer. The Servicer shall pay to the Securities Administrator interest on any such late payment by the Servicer at an annual rate equal to Prime Rate (as defined in *The Wall Street Journal*) plus one percentage point, but in no event greater than the maximum amount permitted by applicable law. Such interest shall be paid by the Servicer to the Securities Administrator on the date such late payment is made and shall cover the period commencing with the day following the Servicer Remittance Date and ending with the Business Day on which such payment is made, both inclusive. The payment by the Servicer of any such interest, or the failure of the Securities Administrator to notify the Servicer of such interest, shall not be deemed an extension of time for payment or a waiver of any Event of Default by the Servicer.

(c)     Funds in the Collection Account and funds in the Distribution Account may be invested in Permitted Investments in accordance with the provisions set forth in Section 3.10.  The Servicer shall give notice to the Trustee, the Securities Administrator and the Master Servicer of the location of the Collection Account when established and prior to any change thereof.  The Securities Administrator shall give notice to the Servicer and the Depositor of the location of the Distribution Account when established and prior to any change thereof.

(d)     Funds held in the Collection Account at any time may be delivered by the Servicer in immediately available funds to the Securities Administrator for deposit in the Distribution Account.  In the event any Servicer shall deliver to the Securities Administrator for deposit in the Distribution Account any amount not required to be deposited therein, it may at any time request that the Securities Administrator withdraw such amount from the Distribution Account and remit to it any such amount, any provision herein to the contrary notwithstanding. In no event shall the Securities Administrator incur liability as a result of withdrawals from the Distribution Account at the direction of the Servicer in accordance with the immediately preceding sentence.  In addition, the Servicer shall deliver to the Securities Administrator no later than the Servicer Remittance Date the amounts set forth in clauses (i) through (iv) below:

(i)     any P&I Advances, as required pursuant to Section 5.03;

(ii)     any amounts required to be deposited pursuant to Section 3.22(d) or 3.21(f) in connection with any related REO Property;

(iii)     any amounts to be paid in connection with a purchase of Mortgage Loans and REO Properties pursuant to Section 10.01; and

(iv)     any amounts required to be deposited pursuant to Section 3.23 in connection with any Prepayment Interest Shortfalls.

SECTION 3.09.     Withdrawals from the Collection Account and Distribution Account.

(a)     The Servicer shall, from time to time, make withdrawals from the Collection Account for any of the following purposes or as described in Section 5.03:

(i)     to remit to the Securities Administrator for deposit in the Distribution Account the amounts required to be so remitted pursuant to Section 3.08(b) or permitted to be so remitted pursuant to the first sentence of Section 3.08(d);

(ii)     subject to Section 3.13(d), to reimburse itself (including any successor Servicer) for P&I Advances made by it, but only to the extent of amounts received which represent Late Collections (net of the related Servicing Fees) of Monthly Payments or rental and other income from the related REO Property on related Mortgage Loans with respect to which such P&I Advances were made in accordance with the provisions of Section 5.03;

(iii)     subject to Section 3.13(d), to pay itself any unpaid Servicing Fees and reimburse itself any unreimbursed Servicing Advances with respect to each related

Mortgage Loan, but only to the extent of any Liquidation Proceeds and Insurance Proceeds received with respect to such related Mortgage Loan or rental or other income from the related REO Property;

(iv)    to pay to itself as servicing compensation (in addition to the Servicing Fee or any portion thereof payable to the Servicer) on the Servicer Remittance Date any interest or investment income earned on funds deposited in the Collection Account;

(v)    to pay to itself or the Sponsor, as the case may be, with respect to each Mortgage Loan serviced by the Servicer that has previously been purchased or replaced pursuant to Section 2.03 or Section 3.13(c) all amounts received thereon not included in the Purchase Price or the Substitution Shortfall Amount;

(vi)    to reimburse itself (including any successor to the Servicer) for

(A)    any P&I Advance or Servicing Advance previously made by it which the Servicer has determined to be a Nonrecoverable P&I Advance or a Nonrecoverable Servicing Advance in accordance with the provisions of Section 5.03;

(B)    any unpaid Servicing Fees payable to the Servicer to the extent not recoverable from Liquidation Proceeds, Insurance Proceeds or other amounts received with respect to the related Mortgage Loan under Section 3.08(a)(iii); or

(C)    any P&I Advance or Servicing Advance made with respect to a delinquent Mortgage Loan which Mortgage Loan has been modified by the Servicer in accordance with the terms of this Agreement; provided that the Servicer shall only reimburse itself for such P&I Advances and Servicing Advances at the time of such modification, or as otherwise provided in this Section 3.09;

(vii)    to reimburse itself or the Depositor for expenses incurred by or reimbursable to itself or the Depositor, as the case may be, pursuant to Section 3.01 or Section 7.03;

(viii)    to reimburse itself or the Trustee, as the case may be, for expenses reasonably incurred in respect of the breach or defect giving rise to the purchase obligation under Section 2.03 of this Agreement that were included in the Purchase Price of the related Mortgage Loan, including any expenses arising out of the enforcement of the purchase obligation;

(ix)    to pay, or to reimburse itself for advances in respect of, expenses incurred in connection with any related Mortgage Loan pursuant to Section 3.13(b);

(x)    to pay to itself any Recovery Fees in respect of net recoveries received on any Charged Off Loans pursuant to Section 3.13; and

(xi)    to clear and terminate the Collection Account pursuant to Section 10.01.

The Servicer shall keep and maintain separate accounting, on a Mortgage Loan by Mortgage Loan basis, for the purpose of justifying any withdrawal from the Collection Account, to the extent held by or on behalf of it, pursuant to subclauses (ii), (iii), (v), (vi), (vii), (viii), (ix) and (x).

(b)    The Securities Administrator shall, from time to time, make withdrawals from the Distribution Account, for any of the following purposes, without priority:

(i)    to make distributions to Certificateholders and the Class A Certificate Insurer in accordance with Section 5.01;

(ii)    to pay to itself, the Custodian and the Master Servicer amounts to which it is entitled pursuant to Section 9.05 or any other provision of this Agreement and any Extraordinary Trust Fund Expenses;

(iii)    to reimburse itself or the Master Servicer pursuant to Section 8.02;

(iv)    to pay any Net Swap Payment or Swap Termination Payment payable to the Supplemental Interest Trust (unless the Swap Provider is the sole Defaulting Party or the sole Affected Party (as defined in the Swap Agreement)) owed to the Swap Provider;

(v)    to pay any amounts in respect of taxes pursuant to Section 11.01(g)(v);

(vi)    to pay the Master Servicing Fee to the Master Servicer;

(vii)    to pay the Credit Risk Management Fee to the Credit Risk Manager; and

(viii)    to clear and terminate the Distribution Account pursuant to Section 10.01.

SECTION 3.10.    Investment of Funds in the Investment Accounts.

(a)    The Servicer may direct, by means of written directions (which may be standing directions), any Depository Institution maintaining the Collection Account to invest the funds in such Collection Account (for purposes of this Section 3.10, an "Investment Account") in one or more Permitted Investments bearing interest or sold at a discount, and maturing, unless payable on demand, (i) no later than the Business Day immediately preceding the date on which such funds are required to be withdrawn from such account pursuant to this Agreement, if a Person other than the Securities Administrator is the obligor thereon, and (ii) no later than the date on which such funds are required to be withdrawn from such account pursuant to this Agreement, if the Securities Administrator is the obligor on such Permitted Investment. Amounts in the Distribution Account may be invested in Permitted Investments as directed in

writing by the Master Servicer and maturing, unless payable on demand, (i) no later than the Business Day immediately preceding the date on which such funds are required to be withdrawn from such account pursuant to this Agreement, if a Person other than the Securities Administrator is the obligor thereon, and (ii) no later than the date on which such funds are required to be withdrawn from such account pursuant to this Agreement, if the Securities Administrator is the obligor thereon. All such Permitted Investments shall be held to maturity, unless payable on demand. Any investment of funds shall be made in the name of the Trustee (in its capacity as such) or in the name of a nominee of the Trustee. The Securities Administrator shall be entitled to sole possession over each such investment in the Distribution Account and, subject to subsection (b) below, the income thereon, and any certificate or other instrument evidencing any such investment shall be delivered directly to the Securities Administrator or its agent, together with any document of transfer necessary to transfer title to such investment to the Trustee or its nominee. In the event amounts on deposit in a Collection Account are at any time invested in a Permitted Investment payable on demand, the party with investment discretion over such Investment Account shall:

(x)   consistent with any notice required to be given thereunder, demand that payment thereon be made on the last day such Permitted Investment may otherwise mature hereunder in an amount equal to the lesser of (1) all amounts then payable thereunder and (2) the amount required to be withdrawn on such date; and

(y)   demand payment of all amounts due thereunder promptly upon receipt by such party of written notice from the Servicer that such Permitted Investment would not constitute a Permitted Investment in respect of funds thereafter on deposit in the Investment Account.

(b)   All income and gain realized from the investment of funds deposited in a Collection Account shall be for the benefit of the Servicer and shall be subject to its withdrawal in accordance with Section 3.09. The Servicer shall deposit into the Collection Account the amount of any loss incurred in respect of any such Permitted Investment made with funds in such account immediately upon realization of such loss. All earnings and gain realized from the investment of funds deposited in the Distribution Account shall be for the benefit of the Master Servicer. The Master Servicer shall remit from its own funds for deposit into the Distribution Account the amount of any loss incurred on Permitted Investments in the Distribution Account.

(c)   Except as otherwise expressly provided in this Agreement, if any default occurs in the making of a payment due under any Permitted Investment, or if a default occurs in any other performance required under any Permitted Investment, the Trustee may and, subject to Section 9.01 and Section 9.02(a)(v), shall, at the written direction of the Servicer, take such action as may be appropriate to enforce such payment or performance, including the institution and prosecution of appropriate proceedings.

(d)   The Trustee, the Master Servicer or their respective Affiliates are permitted to receive additional compensation that could be deemed to be in the Trustee's or the Master Servicer's economic self-interest for (i) serving as investment adviser, administrator, shareholder servicing agent, custodian or sub-custodian with respect to certain of the Permitted

Investments, (ii) using Affiliates to effect transactions in certain Permitted Investments and (iii) effecting transactions in certain Permitted Investments.  Such compensation shall not be considered an amount that is reimbursable or payable to the Trustee or the Master Servicer pursuant to Section 3.09 or 3.10 or otherwise payable in respect of Extraordinary Trust Fund Expenses.  Such additional compensation shall not be an expense of the Trust Fund.

SECTION 3.11.    Maintenance of Hazard Insurance, Errors and Omissions and Fidelity Coverage and Primary Mortgage Insurance.

(a)    The terms of each Mortgage Note require the related Mortgagor to maintain fire, flood and hazard insurance policies. To the extent such policies are not maintained by the related Mortgagor, owner or servicer of the related First Mortgage Loan and the Servicer has been notified that such policies are not maintained, the Servicer shall cause to be maintained for each Mortgaged Property fire and hazard insurance with extended coverage as is customary in the area where the Mortgaged Property is located in an amount which is at least equal to the lesser of the current principal balance of the related Mortgage Loan and the amount necessary to compensate fully for any damage or loss to the improvements which are a part of such property on a replacement cost basis, in each case in an amount not less than such amount as is necessary to avoid the application of any coinsurance clause contained in the related hazard insurance policy. The Servicer shall also cause to be maintained fire and hazard insurance on each REO Property with extended coverage as is customary in the area where the Mortgaged Property is located in an amount which is at least equal to the lesser of (i) the maximum insurable value of the improvements which are a part of such property and (ii) the sum of the outstanding principal balance of the related Mortgage Loan and the related First Mortgage Loan at the time it became an REO Property, in each case in an amount not less than such amount as is necessary to avoid the application of any coinsurance clause contained in the related hazard insurance policy.  The Servicer will comply in the performance of this Agreement with all reasonable rules and requirements of each insurer under any such hazard policies. Any amounts to be collected by the Servicer under any such policies remaining after application of any such amounts to any related First Mortgage Loan and application of amounts to the restoration or repair of the property subject to the related Mortgage or amounts to be released to the Mortgagor in accordance with Accepted Servicing Practices, subject to the terms and conditions of the related Mortgage and Mortgage Note) shall be deposited into the Collection Account, subject to withdrawal pursuant to Section 3.09, if received in respect of a Mortgage Loan, or in the REO Account, subject to withdrawal pursuant to Section 3.22, if received in respect of an REO Property. Any cost incurred by the Servicer in maintaining any such insurance shall not, for the purpose of calculating distributions to Certificateholders, be added to the unpaid principal balance of the related Mortgage Loan, notwithstanding that the terms of such Mortgage Loan so permit. It is understood and agreed that no earthquake or other additional insurance is to be required of any Mortgagor other than pursuant to such applicable laws and regulations as shall at any time be in force and as shall require such additional insurance. If the Mortgaged Property or REO Property is at any time in an area identified in the Federal Register by the Federal Emergency Management Agency as having special flood hazards, the Servicer will cause to be maintained a flood insurance policy in respect thereof. Such flood insurance shall be in an amount equal to the lesser of (i) the unpaid principal balance of the related Mortgage Loan and (ii) the maximum amount of such insurance available for the related Mortgaged Property under the national flood insurance program (assuming that the area in which such Mortgaged Property is located is

98

participating in such program), in each case in an amount not less than such amount as is necessary to avoid the application of any coinsurance clause contained in the related hazard insurance policy.

In the event that any Servicer shall obtain and maintain a blanket policy with an insurer having a General Policy Rating of B:VI or better in Best's Key Rating Guide or otherwise acceptable to Fannie Mae or Freddie Mac insuring against hazard losses on all of the related Mortgage Loans, it shall conclusively be deemed to have satisfied its obligations to cause fire and hazard insurance to be maintained on the Mortgaged Properties, it being understood and agreed that such policy may contain a deductible clause, in which case the Servicer shall, in the event that there shall not have been maintained on the related Mortgaged Property or REO Property a policy complying with this Section 3.11, and there shall have been one or more losses which would have been covered by such policy, deposit into the Collection Account from its own funds the amount not otherwise payable under the blanket policy because of such deductible clause. In connection with its activities as administrator and servicer of the related Mortgage Loans, the Servicer agrees to prepare and present, on behalf of itself, the Trustee, the Trust Fund, the Certificateholders, claims under any such blanket policy in a timely fashion in accordance with the terms of such policy.

(b)      The Servicer shall keep in force during the term of this Agreement a policy or policies of insurance covering errors and omissions for failure in the performance of its respective obligations under this Agreement, which policy or policies shall be in such form and amount that would meet the requirements of Fannie Mae or Freddie Mac if it were the purchaser of the related Mortgage Loans, unless the Servicer, has obtained a waiver of such requirements from Fannie Mae or Freddie Mac.  The Servicer shall also maintain a fidelity bond in the form and amount that would meet the requirements of Fannie Mae or Freddie Mac, unless the Servicer, has obtained a waiver of such requirements from Fannie Mae or Freddie Mac.  The Servicer shall be deemed to have complied with this provision if an Affiliate of the Servicer has such errors and omissions and fidelity bond coverage and, by the terms of such insurance policy or fidelity bond, the coverage afforded thereunder extends to the Servicer. Any such errors and omissions policy and fidelity bond shall by its terms not be cancelable without thirty (30) days' prior written notice to the Trustee.

(c)      The Servicer need not obtain the approval of the Master Servicer prior to releasing any Insurance Proceeds to the Mortgagor to be applied to the restoration or repair of the Mortgaged Property if such release is in accordance with Accepted Servicing Practices. At a minimum, the Servicer shall comply with the following conditions in connection with any such release of Insurance Proceeds in excess of $10,000:

(i)      the Servicer shall receive satisfactory independent verification of completion of repairs and issuance of any required approvals with respect thereto;

(ii)      the Servicer shall take all steps necessary to preserve the priority of the lien of the Mortgage, including, but not limited to requiring waivers with respect to mechanics' and materialmen's liens; and

(iii)    pending repairs or restoration, the Servicer shall place the Insurance Proceeds in the related Escrow Account, if any.

If the Trustee is named as an additional loss payee, the Servicer is hereby empowered to endorse any loss draft issued in respect of such a claim in the name of the Trustee.

