**Hearing Date: June 26, 2013 at 10:00 a.m. (ET)**
**Objection Deadline: June 19, 2013 at 4:00 p.m. (ET)**

Frank Reed
817 Matlack Drive
Moorestown, NJ 08057
Telephone: (856) 956-6950
E-Mail: FrankReedVA@aol.com

*Creditor, Pro Se*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Case No. 12-12020 (MG) |
| RESIDENTIAL CAPITAL, LLC, et al., | Chapter 11 |
| Debtors. | Jointly Administered |

## CREDITOR PRO SE'S LIMITED OBJECTION TO DEBTORS' MOTION FOR AN ORDER UNDER BANKRUPTCY CODE SECTIONS 105(A) AND 363(B) AUTHORIZING THE DEBTORS TO ENTER INTO AND PERFORM UNDER A PLAN SUPPORT AGREEMENT WITH ALLY FINANCIAL INC., THE CREDITORS' COMMITTEE, AND CERTAIN CONSENTING CLAIMANTS

1. I, Frank Reed, creditor pro se, do hereby submit the following limited objection to DEBTORS' MOTION FOR AN ORDER UNDERBANKRUPTCY CODE SECTIONS 105(A) AND 363(B) AUTHORIZING THE DEBTORS TO ENTER INTO AND PERFORM UNDER A PLAN SUPPORT AGREEMENT WITH ALLY FINANCIAL INC., THE CREDITORS' COMMITTEE, AND CERTAIN CONSENTING CLAIMANTS.

### I. BACKGROUND

2. The Debtors' and various major creditors along with Ally bank have negotiated a Plan Support Agreement, (the "Agreement"), in what appears to be a good faith attempt by all of these parties to best resolve the majority of the pending conflicts in and amongst the parties of interest in this instant case before the Court.

3. Contained within the Agreement is a section relating to the Debtors' regulatory obligations, (the Obligations). This section is entitled Debtors' Regulatory Obligations and purports to detail the Obligations of the Debtor's.

4. It is a mere clause of one sentence within this section which is the subject of this instant limited objection.

## II. The OBLIGATIONS

5. Prior to the Debtors' filing of their petition, the Debtors' VOLUNTARILY committed themselves to a multi-lateral agreement with their primary regulator, the Federal Reserve Bank, (the FRB). This voluntary multi-lateral agreement is commonly referred to in this instant case as the Consent Order.

4. It is the many provisions contained within the Consent Order which spell out in detail the numerous prescribed OBLIGATIONS of the Debtors. Contained therein, are components of the Consent Order which call for specific performance of the Debtors. In particular it is the "foreclosure review obligations" which are a concern of this limited objection.

## III. IRREVOCABILITY OF BINDING OBLIGATIONS
   (THE MOMENT OF CREATION)

5. As stated above, the current Agreement before the Court contains a clause of a sentence which is in fact Void Ab Initio and should be struck from the Agreement. The offending clause in particular is: "unless the foreclosure review obligations are otherwise settled" (Agreement, Debtors' Regulatory Obligations, p.11).

6. In the United States any legally competent individual, corporation, partnership, etc. can be bound to a course of action, inaction, payment or other obligation via numerous legal and equitable contrivances which come in a wide variety of forms. The following is a partial list of these forms: contracts, quasi contracts, judicial decrees, regulatory actions, assumption, waiver, and a variety of estoppels. The methods and preconditions which wind up binding a party under these contrivances are as varied as the contrivances themselves. However, there is one thing that they all share in common – TIME. In every one of these contrivances which can bind a party, there is a specific, discrete, moment in time where all the requirements of the contrivance coalesce to a point of no return. It is at that exact

moment in time, that point of no return which is defined by one singular characteristic shared by all. The party bound can no longer act in a **unilateral manner** to alter its obligation(s) now so fixed as required.

