**Hearing Date: July 24, 2013 at 10:00 a.m. (ET)**
**Response Deadline: July 12, 2013 at 4:00 p.m. (ET)**

MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone:    (212) 468-8000
Facsimile:    (212) 468-7900
Gary S. Lee
Joel C. Haims
James J. Beha II

*Counsel for the Debtors and*
*Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------------------------- )
                                                                )
In re:                                                          )    Case No. 12-12020 (MG)
                                                                )
RESIDENTIAL CAPITAL, LLC, et al.,                               )    Chapter 11
                                                                )
                                        Debtors.                )    Jointly Administered
                                                                )
--------------------------------------------------------------- )

**DEBTORS' OBJECTION TO PROOFS OF CLAIM FILED**
**BY THE NATIONAL CREDIT UNION ADMINISTRATION BOARD AS**
**LIQUIDATING AGENT FOR WESTERN CORPORATE FEDERAL CREDIT UNION**
**AND U.S. CENTRAL FEDERAL CREDIT UNION**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........................................................................................ 1

JURISDICTION, VENUE AND STATUTORY PREDICATE ...................................... 4

BACKGROUND ............................................................................................................ 4

    A.   The Credit Unions' Aggressive RMBS Investment Strategies ................................... 4

    B.   The Debtors Issued RMBS With Extensive Disclosures ........................................... 6

    C.   These Chapter 11 Cases ........................................................................................... 8

RELIEF REQUESTED.................................................................................................... 9

OBJECTION .................................................................................................................. 9

I.     THE LEGAL STANDARD GOVERNING THIS OBJECTION ...................................... 9

II.    THE NCUA CLAIMS ARE UNTIMELY ...................................................................... 10

III.   THE NCUA CANNOT PROVE ANY MATERIAL MISSTATEMENT ....................... 14

    A.   The NCUA Cannot Prove Any Misstatement of Fact .............................................. 14

    B.   Given the Extensive Information Available in the Market About Loan Underwriting Standards, Any Purported Misstatement Was Immaterial ........................................ 15

IV.   THE CREDIT UNIONS' RMBS LOSSES WERE NOT CAUSED BY ANY ALLEGED MISSTATEMENT............................................................................................................ 16

NOTICE.......................................................................................................................... 18

CONCLUSION................................................................................................................ 18

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Allstate v. Countrywide,*
  824 F. Supp. 2d 1164 (C.D. Cal. 2011) ........................................................ 11-12

*Am. Pipe & Construction Co. v. Utah,*
  414 U.S. 538 (1974)....................................................................... 12 & n.3

*Castellano v. Young & Rubicam, Inc.,*
  257 F.3d 171 (2d Cir. 2001)..................................................................15

*Cullen v. Margiotta,*
  811 F.2d 698 (2d Cir. 1987)..................................................................13

*Down v. McNeil,*
  520 F.3d 1311 (11th Cir. 2008) ..............................................................13

*Dura Pharm., Inc. v. Broudo,*
  544 U.S. 336 (2005)........................................................................17

*FHFA v. UBS Ams., Inc.,*
  858 F. Supp. 2d 306 (S.D.N.Y.2012)......................................................12 n.5

*Ganino v. Citizen Utils. Co.,*
  228 F.3d 154 (2d Cir. 2000)..................................................................15

*Healthcare Fin. Group v. Bank Leumi USA,*
  669 F. Supp. 2d 344 (S.D.N.Y. 2009)........................................................16

*In re Alstom SA Sec. Litig.,*
  406 F. Supp. 2d 402 (S.D.N.Y. 2005)........................................................10

*In re Arcade Pub.,*
  455 B.R. 373 (Bankr. S.D.N.Y. 2011)........................................................9

*In re Bear Stearns Mortg. Pass-Through Certificates Litig.,*
  851 F. Supp. 2d 746 (S.D.N.Y. 2012).......................................................12

*In re Openwave Sys. Sec. Litig.,*
  528 F. Supp. 2d 236 (S.D.N.Y. 2007).......................................................11

*Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co.,*
  32 F.3d 697 (2d Cir. 1994)..................................................................10

*Lentell v. Merrill Lynch & Co.*,
   396 F. 3d 161 (2d Cir. 2005)..................................................................16

*N.J. Carpenters Health Fund v. Novastar Mortg.*,
   No. 08-Civ-5310 (DAB), 2011 WL 1338195 (S.D.N.Y. Mar. 31, 2011)................................14

*Nat'l Credit Union Admin. Bd. v. Credit Suisse Sec. (USA) LLC*,
   No. 12 Civ. 2648 (JWL), 2013 WL 1411769 (D. Kan. Apr. 8, 2013)....................................11

*Nat'l Credit Union Admin. Bd. v. RBS Sec., Inc.*,
   900 F. Supp. 2d 1222 (D. Kan. 2012).......................................................... 12-13 n.5

