# Exhibit 1

Office of the Comptroller of the Currency
Board of Governors of the Federal Reserve System
Federal Deposit Insurance Corporation
Office of Thrift Supervision
National Credit Union Administration

**CREDIT RISK MANAGEMENT GUIDANCE FOR HOME EQUITY LENDING**

**Purpose**

In response to the exceptionally strong growth in home equity lending over the past few years, the Office of the Comptroller of the Currency, the Board of Governors of the Federal Reserve System, the Federal Deposit Insurance Corporation, the Office of Thrift Supervision and the National Credit Union Administration (collectively, the agencies) are issuing this guidance to promote sound risk management practices at financial institutions with home equity lending programs, including open-end home equity lines of credit (HELOCs) and closed-end home equity loans (HELs). The agencies have found that, in many cases, institutions' credit risk management practices for home equity lending have not kept pace with the product's rapid growth and easing of underwriting standards.

**Overview**

The rise in home values coupled with low interest rates and favorable tax treatment has made home equity loans and lines attractive to consumers. To date, delinquency and loss rates for home equity loans and lines have been low, due at least in part to the modest repayment requirements and relaxed structures that are characteristic of much of this lending. The risk factors listed below, combined with an inherent vulnerability to rising interest rates, suggest that financial institutions may not be fully recognizing the risk embedded in these portfolios. Specific product, risk management, and underwriting risk factors and trends that have attracted scrutiny are:

- Interest-only features that require no amortization of principal for a protracted period;
- Limited or no documentation of a borrower's assets, employment, and income (known as "low doc" or "no doc" lending);
- Higher loan-to-value (LTV) and debt-to-income (DTI) ratios;
- Lower credit risk scores for underwriting home equity loans;
- Greater use of automated valuation models (AVMs) and other collateral evaluation tools for the development of appraisals and evaluations; and
- An increase in the number of transactions generated through a loan broker or other third party.

Like most other lending, home equity lending can be conducted in a safe and sound manner if pursued with the appropriate risk management structure, including adequate allowances for loan and lease losses and appropriate capital levels. Sound practices call for fully articulated policies

1

5/16/2005

that address marketing, underwriting standards, collateral valuation management, individual account and portfolio management, and servicing.

Financial institutions should ensure that risk management practices keep pace with the growth and changing risk profile of home equity portfolios. Management should actively assess a portfolio's vulnerability to changes in consumers' ability to pay and the potential for declines in home values. Active portfolio management is especially important for financial institutions that project or have already experienced significant growth or concentrations, particularly in higher risk products such as high-LTV, "low doc" or "no doc," interest-only, or third-party generated loans. This guidance describes sound credit risk management systems for:

- Product Development and Marketing
- Origination and Underwriting
- Third-Party Originations
- Collateral Valuation Management
- Account Management
- Portfolio Management
- Operations, Servicing, and Collections
- Secondary Market Activities
- Portfolio Classifications, Allowance for Loan and Lease Losses (ALLL), and Capital

**CREDIT RISK MANAGEMENT SYSTEMS**

**Product Development and Marketing**

In the development of any new product offering, product change, or marketing initiative, management should have a review and approval process that is sufficiently broad to ensure compliance with the institution's internal policies and applicable laws and regulations [1] and to evaluate the credit, interest rate, operational, compliance, reputation, and legal risks. In particular, risk management personnel should be involved in product development, including an evaluation of the targeted population and the product(s) being offered. For example, material changes in the targeted market, origination source, or pricing could have significant impact on credit quality and should receive senior management approval.

When HELOCs or HELs are marketed or closed by a third party, financial institutions should have standards that provide assurance that the third party also complies with applicable laws and regulations, including those on marketing materials, loan documentation, and closing procedures. (For further details on agent relationships, refer to the "Third-Party Originations" Section.) Finally, management should have appropriate monitoring tools and management information systems (MIS) to measure the performance of various marketing initiatives, including offers to increase a line, extend the interest-only period, or adjust the interest rate or term.

---

[1] Applicable laws include Federal Trade Commission Act; Equal Credit Opportunity Act (ECOA); Truth in Lending Act (TILA), including the Home Ownership and Equity Protection Act (HOEPA); Fair Housing Act; Real Estate Settlement Procedures Act (RESPA); and the Home Mortgage Disclosure Act (HMDA), as well as applicable state consumer protection laws.

