# Exhibit 4

# NATIONAL CREDIT UNION ADMINISTRATION
# OFFICE OF INSPECTOR GENERAL

## MATERIAL LOSS REVIEW
### of
### U.S. Central Federal
### Credit Union

**Report #OIG-10-17**
**October 18, 2010**



*William A. DeSarno*
*Inspector General*

*Released by:*

*James W. Hagen*
*Deputy Inspector General*

Material Loss Review – U.S. Central Federal Credit Union
OIG-10-17

## CONTENTS

| Section | Page |
|---|---|

| **ACRONYMS** | ii |
| **EXECUTIVE SUMMARY** | 1 |
| **INTRODUCTION AND BACKGROUND** | 6 |
| **OBJECTIVES, SCOPE AND METHODOLOGY** | 8 |
| **RESULTS IN DETAIL** | |
|     A.  Why NCUA Conserved U.S. Central Federal Credit Union | 10 |
|     B.  NCUA Supervision of U.S. Central Federal Credit Union | 23 |
| **RECOMMENDATIONS** | 28 |
| **APPENDICES** | |
|     A.  NCUA Management Comments | 30 |

Material Loss Review – U.S. Central Federal Credit Union
OIG-10-17

_____

**ACRONYMS**

| | |
|---|---|
| ALCO | Asset/Liability Committee |
| CRIS | Corporate Risk Information System |
| CUSO | Credit Union Service Organization |
| DANA | Daily Average Net Assets |
| DOR | Document of Resolution |
| FICO | Fair Isaac Corporation |
| FPR | NCUA Financial Performance Report |
| HTM | Held to maturity |
| IAP | Investment Action Plan |
| MBS | Mortgage-backed Securities |
| MLR | Material Loss Review |
| NCUA | National Credit Union Administration |
| NCUSIF | National Credit Union Share Insurance Fund |
| NEV | Net Economic Value |
| NIMS | Net Interest Margin Securities |
| NPCU | Natural Person Credit Union |
| NRSRO | Nationally Recognized Statistical Rating |
| OCM | NCUA Office of Capital Markets |
| OCCU | NCUA Office of Corporate Credit Unions |
| OCI | Other Comprehensive Income |
| OIG | Office of Inspector General |
| OTTI | Other-than-temporary Impairment |
| SIP | Credit Union System Investment Program |
| TCCUSF | Temporary Corporate Credit Union Stabilization Fund |
| UGLAFS | Unrealized gains and losses on available for sale securities |

## Executive Summary

The National Credit Union Administration (NCUA) Office of Inspector General (OIG) contracted with Crowe Horwath LLP (Crowe) to conduct a Material Loss Review (MLR) of U.S. Central Federal Credit Union (U.S. Central), a federally chartered credit union. The material loss review objectives were to (1) determine the cause(s) for U.S. Central's conservatorship and the resulting loss to the National Credit Union Share Insurance Fund (NCUSIF), (2) assess supervision of the credit union, and (3) make appropriate recommendations to prevent future losses.  To achieve these objectives, we analyzed NCUA examination and supervision reports and related correspondence; interviewed management and/or staff from the NCUA's Office of Corporate Credit Unions (OCCU) and Office of Capital Markets (OCM); and reviewed NCUA guides, policies and procedures, Call Reports, and Financial Performance Reports (FPRs).[1]

Our review determined U.S. Central's management and Board of Directors (Board) contributed to the conservatorship of U.S. Central and resulting material loss to the NCUA's NCUSIF and the Temporary Corporate Credit Union Stabilization Fund (TCCUSF).   Specifically, management and the Board's inadequate oversight resulted in U.S. Central purchasing significant holdings of private label subprime and ALT-A mortgage-backed securities that exposed the credit union to excessive amounts of financial risk.  U.S. Central's management and Board failed to identify and manage this risk exposure prior to the mortgage-backed securities market dislocation that occurred in mid-2007[2].  With regard to managing the investment portfolio, U.S. Central management:

- Did not establish prudent investment sector concentration limits;

- Relied heavily on ratings assigned to the securities by Nationally Recognized Statistical Rating Organizations (NRSRO) when purchasing securities for the portfolio and when monitoring the amount of credit risk in the investment portfolio;

- Implemented a growth strategy that included offering highly competitive rates in order to attract and maintain a greater market share of the liquid assets of the retail corporate credit unions.   Subprime mortgage-backed securities were purchased for U.S. Central's investment portfolio in order to achieve this objective; and

---

[1] Section III provides further details on the Objectives, Scope and Methodologies utilized.

[2] The market dislocation refers to the event which began in 2006 and continued into 2009, when securities collateralized by mortgages, typically considered sub-prime, began to lose value due to high borrower defaults in the underlying mortgages and declines in value of the property securing those mortgages.   As a result of this market dislocation, mortgage-backed securities, which were initially high rated, were downgraded to reflect the greater risk in the underlying mortgages.  The value of the securities declined due to the downgrades and trading in these securities eventually halted in mid-2007.  The problems in the subprime mortgage market were largely blamed on loose lending practices, low interest rates, a housing bubble, and excessive risk taking by lenders and investors.

Material Loss Review – U.S. Central Federal Credit Union
OIG-10-17

- Did not properly identify and monitor credit risk exposure in the underlying mortgage loan collateral of the mortgage-backed securities held in the investment portfolio.

These factors led to increased exposure to high risk investments largely secured by subprime and Alt-A mortgage loan collateral. U.S. Central's significant concentration of mortgage-backed securities left the credit union vulnerable to downturns in national and local economic conditions and the decline in the residential real estate market. U.S. Central's Board and management failed to adequately diversify the investment portfolio.

Since 2001, U.S. Central had modest growth and a generally conservative investment strategy. However, in 2006, U.S. Central's business strategy shifted towards more aggressive growth that was focused on increasing or maintaining market share of the retail corporate credit union balances by offering competitive investment products and rates. U.S. Central's assets grew to $44.7 billion by December 31, 2007, an increase of 22 percent from December 31, 2005. U.S. Central's growth was achieved by offering highly competitive rates to its retail corporate credit union members, encouraging these members to invest their liquid funds with U.S. Central.

U.S. Central's aggressive growth strategy placed increased pressure on the credit union to produce higher levels of revenue in order to increase or maintain sufficient capital. In an effort to maintain or increase net income and continue to grow its retained earnings, U.S. Central management increased its offerings of higher yielding investments for its members to invest in, such as mortgage-backed securities. U.S. Central, in turn, significantly expanded its investments in higher yielding, higher risk subprime mortgage-backed securities, to support this growth strategy. In addition, this growth strategy negatively impacted U.S. Central's defined goal of obtaining a retained earnings to Daily Average Net Assets of 2 percent due to significant losses on previously highly-rated securities. Furthermore, we believe this growth strategy and accompanying investment decisions to purchase higher yielding securities to such extraordinary levels was contradictory to U.S. Central's fundamental purpose as a wholesale corporate credit union, which was serving as a secure investment option and a source of liquidity for retail corporate credit unions, and support for the not for profit credit union structure.

We determined U.S. Central's management and Board failed to recognize the substantial risk they undertook with significant investments in complex mortgage-backed securities collateralized by subprime assets. We also determined management allowed the investments in mortgage-backed products to represent a significant concentration compared to net worth and failed to impose prudent limits in these securities. Management and the Board also did not adequately recognize the credit risk associated with the underlying collateral, much of which was subprime and Alt-A mortgage loans, including home equity loans. Once the investments deteriorated in value, U.S. Central management had no course of action for divestiture of the securities.

U.S. Central suffered substantial losses from their holdings of mortgage-backed securities during 2007, 2008, and early 2009 that quickly eroded the credit union's net worth and net economic value (NEV)[3], which eventually led to it being placed into conservatorship.  As of December 31, 2007, U.S. Central recorded approximately $151.8 million in charges against income related to the deterioration in value of the investment portfolio.  In July 2008, U.S. Central's external auditor required an additional adjustment to Other Comprehensive Income (loss) (OCI) as of December 31, 2007, increasing OCI from a $1.1 billion loss to $1.5 billion loss.

For the year ended December 31, 2008, U.S. Central management recorded other-than-temporary impairment[4] (OTTI) charges of $1.2 billion due to the decline in securities values that were determined to be other-than-temporary.  In addition, the NEV as of December 31, 2008, based on the audited financial statements, reflected a negative fair value of $8 billion.  This severe impairment to capital caused the NCUSIF to deposit $1 billion in a perpetual capital account at U.S. Central to stabilize its balance sheet and provide confidence to members.

