# Exhibit 5

# NATIONAL CREDIT UNION ADMINISTRATION

# OFFICE OF INSPECTOR GENERAL

### MATERIAL LOSS REVIEW OF
### WESTERN CORPORATE
### FEDERAL CREDIT UNION

**Report # OIG-10-19**
**November 16, 2010**



*William A. DeSarno*
*Inspector General*

| Released by: | Auditor-in-Charge: |
|---|---|
| | |
| **James Hagen** | **Marvin Stith** |
| **Asst IG for Audits** | **Senior Auditor** |

Material Loss Review of Western Corporate Federal Credit Union
OIG-10-19

# CONTENTS

| Section | | Page |
|---|---|---|
| I | **EXECUTIVE SUMMARY** | 1 |
| II | **BACKGROUND** | 3 |
| III | **OBJECTIVES, SCOPE AND METHODOLOGY** | 11 |
| IV | **RESULTS IN DETAIL** | 13 |
| | A. Why NCUA Conserved Western Corporate Federal Credit Union | 13 |
| | B. NCUA Supervision of Western Corporate Federal Credit Union | 30 |
| **APPENDIX** | | |
| A | NCUA Management Comments | 40 |

i

Material Loss Review of Western Corporate Federal Credit Union
OIG-10-19

## Executive Summary

The National Credit Union Administration (NCUA) Office of Inspector General (OIG) conducted a Material Loss Review of Western Corporate Federal Credit Union (WesCorp). We reviewed WesCorp to: 1) determine why NCUA placed WesCorp under federal conservatorship; and (2) assess NCUA's supervision of WesCorp. To achieve these objectives, we:

- Analyzed NCUA examination and supervision reports and related correspondence;

- Interviewed NCUA management and staff;

- Reviewed NCUA policies and procedures and Statements of Financial Condition (Corporate 5310 Reports), and

- Reviewed WesCorp policies and procedures and specific investment-related documentation.

We did not analyze the role that third party conduct, including but not limited to, the conduct of underwriters, issuers, and raters, may have played in WesCorp's losses, which resulted in NCUA placing WesCorp under federal conservatorship and ultimately, the losses to the NCUSIF and the Temporary Corporate Credit Union Stabilization Fund.

We determined WesCorp's management and Board of Directors (management) did not implement appropriate risk management practices to adequately limit or control significant risks in its investment strategy. Specifically, although management invested in high investment grade securities (AAA and AA), management implemented an aggressive investment strategy with unreasonable limits in place that allowed for excessive investments in privately-issued residential mortgage backed securities (RMBS). Management's actions allowed a substantial investment portfolio of privately-issued RMBS, resulting in a significant concentration risk, and left WesCorp increasingly vulnerable to significant credit risk, market risk, and liquidity risk through the portfolio's exposure to economic conditions in the residential real estate sector. WesCorp management's actions contributed directly to conditions that resulted in NCUA placing the corporate under federal conservatorship on March 20, 2009 and an expected loss to the Temporary Corporate Credit Union Stabilization Fund (Stabilization Fund) of $5.59 billion.

In addition, we determined Office of Corporate Credit Unions' examiners (OCCU examiners) did not adequately and aggressively address WesCorp's increasing concentration of privately-issued RMBS and the increasing exposure of WesCorp's balance sheet to credit, market, and liquidity risks. Specifically, we determined OCCU examiners did not critique or respond in a timely manner to WesCorp's growing concentrations of privately-issued RMBS in general and in particular RMBS: (1) backed

1

Material Loss Review of Western Corporate Federal Credit Union
OIG-10-19

by higher risk mortgage collateral; (2) concentrated in California; and (3) issued, originated, and serviced by Countrywide.  This occurred because NCUA did not have appropriate regulatory support in place--in the form of more specific investment concentration limits--to address the growing and risky concentration.  As a result, OCCU examiners did not have the regulatory leverage to limit or stop the growth of WesCorp's purchase of privately-issued RMBS, which would have likely mitigated WesCorp's severely distressed financial condition and expected loss as a result of the extended credit market dislocation, and thus averted NCUA's ultimate conservatorship of WesCorp.

We recommended that NCUA provide corporate credit unions with more definitive guidance on limiting investment portfolio concentrations by security type (i.e., agency-backed versus non-agency backed securities), sector type (e.g., residential real estate versus non-residential real estate), geography (e.g., less concentration in a single state), by supporting collateral (e.g., sub-prime; Alt-A; prime; adjustable rate mortgages that included payment option, interest only, or negative amortization features; etc.), and by issuer, originator, and servicer.

*Auditor's Note:*  On September 24, 2010, the NCUA Board took several actions to reform the corporate system under a stronger regulatory framework.  One of those actions was to finalize major revisions to Part 704, NCUA's rule governing corporate credit unions.  The final rule includes new limitations on corporate investments and credit risks, as well as asset-liability management controls, so that high concentrations of the types of investments that caused the corporate crisis will never be permitted again.

Material Loss Review of Western Corporate Federal Credit Union
OIG-10-19

## Background

The Corporate Credit Union System

The corporate credit union system is a three-tiered system consisting of one wholesale corporate credit union, 26 retail corporate credit unions, and nearly 7,600 natural person credit unions.  The wholesale corporate credit union (U.S. Central Federal Credit Union) provided services to the 26 retail corporate credit unions, while the retail corporate credit unions provide services to natural person credit unions, which serve the financial needs of more than 90 million members, including individuals, associations and businesses.  Retail corporate credit unions provide essential support to natural person credit unions through the delivery of liquidity, financial, payment, and correspondent products and services.

A retail corporate credit union's primary responsibility is to serve as a liquidity depository and facilitate the liquidity needs of its natural person credit union members.  As such, an inflow of deposits from member credit unions is ordinarily the primary source of liquidity for retail corporate credit unions.  Natural person credit unions generally invest their excess liquidity when their members' loan demand is low and/or their members' deposits are high.  Conversely, when their members' loan demand and/or deposit withdrawals are high, natural person credit unions draw on funds previously invested for liquidity or borrow funds as needed.

One of the many security types corporates can invest in are mortgage-backed securities (MBS), which include residential mortgage-backed securities[1] (RMBS) and commercial mortgage-backed securities (CMBS)[2].  An investor in RMBS owns an interest in a pool of mortgages, which serves as the underlying asset and source of cash flow for the security. [3]  (For details on RMBS, see the summary starting on page 4 below).

In mid 2007, the mortgage market faced a mortgage market disturbance and credit crisis (credit market dislocation) which has persisted, leading to unprecedented reevaluation and re-pricing of credit risk.[4]  As a result, there has been virtually no market for residential mortgage backed securities other than at distressed sales prices.  With the reduction in lendable value of retail corporate credit union securities, typical collateralized funding from sources such as Federal Home Loan Banks has been impaired and is, consequently, a less stable option for corporate credit unions.[5]  In addition, waning member confidence throughout this period of unprecedented economic and market disruption resulted in abnormal deposit outflows (before NCUA implemented the share guarantee program).

---

[1] A residential mortgage-backed security provides cash flows from residential debt such as mortgages, home-equity loans and sub-prime mortgages.
[2] A CMBS is security backed by mortgages on commercial properties.
[3] Throughout the remainder of the report, we will use the term RMBS as synonymous with MBS.
[4] The credit market dislocation started with sub-prime mortgages.  However, by the end of 2007 and into early 2008, the mortgage problem spread to Alt-A loans, Option ARM loans, and to prime mortgage loans.
[5] The Federal Home Loan Bank (FHLB) system is a government-chartered but member-owned enterprise that works to increase the liquidity of mortgage markets.  The FHLB increases liquidity by advancing funds to institutions that originate mortgages; which, in turn, collateralize the advances.

Material Loss Review of Western Corporate Federal Credit Union
OIG-10-19


Western Corporate Federal Credit Union (WesCorp) History

WesCorp began operations in 1969 as the California Central Credit Union, the nation's
first federally chartered central credit union organized to serve California credit unions
and credit union service organizations (CUSOs).  The field of membership was
expanded in 1975 to include all credit unions and CUSOs in the then-NCUA Region VI,
becoming the nation's first regional corporate.  Prior to obtaining a national field of
membership (FOM) in 1999, the FOM included federal and state-chartered credit unions
in Alaska, Arizona, California, Hawaii, Idaho, Montana, Nevada, Oregon, Washington
and territories of Guam and American Samoa.  In 1998 and 2003, mergers were
accomplished with Idaho and Pacific corporates.

As the result of the credit market dislocation in mid 2007, WesCorp's ability to rely on
member deposits to fund liquidity needs became dependent on increased National
Credit Union Share Insurance Fund ("NCUSIF") guarantees.  Furthermore, experts
retained by NCUA determined there were credit losses in the WesCorp portfolio that
were reasonably likely to be sustained at slightly over $6.5 billion.[6]  Considering the
difficulty in placing a specific value on the exact amount of the expected loss and
allowing for some variance in the expert's figure, NCUA indicated the amount of loss
could likely exceed all of WesCorp's existing capital.

The Board considered a number of possible actions regarding how to best address
WesCorp's problems, but determined there were no remaining viable alternatives other
than placing WesCorp into conservatorship under 12 U.S.C. §1786(h)(1)(A) of the
Federal Credit Union Act (FCU Act).  On March 19, 2009, the NCUA Board approved
the conservatorship of WesCorp and placed it into conservatorship on March 20, 2009.
At the time of conservatorship, WesCorp was the largest of the retail corporate credit
unions, with nearly $25 billion in assets and servicing more than 1,000 credit unions.

At a September 24, 2010 meeting, the NCUA Board authorized the Director of the
Office of Corporate Credit Unions (OCCU) to involuntary liquidate WesCorp on a date to
be determined by the Director of OCCU, on grounds of insolvency pursuant to 12
U.S.C. 1787(a)(1)(A).  The Director of OCCU determined that date to be
October 1, 2010.  On October 5, 2010, NCUA announced the creation of Western
Bridge Corporate Federal Credit Union to assume the operations of WesCorp and
ensure stability and minimize disruption of service to member credit unions.

