KRAMER LEVIN NAFTALIS & FRANKEL LLP
Kenneth H. Eckstein
Douglas H. Mannal
Jeffrey S. Trachtman
David E. Blabey Jr.
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000

*Counsel for the Official Committee*
*of Unsecured Creditors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------ x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| RESIDENTIAL CAPITAL, LLC, <u>et al.</u>, | : | Case No. 12-12020 (MG) |
| | : | |
| Debtors. | : | Jointly Administered |
| | : | |

------------------------------------------------------------ x

**OFFICIAL COMMITTEE OF UNSECURED CREDITORS' STATEMENT IN
SUPPORT OF, AND RESPONSE TO OBJECTIONS TO, DEBTORS' MOTION
FOR AN ORDER UNDER BANKRUPTCY CODE SECTIONS 105(A) AND
363(B) AUTHORIZING THE DEBTORS TO ENTER INTO AND PERFORM
UNDER A PLAN SUPPORT AGREEMENT WITH ALLY FINANCIAL INC.,
THE CREDITORS' COMMITTEE, AND CERTAIN CONSENTING CLAIMANTS**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................................................ ii

PRELIMINARY STATEMENT ................................................................................................... 1

BACKGROUND ........................................................................................................................... 3

    A.    The Settlement Negotiations ............................................................................... 3

    B.    The Global Settlement ......................................................................................... 5

STATEMENT IN SUPPORT AND RESPONSE TO OBJECTIONS .......................................... 8

    A.    Objections Challenging the Debtors' Entry Into The Plan Support Agreement
        Should be Overruled ........................................................................................... 9

        i.    The Entire Fairness Standard Does Not Apply ........................................ 10

        ii.    The Court Need Not Unseal the Examiner Report to Rule on the
            Motion ...................................................................................................... 12

        iii.    The Court Has Authority to Grant the Motion ......................................... 13

    B.    The Findings of Fact in the Proposed Order Are Reasonable and
        Supported by the Record ................................................................................... 13

    C.    Several Objections Request Clarifications ......................................................... 15

        i.    Response to the Ad Hoc Group ............................................................... 15

        ii.    Response to the U.S. Trustee .................................................................. 17

        iii.    Response to NCUAB ............................................................................... 17

        iv.    Response to Certain Insurers .................................................................. 18

        v.    Response to Huntington Bancshares ....................................................... 18

        vi.    Response to Syncora ............................................................................... 18

        vii.    Response to PBGC ................................................................................. 18

    D.    The Remainder of the Objections are Premature Confirmation Objections ......... 19

CONCLUSION ........................................................................................................................... 20

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*In re AMR Corp.*,
   No. 11-15463 (SHL) (Bankr. S.D.N.Y.)..................................................................10

*In re Borders Group, Inc.*,
   453 B.R. 459 (Bankr. S.D.N.Y. 2011)....................................................................10

*In re Chemtura Corp.*,
   No. 09-11233 (REG) (Bankr. S.D.N.Y.) .................................................................13

*Committee of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.)*,
   722 F.2d 1063 (2d Cir. 1983)..................................................................................10

*In re General Maritime Corp.*,
   No. 11-15285 (MG) (Bankr. S.D.N.Y.)...................................................................13

*In re Great Atl. & Pac. Tea Co.*,
   No. 10-24549 (RDD) (Bankr. S.D.N.Y.) .................................................................13

*In re Innkeepers USA Trust*,
   442 B.R. 227 (Bankr. S.D.N.Y. 2010).............................................................. 10-11

*Kane v. Johns-Manville Corp.*,
   843 F.2d 636 (2d Cir. 1988)....................................................................................13

*In re Metaldyne Corp.*,
   409 B.R. 661 (Bankr. S.D.N.Y. 2009)....................................................................10

*In re New Hampshire Electric Co-op., Inc.*,
   131 B.R. 249 (Bankr. D. N.H. 1991) ......................................................................10

*In re Pinnacle Airlines Corp.*,
   No. 12-11343 (REG) (Bankr. S.D.N.Y.) .................................................................10

*In re Tronox Inc.*,
   No. 09-10156 (ALG) (Bankr. S.D.N.Y.) .................................................................13

STATUTES

11 U.S.C. Section 105(a) ................................................................................................12

11 U.S.C. Section 107(a) ................................................................................................12

11 U.S.C. Section 363......................................................................................................11

11 U.S.C. Section 510........................................................................................................6

TO THE HONORABLE MARTIN GLENN
UNITED STATES BANKRUPTCY JUDGE:

The Official Committee of Unsecured Creditors (the "Committee") of the above-captioned debtors and debtors-in-possession (collectively, the "Debtors") hereby files this statement in support of, and response to objections to, the Debtors' motion (the "Motion") for an order authorizing the Debtors' entry into and performance under a plan support agreement (the "Plan Support Agreement") among the Debtors, Ally Financial Inc. ("Ally"), the Committee, and certain consenting claimants (the "Consenting Claimants").

**PRELIMINARY STATEMENT**

1.      The Plan Support Agreement represents a critical milestone in these chapter 11 cases, providing the framework to implement a largely consensual global settlement through a Plan that will maximize creditor recoveries and resolve a seemingly intractable morass of complex litigation.  The agreement and accompanying term sheets represent an optimal use of the bankruptcy process to resolve under one umbrella multiple, far-flung disputes that would otherwise mire these Debtors and multiple other parties in years of conflict.  The Debtors' current Motion for authority to enter into the Plan Support Agreement represents a finite but important first step in a carefully designed and evenhanded process to promulgate and obtain court approval for a confirmable Plan embodying the global settlement.  There can be little doubt that the Court should approve the Motion and launch the plan process.

