**MORRISON & FOERSTER LLP**
1290 Avenue of the Americas
New York, New York 10104
Telephone:(212) 468-8000
Facsimile: (212) 468-7900

Gary S. Lee
Lorenzo Marinuzzi
Todd M. Goren
Jennifer L. Marines
James A. Newton

*Counsel for the Debtors and
Debtors in Possession*

**CURTIS, MALLET-PREVOST,
COLT & MOSLE LLP**
101 Park Avenue
New York, New York  10178-0061
Telephone: (212) 696-6000
Facsimile: (212) 697-1559

Steven J. Reisman
Michael J. Moscato
Theresa A. Foudy
Maryann Gallagher

*Conflicts Counsel for the Debtors and
Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------
)
In re:                                              )    Case No. 12-12020 (MG)
                                                    )
RESIDENTIAL CAPITAL, LLC, *et al.*,    )    Chapter 11
                                                    )
                    Debtors.                  )    Jointly Administered
-------------------------------------------------------------)

**DEBTORS' OMNIBUS REPLY IN FURTHER SUPPORT OF DEBTORS' MOTION
FOR AN ORDER UNDER BANKRUPTCY CODE SECTIONS 105(A) AND 363(B)
AUTHORIZING THE DEBTORS TO ENTER INTO AND PERFORM UNDER A
PLAN SUPPORT AGREEMENT WITH ALLY FINANCIAL INC., THE
<u>CREDITORS' COMMITTEE AND CERTAIN CONSENTING CLAIMANTS</u>**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ..................................................................................1

ARGUMENT .............................................................................................................6

I.    The Debtors' Decision to Enter into the Plan Support Agreement is Governed by and Satisfies the Business Judgment Rule ......................................6

    A.    Entry Into and Performance Under the Plan Support Agreement Should Be Approved Under the Business Judgment Rule ........................6

    B.    Heightened Scrutiny is Inapplicable but is Nonetheless Satisfied ............9

II.    Confirmation-Related Objections are Not Ripe for Consideration .....................10

    A.    Objections to Proposed Third Party Releases are Not Ripe at This Time..............................................................................................................12

    B.    Objections to Provisions of the Anticipated Plan are Premature.............13

    C.    The Plan Contemplated by the Agreement Will Provide Parties in Interest With More Detail Regarding Various Issues as Required by the Bankruptcy Code ..........................................................................15

III.    The Evidence Provided by the Debtors and the Trustees Supports the Findings Contained in the Proposed Order .........................................................15

    A.    The Record Supports the Proposed Finding in Paragraph Three of the Proposed Order ....................................................................................16

    B.    The Record Supports the Proposed Finding in Paragraph Four of the Proposed Order ....................................................................................17

    C.    Proposed Ordered Paragraph Ten Does Not Expand or Prejudice Any Party's Rights ......................................................................................20

IV.    Responses to Certain Individual Objections........................................................20

    A.    Ad Hoc Group of Junior Secured Noteholders' Statement and Reservation of Rights and Joinders Thereto..............................................20

    B.    Syncora's Objection ...................................................................................22

    C.    Credit Suisse's Objection ..........................................................................24

        (i)    The Court has Authority to Approve the Motion ........................24

        (ii)    Approval of the Plan Support Agreement Should Not be Deferred Until the Examiner's Report is Unsealed....................26

    D.    Huntington Bancshares' Limited Objection and Reservation of Rights........................................................................................................27

CONCLUSION ........................................................................................................28

ny-1096440

# TABLE OF AUTHORITIES

**Page(s)**

CASES

Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.),
  416 F.3d 136 (2d Cir. 2005) ...................................................................................... 13

In re Adell,
  325 B.R. 883 (Bankr. M.D. Fla. 2005) ..................................................................... 11

In re Bidermann Indus. U.S.A., Inc.,
  203 B.R. 547 (Bankr. S.D.N.Y. 1997) ....................................................................... 9

In re Drexel Burnham Lambert Grp., Inc.,
  90 B 10421, 1992 WL 62758 (Bankr. S.D.N.Y. Mar. 5, 1992) ............................... 12

In re Ellipso, Inc.,
  09-00148, 2012 WL 368281 (Bankr. D.D.C. Feb. 3, 2012)...................................... 14

In re Indianapolis Downs, LLC,
  486 B.R. 286 (Bankr. D. Del. 2013).......................................................................... 25

In re Innkeepers USA Trust,
  442 B.R. 227 (Bankr. S.D.N.Y. 2010) ....................................................................... 9

In re Innkeepers USA Trust,
  448 B.R. 131 (Bankr. S.D.N.Y. 2011) ..................................................................... 11

In re One Canandaigua Props., Inc.,
  140 B.R. 616 (Bankr. W.D.N.Y. 1992)..................................................................... 11

In re Quigley Co.,
  437 B.R. 102 (Bankr. S.D.N.Y. 2010) ....................................................................... 7

In re Scioto Valley Mortg. Co.,
  88 B.R. 168 (Bankr. S.D. Ohio 1988) ...................................................................... 11

In re Sunshine Precious Metals, Inc.,
  142 B.R. 918 (Bankr. D. Idaho 1992) ...................................................................... 11

In re WorldCom, Inc.,
  Case No. M-47, 2003 WL 21498904 (S.D.N.Y. June 30, 2003) ............................. 14

Nielsen v. Specialty Equip. Cos.,
  92 C 20142, 1992 WL 279262 (N.D. Ill. Sept. 25, 1992), aff'd sub nom., Matter of
  Specialty Equip. Cos., 3 F.3d 1043 (7th Cir. 1993) ................................................ 12

# TABLE OF AUTHORITIES
(continued)

Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated
Res., Inc.),
147 B.R. 650 (S.D.N.Y. 1992) ................................................................7

Rickel & Assocs., Inc. v. Smith (In re Rickel & Assocs., Inc.),
272 B.R. 74 (Bankr. S.D.N.Y. 2002) ....................................................26

Smith v. Van Gorkom,
488 A.2d 858, 872 (Del. 1985) .............................................................7

STATUTES

11 U.S.C. § 1122 .......................................................................................14

11 U.S.C. § 1129(a)(7) ..............................................................................14

OTHER AUTHORITIES

In re AMR Corp.,
Case No. 11-15463 (SHL) (Bankr. S.D.N.Y. June 4, 2013) (Docket No. 8577) ...............6, 25

In re Dana Corp.,
Case No. 06-10354 (BRL) (Bankr. S.D.N.Y. Aug. 1, 2007) (Docket No. 5879) ....................6

In re Gen. Mar. Corp.,
Case No. 11-15285 (MG) (Bankr. S.D.N.Y. Apr. 2, 2012) (Docket No. 421) .............6, 24, 25

In re KIT digital, Inc.,
Case No. 13-11298 (REG) (Bankr. S.D.N.Y. June 17, 2013) (Docket No. 238).....................6

NYC Off-Track Betting Corp.,
Case No. 09-17121 (Bankr. S.D.N.Y. Dec. 1, 2010) (MG) (Docket No. 234) ......................12

In re The Great Atl. & Pac. Tea Co.,
Case No. 10-24549 (RDD) (Bankr. S.D.N.Y. Dec. 19, 2011) (Docket No. 3060) ................25

In re Tronox Inc.,
Case No. 09-10156 (ALG) (Bankr. S.D.N.Y. Sept. 17, 2010) (Docket No. 2072)............6, 25

In re Visteon Corp.,
Case No. 09-11786 (CSS) (Bankr. D. Del. June 17, 2010) (Docket No. 3427)......................6

Transcript of Hearing, In re Arcapita Bank B.S.C.,
Case No. 12-11076 (Bankr. S.D.N.Y. Apr. 26, 2013) (SHL) .................................12

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

Transcript of Hearing, <u>In re Residential Capital, LLC</u>,
    Case No. 12-12020 (MG) (Bankr. S.D.N.Y. May 29, 2013) ..................................................11

Transcript of Hearing, <u>In re Residential Capital, LLC</u>,
    Case No. 12-12020 (MG) (Bankr. S.D.N.Y. June 12, 2013) ..................................................26

ny-1096440

TO THE HONORABLE MARTIN GLENN
UNITED STATES BANKRUPTCY JUDGE:

   The debtors and debtors in possession in the above-captioned cases (collectively,

the "**Debtors**"),[1] hereby submit this omnibus reply (the "**Reply**") to certain objections and

reservations of rights, described below, to the Debtors' motion [Docket No. 3814] (the

"**Motion**")[2] seeking authority to enter into and perform under a Plan Support Agreement (the

"**Plan Support Agreement**") with Ally Financial Inc. ("**AFI**", and together with its non-debtor

affiliates, "**Ally**"), the official committee of unsecured creditors (the "**Creditors' Committee**"),

and certain Consenting Claimants (as defined in the Plan Support Agreement).[3]  In support of

this Reply, the Debtors respectfully state as follows:

## PRELIMINARY STATEMENT

   1.  The breadth of consensus reflected in the Plan Support Agreement represents a

remarkable achievement in these Chapter 11 cases.  The Plan Support Agreement and plan term

sheets[4] evolved from unprecedented mediation that took place over the course of seven months

and involved nearly 150 professionals and principals who worked tirelessly to achieve not one or

two, but numerous settlements of complex inter-creditor and intra-Debtor issues.

