UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK                    NOT FOR PUBLICATION

In re:

    RESIDENTIAL CAPITAL, LLC, *et al*.,

                          Debtors.

Case No. 12-12020
Chapter 11

## MEMORANDUM OPINION
## APPROVING THE PLAN SUPPORT AGREEMENT

Pending before the Court is the Debtors' motion ("Motion" or "PSA Motion," ECF Doc.

# 3814) pursuant to sections 105(a) and 363(b) of the Bankruptcy Code to approve the Debtors'

entry into a plan support agreement ("PSA," annexed to the Motion as Exhibit 1). The PSA is an

agreement among (a) the Debtors, (b) the Debtors' indirect parent, Ally Financial Inc. ("AFI",

and together with its non-debtor affiliates, "Ally"), (c) the Official Committee of Unsecured

Creditors of Residential Capital, LLC (the "Creditors' Committee") and (d) certain Consenting

Claimants[1] (the Consenting Claimants together with Ally, the "Supporting Parties"). In support

---

[1]    The "Consenting Claimants" include American International Group, as investment advisor for certain affiliated entities that have filed proofs of claim in the Debtors' chapter 11 cases; Allstate Insurance Company and its subsidiaries and affiliates; Deutsche Bank National Trust Company and Deutsche Bank Trust Company Americas, each solely in its capacity as trustee, indenture trustee, securities administrator, co-administrator, paying agent, grantor trustee, custodian and/or similar agency capacities in respect of certain of the RMBS Trusts (as defined below) (collectively, "Deutsche"); Financial Guaranty Insurance Corporation ("FGIC"); HSBC Bank USA, N.A., solely in its capacity as trustee in respect of certain of the RMBS Trusts ("HSBC"); the Kessler Class Claimants (as defined in the Plan Support Agreement); Law Debenture Trust Company of New York, solely in its capacity as separate trustee in respect of certain of the RMBS Trusts ("Law Debenture"); Massachusetts Mutual Life Insurance Company and its subsidiaries and affiliates; MBIA Insurance Corporation and its subsidiaries and affiliates (collectively, "MBIA," and together with FGIC, the "Supporting Monolines"); certain funds and accounts managed by Paulson & Co. Inc., holders of Senior Unsecured Notes issued by ResCap ("Paulson"); Prudential Insurance Company of America and its subsidiaries and affiliates; the Steering Committee Consenting Claimants (as defined in the Plan Support Agreement); certain holders of the Senior Unsecured Notes issued by ResCap (the "Supporting Senior Unsecured Noteholders"), The Bank of New York Mellon and The Bank of New York Mellon Trust Company, N.A., each solely in its capacity as trustee, indenture trustee, securities administrator, co-administrator, paying agent, grantor trustee, master servicer, custodian and/or similar agency capacities in respect of certain of the RMBS Trusts (collectively, "BNY Mellon"); the Talcott Franklin Consenting Claimants (as defined in the Plan Support Agreement and, together with the Steering Committee Consenting Claimants, the "Institutional Investors"); U.S. Bank National Association, solely in its capacity as trustee, indenture trustee, securities administrator, co-administrator, paying agent, grantor trustee, custodian and/or similar agency capacities in respect

of the Motion, the Debtors submitted the Declaration of Lewis Kruger ("Kruger Decl.," annexed

to the Motion as Exhibit 2).

The RMBS Trustees submitted a *Joinder of Certain RMBS Trustees to the Debtors'*

*Motion for an Order under Bankruptcy Code Sections 105(a) and 363(b) Authorizing the*

*Debtors to Enter into and Perform under a Plan Support Agreement with Ally Financial Inc., the*

*Creditors' Committee, and Certain Consenting Claimants* (ECF Doc. # 3940).  The RMBS

Trustees also submitted the declarations of the following individuals: Robert H. Major of BNY

Mellon; Brendan Meyer of Deutsche Bank; Fernando Acebedo of HSBC; Thomas Musarra of

Law Debenture; Mamta K. Scott of U.S. Bank; and Mary L. Sohlberg of Wells Fargo.  *See* ECF

Doc. # 3940, Exs. A-F.  Brendan Meyer submitted an amended declaration (ECF Doc. # 3980).

Numerous objections, limited objections, and reservations of rights were filed in response

to the Motion, and are further discussed below.  In considering the Motion and the objections, it

is important to keep in mind the limited issues the Court must decide now and the context in

which the issues arise.  The Court is asked to enter an interlocutory order approving an

agreement between the Debtors and many of their key creditor constituencies that, after more

than a year of contentious proceedings in the bankruptcy court and many months of mediation

overseen by my colleague, Hon. James M. Peck, have reached an agreement to support a

reorganization plan consistent with the terms of the PSA and its two attached term sheets.  The

PSA is *not* a disclosure statement and it is *not* a reorganization plan; those are important, indeed

critical, steps yet to come to move this case forward hopefully to a successful conclusion.

---

of certain of the RMBS Trusts ("U.S. Bank"); and Wells Fargo Bank, N.A., solely in its capacity as trustee,
indenture trustee, securities administrator, co-administrator, paying agent, grantor trustee, custodian and/or similar
agency capacities in respect of certain of the RMBS Trusts ("Wells Fargo" and together with BNY Mellon,
Deutsche, HSBC, Law Debenture, and U.S. Bank, the "RMBS Trustees"); and Wilmington Trust, National
Association, not individually, but solely in its capacity as Indenture Trustee for the Senior Unsecured Notes issued
by ResCap ("Wilmington Trust").

All of the declarations offered by the proponents of the PSA were admitted in evidence without objection during the evidentiary hearing on June 26, 2013. The proponents also introduced in evidence without objection that the PSA, the Plan Term Sheet and the Supplemental Plan Term Sheet. None of the objectors elected to cross examine any of the declarants. The only objector to offer evidence at the hearing was the National Credit Union Administration Board. It introduced the declaration of Nelson C. Cohen without objection or cross-examination. At the conclusion of the hearing, after hearing arguments from counsel, the Court announced that the Motion was granted, and that the revised order submitted by the proponents would be entered, with an opinion further explaining the Court's ruling to follow. The order grainting the Motion was entered on June 26, 2013. (ECF Doc. # 4098.) A separate order unsealing the Examiner's Report was also entered. (ECF Doc. # 4099.)

Without the PSA this case would return to square one. The PSA and attached term sheets, *if* they ultimately result in a confirmed plan, embody numerous settlements and resolutions of extremely complicated legal and factual disputes that *must* be resolved to achieve a confirmable plan in this case. But to be clear, approval of the PSA does *not* assure that a plan embodying its terms will be confirmed. Approval of the PSA does *not* bind the objecting parties or the Court from challenging (in the case of the objectors) or rejecting (in the case of the Court) a plan substantially on the terms set forth in the PSA. Some of the objections raise difficult issues, but, unless they are consensually resolved, those are issues for another day. The standards applicable to approval of the PSA are *not* the standards applicable to approval of a disclosure statement or confirmation of a plan. Most of the objections that have been made are confirmation objections *not* properly raised or considered at this time.

For the following reasons, the Motion was **GRANTED and** the objections to approval of the PSA were overruled.  Many of the objections (again, unless consensually resolved) may be raised again in subsequent proceedings in this case.  To the extent properly applicable to the issues considered by the Court in subsequent proceedings, the Court will rule on them in due course.

## I.    BACKGROUND

On May 14, 2012 (the "Petition Date"), each of the Debtors filed a voluntary petition in this Court for relief under Chapter 11 of Bankruptcy Code.  At the outset of their Chapter 11 cases, the Debtors entered into a settlement and plan support agreement with Ally.  This agreement included an agreement by certain holders of the junior secured bonds ("JSBs") to support an agreed upon plan (the "Original Ally Settlement"), as well as a settlement and plan agreement, as amended by both the *Debtors' Supplemental Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of RMBS Trust Settlement Agreements* (ECF Doc. # 1176) and the *Debtors' Second Supplemental Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of RMBS Trust Settlement Agreements* (ECF Doc. # 1887), with a large number of investors in securities associated with certain RMBS Trusts (as defined below) (the "RMBS Settlement" and, together with the Original Ally Settlement, the "Original Settlements").

The Debtors assert that the Original Settlements were necessary at the outset of the case because, *inter alia*, the Original Settlements provided that: (i) Ally would provide DIP financing and allow the Debtors to continue servicing and originating mortgages; (ii) the Debtors could obtain from Ally and the JSBs consensual use of cash collateral; and (iii) the RMBS Settlement permitted the Debtors to proceed with a sale of the estates' assets and resolve numerous disputes.

On July 3, 2012, the Court approved Arthur J. Gonzalez as the examiner (the "Examiner") (ECF Doc. # 674). The Examiner's Report was filed under seal on May 13, 2013 and has now been unsealed. On November 19, 2012, the Court approved the Debtors' sale of (i) their mortgage servicing businesses (the "Platform Sale") and (ii) most of the estates' whole loan portfolio (the "Whole Loan Sale"). The transactions comprising the Debtors' Platform Sale closed in two parts: a sale to Walter Investment Management Corporation that closed on January 31, 2013, and a sale to Ocwen Loan Servicing, LLC that closed on February 15, 2013. The Debtors' Whole Loan Sale to Berkshire Hathaway Inc. closed on February 5, 2013. In the aggregate, these asset sales yielded approximately $4.5 billion in gross sale proceeds to the Debtors' estates.

After the sales of the Debtors' assets, the Supporting Parties focused their efforts on reaching a consensual resolution for a chapter 11 plan. After months of negotiations, the Debtors sought the appointment of the Honorable James M. Peck, as Plan Mediator (the "Plan Mediator"), and the appointment of Lewis Kruger as the Debtors' Chief Restructuring Officer. These engagements represented critical steps toward overcoming a difficult impasse between and among the Debtors, their creditors, and Ally. Following many weeks of separate mediation meetings and discussions, Mr. Kruger and the Debtors' advisors participated in a mediation "summit" on April 22 and 23, 2013 with the Plan Mediator, advisors and/or business level leaders of each of the Debtors' major claimant constituencies (collectively, the "Mediation Participants"), including the Creditors' Committee, its individual members, Ally, the JSBs, borrower representatives and certain private and governmental securities holders. *See* Kruger Decl. ¶ 10. Additional in-person meetings and conference calls ensued over the following

weeks, followed by two additional global mediation sessions that took place on May 9 and 10, 2013.