SECTION 3.12.    Enforcement of Due-on-Sale Clauses; Assumption Agreements

The Servicer shall, to the extent it has knowledge of any conveyance of any related Mortgaged Property by any related Mortgagor (whether by absolute conveyance or by contract of sale, and whether or not the Mortgagor remains or is to remain liable under the Mortgage Note and/or the Mortgage), exercise its rights to accelerate the maturity of such Mortgage Loan under the "due-on-sale" clause, if any, applicable thereto; provided, however, that the Servicer shall not exercise any such rights if prohibited by law from doing so. If the Servicer reasonably believes that it is unable under applicable law to enforce such "due-on-sale" clause, or if any of the other conditions set forth in the proviso to the preceding sentence apply, the Servicer shall enter into an assumption and modification agreement from or with the person to whom such property has been conveyed or is proposed to be conveyed, pursuant to which such person becomes liable under the Mortgage Note and, to the extent permitted by applicable state law, the Mortgagor remains liable thereon. The Servicer is also authorized to enter into a substitution of liability agreement with such person, pursuant to which the original Mortgagor is released from liability and such person is substituted as the Mortgagor and becomes liable under the Mortgage Note, provided that no such substitution shall be effective unless such person satisfies the then current underwriting criteria of the Servicer for mortgage loans similar to the related Mortgage Loans. In connection with any assumption or substitution, the Servicer shall apply such underwriting standards and follow such practices and procedures as shall be normal and usual in its general mortgage servicing activities and as it applies to other mortgage loans owned solely by it. The Servicer shall not take or enter into any assumption and modification agreement, however, unless (to the extent practicable in the circumstances) it shall have received confirmation, in writing, of the continued effectiveness of any applicable hazard insurance policy. Any fee collected by the Servicer in respect of an assumption or substitution of liability agreement will be retained by the Servicer as additional servicing compensation. In connection with any such assumption, no material term of the Mortgage Note (including but not limited to the related Mortgage Rate and the amount of the Monthly Payment) may be amended or modified, except as otherwise required pursuant to the terms thereof. The Servicer shall notify the Trustee (or the Custodian) that any such substitution or assumption agreement has been completed by forwarding to the Trustee (or the Custodian) the executed original of such substitution or assumption agreement, which document shall be added to the related Mortgage File and shall, for all purposes, be considered a part of such Mortgage File to the same extent as all other documents and instruments constituting a part thereof.

Notwithstanding the foregoing paragraph or any other provision of this Agreement, the Servicer shall not be deemed to be in default, breach or any other violation of its obligations hereunder by reason of any assumption of a Mortgage Loan by operation of law or by the terms of the Mortgage Note or any assumption which the Servicer may be restricted by law from preventing, for any reason whatever. For purposes of this Section 3.12, the term

"assumption" is deemed to also include a sale (of the Mortgaged Property) subject to the Mortgage that is not accompanied by an assumption or substitution of liability agreement.

SECTION 3.13.    Realization Upon Defaulted Mortgage Loans.

(a)    (i)    The Servicer shall use its commercially reasonable efforts, consistent with Accepted Servicing Practices, to foreclose upon or otherwise comparably convert the ownership of properties securing such of the Mortgage Loans as come into and continue in default and as to which no satisfactory arrangements can be made for collection of delinquent payments pursuant to Section 3.06.  With respect to such of the Mortgage Loans as come into and continue in default, the Servicer will decide whether to (i) foreclose upon the Mortgaged Properties securing such Mortgage Loans, (ii) write off the unpaid principal balance of the Mortgage Loans as bad debt, (iii) take a deed in lieu of foreclosure, (iv) accept a short sale (a payoff of the Mortgage Loan for an amount less than the total amount contractually owed in order to facilitate a sale of the Mortgaged Property by the Mortgagor) or permit a short refinancing (a payoff of the Mortgage Loan for an amount less than the total amount contractually owed in order to facilitate refinancing transactions by the Mortgagor not involving a sale of the Mortgaged Property), (v) arrange for a repayment plan, or (vi) agree to a modification in accordance with this Agreement.  In connection with such decision, the Servicer shall take such action as (i) the Servicer would take under similar circumstances with respect to a similar mortgage loan held for its own account for investment, (ii) shall be consistent with Accepted Servicing Practices and the Servicing Performance Standards, (iii) the Servicer shall determine consistently with Accepted Servicing Practices to be in the best interest of the Trustee and Certificateholders, provided, that actions taken by the Servicer in connection with its servicing of the related First Mortgage Loan shall not be considered relevant to a determination of whether the Servicer has met the standard set forth in this clause (iii) so long as in the Servicer's determination, such action is not materially adverse to the interests of the Certificateholders and (iv) is consistent with the requirements of the insurer under any insurance policy required to be maintained under this Agreement; provided, however, that the Servicer shall not be required to expend its own funds in connection with any foreclosure or towards the restoration of any property unless it shall determine in its sole discretion (i) that such restoration and/or foreclosure will increase the proceeds of liquidation of the related Mortgage Loan after reimbursement to itself of such expenses and (ii) that such expenses will be recoverable to it through Liquidation Proceeds (respecting which it shall have priority for purposes of withdrawals from the Collection Account).  The Servicer shall be responsible for all costs and expenses incurred by it in any such proceedings; provided, however, that such costs and expenses will be recoverable as Servicing Advances by the Servicer as contemplated in Sections 3.09 and 3.22.  The foregoing is subject to the provision that, in any case in which a Mortgaged Property shall have suffered damage from an Uninsured Cause, the Servicer shall not be required to expend its own funds toward the restoration of such property unless it shall determine in its discretion that such restoration will increase the proceeds of liquidation of the related Mortgage Loan after reimbursement to itself for such expenses.

(ii)    [Reserved].

(iii)    The Servicer will be obligated to charge off a Mortgage Loan at the time such Mortgage Loan becomes 180 days delinquent under the OTS Method. Once

a Mortgage Loan has been charged off, the Servicer will discontinue making P&I Advances, the Servicer will not be entitled to any additional servicing compensation (except as described in paragraph (a)(iv) of this Section 3.13) or reimbursement of expenses, the Charged Off Loan will give rise to a Realized Loss, and the Servicer will follow the procedures described in paragraph (a)(iv) below.

(iv)    Any Mortgage Loan that becomes a Charged Off Loan may continue to be serviced by the Servicer for the Certificateholders using Special Servicing Practices. For as long as such Charged Off Loan remains part of the Trust, the Servicer will be entitled to retain the Recovery Fee in respect of such Charged Off Loan; provided, that the Servicer will not be entitled to any other servicing fees or reimbursement of expenses in connection with such Charged Off Loan after the date of charge off.  Any such Mortgage Loans serviced in accordance with the Special Servicing Practices will be serviced until six months following the later of (i) the date on which such Mortgage Loans were charged off and (ii) the date on which any collections are received on such Mortgage Loans (the "Mortgage Loan Release Date").  Any net recoveries (less the Recovery Fee paid to the Servicer) received on such Charged Off Loans during such period will be treated as Subsequent Recoveries and included in the Interest Remittance Amount, to the extent allocable to interest payments, and to the Principal Remittance Amount, to the extent allocable to principal payments.

On the Mortgage Loan Release Date, such Charged Off Loan will be released from the Trust Fund, will no longer be an asset of any REMIC, and will be transferred to the Class CE Certificateholders, without recourse, and thereafter (i) the Class CE Certificateholders will be entitled to any amounts subsequently received in respect of any such Released Loans, (ii) the Holders of a majority in Percentage Interest in the Class CE Certificates may designate any servicer to service any such Released Loan and (iii) the Holders of a majority in Percentage Interest in the Class CE Certificates may sell any such Released Loan to a third party.  [Notwithstanding the previous sentence, if at any time after a Mortgage Loan has been Charged Off and prior to six months after the date on which the Servicer begins servicing such Charged Off Loan using Special Servicing Practices, the Servicer determines that there will not be any Subsequent Recoveries on such Charged Off Loan under any circumstances, the Servicer may release such Charged Off Loan to the Holders of a majority in Percentage Interest in the Class CE Certificates in accordance with the provisions set forth in the previous sentence.]  The Servicer shall notify the Master Servicer and Securities Administrator on each Mortgage Loan Release Date of each Charged Off Loan being released from the Trust Fund, and shall thereafter remit any amounts collected on such Charged Off Loan to the Class CE Certificateholder net of any fees and expenses pursuant to the terms of a receivable collections agreement to be entered into between the Class CE Certificateholder and the Servicer.  The Master Servicer shall not be responsible for collecting any payments on a Charged Off Loan after such Charged Off Loan is released from the Trust Fund on the related Mortgage Loan Release Date.

Notwithstanding the foregoing, the procedures described above in this clause (iv) relating to the treatment of Charged Off Loans may be modified at any time at the discretion of the Holders of a majority in Percentage Interest in the Class CE

Certificates, with the consent of the Servicer and the Class A Certificate Insurer, which consent shall not be unreasonably withheld; provided, however, that in no event shall the Holders of a majority in Percentage Interest in the Class CE Certificates or the Class A Certificate Insurer change the fee structure relating to Charged Off Loans in a manner that would cause fees to be paid to the Servicer other than from recoveries on Charged Off Loans.

The Master Servicer shall track collections received by the Servicer on any Charged Off Loans based upon loan level data provided to the Master Servicer by the Servicer on the date on which the Servicer provides its Servicer Report pursuant to Section 5.03(a), identifying the Charged Off Loans as of the related Due Period that the Servicer will continue to service until the related Mortgage Loan Release Date using Special Servicing Practices. On each Distribution Date, the Master Servicer shall verify, based on the recovery and expense information provided by the Servicer (i) the amount of Subsequent Recoveries on such Charged Off Loans for such Distribution Date and (ii) the aggregate amount of Recovery Fees to be paid to the Servicer in respect of such Charged Off Loans as of the related Due Period. The Master Servicer shall be entitled to rely, without independent verification, on the loan level data provided by the Servicer that identifies the recovery amounts on any Charged Off Loan in order to verify the amount in clause (i) of the previous sentence. The Master Servicer will be responsible for independently verifying the aggregate amount of the Recovery Fees described in clause (ii) of the second preceding sentence to be paid to the Servicer.

(b)    Notwithstanding the foregoing provisions of this Section 3.13 or any other provision of this Agreement, with respect to any Mortgage Loan as to which the Servicer has received actual notice of, or has actual knowledge of, the presence of any toxic or hazardous substance on the related Mortgaged Property, the Servicer shall not, on behalf of the Trust Fund, either (i) obtain title to such Mortgaged Property as a result of or in lieu of foreclosure or otherwise, or (ii) otherwise acquire possession of, or take any other action with respect to, such Mortgaged Property, if, as a result of any such action, the Trust Fund, the Trustee or the Certificateholders would be considered to hold title to, to be a "mortgagee-in-possession" of, or to be an "owner" or "operator" of such Mortgaged Property within the meaning of the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended from time to time, or any comparable law, unless the Servicer has also previously determined, based on its reasonable judgment and a prudent report prepared by an Independent Person who regularly conducts environmental audits using customary industry standards, that:

(1)    such Mortgaged Property is in compliance with applicable environmental laws or, if not, that it would be in the best economic interest of the Trust Fund to take such actions as are necessary to bring the Mortgaged Property into compliance therewith; and

(2)    there are no circumstances present at such Mortgaged Property relating to the use, management or disposal of any hazardous substances, hazardous materials, hazardous wastes or petroleum-based materials for which investigation, testing, monitoring, containment, clean-up or remediation could be required under any federal, state or local law or regulation, or that if any such materials are

103

present for which such action could be required, that it would be in the best economic interest of the Trust Fund to take such actions with respect to the affected Mortgaged Property.

The cost of the environmental audit report contemplated by this Section 3.13 shall be advanced by the Servicer, subject to the Servicer's right to be reimbursed therefor from the Collection Account as provided in Section 3.09(a)(ix), such right of reimbursement being prior to the rights of Certificateholders to receive any amount in the Collection Account received in respect of the affected Mortgage Loan or other Mortgage Loans.

If the Servicer determines, as described above, that it is in the best economic interest of the Trust Fund to take such actions as are necessary to bring any such Mortgaged Property into compliance with applicable environmental laws, or to take such action with respect to the containment, clean-up or remediation of hazardous substances, hazardous materials, hazardous wastes, or petroleum-based materials affecting any such Mortgaged Property, then the Servicer shall take such action as it deems to be in the best economic interest of the Trust Fund. The cost of any such compliance, containment, cleanup or remediation shall be advanced by the Servicer, subject to its right to be reimbursed therefor from the Collection Account as provided in Sections 3.09(a)(iii) or 3.09(a)(ix), such right of reimbursement being prior to the rights of Certificateholders to receive any amount in the Collection Account received in respect of the affected Mortgage Loan or other Mortgage Loans.

(c)      Proceeds received in connection with any Final Recovery Determination, as well as any recovery resulting from a partial collection of Insurance Proceeds or Liquidation Proceeds, in respect of any Mortgage Loan (other than a Charged Off Loan), will be applied in the following order of priority: first, to reimburse the Servicer for any related unreimbursed Servicing Advances and P&I Advances, pursuant to Section 3.09(a)(ii) or (a)(iii); second, to accrued and unpaid interest on the related Mortgage Loan, to the date of the Final Recovery Determination, or to the Due Date prior to the Distribution Date on which such amounts are to be distributed if not in connection with a Final Recovery Determination; and third, as a recovery of principal of the related Mortgage Loan. If the amount of the recovery so allocated to interest is less than the full amount of accrued and unpaid interest due on such Mortgage Loan, the amount of such recovery will be allocated by the Servicer as follows: first, to unpaid Servicing Fees; and second, to the balance of the interest then due and owing. The portion of the recovery so allocated to unpaid Servicing Fees shall be reimbursed to the Servicer pursuant to Section 3.09(a)(iii). The portion of the recovery allocated to interest (net of unpaid Servicing Fees) and the portion of the recovery allocated to principal of the related Mortgage Loan shall be applied as follows: first, to reimburse the Servicer for any related unreimbursed Servicing Advances or P&I Advances in accordance with Section 3.09(a)(ii) and any other amounts reimbursable to the Servicer pursuant to Section 3.09, and second, as part of the amounts to be transferred to the Distribution Account in accordance with Section 3.08(b).  Excess proceeds, if any, from the liquidation of a Liquidated Mortgage Loan will be retained by the Servicer as additional servicing compensation pursuant to Section 3.15.

(d)      The Servicer shall have the right to purchase from REMIC I any defaulted Mortgage Loan that is 90 days or more delinquent, which the Servicer determines in good faith will otherwise become subject to foreclosure proceedings (evidence of such determination to be

delivered in writing to the Trustee, in form and substance satisfactory to the Servicer and the Trustee prior to purchase), at a price equal to the Purchase Price.  The Purchase Price for any Mortgage Loan purchased hereunder shall be deposited in the Collection Account, and the Trustee, upon receipt of written certification from the Servicer of such deposit, shall release or cause to be released to the Servicer the related Mortgage File and the Trustee shall execute and deliver such instruments of transfer or assignment, in each case without recourse, representation or warranty, as the Servicer shall furnish and as shall be necessary to vest in the Servicer title to any Mortgage Loan released pursuant hereto.

SECTION 3.14.    Trustee to Cooperate; Release of Mortgage Files.

(a)    Upon becoming aware of the payment in full of any Mortgage Loan, or the receipt by the Servicer of a notification that payment in full has been escrowed in a manner customary for such purposes for payment to Certificateholders on the next Distribution Date, the Servicer will promptly furnish to the Custodian, on behalf of the Trustee, two copies of a request for release substantially in the form attached to the Custodial Agreement signed by a Servicing Officer or in a mutually agreeable electronic format which will, in lieu of a signature on its face, originate from a Servicing Officer (which certification shall include a statement to the effect that all amounts received in connection with such payment that are required to be deposited in the Collection Account have been or will be so deposited) and shall request that the Custodian, on behalf of the Trustee, deliver to the Servicer the related Mortgage File. Upon receipt of such certification and request, the Custodian, on behalf of the Trustee, shall within five (5) Business Days release the related Mortgage File to the Servicer and the Trustee and the Custodian shall have no further responsibility with regard to such Mortgage File. Upon any such payment in full, the Servicer is authorized, to give, as agent for the Trustee, as the mortgagee under the Mortgage that secured the Mortgage Loan, an instrument of satisfaction (or assignment of mortgage without recourse) regarding the Mortgaged Property subject to the Mortgage, which instrument of satisfaction or assignment, as the case may be, shall be delivered to the Person or Persons entitled thereto against receipt therefor of such payment, it being understood and agreed that no expenses incurred in connection with such instrument of satisfaction or assignment, as the case may be, shall be chargeable to the Collection Account, unless it shall represent a Servicing Advance.

(b)    From time to time and as appropriate for the servicing or foreclosure of any Mortgage Loan, the Trustee shall execute such documents as shall be prepared and furnished to the Trustee by the Servicer (in form reasonably acceptable to the Trustee) and as are necessary to the prosecution of any such proceedings. The Custodian, on behalf of the Trustee, shall, upon the request of the Servicer, and delivery to the Custodian, on behalf of the Trustee, of two copies of a request for release signed by a Servicing Officer substantially in the form attached to the Custodial Agreement (or in a mutually agreeable electronic format which will, in lieu of a signature on its face, originate from a Servicing Officer), release within five (5) Business Days the related Mortgage File held in its possession or control to the Servicer. Such trust receipt shall obligate the Servicer to return the Mortgage File to the Custodian on behalf of the Trustee, when the need therefor by the Servicer no longer exists unless the related Mortgage Loan shall be liquidated, in which case, upon receipt of a certificate of a Servicing Officer similar to that hereinabove specified, the Mortgage File shall be released by the Custodian, on behalf of the Trustee, to the Servicer.