7. Central to this position is that the **debtor became subsequently re-bound** to the Consent Order obligations by its acts **post petition**. This Court must take note, and should not deny, the significant fact that the very first day these cases were filed, ResCap CEO James Whitlinger unequivocally acknowledged that the Consent Order had imposed a myriad of ongoing obligations on the Debtors and significantly, the **Debtor's DID NOT reject those obligations.** In fact, Debtor's did the exact opposite. At that moment in time, **CEO James Whitlinger EXPRESSLY and *WITHOUT ANY RESERVATION OF RIGHTS*, ASSUMED THE OBLIGATIONS MANDATED BY THE CONSENT ORDER IN THEIR ENTIRETY.** CEO James Whitlinger did this by stating to the Court and all parties in interest, UNDER THE PENALTY of PURGERY that "[t]he Debtors intend to comply with and adhere to the terms of the Consent Order to the best of their abilities."[1] The operational import of this fact is that from *that* moment forward, debtors have lost their ability to modify their obligations under the Consent Order. **Debtors' did not reserve their rights to alter or "otherwise settle" their obligations.** Debtors' attempt a reservations came in subsequent points in time and all parties in interest did not grant their respective approvals to debtor to modify its obligations. This singular occurrence alone is sufficient invoke and enforce the very binding legal contrivances known as Judicial Estoppel, Equitable Estoppel, Waiver and Assumption, and this creditor pro se does hereby assert them.

## IV. JUDICIAL ESTOPPEL – THE DOCTRINE

8. Immediately below, is the Second Circuit Court of Appeals most recent articulation of the doctrine of Judicial Estoppel:

The Supreme Court has described the doctrine of judicial estoppel in the following terms:

> *Where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him. This rule, known as judicial estoppel, generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase.*

New Hampshire v. Maine, 532 U.S. 742, 749 (2001) (internal quotation marks, brackets, and citation omitted). "[C]ourts have uniformly recognized" that the purpose of the doctrine "is to protect the integrity of the judicial process by prohibiting parties from deliberately changing

positions according to the exigencies of the moment," and because judicial estoppel is designed "to prevent improper use of judicial machinery," it is "an equitable doctrine invoked by a court at its discretion." Id. at 749-50 (internal quotation marks omitted). Courts have also recognized "that the circumstances under which judicial estoppel may appropriately be invoked are probably not reducible to any general formulation of principle." Id. at 750 (internal quotation marks and brackets omitted); see also Young v. U.S. Dep't of Justice, 882 F.2d 633, 639 (2d Cir. 1989) ("The circumstances under which the doctrine could be applied are far from clear.").

Nevertheless, in evaluating whether to apply the doctrine of judicial estoppel, courts generally look for the existence of three factors: (1) that a party's new position is "clearly inconsistent" with its earlier position, (2) that the party seeking to assert this new position previously persuaded a court to accept its earlier position, and (3) that the party "would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." See New Hampshire, 532 U.S. at 750-51. But the Supreme Court has made clear that these factors do not constitute "inflexible prerequisites or an exhaustive formula for determining the applicability of judicial estoppel," and that "[a]dditional considerations may inform the doctrine's application in specific factual contexts." Id. at 751; see also DeRosa v. Nat'l Envelope Corp., 595 F.3d 99, 103 (2d Cir. 2010) (noting that "[t]ypically, judicial estoppel will apply if" these factors are present). Our Court has "further limit[ed] judicial estoppel to situations where the risk of inconsistent results with its impact on judicial integrity is certain." Id. (internal quotation marks omitted); see also Republic of Ecuador v. Chevron Corp., 638 F.3d 384, 397 (2d Cir. 2011).

(INTELLIVISION v. MICROSOFT CORPORATION No. 11-1657-cv. United States Court of Appeals, Second Circuit. June 11, 2012.)


### V. JUDICIAL ESTOPPEL – PRESENT APPLICATION

9. As articulated by the Second Circuit Court of Appeals, and presented herein above, the doctrine of judicial estoppel may be invoked if there exists facts which satisfy the three basic prongs of the doctrine. In the case at hand it is clear that all three prongs are satisfied.

### PRONG 1 – Debtor's Contradictory Positions

10. As stated above, since the commencement of these cases, the Debtors have repeatedly represented both to this Court and to all parties in interest through their court filings and public statements that they would continue to comply with their obligations under the Consent Order. The very first day these cases were filed, ResCap CEO James Whitlinger unequivocally acknowledged that the Consent Order had imposed a myriad of ongoing obligations on the Debtors and significantly, the **Debtor's DID NOT reject those obligations.** In fact, Debtor's did the exact opposite. **CEO James Whitlinger EXPRESSLY and *WITHOUT ANY RESERVATION OF RIGHTS*, ASSUMED THE OBLIGATIONS MANDATED BY THE CONSENT ORDER.** CEO James Whitlinger did this by stating to the Court and all parties in interest, UNDER THE PENALTY of PURGERY that "[t]he Debtors intend to comply with and adhere to the terms of the Consent Order to the best of their abilities."[1] Debtor's instant motion is in direct contradiction to its previous assertions. Debtor's implication that they could now do anything but complete their obligations would be and abrogation of very obligations under the Consent Order which it agreed to complete.