*Schuler v. NIVS Intellimedia Tech. Grp., Inc.*,
   No. 11 Civ. 2484 (KMW), 2012 WL 944777 (S.D.N.Y. 2013) ............................................16

STATUTES, RULES, & REGULATIONS

11 U.S.C.
   § 327(a) ...................................................................................................9
   § 502(b) ............................................................................................1, 4, 9
   § 502(b)(1) .............................................................................................9
   § 510......................................................................................................1 n.1
   § 558......................................................................................................9
   §§ 1107(a) and 1108 ................................................................................8

12 U.S.C.
   § 1787(b)(14)(A)....................................................................................12 n.5

15 U.S.C.
   § 77k(a) ..................................................................................................13-14
   § 77m ....................................................................................................9

28 U.S.C.
   § 157(b)..................................................................................................4
   § 1334....................................................................................................4
   §§ 1408 and 1409 ...................................................................................4

Fed. R. Bankr. P.
   1015(b)..................................................................................................8
   3007(a) ..................................................................................................1, 4

**TO THE HONORABLE MARTIN GLENN**
**UNITED STATES BANKRUPTCY JUDGE:**

Residential Capital, LLC and its affiliated debtors in the above-captioned chapter 11

cases (the "Chapter 11 Cases"), as debtors and debtors-in-possession (collectively, the

"Debtors"), hereby file this objection (the "Objection"), seeking to disallow and expunge the

claims filed by the National Credit Union Administration Board (the "NCUA"), as liquidating

agent for the Western Corporate Federal Credit Union ("WesCorp") and U.S. Central Federal

Credit Union ("U.S. Central" and, together with WesCorp, the "Credit Unions"), listed on

Schedule A to the Proposed Order (collectively, the "NCUA Claims"), pursuant to section

502(b) of title 11 of the United States Code (the "Bankruptcy Code") and Rule 3007(a) of the

Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") on the ground that the

NCUA's claims are not enforceable against the Debtors because they are untimely and without

merit.[1]   The Debtors seek entry of an order, substantially in the form attached hereto as Exhibit 1

(the "Proposed Order"), disallowing and expunging the NCUA Claims.   In support of the

Objection, the Debtors submit the Declaration of James J. Beha II (the "Beha Decl."), and

respectfully represent as follows:

## PRELIMINARY STATEMENT

1.    In a strategy that the NCUA itself called "excessive" and "unreasonable,"

the Credit Unions purchased $30 billion of RMBS securities in the years leading up to the

collapse of the housing market.   According to the NCUA, these "aggressive" investments—

representing approximately 70% of WesCorp's investment portfolio and over 90% of U.S.

---

[1] The Debtors reserve all their rights to object on any other basis to the NCUA Claims.  Without limitation, the
Debtors expressly reserve their rights with respect to their Motion for Summary Judgment seeking a declaration that
NCUA's claims are subordinated under Section 510 of the Bankruptcy Code filed in the adversary proceeding
captioned *Residential Capital LLC v. Allstate*, No. 13-ap-01262-MG (Bankr. S.D.N.Y.).  That motion is fully
briefed and the Court is holding it in abeyance.

Central's—were "essentially bets" on the direction of the U.S. residential real estate market.  Of course, those bets did not pay off.  Rather, like virtually every other major market participant, the Credit Unions suffered losses on their mortgage-backed securities when the housing market crashed.  But the Credit Unions failed to take any action against anyone to recoup these losses in the years before the NCUA placed them into conservatorship.  Apparently, they recognized that the offering materials explicitly warned of the possibility of losses, that their losses were caused by a market-wide phenomenon, and that the securities laws are not a "downside insurance policy."

2.      Nonetheless, years later, in late 2011, the NCUA, as liquidating agent for the Credit Unions, filed a spate of lawsuits against RMBS issuers and underwriters, including a case against debtor Residential Accredits Loans, Inc. ("RALI") in the Central District of California (the "California Action") and a case against debtor Residential Funding Mortgage Securities II, Inc. ("RFMSII")  in the District of Kansas  (the "Kansas Action") (together, the "NCUA Actions").[2]  Both NCUA Actions assert claims under Section 11 of the Securities Act. Essentially, the NCUA Actions theorize that because certain Debtor-issued RMBS securities suffered losses along with the rest of the market during a historic financial crisis, the originators of the underlying mortgages must have abandoned their underwriting standards and the Debtors failed to disclose this "fact."  The NCUA Claims seek to recover in these Chapter 11 Cases for the Section 11 claims NCUA asserted against the Debtors in the NCUA Actions.  But the NCUA is not entitled to any recovery because the underlying NCUA Actions are untimely and meritless.