- 2 -

**Origination and Underwriting**

All relevant risk factors should be considered when establishing product offerings and underwriting guidelines. Generally, these factors should include a borrower's income and debt levels, credit score (if obtained), and credit history, as well as the loan size, collateral value (including valuation methodology), lien position, and property type and location.

Consistent with the agencies' regulations on real estate lending standards,[2] prudently underwritten home equity loans should include an evaluation of a borrower's capacity to adequately service the debt.[3] Given the home equity products' long-term nature and the large credit amount typically extended to a consumer, an evaluation of repayment capacity should consider a borrower's income and debt levels and not just a credit score.[4] Credit scores are based upon a borrower's historical financial performance. While past performance is a good indicator of future performance, a significant change in a borrower's income or debt levels can adversely alter the borrower's ability to pay. How much verification these underwriting factors require will depend upon the individual loan's credit risk.

HELOCs generally do not have interest rate caps that limit rate increases.[5] Rising interest rates could subject a borrower to significant payment increases, particularly in a low interest rate environment. Therefore, underwriting standards for interest-only and variable rate HELOCs should include an assessment of the borrower's ability to amortize the fully drawn line over the loan term and to absorb potential increases in interest rates.

**Third-Party Originations**

Financial institutions often use third parties, such as mortgage brokers or correspondents, to originate loans. When doing so, an institution should have strong control systems to ensure the quality of originations and compliance with all applicable laws and regulations, and to help prevent fraud.

*Brokers* are firms or individuals, acting on behalf of either the financial institution or the borrower, who match the borrower's needs with institutions' mortgage origination programs. Brokers take applications from consumers. Although they sometimes process the application and underwrite the loan to qualify the application for a particular lender, they generally do not

---

[2] In 1992, the agencies adopted uniform rules on real estate lending standards and issued the "Interagency Guidelines for Real Estate Lending Policies." See 12 CFR Part 34, Subpart D (OCC); 12 CFR Part 208.51 and Appendix C (FRB); 12 CFR Part 365 (FDIC) and 12 CFR 560.100-101 (OTS).

[3] The OCC also addressed national banks' need to assess a borrower's repayment capacity in 12 CFR 34.3(b). This safety and soundness-derived anti-predatory lending standard states that national banks should not make consumer real estate loans based predominantly on the bank's realization of the foreclosure or liquidation value of the borrower's collateral, without regard to the borrower's ability to repay the loan according to its terms. See also Regulation Z (Truth in Lending – 12 CFR 226.34(a)(4)).

[4] "Interagency Guidelines Establishing Standards for Safety and Soundness" also call for documenting source of repayment and assessing ability of the borrower to repay the debt in a timely manner. See 12 CFR 30, Appendix A, II.C.2 (OCC); 12 CFR 208, Appendix D-1 (FRB); 12 CFR Part 364, Appendix A (FDIC); and 12 CFR Part 570, Appendix A (OTS).

[5] While there may be periodic rate increases, the lender must state in the consumer credit contract the maximum interest rate that may be imposed during the term of the obligation. See 12 CFR 226.30(b).

use their own funds to close loans.  Whether brokers are allowed to process and perform any underwriting will depend on the relationship between the financial institution and the broker.  For control purposes, the financial institution should retain appropriate oversight of all critical loan-processing activities, such as verification of income and employment and independence in the appraisal and evaluation function.

*Correspondents* are financial companies that usually close and fund loans in their own name and subsequently sell them to a lender.  Financial institutions commonly obtain loans through correspondents and, in some cases, delegate the underwriting function to the correspondent.  In delegated underwriting relationships, a financial institution grants approval to a correspondent financial company to process, underwrite, and close loans according to the delegator's processing and underwriting requirements and is committed to purchase those loans.  The delegating financial institution should have systems and controls to provide assurance that the correspondent is appropriately managed, financially sound, and provides mortgages that meet the institution's prescribed underwriting guidelines and that comply with applicable consumer protection laws and regulations.  A quality control unit or function in the delegating financial institution should closely monitor the quality of loans that the correspondent underwrites.  Monitoring activities should include post-purchase underwriting reviews and ongoing portfolio performance management activities.