Recorded losses increased with the issuance of the December 31, 2008, audited financial statements, which were issued in September 2009 after U.S. Central was placed into conservatorship.  Recognized OTTI charges increased from management's initial estimate of $1.2 billion to $4.9 billion on securities classified asOTTI.  Unrealized losses recorded to other comprehensive income totaled an additional $6.5 billion.

As the value of U.S. Central's investment portfolio declined, so did its borrowing capacity.  U.S. Central's established lenders had a loss of confidence and curtailed their credit lines.  U.S. Central became heavily dependent upon the Federal Reserve Bank of Kansas City to fund liquidity in 2008.  Despite significant borrowings, the NCUSIF was required to lend U.S. Central $3.7 billion in December 2008 to ensure year end liquidity demand was met.  In 2009, the Federal Reserve Bank of Kansas City demoted U.S. Central's status from "primary credit" to "secondary credit"[5] further restricting its ability to borrow.  In addition, the three credit services[6] all downgraded U.S. Central's long-term and short term credit ratings between December 2007 and February 2009.  In response to U.S. Central's diminished capacity to fund liquidity, the NCUA provided several programs that provided temporary liquidity to U.S. Central in 2008 and 2009, prior to conservatorship.

On March 20, 2009, the NCUA Board approved an "Order of Conservatorship" placing U.S. Central into conservatorship and appointing itself conservator.  The NCUA has confirmed that as of June 30, 2010, the TCCUSF has recorded a loss of approximately

---

[3] Net Economic Value is used to measure the economic solvency of a corporate credit union.  It is defined as "the fair value of assets minus the fair value of liabilities (12 C.F.R 704.2)

[4] OTTI is an accounting requirement under GAAP. The premise for OTTI is that certain price declines are not temporary, but reflect fundamental losses in a security that are considered to impair the security's long-term value.

[5] The Federal Reserve Bank of Kansas City's primary credit program allows healthy institutions, once accepted into the program, to borrow short-term funds for any purpose.  Secondary credit, which is priced slightly higher, is available to institutions not eligible for primary credit.

[6] Moody's, Standard & Poor's, and Fitch Rating.

$1.45 billion related to U.S. Central.  This amount includes the $1 billion capital note from the NCUSIF.  At a September 24, 2010, meeting, the NCUA Board authorized the Director of the OCCU to involuntary liquidate U.S. Central Federal Credit Union on a date to be determined by the Director of OCCU, on grounds of insolvency pursuant to 12 U.S.C. 1787(a)(1)(A).  The Director OCCU determined that date to be October 1, 2010.

<u>NCUA Supervision of U.S. Central</u>

We determined OCCU examiners and OCM staff failed to adequately identify and timely focus on U.S. Central's investment portfolio related to the concentration of mortgage-backed securities until it was much too late.  We also determined the lack of adequate and timely oversight of U.S. Central was partially attributable to examiners not having the appropriate regulatory support, such as more specific investment concentration limits, to adequately address U.S. Central's increasing concentration risk and the increasing exposure to credit, market, and liquidity risks.

We determined that the first time OCCU examiners and OCM staff commented on issues related to sub-prime mortgage-backed securities held in U.S. Central's investment portfolio was in the May 31, 2007, examination report.  This examination report identified that U.S. Central owned $7.5 billion of sub-prime mortgage related securities and approximately $8.1 billion of ALT-A related securities.  At the time, this represented nearly 34 percent of total investments and approximately 45 percent of U.S. Central's private issued mortgage related issues and asset backed securities.  The report commented on the deterioration in the subprime mortgage-backed securities market and the concentration of mortgage-backed securities owned by U.S. Central.  The examination report also noted satisfaction with management's increased monitoring of these securities and neither supervisory concerns nor a Document of Resolution (DOR) was issued at that time.

The March 31, 2008, examination report voiced stronger concerns regarding U.S. Central's significant concentration in mortgage-backed securities and a DOR was issued which recommended that management re-evaluate the appropriateness of the existing concentration limits given the recent unprecedented market dislocations in the mortgage-backed securities markets.  As of the date of the examination, U.S. Central had already recorded significant losses due to the deteriorating value of the mortgage-backed securities.

We believe stronger and timelier supervisory action regarding U.S. Central's concentration in mortgage-backed securities could have resulted in a reduced loss to the NCUSIF.  Although NCUA does not provide specific guidance regarding sector concentration limits, we believe OCCU examiners and OCM staff should have recognized the risk exposure that U.S. Central's significant concentration in mortgage-backed securities represented earlier than 2007 and 2008.  Similar to U.S. Central management, prior to 2007, NCUA also placed significant emphasis on the high ratings assigned by the NRSRO on the purchased mortgage-backed securities, and failed to

Material Loss Review – U.S. Central Federal Credit Union
OIG-10-17

recognize U.S. Central's exposure to significant concentration risk due to the lack of diversification in their investments.

As resources allow, the OIG may conduct additional in-depth reviews of specific aspects of the NCUA's supervision program and make recommendations, as warranted.

Material Loss Review – U.S. Central Federal Credit Union
OIG-10-17

**Introduction and Background**

The National Credit Union Administration (NCUA) Office of the Inspector General (OIG) contracted with Crowe Horwath, LLP (Crowe) to conduct a Material Loss Review (MLR) for U.S. Central Federal Credit Union (U.S. Central) as required by Section 216 of the Federal Credit Union Act (FCU Act), 12 U.S. C. 1790d(j).

History of U.S. Central Federal Credit Union

U.S. Central was chartered under Kansas law in 1974 as the nation's only wholesale corporate credit union. U.S. Central was later converted to a federal charter in October 2005. U.S. Central served 26 retail corporate credit unions but also had four Canadian central credit unions, a number of credit union leagues, trade associations, and credit union services organizations as members. As of December 31, 2009, U.S. Central had total assets of $35 billion.

The Nation's credit union system is a three-tiered structure. The first tier consists of approximately 7,600 "natural person" credit unions (NPCU) whose members are individual persons and entities. The middle, or second, tier consists of a network of 26 retail corporate credit unions whose members/owners are the first tier NPCUs. U.S. Central was the third tier of the system whose members/owners were the retail corporate credit unions, for which U.S. Central functioned as a wholesale credit union. The purpose of U.S. Central as a wholesale credit union was to provide liquidity to its retail corporate credit union members. Retail corporate credit unions in turn provide liquidity to their members, the NPCUs, as loan demand increases. Retail corporate credit unions also provide a place for NPCUs to invest excess funds when loan demand declines and/or share deposits increase. The retail corporate credit unions in turn invested much of their excess liquidity in U.S. Central. The retail corporate credit unions draw down on those investments as demands for liquidity from their NPCU members increase.

NCUA's Evaluation of Investment Activities

The NCUA's Office of Capital Markets (OCM) develops agency policies and procedures related to credit union investments and asset liability management. The Office of Capital Markets also provides direct field support by assisting in evaluating investment issues in credit unions and providing expert advice to the NCUA Board on investment issues.

Corporate credit unions qualifying for Type III supervision[7] are assigned an Office of Corporate Credit Unions (OCCU) capital markets specialist (CMS)[8] on a full-time basis.[9]  Having a CMS on-site promotes interaction with the corporate credit union staff by allowing the CMS to maintain a working knowledge of the corporate credit union's operations, especially in the capital markets areas (investments, asset and liability management, risk monitoring, etc.).  It also allows the CMS to more effectively monitor and evaluate financial changes.

U.S. Central invested its members' liquid funds primarily in investment securities, which typically represented approximately 80 percent of U.S. Central's total assets.  The investment portfolio consisted of mortgage and asset-backed securities, government agency securities, corporate bonds and notes, and commercial paper.  Chart 1 (below) illustrates U.S. Central's investment portfolio composition as of December 31, 2004, and four subsequent years.

**Chart 1:  U.S. Central's Investment Portfolio Composition**



*Source:  Audited Financial Statements as of December 31, 2004, 2005, 2006, 2007 and 2008*

In mid-2007, the mortgage-backed securities (MBS) market experienced a significant dislocation which resulted in severe declines in the market value of these types of structured securities.  Trading of mortgage-backed securities was substantially restricted later that year due to the uncertainty regarding the value of the collateral

---

[7] Corporate credit unions which qualify for Type III supervision generally have billions of dollars in assets, and/or have expanded powers in excess of Part I and exercise their approved powers in a significant and assertive manner.  In addition, Type III corporate credit unions have complex and innovative operations, and/or have a significant impact in the marketplace and on the corporate and/or credit union system, and/or present unusual or unique examination and supervision problems, which cannot be adequately addressed by Type I or Type II supervision.