Summary of Residential Mortgage-Backed Securities (RMBS) Markets[7]

The process of creating an RMBS begins when an arranger packages generally
thousands of mortgage loans into a pool, and transfers them to a trust that will issue

---

[6] The credit loss figure includes losses from collateralized debt obligations.
[7] Much of this section includes information from the United States Securities and Exchange Commission. Office of
Compliance Inspections and Examinations, Division of Trading and Markets, and Office of Economic Analysis.
*Summary Report of Issues Identified in the Commission Staff's Examinations of Select Credit Rating Agencies*,
USSEC, July 2008

Material Loss Review of Western Corporate Federal Credit Union
OIG-10-19

securities collateralized by the pool.  The trust purchases the loan pool and becomes entitled to the interest and principal payments made by the borrowers.  The trust finances the purchase of the loan pool through the issuance of RMBS to investors.  The monthly interest and principal payments from the loan pool are used to make monthly interest and principal payments to the investors in the RMBS. [8]

The mortgage loans backing an RMBS are issued by a national network of lenders consisting of mortgage bankers, savings and loan associations, commercial banks, and other lending institutions.  An investor can buy agency or non-agency RMBS:

- Agency RMBS are backed or issued by entities such as Government National Mortgage Association (GNMA or Ginnie Mae), Federal Home Loan Mortgage Corporation (FHLMC or Freddie Mac), and Federal National Mortgage Association (FNMA or Fannie Mae).  Ginnie Mae guarantees investors the timely payment of principal and interest on loans originated through the Federal Housing Association (FHA), the Department of Veterans Affairs (VA), the Rural Housing Service (RHS) and Public and Indian Housing (PIH).  Freddie Mac and Fannie Mae purchase mortgages forming pools and issue RMBS that carry a guarantee of timely payment of principal and interest to the investor.  Unlike GNMA, their obligation is not backed by the full faith and credit of the U.S. government.[9]

- Non-agency RMBS are bought through securities firms or other financial institutions.  They are often referred to as private-label paper[10] and are not guaranteed by Fannie Mae, Freddie Mac, or Ginnie Mae. [11]  Many non-agency RMBS are comprised of interest-only loans and adjustable rate mortgages, thereby exposing investors to borrowers' risk of default.[12]

A trust typically issues different tranches[13] of RMBS offering a sliding scale of coupon rates based on the level of credit protection afforded to the security.  Credit protection is designed to shield the tranche securities from the loss of interest and principal due to defaults of the loans in the pool.  The degree of credit protection afforded a tranche security is known as its credit enhancement[14] and is provided through several means:

---

[8] To find out what is in an RMBS, investors need to thoroughly assess the security, including the originator, underwriter and borrowers--because when mortgage loans are nonperforming, the actual loss is passed on to investors.

[9] Fidelity Investments. "Mortgage-Backed Securities Product Overview". Fidelity.com. August 5, 2010 <http://personal.fidelity.com/products/fixedincome/pombs.shtml>

[10] Unless otherwise noted, we refer to these "private-label" securities as non-agency or privately-issued.

[11] Unlike with agency-backed securities, timely payment of principal and interest to investors in privately-issued securities is not guaranteed.

[12] RMBS not backed by the federal government generally carry a higher risk of default than RMBS backed by the federal government, which carry only some or no risk of default.

[13] A tranche is one of the classes of debt securities issued as part of a single bond or instrument.  Securities often are issued in tranches to meet different investor objectives for portfolio diversification.  Each tranche is paid off consecutively; as one bond matures, the next is paid down in a steppingstone progression.

[14] Credit enhancements are techniques used to improve the credit rating of securities, generally to get investment grade ratings from a bond rating agency and to improve the marketability of the securities to investors.

Material Loss Review of Western Corporate Federal Credit Union
OIG-10-19

- The primary source of credit enhancement is *subordination*, which creates a hierarchy of loss absorption among the tranche securities. For example, if a trust issued securities in 10 different tranches, the first (or senior) tranche would have nine subordinate tranches, the next highest tranche would have eight subordinate tranches and so on down the capital structure. Any loss of interest and principal experienced by the trust from delinquencies and defaults in loans in the pool are allocated first to the lowest tranche until it loses all of its principal amount and then to the next lowest tranche and so on up the capital structure. Consequently, the senior tranche would not incur any loss until all the lower tranches have absorbed losses from the underlying loans.

- A second form of credit enhancement is *over-collateralization*, which is the amount that the principal balance of the mortgage pool exceeds the principal balance of the tranche securities issued by the trust. This excess principal creates an additional "equity" tranche below the lowest tranche security to absorb losses. In the example above, the equity tranche would sit below the tenth tranche security and protect it from the first losses experienced as a result of defaulting loans.

- A third form of credit enhancement is *excess spread*, which is the amount that the trust's monthly interest income exceeds its monthly liabilities. Excess spread is comprised of the amount by which the total interest received on the underlying loans exceeds the total interest payments due to investors in the tranche securities. This excess spread can be used to build up loss reserves or pay off delinquent interest payments due to a tranche security.

A key step in the process of creating and ultimately selling an RMBS is the issuance of a credit rating for each of the tranches issued by a trust. The arranger of the RMBS initiates the ratings process by sending the credit rating agency a range of data on each of the loans to be held by the trust (e.g., principal amount, geographic location of the property, credit history and FICO score of the borrower, ratio of the loan amount to the value of the property and type of loan: first lien, second lien, primary residence, secondary residence), the proposed capital structure of the trust and the proposed levels of credit enhancement to be provided to each RMBS tranche issued by the trust. A lead analyst at the rating agency is assigned responsibility for analyzing the loan pool, proposed capital structure, and proposed credit enhancement levels, and for ultimately formulating a ratings recommendation for a rating committee. The credit rating for each rated tranche indicates the credit rating agency's view as to the creditworthiness of the debt instrument. Creditworthiness is assessed in terms of the likelihood that the issuer would default on its obligations to make interest and principal payments on the debt instrument.

By regulation, corporate credit unions are only allowed to invest in highly rated securities. Corporate credit unions have traditionally used these securities as part of their overall balance sheet management in meeting their member liquidity needs. Historically, the securities could be readily sold in the market or used for collateralized

Material Loss Review of Western Corporate Federal Credit Union
OIG-10-19

borrowing to obtain liquidity, and the values of the securities had experienced little or no loss.[15]

<u>Securities and Exchange Commission (SEC) Findings Regarding Nationally Recognized Statistical Rating Organizations (NRSRO)</u> [16]

Beginning in 2007, delinquency and foreclosure rates for sub-prime mortgage loans in the United States dramatically increased, creating turmoil in the markets for RMBS backed by such loans.  The rating agencies' performance in rating these structured finance products raised questions about the accuracy of their credit ratings generally, as well as the integrity of the ratings process as a whole.  In August 2007, the SEC initiated examinations of three credit rating agencies (NRSROs) -- Fitch Ratings, Ltd. ("Fitch"), Moody's Investor Services, Inc. ("Moody's"), and Standard & Poor's Ratings Services ("S&P") -- to review their role in the turmoil in the sub-prime mortgage-related securities markets.

The SEC's examination review generally covered a period starting from January 2004 through July 2008 when the report was issued.  We identified the following three key findings from the SEC report that highlighted flaws in the RMBS ratings process:

- There was no requirement that a rating agency verify the information contained in RMBS loan portfolios presented to it for rating.  Additionally, rating agencies were not required to insist that issuers perform due diligence, and they were not required to obtain reports concerning the level of due diligence performed by issuers.  Each rating agency publicly disclosed that it did not engage in any due diligence or otherwise seek to verify the accuracy or quality of the loan data underlying the RMBS pools they rated during the review period.  Each rating agency's "Code of Conduct" clearly stated that it was under no obligation to perform, and did not perform, due diligence.  Each agency also noted that the assignment of a rating is not a guarantee of the accuracy, completeness, or timeliness of the information relied on in connection with the rating.  The rating agencies each relied on the information provided to them by the sponsor of the RMBS.  They did not verify the integrity and accuracy of such information as, in their view, due diligence duties belonged to the other parties in the process.  They also did not seek representations from sponsors that due diligence was performed.

- Each of the NRSROs examined used the "issuer pays" model, in which the arranger or other entity that issues the security is also seeking the rating, and pays the rating agency for the rating.  The conflict of interest inherent in this model is that rating agencies have an interest in generating business from the firms that seek the rating, which could conflict with providing ratings of integrity.

---

[15] NCUA. *Corporate Credit Union System Strategy,* January 2009 (Letter No. 09-CU-02)

[16] United States Securities and Exchange Commission. Office of Compliance Inspections and Examinations, Division of Trading and Markets, and Office of Economic Analysis. *Summary Report of Issues Identified in the Commission Staff's Examinations of Select Credit Rating Agencies*, USSEC, July 2008

Material Loss Review of Western Corporate Federal Credit Union
OIG-10-19

NRSROs are required to establish, maintain and enforce policies and procedures reasonably designed to address and manage conflicts of interest. However, although each rating agency had policies and procedures restricting analysts from participating in fee discussions with issuers, these policies still allowed key participants in the ratings process to participate in fee discussions.

- While NRSROs were not required under the law to perform surveillance, a rating agency would generally monitor the accuracy of its ratings on an ongoing basis in order to change the ratings when circumstances indicate that a change is required. This process is generally called "monitoring" or "surveillance," and each rating agency charges issuers, up front or annually, ratings surveillance fees. However, weaknesses existed in the rating agencies' surveillance efforts – lack of resources, poor documentation, and lack of procedures.

RMBS Collateral:  Alt-A and Sub-Prime Mortgages

Within the U.S. mortgage industry, different mortgage products are generally defined by how they differ from mortgages guaranteed by the Government-Sponsored Enterprises (GSEs) Fannie Mae and Freddie Mac.  Sub-prime borrowers generally do not qualify for traditional loans because of their low credit ratings or other factors that suggest that they have a reasonable chance of defaulting on the debt repayment.

In addition, industry experts indicated that the growing popularity of nontraditional loans created a rise in so-called Alt-A RMBS.  As a result, far more RMBS are supported by borrowers who are considered riskier than borrowers with traditional "prime" credit, yet not as risky as sub-prime borrowers.[17]  The biggest growth within non-agency RMBS had been in the area of Alt-A.  There is no true industry standard for Alt-A; Alt-A pools differ depending on programs and originators.  However, there are numerous factors that might cause a mortgage to be classified as "alternatives" to the standard of conforming, GSE-backed mortgages.  Following are a few of the more important factors characterizing Alt-A mortgages:

- Reduced borrower income and asset documentation (e.g., "stated income," "stated assets," "no income verification").  Reduced documentation mortgage loans are intended to assist borrowers obtain mortgage financing when their income, employment, or assets are difficult to verify.  For example:

  o With stated income mortgages, a borrower's income is stated on the application, but is not verified.

  o No documentation mortgages are loans in which employment, income, or assets are not included on the loan application.

---

[17] Lenders may make subprime loans to borrowers who would not ordinarily qualify for credit if customary underwriting standards were applied.  To offset the increased risk that these borrowers might default, lenders charge higher interest rates than they offer to creditworthy borrowers and assess additional fees.

Material Loss Review of Western Corporate Federal Credit Union
OIG-10-19

- Borrower debt-to-income ratios that are above what Fannie or Freddie will allow for the borrower credit, assets, and type of property being financed.

- Credit history with too many problems to qualify for an "agency" loan, but not so many as to require a sub-prime loan.

- Loan to value (LTV) ratios (percentage of the property price being borrowed) are above agency limits for the property, occupancy, or borrower characteristics involved.

Alt-A and sub-prime differ in that, generally speaking, while a sub-prime borrower would suffer from exceptionally weak credit, income or asset characteristics, an Alt-A borrower would have a sufficient financial profile to qualify for a "conforming" mortgage, if not for one of the above factors.

RMBS Collateral:  Home Equity Loans, Exotic Adjustable Rate Mortgages, and Non-Traditional Mortgages

In May 2005, NCUA issued guidance to its Federally Insured Credit Unions regarding managing credit risk in home equity lending.  NCUA indicated that (1) home equity loans were typically long-term with interest-only features that did not require amortization of principal for a protracted period; (2) home equity lines of credit (HELOCs) were inherently vulnerable to rising interest rates; and (3) with the rise in home values and demand for home equity lending, many financial institutions relaxed underwriting standards associated with these loans, such as higher loan-to-value and debt-to-income ratios.