2.      The global settlement is the culmination of efforts that began from the first day of the Committee's formation:  to lead an investigation into the Estates' potential claims against Ally and reach a negotiated or litigated resolution of those claims.  The centerpiece of the settlement is Ally's agreement to contribute $2.1 billion (nearly triple the amount agreed to at the outset of these cases) to settle both estate and third party claims against Ally and its officers and

- 1 -

directors.  Ally agreed to this contribution only after an extensive Committee investigation and months of hard-fought, arms' length negotiations with the Committee and the Consenting Claimants under the direction of the Court appointed Mediator, the Honorable James M. Peck. The increased contribution makes possible a settlement that provides enhanced creditor recoveries across the board while resolving, under a single comprehensive framework, the claims of RMBS trustees and investors, monoline insurers, securities claimants, lenders, bondholders, and borrowers, some of which have been pending against the Debtors and Ally for years in state and federal courts throughout the country.  The settlement also insures that all remaining obligations to the Department of Justice and other agencies regulating ResCap and Ally will be satisfied, while providing Ally the opportunity to obtain closure with respect to its mortgage exposure – thus paving the way for Ally to make full repayment of billions of dollars of TARP funding it received from the U.S. Treasury.

3.    In addition to the Debtors, Ally, and the Committee, the settlement is supported by Consenting Claimants representing almost every major interest in these cases – a significant achievement in view of the complexity of the interests and issues presented. Remarkably, representatives of almost every major creditor group with claims in the chapter 11 case or with mortgage related claims against Ally have affirmatively signed on to the settlement – and the claims of the remaining groups will be paid in full, or left unaffected, under the plan.

4.    Despite the obvious benefits of the settlement and the overwhelming support it enjoys, the Motion has triggered isolated objections from individual creditors and a series of reservations of rights.  The objections, to the extent they seek to halt the plan process before it has even left the ground, are, frankly, irresponsible.  And because the relief actually sought in the Motion is quite limited – merely authority for the Debtors to enter into the Plan

Support Agreement and *commence* a comprehensive plan process that will preserve the rights of all interested parties, and certain limited good faith findings necessary to facilitate the RMBS trustees' entering into the Plan Support Agreement – only a handful of the objections are even appropriately raised at this time.  For reasons discussed below, the standard for granting this type of preliminary relief is easily met.  No party has offered any evidence to contradict the strong factual record put forth by the Debtors in support of the Motion.  Objections, such as Syncora's, that argue for a heightened standard of review are misguided; it was the Committee and Consenting Claimants, and not the Debtors, that through intense arms' length negotiations dealt with Ally and agreed to the proposed settlement.

5.    The great majority of the objections go to confirmation issues that are not properly considered at this preliminary stage and that the parties will have a full opportunity to raise at an appropriate time.  Others contain simple position statements – many misguided – that require only brief response to set the record straight.  Several objections raise concerns about the potential binding effect of certain proposed findings included in the original form of order approving the Settlement.   To avoid any uncertainty or confusion, the Debtors and the Committee have revised the proposed order to make clear that nothing contained in the Order will impair or qualify the right of any party to object to the Disclosure Statement, the Plan, or any other motion related to the Plan.  With these and the other clarifying changes discussed below, the Motion should be approved.

## BACKGROUND

### A.    The Settlement Negotiations

6.    The settlement embodied in the Plan Support Agreement is the result of months of intense negotiations among the Committee, Ally, the Debtors, and the Consenting Claimants that began with the appointment of Judge Peck as Mediator in late December 2012

- 3 -

and culminated with the announcement of the settlement and filing of the Plan Support Agreement in May 2013.  Spanning nearly five months, the negotiations consisted of near-daily calls both among the parties and between individual parties and Judge Peck, as well as dozens of in-person meetings at the offices of Morrison & Foerster and Kramer Levin.  During the three weeks leading up to the May 13 announcement of the global deal, all-hands meetings were held at Kramer Levin on a near-daily basis, many of which were attended by more than 100 people, representing every major constituency in these cases that chose to participate.  Subsequently, the parties continued around-the-clock negotiations on the details of the allocation of the Ally Contribution.  Agreement on the terms of the Supplemental Term Sheet embodying that allocation ultimately required a final 24-hour negotiating session among the Committee, the Consenting Claimants, and Ally that concluded only minutes before the Court-imposed deadline.

7.       The settlement was only made possible because of the Committee's extensive evaluation of potential estate claims against Ally, and was reached against the backdrop of the imminent release of the Examiner's Report and all parties' uncertainty as to the contents of that report and its impact.  The Committee's investigation began in June 2012 when the Court granted the Committee's motion to take Rule 2004 discovery from the Debtors and Ally.  Subsequently, the Examiner was appointed, and the Committee's investigation continued in concert with the Examiner.  As part of the Examiner's investigation, the Committee and Ally – and a number of the Consenting Claimants – submitted extensive written submissions to the Examiner regarding the merits of potential claims against Ally.  In addition, in January 2013, the Committee and Ally exchanged lengthy written and oral presentations regarding the potential claims and causes of action against Ally, as well as defenses to the potential claims.  Finally, in April 2013, the Committee, with the Debtors' support, filed a motion seeking standing to

- 4 -

prosecute and settle certain claims on behalf of the Debtors' estates against Ally and certain of its non-debtor affiliates.  The Committee's standing motion had been briefed and argued, but not decided, when the parties entered into the Plan Support Agreement.