   2.  The mediation occurred under the careful guidance and direction of Judge Peck,

who personally expended hours upon hours meeting with the Debtors, their Chief Restructuring

Officer and professionals, and the Creditors' Committee and its professionals, as well as

individual and groups of claimants.  Judge Peck was not only able to bring parties to the

---

[1] The names of the Debtors in these cases and their respective tax identification numbers are identified on Exhibit 1
to the *Affidavit of James Whitlinger, Chief Financial Officer of Residential Capital, LLC, in Support of Chapter 11
Petitions and First Day Motions* [Docket No. 6].
[2] Capitalized terms not otherwise defined herein have the meanings ascribed to such terms in the Motion.
[3] Attached hereto as Exhibit 1 is a chart summarizing the arguments contained in each of the responses and
objections to the Motion and the Debtors' and other parties' reply to those arguments.
[4] Together, the Plan Support Agreement, the Plan Term Sheet and the Supplemental Term Sheet comprise the
"**Agreement**".

negotiating table and keep them there, but he also was integral in driving the terms of the

Agreement – terms that were reached only after months of hard-fought, good-faith, and largely

adversarial negotiations between and among the Debtors' key stakeholders.  Moreover, the

Debtors' exercise of their business judgment in entering into the Plan Support Agreement was

fundamentally informed by the compromises of claims and disputes driven by Judge Peck –

compromises that would otherwise have taken years of litigation and tens of millions of dollars

in administrative costs to resolve.  Accordingly, the characterization of the Agreement by certain

of the objecting parties as some sort of "back room" deal intended to prejudice certain of the

Debtors' creditors is both outrageous and insulting.  To the contrary, the settlements achieved

through the Agreement, as well as the commitment by the Debtors' parent, Ally, to contribute

$2.1 billion in value, are an extraordinary outcome for the Debtors' estates and all of their

creditors, including those who are not party to the Agreement.

   3.  The Agreement outlines the terms of a joint Chapter 11 plan that is supported by a

substantial majority of the Debtors' major claimants.  Specifically, the Plan terms embodied in

the Agreement if approved, will resolve ongoing claims and disputes between and among the

Debtors and their creditors.  In broad strokes, the Agreement includes the following significant

compromises, among others:

- **RMBS Trust Claims.**  The Agreement resolves issues regarding the allowance, priority and allocation of the claims that have been asserted by RMBS Trustees for all of the Debtors' liabilities in connection with over 1,000 RMBS Trusts, including the RMBS Trusts' argument that their representation and warranty ("**R&W**") claims could give rise to an administrative cure claim (capped in certain circumstances at $600 million per prior agreement with the RMBS Trustees) and servicing cure claims that were asserted to be hundreds of millions of dollars.  As this Court is aware, the proceedings regarding the appropriate amount of the RMBS Trusts' claims span the entirety of this case to date and, if required to continue, would require a trial of several days, if not longer.  Additionally, even if the amounts of the RMBS Trusts' claims are approved, the Debtors believe that a further hearing would likely be required at which the Court would be asked to determine whether these claims should be subordinated to the claims of other general unsecured

ny-1096440

creditors. The Agreement resolves each of these issues with the consent of many of the creditors that had previously, and often vehemently, opposed the RMBS Settlement.

- **Claims of FGIC and MBIA.** The Agreement contemplates the resolution of the claims filed by FGIC and MBIA. The claims asserted by FGIC and MBIA amount to billions of dollars in the aggregate. The plan contemplated by the Plan Support Agreement resolves these claims for a fraction of that amount, and also eliminates the billions of dollars of potential RMBS Trust collateral loss claims related to securities insured by MBIA and FGIC that could otherwise have been asserted against the Debtors.

- **Securities Claims.** The Agreement addresses tens of billions of dollars in claims against the Debtors and non-debtor affiliates arising from their structuring, sponsoring, underwriting and sale of residential mortgage-backed securities ("**RMBS**"). By the creation of a Private Securities Claims Trust (as defined in the Supplemental Term Sheet), the Agreement avoids significant litigation regarding some of the largest claims asserted against the Debtors, including litigation over the validity of the Private Securities Claims and whether such claims should be subordinated pursuant to section 510 of the Bankruptcy Code.

- **Borrower Claims.** The Agreement addresses the treatment of claims asserted by borrowers through the establishment of the Borrower Claims Trust (as defined in the Supplemental Term Sheet) and sets a floor of available assets for distributions to borrowers. The Borrower Claims Trust will provide a streamlined procedure for borrowers to receive distributions.

- **Substantive Consolidation.** The Agreement contemplates the settlement and compromise of the issues relating to whether the liabilities and the assets of the Debtors should be substantively consolidated under the Plan. This resolution resolves what otherwise could have turned into complex, time-consuming, and uncertain litigation at confirmation, the delay and cost of which would have posed material risk to the resolution of the Debtors' Chapter 11 cases and all creditor recoveries.

- **Intercompany Claims.** The Agreement contemplates the resolution of intercompany claims between the Debtors' estates. As will be described in greater detail in the contemplated disclosure statement, while there may be a few factors with respect to any individual intercompany balance that could indicate valid debt, the majority of factors weighed against a determination that the balances represent valid claims. Recognizing the infirmities of the claims and the prospect of years of litigation ensuing, each of the Debtors with intercompany claims determined to waive those intercompany claims in connection with the Plan as part of the compromises reached by the parties through the Agreement.

4.      In addition to resolving these complex inter-creditor and intra-Debtor disputes,

the Agreement also lays the foundation for a global resolution of claims asserted against Ally. In

ny-1096440

addition to the historic monetary and non-monetary contributions Ally has made to the Debtors'

estates, Ally has agreed to contribute $2.1 billion to the Debtors' estates in exchange for releases

from the Debtors and third-parties that have or may assert claims against Ally arising out of the

operation of the Debtors' businesses.  This proposed Ally contribution will materially enhance,

by multiples, the overall recoveries to the Debtors' creditors.  In the absence of the Ally

settlement, the likely ensuing litigation against Ally and the resulting indemnification claims

Ally could assert against the Debtors could take years to conclude.

5.      In sum, the Agreement represents an important leap forward in resolving – as part

of a Plan to be proposed – numerous inter-creditor, intra-Debtor, and third-party disputes.  And

as this Court can appreciate, achieving such consensus was challenging, but was reached as a

result of a great deal of hard work on the part of many parties and the efforts of the Judge Peck,

as Plan Mediator.

6.      In response to the Motion, a number of parties have filed pleadings that range

from broad, general reservations of rights to attacks on the as-yet-to-be-filed Plan itself.  To be

clear, nothing in the Motion seeks approval of the ultimate disclosure statement and

contemplated Plan,[5] and the Debtors do not intend to litigate Plan issues at the hearing on June

26.  Nor could they.  Naturally, the Plan and disclosure statement will each be subject to the

required process for notice and approval by this Court in due course, and parties will have an

opportunity to be heard.  But that time is not now.  Nonetheless, in order to assuage creditors that

may have erroneously believed that approval of the Plan Support Agreement was tantamount to

approval of an as-yet-to-be filed Plan, the Debtors modified the Proposed Order[6] to include an

---

[5] See Motion ¶ 26 n.14.
[6] A copy of a revised Proposed Order and a comparison to the version of the Proposed Order filed on June 19, 2013
[Docket No. 4006] are attached hereto as Exhibits 2 and 3, respectively.

express, broad reservation preserving parties' rights to fully prosecute an objection with respect to any proposed disclosure statement or Plan or any other motion that seeks to effectuate the terms of the Plan Support Agreement.