On May 13, 2013, the Debtors, the Creditors' Committee, and the Supporting Parties agreed on the terms of the PSA, and the Plan Term Sheet and Supplemental Term Sheet are attached to the PSA as Exhibits A and B, respectively (collectively with the PSA, the "Agreement"). *See id.* ¶ 12. The PSA and the attached term sheets set forth many of the terms of a proposed plan that has not yet been filed. The Debotrs' counsel represented at the hearing that the proposed plan will be filed on or before July 3, 2013.

### A.    The PSA Motion

The Plan will provide for partial consolidation (for distribution purposes only) of the Debtors' estates into three groups—the ResCap Debtors, the GMAC Mortgage Debtors, and the RFC Debtors. *See* Supplemental Term Sheet at 2. In connection with the Plan, Ally will contribute (a) $1,950,000,000 in cash on the Effective Date, and (b) the first $150,000,000 received by Ally for any Directors and Officers or Errors and Omissions claims it pursues against its insurance carriers related to the claims released in connection with the Plan, in return for releases by the Debtor and Third Parties. Plan distributions will be funded with net proceeds from the Debtors' asset sales and the assets remaining in the Debtors' estates, which will include the Ally Contribution, with certain securities litigants and borrowers receiving distributions through three trusts to be established under the Plan for this purpose. *See* Supplemental Term Sheet at 2-3. The key provisions of the Plan Support Agreement are as follows:

| PSA Term | Summary |
|---|---|
| Debtors' Obligations (§ 3.1) | • The Debtors will seek approval of the Agreement and use the Agreed Efforts to prosecute the terms of the Agreement, including proposing and seeking confirmation of the Plan in accordance with Milestones set forth in the Plan Term Sheet. |

|  |  |
|---|---|
|  | • The Debtors will not enter into any agreements fixing Claims in an amount over $200,000 individually and $25 million in the aggregate prior to entry of the Confirmation Order without the consent of the Creditors' Committee. |
| Plan Proponents' Obligations (§ 3.2) | • The Debtors and the Creditors' Committee (collectively, the "**Plan Proponents**") will file a Plan and Disclosure Statement in accordance with the terms of the Agreement and Term Sheets and use Agreed Efforts to obtain approval of the Disclosure Statement and confirmation of the Plan.<br><br>• The Plan Proponents will not take or encourage any other person or entity to take, any action that would, or would reasonably be expected to, breach or be inconsistent with the Plan Support Agreement or the Plan or delay or take any negative action to interfere with the acceptance of the Plan. |
| Creditors' Committee and Supporting Parties' Obligations (§ 4.1(a)-(b)) | • In addition to a commitment to support approval of the<br>• Disclosure Statement and confirmation of the Plan, the Creditors' Committee and Supporting Parties agreed to stay all litigation and discovery in connection with actions against the Debtors or Ally, provided that the Kessler Class Claimants may continue to prosecute their class claims and Bankruptcy Rule 7023 motion [Docket No. 2044].<br><br>• The Creditors' Committee and Supporting Parties will also support a partial paydown of no less than $800 million of the Junior Unsecured Notes' secured claim, provided that Ally is paid prior to any such paydown of the Junior Secured Notes Secured Claim in cash in full in satisfaction of all outstanding amounts owed under the Amended and Restated Credit Agreement, dated as of December 30, 2009, among the GMAC Mortgage, LLC, Residential Funding Company, LLC, Residential Capital, LLC, GMAC Residential Holding Company, LLC, GMAC-RFC Holding Company, LLC, Homecomings Financial, LLC, AFI and Wells Fargo Bank, N.A. (as amended or supplemented); provided further that the terms of any Bankruptcy Court order approving such paydown enforces the terms and conditions of the intercreditor agreement between the Junior Secured Notes and Ally in all respects, |

| | |
|---|---|
| | provided, further, however, that in the event the Plan does not become effective, any paydown of Ally's secured indebtedness will have no impact on, and be without prejudice to, the rights of any Party to seek to recharacterize or equitably subordinate Ally's secured claims as if the paydown had not been made, and for the Court to fashion any remedy in connection therewith. |
| Supporting Parties' Agreement to Vote for the Plan (§ 4.1(e)) | • Each Supporting Party will, subject to receipt of an approved Disclosure Statement, vote in favor of the Plan all claims held by each such Supporting Party. |
| Releases of Ally (§ 4.2) | • The Debtors, the Creditors' Committee, and each Supporting Party will support the releases in favor of Ally set forth in the Plan Term Sheet, which include both Debtor and Third Party Releases. The proposed releases do not, however, release any claims against Ally held by the Federal Deposit Insurance Corporation, in its capacity as receiver, or the Federal Housing Finance Agency. |
| Transfer Restrictions on Supporting Parties (§ 4.3) | • Each Supporting Party, other than the Institutional Investors, agrees not to transfer any of its claims against the Debtors to any third-party unless such third-party is or becomes subject to the terms of the Agreement, subject to certain exceptions for transfers of RMBS. <br><br> • Subject to limited exceptions, the Institutional Investors will maintain holdings aggregating 25% of the voting rights in one or more classes of Securities of not less than 235 of the RMBS Trusts sponsored by the Debtors between 2004 and 2007. |
| FGIC Approval (§ 5.1) | • FGIC will use Agreed Efforts to obtain the Rehabilitation Court's approval of the Plan Support Agreement and that certain Settlement Agreement to be entered into among the Debtors, FGIC, The Bank of New York Mellon, The Bank of New York Mellon Trust Company, N.A., U.S. Bank National Association and Wells Fargo Bank, N.A., each in its capacity as RMBS Trustee, and the Institutional Investors (as defined therein), dated not later than May 23, 2013, in each case by no later than August 19, 2013. |
| Specific Parties' Obligations in Connection | • The Supporting Monolines and Investors will withdraw all letters previously sent to the RMBS |

| with the RMBS Trustees (§ 5.2) | Trustees purporting to direct them to accept or not to accept the RMBS Settlement. |
|---|---|
| Obligations of Wilmington Trust (§ 5.4) | <ul><li>On or before May 31, 2013, Wilmington Trust will recommend to holders of Senior Unsecured Notes, that they direct Wilmington Trust to enter into the Plan Support</li><li>Agreement, and obtain such direction by that date.</li></ul> |
| Termination (§ 6.1) | <ul><li>Certain or all of the Debtors, the Creditors' Committee, or the Supporting Parties may terminate the Agreement upon the occurrence of the following events, among others:</li></ul><ul><li>Conversion, dismissal, or appointment of a trustee in the</li><li>Debtors' Chapter 11 cases;</li></ul><ul><li>Modification of the releases set forth in the Plan Term</li><li>Sheet in any manner;</li></ul><ul><li>The Plan Support Agreement ceases to be binding upon Ally, the Creditors' Committee, or any of the Consenting Claimants;</li></ul><ul><li>The Examiner's Report is disclosed to any party prior to the Court's entry of an order authorizing the Debtors' entry into and performance under the Plan Support Agreement;</li></ul><ul><li>The Debtors file with the Bankruptcy Court a proposed disclosure statement, Chapter 11 plan, confirmation order, or other related document that is not an Approved Plan Document;</li></ul><ul><li>Mutual consent of all Parties; or</li></ul><ul><li>The Debtors' failure to comply with any of the milestones set forth in the Plan Term Sheet, including:</li></ul><ul><li>Approval of the Plan Support Agreement by July 3, 2013</li></ul><ul><li>Filing of the Plan and Disclosure Statement by July 3, 2013;</li></ul><ul><li>Approval, no later than August 19, 2013, of a settlement among the Debtors, FGIC, and certain of the</li></ul> |

| | |
|---|---|
| | RMBS Trustees (the "**FGIC Settlement Agreement**"), by the FGIC Rehabilitation Court; |
| | o   Approval of adequacy of the Disclosure Statement by August 30, 2013; and |
| | o   Effectiveness of the Plan not later than 30 days following the entry of an order confirming the Plan and, in no event later than December 15, 2013. |
| Recognition of Applicable Fiduciary Duty (§ 7.5) | •   The Debtors, Ally, the Creditors' Committee, and the Consenting Claimants represent, warrant, and covenant that they took the existence of the Examiner and the expected Examiner's Report into account when exercising their fiduciary duties and entering into the Agreement and that no Party may terminate the Agreement based in any way upon the Examiner's Report or the information contained therein. |

The PSA Order that was entered yesterday provides affirmative findings in connection with the RMBS Trustees' entry into the PSA consistent with the requirements of the PSA. *See* PSA § 5.2(d). The Motion seeks: (1) a finding from the Court that the relief requested is in the best interests of the Debtors' estates and their creditors, and, specifically, that entry into the Agreement, and the RMBS Trustees' performance contemplated thereunder, is in the best interests of the Institutional Investors, the investors in each RMBS Trust, each such RMBS Trust, and the RMBS Trustees, as a compromise of each of the RMBS Trust's asserted claims against the Debtors; (2) a finding from the Court that each of the parties to the Agreement, including the RMBS Trustees, has acted reasonably, in good faith and in the best interests of its respective constituencies in entering into the Agreement, and specifically, a finding that the RMBS Trustees acted reasonably, in good faith and in the best interests of the Institutional Investors, the investors in each RMBS Trust and each such RMBS Trust in agreeing to the

Agreement; and (3) a finding from the Court that the RMBS Trustees' notice of the RMBS

Settlement, the FGIC Settlement Agreement, and the Agreement (the "RMBS Trustees' Notice")

was sufficient and effective in satisfaction of federal and state due process requirements and

other applicable law to put the parties in interest in these Chapter 11 cases, including the

Institutional Investors and the investors in each RMBS Trust, on notice of the Agreement, RMBS

Settlement, and the FGIC Settlement Agreement.