105

Notwithstanding the foregoing, in connection with a Principal Prepayment in full of any Mortgage Loan, the Master Servicer may request release of the related Mortgage File from the Custodian, in accordance with the provisions of the Custodial Agreement, in the event the Servicer fails to do so.

Upon written certification of a Servicing Officer, the Trustee shall execute and deliver to the Servicer, any court pleadings, requests for trustee's sale or other documents prepared and delivered to the Trustee and reasonably acceptable to it and necessary to the foreclosure or trustee's sale in respect of a Mortgaged Property or to any legal action brought to obtain judgment against any Mortgagor on the Mortgage Note or Mortgage or to obtain a deficiency judgment, or to enforce any other remedies or rights provided by the Mortgage Note or Mortgage or otherwise available at law or in equity. Each such certification shall include a request that such pleadings or documents be executed by the Trustee and a statement as to the reason such documents or pleadings are required and that the execution and delivery thereof by the Trustee will not invalidate or otherwise affect the lien of the Mortgage, except for the termination of such a lien upon completion of the foreclosure or trustee's sale. So long as no Servicer Event of Default shall have occurred and be continuing, the Servicer shall have the right to execute any and all such court pleadings, requests and other documents as attorney-in-fact for, and on behalf of the Trustee. Notwithstanding the preceding sentence, the Trustee shall in no way be liable or responsible for the willful malfeasance of the Servicer, or for any wrongful or negligent actions taken by the Servicer, while the Servicer is acting in its capacity as attorney-in-fact for and on behalf of the Trustee.

SECTION 3.15.    Servicing Compensation.

As compensation for its activities hereunder, the Servicer shall be entitled to the Servicing Fee with respect to each Mortgage Loan payable solely from payments of interest in respect of such Mortgage Loan, subject to Section 3.23.  In addition, the Servicer shall be entitled to recover unpaid Servicing Fees out of Insurance Proceeds or Liquidation Proceeds to the extent permitted by Section 3.09(a)(iii), Section 3.09(a)(vi) and out of amounts derived from the operation and sale of an REO Property to the extent permitted by Section 3.22. The right to receive the Servicing Fee may not be transferred in whole or in part except in connection with the transfer of all of the Servicer's responsibilities and obligations under this Agreement to the extent permitted herein.

Additional servicing compensation in the form of Ancillary Income (other than Prepayment Charges) shall be retained by the Servicer only to the extent such fees or charges are received by the Servicer.  The Servicer shall also be entitled pursuant to Section 3.09(a)(iv) to withdraw from the Collection Account and pursuant to Section 3.22(b) to withdraw from any REO Account, as additional servicing compensation, interest or other income earned on deposits therein, subject to Section 3.10.  In addition, the Servicer shall be entitled to retain or withdraw from the Collection Account, pursuant to Section 3.09(a)(x), any Recovery Fees in respect of recoveries on Charged Off Loans as additional servicing compensation. The Servicer shall be required to pay all expenses incurred by it in connection with its servicing activities hereunder and shall not be entitled to reimbursement therefor except as specifically provided herein.

SECTION 3.16.        Collection Account Statements.

Upon request, not later than fifteen (15) days after each Distribution Date, the Servicer shall forward to the Master Servicer and the Securities Administrator and the Depositor, a statement prepared by the institution at which the Collection Account is maintained setting forth the status of the Collection Account as of the close of business on such Distribution Date and showing, for the period covered by such statement, the aggregate amount of deposits into and withdrawals from the Collection Account.  Copies of such statement and any similar statements provided by the Servicer shall be provided by the Securities Administrator to any Certificateholder and to any Person identified to the Securities Administrator as a prospective transferee of a Certificate, upon request at the expense of the requesting party, provided such statement is delivered by the Servicer to the Securities Administrator.

SECTION 3.17.        Annual Statement as to Compliance.

(a)        The Servicer shall deliver (and shall cause any Sub-Servicer engaged by it to deliver) to the Master Servicer and to the Depositor on or before March 15 of each year, commencing in March 2008, an Officer's Certificate stating, as to the signer thereof, that (A) a review of such party's activities during the preceding calendar year or portion thereof and of the Servicer's performance under this Agreement, or such other applicable agreement in the case of a Sub-Servicer, has been made under such officer's supervision and (B) to the best of such officer's knowledge, based on such review, such party has fulfilled all its obligations under this Agreement, or such other applicable agreement in the case of a Sub-Servicer, in all material respects throughout such year or portion thereof, or, if there has been a failure to fulfill any such obligation in any material respect, specifying each such failure known to such officer and the nature and status thereof.  Promptly after receipt of each such Officer's Certificate from the Servicer, any Sub-Servicer engaged by the Servicer, the Depositor shall review such Officer's Certificate and, if applicable, consult with each such party, as applicable, as to the nature of any failures by such party, in the fulfillment of any of the Servicer's obligations hereunder or, in the case of a Sub-Servicer, under such other applicable agreement.

(b)        Failure of the Servicer to comply timely with this Section 3.17 shall be deemed a Servicer Event of Default as to the Servicer, automatically, without notice and without any cure period, and the Master Servicer may, in addition to whatever rights the Master Servicer may have under this Agreement and at law or in equity or to damages, including injunctive relief and specific performance, terminate all the rights and obligations of the Servicer under this Agreement and in and to the related Mortgage Loans and the proceeds thereof without compensating the Servicer for the same (other than the Servicer's right to reimbursement of unreimbursed P&I Advances and Servicing Advances and accrued and unpaid Servicing Fees in the manner provided in this Agreement).  This paragraph shall supersede any other provision in this Agreement or any other agreement to the contrary.

(c)        In the event the Servicer or any Sub-Servicer engaged by the Servicer is terminated, assigns its rights and obligations under or resigns pursuant to the terms of this Agreement, or any applicable agreement in the case of a Sub-Servicer, as the case may be, such party shall provide an Officer's Certificate with respect to the related year pursuant to this

107

Section 3.17(c) or to such other applicable agreement, as the case may be, notwithstanding any such termination, assignment or resignation for the related year.

SECTION 3.18.    Assessments of Compliance and Attestation Reports.

(a)    By March 15 of each year, commencing in March 2008, the Servicer, at its own expense, shall furnish, and shall cause any Servicing Function Participant engaged by it to furnish, each at its own expense, to the Master Servicer, a report on an assessment of compliance with the Relevant Servicing Criteria that contains (A) a statement by such party of its responsibility for assessing compliance with the Relevant Servicing Criteria, (B) a statement that such party used the Relevant Servicing Criteria to assess compliance with the Relevant Servicing Criteria, (C) such party's assessment of compliance with the Relevant Servicing Criteria as of and for the fiscal year covered by the Form 10-K required to be filed pursuant to Section 5.06(d), including, if there has been any material instance of noncompliance with the Relevant Servicing Criteria, a discussion of each such failure and the nature and status thereof, and (D) a statement that a registered public accounting firm has issued an attestation report on such party's assessment of compliance with the Relevant Servicing Criteria as of and for such period. Notwithstanding the foregoing, neither the Servicer nor any Servicing Function Participant engaged by the Servicer shall be required to deliver any assessments until March 31st in any given year so long as it has not received written confirmation from the Depositor that a Form 10-K is required to be filed in respect of the Trust for the preceding calendar year; provided however that, notwithstanding the foregoing, no Subcontractor will be required to deliver any assessments in any given year in which the Form 10-K is not required to be filed.

(b)    By March 15 of each year, commencing in March 2008, the Servicer, at its own expense, shall cause, and the Servicer shall cause any Servicing Function Participant engaged by it to cause, each at its own expense, a registered public accounting firm (which may also render other services to the Servicer or such other Servicing Function Participants, as the case may be) and that is a member of the American Institute of Certified Public Accountants to furnish a report to the Master Servicer, to the effect that (i) it has obtained a representation regarding certain matters from the management of such party, which includes an assertion that such party has complied with the Relevant Servicing Criteria, and (ii) on the basis of an examination conducted by such firm in accordance with standards for attestation engagements issued or adopted by the PCAOB, it is expressing an opinion as to whether such party's compliance with the Relevant Servicing Criteria was fairly stated in all material respects, or it cannot express an overall opinion regarding such party's assessment of compliance with the Relevant Servicing Criteria.  In the event that an overall opinion cannot be expressed, such registered public accounting firm shall state in such report why it was unable to express such an opinion.  Such report must be available for general use and not contain restricted use language. Notwithstanding the foregoing, neither the Servicer nor any Servicing Function Participant engaged by the Servicer shall be required to deliver or cause the delivery of such reports until March 31st in any given year so long as the Servicer has not received written confirmation from the Depositor that a Form 10-K is required to be filed in respect of the Trust for the preceding fiscal year; provided however that, notwithstanding the foregoing, no Subcontractor will be required to deliver any reports in any given year in which the Form 10-K is not required to be filed.

(c)    Failure of the Servicer to comply timely with this Section 3.18 shall be deemed a Servicer Event of Default as to the Servicer, automatically, without notice and without any cure period, and the Master Servicer may, in addition to whatever rights the Master Servicer may have under this Agreement and at law or in equity or to damages, including injunctive relief and specific performance, terminate all the rights and obligations of the Servicer under this Agreement and in and to the related Mortgage Loans and the proceeds thereof without compensating the Servicer for the same (other than the Servicer's right to reimbursement of unreimbursed P&I Advances and Servicing Advances and accrued and unpaid Servicing Fees in the manner provided for in this Agreement). This paragraph shall supersede any other provision in this Agreement or any other agreement to the contrary.

(d)    In the event the Servicer or any Servicing Function Participant engaged by the Servicer is terminated, assigns its rights and obligations under, or resigns pursuant to the terms of this Agreement, or any applicable agreement in the case of a Servicing Function Participant, as the case may be, such party shall provide a report on assessment of compliance with respect to the related year pursuant to this Section 3.18(d) or to such other applicable agreement, notwithstanding any such termination, assignment or resignation for the related year.

SECTION 3.19.    [Reserved].

SECTION 3.20.    Annual Certification; Additional Information.

(a)    The Servicer shall and shall cause any Servicing Function Participant engaged by it to, provide to the Person who signs the Sarbanes-Oxley Certification (the "Certifying Person"), by March 15 of each year in which the Trust is subject to the reporting requirements of the Exchange Act, a certification (each, a "Back-Up Certification"), in the form attached hereto as Exhibit C, upon which the Certifying Person, the entity for which the Certifying Person acts as an officer, and such entity's officers, directors and Affiliates (collectively with the Certifying Person, "Certification Parties") can reasonably rely.  The officer of the Master Servicer in charge of the master servicing function shall serve as the Certifying Person on behalf of the Trust.  In the event the Servicer or any Servicing Function Participant engaged by it is terminated or resigns pursuant to the terms of this Agreement, or any applicable Sub-Servicing agreement, as the case may be, such party shall provide a Back-Up Certification to the Certifying Person pursuant to this Section 3.20 with respect to the period of time it was subject to this Agreement or any applicable Sub-Servicing Agreement, as the case may be.

(b)    The Servicer shall indemnify and hold harmless the Master Servicer, the Securities Administrator, the Trustee, the Depositor and their respective officers, directors, agents and affiliates from and against any losses, damages, penalties, fines, forfeitures, reasonable legal fees and related costs, judgments and other costs and expenses arising out of or based upon a breach by the Servicer or any of its officers, directors, agents or affiliates of its obligations under this Section 3.20 or the Servicer's negligence, bad faith or willful misconduct in connection therewith.  Such indemnity shall survive the termination or resignation of the parties hereto or the termination of this Agreement. If the indemnification provided for herein is unavailable or insufficient to hold harmless the Master Servicer, the Securities Administrator, the Trustee and the Depositor, then the Servicer agrees that it shall contribute to the amount paid or payable by the Master Servicer, the Securities Administrator, the Trustee and the Depositor as a

result of the losses, claims, damages or liabilities of the Master Servicer, the Securities Administrator, the Trustee and the Depositor in such proportion as is appropriate to reflect the relative fault of the Master Servicer, the Securities Administrator, the Trustee and the Depositor on the one hand and the Servicer on the other in connection with a breach of the Servicer's obligations under this Section 3.20.

(c)     The Servicer shall provide to the Master Servicer prompt notice of the occurrence of any of the following:

(i)     any Servicer Event of Default under the terms of this Agreement, any merger, consolidation or sale of substantially all of the assets of the Servicer, the Servicer's engagement of any Sub-Servicer to perform or assist in the performance of any of the Servicer's obligations under this Agreement, any material litigation involving the Servicer that is material to the Certificateholders, and to the extent disclosure is required under Regulation AB, any affiliation or other significant relationship between the Servicer and, American Home Mortgage Corp., the Class A Certificate Insurer, the Sponsor, the Depositor, the Master Servicer, the Securities Administrator, the Trustee, the Custodian and the Swap Provider.

(ii)     If the Servicer has knowledge of the occurrence of any of the events described in this clause (ii), then no later than ten days prior to the deadline for the filing of any Distribution Report on Form 10-D in respect of the Trust, the Servicer shall provide to the Master Servicer notice of the occurrence of any of the following events along with all information, data, and materials related thereto as may be required to be included in the related Distribution Report on Form 10-D (as specified in the provisions of Regulation AB referenced below):

(A)     any material modifications, extensions or waivers of pool asset terms, fees, penalties or payments during the distribution period or that have cumulatively become material over time (Item 1121(a)(11) of Regulation AB);

(B)     material breaches of pool asset representations or warranties or transaction covenants (Item 1121(a)(12) of Regulation AB); and

(C)     any material pool asset changes (such as, additions, substitutions or repurchases) relating to the Mortgage Loans serviced by the Servicer (Item 1121(a)(14) of Regulation AB).

(d)     The Servicer shall provide to the Securities Administrator and Master Servicer such additional information as the Securities Administrator and the Master Servicer may reasonably request, including evidence of the authorization of the person signing any certification or statement, financial information and reports and of the fidelity bond and errors and omissions insurance policy required to be maintained by the Servicer pursuant to this Agreement, and such other information related to the Servicer or its performance hereunder.

SECTION 3.21.        Access to Certain Documentation.

The Servicer shall provide to the Office of Thrift Supervision, the FDIC, and any other federal or state banking or insurance regulatory authority that may exercise authority over any Certificate Owner, access to the documentation regarding the related Mortgage Loans required by applicable laws and regulations.  Such access shall be afforded without charge, but only upon reasonable request and during normal business hours at the offices of the Servicer designated by it.  Nothing in this Section 3.21 shall limit the obligation of the Servicer to comply with any applicable law prohibiting disclosure of information regarding the Mortgagors and the failure of the Servicer to provide access as provided in this Section as a result of such obligation shall not constitute a breach of this Section.  Nothing in this Section 3.21 shall require the Servicer to collect, create, collate or otherwise generate any information that it does not generate in its usual course of business.  The Servicer shall not be required to make copies of or ship documents to any Person unless provisions have been made for the reimbursement of the costs thereof.

SECTION 3.22.        Title, Management and Disposition of REO Property.

(a)        The deed or certificate of sale of any REO Property related to a Mortgage Loan shall be taken in the name of the Trustee, or its nominee, on behalf of the Trust Fund and for the benefit of the Certificateholders. The Servicer, on behalf of REMIC I, shall either sell any REO Property by the close of the third calendar year following the calendar year in which REMIC I acquires ownership of such REO Property for purposes of Section 860(a)(8) of the Code or request from the Internal Revenue Service, no later than sixty (60) days before the day on which the three-year grace period would otherwise expire, an extension of the three-year grace period, unless the Servicer had delivered to the Trustee an Opinion of Counsel, addressed to the Trustee and the Depositor, to the effect that the holding by REMIC I of such REO Property subsequent to three (3) years after its acquisition will not result in the imposition on any Trust REMIC created hereunder of taxes on "prohibited transactions" thereof, as defined in Section 860F of the Code, or cause any Trust REMIC hereunder to fail to qualify as a REMIC under Federal law at any time that any Certificates are outstanding. The Servicer shall manage, conserve, protect and operate each REO Property for the Certificateholders solely for the purpose of its prompt disposition and sale in a manner which does not cause such REO Property to fail to qualify as "foreclosure property" within the meaning of Section 860G(a)(8) of the Code or result in the receipt by any Trust REMIC created hereunder of any "income from non-permitted assets" within the meaning of Section 860F(a)(2)(B) of the Code, or any "net income from foreclosure property" which is subject to taxation under the REMIC Provisions.

(b)        The Servicer shall segregate and hold all funds collected and received in connection with the operation of any REO Property separate and apart from its own funds and general assets and shall establish and maintain with respect to REO Properties an account held in trust for the Trustee, on behalf of the Trust Fund and for the benefit of the Certificateholders (the "REO Account"), which shall be an Eligible Account. The Servicer shall be permitted to allow the Collection Account to serve as the REO Account, subject to the maintenance of separate ledgers for each REO Property. The Servicer shall be entitled to retain or withdraw any interest income paid on funds deposited in the REO Account.