### PRONG 2 – This Court's Acceptance of Debtor's First Position

11. The Debtors affirmed the debtor's express intent, clearly and indisputably asking this Court for authorization to continue to comply with the Consent Order, proclaiming that they "are fully committed to complying with and adhering to the terms of the Consent Order ... to the best of their abilities."[2] And the Court granted the Debtors' request.[3]

### PRONG 3 – Unfair Advantage and Unfair Detriment

12. Currently, over 27,000 borrowers have filed for and are awaiting results of the Independent Foreclosure Review (IFR) being conducted by the debtor that is mandated by the Consent Order. That number, 27,000, is strikingly different from another number, the number of borrowers who filed proofs of claim in debtors' bankruptcy cases; that number is approximately 2,800. There is a clear and logical inference that can be drawn from those drastically different numbers: tens of thousands of borrowers may very well have specifically relied on the explicit position that debtors' took on day one of this bankruptcy that they would complete their obligations under the Consent Order, which includes the IFR.

13. Now, since the time for filing proofs of claim in this case has long passed, it would clearly be of a colossal unfair detriment to the THOUSANDS of borrowers who would have NO OTHER remedy available to them to seek the justice so promised. Conversely, debtors would be granted a massive unfair advantage by purging themselves of tens of thousands of potential claimants. Claimants, one must add, that undoubtedly would have cost the debtors estate money to process if they all filed individual proofs of claim. So, if debtors prevail in their instant motion, they stand to reap a double unjust windfall, 1) the elimination of the administrative expense of processing tens of thousands of claims (prevailing or non-prevailing), and 2) the elimination of the burden of the remediation of those prevailing claims themselves.

## VI. EQUITABLE ESTOPPEL – THE DOCTRINE

14. As the Second Circuit has explained, a "bankruptcy court is essentially a court of equity." In re Ionosphere Clubs, Inc., 85 F.3d 992, 999 (2d Cir. 1996). As such, "[i]ts proceedings are inherently proceedings in equity, and it applies the principles and rules of equity jurisprudence, including principles of estoppel." Id. (quotation marks, alterations, and citations omitted). "The doctrine of equitable estoppel is properly invoked where the enforcement of the rights of one party would work an injustice upon the other party due to the latter's justifiable reliance upon the former's words or conduct." Kosakow v. New Rochelle Radiology Assocs., P.C., 274 F.3d 706, 725 (2d Cir. 2001). Courts—including in the bankruptcy context—have not hesitated to invoke the doctrine to prevent a party that has made a representation and induced another party to rely on that representation to its detriment, from acting contrary to its prior representation. See, e.g., Ionosphere Clubs, 85 F.3d at 1001-02 (holding that debtor who promised to perform obligations under a contract with a modification in order to induce creditor

---

[1] Whitlinger First Day Affidavit, ¶ 87.
[2] GA Servicing Motion, ¶ 42.
[3] See Final Order (I) Authorizing the Debtors to Continue in the Ordinary Course of Bus. (A) Servicing Governmental Ass'n Loans & (B) Foreclosure Activities Related to Certain Real Estate Owned by Fannie Mae, Freddie Mac, & Ginnie Mae; (II) Authorizing the Debtors to Pay Certain Prepetition Amounts Due to Critical Servicing Vendors & Foreclosure Prof'ls; (III) Granting Limited Stay Relief to Enable Borrowers to Assert Direct Claims & Related Counter-Claims in Foreclosure & Eviction Proceedings; (IV) Authorizing the Debtors to Use Cash Collateral Under the Fannie Mae EAF Facility; & (V) Granting Related Relief (June 15, 2012) [ECF No. 401].

to accept that contractual modification was estopped from subsequently opposing enforcement of its obligations under that contract); In re Momentum Mfg. Corp., 25 F.3d 1132, 1136-37 (2d Cir. 1994) (holding that debtor who represented that employees would receive severance payments under reorganization plan and thereby obtained votes needed to confirm the plan was estopped from subsequently seeking to amend plan to eliminate severance payments).

## VII. EQUITABLES ESTOPPEL – PRESENT APPLICATION

15. Since the commencement of these bankruptcy cases, the Debtors have repeatedly represented to this Court and to all parties in interest that they would continue to comply with and complete their obligations under the Consent Order, including the Foreclosure Review.