3.      *First*, the NCUA Claims are barred by the Securities Act's one-year statute of limitation.  The Securities Act statute of limitation begins to run when the plaintiff

---

[2] Neither complaint names any non-Debtor affiliate or Ally entity.

receives inquiry notice of its claims.  In this case, the Credit Unions received inquiry notice of

their claims by June 2007 at the latest based on extensive contemporaneous news reports about

the underwriting deterioration alleged in their complaints and based on explicitly warnings about

such deterioration from the NCUA.  The statute of limitations, thus, extinguished the Credit

Unions' claims by June 2008.  And the NCUA did not bring suit until more than three years later

in August 2011.  *See infra* ¶¶ 25-32.

4.          *Second*, the RMBS offering materials did not contain any actionable

misstatement or omission about the underlying loan originators' underwriting practices.  Rather,

those materials contained extensive risk disclosures explicitly warning of the very risks that

NCUA now claims were concealed.  Specifically, the materials disclosed the factors that the

underwriting guidelines considered, but made clear that the originators retained discretion to

make exceptions to those guidelines, and that, as a result, the underlying mortgage pools might

contain non-confirming loans.  In addition, the offering materials disclosed the material

characteristics of the underlying loan pools.  And the NCUAB does not allege that those

disclosures were inaccurate.  *See infra* ¶¶ 33-35.

5.          *Third*, given those extensive risk disclosures, the NCUA's own repeated

warnings to the Credit Unions about the riskiness of RMBS investments and deteriorating

mortgage underwriting standards, widespread contemporaneous media reports about

deteriorating mortgage underwriting standards, and the Credit Unions' own awareness of the

risks as highly sophisticated RMBS investors, the NCUA cannot prove that any purported

misstatement was material—*i.e.* that it "significantly altered the total mix of information"—at

the time the Credit Unions made their investments.  *See infra* ¶ 36.

3

6.      *Fourth*, the Credit Unions' losses were not caused by any purported

misstatement.  Rather, as the NCUA itself concluded that "losses associated with the private

label mortgage-backed securities that were held by corporate credit unions" were "cause[d]" by

"the overall global economic crisis that emerged in 2007." NCUA Presentation, *Corporate*

*Credit Unions: How Did We Get Here* (Apr. 12, 2011) (*available at*

http://www.youtube.com/watch?v=IjvUngJzQYI); *See also* Beha Decl. Ex. 4 at 1-2 ("U.S.

Central's management and Board failed to identify and manage this risk exposure prior to the

mortgage-backed securities market dislocation that occurred in mid-2007"); Beha Decl. Ex. 5 at

16 ("since the mortgage market disturbance and credit crisis (credit market dislocation) began in

mid 2007, WesCorp has been unable to divest of its substantial RMBS holdings without

incurring significant losses."). The NCUA may not transform a private securities action into a

downside insurance policy against the Credit Unions' market losses on their "clearly

unreasonable" investments.  *See infra* ¶¶ 37-38.

## JURISDICTION, VENUE AND STATUTORY PREDICATE

7.      This Court has jurisdiction over this Objection under 28 U.S.C. § 1334.

This matter is a core proceeding under 28 U.S.C. § 157(b).  Venue is proper before this Court

under 28 U.S.C. §§ 1408 and 1409.

8.      The statutory predicate for the relief requested herein is section 502(b) of

the Bankruptcy Code and Bankruptcy Rule 3007(a).

## BACKGROUND

### A.    The Credit Unions' Aggressive RMBS Investment Strategies

9.      Before their collapse, U.S. Central and WesCorp were the two largest

corporate credit unions in the United States and invested tens of billions of dollars in RMBS

securities.  As early as 2005, the NCUA warned them about deteriorating residential mortgage

4

markets and underwriting standards, including warning of "risks factors" including "[l]imited or

no documentation of a borrower's assets, employment and income" and "eased underwriting

standards" (Beha Decl. Ex. 2 at 1) and that "many lenders appear[ed] to be loosening their credit

standards" which "increase[d] credit risk" and "default rates" on mortgages (Beha Decl. Ex. 3 at

1). *See also* Beha Decl. Ex 1 (providing similar warnings for home equity lending). The NCUA

also warned that these trends exposed "financial institutions to increased risk" of losses. (*Id.*)

10.    In the face of these express warnings from their primary regulator, the

Credit Unions aggressively ramped up their RMBS purchases in 2006 and early 2007. Indeed,

by the height of the housing bubble, U.S. Central was committing over 90% and WesCorp nearly

70% of their respective investment portfolios to asset-backed securities securities. (Beha Decl.

Ex. 4 at 8; Ex. 5 at 16.) And, predictably, when the housing bubble burst, the Credit Unions

failed. As a result, the NCUA placed the Credit Unions under conservatorship on March 20,

2009 and placed them into liquidation and appointed itself liquidating agent on October 1, 2010.

11.    After the Credit Unions failed, the NCUA's Inspector General conducted

post mortems—"Material Loss Reviews"—to determine the cause of death. The Inspector

General determined that WesCorp's "aggressive" RMBS investment strategy had left it

"vulnerable to significant credit risk, market risk, and liquidity risk through the portfolio's

exposure to economic conditions in the residential real estate sector." (Beha Decl. Ex. 5 at 1.)