Both brokers and correspondents are compensated based upon mortgage origination volume and, accordingly, have an incentive to produce and close as many loans as possible.  Therefore, financial institutions should perform comprehensive due diligence on third-party originators prior to entering a relationship.  In addition, once a relationship is established, the institution should have adequate audit procedures and controls to verify that third parties are not being paid to generate incomplete or fraudulent mortgage applications or are not otherwise receiving referral or unearned income or fees contrary to RESPA prohibitions.[6]  Monitoring the quality of loans by origination source, and uncovering such problems as early payment defaults and incomplete packages, enables management to know if third-party originators are producing quality loans.  If ongoing credit or documentation problems are discovered, the institution should take appropriate action against the third party, which could include terminating its relationship with the third party.

**Collateral Valuation Management**

Competition, cost pressures, and advancements in technology have prompted financial institutions to streamline their appraisal and evaluation processes.  These changes, coupled with institutions underwriting to higher LTVs, have heightened the importance of strong collateral valuation management policies, procedures, and processes.

---

[6] In addition, a financial institution that purchases loans subject to TILA's rules for HELs with high rates or high closing costs (loans covered by HOEPA) can incur assignee liability unless the institution can reasonably show that it could not determine the transaction was a loan covered by HOEPA.  Also, the nature of its relationship with brokers and correspondents may have implications for liability under ECOA, and for reporting responsibilities under HMDA.

- 4 -

Financial institutions should have appropriate collateral valuation policies and procedures that ensure compliance with the agencies' appraisal regulations [7] and the "Interagency Appraisal and Evaluation Guidelines" (guidelines).[8] In addition, the institution should:

- Establish criteria for determining the appropriate valuation methodology for a particular transaction based on the risk in the transaction and loan portfolio.  For example, higher risk transactions or non-homogeneous property types should be supported by more thorough valuations.  The institution should also set criteria for determining the extent to which an inspection of the collateral is necessary.
- Ensure that an expected or estimated value of the property is not communicated to an appraiser or individual performing an evaluation.
- Implement policies and controls to preclude "value shopping."  Use of several valuation tools may return different values for the same property.  These differences can result in systematic overvaluation of properties if the valuation choice becomes driven by the highest property value.  If several different valuation tools or AVMs are used for the same property, the institution should adhere to a policy for selecting the most reliable method, rather than the highest value.
- Require sufficient documentation to support the collateral valuation in the appraisal/evaluation.

*AVMs* –When AVMs are used to support evaluations or appraisals, the financial institution should validate the models on a periodic basis to mitigate the potential valuation uncertainty in the model.  As part of the validation process, the institution should document the validation's analysis, assumptions, and conclusions.[9]  The validation process includes back-testing a representative sample of the valuations against market data on actual sales (where sufficient information is available).  The validation process should cover properties representative of the geographic area and property type for which the tool is used.

Many AVM vendors, when providing a value, will also provide a "confidence score" which usually relates to the accuracy of the value provided.  Confidence scores, however, come in many different formats and are calculated based on differing scoring systems.  Financial institutions that use AVMs should have an understanding of how the model works as well as what the confidence scores mean.  Institutions should also establish the confidence levels that are appropriate for the risk in a given transaction or group of transactions.

When tax assessment valuations are used as a basis for the collateral valuation, the financial institution should be able to demonstrate and document the correlation between the assessment value of the taxing authority and the property's market value as part of the validation process.

---

[7] 12 CFR 34, subpart C (OCC); 12 CFR 208 subpart E and 12 CFR 225 subpart G (FRB); 12 CFR 323 (FDIC); 12 CFR Part 564 (OTS); and 12 CFR 722 (NCUA).
[8] Comptroller's Handbook for *Commercial Real Estate and Construction Lending*; SR letter 94-55 (FRB); FDIC (Financial Institution Letter (FIL-74-94), dated November 11, 1994; Thrift Bulletin 55a (OTS); and LTCU 03-CU-17 (NCUA).
[9] National banks should refer to OCC Bulletin 2000-16, "Risk Modeling – Model Validation."

**Account Management**

Since HELOCs often have long-term, interest-only payment features, financial institutions should have risk management techniques that identify higher risk accounts and adverse changes in account risk profiles, thereby enabling management to implement timely preventive action (e.g., freezing or reducing lines).  Further, an institution should have risk management procedures to evaluate and approve additional credit on an existing line or extending the interest-only period.  Account management practices should be appropriate for the size of the portfolio and the risks associated with the types of home equity lending.