[8] Regarding new investment strategies, the CMS is responsible for monitoring the corporate's investment portfolio to identify changes in and/or variances from investment strategies and assessing the impact of changing economic conditions.

[9] U.S. Central met the requirements for Type III supervision.

backing the securities.  Market values and credit ratings of these securities continued to decline throughout 2008 and into 2009.

As of December 31, 2007, U.S. Central recorded approximately $151.8 million in charges against income related to the deterioration in value of the investment portfolio. In July 2008, U.S. Central's external auditor required an additional adjustment to Other Comprehensive Income (OCI) as of December 31, 2007, increasing OCI from a loss of $1.1 billion to a loss of $1.5 billion.

For the year ended December 31, 2008, U.S. Central management recorded a loss of $1.2 billion due to securities reclassified as OTTI.  This severe impairment to capital caused the NCUSIF to respond by depositing $1 billion in a perpetual capital account at U.S. Central to stabilize its balance sheet and provide confidence to members.

The market dislocation severely impacted U.S. Central's ability to perform its primary role--to fund liquidity to the retail corporate credit unions--as they could neither sell the mortgage-backed securities held in their portfolio, other than at distressed prices, nor borrow against them due to the uncertain and depressed value of the securities.

On March 18, 2009, OCCU issued a Board Action Memorandum requesting NCUA Board approval to issue an "Order of Conservatorship" and "Confidential Statement of Grounds" placing U.S. Central into conservatorship and appointing itself conservator. The NCUA Board approved this order on March 20, 2009.  The continuing decline in the fair value of U.S. Central's investment portfolio and resulting recognized losses resulted in economic insolvency of U.S. Central, measured by NEV.  In addition, capital levels were not adequate to support U.S. Central's risk profile and the decline in member confidence further impacted liquidity risk.  The OCCU considered various options and concluded there were no other viable alternatives to conservatorship due to the negative impact of U.S. Central's potential failure on the entire credit union system. Conservatorship was recommended to conserve the assets of U.S. Central, protect the NCUSIF, and to protect the interests of U.S. Central's members.

On March 20, 2009, the NCUA placed U.S. Central into conservatorship and authorized providing special assistance up to a maximum of $3 billion.  As of June 30, 2010, NCUA had provided $1.45 billion in financial assistance to U.S. Central.

## Objectives, Scope, and Methodology

We performed this material loss review to satisfy the requirements of the FCU Act which requires the NCUA OIG to conduct a material loss review if the loss to the NCUSIF exceeds $10 million.[10]  The NCUA confirmed further that as of June 30, 2010, the

---

[10] The FCU Act, 12 U.S.C. § 1790d, §216(j) requires that the OIG conduct a review when the NCUSIF has incurred a material loss with respect to a credit union.  A material loss is defined as (1) exceeding the sum of $10 million and (2) an amount equal to 10 percent of the total assets of the credit union at the time at which the Board initiated assistance or was appointed liquidating agent.  On July 21, 2010, the President signed into law the Wall Street Reform and Consumer Protection Act of 2010, raising the threshold for future NCUA OIG MLRs to $25 million.

Material Loss Review – U.S. Central Federal Credit Union
OIG-10-17

TCCUSF has recorded a loss of $1.45 billion for U.S. Central.  Consequently, in accordance with the FCU Act and Chapter 3 of the NCUA Special Assistance Manual, NCUA OIG contracted with Crowe to conduct a material loss review of U.S. Central.

Our audit objectives were to (1) determine the cause(s) of U.S. Central's conservatorship and the resulting loss to the NCUSIF, (2) assess NCUA's supervision of the credit union, and (3) make appropriate recommendations to prevent future losses.

We conducted this review from March 2010 to September 2010 in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives.  We believe that the evidence obtained as described in the Scope and Methodology section, provides a reasonable basis for our findings and conclusions based on our audit objectives.

The scope of this audit included an analysis of U.S. Central from June 30, 2004, until it was placed in conservatorship on March 20, 2009.  Our review also included an assessment of NCUA regulatory supervision of the institution during the same period. In determining why NCUA placed U.S. Central in conservatorship, we did not analyze any potential impact the actions of third party providers may have had on the losses sustained by U.S. Central and the NCUSIF.

To achieve the objectives, we performed the following procedures and utilized the following techniques:

- Analyzed NCUA examination and supervision contact reports and related correspondence and workpapers contained within the exam databases.

- Interviewed management and/or staff from NCUA's OCCU and OCM and reviewed NCUA guides, policies and procedures, NCUA Call Reports, and NCUA Financial Performance Reports (FPRs).

- Reviewed U.S. Central data and correspondence maintained at the NCUA in Alexandria, VA as provided to Crowe by NCUA.

Crowe relied primarily upon the materials provided by the NCUA OIG and NCUA officials, including information and other data collected during interviews.  We relied on our analysis of information from management reports, correspondence files, and interviews to corroborate data obtained to support our audit conclusions.  Interviews were conducted to gain a better understanding of decisions made regarding the activities of the credit union management and the supervisory approach, and to clarify information and conclusions contained in reports of examination and other relevant supervisory correspondence between the NCUA and U.S. Central.  Crowe relied on the information provided in the interviews without conducting additional specific audit procedures to test such information.

Material Loss Review – U.S. Central Federal Credit Union
OIG-10-17

---

**Results in Detail**

We determined U.S. Central's management and Board of Directors (Board) contributed to the conservatorship and resulting material loss.  Further, we determined that NCUA OCCU examiners and OCM staff[11] could have reduced the loss to the NCUSIF had they adequately assessed and more aggressively pursued resolution to issues related to U.S. Central's high credit risk and concentration in its investment portfolio.

**A.  Why NCUA Conserved U.S. Central Federal Credit Union**

The conservatorship of U.S. Central and resulting material loss to the NCUSIF can be attributed, in part, to inadequate management and Board oversight that exposed the credit union to excessive amounts of financial risk due to significant holdings of private label mortgage-backed securities including subprime and ALT-A mortgage related securities.  U.S. Central's management and Board failed to identify and manage this risk prior to the severe market value decline that occurred starting in mid-2007 and became more severe in 2008 and 2009.  Specifically, with regard to managing the investment portfolio, U.S. Central management:

- Did not establish prudent investment sector concentration limits;

- Relied heavily on ratings assigned to the securities by Nationally Recognized Statistical Rating Organizations (NRSRO) when purchasing securities for the portfolio;

- Implemented a growth strategy that included offering highly competitive rates in order to attract and maintain a greater market share of the liquid assets of the retail corporate credit unions.  Subprime mortgage-backed securities were purchased for U.S. Central's investment portfolio in order to achieve this objective; and

- Did not identify and monitor credit risk in the underlying collateral of the mortgage-backed securities held in the investment portfolio.

These factors led to increased exposure to risky mortgage-backed investments secured with subprime and ALT-A mortgage related collateral.  U.S. Central's significant concentration of consumer-based assets, particularly non-agency, residential mortgage-backed securities left the credit union vulnerable to downturns in national and local economic conditions and the residential real estate market.  U.S. Central's Board and management failed to adequately diversify the risks within the investment portfolio.

---

[11] We determined OCM staff assisted OCCU examiners, on average, on approximately eight percent of the supervisory workload for U.S. Central.

Material Loss Review – U.S. Central Federal Credit Union
OIG-10-17

The consequences of U.S. Central's management and Board's inadequate oversight were:

- Substantial unrealized losses recorded to capital related to the deterioration of the market value of mortgage-backed securities held in U.S. Central's investment portfolio.  Unrealized losses in the investment portfolio continued to grow as U.S. Central management and Board failed to timely recognize securities as other-than-temporarily impaired and record the fair market losses against income.  These realized losses were eventually recorded in conjunction with the December 31, 2008, audited financial statements.

- Market value declines and ratings downgrades eliminated U.S. Central's ability to sell mortgage-backed securities in the marketplace, hampering liquidity sources necessary to meet member credit union needs. U.S. Central's ability to obtain funding sources on reasonable terms and costs became difficult due to the declining value of the securities portfolio, leading to an unsatisfactory liquidity position.  In addition, unsecured lenders lost confidence due to the unrealized losses in the portfolio and reduced their lines of credit available to U.S. Central.