In October 2005, NCUA also issued guidance to its Federally Insured Credit Unions regarding generally increasing risks in mortgage lending.  NCUA indicated there was (1) a demand for more exotic adjustable rate mortgages, which may increase credit risk in an environment of increasing interest rates and flattening or declining home appreciation; and (2) a trend toward liberalized underwriting standards, which increases credit risk.  NCUA highlighted that (a) lenient credit and underwriting standards combined with higher LTVs, interest only, or negative amortization loans and rapid home value appreciation, could result in increased default rates; and (b) higher LTVs combined with lower credit scores results in increased defaults.

In October 2006, NCUA issued additional guidance to its Federally Insured Credit Unions in regards to: (1) managing risks associated with open-end HELOCs that contain interest-only features; and (2) addressing risks associated with the growing use of non-traditional mortgage products—including interest-only and payment option adjustable-rate mortgages--that allow borrowers to defer payment of principal and, sometimes, interest.

Material Loss Review of Western Corporate Federal Credit Union
OIG-10-19

Corporate Credit Union Examinations

The NCUA Office of Corporate Credit Unions (OCCU) fulfills its mission by promoting and ensuring the safety and soundness of the Corporate Credit Union System (System), principally through a program of continual supervision.  Supervision includes, but is not limited to, the on-site examination of corporate credit unions resulting in an examination report.[18]

OCCU's overall supervision goal is to ensure the safety and soundness of the System by: (1) continuously evaluating and supervising the financial condition and performance of individual corporates and their service organizations; and (2) reporting those conditions to the NCUA Board in a timely manner.  The key element in accomplishing OCCU's goal is the timely identification and resolution of any problem or condition that might have a material impact on a corporate, the System, or the NCUSIF.  Annual examinations are required and performed for all corporates.  The scope of each examination and supervisory contact is determined by the examiner-in-charge and the Corporate Field Supervisor, targeting problems and high-risk areas.

Corporates qualifying for Type III supervision[19] will be assigned a capital markets specialist (CMS[20]) from OCCU on a full-time basis.[21]  Maintaining an on-site presence promotes interaction with the corporate's staff and allows the CMS to maintain a working knowledge of the corporate's operations, especially in the capital markets areas (investments, asset and liability management, risk monitoring, etc.).  The knowledge gained through on-site supervision allows the CMS to more effectively monitor and evaluate financial changes.

NCUA's Office of Capital Markets Role in Evaluating Investment Activity

The Office of Capital Markets (OCM) develops agency policies and procedures related to credit union investments and asset liability management.  OCM also assists examiners in evaluating investment and asset and liability management issues in credit unions and provides expert advice to the Board on investment issues.

*Auditor's Note:*  We reviewed OCM's role in the examination of WesCorp during the July 2003 through June 2007 examinations and noted that prior to the June 2007 examination, OCM's assistance was in reviewing Asset/Liability Management.  The June 2007 examination marked the first involvement of OCM staff in reviews specifically

---

[18] The goal of the on-site supervision presence is to develop and maintain a thorough understanding of the operations and risk profiles of large complex corporates.

[19] Corporates which qualify for Type III supervision generally have billions of dollars in assets, and/or have expanded powers in excess of Part I and exercise their approved powers in a significant and assertive manner.  In addition, Type III corporates have complex and innovative operations, and/or have a significant impact in the marketplace and on the corporate and/or credit union system, and/or present unusual or unique examination and supervision problems, which cannot be adequately addressed by Type I or Type II supervision.

[20] Regarding new investment strategies, the CMS is responsible for monitoring the corporate's investment portfolio to identify changes in and/or variances from investment strategies and assessing the impact of changing economic conditions.

[21] WesCorp met the requirements for Type III supervision.

Material Loss Review of Western Corporate Federal Credit Union
OIG-10-19

addressing the concentration and credit quality of WesCorp's investment portfolio, which was around the time of the market dislocation.

## Objectives, Scope and Methodology

The FCU Act requires the NCUA Office of Inspector General (OIG) to conduct a material loss review (MLR) of an insured credit union if the loss to the NCUSIF[22] exceeds $10 million and an amount equal to 10 percent of the total assets of the credit union at the time at which the Board initiated assistance or was appointed liquidating agent.[23], [24]  NCUA notified the OIG of a loss reserve for WesCorp of $5.59 billion. Consequently, in accordance with the FCU Act and Chapter 3 of the NCUA Special Assistance Manual, we initiated a MLR.

The objectives of our review were to: (1) determine why NCUA placed WesCorp under federal conservatorship; and (2) assess NCUA's supervision of the corporate.  To accomplish our review, we conducted fieldwork at NCUA's headquarters in Alexandria, VA.  The scope of our review covered the period from NCUA's July 2003 examination of WesCorp through October 2010 when NCUA created the Western Bridge Corporate Federal Credit Union.

We conducted this review from March 2010 to November 2010 in accordance with generally accepted government auditing standards.  Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives.  We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

To determine the cause of WesCorp's conservatorship and assess the adequacy of NCUA's supervision we:

- Analyzed NCUA examination and supervision reports and related correspondence;

- Interviewed NCUA management and staff;

---

[22] On May 20, 2009, Congress enacted the Helping Families Save Their Homes Act, which amended the Federal Credit Union Act to create the Temporary Corporate Credit Union Stabilization Fund (Stabilization Fund).  The Stabilization Fund established a process for attaining funds to pay costs associated with the corporate credit union stabilization by borrowing from the U.S. Department of the Treasury and repaying the borrowed funds with assessments of all federally insured credit unions over a seven year period.  One of the costs incurred to stabilize the corporate credit unions included guaranteeing the natural person credit unions' deposits in the corporates.  The payment of the insured amounts in a liquidating corporate credit union is primarily a liability of the NCUSIF.  However, the Stabilization Fund legislation allows for the NCUA Board to use the Stabilization Fund to make the payment.
[23] See section 216 of the FCU Act, 12 U.S.C. § 1790d(j).
[24] With the passage of the "Dodd-Frank Wall Street Reform and Consumer Protection Act," Pub. L. no. 111-203, 124 Stat. 1376 (2010), the threshold loss amount that would require the OIG to conduct a MLR was increased from $10 million to $25 million.

Material Loss Review of Western Corporate Federal Credit Union
OIG-10-19

- Reviewed NCUA policies and procedures and Statements of Financial Condition (Corporate 5310 Reports), and

- Reviewed WesCorp policies and procedures and specific investment-related documentation.

We did not analyze the role that third party conduct, including but not limited to, the conduct of underwriters, issuers, and raters, may have played in WesCorp's losses, which resulted in NCUA placing WesCorp under federal conservatorship and ultimately, the losses to the NCUSIF and the Temporary Corporate Credit Union Stabilization Fund.

We used computer-processed data from NCUA's Corporate 5310 Reports.  We did not test the controls over these systems.  However, we relied on our analysis of information from management reports, correspondence files, and interviews to corroborate data obtained from these systems to support our audit conclusions.

Material Loss Review of Western Corporate Federal Credit Union
OIG-10-19

## Results in Detail

We determined WesCorp management's actions contributed directly to conditions that resulted in NCUA placing the corporate under federal conservatorship and an expected loss to the Stabilization Fund of $5.59 billion.  In addition, we determined Office of Corporate Credit Unions' examiners (OCCU examiners) would have likely been able to mitigate these conditions and the expected loss to the Stabilization Fund had appropriate regulatory support--in the form of more specific investment concentration limits--been available to allow the OCCU examiners to take stronger and more aggressive supervisory actions over WesCorp regarding its investment strategy.

## A.  Why NCUA Conserved Western Federal Corporate Credit Union

WesCorp's management and Board of Directors (management) did not implement appropriate risk management practices to adequately limit or control significant risks in its investment strategy.  Specifically, although management invested in high investment grade securities (AAA and AA), management implemented an aggressive investment strategy with unreasonable limits in place that allowed for excessive investments in privately-issued residential mortgage backed securities[25] (RMBS).  Management's actions allowed a substantial investment portfolio of privately-issued RMBS, resulting in a significant concentration risk,[26] and left WesCorp increasingly vulnerable to significant credit risk,[27] market risk,[28] and liquidity risk[29] through the portfolio's exposure to economic conditions in the residential real estate sector.

We determined WesCorp management created significant concentration risk, credit risk, market risk, and liquidity risk by overexposing its investment portfolio to privately-issued securities (1) in a single market sector; (2) in a single geographic real estate market; (3) in a higher risk subordinated class; and (4) collateralized largely with higher risk underlying residential mortgage collateral.

Table 1 summarizes selected annual WesCorp financial information for the periods between 2006 and 2008:

---

[25] An RMBS provides cash flows from residential debt such as mortgages, home-equity loans and sub-prime mortgages.

[26] Concentration risk is the risk associated with having excessive exposure to securities that have related market and/or credit risk.  Concentration in market risk could include, but is not limited to, excessive exposure to interest rate, basis, embedded option and/or liquidity risks.  Concentration in credit risk usually includes excessive exposure to certain industries, groups, or individuals.

[27] Credit risk is:  (1) Exposure to loss as a result of default on a debt, swap or some other counterparty instrument; (2) Exposure to loss as a result of a decline in market value stemming from a credit downgrade of an issuer or counterparty; (3) A component of return variability resulting from the possibility of an event of default; or (4) A change in the market's perception of the probability of an event of default (affecting spreads).

[28] Market risk is the risk that the value of a portfolio, either an investment portfolio or a trading portfolio, will decrease due to the change in value of the market risk factors.

[29] Liquidity risk is the risk that funds may not be available to meet cash outflows when they arise.  This may arise because of insufficient cash flow or because the assets designated as cash equivalents are not able to be sold quickly without causing a large decline in the market value.  Liquidity risk also can become significant if the financial condition of an institution is deteriorating and members and creditors begin to withdraw or demand payment of their funds.

Material Loss Review of Western Corporate Federal Credit Union
OIG-10-19

| | 12/31/2008 (Includes OTT) | 12/31/2008[30] | 12/31/2007 | 12/31/2006 |
|---|---|---|---|---|
| Assets | $14,099,635,919 | $24,390,946,793 | $32,517,008,547 | $30,046,960,034 |
| Investments | $11,411,736,680 | $21,739,260,333 | $29,311,383,241 | $26,506,614,189 |
| Shares | $15,733,605,946 | $15,733,605,945 | $19,617,084,013 | $18,554,810,421 |
| Unrealized Gains(Losses) | ($4,256,284,307) | ($1,665,757,902) | (727,047,797) | ($5,585,252) |
| Retained Earnings | ($5,791,653,875) | $803,063,608 | $752,496,988 | $679,648,940 |
| Total Capital | ($5,791,653,875) | $1,941,537,078 | $2,008,283,790 | $1,696,513,959 |
| Net Economic Value (NEV)[31] | ($10,858,230,000) | ($1,889,511,000) | $1,048,691,000 | $1,721,900,000 |

Table 1: Selected WesCorp Financial Information

_Concentration Risk, Credit Risk, Market Risk and Liquidity Risk Associated with WesCorp's Investment Portfolio_

WesCorp's investment portfolio includes a substantial concentration of privately-issued securities directly linked to the residential real estate mortgage sector. WesCorp's investment portfolio includes not only Mortgage-Related Securities[32] (MRS) (as defined by the SEC), but also RMBS collateralized with first and second lien mortgages, Asset-Backed Securities[33] (ABS[34]) collateralized with first and second lien mortgages, ABS backed by home equity loans and home equity lines of credit secured by first lien and second lien mortgages, and Collateralized Debt Obligations[35] (CDOs) backed by securities collateralized with residential real estate mortgages.[36],[37] In addition, this portfolio has a large concentration of investments with underlying collateral (1) in a single state's residential real estate market; (2) originated[38] and serviced[39] by a single

---

[30] This December 2008 data is unaudited and does not include other than temporary impairments.