8.      The months-long negotiations among the Committee, Ally, the Debtors, and the Consenting Claimants, overseen by Judge Peck, and the Committee's extensive investigation of potential claims against Ally set the stage for the Committee's agreement to the terms of the global settlement embodied in the Plan Support Agreement.  As a result of its thorough investigation of the claims against Ally and the vigorous and arms' length negotiations overseen by the Plan Mediator, the Committee – with the support of the Consenting Claimants – was able to conclude that the Ally Contribution of $2.1 billion represents a reasonable resolution of the claims and a favorable result for unsecured creditors.

**B.      <u>The Global Settlement</u>**

9.      The linchpin of the settlement is the Ally Contribution, which provided the catalyst for a series of delicately balanced compromises of inter-creditor and inter-debtor disputes.  Under the terms of its original pre-petition agreement with the Debtors, Ally would have contributed $750 million to the Debtors' estates.  The Committee and many of the Consenting Claimants believed firmly that this initial proposal was inadequate, and the limited size of the proposed contribution proved an impediment to a global resolution of the chapter 11 cases.  Under the Plan Support Agreement, Ally will increase its contribution by $1.35 billion, to $2.1 billion, an amount far in excess of what was agreed to by the Debtors and Ally and various creditor groups at the outset of these cases.  The increased size of the Ally Contribution enabled the Consenting Claimants to come together to support a Plan resolving the numerous complex inter-creditor and inter-debtor disputes presented in these cases – disputes that could have engulfed the estates in litigation for years at untold expense and with the potential for significant

uncertainty and delays in distributions to creditors – and to support broad third-party releases for

Ally in consideration for its contribution.

        10.     In addition to providing for an agreed allocation of the Ally Contribution

and other estate assets, the issues resolved by the proposed settlement include the following:

- <u>RMBS Claims</u>.  The settlement will resolve the size, allocation, and priority of the put-back, cure, and servicing-related claims of all of the Debtors' RMBS Trusts.  From the outset of these cases, the Committee contended that these issues should be resolved in the context of a global settlement, and the Plan Term Sheet embodies this result.  The settlement of the RMBS claims obviates the need for the five-day trial that had been scheduled for late May regarding the approval of the Debtors' pre-petition settlement agreement with the Institutional Investors that held interests in many of the RMBS Trusts (and any appeals thereof).  Unlike the original settlement, it eliminates lingering uncertainty over the effects of allocation on other creditors' recoveries, the treatment of cure claims, arguments regarding potential subordination of the claims, and the potential that Trusts might opt out of the settlement.

- <u>Monoline Claims</u>.  The settlement also resolves the allowance, priority, and allocation of the claims of the monoline insurers, eliminating the need for complex and uncertain litigation concerning the scope and nature of the claims and their potential subordination.  These issues, only some of which would have been addressed in the context of the contested hearing on the Debtors' original settlement agreement with the Institutional Investors, would have engendered an additional round of lengthy and costly litigation even after the claims of the RMBS Trusts had been resolved.  While MBIA Insurance Corporation ("<u>MBIA</u>") and Financial Guaranty Insurance Company ("<u>FGIC</u>") participated in the mediation and are Consenting Claimants, the Plan Support Agreement contemplates that each monoline that wrapped ResCap RMBS trusts will participate in the settlement.

- <u>Securities Claims</u>.  The settlement will resolve tens of billions of dollars in securities claims against the Debtors and Ally arising from their structuring, sponsoring, underwriting, and sale of RMBS, including the New Jersey Carpenters' Securities Class Action and the Private Securities Claims, which will be resolved through the creation of the Private Securities Claims Trust, obviating the need for litigation concerning such issues as the validity of the claims and their potential subordination pursuant to section 510 of the Bankruptcy Code.  These recoveries will be in addition to those that some of

these claimants will receive as beneficiaries of the RMBS Trustees' put-back claims. Other creditors with securities claims against the Debtors will also have an opportunity to obtain a recovery under the plan.

- <u>Borrower Claims</u>. Similarly, the settlement will resolve the many and varied claims asserted by borrowers through the mechanism of a Borrower Trust and a single, streamlined process for resolving and liquidating the thousands of borrower claims pending around the country in various forums. Unlike the majority of other creditors, borrowers will receive payment of their claims in cash and will have the opportunity for enhanced distributions. Recoveries to borrowers out of the Borrower Trust will be in addition to the borrowers' share of the $230 million paid by the Debtors under the Federal Reserve Board Consent Decree and Settlement, which was also an element of the global settlement with Ally.

- <u>Senior Unsecured Notes</u>. The settlement will resolve the claims of Wilmington Trust, National Association, in its capacity as indenture trustee for the Senior Unsecured Notes ("<u>Wilmington Trust</u>"), against Ally as well as providing for a stay of the prosecution of Wilmington Trust's pending motion for standing to bring the claims of Residential Capital LLC against Ally.