7.      A small number of the objections actually challenge the Debtors' ability to enter into the Plan Support Agreement. These objections argue that the appropriate standard to be applied in determining whether the Debtors should be permitted to enter into the Plan Support Agreement is not one of reasonable business judgment, but rather heightened scrutiny because the Plan Support Agreement contemplates a release of Ally (citing Judge Chapman's decision in Innkeepers, described further infra.). This is not Innkeepers. The Plan Support Agreement was signed more than one year after the commencement of the cases, followed months of mediation, a thorough investigation by the Creditors' Committee and included as key parties to the discussions the Creditors' Committee and claimants of all types, including secured and unsecured creditors. Nevertheless, regardless of the standard that this Court may apply to the Motion, the Debtors believe that they have more than ample justification for entry into the Agreement.

8.      As noted above, the Debtors are not seeking pre-approval of the contemplated Plan through the Motion. But recognizing the complexity of the multi-faceted settlement agreement, the Debtors and certain of the Consenting Claimants have requested as part of the Proposed Order that this Court find that entry into the Plan Support Agreement is in the best interests of the Debtors' estates and creditors and in the best interests of various Consenting Claimants. Due to the "give and take" nature of the negotiations – the hallmark of an effective mediation – the Debtors and the Consenting Claimants have requested these findings from this Court in recognition of their determination to settle rather than litigate for diminishing returns.

ny-1096440

While any creditor can argue that it would have negotiated the Agreement differently had such

creditor been part of the process, the simple truth is that the Consenting Claimants, certain of

which act as fiduciaries, were required to make various judgment calls on many issues relevant

to the global settlement.  The requested findings are supported by the declarations submitted in

support of the Motion by the Debtors and the RMBS Trustees.

        9.      For the reasons stated above and described in more detail herein, the Debtors

respectfully request that this Court approve the Debtors' entry into the Plan Support Agreement

and the related relief requested by the Motion and overrule the objections.

## ARGUMENT

I.     **THE DEBTORS' DECISION TO ENTER INTO THE PLAN SUPPORT AGREEMENT IS GOVERNED BY AND SATISFIES THE BUSINESS JUDGMENT RULE**

    A.     **Entry Into and Performance Under the Plan Support Agreement Should Be Approved Under the Business Judgment Rule**

        10.      Courts in this district and others routinely apply the business judgment rule in

determining whether to approve entry into a plan support agreement.  See, e.g., In re KIT digital,

Inc., Case No. 13-11298 (REG) (Bankr. S.D.N.Y. June 17, 2013) (Docket No. 238) (granting

motion seeking approval of plan support agreement under Bankruptcy Code sections 105(a) and

363(b)(1) on grounds that it was a sound exercise of the debtor's reasonable business judgment);

In re AMR Corp., Case No. 11-15463 (SHL) (Bankr. S.D.N.Y. June 4, 2013) (Docket No. 8577)

(same); In re Gen. Mar. Corp., Case No. 11-15285 (MG) (Bankr. S.D.N.Y. Apr. 2, 2012)

(Docket No. 421) (same); In re Tronox Inc., Case No. 09-10156 (ALG) (Bankr. S.D.N.Y. Sept.

17, 2010) (Docket No. 2072) (same); In re Visteon Corp., Case No. 09-11786 (CSS) (Bankr. D.

Del. June 17, 2010) (Docket No. 3427) (same); In re Dana Corp., Case No. 06-10354 (BRL)

(Bankr. S.D.N.Y. Aug. 1, 2007) (Docket No. 5879) (same).  And, under the business judgment

rule, once a debtor articulates a sound business justification for a proposed transaction, a

presumption arises that "in making a business decision the directors of a corporation acted on an

informed basis, in good faith and in the honest belief that the action taken was in the best

interests of the company."  Official Comm. of Subordinated Bondholders v. Integrated Res., Inc.

(In re Integrated Res., Inc.), 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting Smith v. Van Gorkom,

488 A.2d 858, 872 (Del. 1985)).

11.    The business judgment rule's presumption "shields corporate decision-makers and

their decisions from judicial second-guessing when the following elements are present:  '(1) a

business decision, (2) disinterestedness, (3) due care, (4) good faith, and (5) according to some

courts and commentators, no abuse of discretion or waste of corporate assets.'"  In re Quigley

Co., 437 B.R. 102, 157 (Bankr. S.D.N.Y. 2010) (quoting In re Integrated Res., Inc., 147 B.R. at

656).  Each of those elements is present here, justifying application of the business judgment rule

in considering and approving the Motion.

12.    First, as set forth in detail above and in the Motion, the Debtors have established a

sound business justification for entering into and performing under the Plan Support Agreement.

Specifically, the Plan Support Agreement will provide a path to settlement of critical intra-

Debtor and inter-creditor issues, and will also resolve potential litigation against Ally, all of

which would have required years of litigation costing tens of millions of dollars.  Taken together,

these settlements will result in $2.1 billion of value inuring to the Debtors' estates for the benefit

of all creditors.  Moreover, the terms of the Plan Support Agreement are fair and reasonable, as

indicated by, among other things, the affirmative support of numerous key claimant constituents.

13.    Second, the Debtors were represented in the mediation that led to the Agreement

by Mr. Kruger, the Debtors' Chief Restructuring Officer, acting in his capacity as an independent

7

fiduciary for the Debtors' estates and with no connection whatsoever to Ally. Moreover, the

mediation was not a bilateral negotiation between the Debtors and Ally, but was instead a multi-

party endeavor in which the Creditors' Committee—acting as fiduciary for all of the estates'

unsecured creditors—took a leading role in negotiating the amount of the Ally Contribution.

Accordingly, the Debtors were not self-dealing or "negotiating with themselves" in reaching a

deal that includes Ally among many others.

14.     <u>Third</u>, as detailed in the Motion, the mediation sessions that led to the Agreement

were lengthy and thorough, and the terms that are now embodied in the Agreement were

reviewed and challenged at every step by multiple constituents with varying and, often, divergent

interests. The exhaustive and rigorous character of the mediation that led to the Agreement, in

which the estates' interests were zealously represented by multiple independent fiduciaries,

supports a finding that the Debtors exercised due care in deciding to enter into the Agreement.[7]

15.     <u>Fourth</u>, the Agreement reached through the mediation was led and guided by the

Honorable James M. Peck, as the Court-appointed Plan Mediator, has the support of an

overwhelming number and variety of claimants. These facts strongly support a finding that the

Agreement (including the process that led to it) is fair in both appearance and in fact and was

therefore entered into in good faith.

16.     <u>Finally</u>, the Agreement will facilitate a series of compromises that, taken together,

will bring billions of dollars into the Debtors' estates, refuting any allegations that entry into the

Plan Support Agreement constitutes an abuse of the Debtors' discretion or a waste of corporate

assets.

---

[7] In the *Objection of Credit Suisse to Debtors' Motion for Order Authorizing Entry Into and Performance of Plan Support Agreement* [Docket No. 4019] (the "**Credit Suisse Objection**"), Credit Suisse Securities (USA) LLC ("**Credit Suisse**") suggests that the Debtors cannot show that they have acted in good faith and with due care as they did not review the Examiner's Report prior to entering into the Agreement. Credit Suisse Obj. at 6. For the reasons set forth in section IV.C(ii) of the Reply, this contention is without merit.

17.     For each of the foregoing reasons, the business judgment rule provides the appropriate test for approval of the Motion, and the Motion should be granted.

**B.      Heightened Scrutiny Is Inapplicable But Is Nonetheless Satisfied**

18.     Certain of the objecting parties point to Judge Chapman's ruling in In re Innkeepers USA Trust, 442 B.R. 227 (Bankr. S.D.N.Y. 2010), in support of their apparent argument that heightened scrutiny should apply in any case where, as here, a debtor is seeking approval of a plan support agreement to which an affiliate is a party.[8]  In applying heightened scrutiny in other contexts, courts typically are concerned with the integrity and entire fairness of the transaction at issue, generally examining whether the process and terms of a proposed transaction not only appear fair but are fair and whether fiduciary duties were properly taken into consideration.  See In re Bidermann Indus. U.S.A., Inc., 203 B.R. 547, 551 (Bankr. S.D.N.Y. 1997).