The Debtors assert that entry into the PSA represents a sound exercise of their business

judgment.  *See* Kruger Decl. ¶¶ 19-26.  The Agreement provides a framework for the resolution

of these highly litigious and factional Chapter 11 cases and an expeditious emergence from

Chapter 11.  *See* Kruger Decl. ¶ 22-24.  The PSA reflects a heavily negotiated resolution

regarding the terms of a Plan supported by a substantial majority of the Debtors' major claimant

constituencies, including the Supporting Monolines, the Creditors' Committee, securities

litigants, the RMBS Trustees, Ally, the Supporting Senior Unsecured Notes, along with

Wilmington Trust, the Kessler Class Claimants, and the Institutional Investor groups.  *See*

Kruger Decl. ¶¶ 10-14, 20.  And the PSA provides for enhanced recoveries for the Debtors'

creditors far in excess of what such creditors would otherwise obtain from the Debtors' estates.

*See* Kruger Decl. ¶ 19.  Absent Court approval of the PSA, the global settlement terminates.

The Debtors believe that absent the Agreement, they would be required to litigate many

difficult and complex issues, at significant further expense to their estates, and that their Chapter

11 cases would likely result in the creation of a litigation trust.  Such litigation would include

litigation over the validity of the monolines' claims (potentially including a loan-by-loan analysis

in connection with alleged breaches of representations and warranties), the priority of claims

arising under securities laws relating to the Debtors' RMBS, and the Kessler Class Action. *See*

Kruger Decl. ¶¶ 20-24; Supplemental Term Sheet at 9-11.

The Debtors assert that the Agreement does not implicate section 1125 of the Code

because the PSA merely documents the parties' agreements resulting from negotiations, none of

the Parties have agreed to vote in favor of the Plan unless and until the Court approves a

disclosure statement and their votes have been properly solicited pursuant to section 1125, *see*

Plan Support Agreement § 4.1(e), and the PSA contains termination events that permit parties to

withdraw from their promise to vote in favor of the Plan in certain events.

One of the conditions in the PSA was that the Examiner's Report was to remain under

seal until the PSA was either approved or rejected by the Court. The Examiner's Report was

completed and filed under seal on May 13, 2013 and was unsealed yesterday when the order

approving the PSA was entered. All of the parties to the PSA negotiated and signed the PSA

knowing that the Examiner's Report was likely to contain information and conclusions of the

Examiner that would be highly relevant to matters resolved in the negotiated PSA and

accompanying term sheets. All of the parties that signed the PSA are sophisticated; they have all

been active in this case since the initial filing; many of the parties, such as the Creditors'

Committee, conducted their own extensive investigations of the Debtors and their affiliates; they

negotiated the PSA cognizant of the looming date for completion and filing of the Examiner's

Report; and they collectively decided as they approached agreement that release of the

Examiner's Report before the Agreement was signed would delay or jeopardize completion of

the negotiations. Therefore, the parties made sealing of the Examiner's Report until the PSA

was approved or rejected by the Court, a condition to the PSA. The Court concludes this was a

reasonable decision made by sophisticated parties. Sealing the report did not impinge upon the

rights of parties in interest that have not joined the PSA.  When the Court approved sealing the

report pending the hearing on the PSA, the Court made clear that the Report would be made

public once the PSA was approved or rejected by the Court.

There are many other parties in interest in this case that did not actively participate in the

mediation with Judge Peck, are not signatories to the PSA, and are not bound by its terms.

While the parties to the PSA agreed to support a plan consistent with the terms of the PSA and

accompanying term sheets, the Agreement includes the right to withdraw support for a plan

under a variety of circumstances.  Perhaps most importantly, if the PSA is approved by the

Court, it is an interlocutory order that provides no assurance that the Court will approve a

reorganization plan on the terms provided in the PSA.  The real impact of the PSA, after nearly

one year with little progress in this large and complicated case, is that the case will move forward

towards possible resolution.  Make no mistake about it, many difficult unresolved issues remain

to be settled or adjudicated; some of those issues could prevent a plan on the proposed terms

from being confirmed.  Judge Peck's appointment as Mediator remains in place, and, indeed,

additional mediation sessions have been conducted since this Motion was filed and more are

scheduled.  The parties need to continue working diligently to reach consensual resolution of as

many issues as possible.  That is how the chapter 11 process should work.  The PSA is an

important step in the process; it is far from the last step.

### B.    Objections and Reservations of Rights

Numerous reservations of rights, limited objections and objections have been filed.

Based on the representations made on the record, most if not all of the parties below either

reserved their rights to object at future hearings in this bankruptcy case, and/or withdrew their

objections to the PSA.  A summary of each objection, as filed with the Court, is provided below.

*Reservations of Rights*

### 1.    **Ambac Assurance Corporation** (ECF Doc. # 4009)

Ambac Assurance Corporation and the Segregated Account of Ambac Assurance

Corporation filed a statement and reservation of rights with respect to the Debtor's motion.

Some of the claims that the PSA would resolve implicate monoline insurers, such as Ambac.

Ambac asserts that the terms of the PSA are not specific enough in addressing Ambac's claims to

allow them to determine whether the PSA satisfies section 1129 of the Bankruptcy Code with

respect to Ambac.  While Ambac is currently in discussion with other Consenting Claimants

regarding how they too can become a Consenting Claimant and give the PSA full support,

Ambac currently reserves all rights to object to the PSA and any related disclosure statement.

### 2.    **RALI Certificate Underwriters** (ECF Doc. # 4012)

The RALI Certificate Underwriters group consists of Citigroup Global Markets Inc.,

Deutsche Bank Securities Inc., Goldman, Sachs & Co., and UBS Securities, LLC.  In connection

with Residential Accredit Loans, Inc., the RALI Certificate Underwriters submit a reservation of

rights in response to the Debtor's Motion.  The PSA requires that the plan contain broad third-

party releases, which would release and bar the RALI Certificate Underwriters' claims against

Ally and its officers and directors and the Debtors' officers and directors.  According to the

RALI Certificate Underwriters, the Debtors have not yet provided justification for these broad

releases. They cite case law holding that in this Circuit, in order for third-party releases to be

granted, the releasees must provide a necessary, substantial financial contribution.  However, the

RALI Certificate Underwriters assert that it is currently unclear (due to the sealed Examiner's

Report and a lack of discovery) whether there will be sufficient financial contributions from the

beneficiaries of third-party releases.  The RALI Certificate Underwriters understand that the

releases will be considered in connection with confirmation of the plan and approval of the

disclosure statement, however, they submit this reservation of rights in order to prevent any

misconceptions that they fully approve of the releases within the plan. Therefore, they reserve all

of their rights with respect to the disclosure statement, the plan, and the underlying settlement

agreement.

### 3.    Monarch Alternative Capital and Stonehill Capital Management LLC
(ECF Doc. # 4023)

Monarch Alternative Capital LP and Stonehill Capital Management LLC (the

"Investors") submit a reservation of rights to the Debtors' Motion, joined by Freddie Mac (ECF

Doc. # 4026). The Investors intend to object to the 9019 Motion with respect to a settlement

with FGIC, and with respect to the Proposed 9019 Findings because they do not believe that the

FGIC Settlement is in the best interests of the RMBS trusts or the investors in these RMBS

trusts. They also do not believe that the implicated RMBS trustees, in agreeing to the FGIC

Settlement Agreement, acted in good faith or in the best interests of the trust or the investors.

In response to their preclusion concerns, that the Proposed PSA Findings will prevent the

Investors from contesting the Proposed 9019 Findings or preclude action in state court or in other

proceedings, the Debtors have added language to the revised PSA approval order making it clear

that the findings made in approval of the Motion will not have preclusive effect in the 9019

Motion. The Investors do not object to this language, nor do they object to the PSA Motion.

However, they reserve all rights to object to the 9019 Motion and approval of the FGIC

Settlement Agreement in the FGIC state rehabilitation proceeding and to take further action with

respect to the entry into the FGIC Settlement Agreement by the RMBS Trustees.

4.    **Statement of the United States** (ECF Doc. # 4035)

The Plan Term Sheet provides that "Ally shall have no monetary obligations under the . .

. DOJ/AG Settlement." *Id*. at 11; *see also id*. at 5 ("The Ally Contribution is final and capped at

$2,100,000,000. . . .  Ally will not make any additional contributions to the Debtors or the estates

of any creditor of the Debtors for any cost related to the Debtors, including contributions on

account of the [DOJ/AG Settlement].").  The United States asserts that to the extent that any

proposed Plan attempts to release AFI from liability to the United States under the DOJ/AG

Settlement, thereby posing a risk that the monetary obligations undertaken by Debtors and AFI

will not be fully satisfied, the Government reserves its right to object to confirmation of the Plan

at the appropriate time.

## Objections and Limited Objections

1.    **Plaintiffs in *Rothstein, et al. v. GMAC Mortgage, LLC* Objection And
      Reservation Of Rights** (ECF Doc. # 4007)

Plaintiffs in the class action entitled *Rothstein, et. al. v. GMAC Mortgage, LLC, et. al.*

object to the PSA's provisions that the plan will enjoin the Plaintiffs from pursuing their claims

in the *Rothstein* action again non-debtor parties. They also object to the fact that the PSA

provides very little funding to distribute for the release of claims such as this one.  The PSA

allocates $57.6 million (out of $2.1 billion) for borrower claims. Therefore, the Plaintiffs intend

to object to the plan because of improper third party releases and injunctions, and insufficient

funding for borrower claims.

2.    **Amherst Advisory & Management's Limited Objection** (ECF Doc. #
      4008)

Amherst Advisory & Management ("AAM") serves as investment manager for one or

more RMBS investors that hold, in the aggregate, approximately 50% of a class of RMBS issued

by an RMBS Trust.  AAM argues that the Agreement fails to adequately address the failures of

the original RMBS Settlement Motion—specifically, the Debtors failed to provide RMBS

investors with material input on the proposed allocation between the RMBS Trusts.  The agreed-

upon formulation, as set forth in Schedule A to Annex III to the Supplemental Term Sheet (the

"Proposed Allocation"), continues to provide for the retention of an Outside Professional with

unfettered discretion to allocate value among the trusts.  AAM argues that the RMBS investors

are left with a coercive choice: either opt into the PSA and the RMBS Settlement and thereby

waive any right to challenge the ultimate calculation of their trusts' relative claim amounts or opt

out of the settlement and wait to resolve their claims until an undetermined date.  Any settlement

of the RMBS Claims should permit informed holders, like those represented by AAM, to

compare their estimates as to claims based on representations and warranties with the Outside

Professional's Claim Share calculations before deciding to opt in or out.