111

(c)    The Servicer shall have full power and authority, subject only to the specific requirements and prohibitions of this Agreement, to do any and all things in connection with any REO Property related to a Mortgage Loan serviced by it as are consistent with the manner in which the Servicer manages and operates similar property owned by it or any of its Affiliates, all on such terms and for such period as the Servicer deems to be in the best interests of Certificateholders. In connection therewith, the Servicer shall deposit, or cause to be deposited in the clearing account in which it customarily deposits payments and collections on mortgage loans in connection with its mortgage loan servicing activities on a daily basis, and in no event more than one (1) Business Day after the Servicer's receipt thereof, and shall thereafter deposit in the REO Account, in no event more than two (2) Business Days after the deposit of good funds into the clearing account, all revenues received by it with respect to an REO Property related to a Mortgage Loan serviced by it and shall withdraw therefrom funds necessary for the proper operation, management and maintenance of such REO Property including, without limitation:

(i)    all insurance premiums due and payable in respect of such REO Property;

(ii)    all real estate taxes and assessments in respect of such REO Property that may result in the imposition of a lien thereon; and

(iii)    all costs and expenses necessary to maintain such REO Property.

To the extent that amounts on deposit in the REO Account with respect to an REO Property are insufficient for the purposes set forth in clauses (i) through (iii) above with respect to such REO Property, the Servicer shall advance from its own funds such amount as is necessary for such purposes if, but only if, the Servicer would make such advances if the Servicer owned the REO Property and if in the Servicer's judgment, the payment of such amounts will be recoverable from the rental or sale of the REO Property.

Subject to compliance with applicable laws and regulations as shall at any time be in force, and notwithstanding the foregoing, the Servicer, on behalf of the Trust Fund, shall not:

(i)    enter into, renew or extend any New Lease with respect to any REO Property, if the New Lease by its terms will give rise to any income that does not constitute Rents from Real Property;

(ii)    permit any amount to be received or accrued under any New Lease other than amounts that will constitute Rents from Real Property;

(iii)    authorize or permit any construction on any REO Property, other than the completion of a building or other improvement thereon, and then only if more than ten percent of the construction of such building or other improvement was completed before default on the related Mortgage Loan became imminent, all within the meaning of Section 856(e)(4)(B) of the Code; or

(iv)    allow any Person to Directly Operate any REO Property on any date more than ninety (90) days after its date of acquisition by the Trust Fund;

112

unless, in any such case, the Servicer has obtained an Opinion of Counsel, provided to the Servicer and the Trustee, to the effect that such action will not cause such REO Property to fail to qualify as "foreclosure property" within the meaning of Section 860G(a)(8) of the Code at any time that it is held by REMIC I, in which case the Servicer may take such actions as are specified in such Opinion of Counsel.

The Servicer may contract with any Independent Contractor for the operation and management of any REO Property, provided that:

(i)    the terms and conditions of any such contract shall not be inconsistent herewith;

(ii)    any such contract shall require, or shall be administered to require, that the Independent Contractor pay all costs and expenses incurred in connection with the operation and management of such REO Property, including those listed above and remit all related revenues (net of such costs and expenses) to the Servicer as soon as practicable, but in no event later than thirty (30) days following the receipt thereof by such Independent Contractor;

(iii)    none of the provisions of this Section 3.22(c) relating to any such contract or to actions taken through any such Independent Contractor shall be deemed to relieve the Servicer of any of its duties and obligations to the Trustee on behalf of the Trust Fund and for the benefit of the Certificateholders with respect to the operation and management of any such REO Property; and

(iv)    the Servicer shall be obligated with respect thereto to the same extent as if it alone were performing all duties and obligations in connection with the operation and management of such REO Property.

The Servicer shall be entitled to enter into any agreement with any Independent Contractor performing services for it related to its duties and obligations hereunder for indemnification of the Servicer by such Independent Contractor, and nothing in this Agreement shall be deemed to limit or modify such indemnification. The Servicer shall be solely liable for all fees owed by it to any such Independent Contractor, irrespective of whether the Servicer's compensation pursuant to Section 3.15 is sufficient to pay such fees. Any such agreement shall include a provision that such agreement may be immediately terminated by any successor Servicer without fee, in the event the Servicer shall for any reason, no longer be the Servicer of the related Mortgage Loans (including termination due to a Servicer Event of Default).

(d)    In addition to the withdrawals permitted under Section 3.22(c), the Servicer may from time to time make withdrawals from the REO Account for any REO Property: (i) to pay itself unpaid Servicing Fees in respect of the related Mortgage Loan; and (ii) to reimburse itself or any Sub-Servicer for unreimbursed Servicing Advances and Advances made in respect of such REO Property or the related Mortgage Loan. On the Servicer Remittance Date, the Servicer shall withdraw from each REO Account and deposit into the Distribution Account in accordance with Section 3.08(d)(ii), for distribution on the related Distribution Date in accordance with Section 5.01, the income from the related REO Property received during the

prior calendar month, net of any withdrawals made pursuant to Section 3.22(c) or this Section 3.22(d).

(e)    Subject to the time constraints set forth in Section 3.22(a), each REO Disposition shall be carried out by the Servicer at such price and upon such terms and conditions as the Servicer shall deem necessary or advisable, as shall be normal and usual in accordance with Accepted Servicing Practices.

(f)    The proceeds from the REO Disposition, net of any amount required by law to be remitted to the Mortgagor under the related Mortgage Loan and net of any payment or reimbursement to the Servicer as provided above, shall be deposited in the Distribution Account in accordance with Section 3.08(d)(ii) on the Servicer Remittance Date in the month following the receipt thereof for distribution on the related Distribution Date in accordance with Section 5.01. Any REO Disposition shall be for cash only (unless changes in the REMIC Provisions made subsequent to the Startup Day allow a sale for other consideration).

(g)    The Servicer shall file information returns (and shall provide a certification of a Servicing Officer to the Master Servicer that such filings have been made) with respect to the receipt of mortgage interest received in a trade or business, reports of foreclosures and abandonments of any Mortgaged Property and cancellation of indebtedness income with respect to any Mortgaged Property as required by Sections 6050H, 6050J and 6050P of the Code, respectively. Such reports shall be in form and substance sufficient to meet the reporting requirements imposed by such Sections 6050H, 6050J and 6050P of the Code.

SECTION 3.23.    Obligations of the Servicer in Respect of Prepayment Interest Shortfalls; Relief Act Interest Shortfalls.

The Servicer shall deliver to the Securities Administrator for deposit into the Distribution Account on or before 12:00 noon New York time on the Servicer Remittance Date from its own funds an amount equal to the lesser of (i) the aggregate amount of the Prepayment Interest Shortfalls attributable to Principal Prepayments in full on the related Mortgage Loans for the related Distribution Date resulting solely from voluntary Principal Prepayments received by the Servicer during the related Prepayment Period and (ii) the aggregate amount of the related Servicing Fees payable to the Servicer on such Distribution Date with respect to the Mortgage Loans.  The Servicer shall not have the right to reimbursement for any amounts remitted to the Securities Administrator in respect of this Section 3.23. The Servicer shall not be obligated to pay the amounts set forth in this Section 3.23 with respect to shortfalls resulting from the application of the Relief Act.

SECTION 3.24.    Obligations of the Servicer in Respect of Mortgage Rates and  Monthly Payments.

In the event that a shortfall in any collection on or liability with respect to any Mortgage Loan results from or is attributable to adjustments to Mortgage Rates, Monthly Payments or Stated Principal Balances that were made by the Servicer in a manner not consistent with the terms of the related Mortgage Note and this Agreement, the Servicer, upon discovery or receipt of notice thereof, immediately shall deliver to the Securities Administrator for deposit in

the Distribution Account from its own funds the amount of any such shortfall and shall indemnify and hold harmless the Trust Fund, the Trustee, the Securities Administrator, the Master Servicer, the Depositor and any successor servicer in respect of any such liability. Such indemnities shall survive the termination or discharge of this Agreement.  Notwithstanding the foregoing, this Section 3.24 shall not limit the ability of the Servicer to seek recovery of any such amounts from the related Mortgagor under the terms of the related Mortgage Note and Mortgage, to the extent permitted by applicable law.

SECTION 3.25.     Reserve Fund.

(a)     No later than the Closing Date, the Securities Administrator shall establish and maintain a separate, segregated trust account entitled, "Reserve Fund, Wells Fargo Bank, National Association, in trust for the registered holders of SunTrust Acquisition Closed-End Seconds Trust, Series 2007-1, Asset Backed Pass-Through Certificates."  On the Closing Date, the Depositor will deposit, or cause to be deposited, in the Reserve Fund $1,000.

(b)     On each Distribution Date, the Securities Administrator shall deposit into the Reserve Fund the amounts described in Section [5.01(c)(8)(vi)], rather than distributing such amounts to the Class CE Certificateholders pursuant to Section p5.01(c)(8)(viii)]. On each such Distribution Date, the Securities Administrator shall hold all such amounts for the benefit of the Holders of the Class A Certificates and the Mezzanine Certificates and will distribute such amounts to the Holders of the Class A Certificates and the Mezzanine Certificates, in the amounts and priorities set forth in Section 5.01(c).  If no Net WAC Rate Carryover Amounts are payable on a Distribution Date, the Securities Administrator shall deposit, into the Reserve Fund on behalf of the Class CE Certificateholders, from amounts otherwise distributable to the Class CE Certificateholders, an amount such that when added to other amounts already on deposit in the Reserve Fund, the aggregate amount on deposit therein is equal to $1,000.

(c)     The Reserve Fund constitutes an "outside reserve fund" within the meaning of Treasury Regulation § 1.860G-2(h) and is not an asset of any REMIC.  It is the intention of the parties hereto that, for federal and state income and state and local franchise tax purposes, the Reserve Fund be disregarded as an entity separate from the Holder of the Class CE Certificates unless and until the date when either (a) there is more than one Class CE Certificateholder or (b) any Class of Certificates in addition to the Class CE Certificates is recharacterized as an equity interest in the Reserve Fund for federal income tax purposes, in which case it is the intention of the parties hereto that, for federal and state income and state and local franchise tax purposes, the Reserve Fund be treated as a partnership.  The Master Servicer shall not be required to prepare and file partnership tax returns in respect of such partnership unless it receives additional reasonable compensation (not to exceed $10,000 per year) for the preparation of such filings, written notification recognizing the creation of a partnership agreement or comparable documentation evidencing the partnership.  All amounts deposited into the Reserve Fund (other than the initial deposit therein of $1,000) shall be treated as amounts distributed by REMIC III to the Holders of the Class CE Certificates. Upon the termination of the Trust Fund, or the payment in full of the Class A Certificates and the Mezzanine Certificates, all amounts remaining on deposit in the Reserve Fund will be released by the Trust Fund and distributed to the Class CE Certificateholders or their designees.  The Reserve Fund will be part of the Trust Fund but not part of any REMIC and any payments to the Holders of the Class A

Certificates or the Mezzanine Certificates of Net WAC Rate Carryover Amounts will not be payments with respect to a "regular interest" in a REMIC within the meaning of Code Section 860(G)(a)(1).

(d)      By accepting a Class CE Certificate, each Class CE Certificateholder hereby agrees that the Securities Administrator will deposit into the Reserve Fund the amounts described above on each Distribution Date rather than distributing such amounts to the Class CE Certificateholders.  By accepting a Class CE Certificate, each Class CE Certificateholder further agrees that its agreement to such action by the Securities Administrator is given for good and valuable consideration, the receipt and sufficiency of which is acknowledged by such acceptance.

(e)      At the direction of the Holders of a majority in Percentage Interest in the Class CE Certificates, the Securities Administrator shall direct any Depository Institution maintaining the Reserve Fund to invest the funds in such account in one or more Permitted Investments bearing interest or sold at a discount, and maturing, unless payable on demand, (i) no later than the Business Day immediately preceding the date on which such funds are required to be withdrawn from such account pursuant to this Agreement, if a Person other than the Securities Administrator or an Affiliate manages or advises such investment, and (ii) no later than the date on which such funds are required to be withdrawn from such account pursuant to this Agreement, if the Securities Administrator or an Affiliate manages or advises such investment. All income and gain earned upon such investment shall be deposited into the Reserve Fund.  In no event shall the Securities Administrator be liable for any investments made pursuant to this clause (e). If the Holders of a majority in Percentage Interest in the Class CE Certificates fail to provide investment instructions, funds on deposit in the Reserve Fund shall be held uninvested by the Securities Administrator without liability for interest or compensation.

(f)      For federal tax return and information reporting, the right of the Class A Certificateholders and the Mezzanine Certificateholders to receive payments from the Reserve Fund and the Supplemental Interest Trust in respect of any Net WAC Rate Carryover Amount shall be assigned a value of $[_____].

SECTION 3.26.      Advance Facility.

(a)      Notwithstanding anything to the contrary contained herein, (i) the Servicer is hereby authorized to enter into an advance facility ("Advance Facility") but no more than two Advance Facilities without the prior written consent of the Trustee, which consent shall not be unreasonably withheld, under which (A) the Servicer sells, assigns or pledges to an advancing person (an "Advance Financing Person") its rights under this Agreement to be reimbursed for any P&I Advances or Servicing Advances and/or (B) an Advance Financing Person agrees to finance some or all P&I Advances or Servicing Advances required to be made by the Servicer pursuant to this Agreement and (ii) the Servicer is hereby authorized to assign its rights to the Servicing Fee (which rights shall terminate upon the resignation, termination or removal of the Servicer pursuant to the terms of this Agreement) or pledge its servicing rights; it being understood that neither the Trust Fund nor any party hereto shall have a right or claim (including without limitation any right of offset) to any amounts for reimbursement of P&I Advances or Servicing Advances so assigned or to the portion of the Servicing Fee so assigned or the

116

servicing rights so pledged.  Subject to the provisions of the first sentence of this Section 3.26(a), no consent of the Depositor, Trustee, Master Servicer, Certificateholders or any other party is required before the Servicer may enter into an Advance Facility, but the Servicer shall provide notice to the Depositor, Master Servicer and the Trustee of the existence of any such Advance Facility promptly upon the consummation thereof stating (a) the identity of the Advance Financing Person and (b) the identity of any Person ("Servicer's Assignee") who has the right to receive amounts in reimbursement of previously unreimbursed P&I Advances or Servicing Advances.  Notwithstanding the existence of any Advance Facility under which an advancing person agrees to finance P&I Advances and/or Servicing Advances on the Servicer's behalf, the Servicer shall remain obligated pursuant to this Agreement to make P&I Advances and Servicing Advances pursuant to and as required by this Agreement, and shall not be relieved of such obligations by virtue of such Advance Facility.

(b)   Reimbursement amounts ("Advance Reimbursement Amounts") shall consist solely of amounts in respect of P&I Advances and/or Servicing Advances made with respect to the related Mortgage Loans for which the Servicer would be permitted to reimburse itself in accordance with this Agreement, assuming the Servicer had made the related P&I Advance(s) and/or Servicing Advance(s).

(c)   The Servicer shall maintain and provide to any successor Servicer (with, upon request, a copy to the Trustee) a detailed accounting on a loan-by-loan basis as to amounts advanced by, pledged or assigned to, and reimbursed to any Advance Financing Person.  The successor Servicer shall be entitled to rely on any such information provided by the predecessor Servicer, and the successor Servicer shall not be liable for any errors in such information.

(d)   Reimbursement amounts distributed with respect to each Mortgage Loan shall be allocated to outstanding unreimbursed P&I Advances or Servicing Advances (as the case may be) made with respect to that Mortgage Loan on a "first-in, first out" (FIFO) basis.  The documentation establishing any Advance Facility shall require the Servicer to provide to the related Advance Financing Person or its designee loan-by-loan information with respect to each such reimbursement amount distributed to such Advance Financing Person or Advance Facility trustee on each Distribution Date, to enable the Advance Financing Person or Advance Facility trustee to make the FIFO allocation of each such reimbursement amount with respect to each Mortgage Loan.  The Servicer shall remain entitled to be reimbursed by the Advance Financing Person or Advance Facility trustee for all P&I Advances and Servicing Advances funded by the Servicer to the extent the related rights to be reimbursed therefor have not been sold, assigned or pledged to an Advance Financing Person.