16. There are over 270,000 borrowers covered by the Consent Order who could have potentially filed proofs of claim in this bankruptcy case preserving, and in pursuit of, their respective rights against debtors, (including their rights to object to the various sales of assets and motions presented in these proceedings). It is likely that they did not do so as they **specifically relied** on the open and notorious assertions that the foreclosure review would be completed. If the foreclosure review were to be settled instead of completed, it is clear by the public record, that any such settlement would be to the detriment of the those borrowers who relied on debtors assertions.

17. Congress, (both the the House and the Senate), in bipartisan actions, are in fact investigating the FRB in its role in the settling of the Foreclosure Review obligations of other Loan Servicers similarly situated to debtors. It is clear by both the written record and oral inquiry at Congressional hearings that settling the Foreclosure Review obligations is bad policy and harmful to borrowers, and this Court should not aid or abet any similar behavior by the debtors. The Court's proper application of the doctrine of Equitable Estoppel will prevent just such an occurrence.

## VIII. ASSUMPTION AND WAIVER – CONTROLLING LEGAL DOCTINES

18. The doctrines of assumption and waiver are legal doctrines as opposed to equitable and therefore they do not require a weighing by the Court of the prejudices to the various parties. They shall be invoked and applied if the facts support their application.

19. As stated above, since the commencement of these cases, the Debtors have repeatedly represented both to this Court and to all parties in interest through their court filings and public statements that they would continue to comply with their obligations under the Consent Order. The very first day these cases were filed, ResCap CEO James Whitlinger unequivocally acknowledged that the Consent Order had imposed a myriad of ongoing obligations on the Debtors and significantly, the Debtor's DID NOT reject those obligations. In fact, Debtor's did the exact opposite. CEO James Whitlinger EXPRESSLY and WITHOUT ANY RESERVATION OF RIGHTS, ASSUMED THE OBLIGATIONS MANDATED BY THE CONSENT ORDER. CEO James Whitlinger did this by stating to the Court and all parties in interest, UNDER THE PENALTY of PURGERY that "[t]he Debtors intend to comply with and adhere to the terms of the Consent Order to the best of their abilities."[1]

20. CEO Whitlinger is clearly an officer of the debtor and as such he has either actual or apparent authority to bind the debtors by his actions and statements. CEO Whitlinger's statements in writing to this Court are a clear and shining textbook example of assumption post petition and waiver.

21. Therefore this Court has no alternative but to enforce the legal doctrines of assumption and waiver upon debtors.

## IX. PROMOTING EQUITABLE RESOLUTION

22. The Bankruptcy Court's role in bankruptcy proceedings is to assure and promote the equitable resolution to debtors obligations and the various disputes over those obligations. Debtors are aware of this fact and imply it in their motion in support of the plan agreement by stating the following:

*The Agreement, which was facilitated in large part by the efforts of the Plan Mediator, Mr. Kruger, and counsel for the Creditors' Committee, represents a remarkable achievement given the complexity of the Debtors' capital structure, and the complexity and breadth of the disputed issues posed in these cases, and signals an end to the litigation, infighting, and potential "nuclear war" in these cases.*

(DEBTORS' MOTION FOR AN ORDER UNDER BANKRUPTCY CODE SECTIONS 105(A) AND 363(B) AUTHORIZING THE DEBTORS TO ENTER INTO AND PERFORM UNDER A PLAN SUPPORT AGREEMENT WITH ALLY FINANCIAL INC., THE CREDITORS' COMMITTEE, AND CERTAIN CONSENTING CLAIMANTS, para 3. P. 3)

23. However, this statement could be premature. This creditor pro se has been in discussion with class action counsel regarding the filing of a class action against debtors if the Foreclosure Review is settled.

24. The class action would be based on the post petition actions of the debtors, which would make the ultimate award of the class action an administrative priority expense of the debtors. This possible outcome would therefore both delay the adoption of a plan and most likely greatly affect the current plan being assembled, if it survives at all.

25. In the interest of all parties involved, the Court's order to strike the offending clause contained in the Agreement could easily avoid the specter of such an explosive event at the 11th hour of these proceedings.

## X. CONCLUSION

26. Now, whereas there have been presented herein numerous legal and equitable controlling doctrines proving the clause: "unless the foreclosure review obligations are otherwise settled" (Agreement, Debtors' Regulatory Obligations, p.11), is Void Ab Initio, and could otherwise bring great harm to the parties in interest if it were to be allowed to remain and possibly be acted upon, the Court should order that it be stricken from the Agreement.

**Respectfully submitted, this 19th day of June, 2013.**

*[signature]*

**Frank Reed**
**Creditor, Pro Se**