And the NCUA determined that "[t]he failure of [WesCorp] to consider the risks posed by its

increasing concentration of Option ARM MBS in light of what [it] knew about the deterioration

of the housing market was clearly unreasonable." (Beha Decl. Ex. 6 at ¶ 146.) Likewise, the

Inspector General determined that "U.S. Central's significant concentration of mortgage-backed

securities left the credit union vulnerable to downturns in national and local economic conditions

and the decline in the residential real estate market." (Beha Decl. Ex. 4 at 2.)

12.     The NCUA filed the California Action on August 9, 2011.  RALI and

other defendants moved to dismiss the complaint and the court granted in part and denied in part

the motion.  Notably, however, the automatic stay prevented the court from ruling on RALI's

motion.  In its ruling on the motion to dismiss, the court determined that the issue of when the

Credit Unions were on notice of their claims was a question of fact to be determined by the fact

finder.  On October 29, 2012, the NCUA filed an amended complaint, again naming RALI as a

defendant notwithstanding the automatic stay.  The defendants other than RALI filed a motion to

dismiss on December 13, 2012, and the court recently denied that motion.  There has been no

discovery in the case thus far.

13.     The NCUA filed the Kansas Action on June 20, 2011.  RFMSII and other

defendants moved to dismiss.  On July 25, 2012, the court granted in part and denied in part the

motions, but did not rule on RFMSII's motion because of the automatic stay.  The remaining

defendants appealed certain issues in the court's order on the motion to dismiss and the Kansas

Action is partially stayed pending the interlocutory appeal.  On August 24, 2012, the NCUA filed

an amended complaint in the Kansas Action, again naming RFMSII as a defendant

notwithstanding the automatic stay.   The remaining defendants moved to dismiss the amended

complaint, and those motions are now fully briefed.  There has been no discovery in the case

thus far.

**B.     The Debtors Issued RMBS With Extensive Disclosures**

14.     From 2001 to 2007, the Debtors issued RMBS certificates with an

aggregate original principal balance of more approximately $330 billion.  (Local Rule 7056-1

Statement of Stipulated Undisputed Facts and Agreed-To Exhibits ¶ 1, *Residential Capital, LLC*

6

*v. Allstate Ins. Co.,* No. 13-ap-01262-mg, ECF No. 23.)  In these securitizations, the Debtors

pooled together mortgage loans and conveyed them to trusts in exchange for certificates that

were sold to sophisticated investors, like the claimants here.  (*Id.* ¶ 2.)  The RMBS certificates

entitle their holders to receive principle and interest collected on the issuing trusts' mortgage

loans.  (*Id.* ¶ 3.)

15.     The offering documents for the Debtors' RMBS certificates included

extensive meaningful disclosures about their risks, including explicit disclosures about the risks

that the NCUA now claims were concealed.  For example, the Debtors warned investors that "the

mortgage loans have been originated using underwriting standards that are less stringent than the

underwriting standards applied by certain other first lien mortgage purchase programs" and that

"[a]pplying less stringent underwriting standards creates additional risks that losses on the

mortgages will be allocated to certificateholders."  (Beha Decl. Exs. 7-12 at S-9, S-17.)  The

offering documents also included the aggregate characteristics of the underlying mortgage loans,

including the percentage secured by second mortgages, the percentage originated under "reduced

documentation" programs in which borrowers were not required to document their income, and

the average loan-to-value ratio.  (*Id.*)  The NCUA has not alleged that any of those characteristics

were misstated.

16.     The offering documents also explained the general factors typically

considered in the loan underwriting process, including consideration of the borrowers' credit

scores where available, the loan-to-value ratio, the borrowers' debt-to-income ratio, and

verification or evaluation of income, except with respect to loans originated under reduced or no

documentation programs.  (Beha Decl. Ex. 13 at S-16, S-37-39.)  The Offering Documents also

explained that exceptions to these guidelines were made and that the mortgage pool could

contain mortgages that did not comply with the guidelines.  (*Id.*)

17.    In addition, the offering documents informed investors that RMBS were

highly sensitive to any economic downturn.  In particular, after February 2007, as the real estate

markets began to decline, the offering documents warned that:

> Recently, the residential mortgage market in the United States has experienced a
> variety of difficulties and changed economic conditions that may adversely affect
> the yield on your certificates.  Delinquencies and losses with respect to residential
> mortgage loans generally have increased in recent months and may continue to do
> so.  In addition, in recent months housing prices in many states have declines or
> stopped appreciating, after extended periods of significant appreciation.  A
> continued decline or an extended flattening of those values may result in
> additional increases in delinquencies and loss on residential mortgage loans
> generally, particularly with respect to second homes and . . . and any mortgage
> loans whose aggregate loan amounts (including any subordinate liens) are close to
> or greater than the related property values.