Effective account management practices for large portfolios or portfolios with high-risk characteristics include:

- Periodically refreshing credit risk scores on all customers;
- Using behavioral scoring and analysis of individual borrower characteristics to identify potential problem accounts;
- Periodically assessing utilization rates;
- Periodically assessing payment patterns, including borrowers who make only minimum payments over a period of time or those who rely on the line to keep payments current;
- Monitoring home values by geographic area; and
- Obtaining updated information on the collateral's value when significant market factors indicate a potential decline in home values, or when the borrower's payment performance deteriorates and greater reliance is placed on the collateral.

The frequency of these actions should be commensurate with the risk in the portfolio.  Financial institutions should conduct annual credit reviews of HELOC accounts to determine whether the line of credit should be continued, based on the borrower's current financial condition.[10]

Where appropriate, financial institutions should refuse to extend additional credit or reduce the credit limit of a HELOC, bearing in mind that under Regulation Z such steps can be taken only in limited circumstances.  These include, for example, when the value of the collateral declines significantly below the appraised value for purposes of the HELOC, default of a material obligation under the loan agreement, or deterioration in the borrower's financial circumstances.[11] In order to freeze or reduce credit lines due to deterioration in a borrower's financial circumstances, two conditions must be met:  (1) there must be a "material" change in the borrower's financial circumstances, and (2) as a result of this change, the institution has a reasonable belief that the borrower will be unable to fulfill the plan's payment obligations.

---

[10] Under the agencies' risk-based capital guidelines, an unused HELOC commitment with an original maturity of one year or more may be allocated a zero percent conversion factor if the institution conducts at least an annual credit review and is able to unconditionally cancel the commitment (i.e., prohibit additional extensions of credit, reduce the credit line, and terminate the line) to the full extent permitted by relevant federal law.  See Appendix A to 12 CFR 3, Section 3(b)(4)(ii) for OCC; 12 CFR 208, Appendix A, III.D.4 and 12 CFR 225, Appendix A, III.D.4 for FRB; Appendix A to 12 CFR 325, II(D)(4) (FDIC); and 12 CFR 567.6 (OTS).

[11] Regulation Z does not permit these actions to be taken in circumstances other than those specified in the regulation.  See 12 CFR 226.5b(f)(3)(vi)(A) – (F).

- 6 -

Account management practices that do not adequately control authorizations and provide for timely repayment of over-limit amounts may significantly increase a portfolio's credit risk. Authorizations of over-limit home equity lines of credit should be restricted and subject to appropriate policies and controls. A financial institution's practices should require over-limit borrowers to repay in a timely manner the amount that exceeds established credit limits. Management information systems should be sufficient to enable management to identify, measure, monitor, and control the unique risks associated with over-limit accounts.

**Portfolio Management**

Financial institutions should implement an effective portfolio credit risk management process for their home equity portfolios that includes:

*Policies* - The agencies' real estate lending standards regulations require that an institution's real estate lending policies be consistent with safe and sound banking practices and that an institution's board of directors review and approve these policies at least annually. Before implementing any changes to policies or underwriting standards, management should assess the potential effect on the institution's overall risk profile, which would include the effect on concentrations, profitability, and delinquency and loss rates. The accuracy of these estimates should be tested by comparing them with actual experience.

*Portfolio objectives and risk diversification* - Effective portfolio management should clearly communicate portfolio objectives such as growth targets, utilization, rate of return hurdles, and default and loss expectations. For institutions with significant concentrations of HELs or HELOCs, limits should be established and monitored for key portfolio segments, such as geographic area, loan type, and higher risk products. When appropriate, consideration should be given to the use of risk mitigants, such as private mortgage insurance, pool insurance, or securitization. As the portfolio approaches concentration limits, the institution should analyze the situation sufficiently to enable the institution's board of directors and senior management to make a well-informed decision to either raise concentration limits or pursue a different course of action.

Effective portfolio management requires an understanding of the various risk characteristics of the home equity portfolio. To gain this understanding, an institution should analyze the portfolio by segment using criteria such as product type, credit risk score, DTI, LTV, property type, geographic area, collateral valuation method, lien position, size of credit relative to prior liens, and documentation type (such as "no doc" or "low doc").