- Downgrades to U.S. Central's credit rating eroded public confidence in U.S. Central debt, impeding efforts to issue debt to fund liquidity.

- Economic insolvency as U.S. Central's NEV deteriorated due to the market value declines in the investment portfolio.

- U.S. Central was placed under conservatorship of the NCUA in order to stabilize and restore member and lender confidence.

- A material loss reported by the NCUA of $1.45 billion to the NCUSIF and the TCCUSF as of June 30, 2010.

- U.S. Central was liquidated on October 1, 2010.

Material Loss Review – U.S. Central Federal Credit Union
OIG-10-17

Table 1 (below) summarizes selected year-end financial information for U.S. Central.

Table 1

| Key Financial Data and Ratios ($000's) | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | | | **(1)** | | **(2)** |
| **Date** | **12/31/04** | **12/31/05** | **12/31/06** | **12/31/07** | **01/31/09** | | **12/31/08** |
| **Total Assets** | $36,416,360 | $36,607,889 | $43,357,827 | $44,733,692 | $33,473,697 | | $27,116,930 |
| **Shares** | 29,517,537 | 29,150,067 | 34,539,521 | 36,994,406 | 25,763,061 | | 19,721,998 |
| **Investments (amortized cost)** | 28,885,068 | 26,642,660 | 34,358,789 | 38,158,258 | 32,983,040 | | 29,453,377 |
| **Net Unrealized Losses from Available for Sales Securities** | 27,497 | (37,364) | (7,165) | (1,486,611) | (5,830,448) | | (7,797,570) |
| **Borrowings** | 4,400,145 | 4,998,722 | 6,272,526 | 6,407,162 | 19,569,465 | | 17,178,637 |
| **Retained Earnings** | 577,710 | 623,631 | 668,094 | 598,260 | (454,336) | | (3,688,865) |
| **Total Member's Equity** | 31,622,726 | 31,211,475 | 36,665,692 | 37,828,129 | (3)<br>13,904,232 | | (3)<br>9,574,650 |
| **Net Economic Value** | 2,153,448 | 2,148,031 | 2,133,896 | 727,684 | (6,931,266) | | (10,314,274) |
| **Regulatory Capital Ratio** | 6.37% | 6.37% | 5.8% | 5.1% | 6.36% | | (5.5%) |
| **Retained Earnings Ratio** | 1.7% | 1.9% | 1.8% | 1.3% | (1.14%) | | (10.4%) |
| **Net Income (loss)** | 49,651 | 59,161 | 62,859 | (50,695) | 9,179 | | (4,831,403) |

Source:  Audited financial statements and NCUA reports of examination

*(1)  **Does not include 12/31/2008 year-end audit adjustments.  As of January 31, 2009 unaudited financial statements.***
*(2)  **From audited financial statements issued September 2009***
*(3)  **Includes $1 billion capital note from NCUSIF***

As noted in Table 1, U.S. Central's assets grew in excess of 22 percent between December 31, 2005 and December 31, 2007.  U.S. Central's business strategy was focused on increasing or maintaining market share of the corporate credit union balances by offering competitive investment products and rates.  Beginning in 2006, the significant asset growth began to outpace capital growth, resulting in declines to U.S. Central's capital measures.

Chart 2 (below) shows the effect of the significant asset growth over the period from March 2006 through March 2008, measured by Daily Average Net Assets (DANA), on U.S. Central's capital ratios.

12

Material Loss Review – U.S. Central Federal Credit Union
OIG-10-17

Chart 2



*Source: March 2008 Examination Report*

The significant growth also put pressure on U.S. Central to continue to increase net income in order to grow retained earnings to meet capital goals.  Net income, which had been stable over the past several years at 15-20 basis points of DANA, was declining due to the flat interest rate environment, further reducing capital ratios.  In order to maintain or increase net income and continue to grow retained earnings as a result, management searched for and offered high yielding securities such as mortgage-backed securities to invest funds received from the retail credit unions.

**U.S. Central's Investment Strategy**

Mortgage-Backed Securities

U.S. Central's investment portfolio consisted primarily of asset-backed and mortgage-backed securities.  These securities represented approximately 89-95 percent of the investment portfolio from December 31, 2004 through December 31, 2008.  In 2004 and 2005, mortgage-backed securities represented the majority of the portfolio at approximately 55-57 percent of the total portfolio while asset-backed securities represented approximately 36-40 percent of the portfolio.  Beginning in 2006, mortgage-backed securities grew to represent a larger percentage of the portfolio, increasing to 63 percent of the total portfolio.  Mortgage-backed securities continued to represent the largest percentage of the portfolio through December 2008.  Table 2 (below) shows total mortgage-backed securities as a percent of the total investment portfolio.  The breakdown between residential--both government agency and private-issue securities-- and commercial mortgage-backed securities are shown.

Material Loss Review – U.S. Central Federal Credit Union
OIG-10-17

Table 2

| Mortgage-Backed Securities | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| In thousands (000) | 2004 | | 2005 | | 2006 | | | |
| | Amortized Cost | Fair Value | Amortized Cost | Fair Value | Amortized Cost | Fair Value | | |
| Mortgage-related securities | $ 16,436 | $ 16,449 | $ 14,214 | $ 14,170 | $ 21,275 | $ 21,258 | | |
| Agency | | | | | $ 2,714 | $ 2,699 | | |
| Non-agency (private label) | | | | | $ 18,561 | $ 18,559 | | |
| Asset-backed securities | $ 10,293 | $ 10,307 | $ 10,771 | $ 10,778 | $ 10,520 | $ 10,532 | | |
| **Total Assets** | | $36,416 | | $36,608 | | $43,358 | | |

| | 2007 | | 2008 | | 2009 | |
|---|---|---|---|---|---|---|
| | Amortized Cost | Fair Value | Amortized Cost | Fair Value | Amortized Cost | Fair Value |
| Mortgage-related securities | $ 23,594 | $ 22,291 | $ 16,045 | $ 10,250 | $ 15,197 | $ 8,625 |
| Agency | $ 2,090 | $ 2,073 | $ 1,601 | $ 1,528 | $ 1,272 | $ 1,242 |
| Non-agency (private label) | $ 21,504 | $ 20,218 | $ 14,444 | $ 8,722 | $ 13,925 | $ 7,383 |
| Asset-backed securities | $ 11,580 | $ 11,421 | $ 11,875 | $ 10,030 | $ 10,371 | $ 10,017 |
| **Total Assets** | | $ 44,734 | | $27,117 | | $35,075 |

*Source: Audited Financial Statements and U.S. Central's Quarterly Financial Report for 4th Quarter 2009*

Due to the market dislocation, many of U.S. Central's investment securities were in significant unrealized loss positions as of December 31, 2007, particularly in the non-agency residential mortgage-backed securities which represent the highest percentage of the portfolio.  Approximately $7.5 billion of the non-agency residential mortgage-backed securities were subprime mortgage related securities as of May 2007 and $8.1 billion were ALT-A mortgage related securities.

Table 3 (below) presents U.S. Central's non-agency residential mortgage-backed securities by credit rating and by Fair Isaac Corporation (FICO) score.  U.S. Central viewed assets with FICO scores of 680 or lower as subprime as of December 31, 2007.

14

Material Loss Review – U.S. Central Federal Credit Union
OIG-10-17

Table 3

| Non-Agency Residential Mortgage-Backed Securities | | | | | | |
|---|---|---|---|---|---|---|
| Amortized Cost in thousands (000) | | | | | | |
| FICO | AAA | AA | A | BBB | < BBB | Total |
| FICO 720 or higher | $ 4,636,028 | $    38,532 | $ 1,138 | $182 | - | $4,675,880 |
| FICO 719 – 680 | $ 9,648,330 | $ 105,290 | $          5 | - | - | $ 9,753,625 |
| FICO 679-620 | $ 5,415,898 | $ 611,480 | $     7,289 | $     4,207 | $    15,625 | $ 6,054,499 |
| FICO 619 or lower | $     703,951 | $ 348,446 | $     2,558 | - | - | $ 1,054,955 |
| Total | $20,404,207 | $1,103,749 | $    10,989 | $     4,389 | $    15,625 | $21,538,959 |
| Percent of Total | 94.7% | 5.1% | 0.1% | 0.0% | 0.1% | 100% |

*Source:  Audited Financial Statements dated December 31, 2007.*

U.S. Central's December 31, 2007 annual report stated:

> *"Management believes that the unrealized losses and the severity thereof, are the result of 1) increased defaults and delinquencies on mortgages underlying non-agency residential mortgage-backed securities, particularly for subprime borrowers, and 2) a severe imbalance in the current illiquid market between supply and demand for these same securities."*

Unrealized losses in non-agency mortgage-backed securities totaled $1.3 billion as of December 31, 2007.  Management performed an analysis at this time and believed that the declines in the fair value for many of these securities did not represent OTTI.