[31] NEV measures the fair value of assets less the fair value of liabilities.

[32] A privately-issued security secured by real estate upon which is located a dwelling, mixed residential and commercial structure, residential manufactured home, or commercial structure, that is rated in one of the two highest rating categories by at least one nationally-recognized statistical rating organization.

[33] A security that is primarily serviced by the cash flows of a discrete pool of receivables or other financial assets that by their terms convert into cash within a finite time period plus any rights or other assets designed to assure the servicing or timely distribution of proceeds to the security holders. This definition excludes "mortgage related securities."

[34] Bonds backed by high quality mortgage loans are considered Mortgage Backed Securities (MBS). Bonds backed by home equity loans and other home loans less than high quality are considered Asset Backed Securities.

[35] A CDO is an investment-grade security backed by a pool of bonds, loans and other assets. It provides a means to create fixed-income securities from a pool of diversified debt instruments with differing yields and risks and allows the issuance of securities with a higher credit rating than the securities used to back the CDOs.

[36] For the purposes of this review, we will refer to this portfolio of securities collectively as RMBS unless otherwise indicated.

[37] A September 17, 2009 report published by Standard & Poor's (S&P)--_Commentary Report: Mortgage-Related Losses Aren't Over for Bond Issuers_--addressed the deterioration of Alternative-A (Alt-A), sub-prime, closed-end second (CES), and home equity line of credit (HELOC) mortgages backing the 2005–2007 MBS vintages. The report indicated the industry's RMBS exposure to HELOC and CES products accounted for the majority of S&P's projected RMBS loss, accounting for 76.6 percent of total RMBS projected losses.

[38] A mortgage originator is an institution or individual that works with a borrower to complete a mortgage transaction. A mortgage originator can be either a mortgage broker or a mortgage banker, and is the original mortgage lender.

[39] Mortgage servicing is the collection of monthly payments and penalties, record keeping, payment of insurance and taxes, and possible settlement of defaults.

14

Material Loss Review of Western Corporate Federal Credit Union
OIG-10-19

financial institution; and (3) collateralized largely with higher risk underlying residential mortgages.

NCUA 'Rules and Regulations' requires:

- A corporate credit union's board of directors to be responsible for approving a corporate's comprehensive written strategic plans and policies; and

- Corporates to operate according to a credit risk management policy that is commensurate with the investment risks and activities it undertakes.  At a minimum, corporates must implement a credit risk management policy that addresses concentrations of credit risk (e.g., originator of receivables, insurer, industry type, sector type, and geographic).

In addition, NCUA requires that all investments, other than in a corporate credit union or CUSO, must have an applicable credit rating from at least one nationally recognized statistical rating organization (NRSRO).

NCUA guidance[40] advises that:

- A credit rating is not a substitute for prudent due diligence and should only be considered as one factor in an investment decision.  The ratings and other opinions issued by rating agencies are not recommendations to buy securities and there is not a warranty on the accuracy, timeliness, completeness or fitness of the information provided.

- Credit Analysts are not expected to possess greater insights than rating agencies, but they are expected to understand the implications and conclusions of a rating agency's research and form an independent judgment.

- There is a danger corporates may focus upon high credit ratings and therefore consider default improbable.  Corporates need to consider how concentrations of credit risk will change when market or credit conditions change.  Failing to recognize the impact of credit events other than an event of default ignores a major component of risk.

- Credit risk managers must be mindful that credit ratings are generally a lagging indicator.

- In order for corporates to best manage credit risk exposure, management should be predisposed to take rational and timely steps towards rebalancing or reducing credit risk in the portfolio as needed.

---

[40] NCUA Corporate Examiner's Guide

Material Loss Review of Western Corporate Federal Credit Union
OIG-10-19

- The Asset/Liability Committee (ALCO) and board of directors have a fiduciary responsibility to be aware of the risk assumed by management and be assured that management is actively managing risk.

- Prudent investment portfolio management practices, such as managing concentration risk and maintaining diversification, are as important for corporates as for other investors.

- Failure to manage concentration risk or adequately diversify the portfolio may give rise to excessive liquidity risk. Corporates must be especially mindful of liquidity when making investment decisions since investment portfolio(s) are the primary source of funds to meet ongoing and contingent liquidity demands.

*Concentration of Privately-Issued RMBS*

We determined from a sample of WesCorp securities data as of December 31, 2008, that nearly 70% ($15.8 billion) of WesCorp's $22.7 billion investment portfolio (face value) was comprised of privately-issued RMBS.[41]  Specifically, we determined the following concentrations of privately-issued security types and their respective collateral backing the RMBS portfolio (Table 2):

| Security Type | Actual/Target[42] Collateral[43] | $ Value | Percentage of Portfolio |
|---|---|---|---|
| ABS HELOCS | Home Equity and HELOC Mortgages secured by 1st lien and 2nd lien residential real estate | $    23,755,670.00 | 0.10% |
| ABS Home Equity 2nds | 2nd lien mortgages and HELOCs | $    26,707,138.00 | 0.12% |
| ABS Sub-Prime | Mortgages secured by 1st lien and 2nd lien residential real estate | $4,145,760,111.00 | 18.28% |
| CDO-ABS | 66% to 100% of underlying securities are backed by residential real estate mortgages | $   542,932,316.00 | 2.39% |
| MRS-Alt-A | Residential real estate mortgage-related security (MRS) | $3,285,292,186.00 | 14.49% |
| MRS-Alt-A Option ARM | Residential real estate mortgage-related security | $6,220,955,355.00 | 27.43% |
| MRS-Prime-Jumbo | Residential real estate mortgage-related security | $1,014,802,278.00 | 4.47% |
| MRS-Prime-Jumbo Option ARM | Residential real estate mortgage-related security | $   521,948,705.00 | 2.30% |
| Total | | $15,782,153,759.00 | 69.59% |

Table 2:  WesCorp Privately-Issued RMBS Types and Collateral as of December 31, 2008

Consequently, since the mortgage market disturbance and credit crisis (credit market dislocation) began in mid 2007, WesCorp has been unable to divest of its substantial RMBS holdings without incurring significant losses.  Ultimately, the lack of a viable

---

[41] The WesCorp financial data as of December 31, 2008 was unaudited and did not include other than temporary impairments.
[42] Only one of the CDO's we sampled indicated 'targeted' asset classes.  Collateral for the remaining CDOs and all other securities provided actual data.  We reviewed 100% of the CDOs.
[43] The description of collateral based on data available in the pre-purchase Credit Memoranda.

Material Loss Review of Western Corporate Federal Credit Union
OIG-10-19

market for RMBS led to NCUA's action to: (1) place WesCorp into federal conservatorship pursuant to 12 U.S.C. § 1786(h)(1) based on the need to conserve WesCorp's assets, provide liquidity to its member credit unions, safeguard the interests of member credit unions, protect the NCUSIF; and (2) provide Special Assistance to WesCorp under section 208 of the FCU Act, 12 U.S.C. § 1788.

WesCorp management allowed for significant concentration limits in the privately-issued mortgage-backed real estate sector as illustrated by the following maximum concentration limits (as a percentage of capital) between 2003 and 2007 for each private-label[44] investment type (Table 3):

| Private Label Investment Type - Rating | Percentage of Capital by Year | | | | |
| | 2003 (Policy as of July 03) | 2004 (Policy as of Dec 04) | 2005 (Policy as of Nov 05) | 2006 (Policy as of Nov 06) | 2007 (Policy as of Dec 07) |
|---|---|---|---|---|---|
| ABS/MRS - AAA Rated | 1500% | 1500% | 1500% | 1500% | 1500% |
| ABS/MRS - AA Rated | 100% | 250% | 350% | 350% | 350% |
| CDOs - AAA Rated | NA | NA | 100% | 100% | 100% |

**Table 3: Maximum Allowable WesCorp Concentrations of Private Label Securities per WesCorp Policy**

It was evident throughout NCUA examinations that WesCorp was in fact pursuing an aggressive investment strategy to accumulate RMBS. Following are findings or observations by OCCU examiners and the OIG regarding WesCorp's investment strategy between 2003 and 2007 that contributed to its excessive concentrations of privately-issued RMBS:

- OCCU examiners noted during the July 2003 examination that although WesCorp was maintaining a relatively low-risk investment portfolio that was diversified by issuer as well as concentrated with AAA rated securities, WesCorp increased its exposure to "private mortgage related obligations" by 66 percent from $4.1 billion to $6.8 billion between May 2002 and April 2003.

- We noted that as of July 2003, WesCorp's exposure to privately-issued MRS ($7.7 billion) was 33 percent of its total $23.2 billion in investments and 30 percent of its total $25.3 billion in assets. In addition, the MRS investments were valued at more than 500 percent of WesCorp's capital, and total investments were valued at just over 1,600 percent of capital.

---

[44] Private Label is the term WesCorp uses in its policies. A "private-label" security is synonymous with a "non-agency" security.

17

Material Loss Review of Western Corporate Federal Credit Union
OIG-10-19

- During the August 2004 examination, OCCU examiners indicated:

  o The most notable trend at WesCorp since April 2003 had been a continued increase in private mortgage related issues, and a reduction in U.S. Central obligations and government and agency mortgage-related issues.

  o WesCorp's investment strategy was targeting a portfolio size of approximately $18 billion. We noted that as of August 2004, WesCorp's total investments were already valued at $21 billion.

  o WesCorp had limited the purchase of fixed rate securities because management felt returns were not adequate given the market outlook.

  o WesCorp targeted its purchases towards RMBS, commercial MBS, domestic and foreign ABS, and collateralized debt obligations.

- During the July 2005 examination, OCCU examiners noted:

  o WesCorp's investment and asset-liability management strategy during most of the period had been to target a portfolio size of $18 to $19 billion. We noted total investments had increased nearly 8 percent since the last examination to $22.9 billion, valued at nearly 1400 percent of capital.

  o Although WesCorp had taken steps to minimize overall credit exposure, including diversification across geographic areas and issuers, its investments were skewed heavily toward real estate secured products. The most significant portfolio change was a continued increase in private mortgage-related issues - up 54 percent since April 2003.

- During the July 2006 examination, OCCU examiners indicated:

  o WesCorp's strategy was to target a $20 billion investment portfolio. We noted that total investments were $22 billion and were valued at just over 1300 percent of capital.

  o WesCorp had continued its trend of increasing exposure to private-label MRS. We noted WesCorp's privately-issued MRS investments accounted for 60 percent of its total investment portfolio.

- During the June 2007 examination, OCCU examiners and OCM staff indicated:

  o WesCorp's investment target portfolio was increased from $20 billion to $26 billion due to on-going inflows of member funds and corresponding increases in member capital share deposits. WesCorp's investment portfolio had grown to $29.49 billion since the July 2006 examination.