- <u>Junior Secured Notes</u>. Although the JSNs declined to participate in the global mediation and do not now support the proposed Plan, the settlement substantially improves upon the treatment proposed in their pre-petition agreement with the Debtors. The Plan called for in the global settlement provides the JSNs with payment in full in cash on their claims (including accrued pre-petition interest) and payment of post-petition interest to the extent they are able to establish their entitlement thereto.

- <u>Ally</u>. In addition to providing Ally with releases from estate and third party claims relating to the Debtors' operations, the global settlement resolves Ally's open issues with the federal government and paves the way for it to emerge from under the mortgage-related litigation cloud and, following confirmation of the Plan, be in a position to repay its outstanding TARP debt without the overhang of the ResCap-related litigation

- <u>Inter-Creditor and Inter-Debtor Claims</u>. The settlement resolves a host of complex and contested inter-creditor and inter-Debtor issues, including substantive consolidation, the validity of pre-petition intercompany balances recorded on the Debtors' books and records, various inter-Debtor avoidance actions, and the allocation of administrative expenses and the Ally

Contribution.   Any one of these issues might otherwise have spawned complex, time-consuming, and costly litigation.

11.    In light of the substantial benefits to be realized under the Plan Support Agreement, it is no surprise that it has garnered almost universal support.  Most of the major constituencies in these cases broadly support the settlement, including all six RMBS Trustees; the Institutional Investors; the largest securities fraud claimants; MBIA and FGIC, as the two largest monoline claimants; Wilmington Trust; the Supporting Senior Unsecured Noteholders (as defined in the PSA), including Paulson & Co., Inc.; the representatives of the borrowers on the Committee; and the Debtors, Ally, and the Committee.  For parties that have not yet had time to fully evaluate the settlement or remain uncertain as to their support, the Plan Support Agreement contemplates a substantial amount of time for approval of the Disclosure Statement and the Plan. *See* Supplemental Term Sheet at 4 (milestones).  The milestones will ensure that all parties have ample time and opportunity to consider the proposed plan and to raise at the appropriate time whatever legitimate objections or concerns they may have, and will permit the Plan Proponents time to attempt to resolve those objections and move closer to a universally consensual plan.

## STATEMENT IN SUPPORT AND RESPONSE TO OBJECTIONS

12.    By the Motion the Debtors seek important, but limited, relief:  permission to commit themselves to pursuit of a Plan embodying the terms of the Plan Term Sheet and Supplemental Term Sheet, and certain limited factual findings necessary to facilitate the RMBS trustees' support of the settlement.  The Motion does not seek confirmation of a plan, or even approval of a disclosure statement.  Thus, while the Committee is hopeful that all Plan objections will be resolved prior to the confirmation hearing – and is actively working to achieve that result – granting the Motion will itself have no preclusive effect on any confirmation-related objections.  Instead, it will allow the diverse parties to the Plan Support Agreement to begin, at

long last, a plan process that promises to confer significant benefits on all parties in interest in the cases.  The Committee supports approval of the Motion because the global settlement and Plan embodied in the Plan Support Agreement constitute the best available chance to maximize value for unsecured creditors and resolve these lengthy and contentious chapter 11 cases.

13.    Notwithstanding the clear benefits of the Debtors' entry into the Plan Support Agreement, 20 parties have filed responses to the Motion.  Of these, six are simple reservations of rights that raise no objection to approval of the Motion, and require no response.[1] The remaining pleadings fall into several (non-exclusive) categories:  position statements that require only brief response to correct the record; objections seeking clarification of certain language in the Plan Support Agreement or proposed Order; premature confirmation objections; and a handful of true objections to the limited relief actually sought in the Motion.  Only the latter category is properly before the Court.  As explained below, the objections, statements, and reservations of rights, to the extent actually seeking affirmative relief, should be overruled.

A.    **Objections Challenging the Debtors' Entry Into
The Plan Support Agreement Should be Overruled**

14.    Objections challenging the Debtors' entry into the Plan Support Agreement were filed by Credit Suisse Securities (USA) LLC ("Credit Suisse") [Dkt. No. 4019], Syncora Guarantee Inc. ("Syncora") [Dkt. No. 4028], and the Federal Home Loan Banks of Boston, Chicago, and Indianapolis (the "FHLBs") [Dkt. No. 4034].  Each should be overruled.

---

[1] Simple reservations of rights were filed by: the RALI Certificate Underwriters [Dkt. No. 4012]; the Rothstein Plaintiffs [Dkt. No. 4007] (under the guise of an objection); Ambac Assurance Corporation [Dkt. No. 4009]; Monarch Alternative Capital LP and Stonehill Capital Management LLC (together, "Monarch") [Dkt. No. 4023]; the United States of America [Dkt. No. 4035]; and Federal Home Loan Mortgage Corporation [Dkt. No. 4026].  The Debtors are filing a chart cataloguing and summarizing all objections, statements, and reservations of rights.