19.     It appears that in raising this objection, these parties have somehow overlooked the very active involvement in the mediation process of a sitting Federal Bankruptcy Judge and the seven-month, multi-lateral nature of the mediation.  The facts and circumstances here are diametric to those that troubled the court in Innkeepers.  Here, the entire process was led by the Court-appointed Plan Mediator and independent fiduciaries for the Debtors' estates and representatives for a wide swath of claimant constituencies, including a Creditors' Committee fully informed by its own investigation of the Debtors' interactions with Ally.[9]  No objector has provided a shred of evidence to suggest that self-dealing occurred or that the Debtors or any other party acted other than in good faith in negotiating the Plan Support Agreement.

---

[8] See Objection of Syncora Guarantee Inc. [Docket No. 4028] (the "**Syncora Objection**") at 9; Objection of FHLB Chicago, FHLB Boston, and FHLB Indianapolis [Docket No. 4034] (the "**FHLB Objection**") ¶¶ 7-9.
[9] Indeed, the Debtors had previously agreed to provide the Creditors' Committee with standing to pursue certain claims against Ally on behalf of the estates.

ny-1096440

20.     The objectors rely on unsubstantiated and general allegations that the Motion

should be subject to heightened scrutiny because "Ally sits on both sides of the transaction."

FHLB Obj. ¶ 9.  These allegations are meaningfully ill-informed.  Unlike Innkeepers, the

unrebutted evidence shows that the mediation process that gave rise to the Agreement was

transparent, inclusive, thorough, and conducted at arm's-length.  Moreover, the Agreement

provides a clear benefit to the Debtors' estates and has the broad support of key claimants.

Under the facts set forth above and in the Motion, it is evident that the Agreement is not the

product of self-dealing, bad faith or gross negligence, and, therefore, heightened scrutiny of the

Debtors' entry into and performance under the Plan Support Agreement is not required.

Applying those same facts, however, even if this Court were to apply heightened scrutiny in

determining whether to approve the Agreement, that standard would be easily met.

## II.     CONFIRMATION-RELATED OBJECTIONS ARE NOT RIPE FOR CONSIDERATION

21.     Various parties have filed objections or responses to the Motion, which raise

issues that are not ripe for consideration now, but should instead be addressed at the Plan

confirmation stage.  As detailed below, these issues include (i) the appropriateness of certain

provisions anticipated to be included in the Plan, including the expected third-party releases; (ii)

the anticipated classification of certain claims; and (iii) whether the intended treatment of certain

claims is fair and equitable.  Each and every one of these objections is premature.

22.     Now is not the proper time for parties in interest to lodge objections to the Plan

provisions contemplated by the Agreement.  The Agreement is not intended to substitute for a

Chapter 11 plan, nor is it intended that this Motion substitute for the Plan confirmation process.

The Debtors will be filing a disclosure statement and Plan in short order.  All parties in interest

will have the opportunity to object to the Plan before this Court rules upon whether to confirm it.

10

Potential objections to the Plan, therefore, provide no basis for the Court to refuse to approve the

Plan Support Agreement and should be overruled.

23.    Indeed, courts have uniformly held that objections to plan terms are to be raised at

confirmation, i.e., once a plan has been formally proposed and solicited, and once the plan's

proponents have had the opportunity to present evidence to support plan confirmation.  See In re

Innkeepers USA Trust, 448 B.R. 131, 148 (Bankr. S.D.N.Y. 2011) (holding objections asserting

that "release provisions [were] overly broad and should not be approved absent the consent of

each releasing party" were "best categorized as confirmation objections."); In re Adell, 325 B.R.

883, 886 (Bankr. M.D. Fla. 2005) (rejecting attempt to have confirmation issues considered prior

to the confirmation hearing); In re Sunshine Precious Metals, Inc., 142 B.R. 918, 920 (Bankr. D.

Idaho 1992) (refusing to rule on matters that were "confirmation issues" prior to confirmation

hearing); In re One Canandaigua Props., Inc., 140 B.R. 616, 618 (Bankr. W.D.N.Y. 1992)

(holding that prior to confirmation hearing, disputes over confirmation issues must be deferred as

"the Court ought not to be drawn into the process of drafting of plans."); In re Scioto Valley

Mortg. Co., 88 B.R. 168, 172 (Bankr. S.D. Ohio 1988) ("[I]ssues respecting the plan's

confirmability will await the hearing on confirmation.").  This is all the more apparent given that

the Debtors have reserved the rights of parties to raise any and all issues related to the Debtors'

forthcoming Plan at confirmation.[10]

---

[10] The Proposed Order provides:
    [O]ther than with respect to the parties to the Agreement, nothing herein shall (i) prejudice any
    party in interest's rights to fully prosecute an objection with respect to any proposed disclosure
    statement or Chapter 11 plan or any other motion … that seeks to effectuate the terms of the
    Agreement, and (ii) be deemed to constitute any finding of fact or conclusion of law in connection
    with the approval or confirmation of, as applicable, any disclosure statement, Chapter 11 plan or
    other motion…
Proposed Order ¶ 5; see also Motion at 19 n.14; Transcript of Hearing at 50:8-16, In re Residential Capital, LLC,
Case No. 12-12020 (MG) (Bankr. S.D.N.Y. May 29, 2013) (issues concerning non-debtor releases to be resolved at
confirmation).

ny-1096440

### A.    Objections to Proposed Third Party Releases are Not Ripe at This Time

24.    Certain parties, including Credit Suisse, Syncora Guarantee Inc. ("**Syncora**"), and
the Federal Home Loan Banks of Boston, Chicago and Indianapolis (collectively, the "**FHLBs**"),
have objected to the propriety of the third-party releases to be proposed as part of the Plan
pursuant to the Plan Support Agreement.[11]   Courts in this district, and elsewhere, recognize that
the propriety of releases is an issue to be addressed at confirmation, not before.  For example, in
New York O.T.B., Case No. 09-17121 (Bankr. S.D.N.Y.), when parties raised objections to
certain third-party releases in objecting to the debtor's disclosure statement, this Court deferred
those objections until confirmation, noting that it did "not have a sufficient factual or legal record
to resolve [the] objections at [the] time."  Order Regarding Motion to Approve Disclosure
Statement at 2-3, NYC Off-Track Betting Corp., Case No. 09-17121 (Bankr. S.D.N.Y. Dec. 1,
2010) (MG) (Docket No. 234); see also Nielsen v. Specialty Equip. Cos., 92 C 20142, 1992 WL
279262, at *3 (N.D. Ill. Sept. 25, 1992) (referencing court's earlier decision discussing third-
party release "holding that the validity of the releases was a plan confirmation issue"), aff'd sub
nom., Matter of Specialty Equip. Cos., 3 F.3d 1043 (7th Cir. 1993); In re Drexel Burnham
Lambert Grp., Inc., 90 B 10421, 1992 WL 62758, at *1 (Bankr. S.D.N.Y. Mar. 5, 1992)
(deeming objections to third-party releases "to be in the nature of objections to Confirmation of
the Plan of Reorganization"); see also Transcript of Hearing at 19:8-22, In re Arcapita Bank
B.S.C., Case No. 12-11076 (Bankr. S.D.N.Y. Apr. 26, 2013) (SHL) (referencing numerous
objections to debtor Arcapita's disclosure statement, the Court stated that "there was a lot about
third-party releases, obviously. . . .  And that's a plan issue . . . to address at confirmation").

25.    At confirmation, the Debtors will present evidence showing that the releases to be
proposed as part of the Plan provide substantial benefits to the Debtors and their constituents, are

---

[11] See Credit Suisse Obj. at 6-12; Syncora Obj. at 11-14; FHLB Obj. ¶¶ 12-17.

an essential component and critical to the success of the Plan, and as such meet the standard set

by the Second Circuit in <u>Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re</u>

<u>Metromedia Fiber Network, Inc.)</u>, 416 F.3d 136, 141-42 (2d Cir. 2005).  Moreover, the Debtors

will also present evidence that the Court has proper jurisdiction to issue the proposed third-party

releases, in light of, among other things, the Ally cash contribution, Ally's potential

indemnification claims against the Debtors for Debtor-related liability and Ally's proposed

contribution from the resolution of shared insurance policies with the Debtors.  Evidence will

also show that the releases were negotiated in good faith with, among others, Ally, which

insisted on the releases as a condition to its contribution toward the global settlement.