AAM also argues that there is no rationale for allocating various costs to various Debtor

constituencies.  The Debtors intend to propose a chapter 11 plan that allocates 100% of the case

administration costs, or $1.27 billion, to the RFC Debtors and the GMACM Debtors and $0 of

the case administration costs to the ResCap Debtors.  No justification is given for this split.  This

$1.27 billion constitutes just under 92% of the combined GMACM Debtors' Unsecured

Distribution and the RFC Debtors' Unsecured Distribution.

AAM also objects to the proposed payment of the professional fees of a select group of

RMBS investors out of the recovery of all investors.  Counsel to the Certain Institutional

Investments will share a contingency fee equal to 5.7% of allowed unsecured and cure claims of

all RMBS Claims, reducing RMBS investor recoveries.  *See* Supplemental Term Sheet at 6.

Last, AAM objects to the Motion on the grounds that the mechanics for the issuance and

reserve of Trust Units for the benefit of RMBS investors is flawed.  The Supplemental Term

Sheet states that the number of Trust Units issued at emergence will be based on distribution

amounts in respect of the RMBS Claims (among other claims) and that an estimated portion of

the Trust Units will be set aside for other Monoline Claims and General Unsecured Claims, *see*

Supplemental Term Sheet, at 3, but there is no express set aside for disputed RMBS Claims.

### 3. Certain Insurers under General Motors Combined Specialty Insurance Program's Response and Reservation of Rights (ECF Doc. # 4015)

Certain Insurers under General Motors ("Certain GM Insurers") issued insurance policies

to General Motors Corporation for the policy period commencing December 15, 2000 and

ending December 15, 2003 (the "Policies"), under which certain of the Debtors have asserted

certain rights as a result of being subsidiaries of General Motors Corporation at the time that the

Policies were issued.  The Policies are among the insurance policies referenced in the

Supplemental Term Sheet as the "General Motors Combined Specialty Insurance Program

12/15/00 – 12/15/03."  The PSA contemplates that the Debtors' rights under the Policies will be

assigned to the Borrower Claims Trust.  The Certain GM Insurers do not agree that such an

assignment is proper under the Policies and reserve the right to contest that issue.

The Certain GM Insurers argue that approval of the PSA should be denied if the PSA

contemplates a Plan that is unconfirmable as a matter of law.  *In re Innkeepers USA Trust*, 442

B.R. 227 (Bankr. S.D.N.Y. 2010); 11 U.S.C. § 1129.  They argue that a plan is not confirmable if

it is not "insurance neutral."  *In re Thorpe Insulation Co.,* 677 F.3d 869, 885 (9th Cir. 2012); *In*

*re Pittsburgh Corning Corp*., 453 B.R. 570, 584 (Bankr. W.D. Penn. 2011).  They argue that the

Motion fails to provide any indication that the assignment of the Debtors' interests in the Policies

to the Borrower Claims Trust will be insurance neutral.  In fact, it expressly provides for a Plan

Insurance Supplement that will purport to govern "the processes by which any [alleged] recovery

under the Policies is pursued, paid for, assigned or allocated."  They argue that this language

could be interpreted as an impermissible attempt to modify the Policies.

> ### 4. Ad Hoc Group of Junior Secured Noteholders' Statement and Reservation of Rights (ECF Doc. # 4018)

While the Ad Hoc Group, joined by Berkshire Hathaway (ECF Doc. # 4049) and UMB

Bank, N.A. (ECF Doc. # 4045), states that they are "prepared to refrain from objecting and

reserve its rights at this time" to the PSA, they express a concern that, while the Global

Settlement is not expressly conditioned upon the Court finding that the Junior Secured

Noteholders (the "JSNs") are undersecured, provisions embodied in the Global Settlement will

have that direct effect, and will give rise to the possibility that a determination as to oversecurity

will result in the failure of a condition in the Plan.

The Ad Hoc Group takes issue with what they see as the Debtors' and Committee's

voluntary waiver of a "fiduciary out": specifically, the fact that parties under the agreement

could back out if the Court finds that the JSNs are oversecured.  This voluntary waiver of

fiduciary duties raises the question of why the Debtors and Committee should be otherwise

permitted to "blow up" the plan and risk such consideration over the issue of JSN postpetition

interest.  Committee counsel has represented to the Ad Hoc Group that the waiver of a "fiduciary

out" is limited solely to that aspect of the global settlement that relates to the settlement of claims

against Ally, and that both the Debtors and Committee are free to modify the plan in other

respects, if the Debtors' and/or Committee's fiduciary duties so require, including paying some

or all of the postpetition interest owing to the JSNs.

Lastly, the Ad Hoc Group notes that they would fully support the Plan if their economic and legal rights were preserved for resolution. This means they would like to adjudicate their potential entitlements—such as a finding that the intercompany claims are valid debt claims— without having a "win" constitute a loss of the global settlement.

On June 20, 2013, the JSNs filed another statement (ECF Doc. # 4055), in which they state that, after the filing of their original statement on June 18, 2013, the Debtors filed their first amended complaint in the adversary proceeding governing the dispute between the JSNs, Debtors and Committee (Case No. 13-01343, ECF Doc. # 8). Footnote 11 of the amended complaint contained a statement that the Debtors "waived their intercompany claims," and the JSNs state that, given "the Debtors' use of the past tense to describe actions with respect to intercompany claims, the footnote can be read to indicate that the Debtors have already consummated certain transactions related to intercompany claims prior to approval of the PSA." Moreover, they state that the footnote also indicates that "the Debtors are seeking to have this Court approve what amounts to an abandonment of property of multiple Debtors in connection with its seeking general approval of the PSA Motion." (ECF Doc. # 4055, ¶ 1). The Debtors have represented to the JSNs that no Debtor has waived its intercompany claim(s).

### 5. Credit Suisse's Objection (ECF Doc. # 4019)

Credit Suisse Securities (USA) LLC (f/k/a Credit Suisse First Boston LLC) ("Credit Suisse") underwrote RMBS issued by ResCap. Credit Suisse also holds claims against Ally Securities (f/k/a Residential Funding Securities or GMAC-RFC), an affiliate of AFI. Ally Securities co-underwrote certain of the RMBS with Credit Suisse. Credit Suisse's primary objection relates to the third party non-debtor releases that would be granted to Ally Securities as contemplated by the PSA.

Many purchasers of RMBS have brought claims in state and federal courts against Credit Suisse and Ally Securities, among other underwriters, claiming violations of federal and state securities laws and common-law causes of action.  Both Credit Suisse and Ally Securities have indemnification rights against ResCap for liability, costs and attorney fees.  Credit Suisse and Ally Securities are co-defendants in some of these actions, including actions brought by the FHFA and John Hancock Life Insurance Company, and would be jointly and severally liable to the extent the plaintiffs prevail.  In addition, Credit Suisse may have contribution claims against its co-underwriters for their proportionate share of liability.  Thus, Credit Suisse is concerned that it will lose its contingent contribution claim against Ally for proportionate liability in the state and federal court actions (assuming the underwriters are found liable) if Credit Suisse's claims against Ally Securities are released under the plan.  Credit Suisse argues that it is unfair that FHFA's claims against Ally are being carved out under the PSA, while its potential contribution claim against Ally would be released without Credit Suisse receiving any consideration under the plan.[2]  At the very least, Credit Suisse argues the PSA should include a judgment reduction provision.

Credit Suisse argues that the PSA motion should not be approved because a plan that includes the contemplated third party non-debtor releases would be unconfirmable.  Credit Suisse argues that the Court lacks jurisdiction under *Pfizer Inc. v. Law Offices of Peter G. Angelos (In re Quigley Co., Inc.),* 676 F.3d 45 (2d Cir. 2012), to release Credit Suisse's claims against Ally Securities because those claims for contribution do not affect the *res* of the estate. Credit Suisse acknowledges that both it and Ally Securities have indemnification rights against

---

[2]    It is not true that Credit Suisse will receive no consideration under the plan as proposed by the PSA.  Credit Suisse has a general unsecured claim against ResCap based on its indemnification claim.  General unsecured creditors will receive an aggregate payment of $19.2 million from the Ally contribution, which Credit Suisse will share *pari passu* with other general unsecured creditors—though the recovery will likely be a very small percentage.

ResCap for the full amount of any judgment, but argues that the manner in which the liability is

divided between Credit Suisse and Ally has no effect on the *res* of the estate.  Moreover, Credit

Suisse argues that even if the Court has jurisdiction, the *Metromedia* standard has not been met.

*Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.),*

416 F.3d 136 (2d Cir. 2005).

Credit Suisse also argues that authorization of a plan support agreement, in general, is not

required or permitted under the Code.  Credit Suisse argues that because section 1121 uses the

term "debtor" when referring to who may file a plan within the exclusivity period, as opposed to

the term "trustee," the plan is filed by the "debtor" rather than as debtor-in possession on behalf

of the estate.  As stated in the objection, "the debtor does not act on behalf of the estate in filing a

plan, but only in its capacity as the debtor, and the filing of the plan is not an act for, and does

not bind, the estate."  Credit Suisse Obj. at 12.  Furthermore, the "Court's authority extends to

the supervision of the estate, not the actions that the debtor takes that do not affect the estate."

*Id*.  Therefore, the argument follows that the PSA does not require approval of the Court under

section 363(b)(1) as that Code section only relates to the use, sale or lease of property of the

estate by the trustee/debtor-in-possession.  According to Credit Suisse, because ResCap is not

acting on behalf of the estate in entering into the PSA, the PSA is not entitled to court approval.

Credit Suisse also objects to the proposed finding that the PSA is in the best interest of

the estate and creditors.  Lastly, Credit Suisse argues that the Court should not approve the PSA

without releasing the Examiner's Report, as the report is necessary before the Court can

determine the Debtors acted on an informed basis and in accordance with their sound business

judgment.