(e)   Any amendment to this Section 3.26 or to any other provision of this Agreement that may be necessary or appropriate to effect the terms of an Advance Facility as described generally in this Section 3.26, including amendments to add provisions relating to a successor Servicer, may be entered into by the Trustee, the Depositor, and the Servicer without the consent of any Certificateholder, notwithstanding anything to the contrary in this Agreement, provided, that the Trustee has been provided an Opinion of Counsel that such amendment is authorized hereunder and has no material adverse effect on the Certificateholders, which opinion shall be an expense of the party requesting such opinion but in any case shall not be an expense of the Trustee or the Trust Fund; provided, further, that the amendment shall not be deemed to

adversely affect in any material respect the interests of the Certificateholders if the Person requesting the amendment obtains a letter from each Rating Agency (instead of obtaining an Opinion of Counsel to such effect) stating that the amendment would not result in the downgrading or withdrawal of the respective ratings then assigned to the Certificates; it being understood and agreed that any such rating letter in and of itself will not represent a determination as to the materiality of any such amendment and will represent a determination only as to the credit issues affecting any such rating.  Prior to entering into an Advance Facility, the Servicer shall notify the lender under such facility in writing that: (a) the P&I Advances and/or Servicing Advances financed by and/or pledged to the lender are obligations owed to the Servicer on a non-recourse basis payable only from the cash flows and proceeds received under this Agreement for reimbursement of P&I Advances and/or Servicing Advances only to the extent provided herein, and neither the Master Servicer, the Securities Administrator, the Trustee nor the Trust are otherwise obligated or liable to repay any P&I Advances and/or Servicing Advances financed by the lender; (b) the Servicer will be responsible for remitting to the lender the applicable amounts collected by it as Servicing Fees and as reimbursement for P&I Advances and/or Servicing Advances funded by the lender, as applicable, subject to the restrictions and priorities created in this Agreement; and (c) neither the Master Servicer, the Securities Administrator nor the Trustee shall have any responsibility to calculate any amount payable under an Advance Facility or to track or monitor the administration of the financing arrangement between the Servicer and the lender or the payment of any amount under an Advance Facility.

(f)    The Servicer shall indemnify the Master Servicer, the Securities Administrator, the Trustee and the Trust Fund for any cost, liability or expense relating to the Advance Facility including, without limitation, a claim, pending or threatened, by an Advance Financing Person.

SECTION 3.27.    Indemnification.

The Servicer agrees to indemnify the Trustee, Master Servicer and the Securities Administrator, from, and hold the Trustee, Master Servicer and the Securities Administrator harmless against, any loss, liability or expense (including reasonable attorney's fees and expenses) incurred by any such Person by reason of the Servicer's willful misfeasance, bad faith or gross negligence in the performance of its duties under this Agreement or by reason of the Servicer's reckless disregard of its obligations and duties under this Agreement. Such indemnity shall survive the termination or discharge of this Agreement and the resignation or removal of the Servicer, the Trustee, the Master Servicer and the Securities Administrator. Any payment hereunder made by the Servicer to any such Person shall be from the Servicer's own funds, without reimbursement from REMIC I therefor.

ARTICLE IV

ADMINISTRATION AND MASTER SERVICING
OF THE MORTGAGE LOANS BY THE MASTER SERVICER

SECTION 4.01.     Master Servicer.

The Master Servicer shall, from and after the Closing Date supervise, monitor and oversee the obligations of the Servicer under this Agreement to service and administer the Mortgage Loans in accordance with the terms of this Agreement and shall have full power and authority to do any and all things which it may deem necessary or desirable in connection with such master servicing and administration. In performing its obligations hereunder, the Master Servicer shall act in a manner consistent with Accepted Master Servicing Practices. Furthermore, the Master Servicer shall oversee and consult with the Servicer as necessary from time-to-time to carry out the Master Servicer's obligations hereunder, shall receive, review and evaluate all reports, information and other data provided to the Master Servicer by the Servicer and shall cause the Servicer to perform and observe the covenants, obligations and conditions to be performed or observed by the Servicer under this Agreement. The Master Servicer shall independently and separately monitor the Servicer's servicing activities with respect to each Mortgage Loan, reconcile the results of such monitoring with such information provided in the previous sentence on a monthly basis and coordinate corrective adjustments to the Servicer's and Master Servicer's records, and based on such reconciled and corrected information, prepare the statements specified in Section 5.03 and any other information and statements required to be provided by the Master Servicer hereunder. The Master Servicer shall reconcile the results of its Mortgage Loan monitoring with the actual remittances of the Servicer to the Distribution Account pursuant to the terms hereof based on information provided to the Master Servicer by the Servicer.

The Trustee shall furnish the Servicer and the Master Servicer with any limited powers of attorney and other documents in form acceptable to it necessary or appropriate to enable the Servicer and the Master Servicer to service and administer the Mortgage Loans and REO Properties. The Trustee shall have no responsibility for any action of the Master Servicer or the Servicer pursuant to any such limited power of attorney and shall be indemnified by the Master Servicer or the Servicer, as applicable, for any cost, liability or expense incurred by the Trustee in connection with such Person's misuse of any such power of attorney.

The Trustee, the Custodian and the Securities Administrator shall provide access to the records and documentation in possession of the Trustee, the Custodian or the Securities Administrator regarding the Mortgage Loans and REO Property and the servicing thereof to the Certificateholders, the FDIC, and the supervisory agents and examiners of the FDIC, such access being afforded only upon reasonable prior written request and during normal business hours at the office of the Trustee, the Custodian or the Securities Administrator; provided, however, that, unless otherwise required by law, none of the Trustee, the Custodian or the Securities Administrator shall be required to provide access to such records and documentation if the provision thereof would violate the legal right to privacy of any Mortgagor. The Trustee, the Custodian and the Securities Administrator shall allow representatives of the above entities to

photocopy any of the records and documentation and shall provide equipment for that purpose at a charge that covers the Trustee's, the Custodian' or the Securities Administrator's actual costs.

The Trustee shall execute and deliver to the Servicer or the Master Servicer upon request any court pleadings, requests for trustee's sale or other documents necessary or desirable to (i) the foreclosure or trustee's sale with respect to a Mortgaged Property; (ii) any legal action brought to obtain judgment against any Mortgagor on the Mortgage Note or any other Mortgage Loan Document; (iii) obtain a deficiency judgment against the Mortgagor; or (iv) enforce any other rights or remedies provided by the Mortgage Note or any other Mortgage Loan Document or otherwise available at law or equity.

SECTION 4.02.        REMIC-Related Covenants.

For as long as each REMIC shall exist, the Trustee and the Securities Administrator shall act in accordance herewith to treat such REMIC as a REMIC, and the Trustee and the Securities Administrator shall comply with any directions of the Sponsor, the Servicer or the Master Servicer to assure such continuing treatment. In particular, the Trustee shall not (a) sell or permit the sale of all or any portion of the Mortgage Loans or of any investment of deposits in an Account unless such sale is as a result of a repurchase of the Mortgage Loans pursuant to this Agreement or the Trustee has received a REMIC Opinion prepared at the expense of the Trust Fund; and (b) other than with respect to a substitution pursuant to the Mortgage Loan Purchase Agreement or Section 2.03 of this Agreement, as applicable, accept any contribution to any REMIC after the Startup Day without receipt of an Opinion of Counsel stating that such contribution will not result in an Adverse REMIC Event as defined in Section 11.01(f).

SECTION 4.03.        Monitoring of Servicer.

(a)        The Master Servicer shall be responsible for monitoring the compliance by the Servicer with its duties under this Agreement. In the review of the Servicer's activities, the Master Servicer may rely upon an Officer's Certificate of the Servicer with regard to the Servicer's compliance with the terms of this Agreement. In the event that the Master Servicer, in its judgment, determines that the Servicer should be terminated in accordance with the terms hereof or that a notice should be sent pursuant to the terms hereof with respect to the occurrence of an event that, unless cured, would constitute a Servicer Event of Default, the Master Servicer shall notify the Servicer, the Sponsor and the Trustee thereof and the Master Servicer shall issue such notice or take such other action as it deems appropriate.

(b)        The Master Servicer, for the benefit of the Trustee and the Certificateholders, shall enforce the obligations of the Servicer under this Agreement and shall, in the event that the Servicer fails to perform its obligations in accordance with this Agreement, subject to this Section and Article VIII, notify the Trustee and the Trustee shall terminate the rights and obligations of the Servicer hereunder in accordance with the provisions of Article VIII. In the event the rights and obligations of the Servicer (or any successor thereto) are terminated, the Master Servicer shall act as servicer of the related Mortgage Loans or a successor servicer shall be appointed in accordance with the provisions of Article VIII.  Such enforcement, including, without limitation, the legal prosecution of claims and the pursuit of other appropriate

remedies, shall be in such form and carried out to such an extent and at such time as the Master Servicer, in its good faith business judgment, would require were it the owner of the Mortgage Loans. The Master Servicer shall pay the costs of such enforcement at its own expense, provided that the Master Servicer shall not be required to prosecute or defend any legal action except to the extent that the Master Servicer shall have received reasonable indemnity for its costs and expenses in pursuing such action.

(c)    The Master Servicer shall be entitled to be reimbursed by the Servicer (or from amounts on deposit in the Distribution Account if the Servicer is unable to fulfill its obligations hereunder) for all reasonable out-of-pocket or third party costs associated with the transfer of servicing from the predecessor Servicer (or if the predecessor Servicer is the Master Servicer, from the Servicer immediately preceding the Master Servicer), including without limitation, any reasonable out-of-pocket or third party costs or expenses associated with the complete transfer of all servicing data and the completion, correction or manipulation of such servicing data as may be required by the successor servicer to correct any errors or insufficiencies in the servicing data or otherwise to enable the successor servicer to service the related Mortgage Loans properly and effectively, upon presentation of reasonable documentation of such costs and expenses.

(d)    The Master Servicer shall require the Servicer to comply with the remittance requirements and other obligations set forth in this Agreement.

(e)    If the Master Servicer acts as a successor to the Servicer, it will not assume any liability for the representations and warranties of the terminated Servicer.

SECTION 4.04.    Fidelity Bond.

The Master Servicer, at its expense, shall maintain in effect a blanket fidelity bond and an errors and omissions insurance policy, affording coverage with respect to all directors, officers, employees and other Persons acting on such Master Servicer's behalf, and covering errors and omissions in the performance of the Master Servicer's obligations hereunder. The errors and omissions insurance policy and the fidelity bond shall be in such form and amount generally acceptable for entities serving as master servicers or trustees.

SECTION 4.05.    Power to Act; Procedures.

The Master Servicer shall master service the Mortgage Loans and shall have full power and authority, subject to the REMIC Provisions and the provisions of Article XI, to do any and all things that it may deem necessary or desirable in connection with the master servicing and administration of the Mortgage Loans, including but not limited to the power and authority (i) to execute and deliver, on behalf of the Certificateholders and the Trustee, customary consents or waivers and other instruments and documents, (ii) to consent to transfers of any Mortgaged Property and assumptions of the Mortgage Notes and related Mortgages, (iii) to collect any Insurance Proceeds and Liquidation Proceeds, and (iv) to effectuate foreclosure or other conversion of the ownership of the Mortgaged Property securing any Mortgage Loan, in each case, in accordance with the provisions of this Agreement; provided, however, that the Master Servicer shall not (and, consistent with its responsibilities under Section 4.03, shall not permit

the Servicer to) knowingly or intentionally take any action, or fail to take (or fail to cause to be taken) any action reasonably within its control and the scope of duties more specifically set forth herein, that, under the REMIC Provisions, if taken or not taken, as the case may be, would cause REMIC I, REMIC II or REMIC III to fail to qualify as a REMIC or result in the imposition of a tax upon the Trust Fund (including but not limited to the tax on prohibited transactions as defined in Section 860F(a)(2) of the Code and the tax on contributions to a REMIC set forth in Section 860G(d) of the Code) unless the Master Servicer has received an Opinion of Counsel (but not at the expense of the Master Servicer) to the effect that the contemplated action will not cause REMIC I, REMIC II or REMIC III to fail to qualify as a REMIC or result in the imposition of a tax upon REMIC I, REMIC II or REMIC III, as the case may be. The Trustee shall furnish the Master Servicer, upon written request from a Servicing Officer, with any powers of attorney prepared and delivered to it and reasonably acceptable to it by empowering the Master Servicer or the Servicer to execute and deliver instruments of satisfaction or cancellation, or of partial or full release or discharge, and to foreclose upon or otherwise liquidate Mortgaged Property, and to appeal, prosecute or defend in any court action relating to the Mortgage Loans or the Mortgaged Property, in accordance with this Agreement, and the Trustee shall execute and deliver such other documents prepared and delivered to it and reasonably acceptable to it, as the Master Servicer or the Servicer may request, to enable the Master Servicer to master service and administer the Mortgage Loans and carry out its duties hereunder, in each case in accordance with Accepted Master Servicing Practices (and the Trustee shall have no liability for misuse of any such powers of attorney by the Master Servicer or the Servicer and shall be indemnified by the Master Servicer or the Servicer, as applicable, for any cost, liability or expense incurred by the Trustee in connection with such Person's use or misuse of any such power of attorney). If the Master Servicer or the Trustee has been advised that it is likely that the laws of the state in which action is to be taken prohibit such action if taken in the name of the Trustee or that the Trustee would be adversely affected under the "doing business" or tax laws of such state if such action is taken in its name, the Master Servicer shall join with the Trustee in the appointment of a co-trustee pursuant to Section 9.10. In the performance of its duties hereunder, the Master Servicer shall be an independent contractor and shall not, except in those instances where it is taking action in the name of the Trustee, be deemed to be the agent of the Trustee.

SECTION 4.06.    Due-on-Sale Clauses; Assumption Agreements.

To the extent Mortgage Loans contain enforceable due-on-sale clauses, the Master Servicer shall cause the Servicer to enforce such clauses in accordance with this Agreement. If applicable law prohibits the enforcement of a due-on-sale clause or such clause is otherwise not enforced in accordance with this Agreement and, as a consequence, a Mortgage Loan is assumed, the original Mortgagor may be released from liability in accordance with this Agreement.

SECTION 4.07.    Documents, Records and Funds in Possession of Master Servicer To Be Held for Trustee.

(a)    The Master Servicer shall transmit to the Trustee or the Custodian such documents and instruments coming into the possession of the Master Servicer from time to time as are required by the terms hereof to be delivered to the Trustee or the Custodian. Any funds received by the Master Servicer in respect of any Mortgage Loan or which otherwise are

collected by the Master Servicer as Liquidation Proceeds or Insurance Proceeds in respect of any Mortgage Loan shall be remitted to the Securities Administrator for deposit in the Distribution Account. The Master Servicer shall, and, subject to Section 3.21 of this Agreement, shall cause the Servicer to, provide access to information and documentation regarding the related Mortgage Loans to the Trustee, its agents and accountants at any time upon reasonable request and during normal business hours, and to Certificateholders that are savings and loan associations, banks or insurance companies, the Office of Thrift Supervision, the FDIC and the supervisory agents and examiners of such Office and Corporation or examiners of any other federal or state banking or insurance regulatory authority if so required by applicable regulations of the Office of Thrift Supervision or other regulatory authority, such access to be afforded without charge but only upon reasonable request in writing and during normal business hours at the offices of the Master Servicer designated by it. In fulfilling such a request the Master Servicer shall not be responsible for determining the sufficiency of such information.

(b)    All Mortgage Files and funds collected or held by, or under the control of, the Master Servicer, in respect of any Mortgage Loans, whether from the collection of principal and interest payments or from Liquidation Proceeds or Insurance Proceeds, shall be remitted to the Securities Administrator for deposit in the Distribution Account.

SECTION 4.08.    Standard Hazard Insurance and Flood Insurance Policies.

For each Mortgage Loan, the Master Servicer shall enforce the obligation of the Servicer under this Agreement to maintain or cause to be maintained standard fire and casualty insurance and, where applicable, flood insurance, all in accordance with the provisions of this Agreement. It is understood and agreed that such insurance shall be with insurers meeting the eligibility requirements set forth in Section 3.11 of this Agreement and that no earthquake or other additional insurance is to be required of any Mortgagor or to be maintained on property acquired in respect of a defaulted loan, other than pursuant to such applicable laws and regulations as shall at any time be in force and as shall require such additional insurance.

SECTION 4.09.    Presentment of Claims and Collection of Proceeds.

The Master Servicer shall enforce the Servicer's obligations under this Agreement to prepare and present on behalf of the Trustee and the Certificateholders all claims under any insurance policies and take such actions (including the negotiation, settlement, compromise or enforcement of the insured's claim) as shall be necessary to realize recovery under such policies. Any proceeds disbursed to the Master Servicer (or disbursed to the Servicer and remitted to the Master Servicer) in respect of such policies, bonds or contracts shall be promptly deposited in the Distribution Account upon receipt, except that any amounts realized that are to be applied to the repair or restoration of the related Mortgaged Property as a condition precedent to the presentation of claims on the related Mortgage Loan to the insurer under any applicable insurance policy need not be so deposited or remitted.

SECTION 4.10.         Reserved.

SECTION 4.11.         Trustee to Retain Possession of Certain Insurance Policies and Documents.

The Trustee or the Custodian, shall retain possession and custody of the originals (to the extent available) of any primary mortgage insurance policies, or certificate of insurance if applicable, and any certificates of renewal as to the foregoing as may be issued from time to time as contemplated by this Agreement. Until all amounts distributable in respect of the Certificates have been distributed in full and the Master Servicer and the Servicer have otherwise fulfilled their respective obligations under this Agreement the Trustee or the Custodian shall also retain possession and custody of each Mortgage File in accordance with and subject to the terms and conditions of this Agreement and the Custodial Agreement. The Master Servicer shall promptly deliver or cause to be delivered to the Trustee or the Custodian, upon the execution or receipt thereof the originals of any primary mortgage insurance policies, any certificates of renewal, and such other documents or instruments that constitute Mortgage Loan Documents that come into the possession of the Master Servicer from time to time.