(*See, e.g., id.* at S-19.)

18.    In 2007, U.S. home prices began to drop, mortgage defaults spiked, and

RMBS and other credit markets began to freeze up.  By the fall of 2008, several major financial

institutions—including Lehman Brothers, Bear Stearns, and Wachovia—failed and the country

entered its greatest financial crisis since the Great Depression.  Along with virtually every other

market participant, when the housing market collapsed, WesCorp and U.S. Central suffered

significant losses on their entire "unreasonably" massive RMBS portfolios.

### C.    These Chapter 11 Cases

19.    On May 14, 2012 (the "Petition Date"), the Debtors filed voluntary

chapter 11 petitions in this Court.  The Debtors are managing and operating their businesses as

debtors-in-possession under Bankruptcy Code sections 1107(a) and 1108.  These Chapter 11

Cases are being jointly administered under Bankruptcy Rule 1015(b).

20.    The Court appointed Kurtzman Carson Consultants LLC ("KCC") as notice and claims agent, authorizing it to (a) receive, maintain, record, and otherwise administer the proofs of claim filed in these Chapter 11 Cases; and (b) maintain each Debtor's official claims register.  (Order Pursuant to 11 U.S.C. § 327(a) and Fed. R. Bankr. P. 2014 Authorizing the Employment and Retention of Kurtzman Carson Consultants LLC as Administrative Agent, *Nunc Pro Tunc* to the Petition Date, ECF No. 798.)

21.    Approximately 6,839 proofs of claim have been filed in these Chapter 11 Cases as reflected on the Debtors' claims registers.  NCUA filed 11 proofs of claim asserting claims for approximately $200 million based on the Section 11 claims asserted in its complaints.

### RELIEF REQUESTED

22.    The Debtors file this Objection under section 502(b) of the Bankruptcy Code, seeking to disallow and expunge the NCUA Claims in their entirety.

### OBJECTION

## I.    THE LEGAL STANDARD GOVERNING THIS OBJECTION

23.    As the Supreme Court has recognized, "[c]reditors' entitlements in bankruptcy arise in the first instance from the underlying substantive law creating the debtor's obligation."  *In re Arcade Pub.*, 455 B.R. 373, 378 (Bankr. S.D.N.Y. 2011) (Glenn, J.) (alteration in original and internal quotation marks omitted) (quoting *Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co.*, 549 U.S. 443, 444 (2007)).  And a debtor's estate has "the benefit of any defense available to the debtor as against any entity other than the estate."  11 U.S.C. § 558.  Accordingly, a claim will be disallowed if it is "unenforceable against the debtor and property of the debtor, under any agreement or applicable law."  11 U.S.C. § 502(b)(1).

24.     For the reasons set forth below, the NCUA Claims are not enforceable

against any of the Debtors under applicable law and should be disallowed and expunged in their

entirety.

## II.     THE NCUA CLAIMS ARE UNTIMELY

25.     Section 13 of the Securities Act requires a plaintiff to bring a Section 11

claim within one year from when the plaintiff discovered (or reasonably could have discovered)

the alleged misstatement.  15 U.S.C. § 77m.  The NCUA Claims should be disallowed and

expunged because the NCUA failed to bring its Section 11 claims within one year after the

Credit Unions could have reasonably discovered those claims.

26.     Inquiry notice—when "the circumstances are such as to suggest to a

person of ordinary intelligence the probability" of an alleged violation—triggers the running of

the limitations period.  *Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co.,* 32 F.3d 697, 701 (2d

Cir. 1994) (internal quotation marks and citation omitted).  "[A]ny financial, legal, or other data,

such as public disclosures in the media . . . that provide the plaintiff with sufficient storm

warnings to alert a reasonable person to the probability that there may have been either

misleading statements or material omission involved in the sale of the securities at issue" may be

sufficient to place a plaintiff on inquiry notice.  *In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 402,

421 (S.D.N.Y. 2005).

27.     The gist of the NCUA Claims is that the Debtors failed to disclose that

underlying loan originators has abandoned their mortgage underwriting standards.  Notably,

however, the NCUA Actions do not allege any specific facts about the loans securitized in

Debtor-issued RMBS.  Instead, they rely on allegations about widespread industry practices.  But

these same practices were widely reported in the popular press by mid-2007, including on the

front pages of the New York Times and the Washington Post.  (*See* Beha Decl. Ex. 14 (Gretchen

10

Morgenson, *Crisis Looms in Mortgages*, N.Y. Times, Mar. 11, 2007, at A1 ("Mortgage securities

participants say increasingly lax lending standards in [subprime] loans became almost an

invitation to commit mortgage fraud"); Ex. 15 (*Subprime Lenders Made Record Exceptions,*

*Reuters: analysts*, Apr. 30, 2007) (noting prevalence of "exception" loans that did not comply

with underwriting standards); Ex. 16 (David Cho, *Pressure at Mortgage Firm Led To Mass*

*Approval of Bad Loans*, Wash. Post, May 7, 2007, at A01) ("basic quality controls were ignored

in the mortgage business, while the big Wall Street investment banks that backed [lenders]

looked the other way").  And government investigations into RMBS mortgage underwriting

began in June 2007, as well.  (*See* Beha Decl. Ex. 17 (Patrick Rucker, *Clayton Holdings*

*Subpoenaed in Subprime Probe*, Reuters, July 13, 2007); *In re Openwave Sys. Sec. Litig.*, 528 F.