*Management information systems* - By maintaining adequate credit MIS, a financial institution can segment loan portfolios and accurately assess key risk characteristics. The MIS should also provide management with sufficient information to identify, monitor, measure, and control home equity concentrations. Financial institutions should periodically assess the adequacy of their MIS in light of growth and changes in their appetite for risk. For institutions with significant

concentrations of HELs or HELOCs, MIS should include, at a minimum, reports and analysis of the following:

- Production and portfolio trends by product, loan structure, originator channel, credit score, LTV, DTI, lien position, documentation type, market, and property type;
- Delinquency and loss distribution trends by product and originator channel with some accompanying analysis of significant underwriting characteristics (such as credit score, LTV, DTI);
- Vintage tracking;
- The performance of third-party originators (brokers and correspondents); and
- Market trends by geographic area and property type to identify areas of rapidly appreciating or depreciating housing values.

*Policy and underwriting exception systems* - Financial institutions should have a process for identifying, approving, tracking, and analyzing underwriting exceptions. Reporting systems that capture and track information on exceptions, both by transaction and by relevant portfolio segments, facilitate the management of a portfolio's credit risk. The aggregate data is useful to management in assessing portfolio risk profiles and monitoring the level of adherence to policy and underwriting standards by various origination channels. Analysis of the information may also be helpful in identifying correlations between certain types of exceptions and delinquencies and losses.

*High LTV Monitoring* - To clarify the agencies' real estate lending standards regulations and interagency guidelines, the agencies issued "Interagency Guidance on High LTV Residential Real Estate Lending" (HLTV guidance) in October 1999. The HLTV guidance clarified the "Interagency Real Estate Lending Guidelines" and the supervisory loan-to-value limits for loans on one- to four-family residential properties. This statement also outlined controls that the agencies expect financial institutions to have in place when engaging in HLTV lending. In recent examinations, supervisory staff has noted several instances of noncompliance with the supervisory loan-to-value limits of the "Interagency Real Estate Lending Guidelines." Financial institutions should accurately track the volume of HLTV loans, including HLTV home equity and residential mortgages, and report the aggregate of such loans to the institution's board of directors. Specifically, financial institutions are reminded that:

- Loans in excess of the supervisory LTV limits should be identified in the institution's records. The aggregate of high LTV one- to four-family residential loans should not exceed 100 percent of the institution's total capital.[12] Within that limit, high LTV loans for properties other than one- to four-family residential properties should not exceed 30 percent of capital.

---

[12] For purposes of the "Interagency Real Estate Lending Standards Guidelines," high LTV one-to four-family residential property loans include: (i) a loan for raw land zoned for one-to four-family residential use with a LTV ratio greater than 65 percent; (ii) residential land development loan or improved lot loan with a LTV greater than 75 percent; (iii) a residential construction loan with a LTV ratio greater than 85 percent; (iv) a loan on non-owner occupied one-to four-family residential property with a LTV greater than 85 percent; and (v) a permanent mortgage or home equity loan on an owner-occupied residential property with a LTV equal to or exceeding 90 percent without mortgage insurance, readily marketable collateral, or other acceptable collateral.

- 8 -

- In calculating the LTV and determining compliance with the supervisory LTVs, the financial institution should consider all senior liens. All loans secured by the property and held by the institution are reported as an exception if the combined LTV of a loan and all senior liens on an owner-occupied one- to four-family residential property **equals** or exceeds 90 percent and if there is no additional credit enhancement in the form of either mortgage insurance or readily marketable collateral.
- For the LTV calculation, the loan amount is the legally binding commitment (that is, the entire amount that the financial institution is legally committed to lend over the life of the loan).
- All real estate secured loans in excess of supervisory LTV limits should be aggregated and reported quarterly to the institution's board of directors.

Over the past few years, new insurance products have been introduced to help financial institutions mitigate the credit risks of HLTV residential loans. Insurance policies that cover a "pool" of loans can be an efficient and effective credit risk management tool. But if a policy has a coverage limit, the coverage may be exhausted before all loans in the pool mature or pay off. The agencies will consider pool insurance as a sufficient credit enhancement to remove the HLTV designation in the following circumstances: 1) the policy is issued by an acceptable mortgage insurance company, 2) it reduces the LTV for each loan to less than 90 percent, and 3) it is effective over the life of each loan in the pool.