Prior to the market dislocation in 2007, the majority of U.S. Central's investment portfolio consisted of highly rated, investment grade securities (i.e., rated at BBB or higher).  The May 31, 2007, examination report indicated that 94 percent of U.S. Central's long-term holdings carried a rating of AAA or equivalent.  As these credit ratings declined in 2007, U.S. Central management filed several investment action plans (IAPs) to comply with section 704.10 of NCUA Rules and Regulations. Investment action plans representing securities with the total par value of $56 million were filed as of December 31, 2007.  On June 10, 2008, U.S. Central filed additional IAPs totaling $1.8 billion.

Material Loss Review – U.S. Central Federal Credit Union
OIG-10-17

The March 31, 2008, examination report indicated that the majority of IAPs filed involved Net Interest Margin Securities (NIMS).  Net Interest Margin Securities are a type of security that allows holders to access excess cash resulting from securitized mortgage loan pools.  U.S. Central owned 18 NIMS totaling $51.2 million.  All but one of these securities was eventually written off as other-than-temporarily impaired.  In this March 2008 report, examiners also questioned the permissibility of NIMS for a corporate credit union.

The March 31, 2008, examination report also indicated that U.S. Central owned approximately $7.3 billion in securities collateralized by subprime mortgages and approximately $8.5 billion collateralized by ALT-A mortgages.  We determined these types of securities experienced the most significant market value declines and resulted in both realized and unrealized losses being reported in the December 31, 2008, financial statements.  As of the December 31, 2008, audited financial statements, unrealized losses on private issued mortgage-backed securities totaled approximately $9.4 billion, equivalent to 6.3 times U.S. Central's capital. The March 2008 examination report also indicated that the level of long term securities rated AAA or equivalent had declined to 91 percent (subsequently declining to approximately 88 percent) of the portfolio.  An NCUA document developed during the planned conservatorship of U.S. Central disclosed that as of March 12, 2009, the level of AAA securities in the portfolio had declined to approximately 45 percent with the non-investment grade portion of the portfolio at approximately 34 percent.  Table 4 (below) provides U.S. Central's securities investment ratings as of March 12, 2009.

Table 4

| Securities Investment Ratings | | |
| --- | --- | --- |
| (as of March 12, 2009) | | |
| **Rating** | **Par Value** | **Percent of Portfolio** |
| AAA | $15,944,66,600 | 45.21% |
| AA | 3,007,526,264 | 8.53% |
| A | 1,367,771,094 | 3.88% |
| BBB | 3,091,124,165 | 8.76% |
| BB | 1,202,961,685 | 3.41% |
| B | 4,245,412,584 | 12.04% |
| CCC | 5,003,181,711 | 14.19% |
| CC | 974,794,941 | 2.76% |
| C | 404,435,721 | 1.15% |
| NR | 28,704,116 | 0.08% |
| **Total** | **$35,270,572,881** | **100.00%** |
| | | |
| Investment Grade | $23,439,786,239 | 66.46% |
| Non-Investment Grade | $11,830,786,641 | 33.54% |

*Source:  NCUA*

16

Material Loss Review – U.S. Central Federal Credit Union
OIG-10-17

Chart 3 (below) provides U.S. Central's unrealized losses from January 2008 through January 2009.

Chart 3



*Source:  NCUA summary memo in support of conservatorship*

Management and Board Oversight of U.S. Central's Investment Strategy

Based on our review of U.S. Central's Financial Risk Policy, Asset/Liability Committee (ALCO) reports and meeting minutes, and discussions with examiners, we determined U.S. Central's investment portfolio had a significant level of credit risk associated with the large concentration of mortgage-backed securities and was not adequately identified and managed by its management and Board.  In addition, prudent sector concentration limits were not established to limit exposure to the underlying assets related to mortgage-backed securities.  Further, management and the Board placed over-reliance on the high credit ratings assigned by NRSRO that kept them from performing further evaluation of the concentration and credit risks associated with their investment purchases.

U.S. Central's ALCO minutes indicated management's struggle to find investment products for the large inflow of balances from member credit unions while realizing a reasonable interest rate spread in the flat yield curve environment.  U.S. Central's assets grew by approximately 22 percent between 2006 and 2007 by offering highly competitive rates to its member credit unions, encouraging them to invest their liquid funds with U.S. Central.  ALCO minutes from October 23, 2006 indicated:

> *"…we are continuing to gear up the portfolios a little more aggressively, as discussed in May and June.  Leverage has been increased by $1.5 billion.  As well, we have increased our MBS exposure (currently almost 50% of total assets and a little more*

Material Loss Review – U.S. Central Federal Credit Union
OIG-10-17

*than 60% of spread assets) and our spread risk.  We are taking on
prudent increases in risk in order to gain market share."*

At the same time, U.S. Central's capital percentages were declining as asset growth
was outpacing growth in retained earnings from current income.  In hindsight,
management and the Board were more focused on asset growth than on achieving their
defined capital goals and investment concentrations and credit risk management.

Twice in 2006, U.S. Central management recommended to the ALCO increasing the
limit in the amount of non-agency mortgage-backed securities that could be held in the
investment portfolio.  The minutes from the ALCO indicated that management increased
this limit without regard to the increased exposure to credit risk related to the underlying
collateral of the securities, much of which was subprime mortgage loans.

ALCO minutes from the March 24, 2006 meeting indicated that due to the increase in
member balances, the trading desk was restricted in types of securities it could
purchase by the limits established in U.S. Central's policy.   The minutes stated:

> *"….member balances are soaring, up by almost $6b on average
> month-to-date versus balances during February.  The desk is running
> out of room on most line limits, something that is typical for this time
> of year. There are two additional problems that the desk is dealing
> with at this time.  First, non-agency mortgage-related securities are
> limited by policy to 7x capital.  We are currently at that limit."*

In April 2006, ALCO committee and the Board approved an increase for
non-agency mortgage-backed securities from 7 times capital to 8 times
capital.

Later that same year, the limit was increased again from 8 times to 10 times capital.
The ALCO minutes indicated that management felt this change was necessary to take
advantage of the growing liquidity of these types of securities in the market while being
limited in the investments purchased in other types of securities due to market
conditions and NCUA guidelines.  Management believed they had identified the risks
associated with these securities and had appropriate controls in place to monitor these
risks as noted in the ALCO minutes below:

> *"The major risks of non-agency mortgage-related securities include
> credit risk, interest rate risk and liquidity risk.  U.S. Central has both
> Policies and Procedures to otherwise limit the amount of each of
> these risks taken.  As well, U.S. Central has demonstrated its ability
> to manage these investments proficiently, with no credit problems,
> with very stable interest rate risk exposure and with sufficient
> liquidity to meet the needs of members in recent years.*

Material Loss Review – U.S. Central Federal Credit Union
OIG-10-17

---

> *A limit of ten times Capital would currently amount to approximately $20 billion of non-agency mortgage-related securities. Given recent asset balances ranging between $35 and $40 billion, a limit of ten times capital approximates 50-57% of assets of the company. In an effort to enhance the desk's ability to pay more cooperative rates, A/L believes it needs a higher allocation to this asset sector. A/L believes that a higher concentration of non-agency mortgage-related investments can be managed with continued due diligence for credit risk and interest rate risk and with a continued ability to deliver liquidity as needed by members."*

With U.S. Central's limit set at 10 times capital, non-agency mortgage-backed securities represented $22 to $25 billion as of December 31, 2006 and 2007. This concentration limit of 10 times capital represented approximately 50 percent of U.S. Central's total assets.

We determined the ALCO minutes also reflected discussion related to the stress in the markets related to subprime mortgage-backed securities beginning in February 2007. Management's response to market concerns were that U.S. Central's asset-backed securities holdings historically performed better in comparison to the Asset-Backed Securities Index; articles published regarding increased risk in the subprime mortgage securities market were exaggerated; and the belief that market concerns provided additional opportunity for U.S. Central to grow as they continued to received deposits from members that might otherwise have been invested directly in the mortgage-backed securities market and provided relief from the tight spreads they had been experiencing in the market.