18

Material Loss Review of Western Corporate Federal Credit Union
OIG-10-19

- o Private label MRS had grown to $20.11 billion, accounting for 69 percent of the total investment portfolio.  We noted this represented almost 1100 percent of WesCorp's $1.9 billion in capital.

- We noted that by July 2007, WesCorp's privately-issued MRS ($19.9 billion) represented 71 percent of its total investments of $27.9 billion and 64 percent of its total $31.3 billion in assets.

WesCorp's aggressive investment strategy resulted in increasing concentrations of privately-issued MRS between 2003 and 2007.  Chart 1 below illustrates the growth and concentration of WesCorp's MRS in relation to total investments and total assets between July 2003 and December 2008.  WesCorp's privately-issued MRS peaked at $20.11 billion in June 2007.



**Chart 1:** Concentrations of Privately Issued Mortgage-Related Securities Compared to Total Investments and Assets ($ Billions)

Material Loss Review of Western Corporate Federal Credit Union
OIG-10-19

Chart 2 below illustrates WesCorp's privately-issued MRS and total investments as a
percentage of total capital during the same period.



**Chart 2:** Ratios of Privately-Issued Mortgage-Related Securites and Assets to Capital (%)

We believe that WesCorp management implemented an aggressive investment strategy
(i.e, had high limits) in an effort to increase its profitability and become more
competitive.  Specifically:

- In September 2004, GAO issued a report indicating that corporates were facing
  an increasingly challenging business environment that would potentially stress
  their overall financial condition.[45]  Since 2000, a large influx of deposits, coupled
  with low returns on traditional corporate investments, had constrained earnings
  and caused a downward trend in corporates' overall profitability.  To generate
  earnings, corporates increasingly targeted more sophisticated and potentially
  riskier investments.

Because of this significant concentration of privately-issued securities linked to the
residential real estate market without the backing of the federal government, WesCorp
left its balance sheet highly vulnerable to economic conditions in the residential real
estate market.  As a result, WesCorp was exposed to significantly increased credit risk,
market risk and liquidity risk.

---

[45] Report to the Ranking Minority Member, Committee on Banking, Housing, and Urban Affairs, U.S. Senate
"Corporate Credit Unions: Competitive Environment May Stress Financial Condition, Posing Challenges for NCUA
Oversight" (GAO-04-977, September 2004)

Material Loss Review of Western Corporate Federal Credit Union
OIG-10-19

*Concentration of Privately-Issued RMBS Collateralized with Mortgages in a Single*
*Residential Real Estate Market*

We determined that with most of WesCorp's investment purchases, a significant portion
of the underlying mortgage collateral for each purchase was located in California.
WesCorp's investment policy provided that up to 75 percent of the underlying collateral
of domestic mortgage-related securities in any one state was adequate geographic
diversification.

We reviewed credit memoranda WesCorp staff used to justify the purchase of 176
RMBS WesCorp held as of December 31, 2008.  We determined 98 percent (172) of
the securities included underlying residential mortgage collateral in California, ranging
from 16 percent to 75 percent, and averaging 50 percent per security.  More
significantly, WesCorp reported that as of June 2007 (at its peak around the start of the
credit market dislocation), the market value of collateral concentrated in California was
valued at more than 475 percent of WesCorp's capital.  The value of privately-issued
MRS with mortgage exposure in California as a percentage of capital accounted for
almost half of WesCorp's nearly 1100 percent concentration in privately-issued MRS as
of June 2007.  The next closest geographic concentration was a distant 89 percent
concentration in Florida.

We did not determine why WesCorp allowed up to 75 percent of the underlying
collateral of each security to be in any one state.  However, we determined that absent
more restrictive NCUA guidelines or regulations, WesCorp was clearly allowed to
determine that such a high concentration in a single state fit within the investment risks
it was willing to undertake to pursue increased profits and remain competitive.

As a result of this significant concentration of mortgage collateral in California, WesCorp
left its balance sheet largely vulnerable to economic conditions in a single state, thereby
increasing its vulnerability to credit, market, and liquidity risks.

*Concentration of Privately-Issued RMBS Collateralized with Mortgages Issued,*
*Originated and Serviced by a Single Financial Institution*

OCM staff noted during the June 2007 examination that WesCorp had a large
concentration of RMBS with loans serviced or originated by Countrywide Home Loan,
Inc. (Countrywide).  In addition, as an issuer, Countrywide had issued--as a percentage
of capital--the second highest concentration of RMBS in WesCorp's privately-issued
RMBS portfolio.

OCM staff also noted that WesCorp management had issuer program limits in place;
however, OCCU examiners and OCM staff indicated they did not have concentration
limits by originator or servicer as of the June 2007 examination.  In addition, they
observed during this examination that a large concentration of mortgage-backed
securities were serviced or originated by Countrywide.  Specifically:

21

- As of June 2007, WesCorp reported that Countrywide originated, as a percentage of capital, 200 percent of the underlying collateral within WesCorp's investment portfolio. We believe this was a significant concentration and occurred because, although WesCorp had program limits for its issuers, it did not have any restrictions on the percentage of mortgage collateral that could be originated by a specific entity and included in a security issue. As a result, not only were Countrywide-issued RMBS (collateralized by Countrywide-originated mortgages as discussed below) included in WesCorp's RMBS portfolio, but WesCorp also purchased RMBS issued by other financial institutions that were also comprised of Countrywide-originated mortgages. For example, the underlying mortgage collateral of a specific security issued by Greenwich Capital/Royal Bank of Scotland was collateralized entirely (100 percent) with Countrywide-originated mortgages. The next highest originator concentration was a distant 120 percent of WesCorp's capital. OCCU examiners and OCM staff indicated WesCorp had not established concentration limits for originators based on any documented research of potential risk exposures.

- WesCorp also reported that as of June 2007, Countrywide was the servicer for over 220 percent of the underlying mortgage collateral within its investment portfolio. OCCU examiners indicated during the June 2007 examination that to be consistent with its portfolio management practices, WesCorp should establish servicing concentration limits. When WesCorp approved Countrywide servicer limits in August 2007, WesCorp established the limit at 250 percent of WesCorp's capital. The next highest limit WesCorp established for a servicer was for Washington Mutual at 125 percent of capital approved in July 2007. As of June 2007, Washington Mutual was already servicing 95 percent of the underlying mortgage collateral within WesCorp's investment portfolio. Again, OCCU examiners and OCM staff indicated WesCorp had not established concentration limits for servicers based on any documented research of potential risk exposures. We believe WesCorp set servicer limits to accommodate existing levels within its portfolio rather than to control those levels.

Furthermore, as of June 2007, Countrywide had issued a large concentration of WesCorp's RMBS (126 percent of WesCorp capital) - the second highest issuer concentration within WesCorp's portfolio.[46] We noted that, as applicable, WesCorp increased issuers' limits over time as the actual percentage their RMBS represented of WesCorp's investment portfolio increased. Specifically, we noted that as of April 2003, the limit for Countrywide as an issuer was 50 percent of WesCorp's capital. As of February 2004, WesCorp had increased the limit to 125 percent of capital at a time when Countrywide-issued RMBS were valued at more than 75 percent of WesCorp's capital. We noted that as of May 2006, Countrywide's RMBS issuances were valued at more than 117 percent of WesCorp capital. By August 2006, WesCorp had again increased Countrywide's limit as an issuer--to 150 percent of WesCorp's capital. We found no strategic rationale for or a risk assessment to justify the increases. Therefore,

---

[46] The highest issuer concentration as of June 2007 was valued at 135 percent of WesCorp's capital.

Material Loss Review of Western Corporate Federal Credit Union
OIG-10-19

we believe these increases were likely a function of WesCorp's ongoing investment purchases approaching its previously established issuer program limits.

We believe that in having such a significant concentration of RMBS originated, issued and serviced by a single financial institution, WesCorp exposed its own balance sheet to the economic viability of that single entity as a business enterprise, including the pressures that a company may face to remain afloat in changing economic environments.[47]  Those pressures could impact the quality of underlying collateral within a security or the quality of the servicing of the collateral within the security.

## Concentration of Privately-Issued RMBS in a Subordinated Category

NCUA determined in April 2009 that WesCorp had a large concentration--over one-third--of mezzanine securities backed by Alt-A and Option ARM (negative amortization) loans.  In the simplest terms, mezzanine securities insulate more senior securities within the bond structure by absorbing any losses before they reach the senior securities.[48]  See 'Summary of RMBS Markets' starting on page 4 above, which provides information on RMBS tranches, losses and credit enhancement.  In review, the primary method of credit enhancement is *subordination* through which the holders of the more senior tranches are paid prior to the more junior (or subordinate) tranches.  Furthermore, the next most senior tranches are the mezzanine tranches, which carry higher risk and pay a correspondingly higher interest rate.  The most junior tranche in the structure was called the equity or residual tranche and was set up to receive whatever cash flow was left over after all other tranches had been paid.  These tranches, which were typically not rated, suffered the first losses on any defaults of mortgages in the pool.  The following figure (Figure 1) illustrates and explains how losses and cash flows are applied to tranches.[49]

---

[47] For example, Bank of America acquired troubled Countrywide on January 11, 2008.  At the time, Countrywide held one in six home loans in the U.S. and was the nation's largest mortgage servicer.
[48] Despite the support role of these mezzanine securities, they were rated AAA (or equivalent) at issuance.
[49] The percentages used are for illustration purposes only.

Material Loss Review of Western Corporate Federal Credit Union
OIG-10-19



Figure 1: How Losses are Applied to Security Tranches.

NCUA also determined in April 2009 that: (1) losses for Alt-A and Option ARM loans were projected to exceed the initial AAA subordination in many deals; and (2) due to their first loss position within the AAA portion of the bond, many of WesCorp's mezzanine securities were expected to incur losses in excess of 50 percent of the remaining principal.

*Concentration of Privately-Issued RMBS with Higher Risk Mortgage Collateral*

WesCorp pursued a strategy of purchasing privately-issued RMBS collateralized by sub-prime and Alt-A residential mortgage loans which we believe reflected relaxed lending standards. Specifically, we determined the underlying collateral was comprised largely of sub-prime and Alt-A mortgages underwritten with risky loan terms or characteristics. Using NCUA-provided data valued as of December 2008, WesCorp's RMBS portfolio classified as Alt-A and sub-prime was $13.7 billion and accounted for 60 percent of the total $22.7 billion investment portfolio and 87 percent of the $15.8 million privately-issued RMBS segment of the portfolio. Consequently, WesCorp's investment portfolio of RMBS exposed WesCorp's balance sheet to significant credit and market risk.[50]

We found it concerning that NCUA would (appropriately) issue warnings and guidance to its Federally Insured Credit Unions in 2005 and 2006 regarding higher risk mortgage loans (see "Background" section of this report), but WesCorp invested heavily in

---

[50] We noted there is a perspective in the industry that indicates [mortgage] originators have less incentive towards credit quality and greater incentive towards loan volume since they do not bear the long-term risk of the assets they have created and may simply profit by the fees associated with origination and securitization.