### i.    *The Entire Fairness Standard Does Not Apply*

15.    Syncora and the FHLBs assert that the Debtors must prove the "entire fairness" of the Plan Support Agreement.  *See* Syncora Obj. at 9; FHLBs Obj. ¶¶ 6-9.  There is no basis in law or fact for such a requirement.  The Second Circuit requires only "that a judge determining a § 363 application expressly find from the evidence presented before him at the hearing a good business reason to grant such an application," *Committee of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983), and courts may defer to a debtor's business judgment in that regard, *see In re Metaldyne Corp.*, 409 B.R. 661, 667 (Bankr. S.D.N.Y. 2009); *In re Borders Group, Inc.*, 453 B.R. 459, 473 (Bankr. S.D.N.Y. 2011).  In practice, courts routinely apply the business judgment rule in determining whether to approve entry into a plan support agreement.  *See, e.g.*, *In re AMR Corp.*, Case No. 11-15463 (SHL) (Bankr. S.D.N.Y. June 4, 2013) [Dkt. No. 8577] (granting plan support agreement motion as sound exercise of debtor's business judgment); *In re Pinnacle Airlines Corp.*, Case No. 12-11343 (REG) (Bankr. S.D.N.Y. Jan. 16, 2013) [Dkt. No. 900] (same).[2]

16.    The only case cited by the Objectors for application of the "entire fairness" standard in these circumstances does not actually so hold.  In *In re Innkeepers USA Trust*, 442 B.R. 227 (Bankr. S.D.N.Y. 2010), the court noted only that the "heightened scrutiny/entire fairness standard . . . *may* apply" but expressly declined to decide the matter.  *Id.* at 231 (emphasis added).  Notably, *Innkeepers* involved the type of facts – absent here – that typically give rise to heightened scrutiny in other settings:  an insider deal, a case in its early stages, a failure to involve creditors, and near-universal opposition.  *Id.* at 231-34.[3]

---

[2] *See also* June 4, 2013 Tr. of Hrg. at 12:13-16, *In re AMR Corp.*, No. 11-15463 (SHL) (Bankr. S.D.N.Y.); January 16, 2013 Tr. of Hrg. at 27:18-28:8, *In re Pinnacle Airlines Corp.*, No. 12-11343 (REG) (Bankr. S.D.N.Y.).

[3] With one exception, the other cases cited by the FHLBs on pages 6-7 of their objection (none of which addresses plan support agreements) also concern insider transactions and are hence inapplicable.  The remaining case, *In re*

17.    Even if it were appropriate, in certain circumstances, to subject a debtor's decision to enter into a transaction pursuant to section 363(b) to an entire fairness standard, this is plainly not such a case.  The negotiations leading to the Plan Support Agreement could hardly have been more hard-fought and arms' length.  The Objectors completely ignore that the *Committee*, not the Debtors, took the lead in negotiations with Ally – eliminating any possibility that the settlement was an insider transaction.  They further ignore that the mediation was overseen by an impartial mediator and participated in by dozens of parties holding wildly disparate opinions and interests; that negotiations spanned nearly five months with the parties initially far apart; and that all sides had access to information exchanged during a months-long investigation of the claims against Ally involving the production of millions of pages of documents and preparation of hundreds of pages of legal briefs.

18.    Syncora argues that the Debtors "have a duty to refrain from favoring or appearing to favor one or another of their estates and its creditors over another," Obj. at 9, but fails to explain how the Plan Support Agreement violates that principle.  It does not.  The active involvement of FGIC and MBIA in the settlement negotiations should allay any concerns that the deal struck was intended to favor unwrapped trusts over wrapped trusts.  Nor, despite Syncora's insinuations, is there any issue here of a lack of transparency.  The mediation process here was starkly different from the facts giving rise to "transparency" concerns in *Innkeepers*, 442 B.R. at 233, where virtually all of the debtors' creditors "complain[ed] of having been shut out of the process"; the debtors "downplayed and, at worst, obfuscated" the critical fact that an insider would end up with half of the debtors' equity; and the debtors did not "share the specifics of the

---

*New Hampshire Electric Co-op., Inc.*, 131 B.R. 249, 252 (Bankr. D. N.H. 1991), is a sub rosa plan case, in which the court refused to approve a major restructuring outside of the protections of the plan process.  As noted above, the instant Motion seeks quite limited relief and plan-related objections will be preserved for confirmation.

plan term sheet" with creditors, among other things. *Innkeepers*, 442 B.R. at 233-34. Here, in stark contrast, all major constituencies were represented in negotiations and a detailed term sheet has been a matter of public record for a month.[4]

### ii.    The Court Need Not Unseal the Examiner Report to Rule on the Motion

19.    The Committee supports unsealing the Examiner Report on the earlier of July 3, 2013 or the date of a ruling on the pending Motion. But contrary to Credit Suisse's and the FHLBs' objections, the Court need not – and should not – unseal the Report any sooner. Indeed, to suggest that the Ally Contribution be put at risk in such a manner is irresponsible.[5]

20.    Credit Suisse argues that the Debtors could not have exercised proper business judgment in entering into the Plan Support Agreement without having reviewed the Examiner Report – *i.e.*, that the Debtors improperly "shun[ned] information." Obj. at 16-18. But the Debtors, the Committee, and the Consenting Claimants had in their possession substantial information regarding the nature and merits of claims against Ally and the Committee's detailed assessment of such claims, providing ample basis for a good faith conclusion as to a reasonable settlement. And the pending release of the Examiner Report was itself an important catalyst for the deal; had it been released prior to entry into the settlement, there would certainly not be a settlement today and might well *never* have been a settlement. At the time the Debtors determined to enter into the Plan Support Agreement, the relevant information, for purposes of the Debtors' decision, was that the Examiner was on the verge of releasing a report that contained unknown conclusions that could potentially undermine *any*

---

[4] Syncora also challenges the good faith of the RMBS Trustees. For reasons discussed in the responses of the Debtors and the RMBS Trustees, Syncora's allegations are without merit. The record is clear that the Trustees, with advice from counsel, navigated the multitude of issues posed by the settlement negotiations with diligence and care.