### B.    Objections to Provisions of the Anticipated Plan are Premature

26.    Other parties have objected to certain global settlement provisions contained in

the Agreement.  For example, Amherst Advisory & Management, LLC ("**Amherst**") contends

that: (i) the allocation of administrative expenses to Residential Funding Company, LLC and

GMAC Mortgage, LLC is improper; and (ii) the Trust Unit (as defined in the Supplemental Term

Sheet) allocation does not contain a reserve mechanism for RMBS Trusts that choose to opt out

of the RMBS Settlement.[12]  The allocation of administrative expenses was part of a global

settlement embodied in the Plan pursuant to which the parties resolved a host of intra-Debtor and

inter-creditor issues, and thus cannot be viewed in a vacuum.  Regardless, the appropriateness of

this resolution is a Plan issue that should properly be addressed at confirmation.  The Debtors

and the Creditors' Committee will propose a Plan that complies with the confirmation

requirements set forth in the Bankruptcy Code, and will detail, <u>inter</u> <u>alia</u>, any required reserves.

Once the Plan is proposed, if Amherst does not agree with the terms applicable to its interests, it

will have ample opportunity to object to the Plan during the confirmation process.

---

[12] <u>See</u> *Limited Objection of Amherst Advisory & Management, LLC* [Docket No. 4008] (the "**Amherst Objection**").

27.     Certain other parties have also raised issues that are in reality Plan confirmation

issues.  For example, National Credit Union Administration Board, as Liquidating Agent for

Western Corp. Federal Credit Union and U.S. Central Federal Credit Union ("**NCUAB**") and

Syncora have raised classification issues and have also questioned whether the contemplated

Plan would meet the "best interests of the creditors" test.[13]  See 11 U.S.C. §§ 1122, 1129(a)(7).

These are clearly Plan objections more appropriately addressed at confirmation.  See, e.g., In re

WorldCom, Inc., Case No. M-47, 2003 WL 21498904, at *9 (S.D.N.Y. June 30, 2003)

("Whether the proposed classification is improper is a matter to be decided at the confirmation

hearing . . . ."); In re Ellipso, Inc., 09-00148, 2012 WL 368281, at *2 (Bankr. D.D.C. Feb. 3,

2012) (deferring classification objection to confirmation).[14]

28.     The Debtors will make the appropriate evidentiary showing at confirmation and at

hearings on the Bankruptcy Rule 9019 motions contemplated by the Plan Support Agreement as

to why the proposed global settlement meets the applicable standards under the Bankruptcy Code

and applicable precedent.  Now is not the time to address piecemeal objections to particular

---

[13] *Objection and Reservation of Rights of National Credit Union Administration Board* [Docket No. 4020] (the
"**NCUAB Objection**") at 11-13; Syncora Obj. at 15-18.

[14] To be clear, the Debtors believe that each of these objections is wholly without merit.  For example, with respect
to NCUAB's contention that it is improperly classified, NCUAB concedes, the definition of "Private Securities
Claims" includes only those claims that are either subject to (i) pending litigation against Ally or one of its non-
Debtor affiliates or (ii) a tolling agreement with any of them.  See NCUAB Obj. at 10-11.  NCUAB has neither filed
litigation against Ally nor does it have a tolling agreement with Ally.  Instead, NCUAB claims that, by operation of
various tolling principles, extender statutes, and other arguments, it has un-asserted but timely claims against Ally
and Ally Securities in addition to the prepetition claims it brought against the Debtors.  Id. at 2-3.  The Debtors do
not believe that NCUAB has any timely claims against Ally or Ally Securities, and in fact do not believe that
NCUAB has any timely claims against the Debtors either.  The Debtors recently filed an objection to all eleven of
NCUAB's proofs of claim, seeking to disallow those claims on the basis that, among others, NCUAB's claims are
barred by the applicable statutes of limitation.  [Docket No. 4050].  The Debtors believe those arguments (and
others) extend to any claims NCUAB purports to have against Ally and/or Ally Securities.  In short, the Debtors do
not believe that NCUAB has timely securities claims against the Debtors, Ally or Ally Securities.  As such,
NCUAB's claims are not similar to the claims of those claimants with Private Securities Claims.  NCUAB is not
therefore entitled to be treated similarly to those claimants, and to the extent NCUAB continues to have valid claims
at confirmation, the Debtors will present evidence of such.

provisions of a Plan that is still in the process of being drafted and has not yet been formally

proposed.

> **C.    The Plan Contemplated by the Agreement Will Provide Parties In Interest With More Detail Regarding Various Issues As Required By The Bankruptcy Code**

29.    Finally, certain of the objecting parties argue that the Motion should not be

approved because it does not adequately address their claims or rights.  See, e.g., Amherst

Objection ¶ 15.  As discussed above, by its very nature, the Agreement does not contain

everything that is expected to be – or which by law must be – contained in a Plan.  To the extent

parties in interest require more detail regarding various issues related to the contemplated Plan,

these parties will have ample opportunity to examine and respond to the Plan once it is proposed.

## III.    THE EVIDENCE PROVIDED BY THE DEBTORS AND THE TRUSTEES SUPPORTS THE FINDINGS CONTAINED IN THE PROPOSED ORDER

30.    Certain of the responding parties have objected to particular findings in the

Proposed Order, arguing that these findings are overbroad and will affect substantive rights to

challenge the Plan.  See e.g., NCUAB Objection at 13 (objecting to "disparate treatment").

These objections are misplaced at this juncture because the findings here are specific to entry

into the Agreement and not the ultimate Plan that will be subject to Court approval during the

confirmation process.  Moreover, the only evidence presented shows that the findings are

warranted.

31.    Nonetheless, in order to assuage these parties' concerns that the findings were

overbroad, the Debtors have modified the Proposed Order to reflect a broad reservation,

preserving all parties' rights to fully prosecute an objection regarding any proposed disclosure

statement or Plan or any other motion that seeks to effectuate the terms of the Agreement.

Proposed Order ¶ 5.  In addition, to further clarify that the findings here are limited to the

propriety of entering into and pursuing of the Agreement, paragraph 3 of the revised Proposed

Order substitutes language to this effect in the place of prior language referencing the

transactions contemplated in the Agreement.  See Proposed Order ¶ 3.  As a result, the Debtors

believe that any objections to the proposed findings requested should be denied.

### A.    The Record Supports the Proposed Finding in Paragraph Three of the Proposed Order

32.    The record amply supports the finding that the Agreement is "in the best interests

of the Debtors' estates, their creditors, the Institutional Investors, the investors in each RMBS

Trust, each such RMBS Trust, [and] the RMBS Trustees."  Proposed Order ¶ 3.[15]

33.    The Agreement is in the collective best interest of those parties because, if

approved, the Plan contemplated therein:  (a) brings substantial funds to the table from non-

Debtor Ally, see Motion ¶ 2,[16] and (b) avoids the uncertainty and substantial expense of lengthy

litigation that would otherwise deplete the Debtors' resources.  E.g., Kruger Decl. ¶ 13.

34.    Without the Ally Contribution contemplated by the Agreement, the global

resolution of the many complex issues and competing interests in these cases would likely be

impossible.  See, e.g., Kruger Decl. ¶ 16; Major Decl. ¶ 57 (considering the Agreement's "added

value to the Debtors' estates" and "the certainty associated with fixing the Ally Contribution");

Musarra Decl. ¶ 60 (same); Scott Decl. ¶ 53 (same); Sohlberg Decl. ¶ 59 (same).