6.      **National Credit Union Administration Board's Objection** (ECF Doc. # 4020)

The National Credit Union Administration Board ("NCUAB"), as Liquidating Agent for Western Corp. Federal Credit Union and U.S. Central Federal Credit Union, objects to the Debtors' Motion.  NCUAB has two principal objections, as well as a reservation of rights.  In support, NCUAB attaches the Declaration of Nelson C. Cohen, counsel of record to the NCUAB in this case.

First, the PSA allows parties with Private Securities Claims to be the sole beneficiaries of the Private Security Claimants Trust, which totals $225.7 million.  NCUAB believes it fits into the definition of a Private Securities Claimant.  A Private Securities Claim is defined in the Supplemental Term Sheet as "those securities litigation claims against the Debtors, including claims against the Debtors and Ally, arising from the purchase or sale of RMBS."  NCUAB has both filed securities claims against the Debtors and, it contends, holds unexpired securities claims against Ally.  However, the PSA Supporters interpret this definition as excluding parties that have timely securities claims against the Debtors, unless they have also filed a complaint asserting securities claims against Ally or have a tolling agreement with Ally.  NCUAB states that this distinction "makes no sense" because parties that have unexpired claims against Ally are treated differently based solely on whether or not they have filed claims against Ally or received a tolling agreement.  Also, there is nothing in the PSA motion, the PSA, or the Exhibits, to explain this distinction.  When NCUAB learned about this additional qualification, NCUAB provided the Debtors with their previously-drafted complaint that is ready to file which asserts claims against Ally arising out of RMBS transactions.  NCUAB additionally cites section 1122 of the Bankruptcy Code to argue that the Debtors cannot arbitrarily exclude parties with substantively the same claim from a certain class.  NCUAB argues that at a minimum, the

Debtors should share with them any disclosures that they made to the parties defined as Settling

Private Securities Claimants and allow NCUAB the opportunity to show that it should be

included in the list of holders of Private Securities Claims.

Second, the PSA proponents have submitted a proposed Form of Order which asks the

Court, among other things, to find that the PSA is "in the best interests of Debtors' estates, their

creditors, the Institutional Investors, the investors in each RMBS Trust and each such RMBS

Trust [and] the RMBS Trustees" and "each of the parties to the Agreement, including the RMBS

Trustees have acted reasonably, in good faith and in the best interests of their respective

constituencies in entering into the Agreement." NCUAB disputes the statements and holds that

the PSA is not in its best interest or that the parties to the PSA charged with representing

NCUAB's interests acted "reasonably" or "in good faith." NCUAB additionally argues that the

PSA does not provide sufficient evidence to support this conclusion.

Finally, NCUAB reserves all rights with respect to the Debtors' bankruptcy cases and

NCUAB's claims against the Debtors. On June 20, 2013, the Debtors filed an objection to the

proofs of claim filed by NCUAB, arguing that all of the claims should be disallowed and

expunged as a result of the applicable statute of limitations (ECF Doc. # 4050). The objection is

scheduled to be heard on July 12, 2013.

### 7.    Assured Guaranty Municipal Corp.'s Limited Objection and Reservation of Rights (ECF Doc. # 4025)

Assured provided financial guaranty insurance covering in excess of $1 billion of RMBS

backed by mortgage loans originated or acquired by certain of the Debtors. Pursuant to the terms

of such insurance policies, Assured is required to make payments to RMBS trusts for the benefit

of holders of RMBS in the event of a payment default. The indenture trustee for the relevant

RMBS trust, and not the Debtors, is the party with the right to make a claim under the financial

guaranty insurance policies.  The Plan provides that Insured RMBS Trusts (an RMBS Trust with

an insurance policy with a monoline insurer) reserves the ability to enforce its rights against any

monoline (other than FGIC) that does not, in the future, perform in accordance with the

insurance policy for the benefit of that RMBS Trust.

Assured filed the limited objection and reservation of rights because it contends that it is

impossible to determine the treatment of Assured's claims under the PSA and related transaction

documents.  It claims that the above "reservation of rights" implies rights that do not in fact

exist.  For example, the Insured RMBS Trust has no "right" to enforce any claim it may have

against a monoline in this Court because, it alleges, this Court lacks jurisdiction over such a

dispute.  The insurance policies are for the benefit of the RMBS holders, not the Debtors.

Accordingly, Assured argues that neither the Debtors nor Ally have any rights under the

insurance policies, they are not beneficiaries and are not entitled to any "coverage."  As a result,

Assured argues this Court lacks jurisdiction over any dispute between an Insured RMBS Trust

and Assured, thus the Debtors' and indenture trustees' reservation of rights are improper.

Assured also argues that the RMBS Trustees greatly exaggerate their rights in connection

with RMBS Trusts that are insured, as in the event of a bankruptcy, the indenture trustee

appoints Assured as agent and attorney-in-fact for the Indenture Trustee.  Assured has the sole

rights to enforce the noteholders' rights with respect to the Debtors.  According to Assured, the

monoline insurers, not the RMBS Holders, are the economic stakeholders of RMBS Trusts that

are insured.

### 8.    Syncora's Objection (ECF Doc. # 4028)

Syncora Guarantee Inc. is a monoline insurer to certain of the RMBS Trusts and it insured the payment of interest and principal on more than $2 billion of RMBS pass-through certificates issued by RMBS Trusts for which the Debtor GMACM acted as servicer or master servicer.  GMACM purportedly had certain duties and obligations as servicer, such as servicing the mortgage loans prudently, safeguarding mortgage collateral, complying with state and federal law, and indemnifying Syncora for losses and expenses caused by GMACM's breach of its servicing obligations.  Syncora asserts that it has unsecured "servicing claims" against GMACM.

It asserts that the PSA contains several terms that impact Syncora's servicing claims against GMACM, as well as repurchase and servicer claims held by the RMBS Trusts for which Syncora issued an insurance policy concerning one or more tranches of pass-through certificates, as follows:

- o  it proposes a consolidation for distribution purposes, but neither the Term Sheets nor the Motion explain how the allocations of value are being made nor the rationale for determining that such claims constitute allowed claims entitled to distribution under the Plan;
- o  with respect to the RMBS Trust "cure" claims, the Supplemental Term Sheet states (at 5) that "Insured RMBS Trusts shall be entitled to distributions to the extent provided in the RMBS Trust Allocation Protocol," but the language of the protocol (Annex III to the Supplemental Term Sheet) and its operation are unclear and suggest that only Insured Trusts that made an insurance claim that remains outstanding will receive an Allowed RMBS Trust Claim only to the extent of such non-payment by the insurer (but even still, it appears that Insured Trusts still would release all of their claims against the Debtors, including repurchase claims and servicer claims, as to which such Trusts are not being allowed a claim in the Plan);
- o  the RMBS Trustees disclosed that they retained the financial advisor Duff & Phelps to develop the RMBS Trust Allocation Protocol and undertake an analysis of each settling RMBS Trust's servicer claims and place a value on each such claim, but the Trustees did not disclose the methodology that Duff & Phelps employed to value the claims;

    o    the PSA provides for a non-debtor release of non-debtor entities (non-debtor affiliates of Ally) and a release for claims brought against the Debtors and their successors);

    o    the PSA provides an exculpation clause for RMBS Trustees that includes a finding of good faith and best interest;

    o    the proposed Plan Injunction broadly enjoins actions "on account of or in connection with or with respect to any" Released Claim.

Syncora asserts that, based on conversations with various counsel, Debtors' counsel and the RMBS Trustees' counsel do not have a clear or identical understanding of the material terms of the PSA. For example, counsel for one Trustee said an Insured Trust's repurchase claims against a Debtor would be released if the RMBS Trust Settlement is consummated, but counsel for another Trustee said that such repurchase claims would not be released and that the Insurer's right to assert the claims would become vested.

Syncora also argues that the PSA is a contract with Ally, an insider, and should be subject to the "heightened scrutiny" standard applied by Judge Chapman in *In re Innkeepers USA Trust*, 442 B.R. 227, 231 (Bankr. S.D.N.Y. 2010). The PSA contemplates at least three allocations of assets among either competing estates or creditors, all of which implicate the fiduciary duties of both the Debtors and the RMBS Trustees. The PSA further contemplates that only uninsured RMBS Trusts may have allowed claims against the Debtors, placing at issue the fiduciary duties of the trustees of the insured trusts who propose to settle their trust's claims without any compensation. And, the PSA is unclear as to the rights of partially insured trusts.

In addition, Syncora argues (1) that the Court lacks jurisdiction to enter an order extinguishing or impairing third-party claims against RMBS Trustees; (2) the proposed Plan is unconfirmable on its face, *see In re 18 RVC, LLC,* 485 B.R. 492, 495 (Bankr. E.D.N.Y. 2012) ("[B]ankruptcy court should not approve a disclosure statement if the proposed plan which it describes is incapable of confirmation"); (3) the best interests of creditors' test is not met under

section 1129(a)(7) because insured trusts have claims but receive nothing of value under the

plan; (4) Syncora has direct claims against the RMBS Trustees that are not derivative and that

are based on operative agreements to which Syncora and the RMBS Trustees are parties; and (5)

third parties should not have their attorneys' fees paid as a component of their allowed claims

under the Plan.

### 9.    United States Trustee's Limited Objection and Reservation of Rights
(ECF Doc. # 4031)

The United States Trustee ("UST") is concerned that absent clear language in the order

approving the PSA Motion, the granting of the PSA Motion will result in the approval of third

party releases and the treatment as administrative expenses of professional fees and expenses of

non-retained professionals, including the RMBS Trustees. With respect to the releases, the UST

requests that the proposed order contain an express provision explicitly stating that such broad

relief is not being granted by the Court at this time and that all parties' rights to be heard

regarding the legality of the third party releases are expressly reserved.