SECTION 4.12.         Realization Upon Defaulted Mortgage Loans.

The Master Servicer shall cause the Servicer to foreclose upon, repossess or otherwise comparably convert the ownership of Mortgaged Properties securing such of the Mortgage Loans serviced by the Servicer as come into and continue in default and as to which no satisfactory arrangements can be made for collection of delinquent payments, all in accordance with this Agreement.

SECTION 4.13.         Compensation for the Master Servicer.

As compensation for the activities of the Master Servicer hereunder, the Master Servicer shall be entitled to the Master Servicing Fee and the income from investment of or earnings on the funds from time to time in the Distribution Account, as provided in Section 3.10. The compensation payable to the Master Servicer in respect of any Distribution Date shall be reduced in accordance with Section 4.19. The Master Servicer shall be required to pay all expenses incurred by it in connection with its activities hereunder and shall not be entitled to reimbursement therefor except as provided in this Agreement.

SECTION 4.14.         REO Property.

(a)         In the event the Trust Fund acquires ownership of any REO Property in respect of any Mortgage Loan, the deed or certificate of sale shall be issued to the Trustee, or to its nominee, on behalf of the related Certificateholders. The Master Servicer shall cause the Servicer to sell, any REO Property as expeditiously as possible and in accordance with the provisions of this Agreement.  Further, the Master Servicer shall cause the Servicer to sell any REO Property prior to three years after the end of the calendar year of its acquisition by REMIC I unless (i) the Trustee shall have been supplied by the Servicer with an Opinion of Counsel to the effect that the holding by the Trust Fund of such REO Property subsequent to such three-year period will not result in the imposition of taxes on "prohibited transactions" of any REMIC hereunder as defined in section 860F of the Code or cause any REMIC hereunder to fail to

124

qualify as a REMIC at any time that any Certificates are outstanding, in which case the Trust Fund may continue to hold such Mortgaged Property (subject to any conditions contained in such Opinion of Counsel) or (ii) the Servicer shall have applied for, prior to the expiration of such three-year period, an extension of such three-year period in the manner contemplated by Section 856(e)(3) of the Code, in which case the three-year period shall be extended by the applicable extension period. The Master Servicer shall cause the Servicer to protect and conserve, such REO Property in the manner and to the extent required by this Agreement in accordance with the REMIC Provisions and in a manner that does not result in a tax on "net income from foreclosure property" or cause such REO Property to fail to qualify as "foreclosure property" within the meaning of Section 860G(a)(8) of the Code.

(b)      The Master Servicer shall cause the Servicer to deposit all funds collected and received in connection with the operation of any REO Property into the related REO Account.

SECTION 4.15.      Master Servicer Annual Statement of Compliance.

(a)      The Master Servicer and the Securities Administrator shall deliver (or otherwise make available) (and the Master Servicer and Securities Administrator shall cause any Additional Servicer or Servicing Function Participant engaged by it to deliver) to the Depositor and the Securities Administrator on or before March 15 of each year, commencing in March 2008, an Officer's Certificate stating, as to the signer thereof, that (A) a review of such party's activities during the preceding calendar year or portion thereof and of such party's performance under this Agreement, or such other applicable agreement in the case of an Additional Servicer or Servicing Function Participant, has been made under such officer's supervision and (B) to the best of such officer's knowledge, based on such review, such party has fulfilled all its obligations under this Agreement, or such other applicable agreement in the case of an Additional Servicer or Servicing Function Participant, in all material respects throughout such year or portion thereof, or, if there has been a failure to fulfill any such obligation in any material respect, specifying each such failure known to such officer and the nature and status thereof.

(b)      The Master Servicer shall include all annual statements of compliance received by it with its own annual statement of compliance to be submitted to the Securities Administrator pursuant to this Section 4.15.

(c)      In the event the Master Servicer, the Securities Administrator or any Servicing Function Participant engaged by the parties is terminated, assigns its rights and obligations under, or resigns pursuant to the terms of this Agreement, or any applicable agreement in the case of a Servicing Function Participant, as the case may be, such party shall provide an Officer's Certificate pursuant to this Section 4.15 or to such applicable agreement, as the case may be, notwithstanding any such termination, assignment or resignation.

(d)      Failure of the Master Servicer to comply timely with this Section 4.15 shall be deemed a Master Servicer Event of Default, automatically, without notice and without any cure period, and the Trustee may, in addition to whatever rights the Trustee may have under this Agreement and at law or in equity or to damages, including injunctive relief and specific performance, terminate all the rights and obligations of the Master Servicer under this

125

Agreement and in and to the Mortgage Loans and the proceeds thereof without compensating the Master Servicer for the same.   This paragraph shall supersede any other provision in this Agreement or any other agreement to the contrary.

(e)    Copies of such Master Servicer annual statements of compliance shall be provided to any Certificateholder upon request, by the Master Servicer or by the Trustee at the Master Servicer's expense if the Master Servicer failed to provide such copies (unless (i) the Master Servicer shall have failed to provide the Trustee with such statement or (ii) the Trustee shall be unaware of the Master Servicer's failure to provide such statement).

SECTION 4.16.    Master Servicer Assessments of Compliance.

(a)    By March 15 of each year, commencing in March 2008, the Master Servicer and the Securities Administrator, each at its own expense, shall furnish, or otherwise make available, and each such party shall cause any Servicing Function Participant engaged by it to furnish, each at its own expense, to the Securities Administrator and the Depositor, a report on an assessment of compliance with the Relevant Servicing Criteria that contains (A) a statement by such party of its responsibility for assessing compliance with the Relevant Servicing Criteria, (B) a statement that such party used the Relevant Servicing Criteria to assess compliance with the Relevant Servicing Criteria, (C) such party's assessment of compliance with the Relevant Servicing Criteria as of and for the fiscal year covered by the Form 10-K required to be filed pursuant to Section 5.06(d), including, if there has been any material instance of noncompliance with the Relevant Servicing Criteria, a discussion of each such failure and the nature and status thereof, and (D) a statement that a registered public accounting firm has issued an attestation report on such party's assessment of compliance with the Relevant Servicing Criteria as of and for such period.

(b)    No later than the end of each fiscal year for the Trust for which a 10-K is required to be filed, the Master Servicer shall forward to the Securities Administrator and to the Depositor the name of each Servicing Function Participant engaged by it and what Relevant Servicing Criteria will be addressed in the report on assessment of compliance prepared by such Servicing Function Participant (provided, however, that the Master Servicer need not provide such information to the Securities Administrator so long as the Master Servicer and the Securities Administrator are the same Person).   When the Master Servicer and the Securities Administrator (or any Servicing Function Participant engaged by them) submit their assessments to the Securities Administrator, such parties will also at such time include the assessment (and attestation pursuant to Section 4.17) of each Servicing Function Participant engaged by it.

(c)    Promptly after receipt of each such report on assessment of compliance, (i) the Depositor shall review each such report and, if applicable, consult with the Master Servicer, the Securities Administrator and any Servicing Function Participant engaged by such parties as to the nature of any material instance of noncompliance with the Relevant Servicing Criteria by each such party, and (ii) the Securities Administrator shall confirm that the assessments, taken as a whole, address all of the Servicing Criteria and taken individually address the Relevant Servicing Criteria for each party as set forth on Exhibit E and notify the Depositor of any exceptions.

(d)    The Master Servicer shall include all annual reports on assessment of compliance received by it from the Servicer with its own assessment of compliance to be submitted to the Securities Administrator pursuant to this Section 4.16.

(e)    In the event the Master Servicer, the Securities Administrator or any Servicing Function Participant engaged by the parties is terminated, assigns its rights and obligations under, or resigns pursuant to the terms of this Agreement, or any other applicable agreement in the case of a Servicing Function Participant, as the case may be, such party shall provide a report on assessment of compliance pursuant to this Section 4.16 or to such other applicable agreement, notwithstanding any such termination, assignment or resignation.

(f)    Failure of the Master Servicer to comply timely with this Section 4.16 shall be deemed a Master Servicer Event of Default, automatically, without notice and without any cure period, and the Trustee may, in addition to whatever rights the Trustee may have under this Agreement and at law or in equity or to damages, including injunctive relief and specific performance, terminate all the rights and obligations of the Master Servicer under this Agreement and in and to the Mortgage Loans and the proceeds thereof without compensating the Master Servicer for the same. This paragraph shall supersede any other provision in this Agreement or any other agreement to the contrary.

(g)    Delivery under this Section 4.16 of such reports, information and documents to the Trustee is for informational purposes only, and the Trustee's receipt of such shall not constitute constructive notice of any information contained therein or determinable from information contained therein, including the Master Servicer's compliance with any of its covenants hereunder (as to which the Trustee is entitled to conclusively rely exclusively on an Officer's Certificate).

SECTION 4.17.    Master Servicer Attestation Reports.

(a)    By March 15 of each year, commencing in March 2008, the Master Servicer and the Securities Administrator, each at its own expense, shall cause, and each such party shall cause any Servicing Function Participant engaged by it to cause, each at its own expense, a registered public accounting firm (which may also render other services to the Master Servicer, the Securities Administrator, or such other Servicing Function Participants, as the case may be) and that is a member of the American Institute of Certified Public Accountants to furnish an attestation report to the Securities Administrator and the Depositor, to the effect that (i) it has obtained a representation regarding certain matters from the management of such party, which includes an assertion that such party has complied with the Relevant Servicing Criteria, and (ii) on the basis of an examination conducted by such firm in accordance with standards for attestation engagements issued or adopted by the PCAOB, it is expressing an opinion as to whether such party's compliance with the Relevant Servicing Criteria was fairly stated in all material respects, or it cannot express an overall opinion regarding such party's assessment of compliance with the Relevant Servicing Criteria.  In the event that an overall opinion cannot be expressed, such registered public accounting firm shall state in such report why it was unable to express such an opinion.  Such report must be available for general use and not contain restricted use language.

127

(b)      Promptly after receipt of such assessment of compliance and attestation report from the Master Servicer, the Securities Administrator or any Servicing Function Participant engaged by such parties, the Securities Administrator shall confirm that each assessment submitted pursuant to Section 4.16 is coupled with an attestation meeting the requirements of this Section and notify the Depositor of any exceptions.

(c)      The Master Servicer shall include each such attestation furnished to it from the Servicer with its own attestation to be submitted to the Securities Administrator pursuant to this Section 4.17.

(d)      In the event the Master Servicer, the Securities Administrator or any Servicing Function Participant engaged by the parties is terminated assigns its rights and duties under, or resigns pursuant to the terms of this Agreement, or any applicable custodial agreement or servicing or sub-servicing agreement in the case of a Servicing Function Participant, as the case may be, such party shall cause a registered public accounting firm to provide an attestation pursuant to this Section 4.17, or such other applicable agreement, notwithstanding any such termination, assignment or resignation.

(e)      Failure of the Master Servicer to comply timely with this Section 4.17 shall be deemed a Master Servicer Event of Default, automatically, without notice and without any cure period, and the Trustee may, in addition to whatever rights the Trustee may have under this Agreement and at law or in equity or to damages, including injunctive relief and specific performance, terminate all the rights and obligations of the Master Servicer under this Agreement and in and to the Mortgage Loans and the proceeds thereof without compensating the Master Servicer for the same.   This paragraph shall supersede any other provision in this Agreement or any other agreement to the contrary.

SECTION 4.18.      Annual Certification.

(a)      Each Form 10-K required to be filed for the Trust pursuant to Section 5.06 shall include a certification (the "Sarbanes-Oxley Certification") required to be included therewith pursuant to the Sarbanes-Oxley Act.  Each of the Master Servicer and the Securities Administrator shall provide, and shall cause any Servicing Function Participant engaged by it to provide to the Person who signs the Sarbanes-Oxley Certification (the "Certifying Person"), by March 15 of each year in which the Trust is subject to the reporting requirements of the Exchange Act and otherwise within a reasonable period of time upon request, a certification (each, a "Back-Up Certification"), in the form attached hereto as Exhibit C, upon which the Certifying Person, the entity for which the Certifying Person acts as an officer, and such entity's officers, directors and Affiliates (collectively with the Certifying Person, "Certification Parties") can reasonably rely.  The senior officer of the Master Servicer in charge of the master servicing function shall serve as the Certifying Person on behalf of the Trust.   Such officer of the Certifying Person can be contacted by e-mail at cts.sec.notifications@wellsfargo.com or by facsimile at 410-715-2380.  In the event any such party or any Servicing Function Participant engaged by any such party is terminated, assigns its rights or duties under, or resigns pursuant to the terms of this Agreement, or any applicable sub-servicing agreement, as the case may be, such party shall provide a Back-Up Certification to the Certifying Person pursuant to this Section 4.18 with respect to the period of time it was subject to this Agreement or any applicable sub-

128

servicing agreement, as the case may be. Notwithstanding the foregoing, (i) the Master Servicer and the Securities Administrator shall not be required to deliver a Back-Up Certification to each other if both are the same Person and the Master Servicer is the Certifying Person and (ii) the Master Servicer shall not be obligated to sign the Sarbanes-Oxley Certification in the event that it does not receive any Back-Up Certification required to be furnished to it pursuant to this Section.

SECTION 4.19.    Obligation of the Master Servicer in Respect of Prepayment Interest Shortfalls.

In the event of any Prepayment Interest Shortfalls, the Master Servicer shall deposit into the Distribution Account not later than the related Distribution Date an amount equal to the lesser of (i) the aggregate amounts required to be paid by the Servicer with respect to Prepayment Interest Shortfalls attributable to Principal Prepayments in full on the Mortgage Loans for the related Distribution Date, and not so paid by the Servicer and (ii) the aggregate amount of the compensation payable to the Master Servicer for such Distribution Date in accordance with Section 4.13, without reimbursement therefor.

SECTION 4.20.    Prepayment Penalty Verification.

On or prior to the Servicer Remittance Date, the Servicer shall provide in an electronic format acceptable to the Master Servicer the data necessary for the Master Servicer to perform its verification duties set forth in this Section 4.20. The Master Servicer or a third party reasonably acceptable to the Master Servicer and the Depositor (the "Verification Agent") will perform such verification duties and will use its best efforts to issue its findings in a report (the "Verification Report") delivered to the Master Servicer and the Depositor within ten (10) Business Days following the related Distribution Date; provided, however, that if the Verification Agent is unable to issue the Verification Report within ten (10) Business Days following the Distribution Date, the Verification Agent may issue and deliver to the Master Servicer and the Depositor the Verification Report upon the completion of its verification duties. The Master Servicer shall forward the Verification Report to the Servicer and shall notify the Servicer if the Master Servicer has determined that the Servicer did not deliver the appropriate Prepayment Charge to the Securities Administrator in accordance with this Agreement. Such written notification from the Master Servicer shall include the loan number, prepayment penalty code and prepayment penalty amount as calculated by the Master Servicer or the Verification Agent, as applicable, of each Mortgage Loan for which there is a discrepancy. If the Servicer agrees with the verified amounts, the Servicer shall adjust the immediately succeeding Servicer Report and the amount remitted to the Securities Administrator with respect to prepayments accordingly. If the Servicer disagrees with the determination of the Master Servicer, the Servicer shall, within five (5) Business Days of its receipt of the Verification Report, notify the Master Servicer of such disagreement and provide the Master Servicer with detailed information to support its position. The Servicer and the Master Servicer shall cooperate to resolve any discrepancy on or prior to the immediately succeeding Servicer Remittance Date, and the Servicer will indicate the effect of such resolution on the Servicer Report and shall adjust the amount remitted with respect to prepayments on the Servicer Remittance Date accordingly.

During such time as the Servicer and the Master Servicer are resolving discrepancies with respect to the Prepayment Charges, no payments in respect of any disputed Prepayment Charges will be remitted to the Securities Administrator for deposit in the Distribution Account and the Master Servicer shall not be obligated to deposit such payments, unless otherwise required pursuant to Section 8.01 hereof. In connection with such duties, the Master Servicer shall be able to rely solely on the information provided to it by the Servicer in accordance with this Section. The Master Servicer shall not be responsible for verifying the accuracy of any of the information provided to it by the Servicer.

ARTICLE V

PAYMENTS TO CERTIFICATEHOLDERS

SECTION 5.01.      Distributions.