Supp. 2d 236, 246 (S.D.N.Y. 2007) (government investigation into underlying issues triggers

inquiry notice).  Indeed, the NCUA Inspector General concluded that the Credit Unions "should

have recognized the risk exposure that [their] significant concentration in [RMBS] represented

*earlier than 2007*."  (*See* Beha Decl. Ex 4 at 4.)  Based on these facts, there can be no question

that the Credit Unions were on inquiry notice of their clams by June 2007, at the latest.  As a

result, the one-year limitations period expired on in June 2008—years before the NCUA filed its

complaints in August 2011.

28.    While some RMBS-investor plaintiffs, including the NCUA, have

survived motions to dismiss based on arguments that they had notice of their claims by the

summer of 2007, those decisions are of no moment here in this Court.  First, these decisions are

on motions to dismiss and stress that resolution of when a plaintiff discovered its claim may be

best left to summary judgment.  *See Nat'l Credit Union Admin. Bd. v. Credit Suisse Sec. (USA)*

*LLC*, No. 12 Civ. 2648 (JWL), 2013 WL 1411769, at *6 (D. Kan. Apr. 8, 2013) (determining

when "credit unions reasonably should have discovered [their claims] . . . better left for a

consideration of the evidence at the summary judgment stage or at trial").  This Objection,

however, is not directed at the NCUA's pleading—it is directed at the factual and legal merits of

the claims.  To prevail on its claims, the NCUA must do more than survive a motion to dismiss;

it must establish a factual record entitling it to relief.  And the factual record will show that the

NCUA Claims are untimely.  Second, many of those decisions stressed the lack evidence in the

record about notice connected to the specific securities in the case.  *See In re Bear Stearns*

*Mortg. Pass-Through Certificates Litig.*, 851 F. Supp. 2d 746, 764 (S.D.N.Y. 2012) ("even

though evidence of improprieties and irresponsible risk-taking in the MBS industry began to

emerge in early 2007, there is no indication that that the BSMF 2006-AR1 Certificate declined in

value.")  But the NCUA does not base its claims on allegations about the specific securities the

Credit Unions purchased.  It bases it claims on facts about market-wide trends that were well-

known by June 2007.  *See Allstate Ins. Co. v. Countrywide Fin. Corp*, 824 F. Supp. 2d 1164,

1180 (C.D. Cal. 2011) ("[the plaintiff] is faced here with a Hobson's choice.  If it is correct in its

big-picture argument that systemic abandonment is sufficient to state an RMBS §10(b) claim,

then it was on notice of its claim . . . if it is wrong, . . . then its claim is insufficient").

29.    The NCUA attempts in its complaint against RALI to invoke equitable

tolling under *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974) (*American Pipe*)[3]

based on the filing of a purported Section 11 class action complaint against the Debtors in *N.J.*

*Carpenters Health Fund v. Residential Accredit Loans, Inc.*, No. 08-602727 (Sup. Ct. N.Y.

---

[3] In *American Pipe*, the Supreme Court held that "the commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action."  414 U.S. at 554.

County Sept. 22, 2008) (the "*NJ Carpenters* Action").[4]  But *American Pipe* tolling cannot save the NCUA Claims.[5]

30.     First, because the Credit Unions were on inquiry notice of their claims by June 2007, at the latest, their Section 11 claims were already extinguished when the *NJ Carpenters* Action was filed more than a year later in September 2008.  No tolling theory can revive claims that have already expired.  *See Down v. McNeil*, 520 F.3d 1311, 1325 (11th Cir. 2008) ("tolling does not operate to revive an expired limitations period").

31.     Second, the September 2008 *NJ Carpenters Action* complaint asserted claims based on only three of the eleven RMBS issuances on which the NCUA Claims are based.  As a result, even if the NCUA's claims were timely in September 2008—and they were not—the claims based on eight of the eleven deals at issue would not be subject to *American Pipe* tolling based on the filing of the September 2008 *NJ Carpenters* Action complaint, in any event.  *See Cullen v. Margiotta*, 811 F.2d 698, 720 (2d Cir. 1987) (*American Pipe* tolling only applies "to claims of absent class members that involve the same evidence, memories, and witnesses as were involved in the initial putative class action.")  While the remaining securities were the subject of a subsequent *NJ Carpenters* Action complaint filed on May 18, 2009, there can be no serious

---

[4] The NCUA could not reasonably claim that *American Pipe* tolling applies to its claim against RFMSII, which was never named as a defendant in the *NJ Carpenters.*  Action.  Indeed, the NCUA fails to state any basis on which the claim against RFMSII was timely, under *American Pipe* or otherwise.