*Stress testing for portfolios* - Financial institutions with home equity concentrations as well as higher risk portfolios are encouraged to perform sensitivity analyses on key portfolio segments. This type of analysis identifies possible events that could increase risk within a portfolio segment or for the portfolio as a whole. Institutions should consider stress tests that incorporate interest rates increases and declines in home values. Since these events often occur simultaneously, the agencies recommend testing for these events together. Institutions should also periodically analyze markets in key geographic areas, including identified "soft" markets. Management should consider developing contingency strategies for scenarios and outcomes that extend credit risk beyond internally established risk tolerances. These contingency plans might include increased monitoring, tightening underwriting, limiting growth, and selling loans or portfolio segments.

**Operations, Servicing, and Collections**

Effective procedures and controls should be maintained for such support functions as perfecting liens, collecting outstanding loan documents, obtaining insurance coverage (including flood insurance), and paying property taxes. Credit risk management should oversee these support functions to ensure that operational risks are properly controlled.

*Lien Recording* - Institutions should take appropriate measures to safeguard their lien position. They should verify the amount and priority of any senior liens prior to closing the loan. This information is necessary to determine the loan's LTV ratio and to assess the credit support of the collateral. Senior liens include first mortgages, outstanding liens for unpaid taxes, outstanding mechanic's liens, and recorded judgments on the borrower.

*Problem Loan Workouts and Loss Mitigation Strategies* - Financial institutions should have established policies and procedures for problem loan workouts and loss mitigation strategies. Policies should be in accordance with the requirements of the FFIEC's "Uniform Retail Credit Classification and Account Management Policy," issued June 2000, and should, at a minimum, address the following:

- Circumstances and qualifying requirements for various workout programs including extensions, re-ages, modifications, and re-writes. Qualifying criteria should include an analysis of a borrower's financial capacity to service the debt under the new terms;
- Circumstances and qualifying criteria for loss-mitigating strategies, including foreclosure; and
- Appropriate MIS to track and monitor the effectiveness of workout programs, including tracking the performance of all categories of workout loans. For large portfolios, vintage delinquency and loss tracking also should be included.

While the agencies encourage financial institutions to work with borrowers on a case-by-case basis, an institution should not use workout strategies to defer losses. Financial institutions should ensure that credits in workout programs are evaluated separately for the ALLL, because such credits tend to have higher loss rates than other portfolio segments.

**Secondary Market Activities**

More financial institutions are issuing HELOC mortgage-backed securities (i.e., securitizing HELOCs). Although such secondary market activities can enhance credit availability and an institution's profitability, they also pose certain risk management challenges. An institution's risk management systems should address the risks of HELOC securitizations.[13]

**Portfolio Classifications, Allowance for Loan and Lease Losses, and Capital**

The FFIEC's "Uniform Retail Credit Classification and Account Management Policy" governs the classification of consumer loans and establishes general classification thresholds based on delinquency. Financial institutions and the agencies' examiners have the discretion to classify entire retail portfolios, or segments thereof, when underwriting weaknesses or delinquencies are pervasive and present an excessive level of credit risk. Portfolios of high-LTV loans to borrowers who exhibit inadequate capacity to repay the debt within a reasonable time may be subject to classification.

Financial institutions should establish appropriate ALLL and hold capital commensurate with the riskiness of their portfolios. In determining the ALLL adequacy, an institution should consider how the interest-only and draw features of HELOCs during the lines' revolving period could

---

[13]  Refer to "Interagency Questions and Answers on Capital Treatment of Recourse, Direct Credit Substitutes, and Residual Interests in Asset Securitizations" (May 23, 2002), OCC Bulletin 2002-22 (OCC); SR letter 02-16 (FRB); Financial Institution Letter (FIL-54-2002) (FDIC); and CEO Letter 163 (OTS). See OCC's Comptroller Handbook for Asset Securitization, dated November 1997. The Federal Reserve also addressed risk management and capital adequacy of exposures arising from secondary market credit activities in SR letter 97-21.

affect the loss curves for its HELOC portfolio. Those institutions engaging in programmatic subprime home equity lending or institutions that have higher risk products are expected to recognize the elevated risk of the activity when assessing capital and ALLL adequacy.[14]

**Conclusion**

Home equity lending is an attractive product for many homeowners and lenders. The quality of these portfolios, however, is subject to increased risk if interest rates rise and home values decline. Sound underwriting practices and effective risk management systems are essential to mitigate this risk.

---

[14] See the "Interagency Expanded Guidance for Subprime Lending Programs" issued in January 2001 for supervisory expectations regarding risk management processes, allowance for loan and lease losses, and capital adequacy for institutions engaging in subprime lending programs.