We believe management and the Board misinterpreted the weakening market conditions and allowed U.S. Central to remain significantly exposed to financial risk through their extensive holdings of residential mortgage-backed securities. The ALCO minutes from July 6, 2007, stated the following:

> *"…we feel comfortable with our sub-prime exposure and the desk is meeting with the CMR staff monthly after the remittance reports have been released. The few exposures that we were most concerned about have been sold. There are a handful of exposures that we are still watching aggressively. The trading desk and credit department staff are working together to ensure that we have no real concerns in the portfolio."*

The decisions and discussions reflected in the ALCO minutes from throughout 2007 show management's and the Board's lack of understanding of U.S. Central's risk related to the emerging market concerns regarding subprime and ALT-A mortgage-backed securities, as well as U.S. Central's increasing amounts invested in these types of securities. Their denial of this risk prevented them from appropriately addressing the

Material Loss Review – U.S. Central Federal Credit Union
OIG-10-17

risk and taking steps to reduce exposure to further market value declines and subsequent losses.

U.S. Central's Financial Risk Policy also included guidance related to purchases of investments and ongoing monitoring of the investment portfolio.  A pre-purchase risk analysis was required to be completed prior to each new purchase transaction.  This pre-purchase analysis required transactions to be evaluated to assess the associated interest rate, liquidity, and credit risk.  NCUA examination workpapers and reports indicated that U.S. Central's Credit Risk Group relied primarily on analysis prepared by rating agencies and other market data.  Examiners noted the group obtained analysis such as payment rate, age, delinquencies, cumulative defaults, credit enhancement, etc., to evaluate and monitor credit risk related to the mortgage-backed securities held in the portfolio.  This significant reliance on external data indicated that while management may have been monitoring credit risk on individual security basis, it did not recognize the potential risk related to the more global risks posed by the large concentration of mortgage-backed securities.

Management also did not recognize the impact of potential deterioration of the value of the underlying collateral on U.S. Central's capital and ability to meet liquidity needs.  In addition, external data was primarily based on past experience and trends rather than future expectations and models.  A significant market dislocation, such as the one that occurred, had not been experienced in recent years.  Management failed to recognize the loss exposure until late-2007/early 2008, after the deterioration of the market value of mortgage-backed securities had already impacted U.S. Central's ability to liquidate these securities.

**Diminished Liquidity**

As the value of U.S. Central's investment portfolio declined, so did its borrowing capacity, as established lenders had a loss of confidence and curtailed their lines.  U.S. Central became heavily dependent upon the Federal Reserve Bank of Kansas City to fund liquidity in 2008.  Despite significant borrowings, the NCUSIF was required to lend U.S. Central $3.7 billion in December, 2008 to ensure year end liquidity demand was met.  In 2009, the Federal Reserve Bank of Kansas City demoted U.S. Central's status from that of primary credit to secondary credit which further restricted its ability to borrow.

U.S. Central also experienced a decline in its credit rating which impacted efforts to issue debt to fund liquidity.  From December 2007 through January 2009, all three rating services lowered U.S. Central's long-term debt ratings and two of the rating services downgraded its short-term debt rating.  During January and February 2009, the three rating services placed U.S. Central on their "negative list" for long-term debt.  Table 5 (below) presents U.S. Central's debt ratings from the three ratings agencies.

Material Loss Review – U.S. Central Federal Credit Union
OIG-10-17

Table 5

| U.S. Central Debt Ratings | | | | | | |
|---|---|---|---|---|---|---|
| | **Fitch** | | **Moody's** | | **Standard & Poors** | |
| **Date** | Long-Term | Short-Term | Long-Term | Short-Term | Long-Term | Short-Term |
| **12/31/2007** | AAA | F1+ | Aa1 | P-1 | AAA | A-1+ |
| **2/5/2008** | | | | | AA+ | A-1+*- |
| **3/18/2008** | AA+*- | | | | | |
| **12/22/2008** | | | A1*- | P-1*- | | |
| **1/14/2009** | AA | | | | | |
| **1/30/2009** | | | | | AA- | A-1+ |
| **2/2/2009** | AA*- | F1+*- | | | | |
| **2/10/2009** | | | | | AA-*- | A-1+*- |

**\*- Means Negative Watch**
*Source: NCUA*

Beginning in October 2008, NCUA took several actions to provide liquidity assistance to U.S. Central. This assistance included:

- Establishment of the Temporary Corporate Credit Union Liquidity Guarantee Program as part of the Corporate Stabilization Program[12] by which the NCUSIF guaranteed repayments of unsecured debt issued by corporate credit unions between October 16, 2008, and June 30, 2009.

- Creation of the Credit Union System Investment Program (SIP), another component of the NCUA Corporate Stabilization Program. Through SIP, NCUA provided natural person credit unions (NPCU) with a one year advance that agreed to invest the proceeds in a fixed-rate, matched term, guaranteed SIP Note. Participating NPCUs collected a spread of 25 basis points. U.S. Central's participation in the SIP program generated $5.7 billion in SIP notes as of March 13, 2009.

- A $3.7 billion credit line from the NCUSIF for year-end liquidity through 2008.

- Building member confidence in the credit union system through the Temporary Corporate Credit Union Share Guarantee Program by extending the existing NCUSIF coverage for corporate credit union members' share accounts beyond the $250,000 statutory limit to cover the entire balance of each such account.

---

[12] The NCUA's Corporate Stabilization Program, approved in January 2009, consisted of a series of actions designed to add stability to and strengthen corporate credit unions. The purpose of these actions was to maintain liquidity, strengthen capital, and restructure the corporate system.

Material Loss Review – U.S. Central Federal Credit Union
OIG-10-17

- A $1 billion capital infusion from the NCUSIF on January 28, 2009 to stabilize U.S. Central's balance sheet and provide member confidence.

Auditor's Note: In April 2007, U.S. Central's management and Board launched Sandlot Funding LLC (Sandlot), an off-balance sheet asset-backed commercial paper (ABCP) conduit, with the ability to issue up to $10 billion.  ABCP conduits were common funding structure agreements used by large banks and financial companies, but this was the first of its kind in the corporate credit union network.

Sandlot was set up as an extension of U.S. Central's balance sheet, intended to provide additional funding capacity to help manage cyclical corporate credit union member deposit flows managed by U.S. Central.  As of September 30, 2007, the program had $3.8 billion of predominantly highly-rated mortgage backed securities, most of which sourced from U.S. Central's balance sheet.  The rapid market dislocation within the ABCP market in 2007 resulted in sharp rollover pricing increases for virtually all ABCP programs, including Sandlot.  Given the decline in investor appetite for extendable ABCP, U.S. Central had to use its own liquidity to bring most of the program's assets back on to its own balance sheet, either by buying the paper as maturities rolled off, or by extending repurchase funding to the program.

Sandlot repaid all of the outstanding ABCP notes in December 2007.  In February 2008, U.S. Central management requested the ratings agencies stop rating Sandlot because they had decided against issuing additional commercial paper.  Aside from the questionable timing of U.S. Central management's decision to form an ABCP conduit in 2007 at a time when the market was already showing signs of stress, we believe the previously identified issues with U.S. Central's investment strategy call into question whether U.S. Central's management and Board had the expertise to venture into the business of issuing commercial paper and managing an ABCP conduit.

Material Loss Review – U.S. Central Federal Credit Union
OIG-10-17

## B.  NCUA Supervision of U.S. Central Federal Credit Union

Supervisory Background

Prior to the January 2008 contact, OCCU examiners and OCM staff had few criticisms of U.S. Central's operations or its management.  U.S. Central consistently received Composite Financial Risk and Composite Risk Management ratings of 2 based on a moderate risk profile and adequate risk management practices.  The Empirical Capital Level component of Composite Financial Risk rating consistently received a rating of 3.  OCCU examiners noted that capital strength was adequate in relation to U.S. Central's overall risk profile.

Downgrades to the Financial Risk composite rating and its components were recommended beginning in the first quarter of 2008 as the result of a routine supervision contact.  Downgrades to the Financial Risk composite rating from 2 to 3 were recommended.  Downgrades were made to each of the five components of the Financial Risk composite rating due to significant increases in realized and unrealized losses associated with U.S. Central's marketable securities, which negatively impacted U.S. Central's capital, NEV, and earnings.