Material Loss Review of Western Corporate Federal Credit Union
OIG-10-19

securities collateralized by these same higher risk mortgage loans that created exposure to increased credit risk.  We recognize that part of the securitization and ratings process includes credit enhancements[51] to mitigate the risk of potential losses to the investor (as discussed in the Background section on pages 5 through 6).  We also understand that while WesCorp considered credit enhancements in each of its purchase decisions, we believe WesCorp, in its efforts to increase investment yields to remain competitive, should have been more vigilant about investing so heavily in higher risk residential mortgage loans taken out by borrowers with the questionable ability to repay the mortgages.

We obtained a listing of 888 securities WesCorp held as of December 2008 valued at $22.7 billion, and identified 681 valued at $15.8 billion as privately-issued securities linked to the residential real estate market (i.e., MRS, ABS, HELOC, Home Equity seconds, and CDOs as presented in Table 2 earlier in the report).

We reviewed 176 of the 681 RMBS and determined that with many of the securities the borrowers and underlying mortgage collateral were approved with higher risk loan terms and characteristics.  These securities included 134 RMBS classified as Alt-A and 32 classified as sub-prime.  The risky terms and characteristics included such aspects as adjustable rate mortgages with payment option[52], interest only, and negative amortization[53] features, combined in some cases with high (Combined) LTVs ((C)LTVs), less than prime borrower credit scores, and reduced requirements for borrowers to document/prove their capacity to repay the loans (i.e., poor documentation requirements).[54]  In addition, we identified 107 of these securities that included "silent second" mortgages and a few securities collateralized with "scratch and dent" mortgages (see below for an explanation of these terms and practices).  The following subsections address our findings in each of these areas:

Poor Documentation Requirements:  We determined each of the 176 WesCorp securities we reviewed were backed by mortgages approved with at least one of the following borrower documentation requirements:

- Stated Documentation[55] – 164 securities.  We found that on average, 41 percent of the mortgage pool of each these securities were approved based on stated income documentation requirements (ranging from one percent to 95 percent of the underlying collateral).

---

[51] Credit enhancements are techniques used to improve the credit rating of securities, generally to get investment grade ratings from a bond rating agency and to improve the marketability of the securities to investors.

[52] A payment-option ARM (Option ARM) is an adjustable-rate mortgage that allows the borrower to choose among several payment options each month.  The options typically include:  (1) a traditional payment of principal and interest; (2) an interest-only payment; and (3) a minimum (or limited) payment that may be less than the amount of interest due and may not reduce the amount owed on the mortgage.

[53] Negative amortization occurs when the borrower only makes the minimum payment each month.  As a result, the payment will not reduce the amount the borrower owes and it may not cover the interest due. The unpaid interest is added to the amount owed on the mortgage, and the mortgage loan balance increases. Therefore, even after making many payments, the borrower could owe more than they did at the beginning of the loan.

[54] NCUA officials determined that as of December 31, 2008, nearly 30 percent ($6.7 billion) of WesCorp's privately-issued RMBS were Option ARMs (see Table 2 earlier in the report).

[55] We included "stated income", "stated income verified assets", and "stated income state assets in this category."

Material Loss Review of Western Corporate Federal Credit Union
OIG-10-19

- Limited or Reduced Documentation – 98 securities.  We found that on average, 50 percent of the mortgage pool of these securities were approved under these documentation requirements (ranging from one percent to 93 percent of the collateral).

- No Documentation – 50 securities.  We found that on average, 21 percent of these securities' mortgage pools were approved without any documentation being required (ranging from two percent to 61 percent of the collateral).

Poor Documentation Combined with Other Higher Risk Mortgage Terms and Characteristics:  We determined that the securities WesCorp purchased included the following combinations of higher risk loan terms and characteristics:

- More than 90 percent of the 176 securities (160) we reviewed that included borrowers approved with poor documentation requirements also included exotic mortgage collateral (i.e., adjustable rate mortgages that included payment option, interest only, or negative amortization features).

- Nearly 50 percent of the securities (87) combined poor borrower documentation requirements with (C)LTVs greater than 80 percent.

- Approximately 40 percent of the securities (71) included borrowers approved under poor documentation requirements combined with (C)LTVs greater than 80 percent and funded by exotic mortgages.

- Seventeen percent of the securities (30) included borrowers approved with poor documentation requirements and lower credit scores combined with (C)LTVs greater than 80 percent.

"Silent Second" Mortgages:  As mentioned above, we specifically selected and reviewed 107 (16 percent of the 681) privately-issued RMBS WesCorp held as of December 2008 that included collateral linked to silent second mortgages.  A silent second mortgage occurs when a buyer of a property borrows the down payment from the seller through the issuance of a non-disclosed second mortgage.  The primary lender believes the borrower has invested their own money in the down payment, when in fact, it is borrowed.  The second mortgage may not be recorded in order to further conceal its status from the primary lender.  The Federal Bureau of Investigation (FBI) listed this practice in its Financial Crimes Report to the Public (for fiscal years 2005, 2006 and 2007) as a common mortgage fraud scheme.  Some of the securities we reviewed did not indicate the percentage of the first lien mortgage collateral in the pool linked to silent seconds.  However, where a percentage was provided, it ranged between two percent up to 92 percent of the collateral.

26

Material Loss Review of Western Corporate Federal Credit Union
OIG-10-19

"Scratch and Dent" Mortgages:  A "scratch and dent" mortgage is one that has any one or combination of defects stemming from:  (1) originations made outside a lender's implemented credit guidelines; (2) deficiencies in loan documentation; (3) errors made in following regulatory compliance laws; (4) irregular payment history; or (5) borrower defaults.  These mortgages may also include loans to borrowers who have filed for bankruptcy (in the past or after the subject loan was made), borrowers currently in the foreclosure process, or loans found to be fraudulent after closing (occupancy, income, employment, etc.).  In addition, this term has in the past primarily referred to loans that were either "sub-performing," "re-performing," or "non-performing" in their cash flows/payments.

We identified very few (11) securities partially collateralized with "scratch and dent" mortgages.[56]  However, we found it unsettling that the ratings process could allow for rating securities backed by mortgages of such low quality in the highest investment grade (AAA).  For example, one of the most revealing credit memos WesCorp used to justify the purchase of a AAA-rated RMBS indicated the underlying mortgages were classified as "scratch & dent" for the following reasons:

| | | |
|---|---|---|
| o | Past delinquencies | 35 percent |
| o | Underwriting exceptions | 27 percent |
| o | Appraisal Variance | 21 percent |
| o | Modified Loan | 5 percent |
| o | Bankruptcy Plan | 3 percent |
| o | Other (forbearance plan, cured documentation, in bankruptcy) | 1 – 9 percent |

We reviewed a sample of the credit memoranda WesCorp used to assess and justify the purchase of the privately-issued RMBS.[57]  We determined that the investments were all rated AAA or AA.  We also determined that WesCorp did not specifically or solely rely on the NRSRO ratings.  WesCorp's justifications included reviews of the strength of the underlying collateral, underwriting quality, and the strength of credit enhancements.  It was clear (in reviewing some of the credit memoranda) that WesCorp counted, where applicable, on securities paying off through their full lives before borrower payments associated with interest-only or negative amortization features

---

[56] We did not include these securities in the 176 we reviewed.
[57] The credit memoranda we reviewed supported WesCorp's purchase of 212 of the 681 privately-issued RMBS held as of December 31, 2008.

Material Loss Review of Western Corporate Federal Credit Union
OIG-10-19

increased and adversely impacted a borrower's ability to continue to pay on the mortgage. A corporate examiner who served as an examiner-in-charge of WesCorp independently indicated that WesCorp management believed they would be divested of the RMBS prior to any payment shocks in the underlying collateral. It is also clear that credit enhancements did not protect WesCorp's RMBS portfolio from losses we believe were directly associated with poor quality underlying collateral resulting from loose underwriting standards.

Considering our review of the Credit Memos WesCorp used to justify the purchase of its RMBS and our analysis of the RMBS collateral, we can only conclude that WesCorp management and staff may have given more weight to the credit ratings, albeit flawed, and (where applicable) to the RMBS fully paying off, than to their own rational assessment of the actual risks presented by the underlying residential real estate mortgage collateral, borrower qualifications, and WesCorp's increasing exposure to the residential real estate market.

More importantly, WesCorp management's aggressive investment strategy resulted in various and significantly higher risk concentrations and left WesCorp vulnerable to significant credit, market and liquidity risks. Specifically, NCUA determined that:

- WesCorp had substantial unrealized losses in its investment portfolio. Specifically, as of December 31, 2008, WesCorp's total investment portfolio had incurred almost $3 billion in unrealized losses, including $1.7 billion in net unrealized losses and $1.3 billion in unrecorded investment devaluations. Taking into consideration WesCorp's total investment devaluations (including recorded net unrealized losses and unrecorded investment devaluations), 150 percent of WesCorp's capital was at risk.

- WesCorp was economically insolvent. Specifically, by March 2009, NCUA determined:

  o Losses embedded in WesCorp's securities portfolio had significantly eroded its net economic value (NEV), which had deteriorated to negative $1.89 billion as of December 2008. As a result, WesCorp's asset fair values could not support its shares and liabilities. As of February 2009, NEV decreased by another $1.8 billion.

  o When WesCorp's other than temporary impairments (OTTI) was produced ($740 million), approximately 90 percent of WesCorp's retained earnings were impaired.[58]

---

[58] NCUA indicated that, subject to the provisions of Financial Accounting Statement 115, which became effective December 1993, if it is probable a corporate credit union will be unable to collect all amounts due according to the contractual terms of a debt security not impaired at acquisition, an other-than-temporary impairment (OTTI) shall be considered to have occurred. Therefore, if the decline in fair value is determined to be an OTTI, the cost basis of the individual security(s) shall be written down to fair value as a new cost basis and the amount of the write-down shall be realized in earnings.

- o Almost half of WesCorp's investment portfolio was comprised of securities below investment grade.  Using NRSRO ratings as of February 23, 2009, $12.1 billion, or 53.5 percent, were rated investment grade and $10.5 billion, or 46.5 percent, were rated non-investment grade when using the lowest published rating by Standard and Poor's, Moody's or Fitch.

- WesCorp was no longer able to adequately provide liquidity.  Specifically, the liquidity value of nearly 90 percent of WesCorp's balance sheet was severely distressed.  Consequently, management was unable to reposition the balance sheet through sales of securities without incurring irrecoverable losses.  In addition, the ability to use these securities as collateral for borrowings had been significantly diminished.  Therefore, the vast majority of WesCorp's balance sheet could no longer be effectively used to meet daily funding needs.  WesCorp became increasingly dependent on external and government-guaranteed funding sources.

Because NCUA 'Rules and Regulations' does not provide corporates with specific limits for concentrations of credit risk, NCUA, by default, leaves it entirely up to each corporate to determine their risk levels/limits in their policies.  Clearly, this allowed WesCorp to build significant and excessive concentrations of securities in a single market sector, within a single state, and linked to a single financial institution.