[5] The Committee filed a pleading on June 19, 2013 explaining its position with respect to the unsealing of the Examiner Report, *see* Dkt. No. 4024, and will not repeat its arguments here. Suffice it to say that the temporary sealing of the Examiner Report through no later than July 3, 2013 is a condition to the global deal, and the Court has authority under Bankruptcy Code sections 107(a) and 105(a) to authorize a sealing of this limited duration.

claim against Ally, let alone one worth $2.1 billion. Ally's corresponding uncertainty may well, in turn, have motivated it to agree to the larger contribution. In the face of this mutual uncertainty, the Debtors reasonably determined to support the global settlement, with ample knowledge both with respect to the claims involved and the risks of litigating those claims.[6]

### iii.    The Court Has Authority to Grant the Motion

21.    Credit Suisse argues that the Court lacks authority to grant the Motion because "[t]he Court's authority extends to supervision of the estate, not of actions that the debtor takes that do not affect the estate." Obj. at 13. Credit Suisse cites no direct authority for this assertion, nor does it substantiate the notion that the Plan Support Agreement has no effect on the estates. In any event, the objection ignores that courts in this district routinely approve plan support agreements.[7] Moreover, Credit Suisse's contention that granting the Motion "would effectively cut off the shareholders' rights," Obj. at 13, is both baseless and irrelevant, as no shareholder objects to the Motion.[8]

### B.    The Findings of Fact in the Proposed Order Are Reasonable and Supported by the Record

22.    In addition to granting the Motion, the proposed Order contains two limited proposed factual findings: (i) that the Plan Support Agreement is in the "best interests" of the Debtors' estates and their creditors (*see* introductory recital and paragraph 3), and (ii) that each of the parties to the Agreement acted "reasonably, in good faith, and in the best interests" of

---

[6] The FHLBs premise their argument for unsealing on the mistaken view that the parties to the Plan Support Agreement have reviewed the Examiner Report, gaining an unfair advantage. *See* Obj. ¶¶ 7, 21. To be clear, no party in interest has reviewed the Examiner Report, as it has been kept under seal by Order of the Court.

[7] *See, e.g.*, *In re General Maritime Corp.*, No. 11-15285 (MG) (Bankr. S.D.N.Y. Apr. 2, 2012) [Dkt. No. 421]; *In re Great Atl. & Pac. Tea Co.*, No. 10-24549 (RDD) (Bankr. S.D.N.Y. Dec. 19, 2011) [Dkt. No. 3060]; *In re Chemtura Corp.*, No. 09-11233 (REG) (Bankr. S.D.N.Y. Aug. 9, 2010) [Dkt. No. 3527]; *In re Tronox Inc.*, No. 09-10156 (ALG) (Bankr. S.D.N.Y. Dec. 23, 2009) [Dkt. No. 1030].

[8] Credit Suisse itself appears to lack standing to raise this objection in any event. *See Kane v. Johns-Manville Corp.*, 843 F.2d 636, 643 (2d Cir. 1988) (litigants may assert only their own constitutional and statutory rights).

their constituents in agreeing to the Plan Support Agreement (introductory recital and paragraph 4) (together, the "Findings of Fact").  Both findings are narrowly tailored to the needs of the parties and well supported by the record submitted by the Debtors and the RMBS Trustees, not to mention the vigorous process of investigation and negotiation that unfolded over the past year.

23.     Importantly, the Findings of Fact address *only* entry into the Plan Support Agreement – not plan outcomes.  To the extent this was ever unclear, following a June 17, 2013 hearing at which Monarch questioned the scope of the Order, the Debtors and the Committee amended the Order to confirm that the rights of all parties, other than signatories to the PSA, are fully reserved with respect to plan treatment and objections to the disclosure statement.  *See* Dkt. No. 4006 (revised order).  This change was sufficient to address Monarch's concerns.  *See* Monarch Reservation at 3-4 [Dkt. No. 4023].  In addition, the Debtors have indicated they will amend paragraph 3 of the Order to refer exclusively to the Plan Support Agreement, deleting the reference to "the transactions contemplated therein."  Given these clarifications, and based on the robust process that produced the Plan Support Agreement and the record established by the Debtors and the RMBS Trustees, the Findings of Fact should be approved.

24.     Objections to the Findings of Fact by the National Credit Union Administration Board (the "NCUAB") [Dkt. No. 4020] and Syncora each fail to provide a legitimate counter-narrative or otherwise undermine the solid record supporting the proposed findings.  Syncora's primary objection is that the Plan Support Agreement leaves certain questions about plan treatment unanswered, such as the treatment of partially wrapped trusts.  According to Syncora, those questions make it impossible to determine if either the Debtors or the RMBS Trustees have discharged their fiduciary duties, ostensibly rendering the Findings of Fact inappropriate.  *See* Obj. at 10-11.  Syncora also warns that the Findings of Fact would

- 14 -

affirmatively "release claims," including claims for gross negligence and willful misconduct.  *Id.* at 12.  Neither complaint has merit.  The unremarkable fact that the negotiations did not produce a Plan Support Agreement with all the detail of a plan and disclosure statement does not tarnish the process, nor undermine the general and limited Findings of Fact.  Nor could a "finding of fact" constitute a release.[9]