35.    The Agreement also resolves a host of complex issues that would otherwise

necessitate continued lengthy and expensive litigation.  For example, the Agreement

contemplates the fixing and allowance of the RMBS Trust claims that had been the subject of the

---

[15] See also NCUAB's Objection at 13 (objecting on the grounds that the record is insufficient to support the finding in paragraph 3 of the Proposed Order).
[16] Specifically, as detailed in the Debtor's Motion, the Agreement secures an additional contribution by Ally to the Debtors' estates of $1.35 billion over the cash amount it had agreed to contribute in its prepetition plan support agreement with the Debtors, to a total contribution of $2.1 billion.  Motion ¶ 2.

ny-1096440

contested RMBS Settlement;[17] it permits determination of the R&W claims of the Additional

Settling Trusts (as defined in the Supplemental Term Sheet) without the expense of further

litigation over those claims;[18] it addresses and allows the RMBS Trusts' servicing-related claims,

avoiding further litigation over their valuation and priority;[19] and it resolves many contentious

inter-creditor disputes that risked serious delay and expense to all creditors.[20]   For every complex

issue it resolves, the Agreement reduces the attendant risk of mounting administrative costs,

prevents significant plan-related litigation costs and as a result maximizes distributions to

creditors.  See Kruger Decl. ¶ 13.  Those global benefits are sufficient to find that the Agreement

is in the best interest of all involved.

### B.   The Record Supports the Proposed Finding in Paragraph Four of the Proposed Order

36.   The record also supports the finding that "[t]he RMBS Trustees acted reasonably,

in good faith and in the best interests of the Institutional Investors, the investors in each RMBS

Trust and each such RMBS Trust in agreeing to the Agreement."  Proposed Order ¶ 4.  The

Agreement was the result of a mediation process spanning seven months, overseen by the Plan

Mediator, and attended by nearly 150 professionals and principals.  The nature and breadth of the

mediation process itself supports the finding in paragraph four.  Moreover, contrary to the

objections,[21] the Court need not rely solely on the declaration submitted by Mr. Kruger for that

proposition.  Declarations submitted by the RMBS Trustees demonstrate the extensive good-faith

efforts taken by those RMBS Trustees in connection with their negotiation and evaluation of the

Plan.

---

[17] E.g., Major Decl. ¶ 59.
[18] E.g., id. ¶ 60.
[19] E.g., id. ¶ 61.
[20] E.g., id. ¶ 62.
[21] See NCUAB Objection at 14 n.12

ny-1096440

37.    The RMBS Trustees were active participants in the months of nearly round-the-clock formal and informal hard-fought negotiations guided by the Plan Mediator.  Major Decl. ¶ 23; Meyer Decl. ¶ 23; Acebedo Decl. ¶ 11; Musarra Decl. ¶ 45; Scott Decl. ¶ 23; Sohlberg Decl. ¶ 44.  The RMBS Trustees sought expert advice and, after undertaking a "rigorous selection process," retained Duff & Phelps, LLC based on their experience handling similar evaluations of mortgage loan servicing and origination agreements, bankruptcy litigation, complex securitizations, and RMBS loan repurchase actions.  E.g., Major Decl. ¶¶ 20-21.  The scope of Duff & Phelps' engagement included, among other things:  (i) evaluating the reasonableness of the RMBS Settlement, (ii) determining the reasonable value of R&W claims for any RMBS Trusts not included in the RMBS Settlement for which any of the RMBS Trustees acted as Trustee or Separate Trustee; and (iii) determining the value of the Settling Trusts' servicing-related claims.  E.g., id. ¶ 20.  After conducting a sampling review of over 6,500 mortgage loan files, Duff & Phelps projected that the range of R&W Claims that could be asserted against the Debtors on account of RMBS Trusts included in the RMBS Settlement was between $6.5 billion and $10.2 billion.  Id. ¶ 27.  Duff & Phelps also reached a preliminary estimate of $950 million for the aggregate value of the Additional Settling Trusts' R&W claims,[22] and $1.1 billion for the potential maximum value of servicing claims that could be asserted against the Debtors,[23] though each estimate was subject to uncertainty and further refinement.[24]

38.    The RMBS Trustees also considered likely litigation outcomes in light of the Debtors' viable defenses, potential litigation risks, and the attendant litigation costs.  See, e.g., Major Decl. at ¶¶ 28-30, 38, 46-49, 58-63; Meyer Decl. ¶¶ 28-30, 38, 46-49, 57-62; Musarra

---

[22] Id. ¶ 38.
[23] Id. ¶ 46.
[24] Id. ¶¶ 38, 46-47.

ny-1096440

Decl. ¶¶ 22-23, 28, 35-37, 61-66; Scott Decl. ¶¶ 27-28, 33, 42-43, 54-59; Sohlberg Decl. ¶¶ 28, 35-36, 60-65.

39.    Generally, the objections to the proposed finding in paragraph four do not contend that the finding is incorrect, but instead that the finding is inconvenient.  See NCUAB Objection at 13.  Absent evidence that the finding is inaccurate, the Court should not refuse to make the requested finding simply because it would inconvenience certain objectors.  Regardless, the result reached by the Trustees—an aggregate claim of approximately $7.4 billion, including amounts allowed for Repurchase and Servicing Claims[25]—is objectively within a reasonable range in light of the third-party valuations prepared by Duff & Phelps and taking into account the substantial risks and costs associated with litigation.

40.    Consistent with the above, Syncora objects to proposed finding paragraph four on the theory that it would "release claims" against the RMBS Trustees by insulating them from legal theories premised on a failure to act in good faith.  Syncora Objection at 13.  They further point out that the Court cannot "enjoin" claims against a non-debtor.  Id. at 14.  But the Motion does not seek any release of, or injunction against, any claim by Syncora.  The Motion simply seeks a factual finding based on the evidence recounted above of the RMBS Trustees' good faith efforts in reaching the Agreement.  Syncora will have an opportunity to challenge that evidence at the upcoming hearing on the Motion, and Syncora was free to present any other evidence that might suggest a contrary conclusion, though it failed to do so in support of its objection.[26]

---

[25] Major Decl. ¶ 40, 49.  The amounts set forth in the Supplemental Term Sheet reflect the exclusion of certain claims associated with the RMBS insured by the monolines.  See Major Decl. ¶ 42.  The insured losses on these securities are expect to be covered by the insuring monoline, except that in the case of Financial Guaranty Insurance Company, the recoveries on account of insured securities will be dealt with through a separately proposed settlement.  See id.
[26] The Debtors respectfully submit that Syncora will be unable to offer any contrary evidence because the RMBS Trustees' good faith is apparent from the evidence recounted above.

C.      **Proposed Ordered Paragraph Ten Does Not Expand or Prejudice Any Party's Rights**

41.      NCUAB also objects to the ordered paragraph approving the "discretionary rights granted in the Treatment of Securities Claims Section of the Supplemental Term Sheet," based on its lack of understanding as to what "discretionary rights" the ordered paragraph refers to. To clarify, the "discretionary rights" referred to in the Proposed Order are simply the right of the Settling Private Securities Claimants (as defined in the Supplemental Term Sheet) to terminate the Agreement if the Private Securities Trust Agreement (as defined in the Supplemental Term Sheet) provided in connection with the Plan is not "in form and substance reasonably acceptable" to each of them in their individual capacity. Supplemental Term Sheet, Treatment of Securities Claims ¶ 6. That right is no broader than any other signatory's right to terminate the Agreement if the Plan and attendant documentation are not acceptable, and the term is included in the Supplemental Term Sheet only out of an abundance of caution on the part of the Settling Private Securities Claimants.

## IV.    RESPONSES TO CERTAIN INDIVIDUAL OBJECTIONS

42.      In addition to the general objections and responses described above, certain of the responding parties make statements (unsupported by evidence) and raise arguments that are more tailored to their parochial interests. Certain of those objections and responses are addressed individually below.

A.      **Ad Hoc Group of Junior Secured Noteholders' Statement and Reservation of Rights and Joinders Thereto**

43.      The Ad Hoc Group of Junior Secured Noteholders (the "**Ad Hoc Group**") filed a response to the Motion.[27] While it does not object to the Motion, it raises parochial issues which

---

[27] Berkshire Hathaway Inc. and UMB Bank, N.A. ("**UMB**") each filed so-called "joinders" to the Ad Hoc Group's statement over 24 hours after the objection deadline. Similarly the Ad Hoc Group filed a further statement two days

ny-1096440

this Court has not heard ad nauseum that require a brief response.  First, as noted in the Ad Hoc

Group's Statement and Reservation of Rights [Docket No. 4018], despite the Debtors' and

Committee's belief that the Junior Secured Noteholders ("**JSNs**") are significantly undersecured,

the proposed Plan provides beneficial treatment to such holders in the form of payment in full on

their allowed claims on the Effective Date of the Plan (rather than recovering a portion of their

claim on the Effective Date and being forced to recover the balance over time through their

deficiency claims and as additional collateral is liquidated).  See Supplemental Term Sheet at 4.