### 10.    Pension Benefit Guaranty Corporation's Limited Objection (ECF
Doc. # 4032)

PBGC is a United States government corporation, and an agency of the United States,

that administers the defined benefit pension plan termination insurance program under Title IV

of ERISA, 29 U.S.C. §§ 1301-1461 (2006 & Supp. V 2011). When a pension plan covered by

Title IV terminates without sufficient assets to pay promised benefits, PBGC typically becomes

the statutory trustee of the plan and pays covered plan participants and their beneficiaries their

pension benefits up to the limits established by Title IV.  GMACM sponsors the Employees

Retirement Plan for GMACM (the "Pension Plan").  The Debtors and Ally are members of

GMAC's controlled group.  The Pension Plan is a defined benefit plan covered by Title IV of

ERISA.  The Debtors, Ally and any other members of GMAC's controlled group have joint and several liability with respect to the Pension Plan for any unpaid minimum funding contributions owed to the Pension Plan and unpaid premiums owed to PBGC.

PBGC objects to the release language in the PSA that may arguably release Ally from its statutory obligations with respect to a pension plan covered by Title IV of ERISA.  PBGC believes this matter can be resolved by giving PBGC and the Pension Plan the same carveout from any releases that was given to the Federal Housing Finance Agency ("FHFA") and the Federal Deposit Insurance Corporation ("FDIC") in the PSA.

### 11. Huntington Bancshares Inc.'s Limited Objection and Reservation of Rights (ECF Doc. # 4033)

Huntington is plaintiff-appellant in *Huntington Bancshares Inc. v. Ally Fin. Inc. et al*., pending in the Minnesota Court of Appeals, Case No. A13-0247 (the "Huntington Action") against Debtors, Ally, and other defendants, and is the defendant in an adversary proceeding before this Court (Case No. 12-01671).  The Plan contemplates a global compromise and settlement of securities claims asserted against the Debtors and Ally, including the Huntington Action.  *See* Supplemental Term Sheet, at 7-9.  The Plan provides that a Private Securities Claim Trust shall be established for the benefit of the holders of securities claims against the Debtors and Ally, including Huntington, and that separate tiers of claims will be established based upon the nature and status of the claims.  Huntington understands that the claims in the Huntington Action are currently valued at $0 under the contemplated tier structure, due to the District Court's dismissal of the Huntington Action, but would otherwise be valued at significantly more based on the claims asserted and the anticipated recovery at the tier level where the Huntington Action would fall.  The PSA also provides for stays of litigation brought by the Creditors' Committee or a Supporting Party against the Debtors and Ally.

Huntington previously entered into stipulations with the Debtors to consensually stay the

Huntington Action, but such stipulations provided that briefing and argument on the appeal in

the Huntington Action could proceed.  The Huntington Action is proceeding only against AFI,

Ally and non-debtor defendants.  Huntington objects to the extent that the Motion, the Plan

Support Agreement, and/or the coming Plan stay, or may be construed as staying, the Huntington

Action.  Huntington also reserves its rights to object to any stay provision in the Plan.

### 12.   FHLBs' Objection (ECF Doc. # 4034)

The Federal Home Loan Banks of Boston, Chicago and Indianapolis ("FHLBs") make a

joint objection to the Motion.  They each have significant pending claims against Ally relating to

their roles in issuing, selling and underwriting private-label mortgage backed securities.  The

FHLBs object to the third-party releases of Ally in the PSAs and argue that the hearing on the

Motion should not take place until after the Examiner's Report has been unsealed.

The FHLBs also argue that heightened scrutiny should apply under *In re Innkeepers USA

Trust*, 442 B.R. 227 (Bankr. S.D.N.Y. 2010).  The issue whether the Debtors violated a fiduciary

duty to creditors is particularly important here, where the PSA seeks to release Ally from its own

liability.  They argue that because Ally sits on both sides of the transaction, as a creditor and the

major beneficiary of the PSA, the entire fairness doctrine is invoked.  They also argue that it is

impossible at this point to determine whether creditors that were not party to the negotiation, like

the FHLBs, have had their interests appropriately considered such that Ally and the Debtors

should be released from those creditors' claims.

In addition, the FHLBs argue that the PSA fails to provide specific details regarding how

Securities Claimants have been classified and what amounts will accrue to them or outline the

nature and scope of the Debtors' claims against Ally.  The FHLBs reserve the right to argue that

the Court lacks jurisdiction to approve the non-debtor releases. The FHLBs also argue

(erroneously) that the Consenting Creditors group is operating with a wealth of information,

including access to the Examiner's Report, which has been sheltered from public view.

### 13.    Frank Reed's Objection (ECF Doc. # 4038)

Frank Reed, a *pro se* creditor, objects to the section of the PSA involving the Debtors'

regulatory obligations.  He takes issue with the clause of one sentence of the PSA which states,

"unless the foreclosure review obligations are otherwise settled."  Reed asserts that prior to the

Debtor's filing of their petition, they voluntarily committed themselves to a consent order with

the Federal Reserve Bank that calls for the Debtor's specific performance of foreclosure review

obligations.  Post-petition, CEO James Whitlinger stated to the Court that the Debtors "intended

to comply with and adhere to the terms of the Consent Order to the best of their abilities."  Reed

asserts that over 27,000 borrowers are awaiting the results of the Independent Foreclosure

Review.  Because only 2,800 borrowers filed proofs of claim in the Debtors' cases, Reed

concludes that there are many borrowers relying on the Debtor's assertion that the foreclosure

review obligations will still be performed.  Reed cites judicial estoppel, equitable estoppel, and

assumption and waiver, holding that these principles prevent a party to act contrary to its prior

representation.  Reed asks that clause of the sentence of the PSA regarding the foreclosure

review obligations be stricken.[3]

---

[3]    At the start of the hearing on June 26, 2013, the Debtors' counsel announced that the Debtors have reached a proposed agreement with the Federal Reserve Board ("FRB") to amend the Consent Order with the FRB requiring the Debtors to complete an Independent Foreclosure Review.  The Court entered an order yesterday permitting the Debtors to deposit in escrow approximately $230 million that would be used to fulfill Debtors' obligation to borrowers under the proposed amended Consent Order.  (ECF Doc. # 4091.)  The Debtors must file a motion and obtain approval from this Court of the proposed amended agreement with the FRB within thirty (30) days.

C.      **Replies**

1.      **Ally's Reply**

Ally's reply responds to the objections of Syncora, Credit Suisse, and the FHLB, and

addresses the following issues: (i) the proper standard applicable to the approval of the PSA, (ii)

whether the Court lacks the authority to approve a post-petition PSA, and (iii) the third party

non-debtor releases.

Ally argues that the business judgment standard is the proper standard for approving the

PSA, and that this standard has been clearly met.  Furthermore, even if the Court applies the

entire fairness standard, Ally argues the PSA would meet the heightened scrutiny because of the

$2.1 billion Ally contribution, the active participation of the Creditors Committee and other key

constituents, the months of arms-length negotiations, and the mediation conducted by a sitting

federal bankruptcy judge.  Ally also notes that no objector has cited a single case holding that a

post-petition plan support agreement must be subject to a heightened scrutiny standard merely

because an insider was one of many parties to the agreement.

Second, Ally argues that the Court's authorization of the PSA is both required and

permissible.  Under the PSA, Court approval is required because it is a condition to the PSA.

Furthermore, Ally believes Court approval of the PSA is permissible under section 363(b)

because it is a contract that the Debtors seek to enter into that is outside of the ordinary course of

business.

Third, Ally argues that third party non-debtor release issues should be reserved for

confirmation and are premature at this juncture since the Debtors will not seek to have them

approved until plan confirmation.  However, even if the Court were to consider the releases, Ally

believes they would be appropriate under applicable law.  Ally argues that the Court has

jurisdiction because Ally and its non-debtor subsidiaries have contractual indemnification claims against the estates for the claims the PSA seeks to release, including all claims that would be asserted by Credit Suisse and Federal Home Loan Banks. Furthermore, there is a separate and independent basis establishing jurisdiction over the releases since the Debtors and non-Debtor Ally entities share insurance proceeds—meaning, if the claims are not released, it could deplete insurance funds, thereby reducing an asset of the Debtor's estate. Lastly, the releases are appropriate because of the significant $2.1 billion contribution to be paid by Ally.

### 2.    Debtors' Reply

The Debtors argue that plan and disclosure issues should not be litigated at the PSA hearing. The Debtors modified the Proposed Order to include an express broad reservation of all parties' rights to fully prosecute an objection with respect to any proposed disclosure statement, plan or motion that seeks to effectuate the terms of the PSA.

The Debtors argue that the business judgment standard is the proper standard for approval of the PSA and is distinguishable from *Innkeepers*, as the PSA was signed more than a year post-petition after months of mediation and after an extensive investigation by the Creditors' Committee and other key constituents. Nonetheless, despite no evidence of self-dealing or bad faith on behalf of the Debtors, the Debtors believe they would also satisfy the entire fairness standard. In support of their position that the Debtors satisfy either standard, the Debtors assert: (i) the PSA will provide a path to settlement of critical intra-Debtor and inter-creditor issues, will resolve potential litigation against Ally with Ally contributing $2.1 billion, and will avoid years of litigation costing tens of millions of dollars; (ii) the Debtors were represented in the mediation by a CRO who is an independent fiduciary without any connection to Ally, and the mediation was a multi-party endeavor in which the Creditors' Committee (acting

as a fiduciary for all of the estates' general unsecured creditors) took a leading role; (iii) the

mediation was heavily contested with multiple constituents with diverging interest contesting all

aspects of the PSA; and (iv) the mediation was led by Judge Peck.  The Debtors argue that the

PSA represents a series of compromises that, taken together, will bring billions of dollars into the

estates, thus refuting an objection that the Debtors' decision to enter into the agreement

constituted corporate waste.

The Debtors argue that the following "confirmation-related" objections are not ripe for

consideration: (i) the appropriateness of certain provisions anticipated to be included in the Plan,

including the expected third-party releases; (ii) the anticipated classification of certain claims and

allocation issues; and (iii) whether the intended treatment of certain claims is fair and equitable.

The Debtors do not believe the PSA hearing should, or is intended to, substitute for the plan

confirmation process, and is not the proper time for the Court to hear piecemeal objections to

particular provisions of a plan that is still in the process of being drafted.  The Debtors also note

that the PSA does not contain everything that is expected to be, and must be, contained in the

plan.