(a)      On each Distribution Date, the following amounts, in the following order of priority, shall be distributed by REMIC I to REMIC II on account of the REMIC I Regular Interests and distributed to the holders of the Class R Certificates (in respect of the Class R-I Interest), as the case may be:

(i)      to Holders of REMIC I Regular Interest I and REMIC I Regular Interest I-1-A through I-54-B, *pro rata*, in an amount equal to (A) Uncertificated Interest for such REMIC I Regular Interests for such Distribution Date, plus (B) any amounts payable in respect thereof remaining unpaid from previous Distribution Dates;

(ii)      to the extent of amounts remaining after the distributions made pursuant to clause (i) above, to the Holders of REMIC I Regular Interest I, an amount of principal shall be distributed to such Holders until the Uncertificated Balance of REMIC I Regular Interest I is reduced to zero; and

(iii)      to the extent of amounts remaining after distributions made pursuant to clauses (i) and (ii) above, payments of principal shall be allocated to REMIC I Regular Interests I-1-A through I-54-B starting with the lowest numerical denomination until the Uncertificated Balance of each such REMIC I Regular Interest is reduced to zero, provided that, for REMIC I Regular Interests with the same numerical denomination, such payments of principal shall be allocated *pro rata* between such REMIC I Regular Interests.

(b)      to the Holders of REMIC I Regular Interest I-54-B, all amounts representing Prepayment Charges in respect of the Group I Mortgage Loans received during the related Prepayment Period and to the Holders of REMIC I Regular Interest II-54-B, all amounts representing Prepayment Charges in respect of the Mortgage Loans received during the related Prepayment Period.

(c)      (1) On each Distribution Date, the following amounts, in the following order of priority, shall be distributed by REMIC II to REMIC III on account of the REMIC II Regular Interests or withdrawn from the Distribution Account and distributed to the Holders of the Class R Certificates (in respect of the Class R-II Interest), as the case may be:

(i)      first to the Holders of REMIC II Regular Interest IO, in an amount equal to (A) Uncertificated Interest for such REMIC II Regular Interest for such Distribution Date, plus (B) any amounts in respect thereof remaining unpaid from previous Distribution Dates and second, to the Holders of REMIC II Regular Interest AA, REMIC II Regular Interest A, REMIC II Regular Interest M-1, REMIC II Regular Interest M-2, REMIC II Regular Interest M-3, REMIC II Regular Interest M-4, REMIC II Regular Interest ZZ and REMIC II Regular Interest P, *pro rata*, in an amount equal to (A) the Uncertificated Interest for such Distribution Date, plus (B) any amounts in respect

131

thereof remaining unpaid from previous Distribution Dates. Amounts payable as Uncertificated Interest in respect of REMIC II Regular Interest ZZ shall be reduced when the REMIC II Overcollateralization Amount is less than the REMIC II Required Overcollateralization Amount, by the lesser of (x) the amount of such difference and (y) the Maximum ZZ Uncertificated Interest Deferral Amount and such amount will be payable to the Holders of REMIC II Regular Interest A, REMIC II Regular Interest M-1, REMIC II Regular Interest M-2, REMIC II Regular Interest M-3 and REMIC II Regular Interest M-4 in the same proportion as the Overcollateralization Increase Amount is allocated to the Corresponding Certificates and the Uncertificated Balance of REMIC II Regular Interest ZZ shall be increased by such amount;

(ii)    to Holders of REMIC II Regular Interest I-SUB, REMIC II Regular Interest I-GRP, REMIC II Regular Interest II-SUB, REMIC II Regular Interest II-GRP, and REMIC II Regular Interest XX, *pro rata*, in an amount equal to (A) the Uncertificated Interest for such Distribution Date, plus (B) any amounts in respect thereof remaining unpaid from previous Distribution Dates;

(iii)    to the Holders of REMIC II Regular Interests, in an amount equal to the remainder of the REMIC II Marker Allocation Percentage of the available funds for such Distribution Date after the distributions made pursuant to clause (i) above, allocated as follows:

(A)    98.00% of such remainder to the Holders of REMIC II Regular Interest AA, until the Uncertificated Balance of such REMIC II Regular Interest is reduced to zero;

(B)    2.00% of such remainder, first, to the Holders of REMIC II Regular Interest A, REMIC II Regular Interest M-1, REMIC II Regular Interest M-2, REMIC II Regular Interest M-3 and REMIC II Regular Interest M-4, 1% of and in the same proportion as principal payments are allocated to the Corresponding Certificates, until the Uncertificated Balances of such REMIC II Regular Interests are reduced to zero and second to the Holders of REMIC II Regular Interest ZZ, until the Uncertificated Balance of such REMIC II Regular Interest is reduced to zero;

(C)    to the Holders of REMIC II Regular Interest P, (1) 100% of the Prepayment Charges deemed distributed on REMIC I Regular Interest I-54-B and REMIC I Regular Interest II-54-B and (2) on the Distribution Date immediately following the expiration of the latest Prepayment Charge as identified on the Prepayment Charge Schedule or any Distribution Date thereafter until $100 has been distributed pursuant to this clause; then

(D)    any remaining amount to the Holders of the Class R Certificate, in respect of the Class R-II Interest;

132

provided, however, that 98.00% and 2.00% of any principal payments that are attributable to an Overcollateralization Reduction Amount shall be allocated to Holders of REMIC II Regular Interest AA and REMIC II Regular Interest ZZ, respectively.

        (iv)    to the Holders of REMIC II Regular Interests, in an amount equal to the remainder of the REMIC II Sub WAC Allocation Percentage of available funds for such Distribution Date after the distributions made pursuant to clause (c)(ii) above, such that distributions of principal shall be deemed to be made to the REMIC II Regular Interests first, so as to keep the Uncertificated Balance of each REMIC II Regular Interest ending with the designation "GRP" equal to 0.01% of the aggregate Stated Principal Balance of the Mortgage Loans in the related loan group; second, to each REMIC II Regular Interest ending with the designation "SUB," so that the Uncertificated Balance of each such REMIC II Regular Interest is equal to 0.01% of the excess of (x) the aggregate Stated Principal Balance of the Mortgage Loans in the related loan group over (y) the current Certificate Principal Balance of the Class A Certificate in the related loan group (except that if any such excess is a larger number than in the preceding distribution period, the least amount of principal shall be distributed to such REMIC II Regular Interests such that the REMIC II Subordinated Balance Ratio is maintained); and third, any remaining principal to REMIC II Regular Interest XX.

        (v)    Notwithstanding the distributions described in Section 5.01(c)(1), distributions of funds shall be made to Certificateholders only in accordance with Section 5.01(c)(2) through (8) and Section 5.01(e).

        (2)    On each Distribution Date, the Securities Administrator shall withdraw from the Distribution Account to the extent on deposit therein an amount equal to the Interest Remittance Amount and make the following disbursements and transfers in the order of priority described below, in each case to the extent of the Interest Remittance Amount remaining for such Distribution Date:

        *first*, to the Class A Certificate Insurer, the Premium for such Distribution Date;

        *second,* to the Supplemental Interest Trust, an amount equal to the sum of any Net Swap Payment owed to the Swap Provider and any Swap Termination Payment owed to the Swap Provider not due to a Swap Provider Trigger Event;

        *third*, to the Holders of the Class A Certificates, the Senior Interest Distribution Amount allocable to the Class A Certificates;

        *fourth*, to the Class A Certificate Insurer, any reimbursement amounts owed to the Class A Certificate Insurer under the Insurance Agreement, the Policy or this Agreement;

        *fifth,* sequentially, to the Holders of the Class M-1, Class M-2, Class M-3 and Class M-4 Certificates, in that order, to the extent of the Interest Distribution Amount allocable to each such Class; and

*sixth,* any such Interest Remittance Amount remaining after application pursuant to clauses *first, second, third*, *fourth* and *fifth* above will be applied as part of Net Monthly Excess Cashflow for such Distribution Date pursuant to Section [5.01(b)(5)].

(3)    On each Distribution Date (a) prior to the Stepdown Date or (b) on which a Trigger Event is in effect, the Securities Administrator shall withdraw from the Distribution Account to the extent on deposit therein an amount equal to the Principal Distribution Amount and distribute to the Certificateholders the following amounts, in the following order of priority:

*first*, to the Class A Certificate Insurer, the amount owing to the Class A Certificate Insurer under the Insurance Agreement for the Premium to the extent not paid from the Interest Remittance Amount on such Distribution Date;

*second,* to the Supplemental Interest Trust, an amount equal to the sum of any Net Swap Payment owed to the Swap Provider and any Swap Termination Payment owed to the Swap Provider not due to a Swap Provider Trigger Event to the extent not paid from the Interest Remittance Amount on such Distribution Date;

*third*, to the Holders of the Class A Certificates until the Certificate Principal Balance of the Class A Certificates has been reduced to zero;

*fourth*, to the Class A Certificate Insurer, to the extent not paid from the Interest Remittance Amount on such Distribution Date, any reimbursement amounts owed to the Class A Certificate Insurer under the Insurance Agreement, the Policy or this Agreement; and

*fifth,* sequentially, to the Holders of the Class M-1, Class M-2, Class M-3 and Class M-4 Certificates, in that order, until the Certificate Principal Balance of each such Class has been reduced to zero.

(4)    On each Distribution Date (a) on or after the Stepdown Date and (b) on which a Trigger Event is not in effect, the Securities Administrator shall withdraw from the Distribution Account to the extent on deposit therein an amount equal to the Principal Distribution Amount and distribute to the Certificateholders the following amounts, in the following order of priority:

*first*, to the Class A Certificate Insurer, the amount owing to the Class A Certificate Insurer under the Insurance Agreement for the Premium to the extent not paid from the Interest Remittance Amount on such Distribution Date;

*second*, to the Supplemental Interest Trust, an amount equal to the sum of any Net Swap Payment owed to the Swap Provider and any Swap Termination Payment owed to the Swap Provider not due to a Swap Provider Trigger Event to the extent not paid from the Interest Remittance Amount on such Distribution Date;

*third*, to the holders of the Class A Certificates, the lesser of (x) the excess of (i) the Principal Distribution Amount over (ii) the sum of the amounts distributed to the Class A Certificate Insurer under clause *first* above and to the Supplemental Interest Trust under clause *second* above, and (y) the Class A Principal Distribution Amount, until the Certificate Principal Balance of the Class A Certificates has been reduced to zero;

*fourth*, to the Class A Certificate Insurer, to the extent not paid from the Interest Remittance Amount on such Distribution Date, any reimbursement amounts owed to the Class A Certificate Insurer under the Insurance Agreement, the Policy or this Agreement;

*fifth*, to the holders of the Class M-1 Certificates, the lesser of (x) the excess of (i) the Principal Distribution Amount over (ii) the sum of the amounts distributed to the Class A Certificate Insurer under clause *first* above, to the Supplemental Interest Trust under clause *second* above, to the holders of the Class A Certificates under clause *third* above and to the Class A Certificate Insurer under clause *fourth* above, and (y) the Class M-1 Principal Distribution Amount, until the Certificate Principal Balance of the Class M-1 Certificates has been reduced to zero;

*sixth*, to the holders of the Class M-2 Certificates, the lesser of (x) the excess of (i) the Principal Distribution Amount over (ii) the sum of the amounts distributed to the Class A Certificate Insurer under clause *first* above, to the Supplemental Interest Trust under clause *second* above, to the holders of the Class A Certificates under clause *third* above, to the Class A Certificate Insurer under clause *fourth* above and to the holders of the Class M-1 Certificates under clause *fifth* above, and (y) the Class M-2 Principal Distribution Amount, until the Certificate Principal Balance of the Class M-2 Certificates has been reduced to zero;

*seventh*, to the holders of the Class M-3 Certificates, the lesser of (x) the excess of (i) the Principal Distribution Amount over (ii) the sum of the amounts distributed to the Class A Certificate Insurer under clause *first* above, to the Supplemental Interest Trust under clause *second* above, to the holders of the Class A Certificates under clause *third* above, to the Class A Certificate Insurer under clause *fourth* above, to the holders of the Class M-1 Certificates under clause fifth above and to the holders of the Class M-2 Certificates under clause sixth above, and (y) the Class M-3 Principal Distribution Amount, until the Certificate Principal Balance of the Class M-3 Certificates has been reduced to zero; and

*eighth*, to the holders of the Class M-4 Certificates, the lesser of (x) the excess of (i) the Principal Distribution Amount over (ii) the sum of the amounts distributed to the Class A Certificate Insurer under clause *first* above, to the Supplemental Interest Trust under clause *second* above, to the holders of the Class A Certificates under clause *third* above, to the Class A Certificate Insurer under clause *fourth* above, to the holders of the Class M-1 Certificates under clause *fifth*

above, to the holders of the Class M-2 Certificates under clause *sixth* above and to the holders of the Class M-3 Certificates under clause *seventh* above, and (y) the Class M-4 Principal Distribution Amount, until the Certificate Principal Balance of the Class M-4 Certificates has been reduced to zero.

(5)    On each Distribution Date, the Net Monthly Excess Cashflow shall be distributed as follows:

(i)    *first,* to the Holders of the Class or Classes of Certificates then entitled to receive distributions in respect of principal, in an amount equal to the Overcollateralization Increase Amount, payable to such Holders, to be paid as part of the Principal Distribution Amount;

(ii)    *second,* concurrently, to the holders of the Class A Certificates, in an amount equal to the Senior Interest Distribution Amount remaining undistributed;

(iii)    *third*, sequentially, to the holders of the Class M-1, Class M-2, Class M-3 and Class M-4 Certificates, in that order, in an amount equal to the Interest Distribution Amount and Interest Carry Forward Amount allocable to each such Class;

(iv)    *fourth,* sequentially, to the Holders of the Class M-1, Class M-2, Class M-3 and Class M-4 Certificates, in that order, in an amount equal to the Allocated Realized Loss Amount allocable to each such Class;

(v)    *fifth,* to the Reserve Fund, the amount by which the Net WAC Rate Carryover Amounts, if any, with respect to the Class A Certificates and Mezzanine Certificates exceeds any amounts in the Reserve Fund that were not distributed on prior Distribution Dates;

(vi)    *sixth,* to the holders of the Class A Certificates, in an amount equal to such certificates' allocated share of any Prepayment Interest Shortfalls and any shortfalls resulting from the application of the Relief Act or similar state or local law or the Bankruptcy Code with respect to the related Mortgage Loans;

(vii)    *seventh,* sequentially, to the holders of the Class M-1, Class M-2, Class M-3 and Class M-4 Certificates, in that order, in an amount equal to each such certificates' allocated share of any Prepayment Interest Shortfalls and any shortfalls resulting from the application of the Relief Act or similar state or local law or the bankruptcy code with respect to the Mortgage Loans;

(viii)    *eighth* to the Supplemental Interest Trust, an amount equal to any Swap Termination Payment owed to the Swap Provider, due to a Swap Provider Trigger Event pursuant to the Interest Rate Swap Agreement;

(ix)    *ninth*, to the Holders of the Class CE Certificates the Interest Distribution Amount and any Overcollateralization Reduction Amount for such Distribution Date; and

136

(x)    *tenth,* to the Holders of the Class R Certificates, in respect of the Class R-III Interest, any remaining amounts; provided that if such Distribution Date is the Distribution Date immediately following the expiration of the latest Prepayment Charge term as identified on the Mortgage Loan Schedule or any Distribution Date thereafter, then any such remaining amounts will be distributed first, to the Holders of the Class P Certificates, until the Certificate Principal Balance thereof has been reduced to zero and second, to the Holders of the Class R Certificates.

The Class CE Certificates are intended to receive all principal and interest received by the Trust on the Mortgage Loans that is not otherwise distributable to any other Class of Regular Certificates or REMIC Regular Interests. If the Securities Administrator determines that the Residual Certificates are entitled to any distributions on any Distribution Date other than the final Distribution Date, the Securities Administrator, prior to any such distribution to any Residual Certificate, shall notify the Depositor of such impending distribution. Upon such notification, the Depositor will prepare and request that the other parties hereto enter into an amendment to the Pooling and Servicing Agreement pursuant to Section 12.01, to revise such mistake in the distribution provisions.

On each Distribution Date, after making the distributions of the Available Distribution Amount as set forth above, the Securities Administrator will withdraw from the Reserve Fund all income from the investment of funds in the Reserve Fund and distribute such amount to the Holders of the Class CE Certificates. With respect to any amounts deposited in the Reserve Fund from the Net Monthly Excess Cashflow under Section 5.01(c)(5)(v) above and not distributed pursuant to the preceding paragraph, first, concurrently, to the Holders of the Class A Certificates, the related Net WAC Rate Carryover Amount remaining unpaid for such Distribution Date; second, sequentially, to the Holders of the Class M-1, Class M-2, Class M-3 and Class M-4 Certificates, in that order, in respect of the related Net WAC Rate Carryover Amount remaining unpaid for each such Class for such Distribution Date; and third, to the Class CE Certificates.

(d)    As described in Section 5.01(c)(2), (3), (4) and (5) above, Net Swap Payments and Swap Termination Payments (other than Swap Termination Payments resulting from a Swap Provider Trigger Event) payable by the Supplemental Interest Trust to the Swap Provider pursuant to the Swap Agreement (to the extent not paid by the Securities Administrator from any upfront payment received pursuant to any replacement interest rate swap agreement that may be entered into by the Supplemental Interest Trust Trustee) shall be deducted from the Interest Remittance Amount, and to the extent of any such remaining amounts due, from the Principal Remittance Amount, prior to any distributions to the Certificateholders.