[5] The Federal Credit Union Act contains an "extender" provision extending any applicable statutes of limitation for three-years after the NCUA is appointed conservator or liquidating agent of a credit union, *see* 12 U.S.C. § 1787(b)(14)(A), but it does not help the NCUA in this case, either.  While the extender extends the limitation period for three years for claims that were live on the date of appointment, it does not revive claims that had already expired before the appointment.  Courts considering the FCU Act extender and identical language in other statutes have recognized that such extenders "do[ ] not revive [non-fraud] claims for which the statute of limitations had expired prior to the" appointment.  *FHFA v. UBS Americas, Inc.*, 858 F. Supp. 2d 306, 317-18 (S.D.N.Y.2012) (considering Housing and Economic Recovery Act extender with identical language); s*ee also Nat'l Credit Union Admin. Bd. v. RBS Sec., Inc.*, 900 F. Supp. 2d 1222, 1245 (D. Kan. 2012) (considering FCU Act extender).  And the Credit Unions' claims expired long before the NCUA was appointed conservator on March 20, 2009.

question that the Credit Unions had inquiry notice of their claims well before May 2008, a year

before that later complaint was filed.

32.     As a result, the Securities Act statute of limitations on the NCUA Claims

expired by June 2008—a year after the Credit Unions were on inquiry notice of the claims—and

all of the NCUA Claims should be disallowed and expunged as untimely.

## III.    THE NCUA CANNOT PROVE ANY MATERIAL MISSTATEMENT

33.     To prevail on their Section 11 claims, the NCUA must prove that the

RMBS offering materials contained a material misstatement or omission of a material fact.  15

U.S.C. §77k(a).  The NCUA Claims should be disallowed and expunged because the NCUA

cannot prove that the offering materials contained any material misstatement.

### A.    The NCUA Cannot Prove Any Misstatement of Fact

34.     The NCUA Action complaints contain no particularized factual allegations

linking the NCUA's generalized theory about abandonment of underwriting standards to the

specific RMBS securities the Credit Unions purchased.  To prevail on its claims, however, the

NCUA must prove that the originators of the specific pools in which they invested abandoned

their underwriting practices.  *See N.J. Carpenters Health Fund v. Novastar Mortg.*, No. 08-Civ-

5310 (DAB), 2011 WL 1338195, at *11 (S.D.N.Y. Mar. 31, 2011) (dismissing Section 11 claims

where plaintiff "fail[ed] to make allegations specific to the  . . . origination practices that relate to

the only offering that is relevant").  The NCUA's complaints are devoid of specific allegations

about the Debtors' RMBS and provide no basis to conclude that the NCUA will ultimately be

able to prove facts that it has failed even to allege: that the specific mortgage originators for the

RMBS certificates that the Credit Unions purchased "abandoned" their underwriting standards

and that the Debtors failed to disclose that fact.  In fact, just the opposite is true—the facts

14

demonstrate that the Debtors fully and accurately disclosed the material aspects of the loan underwriting process.

35.    Moreover, the offering documents here accurately disclosed the originators' underwriting guidelines, made clear that originators had discretion to deviate from those guidelines, and that some loans in the loan pools might not comply with the stated guidelines. And, irrespective of the underwriter standards used to evaluate the underlying loans, the offering documents accurately disclosed the material characteristics of the underlying loans, including the loan-to-value ratios and whether they were secured by owner-occupied homes. (*See, e.g.,* Beha Decl. Ex. 13 at S-16, S-37-39.) The NCUA does not allege that any of the affirmative statements that the Debtors made about loan underwriting standards or the characteristics of the underlying loans were false.

**B.**    **Given the Extensive Information Available in the Market About Loan Underwriting Standards, Any Purported Misstatement Was Immaterial**

36.    Nor can the NCUA prove that any purported misstatement in the RMBS offering materials would have been material to highly sophisticated RMBS investors like the Credit Unions. For a misstatement or omission to be material, there must be a "substantial likelihood" that the misstatement or omission "significantly altered the total mix of information" available to the investor. *Castellano v. Young & Rubicam, Inc.,* 257 F.3d 171, 180 (2d Cir. 2001) (internal quotation marks and citation omitted). In this case, given the extensive disclosures in the offering documents, contemporaneous national press coverage of deteriorating mortgages underwriting practices, the NCUA's own repeated warnings to the Credit Unions about the riskiness of their RMBS investing, and the Credit Unions' knowledge as sophisticated RMBS investors, the NCUA cannot prove that any alleged misstatement "significantly altered the total mix of information" available to the Credit Unions in making their investment

ny-1096183

decisions.  Indeed, the NCUA itself concluded that "by summer 2005," WesCorp was "aware

that . . . the credit quality of the Option ARM MBS loan pool was deteriorating [and] a drop in

housing demand could result in a decrease in real estate values and credit losses."  (Beha Dec.