The market value decline of the collateral backing U.S. Central's investments resulted in increased credit risk and liquidity concerns due to U.S. Central's inability to sell a majority of its marketable securities without substantial loss and also impacted its ability to effectively pledge the collateral.  Also, continued growth in DANA continued to outpace growth in capital, which resulted in deterioration of capital measurements.  As of January 2008, no downgrades were recommended to the Risk Management composite rating which remained at 2.  The Financial Risk downgrades were confirmed during the March 2008 annual exam and a DOR was issued regarding re-evaluation of the existing concentration limits, specifically related to the concentration of mortgage-backed securities in U.S. Central's investment portfolio.

Further downgrades were recommended early in March 2009 as the result of a routine supervision contact.   The Financial Risk composite rating was downgraded from 3 to 5 due to further erosion of U.S. Central's financial condition caused largely by the continued deterioration in the value of its mortgage-backed securities.  The Risk Management composite rating was downgraded for the first time from a 2 to a 4, citing management's inadequate policies, strategies, and oversight relating to capital, earnings, liquidity, and credit risk in the investment portfolio.

Throughout 2008 and the beginning of 2009, U.S. Central management and the NCUA created several action plans in an attempt to reduce unrealized losses in the investment portfolio and raise additional capital.  These plans included a NEV Restoration Plan, NCUA's Corporate Stabilization Program, a liquidity bridge loan from the NCUSIF, and NCUA's Temporary Corporate Credit Union Share Guarantee Program.

Material Loss Review – U.S. Central Federal Credit Union
OIG-10-17

U.S. Central consistently received Corporate Risk Information System (CRIS)[13] composite ratings of 2 for both the Financial Risk and Risk Management components prior to the 2008 examination.  Table 6 (below) provides NCUA's examination history of U.S. Central and resulting CRIS composite ratings from 2006 through March 2009:

Table 6

| NCUA Examination History of U.S. Central | | | | | |
|---|---|---|---|---|---|
| Report Issuance Date | 3/11/09 | 7/30/08 | 3/14/08 | 8/28/07 | 08/08/06 |
| Exam "As of" Date | 1/31/09 | 3/31/08 | 1/31/08 | 5/31/07 | 04/30/06 |
| Exam Type | Routine Contact | Annual | Routine Contact | Annual | Annual |
| **Composite Financial Risk** | **5** | **3** | **3** | **2** | **2** |
| Component: | | | | | |
|   Empirical Capital Level | 5 | 4 | 4 | 3 | 3 |
|   Earnings | 5 | 3 | 3 | 2 | 2 |
|   Interest Rate Risk | 3 | 2 | 2 | 2 | 2 |
|   Liquidity Risk | 4 | 2 | 2 | 1 | 1 |
|   Credit Risk | 4 | 4 | 2 | 1 | 1 |
| **Composite Risk Management** | **4** | **2** | **2** | **2** | **2** |
| Component: | | | | | |
|   Capital Accumulation Planning | 4 | 2 | 2 | 2 | 2 |
|   Profit Planning and Control | 3 | 2 | 2 | 2 | 2 |
|   Interest Rate Risk Management | 3 | 1 | 1 | 1 | 1 |
|   Liquidity Risk Management | 4 | 1 | 1 | 1 | 1 |
|   Credit Risk Management | 4 | 2 | 1 | 1 | 1 |
|   Operating Risk | 2 | 2 | 2 | 2 | 3 |
|   Board Oversight, Audit & Compliance | 4 | 2 | 2 | 2 | 2 |

*Source: Reports of Examination*

## Supervisory Efforts to Identify and Correct Key Risks Were Not Adequate or Timely

We determined OCCU examiners and OCM staff did not adequately identify or correct key risks to U.S. Central's investment portfolio.  Specifically, OCCU examiners and OCM staff failed to identify and require corrective action on the credit risk in U.S. Central's investment portfolio related to the concentration of mortgage-backed securities until March 2008.  As a result, U.S. Central experienced significant declines in its

---

[13] The Corporate Risk Information System (CRIS) is used to measure and report risk in the corporate credit union system.  As such, CRIS separates the assessment and communication of quantitative financial risk from qualitative operational and managerial risks and assign individual Financial Risk and Risk Management Composite and Component ratings.  The Composite Financial Risk rating and its components represent the degree of risk to Capital and Earnings.  The ratings are defined as follows:  1 – Low Risk; 2 – Moderate (Managed) Risk; 3 - High Risk; 4 – Excessive Risk; and 5 – Critical Risk.  The Composite Risk Management rating and its components represent the Quality of Policy or Risk Management Process.  The ratings are defined as follows:  1 – Exceptional; 2 – Acceptable; 3 – Minimally Acceptable; 4 – Inadequate; and 5 – Seriously Deficient.

Material Loss Review – U.S. Central Federal Credit Union
OIG-10-17

investment portfolio, and opportunities for reasonable divestiture without incurring significant realized losses were substantially limited.

We also determined the lack of adequate and timely oversight of U.S. Central is partially attributable to OCCU examiners and OCM staff not having the appropriate regulatory support, such as more specific investment concentration limits, to adequately address U.S. Central's increasing concentration risk and the increasing exposure to credit, market, and liquidity risks. It became apparent that examiners lacked the regulatory leverage to limit or stop the growth of U.S. Central's purchase of subprime MBS, which would have likely mitigated the rapid deterioration of U.S. Central's financial condition and mounting investment losses as a result of the extended credit market dislocation.

We determined the May 2007 examination was the first time OCCU examiners commented on the sub-prime mortgage-backed securities held in U.S. Central's investment portfolio. In fact, this discussion was the first sign of supervisory concern related to the deterioration of the sub-prime mortgage sector and the concentration of mortgage-backed securities held in U.S. Central's portfolio. The examination report noted that U.S. Central held approximately $7.5 billion of sub-prime mortgage related securities and approximately $8.1 billion in ALT-A mortgage related securities (approximately 34 percent of the total portfolio). The report also noted that as the sub-prime mortgage sector began experiencing deterioration, U.S. Central enhanced its monitoring procedures to proactively identify problem securities and that these monitoring efforts had been successful. The examination report further noted that management's monitoring efforts became more significant in July 2007 as rating agencies downgraded or issued a negative outlook on one thousand structured securities with sub-prime collateral. We determined U.S. Central did not own any of these specific securities but did own 10 senior tranches[14] of securities where subordinate tranches were downgraded. We found no evidence during this examination that a DOR was issued related to the concentration of mortgage-backed securities held in U.S. Central's portfolio or on management's ability to monitor and manage this risk. The examination report concluded that:

> *"U.S. Central's investment function remains conservative with the portfolio consisting primarily of the highest rated marketable securities. Additionally, U.S. Central's credit function provides adequate ongoing monitoring of all investment exposures which subject the corporate to credit risk. Monitoring of sub-prime and ALT-A mortgage related exposures have been elevated due to the increased risks in this segment of the market. No material issues were noted in these areas."*

During the March 2008 examination, the Report of Examination included a DOR which recommended that management re-evaluate the appropriateness of the existing concentration limits given the recent unprecedented dislocations in the mortgage-backed securities markets.

---

[14] The term tranche is used to describe a specific class of bonds within an offering wherein each tranche offers varying degrees of risk to the investor.

Material Loss Review – U.S. Central Federal Credit Union
OIG-10-17

Prior to the March 2008 exam, OCCU examiners and OCM staff noted no significant concerns regarding U.S. Central's investment function or its strategy to purchase large amounts of securities backed by subprime residential loans, consistently citing the following conclusion in the examination reports:

> *"U.S. Central's investment function remains conservative with the portfolio consisting of primarily the highest rated securities. Investment transactions are subject to reasonable pre-purchase analysis in accordance with regulatory and policy requirements. Additionally, U.S. Central's credit function provides adequate ongoing monitoring of all investment exposures which subject the corporate to credit risk."*

We believe NCUA should have recognized the substantial concentration risk posed by U.S. Central's significant holdings in mortgage-backed securities, especially the subprime and ALT-A mortgage related securities. We also believe that NCUA and U.S. Central should have instituted reasonable limits and placed restrictions on further subprime residential mortgage backed securities investments once these concentrations were identified. The limits outlined in the U.S. Central's Financial Risk Policy were in compliance with NCUA Regulation Part 704.6 - Credit Risk Management. However, NCUA Regulations suggest that U.S. Central should have established concentration limits by sector. The regulations do not provide specific guidance regarding concentration limits other than for investments in any single obligor, as follows:

> *(4) Concentrations of credit risk (e.g., originator of receivables, insurer, industry type, sector type, and geographic).*
>
> *(c) Concentration limits—(1) General rule. The aggregate of all investments in any single obligor is limited to 50 percent of capital or $5 million, whichever is greater.*

The NCUA Corporate Exam Guide (Guide), which was updated in March 2008, discusses the varying degrees of credit risk in the investment portfolio including the risk of the obligor or counterparty and the structure of the transaction (i.e., quality of the underlying collateral, level of subordination and/or credit enhancements). The Guide encourages examiners to ensure that corporate credit unions are properly measuring, monitoring, reporting, and controlling credit risk; particularly complex structured securities such as mortgage-backed securities, which may have numerous components of credit exposure.