## B.  NCUA Supervision of Western Corporate Federal Credit Union

We determined OCCU examiners did not adequately and aggressively address WesCorp's increasing concentration of privately-issued Residential Mortgage-Backed Securities (RMBS) and the increasing exposure of WesCorp's balance sheet to credit, market, and liquidity risks.  Specifically, we determined OCCU examiners did not critique or respond in a timely manner to WesCorp's growing concentrations of privately-issued RMBS in general and in particular RMBS: (1) backed by higher risk mortgage collateral; (2) concentrated in California; and (3) issued, originated, and serviced by Countrywide.  This occurred because the staff did not have the appropriate regulatory support--in the form of more specific investment concentration limits--to address the growing and risky concentration.  As a result, OCCU examiners did not have the regulatory leverage to limit or stop the growth of WesCorp's purchase of privately-issued RMBS, which would have likely mitigated WesCorp's severely distressed financial condition and expected loss as a result of the extended credit market dislocation, and thus averted NCUA's ultimate conservatorship of WesCorp.

NCUA 'Rules and Regulations' requires corporates to operate according to a credit risk management policy that is commensurate with the investment risks and activities it undertakes.  At a minimum, corporates must implement a credit risk management policy that addresses concentrations of credit risk (e.g., originator of receivables, insurer, industry type, sector type, and geographic).

WesCorp's investment policy and procedures provided for the following concentration limits:

- Up to 1,950 percent of WesCorp's capital could be invested in private-label securities backed by residential mortgages.

- Up to 75 percent of the underlying collateral of domestic mortgage-related securities could be located in any one state.

- Maximum concentrations per issuer.

In addition, NCUA 'Rules and Regulations' requires that: (1) all investments, other than in a corporate credit union or CUSO, must have an applicable credit rating from at least one nationally recognized statistical rating organization (NRSRO) and (2) investments with long-term ratings must be rated no lower than AA– (or equivalent), and investments with short-term ratings must be rated no lower than A–1 (or equivalent) at the time of purchase.  However, the NCUA Corporate Examiner's Guide advises examiners that:

- A credit rating is not a substitute for prudent due diligence and should only be considered as one factor in an investment decision.  The ratings and other opinions issued by rating agencies are not recommendations to buy securities and there is not a warranty on the accuracy, timeliness, completeness or fitness of the information provided.  It is simply one tool to assist an investor in making

Material Loss Review of Western Corporate Federal Credit Union
OIG-10-19

investment decisions.  Analysts are expected to understand the implications and conclusions of a rating agency's research and form an independent judgment.

- Credit risk managers must be mindful that credit ratings are generally a lagging indicator.

- There is a danger corporates may focus upon high credit ratings and simply consider the improbability of default.  Corporates need to consider how concentrations of credit risk will change when market or credit conditions change.  Failing to recognize the impact of credit events other than an event of default ignores a major component of risk.

- Failure to manage concentration risk or adequately diversify the portfolio may give rise to excessive liquidity risk.  Corporates must be especially mindful of liquidity when making investment decisions since investment portfolio(s) are the primary source of funds to meet ongoing and contingent liquidity demands.

Furthermore, NCUA guidance advises that when combined with a potentially overpriced real estate market, the impact of exotic adjustable rate mortgages increases risk tremendously, especially if interest rates rise and the rate of home appreciation flattens or declines.

<u>Concentrations of Privately-Issued RMBS (Collateralized by Higher Risk Mortgages) Not Adequately Addressed</u>

We determined that although OCCU examiners recognized the increasing concentration of privately-issued RMBS in WesCorp's investment portfolio early on, they did not respond in a timely manner to the increasing exposure of WesCorp's balance sheet to credit, market, and liquidity risks.  Specifically, we determined OCCU examiners did not require or even advise WesCorp management to limit or reduce its concentration of privately-issued RMBS, or its concentration of RMBS backed by Alt-A and sub-prime mortgage collateral and collateral comprised of exotic adjustable rate mortgages.

Charts 3 and 4 below illustrate the concentration of WesCorp's Privately-Issued RMBS in terms of value (Chart 3) and as a percentage of capital (Chart 4) during select periods between July 2003 and December 2008.  We noted that as of June 2007, around the start of the credit market dislocation, nearly 85 percent of WesCorp's credit sensitive securities[59] were AAA-rated and approximately 15 percent were AA-rated.  By February 2008, less than one percent of the investments were rated less than AA.  However, by February 23, 2009, nearly 47 percent of WesCorp's securities were rated non-investment grade (i.e., BB and below).[60]

---

[59] WesCorp's credit sensitive securities included private-label ABS/MRS, CMBS, and CDOs.
[60] These ratings are based on the lowest of the S&P, Moody's, or Fitch-assigned ratings.  Using only WesCorp's primary NRSRO (S&P) ratings, 23 percent of the securities were below investment grade.

Material Loss Review of Western Corporate Federal Credit Union
OIG-10-19





Material Loss Review of Western Corporate Federal Credit Union
OIG-10-19

We reviewed WesCorp examination files and reports from July 2003 through February 2008 and determined that although OCCU examiners observed the ever-growing concentration of privately-issued RMBS starting with the July 2003 examination, they did not criticize or take action to address or limit the concentration until the February 2008 examination--well after the credit market dislocation began in mid 2007. Specifically, OCCU examiners continually indicated WesCorp's investment portfolio was well diversified and its exposures and credit limits were within regulatory constraints. Also, OCCU examiners informed us WesCorp management knew it was in compliance with NCUA requirements. Therefore, the examiners knew they had limited, if any options to address the concentrations. OCCU examiners did not issue a finding or Document of Resolution (DOR) to address this concentration until February 2008, after credit and liquidity issues began to surface. For example:

- During the July 2005 examination, NCUA corporate OCCU examiners indicated that WesCorp's investments were skewed heavily toward real estate secured products with one of the most significant portfolio changes being a continued increase in private mortgage-related issues--up by 54 percent since April 2003. However, OCCU examiners also indicated WesCorp continued to purchase top quality products and had taken appropriate steps to minimize overall credit exposure, including diversification across issuers and geographic areas. Furthermore, OCCU examiners indicated all reported RMBS exposures conformed to the requirements of Section 704.6 of the NCUA Rules and Regulations.

- During the July 2006 examination, OCCU examiners indicated that exposure to real estate as a collateral was increasing and private-label MRS had increased from 46 percent to 60 percent of total investments since the July 2005 examination. OCCU examiners indicated the portfolio was of high quality with over 80 percent of securities rated AAA, and several levels of diversification mitigated risk, i.e., geographical concentration limits were in place, single issuer exposures were substantially under regulatory limits, and mortgage types, collateral types, and borrower qualifications were varied. In addition, OCCU examiners indicated all established limits conformed to the requirements of Section 704.6 of the NCUA Rules and Regulations.

- During the June 2007 examination, OCCU examiners indicated the most substantive change in WesCorp's investment portfolio included mortgage-backed securities, with private-label mortgage-related securities representing 69 percent of the portfolio. However, OCCU examiners and OCM staff indicated that: (1) overall the portfolio was generally well diversified by industry and sector; (2) WesCorp was in general compliance with the requirements of Sections 704.6 and 704.10 of the NCUA Rules and Regulations; and (3) purchases were focused on higher quality, AAA-rated sectors.

In addition, we noted that during the July 2003 and through July 2006 examinations, corporate OCCU examiners never questioned the quality of the mortgages

Material Loss Review of Western Corporate Federal Credit Union
OIG-10-19

collateralizing WesCorp's RMBS portfolio.  In addition, OCM staff did not question the quality of collateral during the June 2007 examination when they reviewed WesCorp's investment portfolio.[61]  Interestingly, we noted NCUA issued lending guidance to its federally-insured credit unions in 2005 (and additional guidance in 2006) in regards to (1) managing the credit risks created by relaxed underwriting standards associated with home equity loans and; and (2) increasing risks in mortgage lending via exotic adjustable rate mortgages and lenient credit and underwriting standards.  Nevertheless, neither NCUA officials nor OCCU examiners warned WesCorp about the risks associated with investing heavily in privately-issued RMBS backed by these same higher risk mortgage products until April 2007--shortly before the credit market dislocation began.[62]  We noted that as of December 31, 2008, nearly 70 percent of WesCorp's total investment portfolio was comprised of privately-issued RMBS ($15.8 billion), with 26 percent of the RMBS portfolio classified as sub-prime-related securities valued at $4.1 billion and 60 percent as Alt-A-related securities valued at $9.5 billion.

As discussed in Section A, we reviewed a sample of these securities and determined that in many cases, the securities were collateralized with mortgages approved with higher risk terms and characteristics.  Specifically, the mortgages or borrowers were approved with some combination of drastically reduced documentation requirements (e.g., stated income, or limited/reduced/no documentation); exotic mortgages (e.g., adjustable rate mortgages with payment option, interest-only, and negative amortization features); and associated with "silent second" mortgages[63].  In addition, we identified a few securities WesCorp purchased that were classified as "scratch and dent" (see Section A, pg 24, for an explanation of this security type).  Furthermore, WesCorp also invested in Collateralized Debt Obligations (CDOs)[64] collateralized partially with non-investment grade real estate-related securities.[65]  For example, one CDO WesCorp owned (that was collateralized with multiple security types including RMBS) indicated that "non-investment grade collateral is limited to RMBS."  Within this CDO, 19 percent of the portfolio was below investment grade.  Another CDO WesCorp owned was collateralized primarily with residential real estate-related securities in which nearly 38 percent of these underlying securities were rated below investment grade.

Finally, during the February 2008 examination, OCCU examiners indicated that past risk tolerances and investment strategies resulted in elevated credit risk concentrations, limiting flexibility in the balance sheet.  To address this, OCCU examiners issued a DOR item indicating that although portfolio sector diversification limits were within regulatory maximums, WesCorp's current and allowable RMBS concentrations were significant, thereby increasing its exposure to market, credit, liquidity, and reputation risks while

---

[61] Prior to the June 2007 examination, OCM staff assistance was limited to reviews of Asset/Liability Management.  The June 2007 examination marked the first involvement of OCM staff in reviews specifically addressing the concentration and quality of WesCorp's investment portfolio.

[62] NCUA Office of Corporate Credit Unions issued a letter to corporates (Credit and Market Value Risks of Mortgage-Backed Securities (MBS), April 18, 2007) noting concerns with MBS having underlying sub-prime or nontraditional mortgages.

[63] We discussed "silent second mortgages" in detail on page 24 of Section A.

[64] Collateralized debt obligations (CDOs) are a type of structured asset-backed security (ABS) whose value and payments are derived from a portfolio of fixed-income underlying assets.

[65] As of December 2008, WesCorp held 10 CDOs valued at $543 million.

Material Loss Review of Western Corporate Federal Credit Union
OIG-10-19

limiting balance sheet flexibility.  Despite this issue, we noted that OCCU examiners were touting the "overall fundamental quality" of WesCorp's investment portfolio--noting that WesCorp's portfolio remained vastly comprised of AAA securities.  On the other hand, OCCU examiners simultaneously noted that confidence in credit rating agencies had waned.

Although the level of WesCorp's RMBS never threatened WesCorp's self-imposed limit of 1,950 percent, we believe that not only was WesCorp's concentration of RMBS excessive, but also the limits themselves were excessive.  Clearly, (1) NCUA's focus on investment ratings and (2) the absence of more stringent concentration guidelines by NCUA facilitated WesCorp's excessive limits for and concentrations of privately-issued RMBS.  In addition, we believe that because of the focus on credit ratings provided by the credit rating agencies, OCCU examiners had limited leverage to criticize WesCorp management's investment choices despite the questionable quality of the underlying mortgages.  In view of the SEC findings regarding the lack of due diligence by the rating agencies on the quality of underlying RMBS collateral (see Background section of this report), we believe there should be little surprise that the credit market dislocation severely distressed WesCorp's balance sheet.