25.     The NCUAB disputes, based on "the limited information that has been provided to support the disparate treatment of its securities claim," that the Plan Support Agreement is in its interests and that parties acted reasonably, in good faith, and in accordance with the NCUAB's best interests.  *See* Obj. at 13.  The NCUAB misapprehends the import of the Findings of Fact.  They do not prevent the NCUAB from challenging whether the Plan itself is in its best interests or whether the Plan has been proposed in good faith (both confirmation objections), they simply bless the preliminary step of entering into the Plan Support Agreement and thereby *launching* the Plan process.  The NCUAB's mere disagreement with the treatment of its claims, raised before seeing the Plan, does not support declining to proceed with the filing and prosecution of a plan and cannot refute the diligence and good faith embodied in the Plan Support Agreement.

### C.     Several Objections Request Clarifications

26.     Several parties seek clarifications regarding other relief sought in the Motion.  The Committee responds as follows.

### i.     *Response to the Ad Hoc Group*

27.     The Ad Hoc Group of Junior Secured Noteholders (the "Ad Hoc Group") filed a non-substantive "statement and reservation of rights" [Dkt. No. 4018] that airs a variety of

---

[9] Syncora also requests that "any language" that "may be interpreted to have preclusive effect" be stricken.. Monarch raised similar concerns at the June 17 hearing, which were addressed by the addition of new paragraph 5.

grievances but ultimately expresses no specific objection. The only affirmative relief the group appears to seek is further confirmation of two elements of the settlement that are already known to it: the fiduciary out and the treatment of post-petition interest.

28.    As the Ad Hoc Group well knows, the settlement provides for only a limited waiver of the fiduciary out, restricting only "the ability to terminate th[e] Agreement based in any way upon the Examiner's Report or any information, findings, or conclusions contained therein." Plan Support Agreement ¶ 7.5. This is an appropriate and expressly bargained for condition, and it would be unreasonable for Ally to have been expected to provide the Committee and the Consenting Claimants a free option. The agreement in no way prevents the Committee or the Debtors from determining, per their fiduciary duties, other important points, such as that the Plan should pay post-petition interest to the JSNs, even though this determination might cause other Consenting Claimants to withdraw their support of the Plan. Similarly, nothing in the Plan Support Agreement prevents the Court from awarding post-petition interest to the JSNs, and the Plan may still be confirmed if the Court so decides.

29.    The Ad Hoc Group nevertheless insists that it has no choice but to attempt to "blow up" the global deal, Obj. ¶ 8, but its efforts to deflect responsibility for its own actions are unavailing. The group declined invitations to join the plan mediation and now rejects treatment nevertheless provided for the JSNs that includes payment in full in cash on the effective date of the Plan plus the opportunity to receive post-petition interest if they can demonstrate that it is due. The Ad Hoc Group's concern that the global settlement may undermine its ability to establish such an entitlement by, for example, resolving intercompany claims, Obj. ¶ 2, does not provide a ground for denying the Motion, because the JSNs will have a full opportunity to object to the settlement of such claims on the merits, and, to the extent they

exist, to pursue other paths to obtain post-petition interest without attacking any element of the settlement.  The possibility that the JSNs will *not* defeat certain elements of the settlement or gain a right to post-petition interest certainly is no reason to reject the Plan Support Agreement.

### ii.    *Response to the U.S. Trustee*

30.    The United States Trustee filed a limited objection [Dkt. No. 4031] requesting that the Order state that the Court is not ruling on or approving releases or the classification and payment of professional fees and expenses.  The proposed Order is not intended to, and does not by its terms, pre-approve these things in advance of confirmation.[10]

### iii.    *Response to NCUAB*

31.    The NCUAB's objection expresses confusion regarding the classification of its claim based on a willfully unreasonable reading of the Supplemental Term Sheet's definition of "Private Securities Claim."  *See, e.g.*, Obj. ¶¶ 10, 12.[11]  As has been explained to the NCUAB, Private Securities Claimants are exclusively creditors with securities claims against the estate *and* claims against Ally Securities, LLC or Ally Financial, Inc. based on a properly commenced action or tolling agreement.  While the NCUAB insists that it *could* sue Ally, such an action is time-barred.  The Committee has carefully reviewed the NCUAB's draft complaint against Ally, which reflects the NCUAB's view that the statutes of limitation do not apply, and found it meritless.[12]  Nevertheless, to the extent the NCUAB objects to classification and

---

[10] The Committee reserves all rights regarding the argument that classifying or paying claims for fees and expenses of non-retained professionals is "not permissible" (Obj. at 2) – a position contradicted by case law and the Code.

[11] The NCUAB repeatedly cites the first sentence of the definition, when in fact there are two, which together make clear that the NCUAB is not among the Private Securities Claimants.