Moreover, to the extent the Court determines that the JSNs are oversecured during the trial in

October, the Plan will provide for the payment of any postpetition interest to which they are

legally entitled.

44.    Although the Ad Hoc Group and UMB may believe that the compromises

embodied in the Agreement impact their claims, the proper forum to raise those arguments will

be in connection with confirmation of the Plan.  While the Ad Hoc Group accuses the Plan

Proponents of engaging in "brinksmanship" with respect to these issues and would, of course,

prefer to litigate these issues outside the context of the Plan, the Court has already addressed this

issue in a status conference with the Ad Hoc Group and UMB.  The Court determined that

intercompany claims and other issues that impact creditors more broadly should be addressed as

part of the Plan process and bifurcated from the JSN-specific issues that will be resolved through

the separate adversary proceedings.  If the Ad Hoc Group or UMB determine they are required to

object to confirmation as a result, and risk the $2.1 billion settlement offered by Ally (along with

---

after the deadline to file all responses.  UMB's "joinder" was in fact an untimely objection, raising new issues and
attaching a proposed amended order.  UMB's "joinder" and proposed order seek changes to the Proposed Order,
which UMB believes necessary so as to avoid prejudicing its rights.  As set forth above, the Debtors believe that
new paragraph 5 of the Proposed Order adequately addresses this concern.  Nonetheless and notwithstanding the
untimeliness of the joinder, the Debtors, in consultation with the Committee and the Consenting Claimants, have
made certain other changes to the Proposed Order in order to address any further concerns, which changes have been
incorporated into to the revised Proposed Order attached hereto as Exhibit 2.

the favorable treatment being offered to them under the Plan), then this is their choice to make.
The Plan Proponents will present evidence at confirmation, which they believe will be sufficient
for the Court to rule on the reasonableness of the terms of the global settlement and confirm the
Plan.

45.    Finally, the JSNs take issue with the lack of an explicit fiduciary out in the Plan
Support Agreement and seek clarification as to the scope of any fiduciary out.  Pursuant to the
Plan Support Agreement, the parties expressly waived any fiduciary out <u>in connection with the
Examiner's Report</u>.  However, to the extent the Debtors believe their fiduciary duties require
them to terminate the agreement for any other reason, they will be entitled to do so.  Of course,
in light of the substantial contribution expected from Ally under the Plan Support Agreement and
the vast creditor support of the Plan Support Agreement, it would be an extraordinarily high bar
for the Debtors to determine that their fiduciary duties require termination of the Plan Support
Agreement.  Nonetheless, the Debtors believe that such right exists as a matter of law.

**B.    Syncora's Objection**

46.    While most of the objections to the Motion raised by Syncora[28] are addressed
above, the Debtors are compelled to address certain of the other assertions made by Syncora in
its objection and appropriately place Syncora's objection in context.  Syncora has been an active
participant in the Debtors' bankruptcy cases, having filed various sale objections, reservations of
rights, and related correspondence with this Court.  At all times—including at the request of both
law firms representing Syncora—the Debtors and their counsel have been fully cooperative and
responsive to all of Syncora's inquiries, including most recently those involving the Plan Support

---

[28]    Syncora insured payment of principal and interest for the benefit of the holders of certain securities in three
trusts that own loans previously serviced by the GMAC Mortage, LLC. Since the closing of the Debtors' servicing
platform assets to Ocwen Loan Servicing LLC ("**Ocwen**") in February 2013, the relevant loans have been
subserviced by Ocwen.

Agreement.  The Debtors spent hours on the phone with Syncora's counsel walking them

through the various provisions of the Plan Support Agreement and answering all related

questions.  Any suggestion that the Debtors "stonewalled" Syncora[29] is baseless and turns history

on its head.

47.    Ever since the months leading up to the sale hearing in November 2012, the

Debtors have attempted to resolve a number of Syncora's concerns.  Understanding that Syncora

maintained various objections to the sale of the Debtors' servicing platform to Ocwen,[30] the

Debtors explored (together with Syncora and the Creditors' Committee) various alternatives.

Unfortunately, the parties remain at a standstill because Syncora has been unable (or unwilling)

to articulate the nature and amount of its alleged claims.  Over one year into these bankruptcy

cases, Syncora concedes that it is "still investigating the full parameters of its claims against

Debtor [GMAC Mortgage, LLC] with respect to one or more of the Syncora Transactions . . ."

Syncora Obj. at 4.  To Syncora, "it appears [GMAC Mortgage, LLC] has breached" certain

duties and obligations, id., yet repeated inquiries by the Debtors about these alleged breaches (or

even an estimated claim amount) have proved unsuccessful.  As a result, the Debtors remain in

the dark regarding Syncora's purported claims and therefore have not been in a position to have

meaningful resolution discussions with Syncora.[31]

48.    Meanwhile, Syncora seeks to insert itself in the Plan Support Agreement

approval process by raising a number of objections that—to the extent they are even applicable

to Syncora—are more appropriately brought as part of the Plan confirmation process, as

---

[29] See Syncora Obj. at 7-8.
[30] See *Syncora Guarantee Inc.'s Limited Objection to Debtors' Sale Motion* [Docket No. 1657]; *Supplement to Syncora Guarantee Inc.'s Limited Objection to Debtors' Sale Motion* [Docket No. 1996].
[31] The Debtors reserve all rights to object to/seek extinguishment of Syncora's unliquidated proof of claim number 2781 for failure to provide any basis for such claim, and also reserve the right to estimate Syncora's claim at $0 for plan voting purposes.

discussed above.  Despite Syncora's inability to articulate its claims against the Debtors, the

parties remain committed to finding consensual resolutions to potential Plan objections.

### C.    Credit Suisse's Objection

49.    Credit Suisse also filed an objection to the Plan Support Agreement, raising

arguments that: (i) the Plan contemplated by the Plan Support Agreement is unconfirmable

because the third party releases are impermissible, (ii) the Debtors cannot and need not enter into

a Plan Support Agreement at all, (iii) the approval of the Plan Support Agreement cannot bind

parties in interest who do not consent to it, and (iv) the Motion should not be granted until the

Examiner's report is unsealed.  Credit Suisse's arguments about the third-party releases are

complaints about an as-yet-to-be-filed Plan and, as described <u>supra.</u> § II.C., are not proper for

consideration at this juncture.  Credit Suisse's argument that approval of the Debtors' entry into

and performance under the Plan Support Agreement may somehow affect Credit Suisse's

substantive rights have been addressed through the inclusion of the broad reservation in the

Proposed Order, as described <u>supra.</u> § III.  The other arguments raised by Credit Suisse are

likewise meritless and addressed briefly below.

### (i)    The Court has Authority to Approve the Motion

50.    Credit Suisse also argues that this Court lacks authority to approve the Plan

Support Agreement.  Credit Suisse asserts that Bankruptcy Code section 363(b)(1) neither

requires nor permits approval a plan support agreement.  Credit Suisse recognizes that this Court

has approved a plan support agreement under Bankruptcy Code section 363(b)(1) on at least one

occasion.[32]  As set forth in the Motion, the Debtors agree that Bankruptcy Code section

363(b)(1) may well not require approval of the Debtors' entry into and performance under the

Plan Support Agreement.  However, the Debtors do not agree that Bankruptcy Code sections

---

[32]    <u>See</u> <u>In re Gen. Mar. Corp.</u>, Case No. 11-15285 (MG) (Bankr. S.D.N.Y. Apr. 2, 2012) (Docket No. 421).

363(b)(1) and 105(a) forbid approval of the Debtors' entry into and performance under the Plan

Support Agreement.  The Debtors' entry into the Plan Support Agreement is a prime example of

a transaction outside of the ordinary course of business.  Accordingly, the Debtors seek approval

of their entry into and performance under the Plan Support Agreement to ensure that they are not

later faulted for failing to do so or accused of improperly soliciting votes prior to receiving

approval of a disclosure statement.