With respect to the factual findings, the Debtors believe the record supports the finding

that the the PSA is "in the best interests of the Debtors' estates, their creditors, the Institutional

Investors, the investors in each RMBS Trust, each such RMBS Trust, [and] the RMBS Trustees"

and that the "[t]he RMBS Trustees acted reasonably, in good faith and in the best interests of the

Institutional Investors, the investors in each RMBS Trust and each such RMBS Trust in agreeing

to the Agreement."  For support, in addition to the benefits provided by the PSA, the Debtor

points to the Kruger Declaration, the Declarations submitted by the RMBS Trustees, and the

work completed by Duff and Phelps.

As for certain individual objections, the Debtors argue that the JSN and UMB issues, such as the intercompany claims issues, are more properly reserved for plan confirmation. Furthermore, the Debtors note that they only waived their fiduciary out with respect to the Examiner's Report, as opposed to termination of the PSA for plan confirmation, if the need arises. As for Syncora, the Debtors note that Syncora is unable to articulate its claim against the Debtors, and reject the notion that they were stonewalled by the Debtors. With respect to Credit Suisse, the Debtors argue that the third party release issues should wait until the plan confirmation stage, and the Court has ample authority to approve the PSA under section 363(b), as it is a transaction outside of the ordinary course. Lastly, with respect to the Huntington Objection, the Debtors assert that the PSA does not contain a provision that prevents Huntington from pursuing its pending appeal, and Huntington's remaining concerns should be reserved for confirmation.

### 3.    Creditors' Committee's Reply

The Committee filed a response to the objections to the PSA Motion (ECF Doc. # 4064). It grouped its responses into four categories. First, the Committee argues that objections challenging the Debtors' entry into the PSA[4] should be overruled because: (1) the entire fairness standard does not apply (citing recent SDNY cases applying the business judgment standard to PSA motions and differentiating *Innkeepers*); (2) the Court need not unseal the Examiner Report to rule on the Motion because the parties had gathered significant information over the past year and unsealing the Report would prevent global resolution; and (3) the Court has authority to grant the Motion, as shown by many courts in this district approving PSA motions.

Second, the Committee explains that the Debtors have agreed to amend the PSA Order to provide that the findings of fact address only entry into the PSA, and not "the transactions

---

[4]    These objections were filed by Credit Suisse, Syncora and the FHLBs.

contemplated therein."  Moreover, the findings of fact are reasonable and supported by the record; the PSA need not have all the details that will be in the disclosure statement and plan; a "finding of fact" cannot constitute a release; and parties can still argue that the plan is not in the best interests of creditors at the confirmation stage.

Third, the Committee provides clarifications to many of the objections as follows:

- The Ad Hoc Group of JSNs seeks further information on the fiduciary out and the treatment of post-petition interest.  The Committee states that the PSA provides for a limited waiver of the fiduciary out, restricting only the ability to terminate the PSA based on findings in the Examiner's Report.  In addition, the PSA provides that the JSNs will be paid principal and pre-petition interest in full, and they will receive post-petition interest if it turns out they are oversecured.
- In response to the UST, the Committee asserts that the proposed Order is not intended to and does not approve the releases, classification or payment of professional fees.
- The Committee asserts that NCUAB is not included as a "Private Securities Claimant" because it failed to timely file a suit against Ally.
- The Committee says it will work with the GM Insurers on whether assignment of the Debtors' interests in insurance policies to Borrower Claims Trust would be insurance neutral.
- In response to Huntington Bancshares, the Committee states that the proposed Order would not implement a stay of the Minnesota Appeal, and the scope and merits of the release and injunction to be implemented through the Plan is a confirmation issue.
- The Committee provides that it will work with Syncora to ensure that the treatment of partially wrapped RMBS Trusts is adequately explained and reflected in the Plan.
- The Committee states it will work with PBGC to address its concerns regarding the impact the Plan may have on Ally's pension plan (which is none).

Last, the Committee asserts that the remaining objections are premature confirmation objections.  First, it notes that the parties need not show, at this point, that the plan is patently confirmable; that is a disclosure statement inquiry, not a PSA inquiry.  In any event, the following are confirmation issues: releases of Ally; insurance neutrality; the Court's jurisdiction over disputes between monolines and RMBS Trusts; the propriety of paying attorney fees;

classification, treatment, and recoveries; the allocation of administrative expenses; and distribution and reserve mechanics.

### 4.    Institutional Investors' Reply

AIG, Allstate, MassMutual and Prudential (the "Institutional Investors") filed a response to the objections (ECF Doc. # 4062).  These Investors collectively hold more than $1.75 billion in fraud and other claims against the Debtors.  The Investors support approval of the PSA Motion.  They argue that most of the objections go to confirmation of the plan and are not relevant to approval of the PSA Motion.  For instance, objections regarding third-party releases and classification should be dealt with at confirmation, and parties will have an opportunity to brief and argue these issues at that stage.

In addition, the Investors state that the NCUAB objection concerning the proposed form of order is resolved by adding language proposed below.  The NCUAB Objection had raised questions concerning paragraph 9 of the proposed form of order, which approves the "discretionary rights" set forth in the Treatment of Private Securities Claims section of the Supplemental Term Sheet.  This paragraph was included to highlight that because the complete terms of the Private Securities Claims Trust have not been fully negotiated, various parties will play a role in finalizing the terms of the Private Securities Trust Agreement.  Paragraph 6 of this Section states that "[t]he Private Securities Claims Trust Agreement, including the terms, methodology, criteria and procedures for distributing the Private Securities Claims Assets to holders of allowed Private Securities Claims" must be "in form and substance reasonably acceptable to the Settling Private Securities Claimants, each in their individual capacity."  The Settling Private Securities Claimants propose to add language to the order as follows: "The

discretionary rights granted in paragraph 6 of the Treatment of Securities Claims Section of the

Supplemental Term Sheet are hereby approved."

### 5.    RMBS Trustees' Reply

The RMBS Trustees focus specifically on the objections of AAM the monolines (Assured

and Syncora), the NCUAB, the US Trustee, and Monarch/Stone Hill and Freddie Mac.  Overall,

the RMBS Trustees argue that these objections "go beyond the [PSA]" and should be heard in

the context of confirmation of the Plan.  As for specific parties' objections, the RMBS Trustees

address them in the following manner:

To address AAM's main objection, the RMBS Trustees go into detail as to why they

believe the proposed claim allocation methodology is proper (*see* ¶¶ 8-18).

To address the monolines' arguments, the RMBS Trustees assert that (1) this Court does

have jurisdiction over the proposed findings of fact or any dispute between a wrapped trust and a

monoline, (2) the RMBS Trustees have the power to enforce (or settle) any of the RMBS Trust

Claims, and (3) to clarify the rights of partially wrapped trusts in the PSA, the parties would

modify the language in the PSA to make those rights clearer (*see* ¶ 32).

To address NCUAB's objection, the RMBS Trustees argue that the RMBS Trustee

Declarations provide support for the proposed findings.

To address the UST's objection, the RMBS Trustees assert that the payment of their fees

is already authorized pursuant to the Supplemental Servicing Order (ECF Doc. # 774) and the

Ocwen Sale Order (ECF Doc. # 2246).

Lastly, the RMBS Trustees believe that Monarch/Stonehill have incorrectly characterized

their representation on the record when Monarch/Stonehill wrote in their objection that "the

Proposed PSA Findings have no effect in such proceedings as agreed on the record of the June

17th conference." The RMBS Trustees understand the Court to have meant, at the June 17

conference, that the Monarch/Stonehill Reservation of Rights does not extend to reserving rights

to object to the PSA in its entirety, and that the Court will consider separately each and every

condition subsequent to the PSA as those matters arise before this Court.

## II.    DISCUSSION

### A.    Proper Standard of Review

Section 363(b) of the Bankruptcy Code provides, in relevant part, that a debtor, "after

notice and a hearing, may use, sell, or lease, other than in the ordinary course of business,

property of the estate." 11 U.S.C. § 363(b)(1). The debtor's sale or use of property of the estate

outside the ordinary course of business should be approved by this Court if there is a sound

business justification for the proposed transaction. *See In re Iridium Operating LLC*, 478 F.3d

452, 466 (2d Cir. 2007) ("In this Circuit, the sale of an asset of the estate under § 363(b) is

permissible if the 'judge determining [the] § 363(b) application expressly find[s] from the

evidence presented before [him or her] at the hearing [that there is] a good business reason to

grant such an application.'") (quoting *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel

Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983)). *See also Parker v. Motors Liquidation Co. (In re

Motors Liquidation Co.)*, 430 B.R. 65, 83 (S.D.N.Y. 2010) ("The overriding consideration for

approval of a Section 363 sale is whether a 'good business reason' has been articulated."); *In re

First Republic Group Realty, LLC*, 2010 WL 3638032 at *2 (Bankr. S.D.N.Y. Aug. 18, 2010)

(approving sale procedures and break-up fee upon finding that the sale "constitutes the exercise

of the Debtor's sound business judgment").

Once a debtor has articulated a valid business justification under section 363, a

presumption arises that the debtor's decision was made on an informed basis, in good faith, and

in the honest belief that the action was in the best interest of the Debtors. *See Official Comm. of Sub. Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)).   Further, once "the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *Comm. of Asbestos Related Litigants v. Johns Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986).

However, in interested party transactions, an entire fairness/heightened scrutiny analysis applies.  "In applying heightened scrutiny, courts are concerned with the integrity and entire fairness of the transaction at issue, typically examining whether the process and price of a proposed transaction not only appear fair but are fair and whether fiduciary duties were properly taken into consideration." *In re Innkeepers USA Trust*, 442 B.R. 227, 231 (Bankr. S.D.N.Y. 2010).  The business judgment rule, on the other hand, "shields corporate decision makers and their decisions from judicial second-guessing only when the following elements are present: (i) a business decision, (ii) disinterestedness, (iii) due care, (iv) good faith, and (v) according to some courts and commentators, no abuse of discretion or waste of corporate assets." *Id.*

This Court has previously considered whether to approve a PSA motion brought pursuant to section 363 of the Code.  *See, e.g., In re General Maritime Corp.,* No. 11-15285 (MG) (Bankr. S.D.N.Y. Apr. 2, 2012) (ECF Doc. # 421).  In *Innkeepers,* the Debtors sought approval of a motion authorizing the Debtors to assume a plan support agreement entered into with Lehman. Many parties, including the creditors' committee, objected or filed reservations of rights.  The PSA supported a plan term sheet that provided for Lehman to receive 100% of the equity issued in the reorganized debtor in exchange for its secured mortgage claims.  The parties disagreed

over the proper standard the court should apply in considering the motion.  Although Judge

Chapman did note that the heightened scrutiny/entire fairness standard from *In re Bidermann*

*Indus. U.S.A., Inc. (In re Bidermann),* 203 B.R. 547, 551 (Bankr. S.D.N.Y. 1997), may apply,

she did not need to decide which standard was applicable because the Debtors failed to meet

their burden under the business judgment test.