Amounts payable by the Trust to the Securities Administrator in respect of Net Swap Payments and Swap Termination Payments other than Swap Termination Payments resulting from a Swap Provider Trigger Event (and to the extent not paid by the Securities Administrator from any upfront payment received pursuant to any replacement interest rate swap agreement that may be entered into by the Supplemental Interest Trust Trustee) will be deducted from related available funds before distributions to the holders of the Offered Certificates. On or before each Distribution Date, such amounts will be distributed to the Supplemental Interest Trust and paid by the Securities Administrator to the Swap Provider as follows:

*first*, to make any Net Swap Payment owed to the Swap Provider pursuant to the Swap Agreement for such Distribution Date; and

*second*, to make any Swap Termination Payment (not due to a Swap Provider Trigger Event) owed to the Swap Provider pursuant to the Swap Agreement for such Distribution Date (to the extent not paid by the Securities Administrator from any upfront payment received pursuant to any replacement interest rate swap agreement that may be entered into by the Supplemental Interest Trust Trustee).

Any Swap Termination Payment triggered by a Swap Provider Trigger Event owed to the Swap Provider pursuant to the Swap Agreement will be subordinated to distributions to the Holders of the Offered Certificates and shall be paid pursuant to Section 5.01(c)(5)(viii).

(e)     On each Distribution Date commencing on the Distribution Date occurring in May 2007 and ending immediately following the Distribution Date in September 2011, to the extent required, following the distribution of the Net Monthly Excess Cashflow and withdrawals from the Reserve Fund, any Net Swap Payments payable to the Securities Administrator on behalf of the Supplemental Interest Trust by the Swap Provider will be distributed on the related Distribution Date in the following order of priority:

*first*, to the Class A Certificates, the Senior Interest Distribution Amount remaining undistributed after the distributions of the Interest Remittance Amount and the Net Monthly Excess Cashflow;

*second*, sequentially, to the Class M-1, Class M-2, Class M-3 and Class M-4 Certificates, in that order, the related Interest Distribution Amount and Interest Carry Forward Amount, to the extent remaining undistributed after the distributions of the Interest Remittance Amount and the Net Monthly Excess Cashflow;

*third*, to the Class A Certificate Insurer, any remaining amounts owed to it under the Insurance Agreement or the Pooling and Servicing Agreement or as reimbursement for draws on the Policy;

*fourth*, to the holders of the Class or Classes of Certificates then entitled to receive distributions in respect of principal, in an amount necessary to maintain or restore the Required Overcollateralization Amount after taking into account distributions made pursuant to Section 5.01(c)(5)(i) above;

*fifth*, sequentially to the Class M-1, Class M-2, Class M-3 and Class M-4 Certificates, in that order, in each case up to the related Allocated Realized Loss Amount related to such Certificates for such Distribution Date remaining undistributed after distribution of the Net Monthly Excess Cashflow;

*sixth*, to the Class A Certificates, the related Net WAC Rate Carryover Amount, to the extent remaining undistributed after distributions of amounts received by the Securities Administrator in respect of the Net Monthly Excess Cashflow on deposit in the Reserve Fund;

*seventh*, sequentially, to the Class M-1, Class M-2, Class M-3 and Class M-4 Certificates, in that order, the related Net WAC Rate Carryover Amount, to the extent remaining undistributed after distributions of Net Monthly Excess Cashflow on deposit in the Reserve Fund;

*eighth*, to the Swap Provider, an amount equal to any Swap Termination Payment owed to the Swap Provider due to a Swap Provider Trigger Event pursuant to the Interest Rate Swap Agreement; and

*ninth*, to the Class CE Certificates, any remaining amounts.

(f)     On each Distribution Date, the Securities Administrator shall withdraw any amounts then on deposit in the Distribution Account that represent Prepayment Charges and shall distribute such amounts to the Class P Certificateholders as described above.

(g)     All distributions made with respect to each Class of Certificates on each Distribution Date shall be allocated *pro rata* among the outstanding Certificates in such Class based on their respective Percentage Interests. Payments in respect of each Class of Certificates on each Distribution Date will be made to the Holders of the respective Class of record on the related Record Date (except as otherwise provided in Section [5.01(h)] or Section 10.01 respecting the final distribution on such Class), based on the aggregate Percentage Interest represented by their respective Certificates, and shall be made by wire transfer of immediately available funds to the account of any such Holder at a bank or other entity having appropriate facilities therefor, if such Holder shall have so notified the Securities Administrator in writing at least five (5) Business Days prior to the Record Date immediately prior to such Distribution Date and is the registered owner of Certificates having an initial aggregate Certificate Principal Balance that is in excess of the lesser of (i) $5,000,000 or (ii) two-thirds of the initial Certificate Principal Balance of such Class of Certificates, or otherwise by check mailed by first class mail to the address of such Holder appearing in the Certificate Register. The final distribution on each Certificate will be made in like manner, but only upon presentment and surrender of such Certificate at the Corporate Trust Office of the Securities Administrator or such other location specified in the notice to Certificateholders of such final distribution.

Each distribution with respect to a Book-Entry Certificate shall be paid to the Depository, as Holder thereof, and the Depository shall be responsible for crediting the amount of such distribution to the accounts of its Depository Participants in accordance with its normal procedures. Each Depository Participant shall be responsible for disbursing such distribution to the Certificate Owners that it represents and to each indirect participating brokerage firm (a "brokerage firm" or "indirect participating firm") for which it acts as agent. Each brokerage firm shall be responsible for disbursing funds to the Certificate Owners that it represents. None of the Trustee, the Depositor, the Servicer, the Securities Administrator or the Master Servicer shall have any responsibility therefor except as otherwise provided by this Agreement or applicable law.

(h)     The rights of the Certificateholders to receive distributions in respect of the Certificates, and all interests of the Certificateholders in such distributions, shall be as set forth in this Agreement. None of the Holders of any Class of Certificates, the Trustee, the

Servicer, the Securities Administrator or the Master Servicer shall in any way be responsible or liable to the Holders of any other Class of Certificates in respect of amounts properly previously distributed on the Certificates.

(i)     Except as otherwise provided in Section 10.01, whenever the Securities Administrator expects that the final distribution with respect to any Class of Certificates will be made on the next Distribution Date, the Securities Administrator shall, no later than three (3) days before the related Distribution Date, mail to each Holder on such date of such Class of Certificates a notice to the effect that:

> (i)     the Securities Administrator expects that the final distribution with respect to such Class of Certificates will be made on such Distribution Date but only upon presentation and surrender of such Certificates at the office of the Securities Administrator therein specified, and
>
> (ii)     no interest shall accrue on such Certificates from and after the end of the related Interest Accrual Period.

Any funds not distributed to any Holder or Holders of Certificates of such Class on such Distribution Date because of the failure of such Holder or Holders to tender their Certificates shall, on such date, be set aside and held in trust by the Securities Administrator and credited to the account of the appropriate non-tendering Holder or Holders. If any Certificates as to which notice has been given pursuant to this Section 5.01(i) shall not have been surrendered for cancellation within six months after the time specified in such notice, the Securities Administrator shall mail a second notice to the remaining non-tendering Certificateholders to surrender their Certificates for cancellation in order to receive the final distribution with respect thereto. If within one year after the second notice all such Certificates shall not have been surrendered for cancellation, the Securities Administrator shall, directly or through an agent, mail a final notice to the remaining non-tendering Certificateholders concerning surrender of their Certificates but shall continue to hold any remaining funds for the benefit of non-tendering Certificateholders. The costs and expenses of maintaining the funds in trust and of contacting such Certificateholders shall be paid out of the assets remaining in such trust fund. If within one year after the final notice any such Certificates shall not have been surrendered for cancellation, the Securities Administrator shall pay to the Depositor all such amounts, and all rights of non-tendering Certificateholders in or to such amounts shall thereupon cease. No interest shall accrue or be payable to any Certificateholder on any amount held in trust by the Securities Administrator as a result of such Certificateholder's failure to surrender its Certificate(s) on the final Distribution Date for final payment thereof in accordance with this Section 5.01(i). Any such amounts held in trust by the Securities Administrator shall be held uninvested in an Eligible Account.

(j)     Notwithstanding anything to the contrary herein, (i) in no event shall the Certificate Principal Balance of a Class A Certificate or a Mezzanine Certificate be reduced more than once in respect of any particular amount both (a) allocated to such Certificate in respect of Realized Losses pursuant to Section 5.04 and (b) distributed to the Holder of such Certificate in reduction of the Certificate Principal Balance thereof pursuant to this Section 5.01 from Net Monthly Excess Cashflow and (ii) in no event shall the Uncertificated Balance of a REMIC

Regular Interest be reduced more than once in respect of any particular amount both (a) allocated to such REMIC Regular Interest in respect of Realized Losses pursuant to Section 5.04 and (b) distributed on such REMIC Regular Interest in reduction of the Uncertificated Balance thereof pursuant to this Section 5.01.

SECTION 5.02.    Statements to Certificateholders.

On each Distribution Date, the Securities Administrator (based on the information set forth in the Servicer Reports for such Distribution Date and information provided by the Swap Provider under the Swap Agreement with respect to payments made pursuant to the Swap Agreement) shall make available to each Holder of the Certificates, the Swap Provider, the Class A Certificate Insurer, the Servicer and the Credit Risk Manager, a statement as to the distributions made on such Distribution Date setting forth:

(i)    the applicable Interest Accrual Periods and general Distribution Dates;

(ii)    the total cash flows received and the general sources thereof;

(iii)    the aggregate Servicing Fee received by the Servicer and Master Servicing Fee received by the Master Servicer during the related Due Period;

(iv)    the amount, if any, of other fees or expenses accrued and paid, with an identification of the payee and the general purpose of such fees;

(v)    the amount of the related distribution to Holders of the Certificates (by class) allocable to principal, separately identifying (A) the aggregate amount of any Principal Prepayments included therein, (B) the aggregate of all scheduled payments of principal included therein and (C) any Overcollateralization Increase Amount included therein;

(vi)    the amount of such distribution to Holders of the Certificates (by class) allocable to interest and the portion thereof, if any, provided by the Swap Agreement in the aggregate;

(vii)    the Interest Carry Forward Amounts and any Net WAC Rate Carryover Amounts for the related Certificates (if any);

(viii)    the aggregate amount of Advances included in the distributions on the Distribution Date (including the general purpose of such Advances);

(ix)    the number and aggregate principal balance of any Mortgage Loans (not including a Liquidated Mortgage Loan as of the end of the Prepayment Period) that were delinquent (exclusive of Mortgage Loans in foreclosure) using the "OTS" method (1) one scheduled payment is delinquent, (2) two scheduled payments are delinquent, (3) three scheduled payments are delinquent and (4) foreclosure proceedings have been commenced, and loss information for the period;

141

(x) the number, aggregate principal balance, weighted average remaining term to maturity and weighted average Mortgage Rate of the Mortgage Loans as of the related Due Date;

(xi) with respect to any Mortgage Loan that was liquidated during the preceding calendar month, the loan number and Scheduled Principal Balance of, and Realized Loss on, such Mortgage Loan as of the end of the related Prepayment Period;

(xii) the total number and principal balance of any real estate owned, or REO Properties, as of the end of the related Prepayment Period;

(xiii) whether the Stepdown Date has occurred and whether Trigger Event is in effect;

(xiv) the cumulative Realized Losses through the end of the preceding month;

(xv) the aggregate amount of Extraordinary Trust Fund Expenses withdrawn from the Distribution Account for such Distribution Date;

(xvi) the Certificate Principal Balance of the related Certificates before and after giving effect to the distribution of principal and allocation of Allocated Realized Loss Amounts on such Distribution Date;

(xvii) the number and Scheduled Principal Balance of all the Mortgage Loans for the following Distribution Date;

(xviii) the three-month rolling average of the percent equivalent of a fraction, the numerator of which is the aggregate Scheduled Principal Balance of the Mortgage Loans that are 60 days or more delinquent or are in bankruptcy or foreclosure or are REO Properties, and the denominator of which is the Scheduled Principal Balances of all of the Mortgage Loans;

(xix) the Certificate Factor for each such Class of Certificates applicable to such Distribution Date;

(xx) the Interest Distribution Amount in respect of the Class A Certificates, the Mezzanine Certificates and the Class CE Certificates for such Distribution Date and the Interest Carry Forward Amount, if any, with respect to the Class A Certificates and the Mezzanine Certificates on such Distribution Date, and in the case of the Class A Certificates and the Mezzanine Certificates separately identifying any reduction thereof due to allocations of Prepayment Interest Shortfalls and interest shortfalls including the Relief Act Interest Shortfalls and Net WAC Rate Carryover Amounts;

(xxi) the aggregate amount of any Prepayment Interest Shortfall for such Distribution Date, to the extent not covered by payments by the Servicer pursuant to

142

Section 3.23 of this Agreement, the Master Servicer pursuant to Section 4.19 of this Agreement;

(xxii)  the aggregate amount of Relief Act Interest Shortfalls for such Distribution Date;

(xxiii)  the amount of, if any, of Net Monthly Excess Cashflow or excess spread and the application of such Net Monthly Excess Cashflow;

(xxiv) the Required Overcollateralization Amount and the Credit Enhancement Percentage for such Distribution Date;

(xxv)  the Overcollateralization Increase Amount, if any, for such Distribution Date;

(xxvi)  the Overcollateralization Reduction Amount, if any, for such Distribution Date;

(xxvii) the Pass-Through Rate for each class of Certificates for such Distribution Date;

(xxviii) the amount of any deposit to the Reserve Fund contemplated by Section 3.25(b);

(xxix)  the balance of the Reserve Fund prior to the deposit or withdrawal of any amounts on such Distribution Date;

(xxx)  the amount of any deposit to the Reserve Fund pursuant to Section 5.01(c)(7)(vii);

(xxxi)  the Aggregate Loss Severity Percentage;

(xxxii) the amount of the Prepayment Charges remitted by the Servicer;

(xxxiii)the amount of any Net Swap Payment payable to the Trust, any related Net Swap Payment payable to the Swap Provider, any Swap Termination Payment payable to the Trust and any related Swap Termination Payment payable to the Swap Provider; and

(xxxiv)the Credit Risk Management Fee received by the Credit Risk Manager.

The Securities Administrator will make such statement (and, at its option, any additional files containing the same information in an alternative format) available each month to the Certificateholders and the Rating Agencies via the Securities Administrator's internet website. The Securities Administrator's internet website shall initially be located at http:\\www.ctslink.com and assistance in using the website can be obtained by calling the Securities Administrator's customer service desk at 1-301-815-6600. Parties that are unable to

use the above distribution options are entitled to have a paper copy mailed to them via first class mail by calling the customer service desk and indicating such. The Securities Administrator shall have the right to change the way such statements are distributed in order to make such distribution more convenient and/or more accessible to the above parties and the Securities Administrator shall provide timely and adequate notification to all above parties regarding any such changes.

In the case of information furnished pursuant to subclauses (i) and (ii) above, the amounts shall be expressed as a dollar amount per Single Certificate of the relevant Class.

Within a reasonable period of time after the end of each calendar year, the Securities Administrator shall furnish upon request to each Person who at any time during the calendar year was a Holder of a Regular Certificate a statement containing the information set forth in subclauses (i) through (iii) above, aggregated for such calendar year or applicable portion thereof during which such person was a Certificateholder. Such obligation of the Securities Administrator shall be deemed to have been satisfied to the extent that substantially comparable information shall be provided by the Securities Administrator pursuant to any requirements of the Code as from time to time are in force.

Within a reasonable period of time after the end of each calendar year, the Securities Administrator shall furnish upon request to each Person who at any time during the calendar year was a Holder of a Residual Certificate a statement setting forth the amount, if any, actually distributed with respect to the Residual Certificates, as appropriate, aggregated for such calendar year or applicable portion thereof during which such Person was a Certificateholder.

The Securities Administrator shall, upon request, furnish to each Certificateholder during the term of this Agreement, such periodic, special, or other reports or information, whether or not provided for herein, as shall be reasonable with respect to the Certificateholder, as applicable, or otherwise with respect to the purposes of this Agreement, all such reports or information to be provided at the expense of the Certificateholder, in accordance with such reasonable and explicit instructions and directions as the Certificateholder may provide.

On each Distribution Date the Securities Administrator shall provide Bloomberg Financial Markets, L.P. ("Bloomberg") CUSIP level factors for each Class of Certificates as of such Distribution Date, using a format and media mutually acceptable to the Securities Administrator and Bloomberg.

SECTION 5.03.        Servicer Reports; P&I Advances.

(a)        On or before 12:00 noon New York time on the 18th calendar day of the month, and if the 18th calendar day is not a Business Day, the immediately following Business Day, the Servicer shall deliver to the Master Servicer and the Securities Administrator by telecopy or electronic mail (or by such other means as the Servicer, the Master Servicer and the Securities Administrator may agree from time to time) a remittance report containing such information with respect to the related Mortgage Loans and the related Distribution Date as is reasonably available to the Servicer as the Master Servicer or the Securities Administrator may reasonably require so as to enable the Master Servicer to master service the Mortgage Loans and

144