Ex. 18 at 13.)  Because the Credit Unions knew the truth allegedly concealed from them, any

alleged misstatement was immaterial.  *See Ganino v. Citizen Utilities Co.*, 228 F.3d 154, 167 (2d

Cir. 2000) ("a misrepresentation is immaterial if the information is already known to the market

because the misrepresentation cannot then defraud the market").

## IV.    THE CREDIT UNIONS' RMBS LOSSES WERE NOT CAUSED BY ANY ALLEGED MISSTATEMENT

37.    Finally, the NCUA Claims should be disallowed and expunged because

the Credit Unions' losses were not caused by the revelation of any alleged misstatement.  While

a Section 11 plaintiff does not bear the burden of proving loss causation, he nonetheless may

recover only for losses caused by the revelation of the alleged misstatements.  *See Schuler v.

NIVS Intellimedia Tech. Grp., Inc.*, No. 11 Civ. 2484 (KMW), 2012 WL 944777, at *9 n.8

(S.D.N.Y. 2013) (recognizing negative loss causation as an affirmative defense to a Section 11

claim and noting that "[w]hen the purchaser subsequently resells . . . at a lower price, that lower

price may reflect, not the earlier misrepresentation, but changed economic circumstances,

changed investor expectations, new industry-specific or firm-specific facts, conditions, or other

events, which taken separately or together account for some or all of that lower price").

38.    "[W]hen the plaintiff's loss coincides with a marketwide phenomenon

causing comparable losses to other investors, the prospect that the plaintiff's loss was caused by

[an alleged misstatement] decreases" and the plaintiff may only recover if "its loss was caused

by the alleged misstatement as opposed to intervening events."  *Lentell v. Merrill Lynch & Co.*,

396 F. 3d 161, 174 (2d Cir. 2005) (internal quotation marks and citation omitted); *see also*

16

*Healthcare Fin. Group v. Bank Leumi USA*, 669 F. Supp. 2d 344, 349-50 (S.D.N.Y. 2009)

(dismissing claim for lack of loss causation when entire Auction Rate Securities market

collapsed).  The NCUA is not entitled to any recovery here because the Credit Unions losses

were caused entirely by the market-wide (indeed, world-wide) phenomenon of a global financial

crisis.

> 39.    Indeed, the NCUA itself concluded that "losses associated with the private
label mortgage-backed securities that were held by corporate credit unions" were "cause[d]" by
"the overall global economic crisis that emerged in 2007." NCUA Presentation, *Corporate
Credit Unions: How Did We Get Here* (Apr. 12, 2011) (*available at*
http://www.youtube.com/watch?v=IjvUngJzQYI); *See also* Beha Decl. Ex. 4 at 1-2 ("U.S.
Central's management and Board failed to identify and manage this risk exposure prior to the
mortgage-backed securities market dislocation that occurred in mid-2007"); Beha Decl. Ex. 5 at
16 ("since the mortgage market disturbance and credit crisis (credit market dislocation) began in
mid 2007, WesCorp has been unable to divest of its substantial RMBS holdings without
incurring significant losses.").  The NCUA may not recover from the Debtors for losses caused
by the Credit Unions' ill-timed bets on the housing market and the subsequent market collapse.
Allowing the NCUA to recover here would impermissibly "transform a private securities action
into a partial downside insurance policy."  *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 347-48
(2005).

> \*                       \*                       \*

> 40.    The NCUA Claims are untimely; the NCUA cannot allege—let alone
*prove*—any material misstatement in the offering materials; and the Credit Unions' losses were
caused by a market-wide collapse, not by any misstatement by the Debtors.  Accordingly, this

Court should reject the NCUA's belated attempt to recover from the Debtors (at the expense of the Debtors' other creditors) for losses that highly sophisticated RMBS investors suffered when their ill-timed and risky bets went wrong.

## NOTICE

41.    The Debtors have provided notice of this Objection in accordance with the Case Management Procedures Order, approved by this Court on May 23, 2012 [Docket No. 141].

## CONCLUSION

42.    WHEREFORE, the Debtors respectfully request entry of the Proposed Order disallowing and expunging the NCUA Claims.


Dated: June 20, 2013                              /s/ Gary S. Lee
                                                  Gary S. Lee
                                                  Joel C. Haims
                                                  James J. Beha II
                                                  MORRISON & FOERSTER LLP
                                                  1290 Avenue of the Americas
                                                  New York, New York 10104
                                                  Telephone:  (212) 468-8000
                                                  Facsimile:  (212) 468-7900

                                                  *Counsel for the Debtors and*
                                                  *Debtors in Possession*

ny-1096183