The Guide also discusses the effect of credit risk in the investment portfolio on NEV and liquidity. For example, the Guide states in part,

> *"…it is important for corporate credit unions to understand and monitor the impact to NEV of potential volatility in the market value of the investment portfolio. As NEV declines, the ability to meet members' potential liquidity demands diminishes..."*

The Guide further warns of the danger of focusing on high credit ratings and the probability of default (i.e., the higher the rating the less the probability of default) stating in part:

> *"…Failing to recognize the impact on NEV of credit events other than an event of default ignores a major component of risk…"*

In our opinion, OCCU examiners and OCM staff, as well as U.S. Central management, relied too heavily on high credit ratings to determine credit risk in the portfolio. Specifically, we believe OCCU examiners and OCM staff failed to adequately assess the risk in U.S. Central's investment portfolio in accordance with the exam guide. Failure to asses this risk prevented them from recognizing earlier in the process, the inadequacy of management's assessment and monitoring of credit risk in the investment portfolio due to the large concentrations of mortgage-backed and asset-backed securities. In addition, we believe OCCU examiners and OCM staff did not recognize the significance of U.S. Central's management and Board's actions to increase the established concentration limits as needed to facilitate additional investments in mortgage-backed securities.

We determined increased supervisory oversight was warranted, in the form of:

- More timely supervisory action related to the credit risk in U.S. Central's significant concentration in mortgage-backed securities. By the time the DOR was issued in July 2008 (effective March 31, 2008), the mortgage-backed securities market had further deteriorated to the point where these securities were no longer being actively traded. Had NCUA forced U.S. Central to perform more extensive evaluation on its securities concentrations and credit risk exposure prior to the market dislocation in 2007, U.S. Central may have had the opportunity to divest some of these securities or limit their original purchase of these securities.

- More authoritative guidance related to sector concentrations and identifying and monitoring risk related to the market value of securities through the NEV, may have allowed NCUA to more effectively encourage U.S. Central's management to more proactively address the significant risks associated with U.S. Central's investment portfolio.

In summary, U.S. Central's primary role of liquidity repository and provider for the entire credit union system was essentially disregarded in favor of a more traditional retail corporate structure. The flaws in the current corporate credit union structure and the lax regulatory oversight of U.S. Central's investment activities led to its being placed into conservatorship. The lack of prudent limits on mortgage-backed securities was also determined to be a factor in the recording of large losses due to the deterioration in the market value of these securities. In addition, U.S. Central's aggressive growth strategy made it difficult for the credit union to increase capital to a level sufficient to support its growth and meet established capital adequacy plans. As a result, U.S. Central purchased excessive concentrations of high risk, higher yielding MBS, with limited

Material Loss Review – U.S. Central Federal Credit Union
OIG-10-17

governance over investment activities.  Accordingly, we are making the following
recommendations:

## Recommendations

1. We recommend NCUA evaluate the current three tier corporate structure and
   impose comprehensive changes to corporate credit union regulations and
   guidance, as warranted, to strengthen individual corporate credit unions and the
   corporate credit union system as a whole.

   *Auditor's Note: On September 24, 2010, the NCUA Board issued a final rule
   establishing a new comprehensive framework for corporate credit union safety
   and soundness.*

2. We recommend NCUA provide corporate credit unions with more definitive
   guidance on permissible security investment purchases by establishing prudent
   limits on securities.  Such guidance should include limiting investment portfolio
   concentrations by security type (agency-backed versus non-agency backed
   securities), sector type (residential real estate versus non-residential real estate),
   and by supporting collateral (private label sub-prime, Alt-A, prime, exotic
   mortgage, etc.).

   *Auditor's Note: Final amendments to NCUA Rules and Regulations Part 704
   involve major revisions to corporate credit union capital, investments, asset-
   liability management, governance, and credit union service organization (CUSO)
   activities.  The rule requires specific concentration limits by investment type and
   sector, including mortgage-backed securities.  In addition, the rule prohibits
   additional investment types that have proven to be high risk such as Net Interest
   Margin, which U.S. Central had in its portfolio.*

   *To reduce reliance on NRSRO ratings, the rule also requires multiple ratings
   from different NRSRO's when purchasing a security, with only the lowest rating
   used to exclude a security and not as authorization to include a security.*

3. We recommend NCUA revise examiner guidance on evaluating aggressive
   growth strategies when such strategies appear to include increased credit risk for
   the credit union.  Guidance should include the evaluation of growth strategies to
   determine their effect on the capital adequacy and overall safety and soundness
   of the credit union.

   *Auditor's Note: NCUA's final rule includes a provision to eliminate the lower
   retained earnings reserve requirements of wholesale corporate credit unions.
   This rule will assist with managing growth as higher capital requirements as a
   percentage of DANA would have to be maintained.*

Material Loss Review – U.S. Central Federal Credit Union
OIG-10-17

**Agency Response:**  Concur.  NCUA management agreed with the OIG's three recommendations and indicated the Board's final rule, adopted on September 24, 2010, establishes a new comprehensive framework for corporate credit union safety and soundness.  We have included management's comments in their entirety in Appendix A.

**OIG Response:**  The OIG concurs with the agency's response.

## Appendix A: NCUA Management Comments



**National Credit Union Administration**

EI/WAA:waa
SSIC1920

**TO:**      William DeSarno, Inspector General
          Office of Inspector General (OIG)

**FROM:**   Executive Director David M. Marquis
          Office of Executive Director

**SUBJ:**   Material Loss Review of U.S. Central Corporate Credit Union
          (U.S. Central)

**DATE:**   October 18, 2010

This memorandum responds to your request for review and comments on the OIG report entitled *Material Loss Review (MLR) of U.S. Central Corporate Credit Union.* U.S. Central failed due to losses associated with an excessive concentration of private label subprime and ALT-A mortgage-backed securities that deteriorated in value following the mortgage-backed securities market dislocation in mid-2007.

We acknowledge your findings that U.S. Central's aggressive growth strategy led to the purchase of excessive concentrations of high risk, higher yielding mortgage-backed securities with limited governance over these investment activities. We also recognize that earlier, more stringent regulation to limit investment concentrations may have reduced the losses incurred.

We note the report scope stops short of addressing the issue of third party influence on the losses. Third party conduct was a material factor in contributing to U.S. Central losses and the subsequent loss to the National Credit Union Share Insurance Fund. At the time U.S. Central purchased the private label mortgage-backed securities, they were AAA rated by Nationally Recognized Statistical Rating Organizations (NRSROs). At least indirectly, the NRSROs, as well as the third party firms that conducted due diligence and securitized the underlying mortgages, contributed to the losses ultimately suffered by numerous financial institutions that invested in the securities.

We agree with the three recommendations in the report in conjunction with the auditor's notes explaining the changes NCUA implemented since the report was initially drafted. In particular, on September 24, 2010, the NCUA Board issued a final rule that established a new, comprehensive framework for corporate credit union safety and soundness. The final rule prohibits investments in private label residential mortgage-backed securities and subordinated securities, as well as establishes concentration limits to ensure diverse investment pools and risk mitigation. The rule also requires corporate credit unions to maintain minimum retained earnings levels and establishes prompt corrective action requirements.

Thank you for the opportunity to comment on the report.

1775 Duke Street - Alexandria, VA 22314-3428 - 703-518-6300

Material Loss Review – U.S. Central Federal Credit Union
OIG-10-17

cc:    Jim Hagen, Deputy Inspector General for Audit
        Scott Hunt, Director OCCU
        John Ianno, Associate General Counsel
        Tim Segerson, Director E&I DOS
        Wendy Angus, Director E&I DRM

S:\SSIC\1900 - Audit and Inspection\1920 - Inspector General\US Central\USCentral MLR-draft ED Memo.docx

2