<u>Concentrations of RMBS by Geography, Issuer[66], Originator[67], and Servicer[68]</u>

We determined OCCU examiners either did not recognize or did not take issue with the potential risk associated with WesCorp's geographic, issuer, originator, and servicer limits or concentrations early on.  As a result, WesCorp's concentrations of RMBS with collateral in a single state – California – became excessive.  In addition, a large concentration of WesCorp's RMBS was associated with a single financial entity - Countrywide Home Loans, Inc. (Countrywide).  As of the annual examination periods between August 2004 and February 2008, Countrywide had the highest single concentrations as originator and servicer of the underlying mortgage collateral within WesCorp's RMBS portfolio.  Countrywide was also the highest issuer of securities in WesCorp's portfolio except for as of the June 2007 examination date when it was second behind Washington Mutual Mortgage Services Corporation.

Specifically, we noted that between August 2004 and February 2008, the portion of the RMBS portfolio having collateral in California ranged between 45 percent and 67 percent of WesCorp's entire concentration of privately-issued RMBS.  Chart 5 below illustrates WesCorp's concentrations of RMBS with collateral in California between the 2004 and 2008 examination dates, compared to WesCorp's privately-issued MRS as a percentage of capital.

---

[66] An issuer is the entity that issues a security.
[67] An originator is an entity that works with a borrower to complete a mortgage transaction.
[68] A mortgage servicer's functions include collecting mortgage payments and penalties, maintaining the mortgage records, paying the property insurance and taxes and may include settling mortgage defaults.

Material Loss Review of Western Corporate Federal Credit Union
OIG-10-19



In addition, we noted that although WesCorp management had issuer limits in place, they did not have limits in place for originators or servicers. Furthermore, with some issuers, management increased issuer limits over time with no evidence of a corresponding rationale or risk assessment. Specifically, as discussed in Section A:

- Although WesCorp tracked concentrations by originators, it did not have limits on originator concentrations. Consequently, a financial institution (Institution A) could issue securities with mortgages it originated, and another institution (Institution B) could also issue a security that was 100 percent collateralized with mortgages originated by institution A. In the case of Countrywide, this allowed the concentration of securities with Countrywide-originated mortgages to account for 200 percent of WesCorp's capital as of June 2007.

- Although WesCorp tracked concentrations by servicer, it did not have limits on servicer concentrations.

  o OCCU examiners and OCM staff recognized this during the June 2007 examination and OCCU examiners addressed the issue in a finding; however, by that time Countrywide was already the servicer for over 220 percent of the underlying mortgage collateral within WesCorp's investment portfolio as a percentage of capital.

  o We noted that the December 2007 ALCO package indicated WesCorp management approved Countrywide servicer limits in August 2007 at 250 percent of WesCorp's capital.

Material Loss Review of Western Corporate Federal Credit Union
OIG-10-19

- WesCorp had issuer limits in place as a percentage of capital.  However, we observed that, as applicable, WesCorp periodically increased issuers' limits over time when the level of a particular issuer's securities it held increased. Specifically:

  o  We noted that as of April 2003, the limit for Countrywide as an issuer was 50 percent of WesCorp's capital.

  o  By February 2004, WesCorp had increased the limit to 125 percent of capital, and its exposure to Countrywide-issued RMBS were valued at more than 75 percent of WesCorp's capital.

  o  As of May 2006, WesCorp's exposure to Countrywide-issued RMBS were valued at more than 117 percent of WesCorp's capital.

  o  By August 2006, WesCorp had again increased Countrywide's limit as an issuer--to 150 percent of WesCorp's capital, and its exposure to Countrywide was 124 percent.

  o  As of June 2007, Countrywide-issued RMBS were valued at 126 percent of WesCorp's capital.

Chart 6 below illustrates WesCorp's holdings (as a percentage of capital) of Countrywide-issued RMBS and RMBS collateral originated or serviced by Countrywide between August 2004 and February 2008:



Material Loss Review of Western Corporate Federal Credit Union
OIG-10-19

Despite WesCorp periodically increasing issuer limits without apparent rationale, we did not find evidence that OCCU examiners questioned or took issue with the increasing limits.  More importantly, despite the growing concentrations of RMBS associated with California and with Countrywide as the issuer, originator and servicer, we found no evidence OCCU examiners took notice of or questioned the concentration levels until the June 2007 examination—at about the start of the credit market dislocation.  Specifically, OCCU examiners issued a finding during the examination regarding the lack of limits based on potential risk exposures from servicers and originators.  However, this occurred after NCUA issued a letter to corporates in April 2007 advising them to control material exposures to a single originator or servicer.

NCUA 'Rules and Regulations' focuses on investment ratings and only requires corporates to *address* concentrations of credit risk in their policy, leaving it entirely up to each corporate to determine their risk levels/limits.  This general requirement limited OCCU examiners options in addressing WesCorp's investment strategy and growing concentrations in a single market sector, within a single state, and linked to a single financial institution.  If NCUA had more specific concentration limits in place, we believe OCCU examiners would have likely been able to mitigate the conditions that led to WesCorp's excessive concentration of privately-issued RMBS and the expected loss to the Stabilization Fund.

**Recommendation:**  NCUA should provide corporate credit unions with more definitive guidance on limiting investment portfolio concentrations by security type (i.e., agency-backed versus non-agency backed securities), sector type (e.g., residential real estate versus non-residential real estate), geography (e.g., less concentration in a single state), by supporting collateral (e.g., sub-prime; Alt-A; prime; adjustable rate mortgages with payment option, interest-only, and negative amortization features; etc.), and by issuer, originator, and servicer.

*Auditor's Note:* On September 24, 2010, the NCUA Board took several actions to reform the corporate system under a stronger regulatory framework.  One of those actions was to finalize major revisions to Part 704, NCUA's rule governing corporate credit unions.[69]  The final rule includes new limitations on corporate investments and credit risks, as well as asset-liability management controls, so that high concentrations of the types of investments that caused the corporate crisis will never be permitted again.  Specifically, the final rule includes the following:

- Prohibits investments in private label residential mortgage-backed securities (RMBS) and subordinated securities.[70]

- Prohibits investments in collateralized debt obligations (CDOs).

---

[69] The new corporate rule will become effective 90 days after it is published in the *Federal Register*.
[70] Private label RMBS and subordinated securities, together, caused almost all of the credit losses in the corporate system since 2007.

Material Loss Review of Western Corporate Federal Credit Union
OIG-10-19

- Reduces the single obligor limits from 50 percent of capital to 25 percent of capital, with slightly higher limits for mutual fund investments.

- Imposes specific concentration limits by investment sector.[71],[72]

- Eliminates Part II expanded authority, thus making "A-" the lowest possible rating for an NRSRO-rated investment purchased by a corporate with expanded investment authority.

- Requires that a corporate examine the NRSRO rating from every NRSRO that publicly rates a particular investment and only employ the lowest of those ratings. It further requires that at least 90 percent of a corporate's investments be rated by at least two NRSROs.

**Agency Response:**  NCUA management agreed that (1) WesCorp failed due to losses associated with an excessive concentration of privately-issued residential mortgage-backed securities (RMBS); (2) WesCorp's risk management practices failed to identify the nature and extent of the concentration and other risks developed in the RMBS portfolio; and (3) examiners lacked regulatory leverage to enforce limits.  In addition, NCUA management indicated that revisions to the Corporate Credit Union Rule, approved on September 24, 2010 and addressed in NCUA Letter to Credit Unions 10-CU-20, contain stronger concentration limits and provisions to prevent the purchase of privately-issued RMBS.  We have included management's comments in their entirety in Appendix A.

**OIG Response:**  The OIG concurs with NCUA's response.

---

[71] Sectors include residential mortgage backed securities, commercial mortgage backed securities, student loan asset backed securities, automobile loan/lease asset backed securities, credit card asset backed securities, other asset backed securities, corporate debt obligations, municipal securities, money market mutual funds, and an "all others" category to account for the development of new investment types.
[72] The sector limits are, generally, 1) the lower of 500 percent of capital/25 percent of assets, or 2) the lower of 1000 percent of capital/50 percent of assets (for the less risky sectors).

Material Loss Review of Western Corporate Federal Credit Union
OIG-10-19

## Appendix A – NCUA Management Comments

_____National Credit Union Administration_____

EI/SAF:saf:waa<br/>
SSIC1920

**SENT VIA E-MAIL**

**TO:**       Inspector General William DeSarno
             Office of the Inspector General

**FROM:**    Executive Director David M. Marquis
             Office of Executive Director

**SUBJ:**    Material Loss Review of Western Corporate Federal Credit Union

**DATE:**    November 10, 2010

Pursuant to Section 206(j) of the Federal Credit Union Act, as amended by the Dodd-Frank Wall Street Reform and Consumer Protection Act, the National Credit Union Administration's Office of Inspector General (OIG) conducted a material loss review of Western Corporate Federal Credit Union (WesCorp), San Dimas, California, which was placed under NCUA conservatorship on March 20, 2009 and liquidated on October 1, 2010. Western Bridge Corporate Federal Credit Union was chartered to assume the operation of the liquidated credit union. This memorandum responds to your request for review and comments on the draft of the report entitled _Material Loss Review of Western Corporate Federal Credit Union_ provided on November 8, 2010.

WesCorp failed due to losses associated with an excessive concentration of privately-issued residential mortgage-backed securities (RMBS). WesCorp's Board and management strategy to increase its market position through the purchase of higher risk, higher yielding privately-issued RMBS resulted in the development of an asset concentration that declined in value and lacked liquidity as a result of the credit market dislocation that started in mid-2007. Risk management practices failed to identify the nature and extent of the concentration and other risks developed in the RMBS portfolio.

Third parties who originated, securitized and rated the underlying residential mortgages and securities were a material factor in contributing to WesCorp's losses and the subsequent losses to the National Credit Union Share Insurance Fund. WesCorp over-relied on the credit ratings assigned by the Nationally Recognized Statistical Rating Organizations (NRSROs ) despite guidance that credit ratings were not a substitute for prudent due diligence. At the time of purchase, the RMBS securities received AAA or AA ratings.

During the build-up of the concentration of RMBS, examiners expressed concerns but lacked regulatory leverage to enforce limits. The revisions to the Corporate Credit Union Rule, approved on September 24, 2010, and addressed in NCUA Letter to Credit Unions 10-CU-20, contain provisions preventing the purchase of privately-issued RMBS and stronger concentration limits. The revised Corporate Credit Union Rule also establishes a new capital structure, including a risk-based capital requirement to provide corporate credit unions with a stronger capital base.

1775 Duke Street – Alexandria, VA 22314-3428 - 703-518-6300

Material Loss Review of Western Corporate Federal Credit Union
OIG-10-19

Thank you for the opportunity to comment on the report.

cc:  Jim Hagen, Deputy Inspector General for Audit
     Scott Hunt, Director OCCU
     John Ianno, Associate General Counsel
     Tim Segerson, Director E&I DOS
     Wendy Angus, Director E&I DRM