[12] The NCUAB commenced two securities actions against certain Debtors in 2011, based on RMBS deals from 2006 and 2007, and never took steps toward suing Ally for its role in the same transactions until now.  The Debtors have demonstrated that the 2011 actions were time-barred, as well as meritless.  *See* Debtors' Obj. [Dkt. No. 4050].  Regardless, the NCUAB's opportunity also to pursue claims against Ally has long passed.

treatment of its claim, those are issues appropriately reserved for confirmation.[13]

### iv.    *Response to Certain Insurers*

32.    Certain insurers under the General Motors Combined Specialty Insurance Program (the "Certain Insurers") have objected [Dkt. No. 4015] to approval of the Plan Support Agreement on the ground that it failed to specify whether the assignment of the Debtors' interests in insurance policies to the Borrower Claims Trust would be insurance neutral. *See* Obj. ¶ 14. The Committee will work with the insurers regarding this confirmation topic.

### v.    *Response to Huntington Bancshares*

33.    Huntington Bancshares Inc. has objected [Dkt. No. 4033] to the Motion on the ground that it is unclear whether the Motion, the Plan Support Agreement, and/or the Plan operate to stay Huntington's action against Ally pending in the Minnesota Court of Appeals. *See* Obj. at 4. The proposed Order would not implement a stay, and the scope and merits of the release and injunction to be implemented through the Plan is a confirmation issue.

### vi.    *Response to Syncora*

34.    The Committee will work with Syncora to ensure that the treatment of partially wrapped RMBS Trusts, which it claims is unclear in the Plan Support Agreement, *see, e.g.*, Obj. at 10, is adequately explained and reflected in the Plan.

### vii.    *Response to PBGC*

35.    The Committee will work with the Pension Benefit Guaranty Corporation (the "PBGC") to address its concerns regarding the impact the Plan may have on Ally's pension plan. *See* Obj. at 2 [Dkt. No. 4032]. To be clear, however, there will be no impact; Ally's pension plan is not being rejected, nor will Ally be released from its obligations thereunder.

---

[13] The NCUAB notes that it may be eligible for treatment as a member of the New Jersey Carpenters' class, Obj. at n.8, and the Plan Support Agreement does not preclude that.

### D.   The Remainder of the Objections are Premature Confirmation Objections[14]

36.     Certain objectors attempt to cast the forthcoming Plan as patently unconfirmable, but none cites a single case – and the Committee is not aware of any – in which confirmation standards influenced, let alone governed, the consideration of a plan support agreement.   Such concerns are entertained, in rare and extreme circumstances, only at the disclosure statement stage, where a fully developed plan has been filed and proposed to be sent out for solicitation.   At this earlier stage, such an objection should be regarded as a mere reservation of rights, or a preview of issues that can and will be addressed through the plan disclosure, solicitation, and confirmation process, whether through negotiation or litigation.

37.     Foremost among these issues is the proposed third-party release of Ally. *See, e.g.*, FHLBs Obj. at 4-10; Syncora Obj. at 13; PBGC Obj. at 4.   The Committee intends to fully brief the release issue at the appropriate time – and indeed justify it under the applicable Second Circuit standard.   Similarly, issues regarding a bar order that prohibits contribution and indemnity claims against Ally – raised by Credit Suisse under the guise of an objection to the third-party release, *see* Obj. at 6-12 – will be addressed in due course.   For instance, while Credit Suisse objects to the absence of a judgment reduction provision in the Plan Support Agreement, *id.* at 11-12, the Committee intends for an adequate mechanism to be included in the Plan.

38.     The gamut of additional premature confirmation issues includes: insurance neutrality, *see* Certain Insurers Obj. at 5-8; the Court's jurisdiction over disputes between monolines and RMBS Trusts, *see* Assured Obj. at 3-5; the propriety of paying attorney fees, *see* Syncora Obj. at 17-18; classification, treatment, and recoveries, *see* NCUAB Obj. at 14; the allocation of administrative expenses, *see* Amherst Obj. at 6-7; and distribution and reserve

---

[14] This category includes objections by the  FHLBs, Syncora, the PBGC, Credit Suisse, Certain Insurers, Assured, Huntington, Amherst Advisory & Management LLC ("Amherst"), the NCUAB, and Frank Reed [Dkt. No. 4038].

mechanics, *see* Amherst Obj. at 8-9.[15]  Each of these issues will be addressed, as needed, at the appropriate time.   Indeed, it goes without saying that further information about plan classification and creditor recoveries will be provided through the promulgation of the plan and disclosure statement and supported through the confirmation process.  The plan process will afford parties ample opportunity to understand the global settlement in detail, confer with the plan proponents, and, if necessary, object based on the appropriate legal standard.

## <u>CONCLUSION</u>

WHEREFORE, the Committee respectfully requests that the Court deny the objections and grant the Motion.

Dated: New York, New York
       June 24, 2013

KRAMER LEVIN NAFTALIS & FRANKEL LLP

 /s/ Kenneth H. Eckstein
Kenneth H. Eckstein
Douglas H. Mannal
Jeffrey S. Trachtman
David E. Blabey Jr.
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000
*Counsel for the Official Committee*
*of Unsecured Creditors*

---

[15] Amherst also objects to the RMBS Trustee opt-out provision contained in section 5.2(c) of the Plan Support Agreement.  Obj. at 9.  To the extent this is an objection to approval of the Plan Support Agreement, as opposed to a confirmation objection, it is misplaced.  The RMBS Trustees' support of the Plan was a key element of the global settlement, and there would be no global settlement if any party, including the Trustees, had the option to "opt-out" post-confirmation.  Moreover, adequate notice of the Trustees' intentions to support the Plan Support Agreement has been given to RMBS holders and to date no such holder has provided a contrary direction to the Trustees.