51.    Moreover, the Creditors' Committee and Consenting Claimants each required the

Debtors to obtain approval from the Court to enter into and perform under the Plan Support

Agreement, thus providing these parties with comfort that the Debtors would be bound by the

terms of the Plan Support Agreement and the Consenting Claimants would not later be the

subject of challenges seeking to designate their votes for entering into the Plan Support

Agreement.  See, e.g., In re Indianapolis Downs, LLC, 486 B.R. 286, 295-97 (Bankr. D. Del.

2013) (addressing request by plan support agreement challengers to designate votes of

signatories).  In order to provide comfort to the Debtors and the Consenting Claimants, the

Debtors agreed to seek authority to enter into and perform under the Plan Support Agreement

pursuant to Bankruptcy Code section 363(b)(1), a request regularly granted by courts in this and

other districts.  See, e.g., In re Gen. Mar. Corp., Case No. 11-15285 (MG) (Docket No. 421); In

re AMR Corp., Case No. 11-15463 (SHL) (Bankr. S.D.N.Y. June 4, 2013) (Docket No. 8577)

(same); In re The Great Atl. & Pac. Tea Co., Case No. 10-24549 (RDD) (Bankr. S.D.N.Y. Dec.

19, 2011) (Docket No. 3060); In re Tronox Inc., Case No. 09-10156 (ALG) (Bankr. S.D.N.Y.

Sept. 17, 2010) (Docket No. 2072).

### (ii)    Approval of the Plan Support Agreement Should Not Be Deferred Until the Examiner's Report is Unsealed[33]

52.    Credit Suisse's argument that approval of the Plan Support Agreement should be deferred until the Examiner's Report is unsealed and available for public view is similarly without merit.  Credit Suisse's assertion that the parties cannot "present their cases on the merits" without viewing the Examiner's Report misconstrues the relief sought in the Plan Support Agreement and glosses over the process the Debtors must undertake going forward.

53.    As an initial matter, the Motion seeks approval to enter into and perform under the Plan Support Agreement, but does not seek approval of the components—including the Plan structure, distributions and releases—contemplated therein.  If the Plan Support Agreement is approved, the Debtors will file a Plan and disclosure statement with the Court on or before July 3, 2013 that will reflect the terms of the Plan Support Agreement.  Further, the Examiner's Report will be unsealed in a matter of days, as early as June 27, 2013, but no later than July 4, 2013.  Once unsealed, all parties will have a full and fair opportunity to review the Examiner's findings and conclusions alongside the Plan and disclosure statement and can raise any valid objection at the disclosure statement and Plan confirmation phases.[34]  Put simply, approval of the Plan Support Agreement does not foreclose a party's ability (other than  parties to the Plan Support Agreement) to file an objection to the Plan and disclosure statement if it believes that its treatment under the proposed Plan is unfair based on the contents of the Examiner's Report.

---

[33] Incorporated by reference herein are the arguments made by the Debtors in the *Objection to the Motion of Berkshire Hathaway, Inc. to Unseal the Examiner's Report Pursuant to 11 U.S.C. § 107(b)* [Docket No. 4016] relating to the Court's ability to seal the Examiner's Report pursuant to section 105(a) of the Bankruptcy Code.

[34] These parties should remember, however, that the Examiner's Report is hearsay and not admissible as evidence. Transcript of Hearing at 51:9-10, In re Residential Capital, LLC, Case No. 12-12020 (MG) (Bankr. S.D.N.Y. June 12, 2013) ("The examiner report is hearsay no matter what."); see, e.g., Rickel & Assocs., Inc. v. Smith (In re Rickel & Assocs., Inc.), 272 B.R. 74, 87-88 (Bankr. S.D.N.Y. 2002) (concluding that an examiner's report is hearsay, reasoning that "[t]he Examiner conducted an investigation, but he was not charged – nor could he be – with the duty to 'hear and determine' any claims in this case.").

26

54.     Finally, Credit Suisse's suggestion that the Debtors' failed to meet the business judgment standard because their directors "buried their heads in the sand" and did not consider the findings in the Examiner's Report prior to executing the Plan Support Agreement is unsubstantiated and reckless, much like other attempts to persuade the Court to consider the Motion under a heightened standard.  The Debtors and the Creditors' Committee have independently conducted a thorough investigation of the transactions reviewed by the Examiner and determined that resolving the issues arising from such transactions through the Plan Support Agreement was a balanced and reasoned approach.[35]  Moreover, Judge Peck certainly would not have made efforts to facilitate the global resolution of these cases if he believed that the Examiner's Report needed to be considered in arriving at a settlement.  In sum, any suggestion that the parties to the mediation were blind to the issues being investigated by the Examiner is simply false, and plainly this Court would not have agreed to temporarily seal the Examiner's Report if it was not comfortable that doing so was consistent with the Debtors' and other parties' fiduciary duties.

### D.     Huntington Bancshares' Limited Objection and Reservation of Rights

55.     Huntington Bancshares Inc. ("**Huntington**") filed a limited objection and reservation of rights [Docket No. 4033] (the "**Huntington Objection**") based on the Plan Support Agreement's and the Plan's impact on the appeal of its now dismissed securities case against certain Debtors and their non-Debtor affiliates.  That case, filed in 2011 in Minnesota state court against certain of the Debtors, their non-debtor affiliates and a number of individual

---

[35] The FHLBs also argue that the Examiner's Report should be unsealed because they are "unfairly disadvantaged with respect to their access to full information and opportunity to fairly address the issues raised by the present Motion."  FHLB Obj. ¶ 21.  To establish the alleged prejudice to the FHLBs, the FHLBs inaccurately contend that the Consenting Creditors and the Debtors have had access to the Examiner's Report since its filing on May 13, 2013.  In fact, the Examiner's Report has been sealed as to all parties (other than the Court) pursuant to the Sealing Orders.  The FHLBs opposition to the PSA on this basis is without merit.

defendants (the "**Huntington Action**"), alleged a variety of claims related to the issuance of the Debtors' RMBS and was dismissed with prejudice at the end of 2012.

56.    The Huntington Objection boils down to Huntington's concern that either the Plan Support Agreement or the Plan may prevent Huntington from pursuing its pending appeal.  As Huntington concedes, however, the Plan Support Agreement contains no provision that would prevent the continued pursuit of its appeal and there is no other agreement or Court order preventing the appeal from proceeding, which it in fact is.  Huntington Objection at 4 (noting that the litigation stay in the Plan Support Agreement relates only to litigation brought by the Creditors' Committee and Supporting Parties and that the Debtors previously carved out Huntington's appeal from the stay agreed to at the outset of the Chapter 11 cases).  In short, there is nothing in the Plan Support Agreement that will impede Huntington's appeal, and Huntington concedes as much.  Any other concerns raised by Huntington are, at best, confirmation objections, which should be addressed at that time.  Moreover, if and when the Debtors file a motion to stay the appeal of the Huntington Action, Huntington will have a full and fair opportunity to object and be heard.

## CONCLUSION

57.    For the reasons set forth above, the Debtors respectfully request that the Court should enter an order overruling each of the objections and authorize the Debtors to enter into and perform under the Plan Support Agreement.

ny-1096440

WHEREFORE, the Debtors respectfully request that the Court enter an order,

substantially in the form of the revised Proposed Order attached hereto as <u>Exhibit 2</u>, granting the

relief requested herein and granting such other relief as is just and proper.


New York, New York
Dated: June 24, 2013

/s/  Gary S. Lee
Gary S. Lee
Lorenzo Marinuzzi
Todd M. Goren
Jennifer L. Marines
James A. Newton
MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone: (212) 468-8000
Facsimile: (212) 468-7900

*Counsel to the Debtors
and Debtors in Possession*


/s/  Steven J. Reiseman
Steven J. Reisman
Theresa A. Foudy
Maryann Gallagher
Michael J. Moscato
**CURTIS, MALLET-PREVOST,
COLT & MOSLE LLP**
101 Park Avenue
New York, New York  10178-0061
Telephone:  (212) 696-6000
Facsimile:   (212) 697-1559

*Conflicts Counsel for the Debtors and
Debtors in Possession*

ny-1096440