In these cases, the PSA resulted from a months-long, Court-supervised mediation

involving numerous parties.  The PSA contains numerous proposed compromises and

settlements of billions of dollars of claims.  Based on the evidence in the record, the Court is

satisfied and finds that the negotiations were conducted in good faith, with the Debtors

represented by the CRO, Lewis Kruger, who is an unconflicted fiduciary who is not beholden to

AFI.  Under these circumstances, the Court concludes that the business judgment standard is

appropriately applied.

**B.      Solicitation Under Section 1125**

Section 1125(b) provides that "[a]n acceptance or rejection of a plan may not be solicited

after the commencement of the case under this title . . . unless, at the time of or before such

solicitation, there is transmitted . . . a written disclosure statement approved, after notice and a

hearing, by the court as containing adequate information." 11 U.S.C. § 1125(b).  The word

"solicitation" is not defined in the Code.  However, "[c]ase law indicates that the term . . . should

relate to the formal polling process in which the ballot and disclosure statement are actually

presented to creditors with respect to a specific plan, and the term should not be read so broadly

as to chill the debtor's postpetition negotiations with its creditors."  7 COLLIER ON BANKRUPTCY

¶ 1125[1] (*citing In re Dow Corning Corp.*, 227 B.R. 111, 118 (Bankr. E.D. Mich. 1998); *In re*

*Kellogg Square P'ship*, 160 B.R. 336 (Bankr. D. Minn. 1993)). In *Century Glove, Inc. v. First*

*Am. Bank*, the Third Circuit said:

> "solicitation" must be read narrowly. A broad reading of § 1125
> can seriously inhibit free creditor negotiations . . . . The purpose of
> negotiations between creditors is to reach a compromise over the
> terms of a tentative plan. The purpose of compromise is to win
> acceptance for the plan. We find no principled, predictable
> difference between negotiation and solicitation of future
> acceptances. We therefore reject any definition of solicitation
> which might cause creditors to limit their negotiations.

860 F.2d 94, 101-02 (3d Cir. 1988). Collier elaborates on this by remarking that the object of the

chapter 11 process is to produce a plan that provides the best possible result for all parties. "To

achieve this end efficiently and economically, negotiation among the often competing economic

parties in interest, and the exchange of ideas and opinions among them and the debtor, should be

encouraged during the postpetition period and before a disclosure statement for a specific plan is

approved for circulation." 7 COLLIER ON BANKRUPTCY ¶ 1125[1].

Plan support agreements, or "lock-up agreements," have generally been approved by

courts in this and other districts. But in 2002, Judge Walrath entered orders in two cases, *In re*

*Stations Holding Co., Inc.* and *In re NII Holdings, Inc.*,[5] finding votes of creditors cast pursuant

to post-petition plan support agreements could not be counted because such agreements violate

the disclosure and solicitation requirements of section 1125. These cases have generally been

distinguished "on the grounds that the agreements at issue included specific performance

provisions, expressly providing that monetary damages could not compensate a breach of the

agreement, meaning the creditors could not later reconsider their preliminary decision after

receiving adequate information." 7 COLLIER ON BANKRUPTCY ¶ 1125[1][b] (*citing In re The*

*Heritage Org., LLC*, 376 B.R. 783, 794 n.13 (Bankr. N.D. Tex. 2007)). Accordingly, courts

---

[5]      These orders are neither available on Westlaw, Lexis, or PACER. The description here relies on the summary of the orders contained in Collier.

have reasoned that the plan support agreements in *Stations Holding* and *NII Holdings* were impermissible "only because the locked-up creditors could be forced to vote in favor of the plan regardless of the circumstances, which effectively rendered the agreements into votes, and the creditors were thereby 'stripped of the Bankruptcy Code's protection against the harm caused by solicitation without court-approved, adequate information.'"  7 COLLIER ON BANKRUPTCY ¶ 1125[1][b] (citing *In re The Heritage*, 376 B.R. at 793)).

Courts in this district, including this Court, have approved post-petition plan support agreements.  *See, e.g. In re AMR Corp.,* Case No. 11-15463 (SHL) (Bankr. S.D.N.Y. June 4, 2013) (ECF Doc. # 8577); *In re General Maritime Corp.,* No. 11-15285 (MG) (Bankr. S.D.N.Y. Apr. 2, 2012) (ECF Doc. # 421); *In re Great Atl. & Pac. Tea Co.*, No. 10-24549 (RDD) (Bankr. S.D.N.Y. Dec. 19, 2011) (ECF Doc. # 3060); *In re Chemtura Corp*., No. 09-11233 (REG) (Bankr. S.D.N.Y. Aug. 9, 2010) (ECF Doc. # 3527); *In re Tronox, Inc.*, No. 09-10156 (ALG) (Bankr. S.D.N.Y. Dec. 23, 2009) (ECF Doc. # 1030).

### C.    The Plan Support Agreement Should Be Approved In This Case

The PSA does obligate the Supporting Parties to vote in favor of the plan, but there are numerous termination events that allow a party to withdraw from this obligation under certain circumstances.  In addition, none of the Parties have agreed to vote in favor of the Plan unless and until the Court approves the disclosure statement and their votes have been properly solicited pursuant to section 1125.  As such, the Agreement does not constitute an improper "solicitation" under section 1125.

Moreover, the Debtors have met their burden of showing that the business judgment rule applies and that they exercised sound business judgment in reaching the Agreement.  The Agreement is the result of many months of mediation led by Judge Peck and it reflects a heavily

negotiated resolution supported by a substantial majority of the Debtors' major claimant

constituencies.  It is thus far from the type of interested party transactions that the courts in

*Innkeepers* and *Bidermann* dealt with.  *See Inkeepers*, 442 B.R. at 236 (PSA negotiations

involved only one creditor out of many); *Bidermann,* 203 B.R. at 551-52 (contemplating a

leveraged buyout of the debtor to an insider).  The PSA also purportedly provides for enhanced

recoveries for the Debtors' creditors far in excess of what such creditors would otherwise obtain

from the Debtors' estates.  The PSA is not manifestly unreasonable, nor has there been a

showing of bad faith, self-interest or gross negligence.  The Court finds that a preponderance of

the evidence introduced at the hearing supports approval of the PSA.

The findings of fact that each of the parties, including the RMBS Trustees, have acted in

good faith and in the best interests of its respective constituencies in entering into the PSA are

appropriate now and supported by the record.  The PSA resulted from nearly seven months of

mediation addressing scores of issues.

The evidence establishes that the RMBS Trustees participated fully and actively in the

mediation process.  They obtained expert advice from Duff & Phelps, LLC, a firm experienced

in evaluating mortgage loan servicing and origination issues, including representation and

warranty ("R&W") claims.  Duff & Phelps conducted substantial review of loan files, sampling

over 6,500 mortgage loan files, and projecting the range of future losses and potential R&W

claims that could be asserted.  The methodology used by Duff & Phelps has been recognized and

used in other cases asserting R&W claims, including for example in the recently tried case of

*Assured Guaranty Municipal Corp. v. Flagstar Bank*, No. 11 Civ. 2375 (JSR), 2013 WL 440114,

at *36:

> Sampling is a widely accepted method of proof in cases brought
> under New York law, including in cases relating to RMBS and

involving repurchase claims.  *See Syncora Guarantee Inc. v. EMC Mortg. Corp.,* No. 09 Civ. 3106, 2011 WL 1135007, at *4 (S.D.N.Y. Mar. 25, 2011); *MBIA v. Countrywide Home Loans, Inc.,* 30 Misc.3d 1201(A), 2010 WL 5186702 at *4 (N.Y. Sup. Ct. 2010).  Although Flagstar argues that the fact determination of material breach in any given instance requires consideration of an entire loan file renders the loans ill-suited to proof by statistical sampling, this argument is unpersuasive.  The very purpose of creating a representative sample of sufficient size is so that, despite the unique characteristics of the individual members populating the underlying pool, the sample is nonetheless reflective of the proportion of the individual members in the entire pool exhibiting any given characteristic.

The RMBS Trustees acted prudently, considered the advice of Duff & Phelps and the RMBS Trustees' legal advisors, and considered the potential litigation outcomes if no settlement was reached.  Based on the evidence in the record, the Court has no difficulty in concluding that the RMBS Trustees reached their decisions to sign and support the PSA in good faith and in what they believed was the best interests of the investors.

The Court's findings in the context of the approval of the PSA do not preclude a challenge to a plan that includes the proposed settlements embodied in the PSA and term sheets.  Moroeover, the findings of fact made in connection with approval of the PSA do not constitute a release of any claims.  The same is true for a challenge to the proposed FGIC 9019 settlement, which requires approval of this Court and the state FGIC rehabilitation court; the findings of fact in the PSA order do not preclude a challenge to the FGIC settlement.  Because of the unique circumstances regarding FGIC, the FGIC 9019 settlement will be considered by this Court prior to any confirmation hearing in this case.

Other than as discussed above, all of the objections raise issues that should be raised either in connection with a motion seeking approval of a disclosure statement (to the extent

creditors assert that the disclosure statement lacks adequate information) or, more likely, at the time of confirmation.  For purposes of the PSA Motion, the objections are all overruled.

### III.        CONCLUSION

For all of the above reasons, the Court **GRANTS** the PSA Motion.  A separate order has been entered (ECF Doc. # 4098).


Dated:    June 27, 2013
              New York, New York


_____*Martin Glenn*_____
MARTIN GLENN
United States Bankruptcy Judge